DAFLCHE1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5            v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x
                                        October 15, 2013
9                                       9:45 a.m.

10  Before:

11                  HON. LEWIS A. KAPLAN
                                        District Judge
12                      APPEARANCES

13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17
    FRIEDMAN RUBIN
18       Attorneys for Donziger Defendants
    BY:  RICHARD H. FRIEDMAN
19       DEE TAYLOR

20  LITTLEPAGE BOOTH
         Attorneys for Donziger Defendants
21  BY:  ZOE LITTLEPAGE
         RAINEY BOOTH
22
    GOMEZ LLC
23       Attorneys for Defendants Hugo Camacho, Javier Piaguaje
    BY:  JULIO C. GOMEZ
24

25

DAFLCHE1                   Trial

1              THE DEPUTY CLERK:  Chevron against Donziger, et al.

2              Counsel for plaintiff, are you ready?

3              MR. MASTRO:  Ready, your Honor.

4              THE COURT:  Good morning.

5              THE DEPUTY CLERK:  Counsel for defendant Donziger, are

6    you ready?

7              MS. FRIEDMAN:  Good morning, your Honor, yes.

8              THE COURT:  Good morning.

9              MS. FRIEDMAN:  Your Honor, it's actually Mr. Friedman.

10             THE COURT:  I'm sorry.  I've made that mistake quite a

11   lot.  I don't know why.  What can I say.  I apologize.

12             MS. FRIEDMAN:  No problem.

13             THE DEPUTY CLERK:  Counsel for defendants Camacho and

14   Piaguaje, are you ready?

15             MR. GOMEZ:  Ready to address the Court but not for

16   trial.

17             THE COURT:  All right, Mr. Gomez.

18             MR. GOMEZ:  Good morning.

19             THE COURT:  Good morning.  Go ahead, Mr. Gomez, if you

20   have anything to say.

21             MR. GOMEZ:  Well, your Honor, I requested a

22   continuance, a brief continuance, a week ago.  Your Honor

23   denied it.  The request was not made lightly.  It was made

24   because the time was necessary, and passage of one week has not

25   changed that situation.  We are simply not prepared.  I am

DAFLCHE1                      Trial

1    simply not prepared, your Honor, to bring this matter to trial

2    today because of the resources and the lack of assistance that

3    I have so far.  I filed a motion during the past week

4    indicating an alternative request that we proceed at a more

5    rational schedule.

6              THE COURT:  When did you file that?

7              MR. GOMEZ:  That was filed approximately Wednesday or

8    Thursday, if I recall, your Honor.  That schedule would require

9    a maximum of one witness per day to give me an opportunity as a

10   solo practitioner to defend my clients' interest, to be

11   prepared for the day in court, and to be able to provide some

12   sort of defense with some indication of dignity, your Honor.

13             Your Honor, as yet Chevron has opposed that motion.

14   Your Honor has yet to rule on it.  We await a ruling on that.

15   In any event, I want the record to be absolutely clear that by

16   my indicating that I am ready I am not waiving the motion that

17   I made last week that I need more time.  I just want that to be

18   clear, your Honor.  Thank you.

19             THE COURT:  All right.  You made it clear.  I will

20   deal with this more comprehensively at a subsequent time.

21             I will at this moment make this adjustment in the

22   schedule.  We will not sit this Friday.  I may make a further

23   adjustment.

24             You are already aware that there are several days

25   during the final week of October where I indicated previously

DAFLCHE1                    Trial

1    we would not be sitting.  That effectively would give you, in

2    substance, the break between the plaintiff's case and the

3    defendant's case that you asked for.  I had spoken last week

4    about the possibility of sitting that week if the budget

5    situation in Washington is such that the previous commitment

6    that I have resulted in my being here rather than elsewhere.

7           I will now make this further adjustment, that the

8    three days that I indicated we would not sit in late October we

9    will not sit regardless of what happens in Washington.

10          Beyond that, I'll have a good deal more to say

11   shortly, but we are going to proceed this morning.

12          I note that with the current tally of proposed

13   witnesses by plaintiffs and defendants, your proposal would

14   require 108 trial days to try this case.  Last week you stood

15   in my courtroom and said the case could be tried in three

16   weeks.

17          Okay.  We will now proceed.  Opening statement,

18   Mr. Mastro.  Please use the lectern.

19          MR. MASTRO:  Thank you, your Honor.

20          It's been a long, hard road to get here, but the

21   judgment day is at hand, and for that I and my client Chevron

22   are extremely grateful.  We're here today, your Honor, to right

23   a wrong, to expose a $19 billion fraud and extortion scheme and

24   to hold accountable those responsible for it.

25          First and foremost, your Honor, this is a RICO case.

DAFLCHE1                    Opening – Mr. Mastro

1   The head of this racketeering enterprise, the cabeza, the Don,

2   is right here in this courtroom, Steven Donziger, who right

3   here from Manhattan as a U.S. lawyer has masterminded and

4   orchestrated this scheme largely out of the U.S. in collusion

5   with other U.S. lawyers, U.S. consultants, and U.S. funders, in

6   collaboration with Ecuadorian coconspirators, who conspired

7   together as an enterprise for a common purpose to engage in a

8   pattern of racketeering, committing multiple acts of wire and

9   mail fraud, extortion, bribery, obstruction of justice, witness

10  tampering, and money laundering; all with one aim –– to try to

11  pressure a deep-pocketed U.S. victim into paying them off to go

12  away.

13          Your Honor, it's a shakedown scheme, pure and simple,

14  one predicated on lies, billion dollar lies, and now it's time

15  to hold Donziger and his coconspirators accountable for those

16  lies.  And we will prove them, your Honor, lie after lie.

17          Your Honor will recall the very first time I came into

18  this courtroom three and a half years ago and played for you a

19  clip from the movie Crude.  It's offered as Plaintiff's Exhibit

20  No. 4.  It's a clip of Steven Donziger in his own words

21  explaining what he was about to do barging into an Ecuadorian

22  judge's chambers ex parte with cameras rolling.  And his words

23  that day were, This is something we would never do in the

24  United States.  This is just out of bounds, both in terms of

25  judicial behavior and what lawyers would do.  But Ecuador, you

1    know, there's almost no rules here.  And this is how the game

2    is played, dirty.  And we'll prove at this trial that's exactly

3    how Steve Donziger played the game, dirty.

4              Over time he became obsessed with making the big score

5    at Chevron's expense because in his own words on those film

6    outtakes -- and forgive me, your Honor, some of the language

7    that I have to use today is quoting Steven Donziger -- Donziger

8    is in the business of plaintiff's law and "the business of

9    plaintiff's law is to make fucking money."

10             Donziger and his coconspirators have lied and bribed

11   and bullied and ghostwritten their way through the Ecuadorian

12   court system, ghostwriting court documents themselves, even the

13   $19 billion judgment in their own favor.  And they've used the

14   false narrative they created in Ecuador both here in the United

15   States and throughout the world like a club to try bludgeon

16   Chevron into submission.

17             As part of his self-proclaimed Chevron pressure

18   campaign, Donziger has lived by one rule, his words

19   memorialized to his cocounsel, "If you repeat a lie a thousand

20   times it becomes the truth."

21             So Donziger kept telling the same lies over and over

22   again, lying to Congress, to the SEC, to the New York attorney

23   general, to the U.S. courts, among others, about the

24   multibillion dollar damage assessment coming out of Ecuador

25   from the supposedly quote/unquote independent court expert,

DAFLCHE1                    Opening – Mr. Mastro

Richard Stalin Cabrera, that it now turns out -- and it's not

denied -- was secretly ghostwritten by Donziger's team itself

just to get Chevron investigated, colluding with Ecuadorian

officials to get bogus criminal charges brought against two

Chevron attorneys, one of whom you'll hear from as your first

witness in this trial, Mr. Veiga, and the other of whom had to

spend the last years of his life in exile, separated from his

homeland and his family as a result, in implementing a foreign

enforcement strategy laid out in Invictus to, quote, place

settlement pressure on Chevron by, quote, selecting

jurisdictions that offer a path of least resistance and allow

prejudgment attachments that, quote, compound the pressure

already placed on Chevron.

        But the pressure applied here through lies and fraud

goes by another name -- it's called extortion.  And that's what

Steve Donziger and his cronies have been trying to do to

Chevron, coerce a big pay day out of the company to make the

pain go away.  But Chevron didn't give in.  It stood up for its

tens of thousands of employees and shareholders.  It refused to

be extorted and defrauded and that's why we're here today.

        What I want to do in my brief time, your Honor, is set

the stage for what's to come in this case because so much of

the evidence at this trial comes out of Steve Donziger's own

mouth and out of the mouths of his coconspirators.  And it's

their own words and their own documents that prove our case,

1   shocking, smoking gun evidence of Donziger and his

2   coconspirators in their own words on film outtakes, in their

3   own notebooks, in their own private internal communications,

4   all of which they thought would never see the light of day but

5   U.S. court after court throughout this country, including here,

6   ordered them to produce, candidly confessing their crimes and

7   confirming if the truth comes out, "all of us, your attorneys,

8   might go to jail."

9          Instead of coming clean, Donziger and his

10  coconspirators doubled down, obstructing the truth from coming

11  out in the U.S. long enough to buy time to try to -- their

12  words -- cleanse the Ecuadorian court record of the Cabrera

13  fraud and fool funders into giving them the lifeline they

14  needed to keep their scheme going.  And then with their scheme

15  about to unravel, they cut their boldest deal of all, pay the

16  Ecuadorian judge a $500,000 bribe in exchange for which they

17  got to ghostwrite the judgment in their own favor.

18         Because as Steve Donziger put it, for the court in

19  Ecuador, this was all, quote, just a bunch of smoke and mirrors

20  and bull shit.  We have enough to get money.  And the money was

21  plenty of motivation for Steve Donziger, your Honor.  He stands

22  to gain $1.2 billion if these defendants collect on their

23  fraudulent $19 billion Ecuadorian judgment.  It's that

24  inescapable hard evidence from the defendant's own mouths and

25  files that we're going to present to your Honor at this trial,

1    along with the testimony, live or by deposition, of at least a

2    dozen of Donziger former confederates now testifying again him:

3    U.S. cocounsel, U.S. consultant's counsel, U.S. consultants,

4    U.S. employees, U.S. funders, and even Ecuadorian

5    collaborators, all of whom have turned on Donziger and come

6    forward to acknowledge their role in this scheme and the ways

7    in which Steve Donziger lied, manipulated, and misled them.

8           Let me go through who your Honor is going to hear from

9    very briefly.

10          Former cocounsel Jeffrey Shinder, Constantine Cannon

11   firm, hired to be coordinating counsel on the 1782s.  John

12   McDermott, hired to be local counsel on the Stratus 1782.  When

13   Donziger stonewalled them on information about Stratus's role

14   in the production of Cabrera's report, Shinder insisted that he

15   speak directly to Stratus and after he did, when he came out of

16   that meeting, he called Steve Donziger and he told him, he said

17   one minute after he got out of that meeting he had to quit

18   because he was sickened and disgusted by what he learned and

19   Stratus had actually ghostwritten the Cabrera report.  And John

20   McDermott then filed suit withdrawing, telling Steve Donziger

21   he could not put his firm's ethical and professional reputation

22   at stake by continuing to represent Steve Donziger's client.

23          And you'll also hear from Richard Kornfeld, successor

24   counsel on the 1782 for Donziger's clients.  I can't tell you

25   what he's going to say.  He'll be happy to tell you when he

DAFLCHE1                    Opening - Mr. Mastro

gets here why he withdrew.  They have asserted a privilege

objection, the same ones found to be covered by waiver, and

we'll hear from Mr. Kornfeld when gets on the stand about why

he felt compelled to leave the case.

        Stratus's counsel, Mr. Silver and Mr. Beier, by

deposition.  Mr. Shinder will be in this courtroom,

Mr. McDermott by deposition.  Stratus's counsel by deposition

will tell your Honor that Mr. Donziger and his legal team

leaned on him to try to prevent Stratus depositions from going

forward and from their document production going forward in a

timely way and that Mr. Silver was so outraged that he hung up

the phone because, in his own words, confirmed in documents, he

didn't want to be part of an obstruction and have to say he

participated in a conversation about obstruction.

        Your Honor, the Stratus consultants themselves.

You'll hear from one or more of the folks at Stratus.  That's

Doug Beltman, Ann Maest, and Josh Lipton.  At least one of them

will be here to testify live.

        And, your Honor, let me just explain, Mr. Beltman and

Ms. Maest had to admit they had ghostwritten the Cabrera

report.  They now have come forward and sworn that they did

that.  They've renounced that report as based on invalid

assumptions that Donziger gave them.  And they've said that

they renounce their prior testimony of trying to cover it up

and saying things like only 5 percent of the report was written

DAFLCHE1                    Opening - Mr. Mastro

1   by us.

2           And your Honor will hear from Josh Lipton, the head of

3   Stratus, because Doug Beltman and Ann Maest are no longer

4   there.  When Josh Lipton, the head of Stratus found out what

5   his own people had really done, when he found out that Doug

6   Beltman had lied to him about that 5 percent and that they had

7   really ghostwritten the Cabrera report, he was appalled and

8   outraged.  You'll hear that from him on the stand, your Honor.

9           We're going to hear from other former consultants like

10  Mark Quarles, who Donziger got to sign an affidavit in this

11  very courthouse before Judge Sand attesting to Cabrera's

12  independence.  And when Quarles found out that that wasn't

13  true, he candidly admitted in his deposition he never would

14  have done that if Steve Donziger had not pressed him to do

15  that.

16          And you'll hear live from David Russell, by deposition

17  from Dr. Charles Calmbacher, Russell -- Donziger gave him

18  unwarranted assumptions to come up with a remediation damages

19  estimate.  The unwarranted assumptions got it up to 6 billion.

20  And then when Russell got on the ground and started to learn

21  the truth himself, he told Steve Donziger not to use it, it was

22  not valid, Donziger kept using it, kept using the lie to put a

23  big figure out there to pressure Chevron.  And Russell sent him

24  a cease and desist letter.  It was off by an order of magnitude

25  of ten or more, no longer valid, and Donziger kept using it

DAFLCHE1                      Opening - Mr. Mastro

1    over and over and over again even though he knew it was a lie.

2          And Dr. Charles Calmbacher, he was their expert on the

3    ground at those joint inspections, your Honor.  He did reports.

4    Steve Donziger didn't want those reports to be submitted in the

5    way Dr. Charles Calmbacher had written them.  So what did Steve

6    Donziger do?  He pressed him to give signature pages, and then

7    the reports filed in Ecuador were not his report.  His

8    signature, not his report, not his findings.  Steve Donziger

9    engineered that and used the U.S. mails to do it.

10         His former employees, Andrew Woods by deposition, and

11   Laura Garr, who we expect to be here, your Honor, in this

12   courtroom, both admitting that Donziger misled them about the

13   Cabrera ghostwriting and never told them that Stratus had

14   written the report.  Laura Garr was sent on a mission to

15   Ecuador when the scandal first broke, sent on a frolic and

16   detour when Donziger knew darn well that Stratus had

17   ghostwritten the report in coordination with local Ecuadorian

18   counsel.  You'll hear that testimony too, misled and lied to

19   his own employees.

20         The Ecuadorian collaborators.  I'll talk more about

21   former Judge Guerra a little later, your Honor.  He'll be here

22   in this courtroom.  And, of course, Fernando Reyes, an

23   Ecuadorian who Donziger paid to pretend to be an independent

24   expert to try to influence the court on those joint inspections

25   in the early part of this case when he was on Donziger's

1   payroll all along.  You'll see his deposition.  You'll have his

2   testimony.

3           And, finally, the former funders, Joe Kohn, Chris

4   Bogart.  They'll both be here in this courtroom and they will

5   both tell you the same thing, that Donziger lied to them,

6   manipulated them, never told them the truth about the Cabrera

7   ghostwriting fraud.  And if they had known the truth, they

8   never would have continued to fund in Mr. Kohn's case, never

9   would have funded in Mr. Bogart's case, at a critical time when

10  the fraud was unraveling and they had to hide the truth to get

11  Burford to put money in to keep their scheme going when it was

12  on fumes.

13          And, your Honor, you're going to hear the defendant

14  say, oh, these witnesses, they were pressured to come forward,

15  they were lawsuits or threats of lawsuits, well, your Honor,

16  the contemporaneous documents tell the tale because Mr. Kohn

17  wrote to Donziger in August 2010 to say you lied to me, you

18  defrauded me.  And Chris Bogart at Burford wrote to Donziger in

19  2011 to say you lied to us, you defrauded us.

20          Contemporaneous documents tell the tale.  They'll be

21  coming into this courtroom and the other witnesses to tell

22  their truth to this Court.  It's contemporaneously documented.

23          Your Honor, I want to cover a couple other points this

24  morning because your Honor is so familiar with the record

25  already and we will, in proving all the frauds that occurred at

DAFLCHE1                        Opening – Mr. Mastro

1   Ecuador at this trial, your Honor knows them –– the early

2   frauds in the joint inspection process Russell and Calmbacher

3   and Reyes will testify about; the Cabrera ghostwriting and

4   bribery fraud; the blackmailing of the Ecuadorian judge to end

5   those joint inspections, confirmed in their internal documents,

6   and appoint a single global damages expert, Cabrera, and then

7   hijacking his supposedly independent process by bribing him

8   with funds acquired from the U.S. into what they called

9   themselves our secret account and having his report

10  ghostwritten secretly word for word by U.S. consultants at

11  Stratus and elsewhere in the United States, unbeknownst to

12  Chevron and apparently even the Ecuadorian court that they and

13  Cabrera repeatedly submitted lies claiming he was independent;

14  the cleansing expert fraud, as Donziger's legal team sought to

15  obstruct the truth from coming out here about the Cabrera

16  ghostwriting, repeatedly lying to U.S. courts, U.S. Congress,

17  here in the Southern District of New York, courts, and in

18  Colorado, at the same time trying to cleanse the Ecuadorian

19  court record of the Cabrera tape by getting a U.S. consulting

20  firm, Weinberg –– and you'll see the testimony on this, your

21  Honor, from the depositions –– to coordinate filing new U.S.

22  cleansing reports based on Cabrera's report without telling

23  those experts Cabrera wasn't independent, without them having

24  any time to do independent work or visiting Ecuador and, like

25  deja vu all over again, ghostwriting some of their reports.

DAFLCHE1                    Opening - Mr. Mastro

1              All culminating, your Honor, in the judgment

2      ghostwriting form where Donziger's team ghostwrote the

3      $19 billion judgment in their own favor, even though under

4      Ecuadorian law, only the judge can write the judgment and only

5      after reviewing the entire record in the case and only write it

6      himself based on the record, not anything outside the record.

7      And we'll prove that judgment ghostwriting at this trial, your

8      Honor.  We'll prove it beyond any reasonable doubt.

9              We'll prove that right out of Donziger's team's own

10     files, nowhere else to be found in the record.  There are many

11     documents that appear word for word, sometimes in word strings

12     of as much as 150 words in a row in that judgment.  That only

13     happens one way -- they ghost wrote it.

14             Your Honor, that's more than plagiarism.  It's worse

15     than plagiarism.  It's a fraud on the court system and now on

16     all those enforcement courts where they're going around the

17     world peddling a judgment they ghostwrote themselves.  And it's

18     the errors in those internal documents, Donziger team's own

19     internal documents, that particularly give them away, that show

20     up in the judgment word for word, error for error, like

21     fingerprints on the judgment itself, the misquoting of a case

22     and the miscitation of another case that has nothing to do with

23     trusts about the Taharto trust email, yet the misquoting of the

24     case and the miscited case show up word for word, cite for cite

25     in the judgment.

DAFLCHE1                          Opening – Mr. Mastro

1          The Selva Viva database, Selva Viva being the entity

2    that Donziger was president of, that database shows up, even

3    though never put into the court record, with all of the errors

4    and misspellings and punctuation and miscitations and the SV

5    denomination that has nothing to do with citing samples, shows

6    up 70 times in the judgment error for error, capitalizations,

7    punctuations, miscitations, error for error, 70 times.  And the

8    complete misstatements of Australian and California law of

9    causation in the Moody's memo that somehow shows up, same

10   errors in articulating Australian law, same errors in

11   articulating California law.  Your Honor, that's no accident.

12   That's ghostwriting.  And that's why we'll call forensic and

13   linguistic and legal experts to confirm in every particular, to

14   which defendants have no response and no experts they could

15   even find to call to pay anything on that subject.

16          So the only remaining question, your Honor, is not

17   whether the judgment was ghostwritten, it's how it came about.

18   And we now have the answer from an insider, former judge

19   Alberto Guerra, the first judge on this case.  He has come

20   forward as an insider to tell what happened.  They bribed the

21   Ecuadorian judge Nicholas Zambrano 500,000 to ghostwrite the

22   judgment themselves.

23          Now, the defendants attack Guerra because he's gotten

24   money for his hard evidence, perfectly proper.  He's gotten

25   living expenses to allow him and his family to be able to come

DAFLCHE1                    Opening - Mr. Mastro

here because of their safety and security, very, very grave

safety and security concerns.  And they attack him because he's

admitted he's a criminal.  Well, your Honor, we didn't pick

Judge Guerra.  Donziger and his cronies picked Judge Guerra to

commit crimes with.  And Guerra merely corroborates what the

hard evidence from Donziger's teams files already proves, that

he was on Donziger's team's payroll to ghostwrite Zambrano's

orders in this case throughout the case, ghostwrite them.

          They even in their own internal documents refer to him

as the puppeteer whom they had to pay to move the puppet

Zambrano.  And Guerra's account is corroborated in every

particular by the hard evidence he's provided that he was

Zambrano's ghost writer after Guerra left the bench and that he

participated in the ghostwriting of the judgment -- 112

Zambrano orders on Guerra's computer, including nine from this

case; shipping records to Zambrano; bank records showing direct

deposits from Zambrano into Guerra's account and even from

Selva Viva -- that's Donziger's organization -- into Guerra's

account because he was being paid for a period of time a

thousand dollars a month by the plaintiff's team, Donziger's

team, to ghostwrite the orders in the case; and even a memory

aid document, a summary of the case history, given to him to

help edit the judgment after they had ghostwritten it so it

would read more like a judicial opinion, all produced by

Alberto Guerra to support his account.

1           So now Donziger says this case -- you heard it last

2     Wednesday -- boils down to whether Guerra is telling the truth

3     about the bribe or whether Nicholas Zambrano is.  Well, of

4     course, that's not true.  Donziger's other frauds, like the

5     Cabrera fraud, irreparably tainted the Ecuadorian proceedings

6     and we'll prove it here.  Indeed, Cabrera's ghostwritten report

7     shows up all over the judgment in its damages categories, in

8     its pick count, in its causation assessment, and through the

9     cleansing experts who show up in the judgment, among others,

10    and we'll prove all that at this trial.

11          And, of course, Donziger's extortion pressure campaign

12    in the United States predicated on lies didn't rely on the

13    judgment that were lies he told and repeated over and over

14    again, hoping people would believe the lies.  And the evidence

15    at this trial will prove that ghostwriting of the judgment

16    regardless, but Guerra's account of how this happened is based

17    upon the hard evidence at every turn.

18          What about Zambrano?  They say he's going to come

19    here, a reluctant witness.  They say he'll finally appear, but

20    apparently without producing any of their Ecuadorian documents

21    or his Ecuadorian documents that would prove up this scheme.

22          Now, I had a date with Mr. Zambrano in Lima, Peru last

23    spring, but he didn't show.  And if he actually shows now, I

24    intend to give him a big New York welcome.  But his bare

25    unsworn account thus far, your Honor, I can only say is

DAFLCHE1                        Opening - Mr. Mastro

ludicrous on its face.  Unidentified documents supposedly left
on his doorstep which he says he considered in writing the
judgment but never made part of the court record?  Work he
claims he did during the first four months of these
proceedings, his tenure, reviewing the record, preparing the
judgment, even though that's illegal under Ecuadorian law, and
even though the evidentiary record had not been closed.  He had
no reason to believe, unless he's a soothsayer, that the judge
who succeeded him would be recused from the case on a motion
that had yet to be made.

          And his supposed speed reading and speed writing
abilities, reviewing a 236,000 page record and writing a
188-page, single-spaced judgment that a renowned expert in the
field will testify would have been impossible for Zambrano
humanly to have accomplished during his two short tenures on
the case before the judgment issued.  And even by his account,
we will prove that what he claims to have done was in direct
violation of several basic tenets of Ecuadorian law.

