DAG8CHE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5              v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x
                                          October 16, 2013
9                                         9:35 a.m.

10  Before:

11                     HON. LEWIS A. KAPLAN
                                          District Judge
12                          APPEARANCES

13
    GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
    BY:   RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        JEFFERSON E. BELL
          ANNE CHAMPION
17
    FRIEDMAN RUBIN
18        Attorneys for Donziger Defendants
    BY:   RICHARD H. FRIEDMAN
19        DEE TAYLOR

20  LITTLEPAGE BOOTH
          Attorneys for Donziger Defendants
21  BY:   ZOE LITTLEPAGE
          RAINEY BOOTH
22
    GOMEZ LLC
23        Attorneys for Defendants Hugo Camacho, Javier Piaguaje
    BY:   JULIO C. GOMEZ
24

25

DAG8CHE1

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.

3          MR. MASTRO:  Good morning, your Honor.

4          THE COURT:  We have two pieces of unfinished business

5     from yesterday.  The first is the attempt by the defendants to

6     examine Mr. Veiga on the subject of what I will call the

7     alleged Borja incident.  I have reviewed where we have been on

8     this, and I am prepared to rule now.

9          In the *Salazar* or Count Nine case, I sustained at the

10     pleading stage the portion of the unclean hands defense that

11     alleged an attempt by Chevron to frame a judge and to pressure

12     another, which includes the alleged Borja incident.  So the

13     defendants are entitled in general to go into that.

14          We have here, however, a witness who, as far as I

15     know, has no personal knowledge whatsoever on the subject,

16     although I could be mistaken.  He is also an attorney.

17     Examination of him on the subject implicates attorney-client

18     privilege and work product issues in a very substantial and

19     complicated way.  Despite what I thought I understood yesterday

20     to have been some conclusory assertions that the crime fraud

21     exception applies here, there has been no showing at all to

22     support that.

23          So where I come out on it is that I will allow very

24     narrow, targeted examination with respect to this incident into

25     whatever the witness may know by virtue of personal observation

DAG8CHE1

1   or unprivileged communications.  If in the fullness of time

2   there is a persuasive crime fraud showing that would allow

3   broader examination, I don't exclude recalling the witness at

4   that point.  I would suggest to the defense that it might make

5   more sense to hold open that possibility, skip this subject for

6   now, and see where we get with the evidence on the incident, if

7   anywhere.  But I am not going to shut you down if you want to

8   try.  If I do conclude that we are just wasting a lot of time

9   now because we are just getting tied up in endless wrangling

10  about privilege, I may shut it down, subject to the right to

11  reopen it later, depending on what evidence there is, but

12  that's my ruling on that point, and I hope it's sufficiently

13  clear.

14          Everybody understand where we are?

15          MR. FRIEDMAN:  It is clear, your Honor.  I think what

16  we will do, if it's OK, if we can recall him if we need to, I

17  will just leave the issue, and I will try to get it in through

18  Mr. Borja's deposition directly.

19          THE COURT:  That's fine, but I gave you the choice.

20          MR. FRIEDMAN:  I understand.

21          THE COURT:  Because I think, in light of the limited

22  state of the record, it's clearly still in.

23          Now, the other piece that was left open yesterday was

24  this allegation of surveillance and examination of the witness

25  with respect to that, and I thank counsel for their speedily

DAG8CHE1

1    prepared memoranda overnight.  And my ruling is it's out.  It's

2    out for a lot of reasons.  It's out, first of all, because it's

3    completely irrelevant.  It's out, second of all, because the

4    only even arguable relevance argument that I can see, or for

5    that matter has really been made, is that it's somehow

6    pertinent to unclean hands.  I don't accept that argument.  It

7    is not.

8              The argument made in Mr. Donziger's memoranda

9    overnight that the special master to some extent gave some very

10   limited latitude in examining a different witness during

11   depositions on this subject is not persuasive.  There is a

12   difference between discovery and trial and the scope of

13   appropriate examination.

14             The Donziger defendants in their memorandum also

15   raised the crime fraud exception.  They begin from the premise

16   that it's apparently an undisputed fact that surveillance and

17   recording individuals without their consent is illegal in

18   Ecuador.  Well, in my understanding it is not undisputed, and

19   indeed, there is nothing before me to suggest that there is the

20   slightest truth to the statement.

21             We have known in this case since 2011 that various

22   issues of foreign law might arise.  I required well over two

23   years ago that the parties serve statements under Rule 44.1

24   identifying the foreign law they relied on, and everyone did.

25   These have been supplemented as recently as the last couple of

DAG8CHE1

1    weeks.  On no occasion did either side raise the issue of the

2    legality under Ecuadorian law of surveillance of the sort that

3    apparently we are concerned with here, not at all, despite

4    repeated court orders to do so, if that was going to be a

5    contention.  I am not going to entertain it now.  Moreover,

6    even if it were illegal under Ecuadorian law, it's just not

7    sufficiently related to the equity in suit to be pertinent.

8         Now, in addition, the consequences of the failure to

9    raise this properly are extraordinarily clear.  As I think I

10   have drawn to the parties' attention previously, in the *Bel-Ray*

11   case, 181 F.3d 435, the Third Circuit held that it was the

12   burden of the parties to raise issues of foreign law and

13   provide the district court with satisfactory materials and

14   evidence to determine foreign law, and if that does not occur,

15   the court by default applies the law of the forum.  The law of

16   the forum is New York.  There is no right of privacy under New

17   York law.  New York is very much an outlier on this, but it is

18   the fact and the New York Court of Appeals has said over and

19   over again.  There is simply not an issue here.

20        Now, the next argument made in support of crime fraud

21   is that if in fact Chevron was conducting surveillance of

22   persons on the other side, that would have been a violation, to

23   the extent lawyers were involved, of the New York Rules of

24   Professional Conduct, which prohibit lawyers from using methods

25   of obtaining evidence that violate the legal rights of third

DAG8CHE1

1    persons.

2            Now, given what I have said already, it fails at the

3    get-go because there is no violation of legal rights of a third

4    person given the state of the record and the law.  But even if

5    there were, the exception to the attorney-client privilege is

6    for crime or fraud, not breaches of professional ethics, and

7    there we are on that.

8            Having said all of that, I can't help but observing

9    that if there is any evidence at all of any surveillance by

10   Chevron, and of course what the facts really are I don't know,

11   but I can only go on the basis of the record, it is

12   extraordinarily limited.  The memorandum filed overnight

13   contains this statement:  "Mr. Donziger personally has for

14   years been living with the reality confirmed by professional

15   investigation that his movements and those of his family,

16   friends and associates and his lawyers are being tracked,

17   monitored and surveilled and perhaps much more."  And he cites

18   two items.  The first thing he cites is a declaration, it

19   appears at docket item 1197-2, of a professional investigator.

20           Now, I remember that declaration very well.  It is a

21   declaration of an investigator who either observed or was told

22   that on one instance there was a car with strange men on the

23   street outside Mr. Donziger's apartment on -- I won't indicate

24   where.  And that when Mr. Donziger came out, if I remember it

25   correctly, the car seemed to follow him.  Well, gang, I hate to

DAG8CHE1

1    tell you, but things like that happen all the time in New York,

2    and they don't have anything to do with professional

3    investigators, and in any case, one incidence does not

4    surveillance make, if it was what Mr. Donziger thinks it was.

5            There is a reference also to some testimony in

6    Mr. Carson's deposition that there were 20 or 30 reports

7    regarding Mr. Donziger.  It's not clear from the memorandum

8    that was filed as to what they were reports of, and in any

9    case, 20 or 30 reports, over a period of now 20 years, don't

10   make much of a surveillance program.

11           Now, all that said, I note also that there is evidence

12   in the record that the defendants in this case engaged in

13   surveillance activities against Chevron.  Mr. Fajardo has made

14   it clear that they monitor "people tied to Chevron," such as

15   Guerra and Reyes in his view, so that they can, and I am

16   quoting again "know what they are doing and where they are

17   traveling frequently."  He admitted, for example, that they

18   have discovered previous activities of Mr. Guerra by "asking

19   for the information, the migration movements of Mr. Guerra,

20   where he goes and where he can be found."  That appears in

21   docket item 759, Exhibit 3, at pages 4 and 5.

22           In any case, that issue is out of the case.  It's

23   gone, and we can proceed.

24           Now, Mr. Mastro, is there something else?

25           MR. MASTRO:  Yes, your Honor, just a few very brief

DAG8CHE1

1    points.

2              Your Honor admitted into evidence yesterday over our

3    objection two documents that were written by a Mr. Singer and a

4    Mr. Gidez, who are not Chevron employees, they are outside

5    contractors.  I just wanted to clarify that under 801(c), they

6    are statements that may have been made, but I hope your Honor

7    would not admit them for the truth of the matters asserted.

8    They are not statements by Chevron.  They were simply

9    statements made to Chevron by outsiders.

10             THE COURT:  I have your point, and this being a

11   nonjury point, I will consider it if, as and when it becomes

12   appropriate.

13             MR. MASTRO:  Thank you, your Honor.

14             Two, the protocol we worked out about the declarations

15   and objections to a declaration, declarations get filed after

16   admitted.  Objections get filed.  They were filed last night in

17   Mr. Veiga's case.  We would like to have as part of that

18   protocol that we can within 24 hours of their objections give

19   your Honor a response to their objections also in writing.

20             THE COURT:  Any objection in proceeding that way, Mr.

21   Friedman?

22             MR. FRIEDMAN:  No, your Honor.

23             THE COURT:  We will proceed that way.

24             MR. MASTRO:  If we can, your Honor, since we have had

25   multiple witnesses here --

DAG8CHE1

1          THE COURT:  I should have asked Mr. Gomez.

2          Mr. Gomez.

3          MR. GOMEZ:  No, your Honor.

4          MR. MASTRO:  Also, since we have had multiple

5     witnesses here at the courthouse, I understand from Mr.

6     Friedman that he is now going to have about another hour with

7     Mr. Veiga and Mr. Gomez will also have some time with him.  Can

8     we get some real estimation of the cross for the next two or

9     three witnesses because they are all here ready to testify.

10    That is Mr. Bogart, that is Mr. Russell, and that is Sara

11    McMillen.

12         MR. FRIEDMAN:  If I could ask your Honor, before I

13    respond to that, could I just trouble the Court for the

14    citation you gave on the foreign law?  It was the F.3d cite,

15    181 F.3d, and I missed the page.

16         THE COURT:  435.

17         MR. FRIEDMAN:  Thank you.

18         Your Honor, with the Court's permission, we would like

19    Mr. Gomez to take the lead on Mr. Bogart, and I would

20    follow-up.  He can give you his estimate of how long that will

21    be.

22         THE COURT:  How long, Mr. Gomez?

23         MR. GOMEZ:  Your Honor, I would say probably about two

24    hours.

25         MR. FRIEDMAN:  My guess is I would be 10 to 15

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAG8CHE1

1    minutes.

2              THE COURT:  OK.

3              MR. MASTRO:  How about Mr. Russell?

4              MS. LITTLEPAGE:  I will be about two hours, maybe two

5    and a half.

6              MR. MASTRO:  That makes it extremely unlikely we will

7    get past those witnesses today.  We have a third, though, ready

8    to go, and that would be Sara McMillen.

9              MS. LITTLEPAGE:  I don't perceive that we will get to

10   Ms. McMillen today.

11             MR. MASTRO:  Do you have an estimate of the time?

12             MS. LITTLEPAGE:  No.  I haven't completely finished my

13   cross of Ms. McMillen.  I would assume two to three hours for

14   Ms. McMillen.

15             MR. MASTRO:  OK.  Your Honor, one other point I wanted

16   to make.  There were offers of proof that Mr. Friedman made

17   repeatedly yesterday after your Honor made rulings.  I then had

18   to get up and say there was absolutely no basis or evidence in

19   this record or any witness who would say any such thing.

20             The offers of proof themselves were improper under the

21   Second Circuit standards.  You are not supposed to be giving

22   rambling offers of proof without the specific testimony you

23   expect to elicit from the witness and the basis in the record

24   for why you think you can elicit that.  So I just wanted to

25   make that point.  It will save us a lot of time if we have

DAG8CHE1

1    targeted offers of proof to say exactly what you think the

2    witness would say and exactly the basis in this record for what

3    witness or evidence you have to support that.

4           THE COURT:  You rely on what authority for the

5    proposition that you just cited?

6           MR. MASTRO:  I am relying both on Second Circuit's

7    decision in *International Minerals and Resources*, 5 Fed.Appx 5,

8    page 9, Second Circuit 2001.  The quote is, The Offer of proof

9    must be specific and counsel must show what he expects to prove

10   by the testimony of the witness.

11          And *In Re Chateaugay Corp.*, a bankruptcy Southern

12   District case, that rambling narration of allegations, at the

13   end of which, as a profession, that if there were complete

14   discovery, we would be able to get these facts through these

15   questions.

16          THE COURT:  Mr. Mastro, I am sure that Mr. Friedman

17   and Mr. Gomez are grateful to you for bringing to their

18   attention an alleged deficiency that, if it's relevant to

19   anybody at all, is relevant only on appeal should we ever get

20   there.

21          Let's move on.

22          MR. MASTRO:  Finally, your Honor, just so the record

23   is complete, I appreciate your Honor's ruling on the

24   investigation and surveillance issue.  Had it ever been raised

25   in the 44.1s, we would have offered expert testimony.

DAG8CHE1

1            THE COURT:  We don't have to do this.  We are just

2   taking up a lot of time.

3            MR. MASTRO:  I am done, your Honor.

4            Now we are going to call Mr. Veiga back to the stand.

5            THE COURT:  All right.

6   RICARDO REIS VEIGA, resumed.

7            THE COURT:  Mr. Veiga, you are still under oath.

8   CROSS-EXAMINATION (Cont'd)

9   BY MR. FRIEDMAN:

10   Q.  Good morning, Mr. Veiga.

11   A.  Good morning.

12   Q.  I would like to move on to a new subject if I could.

13            Would you tell us who attorney Racines is?  I am not

14   sure I am pronouncing the name right.

15   A.  Yes, I do.  Alberto Racines is an associate with Adolfo

16   Callejas & Associates.

17   Q.  Did Mr. Racines report to you as well?

18   A.  No.  Mr. Racines would report to Mr. Adolfo Callejas.

19   Q.  I am not going to ask you what you learned, but at some

20   point did you learn that Judge Guerra had approached Chevron

21   to, in his words, fix the case?

22   A.  Yes, I did.

23   Q.  I want to ask you about some specific time periods.

24            During August to October of 2009, August to October of

25   2009, did you have at that point any knowledge that Judge

DAG8CHE1                        Veiga - cross

1   Guerra had approached Chevron to fix the case?

2   A.  I don't remember specifically the time frame.  I had

3   knowledge through communications from counsel of the events

4   that you're referring to.

5   Q.  Maybe if I broaden the time.  During 2009 at all, were you

6   aware of Judge Guerra having approached Chevron to fix the

7   case?

8   A.  Vaguely, my recollection is sometime in 2009.

9   Q.  Now, during the fall of 2010, we are now a year further

10  along, during that time period, did you have knowledge that he

11  had again approached Chevron to fix the case?

12  A.  Again, this knowledge was through communications with

13  counsel.  And the answer is yes.

14  Q.  Thank you.

15        Was there a reason that Chevron did not report Judge

16  Guerra to the authorities from making this inquiry?

17        MR. MASTRO:  Just instructing the witness not to

18  reveal anything that would be word product.

19        MR. FRIEDMAN:  I will withdraw the question, your

20  Honor, and I will come at it in a different way.

21  Q.  First of all, I should ask, to your knowledge, did Chevron

22  ever report either of those incidents to the authorities?

23  A.  To my knowledge, the answer is no.

24  Q.  To your knowledge, did Chevron ever try to tape Judge

25  Guerra in the process of approaching them in 2009 or 2010 with

DAG8CHE1                              Veiga – cross

1    offers to fix the case?

2            MR. MASTRO:  Again, work product issue and lack of

3    foundation.

4            THE COURT:  Well, I think you're going to have to come

5    at this one step at a time, Mr. Friedman.

6    Q.  Let's focus in on 2009 time frame.  Are you aware of any

7    efforts by Chevron to tape Judge Guerra during that time frame?

8            MR. MASTRO:  Objection.  Same objection.

9            THE COURT:  Look, there may be a privileged issue

10   here.  There may be an attorney work product issue here.  Can I

11   suggest to you that let's try and find out first if he has got

12   personal knowledge of any of this, apart from what he was told

13   by lawyers.  And then if you want to ask a question about

14   lawyers, then you will get your answer to that, and then we

15   will find out whether he has got lawyer source information.

16   And then if you ask about that, then presumably there will be

17   an objection and I will have to rule on it.

18   Q.  Mr. Veiga, did you have any personal knowledge of efforts

19   by Chevron to tape Judge Guerra in 2009?

20   A.  No, sir.

21   Q.  Did you have any knowledge from information conveyed to you

22   by non-attorneys of Chevron attempting to tape Judge Guerra in

23   that time period?

24   A.  Not to my knowledge.

25   Q.  Do you have any knowledge of Chevron attempting to tape

DAG8CHE1                        Veiga - cross

1    Judge Guerra during that time period either way, either a

2    decision to do it or not do it, because of communications from

3    lawyers during that time period?

4    A.   No.

5    Q.   So how is it that you knew that in 2009 Judge Guerra had

6    approached Chevron?

7              MR. MASTRO:  Your Honor, that's work product.

8              THE COURT:  That's the objection, it's work product?

9              MR. MASTRO:  It's privileged communication too.

10             THE COURT:  No.  How he knew is not a privileged

11   communication.

12             MR. MASTRO:  It's fine, your Honor.

13             THE COURT:  The question is argumentative, counsel,

14   because you say, So how is it you knew?  It seems to be an

15   impossible given that he didn't know anything about any

16   consideration of taping and it's a complete disconnect.

17             Let's try to rephrase.

18   Q.   Can you tell us how you learned that Judge Guerra had

19   approached Chevron for taping?

20             THE COURT:  I think you misspoke.

21   Q.   Did you learn that Judge Guerra had approached Chevron due

22   to direct contact or personal knowledge of your own?

23             MR. MASTRO:  Asked and answered, your Honor.

24             THE COURT:  Sustained.

25             Look, he testified that at some point he learned of

DAG8CHE1                      Veiga - cross

1    the Guerra approaches through counsel, his words.

2              MR. FRIEDMAN:  You're right.  I'm sorry, your Honor.

3    I just got tangled up.

4              THE COURT:  Next question.

5    Q.  Do you have any personal knowledge of Chevron's attempts to

6    tape Judge Guerra in the 2010 time period?

7              THE COURT:  Sustained.  You're assuming facts not in

8    issue.

9    Q.  Were there attempts by Chevron to tape Judge Guerra in

10   2010?

11   A.  I don't have any personal knowledge of that.

12   Q.  Do you have knowledge of attempts to tape Judge Guerra

13   through reports by attorneys?

14             MR. MASTRO:  That goes to the substance of the reports

15   received from the attorneys, but I think he has already made

16   clear he has no knowledge on this subject.

17             THE COURT:  It's the witness who answers the

18   questions, not the lawyers.  The bottom line of all of this is,

19   are you objecting to the question or not?

20             MR. MASTRO:  I was objecting to the question on the

21   basis that it conveys potentially the substance of what lawyers

22   would have communicated to him.

23             THE COURT:  So that objection is sustained as to form.

24   It's not exactly form.  It's sustained on the privilege ground

25   because of the form of the question.  The form of the question

DAG8CHE1                          Veiga - cross

1    directly going to the privileged communication, if there were

2    any.

3    Q.  I want to ask you, in '09, in 2010, or in 2012, did

4    Chevron, from your personal knowledge, ever report Judge Guerra

5    to the authorities?

6    A.  I don't have any personal knowledge of that.

7    Q.  In 2012, when Judge Guerra approached Chevron, were you

8    involved in the negotiations between Judge Guerra and Chevron?

9    A.  I was not.

10   Q.  The negotiations between Judge Guerra and Chevron, were

11   they reported to you -- let me just stop there.  Were they

12   reported to you?

13   A.  Not exclusively to me, but everything that I know came from

14   counsel.

15   Q.  Did you have any decision-making authority as to the deal

16   that was worked out with Judge Guerra?

17   A.  No, sir.

18   Q.  I want to turn then to another section of your declaration.

19   I don't know if you will need to refer to it, but it's

20   paragraphs 63.  Do you have it up there?

21   A.  I think I do.  One second.  Which paragraph, please?

22   Q.  Paragraph 63.

23           THE COURT:  Perhaps someone can put it on the screen

24   for me.

25   Q.  Mr. Veiga, this is the section of your declaration that

DAG8CHE1                         Veiga - cross

1    begins or is titled, "Lago Agrio plaintiffs collude to bring

2    bogus criminal allegations."  Is that correct?

3    A.  That's correct.

4    Q.  Then what follows is -- this goes to paragraph 129 talking

5    about the --

6    A.  100?

7    Q.  129, paragraph 129.

8         MR. FRIEDMAN:  Your Honor, I would be happy to provide

9    you my copy.

10        THE COURT:  My law clerk just ran up to get it off my

11   desk.  Thank you.

12   Q.  Basically, the next paragraphs up to 129 continue sort of

13   the story of the criminal charges from your point of view.  Is

14   that a fair statement?

15   A.  That's my declaration.

16   Q.  And by bogus criminal charges, you mean that the criminal

17   charges lacked factual support, is that right?

18   A.  What I mean by bogus is that there was clearly an ulterior

19   motive for bringing this criminal charge against me and

20   Mr. Rodrigo Perez at the time.  And I suspected that, and I

21   think I have seen data, e-mails and some of the crude outtakes

22   that I could review to confirm the ulterior motive, which was

23   to force Chevron into a settlement.

24   Q.  When you say ulterior motives, you mean the Donziger

25   defendants and the other lawyers working with them, is that who

DAG8CHE1                        Veiga – cross

1    you mean had ulterior motives?

2    A.   That's correct sir.

3    Q.   In Ecuador, do private parties have the right to file

4    criminal charges or are criminal charges filed by the

5    government?

6              MR. MASTRO:   It calls for a legal conclusion.

7              THE COURT:   Sustained.

8    Q.   Who filed these criminal charges against you?

9    A.   The office of the prosecutor general of Ecuador.

10   Q.   Did you believe that that office had ulterior motives?

11   A.   That office had previously, four times, dismissed the same

12   charge against me and Mr. Rodrigo Perez.  Four different

13   prosecutors assigned to the criminal investigation did not find

14   any evidence of criminal conduct.  So for me the fact that it

15   was reopened was an indication that there was political

16   pressure involved, and the two motivations, which basically

17   sustained my declaration that those were bogus criminal

18   charges, was the fact that Mr. Donziger and the plaintiff's

19   attorneys wanted to annul the settlement agreement, and they

20   wanted to force Chevron to settle.

21             I think I mention this in my declaration.  The

22   suspicions that I had were confirmed through documentation that

23   I reviewed and some of the outtakes and e-mails exchanged by

24   Mr. Donziger with other attorneys working on the case on the

25   part of the plaintiffs, and even government officials in

DAG8CHE1                         Veiga - cross

 1    Ecuador.

 2    Q.  So if you could help us just quickly go through the -- when

 3    were the first criminal charges filed against you,

 4    approximately?

 5              MR. MASTRO:  Mr. Veiga referred to multiple

 6    investigations.  Is he referring here to just the filing of the

 7    a charge?  You don't know the time frame?

 8              MR. FRIEDMAN:  I am asking him.

 9              MR. MASTRO:  Sorry, your Honor.

10              MR. FRIEDMAN:  I don't want to get it wrong.  I am

11    just asking him when the first criminal charges were filed.

12    A.  I would like to get a clarification from you, what exactly

13    do you mean by criminal charge, because the process in Ecuador

14    starts with a criminal investigation.  And the criminal

15    investigation started around 2003, end of 2003.

16    Q.  All right.  And you had said that there were four separate

17    times that prosecutors had dropped charges, I think was the

18    word you used, is that right?

19    A.  There were four prosecutors that wrote opinions dismissing

20    the charge or any charge for lack of any evidence.

21    Q.  So the first charge was in 2003?

22    A.  Again --

23              MR. MASTRO:  That misstates his testimony.  These were

24    investigations.

25              THE COURT:  I don't need the testimony through you,

DAG8CHE1                    Veiga - cross

Mr. Mastro.  The witness said now twice that there were four

occasions when prosecutors dismissed or dropped charges.

Counsel is entitled to ask him when.

          MR. MASTRO:  Certainly.

Q.  So the first time was in 2003, is that right?

A.  2003 is when the first crude investigation started.  There

was a period of approximately two years that those

investigations took place.  I remember going at least twice to

Ecuador to grant my testimony to the prosecutors.  And I

believe in 2005, it could be a different date, the prosecutor

general of Ecuador, my recollection is a woman named Cecilia

Armas, basically wrote an opinion dismissing, for total lack of

evidence, the charge for falsification of public documents.

