DAHLCHE1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   CHEVRON CORPORATION,

4                    Plaintiff,

5             v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                    Defendants.

8   -------------------------------x
                                         October 17, 2013
9                                        9:40 a.m.

10  Before:

11                      HON. LEWIS A. KAPLAN
                                         District Judge
12
                             APPEARANCES
13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17
    FRIEDMAN RUBIN
18       Attorneys for Donziger Defendants
    BY:  RICHARD H. FRIEDMAN
19       DEE TAYLOR

20  LITTLEPAGE BOOTH
         Attorneys for Donziger Defendants
21  BY:  ZOE LITTLEPAGE
         RAINEY BOOTH
22
    GOMEZ LLC
23       Attorneys for Defendants Hugo Camacho, Javier Piaguaje
    BY:  JULIO C. GOMEZ

24

25

DAHLCHE1                          Trial

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.

3          I want to take up in part, and only in part, one

4    matter that is pending and that is the matter of the witnesses

5    identified as Doe 3 and Doe 4.

6          First of all, my understanding is that neither of the

7    declarations or affidavits of those two witnesses has been

8    submitted in support of or in opposition to a summary judgment

9    motion.  Am I correct?

10          MR. MASTRO:  That's correct, your Honor.

11          THE COURT:  Okay.  For present purposes, and subject

12    to possible change as I'll indicate, the affidavits of those

13    two witnesses are to be made available to Mr. Friedman and

14    Ms. Littlepage and only to them.  I understand Mr. Gomez has

15    them.  I hereby direct them to keep those documents and all of

16    the information they contain in total confidence to the two of

17    them.  They are not to disclose the documents or the

18    information they contain or any part of it to anyone else,

19    including Mr. Donziger, without prior written approval of the

20    Court.

21          I find for reasons that are largely set out in my

22    February 21 opinion with respect to declarations of witnesses

23    identified as Doe 1 and Doe 2 that there would be a substantial

24    risk of ostracism and economic retaliation and an unacceptable

25    risk of physical retaliation against these two witnesses if

DAHLCHE1                    Trial

1   their identities became more broadly known.

2            I am going to write on this, and this is simply a

3   brief summary statement.  I will entertain any proposals by the

4   defendants to expand the universe of individuals who may be

5   given access to all or part of the information.  I, of course,

6   at the moment have an advantage over defense counsel because I

7   know what it is and who they are and at least Mr. Friedman and

8   Ms. Littlepage don't.

9            I do note that with respect to the Doe 1 and Doe 2

10  declarations, which are essentially now I gather academic

11  because they're not going to be called as witnesses, that I

12  made clear ten months ago that I would entertain applications

13  by the defendants with respect to broader use of that material

14  or broader dissemination and none has ever been made.

15           I am extremely sensitive to the issues, both ways,

16  always, on this.  And I hope that we can reach a solution more

17  amenable to the defendants, but there are very serious

18  interests on the other side as well.

19           None of this is intended to make any ruling with

20  respect to what happens if these witnesses or either of them

21  appears.  I'll deal with that question separately and as soon

22  as I can.

23           Mr. Friedman.

24           MS. FRIEDMAN:  Your Honor, I appreciate you allowing

25  us to look at those.  And what I wanted to ask is if it would

DAHLCHE1                      Trial

be permissible -- again, having not seen it, I don't know

exactly what position we'll take, but I could imagine that we

might want to apply to the Court in camera so as not to reveal

our own thought processes about this material to the plaintiff.

         Would we be permitted, for example, if what we said

was we'd like to talk to person A about this for the following

reasons, could we submit that to you in camera so that we're

not revealing to the other side how we're thinking about these

things?

         THE COURT:  You can certainly file such an application

under seal.  I think the question of doing it in camera is not

one I'm prepared --

         MS. FRIEDMAN:  I'm sorry, I meant under seal.

         THE COURT:  You meant ex parte?  Did you mean under

seal with service on the other side or do you mean ex parte?

         MS. FRIEDMAN:  Ex parte so that we could say to you

here's why we want to talk to witness A about this or here's

why we want to expand the scope.  Part of this, of course, goes

into our work product privilege and our thinking about handling

these witnesses.

         THE COURT:  Well, I'll cross that bridge when we get

there.  If you have an application, I assume you can submit it

under seal.  I will allow it under seal in the first instance

but available at least on a redacted basis to counsel.  And

then we'll deal with the question of whether any redactions

DAHLCHE1                      Trial

1     ought to be disclosed.

2                MS. FRIEDMAN:  Thank you.

3                THE COURT:  Mr. Mastro.

4                MR. MASTRO:  Thank you, your Honor.  I appreciate your

5     Honor's ruling and we will make sure that Ms. Littlepage and

6     Mr. Friedman get those declarations this morning right away.

7                The issue, your Honor, is this and it's why we filed

8     the notice we did last night.  These witnesses are very afraid

9     about testifying here.  They would need to come here on short

10    notice and can't stay here for an extended period or it will be

11    obvious who they are.  And as I said in the notice, at least

12    one of them is prepared to, we believe, to come here as soon as

13    possible, give his or her testimony in a protected environment

14    so security and confidential identity --

15               THE COURT:  I read what you submitted, which you're

16    kindly repeating for me.

17               MR. MASTRO:  So it could, we believe that with your

18    Honor's ruling and whatever your Honor would decide about the

19    protections for when he or she testifies, that person could be

20    here as early as Monday and that, unfortunately, there are a

21    lot of pressures going on in Ecuador.  The witnesses will

22    testify about those pressures.  There's concern that they will

23    be intimidated into not testifying.  So if there's any way to

24    address the protections for testimony, the person could be here

25    as early as Monday.

DAHLCHE1                Trial

1          THE COURT:  Look, I got -- I know the motion is there.

2     I know the little reminder saying, Judge, please get to it

3     arrived last night.  I understand you're saying it again this

4     morning.  I'm aware of all this.

5          MR. MASTRO:  Okay.  I appreciate it, your Honor.  The

6     witness in question has said yes, then no, then yes, then no.

7     Thank you, your Honor.

8          THE COURT:  Thank you.

9          MR. MASTRO:  Your Honor, there are some other

10    housekeeping matters, but it can wait until the end of the day.

11         THE COURT:  Good.

12         MS. FRIEDMAN:  Your Honor, I have two matters I would

13    like to address now if that's all right.  The first one has to

14    do with the pro hac admission of Mr. Rainey Booth.  We have --

15    I'll spare the Court the long story.  The short story is we

16    made several mistakes in trying to get him admitted through the

17    electronic process, the last of those was he's admitted in

18    Florida and Alabama.  We got an Alabama certificate of good

19    standing from the state bar instead of the state supreme court.

20    Just this morning, the state supreme court --

21         THE COURT:  Why do I need to know this?

22         MS. FRIEDMAN:  I'd like to move his admission now

23    because one of the witnesses --

24         THE COURT:  Look, I told you.  I'm going to allow him

25    to examine.  But the clerk's office has to be happy or else the

DAHLCHE1                    Trial

1    computer will quiver and shake and bells and whistles will

2    happen and we don't want that to happen.

3            MR. DONZIGER:  Your Honor, can I be heard about

4    something.  I just want to be clear, first of all, I'm

5    cocounsel to Mr. Friedman and Ms. Littlepage still.  The

6    order -- you didn't let me out of the case.

7            I want to be clear that your decision about giving the

8    Doe 3 and Doe 4 affidavits just to Mr. Friedman and

9    Ms. Littlepage is happening under my objection, and I want to

10   maintain that objection.

11           I understand there might be things happening in

12   Ecuador.  I want to be very clear I have nothing to do

13   personally with anything that these people have put forth with

14   regard to threats that these witnesses might feel.

15           THE COURT:  Mr. Donziger.

16           MR. DONZIGER:  I want to be very clear about that and

17   I feel like the suggestion was made otherwise.

18           THE COURT:  Mr. Donziger, this is unnecessary.  Thank

19   you.

20           MS. FRIEDMAN:  Thank you, your Honor.

21           Your Honor, one last thing that has to do with the

22   film clips that have been submitted to the Court by the

23   plaintiffs.  If I could approach the bench?

24           THE COURT:  All right.  So you've handed me a document

25   marked Plaintiff's Exhibit 4A.

DAHLCHE1                   Trial

1          MS. FRIEDMAN:  I saw you were reading.

2          Your Honor, there are a series of film clips that have

3     been submitted to the Court as Plaintiff's Exhibits.  We had

4     known that the way these had been treated were statements had

5     been cut off either before or after clips, but last night we

6     were looking at one of the early clips for a different reason

7     and basically saw -- if you see what's on the left is what's

8     been submitted to the Court.  What's on the right is the actual

9     transcript in the film.  And if one were to look at the film

10    that was submitted to the Court not knowing that it had been

11    edited, you would think that the yellow was the full statement

12    or the one on the left was.  So it's been edited on the film.

13    It's also been edited on the transcript submitted to the Court

14    to, we believe, create a misleading impression.

15          What we would -- and I'm sure in its spare time the

16    Court is not reading and watching these clips at this point,

17    but what we would like is an opportunity to ask the Court not

18    to read or view the clips and allow us at least over the

19    weekend to present -- we haven't had a chance to go through all

20    of them.  This is like one of the first ones we looked at and

21    we saw this problem.  We wanted to bring it to the Court's

22    attention and ask for some time to take up, if it's a bigger

23    issue than one clip, time to take that up on Monday.

24          THE COURT:  Look, obviously, I expect you will make

25    whatever objections you have.  Indeed, I think we set up a

DAHLCHE1                    Trial

1    schedule for doing that, didn't we?

2              MS. FRIEDMAN:  In a sense, yes.  But there's a -- yes.

3    I'll leave it at that.

4              MR. BRODSKY:  Your Honor, just for your information on

5    that, we provided these clips months ago to the defense.  We've

6    been waiting for their comments.  They haven't provided us with

7    any counter.

8              THE COURT:  Look, I would like to try the case instead

9    of having this endless conversation about trying the case.

10             MR. MASTRO:  Thank you, your Honor.

11             THE COURT:  Could we try the case?

12             MR. BRODSKY:  Yes, your Honor.

13             THE COURT:  Okay.  Mr. Russell, come on back.

14             You're still under oath, Mr. Russell.  Good morning to

15   you too.

16             THE WITNESS:  Good morning, sir.

17             THE COURT:  Ms. Littlepage.

18             MS. LITTLEPAGE:  Yes, your Honor.  May I proceed?

19             THE COURT:  Please.

20    DAVID LLOYD RUSSELL, resumed.

21   CROSS-EXAMINATION (cont'd)

22   BY MS. LITTLEPAGE:

23   Q.  Good morning, Mr. Russell.

24   A.  Good morning.

25   Q.  Do you have the white book in front of you?

DAHLCHE1                    Russell - cross

1    A.  Yes.

2    Q.  Yesterday we were talking about tab 2 your cost estimate

3    that was put together in October of 2003.  Are you with me?

4    A.  I am.

5    Q.  Okay.  If you turn to page 2 of the cost estimate.

6               THE COURT:  Plaintiff's Exhibit 2414.

7               MS. LITTLEPAGE:  Yes, sir.

8    Q.  There's a part of your report where it is entitled remedial

9    techniques which may be applicable and discussion.

10              First of all, can you define for us what you meant by

11   remedial techniques?

12   A.  When one goes to remove contaminants from the soil or from

13   water, there are a number of engineering and scientific methods

14   to do that; and the selection of those or the optimization of

15   those is not necessarily one process, but there are several

16   processes which can be selected.

17   Q.  And in your cost estimate did you indicate that there were

18   specific things that would cost money that you were not

19   considering in this estimate?

20   A.  As I recall, I believe I did.

21   Q.  And is one of them -- it appears that one of them is that

22   you did not include cost for infrastructure; is that fair?

23   A.  If I may refer to page 3 of that exhibit, there is a line

24   there that says additional infrastructure.  Upgrading

25   infrastructure and other supporting -- support including

DAHLCHE1                    Russell – cross

```
 1    laboratory.
 2              So to a certain extent I did address infrastructure.
 3    The infrastructure which might be involved may include such
 4    things as trying to get access across some of the rivers.  At
 5    that time there were several bridges that were in very poor
 6    repair, and I was conscious of the fact that some of the
 7    remedial techniques would require heavy equipment.
 8    Q.  And did you note that in your cost estimate that there were
 9    some costs for infrastructure that you were not including in
10    your cost estimate?
11              MR. BRODSKY:  Your Honor.
12              THE COURT:  That's not what he said at all.
13              MR. BRODSKY:  And the document speaks for itself, your
14    Honor.
15              THE COURT:  Well, that's the second point.
16              Next question.
17              MS. LITTLEPAGE:  Yes, sir.
18    Q.  If you look at page 2, can you explain to me what you meant
19    when you wrote to the extent that access by this equipment is
20    an issue, the cost may increase because I have not added any
21    cost factors for infrastructure including -- and you gave a
22    list of the specific things you were not including.  Is that
23    fair?
24    A.  That is correct.
25    Q.  Okay.  And then if you go to the bottom of the page under
```

DAHLCHE1                      Russell - cross

1  groundwater treatment, did you also indicate that you were not

2  including an estimate for alternative sources of clean water?

3         THE COURT:  Sustained.  I made it very clear.  We're

4  not just going to have the lawyers saying does the document say

5  X and the witness say, oh, yes, it says X.  We're just not

6  going to do that.

7         MS. LITTLEPAGE:  Yes, sir.

8  Q.  Can you explain to me what is an alternative source of

9  clean water that in this context?

10  A.  Most certainly.  I'm holding up this water bottle would be

11  an example of an alternative source of clean water.  In the

12  case of Ecuador, it might be a well which was drilled somewhere

13  outside of a zone which had contamination or at a level which

14  outside of a depth in a zone which did not have contamination.

15  Q.  Okay.  And did you include in your cost estimate any

16  numbers for providing alternative sources of clean water?

17  A.  I don't seem to recall that I did, but I'd have to go back

18  and look at this very carefully.

19  Q.  If you turn to the third page, you write that the cost

20  projections above are very rough.

21         Can you explain why you used those words to describe

22  this cost estimate?

23  A.  Yes.  There are a large number of unknowns.  While I

24  attempted to define unit costs very carefully -- and by unit

25  costs I mean, for example, the cost to produce a unit of water

DAHLCHE1                    Russell – cross

```
 1   or something similar -- the quantities were I used the word

 2   swag, which I won't expand upon but to say it's a

 3   scientifically based wild guess and it's a judgment factor.

 4   And with the amount of unknowns and the lack of information

 5   that I had with regard to not only levels of contamination but

 6   the extent of those levels of contamination, it's a best

 7   estimate.

 8            THE COURT:  Swag is an acronym, right, in common use?

 9            THE WITNESS:  Yes, sir.

10            THE COURT:  And what do the letters SWAG stand for?

11            THE WITNESS:  Scientific Wild Ass Guess.

12            THE COURT:  Next question, please.

13   Q.  You indicate in your report that careful thought must be

14   given to the remediation cleanup.

15            What did you mean by that part of your report?

16   A.  Just that.  Maybe I don't understand your question.

17            THE COURT:  Next question.

18   Q.  When you finished creating these cost estimates, did you

19   type them up at that point in Hotel Lago in the fall of 2003?

20   A.  Yes.

21   Q.  And did you print out the report that is Plaintiff's

22   Exhibit 2414?

23   A.  Yes.

24   Q.  And did you sign it?

25   A.  Yes.
```

DAHLCHE1                    Russell - cross

1   Q.  And did you hand it -- who did you hand it to?

2   A.  Mr. Donziger.

3   Q.  As I understand it, you were in Ecuador at that time also

4   to prepare to testify at trial.  Is that correct?

5   A.  That is correct.

6   Q.  And was it your understanding that you were a potential

7   witness at the trial?

8   A.  Yes.

9   Q.  And was it your understanding that you were a potential

10  witness to testify about your observations, your calculations,

11  and your cost estimate?

12  A.  I'm not sure of that because I never got to trial.  I was

13  selected as a potential witness, but then at the last moment I

14  recall a conversation with -- while I was present between

15  Alberto Wray and Monica Pareja where Alberto came in the room

16  and said, no, he's not going on trial.  We were going to ask

17  him --

18          MR. BRODSKY:  Objection, your Honor.  Hearsay, Alberto

19  Wray told him.

20          MS. LITTLEPAGE:  I'll ask the next question.

21  Q.  Mr. Russell, had you agreed to be a witness?

22  A.  I had agreed to be a witness, yes.

23  Q.  And it ended up that you were not a witness?

24  A.  That is correct.

25  Q.  At the same time when you were there in Ecuador in October

DAHLCHE1                    Russell - cross

1    of 2003, did you meet with a reporter from the Wall Street

2    Journal?

3    A.  I don't recall.  I may have.

4    Q.  If you turn to tab 3, Defendant's Exhibit 1405, did you --

5    let me see if this can refresh your memory.

6         Did you meet with a man called Mark Livsher --

7    although I'm probably butchering his name -- from the Wall

8    Street Journal while you were in Ecuador?

9    A.  This document seems to indicate that I did.

10   Q.  Do you recall meeting with reporters even if you don't

11   remember Mr. Livsher's name?

12   A.  I met with a number of people, and my memory on that point

13   is not specific.

14   Q.  And Defendant's Exhibit 1405 has a quote from you, to put

15   this in perspective, you're looking at something size wise

16   larger than the Chernobyl disaster.

17        Was that your opinion in October of 2003?

18   A.  That was a considered opinion, yes.  And it was developed

19   through conversations with Mr. Donziger where he asked me if

20   I'd ever seen anything about this scale.  And the previous year

21   I had been or that year, I believe, I had been over to the

22   Ukraine and had an opportunity to look closely at Chernobyl,

23   not see it physically, but talk to people who had been in the

24   area and had had permission to study it and so on.  And the

25   physical scale was approximately, from my understanding at that

DAHLCHE1                    Russell - cross

1   point, about the same, about the same size.

2   Q.  And would that statement that was in the Wall Street

3   Journal be a true quote of your opinions at that time?

4   A.  I would take issue with one line in that there is a mention

5   of a $5 billion cleanup estimate, and I believe that the

6   numbers I provided were 6 billion.

7          But the other item I might object to is the phrase

8   that such a project would dwarf any decontamination effort ever

9   undertaken.  I don't know of anything larger, but it's possible

10  since that time, for example, Fukushima or some other

11  ecological projects I'm not aware of may have been that scale

12  or larger.

13  Q.  And in the Wall Street Journal article it indicates that

14  the only effective way to curtail the pollution would be to dig

15  up, transport, and incinerate millions of tons of contaminated

16  soil.

17         Can you explain what was the process you had in mind

18  when you gave this statement?

19  A.  The process is exactly that.  There is a thermal -- one of

20  the ways -- let me back up.

21         There are a number of ways of decontaminating

22  petroleum contaminated soil.  One of them is bioremediation,

23  which at that point had not been proven in Ecuador.  The other

24  is a thermal method where basically you put the soil through a

25  thermal dryer or something, a heat transfer process, heat the

DAHLCHE1                    Russell - cross

1   soil, drive out the volatile components of the petroleum and

2   then return the soil.  And in order to do that, you have to dig

3   up the -- you have to dig up the soil.

4          Now, the issue about transport can be very interesting

5   because transport is a very broad word.  And in some cases with

6   large incinerators, you need to have a fixed base.  In other

7   cases, you can use smaller incinerators of higher capacity

8   which basically could be truck mounted and brought to the site

9   or the locations, I should say.

10  Q.  And, Mr. Russell, when you turned over your cost estimate

11  to Mr. Donziger, did you become aware that Mr. Donziger was

12  using this number in press releases and in discussions with the

13  press?

14  A.  Yes.

15  Q.  Were you aware that your entire report setting out what you

16  had done, as well as some of the limitations of your report,

17  had been uploaded to the Amazon Watch website?

18         MR. BRODSKY:  Objection to the characterization of the

19  report, but fine with the question.

20         THE COURT:  Overruled.

21  A.  At the time, no, I was not.

22  Q.  Did you subsequently become aware that they had not only

23  just used your number, but actually uploaded the whole report

24  so anybody could get on and read --

25  A.  I believe I did.  I believe I did become aware of that.

DAHLCHE1                    Russell – cross

1   Q.   Okay.  Now, you stopped working on the case in 2005; is

2   that accurate?

3   A.   Yes.

4   Q.   And at the time you stopped working on the case, you were

5   owed a significant amount of money by the plaintiffs' team;

6   would that be fair?

7   A.   Yes.

8   Q.   And did you have to file suit against the plaintiffs' team

9   in order to get paid?

10  A.   Yes.

11  Q.   And were you paid?

12  A.   The case was settled and I was paid.

13  Q.   Now, after you stopped working for Chevron, you reached out

14  to Chevron -- sorry.  I know why you're standing.  I said it

15  wrong.

16          After you stopped working for the plaintiffs' team,

17  isn't it true that you reached out to Chevron to discuss some

18  issues about the case?

19          MR. BRODSKY:  Objection to form.

20          THE COURT:  What's the objection to form?

21          MR. BRODSKY:  Vague, issues about the case.

22          THE COURT:  Rephrase it.

23  Q.   Let's go to tab 4, Defendant's Exhibit 729.

24          Mr. Russell, is this an email from you to a scientist

25  for Chevron?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAHLCHE1                    Russell – cross

1   A.  Yes.

2   Q.  Is the name of the scientist from Chevron Sara McMillen?

3   A.  It is.

4   Q.  Are you aware she's the very next witness in this case?

5   A.  I was not aware that she was.  I was generally suspicious

6   of the idea that she might be a witness.

7   Q.  Have you been able to visit with Ms. McMillen while you

8   were here in New York?

9   A.  No.

10          MS. LITTLEPAGE:  Judge, we move to admit Defendant's

11   Exhibit 729.

12          THE COURT:  Received.

13          (Defendant's Exhibit 729 received in evidence)

14   Q.  And in November of 2005, did you write to Ms. McMillen and

15   say -- the subject line is forgot the attachment.

16          Do you see that, sir?

17   A.  Yes.

18   Q.  Do you know what the attachment was?

19   A.  I believe, I believe it may have been a draft, an early

20   draft cost estimate that was never issued.

21          MR. BRODSKY:  Your Honor, we have the attachment.  We

22   don't have to.

23          THE COURT:  Let's just see how it develops.

24   Q.  And the earlier draft cost estimate would have been

25   something that you had drafted while you were operating as an

DAHLCHE1                    Russell - cross

1   expert for Mr. Donziger?

2   A.  Yes.

3   Q.  And why were you sharing your earlier draft work product

4   created in this case for the plaintiffs with the scientist for

5   Chevron?

6   A.  It had no relevance at that point because it was inaccurate

7   and had been substantially revised and it was just kind of for

8   information purposes, no real, no real relevance that I can

9   understand.

10  Q.  In fact, what you told Ms. McMillen was enjoy, right, is

11  that the first words of your email?

12  A.  Yeah.

13  Q.  And then you --

14  A.  That's something that I do frequently.

15  Q.  Then you say the data appear authentic, and I know for a

16  fact that it was soil from the Oriente --

17  A.  Oh, wait a minute.  Wait a minute.  Wait a minute.  This

18  may relate to -- this doesn't relate to the cost estimate then.

19  Q.  That was my next question.  Let's go one step at a time.

20          Does this refresh your memory about what you were

21  sending Chevron's scientist in November of 2005?

22  A.  I believe it does.  I believe this was the Alexis report.

23  Q.  What's been handed to me as the attachment -- I have never

24  seen it before, but it says Ecuador Bioremediation Testing by

25  Alexis Group, September 27, 2005.  Is that --

DAHLCHE1                      Russell - cross

1    A.  That would be correct, yes.

2    Q.  Was there another occasion when you sent Chevron's

3    scientists a draft of your cost estimate?

4    A.  I believe that there was.

5    Q.  Do you know when you contacted Chevron that time it was

6    before or after November of 2005?

7    A.  I do not recall.

8    Q.  And I've never seen this, so tell me what the Alexis group

9    is?

10            THE COURT:  Why don't we get it marked and make sure

11   we're all playing with the same cards.

12            MR. BRODSKY:  Your Honor, for the Court's information,

13   we have it marked it's CVX RICO Bates No. 466855.

14            THE COURT:  What's the exhibit number?

15            MR. BRODSKY:  On this it's Plaintiff's Exhibit 3367.

16   It was produced to the defense.

17            MS. LITTLEPAGE:  Judge, we move to admit Plaintiff's

18   Exhibit 3367.

19            THE COURT:  Can I see it?

20            Is there any objection?

21            MR. BRODSKY:  No.

22            THE COURT:  Plaintiff's 3367 is received.

23            (Plaintiff's Exhibit 3367 received in evidence)

24   Q.  Can you tell us -- I don't know that you have a copy.  Were

25   you given a copy?

DAHLCHE1                    Russell – cross

1   A.  I do not have a copy here but that's all right.  Thank you.

2   Q.  Can you tell us just briefly what the Alexis group was

3   doing in this study?  Tell me the word you would use to

4   describe this document.

5   A.  As a consequence of the publicity surrounding the Ecuador

6   lawsuit, a number of groups came out of the woodwork looking to

7   derive a business opportunity and looking to do work in

8   Ecuador.  This was one of those groups.  They contacted me

9   directly and asked if I could assist them in obtaining soil

10  samples from Ecuador so that they could put them through their

11  process and come up with some sort of estimate or idea as to

12  whether or not their process would work on Ecuadorian soils.

13  Q.  And did you provide I think it says two soil samples from

14  Ecuador to this group?

15  A.  I did not specifically provide them, but I made

16  arrangements where they could contact someone who would provide

17  them.

18  Q.  And it appears that the samples came from the

19  Shushufindi --

20  A.  I will accept that.  I don't have a specific recollection.

21  Q.  And as I understand it, just looking at this report, it

22  appears that this group actually tested the soil for TPH, total

23  petroleum hydrocarbons?

24          THE COURT:  Look, this document speaks for itself.

25  The witness has not testified to any foundation that would

DAHLCHE1                    Russell - cross

1   allow him to testify as to what if anything this organization

2   did.  So if you have a foundation to lay, lay it.  But we're

3   not just going to have speculation based on a document for

4   which he wasn't responsible, as far as the testimony to date

5   indicates.

6   Q.  Mr. Russell, did you review this report when you received

7   it from the Alexis group?

8   A.  I did.

9   Q.  Did you feel like it was important for Chevron to see this

10  data?

11  A.  I did.

12          MR. BRODSKY:  Objection, relevance.

13          THE COURT:  Overruled.  It's already answered.

14  Q.  Is that why you sent this report to Chevron was so they

15  would be aware of the data the Alexis group had uncovered in

16  the soil samples?

17          MR. BRODSKY:  Objection, relevance.

18          THE COURT:  Sustained as to form.

19  Q.  Did the Alexis group find contamination in the soils

20  indicated in the report?

21          THE COURT:  Sustained.

22  Q.  Why did you think Chevron needed to see this report?

23  A.  Because it provided by this particular -- by this

24  particular time, and we are speaking of late 2005, there was a

25  lot going on in my life that is not associated or involved with

DAHLCHE1                    Russell - cross

1   this case, but I had become thoroughly disillusioned with my

2   own cost estimates and had indicated that and was basically no

3   longer working for the original plaintiffs and felt -- I knew

4   from the terms that this was an independent study and my role

5   was basically to just facilitate the information as of

6   scientific interest and I was passing this along to Sara

7   McMillen for informational purposes only.

8          I don't believe that there is any -- and I do not

9   recall -- I do not believe there is any cost information

10   associated with this report.  If I remember correctly, it just

11   outlines the fact that bioremediation techniques could be

12   effective.  And I knew from my own background that

13   bioremediation techniques, once applied, would be substantially

14   less costly than the incineration methods that I had chosen.

15   But I don't believe that in the transmittal or anything else I

16   discussed cost.

17   Q.  And can you describe for us bioremediation and what that

18   would mean and how it's different from the thermal nuclear

19   remediation?

20          MR. BRODSKY:  Objection, your Honor.

21          THE COURT:  Sorry?

22          MR. BRODSKY:  Objection, form.

23          THE COURT:  Overruled.

24   A.  Bioremediation -- all right.  Let me back up.  Thermal

25   remediation I've kind of explained.  And you're nodding so I

DAHLCHE1                         Russell - cross

1   assume you understand that.  All right.

2           Bioremediation is a technique where you provide

3   additional nutrients and in some cases enzymes to enable the

4   natural soil bacteria to attack, solubilize, and degrade

5   various compounds in the soil.  It's a very cost effective

6   technique that had been proven in the United States during the

7   some of the interim dealing with petroleum compounds,

8   specifically, leaking underground storage tanks and the like.

9   But it had not been proven, until I saw this, it was not a

10  proven technique in Ecuador.

11  Q.  And in the interim period, would that be from the fall of

12  2003 when you did your first cost estimate to this date,

13  November of 2005?

14  A.  Yes.

15  Q.  And did you have an understanding after reviewing the

16  Alexis group report that the microbial cultures had been able

17  to remove the contamination from the soil they were testing?

18           MR. BRODSKY:  Same objection before your Honor.

19           THE COURT:  I can't hear you, sir.

20           MR. BRODSKY:  Same objection, your Honor.  She's

21  asking for another way of interpreting the Alexis group report.

22           THE COURT:  Sustained.

23  Q.  You indicate in your email the data appear authentic.  What

24  did you mean by that?

