DAL8CHE1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    CHEVRON CORPORATION,

 4                    Plaintiff,

 5              v.                        11 Cv. 0691 (LAK)

 6    STEVEN R. DONZIGER, et al.,

 7                    Defendants.

 8    ------------------------------x
                                          October 21, 2013
 9                                        9:30 a.m.

10    Before:

11                      HON. LEWIS A. KAPLAN
                                        District Judge
12
                             APPEARANCES
13
      GIBSON, DUNN & CRUTCHER LLP
14         Attorneys for Plaintiff
      BY:  RANDY M. MASTRO
15         ANDREA E. NEUMAN
           REED M. BRODSKY
16         JEFFERSON E. BELL
           ANNE CHAMPION
17
      FRIEDMAN RUBIN
18         Attorneys for Donziger Defendants
      BY:  RICHARD H. FRIEDMAN
19         DEE TAYLOR

20    LITTLEPAGE BOOTH
           Attorneys for Donziger Defendants
21    BY:  ZOE LITTLEPAGE
           RAINEY BOOTH
22
      GOMEZ LLC
23         Attorneys for Defendants Hugo Camacho, Javier Piaguaje
      BY:  JULIO C. GOMEZ
24

25
```

DAL8CHE1

1

2          (Pages 535-541 sealed by order of the Court)

3          (In open court)

4          THE COURT:  Good morning, everyone.

5          Mr. Friedman, you said you wanted to raise something

6     before we began this morning?

7          MR. FRIEDMAN:  Yes, your Honor.  Thank you.

8          We could use some guidance from the Court on this film

9     clip issue.  Let me tell you my proposal if I could.

10          I am prepared to show the Court, if you want to see

11     more of these, but this is an issue that runs throughout many

12     of the, I will call them clips that Chevron has proposed.  I

13     think there are roughly 80 of them.

14          My proposal is to simply have Chevron withdraw what

15     they submitted to the Court, the transcripts and the videos,

16     and substitute in the full take, and then the Court will have

17     the full take, and we don't have to argue about whether things

18     are misleading and so on.

19          So that's my proposal.  I can argue more if we need

20     to.

21          THE COURT:  It's not necessary.

22          Mr. Mastro.

23          MR. MASTRO:  Your Honor, I am going to hand up our

24     response on this issue.  Your Honor asked us to please brief

25     it.

DAL8CHE1

1          Let me just briefly explain for the record that in

2     virtually every instance in this record, approximately half the

3     clips, they have not counterdesignated anything, and the

4     remainder, approximately 50 out of the 93, they are

5     counterdesignating fuller portions of a clip that we already

6     submitted to the Court previously in connection with different

7     motion practice in the case.

8          So there is nothing that we have taken out of context

9     or kept from the Court ever.  In preparing for this trial,

10    which at the time of preparing was potentially a jury trial, we

11    thought it was unfair, for example, in a handful of these clips

12    to include content that would be incredibly misleading, and

13    unfair to a jury and inadmissible, like in the one example he

14    cited to you --

15          THE COURT:  I am very familiar with that.

16          MR. MASTRO:  We explain all this in this letter.  We

17    are not going to have an objection in the overwhelming majority

18    to including the full clips.  We will have in a handful of

19    instances specific objections, like Mr. Donziger saying on its

20    dirty clip, something that he has had to admit at his

21    deposition he has no evidence to support.

22          So there will be a handful of those instances.  But in

23    the vast majority of cases, we have no problem with our shorter

24    clip.  We have redactions of only seven clips total out of 93.

25          THE COURT:  I don't understand that number.  What are

DAL8CHE1

1   you talking about?

2          MR. MASTRO:  There are 93 clips in all, and he

3   complained about redactions within a clip.  There are only

4   seven out of the 93 that had any redactions at all.  The rest

5   were continuous clips.

6          THE COURT:  Is that right?

7          MR. FRIEDMAN:  There are both ones where things are

8   taken out of the middle.  There are also ones where something

9   right before or right after is cut out, which we believe also

10  changes the meaning.

11         MR. MASTRO:  They are allowed to cross-designate.

12         THE COURT:  Yes, of course.

13         MR. FRIEDMAN:  That's what I am looking for guidance

14  on, your Honor.  If you prefer that we simply submit -- we can

15  do them as defense exhibits.

16         THE COURT:  Try to make everyone's life a little bit

17  easier.  I understand that Mr. Berlinger and his guys went to

18  Ecuador, and they shot a lot of video, and they did it not in a

19  continuous run of 600 hours or whatever it was.  They had many,

20  many individual turn on the camera, have a take, stop the

21  camera.

22         I take it from what has been said that we have 93

23  excerpts from all of that video that Chevron has identified,

24  and 86 of them are entirely continuous, unedited, uninterrupted

25  takes or portions of takes?

DAL8CHE1

1            MR. MASTRO:  Correct, your Honor.

2            THE COURT:  And in the cases in which there are

3    portions of takes there may have been some video shot before

4    the piece that Chevron has put forward as an exhibit, or after,

5    or both, but the integrity of the piece they have put on the

6    witness list in 86 of those cases is not questioned.  Is that

7    right, Mr. Friedman?

8            MR. FRIEDMAN:  Well, I think it depends what you

9    mean -- I just want to make sure I am understanding.  If we

10   have a particular take, camera on, camera off, Chevron may have

11   presented something in the middle, a shorter period, where from

12   our perspective the sentence right before or the sentence right

13   after is taken out that changes the meaning.  But the integrity

14   of the clip is I think -- I don't know if the number is 86 or

15   84.

16           THE COURT:  It's about that.

17           MR. FRIEDMAN:  Right.

18           THE COURT:  So in principle, this is no different as

19   to that than somebody offering pages 6 through 12 of a 100 page

20   deposition, right?  There is pages 1 through 5 that come

21   before.  There's pages 13 through 100 that come afterward.

22           Please be seated, Mr. Donziger.  One lawyer at a time.

23           And when a party offers in evidence pages 6 to 12 of a

24   deposition, or whatever I said, the other side has the

25   opportunity to cross-designate other portions that they think

DAL8CHE1

1  in fairness should be considered together with it.  It's

2  exactly the same as that, correct?

3          MR. FRIEDMAN:  I think it's not exactly the same, your

4  Honor, because some of these are stopped in the middle of an

5  answer.

6          THE COURT:  It's exactly the same.  Somebody offers

7  page 6 to page 10, line 2.  And assume line 2 is in the middle

8  of an answer.

9          MR. DONZIGER:  Can I be heard?

10          THE COURT:  No, not right now.  I am talking to Mr.

11  Friedman.

12          It's exactly the same as that.  The party against whom

13  the testimony is offered is at liberty to designate page 10,

14  line 3 and following, and to say, in fairness, it ought to be

15  considered together.  It's exactly like that, isn't it?

16          MR. FRIEDMAN:  I think it's a little different.

17          THE COURT:  How is it a little different?

18          MR. FRIEDMAN:  I don't think the Court would allow a

19  party to read just part of an answer out of a deposition.

20          THE COURT:  Possibly so.  If it were being read out in

21  open court, the court would look at the transcript and it would

22  make a ruling on the spot, right?

23          MR. FRIEDMAN:  Yes.

24          THE COURT:  And if it were being done in a way that is

25  commonly done in bench trials all over the United States, the

DAL8CHE1

1    party offering the deposition is not reading it in court,

2    because there is no point in reading depositions into the

3    record in open court, where the judge can do it in his chambers

4    in another context without a room full of lawyers, and there is

5    a designation up to page 10, line 2 to stay with my example,

6    and the party against whom it is offered says, judge, it cuts

7    off in the middle of the answer and you ought to consider the

8    rest of it.  That submission is made in writing in some way and

9    the judge rules on it in good time.  It's exactly like that,

10    true?

11            MR. FRIEDMAN:  I think it's true enough.  I know where

12    you're going, which is Rule 106, the rule of completeness.  We

13    are entitled to the rest of the thing that should be viewed in

14    fairness.

15            THE COURT:  Yes.

16            MR. FRIEDMAN:  At this point, what I am asking you is

17    a housekeeping issue of, I think what would be simpler is for

18    us to either designate the tapes we want you to view in their

19    entirety.

20            THE COURT:  I am going to get to the way I think we

21    should handle that.

22            For those 86, or whatever the precise number is, you

23    and Mr. Mastro, or whomever you designate, are going to work

24    together.  And you have not been involved in the nastiness that

25    has characterized the relations between the lawyers in this

DAL8CHE1

1     case up until your appearance, and I hope maybe it's ending,

2     but I am not all that hopeful, but I don't blame you.  I want

3     one film clip with respect to those particular items, we will

4     call it the 86.  I know the number might be slightly different.

5           Now, Mr. Mastro is telling me that there are seven in

6     which something was edited out of the film clip that he has

7     presented.  And the example that I was handed last week related

8     to, I think it was Plaintiff's Exhibit 4A, is that correct?

9           MR. MASTRO:  Yes, your Honor.

10          THE COURT:  About 15 words were edited out, both of

11    the film clip and of the transcript right midstream.  There is

12    a sentence of Mr. Donziger on camera.  It cuts partway through

13    the sentence.  The rest of that sentence and part of the next

14    sentence doesn't appear on the exhibit or on the transcript of

15    the exhibit, and then it picks up.

16          Just wait, Mr. Mastro.

17          Then if you look at the video, as I have done, and

18    you're paying very close attention, you see a little

19    discontinuity in the movement of Mr. Donziger's head.  So if

20    you're really paying attention, you realize it's been edited at

21    that point.

22          Now, the fact is that at least that particular clip

23    was submitted to the Court on the preliminary injunction motion

24    or earlier, a long time ago.  It was a focus of Chevron's

25    presentation then.  The minute I saw what you handed up, Mr.

DAL8CHE1

1    Friedman, I knew, because I remembered the clip, that some

2    words had come out.  Given the fact that Mr. Donziger is well

3    represented, and given the fact that this was already fully on

4    the record in this case, I assumed that there was no attempt to

5    mislead, but I want those things fixed.

6            MR. MASTRO:  Certainly, your Honor.  If I may just

7    very briefly.

8            We will definitely fix whatever needs to be fixed.

9    But, your Honor, our exhibit list did disclose very clearly

10   that it was two segments put together, showed the time

11   sequences and the words, where it ended and began, number one.

12           Number two, the other six examples here, three of them

13   they have not objected to at all.  The other three we have no

14   objection to putting the language back.  Only on PX 4, where

15   they accused Texaco, Donziger's self-serving hearsay saying,

16   Texaco paid the judge, and then admitted at his deposition he

17   hadn't paid the judge, he had no evidence of it, those are the

18   only words we cut.

19           THE COURT:  It's not going to hurt to put them back.

20   I am not accepting it for the truth of what Mr. Donziger has

21   said, and you have pointed out to me more than once that Mr.

22   Donziger testified under oath that he has absolutely no

23   personal knowledge or evidence to support the allegation made

24   by him in that tape, or at least that's my memory.

25           MR. MASTRO:  We have always put in the full video.

DAL8CHE1

1          THE COURT:  Enough already.

2          MR. MASTRO:  We are done.

3          THE COURT:  Anything else?

4          MR. MASTRO:  We will work it out with Mr. Friedman.

5          MR. FRIEDMAN:  The remaining housekeeping point is

6    let's take, I don't know, take one of these one where it's cut

7    off at the beginning or the end.  The question is just a

8    housekeeping one of, should we just submit a fuller version of

9    what we think is our defense exhibit?

10          THE COURT:  You and Mr. Mastro together should submit

11   one.  I do not want to have one set of film clips that go from

12   A to B, another one that goes from B to C, and a third one that

13   goes from C to D.  That's nuts.

14          MR. MASTRO:  We will work this out.  If we had met and

15   conferred, this never would have needed to come before you.

16          THE COURT:  Now, the sniping that is going on here is

17   totally out of control, and if I get another letter from you,

18   Mr. Mastro, giving a minute-by-minute account of the e-mails

19   back and forth between you and Mr. Friedman, such as was filed

20   last night, it's not going to be good.

21          MR. MASTRO:  Your Honor, I apologize.  I intended no

22   offense.  Your Honor gave a directive to meet and confer.

23          THE COURT:  Yes, I did.  But if you people could get

24   along like reasonable lawyers, which I expect and demand of

25   you, we wouldn't have nearly the quantity of problems that we

DAL8CHE1

1   have here.  There is no reason why these things can't be

2   resolved in a sensible way, with reasonable understanding and

3   civility each towards the other, and I am tired of it.  And

4   believe me, I do not exclude anybody from what I have just

5   said.

6          Now, what was on your mind, Mr. Donziger?

7          MR. DONZIGER:  Thank you, your Honor.  I just have

8   three issues.  And to the extent this is not what you want to

9   hear, I can put it in writing.

10          First of all, on the outtakes.  I believe a lot of

11   those outtakes were presented in a way that was deliberately

12   misleading as to my state of mind, and I want the opportunity,

13   with my counsel, to make sure the Court sees the clips, how

14   they edited them and the things they took out, and I want an

15   opportunity to be heard on that.

16          There is also a bigger issue because you talked about

17   the integrity of the 86 or 93 clips.  In the 600 hours of

18   outtakes, we have never had an opportunity to review because of

19   the lack of resources.

20          THE COURT:  I have heard the last I am going to hear

21   from you about lack of resources.  Cut it off right here.  If

22   you want to put in affidavits fully accounting for every dollar

23   in this case and in Ecuador on personal knowledge, if you want

24   to get the accountant who produced the accounting for you in

25   here to testify about it, I am all ears.  But you have been

DAL8CHE1

1    going on about this lack of resources from time in memoriam

2    ever since John Keker got out of this case, and I have said to

3    you over and over and over again, produce the evidence.  And

4    you just continue to repeat it and there has never been a

5    single shred of evidence.

6             You made motions in this court in the last month going

7    on about this, and I now know that at least two weeks before

8    this trial, contrary, I believe, although the record needs to

9    be checked, and I acknowledge that, saying you were all by

10   yourself, when Mr. Friedman and Ms. Littlepage were in this

11   case on your behalf.  I have heard enough of it.  You want to

12   put up, put up sworn evidence, otherwise I am not listening to

13   it.

14            What else do you have to say?

15            MR. DONZIGER:  Mr. Keker's motion, Mr. Smyser's motion

16   all outline a lack of resources.

17            THE COURT:  Mr. Keker has as much personal knowledge

18   of that as the Archbishop of Brooklyn.

19            MR. DONZIGER:  I have also submitted an affidavit that

20   I am insolvent due to debts that I owe.

21            THE COURT:  Mr. Donziger, did you collect the $2

22   million or a million nine that you were left last year by your

23   grandparents and that a Florida court ordered be paid to you?

24            MR. DONZIGER:  Sir, do you have any knowledge of all

25   the debts I have?

DAL8CHE1

1          THE COURT:  Mr. Donziger, answer my question.

2          MR. DONZIGER:  That's inappropriate.  I am not

3    answering your question.  Can I please finish my points?

4          What I wanted to say, aside from the resource issue,

5    there are 600 hours of outtakes that in their totality

6    completely contradict the misleading impression these Gibson

7    Dunn lawyers left with you.  So I want to be able to present

8    some or most of that evidence to the Court.

9          THE COURT:  Mr. Donziger, you have an exhibit list.

10   You have a witness list.  You have very talented outside

11   counsel.  You're a very bright lawyer yourself.  I acknowledge

12   that.  You know how evidence is put in.  We are not simply

13   having unsworn speeches here for the benefit of whoever you

14   think it is benefiting.

15         You have another question?

16         MR. DONZIGER:  I have two other quick issues.

17         With regard to the Doe issue, I recognize the Court's

18   ruling.  I would simply ask the Court, in light of what has

19   transpired since I was last here on Thursday, to please take

20   another look at the situation and see if there is --

21         THE COURT:  Mr. Donziger, that was discussed in the

22   robing a short time ago.  It's not going to be discussed

23   further in open court.  So far as we know, no Doe witnesses are

24   being called.  They may.  They may not.  I will deal with

25   whatever has to be dealt with in the ordinary course without

DAL8CHE1

1    the benefit of these kind of statements on your behalf.

2         What is your next issue?

3         MR. DONZIGER:  The third issue is my testimony.  I am

4    in a position, where to deal with all the allegations against

5    me by all of the Chevron witnesses, it is taking me an enormous

6    amount of time to prepare a declaration.  I mentioned this last

7    week when we were in the robing room.  I wanted to ask the

8    Court's permission to testify on direct live and redirected by

9    my counsel.

10         THE COURT:  So your position now is, having seen in

11    writing in advance the testimony of all the witnesses on the

12    other side, you would like to be treated differently from

13    everybody else?

14         MR. DONZIGER:  No.  I think there are two or maybe

15    three other witnesses that are going to be testifying live on

16    direct.  I am not the only one.  However, given my role in this

17    case as being the main defendant, my right to a public trial, I

18    would like to be able to testify openly.  It doesn't mean I

19    won't or can't put in some sort of declaration in advance

20    consistent with the Court's local rules so they can see it, but

21    I want to be able to be directed by Mr. Friedman or Ms.

22    Littlepage live if the Court would consider it.

23         THE COURT:  I will consider it, but I am offering no

24    guarantees.

25         MR. DONZIGER:  Thank you.

DAL8CHE1

| 1 | THE COURT:  All right.  Let's proceed. |

1                    THE COURT:  All right.  Let's proceed.

2                    MS. NEUMAN:  Good morning.  Chevron calls Spencer

3        Lynch to the stand.

4                    MR. GOMEZ:  By consent, we neglected to move into

5        evidence Defendants' Exhibit 1307 and Defendants' Exhibit 478

6        during the Bogart testimony.  I have conferred with plaintiff's

7        counsel, and they have no objection to moving those documents

8        in.

9                    THE COURT:  All right.  They are received.

10                   (Defendants' Exhibit 478 and 1307 received in

11       evidence)

12        SPENCER CHARLES LYNCH,

13            called as a witness by the plaintiff,

14            having been duly sworn, testified as follows:

15                   THE DEPUTY CLERK:  State your name and spell your last

16       name for the record.

17                   THE WITNESS:  Spencer Charles Lynch, L-Y-N-C-H.

18                   THE COURT:  Proceed, please.

19                   MS. NEUMAN:  Thank you, your Honor.

20                   May I approach the witness?

21                   THE COURT:  Yes.

22       DIRECT EXAMINATION

23       BY MS. NEUMAN:

24       Q.  Good morning, Mr. Lynch.

25       A.  Good morning.

DAL8CHE1                              Lynch – direct

1    Q.  Do you have Exhibit 4100 in front of you?

2    A.  I do.

3    Q.  Is that a copy of the direct testimony that you are giving

4    in this matter?

5    A.  It is, yes.

6    Q.  Do your initials appear on each page of Exhibit 4100?

7    A.  They appear on the first page.

8    Q.  Is that your signature at the end of the document?

9    A.  It is, yes.

10   Q.  Are all the statements in Exhibit 4100 true and accurate?

11   A.  Yes.

12        MS. NEUMAN:  We would move the admission of Exhibit

13   4100.

14        THE COURT:  Received on the same basis as the others.

15        (Plaintiff's Exhibit 4100 received in evidence)

16   Q.  Mr. Lynch, are you a digital forensic examiner with Stroz

17   Friedberg?

18   A.  Yes, I am.

19   Q.  In paragraph 30 of your direct testimony, you offer the

20   opinion that in the verification process you performed an

21   analysis to determine if there were any indications that the

22   evidence on the Guerra computer had been tampered with,

23   manipulated, or otherwise fabricated, and found no such

24   indications.  Do you recall that?

25   A.  I do, yes.

DAL8CHE1                      Lynch - direct

1   Q.  Do you have any demonstratives regarding that opinion, sir?

2   A.  Yes.

3            MS. NEUMAN:  Can we have on the screen Exhibit 4103

4   please?

5   Q.  Is this one of the demonstratives that you prepared in your

6   opinion of Mr. Guerra's computer?

7   A.  It is, yes.

8   Q.  Could you explain this demonstrative, please?

9   A.  Yes.  This is an animated timeline of the evidence of the

10  history of the use of Mr. Guerra's computer.

11           First, in 2007, a series of files were copied to the

12  computer that included 157 MP3 files, 430 Word documents and 70

13  Excel files.  Included in those documents were a set of

14  documents that on their face appeared to be judgments or orders

15  with Mr. Guerra's signature block at the bottom from when he

16  was a judge.

17           Next, in 2010, Windows XP was installed on the

18  machine.  It's worth noting that there is evidence that there

19  was a previous installation of Windows on the computer, but

20  this reinstallation of Windows overwrote the files associated

21  with that previous installation.

22           Shortly after Windows was installed, an external USB

23  hard drive was connected to the computer.  And then minutes

24  after it was connected, a series of files were copied to the

25  computer, that included 3,395 pictures, many of which appeared

DAL8CHE1                        Lynch - direct

1   to be family photos, some included photos of Mr. Guerra.

2           And along with those pictures was a group of documents

3   that was also copied.  The documents consisted of 194 Word

4   documents, 78 PowerPoints, and 58 Excel files.  And in that set

5   of documents were documents like Mr. Guerra's CV, and then 11

6   of the drafts of orders issued in the Ecuadorian court system

7   against Chevron.

8           After that, the hard drive was removed, and it's not

9   uncommon after someone reinstalls Windows to then copy files

10  onto a computer.

11          The next significant period of activity began in

12  December 2010.  And from December 2010, until the computer was

13  imaged in July, 209 Word documents, 8 PowerPoints, 21 PDFs were

14  created on the machine.

15          In the Word documents were 104 of the draft orders

16  that I analyzed, and for some of those documents there was

17  metadata that indicated that they were actually created using

18  some of the 1230 Word documents copied in 2007 as templates.

19          Those documents were saved to the machine, and in

20  addition to the documents having been created or saved to the

21  machine, there were 23 USB devices that were connected to the

22  machine, sometimes multiple times in that time period.

23  Q.  Were you able --

24          MS. NEUMAN:  Can you put that back up, please?

25  Q.  Mr. Lynch, were you able to take possession of any of those

DAL8CHE1                        Lynch - direct

1   23 USB devices?

2   A.  I was, yes.

3   Q.  Did any of the draft orders that you analyzed --

4            THE COURT:  23 USB devices, where did they come from?

5            THE WITNESS:  There was evidence on the computer of 23

6   different USB devices.

7            THE COURT:  Ms. Neuman, why are we doing this live as

8   opposed to via the statement?

9            MS. NEUMAN:  He just had some demonstratives to make

10  part of his opinion more clear, and he has one exhibit to

11  correct.  We can go right to the correction if you prefer, your

12  Honor.

13           THE COURT:  You may do the demonstratives.

14           MS. NEUMAN:  I couldn't hear you.

15           THE COURT:  You may do the demonstratives.

16           MS. NEUMAN:  Thank you, your Honor.

17  BY MS. NEUMAN:

18  Q.  The eight USB drives that you had, Mr. Lynch, did they

19  contain also copies of any of the draft orders that you found

20  on the Guerra computer that were subsequently issued by Judge

21  Zambrano?

22  A.  Yes.  The USB devices contained copies of 49 of these

23  orders that I found on the Guerra computer, or drafts of

24  orders.

25           THE COURT:  Is that 49 of the 104, is that correct?

DAL8CHE1                          Lynch - direct

1           THE WITNESS:  Yes.

2    Q.  Were the documents, based on your analysis, copied from the

3    computer to the USB drives or the other way around?

4    A.  The files on the USB drive were all created on the USB

5    drive after they had been created or saved on the Guerra

6    computer.

7    Q.  Were the dates of the documents that were put on the USB

8    drives prior to the dates that those same documents, the orders

9    to which related for Judge Zambrano were issued?

10   A.  Yes.

11   Q.  So the sequence is they are on the computer, they go to the

12   USB drive, and after that orders are issued, is that right?

13   A.  Yes.

14   Q.  Mr. Lynch, did you have an Exhibit 2 to your original

15   report?

16   A.  I did, yes.

17   Q.  Have you made a correction to that exhibit?

18   A.  I have, yes.

19           MS. NEUMAN:  May I approach, your Honor?

20           I have handed the witness what has been marked as

21   Plaintiff's Exhibit 4106.

22   Q.  Is this the corrected version of the prior Exhibit 2 to

23   your report, Mr. Lynch?

24   A.  It is, yes.

25   Q.  Could you please explain the correction that's been made on

DAL8CHE1                        Lynch - direct

1    this exhibit?

2    A.   Yes.   There was a typo in Exhibit 2 that related to files

3    where the same file name appeared twice on the exhibit.

4            If you look about halfway down the page, there are two

5    files that appear with the same name, and in the previous

6    version of the exhibit, there was a typo in that the edit time

7    was the same for both of them.   In this corrected version, the

8    second document has been corrected to accurately reflect the

9    metadata for that document, and that affects a set of documents

10   that appear twice throughout the exhibit.

11   Q.   On Exhibit 4106, has the metadata now been accurately

12   reflected for each of those documents that appear twice on the

