DAMLCHE1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5           v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x
                                        October 22, 2013
9                                       9:36 a.m.

10  Before:

11                      HON. LEWIS A. KAPLAN
                                        District Judge
12
                            APPEARANCES
13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17       GEORGIA K. WINSTON

18  FRIEDMAN RUBIN
         Attorneys for Donziger Defendants
19  BY:  RICHARD H. FRIEDMAN
         DEE TAYLOR
20
    LITTLEPAGE BOOTH
21       Attorneys for Donziger Defendants
    BY:  ZOE LITTLEPAGE
22       RAINEY BOOTH

23  GOMEZ LLC
         Attorneys for Defendants Hugo Camacho, Javier Piaguaje
24  BY:  JULIO C. GOMEZ

25

DAMLCHE1                    Trial

1          (Pages 705-707 SEALED by order of the Court)

2          (In open court; trial resumed)

3          THE COURT:  Good morning, all.

4          Mr. Callejas, you are still under oath.

5          Mr. Friedman, you may continue.

6          MS. FRIEDMAN:  Thank you, your Honor.

7    ADOLFO CALLEJAS RIBADENEIRA, resumed.

8  CROSS-EXAMINATION (cont'd)

9  BY MS. FRIEDMAN:

10 Q.  Mr. Callejas, in your declaration you state that you have

11 been responsible for managing the day-to-day activity of the

12 Chevron's defense of the Lago Agrio litigation since the

13 beginning of the case.

14          Generally speaking, what does that mean you have done?

15 A.  It means that I have handled all the matters, all the

16 defense matters of the company in coordination with my client.

17 Q.  How many lawyers in your firm, how many lawyers were there

18 in your law firm during the 2009, 2010 time period?

19 A.  Five of us were there working on the Chevron case.

20 Q.  Were there other lawyers in your firm that were not working

21 on the Chevron case?

22 A.  Yes, there were some.

23 Q.  Approximately how many?

24 A.  Four or five additional ones.

25 Q.  Were you responsible for managing or supervising other

DAMLCHE1                    Callejas - cross

1   Ecuadorian lawyers working on this case?

2   A.   Yes, it was.

3   Q.   Approximately how many?

4   A.   The four additional ones that I mentioned to you were under

5   my supervision.

6   Q.   Were those four in your law firm or outside of your law

7   firm?

8   A.   They were lawyers that worked under the Callejas y

9   Asociados law firm.

10   Q.   Were you responsible for managing or supervising any

11   nonlawyer personnel who worked on the Chevron case?

12   A.   Yes.

13   Q.   Can you describe for me the categories of personnel you

14   were responsible for managing or supervising?

15   A.   Basically the personnel that in the United States would be

16   called paralegals, also secretaries and lower rank assistants.

17            THE COURT:  Mr. Friedman, let's pause for a minute.

18            (Pause)

19            THE COURT:  Let's proceed.

20            THE WITNESS:  Would it be possible for me to hear the

21   last part of my answer to see if I can completely answered the

22   question.

23            (Record read)

24            THE WITNESS:  I wish to add that there was other

25   personnel whose work was logistical in nature that I

DAMLCHE1                    Callejas - cross

1   supervised.

2   Q.  What type of logistical personnel?

3   A.  Logistics personnel who were in charge of the logistics of

4   our working in Quito, as well as Lago Agrio, and who would

5   coordinate time scheduling, lodging, air travel, that sort of

6   thing.

7   Q.  Did any investigators report to you?

8   A.  No, no investigator has ever reported to me.

9   Q.  Did you work with expert witnesses nominated or put forth

10  by Chevron?

11          MR. MASTRO:  Objection to form, your Honor, and it's

12  vague.

13          THE COURT:  Overruled.

14  A.  I'm sorry, could you clarify what you meant by witness,

15  which was the translation that I heard.

16          MS. FRIEDMAN:  Which was what?

17          THE INTERPRETER:  Which was the translation that I

18  heard.

19  Q.  Expert witness.

20          THE COURT:  The question to you was to please clarify

21  what you mean by expert witness.

22          MS. FRIEDMAN:  Sorry.  Your Honor, I wonder if we

23  could get the mike to the translator again.  I'm sorry, I'm

24  just having trouble hearing.

25  Q.  Mr. Callejas, did you work with experts who provided

DAMLCHE1                    Callejas - cross

1    opinions or data to the trial court?

2    A.  I haven't worked with any expert who has presented a

3    declaration or a report in this trial that I know of.

4    Q.  I'm sorry.  I meant to ask you whether you had worked with

5    any experts who provided reports or data to the trial court in

6    the Lago Agrio litigation.

7    A.  I have not done so.  I have not worked with one that was

8    under my supervision.

9    Q.  Who supervised those experts?

10   A.  Those experts who were suggested by the company I represent

11   for the judicial inspections worked independently and in

12   coordination with the court, as well as with representatives

13   from Chevron who did not work in the legal area.

14   Q.  Were you in charge of deciding the legal strategy Chevron

15   would take in the Lago Agrio litigation?

16          MR. MASTRO:  Objection, your Honor.  Work product.

17          THE COURT:  Sustained.

18   Q.  Did you file briefs and motions in the Lago Agrio

19   litigation?

20   A.  Yes, I've done so.

21   Q.  Did you have any involvement in Chevron's decisions as to

22   which sites it wanted judicial inspections to take place at?

23          MR. MASTRO:  Objection to form.  Work product.

24          THE COURT:  First of all, what's the form objection?

25          MR. MASTRO:  I think it's vague, your Honor, as to

DAMLCHE1                     Callejas - cross

 1    involvement and it's not clear.

 2              THE COURT:  That piece is overruled.

 3              What about work product, Mr. Friedman?

 4              MS. FRIEDMAN:  I think his --

 5              THE COURT:  Which I think is as much a relevance

 6    objection --

 7              MR. MASTRO:  Yes, your Honor.

 8              THE COURT:  -- as it is anything else.

 9              MS. FRIEDMAN:  Well, the relevance part, your Honor, I

10    think goes to his personal knowledge about the various things

11    in his declaration.  What I'm really trying to do is get a

12    sense of where his personal knowledge lies and where it

13    doesn't.  So to the extent he was involved in decision-making

14    about choosing those sites or if he says I had nothing to do

15    with that, I think that gives the Court a clearer picture.

16              THE COURT:  If that's the object, I think there's

17    probably nothing objectionable about your focusing on a

18    specific statement and exploring the question of whether he has

19    personal knowledge for the statement.  But otherwise it begins

20    to sound like what you're really doing is trying to find out

21    how Chevron organized its defense, and I don't think you're any

22    more entitled to do that than they're entitled to go into it

23    with you about how your consultations are going.

24              MS. FRIEDMAN:  I can do it that way, your Honor.

25              THE COURT:  Thank you.

DAMLCHE1                    Callejas – cross

1   BY MS. FRIEDMAN:

2   Q.  Mr. Callejas, could you turn to page 10 of your

3   declaration.

4           THE COURT:  Referring to Plaintiff's 4300.

5   A.  You said page 10, counsel?

6   Q.  Page 10, paragraph 33.  Were you personally involved in the

7   activities described in paragraph 33?

8   A.  I personally participated in a majority of the judicial

9   inspections that were carried out in Lago Agrio, yes.

10  Q.  In what sense did you participate, what was your role?

11  A.  My role was to present arguments and defenses by Chevron

12  during those judicial inspections.

13  Q.  Mr. Callejas, I want to ask you some general questions not

14  related to the Chevron case.

15          Do the lawyers in your firm sometimes win civil trials

16  in Ecuador?

17          MR. MASTRO:  Objection relevance, your Honor.

18          THE COURT:  Sustained.

19  Q.  Have the lawyers --

20          THE COURT:  For whatever relevance it has, which I

21  take to be zero, I'm going to assume they're not still in

22  business unless they do.

23  Q.  Do the lawyers in your firm win trials in Ecuador without

24  bribing judges?

25          MR. MASTRO:  Objection.

DAMLCHE1                    Callejas - cross

1          THE COURT:  Overruled.

2          Don't take a lot of time on this, Mr. Friedman.

3          MS. FRIEDMAN:  Not planning to, your Honor.

4          THE WITNESS:  Must I answer?

5          THE COURT:  Yes, sir.

6          THE WITNESS:  Yes.  We've won trials and all the

7   trials we've won we've done so without paying any judges or

8   court officials.

9   Q.  In those trials, at least, have you been satisfied with the

10  Ecuadorian judicial system?

11          MR. MASTRO:  Objection.

12          THE COURT:  Sustained.

13  Q.  Going back to the Lago Agrio litigation, is it true that

14  the Chevron lawyers were sanctioned at time by the court for

15  filing frivolous motions?

16          MR. MASTRO:  Objection.  The record speaks for itself,

17  your Honor.

18          THE COURT:  What is the relevance of this?

19          MS. FRIEDMAN:  Well, your Honor, some of the things

20  that are in the declaration talk about the background of how

21  proceedings went and there are allegations that plaintiffs were

22  doing things to block things.  And I can go to specific

23  paragraphs, but generally speaking that's the allegation.  I'm

24  just trying to bring out that this was a hard fought litigation

25  with both sides doing things that the court disapproved of.

DAMLCHE1                    Callejas - cross

1          MR. MASTRO:  And your Honor already ruled that things

2     like excessive motions in Lago Agrio and what Chevron did to

3     litigate in the Lago Agrio case, whether there were excessive

4     motions or the like is out of the case.  It's not a part of

5     unclean hands evidence.  It's clearly irrelevant.  And whatever

6     record there is of that case speaks for itself.

7          THE COURT:  And the ruling to which you refer is what?

8          MR. MASTRO:  Your Honor, it's your August 17, 2011

9     memorandum opinion that was in the count nine case, docket

10    entry 348.  One of the unclean hands allegations that was

11    dismissed was so-called procedural misconduct in the Lago Agrio

12    litigation.  This is on page 24, note 69.  You dismissed that

13    part of their unclean hands defenses having insufficient basis.

14         MS. FRIEDMAN:  Your Honor, I don't know that I'm an

15    expert on what happened before here, but my impression was that

16    the count nine case was a separate case from this.

17         THE COURT:  Well, yes, that's absolutely correct.  But

18    the unclean hands defense pleaded in that case is precisely the

19    same unclean hands defense pleaded in this case.  Indeed, if

20    memory serves, it's precisely the same answer in both cases.

21         And Mr. Mastro is correct, absolutely correct, and the

22    objection is sustained.

23         And I would simply invite your attention to the fact

24    if we're going to try to go down this road that between May 17

25    and the last time I looked, your client and Mr. Gomez filed 30

DAMLCHE1                    Callejas - cross

```
 1   motions in this case, so many of which one could debate on the
 2   ground of whether they were frivolous at least.
 3              But let's go on.
 4   Q.  Is it true, Mr. Callejas, that in the Lago Agrio
 5   litigation, the Chevron lawyers filed at least two motions
 6   threatening the presiding judge with jail if he didn't rule in
 7   Chevron's favor?
 8              MR. MASTRO:  Objection.  The record speaks for itself.
 9              THE COURT:  I should think so.
10              THE WITNESS:  I'm sorry, I didn't hear what was your
11   ruling.
12              THE COURT:  I said I should think so.
13              MS. FRIEDMAN:  It may speak for itself, your Honor,
14   but I'd like to ask the witness questions about that.  But --
15              THE COURT:  On what basis?  Is the argument that if
16   they filed a motion in public in court saying whatever it is
17   you say they said, that somehow excuses, if it occurred, your
18   client and Mr. Fajardo, one or the other, really in
19   conjunction -- you know what the evidence is that I'm referring
20   to -- going to a judge ex parte and saying if you don't do what
21   we're asking you to do here we will or may file complaint of
22   judicial misconduct against you and immediately thereafter or
23   shortly thereafter the judge did exactly what they told him to
24   do.  I mean that's the offer of proof from the other side.
25              You think that's equivalent?
```

DAMLCHE1                    Callejas - cross

1           MS. FRIEDMAN:  I don't know that it has to be

2    equivalent for this to be admissible, your Honor.

3           THE COURT:  I think it's too far fetched.  Sustained.

4           If you want to offer a document, I'll consider that

5    separately.

6           MS. FRIEDMAN:  All right.

7    Q.  Mr. Callejas, would you turn to, I'm sorry, paragraph 35 of

8    your declaration or your witness statement.  In this paragraph,

9    you describe efforts by Chevron to inspect one of plaintiffs'

10   labs, and you indicate at the end of the paragraph that on

11   eight separate occasions the Lago Agrio plaintiffs'

12   representatives intervened and blocked the judicial inspection

13   of the laboratory.

14          Is that correct?

15   A.  That is so.  That is what appears at the end of the

16   paragraph No. 35 of my written statement.

17   Q.  And by intervened and blocked the judicial inspection, you

18   mean they went to court and got the judge to prevent Chevron

19   from inspecting the laboratory; is that correct?

20   A.  That happened on at least one occasion, and this is shown

21   in one of the favorite parts of the Crude documentary which I

22   have been able to see.

23   Q.  Other than going to court to ask for judicial intervention

24   blocking that inspection or those -- let me start over.

25          When you write that the plaintiffs' representatives

DAMLCHE1                    Callejas - cross

```
 1   intervened and blocked the judicial inspection, are you
 2   referring to anything other than going to court to prevent
 3   those inspections?
 4   A.  In regards to the first part of your question where you
 5   characterize the actions of the plaintiffs in a way that I'm
 6   not in agreement with, I'd like to comment on that if you'll
 7   allow it.
 8              MS. FRIEDMAN:  Of course.
 9              THE COURT:  Please just answer the question.
10              THE WITNESS:  In regards to Attorney Friedman's
11   question, I must say on the eight occasions where we weren't
12   able to -- where the court was not able to carry out the
13   judicial inspection, it was due to indirect actions of the
14   plaintiffs that caused that to happen.
15              For example, when we were told, we were told that the
16   lab was closed when we arrived there with the judge that was to
17   carry out the judicial inspection on site and we were told that
18   that was at the request of the plaintiffs; or actions such as
19   last minute or last minute actions such as filing requests with
20   the court that would prevent judicial inspections from being
21   carried out on the date or time that they had been scheduled.
22   Q.  I want to ask you about the first part that you said being
23   told that the lab was closed.
24              Were you there at that attempted inspection?
25   A.  No, I was not involved in the inspections.  It was done by
```

DAMLCHE1                    Callejas - cross

```
 1   other attorneys from my firm.
 2              MS. FRIEDMAN:  Your Honor, I'd move to strike the
 3   answer as hearsay then.
 4              THE COURT:  Why not, Mr. Mastro?
 5              MR. MASTRO:  Your Honor, it is what was reported to
 6   him by attorneys at his firm.
 7              THE COURT:  I know.  That's what the hearsay rule is
 8   all about.
 9              MR. MASTRO:  I understand, your Honor, I understand.
10              THE COURT:  Stricken.
11   Q.  Mr. Callejas, I now would like to ask you about the
12   judicial inspections at the sites of claimed oil contamination.
13              Is there a term we can use together to refer to those
14   type of inspections?
15   A.  All the inspections that were carried out were done on
16   wells or production stations of the oil industry in Ecuador.
17   Q.  So I'll just refer to oil or well inspections, is that a
18   suitable term to talk about the judicial inspections?
19   A.  I would suggest a term that we use both in English and
20   Spanish and it would be oil industry facilities.
21   Q.  Thank you.  Is it correct that judicial inspections of oil
22   industry facilities in the Lago Agrio litigation often took
23   several months to complete?
24              THE COURT:  Mr. Friedman, I don't understand your
25   question.  Are you saying that there was -- are you suggesting
```

DAMLCHE1                    Callejas - cross

1   by the question or inquiring by the question as to whether a

2   particular investigation of a site might have taken months or

3   are you suggesting that the whole process of all of the

4   inspections took months?  I don't understand it.

5           MS. FRIEDMAN:  I'll ask a better question, your Honor.

6           THE COURT:  Thank you.

7   Q.  Mr. Callejas, on average, would it be fair to say that the

8   judicial inspection of an oil industry facility site would take

9   several months to complete?

10          THE COURT:  I'm having a similar problem with the

11  question.  Are you inquiring about how long it took from the

12  moment people arrived on site to the moment they left?  Are you

13  suggesting possibly that they were there for several months

14  standing there or doing whatever else they were doing in the

15  jungle or wherever it was?

16          MS. FRIEDMAN:  Oh, no, no.  That the entire process

17  took.

18          THE COURT:  Try to be clear about what you're

19  inquiring about.

20          MS. FRIEDMAN:  I'll refer him to the declaration, your

21  Honor.

22          THE COURT:  There's no -- I don't think there's any

23  substantive problem.  It's a lack of clarity.

24          MS. FRIEDMAN:  I understand.

25  Q.  Mr. Callejas, could you take a look at paragraph 34 of your

DAMLCHE1                         Callejas - cross

1    declaration or of your witness statement and specifically the

2    last sentence, and you refer to a judicial inspection cycle.

3              Could you just describe for us what you meant by that?

4    A.  With the phrase that states to complete each judicial

5    inspection cycle, I refer to the entire process regarding to an

6    judicial inspection that includes the moment when the judge

7    arrives to begin the judicial inspection and through the

8    continuing on through the issuance of the expert witness's

9    report.

10   Q.  Thank you.

11   A.  Perhaps in the interpretation it should be added that I was

12   referring not just to the moment when the expert issues his

13   report, but also to the whole process when the parties can

14   object to the whole process.

15   Q.  Thank you.  And was the process of doing a judicial

16   inspection on an oil industry facility expensive?

17             MR. MASTRO:  Objection, your Honor.  Vagueness.

18             THE COURT:  Sustained, at least as to form.  It rather

19   depends on who's doing it and what they want to invest in it,

20   don't you think?

21   Q.  How expensive was it to, on average, how expensive was it

22   to do an oil -- a judicial inspection on an oil industry

23   facility in the Lago Agrio litigation?

24   A.  I have no personal information that would allow me to

25   answer your question, counsel.

1    Q.  All right.  In -- from what you said that you had been to

2    almost all of the judicial inspections?

3    A.  Correct.

4    Q.  In your view, were the judicial inspections conducted

5    fairly?

6            MR. MASTRO:  Objection, your Honor.

7            THE COURT:  Pardon?

8            MR. MASTRO:  Objection, your Honor.  Calls for the

9    witness's opinion about fairness.

