DAN8CHE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5              v.                        11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x
                                        October 23, 2013
9                                       9:30 a.m.

10  Before:

11                      HON. LEWIS A. KAPLAN
                                        District Judge
12
                             APPEARANCES
13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17       GEORGIA K. WINSTON

18  FRIEDMAN RUBIN
         Attorneys for Donziger Defendants
19  BY:  RICHARD H. FRIEDMAN
         DEE TAYLOR
20
    LITTLEPAGE BOOTH
21       Attorneys for Donziger Defendants
    BY:  ZOE LITTLEPAGE
22       RAINEY BOOTH

23  GOMEZ LLC
         Attorneys for Defendants Hugo Camacho, Javier Piaguaje
24  BY:  JULIO C. GOMEZ

25

DAN8CHE1

1          (Trial resumed; in robing room)

2          MR. MASTRO:  Your Honor, I requested this conference

3    in relation to Zambrano document production issues and it may

4    also relate to Mr Guerra.  They did not agree to produce

5    Zambrano documents.  It may relate to the Guerra

6    cross-examination this afternoon, and we now have new

7    information, both from Sunday's deposition and something that

8    happened yesterday, that I think is important to be addressed

9    forthwith.

10          THE COURT:  What is the issue?

11          MR. MASTRO:  The issue is, not only have they refused

12   to produce Zambrano documents, it is apparent that a report has

13   been produced in Ecuador by a prosecutor's office looking into

14   the charge against Mr. Guerra of incitement of separation.

15   That's the charge.

16          THE COURT:  Is that like alienation of affection?

17          MR. MASTRO:  It's apparently not being patriotic.  The

18   prosecutor's office had a, quote unquote, forensic study done

19   of Zambrano's computer, and a report has issued that

20   miraculously the plaintiffs' group, the Frente in Ecuador, got

21   in advance.  So they put up on their Web site yesterday the

22   results of this examination.

23          Now, this comes full circle to Sunday because the

24   questioning on Sunday focused so much on computers in

25   Zambrano's office, and it's apparent that the other side not

DAN8CHE1

1    only has a press release about it, but they must have the

2    document.

3            Now, they will now have that to cross-examine

4    Mr. Guerra.  Zambrano is coming here.  This is kind of by

5    ambush.  They should have to produce this document to us,

6    because on its face it appears to be a ludicrous examination.

7    The information is provided on the FDA Web site.

8            THE COURT:  Do you have it?

9            MR. FRIEDMAN:  It may take more than one of us to

10    respond to this.

11            THE COURT:  Do you have the document?

12            MS. LITTLEPAGE:  No, sir.

13            THE COURT:  What about you?

14            MR. GOMEZ:  No, your Honor.

15            THE COURT:  Patton Boggs?

16            MR. GOMEZ:  No, your Honor, they do not.  I am

17    informed that the document is not public.

18            MR. FRIEDMAN:  We do have something.

19            THE COURT:  What do you have?

20            MR. FRIEDMAN:  We did learn about this, and we got an

21    affidavit, which I haven't even seen yet, so maybe Ms.

22    Littlepage can talk about it.

23            Well, you should say what it is.

24            MS. LITTLEPAGE:  I will tell you my whole

25    understanding, and we were going to raise this with the Court

DAN8CHE1

1    later today.  I was waiting until we got something signed in

2    writing so I can tell the Court exactly what happened.

3             It was our understanding from the lawyers in Ecuador

4    that a proceeding was started against Mr. Guerra.  My best

5    understanding is it's similar to a grand jury proceeding, in

6    that the documents created in that proceeding are secret.  So

7    we did not know that there was an actual report created, but we

8    did know that there was a forensic study done of Judge

9    Zambrano's computer.  It's done by the forensic team of some

10   division of the police department that does forensics.

11            The lawyers in Ecuador met yesterday with the forensic

12   expert who did the analysis.  They told us that they would get

13   us a declaration from the forensic expert as to what he found,

14   but they could not produce the official report that he provided

15   to the Ecuadorian court because the report is confidential.

16            We anticipated getting that signed declaration some

17   time today, and we were going to immediately turn it over to

18   Mr. Mastro and do a motion to the Court asking the Court to

19   allow us to amend our witness list and bring this forensic

20   expert.  That's all I know.

21            My understanding is that Judge Zambrano's computer was

22   quarantined.

23            THE COURT:  This is an examination of Zambrano's

24   computer or of Guerra's computer?

25            MS. LITTLEPAGE:  Judge Zambrano's computer.  My

DAN8CHE1

1    understanding is that the forensic experts, and I understand

2    there are two, the Ecuadorian court appointed two so one could

3    review the other one's work, that these two experts have found

4    that the verdict was written on Judge Zambrano's work computer.

5    It's a desktop computer.  It was not created on a laptop, like

6    Mr. Guerra says.  It was not moved on to his computer by a USB

7    drive.  That, in fact, the USB port was not accessed during the

8    time the verdict was written.

9            So there is now evidence that the verdict was in fact

10   written on Judge Zambrano's computer, in his office, in the

11   courthouse, and not as Mr. Guerra -- Mr. Guerra has two

12   different stories.  One is that he wrote it on a flash drive

13   one is that he wrote it on a laptop.  Neither of those are

14   supported by the forensic evidence.  That I hope to have for

15   the Court today.

16           MR. FRIEDMAN:  I have one addition.  I think our group

17   up here now has a Spanish version affidavit from this expert.

18           THE COURT:  Turn it over.

19           MR. FRIEDMAN:  We will.  Things are happening in this

20   regard that I am not completely up to speed on so I don't

21   want -- we may have that affidavit now.

22           MR. GOMEZ:  We do.  We have the affidavit and it's

23   signed, and I tried translating it last night.

24           THE COURT:  Turn it over in whatever state it's in.

25           MR. MASTRO:  All I can say, your Honor, is on their

DAN8CHE1

1    own Web site yesterday, they posted about the report and its

2    contents, Fajardo's statements about it.  They said the

3    judgment file was open on the computer on October 11, 2010,

4    that's the day Zambrano resumed on the case, and remained open

5    continuously for 3,571 hours, which is the equivalent of five

6    months, right through the day of the judgment.  This is such a

7    ludicrous report, but we need it.  Questioning occurred on

8    Sunday.

9             THE COURT:  If they have it, they are going to have to

10   turn it over.  If Fajardo has it, it's subject to the order

11   already.  It's to be turned over.

12            MS. LITTLEPAGE:  We have something.  I think we may

13   have brought it in last night signed.  I know we have

14   something.

15            MR. FRIEDMAN:  It's not the report.

16            MS. LITTLEPAGE:  We do not have the report, but we

17   have spoken to the forensic expert.

18            THE COURT:  We are going to deal with this in due

19   course.  Whatever you have you're going to turn over.  I am not

20   now ruling on what is going to happen, with respect to whether

21   these witnesses are going to take the stand, with respect to

22   anything else.  I am just saying turn it over.  In your own

23   best interest turn it over.

24            MS. LITTLEPAGE:  It was our intention all along.

25            MR. MASTRO:  I brought it up.  They didn't.

DAN8CHE1

1           MR. GOMEZ:  If I may add one more point.  If memory

2    serves, Enrique Carvajal, who is Adolfo Callejas' associate, is

3    an attorney of record in that proceeding.

4           THE COURT:  In which proceeding?

5           MR. GOMEZ:  The one dealing with the complaint --

6           MR. MASTRO:  Has been unable to get the report.

7           THE COURT:  Would you stop interrupting, Mr. Mastro?

8           MR. GOMEZ:  My understanding is Mr. Carvajal is an

9    attorney of record.  He represents some party in that

10   proceeding and has been privy to its developments.  So I think

11   the claim that this is totally out of left field and there is

12   virtually no knowledge about it is belied by the fact that Mr.

13   Callejas's associate is attorney of record in the case.

14          THE COURT:  Maybe, maybe not.  I don't know if he is

15   attorney of record.  I don't know what it would mean if he is.

16   That's where we are.

17          MS. LITTLEPAGE:  It's our understanding that the

18   person that worked for Mr. Chevron, Mr. Carvajal, has been

19   present at these proceedings.  Obviously, we have not been

20   present at the proceedings.  But what we have we intended to

21   give them as soon as we got a signed copy, and then we will

22   file the appropriate motion and raise the issue with your

23   Honor.

24          THE COURT:  All right.  That takes care of that.

25          Now, as long as you're in the robing room, I am going

DAN8CHE1

1    to take one more minute.  This is a bench trial, whether you

2    like it or not, that's what it is.  It is not for either side

3    an occasion to produce material for press releases, which if

4    they are fair and true reports of papers filed here or

5    statements made, are not subject to libel suits.

6         The name of the game here is to put the evidence

7    before me in the most efficient way.  That does not include

8    repeating it endlessly.  It does not include endless

9    examination of witnesses by either side about stuff that is

10   undisputed, stuff that the witnesses don't know anything about,

11   that would be competent testimony.  It does not include stuff

12   that you want to emphasize for the press or for somebody else.

13   The exercise is to bring to my attention that which is not

14   otherwise there.  I will hear closing argument in this case,

15   not long, but I will.  You will have post-trial briefing to

16   make all your points.  But it is essential that both sides get

17   down to business and get the possess of putting the evidence I

18   need in here efficiently.

19        We have had a lot of trouble, especially yesterday,

20   but not only yesterday, because both sides are paying very

21   little attention to this.  I have already made my views clear

22   on that.  The fault lies with both sides.  And it has to stop.

23   When you guys do it appropriately, the testimony comes in

24   without any objections, without any interruptions.  And when

25   you depart from it, that's when the trouble starts, and there

DAN8CHE1

1    is no reason for it.  I understand what the issues in this case

2    are.

3          Now, I had no idea, Mr. Gomez, that you folks were

4    short of space outside the courtroom here.  I obviously

5    believed to a degree the argument that it was just you and Mr.

6    Donziger.  Obviously, it was not just you and Mr. Donziger.

7    And obviously Chevron is here with more lawyers than you can

8    shake a stick at.  So the obvious thing was done by my deputy

9    in terms of space.  I haven't got any other space.  I will see

10   whether we can scare up some more space for you.  I will do the

11   best we can.

12         I am not now deciding what I am going to do about the

13   Does, but it's not inappropriate to tell you that I am somewhat

14   skeptical that there is any way for the defense to have an

15   adequate investigation that would fully ensure the anonymity of

16   the two Doe witnesses.  I will, if push do it, ultimately rule

17   on it, but we may come to a point where they are either going

18   to have to decide that they are going to come and testify or

19   that they are not.  We may get there.

20         That's not to say there might not be some measures of

21   a protective nature, if they were to come and testify, and some

22   limitations on what the defense could do with their identities.

23   But I am very troubled by the fairness question about allowing

24   adequate preparation by the defense, and you should just know

25   that I am thinking about it actively.  It's a very difficult

DAN8CHE1

1    problem.

2          Now, Mr. Donziger's testimony.  He is to prepare a

3    witness statement.  Before that gets filed, Mr. Friedman, you

4    are to do what Mr. Mastro should have done.  It is not to be

5    Mr. Donziger's account of the history of the world as it

6    relates to Ecuador.  It is to be facts on personal knowledge,

7    without argument, without supposition.  It's got to be, as it

8    would be on a motion for summary judgment, facts that would be

9    admissible in evidence if testified from the stand.  I will let

10   you, if it's necessary, supplement it with direct testimony.

11   The same stricture as to that.  No speeches, responsive answers

12   to proper questions, evidence, not PR.

13          MR. FRIEDMAN:  I understand.

14          Could I say one thing as to that?

15          THE COURT:  What?

16          MR. FRIEDMAN:  I have been thinking about this issue a

17   lot.

18          THE COURT:  I assumed you were.

19          I will tell you both, you and Ms. Littlepage, that you

20   have been a breath of fresh air in this case, and I am

21   appreciative of it.

22          MR. FRIEDMAN:  For this purpose, the one difference

23   between Mr. Donziger and the other witnesses is that his state

24   of mind is actually critical.

25          THE COURT:  His state of mind on some things is

DAN8CHE1

1   certainly critical, and I understand that.

2           MR. FRIEDMAN:  I am not saying that justifies a tirade

3   about the economic inequalities in Ecuador.  All I am saying is

4   there are things that he saw or observed that he says resulted

5   in him doing certain other things, and I don't know how to -- I

6   guess what I am saying is I think, using my best good faith

7   efforts to respond to all the things that have been said about

8   him in this trial, and will be said, there is going to be

9   things that the Court or certainly Chevron thinks should not be

10  in that statement, but I clearly understand what you're saying,

11  and I am going to do my best to keep it down.

12          THE COURT:  On this as with all other statements, I

13  want you to talk beforehand so that I don't wind up starting

14  the day of his testimony with an hour or two or three fighting

15  about which parts of the statement get cut out, as we did

16  yesterday or the day before, or last week, whatever it is.  You

17  know what I am referring to.  I am not faulting you for raising

18  those points.  I went with you with every one of them.  But you

19  see what I am getting at.  I accept the good faith on your part

20  and on the other side.

21          Obviously, the tempers on both sides -- I am not

22  saying this of you, Mr. Friedman, but your predecessors -- have

23  been like nothing I have ever seen in 40-plus years of

24  practicing and being on the bench.  Nothing.  I have never seen

25  anything like it.  And it has caused both sides to behave in a

DAN8CHE1

1    way that I have often thought would appall the wives and loved

2    ones of all of the actors if they understood what was going on.

3            MR. MASTRO:  Please don't tell my wife.

4            THE COURT:  They appall me.  Let's just leave it at

5    that.

6            So let's try to make a break with the past on that and

7    get this done in a businesslike way.  I know there are

8    difficult issues in this case.  I have known it from the

9    beginning.  Nobody remembers that in the preliminary injunction

10   ruling I did not find a probability of success on the fraud.

11   Mr. Donziger seems to tell the world otherwise I guess, but I

12   did not.  I know what the issues are, and they are important

13   and serious.  I think I know just what they are, and to the

14   extent I don't, you will educate me.

15           MR. FRIEDMAN:  Your Honor, if I could just add one

16   last point on the Doe issue.  I appreciate your comments about

17   that and the difficulties you are balancing.  I am sure you

18   know this, but I just want to say it anyway, which is every day

19   that goes by makes it harder for us --

20           THE COURT:  I am aware of that.  I am very aware of

21   that.  And I know that the clock has a bearing here.  But there

22   it is.

23           MR. FRIEDMAN:  Understood.

24           THE COURT:  The fact that it's a nonjury case could,

25   if we need it, give me a little flexibility there that I

DAN8CHE1

1   wouldn't have with a jury.  So we will just see how that plays
2   out.
3           It is equally true that it is not every case where the
4   defendant knows the identity of every witness against him or
5   her.  It just isn't.  There are only rare instances where that
6   happens, but it happens, and properly happens, as you all know.
7           That's it.  How long are we going to go with Dahlberg?
8           MR. FRIEDMAN:  An hour.
9           MR. GOMEZ:  20 minutes.
10          THE COURT:  We are going to get to Guerra sometime
11   this morning.
12          MS. LITTLEPAGE:  May I raise one thing with Mr. Guerra
13   so we don't have the press listening in on some of this?
14          THE COURT:  They will just read it.
15          MS. LITTLEPAGE:  At least it will be a day later.
16          Chevron has provided a witness statement, although
17   Mr. Guerra will be testifying live, which was very helpful.
18   There are two particular areas that cause me some concern that
19   I wanted to raise with the Court.  There's lots of discussions
20   in Mr. Guerra's statements about conversations he had with
21   Judge Zambrano, what Judge Zambrano told him, which are
22   hearsay.  But there are two particular discussions -- some are
23   not.  I researched all last night to try to understand them.
24   There are two particular things that are very troubling that I
25   would like to object to, and I would like to raise it now so

DAN8CHE1

1    the Court can give me some guidance.

2            On two occasions Mr. Guerra says, Judge Zambrano told

3    me that he had reached a deal with the plaintiffs to get money

4    for writing orders in their favor in the first instance, and

5    then for delivering a verdict to them in the second instance.

6    I think those two specific comments, where Judge Zambrano says

7    them to Mr. Guerra, are rank hearsay.  And because Judge

8    Zambrano is going to be here testifying, none of the exceptions

9    would apply to them, and those two specific comments that are

10   his statement I would object to and ask to be stricken.  I

11   wanted to raise it beforehand because I didn't want them to ask

12   an open-ended question in the courtroom and Judge Guerra

13   blurted out, and then I have to object afterwards.  I know it's

14   not a jury trial, but those are two particular issues that are

15   in his witness statement that I have concerns with.

16           THE COURT:  I understand.  I was anticipating this for

17   quite some time and your answer I am sure I know, but what is

18   your answer?

19           MR. MASTRO:  The exchanges both with what Zambrano

20   said and what he attributes to Fajardo are both in the category

21   of nonhearsay or exceptions to hearsay, co-conspirators and

22   admissions against interest.  So I think they clearly come in

23   under these circumstances and the Court should hear them.

24           Again, what we are doing today, and we agreed upon the

25   procedure, he has done his normal witness statement.  We have

DAN8CHE1

1    made similar redactions, your Honor.  We are going to do a

2    direct examination of him in addition to his witness statement

3    being received on the questions of his ghost-writing for Judge

4    Zambrano and his role in the judgment ghost-writing and bribery

5    solicitations.  So we will be covering the very areas on a

6    direct examination that will supplement the declaration.

7         MS. LITTLEPAGE:  My response is, Judge Zambrano is not

8    listed or named as a co-conspirator, named or unnamed.

9         THE COURT:  It doesn't matter.

10        MS. LITTLEPAGE:  In the complaint, in fact, there are

11   no allegations at all of the bribery.  The complaint was never

12   amended to plead with any specificity any of the allegations

13   that Mr. Guerra is making now.  I am just keeping my record.  I

14   believe it's rank hearsay, and I don't believe it matches an

15   exception.

16        THE COURT:  I am not going to express any views with

17   respect to the statement against interest argument now, though

18   I may in due course.  But my understanding of the law, and if

19   somebody wants to submit anything on this if I am mistaken in

20   your view, you will tell me, or you're at liberty to do it.

21   But my understanding of the law is that the co-conspirator rule

22   applies even in a circumstance where the declarant, which in

23   this case is Zambrano, is not charged with the offense.  It

24   applies whenever there is a conspiracy or concerted action

25   between the declarant and the witness and the statement is made

DAN8CHE1

1    in furtherance of the object of that conspiracy.

2            Now, on the face of Guerra's declaration, he says, in

3    substance, that there was indeed a conspiracy.  There was a

4    conspiracy at least between himself and Zambrano to extract a

5    bribe in exchange for allowing the plaintiffs to write the

6    judgment.  Guerra had a role in that, both vis-a-vis initiating

7    the contact and dealing with the draft judgment, and Zambrano's

8    communication to Guerra was certainly in furtherance of the

9    plan because he was telling Guerra, OK, we have a deal, and

10   you're going to do some of the work, and we are going to get

11   this draft from the plaintiffs.  That's a rough summary.  I

12   don't have the paper in front of me.

13           Now, the question whether it's admissible as a

14   co-conspirator declaration is a question of competence.  It's a

15   preliminary issue of fact for the judge.  I think it comes

16   under Rule 104(b) of the Federal Rules of Evidence, and it is

17   up to me to find, as a threshold to admissibility, that there

18   was a conspiracy, at least to that extent, and that the

19   declaration was in furtherance of it.

20           That obviously depends on who I believe ultimately.

21   So in the first instance those statements, unless you can show

22   me law to the contrary, will come in as they do in all criminal

23   cases, subject to connection, and I will ultimately make a

24   finding about whether they were in furtherance and whether

25   there was the conspiracy.  That's my rough understanding of the

DAN8CHE1

1   law as we sit here now.

2           MS. LITTLEPAGE:  Just for the record, obviously this

3   is very prejudicial.  Certainly, as to the conversation of

4   Judge Zambrano telling Mr. Guerra allegedly that he had reached

5   a deal with the plaintiffs as to writing the verdict, there is

6   no corroboration that that's true.  Guerra is not listed as a

7   co-conspirator.  Mr. Zambrano is not listed as a co-conspirator

8   in the complaint.  So we have got two nonlisted co-conspirators

9   in the complaint talking about something that has no

10  corroboration to it.

11          THE COURT:  I got that the first time you said, except

12  the corroboration point, and I am not aware of a shred of

13  evidence that says that a co-conspirator declaration is not

14  admissible unless it's corroborated -- a shred of law is what I

15  meant, not evidence.

16          You will enlighten me if I misunderstand this.  In any

17  case, it's not anything I have to decide before I decide the

18  case.

19          MS. LITTLEPAGE:  Do I need to object further or have I

20  preserved?  Do you want me to object in the courtroom?

21          THE COURT:  As to the two statements that you have

22  raised specifically, you have made your record.

23          MS. LITTLEPAGE:  Thank you, Judge.

24          MR. MASTRO:  We are going to be handing out disks for

25  you today.  All the deposition designations in our case, their

DAN8CHE1

1    objections, their cross and counterdesignations, you will have

2    all of that with each side's objections.  We will have the new

3    booklets -- they are in more than one box -- left with your

4    courtroom deputy.  So you will have the complete set now with

5    each side's objections.  We agreed that once received by your

6    Honor, like we do with witness declarations, that we e-file

7    both what we put into the record and the objections.

8              Thank you, your Honor.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAN8CHE1

1              (In open court)

2              THE COURT:  Good morning, everyone.

3        TROY DAHLBERG, resumed.

4              THE COURT:  OK.  The witness is reminded he is still

5    under oath.

6              You may proceed, Mr. Friedman.

7              MR. FRIEDMAN:  Thank you, your Honor.

8    CROSS-EXAMINATION (Cont'd)

9    BY MR. FRIEDMAN:

10   Q.  Mr. Dahlberg, can you tell us how much Chevron has been

11   charged for your firm's work on this case?

12   A.  A little under $5 million.

13   Q.  Who have you primarily worked with at Gibson Dunn on this

14   project?

15   A.  Ms. Winston, Mr. Marick and Ms. McCoy.

16   Q.  Have you worked with any people who were not in either your

17   firm or the Gibson Dunn firm on this project?

18   A.  No.

19   Q.  Have you worked on other projects with Gibson Dunn in the

20   past?

