DAOLCHE1                    Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

          v.                          11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                    Defendants.

------------------------------x
                                      October 24, 2013
                                      9:47 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                      District Judge

                         APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
      Attorneys for Plaintiff
BY:  RANDY M. MASTRO
      ANDREA E. NEUMAN
      REED M. BRODSKY
      JEFFERSON E. BELL
      ANNE CHAMPION
      GEORGIA K. WINSTON

FRIEDMAN RUBIN
      Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
      DEE TAYLOR

LITTLEPAGE BOOTH
      Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
      RAINEY BOOTH

GOMEZ LLC
      Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

DAOLCHE1                     Trial

1           (Trial resumed)

2           THE COURT:  Good morning.

3           MR. MASTRO:  Good morning, your Honor.

4           THE COURT:  My deputy received a request from some of

5     the members of the press who are trying to cover this case with

6     respect to the gallery monitor and the interpreter, and we'll

7     do everything we can to accommodate you.  I didn't even know

8     you weren't seeing the stuff on the gallery monitor.

9           So as far as the Spanish language witness is

10    concerned, please speak into the microphone so that everybody

11    can hear you.

12          THE INTERPRETER:  Will do, your Honor.

13          THE COURT:  So far as the gallery monitor is

14    concerned, the request is that those displays go on when the

15    document is received in evidence.  And subject only to the

16    question that my deputy sometimes has to be out of the room for

17    other reasons, that is the policy.  So, and we'll try to make

18    sure that works better than it has up to now.  He's got a lot

19    of other duties and he is sometimes unavoidably out of the

20    courtroom.  And this is a fairly new system and as soon as I'm

21    sure my law clerks are able to pinch hit for him on it, which

22    they may well be, I may just not know it yet, maybe we can do

23    even better.  But we're going to try.

24          Okay.  Now, one more thing.  Mr. Mastro, how much

25    longer do you expect to be with this witness, assuming that we

DAOLCHE1                    Trial

1    do not have lengthy discussions about evidentiary matters which

2    I don't intend to engage in at this point.  It's a bench trial

3    and I can resolve all those matters later.

4              MR. MASTRO:  Appreciate it, your Honor.  In that case,

5    we should be able to finish the direct examination this

6    morning.

7              THE COURT:  Okay.  And give me idea how long the cross

8    is likely to be.

9              MS. LITTLEPAGE:  For the Donziger defendants, I would

10   say four to five hours.  But I don't know with the translation

11   so it could be high or low.  I have a lot to ask Mr. Guerra.

12             THE COURT:  I'm not surprised.

13             Mr. Gomez?

14             MR. GOMEZ:  Your Honor, I would say about an hour and

15   a half, give or take, depending.

16             THE COURT:  So everybody anticipates we're going to

17   finish with him tomorrow.

18             MR. MASTRO:  Yes, your Honor.

19             THE COURT:  Okay.  Now, there was one application -- a

20   lot of applications filed overnight, but the one I will address

21   right now is the request that I take judicial notice of these

22   four Ecuadorian decisions, Plaintiff's Exhibits 400, 429, 430

23   and 431, all of which were offered in evidence not for the

24   truth of the matters asserted and received on that basis.  They

25   were offered by the defendants.  Obviously, they're in evidence

DAOLCHE1                    Trial

1     and so there's no reason to take judicial notice of them.

2            The defendants are under the impression that if I were

3     to take judicial notice of them, they would become, as

4     distinguished from their simply being in evidence, they would

5     be entitled to be treated as prima facie evidence of the facts

6     and opinions contained therein.

7            In my view that is incorrect.  I would not so treat

8     them whether I took them on a judicial notice basis or

9     otherwise.  I think it is flatly contrary to controlling

10    decisions of the Second Circuit.  It's supported only by a

11    phrase in a district court decision.  And if I were to regard

12    that as a holding by my colleagues, whoever it was, I wouldn't

13    follow it because it's in my judgment incorrect, with all

14    respect to my colleagues who are entitled to think my decisions

15    are incorrect.

16            Okay.  Let's proceed.

17            MR. MASTRO:  Thank you, your Honor.

18            THE COURT:  You may proceed.  The witness is still

19    under oath.

20     ALBERTO GUERRA, resumed.

21         called as a witness by the Plaintiff,

22         having previously been duly sworn, testified through the

23         Spanish interpreter as follows:

24    DIRECT EXAMINATION (cont'd)

25    BY MR. MASTRO:

DAOLCHE1                    Guerra - direct

1   Q.  Mr. Guerra, when we broke yesterday you had just testified

2   about a conversation you had with Mr. Zambrano in which he told

3   you taking over the Chevron case again would be "a very good

4   opportunity."

5           Do you recall that testimony?

6           MS. LITTLEPAGE:  Same objection.  Hearsay.

7           THE COURT:  I do not think that the answer to the

8   question "do you remember that testimony" is hearsay.

9           MS. LITTLEPAGE:  I just don't want to waive the

10  objection to the testimony from yesterday.  That's the basis.

11          THE COURT:  I would be grateful, Ms. Littlepage, if

12  you would listen to the questions and make objections when you

13  think they're appropriate to the question, not when you think

14  maybe there will be some other question that you might have an

15  objection to.

16          Let's go on.

17  A.  Yes.

18  Q.  What if anything did Judge Zambrano say to you about why he

19  thought it would be a "good opportunity"?

20          MS. LITTLEPAGE:  Objection, hearsay.

21          THE COURT:  Overruled.

22  A.  Mr. Zambrano considered this an excellent opportunity to in

23  the future, in the near future, write the judgment.  Or if in

24  the near future, if time allowed it, he could remain, he could

25  remain as the judge hearing the case for a year.

DAOLCHE1                    Guerra - direct

1    Q.  Mr. Guerra, directing your attention to October 2010.  Did

2    there come a time when you and Mr. Zambrano had a conversation

3    regarding approaching Chevron about the Lago Agrio litigation?

4    A.  Yes, sir.

5    Q.  What if anything did Mr. Zambrano say to you regarding

6    approaching Chevron about the Lago Agrio litigation?

7              MS. LITTLEPAGE:  Objection, hearsay.

8              THE COURT:  Overruled.

9    A.  Mr. Zambrano on this occasion gave me the specific and

10   concrete instruction to, for a second time, seek to make

11   contact with Chevron and this time to offer them that, in

12   exchange for some financial benefit, that they may draft the

13   judgment in order for him to sign it as his own.

14   Q.  What if anything did you do next after you had this

15   conversation with Judge Zambrano?

16   A.  I made personal contact with Doe 1, from whom I knew from

17   this individual and this person was very close to the Callejas

18   firm.  And after I met with this person, I informed this person

19   of the details, telling this person to specifically make this

20   proposal known to Dr. Callejas, whom I knew as Chevron's lead

21   attorney in the Lago Agrio case.

22   Q.  Did Doe 1 agree to pass along your message to the Callejas

23   firm?

24             THE COURT:  How does it matter, Mr. Mastro?

25             MR. MASTRO:  Your Honor, I was going to elicit what he

DAOLCHE1                    Guerra - direct

1    understand came out of that exchange.

2              THE COURT:  Something happened subsequently, right?

3              MR. MASTRO:  Yes, your Honor.

4    Q.  What if anything happened next?

5    A.  Yes.  Doe 1 conveyed the proposal that I had stated, but

6    later Doe 1 did inform me expressly --

7              MS. LITTLEPAGE:  Objection, hearsay.

8              THE COURT:  Sustained.  Well, hold off on that.

9              Mr. Mastro, we have the witness's statement.

10             MR. MASTRO:  Yes, your Honor.

11             THE COURT:  And isn't the point here that, as he's

12   already testified here this morning, Zambrano made the

13   statement to him and he gave him the instruction and there came

14   a time when there was some contact between him and the Callejas

15   firm; isn't that right?

16             MR. MASTRO:  Yes, your Honor.

17             THE COURT:  What's the point of what happened in

18   between?

19             MR. MASTRO:  Just that he learned the response of the

20   Callejas firm, your Honor.  That's all I'm trying to get at.

21             THE COURT:  So that was conveyed indirectly?

22             MR. MASTRO:  Through Doe 1, your Honor.

23             THE COURT:  All right.  Go ahead.  I'm sorry, I

24   shouldn't say go ahead.  Let's go back.

25             All right.  I take it you're not offering whatever Doe

DAOLCHE1                    Guerra - direct

1    said for the truth; is that accurate?

2          MR. MASTRO:  Correct, your Honor.  And they also

3    themselves, the defendants, put into evidence declarations that

4    confirm the response.  So they didn't object to having that

5    evidence in the record before.

6          THE COURT:  Well, the hearsay objection is overruled

7    because the evidence is not offered for the truth.  Go ahead.

8          I'm sorry.  I spoke too quickly.  I'm one step ahead

9    of myself.

10         Mr. Guerra, were you present or do you otherwise have

11   personal knowledge of what if anything Doe 1 did with respect

12   to your request that a proposal be conveyed?

13         THE WITNESS:  No, your Honor.  I was not present

14   during the conveyance of the proposal by Doe 1 to the Callejas

15   firm.

16         THE COURT:  All right.  I sustain Ms. Littlepage's

17   objection to the question that was previously asked,

18   specifically, or, to be more precise, I strike the answer to

19   the question, "What if anything happened next?" which was "Yes,

20   Doe 1 conveyed the proposal that I had stated."  That much is

21   stricken.  Whatever he knows about that is hearsay, or least at

22   the moment it is.  There may be some effort to lay a

23   foundation, but there hasn't been up until now.

24         Go ahead.

25   BY MR. MASTRO:

DAOLCHE1                    Guerra - direct

Q.  Mr. Guerra, during this time period, October 2010, did you
personally have the opportunity to speak to any of Chevron's
representatives to convey Judge Zambrano's proposal?

A.  No.

Q.  Did you then communicate to Judge Zambrano that you had not
been able to personally speak to anyone at Chevron to convey
the proposal?

A.  Yes.

Q.  What if anything was Judge Zambrano's reaction when you
told him you had not been able to tell anyone at Chevron
representatives directly Judge Zambrano's proposal?

            MS. LITTLEPAGE:  Objection, hearsay.

            THE COURT:  Overruled.

A.  While true that I did not inform Zambrano that I had not
made any direct contact with anybody from Chevron to convey his
proposal, I did tell him that I had done so through Doe 1.  I
also informed Judge Zambrano, excuse me, regarding Chevron's
negative reply.

            And shortly thereafter or immediately after that,
Judge Zambrano instructed me to make a similar proposal to the
plaintiffs, but by then, but by this time indicating to them
that he would receive or that he would do it so in exchange for
obtaining $500,000 for this procedure.

            MS. LITTLEPAGE:  Objection, hearsay, move to strike.

            THE COURT:  Overruled.

DAOLCHE1                          Guerra - direct

```
 1            It is admissible at least for nonhearsay purposes in
 2    order to explain the sequence of events regardless of whether
 3    it was true.  Moreover -- well, that's enough.  I'm going to
 4    receive it and I'll rule on the full dimensions of its
 5    admissibility at a later time, if it's necessary.
 6    Q.  Did Judge Zambrano tell you what procedure he wanted you to
 7    convey to the Lago Agrio plaintiffs' counsel in making this
 8    proposal?
 9            MS. LITTLEPAGE:  Objection, hearsay.
10            THE COURT:  Same ruling.
11    A.  Yes.
12    Q.  What if anything did he tell you on that subject?
13            MS. LITTLEPAGE:  Objection, hearsay.
14            THE COURT:  Same ruling.
15    A.  The specific proposal consisted that the plaintiffs'
16    attorneys could draft the judgment or write the draft of a
17    judgment and that Judge Zambrano would receive it as his own,
18    would sign it as his own, and would publish it as if it was his
19    own.
20    Q.  What if anything did you do next after receiving those
21    instructions from Judge Zambrano?
22    A.  I called Mr. Fajardo on the phone.  I told him that I
23    needed, that we needed to talk, that I had a specific message
24    from Zambrano to him.  And that's how we made an appointment to
25    meet at Rio Coca and Seis de Diciembre in Quito.
```

DAOLCHE1                    Guerra - direct

1   Q.  What if anything happened at that meeting with Mr. Fajardo?

2   A.  Of course, I informed him in detail of Mr. Zambrano's

3   proposal, as well as his intent of obtaining at least $500,000

4   for his involvement.

5   Q.  What if anything did you tell Mr. Fajardo at this meeting

6   about --

7            THE COURT:  I'm sorry.  It's not clear whether you're

8   talking about the phone call or the meeting.

9            MR. MASTRO:  Sorry.  Let me be clear, your Honor.

10  Q.  After the phone call with Mr. Fajardo, you had a meeting

11  with Mr. Fajardo, correct?

12  A.  Yes.

13  Q.  At that meeting, what if anything did you tell Mr. Fajardo

14  about Judge Zambrano's proposal?

15  A.  At that personal meeting, as I've already explained, I

16  explained to Mr. Fajardo the proposal that was coming from

17  Mr. Zambrano.

18  Q.  What if anything did you tell him about the Lago Agrio

19  plaintiffs' lawyers being able to draft the judgment in their

20  client's favor?

21           MR. GOMEZ:  Objection, form, leading.

22           THE COURT:  Overruled.

23  A.  I told Mr. Fajardo that Mr. Zambrano would accept to have

24  them write the judgment, that Mr. Zambrano would sign it as his

25  own, and that in exchange for that, Mr. Zambrano hoped to

1   receive at least $500,000.

2   Q.  What if anything did Mr. Fajardo say to you in response to

3   you conveying Judge Zambrano's proposal at that meeting?

4   A.  Mr. Zambrano felt quite motivated when he learned of the

5   proposal.  He stated that he could not, that he was in no

6   position to make a decision regarding the proposal, that he had

7   to -- that he had to specifically inform Mr. Donziger regarding

8   this issue.

9   Q.  Mr. Guerra, I believe you just used the name Mr. Zambrano

10  in answering that question.  Did you mean that's what

11  Mr. Fajardo said to you?

12  A.  As far as telling Mr. Donziger regarding the proposal, yes,

13  I am referring to Mr. Fajardo.

14  Q.  What was it that Mr. Fajardo said at this meeting that --

15  about being motivated?

16          MR. GOMEZ:  Objection, your Honor.  Mischaracterizes

17  his testimony.

18          THE COURT:  If anything.

19          MR. MASTRO:  If anything, your Honor.

20  A.  He, he said he was happy.  He looked, he smiled and happy.

21  But he did say that -- but he did say regarding this issue,

22  Mr. Donziger would have to decide.

23  Q.  At this meeting, did Mr. Fajardo tell you anything more

24  about why Mr. Donziger had to be involved in the decision?

25          MR. GOMEZ:  Objection, leading.

DAOLCHE1                    Guerra - direct

1        THE COURT:  Sustained.

2   Q.  At this meeting, what if anything did Mr. Fajardo tell you

3   about why he wanted Mr. Donziger to be involved in the

4   decision?

5   A.  He stated, Mr. Fajardo stated that it was Mr. Donziger who

6   had to make the decision because he, among other, he said that

7   Mr. Donziger, he told me in sort of confidence that it was

8   Mr. Donziger who, because of his involvement, his good

9   involvement was getting the money that allowed the procedures

10  to go forward and that for this purpose, he would frequently

11  travel to Europe seeking investors.

12  Q.  Now, sir, did you -- strike that.

13        Did you and Mr. Fajardo discuss setting up another

14  meeting with Mr. Donziger after you met with Mr. Fajardo?

15        MR. GOMEZ:  Objection, leading.

16        THE COURT:  Sustained.

17  Q.  Mr. Guerra, what if anything did you discuss with

18  Mr. Fajardo at this meeting about setting up another meeting

19  with Steven Donziger?

20        MR. GOMEZ:  Same objection.

21        THE COURT:  Overruled.

22  A.  Mr. Fajardo did inform me that it was necessary that

23  Mr. Donziger be informed about the proposal and that in the

24  next few following days, I should meet with him so that in

25  person I would, I would tell Mr. Donziger the details of the

DAOLCHE1                          Guerra - direct

1    proposal.

