DAP8CHE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

            v.                          11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                    Defendants.

------------------------------x
                                        October 25, 2013
                                        9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                        District Judge

                            APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     JEFFERSON E. BELL
     ANNE CHAMPION
     GEORGIA K. WINSTON

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

DAP8CHE1

 1                (Trial resumed)

 2                THE COURT:  Good morning, everyone.

 3                Let's proceed with the witness.

 4    ALBERTO GUERRA, resumed.

 5                MS. LITTLEPAGE:  Before we start, can I just read some

 6    defense exhibit numbers into the record that we talked about in

 7    the previous days but didn't move to admit.  We have met with

 8    defense counsel about it, and I just want the record to be

 9    clear.

10                THE COURT:  I don't want to take the time now.  Use

11    the time for the witness.  We will do it at another time.

12                MS. LITTLEPAGE:  Yes, sir.

13                Mr. Guerra, you are still under oath.

14                You may continue, Ms. Littlepage.

15    CROSS-EXAMINATION (Cont'd)

16    BY MS. LITTLEPAGE:

17    Q.  Mr. Guerra, when we left yesterday, we were finishing up

18    this chart.

19                Do you agree that before November of 2012, the meeting

20    in Chicago, you had not met with any Gibson Dunn lawyers before

21    that date, is that correct?

22    A.  Up to the date that you have stated, I had met only with

23    Dr. Andres Rivero and Mr. Akerman, and I was not informed if

24    they were attorneys for Chevron or not.

25    Q.  My question was Gibson Dunn.  My understanding from your

DAP8CHE1                              Guerra – cross

1    testimony is you did not meet with any lawyers from Gibson Dunn

2    until after November 14th of 2012, as you understood it?

3    A.  No.

4    Q.  After November of 2012, isn't it true that every other

5    meeting was with lawyers from Gibson Dunn present, is that

6    correct?

7              MR. MASTRO:  Objection to form, your Honor.

8              THE COURT:  Sustained as to form.

9    Q.  Were there any meetings after November of 2012 that Gibson

10   Dunn lawyers were not present at?

11             THE COURT:  Are we talking about his chiropractor?  I

12   imagine they weren't there.

13             No problem with what you're trying to ask.  You just

14   need to ask it.

15   Q.  The dates that we discussed yesterday that are reflected on

16   Defendants' Exhibit 1365, would you agree, sir, that after

17   November 14th of 2012, the dates we discussed at each of those

18   meetings Gibson Dunn lawyers were present, is that correct?

19             THE COURT:  I think, Ms. Littlepage, what you're

20   trying to ask is this:

21             Mr. Guerra, as far as you know, did you, after

22   November 2, 2012, have any meetings with anyone who you

23   believed was connected to Chevron that did not include at least

24   a lawyer from Gibson Dunn?

25             Is that what you're trying to ask?

1       MS. LITTLEPAGE:  Yes, sir.

2   A.  I don't recall.

3   Q.  Did you meet with the Gibson Dunn lawyers last night?

4   A.  No.

5   Q.  Did you review the book of documents that we were

6   discussing yesterday last night?

7   A.  No.

8   Q.  Did you meet with your personal lawyers last night?

9   A.  No.

10  Q.  Mr. Guerra, we were talking before we ended yesterday about

11  your job at Sacha in July of 2012.  Do you recall that?

12  A.  Yes.

13  Q.  Did you have another job since July of 2012?

14  A.  Yes.

15  Q.  What was that job?

16  A.  As an attorney for the Optima Insurance Company.

17  Q.  When was the last time you worked that job for the

18  insurance company?

19      THE INTERPRETER:  Your Honor, the interpreter needs to

20  inquire as to one term.

21  A.  I worked for the company until the first days of January,

22  but I was enrolled by that company in the social security

23  system only until December of 2012.

24  Q.  Have you worked since December of 2012?

25  A.  Excuse me.  Can you please clarify December of what date

1  again?

2  Q.  December 2012.

3          Have you worked since January of 2013?

4  A.  No.

5  Q.  When you ended working, you were making $500 per month, is

6  that true?

7  A.  Yes.

8  Q.  You told Chevron when you met with them in 2012 that you

9  were making $80,000 a year, is that correct?

10  A.  I don't recall.

11  Q.  Can you turn to your deposition?  It's in the book marked

12  Guerra deposition, page 51.

13          THE COURT:  Ms. Littlepage, please bear in mind the

14  way I asked all counsel to deal with depositions at the

15  pretrial conference.

16          MS. LITTLEPAGE:  Yes, sir.

17  Q.  Let me ask a question, Mr. Guerra, then.

18          Mr. Guerra, do you agree that you overstated to

19  Chevron what you were earning in order to improve your

20  negotiations?

21  A.  Yes.

22  Q.  Now, at the time that you went to meet with Chevron in June

23  and July of 2012, your house was under construction, is that

24  correct?

25  A.  Yes.

DAP8CHE1                    Guerra - cross

1   Q.  And even though your house was under construction, you and

2   your family were living in the house, is that correct?

3   A.  Yes.

4   Q.  And did you tell Chevron in June of 2012 that you needed

5   $50,000 to fix your house?

6   A.  Yes.

7   Q.  Did you tell Chevron in June of 2012 that getting hold of

8   money was not very easy?

9   A.  I always said that, yes.

10  Q.  Do you recall saying that to Chevron in June of 2012?

11  A.  I recall having said that.  I cannot state the date

12  specifically, but I did say it.

13  Q.  Was it made clear to you by Chevron that it was important

14  to Chevron that you speak to Judge Zambrano about this issue?

15          THE COURT:  About what issue, Ms. Littlepage?

16          MS. LITTLEPAGE:  The issue that Mr. Guerra had

17  approached Chevron about in June of 2012.

18          THE COURT:  I am afraid I just don't understand the

19  question.  I am sure you can do better.

20  Q.  In June of 2012, when you approached Chevron, did you

21  explain to them and describe events to them about the verdict

22  in the Lago Agrio case?

23  A.  Yes.

24  Q.  Did Chevron explain to you that getting Judge Zambrano to

25  confirm what you were telling Chevron was very important to

DAP8CHE1                        Guerra - cross

1    Chevron?

2    A.  I considered that I was a link for Chevron to reach

3    Zambrano.

4    Q.  Did Chevron tell you that you were the bridge to Zambrano?

5    A.  It did say it.

6    Q.  Did Chevron tell you that if you did not deliver Judge

7    Zambrano, you would be left with nothing?

8            MR. MASTRO:  Objection to form, your Honor.

9            THE COURT:  Overruled.

10   A.  That was not talked about.

11   Q.  Can you turn to the book that says just Alberto Guerra, tab

12   3, Defendants' Exhibit 1361, page 46.

13           I want to direct your attention to the first box at

14   the top of the page.  Do you see that, sir, on page 46?  I want

15   to direct your attention to the last few words of that box:

16   "You, too, will be left with nothing."  Do you see that?

17           THE COURT:  I really did ask all counsel earlier,

18   before the trial started, not to do the examinations this way.

19   We are not doing an ophthalmologic examination of him.  This is

20   not about his eyesight.  I am not interested in whether he sees

21   it or doesn't see it.  You have a transcript.  It's in

22   evidence.  Everybody has stipulated to it.  If you want to draw

23   attention to a particular piece of it, you can read it or ask

24   him to look at it and then you can ask a question about it.

25   That's the way I want it done.  Because otherwise we will take

DAP8CHE1                          Guerra - cross

1  double the time that is devoted to these things using

2  unnecessary questions.

3           I know it's not the way lawyers usually do it.  It's

4  the way I want them to do it in my courtroom always.  I know

5  you're trying.  I know it's difficult.

6           MS. LITTLEPAGE:  Can I ask for a clarification?  With

7  the translation, I thought about what the Court had said, but I

8  do need to read the words in order for the translator to

9  translate for him.

10          THE COURT:  But what I am objecting to is you're

11 asking him whether he sees it.  What the heck is the

12 difference?  So let's get on with it.  I don't want to take

13 unnecessary time on it.

14 Q.  Mr. Guerra, in Defendants' Exhibit 1361, did Chevron tell

15 you on July 13, 2012, "you, too, will be left with nothing"?

16 A.  As it appears in the transcript, that's what they have

17 said.

18 Q.  Did Chevron tell you that you will get yours when a deal is

19 reached with Zambrano?

20 A.  That too, they did say that.

21 Q.  Did Chevron ask you to describe your efforts to get Judge

22 Zambrano to speak to Chevron?

23 A.  Can you please clarify your question?

24 Q.  Yes.  Did Chevron ask you on June 25, 2012, to describe to

25 them your efforts to get Judge Zambrano to speak to Chevron?

DAP8CHE1                    Guerra - cross

A.  As far as I can recall, Chevron, Chevron's representatives
gave me certain information related to Mr. Rivero so that I
could give it to Mr. Zambrano, and he would begin to trust them
and talk to them.

Q.  Did Chevron, on June 25, 2012, ask you if Judge Zambrano
was avoiding you?

        MR. MASTRO:  Your Honor, objection to form and the
line of questions.  He is referring to the client as opposed to
the individual who made the statement.

        THE COURT:  Fair point.  Sustained as to form.

Q.  Did the Chevron representatives at the June 25, 2012
meeting ask you if Judge Zambrano was avoiding you?

A.  I cannot state a date for certain, but at some point that
question was asked of me in that context.

        THE COURT:  Ms. Littlepage, just help me out here.
Are you in this line of questioning taking a transcript that
everybody agrees is accurate and just asking him whether the
transcript is accurate, is that about the size of it?

        MS. LITTLEPAGE:  No, Judge.  I think I am asking him
about the things that happened that day.  I do have the
transcript and his memory is different from what the transcript
says.  But I would like to hear what he said happened that
date, and then I would like to use the transcript if it varies
from what he says happened that date.

        THE COURT:  Well, I will give you a little bit of

DAP8CHE1                    Guerra - cross

1    latitude on this, but that will be about the size of it.

2    Because you have got a transcript and everybody agrees it's

3    accurate.  Is that correct?

4            MR. MASTRO:  Correct, your Honor.

5            MS. LITTLEPAGE:  If Chevron will stipulate that what

6    Mr. Guerra told them on June 25, 2012 was accurate versus what

7    he said yesterday, this will go very fast.

8            MR. MASTRO:  That's obviously not the representation.

9            THE COURT:  That's obviously not the point.

10           So what you're doing is you have got a transcript and

11   you are fishing around to see whether he says something

12   different now, is that it?

13           MS. LITTLEPAGE:  I know he says something different

14   now.

15           THE COURT:  Let's go.  We will see.

16   BY MS. LITTLEPAGE:

17   Q.  At the time of the June 25, 2012 meeting with Chevron, had

18   you tried to contact Mr. Zambrano on multiple occasions?

19   A.  I have been in contact permanently with Mr. Zambrano, and

20   as my communications with Chevron's representatives moved

21   along, I was informing him, bringing him up-to-date regarding

22   those conversations.

23   Q.  Had you asked Mr. Zambrano to meet with you personally?

24   A.  Yes.

25   Q.  In fact, had you had conversations with Mr. Zambrano where

DAP8CHE1                    Guerra - cross

1   he would tell you he would be in Lago Agrio the next day, but

2   in fact he wasn't there the next day?

3   A.  I don't recall that specific detail.

4   Q.  Can you turn to page 23 of tab 2?

5          Mr. Guerra, do you recall relating to Chevron on June

6   25, 2012, a conversation you had with Mr. Zambrano where he

7   called you, told you that tomorrow he would be in Lago Agrio --

8          THE COURT:  This is exactly what I ask not be done

9   precisely to the letter.  You asked him for his testimony.  He

10  said he didn't remember such an occasion.  You have a

11  transcript in which on page 23 it is your contention he said

12  something different.  OK.  The transcript is in evidence and

13  it's stipulated among counsel that this is an accurate

14  transcript of what he said on this date, June 25.  Is anything

15  I am saying inaccurate?

16         MS. LITTLEPAGE:  No, sir.

17         THE COURT:  So you have drawn my attention to it.  I

18  understand your point.

19  Q.  Mr. Guerra, does this refresh your memory that Mr. Zambrano

20  would tell you he was in one place, or that he would meet you

21  the next day, and in fact that meeting would not occur?

22  A.  I did not meet with Mr. Zambrano on the date mentioned in

23  this quote.  He was very unpredictable.

24  Q.  In fact, did you describe Mr. Zambrano in this time frame

25  as being very slippery?

DAP8CHE1                    Guerra – cross

1   A.  It's possible that I may have done so.

2   Q.  Was it your understanding in these meetings in June and

3   July that Chevron was interested in all the events leading up

4   to the verdict in the Lago Agrio case?

5           MR. MASTRO:  Objection.  Vague, your Honor.  It calls

6   for speculation.

7           THE COURT:  Overruled.

8           Can somebody tell me whether this transcript is an

9   exhibit?  Has this been marked?

10          MS. LITTLEPAGE:  In tab 2.  It's Defendants' Exhibit

11  1360.

12          THE COURT:  Has it been received?

13          MR. MASTRO:  Yes, your Honor.

14          THE COURT:  Thank you.

15  A.  Could you please repeat the question?

16  Q.  In your meetings in June and July of 2012, did you describe

17  for Chevron the events leading up to the Lago Agrio verdict?

18  A.  I explained it to them, yes.

19  Q.  On June 25, 2012, did you explain to them that you started

20  working on the draft verdict on Friday, January 28 of 2011?

21          MR. MASTRO:  Your Honor, objection.  She is displaying

22  on the screen something not in evidence that purports to refer

23  to the transcripts, and now she is just asking him questions to

24  track the pages on the transcript she is apparently going to

25  recite to.  It's in the transcript.  She is going to refer to

DAP8CHE1                          Guerra - cross

1    the transcript.

2            MS. LITTLEPAGE:  I believe I am entitled to get

3    testimony, and if the testimony is not appropriate in this

4    courtroom, I can impeach him.  But this is a very different and

5    completely irreconcilable story than he testified to yesterday.

6    I think I am entitled to ask him what he told Chevron in June

7    of 2012, and go through the details of that story, and then

8    compare it to the testimony of yesterday.

9            I put it on a chart, recognizing the Court's

10   representations to me, I put it on the chart, put the page

11   number so that we can move very quickly through it, without

12   having to read from any documents, but if we did, we can very

13   quickly go and use the recording to refresh his memory or to

14   verify what he said at that time.  I think I am allowed to ask

15   these questions.

16           THE COURT:  What is it you have put on the screen,

17   what exhibit?

18           MS. LITTLEPAGE:  Defendants' Exhibit 1366.

19           THE COURT:  Is that in evidence?

20           MS. LITTLEPAGE:  No, sir.  But I will offer it once he

21   has testified on it.

22           I am sorry.  It says Defendants' 1441.

23           THE COURT:  It's not in evidence?

24           MS. LITTLEPAGE:  No, sir.

25           THE COURT:  We will try it for a while and we will

DAP8CHE1                        Guerra – cross

1      see.

2                  MS. LITTLEPAGE:  Judge, would you like a copy too?

3                  THE COURT:  That would be helpful.

4                  MR. MASTRO:  It's counsel's work product.

5                  MS. LITTLEPAGE:  May I proceed?

6                  THE COURT:  Go ahead.

7      BY MS. LITTLEPAGE:

8      Q.  Mr. Guerra, on January 25, 2012, did you tell Chevron that

9      you started working on the verdict in February on January 28?

10                 THE COURT:  I am sure you meant to use the date June

11     25, 2012.

12     Q.  On June 25, 2012, did you tell Chevron that you started

13     working on the verdict in February Friday, January 28?

14     A.  It's possible I may have done so.  I don't recall it

15     specifically.

16     Q.  Can you turn to page 88 of tab 2 in your book, and let's

17     see if that can refresh your memory.

18     A.  88?

19     Q.  Yes, sir.

20                 THE COURT:  What in particular are you referring to,

21     Ms. Littlepage?

22                 MS. LITTLEPAGE:  It's towards the bottom part of the

23     page, where there is a discussion as to what weekend he met

24     Judge Zambrano at the Quito airport, Friday, 28th, 29th, 30th

25     of January.

DAP8CHE1                         Guerra - cross

1              THE COURT:  Am I misunderstanding this or are those

2      statements of somebody else?

3              MS. LITTLEPAGE:  Yes.

4              THE COURT:  I am misunderstanding it or not?

5              MS. LITTLEPAGE:  You are correct that they are

6      questions to him.

7              THE COURT:  I see.

8      Q.  Let me ask a better question.  Was there a discussion

9      between you and Chevron on June 25, 2012, that you started

10     writing the Lago Agrio verdict on Friday, January 28?

11             THE COURT:  What does that mean, Ms. Littlepage?

12     There was a discussion that you started writing on January 28.

13     What does that mean?

14             MS. LITTLEPAGE:  The date that he started writing the

15     verdict.

16             THE COURT:  Are you asking him whether he said that?

17     Are you asking him whether someone else said it?  Are you

18     asking him whether some other people said it to each other?

19             And, in fact, when I read what you have drawn my

20     attention to, unless I am missing it, please correct me if I am

21     wrong, he doesn't say it.

22             Now, I am not trying to impede you in any way, but we

23     are getting not very far if the questions are going to be

24     framed this way.  Am I missing something?

25             MS. LITTLEPAGE:  I will come back to it.

DAP8CHE1                    Guerra - cross

1          THE COURT:  OK.  That's fine.

2   Q.  Mr. Guerra, did you tell Chevron on June 25, 2012, that you

3   met Judge Zambrano at the Quito airport, as you always did, to

4   receive the draft verdict of the Lago Agrio verdict?

5   A.  I don't recall the date when I talked about this specific

6   detail you're referring to.  I told them the times when I would

7   meet with Mr. Zambrano.  Likewise, I would inform them of the

8   telephone conversations I had with Mr. Zambrano and the

9   contents of those phone calls.

10  Q.  Did you tell Chevron that a couple of weeks before the

11  judgment, Judge Zambrano gave you a flash drive with the draft

12  of the judgment?  Is that true, sir?

13          MR. MASTRO:  Objection to form.  Chevron.

14          THE COURT:  Sustained as to that.  And sustained also

15  because the question is compound and it's not clear what an

16  affirmative or negative answer would mean.

17          MS. LITTLEPAGE:  Yes, sir.

18  Q.  Mr. Guerra, did you tell the representatives of Chevron, on

19  June 25, 2012, that a couple of weeks before the judgment Judge

20  Zambrano gave you a flash drive with a draft of the judgment?

21  A.  I did say that to them.

22  Q.  Did the Chevron representatives ask you whether you worked

23  on the judgment on the weekend of February the 28th, the 29th,

24  and the 30th of January?

25          MR. MASTRO:  Objection to form, your Honor.

DAP8CHE1                         Guerra - cross

1           THE COURT:  Overruled.

2    A.  Chevron representatives suggested those dates to me.

3    Q.  Did you respond, Yes, weekend?

4    A.  I answered with a doubtful yes, not fully affirmative.

5    Q.  Then did you say the word "weekend"?

6    A.  It's possible I did.

7    Q.  Did you also tell the Chevron representatives that you met

8    Judge Zambrano in person at the airport at that time?

9    A.  Possibly, yes.

10   Q.  Did you also say that you met him at the airport, as he

11   always did, as Judge Zambrano always did, is that correct?

12   A.  Can you please clarify?

13   Q.  Can you turn to page 89 of tab 2?

14           Did you tell the Chevron representatives on June 25th

15   of 2012 that you met Judge Zambrano in the airport, as he

16   always did?

17   A.  I did say that to them.

18   Q.  Did you tell Chevron, the Chevron representatives, on June

19   25, 2012, that the flash drive given to you by Judge Zambrano

20   had the project for the judgment?

21   A.  Yes.

22   Q.  Did you tell the Chevron representatives on June 25, 2012,

23   that the first night you reviewed the draft judgment until

24   around 11:00 at night?

25   A.  That's how I recalled it.  That's what I did.

DAP8CHE1                          Guerra - cross

1   Q.  Did you tell the Chevron representatives on June 25, 2012,

2   that on Saturday you jumped in and started making changes to

3   the draft judgment?

4   A.  If it's stated in the transcription, I did.

5   Q.  Did you tell the Chevron representatives on June 25, 2012,

6   that you worked on the draft judgment at your home in Quito?

7   A.  If it said it in the transcript, I did.

8   Q.  Did you tell the Chevron representatives on June 25, 2012,

9   that you worked on the draft judgment on Friday and Saturday

10  and Sunday of that weekend?

11  A.  If it appears in the transcript, I did.

12  Q.  Do you recall telling the Chevron representatives that?

13  A.  If it appears in the transcript, yes.

14  Q.  About the document the memory aid, did you tell the Chevron

15  representatives on June 25, 2012, that you called Pablo Fajardo

16  to ask him for a document?

17  A.  If it appears in the transcript, I did.

18  Q.  Did you tell the Chevron representatives that you asked

19  Pablo Fajardo to e-mail you something with dates?

20          MR. MASTRO:  Objection, your Honor.

21          THE COURT:  What is the objection?

22          MR. MASTRO:  It misstates what the transcript says.

23          THE COURT:  I understand your point, but let's see.

24          Overruled.

25  A.  At some point I stated that I called Pablo Fajardo to ask

DAP8CHE1                         Guerra - cross

1   him for a document containing information that I considered

2   relevant to clear up the concerns that I had after I had read

3   the draft judgment.

4   Q.  Would you turn to page 93?

5           THE INTERPRETER:  93?

6           MS. LITTLEPAGE:  93.

7           THE COURT:  This is Defendants' 1360, correct?

8           MS. LITTLEPAGE:  Yes, sir.

9           THE COURT:  Thank you.

10  Q.  Did you describe in some detail to the Chevron

11  representatives the phone call you told them you had made to

12  Pablo Fajardo from your house in Quito that weekend?

13  A.  That's how I remembered it.  That's why I said that detail,

14  that specific detail.

15  Q.  Because that was the memory you had of that weekend, and

16  you relayed that memory to Chevron, correct?