          Moreover, if Zambrano shows here, we'll prove he was
removed from the bench even in corrupt Ecuador shortly after
issuing this judgment for "malice and inexcusable error."  In
fact, that disciplinary charge hung over his head like a sword
of Damocles while he was working on this case knowing full well
how the Correa government wanted it to turn out.  What did
Zambrano do?  It's telling, your Honor.  He released on his own

DAFLCHE1                    Opening – Mr. Mastro

recognizance a Colombian FARC drug dealer armed to the teeth

who was caught fleeing the scene of a 500-kilo cocaine bust and

once released was never to be seen from again.

But now the defendant says Zambrano will come here to

testify.  And perhaps that's because since the time he stood me

up in Lima, Donziger's friends in the Correa government got

Zambrano a legal associate job with Petroecuador's new oil

drilling joint venture with Venezuela and China, rife with

ironies, your Honor, that pays almost three times what the

position is listed for in the company's listed salary index.

In any event, who's to be blamed here?  Guerra, who

admits his crimes and corroborates his account with hard

evidence, or Zambrano, the elusive witness and disgraced former

judge who's now on the ROE's payroll?  Your Honor will have the

opportunity to judge that for himself.

And when the defendants try to tell you none of this

matters because the Ecuadorian judgment was affirmed on appeal,

sounds a little bit like collateral estoppel they say they're

not arguing, your Honor.  Your Honor will recall the Ecuadorian

appellate opinion said, quote, this is the clarification order,

Plaintiff's Exhibit 431.  It states out of these accusations

preserving the parties' right to continue the course of the

actions that have been filed in the United States.  In fact, in

Plaintiff's Exhibit 430, the original Ecuadorian appellate

decision, refers specifically to the RICO action here.  And the

DAFLCHE1                         Opening - Mr. Mastro

1    court there having no confidence -- that you should decide the

2    foreign RICO.

3            Now, your Honor, before I conclude, I wanted to

4    address briefly Chevron's separate claim for fraud or should I

5    say many frauds.  First there's Donziger's fraud on his former

6    U.S. funders, Joe Kohn and Chris Bogart of Periphery.  Both

7    will testify live at this trial that Donziger lied to them and

8    defrauded them into providing the funding necessary to keep

9    this scheme going that they never would have funded had they

10   known the truth.  Donziger defrauded each of them in funding

11   his scheme so that he could continue to harm Chevron.

12           Donziger's fraud is also attributable to his

13   codefendants Camacho and Piaguaje, who under New York law bear

14   legal responsibility for any acts that Donziger took as their

15   agent or that they ratified when they re-upped their powers of

16   attorney in late 2010, regardless of whether they personally

17   participated in them.  Although make no mistake, your Honor,

18   they not only turned a blind eye to their agent's misconduct,

19   they have also continued to front in lawsuits filed here in New

20   York and around the world as Donziger and his cronies seek to

21   enforce their fraudulent $19 billion judgment.

22           So Donziger's frauds to Chevron's detriment on U.S.

23   funders, on U.S. regulators, on the U.S. Congress, and other

24   courts around the world will also be proven at this trial, and

25   all of the defendants are liable for it.

1          In closing, your Honor, let me touch briefly upon what

2     we expect to be the defendant's case because so much of what

3     Chevron alleges these defendants did they have not and they

4     cannot dispute.  So what can we expect defendants to say?

5          Donziger will claim his own damning admissions are

6     being taken out of context, although what he'll claim is

7     context is often the rambling self-serving unsubstantiated

8     hearsay that has no place in this trial.  And no one took

9     Donziger out of context when he went up to Congress himself in

10    2009 and testified "the best and most recent independent

11    estimate" comes from "the court, the expert appointed by the

12    court, Richard Cabrera."

13         Donziger will also claim he's just acting as a lawyer

14    in a hard fought litigation against a well-heeled adversary

15    doing what he had to do.  He'll say the ends justify the means.

16    He even wrote about this approach in his own notebook.  He

17    called it "a new paradigm, not only a case, but also how to do

18    a case.  Chevron wanting to settle, billions of dollars on the

19    table, a movie, a possible book.  I cannot keep up with it."

20         But this isn't a new paradigm for how to do a case,

21    your Honor.  It's a familiar story of racketeers targeting a

22    deep pocket for a big score.  Donziger sees billions of dollars

23    on the table.  He's become all about the money.  This is no new

24    paradigm.  It's fraud and extortion.

25         So if Donziger gets away with it here, targeting this

DAFLCHE1                    Opening - Mr. Mastro

U.S. company in a foreign country susceptible to corruption and
then corrupting the process to try to force a payoff, who will
be the next U.S. victim of this "new paradigm"?  It will be
open season on U.S. corporations in corrupt foreign
jurisdictions and that's what's at stake here.  It's time to
put a stop to this new paradigm right here and now and call it
what it is, a crime.

          And at the end of this trial, we'll come back to your
Honor and ask for RICO liability findings against Donziger and
fraud liability findings against all of these defendants and
we'll ask for equitable relief, your Honor, that prevents them
from ever profiting from their crimes because Donziger and his
codefendants shouldn't profit one penny from this fraudulent
$19 billion Ecuadorian judgment they got through fraud and
bribery and blackmail and then ghostwrote for themselves.
Maybe they thought they could get away with this in Ecuador
because, as Donziger said, it's dirty there.  But in his own
words, "This is something you would never do in the United
States."  But he did it here from the United States and he
targeted a U.S. victim, and for that he and his fellow
defendants have to be held accountable.

          Thank you, your Honor.

          THE COURT:  Thank you.  We have an interpreter to be
sworn before you begin.

          (Interpreter sworn)

 1            THE INTERPRETER:  Anton Tabuns, T-A-B-U-N-S.

 2            THE COURT:  Mr. Friedman.

 3            MS. FRIEDMAN:  Thank you, your Honor.

 4            Your Honor, I would like to respectfully suggest that

 5   the time for name calling is over.  The nice thing about a

 6   trial is that it gives both sides at the same time to present

 7   the fact finder with the evidence, all the evidence either side

 8   thinks is relevant in a context that allows the Court or the

 9   jury to get a perspective it doesn't get from the written word

10   or sometimes the spoken word.

11            Let me say that at the end of this trial I think an

12   objective fact finder will conclude that Mr. Donziger did not

13   bribe the judge, that the people that worked with him did not

14   bribe the judge.  There are aspects of the way the Ecuadorian

15   legal system works that are different than the way our system

16   works.  And when we look at those things through our own

17   glasses, some of those things seem odd, maybe suspicious, if

18   you want to look at them that way.

19            For years though Chevron begged, bargained, did

20   everything it could to move the Ecuadorian plaintiffs.

21            THE COURT:  Excuse me to interrupt you.  Go right

22   ahead.

23            MS. FRIEDMAN:  For years, your Honor, Chevron begged

24   and bargained with the courts in this circuit asking, pleading,

25   that the Ecuadorian's case be sent to Ecuador for trial.  It

DAFLCHE1                      Opening - Mr. Friedman

1    eventually got its wish.

2              Mr. Donziger had serious concerns about going there.

3    He and the lawyers that worked with him fought very hard, as

4    this Court knows, to stay out of Ecuador.  He had very serious

5    concerns about whether the Ecuadorian courts would be able to

6    provide justice to his clients.  The people he represented were

7    a disfavored minority in Ecuador similar to the ways American

8    Indians, even African-Americans had been treated in this

9    country.  They were looked down upon.  There were racial or

10   ethnic slurs directed at them as a commonplace part of that

11   country, and they did not have political power.

12             Many in the judicial system identified with the

13   economically powerful forces in that country.  And Chevron, to

14   be sure, was one of the most economically powerful forces in

15   that country.  Like Thurgood Marshall, like Ralph Nader, like a

16   most of other civil rights and human rights lawyers before him,

17   Mr. Donziger understood that to get justice for his client

18   there would need to be both legal change and social change.  He

19   couldn't have one without the other.  They had to go hand in

20   hand.

21             So, yes, he felt the judges needed to be pressured.

22   He felt that they needed to have a spotlight on their

23   activities so things could not be done secretly in the dark

24   behind the scenes.  He thought that judges needed to know that

25   the public and the politicians were watching.

1            And just like Chevron, he did his best to gain

2    attention and gain advantage with the public and the

3    politicians in Ecuador.  Over and over again -- and the Court

4    has seen plenty of the documents already, I know -- over and

5    over both sides went to politicians, went to the public, tried

6    to create an atmosphere in which their side would win, much

7    like the atmospherics that took place, the very serious

8    atmospherics that took place in the south during the 1960s.  It

9    wasn't pretty.  There were a lot of moments that nobody can be

10   proud of on either side.  But there was not bribery, at least

11   by the people represented on this side of the table.

12           Working in a foreign country, working in a foreign

13   court system that he knew very little about in the beginning --

14   I think the Court knows Mr. Donziger was only a couple years

15   out of law school when he started working on this case.  No one

16   in Ecuador had ever handled a case of this size and complexity,

17   and Mr. Donziger was trying to do something that had never been

18   done before.  He was trying to hold a multinational corporation

19   responsible for the environmental harm that it had caused to a

20   third world country, and the remarkable thing is he managed to

21   change the way people think about that.

22           He's here because he managed to get justice for his

23   clients against all odds.  He's here because the only way

24   Chevron can avoid paying for this judgment is to attack him, to

25   attack the court system it once so lovingly described, to

1    attack the judges who work in that court system, to attack

2    virtually every person who lent any assistance to be

3    Ecuadorian's efforts for justice.

4            And if the Court can go back, I'm sure it's repeatedly

5    read Chevron's complaint in this case, virtually everyone in

6    the world is accused of being a coconspirator.  Interestingly,

7    many of the things Chevron accuses the affected Ecuadorians and

8    Mr. Donziger of doing Chevron itself did.

9            I want to talk briefly about two things that

10   Mr. Mastro mentioned to the Court because I think they're

11   indicative of how this case is put together.  He mentions a

12   Crude clip where Mr. Donziger is saying he would never do this

13   in the United States.  We're going to ask the Court to watch

14   the whole clip.  And I guess I'll use the word take because

15   when the camera starts and then the camera ends, we call that

16   maybe a take.  The clip is the part Chevron selected out of

17   that take to show to the Court.

18           Mr. Donziger going with the media to a judge's

19   chambers, something we wouldn't do here ordinarily.  It's not

20   uncommon for, especially before 2009, for lawyers to go ex

21   parte.  But, you know, the interesting thing about that clip is

22   it wasn't ex parte.  If you watch the rest of the clip, you'll

23   see the Chevron lawyer is there too also, from our perspective,

24   in our eyes, haranguing the judge.  And if you look at these

25   clips in context, and I don't think it's unfair to ask the

DAFLCHE1                    Opening - Mr. Friedman

1    Court to consider things in context, you're going to see some

2    remarkable things.

3         One of the things you'll see is that very clip

4    Mr. Mastro talked about:  If you repeat a lie a thousand times

5    it becomes the truth.  If you watch the clip, your Honor, he's

6    expressing his fear about what Chevron is doing.  He's

7    essentially saying they're getting away with this, they're

8    repeating a lie a thousand times, it becomes the truth.  Over

9    and over and over again the tsunami of out-of-context clips has

10   washed over this court.  What we're going to ask the Court to

11   do is step back and watch things, read things in a context

12   that's never been provided before.

13        Your Honor asked Chevron a while ago to clarify its

14   claims, and the Court accepted Chevron's characterizations --

15   this is at docket 720 -- that the discrete inquiry here will be

16   whether the judgment's findings have any support untainted by

17   fraud in the record that existed before the Ecuadorian court.

18        You're going to hear a lot of evidence that was

19   untainted by fraud.  If permitted, we intend to show you

20   evidence in the record, much of it Chevron's own evidence.  If

21   you read the verdict over and over again, the judge, Judge

22   Zambrano, is citing Chevron's own experts and disregarding for

23   various reasons plaintiff's experts.

24        So what did Steven Donziger do to cause a fraudulent

25   verdict?  That's really at the heart of this case.  You're

DAFLCHE1                    Opening – Mr. Friedman

going to hear about the Zambrano verdict and the clarification

also written by Judge Zambrano.

        Then you're going to hear in essence about three

buckets of evidence, your Honor.  There's the various random

acts of Mr. Donziger, many of which I think at the end of this

case you'll see are covered by various privileges, including

the First Amendment, the right to petition the government.  A

lot of it is unseemly, a lot of it is rude, a lot of it is not

the way we would like to conduct ourselves perhaps from this

courtroom in New York.  But the world in Ecuador was different,

and he was faced with a different set of challenges than most

of us are ever faced with.

        You're going to hear about the Cabrera material.  And,

finally, you're going to hear about the bribing of the judge.

        What you're going to see is that the random acts don't

lead to any verdict.  Most of what Mr. Mastro spent his time

talking to the Court about today doesn't go anywhere.  It I

guess is admissible, and you'll be able to take it into account

to kind of judge Mr. Donziger's state of mind at various

points, but it didn't cause the verdict.

        If you look at the Cabrera evidence, what you're going

to hear, and Mr. Donziger, what you're going to hear is that

Mr. Donziger in his deposition admitted Stratus wrote the

executive summary and parts of the annexes.  And, your Honor,

what you're going to hear is there are actually four parts to

DAFLCHE1                    Opening – Mr. Friedman

1    the Cabrera report.  And by far the largest part is the data,

2    the scientific data that was collected by Cabrera and others

3    where there's really no dispute.  That is the data.

4          What you're going to hear though is that about

5    5 percent of the report, the executive summary and some other

6    parts, were in fact written by Stratus.  And we'll leave for

7    later the debate about the implications of that, but one

8    implication is clear.  Mr. Donziger and the people associated

9    with him took steps to downplay their involvement in authoring,

10   helping to author the Cabrera report.  It's beyond dispute.

11         The problem is that it doesn't lead anywhere.  The

12   problem for Chevron is that the judge noted the objections, the

13   allegations of fraud, and he says I'm not going to rely on the

14   Cabrera report.  And as a result, a giant chunk of the damages

15   dropped out of the case, billions of dollars dropped out of the

16   case.

17         So in the United States, this might be the appropriate

18   litigation sanction.  Mr. Donziger might even be put up to the

19   bar on ethical charges.  But it didn't play a part in the

20   verdict, the verdict that was designed to provide justice for

21   the harm done to the people living in the Ecuadorian region.

22         So the Cabrera verdict doesn't lead anywhere.  It

23   doesn't, I'm sorry, the Cabrera report doesn't lead anywhere.

24   The only way to get to where Chevron wants to get, the discrete

25   inquiry of whether or not fraud tainted the verdict in Ecuador

DAFLCHE1                     Opening - Mr. Friedman

1    has to be arrived at through the allegations of bribing the

2    judge.

3              I'm sorry, I got a little ahead of myself.  This is

4    the slide that shows that Judge Zambrano did not consider the

5    report, the Cabrera report.  And this is one example in the

6    second box, your Honor, there, throughout the verdict repeated

7    references to the Court is going to rely upon the Chevron

8    experts and not the plaintiff experts in arriving at its

9    verdict.

10             As the Court is aware, the Court of Appeals of Ecuador

11   provides de novo review, not like our appellate courts.  In

12   fact, the judgment, the verdict of Judge Zambrano, did not even

13   become effective.  It could not even be enforced until after

14   the Court of Appeals ruled on the verdict and did its own de

15   novo review.  It did its own de novo review.  And as far as

16   I've heard and seen in this case -- maybe I've missed

17   something; I've only been involved a short time -- I haven't

18   seen any allegations that the judges on the Court of Appeals

19   were biased or bribed or corrupted in some way.

20             They went back in the record -- and we'll be

21   presenting you with their order and clarification -- and what

22   you're going to see is that they specifically take up most of

23   the allegations you're going to hear in this courtroom, and one

24   by one they knock them down.  They say Chevron says this isn't

25   in the record or that it comes from an improper place and then

DAFLCHE1                    Opening - Mr. Friedman

 1  they go and say here's where it is.  It is in the record.  In

 2  fact, Chevron, you introduced it into the record.  Not every

 3  time, but over and over again they take up Chevron's positions

 4  and say it is right here in the record.

 5          So the Ecuadorian appellate court provides de novo

 6  review, it looked back into the record, it cited to the

 7  findings of Chevron's own experts.  Go to the next one.

 8          And so Chevron's case does come down to a story

 9  provided by a single witness.  An admitted liar, someone who is

10  soliciting bribes from the very beginning of his involvement in

11  this case, whose story has changed multiple, multiple times on

12  big issues and small issues, Alberto Guerra.

13          Here's what Chevron paid for the testimony of Alberta

14  Guerra:  18,000 in cash delivered in a suitcase, state of the

15  art computer, an additional $20,000 payment, new cell phones,

16  all travel and moving expenses for Guerra, his family, his

17  son's family from Ecuador to the United States.

18          I'm going to stop there, your Honor, and just say

19  you're going to hear that's a big deal.  The American dream is

20  alive and well in the third world, and getting a ticket to

21  America is a very big deal.  Mr. Guerra got not only himself to

22  the United States, but his entire family and his son's family.

23  He's getting 12,000 a month since he came here, new car, health

24  insurance for him, his family, payment for a lawyer to

25  represent him in dealing with any federal or state authority,

DAFLCHE1                    Opening - Mr. Friedman

1   civil matters, and payment for an immigration lawyer for

2   everyone in his family.  That's what Mr. Guerra got out of the

3   deal.

4          So here's Mr. Guerra's story.  And really it begins

5   before Judge Zambrano where Mr. Guerra and a Mr. Hanson, Mr. --

6   I'm sorry, a Chevron contractor and a drug trafficker

7   approached a sitting judge in Ecuador and tried to get him to

8   take a bribe.  That's Mr. Borja.  And they are saying they are

9   looking for proof that Ecuador is corrupt.  And they film

10  several conversations with this judge, Judge Munoz, the judge

11  they approached, clearly turned down the bribe, although

12  Chevron tried to suggest he was considering or taking it.  I

13  think several of the courts that looked at all this material,

14  federal courts, said it's clearly not him taking a bribe.  He

15  turned it down.  But he wound up recusing himself because he

16  probably shouldn't have talked to these gentlemen in the first

17  place.

18         Judge Zambrano is temporarily assigned to the case at

19  that point.  Judge Zambrano, as you know, is assigned to the

20  case twice.  So first he is assigned to it at this point when

21  Judge Munoz drops out of the case.  And, again, Chevron's story

22  is they were taping or their people were taping this contact

23  with Judge Munoz so they to show how corrupt the Ecuadorian

24  system was.

25         (Continued on next page)

1          MR. FRIEDMAN:  Well, Zambrano was then substituted in

2     for Judge Munoz.  Mr. Guerra, who is no longer on the bench

3     himself, he is no longer a judge, he says that at Zambrano's

4     request he approaches Chevron.  So Chevron, who supposedly

5     wants to get proof of corruption in the Ecuadorian system,

6     doesn't report this.  This is in August of 2009.

7          In that August of 2009, he tells Chevron, in effect,

8     he can fix the case.  And Chevron doesn't report this, doesn't

9     film him, apparently just lets that pass.

10          Then Mr. Guerra says later, in September of 2010, when

11     Judge Zambrano was back on the case, he was only temporarily

12     assigned as acting judge the first go-around, in 2010,

13     Mr. Guerra says, again at Judge Zambrano's request, he is sent

14     out again to approach Chevron, and again Chevron is so

15     interested in finding corruption, doesn't tape him, doesn't

16     report it, just sits on the information.

17          So now they approached him twice.  Chevron doesn't put

18     him under surveillance, doesn't do a thing about it.

19     At some point Mr. Guerra says he then went to the

20     plaintiffs -- I'm sorry, I got that wrong.  He says at some

21     point -- oh, yes, he went to plaintiffs and was turned down.

22     Plaintiffs said, we can't pay you, according to Judge Guerra.

23          So at the directions of Mr. Zambrano, Judge Zambrano,

24     Guerra again, now for the third time, approaches

25     Zambrano -- I'm sorry, approaches Chevron.  I apologize, your

DAF8CHE1                    Opening – Mr. Friedman

1    Honor.  The story keeps changing, and I got that wrong so let
2    me start over.  Guerra says that in 2010, Judge Zambrano tells
3    him that he has made a deal on his own, and he wants Guerra to
4    help him write a verdict.  And the deal, as Mr. Guerra is told,
5    is that in the future, if plaintiffs recover money, they will
6    pay 500,000 -- he says 300 and then he says 500,000 to Judge
7    Zambrano, which he and Mr. Guerra will split.
8            So according to Mr. Guerra, he and Mr. Zambrano are
9    now working for the plaintiffs.  They write a verdict that is
10   actually ghost written by the plaintiffs, but Mr. Guerra comes
11   in and works extensively on it for over ten hours to get it
12   into shape.  The verdict comes out.
13           Then it goes all the way up on appeal to the Court of
14   Appeals.  And then in April of 2012, Judge Zambrano is no
15   longer a judge.  Mr. Guerra, of course, is no longer a judge.
16   According to him, when the appellate decision is out and the
17   judgment is enforceable, at that point in time, Mr. Zambrano
18   sends Mr. Guerra out to Chevron again, the third time he has
19   been sent out to solicit money by Mr. Zambrano by Chevron.
20           This time Chevron says yes.  They pay him a lot of
21   money.  They send him and his family to America.  They execute
22   a deal, a written agreement with him.  And Chevron sends Guerra
23   back to have his own operatives contact Zambrano.  They want
24   him to be a bridge to Zambrano.
25           And Zambrano, who supposedly has three times solicited

DAF8CHE1                    Opening - Mr. Friedman

1    a bribe from Chevron, who three times has coordinated with

2    Guerra to get money from Chevron, is no longer a judge, whose

3    life is no longer going very well.  He has offered to name his

4    price, Judge Zambrano, offered to name his price.  We have

5    gotten Guerra out, we can get you out, land of milk and honey,

6    lots of money.  And Zambrano, who has been soliciting this all

7    along, now says, No, I am not interested and, in fact, reports

8    the whole thing to the police.

9            Guerra has no explanation for why Judge Zambrano, who

10   over and over supposedly was soliciting bribes, suddenly wasn't

11   interested.  I would suggest to the Court that Judge Guerra

12   conned Chevron, and he is going to try to con you.  Con men

13   know that the easiest way to con people is by telling them

14   things they want them to believe.  This Court may want to

15   believe that Steven Donziger and his associates bribed a judge.

16   Lord knows he has given this Court --

17           THE COURT:  Mr. Friedman, you came in here, you talked

18   about objectivity and getting the evidence on the table in a

19   neutral way, and that's the last time I am going to tolerate

20   that sort of a suggestion in this courtroom.  Now proceed.

21           MR. FRIEDMAN:  I am sorry, your Honor.  Which

22   suggestion?

23           THE COURT:  Think carefully about it.

24           MR. FRIEDMAN:  I don't want to violate your order.

25           THE COURT:  I will take that to be an accident that

1    time.  It better not happen again.  Proceed.

2              MR. FRIEDMAN:  I really want to follow your orders, if

3    you could tell me what I did.

4              THE COURT:  Read the transcript later.  Go ahead.

5              MR. FRIEDMAN:  To deliver a verdict for Chevron in

6    this case, your Honor, you have to first believe this

7    incredible story.  Then you have to venture out on to the shaky

8    legal limbs that Chevron is suggesting to this Court.  You have

9    to say there is a RICO injunction available to private

10   plaintiffs.  You have to say that a New York common law fraud

11   claim can be brought here for bad acts done in a foreign

12   country.  And you have to say that the Ecuadorian legal system,

13   rated by one independent agency, is better than 55 percent of

14   the countries in the world, is not up to the task of policing

15   itself.  Because the Supreme Court of Ecuador has all of this

16   before it, there is also a separate criminal investigation

17   going on as well that I think the Court is going to hear, if it

18   hasn't already in this trial, you're going to have to say that

19   across 3,000 miles, across a language barrier, across a

20   cultural barrier you're better able to resolve this issue than

21   the people and the judges in Ecuador.

22             And if you do that, this truly will be a new paradigm

23   case.  We are going to ask you not to do this at the end of

24   this trial.