And there was another conclusion by a lower prosecutor, a

recommendation by a lower prosecutor, that was investigating

alleged crimes against the environment and --

Q.  Let me interrupt for just a second.  Is this the second set

of charges that you referred to?

A.  When the investigation started, there was a bifurcation of

the investigation.  So two prosecutors -- two different

prosecutors were assigned to the different investigations.  One

on the alleged falsification of public documents and the other

one on the alleged crimes against the environment.  So there's

two prosecutors, special prosecutors assigned.  They wrote

opinions, and the prosecutor general of the country, I don't

DAG8CHE1                          Veiga - cross

1   remember exactly the date, Cecilia Armas then wrote an opinion

2   discharging any criminal allegations for lack of evidence and

3   recommended the present supreme court to archive the file.

4   That was the first one.

5           The second one was --

6   Q.  Can I interrupt you for a second?

7           THE COURT:  Stop interrupting.  You asked the question

8   and now let's hear the answer.

9           Go ahead, Mr. Veiga.

10  A.  So I mentioned to you two special prosecutors wrote

11  opinions, which I believe are in the file, dismissing this

12  charge.  Then the prosecutor general of the country, which is

13  the highest prosecutor in Ecuador, wrote another opinion

14  dismissing the charge.  She was replaced by another prosecutor

15  general I believe named Jorge German, who also wrote, at least

16  a couple of times that I remember, to the same present supreme

17  court saying that those charges had been dismissed and the

18  process should be archived.

19          There was another one, which was ultimately the

20  prosecutor general that reopened the case in 2007, under the

21  administration of President Correa, who had previously also

22  dismissed those charges.  I think the name of the prosecutor

23  was Washington Pesantez.

24          So those were the four different times where this

25  charge had been investigated and dismissed for total lack of

DAG8CHE1                          Veiga - cross

1   evidence, and I think that this is what I described in my

2   declaration.

3   Q.   I just want to ask you some questions to make sure I am

4   understanding.

5            The first charges were in 2003 and one prosecutor was

6   looking at falsification of documents?

7   A.   The investigation started in 2003, and the investigation

8   was bifurcated into two different subjects.   One was alleged

9   crimes against the environment and the second one was the

10  alleged falsification of public documents.   Two special

11  prosecutors were assigned to those two different

12  investigations, and they basically concluded that there was no

13  evidence to move forward with any formal charge.

14  Q.   What was the third subject of investigation?   You said

15  there were four sets of charges.   We have gone through

16  falsification of documents and the environmental one that were

17  bifurcated when they were first filed.   What is the third set

18  of charges you are referring to?

19  A.   I'm sorry.   I don't think I said that, but let me clarify.

20  The investigation started -- the two sets of investigations

21  were two, one falsification of documents, second one alleged

22  crimes against the environment.   So those are the two

23  subsections of the same investigation.   They assigned two

24  different prosecutors.   I don't know why.   It may be just

25  because how they organize themselves.

DAG8CHE1                         Veiga - cross

1      So there were investigations in parallel.  And in the

2  two investigations, the prosecutors assigned, they dismissed

3  any possible charge for lack of evidence.  And that basically

4  followed the process up to the prosecutor general of the

5  country, which then dismissed any allegations of criminal

6  conduct, and basically dismissed the investigation without

7  proceeding and the request of the court to basically archive

8  the process.  And when I say four different times, it is

9  because it had four different prosecutors looking into this and

10  four different prosecutors wrote written opinions dismissing

11  this charge for total lack of evidence.

12  Q.  I see.  Thank you.  That helps.

13      So is it your view that the charges in 2003 relating

14  to falsification of documents were bogus in 2003?

15  A.  I suspect that they were bogus because they were based on a

16  report from the controller general, and these investigations of

17  the controller general took place two years before 2003, 2001 I

18  think.  And it took two years for the controller general to

19  move forward, and the dates of the time were very close to the

20  dates where the plaintiffs filed the Lago Agrio complaint.

21      So I suspected that the timing of the report and the

22  timing of the negotiation where right after the plaintiffs

23  decided to move forward with the Lago Agrio complaint.  And,

24  also, right after we file our response, actually we read our

25  response into the files claiming that those claims were barred

DAG8CHE1                    Veiga – cross

1    by the settlement agreement, it was the subject of the criminal

2    allegations.  So I suspected that they were bogus and those

3    charges had an ulterior motive.

4            That suspicion was actually confirmed when I reviewed

5    the e-mail, memoranda outtakes in which the plaintiff's

6    attorneys are all over stating that the criminal case was key

7    for them in the Lago Agrio defense.  And I believe that Mr.

8    Donziger has even admitted under oath that settling the case

9    was one of the main purpose behind pushing the criminal charge.

10   That's my declaration.  It's my reading of the files.  And I

11   guess I gave you all the information that you ask me.

12   Q.  Yes.  Thank you.

13           MR. GOMEZ:  Move to strike.  Mr. Veiga is interpreting

14   e-mails which he didn't write, he didn't receive, and in our

15   view, he doesn't have personal knowledge to interpret the

16   motivations of persons who wrote those e-mails.  They are

17   out-of-court statements.  He wasn't involved in those

18   conversations and his response should be stricken.

19           THE COURT:  Mr. Mastro.

20           MR. MASTRO:  Your Honor, he was asked the question

21   whether he, his views on whether this was bogus going back to a

22   time in 2003 forward, and he is explaining his view.  That

23   testimony was elicited by Mr. Friedman.  So it's perfectly

24   appropriate that he provide the basis for why he has that view

25   in the answer.  It was elicited by defendants' counsel so the

DAG8CHE1                      Veiga - cross

1    answer should stand, your Honor.

2              THE COURT:  Overruled.

3              Mr. Gomez, had you wished to avoid that testimony, the

4    time to have objected is when Mr. Friedman asked for it.   In

5    any case, I am fully aware, as I made clear yesterday, of the

6    difference between personal opinions and personal knowledge,

7    and we will act accordingly.

8    BY MR. FRIEDMAN:

9    Q.  Mr. Veiga, the heart of the falsification documents charges

10   was that TexPet and certain Ecuadorian officials had acted

11   improperly in executing certain documents relating to the

12   settlement agreements, is that correct?

13   A.  You have to be a little more precise what certain documents

14   you are talking about.

15   Q.  I was hoping to avoid going through all of the documents.

16   Generally speaking --

17             THE COURT:  I think we have gotten beyond the point

18   where this is helpful to anything.  If the documents are

19   relevant, they speak for themselves.  They speak for themselves

20   anyway.  Now let's get on with it.

21   Q.  Both sets of criminal charges, the environmental and the

22   falsification of documents charges, were based upon the

23   remedial action plan entered into between TexPet and Ecuador,

24   is that correct?

25             MR. MASTRO:  Objection.

DAG8CHE1                       Veiga - cross

1          THE COURT:  Sustained.

2          MR. FRIEDMAN:  Your Honor, the declaration of Mr.

3     Veiga goes on for numerous paragraphs.

4          THE COURT:  Didn't we discuss this all yesterday and

5     didn't I make a ruling substantially in your favor on it?

6          MR. FRIEDMAN:  You excluded the broad admission of

7     documents and testimony, although I don't think you actually

8     ruled on the testimony yet, but you excluded the documents.  As

9     I recall your ruling, they wouldn't be wholesale admitted, your

10    Honor, but the narrow point that I am trying to get at is that

11    the charges were not bogus.  And if this is going to serve as a

12    predicate act in plaintiff's case that bogus charges were filed

13    against defendants, then I need to be able to explore whether

14    in fact the charges were bogus or not.

15         MR. MASTRO:  He asked to close the door yesterday and

16    your Honor granted his motion.  Now he wants to open it?

17         THE COURT:  That's exactly right.  Finito.  You won

18    yesterday.  You have to live with the ruling.

19         MR. FRIEDMAN:  Your Honor, the ruling was to keep the

20    agreements out.  It was not to not allow any talk at all

21    about --

22         THE COURT:  Why do you suppose we kept the agreements

23    out?  Look, we are not trying the Ecuadorian environmental

24    case, and we are not trying the Ecuadorian criminal

25    proceedings.  They are background.  They are facts that

DAG8CHE1                      Veiga - cross

1    occurred.  Everybody knows what occurred.  Now let's move on.

2              MR. FRIEDMAN:  Your Honor, I agree with you.  We

3    shouldn't be retrying those cases.

4              THE COURT:  That's exactly what you're trying to do.

5              MR. FRIEDMAN:  No, your Honor.  If I could, what I am

6    trying to do is defend against the predicate act that the

7    defendant or that Chevron has made throughout the complaint and

8    now throughout this declaration that the charges were bogus,

9    that they did not have a factual basis.

10             Now, we don't have to try the whole case to

11   investigate whether the charges were bogus or not, but I don't

12   know how something can be a predicate act and we not be allowed

13   to investigate or talk about it in the trial.

14             THE COURT:  You know, I don't remember a single

15   allegation in the complaint making this or anything like it a

16   predicate act, which is a term of art, as you know.  Maybe you

17   can draw my attention to it.

18             MR. FRIEDMAN:  If I could take just a minute I will do

19   that.

20             THE COURT:  I will tell you what.  Rather than do it

21   that way, move on to something else and after the break, if you

22   have something, you can bring it to my attention.

23             MR. FRIEDMAN:  OK.  Thank you.

24             We have it here, your Honor.

25             Paragraph 3 of the amended complaint, your Honor.  It

DAG8CHE1                         Veiga - cross

1    would be the bottom of paragraph 3 and the top of paragraph 4,

2    your Honor.

3              I can move on and we can take this up after the break.

4              THE COURT:  Go ahead.

5              MR. FRIEDMAN:  I just draw the Court's attention to

6    it, and I will take some time to look at it more carefully.

7    BY MR. FRIEDMAN:

8    Q.  Mr. Veiga, is it your view that Mr. Donziger and the other

9    plaintiff's lawyers had a lot of control and influence over the

10   Ecuadorian legal system?

11             MR. GOMEZ:  Objection, your Honor.  It calls for

12   speculation.

13             THE COURT:  Sustained.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DAGLCHE2                         Veiga - cross

1    BY MS. FRIEDMAN:

2    Q.   In your declaration you discuss your belief that

3    Mr. Donziger and the other plaintiff lawyers influenced the

4    Ecuadorian legal system; is that correct?

5    A.   Can you point out the section you're referring to?

6    Q.   Yes.  Paragraph 101.

7    A.   101?

8    Q.   101, 102.

9    A.   Yes, sir.

10   Q.   And then paragraph 79.

11            THE COURT:  Is there a question about paragraph 101?

12            MS. FRIEDMAN:  What I'm trying to do is refresh his

13   recollection, your Honor, with these paragraphs, and then I

14   hope that will be faster than asking him a question.

15            MR. MASTRO:  He didn't say he needed his recollection

16   refreshed, your Honor.  He was asking for clarification in the

17   question.

18            THE COURT:  That's what I thought.  But let's bear

19   with Mr. Friedman for a minute.

20            THE WITNESS:  I read it.

21   Q.   Okay.  And if we just stay on 79 then, your view is that --

22   I'm at the top of page 23 -- referring to bogus criminal

23   charges brought as part of a scheme by Donziger and his allies

24   in collusion with the Republic of Ecuador to extort settlement

25   from Chevron by threatening me and Mr. Perez Pallares with jail

DAGLCHE2                    Veiga - cross

1    time, etc.

2           Was it your view that Mr. Donziger and his allies were

3    colluding with the Republic of Ecuador around these criminal

4    charges?

5    A.   Yes.

6    Q.   And the Republic of Ecuador was colluding -- was

7    cooperating with the plaintiffs to use the criminal charges

8    against you to leverage Chevron into a settlement?

9    A.   Yes.

10   Q.   And several of the charges, as you've told us, were

11   dismissed before President Correa was elected; is that correct?

12   A.   That's correct.

13   Q.   And you believe that they manipulated and conspired with

14   President Correa's administration to resurrect those charges?

15   A.   That's correct.

16   Q.   And on April 29, 2010, you were charged again; is that

17   correct?

18   A.   I don't remember the date, but.

19   Q.   That would be at paragraph 107 of your declaration.

20   A.   107.

21           MR. MASTRO:  Your Honor, objection to form.  He left

22   out part of paragraph 107.

23           MS. FRIEDMAN:  All I'm trying to do is get the date,

24   your Honor.

25           THE COURT:  Yeah.  Overruled.

DAGLCHE2                    Veiga - cross

1    A.  It is in my declaration.

2    Q.  All right.  And that when these charges were resurrected,

3    President Correa had been president for four years,

4    approximately?

5    A.  President Correa, my recollection is President Correa took

6    office at the beginning of 2007.

7    Q.  All right.  So three years, two and a half years, he'd been

8    president for several years at the time these criminal charges

9    were reinstated?

10           THE COURT:  Don't you think the parties could figure

11   out when the date was and stipulate to it.  Let's move along.

12   Q.  And in -- actually, can I have Exhibit 272, please,

13   Defendant's Exhibit 272.  I'm sorry, it's Plaintiff's

14   Exhibit 272, your Honor.

15           Is this a copy -- I'm not sure what the technical word

16   is, but the official legal document that was filed resurrecting

17   the criminal charges against you?

18           MR. MASTRO:  Objection, your Honor.

19           THE COURT:  What is the objection?

20           MR. MASTRO:  It's the resurrecting that this is a

21   formal charge document.  He never had a formal charge before

22   this, only investigations.

23           THE COURT:  Mr. Mastro, you got to control these

24   speaking objections.

25           MR. MASTRO:  I was just explaining the nature of the

DAGLCHE2                              Veiga - cross

1    objection, your Honor.   Used the word resurrected.

2              THE COURT:   It is unnecessary to do that by feeding

3    the answer to the witness.

4              MR. MASTRO:   I'm not trying to do that, your Honor.

5    Sorry.

6              THE COURT:   I didn't say try.

7    Q.   Is this the criminal charging document that you were

8    referring to in your declaration?

9    A.   That's correct, sir.

10             MS. FRIEDMAN:   Your Honor, I'd move for admission of

11   272.

12             MR. MASTRO:   No objection, your Honor.

13             THE COURT:   Received.   Not for the truth of the

14   matter.

15             (Plaintiff's Exhibit 272 received in evidence)

16   Q.   And in 2011, this charge was dismissed; is that right?

17   A.   It was dismissed.

18   Q.   If you would look at paragraph 125.

19   A.   You're talking about my declaration?

20   Q.   Yes, thank you.   You say in your declaration that evidence

21   obtained in the 1782 proceedings in the U.S. was used in your

22   defense in Ecuador?

23             THE COURT:   Not exactly what it says, Mr. Friedman.

24   Q.   You said Chevron paid U.S. counsel at least 1 million,

25   among other things, to uncover evidence through 1782 discovery

DAGLCHE2                    Veiga - cross

1    proceedings in the United States to be used in our defense of

2    the criminal allegations in Ecuador; is that correct?

3             THE COURT:  That's what it says.  Next question.

4    A.  That's correct.

5    Q.  All right.  What are the "among other things"?

6    A.  Expense, and we also had -- I had to retain counsel in

7    United States to advise me on possible extradition requests

8    from Ecuador.

9    Q.  Okay.  So you're saying that there were other expenses in

10   addition to the 1 million; is that what you're saying?

11   A.  That's correct.

12   Q.  And you said that the 1782 proceedings uncovered evidence

13   to be used in our defense of the criminal allegations in

14   Ecuador.

15            What evidence obtained in the 1782 discovery

16   proceedings was used in your defense to the criminal

17   allegations in Ecuador?

18   A.  Basically evidence of collusion between Mr. Donziger and

19   his lawyers in Ecuador with government officials to put

20   pressure on the Correa administration to reopen charge that had

21   been dismissed by four different previous prosecutors in

22   Ecuador.

23   Q.  And how was that information used, what did you do with it

24   or what did your lawyers do with it?

25            MR. MASTRO:  Objection.

DAGLCHE2                    Veiga - cross

1          THE COURT:  Sustained.

2          MS. FRIEDMAN:  Your Honor, I'm not sure what the

3    objection was.

4          THE COURT:  Well, I think it was objection.  I think,

5    among other things, the words work product were used.  I

6    sustained the objection.

7    Q.  Was any of the 1782 material that was discovered in the

8    United States submitted to the court in Ecuador?

9          MR. MASTRO:  Your Honor, the record speaks for itself.

10         THE COURT:  I don't even know if there was a court

11   proceeding.  Was there a court proceeding on this?

12         MS. FRIEDMAN:  I guess it depends how you define court

13   proceeding.  There was this criminal complaint process.

14         THE COURT:  Well, you know, I know how that works in

15   the United States district courts.  I don't know how criminal

16   complaints work in Ecuador.

17         MS. FRIEDMAN:  I don't either.  That's why I was

18   asking.

19         THE COURT:  But your question presupposed that you

20   knew and that your understanding was correct.

21         MS. FRIEDMAN:  Well.

22         THE COURT:  Look, I don't know what the point of this

23   is.  This is just a colossal side trip.

24         MS. FRIEDMAN:  Well, I think that this is in the

25   declaration because this is harm that Chevron is alleging as

DAGLCHE2                    Veiga - cross

1    part of its RICO case and that's why I'm asking these

2    questions.

3             THE COURT:  Look, if there were a damage claim in the

4    case anymore, maybe there would be some point to this about the

5    million dollars, but there isn't.  All right?

6             MS. FRIEDMAN:  Are you taking a position that Chevron

7    doesn't have to prove economic harm in order to succeed in this

8    case?

9             THE COURT:  I only make rulings.  I don't take

10   positions.  I'll take a position sooner or later.

11            MS. FRIEDMAN:  And in the meantime, your Honor, I have

12   to be worried that.

13            THE COURT:  In the meantime what you have to do is

14   comply with my rulings.  That objection is sustained.  If you

15   wish to proceed, ask your next question.

16   Q.  Mr. Veiga, if we could go to Exhibit 395, I'll bring you up

17   a copy.  It's the verdict written by Judge Zambrano.

18            THE COURT:  Plaintiff or defendant?

19            MS. FRIEDMAN:  Defendant, I believe, your Honor, yes.

20            THE COURT:  I note your statement "written by Judge

21   Zambrano" is a hotly controverted issue in this case.

22            MS. FRIEDMAN:  Fair enough.

23            THE COURT:  You may be aware of that.

24            MS. FRIEDMAN:  I wasn't trying to advocate.  I was

25   just.

DAGLCHE2                    Veiga - cross

1              THE COURT:  I understand.  Bearing his name.

2              MS. FRIEDMAN:  Bearing his name.

3              MR. MASTRO:  Thanks for that clarification.

4              It's also a Plaintiff's Exhibit 399 with an English

5    translation, Plaintiff's Exhibit 400, and we have -- we really

6    only need it to come in once, your Honor.  But we have it both.

7              THE COURT:  Well, right now it seems to be the first

8    time, right?

9              MR. MASTRO:  It is.  It is, your Honor, and obviously.

10             THE COURT:  Obviously, there's no objection to it to

11   the extent that it is offered other than for the truth of the

12   matters asserted.

13             MR. MASTRO:  Correct, your Honor.

14             THE COURT:  All right.  So it is received as being the

15   judgment in Ecuador, not for the truth of anything contained

16   therein.

17             I take it that's the offer, right, Mr. Friedman?

18             MS. FRIEDMAN:  It is the offer at this point.  I'm

19   going to be asking the witness about the truth of matters in

20   the verdict.  But, yes, it's offered not for the truth, but

21   this is the verdict.

22             MR. MASTRO:  Your Honor, the one problem, we have a

23   certified translation that this is not the stipulated one.

24             THE COURT:  Early in the game here I insisted that the

25   parties stipulate to a translation of this document.  And in

DAGLCHE2                        Veiga - cross

1    one of the very few instances where that ever happened in this

2    case, you did.

3          MR. MASTRO:  We did, your Honor.

4          THE COURT:  Okay.  So I'm striking Defendant's

5    Exhibit 395 unless somebody is going to tell me it is the

6    stipulated translation.

7          Anybody claim it's the stipulated translation?

8          MS. FRIEDMAN:  Can I have a second, your Honor.

9          MR. MASTRO:  PX400 is the stipulated translation, your

10   Honor.  I'd have to check whether the one that was just handed

11   to me is a copy of that or not.  That's all, your Honor.  I

12   just want to make sure the stipulated translation is in.

13         MS. FRIEDMAN:  I'm being told this should be the

14   stipulated translation, your Honor.

15         THE COURT:  You're being told it should be.  I think

16   it should be too, but let's find out if it is.

17         MS. FRIEDMAN:  Well, I guess I could ask to look at

18   Chevron's copy.

19         MR. MASTRO:  We're pulling it now, your Honor.  Sorry

20   about that.

21         THE COURT:  Mr. Friedman, I'd also bring to your

22   attention that you indicated you would be one more hour with

23   this witness, and we passed the hour mark some time ago.  Are

24   you about done?

25         MS. FRIEDMAN:  No, your Honor.  I apologize for that.

DAGLCHE2                    Veiga - cross

 1    I'll get better at predicting as we go along, but I was not
 2    anticipating the struggles we had this morning.
 3             THE COURT:  Well, what do you estimate now?
 4             MS. FRIEDMAN:  Well, if I could just check first to
 5    see if we have the same transcript, then I'll give you an
 6    estimate.
 7             MR. MASTRO:  Actually, your Honor, we have the one
 8    that was agreed upon.  It's not that one, but I'm happy to give
 9    it to Mr. Friedman to use.  It's Plaintiff's Exhibit 400 and
10    it's the certified translation that the parties had agreed upon
11    earlier.
12             THE COURT:  And do the defendants accept that?
13             MR. MASTRO:  And I'm not a technical expert, your
14    Honor, but I'm told there is a switch that needs to be turned
15    on so that documents can come up on the screen.  Thank you.
16    That part is way beyond my pay grade.
17             THE COURT:  All right.  Now, Mr. Friedman, Mr. Gomez,
18    do you agree that Plaintiff's Exhibit 400 is the stipulated
19    translation of the Lago Agrio judgment?
20             MS. FRIEDMAN:  Yes, we do, your Honor.
21             THE COURT:  Mr. Gomez?
22             MR. GOMEZ:  Yes, your Honor.
23             THE COURT:  All right.  It's received but not for the
24    truth of the matter asserted.
25             (Plaintiff's Exhibit 400 received in evidence)

DAGLCHE2                      Veiga - cross

1              THE COURT:  Now, how long Mr. Friedman?

2              MS. FRIEDMAN:  If I could just have one more second,

3     your Honor, I'll be able to tell you.

4              I think I'm going to stop here -- just a few more

5     questions.  I'll be done in five minutes.

6              THE COURT:  Wonderful.

7              MS. FRIEDMAN:  All right.

8              THE COURT:  Let's go.

9     BY MS. FRIEDMAN:

10    Q.  Mr. Veiga, to your knowledge, is there a criminal

11    investigation going on in Ecuador right now looking into

12    Chevron's fraud in the verdict allegations?

13             MR. MASTRO:  Objection, privilege, work product.

14             THE COURT:  Well, it's sustained on more grounds than

15    that.

16             MR. MASTRO:  I understand, your Honor.

17             THE COURT:  Next question.

18    Q.  Are you aware through any nonprivileged sources such as

19    newspapers, articles, things of that kind, that there's a

20    criminal investigation going on in Ecuador looking into

21    Chevron's fraud allegations?

22             MR. MASTRO:  Objection to form and relevance.

23             THE COURT:  Sustained.

24             MS. FRIEDMAN:  I'm done, your Honor.

25             THE COURT:  Thank you.

DAGLCHE2                    Veiga - cross

1           Mr. Gomez.

2    CROSS-EXAMINATION

3    BY MR. GOMEZ:

4    Q.  Good morning, Mr. Veiga.

5    A.  Good morning.

6           MS. FRIEDMAN:  I'm sorry, Mr. Gomez.

7           I think there's a misunderstanding between us, your

8    Honor.  If I could just clarify, this goes to the bogus

9    criminal charges issue.  I thought you ruled that we were not

10   entitled to go into that.  Did I misunderstand that?

11          THE COURT:  We are not trying the question of whether

12   there was a basis for the charges.  End of discussion.

13          MS. FRIEDMAN:  That's what I understood.  Thank you.

14          THE COURT:  The claim is -- well, whatever.  Let's

15   move on.  At the behest of any party.

16          Mr. Gomez.

17   Q.  Mr. Veiga, you don't know Hugo Camacho, do you?

18   A.  No, I don't.

19   Q.  And you don't know Javier Piaguaje, do you?

20   A.  Not personally.

21   Q.  And you have never spoken to either Hugo Camacho or Javier

22   Piaguaje; is that correct?

23   A.  No, not that I recall.

24   Q.  You have no knowledge, sir, that Hugo Camacho or Javier

25   Piaguaje personally made any criminal accusations against you

DAGLCHE2                     Veiga - cross

1   to anyone; is that correct?