25  A.  Just that.  They went out of their way to provide, if

DAHLCHE1                    Russell - cross

```
1    you'll turn to the report, the back few pages of the report
2    contains analyses by Sparger Technology.  And page 10 of 14 and
3    beyond contain some gas chromatograph traces indicating that
4    the soil concentrations of total petroleum, whatever they were
5    using to measure total petroleum hydrocarbons, had decreased.
6    Q.  And you indicate you knew for a fact that it was soil from
7    the Oriente, that would be the concession area that was
8    involved in the underlying Ecuadorian action, true?
9    A.  The report has to speak for itself.  I facilitated and I
10   indicated that I had facilitated obtaining the soil samples for
11   the Alexis group.  But can I stand here or sit here and tell
12   you that yes, they absolutely took those soil samples and used
13   this in analysis and all that, no, I cannot.
14            I can only infer from the comments in the report.  But
15   I would say that it would have been in their interest to make
16   sure that their technology was applied and that one looking at
17   this report today I would have to say, I would have to assume
18   that the soil samples were actually those tested, soil samples
19   actually tested were those in Ecuador.
20   Q.  And did this report provide you with any information as to
21   a potential revision of your cost estimate?
22   A.  I believe I've already answered that question, but, yes, it
23   did, because bioremediation techniques have been proven, had
24   been proven at that time to be substantially cheaper than
25   thermal incineration or thermal techniques, yes.
```

DAH8CHE2                        Russell - cross

1    Q.  So if bioremediation worked in the concession area, it

2    would be, in your opinion, cheaper to remove the contamination,

3    am I understanding you correctly?

4    A.  Yes.

5    Q.  Did you send a copy of the Alexis Group report to the

6    plaintiffs' group?

7    A.  No, I did not, because the relations at the time with the

8    plaintiffs' group were I would characterize as poor, bordering

9    on hostile.

10   Q.  In fact, you were all litigating against each other in a

11   lawsuit?

12   A.  I don't remember when the lawsuit was started or when the

13   lawsuit was finished.  I would have to check dates on that and

14   right offhand I can't tell you where this issue with the Alexis

15   Group report falls in that entire process.

16   Q.  At that point it was a difficult relationship between you

17   and the plaintiffs' group?

18          THE COURT:  That's what he said.  Could we stop

19   repeating everything?

20   Q.  Your next sentence says, "Take a look and drop me a line

21   after you have had a chance to look over the report.  What

22   about the issue of letting me see some of the reports?"

23          Can you explain to us what you meant by that sentence?

24   A.  Yes.  I have never seen until just recently any of the

25   reports which were filed with the court on either side, and

DAH8CHE2                        Russell – cross

1   this was more a matter of curiosity because I had been involved

2   with the production of some of the reports which were filed

3   with the Ecuadorian court, but I had never seen either set,

4   either report from either the plaintiffs or the defendants in

5   the process.

6   Q.  It goes on at the end and it says, "One final thing.  I

7   would be happy to prepare a study to revise the cost estimate

8   down to a more reasonable figure."

9          Did you ever get a response from Chevron to that offer

10  to do a revised cost estimate?

11  A.  Never.  The issue was dropped.

12  Q.  Does Ms. McMillen on the top of this page of Defendants'

13  Exhibit 729 indicate, "Thank you very much, Dave.  I will

14  review"?

15  A.  Where are we, please?

16  Q.  Defendants' Exhibit 729.  It's tab 4 in the book.

17  A.  Tab 4.

18  Q.  Let me ask another question.  Other than the e-mail

19  response, did you ever speak to Ms. McMillen about the issue

20  you raised in your e-mail?

21  A.  I may have, but I do not recall.

22  Q.  Now, in 2006, you sent a cease and desist letter to Mr.

23  Donziger, is that true?

24  A.  I believe that's right.

25  Q.  If you turn to tab 5 of your book, Plaintiff's Exhibit 763?

DAH8CHE2                    Russell – cross

1    A.  Yes.

2    Q.  Is that a copy of the cease and desist letter you sent to

3    Mr. Donziger?

4    A.  I believe it is, yes.

5    Q.  Did you ask Mr. Donziger to stop using the cost estimate

6    you had prepared for him in 2003?

7           THE COURT:  It says whatever it says.  Can we stop

8    doing this?  Unless you're asking him whether there was some

9    conversation apart from the letter.

10          MS. LITTLEPAGE:  That was my next question, but I

11   probably don't need the first question.  I can go straight to

12   the second question.

13          THE COURT:  Thank you.

14   Q.  Other than the letter to Mr. Donziger, did you have

15   any -- let me ask another question.

16          Did you send a specific cease and desist letter also

17   to Amazon Watch?

18   A.  Yes.

19   Q.  Did you get a response from both -- first of all, did you

20   get a response from Amazon Watch?

21   A.  Yes.

22   Q.  Did you get a response from Mr. Donziger?

23   A.  Yes.

24   Q.  Let's look at, let's start with tab 6, Plaintiff's Exhibit

25   766.

DAH8CHE2                    Russell - cross

1          MS. LITTLEPAGE:  Judge, these were all, I think,

2     identified in Mr. Russell's witness statement and have been

3     received by the Court from the plaintiffs.  Do I need to

4     reoffer them?

5          THE COURT:  I am going to rely on the plaintiff to

6     bring to my attention anything as to which you go into the

7     contents that has not already been received.

8          MS. LITTLEPAGE:  Yes, sir.

9     Q.  Mr. Russell, Plaintiff's Exhibit 766, who is Leila

10    Salazar-Lopez and did you know that person personally?

11    A.  I believe I met Ms. Lopez or Mrs. Lopez, I'm not sure, in

12    Ecuador in 2003 at the time I was down there in 2003.  I do not

13    recall meeting her after that, and I would not be able to

14    identify her if she was in the courtroom.  But it was my

15    understanding at that time and I believe that she was the

16    manager or director for Amazon Watch.

17    Q.  Your letter to Mr. Donziger was dated February 14, 2006,

18    and the e-mail from Amazon Watch is dated February 16, 2006.

19    In those two date time frames, did you receive any other

20    communication from Amazon Watch or was this the first time you

21    heard from Amazon Watch?

22    A.  I believe it was the first time I heard from Amazon Watch,

23    but I am not specific on that.

24    Q.  Did Amazon Watch tell you that they respected your request

25    and would remove your report from --

DAH8CHE2                    Russell – cross

 1              THE COURT:  Please stop reading the e-mails.

 2              Look, this is going to be a trial of indeterminable

 3    length if what we do is take 4,000 documents and ask the

 4    witnesses to read them back to us or to read them to the

 5    witness and say don't they say that.  I have tried to make it

 6    clear to both sides before we began the trial that we are just

 7    not going to do that, and I insist upon it.

 8              MS. LITTLEPAGE:  Yes, sir.

 9    Q.  Let me ask a better question.  This e-mail indicates that

10    Amazon Watch is going to remove your report from their Web

11    site.  At this point in time, were you aware that Amazon Watch

12    had actually put your entire report on their Web site?

13    A.  I believe I was.

14    Q.  Did you send any further communication to Amazon Watch in

15    February of 2006?

16    A.  I don't recall.  I'm sure you have documents indicating if

17    I have.

18    Q.  If you turn to tab 7.

19              MR. BRODSKY:  This is one where we have an objection.

20    Tab 7 is a defense exhibit.  It's not one that's been received

21    in evidence.  The bottom portion appears on Plaintiff's Exhibit

22    766.  The top portion, which is inadmissible because it's

23    hearsay, Mr. Russell does not appear on that top portion.

24              THE COURT:  Let's see what use is about to be made.

25    Q.  Mr. Russell, do you see Defendants' Exhibit 738?

DAH8CHE2                        Russell - cross

1   A.  Yes.

2   Q.  It appears to be two separate e-mails.  I want to focus

3   your attention on the bottom e-mail.  Is that an e-mail from

4   you to Ms. Salazar of Amazon Watch?

5   A.  Yes.

6   Q.  Did you send an e-mail along with an official letter to

7   Amazon Watch?

8   A.  I believe I did, but I do not recall specifically.

9   Q.  Are you aware that Mr. Donziger forwarded your cease and

10  desist letter to the whole plaintiffs' group in Quito, Ecuador?

11  A.  No, I was not.

12  Q.  In the time that you have met with Chevron, have they shown

13  you the documents of the steps Mr. Donziger took to follow your

14  request in your cease and desist letter?

15          MR. BRODSKY:  Objection to form.  It assumes facts not

16  in evidence.

17          THE COURT:  Sustained as to form.

18  Q.  Have you seen any documents relating to Mr. Donziger's

19  reaction to your cease and desist letter?

20  A.  I believe I have.

21  Q.  If you turn to tab 8, Defendants' Exhibit 741A, is this one

22  of the documents that you have reviewed on that issue?

23          MR. BRODSKY:  We object also to this document.

24          THE COURT:  It has not been offered.

25          MR. BRODSKY:  Yes, your Honor.

DAH8CHE2                        Russell - cross

1    A.  I don't know that I have seen this document.

2              THE COURT:  Next question.

3    A.  No, I have not seen that document.

4    Q.  If you turn to -- let me ask you another question.

5              In all the documents you have reviewed, have you

6    reviewed any documents about Mr. Donziger in February of 2006

7    getting another cost estimate from his technical team in

8    Ecuador?

9    A.  I believe that there was an allegation by Mr. Donziger in

10   his response to my cease and desist, which he had indicated,

11   yes, we will stop using your cost estimate because we have

12   another independent cost estimate.

13   Q.  Have you had an opportunity in the time you have met with

14   Chevron to review that alternative cost estimate that Mr.

15   Donziger had gotten?

16             MR. MASTRO:  Objection to the form.  It assumes facts

17   not in evidence.

18             THE COURT:  Sustained.

19   Q.  Have you received any documents about an alternative cost

20   estimate that Mr. Donziger may or may not have gotten?

21   A.  To the best of my knowledge and recollection, no additional

22   cost document exists nor was any other cost estimate ever

23   provided to me.

24   Q.  When you say such a document doesn't exist --

25             THE COURT:  He said to the best of his knowledge and

DAH8CHE2                     Russell - cross

1   recollection.  Let's move on.

2   Q.  Do you know who Fausto Penafiel is?

3   A.  I believe that I do, but I'm not certain.

4   Q.  Did you go to check the Amazon Watch Web site to verify

5   that your report had been removed from Amazon Watch?

6   A.  I probably did, but I have no specific recollection of

7   that.

8   Q.  Do you recall ever seeing any documents about a 10 to 12

9   billion dollar cost estimate created in April of 2006?

10  A.  I believe I have answered that question.

11  Q.  I'm sorry.  I asked you about February of 2006.  I am now

12  in April.  Did you ever see any documents about a cost estimate

13  in April of 2006?

14  A.  My answer, my previous answer was including up to the

15  present.  So no.

16  Q.  If you turn to tab 16, Plaintiff's Exhibit 788, is that an

17  e-mail between Mr. Donziger and yourself?

18          That was a bad question.  Is Plaintiff's Exhibit 788

19  two e-mails, one from you to Mr. Donziger and then his

20  response?

21  A.  Yes.

22  Q.  In August of 2006, did you write Mr. Donziger and ask

23  that --

24          THE COURT:  Is this in evidence?

25          MR. BRODSKY:  Yes.

DAH8CHE2                    Russell - cross

1              THE COURT:  All right.  Move on.

2    Q.  In August of 2006, did Mr. Donziger respond to you when you

3    raised an issue about your cost estimate?

4              THE COURT:  Move on.  Unless you're asking about

5    something other than the response that is in evidence that's

6    right in front of all of us that we don't have to take time

7    having the witness effectively read to you.

8    Q.  In August of 2006, when Mr. Donziger responded to your

9    second e-mail, did you check to see if the Frente had removed

10   your cost estimate?

11   A.  I do not know at this point and did not know then that the

12   Frente had a Web site and have no way of knowing.  Because I do

13   not speak Spanish, I would not have visited the Frente Web

14   site.  So the answer is no, I have not checked.

15   Q.  Did you visit in August of 2006 the Chevron Toxico Web

16   site?

17   A.  I may have.  It seems that I have according to my e-mail on

18   August 15.

19   Q.  If you turn to tab 17, Defendants' Exhibit 733, is this an

20   e-mail, Mr. Russell, from you -- it's a series of e-mails

21   between you and Chevron's scientist in August of 2006?

22   A.  It appears to be that.

23             MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

24   733.

25             MR. BRODSKY:  No objection.

DAH8CHE2                        Russell - cross

1           THE COURT:  Received.

2           (Defendants' Exhibit 733 received in evidence)

3   Q.  If you start on page 2, August 15, 2006, did you send to

4   Chevron in August of 2006 your e-mail exchange with Mr.

5   Donziger about your concerns of the use of your cost estimate?

6           THE COURT:  You mean apart from what is in this

7   document?

8           MS. LITTLEPAGE:  Yes.  Did he send the actual cease

9   and desist letter?

10          THE COURT:  Which question are you asking?

11          MS. LITTLEPAGE:  That was a bad question.  Let me ask

12  a better question.

13  Q.  In February of 2006, when you sent the first cease and

14  desist letter, did you forward that to Chevron?

15  A.  I may have.  I do not recall.

16  Q.  In August of 2006, did you forward your second e-mail

17  correspondence with Mr. Donziger to Chevron?

18  A.  I do not recall.

19  Q.  Does this document refresh your memory that you forwarded

20  your e-mail exchange to Mr. Donziger to Chevron on August 15th

21  of 2006?

22  A.  It could have been, yes.  I did not necessarily want to

23  introduce this subject at this particular point, but at that

24  particular time, my wife had contracted a very serious case of

25  cancer, which ultimately caused her to pass on in April, and so

DAH8CHE2                    Russell – cross

1   I had many, many distractions and I can't -- my memory on this
2   is not there.
3   Q.  I appreciate that, sir.
4          If you go to the e-mail in the middle of the page from
5   you to Ms. McMillen, you asked her for some information about
6   the case?
7   A.  Are we on page 2?
8   Q.  Yes, sir.  In the middle of the page.  Do you see where you
9   asked Chevron to provide you some information about the case
10  and the timing of the case?
11  A.  Exhibit 733?
12  Q.  Yes, sir.  Page 2.
13  A.  Page 2.
14  Q.  In the middle of the page, "Where are they in the case?
15  How soon will it go to the judge?"
16  A.  OK.
17         THE COURT:  Now, is there a question?
18         MS. LITTLEPAGE:  Yes, sir.
19  Q.  Did Chevron provide you any information about the case?
20  A.  No.
21  Q.  Then on the first page to Ms. McMillen, you indicate that
22  you had seen data indicating some ground contamination.  Do you
23  see that, sir?
24  A.  Yes.
25  Q.  Was the data you had seen involving ground contamination

DAH8CHE2                    Russell - cross

 1    data you saw when you were working for the plaintiffs' group or

 2    was it data you saw after you stopped working for the

 3    plaintiffs' group?

 4    A.   When I stopped working for the plaintiffs' group I had no

 5    access to data, aside from the Alexis report, and as I recall,

 6    there was somebody else out of Florida who contacted me, but I

 7    don't recall what happened with that.  The Alexis Group was the

 8    only other significant contact where I might have seen any

 9    data, aside from the reports which were filed, and not even the

10    reports, the analyses which were from -- I think I had seen

11    analyses from four sites.

12    Q.   You indicate in your witness statement on page 7, at tab 1,

13    page 7, line 21 to 22.

14    A.   Yes, ma'am.  OK.

15    Q.   You indicate in your witness statement that you would be

16    satisfied if Mr. Donziger did not cite you as a source for a

17    damage estimate.  Is that what you wanted out of your cease and

18    desist letter, is not to be cited as a source for the damage

19    estimate?

20    A.   Yes, one of the things at least.

21    Q.   If you go to tab 26, Defendants' Exhibit 732.  Mr. Russell,

22    are you with me?

23    A.   Yes, I am.

24    Q.   Is this an e-mail from you to Ms. McMillen?

25    A.   It is.

DAH8CHE2                      Russell - cross

1            MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

2     732.

3            MR. BRODSKY:  Objection to relevance, your Honor.

4            THE COURT:  And the relevance is, Ms. Littlepage?

5            MS. LITTLEPAGE:  Judge, as I understand reading the

6     amended complaint, the allegation is that Mr. Russell's cost

7     estimate was exaggerated, and I believe that I am entitled to

8     show that --

9            THE COURT:  That's part of it.

10           MS. LITTLEPAGE:  That's A, and then there is a B.

11           From reading the complaint, it appears that there are

12    at least some inferences that the cost estimate was exaggerated

13    because Mr. Russell no longer believed that there was

14    contamination as opposed to that he believed there was just a

15    cheaper remediation method.

16           So the cost estimate -- well, Judge, a cost estimate

17    can be exaggerated and therefore fraudulent because it's wrong

18    or because it's just too high.  And I believe Mr. Russell, and

19    I would like to be able to show Mr. Russell's belief about his

20    cost estimate that it was too high because there were cheaper

21    ways to remove the contamination, not that he ever felt that

22    there was not contamination in the concession area.  And

23    without being allowed to show that whole picture, I think there

24    is an inference allowed that's not true and is not appropriate.

25           THE COURT:  I will take it for what it is worth.

DAH8CHE2                    Russell - cross

1    Proceed.

2              (Defendants' Exhibit 732 received in evidence)

3    Q.  Are you with me, Mr. Russell, on Defendants' Exhibit 732?

4    A.  I am.

5    Q.  In June of 2007, did you write again to Chevron's scientist

6    Sara McMillen?

7    A.  Yes.

8    Q.  And you state, "I know that this fits into the general

9    category of CYA."  What did you mean when you wrote that to

10   Chevron's scientist?

11   A.  CYA is a term of art that generally stands for cover your

12   ass.

13             THE COURT:  Which is a high art form in our society.

14             THE WITNESS:  Thank you, sir.

15   Q.  What happened that motivated you to write this letter to

16   Ms. McMillen?

17   A.  The time frame, I indicated that my wife had passed on in

18   early 2007, I believe it was mid-April.  Later that year I was

19   working in Poland at the Central Mining Institute, and one of

20   the things that the Central Mining Institute was doing, I was

21   working with the radiometric laboratory of the Central Mining

22   Institute on removal of radium from ground water.  The source

23   of the radium was naturally occurring and it was in hydrocarbon

24   deposits of all types, including petroleum.  And this was just

25   an acquaintance speaking to another acquaintance on a technical

DAH8CHE2                    Russell - cross

1   matter saying, Hey, you may want to take this up in case it's

2   ever thought about or whatever.  You may want to investigate

3   this.  It could be nothing.  It could be something.  At that

4   point I was either leaving for Poland or possibly -- I believe

5   at that point I was in Poland and this was just a random

6   thought that had occurred.

7   Q.  Did Chevron ever respond and give you any information as to

8   whether they were testing for radium in the spent messes from

9   Ecuador?

10  A.  No.

11          THE COURT:  Ms. Littlepage, how much longer do you

12  expect to be?

13          MS. LITTLEPAGE:  15 minutes.

14          THE COURT:  We will take a break here.

15          (Recess)

16          THE COURT:  All right.  Ms. Littlepage.

17          MS. LITTLEPAGE:  Yes, sir.  May I proceed?

18          THE COURT:  Yes.

19  BY MS. LITTLEPAGE:

20  Q.  Mr. Russell, can you turn in your white book to tab 27,

21  Defendants' Exhibit 735.

22  A.  Yes.

23  Q.  Is that an e-mail from you to Chevron's scientist, Ms.

24  McMillen -- I'm sorry.  I'm lost.

25          MS. LITTLEPAGE:  I think I have done that one already.

DAH8CHE2                          Russell – cross

1           THE COURT:  I think it's in the book twice.

2           MS. LITTLEPAGE:  It is.  I will move on.

3   Q.  Do you recall in 2009 you wrote Chevron again talking about

4   chromium VI?

5   A.  I may have.  I don't recall.

6   Q.  Do you recall ever writing to Chevron about chromium VI and

7   whether chromium VI was in the soil in the concession area?

8   A.  I may have.  I do not recall.

9   Q.  Can you tell us what is chromium VI?

10          MR. BRODSKY:  Objection, your Honor.  Relevance.

11          THE COURT:  Just a moment.

12          THE WITNESS:  May I answer, sir?

13          THE COURT:  Just a minute.

14          What is the relevance, Ms. Littlepage?

15          MS. LITTLEPAGE:  I will move on because I am missing

16  the exhibit.

17          THE COURT:  I was getting nervous that we were going

18  to move through the periodic table of the elements.

19  Q.  Did you have any contact with Chevron between 2007 and

20  2009, if you recall?

21          THE COURT:  Folks, I am going to have to take a short

22  recess.  I have to confer with another judge on something else.

23  I will be back.

24          (Recess)

25          THE COURT:  Sorry about the interruption, but it was

DAH8CHE2                    Russell - cross

1    necessary.  Let's continue.

2              You want to address chromium VI?

3              MR. MASTRO:  I just wanted to let the Court know that

4    the parties agreed that Mr. Veiga, having finished his

5    testimony, could attend parts of the rest of the trial.  He

6    will leave if there is anything about the Borja matter.

7              THE COURT:  OK.

8              MR. FRIEDMAN:  Basically, the agreement is we can call

9    him back, like you said, even though he is sitting in the

10   courtroom for part of this.

11             THE COURT:  Yes.  In the circumstances.

12             MR. MASTRO:  If that were to be the case.

13             THE COURT:  Let's move on.  Thank you.

14   BY MS. LITTLEPAGE:

15   Q.  Mr. Russell, I have placed before you, and I put one for

16   the Court, your Honor, on the ledge in front of you.  I found

17   the right document during the break of Defendants' Exhibit 735.

18             Is this an e-mail from you to Chevron's scientist Sara

19   McMillen in May of 2009?

20   A.  Yes.

21             MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

22   735.

23             MR. BRODSKY:  No objection.

24             THE COURT:  Received.

25             (Defendants' Exhibit 735 received in evidence)

DAH8CHE2                    Russell - cross

1    Q.   This e-mail talks to Chevron about chromium VI?

2    A.   That's correct, hexavalent chromium.

3    Q.   What is whatever the word you just said chromium?

4         THE COURT:  Hexavalent.

5    Q.   What is that?

6    A.   That is a form of chromium metal, which is highly ironized.

7    It's a state of matter.

8         THE COURT:  It's applied with up to six electrons, is

9    that right?

10        THE WITNESS:  Yes, sir.

11   Q.   You indicated that you had notes that showed chromium VI

12   left in the ground.  Do those notes relate to the time when you

13   were in Ecuador in the 2003 to 2005 time frame?

14   A.   The only notes that I would have had would have been those

15   which were from one of two sources, either the original Texaco

16   cleanup documents, that would have been the Woodward-Clyde

17   report, and it's massive, and I think it was finished in about

18   '95 or so, or some of the analyses from the laboratory, and

19   there may have been one other source, and I will get to that in

20   a moment.

21        The analysis from the laboratory, and I don't recall

22   whether they had -- those would have been in the public reports

23   that were filed with the court.  And then the third point would

24   be my long experience and background knowing, for example, that

25   at one point back in the 70s, and substantially later, maybe

DAH8CHE2                    Russell - cross

1    even into the 80s, hexavalent chromium is used in solutions

2    like chromic acid as not only a passivator to preserve the

3    metal that would be in the drill pipes, but, also, it is used

4    as a biocide to prevent bacterial growth down hole in the

5    wells.

6    Q.  Do you recall, sir, which notes you were referring to in

7    this e-mail?

8    A.  It would have been one of those three sources, and I cannot

9    tell you.  I know at one point I was researching things for the

10   original plaintiffs' team to determine what might have been

11   used down in the wells, and it's quite possible I came across

12   some indication that hexavalent chromium was used at that time

13   many, many years ago.

14   Q.  What is the significance of chromium VI being left in the

15   ground?

16   A.  Well, chromium VI --

17           MR. BRODSKY:  Objection.  It assumes facts not in

18   evidence.  Relevance.

19           THE COURT:  Sustained.

20   Q.  Mr. Russell, does your e-mail indicate that your notes

21   showed there was significant amounts of chromium VI left in the

22   ground?

23           THE COURT:  Sustained.  It's useful when you're

24   intending to object not just to stand up but to say something,

25   counsel.

DAH8CHE2                    Russell - cross

1        MR. BRODSKY:  Yes, your Honor.

2   Q.  Mr. Russell, did you have an understanding whether there

3   was chromium VI left in the ground in Ecuador?

4   A.  The only way I could have shown that there was chromium VI

5   would be by the direct analysis from the laboratory and those

6   would have been contained, if it was found, that would have

7   been contained in the reports which were filed for the judicial

8   inspections.

9        THE COURT:  So as you're sitting here today, you are

10  speculating, right, about chromium VI?

11       THE WITNESS:  That is correct, your Honor.

12       THE COURT:  Move on, please.

13  Q.  I want to turn to a part of your direct testimony witness

14  statement where it talks about your experience with sampling

15  done in Ecuador.  Can you explain what role you played in the

16  sampling process in Ecuador before you stopped working with the

17  plaintiffs' group?

18  A.  I basically set up, managed, organized, supervised and ran

19  administratively and trained the teams.  I also negotiated the

20  protocols with Chevron, and these are the testing protocols

21  that we were going to use for the sampling.

22  Q.  Your witness statement indicates that part of your role as

23  the chief environmental scientist was to also control a bank

24  account that payments were made from for costs, is that true?

25  A.  That is correct.  The bank account was the Global

DAH8CHE2                    Russell - cross

1    Environmental Operations, Inc. (GEO) Ecuador account.

2    Q.  Was it a bank account set up in Ecuador?

3    A.  No.

4    Q.  Was it an American bank account?

5    A.  I'm sorry?

6    Q.  Was it an American bank account?

7    A.  Yes, it was.

8    Q.  Did you pay some of the costs associated with the sampling

9    from the GEO Ecuador account?

10   A.  Absolutely.  The costs -- the GEO account, because we were

11   moving a lot of money through and down to Ecuador to pay for

12   all of the charges and associated fees and laboratory and

13   whatever for the operations in Ecuador, the account was funded

14   by Kohn Swift, and the account was established as a separate

15   account to keep it away from my company accounts for tax

16   purposes.  So it was an entirely separate account and that's

17   the way we maintained it.

18          THE COURT:  Mr. Russell, it would really help if you

19   would confine your answers to the questions you're asked.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  I think your answer fully answered the

22   question as soon as you finished with the word "absolutely."

23          THE WITNESS:  Thank you.

24   Q.  Sir, did you control payments out of the GEO Ecuador

25   account?

DAH8CHE2                          Russell – cross

1          THE COURT:  That's what he said a minute ago.

2     Q.  Were you the only person who controlled payments out of the

3     GEO Ecuador account?

4     A.  I was instructed by Mr. Donziger to make certain specific

5     payments which we complied with.

6     Q.  And the types of things you were paying for in Ecuador was

7     what, what sort of expenses were you paying for?

8     A.  Public relations, technical support for the testing team,

9     salaries, hotel bills, technical supplies, just about

10    everything.

11    Q.  Did you also pay for the laboratories to do the sample

12    testing?

13    A.  As I recall, there were some payments made.

14    Q.  You indicate on page 11, line 4 of tab 1, which is your

15    written statement -- actually, I will ask another question.

16          If you turn to tab 28, Plaintiff's Exhibit 721.

17    A.  Yes.

18    Q.  Is that an e-mail between you and Mr. Donziger?

19    A.  Yes, it appears to be.

20    Q.  First of all, let's start with, who is Mr. Calmbacher,

21    although he may be Dr. Calmbacher?

22    A.  It is Dr. Calmbacher, and he was an employee of Global

23    Environmental Operations during the period of approximately

24    mid-2004 through about mid-2005.

25    Q.  Had he been an employee of GEO before mid-2004?

DAH8CHE2                    Russell - cross

1    A.  No.

2    Q.  Was he brought on to the GEO team solely to work on the

3    Ecuador project?

4    A.  Yes, because he also spoke Spanish.

5    Q.  Did Mr. Calmbacher get ill when he was in Ecuador?

6    A.  He did.

7    Q.  Because of his illness, was he delayed in preparing some of

8    his reports?

9    A.  Yes, he was.

10   Q.  Was that a concern of yours that there was this delay in

11   getting the signed reports?

12   A.  Yes, because there was a threat by Mr. Donziger that unless

13   Dr. Calmbacher, while he was sick, was able to complete the

14   reports and file them with the court in Ecuador, that he would

15   not be paid for the work.

16   Q.  Was Mr. Donziger facing deadlines in the Ecuadorian court

17   to file reports, as you understand it?

18          MR. BRODSKY:  Objection.

19          THE COURT:  Sustained.

20   Q.  Did you have an understanding why it was important in terms

21   of timing for Mr. Calmbacher to get his reports signed?

22          THE COURT:  Sustained.  The word understanding is not

23   an exception to the hearsay rule.

24   Q.  Did you have any direct contact with Mr. Calmbacher about

25   the timing of his expert reports?

DAH8CHE2                    Russell - cross

1   A.  Yes.

2   Q.  Did you have an understanding as to the deadlines

3   associated with --

4           THE COURT:  Sustained.  Third time.  Three strikes,

5   you're out.  Drop that subject.  Move on.