13   exhibit?

14   A.   Yes.

15   Q.   You were also asked in your recent deposition about print

16   times on Exhibit 4106 that predate the date creation of the

17   related document.   Do you recall that?

18   A.   I do, yes.

19   Q.   Were those print times accurate?

20   A.   They were, yes.

21   Q.   Can you explain why they predate the date creation times?

22   A.   Yes.   The documents with print times that predate the

23   creation of the document appear to have -- the metadata is

24   consistent with them having been created using earlier

25   documents as templates.   As an example, on the same section

DAL8CHE1                          Lynch - direct

1    that's zoomed in here, the right most date from 2007 predates

2    either the other dates created or the last saved date.

3              I performed a search of the hard drive for other

4    documents with that same print date, and I did this for all of

5    the documents that had print dates that predated the creation

6    of the document, and found that there was a document copied to

7    the computer in 2007 that had that exact print date to the

8    second, and that when it was used as a template, that print

9    date carried forward into the new version.  And since the new

10   document has never been printed, that print date remains from

11   the previous document.

12   Q.  Is that consistent with your conclusion of the orders

13   having been created on this particular computer?

14   A.  Yes.  It indicates that they were created on this computer.

15             MS. NEUMAN:  I pass the witness, your Honor.

16             THE COURT:  Thank you.

17             Cross-examination.

18             MR. BOOTH:  Good morning, your Honor.  I am Rainey

19   Booth.

20             I have some books, your Honor.  May I pass them out?

21             THE COURT:  Yes.

22             Mr. Friedman, while he is doing that, let me make

23   clear that my comments to Mr. Donziger before do not in any way

24   restrict the evidence that may be adduced in this courtroom by

25   him.  I said I wasn't going to hear any more of his complaints

DAL8CHE1                         Lynch - direct

1    about lack of resources.  Of course, if you want to put

2    evidence in about that, you're welcome to do that.

3          MR. FRIEDMAN:  I understood your position.  Thank you,

4    your Honor, assuming arguendo that it's relevant.

5          MR. BOOTH:  May I proceed?

6          THE COURT:  You may.

7    CROSS-EXAMINATION

8    BY MR. BOOTH:

9    Q.  Good morning, Mr. Lynch.  Nice to see you again.  We have

10   met before, haven't we?

11   A.  Yes.

12   Q.  Mr. Lynch, you work at Stroz Friedberg, is that right?

13   A.  Stroz Friedberg.

14   Q.  Can you tell us a little bit about that firm, please?

15   A.  It's a firm that was started over a decade ago to provide

16   digital forensic services, and we now have a number of

17   different service offerings, that include digital forensics,

18   e-discovery, technical consulting, forensic accounting.

19   Q.  Stroz Friedberg provides a wide range of services, correct?

20   A.  Yes, we do.

21   Q.  Including investigative services?

22   A.  That's correct.

23   Q.  Your particular specialty is what?

24   A.  Digital forensics.

25   Q.  But within your firm, there are former IRS and FBI agents,

DAL8CHE1                    Lynch - cross

1    is that right?

2    A.  Yes, there are.

3    Q.  There are investigators and computer specialists like

4    yourself, correct?

5    A.  Yes.

6    Q.  And if you will turn in your book to tab 2, do you

7    recognize the compilation of pages in tab 2, if you just look

8    through it?

9         Do you recognize that as a printed version of the

10   Stroz Friedberg Web site, or at least portions of the Stroz

11   Friedberg Web site?

12   A.  It appears to be a portion of our Stroz Friedberg Web site.

13   Q.  I will represent to you I have tried to pick out portions

14   that would be the parts of the firm that you worked in, or the

15   types of things that you were doing.  I will also represent

16   it's not the full Web site.

17        MR. BOOTH:  At this time, I would offer Defendants'

18   Exhibit 1335, which is tab 2 in the book, to save time in going

19   through all the different things his firm does.

20        MS. NEUMAN:  We haven't had a chance to review the

21   exhibit yet and it's not the full site.

22        MR. BOOTH:  I am happy to put in a copy of the full

23   site if that's an issue.

24        THE COURT:  Where is the exhibit?  I have got a

25   looseleaf book full of unmarked pages.

1            MS. NEUMAN:  It's under tab 2.

2            THE COURT:  I understand that.  Has the exhibit been

3    marked, the exact proposed exhibit?

4            MR. BOOTH:  Yes, your Honor.  The exhibit I would

5    offer is tab 2, DX 1335.

6            THE COURT:  If you have Exhibit DX 1335, please give

7    it to the deputy.

8            I have the book, but we are marking exhibits.

9            MR. BOOTH:  It's at the bottom of the page.  It should

10   have a Bates number.

11           THE COURT:  Now I have got it.

12           MR. BOOTH:  I apologize.  We had it printed on there.

13           THE COURT:  That's all right.

14           MR. BOOTH:  I would offer that into evidence, but I am

15   happy to substitute a full copy of the entire Web site.  It is

16   just that it goes into other areas that I think would have

17   nothing to do with what he is discussing.

18           THE COURT:  Is there any objection to 1335?

19           MS. NEUMAN:  Your Honor, I don't object for it not for

20   the truth.  It's a hearsay document.  There are many sections

21   of the document that don't relate to Mr. Lynch or his testimony

22   in any way.

23           THE COURT:  I am going to receive it subject to a

24   motion to strike any parts that you object to after you have

25   had an opportunity to review it fully.

DAL8CHE1                    Lynch - cross

1          (Defendants' Exhibit 1335 received in evidence)

2          THE COURT:  Let's go on.

3     BY MR. BOOTH:

4     Q.  Mr. Lynch, in the course of performing your work on this

5     case, if there had been issues or areas of your investigation

6     outside of your particular expertise, would you have been

7     allowed to discuss that with other members of your firm?

8     A.  Yes, I would have been.

9     Q.  Did you end up discussing any aspect of this case with any

10    other investigator or member of the Stroz Friedberg team?

11    A.  Yes.  I have had people working at my direction on the

12    case.

13    Q.  Is that outlined in your witness statement?

14    A.  I believe it is, yes.

15    Q.  Now, can you tell the Court exactly what you were asked to

16    do in this particular case, your exact assignment?

17    A.  I had many different tasks and, generally, they broke into

18    an analysis of Mr. Guerra's hard drive and the documents

19    contained within it; an analysis of the Cabrera report and a

20    2009 filing; analysis of the judgment issued in 2011; and then

21    authentication of some other documents.

22    Q.  I want to start with the Donziger hard drive.  I believe

23    you indicated that you found on the Donziger hard drive a copy

24    of what was filed as the Richard Cabrera report, is that right?

25    A.  Yes.

DAL8CHE1                          Lynch - cross

1   Q.  Can you go through with me just a couple of dates.

2           The report signed by Richard Cabrera that was filed

3   with the Ecuadorian court, can you confirm that it was filed

4   with that court April 1, 2008, is that correct?

5           THE COURT:  Can't the counsel stipulate to that?

6           MS. NEUMAN:  So stipulated, your Honor.

7           THE COURT:  Mr. Gomez?

8           MR. GOMEZ:  Yes, your Honor.

9           THE COURT:  Mr. Booth?

10          MR. BOOTH:  Yes, your Honor.  Thank you.

11  Q.  On Mr. Donziger's hard drive, did you find a draft, what

12  you referred to as a draft of the Richard Cabrera report?

13  A.  Yes.

14  Q.  Was that draft received by Mr. Donziger's e-mail account on

15  April 1, 2008?

16  A.  Yes.

17  Q.  Do you know the time that it was received on that date?

18  A.  I just want to confirm the exact time.

19  Q.  That's fine.

20  A.  Actually, I don't recall the exact time.

21  Q.  Let me ask it this way.  Since we have a filing date of the

22  report with the court in Ecuador, and an e-mail with the draft

23  of the report coming to Mr. Donziger on the same day, can you

24  tell me, from your recollection, which happened first on that

25  day?

DAL8CHE1                         Lynch - cross

1    A.   I don't have --

2              MS. NEUMAN:  Objection.  It assumes facts not in

3    evidence.  Foundation.

4              THE COURT:  Overruled.

5    A.   I don't have an opinion as to which happened first.

6    Q.   In terms of looking at Mr. Donziger's hard drive, did you

7    find any draft version of the Cabrera report prior to April 1,

8    2008?

9              MS. NEUMAN:  Objection.  Beyond the scope.

10             THE COURT:  Overruled.

11   A.   Not on Mr. Donziger's hard drive.

12   Q.   Your report indicates, I believe, that the Cabrera draft

13   that you found on Mr. Donziger's hard drive, after being

14   received as an e-mail on April 1, had been downloaded on to the

15   hard drive.  My question is, do you know when that was

16   downloaded on to Mr. Donziger's hard drive from the e-mail?

17   A.   I do not know when it was downloaded to the hard drive.

18   Q.   Can you give us any estimate of whether that was the same

19   day, April 1, 2008, or whether it was some days after April 1,

20   2008 that that document was downloaded on to the hard drive?

21   A.   No, I cannot.

22   Q.   Now, if you look at page 16, paragraph -- sorry, page 6,

23   paragraph 15 of your witness statement.  In that paragraph,

24   you're discussing some of the metadata on the Richard Cabrera

25   report, is that right?

DAL8CHE1                          Lynch - cross

1   A.   I discuss the metadata on the draft version of it.

2   Q.   The draft report?

3   A.   Yes.

4   Q.   There is a statement on the fourth line down, the statement

5   is "the day before it was filed with the Ecuadorian court,

6   unchanged by Richard Cabrera."  Do you see that statement?

7   A.   I do, yes.

8   Q.   Now, Mr. Lynch, when we talk about metadata, can you

9   explain briefly to the Court what metadata is?

10  A.   Yes.  It's data about data.  In the computer world, it's

11  data about documents or files, or data stored on a computer.

12  It can contain the day that a document was created or a file

13  was created or last saved and the user name of the person who

14  authored it or last saved it, among other things.

15  Q.   Is there anything that can be done with the file in terms

16  of saving it that can reset the metadata on a file such as the

17  one you described in paragraph 15 on page 6?

18  A.   Yes.

19  Q.   What is that?

20  A.   For Word documents, metadata can be reset through the

21  save-as option in Word.

22  Q.   So here in paragraph 15, when you discuss that the document

23  was created on March 30, 2008, and was worked on until sometime

24  March 31, 2008, that's the document we are talking about in

25  that paragraph, right?

DAL8CHE1                          Lynch - cross

1    A.  Yes.

2    Q.  So if the document received on March 30, 2008 had been

3    saved as to the computer that was working on it on that date,

4    that would have reset the metadata, correct?

5    A.  Yes, it could have.

6    Q.  And you would have no way of knowing, had that been the

7    case, what had happened prior to March 30, 2008 in terms of

8    metadata, correct?

9    A.  That's correct.

10   Q.  So here, also, you talk about it being unchanged by Richard

11   Cabrera.  Is it fair to say in that paragraph you mean that

12   between March 30 and March 31, it's your opinion that document

13   was unchanged on a computer used by Richard Cabrera, is that a

14   fair statement?

15   A.  In that statement, I am stating that when the document was

16   filed, it was unchanged from the version sent to Mr. Donziger's

17   e-mail address.

18   Q.  But you had no way of knowing if Mr. Cabrera worked on the

19   computer or assisted in the changes that were made between

20   March 30 and March 31 of that year, do you, sir?

21   A.  I have no opinion as to who was at the computer.

22   Q.  So then the basis of your opinion that it was unchanged by

23   Richard Cabrera is what?

24   A.  That the version that was filed by Mr. Cabrera was an

25   identical match to the document that was sent to Mr. Donziger.

DAL8CHE1                        Lynch - cross

1          MR. BOOTH:  We would move to strike that portion of

2    the opinion based on the lack of personal knowledge and

3    speculative opinion.  And I can file that after the fact if the

4    Court prefers.

5          THE COURT:  You can what?

6          MR. BOOTH:  I can file that objection after the fact,

7    if the Court prefers, but I thought since we had him here I

8    would go ahead and make that objection to that portion of his

9    report.

10         THE COURT:  I will let it stand for what it is worth.

11   I understand the point you're making.

12         I think, Mr. Lynch, it reflects your assumption that

13   Mr. Cabrera was not working on the same computer that the Lago

14   Agrio plaintiffs' lawyer was working on in the last, roughly,

15   48 hours before his report was filed, is that right?

16         THE WITNESS:  I think that's correct.  Also, I think

17   that there is -- my specific opinion is when it was filed, it

18   hadn't been changed from the version that was sent to Mr.

19   Donziger, that the version Mr. Donziger had that was sent to

20   him with the metadata as reflected in my report was identical

21   to the copy filed.

22         THE COURT:  Here in paragraph 15 you say that the

23   metadata shows that Plaintiff's Exhibit 1017, which I take it

24   is the file that you examined on Mr. Donziger's computer, is

25   that right?

DAL8CHE1                    Lynch - cross

1           THE WITNESS:  Yes, I believe 1017.

2           THE COURT:  So you're saying that your opinion is that

3    the file that was on Mr. Donziger's computer was not changed

4    between March 30, 2008 at 9:17 a.m. and the time the document

5    was filed in court on April 1st by Mr. Cabrera, is that what

6    you're saying?

7           THE WITNESS:  No, that's not quite what I am saying.

8           I don't know what changes occurred between 9:17 and

9    10:26 on March 31.  I am saying that whatever changes may have

10   occurred in that time period, those were the final changes to

11   the document before it was filed.  When it was filed, there

12   were no further changes from that version of the document.

13          THE COURT:  I see.  So your view is that between March

14   31 at 11:09 a.m. and the filing, there were no changes by

15   anybody, is that right?

16          THE WITNESS:  Yes.

17          THE COURT:  As to earlier, March 30, 9:17 in the

18   morning, till March 31, 11:09 in the morning, there were

19   changes first of all, is that right?

20          THE WITNESS:  Yes.

21          THE COURT:  And you expressed the view that those

22   changes were not done by Mr. Cabrera, is that right?

23          THE WITNESS:  Yes.  The metadata for those changes is

24   consistent with the changes being made by a computer used by

25   Mr. Juan Pablo Saenz.

DAL8CHE1                         Lynch - cross

1          THE COURT:  So when you say it was unchanged by

2    Mr. Richard Cabrera, the conclusion is based to that extent on

3    the assumption that Mr. Cabrera was not using Mr. Saenz'

4    computer or whatever computer Mr. Saenz' was working on?

5          THE WITNESS:  I think that's correct.  That's fair to

6    say.

7          THE COURT:  And not dictating it to him or

8    communicating it to him so that he would do the key strokes to

9    input his changes, is that right?

10          THE WITNESS:  That's fair, yeah.

11          THE COURT:  That's your assumption?

12          THE WITNESS:  Yes.  I think so, yes.

13          THE COURT:  You have no personal knowledge one way or

14    the other on that precise point?

15          THE WITNESS:  That's correct.  I have no personal

16    knowledge.

17          THE COURT:  All right.

18    BY MR. BOOTH:

19    Q.  Mr. Lynch, let me ask you, I forgot to ask you this when we

20    started.  Your witness statement, direct testimony, Plaintiff's

21    Exhibit 4100, can you briefly tell me how that statement was

22    prepared?

23    A.  Yes.  I was asked by the Gibson Dunn attorneys to work on

24    summarizing my report into a declaration, and I began working

25    on that, and then worked with them sitting in a room kind of

DAL8CHE1                         Lynch - cross

1   typing -- myself typing to reframe it as a declaration.

2   Q.  Did you make all changes to this document, Plaintiff's

3   Exhibit 4100, on your computer sitting in a room typing?

4   A.  Yeah.  I made all the changes.  Gibson Dunn had suggestions

5   that they offered to me.  I reviewed those and either accepted

6   them or rejected them.

7   Q.  And the final version, if we were to check the metadata on

8   your witness statement, the final version would have metadata

9   off your computer?

10  A.  It would.  I did use a template for the formating that they

11  had provided me so there would be some metadata that reflects

12  that template.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DALLCHE2                    Lynch - cross

1   BY MR. BOOTH:

2   Q.  Now, can we go to page 8, paragraph 19, please, of your

3   witness statement.

4        Do you see the statement where it indicates at no

5   point in my analysis did I find any indication in the metadata

6   that Richard Cabrera, and then it goes on to talk about

7   authored or edited; do you see that statement?

8   A.  Yes.

9   Q.  And would it be fair to say that if Richard Cabrera had

10  authored or edited, reviewed or saved his report and then sent

11  it to Mr. Saenz and Mr. Saenz had saved as the document, you

12  would not find any evidence in the metadata of Richard

13  Cabrera's efforts, would you, sir?

14  A.  I can only speak to the metadata in the copy of the

15  document that I analyzed.

16  Q.  Let me ask you about Mr. Donziger's hard drive.

17        Did you look at Mr. Donziger's entire hard drive from

18  his computer?

19  A.  I didn't look at every single bit on the hard drive.  It's

20  hundreds of gigabytes.

21  Q.  How did you decide what portions of Mr. Donziger's hard

22  drive to review?

23  A.  I performed the analysis and looked at the portions of the

24  hard drive that related to the tasks I had been asked to

25  perform.

DALLCHE2                     Lynch - cross

1    Q.  Were you given portions of the hard drive to review?

2    A.  I was given the entire hard drive.

3    Q.  In your review of Mr. Donziger's hard drive, you did not

4    find any versions of the Ecuadorian judgment signed by Judge

5    Zambrano dated February 14, 2011, did you, sir?

6    A.  I did not, no.

7    Q.  In looking at Mr. Donziger's hard drive, you did not find

8    any versions of the clarification order signed by Judge

9    Zambrano in March of 2011, did you, sir?

10   A.  I did not.

11   Q.  In looking at that hard drive, you did not find any

12   versions of either the appellate decision nor the clarification

13   of the appellate decision filed by the Ecuadorian court

14   subsequent to March 2011, did you, sir?

15   A.  I did not.

16   Q.  Let me ask you before I forget, in your work on this

17   particular case, did you review the clarification order signed

18   by Judge Zambrano in March of 2011 for any purpose?

19   A.  I hadn't when we met last time.  I have read it now.

20   Q.  I'm sorry?

21   A.  I have read it now.

22   Q.  You have read the clarification order now?

23   A.  Yes.

24   Q.  But you had not read it before we took your deposition

25   what, a few days ago, right?

DALLCHE2                          Lynch - cross

1    A.  Yeah, just over a week ago.  No, I had not.

2    Q.  And was there any particular purpose why you looked that

3    the clarification order after the deposition?

4    A.  No.  Really just because you asked if I had read it.

5    Q.  Okay.  Did you just read it --

6                THE COURT:  Good thing you didn't suggest the decline

7    and fall of the Roman Empire.

8                THE WITNESS:  I did not.

9    Q.  Did you just read it or did you do any particular analysis

10   of it?

11   A.  I just read it.  I didn't do any analysis.

12   Q.  In terms of the appellate decision and the appellate

13   clarification decision, did you read either one of those

14   Ecuadorian decisions, have you read them ever?

15   A.  I have since we met last time.

16   Q.  Same setup, I asked you or we asked you and so you read

17   them?

18   A.  Yep.

19   Q.  Same reason.

20              You have not done any analysis on the appellate

21   decision or the appellate clarification decision though; is

22   that correct?

23   A.  I did a little bit of analysis of the -- not a metadata

24   analysis or anything like that.  I reviewed the appellate

25   decision a little more closely since it discussed some of the

DALLCHE2                          Lynch - cross

1    findings I had in my opinion, in my report and witness

2    statement.

3    Q.  What particular analysis did you do?

4    A.  I reviewed the statements it made that related to the

5    judgment and the source of the data in the judgment.

6    Q.  And was that the only analysis that you did of that

7    particular Ecuadorian order?

8    A.  Yes.

9    Q.  All right.  Let me ask you about Mr. Guerra's hard drive.

10   You testified that about that just for a few minutes in talking

11   about the demonstrative aid.  Is that right?

12   A.  Yeah, I don't know what demonstrative number it was.  I

13   think 4103.  I believe that was what it was.  I want to see it

14   to double check that.

15   Q.  And let's start with the first set of documents, I think,

16   that's discussed in your witness statement.

17           In looking at the Guerra hard drive, you found some

18   orders, I should say draft orders in the Chevron litigation,

19   correct?

20   A.  Yes.

21   Q.  And you refer to those as draft -- can you turn to page 13.

22   It's actually page 15.  Maybe we can start with page 15.

23           You refer to those as draft Guerra orders in the

24   Chevron litigation.  I'm sorry, draft Guerra Chevron orders.

25   Do you see that?

DALLCHE2                        Lynch - cross

1   A.  Yes.

2   Q.  And at the top of page 15, you say analysis of orders

3   drafted by Guerra.  Do you see that at the very top of the

4   page, the title?

5   A.  Yes.

6   Q.  What is the basis of your opinion that the draft orders

7   were drafted by Mr. Guerra?

8   A.  That they were contained on his hard drive and had metadata

9   that what was consistent with other documents that appear to be

10  drafted by him.

11  Q.  But if we look at -- if you need to look at the exhibit

12  that you handed right when we started, which was Plaintiff's

13  Exhibit 4106, or also in the book is your Exhibit 2 from that

14  we talked about at your deposition, you can look at either one.

15  In the book it's tabbed three.  I realize that Plaintiff's

16  Exhibit 4106 is the corrected version of what I have in my

17  book.  So either one you want to look at.

18          My question is the draft Guerra Chevron orders were

19  all put onto Mr. Guerra's hard drive at the same time, correct?

20  A.  That's correct.

21  Q.  And that date was July 23, 2010?

22  A.  That is correct.

23  Q.  And you don't know where those orders had been before they

24  were on the hard drive that then downloaded onto Mr. Guerra's

25  hard drive, correct?

DALLCHE2                    Lynch - cross

1   A.  No, I do not.

2   Q.  And I may have said that incorrectly.

3        July 23, 2010 there was an external hard drive that

4   was attached to Mr. Guerra's computer hard drive, correct?

5   A.  Yes.

6   Q.  And you don't know where these draft orders were before

7   they were on the external hard drive, correct?

8   A.  No, I have no information as to where they were before

9   that.

10  Q.  And you don't know what the metadata for those documents

11  would have been prior to that, July 23, 2010, correct?

12  A.  I know the metadata that was embedded within them when they

13  were copied.  I don't know what other external metadata they

14  may have had.

15  Q.  That metadata would be consistent with Mr. Guerra taking

16  those orders from some other computer belonging to some other

17  person, placing them on an external hard drive, and then

18  transferring those orders to his hard drive via the external

19  hard drive, correct?

20  A.  Could you repeat that?

21  Q.  Yes.  The metadata you've outlined in your Plaintiff's

22  Exhibit 4106 would also be consistent with Mr. Guerra taking

23  his external hard drive, removing those orders from someone

24  else's computer onto the external hard drive, and then taking

25  the orders from the external hard drive onto Mr. Guerra's hard

DALLCHE2                          Lynch - cross

1   drive, correct?

2   A.  For those it could be.  I don't have any information as to

3   where they were before the external hard drive.

4   Q.  Now, in terms of your description of these orders in your

5   witness statement as having been drafted by Mr. Guerra, earlier

6   I thought I heard you say that in looking at Mr. Guerra's hard

7   drive you identified orders from an earlier date, and I don't

8   recall the date, that Mr. Guerra himself you believed had

9   authored as judge.

10         Did I mishear you or is that what you said?

11   A.  I believe I said that they, on their face, they appeared to

12   have been documents with his signature block at the bottom.

13   Q.  Where Mr. Guerra actually had his name on the documents for

14   him to sign his name at the bottom; is that right?

15   A.  Yes.

16   Q.  As opposed to writing an order for someone else that

17   someone else would sign, right?

18   A.  Yes.

19   Q.  All right.  And those particular orders, do you recall the

20   date of those orders that were set up for Mr. Guerra to sign

21   them?

22   A.  I don't recall the dates for all of them.  There are some

23   in 2006 and 2007, I do recall that, but not specific.

24   Q.  Sorry?

25   A.  Not specifically the dates.

DALLCHE2                    Lynch - cross

1   Q.  And you had access to those orders, correct?

2   A.  Yes.

3   Q.  Did you review those orders?

4   A.  Only in relation to establishing when they were copied to

5   the computer and the metadata that appeared similar to the

6   metadata in later documents.

7   Q.  Now, Mr. Lynch, your firm, Stroz Friedberg, has the ability

8   to do an analysis called authorship identification, correct?

9   A.  I mean I think we have lots of different analyses.  I don't

10  recall the specific names, but that sounds like something that

11  we've done.

12  Q.  All right.  Let me describe it; you tell me if I'm getting

13  it right.

14        Your firm, Stroz Friedberg, has the ability to take

15  two documents and by comparing different features of those

16  documents come to a conclusion about whether the documents were

17  written by the same person or by different people, correct?

18  A.  That's correct.

19  Q.  And here you had orders that you labeled as draft Guerra

20  Chevron orders, and you also had orders from 2006, 2007 that

21  appeared to be set up for Mr. Guerra to sign himself, correct?

22  You had both of those, correct?

23  A.  Correct.

24  Q.  Did you or anyone at your firm make a comparison comparing

25  the 2006-2007 era Guerra orders with the draft Guerra Chevron

DALLCHE2                      Lynch - cross

1    orders to see if, in your opinion, they were drafted by the

2    same person?

3    A.  No, I didn't do a comparison between those documents.

4    Q.  Did you attempt to obtain other orders or orders authored

5    by Judge Zambrano that were actually authored by Judge

6    Zambrano, did you make any attempt to do that?

7    A.  No.  I don't have -- I don't have an opinion for any order

8    whether or not it was authored by Judge Zambrano.

9    Q.  You mentioned -- I'm sorry.

10          So your opinion that the orders on Mr. Guerra's hard