10           MS. FRIEDMAN:  There are repeated references to the

11   witness's opinions about the judicial inspections, and this

12   would be in the area of lay opinion, your Honor.  I'm just

13   trying to get what he observed and how he felt about the

14   process.

15           THE COURT:  What he observed there's no objection to.

16           MS. FRIEDMAN:  I'll rephrase the question.

17   Q.  Did you observe what you considered to be any unfairness in

18   the process?

19           MR. MASTRO:  Same objection, your Honor.  That's the

20   back door, isn't it?

21           THE COURT:  Yeah, I think so.  Sustained.

22   Q.  Did you file any legal papers or make any arguments to the

23   court that the judicial inspections were being conducted

24   unfairly?

25           MR. MASTRO:  Objection to form and the record speaks

DAMLCHE1                     Callejas - cross

 1   for itself.

 2            THE COURT:  Why not, sir?

 3            MS. FRIEDMAN:  The record might speak -- I mean there

 4   may be documents that reflect this, but.

 5            THE COURT:  Well, you're asking him whether he filed

 6   something.  Now, we could put a witness on the stand in this

 7   case, we could call in one of the former lawyers to testify as

 8   to whether he filed any papers that met some description; but

 9   the better way of finding out the answer to that, the best

10   evidence of that would be to look at the docket sheet and the

11   papers, don't you think?

12            MS. FRIEDMAN:  That might be the best evidence as to

13   what was filed, your Honor.

14            THE COURT:  And whether anything was filed.

15            MS. FRIEDMAN:  Or whether anything was filed.

16            Here's the problem I'm having, your Honor.  If we look

17   at the declaration, if we look at paragraphs 32 through 35,

18   really everything there would be subject to the Court's same

19   point that the record speaks for itself and that none of this

20   testimony would be permissible.  And so I understand how the

21   Court is trying to save time on this and I'm trying to respect

22   that, but.

23            THE COURT:  And I think you are.  I appreciate that.

24            MS. FRIEDMAN:  But I think if the same -- I guess, you

25   know, I don't want to be facetious about it, but I would make

1    the same argument as to paragraphs 33 through 35 that they

2    ought to be stricken because the record is the best evidence of

3    that.

4              THE COURT:  The problem is that at least in some

5    respects it appears to me that your premise is not accurate.

6    For example, paragraph 33 begins by saying each inspection

7    began with the court hearing any procedural matters, then

8    swearing in the parties' nominated experts -- let's just take

9    it that far.

10             Now, I think I understood that there was no

11   stenographic record; is that true?

12             MS. FRIEDMAN:  I think no.

13             THE COURT:  I think what we heard was that there was a

14   secretary present.  The secretary took notes.  The secretary at

15   the end of the proceeding then consulted with the lawyers and

16   something called an acto was prepared by the secretary and the

17   acto was filed.  Is that not true?

18             MS. FRIEDMAN:  Well, there's been a deposition that

19   was taken that I don't want to talk about, but essentially I

20   think, I think I can make an offer of proof to the Court that

21   there was a tape recording made of the entire proceedings.

22             THE COURT:  Each and every one?

23             MS. FRIEDMAN:  At least every one -- I can ask

24   Mr. Callejas.  Maybe that would be the best way.

25             THE COURT:  Let's try that.

DAMLCHE1                    Callejas - cross

Q.  Mr. Callejas, was a tape recording made of the judicial
inspections?

A.  Yes, sir.  From the very first judicial inspection we
agreed that all the statements by counsel and other people
intervening in the inspections would be recorded.  And at the
end of the day, the statements recorded would be transcribed
literally on paper by the secretary directly and it would be
revised by the attorneys and after that -- attorneys for both
sides -- after that, the statements would be put into the acto,
the certificate.

Q.  And so --

          THE COURT:  Let me just clarify.

          Mr. Callejas, are you saying there was an electronic
or magnetic recording made or are you saying something else?

          THE WITNESS:  Yes.  Yes.  Each party had at least
three tape recorders that were placed in front of the person
who was speaking in order to record what that person was
saying, your Honor.

          THE COURT:  And are you saying that those recordings
then were transcribed verbatim?

          THE WITNESS:  Correct, your Honor.

          THE COURT:  And were the verbatim transcripts then
included in the acto?

          THE WITNESS:  That's correct as well, your Honor.

          MS. FRIEDMAN:  So, your Honor, I don't want to be

DAMLCHE1                    Callejas - cross

 1   hyper-technical about the issue.  I'm just trying to get to --

 2            THE COURT:  I appreciate that.

 3            MS. FRIEDMAN:  So what I would either do -- well, what

 4   I would do is ask that 33 through 35 be stricken or that I be

 5   permitted to ask him the types of questions I was trying to

 6   ask.

 7            THE COURT:  I'm not going to strike them.  I'll permit

 8   you to question appropriately.  I'm not giving an advisory

 9   opinion about what might constitute the type of questions you

10   were trying to ask, particularly those that I haven't heard

11   yet.

12            MS. FRIEDMAN:  Understood.  Thank you, your Honor.

13   Q.  Mr. Callejas, did you observe any impropriety in the way

14   the judges conducted the judicial inspections?

15            MR. MASTRO:  Objection to form, your Honor.

16   Vagueness.

17            THE COURT:  Sustained.

18            MS. FRIEDMAN:  I didn't hear the objection, your

19   Honor.

20            THE COURT:  The objection was form and vagueness.

21   What you're doing is using the term impropriety and asking for

22   the witness to adopt some unknown definition of the term and to

23   answer the question.

24            MS. FRIEDMAN:  I guess in a sense that's what we

25   always do, your Honor.

DAMLCHE1                    Callejas - cross

1          THE COURT:  Really?

2          MS. FRIEDMAN:  The term, I mean we use terms without

3    defining them when we ask questions.  So I'll try to come at it

4    a different way.

5          THE COURT:  Look, Mr. Friedman, this has been

6    occurring I think through this trial.  But regardless of

7    whether it's happened before, you have a proceeding down there.

8    There is a record of some kind.  And you, at least in this

9    case, are asking questions that are asking the witness to

10   characterize what's on pieces of paper.

11          Now, it's very simple, I think, your point here.  I

12   think your point is that he was at all or most of the judicial

13   inspections.  He either did or didn't, and the record will

14   reveal which, make some application to the court complaining

15   that something had been done at one or more of them that

16   Chevron contended was inappropriate.  Did or didn't.

17          Now, your point is, I take it, that if there are no

18   such complaints, then everything was hunky-dory and that's

19   certainly a permissible argument.  But what we're doing here

20   with this line of examination, other than things that I don't

21   think are particularly appropriate here, I don't understand.  I

22   really don't understand it.

23          MS. FRIEDMAN:  Well, I guess, your Honor, the --

24          THE COURT:  Should we call Mr. Mastro to the stand and

25   say have the defendants in this case done anything that you

DAMLCHE1                    Callejas - cross

```
 1  regard as improper?
 2            MS. FRIEDMAN:  Well.
 3            THE COURT:  I imagine that might be a long answer.
 4  And if we call Mr. Donziger and ask him the same question I'm
 5  sure it will be at least as long.
 6            MS. FRIEDMAN:  I would state it the other way, your
 7  Honor.  If we're talking about Ecuador, is the Court only going
 8  to review what's on the record or is it going to allow
 9  testimony of things that aren't on the record, for example, the
10  offer of proof you mentioned earlier this morning.  Is there
11  going to be testimony about plaintiff lawyers coming in off the
12  record and doing things that are not reflected on the record?
13  I'm asking him about things that may not be reflected on the
14  record.  They may be reflected on the record.
15            THE COURT:  So if they're reflected on the record,
16  it's a waste of time.
17            So now let's get to the next point.  What specifically
18  are you asking him?  You have his testimony.  You have his
19  testimony.  You have a pleading which I think is close to a
20  couple of hundred pages.  You have a record in this case with
21  almost 1500, no, more than 1500 filings by the parties, answers
22  to interrogatories, probably 40, 50 depositions.  You've got
23  another 30 depositions, at least, out of the 1782s.  You've got
24  a gigantic record.  And if there's something specific that you
25  want to ask him about that isn't in the record and it's
```

DAMLCHE1                    Callejas - cross

1   relevant, have at it.

2   Q.  Mr. Callejas, why did Chevron object when the judicial

3   inspections were halted?

4             MR. MASTRO:  Objection.  Work product, your Honor.

5             THE COURT:  Sustained.  You don't get to ask opposing

6   counsel in the circumstances presently before me why they took

7   various steps.

8   Q.  Mr. Callejas, would you turn to paragraph 35 of your

9   declaration, please.  You write during the judicial

10  inspections, I observed that the experts suggested by the Lago

11  Agrio plaintiffs generally used methods that did not meet the

12  requirements of the terms of reference, the sampling plan, or

13  the analysis plan.

14            Was that observation by you put into the record at any

15  place?

16            MR. MASTRO:  Objection, your Honor.  Again, the record

17  speaks for itself.

18            THE COURT:  I'm going to allow this.  This is a

19  specific question about a specific allegation.  He's entitled

20  to go into it.

21            MR. MASTRO:  Certainly, your Honor.

22  A.  We did so when we would file my client's comments to the

23  reports filed by the plaintiff nominated experts in the Lago

24  Agrio case.

25  Q.  In the next sentence you say that your team and you

1    suspected that the HAVOC laboratory did not have the analytical

2    capability or facilities to run the tests required.

3          When you refer to your team and you, are you referring

4    to you and other lawyers or some other team?

5    A.  I am referring both to the legal team and the technical

6    team that was working with us on these issues.

7    Q.  And the suspicions that you had resulted in initiating

8    separate judicial proceedings in Quito; is that correct?

9    A.  Yes.  When we were certain that the results that had been

10   obtained from that laboratory could not have been so because

11   they were not duly accredited nor did they have the necessary

12   equipment to carry out those analysis, we filed, we filed a

13   request for a judicial inspection of that laboratory.

14   Q.  For the reasons you just stated?

15   A.  Yes.  On the website of the Ecuadorian accreditation

16   institute it states that the only samples that could have been

17   tested by this laboratory were water samples to establish

18   acidity and their PH.

19   Q.  Mr. Callejas, I'd like you to look --

20          MS. FRIEDMAN:  I'm sorry, your Honor.  My notes are

21   not clear if we've introduced PX430 yet.  If not, I would ask

22   to introduce.

23          THE COURT:  Tell me what it is, please.

24          MS. FRIEDMAN:  It's the appellate decision.

25          THE COURT:  I think it's in.  Andy, is it in?

DAMLCHE1                        Callejas – cross

1             THE DEPUTY CLERK:  I'd have to check the transcripts,

2     Judge.

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAM8CHE2                    Callejas - cross

1          MR. MASTRO:  It is in, your Honor, I believe not for

2     the truth of the matters asserted.

3          MR. FRIEDMAN:  Your Honor, I would also ask the Court

4     to take judicial notice of the decision under, I think it's

5     Rule 201.

6          THE COURT:  If it's already in evidence, why do I have

7     to take judicial notice of it?

8          MR. FRIEDMAN:  There is a case called *A.I. Trade*

9     *Finance, Inc. v. Centro*, which is 926 F.Supp. 378, which -- I

10    don't need to get into it now, but essentially my reading is it

11    says that if a foreign judgment is taken judicial notice of,

12    that that is -- the word is not coming to me -- prima facie

13    evidence of the facts stated.  So I don't know that you have to

14    rule on that now, but I wanted to put the request on the

15    record.

16         MR. MASTRO:  Your Honor, we have objected and continue

17    to object to this backdoor way to argue collateral estoppel

18    without putting their name on it.  It's not admitted for the

19    truth of the matters asserted, and they are arguing collateral

20    estoppel.

21         THE COURT:  You can make a motion on papers.

22         MR. FRIEDMAN:  All right.  Thank you.

23    BY MR. FRIEDMAN:

24    Q.  Mr. Callejas, do you recognize Exhibit 430?

25         MR. FRIEDMAN:  It just occurred to me, your Honor, we

DAM8CHE2                      Callejas - cross

1    should give him the Spanish version.  I will just ask.

2    Q.  Mr. Callejas, are you familiar enough with this and is your

3    English good enough to recognize what this is?

4              MR. MASTRO:  The Spanish is attached, your Honor.

5              THE COURT:  Pardon me?

6              MR. MASTRO:  The Spanish version is attached in the

7    back.

8              MR. FRIEDMAN:  Can I have just a second?

9              May I approach the clerk, your Honor?

10             THE COURT:  Yes.

11   Q.  In case you need a hard copy, I think the Spanish one is

12   halfway in.

13             THE COURT:  Mr. Friedman, I would appreciate it you

14   would try to pick up the pace here.  You told me last night you

15   had about an hour left, and we are past the hour mark.

16             MR. FRIEDMAN:  I understand.

17   BY MR. FRIEDMAN:

18   Q.  If you could turn to Bates stamp 401 in the English, the

19   last three digits are 401 in the English version.  Does this

20   reference up at the top the position Chevron took in its appeal

21   brief about certain data not being present in the underlying

22   record of the case?

23             MR. MASTRO:  Your Honor, objection.  The document

24   speaks for itself.

25             THE COURT:  Well, the document is not in for the truth

DAM8CHE2                          Callejas - cross

1    of the matters asserted, but the appeal brief speaks for itself

2    and is the best evidence of what it said.  And so the objection

3    is sustained.  If you want to offer the appeal brief and you

4    think it's relevant, Mr. Friedman, we can deal with that.  We

5    are not going to do it this way.

6              MR. FRIEDMAN:  Your Honor, I would like to show the

7    witness DX 1353.

8    Q.  Mr. Callejas, are these pages that have been put into DX

9    1353 pages from the Lago Agrio trial court record?

10             THE COURT:  Is there a dispute about that or not, Mr.

11   Mastro?

12             MR. MASTRO:  Your Honor, there doesn't appear to be a

13   dispute about it, but it's the first time we have seen this

14   document.  It was not actually on their exhibit list.  So we

15   would have to verify it.  The notations in the top corner of

16   the page seem consistent with that, but we would have to verify

17   it.  This is the first time this has ever been disclosed to us

18   as a defendants' exhibit.  It only looks like a partial

19   document, too, your Honor.

20             THE COURT:  The first part of it, they are entitled to

21   use things on cross that were not listed previously as

22   exhibits, as are you.  So what you're telling me is it looks to

23   you like it probably is pages from something in the record.

24             So what is the question, Mr. Friedman?

25             MR. FRIEDMAN:  Maybe I could propose a stipulation and

DAM8CHE2                        Callejas - cross

```
 1   give Chevron a chance to think about it and save some time
 2   here.  The only point of moving to introduce these pages is
 3   that they correspond to the pages in this appellate opinion in
 4   which the appellate court is essentially saying, yes, the
 5   things that Chevron says were not in the prior record actually
 6   were.
 7           THE COURT:  I appreciate that.  Why don't you propose
 8   the stipulation.  If they are what you say they are, I imagine
 9   there is not going to be a problem, and if there is, you will
10   let me know.  You are going to have to put this into English
11   though because I can't read it.
12           MR. FRIEDMAN:  Let me ask the witness a few questions
13   then on this, your Honor.  I am caught in this bind that the
14   record speaks for itself, but it doesn't speak for itself.
15           THE COURT:  It is not a bind.  You can't expect me to
16   rely on Spanish language documents.  I don't speak Spanish.
17   Court proceedings are conducted in English in this country.
18           MR. FRIEDMAN:  I understand.  I will try to quickly do
19   this with Mr. Callejas.
20           THE COURT:  Yes, please.
21   BY MR. FRIEDMAN:
22   Q.  Mr. Callejas, in this page of the appellate opinion, the
23   court references several pages where data regarding alleged
24   contamination is found.  Is that a good -- well, let me stop
25   there.
```

DAM8CHE2                         Callejas – cross

1           THE COURT:  Don't characterize it, please.

2           This is not rocket science.

3           MR. FRIEDMAN:  It feels like it is.

4           THE COURT:  That's nobody's fault here.  You know, you

5    have something that you say comes from the record.  I take it

6    there will be a dispute about it.  If it supports the statement

7    in the appellate opinion, fine.  If it doesn't, fine.  My point

8    to you is only I can't read it.

9           MR. FRIEDMAN:  I understand.

10           THE COURT:  I can read the numbers.  I can't read the

11   Spanish.

12   Q.  Mr. Callejas, if you look on this page of the appellate

13   opinion where they refer to page 104909 of the record, is that

14   the first page of Exhibit 1353?

15           THE COURT:  That's like asking whether four comes

16   before five.  You have got an exhibit here.  Up in the corner

17   it's written 104909 in handwriting.  That part I can read.  OK.

18           MR. FRIEDMAN:  I have to ask that first before I go to

19   the next question.

20           THE COURT:  No.  I assume he can read it too.  He

21   seems to be a literate gentleman.

22   Q.  Mr. Callejas, let me ask you a different question.

23           Does 104909 reflect data for the Sacha field of the

24   Sacha North Central Station?

25           MR. MASTRO:  Objection, your Honor.

DAM8CHE2                         Callejas - cross

1           THE COURT:  And the objection is?

2           MR. MASTRO:  Either the document reflects that or not.

3      The document speaks for itself.

4           THE COURT:  That seems to be right.  If the document

5      is what it purports to be, it purports to have data for

6      whatever it says it has data for.

7           Now, you're asking this man to tell you whether --

8      you're asking him a question that I think is very compound.

9      Suppose for the sake of argument this is a document from the

10     record, and it's a total forgery, somebody made it all up.

11     That could be.  I am not saying it is.  I have no reason to

12     suspect that it is.  How does he know?  Do you understand?

13          We can all read what is on a piece of paper once you

14     get it translated.  I can even help you on that.  I imagine

15     that TPH means total petroleum hydrocarbons, that bario with

16     one "R" is the Spanish word for barium, that chromo is an

17     abbreviation for chromium, and so forth.

18          Could we move this on?  This is taking forever for

19     something that is unnecessary to take remotely a tiny fraction

20     of the amount of time to do.

21          MR. FRIEDMAN:  I would move into evidence DX 1353.

22          THE COURT:  You already did, and it was objected to,

23     and for the time being I sustained it, because counsel wants to

24     verify that it is what you say it is.  You offered him a

25     stipulation and an opportunity to think about it.  I take it

DAM8CHE2                         Callejas - cross

1    you're not withdrawing that offer.