21   A.  Yes.

22   Q.  About how many?

23   A.  One.

24   Q.  What was that case?

25   A.  I don't have a clear recollection, but it didn't last very

DAN8CHE1                      Dahlberg – cross

1   long, and it was probably about maybe 12 years ago, 13 years

2   ago.  So it wasn't a very large matter.

3   Q.  On this project, who was responsible for getting you the

4   records that you used and analyzed the financial transactions?

5   A.  Ms. McCoy.

6   Q.  Who is she?

7   A.  She is an attorney at Gibson Dunn.

8   Q.  You did no independent investigation of the availability of

9   documents?

10  A.  I guess for clarification sake, I can tell you what I did.

11  Q.  Sure.

12  A.  So I asked for all transactional financial records that

13  they had relating to this matter.

14  Q.  But you didn't go out on your own to verify that, for

15  example, this was all that Gibson Dunn had?

16  A.  No.

17  Q.  If I understand what you're saying correctly, you're not

18  saying that you reviewed all the documents produced by Mr.

19  Donziger in this litigation?

20  A.  I don't know, because we made the request for all

21  information that related to financial accounting transactional

22  records, and if they produced everything to us that they

23  received related to that, I don't know.

24  Q.  You're a member of the American Institute of Certified

25  Public Accountants?

DAN8CHE1                    Dahlberg - cross

1    A.  Yes.

2    Q.  Bound by that group's ethical code?

3    A.  Yes.

4    Q.  And that code requires that you only render opinions when

5    you have sufficient relevant data to afford a reasonable basis

6    for your conclusions?

7    A.  That's the consulting standard.  It's kind of a general

8    standard, but that's the consulting.

9    Q.  That would apply in this situation, wouldn't it?

10   A.  Yes.

11   Q.  Even if you're acting in a forensic matter, the code

12   requires that you have sufficient relevant data to afford a

13   reasonable basis for your conclusions?

14   A.  Yes.

15   Q.  If there is not sufficient data to afford a reasonable

16   basis for your conclusion, you're bound by the code to tell us

17   about that?

18   A.  I think I am probably bound not to make the opinion.

19   Q.  As a forensic accountant, you should not be engaging in

20   speculation, would you agree?

21   A.  At some level of your investigative aspect, when you don't

22   have a lot of information, you have to sort of gather things

23   along.  I don't know if you call that speculation, but you go

24   through levels of gathering evidence, and then your opinions

25   become more or less certain and ultimately depending on all the

DAN8CHE1                    Dahlberg - cross

1    evidence you look at.

2    Q.  Well, is there a difference between the level of certainty

3    that an accountant needs in auditing a company than an

4    accountant needs say when providing an opinion in court?

5    A.  Possibly.

6    Q.  Did you engage in speculation in this case?

7    A.  No.

8    Q.  Would you believe that a forensic accountant should be

9    basing opinions on unconfirmed or unreliable information?

10            MS. WINSTON:  Objection, your Honor.  Form.

11            THE COURT:  Sustained.

12   Q.  Did you base opinions in this case on unconfirmed or

13   unreliable information?

14            MS. WINSTON:  Objection, your Honor.

15            THE COURT:  Overruled.

16   A.  I guess you would have to define -- I don't think anything

17   was unreliable, but unconfirmed I don't quite understand.

18   There are different levels of confirmation you could have

19   depending on the type of evidence you are looking at.  So I

20   would need a further definition.

21   Q.  Let me ask you this.  Would you agree that a forensic

22   accountant should not state or imply to someone who has acted

23   fraudulently without solid evidence to support that conclusion?

24   A.  I would agree with that.

25   Q.  I looked at your various summary charts.  Did you do any

DAN8CHE1                          Dahlberg - cross

1    analysis of when different amounts of funding were received?

2    A.  Yeah.  There were a couple of different analyses that

3    involved timing aspects specifically.  Generally speaking, we

4    tried to sort information out at times by when the times came

5    in because we wanted to match things to time amount to sort of

6    see what the interrelationship was between the documents we

7    were looking at.

8    Q.  Is there some summary charts showing the dates in which

9    funding was received?

10   A.  I don't believe in this there is a summary chart.  In my

11   final opinion, there is a summary chart, as far as when funding

12   was received.  The only one in here I have is by the individual

13   entity that the funds came by.

14   Q.  Likewise, did you do a summary chart indicating when

15   expenditures were made?

16   A.  That's not -- there is one chart in here about certain

17   expenditures in time, and then there's other charts that are

18   just by an individual or entity.

19   Q.  But not a summary chart showing when different amounts were

20   spent for different entities?

21   A.  You're talking about in my testimony?

22   Q.  In your direct.

23   A.  There is not an overall for all distribution.

24   Q.  Do you have your direct testimony up there with you?

25   A.  I do.

DAN8CHE1                      Dahlberg - cross

1   Q.  Would you mind turning to page 16, which for the record is

2   also Plaintiff's Exhibit 2143?

3          THE COURT:  You're talking about Plaintiff's Exhibit

4   4900, page 16, right?

5          MR. FRIEDMAN:  Yes.

6   Q.  Mr. Dahlberg, on this chart you have a list of people or

7   entities that provided funding, is that right?

8   A.  Well, not exactly.  Yes and no.

9   Q.  Tell me the yes and then tell me the no.

10  A.  So as you can see, there's three columns, but two columns

11  that have numbers.  There is a center column and a far right

12  column.

13         In the center column, that is actually amounts of

14  money that were actually we were able to confirm that were

15  actually received or paid as funding.  In the far right column

16  is commitments, so that is more documentation surrounding

17  amounts of money that people appear to be committing that they

18  were going to fund at some point in time.

19  Q.  Then if we just go real quickly to page 35, this is also

20  marked as Plaintiff's Exhibit 2137.  This is your summarization

21  of spending, is that right?

22  A.  That is correct.

23  Q.  So if we go then back to page 16 -- actually, if we

24  could -- you actually talk about on page 4 and 5 of your direct

25  testimony things that you refer to as potential indicators of

DAN8CHE1                    Dahlberg - cross

```
1    fraud, correct?
2              THE COURT:  Presumably it says whatever it says, Mr.
3    Friedman.
4    Q.  Have you listed out for us what you viewed as potential
5    indicators of fraud?
6    A.  Yes.
7    Q.  Those include inadequate documentation to support
8    transactions, etc.?
9    A.  Yes.
10   Q.  So if we go to page 16 of your report, does your review of
11   the Kohn Swift records indicate that Kohn Swift kept inadequate
12   documentation to support the financial transactions it engaged
13   in?
14   A.  I didn't do an analysis as to whether Kohn Swift & Graf had
15   adequate records or not for the litigation.
16   Q.  Did you do an analysis of Kohn Swift on your second indicia
17   of fraud, incomplete and/or unclear accounting records relating
18   to those accounting records?
19             MS. WINSTON:  Objection.  Asked and answered.
20             THE COURT:  Sustained.
21             MR. FRIEDMAN:  This is a separate category in the
22   potential fraud.  He has got five of them.
23             THE COURT:  Yesterday he testified, as I remember,
24   that he never looked at Kohn Swift's records.
25             Whether you testified to it or not, is that true?
```

DAN8CHE1                       Dahlberg - cross

1          THE WITNESS:  Unless they were produced with Mr.

2     Donziger's records, that's true.

3          THE COURT:  Let's leave that.  He was not auditing

4     Kohn Swift.  He was looking at the paper that Mr. Donziger

5     produced.

6     Q.  So you're not saying that any of these investors that you

7     listed on this chart have any of the indicators of fraud that

8     you list in your report?

9          THE COURT:  He didn't speak of indicators of fraud.

10    He said potential indicators.

11    Q.  None of these investors in your review demonstrated

12    potential indicators of fraud, is that right?

13    A.  I didn't offer an opinion in this testimony regarding the

14    investors and whether or not there were indicators of fraud

15    relating to the investors, the investors' records.

16    Q.  Would you agree that you have not formed any opinion or

17    conclusion that any of these people or organizations engaged in

18    fraud, any of the ones on this list?

19    A.  We are referring back to page 16, I guess, Exhibit 2143?

20    Q.  That is correct.

21    A.  I didn't form an opinion as to the investors and their

22    actions related to whether they had any fraudulent conduct.

23    Q.  As to the right-hand column then, you started to tell us

24    about that.  In the commitment amounts, you're not intending to

25    suggest that the amounts in the right-hand column were actually

DAN8CHE1                    Dahlberg - cross

1    received, other than to the extent they are reflected in the

2    middle column?

3    A.   That is correct.

4    Q.   So, for example, with the Burford money, you know for a

5    fact that Burford never paid out 15 million to support the

6    lawsuit, correct?

7    A.   Actually, I don't know that for a fact.

8              THE COURT:  Maybe we can save an awful lot of time.

9              Mr. Dahlberg, I understand from your statement that

10   what you did is you asked for all of the financial transaction

11   documents that Mr. Donziger had given Gibson Dunn.  Is that

12   true so far?

13             THE WITNESS:  That's correct.

14             THE COURT:  Then Gibson Dunn gave you what I imagine

15   was a big pile of papers, right?

16             THE WITNESS:  A lot, your Honor.

17             THE COURT:  And you went through those papers and you

18   basically added up whatever you thought relevant or whatever

19   you were asked to add up, and you have set forth the results of

20   your review of as much as he gave you, as much as you got?

21             THE WITNESS:  That's generally correct, your Honor.

22             THE COURT:  You're offering no opinions about anybody

23   else, first of all, other than Mr. Donziger, is that true?

24             THE WITNESS:  There are some transactions involving

25   other individuals that we do talk about, for instance, Mr.

DAN8CHE1                        Dahlberg - cross

1   Cabrera and Mr. Reyes.

2              THE COURT:  But not any of the investors in the

3   lawsuit, is that true?

4              THE WITNESS:  That's correct.

5              THE COURT:  And not any defendant in the lawsuit

6   except Mr. Donziger, is that also true?

7              THE WITNESS:  That's correct.

8              THE COURT:  The boundaries of whatever you can say

9   here depends upon how truthful, accurate and complete the

10  information that you were given to work from was, is that true?

11             THE WITNESS:  That's completely correct.

12             THE COURT:  If there is anything else that needs to be

13  gone into on cross-examination, let's go immediately to it.

14  OK?

15             MR. FRIEDMAN:  Yes, your Honor.

16  BY MR. FRIEDMAN:

17  Q.  To clarify then on the commitment amounts, you are not

18  saying that any of those amounts were actually paid?

19             MS. WINSTON:  Objection.

20             THE COURT:  He already said that.

21         Look, instead of belaboring the obvious, you're saying

22  that you saw evidence in the documents you were given that

23  $15.99 million was actually contributed.  That's what you saw,

24  is that accurate?

25             THE WITNESS:  That's correct.

DAN8CHE1                        Dahlberg - cross

1          THE COURT:  And maybe other money was contributed, but

2     you didn't see any evidence of it, is that right?

3          THE WITNESS:  Yes.

4          MR. FRIEDMAN:  Thank you.

5     BY MR. FRIEDMAN:

6     Q.  If we go to page 35 of your report, you were able to

7     confirm payments of approximately $7 million, is that right?

8     A.  Yes.

9     Q.  And this is just a summary.  Obviously, you break it into

10    smaller pieces in the subsequent pages.  But you specifically

11    excluded from your analysis moneys spent on services, is that

12    right?  And I am using services to include things like -- maybe

13    that's the wrong term -- airfare, hotel, lodging, phone bill.

14    A.  I think in professional parlance, it would be like

15    out-of-pocket expenses.  So you're talking travel, food,

16    lodging, that's correct, those were excluded.

17    Q.  Those were excluded not just for Mr. Donziger, but other

18    individuals who may have been working on the case?

19    A.  No, not always.  As a matter of fact, I actually think

20    generally they probably were actually included for some of the

21    other individuals, because we just went off of invoice totals

22    for a lot of other folks.  Mr. Donziger's invoices were

23    specifically for his hours, and usually he had a separate

24    request for payment for what we call out-of-pocket expenses.

25    Q.  I am looking at the bottom of page 13 of your report then.

DAN8CHE1                        Dahlberg - cross

I am specifically referring to paragraph 33.  Let me just ask
you, was there any rule of decision, if you will, that
determined when you would and would not capture various
expenses, such as airfare, hotel, lodging, and things of that
kind?
A.   The general rule was that if we could see an invoice coming
from a third party entity, and there was sort of a total amount
in that invoice, we attributed that to the entity that that
invoice came from.  So if Stratus, as an example, had an
invoice for, let's say, hypothetically, $50,000, we put that in
the Stratus payment bucket, and this was moneys that were paid
to Stratus.  So we didn't try and break down from there if
Stratus paid like other consultants or other out-of-pockets
from there.

        As I explained with Mr. Donziger, it was a bit easier
because he didn't combine his out-of-pockets almost all the
time with his other hourly fees like most normal billings would
be.  They were completely separate.  So we were able to
separate those.  It was only for him that we did that.
Q.   If I understand what you're saying then, you did not
capture his expenses separately?
A.   His expenses relating to these out-of-pocket things I am
talking about, yes.
Q.   I will ask you the same question as to the chart on page
35.  The print is kind of small here in the footnote.  But it

DAN8CHE1                        Dahlberg - cross

1    sounds like what you're saying under evidence of payment is

2    that could also be categorized as unconfirmed evidence of

3    payments?

4              MS. WINSTON:  Objection.  Vague.

5              THE COURT:  Sustained.

6              What did you mean by evidence of payment?

7              THE WITNESS:  That we saw evidence that a payment was

8    made.

9    Q.  But it was unconfirmed, yes?

10   A.  No.  The evidence we saw was confirmed.  We saw the

11   evidence.  But it's not confirmed in the sense that we defined

12   confirmed, which we actually define in footnote 1, which is

13   actually moneys going through a financial institution, like a

14   bank account, where you see money coming in and out of a bank

15   account.  In that definition of confirmed, it wasn't confirmed.

16   Q.  So as I understood your report, the unconfirmed of evidence

17   of payment could be an e-mail for example?

18   A.  Our the report says an e-mail is evidence of payment.

19   Q.  So if you saw an e-mail about a payment, that would support

20   you putting an entry in the far right-hand column?

21   A.  It could support it.  Again, we were looking at 10, 20,000

22   documents.  So what we did was we actually tried to compare as

23   much as we could a whole different type of set of records, it

24   might be an e-mail, it might be a bank statement, it might be a

25   retainer agreement, all sorts of different things.  And then we

DAN8CHE1                         Dahlberg - cross

1    did our best to put this all together because there really

2    wasn't any accounting system that I can go to to figure out

3    what the disbursements were.  So then we tried to piece

4    together what those were to figure out what evidence we had

5    would be the best evidence of a payment.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANLCHE2                     Dahlberg - cross

```
 1   Q.  And if you -- what I'm trying to understand is your
 2   distinction between confirmed and unconfirmed evidence of
 3   payment.
 4   A.  I don't think I have a distinction between unconfirmed
 5   because that's not a term I'm using in my report.  I have a
 6   distinction between what we refer to as evidence of payment
 7   versus a confirmed payment.
 8   Q.  I'm reading your footnote here, as such, evidence of
 9   payment is an approximate representation of all transactions
10   whether confirmed or unconfirmed.
11             THE COURT:  Yes, but that -- you read only part of it.
12             MS. FRIEDMAN:  I did.
13             THE COURT:  Look, Mr. Friedman, maybe I'm missing
14   something, but it seems clear as a bell to me.  His footnote
15   says that he included as confirmed transactions and transfers
16   that he was able to reconcile to documents from financial
17   institutions, for example, wire transfer records, canceled
18   checks, or bank statements.
19             MS. FRIEDMAN:  Yes.
20             THE COURT:  Other than that, other than things he
21   could reconcile through a bank statement or the other items he
22   mentioned, he treated all other transactions where he had a
23   shred of evidence, whatever it might have been, that a payment
24   was made though not reconcilable to a bank statement and so
25   forth as evidence of payments.  I'm not getting where you're
```

DANLCHE2                    Dahlberg - cross

```
 1   going with this.
 2   Q.  Well, is that correct, Mr. Dahlberg?
 3   A.  That's completely correct.
 4   Q.  All right.  So just the slightest shred of evidence gets
 5   something on the evidence of payments column the way you did
 6   your analysis?
 7   A.  I'm not sure how you're defining slightest shred of
 8   evidence.
 9   Q.  Take out the --
10           THE COURT:  Is this ultimately important to anything
11   in this case, Mr. Friedman?
12           MS. FRIEDMAN:  Ultimately you'll determine that, your
13   Honor.
14           THE COURT:  Yes, but that would be true if you were
15   offering here the Manhattan classified pages, but we're not
16   going to do that.
17           MS. FRIEDMAN:  I'm not offering anything, your Honor.
18   This is their material.
19           What I'm honestly, your Honor, all I'm trying to
20   establish here is that this is not standard accounting, the
21   email, something written on a napkin, basically any kind of --
22           THE COURT:  Look, Mr. Friedman, it all depends what
23   standard accounting is.
24           Is anything in here a certification or an opinion by
25   you as a certified public accountant that the books and records
```

DANLCHE2                    Dahlberg - cross

1    here fairly present the financial condition of any company,

2    entity, or person?

3              THE WITNESS:  No, it does not, your Honor.

4              THE COURT:  Okay.  Are you claiming you did any audit

5    of anything in accordance with generally accepted auditing

6    standards?

7              THE WITNESS:  I am not, your Honor.

8              THE COURT:  But what you did is you took the paper you

9    were given and you added up various things and put them in

10   charts, for whatever that's worth, right?

11             THE WITNESS:  Yes.

12             THE COURT:  Could we now proceed.

13   BY MS. FRIEDMAN:

14   Q.  The charts, Mr. Dahlberg, are titled enterprise, as in

15   summary of enterprise spending.

16             What was your understanding of what the enterprise

17   was?

18   A.  So my understanding of the enterprise was sort of all the

19   activities that related to the Lago Agrio litigation.  So that

20   would be just generally the activities surrounding the actual

21   conducting of the litigation, the media, the publication, the

22   lobbying, the financing.  Pretty much the things that I believe

23   Mr. Donziger seemed like he was in charge of.  I think it was

24   his master services agreement or retainer agreement that he

25   actually executed with the Frente members of the LAPs,

DANLCHE2                    Dahlberg - cross

1  representatives of the LAPs.

2  Q.  So you reviewed activity on a case, not -- let me take this

3  in smaller pieces.

4          I'm understanding then that you reviewed economic

5  activity related to the prosecution of the case; is that

6  correct?

7          MS. WINSTON:  Objection, form.

8          THE COURT:  I'll allow it.

9  A.  I think it was actually much broader than that.  I reviewed

10 economic activity that Mr. Donziger was engaged in that was

11 related to the case or related to the operations and the

12 activities -- financing, disbursements, you know, anything that

13 he was doing that was I guess in furtherance of the case.

14 Q.  Okay.  And but you were not doing an analysis of a

15 particular business, corporation, partnership, something of

16 that kind, a distinct legal entity?

17 A.  I guess I'm confused by your question because it was like

18 multiple parts.

19 Q.  You did not do an accounting analysis of a distinct legal

20 entity?

21 A.  No, I think it was -- there were legal entities involved

22 with this all over the place.  But I think what Mr. Donziger

23 was running I never saw as anything other than just his

24 operations and what he had agreed to do under agreements and

25 that kind of thing.  That's basically what I was looking at.

DANLCHE2                    Dahlberg - cross

1   Q.  Sure.  So, and I think you've already indicated many

2   entities, distinct entities, engaged in activity in this case,

3   yes?

4   A.  Many entities.

5   Q.  All right.

6           THE COURT:  Mr. Friedman, is the source of this

7   concern over the use of the word enterprise?

8           MS. FRIEDMAN:  That's a big part of it, your Honor.

9           THE COURT:  Okay.  Do you have any idea whether or not

10   enterprise is a legal term of art?

11           THE WITNESS:  I do, your Honor.

12           THE COURT:  And were you using this or attempting to

13   use that word in any way that was intended to be consistent

14   with your understanding, whatever that may have been, as to

15   that legal term of art?

16           THE WITNESS:  No, your Honor.  I was using the

17   business sense of what enterprise is.

18   Q.  And the let me ask you this then:  What's the period of

19   time for which you had records, approximately, from what year

20   to what year?

21   A.  Are you talking about the time when the record was created

22   as opposed to the time that the record might actually have

23   information about activity in other points in time?  You

24   understand what I'm saying?

25   Q.  I don't actually, no.

DANLCHE2                    Dahlberg - cross

1    A.  So let me give an example.  There is a Excel spreadsheet

2    that the Kohn firm prepared and it has financial activity in it

3    that I think goes back to '93 or something like that, but I

4    don't believe it was prepared in '93.  So in some sense I have

5    records that relate to financial activity that are much later

6    than the actual date of the record itself.  So I guess that's

7    the clarification I'm seeking.

8    Q.  I understand.  So how far back does your data go, whether

9    it was created that far back or not?

10   A.  You know, I think it's probably the early nineties.  I know

11   that schedule I think went to '93.

12   Q.  Let me focus in on the period from 2003 to 2009.  You

13   indicated in your report that your understanding was that the

14   Kohn firm was primarily responsible for providing financing for

15   the case?

16   A.  Again, with your question, I'm sorry, are you asking me if

17   they were providing financing during that period or they were

18   primarily providing financing during the whole matter?

19   Q.  From 2003 to -- I'm just focusing in on 2003 to 2009.

20   A.  Well, there clearly is financing from Mr. DeLeon, as well

21   as the Kohn firm, and there might even be some Torvia stuff

22   just beginning at that point in time.  I think the period

23   you're talking about the Kohn firm probably put in the most

24   amount of money during that period of time.

25   Q.  If you could turn to page 18 of your report.  The second to

DANLCHE2                    Dahlberg - cross

1    last line, during the period 2003 through 2009, KSG provided

2    financing for the matter and Donziger was primarily responsible

3    for the oversight of the litigation, etc.

4            Is that correct?

5    A.  Yes.

6    Q.  All right.  And during this time, your opinion was that

7    Mr. Donziger may have facilitated expenses paid by KSG, but KSG

8    paid these expenses, correct?

9            MS. WINSTON:  Objection, form, and mischaracterizes

10   the testimony.