2              For that reason, he told me that when the time came

3    and Mr. Donziger were in Quito, he would call me on the phone

4    to schedule the meeting with Mr. Donziger and myself.

5    Q.   What if anything happened next?

6    A.   After a couple weeks went by this previous event that I am

7    talking about, Mr. Fajardo called my personal cell phone --

8    strike that -- my personal phone, and he scheduled for me to

9    meet him that day in the evening at the Honey Honey restaurant,

10   telling me that, yes, that Mr. Donziger was going to, that he

11   was going to be present at that meeting.

12   Q.   What -- strike that.

13             Who attended that meeting at the Honey Honey?

14             MR. GOMEZ:  Objection, assumes facts.

15             THE COURT:  Sustained.

16   Q.   What if anything happened next after Mr. Fajardo called you

17   to schedule a meeting at the Honey Honey?

18   A.   The meeting took place at the Honey Honey in the early

19   evening hours.

20   Q.   Who attended, sir?

21   A.   Mr. Steven Donziger, Mr. Pablo Fajardo, Mr. Luis Yanza, and

22   myself.

23   Q.   What if anything happened at that meeting at the Honey

24   Honey restaurant?

25   A.   At that meeting I took it upon myself to summarize in

DAOLCHE1                    Guerra - direct

1   detail the proposal made by Mr. Zambrano, and I obviously

2   stated expressly regarding his intent of receiving at least

3   $500,000.

4          Actually, I was not able for some reason to at that

5   meeting, I also did not state that Mr. Zambrano had authorized

6   me, as well, to request a sum of money also for me.

7          Mr. Donziger and the whole group of us who were

8   present there showed certain enthusiasm for the proposal.  They

9   stated, they evidenced certain interest in the proposal, but

10  they specifically focused, especially Mr. Donziger, on asking

11  me certain questions about concerns regarding the proposal.

12         And finally they stated that they, they regretted it

13  very much, but that for the time being, at that time they

14  didn't have the money that Mr. Zambrano was requesting.

15  Q.  Sir, what questions if any did Mr. Donziger ask you at that

16  meeting at the Honey Honey?

17  A.  Mr. Donziger's concerns related specifically to is it

18  possible that Zambrano would keep his word as far as issuing

19  the judgment in the terms into which it was given to him or

20  would he make changes to it, or could it be that Mr. Zambrano

21  is thinking about taking the money and --

22         THE INTERPRETER:  I need to look up a word, your

23  Honor.

24         THE COURT:  Yes.

25  A.  -- or swindle us or not comply or not fulfill his word.

DAOLCHE1                         Guerra - direct

1   And, finally, how to be sure that Mr. Zambrano would keep the

2   issue in confidence.

3   Q.  What if anything did you say at this meeting at the Honey

4   Honey in response to Mr. Donziger's questions?

5   A.  I told and I assured Mr. Donziger, Mr. Fajardo, and

6   Mr. Yanza, who were present, that for my part, I was

7   guaranteeing or I guaranteed, I was guaranteeing that

8   Mr. Zambrano would fulfill his commitment, would fulfill his

9   word if the agreement were reached.

10  Q.  What if anything did you tell Mr. Donziger, Mr. Fajardo,

11  and Mr. Yanza at this meeting at the Honey Honey they would get

12  in exchange for paying the $500,000 to Judge Zambrano?

13          MR. GOMEZ:  Objection, leading, asked and answered.

14          THE COURT:  Sustained as to form.

15          Mr. Guerra, what if anything did you say when you were

16  told that they didn't have the money at that time?

17          THE WITNESS:  Your Honor, I thought, I believed, I

18  said to myself that, that possibly in the future, they could

19  have the money and they would talk about me regarding this.

20          MR. GOMEZ:  Objection, move to strike as

21  nonresponsive.

22          THE COURT:  Granted.

23          Proceed, counselor.

24  Q.  At the beginning of the meeting, did what if anything did

25  Mr. Fajardo say?

DAOLCHE1                        Guerra - direct

1              MR. GOMEZ:  Objection, vague, your Honor.

2              THE COURT:  Overruled.

3         You know, you've either got to ask an open question or

4    lead a little; you're objecting to both.

5    A.  At the beginning of the meeting at the Honey Honey

6    restaurant, aside obviously from all of us greeting each other,

7    Mr. Fajardo informed or made Mr. Donziger aware about the

8    details of the proposal that I talked about with him in person

9    days before on Seis de Diciembre.

10             And immediately Mr. Donziger stated that he wanted to

11   know for myself in my own words the proposal and details

12   regarding the proposal.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DAO8CHE1                        Guerra - direct

1   Q.  What, if anything, did you then say to Mr. Donziger with

2   the details of the proposal?

3            MR. GOMEZ:  Objection.  Asked and answered.

4            THE COURT:  Sustained.

5   Q.  Mr. Guerra, after Mr. Donziger asked you -- strike that.

6            After you had the meeting at the Honey Honey with Mr.

7   Donziger and Mr. Fajardo and Mr. Yanza --

8            THE COURT:  Are you just repeating the whole thing

9   again?

10           MR. MASTRO:  No, your Honor.

11  Q.  -- what did you do next, if anything?

12  A.  I informed Mr. Zambrano regarding the details of this

13  meeting.

14  Q.  What, if anything, did he say in response?

15           MS. LITTLEPAGE:  Objection.  Hearsay.

16           THE COURT:  Overruled.

17  A.  Mr. Zambrano became aware of the details of the meeting, of

18  the result of the meeting, and he didn't say anything expressly

19  regarding this.  I sensed that he was disappointed and that's

20  it.

21           MR. GOMEZ:  Objection.  Speculation.  Move to strike.

22           THE COURT:  I will strike what the witness said he

23  sensed.

24  Q.  Did there come a time later when you and Mr. Zambrano had

25  another conversation regarding a bribe in the Chevron case?

DAO8CHE1                      Guerra - direct

1           MR. GOMEZ:  Objection.  Leading.

2           THE COURT:  Overruled.

3    A.  A short time after my meeting with Mr. Donziger, Yanza and

4    Fajardo at the Honey Honey, Mr. Zambrano gave me concrete,

5    specific instructions that from that point forward I should

6    work, regarding the court orders related to the Chevron case,

7    in the city of Lago Agrio.  He said that he could no longer

8    send the case files for the Chevron case to Quito via TAME,

9    much less for him to bring them himself, because in his

10   opinion, Chevron's attorneys or Chevron representatives --

11          MS. LITTLEPAGE:  Objection.  Hearsay.

12          THE COURT:  Overruled.

13   A.  -- have been very attentive as far as finding any

14   irregularities.

15          Aside from that, and because he told me he had reached

16   an agreement with the attorneys for the plaintiffs, an

17   agreement by which they had agreed to give him the $500,000 --

18          MS. LITTLEPAGE:  Objection.  Hearsay, motion to

19   strike.

20          THE COURT:  Stop interrupting the answer.  You

21   objected to the question.  Now listen to the answer.  I ruled.

22   A.  But that such an amount that he, Zambrano, would receive

23   that is a result of the judgment being enforced.

24          So from that point forward, as far as me issuing the

25   court orders related to the Chevron case during Judge

DAO8CHE1                         Guerra - direct

1    Zambrano's second term, I would travel to the city of Lago

2    Agrio.

3    Q.  What, if anything, did Mr. Judge Zambrano tell you in that

4    conversation about who would be writing or drafting the

5    judgment in the Chevron case?

6            MS. LITTLEPAGE:  Objection.  Hearsay.

7            THE COURT:  Overruled.

8    A.  Judge Zambrano did not specifically refer to the person nor

9    the name of the attorney who would write the judgment.  He

10   stated that he reached an agreement with the attorneys, with

11   the representatives and the attorneys for the plaintiffs, and

12   that he would receive from them the $500,000 in the future.

13   Q.  What, if anything, did he say about the drafting of the

14   judgment itself in the case?

15           MR. GOMEZ:  Objection.  Leading.

16           THE COURT:  Overruled.

17   A.  The judgment -- that the judgment would be written by the

18   attorneys for the plaintiffs, and it would be given to him.

19   Q.  Who, if anyone, did Judge Zambrano tell you he had reached

20   this agreement with?

21           MR. GOMEZ:  Objection.  It assumes facts.

22           THE COURT:  It does not assume anything.  Overruled.

23           MS. LITTLEPAGE:  Objection.  Hearsay.

24           THE COURT:  Overruled.

25   A.  With the attorneys for the plaintiffs, without specifying a

1    name.

2    Q.   Mr. Guerra, what understanding, if any, did you have with

3    Judge Zambrano regarding whether you would share in the

4    $500,000?

5    A.   Mr. Zambrano had assured me that once he had received the

6    $500,000, whether in installments or lump sum, he would share

7    with me 20 percent.

8    Q.   Now, Mr. Guerra, referring you to the work you did after

9    this point on the Chevron case, what methods did you use to

10   draft the orders in the Chevron case from that point forward?

11   A.   I would receive the fresh documents from the Chevron case

12   from Mr. Zambrano in his apartment in Lago Agrio.  I would

13   write the corresponding court orders using a computer provided

14   by Mr. Fajardo.  Once the court order had been -- strike that.

15   Once drafting of the court order was finished, Mr. Zambrano

16   would take the computer outside in order to obtain a hard copy,

17   to have it printed, and Mr. Zambrano would then take that

18   physical document to the courthouse to have it typed in to his

19   computer at court.

20   Q.   Do you know of your own personal knowledge, Mr. Guerra, who

21   it was who would type those documents into Judge Zambrano's

22   computer at the courthouse?

23   A.   Yes, sir.

24   Q.   Who was that, sir?

25   A.   I do not recall her name, but she is a daughter of attorney

DAO8CHE1                        Guerra - direct

1    Arturo Calva, an attorney who is close to Judge Zambrano.

2    Q.  Did Ms. Calva work for the court?

3    A.  No.  She was working for Mr. Zambrano.

4    Q.  Sir, during Judge Zambrano's second term, how did you

5    typically travel to Lago Agrio?

6    A.  By land on a co-op bus -- strike that.  By bus.

7    Q.  You just testified that you worked on a computer in

8    drafting the Chevron orders during Judge Zambrano's second

9    term.  What kind of computer was it?

10   A.  What you call it, it's an HP computer.  Not a desktop, but

11   a laptop kind.

12   Q.  How do you know it was Pablo Fajardo's laptop computer?

13   A.  During the first term, I drafted possibly three or four

14   court orders for the Chevron case, because I was in Lago Agrio,

15   and on that occasion and for that purpose Mr. Fajardo

16   personally gave me the computer.

17   Q.  Now, you said, sir, that you did your work on the Chevron

18   case in the second term in Judge Zambrano's apartment in Lago

19   Agrio?

20   A.  Yes.

21   Q.  Where did Mr. Zambrano live in Lago Agrio at the time?

22   A.  He lived in a building located on Calle Orellana Street

23   between Jorge Anasco and Quito Avenue, approximately 200 meters

24   away from where the court building was located.

25   Q.  Can you describe for the Court how large Judge Zambrano's

DAO8CHE1                      Guerra - direct

1    apartment was in Lago Agrio?

2    A.   Yes.   Mr. Zambrano's apartment was located on the third

3    level, and this building where for some time, and at that time

4    even, were the provincial prosecutor's office was located.   The

5    apartment consists of one room only with a wooden entrance, a

6    wooden door, and just one window, wooden with glass.   I

7    understand that it's possibly 26 to 30 meters square.

8    Q.   Mr. Guerra, when you would go to Lago Agrio and have to

9    stay overnight during Judge Zambrano's second term, where would

10   you typically spend the night?

11   A.   In counsel Fernando Alban's apartment.   It was contiguous

12   to Mr. Zambrano's apartment, and by that I mean it was in the

13   same building and the same floor.   Or I would also spend the

14   night at the home of Giussepa Barna, an Italian citizen who

15   lives in Lago Agrio from many years ago.

16   Q.   Mr. Guerra, did Mr. Zambrano have a printer in his

17   apartment in Lago Agrio?

18   A.   No.

19   Q.   After you would finish the draft order in the Chevron case

20   on Mr. Fajardo's laptop during this period, what did you do

21   with the laptop to give Judge Zambrano the draft order?

22              MR. GOMEZ:   Objection.   Leading.

23              THE COURT:   Overruled.

24   A.   At the end of Mr. Zambrano's term, even after I had

25   reviewed the draft judgment, the computer remained at Mr.

DAO8CHE1                        Guerra – direct

1    Zambrano's house without first me, I saw Mr. Fajardo, there is

2    a computer, my friend, and I didn't see the computer again.

3    Q.  Let me turn your attention, sir, to the period early 2011.

4              THE COURT:  Let's break here for a few minutes.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAO8CHE1                         Guerra - direct

1              (Pages 1006-1007 sealed by order of the Court)

2              (In open court)

3    ALBERTO GUERRA, resumed

4              THE COURT:  Let's proceed.

5              MR. MASTRO:  Thank you, your Honor.

6    BY MR. MASTRO:

7    Q.  Mr. Guerra, directing your attention to the time period

8    early 2011.  What, if any, involvement did you have in the

9    issuance of the Lago Agrio judgment?

10   A.  Sir, I reviewed the Lago Agrio judgment.  I read it over in

11   a general way.  I made some changes in phrases and words for

12   the purpose of improving the grammatical structure, and in

13   order also to improve the terminology regarding environmental

14   law.  And all of this in the end for the purpose of that

15   judgment, which had been given to me to perform a rapid review,

16   so that at first glance it would, this judgment would give the

17   appearance of having been written in by the president of the

18   court.

19   Q.  When was it, sir, that you did this review and editing of

20   the draft Lago Agrio judgment?

21   A.  I do not recall the exact date, but this happened two or

22   three weeks prior to February 14th of 2011.

23   Q.  What were the circumstances that led to your review of the

24   draft judgment?

25   A.  Judge Zambrano was concerned that the judgment would

DAO8CHE1                      Guerra - direct

1    be -- Judge Zambrano was concerned that the judgment would be

2    seen as a document that had been prepared by the presidency of

3    the court.  And that is the reason why he requested that I

4    participate in that way.

5    Q.  What, if anything, did he say to you -- strike that.

6            How did Judge Zambrano convey to you a request to

7    review the draft Lago Agrio judgment?

8    A.  He did so in person during one of our meetings in Quito.

9    Q.  Did he ask you to come to Lago Agrio?

10   A.  Yes.

11   Q.  Once you arrived in Lago Agrio, what, if anything, did you

12   do next?

13   A.  I went to Mr. Zambrano's apartment, and when I arrived

14   there, I found Mr. Zambrano already there in the company of Mr.

15   Fajardo.  I was presented with Mr. Fajardo's computer where the

16   draft judgment was already there.

17   Q.  What, if anything, was said to you by Mr. Fajardo or Judge

18   Zambrano about who had drafted the judgment?

19           MS. LITTLEPAGE:  Objection as to Judge Zambrano.

20   Hearsay.

21           THE COURT:  Overruled.

22   A.  Well, I found out through Mr. Zambrano, because he told me

23   so himself, that the plaintiffs had given him the draft of the

24   judgment.

25   Q.  What, if anything, were you told by Judge Zambrano to do

1  regarding the editing of the draft judgment?

2              MS. LITTLEPAGE:  Objection.  Hearsay.

3              THE COURT:  Overruled.

4  A.  As I previously stated, I was to fine-tune it, to polish

5  it, to make it look as if it had been written by a judge in the

6  court.

7  Q.  What, if anything, did Mr. Judge Zambrano say to you about

8  making copies of the draft judgment?

9              MR. GOMEZ:  Objection.  Leading.

10             THE COURT:  Overruled.

11  A.  Judge Zambrano's main recommendation to me was that I was

12  not to make any sort of copy, nor obtain the file, nor copy the

13  file, nor ever even let that computer out into the street.