17          MR. MASTRO:  Objection to form, your Honor.

18          THE COURT:  Sustained as to form.

19  Q.  Was that the memory you had, sir?

20          MR. MASTRO:  Objection to form.

21          THE COURT:  Overruled.

22  A.  I was working for Mr. Zambrano on the court orders that he

23  asked me to work on generally on the weekends.  So that when I

24  was referring to the issue of the judgment in Lago Agrio, I

25  also assumed initially that I had worked on that document on

DAP8CHE1                    Guerra - cross

1   the weekend.

2   Q.  What you told Chevron, the Chevron representatives, on June

3   25, 2012, was that you had called Mr. Fajardo and told him that

4   you were working on something interesting, correct?

5   A.  If that appears in the document, in the transcript, well,

6   yes.

7   Q.  Then you asked Mr. Fajardo to e-mail you a document.

8   That's what you told Chevron representatives, correct?

9   A.  I did say that.

10          THE COURT:  Ms. Littlepage, I must make a point to you

11   that may be helpful to you, as I am the trier of fact.  I know

12   why you're asking these questions, and I haven't quarreled with

13   you about them.  But that question you asked a minute ago,

14   specifically this:  "What you told Chevron, the Chevron

15   representatives, on June 25, 2012, was that you had called Mr.

16   Fajardo and told him you were working on something interesting,

17   correct?"  The key words being "something interesting."

18          What is in the transcript that you have put in front

19   of me, from which you have indicated you're working, is

20   different.

21          MS. LITTLEPAGE:  Let me rephrase it.

22          THE COURT:  Hear me out.  It says, in relevant part,

23   and these are Mr. Guerra's words, according to the transcript,

24   "I called him and say to him, listen, Pablo, damn, you know I

25   am working on this interesting thing.  Damn.  It's a bit

DAP8CHE1                    Guerra - cross

1    somewhat complicated because there are some issues.  It could

2    be I'm lost."  And then it goes on to ask him for something

3    with days.

4            Now, I as a trier of fact take "something interesting"

5    as having a very different implication than "this interesting

6    thing."

7            Your question, whether intended or otherwise, is

8    inviting me to draw the inference, from the use of the phrase

9    "something interesting," that Mr. Guerra is calling Fajardo to

10   talk to him about something that Fajardo probably doesn't know

11   about.  Why else say "something interesting"?

12           Just listen for a minute.  It might help both of us.

13   The transcript talks about "this interesting thing," and the

14   context makes clear that the speaker, assuming the accuracy of

15   what he said, presupposes that Mr. Fajardo knows exactly what

16   "this interesting thing" is.

17           Now, you're entitled to test his memory and all of

18   that.  I just want to alert you to the fact that that

19   particular way of attacking that particular issue was not very

20   helpful to your position and maybe we can be a little more

21   precise and more focused, and it might be better for you.  I

22   know the credibility issue here.

23           MS. LITTLEPAGE:  If you look two sentences above

24   Mr. Guerra says, "I'm working on something interesting."

25   That's why I used those words.  Then two sentences below he

DAP8CHE1                    Guerra - cross

1   goes back and says, "I'm working on this interesting thing."

2   He used both in that transcript.

3            THE COURT:  Sure.  I am just giving you my point of

4   view.  If you were trying a jury case and the jurors could tell

5   you what they are thinking as you're going along, you would be

6   rejoicing.  The judge is here telling you what he is thinking

7   about this particular issue.

8            MS. LITTLEPAGE:  May I ask both of those questions?

9            THE COURT:  If that will make you happy, yes.

10  BY MS. LITTLEPAGE:

11  Q.  Mr. Guerra, did you tell the Chevron representatives that

12  when you spoke to Mr. Fajardo you said, "I'm working on

13  something interesting"?  Did you say that?

14           MR. MASTRO:  Objection.  Asked and answered.

15  A.  I explained to the representatives that I was meeting with

16  all of the situations that were inquired of me in the way that

17  I recalled them.

18  Q.  Did the recording of that conversation indicate that you

19  told Mr. Fajardo, "I'm working on something interesting"?

20           THE COURT:  Ms. Littlepage, we are not going to have a

21  quiz about what the recording shows.  That's why we have the

22  recording.

23  Q.  Did you tell the Chevron representatives on June 25, 2012,

24  that it took Pablo Fajardo until the afternoon to send the

25  document, it took him a while?

1  A.   In the document that I have looked at, it appears that that

2  is what I said; there is proof that that is what I said.

3  Q.   Did you tell the Chevron representatives on June 25, 2012,

4  that Nico dropped it off yesterday when you were talking to the

5  Chevron representatives?

6  A.   Can you clarify whether that means that he dropped by for

7  me or he dropped by to leave a document with me?

8  Q.   If you turn to page 99, your words should be highlighted,

9  Mr. Guerra.  "Nico dropped it off yesterday.  The guy left me

10 that thing yesterday."

11        Were you referring to Nicolas Zambrano?

12 A.   Yes.

13 Q.   Were you discussing with the Chevron representatives at

14 this time that Nicolas Zambrano had dropped off the draft

15 judgment yesterday?

16 A.   That is what I am expressing, yes.

17 Q.   Did you tell the Chevron representatives on June 25, 2012,

18 that you did not consult with Judge Zambrano that weekend,

19 there was no reason for it?

20 A.   If that is what it says in the transcription, I did so.

21 Q.   Did you tell the Chevron representatives on June 25, 2012,

22 that you returned the verdict to Judge Zambrano on a flash

23 drive?

24 A.   Yes.

25 Q.   Did you tell the Chevron lawyers on June 25 -- the Chevron

DAP8CHE1                    Guerra – cross

1   representatives on June 25, 2012, that you believed Judge Nunez

2   had written part of the verdict?

3   A.   At some point I did make that comment.

4   Q.   Now, in July, July 13th of 2012, when you met again with

5   the Chevron representatives, was it your understanding that

6   that meeting was to finalize a price?

7           MR. MASTRO:   Objection to form.  Vagueness.

8           Withdrawn.

9   A.   No.

10  Q.   Can you turn to tab 3 in your book?

11          THE COURT:   This is what exhibit, please?

12          MS. LITTLEPAGE:   Defendants' Exhibit 1361.

13          THE COURT:   Is this in evidence, counsel?

14          MS. LITTLEPAGE:   I believe it was moved in yesterday.

15  If not, I will move it in now.

16          MR. MASTRO:   Yes, it is, your Honor.

17          THE COURT:   Thank you.

18  Q.   Are you at tab 3, Mr. Guerra?

19          If you turn to page 43 –– I'm sorry, page 44, did

20  Mr. Rivero, the Chevron representative, on July 13, 2012, ask

21  you if you wanted to finalize a deal and at what price?

22  A.   Mr. Rivero and Mr. Akerman at that meeting at some point

23  told me that they want to ––

24          THE INTERPRETER:   May the interpreter clarify?

25          THE COURT:   Yes.

1   A.   -- that they wanted to buy my computer from me.

2   Q.   Did someone at that meeting, one of the Chevron -- let me

3   ask another question.

4        Did someone at that meeting tell you that there was

5   authorization, the authorization for this meeting is to decide

6   on something concrete?

7   A.   One of the two gentlemen at that meeting, Mr. Akerman or

8   Mr. Rivero, indicated that, if that is what it says in the

9   transcript.

10  Q.   Did you have an understanding in the June 13, 2012 meeting

11  that Chevron wanted to buy your computer from you?

12       MR. MASTRO:   Objection to form as to date, and asked

13  and answered.

14       MS. LITTLEPAGE:   I got the date wrong.

15  Q.   Were you told on July 13, 2012, that Chevron wanted to buy

16  your computer?

17  A.   As it says in the transcript, on that date, they expressed

18  to me that they were interested in buying my computer from me.

19  Q.   Did Chevron also ask you to give them access to your e-mail

20  account?

21       MR. MASTRO:   Objection to form.   Chevron.

22       THE COURT:   Sustained.

23  Q.   Did the Chevron representatives ask you for access to your

24  e-mail account?

25  A.   Well, after I agreed to turn over the computer, yes.

DAP8CHE1                      Guerra - cross

1   Q.  Did the Chevron representatives on June 13, 2012, also ask

2   you for access to your calendars and daily planners?

3             MR. MASTRO:  Objection to form.

4             MS. LITTLEPAGE:  I got the date wrong again.

5   Q.  On July 13, 2012, did the Chevron representatives ask you

6   for access to your calendars or day planners?

7   A.  Yes.

8   Q.  Did the Chevron representatives tell you that they had

9   $20,000 in cash to pay you?

10  A.  Yes, they did.

11  Q.  Did you respond, Could you add a few zeros?

12  A.  I did say that.

13  Q.  Did you tell them --

14  A.  I was joking.

15  Q.  Did you tell the Chevron representatives that money talks

16  but gold screams?

17  A.  I don't recognize that adage that you are quoting.  It's

18  not something that's typical in my country.  But in one way or

19  another I did express that feeling.

20  Q.  Would you turn to page 58 of Defendants' Exhibit 1361.

21            Does that refresh your memory that you told the

22  Chevron representatives money talks, gold screams?

23  A.  In the document that I have here in my hands, that saying

24  is something that was expressed by Mr. Akerman, not by me.

25  Q.  Do you see the first page of Defendants' Exhibit 1361, the

DAP8CHE1                        Guerra - cross

1    first page of 1361.

2                It's a cover page.  Do you see that that indicates

3    that the letters AG in the transcript --

4                THE COURT:  I can read that.  It's attributed to him.

5    Whether it's accurate or not, we will see, if it matters.

6    Q.  Mr. Guerra, at this point, did you ask Chevron to make it

7    $50,000?

8    A.  In some form, yes, I did state that.

9    Q.  Was that the exact amount you needed to finish the

10   construction on your home?

11   A.  In order to complete construction on my home, I needed more

12   than $50,000.

13   Q.  Did you and Chevron settle on a payment of money that day?

14   A.  For the delivery of the documents and the computer and some

15   other documents that I had at hand, we agreed on $18,000, which

16   I received in cash.

17   Q.  How was the cash delivered to you, in an envelope, in a

18   suitcase, in a backpack?

19   A.  They handed it to me in my hands, the money in cash.

20   Q.  At the hotel or in your home?

21   A.  At my home.

22   Q.  Did Chevron ask you for a receipt for the $18,000 in cash?

23               MR. MASTRO:  Objection.  Form.  Chevron.

24               THE COURT:  Sustained.  You want to rephrase it?

25   Q.  Did the Chevron representatives ask you for a receipt for

DAP8CHE1                         Guerra - cross

1    the $18,000 in cash?

2    A.  No.

3    Q.  You said that you gave the Chevron representatives your

4    computer that day, is that correct?

5    A.  Yes.

6    Q.  Did you ever get back your computer?

7    A.  No.

8    Q.  Did Chevron that day give you a new computer?

9    A.  Yes, a laptop, yes.

10   Q.  Did Chevron tell you that the laptop was the newest model

11   of laptop?

12   A.  I understand it was.

13   Q.  Did the Chevron representatives tell you that they were

14   going to give you the best computer available at the moment to

15   replace your desktop computer from your home?

16   A.  Mr. Akerman specifically told me that the computer that I

17   was being given was a very good computer.

18   Q.  Did Chevron make arrangements to transfer all of your

19   information from your home computer on to the new laptop?

20           MR. MASTRO:  Objection to form.  Chevron.  Vague as to

21   time.

22           THE COURT:  Sustained.

23   Q.  On July 13, 2012, or any time after that, did the Chevron

24   representatives make arrangements to transfer your information

25   from your old home computer to the new laptop?

DAP8CHE1                        Guerra - cross

1  A.  At some point subsequent to that, I can't recall the date,

2  Mr. Akerman brought me a device which contained a good part of

3  the information that I had on the old computer.

4  Q.  On July 13, 2012, did you tell Chevron that the draft

5  verdict in the Lago Agrio case was on your computer?

6            MR. MASTRO:  Objection.  Form.  Chevron.

7            THE COURT:  Yes, Ms. Littlepage.  Do you think we can

8  have a learning moment and stop doing this?

9            MS. LITTLEPAGE:  I didn't think there was any contest

10  that the people there were representing Chevron.

11            THE COURT:  Humor him.

12  Q.  Mr. Guerra, did you tell the Chevron representatives on

13  July 13, 2012, that the draft of the judgment was on your

14  computer?

15  A.  As far as I can recall, I said that it was very possible,

16  that it was probable that the draft of the judgment was on my

17  computer.

18  Q.  And was it your understanding that was why the Chevron

19  representatives wanted to buy your computer?

20            MR. MASTRO:  Objection, your Honor.

21            THE COURT:  Sustained.

22  Q.  Was the draft judgment on your computer?

23  A.  I was not sure.

24  Q.  Later did you understand that the draft judgment was not on

25  your computer?

DAP8CHE1                        Guerra – cross

1    A.  Yes.

2    Q.  Do you understand that the draft judgment was not on any of

3    the flash drives that you had handed over to Chevron or its

4    representatives?

5    A.  Yes.

6    Q.  Do you understand that the draft judgment was not on any of

7    the CDs that you handed over to Chevron or its representatives?

8    A.  I did not recall at that time exactly where the draft of

9    the judgment was.

10   Q.  On July 13, 2012, Mr. Guerra, did you tell the Chevron

11   representatives that the e-mail from Pablo Fajardo with the

12   memory aid was on your computer or in your e-mail?

13   A.  I said that because that is how I recalled it.

14   Q.  Do you recall that the Chevron representatives asked you

15   specifically, did you see the e-mail, and you told them, yes,

16   yes, I saw it.  Do you recall that?

17   A.  That is how I remembered it.

18   Q.  Did the Chevron representatives get access to your e-mail

19   account?

20   A.  I provided them with the passwords.

21            (Continued on next page)

22

23

24

25

DAPLCHE2                    Guerra - cross

 1   Q.  And is it your understanding that no email from Pablo

 2   Fajardo was found in your email account?

 3   A.  I cannot say for sure.

 4   Q.  Have you ever seen an email from Pablo Fajardo that was

 5   taken from your email account?

 6   A.  No.

 7   Q.  Let me hand you what's been marked as Plaintiff's

 8   Exhibit 1732.

 9           MS. LITTLEPAGE:  Judge, we would move to admit

10   Plaintiff's Exhibit 1732.  It's a document produced by Chevron

11   of Mr. Guerra's contact information from his hotmail account.

12           MR. MASTRO:  No objection, your Honor.

13           THE COURT:  Do you agree that's what it is?

14           MR. MASTRO:  I do, your Honor.

15           THE COURT:  Okay.  Mr. Gomez?

16           MR. GOMEZ:  Yes, your Honor.

17           THE COURT:  Received.

18           (Plaintiff's Exhibit 1732 received in evidence)

19   Q.  And Mr. Guerra, can you confirm for me that you do not have

20   even Mr. Pablo Fajardo's contact information or his contact

21   email in your email contacts of your email account?

22           MR. MASTRO:  Objection to form, your Honor.

23           THE COURT:  I'll allow it.

24           Look, this is just wasting time.  You've got the

25   document and it's in evidence.  You've got a stipulation as to

1    what it is.  It's either here or it's not here.  But instead

2    we're having a question as to whether it's here, we're having

3    it translated into Spanish, we're having objections about it.

4    I'll bear this in mind as the day goes on.

5            MS. LITTLEPAGE:  Can I just have this one question,

6    Judge, and I'll move on?

7            THE COURT:  Yeah, but there are a hundred like this.

8            Go ahead.  Answer the question.

9    A.  From the list that I see here, indeed, Mr. Pablo Fajardo's

10   email does not appear.  But at some point I did have his email

11   and we would write to each other frequently.  I'm not a

12   specialist on issues related to emails.  What I can tell you is

13   that on a pair of -- I lost those emails.  The computer was

14   damaged.

15   Q.  When was your computer damaged and your emails lost?

16   A.  From what I can recall, that happened on at least two

17   occasions.

18   Q.  Do you recall the dates of those occasions?

19   A.  Approximately the first occasion when information was lost

20   and there was a problem accessing the email, that happened

21   between October, November of 2010.  And the second occasion

22   approximately toward the end of 2011.

23   Q.  Now, in all the times that you have spoken to the Chevron

24   representatives, given depositions, given declarations, have

25   you ever discussed losing information on your computer before

DAPLCHE2                         Guerra - cross

1    today?

2    A.  I did with Chevron's representatives who spoke with me in

3    the city of Quito.

4    Q.  And, therefore, that conversation would have been on one of

5    these transcripts; is that correct?

6              MR. MASTRO:  No objection, your Honor.

7              THE COURT:  I'm sorry, is there or is there not an

8    objection?

9              MR. MASTRO:  No, your Honor.

10             THE COURT:  Go ahead.

11   A.  As far as I understand, not all conversations that I held

12   with Chevron's representatives in Quito were recorded.

13   Q.  Did Chevron also ask you in June or July of 2012 to provide

14   copies of your calendar and daily planners?

15   A.  Yes.

16   Q.  And did you tell Chevron on June -- the Chevron

17   representatives on June 25, 2012 that you had calendars showing

18   notes of meetings with Pablo Fajardo and meetings with Steven

19   Donziger, do you recall that?

20   A.  If it appears in the transcript, I've said it.

21   Q.  And do you recall telling the Chevron representatives that

22   you had everything, everything that would indicate your

23   meetings with Pablo Fajardo and Mr. Donziger?

24   A.  I said many things to the gentlemen, to their

25   representatives from Chevron.  On many of those I was

DAPLCHE2                    Guerra - cross

1    exaggerating.  I wanted to improve my position regarding these

2    gentlemen in the face of what I expected to be a sure agreement

3    between them and Mr. Zambrano.  I really wasn't -- strike

4    that -- I really didn't consider that I was Chevron's

5    objective.  My intent was to negotiate for Mr. Zambrano, to be

6    the link with Mr. Zambrano.

7    Q.  And did you turn over your calendars and daily planners to

8    the Chevron representatives?

9    A.  Yes.

10   Q.  And do you know that you did -- isn't it true, sir, that

11   you do not have a single calendar entry indicating a meeting

12   with Pablo Fajardo?

13              MR. MASTRO:  Objection, form, your Honor.

14              THE COURT:  What's the objection?

15              MR. MASTRO:  It's also vagueness.  No time frame, the

16   calendars.

17              THE COURT:  Overruled.

18              Here we are again taking time with the witness about

19   the content of a document that's already in evidence.

20              MS. LITTLEPAGE:  Judge, I think it's the lack of the

21   content of the document which can only come from testimony.  I

22   need this.

23              THE COURT:  No, that's ridiculous.  The document has

24   in it what it does and it necessarily doesn't have in it that

25   which is not in it.

DAPLCHE2                      Guerra - cross

1              Answer the question.

2              THE WITNESS:  Can you please repeat your question.

3    Q.  Isn't it true that you did not turn over to the Chevron

4    representatives any calendars or daily planners that show a

5    meeting with Pablo Fajardo?

6    A.  I provided to them daily planners that relate events from

7    July 2011 to July 2012, and my last meeting with Mr. Fajardo

8    had taken place around the same months that I am mentioning but

9    in 2011.

10   Q.  And isn't it true, sir, that you could not produce for the

11   Chevron representatives any calendars or daily planners showing

12   any meetings with Steven Donziger?

13   A.  The daily planners referring to the dates when I was

14   meeting with Mr. Donziger and frequently with Mr. Fajardo, I

15   did not turn them over to Chevron's representatives because I

16   didn't have them myself.  I had lost them.

17   Q.  And did the Chevron representatives ask you to sign a

18   permission slip for them to get access to your phone records?

19   A.  Yes, they did.

20   Q.  And did Chevron get access to your phone records?

21   A.  I don't recall.

22   Q.  Have you ever seen -- have you ever been shown any

23   documents in the three months that you've been preparing for

24   your testimony any documents showing phone records confirming

25   conversations between you and Mr. Donziger?

DAPLCHE2                        Guerra - cross

1  A.  I don't recall.  I don't think so.

2  Q.  And would the same answer be true for any documentation

3  showing conversations between you and Pablo Fajardo?

4  A.  I have not seen any, no.

5  Q.  Mr. Guerra, when you moved from Ecuador to America, you

6  brought with you your son, his wife, and his children; is that

7  correct?

8  A.  Yes.

9  Q.  Had that son been already living in America?

10  A.  No.

11  Q.  Currently in America do all of your children, your two sons

12  and your daughter all live in America?

13  A.  Yes.

14  Q.  I want to turn your attention now to the meeting in

15  November of November 14 of 2012 in Chicago.

16         THE COURT:  We're going to break for ten minutes.  It

17  will be a very short lunch break.

18         (Recess)

19         (Witness not present)

20         THE COURT:  Let's continue.

21         MR. GOMEZ:  Your Honor, we have a small issue, if I

22  may.

23         THE COURT:  What is it?

24         MR. GOMEZ:  Your Honor, this morning I requested a

25  copy of the witness's asylum application.  The last three

DAPLCHE2                    Guerra - cross

1   paragraphs of his direct testimony referred to credible fears,

2   supposedly, as part of an asylum proceeding.

3         This morning I asked Mr. Mastro for a copy of that

4   application so that I can use it in preparing my cross.

5   Mr. Mastro said he would check during the break.  I then during

6   the break spoke to Mr. Clayman.  Mr. Clayman says he doesn't

7   represent the witness with regard to his asylum matters.  I

8   understand that asylum counsel is in Florida.  Mr. Mastro then

9   told me that he cannot procure a copy of it.

10        All I want to do is get a copy of the asylum

11  application so I can use it for my cross.

12        MR. MASTRO:  Your Honor, we don't have the asylum

13  application.  My understanding is that it contains confidential

14  information relating to the witness.  I spoke to Mr. Clayman.

15  Mr. Clayman is here.  He also does not have it, but he would be

16  the person who would deal with whoever the immigration lawyer

17  is.  And I don't see how having -- the application has been

18  made.  He can ask the witness about that.