25             Thank you.

DAF8CHE1                    Opening – Mr. Friedman

1          THE COURT:  Let's take a very short break.

2          (Continued on next page)

DAFLCHE3                    Opening – Mr. Gomez

1         THE DEPUTY CLERK:  Would the interpreter, Mr. Luke

2    Weiss, please rise and raise your right hand.

3         (Interpreter sworn)

4         THE INTERPRETER:  Luke Weiss, W-E-I-S-S.

5         THE COURT:  Okay.  Now, Mr. Gomez, when we had our

6    final pretrial conference, we allocated 30 minutes opening for

7    the plaintiffs and 30 minutes shared by the defendants.

8    Mr. Friedman has used it up, but if you want to make a brief

9    opening, I'll allow you.

10         MR. GOMEZ:  I appreciate that, your Honor.  Very

11    briefly.

12         THE COURT:  Proceed.

13         MR. GOMEZ:  Your Honor, approximately 20 years ago,

14    Ecuadorian plaintiffs like my clients, Hugo Camacho and Javier

15    Piaguaje, were in this court, right here in the Southern

16    District, seeking justice and accountability for Texaco's

17    pollution in the Oriente region of Ecuador.  At that time

18    Texaco argued that case did not belong in New York.  It argued

19    that any indication about pollution in Ecuador belonged in

20    Ecuador.  It argued that Ecuadorian courts were fair and

21    impartial, and this court sent the Ecuadorians packing.

22         Twenty years later Chevron is back forcing the

23    Ecuadorians to return against their will to a court that has no

24    jurisdiction over them, crying that it couldn't get a fair

25    trial in Ecuador, crying that it was defrauded.  Chevron wants

 1   this Court to believe that a multibillion dollar company, one

 2   of the richest in the world, is the victim of a farmer, a canoe

 3   operator, and a couple of attorneys like Steven Donziger

 4   working out of his apartment.

 5        It wants this Court to believe that Chevron was unable

 6   with its army of lawyers like we see here today, its

 7   infrastructure, its massive resources, its largess, to fully

 8   and fairly present its case in a little provincial court in

 9   Lago Agrio, Ecuador.  Not true, your Honor.

10        Hugo and Javier did not defraud anyone, nor did their

11   attorneys.  They did not lie to anyone.  They did not cheat.

12   And this Court will never see any evidence that they asked

13   anyone to do so, knew about it if it happened, or that anyone

14   materially relied on anything to Chevron's detriment in any

15   meaningful way.  And they certainly did not bribe any judge.

16        The judgment at issue in this case is one of the most

17   important judgments in history -- $18 billion against a

18   multinational company.  When was the last time we saw a U.S.

19   court with the guts to issue a judgment like that?  No wonder

20   Chevron has come back to the United States.  But it comes to

21   this court, your Honor, with unclean hands.

22        Chevron never had any intention to play by the rules

23   in Ecuador, and it hasn't played by the rules or fairly here.

24   Many of the witnesses that Mr. Mastro pointed out have either

25   been threatened with economic annihilation, your Honor,

1   compensated for their evidence.

2            Chevron and its lawyers are going to ask this Court to

3   steamroll us through this trial.  Chevron is going to ask this

4   Court to let it off the hook.  And Chevron waived millions of

5   dollars in damages because it did not have the courage to face

6   a jury.  No, sir, Chevron is counting on you.  Chevron is going

7   to show you what kind of a case real money can buy -- perfectly

8   scripted testimonies, edited out-of-context video, and lots of

9   fancy experts, your Honor, professors of law, forensics, real

10  CSI-type stuff.  Because Chevron has spared no expense, your

11  Honor, spent millions even, to avoid ever having to pay a dime

12  to clean the land where my clients live.

13           Thank you.

14           THE COURT:  Thank you.  All right.  Mr. Mastro, your

15  first witness.

16           MR. MASTRO:  Your Honor.

17           MS. FRIEDMAN:  Your Honor, could I address the Court

18  for just a minute?

19           THE COURT:  Yes, sir.

20           MS. FRIEDMAN:  Your Honor, there's one issue that --

21  couple issues actually.

22           The main one I wanted to mention is this issue of the

23  Doe witnesses.  I'm a little uncomfortable starting to

24  cross-examine witnesses knowing nothing about two to four of, I

25  guess, crucial witnesses in this case.

DAFLCHE3

```
 1              THE COURT:  Two of them are on the witness list, only
 2    two of them?
 3              MS. FRIEDMAN:  That's right.  They dropped two.  I
 4    forgot.
 5              I don't know how you're planning to proceed or how
 6    Chevron is planning to proceed.  But I think before I start
 7    cross-examining, maybe they have -- the Court will know and if
 8    in fact these witness have nothing to do with the witness I'm
 9    cross-examining, then it doesn't matter.  But if they do have
10    something to do with the witness I'm cross-examining, I think
11    we need to address that.
12              MR. MASTRO:  Your Honor, they do not have anything to
13    do with either the first two witnesses.  We noticed, noticed to
14    the Court last night that we wanted to raise this issue.  So we
15    hope we'll be able to do it at the end of the trial day, but I
16    can't imagine it will have any implications with Mr. Veiga or
17    Mr. Bogart, our first two witnesses.
18              THE COURT:  I think that's right.
19              And Mr. Friedman, Mr. Gomez has read their affidavits,
20    and certainly he's in a position to say to you at least whether
21    they have anything to do with these witnesses.
22              MS. FRIEDMAN:  Mr. Gomez is being very careful about
23    what he tells me, your Honor.
24              THE COURT:  Well, I hope he is.
25              MS. FRIEDMAN:  I don't blame him.  So, no, I don't
```

DAFLCHE3

 1   know if they relate.  And I don't think he feels comfortable

 2   telling me really anything, understandably.

 3             THE COURT:  We'll deal with that shortly.

 4             MS. FRIEDMAN:  The other issue I had was whether the

 5   Court as a matter of practice invokes evidence Rule 615 or if

 6   it's been invoked in this case, I just don't know.

 7             THE COURT:  Well, if I remember the number correctly,

 8   I do on request.  Let me just make sure we're talking about the

 9   same rule.

10             MS. FRIEDMAN:  The exclusion of witnesses, your Honor.

11             THE COURT:  I invoke it on request.

12             MS. FRIEDMAN:  And I guess I would request that it be

13   invoked.  And, well, I guess before I request that, I would

14   like some guidance from the Court and Chevron about how that

15   would be interpreted because we have this procedure where we've

16   got these declarations that are written of direct testimony,

17   sort of in my experience unusual.

18             THE COURT:  It's not unusual.  Probably a majority of

19   the judges in this court and others with which I'm familiar do

20   this.

21             MS. FRIEDMAN:  I understand.  I'm just unfamiliar with

22   it, your Honor.

23             And so what I'm trying to understand is, for example,

24   if the rule is invoked, would that prohibit us, both sides,

25   from showing direct witness statements of one witness to

DAFLCHE3

1    another witness?

2                THE COURT:  What's your view on that, Mr. Mastro,

3    Mr. Gomez?

4                MR. MASTRO:  Well, your Honor, we haven't invoked the

5    rule.

6                THE COURT:  He has.  So could we?

7                MR. MASTRO:  Yes.  I would think under those

8    circumstances, if he invokes it, we shouldn't be showing

9    witness statements of one witness to another.

10               THE COURT:  Do you have any different view, Mr. Gomez?

11               MR. GOMEZ:  No, your Honor.

12               THE COURT:  Do you have any different view?

13               MS. FRIEDMAN:  No, your Honor.

14               THE COURT:  All right.  That's the ruling.

15               MS. FRIEDMAN:  Can I say one more thing, your Honor.

16               I just I want the Court to know I'm very concerned

17    about following your orders and doing this right.  And I've

18    never been -- it's not my practice to come into court and be

19    unprepared on the facts of the law.  But, frankly, I'm not

20    asking for a continuance.  I'm just letting the Court know that

21    Ms. Littlepage and I are going to make mistakes of fact and

22    law.  We're working very hard to avoid that, but.

23               THE COURT:  I certainly accept that.

24               MS. FRIEDMAN:  Thank you, your Honor.

25               THE COURT:  Until proven otherwise, I assume all

DAFLCHE3

1    lawyers before me are acting in total good faith.

2              MS. FRIEDMAN:  My point, your Honor, is we've only

3    been involved in the case for a few weeks, and it's a complex

4    case.  I just I feel bad that I made the mistake in opening,

5    and I'm going to do my best to not make mistakes.

6              THE COURT:  I appreciate that.

7              MR. MASTRO:  Your Honor, just a couple things before

8    we start.

9              I just want to clarify that if Mr. Donziger's lawyer

10   says now invoked that rule and asked the Court to sequester

11   witnesses, first of all, obviously up until now there's been no

12   sequestration, so the extent any witness saw anything that

13   another witness was doing, of course.

14             But, your Honor, I don't actually know in this

15   courtroom whether they have other witnesses in this courtroom.

16   I see Mr. Piaguaje is here and Mr. Donziger.

17             THE COURT:  They're parties.

18             MR. MASTRO:  Of course.  But I also have here in this

19   courtroom Mr. Pate, who is the general counsel of Chevron.

20   He's on their witness list for some reason although they never

21   deposed him.  He's Chevron's legal representative.  I would ask

22   for an exception for him.

23             THE COURT:  The rule provides that parties and

24   representatives of parties, that is, officers and directors --

25   let me not ad lib it.  A party who is a natural person, an

DAFLCHE3

1    officer or employee of a party that is not a natural person if

2    that person is designated as the party's representative by its

3    attorney, and a person whose presence a party shows to be

4    essential to presenting the claim or defense.  All are

5    permitted in the courtroom notwithstanding the invocation of

6    Rule 615.

7              If you're designating Mr. Pate as Chevron's

8    representative, then he's entitled to be here.

9              MR. MASTRO:  Thank you, your Honor.  I am.

10             Your Honor, I do see, now that I've had to chance to

11   look around the courtroom, I see Ms. Hinton, Karen Hinton.  I'm

12   looking forward to cross-examining her.  She's on their witness

13   list.  So the sequestration would apply to her, your Honor.

14             THE COURT:  All right.  Ms. Hinton, you have to leave

15   the courtroom.

16             MR. MASTRO:  Your Honor, just one other clarification.

17   I should have mentioned the exhibit number of something I

18   referred to in my opening, that's PX1059.  That's an email

19   Mr. Donziger writes, if you tell a lie a thousand times,

20   there's no mention of Chevron in it.

21             Now, your Honor, the first thing I wanted to do before

22   we call our first witness is, as I said I would do on

23   Wednesday, is offer all of the designated deposition testimony

24   that Chevron is designating as part of its affirmative case.

25   And we have put it together the way your Honor asked us to and

DAFLCHE3

1     worked it out with the defendants.  We're offering the

2     deposition testimony of 20 witnesses and four of the witnesses

3     at the sanctions hearing.  We have included in that all of

4     their counterdesignations for any of those 24 depositions.

5     We've also included with it all of our objections to any of

6     their counterdesignations, both in terms of beyond the scope of

7     context as well as other evidentiary objections.

8              They have not actually stated objections yet, your

9     Honor to our designations.  So I don't know when they intend to

10    do that, but we certainly have asked them repeatedly to do

11    that.  They have not.

12             We have here both the video versions of all the

13    depositions.

14             THE COURT:  I got the point.  The exhibit numbers are

15    what?

16             MR. MASTRO:  We marked them, your Honor, Exhibit B for

17    the depositions and Exhibit C for the hearing designations.

18             THE COURT:  They have numbers, right?

19             (Continued on next page)

20

21

22

23

24

25

DAF8CHE4

1          MR. MASTRO:  We designated them B and C, but we can

2     get a number.  It's not a problem.

3          THE COURT:  I am confused.  Exhibit B is what exactly?

4          MR. MASTRO:  Exhibit B is all of the designations from

5     depositions and Exhibit C is all the designations from the

6     sanctions hearing.

7          THE COURT:  All right.  Is there any objection?

8          MR. FRIEDMAN:  I just want to make sure I understand,

9     because Mr. Mastro started out talking about witness

10    declarations.

11         MR. MASTRO:  Depositions.

12         THE COURT:  Perhaps you misheard.

13         MR. FRIEDMAN:  He is moving in Exhibit B, which is all

14    the deposition designations.  We do not have an objection to

15    that.

16         THE COURT:  And C is the designations from the

17    testimony of the sanctions hearing.

18         MR. FRIEDMAN:  I apologize, your Honor.  Ms.

19    Littlepage tells me we do have objections to the deposition

20    designations.  I thought those had been presented to Chevron

21    and they have not been.

22         THE COURT:  When you say you have an objection, you

23    have an objection to any and all of that testimony or are you

24    saying that you have specific objections to individual

25    questions and answers?

DAF8CHE4

1          MR. FRIEDMAN:  Yes, the latter.

2          THE COURT:  You provided them to the plaintiff?

3          MR. FRIEDMAN:  We have not done that.

4          THE COURT:  When do you propose to do that?

5          MR. FRIEDMAN:  We are working on it.  We are trying to

6     get it done.  We'd like to have about a week to get it to them.

7          THE COURT:  I am going to then receive B and C,

8     subject to the filing on or before October 21 of the

9     plaintiff's objections to specific questions and answers.  What

10    I will do with that, as I may have indicated to you previously,

11    is that any objections that were made to the form of questions

12    at the depositions are preserved.  Considering the deposition

13    testimony, I will take into account the defendants' objections.

14    To the extent, if any, that the objections prove to be

15    material, I will rule on them specifically in my ultimate

16    determination.  If I rely on something in my ultimate

17    determination, as to which there was objection without ruling

18    specifically, you may take it that the objection is overruled,

19    but your points are all preserved.

20          MR. FRIEDMAN:  Very well.  Thank you.

21          (Plaintiff's Exhibits B and C received in evidence)

22          THE COURT:  So you have until October 21 for the

23    specific objections.

24          MR. FRIEDMAN:  Thank you, your Honor.

25          THE COURT:  All right.  Anything else?

DAF8CHE4

1          MR. MASTRO:  I am just handing up the disks.

2          THE COURT:  All right.

3          MR. MASTRO:  One more matter before we call our first

4    witness.

5          THE COURT:  What you have handed up is an external

6    hard drive.

7          MR. MASTRO:  Correct.  We also have the paper record

8    of the booklets.

9          THE COURT:  Fine.  The clerk will mark the paper

10   record.  We will do that later, not right now.  Give it to the

11   clerk at the close of the day.  And the hard drive you have

12   handed up says deposition designations.  Does this include

13   Exhibit C also?

14         MR. MASTRO:  Yes, your Honor.  It includes Exhibit B

15   and Exhibit C.

16         THE COURT:  So let's mark the hard drive here, a copy

17   of Plaintiff's Exhibit B and C, and the hard copies will be

18   marked in due course.

19         Are you ready to proceed?

20         MR. MASTRO:  Yes, your Honor.  One more motion that we

21   have.

22         Your Honor, we have prepared and ready to move the

23   admission of all of our trial exhibits, and we have prepared

24   for the Court a detailed index of the documents,

25   cross-referencing why authenticity and admissibility are

DAF8CHE4

1    established, and any cross-references to where they appear in

2    the record already.

3         Your Honor, under Rule 801(d)(2) about how half of

4    these documents, 1200 or so, come straight out of defendants'

5    own files or the files of their agents and co-conspirators.

6    About 400 of these documents come out of the Lago Agrio court

7    record of foreign government documents and from other foreign

8    courts.  And under 902(3), the vast majority of them have

9    already been accompanied by official certifications.  The rest

10   are in the process of getting that, but they are presumptively

11   authentic.  We have no reason to believe there will be any

12   objection to them.

13        There are 900 other documents that are not being

14   offered for the truth of the matters asserted.  We have tried,

15   as we have explained, to get the cooperation of the defense.

16   They had all these documents since the pretrial order, even

17   before that, because we exchanged them.

18        THE COURT:  And these are plaintiff's exhibits

19   numbered what?

20        MR. MASTRO:  They are numbers 1 through 2508, your

21   Honor.  We have withdrawn several of the documents.  So what we

22   are about to hand up to the Court withdraws Plaintiff's

23   Exhibits 218 through 220, 661 through 665, 667 through 671,

24   673, 1168, and 1673 through 76.

25        It's also the case, your Honor, we have all of the

DAF8CHE4

1    crude clipped transcripts reviewed by our expert court

2    transcriber and translator who will be testifying at this

3    trial, Cristina Arsuaga, and she has found in some instances,

4    working off a high-definition platform, she could hear some

5    additional words.  So we are offering those transcripts.  It's

6    17 out of 93 transcripts.  She will be here to authenticate

7    them here in person.

8            THE COURT:  She will be here to authenticate later.

9            MR. MASTRO:  We have replaced within the exhibit group

10   the final transcripts that she will authenticate.  So subject

11   to that connection, they are within this group.

12           That really covers it, your Honor.

13           THE COURT:  Let's see if it covers it.

14           Mr. Friedman.

15           MR. FRIEDMAN:  Your Honor, by and large, you won't be

16   hearing many authenticity objections from us, foundational

17   objections, but we have many objections to many of these

18   exhibits.  I don't know how to proceed with 2000-plus exhibits

19   and --

20           THE COURT:  You're not alone in that, you understand.

21           MR. FRIEDMAN:  Fair enough.  I was hoping, I guess I

22   assumed, maybe wrongly --

23           THE COURT:  Which is not to say that your own exhibit

24   list isn't in the four figures.

25           MR. FRIEDMAN:  We haven't moved them all in.

DAF8CHE4

1           THE COURT:  I assume they are there for a reason.

2           MR. FRIEDMAN:  My point, your Honor, is if we take

3      them witness by witness, like Mr. Veiga, for example, there are

4      some objections we have to some of the exhibits that are in his

5      declaration that we are prepared to argue about.  I guess I

6      would suggest we do it in the order as the witnesses show up so

7      that you know what you're ruling on.

8           THE COURT:  Look, this, of course, is not the way it's

9      supposed to work.  The pretrial order process was designed to

10     get all this done long before trial.  We won't have the usual

11     debate about why it didn't happen, but it just didn't.  So what

12     we will do here is that from now through Thursday, we will

13     handle the exhibits witness by witness.  And then on Friday,

14     Saturday and Sunday, you folks are going to have to get

15     together and work this all out and present me with a list of

16     the stuff as to which there is no objection and the stuff as to

17     which there are objections, and once I see that list, I will

18     decide how to handle it.  But I need to have that, let's say,

19     by midday on Sunday.

20          Now, I know everybody is working hard here, not least

21     of all me.  I am not asking for sympathy.  But we are just

22     going to have to do it that way for the time being.

23          MR. FRIEDMAN:  I understand.

24          THE COURT:  OK, Mr. Friedman?

25          MR. FRIEDMAN:  That's OK.

DAF8CHE4

1      I have a couple of issues with regard to that that

2  might speed things up.

3      THE COURT:  Yes.  Go ahead.

4      MR. FRIEDMAN:  I know the Court has already ruled on

5  Mr. Donziger's notebook or diary in terms of its disclosure

6  over privilege objections.  I know you have already ruled on

7  that.

8      THE COURT:  Not only have I ruled on it, if memory

9  serves, the Court of Appeals ruled on it.

10     MR. FRIEDMAN:  All I was going to ask if I could have

11  a standing objection to all of the diary entries on work

12  product and attorney-client privilege grounds, and then I won't

13  have to be constantly raising that as we go through the trial.

14     THE COURT:  Unless I am mistaken, that ship sailed no

15  later than 2011.  So you do what you think you have to do,

16  counsel, and if it becomes disruptive, we will work something

17  out.  But in my view, you don't have any objections on that

18  ground to that diary.

19     MR. FRIEDMAN:  I understand your Honor.  That's why I

20  didn't want to belabor the point.  If I could have a standing

21  objection to any of the diary coming in over work product and

22  attorney-client privilege grounds, I won't ever have to bring

23  the issue up again.

24     THE COURT:  Well, look, you have made your position

25  clear.  I understand what your position is, and no doubt an

DAF8CHE4

1  appellate court, if you ever get there, should that prove

2  necessary, will understand it.

3              Let's just proceed.

4              MR. FRIEDMAN:  Does that mean I do have a standing

5  objection?

6              THE COURT:  I don't know which rule of the Federal

7  Rules of Evidence say standing objection, no standing

8  objection.  I don't believe the phrase appears anywhere there.

9              MR. FRIEDMAN:  We all know what it means, your Honor.

10             THE COURT:  Yes, we do.  So let's just proceed.

11             MR. FRIEDMAN:  All right.  We have the same objection,

12  your Honor, to all of the e-mails that were produced by Mr.

13  Donziger and his co-counsel on the same work product and

14  attorney-client privilege grounds.

15             THE COURT:  The Court of Appeals spoke to that also.

16             MR. FRIEDMAN:  I understand.

17             I think that's all I need to address right now.

18             THE COURT:  Thank you very much.

19             MR. MASTRO:  Thank you for directing the parties to

20  have that exchange.  I just wanted to point out, obviously,

21  with 2500 exhibits, and we are trying to do a case in two

22  weeks, we are planning to offer many of those exhibits to the

23  Court in a bench trial, not necessarily use each individual one

24  with the witness.

25             THE COURT:  I certainly understand that.

DAF8CHE4

1          MR. MASTRO:  I just wanted to make that clear.

2          THE COURT:  I am in effect, once again, giving the

3    defense more time to do things that they should have done a

4    long time ago.  I am not faulting Mr. Friedman or Ms.

5    Littlepage, though now that I learned they have been in the

6    case for weeks rather than days, something might have been

7    attended to earlier, but I am sure they have been very busy.

8          Let's proceed with the witness.

9          MR. MASTRO:  Chevron calls its first witness, Ricardo

10   Reis Veiga.

11         THE COURT:  Mr. Mastro, is his witness statement

12   already marked as something?

13         MR. MASTRO:  Yes, it is, your Honor.  We have marked

14   it as Plaintiff's Exhibit 3000.

15    RICARDO REIS VEIGA,

16        called as a witness by the plaintiff,

17        having been duly sworn, testified as follows:

18         THE DEPUTY CLERK:  State your name and spell your full

19   name for the record.

20         THE WITNESS:  Ricardo, R-I-C-A-R-D-O, Reis, R-E-I-S,

21   Veiga, V-E-I-G-A.

22         THE COURT:  Proceed, counselor.

23         MR. MASTRO:  Before we begin, Mr. Veiga has been going

24   through a personal ordeal.  He just got back to the country

25   recently.  I just wanted him to explain what he has been going

DAF8CHE4

```
 1    through and confirm that he is ready to proceed.

 2                THE WITNESS:  Well --

 3                THE COURT:  Excuse me, Mr. Reis.

 4                Is this in some way relevant?

 5                MR. MASTRO:  It's fine, your Honor.  I just wanted to

 6    make sure, he is dealing with a personal tragedy and I wanted

 7    to make sure he is ready to proceed.

 8                THE COURT:  Why don't you ask him that.

 9    DIRECT EXAMINATION

10    BY MR. MASTRO:

11    Q.  Mr. Veiga.

12    A.  Unfortunately, my wife passed away a month ago and I had to

13    go to my native country Brazil to dispose of her ashes and pay

14    her last respects.

15    Q.  Are you sure you're ready to proceed today to give your

16    testimony today?

17    A.  Yes, I am.

18                THE COURT:  I am sure, sir, you have the sympathy of

19    everyone in the courtroom.

20                THE WITNESS:  Thank you, your Honor.

21                MR. MASTRO:  May I approach the witness?

22                THE COURT:  You may.

23    Q.  Mr. Veiga, I hand you what has been marked as Plaintiff's

24    Exhibit 3000.

25                Mr. Veiga, do you recognize what that is?
```

DAF8CHE4                    Veiga – direct

1   A.  Yes, I do.

2   Q.  That's a declaration that you submitted to the Court in

3   connection with this trial, correct?

4   A.  That's correct.

5   Q.  Is that a true and correct copy of your declaration,

6   Plaintiff's Exhibit 3000?

7   A.  Yes, it is.

8   Q.  Did you sign it, sir?

9   A.  I did.

10   Q.  Can you go to the last page and confirm to the Court

11   whether or not that's your signature?

12   A.  That's my signature.

13   Q.  At the time you signed your declaration, were your

14   statements true and accurate to the best of your knowledge?

15   A.  Yes, they were.

16   Q.  Is everything in your declaration true and accurate as of

17   today?

18   A.  Yes, they are.

19   Q.  Mr. Veiga, do you offer your declaration as your full and

20   complete direct testimony in this trial?

21   A.  Yes, I do.

22          MR. MASTRO:  I offer Plaintiff's Exhibit 3000.

23          MR. FRIEDMAN:  Your Honor, we have objections to

24   certain paragraphs in that declaration.  I don't know how you

25   would prefer to handle that.