2   A.  Are you asking me in their personal capacities?

3   Q.  Yes, as individuals.  Do you have any knowledge that Hugo

4   Camacho ever accused you of any crime to anyone?

5   A.  No.

6   Q.  Do you have any knowledge that Javier Piaguaje accused you

7   of any crime to anyone?

8   A.  Only through their agent, Mr. Donziger.

9   Q.  But first answer my question.  You have no knowledge

10  that --

11          THE COURT:  He did answer your question.  He said

12  only.  Let's move on.

13  Q.  Through their attorneys.  So do you have knowledge,

14  Mr. Veiga, that Mr. Camacho told his attorneys to accuse you of

15  a crime; do you have knowledge of that?

16          MR. MASTRO:  Objection, your Honor.

17          THE COURT:  Look, can we simplify this.  It has been

18  reasonably claimed to me throughout this case, but let's see if

19  I'm accurate in my understanding, that Chevron's claims, which

20  as I remember are all state law based tort claims, or at least

21  non-RICO claims, are all based on one or another vicarious

22  liability theory, most notably and possibly exclusively the

23  assertion that their agents, acting within the scope of the

24  agent's authority, committed various torts and other wrongs and

25  that there is no suggestion that any of them personally did

DAGLCHE2                    Veiga - cross

1   anything of a tortious nature.

2           Is that an accurate statement, Mr. Mastro?

3           MR. MASTRO:  Your Honor, it is accurate that Chevron's

4   claims against the two individual defendants here, Camacho and

5   Piaguaje, are based on a vicarious or derivative liability

6   theory based on either agency or ratification.

7           THE COURT:  All right.  Thank you.  I think that will

8   save you a lot of time.

9           MR. GOMEZ:  Yes, your Honor.

10          THE COURT:  Mr. Gomez.

11  Q.  Mr. Veiga, do you have any knowledge that Hugo Camacho

12  ratified any of his attorneys' actions to seek criminal

13  sanctions against you?

14          MR. MASTRO:  Objection, your Honor.  Also calls for a

15  legal conclusion.

16          THE COURT:  It certainly does the latter.  Rephrase.

17  Q.  What knowledge do you have that Hugo Camacho or Javier

18  Piaguaje ratified any of the conduct that you alleged in your

19  declaration?

20          MR. MASTRO:  Same objection, your Honor.

21          THE COURT:  Overruled.

22  A.  The evidence that I have is there was never any statements

23  disavowing this kind of conduct by their agent.

24  Q.  What conduct exactly are you talking about, sir?

25          THE COURT:  The conduct you asked about, Mr. Gomez.

DAGLCHE2                      Veiga - cross

1    The conduct alleged in the declaration.  Let's go on.

2    Q.  Mr. Veiga, your charges originally arose from a criminal

3    complaint that the Comptroller General Genaro Pena Ugalde

4    submitted to the prosecutor general in October of 2003; is that

5    correct?

6              MR. MASTRO:  Misstates the testimony and the evidence,

7    your Honor, objection.

8              THE COURT:  The witness can answer.

9              THE WITNESS:  Would you repeat your question, please.

10   Q.  Yes.  The charges against you, did they originally arise

11   from a criminal complaint or denuncia that the Comptroller

12   General Genaro Pena Ugalde submitted to the prosecutor general

13   in October of 2003?

14   A.  Yes, partially, yes.

15   Q.  Do you have any knowledge that any of the attorneys

16   representing Hugo Camacho met with general Genaro Pena Ugalde

17   to persuade him to file that complaint?

18   A.  I don't have any personal knowledge of any meetings between

19   Mr. -- the comptroller general and any of these attorneys.

20   Q.  Do you have any knowledge that the attorneys did anything

21   to pressure the comptroller general Genaro to file that

22   criminal complaint against you in October of 2003?

23   A.  No.

24   Q.  And when, directing your attention to your statement,

25   paragraph 107, Dr. Alvear, Ecuador's acting prosecutor

DAGLCHE2                    Veiga - cross

1   general --

2   A.   Would you tell me which section, please?

3   Q.   I'm sorry, paragraph 107 of your testimony, sir.

4             According to your testimony, it was Dr. Alvear,

5   Ecuador's acting prosecutor general in April 29, 2010, who

6   issued a prosecutorial opinion that reinstated these criminal

7   charges; is that correct?

8   A.   That's what my declaration says.

9   Q.   Sir, do you have any knowledge that any of the attorneys

10  working on behalf of Hugo Camacho met with Dr. Alvear on or

11  around April 29 of 2010, and persuaded him to file that

12  complaint against you?

13  A.   I don't have any knowledge of any meetings between

14  Mr. Camacho and Mr. Piaguaje personally with the prosecutor

15  general.

16  Q.   I'm asking specifically about their attorneys.  Do you have

17  any knowledge that their attorneys, Mr. Donziger, Mr. Fajardo

18  in Ecuador, that they met with Dr. Alvear on or about April 29,

19  2010, to pressure him to issue criminal charges against you?

20  A.   I believe that my declaration refers to documentation

21  exchanges between Mr. Fajardo and Mr. Donziger, referring to

22  meetings that they had with prosecutor general Washington

23  Pesantez, which was Mr. Alvear's boss.

24  Q.   Other than those emails, do you know whether they actually

25  met with that controller, with that prosecutor general, and

DAGLCHE2                    Veiga - cross

1   pressured him to file the criminal charges against you or just

2   met with him and discussed it?

3           MR. MASTRO:  Objection form, your Honor.

4           THE COURT:  Sustained as to form.

5   Q.  Other than those emails, Mr. Veiga, do you have any other

6   evidence that any attorneys met with Dr. Alvear, Ecuador's

7   acting prosecutor general, on or about April 29, 2010 to

8   discuss anything?

9           MR. MASTRO:  Objection to form, your Honor.  Asked and

10  answered about his personal knowledge.

11          THE COURT:  Overruled.

12          THE WITNESS:  Would you repeat the question, please.

13          (Record read)

14  A.  I don't have -- I don't have any other evidence of meetings

15  with Dr. Alvear.  I do mention in my declaration outtakes that

16  refer to meetings and conversations between Mr. Fajardo and

17  President Correa.

18  Q.  But there are no outtakes of meetings between Mr. Fajardo

19  and Mr. Alvear, the acting prosecutor general, who filed the

20  formal accusation against you; is that correct, sir?

21          THE COURT:  There are probably no outtakes of meetings

22  with Yogi Berra either.  Let's move this along.

23  Q.  Sir, your charges were finally dismissed in August of 2011;

24  is that correct?

25  A.  That's correct, sir.

DAGLCHE2                         Veiga - cross

1   Q.  And you have absolutely no reason to believe whatsoever

2   that Judge Zambrano used the criminal allegations against you

3   as a basis for issuing his judgment against Chevron; is that

4   correct?

5   A.  I don't know what Mr. Zambrano has used to issue his

6   decision.

7   Q.  And you have absolutely no reason to believe that the

8   Ecuadorian Court of Appeals, who affirmed the judgment, in any

9   way because of the criminal allegations that were made against

10  you; is that correct?

11  A.  It's the same answer.

12  Q.  Sir, you testified that during the period of 2003 to 2009,

13  you were essentially in charge of day-to-day activities

14  regarding the Ecuadorian litigation; do you remember that?

15          THE COURT:  His testimony stands.  What's your next

16  question.

17  Q.  Is it true that during that time period, Chevron mounted a

18  massive public campaign to discredit global expert Richard

19  Cabrera in Ecuador?

20          MR. MASTRO:  Objection, argumentative, form.

21          THE COURT:  Sustained.

22  Q.  Isn't it true, sir, that during that time period Chevron

23  did what it could to make it impossible for Mr. Richard Cabrera

24  to perform his job in the field?

25          MR. MASTRO:  Objection, argumentative, form.

DAGLCHE2                         Veiga - cross

1              THE COURT:  Sustained.

2    Q.  Mr. Veiga, during that time period, isn't it true that

3    Chevron's workers were directing insults at Richard Cabrera

4    while he worked in the field?

5              MR. MASTRO:  Objection.

6              THE COURT:  Sustained.

7    Q.  Mr. Veiga, do you recall Richard Cabrera writing a letter

8    to the court indicating that Chevron's workers were directing

9    insults at him while he did his work in the field?

10             THE COURT:  Can you possibly explain to me what the

11   witness's memory of such an event, assuming it occurred, would

12   be relevant to in this case in the sense of making a point at

13   issue either more or less probable than without the testimony

14   as to whether the witness remembers any such letter; would you

15   mind doing that?

16             MR. GOMEZ:  I'll withdraw the question, your Honor.

17             THE COURT:  Next question.

18   Q.  Mr. Veiga, do you have any knowledge that Hugo Camacho or

19   Javier Piaguaje authorized any of their attorneys to conceal

20   facts about the Ecuadorian litigation?

21   A.  I don't have any personal knowledge, but they never

22   disavowed, they never came clear.  And they continued to try to

23   benefit from a judgment that is a result of fraud and

24   misconduct of their agent.  And they continue to try to

25   perpetrate this fraud by forcing the fraudulent judgment

DAGLCHE2                    Veiga - cross

1   against Chevron in other jurisdictions.  And in my point of

2   view, trying to benefit from enforcing a fraudulent decision is

3   itself committing fraud.

4   Q.  When you say they didn't disavow, what exactly do you

5   expect my clients to do?

6              THE COURT:  What he expects is not relevant.

7              Look, I understand both sides are playing to an

8   audience outside this courtroom.  But the judicial resources of

9   the United States are a limited resource, and this is not a

10  forum for that kind of stuff for either side.  And let's get on

11  with the question of what the proof is about what happened.

12  I'm going to have something to say to Chevron about that

13  subject too before we're done this morning.

14  Q.  Mr. Veiga, do you have any knowledge, do you know of any

15  evidence that demonstrates that Hugo Camacho or Javier Piaguaje

16  were aware of any misrepresentations to U.S. courts?

17  A.  Again, other than through the acts of their agent, no.

18  Q.  Are you aware that Mr. Hugo Camacho and Javier Piaguaje are

19  aware of the specific actions of their attorneys with respect

20  to the Ecuadorian litigation?

21  A.  I don't have any personal knowledge.

22             MR. MASTRO:  Calls for speculation, your Honor.

23             MR. GOMEZ:  I have nothing further, your Honor.

24             THE COURT:  Thank you.  Will there be a redirect?

25             MR. MASTRO:  No, your Honor.

DAGLCHE2                      Veiga - cross

1              THE COURT:  Okay.

2              MS. FRIEDMAN:  Your Honor, we had talked about looking

3    at the amended complaint over the break to see if it talks

4    about sham criminal charges or bogus criminal charges.

5              THE COURT:  That wasn't exactly what it was about.  It

6    was about predicate acts.

7              MS. FRIEDMAN:  And predicate acts.

8              THE COURT:  Yeah, I've looked in the meantime, and I

9    do understand that there are predicate act allegations.

10             MS. FRIEDMAN:  So I would ask the Court for permission

11   to question Mr. Veiga about the bogusness or shamness of these

12   charges.

13             THE COURT:  Denied.  It's out of the case for both

14   sides.  We are not trying that issue.

15             Chevron, I take it, has no objection; is that right?

16             MR. MASTRO:  The merits of the criminal charge?

17             THE COURT:  Correct.

18             MR. MASTRO:  We're not alleging the merits of the

19   criminal charge, your Honor.

20             THE COURT:  Well, I'm sure opinions will differ on

21   whether you did, but I'm ruling it out of the case either way.

22   Do you have a problem with that?

23             MR. MASTRO:  Your Honor, we don't have a problem with

24   the criminal charges not being a part of the case.  We do

25   argue --

DAGLCHE2                    Veiga - cross

1          THE COURT:  The merits of.

2          MR. MASTRO:  The merits of them, right, not being a

3   part of the case.

4          THE COURT:  Okay.

5          MR. MASTRO:  That was never our allegation, your

6   Honor.

7          THE COURT:  Look, I don't have to get into whether it

8   was ever your allegation.  If it was, it's not anymore, right?

9          MR. MASTRO:  Correct, your Honor, the merits of the

10   criminal case not in the case.

11          THE COURT:  Okay.  Mr. Veiga, thank you.  You are

12   excused.

13          (Witness excused)

14          THE COURT:  We're going to take a short break.

15          The point I want to make to Chevron is this.  Lawyers

16   quite understandably take every possible opportunity to argue

17   their cases.  The witness statements, which I have read 19 of

18   so far, are no exception to that in many cases in the sense

19   that they are filled with argument by the witnesses, the

20   witnesses' purported understandings of various events to which

21   they have no personal knowledge, and other matter which if it

22   were offered on the stand during direct testimony would be

23   objected to and sustained.

24          And that's why we have spent a day and a half on the

25   cross-examination of Mr. Veiga in large measure, not entirely.

DAGLCHE2                    Veiga - cross

1    You know, I can't fault Mr. Friedman for rising to every piece

2    of bait that Chevron tossed on the waters here in Mr. Veiga's

3    statement.

4              This case will go a lot more quickly, it will be tried

5    a lot more efficiently, if that sort of stuff which would not

6    be admittable on a summary judgment motion, is not admissible

7    at trial were purged from all of these statements to the extent

8    it's in there and revised statements turned over in a timely

9    way and if the defense resists the temptation to do the same

10   when they present theirs.

11             I would simply urge that that be done.  I realize it's

12   very hard to switch gears on a dime.  It can't be done for

13   today and tomorrow.  Today is already Wednesday.  Tomorrow is

14   Thursday.  But maybe by next week we can start somewhat fresh.

15             MR. MASTRO:  Understand your Honor's words and we will

16   do it.  It's not something we can do for the next couple

17   witnesses obviously.

18             THE COURT:  I recognize that.

19             MR. MASTRO:  We will definitely review the statements

20   with that in mind.

21             THE COURT:  Let me suggest that the way you do it is

22   to resist another inevitable temptation and that is to put new

23   things in.  All right.  The best thing you can do is to take a

24   great big black magic marker, and I don't mean this necessarily

25   literally, but it might be the best way, and just cross out all

DAGLCHE2                      Veiga - cross

1    of the sorts of things that I'm talking about.

2              I don't mean to suggest either side that anybody leave

3    out anything that you have a good faith argument is admissible

4    in evidence and based on the personal knowledge of the witness

5    or for some other reason appropriately offered.  I'm not saying

6    anybody should curtail any legitimate proof.  But the place for

7    argument is elsewhere.  Okay?

8              MR. MASTRO:  Understood, your Honor.  Thank you.

9              THE COURT:  Okay we'll take a break.

10             (Recess)

11             THE COURT:  Okay.  Let us proceed.

12             MR. MASTRO:  Your Honor, Chevron calls its next

13   witness, Christopher Bogart.

14    CHRISTOPHER BOGART,

15        called as a witness by the Plaintiff,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. MASTRO:

19             THE COURT:  You may proceed, counsel.

20             MR. MASTRO:  Yes, your Honor.

21   Q.  Mr. Bogart, I want to hand you what's been marked

22   Plaintiff's Exhibit 3100, ask you to identify it for the

23   record, please.

24   A.  This is my written direct testimony in this matter.

25   Q.  Hand you the original.

DAGLCHE2                    Bogart - direct

1          And did you sign that declaration on the last page,

2    sir?

3    A.  I did.

4    Q.  And at the time you signed your declaration, was it true

5    and accurate?

6    A.  It was.

7    Q.  And is everything in your declaration true and accurate

8    today?

9    A.  It is.

10   Q.  Do you offer your declaration as your direct testimony

11   today?

12   A.  I do.

13          MR. MASTRO:  Your Honor, I offer Plaintiff's

14   Exhibit 3100.

15          THE COURT:  Received on the same basis as the previous

16   witness statement.

17          (Plaintiff's Exhibit 3100 received in evidence)

18          MR. MASTRO:  And, your Honor, I'm also handing up

19   3100A, which is a list of the exhibits in the Bogart

20   declaration.

21          THE COURT:  Those exhibits are received on the same

22   basis as the previous, the exhibits in conjunction with the

23   previous witness statement.

24          (Plaintiff's Exhibit 3100A received in evidence)

25          MR. MASTRO:  Thank you, your Honor.

DAGLCHE2                         Bogart - direct

1              And, your Honor, as I said last Wednesday, there were

2      some questions that I wanted to put to Mr. Bogart that were not

3      addressed in his declaration about some of the allegations made

4      in more recent motion practice about Burford's dealings with

5      Chevron.

6              THE COURT:  Go ahead.

7              MR. GOMEZ:  Your Honor, may I be heard on that

8      application?

9              THE COURT:  Yes, Mr. Gomez.

10             MR. GOMEZ:  Your Honor, your individual practices

11     clearly state that a witness under control of a party is

12     required to submit their direct testimony only by written

13     declaration absent good cause.  Nothing as I recall that

14     Mr. Mastro mentioned last Wednesday or today has been any kind

15     of a showing of good cause.  This witness has been under the

16     control of Chevron ever since the settlement agreement was

17     signed.  That settlement agreement required Mr. Bogart to

18     cooperate and to testify at trial.

19             THE COURT:  So your point is there has not been a

20     showing of good cause; is that right?

21             MR. GOMEZ:  That's correct.

22             THE COURT:  What's the good cause, Mr. Mastro?

23             (Continued on next page)

24

25

DAG8CHE3                          Bogart - direct

1          MR. MASTRO:  Your Honor, the fact is that Burford and

2     Mr. Bogart are independent of Chevron.  Mr. Bogart had

3     previously provided a declaration, which in sum and substance

4     is substantially similar, in many respects identical to the

5     declaration provided last April.  So he wants to, as an

6     independent witness, also have the opportunity to respond to

7     some of those allegations that were not in his original

8     declaration.

9          THE COURT:  What allegations are you talking about?

10          MR. MASTRO:  I am talking about the allegations, your

11     Honor, that he was coerced into giving his declaration last

12     April by Chevron, and the allegations about why Burford, in

13     their words in their motion practice, is spurned.

14          THE COURT:  Isn't the appropriate way that if there is

15     any attempt to impeach his testimony along those lines, you can

16     go into it on redirect?

17          MR. MASTRO:  I can, your Honor.  I would simply

18     suggest that the one question that they raised that he was

19     somehow coerced into giving his declaration, he should have the

20     opportunity to respond to that.

21          THE COURT:  Is that going to be a contention,

22     gentlemen?

23          MR. GOMEZ:  Your Honor, the cross-examination is going

24     to deal with credibility issues, your Honor.  I imagine it will

25     come up.

DAG8CHE3                      Bogart - direct

1          THE COURT:  Well, you don't imagine at all.  You're

2     the principal cross-examiner.

3          MR. GOMEZ:  It will come up, your Honor.  His

4     motivations for signing the declaration, for being here as a

5     witness, are central to the cross-examination.

6          THE COURT:  OK.  So the discussion is whether it

7     happens now or it happens on redirect.  I will hear it now.

8          MR. MASTRO:  Thank you, your Honor.

9     BY MR. MASTRO:

10    Q.  Mr. Bogart, one question.  What reaction, if any, do you

11    have to the allegation that Chevron "coerced" you into giving

12    your declaration in this case?

13    A.  It's flatly untrue.  It's certainly true that Burford

14    entered into a settlement agreement with Chevron under which we

15    agreed to provide testimony.  But that's a far cry from our

16    testimony being coerced.  In fact, I wrote my declaration,

17    which as you pointed out earlier, became this testimony myself.

18    I swore to its truth.  It was true then and it remains true

19    today.  And candidly, anyone who knows me would reject out of

20    hand the suggestion that I could be coerced into giving

21    untruthful testimony.

22    Q.  Thank you, Mr. Bogart.

23         MR. MASTRO:  I turn the witness over.

24         THE COURT:  Cross, Mr. Gomez.

25         MR. GOMEZ:  I would like to begin by showing the

DAG8CHE3                     Bogart - direct

1   witness the settlement agreement that he just referred to.

2              THE COURT:  What is the exhibit?

3              MR. GOMEZ:  It's Exhibit 1307.

4              THE COURT:  Defendants' or plaintiff's?

5              MR. GOMEZ:  Defendants'.

6              THE COURT:  1367 or 1307?

7              MR. GOMEZ:  1307.

8              May I approach the witness?

9              THE COURT:  Yes.

10  CROSS-EXAMINATION

11  BY MR. GOMEZ:

12  Q.  Good morning, Mr. Bogart.

13  A.  Good morning.

14  Q.  Mr. Bogart, you're being shown what has been marked as

15  Defendants' Exhibit 1307.  Would you take a moment to look at

16  that, sir?

17  A.  Yes.  I have flipped through it.

18  Q.  Is this the settlement agreement between Burford and

19  Chevron?

20  A.  Yes.  It appears to be.

21  Q.  Sir, isn't it true that this settlement agreement contains

22  a term that requires Burford to cooperate fully with Chevron on

23  page 4 of 14, paragraph 3A?

24  A.  With respect to discovery and testimony, yes.

25  Q.  Isn't it true that the settlement agreement between Burford

DAG8CHE3                    Bogart - cross

```
1    and Chevron requires you personally, Mr. Bogart, to either

2    testify in person, by deposition, or by written statement in

3    this particular case for Chevron?

4    A.  Yes.

5    Q.  Isn't it also true, sir, that the settlement agreement

6    between Burford and Chevron prohibits anyone associated with

7    Burford from making any statements that disparage, are inimical

8    to, or damage the reputation of Chevron, as per paragraph 7 on

9    page 9 of 14 of this exhibit?

10              MR. MASTRO:  The document speaks for itself.

11              THE COURT:  I made this point at the pretrial

12   conference a week ago.  I don't believe in having witnesses, in

13   effect, parrot back documents.  It's not a good use of time.  I

14   can read the document.  I know what it says and you can make

15   your arguments at an appropriate time.

16              Now, if there is something in particular that you want

17   to use as a predicate to some question that goes beyond the

18   document, I have no objection to you drawing his attention to

19   the particular portion and then asking your question.

20              MR. GOMEZ:  Thank you, your Honor.

21   Q.  Drawing your attention, Mr. Bogart, to page 9 of 14,

22   paragraph 7, the nondisparagement clause.  Was it the intention

23   of the parties that the nondisparagement clause applied to any

24   public statement?

25              MR. MASTRO:  He can speak to his intention.
```

DAG8CHE3                         Bogart - cross

1          THE COURT:  Yes.  Limit the question.

2     Q.  Was it your intention, Mr. Bogart, that this

3     nondisparagement clause applied to any public statement?

4     A.  Well, presumably so.  It's a standard mutual

5     nondisparagement clause.

6     Q.  It also applies to any forum, is that correct?

7     A.  To any form or any forum?

8     Q.  Any statement in any forum.

9     A.  Well, presumably so.  I don't see that wording, but I am

10    not going to quibble with you.

11    Q.  That would include this forum, the U.S. court?

12    A.  Again, Mr. Gomez, it's a standard settlement agreement,

13    mutual nondisparagement clause.

14          THE COURT:  I think the suggestion that's being put to

15    you is that you're contractually obligated, irrespective of the

16    truth, to testify here in a way that doesn't disparage Chevron.

17    That's the implication of counsel's question.  Is that your

18    understanding?

19          MR. GOMEZ:  No, your Honor.

20          THE COURT:  I am asking the witness.

21          THE WITNESS:  I thought that's where he was going, and

22    I reject the insinuation if so.

23    Q.  Doesn't the agreement require you to consider, if you're

24    testifying truthfully, whether that truthful statement is

25    somehow disparaging or harmful to Chevron?

DAG8CHE3                          Bogart – cross

1   A.  To be perfectly honest, I read it as to public statements

2   distinct from my testimony.

3   Q.  Mr. Bogart, who proposed the settlement agreement that we

4   are looking at here today, Chevron or Burford?

5   A.  Could you be a little bit clearer about whether you're

6   talking about the document or the concept?

7   Q.  The concept.

8   A.  There were, as there often are in such matters, mutual

9   discussions between the parties that led to this agreement.

10  Q.  Which party initiated those discussions, Bogart or Chevron?

11  A.  To be perfectly honest, because they didn't include me

12  directly, I am not sure that I can answer that question for

13  you.

14  Q.  Do you know what litigation this settlement agreement was

15  meant to settle?

16  A.  Was meant to?

17  Q.  To settle or resolve.

18  A.  Well, as it says, any claims that Chevron could bring

19  against Burford and the other entities named in the agreement.

20  Q.  At the time this settlement was entered, had Burford

21  threatened to sue Chevron?

22  A.  Not to my recollection.

23  Q.  At the time that this settlement was executed, had Chevron

24  threatened to sue Burford?

25  A.  Probably, yes.

DAG8CHE3                    Bogart - cross

1   Q.  Please explain.

2                THE COURT:  That's not a question.

3   Q.  What had Chevron threatened to sue Burford about prior to

4   the execution of this settlement agreement?

5   A.  I'm not sure that I have a particularized answer.

6   Q.  Well, you testified that you had an understanding that

7   Chevron threatened to sue Burford prior to the execution of

8   this agreement.  What is the nature of your understanding?

9   A.  As I said, I am not sure that it goes beyond what I just

10  told you into anything that is more particularized.