6           But only in this whole area.  This business of trying

7   to shoehorn in through the witness, who has no personal

8   knowledge of the subject, stuff you would like to get in by

9   asking him whether it is his understanding.  It's my

10  understanding George Washington threw a dollar across the

11  Delaware, but it doesn't prove it.  It's not even admissible.

12  Q.  Mr. Russell, do you have personal understanding of the

13  deadlines, personal knowledge --

14          THE COURT:  That's it.  Move on or the cross is over.

15          Presumably you are going to call Mr. Donziger, and to

16  the extent he has personal knowledge of anything, or his state

17  of mind is an issue, he will tell us all about it.

18  Q.  Mr. Russell, if you turn to tab 1, which is your witness

19  statement.

20  A.  Yes.

21  Q.  Page 6, line 3.

22          THE COURT:  We are talking about Plaintiff's Exhibit

23  3200, right?

24          MS. LITTLEPAGE:  Yes, sir.

25  A.  Yes.

DAH8CHE2                      Russell - cross

1              MS. LITTLEPAGE:  It should be tab 1 in the book if you

2       need to look at it.

3       Q.  Are you with me on page 6, line 3?

4       A.  I am.

5       Q.  It indicates in your direct testimony that you sent the

6       cease and desist letter to Mr. Donziger because you felt that

7       your association with the case was hurting your professional

8       reputation?

9       A.  That's correct.

10      Q.  If you turn to tab 15, Plaintiff's Exhibit 1410.

11      A.  I'm there.

12      Q.  Is that information that is contained on your Web site, the

13      Global Environmental Operations, Inc. Web site?

14      A.  That is.  It is a reprint of an article which was written

15      in 2004 by, I believe, Tom Gibson of a magazine called

16      Progressive Engineering.

17      Q.  Does your Web site even as of today have a copy of that

18      article that was written in the Progressive Engineering

19      magazine?

20      A.  Yes, because I haven't touched my Web site in about four or

21      five years.

22      Q.  If you turn to page 5 of Defendants' Exhibit 1410.

23              MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

24      1410.

25              THE COURT:  Received.

DAH8CHE2                        Russell – cross

1            (Defendants' Exhibit 1410 received in evidence)

2    Q.  Are you on the last page, Mr. Russell?

3    A.  Page 5 of 5?

4    Q.  Yes, sir.

5    A.  Yes.

6    Q.  I want to direct your attention to the paragraph that

7    starts, "A recent job has taken Russell to Ecuador on a project

8    that typifies his overseas work."  Do you see that paragraph?

9    A.  I do.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAHLCHE3                     Russell – cross

1   BY MS. LITTLEPAGE:

2   Q.  And does this article that's on your website discuss your

3   involvement in the Texaco case?

4   A.  It does.  Again, I would point out that this article was

5   written I believe in 2004, so it is not recent, and it was

6   an -- this was the entire article.

7   Q.  And does the article that appears on your website have

8   information about your opinions related to some of the issues

9   in the Ecuador case?

10             THE COURT:  It speaks for itself, doesn't it?

11             THE WITNESS:  If you're referring to this article?

12             THE COURT:  Excuse me, Mr. Russell.

13             Counsel, it speaks for itself, doesn't it?

14             MS. LITTLEPAGE:  Yes, sir.

15             THE COURT:  Move on.

16  Q.  And I note, sir, that you wrote a book that was published

17  in 2011; is that correct?

18  A.  Yes.

19  Q.  And in that book, do you discuss your involvement in the

20  case in Ecuador?

21  A.  I may have.  I don't recall right offhand.

22             MS. LITTLEPAGE:  Those are my questions.  Thank you.

23             THE COURT:  Thank you very much.

24             Mr. Gomez.

25             MR. GOMEZ:  Yes.

DAHLCHE3                      Russell - cross

1   CROSS-EXAMINATION

2   BY MR. GOMEZ:

3   Q.  Good morning, Mr. Russell.

4   A.  Good morning.

5   Q.  Mr. Russell, did you send your cease and desist letter to

6   any of the Ecuadorian plaintiffs directly?

7   A.  I don't recall that I did.  I believe I relied on

8   Mr. Donziger to take care of that because he was running the

9   Ecuadorian plaintiffs' operations.

10  Q.  Did you direct Mr. Donziger to transmit a copy of the

11  letter to the plaintiffs specifically?

12  A.  No, I don't believe I did.

13  Q.  Did you send your cease and desist letter to any of the

14  Ecuadorian plaintiffs' attorneys in Ecuador?

15  A.  No.

16  Q.  Do you know if any Ecuadorian plaintiff was in agreement

17  that Mr. Donziger use your cost estimate over your objection?

18          MR. BRODSKY:  Objection.

19          THE COURT:  Sustained at least as to form.

20  Q.  Do you know if any Ecuadorian plaintiff agreed that

21  Mr. Donziger should use your cost estimate over your objection?

22          MR. BRODSKY:  Same objection.

23          THE COURT:  Same ruling.

24          Did you ever speak to any of the Ecuadorian

25  plaintiffs, Mr. Russell?

DAHLCHE3                    Russell - cross

1           THE WITNESS:  No, sir, I don't believe I have.

2           THE COURT:  Ever meet any of them?

3           THE WITNESS:  Not after 2004.

4           THE COURT:  Ever exchange emails with any of them?

5           THE WITNESS:  Never.

6           THE COURT:  Ever correspond with any of them?

7           THE WITNESS:  No, sir.

8           THE COURT:  Ever communicate with any of them in any

9    way?

10          THE WITNESS:  Not that I recall.

11          THE COURT:  I think we covered it, Mr. Gomez.

12          MR. GOMEZ:  Yes.  Thank you.

13   Q.  Mr. Russell, after you stopped working for the plaintiffs'

14   group, did you ever offer to develop a cost estimate for

15   Chevron regarding the Ecuadorian situation?

16   A.  Yes.

17   Q.  Who did you propose that to?

18          THE COURT:  Haven't we covered that all on

19   Ms. Littlepage's examination, Mr. Gomez?

20          MR. GOMEZ:  I'll move on, your Honor.

21   Q.  Mr. Russell, were you paid for the time you spent reviewing

22   your written declaration in this case?

23   A.  No.

24   Q.  Were you paid for the time you spent preparing to testify

25   in this case?

DAHLCHE3                    Russell - cross

1   A.  No.

2   Q.  And are you being paid by Chevron for the time testifying

3   here yesterday and today?

4   A.  No.

5          MR. GOMEZ:  No further questions, your Honor.

6          THE COURT:  Thank you.

7          Redirect.

8          MR. BRODSKY:  Yes, your Honor.

9   REDIRECT EXAMINATION

10  BY MR. BRODSKY:

11  Q.  Mr. Russell, would you mind turning to in your binder,

12  tab 2, your cost estimate, Plaintiff's Exhibit 2414.

13  A.  Yes, sir.

14  Q.  Do you recall being asked questions by the defense

15  regarding the definitions of open drill pits, open production

16  waste oil pits, and the other items there on the first page?

17  A.  I do.

18  Q.  And giving your answers; do you remember that?

19  A.  Yes.

20  Q.  Do you remember being asked questions and giving answers

21  regarding the appearance of this on a website, Plaintiff's

22  Exhibit 2414?

23  A.  Yes.

24  Q.  Did it say anywhere in your cost estimate how many pits of

25  the approximately 45 on the first page you drove by in a van

DAHLCHE3                    Russell – redirect

1    going 40 to 50 miles per hour?

2    A.  No.

3    Q.  Did it say anywhere in your cost estimate that --

4            THE COURT:  Mr. Brodsky, same rules apply to you.

5            MR. BRODSKY:  Understood, your Honor.

6            THE COURT:  It says what it says.  It's got getting

7    bigger or less.

8            MR. BRODSKY:  Understood.

9    Q.  In the first paragraph of your cost estimate, do you see

10   where it says, and for many reasons Texaco choose not to look

11   at groundwater in its remediation effort.

12           Did you determine that yourself or did someone tell

13   you to assume that?

14   A.  Best of my recollection, I was told that.

15   Q.  And who told you that?

16   A.  Someone from the plaintiffs' party.  I do not recall.  It

17   may have been Mr. Donziger, it may have been someone else.

18   Q.  Let me show you an exhibit.

19           MR. BRODSKY:  May I approach, your Honor?

20           THE COURT:  Yes, you may.

21   Q.  I'm showing you Plaintiff's Exhibit 3201 for

22   identification.  Would you mind, Mr. Russell, taking a moment

23   to look at it, please.

24           For the record, it's a multipage exhibit.  On the

25   first page it says at the top from Dave Russell, December 12,

DAHLCHE3                    Russell – redirect

1   2004, to CBonifaz.  And the Bates number, for the record, is

2   DONZHDD53542 through 548.

3   A.  Okay.

4   Q.  Do you recognize it, Mr. Russell?

5   A.  Yes, I do.

6   Q.  Is that an email exchange you had with Mr. Bonifaz on pages

7   1 and 2 and starting on the second page of the exhibit with

8   Steven Donziger and others?

9   A.  Yes.

10  Q.  Does it relate to your cost estimate, in part?

11  A.  It does.

12          MR. BRODSKY:  Your Honor, we offer it.

13          MS. LITTLEPAGE:  No objection.

14          THE COURT:  It's received.

15          (Plaintiff's Exhibit 3201 received in evidence)

16  Q.  Mr. Russell, turning to the last page of the exhibit, do

17  you recall being asked questions by the defense with respect to

18  Exhibit 733, which is in tab 17 of the defense binder?

19  A.  Okay.

20  Q.  Do you see where it was highlighted for you?

21  A.  Yes.

22  Q.  Let me direct your attention on the last page.  Do you see

23  where it says we don't know the extent -- directing you to that

24  line from we don't have sufficient data through the end of your

25  email.  Could you read that silently to yourself, please.

DAHLCHE3                    Russell - redirect

1          THE COURT:  I'm confused.  Which document are you

2     referring to?

3          MR. BRODSKY:  I apologize, your Honor.  For the

4     record, it's 3201, the last page, it's Bates numbered 53547.

5          THE WITNESS:  Excuse me, counsel, I believe it's page

6     No. 6.

7     Q.  Page 6.  Thank you.  And it's up on your screen if you

8     could scroll down on the screen.  Thank you.

9          MR. BRODSKY:  Could you highlight from we don't have

10    sufficient data through the end, all the way down to the

11    bottom.  Thank you.

12    Q.  Mr. Russell, in addition to this email stating we don't

13    know the extent of the soil contamination or the magnitude or

14    the extent of the groundwater contamination, we cannot provide

15    anyone with a realistic cost estimate.

16         Did you speak to Mr. Donziger regarding the not

17    knowing the extent of the soil contamination or the magnitude

18    or extent of groundwater contamination in 2004?

19    A.  Yes.

20    Q.  What if anything did you tell him about whether you could

21    provide him with a realistic cost estimate in 2004?

22    A.  I believe, to the best of my recollection, that I indicated

23    that we could not provide any sort of accuracy for a cost

24    estimate other than the swag that I had provided in 2003.

25         But the fact was that we were starting to gather data

DAHLCHE3                    Russell - redirect

1  to indicate that the costs appeared to be substantially lower

2  because we weren't finding analytical results consistent with

3  high levels of contamination which may have been in need of

4  remediation.

5  Q.  Mr. Russell, did you tell that to Mr. Donziger on one

6  occasion or more than one occasion in 2004?

7  A.  In more than one occasion.

8  Q.  And directing your attention to that same Exhibit 3201,

9  page 4, down at the bottom of your email you say the

10  differences between an estimate and a guesstimate, right now we

11  are still at the guessing stage.

12          Do you see that?

13  A.  Yes.

14  Q.  Did you, in addition to writing to Mr. Donziger and telling

15  him that, tell that to him in person?

16  A.  Yes.

17  Q.  On one occasion or more than one occasion?

18  A.  More than one occasion.

19  Q.  Directing your attention to page 2 of that same exhibit,

20  3201, at the beginning, you ended it with the estimate

21  guesstimate at the beginning.

22          Did you tell Mr. Donziger -- well, in addition to

23  telling Mr. Donziger a cost estimate is not a trivial matter,

24  do you see that in the top part of your email?

25          THE COURT:  This is in the email dated December 12,

DAHLCHE3                    Russell - redirect

1   2004, 7:32 a.m.  Am I right, counsel?

2            MR. BRODSKY:  Yes.

3   Q.  Did you tell that to Mr. Donziger in person as well?

4   A.  Yes.

5   Q.  And turning to the first page of that email chain, do you

6   see the email on the first page, Plaintiff's Exhibit 3201,

7   5:34 p.m., 12/12/2004, CBonifaz wrote.

8            Do you see that?

9   A.  Yes.

10  Q.  Now, in this particular document, Mr. Russell, can you tell

11  who else, who else received this email from Mr. Bonifaz?  From

12  that first page.

13  A.  From the first page I do not know who received -- this is

14  the material on page 1 of 7; is that correct?

15  Q.  That's correct, if we can go to the first page.

16  A.  It says, where it starts 5:34 p.m.?

17  Q.  Right.  Other than yourself, Mr. Russell, do you know

18  anybody else who received this email, whether or not somebody

19  else received it?

20  A.  I do not know directly.  However.

21  Q.  I'm not going to ask you to speculate, Mr. Russell.

22  A.  Okay.

23  Q.  If you look at the first page, No. 2, do you see that?

24  Would you please read that silently to yourself under

25  5:34 p.m., CBonifaz wrote.

DAHLCHE3                    Russell - redirect

1   A.  Yes.  All the numbers about billions of dollars that get

2   passed around are purely for PR -- meaning public relations --

3   purposes since no one can or has made an accurate estimate of

4   the total costs.

5   Q.  Did you have a conversation with Mr. Donziger in 2003

6   regarding the purpose for your estimate?

7   A.  Yes.  Several.

8   Q.  And was it consistent or inconsistent with what's stated

9   there regarding the billions of dollars getting passed around

10  for purely for PR purposes?

11          THE COURT:  Sustained as to form.

12  Q.  What did Mr. Donziger tell you in 2003 with respect to your

13  cost estimate and PR?

14          THE COURT:  If anything.

15  A.  I believe that I made in my written declaration, I believe

16  that I said and indicated that Mr. Donziger was intending to

17  use this cost estimate to get Chevron's attention and to

18  attempt to get them to settle the case.

19          MR. BRODSKY:  May I approach, your Honor?

20          THE COURT:  You may.

21  Q.  Showing you, Mr. Russell, Plaintiff's Exhibit 3203.  Take a

22  moment to look at that, please.

23  A.  Thank you.

24          MR. BRODSKY:  For the record, at the top it says from

25  David Russell, re nothing personal but, with a Bates number

DAHLCHE3                     Russell - redirect

1    DLR3558 through 3559 and it contains -- first two pages and the

2    last two pages are the same.

3    Q.  If I could direct your attention, Mr. Russell, to the last

4    two pages, the part that's easier to read.

5    A.  Yes, sir.

6    Q.  Do you recognize this email exchange?

7    A.  Very definitely.

8    Q.  And who is it between?

9    A.  It was between me and Steve Donziger, with a blind carbon

10   copy to my attorney at that point who was Sandra Lekan, Esq.,

11   and she had her own Lekan law firm.

12           MR. BRODSKY:  We offer it, your Honor.

13           MS. LITTLEPAGE:  No objection.

14           THE COURT:  Received.

15           (Plaintiff's Exhibit 3203 received in evidence)

16   Q.  Turning to the last page of the email, do you see where it

17   says, Dave, you need to chill?

18   A.  I do.

19   Q.  And the part 2, in addition to writing to you, if you want

20   to initiate a collection action, feel free.  If you do that,

21   you will probably never get paid voluntarily by Joe, you will

22   incur legal costs, and the defense will be nonperformance.

23           Did Mr. Donziger ever say that to you in person?

24   A.  Yes.

25   Q.  Do you recall being asked questions about -- if you turn to

DAHLCHE3                    Russell - redirect

1   tab 3 in your binder -- this Wall Street Journal article,

2   Defense Exhibit 1405, dated October 30, 2003?

3   A.   Okay.

4   Q.   Do you remember being asked questions and --

5   A.   Yes.

6   Q.   -- about this and giving answers?

7   A.   Yes.

8           MR. BRODSKY:  May I approach, your Honor?

9           THE COURT:  Sorry?

10          MR. BRODSKY:  May I approach?

11          THE COURT:  Yes.

12  Q.   I'm showing you Plaintiff's Exhibit 495 for identification.

13  Would you take a moment to look at that.

14          Mr. Russell, and if I could direct your attention to

15  the second page, first full paragraph starting with meanwhile.

16  A.   Yes.

17          MS. LITTLEPAGE:  Judge, we object to the admission of

18  this document.

19          THE COURT:  It hasn't been offered yet.

20          MS. LITTLEPAGE:  Okay.

21  Q.   Do you see that, Mr. Russell?

22  A.   I do.

23  Q.   Is this an interview you gave in 2007 to the same newspaper

24  that you gave an interview to in Defendant's Exhibit 1405 in

25  2003?

DAHLCHE3                    Russell - redirect

1           THE COURT:  I'm sorry, is the question whether the

2     Wall Street Journal is the Wall Street Journal?

3     Q.  Did you give this interview, Mr. Russell, in 2007 and give

4     that answer?

5     A.  Yes, I did, in 2007.

6     Q.  Does it relate to your cost estimate?

7     A.  It does.

8           MR. BRODSKY:  Your Honor, we offer 495.

9           MS. LITTLEPAGE:  Judge, are they offering the entire

10    document or just that paragraph Mr. Russell has referenced?

11          THE COURT:  What's the answer?

12          MR. BRODSKY:  That paragraph, your Honor, would be

13    sufficient for us.

14          MS. LITTLEPAGE:  With those redactions, no objection.

15          THE COURT:  Okay.  So the first full paragraph on the

16    second page of Plaintiff's Exhibit 495 is received.  The rest

17    of the exhibit is not.

18          (Plaintiff's Exhibit 495, redacted received in

19    evidence)

20    Q.  Mr. Russell, do you recall being asked with respect to the

21    Defense Exhibit 1405 in tab 3 of the binder questions about

22    describing the area in the concession, former concession area

23    as larger, quote, size wise, larger than the Chernobyl

24    disaster?

25    A.  Yes.

DAHLCHE3                    Russell – redirect

1   Q.  And do you remember giving your answers?

2   A.  Yes.

3   Q.  Were your answers in October 30, 2003 -- was the

4   information you provided in this article, October 2003, based

5   on statements to you by Mr. Donziger or your own analysis?

6   A.  They were based on my own analysis because I had been over

7   in the area close to and had done some study on Chernobyl.

8   Q.  Did you ever visit Chernobyl?

9   A.  No.  I did a desk study on cleanup of Chernobyl soils for

10  the U.S. Trade and Development agency, probably 1998, maybe

11  '99.

12  Q.  When you said size wise to the reporter, were you comparing

13  the contamination levels or the physical size of a particular

14  area or something else?

15  A.  Physical size.

16  Q.  And by physical size, you meant nothing to do with the

17  actual contamination?

18  A.  That's correct.

19          THE COURT:  So is it accurate to understand you as

20  saying that at that time your understanding of the area in

21  question in Ecuador in terms of square miles or hectares or

22  acres was comparable to the size of the polluted area at

23  Chernobyl as you then understood it; is that what you're

24  saying?

25          THE WITNESS:  Yes, sir.

DAHLCHE3                    Russell – redirect

1          THE COURT:  All right.  Go ahead.

2     Q.  Did there come a time in 2004 when you spoke to

3     Mr. Donziger about using the word Chernobyl in connection with

4     the former concession area in Ecuador?

5     A.  Yes.

6     Q.  Did you speak to him about that analogy?

7     A.  Yes.

8     Q.  What did you tell him?

9     A.  Told him to drop it.

10    Q.  Did you give him a reason?

11    A.  The contamination levels that we were finding at that

12    point -- and I believe it was late 2004 -- were not a good

13    comparison to the situation at Chernobyl.

14    Q.  And they were not a good comparison because?  Why?

15    A.  No, I didn't say cost.

16    Q.  I apologize.  Did you give him a reason why they were not a

17    good comparison?

18    A.  The types of contamination were different and the levels of

19    contamination and harm would have been different.  One was a

20    radioactive source; the other one was chemical exposure.

21         MR. BRODSKY:  May I approach, your Honor?

22    Q.  Showing you a one-page document, Mr. Russell, would you

23    take a moment to look at it.  It's Plaintiff's Exhibit 705 for

24    identification.

25         It's for identification purposes an email from Dave

DAHLCHE3                          Russell – redirect

1   Russell sent Thursday, November 4, 2004, 6:12 a.m., to a number

2   of people, including SDonziger@yahoo.com, with the Bates number

3   DONZHDD54028.

4           Do you see that, Mr. Russell?

5   A.  I do.

6   Q.  Your email references a meeting of senior lawyers

7   representing the litigation.

8           Where did that meeting take place?

9   A.  It took place in New York.

10  Q.  In Manhattan?

11  A.  Best of my recollection, yes.

12  Q.  Who suggested -- was Mr. Donziger present at the meeting?

13  A.  Yes.

14  Q.  And what did you mean when you said that testing for -- the

15  senior lawyers representing the litigation which suggested that

16  the analysis for BTEX and GRO would be counterproductive to the

17  case?

18  A.  The lawyers present at the meeting as I recall were

19  Cristobal Bonifaz, Steven Donziger, and Alberto Wray.

20          And the substance of this message was that the data

21  that we were finding from some of the analysis that we are

22  performing were much more indicative and the fact that we're

23  finding BTEX, which is benzene, toluene, ethylbenzene, and

24  xylene; and GRO, which is gasoline range organics; are much

25  more indicative of contamination from Petroecuador rather than

DAHLCHE3                    Russell - redirect

1    from Texaco because these compounds are volatile and degrade

2    quickly in hot, wet, warm environment such as in the jungle.

3    Q.  After this meeting, did they -- did you do any further

4    testing for BTEX and GRO in the former concession area?

5    A.  I don't believe we did.  That's why we switched to total

6    petroleum hydrocarbons.

7    Q.  Mr. Russell, you were asked some questions regarding

8    Dr. Calmbacher; do you remember those questions --

9    A.  I do.

10   Q.  -- on your cross-examination and your answers?

11   A.  Yes, sir.

12   Q.  And you were shown, if you would turn to tab 28 in your

13   binder, defense binder, Plaintiff's Exhibit 723, you were shown

14   this document.

15        Do you remember being shown this document?

16   A.  Yes, sir.

17        MR. BRODSKY:  May I approach, your Honor?

18        THE COURT:  You may.

19   Q.  I'm showing you, Mr. Russell, one-page document,

20   Plaintiff's Exhibit 3206 for identification.  Would you take a

21   moment to look at that.  At the top it says from Dave Russell,

22   sent Monday, January 31, 2005, to Steven Donziger, subject,

23   travel.

24        Do you see that?

25   A.  I do.

DAHLCHE3                    Russell - redirect

1  Q.   Is this an email that you sent to Mr. Donziger in

2  January 2005?

3  A.   It was.

4  Q.   Does it relate to Dr. Calmbacher's reports?

5  A.   It does.

6            MR. BRODSKY:  We offer 3206, your Honor.

7            MS. LITTLEPAGE:  No objection.

8            THE COURT:  Received.

9            (Plaintiff's Exhibit 3206 received in evidence)

10 Q.   Mr. Russell, where you say at the end, on balance, just as

11 I won't let you put words in my mouth, his professional

12 certification is hanging on the line with this one; what did

13 you mean when you said his professional certification is

14 hanging on the line with this one?

15 A.   When either of -- or let me correct that.  When a certified

16 industrial hygienist stamps and certifies a report, it is his

17 professional reputation and perhaps his certification or

18 license to call himself a certified professional hygienist,

19 which is a valuable commodity, in lieu of falsifying reports or

20 anything like that, it's just not done.

21            And so the import and thrust of that would be to say

22 this is very important, leave it alone, leave it exactly as

23 filed because you could create liability for Charles Calmbacher

24 if you altered this report.

25 Q.   Prior to talking about his professional certification, what

DAHLCHE3                    Russell – redirect

1  did you mean when you said just as I won't let you put words in

2  my mouth to Mr. Donziger?

3  A.   There were other instances where I communicated in writing

4  with Mr. Donziger where he had taken words that I had written

5  to him and used them in a publicity release but they went

6  substantially beyond what I had either stated or implied, and I

7  was not tremendously trusting that if not left –– if not

8  reminded that the report would go in, the reports would go in

9  as submitted.

10          MR. BRODSKY:  Your Honor, may I approach?

11          THE COURT:  You may.

12  Q.   Showing you, Mr. Russell, one-page document marked

13  Plaintiff's Exhibit 3208 for identification.

14          MR. BRODSKY:  Your Honor, we offer –– I forgot to

15  offer the last exhibit, I offer it.

16          MS. LITTLEPAGE:  No objection.

17          MR. BRODSKY:  3206.

18          THE COURT:  3206 was received.

19          MR. BRODSKY:  Thank you, your Honor.

20          THE COURT:  Now you have 3208.

21          MR. BRODSKY:  Yes.

22  Q.   One-page email.  At the top it says from Dave Russell,

23  dated October 12, 2004, to Steve Donziger, copied

24  CCalmbacher@earthlink.net.

25          Do you recognize this, Mr. Russell?

DAHLCHE3                    Russell - redirect

1    A.  I do.

2    Q.  Is this an email exchange you had with Mr. Donziger in

3    October 2004?

4    A.  Yes.

5    Q.  Does it relate to the subject line there, misquoting me is

6    not a good idea?

7    A.  It is.

8            MR. BRODSKY:  Your Honor, we offer 3208.

9            MS. LITTLEPAGE:  No objection.

10           THE COURT:  Received.

11           (Plaintiff's Exhibit 3208 received in evidence)

12   Q.  Is this an exhibit, Mr. Russell, of Mr. Donziger misquoting

13   a conclusion you've made in connection with your work in Lago

14   Agrio?

15           MS. LITTLEPAGE:  Objection, leading.

16           THE COURT:  Rephrase it.

17   Q.  Mr. Donziger, excuse me, Mr. Russell, where you say, Steve,

18   I must protest; do you see that?

19   A.  I do.

20   Q.  What were you protesting?

21   A.  I was protesting the fact in the -- at the end of the I

22   guess it's the second paragraph, I checked back and found that

23   my memo to you had been rewritten to strengthen and make a

24   conclusion I never made, and those words are in highlights or

25   bold.

DAHLCHE3                          Russell - redirect

1    Q.  I'm sorry, did you finish?

2    A.  Yes.

3    Q.  What conclusion did Mr. Donziger reach that you had not

4    reached?

5    A.  Mr. Donziger represented that there was evil intent in the

6    mishandling of samples through the process of shipping the

7    samples into a laboratory in the United States.  I did not

8    conclude that.  I could not conclude that because the samples

9    were inspected by U.S. Department of Agriculture personnel.

10   Q.  After you sent this email to Mr. Donziger in October 2004,

11   did Mr. Donziger respond?

12   A.  I don't recall a response.

13   Q.  Finally, Mr. Russell, you testified during

14   cross-examination in part, quote, I had become thoroughly

15   disillusioned with my own cost estimates and had indicated that

16   and was basically no longer working for the original

17   plaintiffs.

18          Do you remember testifying to that --

19   A.  I do.

20   Q.  -- on cross-examination?

21   A.  Yes.

22   Q.  What did you mean when you said you had become thoroughly

23   disillusioned with your own cost estimate?

24   A.  The amount of data that I saw had indicated that it did not

25   square up or did not -- it was not representative of the

DAHLCHE3                          Russell - redirect

1    assumptions that I made back a year earlier or more than a year

2    earlier by that point of the levels of contamination we might

3    expect which would be in need of remediation.  So the

4    contamination was not there.

5    Q.  And you said, went on to say and had indicated that.

6             To whom had you indicated that information?

7    A.  I had indicated that to Mr. Donziger, to Alberto Wray, to

8    Cristobal Bonifaz.

9    Q.  And what year was the first time you indicated to

10   Mr. Donziger that information?

11   A.  2004.

12   Q.  On one occasion or more than one occasion did you tell

13   Mr. Donziger that?

14   A.  More than one occasion.  It would have been after we

15   started getting some of the analytical data back from the

16   laboratory.

17   Q.  You were asked questions, do you recall, Mr. Russell, being

18   asked questions and giving answers regarding the use of your

19   cost estimate following your cease and desist letter going out?

20   A.  I do.

21   Q.  Would you turn to tab 23 in the defense binder, Plaintiff's

22   Exhibit 485.

23   A.  Yes.

24   Q.  And by March 20, 2007, the date of this press release, how

25   many occasions had you written to Mr. Donziger and told him not

DAHLCHE3                    Russell - redirect

1   to use your cost estimate?

2   A.  As I recall, at least two or three.

3   Q.  And on how many occasions, approximately, had you told him

4   in person or by telephone not to use your cost estimate?

5   A.  Again, two or three.

6   Q.  And if you turn to the second page, the title, do you see

7   it highlighted, 6 billion, on the first page?

8   A.  I do.

9   Q.  Do you see that, tab 23?

10  A.  I do.

11  Q.  If you turn to the second page, the second full paragraph,

12  if we can blow that up, the only independent damage assessment,

13  do you see that?

14          Would you read that silently to yourself, that

15  paragraph.