11   drive that they were drafted by Mr. Guerra is related to the

12   you said the metadata being consistent with other metadata on

13   the computer.  Can you explain what you mean by that?

14   A.  The last saved by name appears on those documents and also

15   on lots of other documents that were transferred to the

16   computer that existed on the computer.

17   Q.  Which means that Mr. Guerra would have saved those

18   documents onto his computer?  I'm sorry.  I don't understand.

19          How does that metadata identify Mr. Guerra as opposed

20   to someone else who would have saved the documents?

21   A.  I guess -- I guess to back up a little bit.  At no point --

22   I'm not trying to state that I know or have any knowledge that

23   Mr. Guerra was sitting at the keyboard.  That is not my

24   opinion.

25   Q.  Well, if you look at Plaintiff's Exhibit 4106, which is

DALLCHE2                    Lynch – cross

1   this sheet.

2           Your Honor, I don't know if you have a copy of that.

3   If not, we can look at, for the purposes of this, we can look

4   at tab 3 in the binder, which I believe is the same, and we can

5   just identify any corrections if we need to talk about those

6   corrections.  Is that fair?

7   A.  I have 4106.

8   Q.  All right.

9           MR. BOOTH:  For the Court, your Honor, it would be our

10  tab 3, and I'll point out if I'm talking about anything that

11  was corrected.

12          THE COURT:  And that's 4105?

13          MR. BOOTH:  Which is 4105, yes, your Honor.

14  Q.  And if you look at the top, let's take the top order, the

15  very first one where it says file created 10/20/09.

16          Do you see that?

17  A.  Yes.

18  Q.  And that would have been before this document ever got onto

19  Mr. Guerra's hard drive after the reinstallation, correct?

20  A.  That is before the reinstallation, yeah.

21  Q.  It says last save 10/20/09, correct?

22  A.  That's correct.

23  Q.  You don't know what computer that last save action happened

24  on, do you, sir?

25  A.  No, I do not.

DALLCHE2                    Lynch - cross

1   Q.  Now, you mentioned earlier when you were talking about the

2   demonstrative aids that there was a reinstallation of -- was it

3   the operating system?

4   A.  Yes.

5   Q.  When you say reinstallation, were you able to determine

6   whether that operating system had been on the computer and was

7   simply reinstalled July 23, 2010?

8   A.  I don't know what operating system was on the computer

9   prior to July 23, just that a new one was installed on July 23.

10  Q.  You were able to determine this computer, Mr. Guerra's

11  computer, was not a new computer to Mr. Guerra, true?

12  A.  I don't know when Mr. Guerra began using it.  I do know

13  that he had documents that were copied to it in 2007.  So

14  presumably it wasn't -- it must not have been new to him in

15  2010, but I don't know when he started using it.

16  Q.  Let me see if I understand what you just said.

17          There were two users for the computer, Mr. Guerra's

18  computer, correct?

19  A.  Sorry.  I don't believe I said that.  I don't know how many

20  users there were.

21  Q.  All right.  You found documents on Mr. Guerra's computer

22  that had been there dated, that were at least dated 2007,

23  correct?

24  A.  Yes.

25  Q.  Now, in your work as a forensic computer analyst, do you,

DALLCHE2                    Lynch - cross

1   do you -- are you often faced with people who attempt to

2   conceal or destroy evidence by reinstalling their operating

3   systems?

4   A.  Yes, I've been faced with that before.

5   Q.  Is that something in your experience some people do to try

6   to destroy or conceal evidence?

7   A.  Yes, some people do do that to try to destroy evidence.

8   Q.  Did you see any evidence here that any files on

9   Mr. Guerra's hard drive were destroyed as a result of the

10  reinstallation of his operating system?

11  A.  When Windows was reinstalled, the hard drive was

12  partitioned into two separate drives, the C drive and the D

13  drive, if you will.  The reinstallation action did delete the C

14  drive and any documents that -- any documents, including the

15  operating system files, that would have been contained on that.

16  Q.  So is then your testimony you don't know what files may or

17  may not have existed on the C drive prior to the

18  reinstallation?

19  A.  I do not know what existed on the C drive prior to the

20  reinstallation.

21  Q.  You did have a conversation with Mr. Guerra; is that

22  correct?

23  A.  I did.

24  Q.  And did you ask him why he had reinstalled his operating

25  system?

DALLCHE2                    Lynch - cross

1    A.  I did not.

2    Q.  Let me ask you about the analysis that you did, and I want

3    to focus on the nine or 11, the Guerra draft Chevron orders

4    that you describe in your witness statement.  All right.

5              Now, as to those orders would you agree that you --

6    let's turn to the pages.  Page 16.  Yeah, page 16, I think it's

7    paragraph 38, if you'll turn there with me.  And you see where

8    it says I analyzed the draft Guerra Chevron orders to determine

9    whether they shared common text or other similarities.

10             Do you see that?

11   A.  I do.

12   Q.  By that statement are you saying that you took the draft

13   orders that you found on Mr. Guerra's computer and you compared

14   them to each other?

15   A.  Yes.

16   Q.  And was the purpose of that for you to make an assessment

17   of whether, in your opinion, those draft Chevron orders were

18   written by the same author?

19   A.  The specific purpose was because the documents appeared to

20   contain a lot of overlapping text and I was attempting to

21   determine the order in which they were drafted and authored and

22   confirm that the document, that the order that they appear to

23   have been drafted on its face matched the text that was in

24   them.

25   Q.  So in doing this comparison of these documents to each

DALLCHE2                         Lynch - cross

1   other, were you looking to form an opinion of whether or not

2   these draft Chevron orders were drafted by the same author?

3   A.  I wasn't attempting to attribute the authorship to anyone.

4   Q.  Is that something that your firm, Stroz Friedberg, has the

5   ability to do, that is, compare documents to see if they have a

6   common author, even if you don't know who the actual author is?

7   A.  We do have linguists who can perform that analysis.

8   Q.  And you did not do that here, correct?

9   A.  I did not do that.

10  Q.  Now, I believe in your witness statement you indicate that

11  you compared then the Guerra draft Chevron orders with orders

12  that you found or were given actually signed by Judge Zambrano

13  in the Chevron case; is that right?

14  A.  That's correct.

15  Q.  And if you look at your witness statement on page 22, does

16  it indicate when you compared the orders the level of

17  similarity or the percentage of similarity between the draft

18  Chevron orders and the orders actually signed by Judge

19  Zambrano; is that what that table does?

20  A.  It does, yes.

21  Q.  And that would be table 11, correct?

22  A.  That's correct.

23  Q.  And the column to the far right, percentage of issued

24  document found in the draft, that would be how much of the

25  draft Guerra Chevron order you actually found when you compared

DALLCHE2                    Lynch - cross

1    it to the final Zambrano order, correct?

2    A.  It's the other way around.  It's the percentage of the

3    issued document that matched exactly to the draft.

4    Q.  Okay.  Let's take the first one.

5    A.  Okay.

6    Q.  If you have, you have the final Zambrano signed order, you

7    have a draft Chevron Guerra order.  As to that first one there

8    would be a 37 percent overlap between those two.

9            Is that what the table is indicating?

10   A.  37 percent of the issued document matched exactly to the

11   draft on the Guerra computer.

12   Q.  Now, you then, you talked earlier when you were describing

13   your demonstrative aids about a second period of orders, I

14   believe is what you called it, beginning December 2010.

15           Did I mishear you or was that accurate?

16   A.  Yeah, there was a second period beginning December 2010

17   that had other orders.

18   Q.  And that period extended from December of 2010 until what

19   date in terms of the dates of the orders you looked at?

20   A.  I don't recall the exact date.  It was in 2012.  I can

21   check.

22   Q.  Would you?  Thank you.  I wrote it down but I think I wrote

23   it down incorrectly.

24           THE COURT:  Let's take our morning break.

25           (Recess)

DALLCHE2                        Lynch - cross

1            THE COURT:  Go ahead, please, Mr. Booth.

2            MR. BOOTH:  Thank you, your Honor.

3   Q.  Hello, Mr. Lynch.  Have you had a chance at the break to

4   find that second date for me?  Let me ask the question better.

5            The second set of orders that you looked at, the

6   earliest date of those was December 2010.  Have you had a

7   chance to find the end date for those?

8   A.  I believe it was November 2011.

9   Q.  Thank you.  And there were 105, I think you told us; is

10  that right?

11  A.  Of the 105, one predated that range.  104 in that range.

12  Q.  And the one that predated the range was what date?

13  A.  That was 2009, August 2009.

14  Q.  All right.  I'm going to ask you a couple questions about

15  the analysis you did on these, on 104 to 105 different orders.

16           First let me ask you, those 105 orders were not in the

17  Chevron case, correct?

18  A.  They were in other cases.

19  Q.  Cases other than Chevron?

20  A.  Yes.

21  Q.  And did -- do you have your Plaintiff's Exhibit 4106 with

22  you?

23  A.  I do.

24           MR. BOOTH:  Your Honor, do you have a copy of 4106?

25  I'd like to refer to that if possible.

DALLCHE2                    Lynch - cross

1          THE COURT:  I don't.

2          MR. BOOTH:  You do not.  Can I have one.

3          THE COURT:  Thank you.

4  Q.  Mr. Lynch, can you look at 4106, and just I want to ask you

5  about the different columns that you have on your chart.  I

6  want to start all the way to the right where it says full path.

7          Can you briefly tell the Court what full path means?

8  A.  That's the full folder path to the document referenced at

9  that line.

10  Q.  Now, you told us that some documents were in more than one

11  place; is that right?

12  A.  Yes.

13  Q.  And so when we have a document here that has a path, have

14  you identified which of the documents on this chart were in

15  more than one place?

16          THE COURT:  Excuse me.  By more than one place,

17  explain what you mean.

18          MR. BOOTH:  Yes.  I apologize.  That was a bad

19  question.

20          THE COURT:  And for the witness.  The witness answered

21  your previous question using that phrase and I'd like to know

22  what he meant.

23          THE WITNESS:  There were documents where there were

24  multiple copies on the hard drive, one in one folder and then

25  another file in the same name in another folder.

DALLCHE2                    Lynch - cross

1          THE COURT:  Thank you.

2          MR. BOOTH:  Thank you, your Honor, because that's not

3   what I meant to ask and that's my fault.

4   Q.  My question is there were some of these orders that were on

5   a thumb drive or USB device as well as being on the hard drive

6   of Mr. Guerra's computer, correct?

7   A.  That's correct.

8   Q.  All right.  And on this chart you do not identify, do you,

9   which orders were on both a thumb drive and also on a hard

10  drive, do you?

11  A.  I do not.

12  Q.  All right.  And then the next, the next column over,

13  created on media.  What is that column?

14  A.  That's the date that the file referenced at that line was

15  created on that device.

16          THE COURT:  I'm sorry.  Someone coughed.  It was

17  created on what?

18          THE WITNESS:  On that device.  So where the full path

19  references it was on the hard drive, it's the date that that

20  file was created on the hard drive.  And where the full path

21  references the USB drive, it was the date it was created on the

22  USB drive.

23  Q.  Again, if a file was on a USB drive and on Mr. Guerra's

24  hard drive, that date created on media that you have in that

25  column would only pertain to the date created on the hard

DALLCHE2                       Lynch – cross

1  drive, correct?

2  A.  With the exception of I think there are two documents where

3  I list the location on the thumb drive, the dates only relate

4  to the hard drive.

5  Q.  All right.  Moving to the left, the date last accessed, is

6  that the last time that someone opened and, well, opened that

7  file?

8  A.  Last access is a, I guess, a very fragile date.  It can be

9  updated by either a user, or many different kinds of system

10  activity may automatically update that as well.

11  Q.  So there were programs on the computer that without you

12  ever opening that file could change that date; is that what

13  you're saying?

14  A.  Yes.

15  Q.  Moving to the left, last written, would that be the last

16  time someone actually typed something on that document, or you

17  tell me.  What does that mean?

18  A.  It's the last time the file was modified.  So the

19  modification could be someone opening a document and typing.

20  It could also be if, depending on the type of file, any change

21  at all, whether initiated by the system or a user, would update

22  that date.

23  Q.  So could that date be changed without anyone actually

24  opening and touching that file, just because the system program

25  on the computer?

DALLCHE2                        Lynch - cross

1    A.  For some types of files.  For the documents in this

2    exhibit, which are Word documents, that date generally would

3    only be changed by some sort of user activity.  Not necessarily

4    typing the document, but any formatting change in the Word

5    document and then saving it or anything that the user does and

6    then saves.

7    Q.  Moving to the left, last -- time last printed.  Would that

8    be last time the document was printed?

9    A.  It's the last time the document was printed or, as I was

10   explaining earlier, if the document was created from a

11   template, that date may carry forward from a template.

12   Q.  And then we move into the embedded metadata.

13        Does that mean the data that goes with the actual Word

14   document itself?

15   A.  Yeah, that embedded metadata is stored in the document

16   itself.  So if you move it from one device to another, the

17   embedded metadata will move with it.

18        And just to note, time last printed is one of those

19   embedded metadata items.

20   Q.  Thank you.  And last saved, that would be the last time the

21   document was saved?

22   A.  Yes.

23   Q.  File created would be when the file was created, that would

24   be the embedded metadata for that, correct?

25   A.  That would be when the file that contains the document was

DALLCHE2                    Lynch - cross

1  created.  That with last saved can be reset when someone uses a
2  save as, the save as functionality.
3  Q.  That was the thing we were talking about earlier; is that
4  right?
5  A.  Yes.
6  Q.  Are those the only two pieces of metadata that can be reset
7  when a person saves the document as save as?
8  A.  No.  There are other items of metadata that can be reset by
9  that.  On this chart, the revision count and the edit time can
10  be reset and the -- because it is a save, the last save by can
11  also be reset.
12  Q.  Moving over, it says total edit time.  Is that the total
13  time the file is open on the computer?
14  A.  It is.  Though, as I mentioned, it can be reset by save as.
15  Q.  And then number of revisions, that's the number of
16  different times that the file is saved; is that true?
17  A.  Yes, with the caveat that it can be reset.
18  Q.  By save as?
19  A.  Yes.
20  Q.  Now, you've told us that there was some things on the
21  earlier version of this chart that you have fixed with this
22  chart, correct?
23  A.  Yes.
24  Q.  Were those typos or was that -- can you tell me the
25  mistakes that were on the earlier chart, what were they the

DALLCHE2                       Lynch - cross

1   result of?

2   A.   They were the result where two files appeared with the

3   exact same name, the edit time was just, as a typo in creating,

4   it was duplicated between both files.  The edit time should

5   have been different for the two files and this version corrects

6   that.

7   Q.   All right.  I asked a bad question.

8          Was that mistake in the metadata or was that mistake

9   in the creating the charts or the typing of the chart?

10  A.   It was in creating the chart, in the previous version of

11  the chart.

12  Q.   Just the typing of it, right?

13  A.   Yes.

14  Q.   If you'll look -- you've looked at this and you feel like

15  you have found the typos and corrected the typos in what is now

16  Plaintiff's Exhibit 4106, correct?

17  A.   Yes.  I corrected all the typos that related to the edit

18  time, and I'm not aware of any other.

19  Q.   Would you turn to the second page of 4106 and look at the

20  order that is one, two, three, fourth down from the top, to the

21  far left column, the 68-2010 -- I'll stop there.

22          Do you see it?

23  A.   Yes.

24  Q.   If you look at the metadata, beginning with number

25  revisions, going over to last save, looking at the embedded

DALLCHE2                          Lynch - cross

1   metadata, do you see that?

2   A.  Yes.

3   Q.  It looks like the file was created on January 12, 2011, at

4   7:22 p.m.; do you see that?

5   A.  Yes.

6   Q.  The file was last saved on January 12, 2011 at 7:27 p.m.;

7   do you see that?

8   A.  Yes.

9   Q.  That would be a total of five minutes on the same day,

10  correct?  Am I doing my math right, five minutes?

11  A.  Yeah, there's five minutes between those two times.

12  Q.  Five minutes between when it's created and when it's last

13  saved, in other words, yes?

14  A.  Yes, that's what that reflects.

15  Q.  And the total edit time that's on your chart for that

16  document is what?

17  A.  It lists 114 minutes.

18  Q.  And the number of revisions on your chart is three; is that

19  right?

20  A.  Yes.

21  Q.  That metadata does not match up, does it?

22  A.  The edit time -- I don't have an explanation as to why the

23  edit time would be 114 minutes for that one.

24  Q.  Now, Mr. Lynch, you talked to us about the USB devices and

25  you, I believe you called them USB devices, and then in your

DALLCHE2                    Lynch - cross

1  witness statement they're also referred to as thumb drives.

2  Are those the same things, for the purpose of your testimony?

3  A.   Yes.

4  Q.   Excluding the original hard drive that was used --

5           THE COURT:  Excuse me, Mr. Booth.

6           Is it also accurate, apart from the way you're using

7  the term in the testimony, that a thumb drive is a USB device,

8  but not all USB devices are thumb drives?

9           THE WITNESS:  That is correct, yes.

10          THE COURT:  Go ahead.

11          MR. BOOTH:  Thank you, your Honor.

12 Q.   And specifically on that point, the hard drive that we

13 talked about earlier where files were transferred July 23,

14 2010, that would also be a USB device, correct?

15 A.   It would, yes.

16 Q.   I want to focus on the thumb drives.

17          THE COURT:  Excuse me for just a minute.

18          You say it would.  Are you saying that you observed

19 some evidence that leads you to the conclusion that it in fact

20 was or are you saying something else?

21          THE WITNESS:  I'm not sure I completely understand.

22          THE COURT:  Are there hard drives that can be plugged

23 into a second device that communicate other than through a USB

24 port, fire wire, for example?

25          THE WITNESS:  Yeah, hard drives can be connected

DALLCHE2                    Lynch - cross

1    multiple different ways to the computer.  The one from -- that

2    I think we're referring to from July 23 was a USB hard drive.

3            THE COURT:  Okay.  That's what I was asking.  Thank

4    you.

5            MR. BOOTH:  Thank you.

6    Q.  All right.  So focusing on the thumb drive version in this

7    case, all right, you testified about the demonstrative aids.

8            What I think I heard you say was on the thumb drives

9    were the orders in such a way that you believed they come from

10   the Guerra hard drive onto the thumb drive as opposed to vice

11   versa; did I mishear you or is that accurate?

12   A.  That's accurate.  The created dates on the thumb drives

13   came after the documents were created on the Guerra computer.

14   So the documents existed on the Guerra computer and then later

15   were created on the thumb drives.

16   Q.  And is the metadata on the thumb drives metadata that would

17   have been changed if -- strike all that.  I'm sorry.

18           On the thumb drives, were there any documents you

19   found where in your opinion they had been on the thumb drive

20   first and then transferred to the Guerra hard drive?

21   A.  I didn't review all of the files on the thumb drive, only

22   those files that bore the same names as the ones listed in this

23   exhibit.  So I can only speak to the ones that bore the same

24   names that are listed in the exhibit.  For those, all of the

25   created dates came after the dates on the Guerra hard drive.

DALLCHE2                    Lynch - cross

1    Q.  Were there any orders -- let me ask -- any orders other

2    than the ones listed here, draft orders or orders, that

3    appeared to have gone from the thumb drive to the Guerra hard

4    drive that you saw?

5    A.  I wouldn't know.  I limited my analysis to these files.

6    Q.  Now, is it possible for you to examine, do an analysis on a

7    hard drive like Mr. Guerra's and determine what USB devices

8    have been connected to it?

9    A.  Yes.

10   Q.  And can you also tell in that analysis the date that those

11   USB devices were connected to the computer?

12   A.  You can generally tell the date that the device was first

13   connected and last connected.  You can't generally tell any of

14   the intermediary dates if it was connected multiple times.

15   Q.  Did you do that analysis on Mr. Guerra's computer to

16   determine all the different USB devices, if any, that had been

17   connected to his hard drive?

18   A.  I did, yes.

19   Q.  And were you able to match up exactly the thumb drives that

20   you took possession of with USB connected history from

21   Mr. Guerra's hard drive?

22   A.  Seven of the thumb drives that I took possession of matched

23   exactly.  One of the thumb drives is broken and nonfunctional,

24   so I couldn't perform any analysis on it.

25   Q.  Were there any thumb drives referenced in your analysis of

DALLCHE2                        Lynch - cross

1   the history from the computer of thumb drive attachment that
2   you didn't find when you took possession of the USB thumb drive
3   devices?
4   A.  Yes.
5   Q.  How many?
6   A.  There were 23 thumb drives in total and I took possession
7   of eight.  So that leaves 15.
8   Q.  And could you tell -- did you do an analysis of the range
9   of dates that those 23 thumb drives had been connected to the
10  computer, the first time and the last time?
11  A.  I did, yes.
12  Q.  And what was the range of dates for those 23 thumb drive
13  devices?
14  A.  They fell from -- I don't recall the exact dates, but after
15  December 2010 until the computer was no longer used.  I don't
16  recall the exact dates for every one of them though.
17          THE COURT:  Were all 15 of them after December of
18  2010?
19          THE WITNESS:  All 23 of the ones I referenced in the
20  demonstrative were after December 2010.
21          THE COURT:  All --
22          THE WITNESS:  During or after December 2010.
23  Q.  And if I understood you, you were only able to analyze
24  seven of the eight thumb drives that you had; is that right?
25  A.  That's correct.

DALLCHE2                    Lynch - cross

1   Q.  So there would have been 16 thumb drives that you had no

2   information about, correct?

3   A.  That's correct.

4   Q.  And you have no information sitting here today whether

5   those other 15 that are missing are?

6   A.  No, I have no information.

7   Q.  Now, in looking at the orders, the 105 orders that were on

8   Mr. Guerra's hard drive, you then compared them to the final

9   orders that were filed over Judge Zambrano's name; is that

10  right?

11  A.  Can you repeat that?

12  Q.  Yes.  The 105 orders that you found on Mr. Guerra's hard

13  drive, you compared those to orders that had been filed in the

14  Ecuadorian court, correct?

15  A.  Yes.

16  Q.  And how many of those orders of those 105 were signed, were

17  orders signed by Judge Zambrano?

18  A.  I don't remember the exact breakdown.  I did two parts of

19  analysis.  One was to review, where possible, the actual signed

20  order.  In some cases, the document I received didn't have a

21  signature on it.  So for those I looked at the set of documents

22  called the actas de sorteo, A-C-T-A-S, D-E, S-O-R-T-E-O.

23         And those documents tracked, as I understand it, the

24  assignment of cases to judges.  And from the signed orders and

25  the actas de sorteo, I found that 101 of the 105 documents were

DALLCHE2                    Lynch – cross

1   issued in cases either signed by Mr. Zambrano or in cases

2   assigned to him.

3   Q.  Now, in terms of these 105 orders we've been discussing,

4   you did not at any time do an authorship analysis to determine

5   the author of any of those orders, correct?

6   A.  No.  Beyond observing that some of the metadata was

7   consistent with them having been created on the Guerra

8   computer, I don't know who authored them.

9   Q.  And for the 105 orders, you did not do any comparison of

10  common authorship to try to compare the writing style or any

11  characteristics of the order to other orders, correct?

12  A.  I did not.

13  Q.  And on page 25 of your witness statement, paragraph 61, do

14  you describe, do you describe a process that you supervise at

15  your office of examining some number of these orders?

16  A.  Yes, paragraph 61 describes one of the processes.

17  Q.  And how many orders, first of all, does paragraph 61

18  describe a process where people at your office actually sat

19  down and compared the draft orders from the Guerra computer

20  with orders filed with the Ecuadorian court?

21  A.  Sixty-one describes a comparison of the orders that -- the

22  orders as they were obtained from the Ecuadorian court website

23  to the actual scanned documents from the Ecuadorian court

24  system.  The 61 does not describe any comparison of the drafts.

25  Q.  I see.  Did you compare the drafts from the Guerra hard

DALLCHE2                         Lynch - cross

1   drive of these 105 orders to a signed version of that order

2   filed with the Ecuadorian court?

3   A.  I compared them to the orders as they were available on the

4   Ecuadorian court system's website.  I then compared the

5   documents that were available on the website to the scanned

6   versions of the orders when a scanned version was available.

7   Q.  And what findings did you make when you compared the draft

8   orders off the Guerra hard drive with the version from the

9   court system?

10  A.  That they had significant amounts of overlapping text, that

11  the draft orders and the versions that were issued had a

12  substantial overlap, and that the drafts predated the issuance

13  of the order.

14  Q.  Earlier we looked at a chart that you did where you

15  actually laid out percentages.

16          Did you do such a chart setting out percentages of

17  comparison or overlap in terms of these 105 orders?

18  A.  I did, yes.

19  Q.  And is that attached in your witness statement?

20  A.  I believe it's referenced as a, as a Plaintiff's Exhibit.

21  It's not attached to the witness statement.

22  Q.  Let me ask you --

23          THE COURT:  Excuse me, which Plaintiff's Exhibit is

24  it?

25          THE WITNESS:  2177.

DALLCHE2                    Lynch - cross