2                MR. FRIEDMAN:  No, I am not.

3                THE COURT:  Could we move along?

4                MR. FRIEDMAN:  All right.

5                THE COURT:  I hate to get impatient about this.

6                MR. FRIEDMAN:  I understand what you're saying.

7                Your Honor, what I would just clarify for Mr. Mastro

8    is that there are two or three of these where the page numbers

9    are a little off, and I will talk to him about that.

10               THE COURT:  Please do.

11               I know this is difficult.  You folks have a huge

12   record.  You are relatively new to the case.  I understand all

13   of that.  Why do we have to take this time in court about this

14   kind of stuff that could be worked out in five minutes between

15   two reasonable people, and I think you are?

16   BY MR. FRIEDMAN:

17   Q.  Mr. Callejas, I would like to move on to a different

18   subject.  Yesterday you said that for some period of time

19   Mr. Borja's office was in the same building as yours, is that

20   correct?

21   A.  Yes, that's true.  That's correct.

22   Q.  And Mr. Borja's uncle owns that building?

23   A.  I don't know how many uncles Mr. Borja has.  Perhaps you

24   could tell me who you are referring to.

25   Q.  Is this referred to as the Borja Paez building?

DAM8CHE2                    Callejas – cross

```
 1   A.  Yes, it is the Borja Paez building, in which my offices
 2   were located, in which the lab was also located where Mr. Borja
 3   worked.
 4   Q.  How long was your office in that building?
 5   A.  I purchased that office in the year 1997.
 6   Q.  Is your office still in that building?
 7   A.  That's correct.  That's my personal office, and it is still
 8   in that building.
 9   Q.  Approximately how long was Mr. Borja's office in that
10   building?
11   A.  I don't recall exactly how long, perhaps several years.
12   Q.  And you told us that you would occasionally greet him in
13   the hall or elevator?
14   A.  Yes.  I said that yesterday.  That's right.
15   Q.  Have you watched or listened to the tapes of Mr. Borja
16   talking to his friend Escobar?
17           MR. MASTRO:  Objection, your Honor.
18           THE COURT:  And the objection is what?
19           MR. MASTRO:  Characterizing Escobar and tapes just as
20   a general listing.
21           THE COURT:  Be more specific, Mr. Friedman.
22   Q.  Have you watched or listened to any recordings of Mr. Borja
23   talking to a man named Escobar?
24           THE INTERPRETER:  Is it E-S-T-E-B-A-N?
25           MR. FRIEDMAN:  E-S-C-O-B-A-R.
```

DAM8CHE2                         Callejas - cross

1   A.  I have not seen nor heard the recordings that you're

2   referring to, counsel.

3   Q.  Have you seen or heard of any recordings where Mr. Borja is

4   talking about his work with Chevron?

5   A.  I have not seen nor heard any recording in which Mr. Diego

6   Borja talks about his work.

7   Q.  Have you seen or heard any tapes or recordings taken of

8   Mr. Borja in October of 2009 where he talks about forming four

9   companies to do work for Chevron?

10  A.  I have not seen nor heard the tapes that you're referring

11  to, counselor.

12  Q.  Have you heard of Mr. Borja's company Interintel G, S.A.?

13  A.  Can I see the writing of the name?

14  Q.  Yes.

15  A.  On the screen perhaps?

16  Q.  I will come back to that when we come across a page that

17  has it on it.

18  A.  Thank you.

19  Q.  Have you seen or heard tapes or seen transcripts of tapes

20  where Mr. Borja states that the Chevron labs were not

21  independent?

22          MR. MASTRO:  Objection.  Objection to form.  Compound.

23  And not knowing what the witness would answer, but it may

24  involve attorney-client or work product communications.

25          THE COURT:  Just answer yes or no, Mr. Callejas.

DAM8CHE2                         Callejas - cross

1    A.  I have no personal knowledge of the facts that you're

2    asking me about.

3    Q.  Have you seen any transcripts at all relating to Mr. Diego

4    Borja?

5            That's a bad question so let me ask it again.

6            Have you seen any transcripts of any conversations

7    Mr. Borja has had with anyone?

8    A.  I have seen parts of a transcription of a video that

9    Mr. Borja made of a meeting he held with Judge Nunez in the

10   city of Quito.  I have seen portions of that video and a

11   transcription of that portion.

12   Q.  Other than that video and transcription that you just

13   described, have you seen any transcripts of any conversations

14   Mr. Borja has had with anybody?

15   A.  Not that I recall.

16   Q.  Have you seen any videotapes of Mr. Borja other than what

17   you just described?

18           THE COURT:  He hasn't described seeing videotapes.

19   Q.  Have you seen any videotapes or heard any audiotapes of

20   Mr. Borja other than the one you just referred to with Judge

21   Nunez?

22   A.  I have not seen nor heard any other video of Mr. Borja.

23   Q.  Are you aware that Chevron helped Mr. Borja relocate to the

24   United States?

25           MR. MASTRO:  Objection, your Honor.  It gets into work

DAM8CHE2                    Callejas - cross

1   product or attorney-client privilege.

2           MR. FRIEDMAN:  I think he testified to that in his

3   deposition, your Honor.

4           THE COURT:  I don't know.

5   Q.  You told us yesterday, Mr. Callejas, that you had a

6   conversation with Mr. Borja about his videotaping of Judge

7   Nunez.  Do you remember that testimony yesterday?

8   A.  Yes.  I remember it perfectly.

9   Q.  Can you tell us how that conversation with Mr. Borja came

10  about?

11  A.  One day, on a day that I cannot remember, I received a call

12  in my office from Eduardo Borja telling me that Diego Borja

13  wished to see me and asking me if I would go up to the offices

14  there in the Borja Paez building where he works, where he rents

15  an office.

16          MR. MASTRO:  Move to strike that as hearsay.

17          THE COURT:  Overruled.  It's not offered for the

18  truth.  It's offered to set the framework as to what caused

19  them to go, I assume we are going to hear, upstairs.

20  Q.  Did you say Eduardo Borja is the one who called you?

21  A.  Yes.  Eduardo Borja called me, and he rents an office in

22  the same Borja Paez building.

23  Q.  Did you go to his office?

24  A.  Yes.  Several minutes later I went to Eduardo's offices.

25  Q.  Can you tell us who was at Eduardo's office when you got

DAM8CHE2                          Callejas – cross

1   there?

2   A.  Only Eduardo Borja and Diego Borja were there, and then I

3   arrived at that meeting.

4   Q.  Can you tell us, generally speaking, what was discussed in

5   that meeting?

6   A.  Diego mentioned to me that he had filmed a meeting that he

7   participated in in a hotel in Quito with a judge hearing the

8   Lago Agrio case at the time, Judge Juan Nunez.

9   Q.  What was your response to that information, what did you

10  say in response to hearing that?

11  A.  I asked him to tell me a bit more about how he had made

12  that recording and under what circumstances he had done so.

13  Q.  What did he tell you in that regard?

14          MR. MASTRO:  Your Honor, now we are getting into

15  hearsay.

16          MR. FRIEDMAN:  It has to do with what he did.  He was

17  told something and then he did something in response.

18          THE COURT:  So it's not offered for the truth of the

19  statements by Diego Borja, is that right?

20          MR. FRIEDMAN:  That is right.

21          THE COURT:  Mr. Mastro?

22          MR. MASTRO:  That's fine, your Honor.

23          THE COURT:  Overruled.  It's received not for the

24  truth of the matters asserted.

25  A.  Could you repeat your question, please?

DAM8CHE2                          Callejas - cross

1    Q.  I am not sure I can exactly.

2              THE COURT:  It was, what did he tell you in that

3    regard?

4    Q.  What did he tell you in regard to taping this meeting?

5    A.  By that date there were no longer judicial inspections

6    being carried out, and so Diego told me that he and a friend

7    were seeking to find a way to work in the oil industry in

8    Ecuador.  And he told me that for that reason his friend, who

9    had a company that worked in the area of environmental

10   remediation, some days earlier when he had been in Lago Agrio,

11   a person Diego knew told him that he could arrange a meeting

12   with Judge Nunez to talk about environmental remediation that

13   would be done after the judgment was issued against Chevron.

14   And he told me that two such meetings with this person and with

15   others had already taken place in Lago Agrio and in Quito, and

16   that he had also recorded those.

17   Q.  Did he offer to show you the recordings -- I'm sorry.  Let

18   me start over.

19             Did you understand at the time that these were video

20   or audio recordings?

21             THE COURT:  Sustained as to the understanding.  You

22   can ask what was said.

23   Q.  Did he tell you whether these were video or audio

24   recordings?

25   A.  He said to me that they were video with audio recordings.

DAM8CHE2                    Callejas - cross

1   I maybe misspoke or wasn't clear in my earlier answer to your

2   question.

3   Q.  Did he offer to play these recordings for you?

4   A.  No, he didn't do so, nor did I ask him to.

5   Q.  Did you take any actions as a result of the conversation

6   that you had with Mr. Borja?

7   A.  Yes, I did.

8   Q.  What did you do?

9   A.  I told Diego that I would talk to my client and sometime

10  later I would tell him what instructions I had received in this

11  regard.

12  Q.  Did you later give Mr. Borja instructions?

13  A.  I hadn't before, nor any time after that, given any

14  instructions to Mr. Borja.

15  Q.  Did you report back to Mr. Borja after this conversation?

16  A.  Yes, I did.

17  Q.  What did you tell him?

18  A.  I told him that I'd talk to my client and in the next days

19  soon thereafter somebody could be contacting him.  And that's

20  the last time that I saw Diego Borja or spoke to him.

21  Q.  That's the last time entirely that you ever seen or spoke

22  to him?

23  A.  Yes.  That's the last time that I had seen him or

24  personally spoken to him.

25  Q.  Did you report to any authorities the information that

DAM8CHE2                          Callejas - cross

1    Mr. Borja had conveyed to you?

2    A.  Yes.  We did so as soon as all of the material that

3    Mr. Borja said he had was given to my client.  I don't know if

4    I am violating a privilege.  I don't have any instruction from

5    my lawyer in this regard.

6    Q.  Did you prepare any affidavit or declaration regarding this

7    encounter with Mr. Borja?

8              MR. MASTRO:  Your Honor, now we are getting into work

9    product.

10             THE COURT:  It's a yes or no question.  Let's find out

11   the answer.

12   A.  No, I did not.

13   Q.  Now I would like to ask you some questions about Judge

14   Guerra.

15             THE COURT:  This is a good place to break.  We will

16   take a short break.

17             (Recess)

18             THE COURT:  Two things before we begin.

19             Mr. Friedman, first of all, I understand your

20   quandary, or what you're perceiving as a quandary, and it seems

21   to me vis-a-vis the record.  And let me just offer this

22   thought.  Both sides have the same problem, if it's a problem

23   with respect to that.  And I think it's not much of a problem.

24             If you or the other side contend that there is

25   something in the record, well then you can offer whatever it

DAM8CHE2                    Callejas - cross

```
 1   is, and that will or won't prove that it's in the record.  If
 2   what you're trying to prove, either one of you, is the absence
 3   of something from the record, you're each at liberty to go to
 4   the other side and say, would you agree that in lieu of putting
 5   in the whole record and translating it into English, which
 6   might take a few years, I want an agreement that it's not
 7   there, whatever it is.
 8            And if you reach an agreement, that's fine.  And if
 9   you don't, and the other side says, to whoever is seeking the
10   stipulation that something is not there, well, show me what you
11   think is there that shows that it's there, and you can agree
12   that whatever they point to is there, and it either will prove
13   or will not prove that something is not absent.  I think that's
14   a perfectly practical way of proceeding, unless somebody
15   persuades me otherwise.
16            MR. FRIEDMAN:  We will give it a try and see how it
17   works.
18            THE COURT:  My question to you then is, now that we
19   have completed this second hour of your estimated hour, how
20   much more?
21            MR. FRIEDMAN:  I didn't think about how it takes
22   longer with translators.
23            THE COURT:  You're right about that.  I understand
24   that.
25            MR. FRIEDMAN:  I think the rest of what I have will go
```

DAM8CHE2                        Callejas - cross

1   very quickly.  I will definitely be done before noon.

2            THE COURT:  Fine.

3            Let's proceed.

4   BY MR. FRIEDMAN:

5   Q.  Mr. Callejas, I forgot to ask you with regard to Mr. Borja,

6   to what authorities did you report the information that he gave

7   you?

8            MR. MASTRO:  Objection.  It assumes facts not in

9   evidence.

10            THE COURT:  I can't hear you.

11            MR. MASTRO:  Objection to form.  It assumes facts not

12   in evidence, that he gave you.

13            THE COURT:  I understand that "I object to the form"

14   just comes out.  But what is the objection to the form?

15            MR. MASTRO:  It's the use of the phrase "that he gave

16   you."

17            THE COURT:  All right.  You want to rephrase it?

18   Q.  You had a conversation with Mr. Borja in which he told you

19   various things about --

20            THE COURT:  One or more recordings.

21   Q.  -- one or more recordings, is that correct?

22   A.  That's correct.

23   Q.  I think you told us before the break that at one point you

24   reported the information Mr. Borja had given you to the

25   authorities, is that correct?

DAM8CHE2                     Callejas - cross

1    A.  Yes.  That's correct.

2    Q.  To which authorities did you report?

3    A.  I personally, as Chevron's attorney, reported this to the

4    National Judiciary Council, which is the oversight, the

5    discipline entity for the legal function in Ecuador.  And,

6    also, another attorney for Chevron reported this fact to the

7    attorney general's office of Ecuador, and also to the

8    prosecutor general's office of the state.

9    Q.  Why did you make those reports?

10             MR. MASTRO:  Objection, your Honor.  Work product,

11   attorney-client.

12             THE COURT:  Sustained.

13   Q.  I am switching topics now, Mr. Callejas, to Mr. Guerra.

14             In 2009, did you have any information that would

15   indicate that Mr. Guerra was writing orders for Judge Zambrano?

16   A.  No, I did not have that information on the date that you

17   mentioned.

18   Q.  In 2010, did you have any information indicating that

19   Mr. Guerra was writing orders for Judge Zambrano?

20   A.  I am trying to recall the year 2010, but that's a

21   little -- it's a bit difficult knowing when I had that

22   information.

23   Q.  Did you have that information before the verdict was

24   written?

25   A.  Yes.  I think it was shortly before the month of February

DAM8CHE2                          Callejas - cross

1    2011, which is when the judgment was issued with Judge

2    Zambrano's signature.

3    Q.  What information did you have indicating that Mr. Guerra

4    was writing orders for Judge Zambrano?

5    A.  I had that information based on conversations that the

6    former Judge Guerra had had with Alberto Racines from my

7    office.

8    Q.  If you would look at paragraph 63 of your declaration.  You

9    state that each lawyer in your office is obligated to report to

10   you any improper or illicit contact or solicitation of a bribe

11   from any government or judicial official.  Is that correct?

12            THE COURT:  That's what it says.  Is there a question?

13   A.  Yes.  This is how I have handled this case.  That's kind of

14   the leadership I like to establish in this case in order to

15   have them inform me of this.

16   Q.  That's just not in this case, that's how you run your

17   office always, isn't it?

18   A.  That's correct.

19   Q.  And that is because such solicitations are against the law,

20   correct?

21            MR. MASTRO:  Objection.  It calls for a legal

22   conclusion.

23            THE COURT:  Overruled.

24   A.  That is because it is both against the law, but, also, it

25   goes against the moral and ethical principles with which we

1   have always run our office.

2   Q.  I would like to hand you what we have marked as DX 99.

3          It's a little confusing because the front page says

4   Exhibit E, which you should ignore.

5          Is DX 99, the first five pages, an affidavit that you

6   wrote?

7   A.  Yes.  This is a photocopy of an affidavit that I wrote and

8   signed.

9   Q.  Then if you would turn to page 8 of this exhibit, is that

10  another affidavit that you -- a copy of another affidavit that

11  you wrote and signed?

12  A.  Correct.

13  Q.  Without describing the specific information, can you tell

14  us what has been removed or redacted from page 9?

15          MR. MASTRO:  It was redacted on privilege grounds.  So

16  we would object to him testifying to what it is.

17          MR. FRIEDMAN:  I am just trying to get the nature of

18  the privilege.

19          THE COURT:  This is a document filed in this case,

20  right?

21          MR. FRIEDMAN:  I believe so.

22          THE COURT:  So it's in the court record in full, is

23  that right, Mr. Mastro?

24          MR. MASTRO:  Absolutely, your Honor.

25          THE COURT:  And the basis for the privilege claim, Mr.

DAM8CHE2                    Callejas - cross

1    Mastro, is what?

2              MR. MASTRO:  It involved attorney-client

3    communication.

4              THE COURT:  Let's move on.

5    Q.  Mr. Callejas, is it accurate that in the summer of 2009,

6    you learned that Dr. Guerra had approached a member of your

7    legal team about causing a favorable outcome in this case, in

8    the Chevron case?

9    A.  What I recall from that conversation between Alberto

10   Racines from my office and former Judge Guerra is that he said

11   that the judgment in the Lago Agrio case was about to be

12   issued, and he would like to talk to him about that.

13   Q.  Did he also communicate, as you understood it, that the

14   case could be decided in favor of Chevron for a price?

15   A.  Alberto told me that's what he inferred from his

16   conversation with former Judge Guerra.

17   Q.  Did you report this information to the authorities at the

18   time?

19   A.  At that time, even the attorney for the Lago Agrio

20   plaintiffs, Pablo Fajardo, was saying that the judgment would

21   be issued soon, and he would say that often in the press.  So

22   that the only thing that I was informed about was what Alberto

23   Guerra told Mr. Racines.

24   Q.  Didn't you understand that Dr. Guerra was offering to fix

25   the case for a price?

DAM8CHE2                      Callejas - cross

1    A.  In that first meeting, according from what Alberto told me,

2    they only discussed that the judgment was about to be issued,

3    not that he could fix the case.

4    Q.  If I could refer you to Defendants' Exhibit 99, paragraph

5    2.

6              MR. FRIEDMAN:  I move for admission of Exhibit 99.

7              THE COURT:  Mr. Mastro.

8              MR. MASTRO:  No objection, your Honor.

9              THE COURT:  99 is received.

10             (Defendants' Exhibit 99 received in evidence)

11   Q.  Mr. Callejas, if you go to the section about four lines

12   from the top -- I'm sorry, from the bottom, it says,

13   Dr. Racines told me he understood this to be an overture by

14   Dr. Guerra to influence the outcome of the Aquinda case in

15   Chevron's favor for a price.

16             Does that refresh your recollection as to what you

17   understood at the time?