11           THE COURT:  Sustained as to form.  At an absolute

12   minimum, it's compound.

13   Q.  If we go to page 19 of your report, paragraph 37.

14           THE COURT:  Mr. Friedman, is what you're trying to get

15   at this -- I'm just trying to help you.

16           MS. FRIEDMAN:  Appreciate the help.

17           THE COURT:  From the records you saw, were the

18   payments that you've attributed to the Kohn firm made by the

19   Kohn firm or were they made by somebody else or both?  What was

20   the flow of funds?

21           THE WITNESS:  The flow of funds normally, your Honor,

22   were from the Kohn firm to like a vendor or third party, Selva

23   Viva, in some situations the flow was to Mr. Donziger and then

24   that vendor or third party.  So it wasn't always consistent.

25           THE COURT:  Okay.  Thank you.

DANLCHE2                    Dahlberg - cross

1   Q.  And you referred in your report to the fact that

2   Mr. Donziger would facilitate that flow of funds, correct?

3   A.  I'm not sure if I used the term facilitate, but he was the

4   one who basically seemed to be directing the activities that

5   the funds related to and he was the one who was authorizing or

6   making the request for payments to the Kohn firm to basically

7   go ahead and, you know, pay an invoice or vendor or request for

8   money.

9   Q.  All right.  And if you look at paragraph 37, line 4, did

10  you indicate that Mr. Donziger maintained control over KSG's

11  investment through the facilitation, authorization of operation

12  expenses, etc.?

13          THE COURT:  Mr. Friedman, if it's on the printed page,

14  he did.  If it's not, he didn't.

15  Q.  And by when there was a need, well, and the Kohn firm kept

16  track of those expenses, correct?

17  A.  I saw schedules that indicated that it looks like they did

18  tracking.

19  Q.  And when there was a need for a disbursement schedule, KSG

20  would provide that to Mr. Donziger?

21          MS. WINSTON:  Objection, form.

22          THE COURT:  Overruled.

23  A.  I'm not sure what you mean by disbursement schedule.

24  Q.  Looking at the bottom of page 19 of your report, the roles

25  of KSG and Donziger are clearly set forth in numerous documents

DANLCHE2                    Dahlberg - cross

1    between Donziger and KSG, for example, whereby KSG provides

2    Donziger a detailed disbursement schedule so Donziger can

3    perform his function of overseeing the disbursements, etc.

4    A.  Thank you for pointing that out.  So in that situation,

5    yes.

6    Q.  All right.  And, in other words, it was KSG's responsible

7    to account for the expenses from 2003 to 2009?

8    A.  That's not consistent with the documentation I saw as far

9    as responsibilities.  In agreements and that kind of thing that

10   Mr. Donziger had executed or even his own statement of what his

11   role was or agreements he did with the Frente or the LAPs or

12   with investors, he had specific requirements under those

13   agreements, as I read them, to keep accurate books and records.

14   Q.  And is it your view that he could not -- let's take the

15   Kohn firm, for example -- that he could not rely on the Kohn

16   firm's disbursement schedules to provide the entities you

17   talked about an accounting of what happened, where the money

18   went?

19   A.  So, I saw no evidence to indicate that that responsibility

20   was actually given to the Kohn firm, whether it was I guess it

21   was the DeLeon investment documents or his agreements and

22   responsibilities with I think it was actually the plaintiffs

23   through Mr. Fajardo.  He had personal responsibility as, I

24   guess, the U.S. representative -- I believe that was loosely

25   what his title was often -- to keep books, records

DANLCHE2                        Dahlberg - cross

1   accountability.  And I never saw any documentation anywhere

2   that that was understood to be assigned to another party.

3   Q.  Well, let me ask you this:  Are you here to give testimony

4   about what Mr. Donziger's legal responsibilities were to other

5   actors in the case?

6   A.  No, I'm only testifying about the information I saw in the

7   documents I read.

8   Q.  All right.  And so let's go to this.

9          During the entire time you analyzed these financial

10  transactions, Mr. Donziger, did he have a separate office apart

11  from his kitchen in his apartment?

12          MS. WINSTON:  Objection, form.

13          THE COURT:  I'll allow it, if you know.

14  A.  I do not.

15  Q.  Did you see any office expenses in the documents that you

16  looked at?

17  A.  I don't recall.

18  Q.  Do you see any indication of, well, you don't recall.

19  Okay.

20          So, are you aware of any legal work he did other than

21  this case and one other matter for Mr. DeLeon during the time

22  period 2003 to 2012?

23  A.  Those are the two that come to mind that I see in the

24  documents.  So I don't think I understood that he was doing

25  anything else.

DANLCHE2                    Dahlberg - cross

1    Q.  Now, were you aware that the court allowed Mr. Donziger to

2    withhold some of his personal financial -- withhold or redact

3    certain personal financial information from production?

4    A.  I was aware of that.

5    Q.  If you would turn to page 12, footnote 15.  One of the

6    indicia of -- potential indicia of fraud that you talk about in

7    your report is having excessive number of bank accounts; is

8    that correct?

9    A.  That's correct.

10   Q.  Is it your opinion that Mr. Donziger had an excessive

11   number of bank accounts?

12   A.  Yes.

13   Q.  If we look at footnote 15, this is where you list those

14   bank accounts?

15   A.  Yes.

16   Q.  When was the -- I want to go to No. 5 first, that's a

17   closed personal account; is that right?

18   A.  It was eventually closed, yes.

19   Q.  And when was it closed?

20   A.  I don't recall.

21   Q.  No. 6, when was that closed?

22   A.  Again, I don't recall the exact time that it was closed.

23   Q.  No. 7, closed personal account, when was that closed?

24   A.  Same, I don't remember the date.

25   Q.  Anything wrong or suspicious about somebody closing a

DANLCHE2                          Dahlberg - cross

1    personal account?

2    A.   No.

3    Q.   He has a personal checking account that you list there.

4              Is there anything excessive or suspicious about having

5    a personal checking account?

6    A.   Just by itself you're talking about?

7    Q.   Well, right.

8    A.   It's a hypothetical.

9    Q.   You'll add them all together in the end, but I want to see

10   where the suspiciousness comes from.

11             Anything suspicious about having a personal checking

12   account?

13   A.   Just having an account by itself, no, that would not be a

14   problem.

15   Q.   Having it in conjunction with a personal savings account,

16   would that be suspicious?

17   A.   Again, by itself, no.

18   Q.   Was it appropriate in your view for him to have an Ecuador

19   case account?

20   A.   That actually was a requirement for some of the funding

21   agreements.

22   Q.   So that would be appropriate in your view?

23   A.   Yes.

24   Q.   Appropriate for him to have a separate law firm account?

25   A.   Yes.

DANLCHE2                    Dahlberg - cross

1   Q.  Now, his agreement with DeLeon would have required or did
2   require a trust account, an IOLA account, correct?
3   A.  That's correct.
4   Q.  In fact, he was doing two different matters for Mr. DeLeon,
5   one involving this case and one involving something else?
6   A.  There was some offshore party gambling matter, something, I
7   believe that's correct, yeah.
8   Q.  So in your view, anything inappropriate about having two
9   IOLA accounts for his work with Mr. DeLeon?
10  A.  No.
11  Q.  He has a Chase investment account.  Anything wrong with
12  having an investment account separate and apart from the other
13  accounts we just discussed?
14  A.  No.
15  Q.  And then there's an unidentified Chase account.  Did you
16  identify how much money was in that account?
17  A.  I don't think we ever got any records on that.  I think we
18  just saw a reference to that account, so I don't think it was a
19  bank statement or anything.
20  Q.  For all you know, this is a college fund for his son?
21  A.  I don't know what it was.
22  Q.  After the Kohn firm left the case and actually a little
23  before that, Mr. DeLeon began putting funding into the case; is
24  that correct?
25  A.  That's what the documents that I reviewed indicate, yes.

DANLCHE2                     Dahlberg - cross

1   Q.  All right.  In 2007, when the first money comes in from

2   Mr. DeLeon, you indicate that that was transferred to the Kohn

3   law firm, correct?

4   A.  Eventually.  It bounced through or went through one, maybe

5   two Donziger accounts, I can't remember, but before it was

6   moved to the Kohn firm.

7   Q.  Let's look at your report.  I'm on page 20, paragraph 39,

8   this says this reflects that the money came in from Mr. DeLeon

9   and was transferred to the Kohn firm?

10  A.  I believe what it represents is that the money came from

11  DeLeon and was -- came into Mr. Donziger's law firm account, so

12  not the trust account that Mr. Donziger had.  And then from his

13  law firm account, the money was then transferred to the Kohn

14  account.

15  Q.  So it went to one Donziger account; is that correct?

16  A.  His law firm account, that's correct.

17  Q.  Now, his -- I think you may have already referred to

18  this -- his agreement with Mr. DeLeon required that he maintain

19  accurate and complete accounting and other financial records.

20  Is that what you told us?

21  A.  That's what the document says.

22  Q.  Did you see any evidence of complaints by Mr. DeLeon about

23  how the money was accounted for?

24  A.  No.

25  Q.  Now, the other category of funding that you talk about is

DANLCHE2                    Dahlberg - cross

1    the Burford funding, correct?

2    A.  I think there's some other -- categories, you're talking

3    about in the report.

4    Q.  Yes.

5    A.  Yes.

6    Q.  And Burford put -- when Burford began funding the case, it

7    put its money into the -- its money wound up in the Patton

8    Boggs trust account; is that correct?

9    A.  That's correct.

10   Q.  Anything wrong with that in your view?

11           MS. WINSTON:  Objection, vague.

12           THE COURT:  Overruled.

13   A.  So just to correct my statement, some of the money did end

14   up with Mr. Donziger.  There was $400,000 that was transferred

15   to him at some point.  So it kind of went to the Patton Boggs

16   account first and then some of it migrated to Mr. Donziger.

17   But the 4 million it looks like went into the Patton Boggs.

18   Q.  And do you have any opinion that it was inappropriate for

19   Patton Boggs to pay that money to Mr. Donziger?

20   A.  The 400,000?

21   Q.  Yeah.

22   A.  I don't have an opinion as to whether it was inappropriate

23   for him to be paid that, no.

24   Q.  You're not saying that there was anything wrong with the

25   way Patton Boggs accounted for the money to Burford, are you?

DANLCHE2                    Dahlberg - cross

1    A.   That's correct.

2    Q.   Did you attempt to calculate how much of his own money

3    Mr. Donziger paid out to help fund this case?

4             THE COURT:   If any.

5    A.   At some point we might have looked at that.  I don't know

6    that we were ever able to completely make it out.

7             It was kind of confusing to figure out where moneys

8    were coming and going and if it really looked like -- we never

9    saw anything that looked like an investment per se or loans per

10   se.  So it was hard to say that, you know, moneys that were

11   kind of coming in to him weren't just flowing to pay, you know,

12   reimbursing for some expense to somebody else.

13            So there never looked like an official investment

14   document or official loan document where you would say that he

15   was actually formally putting in money like for capital.

16   Q.   Right.  And I was more getting at some of the issues you

17   talked about earlier.  You talked about you didn't attempt to

18   capture say money he spent on hotel and travel over this period

19   of years?

20   A.   For the final report, no, we didn't.

21   Q.   In an earlier report did you?

22   A.   Never in a report.  But, you know, initially when we were

23   looking at things, we had a lot of data and there might have

24   been, you know, at some point in time we might have had some

25   idea of what his out-of-pockets were.  But ultimately we

DANLCHE2                     Dahlberg - cross

1    decided not to go with that.

2    Q.  To go in that direction?

3    A.  Yeah.

4    Q.  All right.

5         MS. FRIEDMAN:  Thank you.  I don't have any other

6    questions.

7         THE COURT:  Thank you.  Mr. Gomez.

8    CROSS-EXAMINATION

9    BY MR. GOMEZ:

10   Q.  Good morning, Mr. Dahlberg.

11   A.  Good morning.

12   Q.  Mr. Dahlberg, did you speak to anyone whose names appear on

13   the various records that you've reviewed like Joe Burlinger,

14   for example, or any of the people who work for the entities in

15   the various records you reviewed?

16   A.  No.

17   Q.  And is it fair to say that in the thousands of records that

18   you reviewed, you did not come across any documents showing any

19   transactions to or from Hugo Camacho, an Ecuadorian plaintiff

20   in the Lago Agrio case who is a defendant in this case?

21        MS. WINSTON:  Objection, compound.

22        THE COURT:  Sustained as to form.

23   Q.  Is it fair to say that in all the documents you reviewed,

24   you did not see any transactions to and from a Hugo Camacho?

25   A.  I have no recollection of seeing any documents.

DANLCHE2                    Dahlberg - cross

Q.  Is it fair to say you don't recall seeing any documents
showing any transactions to and from a Javier Piaguaje?
A.  I have no recollection of seeing documents to him as well.
Q.  Sir, do you have a recollection of seeing documents
indicating that any Ecuadorian plaintiff in the Lago Agrio case
had access to the various accounts that Mr. Donziger was
managing?
A.  I don't recall seeing any records to indicate that they
did.
Q.  Sir, isn't it true that after all the hours reviewing the
thousands of documents that you reviewed and the millions of
dollars in payment to your firm --
          THE COURT:  Sounds a little argumentative, sir.  Do
you want to start again.
Q.  Sir, isn't it true that you cannot confirm one way or the
other after all the work that you've done whether Mr. Donziger
intentionally tried to hide any of his transactions or was just
a really disorganized manager of his accounts?
A.  I can confirm what my opinions are in my testimony which is
I guess somewhere in between what you just sort of laid out for
me as parameters to what I can confirm.
Q.  Mr. Dahlberg, isn't it possible Mr. Donziger is just a
really disorganized manager of his accounts?
A.  I would say, well, first of all, it's not more than
possible.  It is a factual truth that he, based on the

DANLCHE2                      Dahlberg - cross

1   documents I saw, his records were completely disorganized and

2   were not well put together.

3          But I think my opinion as in my testimony is that that

4   is, in my experience, something that can be an indicator of

5   fraud, along with other things that I saw within the documents.

6   Q.  But you didn't confirm a fraud; is that correct?

7   A.  That is correct.

8   Q.  And you didn't confirm any intention on Mr. Donziger to

9   actually hide his financial transactions from anyone, is that

10  correct, you didn't confirm that?

11  A.  Well, when you say I didn't confirm it, okay, so there's

12  letters from Burford, a declaration from Bogart where they say

13  he committed fraud and that he did hide things.  And there's a

14  letter from Mr. Kohn saying that he hid things from them and I

15  saw those documents.  So, yes, I saw documentation to indicate

16  that at least people that were his investors believed he was

17  doing that.

18  Q.  But that's all, you just saw documents that said those

19  things?

20  A.  That's right.  I saw documents that said that.

21          MR. GOMEZ:  Thank you.  Nothing further.

22          THE COURT:  Any redirect, Ms. Winston?

23          MS. FRIEDMAN:  I have some, your Honor, I'm not sure

24  what order you want to do that.  This is an area where there's

25  a difference.

DANLCHE2                    Dahlberg - cross

1          THE COURT:  I thought you just cross-examined him for

2     a long period of time.

3          MS. FRIEDMAN:  I did, but Mr. Gomez raised some issues

4     that I think I need to address.

5          THE COURT:  Well, we'll hear from Ms. Winston first

6     and then we'll see where we go.

7          MS. WINSTON:  Just a couple questions, your Honor.

8     REDIRECT EXAMINATION

9     BY MS. WINSTON:

10    Q.  Mr. Dahlberg, do you recall being asked questions about

11    whether standing alone there was anything wrong with the

12    particular bank account held by Mr. Donziger?

13         THE COURT:  Yes, he did.  Let's go on.

14    Q.  Mr. Dahlberg, you commented in your direct testimony that

15    Mr. Donziger held multiple accounts, correct?

16    A.  That is correct.

17    Q.  And is an excessive number of bank accounts a badge of

18    fraud in your view?

19    A.  It is because of the way they related.  So in my opinion

20    what I was saying was that because money moved in and out of

21    these accounts and that they didn't really stay for what their

22    designated purpose was, i.e., his personal accounts seemed to

23    handle money that was coming in from investors and the case

24    accounts seemed to sometimes handle personal money or money

25    that was coming in from his law firm, that it was the fact that

DANLCHE2                    Dahlberg - redirect

1   he had multiple accounts that weren't staying with transactions

2   or interactions that were the designated purpose.  So that's

3   where he had multiple accounts with blurred distinctions about

4   how they were actually functioning and there was a commingling

5   of funds going on in these accounts.

6          MS. WINSTON:  Thank you.  That's all I have, your

7   Honor.

8          THE COURT:  Thank you.

9          What is it, Mr. Friedman?

10         MS. FRIEDMAN:  Your Honor, there are a couple points

11  Mr. Gomez brought up that I would like to address quickly.

12         THE COURT:  Go ahead, briefly.

13  RECROSS EXAMINATION

14  BY MS. FRIEDMAN:

15  Q.  Mr. Gomez asked you a question about -- I can't remember

16  the exact question, but in response you said that Burford and

17  Joe Kohn were complaining that Mr. Donziger had hidden

18  something from them, correct?

19  A.  I think I said they used the term either material

20  misrepresentation or fraud.  I think it was a declaration by

21  Mr. Bogart and one of the letters by Mr. Kohn.

22  Q.  None of those had anything to do with financial or

23  accounting issues, did they?

24  A.  No, that's not correct.  In the course of my work when I'm

25  a forensic investigator, we actually interview people and we

DANLCHE2                    Dahlberg - recross

1    look at statements, you know, declarations, or if there were

2    live people I could have spoken with.

3           So actually when I see allegations by people, they

4    actually are fairly important to the way we investigate and

5    look at the overall documentation, the financial documentation

6    we look at as well.

7    Q.  So I didn't see a reference to you interviewing people in

8    your report?

9    A.  No, I didn't interview anyone.

10   Q.  All right.  So my question is the documents you were

11   referring to in response to Mr. Gomez's questions, those

12   complaints from those investors were not complaints about the

13   way Mr. Donziger managed money, correct?

14   A.  They were about knowing the transparency of the activities,

15   and part of that is knowing the transparency of what the funds

16   were being used for.

17   Q.  Can you show us a single document where either of those

18   entities, Burford or Joe Kohn's law office, complained about

19   the way Mr. Donziger financially accounted for expenditures?

20           MS. WINSTON:  Objection.

21           THE WITNESS:  I'm sorry.

22           THE COURT:  What's the objection?

23           MS. WINSTON:  Outside the scope, your Honor.

24           THE COURT:  I'll allow it.

25   Q.  Can you point us to a single document where they're

DANLCHE2                    Dahlberg - recross

1   complaining about the way he accounted for money?

2   A.   So maybe this is a definitional thing, but they account

3   for, they complain about moneys that they were expending and

4   that they didn't know what the true nature was for what they

5   were spending it for.

6          So that would be part of the accounting is

7   understanding when someone makes a request, like when

8   Mr. Donziger made a request of I guess it was Karen Wilson at

9   the Kohn firm to send money to the Frente relating to

10  Mr. Cabrera, she questioned why it was being done and he didn't

11  tell her why it was really being done.

12         So normally in accounting records, you expect when you

13  get a request for a payment that you're actually going to get

14  information that really relates to what the real purpose of a

15  payment was for.

16  Q.   Let's go back, Mr. Dahlberg.  The fact that he requested

17  money for a certain service and somebody questioned the need

18  for that service is different than saying he's keeping bad

19  records, isn't it?

20  A.   No.  They didn't argue, they didn't even talk about the

21  need for the service.  He didn't tell them what it was for,

22  which goes right back to what Mr. Kohn's letter was about.

23  Q.   Why don't you direct us to the document, if you would.

24  A.   Let's see here.  I'll try.  I believe if you go to my --

25  let's see.  The attachment is probably the easiest way to get

DANLCHE2                    Dahlberg - recross

1    to it because it's in here twice.  Attachment L, which is

2    Plaintiff's Exhibit 2139.

3    Q.  I'm sorry, what page is that?

4    A.  It's page 136.  So if you look at the --

5    Q.  I'm sorry, let me catch up.  I'm not finding page 136.  Are

6    you talking about your report?

7    A.  It's easiest to find it through the attachment.  So it's

8    attachment L, but that's actually got a page number to it too.

9    Q.  So let me catch up with you here for a minute.

10   Attachment L.

11   A.  All right.  So it's a chart and it says payments to Richard

12   Cabrera and it's Plaintiff's Exhibit 2139.

13   Q.  Yes.

14   A.  Okay.  So at the bottom part of this chart, it explains the

15   payments that were made to Cabrera out of the Frente account

16   for, well, there was a $33,000 payment and then there may have

17   been other payments up to 120,000.

18        Actually there's a sequence down of the actual emails

19   that are in a chain where Mr. Yanza starts talking to

20   Mr. Donziger about the need to pay the Wuao for activities that

21   were being done I guess related to his expert witness report in

22   Ecuador.

23        And so he gets from Mr. Yanza the specific request as

24   to what he needs the money for.  Then he makes a money request

25   for this critical money transfer which sort of flows out of 07

DANLCHE2                    Dahlberg - recross

1      towards the bottom of the chart there.  I think it's PX897 if

2      you wanted to go look at the emails.

3              And in that he doesn't explain why he wants the Kohn

4      firm to send the $50,000 to the Frente account, the secret

5      account.  He actually doesn't explain any of that at all.  He

6      doesn't call it the secret account.  He doesn't explain what

7      the basis was.  He just tells the Kohn firm to direct it.

8              And I believe Karen Wilson, who initially is working

9      with Mr. Kohn to kind of keep track of the thing, kind of

10     questions why he's doing it and he basically says just do it.

11     Q.  And do they?

12     A.  They do transfer it ultimately.  And but that's the kind of

13     thing where later on Mr. Kohn directly comes back in his letter

14     where he appears to be ending his relationship with, you know,

15     his representation and he references back to not knowing what

16     these funds were for, not knowing what was going on, and that

17     he holds that as a serious misrepresentation it sounds like

18     when reading the letter.

19     Q.  So I want to be clear.  What you're saying is the letter of

20     termination of the relationship that Mr. Kohn sent to

21     Mr. Donziger, is the letter one of the facts I guess that

22     you're pointing to a document in which Mr. Kohn is complaining

23     about the way money is accounted for?