14  Q.  How long did you work --

15  A.  That I could not do that.

16  Q.  How long did you work on editing the draft judgment?

17             THE INTERPRETER:  I'm sorry, counsel.

18  Q.  How long did you spend, how many days, working on the draft

19  judgment in the Lago Agrio case?

20  A.  Two days.

21  Q.  What, if anything, did Mr. Fajardo tell you to do in regard

22  to editing the draft Lago Agrio judgment?

23             MR. GOMEZ:  Objection.  It assumes facts.

24             THE COURT:  Maybe you can help me by telling me what

25  fact you think it assumes.

DAO8CHE1                       Guerra - direct

1           MR. GOMEZ:  It assumes that Mr. Fajardo told him

2     anything about that subject.

3           THE COURT:  That's why the question was phrased what

4     if anything was said.  Overruled.

5     A.  Mr. Fajardo offered his assistance.  He offered to help me

6     in case I had any questions and needed any help in the event I

7     had any questions.

8     Q.  Did there come a time while you were working on the draft

9     Lago Agrio judgment that you called Mr. Fajardo for help?

10    A.  Yes, I did.

11    Q.  What, if anything, did Mr. Fajardo tell you when you called

12    him to ask for help?

13    A.  He immediately offered to send me a document that, in his

14    opinion, and also in mine, would serve to clarify the questions

15    that I had as I reviewed the judgment.

16    Q.  Did Mr. Fajardo say this document had any name?

17    A.  A memory aid for the process, yes.

18    Q.  Is that a term that's commonly used in Ecuador for

19    documents that summarize background?

20          MR. GOMEZ:  Objection.  Vague.

21          THE COURT:  Overruled.

22    A.  Yes.  That term is used in the manner and for the purpose

23    that you have described.

24    Q.  What, if anything, happened next in terms of Mr. Fajardo

25    providing you with a memory aid document?

DAO8CHE1                        Guerra - direct

1    A.  The content of that document, truth be said, did not serve

2    to help me clarify my questions.

3    Q.  Mr. Guerra, the question was, after you had this

4    conversation with Mr. Fajardo and he offered to provide a

5    memory aid document, what, if anything, happened next in terms

6    of him providing you the document?

7    A.  Yes.  He sent me the memory aid.

8    Q.  Do you recall how he sent it to you?

9    A.  At the beginning, I was certain that I had received that

10   memory aid via e-mail, but then I later recalled that he

11   personally handed me that document in the nighttime hours of

12   the first day of my review of that document.

13   Q.  Sir, I would like to show you what has been marked as

14   Plaintiff's Exhibit 1703 and ask if you can identify this

15   document for us.

16           MR. MASTRO:  He needs to look at the Spanish language

17   version.

18   A.  Yes.  That is the document.

19   Q.  That is what document, sir?  Would you tell us a little bit

20   more, please?

21   A.  This is the document containing the memory aid that Mr.

22   Fajardo delivered to me in the nighttime hours of the first day

23   of my review of the draft judgment in the Lago Agrio case.

24   Q.  Sir, directing your attention to the content of the

25   exhibit, how is it that you can tell -- strike that.

DAO8CHE1                          Guerra - direct

1            MR. MASTRO:  Your Honor, I ask that it be received in

2       evidence.

3            THE COURT:  Received.

4            (Plaintiff's Exhibit 1703 received in evidence)

5    Q.  Mr. Guerra, referring you to the content of the document,

6    how is it that you can tell from the content of the document

7    that this is a memory aid provided to you by the Lago Agrio

8    plaintiffs' representatives?

9    A.  Well, this document contains information regarding the

10   items of information and topics that I had questions about, and

11   regarding which I asked Mr. Fajardo to help me to find the

12   solutions.

13   Q.  Sir, referring you to the last paragraph of that document,

14   who is Mr. Patricio Campuzano?

15   A.  I know that Dr. Patricio Campuzano is a member of the

16   attorneys who are the Chevron attorneys, the team of Chevron

17   attorneys in Ecuador.

18   Q.  Is this paragraph referring to sanctions on Chevron's

19   attorneys?

20   A.  Yes.  That is correct.

21   Q.  It's describing sanctions against defendants and their

22   attorneys, including Patricio Campuzano, correct, sir?

23            MR. GOMEZ:  Objection.  The document speaks for

24       itself.

25            THE COURT:  Sustained.

DAO8CHE1                          Guerra - direct

1   Q.  Sir, did you have an understanding when you read this

2   document of who it was referring to when it says "attorneys for

3   my opposing party," in this paragraph entitled "sanctions on

4   Chevron's attorneys"?

5              MR. GOMEZ:  Objection.  Vague.

6              THE COURT:  It's not vague.  That's overruled.

7              If that's the objection, it's overruled.

8   A.   That expression where they say that the attorneys of my

9   opposing party have been admonished, that refers to the Chevron

10  attorneys.

11             MR. GOMEZ:  Objection.  Move to strike.  Lack of

12  personal knowledge.

13             THE COURT:  It's stricken, but the point is abundantly

14  obvious.  Nobody else had opposing attorneys other than Mr.

15  Fajardo and his colleagues.

16  Q.  Mr. Guerra, do you recall giving a declaration regarding

17  this case back in November of 2012?

18  A.  Yes, I did.

19  Q.  Did you describe in your declaration in November 2012

20  receiving this memory aid from Mr. Fajardo?

21             MR. GOMEZ:  Objection.  The document speaks for

22  itself.

23             THE COURT:  Is it in evidence?

24             MR. MASTRO:  It is not.

25             THE COURT:  Are you going to offer it?

DAO8CHE1                         Guerra - direct

1             MR. MASTRO:  I can offer it or get to the point and

2    just ask discovery questions.

3             THE COURT:  It's filed in the court, right?

4             MR. MASTRO:  It is filed with the court.

5             THE COURT:  I will obviously take judicial notice of

6    the papers filed in this case.

7    Q.  Were you able to find --

8             THE COURT:  Not for the truth of the matters asserted,

9    but for the fact that they are filed.

10   Q.  Were you able to find --

11            THE COURT:  Excuse me.

12            I take it, Mr. Gomez, that the defense agrees that the

13   document in question was a declaration signed by this witness,

14   is that right?

15            MS. LITTLEPAGE:  Yes, sir.

16            THE COURT:  Mr. Gomez?

17            MR. GOMEZ:  Yes.

18   BY MR. MASTRO:

19   Q.  At the time you signed your declaration in November 2012,

20   had you been able to locate a physical copy of this memory aid?

21   A.  No, sir.

22            (Continued on next page)

23

24

25

DAOLCHE3                          Guerra - direct

1    Q.  How if ever did it come about that you were able to locate
2    a copy of this memory aid document?
3    A.  I had brought with me from Ecuador several documents that
4    in regard professional documents, family documents.  And those
5    documents reached me approximately in the month of February of
6    2013, but it was not until late March of 2013 that I reviewed
7    those documents carefully, which is when I found the memory
8    aid, the document containing the memory aid.  It was attached
9    to some of my personal documents or --
10            THE INTERPRETER:  May the interpreter correct?
11   A.  -- it was stuck to some of my personal documents.
12   Q.  Am I correct, sir, that you reviewed those personal
13   documents in late March 2013 because you had been subpoenaed by
14   the defendants in this litigation?
15   A.  Yes.
16   Q.  And that's when you found the memory aid, correct,
17   reviewing your documents in response to their subpoena,
18   correct?
19            MS. LITTLEPAGE:  Asked and answered.
20            THE COURT:  Overruled.
21   A.  Yes, sir.
22   Q.  Now, returning to your work editing the draft judgment,
23   what types of edits did you make to the draft judgment, if any?
24   A.  Regarding form, the document had a lot of deficiencies
25   because initially, at a glance, it did not seem as it had been

DAOLCHE3                    Guerra - direct

1    prepared by a judge.  As a consequence, after reading it I

2    worked on improving its grammatical structure and improving as

3    much as possible the usage of terms by including in it terms

4    that are common regarding environmental law in Ecuador.

5    Grammar and punctuation, there were many mistakes.

6          And, finally, as much as possible I made changes in

7    the structure itself of changes in phrases and words so that it

8    would seem objectively as if the document had indeed been

9    prepared by a judge.

10   Q.  Did you edit the substance of the judgment as opposed to

11   the edits you made to make it seem more like it was issued from

12   a judge?

13   A.  I did not, not on the substance.

14   Q.  Why not, sir?

15   A.  The substance included technical issues.  And regarding the

16   law it was grounded on experiences, on rules, on law, and even

17   foreign doctrine.

18   Q.  Do you recall any of the other countries laws that were

19   included in the draft judgment?

20   A.  Including American we had it also from Peru, Colombia, and

21   specifically from Argentina.  It also included as well from

22   Europe, Germany, specifically.

23   Q.  After you finished making your edits to the draft Lago

24   Agrio judgment, what if anything did you do with the laptop on

25   which you were working?

DAOLCHE3                        Guerra - direct

1   A.  What was by then customary, by that I mean to leave it

2   inside Mr. Zambrano's apartment on the desk.

3   Q.  Did you keep a copy of the draft judgment that you worked

4   on, Mr. Guerra?

5   A.  No.

6   Q.  Did you ever see or use that laptop again?

7   A.  No.

8   Q.  What if anything did Mr. Zambrano tell you happened to the

9   draft judgment after you had finished making your edits and

10  left the laptop in his apartment?

11              MS. LITTLEPAGE:  Objection, hearsay.

12              THE COURT:  Overruled as least for now.  I'll be

13  interested in hearing what people have to say at an appropriate

14  time on the question of whether at this point it's in

15  furtherance.  But let's go on.

16  A.  Excuse me, were you referring to Mr. Fajardo or

17  Mr. Zambrano?

18  Q.  Judge Zambrano.  What if anything did he say to you

19  happened to the draft judgment after you finished your edits

20  and left the laptop at his apartment?

21              MS. LITTLEPAGE:  Same objection.

22              THE COURT:  Same ruling.

23  A.  Later on Mr. Zambrano informed me, made me aware that that

24  document, that attorneys for the plaintiffs made changes on

25  that document practically up to the last minute.

DAOLCHE3                      Guerra - direct

1   Q.  Sir, can I refer you to Plaintiff's Exhibit 399 in your

2   binder, the Spanish language version of the final judgment.

3           MR. MASTRO:  It's already been received in evidence,

4   your Honor.

5   A.  What number again?

6   Q.  399.  Mr. Guerra.

7   A.  Yes.

8   Q.  Have you reviewed this document before?

9   A.  Yes.

10  Q.  Do you recognize it to be the final judgment of the Lago

11  Agrio case?

12          MR. GOMEZ:  Leading.

13          THE COURT:  You stipulated that's what it is, right?

14  You introduced it, am I correct, Mr. Gomez?

15          MS. LITTLEPAGE:  Donziger defendants did.

16          THE COURT:  What about you, Mr. Gomez, are you

17  disputing that's what it is?

18          MR. GOMEZ:  I'm just disputing the need for these kind

19  of questions, your Honor.

20          THE COURT:  I asked you a question.  May I have an

21  answer to it, please.

22          MR. GOMEZ:  No, I'm not disputing that, your Honor.

23          THE COURT:  Move on.

24  Q.  Mr. Guerra, how does the actual judgment issued by --

25  strike that.

DAOLCHE3                    Guerra - direct

1       Have you read that document before, sir?

2    A.  Here in the United States, yes.

3    Q.  And, sir, how does that document compare to the draft

4    judgment that you reviewed and edited in early 2011?

5    A.  Both are substantially the same.

6    Q.  After issuance of the Lago Agrio judgment, what assistance

7    if any did you provide to Judge Zambrano with any other rulings

8    in the Chevron case?

9    A.  I guided Judge Zambrano with the orders of clarification.

10   Q.  Sir, did there come a time --

11          THE COURT:  He's not finished.

12          MR. MASTRO:  I'm sorry, your Honor.

13   A.  I guided Judge Zambrano with the clarification and --

14          THE INTERPRETER:  I need to look up a word, your

15   Honor.

16   A.  -- with supplemental orders regarding the issuance of the

17   judgment.

18   Q.  Mr. Guerra -- strike that.

19          Mr. Guerra, did you continue to work with Judge

20   Zambrano as a ghostwriter after the final judgment was issued

21   in the Chevron case?

22   A.  Yes, sir.

23   Q.  Over the course of your work as a ghostwriter for Judge

24   Zambrano on his civil cases, approximately how many of his

25   orders in civil cases did you ghostwrite?

DAOLCHE3                          Guerra - direct

1   A.  There were a lot, a lot.

2   Q.  More than a hundred?

3   A.  Yes.

4   Q.  Sir, did there come a time when Judge Zambrano was removed

5   from office as a judge in Lago Agrio?

6   A.  Yes.

7   Q.  Approximately when was that, Mr. Guerra?

8   A.  Judge Zambrano and Judge Ordonez were jointly dismissed by

9   the judiciary council at the end of February of 2012.

10  Q.  At the time of Judge Zambrano's dismissal, did you have in

11  your possession any of his case files from the Lago Agrio

12  courthouse that Judge Zambrano had provided you to ghostwrite

13  his civil case orders?

14  A.  Yes.

15  Q.  Did you communicate with anyone employed at the courthouse

16  at the time of Judge Zambrano's dismissal about what to do with

17  those case files?

18  A.  Court personnel got in touch with me to ask if I had files

19  from Judge Zambrano and I answered yes.

20  Q.  Who was it at the courthouse who got in touch with you

21  about whether you had files of Judge Zambrano's cases?

22  A.  Mariela Salazar, who was a clerk of the court; and Narcisa

23  Leon, her assistant.

24  Q.  What response, if any, did you give to them?

25  A.  I told them the numbers of the cases, of the files that I

DAOLCHE3                          Guerra - direct

1    had with me, and I committed myself to in the next few days to

2    go to Lago Agrio to submit those documents so they could be

3    entered into the court, into the court.

4    Q.  Did there come a time when you returned to the courthouse

5    to turn over those case files from Judge Zambrano's civil

6    cases?

7    A.  Yes.

8    Q.  To whom at the courthouse did you turn over those case

9    files?

10            MS. LITTLEPAGE:  Judge, objection.  Outside the scope

11   of the witness statement that was provided.

12            THE COURT:  Overruled.

13   A.  To Mariela Salazar and Narcisa Leon.

14   Q.  Judge Guerra, Mr. Guerra, I'd like to refer you to

15   Plaintiff's Exhibit 1733 and 1734.  See them in front of you,

16   what's been identified for the record as your day planners or

17   diaries?

18   A.  Yes, yes, sir.

19   Q.  Sir, can you please identify for the record what each of

20   those documents is?

21   A.  These are daily planners in which I have written, it was my

22   custom to write down important events or important

23   circumstances that were important for me.

24   Q.  Sir, what year does the day planner PX1733 cover?

25   A.  This daily planner includes the period between July of 2011

DAOLCHE3                       Guerra - direct

1    to December of 2011.

2    Q.  Sir, did you keep this day planner contemporaneously day

3    after day, recording your events each day?

4    A.  Yes.

5    Q.  Can you explain, sir, why the day planner, the printed

6    version of the day planner says 2003?

7    A.  I previously had this daily planner, the one matching that

8    year, but I lost it because of the circumstance.  And because

9    it was already July 2014, I took and I used a previous daily

10   planner from previous years that had not been used.

11        MR. MASTRO:  Can you please read back the answer?  I

12   think the witness misspoke on the year, unless it's a year

13   later than we're here today.

14        (Record read)

15        THE WITNESS:  Yes, I was referring to July 14 of 2011,

16   not the year 2014.

17   Q.  Thank you, Mr. Guerra.  Turning your attention to PX1734,

18   what year is that a day planner for?

19   A.  Likewise, sir, this is a daily planner that includes

20   entries for events that took place between January and July of

21   2012.

22   Q.  Sir, can you please explain why this day planner stops at

23   the date of July 12, 2012?