19        THE COURT:  Look, discovery in this case closed months

20  ago.  You've known about this witness for just a couple days

21  shy of nine months.  This is between you and whoever represents

22  the witness with respect to this matter.  I'm told it's not in

23  Chevron's possession and, on the other hand, I'm not hearing an

24  objection that the question is too late.  But I'm not going to

25  take more time with it now.

1              (Witness present)

2              THE COURT:  Go ahead, counsel.

3    BY MS. LITTLEPAGE:

4    Q.  Mr. Guerra, when we left we were talking about the

5    November 14, 2012 meeting in Chicago where you -- at the end of

6    which you signed your first declaration.

7              Can you tell us how that declaration came about, how

8    was it written?

9    A.  Based on what I understand, a draft of that document was

10   prepared based on the conversations that had been recorded,

11   conversations held between Chevron's representatives and

12   myself.  So that when I was in Chicago and I met and I knew

13   Chevron's attorneys, specifically Mr. Randy Mastro, I was

14   provided with a draft statement which, as I stated, had already

15   been prepared based on the previous background.  And I then

16   proceeded to on several occasions make appropriate changes.

17   Q.  And was it presented to you in Spanish or in English and

18   then someone read it to you in Spanish?

19   A.  No, it was in Spanish.

20   Q.  And your declaration is signed November 17, 2012.  Did you

21   meet with the Chevron lawyers all three of those days --

22   November 14, November 15, November 16 -- before you signed your

23   declaration on November 17?

24   A.  No.  I arrived from Ecuador on the 14th very late at night.

25   I remember on the 15th I visited my sons because I went to see

DAPLCHE2                    Guerra - cross

1   them.  And from what I can recall, I met with attorneys --

2   strike that -- from what I can recall, I met Chevron's

3   attorneys and representatives the 16th and 17th until late

4   afternoon.

5   Q.  And did you have to make many changes to the draft

6   declaration?

7   A.  Yes, I made several changes.  Above all, fine tuning.  Fine

8   tuning.

9   Q.  Fine tuning.  Thank you.

10          And then on May 2, 2013, do you recall giving your

11  deposition?

12  A.  Yes.

13  Q.  All right.  I want to ask you, Defendant's Exhibit 1442, in

14  your deposition on May 2 of 2013, were you asked questions

15  about the declaration that you had signed in November of 2012?

16  A.  I understand that I was.

17  Q.  And were you asked in your deposition to describe the

18  events leading up to the Lago Agrio verdict?

19          THE COURT:  Ms. Littlepage, here we go again, all

20  right.  We have the deposition.  If you want to put it in, put

21  it in.  I'll read it.  You want to draw my attention to

22  specific statements and alleged inconsistencies, I'll read it.

23          MS. LITTLEPAGE:  Judge, I wanted to draw your

24  attention as the fact finder, but I also wanted to question the

25  witness about those inconsistencies to see if he can reconcile

DAPLCHE2                      Guerra - cross

1    those inconsistencies.

2              THE COURT:  Indeed, if there are any, you can do the

3    latter.

4              But I just looked at the first thing which I suppose

5    is supposed to be a list of inconsistencies on what you just

6    handed up, Defendant's Exhibit 1442 for identification, and the

7    first line says when and it says June 25, 2012, Friday,

8    January 28.  Then the second cell says on May 2 at the

9    deposition he testified the when was two to three weeks before

10   the verdict was issued.  The verdict was issued, as we all

11   know, on February 14.  Two weeks before the verdict was issued

12   was January 31, and three weeks was January 24.  January 28 is

13   right in the middle of that period.  It's totally consistent.

14             And all I'm trying to do here is to get through this

15   in a way that's efficient, doesn't lose what points you do have

16   in a mass of irrelevant stuff, and doesn't take an unnecessary

17   amount of time.  That's all I'm trying to do.

18             MS. LITTLEPAGE:  Yes, sir.  I would move Mr. Guerra's

19   May 2, 2013 deposition into evidence as Defendant's

20   Exhibit 1367.

21             THE COURT:  Is there any objection to that?

22             MR. MASTRO:  None, your Honor.

23             THE COURT:  It's received.

24             (Defendant's Exhibit 1367 received in evidence)

25   Q.  Mr. Guerra.

DAPLCHE2                    Guerra - cross

```
 1            THE COURT:  You also have an opportunity to sum up.
 2    You'll have an opportunity to submit proposed findings or
 3    proposed trial brief.  You can make all these arguments.
 4            MS. LITTLEPAGE:  Yes, sir.
 5    Q.  Mr. Guerra, in your deposition did you describe starting to
 6    work on the judgment two to three weeks before the verdict was
 7    issued?
 8    A.  Yes.
 9    Q.  And at that time did you describe that you had traveled to
10    Lago Agrio from your home in Quito to work on the verdict?
11    A.  Yes.
12    Q.  How did you when describing this -- how did you describe
13    you had gotten to Lago Agrio?
14            THE COURT:  Isn't it in the deposition?
15            MS. LITTLEPAGE:  Yes, Judge, but I'm allowed to test
16    the witness's knowledge at this point.  The story has moved
17    away even from the deposition to a different version now.  I
18    would like to establish the evolution of this story.
19            THE COURT:  Your question is how did you describe it.
20    Well, on what occasion were you asking?  Which description, if
21    there was more than one?
22            MS. LITTLEPAGE:  The May 2, 2013 deposition.
23            THE COURT:  Right.  And we have a stenographic
24    transcript.  I don't care if he memorized the transcript.  I
25    don't.  It's there.  That's why there was a stenographer.
```

DAPLCHE2                    Guerra – cross

1          MS. LITTLEPAGE:  Judge, I believe I'm allowed to ask

2     the witness, to confront the witness with his inconsistencies

3     to see if he can reconcile those inconsistencies.

4          THE COURT:  And there is an appropriate way of doing

5     this and this isn't it.

6          MS. FRIEDMAN:  Can we have a minute, your Honor.

7          THE COURT:  Yes.

8     Q.  Mr. Guerra, what caused you to change your story as to

9     where you typed the draft verdict from your home in Quito to

10    Mr. Zambrano's home in Lago Agrio?

11    A.  Yes, my memory improved regarding those facts.

12    Q.  And when did you remember that you had worked on the draft

13    verdict on a laptop of Pablo Fajardo versus Mr. Judge Zambrano

14    giving you a flash drive at the airport in Quito?

15    A.  On a later date, after I was interviewed and questioned and

16    questioned again on several occasions regarding this issue by

17    Chevron's representatives.

18    Q.  And do you recall what caused you to remember in your

19    deposition that you had worked only a few hours on the verdict

20    over two days instead of Friday, Saturday, and Sunday, as you

21    had told the Chevron representatives in June of 2012?

22          MR. MASTRO:  Objection, your Honor.  Mischaracterizes

23    the deposition testimony.

24          THE COURT:  Well, let's see.  Overruled.

25    A.  What I stated in my deposition -- interpreter correction --

DAPLCHE2                        Guerra - cross

1    what I stated in my sworn statement, as well as what I stated

2    in my deposition of May 2, certainly in some situations and

3    some facts are not consistent with some situations and facts

4    that I've mentioned to Chevron's representatives in Quito.

5            And, in essence, this detail is due to the fact

6    that -- and with due respect to all of you -- I wasn't paying

7    too much attention to this detail in Quito.  I did not believe

8    that I was Chevron's objective.  I did not think that I was,

9    excuse me.  I only thought that I was the link, the nexus to

10   reach Zambrano.  And because of that, you have these possible

11   contradictions that you are finding.

12   Q.  Well, today how long do you say that you worked on the

13   verdict, two days or three days?

14   A.  I spent two days on that project.

15   Q.  And can you tell me how many hours you say you worked on

16   the verdict today?

17   A.  Independently or aside from the time that I spent reading

18   the draft, I worked on that project between seven and nine

19   hours total.

20   Q.  I want to ask you about the memory aid.

21           Today am I correct that your testimony in this

22   courtroom was that the memory aid was hand-delivered to you by

23   Pablo Fajardo?

24   A.  That's -- I have that memory that that's how it happened.

25   Q.  Have you ever expressed that memory before your testimony

DAPLCHE2                    Guerra - cross

1    in court yesterday?

2    A.  I don't recall.

3    Q.  If you turn to tab 5 of your book, Defendant's

4    Exhibit 1363.

5           THE COURT:  Is this in evidence, counsel?

6           MS. LITTLEPAGE:  I believe it is.  If not I'll move it

7    in.

8           THE COURT:  Mr. Mastro.

9           MR. MASTRO:  No objection, your Honor.

10          THE COURT:  It's received if it's not been previously.

11          (Defendant's Exhibit 1363 received in evidence)

12   Q.  If you turn to page 5 of Defendant's Exhibit 1363.

13   A.  Which one?

14   Q.  I'm sorry, page 6.

15   A.  What?

16   Q.  Page 6 of tab 5, paragraph 26.  I want to direct your

17   attention to the sentence that's in the middle of the paragraph

18   that starts Mr. Fajardo emailed me a document.  Do you see

19   that, Mr. Guerra?

20          Is it true, sir, November 17 of 2012, you recalled

21   that Mr. Fajardo had emailed you the document; is that true?

22   A.  Yeah, but let me look at the document to see what this is

23   about.

24          Yes, it does state that I stated that detail.

25   Q.  And in your deposition on May of 2013, did you recall that

DAPLCHE2                    Guerra - cross

1    you received the memory aid late in the afternoon on the night

2    of the first day that you were working on the verdict?

3    A.  If that's how it appears in my deposition, that's how I

4    said it.

5    Q.  What is your recollection of what you described about that

6    event in May of 2013?

7              THE COURT:  Sustained.

8              MR. MASTRO:  Objection.

9    Q.  Let's turn to page 79, line 17 of your deposition.  I want

10   to refer you to line 17 through 19.

11             Mr. Guerra, did you testify in May of 2012 that you

12   received the memory aid in the late afternoon or night of the

13   first day?

14             THE COURT:  Sustained.  He did.  That's why there's a

15   transcript.  Move on.

16   Q.  In May of 2013, did you recall having received the memory

17   aid in the late afternoon or night of the first date?

18   A.  That is what it says.  That is how I stated it.

19             THE COURT:  Mr. Guerra, I think what she's asking you

20   is whether that's what you believed at the time you gave that

21   testimony.

22             THE WITNESS:  Yes, your Honor.

23             THE COURT:  And was it true at the time you gave it to

24   the best of your then recollection?

25             THE WITNESS:  Yes, sir.

DAPLCHE2                          Guerra - cross

1           THE COURT:  Do you now remember the issue differently?

2           THE WITNESS:  No, sir.

3           THE COURT:  So you now still remember that you

4    received the memory aid during the two days while you were

5    working on the judgment; is that correct?

6           THE WITNESS:  I received it in the late afternoon or

7    evening hours of the first day that I worked on the judgment.

8           THE COURT:  All right.  Go ahead, Ms. Littlepage.

9    Q.  And in May of 2013, did you recall receiving it because you

10   left Judge Zambrano's house, went to an internet cafe and got

11   the memory aid at an internet cafe?

12          MR. MASTRO:  Objection.

13          THE COURT:  What's the objection?

14          MR. MASTRO:  The objection, your Honor, is this is

15   what I thought your Honor didn't want deposition transcripts to

16   be used for when they're in evidence.

17          THE COURT:  She's asking if the reason he remembered

18   it is because he left Zambrano's house and went to an internet

19   cafe and got it there.

20          MR. MASTRO:  That's fine, your Honor.

21          THE COURT:  I'll allow that.

22   A.  When I stated that detail, that was how I recalled it.

23   Q.  And you did recall leaving Judge Zambrano's house and going

24   to which internet cafe?

25   A.  During the two days in which I was working on the draft of

DAPLCHE2                    Guerra - cross

1    the judgment, I left the room, Mr. Zambrano's home, several

2    times.  I had to have meals, breakfast, lunch, dinner.  And I

3    generally did this with Mr. Zambrano or with Dr. Alban, so I

4    would go out.

5    Q.  And do you recall going to an internet cafe in Lago Agrio

6    to get an email from Pablo Fajardo while you were working on

7    the verdict?

8    A.  Initially that is how I recalled it.

9    Q.  Sir, initially isn't it true that you recalled that you

10   were in Quito and you received the document from Mr. Pablo at

11   your home in Quito by email; isn't that true?

12   A.  That was at the very beginning of my conversations with the

13   Chevron representatives.

14   Q.  And then after you met with the lawyers and Mr. Mastro, did

15   you recall that you had received it by email by going to an

16   internet cafe in Lago Agrio?

17   A.  No.

18   Q.  You never recalled going to an internet cafe to get the

19   Pablo Fajardo email?

20   A.  I have gone to email, to retrieve documents, etc., but I

21   cannot assure you that I received the email from Pablo Fajardo

22   via email.

23   Q.  And isn't it true that today your testimony is it didn't

24   come by email either to Quito or to Lago Agrio, it came by hand

25   delivery by Mr. Fajardo; is that correct?

DAPLCHE2                          Guerra - cross

1    A.  Could you please rephrase that question?

2    Q.  And isn't it true that today your testimony is that you did

3    not receive the memory aid by email, but that Mr. Fajardo

4    hand-delivered it to you in Lago Agrio?

5    A.  The topic is that I have the memory aid in my possession.

6    I found the memory aid.  And whether he delivered it to me

7    personally or sent it to me via email seems to me is not of

8    great importance.

9    Q.  Isn't it true, sir, that the first time you related the

10   events you told the Chevron representatives that you did not

11   consult with Judge Zambrano that weekend, there was no reason

12   for it?

13   A.  Pardon me, but if you could please clarify exactly what you

14   are referring to?

15   Q.  On June 25, 2012, did you tell the Chevron representatives

16   that that weekend you did not consult with Judge Zambrano,

17   there was no reason for it?

18           MR. MASTRO:  Objection to form, vague.

19           THE COURT:  I couldn't hear you, Mr. Mastro.

20           MR. MASTRO:  Objection to form, vague, your Honor.

21           THE COURT:  I'll sustain an objection to form on the

22   ground it's compound.

23   Q.  In June of 2012, did you tell the Chevron representatives

24   that you did not consult with Judge Zambrano that weekend?

25   A.  If you are referring to my consulting with Judge Zambrano

DAPLCHE2                         Guerra - cross

1    regarding the court orders on the cases assigned to him, no, I

2    did not.  And if you are referring to my consulting with Judge

3    Zambrano regarding the court orders I was issuing in the

4    Chevron case, I did not consult.  And if you are referring to

5    my consulting Judge Zambrano about the continuous topics in

6    regard to the draft judgment, I did not consult.

7    Q.  And did you tell the Chevron lawyers in June of 2012 that

8    there was no reason for you to consult Judge Zambrano the

9    weekend you were working on the draft verdict?

10   A.  I stated that there was no reason to consult him not on one

11   weekend nor on another weekend.  It is understood that

12   Mr. Zambrano had enough confidence in me that he trusted that I

13   would do what was proper and prudent.

14                  (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DAP8CHE3                    Guerra - cross

1    Q.  Mr. Guerra, then in May of 2013, did you describe that

2    weekend and recall that you had maintained phone contact with

3    Judge Zambrano during the weekend?

4    A.  If that is what in the transcript, then I said it.

5    Q.  I want your recollection.  Is it your recollection that the

6    weekend you were working on the verdict, did you not consult

7    with Judge Zambrano because there was no reason for it, or did

8    you maintain phone contact with him?

9               MR. MASTRO:  Objection.

10              THE COURT:  Sustained.  Compound and there is no

11   inconsistency between the two statements.

12   Q.  In May of 2013, did you recall that you had had dinner

13   together with Judge Zambrano in the evening when you were

14   working on the draft verdict?

15   A.  I have stated that I was in constant communication with Mr.

16   Zambrano during the days when I was working on the judgment.

17   Q.  Sir, when you first described the drafting of the Lago

18   Agrio verdict, did you recall that you had given Judge Zambrano

19   the draft verdict on a flash drive?

20   A.  Initially that was my memory.

21   Q.  And then you handed over your flash drives to the Chevron

22   representatives, correct?

23   A.  I delivered to the Chevron representatives several

24   removable memories, flash, that were used between Mr. Zambrano

25   and myself in regard to the court orders that I prepared for

DAP8CHE3                         Guerra – cross

1   him.

2   Q.  When the verdict, the draft verdict was not found on any of

3   those flash drives, did you then recall that you had written

4   the judgment on the laptop?

5   A.  Well, upon learning from the Chevron representatives the

6   statement that the draft judgment had not been found on any of

7   the flash drives or on my home computer, and after engaging in

8   a mental process strengthening my memory regarding these events

9   in time and space, I was able to recall that I had worked on

10  that project in Lago Agrio.

11  Q.  Sir, at that time, in January and February 2011, did you

12  have a printer at your home in Quito?

13  A.  Yes.

14  Q.  Did Judge Zambrano have a printer in his house in Lago

15  Agrio?

16  A.  No.

17  Q.  If you turn to tab 7, Defendants' Exhibit 1368, sir, is

18  that a declaration from you that attaches the memory aid that

19  we have been discussing?

20  A.  Yes.

21  Q.  If you turn to the last page of the memory aid --

22          THE COURT:  Is it an exhibit in evidence?

23          MS. LITTLEPAGE:  1368.  I believe the memory aid is in

24  evidence.

25          MR. MASTRO:  The memory aid is in evidence, but we

DAP8CHE3                    Guerra - cross

1   have no objection to the declaration attached to the memory aid

2   coming into evidence.

3            THE COURT:  1368 is received.

4            (Defendants' Exhibit 1368 received in evidence)

5   Q.  From looking at the last page, Mr. Guerra, can you confirm

6   that the last events discussed in this document are in the

7   month of August of 2009?

8            THE COURT:  It says what it says.

9   Q.  Does the document describe any events after the --

10            THE COURT:  Move on.

11            MS. LITTLEPAGE:  I am getting somewhere.

12            THE COURT:  Yes.  The usual way is directly.

13   Q.  Is there any indication in this document of events after

14   the month of August of 2009?

15            THE COURT:  Sustained.

16   Q.  Do you know, sir, why Mr. Fajardo would send you a document

17   to help you write a draft verdict, according to your testimony,

18   that does not contain any events that are described after the

19   month of August of 2009?

20            MR. MASTRO:  Objection.

21            THE COURT:  Sustained.

22            I may well have done you an enormous favor by

23   sustaining that objection, Ms. Littlepage, because I apprehend

24   you might not like the answer, but that's not the point.  The

25   point is you can't ask a witness to testify to what was in

DAP8CHE3                          Guerra - cross

1    someone else's head.

2    Q.  Mr. Guerra, did you ask Mr. Fajardo, under your testimony,

3    to send you dates that would help you draft the verdict?

4    A.  The judgment had already been drafted.  I am not the

5    author, nor am I the coauthor of that judgment.  I was just to

6    review it, to improve it, touch it up so that it would look

7    like a document that had been issued by the court in Lago

8    Agrio.  That is why, when I read it, I observed certain

9    inconsistencies, which I looked at, I focused on, and for this

10   reason I requested from Mr. Fajardo by telephone to send me a

11   document, or give me information, regarding certain specific

12   points, and regarding the dates on which those points had been

13   processed in the evidentiary process of the trial.  And these

14   are dates that I had no personal knowledge of because they had

15   happened during a period of time prior to Mr. Zambrano's term.

16   Q.  Yesterday, Mr. Guerra, you testified that this memory aid

17   did not help clarify or answer your questions, correct?

18   A.  Yes.

19   Q.  You know Mr. Fajardo personally, right, sir?

20   A.  Yes.

21   Q.  Isn't it true, sir, that Mr. Fajardo gave you the memory

22   aid in 2010 to help you prepare a speech you were giving to a

23   class?

24   A.  No.

25   Q.  I want to turn now to Judge Zambrano.  Is it true that

1    Judge Zambrano was a criminal prosecutor before he was a judge?

2    A.  He was a prosecutor, yes.

3    Q.  Would you describe him as a strong man?

4         THE COURT:  Strong in what sense, Ms. Littlepage?

5         MS. LITTLEPAGE:  I was going to ask him to define it

6    for me if he agreed that is how he described Judge Zambrano.

7         THE COURT:  You asked whether he would describe him as

8    a strong man.  You didn't ask him whether he has described him

9    as a strong man.  That is different.

10   Q.  Have you described Judge Zambrano as a strong man?

11   A.  Yes.

12   Q.  What did you mean by that?

13   A.  He is mistrustful even of himself, even of his own actions.

14   Q.  Have you described Judge Zambrano as a tough prosecutor?

15   A.  Yes.

16   Q.  Have you described Judge Zambrano as a strict man?

17   A.  Yes.

18   Q.  Because of Judge Zambrano's background, you did not

19   participate in the writing of any of his criminal orders, is

20   that correct, sir?

21        MR. MASTRO:  Objection.  It also calls for him to

22   explain the reasoning of Judge Zambrano's thinking.

23        THE COURT:  Sustained.  Break it up.

24   Q.  Mr. Guerra, you testified that you had assisted Judge

25   Zambrano in drafting some of his rulings in civil cases, is

DAP8CHE3                    Guerra - cross

1    that correct?

2    A.   Yes.

3    Q.   But you did not assist Judge Zambrano in his writing of his

4    criminal orders, is that correct?

5    A.   That's correct.

6    Q.   And did he issue criminal orders where there would be a

7    record of his writing style, his own writing style, in criminal

8    orders?

9              MR. MASTRO:   Objection, your Honor.

10             THE COURT:   Sustained as to form because the question

11   assumes that he actually wrote them.

12             You can ask the witness if he knows of his own

13   personal knowledge whether Zambrano's criminal case orders were

14   actually written by Zambrano.

15   Q.   Mr. Guerra, isn't it true that Judge Zambrano's criminal

16   case orders were written by Judge Zambrano?

17   A.   There is no reason why I should doubt that.  He specialized

18   in the field.

19   Q.   Is it true that Judge Zambrano told you that he was not

20   willing to provide information to Chevron about the Lago Agrio

21   verdict?