DAF8CHE4                    Veiga - direct

1          THE COURT:  Let me look at them.

2          MR. FRIEDMAN:  The first one is in paragraph 3.

3          THE COURT:  Just give me the numbers first.

4          MR. FRIEDMAN:  It would be 3, 14, 15, 16, 17, 18, 19,

5     21, 22, 23, 24, 25 through 35, 36 through 41.  These are not in

6     any specific group.  This is as I made my notes today.  54

7     through 57, 59 through 62, 67, 80, 82, 85, 86, 87, 88, 89, 125,

8     127, 128 and 138.

9          THE COURT:  Now, do these fall into a couple of

10    categories?

11         MR. FRIEDMAN:  I think some of it does, your Honor.  I

12    the big category, I would say, is there is a lot of reference

13    to the remediation agreements with the Republic of Ecuador and

14    the settlement of claims with the Republic of Ecuador and with

15    various municipalities.  I am sort of giving you a broad brush.

16         THE COURT:  That's what I asked for.

17         MR. FRIEDMAN:  That's the thrust of a big category of

18    this.  So a lot of these, particularly in the roughly 3 through

19    35 range that I gave you, virtually all of those are

20    remediation settlement type objections.  The threshold question

21    of course for the Court is, are we going to get into issues of

22    settlement discussions with other parties and remediation

23    agreements I guess would be the way to say it.

24         The rest, your Honor, although there are some more in

25    that category, the rest don't really fall into clear categories

1   like that.  That's the main issue here.

2          THE COURT:  All right.  With respect to the rest,

3   having read this carefully, I would imagine that here and there

4   there are hearsay and personal knowledge objections and

5   argumentative.  Is that about it?

6          MR. FRIEDMAN:  There is also some expert legal opinion

7   being offered at various points, and a lot of speculation,

8   mind-reading going on.  So, yes, I think you have got the

9   sense, without going through them one by one.

10          THE COURT:  So let's deal with it this way, which is

11   consistent more or less -- it's consistent with what I

12   generally do.

13          I have your points.  You have enumerated which

14   paragraphs there are issues about in your mind.  I will take it

15   all subject to your objections, and we will deal with it the

16   same we dealt with the objections on the depositions.  That is

17   to say, if it turns out to matter, I will rule on it.  I am

18   certainly very well able to understand that when a witness

19   said, I understand by reason of having talked to somebody else,

20   there just might be a little bit of a hearsay problem, and I am

21   very conscious of these things.  It would have been more

22   helpful if the document had been drafted in a way that avoided

23   that sort of thing, but lawyers argue their cases whenever they

24   get a case chance, and I know the difference.

25          To the extent you think any of it is important, you

DAF8CHE4                        Veiga - direct

1    will get an opportunity either before we conclude the trial or

2    in any post-trial briefing to be more specific with respect to

3    the paragraphs and the points you have raised, if you want to

4    elaborate on it.

5             MR. FRIEDMAN:  I wonder if it would be appropriate for

6    us to just file a written set of objections to each declaration

7    as it comes in.

8             THE COURT:  That will be fine.  That will be

9    preferable.

10            MR. FRIEDMAN:  I think that's what we will try to do

11   from now on.

12            THE COURT:  Starting in a day or so, I will expect you

13   to be ready to do that when it's filed.  With respect to what

14   comes in today and tomorrow, get it to me by the first of the

15   week, unless there is going to be an issue where the nature of

16   the objection is such that if the witness were on the stand,

17   there would be some prospect of his curing it, in which case I

18   want to hear it right away.

19            MR. FRIEDMAN:  I think that's where we are with the

20   remediation settlement issue, in that a big part of this -- the

21   question for me is, do I cross-examine him on this issue or is

22   it out of the case?  That's the question.

23            THE COURT:  Fair point.

24            Mr. Mastro, what do you say about that?

25            MR. MASTRO:  On the remediation question, first,

DAF8CHE4                    Veiga - direct

1    that's offered for background purposes.  We don't go into more

2    than the general background and history of his experience.

3    It's also offered for this witness to reflect his own state of

4    mind about what was going on in Ecuador and how he was treated

5    because, of course, this is going to be two individuals who

6    were subjected to criminal charges there.  I think for both

7    reasons, by way of background for the Court and also because it

8    informs his whole experience and reaction to that trauma, that

9    your Honor should take it.

10             THE COURT:  My reaction to what you say is this.  To

11   whatever extent this business about remediation is background,

12   background doesn't make something relevant.  You're objecting

13   strenuously to evidence regarding the state of the environment

14   in the Oriente, and if background is a justification for stuff

15   coming in, well, we are going to be here two years from now.

16             In terms of just the general background of how the

17   litigation came to be, there is an abundant record of which

18   judicial notice has been taken before as to what happened in

19   what year and so forth, and that seems to me that's available,

20   and I think we are not going to get into remediation because it

21   simply doesn't appear to me to be relevant to the issues in

22   this case.  I will give you a chance to respond to that.  And

23   so far as it being relevant to the witness's state of mind, I

24   have no doubt that it is in some sense, but I am not sure his

25   state of mind is at issue here.

DAF8CHE4                    Veiga - direct

1           MR. MASTRO:  It's also the case, your Honor, and it's

2      why I raised it in that context, in the context of Mr. Veiga's

3      testimony, some of that background does inform and is relevant

4      on the question of the extortion scheme and pressure scheme to

5      gin up criminal charges against this Chevron attorney and one

6      of his colleagues.  So I think that in that sense the

7      background helps inform some of that.

8           THE COURT:  There is no question there was a

9      settlement between Texaco and Republic of Ecuador and with the

10     various municipalities.

11          Is there any dispute about that, Mr. Friedman?

12          MR. FRIEDMAN:  No, your Honor.

13          THE COURT:  Mr. Gomez.

14          MR. GOMEZ:  No, your Honor.

15          THE COURT:  It happened.  It's a matter of public

16     record.  Everybody knows what it was.

17          I understand the argument you make that the attempted

18     or maybe actual, I don't know the precise detail, criminal

19     prosecution of Mr. Veiga and others was an attempt by your

20     adversaries to circumvent or nullify or in some other way deal

21     with the fact that the Republic of Ecuador and others, at least

22     Texaco from all claims, goes to motive and it goes to the

23     extortion claim, and I understand all of that.  But it all

24     starts from the fact that there was release, and that's

25     undisputed.  So how we got from, I don't know, 19 whatever it

DAF8CHE4                        Veiga - direct

1    was to there being a release, I just don't see the relevance of

2    it.  Am I missing something?

3           MR. MASTRO:  Your Honor, only for the reasons that I

4    have suggested.  Your Honor never misses anything.

5           THE COURT:  I wish it were true.

6           So the answer to your question, Mr. Friedman, is, no,

7    you don't have to.  If I change my mind, I will surely let you

8    know.

9           MR. FRIEDMAN:  So procedurally then, your Honor, would

10   it be that, and I can read them back into the record, the

11   paragraphs that deal with those issues are stricken from the

12   declarations?

13          THE COURT:  That's not an appropriate way to proceed

14   at this point.  You have my ruling, that is to say, we are not

15   trying who did what to whom and the process of getting from

16   whenever there was an initial issue of liability to the point

17   of there being remediation and a release.  You don't have to

18   cross-examine on that.

19          Now, for me to answer yes to your question, what

20   you're asking me to do is to try on the cuff to remember every

21   single word in every single one of those paragraphs, and I

22   can't do that.  I am not a computer.  And so I am not going to

23   give you a yes, but in principle you have my ruling.  And

24   you're protected also by the fact that you're submitting your

25   written objections and your objections are clear, and if at

DAF8CHE4                        Veiga – direct

1    some point you conclude that I have done something inconsistent

2    with that part of the statement with the ruling I am giving you

3    now, believe me, I understand you know where to go about that.

4           So you're fully covered, and I am just not going to,

5    in effect, buy the big in a poke.  Not that you were attempting

6    that.  You were just being careful.

7           MR. FRIEDMAN:  I am trying to understand the

8    procedure, your Honor.  Typical for me, I understand there is a

9    routine process here, but if a witness were starting to give

10   direct testimony on one of these issues, I would object, it

11   would never come into the record in the first place.

12          THE COURT:  So the whole exhibit is in subject to your

13   objections.  I have already given you a ruling in principle on

14   what you say is the big issue.

15          (Plaintiff's Exhibit 3000 received in evidence)

16          MR. FRIEDMAN:  Fair enough.

17          THE COURT:  Mr. Mastro.

18          I move the exhibit in evidence, and I will turn the

19   witness over to Mr. Friedman.

20          THE COURT:  The witness is tendered.

21   Cross-examination.

22          MR. GOMEZ:  May I be heard?

23          THE COURT:  Yes.

24          MR. GOMEZ:  The defendants Camacho and Piaguaje have

25   an objection to this procedure of using his direct testimony in

DAF8CHE4                        Veiga - direct

1   this trial for the following reasons.

2            The fact that we are doing it this way simply creates

3   more work for already understaffed, under-resourced

4   representatives for the defendants.  It also deprives the

5   public of a public and complete and open trial.

6            The reason why we are in this situation, your Honor,

7   as you well know, is we have never had the resources to keep up

8   with the calendars.  We have never had the resources to keep up

9   with the work.  So we have a pretrial that wasn't complete

10  because we simply didn't have the time or the personnel to do

11  everything that needed to be done within the time that was

12  provided.  So we are left in the awkward position of having to

13  complete tasks for the pretrial where we are actually trying

14  the case.  That puts up at an enormous disadvantage.

15           Now, in terms of admitting these direct testimonies,

16  we are now going to have to prepare written objections to the

17  very testimony.  Were we proceeding by the usual course, having

18  the witness testify on direct, we would be handling all of this

19  as it comes in a much more orderly fashion.  And the way that

20  it's being done, it's all being put in the record, and if we

21  are not able as representatives to keep up with these written

22  objections that now have to be submitted, at the same time

23  preparing for cross-examinations that will be seen at a greater

24  rate, we won't have a fair trial.

25           I understand that the Court has used this procedure

DAF8CHE4                        Veiga - direct

1    commonly, that it's common in the district, but I think the

2    Court also has to be mindful that in some situations it's

3    simply not advisable.  That when the parties are so mismatched

4    in economic resources, that the Court has to recognize that

5    maybe procedures that are used commonly simply don't make sense

6    in these unique circumstances.  I would like the record to be

7    clear that we are proceeding under that objection.

8              THE COURT:  The objection is overruled.  Mr. Gomez, we

9    have been all over this ground.  The objection is so poorly

10   taken.  You say it makes more work.  If this were a criminal

11   trial, you would hear the direct testimony in the courtroom.

12   You would have had no discovery to speak of from nonparty

13   witnesses, none whatsoever.  At the conclusion of the direct

14   testimony, you would get Jencks Act material, that is to say

15   written statements by the witness or adopted by the witness,

16   and you would then proceed with your cross-examination.

17             You instead have been provided in advance of the trial

18   with the written direct testimony of most of the plaintiff's

19   witnesses, a vast advantage over criminal cases.  It is a vast

20   advantage over most civil cases.  Civil cases tried with a jury

21   requires you to hear the testimony in the courtroom and then

22   proceed with the cross-examination.

23             So in terms of your saying it creates more work, I

24   categorically reject the validity of the argument.  I

25   categorically reject the suggestion that it is in any way

DAF8CHE4                        Veiga - direct

unfair.  To the contrary, it gives you advantages that are very

uncommonly enjoyed by defendants, or for that matter

plaintiffs, in civil cases.  And I will say quite a bit of more

of this in due course in a written ruling on your motion.

I would note also that until the last couple of days,

although you have been well aware that this is my practice,

this objection was never raised.  I have made significant

accommodations to you, over and over again, since you took over

the defense, which you have been involved in for a couple of

years, allegedly on your own.  The schedule has been pushed

back over and over again to accommodate assertions on your part

that I think were ill-founded and unwarranted simply to give

you the benefit of every conceivable doubt.

I have written before on the subject of your claim

that you are here alone.  If that is true, that is, so far as I

am aware, because those who are controlling this case on behalf

of your clients have made a conscious decision, about which

they have spoken in public, not to make the resources available

for the New York case because they have regarded it as, and I

quote, a sideshow.

I have for months been offering you the opportunity to

put evidence before me to substantiate the claim that your

clients lack resources.  You have, and I don't fault you

personally, you understand that, I respect you personally, but

those who are calling the shots on your side of the case have

DAF8CHE4                          Veiga - direct

1   simply refused to do it.

2            Now, it's a matter of public record that your clients

3   raised at least 10 to 15 million dollars to finance this

4   litigation.  Where it went, to whom it went, how much of it is

5   left, what other money has been raised, is a great terra

6   incognita, and that is so only because your people have chosen

7   not to disclose it.

8            Now, you asked me to accept that you are impecunious,

9   but you simply don't ever produce the evidence.  That's the way

10  it is.

11           Now, you know there are lots of people with

12  meritorious cases who can't afford lawyers at all, and on the

13  civil side of our system, unless and until the Congress and the

14  state legislatures change the system, that's the way it goes.

15  I don't endorse that.  I don't think it's necessarily a great

16  thing or not.  It's not my job.  40 some odd of the Ecuadorian

17  plaintiffs simply elected to default in this case and not to

18  appear.  The two for whom you are defending elected to defend.

19  If they and those backing them don't want to put up the money,

20  well, that's a choice.  But you sit here and ask me simply to

21  accept on faith all of this.

22           Now, you asked me to do that also when one of the

23  biggest law firms in the United States has been representing

24  your clients in appellate proceedings in this case and in at

25  least a dozen, and probably two dozen other cases around the

DAF8CHE4                          Veiga – direct

 1   United States relating to this dispute.  Maybe it's a business

 2   judgment on their part that they don't want to be involved

 3   here.  Maybe it's a tactical decision.  I have no idea.  But I

 4   do not find any merit in the objection you have made given the

 5   lack of record you have made to support it.

 6             I appreciate that you personally may be working -- I

 7   assume you're working very hard on behalf of your clients, and

 8   I respect that.  But I am just not going to let you create a

 9   completely misleading impression of what is going on here.

10             Let's proceed.

11             MR. MASTRO:  Your Honor, I also wanted to clarify we

12   are moving the admission of the declaration and the exhibits in

13   the first two, but the procedure we are following with

14   objections that are coming later from Mr. Friedman I gather

15   will follow with the exhibits too.

16             THE COURT:  Do we have a list of the exhibits that are

17   referred to in here?

18             MR. MASTRO:  It's quite lengthy, if you want me to

19   recite it into the record.

20             THE COURT:  Let's just mark it.

21             MR. MASTRO:  I will mark it as Plaintiff's Exhibit

22   3000A.

23             THE COURT:  So the exhibits enumerated on Plaintiff's

24   Exhibit 3000A are received subject to the discussion we had

25   earlier.

DAF8CHE4                    Veiga – direct

1          OK, Mr. Friedman?

2          MR. FRIEDMAN:  Yes.

3          THE COURT:  Mr. Gomez?

4          MR. GOMEZ:  Yes, your Honor.

5          THE COURT:  All right.  Thank you.

6          (Plaintiff's Exhibit 3000A received in evidence)

7          THE COURT:  Your witness, Mr. Friedman.

8          MR. FRIEDMAN:  Thank you, your Honor.

9   CROSS-EXAMINATION

10  BY MR. FRIEDMAN:

11  Q.  Do you prefer Reis Veiga or Mr. Veiga?

12  A.  My last name is Veiga.

13  Q.  Mr. Veiga, I too am sorry to hear about your wife.

14         My name is Rick Friedman.  I represent the Donziger

15  defendants.

16         Could you tell us, I understand from your declaration

17  you're admitted to practice law in Brazil.  Are you admitted to

18  practice anywhere else?

19  A.  No, sir.

20  Q.  Had you ever worked in the Ecuadorian system, legal system,

21  before Lago Agrio litigation?

22  A.  I am not a licensed attorney in Ecuador either.

23  Q.  I guess what I am trying to get at is had you worked in

24  legal matters in Ecuador before this litigation began?

25  A.  Yes.  I was involved on legal matters involving the TexPet

DAF8CHE4                      Veiga - cross

1   winding down operations in Ecuador since 1990.

2   Q.  It sounds like since 1990 you have been one of the

3   principal lawyers involved in providing legal advice to Texaco,

4   TexPet, Chevron operations in the Oriente region?

5   A.  Chevron has never operated in Ecuador and has never had any

6   involvement in the consortium Ecuador.  I provided legal advice

7   and liaison with regard to TexPet's minority equity

8   participation in the consortium and winding down of several

9   litigations when the concession expired.

10  Q.  After the concession expired, and the Lago Agrio litigation

11  began, you were involved in providing advice to TexPet?

12  A.  The Lago Agrio litigation was filed against Chevron core in

13  2003, and I was responsible for providing day-to-day

14  supervision and liaison with our Ecuadorian litigators until

15  2009.

16  Q.  As I understand it, from 2003 to 2009, you oversaw the

17  day-to-day defense of the lawsuit against Chevron in Lago

18  Agrio?

19  A.  That's correct.

20  Q.  You were also in charge of the day-to-day supervision of

21  the activities in Chevron's defense there, is that fair?

22  A.  It's fair with regard to the legal strategy and making sure

23  that we had the logistics and providing safety work environment

24  for everyone involved in the litigation, that's correct.

25  Q.  Who reported to you about those day-to-day events?

DAF8CHE4                      Veiga - cross

A.  We had several lawyers, Ecuadorian lawyers, primarily

lawyers working for the firm of Adolfo Callejas & Associates.

They were reporting directly to me as a client.

Q.  Where were you living in that 2003-2009 time frame?

A.  I was living in Coral Gables, Florida.

Q.  They would report to you by e-mail, phone or letter?

A.  They would report on phone.  We had several meetings in

Coral Gables, meetings in Ecuador, and by correspondence as

well.

Q.  Can you describe for us the type of authority you had to

make decisions about the day-to-day conduct of litigation in

Ecuador?

A.  I was basically monitoring the day-to-day work.  My

authority would be to establish delegation of authority in

Chevron, and I was reporting myself to my supervisor Ed Scott

in San Ramon, California.

Q.  Can you give us an idea of the types of decisions you would

make on a day-to-day basis regarding the litigation?

        MR. MASTRO:  I just want to caution that the witness

should not disclose attorney-client communications and only

describe in general terms.

A.  Without getting into any privileged communications with the

litigators of record, basically, what I would do is more of a

liaison and keeping my supervisor updated on the process and

the progress of the litigation.  I would make sure, also, that

DAF8CHE4                         Veiga - cross

```
 1    I would attend judicial inspections in the field, which was
 2    part of the production phase.  One of my primary
 3    responsibilities that was assigned to me was to make sure that
 4    everybody would be safe, because this was a -- not your
 5    ordinary litigation in an area with some safety concerns.  So I
 6    was having to make sure that everybody would be safe and could
 7    do their work within ethics and in a more effective way.
 8    Q.  Why would you be the person in charge of keeping people
 9    safe?  Did you have some background in security or police work
10    or something?
11              MR. MASTRO:  Objection to form.
12              THE COURT:  Sustained as to form.
13    Q.  Did you have some background in police or security work?
14    A.  Not at all.
15    Q.  Why were you the person in charge of keeping people safe?
16    A.  Because I was the Chevron in-house attorney responsible for
17    monitoring and supervising the case, and therefore this was
18    requested from me.  Because I had a civil law background, I
19    think I was chosen a lot for that reason.  In my involvement
20    previously with the winding down of the TexPet participation in
21    Ecuador, because I was the point of contact, that
22    responsibility would follow me.
23    Q.  So with regard to, say, the judicial inspections, would you
24    make decisions about where samples would be taken?
25    A.  Not at all.
```

DAF8CHE4                    Veiga - cross

1   Q.  Would you make decisions about which experts would be

2   hired?

3   A.  Not at all.

4   Q.  Would you make decisions about what legal arguments would

5   be made in court?

6          MR. MASTRO:  Your Honor, we are getting into a work

7   product area.  I allowed the first question.  This seems to be

8   objectionable.

9          THE COURT:  I don't see the relevance of it to begin

10  with.

11         MR. FRIEDMAN:  The relevance is there is a lot of talk

12  about what he knew -- in the declaration, there is a lot of

13  references to things he knew and didn't know and how he felt

14  and what he did.  I am trying to fill out that background so I

15  understand the full picture.

16         THE COURT:  Let's get to something specific.

17  Q.  Who was your superior in supervising these matters?

18         MR. MASTRO:  Asked and answered.

19         THE COURT:  Sustained.  It was Ed Scott.

20  Q.  When did you stop the day-to-day supervision?

21  A.  Around 2009.

22  Q.  As I understand from your declaration, you still remained

23  actively involved in monitoring the litigation efforts?

24  A.  That's correct, sir.

25  Q.  In what sense then did things change?  What was different

DAF8CHE4                        Veiga - cross

1   after 2009 than before?

2   A.   In 2009, I had a more day-to-day type of responsibility.  I

3   would travel to Ecuador.  I would get in touch very often with

4   our litigators of record, and starting in 2009, my involvement

5   has been as a member of a litigation committee that supervised

6   the whole set of lawsuits on the Ecuador matter.

7   Q.   Now, you said in paragraph 13 of your declaration that part

8   of your job was to review crude outtakes?

9   A.   It was not part of my job, but I did review some of the

10  crude outtakes.

11  Q.   Did you say it was not part of your job?

12  A.   It was not specifically my job, but I ended up providing

13  the service and providing the monitoring and supervision.  I

14  ended up reviewing outtakes from crude.

15  Q.   You also reviewed documents obtained in discovery,

16  arguments in public statements that were made by Mr. Donziger,

17  is that correct?

18  A.   Yes, I did.

19  Q.   And also discovery, public statements that were made by the

20  other Lago Agrio plaintiff attorneys in the Republic of

21  Ecuador?

22  A.   Yes, I did.

23  Q.   Did you also review Chevron's public statements?

24  A.   Yes, some of them.

25  Q.   And Chevron's court filings?

DAF8CHE4                     Veiga - cross

1    A.  Some of them.

2    Q.  Did you also monitor activities related to this litigation

3    that took place in the U.S.?

4    A.  Would you be a little more specific, please?

5    Q.  Sure.  For example, if Mr. Donziger or Chevron made

6    statements in the United States, would you have monitored those

7    as well as the ones that took place in Ecuador?

8    A.  Some of them, not a lot during my day-to-day supervision of

9    the litigation.

10   Q.  I am going to ask you to look at Plaintiff's Exhibit 853.

11          MR. FRIEDMAN:  Your Honor, if I could just have a

12   minute to pull my book out?

13          THE COURT:  Sure.

14   Q.  I think, Mr. Veiga, I don't know, I think you might have a

15   copy of 853 with the declaration that Mr. Mastro handed you,

16   but maybe not?

17   A.  I don't.

18          THE COURT:  Do you have a copy for me while my deputy

19   is out of the courtroom?

20          MR. MASTRO:  Your Honor, if I may approach, I can give

21   a complete set.

22          MR. FRIEDMAN:  Could I ask if you have 853 yet?

23          THE COURT:  Not yet, but I am hopeful.

24          MR. FRIEDMAN:  I don't understand the technical

25   things.

DAF8CHE4                      Veiga - cross

 1              THE COURT:  I don't understand it either right now.

 2     The man who understands it is off doing something else.

 3              MR. FRIEDMAN:  We are trying to get the screens

 4     switched back so we can show exhibits.  Maybe we have to wait

 5     for him to return.

 6              THE COURT:  Maybe not.

 7              MR. FRIEDMAN:  Since there is no jury, is there any

 8     problem with showing these on a screen for the admission

 9     process of the exhibits?

10              THE COURT:  When the electronics are all in gear, then

11     it can be shown to the witness first without it being generally

12     available, and then when it's received, we will hit the button

13     and if everything works according to plan, it will then be

14     visible generally.  But there is some other business going on

15     on my docket today so my deputy is busy.

16              So we have Plaintiff's Exhibit 853 for identification.

17              Mr. Veiga, do you have it before you?

18              THE WITNESS:  Yes, I do.

19              THE COURT:  Mr. Friedman, do you have a question?

20              MR. FRIEDMAN:  I do.  Thank you, your Honor.

21     BY MR. FRIEDMAN:

22     Q.  Mr. Veiga, do you recognize this?  I guess it's a

23     transcript of President Correa from April 28, 2007.  It's

24     referenced in your declaration.