11  Q.  Had Burford thought that it had done something wrong prior

12  to the entry of the settlement agreement that it had to resolve

13  by entering into it?

14  A.  No.

15  Q.  Had Chevron made a formal notice or demand of Burford prior

16  to entering into the settlement agreement?

17  A.  Again, I'm not entirely sure what those words mean in this

18  context, Mr. Gomez.

19  Q.  Mr. Bogart, what I am trying to understand is, if Burford

20  is settling with Chevron, what exactly is it settling through

21  this agreement?

22  A.  Well, as the agreement makes plain, any potential claim

23  that Chevron might have been able to bring against Burford.

24  Q.  At the time, what claim did Burford believe Chevron might

25  have been able to bring that would -- at the time, what claim

DAG8CHE3                         Bogart - cross

1    did Burford believe Chevron might have been able to bring

2    against it?

3              MR. MASTRO:  Objection to form, your Honor.

4              THE COURT:  Overruled.

5    A.  Well, Burford had already been named not as a party, but

6    had been named in the complaint in this action.

7    Q.  So did Burford fear that it would be sued as a

8    co-conspirator or that it would be added as a named

9    co-conspirator to the action?

10   A.  Again, you're taking me into a world of speculation, and I

11   have already told you that we weren't engaged here in

12   particularized sort of statement of claim level discussions.

13   So if you want me to speculate, I suppose I can.

14             MR. MASTRO:  Objection to speculating, your Honor.

15             MR. GOMEZ:  May I have Exhibit 587, please,

16   defendants'.

17             Your Honor, we have the exhibits for the cross.  So I

18   think I would like to just hand the binder over so that all of

19   them will be in front of the witness.

20             THE COURT:  That's fine.

21             If you have one for me, it will be helpful too, but I

22   guess not.

23             MR. GOMEZ:  Your Honor, I can hand you individually.

24             THE COURT:  Thank you.

25             MR. MASTRO:  Why don't you give the judge the binder

DAG8CHE3                    Bogart - cross

1   and you can give me individually.

2   Q.  Mr. Bogart, would you please turn to the tab marked

3   Defendants' Exhibit 587, please?

4           Sir, is this a declaration that you signed on April

5   17th of this year?

6   A.  Yes, it appears to be.

7   Q.  If you turn to page 17 of the document.  The number is at

8   the bottom of the document.  Is that your signature that

9   appears on that page?

10  A.  There are two of them in here both marked 3687.  Is that

11  what you're referring to?  Are they the same?  I guess so.

12  Q.  Exhibit 0587.

13          If you will look at the defendants' exhibit

14  designation at the bottom right-hand corner.

15  A.  I see it, and yes, that is my signature.

16  Q.  This is the declaration that you referred to in your direct

17  examination that you had prepared, sir?

18  A.  That's correct.

19          MR. GOMEZ:  I would like to enter this into evidence,

20  please.

21          THE COURT:  Any objection?

22          MR. MASTRO:  No objection.

23          THE COURT:  Defendants' 587 is received.

24          (Defendants' Exhibit 587 received in evidence)

25  Q.  Mr. Bogart, did Chevron see a draft of this declaration

DAG8CHE3                          Bogart – cross

1    before agreeing to settle with Burford?

2    A.  Yes.

3    Q.  How far in advance did Chevron see a draft of this

4    declaration before agreeing to settle with Burford?

5    A.  The declaration and the settlement agreement were roughly

6    contemporaneous.

7    Q.  Did Chevron require you to make any changes to this

8    declaration as a condition to agreeing to settle with Burford?

9    A.  No.

10   Q.  Was it your understanding that the settlement was

11   contingent on you signing a particular declaration?

12   A.  A particular declaration, no.

13   Q.  Was it your understanding that the settlement with Burford

14   was contingent upon you signing the declaration where you

15   asserted that Burford was misled?

16           MR. MASTRO:  Objection to form.

17           THE COURT:  I'm sorry.  There was an objection?

18           MR. MASTRO:  To the form.

19           THE COURT:  Sustained.

20   Q.  Mr. Bogart, were you specifically told by Chevron that

21   Chevron would settle with Burford no matter what your

22   declaration said?

23   A.  No.

24   Q.  Sir, your testimony in this case, if I understand it

25   correctly, is that it became clear to Burford that it was

DAG8CHE3                         Bogart - cross

1    involved in a fraud as a result of three events.  One was a

2    January 27, 2011 telephone call from Mr. James Tyrrell, second

3    was the February 1, 2011 filing of this RICO complaint in this

4    action, and the third was this Court's March 7, 2011 decision

5    to enter into a preliminary injunction.  Do I understand your

6    testimony correctly, sir?

7              MR. MASTRO:  Objection.  It mischaracterizes his

8    testimony.  Compound question.

9              THE COURT:  Sustained.

10   Q.  Mr. Bogart, is it your testimony that Burford made a

11   determination or came to the conclusion that it had been misled

12   as a result of this Court's March 7, 2011 decision to enter a

13   preliminary injunction in this case?

14   A.  There is no --

15             MR. MASTRO:  Objection to form, your Honor.

16             THE COURT:  Overruled.

17   A.  There is no question that this Court's lengthy opinion in

18   connection with the grant of the preliminary injunction

19   certainly informed Burford's thinking, yes.

20   Q.  Is it your testimony that as of March 7, 2011, Burford

21   entertained the belief that it had been misled as of that date?

22   A.  Yes.

23   Q.  Is it your testimony that as of that date, Burford made the

24   determination that it can no longer proceed funding the

25   litigation?

DAG8CHE3                        Bogart - cross

1   A.  I don't know that Burford had made the latter determination

2   at that point.

3   Q.  Mr. Bogart, I would like to direct your attention to

4   Defendants' Exhibit 482.  Please take a look at that.

5            MR. GOMEZ:  For the record, Defendants' Exhibit 482

6   has a cover sheet.  The actual exhibit is the second and third

7   pages, with the Bates number BUR 005754757548.

8   Q.  Mr. Bogart, does this exhibit contain an e-mail chain from

9   you to Aviva Will, dated Thursday, June 2, 2011, at 9:34 p.m.?

10  A.  Yes, it appears to be.

11  Q.  Incorporated in that e-mail is there a message forwarded

12  from you to a Herbert Lichtman, dated Thursday, June 2, 2011,

13  at 1:57 p.m.?

14  A.  1:27 p.m., but yes, it appears to be.

15  Q.  1:27 p.m.  Mr. Bogart did you send that 1:27 p.m. e-mail to

16  Mr. Herbert Lichtman?

17  A.  I believe I did.

18           MR. GOMEZ:  At this time, I would like to move Exhibit

19  482 into evidence.

20           MR. MASTRO:  No objection, your Honor.

21           THE COURT:  Received.

22           (Defendants' Exhibit 482 received in evidence)

23  Q.  Mr. Bogart, looking at this e-mail, were you advising

24  Mr. Lichtman to remain involved in the -- withdraw the

25  question.

DAG8CHE3                          Bogart - cross

1          Mr. Bogart, with this e-mail, were you reprimanding

2    Mr. Lichtman for his inclination to cease his involvement with

3    this case on June 2, 2011?

4          MR. MASTRO:  Objection to the form.  The document

5    speaks for itself.

6          THE COURT:  Sustained.

7    Q.  What was your purpose in sending this e-mail to

8    Mr. Lichtman?

9    A.  I was responding, as it says in the first paragraph, to a

10   communication that I had received from him.

11   Q.  In this e-mail, I would like you to explain what you mean

12   by a particular sentence.  I will direct your attention to the

13   paragraph that begins, "I also think we need to move on."  Do

14   you see the paragraph that I am talking about?

15   A.  I do.

16   Q.  In the middle of that paragraph, you write, "We told you

17   about the deterioration of the relationship, about the

18   shenanigans with Ernie and so forth."

19          What did you mean by the deterioration of the

20   relationship, sir, when you wrote this e-mail?

21   A.  My recollection is that it carries on from the preceding

22   sentence and it refers to a deterioration of the relationship

23   with the plaintiffs.

24   Q.  And when you write about the shenanigans with Ernie, what

25   are you referring to, sir?

DAG8CHE3                          Bogart - cross

1    A.  I believe I was referring to the shenanigans relating to

2    the arrival of Mr. Ernie Getto to Burford.

3    Q.  What specifically happened that you were referencing when

4    Ernie Getto arrived at Burford?

5    A.  Sitting here today I am not sure that I have a crisp

6    recollection of what I meant in this particular e-mail, but

7    from the context, I am assuming that it relates to your

8    client's complaint to us.

9             MR. MASTRO:  Your Honor, if he doesn't have a

10   recollection from the e-mail, he would be speculating.

11            THE COURT:  The question is what you remember, sir.

12   You either remember or you don't remember.

13            What is your best recollection, if any?

14   A.  I think I had finished.

15            MR. GOMEZ:  Can I have the last answer read back,

16   please?

17            (Record read)

18   Q.  What complaint are you referring to, sir?

19   A.  There was a complaint about the arrival of Mr. Getto made

20   by your client to Burford.

21   Q.  What was the nature of that complaint?

22   A.  Your clients were unhappy that Mr. Getto, who had formerly

23   been a partner at Latham & Watkins, had joined Burford.

24   Q.  When Ernie Getto was a partner at Latham & Watkins, did he

25   represent Chevron Corporation?

DAG8CHE3                      Bogart - cross

1   A.  I believe they were one of his clients, yes.

2   Q.  Didn't his joining Burford pose a potential conflict of

3   interest in view of the fact that Burford was funding

4   litigation where Chevron was an adverse party?

5              MR. MASTRO:  Objection.

6              THE COURT:  Sustained.

7   Q.  Mr. Bogart, when you sent this e-mail on June 2, 2011, the

8   Court in this case had already issued its decision of a

9   preliminary injunction, and you indicate to Mr. Lichtman that

10  you offer to sell Burford's interests to him, is that correct?

11             MR. MASTRO:  Objection to form, your Honor.

12             THE COURT:  Sustained.  It either says it or it

13  doesn't.

14  Q.  Why were you offering to sell Burford's interest in a case

15  that at the time you believed was a subject of fraud?

16  A.  I suppose the answer to at least the first part of your

17  question is that obviously the e-mail is conveying some

18  unhappiness on the part of a coinvestor, and one of the ways to

19  try and solve unhappiness with coinvestors is to not be

20  coinvestors anymore one way or the other.

21  Q.  On or about the time that you sent this e-mail to Herbert

22  Lichtman, did you communicate to him that you believed you had

23  been misled into furthering a fraud with funding?

24  A.  I very rarely had communications with Mr. Lichtman.  So I

25  would think probably not.

DAG8CHE3                          Bogart - cross

1   Q.  He was an investor in the same case, wasn't he?

2   A.  Mr. Lichtman had, through his firm, become an equity

3   investor in Treca.

4   Q.  And if Burford felt misled, don't you think Burford had an

5   obligation to inform Mr. Lichtman about the basis for that

6   sentiment?

7   A.  Well, as you can see from the e-mail, there is no

8   suggestion that Burford is not communicating actively with

9   Mr. Lichtman.  And I believe there was such active

10  communication.  It was simply not through me.

11  Q.  Who do you believe was engaging in that kind of

12  communication?

13  A.  Principally, Jon Molot of Burford.

14  Q.  You have personal knowledge of what Jon Molot at Burford

15  may have actually told Herbert Lichtman regarding Burford's

16  belief that it had been misled to fund a fraudulent lawsuit?

17  A.  I don't have personal knowledge, no.

18  Q.  Sir, let me show you another document.  I direct your

19  attention to Defendants' Exhibit 483.  483 is composed of two

20  pages.  The second page seems to be a series of notations

21  handwritten with the Bates number BUR 0004496.

22          Do you see that document, Mr. Bogart?

23  A.  I do.

24  Q.  Sir, what is this document?

25  A.  I believe these are my handwritten notes in preparation for

DAG8CHE3                    Bogart - cross

1   my giving a briefing to the board of directors of Burford

2   Capital.

3   Q.  Do you know approximately what date you made these notes?

4   A.  I would think shortly before the middle of February,

5   probably February 12th or 13th of 2011.

6   Q.  Do you recall whether you made these notes before or after

7   this Court entered a preliminary injunction in this case in

8   2011?

9   A.  You will be able to correct my recollection from the

10  record.  It was certainly before the Court's opinion on the

11  preliminary injunction.

12          THE COURT:  Under the portion of the memorandum, Mr.

13  Bogart, that had something like a heading, wide range of

14  options, isn't there a reference to the decision of this court,

15  the preliminary injunction, and it then says, If lifted,

16  seriously consider further funding?

17          THE WITNESS:  I wasn't attempting to split hairs, your

18  Honor.  I honestly don't recall when the TRO became a

19  preliminary injunction.  My recollection of these notes is that

20  they were made after this Court had granted the TRO, long

21  before this Court had issued its lengthy opinion on the

22  preliminary injunction.  Whether the TRO had been converted to

23  a preliminary injunction before opinion I simply don't recall.

24          THE COURT:  OK.  Thank you.

25          THE WITNESS:  But I am quite clear on the date of

DAG8CHE3                    Bogart - cross

1   these notes.

2   Q.  As of this point in time, Burford still considered

3   continuing its involvement in funding the Ecuadorian

4   litigation, isn't that correct, the enforcement of the

5   Ecuadorian litigation, isn't that correct, as of the time you

6   took these notes?

7   A.  As I said, these are my outline as opposed to notes of a

8   conversation.  But as the document says, I was listing for

9   discussion a wide range of options.

10  Q.  One of those options was to, quote, ride it out, is that

11  what you note there, Kaplan and Second Circuit?

12  A.  Yes.  That note, the line that starts with S/T, which is my

13  nomenclature for short-term.  So short-term ride out.

14  Q.  When you referenced the notation "if lifted," you're

15  referring to the temporary restraining order, the preliminary

16  injunction in this action, sir?

17  A.  Well, as I said, I don't recall if we were at the TRO or

18  the PI phase, but I presumed there would be an appeal of the PI

19  that ultimately would be entered, and that is what I was

20  referring to.

21  Q.  Sir, under the terms of the settlement agreement, Burford

22  claims to have renounced its interest in the proceeds of the

23  Lago Agrio judgment, is that correct?

24  A.  Yes, it is.

25  Q.  How much did Burford invest in the litigation?

DAG8CHE3                        Bogart - cross

1    A.  $4 million initially.

2    Q.  Did Burford sell any or part of its interest before

3    renouncing in the settlement?

4    A.  You will have to clarify your question for me, I am afraid.

5    Q.  Burford invested $4 million.  Did Burford recoup that $4

6    million from another investor before renouncing its interest by

7    way of the settlement agreement?

8          THE WITNESS:  Shall I explain?

9          THE COURT:  Just answer the question.

10   A.  The answer to your question is that Burford invested $4

11   million in early November 2010, sold equity in Treca, the

12   investment vehicle, for $4 million in December 2010, and

13   entered into the settlement agreement you're discussing with

14   Chevron in 2013.

15   Q.  When did it sell that equity in Treca?

16   A.  In December 2010.

17   Q.  Were there any other sales of equity between December 2010

18   and the settlement agreement with Chevron?

19   A.  No.

20         THE COURT:  Is the structure of this that Burford

21   invested $4 million in Treca, Treca then invested $4 million

22   with the plaintiffs.  Is that correct so far?

23         THE WITNESS:  That's correct so far.

24         THE COURT:  And then the equity that Burford held in

25   Treca Burford sold to somebody else?

DAG8CHE3                        Bogart - cross

1                THE WITNESS:  No.  Shall I explain?

2                THE COURT:  Yes, please.

3                THE WITNESS:  Treca had 15 shares of share capital

4      reflecting the total potential commitment in the funding

5      agreement of $15 million.  So at the time that Treca entered

6      into the funding agreement with the plaintiffs in October 2010,

7      Burford indirectly owned all 15 of those shares, and, indeed,

8      funded $4 million through Treca to the Patton Boggs trust

9      account.  A little more than a month later, Treca

10     sold -- Burford effectively sold four of those 15 shares in

11     Treca for $4 million.

12     Q.  Did Burford ever sell the remaining shares?

13     A.  No, it did not.

14                THE COURT:  So is the net of all this, from the

15     standpoint of Burford and its equity shareholders, that it's

16     not out-of-pocket a penny, and that what has been renounced is

17     the potential recovery in respect of the 11 of the 15 shares,

18     is that correct?

19                THE WITNESS:  That is correct, other than the

20     significant fees, legal fees.

21                THE COURT:  OK.  Go ahead.

22     Q.  Mr. Bogart, is it fair to say that Burford positions itself

23     as a financier of large commercial litigation matters, disputes

24     between corporations?

25     A.  Yes.

DAG8CHE3                          Bogart – cross

1    Q.  And Burford's core clientele are general counsel in

2    corporations, is that correct?

3    A.  Yes.  But more significantly the law firms that represent

4    them.

5    Q.  Is it fair to say that there was considerable debate at

6    Burford about whether the investment in the Ecuadorian

7    litigation was in line with the core business model of Burford?

8    A.  There was discussion inside of Burford about disliking the

9    investment.

10   Q.  Well, isn't it true, Mr. Bogart, that some of Burford's

11   core clientele expressed concern that Burford had invested in

12   this type of a case on the plaintiff's side?

13              MR. MASTRO:  Objection.  It calls for hearsay.

14              THE COURT:  No.  It's not offered for the truth of the

15   matter.  It is offered for the fact that it was said if it was

16   said.

17              Answer the question, please.

18   A.  Yes.

19   Q.  Is it fair to say that some of Burford's partners had

20   concerns about continuing with this type of investment because

21   it might impair its ability to continue to attract clientele to

22   its core business?

23              MR. MASTRO:  Your Honor, objection to form.  It's not

24   clear what time period.

25              THE COURT:  Overruled.

DAG8CHE3                        Bogart – cross

1   A.   No.

2   Q.   Mr. Bogart, isn't it true that when Burford invested in the

3   Ecuadorian litigation, that it created some fallout among

4   certain law firms that were on the opposite side of the case?

5   A.   To be honest, I don't know what you mean by fallout in that

6   context.  At the time that Burford made the investment, it

7   wasn't known to the law firms on the other side of the case.

8   Q.   I would like to direct your attention to Defendants'

9   Exhibit 501.

10           MR. GOMEZ:  For the record, Defendants' Exhibit 501

11   has a cover sheet.  The exhibit runs three pages.  The second

12   and third page appear to be e-mails.

13   Q.   Mr. Bogart, I am direct your attention to the top e-mail on

14   the second page.  It is from a Doug Donsky to you, dated June

15   15, 2011, at 6:57 p.m.

16           Do you see that e-mail, sir?

17   A.   I do.

18   Q.   In the center of that e-mail it says, "Negatively,

19   Burford's decision to invest has created some painful fallout,

20   particularly among certain law firms on the opposite side of

21   the case."

22           Sir, did you receive this e-mail on or about June 15,

23   2011, at 6:57 p.m.?

24   A.   I believe so.

25   Q.   When you received this e-mail, did you read it?

DAG8CHE3                        Bogart - cross

1    A.  I assume so.

2    Q.  When you read that sentence that I just read, what did you

3    understand Mr. Donsky to be referring to when he said

4    "Burford's decision to invest has created some painful

5    fallout"?

6              MR. MASTRO:  Your Honor, this hasn't been offered into

7    evidence and he is asking him to comment on hearsay.

8              THE COURT:  Sustained.

9              MR. GOMEZ:  I ask that Defense Exhibit 501 be entered

10   into evidence.

11             MR. MASTRO:  Not for the truth of the matter asserted

12   by some outside consultant.  It's still hearsay, that

13   particular statement.

14             THE COURT:  What is the purpose of the offer?

15             MR. GOMEZ:  The purpose of the offer, your Honor, is

16   to prove that Mr. Bogart received this e-mail and was having

17   this conversation with Mr. Donsky.

18             THE COURT:  How is that relevant?

19             MR. GOMEZ:  It is relevant because the document speaks

20   to the state of mind of Burford at the time in question.

21             THE COURT:  What is the state of mind of Burford

22   actually?

23             MR. GOMEZ:  I am sorry?

24             THE COURT:  What is the state of mind of a corporate

25   entity?  Is it the sum total of all of the thoughts,

DAG8CHE3                         Bogart - cross

1    contradictory and otherwise, of all the people who work for it?

2               MR. GOMEZ:  I am trying to prove up the state of mind

3    of one of its chief executive officers.

4               THE COURT:  Who is that?

5               MR. GOMEZ:  Mr. Bogart.

6               THE COURT:  So it's offered for Mr. Bogart's state of

7    mind?

8               MR. GOMEZ:  Yes.  His understanding of the situation

9    in which his company was --

10              THE COURT:  If you're offering it to prove that

11   somebody said X, then I will receive it for the proposition

12   that somebody said X, but not for the truth of X.  Do you

13   understand?

14              MR. GOMEZ:  It's also offered for impeachment, your

15   Honor.  Mr. Bogart testified that he did not know what painful

16   fallout meant.

17              THE COURT:  That's not what he said.

18              MR. MASTRO:  It's not what he testified to.  He talked

19   about a more specific time frame and context.  It's not a

20   proper impeachment.

21              THE COURT:  Look, I am going to receive it simply as

22   an e-mail that was sent to this witness.  So for that limited

23   purpose it's received, not for the truth of statements made by

24   anyone other than the witness.

25              (Defendants' Exhibit 501 received in evidence)

DAG8CHE3                    Bogart - cross

1   BY MR. GOMEZ:

2   Q.  Mr. Bogart, on or about June 15, 2011, the time of this

3   e-mail, were law firms complaining to Burford about its

4   investment in this litigation?

5   A.  No.

6   Q.  At the time of this e-mail, Mr. Bogart, did both Burford's

7   partners believe that public awareness of Burford's involvement

8   in this case would cause serious problems for the firm because

9   it was supporting the plaintiff's side of the litigation?

10          MR. MASTRO:  Objection to form, your Honor.

11          THE COURT:  It's compound and it calls for the state

12   of mind of a person other than the witness.

13   Q.  Mr. Bogart, when did Ernie Getto arrive at Burford?

14   A.  In January 2011.

15   Q.  Was Mr. Ghetto in favor of Burford's investment in the

16   Ecuadorian litigation?

17          MR. MASTRO:  Hearsay, your Honor.

18          THE COURT:  I can't hear you.

19          MR. MASTRO:  Objection.  Hearsay.

20          THE COURT:  Sustained.

21   Q.  Do you know whether Mr. Getto objected to Burford remaining

22   involved in funding the Ecuadorian litigation when he arrived

23   at Burford?

24          MR. MASTRO:  Same objection and to form.

25          THE COURT:  Sustained.

DAG8CHE3                    Bogart - cross

          Look, obviously, Mr. Gomez, what is implicit in the
question is one of at least two different things.  You could be
asking what the witness thinks somebody else thought.  That's
one possibility, for the purpose of proving what that other
person thought.  You could be asking for what, if anything,
that other person said to the witness.  There are probably some
other permutations, but that's a good start.

          Now, the analysis from an evidentiary standpoint is
very different depending on which of those two options you're
trying to get at, and I can't tell because I can't
psychoanalyze the question.  So it would be really helpful if
you would try to formulate questions that would permit us all
to understand what you're trying to get at and how so that we
can all deal with what you're really trying to ask.  I know
you're trying to do that.  Let's go.

          MR. GOMEZ:  Thank you, your Honor.
BY MR. GOMEZ:
Q.  Mr. Bogart, did Mr. Getto, on arrival at Burford, insist
that Burford cease funding the Ecuadorian litigation?
A.  No.
Q.  Did he ever communicate that to you?
A.  I think I have already answered that.
Q.  Do you know whether he communicated that to others in your
firm?
          MR. MASTRO:  Objection.  Hearsay.

DAG8CHE3                    Bogart - cross

1          THE COURT:  No.  It's calling for whether you ever

2     heard him communicate that to somebody else from your own ears.

3     A.  I did not ever hear him communicate that to someone else.

4     Q.  Was it your understanding that Mr. Getto was supposed to

5     stay on at Latham in some capacity after he became associated

6     with Burford?

7     A.  No.

8     Q.  Who was Jon Molot?

9     A.  Jon Molot is Burford's chief investment officer.

10    Q.  Did Jon Molot raise concerns about Ernie Getto joining

11    Burford?

12    A.  Not that I recall sitting here.

13    Q.  I would like to turn your attention to Exhibit 448.  It's a

14    two page exhibit.  The second page is an e-mail with Bates

15    number BUR 0056893, from Jon Molot to Christopher Bogart, dated

16    January 27, 2011, at 10:39 p.m.

17         Sir, did you receive this e-mail on or about this

18    time?

19    A.  I assume so.

20         MR. GOMEZ:  I would like to enter this into evidence.

21         MR. MASTRO:  Once again, your Honor, we have no

22    objection as long as it's not for the truth of the matters

23    asserted.

24         THE COURT:  What is the purpose of the offer?

25         MR. GOMEZ:  The E-mail is offered to prove that the

DAG8CHE3                    Bogart – cross

1   communication between Mr. Molot and Mr. Bogart took place.