16  A.  I'm familiar with that.

17  Q.  Is that your company, the U.S. firm Global Environmental

18  Operations?

19  A.  It is.

20  Q.  And do you recall being asked questions and giving answers

21  regarding whether there was some other cost estimate,

22  independent cost estimate out there; do you remember that on

23  your cross-examination?

24  A.  I do, and as I recall the question was do I know

25  Mr. Penafiel, Fausto Penafiel.

DAHLCHE3                    Russell – redirect

1    Q.  Do you see where it says the only independent damage

2    estimate; do you see that?

3    A.  I do.

4            MR. BRODSKY:  No further questions.

5            THE COURT:  All right.  Any redirect?  Recross?

6            MS. LITTLEPAGE:  Yes, sir.  Judge, may I ask two

7    questions.

8            THE COURT:  Yeah, let's make it real recross.

9    RECROSS EXAMINATION

10   BY MS. LITTLEPAGE:

11   Q.  Mr. Russell, let me ask this question.

12           Did you ever get to see the data, the sampling data of

13   Chevron's experts on the sites in Ecuador?

14   A.  No.

15   Q.  And the last time you saw any data of sampling data would

16   have been 2005 or previously?

17   A.  Yes, aside from the Alexis data.

18           MS. LITTLEPAGE:  Thank you.

19           THE COURT:  Thank you.

20           Mr. Gomez, anything?

21           MR. GOMEZ:  Nothing, your Honor.

22           THE COURT:  I have a couple questions before you

23   leave, Mr. Russell.

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Could somebody please provide Mr. Russell

DAHLCHE3                    Russell – recross

1   with Plaintiff's Exhibit 3206 or tell him where in the binder

2   to find it.

3           Do you have it?

4           MR. BRODSKY:  Sorry, your Honor.  I'm just looking for

5   it.  3206.

6           THE WITNESS:  Yes.

7           THE COURT:  It's something you handed up, Mr. Brodsky.

8           MR. BRODSKY:  Yes, your Honor, I have it.  Sorry.

9   BY THE COURT:

10  Q.  Do you have it, Mr. Russell?

11  A.  Yes, sir.

12  Q.  It refers to XDrive.

13  A.  Yes.

14  Q.  Do you know what XDrive was or is?

15  A.  Yes.  It is -- it was a method that we used so that we

16  could transfer reports and files back and forth when they were

17  larger than what could be transmitted by email.  The current

18  equivalent of that would be using the cloud to or I use Drop

19  Box.  So it's a way that I can transfer large files back and

20  forth and other people can look at them and edit them and so

21  on.

22  Q.  You're referring to digital files, I take it?

23  A.  Digital files, yes, sir.

24  Q.  And was XDrive some external service provider or was it --

25  A.  It was an external service provider.

DAHLCHE3                    Russell

1   Q.   And do you know where it was located?

2   A.   I do not.

3   Q.   And what was the practice that you and others involved on

4   the Lago Agrio plaintiffs side used with respect to XDrive

5   during the time that you were involved in that?

6   A.   For the reports, as I recall, the reports would be written

7   either in Lago Agrio or in -- Chuck would have written them in

8   Atlanta, and they would be perhaps edited or reviewed by Chuck

9   for final content and conclusions and recommendations and so on

10  for the drive and then printed in, once they were finalized,

11  then they were printed down in Lago Agrio on different size

12  paper so they had a little bit of a -- little bit of different

13  formatting, but not much.

14  Q.   And do you know who on the Lago Agrio side of the case had

15  access to the XDrive in the period you were involved?

16  A.   Edison, the team which was assembling the reports in

17  Alberto Wray's office, and Steven Donziger had them, had access

18  as well.

19  Q.   And did he have access from only in Ecuador or elsewhere?

20  A.   From elsewhere.

21  Q.   Did he have --

22  A.   From wherever.  It's the type of service that you can just

23  sign in to this and you can pull up the files.  It's password

24  protected and so on.

25  Q.   Now, on January 31, 2005, the date of Plaintiff's

DAHLCHE3                    Russell

1    Exhibit 3206, did you know where Mr. Donziger physically was?

2    A.  No, I do not.

3    Q.  Do you know whether he was in Ecuador or in the United

4    States?

5    A.  I believe he was in the United States.

6    Q.  And the basis for your belief is what?

7    A.  A discussion, the initial line, I'm probably leaving here

8    in about an hour to go to the airport to get a ticket for

9    Miami.  I'll drop the stuff for Edison at DHL so that he will

10   have it on Tuesday.

11   Q.  So you were sending him a package by DHL?

12   A.  I was sending him a package of signed sheets that had

13   Chuck's initials and that and a final sheet, and we were

14   relying on them to take the material off the XDrive and

15   transcribe it accurately and completely and not to change any

16   of the conclusions.

17   Q.  And was the contemplation that then the signature pages you

18   were sending by DHL would be affixed to whatever was printed

19   off the XDrive?

20   A.  Yes, sir.

21   Q.  And did you discuss that with Mr. Donziger?

22   A.  Yes, sir.  That was standard operating procedure.

23   Q.  And did you use DHL to -- when you were in Ecuador to

24   transmit documents to any place except the United States?

25   A.  No, sir.

DAHLCHE3                    Russell

1   Q.  Did you ever use DHL to transmit documents to Mr. Donziger

2   anywhere other than New York?

3   A.  No, sir, I don't believe I did.

4   Q.  And there was one other thing I wanted to ask you about.

5            THE COURT:  Could we give the witness Plaintiff's

6   Exhibit 705, which was referred to in the last bit of

7   examination.

8            THE WITNESS:  Yes, sir.  I have it.

9   Q.  Now, first of all, remind me, please, what the acronyms

10  mean.  BTEX is benzene, toluene, and what else?

11  A.  Ethylbenzene, E-T-H-Y-L-B-E-N-Z-E-N-E.

12  Q.  Yes.

13  A.  And the last one is xylene, X-Y-L-E-N-E.

14  Q.  And those are all organic hydrocarbons?

15  A.  They are organic hydrocarbons.  They are classified as

16  aromatic hydrocarbons.  They also have some immediate health

17  effects on exposure.  For example, benzene is a carcinogen.

18  Toluene is it used to be used in paints and it is slightly

19  narcotic.

20  Q.  I think you've gone beyond the question.

21  A.  Sorry.

22  Q.  Quite sufficient.  And GRO?

23  A.  Gasoline range organics.

24  Q.  Okay.  Now, you referred to a meeting and you told us, as I

25  remember, that the meeting you referred to in Plaintiff's 705

DAHLCHE3                    Russell

1    took place in Manhattan.  Is that right?

2    A.  Yes, sir.

3    Q.  And you told us the names of certain lawyers who were

4    present.  Were you present at the meeting as well?

5    A.  For part of it.

6    Q.  And did you say anything at the meeting to whoever else was

7    there about analyses for BTEX and GRO?

8    A.  I said that the analyses that we were doing on the various

9    sites that we had information on at the time did not show any

10   of these compounds at the types of levels which would be

11   indicative of any sort of health effects.

12        And I went further to qualify that with regard to the

13   information that is in the memo because the presence of these

14   compounds, if they were found -- I'm sorry, the presence -- we

15   were finding these compounds.  There we go.  I'm sorry.  I was

16   confused.

17        We found BTEX and GRO, and that was indicative of

18   recent contamination rather than contamination which would have

19   been ten or perhaps 20 years old from Texaco.

20   Q.  And did you make any suggestion in light of that?

21   A.  I don't recall making a suggestion.  But the -- in the

22   ensuing discussion, the recommendation came down, well, then

23   stop analyzing for this.

24   Q.  And who made that recommendation?

25   A.  Some of the people sitting around the table which would

DAHLCHE3                    Russell

1    have been Bonifaz, Donziger, Kohn, and Alberto Wray.

2    Q.  And did you make any change in what you were doing in

3    Ecuador in terms of looking at samples in consequence of what

4    was said at that meeting to you?

5    A.  Yes, sir.  Those were taken as instructions.

6    Q.  And what change occurred?

7    A.  We stopped analyzing for those compounds.  We started

8    instead substituting a less reliable measure which was total

9    petroleum hydrocarbons.

10   Q.  And are there various methods to analyze samples for TPH?

11   A.  Yes.  There are several different methods that one can use.

12   The analytical problem with TPH is that TPH methods currently

13   in use can show up naturally occurring compounds as an

14   indication of petroleum, so give you a false positive.

15   Q.  Did you select for the further work in Ecuador on behalf of

16   the Ecuadorian plaintiffs a particular TPH method or did you

17   use more than one?

18   A.  I believe we used whatever the laboratory had available,

19   and it may have been the EPA method that was recommended.  I

20   believe it was the infrared method, but I can't recall right at

21   the moment.

22   Q.  Did any of the methods that subsequently were used while

23   you were supervising this activity distinguish between TPH

24   attributable to recent activity on the site as compared to

25   activity a considerable period in the past?

DAHLCHE3                    Russell

1   A.   The TPH test would not be able to discriminate, make that

2   discrimination, sir.

3             THE COURT:  All right.  Thank you.

4             Does counsel on either side wish to examine further in

5   light of my questions?

6             MR. BRODSKY:  No, your Honor.

7             MS. LITTLEPAGE:  No, your Honor.

8             MR. GOMEZ:  No, your Honor.

9             THE COURT:  All right.  We'll break for lunch.

10  2 o'clock.

11            (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAH8CHE4                    McMillen – direct

                        AFTERNOON SESSION

1                         2:00 p.m.

2          THE COURT:  OK.  Next witness, please.

3          MS. NEUMAN:  Good afternoon, your Honor.  Chevron

4    calls Sara McMillen to the stand.

5     SARA McMILLEN,

6         called as a witness by the plaintiff,

7         having been duly sworn, testified as follows:

8          THE DEPUTY CLERK:  State your name and spell your last

9    name for the record.

10         THE WITNESS:  My name is Sara McMillen,

11   M-C-M-I-L-L-E-N.

12         THE COURT:  Proceed, Ms. Neuman.

13   DIRECT EXAMINATION

14   BY MS. NEUMAN:

15   Q.  Good afternoon, Ms. McMillen.

16         MS. NEUMAN:  Your Honor, may I approach the witness?

17         THE COURT:  You may.

18   Q.  Ms. McMillen, do you have Exhibit 3300 in front of you,

19   plaintiff's exhibit?

20   A.  Yes.

21   Q.  Do you recognize that document?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is my direct testimony.

DAH8CHE4                         McMillen - direct

1   Q.  When was the last time you reviewed your direct testimony?

2   A.  This morning.

3   Q.  Have you made any changes to your testimony since it was

4   signed originally?

5   A.  Yes.  I made some changes this morning.

6   Q.  To what paragraph did you make a change?

7   A.  The first change is in paragraph 22.  I deleted "court

8   appointed."

9   Q.  Did you initial that change?

10  A.  I did.

11  Q.  Why did you make that change?

12  A.  Because I wasn't certain whether or not the court appointed

13  the expert.  I just wasn't sure about the civil procedure that

14  was involved there.

15  Q.  Did you make any other changes?

16  A.  Yes.  I made two other changes.

17  Q.  What paragraph is your next change in?

18  A.  It's in paragraph 71.

19  Q.  What did you change there?

20  A.  I deleted "a pit of fresh," and I deleted "sole."

21  Q.  Why did you make those changes?

22  A.  I made those changes because, first of all, the pit is not

23  composed just of crude oil, and also because I wasn't there at

24  the site when it happened.  I didn't feel like, from a

25  scientific point of view, I could say whether or not it was

DAH8CHE4                       McMillen - direct

1   fresh.  And I crossed out sole because I believe there are two

2   pits at this site, one of which has already been remediated by

3   Petroecuador.

4   Q.  Are there any other changes to your direct testimony?

5   A.  No.

6   Q.  Are the changes that you just described for me noted in

7   Exhibit 3300 that you have in front of you?

8   A.  Yes, they are.

9              MS. NEUMAN:  We move the admission of Exhibit 3300,

10  your Honor.

11             THE COURT:  Received on the same basis as the other

12  statements.

13             (Plaintiff's Exhibit 3300 received in evidence)

14             MS. NEUMAN:  Also, on the basis of Ms. McMillen's

15  direct testimony, the plaintiffs would move the admission of

16  the exhibits cited therein.  I have them on an exhibit that's

17  marked 3300A, or would you prefer that I read each one into the

18  record?

19             THE COURT:  How many are there?

20             MS. NEUMAN:  It's close to 35.

21             THE COURT:  Let's just mark 3300A for identification

22  and the exhibits listed thereon are received subject to the

23  same procedure we have been using.

24             MS. NEUMAN:  Thank you, your Honor.  Pass the witness.

25             THE COURT:  Thank you.

DAH8CHE4

1           Cross-examination.

2           MS. LITTLEPAGE:  Judge, preliminarily, can I deal with

3    some of the objections I have to Ms. McMillen's declaration or

4    witness statement?  We will be filing detailed objections on

5    the statement, but there are a couple of sections that I would

6    like to have the Court look at first and see if there is an

7    issue that I would need to cross-examine on.

8           THE COURT:  Yes.

9           MS. LITTLEPAGE:  The first is page 9, paragraph 19.

10          THE COURT:  What is the problem?

11          MS. LITTLEPAGE:  Judge, there is an explanation on

12   paragraph 19 from Ms. McMillen about signatures of Dr.

13   Calmbacher.  She is obviously not an expert in handwriting

14   analysis.  She is not an expert in signature analysis.  She has

15   no personal knowledge of Mr. Calmbacher's signature.  She is

16   not even opining which one she thinks is his signature.  So we

17   would object on lack of foundation, lack of expertise.

18          THE COURT:  It's of course possible to take a great

19   deal of time with this, but let's try not to.

20          It is obvious to the naked eye that the three

21   signatures are inconsistent.  You don't have to be a

22   handwriting expert to know that.  She offers no opinion as to

23   which, if any, of them is genuine.  And the only opinion she

24   offers is that she is led to believe by the inconsistency that

25   he had not signed all of them personally.

DAH8CHE4

1           Now, I don't see that there is anything to

2   cross-examine about, frankly, but maybe you can enlighten me.

3           MS. LITTLEPAGE:  I will take the Court's guidance and

4   not cross-examine on that issue.

5           THE COURT:  I was offering you observations.  It's

6   your call.

7           MS. LITTLEPAGE:  May I proceed?

8           THE COURT:  Yes.  Go ahead.

9           MS. LITTLEPAGE:  Judge, may I approach?

10          THE COURT:  There were no other objections that you

11  wanted to raise?

12          MS. LITTLEPAGE:  We have objections on almost every

13  line of Ms. McMillen's testimony, but according to the Court's

14  procedure, we will file those.

15          THE COURT:  Fine.

16  CROSS-EXAMINATION

17  BY MS. LITTLEPAGE:

18  Q.  Ms. McMillen, do you have a three-ring binder in front of

19  you that has your name on it?

20  A.  Yes.

21  Q.  Inside should be documents under tabs, and I will try and

22  direct you to the tab I am going to talk about.  And the

23  documents should be highlighted, but if you lose me along the

24  way, just tell me and I will try and show you what I am talking

25  about.

1   A.  OK.

2   Q.  Can you tell me first, tab 1 is the direct testimony of

3   Sara McMillen, Plaintiff's Exhibit 3300.  Can you tell me how

4   that declaration was prepared?

5   A.  Yes.  I dictated my testimony to an attorney who asked me

6   questions for clarification and they transcribed it, and then I

7   reviewed it and edited it as needed.

8            THE COURT:  Just for the record, this tab 1 does not

9   include the three changes the witness testified she made this

10  morning.  I am just noting it.

11           What is it, Ms. Neuman?

12           MS. NEUMAN:  I am just noticing that tab 1 has

13  highlighting and handwriting that's not Ms. McMillen's.

14           THE COURT:  Obviously, counsel has been using the

15  highlighting all along.  We all understand that.  And somebody

16  has written in line numbers, which we have been dealing with

17  all morning.  Is there anything else?

18           MS. NEUMAN:  Yes.  On page 9 of mine at least, there

19  is some other handwritten notes.  I am not sure if I should tab

20  them or not.  They appear to be objections in the margin.

21           MS. LITTLEPAGE:  She is correct.  My notes on this

22  specific witness statement made it into this book.  I don't

23  think it makes any difference, but if the Court thinks it makes

24  a difference, I can hand up the new version.

25           THE COURT:  We just are all going to ignore them.

DAH8CHE4                         McMillen - cross

1   Let's go on.

2   BY MS. LITTLEPAGE:

3   Q.  I am sorry.  We interrupted you.  You said you had dictated

4   your testimony.  How long did it take?

5   A.  I spent, I think, about two and a half days dictating.

6   Q.  Was the attorney in the room with you or were you dictating

7   over the phone?

8   A.  In the room.

9   Q.  When did you spend those two and a half days?

10  A.  It was a couple of weeks ago.  I can't remember the exact

11  dates.

12  Q.  Can you give us a week?  Was it in this week, was it over

13  the weekend, anything that would identify when you started the

14  declaration?

15  A.  I think it was the week before last.

16  Q.  Then how did it come to be printed for you to sign it?

17  A.  It was delivered to me by a courier.

18  Q.  Delivered where?

19  A.  To my home.

20  Q.  Where is your home?

21          THE COURT:  Let's not.

22          MS. LITTLEPAGE:  I don't want her address.  Whether

23  it's in New York.

24  Q.  Do you live in New York?

25  A.  No.  I live in California.

DAH8CHE4                        McMillen - cross

1   Q.  Did you make edits or revisions to what was delivered to

2   you?

3   A.  Yes, I did.

4   Q.  Then how were those edits and revisions incorporated into

5   what you finally signed?

6   A.  I spoke with the attorney by phone and we talked through

7   the edits, and then I believe it was sent to me via e-mail and

8   I printed it.

9   Q.  When did you arrive in New York to prepare for your

10  testimony today?

11  A.  I arrived last Saturday.

12  Q.  How much time have you spent working with the attorney to

13  prepare for your testimony?

14  A.  I spent sometime Saturday evening, Sunday, and sometime on

15  Monday.

16  Q.  Have you met with the lawyers at all since Monday?

17  A.  Yes.

18  Q.  How long did you meet with the lawyers on Tuesday?

19  A.  I'm not sure what you mean by meet with.  I was here for

20  opening statements.  So the attorneys were here.  So it wasn't

21  like a meeting about my testimony.

22          THE COURT:  Ms. Littlepage, I assume always that party

23  witnesses have met with counsel before testifying, and for

24  whatever value that has in assessing credibility, you can take

25  it as a given.  Could we please get on to substance here?

1              MS. LITTLEPAGE:  Yes, sir.

2     Q.  I believe your title was lead scientist for Chevron in the

3     Ecuadorian case.  Would that be true?

4     A.  That was not my title.  I was the lead scientist, but

5     that's not a title per se.

6     Q.  Can you tell us what was your responsibilities or role as

7     the lead scientist for the Ecuadorian case?

8     A.  Yes.  I was asked by the legal team to help them on

9     scientific issues in the case.  I helped identify potential

10    experts who could work with Chevron.  I reviewed most of the

11    documents that were submitted in Lago Agrio, which they have a

12    technical component to it.  And I tried to make sure that

13    everything that was being done on Chevron's behalf was the best

14    science possible.

15    Q.  Did you also review documents filed from the plaintiffs'

16    group in the Lago Agrio case?

17    A.  Yes, I did.

18    Q.  Was it you personally that chose the experts that Chevron

19    used in the case or was it a group of people that made that

20    decision?

21    A.  I would recommend individuals to the legal team and the

22    final decision was theirs.

23    Q.  Did Chevron have a number of experts that worked on

24    Chevron's behalf in that case?

25    A.  Yes.

DAH8CHE4                           McMillen - cross

1   Q.  Do you know how many?

2   A.  Probably, roughly, two dozen.

3   Q.  Do you know how many experts worked on behalf of the

4   plaintiffs' group in the litigation?

5            THE COURT:  Sustained.  Please go to something

6   relevant.

7   Q.  Could you provide for me the names of the experts that were

8   Chevron's experts in the Lago Agrio case?

9            MS. NEUMAN:  Objection.

10           THE COURT:  Sustained.  Please go to something

11   relevant.

12   Q.  If you go to your direct testimony on page 2, line 5.  Are

13   you with me?

14   A.  Yes.

15   Q.  You indicate that one of your jobs was to review the

16   Chevron nominated technical expert reports for accuracy and

17   scientific rigor.  Can you tell me what you did in that role?

18   A.  Yes.  Most of the judicial inspection reports that were

19   submitted I reviewed or I asked someone else on the team to

20   review them, and that was for the purpose of making sure they

21   were scientifically accurate, all the tables that they said

22   were there, the figure numbers were correct, and those kinds of

23   things, proof reading.

24   Q.  Were you finished?

25   A.  I am.

DAH8CHE4                        McMillen - cross

1    Q.  Would you meet with the experts and discuss their reports

2    with them before they were finalized?

3    A.  No.

4    Q.  Would you have an opportunity to comment on the experts'

5    reports before they were finalized?

6    A.  I did provide them with any comments that I had, yes.

7    Q.  Did you provide them with actual edits to the reports

8    before they were filed?

9    A.  I sometimes made suggested edits if I thought there was

10   something that wasn't worded quite accurately or they had made

11   a mistake or had some figure number wrong or something like

12   that.

13   Q.  Were you involved in the initial trial phase of the case in

14   2003?

15   A.  No, I was not involved in 2003.

16   Q.  Did you have any role in the initial trial phase?

17          MS. NEUMAN:  Objection.  Vague as to what the initial

18   trial phase is.

19   Q.  Can you explain to us what was the initial trial phase of

20   the case when it first went back to Ecuador in 2003?

21          MS. NEUMAN:  Objection.  It calls for a legal

22   conclusion.

23          THE COURT:  I sustain it on more grounds than that.

24   You're going to have to do better with your question.

25   Q.  Did Chevron present any witnesses at the initial trial

DAH8CHE4                    McMillen - cross

1    phase of the case in Ecuador?

2              MS. NEUMAN:  Objection.  Relevance.  It calls for a

3    legal conclusion.  The record speaks for itself.

4              THE COURT:  Sustained.

5    Q.  What phase did you get involved in?

6    A.  I'm not sure what you mean by phase.

7    Q.  When you got involved in the case, was the trial phase

8    over?

9              MS. NEUMAN:  Objection.

10             THE COURT:  Sustained.  You're asking questions that

11   presuppose a meaning to trial phase, which for all I know is a

12   term of art in Ecuadorian civil procedure.  There is no way

13   that I have any idea what you're talking about, nor would any

14   reviewing court, nor is there any reason to suppose that the

15   witness has any idea of what you're talking about.  And even if

16   the witness were to answer, the answer would be based on some

17   assumption on her part which would be entirely unstated and

18   thus leave the whole record essentially as clear as a bowl of

19   chocolate pudding.  If there is something specific you have in

20   mind, ask about it.  I am not stopping you from that.

21   Q.  Did any Chevron expert testify before the Ecuadorian court

22   in 2003?

23   A.  What do you mean by Chevron expert?  You mean a Chevron

24   employee?

25   Q.  Do you understand the term Chevron expert?

1          THE COURT:  Look, counsel, we have a 216,000 page

2     record of the proceeding in Ecuador, right?

3          MS. LITTLEPAGE:  Yes, sir.

4          THE COURT:  OK.  The answer is there, is it not?

5          MS. LITTLEPAGE:  Judge, I don't know that I know the

6     answer to that.

7          THE COURT:  Somebody on your side ought to, don't you

8     think?

9          MS. LITTLEPAGE:  I believe someone on my side does

10    know the answer to that.

11         THE COURT:  And if it's there, you can bring it to my

12    attention.  This is not a constructive use of time.  If there

13    is some specific inquiry you want to make, please get to it

14    without these vague terms or terms susceptible of many

15    meanings.  Get there.  I don't even know what you mean by

16    testified before the Ecuadorian court.  I don't know if they

17    take live testimony.  Do they?  Do you know?

18         MS. LITTLEPAGE:  Yes, sir, I do.

19         THE COURT:  Maybe you will put an appropriate witness

20    on the stand or bring to my attention appropriate Ecuadorian

21    law that will inform me on that subject, but I am not simply

22    going to assume that the witness knows, and she is making quite

23    clear she doesn't.

24    Q.  When did you get involved in the Ecuadorian case?

25    A.  I was asked to start working on the case in 2004.

DAH8CHE4                    McMillen - cross

1    Q.  Were there any Chevron experts working on the case before

2    your involvement?

3    A.  Again, I'm not sure what you mean by Chevron experts.

4    Q.  Let's stop there.  Did Chevron select experts for the

5    Ecuadorian case?

6    A.  Do you mean -- again, I'm not sure what you mean.  There

7    were different types of experts in the Ecuadorian case.  So

8    there were judicial inspection experts.  There is also rebuttal

9    experts.  So I'm not sure what you mean.  Sorry.

10   Q.  Can you describe for us the different types of experts that

11   were used in the Ecuadorian case?

12   A.  Yes.  There were Chevron nominated judicial inspection

13   experts that took part in the judicial inspections that the

14   court ordered.  Then there were also scientific experts on

15   behalf of Chevron who wrote specific expert reports in areas of

16   their expertise that would sometimes be attached to the

17   judicial inspection reports or be incorporated into a Chevron

18   rebuttal to a plaintiffs' expert report.

19   Q.  Were there any other types of experts?

20   A.  No, I don't think so.

21   Q.  You say Chevron nominated.  Would that be an expert that

22   Chevron had chosen and asked the court to appoint as an expert

23   in the case?

24   A.  Each side in the Lago Agrio case had the opportunity to

25   nominate an expert that they had selected to the court, and

1   then the court would appoint them as an expert for that party.

2   That's my understanding, but I'm not an expert in Ecuadorian

3   civil procedure.

4   Q.  For the rebuttal experts, did they similarly have to be

5   appointed by the court?

6          MS. NEUMAN:  Objection.  It calls for a legal

7   conclusion.

8          THE COURT:  Sustained.

9   Q.  Do you know how many expert reports were submitted in the

10  case?

11  A.  Hundreds, at least.

12  Q.  In your declaration on page 5, line 10 -- I'm sorry, it's

13  line 13.  Do you see where you're talking about Mr. Cabrera

14  appointed by the Ecuadorian court as a supposedly neutral

15  independent expert on line 13?

16  A.  Yes.

17  Q.  Can you tell me what is your definition of independent

18  expert in this context?

19  A.  Well, I would use the language of the court, which was that

20  he was to be independent vis-a-vis the parties.

21  Q.  Was Mr. Cabrera allowed to interact with the parties?

22  A.  Again, I'm not an expert on civil procedure, but it was my

23  understanding that he was not to interact with the parties, and

24  I know he submitted documents to the court saying that he was

25  not interacting with the parties.

DAH8CHE4                      McMillen - cross

1  Q.  Was Mr. Cabrera allowed to receive materials from the

2  parties?

3          MS. NEUMAN:  Objection.  It calls for a legal

4  conclusion?

5          THE COURT:  Sustained.

6  Q.  Did you review any materials that Chevron submitted to

7  Mr. Cabrera?

8  A.  Chevron only submitted materials through the court.

9  Q.  Did Chevron submit materials through the court for

10  Mr. Cabrera?

11  A.  Chevron only, to my knowledge, only submitted a response to

12  his reports.

13  Q.  Did you review the materials submitted by the plaintiffs'

14  group through the court for Mr. Cabrera?

15          MS. NEUMAN:  Objection.  It assumes facts not in

16  evidence.

17          THE COURT:  It certainly does.  Sustained.

18  Q.  Did the plaintiffs' group submit documents to the court for

19  Mr. Cabrera?

20          MS. NEUMAN:  Objection.  It calls for a legal

21  conclusion.  The record speaks for itself.

22          THE COURT:  No.  Overruled.

23          Answer if you know.

24  A.  It's my understanding that Chevron was not allowed to have

25  copies of anything that the plaintiffs submitted to

DAH8CHE4                    McMillen - cross

1  Mr. Cabrera.  We specifically asked for those documents and we

2  never got them.

3  Q.  The court did not provide you copies?

4          THE COURT:  Do you know one way or the other, Ms.

5  McMillen?

6          THE WITNESS:  I don't remember the exact wording in

7  the documents.  I just know we were never able to obtain a copy

8  of whatever, if anything, they gave to Mr. Cabrera.

9  Q.  Did you review the filing with the court indicating that

10 the plaintiffs were giving documents to Mr. Cabrera through the

11 court?

12 A.  I did not review that filing at the time.  I was told about

13 it though.

14 Q.  You talked about rebuttal experts.  Were the Chevron

15 rebuttal experts Dr. Alvarez, Dr. Mackay, and Dr. Hinchee?

16 A.  Those three scientists served as experts.  There were many

17 other people who also served as rebuttal experts.

18 Q.  Were those three some of Chevron's rebuttal experts?

19         THE COURT:  That's what she just said, don't you

20 think?

21 Q.  Did Chevron select those three experts?

22 A.  Yes.

23 Q.  Were they retained by Chevron?

24 A.  They were retained by King & Spalding.

25 Q.  Were they paid by Chevron?

DAH8CHE4                    McMillen - cross

1    A.  Yes.

2    Q.  Did Chevron ask them to conduct specific assessments?

3    A.  They were asked to address specific technical issues and

4    write a report and fair opinions.