```
1              THE COURT:  Thank you.
2   Q.  Now, in terms of your review of the Guerra hard drive, it's
3   true, is it not, that you found no version of the Ecuadorian
4   judgment dated February 14, 2011, on Mr. Guerra's hard drive,
5   true?
6   A.  I found no version of the Ecuadorian judgment.
7   Q.  Is it true you found no version of the clarification order
8   signed by Judge Zambrano in March of 2011 on Mr. Guerra's hard
9   drive, true?
10  A.  That's correct.
11  Q.  You found no version of the appellate court decision or the
12  clarification order from the appellate court on Mr. Guerra's
13  hard drive, correct?
14  A.  That's correct.
15  Q.  Now, if you -- I want to talk to you now about the
16  Ecuadorian judgment dated 2/14/11.  Okay?
17  A.  Okay.
18  Q.  In looking at that document, is it your opinion that part
19  of that judgment, portions of that judgment were copied from a
20  document you refer to as the Ecuadorian lawyers' unfiled data
21  compilation; is that your opinion?
22  A.  That is my opinion.
23  Q.  And can you tell us over how many pages in your opinion do
24  you find the portions that were copied from which you refer to
25  as the Ecuadorian lawyers' unfiled data compilation?
```

DALLCHE2                          Lynch - cross

A.  The pages of the judgment 101 to 112 contain information

that was copied from or derived from the data compilation.

Q.  Did you make any attempt to determine in word count how

many words that was compared to the words of the judgment, for

example?

A.  No, I did not.

Q.  Did you make any attempt to calculate in any way the

percentage of the judgment you believed was copied from the

Ecuadorian lawyers' unfiled data compilation?

A.  I did not.

Q.  The document that you reviewed when you just told us pages

101 through 112, can you turn to tab 4 of the binder,

Plaintiff's Exhibit 400.

        Were the pages you were referring to pages from

Plaintiff's Exhibit 400, which is a 188-page document, is that

the same document you used in doing the assessment that you

described in your report?

A.  Yeah, I've not reviewed the entire document here.  It

appears to be the same.

Q.  Well, the document that you reviewed that we've referred to

as the Ecuadorian judgment, 2/14/2011, did the document you

reviewed have 188 pages?

A.  It did.  I should make clear I reviewed two different

versions of the document.  There was a Spanish version and an

English translation.

DALLCHE2                        Lynch - cross

1   Q.  All right.  So the pages 101 to 112, would that have been

2   on the English version or the Spanish version?

3   A.  The pages for them appear to be the same.

4   Q.  I want to ask you about the use of the term Ecuadorian

5   lawyers' unfiled data compilation.

6           Did you make any attempt yourself to search any court

7   records from Ecuador to determine whether the documents you

8   referenced were filed or unfiled?

9   A.  No, I have not searched the court record.

10  Q.  Do you consider that you have expertise sufficient to allow

11  you to judge whether something is filed or unfiled under

12  Ecuadorian law?

13  A.  No, I have no knowledge of the Ecuadorian legal system.

14  Q.  When you used that phrase Ecuadorian lawyers' unfiled data

15  compilation, is that just a name that you've given it for the

16  purpose of your report?

17  A.  Yeah.

18  Q.  You're not forming an opinion for the Court about the

19  unfiled aspect?

20  A.  No.  I understand, in using that name I'm relying on other

21  experts that I believe have -- I've read the reports and they

22  concluded it was not filed, but I don't have an opinion as to

23  whether or not it was filed.

24  Q.  Now, in your review of the Ecuadorian judgment 2/14/11, you

25  did not do any analysis to form an opinion as to the author of

DALLCHE2                    Lynch - cross

1   that judgment in its entirety, did you, sir?

2   A.  No, I have no opinion as to who authored it.

3   Q.  And you didn't do any type of analysis to determine

4   authorship, did you, sir?

5   A.  No.

6   Q.  You did not do any type of common authorship analysis that

7   you described earlier, did you, sir?

8   A.  I have not.

9   Q.  And, again, on that document, the judgment of 2/14/11,

10  correct?

11  A.  No, I performed no analysis as to who authored document.

12  Q.  You did not do any analysis comparing the 2/14/11

13  Ecuadorian judgment to the clarification order signed by Judge

14  Zambrano; is that right?

15  A.  I have not.

16  Q.  Okay.  Can you turn to page 42 of your report, please.  I

17  want to ask you about the pit count part of your report.

18         Are you with me?

19  A.  Yep.

20  Q.  And pit count, when you say pits, you're talking about oil

21  pits; is that right?

22  A.  Yeah, that's my understanding.

23  Q.  And you reference, I believe on page 42 you reference

24  page 125 of the Ecuadorian judgment of 2/14/11, correct?

25  A.  Yes, I referenced 125.

DALLCHE2                    Lynch - cross

Q.   And that should be tabbed in your book, page 125 of the
judgment?

A.   Yes.

Q.   And we have to flip back and forth.  So let me ask you
first in your witness statement, paragraph 98, you indicate in
the first sentence it talks about the pits and the number 880.
        Do you see that?

A.   Yes.

Q.   Then it goes on to say a number purportedly reached largely
through examination of aerial photographs; do you see that?

A.   Yes.

Q.   And where do you get the phrase, what is the basis of your
statement reached largely through an examination of aerial
photographs?

A.   It states proven -- and this is from page 125 of the
judgment -- proven through aerial photographs certified by the
geographic military institute which appeared throughout the
record analyzed together with -- and then it lists another set
of documents.

Q.   All right.  So on page 125, do you see the other things
that -- I'm sorry.
        On page 125 of Plaintiff's Exhibit 400, the Ecuadorian
judgment, do you see the other things that it says these
photographs were analyzed with?

A.   Could you repeat that?  I want to make sure I understand.

DALLCHE2                        Lynch - cross

1    Q.  Yes.  You referenced me to page 125 of Plaintiff's

2    Exhibit 400, correct?

3    A.  Yes.

4    Q.  And you read me a line from that judgment, correct?

5    A.  Yes.

6    Q.  Do you see just past where you read that it says analyzed

7    together with, do you see the things that are listed there on

8    page 125?

9    A.  Yes.

10   Q.  And one thing is official documents of Petroecuador; is

11   that right?

12   A.  Yes.

13   Q.  Did you review official documents of Petroecuador?

14   A.  I have not, no.

15   Q.  Did you take any steps to determine what if any information

16   was included regarding pit count from official documents of

17   Petroecuador?

18   A.  I have not.

19   Q.  If you look beyond that, there's reference to the expert

20   Gerardo Barros, G-E-R-A-R-D-O, B-A-R-R-O-S, do you see that

21   reference?

22   A.  I do.

23              (Continued on next page)

24

25

DAL8CHE3                        Lynch - cross

1    Q.  It says especially by expert Gerardo Barros.

2           Did you take any steps to determine whether Mr. Barros

3    had any information regarding pit count, either written or in

4    any form?

5    A.  No.

6    Q.  Did anyone give you any assumptions or other information

7    regarding Mr. Barros's information, if any, about pit count?

8    A.  No.

9    Q.  Did you, in reaching your opinion regarding the pit count

10   issue described in your witness statement, take any steps to

11   determine the actual number of oil pits in the area discussed

12   in the judgment of 2/14/11, Plaintiff's Exhibit 400?

13   A.  I have performed no surveys or analysis of how many pits

14   actually exist.

15   Q.  Were you asked to assume by anyone what would be the

16   correct number of oil pits in the area being described in the

17   judgment, Plaintiff's Exhibit 400?

18   A.  No.  I have no opinion or knowledge as to the correct

19   number of pits.

20   Q.  Now, in paragraph 98 of your witness statement on page 42,

21   you make reference to Dr. James Ebert.  Do you see that?

22   A.  I do.

23   Q.  The remainder of that paragraph, would you look at it,

24   there is some language about aerial photos and discussion.  Do

25   you see that?

DAL8CHE3                          Lynch - cross

1    A.  Yes.

2    Q.  Are those your opinions or are you just putting down what

3    someone told you Mr. Ebert's opinions were?

4    A.  Where I state that Dr. Ebert or that I understand that

5    Dr. Ebert analyzed the aerial photographs and concluded that

6    the record did not contain photographs for a significant number

7    of states, and that it is nearly impossible for then Judge

8    Zambrano to have arrived at 880 pits through the examination of

9    aerial photographs, that's based on my having read Dr. Ebert's

10   report.

11   Q.  So what you're doing there is you are paraphrasing what you

12   understood Dr. Ebert's report to say, not expressing your own

13   opinion on that topic, is that fair?

14   A.  That's fair.

15   Q.  Your analysis on the issue of the 880 pits, if I understand

16   it correctly, you found the number 880 in the judgment, as we

17   just saw, the Plaintiff's Exhibit 400, is that right?

18   A.  Yes.

19   Q.  And then you went to a compilation of data, including a

20   compilation in an annex to the Cabrera report, is that right?

21   A.  That's correct.

22   Q.  Then using the data in the Cabrera report, you did some

23   math, correct?

24   A.  Yes.  I used an Excel version of the Cabrera report and

25   performed the calculation on that data.

DAL8CHE3                          Lynch - cross

1    Q.  When you say calculation, what was the number of oil pits

2    referenced in the Cabrera report, the total number?

3    A.  What is the question?

4    Q.  That was a bad question.  What was the total number of oil

5    pits referenced in annex H1 to the Cabrera report?

6    A.  Annex H1 lists 916 pits.

7    Q.  Does anywhere in the Cabrera report the number 880 appear?

8    A.  It doesn't appear as a number.  It can be calculated using

9    that data.

10   Q.  So if you take the number 916 from the Cabrera report, you

11   can subtract a number from 916, based on data in the Cabrera

12   report, and you can end up with a number of 880, is that what

13   you're saying?

14   A.  Yeah.  You can analyze the Cabrera report and information

15   there, and I guess cut it such that it results in 880.

16   Q.  You have no personal knowledge of how the author of the

17   Ecuadorian judgment, Plaintiff's Exhibit 400, actually arrived

18   at the number 880, do you, sir?

19   A.  No.  My opinion is that that number 880 can be derived from

20   the Cabrera report.

21   Q.  That number can be derived?

22   A.  Yes.

23   Q.  Just a couple of more, Mr. Lynch.

24            On page 44 of your witness statement?

25   A.  What page number was that?

DAL8CHE3                      Lynch - cross

1    Q.   44 of your witness statement.

2            On that page do you describe the process by which

3    documents were obtained from Mr. Donziger's hard drive?

4    A.   Yeah.  The discussion begins on page 44.

5    Q.   The document you referred to is the Ecuadorian plaintiffs'

6    lawyers' unfiled data compilation.  Is it your understanding

7    that document came from Mr. Donziger's hard drive?

8    A.   No.  That document, the unfiled data compilation was not on

9    Mr. Donziger's hard drive.

10   Q.   Where did that, if you know, where did that document, the

11   Ecuadorian plaintiffs' lawyers' unfiled data compilation

12   document, where did that come from, if you know?

13   A.   It was produced by a consultant working for the Ecuadorian

14   plaintiffs.

15   Q.   Do you know the date that document was produced to Chevron?

16   A.   I do not.

17   Q.   Do you know the date it was turned over by the consultant?

18   Let me ask it that way.

19   A.   I do not.

20   Q.   Counsel was kind enough to hand me the exhibits to your

21   testimony.  It's in two boxes.  Do you recognize this as being

22   about the size of one of the eight binders of your exhibits?

23           THE COURT:  That's not exactly a very helpful

24   question, do you think, Mr. Booth?  It's about the size of a

25   big looseleaf book.

DAL8CHE3                         Lynch - cross

1   Q.  That looks about right for one of them?

2   A.  Yes.  It looks about right for one of them.

3           MR. BOOTH:  Those are my questions.  Thank you.

4           THE COURT:  Thank you.

5           Redirect.

6   REDIRECT EXAMINATION

7   BY MS. NEUMAN:

8   Q.  Mr. Lynch, I want to return to the topic of the data

9   transfer that occurred from the hard drive via a USB port to

10  Mr. Guerra's computer in July of 2010.  Do you have that in

11  mind?

12  A.  Yeah.  I recall that.

13  Q.  Let me ask you, is there anything unusual about

14  reinstalling Windows on a computer?

15  A.  No.  It happens frequently.  It's common for people, if

16  their computer is sluggish or they have got a virus or

17  something like that, to reinstall Windows.

18  Q.  Would it be common to reinstall Windows if you wanted to

19  upgrade the version of Windows you're using?

20  A.  Yes.

21  Q.  Prior to a reinstallation of Windows on a computer, is it

22  also typical for users to transfer their files from that

23  portion of the computer to an external hard drive?

24  A.  Yes.  Depending on how you perform an installation or

25  reinstallation of Windows, it can overwrite data that was once

1  on your computer.  So it's common practice by many to back up

2  the data on their computer to an external device before they

3  reinstall it.

4  Q.  As I understand it in what you have testified to, Windows

5  was reinstalled on Mr. Guerra's computer, and then shortly

6  thereafter a significant amount of data was transferred back on

7  to the computer, is that right?

8  A.  Yes.

9  Q.  Over what period of time did that data transfer occur, more

10 or less?

11 A.  I don't recall the exact time.  I believe it was 16

12 minutes.

13 Q.  16 minutes.  During those 16 minutes that the hard drive

14 was hooked up to Mr. Guerra's computer and data was

15 transferring, did just the orders in the Chevron case transfer

16 or did significant amounts of other information transfer?

17 A.  There was a lot more than just the drafts of Chevron

18 orders.  There were over 4,000 different files, many of which,

19 as my demonstrative showed earlier, included his family

20 photographs and his CV.

21 Q.  Based on your analysis of those over 4,000 files that were

22 transferred to Mr. Guerra's computer in a 16 minute time span,

23 was the transfer consistent with Mr. Guerra having downloaded

24 the information off of his computer on to a hard drive, having

25 then reinstalled Windows, and then having uploaded the

1   information back on to the computer?

2   A.  It's consistent with that.

3           MS. NEUMAN:  I would like to put up on the screen

4   Plaintiff's Exhibit 2180.

5   Q.  Mr. Lynch, is 2180 a graphic representation of what you

6   determined in terms of when the Chevron orders were last saved

7   according to their embedded metadata versus when they were

8   issued by Judge Zambrano?

9   A.  Yes, it is.

10  Q.  Except for the ninth order, were all the orders saved prior

11  to the time they were issued by Judge Zambrano?

12  A.  Yes.  The orders were all saved before they were issued.

13  Q.  With regard to the ninth one, do you have any view as to

14  why the last saved date postdates the issuance date?

15  A.  It appears that for that document, that on March 7, the

16  document was saved using the save-as functionality which would

17  reset the metadata for that document.

18  Q.  Now, in table 11 of your report, at page 22, I believe that

19  counsel was questioning you about the percentage overlap

20  between the draft Chevron orders on Guerra's computer and the

21  orders actually issued by Judge Zambrano.  Do you recall that?

22  A.  Yes, I do.

23  Q.  Look at table 11, and for the first order am I correct that

24  the order issued by Judge Zambrano only contained 37 percent of

25  the material that was in the draft order on the Guerra

DAL8CHE3                        Lynch - redirect

1    computer?

2    A.  That's correct.

3            THE COURT:  Let me just interject.

4            Are you saying here that 37 percent of the Zambrano

5    order was found in identical form in what you call the Guerra

6    draft, is that what you're saying?

7            THE WITNESS:  That is what I am saying.

8            THE COURT:  As opposed to 37 percent of the draft

9    being in the Zambrano order.

10           THE WITNESS:  Yes.  That's exactly correct.

11           THE COURT:  Thank you.  Go ahead.

12   Q.  On table 11, it shows in the embedded metadata that the

13   first order was last saved on October 20, 2009, is that

14   correct?

15   A.  That's correct.

16   Q.  Can you use the microphone?

17   A.  That's correct.  I will move closer to it.

18   Q.  Thank you very much.

19           Then the order was issued the next day, October 21,

20   2009, is that correct?

21   A.  That's correct.

22   Q.  According to the information on your table 11, is it

23   consistent with that information for Judge Zambrano to have

24   copied the material that was in draft form in Judge Guerra's

25   computer into a larger order and then issued it the next day on

1    October 21, 2009?

2    A.   I think it's consistent with that, yes.

3    Q.   In each case, the Chevron orders that were on Judge

4    Guerra's computers were only a portion of the order that was

5    subsequently issued by Judge Zambrano, is that right?

6    A.   That's correct.

7    Q.   And you have not seen any other source on which this series

8    of draft Chevron orders versus the final Chevron orders

9    resided, correct?

10   A.   No.  I have not analyzed any other source that has these

11   set of drafts.

12   Q.   Why don't you go to the second page of Exhibit 2108 -- I'm

13   sorry, 2180.

14         THE COURT:  What is 2180, is that in evidence?

15         MS. NEUMAN:  It's a demonstrative from Mr. Lynch's

16   opinion I neglected to move in earlier.

17         THE COURT:  We will do that.

18         2180.  Thank you.

19   Q.   What is shown here on the second page of Exhibit 2180, Mr.

20   Lynch?

21   A.   This is similar to the other timeline.  It's the date in

22   orange that the document was created on the Guerra computer as

23   it relates to the date it was -- the order was then issued by

24   Zambrano in purple.

25   Q.   In each case, for the 101 orders that you looked at in this

DAL8CHE3                        Lynch - redirect

1    time frame, was the draft on the Guerra computer created before

2    the order was issued by Judge Zambrano?

3    A.   I believe in all but one instance the order was created on

4    the Guerra computer before it was issued.

5    Q.   Now, were all of these orders -- let me withdraw that.

6          If you had wanted to obtain these orders from Judge

7    Zambrano's computer while they were being drafted, and then put

8    them on Mr. Guerra's computer, on how many different occasions

9    would you have had to have downloaded the draft order from

10   Judge Zambrano's computer and then have uploaded it to

11   Mr. Guerra's computer?

12          MR. BOOTH:  Objection.  Speculation.

13          THE COURT:  First of all, I am confused by the form of

14   the question.  So let's try it again.

15          MS. NEUMAN:  Certainly, your Honor.

16   Q.   You have been able to tell when each of the documents was

17   created and last saved on the Guerra computer, correct?

18   A.   Yes, that's correct.

19   Q.   As I read the second page of Exhibit 2180, those were a lot

20   of different dates, is that right?

21   A.   Yes.

22   Q.   Subsequent to each of those dates, the orders were issued

23   by Judge Zambrano, correct?

24   A.   Yes.

25   Q.   Now, because you know that the December 19, 2010 order was

DAL8CHE3                        Lynch - redirect

1    last saved on the Guerra computer on December 19, 2010, if

2    someone was going to transfer the order on to that computer,

3    they would have had to do it as of that date, right?

4    A.  Yes.

5    Q.  And if you look down at the bottom, you have an order from

6    January of 2011, January 7th of 2011.  Do you see that?

7    A.  I do.

8    Q.  They would have had to put that order on Guerra's computer

9    by January 7th of 2011, is that right?

10   A.  It was created on the Guerra computer on January 7, I

11   believe.  I can check the exhibit.

12   Q.  Is created on the computer similar to transferred on to the

13   computer?

14   A.  Yes.

15   Q.  As you're using it?

16   A.  Yes.

17   Q.  So the orders on the Guerra computer that were portions of

18   draft orders subsequently issued by Judge Zambrano were put on

19   that computer, whether they were created on the computer or

20   transferred to the computer, on how many different occasions?

21   A.  On 59 different days.  So the orders were created on the

22   Guerra computer 59 different days all prior, except for one

23   instance, all prior to when the order was issued or the ruling

24   was issued in the Ecuadorian court system.  For the one that

25   appears having been created after, like one of the other

DAL8CHE3                    Lynch - redirect

1    Chevron documents, appears to have been a save as.

2    Q.   Does your analysis rule out the possibility that someone

3    hypothetically gained access to Judge Zambrano's computer,

4    downloaded these 101 files all at the same time, and then

5    uploaded them on to Mr. Guerra's computer?

6    A.   Yes.  It rules that out, that it could not have happened

7    all at the same time.

8    Q.   In fact, it had to happen on at least 59 separate

9    occasions, is that right?

10   A.   Yes.

11   Q.   From your analysis, do these documents appear to have

12   actually been created on the Guerra computer as opposed to

13   having been transferred on to the Guerra computer?

14   A.   Some of them appear to have been created on the Guerra

15   computer, yes.

16   Q.   Now, I want to turn your attention, Mr. Lynch --

17            MS. NEUMAN:  I would like to put on the screen

18   Plaintiff's Exhibit 4101.

19   Q.   You mentioned during your examination by counsel that you

20   had analyzed the Guerra computer to make sure it was not

21   tampered with.  Do you recall that?

22   A.   Yes.

23   Q.   In doing that analysis, how many log files did you analyze

24   in reaching that conclusion?

25   A.   I looked at tens of thousands, if not hundreds of thousands

DAL8CHE3                        Lynch - redirect

1   of log entries.

2   Q.  Were all the entries that you looked at consistent with the

3   Guerra computer not having been tampered with?

4   A.  Yes.  They were all consistent with it not having been

5   tampered with.

6   Q.  Did your analysis include analyzing the virus log files?

7   A.  Yes, it did.

8   Q.  Does Plaintiff's Exhibit 4101 relate to your analysis of

9   the virus log files on the Guerra computer?

10  A.  Yes, it does.

11  Q.  Can you explain what you found in that regard, Mr. Lynch?

12  A.  Sure.  Let me start by describing the virus logs a little

13  bit.

14          Mr. Guerra's computer had on it an anti-virus program,

15  and every time that anti-virus program run or started or

16  updated or did any number of things that it would do in doing

17  its job, it recorded data into a log file.  That log file

18  contains, or the log records that it was making contained the

19  date that the computer believed it to be when that log was

20  being written to the file.

21          Because of the way the computer operates and the way

22  the clock operates, the log files should always appear in

23  sequential order, such that the first log entry in the file

24  would be the first ever written by the virus program, the last

25  one would be the last entry ever written by the virus program,

DAL8CHE3                          Lynch - redirect

1    and all of the log entries in between those would be in

2    sequential order.

3           In 4101, I am displaying a hypothetical example of

4    what you may see on a computer that had been tampered with.  In

5    this example, the log file jumps.  It starts sequentially

6    advancing a few seconds, and then jumps back in time nearly two

7    years, and there is a block of logs that are two years out of

8    date compared to all the logs near them, and it's not in

9    sequential order.  That's what I would expect to see on a

10   computer that had been tampered with in some way.

11   Q.  Did you see anything like that on Mr. Guerra's computer's

12   virus log?

13   A.  No.  On the next page of that demonstrative, I show an

14   example from Mr. Guerra's machine.  Mr. Guerra's machine

15   contained 7,342 different time stamps in the anti-virus logs,

16   and all of them were in sequential order, which is exactly what

17   I would expect if the computer had not been tampered with.

18   Q.  Did you also do an analysis of the Microsoft Windows update

19   logs in determining that the Guerra computer had not been

20   tampered with?

21   A.  I did.

22          MS. NEUMAN:  Can you put on the screen Plaintiff's

23   Exhibit 4102, please?

24   Q.  Mr. Lynch, is Exhibit 4102 a demonstrative related to your

25   analysis of the Windows update logs on the Guerra computer?

DAL8CHE3                           Lynch - redirect