18             MR. MASTRO:  Objection, your Honor.

19             THE COURT:  Sustained as to form.  He didn't profess

20   any lack of recollection.

21   Q.  Is that an accurate statement as to your understanding at

22   the time?

23   A.  From the way it appears on the fourth line from the bottom

24   of page 2, it states that Alberto Racines understood that

25   that's what it was, that it could be fixed for a price, not

DAM8CHE2                        Callejas - cross

1   that I understood.

2   Q.  Would you agree that this is an improper solicitation?

3          MR. MASTRO:  Objection, your Honor.

4          THE COURT:  Look, Mr. Friedman, what it actually says

5   is that Mr. Racines told the witness that Guerra told Racines

6   that the decision would come soon, and he wanted to discuss it,

7   period, full stop.  Racines then said that he, Racines,

8   understood that to be an overture to influence the outcome for

9   a price.

10          Your question in that context is making assumptions

11   that may be entirely correct, but they are assumptions, and

12   they are a couple of steps removed.  This is an important area

13   of inquiry and an appropriate one, but please try and ask

14   questions that are specific and consistent with what is before

15   us.  It will go a lot easier.

16   Q.  Did Dr. Racines work for you?

17          THE COURT:  We already know that.  Can we move along?

18   Q.  Did you instruct Dr. Racines to report this to the

19   authorities?

20   A.  No, I did not.

21   Q.  Did you start any investigation of this overture?

22          MR. MASTRO:  Your Honor, we are getting into work

23   product and privilege.

24          THE COURT:  Answer it yes or no, sir.

25   A.  I did no investigation of the issue.

DAM8CHE2                     Callejas - cross

1    Q.  Again, in October, did Mr. Racines tell you that he had

2    received another contact from Dr. Guerra?

3    A.  Yes.  He informed me that he had received a telephone call

4    from former Judge Guerra.

5    Q.  Did he inform you that Judge Guerra offered to serve as an

6    intermediary in communicating with Judge Zambrano?

7    A.  Yes, that's what Alberto Racines informed me.

8    Q.  Did he inform you that Dr. Guerra was offering to correct

9    errors that had or -- let me start over.

10            Did he inform you that he could communicate with Judge

11   Zambrano and arrange for the correcting of errors that former

12   Judge Juan Nunez had committed?

13            MR. MASTRO:  Objection to form.  That he informed you

14   that he could communicate.  There's two different he's.

15            THE COURT:  Yes.

16            MR. FRIEDMAN:  I will rephrase it.

17   Q.  Let me just ask you this, Mr. Callejas.  Were you informed

18   by Dr. Racines that Dr. Guerra was offering to fix the entire

19   case due to his influence with Judge Zambrano?

20            THE COURT:  Don't you want to break that question up,

21   Mr. Friedman, really?  Your "due to his influence" limits the

22   breadth of the question.  From your own perspective, don't you

23   want to break it up?

24            MR. FRIEDMAN:  I will break it up.

25            (Continued on next page)

DAMLCHE3                    Callejas – cross

1   BY MS. FRIEDMAN:

2   Q.  Did Dr. Racines communicate to you that Dr. Guerra was

3   offering to fix the case?

4   A.  Yes, he did.

5   Q.  And did he communicate that Dr. Guerra was saying he could

6   fix the entire case because of his influence with Judge

7   Zambrano?

8   A.  No, no, he didn't mention to me how he could do it.  From

9   what Alberto told me, he, Guerra, told him that he could

10  correct the mistakes that had been committed by Judge

11  Zambrano's predecessors.

12  Q.  And he was also offering to fix the entire case; is that

13  correct?

14          MR. MASTRO:  Objection, asked and answered.

15          THE COURT:  Racines told him.

16  Q.  Let me ask a different question.

17          Did Racines tell you that Dr. Guerra offered to fix

18  the entire case?

19          MR. MASTRO:  Objection, asked and answered.

20          THE COURT:  Of course I'm going to allow this, just

21  like I allowed it the last two or three times, but it's the

22  last time.

23  A.  Yes, I repeat it, yes, he did say it to me.

24  Q.  Did you report this overture from Dr. Guerra to any

25  authorities?

DAMLCHE3                    Callejas - cross

1    A.  I'd like you to specify what time period your question

2    refers to.

3    Q.  Within a month or two of receiving this overture from

4    Dr. Guerra.

5    A.  During the ten years that the case has been pending in

6    Ecuador, we have received multiple offers of miraculous

7    arrangements to solve the case, to resolve the case from many

8    different sources.  So in this case, this was one more of the

9    many offers that we received and I did not report this.

10   Q.  Did you report --

11   A.  I did not report this offer to fix the case.

12   Q.  Did you report any of the offers you received over the

13   years to fix the case to the authorities?

14            MR. MASTRO:  Your Honor, I object to the form.

15            THE COURT:  Sustained.

16            What he said was miraculous arrangements to resolve

17   the case.  He didn't say there were other offers to fix it.

18   Now, for all I know it was voodoo.  I mean I don't have any

19   idea.

20   Q.  Did you report any of the miraculous offers you received

21   over the years with regard to the case?

22            MR. MASTRO:  Objection to form, your Honor.

23            THE COURT:  Overruled.

24   A.  At least in Ecuador, there are constantly lawyers that

25   contact other lawyers to offer to make arrangements to resolve

1     the situation in a case.  So there was nothing to report.  This

2     was just another offer to fix a case.

3     Q.  Would you look at paragraph 6 of Exhibit 99, please, it's

4     on page 4.

5            Did you believe that what you are reporting here in

6     paragraph 6 was another miraculous offer as you've used the

7     term?

8     A.  No.  This was a concrete offer that we participate in the

9     preparation of the judgment, something that is illegal.

10    Q.  Did you report this to the authorities at the time?

11    A.  This offer was made by someone who was not the judge on the

12    case but rather a former judge.

13           THE COURT:  Did you report.

14    A.  And for that reason, I did not report it to the authorities

15    at the time.

16    Q.  In mid-October did you also receive a call from someone who

17    said that she could arrange a meeting with you and Judge

18    Zambrano?

19    A.  Yes.  In early October, in the first part of October 2009,

20    I did receive a phone call from someone who told me that, like

21    you say, she could arrange a meeting with Judge Zambrano.

22    Q.  Did you report that information to the authorities?

23    A.  I did not.  And if the Court would allow me, I'd like to

24    explain the reasons why I did not.

25           THE COURT:  Your lawyer can ask you on redirect unless

DAMLCHE3                    Callejas - cross

1    Mr. Friedman asks you.

2              MS. FRIEDMAN:  I'll ask, your Honor.

3    Q.  Yes.  Please tell us why not.

4    A.  I was very mindful of what had happened when we had filed a

5    report regarding the illegal activities of Judge Juan Nunez.

6    Not only was Judge Nunez not sanctioned in spite of the fact

7    that he acted as a judge in a case in which that was not

8    proper, but he is today still the president of the provincial

9    court of Sucumbios Province, something that I consider to be a

10   shame for the Ecuadorian judiciary.

11             Instead of having Judge Nunez investigated, somehow

12   the plaintiffs managed to have an investigation done of me and

13   of Dr. Rodrigo Perez, as if we had somehow had something to do

14   with those facts.

15             And also there was no recording of the phone call.  So

16   the only thing that I would have been able to report to the

17   authorities was that I had received a phone call, and the other

18   person could have said that never happened.  And the

19   possibility was there that I be charged with having or that I

20   be accused of having infringed on their honor and reputation.

21             I was also aware or mindful of the efforts that for

22   several years the plaintiffs in the Lago Agrio case had caused

23   to happen for the prosecutor to bring sham charges against my

24   colleagues, lawyers Ricardo Veiga and Rodrigo Perez, efforts

25   which culminated in 2010 and which the plaintiffs from their

DAMLCHE3                    Callejas - cross

1    own internal correspondence or communications sought to hide

2    the fact that they had been involved in those charges being

3    brought.

4            MS. FRIEDMAN:  Your Honor, I'll move to strike the

5    last part of the answer as being unresponsive, also as hearsay

6    and also as dealing with a topic that the Court has ruled out

7    of the case.

8            MR. MASTRO:  Your Honor, I think except as to the part

9    where the witness refers to plaintiff's own internal

10   correspondence or communications, everything else was his

11   contemporaneous thinking about why he acted the way he did that

12   Mr. Friedman elicited from the witness.  He elicited this

13   testimony why he did or didn't take a certain action.  The

14   witness has explained exactly why based on what was happening

15   contemporaneously at the time.

16           The only part of the answer that may or may not be

17   contemporaneous is the part about the at the very end about

18   internal work product.  Even that may have been contemporaneous

19   based on the discovery that was occurring in 2010.

20           THE COURT:  Mr. Friedman.

21           MS. FRIEDMAN:  Your Honor, I think it does go to his

22   state of mind and I did elicit that.  If the Court will limit

23   its consideration to this as going to his state of mind and not

24   for the truth of anything that's said, I don't have a problem

25   with that.

1          THE COURT:  I don't think we really have any

2     disagreement.  You asked him why he didn't report it and he

3     told you.  And I think it's quite likely that the last tag line

4     on his answer about internal communications postdates his

5     contemporaneous understanding.  And to the extent that that's

6     true, I'm certainly not going to consider it as explaining why

7     he did or didn't do things several years ago.  As to the rest

8     of it, it just goes to why he didn't report it.  So I think we

9     agree.

10          MS. FRIEDMAN:  Thank you, your Honor.

11          Your Honor, I'd like to hand the witness what's been

12     marked as DX101.

13     Q.  Mr. Callejas, you not only didn't -- let me start over.

14          Mr. Callejas, is this an agreement you entered into

15     with Chevron to keep the overtures regarding fixing the case

16     confidential and private?

17          THE COURT:  Well, you built into the question the

18     content of the document.  I have no doubt that the content of

19     the document will be admitted, at least that's my assumption.

20     The unfortunate part of it is that I don't believe you've built

21     it in accurately.

22          MS. FRIEDMAN:  I'll just ask this.

23          THE COURT:  Why don't we take it one step at a time.

24     Q.  Mr. Callejas.

25          MR. MASTRO:  Your Honor, there's also a question of

DAMLCHE3                    Callejas - cross

```
 1   the confidential designation on the document.
 2              THE COURT:  Well, let's deal with one step at a time.
 3   Let's see if it's coming into evidence, as I imagine it will.
 4   Q.  Mr. Callejas, did you sign this agreement with Chevron
 5   corporation on or about October 16 of 2009?
 6   A.  First thing I'd like to refer to the fact that you made
 7   mention of earlier that this document references overtures to
 8   fix the case.  That's not true.  By the time of this date, we
 9   had only heard that the judgment was soon to be issued by Judge
10   Zambrano.
11   Q.  Mr. Callejas is this an agreement --
12   A.  And, yes, I did sign this document on the 16th of October
13   of 2009.
14              MS. FRIEDMAN:  And, your Honor, I'd move for admission
15   of DX101.
16              THE COURT:  Any reason why it shouldn't be admitted?
17              MR. MASTRO:  None, your Honor.
18              THE COURT:  It's received.
19              (Defendant's Exhibit 101 received in evidence)
20   Q.  And you and Mr. Racines also signed declarations relating
21   to the overtures you'd received; is that correct?
22   A.  That is true, yes.
23   Q.  Who is it that signed this agreement for Chevron
24   corporation?
25   A.  This agreement was signed by Mr. Ricardo Veiga.
```

DAMLCHE3                    Callejas - cross

```
 1   Q.  Did you sign other declarations about offers to fix the
 2   case during the time you handled the Lago Agrio case?
 3              MR. MASTRO:  Objection to form and mischaracterizes
 4   the prior testimony.
 5              THE COURT:  Sustained.  Try again, Mr. Friedman,
 6   please.
 7   Q.  Mr. Callejas, in this document there is reference to you
 8   signing declarations about overtures that were made.
 9              THE COURT:  There really isn't any need for you to try
10   to rephrase what the agreement is about in your question.
11              MS. FRIEDMAN:  I think that's right, your Honor.  I'll
12   move on.
13   Q.  Were there any other agreements to keep -- I'm sorry.  Let
14   me start over.
15              Did you enter into any agreements besides this one to
16   keep Mr. Guerra's overtures confidential?
17              MR. MASTRO:  Objection, your Honor.
18              THE COURT:  Sustained.  This agreement is an agreement
19   by Chevron to keep confidential the declarations the witness
20   and Mr. Racines signed, not an agreement by them to keep
21   anything confidential.  I take it you don't disagree with my --
22              MS. FRIEDMAN:  I'm just going to come at it a
23   different way, your Honor.
24   Q.  I'd like to hand the witness Exhibit 102, DX102.
25              Is this a authorization that you and Mr. Racines
```

DAMLCHE3                          Callejas - cross

1   signed on or about December 7th of 2012?

2   A.  Yes, it is, counsel.

3   Q.  If you look at the third paragraph of the document --

4              THE COURT:  Are you offering it?

5              MS. FRIEDMAN:  I could.  Sure.  I'll offer DX102.

6              THE COURT:  I'm not trying to force you to do

7   anything.

8              MR. MASTRO:  No objection, your Honor.

9              THE COURT:  Are you offering it?

10             MS. FRIEDMAN:  I was not planning to offer it.

11             MR. MASTRO:  Your Honor, I think if he's going to

12  question on the content of the document, it should be received.

13             MS. FRIEDMAN:  That's fine.  I'll offer the document,

14  your Honor.

15             THE COURT:  Received.

16             (Defendant's Exhibit 102 received in evidence)

17  Q.  Third paragraph, Mr. Callejas, there is reference to you

18  and Mr. Racines stating that Chevron corporation may now use

19  and otherwise disclose the October 16, 2009 Callejas

20  declaration, the October 16, 2009 Racines declaration, as well

21  as any other declarations they've signed at the request of

22  Chevron corporation.

23             Do you see that?

24             THE COURT:  I'm sure he sees it.  Next question.

25  Q.  Can you tell us what other declarations you signed at the

DAMLCHE3                    Callejas - cross

1  request of Chevron corporation that were subject to

2  restrictions regarding confidentiality?

3          THE COURT:  If any.

4  Q.  If any.

5  A.  Under the oath that I have taken I can state to you that I

6  have not signed any other declaration that was treated as

7  confidential by the Chevron corporation.

8  Q.  I want to ask you about the section of your witness

9  declaration that begins at paragraph 73.

10          THE COURT:  Plaintiff's 4300.

11  Q.  Mr. Callejas, if you look at paragraph 74, you talk about

12  different judges being substituted on and off the appellate

13  panel.

14          Did some of those judges take themself off the panel

15  because they had been involved in the case at the trial level?

16  A.  No, they did not.

17  Q.  You reference that there were two changes in the panel

18  composition affected by lottery.  That is the process by which

19  appellate judges are ordinarily replaced if a judge is unable

20  to serve for one reason or another.

21          Is that true?

22  A.  In effect, that is what the law provides, that it must be

23  through a rotation -- through a public lottery system that is

24  provided under the general rules governing judicial function.

25  Q.  Do you have personal knowledge of how those lotteries were

DAMLCHE3                      Callejas - cross

1    held in this case?

2            THE COURT:  If they were held.

3    Q.  If they were held.

4    A.  The so-called lotteries were done without the parties'

5    participation and presided over by Judge Zambrano, whose

6    judgment or whose ruling was to be reviewed by those same

7    judges.

8    Q.  In paragraph 75 you say that Chevron had the right to be

9    present at the lottery.

10           Can you point us to a statute or law that says that?

11           THE COURT:  Look, I'm going to take the answer but you

12   understand that starting in 2011, I more than once told the

13   parties that if they intended to rely on any provision of

14   foreign law, they were to identify it and provide the Court

15   with substantiation and the materials necessary for me to

16   decide what the law is.  I know you are aware under Rule 44 the

17   determination of issues of foreign law is a question of law for

18   the judge.  It is not a matter of fact to be proved through

19   evidence.

20           Nonetheless, I'll allow the witness to answer for

21   whatever it's worth.

22           MS. FRIEDMAN:  Thank you, your Honor.

23           THE COURT:  And I said Rule 44.  I meant 44.1.

24           THE WITNESS:  Please, counsel, could you repeat your

25   question.

DAMLCHE3                    Callejas - cross

1   Q.  Yes.  I'm referring to paragraph 75 of your witness

2   statement, and about halfway through you say that Chevron had

3   the right to be present at the lotteries.  I'm asking whether

4   you can point us to a statute or a law that gave the parties

5   the right to be present.

6   A.  Yes.  The constitution of the Republic of Ecuador

7   establishes in Article 76, if I'm not mistaken, that all

8   judicial proceedings must be public.  And what proceeding, what

9   judicial proceeding could be more important than the proceeding

10  in which judges are designated to hear a case.

11          However, in this case all we received was a

12  notification that the lottery had been held under the

13  president -- under the presidency of the court of Judge

14  Zambrano and that was signed, that ruling was signed by Judge

15  Zambrano himself.

16  Q.  I want to change subjects now and ask if you would turn to

17  paragraph 85 of your declaration.

18          THE COURT:  Excuse me, just before you do, does either

19  side intend to offer this notice or any other court record on

20  this point?

21          MS. FRIEDMAN:  It was the lottery you're talking

22  about?

23          THE COURT:  The fact that it was under Judge Zambrano.

24          MS. FRIEDMAN:  They've been marked in the deposition

25  we took in the last few days.