24     A.  He's complaining about the fact he doesn't know, right,

25     what the purpose of the funds were and that had he known, he

DANLCHE2                    Dahlberg - recross

1    would have I guess based on the letter done something

2    differently.

3    Q.  All right.

4              MS. FRIEDMAN:  Thank you.

5              THE COURT:  Anything?  Thank you.

6              Ms. Winston, anything else?

7              MS. WINSTON:  No thank you, your Honor.

8              THE COURT:  All right.  We'll take our morning break

9    right here.

10              (Witness excused)

11              (Recess)

12              THE COURT:  Okay.  Next witness, please.

13              MS. NEUMAN:  Your Honor, Chevron calls James Spigelman

14    to the stand.

15              MR. BOOTH:  Your Honor, I have an objection to make

16    before this witness testifies.

17              Your Honor, I'm moving to strike the witness statement

18    of this witness in its entirety for two reasons.  First of all,

19    it is -- this is a witness who is or has read documents which

20    are in evidence, documents which speak for themselves.  He is

21    interpreting the words of those documents and he is rendering

22    opinions on foreign law, all of those things as I understand to

23    be things that -- especially from watching yesterday -- that

24    this is not proper subject of testimony.

25              And so we would move to strike this witness and this

DANLCHE2

1   witness statement in its entirety.  His statement does not

2   contain anything other than those things.

3              (Continued on next page)

DAN8CHE3

1              THE COURT:  Ms. Neuman.

2              MS. NEUMAN:  Thank you, your Honor.

3              THE COURT:  You have had this statement for how long,

4    Mr. Booth?

5              MR. BOOTH:  Me, personally, I got it last night.  We

6    have had it longer.

7              THE COURT:  Let's talk about it collectively, please.

8    You have had it for a couple of weeks, right?

9              MS. NEUMAN:  We served the report in February.  This

10   was a served expert report.  The statement matches the report

11   exactly.

12             THE COURT:  Go ahead.

13             MS. NEUMAN:  Your Honor, I think counsel is confusing

14   the issues of foreign law the Court needs to address with the

15   substantive decision it's going to make in this case, and these

16   issues of foreign law which are mixed with the evidence of

17   fraud.

18             According to Mr. Spigelman's direct testimony, there

19   is an incorrect statement of Australian law that appears both

20   in the Moodie memo, Plaintiff's Exhibit 1101, and the

21   Ecuadorian judgment.  The misstatements in the words used to

22   make the misstatements are identical.  So it is not opinion of

23   foreign law which your Honor has to reach to make a finding of

24   liability or otherwise.  It's an opinion that the statement of

25   foreign law in the judgment and in a plaintiff's document are

DAN8CHE3

1    identical and incorrect.

2           Mr. Spigelman's report is a subreport to Professor

3    Green, who offers an opinion that the discussion of causation

4    in the judgment was derived also from the Moodie memo.  And he

5    relies on Mr. Spigelman's opinion to reach that ultimate

6    conclusion as it relates to issues of Australian law.

7           THE COURT:  Anything else to say on this, Mr. Booth?

8           MR. BOOTH:  Yes, your Honor.

9           The critical issue here is this is a witness that

10   appears to be, they testified that the coincidence that two

11   documents could have the same language is too great, given the

12   concept of the language is wrong under the law that it purports

13   to cite.  If the language is not wrong, if this is an

14   appropriate statement of Australian law, then the coincidence

15   is not quite as big, because obviously it could have been found

16   as a correct statement of Australian law.

17          THE COURT:  That was in the extensive Australian law

18   libraries of Quito?

19          MR. BOOTH:  Yes.  So my point is there will be

20   discussion about this being incorrect, which is a issue of

21   foreign law.  And I believe that the Court has dealt with that

22   in a certain way.

23          THE COURT:  I think it's probably distinguishable.  I

24   will take it subject to your objection, and I will see what I

25   make of it, and I will hear the witness.

DAN8CHE3

```
 1              MS. NEUMAN:  Thank you, your Honor.
 2      JAMES SPIGELMAN,
 3          called as a witness by the plaintiff,
 4          having been duly sworn, testified as follows:
 5              THE DEPUTY CLERK:  State your name and spell your last
 6      name for the record.
 7              THE WITNESS:  James Spigelman, S-P-I-G-E-L-M-A-N.
 8              THE COURT:  You may proceed, counsel.
 9      DIRECT EXAMINATION
10      BY MS. NEUMAN:
11      Q.  Good morning, Mr. Spigelman.
12      A.  Good morning.
13      Q.  Did you prepare your direct testimony in a written form?
14      A.  I did.
15              MS. NEUMAN:  May I approach the witness?
16              THE COURT:  You may.
17      Q.  Mr. Spigelman, do you have Exhibit 5000 in front of you?
18      A.  I do.
19      Q.  Is this a true and correct copy of your direct testimony in
20      this matter?
21      A.  It is.  I have signed it and initialed each page.
22      Q.  You see the initials and signatures that you put on the
23      copy in front of you?
24      A.  Yes.
25              MS. NEUMAN:  Plaintiffs would move the admission of
```

DAN8CHE3                         Spigelman - direct

1    Plaintiff's Exhibit 5000 and Plaintiff's Exhibit 1101, the

2    Moodie memo which is referenced in Exhibit 5000.

3              THE COURT:  You're offering the Moodie memo for the

4    truth or are you offering it on some other basis?

5              MS. NEUMAN:  Not for the truth.

6              THE COURT:  Any objection beyond what I have heard

7    already?

8              MR. BOOTH:  No, your Honor.

9              THE COURT:  5000 is received on the basis that I

10   indicated previously.

11             Plaintiff's 1101 is received, but not for the truth of

12   the matters stated.

13             (Plaintiff's Exhibits 5000 and 1101 received in

14   evidence)

15             MS. NEUMAN:  Plaintiffs pass the witness.

16             THE COURT:  Cross-examination, Mr. Booth.

17             MR. BOOTH:  May I, your Honor?

18             THE COURT:  Sure.

19   CROSS-EXAMINATION

20   BY MR. BOOTH:

21   Q.  Good morning, sir.  My name is Rainey Booth.  I want to

22   begin with, do you have your witness statement in front of you?

23   A.  I do.

24   Q.  In the book that I just handed you, your witness statement

25   should be tab 1?

DAN8CHE3                    Spigelman - cross

1    A.   Yes.

2    Q.   First, can you tell the Court what material specifically

3    you reviewed in forming your opinion in this case?

4    A.   I had undertaken a search of certain words on electronic

5    databases, two relevant databases, and I didn't really review

6    any materials, in the sense that I drew on my own memory and

7    knowledge of Australian tort law.  The only case I read at the

8    time that I prepared my original report was my own judgment in

9    a case called *Seltsam* that is referred to in the Moodie memo as

10   an authority.  I did refer to that case at the time of

11   preparing.

12              THE COURT:  Just for the sake of clarity, sir, and

13   bearing in mind the notion that the UK and the United States

14   are two nations separated by a common language, I take it that

15   in your parlance, a judgment is what we would call, we American

16   lawyers and judges, an opinion or a decision, is that correct?

17              THE WITNESS:  That's correct.

18              THE COURT:  Let's proceed.

19   Q.   And *Seltsam* is S-E-L-T-S-A-M, is that right?

20   A.   Yes.

21              In addition to that, I read a High Court judgment,

22   which was after *Seltsam* but in the same territory, called *Amaca

23   v. Ellis*.  I did read that at the time as well.

24   Q.   Would you describe the search of the databases?  Was that

25   something you directed others to do on your behalf?

DAN8CHE3                    Spigelman - cross

1    A.   Yes.  I have a research assistant who does work for me.

2    Q.   If you look at your witness statement, those databases, can

3    you tell us, are those Australian databases?

4    A.   Yes.

5    Q.   Those would be in English?

6    A.   They are in English, yes.

7    Q.   Those would be Australian law databases?

8    A.   They are.

9    Q.   Did you direct any searches in any other database other

10   than Australian law databases?

11   A.   No.

12   Q.   Did you direct any searches in any Spanish language

13   databases?

14   A.   No.

15   Q.   Did you have anyone direct any database searches in

16   Spanish?

17   A.   No.

18   Q.   Did you attempt to make any determination of what resources

19   would have been available in Ecuador to conduct searches of

20   Australian law prior to February 14, 2011?

21   A.   No.

22   Q.   Did you read the Ecuadorian judgment of February 14, 2011?

23   A.   I tried.  I found it a difficult process.  My attention had

24   been directed to certain pages, and I read those carefully, and

25   I sought to put them in their context, but I found it a

DAN8CHE3                    Spigelman - cross

1    difficult process.  I could say I skimmed the judgment, but I

2    did not read it in whole.  I read certain pages.

3    Q.  Did you read the judgment in English or in Spanish?

4    A.  Only in English.  I have no Spanish.

5    Q.  You do not speak Spanish?

6    A.  No.

7    Q.  In terms of the actual pages that you sat down and actually

8    read as opposed to skimmed, do you have any idea what those

9    pages were?

10        I can direct you to tab 7 of the book I handed you.

11   Is the judgment --

12   A.  80 something would have been the first -- I can't remember.

13   It was in the 80s I thought.

14   Q.  I think that the part of the judgment that you quote in

15   your witness statement is on page 90.

16   A.  Yes.  But I read from before that.

17        At the foot of page 86, there is a heading called

18   causation -- not a heading.  The second to last line is

19   causation.  I read from there onwards, to I think page 90.

20   Then there was another passage a few pages later.

21        I'm sorry.  I can't pick it up.  It was a shorter

22   passage of two or three pages as I remember.

23   Q.  My question to you, let me ask it this way.  You did read

24   the Ecuadorian judgment in terms of the sections that you found

25   pertaining to causation, is that fair?

DAN8CHE3                        Spigelman - cross

1    A.  Yes, only causation.

2    Q.  Now, in your report you make reference at paragraph 13 -- I

3    should say your witness statement, you make reference at

4    paragraph 13, I believe that's on page 4, to a phrase "minimum,

5    trivial or an insignificant factor."  Do you see that?

6    A.  Yes.

7    Q.  In the searches that you had performed for you, I think you

8    describe in your report how those searches were conducted in

9    the Australian legal databases, is that right?

10   A.  That's right.

11   Q.  In terms of those words, do you know whether any search was

12   done of those words in Spanish in any database?

13   A.  No, it was not.  Sorry.  It was not by me or at my

14   direction.

15   Q.  I believe that you mention or you indicate in paragraph 13

16   that you are aware of a published article in the Medical

17   Journal of Australia in 2002 that has or contains that phrase

18   "minimum, trivial or an insignificant factor"?

19   A.  It was a footnote in the Moodie memorandum.

20   Q.  If you turn to tab 2 of the book I gave you, would you

21   confirm that that document, which is Defendants' Exhibit DX

22   1201, is in fact that medical --

23   A.  Yes, it is.

24   Q.  -- article from Australia?

25   A.  Yes.

DAN8CHE3                          Spigelman – cross

1    Q.  Were you satisfied that this medical article from Australia

2    named "Sharp v. Port Kembla RSL Club:  Establishing causation

3    of laryngeal cancer by environmental tobacco smoke" was

4    available publicly prior to February 14, 2011?

5    A.  I am sure it was.

6    Q.  Did you take any steps to see if this article, or materials

7    discussed in the article, was available prior to February 14,

8    2011 in Spanish?

9    A.  I am quite sure the Medical Journal of Australia isn't

10   published in Spanish, but whether someone translated it, I

11   would not know.

12   Q.  If you look back to your witness statement, paragraph 14 I

13   believe, I believe you discuss in the context of Australian

14   law, there are cases in which the terms "de minimis" or

15   "negligible" contribution have been used to describe a

16   causation analysis, is that true?

17   A.  That's true.

18   Q.  I meant to ask you earlier, were the only two cases you

19   reviewed specifically for doing this witness statement was your

20   opinion in the *Seltsam* and the *Amaca v. Ellis* case, is that

21   right?

22   A.  Reviewed, yes, but I have a great deal of familiarity with

23   this area of the law that I didn't need to look up cases or

24   even texts.  But those were the specific cases that I checked.

25   The main reason I looked at *Ellis* is because it came out after

DAN8CHE3                    Spigelman - cross

1    I stopped reading things like this profession; it was a new

2    judgment for me.

3    Q.  Did you read the case *Amaca v. Booth*?

4    A.  Yes.  I have read that at some stage, but not in this

5    context.

6    Q.  Here on paragraph 14 of your report, you talk about the

7    circumstances when de minimis or negligible contribution, when

8    that type of causation analysis is appropriate under Australian

9    law?

10   A.  Yes.

11   Q.  What you have written here, I won't reread it, but would

12   you agree that those cases, where that standard is applicable,

13   would be cases like an asbestosis exposure over many years?

14              MS. NEUMAN:  Objection.  Vague.

15              THE COURT:  Overruled.

16   Q.  Is that right?

17              THE WITNESS:  I'm sorry?

18              THE COURT:  Overruled means you go ahead and answer

19   it.

20              THE WITNESS:  Thank you.  Sorry.

21   A.  No, I don't think so, although there are some theories of

22   mesothelioma in which it could apply.  The case in question was

23   a silica case, where that formulation was used, as explained by

24   the High Court in *Amaca v. Ellis*.  It was a form of, where the

25   actual medical causation was cumulative, in the sense that each

DAN8CHE3                          Spigelman - cross

1   exposure made a contribution to the disease.

2           Now, there are some aspects of the asbestosis case

3   law, with which I am not completely familiar, but it would be

4   consistent with a single fiber theory of mesothelioma, but it

5   would apply, I understood, to other kinds of exposure.

6   Q.   Primarily, if I understand what you said, to exposures that

7   would be cumulative over a period of time as opposed to a

8   one-time shot, right?

9   A.   Yes.  Either a one-time shot or a context in which you're

10  attributing responsibility for multiple exposures of the same

11  kind.

12  Q.   That would be the circumstances, the cumulative exposure,

13  when the terms de minimis or negligible contribution causation

14  analysis would be appropriate under Australian law?

15  A.   No.  Well, similar terminology, de minimis or minimal.

16  That's an old English case from the 1940s where that

17  terminology first emerged, and in Australian law, it's been

18  clearly confined to that kind of context.  And asbestos raises

19  different issues, and different cases in that field involve

20  different kinds of evidence.  It's a bit hard to generalize, I

21  think, in the mesothelioma territory.

22  Q.   Let me ask you to turn to paragraph 16, page 5, your second

23  opinion.

24  A.   I'm sorry, 16?

25  Q.   Paragraph 16, which is on page 5.

DAN8CHE3                          Spigelman - cross

1   A.  I'm sorry.  Yes.

2   Q.  Now, I am not sure I understand the opinion here so I need

3   clarification of what you're saying.

4           Are you saying that the use of the phrase "strands in

5   a cable" that you used in your opinion in *Seltsam*, that you

6   interpret that phrase to be related somehow to the portions of

7   the Ecuadorian judgment in the Moodie memo that you quote?

8   A.  Yes.  In fact, the Moodie memo references my judgment at

9   the very paragraphs in which I adopt that terminology.  It's

10  not my terminology.

11  Q.  If we focus on the Ecuadorian judgment, the portion of it

12  that you quote here on page 5, and then on page 6, nowhere in

13  that portion does it use the phrase "strands in a cable,"

14  correct?

15  A.  Yes.

16  Q.  It's your interpretation of what the Ecuadorian judgment is

17  saying that you say that relates to the terminology or the term

18  "strands in a cable," correct?

19  A.  Well, I think it's similar.  But, yes, that was my

20  interpretation.  I think strands in a cable is a very

21  well-known formulation for that kind of inference.

22  Q.  But if your interpretation is correct, your criticism here

23  is that the author of the Ecuadorian judgment attributes that

24  concept to Australian case law as opposed to a more global

25  understanding of case law, is that fair?

DAN8CHE3                          Spigelman – cross

1   A.  I wouldn't call it criticism.  It's just something that I

2   found odd that a proposition of that general character would be

3   attributed to Australian case law.  It was an oddity rather

4   than -- I don't disagree with it.  I think it's correct.  But

5   it's just an oddity for it to be described in that manner in

6   both documents.

7   Q.  Well, let me ask you, in the parts of the judgment, the

8   Ecuadorian judgment of 2/14/11 that you read, did you see that

9   the author spoke about the law from other countries as well?

10  A.  Yes.

11  Q.  Colombia, for example?

12  A.  I did see that, yes.

13  Q.  France, for example?

14  A.  Yes.

15  Q.  The United States?

16  A.  Yes.

17  Q.  The UK?

18  A.  Yes.

19  Q.  As well as Australia?

20  A.  Yes.

21  Q.  Could you see that the author of the Ecuadorian judgment

22  was discussing causation concepts from different countries in

23  that portion that you read?

24  A.  Yes.

25          MS. NEUMAN:  Objection.  Form.  It assumes facts not

DAN8CHE3                        Spigelman - cross

```
 1        in evidence.
 2                THE COURT:  I will allow the answer to stand.
 3        Q.  I think you just indicated, but let me be sure.  The
 4        statement that you quote on page 5, Australian case law tells
 5        us, strands in the cable is a phrase used in Australian case
 6        law, correct?
 7        A.  Well, it's Wigmore's terminology.  It's from an American
 8        text.  We stole it.
 9        Q.  But after you stole it, it was an Australian case law?
10        A.  It's used often.
11        Q.  If you will turn to tab 3 of the binder I gave you.
12                First of all, do you recognize this document, is this
13        something that you have seen?  It's Defendants' DX 1203?
14        A.  No.
15        Q.  Do you see the first page where it indicates copyright
16        2007, the very first page?
17                THE COURT:  Let's hope this is not an eye examination.
18                MR. BOOTH:  Sorry, your Honor.  I apologize.
19        Q.  Can you turn to the tab in the paper?  That should be page
20        15.  Let me ask you -- is the portion highlighted?
21        A.  Yes.
22        Q.  You see where it indicates, it's talking about in
23        Australia, and it discusses the *Seltsam* case.  Do you see that?
24        A.  Yes.
25        Q.  You see going down to the second area of highlight, it
```

DAN8CHE3                          Spigelman - cross

1    talks about Spigelman, "paragraph 137 speaks of sources of

2    evidence in tortious claims as strands in the cable."  Do you

3    see that?

4    A.  Yes.

5    Q.  Do you not see anywhere that it cites to Wigmore or any

6    other source other than your case, right?

7    A.  Yes.  I see that.

8           THE COURT:  It also says tortuous, not tortious.

9    Q.  So it would not surprise you then, would it, to find your

10   case cited throughout various different domestic and

11   international law journals discussing this "strands in a cable"

12   analogy, would it?

13   A.  I am flattered by that, yes, thank you.

14   Q.  The analogy you use in your case, "strands in a cable" type

15   assessment, from your view of Australian law, is that still an

16   accurate statement in Australian law, is that still an accurate

17   way to view causation under Australian law?

18   A.  It is a process of finding facts of any character,

19   causation or other facts.

20   Q.  As you indicated, that is a concept that you have found

21   present in international law looking at the issue of causation

22   as well?

23   A.  Yes.

24   Q.  Mr. Spigelman, would you also look at tab 4 of the binder?

25   A.  Yes.

DAN8CHE3                    Spigelman - cross

1   Q.  Do you recognize Defense Exhibit 1204 as being a copy of

2   the *Fairchild* case from the UK?

3   A.  Yes.

4   Q.  Are you familiar with that case?

5   A.  I actually never read it, but I am familiar with what its

6   basic propositions are.

7   Q.  The *Fairchild* case is a case that is cited in Australian

8   cases, correct?

9   A.  Incorrect.  It's cited, but with a view of disapproval.

10  Q.  Can you turn to tab 5 of the binder?

11  A.  Yes.

12  Q.  Now, this is not a case.  I will represent that to you.

13  It's Defendants' DX 1205.  I will ask you to forgive me.  I

14  could not get on an Australian legal Web site last night to

15  print the actual case.  Do you recognize this as an article

16  referencing the *Amaca v. Booth* case?

17  A.  Yes.

18  Q.  Do you see the highlighted portion where it indicates in

19  Australia the House of Lords endorsed that material increase to

20  risk causation --

21  A.  We don't have a House of Lords.

22  Q.  I misread.

23       Are you aware of whether the *Amaca v. Booth* case has

24  approached the *Fairchild* approach to material increase to risk

25  that was adopted by the House of Lords in the *Fairchild* case?

DAN8CHE3                    Spigelman - cross

1    A.  My understanding in *Amaca v. Booth*, the Australian High

2    Court refused to follow it.  I have answered your question.

3    Q.  Can you turn to tab 6 of the binder that I gave you and

4    confirm that Defendants' Exhibit 1202 is a copy of the opinion

5    that you wrote in the *Seltsam* case?

6    A.  Yes, it appears to be.

7              MR. BOOTH:  At this time, we would move into evidence

8    the Defendants' Exhibit DX 1201, which is at tab 2.

9              MS. NEUMAN:  No objection.

10             THE COURT:  Simply for the fact that they say what

11   they say, is that right?

12             MR. BOOTH:  Yes, your Honor.

13             THE COURT:  Received on that basis.

14             (Defendants' Exhibit 1201 received in evidence)

15             MR. BOOTH:  On the same basis, Defendants' Exhibit

16   1203.

17             THE COURT:  Same ruling.

18             (Defendants' Exhibit 1203 received in evidence)

19             MR. BOOTH:  Again, your Honor, to the extent that this

20   deals with not what actually is Australian law, but testimony

21   about what would have been available, we would move it in for

22   that purpose.

23             Tab 4, which is DX 1204, the *Fairchild* case, we move

24   that in evidence.

25             THE COURT:  Received not for the truth.

```
1              (Defendants' Exhibit 1204 received in evidence)
2              MR. BOOTH:  Defendants' Exhibit DX 1205.
3              THE COURT:  And 1202, I take it, right?
4              MR. BOOTH:  Yes.
5              THE COURT:  All received on that basis.
6              (Defendants' Exhibits 1202 and 1204 received in
7     evidence)
8              MR. BOOTH:  Those are my questions.
9              THE COURT:  Mr. Gomez.
10   CROSS-EXAMINATION
11   BY MR. GOMEZ:
12   Q.  Good morning, Mr. Spigelman.
13   A.  Good morning.
14   Q.  Mr. Spigelman, what is the total amount that you have been
15   paid for your work on this matter?
16   A.  I don't know.  Up to today, I'm not sure.  10, 20, maybe
17   20, 30.
18   Q.  Are you being paid on a flat rate or an hourly rate?
19   A.  An hourly rate.
20   Q.  What is your hourly rate?
21   A.  A thousand dollars Australian an hour.
22   Q.  How many trips have you made to the United States for
23   purposes of this work?
24   A.  This is my second.
25   Q.  Have you been paid for your time to travel on those trips
```

DAN8CHE3                     Spigelman – cross

1   at the thousand dollar an hour rate?