24   A.  This daily planner ends on that specific date, July 12,

25   2012, because on that very next date, on July 13 of 2012, I

DAOLCHE3                    Guerra - direct

1   placed this daily planner and other evidence in the hands of

2   Chevron's representatives with whom I have had conversations.

3   Q.  And, sir, as to the daily planner PX1734, is that a daily

4   planner where you recorded the day's events contemporaneously

5   day after day?

6   A.  Yes.

7   Q.  Can you briefly describe for the Court why you used the day

8   planner and recorded certain events on your day planners?

9           MS. LITTLEPAGE:  Judge, I have an objection to the

10  document, so I'd ask the witness not to go into the contents of

11  the document if it's admitted into evidence.  If it's just

12  procedural -- the question is kind of broad and I don't want to

13  waive any objection by him saying something.  I do object to

14  these documents and any discussion about these documents.

15          THE COURT:  They haven't been offered yet.

16          MS. LITTLEPAGE:  I know.

17          THE COURT:  Please answer the question.

18  A.  It has been my custom to write down on a daily planner such

19  as these the important events that have occurred in a day -- a

20  birthday party or a telephone call from one's children, an

21  accident, a pain, medication, the cost of that medication, the

22  money I received, from whom I received it, why I received it,

23  specifically how I spent it, what I used it for.  It's a way of

24  remembering that I was not rich and that I had to take care of

25  those needs.

DAOLCHE3                    Guerra - direct

1    Q.  Sir, these two day planners only reflect notes for events

2    between July 14, 2011, and July 12, 2012.

3            Were you using day planners prior to July 14, 2011?

4    A.  Yes.

5    Q.  Is there any reason why you haven't turned over those day

6    planners to Chevron for the period prior to July 14, 2011?

7    A.  I lost the daily planner, daily planners from before this

8    period.  Nonetheless, I mentioned and I told Chevron's

9    representatives about all the daily planners that I had, but

10   they only chose these two ones that we have here.

11   Q.  Did you have any daily planners prior to this date?

12   A.  Not from immediately before, but from years back, yes.

13   Q.  Years ago?

14   A.  From years back, yes.

15   Q.  Did you have any for the period 2009, 2010, first half of

16   2011 that you didn't turn over to Chevron?

17   A.  No, not for those years.

18           MR. MASTRO:  Your Honor, we ask that they be received

19   in evidence.

20           MS. LITTLEPAGE:  Objection, hearsay.

21           MR. MASTRO:  Rule 33 and 34.

22           THE COURT:  Briefly, I just want to hear your

23   response.

24           MR. MASTRO:  Certainly, your Honor.  Prior consistent

25   statement.  The witness's veracity has been attacked in opening

DAOLCHE3                        Guerra - direct

1    and otherwise.  That would be under 801(d)(1)(B).  And also

2    with the residual exception that he kept these

3    contemporaneously over a period of years and they have all the

4    indicia of reliability.  He's verified in person.  So under

5    both.

6              THE COURT:  Are there specific entries that you're

7    offering?

8              MR. MASTRO:  Yes, your Honor.

9              THE COURT:  Prior consistent statements.

10             MR. MASTRO:  Yes, your Honor.

11             THE COURT:  And what are they?

12             MR. MASTRO:  Your Honor, they're a series of entries

13   over an extended period of him working on cases, and I would

14   ask him whose cases and files; and payments that he received

15   from a particular individual, and I'd ask him what those

16   notations mean and what the payments are and what they were

17   for.

18             THE COURT:  From a particular individual, do you have

19   somebody in mind?

20             MR. MASTRO:  Yes.  His name is Nicolas Zambrano, your

21   Honor, or Nico sometimes referred to in the diary.

22             THE COURT:  Are all the defendants prepared to concede

23   they will not attack his credibility on those points?

24             MS. LITTLEPAGE:  Judge, I'm not sure I understand the

25   question.  The Pfister case, United States Supreme Court case,

DAOLCHE3                    Guerra - direct

1    Pfister says that you can't use, for example, things like

2    diaries to show that the declarant acted in conformity when

3    you're involving third party, which is Judge Zambrano.

4           So my biggest concern is exactly what they're trying

5    to do which is use portions of this to prove up some sort of

6    support for what Judge Zambrano allegedly did, which is

7    hearsay.

8           THE COURT:  That's the point that counts.

9           MR. GOMEZ:  Excuse me, your Honor, may we excuse the

10   witness for this exchange?

11          THE COURT:  I don't see the need.  It's going to be

12   over very fast.

13          It's offered as, first and foremost, as prior

14   consistent statements.  If you're prepared to represent that

15   you accept the credibility of his testimony on the points that

16   Mr. Mastro said he will use to bolster it, then you don't need

17   a prior consistent statement to corroborate his testimony.

18          If on the other hand you want to reserve the right to

19   attack his credibility either generally or as to those

20   statements in particular, then the only question is whether it

21   comes in now or on rebuttal, but it will come in as a prior

22   consistent statement.

23          So what's your position?

24          MS. LITTLEPAGE:  We do not accept his credibility.

25          THE COURT:  Mr. Gomez?

 1              MR. GOMEZ:  Same, your Honor.

 2              THE COURT:  All right.  Well, I'm going to take it

 3     now, and if at the conclusion of all of the evidence there is a

 4     contention that any of the entries that are offered as prior

 5     consistent statements should be stricken or disregarded on the

 6     ground that there was no attack on his credibility on those

 7     points, well, then I'll consider it.  And on that basis I

 8     expect I'll never have to reach any hearsay question.  Okay.

 9              MR. MASTRO:  Thank you, your Honor.

10              THE COURT:  They're received on the basis indicated.

11              (Plaintiff's Exhibits 1733 and 1734 received in

12     evidence)

13              MR. MASTRO:  Thank you, your Honor.

14     Q.  Referring you, Mr. Guerra, to PX1733, the entry on page 25

15     for July 16, 2011.

16              Do you see, sir, on the fourth line there where it

17     says trabajo, trabajo?

18     A.  Yes, I work on trials.

19     Q.  Can you tell the Court whose trials you were working on?

20     A.  Referring to the trials I received from Mr. Zambrano.

21     Q.  Now, sir, referring you to page 25, July 15, 2011.

22              MS. LITTLEPAGE:  I would object to the last series of

23     questions and answers.  It's got no linking to Mr. Zambrano.

24     It says he's working on files.  The man is a private attorney

25     at the time obviously working on files.  It can't be a prior

DAOLCHE3                        Guerra - direct

 1   consistent statement if it's got no tie-in to the facts of the

 2   case.

 3          THE COURT:  Within the last 90 seconds from the

 4   transcript, question, referring to the trials I received from

 5   Mr. Zambrano -- that's the answer, excuse me.  The question was

 6   can you tell the Court whose trials you were working on.

 7          It seems to me it's linked to Mr. Zambrano.

 8   Q.  Mr. Guerra, referring you to the entries for July 15, 2011,

 9   do you see there where it says recibo 500 de Nicolas?

10   A.  Yes.

11   Q.  Can you tell the Court what you were referring to when you

12   said recibo 500 de Nicolas?

13   A.  I'm stating that I received $500 from Mr. Nicolas Zambrano.

14   Q.  Can you tell the Court from this entry why Mr. Zambrano was

15   giving you $500?

16   A.  Mr. Zambrano had made a commitment to me to pay me $1,000

17   per month for my collaboration with him in issuing court

18   orders, but Mr. Zambrano sometimes would give me more or

19   sometimes would give me less.

20   Q.  Was this a payment to you by Mr. Zambrano for your help in

21   drafting orders in his civil cases?

22          MS. LITTLEPAGE:  Objection, leading.

23          THE COURT:  Sustained.

24   Q.  Mr. Guerra, what if anything was Mr. Zambrano paying you

25   the $500 to do?

DAOLCHE3                    Guerra - direct

1   A.  The $500 reflected on this entry constitute a payment for

2   Mr. Zambrano to me or part of the payment that Mr. Zambrano

3   committed himself to paying me.

4   Q.  For doing what work, sir?

5   A.  For drafting the judgments for the case files that he was

6   assigned by lottery.

7   Q.  Sir, turning your attention to date of August 10, 2011 in

8   your day planner, page 40.

9        Do you see there, sir, where it refers to retiro

10  juicios de TAME and trabajo juicios?

11  A.  Did you say August 10?

12  Q.  What are those referring to, sir, those entries?

13  A.  Oh, August.

14  Q.  That's August 10, 2011, page 40.  And it's on the screen as

15  well, Mr. Guerra.

16        What are those entries referring to?

17  A.  I am specifically stating on this date, August 10 of 2011,

18  that I retrieved trials from TAME.

19  Q.  Received trials sent to you by whom, sir?

20  A.  These are the files that are sent to me by Mr. Zambrano

21  using Transportes Aereos Militares Ecuatorianos.  It's the

22  airline company.

23  Q.  And the reference just below it to trabajo juicios, worked

24  on cases, whose cases were you working on, sir?

25  A.  That entry refers to the fact that on the same day I

1    retrieved the trials from TAME, and right away I sit down to

2    work on the corresponding court orders that same day.

3    Q.  Sir, directing your attention to August 11, 2011, also page

4    40.  Do you see there the reference to trabajo juicios, worked

5    on cases?

6    A.  Yes, that's correct.

7    Q.  Whose cases were you working on, sir?

8    A.  Mr. Nicolas Zambrano's.

9    Q.  Do you see there just below that, Aeropuerto recibo de Nico

10   1,000.  Airport received 1,000 from Nico.

11           Do you see that, sir?

12   A.  Yes, sir.

13   Q.  Who were you referring to when you say Nico?

14   A.  Mr. Nicolas Zambrano.

15   Q.  When you say there that you received 1,000 from Nicolas

16   Zambrano, is that $1,000?

17   A.  Yes, $1,000.

18   Q.  Was it you were receiving $1,000 from Nicolas Zambrano to

19   do?

20   A.  Regarding the entry I'm referring to, that I meet

21   personally with Nicolas Zambrano at the Quito airport and that

22   I receive from him the sum of $1,000.

23   Q.  For doing what?

24   A.  For being his ghostwriter.

25   Q.  Sir, referring you to August 28, 2011, page 44, the entry

DAOLCHE3                    Guerra - direct

 1   highlighted in yellow, work on labor case No. 318-2011.

 2              Do you see that, sir?

 3   A.  Yes, sir, yes.

 4   Q.  For whom were you working on the labor case of that number?

 5   A.  For Mr. Nicolas Zambrano.

 6   Q.  What were you doing?

 7   A.  The judgment for the case at hand.

 8   Q.  Turning your attention to October 14, 2011, page 72 of your

 9   day planner, do you see there where it says in yellow

10   highlighting, received from Nicolas Zambrano $500?

11   A.  Yes.

12   Q.  What were you receiving $500 from Nicolas Zambrano to do?

13   A.  To draft the court orders that he required that I do for

14   the trials assigned to him.

15   Q.  Mr. Guerra, let me refer you to Plaintiff's Exhibit 1734,

16   the entry dated February 24, 2012 on page 48.

17   A.  Yes.

18   Q.  Do you see there where it says Nicolas transfers me $2,000?

19   A.  Yes, that's what it says.

20   Q.  Who were you referring to there when you wrote Nicolas?

21   A.  Mr. Nicolas Zambrano.

22   Q.  What was he paying you $2,000 for, sir?

23   A.  So that I would write the judgments of the trials assigned

24   to him.

25              MR. MASTRO:  Your Honor, I don't want to take more of

DAOLCHE3                    Guerra - direct

1   the Court's time, but if I can just ask the following two

2   questions.

3   Q.  One, where, Mr. Guerra, you refer in these diaries or these

4   day planners, Plaintiff's Exhibit 1733 and 1734, to working on

5   cases or trials or files, for whom were you working on cases or

6   files or trials?

7   A.  I'm stating that I'm working on the cases and the files of

8   Mr. -- of Judge Zambrano exclusively.

9   Q.  Sir, just one last entry I want to refer you to.  It's in

10  PX1734, February 23, 2012, where you write, Nicolas Zambrano --

11  can you please translate that line for me -- Nicolas Zambrano,

12  what does it say after that?

13  A.  After Nicolas Zambrano, it says he will remit documents.

14  Q.  What was it you were referring to here when you said

15  Nicolas Zambrano will remit documents?

16  A.  By that day he had told me on the phone that, that on the

17  very next day he will send me documents on TAME airlines and so

18  I leave evidence of this fact, of this notice.

19  Q.  What were the documents to be used for, sir?

20  A.  The documents that I refer in the majority of the entries

21  relate specifically to the trials or the case files of the

22  trials which Mr. Zambrano would send to me so that I would work

23  on the corresponding decisions.

24  Q.  Now, Mr. Guerra, I want to refer you to Plaintiff's

25  Exhibit 1745.  You testified earlier about communicating with

DAOLCHE3                        Guerra - direct

1    Mr. Donziger about a family immigration issue.

2              Do you recall that, sir?

3    A.  Yes.

4    Q.  Is this, is this email -- strike that.

5              Is this an email from you to Steven Donziger dated

6    Sunday, September 5, 2010?

7    A.  Yes, sir.

8    Q.  Is this the communication you were referring to earlier in

9    your testimony about contacting Steven Donziger directly about

10   a family immigration issue?

11   A.  No.  I stated that initially I told Mr. Donziger in person

12   regarding an immigration issue of my son's.  This communication

13   refers to a consultation regarding my daughter's situation.

14   Q.  So this is a separate contact with Mr. Donziger about a

15   family immigration issue, correct, sir?

16   A.  Yes.  Yes, sir.

17             MR. MASTRO:  Your Honor.

18   Q.  And is this a true and correct copy of the email you sent

19   to Steven Donziger on that date?

20   A.  Yes.

21             MR. MASTRO:  Your Honor, I ask that it be received.

22             MS. LITTLEPAGE:  No objection.

23             THE COURT:  Mr. Gomez?

24             MR. GOMEZ:  No objection.

25             THE COURT:  It's received.

DAOLCHE3                         Guerra - direct

1           (Plaintiff's Exhibit 1745 received in evidence)

2           THE COURT:  Now, just I notice the Bates number on the

3    bottom.  Is it agreed this is an email that was produced by

4    Mr. Donziger in this case or a related case?

5           MS. LITTLEPAGE:  Yes, your Honor.

6           THE COURT:  Mr. Gomez?

7           MR. GOMEZ:  Yes.

8           THE COURT:  All right.

9    Q.  Mr. Guerra, in this September 5, 2010 email that you sent

10   to Mr. Donziger, I want to refer you specifically to the

11   sentence that reads, "I will support the matter of Pablo

12   Fajardo so it will come out soon and well."

13          Can you please tell us what you meant by the term, "I

14   will support the matter of Pablo Fajardo"?

15   A.  By this date, Judge Zambrano and I knew that later on Judge

16   Zambrano would rehear the case.  In these circumstances and

17   through this message, specifically regarding the issue that I

18   will support the matter of Pablo Fajardo so it will come out

19   soon and well, this subject was related only with the Chevron

20   case.

21   Q.  Sir, I'd like to refer you to what's been marked as

22   Plaintiff's Exhibit 1682, the second page, please.

23          And, sir, can you identify this for the record as to

24   what this document is?  You can also see it on the screen,

25   Mr. Guerra.

DAOLCHE3                    Guerra - direct

1  A.  In Spanish, yes.  This is the report from TAME.

2          MS. LITTLEPAGE:  Judge.

3  A.  Regarding the --

4          THE COURT:  I would like to hear what it is.

5  A.  Regarding the deliveries that I make, as well as deliveries

6  made to me during this time.

7  Q.  And, sir, is this a record that you went to TAME and

8  requested personally be provided to you?

9  A.  I made the request, yes.

10 Q.  And if we can reduce the size so that the witness can see

11 on the screen the markings in the lower right-hand corner in

12 the Spanish language version, please.

13         Do you see, sir, the seal and signature of TAME

14 official dated September 10, 2012?

15 A.  Yes.

16 Q.  Is this a true and correct copy of what TAME provided to

17 you in response to your request and certified at the bottom of

18 each page?

19 A.  Yes.

20         MR. MASTRO:  Your Honor, I ask it be received in

21 evidence.