22             MR. MASTRO:   Objection to form, your Honor.  Time

23   frame.

24             THE COURT:   Be more specific about the time frame.

25   Q.   Turn to tab 1 in your book, your witness statement, your

DAP8CHE3                         Guerra – cross

1  direct testimony in this case.  Page 24.

2           THE COURT:  What is the exhibit number, please?

3           MS. LITTLEPAGE:  PX 4800.

4  Q.  Page 24, line 18 through 19, in the first sentence of

5  paragraph 60.

6  A.  Is there a Spanish one?

7  Q.  I think it's right behind it.  The pages should correspond.

8           They don't actually.  It will be paragraph 60.

9  A.  I'm almost there.

10  Q.  Isn't it true, sir, that Judge Zambrano told you that he

11  was not willing to provide information to Chevron?

12           MR. MASTRO:  It's the same objection, your Honor.

13           THE COURT:  Yes.  I already ruled on that question,

14  and I told you to be more specific about the time period.

15  There is no mystery here.  There seems to be a period allegedly

16  when Zambrano was willing to talk and a period when he changed

17  his mind.

18           MS. LITTLEPAGE:  That is hotly contested, Judge.

19           THE COURT:  Well, that's, I gather, what the witness's

20  story is.  So let's focus on the time period.

21  Q.  In June and July of 2012, had Judge Zambrano lost his job

22  as a judge?

23           MR. MASTRO:  Objection to form.  Lost.

24           THE COURT:  He was removed from the bench, right,

25  counsel?  Fairly or unfairly, justifiably or unjustifiably,

DAP8CHE3                    Guerra - cross

1    that's what happened, isn't that true?  There is no dispute

2    about that.

3              MS. LITTLEPAGE:  Are you asking me or Mr. Mastro?

4              He was not a judge in June or July of 2012.

5              THE COURT:  Did you hear what I said?

6              MS. LITTLEPAGE:  No, sir.

7              THE COURT:  He was removed from the bench, isn't that

8    agreed by all parties?  Whether it was justifiably removed,

9    unjustifiably removed, that is in fact what occurred, that is

10   undisputed, is it not?

11             MS. LITTLEPAGE:  That's true, Judge.

12   Q.  Can you confirm, Mr. Guerra, that in June or July of 2012,

13   Mr. Zambrano was no longer working as a judge?

14   A.  He was no longer working.

15   Q.  He was no longer working at all, he was unemployed in June

16   and July of 2012, is that your testimony?

17   A.  I'm not aware if he was employed or unemployed, but he was

18   no longer a judge in Lago Agrio.

19   Q.  Was it your understanding that the money, immigration, car,

20   insurance, all the benefits that Chevron was offering you,

21   would also be offered to Judge Zambrano in June or July of

22   2012?

23             MR. MASTRO:  Objection.

24             THE COURT:  Sustained.

25   Q.  What was Chevron offering Judge Zambrano in June or July of

DAP8CHE3                          Guerra - cross

1    2012, as you understood it?

2              THE COURT:  Sustained.

3    Q.  Were you supposed to be the ambassador or the link or the

4    bridge between the Chevron representatives and Judge Zambrano

5    in June or July of 2012?

6              MR. MASTRO:  Objection.  Asked and answered and

7    testified to.

8              THE COURT:  Sustained.

9    Q.  As the bridge to Judge Zambrano, what were you to tell

10   Judge Zambrano was being offered by the Chevron

11   representatives?

12             MR. MASTRO:  Objection.

13             THE COURT:  Sustained.

14             Look, I know exactly what you're trying to get at.

15   You're just not asking the right questions.  There are right

16   questions.

17   Q.  What, if anything, did Chevron's representatives tell you

18   in June or July of 2012 --

19             MS. LITTLEPAGE:  Sometimes I need some help, your

20   Honor.

21             THE COURT:  I have tried intermittently, but I don't

22   want to be unduly intrusive.  You are the ones getting the big

23   bucks for asking the questions.

24             Let me put it another way.  It's been 20 years since I

25   have gotten anything for asking questions.

DAP8CHE3                    Guerra - cross

1    Q.  Mr. Guerra, what, if anything, did the Chevron

2    representatives tell you --

3            THE COURT:  And I was much better paid for that.

4    Q.  What, if anything, did the Chevron representatives tell you

5    in June or July of 2012 to relay to Judge Zambrano?

6    A.  Chevron's representatives wanted to meet with Mr. Zambrano,

7    and I was enthusiastic about such a meeting taking place.  But

8    Mr. Zambrano, when it seemed as if he would accept to meet with

9    them, he stated definitely the person with whom he would agree

10   to meet was a man named James Gray, whom he identified as

11   Chevron's spokesman in Ecuador and South America.

12           And because of this, I informed Chevron's

13   representatives, and at some point they gave me magazines,

14   documents, newspapers, in which it appeared that Andres Rivero

15   was an attorney for Chevron.  And these press documents,

16   including a business card from Mr. Rivero, I gave in person to

17   Mr. Zambrano in mid-August of 2012.  Up to the date, I was

18   trusting, I was hoping that Mr. Zambrano would meet with

19   Chevron's representatives.

20           THE COURT:  You mentioned the name of a man named

21   James something that was mentioned to you by Mr. Zambrano.

22   What was the man's surname, please?

23           THE WITNESS:  I don't speak English, but it's Gray or

24   Grag.  I don't know how to pronounce it.  But he is Chevron's

25   representative in Ecuador and South America.  He is Chevron's

DAP8CHE3                          Guerra - cross

1    spokesman.  The press mentions that.  The television was

2    quoting him over there.

3              THE COURT:  Thank you.

4              MS. LITTLEPAGE:  I think it's James Craig, Judge.

5              THE COURT:  I am guessing that too.

6    BY MS. LITTLEPAGE:

7    Q.  Mr. Guerra, you just said that you had hoped that Mr.

8    Zambrano would meet with Chevron.  Why did you hope that?

9    A.  Because during all the conversations with Chevron, I had

10   considered that I was their link to reach Zambrano, and also

11   because initially, because initially I sought to make contact

12   with Chevron's representatives initially under Zambrano's

13   suggestion.

14   Q.  Mr. Guerra, were you aware that a Chevron representative,

15   Mr. Rivero, called Judge Zambrano on the phone?

16   A.  I became aware of that fact.

17   Q.  Have you reviewed the transcript of that phone call where

18   Judge Zambrano recorded Chevron calling him?

19             MR. MASTRO:  Objection.

20             THE COURT:  I will allow him to answer yes or no.

21   A.  No.

22   Q.  How did you become aware that Mr. Rivero had called Judge

23   Zambrano?

24   A.  In some conversation, Mr. Akerman, who is a colleague of

25   Mr. Rivero, informed me about details regarding this issue.

DAP8CHE3                    Guerra - cross

1    The reason was that I had asked him about this issue because I
2    had found out through the press in the foreign country
3    regarding this via e-mail.
4    Q.  Mr. Guerra, did you know that Judge Zambrano had reported
5    to the police that he was being followed by Chevron agents?
6                MR. MASTRO:  Objection.
7                THE COURT:  Sustained.
8    Q.  Did you ever have a conversation with Judge Zambrano about
9    any reports he might have made to the police, if any?
10               THE COURT:  Answer it yes or no.
11   A.  No.
12   Q.  Mr. Guerra, you talked yesterday, and you referred to
13   yourself as a ghost writer, is that correct?
14   A.  Yes.
15   Q.  But when you met with the Chevron representatives on June
16   25th of 2012, isn't it true that you told them you had no idea
17   what that term was, ghost writer?
18   A.  What term are you referring to, please?
19   Q.  The term ghost writer.
20   A.  Yes.  I told them I did not know what the scope of the term
21   was.  I prefer the term "behind the scenes" writer.  We use
22   that in my country.
23   Q.  If you turn to page 33 of tab 2.
24               THE COURT:  Defendants' 1360?
25               MS. LITTLEPAGE:  1360, Judge.

DAP8CHE3                         Guerra - cross

1    Q.  It's a little bit below the middle of the page.  Does that

2    refresh your memory that when you were asked about the word

3    ghost writer, you said, I don't know what that term is?

4            THE COURT:  He didn't profess a lack of memory.  He

5    said he told them he didn't know that term.

6    Q.  When you used the term ghost writer multiple times in your

7    testimony, is that a term that the Chevron lawyers told you to

8    use?

9    A.  I am in the United States and somehow I have to balance my

10   presence to the terms used here, yes.

11   Q.  Mr. Guerra, when you and Mr. Zambrano would communicate in

12   the 2009, 2010, 2011 time frame, isn't it true that you did not

13   use e-mail?

14   A.  We did not use e-mail.

15   Q.  Was one of the reasons you did not use e-mail was because

16   Judge Zambrano and you were not very skilled with technology so

17   sending files via e-mail was difficult for you and Mr.

18   Zambrano, is that correct?

19           MR. MASTRO:  Objection.

20           THE COURT:  Certainly in that form it's sustained.

21   Q.  Do you agree, sir, that you and Mr. Zambrano were not very

22   skilled with e-mail technology?

23           MR. MASTRO:  Objection.

24           THE COURT:  Sustained.

25   Q.  Let's turn to your direct testimony in your witness

DAP8CHE3                      Guerra - cross

1    statement, at tab 1, page 6, line 4 and 5.

2              THE COURT:  Let's not take time on this.  The

3    statement is there.  I accept that he testifies on personal

4    knowledge that he is not very skilled.  I also accept, in the

5    absence of evidence to the contrary, that he has no personal

6    knowledge as to what Mr. Zambrano's skill knowledge is.

7              MS. LITTLEPAGE:  May I ask that question?

8              THE COURT:  You can ask that question.

9    Q.  Mr. Guerra, did you know that Judge Zambrano, did you have

10   personal knowledge that Judge Zambrano was not very skilled at

11   technology?

12             THE COURT:  Sustained.  I don't know if he was or he

13   wasn't.  You're assuming he wasn't.  For all I know, he is Bill

14   Gates' helper.

15             Now, if Zambrano said something on that subject, I'm

16   all ears.  If he gave him an exam on C+ or whatever, and he did

17   poorly or well, fine.  But could we stick to personal

18   knowledge?  I wouldn't be surprised if you objected to the

19   statement you're now relying on on the ground of lack of

20   personal knowledge.

21   Q.  Mr. Guerra, do you agree that you are not an expert at

22   computers?

23   A.  I agree.

24   Q.  And can you agree that you use a computer as a typing

25   machine, basic stuff?

DAP8CHE3                    Guerra - cross

1   A.  Yes.

2   Q.  Now, you discussed in your direct testimony some shipping

3   records with the shipping company TAME.  Do you recall that?

4   A.  Yes.

5   Q.  On your direct testimony, you discussed Plaintiff's Exhibit

6   1735, an exhibit from your diary, dated August 10, 2011.

7              MR. MASTRO:  For the record, it is Exhibit 1733.

8              MS. LITTLEPAGE:  It has 1735 on the bottom.

9              Mr. Mastro, do you want me to call it 1733?

10              THE COURT:  Where is the physical exhibit, please?

11              MR. MASTRO:  May I approach the witness?

12              THE COURT:  Approach the bench.

13              The date, Ms. Littlepage, is what?

14              MS. LITTLEPAGE:  August 10, 2011.

15              THE COURT:  Can you put the whole page on the screen

16   of whatever copy.  It's actually on the page February 5.

17              MS. LITTLEPAGE:  Yes, sir.

18              THE COURT:  The correct exhibit number is 1733.

19   Q.  Mr. Guerra, yesterday you discussed that you had sent or

20   received a package of files on August the 10th, 2011.  Do you

21   see any notation in this diary of sending or receiving files on

22   that date?

23   A.  Yes.

24   Q.  Can you read the words that indicate you were receiving or

25   sending a package on that date?

DAP8CHE3                          Guerra - cross

1   A.  I am expressing that I received it, and it says

2   specifically, I pick up files from TAME.

3            THE INTERPRETER:  Interpreter correction.

4   A.  I pick up cases from TAME.

5            MR. GOMEZ:  Objection, your Honor, to the translation.

6   A.  Trials from TAME.  I pick up trials from TAME.

7            THE COURT:  Any objection, counselor?

8            MR. GOMEZ:  No, your Honor.

9   Q.  If you turn to tab 15 in your book, it is Plaintiff's

10  Exhibit 1682.

11           Are you with me, Mr. Guerra?

12  A.  Yes.

13  Q.  The bottom part of Plaintiff's Exhibit 1682 is a listing of

14  documents or packages that you received, is that correct?

15           THE COURT:  Could I please have the entire exhibit?

16  The binder you gave me has 1 of 9 pages.

17           MS. LITTLEPAGE:  The entire exhibit is in the

18  plaintiff's book.

19           THE COURT:  You said tab 15?

20           MS. LITTLEPAGE:  I am at tab 15.  I took one of those

21  pages out.  I think the entire exhibit is in the plaintiff's

22  binder.

23           THE COURT:  Give me the exhibit number again.

24           MS. LITTLEPAGE:  1682.

25           THE COURT:  So you're addressing page 2 of 9 of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAP8CHE3                    Guerra – cross

1    Plaintiff's Exhibit 1682, is that right?

2            MS. LITTLEPAGE:  Yes, sir.

3            THE COURT:  All right.

4    Q.  Mr. Guerra, is the bottom part of the shipping record on

5    page 2 of Plaintiff's Exhibit 1682 a listing of packages that

6    you received?

7    A.  Yes.

8    Q.  Can you point out where in this document it indicates you

9    received a package from Judge Zambrano on August the 10th,

10   2011?

11           MR. MASTRO:  Your Honor, may we approach the side bar?

12           THE COURT:  That might be a good idea.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DAP8CHE3                    Guerra - cross

1              (At the side bar)

2              MR. MASTRO:  Your Honor, I think this is a simple

3    matter as it's a mistranslation.

4              Page 9 of the document reflects an August 10, 2011

5    package.  You will see it on page 9.

6              THE COURT:  I see it on page 2 to start with.

7              Where is Ms. Littlepage?

8              MS. LITTLEPAGE:  I am here, Judge.

9              THE COURT:  It's on page 2.  It may be elsewhere, but

10   it's on page 2, next to last line, isn't it?

11             MS. LITTLEPAGE:  No.  That's 2012.

12             MR. MASTRO:  It's simply a mistranslation of the date.

13             THE COURT:  What page are you pointing me to?

14             MR. MASTRO:  Page 9, your Honor.

15             THE COURT:  It's pretty hard to mistranslate a date.

16             MR. MASTRO:  It's probably just a typo.  You can see

17   it's the same entry except it's 2011.

18             THE COURT:  What about that, Ms. Littlepage?

19             MS. LITTLEPAGE:  I don't look at the Spanish versions

20   because I don't read Spanish.  I assumed that Chevron's

21   translation would be accurate.  I set up my questions based on

22   the accuracy of Chevron's translations.  It's one of the

23   problems of trying a case where all the documents are in

24   Spanish and I don't speak Spanish.

25             THE COURT:  There is no question here, right?

DAP8CHE3                    Guerra – cross

1            MS. LITTLEPAGE:  I didn't look at the Spanish one.

2            THE COURT:  You ought to take a look at it.  It's

3    exactly the same thing.

4            MS. LITTLEPAGE:  It is, Judge.

5            THE COURT:  OK.  Let's move on.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAP8CHE3                          Guerra - cross

1              (In open court)

2              THE COURT:  For those following along, it's probably

3      just a typo.  The Spanish version has the right date.

4      BY MS. LITTLEPAGE:

5      Q.  Mr. Guerra, you testified that Judge Zambrano paid you

6      $1,000 a month for your help in writing orders, is that

7      correct?

8      A.  His commitment was to give me $1,000 a month, and I agreed

9      to receive that amount.

10     Q.  In the past, you have described a different arrangement

11     with Judge Zambrano as to the money he would pay you every

12     month, isn't that correct?

13     A.  What I did say was that Mr. Zambrano did not regularly give

14     me the thousand dollars.  What I have said is that he sometimes

15     gave me more, other times gave me less.

16     Q.  On June the 25th of 2012, did you tell Chevron's

17     representatives that you received $1500 or $2,000 a month from

18     Judge Zambrano?

19     A.  I did tell them some exaggerated things because it was my

20     intention or for the purpose of bettering or improving my

21     position.

22     Q.  Did Chevron ask you to get copies of your bank account

23     statements and deposit slips?

24     A.  I have kept the originals of my bank statements for several

25     years in my files.  And regarding the deposit slips, they did

DAP8CHE3                         Guerra – cross

1   ask me to request from the bank the certified copies of them.

2   Q.  Did they also ask you to get copies of deposit slips?

3   A.  Yes.

4   Q.  When you reviewed the deposit slips, did you find deposit

5   slips from Judge Zambrano for 1,000, 1500 or $2,000?

6   A.  Deposits in the amounts reflected in the documents were

7   found.

8   Q.  If you turn to tab 11, Plaintiff's Exhibit 1713, page 3.

9   It's the first page under tab 11.  You see at the bottom it

10  says Plaintiff's Exhibit 1713, page 3 of 32.

11          Do you see that, sir?

12  A.  Yes.

13  Q.  Can you say how much money it is your testimony Judge

14  Zambrano was depositing through this deposit slip?

15          MR. MASTRO:  Objection.  Form.

16          THE COURT:  Sustained.

17  Q.  How much money did Judge Zambrano deposit into your account

18  in June of 2011?

19  A.  According to the document I am looking at on the screen,

20  which is similar to the one I have physically, the deposit

21  amount is $300.

22  Q.  And the date is June of 2011, four months after the Lago

23  Agrio verdict, is that correct?

24          THE COURT:  Is the issue here my ability to read the

25  document?  I am getting help here because of my eyesight?

1          MS. LITTLEPAGE:  No, sir.

2          THE COURT:  Move on.

3   Q.  Mr. Guerra, did you find any other deposit slips to

4   corroborate your testimony that Judge Zambrano was paying you

5   1,000, 1500 or $2,000 a month?

6          MR. MASTRO:  Objection to form, your Honor.

7          THE COURT:  Sustained as to form.

8   Q.  Mr. Guerra, did you find any other deposit slips for Judge

9   Zambrano into your account?

10  A.  There are several deposit slips.

11  Q.  From Judge Zambrano?

12  A.  From Mr. Nicolas Zambrano.

13  Q.  What dates are those?

14  A.  Well, for example, the one that I recall from February 24th

15  of 2012 for $2,000.

16  Q.  What else?  What other dates do you recall?

17  A.  There are several.  I can't remember them specifically, but

18  there are some.  And this last one that I recall, I recall it

19  specifically because in my memory that is the last payment that

20  Mr. Zambrano made to me.  Four or five days after that last

21  deposit he was removed as a judge.

22  Q.  Did you find any deposit slips before February of 2011,

23  sir?

24          THE COURT:  Are you asking any deposit slips at all?

25  Q.  Did you find any deposit slips showing deposits by Judge

DAP8CHE3                      Guerra – cross

1   Zambrano into your account before February of 2011?

2              THE COURT:  There is a persistent lack of clarity.

3              Are you asking, did he find any deposit slips which he

4   can tell you reflect deposits by Judge Zambrano, or are you

5   asking him did he find any deposit slips with Judge Zambrano's

6   name on it, or both or neither?

7              MS. LITTLEPAGE:  Both.  I like the judge's questions.

8   I like to say them exactly as you say them.

9              THE COURT:  I am flattered.  Maybe we can just move it

10  along if you would follow some of these principles.

11  Q.  Did you find any deposit slips which reflect payments by

12  Judge Zambrano into your account before February of 2011?

13             THE COURT:  Regardless of whether his name is on them.

14  A.  In spite of my insistence, the bank of Pichincha did not

15  provide all of the documents, and they argued a great number of

16  things.  Of the ones that were provided, the ones that they did

17  provide, I delivered to the Chevron representatives in the city

18  of Quito immediately after they were provided to me.

19             I know that there are deposits that were made by Mr.

20  Zambrano.  I am familiar with his signature, and those deposits

21  correspond to entries in my day planners that I have found and

22  turned over.

23  Q.  Mr. Guerra, is the answer to my question that you found no

24  deposits slips showing Judge Zambrano depositing money into

25  your account before February of 2011?

DAP8CHE3                        Guerra - cross

```
 1              THE COURT:  I have explained exactly what the problem
 2    with that question was, and you said you wanted to do it just
 3    the way I asked.  Would you do that, please?
 4              MS. LITTLEPAGE:  I will move on.
 5              THE COURT:  I am not stopping you.  I am just telling
 6    you there is a way to do this, and you're not doing it right.
 7              MS. LITTLEPAGE:  I think probably --
 8              THE COURT:  No disrespect.  I am trying to help you.
 9    Q.  Mr. Guerra, I want to change times now to the July, August,
10    September time frame of 2009.
11              THE COURT:  I must say I don't have your point.  And
12    it would be helpful if I had your point.  I know you would like
13    me to conclude that there is nothing to corroborate any
14    payments by Zambrano to the witness before whatever date
15    mentioned in your question.  But you have left it all in a
16    great muddle.
17              What I know is that he says there are notations in his
18    day planners that correspond to deposits.  I don't know the
19    dates offhand.  Some of it was developed yesterday.  I don't
20    know what period the records produced by the bank covered.  I
21    don't know whether I am being told that there are other
22    instances where there are records that has Zambrano's name on
23    it, as distinguished from being records of deposits in an
24    appropriate amount, which the witness is telling me of his
25    personal knowledge that they come from Zambrano, but his name
```

1    is not there.  Maybe when I spend four hours sorting out this

2    transcript, some of that will become clearer.  My only point to

3    you is if you ask the questions more clearly, I will be a long

4    way down the learning curve, but I am not.  But if you want to

5    move on, that's your prerogative.

6    BY MS. LITTLEPAGE:

7    Q.  Mr. Guerra, you indicated that there were notations in your

8    day planner corresponding to money received, under your

9    testimony, from Judge Zambrano, is that correct?