25     A.  It looks like one of the presidential addresses.

DAF8CHE4                        Veiga - cross

 1          MR. FRIEDMAN:  Your Honor, if you would look at

 2   paragraph 3, this gets to the issue Mr. Mastro alluded to

 3   earlier.  I didn't want to get into this area without talking

 4   to the Court first.

 5          THE COURT:  I don't know where you're going with the

 6   exhibit generally, but I haven't heard an objection yet.

 7   Q.  Mr. Veiga, if you would look at the third paragraph of this

 8   statement, the third line down, do you see where it says, And

 9   we also have people from Petroecuador in 1998, a certificate

10   was signed stating that everything was remediated?

11   A.  Yes, I see that.

12   Q.  Was a certificate signed saying everything was remediated?

13   A.  There was a --

14          THE COURT:  This is exactly what I thought we were not

15   going to do.

16          MR. FRIEDMAN:  This is the part that Mr. Mastro

17   referred to that we have got the big remediation issue, and

18   then we have a smaller issue that relates to the criminal

19   charges that were filed against Mr. Veiga, and I am trying to

20   get to that point without getting to the whole thing.

21          THE COURT:  What is that point from what your point of

22   view?

23          MR. FRIEDMAN:  From our point of view, your Honor, the

24   allegations in the declaration are that the criminal charges

25   were baseless, and what I am trying to establish is that they

DAF8CHE4                    Veiga - cross

1    were not baseless.

2              THE COURT:  So we are going to try an Ecuadorian

3    criminal case now here, right?

4              MR. MASTRO:  That isn't the allegation in our lawsuit,

5    your Honor.  We did not offer this document for the truth of

6    the matters asserted.  He objected to talking about this

7    subject at all.  What we have argued is that those criminal

8    charges were brought for ulterior reasons -- for extortion, as

9    a sham, and for other reasons.  That's what we have argued,

10   your Honor.  The evidence will show the collusion between

11   Donziger's team and the Ecuadorian government to gin up those

12   charges.  That's why we offered it.

13             THE COURT:  Mr. Friedman.

14             MR. FRIEDMAN:  Here is the problem.  A central part of

15   their RICO case is that baseless criminal charges were filed.

16   It's all through their paperwork and it's through this

17   declaration.  And so should we try to the Ecuadorian case?  Of

18   course not.  But the issue of whether these charges are

19   baseless or not goes to the core of this declaration.

20             MR. MASTRO:  Actually, your Honor, just as we

21   explained to the Court what we meant by sham litigation, it is

22   what we mean by the sham criminal charges, and those are the

23   words that Mr. Veiga uses throughout his declaration -- sham,

24   bogus.  He is talking about the ulterior motives behind the

25   action that have nothing to do with what this gentleman is

DAF8CHE4                        Veiga - cross

1    talking about.  We do not use that word that he has just used

2    about this subject.  We have been very mindful of the Court's

3    admonitions about not getting into the merits.

4              MR. FRIEDMAN:  Your Honor, the kind of core of this

5    issue is they are saying that, and I will pull out the

6    paragraphs, but basically that this was a baseless, I think

7    they might have used the word fraudulent as well, criminal

8    prosecution.  They are using very strong language about the

9    lack of merit to these criminal charges, and they are saying

10   defendants were behind these charges and that they were

11   baseless.

12             Well, that's a pretty serious accusation.  And if they

13   are baseless, that supports Chevron's position.  If they are

14   not baseless, if they were founded in good faith, and

15   regardless of Mr. Donziger's hope that good things would come

16   from them, the issue is whether this was some sort of

17   inappropriate action.  The RICO law is quite clear, and I am

18   certainly no expert on RICO law, but the RICO law is pretty

19   clear that someone can institute lawsuits, criminal charges and

20   have a bad subjective motive, but if objectively they had the

21   right to do it, objectively they had the right to do it, it

22   doesn't matter what their subjective motives are.

23             So we are back to objective basis for these criminal

24   charges.

25             MR. MASTRO:  Actually, your Honor, for extortion, it's

DAF8CHE4                    Veiga - cross

1    often the case that someone extorts another with truthful

2    information, but does it for the improper purpose of coercion.

3    It has nothing to do with that.  It has to do with the fact

4    that whatever was being pursued was to extort, pressure, jam

5    up, coerce Chevron into paying them off.  That's the

6    allegation.

7            MR. FRIEDMAN:  If I file a lawsuit against Chevron for

8    a client that has been run over by a Chevron oil truck, and my

9    motive is to force Chevron to pay my injured client, that's not

10   a RICO claim.  There are a lot of different types of extortion.

11   But one that is not extortion, and I can get you some cites

12   over the noon hour, what is not extortion is to exercise a

13   right that you have a right to do.

14           THE COURT:  If you see your neighbor out with a woman

15   other than his wife, do you have a right to state that fact?

16           MR. FRIEDMAN:  Well, I do have the right to state that

17   fact.

18           THE COURT:  And if you go to your neighbor, who you

19   saw out with a woman other than his wife, and say, pay me money

20   or else I am going to tell your wife you were out with this

21   other lady, is that extortion?

22           MR. FRIEDMAN:  I don't know if that's extortion, but I

23   know what is not extortion, which is to file a claim that you

24   have a legal right to make.

25           THE COURT:  The objection is sustained.

DAF8CHE4                    Veiga - cross

1              MR. FRIEDMAN:  So I am clear, your Honor, are we going

2    to be allowed to, so I don't waste the Court's time--

3              THE COURT:  You objected to getting into the whole

4    subject of the remediation, and I sustained your objection, and

5    now I am holding you to it, in addition to ruling on grounds of

6    relevance and under Rule 403.  Not to mention the fact that

7    President Correa's speech is not admissible for the truth of

8    the matters asserted, which is among the ways you appear to be

9    trying to use it.

10             MR. FRIEDMAN:  I won't argue with the Court.  I

11   understand your ruling.

12             Is 853 still in evidence then?

13             THE COURT:  We established the procedure earlier.

14   It's there for now.

15             MR. FRIEDMAN:  Fair enough.

16             THE COURT:  I understand one way to try this case

17   would be to spend three months in this courtroom, paragraph by

18   paragraph, document by document, and that's just not the way we

19   are going to try it.

20             MR. FRIEDMAN:  I am not asking you to do that, your

21   Honor.

22             THE COURT:  I appreciate that.

23             MR. MASTRO:  Just for future reference, it's the

24   Second Circuit's decision in *United States v. Jackson*, 180 F.3d

25   5566 (2d Cir. 1999).  Truth is not a defense to a charge of

DAF8CHE4                     Veiga – cross

 1   extortion.

 2            MR. FRIEDMAN:  That wasn't my argument.

 3            THE COURT:  I didn't exactly think it was.

 4            Thank you, Mr. Mastro.

 5            Let's move along, folks.

 6            MR. FRIEDMAN:  I am trying, your Honor.

 7            THE COURT:  I know you are.

 8   BY MR. FRIEDMAN:

 9   Q.  Mr. Veiga, during the time you were supervising day-to-day

10   operations in Ecuador, was it permissible for lawyers to have

11   ex parte contacts with judges relating to cases that were

12   before those judges?

13            MR. MASTRO:  Objection to form, your Honor, and it

14   calls for a legal conclusion.

15            THE COURT:  Sustained.

16   Q.  During the time you were supervising the day-to-day

17   operations of the Chevron legal team in Ecuador, was it your

18   understanding that ex parte contacts were proper relating to

19   the subject matter of the litigation?

20            MR. MASTRO:  Objection to form and calls for a legal

21   conclusion.

22            THE COURT:  Sustained.

23            Mr. Friedman, if that question or some facsimile of it

24   ultimately is significant in this case, it's a question of law

25   which under Rule 44.1 of the Rules of Civil Procedure is for me

DAF8CHE4                    Veiga – cross

1   to decide.  Both parties have submitted more proposed expert

2   testimony than you can shake a stick at on that subject.  We

3   are not going to get that question from witnesses who insofar

4   as the law of Ecuador is concerned are lay witnesses.

5          Move on, please.

6          MR. FRIEDMAN:  I was offering it two ways.  Under

7   44.1, it is permissible to elicit testimony from a witness

8   about the law.

9          THE COURT:  Yes.  And at the final pretrial conference

10  I said I would take all of your written submissions on it, and

11  if ultimately I concluded it was appropriate to hear any expert

12  testimony, I would let you know.  I am also, based on the

13  evidence you elicited, not accepting this witness as an expert

14  on Ecuadorian law.

15         MR. FRIEDMAN:  The second basis, your Honor, would go

16  to his state of mind, Chevron's state of mind, as to the

17  propriety of ex parte contacts.  The reason being that both

18  parties in Ecuador were in a hard fought, bitter litigation,

19  and accusations about impropriety on both sides were made down

20  there and are being made down up here.  And to understand

21  Chevron's position, their state of mind with regard to ex parte

22  contacts I think is important for the Court to be able to make

23  a decision.

24         MR. MASTRO:  Obviously, we object to that on multiple

25  grounds, relevance, calls for a legal conclusion.

DAF8CHE4                          Veiga - cross

1          THE COURT:  Maybe if you spoke more slowly, I would

2     understand more of it.

3          MR. MASTRO:  We object to that both on relevance

4     grounds, to speculate on Chevron's state of mind.  It calls for

5     a legal conclusion.

6          THE COURT:  It doesn't call for a legal conclusion.

7     You could bring in somebody whose job at Chevron is to prepare

8     the mashed potatoes in the cafeteria and ask their opinion, and

9     if under the laws of agency that's attributable to Chevron, it

10    goes to Chevron's state of mind.  Now, obviously, it wouldn't

11    be, but I am making a broader point.

12         Look, I will let him answer the question as you put it

13    for whatever it proves to be worth.

14         Read the question back to the witness.

15         (Record read)

16    A.  My understanding is that no ex parte meetings would be

17    appropriate to discuss any substantial matter within the

18    litigation.

19    Q.  That would be true of Chevron as well as of the plaintiffs?

20    A.  Yes, sir.

21    Q.  What was your understanding about what would be a

22    substantial matter versus an unsubstantial matter?

23    A.  Substantial matters usually go to the merits of the case as

24    opposed to a mere procedural schedule matter.

25    Q.  Now, from watching the crude outtakes and the various other

DAF8CHE4                       Veiga - cross

```
 1   things, it sounds like the hearings that were conducted both in
 2   the courthouse and out in the field involved -- let me start
 3   over.  I apologize.
 4              How was the record kept, as you understood it, the
 5   official record of the Ecuadorian court?
 6              THE COURT:  This is a matter of law.  He is not an
 7   expert on that.
 8              MR. FRIEDMAN:  I understand the law part, but I think
 9   it's also a fact part in the sense of what the practice was.
10              THE COURT:  You're asking him to give you his
11   understanding based on what he watched in the crude outtakes
12   and, quote, various other things unspecified, close quote?
13              MR. FRIEDMAN:  I could probably ask a better question.
14              THE COURT:  I bet you can.
15   Q.  Mr. Veiga, is it correct that out in the field in these
16   court hearings there was no court reporter?
17   A.  Are you referring to the judicial inspection proceedings?
18   Q.  Yes.  The judicial inspection proceedings.
19              MR. MASTRO:  If he knows.
20              THE COURT:  Of course.
21   A.  To the extent of my personal observation in the judicial
22   inspections that I attended, there was a court reporter.
23   Q.  Was the court reporter taking notes of what took place?
24   A.  The court reporter would take notes and later on would
25   confer with both attorneys to check if the transcripts would be
```

1    accurate.

2    Q.  The transcripts that were created, they were not like a

3    transcript we will see from this court proceeding here today

4    where you have question answer, question answer, but they are

5    more general sort of summary sheets, is that fair?

6    A.  I would not be able to respond to this question.  I am not

7    so familiar with how this procedure works.

8    Q.  But you were familiar that at the end of the day, the

9    parties would get together with somebody and create a record of

10   some sort?

11   A.  I don't think that's accurate.  I think the court reporter

12   would have his or her own records.  She would basically

13   finalize and type, and then she would ask the attorneys for

14   both parties and experts that have attended to the judicial

15   inspections to verify for accuracy.

16   Q.  Maybe I can cut off a line of questioning here.

17         Were you ever involved in the service of documents on

18   the court?

19   A.  No, I was not.

20         THE COURT:  We are going to break here for another

21   matter and for lunch.  I do before we break want to say one

22   more thing in relation to Mr. Gomez's objection, which I

23   neglected to address.

24         Mr. Gomez asserted that there was a problem with the

25   procedure of taking the direct testimony in writing vis-a-vis

DAF8CHE4                         Veiga - cross

1    public trial.  That point would be well taken if the material

2    did not become part of the public record promptly.  That

3    material will be become part of the public record promptly.

4    The parties are to report back to me in the morning, after

5    conferring with each other, about how they propose to put the

6    direct testimony, after its received, into the publicly

7    available record.

8              Thank you.  I will see you at 2:00.  We won't normally

9    take as long a break as this.

10             MR. MASTRO:  We do have our next witness here.  If Mr.

11   Friedman, who has previously declined to say so, can give us

12   some feel of how long this witness will last.

13             THE COURT:  How about it, Mr. Friedman?

14             MR. FRIEDMAN:  If I could take a look at my notes, I

15   will tell Mr. Mastro.  A bunch of questions that I was going to

16   ask are no longer going to be asked.

17             THE COURT:  Thank you.  I look forward for great

18   cooperation.

19             (Luncheon recess)

20

21

22

23

24

25

DAF8CHE4                    Veiga - cross

1                      AFTERNOON SESSION

2                         2:05 p.m.

3          (In the robing room; Mr. Mastro, Mr. Friedman,

4     Mr. Gomez, and Mr. Donziger present)

5          THE COURT:  I asked you to come in because it was

6     reported to me that a man wearing a leather jacket who was

7     seated next to Karen Hinton in the spectators' section earlier

8     this morning and later was in the cafeteria at lunch hour with

9     Mr. Piaguaje approached one of my law clerks and it was quite

10    unsettling and he identified himself as Mitch.  And I would

11    like it to stop.  I don't know who it was.  I'm not asking.

12    Okay.

13          (In open court)

14          THE COURT:  Okay.  Let us proceed.

15          MR. MASTRO:  Your Honor, I just wanted to say before

16    we started that we have a break-through moment where protocol

17    has been agreed upon by counsel for posting an ECF as soon as a

18    witness's declaration --

19          THE COURT:  Could we move with the testimony.  I'm

20    glad there's a breakthrough.

21          MR. MASTRO:  Thank you.

22          THE COURT:  Let's move.

23          MS. FRIEDMAN:  Thank you, your Honor.

24          Your Honor, what I was hoping might speed things along

25    is if my assistant, Mr. Taylor, could hand documents either to

1    your clerk or to the witness.  I've got one set here.  He's got

2    another set.  Would that work or no?

3              THE COURT:  I'm a little confused.  We have this whole

4    presentation system and we now have the genius who operates it,

5    Andy.  So why don't we do that.

6              MS. FRIEDMAN:  This would be to hand the original to

7    the witness, your Honor.

8              THE COURT:  Is there --

9              MS. FRIEDMAN:  You're thinking he doesn't even need

10   that.

11             THE COURT:  Right.

12             MS. FRIEDMAN:  Okay.  All right.  That's fine.

13             THE COURT:  Unless there's something I'm missing.

14             MS. FRIEDMAN:  No, I think that will work fine.

15             THE COURT:  Okay.

16   BY MS. FRIEDMAN:

17   Q.  Mr. Veiga, when the original Ecuadorian case was filed here

18   in the United States back in the early nineties -- do you have

19   in mind the time frame I'm talking about?

20   A.  Yes, sir.

21   Q.  All right.  When that was filed, did Chevron work with

22   Ecuador, the Republic of Ecuador, to put pressure on the U.S.

23   court to dismiss the case?

24   A.  Chevron was not a defendant in that case.

25   Q.  Did Texaco work with the Republic of Ecuador to put

1    pressure on the U.S. court to dismiss the case?

2              MR. MASTRO:  Objection, your Honor.

3              THE COURT:  Sustained as to form.

4    Q.  Let me show you, if I could, Mr. Veiga, Exhibit DX376.

5              MS. FRIEDMAN:  And, your Honor, I'd move into evidence

6    Exhibit 376.  I don't think there's any authentication issue.

7              THE COURT:  Is there any objection to 376?

8              MR. MASTRO:  Your Honor, there is.  It's hard to read

9    the handwriting and it's just a transmittal page.

10             THE COURT:  I assume we're not interested in the

11   transmittal page, right, Mr. Friedman?

12             MS. FRIEDMAN:  Well, in a sense we are because it

13   shows, it comes from the corporate communications division of

14   Texaco, if I'm reading it correctly, federal government affairs

15   from Texaco.  So that's the significance of the cover page,

16   your Honor.

17             THE COURT:  I'm smiling because I'm trying to see what

18   comes behind the cover page.

19             MS. FRIEDMAN:  Fair enough.

20             THE COURT:  And it's at a 90-degree angle to

21   horizontal and it's got a Post-it note obscuring part of it so

22   it's not too helpful.  But maybe I'll look over here.

23             MS. FRIEDMAN:  I could hand you, your Honor.

24             THE COURT:  Could somebody put this -- thanks.

25             So what's the objection?

DAFLCHE5                         Veiga - cross

1          MR. MASTRO:  Your Honor, I think we should see if the

2     witness can identify it and, second, I don't see how this could

3     possibly be relevant in any event.

4          THE COURT:  Well, let's start with the first.

5          Mr. Friedman.

6          MS. FRIEDMAN:  Your Honor, this is a, I believe --

7     and, again, I'm a little shaky ground on the procedural history

8     of this case.  But my understanding is the CA Bates number

9     indicates this was produced by Chevron in a litigation.  The

10    fax corporate transmittal sheet is from Texaco.  I don't think

11    the witness himself needs to necessarily recognize the document

12    for it to be admissible if there's no authenticity objection.

13         THE COURT:  Is there any dispute about authenticity?

14         MR. MASTRO:  Your Honor, even accepting authenticity,

15    I think this is clearly irrelevant to this case.  Talking about

16    completely different litigation involving different parties,

17    some overlap, but different parties and very different claims.

18    What happened in the Southern District and back and forth in

19    the Southern District in a claim by individuals for individual

20    claims seeking class action treatment in the United States is

21    not the subject of our lawsuit.  It's about what happened in

22    Ecuador later when a wholly new action for community harms is

23    brought against Chevron alone.  So this is totally irrelevant.

24         THE COURT:  Mr. Friedman.

25         MS. FRIEDMAN:  Your Honor, of course, the first action

DAFLCHE5                        Veiga - cross

1    and the second action have a lot of overlap.  And we're really

2    looking at -- I understand Chevron would like to limit the

3    inquiry to a particular period of time, but we're not just

4    talking about a chronological time period.  We're also talking

5    about the propriety of doing certain things such as there's

6    lots of allegations in the complaint and in some of these

7    witness declarations about improperly trying to pressure

8    governments to do things to influence cases, and here we have

9    Chevron doing exactly that same thing.  So it goes to the

10   unclean hands defense.

11          But I think more importantly than unclean hands, your

12   Honor, it goes to it's essentially an admission by conduct.

13   Chevron can't take the position pressuring government officials

14   is improper when it's doing it itself.

15          MR. MASTRO:  And I just want to say for the record,

16   your Honor, it doesn't show any such thing.  But it's totally

17   irrelevant whether there was communication with the Republic of

18   Ecuador about a separate lawsuit involving individual claims

19   when, as your Honor is well aware, there was settlement and

20   release issue as well.

21          But this is -- it doesn't -- it's totally irrelevant

22   to this lawsuit.  And your Honor previously ruled that only

23   discovery from 2000 on would apply as to this lawsuit.  I mean.

24          THE COURT:  The objection is sustained, both as to

25   relevance and 403.  Whatever might have happened in 1993 in

DAFLCHE5                    Veiga – cross

1    this respect is simply too far afield and we're not going

2    there.

3           MS. FRIEDMAN:  Your Honor, I neglected to mention I do

4    see that Mr. Veiga was a recipient of this fax.

5           THE COURT:  Well, maybe so, maybe not.

6           MS. FRIEDMAN:  I'll move on.

7    BY MS. FRIEDMAN:

8    Q.  Mr. Veiga, would you look at paragraph 47 of your

9    declaration.  Have you been able to find that?

10   A.  Yes, sir.

11   Q.  All right.  And you're talking here about watching

12   Mr. Donziger on a number of occasions.

13          Did any of those occasions happen after 2009?

14   A.  If you're referring to the second sentence where I saw

15   Mr. Donziger at a number of judicial inspections, the answer is

16   no.  I did not attend any judicial inspections after 2009.

17   Q.  All right.  Did you attend any in 2008?

18   A.  I don't remember.  I may.

19   Q.  All right.  So in your best memory as you sit here today,

20   when is the last time you saw Mr. Donziger directing people at

21   judicial inspections?

22   A.  I believe, I believe the last judicial inspections I

23   attended were around the end of 2006, beginning of 2007, but

24   it's just part of my recollection.

25   Q.  All right.  Can you look then at Defendant's Exhibit 668.

DAFLCHE5                         Veiga - cross

1          Can you tell us who William T. Irwin is?

2     A.  Mr. Irwin is an employee of Chevron who works in our

3     Washington, D.C. public affairs office.

4     Q.  And are you aware of what his job is, what his job duties

5     are, generally speaking, in the public affairs office?

6     A.  I'm generally familiar with his duties.

7     Q.  And what are they?

8     A.  He basically monitors Chevron's, Chevron's presence in

9     several countries and monitors progress of litigations and this

10    kind of work.

11    Q.  And there's a reference in the middle of the page to saying

12    please forward this to Ricardo Veiga, and then up at the top it

13    appears that it was sent to you.

14          Do you recall that?

15    A.  I don't particularly recall that, but it may very well have

16    been sent to me.

17          MS. FRIEDMAN:  Your Honor, I'd move for admission of

18    668.

19          MR. MASTRO:  Your Honor, there's hearsay in the

20    document and I also object on relevance grounds.

21          THE COURT:  What's the hearsay?

22          MR. MASTRO:  Well, it talks about, it talks about what

23    she said in the bottom part of the message from Sullivan.

24    There's what other people said and not to him.

25          THE COURT:  What's the purpose of the offer,

1   Mr. Friedman?

2              MS. FRIEDMAN:  Your Honor, and I could lay a better

3   foundation if I need to.

4              THE COURT:  Go ahead.

5              MS. FRIEDMAN:  The purpose of the offer is to indicate

6   that Chevron was meeting with the minister of foreign trade

7   about the lawsuit in Ecuador and the other things that are in

8   the email as well.

9              MR. MASTRO:  He is offering it for the truth of the

10  matters asserted, your Honor, and it has to do with the hearsay

11  from the particular individual referred to in the bottom part

12  of the email.  Not a direct communication with Mr. Veiga.

13             MS. FRIEDMAN:  If I could, your Honor, I'll ask a

14  couple more questions to lay a function.

15             THE COURT:  Go ahead.

16  Q.  Mr. Veiga, who is Jim Sullivan, SCO Ecuador?

17  A.  Mr. Sullivan, my recollection is that Mr. Sullivan was the

18  commercial attache at the U.S. Embassy in Quito.

19  Q.  And then you've told us who Mr. Irwin is.  He is the -- I

20  forget the title, but he works for Chevron in public relations?

21  A.  Public affairs.

22  Q.  Public affairs, I'm sorry.

23             On the CC it says Mr. or Mrs. Saxton.  Who is that?

24  A.  I can't see from here.

25  Q.  I'm sorry.  Do you see it?

DAFLCHE5                    Veiga - cross

A.  Mary Beth Saxton.  Mary Beth Saxton, my recollection is she

was an employee of public affairs in the Coral Gables office.

Q.  And understanding that you don't have a specific

recollection of receiving this email, was it uncommon for you

to get correspondence about what the foreign minister was doing

with respect to the Ecuador lawsuit?

A.  I received several emails with regard to Chevron's position

that the Republic of Ecuador, Petroecuador had to honor their

agreements.  To that extent, I did receive several emails with

regard to that subject.

Q.  All right.  And whether it was in this email or in another

communication, did you receive suggestions from the minister of

foreign trade in Ecuador that Texaco and/or Chevron participate

in parallel negotiations with the indigenous people who filed

the suit?