2           THE COURT:  And not the truth of the matter.

3           MR. GOMEZ:  Right.

4           THE COURT:  And to what is that relevant?

5           MR. GOMEZ:  It's relevant to the fact that these

6   issues were being discussed on or about this time.

7           THE COURT:  What is that relevant to?

8           MR. GOMEZ:  There may have been other reasons why

9   Burford ceased funding the litigation as opposed to its sense

10  that it was misled in participating in the fraud.

11          THE COURT:  Received not for the truth of the matter.

12          (Defendants' Exhibit 448 received in evidence)

13          THE COURT:  Any more questions?

14  Q.  Mr. Bogart, reading the e-mail, do you recall Mr. Molot

15  raising these kinds of concerns with you?

16          THE COURT:  He testified he received the e-mail.

17          Next question.

18  Q.  What was your reaction to Mr. Molot's expressed concerns?

19  A.  You're going to have be a little more specific for me.

20  This is, as it says, a draft e-mail from Mr. Molot to Mr.

21  Getto.

22  Q.  At the time, was Mr. Molot in favor of continuing the

23  funding of the Ecuadorian litigation?

24          MR. MASTRO:  Objection.  Relevance.

25          THE COURT:  Sustained.  It calls for the operation of

DAG8CHE3                          Bogart - cross

1  | someone else's mind as well.

2  |              Any more questions, Mr. Gomez?

3  |              MR. GOMEZ:  Yes, your Honor.  I am just trying to sort

4  | through.

5  | Q.  Mr. Bogart, did anyone ever express to you that Chevron

6  | ceased to provide work to Latham & Watkins in order to pressure

7  | Burford to cease funding the Ecuadorian litigation?

8  |              MR. MASTRO:  Objection to form and hearsay.

9  |              THE COURT:  Sustained.

10 |              Let me back up.  The purpose of the inquiry, the

11 | purpose of the offer?

12 |              MR. GOMEZ:  To establish an alternative reason for

13 | Burford's decision to withdraw from funding the matter.

14 |              MR. MASTRO:  Hearsay, your Honor.  It's for the truth

15 | of the matter asserted.

16 |              THE COURT:  Well, look, no.  I will take it for

17 | non-hearsay purposes.  It could be that whoever he buys his

18 | newspaper from might have told him that Mayor Bloomberg would

19 | be very happy if business stopped going to Latham & Watkins to

20 | pressure his firm, and it's theoretically conceivable that he

21 | might care.  So we can play at this game for a long time, but I

22 | will allow the question.

23 |              Answer the question, Mr. Bogart, please.

24 | A.  My recollection is the question was in a couple of parts.

25 | Could I have it either read --

DAG8CHE3                          Bogart - cross

1              THE COURT:  Did anyone ever express to you that

2     Chevron stopped providing work to Latham for the purpose of

3     pressuring Burford to cease funding the Ecuadorian litigation?

4              THE WITNESS:  I do not recall any such pressure being

5     applied on Burford through Latham.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAGLCHE4                    Bogart - cross

 1  BY MR. GOMEZ:

 2  Q.  Mr. Bogart, weren't former Latham partners on the board at

 3  Burford?

 4  A.  Burford's vice chairman is a former Latham partner, yes.

 5  Q.  Wasn't there a lunch meeting in which Latham partners met

 6  with Burford executives and informed them that they were losing

 7  work as a result of Burford's investment in this case?

 8  A.  It's entirely possible that was the case.

 9          THE COURT:  Do you know one way or the other?

10          THE WITNESS:  I was not at any such meeting.  I

11  only --

12  Q.  Did anyone inform you that that happened, that

13  communication was made?

14  A.  Yes, yes.

15  Q.  In fact, wasn't the term used that Latham was being

16  blackballed by Chevron so that they could persuade Burford to

17  cease funding the litigation?

18          MR. MASTRO:  Objection, hearsay, your Honor.

19          THE COURT:  I'll allow it not for the truth, but for

20  the fact if it be so that he heard it.

21          THE WITNESS:  I'm not trying to be difficult at all,

22  your Honor.  The problem I'm having is the continued addition

23  of the purpose in his questions.

24          THE COURT:  Well, you know, he's the master of the

25  question.  Answer the question he asked you.

DAGLCHE4                    Bogart - cross

1            THE WITNESS:  No.

2    Q.  I'd like to direct your attention to Defendant's Exhibit

3    492.  492 is an email from Christopher Bogart to Ernie Getto

4    dated January 27, 2011, 10:23 p.m., Bates number BUR0056012

5    through 014.

6            Mr. Bogart, does this exhibit contain an email that

7    you sent to Mr. Getto on or about this time?

8    A.  It appears to, yes.

9    Q.  Why did you send this email?

10   A.  My recollection is that it was to provide some background

11   to Mr. Getto before he went and met with Chevron.

12   Q.  And he was meeting precisely with general counsel at

13   Chevron, Hewitt Page; is that correct?

14   A.  Among others, I believe, that's correct.

15   Q.  That meeting took place on January 27, 2011?

16   A.  That actually was my recollection until I'm seeing

17   10:20 p.m. stamp on the email.

18   Q.  So what's your best recollection as to when that meeting

19   took place?

20   A.  In this general time period.

21   Q.  Is it customary for Burford's officers and directors to

22   meet with the general counsel of their client's litigation

23   adversaries in the middle of a case?

24   A.  No.

25   Q.  Was Patton Boggs or any of the attorneys handling the

DAGLCHE4                    Bogart - cross

1    Ecuadorian litigation informed that Ernie Getto was meeting

2    with Chevron's general counsel Hewitt Pate in advance of that

3    meeting?

4              MR. MASTRO:  Objection, relevance.

5              THE COURT:  Overruled.

6    A.  I cannot as I sit here today recall if Patton Boggs was

7    informed or not.  I don't believe any other lawyers on the

8    plaintiff's side of the case would have been, no.

9    Q.  In this exhibit, turning to the fourth page of this email,

10   you write as follows.  Well, I'd like to direct your attention

11   to the last five bullets in this email, Mr. Bogart.

12             And my question to you is, sir, why were you providing

13   points, talking points to Mr. Ernie Getto regarding the

14   Ecuadorian litigation for him to have a meeting with Chevron

15   general counsel Hew Page?

16   A.  As I already testified, Mr. Getto joined Burford in

17   January 2011 after he retired as a partner at Latham & Watkins.

18   He was not involved at Burford in the Chevron matter on any

19   substantive basis at all.  But as I've also already testified,

20   both the plaintiffs and Chevron expressed to Burford some

21   degree of concern or unhappiness about Mr. Getto's arrival at

22   Burford given the pendency of this particular litigation.

23             These notes were to familiarize Mr. Getto with the

24   background to the matter so that he could go off and have an

25   intelligible conversation with Chevron, his former client, who

DAGLCHE4                    Bogart - cross

1    had asked him to dinner to discuss the matter.

2    Q.  So the purpose of the meeting was for general counsel Hew

3    Pate to discuss the Ecuadorian litigation with Mr. Ernie Getto?

4              MR. MASTRO:  Objection, mischaracterizes the

5    testimony.

6              THE COURT:  Sustained.

7    Q.  Your last response you said discuss the matter.  What

8    matter were you referring to in your last response?

9              THE COURT:  He said discussed -- go ahead.  I'll

10   withdraw that.

11   A.  The Chevron Ecuador matter.

12   Q.  So Ernie Getto and Chevron general counsel --

13   A.  I believe I meant that.  I'm sorry, I might need the

14   testimony read back.  Without having the testimony in front of

15   me, I now do not recall if the matter meant the Chevron

16   litigation or the Mr. Getto's joining of Burford.  It meant one

17   or the other of those things.

18   Q.  Why would Mr. Getto need to discuss him joining Burford

19   with Chevron general counsel Hew Pate?

20             MR. MASTRO:  Your Honor --

21             THE COURT:  Sustained.

22             Look, Mr. Bogart, what you said was these notes were

23   to familiarize Mr. Getto with the background to the matter so

24   that he could go off and have an intelligible conversation.

25   What was the matter to which you referred?

DAGLCHE4                    Bogart – cross

1           THE WITNESS:  Thank you.  The Chevron Ecuador matter.

2           THE COURT:  Proceed, please.

3  Q.  Reviewing these five bullet points, Mr. Bogart, was Burford

4  looking for a way out of funding this litigation on or about

5  January 27, 2011, because it understood that this investment

6  was going to have a detrimental impact on its core business?

7           MR. MASTRO:  Objection to form, your Honor.

8           THE COURT:  Overruled.

9  A.  No.  I've already told you what the purpose of the bullet

10  points were.

11  Q.  Mr. Bogart, I'd like to direct your attention to

12  Defendant's Exhibit 493.  This exhibit includes an email from

13  you to Mr. Randy Mastro.  It's Bates No. BUR0071161 through

14  1164.  The email, Mr. Bogart, that you sent to Mr. Mastro on or

15  about Friday, February 11, 2:47 p.m.

16           Do you see that, sir?

17  A.  12:47 p.m., I do.

18  Q.  Did you send this email to Mr. Mastro on or about that

19  time?

20  A.  I assume I did.

21  Q.  Sir, can you explain why you, the CEO of an entity that was

22  funding the litigation on behalf of the Ecuadorians, was

23  congratulating the attorney of the other side for a superbly

24  executed campaign on February 11, 2011?

25  A.  Sure.  The necessary background is that I've known

DAGLCHE4                    Bogart - cross

1    Mr. Mastro for a number of years.  We've litigated against each

2    other in the past, and we've served together as directors of

3    the Legal Aid Society, among other encounters.

4            He had, as you can see here, just been named litigator

5    of the week due to his carriage of this matter.  And I was

6    writing I suppose somewhat sardonically because on one hand he

7    had been named litigator of the week.  On the other hand, part

8    of his achievement had been only a few days earlier naming my

9    company as, effectively, an unindicted coconspirator in a RICO

10   claim.  So there was an underlying message in this email to him

11   as well.

12           MR. GOMEZ:  Your Honor, I was wondering if we could

13   break for lunch so I could go over the notes that are the

14   remainder of my cross.

15           THE COURT:  How much more do you have?

16           MR. GOMEZ:  I probably have maybe 15, 20 minutes or

17   so.

18           THE COURT:  Well, let's finish.

19           MR. GOMEZ:  I could really use the time to organize my

20   questioning, your Honor.  It would run more smoothly.

21           THE COURT:  All right.  We'll break here until

22   2 o'clock.

23           MR. GOMEZ:  Thank you.

24           MR. MASTRO:  Thank you, your Honor.

25           (Luncheon recess)

DAGLCHE4                          Bogart - cross

1                        AFTERNOON SESSION

2                            2:06 p.m.

3              THE COURT:  Good afternoon.

4              Let's continue, Mr. Gomez.

5              MR. GOMEZ:  Your Honor, this needs to go back to the

6      witness.

7              THE COURT:  Pardon me?

8              MR. GOMEZ:  This binder needs to go back before the

9      witness.

10             THE WITNESS:  Thank you.

11             MR. GOMEZ:  Your Honor, the last document I was on was

12     Defendant's Exhibit 493.  I'd like to move that document into

13     evidence at this time.

14             THE COURT:  Received without objection.

15             (Defendant's Exhibit 493 received in evidence)

16     BY MR. GOMEZ:

17     Q.  Mr. Bogart, you've testified that one of the issues that

18     led you and your company, Burford, to believe that you had been

19     misled was the revelation that the Kohn firm had a falling out

20     with the Ecuadorian plaintiffs and was no longer involved in

21     the case; isn't that correct?

22     A.  Certainly, certainly the issues with respect to Mr. Kohn

23     represent one of the areas in which we believe we were misled,

24     yes.

25     Q.  And isn't it true that you learned of those allegations at

DAGLCHE4                        Bogart - cross

1   the end of 2010 and, more precisely, August of 2010?

2   A.  No, I don't believe that's correct.

3   Q.  When did you learn about the Kohn allegations?

4   A.  I'm not sure as I sit here today that I can put a date on

5   it, but well, well after that date.

6   Q.  Isn't it fair to say that after you learned about the Kohn

7   allegations, you had a discussion with Jim Tyrrell about the

8   possibility of Burford purchasing Kohn's interest?

9   A.  There had been a number of discussions about the problem

10  created in the intercreditor agreement by the absence of

11  Mr. Kohn, so, yes.

12  Q.  But my point, Mr. Bogart, is that after you learned that

13  the Kohn, that the Kohn firm felt it was misled, instead of you

14  questioning whether you should conduct a further examination of

15  due diligence of the matter, you instead inquired how you could

16  buy out the Kohn firm's interest; isn't that correct?

17              MR. MASTRO:  Objection to form and argumentative.

18              THE COURT:  Sustained on those grounds.

19  Q.  Mr. Bogart, isn't it correct that after you learned that

20  the Kohn firm had felt misled, instead of you conducting

21  further due diligence, you instead inquired about how to

22  purchase the Kohn firm's interest?

23              MR. MASTRO:  Same objection, your Honor.

24              THE COURT:  Same question, same objection, same

25  ruling.

DAGLCHE4                    Bogart - cross

1    Q.  Did you or did you not, Mr. Bogart, inquire how to purchase

2    the Kohn firm's interest after the Kohn firm had renounced its

3    interest in the case?

4            MR. MASTRO:  Objection, your Honor.  Lack of

5    foundation and assumes facts not in evidence.

6            THE COURT:  Sustained as to form.

7    Q.  Mr. Bogart, I'm going to direct your attention to

8    Defendant's Exhibit 478, second page of this exhibit.  It's an

9    email from you, sir, to James Tyrrell, dated Monday, January 3,

10   2011, at 10:43 a.m.

11           Do you see that, sir?

12   A.  I do.

13   Q.  Did you send this email to James Tyrrell on or about that

14   date?

15   A.  I assume I did.

16   Q.  Isn't it true you sent this email after you knew about

17   the -- that the Kohn firm had left the case because it had felt

18   it had been misled?

19   A.  I would have to have my recollection refreshed about the

20   precise dates.

21   Q.  Look at your witness statement, paragraphs 22 through 24,

22   please, sir.  You testified that the particular letter that

23   Kohn sent to certain of the Lago Agrio plaintiffs'

24   representatives in August 2010 would have been material to

25   Burford.

DAGLCHE4                    Bogart - cross

1         Does that refresh your recollection about when you

2    learned about the Kohn allegations, sir?

3    A.  Well, it doesn't refresh my recollection.  I've never said

4    that I didn't recall the materiality of the Kohn letter.  My

5    testimony doesn't place a date on my knowledge of that letter.

6    I simply can't tell you if on January 3, 2011, I did or did not

7    know that.

8         MR. GOMEZ:  Your Honor, I'd like to move Defendant's

9    Exhibit 478 into evidence.

10        MR. MASTRO:  No objection, your Honor.

11        THE COURT:  Received.

12        (Defendant's Exhibit 478 received in evidence)

13   Q.  Mr. Bogart, in your testimony you have suggested that prior

14   to its investment in November of 2011, Burford believed the

15   issue with Cabrera was limited to ex parte contacts as opposed

16   to ghostwriting.  I'm referring to your witness statement

17   paragraph 15.

18        MR. MASTRO:  Objection to form.

19        THE COURT:  Just a minute.

20   Q.  You've also testified --

21        THE COURT:  I said just a minute.

22        MR. GOMEZ:  I'm sorry, your Honor.

23        THE COURT:  Overruled.

24   Q.  And you've also testified, sir, I'm referring to witness

25   statement paragraph 38, that Donziger --

DAGLCHE4                    Bogart - cross

1   A.  I haven't answered the prior question.

2           THE COURT:  I'm sorry?

3           THE WITNESS:  I haven't answered the prior question.

4           MR. GOMEZ:  I haven't finished the question.  I'm

5   sorry.

6           THE COURT:  Maybe you ought to start all over again.

7   How is that.

8   Q.  Mr. Bogart, is it true that you have suggested that prior

9   to its investment in November 2011, Burford believed the issue

10  with Cabrera was limited to ex parte contacts as opposed to

11  ghostwriting?  I'm referring to paragraph 15.

12          THE COURT:  Look, this is not helping much.  Are you

13  asking him whether that's what paragraph 15 says, or are you

14  asking him to buy into your characterization of what

15  paragraph 15 says, or are you asking him about the facts?

16  Q.  I'm asking prior to your investment in November of 2011,

17  did Burford believe that the issue with Cabrera was limited to

18  ex parte contacts as opposed to ghostwriting?

19          THE COURT:  I'm amending the question to ask whether

20  that's what you believed, but otherwise answer it.

21  A.  So, first of all, it's November 2010, not November 2011.

22  With that amendment, certainly at the time that Burford made

23  the investment we believed that whatever the Cabrera issue was,

24  it pertained only to limited and permissible contacts, that's

25  right.

DAGLCHE4                    Bogart - cross

1              MR. GOMEZ:  Your Honor, Mr. Bogart has submitted

2     direct testimony where he is speaking on behalf of Burford.

3     However, he is not permitted to testify -- he's only permitted

4     to testify as to his own beliefs.  I would submit, your Honor,

5     that if Mr. Bogart has submitted a declaration or direct

6     testimony that tends to describe the knowledge of the entity

7     Burford as opposed to just his own knowledge, that he also be

8     allowed to testify here today as almost akin to a 30(b)(6),

9     that is, representing the knowledge of the entity.

10             THE COURT:  Except Rule 30(b)(6) has nothing to do

11    with trials.  And we've already had discussions for a

12    considerable period of time, both yesterday and today, about

13    the fact that the way in which the witness statements were

14    drafted were such that they included all sorts of stuff that

15    would not be admissible in evidence -- and we just had this

16    discussion before the lunch break -- stuff of which there's no

17    personal knowledge and the like.

18             Now, you know, I suppose you could get somebody in

19    here whose job is to clean rest rooms at General Motors and ask

20    him questions about what General Motors believed on a

21    particular day and that's not useful.  And you could get the

22    CEO in and that wouldn't be any more useful because the CEO

23    doesn't necessarily know what the executive vice president knew

24    or what the person in charge of research on positraction axles

25    is or whatever My Cousin Vinny was talking about in the movie.

DAGLCHE4                    Bogart - cross

1              The idea is we are supposed to try this case on the

2      basis of competent evidence and we're going to do that.

3      Q.  Mr. Bogart, do you believe that Donziger and Patton Boggs

4      misled you by suggesting that ex parte meetings and

5      communications are lawful in Ecuador?

6      A.  I certainly believe that we were misled about the quantity

7      and nature of the ex parte communications that appear to have

8      occurred here.

9      Q.  What reason do you have to believe that Ecuadorian law

10     prohibits communications or meeting ex parte with experts?

11              MR. MASTRO:  Mischaracterizes the testimony, your

12     Honor.

13              THE COURT:  Sustained.

14     Q.  Why do you have the belief that you were misled as a result

15     of the quantity and nature of the ex parte communications at

16     issue?

17     A.  Well, for a variety of reasons, I believe all of which are

18     in the record of this proceeding, starting with the fact that

19     Mr. Donziger altered substantially the story he gave about

20     Cabrera between the time he took our capital and the time that

21     this matter came to court.

22     Q.  Mr. Bogart are you aware -- who is Frank Schwitter,

23     Mr. Bogart?

24     A.  Frank Schwitter, to the best of my knowledge, was a

25     consultant or employee of a firm called Burford Advisors, which

DAGLCHE4                      Bogart - cross

1    is not related to Burford Capital.

2    Q.  Mr. Schwitter wasn't Burford's CEO in the months leading up

3    to Burford's Ecuador investment?

4    A.  No, I was.

5    Q.  CFO, I'm sorry.

6    A.  No.  As I said, Mr. Schwitter was with a firm called

7    Burford Advisors, which was unrelated to Burford Capital.

8            The similarity in names stems merely from the fact

9    that Mr. Seidel named all of his various ventures with a

10   Burford moniker.  But Mr. Schwitter was not in any way involved

11   in Burford Capital's consideration of this matter.

12   Q.  Do you have any knowledge of an email by Mr. Schwitter

13   where he commented on the Cabrera report, in particular in

14   Annex T, and opined that work was probably done by a firm

15   called Stratus?

16   A.  I do not.

17   Q.  Sir, with reference to paragraph 16 of your testimony, you

18   testified that Burford invested despite concerns about the

19   Cabrera allegations.  I withdraw that.

20           Do you believe, sir, that Burford invested despite

21   concerns about the Cabrera allegations largely because it

22   believed in Patton Boggs's approach of submitting supplemental

23   expert reports concerning damages to the Ecuadorian court?

24           MR. MASTRO:  Objection to form, your Honor.

25           THE COURT:  Sustained as to form.

DAGLCHE4                     Bogart - cross

Q.  Did Burford believe that the submission of supplemental

experts to the Ecuadorian court cured any of the allegations

with respect to the Cabrera report at the time it made its

investment?

          MR. MASTRO:  Objection to form, your Honor.

          THE COURT:  Sustained as to form.

          As far as I can tell, Mr. Gomez, what you're doing at

the moment is you're taking paragraph 16 of the declaration,

which says sort of what I gather your questions are trying to

get the witness to admit and you're repackaging them in

language that you would rather have it stated in and trying to

get the witness to buy into it and it's not a useful exercise.

If I'm wrong about that, maybe you can clarify it for me.

Q.  Mr. Bogart, what is the basis for your allegation that the

Invictus memo contains false information?

A.  I think the short answer is that the disclosure of facts

subsequent to the memo being written have clearly demonstrated

that a number of facts in it were inaccurate or incomplete.

Q.  Which particular facts are you referring to?

A.  Well, I think we've just been discussing, for example, the

Cabrera report.  And it is, you know, I think it has been made

clear through both my testimony and the documents in the case

it was unquestionably Burford -- Burford was relying

unquestionably on the representations from both Mr. Donziger

and Patton Boggs about a set of facts that turned out not to be

DAGLCHE4                    Bogart - cross

1    true.

2    Q.   What particular representation was Mr. Donziger saying that

3    Mr. Burford -- that Burford was relying upon with respect to

4    the Cabrera report, can you be more specific?

5    A.   As I've already said that whatever contacts had occurred

6    with Cabrera, they were both permissible and limited.

7    Q.   Which contacts?

8    A.   Contact between Cabrera and what are colloquially called

9    the LAPs.

10   Q.   Are you talking about any contacts or particular kinds of

11   contacts?

12   A.   I'm talking generally about the body of contacts that I

13   understand to have occurred.

14   Q.   Mr. Bogart, aren't you aware under Ecuadorian law it is

15   permissible to have ex parte contacts with the testifying

16   expert?

17            MR. MASTRO:   Objection, your Honor.

18            THE COURT:   Sustained.

19   Q.   Do you have any reason to believe that under Ecuadorian

20   law --

21            THE COURT:   Sustained.  Move on.  The witness's

22   position is abundantly clear.

23   Q.   Directing your attention to paragraph 21 of your statement,

24   sir, you state you still "have not viewed more than a handful

25   of outtakes.  Those that I have viewed caused me serious

DAGLCHE4                    Bogart – cross

1    concerns and appeared to be inconsistent with the

2    representations in Invictus."

3         What particular Crude outtakes, sir, are inconsistent

4    with representations in the Invictus memo?

5    A.  I'm not sure how I identify outtakes to you.  I suppose I

6    have two sets of knowledge about the outtakes.  One was a small

7    number of outtakes that were available on the American Lawyers

8    website; and then there were yet more, to my recollection,

9    outtakes that were exhibits to or described in this Court's

10   decision in March of 2011, if I'm not mistaken about the date.

11        And the Invictus memo was perfectly clear about the

12   outtakes.  And it was a topic discussed at some length in that

13   memo in which we were told that the outtakes that were the

14   subject of what was at that point Chevron's allegations

15   represented a mere less than .1 percent of the total volume of

16   outtakes and, indeed, that the overall view of the outtakes was

17   that they supported the plaintiff's position and contradicted

18   Chevron's.

19   Q.  You only viewed a handful of outtakes total; isn't that

20   correct?

21   A.  Correct.

22   Q.  So how could you verify that?

23   A.  It's certainly the view that I have taken on the outtakes

24   that I viewed, and it's certainly the view expressed in other

25   materials in this litigation.

DAGLCHE4                      Bogart - cross

1    Q.  But, again, you've only viewed a handful of the outtakes;

2    is that correct?

3             THE COURT:  How many times are you going to ask that,

4    Mr. Gomez?

5    Q.  Any particular outtakes, Mr. Bogart, that you remember

6    seeing caused you serious concern?

7    A.  I don't know --

8             MR. MASTRO:  Asked and answered, your Honor.

9             THE COURT:  Sustained.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAG8CHE5                    Bogart - cross

1          MR. GOMEZ:  I have misplaced one of my exhibits.  Just

2     give me a moment.

3     Q.  Mr. Bogart, I would like to direct your attention back to

4     Exhibit DX 490.

5     A.  Just before you do, Mr. Gomez, if I could just make sure my

6     testimony is clear thinking back on one point.