5    Q.  Did you review their expert report before they were

6    finalized?

7    A.  I think they only wrote one report together, but yes, I am

8    sure I would have read it before it was submitted.

9    Q.  Did you make any edits or changes or suggestions to their

10   report before it was finalized?

11   A.  I might have.  I don't remember.

12   Q.  Would you turn to tab 2 of Defendants' Exhibit 1416, a

13   filing by Mr. Callejas on behalf of Chevron.

14           Do you recognize this document?

15   A.  Can I have a moment to read it, please?

16   Q.  Of course.

17   A.  This is just the cover letter on top of the report, is that

18   right?

19   Q.  Yes.

20   A.  I have read it.

21           MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

22   1416.

23           MS. NEUMAN:  No objection.

24           THE COURT:  Received.

25           (Defendants' Exhibit 1416 received in evidence)

DAH8CHE4                    McMillen - cross

1    Q.  Ms. McMillen, if you look at the first sentence of the

2    second or the third paragraph, however you identify it on the

3    page, where it says, "I allowed myself to share for your

4    knowledge a technical and independent assessment for the

5    designated general plan of activities."  Do you see that?

6    A.  Yes.

7    Q.  Would you have considered the assessment by Dr. Alvarez,

8    Dr. Mackay and Dr. Hinchee an independent assessment?

9             MS. NEUMAN:  Objection.  Form.

10            THE COURT:  Sustained.

11   Q.  Do you believe this is an accurate description of the

12   assessment done by Dr. Alvarez, Mackay and Hinchee?

13   A.  Yes.

14   Q.  It indicates that there has been a study conducted by three

15   international technicians.  What study were Chevron's rebuttal

16   experts, Alvarez Mackay and Hinchee, doing?

17   A.  Well, according to the document, they were reviewing

18   Mr. Cabrera's general plan of activities and commenting on it.

19   Q.  So were they doing an independent study or just a review

20   with opinions?

21            MS. NEUMAN:  Objection.

22            THE COURT:  Sustained as to form.

23   Q.  What type of study were the experts retained by Chevron

24   doing as to Mr. Cabrera's plan?

25   A.  Well, they examined his plan, studied it, and wrote an

DAH8CHE4                    McMillen - cross

1   opinion about whether it was adequate.  I don't know because I

2   don't have that report here and I would have to see the

3   document again to remind me of its contents specifically.

4   Q.  Would it be accurate to describe that study as an

5   independent assessment?

6   A.  Yes.

7   Q.  Can you tell me who either Mr. or Dr. Loehr is?

8   A.  Yes.  He was an expert who was retained by Chevron early in

9   the case.  He is a retired chair in environmental engineering

10  at the University of Texas.

11  Q.  Is he a doctor?  Shall I say Dr. Loehr?

12  A.  He is a doctor.

13  Q.  Did you play a role in retaining Dr. Loehr as an expert for

14  Chevron?

15  A.  I recommended him to the legal team.

16  Q.  Did you assist Dr. Loehr in the preparation of his report

17  in the Ecuadorian case?

18  A.  Which report are you referring to?

19  Q.  Let me ask a better question.  How many reports did Dr.

20  Loehr prepare?

21  A.  I'm not certain.  I think at least two or three.

22  Q.  Would you have provided assistance on two or three of those

23  reports?

24          THE COURT:  Is it a hypothetical question or are you

25  asking what she did?

DAH8CHE4                    McMillen - cross

1   Q.  Did you provide either assistance or edits to the two or
2   three reports of Dr. Loehr?
3   A.  I would have given him any documents that he needed to
4   review or spoken with him about what it was he was being
5   retained to do.  So that's what I would have done.
6   Q.  Dr. Marquez, can you tell me who Dr. Marquez is?
7   A.  Ralph Marquez is a retired -- I don't know his exact title,
8   but he was of the lead regulatory agency for the state of
9   Texas, and he submitted some comments in Lago Agrio.  I believe
10  he only submitted one report and that was about his
11  observations of Mr. Cabrera's work in the field.
12  Q.  Did you assist Dr. Marquez in the creation of that report?
13  A.  No.
14  Q.  Did you define for him the scope of the work that you
15  retained him for?
16  A.  I don't recall that I ever spoke with Dr. Marquez.  I think
17  he may have only spoke with the legal team that asked him to go
18  to Ecuador and observe.
19  Q.  Did Chevron reimburse Dr. Loehr and Dr. Marquez for their
20  work in the Ecuadorian case?
21  A.  Yes.
22  Q.  If you turn to tab 3, Defendants' Exhibit 871, do you see a
23  Chevron press release dated July 30, 2007?
24  A.  Yes.
25          MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

DAH8CHE4                        McMillen - cross

1     871.

2              MS. NEUMAN:  Not for the truth, but no objection

3     otherwise.

4              THE COURT:  I am sorry.  You're objecting to your own

5     press release insofar as it's offered for the truth?

6              MS. NEUMAN:  No objection.

7              THE COURT:  It's received.

8              (Defendants' Exhibit 871 received in evidence)

9     Q.  If you look at the first paragraph, does this press release

10    discuss Dr. Rafael Marquez?

11             THE COURT:  Sustained.  It says what it says.

12             Next question.

13    Q.  Would it be accurate to say that Dr. Marquez was going to

14    serve as an independent international observer and to provide

15    independent oversight in the Ecuadorian case?

16    A.  He served as an observer to Mr. Cabrera's work.  That's

17    what I know he did.

18    Q.  Would it be accurate to call him an independent

19    international observer?

20    A.  Yes.

21    Q.  Would it be accurate to say he was going to provide

22    independent oversight?

23    A.  I don't really understand why it says oversight.  I think

24    they are referring to just his observing.

25    Q.  Would it be accurate to say he was going to provide

DAH8CHE4                         McMillen - cross

1    independent oversight?

2           THE COURT:  Counselor, I am going to read back to you

3    your last several questions, and at the end of them, I am going

4    to ask you to tell me what the difference among them is.

5           Question 1:  Would it be accurate to say that

6    Dr. Marquez was going to serve as an independent international

7    observer and to provide independent oversight in the Ecuadorian

8    case?

9           Question 2:  Would it be accurate to call him an

10   independent international observer?

11          Question 3:  Would it be accurate to say he was going

12   to provide independent oversight?

13          Now, the question for you is, exactly what is the

14   difference among those three questions?

15          MS. LITTLEPAGE:  I think my questions are the same,

16   but it was her answers that prompted the next question.  The

17   first answer did not discuss the word independent.  She just

18   verified he was an international observer.  The second time I

19   went to the second part of the question, which was -- there's

20   two independents in this sentence.  One is he is an independent

21   observer and one is he is going to give an independent

22   oversight report.

23          THE COURT:  That's not true of your second question,

24   but you have got an unqualified yes to the second question.

25          How about the third time?

DAH8CHE4                    McMillen - cross

1          MS. LITTLEPAGE:  I believe the third time dealt with

2     the second part of the sentence which has "and" in it.

3          THE COURT:  Counselor, if I have to put a clock on

4     you, I will.  But you better get on with this.

5          MS. LITTLEPAGE:  Yes, sir.

6     BY MS. LITTLEPAGE:

7     Q.  If you turn to tab 4, Plaintiff's Exhibit 872, is that a

8     Chevron press release dated November 24, 2007?

9     A.  Yes.

10         MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

11    872.

12         MS. NEUMAN:  No objection.

13         THE COURT:  Received.

14         (Defendants' Exhibit 872 received in evidence)

15    Q.  Does this press release indicate that Dr. Loehr and

16    Dr. Marquez are independent environmental experts?

17         THE COURT:  Sustained.

18         We are getting very close to the line, counsel.  We

19    are getting very close to the end of your examination.  Your

20    point here for the last half hour is that in various contexts

21    Chevron used the word "independent" to describe experts whom

22    they nominated and were paid.  I have got it.  Clearly they

23    did.

24         Now, let's get on.

25         MS. LITTLEPAGE:  May I just respond?  I went back and

DAH8CHE4                          McMillen - cross

1    looked at the amended complaint.  The word "independent" forms

2    a very substantial part of the accusations against Mr.

3    Donziger, that he inappropriately used the word "independent"

4    in certain contexts.  Their allegations are that he used it

5    inappropriately when he filed things with the court.  So I

6    first used a court filing.  He used it inappropriately when he

7    spoke to the press.  So I used a --

8              THE COURT:  I understand that.

9              MS. LITTLEPAGE:  -- press release.

10             THE COURT:  I understand that.  I have got it.  It

11   does not justify endless repetition.  You have made your point.

12   The documents are in.  Move on.

13             MS. LITTLEPAGE:  Yes, sir.

14   Q.  Let me ask you first about an expert called Marcelo Munoz.

15   Can you tell me who Dr. Munoz is?

16   A.  He was a court appointed judicial inspection expert.

17   Q.  By saying "court appointed," does that mean he was not a

18   Chevron nominated expert?

19   A.  He was not nominated by either party.

20   Q.  And if you turn to tab 6, Defendants' Exhibit 1067, do you

21   recognize Defendants' Exhibit 1067 as a filing in the Lago

22   Agrio case by Dr. Munoz, the expert we were just discussing?

23   A.  Give me a moment to read it, please.

24   Q.  Sure.

25   A.  I would have to make an assumption that it is the court

DAH8CHE4                    McMillen - cross

1   record.  It doesn't have exactly the same format that I am used

2   to seeing in the court because usually it has the foja number

3   at the top of each page, which I don't see here.

4   Q.  Do you see on the last page of the tab a stamp from the

5   court?

6   A.  I do, which is why I am assuming it must be, but again,

7   it's not the usual format that I usually see.

8   Q.  Can you tell me who engineer Guerrero is?

9   A.  He is an engineer, an Ecuadorian engineer in Quito who

10  assisted the legal team in Ecuador.

11  Q.  That was the Chevron legal team?

12  A.  Yes.

13  Q.  Was he an employee of Chevron?

14  A.  He is not a Chevron employee.

15  Q.  Was he a consultant or expert for Chevron in the Ecuadorian

16  case?

17  A.  He was a contractor.

18  Q.  Did Chevron's contractor engineer Guerrero meet with

19  Marcelo Munoz to discuss Dr. Munoz's work plan?

20          MS. NEUMAN:  Objection.  Lacks foundation.  Hearsay.

21          THE COURT:  Well, it's not calling for the content of

22  the communication so it's not hearsay, but there is no

23  foundation for it.  You are at liberty to try to establish one.

24  Q.  Did engineer Guerrero act as a consultant for Chevron in

25  the Ecuadorian case, and as part of that role, did he meet with

1   Dr. Munoz?

2           THE COURT:  The question is compound.  Half of it was

3   answered.

4           MS. LITTLEPAGE:  I'm sorry, Judge.  Half was answered?

5           THE COURT:  She said he was a contractor.

6   Q.  Do you know if Chevron's contractor met with Dr. Munoz?

7   A.  I don't know.

8   Q.  Would it be appropriate for Chevron's contractor to meet

9   with Dr. Munoz?

10          MS. NEUMAN:  Objection.  It calls for a legal

11  conclusion.

12          THE COURT:  Sustained.

13  Q.  Were you aware that Dr. Munoz filed papers in the

14  Ecuadorian court when an issue came up about payment from

15  Chevron?

16  A.  Are you referring to this document?

17  Q.  I am.

18  A.  I have seen this document before, but I don't know anything

19  about it other than what it says.

20          MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

21  1067.

22          MS. NEUMAN:  No objection.

23          THE COURT:  Received.

24          (Defendants' Exhibit 1067 received in evidence)

25  Q.  Do you know what a technical planning meeting is?

DAH8CHE4                        McMillen - cross

1    A.  In this context, no, I don't know anything about this.

2    Q.  Do you know what a work plan is in the context of the

3    Ecuadorian case?

4             THE COURT:  Assuming that it has a single meaning in

5    the context of the Ecuadorian case.

6    A.  The only work plan that I know about is the one that was

7    filed by Mr. Cabrera.  Other than that, I don't think there is

8    a specific definition of a work plan.  So, again, I don't know

9    anything about this other than what is written here.

10   Q.  Could either side meet with a court appointed expert?

11            MS. NEUMAN:  Objection.  It calls for a legal

12   conclusion.

13            THE COURT:  Sustained.

14   Q.  Did Chevron meet with court appointed experts, if you know?

15            Did Chevron meet with court appointed experts, if you

16   know?

17            MS. NEUMAN:  Objection.  Vague as to court appointed.

18            THE COURT:  In the context it certainly is.  Try

19   again.

20   Q.  Do you draw a distinction between court appointed experts

21   and Chevron retained experts in the context of the Ecuadorian

22   case?

23   A.  I'm not sure what you mean.

24   Q.  Well, you told me Dr. Munoz was a court appointed expert.

25            THE COURT:  Counsel, nobody is trying to stop you from

DAH8CHE4                    McMillen – cross

1   getting at anything appropriate you want to get at.  The

2   witness testified already to the distinction between party

3   nominated experts in the judicial inspection process who were

4   appointed by the court after being nominated by the parties on

5   the one hand.  She testified also to experts, at least one, who

6   was appointed by the court without a nomination of that

7   character.  I don't remember whether that was in relation to

8   judicial inspections or otherwise.  And that's only part of the

9   lack of clarity that we are having here.

10  Q.  Dr. Munoz, was he nominated by Chevron?

11  A.  No.

12  Q.  Was he nominated by the plaintiffs' group?

13  A.  No.

14  Q.  Was he court appointed?

15  A.  Yes.

16  Q.  Is there some specific word that we could use to describe

17  Dr. Munoz and people who were court appointed other than court

18  appointed?

19  A.  He was a court appointed judicial inspection expert.

20  Q.  Could either party meet with court appointed judicial

21  experts?

22          MS. NEUMAN:  Objection.

23          THE COURT:  You have altered the answer of course.

24  She said he was a court appointed judicial inspection expert

25  and you dropped the word "inspection" from your next question.

1          MS. LITTLEPAGE:  Let me ask that question again.

2     Q.  Could either party meet with court appointed judicial

3     inspection experts?

4          MS. NEUMAN:  Objection.  Vague.

5          THE COURT:  Now, does that mean, is it theoretically

6     possible that they would meet, having been in the same

7     restaurant?  Or are you asking a legal question?  What are you

8     talking about?

9          MS. LITTLEPAGE:  Judge, she was the chief scientist in

10    Ecuador.

11         THE COURT:  Key word being scientist.

12         MS. LITTLEPAGE:  I am trying to find out what the

13    process was in Ecuador dealing with the scientific experts.

14    Was there a practice of meeting with the court appointed

15    experts by either side?

16         THE COURT:  You are welcome to ask her what she did,

17    what she was present at.  You are not entitled to try to, or

18    even without trying, to get in through the backdoor of what

19    will later be cited back to me and in press releases all over

20    the world what will be portrayed or might be portrayed as a

21    witness buying into a legal proposition that the plaintiffs

22    have been trying very hard, the Ecuadorian plaintiffs, from the

23    beginning of all this litigation to convince me of.

24         Now, let's just proceed.  You have experts all over

25    the place, as I remember, on what the Ecuadorian law is on this

DAH8CHE4                        McMillen - cross

1   point, and I will decide the law in due course.  If you want to

2   get to the facts, that's what we are here for.

3            MS. LITTLEPAGE:  Yes, sir.

4   BY MS. LITTLEPAGE:

5   Q.  Did you supervise a team of technicians, scientists, in the

6   Ecuadorian case?

7   A.  I was the lead scientist assisting a legal team.

8   Q.  Was engineer Guerrero in that team?

9   A.  He is part of the technical team reporting to the Quito

10  legal team.

11  Q.  Do you know if engineer Guerrero met with Mr. Munoz?

12  A.  Again, all I know is what is written here.  I haven't

13  spoken to Mr. Guerrero about it.

14  Q.  Did you ever discuss with engineer Guerrero about meeting

15  with Mr. Munoz?

16           MS. NEUMAN:  Objection.  Asked and answered.

17           THE COURT:  Overruled.

18  A.  No, I did not.

19  Q.  If you turn to Defendants' Exhibit 613, tab 7.

20  A.  Yes.

21  Q.  Can you tell me who is Kent Robertson?

22  A.  He is a Chevron employee.

23  Q.  What was his title?

24  A.  It's media relations adviser.

25  Q.  Do you know who James Craig is?

DAH8CHE4                    McMillen - cross

1    A.  Yes.

2    Q.  Who is that?

3    A.  He is a Chevron employee.

4    Q.  Do you know who Mercedes Alvaro is?

5    A.  I believe she is a reporter.

6          MS. LITTLEPAGE:  We move to admit Defendants' 613.

7          MS. NEUMAN:  Objection.  Hearsay.  Ms. McMillen is not

8    even on this e-mail.

9          MS. LITTLEPAGE:  It's an admission of a party.

10          THE COURT:  Well, the e-mail from Mercedes Alvaro to

11   Mr. Robertson is not a statement by a party.  So that's out.

12          Both of the e-mails from Ms. Alvaro are out to the

13   extent they are offered for the truth.  I haven't heard any

14   other sort of offer.

15          The e-mails from Mr. Robertson I will receive.  So

16   Defendants' Exhibit 613 is received as to the e-mails from

17   Mr. Robertson.

18          (Defendants' Exhibit 613 received in evidence)

19   Q.  If we look, it's hard to direct you, but the second e-mail

20   down on the first page from Kent Robertson to Mercedes Alvaro.

21   Do you see that?  It's dated June 24, 2009, at 3:06 p.m.

22   A.  Yes.

23   Q.  Do you know if you or anybody on your team had phone

24   conversations with Mr. Munoz during the Ecuadorian case?

25   A.  The third note down --

DAH8CHE4                          McMillen - cross

1          THE COURT:  The third note down is not in evidence.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Did you ever speak to Mr. Munoz?

4          THE WITNESS:  No, I did not.

5          THE COURT:  Did anybody at Chevron ever tell you that

6     he or she had spoken to Mr. Munoz?

7          THE WITNESS:  No.

8          THE COURT:  Orally or in writing?

9          THE WITNESS:  No.

10         THE COURT:  By that I mean did anyone at Chevron tell

11    you, orally or in writing, that he or she had spoken to

12    Mr. Munoz?

13         THE WITNESS:  No, they did not.

14         THE COURT:  Next question, counsel.

15    Q.  Turn to tab 9, Defendants' Exhibit 612.

16         Is this e-mails between you and various people,

17    including Kent Robertson and James Craig?

18    A.  Yes.

19         MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

20    612.

21         MS. NEUMAN:  No objection.

22         THE COURT:  Received.

23         (Defendants' Exhibit 612 received in evidence)

24    Q.  If you go to page 3 of the document because the e-mails

25    come sort of from the bottom up, the bottom of page 3, did

DAH8CHE4                        McMillen – cross

1   Mr. Robertson, on June 1, 2009, provide you with a statement

2   for your help?

3          THE COURT:  That's what it says.

4   Q.  Did you assist Chevron in looking at and reviewing press

5   statements concerning the Ecuadorian case?

6   A.  Yes.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAHLCHE5                    McMillen – cross

1   Q.  And in June of 2009, did you assist Mr. Robertson in

2   producing, in reviewing a press statement for Chevron?

3   A.  I believe so.

4   Q.  And if you look to the top of that page, on Monday, June 1,

5   at 11:44 p.m., did you respond to Mr. Robertson's email below?

6   A.  I'm sorry, I'm not sure where you are.

7   Q.  Top of the same page, page 3.  Tell me when you're with me.

8   A.  Yes, top of the page.

9   Q.  On June 1, 11:44 p.m., did you respond to Mr. Robertson's

10  request?

11  A.  Yes.

12  Q.  Did you edit the press statement he had provided?

13  A.  That's what it says, yes.

14  Q.  The email that you sent also discusses data for samples

15  collected by Chevron and Munoz.

16          Did Mr. Munoz turn his samples that he collected over

17  to Chevron for analysis or did he independently analyze the

18  samples he took?

19          THE COURT:  That doesn't exhaust the possibility, so

20  why don't you try to ask the question a piece at a time.

21  Q.  What happened to the samples Mr. Munoz collected as a court

22  appointed expert?

23          MS. NEUMAN:  Objection, lacks foundation.

24  Q.  Court appointed judicial inspection expert.

25          MS. NEUMAN:  Lacks foundation.

DAHLCHE5                          McMillen - cross

1          THE COURT:  Precisely.  Do you have any knowledge of,

2     first of all -- well, strike that.

3          Do you have any personal knowledge, Ms. McMillen, of

4     what Mr. Munoz did with the samples he collected?

5          THE WITNESS:  What I know about those samples were

6     what he submitted to the court in his judicial inspection

7     expert in which he did submit the analytical data for his

8     samples.

9     Q.  Was Chevron responsible for analyzing those samples?

10    A.  No.

11    Q.  Do you know what lab Mr. Munoz used to analyze his samples?

12    A.  I don't remember.  I would have to refer back to his

13    report.

14    Q.  You indicate in this email that this type of press release

15    won't do anything against potential bombshell that Munoz may

16    drop if he agrees with everything Cabrera said.

17         Can you explain to me what you meant by potential

18    bombshell that Munoz may drop?

19    A.  At this time I already was aware that the plaintiffs had

20    been interacting with Mr. Cabrera and had actively worked on at

21    least part of his report.  So I was very concerned that they

22    may have also been working with Mr. Munoz and that he might

23    agree with some of the conclusions of Mr. Cabrera, but he did

24    not.

25    Q.  And if you had no contact with Mr. Munoz, how did you

DAHLCHE5                        McMillen - cross

1    anticipate a potential bombshell from Mr. Munoz?

2    A.  I was just concerned that the plaintiffs might be working

3    with Mr. Munoz as well.  That's all I was referring to here.

4    Q.  If you turn to the page 2 going backwards, did Mr. Craig

5    respond to you by email on June 1, 2009 at 9:17 p.m.?

6    A.  Yes.

7    Q.  And does he -- I want to ask you a question.

8            There's a notation about preempting Munoz's findings.

9    Do you see that under No. 2?

10   A.  Yes.

11   Q.  Did Chevron have access to Mr. Munoz's findings?

12   A.  No, we did not.

13   Q.  Did you know what Mr. Munoz's findings were?

14   A.  At this time, no.

15   Q.  And if you turn to the top of that page, did Mr. Craig send

16   another email at 9:51 p.m.?  The start of the email is on the

17   bottom of page 1 and it goes over to page 2.

18           Do you see that?

19   A.  Yes.

20   Q.  And there's a discussion about offsetting a damaging report

21   by Munoz.  And, again, was there a report that Chevron was

22   aware of?

23   A.  No, there was not.

24   Q.  On page 22, line 23 of your declaration, are you with me,

25   page 22, line 23?

DAHLCHE5                      McMillen - cross

1  A.  I don't have line numbers marked.  In your version --

2           THE COURT:  Looks like paragraph 47.  Is that right,

3  Ms. Littlepage, you're at paragraph 47?

4           MS. LITTLEPAGE:  Yes, sir.

5  Q.  It's line 23, the last sentence of page 22.

6           THE COURT:  Thank you.  Do you see it?

7           THE WITNESS:  Yes, I do.

8  Q.  Okay.  And it indicates that you reviewed some documents in

9  preparation for a mediation in the fall of 2003.

10          Did you attend that mediation?

11 A.  That was in 2007.

12 Q.  I asked the wrong question.

13          In 2007, did you attend a mediation in 2007?

14 A.  Yes.

15 Q.  And Chevron had asked for that mediation?

16 A.  I don't know.  I wasn't involved in the initial mediation.

17 That was just a technical meeting.

18 Q.  I'm sorry, it was a technical meeting or it was a

19 mediation?

20 A.  Well, there was a mediation.  But as a scientist I was not

21 involved in -- I had no idea how the mediation was set up or

22 any of the legal issues other than just what I was told by

23 Mr. Veiga.

24 Q.  Did you have an understanding whether this was a voluntary

25 mediation or a court ordered mediation?

DAHLCHE5                          McMillen - cross

 1            MS. NEUMAN:  Objection, relevance.

 2            THE COURT:  Sustained.

 3            MS. LITTLEPAGE:  Judge, may I proffer the question and

 4   answer then because I do believe that the allegations in the

 5   complaint repeatedly say that Mr. Donziger was putting Chevron

 6   in a position where they felt that they were being extorted for

 7   money, and voluntarily going to a mediation is inconsistent at

 8   least on some level with that allegation.

 9            THE COURT:  I stand by the ruling.

10   Q.  Ms. McMillen, for the Cabrera report, did you review the

11   Cabrera report in detail?

12   A.  Are you referring to his April 1, 2008 report?

13   Q.  Yes, ma'am.

14   A.  Yes, I reviewed that.

15   Q.  And were there several sections to the report?

16   A.  Yes, there were.  There were many anexos.

17            THE COURT:  You're switching to another subject?

18            MS. LITTLEPAGE:  I am.

19            THE COURT:  We'll take a short break.

20            (Recess)

21            THE COURT:  Okay.  Let's continue.

22            MS. LITTLEPAGE:  May I proceed?

23            THE COURT:  Oh, yes, of course.

24   Q.  Ms. McMillen, we were talking about the Cabrera report when

25   we took our break and you told us there were several sections

DAHLCHE5                        McMillen – cross

1   of the Cabrera report.

2           Was one of those sections data that Mr. Cabrera had

3   gathered from actual samples or inspections?

4   A.  Yes.  Anexo A contained all of the data sheets from the

5   laboratory.

6   Q.  Was that the first time the parties saw the data or had it

7   been filed in the court before?

8           MS. NEUMAN:  Objection, lacks foundation.

9           THE COURT:  At least.  Objection sustained.

10  Q.  And what was the data that was attached as annex A?

11          THE COURT:  I don't even understand the question.  Are

12  you asking for each reading at each sample site of each

13  chemical?  That would answer the question.  Are you asking what

14  she understood Cabrera was representing it to be if indeed he

15  wrote it?  You know, this could go on and on.  You've got to be

16  a lot more specific.

17          And basically your problem is you've got a document,

18  it is either in evidence or it will be in evidence and it

19  speaks for itself.

20  Q.  Ms. McMillen, was annex A lab reports or did it involve any

21  analysis or opinion?

22          THE COURT:  It speaks for itself.

23          MS. LITTLEPAGE:  Judge, it's not in evidence.

24          THE COURT:  It will speak for itself, or are you

25  saying you're not going to offer it?

DAHLCHE5                    McMillen - cross

1          MS. LITTLEPAGE:  Judge, we've offered the entire Lago

2     Agrio record.

3          THE COURT:  Okay.  Is there going to be any objection

4     to the Cabrera report insofar as offered simply for what it

5     says as opposed to the truth?

6          MR. MASTRO:  No objection, your Honor.

7          THE COURT:  What's the exhibit number of that?

8          MR. MASTRO:  It's on our exhibit list.

9          MS. LITTLEPAGE:  Defendant's Exhibit 605 is the entire

10    Lago Agrio record.

11         THE COURT:  That's not what I asked.  The Cabrera

12    report.

13         MR. MASTRO:  Your Honor, we will pull that up and put

14    it on the record.

15         THE COURT:  If it's necessary to have 216,000 pages in

16    this trial record, we'll do it.  But we don't have to do that

17    for right now.

18         MS. LITTLEPAGE:  May I proceed?

19         THE COURT:  No.  We're trying to get this resolved.

20         MS. NEUMAN:  Plaintiff's Exhibit 310, the Cabrera

21    report with annexes, your Honor.

22         THE COURT:  All right.  Does everybody agree that

23    Plaintiff's Exhibit 310 is the Cabrera report with annexes,

24    complete with English translation, I assume; is that right?

25         MS. NEUMAN:  I don't believe every annex is

DAHLCHE5                          McMillen – cross

 1   translated.

 2              THE COURT:  Is the text translated as opposed to all

 3   the annexes?

 4              MS. NEUMAN:  Yes, your Honor.

 5              THE COURT:  Everybody agree that's it?  I mean we've

 6   been hearing about the Cabrera report for three years.  This

 7   shouldn't be a toughy.

 8              MS. LITTLEPAGE:  I will agree.

 9              THE COURT:  Okay.  Any objection to Plaintiff's 310

10   coming in subject to the provision of English translations of

11   whatever parts that have not yet been translated?

12              MS. LITTLEPAGE:  No, sir.

13              THE COURT:  All right.  Plaintiff's Exhibit 310 is

14   received, not for the truth of the matter, but for the fact

15   that it was said.

16              (Plaintiff's Exhibit 310 received in evidence)

17              THE COURT:  Now, it now speaks for itself.  Now let's

18   move on.

19   Q.  If you turn to your page 17, line 4 of your witness

20   statement.

21   A.  Yes.

22   Q.  And you indicate that you reviewed the Cabrera report the

23   evening it was filed.

24              Were you in Ecuador the day it was filed?

25   A.  No, I was not.

DAHLCHE5                        McMillen - cross

1   Q.  Did you receive a Spanish or an English -- did you receive

2   a Spanish version of the Cabrera report?

3   A.  I received a Spanish version.  I think this is the day

4   after it was filed.  I don't believe I got a copy on April 1.

5   Q.  The evening of April 2, would be what you are referring to

6   in line 1 of paragraph 35?

7   A.  That's my recollection, yes.

8   Q.  And, I'm sorry, I didn't understand.  Did you receive a

9   Spanish version or an English version?

10  A.  Spanish.

11  Q.  Do you read Spanish?

12  A.  I read technical Spanish fairly well because I spent so

13  much time reading the reports as submitted.