```
1    A.  It is, yes.

2    Q.  Can you explain that analysis, please?

3    A.  Sure.  Similar to the anti-virus logs, when Windows -- I

4    guess let me back up one second.

5            Windows or Microsoft, the publishers of Windows, make

6    available a series of updates for the computer, and those

7    updates are available to be downloaded through the Internet.

8    Microsoft Windows XP, which was running on the Guerra machine,

9    will automatically periodically check for updates and then

10   download them and install them.

11           When those updates are downloaded and installed, a log

12   entry is created that similar to the anti-virus logs records

13   when the computer believed that action took place.  So the

14   example shown on this screen is of a Windows update that the

15   computer believed was installed July 23, 2010.  And this is a

16   hypothetical example.

17           This is an example of how you can see that there has

18   been some sort of tampering with the computer, because when you

19   actually check the history of that update, Microsoft had not

20   released it until nearly a month later on August 9.  So the

21   computer believed that it was July 23 when this update was

22   installed, and that would be impossible, this update did not

23   exist when the computer believed it to be -- when it was July

24   23.  So the computer must have been mistaken in believing that

25   it was July 23.  It must have been after August 9, 2010.
```

DAL8CHE3                      Lynch - redirect

1   Q.  In your professional experience, are these kinds of

2   mistakes made by the computer when the computer clock has been

3   tampered with?

4   A.  Yes.  That's generally the source of these types of

5   mistakes.

6   Q.  Did you see any anomalies in the Microsoft log on the

7   Guerra computer?

8   A.  No.  On the next page I have an example from the Guerra

9   computer for the same Windows update.  On the Guerra computer,

10  all of the Windows updates were installed after they had been

11  released by Microsoft, which is what I would expect.  Some of

12  the logs were installed immediately after Windows was

13  reinstalled on the computer, and then all of the

14  subsequent -- all the subsequent Windows updates were installed

15  a few days after they were released by Microsoft, which is

16  completely consistent with a computer that was operating

17  normally and no one was tampering with the clock.

18  Q.  Did you do whatever analysis in your expert opinion you

19  needed to do to form your opinion that the Guerra computer had

20  not been tampered with or fabricated?

21  A.  Yes.  I performed an extensive analysis to see if there

22  were any issues, and I found none.

23  Q.  Is it your opinion, to a reasonable degree of scientific

24  certainty, that the Guerra computer has not been tampered with

25  or fabricated?

DAL8CHE3                        Lynch - redirect

1   A.  Yes, it is.

2   Q.  Can you turn to page 25 of your direct testimony?

3   A.  Yes.

4   Q.  Counsel was asking you some questions about the judgments

5   to which you compared the draft on the Guerra computer.  Do you

6   recall that?

7   A.  I do.

8   Q.  Now, you said you had two sources for those judgments.  In

9   some cases you had a signed hard copy and in other cases you

10  had to rely exclusively on the Ecuadorian court's Web site, am

11  I correct about that?

12  A.  Yeah.  I didn't have a hard copy in the sense of a piece of

13  paper, but I had a scanned version of a hard copy document with

14  a signature on it.

15  Q.  So for a certain number of the orders you could see Judge

16  Zambrano's signature on the order, is that right?

17  A.  That's right.

18  Q.  And those orders matched to a significant degree with the

19  drafts of the same order found on the Guerra computer, is that

20  right?

21  A.  Yes.

22  Q.  For the orders where you couldn't see or you didn't have a

23  scanned hard copy, you went to the Ecuadorian court's Web site,

24  correct?

25  A.  I pulled copies of the text for all of the orders from the

DAL8CHE3                          Lynch - redirect

1    court Web site.

2    Q.   The court Web site, does it show the signature block for

3    the person that issued the order or not?

4    A.   It does not, no.

5    Q.   It doesn't show that.

6             In the absence of having the signature block available

7    to you, what other information did you pull off the Web site to

8    lead to your conclusion that these were judgments likely issued

9    by Judge Zambrano?

10   A.   From the Web site, I pulled the text of the order and the

11   date it was issued, and then using another set of documents,

12   the Actas de Sorteo, I reviewed those to determine what judge

13   had been assigned the cases that the judgment was issued in or

14   the rulings were issued in.

15   Q.   In each of the 101 cases, you were able to confirm either

16   that you had an order actually signed by Judge Zambrano or that

17   the Ecuadorian Web site said the case was assigned to him to

18   decide, is that right?

19   A.   Yes.  For 101 of the 105, the document was either -- I

20   either had a hard copy that reflected it was issued by Mr.

21   Zambrano or the Actas de Sorteo showed that it was a case

22   assigned to Mr. Zambrano.

23            MS. NEUMAN:  I would like to put on the screen

24   Plaintiff's Exhibit 2177.

25   Q.   Is Exhibit 2177 an exhibit that you had prepared, Mr.

DAL8CHE3                      Lynch - redirect

1    Lynch?

2    A.  It is, yes.

3    Q.  In the last column, if we can focus on the last column, can

4    you tell us what is shown in the last column?

5    A.  That's the, I guess the similar computation as I described

6    for the orders in the Chevron case.  It's the percentage of the

7    issued document that appears as an exact match to the draft

8    found on Mr. Guerra's machine.

9    Q.  In the majority of the cases, is the document that was

10   issued by Judge Zambrano over a 90 percent match with the draft

11   that was on the Guerra computer?

12   A.  I don't recall the exact number or percentage for each one,

13   but a very substantial number had more than a 90 percent

14   overlap.

15   Q.  Is it correct that in no case was there 100 percent

16   overlap?

17   A.  No.  There was a header in the issued document that didn't

18   appear in any of the drafts.  So for that reason alone there

19   would never have been a 100 percent match.

20   Q.  Let me go, Mr. Lynch, to your opinion that the unfiled data

21   compilation was used in the drafting of the Ecuadorian

22   judgment.

23   A.  OK.

24   Q.  How many different types of overlap did you find between

25   the unfiled data compilation and the judgment?

DAL8CHE3                          Lynch - redirect

1   A.   There were four different kinds of overlap.

2            First, the names of some samples appeared to have been

3   copied from or appeared identically in the data compilation in

4   the judgment.

5            Second, there were a number of data irregularities

6   that matched between the judgment and the data compilation, but

7   those did not match the file, the lab results.

8            There was, third, a misidentified expert, where the

9   expert for a particular set of results was misattributed in

10  data compilation and in the judgment.

11           And then there was a series of statistics that were

12  calculated where the statistics overlapped exactly with the

13  data compilation, overlapped from the judgment to the data

14  compilation.

15  Q.   On what page of the judgment did those statistics appear?

16  A.   It appeared on pages 101 and 102.

17           MS. NEUMAN:   I am going to ask to put on the screen

18  Plaintiff's Exhibit 4104, please?

19  Q.   Mr. Lynch, is this a chart of a comparison of those

20  percentages you just referenced as they appear in the

21  Ecuadorian judgment versus your calculations from the

22  plaintiffs' data compilation?

23  A.   It is.

24  Q.   The plaintiffs' data compilation, what type of file is it?

25  A.   It's an Excel file.

DAL8CHE3                           Lynch - redirect

Q.  In order to calculate the percentages in the far right

column of Exhibit 4104, what is your view on the amount of

proficiency you would have to have with Excel to calculate

those percentages using the data compilation?

          MR. BOOTH:  Objection.  Form.  Expert opinion.

Speculation.

          THE COURT:  Certainly as to form sustained.

Q.  Mr. Lynch, did you use the data compilation to calculate

the percentages shown in the far right-hand column of Exhibit

4104?

A.  I did.

Q.  Can you describe how you went about doing that?

A.  Yes.  First, I created a formula to implement some logic

tests in Excel to bucket each one of the results into three

different categories, whether or not the test result was less

than 1,000, between 1,000 and 5,000, or greater than 5,000.

          I then used pivot tables to then calculate the number

of results based on those buckets that appeared in a number of

different categories, those categories such as whether or not

the Ecuadorian data compilation attributed the result to Texaco

or to the plaintiff.

          And then, finally, used another series of formulas to

calculate the statistics based on the calculation using the

pivot tables.

Q.  Having gone through all of those steps to calculate these

DAL8CHE3                          Lynch - redirect

percentages, what is your opinion on the level of proficiency
with Excel someone would need to have in order to be able to
make those same calculations?

             MR. BOOTH:  Objection.  Form.

             Your Honor, also, I believe we have gone far afield
from my cross-examination on this topic.

             THE COURT:  Let's deal with that second objection.

             How is this related to the cross, this question?

             MS. NEUMAN:  I believe, your Honor, he examined the
witness on his opinion that the unfiled data compilation was
used to create the numbers in the judgment specifically.  And
he also discussed with the witness the calculation of these
percentages.

             THE COURT:  Well, Mr. Booth.

             MR. BOOTH:  No, your Honor.  I asked him if that was
his opinion.  He said yes.  I asked him over how many pages he
believed the copied materials existed?  I asked him percentage
of words that he believed were copied compared to the total
percentage in the verdict.  I asked him the percentage of pages
he believed were copied compared to the total number of pages,
and I left the topic.  This seems to be a rehash of the direct
examination that I did not go into at all.

             THE COURT:  I think this door was well open, but I
think you should rephrase the question, Ms. Neuman.

             MS. NEUMAN:  Thank you, your Honor.

DAL8CHE3                    Lynch - redirect

1    BY MS. NEUMAN:

2    Q.  Mr. Lynch, when you created the buckets into which you

3    put -- let me withdraw that.

4         In the Excel database, is what you have columns of TPH

5    samples, and the sample results are noted in a column, and the

6    fact that TPH is noted in another column, is that right?

7    A.  The data compilation, it's not just TPH results; it's lots

8    of different other types of results.  It's a total of 65, over

9    65,000 results.  The type of test that it was, the sample name,

10   who the sample is attributed to, and the result were all listed

11   in separate columns.

12   Q.  In order to figure out how many TPH results that were

13   greater than 5,000 were in the unfiled plaintiffs' database,

14   did you have to do a query?

15   A.  I had to write a formula to calculate that.

16   Q.  After you wrote that formula and ran it on the unfiled data

17   compilation, you determined that, according to that

18   compilation, 10 percent of the sample results were greater than

19   5,000 for TPH, is that right?

20   A.  Yes.

21   Q.  Did that match the percentage used in the judgment?

22   A.  Yeah.  The judgment appeared to have rounded that number.

23   It didn't include any decimal points.  But my calculation, if

24   you round it the same way, is identical to that 10 percent.

25   Q.  When you performed those calculations for each of the

DAL8CHE3                        Lynch - redirect

1    categories culled out in the judgment for TPH, did you find

2    that you were able to identically or within a rounding error

3    match what you got using the plaintiffs' data compilation?

4    A.   Yes.

5    Q.   Is that the basis of your opinion that the data compilation

6    was used by whoever put these percentages in the Ecuadorian

7    judgment?

8    A.   That's one of the bases of my opinion.

9    Q.   On how many --

10           THE COURT:  Let me ask a different question, please,

11   Mr. Lynch.

12           You would get substantially the same result, would you

13   not, if the data used by whoever wrote the judgment and the

14   data in the unfiled compilation, just to use the term that's

15   been used, had a common source, is that right?

16           THE WITNESS:  If there was another compilation with

17   the same data in it, you could end up with the same result.

18           One thing that's notable about this calculation is

19   that it assumes what is, I guess, an incorrect interpretation

20   of the data.  The data compilation listed TPH results in

21   actually four different ways.  They were listed as TPH results,

22   and then as two different subparts, TPH DRO and TPH GRO.

23           My understanding from the documents that I have read

24   is that you have to add DRO and GRO together to arrive at the

25   full TPH number.  But in calculating the statistics, you don't

DAL8CHE3                          Lynch – redirect

perform that addition.  You have to have a data set that

separates out DRO and GRO exactly the same way that the data

compilation does.

         THE COURT:  All right.  But if there were a common

antecedent to both documents, you would get to the same place,

right?

         THE WITNESS:  If you had the same set of data, you

could get to the same place.

         THE COURT:  Proceed.

BY MS. NEUMAN:

Q.  Did plaintiffs' data compilation list a single sample

result for TPH on multiple rows?

A.  Yeah.  In some cases a single test result, or a single

sample location or sample name appears next to multiple

results.  The two different subparts, DRO and GRO, are

sometimes listed separately, and they are also sometimes listed

alongside a cumulative TPH result.  So a single result is

sometimes counted twice or sometimes even three times in the

data compilation.

Q.  If the drafter of the judgment intended to only count each

TPH sample that was taken in the field once, are the

percentages that were derived from the plaintiffs' data

compilation correct or in error?

A.  They are not correct.

Q.  If you went through the Ecuadorian court record and you

DAL8CHE3                           Lynch - redirect

1   counted up the number of lab results you had for TPH, and then

2   you bucketed those lab results into these same buckets that you

3   have used on Exhibit 4104, would you get a different result

4   than the percentages that appear in the judgment?

5   A.  I have not seen every single filed lab result, but I do

6   know that some of the filed lab results didn't appear to list

7   TPH split as apparently into its different subparts.  In one of

8   the lab results that I saw the DRO subpart was not listed as

9   TPH DRO.  It was listed with a separate name.  So I think you

10  would have to, I guess, misinterpret the lab results to

11  calculate it this way.

12  Q.  To calculate it the way the judgment did?

13  A.  Yes.

14  Q.  Counsel mentioned to you the appellate court's decision.

15  Do you recall that?

16  A.  I do, yes.

17  Q.  Did you review the appellate court's decision since your

18  deposition?

19  A.  Yes, I have.

20  Q.  Does that decision discuss to some extent the overlap

21  between the plaintiffs' data compilation and the trial court's

22  judgment?

23  A.  It does.

24  Q.  Based on your analysis of the appellate court's discussion

25  of that overlap, was an alternative source for any of the

DAL8CHE3                         Lynch – redirect

1    information that you opine originated from the unfiled

2    plaintiffs' data compilation provided by the appellate court?

3    A.   No, there was no alternative source.  I guess one thing I

4    did note is that the appellate decision referenced that it had

5    no understanding of what the database was, which seemed to me

6    to confirm the opinion that it was not filed.

7    Q.   Did the appellate decision confirm the errors in the

8    judgment that you believe originated from the plaintiffs' data

9    compilation?

10   A.   Yes.  It either was silent on them or it confirmed that an

11   error existed.

12   Q.   Versus what was in the record, correct?

13   A.   Correct.

14   Q.   I would like to go to your opinion, Mr. Lynch, on the copy

15   of the Cabrera report that was attached to an e-mail, dated

16   April 1, 2008, that was sent from gringograndote@gmail.com to

17   Mr. Donziger.  Do you recall that?

18   A.   I do.

19   Q.   As I understand your opinion, it is that Mr. Saenz last

20   saved the document on March 31, 2008, at 11:09 a.m., is that

21   correct?

22   A.   Yes, that's correct.

23   Q.   A version of the Cabrera report that was last saved by Mr.

24   Saenz on March 31, 2008, is an exact match to what Mr. Cabrera

25   ultimately filed, excepting his signature and the court stamp,

DAL8CHE3                          Lynch - redirect

1    is that right?

2    A.  Yes.

3    Q.  Now, counsel asked you if you knew anything about how that

4    document got on to Mr. Saenz' computer.  Do you recall that

5    generally?

6    A.  Yes.

7    Q.  Had you had access to Mr. Saenz' computer, would you have

8    been able to determine more facts with regard to the

9    origination of that version of the Cabrera report?

10            MR. BOOTH:  Objection.  Speculation.

11            THE COURT:  Overruled.

12   A.  Yes.  I would have been able to determine more information

13   about how it came to be in Mr. Saenz' possession.

14   Q.  If you had access to Mr. Saenz' computer, could you have

15   searched that computer to see if it contained a draft of the

16   Ecuadorian court's judgment?

17   A.  Yes.  Unless the computer had been wiped or the drafts on

18   it destroyed, yes, I would have been able to do that.

19   Q.  Finally, Mr. Lynch, I wanted to go back to your opinion

20   that the 880 pit number in the judgment was derived from annex

21   H1 to the Guerra report.  Do you have that opinion in mind?

22   A.  Yeah, I do.

23   Q.  How did you use annex H1 to reach the conclusion that the

24   880 pits in the judgment came from that electronic file?

25   A.  I reviewed an English translation of the judgment, and in

DAL8CHE3                          Lynch - redirect

reviewing it noted that the judgment was describing the number

of pits that had some sort of environmental impact and couldn't

be attributed to Petroecuador.

          I then looked at Anexo H1 and removed those pits that

were attributed to Petroecuador or were listed as having no

impact, and when I removed those, what was left was the 880

pits.

Q.  Did you remove those based on what the judgment author had

indicated it was doing in arriving at the number of 880?

A.  Yes.  I removed those based on my understanding of what the

judgment was listing it was describing as 880.

Q.  Is it your opinion, to a reasonable degree of scientific

certainty, that it's more likely than not that annex H1 was

used to get the 880 pit number that appears in the judgment?

          MR. BOOTH:  Objection.  Speculation.  Not qualified to

render that opinion.

          THE COURT:  Well, I will hear the opinion and hear the

basis and we will see.

          Proceed.

A.  Relying on Mr. Ebert's or Dr. Ebert's opinion that it was

not as the judgment describes based on the aerial photographs,

the only source that I have seen is an original version of

Anexo H1, an Excel version, and then Anexo H1 itself.  And my

opinion is that it is more likely than not, given the analysis

that I performed and the data that I had available to me, that

DAL8CHE3                        Lynch - redirect

1     it was derived from Anexo H1 or the original Excel version.

2              THE COURT:  But there is quite clearly material

3     referred to in the judgment by this point that you have never

4     looked at, is that correct?

5              THE WITNESS:  That's correct.

6              THE COURT:  Ms. Neuman, how much longer do you expect

7     to be?

8              MS. NEUMAN:  Three minutes, your Honor.

9              THE COURT:  All right.

10             MS. NEUMAN:  I think I am actually done, your Honor.

11             We have marked as 4100A all of the exhibits referenced

12    and authenticated in Mr. Lynch's direct testimony, and we would

13    move the admission of those exhibits.

14             MR. BOOTH:  I believe some were demonstrative aids,

15    and I would object to moving into evidence demonstrative aids

16    because they are not exhibits.

17             THE COURT:  They are received on the same basis as

18    previously, and I have made careful note of what is

19    demonstrative as distinguished from evidentiary.

20             (Plaintiff's Exhibit 4100A received in evidence)

21             THE COURT:  Mr. Gomez.

22             MR. GOMEZ:  I have a few questions on a subject not

23    yet covered.

24             THE COURT:  All right.

25             MR. GOMEZ:  Thank you, your Honor.

1  RECROSS-EXAMINATION

2  BY MR. GOMEZ:

3  Q.  Good afternoon, Mr. Lynch.

4  A.  Good afternoon.

5  Q.  Sir, did you investigate any e-mail accounts belonging to

6  Mr. Guerra?

7  A.  I did, yes.

8  Q.  In fact, you reviewed Mr. Guerra's Hotmail e-mail account?

9  A.  Yes.

10  Q.  Did you investigate any other e-mail accounts?

11  A.  No, not for Mr. Guerra.

12  Q.  In your analysis of Mr. Guerra's e-mail accounts, is it

13  fair to say you found no evidence of mail being sent to and

14  from Mr. Guerra to Steven Donziger?

15  A.  No.  There was a contact containing Mr. Donziger's e-mail

16  address, but there were no e-mails between the two accounts.

17  Q.  Is it fair to say, also, you found no evidence of e-mails

18  going to and from Mr. Guerra to a Pablo Fajardo?

19  A.  There were no e-mails between Mr. Guerra and Mr. Fajardo.

20  Q.  Is it also fair to say that you found no e-mails going to

21  and from Mr. Guerra and Mr. Zambrano?

22  A.  Yes.  There were no e-mails between those two.

23  Q.  In your investigation of the e-mails, did you find any

24  indication of any draft orders being sent to and from

25  Mr. Guerra?

DAL8CHE3                         Lynch – cross

1   A.   No.

2              MR. GOMEZ:  Thank you.

3              THE COURT:  Thank you.

4              Any further examination of this witness?

5              MR. BOOTH:  No, your Honor.  Thank you.

6              THE COURT:  Mr. Lynch, thank you.

7              We will break for lunch.  See you about 10 past 2.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DALLCHE4                          Leonard - direct

```
 1                         AFTERNOON SESSION

 2                             2:12 p.m.