DAMLCHE3                     Callejas – cross

```
 1              THE COURT:  Is it on anybody's exhibit list?
 2              MS. FRIEDMAN:  Yes.
 3              MR. MASTRO:  We'll make sure to add it to ours, your
 4   Honor, to the extent anything relevant isn't on it.
 5              THE COURT:  All right.  Let's go on.
 6   Q.  If we could go to paragraph 85 of your declaration,
 7   Mr. Callejas, has Chevron ever done business in Ecuador?
 8   A.  As far as I know, Chevron has had businesses in Ecuador.
 9   Q.  Does it have any property in Ecuador?
10   A.  As far as I know, Chevron has no real estate properties in
11   Ecuador.
12   Q.  And is Chevron IP a corporation separate from Chevron?
13              MR. MASTRO:  Objection, your Honor.  Calls for a legal
14   conclusion.
15              MS. FRIEDMAN:  I don't know, your Honor.  This is --
16              THE COURT:  This is relevant because?
17              MS. FRIEDMAN:  I don't know.  I asked you to strike
18   this.
19              THE COURT:  We're on what paragraph?
20              MS. FRIEDMAN:  We're on 84 through 86, your Honor.
21   Kind of the embargo, the intellectual property material.
22              I just looked, your Honor.  I did not ask you to
23   strike this.
24              MR. MASTRO:  Did not ask to strike it.  And I can
25   explain why it's relevant.  It does speak for itself why it's
```

DAMLCHE3                    Callejas - cross

1    relevant, your Honor.

2              THE COURT:  You're going to tell me it's relevant to

3    this unjust enrichment claim you'd like to put back in the

4    case; is that right?

5              MR. MASTRO:  Absolutely, your Honor.

6              THE COURT:  If and when it comes back in the case,

7    we'll worry about it.

8              MR. MASTRO:  Thank, your Honor.  It also goes to the

9    fact that Chevron has been harmed by the Ecuadorian judgment --

10             THE COURT:  The existence of which is a matter of

11   public record.

12             Could we go on, as we move into hour four of the

13   one-hour cross-examination.

14             MS. FRIEDMAN:  Your Honor, could I ask, what I need to

15   know is if we're trying an unjust enrichment case.

16             THE COURT:  You'll find out in due course.

17             MS. FRIEDMAN:  All right.  Then I'd like to ask that

18   84 through 86 be stricken.

19             THE COURT:  Take it under consideration.  Move on,

20   please.

21             MS. FRIEDMAN:  Am I allowed to ask questions about 84

22   to 86?

23             THE COURT:  Not now.

24             MR. GOMEZ:  Your Honor, may I be heard?

25             THE COURT:  Yes.

DAMLCHE3                    Callejas - cross

1           MR. GOMEZ:  The problem with reserving a ruling on

2    this, your Honor, is that once the witness leaves and your

3    Honor decides to keep 84 through 86 --

4           THE COURT:  You're making an assumption.

5           MR. GOMEZ:  -- there's no way to do that.

6           THE COURT:  That's not true at all.  If I tell him to

7    come back, you can be sure he'll be back.

8           MR. MASTRO:  He will be, your Honor.

9    BY MS. FRIEDMAN:

10   Q.  If you would turn to paragraph 99 of your witness

11   statement, Mr. Callejas.

12          Can you tell us for what purpose you put in this

13   reference to the Catholic church in your witness statement?

14   A.  I am somebody who professes a Catholic faith and I believe

15   that the church should not be involved in a case such as Lago

16   Agrio case and much less in the case that is being heard in

17   Judge Kaplan's courtroom.

18          MS. FRIEDMAN:  Your Honor, could I ask to strike 99?

19          THE COURT:  Just move on.

20          MS. FRIEDMAN:  All right.

21          Your Honor, I just want to be sure that the appellate

22   decision PX430 and appellate clarification PX431 had been moved

23   and admitted into evidence.

24          MR. MASTRO:  No objection as long as not for the truth

25   of the matters asserted.

DAMLCHE3                    Callejas - cross

1          THE COURT:  If they're not in previously, and I think

2   at least one and probably both are, they are now and not for

3   the truth of the matters asserted.

4          (Plaintiff's Exhibit 430, 431 received in evidence)

5          MS. FRIEDMAN:  That's all the questions I have, your

6   Honor.  Thank you.

7          THE COURT:  All right.  Thank you.

8          Now, Mr. Gomez, you are still talking about two hours?

9          MR. GOMEZ:  Well, your Honor, I don't want to commit.

10         THE COURT:  Well, yeah, I can see that at this point.

11         MR. GOMEZ:  At this point I think we should just get

12  started, but I think I will exceed the two-hour mark.  I think

13  there are a lot of questions raised by his testimony that we've

14  heard so far this morning and I'd like to probe those areas

15  adequately.

16         THE COURT:  We're going to break for lunch until

17  2 o'clock at this point.  And I suggest you review your notes

18  carefully, Mr. Gomez, because I consider a great deal of the

19  time taken this morning has been unproductive.

20         (Luncheon recess)

21

22

23

24

25

DAM8CHE4                          Callejas – cross

                            AFTERNOON SESSION

                                2:00 p.m.

          THE COURT:  Before we resume, this is not a ruling.  I

will make a ruling in due course.  But I think counsel should

assume that the unjust enrichment issue is not coming back into

this case, at least at this point, that is to say during this

trial.

          Mr. Gomez.

          MR. GOMEZ:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. GOMEZ:

Q.  Good afternoon, Dr. Callejas.

A.  How are you, counsel Gomez?

Q.  Good.  Thanks.

          Dr. Callejas, you are personally paid $33,000 a month

to represent Chevron, are you not?

          MR. MASTRO:  Objection.  This was confidential in his

deposition, and we alerted defense counsel of this before, his

compensation levels.  So I am surprised to see this question

come in.

          THE COURT:  It's appropriate cross-examination.

          THE WITNESS:  May I answer it?

          THE COURT:  Yes.

A.  Yes, sir, that's correct.

Q.  Is it fair to say that in some months you received at least

DAM8CHE4                          Callejas - cross

1   90 percent of your income from Chevron?

2   A.  I believe I had stated this to you in the deposition in May

3   that I had not calculated the percentage, but that the amount

4   would fluctuate in certain months.

5   Q.  Is it correct that in some months you earn as much as 90

6   percent of your income from Chevron?

7   A.  Once again, I have not calculated it, but I am assuming

8   that it could be; I assume that it could be.

9   Q.  Each of your associates earns, approximately, between 10

10  and $15,000 per month to represent Chevron, isn't that correct?

11  A.  The attorneys who work with me receive an amount that is

12  between the range that you have stated, yes.

13  Q.  In fact, the Lago Agrio litigation has been the most

14  lucrative case in your law practice, isn't that correct, sir?

15  A.  I can tell you that more than 80 percent of my estate was

16  acquired before 2003 during my more than 30 years of

17  professional experience.

18  Q.  Since 2003, has the Lago Agrio litigation been the most

19  lucrative case in your law practice, sir?

20  A.  It has been a lucrative case, yes.

21  Q.  I didn't hear that.

22  A.  It has been a lucrative case, yes.

23  Q.  Has it been the most lucrative case in your law practice,

24  sir, yes or no?

25  A.  As an individual case, yes, it has been.

DAM8CHE4                    Callejas - cross

```
 1   Q.  Can you estimate the total amount of fees that you, sir,
 2   have been paid to represent Chevron since the lawsuit was filed
 3   in 2003?
 4            MR. MASTRO:  Your Honor, there is an objection, and it
 5   relates to the confidentiality that the witness has asked us to
 6   claim with regard to this information.  It's not that the Court
 7   shouldn't hear this information; it's the confidentiality of
 8   it.
 9            THE COURT:  The point of the examination is that this
10   case has been financially very important to the witness, and
11   thus, gives him arguably an interest in the outcome.  I have
12   the point.  I think you have established it.  Now let's move
13   on.
14            MR. MASTRO:  Thank you, your Honor.
15   Q.  Dr. Callejas, I would like to refer your attention to your
16   direct written testimony, Exhibit 4300.  Do you have it in
17   front of you?
18   A.  I have it here now, yes.
19   Q.  Sir, how did you prepare your written testimony?
20   A.  During several weeks I have met with attorneys from Chevron
21   to whom I have related various experiences that I had as the
22   lead attorney handling the Maria Aquinda lawsuit in the
23   Provincial Court of Justice of Sucumbios in the Republic of
24   Ecuador.
25   Q.  Please estimate for me how many --
```

DAM8CHE4                        Callejas - cross

1    A.  I have not finished.

2             THE COURT:  He is not finished.

3    Q.  I'm sorry.

4    A.  As a result of that information, we were preparing the

5    document that I ended up signing in the city on October 9th of

6    2013.

7    Q.  How many weeks did you spend working on this written direct

8    testimony as you have described?

9    A.  I recall having come to the United States on at least three

10   occasions to do so.

11   Q.  What was the date of the first occasion?

12   A.  It must have been at the beginning of the month of

13   September of 2013.  I don't recall the exact date.

14   Q.  When was the second occasion, approximately?

15   A.  The second occasion must have been toward the end of

16   September of 2013.

17   Q.  When was the third occasion, approximately?

18   A.  The third occasion was last week.

19   Q.  How many total days did you work on your written

20   declaration on or about September 1, 2013?

21             THE COURT:  Are you asking how many 24-hour

22   consecutive periods he worked on it, or are you asking him on

23   how many different days he did something on it, or something

24   else?

25             MR. GOMEZ:  The latter.  Thank you.

DAM8CHE4                    Callejas - cross

1    Q.  Dr. Callejas, on how many different days did you work on

2    your written declaration on or about September 1, 2013?

3    A.  I worked on that subject, it must have been 10 or 12 days.

4    Q.  How many days did you work on your written declaration on

5    or about the end of September 2013?

6    A.  It seems to me that towards the end of September it was

7    four days.

8    Q.  On the third occasion, on how many different days did you

9    work on your written declaration, sir?

10   A.  I told you before there was a third occasion, it was last

11   week.  But prior to that, there was another occasion, it was

12   towards the beginning of October, and on that occasion, I

13   worked on the declaration on five consecutive days.

14   Q.  You testified that you related diverse experiences to other

15   attorneys as the initial step towards preparing your written

16   direct testimony.  Did you dictate this material to attorneys,

17   is that how it worked?

18   A.  I don't know if I may be revealing privileged information,

19   but at the beginning in September, I was not dictating

20   information, but I was being prepared for testimony; I was not

21   dictating, but telling them what was happening based on

22   questions they were asking me.

23   Q.  Dr. Callejas, did you yourself draft the language in

24   Exhibit 4300?

25   A.  Many of the words that appear there are words that I said

DAM8CHE4                    Callejas - cross

1   during our meetings during the months of September and October

2   of 2013.

3   Q.  Who reduced your words into writing, you or someone else?

4   A.  I am not someone who can write competently on a computer so

5   it was somebody else who did it for me.

6   Q.  Who?

7   A.  I have no personal knowledge regarding that.

8   Q.  Do you know if the person was an attorney or not an

9   attorney?

10   A.  I don't have personal knowledge regarding that.

11   Q.  Who gave you a written draft of Exhibit 4300, sir?

12   A.  Could you please repeat it?

13   Q.  Who gave you a written draft of Exhibit 4300, sir?

14   A.  It was always provided to me by an attorney who was working

15   with me, first in preparing my testimony and then also in

16   preparing my affidavit.

17   Q.  What is the name of that attorney?

18   A.  His name is Robert Blume.

19   Q.  Once you were provided with a draft of Exhibit 4300, did

20   you review it?

21   A.  I reviewed not only the draft, but also the contents of the

22   English document alongside an interpreter who always worked

23   with me the whole time.

24   Q.  So the initial draft that you reviewed was in English,

25   correct?

DAM8CHE4                        Callejas - cross

1    A.  That's correct.

2    Q.  You were never provided a Spanish written translation of

3    Exhibit 4300 or any of its draft, is that correct?

4    A.  As I stated in my statement, I feel rather comfortable

5    reading the English language, and therefore I didn't feel it

6    was necessary to put it down in the Spanish language.

7    Q.  Nevertheless, you relied on a translator to translate the

8    English written version of Exhibit 4300 for you to understand

9    it, isn't that correct?

10   A.  Yes.  I wanted to make sure that I knew the meaning of each

11   word, because sometimes when I read the English language, there

12   are certain words whose meaning I do not know, and sometimes I

13   have to use a dictionary.  Also, I didn't want to assume the

14   general meaning of any word that's in the document.  In order

15   to avoid that, I wanted to know the meaning of the words.

16   Q.  How did you do that?

17   A.  As I told you earlier, that was done through a translator,

18   and also with using one of the attorneys who works with me who

19   speak both English and Spanish.

20   Q.  Did you mark up the initial draft in English that you

21   reviewed?

22   A.  We reviewed the document paragraph by paragraph.  As it

23   became necessary, I would ask questions.  We would add things

24   or delete things that it being necessary for me to make any

25   markings on the draft.

DAM8CHE4                    Callejas - cross

1    Q.  Who was responsible for revising the document according to

2    your edits?

3    A.  I don't have personal knowledge about that, but I always

4    worked with attorney Blume, who I mentioned, regarding this.

5    Q.  Did you review Exhibit 4300 after you had asked for changes

6    to be made to it?

7    A.  Of course, yes.  Whenever there was a change made, I asked

8    to review the text to make sure that it was the words as I

9    defined them for this statement.

10            THE COURT:  Mr. Gomez, are you near the end of this

11   line of examination?

12            MR. GOMEZ:  Yes.

13            THE COURT:  How close are you?

14            MR. GOMEZ:  I am done, your Honor.

15            THE COURT:  Thank you.

16   Q.  Let's go through your testimony in more detail, sir.

17            Dr. Callejas, I would like to direct your attention to

18   paragraph 22 of your written testimony.

19   A.  22 you said?

20   Q.  Yes.  Paragraph 22.

21            According to your written testimony, you state, "At no

22   time did I or any member of my team provide documents or

23   evidence to a judge presiding over the Lago Agrio litigation

24   outside the procedures set forth by law."

25   A.  That's correct.  That's what the first sentence of the

DAM8CHE4                        Callejas - cross

1    paragraph states.

2    Q.  My question to you, sir, is, what procedure are you

3    referring to in that statement?

4    A.  I am referring to the fact that, according to Ecuadorian

5    law, any party who may want to submit a document to be included

6    in the record must file a motion before the judge who must rule

7    on whether or not the document will be incorporated into the

8    record.  Or, also, during judicial inspections, the parties

9    were authorized to read or to use certain documents, which

10   would then be submitted to the judge, and he later, through a

11   written order, would annex them to the record.

12   Q.  You attended many of the judicial inspections, correct?

13   A.  Yes.  That's correct.

14   Q.  During those judicial inspections, were there occasions

15   when you would read from documents to the judge, as you have

16   described was the procedure?

17   A.  They allowed the parties to read or use documents

18   pertaining to the site that is being inspected, and those would

19   later be turned over to the judge in order for the judge to

20   attach them to the record.  And I did that during several

21   judicial inspections.

22   Q.  Did you observe the plaintiffs' attorneys also do the same

23   thing during the judicial inspections that you attended?

24   A.  Yes.  I did see that on the inspections when I attended,

25   and if they submitted those documents to the judge, those

DAM8CHE4                    Callejas - cross

1   should have been specifically identified in the record after

2   the judge received those documents and issued an order annexing

3   them to the record.

4   Q.  Did you observe the plaintiffs' attorneys giving documents

5   to judges overseeing the judicial inspections in the Lago Agrio

6   case?

7   A.  I observed on occasions they gave the judge aerial

8   photographs of the site that was being inspected.

9   Q.  Did you ever see the plaintiffs' attorneys give judges at

10  judicial inspections briefs or legal arguments?

11          THE COURT:  You are referring to documents, is that

12  right?

13          MR. GOMEZ:  Yes.

14          MR. MASTRO:  Objection to form.  It's compound.  And

15  he has already answered the question about what he saw at

16  judicial inspections.

17          THE COURT:  I will sustain it as to form.

18  Q.  Dr. Callejas, did you observe during judicial inspections

19  the plaintiffs' attorneys give documents to judges presiding

20  over those inspections which contained legal arguments?

21          MR. MASTRO:  Objection.  Asked and answered.

22          THE COURT:  I think the question is better put this

23  way.

24          Dr. Callejas, did you ever see the plaintiffs' lawyers

25  at a judicial inspection hand to the judge any documents other

DAM8CHE4                     Callejas - cross

1   than aerial photographs?

2           THE WITNESS:  I don't recall specifically that that

3   may have happened.

4   Q.  Dr. Callejas, whose responsibility was it upon the judge

5   receiving documents from a party at judicial inspections to

6   enter them into the record and into the acta for that judicial

7   inspection?

8   A.  The responsibility was the judge's, who had to order that

9   the documents be numbered and to be annexed to the record of

10  the inspection.

11  Q.  Are you aware of instances where documents handed to the

12  judge by a party at a judicial inspection were lost or

13  misplaced?

14          THE COURT:  In this case?

15          MR. GOMEZ:  Yes.

16  A.  I recall only that a video, which was in a DVD format, did

17  not appear on the record even though it was mentioned by the

18  judge in the acta.

19  Q.  Which party submitted that DVD which is the subject of your

20  recollection?

21  A.  It was done by the plaintiffs.

22          THE INTERPRETER:  I'm sorry.  Strike it.

23  A.  It was done by the defendant.

24          THE INTERPRETER:  Interpreter's correction.

25  Q.  Dr. Callejas, are you familiar with a document in this case

DAM8CHE4                        Callejas - cross

1    that is referred to as the Fusion memo?

2    A.  Yes.  I read about it, and I have mentioned it in some

3    arguments that I filed in Ecuadorian courts.

4    Q.  Have you filed a copy of the Fusion memo in an Ecuadorian

5    court proceeding?

6              MR. MASTRO:  Objection, your Honor.  Objection to the

7    form and the record will speak for itself as to whether copies

8    were filed, and if it has, the record speaks for itself as to

9    when that would have been.

10             THE COURT:  Focus on time period, counsel.

11             MR. GOMEZ:  I will withdraw that question, your Honor.

12   Q.  Dr. Callejas, did the plaintiffs ever provide a judge at a

13   judicial inspection a copy of the Fusion memo?

14   A.  As background to my answer, I must say that it is not

15   permissible to submit written arguments during the judicial

16   inspections.  The documents that are permissible to be

17   submitted are press releases or information, aerial

18   photographs, property deeds, but not internal writings or

19   arguments, nor work product.  And any document that was

20   submitted must be included in the acta or certificate, and it

21   must be ordered that it be made part of the record.

22             And I don't recall that any document such as the one

23   you mentioned was submitted by any of the parties during any of

24   the judicial inspections in which I was present, nor have I

25   found mention of the document to which you refer in any of the

DAM8CHE4                    Callejas - cross

1   actas or the certificates or the judicial inspections which I

2   have read.