2   A.  Yes.

3   Q.  How long is the flight from New York to Australia, sir?

4   A.  Hopefully, about 22 hours.

5   Q.  You always fly first class?

6   A.  I did the first occasion.  I did not on this occasion.

7   Q.  Are you an expert on plagiarism?

8   A.  No.

9   Q.  You have no training, sir, to assess how much similarity

10  between texts would constitute plagiarism?

11  A.  Not particularly.

12          MS. NEUMAN:  Objection.  Beyond the scope.

13          THE COURT:  Sustained.

14  Q.  Sir, during your analysis and during the work and the

15  searches that you did, were you able to rule out the existence

16  of a common antecedent document that may have been used by the

17  authors of the judgment and the Moodie memo to make the

18  statements that are the focus of your analysis?

19          MS. NEUMAN:  Objection.  Beyond the scope.

20          THE COURT:  Overruled.

21          I couldn't hear the answer.

22  A.  No.  I made no such analysis.

23          MR. GOMEZ:  Thank you.

24          THE COURT:  Thank you.

25          Anything else, Ms. Neuman?

DAN8CHE3                      Spigelman - cross

```
 1              MS. NEUMAN:  No redirect.

 2              THE COURT:  Thank you, Mr. Spigelman.  You're excused.

 3              (Witness excused)

 4              THE COURT:  Next witness, please.

 5              MR. MASTRO:  Your Honor, Chevron calls Alberto Guerra.

 6    ALBERTO GUERRA,

 7         called as a witness by the plaintiff,

 8         having been duly sworn, through official Spanish

 9         interpreter, testified as follows:

10              THE DEPUTY CLERK:  State your name for the record.

11              THE WITNESS:  I respond to the names of Alberto Guerra

12    Bastidas.

13              MR. MASTRO:  May I approach the witness?

14              THE COURT:  You may.

15    DIRECT EXAMINATION

16    BY MR. MASTRO:

17    Q.  Mr. Guerra, I am handing you a copy of your declaration.

18    Do you see that, sir?

19    A.  Yes, I see it.

20    Q.  Would you please turn to the last page?  Is that your

21    signature on the last page of the document, sir?

22    A.  Yes, it is.

23    Q.  Sir, we have over the last 24 hours made a number of

24    changes in your declaration to remove certain language.  You

25    have initialed those, correct, sir?
```

DAN8CHE3                        Guerra - direct

1    A.  Yes.

2    Q.  I refer you specifically to paragraphs 4, 7, 10, 11, 21,

3    22, 50, and 63.

4    A.  Yes.

5    Q.  Are those the paragraphs where you removed certain of your

6    declaration language and initialed them in the margin?

7    A.  Correct.

8    Q.  Sir, was this declaration as redacted true and correct at

9    the time you signed it?

10   A.  Yes, sir.

11   Q.  Is it true and correct today?

12   A.  Yes.

13            MR. MASTRO:  Your Honor, I am going to do a

14   supplemental examination, as agreed, on subjects of

15   Mr. Guerra's work on the Chevron case and as a ghost writer for

16   Judge Zambrano, and then issues relating to the issues of the

17   judgment in the Chevron case.

18            I offer at this time the declaration as his direct

19   testimony to be supplemented by those examinations.

20            THE COURT:  Received on the same basis of the others.

21            (Plaintiff's Exhibit 4800 received in evidence)

22            MR. MASTRO:  I also hand up to the Court 4800A, which

23   is a list of the exhibits that Mr. Guerra entered in his

24   deposition.

25            MS. LITTLEPAGE:  We have some objections to the

DAN8CHE3                         Guerra - direct

exhibits.  I thought that perhaps Mr. Mastro would lay a

stronger foundation for some of the exhibits.  Do you want me

to make my objections now?  There are some records that do not

have a custodial records affidavit.  There is no authenticity,

and we object to them.

          THE COURT:  First of all, I am going to take them all

on the same basis that we have taken all of the others.  But

you are to inform Mr. Mastro when we break for lunch of any

exhibits as to which you have any objection that could be cured

through the examination with the witness, even arguably.  So

that he can lay whatever foundation he is able and needs to lay

in his judgment.

          MS. LITTLEPAGE:  Yes.

          (Plaintiff's Exhibit 4800A received in evidence)

          MR. MASTRO:  If I may also approach the witness before

I begin my examination.

          THE COURT:  Yes.

          MR. MASTRO:  I wanted to hand him two originals of PX

1733 and PX 1734 in case he needs to refer to them.

BY MR. MASTRO:

Q.  Am I correct, sir, that those are day planners or diaries

that you kept?

A.  Yes, they are.

Q.  Mr. Guerra, directing your attention to the period after

you stopped being a judge, after 2008, what, if any,

DAN8CHE3                        Guerra - direct

1    involvement did you have in the Chevron case?

2    A.  Through an agreement with Mr. Zambrano, after 2008, after

3    being a judge, I became his ghost writer regarding all the

4    court orders involving all the trials that were assigned to him

5    by draw, by lottery.  And I was likewise the ghost writer

6    regarding the court orders that he had to issue regarding the

7    Chevron case, during the periods of time when he was in charge

8    of writing those orders, because he was hearing the case.

9            Finally, because of the circumstance, I undertook a

10   review, revision of the judgment, which according to him, as he

11   stated to me and he assured me, had been provided to him by the

12   plaintiffs in the Chevron case.

13   Q.  I am going to ask you more questions about that over the

14   course of this examination, Mr. Guerra.

15           You just made reference to ghostwriting orders for

16   Judge Zambrano.  In what types of cases did you ghostwrite

17   orders for Judge Zambrano?

18   A.  I wrote for Judge Zambrano the rulings and the judgment

19   that was to be issued in those matters, civil matters, that

20   were assigned to Mr. Zambrano by lottery.

21   Q.  Mr. Guerra, I refer you to PX 129.  It will come up on the

22   screen.

23           Can you identify for us who this is a photograph of?

24   A.  Yes.  This is Judge Nicolas Augusto Zambrano Lozada.

25   Q.  When was the first time that Mr. Zambrano began presiding

DAN8CHE3                          Guerra – direct

1   over the Chevron case?

2   A.  He heard the case, he began hearing the case in October of

3   2009.

4   Q.  What happened, if anything, in October 2009 that led Mr.

5   Zambrano to be the judge presiding over the Chevron case?

6   A.  The president of the court, who was also the sitting judge

7   hearing the Chevron case at the time, recused himself from the

8   case.  And under these circumstances, Mr. Zambrano, Judge

9   Zambrano, took over the Chevron case because he was the

10   subrogating judge of the court.

11   Q.  Mr. Guerra, how long --

12          THE COURT:  I'm sorry.  I missed a word.  He was a

13   what judge?

14          THE INTERPRETER:  Subrogating judge of the court.

15   Q.  Mr. Guerra, once Mr. Zambrano took over presiding over the

16   Chevron case in October 2009, how long did he preside over the

17   case in his first tenure?

18   A.  He heard the case during that first stage until February of

19   2010.

20   Q.  Am I correct that the judge he succeeded was Judge Nunez?

21   A.  Judge Zambrano replaced Judge Nunez.

22   Q.  Who presided over the Chevron case after February 2010,

23   which judge?

24   A.  It was heard by Judge Leonardo Ordonez Pina.

25   Q.  Did there come a time after February 2010 that Judge

1    Zambrano resumed presiding over the Chevron case?

2    A.  Yes.

3    Q.  What happened, if anything, that led to Mr. Zambrano

4    presiding over the Chevron case again?

5    A.  Judge Ordonez Pina was recused by Chevron and therefore he

6    had to recuse himself from the case.

7    Q.  Sir, during which period of time did you ghostwrite orders

8    for Judge Zambrano in the Chevron case, his first tenure, his

9    second tenure or both?

10   A.  In both terms of Mr. Zambrano's.

11   Q.  In drafting Judge Zambrano's orders in the Chevron case,

12   did you understand that you were violating Ecuadorian law?

13   A.  Yes.

14   Q.  Let me return to Judge Zambrano's first tenure on the

15   Chevron case, October 2009 to February 2010.

16        During that period of time, when you were ghostwriting

17   for Judge Zambrano, what, if anything, did you receive from

18   Judge Zambrano in exchange for ghostwriting his orders in civil

19   cases?

20   A.  He and I agreed that regarding the issue of my writing for

21   him the court orders in his civil cases, I would receive from

22   him a thousand dollars a month.

23   Q.  Did Judge Zambrano pay you out of his own pocket from his

24   own funds that thousand dollars a month?

25   A.  He paid it to me.  I understood he was getting it from his

DAN8CHE3                        Guerra - direct

1   own funds, from his own pocket.

2   Q.  Sir, in receiving a thousand dollars a month from Judge

3   Zambrano to ghostwrite his orders in civil cases, did you

4   understand you were violating Ecuadorian law?

5   A.  Yes, of course, yes.

6   Q.  Did there come a time when you and Judge Zambrano discussed

7   during his first tenure of the Chevron case soliciting a bribe

8   from Chevron?

9   A.  Yes.

10  Q.  What, if anything, did Judge Zambrano say to you about

11  soliciting such a bribe?

12  A.  Mr. Zambrano instructed me, because I was somebody whom he

13  trusted, that I should use my friendships, my acquaintances, to

14  make contact with attorneys from Chevron, the attorneys

15  defending Chevron, in order for me to talk to them for the

16  purpose of to make contact with them to talk about, to agree

17  regarding certain important issues of the case, which finally,

18  obviously, included the possibility of drafting the judgment.

19  Q.  Sir, just to be clear on the time frame, the conversation

20  you just testified about with Judge Zambrano, that would have

21  been late summer, early fall of 2009?

22  A.  In Ecuador, we don't have the seasons very clearly defined,

23  but this event took place, approximately, between August and

24  September of 2009.

25  Q.  By that time, did Judge Zambrano anticipate becoming the

DAN8CHE3                         Guerra - direct

1   judge on the Chevron case because of the Nunez recusal?

2   A.   Correct, sir, yes.

3   Q.   What did Judge Zambrano tell you, if any, in the

4   conversation you just described about why he wanted you to

5   contact Chevron in the first instance instead of the Ecuadorian

6   plaintiffs' lawyers?

7           MS. LITTLEPAGE:  Objection.  Hearsay.

8           THE COURT:  Overruled.  Subject to the point that was

9   made in the robing room conference this morning, I am taking it

10  subject to connection.

11          MS. LITTLEPAGE:  Can I just have a running objection?

12          THE COURT:  Let's start out making it for each, and if

13  it becomes a burden, we will see where we are.

14  A.   Judge Zambrano and I obviously believed that Chevron was in

15  quite a better financial situation than the plaintiffs, and

16  that as a consequence of this, a larger financial benefit could

17  be obtained, especially for Mr. Zambrano and to some degree for

18  me.

19  Q.   After this conversation with Judge Zambrano, what, if

20  anything, did you do next?

21  A.   I contacted one of Chevron's attorneys.

22  Q.   Which attorney, sir?

23  A.   Dr. Alberto Racines.

24  Q.   How did you know Dr. Alberto Racines?

25  A.   I knew counsel Racines as well as attorneys from both

DAN8CHE3                        Guerra - direct

1    litigating parties because I had been the first judge to hear

2    the case.

3    Q.  How did you contact Dr. Racines?

4    A.  I called him on the phone to his cell phone, and that is

5    how we set up an appointment.

6    Q.  What, if anything, did you say to him in that phone

7    conversation?

8    A.  On that telephone call, after the appropriate greetings, I

9    told him that I was interested in talking to him, that I had

10   been authorized to do so by Mr. Zambrano, that it was necessary

11   that we chat, that we have a conversation regarding an issue

12   for which I had been authorized by Mr. Zambrano to convey to

13   him.

14   Q.  What, if anything, happened next with Mr. Racines?

15   A.  We held a meeting.  He invited me over to an Argentinean

16   food restaurant.  On that occasion, which was the only occasion

17   in which I met with him, I made the proposal, this proposal,

18   the proposal as I stated, which was conceived by Judge

19   Zambrano.

20   Q.  What was that proposal, sir, that you made to Mr. Racines?

21   A.  Specifically, the proposal was that I would be a link

22   between Chevron and Mr. Zambrano for the purpose of discussing

23   or agreeing on certain important issues of the Chevron case,

24   and the judgment if need be.

25   Q.  What, if anything, did he say to you after you told him

DAN8CHE3                          Guerra – direct

1    that proposal?

2    A.   Mr. Alberto Racines did inform me that he would convey to

3    his peers the details of the proposal.  And once it had been

4    done at the appropriate time, he would give me an answer.

5    Q.   In this conversation, did you tell Mr. Racines that you

6    were Judge Zambrano's ghost writer?

7    A.   No.

8    Q.   After your meeting with Mr. Racines, did you have any

9    further communications with Mr. Racines about the conversation

10   you had had?

11   A.   No.

12   Q.   Did you try to call him on the phone?

13   A.   I called him on the phone several times trying to get an

14   answer, his reply, but he didn't answer.

15   Q.   At some point thereafter were you able to get in touch with

16   him?

17   A.   In spite of my insistence, he did not answer my telephone

18   calls.  But at some later point in the future he called me on

19   my cell phone, and he did inform me that under no circumstance,

20   under no guise would Chevron agree to any sort of an agreement.

21   Q.   Sir, did you report that conversation you had with

22   Mr. Racines to Judge Zambrano?

23   A.   Yes.

24   Q.   What did Judge Zambrano say in response?

25            MS. LITTLEPAGE:  Objection.  Hearsay.

DAN8CHE3                    Guerra - direct

```
 1                THE COURT:  Overruled.
 2   A.   Judge Zambrano was very hopeful thinking with certainty
 3   that it would have been accepted, and likewise I believed the
 4   same.  And as a consequence, once Zambrano found out this
 5   reality, this rejection, he was disappointed --
 6                THE INTERPRETER:  I need to look up a word, your
 7   Honor.
 8                THE COURT:  Please.
 9   A.   Discouraged, dispirited.
10   Q.   Mr. Guerra, did you and Mr. Zambrano discuss how to proceed
11   next at that point?
12   A.   Some days later, after this event that I am referring to,
13   he gave me specific instructions to meet with Mr. Pablo Fajardo
14   with whom, according to what he himself told me, he had reached
15   an agreement with Mr. Fajardo to expedite the case, the
16   proceedings in the case.  And it was Mr. Zambrano's intent that
17   I should meet with Mr. Fajardo in order to define certain
18   specific aspects that would allow to expedite the case, and
19   that I should agree as well financially with Mr. Fajardo as to
20   what they would provide to me financially for my involvement in
21   the case.
22   Q.   "They" being who, sir?
23   A.   Mr. Fajardo.
24   Q.   What was Mr. Fajardo's position at the time?
25   A.   After I received those instructions from Mr. Zambrano --
```

1    Q.  Mr. Guerra, what was Mr. Fajardo's position at that time

2    when Mr. Zambrano told you to meet with Mr. Fajardo, who was he

3    representing?

4    A.  Mr. Fajardo was the main attorney for the plaintiffs in

5    Ecuador.

6    Q.  Did there come a time shortly thereafter when you met with

7    Mr. Fajardo as Judge Zambrano had instructed you to do?

8    A.  Yes.

9    Q.  When, approximately, was that, what month approximately?

10   A.  This encounter took place between September, October, or

11   November of 2009.

12   Q.  Where did you meet with Mr. Fajardo?

13   A.  He called me and we met at the corner of Seis de Diciembre

14   and Rio Coca Avenues in Quito.

15   Q.  What time of day was it, sir?

16   A.  It was nighttime.

17   Q.  Directing your attention to Plaintiff's Exhibit 95.  It

18   will come up on the screen.  Can you identify for the Court who

19   that is?

20   A.  Yes.  This is Mr. Pablo Fajardo Mendoza.

21   Q.  This is who you met with that night?

22   A.  Yes.

23   Q.  What, if anything, happened at your meeting with

24   Mr. Fajardo that night?

25   A.  Aside from greetings and comments of a personal nature,

DAN8CHE3                         Guerra - direct

1    one's health and family, we specifically agreed on three
2    things:  One, that I would see to issuing court orders that
3    would allow to speed up to expedite the proceedings; two, when
4    issuing the court orders, I would see that to somehow limit
5    Chevron's procedural options; and third, finally, I would
6    receive from them, from Mr. Fajardo, the sum of a thousand
7    dollars per month for my involvement in this issue.
8    Q.  Did you have an understanding of how long a period it would
9    be that you would receive a thousand dollars a month from
10   Mr. Fajardo?
11   A.  It was understood that I would receive that money from
12   Mr. Fajardo during the time when Zambrano was hearing the case.
13   Q.  At the time you reached this agreement with Mr. Fajardo to
14   receive a thousand dollars a month from him, while you were
15   ghostwriting orders on the Chevron case, did you understand
16   that you were violating Ecuadorian law?
17   A.  It hurts me to say so, but yes.
18   Q.  Mr. Fajardo, did you ever discuss this agreement you
19   reached with Mr. Fajardo with any other representatives of the
20   Lago Agrio plaintiffs' team?
21           MR. MASTRO:  Excuse me.  I have to rephrase the
22   question.
23   Q.  Mr. Guerra, did you ever discuss with any other members of
24   the Lago Agrio plaintiffs' team, besides Mr. Fajardo, the
25   agreement you reached with Mr. Fajardo?

DAN8CHE3                         Guerra - direct

1          THE COURT:  You mean in this time period?

2          MR. MASTRO:  In this time period.

3   Q.  About the thousand dollars a month to ghostwrite orders for

4   the Chevron case?

5   A.  Yes.

6   Q.  Please explain who, if anyone else, on the Lago Agrio

7   plaintiffs' team you met with to discuss that subject, the

8   agreement you had reached with Mr. Fajardo to receive a

9   thousand dollars a month to ghostwrite orders in the Chevron

10  case?

11  A.  When I made the agreement with Mr. Fajardo regarding the

12  understanding I just mentioned, Mr. Fajardo insisted that I

13  should meet a few days later, he told me with Mr. Steven

14  Donziger, so that he can find out with my own words regarding

15  my commitment that I had made with Mr. Fajardo.

16  Q.  Did Mr. Fajardo tell you why he wanted you to meet with Mr.

17  Donziger?

18  A.  Mr. Fajardo stated that all important matters should be

19  brought to the attention of Mr. Donziger because he said that

20  he was the boss of the attorneys -- of the legal team.

21  Q.  Did there come a time when you then met with Mr. Donziger

22  to discuss this subject of the agreement you had reached with

23  Mr. Fajardo?

24  A.  Yes.

25  Q.  How soon after you reached this agreement with Mr. Fajardo

1   did you meet with Mr. Donziger?

2   A.   From what I can recall, a week or two afterwards.

3   Q.   Where was this meeting that you had with Mr. Donziger?

4   A.   This meeting took place at the Honey Honey restaurant in

5   the city of Quito.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANLCHE4                    Guerra - direct

1   BY MR. MASTRO:

2   Q.  What time of day was it?

3   A.  It was early nighttime.

4   Q.  Who else was in attendance at this meeting you had with

5   Mr. Donziger, if anyone?

6   A.  Mr. Donziger, Mr. Pablo Fajardo, and Mr. Luis Yanza.

7   Q.  Mr. Guerra, directing your attention to Plaintiff's

8   Exhibit 1686, pages 9 and 10.  They're going to come up on the

9   screen.

10          Can you identify for the Court what those are

11  photographs of?

12  A.  The one on the left is the facade of the Honey Honey

13  restaurant that I have mentioned.  And the one on the right, it

14  relates to the back of the restaurant.

15  Q.  Where did you meet with Mr. Donziger and Mr. Fajardo and

16  Mr. Yanza within that restaurant?

17  A.  In this photograph I met with them on the back of the left

18  side of the restaurant.

19  Q.  And, sir, do you see Mr. Donziger in this courtroom?

20  A.  Yes, sir.

21  Q.  Can you point him out to us and tell what he's wearing?

22  Tell us what he's wearing.

23          THE COURT:  Usual way of doing that, Mr. Mastro, is

24  not for you.

25          MR. MASTRO:  Understood.

DANLCHE4                    Guerra - direct

1   A.  He just smiled.  He is behind the lady in red.  He knows

2   me.  He knows me.  He has seen me.  We have been together.

3            THE COURT:  I'm sorry.  Is the translation accurate

4   that he's behind the lady in red?

5            THE INTERPRETER:  Yes, your Honor.

6   Q.  Can you describe what Mr. Donziger is wearing, sir?

7   A.  He's wearing a dark suit, white shirt, and possibly a blue

8   tie, possibly with stripes.

9   Q.  Thank you.  Turning your attention to PX94, can you tell us

10  who this is a photograph of, sir?

11  A.  This is Mr. Luis Yanza.

12  Q.  Do you have an understanding of what Luis Yanza's role was

13  on the Lago Agrio plaintiffs' team?

14           THE COURT:  Sustained.

15  Q.  What understanding if any do you have of Luis --

16           THE COURT:  Sustained.  Personal knowledge, not

17  gossip.

18  Q.  Mr. Guerra --

19           THE COURT:  Otherwise admissible evidence would be

20  acceptable also.

21  Q.  Do you know of your own personal knowledge what role Luis

22  Yanza had on the Lago Agrio plaintiffs' team?

23  A.  I know that Luis, Mr. Luis Yanza represented the team, the

24  group of plaintiffs, but I do not know what role Mr. Yanza had

25  in within the team of the legal representatives of the

DANLCHE4                        Guerra - direct

1    plaintiffs.

2              MR. MASTRO:  I'll move on, your Honor.

3    Q.  What if anything happened at this meeting at the Honey

4    Honey restaurant that you had with Mr. Donziger, Mr. Fajardo,

5    and Mr. Yanza?