22         MS. LITTLEPAGE:  Objection.  Hearsay, authenticity,

23 lack of foundation, lack of personal knowledge, best evidence.

24         THE COURT:  Mr. Mastro.

25         MR. MASTRO:  Your Honor, 803(6).  It qualifies as a

DAOLCHE3                    Guerra - direct

1   business record, and the witness has attested to personally

2   going.

3          THE COURT:  I'm sorry, I can't hear you.

4          MR. MASTRO:  Your Honor, it's under 803(6), it's a

5   business record, and the witness has testified as to personally

6   going, requesting, and receiving the documents from TAME, that

7   TAME then certified on each page.

8          I would also offer it under 807, the residual

9   exception.  I think it clearly qualifies as a business record.

10          THE COURT:  I can't hear you.

11          MR. MASTRO:  I'm sorry, your Honor.  I think it

12   clearly qualifies as a business record, your Honor, based on

13   the witness's testimony, but it also would qualify under 807.

14          THE COURT:  We're not going to take a lot of time on

15   this right now, but how long have the plaintiffs have this

16   document?

17          MR. MASTRO:  Your Honor, this was produced as an

18   attachment or an exhibit to records that Mr. Guerra provided.

19   I think it was on his November declaration, but they certainly

20   had it for many months.

21          THE COURT:  Ms. Littlepage, in light of the fact, and,

22   Mr. Gomez, in light of the apparent fact that you've had this

23   since last year sometime -- I don't mean you personally in your

24   case, Ms. Littlepage -- what good faith basis do you have for

25   denying or challenging the authenticity of the document, that

DAOLCHE3                    Guerra - direct

1    is, that it is not in fact a schedule of what it says it is a

2    schedule of from TAME, obtained from TAME?

3          MS. LITTLEPAGE:  Judge, there's ways for a proponent

4    of a piece of evidence to prove up a document.

5          THE COURT:  That was not the question I asked you.

6          MS. LITTLEPAGE:  If you're asking me if I trust

7    anything that Mr. Guerra has produced in this litigation as

8    being authentic, I do not.

9          THE COURT:  That's not what I asked you either.

10         MS. LITTLEPAGE:  That's the basis.

11         THE COURT:  In light of the fact that you've had

12   almost a year, do you have any good faith basis for suggesting

13   to me that this document did not originate with TAME, any good

14   faith basis at all?

15         MS. LITTLEPAGE:  Well, I think I have a very good

16   faith basis which is that the only person who says it

17   originated with TAME is Mr. Guerra.

18         THE COURT:  And if Mr. Guerra handed you the New York

19   City telephone directory today and said here's the New York

20   City telephone directory, you would be in the position of

21   saying, I take it, that I have no way to even begin to address

22   the question --

23         MS. LITTLEPAGE:  I would be skeptical, Judge.

24         THE COURT:  I understand that.  But I'm asking you a

25   specific question that goes to the issue of whether I should

DAOLCHE3                     Guerra - direct

1    take at least the authenticity part of what you say with the

2    slightest degree of seriousness.

3             Mr. Gomez.

4             MR. GOMEZ:  Your Honor, with all due respect, I think

5    the question shifts the burden.  You're right, this has -- this

6    is a document that has been produced in discovery.  And have I

7    hired experts to find out if this document is a true and

8    correct copy of similar documents that TAME produces?  No.

9             THE COURT:  Did you go to the legal department of TAME

10   who signed off on it and say is this you?  Did you do that?

11            MR. GOMEZ:  No, your Honor.  I have not done any of

12   those things.  If I had the resources to do it, I would.  I

13   know we discussed that before.

14            THE COURT:  We're not going there.

15            MR. GOMEZ:  I understand, your Honor.

16            THE COURT:  You had outside counsel for months after

17   this was produced, and then there's of course Patton Boggs.

18   But we're not going to have that discussion now.

19            MR. GOMEZ:  My point simply, your Honor, for the

20   record is that defendants need not take a position one way or

21   the other.  It is entirely the plaintiff's burden to prove up

22   this document.

23            THE COURT:  Well, it's received for now and you can

24   both brief it and if you can persuade me that you're right,

25   I'll disregard it.

DAOLCHE3                         Guerra - direct

1           (Plaintiff's Exhibit 1682 received in evidence)

2           MR. MASTRO:  Thank you, your Honor.

3   Q.  Mr. Guerra, I want to refer you to your what's been marked

4   as Plaintiff's Exhibit 1689, 1704, 1705, and 1708.  If you

5   could please look at each of those.

6           Mr. Guerra, are each of those documents a monthly bank

7   statement that you received from your bank, Banco Pichincha,

8   concerning your bank account?

9   A.  Yes, sir, they are.

10  Q.  Do you recognize them to be true and correct copies of your

11  bank statements that you received directly from your bank, your

12  monthly statements?

13  A.  Yes.

14  Q.  Are these documents that you turned over to Chevron in

15  connection with this litigation?

16  A.  Yes.

17          MR. MASTRO:  Your Honor, we move their admission.  And

18  we note that they were included in the summary judgment motion

19  made in January of 2013, docket entry No. 746-3, just as the

20  TAME shipping documents were.

21          MS. LITTLEPAGE:  Objection, hearsay, authenticity,

22  best evidence, lack of personal knowledge.

23          MR. MASTRO:  Business record, your Honor, as well as

24  under the residual exception.

25          MS. LITTLEPAGE:  No evidence of a business record

DAOLCHE3                    Guerra - direct

1   exception.  There's no custodian of records that have answered

2   the business record exception questions.

3          THE COURT:  The January summary judgment motion was or

4   was not one that I ruled on?

5          MR. MASTRO:  You did rule on it, your Honor.  You

6   denied it without prejudice to renewing parts later.

7          THE COURT:  With or without a response from the other

8   side?  After a response.

9          MR. MASTRO:  I think there was a response, your Honor.

10         THE COURT:  And, well, all right.  Fine.  That's

11  enough.  I'm going to receive it on the same basis as 1682.

12         (Plaintiff's Exhibits 1689, 1704, 1705, and 1708

13  received in evidence)

14         MR. MASTRO:  Thank you, your Honor.

15         THE COURT:  How much longer do you expect to be on

16  direct?

17         MR. MASTRO:  Your Honor, I'm probably another ten or

18  15 minutes.

19         THE COURT:  All right.  Go ahead.

20  Q.  Mr. Guerra, I'd like to refer you to Exhibit 1722, 1723,

21  1724, 1725, and 1726, and I'd like to ask you if you can

22  identify these records for us?

23  A.  Yes, sir.

24  Q.  Mr. Guerra, are these documents that you requested from

25  TAME relating to air travel you took on TAME?

DAOLCHE3                    Guerra - direct

1   A.  Yes.

2   Q.  Are these true and correct copies of the documents that

3   TAME provided to you in response to your request for your air

4   travel records on TAME?

5   A.  Yes.

6   Q.  Are these documents that you then turned over to Chevron in

7   connection with this litigation?

8   A.  Yes.

9            MR. MASTRO:  Your Honor, I ask they be received in

10  evidence.

11           MS. LITTLEPAGE:  Objection, hearsay, authenticity,

12  best evidence.

13           MR. MASTRO:  Your Honor, again.

14           THE COURT:  Same ruling.

15           MR. MASTRO:  Business records residual exception.

16           THE COURT:  Same ruling as previously.

17           MR. MASTRO:  Thank you, your Honor.

18           THE COURT:  Which is to say they're received for now.

19           (Plaintiff's Exhibits 1722, 1723, 1724, 1725, and 1726

20  received in evidence)

21  Q.  Mr. Guerra, how did Chevron obtain all of these documents

22  that we've just put into evidence -- your bank records, your

23  TAME shipping and air records, your day planners -- how did

24  that come about?

25  A.  Chevron obtained them because I personally gave these

DAOLCHE3                    Guerra - direct

1  documents to them.

2  Q.  Did you provide any other materials or evidence to Chevron?

3  A.  Yes.

4  Q.  Can you describe some of that other evidence that you

5  provided to Chevron?

6  A.  I provided a computer, flash drives, originals of bank

7  records from many years.  I provided documents related to TAME

8  regarding deliveries made by me or received by me.  I provided

9  certifications by TAME regarding my own personal transportation

10  trips that I made during certain periods of time.

11          From what I can recall, I turned over a pair of cell

12  phones that I had used.  I turned over a certificate for the

13  records for phone numbers called from my telephone.  And these

14  documents were provided by corresponding telephone companies,

15  among other documents, sir, the ones that I have mentioned.

16  Q.  Am I correct that you provided all of this hard evidence to

17  Chevron starting in July 2012 and thereafter?

18          MS. LITTLEPAGE:  Objection to the form.

19          THE COURT:  Overruled.

20  A.  I provided this evidence to Chevron, part of that on

21  July 13, 2012.  And from I can recall, later on, on November 2

22  of that same year.  And, finally, in April of this year.

23  Q.  Thank you, sir.

24          MR. MASTRO:  May I approach, your Honor?

25          THE COURT:  You may.

DAOLCHE3                          Guerra – direct

1              MR. MASTRO:  Your Honor, I'm handing the witness what

2      has been marked as Plaintiff's Exhibit 1671 and Plaintiff's

3      Exhibit 1672.

4      Q.  Mr. Guerra, do you recognize these documents?

5      A.  Yes.

6                  (Continued on next page)

DAO8CHE4                    Guerra - direct

1  Q.  What are they, sir?

2  A.  These are the agreement and the supplemental agreement that

3  I signed with Chevron.

4  Q.  Sir, if you please turn to the last page of each agreement.

5  A.  Yes.

6  Q.  Am I correct that that's your signature on the last page of

7  each of these?

8  A.  Yes, sir, it is.

9  Q.  PX 1671, that's a document that you executed on January 27,

10 2013?

11 A.  Yes, sir.  This one, yes, it is.

12 Q.  PX 1672, that's the supplemental, you executed that on or

13 about July 31, 2013, correct, sir?

14 A.  Yes.

15 Q.  Before you signed these agreements, you had Spanish

16 language translations of them, correct, sir?

17 A.  Yes.

18 Q.  You were represented by counsel and advised by counsel at

19 the time you signed these agreements?

20 A.  Yes.

21 Q.  Do these agreements accurately reflect the terms of any

22 agreement you have with Chevron?

23 A.  Indeed, yes.

24 Q.  Am I correct that there are no other terms or agreements

25 that you have with Chevron besides these two agreements?

DAO8CHE4                         Guerra - direct

1   A.   That's correct.   There is no other agreement aside from

2   this.

3              MR. MASTRO:   Your Honor, 1671 is already in evidence,

4   and I ask the Court to receive both agreements.

5              MS. LITTLEPAGE:   No objection.

6              THE COURT:   Sorry.   If 1671 is in evidence, why do I

7   have to do it again?

8              MR. MASTRO:   You don't.   I just ask that you receive

9   1672.

10              THE COURT:   1672 is received.

11              (Plaintiff's Exhibit 1672 received in evidence)

12   Q.   Mr. Guerra, during all the time that you were a ghost

13   writer for Judge Zambrano, how much money were you paid in

14   total by Judge Zambrano?

15   A.   He fulfilled his commitment to pay me about a thousand

16   dollars per month.   So because of that, I estimate that I

17   received from him approximately $40,000.

18   Q.   At any point in time, did you have access to Judge

19   Zambrano's office computers when he was not present?

20   A.   No, sir.

21   Q.   At any point in time, did you ever put a flash drive on any

22   of Mr. Zambrano's office computers to download any files from

23   those computers?

24   A.   No, sir.

25   Q.   At any point in time, did you ever steal drafts from Judge

DAO8CHE4                         Guerra – direct

1   Zambrano of any of Judge Zambrano's rulings, from his computer

2   or otherwise?

3   A.  No, sir.

4   Q.  Mr. Guerra, on your own computer, and on your own flash

5   drives, who drafted all of the orders found on your own

6   computer and your own flash drives that you turned over to

7   Chevron, who drafted those orders, sir?

8   A.  I did.

9   Q.  Mr. Guerra, I have to ask you these last few questions.

10          Sir, at the time you were being paid a thousand

11  dollars a month by Judge Zambrano to ghostwrite his orders in

12  civil cases, did you understand that you were violating

13  Ecuadorian law?

14  A.  Yes, sir.

15  Q.  And at the time that you were receiving a thousand dollars

16  a month from Mr. Fajardo on behalf of the Lago Agrio

17  plaintiffs' team to ghostwrite orders in the Chevron case, did

18  you understand that you were violating Ecuadorian law?

19  A.  Yes.

20  Q.  At the time you solicited a bribe from Chevron's attorneys,

21  did you understand you were violating Ecuadorian law?

22  A.  Yes.

23  Q.  And at the time that you solicited a $500,000 bribe from

24  Mr. Donziger and his colleagues in exchange for which they

25  would get to ghostwrite the Ecuadorian judgment in their own

DAO8CHE4                         Guerra - direct

1   favor, did you understand that you were violating Ecuadorian

2   law?

3   A.  Yes, sir.

4   Q.  At the time that you edited the Lago Agrio judgment that

5   you knew was ghostwritten by the Lago Agrio plaintiffs'

6   representatives, did you understand that you were violating

7   Ecuadorian law?

8            MR. GOMEZ:  Objection.  It calls for speculation.

9            THE COURT:  What speculation is that?

10            MR. GOMEZ:  His knowledge of who wrote the draft.

11            THE COURT:  You might rephrase the question without

12   the use of the word "you."

13   Q.  Mr. Guerra, at the time that you edited the draft Lago

14   Agrio judgment that you understood had been ghostwritten by the

15   Lago Agrio plaintiffs' team, did you understand that you were

16   violating Ecuadorian law?

17   A.  The law in Ecuador mandates that a judgment should be

18   drafted and edited only by the judge, and because of that,

19   anything that is against that, I acknowledge it, I admit it,

20   yes.

21            MR. MASTRO:  No further questions, your Honor.

22            THE COURT:  Thank you.  We will break for lunch.

23   2:20.

24            (Luncheon recess)

25

DAO8CHE4                          Guerra - direct

1                           AFTERNOON SESSION

2                              2:20 p.m.

3    ALBERTO GUERRA, resumed.

4           THE COURT:  Mr. Guerra, you are still under oath.

5           Cross-examination, Ms. Littlepage.

6           MS. LITTLEPAGE:  Yes, sir.

7    CROSS EXAMINATION

8    BY MS. LITTLEPAGE:

9    Q.  Good afternoon, Mr. Guerra.  My name is Zoe Littlepage.

10          Can you tell me how long you have been in New York

11   preparing for your testimony?

12   A.  I have been here in the City of New York for approximately

13   three months with intervals.

14   Q.  How many intervals?  In other words, are you here Monday

15   through Friday and you go somewhere else on the weekend?  Can

16   you describe how you are in New York?

17   A.  I arrive here on Sunday night or Monday night.  I stay here

18   in New York for three to four days, and then I return to my

19   home.

20   Q.  And your home is now in the United States?

21   A.  Yes.

22   Q.  It's not in the state of New York?

23   A.  It is not here.

24   Q.  When you come for three or four days a week, do you meet

25   with the Gibson Dunn lawyers?

DAO8CHE4                         Guerra - cross

```
 1    A.  Yes.
 2    Q.  For how many hours a day?
 3    A.  Between four and six hours a day.
 4    Q.  You say you started doing these weekly trips to New York
 5    three months ago.  Do you recall the date of the first trip up
 6    here to prepare for your testimony?
 7    A.  I do not recall it.
 8    Q.  In your meetings with the Gibson Dunn lawyers, have you
 9    rehearsed your testimony, in other words, been asked questions
10    and you give answers, just like if you were in the courtroom?
11              MR. MASTRO:  Objection to form, your Honor.
12              THE COURT:  Restate it, counsel, properly.
13    Q.  Can you tell us if in these meetings you have ever
14    rehearsed your testimony in a question and answer form, if any
15    time?
16              MR. MASTRO:  It's the same objection, your Honor.
17              THE COURT:  I will allow it.
18    A.  They haven't been exactly rehearsals, as I literally
19    understand the meaning of rehearsal.  They have been
20    preparation.
21    Q.  And describe what you mean by preparation.
22    A.  They have asked me questions.  I have given answers.
23    Q.  In any of these meetings, have you rehearsed
24    cross-examination, where the lawyers have pretended to
25    cross-examine you, if ever?
```

DAO8CHE4                        Guerra - cross

1          MR. MASTRO:  Objection.  Rehearsed.  Form.

2          THE COURT:  I will allow it.

3    A.  Yes.

4    Q.  How many times have you rehearsed cross-examination?

5    A.  There were some times, not many.

6    Q.  In these three months of meetings, have you had an

7    opportunity to go back and read through your prior statements?