10   A.  In the day planners that are here, that are here in court,

11   yes.

12   Q.  Isn't it true that there are no day planners here in court

13   for the period of time before February of 2011?

14   A.  No.  We don't -- excuse me.  Yes.  For the dates that you

15   are mentioning, we do not have them.

16   Q.  Do you agree, sir, that there are no deposit slips with

17   Judge Zambrano's name on them before February of 2011?

18             THE COURT:  Counsel, are you asking him to agree they

19   don't exist?  Are you asking him to agree they never existed?

20   Or are you asking him whether we don't have them here in the

21   courtroom?  It rather matters.

22   Q.  Would you agree with me, Mr. Guerra, that you have not

23   produced to Chevron any deposit slips from your bank in Judge

24   Zambrano's name showing deposits into your account -- let me

25   ask a better question.

DAP8CHE3                          Guerra - cross

1              Isn't it true, sir, that you did not produce to

2     Chevron any deposit slips from your bank with Judge Zambrano's

3     name on them showing deposits into your account before February

4     of 2011?

5     A.   The originals of the deposit slips in Ecuador are kept by

6     the bank.   Those originals can only be submitted by the bank by

7     means of a court order when they are sought for production of

8     documents.

9              THE COURT:   Please finish.

10    A.   The requester, that is the account holder, the savings

11    account holder, can be given copies of those documents, but

12    they generally don't do the totality of the documents.   There

13    are too many obstacles.   And that is due to the place of the

14    deposits.

15             If the deposits are made in Lago Agrio, the originals,

16    the proof of deposit is kept there in Lago Agrio.   So that is

17    why, if you request those deposit slips in Quito, which is

18    another city, that's what generates problems and insufficiency.

19             THE COURT:   Let me try.

20             You went to the bank and asked for deposit slips,

21    true?

22             THE WITNESS:   Yes.

23             THE COURT:   Did you ask for the deposit slips for a

24    period of time?

25             THE WITNESS:   Yes.

DAP8CHE3                         Guerra - cross

1             THE COURT:  What was the period of time for which you

2       asked?

3             THE WITNESS:  2010 to 2012.

4             THE COURT:  You're familiar with your own bank

5       account, right?

6             THE WITNESS:  Yes.

7             THE COURT:  The bank provided you with copies of at

8       least some deposit slips in response to your request, is that

9       true?

10            THE WITNESS:  That's true.

11            THE COURT:  Did they provide you with copies of all of

12      the deposit slips on your account for that period?

13            THE WITNESS:  No.

14            THE COURT:  Of the deposits that they gave you, did

15      any of them bear the name or signature or initials of Nicolas

16      Zambrano, apart from the one we saw in evidence yesterday and

17      today?

18            THE WITNESS:  It seems to me that there are one or two

19      other ones, yes.

20            THE COURT:  Now, were any of the deposit slips that

21      you were provided that did not contain the name, signature or

22      initials of Mr. Zambrano nonetheless slips reflecting deposits

23      made by him?

24            THE WITNESS:  Yes.

25            THE COURT:  Now, are you able to tell us, yes or no,

DAP8CHE3                         Guerra - cross

1    whether any of the deposit slips that you can remember, copies

2    of which were not provided to you, contained the name,

3    signature or initials of Mr. Zambrano?

4               THE WITNESS:  No.

5               THE COURT:  You just don't know, is that what you're

6    telling me?

7               THE WITNESS:  I do not know.

8               THE COURT:  Were any of deposit slips that were not

9    provided to you, copies of which were not provided to you,

10   deposit slips that reflected deposits by Mr. Zambrano where his

11   name, signature or initials did not appear on the deposit slip,

12   if you know?

13              THE WITNESS:  I do not know.

14              THE COURT:  Continue, please.

15   BY MS. LITTLEPAGE:

16   Q.  Mr. Guerra, turning to the time frame of July, August,

17   September of 2009, what was your job at that time?

18   A.  I was working for the Optima Insurance Company.

19   Q.  Were you working as an attorney?

20   A.  Yes.  I was in charge of the legal matters for that

21   company.

22   Q.  Did your job take you to the courthouse?

23              THE COURT:  What courthouse?

24   Q.  Did your job take you to the Lago Agrio courthouse?

25   A.  Not for reasons of the job that I had at the insurance

DAP8CHE3                        Guerra – cross

1    company.

2    Q.  Was there another job that would take you to the

3    courthouse?

4    A.  The job that I had with the insurance company took place in

5    the city of Quito.  And pursuant to the agreement I had reached

6    with the manager of the company, I would take care of their

7    legal matters as needed, whenever it was necessary.

8    Q.  You described on direct examination that you approached

9    Mr. Racines, a lawyer from Chevron, to discuss potentially

10   getting a deal with the Chevron lawyers.  Do you recall when

11   that date was when you first approached Mr. Racines?

12            MR. MASTRO:  Objection to form and misstates prior

13   testimony.

14            THE COURT:  Sustained as to form.

15            Give me a read on how much longer you expect to be,

16   counsel.

17            (Continued on next page)

18

19

20

21

22

23

24

25

DAPLCHE4                          Guerra – cross

1          MS. LITTLEPAGE:  Several hours.

2          THE COURT:  You know, you told me when this began that

3    you expect it to be five hours, which I thought enormous.

4    You're now five and a half hours.  I'm beginning to sense

5    something I'm not happy about sensing.

6          But we'll break now for lunch.  Thirty minutes.  And

7    counsel should be prepared to stay until this witness is

8    concluded, regardless of how late.

9          (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAPLCHE4b                    Guerra - cross

                           AFTERNOON SESSION

 1                              1:33 p.m.

 2            THE COURT:  Okay.  Let's continue.  The witness is

 3    still under oath.

 4    BY MS. LITTLEPAGE:

 5    Q.  Mr. Guerra, we were talking about when you first approached

 6    Mr. Racines to discuss with him reaching a deal in July,

 7    August, or September of 2009.

 8            Do you recall what date you first met with

 9    Mr. Racines?

10    A.  I don't recall the date, but it was between August and

11    November of 2009.

12    Q.  I'm sorry, did you say August and November?

13    A.  Between August and November.

14    Q.  And can you tell us where you were when you first met with

15    Mr. Racines?

16    A.  I was in the city of Quito and I called him on my cell

17    phone.

18            MS. LITTLEPAGE:  Judge, I want to identify for the

19    record Defendant's Exhibit 1441.

20            THE COURT:  For identification, I take it.

21            MS. LITTLEPAGE:  I'm going to move it in, but for

22    right now it's for identification.

23            And I'll move it right now.  Defendant's Exhibit 1441.

24            THE COURT:  Any objection to this?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

DAPLCHE4b                    Guerra - cross

1          MR. MASTRO:  Your Honor, it's the first we've seen the

2   document so I don't know yet if we have an objection to it.

3          THE COURT:  Well, you have to lay a foundation and so

4   forth.

5          MS. LITTLEPAGE:  Well, Judge, it's one of the

6   documents of the Lago Agrio record.  You'd asked us to, if we

7   were going to use certain portions, to identify them as

8   separate numbers.

9          THE COURT:  So it might be.  But one of the

10  characteristics, I gather, of something that is part of the

11  Lago Agrio record is that the pages are numbered sequentially,

12  and that's not true of this.  So, you know, if you give your

13  adversary time to consider this, you may well get a

14  stipulation.  But in the absence of a stipulation you're going

15  to have to lay a proper foundation.

16  Q.  Mr. Fajardo -- Mr. Guerra, do you know what date Judge

17  Nunez's motion for recusal was filed?

18         THE COURT:  I take it the question is on what date a

19  motion to recuse Judge Nunez was filed.

20         MS. LITTLEPAGE:  Judge, I think actually the judge

21  himself filed something to recuse himself.

22         THE COURT:  If that's true, I stand corrected.

23  A.  Not exactly, but from what I can recall it was in the month

24  of August of 2009.

25  Q.  And if the record shows it was September 3, 2009, do you

DAPLCHE4b                    Guerra - cross

1    have any reason to disagree with the record?

2              THE COURT:  That's not the point, is it?

3              MS. LITTLEPAGE:  Judge, I'm just trying to get a time

4    frame.

5              THE COURT:  Yes, I know you are, but you don't get it

6    by saying if I tell you this, do you have any reason to think

7    it's wrong.  He might very well say you're the lawyer on the

8    other side, that's reason enough.

9              It doesn't advance the ball.  There are facts.  Let's

10   deal with facts.

11             MS. LITTLEPAGE:  Well, Judge, the fact is the motion

12   was filed September 3.  It's in the Lago Agrio record.

13             THE COURT:  Shall we swear you and you can tell us the

14   basis of your information?

15             I expect in the fullness of time we will have an

16   agreement on this.  All I'm telling is you don't get there by

17   asserting it.  Had you given this to the other side two hours

18   ago, I'm sure you would know where you are.

19   Q.  Your recollection is the motion was filed in August of

20   2009; is that correct?

21   A.  Yes, that's what I recall.

22             THE COURT:  You know, it may even be established

23   elsewhere in this record before me.  I just don't know.

24             MS. LITTLEPAGE:  I don't know either, Judge.

25             THE COURT:  Look, I understand that and I appreciate,

DAPLCHE4b                          Guerra - cross

1    you know, that you haven't lived with this --

2            MS. LITTLEPAGE:  I have not.

3            THE COURT:  -- the same way as some other people.

4    But, you know, I don't have total recall of the record in this

5    case.  It would be impossible.

6    Q.  Was there a time when Judge Nunez's motion was filed that

7    it had not yet been granted?

8    A.  I don't know.

9    Q.  Do you know when his motion to recuse was granted?

10   A.  It was in the month of October of 2009.

11   Q.  October 2009.  And when the motion recusing Judge Nunez was

12   granted, did Judge Zambrano automatically become the judge in

13   the Chevron case or was there a process to get him appointed to

14   the case?

15   A.  There was a process that took some time.

16   Q.  Do you know how long that process took?

17   A.  From what I can recall, just a little bit over a month.

18   Q.  And did you approach Mr. Racines from Chevron before or

19   after Judge Zambrano was -- let me ask a better question.

20           Did you approach Mr. Racines before or after Judge

21   Nunez's motion was filed?

22           MR. MASTRO:  Objection, your Honor.

23           THE COURT:  What is the objection?

24           MR. MASTRO:  Before or after Judge Nunez's motion was

25   filed.  The witness hasn't testified knowing that date.

1           THE COURT:  Well, he doesn't have to know the date.  I

2  don't know, you know, what year the 1956 World Series started,

3  but I sure know it was before or after the 1955 World Series.

4           MR. MASTRO:  That's fair, your Honor.

5           THE COURT:  Go ahead.  You can tell I'm living in the

6  past.  The Yankees didn't have such a good year.

7  A.  I cannot state so accurately.  I do not recall when that

8  was.

9  Q.  Can you recall what you spoke to Mr. Racines about the

10  first time you approached him on this matter?

11  A.  Yes.

12  Q.  And what did you tell Mr. Racines?

13  A.  That I could establish contact with Mr. Zambrano for the

14  purpose of dealing with important issues in the Chevron case,

15  including in the future the judgment.

16  Q.  And why would that have been something you told Mr. Racines

17  if Judge Nunez's motion was not filed yet to recuse himself?

18           MR. MASTRO:  Objection, your Honor.

19           THE COURT:  It sounds to me you're just arguing with

20  the witness.

21           MS. LITTLEPAGE:  No, Judge, I'm asking to explain the

22  purpose of his conversation with Mr. Racines.

23           THE COURT:  Money.

24           MS. LITTLEPAGE:  Judge, if Judge Nunez is still in the

25  case, there would be no point in having a conversation.

DAPLCHE4b                        Guerra - cross

1            THE COURT:  That's an argument.  Next question.

2     Q.  Why did you have a conversation with Chevron's lawyer at

3     that point in time about Judge Zambrano and any relationship

4     with the Chevron case?

5     A.  I request that you be more specific, please?

6     Q.  When you had the first conversation with Mr. Racines, why

7     were you talking to Mr. Racines about Judge Zambrano and the

8     Chevron case?

9     A.  Because Mr. Zambrano and I knew that Mr. Zambrano would

10    hear the case as the judge.

11    Q.  And how did you know that?

12    A.  Mr. Zambrano said so.

13    Q.  And would Judge Zambrano take over the case anyway or only

14    if Judge Nunez filed a motion to recuse himself?

15            MR. MASTRO:  Objection, compound, form.

16            THE COURT:  Overruled.

17    A.  Judge Nunez was facing a conflict as of the month of August

18    of 2009, and for that reason, Mr. Zambrano knew that in the

19    near future he would come to hear the case.

20    Q.  Would the parties, would Chevron and the plaintiffs' group

21    have also known that Judge Zambrano would be taking over for

22    Judge Nunez?

23            MR. MASTRO:  Objection.

24            THE COURT:  Sustained.

25    Q.  How did Judge Zambrano know that he would take over from

DAPLCHE4b                    Guerra – cross

1   Judge Nunez, if you have any personal knowledge of it?

2   A.  Due to Judge Nunez being discredited.

3   Q.  If you turn to tab 12 in your book, Defendant's

4   Exhibit 1354.

5          THE COURT:  Is this in evidence?

6          MS. LITTLEPAGE:  Yes, sir.

7          THE COURT:  Thank you.

8   Q.  Mr. Guerra, have you ever seen this document before?

9   A.  No.

10  Q.  Have you ever seen any documentation by Mr. Racines where

11  he describes his involvement or interactions with you in 2009?

12  A.  No.

13  Q.  Did you ever meet Mr. Racines while you all were walking

14  along the street in Quito in July or August of 2009?

15  A.  No.

16  Q.  Did you ever have a discussion with Mr. Racines about Judge

17  Zambrano's taking back over the Chevron case on the street in

18  Quito?

19         MR. MASTRO:  Objection, form.

20         THE COURT:  Overruled.

21  A.  I don't recall.

22  Q.  Is your first recollection of discussing this matter with

23  Mr. Racines a phone call between you and Mr. Racines?

24  A.  That's what I recall.

25  Q.  And was it a phone call that you made to Mr. Racines or did

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DAPLCHE4b                          Guerra – cross

1    Mr. Racines call you?

2    A.   I made the phone call to Mr. Racines.

3    Q.   Mr. Racines reports the phone call occurred in early

4    October 2009.  Does that refresh your memory as to what time

5    frame that first phone call happened?

6    A.   If he says so, he probably has it more clearly.  What I

7    state is that from what I can recall I called him.

8    Q.   And did you call him at a work number or cell phone number?

9    A.   I recall having called him to a cell phone number.

10   Q.   How did you have Mr. Racines's cell phone number?

11   A.   I asked the clerk's office of the Lago Agrio court to give

12   it to me.

13   Q.   And when you called Mr. Racines, did he pick up the phone

14   or did you have to leave a message for him?

15   A.   I don't recall.

16   Q.   Did you have any subsequent phone calls with Mr. Racines on

17   this matter?

18   A.   Later on I called him on several occasions on that initial

19   phone number but he did not answer.

20   Q.   Did you ever have a phone conversation with Mr. Racines

21   where you asked him if Chevron's lawyers would be willing to be

22   put into contact with Mr. Zambrano?

23   A.   I was calling Mr. Racines to find out the result of the

24   proposal that I had made.

25   Q.   And did you have -- was this before or after you met

DAPLCHE4b                    Guerra - cross

1    Mr. Racines at the restaurant?

2    A.   After.

3    Q.   So between your first phone call and the meeting at the

4    restaurant, did you have any other contact with Mr. Racines?

5    A.   The telephone call was to -- it served to set up the

6    meeting at the restaurant.

7    Q.   Did he call you or did you call him to set up the meeting

8    at the restaurant?

9    A.   I called him.

10   Q.   And what did you tell him when you called him?

11   A.   I told him that it was that I was aiming to meet with him

12   so that I could make a proposal regarding the Lago Agrio case.

13   Q.   And did you suggest the restaurant or did Mr. Racines?

14   A.   Mr. Racines did.

15   Q.   And did you meet him at that restaurant?

16   A.   Yes.

17   Q.   Mr. Racines recalls the meeting at the restaurant was one

18   or two months after October of 2009.  Is that consistent with

19   your recollection?

20           MR. MASTRO:  Objection, your Honor.

21           THE COURT:  Sustained.

22           Next question, please.

23           MS. LITTLEPAGE:  I'm thinking, Judge.

24   Q.   What was the name of the restaurant?

25   A.   I don't recall.

DAPLCHE4b                         Guerra - cross

1  Q.  Was it El Chacal restaurant?

2  A.  Correct, that one.

3  Q.  And did you sit and have dinner that evening with

4  Mr. Racines?

5  A.  Yes.

6  Q.  Who paid for the bill?

7  A.  Mr. Racines.

8  Q.  At the end of that meal, had you received an answer to your

9  proposal from Chevron or Chevron's attorneys?

10  A.  No.

11  Q.  How long after that meeting, that dinner, did you get an

12  answer from Mr. Racines?

13  A.  It was some days later.

14  Q.  And is that the phone call where you called him again on

15  his cell phone?

16  A.  I obtained the reply during a phone call that he made to

17  me.

18  Q.  Did he call you on your cell phone?

19  A.  Yes, that's what I recall.

20  Q.  And what did Mr. Racines tell you at that point?

21  A.  That the proposal had not been accepted.

22  Q.  Now, did you describe for Chevron that it was about two or

23  three months between your first contact with Mr. Racines and

24  when you received Chevron's answer that they were not -- that

25  the proposal was not accepted?

DAPLCHE4b                    Guerra - cross

1           MR. MASTRO:  Objection.

2           THE COURT:  Ground?

3           MR. MASTRO:  Misstates the testimony -- did you

4    describe for Chevron.

5           MS. LITTLEPAGE:  I'll rephrase.

6    Q.  Mr. Guerra, did you describe for Chevron's representatives

7    that it was about two or three months between the first contact

8    with Mr. Racines and when you received the answer that your

9    proposal was not accepted?

10          MR. MASTRO:  Same objection, your Honor.

11          THE COURT:  I'm losing the point of all of this now,

12   but I'll overrule the objection.  Go ahead.

13          MS. LITTLEPAGE:  The witness has to answer.

14          THE COURT:  Yes.

15   A.  Probably if it is stated in the document I did so.

16   Q.  Is that your recollection?

17          THE COURT:  Is it his recollection that it was two or

18   three months, or is it his recollection that if it's stated in

19   a document it must be so?  What?

20          MS. LITTLEPAGE:  Good question.

21   Q.  Is it your recollection that it took two or three months

22   from your first contact with Mr. Racines to when you received

23   the answer that your proposal was not accepted?

24          MR. MASTRO:  Objection, your Honor.  It's been asked

25   and answered.  He gave his testimony and then she put Racines

DAPLCHE4b                              Guerra - cross

1    declaration in front of him.

2              THE COURT:  Hasn't he answered this question?

3              MS. LITTLEPAGE:  I don't believe so, Judge, and it's

4    an important question.

5              THE COURT:  Well concealed.

6              Answer the question, please.

7              MS. LITTLEPAGE:  I hope so.

8    A.  No, actually not too much time went by.  It was a few days.

9    Q.  I'm sorry, it was two days from what?

10             THE COURT:  He said few days.

11   A.  It was days.

12   Q.  Previously in June 25 of 2012, did you tell Chevron's

13   representatives that it was two or three months that you were

14   meeting with Chevron before you got the answer to their

15   proposal?

16             THE COURT:  This is in a recorded conversation; is

17   that right?

18             MS. LITTLEPAGE:  Yes, sir.

19             THE COURT:  Next question.

20             It's either there or it isn't.

21   Q.  Today, Mr. Guerra, do you recall how long it took from the

22   time you first spoke to Mr. Racines until that meal in the

23   restaurant where -- the phone call after the meal in the

24   restaurant where you were told your proposal was not accepted?

25             MR. MASTRO:  Objection, your Honor.

DAPLCHE4b                    Guerra - cross

1          THE COURT:  I'm going to overrule it because the

2     answer, whatever it is, adds nothing to the store of

3     information about this case because the question is so

4     convoluted.

5          If you'd like to withdraw it and try again, be my

6     guest.  If you want an answer, you've got it.

7          MS. LITTLEPAGE:  I'll withdraw it and try again.

8     Q.  Let me ask it this way, Mr. Guerra.

9          After you had received word from Mr. Racines that

10    Chevron was not accepting your proposal, did you go back and

11    visit with Judge Zambrano, according to your testimony?

12         THE COURT:  Why did you have to add the last few

13    words?  It was a perfectly good question up to that point.  Are

14    you asking him whether he previously so testified somewhere or

15    not?

16         MS. LITTLEPAGE:  I'll rephrase the question, Judge.

17         THE COURT:  Thank you.

18    Q.  After you received word from Mr. Racines that your proposal

19    was not accepted, did you speak to Judge Zambrano?

20    A.  I inform Judge Zambrano, yes.

21    Q.  How long after you spoke to Mr. Racines did you inform

22    Judge Zambrano?

23    A.  Immediately.

24    Q.  Was it by phone or in person?

25    A.  By telephone.

DAPLCHE4b                         Guerra - cross

1   Q.  And you told us that Judge Zambrano instructed you to go

2   and meet with the plaintiffs' group; is that correct?

3   A.  Yes.

4   Q.  And how long after you spoke to Judge Zambrano were you

5   able to speak to Pablo Fajardo?

6   A.  If you will allow, Judge Zambrano indicated or provided

7   that I should speak to Pablo Fajardo because, according to what

8   he said to me, he had already made an agreement with Pablo

9   Fajardo to expedite the process.

10  Q.  And how much was Judge Zambrano going to be paid by Pablo

11  Fajardo for expediting the process?

12  A.  I don't know.

13  Q.  Did you have an understanding as to whether there was going

14  to be any payment of any kind between the plaintiffs' group and

15  Judge Zambrano to expedite the case?

16  A.  No.

17  Q.  Now, sir, isn't it true that you -- let me start again.

18          Mr. Guerra, did you reach an agreement with Pablo

19  Fajardo of your involvement in the Chevron case in 2009?

20  A.  Yes.

21  Q.  And after you reached that agreement, did you start writing

22  orders in the Chevron case?