        MR. MASTRO:  Objection, your Honor, hearsay.

        THE COURT:  Overruled.

A.  I don't have any personal knowledge or recollection about

this kind of suggestions.  We did spend time and had several

meetings, some of them I participated, in which Chevron was

trying to assure that the obligations assumed by Petroecuador

and the Republic of Ecuador would be honored.  And we try to

resolve this amicably in order to avoid an arbitration that we

end up initiating against the republic.  So there were several

meetings in which we discussed the lack of compliance by the

DAFLCHE5                         Veiga – cross

Republic of Ecuador and Petroecuador about their part of the bargain.

Q.  But the case that was filed in Ecuador, the one that's being referred to here, is filed not on behalf of the Republic of Ecuador but on behalf of indigenous people that live in the area; is that right?

A.  The case, Lago Agrio, was basically claims for diffuse rights and rights of the collectivity, general environmental claims.  In those claims, and our position has been they have been settled by the Republic of Ecuador and Petroecuador, which was the majority partner in the consortium.  It was supposed and assumed responsibility to remediate a number of sites that were corresponding to their equity position in the consortium, which they failed to my knowledge to remediate and were being sued for the things that the republic assumed they were supposed to do.  So that was basically the relationship with the liability that might arise out of the Lago Agrio case.

Q.  And think I understand your position on that.

My question is if that's the case, why would you undertake parallel negotiations with the indigenous people?

A.  We did not maintain any parallel negotiations with the indigenous people that I know.

Q.  Okay.

MS. FRIEDMAN:  Your Honor, I move into evidence 668.

MR. MASTRO:  Still objection hearsay, your Honor.  The

DAFLCHE5                    Veiga - cross

1    lower part of the email chain that Mr. Veiga was not on is all

2    hearsay.  It's offered for the truth the matter asserted.

3         THE COURT:  What about it, Mr. Friedman?

4         MS. FRIEDMAN:  Your Honor, it is offered not --

5    although my questioning, of course, got to some of the issues

6    that were the truth of the matter, it is a reflection of the

7    communication going back and forth between -- the Court is

8    aware from the complaint and from numerous other documents in

9    this case that Chevron's position has been that it's improper

10   for the plaintiffs and their lawyers to have been communicating

11   with officials in the Republic of Ecuador on the subject matter

12   of this case.  That runs through all the paperwork.  Here is an

13   example.

14        THE COURT:  That's an obscure statement of their

15   position.  I'm sure they'll have several statements of your

16   position from time to time that you may disagree with as well.

17        MS. FRIEDMAN:  Sure.  So, yeah.  I don't want to

18   overstate it.  But there are I think it's fair to say both in

19   the complaint and in the witness declarations assertions by

20   Chevron and its witnesses that it was improper to have contact

21   with Republic of Ecuador representatives, governmental

22   representatives, about the subject matter of the case.  And

23   here we have evidence that that was clearly going on by Chevron

24   as well.  At this point that's the limited purpose of seeking

25   admission.  It's really as simple as that.

1          MR. MASTRO:  Your Honor, I was just going to say our

2     position is it's improper to have improper context.  This is

3     offered for the substance of the communication, what was said

4     for the truth of the matter said.  That makes it classic

5     hearsay.

6          THE COURT:  Look, for what it's worth, I'll take it

7     without making an issue of the hearsay for the moment.

8          (Defendant's Exhibit 668 received in evidence)

9          MS. FRIEDMAN:  Thank you, your Honor.

10          THE COURT:  Go ahead.

11     BY MS. FRIEDMAN:

12     Q.  Mr. Veiga, I'm going to switch topics now if I could.

13          I want to ask you about some witnesses that Chevron --

14     well, maybe just so you and I are communicating, in the

15     litigation in Ecuador, was Chevron a party?

16     A.  You're talking about the Lago Agrio?

17     Q.  Yeah.

18     A.  Chevron was the only defendant in that case.

19     Q.  When we talk about Chevron's positions, we're talking

20     about -- well, I think that's all we need.

21          So Chevron hired a Dr. Alvarez, a Dr. Mackay, and a

22     Dr. Hinchey as expert witnesses to provide information to the

23     court; is that correct?

24     A.  The -- there were several experts that both parties

25     nominated to the court as part of judicial inspections.  And

DAFLCHE5                     Veiga - cross

1    those nominations go to the judge, and the judge would then

2    either accept or not.

3              To my recollection, the judge have accepted all the

4    nominations by both parties.  So to the extent that these

5    individuals were nominated by Chevron as their technical

6    consultant for the judicial inspections, that's true.

7    Q.  All right.  Just so I make sure the record is clear,

8    sometimes Chevron would nominate experts, but before those

9    experts could provide information to the court they had to be

10   approved by the court; is that right?

11   A.  There was a procedure for them to be sworn in and finally

12   selected by the court to work and attend and participate as

13   members of the judicial inspection procession.

14   Q.  And, likewise, plaintiffs would sometimes nominate experts

15   that would then have to go through that same process?

16   A.  In my recollection is that the plaintiffs did the same

17   process for I would say most of the judicial inspections.

18   Q.  And so among others, I know there were many, but among

19   others, Chevron hired or nominated Dr. Alvarez, Dr. Mackay, and

20   Dr. Hinchey to provide expert information to the court?

21   A.  Sitting here today, my recollection is that they were some

22   of them, but I just don't remember all the names.

23   Q.  All right.  If an expert was nominated by Chevron to

24   provide information to the court, who would pay for that

25   expert?

DAFLCHE5                    Veiga – cross

A.   Usually each party pays the expense and the fees for their

respective technical consultants.

Q.   All right.  And with the technical consultants that Chevron

nominated and got approved by the court, you would meet with

those experts, not you personally, but Chevron lawyers would

meet with those experts?

A.   Yes, I would say so.

              (Continued on next page)

DAF8CHE6                    Veiga - cross

1   Q.  And they would discuss the substance of the case and the

2   substance of the expert's opinions in those meetings?

3         MR. MASTRO:  Objection, your Honor.  He is being asked

4   hearsay.  He didn't say he was the person who as at any such

5   meetings or involved in those conversations.

6         THE COURT:  Certainly it's not asking for any hearsay.

7         You want to rephrase the question, Mr. Friedman?

8         MR. FRIEDMAN:  I will, your Honor.  Thank you.

9   Q.  As the supervisor of the day-to-day operations of the

10  litigation in Ecuador, the Lago Agrio litigation, were you

11  informed of meetings between Chevron lawyers and Chevron

12  nominated experts?

13  A.  Yes.  My only caveat is that the information would come

14  from my conversations with counsel.  So I am just -- there

15  might be areas that I will not be able to get into.

16  Q.  In other words, your counsel, and I am not going to ask you

17  for the substance, but your counsel would meet with experts

18  that had been nominated by Chevron and approved by the court,

19  your lawyers would meet with those experts, discuss their

20  opinions, their reports, their future reports, and would report

21  back to you to keep you up-to-date on what was going on?

22        THE COURT:  The question is highly compound.

23        MR. FRIEDMAN:  I will break that down.

24  Q.  Your lawyers would report to you about meetings with

25  experts nominated by Chevron, is that correct?

DAF8CHE6                          Veiga - cross

1              MR. MASTRO:  Objection.  Asked and answered.

2    A.  Yes.

3    Q.  They would report to you about reports the experts were

4    going to write in the future?

5              THE COURT:  Could we work on the problem of the

6    subjunctive here?  Are we asking for what the man remembers or

7    what he supposes would have happened if the world had been

8    working the way he had hoped?

9              MR. FRIEDMAN:  I am trying to ask what he remembers

10   about the process.

11             THE COURT:  That would be a better way of asking the

12   question if I could kindly suggest.

13             MR. FRIEDMAN:  I will be happy to take the suggestion.

14   Q.  Mr. Veiga, I am asking about the process by which you would

15   learn about what your lawyers were doing, and I am asking

16   specifically about their interactions with the experts.  OK?

17             MR. MASTRO:  I caution the witness not to --

18             THE COURT:  Just ask another question, please.

19             Let me help out.

20             MR. FRIEDMAN:  That would be great.

21             THE COURT:  Were there occasions when your lawyers

22   reported to you about the lawyers' interactions with experts

23   nominated by Chevron for the judicial inspection process?

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  Next question, please, Mr. Friedman.

DAF8CHE6                         Veiga - cross

1   Q.  Would they tell you about what they expected the experts to

2   put in their reports?

3           THE COURT:  Did they tell you about that?

4   Q.  Did they tell you about what they expected the experts to

5   put in their reports?

6   A.  Obviously not.

7   Q.  Did they tell you about what they expected the experts'

8   opinions to be?

9   A.  No.

10  Q.  So when the experts' opinions came out, those were a

11  complete surprise to you?

12  A.  They were the opinions of the experts.  It's difficult to

13  say they would be a surprise because we had our own views of

14  certain issues at stake.  Example, if the inspection was at a

15  site that has been operated by Petroecuador, at least I expect

16  a certain result, an open pit would have no record of being

17  operating that site.  So it was not a surprise, but I obviously

18  would not know what the final position of any expert would be.

19  Q.  What was the purpose then of your lawyers meeting with

20  these experts?

21  A.  The main purpose was -- I don't know if you have experience

22  in the judicial inspection process.  It's a process, a

23  procedure that is very common in civil law litigation.  Usually

24  it's done to request the inspection of a certain evidence in a

25  closed environment.  Example, I want the judge to inspect the

DAF8CHE6                    Veiga - cross

books of a company.  I know what the subject is of the

inspection.  I know where the books will be.  It's a closed

environment.  It's very well defined.

        In this case, this was very different.  The parties

had requested judicial inspections in an open environment.  So

if you could imagine, you go to an industrial facility that is

being operated by another company in an open area.  So you have

to define, what is it that you're going to inspect?  What are

you going to look for?  What is it you're going to evaluate?

So a lot of the communications was basically logistically to

see what is it we are going to look and how you go about to

define where a pit was located if the pit was closed and the

rain forest has already reclaimed that area.  You need to find

the pit first.  You need to have coordinates of the pit.  You

need how to delineate the pit.

        So a lot has been in preparation of this procedure and

the lawyers, obviously, will not know exactly how to proceed if

they couldn't have this kind of communication.  I believe that

the same was true for the plaintiff's experts and the

plaintiff's lawyers.

Q.  So your lawyers talked to your nominated experts about

those kinds of issues, and that would get reported back to you?

A.  Not always.

Q.  Not always.  But on occasion?

A.  Occasionally, yes.

DAF8CHE6                        Veiga - cross

1   Q.   Now, when that happened, when say an expert like

2   Dr. Alvarez or Dr. Mackay interacted with your lawyers around

3   the issues that you just described as being paid by Chevron, do

4   you still consider them to be independent experts?

5             MR. MASTRO:   Objection.

6             THE COURT:   Sustained.

7             MR. FRIEDMAN:   Could I have the basis for the

8   objection?

9             THE COURT:   The witness's opinion isn't relevant.

10  Q.   Were experts in that context represented to the court as

11  being independent experts?

12            MR. MASTRO:   Objection, your Honor.   Again, this is

13  the joint inspection experts nominated by one party for

14  another.   I object to the question, your Honor.

15            THE COURT:   And the ground, Mr. Mastro, is?

16            MR. MASTRO:   It's asking for his opinion.

17            THE COURT:   No, it's not.

18            If you know.   Answer the question, sir.

19  A.   The judicial inspection process, I had two technical

20  consultants or experts nominated by both parties.   And the

21  court would also nominate in this case five settling experts

22  themselves.   And the system worked, each party would pay for

23  its own technical consultant.   The five settling experts' fees

24  and expenses will be shared by both parties.   And as a matter

25  of law, everyone working on a judicial inspection, or issuing a

1  report to the court, has judiciary duty to the court, needs to

2  be impartial, neutral, and truthful.

3  Q.  And that would include the technical consultants that you

4  just described, the ones that were nominated by Chevron?

5  A.  Yes, sir.

6  Q.  They have an obligation to be impartial, objective, and

7  truthful?

8  A.  As the expert nominated by the plaintiffs as well.

9  Q.  It was common to refer to those technical consultants or

10  experts as independent experts, wasn't it?

11            MR. MASTRO:  Objection.

12            THE COURT:  Sustained.

13            MR. FRIEDMAN:  Your Honor, part of the --

14            THE COURT:  I know exactly what you are arguing about.

15  You can go ahead, but I am ahead of you I think.

16            MR. FRIEDMAN:  You probably are.

17            In the complaint and in some of the declarations,

18  although I couldn't cite you to them right now, there are

19  references, criticisms of Mr. Donziger, his referral of

20  Mr. Cabrera as being independent.  As my offer of proof, I

21  would like to propose that this was a common practice to refer

22  to all of these experts that had been approved by the court as

23  independent experts.  That was a common practice of both

24  parties in Ecuador because of the reasons that Mr. Veiga has

25  told us.

DAF8CHE6                    Veiga - cross

1           MR. MASTRO:  Your Honor, in the context in which

2    Mr. Cabrera later served, he was not a joint inspection expert.

3    He was the court's single global damages assessment expert

4    obligated under court orders to be independent, impartial and

5    transparent in any dealings he had with any parties.

6           MR. FRIEDMAN:  That would go to the weight.

7           THE COURT:  The objection is sustained.  This is an

8    attempt to compare a cart load of apples to a truckload of

9    oranges, and it's just not helpful.  And the specific question,

10   which is as to whether it was common to refer to technical

11   consultants or experts nominated by parties in a judicial

12   inspection, where there were two partisan experts and a

13   settling expert, is entirely off the mark from the point I have

14   made already.  Common where?  To whom?  In what time period?

15   What constitutes common?  Those are rhetorical questions of

16   course.

17          MR. FRIEDMAN:  So for my offer of proof, your Honor, I

18   would say that throughout the course of the litigation, both

19   parties commonly, frequently, regularly referred to any expert,

20   who had been approved by the court to provide expert reports or

21   opinion, as independent experts.  And understanding your

22   ruling, I won't ask any more questions about that.

23          THE COURT:  Let's go on.

24   BY MR. FRIEDMAN:

25   Q.  Mr. Veiga, I wouldn't expect you to know the exact number

1   necessarily, but could you give us the approximate number of

2   expert reports the Ecuador court had at the time it wrote its

3   verdict?

4   A.  I don't have this in my mind.  I'm sorry.

5   Q.  Is it over 100?

6           MR. MASTRO:  Objection.

7           THE COURT:  Sir, you have got a 216,000 page record.

8   If you're interested, you can count instead of taking rank

9   speculation.

10  Q.  Is it correct, Mr. Veiga, that Chevron filed recusal

11  motions on every judge in the Ecuador case except for Judge

12  Guerro?

13          MR. MASTRO:  Objection.  The record speaks for itself.

14          THE COURT:  Sustained.

15          MR. FRIEDMAN:  Then I would move into evidence the

16  entire record of the Ecuadorian proceedings.

17          THE COURT:  I imagine we will get there before long.

18          Let's go along.

19  Q.  Were you consulted about Chevron's decisions to file

20  recusal motions?

21  A.  I participated in some discussions with counsel, yes.

22  Q.  Are you aware of any judge that Chevron did not make a

23  recusal motion about?

24          MR. MASTRO:  Objection, your Honor.  It's

25  attorney-client that would only be in communications with

DAF8CHE6                        Veiga – cross

1    counsel.

2              THE COURT:  Sustained.

3    Q.  Did Chevron place ads in Ecuadorian media outlets, such as

4    newspapers, magazines and television -- let me take it a step

5    at a time.  Strike that question.

6              Let me ask it this way.  Did Chevron place ads in

7    newspapers about this litigation in Ecuador?

8    A.  Chevron did place press release and has placed open letters

9    that I remember setting the record straight with regard to the

10   true facts involved in the litigation.

11   Q.  Some of those ads, for example, have the headline fraud of

12   the century?  Do you recall that?

13   A.  I don't recall specifically, but we did present evidence in

14   our belief that the Lago Agrio judgment was created with fraud.

15   Q.  That was even before the verdict came out, is that right?

16   A.  I don't remember exactly the dates, sir.

17   Q.  Would you take a look at Defendants' Exhibit 764, please?

18   A.  Which one?

19   Q.  It's up on the screen, but I will hand you a copy as well.

20             Mr. Veiga, I see your name up at the top as somebody

21   who is on this e-mail trail.  Do you see your name up there?

22   A.  If you can give me just one second.

23             Yes, sir.

24             MR. FRIEDMAN:  I would move for admission of 764.

25             THE COURT:  Is there some reason why the version of

DAF8CHE6                      Veiga - cross

764 that is on the disk containing the defendants' exhibits is

not the same document that is on the screen that we are

currently using?  There may be substantial, partial or complete

overlap of text, but they are certainly not the same documents.

They are formated differently.  The number of pages is

different.

          MR. FRIEDMAN:  Yes.  The short answer is I don't know,

your Honor.

          THE COURT:  Which deck of cards are we going to play

with?

          MR. FRIEDMAN:  I have got a paper original.  The

witness has a paper original.  I can give the Court a paper

original.

          THE COURT:  What is the source for this monitor?

          MR. FRIEDMAN:  I think it's the hard drive that we

gave you.  If we can check with Mr. Taylor, maybe he has an

answer that I don't understand.

          MR. MASTRO:  Just to clarify, last night at 1 in the

morning we were sent by Mr. Donziger a completely new set of

their exhibits, some numbers changed, some content changed,

included dozens and dozens of crude clips for the first time,

out of the 600 hours of crude clips, and some of the numbers

changed and content.  So, unfortunately, this might fall into

that category.  But I plan to raise that with the Court at the

end of the day.

DAF8CHE6                    Veiga - cross

1          THE COURT:  Does anybody know?

2          MR. FRIEDMAN:  Here is what I can tell you.  I don't

3    know how helpful this is.  Ms. Littlepage and I got involved in

4    this case a few weeks ago.  What we discovered is that the

5    people working on behalf of Mr. Donziger had not done trial

6    work before, and they assumed that anything that had been put

7    attached as anywhere in the record ever in the history of this

8    case was part of the record and would be able to be considered

9    by the Court or the Court of Appeals.  We caught that error,

10   and we have been trying to fix this situation ever since.  And

11   so we have been working hard, pretty much every waking moment,

12   trying to get the exhibits into the kind of order that one

13   would expect in a trial like this.  And all I can do is

14   apologize.

15         THE COURT:  In this instance, we will go to the paper.

16   Provide me with the paper, please.

17             For the record, the paper version of the exhibit is

18   marked Defendants' Exhibit DX 764.  It is four pages in length.

19   It bears numbering stamp CVX-IRCO-4908045 through 48.  Let's

20   proceed.

21         MR. FRIEDMAN:  I think I just moved this into evidence

22   when we left off.

23         MR. MASTRO:  If I could just get clarification.  On

24   what basis is it being offered for, impeachment, for truth of

25   the matters asserted in it?

1           MR. FRIEDMAN:  Yes.  For the truth of the matter.  I

2    can walk him through each of these people, but I think from the

3    e-mail addresses it looks like they are all Chevron people.

4           THE COURT:  What is the point of it?

5           MR. FRIEDMAN:  The point of it is that Chevron was

6    trying to reach the public with various ads, trying to reach

7    politicians with various ads.  Again, the same sort of things,

8    without getting into argument, that Mr. Donziger and his people

9    were accused of doing.

10          THE COURT:  Quickly, Mr. Mastro.

11          MR. MASTRO:  They are not all Chevron people.  Many of

12   them are from outside firms communicating with people within

13   Chevron.  The portion where Mr. Veiga wants to rebut the lies

14   and the falsehoods that are coming from the other side, I don't

15   have any problem with that coming in.  I am just pointing out

16   there are many parts of this that are potentially hearsay and

17   they are not from Chevron people.  They are from outsiders.

18          THE COURT:  They mainly don't have any content either.

19          Received.

20          (Defendant's Exhibit 764 received in evidence)

21          MR. FRIEDMAN:  I will just do paper for the rest of

22   the day and then I will switch over.

23          THE COURT:  Mr. Friedman, maybe we can make some real

24   progress.  Is the point that Chevron ran ads in Ecuador putting

25   forth its view of the case, is that the point?

DAF8CHE6                      Veiga - cross

1          MR. FRIEDMAN:  Yes, your Honor.

2          THE COURT:  So stipulated, Mr. Mastro?

3          MR. MASTRO:  Yes, your Honor, to set the record

4     straight, absolutely.  Chevron did that to set the record

5     straight.

6          THE COURT:  Let's move on.  It's stipulated.

7          MR. FRIEDMAN:  Nevertheless, your Honor, I would just

8     like to get 798 into the record.  It talks about the amounts of

9     money that Chevron was spending in that regard.

10          THE COURT:  How is that relevant or material?  It's

11     stipulated that they did it.  What is the point?

12          MR. FRIEDMAN:  I think the point is the extent to

13     which they did it.  Three ads a week over a five week period,

14     etc., the magnitude of what they were doing.

15          THE COURT:  What fact in issue does that make more or

16     less probable in this case?

17          MR. FRIEDMAN:  It makes it more probable that Mr.

18     Donziger and his allies pushing back against that media barrage

19     was necessary and appropriate and not improper in any way.  If

20     they will stipulate that what he did in pushing back against it

21     is not inappropriate, then we don't have an issue, but I don't

22     think they are going to do that.

23          MR. MASTRO:  What we allege Mr. Donziger did was lie

24     to the press, to courts, to government regulators, etc.

25          THE COURT:  Got it.

1           What about that, Mr. Friedman?

2           MR. FRIEDMAN:  There are two sides to this litigation,

3    your Honor.  I understand there are plenty of press reports.

4    For example, I will just take one example to illustrate.  Mr.

5    Donziger is accused of organizing demonstrations in Ecuador.

6    He would say to combat the barrage of public ads and other

7    things that Chevron did.

8           THE COURT:  This is where I expected sooner or later

9    to get to today, and it is the notion that if your adversary is

10   active and aggressive and putting forward his position, you not

11   only may do what the adversary is lawfully doing, but you can

12   engage in other activities which are not, and the theory of it

13   is that the ends justify the means, and the problem is they

14   don't.

15          Now, if you as part of a defense here are offering to

16   prove that Chevron was out there telling untruths, pressuring

17   judges, whatever, within the limits of the rulings I have made,

18   that's fair game.  If you're saying that because Chevron ran

19   ads in Ecuador, it was therefore appropriate for Mr. Donziger,

20   assuming the proof bears this out, to lie his head off in ads,

21   well, that's not getting you to first base.  So let's move on.

22          MR. FRIEDMAN:  To be clear, your Honor, we are not

23   arguing that the ends justify the means.  But we are arguing

24   that many of the things that Chevron is accusing him of -- the

25   demonstrations, there is no argument, I don't think, that

DAF8CHE6                        Veiga - cross

1    statements made in those demonstrations were untruths for

2    example.  So he is combating ads that --

3            THE COURT:  All I can do is deal with one thing at a

4    time.  Right now we are on the subject of advertising.  Chevron

5    stipulated they did advertise it.  Now move on.  We don't have

6    to have more proof that they did advertise.

7            MR. DONZIGER:  Can I consult with Mr. Friedman for one

8    moment?

9            THE COURT:  Fine.

10           Next question, please.

11           MR. FRIEDMAN:  Yes, your Honor.

12   Q.  Mr. Veiga, switching subjects, would it be correct that

13   towards the end of 2003, or early 2004, you on behalf of

14   Chevron approached the attorney general of Ecuador to talk

15   about this case, the Lago Agrio case?

16   A.  Around that time, I did attend a meeting with the attorney

17   general of Ecuador.  The subject of that meeting was basically

18   our views of the obligations in the Republic of Ecuador and

19   Petroecuador vis-a-vis the contracts, the agreements that they

20   signed, and the fact that we are being sued for the same claims

21   for which had been released.

22   Q.  And you wanted the attorney general to issue an official

23   statement with respect to the litigation, is that correct?

24   A.  We basically requested the attorney general to give us

25   assurance that the Republic of Ecuador would in fact honor the

DAF8CHE6                        Veiga – cross

1    obligations that they assumed.  We didn't ask any specific

2    thing that I remember from those initial meetings.

3    Q.  Didn't you ask him to make an official statement or

4    stipulation that could be used to get the Lago Agrio court to

5    dismiss the case?