7          You had asked me about a memorandum from

8     Mr. Schwitter, which I said that I had not seen.  My answer was

9     intended to be that I had not seen it contemporaneously.

10    Q.  Directing your attention back to Defendants' Exhibit 490,

11    this is an e-mail chain.  The first e-mail in the chain is from

12    Ernie Getto to you, Mr. Bogart, dated Friday, July 8, 2011, at

13    12:11 p.m.  Do you see that, sir?

14    A.  I do.

15    Q.  Sir, does that particular e-mail refresh your recollection

16    that you attended the lunch which is discussed in the e-mail

17    above this one on this exhibit?

18    A.  My recollection was not in need of refreshing.  I did not

19    attend the lunch.

20    Q.  So when Mr. Getto sent this e-mail to you and writes,

21    "After our lunch the other --"

22          MR. MASTRO:  It's not in evidence, your Honor.

23          THE COURT:  Correct.  Sustained.

24          MR. GOMEZ:  Based on the prior testimony, your Honor,

25    I would like to move Defendants' Exhibit 490 into evidence.

DAG8CHE5                      Bogart - cross

1              MR. MASTRO:  I object, your Honor.  He says he neither

2    attended the lunch nor should it be admitted for any purpose,

3    certainly not for the truth of it.  He is not on the e-mail

4    chain.

5              THE COURT:  Well, he is on part of it.

6              MR. MASTRO:  Just part of it, your Honor.

7              THE COURT:  What is the purpose of the offer?

8              MR. GOMEZ:  This exhibit, your Honor, was discussed

9    previously when Mr. Bogart was answering questions regarding

10   whether Latham was blackballed due to Burford.

11             THE COURT:  How does that illuminate the purpose for

12   which it is now offered?

13             I mean, it all or substantially all seems to be

14   hearsay offered to prove the truth of the matters asserted and

15   of dubious relevance to this lawsuit.  But maybe I am missing

16   something.  I invite you to help me.

17             MR. GOMEZ:  Your Honor, Mr. Bogart has testified that

18   he was aware of some discussions brought on that Latham

19   partners were concerned that they may be losing business from

20   Chevron as a result of Burford's involvement in the case.  This

21   e-mail, the top of which confirms that those kind of concerns

22   were being voiced on or around September to July 9, 2011.

23             MR. MASTRO:  The e-mail he is trying to get in on the

24   truth of the matter asserted, he didn't get, he didn't go to

25   the lunch, and there is no impeachment involved here because it

DAG8CHE5                     Bogart - cross

1   doesn't contradict him.  It's irrelevant.

2             THE COURT:  Sustained.

3   BY MR. GOMEZ:

4   Q.  Mr. Bogart, turning your attention back to Defendants'

5   Exhibit 492.  This is the e-mail where you identified some

6   talking points for Mr. Ernie Getto's meeting with Chevron's

7   general counsel Hew Pate.

8             Mr. Bogart, isn't it correct that at this time, when

9   you sent this to Mr. Getto, you were of the opinion that

10  Burford would be better off not being involved in the

11  Ecuadorian litigation, isn't that correct?

12  A.  Even if that is so, we were.

13  Q.  You were looking for a way out at this time, weren't you,

14  as a result of that sentiment, isn't that correct?

15  A.  Are you relating to this document or are you asking me a

16  general question?

17  Q.  I am asking you a general question.

18  A.  So at the end of January 2011, I think we probably reached

19  the point in this investment by which we would have been

20  happier not to have made it, but we had made it.  And we had

21  not yet reached any conclusion about what to do about it, in

22  part because we had not yet discovered a variety of the

23  evidence that has now come to light.

24  Q.  Isn't it also true that you would have relinquished your

25  interest at that time if you could have figured out a way to

DAG8CHE5                     Bogart - cross

1   deal with the fact that Patton Boggs would have been left

2   without funding?

3          MR. MASTRO:  Your Honor, that's a subjunctive improper

4   question.  I object to the form.

5          THE COURT:  It reminds me of one of my favorite

6   objections to a question at a deposition asked in similar form.

7   Objection.  If you had wheels, would you be a bicycle?

8          The objection is sustained.

9   Q.  Mr. Bogart, was the reason that Ernie Getto was meeting

10  with Chevron was simply to relieve Chevron of any concerns

11  about the business that Burford had entered into, so that there

12  would be no fallout with large law firms like Gibson Dunn, and

13  figure out a way for Burford to disassociate itself from this

14  investment in a way that didn't look like it was abandoning

15  Patton Boggs?

16         MR. MASTRO:  Objection to form.  Argumentative.

17         THE COURT:  Answer it if you can.

18  A.  I think the fundamental answer to that is no, that was not

19  the purpose of Mr. Getto's conversation with Chevron.

20  Q.  Was it something that Mr. Getto discussed with Mr. Pate

21  during that meeting?

22         THE COURT:  That would depend if he were there,

23  wouldn't it, Mr. Gomez?

24  Q.  Did Mr. Getto inform you that he discussed that with Mr.

25  Pate?

DAG8CHE5                    Bogart – cross

1          THE COURT:  Which is being offered for the truth of

2     the matter if such a statement was made.  And Mr. Mastro is on

3     his feet and what is he going to say?

4          MR. MASTRO:  Hearsay.

5          THE COURT:  Sustained.

6          MR. GOMEZ:  I have nothing further.

7          THE COURT:  Thank you.  Any redirect?

8          Mr. Friedman.

9          MR. MASTRO:  He was just asking about DX 492, and that

10    actually never was moved into evidence.  My notes reflect it

11    wasn't moved into evidence.  I think it should be received.

12         THE COURT:  Let's see if Mr. Friedman has any

13    questions, and then if you want to offer it on your redirect,

14    you may do so.

15         Any questions, Mr. Friedman.

16         MR. FRIEDMAN:  Yes, your Honor, just quickly.

17    CROSS-EXAMINATION

18    BY MR. FRIEDMAN:

19    Q.  Mr. Bogart, if I understood your testimony correctly, Treca

20    is a Cayman Island corporation?

21    A.  That's correct.

22    Q.  And it's Treca that provided the money to the plaintiff

23    lawyers?

24    A.  Yes.  Treca was the party to the investment agreement and

25    the funding would have passed from Treca to Patton Boggs' trust

DAG8CHE5                        Bogart - cross

 1   account.

 2              MR. FRIEDMAN:  That's all I have.  Thank you.

 3              THE COURT:  Redirect.

 4              MR. MASTRO:  Thank you, your Honor.

 5         I do think the Court should receive DX 492.

 6              THE COURT:  Any objection to 492?

 7              MR. GOMEZ:  No, your Honor.

 8              THE COURT:  Mr. Friedman?

 9              MR. FRIEDMAN:  Again, I guess not for the truth, your

10   Honor, but I guess I would ask what it is offered for.

11              THE COURT:  What is it offered for, Mr. Mastro?

12              MR. MASTRO:  This is from Mr. Bogart, and he is saying

13   himself on the last page, Burford is obviously extremely

14   distressed by the Donziger proceedings and the facts that have

15   emerged, which are very different from the facts as we

16   understood them to be when we made the decision to fund.

17         So he was challenged on these things, and I think the

18   Court has a right to consider this evidence.  He was questioned

19   on this document.

20              THE COURT:  So it's offered as a prior consistent

21   statement.

22              MR. MASTRO:  Correct, your Honor.

23              THE COURT:  Any objection on that basis?

24              MR. FRIEDMAN:  No, your Honor.

25              THE COURT:  Received on that basis.

DAG8CHE5                     Bogart – cross

1                (Defendants' Exhibit 492 received in evidence)

2                THE COURT:  Any other redirect?

3                MR. MASTRO:  I wanted the record to be clear.  When we

4     moved the declaration, we also moved the 12 exhibits to the

5     Bogart declaration.  Of course, they will have the opportunity,

6     the other side, to exchange with us on whether they have any

7     objections.

8                Your Honor, just a few questions.

9                THE COURT:  Before you do that, let me just check my

10    notes.

11               The exhibits listed in Plaintiff's Exhibit 3100A are

12    received on the same basis as the exhibits to the previous

13    witness statement, Plaintiff's Exhibit 3000, on the same

14    procedure we outlined yesterday.

15               Go ahead.

16               MR. MASTRO:  Thank you, your Honor.

17    REDIRECT EXAMINATION

18    BY MR. MASTRO:

19    Q.  Mr. Bogart, just to be clear, when was it that you became

20    aware of Joe Cohen's August 2010 letter, before or after

21    Burford funded in this case in November 2010?

22    A.  After.

23    Q.  Sir, directing your attention to Defendants' Exhibit 483.

24    Those were handwritten notes you made, and I believe that you

25    testified you made them on February 12 or 13.  Can you please

DAG8CHE5                         Bogart - redirect

1   explain to -- February 12 or 13, 2011.

2              Can you please explain to the Court how it is that you

3   know when you made these notes, these handwritten notes?

4   A.   As I testified previously, these were notes to myself,

5   essentially an outline for my briefing to the Burford Capital

6   board of directors about this matter.   The Burford board only

7   meets quarterly.   The relevant quarterly meeting was the 14th

8   through the 16th of February 2011.   The board actually had a

9   specific discussion session around the Chevron matter on the

10  first day of that three day period on the 14th, and so these

11  notes were made shortly before the weekend.   That was a Monday,

12  the 14th.   They were made on the weekend when I was preparing

13  for the board meeting, and they of course were made after the

14  issuance of at least the TRO action, so it's quite easy for me

15  to date them with specificity.

16  Q.   Did you do anything else to go back and confirm that these

17  notes were in fact made on February 12 and 13, 2011?

18  A.   I didn't really need to, but these are notes from a spiral

19  bound hardcover notebook, and the pages make it clear that that

20  is the correct date range for them.

21  Q.   Is that spiral notebook that you just described a record

22  that you make at or near the time you are documenting

23  particular information?

24  A.   Yes.   Everything in there would be contemporaneous.   As I

25  said in my declaration, I am not an inveterate note taker, but

DAG8CHE5                        Bogart - redirect

1    when I do make notes that I am preserving in my notebooks, they

2    are contemporaneous.

3    Q.  Is that the kind of record that you keep in the regular

4    course of regular conducted activity of Burford?

5    A.  It is.

6    Q.  You make it a regular practice if you think something is

7    important to put in your spiral notebook in the regular course

8    of your duties?

9    A.  When I make that election, yes, it's clearly in the regular

10   course of my duties.

11   Q.  Can I refer you, please, Mr. Bogart, to Plaintiff's Exhibit

12   1473.

13              THE COURT:  Are you offering these it or not?

14              MR. MASTRO:  I am happy to have them received.  They

15   were not offered by the other side.

16              THE COURT:  I understand that.  You just laid a

17   business records foundation.  I was wondering why, whether it

18   was just kind of CLE or something.

19              MR. MASTRO:  I am always trying to do it right.  I was

20   going to offer another piece from the notebook.

21              THE COURT:  I can wait.

22              MR. MASTRO:  Please take it now.

23              THE COURT:  Is there any objection to 483?

24              MR. GOMEZ:  No, your Honor.

25              MR. FRIEDMAN:  No, your Honor.

DAG8CHE5                    Bogart – redirect

1              THE COURT:  Received.

2              (Defendants' Exhibit 483 received in evidence)

3              MR. MASTRO:  May I approach the witness, your Honor?

4              THE COURT:  Certainly.

5    Q.  Mr. Bogart, I have just handed you Plaintiff's Exhibit 1473

6    that we already offered into evidence in connection with your

7    declaration and you describe in paragraph 29.  Do you recall

8    that?

9    A.  I do.

10   Q.  The date on these handwritten notes is January 27, 2011?

11   A.  Yes.

12   Q.  Are these notes a conversation you had with James Tyrrell

13   on January 27, 2011?

14   A.  Yes.

15   Q.  Were these also kept by you in the same notebook you

16   described as you keep in the regular course of business?

17   A.  Yes.

18   Q.  Did you make these contemporaneously with the call, in

19   fact, while the call was occurring?

20   A.  I did.

21              MR. MASTRO:  Your Honor, this has already been

22   received subject to that objection, but I just wanted to lay

23   the proper foundation.

24              THE COURT:  All right.

25   Q.  Now, Mr. Bogart, you were asked some questions about

DAG8CHE5                        Bogart - redirect

1    Defendants' Exhibit 482.  That's a June 2, 2011 e-mail chain.

2    It includes communications between you and Mr. Lichtman.

3              I just wanted the record to be clear, can you please

4    explain to the Court your course of dealings with Mr. Lichtman

5    in connection with this Lago Agrio litigation investment, when

6    he invested and then what happened subsequently?

7    A.  I can.  It took some number of months in 2010 for this

8    investment to come together, between negotiation of the

9    economic terms and due diligence, and that culminated in the

10   fall of 2011 when we were really in active documentation.

11             It was clear fairly early on that Burford would not

12   have itself an appetite for a complete $15 million of risk

13   here.  That was purely a portfolio risk management matter.  And

14   so we had begun talking to the Arena firm, even before the

15   investment was closed, about the possibility of them taking

16   part of the investment here.  We had a prior ongoing

17   relationship with this firm.  And so we were effectively

18   walking down the road with them, if you will.

19             We then, at the very end of October, closed the

20   funding agreement with the plaintiffs, using the Treca vehicle

21   that I have already described, and then within some weeks

22   thereafter, and certainly before the end of the year, we had

23   turned around and completed the share sale to Arena that I

24   described earlier.

25   Q.  What, if anything, happened next in connection with

DAG8CHE5                    Bogart - redirect

Mr. Lichtman, Arena's views of the investment in early 2011?

A.  So in January 2011, we had reached the point in this matter where quite a lot of disturbing information was coming out, and the particular circumstances of the way the Arena investment was structured wasn't intended to put all of the front end risk on Arena and none on Burford.  It was simply the way the tranches flowed through the deal.  And so we were, of course, unhappy, as has been described in my declaration.  Arena was also anxious.  And we, basically, for the sake of our relationship with Arena, offered to reverse in January 2011 Arena's purchase of the four shares in Treca.

At that point, nobody quite knew what the future held for us, but we were offering in January 2011 to reverse that position so that effectively we would take the first tranche and they would wait it out, as I said, for relationship reasons.

We went down the road towards doing that, and it looked as though, in fact, we were going to do that, until the middle of February when we were just about to close that and the judgment in Ecuador came out, which obviously caused a change in Arena's calculus.  And Arena decided that they would not withdraw from having taken the first tranche, and so they declined our offer at the time to rescind the equity purchase.

Q.  What, if anything, happened between mid-February 2011 and June 2011 when you had this e-mail exchange, in terms of

DAG8CHE5                    Bogart - redirect

1    Mr. Lichtman's, Arena's perception of investment in Lago Agrio?

2    A.  We had made it clear, when in February they elected to stay

3    in, we had made it clear that was the end of the opportunity to

4    exit, that it was effectively a one-time-only offer on our

5    part.  However, as 2011 proceeded, the factual climate and

6    context around this matter frankly kept on getting worse and

7    more alarming.  I think a fairly significant event was the

8    release of this Court's preliminary injunction decision.  And

9    in the months that followed that, the litigation financing

10   aspect of this was frozen by the injunction so nobody needed to

11   do anything, but Mr. Lichtman, on behalf of his own investors,

12   was, like any sensible commercial player, trying to get us to

13   go back and be willing to do in the middle of the year what we

14   had been willing to do in January and February.  And so this

15   communication was basically me saying to him, I'm sorry, we

16   were willing to do it, we have closed our books for the year,

17   you had your chance, and now you're where you are.

18   Q.  Thank you, Mr. Bogart.

19             MR. MASTRO:  No further questions, your Honor.

20             THE COURT:  Thank you.  The witness is excused.

21             You can leave all of that stuff there.

22             (Witness excused)

23             THE COURT:  The next witness will be?

24             MR. BRODSKY:  David Russell.

25             THE COURT:  We will take our break now and not

DAG8CHE5                    Bogart – redirect

1    interrupt him.

2              MR. BRODSKY:  Before we call him, your Honor, we

3    wanted to make a motion in connection with his testimony,

4    whether you want to do it now or after.

5              THE COURT:  Be seated, folks.

6              MR. BRODSKY:  I know you have read the testimony of

7    Mr. Russell so I won't go into the specifics, but our motion is

8    to preclude cross-examination about the nature and extent of

9    contamination in Ecuador.  Your Honor has already issued

10   rulings relating to litigating whether or not there is

11   contamination in Ecuador in this case.

12             We are offering Mr. Russell's testimony for multiple

13   purposes.  The first purpose is that Mr. Russell, as he

14   testifies in his written statement, Mr. Donziger told him he

15   really wanted a big number for a cost estimate in 2003 for

16   purposes of pressuring Chevron.  Regardless of whether or not

17   there is contamination in Ecuador, and Mr. Russell's evidence

18   to that effect, that testimony is relevant, overt acts in

19   furtherance of the RICO claims.

20             Second, Mr. Russell testifies he told Mr. Donziger

21   several times to stop using it, and Mr. Donziger continued to

22   use it, regardless, again, of whether there is contamination in

23   Ecuador and the nature and extent of it.

24             We bring this up because Mr. Russell did submit a

25   declaration earlier in the proceeding.  That declaration was

DAG8CHE5

1   much more expansive and included evidence about the nature and

2   extent of the contamination, and that he didn't find

3   significant evidence of contamination or much of any.  So we

4   wanted to be clear we are moving to preclude that kind of

5   examination before Mr. Russell takes the witness stand.

6            THE COURT:  Ms. Littlepage.

7            MS. LITTLEPAGE:  Good afternoon.

8            Judge, when I looked at the amended complaint of the

9   plaintiffs --

10            THE COURT:  I am having trouble hearing you.

11            MS. LITTLEPAGE:  When I looked at the amended

12   complaint from the plaintiffs to see what was alleged in the

13   complaint about Mr. Russell, those allegations start at

14   paragraph 101 of the amended complaint, and in paragraph 101,

15   the plaintiffs set out two false data points.  They are going

16   through a litany of predicate acts, and when they get to Mr.

17   Russell, they say that there are two false data points relating

18   to Mr. Russell.  The first of which, as alleged in the amended

19   complaint, is that the RICO defendants pressured Mr. Russell to

20   develop an exaggerated damages estimate.

21            So I am prepared to cross Mr. Russell on at least some

22   of the basic information of the contamination to rebut the

23   specific allegation in the complaint that his damages estimate

24   is exaggerated.  If, in fact, it's valid based on the evidence,

25   it can't be exaggerated.  And the word that they used about

DAG8CHE5

1     this false data point is the two points.  Pressured, Mr.

2     Donziger pressured him to give an exaggerated damages estimate.

3     And so I was looking exactly at the allegations made by the

4     plaintiffs, and I was intending to rebut exactly those

5     allegations.

6              THE COURT:  What data points are you talking about,

7     and where are they referred to in the complaint?

8              MS. LITTLEPAGE:  Paragraph 101.

9              THE COURT:  That data point was the damage estimate

10    itself.

11             MS. LITTLEPAGE:  The claim that it's exaggerated.  I

12    don't think they have an objection to Mr. Donziger getting a

13    damages estimate.  I think that was required of him in the

14    litigation.  Their allegation is that it is false because it

15    was exaggerated.

16             THE COURT:  It's false because the man who gave it

17    said it's not the view he held.

18             MS. LITTLEPAGE:  I think that's not actually his

19    testimony.

20             THE COURT:  I'm sorry.  I have read his testimony

21    quite a few times.  His point is that he was down there.  Mr.

22    Donziger told him he wanted a damage estimate.  He had no

23    underlying data.  Mr. Donziger said, assume A, B, C, D, E and

24    F.  He then went into some empty hotel room, spent a day and a

25    half, and came back with a letter saying $6 billion, based not

DAG8CHE5

1   on any underlying data at all, based upon what Mr. Donziger

2   told him to assume.  Mr. Donziger then hands this to the world

3   and says, see, this is what the damages are.

4        It's as if I said to you, you know, assume that there

5   were no people on the island of Manhattan.  Given that

6   assumption, how long would it take to fill it up with people to

7   get 6 million people here?  Well, the problem is so obvious and

8   so obviously inherent.  If the testimony is truthful, you're

9   not going to get to try the merits of the pollution claim on

10  the issue of whether it was exaggerated.  The argument about

11  the exaggeration is that the man was handed assumptions and

12  made up a figure given the assumptions.  And then told Mr.

13  Donziger not to use it anymore because it had no validity in

14  his view, and Mr. Donziger kept doing it.

15       MS. LITTLEPAGE:  My point would be, if the assumptions

16  were, A, reasonable, and, B, proven to be truthful, then the

17  estimate can't be exaggerated.  You can't have an exaggerated

18  estimate if it's based on -- first of all, it's based on two

19  things.  It's based on actually going to the sites and looking

20  at the sites.

21       THE COURT:  Suppose a big four accounting firm gives

22  an audit opinion that says that the financial statements

23  presented in a 10-K fairly present the condition of the

24  company, and that we have done an audit in accordance with

25  generally accepted accounting standards, and, in fact, there

DAG8CHE5

1    has been no audit.  What they did is, in exchange for some

2    compensation, took data they were given by somebody and falsely

3    certified it.

4          Now, there may be an issue as to whether some

5    stockholder who relies on it can recover damages if it turns

6    out that by pure happenstance the numbers turn out to be right.

7    But for the auditor to go out and say, we have done this audit

8    and in our opinion this fairly presents the financial position

9    of the company, knowing full well that they have no basis for

10   it at all, that's fraudulent, isn't it?

11         MS. LITTLEPAGE:  But that's not what happened here,

12   sir.  Because what happened here is his own report says, I am

13   doing these estimates based on these assumptions.  The entire

14   report was uploaded to the Web site.  So anybody who wanted to

15   see what was underlying the $6 billion number could go and see

16   the assumptions he had been given.  And I think it is

17   commonplace in different parts of litigation, and remember this

18   is very early on in the litigation, that experts are asked to

19   make assumptions, and to offer opinions based on those

20   assumptions, and then the lawyer proves those assumptions.

21         THE COURT:  Absolutely.

22         MS. LITTLEPAGE:  I guess my question, your Honor, is,

23   if the claim is that this is a predicate act because the cost

24   estimate was exaggerated, then I believe I need to rebut that

25   claim of exaggeration, because it can't be a predicate act if

DAG8CHE5

1    the cost estimate was based on reasonable and valid assumptions

2    that in fact were true.

3            THE COURT:  Mr. Brodsky.

4            MR. BRODSKY:  Your Honor, again, the purpose of his

5    testimony is not to go into regardless of whether or not there

6    was contamination.  He was told the purpose of this estimate

7    was to pressure Chevron into a settlement.  He himself said,

8    this estimate that I gave is inaccurate, and I don't want you

9    to use it, cease and desist, stop using it.  Mr. Donziger went

10   on to use it.  Then he told him again and Mr. Donziger

11   continued to use it.  Then he told him again and Mr. Donziger

12   continued to use it.  That's his testimony, and that's true

13   regardless of whether or not these underlying assumptions that

14   Mr. Donziger threw at him about contamination are accurate or

15   inaccurate.

16           THE COURT:  So the essence of your point is that Mr.

17   Donziger was misrepresenting the fact that this expert in fact

18   stood behind these projections, is that right?

19           MR. BRODSKY:  Yes, your Honor.

20           MS. LITTLEPAGE:  Your Honor, paragraph 101 of the

21   complaint raises both of those issues with an "and."  It says,

22   We are bringing Mr. Russell here to prove two points.  A, that

23   Mr. Donziger pressured him into giving an exaggerated damages

24   estimate.  And that Mr. Donziger continued to use that estimate

25   after the cease and desist.

DAG8CHE5

                 I recognize the argument on the second part of the

    "and."  It's the first part of the "and" that I am dealing

    with.  Because the purpose of a plaintiff's lawyer in any case

    is to get evidence to win your case.  So asking Mr. Russell to

    assume things in order to get a cost estimate, that your

    ultimate goal was to use that cost estimate to win your case

    for your clients, is the goal of every plaintiff's lawyer.

    There is nothing fraudulent or criminal about that.

                 But if the claim here, if Chevron's claim here, as I

    read it in their complaint, is that there is a predicate act

    here because the cost estimate was exaggerated, then I am

    asking for the opportunity to rebut that claim by showing that

    the assumptions he was given were reasonable and ultimately

    proven to be valid.

                 THE COURT:  I will think about it over the break.

                 (Recess)

                 THE COURT:  Anybody have anything they want to add to

    the discussion before the break?

                 OK.  Look, I am prepared to go this far at this

    moment, and we will see where it goes from here.  There is at

    least one statement in Mr. Russell's witness statement, there

    may be others, I am referring to paragraph 11, in which he said

    that within a year of working for Donziger, I came to learn

    that my cost estimate was wildly inaccurate and had no

    scientific data to back it up, and he goes on in that vein a

DAG8CHE5

1    little bit.  And I am sure there is at least one other

2    reference.