14  Q.  And you indicated that from your review of the reports the

15  evening after it was filed that you noticed -- let me ask you

16  this -- inconsistencies; would that be fair?

17  A.  Yes.  There were internal inconsistencies.

18  Q.  And so would it be fair to say you did not rely on the

19  Cabrera report from the first time you saw it the night after

20  it was filed?

21          MS. NEUMAN:  Objection, vague.

22          THE COURT:  Sustained.  For what purpose?

23          MS. LITTLEPAGE:  Judge, I believe an element of the

24  claim being made is detrimental reliance, and I think I'm

25  entitled to ask the witnesses whether they relied on the things

DAHLCHE5                          McMillen - cross

1    that they say were fraudulent because that's one of the

2    elements.

3              THE COURT:  My recollection is I dismissed all of

4    Chevron's fraud claims on the ground that Chevron couldn't

5    conceivably establish that Chevron relied to its detriment.

6    Did I not do that?

7              MR. MASTRO:  Correct, your Honor.  It's third party

8    fraud.

9              THE COURT:  Right.  Let's go on.  So you're right,

10   absolutely.  It's just that you won that point two years ago.

11   Q.  If you turn to -- did you play any role in the preparation

12   of the Chevron motion requesting that the Lago Agrio court

13   disregard the Cabrera report?

14             MS. NEUMAN:  Objection, vague as to which motion is

15   being referred to.

16             MS. LITTLEPAGE:  Let me ask a better question.

17   Q.  Did Chevron file motions in the Lago Agrio case asking the

18   Court to disregard the Cabrera report?

19   A.  The only effort that I participated in was responding to

20   the technical issues of Mr. Cabrera's report and his subsequent

21   report, so I'm not sure what you mean.

22   Q.  Did you review any filings by Chevron in the Lago Agrio

23   case concerning a request for the court to disregard the

24   Cabrera report?

25   A.  I worked on the technical elements of Chevron's responses

DAHLCHE5                        McMillen - cross

1    or rebuttals to Mr. Cabrera.

2    Q.  And okay.  If you turn to tab 11, Plaintiff's Exhibit 400.

3    And this is not the full version.  The full version is very

4    long, but it's already in evidence.

5            Do you recognize the first page as the first page of

6    the order, the verdict from Judge Zambrano issued February 14,

7    2011?

8            THE COURT:  What difference does it make?  Everybody

9    agrees that's what it is.  So we're going to take testimony

10   about whether that's what it is?

11           MS. LITTLEPAGE:  Okay, Judge.

12   Q.  Did you review Judge Zambrano's verdict when it was issued

13   on February 14, 2011?

14   A.  I read the judgment and evaluated, studied the technical

15   parts of that judgment.

16   Q.  And if you turn to page 31 of your direct statement, the

17   last line, line 23.

18   A.  I'm sorry, did you say page 31?

19   Q.  I did.  Looking at the sentence that says I noted that the

20   Ecuadorian judgment purported to exclude harm caused by

21   Petroecuador -- it goes on to the next page.  Are you with me?

22   A.  Yes.

23   Q.  And is that notation based on your review of the Zambrano

24   verdict of February 14, 2011?

25   A.  It's based on my review of the judgment that was filed

DAHLCHE5                    McMillen - cross

1   February 14, yes.

2   Q.  And what do you mean by exclude harm caused by

3   Petroecuador?

4   A.  I guess I'm not sure how else to say it other than what it

5   says, that no impacts or harm cause by Petroecuador were

6   included in the judgment.

7   Q.  And in the judgment, did Chevron's motion for the court to

8   disregard the Cabrera report get granted?

9        MS. NEUMAN:  Objection, calls for a legal conclusion.

10        THE COURT:  Sustained.

11   Q.  If you turn to tab 11, it's second page of tab 11 which is

12   Plaintiff's 400.

13        Do you know, Ms. McMillen, if Chevron's motion to

14   disregard the Cabrera report was granted?

15        MS. NEUMAN:  Objection, your Honor, the judgment --

16        THE COURT:  Sustained.

17   Q.  Did you assist the Chevron lawyers in filing any motions

18   after the verdict was entered on the issue of whether the

19   Cabrera report had been considered or disregarded in the

20   verdict?

21   A.  I only assist the legal team in terms of technical

22   questions.  Specific motions, I really am not familiar with

23   that and really can't answer.  It's really a legal question

24   that I am not familiar with the various filings.

25   Q.  Did you assist on the technical issues of any legal

DAHLCHE5                        McMillen - cross

1   document that was being prepared by Chevron for filing after

2   February 14, 2011 concerning the Cabrera report?

3   A.  I'm sorry.  I'm not following the question.  Could you

4   repeat it again, please.

5   Q.  Sure.  Do you recall working on the technical issues of any

6   legal briefing or motion filed by Chevron after the

7   February 14, 2011 verdict concerning Mr. Cabrera?

8           THE COURT:  I'm sorry, was there a judgment concerning

9   Mr. Cabrera?

10  Q.  Concerning Mr. Cabrera's report.

11  A.  I'm sure I assisted the legal team in addressing any

12  scientific issues, but I'm still struggling to really

13  understand what you're asking me.  I'm sorry.

14  Q.  If you turn to tab 13, Plaintiff's Exhibit 429.  Do you

15  recognize that as a clarification that was issued by Judge

16  Zambrano on March 4, 2011?

17          THE COURT:  Is there any dispute that this is a

18  decision issued on that date over Mr. Zambrano's name?

19          MS. NEUMAN:  No, your Honor.

20          THE COURT:  Any objection to its being received on

21  that basis, not for the truth but for the fact of what it is?

22          MS. NEUMAN:  No, your Honor.

23          THE COURT:  Plaintiff's 429 is received.

24          (Plaintiff's Exhibit 429 received in evidence)

25          THE COURT:  I take it the defense doesn't object,

DAHLCHE5                          McMillen - cross

1    right?

2              MS. LITTLEPAGE:  No, sir.

3              THE COURT:  Okay.  Fine.

4    Q.  Between February 14, 2011, and March 4, 2011, did you

5    assist the Chevron team in addressing an issue of the number of

6    pits that was discussed in the 2/14/11 verdict?

7    A.  I did assist in determining the origin of the 880 pits

8    that's mentioned in the judgment.

9    Q.  And what did Judge Zambrano explain that issue in PX429,

10   his clarification?

11             THE COURT:  Sustained.  It speaks for itself.

12   Q.  Did you assist the Chevron team in any of the technical, on

13   the technical side for any of the motions filed after Judge

14   Zambrano's clarification of March 4, 2011 in the appeal

15   process?

16   A.  I probably did, but I don't have specific recollection.

17   Q.  If you turn to tab 14, Plaintiff's Exhibit 430.

18             MS. LITTLEPAGE:  Judge, move to admit Plaintiff's

19   Exhibit 430, the January 3, 2012 decision of the appellate

20   court.

21             THE COURT:  Any objection?

22             MS. NEUMAN:  Your Honor, I do not if it's not coming

23   in for the truth.  But as you know, defendants contend they're

24   declining to assert the defense of collateral estoppel.  So if

25   they're putting the appellate decision in for the truth of any

DAHLCHE5                    McMillen - cross

1    matter asserted therein, saying that it shows the judgment is

2    an enforceable judgment, we object to that, unless they've

3    changed their position.  I don't see the relevance of the

4    appellate judgment otherwise.

5              MS. FRIEDMAN:  Your Honor, may I address that?

6              THE COURT:  Yeah.

7              MS. FRIEDMAN:  Your Honor, I would want to make clear

8    we are not asking for collateral estoppel, that is, this Court

9    is bound by factual findings in that record.  We are later

10   going to ask the Court to take the verdict, the clarification,

11   the appellate ruling, and the clarification of the appellate

12   ruling, we are going to ask that you take them for the truth,

13   but we don't have to deal with that today.

14             But when we do that, we're not going to be asking the

15   Court to rule as a matter of collateral estoppel that it's

16   bound by those findings, but we are going to ask that the Court

17   take it as evidence for the truth, not just for the fact that

18   the judgments were issued.

19             THE COURT:  One lawyer per -- well, they've already

20   violated.  What do you want to say, Mr. Mastro?

21             MR. MASTRO:  That's remarkable slight of hand, your

22   Honor.  You should take it for the truth and credit it and be

23   bound by it, but they're not offering it as collateral

24   estoppel.  I think that this is how this has been played in

25   this litigation.  They shouldn't come in for the truth of the

DAHLCHE5                    McMillen - cross

1  matters asserted.

2          THE COURT:  Look, there's no dispute about what it is,

3  right?

4          MR. MASTRO:  There's no dispute about what it is, your

5  Honor.

6          THE COURT:  All right.  So it's received not for the

7  truth of the matters asserted.

8          (Plaintiff's Exhibit 430 received in evidence)

9          THE COURT:  If, as and when it's ever offered on that

10  basis, I'll deal with it then, that is to say, if it's ever

11  offered for the truth.  Even if it came in, it would come in

12  for the truth, I suppose, but in no way as conclusive, I

13  imagine.

14          MS. FRIEDMAN:  That would be our position, your Honor.

15          THE COURT:  Okay.  Let's go ahead.

16          MS. LITTLEPAGE:  Judge, while we're on this issue, if

17  you turn to tab 15, Plaintiff's Exhibit 431, it's the appellate

18  clarification issued on January 13, 2012.  We would move for

19  the admission of Plaintiff's Exhibit 431.

20          THE COURT:  Any reason why it shouldn't be the same

21  ruling?

22          MS. NEUMAN:  No, your Honor.  On the same basis we

23  have no objection.

24          THE COURT:  It's received on that limited basis.

25          (Plaintiff's Exhibit 431 received in evidence)

DAHLCHE5                        McMillen - cross

1    Q.  I want to go back to the pit count in the original verdict.

2    Did you review the Cabrera report for the number of pits that

3    are identified in the Cabrera report?

4    A.  I reviewed the number of pits that are identified in the

5    Cabrera report, yes.

6    Q.  And does the Cabrera report identify 916 pits?

7    A.  In some parts it says 916, and in other parts it says 917.

8    Q.  And did the verdict refer to 880 pits?

9            THE COURT:  The verdict is now getting to be a

10   problem.

11           MS. LITTLEPAGE:  I'll move on.

12   Q.  If you turn to your declaration, which is tab 1, page 5,

13   line 8 through 9.

14   A.  The page number again?

15   Q.  Five.

16   A.  Yes.

17   Q.  And you indicate that the Ecuadorian plaintiffs blocked

18   Chevron's attempts to have a court ordered inspection of the

19   HAVOC lab.

20           The HAVOC lab was the lab used by the plaintiffs to

21   evaluate some of their samples; is that correct?

22   A.  The plaintiffs had about 75 percent of their samples

23   analyzed by the HAVOC lab, yes.

24   Q.  And Chevron had asked the court to order an inspection of

25   that lab; is that fair?

DAHLCHE5                         McMillen - cross

1    A.  Chevron's legal team, yes, asked for a judicial inspection

2    of the laboratory.

3    Q.  And the plaintiffs' team filed a response and argued

4    against that inspection?

5             THE COURT:  Look, again, are you asking what the

6    witness knows of her own personal knowledge or are you

7    basically asking for what was said around the water cooler at

8    Chevron?

9             MS. LITTLEPAGE:  I'm asking for the basis of her

10   opinion in this declaration that Mr. Donziger and his group

11   blocked Chevron's attempt to have a court ordered inspection,

12   when in fact it was the court ruled against them and granted

13   what would be essentially a motion to quash.

14            THE COURT:  Would you like now to be sworn and testify

15   as to the factual representations you're making to me?

16            Look, the whole point, of course, is, once again, the

17   object of this exercise is to get information from people who

18   are competent to give it to you, personal knowledge as a rule.

19   The reason we've had problems all day is because that has not

20   been your uniform mode of examination.

21            Presumably, whatever happened as a matter of procedure

22   down there is a matter of record.  Would I be right in that?

23            MS. LITTLEPAGE:  I actually don't know if this would

24   be in the Lago Agrio record, Judge, because this was the

25   ancillary action, sort of like a subpoena action, in Quito.

DAHLCHE5                    McMillen - cross

1          THE COURT:  And is the suggestion that Ms. McMillen

2    was there?

3          MS. LITTLEPAGE:  I'm trying to test the basis of her

4    representation in her written statement about that fact.

5          THE COURT:  That's fair enough.  Go ahead.

6    Q.  Ms. McMillen, do you have any factual knowledge as to what

7    happened in the proceedings that dealt with the inspection of

8    the HAVOC lab?

9    A.  I saw in the movie Crude, in part of that movie

10   Mr. Donziger and Mr. Yanza visits the judge asking for the

11   judicial inspection to be suspended.

12          I read Mr. Donziger's documents that refer that it

13   would be a disaster for the HAVOC lab to be inspected.

14          And each time that we scheduled a judicial inspection,

15   I ask a chemist to assist the legal team and they would report

16   to me that that same day that they had not been able to do

17   their work because they could not enter the laboratory.

18   Q.  If you turn to tab 16, Defendant's Exhibit 1417, do you

19   recognize those photographs as still shots from the Crude

20   movie, the movie Crude, that you were just discussing?

21   A.  I'm not certain if they're from the movie or from the

22   outtakes, but I have seen these images before.

23   Q.  And do you -- is this the judicial hearing that you were

24   referencing discussing the inspection of the lab, of HAVOC lab?

25   A.  I don't know that there was a hearing.  I saw Mr. Donziger

DAHLCHE5                         McMillen - cross

1   go into the office and speak with the judge without our

2   attorneys present.

3   Q.  Well, if you turn to the last photograph, do you recognize

4   that as being inside the judge's office with Mr. Donziger and

5   Mr. Ponce, and can you identify the person that's in that

6   picture?

7   A.  That's one of the Chevron attorneys on the Quito legal

8   team.

9   Q.  Is that Mr. Callejas?

10  A.  No, it's not.

11  Q.  Who is it?  I'm asking.  I thought it was Callejas, but who

12  is it?

13  A.  I'm having a mental block.

14  Q.  Is it Diego Reyes -- Larrea, Diego Larrea?

15  A.  Diego Larrea, that's right.

16  Q.  And does Mr. Larrea represent Chevron?

17  A.  Yes, he does.

18  Q.  In the Ecuadorian matter?

19  A.  Yes.

20          MS. NEUMAN:  For the record, your Honor, I think

21  counsel misidentified Luis Yanza as Mr. Ponce in the last page

22  of this exhibit.

23          THE COURT:  Well, you're not going to be a witness any

24  more than your adversary is.

25          MS. LITTLEPAGE:  Let me ask a better question.

1   Q.  Is the photograph No. 3 two representatives from the

2   plaintiff's group speaking with the judge?

3          THE COURT:  If you know.

4   A.  The third one I see the judge, I see Mr. Yanza and I see

5   Ponce.

6   Q.  Mr. Ponce.  And the fourth one would be the lawyer for

7   Chevron?

8   A.  Yes.

9          MS. LITTLEPAGE:  Judge, we move to admit Defendant's

10  Exhibit 1417.

11         MS. NEUMAN:  No objection.

12         THE COURT:  Received.

13         (Defendant's Exhibit 1417 received in evidence)

14  Q.  And was it your understanding that the court ordered -- the

15  court did not order an inspection of the HAVOC lab?

16  A.  It was my understanding that the judge said he was going to

17  suspend the inspection that day.

18  Q.  And can you tell me which labs Chevron used for their

19  samples?

20  A.  Yes.  We used Severn-Trent laboratories in Houston and New

21  Field's lab in Massachusetts.

22  Q.  And did Severn-Trent also have a office in Ecuador?

23  A.  They were constructing a laboratory in Ecuador, but it was

24  never used for the judicial inspection analysis.

25  Q.  And was a man called Mr. Borja, B-O-R-J-A, an employee of

DAHLCHE5                         McMillen – cross

1  Severn-Trent labs in Ecuador?

2  A.  Mr. Diego Borja, I'm not certain if he was an employee of

3  STL or not.

4  Q.  Do you know if he was a employee of Texaco or Chevron,

5  Texaco or Chevron?

6  A.  He was not a Chevron employee.

7  Q.  Had he been either a Texaco or Chevron employee?

8  A.  Not to my knowledge.

9  Q.  Was he a contractor of Texaco or Chevron?

10         MS. NEUMAN:  Objection, lacks foundation.  The witness

11  has never even worked for Texaco.

12         THE COURT:  Ms. McMillen, did you ever work for

13  Texaco?

14         THE WITNESS:  No, I did not.

15         THE COURT:  Do you have personal knowledge of whether

16  this individual ever worked for Texaco?

17         THE WITNESS:  No, I do not.

18         THE COURT:  Do you have personal knowledge of whether

19  he ever worked for Chevron?

20         THE WITNESS:  I know that he helped with shipping and

21  receiving, but I'm not sure exactly the employment arrangement.

22         THE COURT:  Shipping and receiving what?

23         THE WITNESS:  Of equipment and samples.

24         THE COURT:  And do you know for whom he did that, that

25  is to say, who his employer was when he did that?

DAHLCHE5                         McMillen - cross

1          THE WITNESS:  I'm not certain what the company was

2    that he worked for.

3          THE COURT:  Let's go.

4    Q.  But was the company that he worked for working for Chevron

5    doing shipping and receiving of equipment?

6          MS. NEUMAN:  Objection, lacks foundation.

7          THE COURT:  Sustained.  You have to lay a foundation.

8    Q.  Do you know if the company that Mr. Borja worked for was

9    contracted by Chevron to do shipping and receiving of equipment

10   and supplies?

11         MS. NEUMAN:  Objection, lacks foundation.  The witness

12   already testified she didn't know which company he worked for.

13         THE COURT:  I think that's right, isn't it,

14   Ms. Littlepage?

15         MS. LITTLEPAGE:  Yes.  I'm not asking for the name of

16   the company.  I'm asking if she knows the relationship between

17   that company which name she's forgotten and Chevron.

18         THE COURT:  So if he works for DHL and the answer is

19   yes, what have you got?  He works for the U.S. Postal Service

20   and you get a yes, what have you got?

21   Q.  The company that you do not recall the name, do you know

22   what role it played in working with Chevron, if any?

23   A.  No, I guess I don't.  I know that he did shipping and

24   receiving.  I don't remember the name of the company.  I never

25   saw any -- I don't know.

DAH8CHE6                         McMillen - cross

1   Q.  Did you ever meet Mr. Diego Borja?

2   A.  Yes, I did.

3   Q.  How many times did you meet Mr. Borja?

4   A.  I think I recall three occasions.

5   Q.  What were those occasions?

6   A.  I met him right before the judicial inspections began in

7   2004 to talk about how we were going to be able to get the

8   sample containers shipped into Ecuador, kind of the logistics

9   of shipping and receiving, how we were going to make sure that

10  we could get samples to the United States within the holding

11  time, that kind of thing.  And, basically, I reviewed the area

12  where the samples would be brought to Quito and then packaged

13  for -- putting coolers for the flight to the United States.

14  Q.  Was Mr. Borja responsible for that packing and shipping

15  process for the Chevron samples?

16  A.  I know he was a part of that process.

17  Q.  What about the other two occasions?

18  A.  The other two occasions were in the Oriente, in Lago Agrio.

19  Q.  What was the occasion of meeting Mr. Borja then?

20  A.  I believe that he was there during some judicial

21  inspections, and he was there and I remember speaking with him,

22  saying hi.  I believe he was probably there to assist with the

23  shipment of the samples to Quito.

24  Q.  The assistance would be for Chevron's shipment of the

25  samples to Quito?

DAH8CHE6                         McMillen - cross

1   A.  Or for the judicial inspection expert, because they were

2   the expert samples.

3   Q.  Was Chevron responsible for shipping the judicial expert

4   samples to Quito?

5   A.  I believe Chevron paid for that.

6   Q.  Did Chevron also pay for the judicial inspection expert

7   samples to be analyzed?

8   A.  I believe so.

9   Q.  Did Chevron select the lab that the judicial inspection

10  expert samples were analyzed?

11  A.  The SDL lab had been selected before I started working on

12  the case, and I suggested new fields for some specialized

13  analytical, but the judicial inspection expert would write on

14  their chain of custody which laboratory which samples should go

15  to.

16          THE COURT:  When you are referring to judicial

17  inspection experts, are you speaking of those nominated by

18  Chevron, those nominated by the other side, or the court

19  appointed nonparty nominated experts, all of them or some of

20  them?  What are you talking about?

21          THE WITNESS:  I know for the samples taken by the

22  Chevron nominated experts, that they were shipped under chain

23  of custody, and they would identify all the chain of custody,

24  what the samples were to be analyzed for and which laboratories

25  were to be used.  And I believe many of the times the

DAH8CHE6                        McMillen - cross

1    plaintiffs nominated experts also did that.

2              THE COURT:  You said earlier that you believed Chevron

3    paid for shipping the judicial experts' samples.  Is that true

4    for samples taken by the Chevron nominated judicial inspection

5    experts, the other side's nominated judicial inspection

6    experts, the court appointed nonparty nominated experts, or

7    some or all of them?

8              THE WITNESS:  To my knowledge, Chevron only paid for

9    the Chevron nominated expert samples to go to the laboratory.

10             THE COURT:  Now, is your answer the same with respect

11   to the selection of the laboratory at which the samples were

12   analyzed?

13             THE WITNESS:  I'm sorry?

14             THE COURT:  You were asked whether Chevron selected

15   the lab that the judicial inspection expert samples were

16   analyzed at.  And you responded that SDL had been selected

17   before you started working, that you suggested new fields for

18   certain special work, and there was chain of custody and so

19   forth.  When you said Chevron paid for the analysis of the

20   judicial expert samples, which experts were you talking about?

21             THE WITNESS:  I meant the Chevron nominated experts.

22             THE COURT:  Let's continue.

23   BY MS. LITTLEPAGE:

24   Q.  In your written statement, you discuss reviewing crude

25   outtakes and the movie *Crude* concerning the visit of President

1    Correa to the Oriente.  Do you recall seeing those images?

2    A.  Yes.

3    Q.  Were you in the Oriente the day that President Correa went

4    to the concession area to view the area?

5    A.  No, I was not.

6    Q.  If you turn to tab 18, Defendants' Exhibit 1420, do you

7    recognize those images as images that you saw of President

8    Correa in the Oriente?

9         MS. NEUMAN:  Objection.  Irrelevant.

10        THE COURT:  Sustained.

11   Q.  Ms. McMillen, this morning you indicated that you had made

12   two changes to your declaration -- three changes, two of which

13   dealt with this particular issue, President Correa going to the

14   Oriente to inspect.  Do you recall that?

15        MS. NEUMAN:  Objection.  It misstates the witness's

16   testimony.

17        THE COURT:  I would say so.  Sustained.

18        You did make two changes in paragraph 71, Ms.

19   McMillen, and they referred to a sentence in which you made a

20   the statement about President Correa going to Lago Agrio.  That

21   is correct, is it not?

22        THE WITNESS:  Yes.

23        THE COURT:  Next question.

24   Q.  Were there people of your technical team, Chevron's

25   technical team, present in the Oriente the day that President

DAH8CHE6                    McMillen - cross

1   Correa went to inspect the concession area?

2   A.  I would like to clarify that in my statement I am talking

3   about a visit that just happened I think two weeks ago, not

4   anything that happened in the outtakes.

5   Q.  OK.  Were you present when President Correa visited the

6   Oriente as shown in the *Crude* movie on the outtakes?

7   A.  No, I was not.

8   Q.  Were there people from Chevron technical team present the

9   day President Correa went to the concession area?

10           MS. NEUMAN:  Objection.

11  Q.  In the images captured on the movie *Crude*?

12           MS. NEUMAN:  Objection.  Lacks foundation.

13           THE COURT:  All she asked -- OK.

14           Do you know whether there were any Chevron technical

15  team there that day some years ago?

16           THE WITNESS:  Not to my knowledge, there weren't.

17  Q.  Were there Chevron people present in the last couple of

18  weeks when President Correa went back to the concession area?

19  A.  No.

20  Q.  On page 33 of your declaration, line 9, it's in paragraph

21  70.  It's the first couple of sentences of paragraph 70.  Do

22  you see that, Ms. McMillen?

23  A.  Yes.

24  Q.  You discuss some Ecuadorian government funded studies.  Do

25  you see that?

DAH8CHE6                          McMillen – cross

1   A.   Yes.

2   Q.   Can you describe for the Court what types of studies the

3   Ecuadorian government had funded on issues relating to the

4   concession area?

5   A.   In paragraph 70 here?

6   Q.   Yes, ma'am.

7   A.   Well, I found a copy of the contract, so part of the

8   wording from that contract is here.  And, really, all I know is

9   what is in the wording of the contract.

10  Q.   You have no personal knowledge of the studies?

11          THE COURT:  If indeed they were studies.

12  Q.   Or if they were even studies?

13  A.   I know we received documents from the Ministry of

14  Environment documenting the work that was done and who did it.

15  Q.   Do you have any personal knowledge of the type or scope of

16  the studies that were sponsored by the Ecuadorian government in

17  the concession area?

18  A.   I know what was written in the documents.

19  Q.   So what types of studies were done in the concession area

20  based on your understanding or knowledge of that topic?

21  A.   Just as it says.  There was an environmental liabilities

22  information system and information about the

23  socio-environmental problems.

24  Q.   Have you ever reviewed any of the underlying data for those

25  government sponsored studies in the concession area?

DAH8CHE6                          McMillen - cross

1       THE COURT:  If they were studies and if there is any

2   underlying data.

3   A.  I have seen some documents, but I haven't reviewed those

4   recently.

5   Q.  Did you review documents relating to the two specific

6   studies that you reference in your written statement in a way

7   that you would have any details about those studies?

8       THE COURT:  You know, you love the word "studies" in

9   this question, but I don't know where it's coming from.

10  Q.  I will call it data.  I think that's the word used in the

11  declaration.  Do you have any personal knowledge or detailed

12  information about the data collected in the two items

13  referenced in your written statement?

14  A.  Well, just as it said, I reviewed the documents, and I

15  noted that some of the people on that contract in those

16  documents were some of the same people that were listed in the

17  Anexo V of the Cabrera report as people that were working on

18  Mr. Cabrera's team.

19  Q.  If you turn to page 2, line 9 of your written statement,

20  it's paragraph 3, you discuss unfounded cost estimates.  Do you

21  see that in paragraph 3?

22  A.  Yes.

23  Q.  Did Chevron ever do a cost estimate analysis of any of the

24  issues related to the Ecuadorian case?

25      MS. NEUMAN:  Objection.  Relevance.

DAH8CHE6                         McMillen - cross

 1              THE COURT:  Sustained.

 2              MS. LITTLEPAGE:  Judge, may I proffer?  I believe that

 3    if a witness makes a statement that the cost estimates of the

 4    plaintiffs are unfounded, that I am allowed to ask if Chevron

 5    had any alternate cost estimates that might be the same,

 6    similar or different.

 7              THE COURT:  So your proffer is in fact an argument?

 8              MS. LITTLEPAGE:  My proffer is a proffer with some

 9    argument, small argument.

10              THE COURT:  Which is the proffer part?

11              MS. LITTLEPAGE:  I would like to ask the witness the

12    questions, and if the Court doesn't take it as the fact finder,

13    for the appellate record.

14              THE COURT:  No.

15         A cost estimate may be unfounded because it's made up.

16    It might even be a scientific wild-assed guess, to use a

17    technical term that I learned this morning.

18    Q.  If you turn to tab 20, Defendants' Exhibit 729, which has

19    already been received into evidence.  Do you recognize this

20    document?

21    A.  Yes.

22    Q.  Is it, in fact, an e-mail between you and Mr. Russell on

23    November 13, 2005?

24    A.  On this page it's an e-mail November 12 and November 13.

25    Q.  In this e-mail, did Mr. Russell offer --

DAH8CHE6                         McMillen - cross

 1          THE COURT:  Sustained.  It says what it says.  Next

 2    question.

 3    Q.  Did Chevron ever take Mr. Russell up on his offer to do a

 4    cost estimate on the issues relating to the Ecuadorian case?

 5    A.  No.

 6    Q.  In your direct testimony you discuss being actually present

 7    at some of the judicial inspections.  How many judicial

 8    inspections did you personally attend?

 9    A.  I attended 14.

10    Q.  At those judicial inspections, was the judge present?

11    A.  Yes.

12    Q.  Did the judge take testimony at those judicial inspections

13    from people who lived in that area?

14          MS. NEUMAN:  Objection.  The record speaks for itself.

15          THE COURT:  How is that clear?  We are now talking

16    about what taking testimony means under Ecuadorian law, right,

17    and what it means to take testimony under Ecuadorian law.  And

18    you're presupposing something, Ms. Neuman, and so, too, is your

19    adversary.  The question is indeterminable.

20          What do you mean, counsel?  Do you mean did the judge

21    cause any persons to be sworn to either permit the lawyers to

22    ask the questions, or for the judge to ask the questions, and

23    for a stenographer to take down what was said, did that ever

24    happen at one of these judicial inspections?

25          MS. LITTLEPAGE:  Yes, except for the stenographer.  I

DAH8CHE6                    McMillen - cross

1   believe they just used a recording device.

2            THE COURT:  You get to testify on Monday.  I am asking

3   Ms. McMillen.

4            MS. LITTLEPAGE:  I don't know if you wanted me to ask

5   her.