 3              THE COURT:  Who's the next witness?

 4              MS. NEUMAN:  Professor Leonard, your Honor.

 5      ROBERT A. LEONARD,

 6           called as a witness by the Plaintiff,

 7           having been duly sworn, testified as follows:

 8              THE COURT:  All right.  Let's proceed.

 9      DIRECT EXAMINATION

10      BY MS. NEUMAN:

11      Q.  Good afternoon, Professor Leonard.

12      A.  Good afternoon.

13      Q.  Are you a professor of linguistics?

14      A.  Yes.

15      Q.  And have you ever been qualified as an expert in

16      linguistics by any court?

17              THE COURT:  Not necessary to do this.  I assume it's

18      in his statement, right?

19              MS. NEUMAN:  Yes, your Honor.

20              May I approach the witness?

21              THE COURT:  Yes.

22      Q.  Professor Leonard, do you have Exhibit 3700 in front of

23      you?

24      A.  Yes.

25      Q.  Is that your direct testimony in this matter?
```

DALLCHE4                      Leonard – direct

1   A.  It is.

2   Q.  Are the statements in Exhibit 3700 true and accurate?

3   A.  Yes.

4   Q.  Is that your signature on the last page?

5   A.  Yes.

6           MS. NEUMAN:  Plaintiffs move the admission of

7   Exhibit 3700.

8           THE COURT:  Received on the same basis as the prior

9   exhibits of like nature.

10          MS. NEUMAN:  Thank you, your Honor.

11          (Plaintiff's Exhibit 3700 received in evidence)

12  Q.  Mr. Leonard, did you prepare any demonstratives in

13  connection with your testimony?

14  A.  Yes.

15  Q.  Can we have on the screen Exhibit PX3721.

16  A.  Yes.

17  Q.  Is Exhibit 3721 one of your demonstratives?

18  A.  It is.

19  Q.  Could you describe what this demonstrative shows to the

20  Court, please?

21  A.  This is a PowerPoint that shows not only that material from

22  the unfiled Lago Agrio plaintiffs' materials winds up in the

23  Ecuadorian judgment, but that it seems to first have been

24  information gathered from the index summaries of the unfiled

25  index summaries of the plaintiffs.

DALLCHE4                    Leonard - direct

1   Q.  Could you walk through the demonstrative, please,

2   indicating when to page turn.

3   A.  Turn.  Here is the passage in the index summary and the

4   highlighted red is what has -- is going to be taken out and

5   rearranged into the index summary.

6          Information is added and then it is this information,

7   this passage verbatim that winds up in the Ecuadorian judgment.

8          MS. NEUMAN:  Can we go back to the first page of that

9   exhibit.

10   Q.  Professor Leonard, is this the page of the record from

11   which the information comes?  I think you misspoke and called

12   this the summary as well?

13   A.  Oh, yes, quite right.  This is the official record, 3378.

14   Q.  Thank you.

15          MS. NEUMAN:  We also have as Exhibit 3700A, your

16   Honor, the exhibits that we'd move in in connection with

17   Professor Leonard's testimony.

18          THE COURT:  All right.  The exhibits listed on

19   Plaintiff's 3700A for identification are received on the same

20   basis as previously.

21          (Plaintiff's Exhibit 3700A received in evidence)

22          MS. NEUMAN:  Pass the witness, your Honor.

23          THE COURT:  Thank you.  And just remind me of the

24   number of the demonstrative, please?

25          MS. NEUMAN:  3721, your Honor.

DALLCHE4                         Leonard - direct

1          THE COURT:  Thank you.

2          Mr. Booth.

3          MR. BOOTH:  Yes, your Honor.  Thank you.

4          May I?  I'm sorry.  I didn't ask.

5          May I proceed, your Honor?

6          THE COURT:  Yes, you may.

7   CROSS-EXAMINATION

8   BY MR. BOOTH:

9   Q.  Good afternoon.

10  A.  Good afternoon.

11  Q.  Do you prefer professor or doctor?

12  A.  It's all the same.

13  Q.  Okay.  Doctor, I'm Rainey Booth.  Nice to meet you.

14  A.  Nice to meet you.

15  Q.  I want to go through briefly your employment.

16          It indicates in your direct testimony that you are a

17  professor of linguistics at Hofstra; is that right?

18  A.  Yes.

19  Q.  Do you work at or for any other businesses currently?

20  A.  I have my own consulting practice.

21  Q.  And what is the name of your consulting practice?

22  A.  Robert Leonard & Associates.

23  Q.  Can you turn to tab 2 of the black binder I handed you.

24          Can you verify that is a Xerox copy of the website

25  from your consulting business, Robert Leonard & Associates?

DALLCHE4                    Leonard - cross

1    A.  It appears to be from that website.

2    Q.  Thank you.  And, Doctor, can you also turn to tab 6 in the

3    binder, and do you recognize these, this set of documents?

4           THE COURT:  Just so we have clarity, the last exhibit

5    was Defendant's 1327.  This one is Defendant's Exhibit 1333.

6           MR. BOOTH:  Thank you, your Honor.

7    Q.  Do you recognize the documents labeled at the bottom of the

8    Exhibit DX1332?

9           THE COURT:  1333.

10   Q.  Sorry.  1333.

11   A.  It appears to be a Hofstra web page.

12   Q.  And is that the web page from the university that you teach

13   at?

14   A.  Yes.

15   Q.  And one more.  Can you look behind I believe tab 6.

16          THE COURT:  That's the one you just were looking at.

17          MR. BOOTH:  I apologize.

18   Q.  Can you look behind tab 7.  And that should be EXDX1332.

19          THE COURT:  Not in the book you gave me.

20          MR. BOOTH:  May I?

21   Q.  Okay.  The one I want is tab 5.  Sorry.

22          Is that EXDX1332?

23   A.  It is.

24   Q.  Do you recognize those documents?

25   A.  Yes.

DALLCHE4                          Leonard - cross

1    Q.   And what are those documents?

2    A.   These appear to be from the website of forensic

3    consultants, who asked if I wanted to be listed with them to

4    potentially work with them on cases.

5    Q.   All right.  Is that a business that you are employed by or

6    is that just a website that lists you as a possible consultant?

7    A.   It is a website that lists me as a possible consultant.

8    Q.   In this particular case, have you been compensated by

9    Chevron or the law firm Gibson Dunn for your time in looking at

10   these issues?

11   A.   In the matter we're here about today?

12   Q.   Yes.

13   A.   Yes, I have.

14   Q.   And what if any business have you been working on behalf

15   of, has it been through your consulting business or through

16   your work at Hofstra?

17   A.   It's been for myself as a sole proprietor.

18   Q.   In your consulting business?

19   A.   Correct.

20   Q.   Can you tell me when you were first hired to look at issues

21   in this particular case, even if it's a general range of time?

22   A.   May 2011.

23   Q.   And who defined for you the issues to consider in this

24   case?

25   A.   I was asked to analyze materials by Gibson Dunn.

DALLCHE4                    Leonard - cross

1    Q.  And what specifically were you asked to analyze, what

2    specifically were you asked to do with the materials you were

3    to analyze?

4    A.  I was asked to analyze sets of documents for potential

5    overlap that could be attributed to either chance or set phrase

6    versus common authorship.

7    Q.  Since you were retained in this matter, have you reviewed

8    the expert reports of any other expert in this case?

9    A.  Yes.

10   Q.  What experts are those?

11   A.  Mr. Lynch, Mr. Hernandez, and Dr. Juola.

12   Q.  I'm going to briefly ask you about some of your

13   qualifications.

14          You indicated already you have a PhD in linguistics;

15   is that right?

16   A.  Yes.

17   Q.  And can you explain for the Court what, first of all, is

18   linguistics in your opinion a science, is it a scientific

19   pursuit?

20   A.  Yes.

21   Q.  Can you explain to the Court what linguistics is, the

22   science of linguistics?

23   A.  Yes.

24   Q.  Would you explain that to the Court, please.

25   A.  Linguistics is the science that tries to analyze virtually

DALLCHE4                    Leonard - cross

1    every aspect of language, normally, human language.  And it

2    does this in a way that all sciences operate -- by systematic

3    detailed observation, by building theories, and testing

4    hypotheses to advance the theoretical understanding so that we

5    may explain the nonrandom distribution of the linguistic data.

6    Q.  And how long have you worked in the field of linguistics?

7    A.  Since 1970.

8    Q.  Forensic linguistics, is that a field that you work in

9    currently?

10   A.  Forensic linguistics is the term that we use to describe

11   the analysis of linguistic data that is related to the courts

12   or forensic matters.

13   Q.  And how long have you worked in the or how long have you

14   worked as a forensic linguistic expert?

15   A.  I have done the odd case for many years, but heavily for

16   about ten years.

17   Q.  Doctor, let me ask you, if you could turn back to tab 5,

18   which is Defendant's Exhibit 1332, DX1332.  If you look at the

19   third page after that tab.

20   A.  1332, the forensic consultants?

21   Q.  Yes.

22   A.  Okay.  And you asked where in there?

23   Q.  It's the beginning on the third page, page 3 of four of

24   that tab.

25   A.  Mm-hmm.

DALLCHE4                    Leonard - cross

1   Q.  Can you look over that, can you confirm for me that is an
2   accurate biographical sketch of your experience, your
3   qualification history, the people you've worked for, that type
4   of thing.  On page 4, if you would just verify.
5   A.  This dates from several years ago.
6   Q.  Is the information contained in it accurate, just maybe not
7   complete at this point, is that what you're saying?
8   A.  Let me read it through.  Yes, it looks accurate.
9              MR. BOOTH:  Your Honor, we would move into evidence
10  DX1332.
11             MS. NEUMAN:  No objection, your Honor.
12             THE COURT:  Received.
13             (Defendant's Exhibit 1332 received in evidence)
14  Q.  And, Doctor, that will save some time going through your
15  credentials and that type of thing.
16             All right.  I'm going to ask you about your the
17  Hofstra website, which I believe is tab 6 and it is DX1333.
18  A.  Yes.
19  Q.  Now, at Hofstra, you are a professor, you told us, right?
20  A.  Yes.
21  Q.  And is there a particular institute at Hofstra that you
22  work as the director of that deals with forensic linguistics?
23  A.  Yes.
24  Q.  And can you explain to the Court what that institute is?
25  A.  It's the Institute for Forensic Linguistics Threat

DALLCHE4                    Leonard - cross

1    Assessment and Strategic Analysis, which I'm the director of,

2    and it is our research arm of our graduate program.

3    Q.  And as -- do you teach as part of your role as director of

4    that institute?

5    A.  We do pro bono case assistance to, for example, the Midwest

6    Innocence Project via that institute, and I am the one who

7    directs those internships and coordinates the research of our

8    interns working for eventual use by the Midwest Innocence

9    Project.  So in that sense, I am the teacher, I'm listed as the

10   teacher for whatever the course number is that is internship.

11   Q.  If you also turn to page 3 of tab 6, the same Exhibit

12   DX1333, there's a discussion about, well, if you look at that

13   page, I'm going to ask you something about that.

14           Let me just ask my question:  Is Hofstra the only

15   university in this country that has a master's program in

16   forensic linguistics in the United States?

17   A.  Well, our master's degree granted -- we were granted

18   ability to bestow degrees by the New York State Department of

19   Education.  Our actual master's is in Linguistics:  Forensic

20   Linguistics, which means we teach the science of linguistics,

21   and when we can, we use data from what has now come to be known

22   as forensic linguistics, which is really any legal related

23   language data.

24   Q.  And your program at Hofstra is the only one in the country

25   that provides a master's degree; in that correct?

DALLCHE4                    Leonard - cross

1   A.  As far as I know, yes.

2   Q.  There are some in other countries, but not here other than

3   yours, correct?

4   A.  That is correct.

5   Q.  If you look at tab 2 of the binder, it is Defendant's

6   Exhibit DX1327.  I believe you identified that as a printed

7   copy of the website from your consulting business Robert

8   Leonard & Associates.

9          Do you see that?

10          THE COURT:  Let's just proceed.  I assume he sees it.

11          MR. BOOTH:  Sorry, your Honor.

12  Q.  In the field of linguistics, there's a number of different

13  types of analysis and assessments that one can do; is that

14  right?

15          Let me ask a better question.  In the field of

16  forensic linguistics, there's a wide range of analyses that can

17  be done, true?

18  A.  There's a wide variety of data that we can analyze, if

19  that's what you mean.

20  Q.  That's a better way to say it.

21          If you look at Defendant's Exhibit 1327, does this,

22  does your website detail, without us having to go through it

23  piece by piece, the different types of data that you analyze in

24  forming opinions in different cases that you've looked at as a

25  forensic linguistic expert?

DALLCHE4                    Leonard - cross

A.  The intent, yes, but the intent of this site is to make the

public aware.  I was not trying to be exhaustive or overly

technical, of course.

MR. BOOTH:  Your Honor, we would move into evidence

Defendant's Exhibit 1327.

MS. NEUMAN:  No objection, your Honor.

I just want to clarify as to Defendant's Exhibit 1332

that counsel was moving in the two pages that the witness

authenticated as opposed to all four that are in the book.

THE COURT:  That's my understanding.

MR. BOOTH:  Yes, your Honor, that was my intent.  I

apologize.  Just those two pages.

THE COURT:  No apology needed.

Q.  Doctor, in terms of the work that you do in forensic

linguistics, if you look at your witness statement paragraphs

13, 14, there's some discussion about different cases that

you've worked on.  Actually, let me go to 14, 15, and 16.

Can you give the Court some idea of the types of cases

you've worked on, just very brief summary of the types of

issues you've worked at as a forensic linguistic expert as

outlined in your witness statement?

THE COURT:  Counsel, it's right here.  Avoiding this

is precisely the purpose of doing it in writing.

MR. BOOTH:  I apologize.

Q.  If you look at tab 16, do you see the one of the cases

DALLCHE4                    Leonard - cross

1    indicated or described is analyze murder related letters for

2    Pennsylvania state police; do you see that?

3    A.  Yes.

4    Q.  Was that a case where you sought to determine the

5    authorship of some letters that had been written following a

6    murder?

7    A.  And prior to the murder.

8    Q.  And prior to the murder?

9    A.  Yes.

10   Q.  Was your analysis in that case what's referred to as

11   authorship identification?

12   A.  No.

13   Q.  What was it?

14   A.  Authorship analysis.

15   Q.  Sorry, authorship analysis.

16           You were seeking to identify the author of the

17   letters; is that right?

18   A.  No.

19   Q.  What were you seeking to do?

20   A.  The police and the triers of fact were seeking to identify

21   the authors of the letters.  I was analyzing the linguistic

22   data to see whether the best hypothesis was common authorship

23   and also common authorship with a set of known documents.

24   Q.  And can you describe what, can you define what common

25   authorship means?

DALLCHE4                    Leonard – cross

1    A.  That there is a single, in the simplest situation, author

2    to two sets of documents or to two documents.

3    Q.  And is that an analysis that you do as a forensic

4    linguistic expert?

5    A.  Authorship analysis?

6    Q.  Yes.

7    A.  Yes.

8    Q.  And common authorship analysis, are they the same thing?

9    A.  Yes.  Well, it depends on the task with authorship

10   analysis.

11   Q.  Now, Doctor, in this case a number of the documents are in

12   Spanish, correct?

13   A.  We're off the Pennsylvania case now?

14   Q.  Sorry.  In this case we're here on today --

15   A.  Yes.

16   Q.  -- a number of the documents are in Spanish; is that right?

17   A.  Yes.

18   Q.  And are you -- does the fact that the documents are in

19   Spanish, does that in any way inhibit your ability to render

20   opinions in this particular case in your opinion?

21   A.  No.

22   Q.  Are you fluent in Spanish?

23   A.  I have facility in Spanish.  I studied Spanish.  I ran a

24   business in Puerto Rico in Spanish a long time ago.  I'm no

25   longer fluent, however.

DALLCHE4                    Leonard - cross

1   Q.  The term used in your witness statement, I see a term used

2   in your witness statement, plagiarism.

3           Can you define for me what plagiarism is as you're

4   using the term?

5   A.  As I say in the witness statement, I was using the

6   definition given by the Merriam-Webster online dictionary,

7   which is the practice of taking someone else's work or ideas

8   and passing them off as one's own.  Sorry, it was the Oxford

9   online dictionary, not Merriam-Webster.

10  Q.  Does your definition of plagiarism as you are using that

11  term in your witness statement, does it include a judgment that

12  someone has done something wrong?

13          Do you understand the question?

14          Let me ask:  Are there circumstances in your opinion

15  where a person could copy from another, not attribute

16  authorship to the other, but because of the circumstances, that

17  act not be plagiarism?

18  A.  I'm not sure.  So let me try to return to your prior

19  question.  I'm not making any moral judgments.  Plagiarism is a

20  subset of authorship and it is a popularly known, common term.

21  One of the reasons I used plagiarism in this declaration is

22  because it is popularly and easily understood.  It's the same

23  kind of idea of avoiding all the technical terms that I might

24  have used in my linguistic analysis.

25  Q.  Going back to my question, Doctor -- thank you for that

DALLCHE4                    Leonard - cross

1   explanation.  I will follow up.

2           But going back to my question, are there circumstances

3   in your judgment as a linguistic expert where, for example, I

4   could copy from another, not attribute authorship, but because

5   of the circumstances it not be considered plagiarism, that it

6   would be okay for me to have done that?

7   A.  For example?

8   Q.  Well, the only one I can think of was if I go to school and

9   I copy my notes from my friend because I was sick yesterday and

10   I copied it word for word, on the exam, wrote down what he had

11   shown me, I wouldn't have to attribute authorship.  In the

12   alternative, if I copied his term paper word for word, that

13   might be a problem?

14           THE COURT:  Counsel, I don't think this is getting us

15   anywhere.  Can we move on.

16           MR. BOOTH:  I apologize.

17   Q.  Do you understand -- apologize.

18           My question is, Doctor, every time someone copies

19   without attribution, in your opinion is that plagiarism?

20   A.  Not necessarily.

21   Q.  You mentioned, I think, that plagiarism is a subset in your

22   opinion of authorship analysis.

23           Can you tell me what similarities, differences there

24   are between an assessment of plagiarism and an assessment of

25   authorship identification?

DALLCHE4                    Leonard – cross

1   A.  Well, in the Pennsylvania case, which was a homicide, the

2   intent of the trier of fact and the police was not to assay

3   plagiarism, but to see whether the husband of the murdered

4   woman penned the letters that threatened her death, that under

5   a different name claimed to have committed her murder, and the

6   known writings of the husband from his workplace.  So

7   plagiarism was not the issue per se, although, of course, it

8   was an authorship case, just like the current matter is an

9   authorship case.

10  Q.  Do you have expertise in understanding what must be

11  attributed by a judge in Ecuador when writing an order?

12          MS. NEUMAN:  Objection, beyond the scope.

13          THE COURT:  Sustained.

14  Q.  Are you offering an opinion about what is appropriate or

15  inappropriate for a judge to cite in an Ecuadorian judgment?

16          MS. NEUMAN:  Objection, beyond the scope, calls for a

17  legal conclusion.

18          THE COURT:  Sustained.

19          MR. BOOTH:  Your Honor, I would move to strike any

20  reference to plagiarism under in terms of the judgment.

21          THE COURT:  Denied.

22  Q.  Doctor, in this particular case, if you'll turn to page 8

23  of your witness statement.

24  A.  Yes.

25  Q.  Paragraph 34, under analysis, can you read the first line

DALLCHE4                    Leonard - cross

1   to yourself from the first line of paragraph or the first

2   sentence of paragraph 34 to yourself, and I want to ask you

3   something.  Have you done that?

4   A.  Yes.

5   Q.  As you approach this case, you look to whether the, in your

6   opinion, the Ecuadorian judgment of 2/14/11 had been

7   plagiarized in whole or in part, correct?

8   A.  I think better whether in whole or in part it had been

9   plagiarized.

10  Q.  And your opinion on that issue was that the Ecuadorian

11  judgment of 2/14/11 had been plagiarized in part, correct?

12  A.  Yes.

13  Q.  You have not formed an opinion in this case that the

14  Ecuadorian judgment of 2/14/11 was plagiarized completely,

15  correct?

16  A.  You mean whether the entirety of the Ecuadorian judgment

17  had been plagiarized from other sources?

18  Q.  That's a better way to say it, yes.

19  A.  I have not formed an opinion on that.

20  Q.  And in looking at the portions that you believe were

21  plagiarized, can you tell us over what number of pages you

22  believe plagiarized materials are found in the Ecuadorian

23  judgment of 2/14/11?

24  A.  That's normally not a very useful metric.

25          THE COURT:  But perhaps we could just answer the

DALLCHE4                    Leonard - cross

1    question.

2               THE WITNESS:  I'm trying to remember, your Honor, I'm

3    sorry.  I believe it's 22 pages.

4    Q.  If you look at page 2 of your report, paragraph 4.

5    A.  Yes.

6    Q.  Do you see you indicate 23 pages?

7    A.  I stand corrected, yes.

8    Q.  And that would be portions of 23 pages, correct?

9    A.  Some were virtually entire, some only had one word.

10   Q.  Did you do an assessment to determine the word count, for

11   example, how many words were plagiarized versus the words in

12   the document, did you do any sort of percentage assessment of

13   that?

14   A.  Percentage of what?

15   Q.  Bad question.

16               Did you compare the number of words that had been

17   plagiarized with the total number of words in the Ecuadorian

18   judgment of 2/14/11?

19   A.  No.

20   Q.  Did you do any sort of percentage calculation based on the

21   number of pages over which the plagiarized materials appears

22   versus the total number of pages of the judgment?

23   A.  I believe it's around 12 percent of the pages.

24   Q.  And if you'll turn to the last tab in your book, in your

25   binder that I handed you, and look at Plaintiff's Exhibit

DALLCHE4                    Leonard - cross

1   No. 400.

2   A.  Yes.

3   Q.  And can you verify for me that when you describe page count

4   that we were just discussing, you were making reference to this

5   document, Plaintiff's Exhibit 400?

6   A.  No.

7   Q.  What page count, what document did you use for your page

8   count?

9   A.  The Spanish version of the Ecuadorian judgment.

10  Q.  And I think, well, can you tell me, the Spanish version,

11  how many pages did it have, do you know?

12  A.  I don't recall.

13  Q.  That's fine.

14          Now, Doctor, can you tell us briefly how you did your

15  analysis of whether portions of the Ecuadorian judgment were

16  plagiarized from other documents?

17  A.  I compared -- I looked at overlapping text strings of words

18  and symbols that occurred in the six documents that appear to

19  be source documents.  That's counting two documents for the

20  index summaries and the Ecuadorian judgment.  And then I

21  ascertained whether they were better explained by random chance

22  or set phrases or copying.

23          Since I found many examples of 20, 30, 40, 120 words

24  in precisely the same order, identical mistakes, identical

25  misattributions, I concluded that copying was the superior

DALLCHE4                       Leonard - cross

1    hypothesis to explain the overlap rather than trying to

2    attribute it to random chance or set phrases.

3    Q.  In forming your opinion in this case, did you make any

4    attempt to ascertain any demographic information about the

5    author of the Ecuadorian judgment 2/14/11?

6              MS. NEUMAN:  Objection, beyond the scope.

7              THE COURT:  Overruled.

8    A.  No.

9    Q.  In forming your opinions in this case, did you take any

10   steps to identify using authorship analysis the author of the

11   Ecuadorian judgment from 2/14/11 in its entirety?

12             MS. NEUMAN:  Objection, assumes facts not in evidence.

13             THE COURT:  Overruled.

14             Well, no.  I take it back.  Sustained.  It assumes

15   that there is a single author.

16             MR. BOOTH:  Let me ask a better question.

17   Q.  Did you in forming your opinions make any assessment as to

18   the number of authors who contributed to writing the judgment

19   of 2/14/11, the Ecuadorian judgment dated 2/14/11?

20   A.  Only that the author of some of it was the author or

21   authors of the other documents.

22   Q.  In forming your opinions in this case, did you compare the

23   Ecuadorian judgment of 2/14/11 to any other document for the

24   purpose of -- that's a bad question.

25             Other than the plagiarism analysis you've already

DALLCHE4                        Leonard – cross

1    described for us, did you compare the Ecuadorian judgment of

2    2/14/11 to any other document to look to see if you believed

3    there was a common author between those two documents?

4    A.  Yes.

5    Q.  What other documents were those?

6    A.  The entire record, the filed record.

7    Q.  Let me ask you specifically, did you compare the Ecuadorian

8    judgment of 2/14/11 to the clarification order signed by Judge

9    Zambrano in March of 2011 to look at the issue of common

10   authorship between those two documents?

11   A.  No.

12   Q.  Did you compare the Ecuadorian judgment of 2/14/11 to any

13   orders written by Mr. Guerra to look at the issue of common

14   authorship?

15   A.  The Ecuadorian judgment of 2/14/11 to by Mr. Guerra?

16   Q.  So any orders or documents authored by Mr. Guerra?

17   A.  No.

18   Q.  Did you compare the Ecuadorian judgment of 2/14/11 to any

19   documents authored by Judge Zambrano?

20   A.  You mean any known documents by Judge Zambrano?

21   Q.  Better way to say it.

22   A.  No, no.

23   Q.  For the purpose of forming your opinions, is it true that

24   you did not review the clarification order signed by Judge

25   Zambrano March of 2011 for any analysis; is that true?

DALLCHE4                        Leonard - cross

1   A.  For my opinion here on the plagiarism of the Ecuadorian

2   judgment, no.

3   Q.  For the purpose of rendering opinions in this case, did you

4   review the Ecuadorian appellate decision?

5            MS. NEUMAN:  Objection, beyond the scope.

6            THE COURT:  Mr. Booth, what do you say to that?

7            MR. BOOTH:  I have one more question after this, your

8   Honor.  I'm just trying to identify the things he did not do

9   and I have one more question.

10            THE COURT:  I'll allow it.

11   Q.  Do you need me to repeat it?

12   A.  If you wouldn't mind.

13   Q.  For the purpose of forming your opinions in this case, did

14   you review or analyze the Ecuadorian appellate court decision

15   in the underlying case?

16   A.  Written when?

17   Q.  I have to look it up.

18   A.  What year?

19   Q.  I have to look it up.  2012.

20   A.  No.

21   Q.  Did you review the Ecuadorian appellate court clarification

22   court decision written in 2012 for the purpose of doing any

23   analysis in this case?

24   A.  No.

25            MR. BOOTH:  May I have one second.

DALLCHE4                      Leonard - cross

1           THE COURT:  Yes.

2    Q.  Did you in forming your opinions in this case compare the

3    Ecuadorian judgment of 2/14/11 to any documents authored by

4    Steven Donziger?

5           MS. NEUMAN:  Objection, assumes facts not in evidence.

6           THE COURT:  What might those be, Ms. Neuman?

7           MS. NEUMAN:  Who the authors of the various documents

8    are, your Honor.

9           THE COURT:  Overruled.

10   A.  I was going to say that I don't know what documents

11   Mr. Donziger authored or did not author, even if one doesn't

12   know even when one's signature is under a document who has

13   authored it.

14          MR. BOOTH:  Those are all my questions, your Honor.

15   Thank you.

16          THE COURT:  Thank you.

17          Any redirect?

18          MS. NEUMAN:  Yes, your Honor.  Briefly.

19          THE COURT:  Excuse me, Mr. Gomez, anything for you?

20          MR. GOMEZ:  No, your Honor.

21          THE COURT:  Ms. Neuman.

22          MS. NEUMAN:  Thank you, your Honor.

23   REDIRECT EXAMINATION

24   BY MS. NEUMAN:

25   Q.  Just a couple questions, Professor Leonard.

DALLCHE4                    Leonard - redirect

1          You were asked questions and gave answers about

2    whether you formed an opinion regarding the entirety of the

3    Ecuadorian judgment being plagiarized.

4          Do you recall that?

5    A.  Yes.

6    Q.  If you had more documents from individuals who allegedly

7    participated in drafting the Ecuadorian judgment, would that

8    help you in determining whether the entire judgment was

9    plagiarized?

10   A.  Yes.

11   Q.  If you had access to Spanish language documents from the

12   Lago Agrio plaintiffs' lawyers' computers, could you have

13   requested the search of those computers to determine whether

14   additional portions of the Ecuadorian judgment were

15   plagiarized?

16   A.  Yes.

17          MS. NEUMAN:  Nothing further, your Honor.

18          MR. BOOTH:  May I?

19          THE COURT:  Yes.

20   RECROSS EXAMINATION

21   BY MR. BOOTH:

22   Q.  Dr. Leonard, is it your testimony that you did not have the

23   documents necessary to do either an authorship or a common

24   authorship analysis in this case or did I misunderstand your

25   testimony?

DALLCHE4                    Leonard - recross

1          THE COURT:  I thought you did, counselor.

2          MR. BOOTH:  Then I apologize, your Honor.

3          THE COURT:  Do you want to try to rephrase it?

4          MR. BOOTH:  Well, no.  I misheard it.  I apologize.

5          Thank you, Doctor.

6          THE COURT:  Anything else, counsel?

7          MS. NEUMAN:  No, your Honor.

8          THE COURT:  Dr. Leonard, you're excused.  Thank you.

9          (Witness excused)

10          THE COURT:  Next witness.

11          MR. MASTRO:  Your Honor, Chevron calls Dr. Adolfo

12   Callejas.

13    ALDOLFO CALLEJAS RIBADENEIRA,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified through the Spanish

16        interpreter as follows:

17          THE COURT:  All right, Mr. Mastro, you may proceed.

18          MR. MASTRO:  Thank you, your Honor.

19          May I approach the witness?

20          THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MR. MASTRO:

23   Q.  Mr. Callejas, did you prepare a declaration in this case?

24   A.  Yes, I did.

25   Q.  And is what's been marked here as Plaintiff's Exhibit 4300

DALLCHE4                    Callejas - direct

1   a true and correct copy of that declaration, sir?

2   A.  Yes, it is.

3   Q.  Dr. Callejas, I direct your attention to page 42, the last

4   page.  Is that your signature, sir?

5   A.  Yes, it's my signature.

6   Q.  Sir, your declaration is in English, correct?

7   A.  Yes, that's correct.

8   Q.  You are comfortable preparing your declaration in English,

9   correct, sir?

10  A.  Yes, that's so.

11  Q.  Please explain to the Court, Dr. Callejas, why you're

12  testifying in Spanish.

13  A.  Because I want the words that I say to exactly reflect my

14  thinking and I can do that only in Spanish, which is my native

15  language.

16  Q.  Thank you, Dr. Callejas.

17        And, Dr. Callejas, we redacted, we took out some

18  paragraphs in your declaration, correct, sir?

19  A.  Yes, that's correct.

20  Q.  And in addition to what -- strike that.

21        In addition to what has already been taken out of your

22  declaration, I wanted to apprise the Court of two additional

23  changes before your testimony begins today, sir.

24        First, can you go to paragraph 47.

25  A.  Yes, I see it now.

DALLCHE4                          Callejas – direct

1    Q.  Are these additional changes you have made in your

2    declaration as of today?

3    A.  Yes, that is so.

4    Q.  And, please, directing your attention to paragraph 73,

5    Dr. Callejas, are these additional changes in your declaration

6    that you have made today, sir?

7    A.  Yes, that is so.

8    Q.  Dr. Callejas, besides the paragraphs that you have taken

9    out or changes made in your declaration, is everything else in

10   your declaration true and correct, sir?

11   A.  Yes, it is.

12   Q.  Your declaration was true and correct at the time you

13   signed it, correct, sir?

14   A.  It was to the best of my knowledge on that day.

15   Q.  And sitting here today, your declaration is true and

16   correct?

17   A.  Yes, it is.

18   Q.  You offer your declaration as your full and complete direct

19   testimony in this case, Dr. Callejas?

20   A.  Yes, I present it that way.

21        MR. MASTRO:  Your Honor, we offer PX4300 into evidence

22   and we further offer PX4300A as the exhibits listed in

23   Dr. Callejas's declaration that are offered into evidence.

24        THE COURT:  Both received on the same basis as before.

25        (Plaintiff's Exhibits 4300, 4300A received in

DALLCHE4                          Callejas - direct

1    evidence)

2              MR. MASTRO:  Thank you, your Honor.

3              Your Honor, I turn over the witness.

4              THE COURT:  Thank you.  Cross-examination.

5              MS. FRIEDMAN:  Thank you, your Honor.

6              THE COURT:  And, Mr. Friedman, before you start, let

7    me just say that I'm aware that despite my requests, some of

8    the colorful rhetoric has remained in here, and it would not be

9    an efficient use of time to quarrel with the witness about the

10   rhetoric.  I know the difference between facts and rhetoric.

11             MS. FRIEDMAN:  I understand that, your Honor.  I do

12   have some substantive issues I think it would be helpful to get

13   a ruling on from the Court, if we could.

14             THE COURT:  All right.  Let's see whether we can.

15             MS. FRIEDMAN:  Your Honor, the first ones are

16   paragraphs 13 through 16 which relate to the TexPet and

17   Republic of Ecuador business relationships, shall we say.

18             THE COURT:  I looked at that before.  I know just what

19   it relates to.  I would assume this is something that either

20   has been or should be stipulated, or at least if there's any

21   error in it, that it will be corrected and stipulated, or that

22   it's something of which I can take judicial notice.  God knows

23   it is all over -- I don't know -- an enormous number of

24   decisions both by me and Judge Sand and Judge Rakoff and the

25   Court of Appeals.  There's no mystery about any of this.

DALLCHE4

1          MS. FRIEDMAN:  This is the question, your Honor.  I

2     have not gone through fact by fact what -- when we dealt with

3     this issue with Mr. Veiga at the beginning of the trial, I

4     think the Court said something along the lines of what you did

5     and struck those paragraphs so that we didn't have to ask

6     questions about it and we don't have to bring witnesses to

7     address.

8          As the Court is aware, the parties have different

9     opinions about lots of facts in this case, but I don't think

10    any of this is material to the decisions the Court is going to

11    be making and that's what I'm getting at.  If it's material, we

12    get at it, but.

13         THE COURT:  Look, the background of how it came to be

14    that Texaco was in Ecuador and in what way it was in Ecuador

15    and when it got out of Ecuador, it is kind of -- it's hard for

16    me to foresee that it affects the outcome, here but it is

17    certainly indisputably part of the context in which this all

18    takes place.

19         MS. FRIEDMAN:  Let me put my cards on the table about

20    that, your Honor.  There are a lot of issues that were

21    litigated below in terms of in this case in this -- not below,

22    I'm sorry.

23         THE COURT:  I was going to say --

24         MS. FRIEDMAN:  Down south.

25         THE COURT:  -- there was nobody lower than me.

DAL8CHE5

1          MR. FRIEDMAN:  Down south, your Honor, in Ecuador,

2    including the characterization of the relationships between the

3    parties TexPet, Ecuador, Chevron, etc.  And so what I am trying

4    to develop is some clarity in my mind about what we are

5    actually fighting about here.

6          THE COURT:  I don't think anybody is fighting about

7    this.  I do frequently search for metaphors so I will abstain.

8          The fact of the matter is this is part of the relevant

9    history of the world.  Now, is it likely to affect the question

10   of whether the Cabrera report was inappropriately written and

11   fed to Cabrera, as is claimed?  Is it likely to affect any

12   determination on who did what to whom in relation to the

13   judgment?  Obviously not.  Is it part of the general background

14   that everybody had?  Sure it is.

15         MR. FRIEDMAN:  I will leave that alone, but I would

16   then like --

17         THE COURT:  That's not to say, if there is an error

18   here, it shouldn't be cleaned up.  I didn't notice one, but

19   that's not definitive.  And there are ways to clean it up.  I

20   don't think there are any issues.

21         MR. FRIEDMAN:  Just one example, your Honor.  At the

22   bottom of paragraph 16, I think we would take issue with the

23   $500 million, but again, I can't imagine that would be relevant

24   or material to the Court's --

25         THE COURT:  I think the last sentence of paragraph 16

DAL8CHE5

1    seems to be entirely unnecessary for any purpose whatsoever,

2    including background.

3            Mr. Mastro, any disagreement about that?

4            MR. MASTRO:  We included it for background, but I

5    understand, your Honor.

6            THE COURT:  So the last sentence of paragraph 16 is

7    stricken.

8            MR. FRIEDMAN:  Getting to something that I think is

9    potentially more critical, in terms of how we go forward, I

10   would ask the Court to take a look at paragraph 35.

11           This issue, I am sure the Court has heard a lot about

12   it during the course of this litigation, about stopping

13   inspections of the lab, how each side accused the others of

14   having inappropriate lab procedures that was litigated

15   extensively in Ecuador.  To be precise, I would ask that 35 be

16   stricken.

17           THE COURT:  Mr. Mastro.

18           MR. MASTRO:  This is a subject on which the witness

19   has personal knowledge, and we think it is relevant, your

20   Honor, because one of the ways in which Mr. Donziger is trying

21   to create a false narrative, and pressured the court and

22   bullied the court, was to prevent an inspection of this HAVOC

23   lab.  He referred to it internally as it would be a disaster

24   for them.  And that's the subject of the barging in ex parte in

25   the judge's chambers.

DAL8CHE5

1          THE COURT:  I am not striking this, Mr. Friedman.

2          MR. MASTRO:  Thank you, your Honor.

3          MR. FRIEDMAN:  Your Honor, on a related point would be

4     paragraphs 39 through 42.  This relates to the appropriateness

5     when the plaintiffs below dropped their request for judicial

6     inspections.  Again, it's the same argument, if you will, but

7     in a broader context, both sides argued this extensively in

8     front of the Ecuadorian courts.  We can repeat those arguments

9     again to this Court factually, if you want to hear both sides'

10    version of what happened there.  So I am just looking for some

11    guidance.

12         THE COURT:  Look, this seems to me, if not at the

13    heart of the case, it is certainly in a very significant part

14    of the circulatory system.

15         MR. FRIEDMAN:  Thank you.  I think once this is

16    clarified for us, we will be able to move faster in our case in

17    chief as well and be able to help Mr. Mastro in terms of what

18    witnesses we are calling.

19         THE COURT:  My understanding, and Mr. Mastro will

20    correct me if I am wrong, is this.  Did the plaintiffs in the

21    abstract have the right to say, we'd rather not do any more

22    judicial inspections?

23         I take it there is no issue that if that's what they

24    wanted to do, they had the right to do that, just like you have

25    the right, if you decide not to cross-examine this witness, to

DAL8CHE5

1    sit down.  I wasn't suggesting that you should.  I am just

2    saying you have that right.  But that's not what they are

3    saying.

4              Right, Mr. Mastro?

5              MR. MASTRO:  That's not what we are saying.

6              THE COURT:  They are saying, as I understand them, and

7    I have been around this case for a while, for better or for

8    ill, and I am not asking for an opinion, that for whatever

9    reason they decided they didn't want him anymore, what they did

10   at least was to take advantage of the opportunity to pressure

11   or blackmail, or whatever word they would care to use, the

12   judge to let them, and then to substitute for the inspections a

13   single expert, whom they were happy with and who they could

14   control, and then ultimately did control.  And you know the

15   rest of the story, as well as I do.

16             If that happened, that may well have been wrong.  It's

17   at the heart of the case.  Maybe not the absolute top of Mount

18   Everest, but it's up there.

19             I get your point, right, Mr. Mastro?  I am not

20   misstating your position?

21             MR. MASTRO:  Not at all.

22             MR. FRIEDMAN:  Paragraph 70, as best I can tell, is

23   all just hearsay statements that I would ask to be stricken.

24             THE COURT:  Yes, Mr. Mastro.  I can't understand why

25   this is still in here.

DAL8CHE5

1          MR. MASTRO:  Your Honor, it is, from the witness's

2     point of view, his state of mind about Judge Zambrano and what

3     Judge Zambrano's reputation was, but I understand the Court.

4          THE COURT:  His state of mind about Judge Zambrano

5     isn't relevant.  Paragraph 70 is stricken.

6          Anything else, Mr. Friedman?

7          MR. FRIEDMAN:  I am nearing the end, your Honor.

8          79, I don't want to be pejorative, but it's

9     essentially this witness's characterization of what happened in

10    the appellate court, which I think this Court has said the

11    record is the record.  I don't want to have to argue with him

12    about what the record says.  But if you believe there is

13    something here that is material, again, I will address it.

14         THE COURT:  Mr. Mastro, what about it?

15         MR. MASTRO:  Actually, your Honor, they very much now

16    put this at issue what happened in the appellate proceedings,

17    and this is this witness's knowledge of what happened in the

18    appellate proceedings and his perception of how they were

19    distorted.  They are basically trying to make an argument that

20    the appellate proceedings somehow cured certain things about

21    fraud in the judgment, and this witness is here to testify from

22    his own personal knowledge and experience how he saw the

23    appellate process playing out in ways that created a

24    distortion.  So that's why it's in here.

25         THE COURT:  I know why it's in here.

DAL8CHE5

1          There is a record in this proceeding, right?

2          MR. MASTRO:  There is, your Honor.

3          THE COURT:  And is there a single fact as opposed to a

4   characterization or a supposition that's in this paragraph that

5   isn't there?

6          MR. MASTRO:  Your Honor, what the witness testifies

7   about in this regard is that he saw the appellate process and

8   the motion practice there as an attempt to manipulate the

9   appellate record to address the problems that the plaintiffs

10  had.  So I thought that his personal knowledge might be --

11         THE COURT:  It's not personal knowledge.  It's his

12  personal opinion, as the advocate for you, your client.

13         MR. MASTRO:  I understand.

14         THE COURT:  Is there a fact?

15         MR. MASTRO:  It's his interpretation of the record.

16         THE COURT:  79 is out.

17         MR. FRIEDMAN:  We make the same point for 80 and 81.

18         THE COURT:  It's out, I should say, on the assumption

19  that you're going to offer the record.  There are facts that

20  are not characterizations that he is competent to testify to in

21  79, such as the first sentence.  But I take it the record is

22  going to be before me, is that correct, Mr. Mastro?

23         MR. MASTRO:  Your Honor, I believe we will be offering

24  the relevant pieces of the record, particularly in light of the

25  position they are taking in the case.

DAL8CHE5