3   Q.  Dr. Callejas, are you aware that the exhibits to the Fusion

4   memo appear in acta for a judicial inspection in the Lago Agrio

5   case?

6   A.  I am not aware that that's true.

7   Q.  Did Chevron ever submit written legal argument to judges at

8   judicial inspections in the Lago Agrio case?

9   A.  We didn't do so because legal arguments during judicial

10  inspections must be made orally, and then recorded, and then

11  transcribed on to the acta or certificate.

12         THE COURT:  Mr. Callejas, this will all be much more

13  efficient if you would simply answer the question.  I

14  understand your answer to the question to be no.  For whatever

15  reason, it's no.

16         THE WITNESS:  I will do so, your Honor.

17  Q.  Mr. Callejas, referring you back to your written testimony,

18  paragraph 22, you state, "My team certainly never left

19  documents related to the case at the door of any judge of the

20  Lago Agrio court."

21         To whom are you referring by the term "my team" in

22  this particular statement?

23  A.  I am referring to the attorneys that worked with me in the

24  Lago Agrio case.

25  Q.  What is your basis for saying that the attorneys who worked

DAM8CHE4                    Callejas - cross

1    with you never left documents related to the case at the door

2    of any judge of the Lago Agrio court?

3    A.   Once again, I am referring to what I already said to

4    attorney Friedman this morning.  Any action taken by the

5    attorneys in Lago Agrio had to be reported to me, and that has

6    been a rule since the beginning.  And it was never reported to

7    me that that ever happened, ever.

8    Q.   Is that your only basis?

9    A.   Yes.  Because I haven't been for 24 hours a day, seven days

10   a week, at the door of the judge to know if that happened or

11   not.

12   Q.   Did you ever ask all of the attorneys who worked for you

13   whether they ever left documents related to the case at the

14   door of any judge of the Lago Agrio court, sir?

15   A.   Yes, I did.  When I read a declaration from Judge Zambrano,

16   who said something to that effect, and they all replied to me

17   that they had never done so.

18   Q.   Did Chevron have private investigator -- let me withdraw

19   that.

20            Sir, did Chevron have agents stationed at the Lago

21   Agrio court during the pendency of the Lago Agrio case?

22   A.   The attorneys who work with me have taken turns to be at

23   the Lago Agrio court, but the least time possible and only the

24   time necessary to fulfill their work obligations, chiefly for

25   reasons of security.

DAM8CHE4                    Callejas - cross

Q.  Other than what you have just described, has Chevron had

any agents stationed throughout the day at the Lago Agrio court

during the pendency of the Lago Agrio case?

          MR. MASTRO:  Objection.  Asked and answered, your

Honor.

          THE COURT:  Overruled.

A.  As the attorney responsible for the case, I never had any

agents assigned on a permanent basis to the Lago Agrio court

other than the lawyers who went there accompanied by security

personnel.

Q.  Sir, do you know whether Chevron hired any agents not

working through you who were stationed at the Lago Agrio court

during the Lago Agrio case?

          MR. MASTRO:  Objection, your Honor.  Attorney-client

and work product.

          THE COURT:  Sustained.  We have been up and down this

mountain quite a few times.

Q.  Dr. Callejas, do you know whether anyone working for

Chevron, other than the attorneys or personnel under your

direct supervision, left documents related to the case at the

door of any judge of the Lago Agrio court?

A.  I am not aware that that ever happened.

Q.  Did you ever ask your client whether they had persons or

had hired persons to leave documents related to the case at the

door of any judge of the Lago Agrio court?

1          MR. MASTRO:  Objection, your Honor.

2          THE COURT:  Sustained.

3  Q.  Sir, I would like to direct your attention to paragraph 27

4  of your written testimony.

5          Paragraph 27 states, "I recall that the Lago Agrio

6  plaintiffs' representatives organized a hostile group of

7  protesters outside the courthouse on the day of the

8  conciliation hearing."

9          My question to you, sir, to whom are you referring by

10  your reference to "Lago Agrio plaintiffs' representatives" in

11  that statement?

12  A.  I remember personally having seen and having seen

13  photographs of Mr. Luis Yanza, as well as Mr. Steven Donziger

14  here present, at those demonstrations.

15  Q.  Were you present at the protest outside the courthouse on

16  the day of the conciliation hearing that you referred to in

17  your testimony, sir?

18  A.  Yes.  At the time that we went into court, the

19  demonstration was already underway.  So we had to quickly move

20  through, but I was able to observe what I already stated.  And,

21  also, from a window and terrace in the building of the

22  courthouse we were able to observe the demonstration.  And at

23  nearly all times we were able to hear what was being said and

24  shouted at that demonstration.

25  Q.  Is it your testimony, sir, that Luis Yanza and Steven

DAM8CHE4                    Callejas – cross

1   Donziger organized this protest, or were merely present?

2   A.  It's an assumption that I can make by the way that Luis

3   Yanza and Steven Donziger addressed and interacted with the

4   persons who were present at that demonstration.

5   Q.  Did you ever ask Mr. Yanza or Mr. Donziger if they

6   organized this protest?

7             THE COURT:  Let's take a little time here for a

8   change.  Mr. Yanza can come and tell us.  So can Mr. Donziger.

9   Let's get on with it.

10             My assumption is the witness doesn't know.

11             MR. GOMEZ:  Would Chevron stipulate to that, your

12   Honor?

13             THE COURT:  Just a minute, Mr. Callejas.

14             Mr. Mastro.

15             MR. MASTRO:  Your Honor, his testimony is based on

16   what he observed that day.  So he knows what he observed, and

17   he observed those persons acting in a certain way.

18             THE COURT:  So you're stipulating that apart from his

19   observations on that day, he has no personal knowledge, is that

20   correct?

21             MR. MASTRO:  That is correct, your Honor.

22             THE COURT:  Move on, counsel.

23   BY MR. GOMEZ:

24   Q.  Dr. Callejas, is it true that people in Ecuador have a

25   right to protest?

1              THE COURT:  Sustained.

2              We are finishing at 4:30, Mr. Gomez, whether you're

3    done or not.  Use time a little bit better.  You spent between

4    30 and 40 minutes on how the statement was prepared, when the

5    way that would have been done in any circumstance, in any other

6    case, would have been to ask the witness whether he wrote out

7    all the words, received in the answer no, which is almost

8    always the case, and then would have asked the witness, have

9    you reviewed it, have you reviewed it carefully, is everything

10   in there true or not?  And that would have been the end of it,

11   in about as much time as it has taken for me to tell what I

12   would have said.  Hundreds and hundreds of trials are conducted

13   that way.  You took 30 or 40 minutes.  Now let's move on.

14             Of course, you should be aware that the responsibility

15   for this little bit of time wasting was not yours alone, it was

16   Mr. Mastro's equally, because he left this dumb paragraph in

17   the statement, after I asked that everything not based on

18   personal knowledge be deleted.  But neither side has the

19   ability to focus on anything at the heart of the case, except

20   on occasions, but instead is off in every direction where they

21   think they can get a dig in at the other side, whether it's

22   based on personal knowledge or not.

23             Let's get on with it.  There are serious issues, there

24   are people who actually know things about the allegations, and

25   let's focus on the evidence.

DAM8CHE4                          Callejas - cross

1   BY MR. GOMEZ:

2   Q.  Dr. Callejas, did anyone participating in this protest

3   threaten you directly that day?

4   A.  No, they did not.

5   Q.  Did anyone participating in this protest attempt to

6   intimidate you, sir?

7          THE COURT:  That depends on the subjective intention

8   of the people involved in the behavior.  Get on with it.

9          MR. GOMEZ:  I will rephrase it.

10  Q.  Did any person participating in this protest that day

11  intimidate you, sir?

12  A.  They didn't intimidate me, but I was worried because of the

13  presence of the number of people and the shouts that I heard

14  from the demonstration, who could not have been there had they

15  not been organized to do that.

16  Q.  I direct your attention to paragraph 29 of your testimony.

17         In this paragraph, you make reference to "the initial

18  six-day evidentiary period."

19         What are you referring to, sir, in that statement?

20         I'm sorry.  What do you mean by "initial six-day

21  evidentiary period" in that statement?

22  A.  What I am referring to is that in proceedings that are

23  heard under the category of verbal summary proceedings, that is

24  the initial period of evidence at the outset of the case, which

25  lasts six working days, and during that period of time the

DAM8CHE4                      Callejas - cross

1    parties are to present all of the -- indicate all of the

2    evidence that they intend to present during the trial.

3    Q.  You mean the parties are supposed to identify the types of

4    evidence that they will present later in the proceeding to

5    prove their case?

6    A.  I am referring to the fact that during those six days, they

7    are to present all of the documents that they have in their

8    possession ahead of time, all of the testimony of witnesses

9    that they intend to obtain and -- or --

10              THE INTERPRETER:  The interpreter wants to inquire.

11   A.  The statements of witnesses that they are presenting, as

12   well as judicial inspections that they intend to have.

13   Q.  You state in paragraph 29 of your testimony that there were

14   requests for a total of 122 site inspections.  And my question

15   to you, sir, is how many of those site inspections did Chevron

16   request?

17              MR. MASTRO:  Your Honor, we will stipulate to the

18   numbers that are in the record.  It's a matter of record.

19              THE COURT:  Mr. Callejas, were the requests made in

20   writing?

21              THE WITNESS:  Yes, your Honor.

22              THE COURT:  And the written requests were filed with

23   the court, is that right?

24              THE WITNESS:  That's correct.

25              THE COURT:  Move on, Mr. Gomez.

DAM8CHE4                    Callejas - cross

1   Q.  Did the Ecuadorian plaintiffs request a global damages

2   expert be presented during the six-day evidentiary period, sir?

3             MR. MASTRO:  It's also a matter of record, your Honor,

4   one way or the other.

5             THE COURT:  I will take a yes or no.

6   A.  Yes.  They asked for that in writing during those six days.

7   Q.  You testified that these six days took place at the outset

8   of the case.  How soon after the case is filed did this six-day

9   evidentiary period take place?

10            MR. MASTRO:  Objection.  Also a matter of record, your

11  Honor.

12            THE COURT:  I will hear it.

13  A.  According to the statute, the evidentiary period begins on

14  the next working day following the day on which the answer to

15  the complaint -- the hearing in which the answer to the

16  complaint is heard.

17            (Continued on next page)

18

19

20

21

22

23

24

25

DAMLCHE5                    Callejas - cross

1    BY MR. GOMEZ:

2    Q.  And is it correct that Chevron did not propose to present a

3    global expert on damages during this six-day evidentiary

4    period, sir?

5    A.  That's correct, Mr. Gomez.

6    Q.  And isn't it correct that a party may only present evidence

7    that it identifies during this six-day evidentiary period, sir?

8    A.  Evidence related to the merits of the case must -- may only

9    be presented during those six days.

10   Q.  And is it fair to say, Dr. Callejas, if a party fails to

11   identify a type of evidence to present during those six days,

12   it is precluded later in the proceeding from presenting such

13   evidence?

14           THE COURT:  Mr. Gomez, I've been allowing this as a

15   matter of convenience more than anything else.  As I said

16   earlier in the day, you were repeatedly offered the opportunity

17   and indeed required to set forth whatever propositions of

18   Ecuadorian law or the laws of other nations upon which you

19   relied and to provide me with the necessary material.  Whatever

20   you have submitted you have submitted.  You're not turning this

21   witness or anybody else into an expert on Ecuadorian law.  I

22   will let you know whether I want to take testimony on

23   Ecuadorian law and from whom under Rule 44.1, as I had

24   previously made abundantly clear.

25           MR. GOMEZ:  Your Honor, may I get a yes or no answer

DAMLCHE5                    Callejas - cross

```
 1   to the last question?
 2             THE COURT:  No.  Let's get on with it.
 3   Q.  Sir, directing your attention to paragraph 35 of your
 4   written testimony, you state, quote, a separate judicial
 5   proceeding in Quito, where the HAVOC laboratory was located, to
 6   conduct a judicial inspection of the laboratories facilities --
 7   I'm sorry.  I read that improperly.  Let me withdraw and try
 8   again.
 9             Sir, in paragraph 35 of your written testimony, you
10   state, we initiated a separate judicial proceeding in Quito,
11   where the HAVOC laboratory was located, to conduct a judicial
12   inspection of the laboratories facilities.
13             And my question to you, sir, is did you provide
14   plaintiffs' attorneys with notice that you had filed the
15   separate judicial proceeding in Quito to secure an inspection
16   of their laboratories?
17   A.  The judicial inspection was based on a legal norm that
18   allows any party to request an inspection to obtain information
19   that is of interest to it.  And we didn't notify the plaintiffs
20   in the Lago Agrio case because the matter was only in regards
21   to the HAVOC laboratory.
22   Q.  Did you notify the Lago Agrio court that you were seeking
23   an order from a Quito court to inspect a laboratory that was
24   performing work for the Lago Agrio case at the time?
25   A.  The court in Lago Agrio had no jurisdiction over the matter
```

DAMLCHE5                    Callejas - cross

```
 1    since for territorial reasons it was the court in Quito that
 2    would hear that issue.
 3    Q.  So is your answer no, sir, you did not so notify the Lago
 4    Agrio court?
 5    A.  I'm sorry.  If I didn't say so, no, we did not notify the
 6    court in Lago Agrio.
 7    Q.  Do you know, sir, how the Ecuadorian plaintiffs found out
 8    that you filed a separate proceeding in Quito to have their
 9    laboratory inspected?
10              MR. MASTRO:  Your Honor, I object.  He's asked him
11    about the plaintiffs found out.
12              THE COURT:  Well, the answer may be, unlikely as it
13    seems, that he called them up and told them.  Then he would
14    have personal knowledge.
15              MR. MASTRO:  Okay.
16              THE COURT:  The question is do you know, Mr. Callejas.
17    If you know, answer.  If you don't know, say so.
18              THE WITNESS:  I do not know how they found out about
19    our request for an inspection of the HAVOC laboratory.
20    Q.  And you never called them to tell them, did you?
21              THE COURT:  Already answered that question.  Move on.
22    Q.  Directing your attention to paragraph 40 of your written
23    testimony, sir -- I'll withdraw that, your Honor.  I'll move
24    on.
25              Directing your attention to paragraph 41, sir, you
```

DAMLCHE5                         Callejas - cross

1    state, "I recall that they also organized several

2    demonstrations outside the courthouse and subjected the

3    presiding judge at the time, Judge German Yanez, to a press

4    campaign that questioned his handling of the case and accused

5    him of bias in favor of Chevron."

6              THE COURT:  Mr. Mastro, I take it you're willing to

7    agree as to the first part of the sentence about organizing

8    demonstrations that the situation is exactly the same as the

9    last time we discussed that.  Is that right?

10             MR. MASTRO:  I am, your Honor, yes.

11             THE COURT:  Okay.  Move on.

12             MR. GOMEZ:  I ask that be stricken, your Honor.

13             THE COURT:  No, but move on.  I understand the point.

14   Q.  Paragraph 42 of your written testimony Dr. Callejas, you

15   tested that the Lago Agrio plaintiffs filed a new request, this

16   time to relinquish a total of 64 inspections -- all of their

17   requested inspections that had not been scheduled yet by the

18   court.

19             And my question to you, sir, is what do you mean by

20   the phrase "all of their requested inspections"?

21   A.  I referred specifically to the way it's written.  In

22   Spanish, I would have said it I'm referring to all those that

23   they had requested that had not yet been carried out.

24   Q.  Is it fair to say, Dr. Callejas, that when the Ecuadorian

25   plaintiffs asked for the judicial inspections to be canceled,

DAMLCHE5                    Callejas - cross

1  they were only asking for inspections that they had requested

2  to be canceled and not for Chevron's judicial inspections to be

3  canceled?

4          THE COURT:  I'm sorry.  I think you got tied up in

5  that question in the language.

6          MR. GOMEZ:  I'll try again.

7  Q.  Dr. Callejas, is it fair to say that the only judicial

8  inspections that the Ecuadorian plaintiffs asked to be canceled

9  were the specific inspections that they had requested and not

10 Chevron?

11 A.  Indeed, that's how it's written in my statement.

12 Q.  And is it fair to say, Dr. Callejas, that at no time during

13 the Lago Agrio case did the plaintiffs ever ask that the

14 judicial inspections that Chevron wanted to conduct be

15 canceled?

16         MR. MASTRO:  Again, your Honor, the record speaks for

17 itself.

18         THE COURT:  Look, I don't know why we're taking the

19 time.  Nobody ever said otherwise.  You know, this is like I

20 don't know.  It's just eating up the clock.  That's what it's

21 doing.

22         MR. GOMEZ:  If Chevron will stipulate.

23         THE COURT:  They don't have to stipulate.  They don't

24 have to stipulate there was a lawsuit in Ecuador.  They don't

25 have to stipulate that you've been examining for an hour or

DAMLCHE5                      Callejas - cross

1   more.  They don't have to stipulate to it.  It's in the record.

2   Move on.

3           MR. GOMEZ:  Your Honor, the only way I can prove this

4   is if I take all numerable motions and pleadings in the Lago

5   Agrio record, have them translated and have them brought into

6   this court.

7           THE COURT:  Mr. Gomez, you know that's ridiculous, or

8   at least you should.  And I make due allowance to the heat of

9   the moment.  Believe me, I do.

10          This generic problem came up this morning.  I

11  discussed it in your presence with Mr. Friedman.  At some

12  point, I think when I came back from lunch, I proposed the way

13  of dealing with that record.  It seems to me that it is a

14  perfectly sensible way of dealing with that record.

15          If you are seeking to establish something that is

16  established in the record, that is, there's something there,

17  you and Chevron and Mr. Friedman can agree that it's there, and

18  if the content is necessary for me it look at, you can provide

19  me the relevant piece of paper or group of pieces of paper.

20          If on the other hand you're trying to prove the

21  negative, you can talk to your adversary and your cocounsel and

22  see if you can agree that it's not there and either you will

23  agree it's not there or somebody will say, well, it's here in

24  substance or it's really here and then you'll provide me with

25  whatever it is that underlies the claim and I'll resolve it.