6    A.  Mr. Fajardo brought up to date or he summarized the

7    agreement that he had reached with me.  He made Mr. Steven

8    Donziger and Mr. Yanza aware of this detail.  And specifically

9    after hearing Mr. Fajardo, Mr. Donziger asked me if what

10   Mr. Fajardo had conveyed was correct, it was accurate.  And

11   after hearing my positive answer regarding that statement,

12   Mr. Yanza and Mr. Donziger thanked me for my involvement.

13   Strike that.  He thanked me for the work that I was going to

14   do.

15   Q.  Did Mr. Donziger say anything else to you at this meeting

16   besides thanking you for the work you were about to do?

17   A.  Yes.  And I am honestly not sure if it was at this meeting

18   or the second meeting which we -- which we had at the same

19   place.  Mr. Donziger heard from me a concern, a preoccupation

20   that I had regarding the immigration situation of a son of mine

21   who had been living here illegally in the United States for

22   many years.

23              And regarding this he told me he was no expert in

24   immigration issues, but that in any case he would consult with

25   an acquaintance or a friend or somebody who understood the

DANLCHE4                    Guerra - direct

1  issue and that he would convey it to me.  And he did inform me

2  that he had a friendship, very interesting, that was a friend

3  with the President of the United States, Barack Obama, because

4  they had been classmates at the same university.

5  Q.  Mr. Guerra, just to be crystal clear, did Mr. Fajardo say

6  at this meeting you had with Mr. Donziger the terms of the

7  agreement you'd reached with Mr. Fajardo, including that you be

8  paid a thousand dollars a month to ghostwrite orders in the

9  Chevron case?

10             MR. GOMEZ:  Objection, your Honor.

11             THE COURT:  Sustained as to form.

12  Q.  Mr. Guerra, when you just identified that Mr. Fajardo

13  described your agreement at this meeting you had with

14  Mr. Donziger and Mr. Fajardo and Mr. Yanza, what if anything

15  did Mr. Fajardo say to describe the terms of your agreement

16  with Mr. Fajardo?

17  A.  Mr. Fajardo stated, well, he said, look, Steven, we've met

18  with Mr. Guerra already and, as you know, he's the one who

19  writes for Dr. Zambrano.  And we have agreed with him and he

20  agrees that -- that he will issue the court orders to expedite

21  the case.  He will see to it that Chevron's procedural options

22  are limited and I or, from our side, I've committed to paying

23  him a thousand dollars per month.

24  Q.  At any point during this meeting at the Honey Honey with

25  Mr. Fajardo, Mr. Donziger, and Mr. Yanza, did Mr. Donziger

DANLCHE4                    Guerra - direct

1   object at any point to any of those terms?

2   A.  No.

3   Q.  Did you -- what if any -- strike that.

4          What if any discussion did you have subsequently with

5   Judge Zambrano about the meeting you had with Fajardo,

6   Donziger, and Yanza at the Honey Honey restaurant?

7          MS. LITTLEPAGE:  Objection, if he's going to talk

8   about what Mr. Zambrano said to him would be hearsay.  The

9   question is very broad, so I didn't want to waive my objection.

10         THE COURT:  Your objection is noted.  Let's see what

11  the testimony is.

12         As I indicated in the discussion we had previously, I

13  view this as all being taken subject to connection at a minimum

14  under the coconspirator rule.

15         THE WITNESS:  So do I answer?

16         THE COURT:  Yes.  I'm sorry.

17  A.  I made, I informed regarding my conversation with

18  Mr. Fajardo initially and as well as my conversations with

19  Fajardo, Donziger, and Donziger later on, I always informed

20  Mr. Zambrano about that.  And Mr. Zambrano was informed, he was

21  in agreement and was up to date with the agreement I had

22  reached with them.

23  Q.  Mr. Guerra, what if anything happened next in terms of

24  compliance with the agreement you reached with Mr. Fajardo?

25         THE COURT:  This seems to be a good place to break for

DANLCHE4                        Guerra – direct

1    lunch.   Ten past two.

2              MR. MASTRO:   Certainly.

3                (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANLCHE4b                         Guerra - direct

                            AFTERNOON SESSION

                                2:15 p.m.

              THE COURT:  Good afternoon, folks.

              MR. MASTRO:  Good afternoon, your Honor.

              THE COURT:  Before we resume, I just want to correct a
tiny mistake I made this morning.

              In the course of a discussion about the coconspirator
issue, I made a reference to Federal Rule of Evidence 104(b).
I should have referred to (a).  The substance is the same, that
is, not of the two rules but of the principle.

              Let's go.

              MR. MASTRO:  Thank you, your Honor.

BY MR. MASTRO:

Q.  Mr. Guerra, before the break you were testifying about the
agreement you reached with Pablo Fajardo in or about September,
October 2009.

              Do you recall that testimony?

A.  Yes.

Q.  After you reached that agreement with Mr. Fajardo, what if
anything did you do to fulfill your commitments under that
agreement?

A.  I reported everything regarding this matter to
Mr. Zambrano, even the content of the conversation that I had
with Mr. Fajardo, Mr. Donziger, and Mr. Yanza.  And then after
that, I subsequently worked on the court orders that had to be

DANLCHE4b                          Guerra - direct

1    ruled on in the Chevron matters, and in so doing, I was

2    following the guidelines of my agreement with Mr. Fajardo and

3    his team.

4    Q.   Did you sometimes draft orders for Judge Zambrano ruling in

5    Chevron's favor?

6    A.   I drafted the court orders that Judge Zambrano was to make.

7    If I did not draft all of them, I drafted almost all of them.

8    Q.   Sir, my question was were there times after you reached

9    this agreement with Mr. Fajardo where you drafted orders where

10   Chevron would win a motion?

11             MR. GOMEZ:   Leading, your Honor, asked and answered.

12             THE COURT:   Overruled.  I think the correct

13   characterization would be asked but not answered.

14   A.   As I was drafting the court orders in the Chevron case,

15   certain portions of those orders were drafted in favor or for

16   the benefit of Chevron.

17   Q.   Can you explain to me why after you had a deal with

18   Mr. Fajardo that some of the orders were drafted to be in

19   Chevron's favor?

20   A.   Well, you see, it could seem much too obvious if every

21   single portion of every single court order that I drafted, it

22   could not seem as though all of the orders were being issued

23   for the benefit of the plaintiffs.  That would have looked

24   suspicious and the idea was to not have it look suspicious.

25   Nevertheless, some of these parts, even though they were to the

DANLCHE4b                    Guerra - direct

1    benefit of Chevron, were not done for the purpose of delaying

2    the actions of the plaintiffs in the case.

3    Q.  Now, Mr. Guerra, what -- strike that.

4         Mr. Guerra, after you reached your agreement with

5    Mr. Fajardo, what if anything did he do to fulfill his end of

6    the bargain?

7    A.  Well, first of all, Mr. Fajardo made the payments that he

8    had offered.  And also we would occasionally meet in person to

9    discuss matters of the case and to discuss matters that were to

10   be included in the court orders in the case or in regard to

11   those matters.  And if there were any questions, that was

12   something we would discuss by telephone.

13   Q.  Let's come back to the money.  How much did he pay you, how

14   often, and for how long?

15   A.  The agreement was for $1,000 and I was paid $1,000 per

16   month.  And those payments happened and those payments were

17   made during the entire time that I was ghostwriting the court

18   orders.

19   Q.  Sir, how did Mr. Fajardo make those thousand dollar monthly

20   payments to you?

21   A.  He either paid me personally in cash or he would deposit

22   the money into my savings account at the Pichincha bank.

23   Q.  On those occasions when you were paid in cash, who

24   specifically paid you the cash?

25   A.  Mr. Pablo Fajardo.

DANLCHE4b                          Guerra - direct

 1   Q.  Did he pay you -- rephrase.

 2          When Mr. Fajardo would pay you in cash, was there a

 3   particular place where you would meet to do that?

 4   A.  During the entire time that I had meetings with

 5   Mr. Fajardo, they always took place at the same location which

 6   was at the corner of Avenida Seis de Diciembre and Avenida Rio

 7   Coca in the city of Quito.

 8   Q.  How did Mr. Fajardo give you the money and in what

 9   denominations?

10   A.  He would hand me a blank white envelope and inside the

11   envelope were 20 and $50 bills.

12   Q.  You also testified that sometimes Mr. Fajardo would arrange

13   for the money to be deposited into your bank account?

14   A.  There were times when Mr. Fajardo would call me on my cell

15   phone and he would just tell me that a deposit had been made

16   into my savings account.

17   Q.  How would he know -- how did he know what your savings

18   account deposit number was?

19   A.  At one time he had asked me for my savings account number

20   and for my checking account number and clearly I gave them to

21   him.

22   Q.  How much was deposited into your account on those occasions

23   when Mr. Fajardo told you there would be a direct deposit into

24   your bank account?

25   A.  It was exactly the $1,000.

DANLCHE4b                    Guerra – direct

Q.  Did Mr. Fajardo ever personally make the deposit into your

bank account?

          MR. GOMEZ:  Objection, calls for speculation.

          THE COURT:  Overruled.

A.  I have no personal knowledge.

Q.  Mr. Guerra, after Mr. Fajardo called and told you there

would be a direct deposit into your account, what steps if any

did you make to determine whether the direct deposit actually

occurred of a thousand dollars?

          MR. GOMEZ:  Objection, misstates prior testimony.

          THE COURT:  Rephrase it, counselor.

Q.  Did Mr. Fajardo call you on occasion to say that the

thousand dollars would be direct deposited into your bank

account?

          MR. GOMEZ:  Objection, leading.

          THE COURT:  Overruled.

A.  No.

Q.  How would you -- what steps did you take to determine

whether there had been a thousand dollar deposit into your

account?

A.  Once I found out that a $1,000 deposit had been made into

my account at the bank due to the information that Mr. Pablo

Fajardo had given me in that regard, I would then go to a -- an

automatic teller for that bank, for Banco Pichincha.  I would

then use my bank card in order to verify that a deposit had in

DANLCHE4b                    Guerra - direct

1    fact been made into my account.

2    Q.  Sir, did you take steps to collect deposit slips into your

3    account directly from Banco Pichincha?

4    A.  I did that in mid -- approximately in mid 2012.

5    Q.  You went to the bank yourself to get the deposit slips,

6    correct?

7    A.  Yes, sir.

8    Q.  I'd like to direct your attention to PX1713, please.  It's

9    on the screen, sir.  Can you see it?

10   A.  Yes.

11   Q.  Is this one of the deposit slips you personally went to the

12   bank to collect?

13   A.  Yes.

14   Q.  Do you see there in the bottom right-hand corner --

15          MS. LITTLEPAGE:  Objection.

16          THE COURT:  What is the objection?

17          MS. LITTLEPAGE:  No.  Sorry.

18   Q.  Do you see there in the bottom right-hand corner a stamp

19   from Banco Pichincha signed by somebody from the bank?

20   A.  Yes, sir.

21   Q.  Sir, what is this document?

22          MS. LITTLEPAGE:  Objection.  We have an objection to

23   the document and objection to discussion of the document unless

24   it comes into evidence.

25          MR. MASTRO:  Your Honor, I move it into evidence and

DANLCHE4b                    Guerra - direct

1    it's a record that he personally went to the bank to get and

2    the bank has certified at the bottom that it comes from the

3    bank.  And under foreign document rules under Federal Rule 902

4    of evidence and Federal Rule of Civil Procedure 44(a)(2), it

5    does not have to be a certified document to have the indicia.

6            THE COURT:  Let me hear what the objection actually

7    is.

8            MS. LITTLEPAGE:  Hearsay, authenticity, no business

9    record exception, no custodian of the records, no foundation.

10            MR. MASTRO:  Your Honor.

11            THE COURT:  Just a minute.

12            MR. MASTRO:  Certainly, your Honor.

13            THE COURT:  Can you speak slowly enough so that I can

14    write down all of the arguments you made.

15            MS. LITTLEPAGE:  Me, sir?

16            THE COURT:  Yeah, you.

17            MS. LITTLEPAGE:  Hearsay, lack of authenticity, lack

18    of foundation.

19            THE COURT:  How is that different from lack of

20    authenticity?

21            MS. LITTLEPAGE:  Sorry, somebody was yelling in my

22    ear.

23            THE COURT:  I think he was yelling very softly.

24            MS. LITTLEPAGE:  He was.  That's why I was trying to

25    concentrate.  I'm sorry, Judge.  Ask me the question again.

DANLCHE4b                        Guerra - direct

1              THE COURT:  I need your list.

2              MS. LITTLEPAGE:  Best evidence.

3              THE COURT:  What else?

4              MS. LITTLEPAGE:  I think that's it, Judge.

5              THE COURT:  How is lack of foundation different from

6    lack of authenticity or hearsay?

7              MS. LITTLEPAGE:  I don't know, but I'm covering all my

8    bases, Judge.

9              THE COURT:  Well, if the answer is I don't know, you

10   haven't covered it.  That one is off the list.

11             Okay.  Let's deal first with authenticity.

12   Mr. Mastro.

13             MR. MASTRO:  Yes.  Your Honor, first of all, in the

14   objections that the defendants actually filed in the case, they

15   did not challenge this exhibit or any of the exhibits of this

16   witness on authenticity grounds.  It was not a stated

17   objection.

18             Second, your Honor, on authenticity, the witness has

19   testified that he went to the bank himself, got these records

20   directly from the bank.  The bank actually certified on each

21   page that it comes from the bank with the bank officer.  It is

22   a foreign record.  And I think under the rules of evidence as

23   well as the rules of civil procedures, under these

24   circumstances he's more than established the foundation of his

25   own personal knowledge and based on the contents of the

DANLCHE4b                    Guerra - direct

1    document itself that it's an authentic document.  It's a

2    deposit slip from his account.

3             THE COURT:  Whatever you've got on the screen would

4    appear not to have photocopied very well.  So can I have a

5    legible copy of what's on the screen?

6             MR. MASTRO:  Certainly, your Honor.  I think if your

7    Honor turns to Exhibit 1713, you will see a clearer copy.

8             THE COURT:  And where am I supposed to turn to that

9    in, Mr. Mastro?

10            MR. MASTRO:  It's in the big binder, your Honor.

11            THE COURT:  Can you narrow it down?  I've got about

12   nine of those.

13            MR. MASTRO:  Okay.  Your Honor, it is the binder I

14   handed you at the beginning.  He only has one binder for his

15   examination, your Honor.

16            THE COURT:  Now I know which one.

17            Now, the reason I made the point of this was that

18   there seems to be something highlighted in yellow on the screen

19   in the lower right-hand corner and whatever that is, it didn't

20   reproduce in what you've got in the binder.  And there is a

21   typewritten legend below that part of the document in the one

22   typed in the binder that isn't on the screen, at least with

23   respect to this page.

24            MR. MASTRO:  Yes, your Honor.  If you look at the

25   Spanish language version, you will see that.

DANLCHE4b                          Guerra – direct

1              THE COURT:  And that would be the one Bates stamped

2      ending in 097; is that right?

3              MR. MASTRO:  It would be 096, your Honor.  In the

4      Spanish language version, page 7 of 32.  You will see that

5      legend there, your Honor, as well as on the subsequent pages.

6              THE COURT:  All right.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAN8CHE5                          Guerra - direct

1          THE COURT:  I find that the requirements of

2    authentication are satisfied under Rule 901 and 902.  I invite

3    you particularly to 901(a), 901(b)(1), 901(4), 902(7), 902(9),

4    and there may be others, but I think that covers it, sufficient

5    to cover it.

6          Now, what is it that the defendant claims is better

7    evidence?

8          MS. LITTLEPAGE:  The original, Judge.  I can't read

9    what is on this.  I know the witness is about to interpret what

10   is on it, but the original would be what we would need because,

11   as the Court has already pointed out, these are very difficult

12   to read.

13         THE COURT:  The Spanish language copy 096 is quite

14   legible.

15         MS. LITTLEPAGE:  I was looking at Rule 1002, the

16   requirement of a original.  Because under Rule 1003, we are

17   raising a question about the authenticity.

18         THE COURT:  You may have been raising it, but it was

19   overruled.

20         MS. LITTLEPAGE:  I want to make sure the record knows

21   I am objecting under Rule 1002 and Rule 1003.

22         THE COURT:  Well, I see no genuine question as to

23   authenticity, and so the best evidence rule does not apply in

24   this context.

25         Now, Mr. Mastro, before we get on to hearsay, you

DAN8CHE5                          Guerra - direct

1  asserted that this objection was in any case waived by failure

2  to object in a timely way.  Spell this out for me.

3           MR. MASTRO:  Your Honor had directed that the

4  defendants provide their objections to us on our exhibits.

5  They have actually filed a notice with the Court detailing

6  their objections.  They did that on Monday.  And they did not

7  list any of those objections other than hearsay.

8           THE COURT:  We have disposed of everything but

9  hearsay.  So are you telling me they preserved the hearsay

10  point but nothing else.

11          MR. MASTRO:  That's correct.

12          THE COURT:  Do you dispute that much, Ms. Littlepage,

13  that you didn't object on authenticity or best evidence

14  grounds?

15          MS. LITTLEPAGE:  I have no personal knowledge to

16  answer the Court's question.

17          THE COURT:  Somebody must at your table.

18          What about you, Mr. Gomez?

19          MR. GOMEZ:  I don't have that knowledge.

20          THE COURT:  In the absence of any indication to the

21  contrary, and subject to correction if it turns out to be

22  wrong, an alternative basis for my ruling as to authenticity

23  and best evidence is it's waived by the failure to make the

24  objection earlier.

25          Address the hearsay point, counsel.

DAN8CHE5                         Guerra - direct

1              MR. MASTRO:  The witness is here testifying that these

2      are, in fact, his bank records that he obtained and obtained

3      this information.  So he is here to be cross-examined on them,

4      if they choose to cross-examine him.  He has taken the steps to

5      obtain this information from the bank.  He is swearing that he

6      did that, and he is swearing that this is the accurate

7      information that he received.  So under those circumstances,

8      your Honor, I think they should be admissible.  This is

9      information he received from his bank.

10             MS. LITTLEPAGE:  It's still hearsay.  They are

11     offering it for the truth of the matter asserted.  It's an

12     out-of-court document.  He has no personal knowledge of it.  He

13     admits it's not him depositing.  He has gotten this document

14     from whoever it is, and he now wants to come into court and

15     testify about it.  He has no personal knowledge of any of the

16     underlying facts and the document is hearsay.

17             MR. MASTRO:  He absolutely does, your Honor.  He can

18     testify firsthand a thousand dollars is deposited into his

19     bank, and he went to the bank to confirm who deposited the

20     money, and got this deposit slip.  So it's the information that

21     was given to him, and he is here to testify about it.  I think

22     it's fairly admissible.

23             MS. LITTLEPAGE:  There is no such exception to the

24     hearsay rule.

25             THE COURT:  The document is a written assertion that a

DAN8CHE5                          Guerra - direct

1    thousand dollars went into his bank account on a particular

2    date.  That's what it is.

3            Now, I imagine, without necessarily ruling on this at

4    this point, there might be additional evidence that would be

5    elicited that would be relevant.  I am sure Ms. Littlepage

6    probably has, although I don't presume to speak for her

7    obviously, things that make direct deposits to her account, and

8    she knows she has got those deposits because she goes out and

9    spends them.

10           Now, if not you, Ms. Littlepage, I can be sure that I

11   do, and most other people do.  Most people in the United States

12   who get Social Security do it all the time.  That might be an

13   avenue to explore.

14           MS. LITTLEPAGE:  Our objection is to any comment or

15   statement by this witness as to who deposited the money.  He

16   can obviously say there was a thousand dollars in his bank

17   account, and you're right, he probably took the money and spent

18   it.  He can testify to personal knowledge of that.

19           THE COURT:  So what you're objecting to is not the

20   written statement in this document that on a particular date, a

21   thousand dollars was deposited into the account, is that

22   correct?

23           MS. LITTLEPAGE:  I am not objecting to that part of

24   the document.  I am objecting to the part of the document that

25   I believe Mr. Guerra is going to interpret as giving

DAN8CHE5                        Guerra - direct

1    information as to who deposited the money, which he has no

2    personal knowledge of.

3              THE COURT:  That's a separate question.

4              So 1713, there is no hearsay objection and the

5    document is received.

6              Now, I gather that there may be one later that has

7    some notation on it.

8              MS. LITTLEPAGE:  This one does, and we do have a

9    hearsay objection.

10             THE COURT:  I don't understand.  If that's so, you

11   haven't called it to my attention.

12             MS. LITTLEPAGE:  You indicated that on the document

13   marked 3096, I know it's hard to read, but Mr. Guerra

14   interprets the --

15             THE COURT:  Forget about what he interprets.  We are

16   talking about the document alone.

17             MS. LITTLEPAGE:  The document alone --

18             THE COURT:  We will get to what he interprets later.

19             MS. LITTLEPAGE:  We object to the part of the document

20   that on the left-hand bottom part that appears to have a

21   signature and a name, although I cannot read it, that would be

22   the signature and name of the person making the deposit that

23   Mr. Guerra would not know about other than from a hearsay

24   document.

25             THE COURT:  Is there any better copy of this in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAN8CHE5                          Guerra - direct

1   room?

2          MR. MASTRO:  We are getting one for you, your Honor.

3   The better copies of the two pages of this document are on page

4   7 of 32 and on page 8 of 32.

5          THE COURT:  So pages 7 and 8 are the same document, is

6   that correct, two different copies?  No.

7          MR. MASTRO:  They are separate deposits with the same

8   name of the depositor.  On the second one, there is a cedula

9   number -- that's a tax ID number -- very clearly legible.

10         THE COURT:  Ms. Littlepage, just so we are clear what

11  everybody is talking about, on pages 7 and 8 of Plaintiff's

12  1713, I now see what you are referring on the left side.

13         MS. LITTLEPAGE:  It's not quite in the left bottom

14  corner.

15         THE COURT:  On page 8, on the final line, I can read a

16  number, and the number is 1716841547.  Do we agree?

17         MS. LITTLEPAGE:  Yes.

18         THE COURT:  Do we agree that that same number is

19  somewhere on page 7, or do we not agree?

20         MS. LITTLEPAGE:  I cannot see anything.

21         THE COURT:  You don't see a number?

22         MS. LITTLEPAGE:  I don't see a number that I can read

23  on page 7.