8          MR. MASTRO:  Objection to form, your Honor.  It

9    mischaracterizes his testimony, in these three months.

10         THE COURT:  Overruled.

11   A.  Yes.

12   Q.  Have you had any meetings with consultants to train you or

13   to give you advice on how to present your testimony in this

14   courtroom?

15         MR. MASTRO:  Objection to form, your Honor.

16   Consultants.

17         THE COURT:  Sustained.  I think you need to rephrase

18   it.

19   Q.  Have you met with anyone in any of these meetings where the

20   discussion was how to better present your testimony at trial?

21   A.  I have had meetings, but not for that specific purpose.

22   Q.  Can you describe the types of meetings you had in the three

23   months?

24   A.  I have met specifically with attorneys, Chevron attorneys,

25   attorneys at Gibson Dunn, and my attorney, Dr. Charles Clayman,

DAO8CHE4                    Guerra - cross

1   has always been present at those meetings.  And the purpose of

2   said meetings has been to review documents, analyze the

3   contents of the documents, the scope of said documents, and to

4   prepare for my testimony in this case, in this court, before

5   this court, and as well as for a commitment that I had in May

6   of last year when I was questioned precisely by the plaintiff's

7   attorneys in this case.

8   Q.  Who pays your attorney?

9           THE INTERPRETER:  The interpreter requests a

10  repetition.

11  Q.  Who pays your attorney?

12  A.  It's my understanding, as far as I understand, he is paid

13  by Chevron.

14  Q.  Have you ever paid even a dollar to your attorney?

15  A.  No.

16  Q.  Who selected your attorney?

17  A.  I selected, I chose my attorney at the suggestion of Gibson

18  Dunn.

19  Q.  Did they give you a list of names to choose from?

20  A.  They stated to me that there was a possibility between two

21  or three different attorneys.  They invited me to visit them.

22  The first one I visited was Dr. Clayman.  We spoke.  I liked

23  him and I accepted, I agreed that he should be my attorney.

24  Q.  Do you know how much your attorney's fees have been to

25  date?

DAO8CHE4                    Guerra - cross

1    A.  No.

2    Q.  Do you even receive bills from your attorney?

3    A.  No.

4    Q.  Do you receive -- let me ask you a better question.

5           Have you received additional money from Chevron in the

6    last three months to compensate you for all of these meetings

7    in New York?

8           MR. MASTRO:  Objection to form.

9           THE COURT:  Sustained as to form.  It's not clear what

10   you mean when you say "additional."  Additional to what?

11   Q.  Mr. Guerra, you are paid every month by Chevron, is that

12   correct?

13   A.  There is an agreement, and pursuant to that agreement, I

14   receive a certain sum of money monthly.

15   Q.  And that sum of money is $10,000 a month, correct?

16          MR. MASTRO:  Your Honor, the agreement speaks for

17   itself.

18          THE COURT:  Overruled.

19   A.  I receive the sum of $12,000 monthly.

20   Q.  And does that come in a check or do you get that in cash

21   from Chevron?

22   A.  By check.

23   Q.  Have you received any sum of money from Chevron in addition

24   to the $12,000 a month you receive in the last three months?

25   A.  I received the sum of $10,000 in this month now, October.

DAO8CHE4                        Guerra - cross

1   Q.  What was your understanding that money was for?

2   A.  That money was not for expenses, but as compensation or

3   payment for having found and delivered to them a document

4   titled memory aid.

5   Q.  When did you find and deliver that document to Chevron?

6   A.  As far as I can recall, it was in late March of 2013.

7   Q.  Do you know why you have only just received payment for

8   that document?

9   A.  No.

10  Q.  Did you negotiate with Chevron for the $10,000 payment for

11  this document?

12  A.  No.

13  Q.  How did it come about that Chevron paid you $10,000 for

14  turning over a document?

15  A.  My attorney, Dr. Clayman, upon finding out about this

16  particular topic, indicated to me that he had heard or that he

17  knew that I was going to be compensated that sum of money for

18  my efforts in finding this document.

19  Q.  And the efforts you're talking about is going through some

20  paperwork in order to find this document, right, sir?

21  A.  No.

22  Q.  What were the efforts?

23  A.  Excuse me, but I did not understand the question.  Could

24  you repeat that?

25  Q.  Yes.  Mr. Guerra, you told us that the $10,000 were for

DAO8CHE4                          Guerra - cross

1   your efforts in finding the document.  Can you describe what

2   you mean by efforts?

3   A.   I did a detailed review and search of all the documents

4   that I brought from Ecuador that I had received from Ecuador,

5   and I did that for the purpose of finding some documents that

6   had been requested by the defendants in this case.  And it was

7   while doing so, in that circumstance, that I found the document

8   that you are referring to.  It was stuck to some other ones

9   that I had in my possession.

10  Q.   And in the past, each time you have provided documents to

11  Chevron, you have received lump sum cash payments, is that

12  correct?

13              MR. MASTRO:  Objection, your Honor.  Could we approach

14  the side bar for one second, your Honor?

15              THE COURT:  All right.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

DAO8CHE4                        Guerra - cross

1                    (At the side bar)

2                    MR. MASTRO:  Your Honor, just two things, and I didn't

3        want to say this in front of the witness.

4                    One, what he is referring to is the supplemental

5        agreement, Exhibit 1672, that's in the record.  We put it in

6        the record.  I don't know why the payment came months later,

7        but that's what he is referring to.

8                    He is being asked questions about what Mr. Clayman

9        discussed with him and told him.  It's not really my objection,

10       his attorney-client communications.  He doesn't really

11       understand all the circumstances in which his lawyer negotiated

12       a supplemental agreement for him, but he is being asked to

13       invade attorney-client privilege.  He has already testified.

14       Exhibit 1671 and Exhibit 1672 reflect all of the agreements he

15       has with Chevron in any respect.  So we have just elicited the

16       10,000 he was entitled to under the supplemental agreement.

17                   There is nothing more to be said.  But to the extent

18       his lawyer negotiated those agreements for him, she has already

19       elicited some attorney-client communication and apparently is

20       intent on eliciting more.  Mr. Clayman is here in the

21       courtroom.  I am not sure whether he knows what his rights are

22       in this regard to assert privilege claims on behalf of his

23       client.  It's not my privilege to be able to assert these

24       communications, but Mr. Clayman negotiated these agreements and

25       it's creating an incredibly misleading record.

DAO8CHE4                    Guerra - cross

1            THE COURT:  Ms. Littlepage.

2            MS. LITTLEPAGE:  I do intend to ask him factually the

3    background of all of the money he received from Chevron, and to

4    go through, in not great detail, but I do believe I am allowed

5    to not just rely on a black and white document, but to find out

6    exactly what the terms are, what he gets, how he gets it, how

7    it's paid.  I think it's very important for the fact finder to

8    see the bias and judge the credibility of this witness beyond

9    what is just in the document.  I don't think I have stepped

10   over the line.  I don't think I have gone too far.

11           Judge, I think you see my point.  Every time this man

12   turns over documents he gets money.

13           THE COURT:  What makes you think that's true?  Maybe

14   it's true, maybe it isn't, but I don't know.

15           MS. LITTLEPAGE:  That was my last question which

16   brought us up to the side bar.

17           THE COURT:  As usual, we are really getting wide of

18   the mark.  I will make clear to Mr. Clayman that he is entitled

19   to assert any privileges that he feels he needs to assert on

20   behalf of the witness, and we will take it one question at a

21   time.  What will be really unfortunate is if what you do is

22   mush everything together and we then have to spend another hour

23   and a half on redirect sorting it all out.  So it would be

24   helpful if you would try to avoid that.

25           (Continued on next page)

DAO8CHE4                    Guerra - cross

 1                (In open court).

 2                THE COURT:  I am informed that Mr. Clayman is in the

 3      courtroom.  Is that right?

 4                MR. CLAYMAN:  Yes.

 5                THE COURT:  Just so you understand, you are free to

 6      assert on behalf of the witness any relevant privilege if at

 7      any point you have an objection.

 8                MR. CLAYMAN:  Thank you, your Honor.

 9                THE COURT:  Let's proceed.

10      BY MS. LITTLEPAGE:

11      Q.  Mr. Guerra, in the past, when you have provided documents

12      to Chevron, isn't it true that you have received cash payments?

13                THE COURT:  Just for the sake of clarity, Ms.

14      Littlepage, do you mean greenbacks?  Is that what you're

15      talking about?

16                MS. LITTLEPAGE:  I think he said he gets paid in a

17      check.

18                THE COURT:  I think it's useful, if you're talking

19      about payments generally, that you don't say cash payments, and

20      thus imply that paper money or coins changed hands, if that's

21      not what you're getting at.

22                MS. LITTLEPAGE:  There is an instance when it will be

23      cash.

24                THE COURT:  It may be.  I am just saying let's keep

25      the record as clear as we can keep it.

DAO8CHE4                         Guerra - cross

1   BY MS. LITTLEPAGE:

2   Q.  Let me ask you a better question.  In the past when you

3   have provided documents to Chevron, do you get paid money?

4   A.  Yes.

5   Q.  Is it always the same amount of money or is it sometimes

6   different amounts of money?

7   A.  Different amounts of money.

8   Q.  I want to talk first about February 14, 2011.  Do you

9   recognize that as the date that the verdict was issued in the

10  Lago Agrio case?

11  A.  Yes.

12  Q.  I think you testified that you read the final version of

13  the verdict when you were in the U.S., is that correct?

14  A.  Yes.

15  Q.  Is that after Chevron moved you and your family to the

16  U.S.?

17          MR. MASTRO:  Objection to the form, your Honor.

18          THE COURT:  The form defect is what?

19          MR. MASTRO:  Characterization of the move of you and

20  your family.

21          THE COURT:  Let's be precise as we can, please,

22  counsel.  It may ultimately not matter, but let's be precise.

23          MS. LITTLEPAGE:  Yes, sir.

24  Q.  Is part of your agreement with Chevron that Chevron paid

25  for you, your wife, your son, your son's wife, and your

DAO8CHE4                          Guerra - cross

1    grandchildren to move from Ecuador to the United States?

2    A.  That is part of the agreement, yes, but allow me.  But not

3    for them to move us, but to provide the resources so that we

4    could move.

5    Q.  They paid for your move, would that be fair?

6    A.  Yes.

7    Q.  How much?

8    A.  I don't recall.

9    Q.  Do you have a range?

10   A.  Well, in regard to the move, they paid for the airline

11   tickets.  They paid an amount of money that I don't know for

12   the transportation of suitcases that contained personal

13   belongings and documents.  And then at the end, they gave me a

14   sum of money that would cover in a certain way to compensate me

15   an amount of money to compensate me for not bringing from

16   Ecuador to the United States items such as beds, refrigerators,

17   kitchen, the stove.

18   Q.  How much was that sum of money?

19   A.  I don't remember exactly, but I am under the impression

20   that it was $12,000.

21   Q.  How many airplane tickets did they buy to move you and your

22   family from Ecuador?

23   A.  Five airline tickets.

24   Q.  Did Chevron hire you an immigration lawyer to get

25   immigration papers for you, your wife, your son, your son's

DAO8CHE4                        Guerra - cross

1    wife, and your grandchildren?

2              MR. MASTRO:  Objection, your Honor, to form,

3    immigration papers.

4              THE COURT:  Sustained as to form.  I don't think it

5    matters much, but ask it another way.

6    Q.  Did Chevron hire an immigration lawyer for you?

7              THE COURT:  What you're trying to ask is, did they pay

8    for an immigration lawyer for him, right?

9    Q.  Let me ask you this way.  Do you have an immigration

10   lawyer?

11   A.  Yes.

12   Q.  Did you select the immigration lawyer?

13   A.  No.

14   Q.  Who selected your immigration lawyer for you?

15   A.  It's my understanding that it was the attorneys at Gibson

16   Dunn.

17   Q.  Does the same immigration lawyer represent you, your wife,

18   your son, your son's wife, and your grandchildren?

19   A.  Yes.

20   Q.  Who pays for that immigration lawyer?

21   A.  I do not pay them; Chevron does.

22   Q.  Do you know how much Chevron has paid for your immigration

23   lawyer to date?

24   A.  No.

25   Q.  When you arrived in the United States, did Chevron choose a

DAO8CHE4                       Guerra - cross

1    house for you?

2    A.  No, they allowed me to do that.

3    Q.  Tell me how it came about that you chose your house.  Were

4    you staying in a hotel?  Tell us how that happened.

5    A.  Yes.  Initially, I was staying at a hotel, and at some

6    point it became a need to find a place to live, to rent an

7    apartment.

8    Q.  Who paid for the hotel?

9    A.  Chevron.

10   Q.  How long did you live in the hotel?

11   A.  A good part of the time, from the time I arrived into the

12   United States until I was able to rent the apartment.

13   Q.  How long was that?

14   A.  From the date of my arrival in the United States until the

15   date on which I rented the apartment.

16   Q.  What date did you arrive in the U.S.?

17   A.  February 12th of 2012.

18           Excuse me.  Pardon me.  It was January 12th.

19   Q.  Are you sure it was 2012 and not 2013?

20   A.  Oh, 2013.

21   Q.  When did you rent your house, sir?

22           THE COURT:  I think he said it was an apartment.

23   Q.  When did you rent your apartment?

24   A.  I committed to renting that apartment in the last days of

25   February 2013, and I moved in on February 4th of this year.

DAO8CHE4                      Guerra - cross

1   Q.  What hotel had you been staying at before you got your

2   apartment?

3             MR. MASTRO:  Your Honor, objection.  Confidentiality

4   grounds.  Where?  The answer may reveal where he has resided or

5   is residing in the U.S.

6             THE COURT:  Ms. Littlepage, you're welcome to explore

7   what it cost, if he knows, what class of hotel, what the

8   accommodations were, but we are not going into where it was.

9   Q.  Was the hotel you were living in before your apartment a

10  chain hotel, like a Marriott or a Hilton or a Radisson?

11  A.  It was a chain hotel.

12  Q.  What chain?

13  A.  I can't remember exactly.  I can't tell you accurately.

14  Q.  What hotel do you stay at when you have come to New York

15  these last three months?

16            MR. MASTRO:  Same objection, your Honor.  It would

17  reveal the place he stays at on a periodic basis.

18            THE COURT:  Why shouldn't I make the same ruling?

19            MS. LITTLEPAGE:  Let me ask him a different way.

20  Q.  When you come to New York, do you stay at a chain hotel?

21  A.  I don't know if the hotel where I am staying is a chain

22  hotel.  I can't tell you exactly.

23  Q.  What class of hotel, how many stars in the hotel you're

24  staying at?

25  A.  Same thing.  I wouldn't be able to say.

DAO8CHE4                       Guerra - cross

1    Q.  Did Chevron buy you a car?

2    A.  Yes.

3    Q.  Does Chevron pay your car insurance?

4    A.  Yes.

5    Q.  Does Chevron pay your health insurance?

6    A.  Yes.

7    Q.  Does Chevron pay health insurance for your wife, your son,

8    your son's wife, and your grandchildren?

9    A.  Yes.

10   Q.  You said that you had read the February 14, 2011 verdict

11   when you came to America.  Is that after you moved to America?

12   A.  I read it when I was already here in the United States

13   having moved here.