23  A.  As far as I remember, before I reached an agreement with

24  Mr. Fajardo I was already writing the orders in the case that

25  was assigned to Judge Zambrano.

DAPLCHE4b                         Guerra - cross

1   Q.  Would that have included the Chevron case?

2   A.  Yes.

3   Q.  And so would it be fair to say that you reached a deal with

4   Pablo Fajardo after Judge Zambrano was back being the judge in

5   the Chevron case?

6   A.  Yes.

7   Q.  Do you recall how long after Judge Zambrano was back on the

8   case that you reached a deal with Pablo Fajardo?

9   A.  Your question is ambiguous.  But if you are talking about

10  Judge Zambrano's first term, then yes.  It was shortly after

11  that.  Maybe a month, month and a half.

12  Q.  And did you reach an agreement with Pablo Fajardo before or

13  after you met with Mr. Donziger at the Honey Honey restaurant?

14  A.  I spoke of the agreement with Mr. Fajardo and then I

15  subsequently met with Mr. Donziger, Mr. Fajardo, and Mr. Yanza

16  at the Honey Honey restaurant.

17  Q.  And was it at the Honey Honey restaurant where Mr. -- with

18  Mr. Donziger that you reached an agreement of your involvement

19  in the Chevron case in 2009?

20  A.  Yes.

21  Q.  And is it -- how many orders in the Chevron case did you

22  write for Judge Zambrano?

23  A.  All the ones that Judge Zambrano requested that I write.

24  Q.  And did you have -- did you tell the Chevron

25  representatives in June of 2012 that you wrote 30 or 40 orders

DAPLCHE4b                          Guerra - cross

1    or more for the Chevron case?

2            MR. MASTRO:  Objection.  The transcripts speak for

3    themselves, your Honor.

4            THE COURT:  I can't understand you, Mr. Mastro.

5            MR. MASTRO:  Objection.  The transcripts speak for

6    themselves, your Honor.

7            THE COURT:  This is the June 25 meeting?

8            MS. LITTLEPAGE:  Yes, sir.

9            THE COURT:  Ask another question.  You can draw his

10   attention to something in the transcript and ask another

11   question about it.  I'm not going to have responsive readings

12   from the transcript.

13           MS. LITTLEPAGE:  I wasn't reading from the transcript,

14   Judge, but I can read from the transcript or I can refer him to

15   the transcript, but I'd like to test his testimony on that

16   issue.

17           THE COURT:  You know the rules that you can draw his

18   attention to it in an appropriate way.

19   Q.  Mr. Guerra, do you recall if you wrote 30 or 40 orders or

20   more for the Chevron case?

21   A.  In during the first term, I recall writing approximately 12

22   orders.

23   Q.  And how many orders in the second period?

24   A.  Approximately the same number.

25   Q.  Twelve?

DAPLCHE4b                    Guerra - cross

1    A.   Approximately.

2    Q.   And do you recall how many orders in the Chevron case, how

3    many orders from the Chevron case was found on your computer or

4    your flash drives?

5    A.   Yes.

6    Q.   Was the number nine, nine orders from the Chevron case were

7    found on your computer or your flash drive?

8    A.   What I can state is that I was told that nine orders were

9    found on my computer, but I was not told anything about the

10   flash drives.

11   Q.   Isn't it true, sir, that if an order is not on your

12   computer, you did not write it?

13             MR. MASTRO:  Objection.

14             THE COURT:  Among other things, I'm sure his flash

15   drive or computer does not contain any of my decisions and he

16   didn't write them.  Let's move on.  Got a better question?

17             MS. LITTLEPAGE:  Yes, sir.

18   Q.   Isn't it true, sir, that if a draft of an order did not

19   appear in your computer, you did not write it?

20             MR. MASTRO:  Objection, your Honor.

21             THE COURT:  Sustained.

22   Q.   Can you turn to page 75 of tab 2.

23             THE COURT:  Defendant 1360.

24             MS. LITTLEPAGE:  Defendant's Exhibit 1360.  Thank you,

25   Judge.

DAPLCHE4b                    Guerra – cross

1   Q.  Mr. Guerra, did you tell Chevron's representatives that one

2   way to confirm if you wrote an order was that if the order was

3   not in your computer, you did not write it?

4            MR. MASTRO:  Objection, your Honor.

5            THE COURT:  Sustained.

6            I see what you're referring to here.

7            MS. LITTLEPAGE:  Judge, for the record, may I ask

8   questions about it?

9            THE COURT:  Yes, but you haven't done that yet.

10  Q.  Would it be true, sir, that if an order was not found in

11  your computer, you did not write it?

12           MR. MASTRO:  Objection, your Honor.

13           THE COURT:  Overruled.

14  A.  When I was speaking to the Chevron representatives, they

15  were asking me about a great many topics and I never went to

16  those meetings prepared to, to deliberately refer to past facts

17  within a specific space and time.

18  Q.  Mr. Guerra, in September of 2010, did you have some

19  concerns about the immigration status of your daughter?

20  A.  Yes.

21           (Continued on next page)

22

23

24

25

DAP8CHE5                        Guerra - cross

1   Q.  And did you write to Mr. Donziger about those concerns?

2   A.  Yes.

3   Q.  Isn't it true that Mr. Donziger never responded to in

4   writing to you in response to this e-mail?

5   A.  He did not do so in writing.

6   Q.  Isn't it true that Mr. Donziger did not speak to you in

7   response to this e-mail?

8   A.  He sent me a very short reply by means of Mr. Fajardo.

9   Q.  If you turn to tab 8, Plaintiff's Exhibit 1745.

10          Is that the e-mail you sent to Mr. Donziger on

11  September 5, 2010?

12  A.  Yes.

13  Q.  Towards the bottom of the e-mail it says, "I will support

14  the matter of Pablo Fajardo so it will come out soon and well."

15  A.  Yes.

16  Q.  If you turn to tab 1, your witness statement of your direct

17  testimony, on page 15.

18          THE COURT:  Plaintiff's 4800?

19          MS. LITTLEPAGE:  Yes, sir.

20  Q.  On line 2 of page 15.

21  A.  Page 15?

22  Q.  Page 15, line 2.  I refer you to the part that says "a code

23  term that I use to refer to Chevron case."

24          Do you see that, sir?

25          MR. MASTRO:  There is a Spanish language version of

DAP8CHE5                     Guerra – cross

1     this that the witness can read without reading the translation.

2                    THE COURT:  Thank you.

3     A.  Maybe you're referring to number 15 rather than page 15.

4     Q.  In the Spanish language version it's page 16, paragraph 37,

5     the first sentence.

6                    Paragraph 37, do you see where it talks about support

7     the matter of Pablo Fajardo being a code term that I use to

8     refer to Chevron case.  Do you see that part?

9     A.  Yes, I see it.

10    Q.  In the past, when you have been asked about that part of

11    the e-mail, isn't it true that you have said, it had nothing to

12    do with the Chevron case?

13    A.  I don't recall as to that subject you're asking me about.

14    Q.  Can you turn to tab 4, Defendants' Exhibit 1362, page 30.

15                    Isn't it true, Mr. Guerra, when you were asked

16    specifically about this e-mail and that sentence of the e-mail,

17    you said, The truth is no that it did not refer to the case?

18                    MR. MASTRO:  Objection, your Honor.  You have to read

19    the two pages of the transcript where it says unintelligible

20    after the word "no."  The two pages of the transcript is

21    completely consistent with his prior testimony.

22                    THE COURT:  I'm sorry.  There are two pages of

23    transcript that are unintelligible, but I have a transcript of

24    it?

25                    MR. MASTRO:  No.  Pages 30 and 31, what she has just

1  quoted is half a sentence where the second part of the sentence

2  is unintelligible.  When you read the entire page 30 on to the

3  top of page 31, the testimony is completely consistent with

4  what he said back in July.

5              THE COURT:  I will just read it.  That might be a good

6  idea.

7              MR. MASTRO:  Thank you, your Honor.

8              (Pause)

9              THE COURT:  Ms. Littlepage, he seems to be dead right,

10  and just for the sake of the record, I will read it.

11             This is whoever is questioning or interviewing the

12  witness.

13             "The first one is, what was it that, that you were

14  going to -- as it says here, 'I give support so that the

15  subject related to Pablo Fajardo turns out quickly and well,'

16  is that the case?

17  "A.  The truth is no."  And then there is something

18  unintelligible.

19  "Q.  You didn't have another subject with Pablo Fajardo?

20  "A.  No other."  Then there is something whispered that's

21  unintelligible.

22  "Q.  Now try to jog your memory to September of 2010.  Zambrano

23  was not a judge.  So then you're not the judge of the case

24  either, since you're not the judge behind the judge.

25  "A.  Uh-huh.

DAP8CHE5                     Guerra - cross

1    "Q.  How could you have been helping?

2    "A.  It's the period of the recusal for -- Ordonez's.  Ordonez

3    recusal began in August -- hm? -- and is ruled on in October.

4    The issue was that the subject, I think Fajardo's subject is

5    perhaps Ordonez's recusal."

6           Now, that in what I am reading from is attributed to

7    the questioner, but given the context, it is obviously a

8    misattribution.

9           Then the next comment is now attributed to the

10   witness, but seems in context actually to be, in this

11   attribution, it's the questioner.  Because what then happens is

12   it says, "(Unintelligible whisper), but the recusal is filed

13   before Nicolas."

14          Answer attributed to the questioner -- possibly

15   wrongly, possibly correctly -- answer, "That's why."

16          Next comment attributed to the witness, maybe rightly

17   maybe wrongly, "Because he was the --"

18          Next interjection or comment attributed to the

19   questioner, rightly or wrongly, something unintelligible,

20   "That's why."

21          Now attributed to the witness:  "So then, look, what

22   happens is that I handled that, too.  And Nic -- I mean,

23   Nicolas knew, we knew that we will allow the procedure and the

24   recusal will be accepted at the end.  So then, I mean,

25   beforehand we knew that obviously that Nicolas will return to

DAP8CHE5                    Guerra - cross

1    be there, right?  I mean he will return to the, and to, and to

2    speed up the procedure.  Well, it must have been that.

3    Because, because I have not had any other business with Pablo

4    Fajardo.  The issue of Pablo Fajardo turns out quickly and

5    well, was the trial.  I have not had any other business, any

6    other."

7              The transcript from of July 31 is 100 percent

8    consistent with what the witness said here.

9              Let's proceed.

10   BY MS. LITTLEPAGE:

11   Q.  Mr. Guerra, is it your testimony now that the subject that

12   was going to be turn out quickly and well was the recusal of

13   Judge Ordonez?

14             MR. MASTRO:  Objection.  It misstates the testimony.

15             THE COURT:  I will let him answer.

16   A.  No.  That was not the subject matter.

17   Q.  In September of 2009, Judge Zambrano was not the judge of

18   the Chevron case, is that correct?

19             MR. MASTRO:  Objection.  It misstates the record, your

20   Honor.

21             THE COURT:  It's a question.

22             MS. LITTLEPAGE:  I can ask a better question.

23   Q.  On September 5, 2009, isn't it true that Judge Zambrano was

24   not the judge of the Chevron case?

25             MR. MASTRO:  Objection, your Honor.  It misstates the

DAP8CHE5                    Guerra - cross

1    record and it says 2009.

2              THE COURT:  What is the second point?

3              MR. MASTRO:  She asked about 2009, your Honor.

4              THE COURT:  I understand.  It was a simple question.

5    Overruled.

6    A.   In September of 2009, Judge Zambrano was not in charge of

7    the Chevron case.

8    Q.   Is it true that September the 5th of 2010, Judge Zambrano

9    was not the judge of the Chevron case?

10   A.   That is correct.

11   Q.   Isn't it true, sir, that you did not assist Judge Zambrano

12   in writing the order for Judge Ordonez's recusal?

13   A.   I provided guidance for that document.

14   Q.   Would it be fair, too, to say that Judge Zambrano wrote the

15   recusal for Judge Ordonez, the recusal order for Judge Ordonez?

16             THE COURT:  The question isn't whether it would be

17   fair to say it.  The question is whether he has personal

18   knowledge of who wrote it.  You may ask that.

19   Q.   Mr. Guerra, did you tell the Chevron representatives on

20   June 25, 2012, that Judge Zambrano wrote the recusal order of

21   Judge Ordonez?

22             MR. MASTRO:  Objection.  The transcript speaks for

23   itself.

24             THE COURT:  Sustained.

25   Q.   Well, Mr. Guerra, I thought I heard you testify on direct

DAP8CHE5                          Guerra – cross

1    that you wrote Judge Ordonez's recusal order.  Was I wrong?

2                 THE COURT:  Yes, ma'am, I think you were.

3                 I think he said he counseled or some other such word,

4    offered guidance, some formulation like that.  It struck me at

5    the time because it was so different from everything else.

6    Q.  In the past, on June 25th of 2012, did you tell Chevron's

7    representatives, I did not do this one, referring to the order

8    of Judge Ordonez's recusal?

9                 MR. MASTRO:  Same objection.

10                THE COURT:  Sustained.

11                Look, if you want to draw his attention to it and ask

12   him whether what he said then was true, no problem.  What I am

13   not going to do is simply have you here reading or paraphrasing

14   transcripts to him and testing his memory about the transcript.

15   That's useless.

16                MS. LITTLEPAGE:  I was trying to test his memory

17   altogether, but I will ask a better question.

18   Q.  If you turn to page 73 of tab 2, Defendants' Exhibit 1360.

19   A.  73?

20   Q.  Yes, sir.  I am referring you to just below the middle of

21   the page where it says, "It seems to me I didn't do this one."

22                Is what you said to the Chevron representatives June

23   25, 2012 true?

24                MR. MASTRO:  Objection.

25                THE COURT:  Overruled.

DAP8CHE5                    Guerra - cross

1           We are engaged in impeachment on prior consistent

2    statements.

3    A.  It was a quick assessment.  If I said it, I said it.

4    Q.  Mr. Guerra, while you were writing orders in the Chevron

5    case, isn't it true that you did not consult with the

6    plaintiffs on some of the court orders?

7    A.  I generally didn't do that.

8    Q.  You generally didn't consult with the plaintiffs when you

9    were writing orders in the Chevron case, is that correct?

10   A.  Yes, that's correct.

11   Q.  I want to turn now to the second period when Judge Zambrano

12   was the judge.  Do you recall when Judge Zambrano took the case

13   back over towards the end of 2009 -- 2010, sorry.

14   A.  In October of 2010.

15   Q.  Did you approach Chevron to discuss fixing the verdict

16   before or after Judge Zambrano resumed control of the case?

17           MR. MASTRO:  Objection to form.

18           THE COURT:  Overruled.

19   A.  I don't recall exactly.

20   Q.  Did the plaintiffs offer to pay you $300,000 towards the

21   end of 2010 for your assistance in the case?

22           THE COURT:  I am sure you realize, also, if you think

23   about it, that in this context, the use of the word

24   "plaintiffs" leaves the identity of the person inquired about

25   absolutely useless.

1           MS. LITTLEPAGE:  Let me ask another question.

2           THE COURT:  I am just trying to have a clear record.

3    Q.  Is it your testimony that in the end of 2010, the

4    plaintiffs' group on behalf of the Lago Agrio plaintiffs

5    offered to pay you $300,000 for your assistance in the case?

6    A.  No.

7    Q.  Do you recall telling Chevron's representatives that the

8    plaintiffs' group for the Lago Agrio plaintiffs had offered to

9    pay you $300,000 for your assistance in the case?

10          MR. MASTRO:  Objection.  The transcript speaks for

11   itself.

12          THE COURT:  I will hear his answer.

13   A.  There was an exaggeration from a part towards Chevron's

14   people in order to secure a better position for myself.

15   Q.  But it was not true, is that correct?

16   A.  It was not true.

17   Q.  Now, as to the agreement that you have described between

18   Judge Zambrano and the plaintiffs' lawyers, who represented the

19   Lago Agrio plaintiffs, isn't it true that you never spoke to

20   the plaintiffs' lawyers about that deal, the deal they had with

21   Judge Zambrano?

22   A.  Can you please clarify your question, if you're referring

23   to expediting the case or the judgment?

24   Q.  Let's start with the second one.  Isn't it true, sir, that

25   you never personally discussed any deal with the plaintiffs'

DAP8CHE5                    Guerra - cross

1   group as to what they would pay Judge Zambrano for rendering

2   the verdict in their favor?

3   A.  I didn't talk to them initially specifically regarding

4   that, but they knew from me that Judge Zambrano wanted $500,000

5   in order to let them draft the judgment.  I told them that.

6   Q.  If you turn to page 47 of tab 2, Defendants' Exhibit 1360.

7           Did you tell Chevron's representatives that you never

8   spoke to the plaintiffs regarding this?

9   A.  In this part of the conversation, I am referring to, saying

10  that Mr. Zambrano makes the deal with the plaintiffs regarding

11  the $500,000 and that I did not intervene in that.

12  Q.  Your only knowledge of that deal is what Judge Zambrano

13  told you, correct?

14  A.  We were in the final agreement regarding the money.  If it

15  was $500,000 or more or less, if it would be paid or not, and I

16  did not intervene in any such conversation, and what I know is

17  because what Mr. Zambrano expressly told me regarding that

18  issue.

19  Q.  How much of the $500,000 were you supposed to get, sir?

20  A.  Mr. Zambrano spoke about sharing a percentage with me,

21  which he said it would be 20 percent.

22  Q.  Now, is this the first time you have ever put the number 20

23  percent on that agreement?

24  A.  Yes.  From what I can recall, yes.

25  Q.  Isn't it true, sir, that in all of your prior declarations,

DAP8CHE5                          Guerra - cross

1   you have never previously said that Judge Zambrano told you he

2   was going to give you 20 percent?

3   A.  I did not mention the percentage.

4   Q.  What suddenly made you decide to mention the percentage?

5   A.  Mr. Zambrano generally gave me important amounts, large

6   amounts, percentages, when there was an opportunity to do so.

7   Q.  If you turn to tab 5 of Defendants' Exhibit 1363, the

8   November 14, 2012 declaration.  Can you turn to page 5 of tab

9   5, paragraph 23.

10          In that declaration, on the last sentence of paragraph

11  23, do you discuss that Judge Zambrano was going to share part

12  of the money with you from the verdict?

13          THE COURT:  Next.

14  Q.  Did you identify what percentage --

15          THE COURT:  No.  Next.  I can read it.

16  Q.  Mr. Guerra, as I understand your testimony, you talk about

17  a daughter of a friend of Judge Zambrano's coming to retype his

18  orders.  Do you know the name of that person?

19  A.  No, not the name.  The last name, yes.

20  Q.  Can you tell us the last name?

21          THE COURT:  He has done that quite a few times, hasn't

22  he?

23  A.  Yes.

24          THE COURT:  Can we move along?

25  Q.  Do you have any personal knowledge -- let's start with, do

DAP8CHE5                          Guerra - cross

1    you have any personal knowledge of when this daughter started

2    working for Judge Zambrano?

3    A.   It was before the second term the Chevron case began.

4    Q.   How long did she work for Judge Zambrano?

5    A.   Some time.

6    Q.   Weeks, months, years?

7    A.   From what I understand, she worked until the time when he

8    was dismissed.

9    Q.   Did she work all day or in the evenings or on the weekends?

10   A.   Every day.

11   Q.   Was she an employee of the court?

12   A.   No.  She was an employee of Mr. Zambrano's.

13   Q.   Would she sit in Mr. Zambrano's office at his computer

14   during the days?

15   A.   Yes.

16   Q.   So people walking by Mr. Zambrano's office would be able to

17   see her in his office working, is that correct?

18            MR. MASTRO:  Objection.

19            THE COURT:  What is the objection?

20            MR. MASTRO:  It assumes you can see into his office.

21            THE COURT:  Overruled.

22   A.   If the window and the door that leads into Mr. Zambrano's

23   office had the curtains up, obviously, any person could see

24   her.

25   Q.   Did she work 9 to 5, a full day?

DAP8CHE5                          Guerra – cross

1   A.  I cannot speak as to her schedule, but when I would

2   regularly visit the courthouse, I would find her, I would find

3   her working during work hours.

4   Q.  Mr. Guerra, what is the reason why you never mentioned the

5   daughter typing for Judge Zambrano in any of your prior

6   declarations?

7              MR. MASTRO:  Objection.

8              THE COURT:  What is the objection?

9              MR. MASTRO:  What is the reason why he didn't mention

10  a huge number of things in his declaration?  He had certain

11  things in his declarations and then other issues have come up

12  that have become relevant.

13             THE COURT:  Overruled.

14             Please answer it.

15  A.  I didn't mention her because my initial statement of

16  November of 2012 was very compact, very specific.  It didn't

17  include details such as this one.

18  Q.  When did you first learn that Judge Zambrano's computer

19  from the courthouse was being analyzed by a forensic scientist

20  in Ecuador?

21             MR. MASTRO:  Objection.  Foundation.  It assumes facts

22  not in evidence.

23             THE COURT:  Sustained.

24  Q.  Do you know, sir, if Judge Zambrano's computer has been

25  analyzed by a forensic expert in Ecuador?

DAP8CHE5                    Guerra - cross

1          MR. MASTRO:  Objection.  Personal knowledge, your

2     Honor.  And whether there's any attorney-client communications

3     involved in that.

4          THE COURT:  Rephrase your question appropriately,

5     counsel.

6     Q.  Without giving me any details or describing any

7     conversation, can you tell me if you learned that Judge

8     Zambrano's computer was being analyzed by a forensic expert in

9     Ecuador?

10          THE COURT:  The question assumes that your premise is

11     true.

12          MS. LITTLEPAGE:  We filed a declaration on that exact

13     issue.

14          THE COURT:  I know that, but whether it's true or not

15     remains to be seen, and whether the person is an expert or not

16     remains to be seen.  Lots of things remain to be seen.