6    A.  No, sir.  The attorney general in one of the subsequent

7    meetings offered an officio, which is a binding opinion by the

8    Republic of Ecuador, establishing that TexPet and its

9    affiliated companies had indeed been released of any

10   environmental liabilities and that Petroecuador had assumed any

11   liabilities therefor.  It was not to use specifically in the

12   Lago Agrio litigation, but he offered as an assurance that they

13   would honor those obligations.

14   Q.  So I want to make sure we understand what you're saying.

15   He could issue an official statement.  What is that called?

16   A.  Officio.

17   Q.  And that officio statement would have effect on the courts

18   in Ecuador?

19   A.  I don't know that.

20   Q.  Your hope was that if you got that officio statement, it

21   would cause the Lago Agrio litigation to be resolved, is that

22   correct?

23          MR. MASTRO:  Objection, your Honor.

24          THE COURT:  Overruled.

25   A.  Our hope was that they would honor their obligations and

1    justice will be made.

2    Q.  And that the case would be resolved based on the attorney

3    general's officio?

4    A.  The case would be resolved based on the facts and based on

5    and the facts that Petroecuador had assumed any remaining

6    obligations for environmental remediation there.

7              MR. FRIEDMAN:  Can I have just a moment, your Honor?

8              THE COURT:  Yes.

9              MR. FRIEDMAN:  I wasn't sure of the procedure.  What I

10   have done is marked for the record, although I would move it

11   into evidence, portions of this deposition.

12   Q.  Mr. Veiga, if you would turn to, let's just go right to

13   page 238, if we could.

14             MR. MASTRO:  This is not a 30(b)(6) in this case.

15             THE COURT:  What?

16             MR. MASTRO:  He is offering this --

17             THE COURT:  He hasn't offered anything yet.  He just

18   asked him to turn to page 238.

19             MR. MASTRO:  That's fine, your Honor.

20   Q.  Mr. Veiga, just for the record, this is a deposition you

21   gave on November 8, 2006, in the case of *Republic of Ecuador v.*

22   *Chevron Texaco Corporation, et al.*?

23             THE COURT:  We are not doing that.  We covered that,

24   remember, last week?  It is what it is.

25             MR. FRIEDMAN:  All right.

DAF8CHE6                    Veiga - cross

1          THE COURT:  Ask your question.

2   Q.  If you go to page 238, Mr. Veiga, and feel free to read the

3   earlier parts as well, didn't you respond to questions about

4   the attorney general --

5          THE COURT:  Page, line numbers.  There was a

6   stenographer there.  We know exactly what was asked and what

7   was responded.  If you have a question, based on that, you can

8   ask it.  But let's save all this time about the usual back and

9   forth about weren't you deposed, weren't you asked this,

10  weren't you asked that.  Let's move on.

11          238, line?

12          MR. FRIEDMAN:  Line 8 through 12.

13  Q.  Didn't you testify that your hope was the officio from the

14  attorney general could be used to get the Lago Agrio court case

15  dismissed or resolved?

16  A.  Page 238, line?

17  Q.  8 through 12.

18  A.  I don't think those lines say that.

19  Q.  How do you interpret those lines?

20          THE COURT:  I think the first problem is you have

21  probably given him the wrong line numbers, Mr. Friedman.  I

22  think you probably meant to indicate line 1 to line 12, which

23  puts a rather different spin on it.

24          MR. FRIEDMAN:  Actually, even going back further, but

25  I wanted to get right to it.

DAF8CHE6                     Veiga - cross

1    Q.  Lines 1 through 12.  Let's try that.

2                MR. MASTRO:  I don't think this is proper impeachment

3    at all.  His testimony on examination was about hoping to

4    resolve the case, and his answer here is ultimately to get that

5    resolved.

6                THE COURT:  We are wasting a lot of time here.

7                This all starts off -- I shouldn't say starts off.

8    But the penultimate piece of testimony says, the attorney

9    general made a speech of his views.  And the witness recounted

10   his recollection of what the attorney general said.  And then

11   he was asked whether there was any further discussion or did

12   the meeting break up.  And he went on for a little bit about

13   what happened after that.  And then he was asked, so the

14   contemplation was thus and such.  And he responded, the

15   stipulation could be used, which is all entirely consistent

16   with what he has said.  And if you want to offer this at some

17   appropriate point, fine.  But let's try to make a little

18   progress is.

19               MR. FRIEDMAN:  What I would like to do is just offer

20   1302 as part of the record.  I don't need to argue with anybody

21   about the meaning or any of that.  I think the statement speaks

22   for itself.

23               THE COURT:  Now, what have we got here, 20, 30 pages,

24   that you want to offer?

25               MR. FRIEDMAN:  It starts at Bates number 2288783 and

DAF8CHE6                    Veiga – cross

1    it ends at --

2              THE COURT:  Did you designate this as part of your

3    deposition designations?

4              MR. FRIEDMAN:  I don't believe so because we thought

5    he was coming live.

6              THE COURT:  Yes, he is live.  So you're entitled to

7    use it for impeachment, but it's not proper impeachment because

8    it's consistent with his testimony.

9              MR. MASTRO:  Correct, your Honor.

10             MR. FRIEDMAN:  I have a different view of whether it's

11   consistent, your Honor.  I would just like it part of the

12   record.

13             THE COURT:  Look, it's marked for identification.

14   It's part of the record.  The bottom line of this is it is also

15   of no probative value here, at least not to this trier of fact.

16   So let's get on.  It's an argument about choice of language, at

17   best.

18   BY MR. FRIEDMAN:

19   Q.  Now, around this same time period, Mr. Veiga, that is late

20   2003, early 2004, you also approached the president of Ecuador

21   while he was in New York -- let me just stop there.  You also

22   approached the president of Ecuador while he was in New York?

23   A.  I didn't approach him.  There was a conference sponsored by

24   Ecuador to promote several potential investors in companies who

25   were invited, and I attended this conference.  It was basically

DAF8CHE6                        Veiga – cross

1   the venue for this meeting.

2   Q.  At that meeting with the president, you also discussed with

3   him the points you talked earlier about, Texaco's position

4   about how the earlier agreement should be honored?

5   A.  Very briefly.  There were specific meetings after the

6   conference, and it was a very brief meeting, in which we

7   introduced ourselves and we raised this concern that we had.

8   Q.  The concern was that the Lago Agrio litigation was contrary

9   to the agreements the Republic of Ecuador had signed?

10  A.  No.  The concern was really that we needed to have

11  assurance that Petroecuador would honor the obligations that

12  they assumed, since they were the sole operator of the former

13  consortium fields, and the Republic of Ecuador would honor the

14  release that they granted.

15  Q.  And that's because the claims that were being made by the

16  Lago Agrio plaintiffs you felt fell exactly within the

17  settlement agreements?

18  A.  That's correct.

19  Q.  And it was your hope that if the president of Ecuador would

20  honor those agreements in some way, it would end the Lago Agrio

21  litigation?

22  A.  It was my hope.

23          THE COURT:  What is the objection?

24          MR. MASTRO:  Your Honor, he is using the subjective

25  voice again in formulation of the question.

DAF8CHE6                          Veiga – cross

1          THE COURT:  Overruled.

2          Please answer.

3   A.   The hope was simple.  We sign an agreement.  We complied

4   with our portion of the bargain.  We have been released of any

5   further environmental liabilities.  The state oil company,

6   Petroecuador, continue to operate those fields.  We have been

7   sued for claims that fall exactly within the scope of the

8   release, and we just want them to assure they will comply with

9   that bargain.  I don't know in which way to comply.  Hopefully,

10  they would do the remediation that they had and assume the

11  liabilities, if they exist, in whatever way they thought would

12  be appropriate.  We never asked the Republic of Ecuador to

13  intervene in the case, but we comply with our portion of the

14  bargains, and we thought that they should comply with theirs.

15  Q.   What did you want the Republic of Ecuador to do in response

16  to these communications?

17  A.   In this meeting, we didn't ask anything specifically to the

18  president of the Republic.  It was just a very brief meeting in

19  which we raised the issue and expressed our concerns.

20  Q.   Let's just take this early time period of 2003, 2004.  In

21  that time period, you personally and other Chevron people, to

22  your knowledge, had other contacts with the president and other

23  high government officials about the lawsuit, is that true?

24          MR. MASTRO:  Objection to form.  There are a lot of

25  parts and components, and this, and that.

DAF8CHE6                    Veiga - cross

1           THE COURT:  Sustained as to form.  Break it down,

2     please.

3     Q.  Did you have other contacts with high government officials,

4     besides the two we have just talked about, during the 2003-2004

5     time period?

6     A.  I had some other meetings with government officials of

7     Ecuador.

8     Q.  About the Lago Agrio case?

9     A.  About the settlement agreements that we signed.  When you

10    say the Lago Agrio litigation, the release is exactly for the

11    same claims.  So, obviously, there is a relationship to the

12    claims that were made.  But our primary objective was to get

13    assurance that they would honor the agreements that they

14    signed.  It's a very reasonable expectation that any company

15    might have after complying with their portion of the bargain.

16    Q.  What did you want these government officials to do to honor

17    their part of the bargain?  What were you asking them to do?

18          MR. MASTRO:  Asked and answered, your Honor, about

19    three or four times.

20          THE COURT:  Sustained.

21          MR. FRIEDMAN:  I don't think he has ever said what he

22    wanted them to do other than honor the agreement.

23          THE COURT:  Apart from that, Mrs. Lincoln, how did you

24    like the show?

25          Move on, please.

DAF8CHE6                      Veiga - cross

1           MR. FRIEDMAN:  For my offer of proof, I would like to

2     state that --

3           THE COURT:  The witness testified he never asked the

4     Republic of Ecuador to intervene in the case, and in addition,

5     he has answered this question a number of times.

6           MR. FRIEDMAN:  He said that he wanted them to honor

7     the agreement, but he hasn't said what he wanted them to do.

8     That's what I am trying to find out.  If he only gives one side

9     of the story and I can't cross-examine him about the other, I

10    have got a problem.

11          THE COURT:  You have been cross-examining for a while.

12          Answer it once more, Mr. Veiga.

13    A.  First of all, we wanted them to give assurance to us that

14    they would honor their obligations.  Part of those obligations

15    had to do with Petroecuador assuming liabilities for any

16    remaining remediation of the sites, not including the scope of

17    work that we were responsible for.  And the other one was for

18    the Republic of Ecuador to assume any liabilities based on the

19    release that they got.

20    Q.  Did they ever agree to do either of those things?

21    A.  In the contracts, yes.

22    Q.  I mean in your conversations.

23    A.  All these conversations were very vague.  A lot of

24    background information -- thank you, we will think about or get

25    more information.  No concrete result, which really prompt us

DAF8CHE6                          Veiga – cross

1    to have to initiate arbitration against the Republic of

2    Ecuador.

3    Q.  The attorney general that you spoke to in that conversation

4    that you referred to a few minutes ago, was that Attorney

5    General Borja?

6    A.  Yes, sir.

7    Q.  Did Chevron, to your knowledge, ever ask Attorney General

8    Borja to call Judge Guerra and ask him not to move the Lago

9    Agrio case forward?

10   A.  Not to my knowledge.

11   Q.  Was that something that you would have wanted Attorney

12   General Borja to do?

13              MR. MASTRO:  Objection to form.  He is asking him to

14   speculate on whether he wanted that done or not, when he never

15   said he wanted that done.

16              THE COURT:  Sustained.

17   Q.  Is it correct that Chevron hired a security firm to place

18   Mr. Donziger and other people associated with the plaintiff

19   side of the case under surveillance?

20              MR. MASTRO:  Objection, your Honor.  It calls for work

21   product, even if that were the case.  But objection.

22              THE COURT:  I think I have ruled on this, sir.

23              MR. FRIEDMAN:  Yes, sir.  I am unfamiliar with your

24   ruling.  I'm sorry.

25              THE COURT:  That it's protected by work product.

DAF8CHE6                          Veiga – cross

1              If I am mistaken in that, I would like you to call it

2       to my attention.

3              We will take a short break right now and you can check

4       with your colleagues.

5                  (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAFLCHE7                          Veiga - cross

1              THE COURT:  Be seated, folks.

2              Okay.  What is the objection?

3              MS. FRIEDMAN:  I think where we left off, your Honor,

4      there was an objection on work product privilege, to me asking

5      questions about surveillance of the plaintiffs.

6              THE COURT:  I think there was an objection.  So let's

7      hear what the objection is.

8              MR. MASTRO:  Yes, your Honor.  It's a work product

9      objection and your Honor has already ruled on this and that's

10     document No. 1276 your Honor's order in which you said the

11     extent work is -- work product privilege extends to work

12     prepared by private investigator in anticipation --

13             THE COURT:  Slow down, would you please, Mr. Mastro.

14             MR. MASTRO:  So your Honor ruled already that work

15     product privilege extends to --

16             THE COURT:  Would you get near a microphone.  This is

17     very difficult.

18             MR. MASTRO:  Sure.  That's all I wanted to say, your

19     Honor.

20             THE COURT:  But I didn't hear any of it.

21             MR. MASTRO:  Your Honor, in document 1276 in your

22     Honor's order filed on June 28, 2013, you already ruled that

23     work product privilege extended to this subject matter, work

24     prepared by a private investigator in anticipation of

25     litigation, at least where the investigator is working at the

DAFLCHE7                    Veiga - cross

1    direction of an attorney.

2                   THE COURT:  Do you mean 1276 or 1277?

3                   MR. MASTRO:  The docket number is 1276 that I'm

4    reading from, your Honor.

5                   THE COURT:  Okay.

6                   MR. MASTRO:  It's also a relevance issue, your Honor,

7    as to why that would be relevant, but it's a work product

8    privilege as well.

9                   THE COURT:  Okay.  Mr. Friedman.

10                   MS. FRIEDMAN:  Your Honor, here's my understanding of

11   the situation, but I'd be the first to defer to anybody else.

12   But my understanding is the Court made a ruling that we could

13   not get the substance of what the reports, for example, of the

14   surveillance company, but that during depositions we were

15   allowed by the magistrate or, I'm sorry, the special master to

16   ask some questions about the extent of the surveillance and

17   things like that.

18                   So I think my impression is the special master took

19   your ruling and applied it to discovery and so we do know some

20   things from those depositions that came in over objection by

21   the special master's rulings.

22                   THE COURT:  And what about relevance?

23                   MS. FRIEDMAN:  The relevance, your Honor, is once

24   again the part of the allegations against the plaintiff is all

25   of the pressure they applied to Chevron personnel.  And this is

1    not an ends justify the means argument, your Honor, but it's a

2    what's going on is not improper.  If it's not improper for them

3    to do -- and I won't recite the facts because you haven't ruled

4    on it yet.  But it's not improper for them to do these things,

5    it's not improper for us to have some somebody watching them

6    or, you know, similarly keeping track of what they're doing.

7           So it's -- what I think Chevron is asking is that you

8    hear one half of what happened in Ecuador and not hear the

9    other half.

10          MR. MASTRO:  Your Honor, there's no allegation in our

11   case that whether or not Mr. Donziger or the Lago Agrio

12   plaintiffs have an investigator that that's part of our

13   substantive claims.

14          And, your Honor, just to set the record straight

15   because I was at many of these depositions, Special Master Katz

16   shut down this line of questioning immediately in the Rivero

17   deposition.  Special Master Gitter allowed limited questioning

18   and then shut it down at the Carson deposition.

19          THE COURT:  Well, for the moment I'm going to sustain

20   the objection, subject to allowing both sides to go back and

21   call to my attention anything else in the record that may

22   indicate a different result.

23          On the issue of relevance, my recollection is that

24   there's no contention by Chevron that any part of the allegedly

25   extortionate behavior consisted of doing surveillance on any

DAFLCHE7                        Veiga - cross

1    Chevron personnel.  I simply don't remember that in the

2    complaint or anywhere else and so I don't see what else it

3    could possibly be relevant to, if that.

4          Now, there was an awful lot of pretrial litigation

5    over discovery with respect to surveillance activities or

6    alleged surveillance activities.  My best recollection, and as

7    much as I've been able to check in the brief period since we

8    took the recess, none of that effort by the defendants to get

9    into that subject was based on the argument that's now

10   advanced.  There were all sorts of other arguments, but none

11   based on that.  And there were several rulings both by the

12   magistrate, by the special masters and by me and I think by

13   Judge Francis.

14         So for now we're not going into this.  You're all

15   welcome to brief this or simply to give me any materials you

16   consider relevant by 8:30 tomorrow morning, and then we'll see

17   whether there's any basis to change the ruling.

18         I'm frank to say with a record of over 1,500 filings,

19   I can't always remember instantly each and every one of them

20   though I try.  So that's where we are at the moment.

21         MS. FRIEDMAN:  Thank you, your Honor.

22   BY MS. FRIEDMAN:

23   Q.  Mr. Veiga, I'm going to ask to you look at Exhibit 780.

24         THE COURT:  Plaintiff or defendant's?

25         MS. FRIEDMAN:  I'm sorry, Defendant's Exhibit 780.

DAFLCHE7                          Veiga - cross

1        THE COURT:  I would also, Mr. Friedman, before just

2   leaving that subject entirely, specifically invite your

3   attention to the opinion filed June 28 in which I went to quite

4   I thought great extent to recognize an argument that could have

5   been made but wasn't really by your clients, recognize it, and

6   do an in camera inspection of documents to make sure there

7   wasn't anything in there that was pertinent to the point

8   that --

9        MS. FRIEDMAN:  Understood.

10        THE COURT:  -- might well have been argued or argued

11   better.  Anyhow, I'm aware of the issue and there we are.

12        Next.

13   Q.  Yes.  Mr. Veiga, could you tell us who Sam Singer is?

14   A.  I believe that Mr. Singer is a contractor for Chevron.

15   Q.  And in what area does he contract?

16   A.  Public relations.

17   Q.  And who is Kent Robertson?

18   A.  Kent Robertson is one of Chevron employees in the public

19   relations department.

20   Q.  So Sam Singer provides advice to Chevron regarding public

21   relations?

22   A.  He does provide recommendations.

23   Q.  And I guess Kent Robertson implements, if he thinks

24   appropriate, those recommendations?

25   A.  I'm not sure.

DAFLCHE7                        Veiga - cross

1        MR. MASTRO:  Objection, calls for speculation.

2        MS. FRIEDMAN:  Your Honor, I'd move for admission of

3   780, Defendant's Exhibit 780.

4        MR. MASTRO:  Objection, your Honor.  This is from

5   outside consultant.  Mr. Veiga is not on the document.  It's

6   not any sort of admission or statement by Chevron, so we object

7   to it on hearsay grounds, also on relevance grounds.

8        MS. FRIEDMAN:  Your Honor, the testimony is that

9   Mr. Singer is an outside consultant who is hired by Chevron to

10  give advice on public relations.  This is within the scope of

11  his assignment under 801(d)(2)(D).  He's an agent of a party

12  for purposes of working on public relations issues.

13        THE COURT:  What's the relevance?

14        MS. FRIEDMAN:  Well --

15        THE COURT:  I'm sure there's a contractor who stocks

16  the paper towels in the rest rooms and probably has written

17  memos.  What's it got to do with anything?

18        MS. FRIEDMAN:  Well, for one thing, your Honor, you

19  earlier told us that if we could show that -- well, let me just

20  go back.  I don't want to -- let me say it this way.

21        The messages and themes on the second page include

22  trying to paint Mr. Donziger -- this is towards the middle of

23  the page, your Honor -- Steven Donziger, the most powerful man

24  in Ecuador, how one American attorney is pulling the strings of

25  an emerging banana republic in Ecuador.  Up above that, couple

DAFLCHE7                    Veiga - cross

1   bullet points, Ecuador, the next major threat to America.

2            This is the pushback.  Both sides have accused the

3   others of intimidation, misstatements.  I think we could all

4   agree, if nothing else, Mr. Donziger is not the most powerful

5   man in Ecuador.

6            There are a variety of things here that Chevron was

7   intent on communicating a message.  People can differ on

8   whether that message is accurate or not, but it goes back to

9   the point of what he's pushing back against.  You know, they

10  haven't just said, your Honor, he bribed a judge, hold him

11  responsible for that.  They said he's had demonstrations, he's

12  talked to people, he's given speeches he took out ads.  They

13  have put all of that into their complaint and into their

14  paperwork.  And to look at what he does in a vacuum and not see

15  what he was addressing is we would say inappropriate.

16            MR. MASTRO:  Your Honor, this is an outside contractor

17  who Mr. Veiga said would make recommendations.  And he's trying

18  to take those out of context, rank hearsay.  And, your Honor,

19  in this trial we will prove that Mr. Donziger was pretty darn

20  powerful in Ecuador with what he did and the friends he had in

21  the Carega.

22            But, your Honor, that's not the point.  This is

23  irrelevant.  It doesn't belong in here.  And it's certainly not

24  attributable to Chevron that some outside consultant made

25  recommendations.

DAFLCHE7                      Veiga - cross

1              MS. FRIEDMAN:  I'm hoping to offer as the trial goes

2      on evidence that they followed through on these

3      recommendations, many of them.

4              THE COURT:  So what?

5              MS. FRIEDMAN:  Well, your Honor, we don't have a jury

6      here.  You're going to weigh what you think is appropriate as

7      you think it's appropriate.  I am urging the Court to look at

8      both sides of the story.  That's what I'm doing.

9              THE COURT:  That's what I've been doing from day one.

10             MS. FRIEDMAN:  I believe that.  And so I would ask you

11     to admit this exhibit so you can weigh this as well.

12             THE COURT:  I will receive this exhibit.

13             (Defendant's Exhibit 780 received in evidence)

14             THE COURT:  But really if I get the idea that this is

15     really being done essentially to run the clock, my attitude

16     toward this is going to change.  I'm telling you right now it's

17     not helpful.  You heard the openings.  You know what their case

18     is.

19             They are not suing you for running ads in and of

20     itself; they're not.  They're not suing you for having a PR

21     strategy in and of itself; they're not.  They're not suing you

22     for litigating a lawsuit in and of itself; they're not.  And as

23     soon as we understand what the issue is, we will much more

24     swiftly get to the real issues in this case, which I hope will

25     happen.  So let's move along.

DAFLCHE7                    Veiga – cross

 1              MS. FRIEDMAN:  I'm trying.

 2              THE COURT:  I know you're trying.

 3              MS. FRIEDMAN:  And, your Honor, on the running down

 4    the clock thing, your Honor, I am not trying to run down the

 5    clock.  I am not as organized as I ordinarily am in court and I

 6    apologize for that.

 7              THE COURT:  I understand.  We're off to a perfectly

 8    good start, you and I.  I understand.  I really mean it.  Let's

 9    go ahead.  I appreciate your attitude, very professional.

10    Let's get on.

11              MS. FRIEDMAN:  Thank you, your Honor.

12              THE COURT:  Okay.  So it's in evidence.  Do we have

13    any more questions?

14              MS. FRIEDMAN:  It's in evidence.  I'll move on, your

15    Honor.

16              THE COURT:  Thank you.

17              MS. FRIEDMAN:  If I could have exhibit, Defendant's

18    Exhibit 685.  Bates 4875276.

19              (Pause)

20              MS. FRIEDMAN:  Your Honor, for the record, Mr. Mastro

21    wants me to read in 780 was CDX RICO 4746090.

22              THE COURT:  I'm sorry.  Again, please?  I understand.

23    I got it.

24              MS. FRIEDMAN:  And Defendant's Exhibit 685 is CDX RICO

25    4875276.

DAFLCHE7                    Veiga - cross

1              THE COURT:  Through 79.

2              MS. FRIEDMAN:  Yes.  I'm just going to give the first

3    page if that's okay.  Frankly, don't really understand why I'm

4    doing that.

5              THE COURT:  Well, because there's some issue as to

6    what the exhibits actually are.  So it's well to be.

7              MS. FRIEDMAN:  So, yes, it would be through 279.

8              THE COURT:  Let's go ahead.

9    BY MS. FRIEDMAN:

10   Q.  Mr. Veiga, I apologize if I asked you this before, William

11   T. Irwin, could you tell us who he is?

12   A.  William Irwin is an employee of Chevron in the public

13   affairs department in Washington, D.C.

14   Q.  All right.  And you told us who Mr. Cadez is.

15             MS. FRIEDMAN:  Your Honor, I'd move for admission of

16   685.

17             MR. MASTRO:  Your Honor, this is the same objection.

18   Mr. Cadez --

19             THE COURT:  Same ruling.

20             MS. FRIEDMAN:  Thank you, your Honor.

21             If I could have Defendant's Exhibit 626.

22             Your Honor, I'm going to pass on that exhibit because

23   we only have a Spanish version of it.