3            There is in doubt in my mind that the defendants have

4    the right to attempt to impeach the veracity of that testimony

5    in an appropriate way, and that will be permitted.  Where we go

6    from there remains to be seen, and it will depend on questions

7    and what evidence is offered, and when it's offered and through

8    whom conceivably.

9            If the parties would like to brief this matter, it

10   might well be helpful.  And if this is going to come up

11   tomorrow further, it would be helpful to have it by the

12   morning.  If it's not going to come up until next week, then I

13   would like it by Friday.

14           OK.  Let's proceed.

15           MR. BRODSKY:  Plaintiffs call David Russell.

16    DAVID LLOYD RUSSELL,

17       called as a witness by the plaintiffs,

18       having been duly sworn, testified as follows:

19           THE DEPUTY CLERK:  State your name and spell your last

20   name for the record.

21           THE WITNESS:  My name is David Lloyd Russell,

22   R-U-S-S-E-L-L.

23           THE COURT:  Proceed, Mr. Brodsky.

24   DIRECT EXAMINATION

25   BY MR. BRODSKY:

DAG8CHE5                              Russell - direct

1    Q.  Mr. Russell, did you submit a declaration in connection

2    with this case, in this trial?

3    A.  Yes, I did.

4             MR. BRODSKY:  May I approach, your Honor?

5             THE COURT:  You may.

6    Q.  Mr. Russell, I am showing you what is marked as Plaintiff's

7    Exhibit 3200 for identification.  Would you take a moment to

8    look at that, please?

9             MR. BRODSKY:  For the record, your Honor, it's 19

10   pages, under a heading declaration of David Russell, with 24

11   pages behind it of demonstrative exhibits.

12   Q.  Have you had a chance to look at it, Mr. Russell?

13   A.  I have.

14   Q.  Do you recognize it?

15   A.  Yes, I do.

16   Q.  Is that your declaration?

17   A.  Yes, it is.

18   Q.  How do you recognize that as your declaration?

19   A.  My signature is on the, I think it's page 19.

20   Q.  After page 19, do your initials appear on each of the

21   demonstrative exhibits, the 24 pages?

22   A.  They do.

23   Q.  At the time you signed the declaration, were your

24   statements truthful and accurate?

25   A.  Yes.

DAG8CHE5                          Russell – direct

1    Q.  Is everything in your declaration truthful and accurate as

2    of today?

3    A.  Yes.

4    Q.  Do you offer your declaration as your full and complete

5    direct testimony?

6    A.  I do.

7             MR. BRODSKY:  We offer 3200.

8             THE COURT:  Received on the same basis as the other

9    witness statements.

10            (Plaintiff's Exhibit 3200 received in evidence)

11   Q.  Are the e-mails in your declaration that you sent and

12   received true and correct copies of the ones that you sent and

13   received?

14   A.  Yes.

15            MR. BRODSKY:  Your Honor, we offer in connection with

16   his declaration Plaintiff's Exhibit 688, 693, 696, 698, 699,

17   701, 704, 721, 723, 763, 766 and 788 for the truth.

18            We offer Defense Exhibits 730 and 741, which are

19   e-mails, which were marked by the defense as of August 31,

20   2013, but their numbers in recent productions from the defense

21   have changed.  So since Mr. Russell signed his declaration

22   before that change, we offer them as the old exhibit numbers,

23   Defense Exhibit 730 and 741.

24            We offer Mr. Russell's cost estimate, Plaintiff's

25   Exhibit 2414, Plaintiff's Exhibit 754.

DAG8CHE5                         Russell - direct

1          THE COURT:  I am confused.

2          You're offering Exhibits 730 and 741.

3          MR. BRODSKY:  For the truth, along with the other list

4     of the plaintiff exhibits.

5          I am about to offer some exhibits but not for their

6     truth.

7          THE COURT:  OK.

8          MR. BRODSKY:  The list that we are offering, but not

9     for the truth of the matters asserted therein, are Plaintiff's

10    Exhibits 2414, his cost estimate, Plaintiff's Exhibit 754, and

11    the following press releases, 466, 467, 472 to 483, 485, 486,

12    491 through 494, 497 and 499, and the timeline based on that,

13    which is an exhibit marked Plaintiff's Exhibit 2221.

14         THE COURT:  OK.

15         MR. BRODSKY:  No further questions.

16         THE COURT:  Those will be received without objection

17    on the same basis.

18         (Plaintiff's Exhibits 688, 693, 696, 698, 699, 701,

19    704, 721, 723, 763, 766 and 788, 2414, 754, 466, 467, 472 to

20    483, 485, 486, 491 through 494, 497 and 499 and 2221 received

21    in evidence)

22         (Defendants' Exhibit 730 and 741 received in evidence)

23         MS. LITTLEPAGE:  Judge, there is one part of Mr.

24    Russell's declaration that I would ask the Court to give me

25    some guidance on.  It is paragraphs 24 and 25.

DAG8CHE5                        Russell - direct

1          So we have some objections to Mr. Russell's written

2     declaration.  We will file those.  But these two paragraphs I

3     either have to cross-examine him on or not so I wanted to have

4     a discussion with the Court about them.

5          In the plaintiff's amended complaint, the plaintiff

6     identified with specificity the allegations that they were

7     making in relation to David Russell.  The points made in

8     paragraph 24 and 25 are not included in the amended complaint,

9     and there is no predicate act language that would even

10    theoretically apply to paragraph 24 and 25.  I don't believe

11    they have any relevance to the case.  They are not for

12    foundation of any claim.  They are not for foundation of any

13    predicate act or allegation.

14          THE COURT:  Mr. Brodsky.

15          MR. BRODSKY:  Your Honor, the complaint doesn't have

16    to list out each and every -- I know this is an extensive

17    amended complaint and it has the bulk of many allegations of

18    wrongdoing.

19          THE COURT:  Almost long enough to be a 10b-5

20    complaint.

21          MR. BRODSKY:  I think it's longer than that, your

22    Honor.  But, clearly, the rules don't require the amended

23    complaint to contain each and every allegation of relevant

24    testimony.  Paragraphs 24 and 25, regarding Mr. Russell's

25    observations and conversations with Mr. Donziger, contain

DAG8CHE5                        Russell - direct

1    probative evidence that's relevant to the case and should not

2    be stricken simply because they are not exactly stated in the

3    amended complaint.

4                THE COURT:  Sounds right to me, Ms. Littlepage.  Why

5    not?

6                MS. LITTLEPAGE:  As I read 24 and 25, the sort of

7    allegation being made is that Mr. Donziger was acting

8    inappropriate because he didn't have the money to fund a

9    specific type of investigation that Mr. Russell wanted.  The

10   declaration says, Donziger refused to approve the investigation

11   that I had recommended, claiming it would be too costly.

12               I don't want to have to spend time crossing on whether

13   that's appropriate or not in the litigation for a plaintiff's

14   lawyer to not have the money to do everything that you could do

15   if it's not a predicate act and it's not an allegation that we

16   are here to rebut.  I don't think it has any relevance.

17               MR. BRODSKY:  The intent of that paragraph is not to

18   go to the costs.  It's to go to the purpose of the estimate was

19   to pressure Chevron, and that's the relevance of the testimony.

20   If they don't want to cross-examine on the extensive costs to

21   whether or not plaintiff's lawyers have the funds to do it or

22   not, that's really not an issue, I believe, that we are

23   offering Mr. Russell for.

24               MS. LITTLEPAGE:  I don't believe of what I have read

25   of the RICO laws that it can be a predicate act for a

DAG8CHE5                         Russell - direct

1   plaintiff's lawyer to create evidence in a discovery phase of a

2   trial and claim that is to put pressure on the opponent to

3   resolve the case in favor of the client.  That is his job, is

4   to create evidence.

5           THE COURT:  Create evidence, is it really?  That's

6   what plaintiffs do?  I know Mr. Donziger I think said it on one

7   of the videotapes.

8           MS. LITTLEPAGE:  I think the plaintiff's lawyer's job

9   is identify what evidence is needed, hire the appropriate

10  experts to address those issues, gather that evidence, submit

11  it to the court.

12          THE COURT:  That's certainly a little bit different

13  than creating evidence.

14          MS. LITTLEPAGE:  I have spoken inartfully, and I

15  apologize.

16          THE COURT:  That's OK.

17          MS. LITTLEPAGE:  I am trying to understand what I am

18  to rebut here, because I don't want to rebut things that are

19  not predicate acts, and I read the complaint trying to

20  understand the predicate acts.

21          THE COURT:  Not everything in the complaint is a

22  predicate act.

23          MS. LITTLEPAGE:  I understand.

24          THE COURT:  OK.  Let's proceed.

25          MS. LITTLEPAGE:  May I approach the witness to hand up

DAG8CHE5                        Russell - direct

1    a book?

2              THE COURT:  Yes.

3    CROSS-EXAMINATION

4    BY MS. LITTLEPAGE:

5    Q.  Good afternoon, Mr. Russell.  I have put in front of you a

6    three-ring binder.  It's tabbed.  I have tried to highlight the

7    parts of each document that I want to talk to you about so that

8    you can follow along with me.  If I lose you at any time,

9    please just tell me and I will make sure that I get your

10   attention.

11             I want to start first with, can you explain the

12   process by which your witness statement or declaration that was

13   filed as your direct testimony was created?

14   A.  I am not sure I understand the terms or what sort of answer

15   you're seeking.  Would you be more specific, please?

16   Q.  Sure.  Tab 1 of the book is your -- let me get the title --

17   declaration of David L. Russell.

18   A.  That's correct.

19   Q.  Can you explain to me the process by which this document

20   was created?

21             MR. BRODSKY:  Objection, your Honor.  It calls for a

22   narrative.

23             THE COURT:  So does the question what happened -- one

24   of the standards of direct examination.  Overruled.

25   A.  I was subpoenaed by -- I was given a subpoena by Chevron,

DAG8CHE5                          Russell - cross

1    and in the process I created a statement and shared thoughts

2    and discussions and so on.  And then the attorneys for Chevron

3    typed it and had me review it and then sign it.

4    Q.  They typed -- what did they type?  Had they recorded your

5    words and they typed them up?

6              MR. BRODSKY:  Objection, your Honor.  Two questions

7    there and the last one assumes facts not in evidence.

8              THE COURT:  Rephrase it, please.

9    Q.  What did they type?

10   A.  They typed the statement itself.

11   Q.  From what?

12   A.  From their notes of discussions with me.

13   Q.  So when you talked about issues with the Chevron lawyers,

14   it was your understanding they were taking notes of your

15   conversation?

16   A.  That is my understanding.

17   Q.  And then the Chevron lawyers created this witness statement

18   based on those notes?

19   A.  Yes.

20   Q.  And did they write it in the first person, I, David L.

21   Russell, as it appears here?

22   A.  Yes.

23   Q.  And so you received something from the Gibson Dunn lawyers

24   that you were asked to review, correct?

25   A.  I did.

DAG8CHE5                          Russell – cross

```
 1   Q.  And then you were asked if you agreed with it to sign it,
 2   correct?
 3   A.  I was asked to correct it and modify any sections where I
 4   disagreed with it so it would be a truthful and accurate
 5   reflection of my opinions and thoughts.
 6   Q.  And did you modify different sections?
 7   A.  I did.
 8   Q.  And if the statement had come written in the first person
 9   in a way that you agreed with all of it, would you have
10   modified it?
11           MR. BRODSKY:  Objection.  Calls for speculation.
12           THE COURT:  Sustained.
13   Q.  Do you know which sections you modified or corrected?
14   A.  Offhand, I cannot recall.
15   Q.  Then was it your understanding that after you had signed
16   the statement provided by the lawyers that it would be filed in
17   this proceeding?
18   A.  That I believe is my understanding, yes.
19   Q.  Can you tell me when you arrived in New York?
20   A.  Saturday.  I believe Saturday was the 11th.
21   Q.  This past Saturday?
22   A.  This past Saturday.
23   Q.  And have you had an opportunity to meet with the Chevron
24   lawyers since Saturday?
25   A.  Yes.
```

DAG8CHE5                          Russell – cross

1    Q.   On how many occasions?

2    A.   Probably every day since then.

3              (Continued on next page)

DAGLCHE6                    Russell - cross

1    BY MS. LITTLEPAGE:

2    Q.  And do you know how many hours you have met with the

3    Chevron lawyers since Saturday until today?

4    A.  Not offhand, no.

5    Q.  About how many hours a day would you estimate?

6    A.  Approximately, there were two meetings that lasted eight

7    hours, perhaps more.  And then there were some subsequent

8    meetings which lasted less than that, and I can't tell you

9    exactly how long they were.

10   Q.  By the time you arrived in New York, as I understand it,

11   your declaration was already completed and signed; is that

12   true?

13   A.  That is correct.

14   Q.  Were you given an opportunity to review documents in any of

15   these meetings with the Chevron lawyers?

16   A.  Yes.

17   Q.  And are there -- were you given an opportunity to look at

18   documents that are not identified in your declaration, in other

19   words, other documents?

20   A.  I am not an expert on -- I can't tell you which documents I

21   saw specifically or which documents I did not.  But the

22   documents that are referred to in here are documents that I

23   saw.

24   Q.  And you would have seen those documents before you arrived

25   in New York or did you only see them once you got here?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAGLCHE6                      Russell – cross

1   A.  Oh, I saw them before I arrived in New York.

2   Q.  And were you given an opportunity to see new documents here

3   in New York that you don't recall seeing before?

4            MR. BRODSKY:  Objection to the form of new documents.

5            THE COURT:  Strike the word new.  Answer the question

6   without the word new.

7            THE WITNESS:  Yes, sir.

8   A.  I do not believe that I saw documents that I had never seen

9   before as most of my documents were –– most if not all my

10  documents were ones that I had either written or created or

11  were direct correspondence where I was copied or –– so the

12  answer is no.

13  Q.  Is it true that you have seen and reviewed documents that

14  are not identified specifically in your declaration?

15  A.  I cannot answer that.  I'm sorry.

16  Q.  Let me step back a little bit into 2003.

17           Do you recall when you were first contacted by

18  Mr. Donziger?

19  A.  The first contact came through a phone call from a search

20  firm, an expert search firm in Pennsylvania that I think I've

21  identified there.

22  Q.  You actually didn't give us a name.  Do you recall the name

23  of the firm?

24  A.  At this moment I cannot.

25  Q.  Was it a firm that you had done business with before?

DAGLCHE6                       Russell - cross

1    A.  Yes.

2    Q.  And had you been a legal expert in litigation before

3    Mr. Donziger approached you?

4                MR. BRODSKY:  Objection.

5                THE COURT:  What's the objection?

6                MR. BRODSKY:  Legal expert, form.

7                THE COURT:  Sustained as to form.  Rephrase.

8    Q.  Had you been an expert in legal matters or litigation

9    before Mr. Donziger contacted you?

10   A.  Yes.

11   Q.  Do you recall how many times?

12   A.  Perhaps four or five.  I do not recall specifically.

13   Q.  And were you -- had you listed yourself with the expert

14   search firm that contacted you?

15   A.  Yes.

16   Q.  And the work that you done in the past as an expert in

17   litigation, had that been -- had all that work been done

18   through that same expert search firm?

19   A.  Would you clarify, please, or restate.

20   Q.  Sure.  The previous times that you had been an expert in

21   litigation matters, were all of those times situations that

22   came from that same expert search firm?

23   A.  Best of my belief and recollection, yes.

24   Q.  Were you listed at the time in 2003 with multiple expert

25   search firms?

DAGLCHE6                    Russell - cross

1   A.  I honestly don't recall.

2   Q.  You had your own company called Global Environmental

3   Operations; is that correct?

4   A.  That is correct.

5   Q.  Do you still have that company?

6   A.  I do.

7   Q.  And how long have you operated as -- let me ask a better

8   question.

9        Are you the CEO or the president, how would I -- what

10  are you in that company?

11  A.  I often refer to myself as chief cook and bottle washer.

12  But it was originally a and still is a stock corporation.  It

13  was originally the stock was owned by my wife and when she

14  passed, it devolved to me.

15  Q.  And how long had you -- let me ask you better question.

16       Is Global Environmental Operations a company that does

17  things other than expert work for litigation?

18  A.  Yes.

19  Q.  How long have you worked for Global Environmental

20  Operations?

21  A.  Since it was founded.

22  Q.  Which is when, sir?

23  A.  I think it was '86, but it may have been a little bit

24  later.

25  Q.  And when Mr. Donziger approached you, had you ever met

1    Mr. Donziger before?

2    A.  No.

3    Q.  And did you agree to go to Ecuador and work on this, on his

4    case with him?

5    A.  My first meeting with Mr. Donziger was in New York.  It was

6    an interview.  After that, he indicated that he wanted me to go

7    down to Ecuador.  There may have been one meeting in New York,

8    there may have been two, I don't recall.  But the sum and

9    substance was that I was to go down to Ecuador to work on this

10   case.

11   Q.  And did you agree to work on the case as an expert?

12   A.  I did.

13   Q.  Do you speak Spanish, sir?

14   A.  No.

15   Q.  As I read your declaration, it appears that you had two

16   distinct roles in the case.  Let me ask you about the first

17   role.  The first role was to do a cost estimate for

18   remediation.  Would that be correct?

19              MR. BRODSKY:  Your Honor, objection to the

20   characterization of the two roles.

21              THE COURT:  Sustained.

22   Q.  Was one of your roles as an expert in this case to do a

23   cost estimate for remediation?

24   A.  Yes.

25   Q.  And was another role to be the environmental scientist in

DAGLCHE6                          Russell - cross

1   the Ecuadorian litigation?

2   A.  The environmental scientist is not a term I would use.  I

3   was being contemplated and prepared as a potential witness.

4   Now, if that constitutes being the designated environmental

5   scientist, that would be correct.

6   Q.  If you turn to page 10 of your witness statement, it says

7   at the top of the page, my role as chief environmental

8   scientist for Donziger.

9        Were those words chosen for you by Gibson Dunn or was

10  that your selection of words to describe your role?

11  A.  That was in 2004 and not with -- the next line clearly says

12  from the summer of 2004 through the end of 2004.  So it was not

13  my initial assignment in Ecuador.

14  Q.  Okay.  Maybe I wasn't clear them.

15       Was one of your roles as an expert in this case to be

16  the chief environmental scientist on the case?

17  A.  That would be more or less my understanding, yes.

18  Q.  As I understand, you started working on the case in the

19  fall of 2003; is that correct?

20  A.  The work on the case in 2003 predominantly consisted of my

21  first visit to Ecuador and preparation of the cost estimate.

22  Between -- after the trial ended in 2003, there was not much

23  activity until 2004.

24  Q.  Okay.  Do you recall when you first went to Ecuador in the

25  fall of 2003?

DAGLCHE6                    Russell – cross

1    A.  Yes.

2    Q.  What date was that?

3    A.  I believe it was sometime in October, but I'm not sure as

4    far as the dates.

5    Q.  And you would agree, sir, that you went voluntarily to

6    Ecuador, true?

7    A.  Yes.

8    Q.  And how long did you stay on that first visit in October of

9    2003?

10   A.  A number of days, perhaps two weeks or so.

11   Q.  And did you stay the whole time in Quito or did you

12   actually go out and say in Lago Agrio?

13   A.  I went into Quito because that is the principal airport and

14   then spent the predominant bulk of my time from there in Lago

15   Agrio.

16   Q.  And how did you get from Quito to Lago Agrio, did you fly?

17   A.  Yes.

18   Q.  And then from the town of Lago Agrio, did you go out to

19   actually visit a number of sites?

20   A.  Yes.

21   Q.  How many sites did you visit?

22          MR. BRODSKY:  Your Honor, objection to the form of

23   sites.  I'm not sure what sites.

24          THE COURT:  Rephrase it, please.

25   Q.  Let me ask a better question.

DAGLCHE6                    Russell - cross

1            How many pits did you visit in that first visit in
2   Ecuador in October of 2003?
3   A.   I believe my cost estimate mentions 45, but I'm not -- in
4   recollection, that was ten years ago.  I cannot confirm that it
5   was 45, but a number.
6   Q.   If you turn to tab 2 of your book, it's Plaintiff's
7   Exhibit 2414 that was just moved into evidence by the
8   plaintiffs.  As you can see highlighted in the second paragraph
9   you indicate approximately 45 pits.
10           Is that your best recollection as to how many pits you
11   visited on that trip?
12           MR. BRODSKY:  Objection, asked and answered.
13           THE COURT:  Overruled.
14   A.   I believe it was 45, but it could have been more, it could
15   have been slightly less.  I have no specific recollection of
16   the precise number.
17   Q.   And when you went to visit the pits, who went with you?
18   A.   Members of -- let me correct that.  Spanish speaking
19   members who were familiar, were familiar with the area.  I do
20   not recall specifically who went with me.
21   Q.   Did you go to different pits each day for some part of the
22   two weeks you were there?
23   A.   Yes.
24   Q.   And it indicates in paragraph 2 of your report that this
25   estimate is based on investigation and a projection of the cost

DAGLCHE6                    Russell – cross

1  based upon my observations.  Do you see that, sir?

2          Sorry, it's the first page, the second paragraph, last

3  sentence.  I should probably have told you that.  I'm sorry.

4  A.  Second paragraph, last sentence, correct?

5  Q.  Yes, sir.  That your report is based on an investigation

6  and a projection of the costs based upon your observations?

7  A.  Yes.

8  Q.  And is it true, sir, that you didn't just sit in a hotel

9  room and come up with numbers, you actually went out to sites

10  and saw pits?

11  A.  Yes, I saw pits.  I saw stations.  I saw sites that had

12  been remediated.  It was a broad tour of the oil concession

13  areas.

14  Q.  Did you take photographs or videos of what you were seeing?

15  A.  I believe I took a few.

16  Q.  And did you take measurements of the size of the pits or

17  the size of the concession area?

18  A.  No.

19  Q.  If you look further down on the page, the first page of

20  Plaintiff's Exhibit 2414, it indicates, first of all, that you

21  looked at open drill pits that were several meters deep and may

22  contain free oil, barium sulfate, drilling fluids, and

23  petroleum residuals.

24          Do you see that, sir?

25          MR. MASTRO:  Your Honor, two things.  One, this is a

DAGLCHE6                     Russell - cross

1   document that's not in for its truth.  And, two, we would move

2   to preclude an examination over barium sulfate and drilling

3   fluids and petroleum residuals.  This is getting far afield

4   into Mr. Russell's testimony which is his cost estimate was

5   based on representations of Mr. Donziger and when he indicated

6   what he indicated to him, it continued to be used.

7            THE COURT:  For the moment it seems like appropriate

8   cross.  Overruled.

9            THE WITNESS:  Would you restate the question, please.

10  Q.  Sure.  Do you see on the first Roman numeral one, pits, the

11  pits you observed were several meters deep and may contain free

12  oil, barium sulfate, drilling fluids, and petroleum residuals.

13           Do you see that, sir?

14  A.  Which page are we on, please?

15  Q.  Page 1, No. 1.

16  A.  No. 1.  Yes.

17  Q.  Did you measure the drill pits in order to estimate that

18  they were several meters deep or how did you get that

19  calculation to put into this estimate?

20  A.  An associate of Mr. Bonifaz by the name of Manuel Pallares

21  provided a CD that had approximate information.  He had done

22  some preliminary survey to enumerate the number of pits and the

23  approximate dimensions.

24  Q.  So you were provided a CD of photographs or measurements or

25  documents, can you describe what the CD was?

DAGLCHE6                    Russell - cross

1    A.  As I recall, the CD had some photographs and it had

2    approximate dimensions of a number of the pits.  I cannot be

3    more certain than -- I cannot say, yes, all of the pits.  A

4    number of the pits, yes.

5            THE COURT:  When you refer to a number of the pits or

6    all of the pits, what's the approximate number in the universe

7    to which you are referring?  Is it 45 plus or minus or is it

8    something else?

9            THE WITNESS:  I believe, the best of my recollection,

10   the number is somewhere above 600, almost 700 pits total.  It

11   may be as high as 900, but somewhere around 700 is the number

12   that sticks in my memory, your Honor.

13           THE COURT:  Thank you.

14           Go ahead, counsel.

15   Q.  And so when you looked at approximately 45, did you look at

16   a variety of different kinds of pits?

17           MR. BRODSKY:  Objection, misstates the testimony.

18           THE COURT:  I'm sorry?

19           MR. BRODSKY:  It misstates his testimony about 45.

20           THE COURT:  Overruled.

21           THE WITNESS:  Rephrase or re-ask, please.

22   Q.  Sure.  When you say that you saw approximately 45 pits, did

23   you see a variety of different kinds of pits or pits in

24   different locations or areas?

25   A.  Yes.

DAGLCHE6                        Russell - cross

1    Q.  Did you see some pits where only Texaco had operated that

2    site and the site had not been operated again since Texaco left

3    Ecuador?

4    A.  I could not make that evaluation at that time because I was

5    told that everything had belonged to Texaco and that Texaco was

6    totally responsible for all contamination regardless of who was

7    operating the pits.  Texaco had allegedly provided the

8    technology and that that was the, supposedly, the technology

9    that was available.