6            THE COURT:  I am asking Ms. McMillen.

7            THE WITNESS:  I saw during the judicial inspections

8   that sometimes local people would speak, but I don't recall

9   that they were sworn in.  They might have been.  I don't know.

10            THE COURT:  Did you see any stenographers writing down

11   what they said?

12            THE WITNESS:  The court secretary was there, but I

13   don't think she was a stenographer.

14            THE COURT:  We will do a lot better with asking what

15   happened than trying to package it in little packages with all

16   sorts of legal assumptions.

17            Let's go on, Ms. Littlepage.

18   BY MS. LITTLEPAGE:

19   Q.  Ms. McMillen, did you observe that there was a recording

20   device at the judicial inspections that recorded whatever local

21   people would speak?

22            THE COURT:  Did you observe whether there was a

23   recording device at the judicial inspections on any occasion?

24            THE WITNESS:  Yes.

25   Q.  Did you review the documents created out of those

DAH8CHE6                         McMillen - cross

1    recordings?

2              THE COURT:  If any were.

3    Q.  If any were?

4              THE COURT:  And if any recording device was ever

5    turned on and made any recordings.

6    A.  There were recordings made.  It was my understanding that

7    the attorneys for each side met with the court secretary and

8    then wrote down what happened during the judicial inspection

9    and it would be -- it was what they called a Judicial

10   Inspection Acta.

11   Q.  Did both sides get input into the acta?

12   A.  I wasn't present when that was done.  That was something

13   that the legal team did so I am not comfortable answering

14   exactly how that came about.

15   Q.  Did you ever review any actas?

16   A.  I have read a few of them.

17   Q.  Do they describe local people speaking?

18             MS. NEUMAN:  Objection.  Actas speak for themselves,

19   your Honor.

20             THE COURT:  I will take that as a best evidence

21   objection and sustain it.

22   Q.  Did you observe Chevron lawyers asking questions of the

23   local people who might speak at the judicial inspections, if

24   any?

25   A.  Yes, I think I did see that at at least one judicial

DAH8CHE6                          McMillen – cross

1    inspection.

2    Q.  Did you see lawyers from the plaintiffs' side asking

3    questions of local people, if any, at the judicial inspections?

4    A.  I don't remember seeing that.

5    Q.  Did you observe the judge asking questions of local people,

6    if any, at any of the judicial inspections?

7    A.  I know people spoke, but I really don't remember if the

8    judge asked them specific questions or not.

9    Q.  In your written statement, you note that the Ecuadorian

10   plaintiffs succeeded in canceling the judicial inspections.

11   What do you mean by that phrase?

12          Let me ask another question.  Did the plaintiffs'

13   group file a motion or a pleading to stop the judicial

14   inspections, if you know?

15          THE COURT:  We are calling for hearsay here, is that

16   the objective?

17          MS. LITTLEPAGE:  No, Judge.  I think I am calling for

18   her knowledge of an actual event.

19          THE COURT:  Was Abraham Lincoln elected the 16th

20   president of the United States?  Now, that's calling for

21   hearsay about an actual event, right?

22          MS. LITTLEPAGE:  It's also like what is your name?

23   Obviously, somebody had to tell them my name at some point to

24   know what my name is.

25          THE COURT:  So if you ask somebody who was in

1   Cleveland yesterday whether the light was green when there was

2   an accident on First Avenue, that's calling for an event.  And

3   on your theory, the person who was in Cleveland gets to testify

4   about whether the light was green.  Isn't that the logic of

5   your position?

6           MS. LITTLEPAGE:  No, sir.  I believe that if a witness

7   in a direct testimony states that the plaintiffs succeeded in

8   canceling the judicial inspections, I am allowed to ask the

9   basis of that -- not opinion because she's a fact witness, but

10  the basis of that statement.

11          THE COURT:  We agree with that.  Go right ahead.

12  Q.  Would you agree with me that the canceling of the judicial

13  inspection came from a court order?

14          THE COURT:  I thought the question you were going to

15  ask was what the basis for her statement was.

16  Q.  What is the basis of that statement?

17  A.  I know that the sites that the other side asked to have

18  judicial inspections of, that those judicial inspections never

19  happened.

20  Q.  Did they not happen because of a court order?

21  A.  I believe so.

22  Q.  Did you play any role on the technical side of any of the

23  briefing or motions filed by Chevron on the issue of a request

24  to cancel the judicial inspections made by the plaintiffs?

25  A.  I remember I discussed it with the legal team.  I don't

DAH8CHE6                         McMillen - cross

1    believe I had any direct role in writing any motions.

2    Q.  Did you review any orders from the court relating to

3    canceling the judicial inspections?

4    A.  I think I have seen it, but it wasn't typically my role to

5    review legal orders.

6    Q.  When you were at judicial inspections, did the judges also

7    accept legal argument during the judicial inspections, did you

8    observe that?

9    A.  I observed the attorneys for each side speaking.

10   Q.  Did you observe attorneys from either side providing

11   additional materials or documents to the judges during the

12   judicial inspections?

13   A.  Sometimes the attorneys would have what I would

14   characterize as visual aids, so they would have maps, aerial

15   photographs that were blown up, just like an exhibit I would

16   guess would be in the U.S.

17   Q.  Did you observe, other than the visual aids, lawyers from

18   either party providing documents to the judge that the judge

19   took away from the judicial inspection, if any?

20   A.  I don't recall if there was sharing of documents per se.

21   Q.  Did you play any role in the creation of visual aids or

22   materials that were used at judicial inspections?

23              MS. NEUMAN:  Objection.  Relevance.

24              THE COURT:  Sustained.

25              MS. LITTLEPAGE:  Judge, may I be heard?

1          THE COURT:  Sure.

2          MS. LITTLEPAGE:  There is an allegation that is in Ms.

3    McMillen's written statement in the amended complaint that

4    there is no ability to recognize or count pits based on aerial

5    photographs.  And aerial photographs were used at judicial

6    inspections, specifically to discuss with the judge the number

7    of pits that occurred at that site.  And so I would like to --

8          THE COURT:  Why don't you ask the witness what she

9    knows because she observed it as opposed to your testifying?

10         MS. LITTLEPAGE:  I apologize, Judge.  I thought I was

11   leading, but I will ask an open-ended question.

12   Q.  What did you observe in the judicial inspections -- let me

13   ask a slightly leading question.

14         THE COURT:  She said a little while ago that sometimes

15   the attorneys would have had what I would characterize as

16   visual aids, so they would have maps, aerial photographs that

17   were blown up, just like an exhibit I would guess would be in

18   the U.S.

19         Now, you may proceed from that.

20   Q.  Did you observe a discussion at the judicial inspections

21   about the location of pits based on aerial photographs?

22   A.  At the judicial inspections, they would show the maps or

23   aerial photographs for that particular site, and those were

24   always entered into the court record.

25   Q.  Did Chevron use aerial photographs to identify the location

DAH8CHE6                    McMillen – cross

1    of pits?

2    A.  We would never use aerial photographs alone to identify

3    pits.  The quality of the aerial photographs was very poor for

4    many of the years and they were in black and white.  It's

5    really impossible to accurately determine pit locations based

6    on aerial photographs.

7    Q.  Would aerial photographs be one of the sources of

8    information Chevron would use to look at the location of pits?

9    A.  The experts that we nominated were provided with aerial

10   photographs for their information and for their assessment of

11   the site.

12   Q.  If you turn to tab 22, Defendants' Exhibit 591.

13   A.  Yes.

14   Q.  Do you recognize this as a Chevron document called a

15   judicial inspection playbook?

16   A.  Yes.

17          MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

18   591.

19          MS. NEUMAN:  Objection.  Relevance.

20          THE COURT:  What is the relevance?

21          MS. LITTLEPAGE:  Judge, this judicial inspection

22   playbook was put together to help the technical team prepare

23   for the judicial inspection that uses aerial photographs to

24   identify and actually mark different areas of the site

25   including pits.

1              THE COURT:  And therefore?

2              MS. LITTLEPAGE:  Therefore, it is some evidence that

3     you can identify pits from aerial photographs.

4              THE COURT:  It's for that purpose?

5              MS. LITTLEPAGE:  Yes, sir.

6              MS. NEUMAN:  No objection for that purpose.

7              THE COURT:  Received for that limited purpose.

8              (Defendants' Exhibit 591 received in evidence)

9     Q.  Ms. McMillen, when you were talking about judicial

10    inspections, did Chevron have a policy of pre-inspections?

11    A.  The technical team for Chevron did conduct pre-inspections.

12    Q.  Can you describe for the Court what a pre-inspection is?

13    A.  It changed or varied over time and for different purposes.

14    I know I went on some pre-inspections before the judicial

15    inspections started because I had never been to Ecuador.  I

16    never worked for Texaco.  I hadn't seen any of the sites so we

17    went down and looked at several of the sites that were on the

18    judicial inspection requested site list.

19    Q.  Would Chevron know ahead of time which was the next site

20    that was going to be visited by the judge?

21    A.  I believe generally the court would order -- went in

22    basically the order that they were listed, unless there was

23    some reason not to, and I can't recall.  And the judge would

24    notify the legal team ahead of time, he would schedule a

25    judicial inspection, and so there was some notice, some amount

DAH8CHE6                     McMillen - cross

1    of time before we knew we would be there.

2    Q.  If you turn to tab 23, Defendants' Exhibit 592.

3            Can you confirm that this is a document discussing

4    judicial inspections and a layout for judicial inspections?

5            THE COURT:  Why don't we start with this.

6            Have you seen this before, Ms. McMillen?

7            THE WITNESS:  I have seen this before.

8            THE COURT:  All right.  What is it?

9            THE WITNESS:  This is a table for the summary of

10   sampling and testing program for the Sacha Norte production

11   station.

12           THE COURT:  Prepared by who?

13           THE WITNESS:  That was prepared by Bjorn Bjorkman, who

14   was a Chevron nominated judicial inspection expert.

15           MS. LITTLEPAGE:  We move to admit Defendants' Exhibit

16   592.

17           MS. NEUMAN:  No objection.

18           THE COURT:  Received.

19           (Defendants' Exhibit 592 received in evidence)

20   Q.  If you turn to page 2, under sampling activities, the box

21   which starts, "Collect soil samples at four or more locations

22   surrounding the site using locations that the PI team has shown

23   to be clean."  Can you tell me what the PI team is?

24   A.  It's an abbreviation for pre-inspection.

25   Q.  When Chevron conducted the pre-inspections, would Chevron

1   take samples of the site ahead of the time for the official

2   judicial inspection?

3            MS. NEUMAN:  Objection.  Relevance.

4            THE COURT:  Overruled.

5   A.  Sometimes.

6   Q.  And would Chevron have those samples analyzed?

7   A.  Yes.

8   Q.  Would Chevron look to see if the samples showed impact

9   versus clean?

10  A.  I would look at all the pre-inspection data and just look

11  at what the results were in general.

12  Q.  Would some of the results show impact and some of the

13  results show clean?

14           MS. NEUMAN:  Objection.  Vague.

15           THE COURT:  Overruled.

16  A.  Sometimes there would be hydrocarbons that would be

17  detected in samples or other compounds detected in samples.

18  Q.  Was Chevron's judicial inspection protocol, as reflected in

19  Defendants' 592, that there would be a collection of soil

20  samples at four or more locations surrounding the site, using

21  locations that the pre-inspection team had shown to be clean?

22           MS. NEUMAN:  Objection.  It misstates the evidence.

23           THE COURT:  It's a question.  Overruled.

24  A.  This was Mr. Bjorkman's plan for this particular site, and

25  what he is referring to here is taking perimeter samples.  And

DAH8CHE6                    McMillen - cross

1   the reason I believe he was doing that was because of the

2   plaintiffs' claim that there was widespread contamination, and

3   so he was striving to delineate where there were impacts and

4   where there were not.

5   Q.  The word clean would mean a sample that had been tested to

6   show no contamination or limited contamination?

7          Let me ask another question.  Would clean mean no

8   contamination?

9   A.  Mr. Bjorkman wrote this.  I assume he probably means that

10  there was no or very little concentration of hydrocarbons

11  present.

12  Q.  Was it Chevron's practice to use the pre-inspection data to

13  collect samples at sites during the judicial inspection that

14  Chevron already knew was clean from the pre-inspection?

15  A.  Well, this document is specific to Sacha Norte 1.  So this

16  document doesn't reflect what other nominated experts did at

17  different sites.

18         I'm sorry.  I am trying to answer your question, but I

19  think your question is broader than this document perhaps.

20  Q.  Yes.  And then I was going to ask you a more specific

21  question about this document.

22         My broader question is, did Chevron have a protocol to

23  sample during the judicial inspection sites that Chevron

24  already knew was clean based on the pre-inspection analysis?

25         THE COURT:  Chevron didn't pick the sites or did it?

DAH8CHE6                    McMillen – cross

How were the sites determined?

           I am asking the witness, not the lawyer.

           THE WITNESS:  The judicial inspection sites were
requested by both parties.  So some were requested by Chevron
and some were requested by the Frente, and they would be well
sites or production sites.

Q.  The sample locations, did the parties get to choose or at
least have some input into which locations in that site were
sampled during the judicial inspection?

A.  The way I observed the judicial inspection process
occurring was that the attorneys for each side would discuss
with the judge or point out to the judge certain features of
the site, and would suggest sampling of certain features of the
site, and the judge would then order the experts to take
samples or he would kind of affirm the request from both legal
teams.

Q.  Were the pre-inspections sample analysis submitted to the
court in Lago Agrio?

A.  No.  It was my understanding that they were inadmissible.

Q.  Did the plaintiffs' group know that Chevron was conducting
pre-inspection sampling before the official judicial
inspections?

A.  Yes.

Q.  How did they know?

A.  I know that we asked through the court for access to some

DAH8CHE6                    McMillen - cross

1    sites, so that request would have been filed with the court.

2    And, also, I know that the technical teams would see each other

3    at sites.

4    Q.  On the last column in the analysis column it indicates,

5    "Samples showing field evidence of contamination are sent to

6    new field for PAH analysis."

7              First of all, what is field evidence of contamination?

8    A.  This is Mr. Bjorkman's document again, but I believe what

9    he would be referring to, if he saw visible evidence of

10   hydrocarbons, that it would be sent to new fields for this type

11   of analysis.

12   Q.  Did Chevron take videotapes, video record the

13   pre-inspection process?

14   A.  Sometimes.

15   Q.  Were those video recordings submitted to the Lago Agrio

16   court?

17   A.  I only recall one occasion where that was done, and that

18   was at Sacha 14 where there was a video showing Petroecuador

19   remediating a spill at the site.

20   Q.  Other than the one occasion at Sacha 14, did Chevron submit

21   their pre-inspection video recordings to the court in Lago

22   Agrio?

23   A.  Not to my knowledge.

24   Q.  Were the pre-inspection videos provided to the plaintiffs'

25   group in the Lago Agrio case?

DAH8CHE6                          McMillen - cross

 1            MS. NEUMAN:  Objection.  Work product.

 2            THE COURT:  That's a question.  It's a yes or no.

 3    They either were or weren't.  We are not talking about why.

 4            THE WITNESS:  Not to my knowledge.

 5            THE COURT:  How much longer with the witness, please?

 6            MS. LITTLEPAGE:  I am actually entering an area that I

 7    need to approach the Court with.  You told us there was some

 8    issues that you wanted us to approach you on before we asked

 9    questions, and I want to notify the Court of that now.

10            THE COURT:  All right.  And if that were to go

11    forward, how long?  And if it were not, are you done?

12            MS. LITTLEPAGE:  If it were not, I am done in about

13    five minutes.  It's a distinct topic.

14            THE COURT:  We will take a short break and I will see

15    counsel and the reporter in the robing room and we will deal

16    with this.

17            (In robing room)

18            THE COURT:  What's up, Ms. Littlepage?

19            MS. LITTLEPAGE:  There are two issues.  I will

20    highlight them.  The first is the pre-inspection videotapes.

21            THE COURT:  Yes.

22            MS. LITTLEPAGE:  The second is Chevron's lab results

23    from the judicial inspections.

24            Let me start with the first one.  As I have

25    established with the witness, Chevron did pre-inspections,

DAH8CHE6                          McMillen - cross

1    recorded themselves, and those results were not filed in the

2    Lago Agrio record.  We received copies of about 50 -- is that

3    right?  A box of tapes was left at Amazon Watch anonymously.

4    We notified Chevron that we had received this box of tapes,

5    because when Amazon Watch watched them, it was clearly

6    videotapes of Chevron sampling the sites before the official

7    judicial inspection.

8            Several months went by.  We did not hear from Chevron.

9    My understanding is those tapes were filed in some court

10   proceeding, and the day that they were filed in the court

11   proceeding there was a --

12           THE COURT:  Filed by who?

13           MS. LITTLEPAGE:  By the plaintiffs.

14           THE COURT:  By your side.

15           MS. LITTLEPAGE:  Yes.  They were filed by our side in

16   a legal proceeding.

17           THE COURT:  In this country?

18           MS. LITTLEPAGE:  In this country.  That same day or

19   very contemporaneously Chevron asserted a privilege over the

20   videotapes as a work product privilege.

21           That issue has come to the court peripherally, as I

22   understand it from looking at the record.  We asked for a

23   30(b)(6) witness to question the witness about the inspection

24   videos.  The court allowed us to do that and Ms. McMillen was

25   put up as the 30(b)(6) witness.  She did identify that they are

DAH8CHE6                    McMillen - cross

1    in fact pre-inspection videos, that she had seen them, and they

2    were Chevron employees, she recognized the people.  It is in

3    fact the Chevron tapes.  But the privilege issue has -- the

4    special master did not allow any substantive questions on the

5    issue, and I don't believe this Court has ever ruled

6    specifically on the work product privilege of the issue.  And

7    because Ms. McMillen is here and would be the person through

8    which I would put the pre-inspection videos into the record.

9              THE COURT:  Did the special master rule on the

10   privilege issue?

11             MR. MASTRO:  Yes, your Honor.

12             MS. LITTLEPAGE:  From my review of the deposition,

13   that is not what happened.  My review of the deposition is

14   Chevron took the position.  The court had already ruled on the

15   privilege.  The defendants took the position that the fact that

16   the court had allowed us the deposition indicated that there

17   was some discovery permitted on the issue.  But we were allowed

18   to ask authentication questions so that we could at least prove

19   that they weren't just dummy tapes, they are in fact what they

20   are.

21             THE COURT:  Did you ask questions going beyond

22   authentication, objections to which were sustained?

23             MS. LITTLEPAGE:  Yes, sir.

24             THE COURT:  Did you appeal it?

25             MS. LITTLEPAGE:  That I don't know.

DAH8CHE6                       McMillen - cross

1              MR. MASTRO:  No, your Honor.  I was actually at the

2     deposition.

3              MS. LITTLEPAGE:  I think Mr. Gomez was there.

4              MR. DONZIGER:  I was there too.  This a little

5     challenging because counsel is so new.  But my recollection is

6     we never actually showed the videos.  Special Master Katz

7     determined that threshold issue, I believe, that it was work

8     product and prevented us from showing the videos.

9              We had copies of the videos.  We had edited them down

10    to coherent short versions that we felt could be appropriately

11    shown to the witness for various reasons, and we were told we

12    were not allowed to do that.  We never showed them.

13             THE COURT:  Did you appeal Judge Katz's ruling?

14             MR. GOMEZ:  No, we did not.

15             THE COURT:  Mr. Mastro, what is your side of it?

16             MR. MASTRO:  Your Honor, I will be very brief.  This

17    isn't a new issue to your Honor.  Your Honor ruled back on

18    March 13 that --

19             THE COURT:  It seems like a lifetime ago.

20             MR. MASTRO:  It does to all of us, your Honor, except

21    the new folks who are here.  Your Honor ruled, in view of the

22    fact that the Ecuador pollution case is not to be retried here,

23    these videos are not relevant.  That's docket entry 901 at

24    pages 2 and 3.

25             Then, of course, this issue was broached.  And I know

DAH8CHE6                    McMillen - cross

1    Ms. Littlepage is new to the case so I would like to see what

2    notice we were given by Amazon Watch.  The first we found out

3    that they had improperly obtained our work product was when it

4    ends up being filed in another case and we asserted work

5    product.

6            Then what happens?  Despite your Honor's ruling, they

7    try and bring it in before Special Master Katz.  And Special

8    Master Katz, after allowing them foundational type questions,

9    expressly ruled, "The videos clearly fall within the work

10   product privilege."  That's McMillen deposition, page 196,

11   lines 1 and 2.  And he further held expressly, same page, lines

12   3 through 5, that the videos "were made at the direction of an

13   attorney for the purposes of prelitigation investigation."

14   And then there was no appeal, end of story.

15           We have demanded these videos back time and time again

16   after your Honor's ruling and after Special Master Katz's

17   ruling.  They have refused even though they have obtained them.

18   We don't know how they obtained them, but obviously in some

19   surreptitious means, and now they are trying to introduce them

20   here.  I hope the Court will have none of it.  They are beyond

21   the point where they can possibly raise this issue.

22           THE COURT:  Let me go to the next point.  Assuming I

23   were to disagree so far, what do you say these prove?

24           MS. LITTLEPAGE:  There is assertions in Ms. McMillen's

25   witness statement that the plaintiffs -- I don't have her

DAH8CHE6                    McMillen - cross

1    statement in front of her, but basically she discusses the

2    conduct of the parties at the judicial inspections, and one of

3    the things she talks about is her perception that the

4    plaintiffs would tap their foot at a certain area and make sure

5    that the judicial samples happened at that area.

6           So for the full context, and we are here on the state

7    of mind of Mr. Donziger and what was or was not his state of

8    mind as to the appropriate conduct at the judicial inspections,

9    I think it's important for the Court to understand the context

10   that the defendants were at the judicial inspections with

11   pre-inspection sample data, that they knew where was impacted

12   and where was clean, and that they requested site samples at

13   the judicial inspection process of areas that they knew to be

14   clean.

15          THE COURT:  What is the evidence of that?

16          MS. LITTLEPAGE:  The document I just discussed with

17   Ms. McMillen.

18          THE COURT:  Really?

19          MS. LITTLEPAGE:  I think it is some evidence that

20   their expert, in his own judicial inspection report --

21          MS. NEUMAN:  I think we are confusing Ms. McMillen's

22   statement.

23          THE COURT:  One thing at a time.

24          Continue with what you think they prove and why.

25          MS. LITTLEPAGE:  I think that they put a full context

DAH8CHE6                        McMillen - cross

1   on the assertions and allegations raised as to the conduct --

2              THE COURT:  That may be, but so does the

3   constitutional history of Ecuador put a full context on it.

4              What do you think it proves that is material to this

5   case?

6              MS. LITTLEPAGE:  I think it proves two things, and we

7   are going to get to the second part in just a minute, but I

8   think it proves that those pre-inspection sample results were

9   not submitted to the court.

10              THE COURT:  Are you suggesting there was any

11   requirement that that be done?

12              MS. LITTLEPAGE:  No.

13              MR. FRIEDMAN:  May I speak?

14              THE COURT:  Sure.  Go ahead.

15              MR. FRIEDMAN:  In my view, there are two ways to look

16   at this information.  One would be that Chevron is going ahead

17   to the sites that it knows are going to be inspected.  It's

18   taking samples ahead of time so that, to use a euphemism, it

19   can cheat.

20              THE COURT:  That's your argument.  But in a minute we

21   are going to see why that is at best a stretch.

22              MR. FRIEDMAN:  It might be a stretch.  I acknowledge

23   that.

24              The other way to look at this evidence is to say there

25   is nothing improper about doing that.  If the parties have

DAH8CHE6                    McMillen - cross

knowledge ahead of time that there are areas that are clean,

and therefore indicate to the judge ahead of time, it's OK,

we'd like you to do here or sort of signal we want you to do

here or there, that that's perfectly appropriate.

Either one of those helps our case because Chevron's

position is that we had ahead knowledge of where the

contaminated areas were, and we were signaling for people to do

samples there, and that that was improper.  So it's either

improper or it's cheating.  I mean, it's either improper or

it's OK, and whichever one it is helps us, and this evidence

shows that, in essence, both sides were doing the same thing.

MS. LITTLEPAGE:  May I add one thing?  The

pre-inspection videotapes do indicate that Chevron is finding

impacted areas, to use Ms. McMillen's words.  You do see on the

videotape, as they take the samples, there is a discussion of

the smell of the oil in the soil and the texture of the soil.

There is a closeup of the mud where you can see sort of a

viscous fluid to the mud.  The pre-inspection videos do show

that there is at least advance knowledge on Chevron's part of

areas that are potentially impacted and areas that are

potentially clean.  And then they confirm it with their lab

testing.

THE COURT:  So you're telling me that if you look at

the film, you see the dirty areas, and Chevron needed this in

order to determine where the dirty areas were?

DAH8CHE6                        McMillen - cross

1          MR. FRIEDMAN:  When you stick the core in.

2          MS. LITTLEPAGE:  They go down like ten --

3          THE COURT:  I appreciate all the advocacy, but let me

4     as to this first issue, the pre-inspection videos, say the

5     following.

6          Number one, you had your chance with the special

7     master.  You argued the issue.  You lost.  You had the right to

8     appeal.  You didn't.  It's over on that basis.

9          Secondly, even if you hadn't lost on that basis, which

10    effectively amounts to law of the case, and I were to consider

11    the matter de novo, my view would be that it's obviously work

12    product and you don't get it anyway.

13         Third, I appreciate Mr. Friedman's candid

14    acknowledgement that the argument may be a bit of a stretch

15    with respect to this pre-inspection inspection I guess, right?

16    Actually, I read the whole document you were examining the

17    witness about, not just the parts you highlighted.  It's

18    Defendants' Exhibit 592 for the record, the Bjorkman document

19    relating to Sacha Norte 1.

20         Now, you focused on line number 3 on the first page of

21    the table, and you completely ignored the very first thing that

22    is stated there.  That the point here was to draw a clean line

23    around the site to show no widespread impacts.  And this part

24    you did emphasize.  "Locations for perimeter sampling should be

25    chosen to emphasize clean points around the pits when

DAH8CHE6                    McMillen - cross

1    possible." And then adjacent to that, under sampling

2    activities, it says, To collect soil samples at four or more

3    locations around the sites using locations that the preliminary

4    inspection team has shown to be clean.

5         Now, to me it's crystal clear that the point made in

6    that line is perfectly analogous to what happens when a surgeon

7    operates on a malignant or suspected malignant tumor. There is

8    a tumor. You want to know if it is malignant, and if it is

9    malignant, you want to know how far out, from what is

10   observable with the naked eye and then confirmable

11   pathologically, the tumor extends. And so the surgeon causes

12   the pathologist to test not only the heart of the tumor, which

13   is of course essential to identify the pathology, but what

14   appeared to be clean areas around it to ensure that when the

15   surgeon cuts -- the analogy here being remediates -- you get

16   the whole cancer. The presupposition is here we are testing

17   pits that are, to one degree or another, in colloquial terms,

18   dirty, cancerous using my metaphor. And what this line is

19   talking about is, don't assume that it spreads outward from the

20   pit infinitely. What are the limits?

21        Now, that's very important. It's important to what

22   damage there may have been. It's important to what, if any,

23   remediation there ought to be. It's important to what that

24   remediation might cause. But that's not all that is in this

25   document. Because on the last page of the table, in line

DAH8CHE6                    McMillen - cross

1   number 7, in sampling activities, it talks about collecting

2   representative samples from within the pit spill area or other

3   potential area of concerns.  If plaintiff sample is not a

4   representative sample of pit area conditions, do not take a

5   split of the sample but collect an independent representative

6   sample.  And then a little later down it talks again about

7   perimeter sampling.

8           So the suggestion that I took -- maybe it's not what

9   you intended, but that I took -- was that you were suggesting

10  something nefarious about perimeter sampling, the implication

11  being that there was an attempt by perimeter sampling to get a

12  dirty location to test clean, when in fact the thrust of the

13  document on its face is to define what the area of dirt, if

14  there is one, is and beyond which it doesn't extend any

15  further.

16          So, look, you will argue what you're going to argue

17  about it, but it's to me, at least at first blush, and maybe

18  there will be more evidence, just not quite what I at least

19  took the implication of the line of examination to be, perhaps

20  wrongly.  But the bottom line of it all is no pre-inspection

21  videos.

22          Now, let's go to your second issue.

23          MS. LITTLEPAGE:  My second issue, Judge, is tab 27.

24  It is a collection of --

25          THE COURT:  So this is Plaintiff's Exhibit?

DAH8CHE6                      McMillen - cross

1        MS. LITTLEPAGE:  Defendants' Exhibit 1425.

2        THE COURT:  Defendants' Exhibit.

3        MS. LITTLEPAGE:  Yes, sir.

4        THE COURT:  I'm sorry.  You're right.  We all get

5   conflicted and mixed up on this.

6        MS. LITTLEPAGE:  Defendants' Exhibit 1425 is a few, I

7   think I chose 12 or 13, lab results of various different

8   judicial inspection sites.  These are all lab results from

9   Chevron's expert's judicial inspections.

10        MS. NEUMAN:  Do you mean filed in the record with

11   their report?

12        MS. LITTLEPAGE:  Yes.  But it's not the report; it's

13   just the lab data.