```
 1          THE COURT:  OK.  So you can argue whatever you want to
 2   argue from the record and I will either conclude that when the
 3   appellate court issued its decision on January 13 it was a
 4   ignoring a prior pleading, or I will conclude it's immaterial,
 5   or I will conclude they weren't ignoring it, if it matters.  I
 6   don't know if it matters.
 7          Now, as to paragraph 80, same question.  Is there a
 8   record and is there anything in this paragraph of which the
 9   witness has personal knowledge that isn't in that record?
10          And I am sure there will be the same question as to 81
11   and 82 and 83.
12          MR. MASTRO:  Your Honor, it was offered for the same
13   reason, that he was explaining what happened procedurally and
14   his understanding what happened procedurally.
15          THE COURT:  Is there anything in 80 through 83 of
16   which the witness has personal knowledge that isn't proved by
17   the record from the court proceeding which someone is going to
18   offer in this case?
19          MR. MASTRO:  Your Honor, the arguments that are made
20   are his authentication from personal knowledge of the BIT
21   tribunal order, that is PX 444, that is in paragraph 81, and
22   the familial relationship in paragraph 83 of the presiding
23   judge of the panel to a member of the National Assembly from
24   the governing political party.
25          THE COURT:  I take it there is no dispute, Mr.
```

DAL8CHE5

1    Friedman, that Plaintiff's 444 is what Mr. Callejas says it is,
2    is that right?
3            MR. FRIEDMAN:  Yes.  But we have objection to the BIT
4    tribunal.
5            THE COURT:  That's another matter.
6            MR. FRIEDMAN:  No.  There is no objection that it is
7    what it purports to be.
8            THE COURT:  So that takes care of that.
9            Is there any dispute about the last sentence of
10   paragraph 83?  And if there is, we will see.
11           MR. FRIEDMAN:  I don't know the answer to that.
12   Whether you leave this in or not, I am not going to question
13   him about that.
14           THE COURT:  Frankly, I don't know what difference it
15   makes, Mr. Mastro.
16           MR. MASTRO:  I understand, your Honor.  I think the
17   witness would make a further connection.
18           THE COURT:  I will tell you what.  On redirect I will
19   allow you, if he has personal knowledge, to go into that.
20           Subject to that caveat, 80 to 83 are stricken.  This
21   is part of what I hoped was going to be coming out from these
22   statements.
23           What else?
24           MR. FRIEDMAN:  87 to 88.
25           THE COURT:  Is there any dispute about the facts in

DAL8CHE5

1     paragraph 87?

2             MR. FRIEDMAN:  That would be a relevance objection,

3     your Honor.

4             THE COURT:  Putting aside relevance, is there any

5     dispute about the facts?

6             MR. FRIEDMAN:  Can I have just a second, your Honor?

7             There is a dispute as to -- I am at the top of page

8     33 -- the former concession area, as well as those related to

9     the former consortium that remained Petroecuador's

10    responsibility after the settlement.

11            THE COURT:  I don't understand what you just said.

12            MR. FRIEDMAN:  What is being stated there is there is

13    an assumption in that sentence that those things remained

14    Petroecuador's responsibility, which there is a dispute about.

15            THE COURT:  I will leave the first part of 87 in and

16    strike the portion that begins on page 33 with the words "which

17    included" through the end of the paragraph.

18            MR. FRIEDMAN:  Thank you.

19            88, your Honor.

20            THE COURT:  The third and fourth sentence is stricken

21    along with the words "not surprisingly" from the fifth

22    sentence.

23            Anything else?

24            MR. FRIEDMAN:  90 to 94 are the things I think you

25    have already ruled on.  I can't remember what day it was.  When

DAL8CHE5