DAMLCHE5                         Callejas - cross

 1            Nobody is saying you have to translate 216,000 pages.
 2     And the idea that you're going to prove what is and isn't in
 3     that record by examining witnesses about what they remember of
 4     what is and isn't in 216,000 pages is just not sensible.
 5            Now, the Federal Rules of Evidence give the trial
 6     judge the authority to control the mode of the proof and that
 7     is what I am doing.  A great deal of time is being taken up to
 8     no good purpose here.
 9            Now, I understand part of it is because of the
10     translation, which is always frustrating for anybody in a
11     courtroom and I include myself, of course, because it's slow
12     and it's tedious and that's just the way it is.  But there's a
13     lot of time being eaten up because of this insistence on
14     attempting to prove what is and isn't in the record by asking
15     people.  It's just not useful and I'm not going to put up with
16     it from either side.
17            I've told you how I want it done and unless and until
18     somebody can persuade me it's not practical, that's the way
19     we're doing it.
20            MR. GOMEZ:  Your Honor, if I may respond to that, the
21     witness has never indicated that he doesn't remember the
22     information necessary to answer my questions and a simple yes
23     or no answer would suffice and we can move on.
24            THE COURT:  We're moving on regardless.
25            It's a matter of objective fact one way or another.

DAMLCHE5                    Callejas - cross

1    I'm no more going to allow that than I'm going to have a series

2    of witnesses come in here to testify whether the wood in the

3    courtroom paneling is oak, cherry, maple or birch, as to which

4    you could probably get quite a few different answers.

5            I am, in fact, allowing the defense quite a lot of

6    latitude here.

7    Q.  Sir, directing your attention to paragraph 50 of your

8    written testimony, you state, "Mr. Cabrera returned to the

9    courthouse and with the assistance of then presiding Judge

10   Yanez snatched Mr. Cabrera's request from the case file before

11   it had been hand-numbered and part of the record, thereby

12   erasing all evidence of the mentioned payment arrangement from

13   the court records."

14           What is your basis for that statement?

15   A.  The basis for my statement is the report that exists in the

16   Lago Agrio record submitted under oath by the court's clerk

17   following a specific order by Judge Yanez related to our

18   request.

19           MR. GOMEZ:  Your Honor, I ask this statement be

20   stricken from the testimony for lack of personal knowledge.

21           THE COURT:  Mr. Mastro, why not?

22           MR. MASTRO:  Your Honor, we'll be happy to submit the

23   court record in place of it.

24           THE COURT:  It's stricken.

25           Now, look, a lot of this responsibility, Mr. Mastro,

DAMLCHE5                      Callejas - cross

for this waste of time is with Chevron.  You've put stuff in

this statement of which the witness has no personal knowledge.

I told you to get it out.  You didn't.  I'm tired of it.

Q.  Paragraph 51, Dr. Callejas, of your written testimony, you

state, "Evidence uncovered later by Chevron in U.S. discovery

proceedings revealed that the Lago Agrio plaintiffs

representatives had hand-picked Mr. Cabrera to be the global

expert and had met with him extensively prior to his judgment."

          Sir, what is your basis for that statement?

          THE COURT:  Are you referring to paragraph 51,

Mr. Gomez?

          MR. GOMEZ:  Yes.

          THE COURT:  Which sentence?  I'm sorry, I see it.

It's the third from last sentence, right?

          MR. GOMEZ:  Yes.

A.  I based myself mainly on outtakes from the movie Crude

which show engineer Cabrera meeting with the attorneys for the

plaintiffs in -- meeting with the Lago Agrio plaintiffs several

days before Mr. Cabrera was appointed by the judge hearing the

case.

          In those videos I have seen Mr. Donziger and

Mr. Fajardo among other individuals.  And, in summary,

Mr. Fajardo says that the attorneys and representatives for the

Lago Agrio plaintiffs will write the report for Mr. Cabrera and

that Mr. Cabrera wouldn't have to do it, to which Mr. Donziger

DAMLCHE5                    Callejas - cross

1     says obviously, Richard, you have to agree to that.  And

2     Mr. Richard Cabrera says, yes, I am.

3                MR. GOMEZ:  Your Honor, I ask that the statement --

4                THE COURT:  It's out.

5                MR. GOMEZ:  Thank you.

6                THE COURT:  Now we're going to take a short break here

7     and, Mr. Gomez, you and Mr. Mastro are going to go through

8     what's left of your cross vis-a-vis the statement and you're

9     going to identify to him all the points that you're going to

10    make of the nature of the last few and hopefully you will

11    resolve it and come back with an agreement and then we'll see

12    what's left to be done.  But this is just inappropriate what's

13    going on here and it's the fault of both sides.

14                (Recess)

15                THE COURT:  Be seated, please.  If there is anybody in

16    this room with a BlackBerry, cell phone, or other such device,

17    it is forbidden and it better not be in here henceforth.  There

18    is a sign and the last time I looked right in the doorway.

19                Okay.  Did you resolve this stuff?

20                MR. MASTRO:  Yes, your Honor.  I met with Mr. Gomez.

21    Every change that he requested we have made.  So hopefully that

22    expedites the examination.

23                It was our intention, and we will be doing this, to

24    take Dr. Callejas's declaration and those portions which we've

25    either agreed to withdraw further or your Honor ruled be

DAMLCHE5                    Callejas - cross

1    stricken during the examination, we intended to refile a

2    corrected version to reflect your Honor's rulings and what we

3    have just agreed in a handful of instances to withdraw.

4         And we also agreed that there are two exhibits the

5    defendants want to offer that we will consent to coming into

6    evidence.  They are Defendant's Exhibit 1354 and 1355.  They

7    are affidavits of Alberto Racines.  One dated October 16, 2009,

8    and one dated November 29, 2012, and we consent to them being

9    received in evidence.

10             THE COURT:  Those two exhibits are received.

11             (Defendant's Exhibits 1354, 1355 received in evidence)

12             THE COURT:  So this will be the new version of the

13   witness statement will be I guess 4300X, all right?

14             MR. MASTRO:  Thank you, your Honor.

15             THE COURT:  And you'll get it in tomorrow.  And

16   overnight or as soon as possible you will go over all the other

17   statements with a fresh eye.  There's no reason for this to go

18   on as long as it's going on.  None.

19             MR. MASTRO:  Understood, your Honor.

20             THE COURT:  Mr. Gomez.

21   BY MR. GOMEZ:

22   Q.  Dr. Callejas, you testified earlier that during the ten

23   years that you have represented Chevron in Lago Agrio case, you

24   received numerous offers from various people claiming to be

25   able to resolve the case.  You referred to these as miraculous

DAMLCHE5                    Callejas - cross

1   arrangements, sir.

2                THE COURT:  Do you have a question.

3   Q.  My question to you, sir, is in those ten years, how many

4   times did a former judge of the Lago Agrio court who had

5   actually presided over the Lago Agrio case ever offer you to

6   resolve or fix the outcome of that case?

7   A.  That never happened.

8   Q.  Dr. Callejas, did you inform any presiding judge in the

9   Lago Agrio case that former judge Alberto Guerra told your

10  associate he could fix the outcome of the case?

11               THE COURT:  I think that comes under the heading of

12  authorities.  It's been asked and answered.  Let's move on.

13  Q.  Did you inform the judiciary counsel --

14               THE COURT:  Same ruling.  Move on.

15  Q.  Did you inform the bar of the Chincha --

16               THE COURT:  Move on.

17               You didn't inform anybody other than your client, is

18  that right, Mr. Callejas?

19               THE WITNESS:  I informed my client.  I also informed

20  the national court of justice.  And another attorney for

21  Chevron, he informed other authorities in Ecuador including the

22  attorney general's office, the prosecutor general's office, the

23  judiciary council, both at the national level as well as in the

24  province of Sucumbios, the speaker of the national assembly,

25  several ministers of President Correa's cabinet, and other

DAMLCHE5                    Callejas - cross

1    authorities whom I don't recall specifically right now.

2              THE COURT:  This is with respect to former Judge

3    Guerra?

4              THE WITNESS:  Correct, your Honor.

5              THE COURT:  And when did you first do any of this?

6              THE WITNESS:  That was in 2013, current year.

7              THE COURT:  Mr. Gomez.

8    Q.  By the time that you so informed or your associate so

9    informed the various authorities that you have listed,

10   Dr. Callejas, had Chevron already made arrangements for Judge

11   Guerra to leave Ecuador?

12             MR. MASTRO:  Objection, your Honor, and it also

13   involves work product and attorney-client privilege.

14             THE COURT:  Answer the question if you know,

15   Dr. Callejas, of your own knowledge.

16             THE WITNESS:  I have no personal information regarding

17   this.

18   Q.  And when you informed or your associates informed all of

19   these various authorities that you have listed, did you also

20   inform those authorities that Chevron was paying Alberto Guerra

21   for the evidence he would be providing in this case in the

22   United States?

23             MR. MASTRO:  Objection, your Honor.

24             THE COURT:  Sustained as to form.

25   Q.  Dr. Callejas, when you informed the authorities that you

DAMLCHE5                    Callejas - cross

```
 1   have so described, did you also report to them that Chevron was
 2   paying Alberto Guerra for the evidence that he was supplying
 3   for use in this case in the United States?
 4              MR. MASTRO:  Objection to form, your Honor, and also
 5   misstates his prior testimony.
 6              THE COURT:  Look, Mr. Gomez, it is almost verbatim to
 7   the question I just sustained an objection to, and there's
 8   certainly no material difference in the wording.  Can't you
 9   adhere to the rulings?
10   Q.  Dr. Callejas, you personally informed the national court of
11   justice that Judge Guerra told your associate he could fix the
12   outcome of the case, correct?
13              MR. MASTRO:  Objection, asked and answered and
14   misstates his prior testimony.
15              THE COURT:  Well, it doesn't incorporate anything
16   about the prior testimony.  It's a new question.
17              MR. MASTRO:  The words personally informed.
18              THE COURT:  He's asking him.  Overruled.
19   A.   In the filing that I submitted to the national court of
20   justice, it included as attachments affidavits by Alberto
21   Racines, by Patricio Campuzano, and myself.  So, therefore, we
22   did inform the national court of justice of the overtures by
23   former Judge Guerra.  Those affidavits are the same ones that
24   have been submitted in this trial before Judge Kaplan.
25   Q.   Did you inform the national court of justice of the
```

DAMLCHE5                    Callejas - cross

1   agreement between Chevron and Guerra to compensate Mr. Guerra

2   for evidence in this case?

3          MR. MASTRO:  I'll let it go, your Honor.

4   A.  I don't recall if --

5          THE INTERPRETER:  I need to inquire.

6   A.  I don't recall if the information that was mentioned

7   included information regarding payments that was made or

8   payments for belongings to Mr. -- of Mr. Guerra's.

9   Q.  Dr. Callejas, did Chevron make arrangements to fly

10  Mr. Guerra out of Ecuador after he agreed to provide evidence

11  for Chevron's use in this case?

12         MR. MASTRO:  Objection, your Honor.  Work product,

13  attorney-client privilege.

14         THE COURT:  Look, my recollection is that at or

15  shortly after the time you put in Guerra's affidavit in this

16  case months ago, you put in, in some form, what you have said

17  is complete information about what the arrangement with Guerra

18  was.  Is that right?

19         MR. MASTRO:  That's correct, your Honor.

20         THE COURT:  And where is it?  I mean where in the

21  record?  It's in the record.  I'd like to know where.

22         MR. MASTRO:  We'll give you the exact citation, your

23  Honor.  It's a question of his personal knowledge.

24         THE COURT:  I understand that.  Is somebody going to

25  give it to me?

DAMLCHE5                    Callejas - cross

1          MR. MASTRO:  They're looking it up right now, your

2     Honor.

3          THE COURT:  Now, I want an offer of proof.  This has

4     all been disclosed on the record.  It's part of the record of

5     this case, unless there is some reason to think that there's

6     some inaccuracy.  And I want to know what the good faith basis

7     is for any suggestion that there's an inaccuracy, if that's

8     what you're suggesting, and I want to know whether that's what

9     you're suggesting or whether instead this is essentially an

10    effort to repeat through this witness what Chevron has already

11    made public on the record of this case.

12         MR. GOMEZ:  Your Honor, my understanding from the

13    record is that there is -- Chevron has not taken a position

14    that it has relocated Mr. Guerra to the United States.  The

15    agreement is silent on who actually did that and how.  My

16    recollection of asking these questions to the 30(b)(6)

17    deponent, conclusive information was not provided.  And I

18    believe that this witness may or may not have knowledge as to

19    who made that decision and when and if it was done prior to

20    making the report to the national court of justice.

21         THE COURT:  What is the relevance of who?

22         MR. GOMEZ:  Well, your Honor, Chevron is, Chevron is

23    claiming that it has reported this act of corruption to the

24    national court of justice, while at the same time it has

25    relocated the very perpetrator of the fraud outside the reach

DAMLCHE5                    Callejas - cross

1    of Ecuadorian law enforcement authorities.  I want to know if

2    this witness knows if that happened before they made their

3    report to the republic.

4                THE COURT:  Perhaps you recall the question I asked

5    you.

6                I'll take the lengthy silence --

7                MR. GOMEZ:  Perhaps I misunderstood.

8                THE COURT:  I asked you what was the relevance of who.

9                MR. GOMEZ:  Of who relocated?

10               THE COURT:  Of who -- you talked about who made the

11   decision.  I want to know the relevance of that fact.

12               MR. GOMEZ:  Well, if Chevron made the decision to

13   relocate Mr. Guerra, then Chevron is the party that has allowed

14   him to escape, that has enabled him to escape accountability in

15   his own country.

16               If Mr. Guerra of his own volition left Ecuador, then

17   Chevron is not involved in his escaping the jurisdiction of his

18   country to face for the acts that he admits he committed.

19   Unclean hands, your Honor.

20               THE COURT:  Mr. Friedman.

21               MS. FRIEDMAN:  Your Honor, I don't want to speak for

22   Mr. Gomez, but.

23               THE COURT:  He's doing okay on his own.

24               MS. FRIEDMAN:  He is.  What I wanted to say is we

25   would like the line of questioning to either come in, or if the

DAMLCHE5                    Callejas - cross

1    document number is found where this is disclosed, have that

2    made a part of this record because, obviously, the fact that

3    it's in the record somewhere in this case doesn't get it into

4    the trial record.  So that's our, at least speaking for my

5    clients, that is what we would like to see happen.

6              THE COURT:  Where is it?

7              MR. MASTRO:  Your Honor, it's actually an exhibit we

8    proposed for this trial.  It's 1671 and it was submitted in

9    connection with the summary judgment motion late January.  I'm

10   just trying to find the citation.  But we've offered it as an

11   exhibit in the case, your Honor, when understandings were

12   reached.

13             MS. FRIEDMAN:  Based on that representation, your

14   Honor, we just move it into evidence and that would satisfy us

15   for now.  I'll take a look at it.

16             THE COURT:  What about you, Mr. Gomez?

17             MR. GOMEZ:  Yes, and I can skip over to a different

18   line and move forward.

19             THE COURT:  What about you, Mr. Mastro?

20             MR. MASTRO:  That's fine by me, your Honor.

21             THE COURT:  Okay.  Fine.  Plaintiff 1671 is received.

22             (Plaintiff's Exhibit 1671 received in evidence)

23             THE COURT:  And that takes care of that.

24             And there should be no misunderstanding.  Obviously,

25   the question of what if any inducement was given to Guerra is

DAMLCHE5                        Callejas - cross

1    highly relevant.  It goes to veracity.  Possible economic

2    benefit to any witness in consequence of that witness's

3    testimony goes to veracity, not just Mr. Guerra, and it's

4    appropriate.  All we're talking about here is how it's going to

5    come in.  It's now in and counsel is moving on voluntarily.

6    Q.  Dr. Callejas, Judge Leonardo Ordonez presided over the Lago

7    Agrio case from February 2010 to September 2010; is that

8    correct?

9    A.  Yes, I believe those are the correct dates, Mr. Gomez.

10   Q.  And you moved to have Judge Ordonez recused from the case;

11   is that correct?

12   A.  Yes, that's right.

13            THE COURT:  I didn't hear an answer.

14   A.  Yes, that's right.

15   Q.  At the time that you moved to have Judge Ordonez recused,

16   did you know that Judge Zambrano would replace him as the

17   presiding judge in the case?

18   A.  We didn't know who, which judge would be the judge to

19   replace him because that is determined based on seniority.  And

20   we weren't certain if at that time that was Judge Zambrano or

21   another judge on the court.

22   Q.  And you never -- you never moved to recuse Judge Zambrano

23   after he replaced Judge Ordonez on or about September 2010; is

24   that correct?

25            MR. MASTRO:  Again, the record speaks for itself, your

DAMLCHE5                    Callejas – cross

1   Honor.

2          THE COURT:  I'll take the answer as a matter of

3   convenience.

4   Q.  Yes or no?

5   A.  We didn't do so because no causes, none of the few causes

6   that are available at law for a recusal had taken place at that

7   time.

8   Q.  Sir, you represented Chevron corporation in Ecuador for

9   over ten years and before that you were the attorney for

10  Texaco; is that correct?

11  A.  Yes, that's correct.

12  Q.  For about how many years did you represent Texaco in

13  Ecuador?

14  A.  I was an in-house of employee of Texaco for approximately

15  15 years, and afterwards represented Texaco for some five or

16  six years additionally, but not continuously.

17  Q.  And during all that time, sir, that you represented Chevron

18  and Texaco, has anyone physically harmed you because you were

19  their representative?

20  A.  No.  No person has caused me physical harm.

21  Q.  During all the time that you were Chevron and Texaco's

22  attorney, has anyone physically harmed a member of your family

23  because of your representation of these companies?

24  A.  No, they have not.

25  Q.  During all this time that you've represented Chevron and

Texaco, has anyone directly threatened you for being their

representative?

A.  Yes.  They have done so going so far as to qualify us as

traitors of the country and corrupt, which is a harm that is

more serious than a physical harm because it has affected --

because it affects my honor and my reputation.

Q.  So you're referring to -- what are you referring to?  How

were those threats directed to you?

A.  Constantly those of us who have defended Texaco have been

referred to as corrupt, traitors, and those who would sell out

their fatherland.

        I have seen videos of demonstrations in which there is

an incitement to violence and hate against my person and other

Chevron employees, including protests called by the

representatives of the plaintiffs in Lago Agrio through press

bulletins.

        In those demonstrations, there have been images of my

person paraded through the streets of Lago Agrio, images of me

as a prisoner, and images or effigies of Mr. Veiga, Mr. Perez,

Mr. Jim Craig and the CEO of Chevron at the time, Mr. O'Brien

or Mr. O'Reilly.