24         THE COURT:  And then above the number on page 8, there

25  is what appears to be possibly a handwritten name or signature

DAN8CHE5                          Guerra – direct

1    within an oval line, and then to the right of that, what might

2    be three letters of the alphabet within an oval line.  Do you

3    see that?

4               MS. LITTLEPAGE:  Yes, sir.

5               THE COURT:  Does anybody have any input to me about

6    what is written within those two geometric shapes?

7               MR. GOMEZ:  I would suggest, your Honor, that the

8    witness be excused during this exchange, especially if the

9    witness is going to be asked that very precise question and

10   provide an answer to it.  And I think that all of the confusion

11   that these copies are creating, I think begs the question where

12   is the original, and the plaintiffs have not provided any kind

13   of explanation as to why the original couldn't be provided

14   given that the supposed witness obtained these copies.

15              THE COURT:  That shape has sailed.

16              Let's excuse the witness for the moment.

17              Mr. Guerra, please wait outside.

18              (Witness exits courtroom)

19              THE COURT:  Mr. Mastro, you think you're able to read

20   what is in those two circles or ovals on page 8?

21              MR. MASTRO:  Yes, your Honor.  The witness will

22   testify, your Honor, that he, having seen the bank slips, and

23   of course he got the best copies he could from the bank, that

24   he reads the name as Ximena.  And then, your Honor, he reads

25   the number just below it, which is the cedula number.

DAN8CHE5                         Guerra - direct

1           THE COURT:  What about in the circle to the right of

2     what you say he will say is the word Ximena?  Do you know or is

3     he going to testify or is somebody going to testify?

4           MR. MASTRO:  The small circle to the right of the

5     name, he is going to say he doesn't know what is in that

6     circle.  He can just read the name Ximena and then he can read

7     the number below it.

8           THE COURT:  And so can we all.

9           Now, is it your position that on page 7, on the same

10    line of the form on which the name Ximena allegedly appears on

11    page 8, also appears the name Ximena?

12          MR. MASTRO:  Yes, your Honor.  That's what the witness

13    will testify, that he reads that as Ximena when he received

14    this document.

15          THE COURT:  What is the offer of proof as to what is

16    to the right of Ximena on page 7?

17          MR. MASTRO:  Then he cannot read what is in the little

18    circle next to the name.

19          THE COURT:  So we have got one little circle of

20    letters that's illegible on both documents.  And we have this

21    number on one of the two.

22          We all agree that that's what we are dealing with, Ms.

23    Littlepage?

24          MS. LITTLEPAGE:  Yes, sir.

25          THE COURT:  Now, what is the hearsay analysis from

DAN8CHE5                    Guerra - direct

1    your point of view, Ms. Littlepage, about the word Ximena, or

2    whatever it says, and on one of these two pages the number?

3              MS. LITTLEPAGE:  Judge, from reading Mr. Guerra's

4    witness statement, on this issue Mr. Guerra says that he read

5    this signature.  He actually testified he read the whole

6    signature to be Ximena Centeno.  That he looked up the number

7    that's written on this form, which I would point out is written

8    in a different handwriting than the rest of the form, which he

9    says is not written in afterwards but was the way the form was

10   produced to him.  And that he is here to testify that both of

11   these deposit slips were made by a woman known as Ximena

12   Centeno.

13             THE COURT:  I understand all of that.  I have before

14   me the offer of a document.  The only part of it that remains

15   open for discussion is whether the name Ximena, or whatever it

16   is, and in the case of one of the two documents, two pages, the

17   number, is or is not an out-of-court statement made by somebody

18   for the purpose of establishing the truth of some relevant

19   proposition in this case.

20             MS. LITTLEPAGE:  I believe it is, Judge.  He has no

21   personal knowledge.

22             THE COURT:  It doesn't matter whether he has personal

23   knowledge.  We are only talking about the document.  And we

24   will get this wrapped up a lot sooner if you would stop

25   shifting all the time to talking about whether there is some

1    objection to what you think he is going to say.  That's a

2    separate question.

3              MS. LITTLEPAGE:  I believe this is hearsay.  It is

4    being offered for the truth that someone called Ximena Centeno

5    deposited this money on this date.  And on the one where you

6    can't really read the signature, again, it's an out-of-court

7    statement being offered for the truth that again this woman,

8    Ximena Centeno, deposited this money on this date.

9              THE COURT:  Is there something on the form, because I

10   have a very small version of it, printed below where this

11   possible name is that says something?  And if so, what does it

12   say?  Can anybody help me on that?

13             MR. MASTRO:  Your Honor, what I understand below there

14   is a reference for the name of the depositor to be put on that

15   line.

16             THE COURT:  Do you know what it actually says?  Do you

17   have it?  No.

18             It seems to me that there are various possibilities

19   here.  One possibility is that someone at the bank, at or after

20   the moment the deposit was made, knowing in one way or another

21   the identity of the depositor, wrote the identity of the

22   depositor in there.

23             The second possibility is that the depositor, whoever

24   it was, wrote his or her own name, if that's what it is there.

25             The third is, at the risk of being a little facetious,

DAN8CHE5                        Guerra - direct

1    someone just decided to write the name of his favorite hockey

2    team in there.  I don't know what it says.  I understand what

3    your theory is.

4            Now, if it is a statement by somebody at the bank that

5    purports to identify the depositor, then it is an out-of-court

6    statement by the bank employee offered for the truth of the

7    identity of the depositor and it's hearsay, right?

8            MR. MASTRO:  Your Honor, these records are kept in the

9    normal course by the bank.

10           THE COURT:  Mr. Mastro, maybe so.  If, as and when you

11   produce a witness to say that, we will talk about that issue.

12   Could you please focus on the question I am putting to you?

13           MR. MASTRO:  The name that's put there on the line

14   that says *firma del depositante* -- I don't speak Spanish, but

15   that's what the line says.

16           THE COURT:  What does *firma* mean?

17           MR. MASTRO:  Signature on depositor.

18           THE COURT:  Mr. Interpreter, what does *firma del*

19   *depositante* mean?

20           THE INTERPRETER:  Signature of the depositor.

21           THE COURT:  Suppose for the sake of the discussion it

22   is the signature of the depositor.  I am taking your silence on

23   the previous question I put to you to be an acknowledgement

24   that if it's the bank employee writing the name in, it's

25   classic hearsay.

1          MR. MASTRO:  I am not contesting that, but we believe

2     it is the signature of the individual depositor.

3          THE COURT:  Address the question of whether the

4     signature of the depositor is hearsay.

5          MR. MASTRO:  I don't think it should be considered

6     hearsay, leaving aside that it is a business record.  It has

7     the indicia of reliability.  He went to the bank to get his own

8     deposit records.  Under 807 it should come in in any event

9     because this is the record that the bank provided of how the

10    deposit was made.

11         THE COURT:  I am going to let you make all your

12    arguments in due course, Mr. Mastro.

13         Can we please focus on what I am trying to work

14    through on?

15         MR. MASTRO:  I understand.

16         THE COURT:  If you go to your bank and you fill out a

17    deposit ticket and you sign your name on the deposit ticket

18    above a line that says "signature of depositor," and someone

19    then offers that in evidence to prove the identity of the

20    depositor, is that hearsay or is it not hearsay?

21         MR. MASTRO:  To the extent it would be hearsay, I

22    think that your Honor, under these circumstances, since the tax

23    ID number on one of these slips identifies a woman named Ximena

24    Centeno, who is at Selva Viva, and who was on their witness

25    list to come to Lima, Peru and didn't show up, under these

DAN8CHE5                      Guerra - direct

circumstances, it has the indicia of liability.  There is no

other way for us to get this evidence.  We cannot subpoena a

bank employee from Ecuador.  They did not produce Ximena

Centeno themselves.  The tax ID number on one of these slips is

hers, and is on government official records that anyone can

access on the official government Web site.  I think this has

all the indicia that it should be accepted into evidence.

          And it is also a statement of a co-conspirator in this

context.  She is working for Selva Viva.  That is Donziger's

organization.  In furtherance of the conspiracy by making the

deposit at Fajardo's request.  She is an employee of Selva

Viva.

          THE COURT:  Is there any dispute about that, Ms.

Littlepage?  Was she an employee of Selva Viva at this date?

          MS. LITTLEPAGE:  We do agree that there was an

employee with this name, which is a very common name in

Ecuador.

          THE COURT:  How about with this identification number?

          MS. LITTLEPAGE:  I don't know, because we are not

going to have another hearsay statement by Mr. Guerra based on

no personal knowledge of looking up this number.

          THE COURT:  I have taken your objection very seriously

because this is a very serious point, and I understand its

importance to both sides, but I am not going to take seriously

a "who the heck knows" kind of argument about something that is

DAN8CHE5                        Guerra - direct

1   objectively verifiable, like the national identity number of an

2   employee of your client's company down there.  I am just not.

3           If you're going to come to me in good faith and say

4   it's not the number, or in good faith, we don't know and we

5   can't find out, that's one thing.  But if we are just throwing

6   dust up, that's a different thing.  And I hope that it's not

7   the latter.

8           MS. LITTLEPAGE:  I don't know the answer.  I do know

9   that there is a public record that you can look up numbers.  If

10  you wanted to look up a number, for example, to write on a

11  deposit slip, for example, you could look it up, and you can

12  get a name and you can get a number.  And seeing that we have

13  no personal knowledge that this is the person who signed this

14  form, it's hearsay.

15          THE COURT:  She works for you or for Mr. Gomez's

16  people, I'm not sure at the moment exactly where, works for

17  you.  You know or can find out with a phone call what the

18  identification number is.  This is just more of the same.  If

19  it's in Ecuador, your position is, and your client's position

20  has been for three years, we are not telling.  And this is not

21  Cambodia 40 years ago.

22          MS. LITTLEPAGE:  That's not my argument.  My argument

23  is there is apparently a Web site you can get on.

24          THE COURT:  So what?  I want to know if it's her

25  number.  That's a simple question.  Is it her number?

DAN8CHE5                         Guerra - direct

1              MS. LITTLEPAGE:  Yes.  There is a woman who worked for

2       Selva Viva, whose name is Ximena Centeno, whose number this is.

3       We believe this is hearsay because we do not believe there is

4       any evidence that that woman deposited this money at this bank.

5              THE COURT:  Look, I am not going to spend the whole

6       afternoon on this discussion.  I am just not.  You can brief

7       these matters.  The documents are in, subject to the fact that

8       I am reserving pending just a little more discussion and

9       whatever briefs I get on the question of whether that name, if

10      that's what it is, and the number on the second page are or are

11      not hearsay, and are or are not within some exception.

12             We have spent enough time on it.  I strongly suggest

13      that you, on both sides, focus on the strict, careful

14      step-by-step analysis, instead of listening to every question

15      that I ask, and if you're not ready to answer it, or you don't

16      want to answer it, talking about something else.  You have both

17      done it.  Lawyers do it all the time.  I understand why it

18      happens.  But if you want to convince me, either side of you,

19      you're going to have to take this like a law school exam and

20      analyze it properly.  And the result of a failure to do that

21      you may not be happy with, either way.

22             Now, I heard the 804(d)(2)(E) issue raised, and it

23      seems to me that warrants some attention from both sides.  I

24      heard an 807 issue raised, and that ought to be addressed.

25             Now, in that connection, Mr. Mastro, you need to

DAN8CHE5                       Guerra - direct

1     address, in addition to everything else, the notice question.

2              Ms. Littlepage, without having reached a conclusion on

3     this by any stretch of the imagination, you ought to focus on

4     the question why this woman did not show up for her deposition

5     when that opportunity was presented.

6              So they are received subject to the caveat and let's

7     move on.

8              MS. LITTLEPAGE:  At the time that she was noticed for

9     her deposition, she was no longer working for us, and we had no

10    control over her.

11             THE COURT:  That's the time to do it.

12             (Plaintiff's Exhibit 1713 received in evidence)

13             THE COURT:  Let's get the witness back.

14    ALBERTO GUERRA, resumed.

15    BY MR. MASTRO:

16    Q.  Mr. Guerra, directing your attention to Plaintiff's Exhibit

17    1713.

18             MR. MASTRO:  Can we enlarge the deposit slip, please?

19    Q.  Mr. Guerra, what is this document?

20    A.  This is a copy of a deposit slip, specifically, it's used

21    at the Banco Pichincha.  It states here that the deposit may be

22    made in cash --

23             MS. LITTLEPAGE:  Objection.  Hearsay.

24    Q.  -- by check or in coins.

25             THE COURT:  The objection is sustained.  Let's not

DAN8CHE5                        Guerra - direct

1    have any reading from the document.

2    Q.  Sir, the signature of the depositor on the document, can

3    you read that signature?

4              MS. LITTLEPAGE:  Objection.  Hearsay.  The document

5    speaks for itself.

6              THE COURT:  I am sustaining the objection on form

7    grounds because it assumes that it is a signature of the

8    depositor.

9              MR. MASTRO:  Certainly, your Honor.

10   Q.  Mr. Guerra, can you read what is written on this document

11   on the line above *firma del depositante*?

12             MS. LITTLEPAGE:  Same objection.  Form.  The document

13   speaks for itself.

14             THE COURT:  There is no objection to form.  I solicit

15   anybody's help in reading what is on that line.  If the

16   document adequately spoke for itself on this, we wouldn't have

17   to inquire.

18             MS. LITTLEPAGE:  Lack of personal knowledge.

19             THE COURT:  I think maybe I need to instigate a rule

20   here that any lawyer who asks a witness to read something from

21   a document it costs a thousand dollars per question, and then I

22   think we will solve this question, but I am not going to do

23   that.

24             Look, the handwriting is whatever it is.  It could be

25   that whatever he or you or somebody else says may help me read

DAN8CHE5                          Guerra - direct

1    it.  I am prepared to hear it on that basis.  That's all.

2          If he tells me that he has other experience with the

3    signature of the individual, if he tells me he saw it signed,

4    if he tells me anything like that, of course it means something

5    else.

6          THE COURT:  Please answer the question, sir.

7    A.  I do not identify it fully in this document.

8          THE COURT:  We are talking about page 7 of Exhibit

9    1713.

10         MR. MASTRO:  Correct, your Honor.

11   Q.  Would you please go to page 8 of this document?

12         Mr. Guerra, can you identify this document?

13   A.  Yes.

14   Q.  Please tell us what it is.

15   A.  It's a receipt for a bank deposit.

16   Q.  Mr. Guerra, please tell us how you read the handwriting on

17   the line above *firma del depositante*?

18         MS. LITTLEPAGE:  Same objection.

19         THE COURT:  I will sustain that objection because I

20   can read this one.

21   Q.  Mr. Guerra, when you got this deposit slip from the bank,

22   what steps, if any, did you take to confirm the identity of who

23   had made this deposit?

24         MS. LITTLEPAGE:  I don't want to wait until after the

25   answer, but there is nothing he can do that would give him

1    personal knowledge because he said he didn't get this until

2    2012.

3              THE COURT:  I don't think you know that, counsel.

4              MS. LITTLEPAGE:  He testified to that earlier when we

5    started this process, that he went to the bank and got these

6    slips in 2012.

7              THE COURT:  I agree with you about that.

8              For all I know, he went to this lady Ximena in 2012

9    and said, Is this your signature on the slip?

10             So let's get the answer.  Or maybe he compared it with

11   known exemplars or maybe he took it to a handwriting expert.

12   Let's get the answer.

13             MR. GOMEZ:  Objection.

14             THE COURT:  What is the objection?

15             MR. GOMEZ:  The possibilities of what the response may

16   be.

17             THE COURT:  The point is, counsel made an objection

18   that for the reasons I indicated is patently not well-founded.

19   Let's move on.

20   A.  At that time, I entered the citizen's identification number

21   that appears on the document via the Internet in the Internal

22   Revenue Service of Ecuador Web site.

23             MS. LITTLEPAGE:  Objection.  No personal knowledge.

24   Hearsay.  Lack of foundation.

25             THE COURT:  Overruled.

DAN8CHE5                         Guerra – direct

1    Q.  Can you explain to the Court what a cedula number is?

2               THE COURT:  A what?

3               MR. MASTRO:  Cedula number.

4               THE COURT:  Can you spell it?

5               MR. MASTRO:  C-E-D-U-L-A.

6    A.  In Ecuador, it is an identification number that it's

7    exclusively assigned to the state to each individual,

8    specifically, of Ecuadorian nationality, and which is used to

9    identify the person throughout his or her life.

10   Q.  Is there an official government Web site that one can

11   access to determine who the identity of the person is by cedula

12   number?

13   A.  Yes, sir.

14   Q.  Is that the official government Web site that you went to

15   with the cedula number to determine the identification of this

16   individual?

17   A.  Yes.

18   Q.  Were you able to determine the identification of this

19   individual from going to that Web site?

20              MS. LITTLEPAGE:  Objection.  Hearsay.  Lack of

21   foundation.  The document will speak for itself.

22              THE COURT:  What document would that be, Ms.

23   Littlepage?

24              MS. LITTLEPAGE:  The Web site that he is apparently

25   going to.

DAN8CHE5                          Guerra - direct

1          THE COURT:  How do we physically bring it in and mark

2    it as an exhibit?

3          MS. LITTLEPAGE:  Under one of these tabs, Judge.

4          THE COURT:  For God sake.

5          Look, folks, I know it's a hard-fought case.  You're

6    all doing the right thing by fighting hard, but there comes a

7    point where you are just wasting time.  I thought we had an

8    agreement that this is the number of this woman Ximena, who at

9    least formerly worked for the defendants.  Is that not right?

10         MS. LITTLEPAGE:  Yes, sir.

11         THE COURT:  Mr. Gomez, is that right?

12         MR. GOMEZ:  Yes.

13         THE COURT:  Why are we wasting all this time?  You

14   have now agreed it's the number, and we have spent 20 minutes

15   on objections to what he did to verify what you all agree is

16   the case anyway.  It's like we were having objections here

17   about whether a witness had personal knowledge that today is

18   Wednesday.

19         MR. MASTRO:  Your Honor, I would also move into

20   evidence Exhibit 1742, which is the Web site.

21         THE COURT:  You don't need it.  You have a

22   stipulation.

23         MR. MASTRO:  I will move on.

24         THE COURT:  We will take our break here.  Please talk

25   to each other.  This is not so hard.

DAN8CHE5                          Guerra - direct

1               (Recess)

2               THE COURT:  Let's continue.

3               MR. MASTRO:  Thank you, your Honor.

4       BY MR. MASTRO:

5       Q.  Before we leave Plaintiff's 1713, Mr. Guerra, I want to

6       refer you to page 9.

7               MR. MASTRO:  Can you please bring that up?

8       Q.  Mr. Guerra, I am referring you to the line *firma del*

9       *depositante*.  Do you recognize the handwriting on that deposit

10      slip?

11              MS. LITTLEPAGE:  Objection.  The document speaks for

12      itself.  Hearsay.  Lack of personal knowledge.

13              THE COURT:  Who is offering an out-of-court statement

14      for the truth of the proposition that he either does or doesn't

15      recognize the handwriting?

16              MS. LITTLEPAGE:  If his answer is just yes or no,

17      that's fine.

18              THE COURT:  Ma'am, you have a little incantation and

19      it's not helping.

20              Overruled.  Please answer the question.

21      A.  Yes, sir.

22      Q.  Whose handwriting is it that you recognize there?

23              MS. LITTLEPAGE:  Objection.  Hearsay.  Lack of

24      personal knowledge.  The document speaks for itself.

25              THE COURT:  That's a ludicrous objection.  Overruled.

DAN8CHE5                         Guerra - direct

1    A.   It represents or is the signature of the depositor, Nicolas

2    Zambrano.

3              THE COURT:  I'm sorry?

4              THE INTERPRETER:  It represents or is the signature of

5    the depositor.

6              THE COURT:  Can I have the question back from the

7    reporter, please.

8              (Record read)

9              THE COURT:  Now I have the answer.

10             MR. GOMEZ:  I move to strike reference to name of the

11   depositor.  He was asked to identify the signature.

12             THE COURT:  Your statement of what he was asked to

13   identify is not accurate.  It's not what he was asked.

14             Let's have the question and answer back.

15             (Record read)

16             MR. GOMEZ:  I move to strike everything but the name.

17             THE COURT:  All right.  I will strike everything but

18   the name.  He recognizes Nicolas Zambrano's handwriting on it.

19   Q.   Do you see there on the document there is a cedula number

20   under the signature?

21             THE COURT:  Maybe it would be useful to identify what

22   handwriting on here he recognizes as that of Mr. Zambrano.

23   Don't you think that would be a good idea?

24   Q.   Mr. Guerra, what handwriting on this document do you

25   recognize as being the handwriting of Nicolas Zambrano?

DAN8CHE5                    Guerra – direct

1    A.  The signature specifically.

2    Q.  Now, sir, did you do anything after you got this deposit

3    slip from the bank to confirm the identity of the depositor?

4    A.  Yes.

5    Q.  Just to be clear, how is it that you recognize that to be

6    the signature of Nicolas Zambrano?

7    A.  I have seen it.  I have seen it many times.  That is his

8    characteristic signature.

9    Q.  Sir, what steps did you take to confirm the identity of the

10   depositor after you got this deposit slip from the bank?

11           MS. LITTLEPAGE:  Can we ask for a time frame when he

12   would have done this investigation?

13           THE COURT:  Sure.

14           Mr. Mastro.

15           MR. MASTRO:  Certainly.

16   Q.  Sir, please, first tell the Court when it was that you

17   obtained this deposit slip, approximately?

18   A.  I obtained this deposit slip and other similar to these

19   ones approximately around mid-December of 2012.

20   Q.  Sir, what steps did you take once you received this

21   document to confirm the identity of the depositor, if any?

22   A.  In this specific case, I went into the Internal Revenue

23   Service web page of Ecuador, and I identified that the

24   citizen's identification number that appears in this document

25   corresponds to Nicolas Augusto Zambrano Lozada.

DAN8CHE5                    Guerra - direct

1   Q.  Turning to PX --

2            MR. GOMEZ:  Time frame, please, for the

3   identification.

4            THE COURT:  When did this happen, Mr. Guerra?

5            THE WITNESS:  Once I was already here in the United

6   States.

7   Q.  Now, Mr. Guerra, where on this document is the citizen's

8   identification number, the cedula number that you said you used

9   to go into the Internal Revenue Service government database?