14   Q.  Do you know that the Ecuadorian appellate court issued its

15   decision in January of 2012?

16   A.  Yes.  I heard that through the press.

17   Q.  Have you read the Ecuadorian appellate court decision?

18   A.  No.

19   Q.  According to you, Judge Zambrano promised to pay you 20

20   percent of the $500,000 he was going to get from the verdict,

21   is that correct?

22   A.  Yes.

23   Q.  Which would be $100,000?

24   A.  That's the math, yes.

25   Q.  When the appellate court issued its decision in January of

1    2012, that made the verdict enforceable, correct, sir?

2             MR. MASTRO:  Objection.  It calls for a legal

3    conclusion.

4             THE COURT:  Sustained.

5    Q.  What impact does the appellate court decision have on the

6    underlying verdict?

7             MR. MASTRO:  Objection.  It calls for a legal

8    conclusion and this witness wasn't called as an expert on

9    Ecuadorian law.

10            MS. LITTLEPAGE:  I think he testified a lot today

11   about what violates Ecuadorian law over and over again.  I

12   think this is a simple question.

13            THE COURT:  He testified a lot about the fact that he

14   understood that various things he did were illegal, which is

15   rather a different matter than what you are doing now.  I don't

16   see the relevance of the inquiry, even on a state of mind

17   basis.

18            MS. LITTLEPAGE:  I think it's very relevant to see the

19   timing of his approach to Chevron.  What I am doing is building

20   a timeline.

21            THE COURT:  Well, you can do that without doing what

22   you're doing.  There is no dispute about when the ruling was in

23   Ecuador.  If it's relevant and material, I will decide what

24   effect it had.  And you know when he came to the United States.

25   And you can explore when whatever went on between him and

DAO8CHE4                    Guerra - cross

 1    Chevron representatives occurred.  The rest of it is a matter

 2    of argument.

 3             MS. LITTLEPAGE:  His state of mind, if he appreciated

 4    that in January of 2012 the appellate court decision brought

 5    him closer to the $100,000, it is at least some evidence of the

 6    inconsistency in the timing of him approaching Chevron.

 7             THE COURT:  The difficulty is with your question, in

 8    part.  First of all, you're asking him general questions about

 9    enforceability.  Well, there is enforceability under the law of

10    Ecuador against who knows what, having who knows what value.

11    There is enforceability under the law of Canada, which so far

12    is zero.  There is enforceability under the law of the United

13    States, which is whatever it is.  You're going to have to try

14    and get at this a better way.

15    BY MS. LITTLEPAGE:

16    Q.  Mr. Guerra, as a former judge, did you have an

17    understanding that the Ecuadorian appellate court decision had

18    some impact on the underlying verdict?

19             MR. MASTRO:  Objection, your Honor.  It calls for a

20    legal conclusion and asking for expert testimony.

21             THE COURT:  I am going to sustain it, at least because

22    it's extraordinarily vague.  And if he says yes or no, it

23    doesn't mean a thing.  Did it have some impact?  What?

24             Next question.

25    Q.  Mr. Guerra, as a former judge, did you have an

DAO8CHE4                    Guerra - cross

1   understanding that the appellate court affirming an underlying

2   verdict impacted that verdict's enforceability?

3           MR. MASTRO:  Same objection, your Honor.

4           THE COURT:  Sustained.  Ask a proper question, and I

5   will let you get an answer, but you haven't come close yet.

6           MS. LITTLEPAGE:  You want to give me a hint on a

7   proper question?

8           THE COURT:  Yes.  I will ask it for you.

9           Mr. Guerra, was it your understanding that the

10  decision of the Ecuadorian appellate court upholding the

11  judgment signed by Judge Zambrano made that judgment

12  enforceable in Ecuador, whatever that might have meant?  Did

13  you have such an understanding?

14          THE WITNESS:  As a former judge and an attorney

15  knowledgeable of the procedure, I knew that the judgment of the

16  appellate level, which ratified the judgment issued by Judge

17  Zambrano, had to be enforced --

18          THE INTERPRETER:  I need to inquire of a legal term,

19  your Honor.

20  A.  -- had to be affirmed, reaffirmed before it was to be

21  enforced.

22          THE COURT:  I'm sorry.  Mr. Guerra, what had to be

23  reaffirmed?

24          THE WITNESS:  The appellate level ruling.

25          THE COURT:  All right.  Obviously, I am taking that

DAO8CHE4                         Guerra - cross

1  only for the witness's state of mind and not on the law, which

2  at least as it's been presented to me is not consistent with

3  that.

4  Q.  In April of 2012, where were you working?

5  A.  In the city of Quito.

6  Q.  Doing what, sir?

7  A.  I was an adviser or attorney for a company that involved

8  insurance, reinsurance.

9  Q.  Reinsurance?

10 A.  Yes.

11 Q.  In April of 2012, were you in the courthouse and saw

12 Enrique Carvajal?

13 A.  Yes.

14 Q.  Mr. Guerra, in April of 2012, why were you at the

15 courthouse?

16 A.  I was there for work-related reasons.  I would travel from

17 Quito to the Oriente region, Lago Agrio, and I would usually

18 visit the court when I was visiting that city.

19 Q.  Were you in court that day as a lawyer or were you just

20 visiting the courthouse?

21 A.  From what I can recall, it seems to me that on that day I

22 was there as an attorney.

23 Q.  Had you planned on meeting Mr. Carvajal that date?

24 A.  No.

25 Q.  How did it come about that you had a conversation with

1    Mr. Carvajal that day?

2    A.  By chance I ran into Mr. Carvajal in one of the hallways of

3    the courthouse, and I took advantage of this opportunity of

4    seeing him to tell him what I told him.

5    Q.  Were you all in the courtroom or out in the hallway when

6    you spoke to him, or where were you when you spoke to him?

7    A.  In the hallway.

8    Q.  And Mr. Carvajal is an attorney for Chevron, is that

9    correct?

10   A.  Yes.

11   Q.  What firm does he work for?

12   A.  It's my understanding that he worked for Dr. Callejas's

13   firm.

14   Q.  How long did you speak to Mr. Carvajal that date?

15   A.  The meeting was very quick, very short, no more than five

16   minutes.

17   Q.  Do you recall what day in April you had that meeting?

18   A.  Not exactly, but it was in late April.

19   Q.  What did you tell Mr. Carvajal that day?

20   A.  I specifically told him that I knew how the draft judgment

21   had been written, had been issued by Judge Zambrano, and that I

22   expected, if he thought it prudent, that he should inform the

23   attorneys of his firm about this detail.  And if there was an

24   interest in this, that they should get in touch with me so we

25   could talk.

DAO8CHE4                          Guerra - cross

1   Q.   How were they supposed to get in touch with you?

2   A.   Through Doe 2.

3   Q.   How long after April 2012 did you hear from anybody

4   connected with Chevron?

5   A.   A short time after my meeting with Dr. Carvajal, a few days

6   later, the first days of May 2012, Doe 1 got in touch with me

7   letting me know that Chevron was interested in talking to me

8   about the issue I had brought up.

9   Q.   What was the next thing you did?

10          MR. MASTRO:  Your Honor, a demonstrative is being

11  displayed that is not in evidence and it's mischaracterizing

12  some of the witness's statements.  I am not sure why that is

13  being displayed.

14          MS. LITTLEPAGE:  I am trying to build a timeline so

15  that we can keep track for the rest of this examination where

16  we are in the timeline.

17          THE COURT:  We will mark it before you take it away,

18  but I can pretty much follow it, Mr. Mastro.

19          MR. MASTRO:  OK, your Honor.

20  Q.   Mr. Guerra, what is the next thing you did?

21  A.   During June I had some conversations with Doe 2 regarding a

22  future meeting that I would have in the future with two

23  individuals representing Chevron, or individuals who were part

24  of an investigative team from Chevron.  Later on I did have a

25  telephone conversation with these individuals, until finally we

DAO8CHE4                    Guerra – cross

1  did meet in person.  The first time in the presence of Doe 2,

2  and the very next time without Doe 2.

3  Q.  Was the next contact a phone call or a meeting with Chevron

4  after May 2012?

5           THE COURT:  I think you're confused on your timeline.

6  He said he had conversations about a future meeting, and that

7  those meetings were in June.  And later than that there was a

8  meeting.

9  Q.  Between the June 2012 discussion of a future meeting, what

10 was the next step, a phone call or a meeting, after the June

11 '12 discussion?

12 A.  I cannot specify the date, but I can be emphatic regarding

13 that the first meeting I had with Chevron's representatives, or

14 Chevron's investigators, took place between the 3rd or 4th of

15 June of 2012.

16          Excuse me.  Personal meeting, July 3rd or 4th of 2012.

17 And at this meeting Doe 2 was present.

18 Q.  Do you see in front of you a black binder that's marked

19 Alberto Guerra deposition?

20          THE COURT:  Let's take our break here.  Ten minutes.

21          (Recess)

22          THE COURT:  Continue.

23 BY MS. LITTLEPAGE:

24 Q.  Mr. Guerra, after the July 3rd or 4th 2012 meeting, what

25 was the next thing that happened?

DAO8CHE4                    Guerra - cross

1   A.  After that there was a meeting of July 13th of 2012, from

2   what I can recall.

3   Q.  The meeting on July 3rd or 4th was with whom?

4   A.  With the representatives or the agents or the investigators

5   for Chevron who were in Quito, Ecuador, as well as the presence

6   of Doe 2.

7   Q.  Do you know the names of the investigators that you met

8   with on July 3rd or 4th?

9   A.  Yes.

10  Q.  What were their names?

11  A.  Mr. Yohir Akerman and the attorney or Dr. Andres Rivero.

12  Q.  Is Mr. Rivero a lawyer in Ecuador?

13  A.  No.  He is an attorney in the United States.

14  Q.  Was Mr. Akerman an attorney or an investigator?

15  A.  I cannot state with certainty that he was an attorney, but

16  he told me that he was an investigator.

17  Q.  Where was that meeting on July 3rd or 4th?

18  A.  It was in the city of Quito at the hotel where they were

19  staying.

20  Q.  What was the hotel?

21  A.  If I recall correctly, it was at the Marriott Hotel.

22  Q.  July 13, 2012, who was present at that meeting?

23  A.  Mr. Akerman, Mr. Rivero, and myself were present.

24  Q.  Where was that meeting?

25  A.  That meeting began at the hotel where both men were

DAO8CHE4                     Guerra - cross

1   staying.

2   Q.  Was that the Marriott again?

3   A.  I'm not sure about that.

4   Q.  Was it in the city of Quito?

5   A.  Yes.

6   Q.  And on July 3, 2012, how did you get to that meeting?  Did

7   you drive?  Did you go by bus?

8   A.  I drove my vehicle.

9   Q.  On July 13, how did you get to that meeting?

10  A.  I drove my vehicle.

11  Q.  In the unknown hotel that you met at, did you meet in a

12  room or a conference room or the restaurant, where in that

13  hotel did you meet Mr. Akerman and Mr. Rivero on July 13?

14  A.  In the room one of them had been using.

15  Q.  What was your next contact with anyone from Chevron after

16  July 3, 2012?

17  A.  After that I had conversations with Mr. Akerman and

18  Mr. Rivero.

19  Q.  But no more meetings?

20  A.  I cannot state it with certainty.  I'm not sure if we have

21  met.

22  Q.  You don't remember if you met them again after July 13,

23  2012?

24  A.  Yes, of course, I met with them.

25  Q.  How many more times did you meet with Mr. Akerman and

DAO8CHE4                          Guerra - cross

1    Mr. Rivero after July 13, 2012?

2    A.  I recall that I met them at the end of July, on November

3    2nd with all certainty also.

4    Q.  The end of July and?

5    A.  As I already said, November 2nd.

6    Q.  The meeting at the end of July, who was present?

7    A.  Mr. Akerman, Mr. Rivero, and myself.

8    Q.  Where was that meeting?

9    A.  The meeting of November 2nd, that was at the hotel where

10   they were staying.

11   Q.  In what city?

12   A.  The city of Quito.

13   Q.  Who was present for the November 2, 2012 meeting?

14   A.  Mr. Akerman, Mr. Rivero, and myself.

15   Q.  And the meeting at the end of July, where did that take

16   place?

17   A.  Part of it was at their hotel and another part in my

18   residence, second part.

19   Q.  What hotel were they staying at for that meeting at the end

20   of July?

21   A.  I cannot state with certainty, but they were chain hotels.

22   Q.  The November 2nd meeting, what hotel did you meet them at?

23   A.  The hotel where they had arrived, but as I told you

24   earlier, I cannot state it with certainty, but they usually

25   arrived at the Marriott or the Quito International hotel, and

DAO8CHE4                      Guerra - cross

1  the Swissotel, and some other well-known hotel in Quito.

2  Q.  So each time you met with the representatives of Chevron

3  you went to a different hotel?

4  A.  Yes.

5  Q.  What was your next meeting after November 2, 2012?

6  A.  I don't recall specifically, but already by that date I had

7  already agreed with them that I would come to the United

8  States, and I travelled to Chicago.

9  Q.  Do you recall what day you went to Chicago?  When did you

10 go to Chicago?

11 A.  On November 14th, if I recall correctly, it was November

12 14th of 2012.

13 Q.  Who was present at the meetings in Chicago?

14 A.  Present there were Chevron representatives from Gibson

15 Dunn, Mr. Akerman, and Mr. Rivero, other individuals, either

16 from Chevron or Gibson Dunn, I couldn't specify, and myself.

17 Q.  Can you specifically recall Mr. Mastro being present for

18 that meeting?

19 A.  Yes.

20 Q.  Where did that meeting take place?

21 A.  From what I can recall, that meeting took place in a hotel

22 in that city.

23 Q.  You should have a book in front of you that just has your

24 name Alberto Guerra.  It does not say Alberto Guerra

25 deposition.  Do you see that, sir?

DAO8CHE4                      Guerra - cross

```
 1    A.  Yes.
 2    Q.  If you turn to tab 2 of that book, do you see a recorded
 3    transcript of a meeting with you and some representatives of
 4    Chevron on June 25, 2012?
 5    A.  Yes, I see it.
 6    Q.  Have you reviewed the transcript of the recordings made by
 7    Chevron at that meeting?
 8             THE COURT:  Has this been marked as an exhibit?
 9             MS. LITTLEPAGE:  No, Judge, but I can.
10             THE COURT:  Well, that's the way we do it.
11             MS. LITTLEPAGE:  I was just going to use it as an
12    inconsistent statement if I needed to impeach him.  I am just
13    having him identify it, but I am happy to mark it as well.
14             THE COURT:  You have to.  You don't have to put it in
15    the record, but you have to mark it.
16             MS. LITTLEPAGE:  Defendants' Exhibit 1360.
17             THE COURT:  For identification.
18             Can you provide the clerk with a copy?
19             MS. LITTLEPAGE:  Yes, sir.
20             On this one I would move it into evidence, Defendants'
21    Exhibit 1360.
22             THE COURT:  Is there any objection?  Is there a
23    stipulation as to what it is?
24             MR. MASTRO:  Your Honor, I think there is an agreement
25    on what it is.  It's a transcription of what occurred at a
```

DAO8CHE4                         Guerra – cross

1    meeting.

2              THE COURT:  On that date.

3              MR. MASTRO:  On that date.

4              THE COURT:  So stipulated, counsel?  Ms. Littlepage?

5              MS. LITTLEPAGE:  Yes.

6              THE COURT:  Mr. Gomez?

7              MR. GOMEZ:  Yes.

8              THE COURT:  Now, is there any objection to it, Mr.

9    Mastro?

10             MR. MASTRO:  Your Honor, I don't have any objection to

11   it being received.

12             THE COURT:  Mr. Gomez?

13             MR. GOMEZ:  No, your Honor.

14             THE COURT:  It's received.

15             (Defendants' Exhibit 1360 received in evidence)

16   BY MS. LITTLEPAGE:

17   Q.  On June 25, 2012, did you meet with Mr. Akerman and

18   Mr. Rivero?

19   A.  Yes.

20   Q.  If you turn to the black binder that has your depositions

21   in it, under tab 1, page 128, starting at line 5.