17     Q.  Mr. Guerra, have you been told, without telling the details

18     of the conversation, have you been told that Judge Zambrano's

19     computer was being analyzed by a forensic technician in

20     Ecuador?

21          MR. MASTRO:  Objection.  Also on hearsay grounds.

22          THE COURT:  It goes to state of mind, and I will

23     receive it only on that basis.

24          Now, if there is any other objection, what is it?

25          MR. MASTRO:  It's also a question of has he been told

DAP8CHE5                     Guerra - cross

1    by who and whether that invades attorney-client communications.

2              THE COURT:  Overruled.

3    A.  I found out that there was an attempt to carry out that

4    forensic analysis when I became aware of the details of the

5    complaint that Mr. Fajardo and others filed in the prosecutor's

6    office against me in Lago Agrio.

7    Q.  When did you find out that there was an analysis by a

8    forensic technician in Ecuador of Judge Zambrano's computer?

9              THE COURT:  Sustained.

10             Mr. Guerra, when did you learn of what you just told

11   us you learned?

12             THE WITNESS:  Several months ago.  It seems to me it

13   was February or March of the current year, 2013.

14             THE COURT:  Proceed, Ms. Littlepage.

15   Q.  Now, after the verdict was issued on February 14, 2011,

16   Judge Zambrano issued a clarification, is that correct?

17             THE COURT:  It's in evidence.  Move along.

18   Q.  Isn't it true, sir, that you did not write the

19   clarification?

20   A.  I provided guidance so that the order you're referring to

21   would come out properly.

22   Q.  By guidance, do you mean you discussed the issue with Judge

23   Zambrano on the telephone?

24   A.  Yes.

25   Q.  Is it true, sir, that you have no personal knowledge about

1   the appellate panel that ruled on the Ecuador judgment?

2   A.  I had no involvement, no knowledge, nothing.

3   Q.  Mr. Guerra, isn't it true that Chevron asked you to provide

4   them with copies of orders that you had written when you were a

5   judge so that they could compare your writing style with the

6   verdict?

7            MR. MASTRO:  Objection, your Honor.

8            THE COURT:  What is the objection?

9            MR. MASTRO:  It's form and it assumes the witness

10   would know the reasons why something was requested, even if it

11   were requested.

12           THE COURT:  Sustained as to form.

13   Q.  Sir, did Chevron request copies of orders that you had

14   written as a judge from you?

15   A.  The copies of those orders were in my computer.  So that

16   when I provided the computer to Chevron, those orders were in

17   the computer and Chevron had access to those documents.

18   Q.  Did you understand, sir, that the specific purpose was to

19   find similarities between your prior orders and all these

20   things that were going on in the case?

21           MR. MASTRO:  Objection, your Honor.

22           THE COURT:  Sustained.

23   Q.  Did you have an understanding as to why Chevron wanted

24   copies of your prior orders when you were a judge, not when you

25   were assisting Judge Zambrano?

DAP8CHE5                          Guerra - cross

1              MR. MASTRO:  Same objection.

2              THE COURT:  Sustained.

3  Q.  Why did Chevron want copies of your orders when you were a

4  judge?

5              MR. MASTRO:  Same objection.

6              THE COURT:  Sustained.

7              THE COURT:  You want to ask him why my wife went to

8  Bloomingdale's?

9  Q.  Were you told by Chevron why they wanted copies of your

10  orders when you were a judge?

11             THE COURT:  Answer yes or no.

12  A.  No.

13  Q.  If you turn to page 54 of tab 2, Defendants' Exhibit 1360.

14             On June 25th of 2012, did you tell the Chevron

15  representatives that you understood that the specific purpose

16  for getting those orders was to look for similarities?

17             THE COURT:  Here we go again.  Reading, reading,

18  reading.  Do you have a question about it, other than, didn't

19  you say that?  We know he said that.  That's why there was a

20  stenographer.  We know what your last question was because we

21  have a stenographer here, counsel, and we don't need to ask you

22  what your last question was for that reason.

23             Could we get with the program?

24  Q.  What was the basis for your statement that Chevron wanted

25  copies of your formal orders to look for similarities?

DAP8CHE5                          Guerra - cross

1    A.   I have been an attorney and a judge, for 14 years an

2    attorney and also 14 years as a judge, so that I can tell

3    what's coming in the future.

4              THE COURT:  It would be nice if that were really the

5    case.

6              MR. GOMEZ:  May we take a short break, please?

7              THE COURT:  Ten minutes.

8              MR. GOMEZ:  Thank you.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  What's your current estimate,

2   Ms. Littlepage?

3              MS. LITTLEPAGE:  Fifteen minutes.

4              THE COURT:  Thank you.  Proceed.

5              The witness is still under oath.

6              You may proceed, counselor.

7   BY MS. LITTLEPAGE:

8   Q.  Mr. Guerra, can you describe why you were dismissed as a

9   judge?

10  A.  The judicial council, which is the body charged with

11  control and oversight of the judicial function in Ecuador,

12  determined that I had committed serious fault when at one point

13  I privately stated or expressed that in the event that I should

14  again become president of the court, I would rule to nullify

15  the case against Chevron, and this took place in the month of

16  May 2008.

17             After that, in June of that same year, unexpectedly

18  and strangely, a second dismissal against me was made.  And

19  then finally in the month of July of that same year, I was

20  dismissed for the third time.  There was a third dismissal

21  order.

22  Q.  Mr. Nunez, were you also -- Mr. Guerra, were you also

23  immediately suspended from your position at any time?

24  A.  Yes.

25  Q.  And let me hand you what's been marked as Defendant's

DAPLCHE6                    Guerra - cross

1    Exhibit 1440.

2              MR. MASTRO:  Your Honor, may we approach the side bar?

3              THE COURT:  Yes.

4              (At the side bar)

5              MR. MASTRO:  Your Honor, Ms. Littlepage, who may not

6    be familiar with this history, is attempting to introduce a

7    document, I believe, that she would attempt to elicit from the

8    witness that this is an article or a speech that he had

9    prepared at a particular point in time talking about some

10   personal views or observations and experiences of his own

11   family, his father.

12             This same document was attempted to be used at

13   Mr. Guerra's deposition.  The special master, Special Master

14   Gitter, expressly ruled "it's absolutely irrelevant for the

15   purpose that you're seeking to use it at this deposition."

16   There was an in camera -- that's on deposition transcript page

17   231.  They had in camera presentation to Special Master Gitter.

18   He reiterated his ruling that it was absolutely irrelevant, and

19   the defendants never appealed that ruling about being able to

20   use this document and question this witness on it.

21             I can explain on the face of it when you look at it

22   why this would be completely irrelevant and out of bounds given

23   your Honor's prior rulings about going into the merits or any

24   subjective views he may have about environmental conditions or

25   subjective views he may have about his own family members'

DAPLCHE6                    Guerra - cross

1    experiences.  This is way, way out of bounds.  And to try to

2    use this with this witness when a special master already

3    ruled --

4              THE COURT:  All right.  I got that point the first

5    time.

6              What is this?

7              MS. LITTLEPAGE:  Judge, it's a document that

8    Mr. Guerra identified as a document he wrote.

9              THE COURT:  Fine.  What is it, what does it do?

10             MS. LITTLEPAGE:  He wrote it as part of a speech --

11   actually, at the deposition he said two things.  He wrote it as

12   part of a speech he was going to give to students.  Then he

13   also said he wrote part of it relating to his father.  At the

14   deposition Mr. Guerra said the document was written in 1985.

15             MR. MASTRO:  That's not true.

16             THE COURT:  Are you disputing that?

17             MR. MASTRO:  Absolutely, your Honor.  That's when he

18   said his father passed away.

19             THE COURT:  Okay.

20             MS. LITTLEPAGE:  But clearly on page 21 of the

21   document, it's clear the document records events from 2010

22   because he talks about the case lasting seven years and it was

23   filed in 2003 in Ecuador.  And it says in Ecuador, of my

24   country.

25             THE COURT:  All right.  So what?

DAPLCHE6                    Guerra - cross

1            MS. LITTLEPAGE:  Well, Judge, I want to ask him about

2   the information that's contained on page 23 and 24 relating to

3   his suspension.

4            THE COURT:  What about it?

5            MS. LITTLEPAGE:  Well, I can just introduce the

6   document.  Then we don't have to talk about it at all.

7            THE COURT:  Why is any of it relevant?  Could you get

8   to the point, please.

9            MS. LITTLEPAGE:  Judge, I think for bias and

10  credibility it's important to establish that this person was

11  reprimanded and sanctioned as a judge under these

12  circumstances.

13           THE COURT:  He was reprimanded, sanctioned, he was

14  removed.  Okay, you've got that.  It's on the record.  Now.

15           MS. LITTLEPAGE:  May I ask about the details?

16           THE COURT:  May you explain what the heck this is all

17  about because what I get is I ask you questions and I get back

18  all too often vague generalities that are sort of like excerpts

19  from the table of contents from the Corpus Juris Secundum.

20           I would like to know what the relevance of it is.

21  That's what I want to know.

22           MS. LITTLEPAGE:  I believe it is relevant on bias and

23  credibility.

24           THE COURT:  I didn't ask what your theological beliefs

25  are.  I want you to point to something and explain to me how it

DAPLCHE6                    Guerra - cross

1    bears on bias or credibility.

2            MS. LITTLEPAGE:  Judge Guerra was suspended from his

3    position because of a decision he made in the Mrs. Guadelupe

4    Lore case involving her detention.

5            THE COURT:  All right.  Now, what about the

6    explanation?

7            MS. LITTLEPAGE:  Well, I'm going to ask him.

8            THE COURT:  Against whom is he biased by virtue of

9    that?

10           MS. LITTLEPAGE:  Well, Judge.

11           THE COURT:  Answer the question.

12           MS. LITTLEPAGE:  I believe it shows a certain -- it is

13   some information on his credibility as a judge and his

14   credibility as an officer of the court when he was a judge.

15           THE COURT:  The fact that he was suspended or whatever

16   goes to credibility, is that the argument?

17           MS. LITTLEPAGE:  Yes, Judge.  I would believe a judge

18   being suspended goes to the credibility of that person.

19           THE COURT:  So you're offering this for the truth of

20   the charges against him; is that right?

21           MS. LITTLEPAGE:  No.  I think I'm offering it not for

22   the truth of the charges but the truth of the sanction.

23           THE COURT:  Well, that he's already admitted, right?

24           MR. GOMEZ:  Your Honor.

25           THE COURT:  One at a time.  You'll get your chance.

DAPLCHE6                      Guerra - cross

1           MS. LITTLEPAGE:  Can I get Mr. Gomez's help at this

2    particular?

3           THE COURT:  If you're finished.

4           MS. LITTLEPAGE:  I'm finished.

5           THE COURT:  Mr. Gomez.

6           MR. GOMEZ:  Your Honor, my understanding is there's

7    also a separate reason for this document.  We have come to

8    learn or we've received information that the reason why the

9    witness actually received the memory aid from Mr. Fajardo is to

10   assist him in preparing this particular document, that that was

11   the basis why he received the memory aid, not the basis to

12   which he is testified.

13          We would like the opportunity to question him about

14   this document, when he wrote it, when he prepared it, and

15   whether he recalls receiving the memory aid at that time to

16   prepare this particular document.

17          MR. MASTRO:  Your Honor, Ms. Littlepage already asked

18   him that very question about the speech he gave in 2010,

19   whether he got the memory aid for that, and he answered flat

20   out no.

21          THE COURT:  Is there any link between the memory aid

22   and any content in this document?

23          MR. MASTRO:  Zero.

24          MS. LITTLEPAGE:  I don't know the answer, Judge.

25          THE COURT:  You read the memory and you read the

DAPLCHE6                    Guerra - cross

1   document.  Right?  Is there something in the document that's in

2   the memory aid?

3            MS. LITTLEPAGE:  I think there's lots of things in the

4   document in the memory aid.  Is there a quote from the memory

5   aid --

6            THE COURT:  Get the memory aid and show them to me.

7            MS. LITTLEPAGE:  Judge, the memory aid has a time

8   line.  I don't know that there's anything specific.

9            THE COURT:  Show me the equivalent material in here,

10  other than the fact that the case started in 2003 and has been

11  pending seven years.

12           MS. LITTLEPAGE:  That's why I don't want to make this

13  argument.  I want Mr. Gomez to make this argument.

14           MR. MASTRO:  If I may, your Honor, the memory aid

15  gives a time line procedurally of the Lago Agrio trial.

16           THE COURT:  I understand.

17           MR. MASTRO:  This is largely a narrative about

18  environmental issues and conditions.  The two don't overlap

19  other than that they reference the fact that there is such a

20  case.  And there's no direct content of the one and the other.

21           THE COURT:  Mr. Gomez has absented himself from the

22  side bar.

23           (Pause)

24           THE COURT:  All right.  The record will reflect that

25  there is a lengthy period going by while counsel for the

DAPLCHE6                     Guerra - cross

1   defendants are searching through things and consulting at

2   counsel table.

3            MS. FRIEDMAN:  Could I suggest something, your Honor?

4            THE COURT:  Yes.  What?

5            MS. FRIEDMAN:  I'd suggest we just leave this issue.

6   We don't need Mr. Guerra to prove this one way or the other.

7   We've got the two documents.  If we can find a connection,

8   we'll show them to you.

9            THE COURT:  Is that acceptable to Mr. Gomez?

10           MR. GOMEZ:  Yes.

11           MR. MASTRO:  Thank you, your Honor.

12           THE COURT:  Okay.  We'll leave it.

13           MS. LITTLEPAGE:  Judge -- you do agree this is his

14  document, right, I don't need to ask him anything to

15  authenticate it?

16           MR. MASTRO:  It was already raised at his deposition,

17  which in evidence.

18           THE COURT:  Just answer the question, please,

19  Mr. Mastro.

20           MR. MASTRO:  Yes, he acknowledged it was his document

21  at the deposition.

22           THE COURT:  You're not disputing that?

23           MR. MASTRO:  I am not, just that it shouldn't come

24  into evidence.

25           THE COURT:  I understand.

1              (In open court)

2              THE COURT:  Proceed, counsel.

3     BY MS. LITTLEPAGE:

4     Q.  Mr. Guerra, let me hand you what's been marked as

5     Plaintiff's Exhibit 1714.

6              MS. LITTLEPAGE:  Judge, I move to admit Plaintiff's

7     Exhibit 1714.

8              THE COURT:  Is there an objection or not?

9              MR. MASTRO:  No objection, your Honor.

10             THE COURT:  Received.

11             (Plaintiff's Exhibit 1714 received in evidence)

12    Q.  Mr. Guerra, is Plaintiff's Exhibit 1714 on page 1 a copy of

13    a check made payable to you, sir?

14    A.  Yes.

15    Q.  And at the bottom half of the page there seems to be a

16    signature.  Is that your signature, sir, on the back of the

17    check?

18    A.  Yes, it is.

19    Q.  And is that your centensa number or ID number written below

20    your signature?

21    A.  Yes.

22    Q.  And is that your handwriting writing your centensa number?

23    A.  Yes.

24    Q.  And is that true for page 3, the bottom half of page 3 of

25    Plaintiff's Exhibit 1714, is that your signature and your

DAPLCHE6                    Guerra - cross

1   handwriting with your number?

2   A.  Yes.

3          MS. LITTLEPAGE:  Those are my questions.  Thank you,

4   Mr. Guerra.

5          THE COURT:  All right.  Thank you.

6          Mr. Gomez.

7   CROSS-EXAMINATION

8   BY MR. GOMEZ:

9   Q.  Buenas tardes, Sr. Guerra.

10         THE INTERPRETER:  Good afternoon, Mr. Guerra.

11         THE COURT:  In English, please, Mr. Gomez.

12  Q.  Good afternoon, Mr. Guerra.

13  A.  Thank you very much.  Good afternoon, Mr. Gomez.

14  Q.  Mr. Guerra, as a practicing attorney, you bribed judges on

15  occasion to rule in favor of your clients; is that correct?

16  A.  When I practiced my profession, yes.

17  Q.  And you practiced your profession from 1982 to 1995; isn't

18  that correct?

19  A.  Yes.

20  Q.  How many times did you bribe judges between 1982 and 1995,

21  sir?

22  A.  I couldn't say exactly.

23  Q.  More than ten?

24  A.  I consider it was more.

25  Q.  More than 20?

DAPLCHE6                       Guerra – cross

1    A.   Possibly not.

2    Q.   What kinds of cases did you bribe judges in on behalf of

3    your clients when you were an attorney?

4    A.   Specifically civil matters and administrative matters.

5    Q.   Did you ever solicit bribes in criminal cases as an

6    attorney on behalf of a client, sir?

7              THE COURT:   Solicit bribes on behalf of a client, you

8    really meant that question?

9    Q.   Offer bribes on behalf of a client, excuse me.

10   A.   I don't recall specifically.

11   Q.   What was the largest amount of money that you ever offered

12   a judge to bribe in while you were an attorney, Mr. Guerra?

13   A.   If you allow me, back then in Ecuador the currency was the

14   sucre.  And, therefore, upon doing a quick mathematical

15   calculation, it must have been between 3,000 and $5,000.

16   Q.   And you became a judge in 1995; is that correct?

17   A.   Yes.

18   Q.   And as a judge, you occasionally accepted bribes from

19   litigants in exchange for issuing favorable rulings; isn't that

20   correct?

21   A.   Yes.

22   Q.   How many times, sir, did you accept bribes from litigants

23   in exchange for issuing favorable rulings?

24   A.   I couldn't say.

25   Q.   More than ten times?

DAPLCHE6                          Guerra - cross

1   A.  I considered that it's yes.

2   Q.  More than 20 times?

3   A.  No.

4   Q.  In what kinds of cases did you accept bribes as a judge?

5   A.  Specifically civil issues.

6   Q.  What was the lowest amount of money that you accepted as a

7   bribe when you were a judge?

8   A.  200, $300.

9   Q.  I guess it doesn't take very much, does it, Mr. Guerra?

10          MR. MASTRO:  Objection.

11          THE COURT:  All right, counsel.  Cut it out.

12  Q.  Did those bribes always involve the exchange of judgment

13  for money, sir, or did they ever involve the exchange of

14  favors?

15  A.  Can you specify what kinds of favors you're referring to,

16  please?

17  Q.  Any kind of favor that didn't involve the exchange of

18  money.

19  A.  No, they didn't involve any favor.

20  Q.  Was there any occasion when you used a bribe to gain a

21  result favorable to a member of your family?

22  A.  No.

23  Q.  So you never offered a bribe to have a family member win a

24  case against them?

25  A.  I don't recall.

DAPLCHE6                    Guerra – cross

1   Q.  You would not have any hesitation, sir, would you, to

2   accept a bribe or solicit a bribe to help out a member of your

3   family; is that correct?

4            MR. MASTRO:  Objection.

5            THE COURT:  Sustained.

6   Q.  Isn't your family the most important thing in your life,

7   sir?

8            MR. MASTRO:  Objection, relevance.

9            THE COURT:  Overruled.

10  A.  Yes.

11  Q.  Would you ever pay a bribe to help a member of your family?

12           MR. MASTRO:  Objection.

13           THE COURT:  Sustained.

14           Where are you going with this?

15           MR. GOMEZ:  I'll move on, your Honor.

16  Q.  Mr. Guerra, you're married?

17  A.  Yes.

18  Q.  How long have you been married?

19  A.  I was married from 1975 to 1990 and from 1997 to the

20  present.

21  Q.  And you have three children as a result of that marriage;

22  is that correct?

23  A.  Yes.

24  Q.  You have a daughter and two sons, right?

25  A.  Yes.

DAPLCHE6                    Guerra – cross

1    Q.  Your daughter is married, yes?

2    A.  Yes.

3    Q.  She lives in the United States?

4    A.  Yes.

5    Q.  She has legal residency in the United States; is that

6    correct?

7    A.  Yes.

8    Q.  How long has she lived in the U.S.?

9    A.  Since 2009 to the present.

10   Q.  Has she returned to Ecuador since 2009?

11   A.  No.

12   Q.  She married her American boyfriend while she lived here; is

13   that correct?

14   A.  Yes.

15   Q.  And she lives in Chicago, right?

16   A.  Yes.

17   Q.  Another one of your sons has been living in the United

18   States as well; is that correct?

19   A.  Yes.

20   Q.  When did he arrive in the United States, sir?

21   A.  In 2004.

22   Q.  Has he returned to Ecuador since 2004?

23   A.  No.

24   Q.  That son does not have legal residency in the United

25   States; is that correct?

DAPLCHE6                    Guerra - cross

1   A.  Yes.

2   Q.  He has a wife, right?

3   A.  Yes.

4   Q.  Does he have any children?

5   A.  Yes.

6   Q.  How many children does he have?

7   A.  Two.

8   Q.  Has he tried to obtain legal residency in the United States

9   during the time he's been here since 2004?

10  A.  I understand that he has done everything possible to obtain

11  it, but it hasn't been feasible.

12  Q.  And that has been the subject of concern for you, has it

13  not?

14  A.  Yes.

15  Q.  And a subject of concern for your wife?

16  A.  It also concerns my wife.  My son's immigration status also

17  concerns my wife, yes.

18  Q.  In fact, isn't it correct, sir, that both you and your wife

19  have been concerned that your son, who has a wife and child in

20  this country, could be deported at any moment; isn't that

21  correct?

22  A.  The concern exists.

23  Q.  Does that son live in Chicago too, sir?

24  A.  Yes.

25  Q.  You have a third child, a second son; is that correct?

DAPLCHE6                     Guerra - cross

1    A.  My first son.

2    Q.  He's married with two children; is that correct?

3    A.  Yes.

4    Q.  And that son and his family relocated to the United States

5    with you and your wife when you relocated to the U.S.; isn't

6    that correct?

7    A.  He moved days after I moved.

8    Q.  And Chevron paid his relocation expenses as well; isn't

9    that correct?

10   A.  Yes.

11   Q.  And Chevron has hired him an immigration attorney; is that

12   correct?