24             And I will move on to Exhibit 585, Defendant's

25   Exhibit 585, which is -- does not have a Bates number.

DAFLCHE7                          Veiga - cross

1   Q.  And, Mr. Veiga, this 585, let me ask it this way because

2   I'm not seeking to produce the exhibit.

3           At some point did you become aware that Chevron had

4   offered a journalist some money, $20,000, to go and pretend to

5   be doing a story about the Ecuadorian case for the plaintiffs

6   in the hopes of gaining information for Chevron?

7   A.  I have no personal knowledge of that.

8   Q.  At some point did you become aware of that incident?

9           MR. MASTRO:  Objection.

10  Q.  Was it reported to you?

11          MR. MASTRO:  Objection, your Honor.  He has no

12  personal knowledge of how.

13          THE COURT:  He certainly has personal knowledge of

14  whether it was reported to him.

15          THE WITNESS:  The subject was discussed through

16  counsel with me.

17  Q.  All right.  And let me ask did -- I don't want to know the

18  substance of anything, but did you have supervisory or contact

19  with Kroll, the security firm Kroll?

20  A.  Not at all.

21  Q.  Who was responsible for interacting with Kroll on the legal

22  team of Chevron?

23  A.  Outside counsel.

24  Q.  And in this case who would that have been?

25          MR. MASTRO:  Objection, relevance, your Honor.

DAFLCHE7                        Veiga - cross

1        THE COURT:  Overruled.

2    A.  I believe Gibson Dunn.

3    Q.  Okay.  And during your day-to-day supervision of the case,

4    did you become aware of a man by the name of Diego Borja?

5    A.  Yes.

6    Q.  And did you ever meet him personally?

7    A.  I think I met Mr. Diego Borja a couple occasions casually.

8    Q.  And is it true that he had worked for TexPet, Texaco, or

9    Chevron for a number of years?

10        MR. MASTRO:  Objection to form and attorney-client

11   privilege and work product.  To the extent he has any knowledge

12   in this area, it hasn't been established that he has any

13   personal knowledge of this area at all.

14        THE COURT:  You're going to have to take baby steps,

15   Mr. Friedman.

16        MS. FRIEDMAN:  I will.

17   Q.  Did you become aware of -- in your day-to-day supervision

18   of the litigation, did you become aware that Mr. Borja was

19   closely connected with companies that were doing laboratory

20   analysis of samples in the litigation?

21        MR. MASTRO:  Again, your Honor, same objection.  The

22   witness shouldn't get into anything that he only knows because

23   of communications with counsel.

24        THE COURT:  Subject to that limitation, please answer.

25        THE WITNESS:  I'm not sure I understand your question.

DAFLCHE7                        Veiga – cross

1   What do you mean by closely connected?

2   Q.  Well, did he own or have an ownership interest in Inter

3   Intell G S.A.?

4   A.  My understanding is that Mr. Diego Borja was an employee of

5   STL Laboratories and then he had his own firm.  I'm not sure if

6   this is his firm or not.

7   Q.  All right.  And his own firm, did his own firm do

8   laboratory work for Chevron in the underlying case?

9   A.  Again, I don't have specific personal knowledge of that.

10  My understanding is that the only service that he did was

11  really to phase out a laboratory, basically dispose of

12  laboratory equipment, and this is just the limitation of my

13  understanding.

14  Q.  Okay.  Is it true that he also transported laboratory

15  samples from the field to Chevron's laboratories?

16  A.  I don't know if he did it personally.  I know that STL did.

17  Q.  Is it true that Chevron eventually began paying Mr. Borja

18  10,000 per month approximately in return for being a witness in

19  this case?

20          MR. MASTRO:  Objection, your Honor, and again haven't

21  established the foundation.

22          THE COURT:  I can't hear you, Mr. Mastro.

23          MR. MASTRO:  I'm objecting, your Honor, and this

24  witness, there has not been a foundation established as to

25  whether he knows that from communications with counsel or

DAFLCHE7                    Veiga - cross

 1   whether he knows it by personal knowledge, each of these

 2   questions as we get deeper into this.  I want to make sure the

 3   witness knows there is a standing objection to attorney client

 4   communications.

 5           THE COURT:  Mr. Friedman, I think you need to phrase

 6   your questions with precision.

 7           MS. FRIEDMAN:  I'll do my best, your Honor.

 8   Q.  Is Chevron paying a monthly payment to Mr. Borja at

 9   present?

10   A.  I'm not sure of the current situation of Mr. Borja.

11   Q.  Are you aware that Chevron was paying Mr. Borja a monthly

12   payment during some period of time?

13           MR. MASTRO:  Objection, your Honor, again, same basis.

14   We don't know what his knowledge is based on and whether it's

15   only from attorneys and attorney client communication.

16           MS. FRIEDMAN:  Your Honor, part of the problem here is

17   we have information from discovery and from tape recordings

18   that were made with Mr. Borja.  I'm sure you're familiar with

19   all this.

20           THE COURT:  You would not be correct.

21           MS. FRIEDMAN:  All right.  I'm just delighted I know

22   something you don't.

23           THE COURT:  More than that, I'm sure.

24           MS. FRIEDMAN:  I'm trying to argue this in a neutral

25   way, your Honor.  If Chevron is paying a witness in this case

DAFLCHE7                     Veiga - cross

1   money and other things for their testimony, I don't think that

2   would be covered by the attorney-client privilege even if an

3   attorney is the one who puts that together.

4           THE COURT:  If Chevron calls the witness, wouldn't the

5   logical way to deal with it be to ask the witness?

6           MS. FRIEDMAN:  Well, the problem, your Honor -- that

7   would be one logical way to deal with it, for sure.  But the

8   problem is, A, they may not call the witness.

9           THE COURT:  Then it's not a concern, is it?

10          MS. FRIEDMAN:  Well, it would be because the facts

11  surrounding, as I said in opening, your Honor, it was Mr. Borja

12  who approached Judge Munoz and tried to bribe him.  And as a

13  result of that interaction -- I won't go into all the details,

14  but I can if you want -- as a result of that interaction,

15  Chevron took out ads that were false that said Judge Munoz had

16  accepted a bribe, they had evidence of bribes, etc., etc., when

17  in fact to my knowledge at least one, and I think it's more,

18  federal judges actually looked at the tapes and said there's no

19  evidence of bribing here at all.

20          So we've got Chevron -- and that's why Mr. Borja's

21  relationship with Chevron is so important as well.  We've got

22  them going into this judge recording, offering him a bribe, or

23  trying to offer him a bribe.  Ultimately, he doesn't take the

24  bribe, but they use that as an excuse to knock the judge off

25  the case, slowing things down yet again, and take out ads

DAFLCHE7                         Veiga – cross

1    saying this is proof of how corrupt the Ecuador legal system

2    is.

3              Then they take Mr. Borja, fly him out of the country

4    with his family, I believe, and at one point in time were

5    paying him a pretty healthy stipend, different things in the

6    record, either 6,000 or 10,000 a month, got him a house in

7    California in a gated community with a swimming pool on the

8    side of a golf course, gave him an SUV, gave his wife a job.

9              So it's relevant for many, many issues in this case,

10   and I don't see the attorney-client privilege.

11             THE COURT:  It's relevant for what issues in this

12   case?

13             MS. FRIEDMAN:  Well, it's relevant to Chevron's claims

14   that the Ecuadorian legal system is corrupt because in fact the

15   person turns down the bribe.

16             THE COURT:  So, in other words, it's probative of the

17   rectitude or lack thereof of the Ecuador system if on one

18   occasion one judge declined a bribe.  If that's the argument,

19   we're not going with it.

20             Next point.

21             MS. FRIEDMAN:  All right.  Fair enough.

22             The other thing, your Honor, is it is relevant to

23   Chevron's clean hands or lack of clean hands and that one is

24   obvious and maybe I'll just stop there.  That's probably our

25   strongest argument.

DAFLCHE7                         Veiga - cross

1           I think it's also relevant to sort of the sequence of

2    events that occurred in this process because what you're going

3    to hear in the outtakes that you haven't heard yet are that --

4           THE COURT:  You're making a big assumption there.

5           MS. FRIEDMAN:  Well, let me say this.  There's going

6    to be testimony to the effect that the plaintiff lawyers in

7    Ecuador were very concerned that Chevron was doing everything

8    it could to disrupt the proceedings.  I understand there's

9    another side to that, but I'm telling you our side of that

10   which is that Chevron was doing everything it could to disrupt

11   the proceedings, including attempting to bribe a judge that

12   ultimately resulted in his recusal and another judge having to

13   come in.  So that's the packet of information.  If it's true, I

14   don't think an attorney-client privilege should stand in the

15   way of the Court hearing that evidence.

16          THE COURT:  Mr. Mastro.

17          MR. MASTRO:  Thank you, your Honor, because I have to

18   respond briefly.  This witness already said he has no personal

19   knowledge.  Mr. Borja was a 1782 witness who denied under oath

20   that Chevron had any idea he was making the tapes he was making

21   at the time he made them.  They haven't designated from his.

22          THE COURT:  I'm sorry?

23          MR. MASTRO:  They haven't designated from his

24   deposition to put any of that evidence in here.  Your Honor, he

25   has so misstated the facts of what happened in that situation,

1   they neither show an innocent judge nor an innocent government

2   official from the political party of President Correa who

3   solicits a $3 million bribe -- 1 million for the president's

4   office, 1 million for the judge, and 1 million for the

5   plaintiff's side of the case.  And then the judge meets

6   privately in a Holiday Inn several times with Mr. Borja to tell

7   him this is what the tapes would show -- they're on their

8   list -- to tell him, yes, Chevron, there's going to be a

9   judgment again Chevron and there will be remediation work for

10  you.  That's what they say is refusing a bribe.  It's those

11  tapes that Mr. Borja made without Chevron's knowledge.  That's

12  what their own special counsel told them after he had reviewed

13  the situation.

14          THE COURT:  I'm sorry, whose only special counsel?

15          MR. MASTRO:  Donziger and the plaintiff's side hired

16  special counsel, Aton Goldman, you may remember him from the

17  U.S. Attorney's Office here, who wrote to them it appears what

18  Chevron is saying is absolutely true based on our review.  They

19  didn't know Borja was doing that.  But what Borja found out was

20  not an innocent judge.  He found out there were bribes

21  solicited.

22          That's not the point, your Honor.  This is not --

23          THE COURT:  No, it's not.

24          MR. MASTRO:  This is neither unclean hands, nor does

25  it show anything about the Ecuadorian judiciary that reflects

DAFLCHE7                      Veiga - cross

1    well on the Ecuadorian judiciary.  It should be irrelevant to

2    this case.

3                 THE COURT:  Well, the very first question in my mind

4    is this.  There is a pleaded affirmative defense of unclean

5    hands.  And in Salazar I have ruled on what about that defense

6    was sufficient and what wasn't.  And you have a pending motion

7    before me to apply, in effect, to apply that ruling here, which

8    will be decided swiftly.  And if need be, I'll decide this

9    piece of it now or in the morning.

10                My question is was this pleaded in that defense and

11   what was my previous ruling about it?  It was a while ago.

12                MS. FRIEDMAN:  Can I have a minute, your Honor?

13                THE COURT:  Please.

14                MR. MASTRO:  Your Honor, my recollection is that your

15   Honor allowed limited discovery on this issue and the limited

16   discovery proves not only that Chevron didn't know what Borja

17   was doing but that --

18                THE COURT:  It's not the right question.  The question

19   is what my ruling was on what's in and out of the case.

20   Discovery comes later.

21                MR. MASTRO:  Right.  I understood, your Honor, on the

22   affirmative defense, you specified a small number of categories

23   where they could -- that would continue to remain in the case

24   for purposes of discovery.  We believe that what we understood

25   your Honor's ruling to be after that was done that your Honor

DAFLCHE7                          Veiga - cross

1    would revisit whether it had any relevance to the case any

2    longer based on what that discovery showed because that

3    discovery shows --

4              THE COURT:  But I'm not talking about discovery now.

5              MR. MASTRO:  I understand, your Honor.

6              MS. FRIEDMAN:  Your Honor, Ms. Littlepage informs me

7    that she read the order recently and believes that it says that

8    it was pled, Borja is in.  But both of us are kind of fuzzy

9    right now, but that's our understanding of the record.

10             THE COURT:  All right.  Let's leave this issue until

11   the morning.

12             MS. FRIEDMAN:  All right.

13             THE COURT:  Give me an idea of how much more you have.

14             MS. FRIEDMAN:  Give me just a second, your Honor.

15             MR. MASTRO:  We were very much hoping to finish with

16   Mr. Veiga today.

17             THE COURT:  I'm sure you were.  So was I.

18             MR. MASTRO:  Thank you, your Honor.

19             THE COURT:  Only Mr. Gomez is happy.

20             MS. FRIEDMAN:  Your Honor, I think I have if I were to

21   just ask my questions and --

22             THE COURT:  I understand.

23             MS. FRIEDMAN:  I would say --

24             THE COURT:  I'm trying early on to fully understand

25   both parties' positions on all these issues.  But it's going to

DAFLCHE7                    Veiga - cross

1   move faster as we get more educated.

2            MS. FRIEDMAN:  It always does.  Your Honor, I think I

3   probably have about an hour more.

4            THE COURT:  All right.  Let's go on and see what

5   progress we can make now.

6            MS. FRIEDMAN:  Thank you.

7   BY MS. FRIEDMAN:

8   Q.  Mr. Veiga, I'm switching topics now.

9            Were you aware that before the verdict by Judge

10  Zambrano, Mr. Guerra had approached Chevron about obtaining

11  money from Chevron for helping to fix the case?

12           MR. MASTRO:  Objection, your Honor.  Same issue.  He

13  only knows it through counsel and it's attorney-client

14  privilege.  Foundation and privilege issues.

15           MS. FRIEDMAN:  I would say, your Honor, if a lawyer

16  learns that somebody, a judge or a former judge, is approaching

17  to fix a case, that would be outside the attorney-client

18  privilege.

19           THE COURT:  Really?  On what theory would that be?

20           MS. FRIEDMAN:  Crime fraud.

21           MR. MASTRO:  The witnesses will testify we turned down

22  as opposed to them.  Anyway, that's crime fraud.

23           THE COURT:  Well, no.

24           MS. FRIEDMAN:  Your Honor, the integrity of the

25  proceedings in Ecuador were of substantial concern to both

DAFLCHE7                    Veiga - cross

```
 1   sides.  If Chevron, if Chevron gets repeated solicitations from
 2   their star witness to fix the case, I would say that's highly
 3   relevant both to unclean hands --
 4           THE COURT:  You've already got an affidavit from the
 5   man who was approached who is going to be a witness here.  So
 6   why are we wasting time with this?
 7           MS. FRIEDMAN:  Well, he was approached by Guerra, but
 8   Guerra approached Chevron and Chevron's action --
 9           THE COURT:  The way Guerra approached Chevron, if I
10   understand the evidence, is he went to Callejas.  Right?
11           MS. FRIEDMAN:  I'm sorry, your Honor.
12           THE COURT:  Do I have the name right?
13           MR. MASTRO:  He went to Racines, his partner.  It was
14   Liliana Suarez, Judge Zambrano's sort of law clerk, secretary,
15   and companion.
16           THE COURT:  Whatever it is, there is direct testimony
17   coming in from the person whom Guerra admits having approached
18   that in fact he approached him.  Okay.  That means whatever it
19   means.  Why are we asking the in-house lawyer for the company
20   about it?
21           MS. FRIEDMAN:  It goes to the credibility of Chevron's
22   position in this case, your Honor, that when they approached --
23   when he was approached, when Mr. Guerra approached the Chevron
24   people, they didn't try to tape him.  They didn't report him to
25   the authorities like had occurred with the Borja incident with
```

DAFLCHE7                    Veiga - cross

1   Judge Munoz.  Instead, they sat on it.  And several years later

2   he becomes their star witness after he admits that he had

3   several other approaches to Chevron.

4               THE COURT:  And all of that you know because Chevron

5   has put it on the record, right?

6               MS. FRIEDMAN:  Well, we know --

7               THE COURT:  All of it, each and every bit.

8               MS. FRIEDMAN:  Well, Mr. Guerra's story keeps changing

9   and we've never heard -- well, I can't say what we've never

10  heard.  I don't believe we've heard Chevron's version, a

11  decision-maker at Chevron saying what they did and why they did

12  it at various times.

13              THE COURT:  And that would be relevant why?

14              MS. FRIEDMAN:  Well, starting with unclean hands, it

15  would be relevant to that.  Starting to the credibility of

16  Mr. Guerra's --

17              THE COURT:  Why, why?  I do understand that every now

18  and then the argument is put forward that anything that --

19  well, I'm not going to put it that way.  Just it's like an

20  incantation, right.  But I'm not following the logic.

21              MS. FRIEDMAN:  Here would be the logic.  Let's take a

22  hypothetical.  Mr. Donziger bribed the judge and at the same

23  time Chevron was bribing judges.  Same time, same case, they're

24  bribing judges.  Are they allowed to come into a court of

25  equity and ask that equity be done?  I think the answer is

DAFLCHE7                    Veiga - cross

1    pretty clear that they're not.

2            THE COURT:  And that fits this scenario how?  Somebody

3    is shaking them down.  They don't say okay, we'll pay.  They

4    say, no, we won't pay.  And you're accusing them of unclean

5    hands for the crime of not paying the bribe.

6            MS. FRIEDMAN:  Well, here's the problem, your Honor.

7    They're very selective about when they pay and when they don't

8    pay.  When Mr. Borja did what he did, they were happy to tape

9    it and publicize it and, from our perspective, twist it out of

10   reality to get advantage in the case and in the public.

11           THE COURT:  And subject to whatever rulings I've made

12   on that subject, you may be permitted to prove all of that.

13           MS. FRIEDMAN:  Here's the circumstantial evidence,

14   your Honor.  If that's true --

15           THE COURT:  I'm sorry, here's the circumstantial

16   evidence?  This is going to prove what happened with Borja?

17           MS. FRIEDMAN:  No.  What I'm saying is there's more

18   than one piece to this puzzle.  And the other piece is so why

19   didn't they tape Guerra?  Supposedly from their statements

20   about Borja, they're saying we're very concerned about the

21   integrity of the system and so on and so forth and that's why

22   we taped and that's why we're doing this stuff.  That's why

23   we're getting him out of the country, to protect him.

24           Now, they're also approached by Guerra.  So we've got

25   Judge Munoz who we say did not take a bribe and they're

DAFLCHE7                          Veiga - cross

1   reacting in one way.  Then we've got Guerra who says he

2   approached them and I guess they agree he approached them.

3            THE COURT:  That's how we all know it, because they've

4   disclosed it.

5            MR. MASTRO:  Correct.

6            MS. FRIEDMAN:  Well, I can't -- I'm not sure how it

7   first came out.

8            But my point is not that.  My point is the disparity

9   in treatment between how they treated the Borja incident in

10  which Judge Munoz says I won't take a bribe, taping,

11  publicizing it and so on and trying to twist it out of

12  proportion, compared to the Guerra incident where ultimately he

13  does take -- I'm not going to characterize it as a bribe.  He

14  does take money from Chevron in order to impeach the verdict.

15           MR. MASTRO:  Your Honor, may I please be heard briefly

16  on this?

17           THE COURT:  Yes.

18           MR. MASTRO:  Your Honor, there isn't a shred of

19  evidence in this record of Chevron doing anything other than

20  refusing any overtures on a bribe.

21           And, your Honor, the Borja situation has nothing to do

22  with Zambrano situation.  Borja comes forward with this

23  evidence of private meetings with the judge and a political

24  party official of Correa's, political party official of

25  Correa's having solicited a bribe and Chevron makes that known.

DAFLCHE7                    Veiga - cross

Chevron makes known that it was solicited for bribes in the

Zambrano era.  Chevron has done nothing wrong, there's no

unclean hands.

          Certainly this witness is not the one to ask these

questions of.

          THE COURT:  Look that last point is the ultimate point

in this discussion.  We'll see whether the Borja incident comes

in, and if it comes in, we'll see what the evidence is.  And

you are going to have the witness who says he was approached by

or on behalf of Guerra allegedly acting on behalf of Zambrano.

And you will have the people with personal knowledge of what

happened and we'll see what the evidence is.

          I don't see any justification for trying to do this by

starting in the general counsel's office and working back down

the chain.  We're just not going to do it that way.

          MS. FRIEDMAN:  And just so you understand why I was

doing it this way, your Honor, he is the first witness.

          THE COURT:  I understand, but, you know, you can't

prove the whole case with the first witness.

          MS. FRIEDMAN:  Understood.

          THE COURT:  Supposedly they call a document custodian.

          MS. FRIEDMAN:  I suppose there's a lot of documents to

ask him about.

          THE COURT:  You can be sure they'll try not to.

          MS. FRIEDMAN:  I'll move on, your Honor.

DAFLCHE7                          Veiga - cross

1          THE COURT:  Well, look, it's 25 after four.  We'll

2    break until tomorrow morning at 9:30 and because I think

3    continuity is pretty much shot at the moment.

4          But let's see if we can't make more headway tomorrow.

5    Please.

6          Is there anything that must be done before we break

7    tonight?

8          MR. MASTRO:  Well, your Honor, we have the timelines

9    for you that your Honor requested.  Happy to hand those up.

10          THE COURT:  You've given them to the other side,

11    right?

12          MR. MASTRO:  We're going to give to everybody right

13    now.

14          THE COURT:  Okay.

15          MR. MASTRO:  And we can deal with --

16          THE COURT:  No problem with that, Mr. Friedman?

17          MS. FRIEDMAN:  No.

18          THE COURT:  Mr. Gomez?

19          MR. GOMEZ:  No, your Honor.

20          MS. FRIEDMAN:  I have to see them first, but no

21    problem with the process.

22          MR. MASTRO:  And your Honor --

23          THE COURT:  Do you want to see them before they're

24    passed to me?

25          MS. FRIEDMAN:  No, no, no.

DAFLCHE7                    Veiga – cross

1            MS. LITTLEPAGE:  Judge, may I raise one issue.  I

2       haven't spoken yet.

3            We had filed a motion for pro hac admission of my

4       partner Rain Booth.  He has been working on one of the

5       witnesses we expect to come tomorrow.  So I'm just asking the

6       Court if we could expect a ruling on his pro hac, whether one

7       of us has to take over the witness.

8            THE COURT:  Nobody is going to have to take over the

9       witness, regardless of whether I get to the paperwork, unless

10      there's something unusual in the paperwork that's going to give

11      me a problem, is there?

12           MS. LITTLEPAGE:  I don't think there is, no.

13           MR. MASTRO:  And, your Honor, that witness I believe

14      is Christopher Bogart, is that who?

15           MS. FRIEDMAN:  No.

16           MR. MASTRO:  Nobody has told us how long they expect

17      Mr. Bogart to be cross-examined.

18           MS. FRIEDMAN:  He will be much shorter.  I'm going to

19      say an hour in cross.

20           THE COURT:  All right.

21           MR. MASTRO:  Very good.  Your Honor, the issue of

22      confidentiality and the defendant's witness list still being

23      over 70 witnesses, we don't have to address that now, but

24      perhaps we can do it first thing in the morning.

25           THE COURT:  Perhaps we can do it in the morning.

DAFLCHE7                    Veiga - cross

1              MR. MASTRO:  Thank you, your Honor.

2              THE COURT:  Or afternoon.  We'll see.

3              MR. MASTRO:  Just handing up Exhibit 3000A, which is

4      the list of the exhibits associated with Mr. Veiga.

5              THE COURT:  Give it to my law clerk sitting in the

6      jury box.

7              Thank you, folks.

8              MR. MASTRO:  Thank you very much, your Honor.

9              (Adjourned to October 16, 2013, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     RICARDO REIS VEIGA

 4     Direct By Mr. Mastro . . . . . . . . . . . . .57

 5     Cross By Mr. Friedman  . . . . . . . . . . . .71

 6                          PLAINTIFF EXHIBITS

 7     Exhibit No.                               Received

 8      B and C  . . . . . . . . . . . . . . . . .49

 9      3000     . . . . . . . . . . . . . . 65

10      3000A    . . . . . . . . . . . . . . 71

11                          DEFENDANT EXHIBITS

12     Exhibit No.                               Received

13      668     . . . . . . . . . . . . . . . .101

14      764     . . . . . . . . . . . . . . . .115

15      780     . . . . . . . . . . . . . . . .137

16

17

18

19

20

21

22

23

24

25
```