10   Q.  Okay.  So let me ask you a follow-up question then.

11            You were asked to assume a legal theory of operator

12   liability that you were to look at all of the pits and make an

13   estimate irrespective of whether the pit was currently operated

14   by Petroecuador or had not been operated since Texaco left; is

15   that true?

16            MR. BRODSKY:  Objection to the form and calls for a

17   legal analysis.

18            THE COURT:  Certainly the objection to form is

19   sustained.

20   Q.  Let me break it down then, sir.

21            Were you asked to make -- were you given some

22   assumptions to use in your cost estimate?

23   A.  Yes.

24   Q.  Was one of the assumptions that you were given to consider

25   is that you were to evaluate the effect that you were seeing in

DAGLCHE6                     Russell – cross

the field irrespective of Texaco or Petroecuador or any

specific name of a company?

A.  I was told that part of my assumptions would be that

everything that I saw was the responsibility of Texaco.

Q.  And you understood that was Mr. Donziger's claim that what

was happening in the concession area was the responsibility of

Texaco as the original operator of the whole area?

          MR. BRODSKY:  Objection.

          THE COURT:  Sustained in that form.

Q.  Did you have, did you understand Mr. Donziger -- let me ask

a better question.

          Were you asked to assume that everything that you saw

in the concession area should be taken into account for the

cost estimate?

A.  I was told that Texaco was responsible for everything, all

of the environmental damage that was observed in the concession

area.

Q.  Did you have an understanding that the lawsuit on behalf of

the Ecuadorians was for holding Texaco responsible for

everything in the concession area?

          MR. BRODSKY:  Objection.

          THE COURT:  Objection is sustained.  Among other

points, they never sued Texaco in Ecuador.

Q.  Mr. Russell, do you recognize or did you hear at that time

the words joint and several liability, does that mean anything

DAGLCHE6                    Russell – cross

1   to you?

2            MR. BRODSKY:  Objection.

3            THE COURT:  Sustained.

4   Q.  Did you ever hear the words or understand the concept of

5   operator liability?

6            MR. BRODSKY:  Objection.

7            THE COURT:  Sustained.

8   Q.  Did you understand that one of the assumptions you were

9   being asked to make is that the claims being raised on behalf

10  of the afflicted Amazonians was for everything that was damaged

11  in the concession area?

12           MR. BRODSKY:  Same objection, your Honor.

13           THE COURT:  What's the objection this time?

14           MR. BRODSKY:  It's, first, it's hearsay.  Second, it's

15  to the form.  And it seems another way of wording the legal

16  theory of the case.

17           THE COURT:  Sustained.

18  Q.  If you look at tab 2, Plaintiff's Exhibit 2414, No. 2, are

19  you with me, sir?

20  A.  I am.

21  Q.  The second thing you observed was open production and waste

22  oil pits.  Do you see that?

23  A.  I do.

24  Q.  I didn't ask you for No. 1 the open drill pits, can you

25  tell me what an open drill pit is?

DAGLCHE6                    Russell - cross

A.  My best understanding of an open drill pit is that in the
process of drilling back in the seventies, when there were no
environmental regulations, one of the practices was to take the
wastes which were used that consists of oil, consists of drill
muds, weighting agents, and anything else that might have come
out of the bore hole and to drain them from the actual drill
site into a pit.

        An open drill pit by that definition would be one that
was still open to the environment.
Q.  And is there a closed drill pit, is there some distinction
between an open drill pit and a closed drill pit?
A.  A closed drill pit would be a remediated pit.  Current
technology in the past five or ten years has had some of the
oil producing states, such as Texas and Oklahoma, and that
recognize that these old pits were in existence and they come
in, scoop up the material and dispose of it and then close the
pit by sealing it over with fresh earth.
Q.  So in your visit in October of 2003, you saw open drill
pits, drill pits that had not been remediated?
A.  Yes.
Q.  Do you recall how many open drill pits you observed in that
first visit?
A.  No, I do not, because the trip was over -- I spent perhaps
a week.  I'm not certain of the exact time frame, but let's say
for sake of estimation between five and seven days riding

DAGLCHE6                          Russell – cross

1    around to various locations.  And in the process, sometimes

2    along the side of the road you may see an open pit.  Sometimes

3    I was taken to locations where they had performed remediation.

4            And when you're driving along the side of the road at

5    normal speeds of 40 or 50 miles per hour, perhaps, down there,

6    you may have a pit coming up on one side of the road.  Okay,

7    that's a pit, and go on.  And you have a three second, five

8    second, ten second glance at it.

9    Q.  And some of the pits you stopped, got out, went and saw

10   them, photographed them --

11   A.  Yes, yes.

12   Q.  -- correct.  Did you ever ask the people that were taking

13   you around to stop at a particular pit and you were not allowed

14   to stop?

15           MR. BRODSKY:  Objection, your Honor.  Relevance.

16           THE COURT:  Sustained.

17   Q.  Okay.  No. 2 on Plaintiff's Exhibit 2414 is open production

18   and waste oil pits.  Can you explain to me what is an open

19   production and waste oil pit?

20           MR. BRODSKY:  Objection relevance, your Honor.

21           THE COURT:  Look, I'll let this go a little longer but

22   this is pretty far afield.

23   A.  An open production and waste oil pit is generally at a

24   separation station.  And to clarify, the oil is taken from the

25   ground by usually a jack pump which is -- it's kind of out of

DAGLCHE6                    Russell - cross

1    the discussion here, but it's a pump and put in a pipeline and

2    sent to a separation station.

3              Now, the reason it is sent to a separation station is

4    because in the process of pulling the oil from the ground, you

5    also get formation water.  And the formation water is generally

6    between 3 barrels and 10 barrels of water per barrel of oil.

7              So the separation station puts this in either pits or

8    tanks and allows gravity to separate and then discharges the

9    waste water and then collects, collects the good oil and will

10   oftentimes just leave the waste oil or heavy oils alone in a

11   separate pit.

12   Q.  And what your No. 2 indicates is that you observed dumped

13   waste oils, other fluids on one or more occasions, and may

14   contain between 5 percent and 40 percent free oils.

15             Did you do any testing to come up with your

16   percentages of between five and 40 percent that's noted in your

17   report?

18             MR. BRODSKY:  Objection.  The report is not in

19   evidence for its truth.  That was a compound -- it was a

20   statement and then a compound question on top of it.

21             THE COURT:  Sustained.

22   Q.  Let me ask a better question.

23             Did you do any specific calculations or evaluation

24   yourself to come up with the number between 5 percent and

25   40 percent free oils that's addressed in your estimate?

DAGLCHE6                    Russell - cross

1     MR. BRODSKY:  Assumes facts not in evidence.

2  Objection.

3  A.  No.

4  Q.  Where did you get the numbers 5 percent and 40 percent

5  from?

6  A.  Research figures, my own experience as a wastewater

7  treatment engineer, industrial waste experience, general

8  observation.  The wide range is just that, a wide range,

9  because there was no testing of any type done.

10     THE COURT:  So are you saying in essence it could have

11  been 5 percent, 40 percent, 0 percent, 80 percent, they're just

12  numbers that have no specific relationship to the specific pits

13  you're talking about here; is that correct?

14     THE WITNESS:  Up to a point, yes, sir.

15     THE COURT:  Up to what point?

16     THE WITNESS:  The thing is if it had 0 percent, it

17  would have a different look.  If it had 5 percent free oil, you

18  might notice a relatively thin film on the top of one of the

19  pits.  If it had 40 percent oil, it would have a more viscous,

20  darker appearance, perhaps black and blacker and much more

21  viscous.

22     A good example might be something like one of the

23  pits, I think it was associated with Texaco's well No. 1, where

24  it was a favorite pastime on what was referred to as the toxic

25  tour, when they would take a rock and toss it in the middle of

DAGLCHE6                    Russell - cross

1   this pit, this open pit.  And instead of going splash, you'd

2   hear something that would sound like a glup and this was an

3   indication of a viscous oil.

4            THE COURT:  So this is based not on any chemical

5   analysis.  It's based on eyeballing it, sometimes at 40 or

6   50 miles per hour, is that it?

7            THE WITNESS:  In some cases.  In other cases, actual

8   inspection on the site.

9            THE COURT:  Okay.  Let's move on.

10  Q.  And these numbers were not provided to you, this five to

11  40 percent, five and 40 percent were not provided to you by

12  Mr. Donziger.  They were based on your research, experience,

13  and observations?

14           MR. BRODSKY:  Objection to form.

15  A.  Correct.

16           MR. BRODSKY:  There were multiple questions in there.

17           THE COURT:  It's all right.  Overruled.

18  A.  Correct.

19  Q.  You also indicate that typical oil station appears to

20  contain one pit or more pits of fairly substantial size.

21           Again, were you provided any dimensions to come up

22  with your fairly substantial size description in your cost

23  estimate?

24           MR. BRODSKY:  Objection.  I'm sorry to object again,

25  your Honor, but the document is not in evidence for its truth

DAGLCHE6                    Russell - cross

1    and this is far afield.  It's not relevant.

2              THE COURT:  Overruled.

3              THE WITNESS:  Would you state the question again,

4    please.

5    Q.  Sure.  You indicate in your cost estimate that one of the

6    bases of your cost estimate is that typical oil station appears

7    to contain one pit or more pits of fairly substantial size.

8              Did you measure to come up with the fairly substantial

9    size description or were you given data to make that

10   conclusion?

11   A.  Neither.  Sorry.  It was a visual estimate because it was

12   on fenced-in property which we were not permitted to access.

13   So depending upon the calibration of my eyeball, I could say

14   substantial size.

15   Q.  Got it.  It wasn't a number or a figure Mr. Donziger gave

16   you, it was based on your training, experience, and visual

17   observation?

18             MR. BRODSKY:  Objection.

19             THE COURT:  Well, it's compound.  Break it up.

20   Q.  Was it based on your visual observation?

21   A.  Yes.

22   Q.  Did you consider these pits to be of fairly substantial

23   size based on your experience?

24   A.  They were bigger than the drill pits.  So, yes.

25   Q.  Did you actually visually go to any of the sites where you

DAGLCHE6                    Russell - cross

1    could by your training and experience assess closer to a

2    40 percent number versus a 5 percent number?

3              MR. BRODSKY:  Objection to the form.

4              THE COURT:  Overruled.

5    A.  I believe I answered that question with regard to, for

6    example, Texaco well No. 1.

7    Q.  My question -- you actually stopped and went and saw Texaco

8    well one?

9    A.  Yes.

10   Q.  And did you see the rock being thrown into the open pit

11   yourself?

12             MR. BRODSKY:  Objection, your Honor.  Isn't this far

13   afield?

14             THE COURT:  Yes, of course it is.

15   A.  I threw one in, yes.

16   Q.  No. 3.

17             THE COURT:  Just so that we don't miss any detail

18   here, did you watch it all the way in from the point of

19   release?

20             THE WITNESS:  I threw it in and I watched it, sir.

21             THE COURT:  Okay.  Thank you.  I wouldn't want any

22   rock to be unturned.

23             THE WITNESS:  Or disappear.

24   Q.  No. 3, open drill pits with vegetative cover.  You indicate

25   in this one that these pits had some vegetative cover.  I have

DAGLCHE6                          Russell - cross

1   estimated in spots the cover may be full or partial and may be

2   between 15 and 30 centimeters thick, floating on a layer of

3   water and oils.

4             Can you first describe what is an open drill pit with

5   vegetative cover?

6   A.   It's just that.  It is an area which has substantial

7   foliage, i.e., trees growing around it.  And over the years the

8   trees have dropped leaves and the leaves have formed a mat on

9   top of the oil.  And in some cases you could step on this and

10  could you feel it move beneath your feet.

11            In other cases, there was one report of one of the

12  members of -- I think it was Mr. Pallares --

13            MR. BRODSKY:  Objection, your Honor.

14            THE COURT:  Let's stay away from what reports there

15  were.

16  Q.   Let me ask you this:  Did you go to an open drill pit with

17  vegetative cover and walk on it and feel the layer of water and

18  oils below the vegetative cover?

19  A.   The site was -- some of these sites were identified as

20  former locations where there were open drill pits and, yes, I

21  did at least put my foot out on there and felt it give.  So I

22  wasn't about to go swimming.

23  Q.   And those would be open drill pits that were not currently

24  being operated by anybody, they had been -- would that be true?

25            MR. BRODSKY:  Objection.

DAGLCHE6                        Russell - cross

1          THE COURT:  Overruled.  I'm sorry.  Sustained.  He's

2    talking about a pit where he put his toe on something.

3    Q.  Let me ask a better question.

4          What's in No. 3, these open drill pits with vegetative

5    cover, would those all be drill pits that were no longer

6    currently being operated by any company?

7          MR. BRODSKY:  Your Honor, objection.  Lacks

8    foundation.

9    A.  I couldn't say.

10         THE COURT:  Overruled.

11         MS. LITTLEPAGE:  Hold on.

12         THE COURT:  Go ahead.

13   A.  I couldn't say.  It was a pit that had -- it was covered

14   with a vegetative cover and it was squishy.  It's kind of like

15   stepping on the soft surface of a sponge but a very big sponge.

16   Q.  Did you do any actual measurements yourself to come up with

17   the 15 to 30 centimeters thick number that's in your cost

18   estimate?

19   A.  No.

20   Q.  Was that this number based on your training and experience

21   of what you believed -- tell me where the number came from, 15

22   to 30 centimeters.

23   A.  A rough estimate that would be between six and 12 inches.

24   Q.  And in your experience, is that what in your training and

25   experience, is that what you believed the measurement would be

DAGLCHE6                          Russell – cross

1    if you had measured it?

2              MR. BRODSKY:  Objection.

3              THE COURT:  Sustained.

4    Q.  Now, as I understand it, let me ask the question actually.

5              Did you do all of the site inspections or all the site

6    reviews before you sat down and started calculating your cost

7    estimate?

8              MR. BRODSKY:  Objection to the form.

9              THE COURT:  Sustained as to the form.

10   Q.  Did you do any cost estimates before you finished looking

11   at all the sites, the 45 that you talk about?

12   A.  I started preparing the cost estimates, but did not work on

13   the completion of the cost estimate until after I had seen

14   the -- a number of the pits.  So the answer is did I do it

15   beforehand?  I may have started it, but it was not, it was not

16   finalized in any way, shape, or form until after I had had a

17   thorough examination.

18   Q.  And you indicate in your witness statement that you sat in

19   a hotel room, I think in an empty ballroom, and spent several

20   days doing calculations.

21             Can you describe that process for us?

22   A.  I needed a quiet place to work.  It was the Hotel Lago in

23   Lago Agrio and the ballroom was unoccupied.  So I sat on a bar

24   stool at a table or something like that and worked on the cost

25   estimate.

1    Q.  How many days do you think -- I know you said you sort of

2    worked on it a little bit the whole time, but how many days in

3    the Hotel Lago did you spend concentrating on the cost

4    estimate?

5    A.  I honestly can't recall.  It may have been two.  It may

6    have been three.

7    Q.  And you said you needed a quiet place.  Were you there

8    alone or was anybody with you?

9    A.  I was essentially alone, but Mr. Donziger came in on a

10   couple of occasions to see how I was doing.

11   Q.  I didn't hear.  Mr. Donziger?

12   A.  Mr. Donziger visited periodically to see how I was doing.

13   Q.  Did Mr. Donziger sit with you and do any of the

14   calculations himself?

15   A.  No.

16   Q.  Were all the calculations that you did that formed the

17   basis of your cost estimate done by you?

18   A.  I believe I also referred to that CD which was provided me

19   with some rough numbers in order to come up with rough

20   quantities.

21   Q.  And other than the CD that had dimensions and some

22   additional information, were you provided any other materials

23   in forming the basis of your cost estimate?

24   A.  Could you be more specific?

25   Q.  I don't know the answer to my question.  So were you given

DAGLCHE6                      Russell - cross

 1  any other documentation that you reviewed or looked at when you

 2  were creating your cost estimate?

 3  A.  Given any other documentation, no.

 4  Q.  Were you provided any other materials of any kind?

 5         MR. BRODSKY:  Objection.  Asked and answered.

 6         THE COURT:  Overruled.

 7  A.  I had my own book from 1992 if that's -- but I wasn't given

 8  that.  That was in my possession.

 9  Q.  And were you using your book as a reference in creating

10  these calculations for your cost estimate?

11  A.  On occasion.

12  Q.  Was one of the assumptions that you were given in creating

13  this cost estimate an assumption that Mr. Donziger was seeking

14  a full and complete compensation for the afflicted or affected

15  Amazonians?

16         MR. BRODSKY:  Objection to form.

17         THE COURT:  What's the form problem?

18         MR. BRODSKY:  Full and complete, afflicted or

19  affected.

20         THE COURT:  Sustained.  Rephrase.

21  Q.  You tell me.  What words are you comfortable for me using

22  to represent the affected people of the Amazon?

23         THE COURT:  Ms. Littlepage, you ask the questions,

24  please.

25  Q.  Was one of the assumptions you were asked to make is that

DAGLCHE6                          Russell - cross

1   Mr. Donziger was looking for a full and complete compensation

2   for the people impacted in the concession area?

3           MR. BRODSKY:  Same question.

4           THE COURT:  Sustained.  You want to ask what

5   Mr. Donziger told him, ask.

6   Q.  Did Mr. Donziger tell you anything about whether he -- what

7   type of remediation effort he was looking for on behalf of the

8   people impacted in the concession area?

9           THE COURT:  Ms. Littlepage, Mr. Brodsky has risen and

10  I anticipate that the objection is the same.

11          Right, Mr. Brodsky?

12          MR. BRODSKY:  Yes, your Honor.

13          THE COURT:  Okay.  And the ruling is the same.  You

14  can ask what you need to ask without larding it up with the

15  plaintiff's closing argument -- the defendant's closing

16  argument in this case, everybody being on both sides one place

17  or the other.

18          MS. LITTLEPAGE:  I was trying to do that math in my

19  head, Judge.

20          THE COURT:  I know it's very difficult.

21  Q.  What type of assumptions were you asked to take into

22  account when you were doing this cost estimate as to the type

23  or level of remediation?

24          MR. BRODSKY:  Objection to the form.

25  A.  I was asked to determine what it might cost to clean up the

DAGLCHE6                  Russell - cross

1    area.  There was no standard given.  There was initial, as I

2    recall, there may have been an initial question about health

3    effects, but I indicated early on that I could not answer

4    questions about health effects with regard to the clean up

5    because I am not medically trained.

6    Q.  And is that true that your cost estimate includes no

7    figures for health effects?

8    A.  That is correct.

9    Q.  What assumption were you asked to -- what type of

10   remediation were you considering in this cost estimate?

11                MR. BRODSKY:  Your Honor, objection to the relevancy

12   of this line of questioning.

13                THE COURT:  Well, how about that, Ms. Littlepage,

14   what's the relevance?

15                MS. LITTLEPAGE:  I believe the amended complaint says

16   that Mr. Russell's cost estimate was based on inaccurate

17   assumptions or theories of Mr. Donziger.

18                I would like to establish that Mr. Russell's estimate

19   was based on Mr. Russell's own belief of what it would take or

20   what it would mean to remediate the concession area.  It has

21   nothing to do with Mr. Donziger and, therefore, he had no

22   intent underlying these actions.

23                THE COURT:  I'm sorry, who had no intent underlying

24   what?

25                MS. LITTLEPAGE:  That Mr. Donziger had no criminal

DAGLCHE6                     Russell - cross

1    intent or predicate intent or RICO intent or fraudulent intent

2    in his request of Mr. Russell, and it's Mr. Russell's own

3    observations, assessment, and analysis that form the basis of

4    the cost estimate.

5         MR. BRODSKY:  That is ignoring what his direct

6    testimony is in the case, ignoring --

7         THE COURT:  Cross-examiners are entitled to do that,

8    aren't they?

9         MR. BRODSKY:  Sure, if they're asking about relevant

10   matters.  What she's asking about is simply the underlying --

11   the underlying assumptions he was given are not really

12   relevant.  What's relevant is his determination, what he was

13   told the purpose of it was for, and then when he determined it

14   was not accurate, they continued to tout his estimate.

15        Regardless of the underlying assumptions of whether

16   they're correct or incorrect, retrying that litigation of

17   contamination is not relevant to what we offered Mr. Russell's

18   testimony for.

19        THE COURT:  Look, Ms. Littlepage pointed to the

20   complaint which makes in that paragraph that she drew to my

21   attention earlier two assertions.  One is that the numbers

22   were, if I remember the precise quotation, wildly exaggerated.

23   And the second was one that related to the repetition after the

24   witness said these are not appropriate and you can't rely on

25   what I told you before.  Correct?

DAGLCHE6                    Russell – cross

1          MR. BRODSKY:  Your Honor, it does say to develop an

2     exaggerated damages estimate, within a long sentence on

3     paragraph 101.

4          I don't read that as the thrust of the complaint that

5     we're emphasizing whether or not the estimate was accurate.

6     The thrust of that complaint is that Mr. Donziger used it to

7     put out a figure that will scare Chevron and investors long

8     after Russell sends Donziger a cease and desist letter

9     demanding that he stop using the estimate.

10          And regardless of whether or not you prove or disprove

11     the existence of contamination or whether an assumption was

12     accurate or inaccurate, once Mr. Russell made a determination

13     and told him to stop using it and he continued to use it, our

14     point is that those were overt acts in furtherance of the RICO

15     enterprise and part of the pressuring Chevron regardless of the

16     truth.

17          THE COURT:  Yes.

18          MS. LITTLEPAGE:  Judge, if Chevron is willing to

19     stipulate that they are not proceeding on any allegation that

20     Mr. Russell was –– that Mr. Donziger pressured Mr. Russell to

21     develop an exaggerated damages estimate, I can move on.  But

22     the "and" tells me I have to address both issues.  I haven't

23     gotten to the second issue yet.  But if they stipulate they're

24     withdrawing the claim as to the first issue, I can move on.

25          MR. BRODSKY:  In order for Mr. Russell to reach his

DAGLCHE6                    Russell - cross

1   conclusion and say they're wildly inaccurate, that's relevant

2   that he reaches that conclusion and he tells --

3           THE COURT:  At a subsequent point; is that right?

4           MR. BRODSKY:  At the end of 2004.  By the end of 2004

5   he reaches that conclusion.

6           THE COURT:  So are you saying that Chevron is not

7   contending that at the time he formulated the evidence it was

8   not wildly exaggerated, at least in the witness's mind?

9           MR. BRODSKY:  Well, in the witness's mind -- I think

10  his direct testimony is he relied on others at that time,

11  Mr. Donziger, and he determined after being on the case through

12  2004 that it was wildly inaccurate, if you're taking from his

13  perspective.

14          THE COURT:  Well, look.  I have another case waiting

15  now.  I think you and Ms. Littlepage ought to talk about this

16  overnight.  And if you can agree on a result, that's fine.  And

17  if you can't, I expect to hear from you about exactly what

18  you're doing in relation to the point Ms. Littlepage makes, if

19  anything.

20          MR. BRODSKY:  Yes, your Honor.

21          THE COURT:  Okay.  Thank you.

22          (Adjourned to October 17, 2013 at 9:30 a.m.)

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                          Page
 3   RICARDO REIS VEIGA
 4   Cross By Mr. Friedman  . . . . . . . . . . . 171
 5   Cross By Mr. Gomez . . . . . . . . . . . . . 200
 6   CHRISTOPHER BOGART
 7   Direct By Mr. Mastro . . . . . . . . . . . . 212
 8   Cross By Mr. Gomez . . . . . . . . . . . . . 217
 9   Cross By Mr. Friedman  . . . . . . . . . . . 267
10   Redirect By Mr. Mastro . . . . . . . . . . . 269
11   DAVID LLOYD RUSSELL
12   Direct By Mr. Brodsky  . . . . . . . . . . . 283
13   Cross By Ms. Littlepage . . . . . . . . . . 290
14                    PLAINTIFF EXHIBITS
15   Exhibit No.                            Received
16   272   . . . . . . . . . . . . . . .192
17   400   . . . . . . . . . . . . . . .198
18   3100  . . . . . . . . . . . . . . .213
19   3100A  . . . . . . . . . . . . . . .213
20   3200  . . . . . . . . . . . . . . .285
21   688, 693, 696, 698, 699, 701, 704, 721, . . . 286
22             723, 763, 766 and 788, 2414,
23             754, 466, 467, 472 to 483,
24             485, 486, 491 through 494, 497
25             and 499 and 2221
```

```
 1                         DEFENDANT EXHIBITS

 2    Exhibit No.                              Received

 3    587    . . . . . . . . . . . . . . .223

 4    482    . . . . . . . . . . . . . . .226

 5    501    . . . . . . . . . . . . . . .238

 6    448    . . . . . . . . . . . . . . .242

 7    493    . . . . . . . . . . . . . . .251

 8    478    . . . . . . . . . . . . . . .254

 9    492    . . . . . . . . . . . . . . .269

10    483    . . . . . . . . . . . . . . .272

11    730 and 741   . . . . . . . . . . .286

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```