14        THE COURT:  And so?

15        MS. LITTLEPAGE:  Judge, I know you heard Mr. Friedman

16   talk about this in opening statement.  From reviewing the

17   record, it appears that the Court and Chevron was clear earlier

18   this year of narrowing the focus of this trial.  The language

19   being the discrete inquiry was whether there were findings

20   untainted by fraud in the Ecuadorian record that supported the

21   verdict.  And having read the Court's order, we have tried to

22   tailor our case to the discrete inquiry that was reflected in

23   that order.  And this is Chevron's evidence, and there is no

24   allegation Chevron's experts were tainted by fraud.

25        THE COURT:  Not that we have heard so far.

DAH8CHE6                          McMillen - cross

1          MS. LITTLEPAGE:  No allegations in the complaint on

2    that issue.

3          THE COURT:  Or the answers.

4          MS. LITTLEPAGE:  Or the answers.  And this is a series

5    of lab results from Chevron's experts that show elevated levels

6    of various chemicals and products, at various different sites,

7    that is some evidence untainted by fraud in the Ecuadorian

8    record to support the verdict.

9          So narrowing our case according to that inquiry, I

10   would like to move to admit Defendants' Exhibit 1425 to address

11   that specific part of the discrete inquiry.

12         THE COURT:  What does Chevron have to say?

13         MR. MASTRO:  Your Honor, it seems to me that this goes

14   to the very heart of the line that has been drawn in this case.

15   This is an attempt to cherry pick a few test results and put

16   them into the record.  We don't know whether these are sites

17   that Petroecuador continued to work at afterwards, what the

18   sources of the pollution are.  This really is just an attempt

19   to cherry pick to litigate the merits at certain sites.

20         We are talking about fraud on a massive scale and the

21   ghostwriting of a court expert's report and then the judgment

22   itself.  We are not talking about cherry picking a few data

23   results.  Now we are going to have to go back and litigate the

24   dozen results here, and I am going to have to go back and point

25   out how that test result happened to have been a Petroecuador

DAH8CHE6                    McMillen - cross

1   subsequent pit or the levels were not high enough to constitute

2   something.  That is going right to the merits.  It's not what

3   we are supposed to be doing and there is not evidence in the

4   record to support an $18.2 billion judgment.  So if we get into

5   these kind of weeds, we are going down a path that both your

6   Honor and we committed not to go.

7              THE COURT:  This exhibit is part of the Lago Agrio

8   record, is that right?

9              MS. LITTLEPAGE:  Yes, sir.

10              THE COURT:  Now, is it being represented to me that

11   this is all there is in that record on that subject?

12              MS. LITTLEPAGE:  No, sir.  No.  But the discrete

13   inquiry in the Court's order says any findings untainted by

14   fraud.  I was bringing the Court some findings, certainly not

15   all findings.

16              MR. MASTRO:  This isn't a finding.

17              THE COURT:  This is a joke, OK.  Please understand

18   it's a joke.  You're going over to that record and you're

19   tapping your foot by the judge about which part of it you want

20   me to look at.  Is that about it?

21              MS. LITTLEPAGE:  No, sir.  But I don't think there is

22   any allegation that these records are tainted by fraud.

23              THE COURT:  I understand.  But what about others that

24   may not be tainted by fraud?

25              MR. MASTRO:  This isn't a finding at all.  This is

DAH8CHE6                    McMillen - cross

1   just one piece of data.

2              THE COURT:  I understand that.

3              MR. FRIEDMAN:  Can I address that?

4              THE COURT:  Yes.

5              MR. FRIEDMAN:  Throughout Judge Zambrano's record he

6   cites Chevron's scientist's reports and data.  We haven't

7   collated every single reference, but this is the precise point

8   that we are trying to make.  That if the issue is, are there

9   parts of the judgment that are untainted by fraud, if Chevron

10  is saying this is correct information and this is the

11  information that is relied upon in the judgment, then that

12  would seem to be highly relevant.  We are not relitigating.  We

13  are not asking you to rule who is right about who is

14  responsible for this oil or that oil.  We are not asking you to

15  rule on which pits were Texaco's.  What we are asking you to

16  look at --

17             THE COURT:  That may matter.

18             MR. FRIEDMAN:  It may matter.  I agree that may

19  matter, but that's a different issue than what we are talking

20  about right now, which is you take Judge Zambrano's order, and

21  you will see all the sites to Chevron's expert data and

22  reports, and we are just connecting the dots and saying, yes,

23  indeed, here is -- I guess if they would stipulate that he got

24  their results right -- well, it's their stuff.

25             THE COURT:  Finish your point.  Mr. Mastro is

DAH8CHE6                         McMillen - cross

1    sometimes more expressive than he perhaps should be.

2              MR. FRIEDMAN:  My point is simply that one way or

3    another we have to address the question of whether or not that

4    judgment is supportable or not.  And we are trying to show you

5    that it's supportable largely by Chevron's own data and

6    scientists, which nobody is claiming is fraudulent.

7              THE COURT:  Let's get for the moment to a bottom line.

8    You don't need this witness for this at all, right?

9              MS. LITTLEPAGE:  She is the lead scientist.  If there

10   was any issue about these results, she was the person in charge

11   of this process.

12             THE COURT:  I heard a full day of testimony from her.

13   You don't need her at all.  It is what it is, and if I decide

14   it's admissible, it's not going to change.  You basically spent

15   the day with her, in the main, in an examination that for the

16   most part didn't have to be done at all, for the most part, not

17   entirely.

18             MS. LITTLEPAGE:  That's so hurtful.

19             THE COURT:  Full credit for hard work, extensive

20   preparation, but truly, this could have all been argued on the

21   papers in major part.  You don't need her for anything here,

22   right?

23             MS. LITTLEPAGE:  If the Court does not believe we need

24   any underlying testimony for the data, we do not need her.

25             THE COURT:  Do you think there is any necessity for

DAH8CHE6                          McMillen - cross

1    the data, testimony for the data, assuming it's otherwise

2    admissible?

3              MR. MASTRO:  Not from this witness.  But the fact of

4    the matter is this data that they are trying to put in is only

5    in the Ecuadorian record attached to experts' reports, experts

6    proffered by Chevron, all of whom interpret that data and

7    conclude that it does not support one whit what is in the

8    judgment.  So you couldn't take the data without having the

9    data attached to the expert reports interpreting it and saying

10   to the Ecuadorian court, this data shows you can't enter a

11   judgment for the other side, and then we get into relitigating

12   the merits.

13             THE COURT:  Let's focus on this witness.

14             MR. MASTRO:  No need for this witness.

15             THE COURT:  Right?

16             MS. LITTLEPAGE:  Yes, sir.

17             THE COURT:  So you can both brief this issue in due

18   course.  If I conclude that it should come in, it will come in.

19   If that necessitates other evidence, it will necessitate other

20   evidence, and we will see.  I will think about it.

21             MR. MASTRO:  Understood.

22             THE COURT:  I understand both sides' points.

23             So we are done with this witness, is that right?

24             MS. LITTLEPAGE:  Yes, sir.

25             THE COURT:  Now, a couple of other things I will say,

DAH8CHE6                    McMillen - cross

1   and I will say it here.

2         I was handed, Mr. Mastro, a piece of paper this

3   morning relating to Plaintiff's Exhibit 4A, and the suggestion

4   is that you put stuff before me that was very much out of

5   context, that key language was dropped, and I am not asking for

6   a response now, but I want to know the full story about this,

7   and I would like to know it by next week.  I take it seriously.

8   That's the first thing.

9         The second thing I have already alluded to.  I really

10  do appreciate, Ms. Littlepage, how hard you're working on this

11  and how much preparation has gone into it.  You're trying to

12  put in the whole defense case through witnesses who for the

13  most part have no personal knowledge of many of the subjects

14  you're asking about, and that's why we are having the

15  difficulty and the slow progress that we are having, in part.

16        And the other part of it is what I alluded to a day or

17  so ago, and that is that Chevron just couldn't resist the

18  temptation to turn every one of these witness statements into

19  yet another brief with witnesses arguing the case often on the

20  basis -- I shouldn't say often, but in some degree, big or

21  small, on the basis of hearsay and stuff they have read and so

22  forth, and I have already addressed myself to that.  And let's

23  try to avoid both.  This will go a lot more smoothly.  I have

24  no problem with the lawyers, but let's just get on with it.

25        MR. MASTRO:  Understood, your Honor.

DAH8CHE6                          McMillen - cross

1          If I may just briefly say, and then we will give your

2     Honor a fuller report later.  First, on the latter point.  I

3     promised after these two witnesses to go over all of our

4     already submitted declarations and over the weekend we will

5     give revised ones.

6          THE COURT:  Blue pencil, please.  I think that will be

7     best, if it's possible.

8          MR. MASTRO:  And the new ones that we submitted last

9     night, we did take out paragraphs in at least two of them.  So

10    the others that we have already given, and there are 14 others

11    I believe, we will go through all of them, and we will serve

12    them over the weekend and get them to the Court.

13         On the point of the quotation that they use, we have

14    given them the clips we wanted to put in.  They have been out

15    there for a long time.  The particular clip that we are talking

16    about your Honor saw the very first day I appeared before your

17    Honor.  And Mr. Donziger's self-serving comments, things like

18    Texaco bribed the judge, we asked him in his deposition about

19    that and whether he had any --

20         THE COURT:  I understand.  I even remember it.

21         MR. MASTRO:  We didn't take it out of context.

22         THE COURT:  I know you asked him at his deposition, I

23    seem to remember that anyway, and that he said he had no

24    evidence of it.

25         MR. MASTRO:  Correct.

DAH8CHE6                        McMillen – cross

1            THE COURT:  I understand that.

2            Even assuming that's accurate, and at least for the

3    moment I accept that representation, it's consistent with what

4    I remember, I am troubled by selective editing.  Let's just

5    leave it at that.

6            MR. MASTRO:  I understand, your Honor.  But on the

7    crude clips that we proposed, approximately half of them, they

8    don't have any counterdesignations, and in one sense it's a

9    little bit like a deposition, in the sense that we know what we

10   want to use.  Much of what Steve Donziger says on these

11   particular crude outtakes are self-serving, self-promotion,

12   hearsay that would never come in.  So we don't want to offer

13   his diatribes about Chevron.  I alluded to this in my opening,

14   that the things they say are out of context are his diatribes

15   against Texaco that are totally unsupportable.

16           THE COURT:  I didn't want to take up the substance of

17   this this afternoon at all, and I still don't.

18           MR. MASTRO:  I am just trying to explain.

19           THE COURT:  I just want that addressed.

20           MR. MASTRO:  It certainly will be.  But they have had

21   every right to designate what they wanted from the crude clips.

22           THE COURT:  I have got it.  I don't know what actually

23   happened.  But when you leave words out of a quote, the custom

24   is to put ellipses in for one thing, and even when you do that,

25   you better be fair in what you're doing.  So I just want to

DAH8CHE6                    McMillen - cross

1    know what happened.  I haven't prejudged it one way or the

2    other, but I want to know what happened.

3           The comment with respect to witness statements, there

4    are at least two more of these witness statements.  Is there

5    going to be a challenge to Nancy Moore's testimony?

6           MS. LITTLEPAGE:  That's my witness, but I will be

7    honest, I haven't reached her yet because I was focusing on the

8    witnesses for this week.  You're ahead of me.  I don't know.

9           THE COURT:  OK.

10           MS. LITTLEPAGE:  I can look at it over the weekend.

11           THE COURT:  There is another one, Meacham.  Is that

12    the former FBI agent that is going to instruct me on the law of

13    RICO?

14           MR. MASTRO:  Actually, your Honor, that's not the

15    reason he has been offered.  He has been offered as an expert

16    on association in fact enterprises that he has testified about

17    in the past, and was part of putting together such cases for

18    the FBI involved in RICO cases.  And in my experiences going

19    back to the U.S. Attorney's Office days, agents -- and

20    Mr. Meacham was for many, many years -- often testified on

21    enterprise, in the association in fact context, on what would

22    constitute an enterprise and how it came together and why it

23    constituted a RICO enterprise.  We are not talking about a RICO

24    enterprise that is an existing entity like a corporation being

25    used for criminal activity.  We are talking about an

DAH8CHE6                        McMillen - cross

1   association in fact.  And that is not an uncommon form of

2   testimony at a RICO trial, I don't believe.

3           THE COURT:  Well, that would come as a surprise to me.

4   And the Second Circuit has had a lot to say in the last couple

5   of years about expert testimony in criminal cases generally.  I

6   can't say specifically to association in fact enterprises, but

7   organized crime, drug organizations, and you folks ought to pay

8   attention to that.  I certainly understand what the plaintiff's

9   enterprise theory is.  You ought to consider whether you need

10  the testimony of that witness.  I am not ruling on it now.

11          MR. MASTRO:  I understand.

12          THE COURT:  Think about it.

13          Mr. Gomez keeps giving me a letter -- I am teasing of

14  course -- every day.  It's not really every day.  We have

15  dropped 50 more witnesses.  I don't have any idea who is on

16  your witness list anymore, Mr. Gomez.  You never tell me.  You

17  never tell me all these witnesses who have disappeared.  We

18  need a witness list.  I have got to know where we are.

19          MR. MASTRO:  We would appreciate that.

20          THE COURT:  We have been through three days now.  How

21  long is this going to go, with the benefit of three days of

22  experience?  I am hoping to get up to the rate of speed Mr.

23  Gomez is trying to achieve.

24          MR. MASTRO:  Of course, we are going to do what we

25  pledged to do at your Honor's direction to narrow some of the

DAH8CHE6                    McMillen - cross

1   witness declarations.  We will take another look at potentially

2   narrowing our list some more, but our questioning has been less

3   than half an hour.

4         THE COURT:  I understand that.  You have done a fair

5   amount of inviting what the other side has done, for which I

6   can't fault them.  And then we have had some problems with

7   formulation of questions, and the whole personal knowledge

8   issue, and I am hoping to do better on that.

9         How long is this going to take?

10        MR. MASTRO:  Your Honor, it's still our hope, although

11  the week after next is a week we are only sitting one day, but

12  it's our hope to finish this -- this has taken longer than we

13  expected, but we still are hoping to finish our case within a

14  three week period.

15        THE COURT:  You almost got very lucky at the expense

16  of the country, because had the Congress not done what it did

17  last night, that three days in the week after next would have

18  been back in the schedule, but they did, so there we are.

19        MR. MASTRO:  I meant, your Honor, basically two more

20  trial weeks.

21        THE COURT:  I knew you meant that.

22        MR. FRIEDMAN:  Could I ask your Honor, Mr. Mastro said

23  we are only going one day?

24        THE COURT:  The last week of October, the first three

25  days of the week, it's no secret, I am sitting on a

DAH8CHE6                    McMillen - cross

1   multi-district panel, and therefore often have a multi-district

2   panel commitment that predates this case.  So we are at the

3   moment scheduled to sit only Thursday that week.  So we are

4   only going to have one day that week.  So Mr. Gomez will have

5   plenty of time to get ready.

6          MR. FRIEDMAN:  Your Honor, I would prefer to answer

7   your question on Monday.  We really are still playing catch-up.

8          THE COURT:  Of course you are.  I am too, and I have

9   been living with this.

10         MR. FRIEDMAN:  I think if the witness statements are

11  narrowed, we can narrow our own issues also over the weekend

12  and be more focused and then be prepared to give you an

13  estimate on Monday.

14         THE COURT:  I appreciate that.  That will be very

15  helpful.

16         OK.  So we will go back in.  We will sign off.  We

17  will let Ms. McMillen go.

18         The next witness will be?

19         MS. LITTLEPAGE:  Mr. Gomez has some questions.

20         MR. GOMEZ:  It's very limited.  If the other side is

21  willing to stipulate that she doesn't know my clients and

22  hasn't had any communications with them, then we are done with

23  this witness.

24         MR. MASTRO:  We are willing to stipulate to that.

25         THE COURT:  All right.  That's stipulated.

DAH8CHE6                        McMillen - cross

1          So who is the next witness after this?

2          MR. MASTRO:  Your Honor, Mr. Leonard is the next

3    witness.  Mr. Rayner was also going to be on Monday because he

4    had to be, but now he has to move.

5          We have received information that -- I can't talk

6    about that at the moment while Mr. Donziger is here.

7          MR. DONZIGER:  Is this a Doe issue?

8          MR. MASTRO:  It is a Doe issue.

9          Let me just finish one other point too.  We are

10   planning to call Mr. Guerra next week.  I think Mr. Zambrano is

11   supposed to be coming by next Saturday for a deposition.  Your

12   Honor's order had a provision or a condition but not in the

13   final.

14         THE COURT:  That the deposition would be at the

15   courthouse.  It's going to be on the weekend.  So it's going to

16   have to move out of the courthouse.

17         MR. MASTRO:  We can do it at our offices.

18         THE COURT:  Any problem with that?

19         MS. LITTLEPAGE:  No, sir.

20         THE COURT:  So submit a stipulation on the changing of

21   the location.

22         MR. MASTRO:  Your Honor also referenced in the order,

23   although not the last paragraph but immediately before it, that

24   we should be receiving documents well enough in advance to be

25   able to use them effectively at the deposition.  I did serve a

DAH8CHE6                        McMillen - cross

1    subpoena for Mr. Zambrano to bring documents.  There has been

2    no commitment to do that.  There has been no commitment that he

3    accept that subpoena as opposed to my trial subpoena.  So I am

4    getting no documents from Mr. Zambrano in advance of his

5    deposition.

6              THE COURT:  What is the story on that?

7              MR. GOMEZ:  I am not authorized to accept service of

8    the documents for Mr. Zambrano.  I don't represent him.

9              In terms of the documents in the order, my

10   understanding is the only documents you requested were evidence

11   of a valid passport, which we have provided; evidence of the

12   visa, which we are waiting from the embassy to provide to him

13   so he can get it to me; and all the documentation that I have

14   that he had his visa interview and has been in my possession I

15   have provided to the plaintiffs.

16             THE COURT:  I am not going to decide anything on the

17   fly relating to documents.  Whether he brings documents may or

18   may not have a bearing on the weight that will be accorded to

19   his testimony.  That may hold true also with respect to whether

20   or not the defendants produce documents in compliance with my

21   order.

22             MR. MASTRO:  Which I also intended to ask about.  We

23   do intend to call Mr. Zambrano in our case.  He is coming for

24   the deposition, and after the deposition we intend to call him

25   shortly thereafter in our case, and I will cross-examine him.

DAH8CHE6                        McMillen - cross

1           We have given Mr. Guerra's witness statement to the

2   parties and to the Court.  We will go over that.  I don't think

3   he is going to have the same issues that the Chevron witnesses

4   have.

5           THE COURT:  Are they both going to testify in Spanish?

6           MR. MASTRO:  They are.  We have an interpreter here

7   who both sides have used at their depositions.  I think that

8   will work fine.  It was our intention to put Mr. Guerra -- put

9   him on by declaration.  Your Honor said you might have wanted

10  to hear some direct so we were thinking that --

11          THE COURT:  I want to hear his direct.  I want to hear

12  the direct of both of them.

13          MR. MASTRO:  I will be cross-examining him first, your

14  Honor.

15          THE COURT:  Zambrano.  But Guerra is your witness.

16          MR. MASTRO:  Guerra is my witness.

17          I would suggest, for efficiency purposes, since there

18  are over 200 documents associated with Mr. Guerra's declaration

19  that he references and authenticates in his deposition, and

20  some of it is procedural background and history, that what

21  would be the most efficient way to put Mr. Guerra on is we have

22  the declaration.  I put him on, and I will start with the

23  entire sequence of his ghost writing for Zambrano in this case,

24  then going through the ghost writing and bribe scandal of the

25  judgment itself.  So we cover Guerra's work for Zambrano and

DAH8CHE6                         McMillen – cross

1    the plaintiff as a ghost writer in the case in his first tenure

2    and then as the facilitator of the bribe and the ghost writing

3    so that we cover that period.  That would expedite putting him

4    on as opposed to --

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAHLCHE7

```
 1            THE COURT:  Leaving out what?

 2            MR. MASTRO:  It's really, it's really his earlier

 3    history, his earlier history as a judge in this case, other

 4    things that he did.  It's the core of his story.

 5            THE COURT:  I see.

 6            MR. MASTRO:  And they can cross-examine anything they

 7    want to.

 8            THE COURT:  I understand what you're saying.

 9            Any reason not to do it that way?

10            MS. FRIEDMAN:  I think it's all right to do it that

11    way with the caveat that we're going to get into -- if the

12    declaration is written the way some of the other ones were,

13    we're going to be back in the same boat.  But generally

14    speaking, yes, no problem with that.

15            THE COURT:  You're editing that declaration.

16            MR. MASTRO:  We're going to take a look at that too.

17    I don't think it has the same problems.

18            THE COURT:  I guess not actually.

19            MR. MASTRO:  They've had them for a week.

20            THE COURT:  They've had them for a long time.

21            MR. MASTRO:  That's appreciated, your Honor.

22            THE COURT:  I don't have any problem with it in

23    principle.  If there's a problem with it in practice, we'll

24    deal with it.

25            MS. LITTLEPAGE:  Judge, seeing as Judge Zambrano is
```

DAHLCHE7

1    doing his deposition on Saturday the 26th and we're not sitting

2    Monday, Tuesday, or Wednesday, will he be just -- he's got to

3    go back to Ecuador.  Will he be on the stand on Thursday?

4              MR. MASTRO:  It would be my intention to do him next.

5              THE COURT:  November 1.

6              MS. LITTLEPAGE:  Think it's the 31st.

7              MR. MASTRO:  Halloween.

8              MS. NEUMAN:  We're dark on the 1st.

9              MR. MASTRO:  Yes.

10             THE COURT:  I can't remember the calendar.

11             MR. MASTRO:  You're out.

12             THE COURT:  Monday, Tuesday, Wednesday, whatever that

13   is.

14             MS. NEUMAN:  28th, 29th, 30th.

15             THE COURT:  So the 31st, Halloween.  Okay.

16             And you're going to finish him that day?

17             MR. GOMEZ:  Your Honor, if I may, I'm a little

18   concerned about stretching out the date between the deposition

19   and the actual trial testimony because it ends up being cost

20   prohibitive.  We are -- we are paying for his flight and his

21   stay.  I don't know, one, I don't know that we can afford two

22   trips at this point in time.  Two, I don't know whether

23   Mr. Zambrano is allowed by his employer to take a trip the 26th

24   and then go back and then come back again if there's a long

25   span of time.

DAHLCHE7

1        I guess what we need to do is what I would prefer is

2    to do it all in one trip.  But that's not possible, then I have

3    to talk to Mr. Zambrano.

4        MR. MASTRO:  Your Honor, I'm just trying to meet the

5    Court's schedule, but I don't have a problem in principle to

6    doing him on the 2nd and the 3rd and having him in here on the

7    4th and the 5th to testify.

8        THE COURT:  Of what?

9        MR. MASTRO:  November.  It will be the following week.

10   I don't in principle have a problem with that.  And then

11   hopefully they would actually produce documents so I can

12   actually use them at a deposition.

13       THE COURT:  Look, you should talk to each other about

14   this.  See what you can work out.  Bear in mind you got to take

15   into account the schedules of the special masters because

16   they're not necessarily available whenever you want to have

17   them at this point.

18       MR. MASTRO:  I understand, your Honor.  And then if we

19   could just address the one issue outside the presence of

20   Mr. Donziger.

21       THE COURT:  Okay.  Thanks, Mr. Donziger.

22       MR. DONZIGER:  Just noting my continued objection to

23   this aspect of this procedure.

24       THE COURT:  You've made your point.

25       (Pages 520-527 SEALED by order of the Court)

DAHLCHE9

1              (In the robing room)

2              THE COURT:  That part of the discussion is over.

3              Mr. Donziger, Mr. Mastro wanted to raise something

4    else.

5              MR. MASTRO:  Sure.  We are, your Honor, consistent

6    with the direction your Honor gave, the parties have agreed to

7    work on our exhibits.

8              THE COURT:  Yes.  Go ahead.

9              MR. MASTRO:  And the one question that I needed the

10   Court's guidance on was the Court had granted Mr. Donziger's

11   motion to supplement his exhibit list and his witness list.  We

12   had a relatively discrete motion to supplement to add certain

13   exhibits and a couple of witnesses.

14             THE COURT:  I'm just waiting for answering papers.

15             Are there going to be any answering papers?

16             MS. LITTLEPAGE:  Judge, we do not object.

17             THE COURT:  That's easy.

18             You too, Mr. Gomez?

19             MR. GOMEZ:  Yes, your Honor.

20             MR. MASTRO:  Since your Honor has permitted the

21   defense to look into to question the Borja issue, we did not

22   typically designate about the Borja issue.  But there are a few

23   discrete exhibits or deposition designations that we would have

24   on that issue that we would now present since that was ruled to

25   be part of the case.

DAHLCHE9

1          MS. LITTLEPAGE:  We're happy that look at that, and I

2     doesn't think there's going to be an issue.

3          MS. FRIEDMAN:  No procedural issue.

4          THE COURT:  It's much appreciated.

5          MR. MASTRO:  And, your Honor, we will look to pare our

6     witness list back even more.  We cut it about a third already.

7     And I commit to do that by Sunday and apprise the Court.

8          THE COURT:  Easy for you to say.

9          MR. MASTRO:  Your Honor, nothing is easy on this case,

10    but I hope the defense will make a similar commitment to come

11    down from their 71 witnesses that are still left.

12          And we will get by Sunday the revised witness

13    statements that we've already put in.  And we will notify the

14    defense over the weekend order of witnesses and adjustments to

15    next week's schedule.

16          THE COURT:  Fine.  Okay.

17          MR. MASTRO:  Much appreciated.

18          MR. DONZIGER:  Can I raise one quick issue.  I want to

19    inform your Honor that I am in a bit of a bind in that I'm

20    preparing my declaration, which is going to be large with lots

21    of exhibits and stuff.  Next week I might be either not here or

22    in and out of court depending on how much work I get done.  No

23    disrespect intended.  I would prefer to be here the whole time.

24    But if I'm not here, it's only because I'm working on that.

25          THE COURT:  I understand it.  I appreciate it.  Thank

DAHLCHE9

1   you for telling me.

2          MR. MASTRO:  One last thing.

3          THE COURT:  Is there no end to this?

4          MR. MASTRO:  I'm sorry, your Honor.

5          Mr. Pate, the general counsel at Chevron, got served

6   with a subpoena yesterday.  We will move to quash.  Does your

7   Honor want that on an expedited schedule or just a normal

8   schedule?

9          THE COURT:  What is going on with this?

10          MR. MASTRO:  I don't know how he can be a proper

11   witness, but anyway.

12          MS. FRIEDMAN:  I think somebody on our team got

13   overenthusiastic, your Honor, and we'll work with Mr. Mastro

14   about that issue.

15          THE COURT:  Okay.

16          MR. MASTRO:  Thank you, your Honor.

17          (In open court)

18          THE COURT:  Be seated, folks.

19          I understand from counsel that there are no further

20   questions for the witness, right?

21          MS. LITTLEPAGE:  That's correct, sir.

22          THE COURT:  Ms. McMillen, thank you very much.  You

23   are excused.

24          (Witness excused)

25          THE COURT:  I believe we have nothing else this

DAHLCHE9

1    evening.  So I will see you all at 9:30 Monday morning.  Thank

2    you all very much.

3              (Adjourned to October 21, 2013 at 9:30 a.m.)

```
 1                       INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    DAVID LLOYD RUSSELL
 4    Cross By Ms. Littlepage  . . . . . . . . . . 335
 5    Cross By Mr. Gomez . . . . . . . . . . . . 380
 6    Redirect By Mr. Brodsky  . . . . . . . . . 382
 7    Recross By Ms. Littlepage  . . . . . . . . 402
 8    SARA McMILLEN
 9    Direct By Ms. Neuman . . . . . . . . . . . 410
10    Cross By Ms. Littlepage  . . . . . . . . . 414
11                       PLAINTIFF EXHIBITS
12    Exhibit No.                          Received
13     3367    . . . . . . . . . . . . . .347
14     3201    . . . . . . . . . . . . . .384
15     3203    . . . . . . . . . . . . . .389
16     495, redacted   . . . . . . . . . .391
17     3206    . . . . . . . . . . . . . .396
18     3208    . . . . . . . . . . . . . .398
19     3300    . . . . . . . . . . . . . .412
20     310     . . . . . . . . . . . . . .451
21     429     . . . . . . . . . . . . . .456
22     430     . . . . . . . . . . . . . .459
23
24
25
```

```
 1    431    . . . . . . . . . . . . . . .459

 2                    DEFENDANT EXHIBITS

 3    Exhibit No.                       Received

 4    729    . . . . . . . . . . . . . . .345

 5    733    . . . . . . . . . . . . . . .362

 6    732    . . . . . . . . . . . . . . .366

 7    735    . . . . . . . . . . . . . . .369

 8    1410   . . . . . . . . . . . . . . .378

 9    1416   . . . . . . . . . . . . . . .427

10    871    . . . . . . . . . . . . . . .431

11    872    . . . . . . . . . . . . . . .433

12    1067   . . . . . . . . . . . . . . .436

13    613    . . . . . . . . . . . . . . .441

14    612    . . . . . . . . . . . . . . .442

15    1417   . . . . . . . . . . . . . . .464

16    591    . . . . . . . . . . . . . . .483

17    592    . . . . . . . . . . . . . . .484

18

19

20

21

22

23

24

25
```