```
 1    Mr. Veiga was testifying about the sham or bogus criminal
 2    charges.  I think there was a stipulation or an agreement that
 3    that would be out of the case.
 4              THE COURT:  Mr. Mastro, what about this?
 5              MR. MASTRO:  Your Honor, I stipulated that the merits
 6    of the criminal charges were not part of the case and were not
 7    a predicate act of Chevron's.  I explained to the Court that
 8    the evidence there of collusion with the Republic of Ecuador,
 9    ulterior motives to pressure Chevron into settling, of other
10    ulterior motives including to try and undermine --
11              THE COURT:  Isn't almost the entirety of these
12    paragraphs material as to which this witness is making a
13    lawyer's argument rather than stating matters on personal
14    knowledge, isn't that true?
15              MR. MASTRO:  Actually, your Honor, he observed and
16    himself lived in fear the persecution of two other Chevron
17    lawyers with whom he litigated side by side for years.  That's
18    what he is describing, the real effects of that political
19    pressure.  Of course, it's also ultimately those charges, being
20    able to make them go away if Chevron ever relented on
21    settlement.
22              THE COURT:  He is going to talk about personal
23    knowledge about that?
24              MR. MASTRO:  He is not.  But he is going to speak of
25    personal knowledge as to how the pendency of those charges
```

DAL8CHE5

1    caused real pressure and fear for himself and these other

2    Chevron lawyers.

3              MR. FRIEDMAN:  Your Honor, I think it was 10/17.  I

4    think you ruled that this issue was out of the case for both

5    sides.  Mr. Mastro tried to make the merits distinction, but

6    you --

7              THE COURT:  What page?

8              MR. FRIEDMAN:  We don't have a transcript, your Honor.

9    I apologize.  We don't order those.  But it was on 10/17.  I

10   was cross-examining Mr. Veiga, and we got to this point and I

11   was trying to point out that the charges were not sham, that

12   there was substantive merit to them, and that's when we got

13   sidetracked.

14             MR. MASTRO:  I do remember the exchange very well.

15             THE COURT:  You say it was on the 17th?

16             MR. FRIEDMAN:  It was.  I don't know if you have a

17   word search capability, but if you search for bogus it will

18   come up.

19             THE COURT:  The word was not used on October 17.

20             MR. FRIEDMAN:  It must be the 16th.

21             MR. MASTRO:  Mr. Veiga testified earlier, your Honor.

22             THE COURT:  He was on the first day?

23             MR. FRIEDMAN:  Second.

24             MR. MASTRO:  On page 209, I made very clear -- your

25   Honor asked me -- we are not alleging the merits of the

DAL8CHE5

1   criminal charge.  That's on page 209, lines 16 through 19 on

2   the 16th.

3           I went on at other points to explain that we thought

4   the evidence was still relevant, in terms of the pressure

5   campaign that was ultimately perpetrated.

6           THE COURT:  I have reviewed the transcript.  Mr.

7   Mastro's recollection of my ruling is accurate.

8           MR. FRIEDMAN:  Your Honor, I apologize.  I don't have

9   it here.  I think it went on for several pages, and I started

10  asking more questions, and ultimately the Court ordered us to

11  move on and not ask Mr. Veiga questions about the charges

12  because they were out of the case for both sides.

13          MR. MASTRO:  The merits of the charges.

14          THE COURT:  Look, I have very quickly skimmed about 20

15  pages after the ruling, and I don't see it, Mr. Friedman.  If I

16  am mistaken, I am sure someone will call it to my attention,

17  and I will take another look at it this evening.

18          We have got an abundance of evidence about the

19  criminal charges, as I recall.

20          Then we have in paragraph number 91, the witness

21  purporting to testify as to the toll that all of this took on

22  other people.  No personal knowledge.

23          He purports to testify about why Dr. Perez relocated

24  to the United States.  No personal knowledge.

25          Now, if Dr. Perez told him why he relocated, and

DAL8CHE5

1   Dr. Perez's view was pertinent to his state of mind and his

2   state of mind is relevant, that would be one thing, but I'm not

3   sure I see that.  Maybe Mr. Mastro will correct me when I get

4   through with this.  And I gather there were some conversations.

5           Then he goes on about Dr. Perez dying three weeks

6   after he returned to Ecuador.  So what?  I mean, I don't

7   minimize anybody's death, obviously.  When I say "so what," I

8   am saying, what has it got to do with this case?  And the

9   witness's own personal state of mind about what he perceived to

10  be a threat against him of similar prosecution, I don't see how

11  it advances the ball, Mr. Mastro, I don't.

12          MR. MASTRO:  Your Honor, I don't want to belabor the

13  point.  The witness wanted to explain from his personal

14  knowledge and personal observation why this pressure campaign

15  caused such fear.

16          THE COURT:  There is a difference between evidence

17  that is relevant and material in deciding the lawsuit in front

18  of me and things that people, who feel deeply about this whole

19  thing, like Mr. Callejas and Mr. Donziger, would like to say.

20          MR. MASTRO:  I understand, your Honor.  We can go on,

21  your Honor.

22          THE COURT:  Let's move on.

23          MR. FRIEDMAN:  Here is the problem and it's the same

24  one we ran into with Mr. Veiga.  The title is sham criminal

25  charges and the first --

DAL8CHE5

```
 1              THE COURT:  I already ruled on it.  Could we please
 2   move on?
 3              MR. FRIEDMAN:  I didn't understand what your ruling
 4   was.
 5              THE COURT:  Mr. Mastro will lend you his transcript at
 6   page 209 and feel free in the break which I am going to call
 7   right now to look at it again.
 8              (Recess)
 9              THE COURT:  Did anybody find anything?
10              MR. FRIEDMAN:  I did, your Honor.
11              THE COURT:  Please bring it to my attention.
12              MR. FRIEDMAN:  Your Honor, if you go to page 209, what
13   happened was I had started to question Mr. Veiga, and the issue
14   came up about what was alleged in the complaint.  So we took a
15   break and discovered that, in fact, the allegations of sham
16   criminal charges were in the complaint in various places.
17              I think at line 10 of 209, after going through that
18   with the Court, I asked for permission to question Mr. Veiga
19   about the bogusness or shamness of the charges.  And at line 13
20   the Court denied that, saying this issue is out of the case for
21   both sides.
22              THE COURT:  That's what I think I said earlier.
23              MR. FRIEDMAN:  Then 90 through 94 would be out.
24              THE COURT:  I have already ruled on that before the
25   break.
```

DAL8CHE5

1              MR. FRIEDMAN:  I'm sorry.  I misunderstood.

2              THE COURT:  OK.  So this is a nonjury case and it

3    might be helpful to both sides to give you a most tentative

4    view of this, because nobody has really addressed this,

5    especially in light of the exchange to which counsel has just

6    referred.

7              When this all began, Chevron was certainly alleging

8    that the attempt to revive the criminal charges was wrongful

9    because the charges were bogus.  I understood the complaint was

10   certainly broad enough to include it, and I think maybe they

11   specifically argued, and I think it may have come up in the

12   exchange the other day, and certainly today, that although they

13   have now said we are not going to litigate the question of

14   whether they were bogus, that is to say whether there was any

15   substantial basis for them, they are still taking the position

16   that, in one degree or another, the fact that an attempt was

17   made to revive the charges, and the means by which it was done,

18   if it occurred, is still relevant to the case, relevant to the

19   extortion charge, and maybe in other respects.  I don't know

20   fully.

21             Now, the analogy that comes to my mind, because I am a

22   super antitrust lawyer from another era, relates to the

23   Noerr-Pennington doctrine in antitrust law.  And that is that,

24   speaking very loosely, the Supreme Court held in those cases

25   that lawsuits by one competitor against another, or other

DAL8CHE5

1    efforts to invoke governmental authority, for anti-competitive

2    reasons with an anti-competitive effect, are typically not

3    actionable because they are protected, in this country anyway,

4    by the First Amendment.

5            There has developed something, and it's a long time

6    ago that it developed, and it has grown, something called the

7    sham exception, which has various manifestations, which are

8    exceptions to the general rule that the First Amendment

9    precludes antitrust liability for suing people and invoking

10   governmental action in other ways.  One, as I remember it, is

11   that the lawsuit or whatever it was was a sham.  There was no

12   objective basis for thinking it had any merit, and it was

13   brought anyway and it was brought for an anti-competitive

14   purpose or with an anti-competitive effect or both.

15           A second exception to the principle may exist where

16   the party seeking to invoke governmental action does it without

17   regard to whether there is any merit to it and for the purpose

18   of injuring a market rival.  And the fact that some lawsuits or

19   attempts to invoke governmental action, in those circumstances,

20   may turn out to have some merit may be beside the point on

21   those facts.  I don't purport to say the Supreme Court has said

22   all of this, I'm not sure, but there is a line of cases that

23   says that.

24           There is a third line of cases that says the

25   Noerr-Pennington doctrine, at least in some circumstances, does

DAL8CHE5

1    not protect somebody who seeks to invoke governmental action

2    through intentional misrepresentations and maybe other

3    misconduct.

4          Now, in light of all of that, and in light of the fact

5    that nobody has addressed in any serious way where we are,

6    given Chevron's position with respect to the sham allegation, I

7    am not saying today.  To whatever extent you folks want to help

8    me out on that should it arise again, that would be welcome.

9          What I have said is that for this witness, based on

10   the witness statement, he has nothing to say on personal

11   knowledge that's relevant to this on any theory so we are just

12   going to go ahead with his testimony.  And if this arises later

13   in the case, we will deal with it then, and we will all be in a

14   position to address it in a better informed way.

15         MR. FRIEDMAN:  Thank you.  That's very helpful, your

16   Honor.  And while it may not seem like it, I think we are

17   saving lots of time here.

18         THE COURT:  From your lips to God's ears.

19         MR. DONZIGER:  Before we conclude this, can I say one

20   quick thing?

21         THE COURT:  I'm sorry.  The rule in my courtroom is

22   the first lawyer who stands up on a witness is the lawyer on

23   that witness.  And that's Mr. Friedman.

24         MR. DONZIGER:  It's just a legal argument.

25         THE COURT:  It's under the rule.

DAL8CHE5

1            MR. DONZIGER:  So I can't speak?

2            THE COURT:  Not now.  You talk to Mr. Friedman, and I

3    am sure he will bring to my attention whatever he needs to

4    bring to my attention.

5            MR. FRIEDMAN:  Could I have just a second?

6            If I could then ask that we take a look at 95 through

7    103, which largely is Mr. Callejas's kind of characterization

8    of the media war that went on down in the Ecuador.

9            THE COURT:  I am not going to address that now.  You

10   object if you want to object through the mechanism we set up.

11   Let's just get on with the testimony.  We can sit here and

12   debate every sentence in every one of these statements for

13   three days and the trial will go on into the year after next.

14           Do you have any questions for the witness?

15           MR. FRIEDMAN:  I do, your Honor.  Give me just a

16   second.

17           THE COURT:  I have to break promptly today because I

18   have another case.

19           MR. FRIEDMAN:  At 4:30, your Honor?

20           THE COURT:  Yes.

21   CROSS-EXAMINATION

22   BY MR. FRIEDMAN:

23   Q.  Mr. Callejas, my name is Rick Friedman.  I represent Mr.

24   Donziger in this case.

25           I wonder if I could ask you about ex parte contacts in

DAL8CHE5                        Callejas - cross

1    the litigation in Ecuador.

2              In fact, did Chevron attorneys have ex parte contacts

3    with judges in Ecuador?

4    A.  We never had a nonauthorized contact with the judges

5    hearing the case in Ecuador, nor to discuss substantive issues

6    related to our defense, nor the merits of the case, nor the

7    presence, nor the knowledge by the attorneys for the other

8    side.

9              THE COURT:  I didn't quite understand the answer.

10   What did you mean to convey when you referred to the attorneys

11   for the other side, sir?

12             THE WITNESS:  When I referred to the attorneys for the

13   other side, I referred to the attorneys for the plaintiffs in

14   the trial known as *Maria Aquinda, et al. v. Chevron*, which took

15   place in the Provincial Court of Justice in Sucumbios in

16   Ecuador.

17   Q.  You had referred to nonauthorized contacts.  What is an

18   authorized ex parte contact?

19   A.  The characterization that I made of nonauthorized refers to

20   it being something improper because it violates rules of

21   procedure and also because it would violate legal rules.

22             MR. FRIEDMAN:  I would like to approach the witness,

23   your Honor, with DX 1350.

24             THE COURT:  You're not going to follow up on this?

25             MR. FRIEDMAN:  I am going to come at it differently,

DAL8CHE5                        Callejas - cross

1    if that's OK.

2              I am having a little trouble hearing the interpreter.

3    Is it possible to have a mike for him or ask him, I guess, to

4    speak up a little.

5    Q.  Mr. Callejas, did you help draft interrogatory number 10

6    response here that we have made, Exhibit DX 1350?

7    A.  No, I did not.

8              MR. FRIEDMAN:  Your Honor, nevertheless, I would move

9    DX 1350 in as sort of Chevron's response to ex parte contacts.

10             THE COURT:  Any objection?

11             MR. MASTRO:  No objection, your Honor.

12             THE COURT:  The response to interrogatory number 10 in

13   DX 1350 is received.

14             (Defendants' Exhibit 1350, response to interrogatory

15   number 10, received in evidence)

16   Q.  Mr. Callejas, did Chevron lawyers, during the course of the

17   Lago Agrio litigation, have ex parte contacts with judges, that

18   is contacts in which the plaintiff lawyers were not present?

19             MR. MASTRO:  Objection.  Asked and answered.

20             THE COURT:  The answer was very hard to understand

21   because there the word "nor" appeared every other phrase.

22   Overruled.

23   A.  Based on the definition I have already provided of the ex

24   parte contacts that you're referring to, meaning inappropriate

25   contacts with judges who are hearing the case, during which the

DAL8CHE5                    Callejas - cross

1   aim is to influence in a nonauthorized way his hearing of the

2   case, or the way in which the merits of the case will be ruled,

3   without the other party being notified, nor the other party

4   being present, I repeat that we have never had those kinds of

5   contacts with the judges hearing the case in Lago Agrio.

6   Q.  When is it proper for an attorney -- well, let me start

7   over.

8           Did the law regarding ex parte contacts in Ecuador

9   change in 2009?

10          MR. MASTRO:  Objection.  It calls for a legal

11  conclusion.

12          THE COURT:  Well, he is a lawyer.

13          THE WITNESS:  Excuse me.  Does it mean that I should

14  answer?

15          THE COURT:  Yes.

16  A.  Can you please repeat the question?  I got lost.

17  Q.  Did the law regarding the propriety of ex parte contacts in

18  Ecuador change in 2009?

19  A.  In 2009 the new organic code, the judicial function was

20  issued.  It included a rule that prohibited judges from having

21  unilateral contacts with parties in the trial.  However, since

22  I was in law school, since then there were already rules that

23  regulated those kinds of activities.  Indeed, the law stated

24  that the judges should act with total independence from the

25  parties.  They should be objective and impartial.  Rules that

DAL8CHE5                    Callejas - cross

1   obviously imposed on them the provision of having these kinds

2   of contacts even before March of 2009.

3            THE COURT:  I'm sorry.  Was the word the provision of

4   having these kinds of contacts or the prohibition of having

5   these kinds of contacts?

6            THE INTERPRETER:  The prohibition.

7            THE COURT:  Thank you, Mr. Interpreter.

8            MR. FRIEDMAN:  Did you say prohibition?

9            THE INTERPRETER:  Prohibition.

10  Q.  Before 2009, in the Lago Agrio litigation, did both sides

11  have ex parte contact with the judges?

12           MR. MASTRO:  Objection to form.

13           THE COURT:  Sustained as to form and it's compound.

14           It will be very helpful if you would have in mind the

15  definition the witness gave you to begin with, because without

16  that, this is going to be extremely confusing and unhelpful.

17           MR. FRIEDMAN:  I will just go to a document, DX 626.

18           The copy I have for the Court is not marked.  I

19  apologize.  It's 626.

20  Q.  Mr. Callejas, I am not sure whether it's better that you

21  and I work off of an English version or a Spanish version.

22  Which would be easier for you?

23  A.  It would be easier for me to work from the Spanish copy,

24  but I would like to read it briefly, if you and your Honor

25  allow me to, because I don't recall the contents.

DAL8CHE5                          Callejas - cross

1   Q.  The Spanish begins on page 4 of this exhibit.

2            Let me know when you're ready for me to ask you a

3   question about it.

4            (Pause)

5   A.  I'm ready, counsel.

6   Q.  Can you tell us, first of all, what this document is?

7   A.  This document, from the characteristics that I see in the

8   Spanish copy here, is a filing presented on my behalf by the

9   attorney Diego Larrea Alarcon.

10  Q.  Is he an attorney in your law firm?

11  A.  Yes.  He is an attorney that works with me on the Chevron

12  case in the Lago Agrio trial.

13  Q.  If we look at the fourth paragraph in this document, can

14  you tell us what request is being referenced here?

15  A.  The fourth paragraph refers to the possible existence of a

16  request made by the plaintiff party, and we were writing

17  because we wished to confirm its existence.

18  Q.  The request related to judicial inspections, is that

19  correct?

20  A.  In theory, that was what the request concerned that we

21  wanted to confirm, whether it existed or not, in the Lago Agrio

22  case.

23  Q.  If we go to the fifth paragraph, does it indicate that one

24  of the lawyers for Chevron went to see the judge with regard to

25  that request?

DAL8CHE5                      Callejas – cross

1        MR. MASTRO:  Objection to form and the document speaks

2   for itself.

3        THE COURT:  I will regard that as a predicate to a

4   question.

5        What is the next question?

6   Q.  Mr. Callejas, did one of your lawyers go to see this judge

7   about judicial inspections on an ex parte basis?

8        MR. MASTRO:  Objection to form, your Honor.

9   Definition of ex parte.

10       THE COURT:  Rephrase it in terms of whether he went

11  without notice to the other side being present.

12  Q.  Did one of the lawyers for Chevron -- let me start over.

13       Does this document reflect that one of the lawyers for

14  Chevron went to see the judge without prior notice to the

15  plaintiffs?

16  A.  This document reflects that one of the Chevron lawyers, in

17  effect, met with, visited the judge on the case to address

18  matters that were eminently of a logistical and scheduling

19  nature as to the judicial inspections, not to address

20  substantive or merit issues in the case.

21       If you are referring to that part of paragraph 5, I

22  would ask that you also refer to the previous part of paragraph

23  5, which I would permit myself to read in the Spanish original

24  to have the interpreter translate.

25       "After learning that the active party had maintained a

DAL8CHE5                    Callejas - cross

1    dialogue with you with regards to this request."  This confirms

2    in my mind what I said in my earlier declaration that both our

3    meeting and a possible meeting by the plaintiffs with the court

4    were merely for logistical matters and scheduling, and were not

5    ex parte meetings to address substantive matters at the heart

6    of the case or the litigation.

7    Q.  Am I understanding you correctly then that you do not think

8    that there was anything improper in the plaintiffs' contact

9    with the judge either?

10              MR. MASTRO:  Objection.  It misstates his prior

11   testimony.  It calls for his opinion.  It calls for a legal

12   conclusion.

13              THE COURT:  Is your question limited to this occasion?

14              MR. FRIEDMAN:  This occasion.

15              THE COURT:  Overruled.

16   A.  Could you ask the question again?

17   Q.  Yes.  Is it your view that on this occasion there was

18   nothing improper in the plaintiffs' contact with the judge?

19   A.  If that meeting only concerned logistical aspects of the

20   judicial inspections, there was nothing improper about that

21   meeting.

22   Q.  Do you know Diego Borja?

23   A.  I know two persons in Ecuador whose name is Diego Borja.  I

24   don't know which one you are referring to.

25   Q.  Do you know a Diego Borja who was involved in the incident

DAL8CHE5                          Callejas - cross

 1    with Judge Nunez?
 2    A.   Yes, I know him.
 3    Q.   That's the Diego Borja I would like to ask you about.
 4    A.   OK.  Perfect.
 5    Q.   Can you tell us when you first met him?
 6    A.   I can't be sure when I met him for the first time, probably
 7    the year 2005 or 2006, most likely.
 8    Q.   We don't need to know the exact date, but can you tell us
 9    the context in which you met him?
10    A.   I met him during the course of a judicial inspection when
11    he was presented to me as an employee of the lab that was doing
12    work related to the handling of samples from that judicial
13    inspection.
14    Q.   Which lab was he represented to be an employee of?
15    A.   I don't remember the name of the lab, but it was a lab that
16    was duly accredited in Ecuador to do an analysis of samples.
17    Q.   Whatever the name of the lab, it was handling samples for
18    Chevron, is that correct?
19    A.   That lab was going to do certain analyses that the experts
20    proposed by Chevron had ordered.
21    Q.   Was the name of that lab Severn-Trent?
22    A.   It could be.  I don't know.
23    Q.   How often would you see Mr. Borja at judicial inspections?
24    A.   Not very frequently since the work of sampling was done by
25    the experts after lawyers and the court had concluded that

DAL8CHE5                        Callejas - cross

1    judicial inspection.  And, therefore, Diego Borja's presence at

2    the inspection site to handle the samples from there to the

3    city of Lago Agrio, and thereafter to the city of Quito, would

4    have occurred after my presence at the inspection.

5    Q.  Other than encountering Mr. Borja at judicial inspections,

6    have you had any other contact with him?

7    A.  I can affirm to you under the oath that I have taken that

8    Diego Borja was never in my office, nor was I ever in Diego

9    Borja's office, nor have I ever spoken to him by phone.

10   However, on one occasion I did speak to him in regards to

11   videos that you have presented about Judge Nunez Zanabria's

12   participation.

13   Q.  Is Mr. Borja's office -- I will start over.

14            In 2008, 2009, was Mr. Borja's office in the same

15   building as your office?

16            MR. MASTRO:  Objection.  Compound.

17            THE COURT:  Overruled.

18   A.  I don't remember the dates, but for some time Diego Borja's

19   office and the laboratory for which he worked was in the same

20   building in which my offices are located.

21   Q.  And you said that you did have one other conversation with

22   him in person with regard to the incident with Judge Nunoz, is

23   that correct?

24            THE COURT:  I think you misspoke.  I think the name is

25   Nunez.

DAL8CHE5                    Callejas - cross

1    A.  What was the question?  I'm sorry.

2    Q.  Is it your testimony that other than at the judicial

3    inspections, you have only spoken to Mr. Borja one other time?

4    A.  My testimony is that, in effect, only that other time,

5    other than for occasionally greeting each other in the

6    elevators or in the parking lot of the building where we both

7    had our offices.

8            MR. FRIEDMAN:  Your Honor, would this be a good time

9    to break?

10           THE COURT:  Yes.

11           Before we leave, Mr. Friedman, give me an idea of how

12   long you expect to be with the witness tomorrow?

13           MR. FRIEDMAN:  I would say an hour.

14           THE COURT:  Then what is coming up tomorrow?

15           MR. GOMEZ:  I would have at least an hour with the

16   witness, your Honor, at least.  Given the translation, it's

17   hard to tell.

18           THE COURT:  Thank you.

19           MR. MASTRO:  After this witness, your Honor, there are

20   some scheduling issues so it would either be Mr. Dahlberg or

21   Mr. Guerra.  We are hoping to do Mr. Dahlberg first.

22           THE COURT:  All right.

23           MR. MASTRO:  How long do you expect with Mr. Dahlberg?

24           MR. FRIEDMAN:  Half an hour.

25           THE COURT:  Mr. Gomez, how about you?

DAL8CHE5

1          MR. GOMEZ:  Not very long.  Just a few questions, if
2     any.
3          MR. MASTRO:  So we expect Mr. Dahlberg and then
4     Mr. Guerra.
5          MR. FRIEDMAN:  I neglected to move DX 626 into
6     evidence.
7          THE COURT:  Is there any objection?
8          MR. MASTRO:  I am not sure why his prior affidavit
9     would come into evidence, but we have no objection to it.
10          THE COURT:  All right.  DX 626, right?
11          MR. FRIEDMAN:  It's the pleading.
12          THE COURT:  It's a pleading from the Lago Agrio case.
13          (Defendant's Exhibit 626 received in evidence)
14          (Adjourned to October 22, 2013, at 9:30 a.m.)
15
16
17
18
19
20
21
22
23
24
25

```
 1                     INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    SPENCER CHARLES LYNCH

 4    Direct By Ms. Neuman . . . . . . . . . . . 555

 5    Cross By Mr. Booth . . . . . . . . . . . . 563

 6    Redirect By Ms. Neuman . . . . . . . . . . 615

 7    Recross By Mr. Gomez . . . . . . . . . . . 641

 8    ROBERT A. LEONARD

 9    Direct By Ms. Neuman . . . . . . . . . . . 643

10    Cross By Mr. Booth . . . . . . . . . . . . 646

11    Redirect By Ms. Neuman . . . . . . . . . . 666

12    Recross By Mr. Booth . . . . . . . . . . . 667

13    ALDOLFO CALLEJAS RIBADENEIRA

14    Direct By Mr. Mastro . . . . . . . . . . . 668

15    Cross By Mr. Friedman . . . . . . . . . . . 690

16                     PLAINTIFF EXHIBITS

17    Exhibit No.                         Received

18     4100      . . . . . . . . . . . . . . .556

19     4100A     . . . . . . . . . . . . . . .640

20     3700      . . . . . . . . . . . . . . .644

21     3700A     . . . . . . . . . . . . . . .645

22     4300, 4300A   . . . . . . . . . . . . . . 670

23                     DEFENDANT EXHIBITS

24    Exhibit No.                         Received

25     478 and 1307   . . . . . . . . . . .555
```

1     1335     . . . . . . . . . . . . . .566

2     1332     . . . . . . . . . . . . . .651

3     1350, response to interrogatory number 602

4     626  . . . . . . . . . . . . . . .701

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25