        Those images, after being paraded through the streets

of Lago Agrio, even the street facing the courthouse or in

front of the courthouse, were grotesquely handed over to

someone dressed as an image of death.  And this character who

DAMLCHE5                    Callejas – cross

1   had in his hands a gigantic sickle carried out the action of

2   cutting the head off each of those effigies and then placed

3   them in a coffin.

4           If that's not an incitement to violence, to personal

5   violence and hate, I can't imagine what it would be.

6   Q.  Sir, did you report that conduct to the police in Ecuador?

7   A.  No, I did not.

8   Q.  Did you ever file a complaint against any of the persons

9   you believed were responsible for that conduct that you just

10  described?

11  A.  I did not.  But I took it very seriously and it had a

12  serious effect on my personal and professional life.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DAM8CHE6

1          MR. GOMEZ:  I have nothing further at this time.

2          THE COURT:  Thank you.

3          Mr. Mastro.

4          MR. MASTRO:  I have no further questions for

5     Dr. Callejas.

6          THE COURT:  Dr. Callejas, you are excused.

7          (Witness excused)

8          MR. MASTRO:  Your Honor, just so the record is

9     complete, the understandings of Mr. Guerra were submitted.  It

10    is docket entry 755-14.  It was Exhibit 3268 to the Stavers

11    declaration.  I believe that was filed in late January 2013.

12    And that is PX 1671, your Honor.

13         THE COURT:  And to those interested, that is

14    available, I gather, on a public kiosk in the clerk's office,

15    and I am sure elsewhere.  It is available on the Internet.

16         Next witness, please.

17         MR. MASTRO:  Certainly, your Honor.

18         Chevron calls Troy Dahlberg, and he will be examined

19    by my partner, Georgia Winston.

20     TROY DAHLBERG,

21        called as a witness by the plaintiff,

22        having been duly sworn, testified as follows:

23         THE DEPUTY CLERK:  State your name and spell your last

24    name for the record.

25         THE WITNESS:  Troy Dahlberg, D-A-H-L-B-E-R-G.

DAM8CHE6

```
 1                 THE COURT:  You may proceed, Ms. Winston.

 2                 MS. WINSTON:  May I approach the witness?

 3                 THE COURT:  You may.

 4     DIRECT EXAMINATION

 5     BY MS. WINSTON:

 6     Q.  Mr. Dahlberg, do you have Plaintiff's Exhibit 4900 in front

 7     of you?

 8     A.  Yes.

 9     Q.  Do you recognize that document?

10     A.  I do.

11     Q.  What is it?

12     A.  It's my direct testimony.

13     Q.  Can you turn to the last page?

14     A.  I have it.

15     Q.  Is that your signature on the last page?

16     A.  It is.

17     Q.  At the time you signed your declaration, were your

18     statements true and accurate?

19     A.  Yes.

20     Q.  When was the last time you reviewed your testimony?

21     A.  Earlier today.

22     Q.  Have you made any changes since you signed your direct

23     testimony?

24     A.  There were a couple of adjustments, yes.

25     Q.  Are there corrections you make to paragraph 7, 30, 116,
```

DAM8CHE6                    Dahlberg – direct

```
 1    117, 118 and 137?

 2    A.  Yes.

 3    Q.  Did you initial each of the changes in your direct

 4    testimony?

 5    A.  I did.

 6    Q.  Do you consider any of the changes you made to be

 7    substantive?

 8    A.  No.

 9    Q.  As corrected, is your declaration true and accurate today?

10    A.  It is.

11           MS. WINSTON:  We move to ask Mr. Dahlberg a few

12    additional questions regarding a recent production of documents

13    made by Andrew Woods.  The documents were produced after Mr.

14    Dahlberg had signed his direct testimony so he couldn't

15    incorporate that information.

16           THE COURT:  Are you offering 4900?

17           MS. WINSTON:  Yes.

18           THE COURT:  Received on the same basis as the other

19    statements.

20           (Plaintiff's Exhibit 4900 received in evidence)

21           THE COURT:  Now, are there exhibits incorporated in it

22    that you are offering?

23           MS. WINSTON:  We also move to offer the exhibits

24    listed at 4900A.

25           THE COURT:  Received on the same basis as the others.
```

DAM8CHE6                         Dahlberg - direct

1           (Plaintiff's Exhibit 4900A received in evidence)

2           THE COURT:  Is there any objection to the proposed

3    supplementary direct?

4           MR. FRIEDMAN:  If I could just get direction to what

5    additional documents and where they are that the witness is

6    relying upon for the new direct testimony.

7           MS. WINSTON:  The documents are Bates stamped WDS

8    008803 to WDS 009329, and they were produced on October 10 by

9    Stuart Gross, counsel for Andrew Woods, and I have about three

10   questions.

11          MR. FRIEDMAN:  I would object to that.  I did not see

12   those documents.  I guess I could have, but I did not see that

13   they were going to be part of this examination, so I am not

14   familiar with what they are.

15          THE COURT:  When were they produced, by whom, to whom?

16          MS. WINSTON:  They were produced on October 10 to

17   Gibson, Dunn & Crutcher, to Mr. Donziger and Mr. Gomez, by

18   counsel for Andrew Woods, Stuart Gross.

19          THE COURT:  Mr. Friedman, check with your client.  Is

20   that right?

21          MR. FRIEDMAN:  I will take it as being right.  What I

22   am saying is the connection to somebody saying these documents

23   are going to be used with this witness was never made for us.

24   So a lot of documents come in, but we were not informed it was

25   going to be part of the presentation today.

1              MS. WINSTON:  If I may clarify.  The documents aren't

2      being offered into evidence.  They are just additional

3      materials relevant to Mr. Dahlberg's testimony.  I just want to

4      clarify for the record whether they had any impact on his

5      written testimony.

6              MR. FRIEDMAN:  If it's a yes or no, they did or they

7      didn't, that's OK.  If the answer is yes and it's going to

8      be --

9              THE COURT:  If the answer is no, we don't have an

10     issue.  Let's find out what the answer is.

11             MS. WINSTON:  May I proceed?

12             THE COURT:  Go ahead.

13     BY MS. WINSTON:

14     Q.  Mr. Dahlberg, since signing your direct testimony, have you

15     received any additional documents relating to the subject

16     matter of that testimony?

17     A.  Yes.

18     Q.  Would you please briefly describe those documents?

19     A.  The documents were primarily related to requests that Mr.

20     Donziger had made to magistrate law for reimbursement for

21     expenses that he had incurred related to the litigation, and

22     there were a handful of documents that related to the Kaplan

23     firm, and some requests by Mr. Donziger.

24     Q.  Just to clarify, when you said magistrate law, is that

25     magister law?

DAM8CHE6                    Dahlberg – direct

1    A.  Magister law.  Excuse me.

2              THE COURT:  I didn't understand the words.  What are

3    the words?

4              MS. WINSTON:  Magister law.

5              THE COURT:  Magister law?

6              MS. WINSTON:  Yes.

7    Q.  Do any of the documents you recently received affect the

8    conclusions set forth in your written direct testimony?

9    A.  They do not.  The opinions that I have stay the same.

10             THE COURT:  OK.  Mr. Friedman.

11             MR. FRIEDMAN:  Thank you.

12             THE COURT:  Anything else?

13             MS. WINSTON:  No, your Honor.

14   CROSS-EXAMINATION

15   BY MR. FRIEDMAN:

16   Q.  My name is Rick Friedman, and I represent the Donziger

17   defendants.  How do you do?

18   A.  I am fine.

19   Q.  I first wanted to ask you, did anything that you reviewed

20   indicate any direct payments to a Judge Zambrano in Ecuador?

21   A.  No.

22   Q.  Anything you reviewed indicate any direct payments to a

23   Mr. Guerra in Ecuador?

24   A.  Yes.

25   Q.  What was that?

DAM8CHE6                    Dahlberg – cross

1   A.  I think it was either a declaration or deposition that

2   Mr. Guerra had.

3   Q.  I meant financial documents.

4   A.  There were some financial documents that were exhibits to

5   the declaration that he claimed represented the payments.

6   Q.  Any independent documents?

7        Let me start over.  Any documents independent of

8   Mr. Guerra that reflected payments to him?

9   A.  Other than the ones I mentioned, no.

10  Q.  If you could turn to page 34 of your testimony.  In

11  paragraph 57, the first sentence, I want to make sure that I am

12  understanding what you're saying here.

13       Are you saying that all disbursements that you

14  reviewed fall into this category or these categories that you

15  described in the first sentence?

16  A.  For the most part.  There is a small number that weren't

17  included in this, but it does reflect almost all of the

18  financial transaction information that I saw.

19  Q.  You stress throughout your report that you had incomplete

20  information, and I am not going to ask you to go through the

21  whole report again, but, generally speaking, could you tell me

22  what the major categories of incomplete information were?

23  A.  So as it relates to the financial and accounting records

24  that I reviewed and business records, major categories were

25  anything that would sort of be summarizing distributions,

DAM8CHE6                    Dahlberg - cross

disbursements.  So things like a checkbook, or maybe an

accounting system with a general ledger, something like a

Quicken's book type of thing, some summary of moneys coming in,

moneys being received, investment funds received, sort of your

kind of basic accounting records that you would expect where

you would maybe have authorizations for a transaction and then

you have supporting records for that transaction, such as maybe

an invoice, and you might have an e-mail requesting approval

for something with the invoice, so something directing someone

to actually pay for the invoice.  Then reconciliations back to

bank statements that would maybe show either moneys coming in

or moneys going out.  Bank reconciliations so that you would

know if you were actually tying out to your accounts.  Sort of

classic normal records that I have seen throughout the course

of my professional career.

Q.  Would it be fair to say that you did see some of those

things, but you didn't see a uniform system that would allow

you to reconcile payments in and payments out and where they

went?

A.  Actually, I saw no evidence of a structure of a financial

or accounting record keeping.  Basic things like a checkbook or

something like that, nothing like that, or sort of a

disbursements journal.  And this relates to Mr. Donziger now.

There were other people where I saw some records that they

maintained, other entities.  But as far as for Mr. Donziger was

DAM8CHE6                        Dahlberg - cross

1    concerned, I saw nothing that looked like it was keeping track

2    on a summarized basis of the transactions, accounting or

3    financial activities that were really going on.

4    Q.  So you did see, for example, you used the example of

5    checkbooks.  Did you see some checkbooks for some entities?

6    A.  No, I never saw checkbooks from anybody.

7    Q.  You made reference just a moment ago to seeing some of the

8    sort of things like -- I forget the term you used -- books,

9    sort of standard accounting documents.

10   A.  Correct.  There was evidence of that.

11   Q.  But not as to Mr. Donziger himself is what you're saying?

12   A.  That is correct.  I saw no evidence of that with Mr.

13   Donziger.

14   Q.  Typically, when you look at a business or enterprise, there

15   is a uniform system of accounting that's applied, sort of a

16   standard, customary set of materials you're used to seeing, is

17   that what you're trying to convey?

18   A.  Basically, with any kind of organization that has any kind

19   of a financial -- sort of conducts financial activity, it could

20   even be individuals, small businesses, nonprofits, whatever,

21   something that kind of comes out of making sure that people can

22   figure out what transactions occur, what documentation relates

23   to the transactions, some way to accumulate transactions so

24   that you know how much moneys were spent in specific areas for

25   specific vendors, being able to reconcile back, all of those

DAM8CHE6                         Dahlberg - cross

1    kind of things that for a normal business, maybe like a general

2    ledger or financial statements on a higher level, and would

3    allow you to track in and be able to reconcile the activities

4    in the operations.  I didn't see anything like that for Mr.

5    Donziger.

6    Q.  So, for example, Mr. Kohn's law firm, you saw some

7    financial documents relating to that?

8    A.  I did.

9    Q.  I doubt you were given the opportunity, but if you were

10   given the opportunity to go to his law firm as an accountant

11   and look at all his financial records, you would expect to see

12   the sort of things you were just describing?

13   A.  Actually, I have done work for law firms before, and they

14   keep books and records so they can bill their clients and know

15   what they are revenues are and that kind of thing.  So, yes,

16   law firms typically do keep those type of records in my

17   experience.

18   Q.  And there were several, maybe even many different

19   businesses whose records you looked at in this case.  I am

20   thinking like the Kohn law firm, Crude, Inc.  We can go through

21   the list, but there are a variety of entities that you looked

22   at.

23   A.  Not actually in the sense where I got to see all the

24   records from that particular business.  I got to sort of see

25   them through, I guess, productions through Mr. Donziger and

DAM8CHE6                      Dahlberg - cross

1   maybe associates of his law firm.  But I never understood that

2   I got all the records or books for the Kohn firm or really for

3   any other entity except for Mr. Donziger.

4   Q.  If I understand what you're saying, in this case, you

5   didn't see a uniform system of financial accounting like you

6   would expect to see in an ordinary enterprise?

7   A.  I would say almost any type of enterprise.  I think

8   individuals might keep better records personally than what I

9   saw for this.

10  Q.  So you're not expressing the opinion, for example, that the

11  Kohn law firm has inadequate records, in the way that they keep

12  their financial records?

13  A.  I didn't express that opinion, no.

14  Q.  You're not expressing the opinion that Crude, Inc., I think

15  is the name of the corporation, is keeping inadequate records?

16  A.  No.  I didn't express that opinion.

17  Q.  What you're telling us is -- well, I think that's clear.

18  Thank you.

19          If you would look at page 3 of your report, and I

20  guess I should ask you, Mr. Dahlberg, did you write up your

21  direct testimony?

22  A.  I did.

23  Q.  What we are reading here are your words?

24  A.  Yes.

25  Q.  If we look under Ecuadorian counsel, where you say that

DAM8CHE6                          Dahlberg - cross

1    there were payments of approximately 684,000 to individuals or

2    entities primarily working at Donziger's direction, what is

3    your basis for determining that these counsel were working

4    primarily at Donziger's direction?

5    A.  So during the course of my work, we looked at thousands and

6    thousands of documents, and the scope of the documents were

7    e-mails, various types of correspondence, retainer agreements,

8    all sorts of business types of records.  And so what I am

9    expressing here is for any dollar amounts that we entered in

10   the report, we saw actual business operational documentation to

11   let us understand what those dollars related to.

12   Q.  I am not sure I am understanding what you're saying.  Are

13   you saying that you reviewed documents where Mr. Donziger is

14   giving orders to the Ecuadorian lawyers about how they should

15   conduct activities in Ecuador?

16   A.  Yes.

17   Q.  What sort of activities was he directing?

18   A.  I think, basically, it was more direction about

19   expenditures.  So, in other words, money getting expended for,

20   you need $50,000 to Selva Viva or $60,000 for Frente or

21   something like that.  Those are the types of things that I saw

22   that Mr. Donziger was directing flows of funds.

23   Q.  I see.  So would it be fair to say he was facilitating the

24   flow of funds?  I am not trying to parse words with you, but

25   trying to understand your meaning about directing.

DAM8CHE6                     Dahlberg - cross

1  A.  So in the documents I saw, it was more of, I would say, a

2  firm sort of statement like, send money to.  He would say that

3  to the Kohn firm.  Send $50,000 to Frente to Mr. Yanza, or

4  something like that.  So it wasn't like a request, like if you

5  feel like it send the $50,000.  It was like, you know, can you

6  please send it, there is a need to.  And he may express like

7  Mr. Cabrera or something like that he would designate the

8  reason why the funds needed to be sent.

9  Q.  If I am understanding you correctly, you were not in the

10  main reviewing documents that indicated that he was controlling

11  what the Ecuadorian lawyers were doing, other than as to

12  getting them money, if you will?

13  A.  Yeah.  I don't remember seeing documents that were

14  directing how the day-to-day activities for the Frente or Selva

15  Viva were expending funds that Mr. Donziger was directing.

16  Q.  If we go to where it says experts and consultants, would

17  the same thing be true, that when you use the phrase Donziger's

18  direction to provide scientific or technical services in the

19  litigation, is that a money based direction again, or are you

20  talking about specific direction to experts and consultants to

21  do particular types of work?

22  A.  So the direction would be that 50,000 or 40,000 is needed

23  to pay for these technical services so they can be done.

24         THE COURT:  We will break right here because I have

25  another case that I have to attend to.

DAM8CHE6

1          Give me an estimate of how long the cross of this

2    witness is going to take, please.

3          MR. FRIEDMAN:  I would say an hour, your Honor.

4          THE COURT:  Mr. Gomez.

5          MR. GOMEZ:  Maybe 15 minutes, your Honor.

6          THE COURT:  Thank you.  And the next witness will be?

7          MR. MASTRO:  The next witness will be former Chief

8    Justice Spigelman.

9          THE COURT:  I'm sorry?

10          MR. MASTRO:  James Spigelman, your Honor.  And then

11    Mr. Guerra.

12          THE COURT:  How long will you be taking with

13    Mr. Spigelman, Mr. Friedman, Mr. Gomez?

14          MR. BOOTH:  I would expect less than an hour.

15          MR. GOMEZ:  I don't expect very much at all.

16          THE COURT:  So we should reach Mr. Guerra before lunch

17    or about lunchtime, is that right?

18          MR. FRIEDMAN:  I think that's correct.

19          THE COURT:  Fine.  I will see you tomorrow morning at

20    9:30, folks.  Thank you.

21          (Adjourned to October 23, 2013, at 9:30 a.m.)

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2    Examination of:                           Page
 3    ADOLFO CALLEJAS RIBADENEIRA
 4    Cross By Ms. Friedman  . . . . . . . . . . . 708
 5    Cross By Mr. Gomez . . . . . . . . . . . . . 772
 6    TROY DAHLBERG
 7    Direct By Ms. Winston  . . . . . . . . . . . 816
 8    Cross By Mr. Friedman  . . . . . . . . . . . 820
 9                      PLAINTIFF EXHIBITS
10    Exhibit No.                             Received
11     430, 431   . . . . . . . . . . . . .771
12     1671   . . . . . . . . . . . . . . .810
13     4900   . . . . . . . . . . . . . . .817
14     4900A  . . . . . . . . . . . . . . .818
15                      DEFENDANT EXHIBITS
16    Exhibit No.                             Received
17     99   . . . . . . . . . . . . . . . .753
18     101  . . . . . . . . . . . . . . . .762
19     102  . . . . . . . . . . . . . . . .764
20     1354, 1355 . . . . . . . . . . . . . . 803
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300