10  A.  It is on the lower right-hand corner and below the

11  depositor's signature.

12  Q.  Mr. Guerra, referring you to Plaintiff's Exhibit 1743.

13           THE COURT:  I couldn't hear you.

14           MR. MASTRO:  I am referring him to Plaintiff's Exhibit

15  1743.  It just came on the screen.

16  Q.  Can you please identify for the Court what that document

17  is, please?

18  A.  This is the page from the Internal Revenue Service of

19  Ecuador Web page, and it shows the name of the person regarding

20  tax payments related to the previously immediate year.

21  Q.  Sir, when you went to this government Web site, did you

22  confirm that the number here, the cedula number for Mr.

23  Zambrano, matched the number that was on the deposit slip?

24  A.  Yes, sir.

25           MR. MASTRO:  I ask that 1743 be received.

DAN8CHE5                         Guerra – direct

1                MS. LITTLEPAGE:  Objection.  Hearsay.

2                MR. MASTRO:  Material appearing on an official

3       government Web site may be authenticated under Federal Rule

4       902(5).

5                THE COURT:  Authenticity and hearsay are two different

6       propositions, aren't they?

7                MR. MASTRO:  This is an official government record

8       that is kept in the normal course and made available to the

9       public.

10               THE COURT:  Ms. Littlepage, here is the deal.  You are

11      going to either stipulate to this number, and Mr. Gomez, or

12      you're going to give me a good faith basis for questioning it,

13      or you're both personally going to pay whatever it costs to

14      prove it.  Are we clear?

15               MS. LITTLEPAGE:  Yes, sir.

16               THE COURT:  If there is a good faith basis, I have no

17      problem with you at all.  None.  I want that to be perfectly

18      clear.

19               MS. LITTLEPAGE:  Yes, sir.  Can I look at it

20      overnight?

21               THE COURT:  Absolutely.

22               MR. MASTRO:  I will move on, your Honor.

23      BY MR. MASTRO:

24      Q.  Mr. Guerra, I would like to return to the orders you

25      drafted for Judge Zambrano in the Chevron case.

DAN8CHE5                         Guerra - direct

1              Can you tell the Court approximately how many orders

2    you drafted for Judge Zambrano in the Chevron case?

3    A.  I drafted all the court orders that he requested that I

4    draft during both periods.

5    Q.  Approximately how many orders in total?

6              THE COURT:  Let me just interrupt for a minute.

7              Ms. Littlepage, let's be clear.  Mr. Zambrano is your

8    witness.  You're bringing him here to testify.  He is a phone

9    call away.  He knows what his number is.  You, among many other

10   ways, can find out from him, right from the horse's mouth,

11   whether this is his number.  The idea that you're here making

12   objections if you haven't done that is really objectionable.

13   And you have got to do it and you have got to give me some real

14   basis to think this is inaccurate.

15             MS. LITTLEPAGE:  Yes, sir.

16             THE COURT:  If it is.

17             MS. LITTLEPAGE:  Judge Zambrano is not our witness.

18   We are making arrangements to bring him.  But even to assume

19   that we control Judge Zambrano --

20             THE COURT:  I didn't say control.  He is your witness.

21   He is on your witness list.  You moved for leave to bring him

22   here to testify, despite his failure to show up for his

23   deposition when it was noticed.  He is your witness.  Now, that

24   doesn't mean that you control him or anything else necessarily.

25   You're the one calling him.  You're the one who proposes to

DAN8CHE5                    Guerra - direct

1    bring him here.

2              MS. LITTLEPAGE:  That is true.

3              THE COURT:  And I have granted your application for

4    him to testify.  And Mr. Gomez has gone on at some length about

5    the fact that he has had conversations with him.  You know how

6    to find out if this is really his number if you don't know

7    already.

8              MS. LITTLEPAGE:  I have never spoken to Judge

9    Zambrano, but I will make an effort --

10             THE COURT:  That was the imperial you.  You know who I

11   am talking about.

12             MS. LITTLEPAGE:  OK.

13             THE COURT:  I have no objection to lawyers fighting

14   hard.  What I have objections to is lawyers fighting about

15   nothing for the sake of the fight.

16             Let's go.

17             MR. MASTRO:  Thank you, your Honor.

18   BY MR. MASTRO:

19   Q.  Mr. Guerra, directing your attention to Judge Zambrano's

20   first term presiding over the Chevron case.

21             THE INTERPRETER:  Excuse me, counsel.

22             Your Honor, there was an answer that was given before.

23             THE COURT:  To what?

24             THE INTERPRETER:  To the previous question as to how

25   many court orders Mr. Guerra had drafted for Mr. Zambrano

DAN8CHE5                     Guerra - direct

1   pertaining to the Chevron case, and there was an answer given.

2   A.  A couple dozen.

3              THE COURT:  Thank you.

4              MR. MASTRO:  Thank you, Mr. Interpreter.

5   BY MR. MASTRO:

6   Q.  Mr. Guerra, directing your attention to Judge Zambrano's

7   first term presiding over the Chevron case, how did you go

8   about drafting the orders in the Chevron case?

9   A.  I would receive from him, when I met him on Friday late

10  afternoons at the Quito airport, and the reason was that Mr.

11  Zambrano was traveling from the city of Lago Agrio to the

12  cities of Manta or Guayaquil, I would receive from him in

13  person the documents or the case files that contained the

14  motions by the parties, the filings that the parties have

15  submitted during the previous week, the last week.  And I would

16  study those documents in my home, in my residence in the city

17  of Quito.  I would prepare the court orders that needed to be

18  made, working on these documents in chronological order in

19  which they had been filed by the plaintiffs and the defendants.

20  And finally the document would come out or I would make a

21  physical copy of the document.

22             Finally, I would record it into a flash drive, a thumb

23  drive.  And on Sunday, late afternoon or early evening, when

24  Mr. Zambrano would return to Lago Agrio, I would give him those

25  documents that I had worked on with the result, with the hard

DAN8CHE5                          Guerra - direct

1   copy of the documents that I had worked on, in order so that

2   he, following the very next week, or the very next Monday, he

3   would then issue the corresponding court orders and notice the

4   parties.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DANLCHE6                    Guerra - direct

1    Q.  Was this the same procedure you followed drafting orders

2    for Judge Zambrano on his other civil cases during his first

3    term on the Chevron case?

4    A.  Yes.

5    Q.  Sir, during Judge Zambrano's first term, on what platform

6    or method did you do the drafting of the orders?

7    A.  Well, well, I was not and I'm not very skilled, very

8    capable, very technical as far as using a computer.  Because of

9    that, what I would do is to copy the last court order that I

10   had drafted and on top of that I would work the recent, the

11   contemporaneous, the fresh documentation that had been given to

12   me by Judge Zambrano.

13   Q.  Am I correct you worked on your personal computer at your

14   home during Judge Zambrano's first term in drafting orders for

15   him?

16   A.  Yes.

17   Q.  When you would meet Judge Zambrano on Fridays to get files

18   and then on Sundays to give him back files and draft orders,

19   was there a particular place in Quito where you would meet

20   typically during his first term?

21   A.  Yes.

22   Q.  Where was that, sir?

23   A.  Generally outside the Quito airport, the Mariscal Sucre

24   Airport, or also across from the airport at a shopping center

25   called airport shopping center.

DANLCHE6                    Guerra - direct

Q.  Mr. Guerra, what other means, if any, did you have for

getting files from Judge Zambrano and returning files and draft

orders to Judge Zambrano during his first term?

A.  Specifically, if it was not possible for Zambrano to give

me, to receive them directly from Zambrano coming from him, he

would send me the packages with the corresponding documentation

through a -- through an airline Toma.  It's a shipping and

delivery airline.

Q.  In addition to him shipping documents to you by Toma

airline service, was there anyone else at the Lago Agrio

courthouse who would ever ship you documents on behalf of Judge

Zambrano during his first term on the Chevron case?

A.  No.

Q.  Sir, did you ever ship documents back to Judge Zambrano

with draft orders during his first term in the Chevron case?

A.  Yes.

Q.  Did you use this same delivery service, Toma?

A.  Excuse me, I didn't, I didn't understand.

Q.  Did you use the same delivery service to ship back to him

that he used to ship to you during his first term on the

Chevron case, Toma?

A.  Yes.

Q.  Did you -- was there anyone else besides Judge Zambrano to

whom you sometimes shipped files and draft orders for Judge

Zambrano at the Lago Agrio courthouse during Judge Zambrano's

DANLCHE6                          Guerra - direct

1    first term on the Chevron case?

2    A.  Yes, I did, sir, yes.

3    Q.  Who are the other persons to whom you would sometimes ship

4    files and draft orders for Judge Zambrano at the Lago Agrio

5    courthouse during his first tenure on the Chevron case?

6    A.  They are Narcisa Leon and Fernando Alban.

7    Q.  Who was Narcisa Leon?

8    A.  She's an employee of the Court of Justice of Sucumbios.

9    Q.  And who is Fernando Alban?

10   A.  Likewise, he's an officer.  He's a judge of the Court of

11   Justice of Sucumbios.

12   Q.  Now, Mr. Guerra, when did Judge Zambrano's first term end

13   presiding of the Chevron case?

14   A.  He finished exactly on February 18 of 2010.

15   Q.  Why did Judge Zambrano stop presiding over the Chevron case

16   on that date?

17   A.  Because on that date, Leonardo Ordonez Pena was appointed a

18   new associate judge of the court.

19   Q.  At the time --

20              THE COURT:  What's the connection between the two

21   events, Mr. Guerra?

22              MR. MASTRO:  Yes.

23              THE WITNESS:  When Mr. Ordonez was appointed as a

24   president of the Court of Justice, he was at the same time

25   precisely being handed the Chevron case for him to hear.

DANLCHE6                          Guerra - direct

1    Q.  Sir, when Judge Ordonez became presiding judge over the

2    Chevron case, did he have a term of years in which he would

3    serve in that capacity?

4    A.  Yes, sir, two years.

5    Q.  During Judge Zambrano's first term presiding over the

6    Chevron case, did he know that his term on the Chevron case

7    would be ending by a date certain?

8              MS. LITTLEPAGE:  Objection, lack of personal

9    knowledge, hearsay.

10             THE COURT:  Sustained as to the lack of personal

11   knowledge.

12             MR. MASTRO:  Certainly, your Honor.

13   Q.  During Judge Zambrano's first term presiding over the

14   Chevron case, did you ever witness him preparing the judgment

15   in the Chevron case or reviewing the entire record in the

16   Chevron case?

17             MR. GOMEZ:  Objection, leading, your Honor.

18             THE COURT:  Overruled.

19   A.  No.

20   Q.  During Judge Zambrano's first term presiding over the

21   Chevron case, did you ever discuss with Judge Zambrano whether

22   he could possibly issue the judgment in the Chevron case during

23   that first term?

24             THE COURT:  That's a yes or no, please.

25   A.  Yes.

DANLCHE6                        Guerra - direct

```
 1   Q.  What if anything did you discuss with Judge Zambrano during
 2   his first term on the Chevron case, from October 2009 to
 3   February 2010, about whether he could possibly issue the
 4   judgment in the Chevron case?
 5              MS. LITTLEPAGE:  Objection, form, hearsay.
 6              THE COURT:  What's the form objection?
 7              MS. LITTLEPAGE:  Well, it's a compound question
 8   because he's asking him to discuss everything he and Judge
 9   Zambrano discussed in a five-month period of time.
10              THE COURT:  No, he isn't.  He was asked whether he
11   ever discussed a specific subject in that period.
12              MS. LITTLEPAGE:  And hearsay, Judge.
13              THE COURT:  What's the answer to the hearsay
14   objection?
15              MR. MASTRO:  Well, these are coconspirators, your
16   Honor, discussing potential issue in the Chevron judgment.
17              THE COURT:  I'm sorry.  I can't hear you.
18              MR. MASTRO:  These are coconspirators discussing the
19   issuance of the Chevron judgment at the very time when the
20   witness previously testified he was soliciting bribes on Judge
21   Zambrano's behest as well.
22              THE COURT:  How is this particular conversation,
23   assuming there was any, in furtherance of the conspiracy?
24              MR. MASTRO:  Your Honor, it's -- I'll withdraw the
25   question.
```

DANLCHE6                    Guerra - direct

1   Q.  Now, Mr. Guerra, when you were ghostwriting for Judge
2   Zambrano during his first term on the Chevron case, had Chevron
3   yet made a recusal motion to recuse Judge Ordonez from taking
4   over the case?
5           MS. LITTLEPAGE:  Objection to the form.
6           THE COURT:  Sustained as to form.
7           MR. MASTRO:  I'll withdraw, your Honor.
8   Q.  What happened in the Chevron case that caused Judge
9   Zambrano to resume presiding over the case in October 2010?
10          MS. LITTLEPAGE:  Objection to hearsay if the question
11  asks for hearsay.  It's hard for me to know.  It's not a yes or
12  no question.  If he has personal knowledge, it would not be
13  hearsay.  But if he's going to report something someone else
14  told him, it would be.
15          THE COURT:  Ask it another way, Mr. Mastro.
16          MR. MASTRO:  Sure.
17  Q.  Mr. Guerra, do you know of your own personal knowledge what
18  happened in the Chevron case that caused Mr. Zambrano to resume
19  presiding over the case in October 2010?
20  A.  Yes, sir.
21  Q.  Tell us what you know of your own personal knowledge on
22  that subject.
23  A.  Chevron recused Judge Ordonez.  When that recusal was
24  admitted, Ordonez stopped hearing the Chevron case.  And
25  consequently, by law, that case came to be heard by the

DANLCHE6                         Guerra - direct

1    substituting judge who precisely was Mr. Nicholas Zambrano.

2    Q.  Sir, what role if any did you play in helping Judge

3    Zambrano write the order relating to recusal of Judge Ordonez

4    in the Chevron case?

5              THE COURT:  I think you're jumping a step ahead,

6    Mr. Mastro.

7              MR. MASTRO:  I'll step back.  I'll step back, your

8    Honor.

9    Q.  Mr. Guerra, of your own personal knowledge, who wrote the

10   order that resulted in Judge Ordonez being recused from the

11   Chevron case -- let me withdraw it, your Honor.

12             Of your own personal knowledge, which judge signed the

13   order requiring Ordonez to be recused from the Chevron case?

14   A.  Nicolas Zambrano.

15   Q.  What role if any did you play in drafting the order of

16   recusal of Judge Ordonez from the Chevron case?

17   A.  I guided Mr. Zambrano regarding the recusal procedures --

18   strike that -- process, and also when in relating to the

19   drafting of the order accepting the recusal, admitting the

20   recusal.

21   Q.  What discussion if any did you have -- withdrawn.

22             What if anything did Judge Zambrano tell you at the

23   time you drafted the recusal order for him?

24             MS. LITTLEPAGE:  Objection, hearsay.

25             THE COURT:  Overruled to the extent that I'm taking it

DANLCHE6                        Guerra - direct

```
1    subject to connection.
2              And to be clear, the case law is absolutely crystal
3    clear that as long as there is a conspiracy -- I'll hold this
4    for another time, but I'm taking it subject to connection.
5    A.   Please could you repeat the question?
6    Q.   Certainly.
7              What if anything did Judge Zambrano tell you at the
8    time you drafted the recusal order for him to issue concerning
9    Judge Ordonez?
10             MS. LITTLEPAGE:  Just for the record, same objection.
11             THE COURT:  Same ruling.
12   A.   Well, there were specifically two topics.  One was that
13   Mr. Zambrano had asked me to help him in that matter because he
14   was not very skilled in regard to civil matters, specifically
15   civil law, and then also in regard to procedure.  His basic
16   studies were in the criminal law area.
17             THE COURT:  Excuse me, Mr. Guerra, the question is
18   what Judge Zambrano told you.  Let's stick to that.  If this is
19   what he told you, that's one thing.  But if this is just
20   something else you want to say, let's move to what he told you.
21             THE WITNESS:  Yes, your Honor.  A very good chance to
22   take over the Chevron case once again.
23             THE COURT:  Is that something he said to you or is
24   that something else?
25             THE WITNESS:  No, this was Mr. Zambrano, when speaking
```

DANLCHE6                      Guerra - direct

1    to Judge Ordonez's recusal, he said it was a very good

2    opportunity to take -- to take over the Chevron case again, to

3    again hear the case.

4              THE COURT:  All right.  Let's break with the witness

5    here.

6              Mr. Guerra, you're through for the day.  You'll be

7    back tomorrow and you should leave the courtroom now.

8              (Witness not present)

9              THE COURT:  Mr. Mastro, for my benefit, how do you

10   propose, if at all, to connect this last conversation to the

11   defendants if you're relying on the coconspirator exception,

12   and if you're not, what's the other basis for it?

13             MR. MASTRO:  Your Honor.

14             THE COURT:  Please step back to the lectern.  I can't

15   hear you.

16             MR. MASTRO:  Your Honor.

17             THE COURT:  My hearing is not up to you sometimes.

18             MR. MASTRO:  Sometimes I'm soft spoken, your Honor.

19             THE COURT:  We'll take a vote on that.

20             MR. MASTRO:  Your Honor, I believe that the witness

21   will testify as we continue the direct that the opportunity

22   that Judge Zambrano saw was not really presiding over the case,

23   but to make money off the case, to bribe, to solicit.

24             The next area of inquiry would have been the next

25   marching order.  He comes back on the case.  There's another

DANLCHE6

1   overture to Chevron, and then there's the deal struck with the

2   Lago Agrio plaintiffs team.  And that's where we were going,

3   your Honor.  So we were very close to that moment, but that's.

4            THE COURT:  Okay.  But, look, are you relying entirely

5   on a coconspirator rule or not?

6            MR. MASTRO:  Your Honor, in that regard.

7            THE COURT:  Or are you not offering it for the truth?

8            MR. MASTRO:  I am offering it for the truth.  I

9   believe that the very next question he would have said that the

10  opportunity Zambrano saw was to solicit a bribe and make money

11  off the case.  Go back to Chevron if you can and then go to the

12  other side.  That would be the testimony.  So I think it's both

13  statements against interest as well as coconspirator

14  statements.

15           THE COURT:  Statement against interest by Zambrano.

16           MR. MASTRO:  Correct, your Honor.

17           MS. LITTLEPAGE:  And, Judge, statement against

18  interest is only if declarant is unavailable.

19           THE COURT:  I understand that.

20           MR. MASTRO:  He's unavailable to us, your Honor.

21           THE COURT:  Look, can I please ask of all of you that

22  you go back tonight and get better educated than I'm at least

23  sensing, rightly or wrongly, you may be on some of the

24  evidentiary rules that govern here.  I hope I'm mistaken in

25  thinking that you need it.

DANLCHE6

1      But my general understanding of the rule, as I think I

2 told you this morning, it's an out-of-court statement by a

3 coconspirator made during the course and in furtherance of a

4 conspiracy with the defendant is not hearsay and is admissible

5 for the truth of the matters.

6      Ms. Littlepage suggested that Mr. Zambrano, and she

7 may not have sublimited it, but certainly she said Mr. Zambrano

8 is not charged as a coconspirator in the complaint and so

9 forth.  The law in this circuit is abundantly clear that that

10 is unnecessary as long as there was a conspiracy between the

11 party against whom the statement is offered and the declarant

12 and the statement is in furtherance, it comes in as nonhearsay.

13      Now, I can certainly understand the analysis of the

14 statements attributed to Mr. Zambrano giving instructions as to

15 what to do once an agreement had been reached.  I'm talking

16 about the first period only.  It is not self-evident that

17 statements made by Mr. Zambrano to Mr. Guerra, though perhaps

18 in furtherance of a conspiracy among themselves to work this

19 case for whatever it was worth to them are chargeable to the

20 defendants at that point.  I'm just not clear on it one way or

21 the other.

22      It may also be that what went on, if anything, between

23 Zambrano and Guerra preparatory to the overtures to Chevron and

24 then to the plaintiffs is in fact not being offered for the

25 truth of the statements made but for the purpose of showing how

DANLCHE6

1    it came to be that Guerra approached first Chevron and then the

2    defendants.

3              MR. MASTRO:  Correct, your Honor.

4              THE COURT:  I am just asking you all, as I did in

5    relation to the signature on the deposit slip, to help me

6    consider these things properly in their appropriate analytical

7    context and give me the relevant authority that you rely on

8    instead of a bunch of general statements that in some cases

9    don't fit the facts, don't fit the legal context.

10             There is nobody who is more conscious in this

11   courtroom, but there are several people as conscious of the

12   importance of this testimony and these documents to both sides.

13   I expect it to be hard fought.  But I am looking for genuine

14   assistance, not rhetoric.  Okay?  Help me out with it.  That's

15   your job.  It goes for everybody.

16             Okay.  I'll see you tomorrow at 9:30.

17             MR. MASTRO:  Thank you, your Honor.

18             (Adjourned to October 24, 2013, at 9:30 a.m.)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                       INDEX OF EXAMINATION

2   Examination of:                              Page

3   TROY DAHLBERG

4   Cross By Mr. Friedman . . . . . . . . . . . 848

5   Cross By Mr. Gomez . . . . . . . . . . . . . 878

6   Redirect By Ms. Winston . . . . . . . . . . 881

7   Recross By Ms. Friedman . . . . . . . . . . 882

8   JAMES SPIGELMAN

9   Direct By Ms. Neuman . . . . . . . . . . . . 891

10  Cross By Mr. Booth . . . . . . . . . . . . . 892

11  Cross By Mr. Gomez . . . . . . . . . . . . . 906

12  ALBERTO GUERRA

13  Direct By Mr. Mastro . . . . . . . . . . . . 908

14                      PLAINTIFF EXHIBITS

15  Exhibit No.                              Received

16   5000 and 1101  . . . . . . . . . . . . . . 892

17   4800  . . . . . . . . . . . . . . . . . .909

18   4800A  . . . . . . . . . . . . . . . . . .910

19   1713  . . . . . . . . . . . . . . . . . .954

20                      DEFENDANT EXHIBITS

21  Exhibit No.                              Received

22   1201  . . . . . . . . . . . . . . . . . .905

23   1203  . . . . . . . . . . . . . . . . . .905

24   1204  . . . . . . . . . . . . . . . . . .906

25   1202 and 1204  . . . . . . . . . . . . . . 906