22   A.  Which book?  I am not sure I understand the number you're

23   referring to.

24   Q.  Tab 1 is Mr. Guerra's deposition.

25   A.  Page?

DAO8CHE4                         Guerra - cross

1   Q.   128, starting at line 5.

2            Mr. Guerra, isn't it accurate that you met with

3   Chevron on June 3, 2012, at a hotel with Mr. Rivero and

4   Mr. Akerman, is that correct?

5   A.   I am indicating yes.

6            (Continued on next page)

DAOLCHE5                         Guerra - cross

1   BY MS. LITTLEPAGE:

2   Q.  Do you recall where -- if there was anybody else present at

3   that meeting on June 3, 2012, other than Mr. Akerman,

4   Mr. Rivero, and yourself?

5   A.  You're asking me?

6   Q.  Yes, sir.

7   A.  Specifically as to that meeting, if it happened on the date

8   that you are indicating, I do not recall.

9   Q.  You don't recall if there was anybody else present at the

10  meeting; is that correct?

11  A.  May -- will you allow me one minute to explain?

12  Q.  Sure.

13  A.  The meetings that I had with Chevron representatives

14  Akerman and Rivero, in the first one happened in the presence

15  of Doe 1, and from then on the conversations occurred only

16  between them and myself.

17          And in one or two of the meetings there was a person

18  present, a male, I believe his name was Sam, and I was told

19  that he was a specialist in computers.  He was present at my

20  home at the time when my computer was reviewed, and it was Sam

21  who performed a light check or review of my computer and took

22  the computer from my home.

23          And then, finally, there was one last meeting or at

24  one of the meetings I had with Akerman and Rivero there was a

25  young lady present.  She was an attorney from the United States

DAOLCHE5                         Guerra - cross

1    on Andres Rivero's team.  And on that occasion the meeting

2    happened outside of the bank where I kept a savings account.

3    Q.  Do you recall the date of that meeting, the one where the

4    woman is present?

5    A.  No.

6    Q.  Was it before or after Chevron, the Chevron representatives

7    went to your house?

8    A.  The one with the young lady was later.  It was when I was

9    making the efforts needed to get bank records.

10   Q.  Was it before you went to Chicago?

11   A.  Yes, before.

12   Q.  Do you know if it was before the November 2 meeting with

13   Mr. Akerman and Mr. Rivero?

14   A.  I could not say for sure.

15   Q.  And in that meeting, the meeting where the woman was

16   present, did you all start the meeting at a hotel?

17   A.  No.  No, the meeting happened outside of the bank.

18   Q.  All right.  Let's start with the June 3, 2012 meeting.

19           Do you know if that meeting was recorded by Chevron?

20   A.  Once I was already here in the United States, I found out

21   that certain conversations I had had in Ecuador with Doe 1,

22   excuse me, with Doe 2 and with Mr. Akerman and Mr. Rivero had

23   been recorded.

24   Q.  And have you had an opportunity to look at those recordings

25   or the transcripts of those recordings?

DAOLCHE5                     Guerra - cross

1    A.  Yes.

2    Q.  Have you reviewed a recording for the meeting on June 3,

3    2012?

4    A.  I have made a light review of all the transcriptions.

5    Q.  Do you recall seeing a transcript for the June 3, 2012

6    meeting?

7            MR. MASTRO:  Your Honor, we're willing to stipulate

8    that the transcripts can come into evidence.  They're the best

9    evidence of what was said there, the exact dates on which the

10   meetings actually occurred, instead of doing a memory test on

11   the witness.

12           THE COURT:  I think the witness's memory is at issue.

13           MR. MASTRO:  Certainly, your Honor.  I'm just saying

14   there are transcripts.

15           THE COURT:  I know what you were doing.

16   Q.  Do you recall seeing a transcript for the June 3, 2012

17   meeting?

18   A.  I recall that I reviewed the contents of all the

19   transcripts, but I cannot specifically tell you about the

20   content of the specific meeting that you are referring to.

21   Q.  If you turn to the second book, the one with lots of tabs,

22   can you turn again to tab 2?

23   A.  Yes.

24   Q.  And Defendant's Exhibit 1360, is that a recording for the

25   June 25, 2012 meeting?

DAOLCHE5                    Guerra - cross

1          THE COURT:  It's already been so stipulated.  Let's

2     move along.

3     Q.  If you turn to tab 3, Defendant's Exhibit 1361, is that a

4     transcript of the recording of the meeting on July 13, 2012?

5          THE COURT:  I'm sorry.  Are you really asking him to

6     sit here and read a 90-plus page transcript in order to tell

7     you the answer to that question, or do you think possibly

8     counsel can agree on what it is?

9          MS. LITTLEPAGE:  I'll be happy if counsel agrees and

10    we can move on.

11         THE COURT:  Mr. Mastro.

12         MR. MASTRO:  Yes, your Honor.

13         THE COURT:  What are you saying yes to?

14         MR. MASTRO:  I'm happy to agree on what it is.  It's

15    the transcript of meeting on July 13, 2012.

16         THE COURT:  All right.  So stipulated, Ms. Littlepage?

17         MS. LITTLEPAGE:  Yes.

18         THE COURT:  Mr. Gomez?

19         MR. GOMEZ:  So stipulated.

20         MS. LITTLEPAGE:  Judge, we move to admit Defendant's

21    Exhibit 1361.

22         THE COURT:  Any objection?

23         MR. MASTRO:  No, your Honor.

24         THE COURT:  It's received.

25    Q.  If you turn to tab 4, Mr. Guerra, Defendant's Exhibit 1362.

DAOLCHE5                    Guerra - cross

1          MS. LITTLEPAGE:  And, Judge, Defendant's Exhibit 1362

2     is a recorded transcript of July 31, 2012.

3          THE COURT:  So stipulated, Mr. Mastro?

4          MR. MASTRO:  Yes, your Honor.

5          THE COURT:  Mr. Gomez?

6          MR. GOMEZ:  Yes, your Honor.

7          THE COURT:  All right.

8          MS. LITTLEPAGE:  We move to admit Defendant's

9     Exhibit 1362.

10         THE COURT:  Any objection?

11         MR. MASTRO:  No objection.

12         THE COURT:  Received.

13         (Defendant's Exhibit 1362 received in evidence)

14    Q.  Mr. Guerra, you had indicated that you recalled a meeting

15    at the end of July.  Was the date of that meeting July 31,

16    2012?

17    A.  Most probably it is, yes.

18    Q.  Have you ever seen a recording for the meeting on

19    November 2 of 2012?

20    A.  I have not had the chance to access the recordings

21    themselves.

22    Q.  I asked a bad question.

23         In the three months that you've been preparing for

24    your testimony, have you ever reviewed a transcript for the

25    November 2, 2012 meeting?

DAOLCHE5                    Guerra – cross

1              MR. MASTRO:  Objection to form.

2              THE COURT:  Overruled.

3   A.  I have reviewed transcriptions of all the conversations

4   that I had specifically with Akerman and Rivero.

5              THE COURT:  Mr. Guerra, the question is whether you

6   ever reviewed a transcription of the meeting, if there was one,

7   on 11, that is to say, November 2, 2012.  We're not talking

8   about all the other ones.  We're talking about that one.

9              THE WITNESS:  I don't recall, your Honor.

10  Q.  Did you know at the time that Chevron was recording some of

11  your meetings?

12  A.  No.

13  Q.  If you turn to tab 5, is that a declaration you signed in

14  November of 2012?

15             THE COURT:  This has got to be marked.

16             MS. LITTLEPAGE:  Plaintiff's Exhibit 1363.

17             THE COURT:  Plaintiffs?

18             MS. LITTLEPAGE:  Defendant's, sorry, 1363.

19             THE COURT:  All right.  1363 for identification.

20  There's no question yet.

21  Q.  Was this declaration, Defendant's Exhibit 1363, signed by

22  you during the meeting in Chicago with Mr. Akerman, Mr. Rivero,

23  the Gibson Dunn lawyers, and Mr. Mastro?

24             THE WITNESS:  May I answer?

25             THE COURT:  Yes, please.

DAOLCHE5                         Guerra - cross

1    A.  Yes, it is.

2    Q.  If you turn to tab 6, Defendant's Exhibit 1364.

3           MR. MASTRO:  Your Honor, we have no objection to that

4    last exhibit being received.

5           THE COURT:  Well, if they offer it, I'm sure they'll

6    be gratified.

7           MR. MASTRO:  Thank you.

8    Q.  Sir, is this a declaration signed by you, Defendant's

9    Exhibit 1364, in New York on January 13, 2013?

10   A.  Yes.

11          THE COURT:  Look, is there any dispute about this?

12   Can't we stipulate to some of this stuff and move this thing

13   along?

14          MR. MASTRO:  I would so stipulate, your Honor.

15          THE COURT:  All right.  You have more of these?

16          MS. LITTLEPAGE:  Yes.  I have some questions about

17   this meeting.

18          THE COURT:  All right.

19   Q.  Can you tell me what happened in January of 2013 while you

20   were in New York meeting with the lawyers, the Chevron lawyers?

21   A.  At that date I had already read the entire judgment that

22   had been issued on January 13 -- February -- February 14.

23   Q.  And why were you meeting with the lawyers on January 13,

24   2013?

25   A.  The attorneys from Gibson Dunn had invited me to meet with

DAOLCHE5                    Guerra - cross

1  them permanently, ongoing, so that I could review documents and

2  to prepare and also to search for an attorney to represent me

3  and in order to initiate conversations regarding my immigration

4  situation and also, finally, to accomplish an agreement which

5  would allow me to stay indefinitely and legitimately in this

6  country.

7  Q.  And if you turn to tab 16 in your book, 16, the book that's

8  in front of, Mr. Guerra.  Mr. Guerra, the book in front of you,

9  can you turn to tab 16, Plaintiff's Exhibit 1671.

10          THE COURT:  This is in evidence, isn't it, already?

11          MS. LITTLEPAGE:  It is, Judge.  I just have a question

12  about --

13          THE COURT:  Is it under the same number?

14          MS. LITTLEPAGE:  It is, Judge.  That's why I put it in

15  at that number.

16          THE COURT:  Go ahead.

17  Q.  Between January 13, 2013 and January 27, 2013, when you

18  signed the agreement with Chevron, were you in New York that

19  entire time?

20  A.  As far as I can recall, yes.

21  Q.  And between January 27, 2013 and May 2 of 2013, when you

22  gave your deposition, how many times did you meet with the

23  Gibson Dunn lawyers to prepare for your deposition?

24  A.  Several times.  I can't say specifically how many.

25  Q.  Were you coming up to New York every week to meet with the

DAOLCHE5                         Guerra - cross

1   Gibson Dunn lawyers on a regular basis before your deposition

2   in May of 2013?

3              MR. MASTRO:  Objection.  Objection to form, vague,

4   mischaracterizes his prior testimony.

5              THE COURT:  Sustained as to form.

6   Q.  Did you come to New York to meet with lawyers in

7   preparation for your deposition?

8              THE COURT:  I think he already said that he did.

9   Q.  Did you come every week to meet with lawyers in preparation

10  for your deposition?

11             MR. MASTRO:  Objection, and he's already testified.

12             THE COURT:  Overruled.

13  A.  No.

14  Q.  Your witness statement is under tab 1 of the book,

15  Plaintiff's Exhibit 4800.  It is dated October 9, 2013.

16             Can you tell us how that statement was prepared?

17  A.  We already had as a base the deposition -- the sworn

18  statement from November.  But this document, this instrument

19  consists of eight or nine pages and knowing that and then also

20  becoming aware that this trial was going to proceed without the

21  presence of a jury, my attorney, Dr. Clayman, stated that there

22  had been an agreement with the attorneys from Gibson Dunn that

23  it would be necessary to supplement with detail or add detail

24  to the November statement.

25  Q.  Was your witness statement written in Spanish or in

DAOLCHE5                    Guerra - cross

1    English?

2    A.  My witness statement was written in Spanish.

3    Q.  And did you write your witness statement or did someone

4    write it for you and you reviewed it?

5    A.  That document was typed by other people, but I was

6    constantly reviewing the document as written in Spanish.  I

7    made changes.  I made revisions regarding words or phrases in

8    the general content and so on until the document took the form

9    it now has.  Once the document was completed, completely

10   written in Spanish, they proceeded to write it in English.

11   Q.  It was typed from what?  You said it was typed by other

12   people.  What were they typing?

13   A.  The changes that I was suggesting, changing some letters or

14   changing some words.

15   Q.  And what were you changing, where did the original document

16   come from that you were changing?

17            MR. MASTRO:  Objection, form.

18   A.  The base document was my statement of November of 2012.

19   Details that were not in the November 2012 document were added.

20   Q.  By whom?

21   A.  I did.

22   Q.  Mr. Guerra, back in the June or July time frame, did

23   Chevron offer you $5,000 if you met with Chevron executives in

24   Bogota?

25   A.  Last year, as far as I can recall, yes, they did, when I

DAOLCHE5                    Guerra - cross

1    was in Quito, but meeting with Doe 2.

2    Q.  Did you ever meet in Bogota with the Chevron executives?

3    A.  No.

4    Q.  Now, in June of 2012, you had just lost your job at Sacha,

5    Sacha, S-A-C-H-A; is that correct?

6    A.  With all due respect, I resigned that job.  I did not lose

7    it.

8    Q.  What day did you resign your job with Sacha?

9    A.  In late June, the last day of June, I left my resignation

10   in the hands of the mayor.  But nevertheless I did in early

11   July, the first days of July, I accompanied the mayor to some

12   procedures in the city of Quito.  And after that I did not

13   return to Sacha.

14            THE COURT:  We're going to stop here for the

15   afternoon.

16            THE INTERPRETER:  Your Honor, may I finish the

17   interpretation?

18            THE COURT:  I'm sorry, of course.

19   A.  But, nevertheless, the mayor saw to it that payment for the

20   month of July was processed for me.

21            THE COURT:  All right.  9:30 tomorrow morning.

22            MR. MASTRO:  Your Honor, can we get some estimate of

23   the timing for the witness?

24            THE COURT:  Well, let's get an update.  How about it,

25   Ms. Littlepage?

DAOLCHE5

1          MS. LITTLEPAGE:  Many hours left.

2          THE COURT:  Look, this morning you told me about five

3    hours.  You've been going --

4          MS. LITTLEPAGE:  I said four to six, Judge.

5          THE COURT:  Actually, you said about five.  But you've

6    been going two.  So I'd like an estimate.

7          MS. LITTLEPAGE:  At least four more.

8          THE COURT:  Be efficient.

9          Any change in your situation, Mr. Gomez, your

10   anticipated duration?

11         MR. GOMEZ:  Your Honor, I think I'll take an entire

12   afternoon, but we'll see how Ms. Littlepage proceeds.

13         MR. MASTRO:  Thank you, your Honor.

14         (Adjourned to October 25, 2013 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION
2    Examination of:                            Page
3    ALBERTO GUERRA
4    Direct By Mr. Mastro . . . . . . . . . . . . 985
5    Cross By Ms. Littlepage  . . . . . . . . . .1049
6                    PLAINTIFF EXHIBITS
7    Exhibit No.                             Received
8     1703    . . . . . . . . . . . . . . 1013
9     1733 and 1734   . . . . . . . . . . . . . .1028
10    1745    . . . . . . . . . . . . . . 1035
11    1682    . . . . . . . . . . . . . . 1040
12    1689, 1704, 1705, and 1708  . . . . . . . .1041
13    1722, 1723, 1724, 1725, and 1726  . . . . .1042
14    1672    . . . . . . . . . . . . . . 1046
15                    DEFENDANT EXHIBITS
16   Exhibit No.                             Received
17   1360 . . . . . . . . . . . . . . . . 1077
18   1361 . . . . . . . . . . . . . . . . .1082
19   1362 . . . . . . . . . . . . . . . . .1083
20
21
22
23
24
25
```