13   A.  There is only one immigration attorney who is -- who is in

14   charge of the entire immigration situation for the family.

15   Q.  Is that immigration attorney in charge of the immigration

16   situation of both of your sons?

17   A.  Yes.

18   Q.  Before the year 2012, sir, the year that you made contact

19   to tell Chevron you helped ghostwrite the judgment, you had not

20   seen your daughter or your son for several years; isn't that

21   correct?

22   A.  Yes.

23   Q.  How many years?

24   A.  I don't recall.

25   Q.  Can you estimate?

DAPLCHE6                    Guerra - cross

1   A.  My daughter, since 2009.  So 2012, it would have been

2   three.  And from what I can recall, it seems to me I had seen

3   my son in 2008.

4   Q.  Was that a long time to be separated from your children,

5   sir?

6   A.  The -- yes.

7   Q.  And you miss them; isn't that correct?

8   A.  Every parent loves his children.

9   Q.  And your wife missed them; isn't that correct?

10  A.  Yes.

11  Q.  Weren't you worried that your daughter was living so far

12  away from home and the guidance of her father?

13  A.  In certain, in a certain way, yes.  But because of my

14  daughter's upbringing and her culture, I knew that, you know,

15  you have to give your children wings.  They have to have the

16  right.

17  Q.  And weren't you worried that your son could be arrested and

18  deported for being in the United States illegally?

19          MR. MASTRO:  Objection, asked and answered.

20          THE COURT:  Sustained.

21  Q.  Sir, you've always wanted your children to live in the

22  United States; isn't that correct?

23  A.  No.

24  Q.  Isn't that why you encouraged your children to learn

25  English at an early age?

DAPLCHE6                     Guerra - cross

1   A.  I encouraged them to learn English as part of their

2   upbringing and culture and for a greater chance at success.

3   Q.  Didn't your children think they had a better chance of

4   success in the United States?

5           MR. MASTRO:  Objection.

6           THE COURT:  Hold it.  Hold the translation.

7           Sustained.

8   Q.  You believe that your children could do better in the

9   United States; isn't that correct?

10  A.  No.

11  Q.  So you're telling me that if your children were

12  professionals in the United States, you don't think they would

13  have a better chance at a better life?

14          MR. MASTRO:  Objection, argumentative.

15          THE COURT:  Sustained.

16  Q.  Sir, in July 2012, you were unemployed; isn't that correct?

17          MR. MASTRO:  Objection, asked and answered.

18          THE COURT:  Sustained.

19  Q.  On or around July 2012, sir, you had worked for a

20  municipality that was paying you an average of $1,000 a month;

21  isn't that correct?

22  A.  Yes.

23  Q.  And even though that municipality was supposed to pay you

24  more in salary, it couldn't keep up with those payments; isn't

25  that correct?

DAPLCHE6                    Guerra - cross

1    A.   That did not take place.

2    Q.   What didn't take place, sir?

3    A.   The possibility of receiving a higher payment that I

4    received.

5    Q.   And then when you went to work for the insurance company as

6    an attorney, you only made $500 a month; isn't that correct?

7    A.   At that time, yes.

8    Q.   So at the time that you went to meet with Chevron initially

9    to explain to them for the first time your involvement in

10   ghostwriting the judgment, you were only earning $500 a month;

11   isn't that correct?

12          MR. MASTRO:  Objection to form.  Misstates the prior

13   testimony.

14          THE COURT:  Look, you have the facts in the record.

15   Let's move on.

16   Q.   Sir, at the time that you made your initial contact with

17   Chevron in 2012, you had no savings, did you?

18   A.   I had some moneys.  I had moneys but, but to invest them.

19   I didn't have moneys as savings.

20   Q.   And then on July 13, 2012, Chevron paid you $18,000 in

21   cash; isn't that correct?

22   A.   Yes.

23   Q.   And you asked Chevron's representatives that day if you

24   could add a couple of zeros to that was how you testified; is

25   that correct, sir?

DAPLCHE6                    Guerra - cross

1            MR. MASTRO:  Asked and answered.

2            THE COURT:  Look, Mr. Gomez, I know it's

3    cross-examination, but I'm not deaf, dumb, and blind.  I've

4    heard it all, so far, for at least eight hours of

5    cross-examination and several hours of direct.  I'm not going

6    to tolerate repetition.  Just get on with it.

7    Q.  Mr. Guerra, isn't it true that at the end of that day, you

8    understood that Chevron was willing to pay you more money if

9    you had more information to give it?

10   A.  That was not talked about.

11   Q.  I didn't ask you if it was talked about.  I asked you if

12   you understood that day that if you were to give Chevron more

13   information, Chevron would pay you more money?

14           THE COURT:  Are you asking whether somebody told him

15   that or are you asking him whether it's what he thought?

16           MR. GOMEZ:  I'm asking him whether he had an

17   understanding, sir, that goes to his state of mind.

18           MR. MASTRO:  Objection, your Honor.

19           THE COURT:  Well, you obviously didn't get the point

20   of my remark.  It makes a difference whether it's an assumption

21   on his part or whether somebody told him that.  Try to ask a

22   proper question.

23   Q.  Mr. Guerra, did you assume on July 13, 2012, after Chevron

24   paid you $18,000 in cash, that if you provided Chevron with

25   more information, Chevron would pay you more money?

DAPLCHE6                    Guerra – cross

 1             MR. MASTRO:  Objection, your Honor.

 2             THE COURT:  Overruled.

 3   A.  No, sir.

 4   Q.  Were you surprised, sir, when Chevron gave you $20,000 on

 5   July 31, 2012, for you providing Chevron with more evidence?

 6             MR. MASTRO:  Objection.  Misstates prior testimony,

 7   assumes facts not in evidence.  And the agreements themselves

 8   are the best evidence of this and speak for themselves.

 9             THE COURT:  Overruled.  I know the hour is drawing

10   late, but let's try to focus, folks.

11             MR. GOMEZ:  Can the last question be read back?

12             THE COURT:  Do you need the question read back,

13   Mr. Guerra, or do you remember it?

14             THE WITNESS:  I remember it, sir.

15             THE COURT:  Answer it, please.

16             THE WITNESS:  On November 2 of 2012, Chevron didn't

17   give me money because it wanted to give it to me.  In some way

18   I demanded, I requested, I demanded that that amount of money

19   should be given to me both in order to continue cooperating

20   with them, as well as for my time and my efforts from months

21   before to gather evidence that I was providing to them every

22   now and then.

23             MR. GOMEZ:  Your Honor, I move to strike for

24   nonresponsiveness.

25             THE COURT:  Granted.

DAPLCHE6                    Guerra - cross

1          The question was, sir, were you surprised?

2          MR. GOMEZ:  Could we please read back the question

3    that began with were you surprised?

4          THE COURT:  Please read it back.

5          What's the problem, Mr. Mastro?

6          MR. MASTRO:  It assumes a date of a certain payment

7    and the witness testified about a subsequent date.  It's --

8          THE COURT:  What was the date you say he said it was?

9          MR. MASTRO:  November 2.  The question was about

10   July 31, and that's why I objected in the first place.

11         THE COURT:  Thank you.  Sustained.

12         MR. MASTRO:  Thank you.

13   Q.  Mr. Guerra, when you received an additional $20,000 --

14   withdrawn.

15         Mr. Guerra, when Chevron paid you $20,000 to obtain

16   possession of items that belonged to you in November, were you

17   surprised to receive that payment, sir?

18         MR. MASTRO:  And, objection, asked and answered.  That

19   was the answer he gave.

20         THE COURT:  Overruled.

21   A.  No.

22   Q.  And when you received $10,000 for providing Chevron with a

23   copy of the memory aid, were you surprised then to receive a

24   payment?

25   A.  That one did surprise me.  I was not expecting it.

DAPLCHE6                    Guerra - cross

1   Q.  Sir, I'd like to turn your attention to Plaintiff's

2   Exhibit 1671.

3            MR. GOMEZ:  It is in evidence, your Honor.  I don't

4   know if is it before the witness, Mr. Guerra.

5            THE COURT:  I have it.

6            MR. GOMEZ:  Your Honor, do you have the binder that

7   was used for the direct examination?

8            THE COURT:  I can't answer that quite directly, but I

9   have one that has this document in it.

10           MR. GOMEZ:  Your Honor, may I approach the witness?

11           THE COURT:  Yeah.

12  Q.  Mr. Guerra, do you have Plaintiff's Exhibit 1671 dated

13  January 27, 2013 titled agreement?

14  A.  In English, yes, sir.

15  Q.  Sir, I want to draw your attention back to November of

16  2012.  When you met with Chevron representatives, including

17  attorneys from the firm of Gibson Dunn in Chicago, isn't it

18  correct, sir, that you reached agreements with Chevron's

19  representatives that ultimately ended up in the agreement,

20  Plaintiff's Exhibit 1671, during that meeting in Chicago in

21  November of 2012, sir?

22  A.  In November, given the shortness of time, as far as I can

23  recall, I was with them for only two days.  We did not make

24  great approaches, overtures towards accomplishing the

25  agreement.

DAPLCHE6                    Guerra - cross

1  Q.  Isn't it true, sir, that during that meeting in November of

2  2012, you and Chevron agreed that you would be paid $12,000 per

3  month for cooperating with Chevron in this case?

4  A.  No, sir.

5  Q.  Isn't it true, sir, that while you were in Chicago,

6  November of 2012, you and Chevron agreed that Chevron would

7  hire you an immigration attorney for your cooperation in this

8  case?

9  A.  Chevron stated some benefits that I was to receive and

10 among them was the hiring of an attorney, an immigration

11 attorney, who would take charge of the immigration case for

12 myself and my wife.

13 Q.  Isn't it true that while you were in Chicago in November of

14 2012, you and Chevron agreed that Chevron would buy health

15 insurance for you and your family in exchange for your

16 cooperation in this case?

17 A.  Chevron mentioned they would be buying health insurance

18 policy for myself and my wife.

19 Q.  And --

20         THE COURT:  Mr. Gomez, is there some significance in

21 your submission between whether agreements on these points, all

22 of which are in the document, occurred on November 2, as

23 distinguished from at some later date, no later than

24 January 27?

25         MR. GOMEZ:  Yes, there is, your Honor.

DAPLCHE6                    Guerra - cross

 1              THE COURT:  Go ahead.

 2              MR. GOMEZ:  Thank you.

 3   Q.  Is it true, sir, that while you were in Chicago in November

 4   of 2012, you and Chevron agreed that Chevron would lease you an

 5   automobile in exchange for your cooperation in this case?

 6   A.  Yes, sir.

 7   Q.  Isn't it also true, sir, that while you were in Chicago in

 8   November of 2012, you and Chevron agreed that Chevron would

 9   cover the cost of you, your wife, and your son's family's

10   relocation from Ecuador to the United States?

11              MR. MASTRO:  Objection, your Honor.  It misstates his

12   prior testimony and misstates his deposition testimony.

13              THE COURT:  Overruled.

14   A.  No, sir.  It was only in regard to the relocation of myself

15   and my wife.

16   Q.  And, sir, isn't it also true that during that very same

17   meeting in Chicago when you made all those agreements with

18   Chevron, you signed your very first declaration in this case?

19              MR. MASTRO:  Objection, your Honor.

20              THE COURT:  Overruled.

21              MR. MASTRO:  Your Honor, he testified --

22              THE COURT:  Stop it.

23   A.  Even though you and everyone else may think this is

24   strange, when I signed, the date on which I signed that

25   declaration in Chicago, I had already received offers from

DAPLCHE6                    Guerra – cross

1  Chevron in exchange for my cooperation, but a specific,

2  concrete agreement had not been reached.

3          MR. GOMEZ:  Move to strike, your Honor.

4          THE COURT:  Overruled.

5  Q.  Sir, wasn't it true that you were the person who selected

6  Chicago as the location of that meeting so that you could spend

7  time with your family?

8  A.  Yes, sir.

9  Q.  And Chevron paid for your expenses during that trip; isn't

10 that correct?

11 A.  Yes.

12         MR. GOMEZ:  Your Honor, I may not have much more, but

13 I would like a ten-minute break just to check over my notes to

14 make sure I'm not missing anything.

15         THE COURT:  Define much more.  Ordinarily I wouldn't

16 raise it.

17         MR. GOMEZ:  I would say 15, 20 minutes, but it may

18 even be less than that.

19         THE COURT:  You got it.

20         MR. GOMEZ:  Thank you very much.

21         (Recess)

22         (Continued on next page)

23

24

25

DAP8CHE7                    Guerra - cross

1    ALBERTO GUERRA, resumed.

2              THE COURT:  The witness is still under oath.

3              Mr. Gomez.

4    BY MR. GOMEZ:

5    Q.  Mr. Guerra, have you applied for political asylum in the

6    United States?

7    A.  Yes.

8    Q.  When did you apply?

9    A.  I understand that it took place in the first 15 days of

10   July of this year.

11   Q.  Does that application include your wife, sir?

12   A.  Yes.

13   Q.  Does it include your son who lived in Ecuador?

14   A.  Yes.

15   Q.  Does it include his family?

16   A.  Yes.

17   Q.  Does it include the son that was living here in the United

18   States?

19   A.  Yes.

20   Q.  Does it include your daughter?

21   A.  No.

22   Q.  Sir, what is the basis of your political asylum claim?

23   A.  The risk that myself and my family would run in Ecuador,

24   would face in Ecuador in case we were to return.

25   Q.  Sir, has any member of the plaintiffs -- let me withdraw

DAP8CHE7                          Guerra - cross

1   that.

2           Has any plaintiff in the Lago Agrio litigation ever

3   threatened you or a member of your family?

4   A.  Not personally.

5   Q.  You know Hugo Camacho, a defendant in this case?

6   A.  No.

7   Q.  Do you know Javier Piaguaje, a defendant in this case?

8   A.  No, sir.

9   Q.  Sir, what is the status of your political asylum

10  application?

11  A.  I don't know, sir.

12  Q.  Mr. Guerra, what is more important to you, sir, the money

13  that Chevron is paying you monthly for you and your family or

14  getting asylum in the United States?

15  A.  The circumstances that I find myself in, it's more

16  important that I be granted asylum in the United States.

17          MR. GOMEZ:  I have nothing further, your Honor.

18          THE COURT:  Redirect, please.

19          Thank you, Mr. Gomez.

20          MR. MASTRO:  Your Honor, we have no further questions.

21          Thank you, Mr. Guerra.

22          THE COURT:  I have two questions for the witness.

23          Mr. Guerra, have you told you the truth in this

24  courtroom?

25          THE WITNESS:  Yes.

DAP8CHE7

1            THE COURT:  Do you understand that testifying falsely

2    in this courtroom could subject you to prosecution for perjury

3    and result in a jail term?

4            THE WITNESS:  I know that, sir.

5            THE COURT:  All right.  Thank you.

6            The witness is excused.

7            (Witness excused)

8            THE COURT:  Next witnesses will be what?

9            MR. MASTRO:  Your Honor, we were just talking about

10   that.  We believe that Mr. Shinder will be our next witness.

11           THE COURT:  And after him?

12           MR. MASTRO:  We need to caucus.  He has to go on live.

13   He is an independent witness, a former co-counsel.  So there

14   will be a direct, and then we will be advising tonight who we

15   expect to call immediately after Mr. Shinder.

16           THE COURT:  Has anyone been removed from the list of

17   October 18th of 16 witnesses that remained at that time?

18           MR. MASTRO:  We did remove Mr. Meacham and Professor

19   Moore.

20           THE COURT:  But they weren't on the list I am talking

21   to you about.

22           MR. MASTRO:  We are intending to go back tonight and

23   remove more witnesses.

24           We still face the problem that there are over 60

25   witnesses left on the defendants' list.

DAP8CHE7

1        THE COURT:  Can I just deal with one at a time?

2   Nobody can resist the opportunity to take a shot at the other

3   side.

4        MR. MASTRO:  I wasn't.

5        THE COURT:  Yes, you were.

6        So we have one day of court next week, and then the

7   following week, are we going to finish Chevron's case the

8   following week?

9        MR. MASTRO:  We have every intention of doing that.

10  So that's why we are going to try and pare back on some of the

11  witnesses.  There may be a need to take one witness out of

12  turn.

13       THE COURT:  OK.  Where are the defendants?  I have

14  raised quite sometime ago the fact that I was getting a couple

15  of communications from Mr. Gomez constantly telling me so and

16  so many witnesses are removed, never told me who.  I have no

17  idea where you're going, other than the fact that you told me

18  your case will take a week.

19       MR. FRIEDMAN:  I think it will take slightly more than

20  a week.

21       THE COURT:  Define slightly.

22       MR. FRIEDMAN:  No more than two weeks.

23       THE COURT:  Do you agree, Mr. Gomez?

24       MR. GOMEZ:  Completely.

25       THE COURT:  Where are we on witnesses?

DAP8CHE7

1          MR. FRIEDMAN:  We were going over that, and the short

2    answer is we have somewhere between 8 and 10 witnesses that we

3    are pretty certain we are going to call.  There are two or

4    three of those who are still in the stages of time to decide.

5    So we have got a core of 8 to 10 that is our solid core, if you

6    will, with two or three of those as maybes.  Then we have a

7    bunch we are holding in reserve because we don't know

8    completely what we are going to hear in the next week or so.

9    So we have people in reserve to rebut things if those things

10   come in, but the core of what we want to present is probably 8

11   to 10 witnesses.

12         THE COURT:  Who is the 10?

13         MR. FRIEDMAN:  I am not sure I brought those with me.

14         THE COURT:  I hope by this time in the case you would

15   remember.

16         MR. FRIEDMAN:  Oh, no.

17         If I could consult with Ms. Littlepage.  She has got a

18   better memory than I do.

19         THE COURT:  Absolutely.

20         MR. FRIEDMAN:  Should I read the names?

21         THE COURT:  Yes.

22         MR. FRIEDMAN:  Javier Piaguaje.

23         I may ask Mr. Gomez to read the names.

24         MR. GOMEZ:  Obviously, the defendants, Hugo Camacho,

25   Javier Piaguaje, and Steven Donziger will take the stand.

DAP8CHE7

1    However, I will point out, your Honor, I do not have the funds

2    to bring my clients yet to testify, and we are trying to raise

3    that money.  That's just a caveat.

4            In addition to those witnesses, your Honor, we have

5    Joe Berlinger, Karen Hinton, Donald Moncayo, Humberto Piaguaje,

6    Alejandro Ponce Villacis.

7            THE COURT:  Just a minute.  Humberto?

8            MR. GOMEZ:  Piaguaje.  Alejandro Ponce, Atossa

9    Soltani, Selvyn Seidel, Judge Zambrano of course, Juan Pablo

10   Alban.

11           THE COURT:  So that's 12 of your 8 to 10.

12           MR. GOMEZ:  The caveat is my clients because I don't

13   think I am going to have the money to bring them up from

14   Ecuador.  Of course, we have made an application separately for

15   the forensic expert from Ecuador who submitted a declaration

16   that he had examined Judge Zambrano's computer.

17           THE COURT:  Are there going to be any in limine

18   applications to get rid of any of these witnesses or not?

19           MR. FRIEDMAN:  Are you asking us?

20           THE COURT:  Not unless you're going to move to exclude

21   some of your own witnesses.

22           MR. FRIEDMAN:  We are not going to be moving on any of

23   the plaintiff's.

24           THE COURT:  Thank you.

25           MR. MASTRO:  We may have such a motion on the list

DAP8CHE7

1  that they just provided.  I have to talk to my team.

2           THE COURT:  Let my chambers know this week.

3           MR. MASTRO:  Is Juan Pablo Alban the person who gave

4  testimony as an expert?

5           MR. GOMEZ:  That's correct.

6           THE COURT:  You're calling him for what reason?  He is

7  a law expert or another kind of expert?

8           MR. GOMEZ:  He is an Ecuadorian law expert.

9           MR. FRIEDMAN:  There is another issue for him that

10 relates to the Does that I would be happy to explain to you.

11 If you look at the document we submitted with the investigative

12 plan, there is an item there referencing an expert witness.

13          THE COURT:  OK.  I will take a look at that.

14          MR. GOMEZ:  I'm sorry.  Ms. Littlepage just reminded

15 me of one additional name.  Santiago Escobar.

16          THE COURT:  Who is that?

17          MR. GOMEZ:  He is the gentleman who is purported to

18 have conversations with Mr. Diego Borja.

19          THE COURT:  Who is Moncayo?

20          MR. GOMEZ:  Donald Moncayo is a gentleman in Ecuador

21 who has personal knowledge regarding ex parte contacts between

22 Chevron representatives and judges.

23          THE COURT:  Humberto Piaguaje.

24          MR. GOMEZ:  Humberto Piaguaje is the leader of the

25 union of the affected, also known as assembly of the affected,

DAP8CHE7

1    and can speak to the management of the litigation and the

2    existence of the client and their interests.

3            THE COURT:  Well, I am sure I will be getting a motion

4    on that.

5            I am sure that the defense knows this already, but in

6    the interest of everybody knowing it, Mr. Seidel was an

7    associate at the firm I was an associate at for a period of

8    years, probably 35 years ago.  I am not sure if I have even

9    seen him since, but in any case, I thought you should know

10   that.  I guess that takes care of everything.

11           Thank you.

12           (Adjourned to October 31, 2013, at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   ALBERTO GUERRA

 4   Cross By Ms. Littlepage  . . . . . . . . . .1093

 5   Cross By Mr. Gomez . . . . . . . . . . . . .1216

 6                        PLAINTIFF EXHIBITS

 7   Exhibit No.                              Received

 8    1732   . . . . . . . . . . . . . . . 1122

 9    1714   . . . . . . . . . . . . . . . 1215

10                        DEFENDANT EXHIBITS

11   Exhibit No.                              Received

12    1367   . . . . . . . . . . . . . . . 1131

13    1363   . . . . . . . . . . . . . . . 1135

14    1368   . . . . . . . . . . . . . . . 1143

15

16

17

18

19

20

21

22

23

24

25
```