DAV8CHE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                    Plaintiff,

5              v.                        11 Cv. 0691 (LAK)

6    STEVEN R. DONZIGER, et al.,

7                    Defendants.

8    ------------------------------x
                                         October 31, 2013
9                                        9:30 a.m.

10   Before:

11                   HON. LEWIS A. KAPLAN
                                         District Judge
12
                          APPEARANCES
13
     GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        JEFFERSON E. BELL
          ANNE CHAMPION
17        GEORGIA K. WINSTON

18   FRIEDMAN RUBIN
          Attorneys for Donziger Defendants
19   BY:  RICHARD H. FRIEDMAN
          DEE TAYLOR
20
     LITTLEPAGE BOOTH
21        Attorneys for Donziger Defendants
     BY:  ZOE LITTLEPAGE
22        RAINEY BOOTH

23   GOMEZ LLC
          Attorneys for Defendants Hugo Camacho, Javier Piaguaje
24   BY:  JULIO C. GOMEZ

25

DAV8CHE1

1              (Trial resumed)

2              THE COURT:  Before we get started, first, the witness

3     identified as Doe 3 will remain subject to the existing

4     protective order.  If Chevron intends to call her, they are to

5     tell us by next Monday.  In the event they propose to call her,

6     I will authorize the disclosure of her identity and the

7     material that is, at least some of the material, probably all

8     of the material that's under seal at the moment, to the

9     defendants.  And if she is going to come, she is just going to

10    have to make a choice.

11             Secondly, the motion for terminating sanctions has

12    been denied in an order that will be filed this morning.

13    That's the defendants' motion.

14             The motion filed by the defendants, I think hours ago,

15    to strike the testimony of Mr. Guerra I consider to be entirely

16    frivolous and will be denied.  The question of whether

17    Mr. Guerra is telling the truth is for the trier of fact to

18    decide on the basis of all the evidence.  If we tried cases by

19    having each side move to strike the testimony of every witness

20    they considered to be incredible, what we would have is not

21    trials, but motions to strike the testimony of the various

22    witnesses, that would no doubt be met by a motion to preclude

23    the testimony of Mr. Donziger, because I am sure Chevron

24    contends he is not a credible witness.  We have trials to

25    determine who the credible witnesses are and to what extent.

DAV8CHE1

1    We don't decide it as a matter of law, except in truly

2    extraordinary circumstances that are clearly not present here.

3            Mr. Mastro, I would like to have a proffer as to

4    Mr. Shinder's testimony.

5            MR. MASTRO:  Certainly.  Mr. Brodsky is going to be

6    putting on Mr. Shinder so I am going to ask him to please give

7    that to you, your Honor.

8            MR. BRODSKY:  Thank you, your Honor.

9            Mr. Shinder, in substance, is going to testify that

10   Mr. Donziger approached him in late 2009 to represent the Lago

11   Agrio plaintiffs in connection with potentially enforcing a

12   potential large judgment in the United States.  And thereafter,

13   during those discussions, Mr. Donziger lied to Mr. Shinder

14   about Mr. Cabrera.  He told Mr. Shinder over and over Mr.

15   Cabrera was independent, impartial, Mr. Cabrera had reached a

16   conclusion as a court appointed expert that damages should be

17   assessed at approximately $27 billion.

18           Mr. Shinder relied on those representations, and in

19   about early 2010, he was asked by Mr. Donziger to represent the

20   Lago Agrio plaintiffs in two Section 1782 proceedings in the

21   United States.  In connection with those proceedings, Mr.

22   Donziger continued to lie to Mr. Shinder about Mr. Cabrera and

23   his independence.  Mr. Shinder told Mr. Donziger that he wanted

24   to interview Stratus witnesses after being retained in a

25   retention agreement.

DAV8CHE1

1          He interviewed Stratus witnesses, and on or about

2    March 17, 2010, learned from an interview of Mr. Beltman that

3    Mr. Donziger had been lying to him and misrepresenting the

4    facts to him, and he immediately withdrew.  He informed Mr.

5    Donziger that he thought Mr. Donziger was not credible.  He

6    told Mr. Donziger that he thought he had irretrievably

7    compromised potentially any judgment in the case, and he could

8    no longer ethically, as far as a business proposition,

9    represent the Lago Agrio plaintiffs.

10         We believe all of this is relevant, your Honor.  His

11   testimony is going to be relevant to making it more probable

12   than not that Mr. Donziger obstructed justice.  He knew that

13   the Cabrera report was not independent.  He lied to Mr.

14   Shinder, as he did to others, to try to get Mr. Shinder to

15   represent to U.S. federal courts that Mr. Cabrera was

16   independent and to oppose 1782 proceedings in the United

17   States.

18         It shows that Mr. Donziger had a corrupt intent, that

19   he knowingly and intentionally knew the truth about Cabrera,

20   lied to others to induce them to act.  It shows that by March

21   of 2010, when Mr. Shinder told him, and Mr. Donziger was

22   present for this interview where Mr. Beltman revealed the truth

23   about ghost-writing the Cabrera report, it shows that Mr.

24   Donziger thereafter continued to propagate lies and perpetuate

25   a fraud on U.S. federal courts.

DAV8CHE1

1      His testimony is also relevant because it will show

2  Mr. Donziger was in control of the litigation of this case and

3  in Ecuador.  There is testimony that relates to Mr. Donziger's

4  actions in the United States in furtherance of the RICO

5  conspiracy.

6      THE COURT:  Thank you.

7      Mr. Friedman, Mr. Gomez.

8      MR. FRIEDMAN:  Your Honor, I would disagree with some

9  of the proffer, but I think that would remain for you to hear

10  from the witnesses.  I will accept it for present purposes.

11      The objection we have is relevance.  That's the

12  primary objection.  The fact that Mr. Shinder feels like he was

13  misled by Mr. Donziger doesn't make any fact an issue more or

14  less relevant.  That's the heart of it.

15      THE COURT:  So your objection is to Mr. Shinder's

16  personal conclusion as opposed to all the other things that Mr.

17  Brodsky offered?

18      MR. FRIEDMAN:  The deposition is often characterized,

19  and that's the only offer of proof I have, the deposition

20  repeatedly says, I believe, maybe this.  There is a lot of

21  personal characterization.

22      When you boil it all down, I think what it is going to

23  show is a lot of back and forth conversations that were pretty

24  vague, culminating in Mr. Shinder saying, Well, if I am going

25  to do this job for you, I would like to meet with the Stratus

DAV8CHE1

1    people.  Mr. Donziger making the Stratus people freely

2    available, arranging a meeting, attending it, not interfering

3    in any way with what Mr. Shinder learned.  And then Mr. Shinder

4    making a personal decision, I don't want my firm involved in

5    this case.  That's the essence of it as I understand it.

6              THE COURT:  I am certainly not prepared, given the

7    proffer, to say that everything that comes out of the witness's

8    mouth is not relevant.

9              Did you want to add to this, Mr. Gomez?

10             MR. GOMEZ:  Yes, your Honor.  Thank you.

11             We dispute, first of all, the proffer and the facts

12   that there were misrepresentations to Mr. Shinder.

13             THE COURT:  That's why we hear the evidence.

14             MR. GOMEZ:  I understand.  My point is, even if you

15   assume that there were lies to Mr. Shinder, Mr. Shinder entered

16   no appearance on behalf of the people he was representing in

17   any particular case.  So even if you assumed the reliance on

18   Mr. Shinder, there was no reliance made by Chevron because he

19   never entered an appearance, never acted on the

20   misrepresentations, never made any representations on the basis

21   of those to anyone else.  I think that goes to the heart of

22   what the relevance is of this witness, in addition to

23   everything else that has been said.

24             This witness has no personal knowledge of anything.

25   Everything he learned was from talking to other people.  So

DAV8CHE1

1    it's rank hearsay.  His opinions are all based on hearsay,

2    statements of others.

3         So on those bases, in addition to what is in our

4    papers, we obviously filed a motion.

5         THE COURT:  And the motion is, what, to preclude?

6         MR. GOMEZ:  To preclude his testimony as being

7    irrelevant based on hearsay.

8         THE COURT:  The motion to preclude is denied.

9         If there are specific objections to specific

10   questions, specific issues as to personal knowledge, I will

11   certainly hear them during the course of the testimony.

12        Call the witness, please.

13        MR. BRODSKY:  Chevron calls Jeffrey Shinder.

14        Your Honor, just to inform the Court, Mr. Shinder is

15   represented by Katie Lachter of the law firm Hinshaw &

16   Culbertson, and to the event any privilege issues come up, we

17   would ask the Court's permission to have her sit on the side.

18        THE COURT:  Certainly.

19        If in the course of the examination, you feel there is

20   a privilege objection to be asserted, let me know.

21    JEFFREY ISAAC SHINDER,

22        called as a witness by the plaintiff,

23        having been duly sworn, testified as follows:

24        THE DEPUTY CLERK:  State your name for the record,

25   spelling your last name.

DAV8CHE1

1          THE WITNESS:  Jeffrey Isaac Shinder, S-H-I-N-D-E-R.

2          THE COURT:  You may be seated.

3          Proceed, Mr. Brodsky.

4     DIRECT EXAMINATION

5     BY MR. BRODSKY:

6     Q.  Good morning, Mr. Shinder.

7          Mr. Shinder, where do you work?

8     A.  I work at Constantine Cannon.

9     Q.  What is your present position at Constantine Cannon?

10    A.  I am the managing partner of Constantine Cannon's New York

11    City office.

12    Q.  Would you mind pulling the microphone a little bit closer

13    to you?

14    A.  I would not mind doing that.  Is that better?

15    Q.  Yes.  Thank you.

16          How long have you been the managing partner at

17    Constantine Cannon?

18    A.  I have managed the New York City office since 2007.

19    Q.  How long have you worked for Constantine Cannon?

20    A.  Since 1994.

21    Q.  Do you know Steven Donziger?

22    A.  I do.

23    Q.  How do you know him?

24    A.  I met him several years ago in connection with a matter

25    that was pending in Ecuador.

DAV8CHE1                          Shinder - direct

1    Q.  Did you come to represent him?

2    A.  I did.

3    Q.  Did you come to represent the Lago Agrio plaintiffs?

4    A.  Yes.

5    Q.  In connection with what matter or matters, did you

6    represent Mr. Donziger and the Lago Agrio plaintiffs?

7    A.  I represented them in connection with, there were two

8    pending so-called 1782 applications that Chevron had made to

9    get evidence in aid of a foreign matter, one pending in

10   Colorado and the other one in Georgia.

11   Q.  Approximately when did you meet Mr. Donziger for the first

12   time?

13   A.  I met him for the first time in October 2009.

14   Q.  When did you represent Mr. Donziger and the Lago Agrio

15   plaintiffs in connection with the 1782 proceedings?

16   A.  That engagement began in March of 2010.

17   Q.  Do you still represent Mr. Donziger or the Lago Agrio

18   plaintiffs today?

19   A.  I do not.

20   Q.  Are you testifying today voluntarily or pursuant to a trial

21   subpoena?

22   A.  Pursuant to a trial subpoena.

23   Q.  Have you been deposed in this case, this civil case, by

24   Chevron?

25   A.  I was deposed.

1  Q.  Prior to the deposition taken by Chevron, did you speak

2  with Chevron's representatives or Chevron lawyers?

3  A.  No, I did not.

4  Q.  During the deposition, did the special master overseeing

5  that deposition make rulings regarding privilege?

6  A.  He did.

7  Q.  As a result of the special master's rulings, did you

8  testify about the nature and substance of your representation

9  of Mr. Donziger and the Lago Agrio plaintiffs?

10 A.  Yes, I did.

11 Q.  How did your representation of Mr. Donziger and the Lago

12 Agrio plaintiffs end?

13 A.  It ended when I withdrew from the representation.

14 Q.  Let's talk about your background and then go through it

15 chronologically.

16       Where did you graduate from law school, Mr. Shinder?

17 A.  I graduated from Osgoode Hall Law School in Toronto in

18 1991.

19 Q.  Did you obtain any additional degrees?

20 A.  I did.  I obtained an LLM from New York University Law

21 School in 1993.

22 Q.  Are you admitted to the New York bar?

23 A.  Yes, I am.

24 Q.  Following graduation from NYU with a master's of law, what

25 did you do?

DAV8CHE1                        Shinder - direct

1    A.   Following NYU, I started working at Constantine Cannon.  At

2    the time it was called Constantine & Associates.  I am an

3    antitrust lawyer.  It was an antitrust boutique that had just

4    been formed.

5    Q.   Other than your work at Constantine Cannon since graduating

6    from NYU, did you work anyplace else?

7    A.   The only other employment I had was I was retained, if you

8    will, as special counsel to the Federal Trade Commission

9    working with Commissioner Pam Harbour on a major antitrust

10   case.  So for about a year and a half, I had sort of a split

11   existence, whereby I was still a private lawyer at Constantine

12   Cannon for a portion of my time, and a portion of my time was

13   dedicated to working at the FTA in Washington.

14   Q.   How did you come to meet Mr. Donziger in the fall of 2009?

15   A.   I was introduced to Mr. Donziger by Nicolas Economou, who

16   is -- I may be getting his title wrong -- the CEO, president of

17   a company called H5.  H5 had some involvement or was looking

18   into the Lago Agrio case.  I had previously worked with Nicolas

19   in the Discover antitrust case, one of the major cases we have

20   handled for Constantine Cannon.  Nicolas and I knew each other

21   very well.  I had a high regard for him.  He said, I have

22   someone I want you to meet, and he put us together.

23   Q.   What is H5?

24   A.   H5 is sort of a litigation support company that specializes

25   in analysis of evidence and their special sauce, their

DAV8CHE1                    Shinder – direct

1    algorithms enable the review of very, very large populations of

2    documents in a way that obviates the need for contract

3    attorneys.  It is an effective way, when it works, to handle

4    large populations of documents and get to the documents that

5    are most relevant.  They specialize in doing that.

6    Q.  Did you come to speak to Mr. Donziger in the fall of 2009?

7    A.  Yes, I did.

8    Q.  Generally, do you recall what legal services Mr. Donziger

9    was looking for?

10   A.  I do.  He was looking for enforcement counsel, lawyers in

11   the United States who were going to take a judgment that he

12   anticipated getting from the court in Ecuador and getting it

13   enforced in the United States against Chevron, and that was the

14   role we were auditioning for.

15   Q.  Did you say enforcing in the United States?

16   A.  Yes.

17   Q.  Did Mr. Donziger say that to you?

18   A.  Yes.

19   Q.  What, if any, statements did Mr. Donziger make regarding

20   the goals that he wanted to achieve with respect to your

21   potential representation?

22              MR. GOMEZ:  Objection.  Privileged.

23              THE COURT:  Overruled.

24   A.  As I said before, he was looking for enforcement counsel.

25   He expected to get a judgment from Ecuador, and he wanted it

DAV8CHE1                    Shinder – direct

enforced.  His talk track, if you will, was that Chevron had

committed, or its predecessor had committed this environmental

wrong in Ecuador to the tune of multi, multi, multi-billion

dollars, and they would have to pay for it, and to accomplish

that he would need to get a judgment enforced, and that's what

we were looking to help him with.

Q.  In or about October 2009, what, if anything, did Mr.

Donziger say regarding his relationship with the Executive

Branch of the United States?

          MR. GOMEZ:  Objection.  Privileged.

          THE COURT:  Address that, Mr. Brodsky.

          MR. BRODSKY:  Certainly, it's not privilege.  It's Mr.

Donziger's statements to Mr. Shinder.  Its relevance is that it

corroborates statements that Mr. Donziger made to others.

          THE COURT:  I understand the latter.  The objection is

privileged.  What is the privilege analysis from your point of

view?

          MR. BRODSKY:  I think it's tied up in connection with

his representation, how he is getting the trust of people in

connection with causing them to represent him and the Lago

Agrio plaintiffs, as he is lulling them in to assurances

regarding the case, and then leading them, and then making

misrepresentations.

          THE COURT:  I understand the argument, but I am not

sure I understand how it overcomes the privilege objection,

DAV8CHE1                       Shinder - direct

 1    assuming for the sake of argument there were an adequate

 2    showing in the first place.

 3            MR. BRODSKY:  Mr. Donziger has made this statement to

 4    nonlawyers and there is really no privilege to that statement.

 5    He has said it to others.  There is testimony of him saying it,

 6    for example, to Mr. Guerra, and therefore there really is no

 7    privilege to this particular statement that he makes.

 8            THE COURT:  Mr. Gomez.

 9            MR. GOMEZ:  Your Honor, the plaintiffs should call the

10    nonlawyers that the statements were made to and have them

11    testify about them.  We shouldn't be getting this information

12    from counsel.

13            THE COURT:  What I am not hearing from you, Mr. Gomez,

14    is any evidentiary showing that this was a confidential

15    statement made for the purpose of legal advice, the substance

16    of which has been obtained in confidence, and the other

17    requirements of the attorney-client privilege.

18            MR. GOMEZ:  Your Honor, my understanding from the

19    witness's testimony so far is he first met with Mr. Donziger in

20    October 2009.  The purpose of the discussions thereafter were

21    to engage Mr. Shinder and his firm for possible entry of

22    appearances as enforcement counsel in the case.  Any statements

23    that would have been made by Mr. Donziger to Mr. Shinder for

24    purposes of persuading Mr. Shinder to enter appearances and

25    engage in the representation I think are privileged, and I

DAV8CHE1                        Shinder – direct

1    think these statements fall within that category.

2              THE COURT:  Were you rising, Mr. Friedman?

3              MR. FRIEDMAN:  I was, your Honor, just to join in the

4    objection, and also to point out that I think we can lay a

5    better foundation for the privilege.  I think it's in his

6    deposition.  All of his contact with Mr. Donziger was in the

7    context of an attorney-client relationship or the beginning of

8    the formation of such a relationship where the privilege lies.

9              THE COURT:  Mr. Brodsky.

10             MR. BRODSKY:  I don't think either counsel has

11   demonstrated that the information is confidential.  These are

12   statements Mr. Donziger has made to many, many different

13   people, including Mr. Guerra who testified to it in his written

14   direct testimony.

15             MR. FRIEDMAN:  I wonder if I could do a brief voir

16   dire of the witness.

17             THE COURT:  You can have a brief voir dire.

18   VOIR DIRE EXAMINATION

19   BY MR. FRIEDMAN:

20   Q.  Mr. Shinder, my name is Rick Friedman and I represent Mr.

21   Donziger.

22             As I understand it, your first contact with Mr.

23   Donziger was in October of 2009, correct?

24   A.  Yes.

25   Q.  You were in interested in perhaps getting the judgment

DAV8CHE1                    Shinder – direct

1   enforcement business that Mr. Donziger was talking to you

2   about?

3   A.  Yes.

4   Q.  You didn't have a social relationship with him, apart from

5   the business that you were engaging in or discussing?

6   A.  No, I did not.

7   Q.  You referenced both today and in your deposition numerous

8   conversations that you had with Mr. Donziger from roughly

9   October of '09 to March of 2010, correct?

10  A.  Yes.

11  Q.  Would it be fair to say that all of those conversations

12  were either in the context of an attorney–client relationship

13  or in anticipation of such a relationship being formed?

14  A.  It would be fair to say that.

15          MR. FRIEDMAN:  Thank you, your Honor.

16          THE COURT:  Mr. Brodsky.

17          MR. BRODSKY:  I maintain, your Honor, that this

18  information he provides is information that Mr. Donziger has

19  disclosed to numerous people and therefore it's not a

20  confidential communication.  It's also not a statement for the

21  purposes of seeking legal advice.  It's a statement that he

22  makes in connection with speaking with someone but not in

23  connection with seeking legal advice.

24          THE COURT:  Did he testify to this in the deposition?

25          MR. BRODSKY:  He did not.

DAV8CHE1                    Shinder – direct

1          THE COURT:  And you're not arguing the crime fraud as

2     to this particular question?

3          MR. BRODSKY:  No, your Honor.

4          THE COURT:  Sustained.

5     BY MR. BRODSKY:

6     Q.  Mr. Shinder, over time, from late 2009 through early 2010,

7     did Mr. Donziger describe his role to you in the Ecuadorian

8     litigation?

9     A.  He did.

10    Q.  What did he say?

11         MR. GOMEZ:  Objection.  Privileged.

12         MR. FRIEDMAN:  We join, your Honor.

13         THE COURT:  Overruled.  This is surely not a

14    confidential communication for the purpose of obtaining legal

15    advice.

16    Q.  Mr. Shinder, what did he say?

17    A.  He described his role -- this is my term, but it sort of

18    summarizes the gist of it.  What he described was that he was

19    sort of a quarterback of what was going on in Ecuador, that he

20    he had a close relationship with the plaintiffs, and that he

21    sort of supervised, coordinated the case, local counsel, the

22    experts, pretty much the entire gamut of the proceeding was

23    under his sort of supervision.

24    Q.  Did Mr. Donziger say or describe actions that he was taking

25    in the United States relating to the Ecuadorian litigation?

DAV8CHE1                          Shinder - direct

1              MR. FRIEDMAN:  Objection.  Privileged.  There are

2      memos that are attached to the deposition where Mr. Donziger is

3      giving information, and Mr. Shinder is forming opinions about

4      legal issues having to do with the litigation in Ecuador.  So I

5      think what is going on, what the plans are, that's all integral

6      to soliciting Mr. Shinder's advice.

7              THE COURT:  Mr. Brodsky.

8              MR. BRODSKY:  The statements that Mr. Donziger made,

9      and as Mr. Shinder just testified regarding his role in

10     connection with the Ecuadorian litigation, are certainly not

11     for the purposes of obtaining legal advice.  What he says that

12     he does as part of that role in the United States is certainly

13     not in terms of seeking legal advice.

14              In addition, your Honor, these are all statements that

15     he makes in furtherance of crime fraud that your Honor has

16     already found and the special master has ruled throughout his

17     deposition, and that is that this is tied directly into what

18     can be called the Cabrera fraud.

19              THE COURT:  Was this question asked in the deposition?

20              MR. BRODSKY:  Without looking at it, I don't have that

21     offhand.

22              MR. FRIEDMAN:  I don't have that memory.

23              THE COURT:  Was there a ruling on this by the special

24     master?

25              MR. BRODSKY:  To that particular question, I don't

DAV8CHE1                         Shinder - direct

1    have an answer.

2                THE COURT:  You can come back to it later.  Move

3    ahead.

4    BY MR. BRODSKY:

5    Q.   Did Mr. Donziger provide you with any information about the

6    Ecuadorian lawsuit?

7    A.   He did.  After our initial meeting --

8                MR. FRIEDMAN:  I object.  I think that's the same

9    issue.  There are memos here where Mr. Donziger is clearly

10   providing --

11               THE COURT:  There are memos where?

12               MR. FRIEDMAN:  Attached to his deposition.

13               THE COURT:  There were exhibits at the deposition, is

14   that correct?

15               MR. FRIEDMAN:  There were exhibits.

16               THE COURT:  Was he asked about them at his deposition?

17               MR. FRIEDMAN:  Some of them, yes.

18               THE COURT:  Therefore, one of two things is true.

19               MR. FRIEDMAN:  That's true.

20               THE COURT:  Either there was no objection, in which

21   case any privilege was waived.  Or there was an objection and

22   the special master ruled on it.

23               MR. FRIEDMAN:  I have not seen him rule on these, your

24   Honor.  What I am saying is --

25               THE COURT:  This is a very simple matter.  You have

DAV8CHE1                    Shinder - direct

1    known about this witness for quite a while already.  Here we

2    come to the trial testimony, and what you're really telling me

3    is you haven't read his deposition?

4         MR. FRIEDMAN:  No, I have read his deposition.  What I

5    am saying is the memos make clear that there was an exchange of

6    information for the purpose of soliciting legal representation

7    and legal advice.

8         THE COURT:  The memos wouldn't be there, unless I am

9    missing something, unless you either waived privilege at the

10   deposition or the special master overruled the privilege

11   assertion, right?

12        MR. FRIEDMAN:  I think he overruled the privilege as

13   to the memos, yes.  What I am saying is the memos are the

14   background establishing the context.  The specific question I

15   don't believe was asked or ruled on.  In other words, what did

16   he tell you -- I can't remember the question exactly, but what

17   did he tell you about what was going on in Ecuador?  I don't

18   think that line of questioning was pursued.  That's what I am

19   trying to say.

20        THE COURT:  Mr. Brodsky.

21        MR. BRODSKY:  I will withdraw that question and zero

22   in on exactly what we are getting at.

23        THE COURT:  OK.

24   BY MR. BRODSKY:

25   Q.  What, if anything, Mr. Shinder, did Mr. Donziger say to you

DAV8CHE1                         Shinder – direct

1   regarding Richard Stalin Cabrera Vega?

2   A.   He told me that Mr. Cabrera was a court appointed

3   independent expert who had, consistent with Ecuadorian

4   procedures, undertaken an independent review of the evidence,

5   under procedures that had been set up, and that he had issued

6   reports that at the end of the day came to the conclusion that

7   the damage caused by Chevron's predecessor amounted to

8   something in the neighborhood of $27 billion in Ecuador and to

9   the Ecuadorian plaintiffs.

10   Q.   Did Mr. Donziger say what he meant when he said, Mr.

11   Cabrera conducted an independent review of the evidence?

12             MR. GOMEZ:   Objection.   Form.

13             THE COURT:   Overruled.

14   A.   He did.   And the purported independence of the expert was

15   important in our conversations.   It was of obvious

16   significance.   It was of significance to me in evaluating the

17   possibility of being enforcement counsel that the process had

18   integrity and it was the kind of process that would withstand

19   scrutiny should we take that judgment and try to enforce it in

20   an American court, and that the expert was supposedly

21   independent and had done a review of the evidence that had

22   procedural integrity was consequential and something we

23   discussed.

24   Q.   What did Mr. Donziger say in describing Mr. Cabrera as

25   independent?

DAV8CHE1                         Shinder - direct

1   A.  That he was court appointed, that he was a court appointed

2   expert, and therefore had independence from the parties, that

3   he had the expertise necessary to do a proper evaluation of the

4   evidence of the environmental harm, and that he had rendered

5   conclusions that quantified the damage.

6   Q.  What was the significance of the fact that Mr. Donziger was

7   saying Mr. Cabrera was independent?

8              MR. GOMEZ:  Objection.

9              MR. FRIEDMAN:  Objection.

10              THE COURT:  Sustained.

11   Q.  What did Mr. Donziger say regarding Cabrera's assessment

12   and issuance of reports of $27 billion in damages?

13              MR. GOMEZ:  Objection.  Form.

14              THE COURT:  Rephrase it.

15   Q.  What did Mr. Donziger say -- well, before I get to that.

16              Mr. Shinder, did Mr. Donziger say that Mr. Cabrera was

17   independent once to you or more than once?

18   A.  More than once.

19   Q.  Approximately how often between October 2009 and March of

20   2010?

21   A.  That's hard to say, but it was often enough.  It could have

22   been every time we spoke, but if it wasn't every time, it was

23   close.  This was important.

24   Q.  What did Mr. Donziger say to you regarding the significance

25   of Cabrera's assessment of $27 billion in damages against

DAV8CHE1                    Shinder – direct

1     Chevron?

2              MR. GOMEZ:  Objection.  Form.

3              THE COURT:  Sustained as to form.

4              If anything, Mr. Brodsky,.

5     Q.  What, if anything, did Mr. Donziger say to you regarding

6     the significance of Mr. Cabrera's damages assessment of $27

7     billion?

8     A.  He had an expectation that there was going to be a judgment

9     against Chevron.  He was brandishing that as an asset in front

10    of not just our firm but other firms.  And the primary sort of

11    underpinning for that expectation that this asset was going to

12    come into being was the fact that the supposedly independent

13    expert had reached the conclusion that $27 billion in damage

14    had been sustained through a process that had the venire, it

15    was court appointed, it had procedures in place and whatnot.

16             And as I noted before, this is why we talked about it

17    often, I was looking into the role of being enforcement

18    counsel, and in doing what I consider due diligence as to

19    whether this was a matter that made sense for my firm to take

20    on, the integrity of the process was the heart and soul of what

21    we wanted to understand to see whether or not this asset was a

22    real asset.

23    Q.  What do you mean by the integrity of the process?

24    A.  That the process in Ecuador had the procedural and

25    substantive integrity such that you could enforce a judgment,

DAV8CHE1                      Shinder - direct

1   since my expectation was that if we were going to be

2   enforcement counsel, that process would, for lack of a better

3   term, degenerate into a trial of whether or not what happened

4   in Ecuador had integrity, such that whatever American court we

5   were going to bring this to would enforce the judgment.

6   Q.  You mentioned that Mr. Donziger was brandishing that as an

7   asset not just to our firm but other firms.  What did Mr.

8   Donziger say about brandishing or bringing the -- withdrawn.

9           What did Mr. Donziger say about what he was doing with

10  respect to other firms?

11  A.  At some point I came to understand, and initially this was

12  more informal and then there was an RFP that was circulated

13  that whoever else he was talking to responded to, that we were

14  not alone in terms of the firms that he was talking to, that he

15  was talking to other firms, and then the conversation morphed

16  into that there may be sort of a division of labor between our

17  firm and other firms who were also interested in this.

18          Because we withdrew we never reached that point, but

19  at some point, certainly by December or January, I was well

20  aware that Mr. Donziger was having lots of conversations with

21  reputable firms and that he had a need -- I saw this actually

22  from the very beginning -- he had a need to professionalize the

23  operation, that Chevron was filing different motions, and this

24  predated the 1782 applications.  There was the BIT arbitration,

25  there were different issues that needed to be navigated, and

DAV8CHE1                    Shinder - direct

1    Mr. Donziger's firm did not have the bandwidth to handle it.

2    Q.  Did there come a point when you and Mr. Donziger discussed

3    compensation?

4    A.  Not to any great degree.  The conception was that we were

5    going to do some form of contingency fee arrangement, but I was

6    of the mind that there was too much risk to do this fully on a

7    full contingency, and I had misgivings about whether, as a

8    business matter, it was going to make sense to do the case.

9    And as I said in my deposition, to me the 1782 applications

10   were an opportunity to get under the hood of the case and get a

11   better understanding of whether or not this was really

12   something that we could see ourselves doing as a business

13   matter, since I was concerned that an enforcement judgment

14   would, as I said, degenerate in a trial in the U.S. about the

15   trial in Ecuador, and I really didn't know what happened in

16   Ecuador until I got under the hood through the 1782

17   applications.

18            MR. BRODSKY:  May I approach, your Honor?

19            THE COURT:  Yes.

20   Q.  Mr. Shinder, I am showing you a one-page document marked

21   Plaintiff's Exhibit 1165 for identification.

22            At the top it says, "To Jeffrey Shinder, from Steven

23   R. Donziger, Re: key to documents on enclosed disk," dated

24   October 5, 2009.  Do you recognize this?

25   A.  I do.

DAV8CHE1                    Shinder - direct

1   Q.  What is it?

2   A.  It's a memo from Mr. Donziger to me that sort of covered a

3   disk of materials that he sent me, which comprised sort of the

4   initial materials that he sent me after we first met and I

5   requested materials to begin with what I would characterize as

6   our due diligence process.

7   Q.  Were part of the materials, as reflected in Plaintiff's

8   1165 for identification, about Richard Cabrera?

9   A.  Can you repeat that?

10  Q.  Were part of the materials that Mr. Donziger sent to you,

11  as reflected in Plaintiff's 1165 for identification, related to

12  Mr. Cabrera?

13  A.  Yes.

14          MR. BRODSKY:  We offer 1165.

15          MR. GOMEZ:  No objection.

16          THE COURT:  Received.

17          (Plaintiff's Exhibit 1165 received in evidence)

18  Q.  Mr. Shinder, directing your attention to number 5, folder

19  number 5.

20          Before we get to that, do you see at the top where it

21  says "enclosed on the attached disk."  You received all these

22  materials by disk?

23  A.  We did.

24  Q.  Directing your attention to folder number 5, would you read

25  that silently to yourself?

DAV8CHE1                    Shinder - direct

1   A.  Yes.

2   Q.  Does that reference the Cabrera reports?

3   A.  It does.

4   Q.  After Mr. Donziger sent you these materials, did there come

5   a time when Mr. Donziger discussed with you representing him

6   and the Lago Agrio plaintiffs in the Section 1782 proceedings?

7   A.  Yes.

8   Q.  Approximately when did that discussion begin?

9   A.  It began towards the end of January 2010.

10  Q.  What, if anything, did Mr. Donziger say regarding these two

11  Section 1782 proceedings?

12  A.  Well, our discussions were primarily connected to what I

13  will call the Colorado, the Stratus 1782.  And my recollection

14  is that he told me in direct response, in response to direct

15  questions where after reading the allegation that Chevron had

16  made that the Cabrera report had largely adopted work done by

17  Stratus, I asked Mr. Donziger, I remember this vividly, Steven,

18  What am I going to find?  I need access to the facts.  He

19  denied the allegations.  And the facts as he portrayed them to

20  me were that Chevron was trumping up this allegation that

21  Stratus had essentially ghostwritten the Cabrera report by sort

22  of drawing improper inferences from materials that had been

23  properly submitted to Mr. Cabrera through the process in

24  Ecuador, that Mr. Cabrera had independently taken in those

25  materials, and independently chose to incorporate them into his

DAV8CHE1                        Shinder - direct

1    report.

2              The other thing he told me was that Chevron had

3    improperly utilized Stratus materials that it received via

4    mediation that occurred well before my brief sojourn on this

5    case, and that it utilized those Stratus materials, which it

6    had access to via the mediation, to compare those materials to

7    the Cabrera report, and that that sort of somehow violated the

8    mediation agreements and was improper.  The bottom line is he

9    portrayed to me that they -- the allegation was incorrect, was

10   inaccurate, was trumped up, and that the inferences they were

11   trying to draw were unwarranted.

12   Q.  Did Mr. Donziger say Chevron's allegations included that

13   Mr. Cabrera was not independent?

14   A.  Yes.

15   Q.  What, if anything, did Mr. Donziger say regarding the

16   relationship between Stratus Consulting and Cabrera?

17   A.  Well, I had been told that there was no, quote unquote,

18   relationship between Stratus and Mr. Cabrera.  That to the

19   extent that there were any similarities between the Cabrera

20   report and work that Stratus had done, that that was the result

21   of Mr. Cabrera's independent judgment, and that something like

22   3,000 pages of materials had been properly funneled, consistent

23   with the process that had been set up, that both parties had

24   the opportunity to send materials to Mr. Cabrera, I think at

25   his request, and that he had independently chosen to adopt or

DAV8CHE1                          Shinder - direct

```
 1   rely on those materials, and, therefore, there may have been
 2   some similarity, but that that did not establish anything
 3   untoward and that there was no relationship between Stratus and
 4   Mr. Cabrera.
 5              THE COURT:  Is that something Mr. Donziger told you?
 6              THE WITNESS:  Yes.
 7              THE COURT:  Thank you.
 8   Q.  The other Section 1782 proceeding, where was that?
 9   A.  That was in Georgia.
10   Q.  Who did that relate to?
11   A.  To a gentleman named Charles Calmbacher.
12              MR. BRODSKY:  May I approach, your Honor?
13              THE COURT:  You may.
14   Q.  I am showing you, Mr. Shinder, a multipage document marked
15   Plaintiff's Exhibit 1213 for identification, with a Bates
16   number at the bottom Chev.Priv 414 through 440.  And at the top
17   of the first page it's an e-mail from Steven Donziger, dated
18   January 23, 2010, to Jeffrey Shinder, subject issue where it
19   describes attached Denver.Chevronapplication.pdf.
20              Would you take a moment to look at that, please?
21   A.  Sure.  OK.
22   Q.  The first paragraph, if you would read that to yourself for
23   a moment?
24   A.  OK.
25   Q.  What did Mr. Donziger say about his ongoing effort to
```

1   locate co-counsel on the Ecuador case?

2           THE COURT:  I take it you're asking apart from what is

3   in the memorandum?

4           MR. BRODSKY:  Correct.

5   A.  As I testified earlier, I was aware that he was talking to

6   other people, at least two other firms.  There frankly could

7   have been more.

8   Q.  In addition to what you have testified already, looking at

9   paragraph 3, the first phrase there, what did Mr. Donziger say

10  regarding Chevron's factual assertions relating to Mr. Cabrera?

11          MR. GOMEZ:  Objection.  Form and privileged.

12          MR. FRIEDMAN:  I join in the privilege.

13          THE COURT:  Sustained as to form.

14          I am not clear whether you are asking him to give you

15  back the memorandum or whether you're asking something else.

16  Q.  Putting aside what is stated here in the e-mail and what

17  you have already testified to, Mr. Shinder, what, if anything,

18  else did Mr. Donziger tell you regarding Chevron's factual

19  assertions in the Section 1782 proceeding in Denver relating to

20  Mr. Cabrera?

21  A.  I already testified to the sort of counter narrative that

22  he imparted to me.  I have nothing to add to that, other than

23  to say that he repeatedly portrayed these motions as part of a

24  broad-based effort that was being initiated by Chevron in bad

25  faith and to taint the process as fraudulent, when in fact,

DAV8CHE1                          Shinder - direct

1    according to him, it had procedural integrity and it was done

2    consistent with proper practice in Ecuador.

3    Q.  Following receipt of this e-mail from Mr. Donziger on

4    January 23, 2010, did you meet with him?

5    A.  I did.

6    Q.  Where did you meet?

7    A.  We had breakfast at a lousy diner near my apartment,

8    Gracie's Cafe.

9    Q.  In Manhattan?

10   A.  In Manhattan.

11   Q.  What, if anything, did Mr. -- before we get to what Mr.

12   Donziger said, how long was this breakfast?

13   A.  An hour and a half.

14   Q.  During that breakfast, did you get an opportunity to

15   observe Mr. Donziger's demeanor?

16   A.  I did.

17   Q.  Describe, based on your observations, what Mr. Donziger's

18   demeanor was.

19              MR. GOMEZ:  Objection.  Relevance.

20              THE COURT:  Overruled.

21   A.  I found him to be -- he was worried, borderline sort of

22   panicked over this.  To put it in context, from the beginning,

23   going back to October, our discussions to some extent revolved

24   around his concern that Chevron was filing different motions,

25   and our first conversations we talked a bit about the BIT, for

1   example, and that he needed bandwidth and lawyers with muscle

2   to sort of take things to the offensive because he was tired of

3   being reactive, and that Chevron had a strategy in his view to

4   sort of distract and use all kinds of procedural levers and

5   baseless motions to get away from the core issue.

6          So I was accustomed to that sort of backdrop to our

7   conversation.  This was a new manifestation of that strategy in

8   his mind, but I saw a different level of concern.  The fact

9   that we were meeting on a Sunday for breakfast to discuss this

10  sort of is indicative of that.  He was very concerned, and this

11  was the breakfast where I said to him, if I handle this, what

12  am I going to find?

13  Q.  What did Mr. Donziger say in response when you asked what

14  are you going to find?

15  A.  He denied the allegations, but he did say to me, you have

16  to understand that they do things differently in Ecuador, that

17  was sort of a mantra of his, although I never got a great deal

18  of specificity as to what he meant by that until I got under

19  the kimono, so to speak, when we were engaged to do the 1782.

20  Q.  Before you were engaged at this breakfast in Manhattan,

21  during that same conversation Mr. Donziger said, you have to

22  understand things are done differently in Ecuador, did Mr.

23  Donziger make any statements about Mr. Cabrera?

24  A.  He did.  He denied the allegations.  This conversation was

25  against the backdrop of the 1782 application, which I think I

1  had received the night before, where for the first time I saw

2  the very specific allegation that Chevron was making that Mr.

3  Cabrera essentially was not independent and that the

4  plaintiffs' experts had ghostwritten his report, and he denied

5  those allegations and reaffirmed that, while things may be done

6  differently in Ecuador, the expert was independent.

7          MR. BRODSKY:  May I approach, your Honor?

8          THE COURT:  You may.

9  Q.  Mr. Shinder, I am showing you a three-page document marked

10  Plaintiff's Exhibit 1224 for identification, Bates numbered

11  DONZ 18684 through 685.

12          MR. BRODSKY:  Your Honor, I forgot to offer 1213.  So

13  I offer it now.

14          MR. FRIEDMAN:  I object on ground of privilege, your

15  Honor.

16          MR. GOMEZ:  Same objection, your Honor.

17          THE COURT:  Overruled.  There may be other bases,

18  which I may articulate later, but in my judgment, there is

19  probable cause to believe that there was a fraud with respect

20  to the Cabrera report and, in particular, with respect to the

21  attempts to defeat the 1782 proceeding that sought to get

22  evidence thereof, and I find that this document is in

23  furtherance thereof.

24          (Plaintiff's Exhibit 1213 received in evidence)

25  Q.  Mr. Shinder, do you recognize 1224 for identification?

DAV8CHE1                        Shinder – direct

1   A.  I do.

2   Q.  What is that?

3   A.  It's a document –– there is a cover e-mail from Mr.

4   Donziger to me, and the e-mail attached is a set of what I will

5   characterize as prepackaged responses to allegations that

6   Chevron was making against the Lago Agrio plaintiffs and, in

7   particular, Mr. Cabrera and his report.

8          MR. BRODSKY:  We offer 1224.

9          MR. FRIEDMAN:  No objection.

10         THE COURT:  Received.

11         (Plaintiff's Exhibit 1224 received in evidence)

12  Q.  Directing your attention, Mr. Shinder, to the second page

13  of the document, the second bullet point, would you review that

14  silently to yourself where it says "Chevron allegations:

15  Sections of the Dr. Cabrera's $27 billion claim are copied word

16  for word"?

17  A.  OK.

18  Q.  Do you recall whether or not, in addition to writing to you

19  in this memo and describing Cabrera as Dr. Cabrera, did Mr.

20  Donziger ever, by phone or in person, describe Cabrera as a

21  doctor?

22  A.  I don't recall that.  I'm sorry.

23  Q.  Directing your attention to the third sentence under

24  "fact," it's the second sentence, "some small analyses."  Do

25  you see that?

DAV8CHE1                        Shinder – direct

1    A.  Yes.

2    Q.  What, if anything, did Mr. Donziger say about some small

3    analyses were provided by the parties?

4    A.  This is a reference to the approximately 3,000-plus pages

5    of documents that he told me right from the beginning that had

6    been submitted to Mr. Cabrera.  Consistent with the process

7    that had been set up, that the court had approved, both parties

8    had an opportunity to submit materials to Mr. Cabrera, and the

9    plaintiffs had properly availed themselves of that opportunity

10   and sent 3,000-plus pages to Mr. Cabrera.  It's a reference to

11   those materials.

12   Q.  Did you ask for those materials?

13   A.  I did.

14   Q.  Did you ever get them?

15   A.  I did not.

16   Q.  The last sentence there under "fact," in addition to

17   writing to you here "that this process is entirely proper,

18   routine and consistent with the practice of judges and experts

19   in the United States and other countries," did Mr. Donziger say

20   anything to you in person or by telephone that the process in

21   Ecuador relating to Mr. Cabrera was consistent with the

22   practice in the United States?

23           MR. GOMEZ:  Objection.  Form, your Honor.  What

24   practice are we talking about?

25           THE COURT:  Overruled.  I thought it was pretty clear.

DAV8CHE1                    Shinder - direct

1   A.  He did.  He said things to the effect, there is nothing

2   particularly untoward about a process where a court appointed

3   independent expert may rely upon materials that had been

4   prepared by the parties, including their experts, and make

5   independent judgments as to those materials and possibly rely

6   upon them.

7                MR. BRODSKY:  May I approach, your Honor?

8                THE COURT:  You may.

9   Q.  Mr. Shinder, I am showing you a multipage document,

10  Plaintiff's Exhibit 1244 for identification, with a Bates

11  number at the bottom Chev.Priv 927 through 930.

12               At the top of the first page, it's an e-mail from

13  Steven Donziger, dated March 8, 2010, to Jeffrey Shinder and

14  Lisa Minnetto, subject for meeting today, see you at 12:15,

15  not 12.  Brownstein memo.March8..

16               Would you take a moment to review that?

17  A.  OK.

18  Q.  Do you recognize this?

19  A.  I do.

20  Q.  What is it?

21  A.  It's an e-mail from Mr. Donziger to myself and to my

22  assistant, dated March 8, 2010.  Attached to it is an analysis

23  Mr. Donziger and his colleague Aaron Page had prepared

24  regarding the 1782 application in Denver.

25  Q.  Relating to Mr. Cabrera?

DAV8CHE1                          Shinder - direct

1    A.  Yes.

2              MR. BRODSKY:  We offer 1244.

3              MR. FRIEDMAN:  No objection.

4              MR. GOMEZ:  Objection.  Privileged, your Honor.

5              THE COURT:  Mr. Brodsky.

6              MR. BRODSKY:  This is subject to the crime fraud

7    rulings your Honor has admitted in the past and the special

8    master has made.  I would have to check if this specific

9    document was raised in the deposition, which I can do very

10   quickly, but this, your Honor, is another example of statements

11   Mr. Donziger made in furtherance of there is probable cause as

12   your Honor found it.

13             THE COURT:  Why don't you quickly check?

14             MR. BRODSKY:  I have been informed by my colleagues

15   this is a document Mr. Donziger produced, and it has been used

16   in other depositions, including the deposition of Aaron Page.

17             THE COURT:  Was there any privilege objection asserted

18   in any of those depositions?

19             MR. BRODSKY:  Yes, your Honor, there was, and it was

20   overruled.

21             THE COURT:  Anybody disagree with that?

22             MR. GOMEZ:  I don't have the knowledge.  I was in Mr.

23   Shinder's deposition and this document was not used in Mr.

24   Shinder's deposition, but I have no personal knowledge of what

25   occurred in Mr. Page's.

DAV8CHE1                        Shinder - direct

1              THE COURT:  Mr. Friedman, you said you agreed, right?

2              MR. FRIEDMAN:  What I was saying is I don't have any

3    knowledge one way or the other.  I am not contesting that

4    because I don't know.

5              THE COURT:  Mr. Brodsky, was this turned over in the

6    Colorado litigation?

7              MR. BRODSKY:  We are going to find out in a moment.

8              I would also add, your Honor, that it is subject to

9    waiver.  Mr. Donziger did testify in his deposition about

10   Cabrera, and he did testify about in connection with what, if

11   any, relationship he had with Mr. Cabrera.

12             THE COURT:  That's different from communications with

13   the lawyer about the same subject.

14             MR. BRODSKY:  Over the defendants' objection, the

15   judge ordered the production of this document, Judge Day in the

16   District of Maryland.  And during Mr. Page's deposition, over

17   Mr. Gomez's objection, the special master has ruled that

18   questions could be asked about this document and the privileged

19   objections were overruled.

20             THE COURT:  OK.  This objection is overruled.  First,

21   on the basis that it's the law of the case.  Second, on the

22   basis that, insofar as it relates to Cabrera and the 1782, the

23   crime fraud exception is fully satisfied as to probable cause

24   and in furtherance.  The defense is at liberty upon further

25   study to move to strike it if the factual predicate that I have

DAV8CHE1                    Shinder – direct

1   referred to turns out to be mistaken.

2          Go ahead.

3          (Plaintiff's Exhibit 1244 received in evidence)

4   BY MR. BRODSKY:

5   Q.  Mr. Shinder, directing your attention to the first page

6   where it says "for meeting today, see you at 12:15."  Do you

7   recall what that is in reference to?

8   A.  I do.  By this time I am pretty sure I would have been

9   retained to handle the 1782s, and this was a meeting discussion

10  to begin to strategize how to handle them.  We did not have a

11  lot of time so this was part of that beginning effort.

12  Q.  On the first page, who is Aaron Page, where it mentions

13  coming with Aaron Page?  Who is Mr. Page?

14  A.  Mr. Page was, and maybe still is, an attorney who worked

15  with Mr. Donziger.

16  Q.  Who was Brownstein?

17  A.  Brownstein was the firm in Denver that Mr. Donziger had

18  retained to be local counsel and up till this point had

19  spearheaded the effort to resist the 1782 application in

20  Denver.

21  Q.  Turning to the second page of the document, at the top

22  where it says, "After doing considerable research in Ecuador,"

23  did you know whether or not Mr. Donziger went to Ecuador in

24  connection with the 1782 proceeding in Denver?

25          MR. GOMEZ:  Objection.  Vague.

DAV8CHE1                     Shinder - direct

1           THE COURT:  Sustained.

2   Q.  What, if anything, did Mr. Donziger tell you about him

3   personally taking a trip to Ecuador in connection with research

4   relating to Mr. Cabrera?

5           MR. GOMEZ:  Objection.  Form.

6           THE COURT:  Overruled.

7   A.  I don't recall whether Mr. Donziger told me that he went to

8   Ecuador in connection with the 1782 application.

9   Q.  Directing your attention to the last full paragraph on that

10  second page, "With respect to the Stratus documents," would you

11  read that silently to yourself?

12  A.  Which paragraph again?

13  Q.  It's the last paragraph on the page, page number 928, where

14  it begins, "With respect to the Stratus documents."

15          THE COURT:  It should be on your screen.

16          THE WITNESS:  Thank you, your Honor.

17  A.  OK.

18  Q.  What, if anything, did Mr. Donziger tell you in person or

19  by phone about his knowledge of precisely what documents were

20  given to Mr. Cabrera?

21  A.  He told me that, again, approximately 3,000 pages had been

22  turned over to Mr. Cabrera, that it was consistent with the

23  procedures that had been implemented in Ecuador, there was

24  nothing untoward about that.  And he also told me that he was

25  not sure exactly which documents had been turned over.  As I

DAV8CHE1                        Shinder - direct

1    testified earlier, I asked for them.  I never got them.

2              MR. BRODSKY:  May I approach, your Honor?

3              THE COURT:  Yes.

4    Q.  I am showing you, Mr. Shinder, a document marked

5    Plaintiff's Exhibit 1255 for identification, which is Bates

6    labeled DONZ 40859 through 860.  At the top, it's an e-mail

7    from Andrew Woods on the first page, dated March 15, 2010, to

8    LMinnetto@ConstantineCannon.com, copy to Jeffrey Shinder and

9    Steven Donziger, subject signed retainer letter.

10             Do you see that, Mr. Shinder?

11   A.  I do.

12   Q.  Do you recognize it?

13   A.  I do.

14   Q.  What is it?

15   A.  The first page is an e-mail from Mr. Woods, who worked with

16   Mr. Donziger, to my assistant.  And the e-mail attached is the

17   executed retainer between myself, my firm, and Mr. Donziger.

18   Q.  On the second page, what, if anything, did Mr. Donziger say

19   regarding structuring the retention agreement so that you were

20   representing both Mr. Donziger and the Lago Agrio plaintiffs?

21             MR. GOMEZ:  Objection.  Form.

22             THE COURT:  Overruled.

23   A.  We had some discussion on how to structure this.  This was

24   a somewhat unusual situation for me in terms of how to set it

25   up.  And Mr. Donziger represented and held himself out as

DAV8CHE1                          Shinder - direct

1   counsel for the Lago Agrio plaintiffs, and there was some

2   discussions whether it was sufficient to simply be retained by

3   the law offices of Steven Donziger.  And I recall not being

4   comfortable with that, that I thought that the better construct

5   was to set up an attorney-client relationship with him, his

6   firm, and with the Lago Agrio plaintiffs, and have them

7   structured here in some fashion, and the attachment reflects

8   that.

9   Q.  Did you ever come to talk to any of the Lago Agrio

10  plaintiffs?

11  A.  I did not.

12  Q.  Or communicate with them in any way, by e-mail or

13  otherwise?

14  A.  No.  I communicated with them through Steven Donziger.

15           MR. BRODSKY:  We offer 1255.

16           MR. FRIEDMAN:  No objection.

17           MR. GOMEZ:  No objection.

18           THE COURT:  Received.

19           (Plaintiff's Exhibit 1255 received in evidence)

20  Q.  On that second page, Mr. Shinder, directing your attention

21  to the second full paragraph, the last sentence, would you read

22  that, where it says "all funds for both matters"?

23           On your screen it's highlighted for you.

24  A.  I see that.

25  Q.  Did you discuss with Mr. Donziger who would be funding and

DAV8CHE1                    Shinder - direct

1    paying for your fees?

2    A.  I did.

3    Q.  What did Mr. Donziger say?

4    A.  He said that he would pay the fees, and it was important to

5    me that we received as much of them as possible in advance of

6    us even beginning to do work.

7    Q.  After this engagement letter was signed in March of 2010,

8    what happened next?

9    A.  What happened next was we began work.  So I tasked

10   associates in the firm to get our arms around the 1782 body of

11   law that would be applicable to the motion practice that we

12   were about to get into, and we created task lists, because

13   there were tasks that we were doing, there were tasks that Mr.

14   Donziger and his firm were going to do.  Particularly when it

15   came to the facts, there were things that, in the very short

16   period of time we had just getting into the case, it was

17   impossible for us to get our arms around, we were going to have

18   to rely on Mr. Donziger's firm to help us with, but I was very

19   pointed with Mr. Donziger that I wanted as soon as possible to

20   fly out to Colorado and meet with the Stratus people and

21   interview them in a way that I can get directly from them the

22   facts as they recalled them.

23   Q.  Did you do that?  Did you fly to Colorado?

24   A.  I did.

25   Q.  Before we get to that trip to Colorado, go back to

DAV8CHE1                    Shinder - direct

1   Plaintiff's Exhibit 1265 in evidence, to the second page,

2   signature page.

3   A.  Yes.

4   Q.  Below the date of March 15, 2010, Mr. Donziger signed on

5   behalf of plaintiffs.  Do you see that?

6   A.  I do.

7   Q.  Is there anywhere in this letter the identification of the

8   plaintiffs?

9   A.  They are identified in the attachment.

10  Q.  Moving back to your trip to Colorado, would you describe

11  your trip?

12  A.  Probably about a week into the engagement, I flew out to

13  Colorado.  I was met at the airport by Aaron Page.  We took a

14  car together to Boulder.  It was the first time I had been to

15  Boulder.  We arrived at night.  We stayed in a very nice hotel,

16  which I noted.  And then the next day we had structured

17  interviews through the day, basically in what I will

18  characterize as an ascending ladder of seniority, in terms of

19  the Stratus work, with Mr. Beltman at the end.  We had lunch in

20  Boulder in the middle of the day.  And there was wall-to-wall

21  interviews the day I was there, culminating in an interview

22  with Mr. Beltman in Denver.

23  Q.  Who structured the interviews in terms of who you would be

24  interviewing in ascending order of priority?

25  A.  I did.  I think there may have been logistics in terms of

DAV8CHE1                    Shinder - direct

```
 1   availability of people.  It was consequential to me that I see
 2   Mr. Beltman at the end and talk to some of his subordinates
 3   first.  So based on input, because I didn't know any of these
 4   people before I went out there, and knew very little about
 5   their respective roles, what they really did, since I had been
 6   on this matter for a week, I had to rely on some input in terms
 7   of how to set that up, but it was clear that Mr. Beltman had to
 8   be the last.
 9   Q.  Who paid for the flight to Colorado?
10   A.  Mr. Donziger.
11   Q.  Who paid for your car service to Boulder?
12   A.  Mr. Donziger.
13   Q.  Who paid for the lunch and the nice hotel?
14   A.  Mr. Donziger.
15   Q.  Was Mr. Donziger with you in Colorado?
16   A.  He was.
17   Q.  Based on your observations of Mr. Donziger -- withdrawn.
18            Did you have any observations of Mr. Donziger with
19   respect to expenses while you were with him in Colorado?
20            MR. GOMEZ:  Objection.  Vague.
21            THE COURT:  Overruled.
22   A.  My observation was that, and I remember thinking this to
23   myself, to use an expression that I like, he was living large.
24   I have been doing this for a while, and I have had clients that
25   scrutinize the bills and do not allow you to stay in nice
```

DAV8CHE1                         Shinder - direct

1  hotels or dial it down to hold down the costs.  We stayed in a

2  nice hotel.  We had a nice lunch.  Given that I thought that or

3  the effort was somewhat cash strapped, and we negotiated over

4  how much was going to be on the retainer, I was surprised to

5  see the accommodations were nicer than I had expected.  So my

6  thought at the time was Steven is living large.

7  Q.  Did there come a time when you were in Colorado that you

8  met Mr. Beltman?

9  A.  I did.

10  Q.  Did you meet him prior to your interview of him or at your

11  interview of him?

12  A.  I met him over lunch the day I was there.

13  Q.  Who else attended this lunch besides you and Mr. Beltman?

14  A.  Mr. Donziger for sure.  I believe Mr. Page was there.

15  There may have been another.  I can't remember.

16  Q.  How long was your interview -- withdrawn.

17        How long after the lunch was your interview of

18  Mr. Beltman?

19  A.  It was that afternoon.  What I don't recall is whether we

20  went straight from lunch to a car that took us back to Denver.

21  Q.  Was the interview of Mr. Beltman in Denver or Boulder?

22  A.  Denver.

23  Q.  How long was the interview with Mr. Beltman?

24  A.  Two hours.

25  Q.  Who, if anyone, else was present during this interview?

DAV8CHE1                    Shinder - direct

1    A.   Mr. Beltman had counsel present.   Stratus had counsel

2    present.   There were two lawyers for Stratus, I don't remember

3    their names.   Mr. Donziger was present.   I believe Mr. Page was

4    present.

5    Q.   What, if anything, do you recall from the interview?

6    A.   I recall needing every minute of the two hours to interview

7    him.   I had sort of accumulated some sense during the day,

8    although it was incomplete, and certainly paled in comparison

9    with what I heard from Mr. Beltman, that Stratus's involvement

10   in the Cabrera report was much deeper and much more problematic

11   than had been characterized to me.

12          I approached the interview in a way, I wanted to

13   maintain a kind of collegial, conversational tone so

14   Mr. Beltman and I could develop a good rapport, which I think

15   was achieved.   I asked him a lot of detailed follow-ups,

16   contextual follow-ups on things, a lot of questions about his

17   time in Ecuador, how he met Mr. Cabrera, Stratus's work in

18   terms of what they were doing on the case.   And over time and

19   the climax, if you will, it was about an hour and 45 minutes

20   in, it became a very forthcoming interview, and about an hour

21   and 45 minutes in he essentially, quite explicitly --

22          MR. FRIEDMAN:   I would object to statements from

23   Mr. Beltman as being hearsay.   It's not in furtherance of the

24   conspiracy, as I understand, but what Mr. Beltman is about to

25   say, they don't fit within the exception.

DAV8CHE1                     Shinder – direct

1          THE COURT:  Mr. Brodsky.

2          MR. BRODSKY:  They fall within, first, 801(d)(2)(D), a

3   statement is not hearsay if it's made by a party's agent or

4   servant concerning a matter within the scope of agency.

5   Mr. Beltman was Mr. Donziger's agent.  His statements here were

6   falling within that scope.

7          Second, they fall within 801(d)(2)(E).  Although Mr.

8   Shinder certainly wasn't part of any conspiracy, far from it,

9   Mr. Donziger and Mr. Beltman in connection thereto were, and

10   Mr. Donziger was luring, I think the evidence shows, Mr.

11   Shinder into it.  And so statements by Mr. Beltman in

12   connection with trying to get Mr. Shinder's assistance in

13   making representations to U.S. federal courts and oppose

14   Chevron's allegations were in furtherance of the conspiracy.

15          THE COURT:  Will there be testimony also about what,

16   if anything, Mr. Donziger did or didn't do when Mr. Beltman

17   said whatever he said?

18          MR. BRODSKY:  Yes.

19          THE COURT:  Anything else, gentlemen?

20          MR. FRIEDMAN:  As to furtherance of the conspiracy, I

21   think what you are about to hear, if you hear it, is that

22   Mr. Beltman acknowledged substantial involvement in preparing a

23   report, which would not be in furtherance of the conspiracy,

24   it's the opposite of the conspiracy.  I don't want to

25   characterize it too simplistically, but essentially

DAV8CHE1                          Shinder – direct

1    acknowledging the thing that is supposedly being hidden by the

2    conspiracy.  I don't think it falls within that rule.

3              THE COURT:  Anything else on the defense side?

4              MR. GOMEZ:  No, your Honor.

5              MR. BRODSKY:  I should also mention this was the

6    subject of Mr. Shinder's testimony during the deposition, and

7    over the objection of the defense, the special master ruled

8    that this was admissible evidence.

9              THE COURT:  The objection is overruled on at least the

10   following grounds.

11             First, it's not hearsay because the statements by

12   Mr. Beltman at the time were statements by an individual or

13   within the scope of his employment as an agent of the

14   defendants.

15             Secondly, they were co-conspirator declarations that

16   were in furtherance of the alleged conspiracy, in that they

17   were trying to enlist the aid of Mr. Shinder in stopping the

18   disclosure pursuant to the 1782 procedure that was underway in

19   Denver.

20             Thirdly, even if they were not admissible for the

21   truth of the matter, they would be admissible to the extent

22   they shed light on Mr. Donziger's reaction to whatever was

23   said.  I have a general understanding from pretrial proceedings

24   about what was said, notably the deposition, and I believe that

25   is true also.

DAV8CHE1                         Shinder – direct

1          I think it is also law of the case in light of the

2     special master's ruling, which I understand has not been

3     challenged.  I think, further, that the crime fraud exception

4     to any privilege applies here for reasons previously

5     articulated at length.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAV7CHE2                          Shinder - direct

```
 1   BY MR. BRODSKY:
 2   Q.  Mr. Shinder, would you please continue with your answer?
 3   A.  So, I was about to say so that, you know, an hour and 45
 4   minutes approximately into the interview Mr. Beltman in a
 5   rather forthcoming way essentially and pretty explicitly
 6   admitted to having written significant portions of the Cabrera
 7   report.
 8   Q.  And what if anything did Mr. Beltman say regarding whether
 9   Stratus also wrote in addition to the Cabrera report other
10   submissions to the Ecuadorian court?
11   A.  Well, once what I thought -- and still think -- was the
12   truth came out, you know, there were additional, what I will
13   characterize as lurid details that he admitted to, such as
14   Stratus had essentially had ghostwritten the Cabrera report,
15   then Stratus acting as experts for the plaintiffs wrote
16   comments to their own work, and then wrote the Cabrera report's
17   responses to their own comments, which was just astounding to
18   me the levels to which this descended.
19   Q.  Given that this occurred over three years ago, how do you
20   remember these last 15 minutes of the interview of Mr. Beltman
21   so clearly?
22   A.  You just -- you know, it's interesting, as a lawyer I'm
23   usually on the other end of these questions, probing witnesses,
24   and certain things are so shocking that they stand out.  And
25   what he said was so starkly inconsistent with what I had been
```

DAV7CHE2                    Shinder - direct

1    told before, and so profoundly troubled me, that those 15

2    minutes stand out, including I remember basically sort of

3    saying internally just keep the poker face because he's being

4    forthcoming; I did not want Mr. Beltman to see my internal

5    reaction to this.  I wanted to get as much out of the process

6    as possible and then make my own judgments afterwards as to

7    what it meant for our continuing representation of Mr.

8    Donzinger.  So, you know, it was a shocking event, and I

9    remember it very clearly.

10         MR. GOMEZ:  Your Honor, move to strike the witness's

11   personal reactions.  They're not relevant to these proceedings.

12         THE COURT:  Do you concede the accuracy of his

13   testimony?  I think it's relevant to why he remembers it, not

14   for any other purpose.

15   Q.  You had said, Mr. Shinder, that you had asked Mr. Beltman

16   had he met Mr. Cabrera.  What did Mr. Beltman say in response

17   to your question?

18   A.  Well, earlier in the interview I recall hearing how there

19   was some dinner at Mr. Cabrera's house, and I remember at the

20   time I was peppering him with a lot of sort of seemingly

21   innocuous questions:  What was his house like?  Where was it?

22   What kind of neighborhood was it?  Was it in the suburbs?  How

23   many people were there?  What was the art like?

24         And as the interview progressed, and as the day

25   progressed, the picture got more troubling, although the extent

DAV7CHE2                         Shinder – direct

1   to which it got troubling was not immediately apparent to me

2   until an hour and 45 minutes in.  But earlier in the interview

3   it was clear that there had been contacts, social contacts, you

4   know, between people working for the plaintiffs and Mr.

5   Cabrera.

6   Q.  You mentioned people working for the plaintiffs.  During

7   the interview did Mr. Beltman mention any of those people?

8   Putting aside --

9            THE COURT:  Well, I think you need to rephrase that

10  question.

11           MR. BRODSKY:  I apologize.  I will withdraw that.

12  Q.  What if anything did Mr. Beltman say -- well, withdrawn.

13  Did the name Pablo Fajardo come up during your interview of

14  Mr. Beltman?

15  A.  I don't recall.

16  Q.  What if anything did Mr. Beltman say regarding the actual

17  submission of Mr. Cabrera's report to the Lago Agrio court?

18           MR. GOMEZ:  Objection to the form.

19           THE COURT:  Overruled.

20  A.  The other troubling, shocking detail that came out towards

21  the end --

22           THE COURT:  Mr. Shinder, just answer the question.

23  OK?

24           THE WITNESS:  OK.

25  A.  He told me that the day before the submission was to be

DAV7CHE2                          Shinder – direct

1    filed with the court, he recalled seeing it boxed and packaged

2    up in the offices of the plaintiffs' lawyers in Ecuador.

3    Q.   He recalled seeing what boxed up?

4    A.   The report.  The report, its annexes.

5    Q.   The Cabrera report.

6    A.   Yes.

7    Q.   And did he describe whether he recalled seeing it before

8    this report was filed?

9    A.   Yes, this was the day before the report was filed.

10   Q.   Now, was Mr. Donzinger in the room with you when

11   Mr. Beltman made these statements?

12   A.   He was.

13   Q.   And during these last 15 minutes of your interview of

14   Mr. Beltman, did you observe Mr. Donzinger?

15   A.   I did.

16   Q.   How, if at all, did Mr. Donzinger respond, based on your

17   observations, to what Mr. Beltman was telling you regarding

18   Cabrera and Stratus's relationship with Cabrera?

19   A.   Well, I recall noting when the totality of this came out

20   sort of looking to see whether or not Steven had any kind of

21   reaction, and he didn't; he was nonplussed.

22   Q.   What if anything did Mr. Beltman say regarding Mr.

23   Donzinger and his involvement with Mr. Beltman in ghostwriting

24   the Cabrera report?

25   A.   Well, he said that everything he did was sort of under the

DAV7CHE2                    Shinder - direct

1    instruction and supervision of Mr. Donzinger and the lawyers

2    who were handling the case.

3           MR. BRODSKY:  One moment, your Honor.

4           THE COURT:  Are you nearly done, Mr. Brodsky?

5           MR. BRODSKY:  Yes, your Honor, I'm almost done.  I

6    have about ten, 15 minutes.

7           THE COURT:  Fine.  We will take a break right here.

8    Ten minutes.

9           (Recess)

10          MR. BRODSKY:  Your Honor, as Mr. Shinder retakes the

11   stand, I just wanted to point out when I was describing

12   Plaintiff's Exhibit 1244, I had said -- this was the deposition

13   in the district of Maryland overseen by Judge Day, I had said

14   that --

15          THE COURT:  Well, the exhibit was not.

16          MR. BRODSKY:  I'm sorry, your Honor.

17          THE COURT:  You said when you were describing 1244

18   this is the deposition --

19          MR. BRODSKY:  I'm sorry.  When I was describing making

20   my argument why it was no longer privileged, I inadvertently

21   said that the special masters were present and had ruled on

22   this document.  In fact it was Judge Day when this document was

23   introduced during the deposition of Mr. Page.  The defense

24   objected, Judge Day was called during the deposition, and Judge

25   Day ruled that the crime fraud doctrine applied not just to

DAV7CHE2                      Shinder - direct

 1   testimony but to this document itself, and other documents, and

 2   then there were questions permitted about the document.  But I

 3   just wanted to clear up the record that it wasn't the special

 4   masters present.

 5           THE COURT:  OK.  The only effect of that is that it

 6   changes so much of the ruling, if any, that relied on law of

 7   the case, which it would be discretionary in any case, to the

 8   fact that I agreed with Judge Day.

 9           MR. BRODSKY:  Yes, your Honor.

10           THE COURT:  Let's continue.

11   BY MR. BRODSKY:

12   Q.  Mr. Shinder, you had described Mr. Donzinger's reaction

13   during those last 15 minutes of your interview of Mr. Beltman

14   as "nonplussed".  What did you mean by nonplussed?

15   A.  What I mean by that is there was no reaction at all.

16   Q.  Approximately at what time did the interview end, to the

17   best of your recollection?

18   A.  I believe it was 5 p.m. Mountain Time.

19   Q.  What did you do when the interview ended?

20   A.  When the interview ended, I immediately got into a car

21   alone, because I had to catch a flight to Los Angeles.

22   Q.  What happened next?

23   A.  I flew to Los Angeles.  At some point I reached out to our

24   ethics counsel, because I wanted to speak to them before

25   communicating with Mr. Donzinger.  I did that the following

1  morning.  I talked to Mr. Aborn, who is one of the managing

2  partners of the firm, after I talked to our ethics counsel.

3  Basically we agreed that the firm could not continue to

4  represent Mr. Donzinger and the Lago Agrio plaintiffs.

5          And before 10 o'clock Pacific -- I recall that because

6  I had another meeting, and I wanted to speak to Mr. Donzinger

7  before that meeting -- I communicated to Mr. Donzinger our

8  decision that we had to withdraw.

9  Q.  How many conversations did you have with Mr. Donzinger

10 regarding your decision to withdraw?

11 A.  We spoke twice that day.  In the morning, as I just

12 testified, and then later in the afternoon we spoke again.

13 Q.  How long was the call in the morning with Mr. Donzinger?

14 A.  That was very brief.

15 Q.  How long was the call later in the day?

16 A.  We had a more extensive conversation later in the day.

17 Q.  What if anything did you tell Mr. Donzinger during your

18 second call, the longer call, about your decision to withdraw,

19 and what if anything did Mr. Donzinger say in response?

20 A.  Well, I communicated to him -- and I'll keep it short -- I

21 discussed what I learned.  I communicated to him that I thought

22 that to the extent there was an underlying case to be made

23 regarding the environmental damage in Ecuador, that the conduct

24 that I learned had irretrievably wounded it, that it could not

25 rely on the Cabrera report since it was not independent, and I

DAV7CHE2                          Shinder - direct

1    was not his lawyer anymore, so I wasn't going to counsel him on

2    what, if anything, to do to try to fix the situation, but it

3    bothered me, and still bothers me, that we'll never know

4    whether or not there was a case to be made against Chevron.

5    That bothered me, and I communicated that to him.

6    Q.   What if anything did Mr. Donzinger say in response?

7    A.   Well, he understood, and he did not try to dissuade me.  He

8    understood that I was dug in.  At some point he said, well,

9    what can we do?  What can we do about this?  And that's the

10   portion of the conversation where I basically said it's not for

11   me to advise you, I'm not your lawyer anymore, but you can't

12   rely on the Cabrera report; and whether there is actually a way

13   to make a case without it, you know, that's a judgment that

14   others will have to make; but your credibility is going to be a

15   problem if you swap out one report for another; and that's why

16   I thought the case really was irretrievably wounded by what had

17   I learned.

18   Q.   When you said your credibility, who did you mean by that

19   when you were speaking to Mr. Donzinger?

20   A.   Mr. Donzinger, the plaintiffs who he represented.

21   Q.   What did you mean by that?

22   A.   You know, in the very short analysis, between learning of

23   this and the next day, when I thought like how could you

24   enforce a judgment in the United States where my expectation

25   was -- as has happened -- that the Stratus ghostwriting of the

DAV7CHE2                     Shinder - direct

1    Cabrera report was going to get out, and so how are you going

2    to say to an American court that this case had integrity when

3    there was one expert report was submitted and then the

4    plaintiffs go, well, oops, something was untoward, so we will

5    substitute something else in, after this case had been going on

6    for, you know, almost several decades.  I just did not see how

7    one could credibly pull that off.

8           MR. BRODSKY:  May I approach, your Honor?

9    Q.  I am showing you, Mr. Shinder, a one-page document,

10   Plaintiff's Exhibit 1262 for identification, Bates number

11   Chev.Priv 1590, which is an e-mail from Jeffrey Shinder dated

12   March 19, 2010 to S. Donzinger at Donzinger & Associates.com.

13   Do you recognize this?

14   A.  I do.

15   Q.  What is it?

16   A.  It's the e-mail I sent to Mr. Donzinger on Friday, March

17   19, 2010, the day I got back to my office from Los Angeles,

18   confirming in writing what I communicated to Mr. Donzinger the

19   day before, and that based upon the conversations we had that

20   Constantine Cannon was withdrawing from representing Mr.

21   Donzinger and the Lago Agrio plaintiffs in the 1782

22   applications.

23          MR. BRODSKY:  May I approach again?

24          THE COURT:  You are offering that last one, I take it?

25          MR. BRODSKY:  Yes, your Honor.

1            MR. GOMEZ:  No objection.

2            MR. FRIEDMAN:  No objection.

3            THE COURT:  Received.

4            (Plaintiff's Exhibit 1262 received in evidence)

5    Q.  Mr. Shinder, I am showing you what is marked as Plaintiff's

6    Exhibit 1264 for identification, which is Bates numbered Donz

7    67569.  It's a three-page document, and on the last e-mail

8    exchange at the top of the first page it's from Steven

9    Donzinger to Jeffrey Shinder dated March 19, 2010.  Would you

10   take a moment to look at that, Mr. Shinder.

11   A.  OK.

12   Q.  Do you recognize it?

13   A.  I do.

14   Q.  What is it?

15   A.  It's a series of e-mails culminating in an e-mail from Mr.

16   Donzinger to me, where he gave permission for me to talk to

17   Mr. McDermott at the Brownstein firm.  I had asked Steven in

18   our conversations where the conversations where I communicated

19   our decision to withdraw, that I wanted a protocol in place so

20   that he and I had an understanding of what I could say to

21   people.  And I was concerned about any privilege issues.  I did

22   not want to speak to anyone, even the other lawyers who were

23   involved, about what I had learned, without his permission.  So

24   this was Mr. Donzinger granting me permission to be forthcoming

25   and fully discuss the Stratus interviews with McDermott.

DAV7CHE2                        Shinder - direct

1   Q.   In your conversations with Mr. Donzinger regarding

2   withdrawal of your firm, was the protocol that you just

3   mentioned, that you needed Mr. Donzinger's permission before

4   you could disclose the reason for your withdrawal to other

5   people?

6   A.   Yes.

7   Q.   And did there come a time when you spoke to Mr. McDermott?

8   A.   Yes.

9   Q.   Approximately when did that call take place?

10  A.   Approximately maybe two, three days after the Stratus

11  interviews.  It was pretty shortly after.

12  Q.   And what did you tell Mr. McDermott?

13  A.   I explained to him that I had learned facts that I was

14  uncomfortable with about the extent of Stratus' involvement in

15  the Cabrera report, facts that were inconsistent with what I

16  had been told before.

17          I told him that while perhaps there was a way to weave

18  procedural or legal argument against the 1782 applications that

19  was not dependent upon a portrayal of the facts that I would

20  have been uncomfortable to make to an American court, that my

21  firm was not ethically comfortable with doing that, and

22  therefore we withdrew.

23          I told him that they should be -- if they're going to

24  make their own judgment and continue to represent Mr.

25  Donzinger, that they should be leery about what they are being

DAV7CHE2                      Shinder - direct

1    told.

2              MR. BRODSKY:  Your Honor, we offer 1264.

3              MR. FRIEDMAN:  No objection.

4              THE COURT:  Received.

5              (Plaintiff's Exhibit 1264 received in evidence)

6              MR. BRODSKY:  May I approach for the final time, your

7    Honor?

8              THE COURT:  Yes.

9    Q.  I am showing you, Mr. Shinder, a one-page document marked

10   Plaintiff's Exhibit 1266 for identification, Bates numbered

11   BHF-S-56, dated March 19, 2010.  Was March 19, 2010,

12   Mr. Shinder, the day you spoke with Mr. McDermott?

13   A.  I believe it was.

14   Q.  And Plaintiff's Exhibit 1266 for identification are not

15   your notes, correct?

16   A.  No, they're not.

17             MR. BRODSKY:  Your Honor, we offer 1266 for

18   identification, and we offer them -- I don't know of any

19   objection, but we offer 1266.

20             MR. FRIEDMAN:  There is no foundation, your Honor.

21   And hearsay as well.

22             THE COURT:  Well, Mr. Brodsky?

23             MR. BRODSKY:  Yes, your Honor.  With respect to

24   foundation, we can offer it now subject to connection with your

25   Honor reviewing the testimony.  We have authenticated this

DAV7CHE2                      Shinder - direct

1    during the deposition and designated testimony of the

2    deposition of John McDermott, in which these notes were

3    authenticated as the notes of Michael Polks, who works with Mr.

4    McDermott, an associate of Mr. McDermott, and during that

5    deposition these notes were authenticated by Mr. McDermott.

6              In terms of hearsay, your Honor, unless the defense is

7    prepared to stipulate to Mr. Shinder's testimony, we would

8    offer it under 801(d)(1)(B) as a prior consistent statement.

9              MR. FRIEDMAN:  Your Honor, it's not a statement of

10   Mr. Shinder's, so it doesn't fall within a prior consistent

11   statement.  If I understood the offer, it's not even the person

12   who wrote the notes has authenticated them, but a partner

13   supervising him, I guess, maybe.  I don't think that is

14   adequate foundation, and it's clearly hearsay.

15             MR. BRODSKY:  Your Honor --

16             THE COURT:  Just a minute.  To the extent it's offered

17   as evidence of a prior consistent statement, the hearsay rule

18   has nothing to do with it, right?

19             MR. FRIEDMAN:  Right.

20             THE COURT:  So, given that that's the basis of the

21   offer, what's left of your objection?

22             MR. FRIEDMAN:  Well, I think the basis of the offer is

23   prior consistent statement.  I would say it's not a statement

24   of the party.  I guess what I'm saying is there is no

25   foundation that this is what it purports to be.  It's not like

DAV7CHE2                    Shinder - direct

1    Mr. Shinder said, yes, this is my statement.

2              THE COURT:  This is very confusing to me.  I am told

3    that there was a deposition taken at which the fact that they

4    are notes of this man, whose name I haven't kept in my mind,

5    was established.  Now, is that true or is it not true?

6              MR. FRIEDMAN:  I will accept the representation that

7    somebody said notes were taken by somebody else, but beyond

8    that I don't think we know --

9              THE COURT:  Do you have the deposition here,

10   Mr. Brodsky?  I mean this is obviously taking a lot of time

11   over very little, I think, but...

12             MR. BRODSKY:  I only have notes of the excerpts of the

13   deposition.  It's 1266.  Apparently we do have the deposition.

14             THE COURT:  May I have the deposition?

15             MR. BRODSKY:  And I could direct you to the specific

16   page, your Honor.

17             THE COURT:  Yes, please.

18             MR. BRODSKY:  Page 92, line 1 through 94, line 1.

19             THE COURT:  All right.  Let's start with the basics.

20   Does everybody agree that the document referred to at the

21   deposition as Exhibit 4010 is just another copy of the document

22   which is Plaintiff's 1266 for identification here?  Any

23   disagreement about that?

24             MR. FRIEDMAN:  Give us just a second, your Honor.

25             MR. BRODSKY:  That is described on page 162 of the

DAV7CHE2                        Shinder - direct

1   transcript.

2                MR. FRIEDMAN:  Yes, we agree.

3                THE COURT:  OK.  Now, let me look at the testimony.

4                At page 92, line 25 to page 93, line 3, the witness,

5   Mr. McDermott, testified that these were notes taken by Mr.

6   Polk.  Now, is there evidence somewhere that Mr. Polk was

7   present at the conversation, if it was in person or on the

8   telephone, if it was that?

9                MR. BRODSKY:  I believe, your Honor, that there was.

10  I would have to look at the transcript to see exactly where it

11  was.

12               THE COURT:  Now, I think I may have been misled by

13  something in the transcript.  The discussion of the handwritten

14  notes that we're dealing with -- unless there is a typo on page

15  92 -- seems to deal with what was Exhibit 4011 at the

16  deposition.  Am I mistaken about that, folks?  I am referring

17  to page 97, at the top.

18               MR. BRODSKY:  I think that's a mistake.

19               THE COURT:  In the transcript?  At which page?

20               MR. BRODSKY:  Well, your Honor, you are not mistaken.

21  4011 on page 162 is identified as handwritten notes dated

22  3/19/2010.  So, there were two sets of handwritten notes.  One

23  is 4010 and one is 4011.

24               THE COURT:  Look, we're not going to take the time

25  right now.  I will reserve on this, and you folks can do this

DAV7CHE2                    Shinder – direct

1   archeology over lunch.

2          MR. BRODSKY:  Your Honor, may I offer it subject to

3   connection, and ask Mr. Shinder about a document to help

4   establish that it reflects what he recalls?

5          THE COURT:  Sure.  And obviously what this is all

6   about is whether Mr. Shinder made these statements, so

7   presumably you could ask him.

8          MR. BRODSKY:  Yes.

9   Q.  Mr. Shinder, taking a look at Plaintiff's Exhibit 1266 for

10  identification, would you review it and let me know when you

11  finish.

12  A.  OK.

13  Q.  Mr. Shinder, after it says "call with Jeff Shinder," that

14  first -- there are a number of different sentences there.  I'm

15  going to ask you about each one.

16          The sentence beginning with "originally told," did you

17  make that statement to Mr. McDermott on or about March 19,

18  2010?

19  A.  Yes.

20  Q.  The second statement where it says "very clear line," did

21  you make that statement to Mr. McDermott on or about March 19,

22  2010?

23  A.  Yes.

24  Q.  The third statement "a few reports," do you see there is a

25  question mark, asked him flat out, where it says a few reports

DAV7CHE2                          Shinder - direct

1   here and there?  Well, withdrawn.  Where it says, "Asked him

2   flat out, assuming U.S. privilege aside from Cabrera materials,

3   what's left," do you see that?

4   A.  I do.

5   Q.  Who asked that question?

6   A.  I don't recall.

7   Q.  Do you see the statement where it says "Be careful"?

8   A.  Yes.

9   Q.  Did you make that statement to Mr. McDermott?

10  A.  Yes.

11  Q.  Where it says, the next sentence, "Best approach," do you

12  see that?

13  A.  Yes.

14  Q.  Did you make that statement?

15  A.  Yes.

16  Q.  Where it says, "Be leery about information we're getting,"

17  did you make that statement to Mr. McDermott on or about March

18  19, 2010?

19  A.  Yes.

20  Q.  Did you make the statement where it says "like criminal

21  defense lawyer with guilty client making procedural objection,"

22  did you make that statement to Mr. McDermott on March 19, 2010?

23  A.  I did.

24  Q.  And then finally, "physically ill, fraud on foreign court,"

25  did you make that statement to Mr. McDermott on March 19, 2010?

DAV7CHE2                         Shinder - direct

```
 1    A.  I did.

 2    Q.  Do you recall, Mr. Shinder, in your two conversations with

 3    Mr. Donzinger regarding your withdrawal, what, if anything, did

 4    you tell Mr. Donzinger that you were withdrawing for ethical

 5    reasons?

 6    A.  I'm not clear on the question.

 7    Q.  What if anything did you tell Mr. Donzinger during your

 8    telephone conversations with him about your withdrawal that one

 9    of the reasons you were withdrawing was for ethical reasons?

10             MR. FRIEDMAN:  Objection.  Form.

11             THE COURT:  Overruled.

12             MR. GOMEZ:  Relevance, your Honor?

13             THE COURT:  Overruled.

14    A.  I did tell him that the primary reason we were withdrawing

15    was ethical reasons, that I had serious issues with the conduct

16    that I learned in Denver, and I did not think that I or my firm

17    could continue to handle this matter consistent with our

18    ethical obligations, and I wanted no part of it.

19             THE COURT:  Among other things, Mr. Gomez, the

20    relevance is in part that it bears on Mr. Donzinger's intent

21    from that moment forward.

22             MR. BRODSKY:  No further questions, your Honor.

23             THE COURT:  Cross-examination, Mr. Friedman.

24             MR. FRIEDMAN:  Thank you, your Honor.

25
```

DAV7CHE2                    Shinder – direct

1    CROSS EXAMINATION

2    BY MR. FRIEDMAN:

3    Q.  Mr. Shinder, can you tell us what you did to prepare for

4    your testimony today.

5    A.  What I did to prepare?

6    Q.  Yes.

7    A.  I met with Chevron's counsel a few times to discuss the

8    questions they were going to ask me.

9    Q.  And did you go over your deposition?

10   A.  I reread it.

11   Q.  How many times did you meet with Chevron's counsel?

12   A.  I am going to have to give you an approximation.  Three or

13   four.

14   Q.  And approximately how much time did that involve between

15   the three or four sessions total?

16   A.  You know, each session was, you know, probably a couple

17   hours.

18   Q.  When you were first approached by Mr. Donzinger, would it

19   be fair to say you were intrigued with the idea that your firm

20   might be hired to do the enforcement action?

21   A.  Yes.

22   Q.  And you thought that the enforcement action might be quite

23   lucrative?

24   A.  Yes.

25   Q.  But you were on the fence about whether you wanted to do

DAV7CHE2                     Shinder – cross

1   the enforcement action.  Is that fair?

2   A.  Yes.

3   Q.  You thought that the 1782 proceedings might be a good way

4   to evaluate the viability of the enforcement action.  Is that

5   correct?

6   A.  Yes.

7   Q.  So the retainer agreement that you signed with Mr.

8   Donzinger and the Ecuadorian plaintiffs is dated March 10th of

9   2010; is that right?

10  A.  Yes.

11  Q.  That's when your formal employment or representation began?

12  A.  The retention began then, yes.

13  Q.  All right.  And if I am understanding these documents

14  correctly, you withdrew on the 18th of March?

15  A.  Yes.

16  Q.  So, we are talking about an eight-day period in which you

17  were a lawyer for Mr. Donzinger and the Ecuadorian plaintiffs.

18  A.  Yes.

19  Q.  And the retention was just for the 1782s, is that right?

20  A.  That's correct.

21  Q.  Before taking on the 1782 assignment, you had not been

22  provided with any information other than what was publicly

23  available; is that true?

24  A.  Yes.

25  Q.  You told Mr. Donzinger that you would only do the 1782 work

DAV7CHE2                         Shinder - cross

```
1    if he gave you complete access to Stratus.

2    A.  Yes.

3    Q.  You actually didn't want details about the Cabrera issue

4    from Mr. Donzinger; you wanted them right from the source, from

5    Stratus.   True?

6    A.  Yes.

7    Q.  And you told Mr. Donzinger that.

8    A.  Yes.

9    Q.  Mr. Donzinger, after you told him that, arranged for you to

10   meet with the Stratus people, including Mr. Beltman.

11   A.  He did.

12   Q.  All right.  And he didn't try to interfere with your

13   ability to talk freely with them, did he?

14   A.  That's correct.

15   Q.  Now, did Mr. Donzinger fly out to Colorado with you, or was

16   he there when you got there, or do you know?

17   A.  My best recollection is that he did not fly with me, that

18   he was there.  I do remember this first time I saw him was in

19   the lobby of the hotel the night I arrived.

20   Q.  All right.  And you don't know what Mr. Donzinger may or

21   may not have known about preparation of the Cabrera report

22   before this set of meetings in Colorado, do you?

23   A.  I'm not clear on the question.  I will do my best to answer

24   it.

25   Q.  OK.
```

DAV7CHE2                    Shinder - cross

1    A.  I know what I had been told was that Mr. Donziger had

2    involvement sufficient to assure me several times that the

3    Cabrera report was independent, and that the allegations that

4    Chevron made were inaccurate, and the extent that there were

5    any adverse inferences to be drawn, as I testified earlier,

6    they came from unwarranted inferences that Chevron was drawing.

7    Q.  Were you given exhibit PX 1244?  Yes, you were.  I think

8    you still have it up there?

9    A.  I'm trying to find it.  I must have it.  Yes, I have it.

10   Q.  I'm sorry, I misspoke.  I wanted to ask you about 1256

11   first.  I apologize.  I don't think you have been shown 1256.

12   Let me hand it to you.

13          Is this an e-mail you received from Laura Garr

14   approximately March 15, 2010?

15   A.  The bottom half of the document is an e-mail from Ms. Garr,

16   yes.

17   Q.  All right.  And, right, absolutely.  Do you recall

18   receiving this approximately March 15th of 2010?

19   A.  I do.

20          MR. FRIEDMAN:  Your Honor, I move for admission of

21   1256.

22          MR. BRODSKY:  No objection.

23          THE COURT:  It's received.

24          (Defendant's Exhibit 1256 received in evidence)

25   Q.  Did you understand at the time that Ms. Garr was an

DAV7CHE2                    Shinder – cross

1    associate at the time working for Mr. Donzinger?

2    A.  Yes.

3    Q.  Let me ask you this.  If we could go to 1244 now.  If you

4    would turn to the bottom of Bates stamp 928.  Do you see at the

5    very last –– second to last line where it's you talking about

6    the submission of helpful information as requested by Cabrera

7    of both parties?

8    A.  I do.

9    Q.  Did you ever check to see if that was accurate?

10   A.  I want to make sure I understand the question.  Did I check

11   to confirm that Mr. Cabrera had requested information?

12   Q.  Correct.

13   A.  I did not.

14   Q.  Did you check to see if Chevron formally declined to submit

15   anything to Mr. Cabrera?

16   A.  I did not.

17   Q.  Did you check to see if that request was in fact formalized

18   and ordered by the court?

19   A.  I did not.

20   Q.  I think you –– well, let me just ask you, you didn't

21   consider yourself an expert in Ecuadorian procedure, I take it.

22   A.  I did not.

23   Q.  If you go a couple lines down on page 929 where it says,

24   "If documents were turned over to Cabrera by our local counsel,

25   he would have every right to adopt them as his own," did you

DAV7CHE2                    Shinder - cross

1    research or look into the accuracy of that assertion?

2    A.  I did not.

3    Q.  Now, during the meeting with Mr. Beltman, did Mr. Donzinger

4    make any effort to interfere with you getting the full story

5    from Mr. Beltman?

6    A.  He did not.

7    Q.  After that meeting, did he make any effort to keep you from

8    talking to John McDermott?

9    A.  He did not.

10   Q.  In fact, as I understand what you said, he authorized you

11   to talk to Mr. McDermott.

12   A.  Yes.

13   Q.  And to speak freely with him.

14   A.  That's correct.

15   Q.  Is it your position that Mr. Donzinger told you there was

16   no direct contact between Stratus and Cabrera?

17   A.  First of all, I'm not here to offer any positions.  My

18   recollection of what he told me is that to the extent that

19   there was any inference to be drawn between the similarity of

20   Stratus work and the ultimate Cabrera report, that was merely

21   because of materials that had been funneled to Mr. Cabrera,

22   consistent with the process that had been set up, and that

23   there was nothing particularly untoward about that.

24   Q.  All right.  I may have just misheard your direct testimony.

25   You weren't suggesting that Mr. Donzinger ever told you there

DAV7CHE2                     Shinder – cross

1   was no direct contact between Stratus and Cabrera, were you?

2           MR. BRODSKY:  Objection.  Asked and answered.

3           THE COURT:  Sustained.

4           MR. FRIEDMAN:  I don't have any other questions.

5   Thank you.

6           THE COURT:  Thank you.

7           Mr. Gomez?

8   CROSS EXAMINATION

9   BY MR. GOMEZ:

10  Q.  Good morning, Mr. Shinder.  Sir, you do not know if

11  Ecuadorian law permits a party to have ex parte contact with a

12  court-appointed expert, is that correct?

13  A.  I don't.

14  Q.  And you do not know if Ecuadorian law permits a party to

15  share information ex parte with a court-appointed expert, is

16  that correct?

17  A.  I don't.

18  Q.  You have no idea if Ecuadorian law permits a party to

19  provide an expert with proposed findings of fact, is that

20  correct?

21  A.  I don't.

22  Q.  You have no idea if Ecuadorian law permits a party to

23  provide an expert with proposed conclusions, is that correct?

24  A.  That is correct.

25  Q.  And at the time that you met with Mr. Beltman, isn't it

DAV7CHE2                    Shinder – cross

1    also correct that you had no idea whether Mr. Cabrera under

2    Ecuadorian law could choose to adopt whatever information

3    Stratus provided to him and still be an independent expert, is

4    that correct?

5    A.  That's correct.

6    Q.  Is it also correct, sir, that after you met with

7    Mr. Beltman, you made no attempt to find out whether Ecuadorian

8    law permitted any of the contacts that Mr. Beltman had

9    described to you in the interview?

10   A.  That is correct.

11   Q.  Isn't it also correct, sir, that you have no idea what

12   revisions Mr. Cabrera made to the material, if any, he received

13   from Stratus before he filed it?

14            THE COURT:  If any revisions there were.

15            MR. GOMEZ:  If any revisions there were.

16   A.  That is correct.

17   Q.  Is it also true that you made no attempt to contact expert

18   Richard Cabrera to ascertain what, if anything, he did to

19   prepare his report, or how he relied on any material that

20   Stratus may have provided to him?

21   A.  That is correct.

22   Q.  Sir, you did not tell anyone at Silver & DeBoskey why you

23   were withdrawing from the case, is that correct?

24   A.  I don't recall talking to them about my withdrawal.

25   Q.  And you did not tell anyone at the Patton Boggs firm why

DAV7CHE2                        Shinder - cross

```
1    you were withdrawing from the case, is that correct?
2    A.  I don't recall talking to them either.
3    Q.  Sir, you executed a retainer agreement to represent the
4    Lago Agrio plaintiffs.  It's marked as PX 1255.  Is that in
5    front of you, sir?
6    A.  It is now.
7    Q.  Sir, is it fair to say that despite your strong feelings
8    about the information that you received, you made absolutely no
9    attempt to contact any of the Lago Agrio plaintiffs whose names
10   appear in the exhibit to that retainer agreement?
11   A.  That is correct.
12   Q.  Is it correct also that you made no effort to report to any
13   of the Lago Agrio plaintiffs listed in the retainer agreement
14   the result of your due diligence with respect to this matter?
15   A.  That is correct.
16   Q.  Is it correct that you made no attempt to contact Hugo
17   Camacho who appears in that list?
18   A.  That is correct.
19   Q.  Is it correct that you made no attempt to contact Javier
20   Piaguaje, who appears on that list?
21   A.  Yes, that's correct.
22   Q.  Is it also correct, sir, that you never even asked Mr.
23   Donziger to provide you with any contact information for any
24   of the Lago Agrio plaintiffs on that list?
25            THE COURT:  Do you think that's covered by your
```

DAV7CHE2                    Shinder - cross

 1    previous questions, counsel?

 2              MR. GOMEZ:  Yes, your Honor.  I will move on.

 3    Q.  Sir, you never entered an appearance at any case in

 4    relation to the representation in that retainer agreement,

 5    correct?

 6    A.  Yes, that's correct.

 7    Q.  And is it also correct, sir, that you have no personal

 8    knowledge of what Mr. Donzinger may have told others with

 9    respect to Stratus' relationship or -- let me withdraw that.

10              Is it correct, sir, that you have no personal

11    knowledge of what Mr. Donzinger told to others regarding the

12    drafting of the Cabrera report?

13              MR. BRODSKY:  Objection, your Honor.  Form.  Vague.

14    To others?

15              THE COURT:  Sustained as to form.

16    Q.  Sir, is it correct that you have no personal knowledge of

17    what, if anything, Mr. Donzinger told others regarding Stratus'

18    involvement in the drafting of the Cabrera report?

19              MR. BRODSKY:  Same objection.

20              THE COURT:  Same question, same ruling.

21    Q.  Is it correct, sir, that you never made any representations

22    to others in reliance on the information that Mr. Donzinger

23    provided to you regarding Stratus' role in the Lago Agrio

24    litigation?

25              MR. BRODSKY:  Objection.

DAV7CHE2                    Shinder - cross

1        THE COURT:  Overruled.

2   A.  I'm a little unclear on the question, but I will do my best

3   to answer it.  Representations to others?  You know, the only

4   people -- can you read back -- I just want to make sure I'm

5   answering this accurately.  Can you read it back to me?

6        (Record read)

7   Q.  Yes or no.

8   A.  I believe the answer to that is no.

9        MR. GOMEZ:  No further questions.

10        THE COURT:  Any redirect?

11        MR. BRODSKY:  Very briefly.

12  REDIRECT EXAMINATION

13  BY MR. BRODSKY:

14  Q.  Mr. Shinder, you were asked some questions regarding your

15  formal retention on March 10, 2010.  Do you remember the

16  questions you were asked and the answers you gave?

17  A.  Yes.

18  Q.  Prior to getting formally retained, did you speak with Mr.

19  Donzinger?

20  A.  On numerous occasions.

21  Q.  Did he provide you with information?

22  A.  He did.

23        MR. BRODSKY:  Can we pull up on the screen PX 1224,

24  and flip to the second page, please.

25  Q.  Mr. Shinder, was Plaintiff's Exhibit 1224 in evidence that

DAV7CHE2                          Shinder – redirect

1   you received a publicly available document?

2   A.  I don't think this was publicly available.

3          MR. BRODSKY:  Can we put up 1244 in evidence.  And can

4   we go to the second page.

5   Q.  Mr. Shinder, was Plaintiff's Exhibit 1244, a memo dated

6   March 8, 2010 from SRD and Aaron Page, a publicly available

7   document?

8   A.  No, it was not.

9          MR. BRODSKY:  May I approach, your Honor?

10         THE COURT:  Yes.

11  Q.  I am showing you, Mr. Shinder, Plaintiff's Exhibit 1241 for

12  identification, which is a multi-page document, Bates numbered

13  Chev.Priv 844 through 847, and the e-mail on the first page

14  says from Steven Donzinger dated March 5, 2010 to Jeffrey

15  Shinder, subject memo.  Do you recognize this document?

16  A.  I do.

17  Q.  Does it relate to Mr. Cabrera?

18  A.  It does.

19         MR. BRODSKY:  Your Honor, we offer 1241.

20         MR. FRIEDMAN:  No objection.

21         THE COURT:  Received.

22         (Plaintiff's Exhibit 1241 received in evidence)

23  Q.  Was Plaintiff's Exhibit 1241 a publicly available document?

24  A.  No, it was not.

25  Q.  During the time that Mr. Donzinger made statements to you

DAV7CHE2                    Shinder - redirect

1    regarding the Ecuadorian litigation and the 1782 proceedings,

2    from October 2009 prior to your formal retention on March 10,

3    2010, did he provide you with information pursuant to the

4    understanding that it would be nonpublic?

5    A.  Yes.

6    Q.  You were asked some questions on cross-examination

7    regarding whether you made an attempt to contact Mr. Cabrera.

8    Do you remember the question and the answer you gave?

9    A.  I do.

10   Q.  After your interview of Mr. Beltman where Mr. Donzinger was

11   present, did Mr. Donzinger deny to you after that interview

12   that Stratus had ghostwritten the Cabrera report?

13   A.  He did not.

14   Q.  Did Mr. Donzinger deny that Mr. Beltman's statement to you

15   that Stratus and Mr. Beltman ghostwrote the Cabrera report at

16   Mr. Donzinger's direction?

17             MR. GOMEZ:  Objection.  Leading.

18             THE COURT:  Overruled.

19   A.  He did not deny that either.

20   Q.  Did he deny any of the statements that Mr. Beltman made to

21   you regarding the Cabrera report during the last 15 minutes of

22   your interview of Mr. Beltman?

23   A.  He did not.

24   Q.  You were asked some questions regarding Ecuadorian

25   procedure and about Ecuadorian law on cross-examination.  Do

DAV7CHE2                        Shinder – redirect

1   you remember the questions you were asked and the answers you

2   gave?

3   A.  I do.

4   Q.  Did your decision to withdraw as counsel for Mr. Donzinger

5   and the Lago Agrio plaintiffs have anything to do with

6   Ecuadorian law?

7   A.  It did not.  You know, I'm a professional that was being

8   asked to oppose an application in the United States to a U.S.

9   court, using my professional judgment on what I had learned.

10  It did not matter to me -- it was not consequential in any way

11  to our decision ethically to not continue what the specifics of

12  Ecuadorian law and procedure were.

13            MR. BRODSKY:  No further questions.

14            THE COURT:  Thank you.  Recross, Mr. Friedman?

15            MR. FRIEDMAN:  Thank you, your Honor.  Just one point,

16  if I could.

17  RECROSS EXAMINATION

18  BY MR. FRIEDMAN:

19  Q.  In your direct testimony, if I understood it correctly, you

20  said that Mr. Beltman told you that what Stratus had done was

21  at the direction of Mr. Donzinger and the plaintiffs'

22  attorneys, is that correct?

23  A.  Mr. Donzinger.  Specifically the plaintiffs' attorneys, I

24  don't recall.

25  Q.  OK, I guess the record will speak for itself then.  Thank

DAV7CHE2                        Shinder - recross

1     you.

2   A.  OK.

3              MR. FRIEDMAN:  Thank you.

4              THE COURT:  Thank you.

5              Mr. Gomez?

6              MR. GOMEZ:  Nothing further, your Honor.

7              THE COURT:  All right.  Just give me a minute to see

8    whether I have a question or not.

9              All right.  No, thank you.  The witness is excused.

10             (Witness excused)

11             THE COURT:  Next witness.

12             MR. BRODSKY:  Your Honor, would you mind if we

13   approach the side bar about one small matter relating to what

14   happened this morning?

15             (At the side bar)

16             MR. MASTRO:  Your Honor, Mr. Shinder's counsel

17   approached me during the break this morning, told me something

18   that I thought had to be conveyed to your Honor.  It was not

19   conveyed to the witness.  We didn't want to interrupt the

20   examination, but she wanted it to be known that this had

21   happened at the break.  So, if she could please speak for

22   herself.

23             MS. LACHTER:  Of course.  Christopher Gowan came up to

24   me right after Jeff had finished the first part of his direct

25   examination, and he said to me I suggest you talk to the

DAV7CHE2                         Shinder – recross

 1   witness about his testimony about Don being in the room,

 2   because that was perjury.  I then asked him, you know, who are

 3   you, who do you represent, I don't know you.  And he then

 4   repeated just talk to the witness.

 5           THE COURT:  Do you wish to call this lady as a

 6   witness?

 7           MR. MASTRO:  I don't, your Honor, but I think that the

 8   attempt by someone working with the defendant's team to have

 9   gone up to Mr. Shinder's lawyer and said such a thing, we

10   needed to make a record that that had happened.

11           THE COURT:  Well, look, what do you want me to do

12   about it?

13           MR. MASTRO:  I think it's totally inappropriate for

14   members of their team to approach his lawyer and try to

15   influence his testimony in the midst of his examination.

16           THE COURT:  It's up to you to decide what you want to

17   do with it.

18           MR. MASTRO:  Just as we, your Honor, would never

19   approach him in the middle of his examination --

20           THE COURT:  Mr. Mastro, fish or cut bait.

21           MR. MASTRO:  Your Honor, I think they should be

22   instructed not to have their legal team going up to individual

23   witness's counsel and threatening them with perjury

24   accusations.  That's why I asked that we have this side bar.

25           MR. FRIEDMAN:  Your Honor, I am going to have a

DAV7CHE2                    Shinder - recross

1   conversation with Mr. Gowan.  I don't know that anything else

2   is necessary.

3            MR. MASTRO:  Well, I take Mr. Friedman at his word,

4   and he has been true to his word in similar circumstances where

5   things like this have happened, so if Mr. Friedman is going to

6   speak to Mr. Gowan --

7            THE COURT:  Where is Mr. Gowan now?

8            MR. GOMEZ:  He is not in the courtroom, but he may be

9   outside.

10            THE COURT:  Go get him, please.

11            Tell me your name again, ma'am.

12            MS. LACHTER:  Katie, K-a-t-i-e.  Last name is Lachter,

13   L-a-c-h-t-e-r.

14            MR. GOMEZ:  Your Honor, he is not in the meeting

15   rooms, and I am informed that he had to catch a train to D.C.

16   and may have left the building.  But I have not stepped outside

17   or searched the building so I can't tell you more than that,

18   I'm afraid.

19            THE COURT:  Ms. Lachter, I want you to tell me

20   directly exactly what happened, on the understanding that you

21   are making a statement to a federal judicial official and that

22   any false statement may be prosecutable under 18 U.S. Code

23   1001.

24            MS. LACHTER:  Certainly, your Honor.  When we broke a

25   little bit after 11 this morning in the middle of my client

DAV7CHE2                        Shinder – recross

1   Jeffrey Shinder's direct examination, I was approached by

2   Christopher Gowan, who initially did not identify himself.  He

3   said to me something to the effect of I suggest you tell your

4   client to rethink that testimony that Don was in the room,

5   because that's perjury.

6        I then asked him, you know, who are you, who do you

7   represent, are you here on behalf of Mr. Donzinger and the LAPs

8   or just Mr. Donzinger.  He said I'm on this side, and he

9   pointed to the defense table.  I said, do you work with

10  Mr. Gomez or just for Mr. Donzinger?  He said just Mr.

11  Donzinger.  And then I said, and what is it you want me to do?

12  And he said just, you know, talk to the witness about that last

13  testimony.

14        That in substance is what occurred this morning.  I

15  did not speak to my client; I did not want anything to

16  interfere with his testimony.  I certainly was not going to

17  relay any perjury to him.  I did inform Mr. Mastro that the

18  conversation had taken place.

19        THE COURT:  All right.  I will consider what if

20  anything I want to do about it.

21        MR. MASTRO:  Thank you, your Honor.

22        THE COURT:  But, Mr. Friedman, it better not happen

23  again.

24        (In open court)

25        THE COURT:  Next witness.

DAV7CHE2                    Shinder - recross

1           MR. MASTRO:  Your Honor, Chevron calls Dr. James

2      Ebert.  He will be presented by my colleague Avi Weitzman, your

3      Honor.

4       JAMES EBERT,

5            called as a witness by the plaintiff,

6            having been duly sworn, testified as follows:

7                COURT CLERK:  Please state your name for the record.

8                THE WITNESS:  I'm James Ian Ebert, E-b-e-r-t.

9                THE COURT:  You may proceed, Mr. Weitzman.

10     DIRECT EXAMINATION

11     BY MR. WEITZMAN:

12     Q.  Good afternoon, Dr. Ebert.  I am handing you what has been

13     marked as Plaintiff's Exhibit 4000.  Do you recognize

14     Plaintiff's Exhibit 4000?

15     A.  Yes, I do.

16     Q.  Is that a copy of your witness statement in this case?

17     A.  It is.

18     Q.  Would you turn to the last page of the document.  Have you

19     signed your witness statement?

20     A.  Yes, I did.

21     Q.  Since the signing of your witness statement, Chevron had

22     made certain edits to paragraphs 2, 3 and 14 of your witness

23     statement.  Have you reviewed those edits?

24     A.  I have.

25     Q.  And have you initialed each of the pages of your witness

DAV7CHE2                          Ebert - direct

 1   statement with the edits?

 2   A.   Each one.

 3   Q.   Is your witness statement true and correct with the edits

 4   made as of today?

 5   A.   Yes.

 6   Q.   Do you offer your witness statement as your direct

 7   examination today?

 8   A.   Yes, I do.

 9            MR. WEITZMAN:   I offer Plaintiff's Exhibit 4000, your

10   Honor.

11            THE COURT:   Received on the same basis as previously.

12            (Plaintiff's Exhibit 4000 received in evidence)

13            MR. WEITZMAN:   Before passing the witness, I have just

14   two exhibits I would like the witness to identify.

15   Q.   In your binder, Dr. Ebert, there is an exhibit marked

16   Plaintiff's Exhibit 4020 and Plaintiff's Exhibit 4021.  Do you

17   have those?  There is a binder right in front of you, I

18   believe.

19   A.   Oh.

20   Q.   You can turn to Plaintiff's Exhibit 4020.

21   A.   Yes.

22   Q.   Can you briefly identify what that is.

23   A.   It's two photographs of the Sushufindi 33 site.

24   Q.   And are these photographs replicated in your witness

25   statement on page 9?

DAV7CHE2                    Ebert - direct

1   A.  Yes, it is.

2   Q.  What is the difference between the photograph that is

3   Plaintiff's Exhibit 4020 and the images on page 9 of your

4   witness statement?

5   A.  Well, page 9 of my witness statement was printed with a

6   normal printer.  Exhibit 4020 is printed with a photographic

7   quality printer.

8   Q.  And if you can just quickly identify what the difference is

9   between the first top image and the bottom image in Plaintiff's

10  Exhibit 4020.

11  A.  The top image is an image from Mr. Cabrera's report, and

12  the bottom image is from another photographic database, Ellis

13  Geospacial, that I received.

14  Q.  When in relation to the image that was in the Cabrera

15  report is the bottom image taken or obtained?

16  A.  Well, it was taken at the same time as the Cabrera image;

17  it came from the same photographic negative.

18  Q.  In the bottom image you circled -- there is a yellow circle

19  around a portion of the photograph.  What is it that you

20  circled?

21  A.  It's a tree at the Sushufindi 33 site.

22  Q.  And what conclusions do you draw about the Cabrera report

23  as a result of your identifying a tree within that circle?

24  A.  Well, Mr. Cabrera identified it as a pit, and it's not,

25  it's a tree.

DAV7CHE2                         Ebert - direct

1              MR. WEITZMAN:  Chevron offers Exhibit 4020, your

2    Honor.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 4020 received in evidence)

5    Q.  Can we turn to Exhibit 4021.  What is Plaintiff's Exhibit

6    4021?

7    A.  It's two photographs derived from the same photographic

8    negative of the Sacha Sur site.

9    Q.  And the top image, where did you obtain that image from?

10   A.  From Mr. Cabrera's report.

11   Q.  Just to be clear, are the red circles and squares with the

12   words pit around them, are those your additions, or were those

13   in Mr. Cabrera's report originally?

14   A.  They are in the Cabrera report.

15   Q.  If we can scroll down to the bottom image.  What is the

16   bottom image that we are looking at?

17   A.  Well, it's from the same photographic negative as the top

18   image.  It's from a higher resolution digital database that I

19   obtained.

20   Q.  And if we can zoom out on that so that we have both images.

21   What did you find based on your examination of the higher

22   quality image, that is, the bottom image, what did you find

23   about Mr. Cabrera's conclusion regarding pit 4, which is within

24   the yellow circle?

25   A.  My conclusion is that pit 4 is not a pit but a tower, a

DAV7CHE2                          Ebert - direct

```
 1   tank of some sort, circular tank, and so it's not a pit.
 2            MR. WEITZMAN:  No further questions, your Honor.
 3            THE COURT:  Thank you.  Any cross?
 4            MR. BOOTH:  Yes, your Honor.
 5   CROSS EXAMINATION
 6   BY MR. BOOTH:
 7   Q.  Good morning, sir.
 8   A.  Good morning.
 9   Q.  I'm Rainey Booth.  Let me ask you, the photographs that you
10   just referred to, that I believe you indicated were a better
11   quality of aerial photographs, did they come from a
12   different --
13            THE COURT:  I think that misstates the testimony
14   actually.
15            MR. BOOTH:  Let me ask it better.
16   Q.  You mentioned you had photographs that were contained in
17   the Cabrera report, is that right?
18   A.  Yes, that's right.
19   Q.  And again I'm talking about aerial photographs.
20   A.  Yes.
21   Q.  And then you received photographs from a different source?
22   Or did I misunderstand you?
23   A.  Yes, I did.  The photographs, they were clearly digitized
24   at a higher resolution, and it's a database that was put
25   together by a place called Ellis Geospacial.
```

DAV7CHE2                     Ebert - cross

1              THE COURT:  Let's see if we can clarify this, please.

2      You said they were from the same negatives, is that right?

3              THE WITNESS:  Yes.

4              THE COURT:  So, a negative is I suppose in 2011 an

5      antique photographic artifact, right?

6              THE WITNESS:  It is, and it has been for about five

7      years.

8              THE COURT:  Maybe even longer.  So, in each case, if I

9      understand what you are telling us, the underlying photographic

10     image is a negative, and the negative of each of the paired

11     images is identical, right?

12             THE WITNESS:  Yes, that is correct.

13             THE COURT:  And to get this image into a digital form,

14     what happens is that the negative is optically scanned and

15     converted from an analog image into a digital file, is that

16     right?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  And I think what I understood you to say

19     is that the level of resolution in the bottom images on each of

20     these two exhibits was higher, that is to say, they captured

21     more of the detail that was in the identical negative than did

22     the print that was used in the Cabrera report.  Is that

23     accurate?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  OK.  Let's go from there.

1          MR. BOOTH:  Thank you, your Honor.

2     BY MR. BOOTH:

3     Q.  Is it Dr. Ebert?  Do you go by doctor?

4     A.  That's fine.

5     Q.  Dr. Ebert, other than the aerial photos from the Cabrera

6     report, and the images that the court just discussed with you,

7     did you receive any other aerial photographs in this case to

8     review?

9     A.  Well, I saw photographs in a number of the reports that I

10    reviewed.

11    Q.  And did you review the aerial photographs from any other

12    report other than the Cabrera report?

13    A.  I did.  I saw photographs, aerial photographs, and other

14    search of photographs in the Barros report and in a couple of

15    other reports, the hidden pits report, for instance.

16    Q.  The hidden pits report is what you just said?

17    A.  That's right.

18    Q.  And did you see just one hidden pits report, or did you see

19    more than one?

20    A.  I saw one.

21    Q.  And did you obtain any materials on your own other than

22    what was provided to you by Chevron or their lawyers?

23    A.  No.

24    Q.  Other than aerial photographs, did you make any review of

25    any other materials from the Ecuadorian record?

DAV7CHE2                          Ebert - cross

1   A.  Yes, I read a number of reports that I believe are part of

2   that record.  I read those reports.  They are listed in my

3   expert witness report.

4   Q.  Now, have you been paid for your time in this case?

5   A.  Yes, I have.

6   Q.  And can you estimate or tell me exactly if you can the

7   amount you have been paid so far.

8   A.  I really can't.

9   Q.  Can you estimate for me?

10  A.  I would estimate perhaps 20,000 or $30,000.

11  Q.  Now, your report, there was some discussion about your

12  report and some revision to the report at some point during

13  your direct examination.  Can you tell me, first of all, did

14  you play any role in revising your report after you signed it?

15  A.  I don't think I did revise it.

16  Q.  Who revised your report, if anyone, after you signed it?

17  A.  No one, to my knowledge.  There were those -- those lines

18  were redacted, I believe.  I don't know who did that.

19  Q.  It was not your idea to put the lines through certain

20  portions of the report that you had signed?

21  A.  No.

22  Q.  Did you agree with the portions that had been redacted?

23  Sorry, that was a bad question.  Did you agree with the

24  redactions that had been made that they needed to be made?

25          MR. WEITZMAN:  Objection, your Honor.

DAV7CHE2                    Ebert - cross

1              THE COURT:  Sustained.  Counsel, unless I am missing

2    something here, the person who said that had to be done was me,

3    and the reason I did was in response to your objection that

4    there was argumentative material and the like.  So, could we

5    stop chasing rabbits across hedge fields here?

6              MR. BOOTH:  I don't believe I am, your Honor, and I

7    can explain the rationale, or I can ask him some more

8    questions, but I will move on.

9              THE COURT:  OK, move on.  That would be a good idea.

10   Q.  My question, doctor, is this:  Did you believe after you

11   signed it that there were any revisions you believed needed to

12   be made to the report?

13   A.  No.

14             MR. WEITZMAN:  Objection.

15             THE COURT:  Overruled.

16   Q.  Let me ask you to turn to your witness statement, page 1,

17   paragraph 2, if you could.  First let me ask you, did you

18   actually review the Cabrera report and its annexes?

19   A.  Yes.

20   Q.  And did you actually review the Ecuadorian judgment dated

21   February 14, 2011?

22   A.  Yes.

23   Q.  Did you review the entire judgment or just a portion?

24   A.  I looked through it, so I did review the entire judgment,

25   the English version.

DAV7CHE2                     Ebert - cross

1   Q.  If you look at paragraph 2, you indicate that the Cabrera

2   report recites the same number of 880 pits.  Can you tell us

3   where in the Cabrera report the number 880 appears?

4   A.  The number 880 does not appear in and of itself in that

5   report.

6   Q.  So in your witness statement where it indicates the Cabrera

7   report recites the same number of 880 pits, do you consider

8   that sitting here today to be an accurate statement about the

9   Cabrera report?

10  A.  Well, it contains the idea of 880, which is very simply

11  reached by doing what Judge Zambrano said in his clarification.

12  Q.  That wasn't my question, sir.  Do you consider the

13  statement you have in your report, that 880 pits was recited in

14  the Cabrera report, to be an accurate statement?

15  A.  Perhaps I wouldn't use the word recited, but it contains --

16  that number can be derived from the Cabrera report.

17  Q.  What you are testifying to is that if you go to the Cabrera

18  report, there is math you can do utilizing portions of that

19  report to get you to the number of 880, is that correct?

20  A.  Well, actually using portions of Judge Zambrano's

21  clarification.

22  Q.  Where in Judge Zambrano's clarification does that exist?

23  A.  On page 15.

24  Q.  But specifically as to the Cabrera report, if you will turn

25  to page 2, paragraph 3, you say the Cabrera report indicates

DAV7CHE2                          Ebert - cross

1    the same 880 pits requiring remediation after filtering out

2    certain pits.  Do you see that --

3    A.  Yes.

4    Q.  -- where I'm referring to?

5    A.  I do.

6    Q.  So there you are referring to the fact that you could do

7    some math from the information in the Cabrera report, and then

8    you could get to the number of 880, is that right?

9              MR. WEITZMAN:  Objection, your Honor.  Misstates this

10   witness's testimony.

11             THE COURT:  Sustained.

12             Are we going to get to something helpful here?

13             MR. BOOTH:  I'm trying, your Honor.

14   Q.  By filtering, doctor, you are indicating that you would

15   take a number, remove another number and get to the number 880,

16   correct, in the Cabrera report?

17   A.  Well, that's correct.

18   Q.  Now, if you look down further in that same paragraph,

19   paragraph 3, it indicates your opinion, I believe, you

20   conclude -- you see what the last sentence of paragraph 3 --

21   A.  Yes.

22   Q.  -- where you conclude to a reasonable degree of certainty?

23   My question is that it appears that you set up an either/or,

24   that either the Ecuadorian judgment was based on the Cabrera

25   report, and you believe that's more likely than it being an

DAV7CHE2                    Ebert - cross

1    independent attempt to assess aerial photographs.  Do you see

2    that?

3              MR. WEITZMAN:  Objection.  Vague.  Compound.

4              THE COURT:  Sustained.

5    Q.  Do you see the last sentence of paragraph 3?

6              THE COURT:  We are not doing eye tests.  Let's move

7    on.

8              MR. BOOTH:  I apologize.

9    Q.  Do you see the last sentence of paragraph 3?

10   A.  I do.

11   Q.  Do you consider those to be the only options of how the

12   author of the Ecuadorian judgment dated February 24, 2011 could

13   have come up with a pit count in that judgment?

14             MR. WEITZMAN:  Objection, your Honor.  Objection to

15   form.  It misstates his testimony.  And argumentative.

16             THE COURT:  Look, I'll let it go for a while, but the

17   witness has made a point of pristine simplicity.

18             If you were looking at these aerial photographs and

19   counting up pits, you also counted up trees, you counted up

20   towers, and so forth, and the odds that Cabrera and the

21   judgment got there independently are slim.  OK, I got the

22   point.  You know, now let's go on with it.

23             MR. BOOTH:  Then let me jump ahead, because I think

24   that is not the point.

25             THE COURT:  Well, that's his point; and I'm not

DAV7CHE2                    Ebert - cross

1   getting yours at all.

2          MR. BOOTH:  Thank you, your Honor.  I will move on to

3   it.

4   Q.  Can you turn to page 6 of your witness statement.  If you

5   look at the top of page 6, which is the continuation of

6   paragraph 14, do you see that the portion of your statement

7   that has been redacted -- actually, that's the wrong page.  I'm

8   sorry, go to page 5, paragraph 14.  Do you see the portions

9   that have been redacted?

10  A.  I do.

11  Q.  And that was the portion that you had quoted in your

12  original witness statement from the Ecuadorian judgment dated

13  February 14, 2011, correct?

14          THE COURT:  It says what it says.  Is there a

15  question?

16  A.  Yes.

17  Q.  There were three things mentioned in the judgment as

18  supporting the pit count of 880 pits, correct?

19  A.  I don't recall three.

20  Q.  If we look at the portion cited that was redacted, it says

21  aerial photographs from geograph military, together with

22  official documents of Petroecuador and statements by expert

23  Geraldo Barros.  Do you see those as three things, sir?

24  A.  I see them.

25  Q.  All right.  And in your opinion, in your report, you are

DAV7CHE2                    Ebert - cross

1  talking about only one of those three things, specifically

2  aerial photographs, correct?

3  A.  That's correct.

4           MR. WEITZMAN:  Objection.  Misstates his testimony.

5           THE COURT:  Overruled.

6  Q.  Did you take any steps in forming your opinion to determine

7  what the proper number of oil pits there were in the area?

8  A.  I did not.

9  Q.  In forming your opinion, was it part of your work to

10  determine whether 880 was a correct number of pits or not?

11  A.  No.

12  Q.  Did you take any steps to review the record to see what

13  other sources of information might have existed in the

14  Ecuadorian record to support a pit count of 880?

15  A.  I didn't.  I didn't see that.

16  Q.  On page 6, paragraph 15 of your report, towards the middle

17  you discuss -- I'm sorry, the very beginning of paragraph 15

18  you indicate annex E to the Cabrera report was the primary

19  source of aerial photographs.  Were there other sources of

20  aerial photographs in the Ecuadorian record?

21  A.  There are some aerial photographs in some of the reports I

22  saw that I believe are part of the record.

23  Q.  Toward the middle of that paragraph you indicate in your

24  opinion it is practically impossible for Judge Zambrano to

25  accurately have interpreted the aerial photo.  Is it your

DAV7CHE2                        Ebert - cross

1   testimony that Judge Zambrano did not review the aerial photos,

2   or just that he could not have come to a number accurately by

3   doing so?

4   A.  I don't really understand your question.

5   Q.  Well, are you offering an opinion as to what the author of

6   the Ecuadorian judgment did or did not do in arriving at the

7   number 880, or are you indicating that arriving at the number

8   880 could not accurately have been done by aerial photograph?

9             MR. WEITZMAN:  Objection.  Form.  Compound.

10            THE COURT:  Sustained as to form.

11  Q.  Are you offering an opinion as to how the author of the

12  Ecuadorian judgment arrived at the number 880?

13  A.  No, I'm not.

14  Q.  Did you review the underlying Ecuadorian record to

15  determine how many oil pits Chevron had claimed existed in the

16  area in the underlying Ecuadorian case?

17  A.  I didn't review anything that had that.

18  Q.  Did you review any evidence from the underlying Ecuadorian

19  case as to how many oil pits the plaintiffs contended existed

20  in the concession area?

21  A.  No.

22  Q.  If we look at the photographs you provided, you selected it

23  looks like photographs, for example, for the court.  How many

24  photographs did you go through to select those two examples?

25  A.  About seven, I think.

DAV7CHE2                          Ebert - cross

```
 1   Q.  And in the other seven, were the pits identified in the
 2   aerial photos correctly identified?
 3            THE COURT:  Mr. Booth, seven minus two would be five.
 4            MR. BOOTH:  Sorry, I forgot to do the math, Judge.
 5            THE COURT:  It's helpful when counting pits.
 6            MR. BOOTH:  Sorry?
 7            THE COURT:  It's helpful in counting pits.
 8            MR. BOOTH:  It is.  Sorry, your Honor.
 9   Q.  In the other five photos, were the correct number of pits
10   labeled in the aerial photos, in your opinion?
11   A.  No.
12   Q.  In these two photographs, aside from the two problems you
13   pointed out, one in each, are the other pits labeled correctly
14   in these photographs?
15   A.  I don't think so.  At least some of them aren't.
16   Q.  And is it fair to say, sir, that whether or not 880 is an
17   accurate number was not in any way part of your work or the
18   opinions you formed in this case?
19            MR. WEITZMAN:  Objection, your Honor.
20            THE COURT:  Sustained.
21            MR. BOOTH:  May I know the basis of the objection?  I
22   don't want to keep trying to get the form right if there is
23   some other basis.
24            THE COURT:  Mr. Weitzman?
25            MR. WEITZMAN:  I think the witness has testified on
```

DAV7CHE2                    Ebert - cross

1    direct that that is part of his testimony, whether 880 can be

2    derived from the aerial photographs in the record.

3              MR. BOOTH:  Then I will ask a better question.

4              THE COURT:  Yes.

5    Q.  Doctor, is it fair to say that the question of the correct

6    number of pits existing in the concession area -- correct

7    number of oil pits that actually exist in the concession

8    area -- it was not part of your work or your opinion to

9    determine whether the number 880 was the correct number for

10   those pits?  Correct?

11   A.  That's correct.

12             MR. BOOTH:  Thank you.  No further questions.

13             THE COURT:  Thank you.

14             Mr. Gomez?

15             MR. GOMEZ:  Nothing, your Honor.

16             MR. WEITZMAN:  Just very brief redirect.

17             MR. GOMEZ:  I'm sorry, your Honor.  I do have one, if

18   I may.

19             THE COURT:  All right, Mr. Gomez.

20   CROSS EXAMINATION

21   BY MR. GOMEZ:

22   Q.  Sir, you estimated being paid 20 to $30,000 for your work

23   in the case?

24   A.  I think so, up until this point.  I'm really not certain

25   about that.  I don't --

DAV7CHE2                         Ebert – cross

1    Q.  Were you paid on a flat fee basis or on an hourly basis?

2    A.  An hourly basis.

3    Q.  What's the hourly?

4    A.  $245 an hour.

5    Q.  And approximately how many hours do you estimate you have

6    worked on this case?

7    A.  I don't know.  It's been the better part of a year, and I

8    really couldn't give you a figure.  I work on many other

9    things.

10           MR. GOMEZ:  Nothing further.

11           THE COURT:  Thank you.  Any redirect?

12           MR. WEITZMAN:  Yes, your Honor, briefly.

13   REDIRECT EXAMINATION

14   BY MR. WEITZMAN:

15   Q.  Dr. Ebert, you were asked on cross-examination questions

16   about whether you are offering an opinion as to how the author

17   reached the 880 pit count.  Do you recall being asked those

18   questions and giving answers to those questions?

19   A.  Yes.

20   Q.  Based on your examination of the aerial photographs in the

21   record, could the author of the judgment have independently

22   reached the 880 pit count based on an examination of the aerial

23   photographs in the record?

24   A.  It's my opinion that he couldn't have.

25   Q.  You were asked questions about whether the pits in

DAV7CHE2                    Ebert - redirect

1  Plaintiff's Exhibit 4020 and 4021 are -- other pits are

2  properly marked other than the ones that you discussed in your

3  direct examination.  Do you recall that?

4  A.  Yes.

5  Q.  As to the content of the pits, what if any conclusions can

6  you draw as an experienced photo grammatist about the contents

7  of the pits based on your examination of these aerial

8  photographs?

9          MR. BOOTH:  Objection.  Outside the scope of

10  cross-examination.

11          THE COURT:  Now we develop that objection?  Overruled.

12  A.  Could you ask me that again?

13  Q.  Yes.  As an experienced photo grammatist, based on your

14  examination of the alleged pits in Plaintiff's Exhibit 4020 and

15  4021, can you draw any conclusions about the content of those

16  pits?

17          MR. BOOTH:  I apologize.  It's also objection, outside

18  the scope of his direct testimony, outside the scope of his

19  report, to my knowledge.

20          THE COURT:  Answer the question, please.

21  A.  I don't think that one -- a trained photo grammatist or

22  not -- could reach a conclusion about the content of pits from

23  simply looking at aerial photos.

24  Q.  Why is that?

25  A.  Well, the aerial photos in this case are panchromatic black

DAV7CHE2                    Ebert - redirect

1   and white photos; and liquids, water, oil, both look very dark,

2   black, in such photographs.

3   Q.  What if anything would an investigator of some sort need to

4   do to determine what the contents of the pits are?

5              MR. BOOTH:  Objection.  Speculation.

6              THE COURT:  Sustained, unless you can qualify him on

7   that.

8              MR. WEITZMAN:  I will ask a different question, your

9   Honor.

10  Q.  In your review of the judgment or the clarification order,

11  did Judge Zambrano or the author of the judgment indicate

12  whether he undertook any ground treatment --

13             THE COURT:  Speaks for itself, counsel.

14             MR. BOOTH:  Objection.

15             MR. WEITZMAN:  Your Honor, at this point I neglected

16  to move in Plaintiff's Exhibit 4021.  I would move that into

17  evidence.

18             THE COURT:  Received.

19             (Plaintiff's Exhibit 4021 received in evidence)

20             MR. WEITZMAN:  Nothing further, your Honor.

21             THE COURT:  Any recross?

22             MR. BOOTH:  No, your Honor.  Thank you.

23             THE COURT:  The witness is excused.  Recess until 2

24  o'clock.

25             (Luncheon recess)

DAV8CHE3                    Green - direct

1           AFTERNOON SESSION

2                2:05 p.m.

3           THE COURT:  Next witness, please.

4           MS. NEUMAN:  Chevron calls Professor Michael Green,

5    your Honor.

6     MICHAEL GREEN,

7         called as a witness by the plaintiff,

8         having been duly sworn, testified as follows:

9           THE DEPUTY CLERK:  State your name for the record

10    spelling your last name.

11           THE WITNESS:  Michael Green, G-R-E-E-N.

12           THE COURT:  Ms. Neuman, go ahead.

13    DIRECT EXAMINATION

14    BY MS. NEUMAN:

15    Q.  Good afternoon, Professor Green.

16    A.  Good afternoon.

17           MS. NEUMAN:  May I approach the witness, your Honor?

18           THE COURT:  You may.

19    Q.  Professor Green, do you have Exhibit 5100 in front of you,

20    sir?

21    A.  Yes, I do.

22    Q.  Is that your written direct testimony in this matter?

23    A.  Yes, it is.

24    Q.  Is everything that's in Exhibit 5100 true and correct?

25    A.  To the best of my knowledge and belief, yes.

DAV8CHE3                    Green - direct

1    Q.  Did you recently correct two typographical errors in

2    Exhibit 5100?

3    A.  I did.

4    Q.  One of the errors, does it appear on the first page?

5    A.  It does.

6    Q.  Could you describe what that was?

7    A.  Yes.  The short version for the Ecuadorian judgment is in

8    quotes "Ecuadorian judgment."  And to make it parallel, the

9    reference to the "Ecuadorian litigation" should have both words

10   inside the quotation marks.  I discovered that yesterday on my

11   trip up here and thought I would correct it.

12   Q.  Did you correct it and initial it where you made the

13   correction?

14   A.  I did.

15   Q.  Is your other typographical correction on page 16,

16   paragraph 22 of Exhibit 5100?

17   A.  Yes, it is.

18   Q.  Can you describe what that correction is?

19   A.  Well, there was a word omitted that should have been there

20   that changed its meaning 180 degrees, and I put in the negative

21   which should have been there.

22   Q.  So at paragraph 22, does Exhibit 5100 now read, "Other

23   commonalities in articulating standards for causation that are

24   not anomalous or incorrect"?

25   A.  It does.

DAV8CHE3                    Green - direct

1    Q.  Did you initial that change?

2    A.  I did.

3    Q.  With those typographical errors corrected, are there any

4    other changes that you would make to your direct testimony?

5    A.  No.  Not that I know of now.

6              MS. NEUMAN:  Plaintiff move the admission of 5100.

7              THE COURT:  Received on the same basis.

8              (Plaintiff's Exhibit 5100 received in evidence)

9              MS. NEUMAN:  Pass the witness.

10             THE COURT:  Cross-examination.

11             MR. BOOTH:  Yes, your Honor.  Thank you.

12   CROSS-EXAMINATION

13   BY MR. BOOTH:

14   Q.  Good afternoon, Professor.

15   A.  Good afternoon.

16   Q.  I am Rainey Booth.

17             There is a memo referred to in your report called the

18   Moodie memo.  Are you familiar with that memo?

19   A.  Yes.  Let me correct that.  I am familiar with portions of

20   that memo, very familiar with portions of it.

21   Q.  Did you review the entire memo or just portions?

22   A.  I think I read the entire memo quite a while ago with the

23   idea that I would find the relevant portions of it.

24   Q.  Did you read the memo in English or in Spanish?

25   A.  I read it in English.

DAV8CHE3                         Green - cross

1   Q.  Are you capable of reading and understanding Spanish?

2   A.  No.  Regretfully, I only have one language I am fluent in.

3   Q.  Did you have anyone assist you in reviewing the Spanish

4   version of the Moodie memo?

5          MS. NEUMAN:  Objection.  It assumes facts not in

6   evidence.

7          MR. BOOTH:  I just asked if he did.

8          MS. NEUMAN:  I am unaware of the existence of a

9   Spanish version of the Moodie memo.

10          MR. BOOTH:  Let me ask a better question.

11  Q.  Have you seen any Spanish language version of the Moodie

12  memo?

13  A.  I don't believe I have seen any Spanish version of any

14  document in this case.  It wouldn't mean anything to me.

15  Q.  Because of something in your report, let me ask you next

16  about the Ecuadorian judgment.

17  A.  Yes.

18  Q.  The judgment dated 2/14/11 is the one I am talking about.

19          Did you see that judgment in Spanish?

20  A.  No.

21  Q.  In reviewing the Ecuadorian judgment, did anyone assist you

22  with any aspect of Spanish translation, specifically for the

23  analysis you were doing?

24  A.  I received a translated version of the Ecuadorian judgment,

25  and that's what I reviewed.

DAV8CHE3                    Green – cross

1    Q.   So your analysis in this case would be based on the

2    translated version of any Spanish document that you were then

3    given?

4    A.   That's correct.

5    Q.   Now, in terms of your analysis and your expert work in this

6    case, did you review any Spanish language databases?

7    A.   No.

8    Q.   Did you search for any legal terms or legal concepts in

9    Spanish?

10   A.   No.

11   Q.   Did you have anyone do that on your behalf?

12   A.   No.

13   Q.   The searches that you did then would have been only in

14   English, is that correct?

15   A.   That's correct.

16   Q.   There is reference in your report to the discussion of

17   Anglo-Saxon, I guess U.S., English and Australian law in the

18   Ecuadorian judgment.  Did you review any other portions of the

19   Ecuadorian judgment other than the pages that discuss that

20   part?

21   A.   Yeah.  I turned through the pages of all of the pages of

22   the Ecuadorian judgment just to satisfy myself that there

23   wasn't another discussion of causation that was relevant to

24   what Gibson Dunn requested me to do.  That was a painful

25   process, and I didn't see anything, and if you told me there

1    was something there that I missed, I probably wouldn't argue

2    with you, but I did do that.

3    Q.  Did you look to see if the law of any other countries was

4    cited in the Ecuadorian judgment?

5    A.  I know there is a reference to French law in the Ecuadorian

6    judgment just before the discussion of Anglo-Saxon law.

7    Q.  Your work in this case did not involve your assessment of

8    any discussion in the Ecuadorian judgment about the law of any

9    other country other than England, the United States, and

10   Australia?

11   A.  That's correct.

12   Q.  There is a discussion -- well, appendix A of your report?

13   A.  Yes.

14   Q.  It doesn't have a page other than appendix A, but it is in

15   the back of your report, isn't it?

16   A.  It is.  I think my report ends on page 19.  So it begins

17   the page after page 19.

18   Q.  You have identified some language in the Moodie memo and in

19   the Ecuadorian judgment that you call -- it appears that you're

20   saying there is a comparison of overlap.  So first let me ask

21   you, is the language you reference in appendix A what you

22   consider to be overlapping language?

23   A.  Yes.  The language, I started with the Moodie memorandum

24   and the Ecuadorian judgment, and put together the commonalities

25   that I identified earlier in my report.

DAV8CHE3                    Green - cross

1    Q.  Now, Professor, you reference in your witness statement

2    some discussion about or your opinion that the Moodie memo was,

3    in your opinion, used by the author of the Ecuadorian judgment

4    because of this overlap in words, is that right?

5    A.  My opinion is it's highly unlikely that the two were

6    prepared independently.

7    Q.  Have you taken any steps to look at Ecuadorian law to

8    determine whether it's appropriate or not appropriate for an

9    author of a judgment in Ecuador to rely on a legal memorandum

10   provided by one of the parties?

11             MS. NEUMAN:  Objection.  Beyond the scope.

12             THE COURT:  Pardon?

13             MS. NEUMAN:  Beyond the scope.

14             THE COURT:  Sustained.

15             MR. BOOTH:  I don't remember the last question I asked

16   so I don't know if my form was wrong or if I am not allowed to

17   ask him on this topic.  So I am going to try again, not because

18   I am arguing with you, I just don't remember what I asked.

19   Q.  My question, sir, is, in forming your opinion, did you take

20   any steps to determine whether what you found here would have

21   been appropriate or inappropriate under Ecuadorian law?

22             MS. NEUMAN:  Objection.  Beyond the scope.

23             THE COURT:  Sustained.

24   Q.  So you are not offering an opinion about Ecuadorian law in

25   your witness statement or here today, correct?

DAV8CHE3                    Green - cross

1          MS. NEUMAN:  Objection.  Beyond the scope.

2          THE COURT:  The statement is absolutely clear.  Move

3    on.

4          MR. BOOTH:  It wasn't clear to me, your Honor, which

5    is why I asked.  I apologize.

6    Q.  If we look at your appendix A, did you take any steps, with

7    any of what you refer to as overlapping words --

8          MS. NEUMAN:  It misstates the document.

9          THE COURT:  I haven't heard the full question.

10         MR. BOOTH:  Let me start over.

11   Q.  In looking at where it says the comparison of overlap, as

12   you looked at the comparison of overlap in your appendix A,

13   between the Moodie memo words and the Ecuadorian judgment words

14   that you have listed, did you take any steps to search any

15   Internet databases to see if those words appear in what might

16   be a common source for both of those documents?

17   A.  I know that there are some sources in which those terms

18   appear, yes.  And predominantly the material that's overlap

19   comes from two cases.

20   Q.  Which cases?

21   A.  The *Rutherford* case in California and the *Seltsam* case from

22   Australia.

23   Q.  That would have been an English language search again, not

24   in Spanish?

25   A.  I have read those cases.  I knew the *Rutherford* case, and I

DAV8CHE3                    Green – cross

1    was referred to the *Seltsam* case.

2         MR. BOOTH:  Your Honor, may I approach?

3         THE COURT:  You may.

4    Q.  Let me hand you two papers.  Let me identify them when I

5    get back to mine.

6         The first one is Defendants' Exhibit DX 1206.  Do you

7    recognize that paper as one that you were co-author on?

8    A.  The insubstantiality of a substantial factor test?

9    Q.  Yes.

10   A.  Yes.

11   Q.  Do you have a recollection of what date this paper was

12   published?

13   A.  It was about three or four years ago.  2008.

14   Q.  You found it.  2008.

15        MR. BOOTH:  We move this paper into evidence.

16        MS. NEUMAN:  No objection.

17        THE COURT:  Received.

18        (Defendants' Exhibit 1206 received in evidence)

19   Q.  Defendants' Exhibit 1207, DX 1207, have you ever seen this

20   paper before?

21   A.  If I have, I don't recall it.

22   Q.  This is a paper dated 2010?

23   A.  Yes.

24        MR. BOOTH:  We move this paper into evidence as well.

25        MS. NEUMAN:  No objection.

DAV8CHE3                    Green - cross

1          THE COURT:  Received.

2          (Defendants' Exhibit 1207 received in evidence)

3   Q.  I want to ask you one last thing about your report.  I

4   think it is paragraph 15 of page 4.

5          I'm sorry.  It's page 4, paragraph 13, and it

6   continues on to page 5.  The part I want to ask you about is at

7   the very top of page 5.  You see where you talk about "courts

8   that rely on briefs and memoranda," do you see that sentence?

9   A.  Yes.

10  Q.  Are you referring to Ecuadorian courts or U.S. courts?

11  A.  I am referring to U.S. courts.

12  Q.  You're discussing that sometimes courts will rely on a memo

13  from counsel, but not rely on every word of counsel's memo; is

14  that what you're indicating there?

15  A.  Correct.

16  Q.  In the U.S., from your experience, do judges cite to the

17  legal memo that counsel has given you?

18  A.  No, they don't.

19          MR. BOOTH:  Thank you.  Those are my questions.

20          THE COURT:  Mr. Gomez?

21          MR. BOOTH:  Sorry.  I need to ask him one other thing.

22  Q.  Have you received compensation for your time and attention

23  in analyzing your expert opinions in this case?

24  A.  I have been paid for my time, yes.

25  Q.  Can you give me an estimate of what you have been paid, or

DAV8CHE3                        Green - cross

1   precisely what you have been paid?

2   A.  I don't know precisely.  I would be guessing.  I am pretty

3   sure I went back after last time I was here and determined that

4   it was less than 100 hours that I had worked on this matter.

5   Q.  And your hourly rate?

6   A.  $500 an hour.

7              MR. BOOTH:  Thank you.

8              MR. GOMEZ:  Nothing further, your Honor.

9              THE COURT:  Ms. Neuman.

10             MS. NEUMAN:  No redirect.

11             THE COURT:  Thank you, Professor Green.  You're

12  excused.

13             (Witness excused)

14             THE COURT:  Next witness.

15             MR. MASTRO:  Yes, your Honor.  While this is going

16  much faster today than the defendants have told us they

17  expected on their cross-examinations, we do have more

18  witnesses.

19             THE COURT:  Good.

20             MR. MASTRO:  We have two more today.

21             Your Honor, Chevron calls Yerim Kim.

22             Ms. Kim is a summary witness who will be presented by

23  my colleague Anne Champion.

24             (Continued on next page)

25

DAV8CHE3                    Green – cross

1    YERIM KIM,

2          called as a witness by the plaintiff,

3          having been duly sworn, testified as follows:

4                THE DEPUTY CLERK:  State your full name and spell your

5    last name.

6                THE WITNESS:  Yerim, Y-E-R-I-M, Kim, K-I-M.

7                MS. CHAMPION:  Your Honor, may I approach the witness?

8                THE COURT:  You may.

9    DIRECT EXAMINATION

10   BY MS. CHAMPION:

11   Q.  Good afternoon, Ms. Kim.

12          Did you submit a witness statement in this matter?

13   A.  I did.

14   Q.  Is that your witness statement in front of you?

15   A.  It is.

16   Q.  Can you turn to the signature page, please?

17   A.  Yes.

18   Q.  Is that your signature?

19   A.  It is.

20   Q.  At the time you signed that statement, were the statements

21   in it true and accurate?

22   A.  Yes.

23   Q.  Is everything in it true and accurate as of today?

24   A.  Yes.

25   Q.  Do you offer that witness statement marked PX 4400 as your

DAV8CHE3                        Kim - direct

1    full and complete direct testimony today?

2    A.  I do.

3           MS. CHAMPION:  Chevron offers PX 4400A, a list of

4    exhibits offered through Ms. Kim.

5           I pass the witness, your Honor.

6           THE COURT:  Are you offering anything in evidence?

7           MS. CHAMPION:  I should offer her witness statement in

8    evidence, PX 4400, and a list of exhibits, PX 4400A.

9           THE COURT:  4400 is received on the same basis as

10   before.  The exhibits listed on 4400A are received for the

11   purposes indicated on 4400A only.

12          (Plaintiff's Exhibits 4400 and 4400A received in

13   evidence)

14          THE COURT:  Cross-examination.

15   CROSS-EXAMINATION

16   BY MS. LITTLEPAGE:

17   Q.  Good afternoon, Ms. Kim.

18          Could you tell us the title that you have at your job?

19   A.  I am a manager at Stroz Friedberg.

20   Q.  Manager in what division?

21   A.  The forensic accounting group.

22   Q.  When was the first time you started working on this case?

23   A.  I would say three or four weeks ago.

24   Q.  How did that come about you getting retained three to four

25   weeks ago to work on this case?

DAV8CHE3                    Kim - cross

1    A.  I was asked by my superior if I would be interested in

2    testifying in a case.

3    Q.  What was your understanding of your role in the case?

4    A.  That I would be giving a body of documents, and I would be

5    introducing those documents to the Court.

6    Q.  What was your understanding of what you were supposed to do

7    in that role?

8    A.  Review a body of documents and identify references to

9    certain topics.

10   Q.  Were you provided the topics you were supposed to have

11   references to?

12   A.  I was.

13   Q.  Who provided those to you?

14   A.  Counsel did.

15   Q.  Counsel being Gibson Dunn, counsel for Chevron?

16   A.  Yes.

17   Q.  What were the topics that you were given?

18   A.  A $6 billion damage estimate, and 30 times Exxon Valdez oil

19   spill, and Cabrera's independence.

20   Q.  Were you given any other topics?

21   A.  Those were the only three.

22   Q.  Were you given a series of documents to review in

23   connection with those three topics?

24   A.  I was.

25   Q.  Were you given documents that you did not include in your

DAV8CHE3                        Kim - cross

1    summary report?

2    A.  I was not.

3    Q.  So as I understand it then, your whole role was just to

4    count up the documents that Chevron gave you?

5    A.  Yes.  Count the number of the references to those three

6    topics.

7    Q.  Were they already divided out by those three topics when

8    they were given to you?

9    A.  They were not.

10   Q.  So you made the decision as to which pile to put the press

11   release in?

12   A.  Depending on the references they contained.

13   Q.  How much have you billed for your work in this case?

14   A.  I do not know the exact figure.  I would say maybe around

15   30 hours.

16   Q.  What is your hourly rate?

17   A.  300.

18   Q.  Can you tell us how your declaration was prepared?

19   A.  I was actively involved in the preparation of the

20   declaration, but it was drafted by counsel.

21   Q.  What was your active participation?

22   A.  I provided information to be included in the declaration.

23   I reviewed it, suggested changes, which were incorporated,

24   approved it, and signed it ultimately.

25   Q.  What was the information you provided?

DAV8CHE3                          Kim - cross

1    A.  The counts to be included, as well as my qualifications,

2    background.

3    Q.  I want to start first with the $6 billion estimate.  What

4    was your understanding of your role in signing press releases

5    under that category?

6    A.  Exactly when it referenced 6 billion, I identified a

7    document as containing that reference.  That was it.

8    Q.  Were you asked to assess whether the word 6 billion was

9    cited to a specific person, such as Mr. Russell?

10   A.  I was not.

11   Q.  Just the word 6 billion?

12   A.  Yes.

13   Q.  If you turn to PX 456, it should be in one of those binders

14   in front of you.

15   A.  Yes.

16   Q.  On the first page, there is a title and then a subtitle

17   that says "6 billion potential liability."

18        Would this press release have come to you with any

19   highlighting or would you have read the press release to look

20   at that number 6 billion?

21   A.  It would not have come with any highlighting.  It would

22   have been a clean copy.

23   Q.  If you turn to page 3 of the document, on the top

24   paragraph, there is a discussion of a preliminary report of

25   damages by Mr. Russell.  Do you see that paragraph?

DAV8CHE3                    Kim - cross

1   A.  I do.

2   Q.  That paragraph indicates 6.14 billion.  Were you given

3   instructions as to whether to count 6.14 billion or just 6

4   billion or just 6.1 billion?

5   A.  6.14 billion were counted.

6   Q.  Were counted?

7   A.  Yes.

8   Q.  Were you told to identify which press releases identified

9   Mr. Russell by name versus press releases that did not identify

10  Mr. Russell by name?

11  A.  I was not.  I was not asked to make that distinction.

12  Q.  In your witness statement, you identify a time when Mr.

13  Russell issued a cease and desist letter, February 14, 2006.

14  Were you provided a copy of that letter?

15  A.  I saw the letter.

16  Q.  What was your understanding of your role in identifying

17  press releases, before the letter or after the letter?

18          THE COURT:  If any.

19  Q.  If any?

20  A.  I did not know.  I was asked to look for documents

21  postdating that letter.  I did not understand the significance

22  of that letter.

23  Q.  Did you find any documents postdating that letter that

24  cited Mr. Russell as the source of a 6 billion dollar number?

25  A.  I do not recall off the top of my head.

DAV8CHE3                    Kim – cross

1              THE COURT:  Is it correct that every single press

2    release that you identified that used the 6 billion dollar

3    number is in one of these two binders, as far as you know?

4              THE WITNESS:  Yes, as far as I know.

5              THE COURT:  Let's save a little time, Ms. Littlepage.

6    Q.  If you turn to Plaintiff's Exhibit 461, page 2.

7              I think it's the second sentence on the top of page 2,

8    "The affected local people have sued Chevron for damages worth

9    6 billion."  Were you instructed to count this as a 6 billion

10   dollar representation?

11   A.  Yes.  I would have counted it.

12   Q.  Now, on the Exxon Valdez issue, if you turn to Plaintiff's

13   Exhibit 456, it's the one we just talked about?

14   A.  OK.

15   Q.  I direct your attention to page 3 where it says, "Chevron

16   Texaco, a disaster that dwarfs the Exxon Valdez in scale, said

17   Bianca Jagger."

18   A.  Yes.

19   Q.  Would you have counted this as an Exxon Valdez

20   representation, this quote from Ms. Bianca Jagger?

21   A.  No.

22   Q.  Is this the first time that the word Exxon Valdez is

23   compared to the contamination in Ecuador in the chronological

24   lineup of press releases?

25             THE COURT:  I thought she just said it wasn't counted.

DAV8CHE3                    Kim - cross

1              THE WITNESS:  It's not counted.

2              MS. LITTLEPAGE:  It wasn't counted as what she was

3    counting for Exxon Valdez, but I would like to establish that

4    this is the first time the word Exxon Valdez is associated with

5    the contamination.

6              THE COURT:  Maybe you should possibly ask somebody who

7    has some idea about that.

8    Q.  If you turn to Plaintiff's Exhibit 459.

9              THE COURT:  Just to be sure, you have no idea whether

10   that's the first time ever, right?

11             THE WITNESS:  I don't know.

12             THE COURT:  You were given piles of documents, you

13   divided them into three piles, and that was it, is that right?

14             THE WITNESS:  That's correct.

15             THE COURT:  Ms. Littlepage, I think this could be

16   accelerated.

17             MS. LITTLEPAGE:  Yes, sir.

18   Q.  Are you at Plaintiff's Exhibit 459?

19   A.  I am.

20   Q.  If you look at the paragraph right above where it says,

21   "Photo exhibit in San Juan," there is a statement that says,

22   "This is 30 times more than the devastating Exxon Valdez spill,

23   according to Amazon Watch."  Do you see that?

24   A.  Yes.

25   Q.  Would you have counted this quote from the San Francisco

DAV8CHE3                         Kim - cross

1   Bay's nonprofit organization Amazon Watch as one of your Exxon

2   Valdez press releases?

3   A.  Yes, I would have.

4   Q.  If you turn to Plaintiff's Exhibit 460, page 2, it's the

5   second paragraph.  It's the statement that starts, "The amount

6   of pure crude dump by Texaco is at least the equivalent of 30

7   Exxon Valdez spills, according to Fausto Penafiel."  Do you see

8   that?

9   A.  I do.

10  Q.  Did you ever look at Fausto Penafiel's assessment of the

11  size of the Ecuador contamination?

12          THE COURT:  If there was such a thing.

13  A.  I did.  It was outside the scope of my assignment.

14  Q.  Would you have counted this quote by Fausto Penafiel, this

15  description by Fausto Penafiel, as one of the Exxon Valdez

16  press releases?

17  A.  Yes.

18  Q.  The last category you were asked to look at was Cabrera, is

19  that correct?

20  A.  That is correct.

21  Q.  You were asked to identify every time Mr. Cabrera was

22  described as an independent or court appointed expert, is that

23  right?

24  A.  Just independent.

25  Q.  Any time the word independent expert appeared?

DAV8CHE3                    Kim - cross

1   A.  Yes.

2            MS. LITTLEPAGE:  Those are my questions.  Thank you.

3            Mr. Gomez.

4            MR. GOMEZ:  Nothing further, your Honor.

5            THE COURT:  Ms. Champion.

6            MS. CHAMPION:  No further questions.

7            THE COURT:  Thank you, Ms. Kim.  You're excused.

8            (Witness excused)

9            MR. FRIEDMAN:  Could we have a minute before the next

10  witness is brought in to discuss an issue with you?

11           THE COURT:  Let's hold off on the witness for a

12  moment.

13           What is the issue?  Who is the next witness?

14           MR. FRIEDMAN:  Joseph Ryan.

15           MR. MASTRO:  Yes, your Honor.  It's Joseph Ryan.

16           THE COURT:  What's next?

17           MR. FRIEDMAN:  I have basically three issues to bring

18  up with respect to Mr. Ryan.  The first is the relevance of his

19  testimony.  As I understand, his direct exam or his direct

20  statement, it is essentially that Chevron spent money on the

21  1782s.  He also makes reference to criminal charges in Ecuador.

22  But, basically, the thrust of it is Chevron spent money on the

23  1782s.  I am not sure what the relevance of that is in terms of

24  this case.  So that's the first thing.

25           The second issue, your Honor, has to do with Rule

DAV8CHE3

1006.  Mr. Ryan purports to testify based upon summary charts
he was given, presumably by Gibson Dunn, but those summary
charts themselves -- well, they are summaries, and the
underlying data that we requested from Chevron has not been
produced, that would be the time slips or the time billing
records.  Under 1006, of course, if a summary is going to be
used or introduced, the proponent is required to make that
underlying information available to the opposition.

I have another issue, but those are the two main ones.

THE COURT:  What is the one that is not a main one,
unless it has vanished?

MR. FRIEDMAN:  The last one has to do with paragraph 9
of Mr. Ryan's report, in which he is talking about the criminal
investigation in Ecuador.  We have argued about that several
times already.  I would ask that paragraph 9 be stricken.

THE COURT:  Who is going to respond?

Mr. Gomez, do you have something else?

MR. GOMEZ:  Just to clarify, defendants' position,
Javier Piaguaje's and Hugo Camacho's position is that
Mr. Ryan's testimony, purported testimony, is not relevant.  He
purports to offer an opinion on the reasonableness of
plaintiffs' fees incurred in the 1782 actions.  To the extent
that Chevron seeks to prove up the reasonableness of fees in
1782 actions, it should have filed papers in those cases
seeking discretion of those courts to direct an order requiring

DAV8CHE3

1    payment of fees and assessing the reasonableness thereof.   To

2    the extent that they are brought in this case, your Honor, they

3    are nothing but evidence of damages, which my understanding,

4    your Honor, had been waived by the plaintiff, and therefore

5    there is no basis for this Court to render on the question of

6    the reasonableness of these damage claims.

7          We would argue that position, and we would echo the

8    other positions by my co-counsel.

9          THE COURT:  Mr. Mastro.

10         MR. MASTRO:  Thank you, your Honor.

11         Your Honor, in one sense, we are like ships passing in

12   the night.  This isn't about money damages and proving up money

13   damages.  The relevance of this evidence is that, for both a

14   fraud claim and for a RICO claim, there is still a need to

15   show, and this is one element of a number of elements, that

16   there has been injury or economic harm and that the fraudulent

17   activity, or the pattern of racketeering activity, was the

18   proximate cause of the harm.

19         Here, therefore, this particular piece of harm or

20   injury evidence is not about the particular dollar figure.  It

21   relates to 1782 proceedings, and Mr. Ryan saying that these

22   were legal fees reasonably incurred in efforts to uncover the

23   fraudulent scheme, defend against it, and the acts of

24   obstruction that were conducted by the defendants in the United

25   States proceedings to suppress the evidence from coming out,

DAV8CHE3

1    including here in the Southern District, as well as in Colorado

2    and other districts.  It's not about the specific dollar amount

3    as it is part of the evidence of injury and economic harm, U.S.

4    based, that we have to show.

5         And this is an issue that they have raised, your

6    Honor, in their original moving papers about causation and

7    proximate cause.  So we believe that your Honor should take

8    this evidence.  It's not about the specific dollar figure or

9    proving money damages.

10        As for Mr. Friedman's point about Federal Rule of

11   Evidence 1006, we are not offering the summary charts into

12   evidence.  We produced in discovery voluminous records, cover

13   sheets of a lot of bills relating to all of this.  This was not

14   an issue raised in the discovery process.  They have all of

15   that.  They can match the cover sheets of our bills that give

16   the specific amounts, they can match those to what is on these

17   charts.  But again, it is not about the specific dollar figure.

18   It is about this witness, former managing partner of O'Melveny

19   & Myers, talking about these legal fees having been reasonably

20   incurred in efforts to uncover the fraud and to go up against

21   the acts of obstruction in U.S. discovery proceedings.

22        So, your Honor, we urge you to take the evidence.  I

23   think it will be a short examination.  We tried to agree to a

24   stipulation to this extent, but we could not reach agreement on

25   a stipulation.

DAV8CHE3

1        THE COURT:  What was the problem?

2        MR. MASTRO:  You would have to ask Mr. Friedman.

3        THE COURT:  What about it, Mr. Friedman?

4        MR. FRIEDMAN:  Your Honor, it had to do with, first,

5   the relevance of this material, and also, more importantly, the

6   reasonableness of the fees.  There were concerns on our part

7   that stipulating to the language suggested by Chevron would be

8   somehow an admission that would be used in other ways.  So

9   there was reluctance to stipulate to reasonableness.

10       MR. MASTRO:  In brief response, we would have agreed

11   that, without prejudicing their rights to argue about

12   reasonableness of fees in any other context, that they were

13   simply not contesting the reasonableness of having to have

14   incurred fees in connection with these proceedings.  That's all

15   we asked them to do, and we couldn't even get that stipulation.

16   So we have to call the witness.

17       THE COURT:  You think if I gave you all enough time

18   you could agree that today is Monday?  That's directed to all

19   of you equally.  This is like everything else in this case.

20       Look, I express at this time no view as to the need

21   for this at all, or as to its relevance.  But I can't, for the

22   life of me, imagine why the agreement that's offered is not

23   acceptable, Mr. Friedman.

24       MR. FRIEDMAN:  Your Honor, we spent a lot of time

25   going back and forth on this.

DAV8CHE3

1          THE COURT:  I take that as a given.

2          MR. FRIEDMAN:  What I am saying is we tried.  We spent

3    a lot of time trying to do this.  I do not like being in the

4    position I am in right now.  That's all I can tell you.

5          THE COURT:  I take it that it is your position and Mr.

6    Gomez's that they need to prove economic harm and causation, a

7    proposition of which I take no position, but I take it that is

8    your view, right?

9          MR. FRIEDMAN:  Yes, sir.

10          THE COURT:  You don't dispute that incurring legal

11    fees, for the purposes indicated here, if that was proven,

12    would establish that, is that true?

13          MR. FRIEDMAN:  No.  I can't agree to that, your Honor.

14    We would contest the need for the 1782s in order to -- if we

15    look at what the relief accomplished was, we have got an

16    Ecuador litigation, an allegation that the Cabrera report is

17    flawed.  We don't think there was a need for the 1782s in order

18    to establish and get the Cabrera report thrown out of the

19    Ecuadorian courts, which is ultimately what happened.

20          THE COURT:  That's your view of what happened anyway.

21          MR. FRIEDMAN:  That's why we can't stipulate.

22          THE COURT:  Well, look, we will take the testimony.

23    Let's go.

24          MR. MASTRO:  Thank you, your Honor.

25          MR. FRIEDMAN:  Could I address the 1006 issue?

DAV8CHE3

1                THE COURT:  Yes.

2                MR. FRIEDMAN:  If the point is the reasonableness of

3     the fees, what we were pointed to by Mr. Mastro, when we

4     inquired about the summary charts, were just other summary

5     charts.  We will just take an example at random.  September

6     2010, 5.3 hours by Mr. Mastro.  We don't know what was done in

7     that time.

8                THE COURT:  I must tell you that I don't understand

9     what you're talking about.

10               MR. FRIEDMAN:  If you were to go to the first

11    appendix.

12               THE COURT:  What page?

13               MR. FRIEDMAN:  They are not numbered sequentially.

14               THE COURT:  This is Plaintiff's Exhibit 5900, right?

15               MR. FRIEDMAN:  Yes.

16               THE COURT:  Those pages are numbered, aren't they?

17               MR. FRIEDMAN:  My copy wasn't for some reason.

18               It would be page 27.

19               THE COURT:  What is the problem?

20               MR. FRIEDMAN:  What we have here, your Honor, is just

21    a plain summary chart that doesn't indicate -- there would be

22    no way to really tell whether any of this is reasonable or not

23    reasonable.  You have to look at the underlying data.  And if

24    you go to the pages that Mr. Mastro cited me to -- can I have a

25    minute, your Honor?

DAV8CHE3

1          Can we have five minutes to try to stipulate?

2          THE COURT:  Let's get this worked out.  Two of these

3     1782s I presided over.  Are you really going to sit here and

4     quarrel over the question of whether money was reasonably spent

5     litigating those two things, both of which they won?

6          (Recess)

7          THE COURT:  You're looking frustrated, Mr. Mastro.

8          MR. MASTRO:  I am not easily frustrated, but I am

9     still waiting to hear from Mr. Friedman.  He has a written

10    proposal in front of him that I made a further modification to

11    at his request, and I am just waiting to hear what emerges from

12    their chamber.  And here they come.

13         THE COURT:  And the winner of the academy awards for?

14         MR. FRIEDMAN:  Your Honor, he is our last witness for

15    the day.  Can we have a few more minutes?  I think we can do

16    this.  I have spent seven or eight hours over the weekend

17    trying to get this done.  I have really been working at it.  If

18    I could just have a few more minutes, I think we can do it.

19         THE COURT:  A few more minutes.

20         (Recess)

21         (Continued on next page)

22

23

24

25

DAV7CHE4

1           THE COURT:  Be seated, folks.  OK.  Where are we?

2           MR. MASTRO:  Your Honor, I am pleased to report that

3   we have a stipulation and proposed order.

4           THE COURT:  All right.

5           MR. MASTRO:  So, if I may approach, I will hand it up,

6   and that would obviate the need to call Mr. Ryan as a witness.

7           THE COURT:  Thank you.  Satisfactory to both sides?

8   All sides?

9           MR. FRIEDMAN:  Yes, your Honor.

10          MR. GOMEZ:  Yes, your Honor.

11          MR. FRIEDMAN:  Your Honor, implicit in that I think --

12  we never explicitly discussed it -- is that Mr. Ryan's witness

13  statement would then not become part of the record.

14          THE COURT:  Well, it hasn't yet.

15          MR. MASTRO:  It's not necessary, your Honor, because

16  the stipulation memorializes the gist of his testimony as the

17  testimony in this case.

18          MR. FRIEDMAN:  Exactly.  Thank you.

19          THE COURT:  All right.  Thank you all.

20          MR. MASTRO:  Thank you, your Honor.

21          Based on the cross-examination lengths, that concludes

22  the five witnesses we had for today, but there is one more item

23  of business for today, which is plaintiff's exhibits.  We have

24  had the exchanges, as your Honor required of the parties, and

25  we have been able to memorialize in cohesive documents our

DAV7CHE4

1    offer of the exhibits, the bases for offering them, both

2    authentication and admissibility, the objections that the

3    defendants have asserted, and any response we have to them.  We

4    have those to hand up to the court both by PX number and by

5    chronological order.

6         We also reached agreement on the Crude clips, and we

7    are now submitting to the court Crude clips where the

8    defendants have requested longer versions, so there are no

9    objections to them.

10        And authentication, there are less than 20 documents

11   out of the 25 to 2600 total where they have raised an

12   authentication issue, and we believe they are either self

13   authenticating or authenticated by other means that we

14   explained in the presentation.

15        So, we are prepared, your Honor, to hand up to your

16   Honor a complete list of all of our exhibits by PX number and

17   chronological order, and a hard drive that includes all of the

18   exhibits now and in their proper form, move them into evidence.

19   Your Honor would then be in a position to make any rulings on

20   objections.

21        And also, if your Honor would prefer not to have the

22   hard drive, we could give you a thumb drive for just the new

23   documents.  But the hard drive might be best because it covers

24   everything, and it would be a new hard drive for you.  It's

25   coming up.  The hard drive is coming up.  And we have multiple

DAV7CHE4

1   sets.

2          So, I have handed up the hard drive version.  And,

3   your Honor, the only other issue that I think --

4          THE COURT:  Just before you go on, let me just take a

5   minute to look at what you have passed up.

6          MR. MASTRO:  Certainly, your Honor.

7          THE COURT:  It's somehow fitting that this comes on

8   Halloween.

9          All right.  I have marked the hard drive you handed

10  me.  I am going to mark the exhibit list Court Exhibit A and B

11  for identification.

12         OK.  So, I take it then the proposal is that the

13  plaintiff's exhibits listed on Court Exhibit A -- which is the

14  numerical order, which run with some little variations but

15  basically from Plaintiff's Exhibit 1 to Plaintiff's Exhibit

16  2561 -- be received subject to the various objections set forth

17  here, to the extent not previously received.  Is that right?

18         MR. MASTRO:  Yes, your Honor.

19         THE COURT:  And I take it that's agreeable, right,

20  counsel?

21         MR. FRIEDMAN:  Your Honor, I just want to make sure we

22  are communicating.  I see them as being offered, and then you

23  would have to rule before they would be received, right?

24         THE COURT:  I'm doing it right now.  They are received

25  subject to any rulings to the contrary.

DAV7CHE4

1          Now, look, let's be very practical.  This is a 258

2     page list of 2,561 exhibits, and based on my experience the

3     likelihood that more than 20, 40, 60 are ever going to matter

4     in this case -- maybe a little more -- is limited.  Right?  I

5     mean in the KPMG case there were 25 million documents, there

6     were 1500 exhibits, and probably not more than two dozen ever

7     mattered.

8          If what you are thinking about is you are going to

9     hold your breath while I issue individualized rulings on 2,561

10    exhibits, I suggest you get intubated right away with some

11    oxygen; it's going to be a long wait.  But if in the course of

12    preparing to rule in this matter there are substantial

13    objections to exhibits that matter, obviously I will do what's

14    necessary, and that's the way I will approach this, as I do in

15    every bench trial.

16         OK.  On that basis, they are all received.

17         MR. MASTRO:  Thank you, your Honor.

18         THE COURT:  And if there is anything in here that you

19    feel compelled, Mr. Friedman, or think is especially worthy of

20    briefing, motion to strike or whatever, I'm not stopping you.

21         MR. FRIEDMAN:  I understand.

22         THE COURT:  All right?

23         MR. FRIEDMAN:  Yes.

24         THE COURT:  OK.

25         MR. MASTRO:  Thank you, your Honor.

DAV7CHE4

1           THE COURT:  So that takes care of all of that.

2           MR. MASTRO:  Thank you, your Honor.  There is one

3     discrete issue, and there have been notices filed on this

4     issue.  Some of these documents -- a very discrete number, in

5     the dozens, not in the hundreds -- are documents that have had

6     confidentiality protection either under this court's protective

7     order, or protective orders entered in other cases when the

8     witnesses produced the documents, sometimes at the defendant's

9     request, sometimes at the witness's request, sometimes at

10    Chevron's request, consistent with the protective order in this

11    case.

12          We have not been able to reach agreement on a

13    protocol.  We have filed a notice with the court on how we

14    propose to deal with that, that if they were going to be used

15    in court, that the parties could use them but not display them

16    to the audience and reveal their contents if they were

17    confidential.  But there will need to be some protocol for that

18    potentially, because there is the potential that some -- not

19    many, very few -- might be used in open court.  And we have

20    noted of course the ones as to which there were confidentiality

21    protection claimed in the exhibit list.

22          THE COURT:  You are not proposing I go through 258

23    pages looking for them.

24          MR. MASTRO:  No, your Honor.  I am really just talking

25    about what our protocol should be if any of the parties choose

DAV7CHE4

1   to use any of those documents in court.

2          THE COURT:  Well, I suggest you work it out.

3          MR. MASTRO:  OK.  Well, there is a new day dawning,

4   your Honor, so I will talk to Mr. Friedman and see if we can

5   work it out now.

6          THE COURT:  Well, good.

7          MR. FRIEDMAN:  Your Honor, in the -- well, we will

8   talk.  That's probably the best.

9          THE COURT:  Yes.

10          MR. MASTRO:  Thank you, your Honor.

11          THE COURT:  OK.  So, we are now going to be off

12   momentarily until Monday.  What's happening Monday?

13          MR. MASTRO:  Your Honor, we will be calling as our

14   first witness on Monday Joseph Cohen.  We will then be calling

15   two experts, Mr. Juola and Mr. Hernandez.  And then we will be

16   calling another expert.  Mr. Juola and Mr. Hernandez are

17   experts who have reviewed the entire Lago Agrio record and will

18   be testifying about what is not in it.

19          Then we will be calling Sandra Elena.  She is an

20   expert on comparative judicial systems, impartiality and

21   independence, and will be opining on the issues relating to the

22   Ecuadorian judiciary and its lack of independence and

23   impartiality.

24          Finally, your Honor, after those four witnesses, it's

25   our intention, your Honor, just to be crystal clear, that we

DAV7CHE4

1    will call Mr. Zambrano as a witness identified with an adverse

2    party under Federal Rule of Evidence 611(c) and cross-examine

3    him.  And we will have completed his deposition by then.  So we

4    are going to go right to a cross-examination of Mr. Zambrano

5    right here in this courtroom after those four witnesses.

6         THE COURT:  All right.  And then after that?  Or is it

7    too soon to tell?

8         MR. MASTRO:  It's a little soon to tell, your Honor.

9    We are still trying to pare back where we can.  We eliminated

10   eight witnesses already, and we are going to continue to

11   endeavor to try and do that.

12        THE COURT:  OK.

13        MR. MASTRO:  We expect to complete our case, your

14   Honor, by no later than this coming Thursday.  We cannot

15   control how long Mr. Zambrano will be on the stand necessarily,

16   but assuming a reasonable estimate for how long he is on the

17   stand, I believe that we will complete our case by no later

18   than next Thursday, a week from today, November the 7th.

19        THE COURT:  Now, there is before me a motion with

20   respect to the defense defense's desire to call this Ecuadorian

21   policeman or employee, whatever he is exactly, and then I think

22   I saw one with respect to this young woman who for a period

23   worked for Mr. Zambrano.  Am I right about that?

24        MR. FRIEDMAN:  Yes.

25        THE COURT:  And there has been some response as to the

DAV7CHE4

1    first but not as to the second.

2           MR. MASTRO:  Yes.  We just found out about the typist

3    yesterday.  We will be filing tonight our position on her.

4           THE COURT:  OK.  Now, assuming for the sake of

5    argument that I were to allow the police fellow to testify,

6    what surprises are in store for me?  I don't mean the substance

7    of the testimony, but I don't expect anything like that to

8    happen without a bunch more motions and objections and --

9           MR. FRIEDMAN:  I think my sense, your Honor, is the

10   surprises that are in store for you are pretty much listed in

11   Chevron's opposition to him testifying.

12           There are issues about what he is allowed to bring up

13   here, what he is allowed to talk about.  They are pretty well

14   cataloged in Chevron's motion, the things that they are

15   troubled by.  I am not aware of anything other than what is in

16   their motion in terms of potential surprises.

17           THE COURT:  Mr. Mastro?

18           MR. MASTRO:  Your Honor, this is in the category of

19   we're going to call this individual, who apparently works for

20   the government and knows what was in that report, but we're not

21   able to give you the report supposedly, we're not able to give

22   you mirror images of the hard drives he looked at supposedly,

23   so just take his word for it, and then you are forced to

24   cross-examine him.

25           Your Honor, we have no problem being on a fair and

DAV7CHE4

1    level playing field, but you can't call a guy who you say has

2    information that they claim comes out of a report, and a

3    process that they can't get the report, and they can't get

4    mirror images of the hard drives, but we can bring him here to

5    say I'll tell you selectively what's in there.  That's really

6    hiding the ball; that's not fair.

7              THE COURT:  I got that part of the argument.

8              MR. MASTRO:  So he should have --

9              THE COURT:  There are a number of evidentiary issues

10   that all of this raises.  There is the rule of completeness and

11   its interrelationship with the best evidence rule and all of

12   that, which I'm not sure anybody has adequately briefed.

13             If he testifies, are we going to have -- well, are we

14   going to have a rebuttal about the position of the Republic of

15   Ecuador vis-a-vis this litigation?

16             MR. MASTRO:  There is certainly that potential.  I

17   mean it's sort of like selectively dribbling out -- the

18   Republic, as we argued to your Honor, is clearly acting in

19   collusion with the Lago Agrio plaintiffs.

20             THE COURT:  I wasn't exactly giving away a secret in

21   terms of --

22             MR. MASTRO:  No, you are not.  That's definitely

23   something that would come out of this, your Honor.  And on the

24   issues that your Honor raises, yes, they are sort of

25   fundamental issues about the prejudice to us of proceeding in

DAV7CHE4

1    this way.

2           If this witness is going to be allowed to come here by

3    the Republic of Ecuador, and to have revealed what he did by

4    the Republic of Ecuador, then surely they can give us the

5    report, give us a mirror image of the hard drives that we can

6    be sure is the real mirror image, and then with that evidence

7    we could depose him, and then he could go on the stand, and now

8    we have something approaching a level playing field.

9           We are not being told we're going to get that.  We are

10   being told that the Republic of Ecuador is going to selectively

11   let them have this witness say what he thinks about these

12   things, without the underlying report, and without the

13   underlying hard drive image, and that's just fundamentally

14   unfair, and he shouldn't be allowed to testify under those

15   circumstances.

16          We have said to your Honor, no problem, if we have a

17   level playing field, but this is the same bait-and-switch that

18   has happened time and time again in this case, that you can't

19   get any documents out of Ecuador, but when they need

20   affirmative information that helps their case, suddenly it's

21   forthcoming in a protected environment.

22          Now, Mr. Zambrano is going to be here.  We never got a

23   single piece of paper about Mr. Zambrano.  I am going to go

24   forward obviously even though we got no documents, and your

25   Honor should be drawing adverse inferences from this failure.

DAV7CHE4

1    He doesn't have a shred of evidence to support his version of

2    events.  But now they come up with this new guy, oh, I did the

3    forensic report for the government, and I will tell you what's

4    in there selectively, and just take my word for it.  Well,

5    that's just not fair, your Honor.  If that guy can be permitted

6    to testify, we should get the underlying information so we can

7    have a level playing field before he testifies, and we have a

8    deposition too, similar to what your Honor ordered with Mr.

9    Zambrano.

10            THE COURT:  Anything you want to add, Mr. Friedman?

11   Mr. Gomez?  There is some substance to these points.

12            MR. FRIEDMAN:  Your Honor, a couple of things.  And I

13   am hearing things thirdhand, so Mr. Mastro can correct me if

14   I'm wrong.

15            THE COURT:  You are hearing things --

16            MR. FRIEDMAN:  -- third hand from people.  I don't

17   speak Spanish.  I'm relying on information relayed to me.  But

18   my understanding -- and Mr. Mastro can correct me if I'm

19   wrong -- is that people are allowed to look at the report down

20   in Ecuador.  Chevron's lawyers, our lawyers, are allowed to

21   look at the report; and what is prohibited is copying the

22   report.  Why that is, I don't know, but that's the status.  And

23   if we were in a reverse situation, and a New York City police

24   officer were being asked to testify in Ecuador, England or

25   anywhere, he might not be able to bring the evidence with him

DAV7CHE4

1      to the other country.  I don't think that would necessarily

2      prohibit him from testifying.

3              THE COURT:  It might not.  It might have some bearing

4      on whether it has any probative value.

5              MR. FRIEDMAN:  It might.  I mean --

6              THE COURT:  I just had a hearing at which various

7      officials of the antiterrorist branch of Scotland Yard

8      testified in this courtroom on the most sensitive kinds of

9      matters, and the documents got produced from the British SO13.

10             MR. FRIEDMAN:  So, I am not in a position to address

11     all of Mr. Mastro's concerns.  I am not saying they're

12     frivolous concerns.

13             What we would like is an opportunity to try to present

14     this witness.  If you decide he has no probative value, or

15     limited probative value, you can take it for what it's worth.

16     We are operating on very short timeframes across cultures and

17     language, and we're doing the best we can to get the relevant

18     evidence in front of you.

19             MR. GOMEZ:  If I may.  Additionally, there are words

20     that get thrown about like selectivity of evidence, and

21     collusion with the Republic of Ecuador, that I don't think

22     there is any basis for.

23             First of all, it's not my decision not to be able to

24     bring this report here.  Certainly I would want to bring that

25     report, because it would corroborate what this gentleman is

DAV7CHE4

1       saying to me.

2                   Secondly, I would also like to have forensic images of

3       the computer, because to the extent that he did his work

4       properly, they would certainly corroborate what his declaration

5       says.

6                   I am only capable of offering as proof what I am told

7       I'm capable of bringing, or what people are willing to give to

8       us.  And that's why we have offered this.

9                   To the extent the report is made public, we will

10      certainly bring it and produce it.  And if for some reason the

11      forensic image of the hard drive is made available to us, we

12      will bring that up as well.

13                  In terms of collusion with the Republic of Ecuador,

14      your Honor, I haven't had any discussions with any federal

15      officials of the Republic.  I don't even know if they are aware

16      of the fact that this gentleman has given us a declaration and

17      is willing to come here.  There is absolutely no evidence of

18      collusion that I know of.

19                  THE COURT:  So, you think an Ecuadorian policeman in a

20      case of this level of significance to the government of Ecuador

21      is volunteering, without any discussion with anybody in the

22      government, to get on an airplane and come up and testify about

23      what he did as an Ecuadorian government official in an American

24      court.  Well, I suppose it's conceivable.

25                  MR. GOMEZ:  It is conceivable.  And none of us have

DAV7CHE4

1   any idea.

2          THE COURT:  I imagine your average F.B.I. agent would

3   go testify in Ecuador on his own hook in a case of major

4   importance to the United States, without a second thought and

5   without checking with anybody.  I am sure that's what would

6   happen.  We'll see.  I have not ruled on it.

7          Now, is that gentleman who was mentioned at the side

8   bar this morning here now?

9          MR. FRIEDMAN:  I think he went back to Maryland, your

10  Honor.

11         THE COURT:  And is he going to be here tomorrow?

12         MR. FRIEDMAN:  If I have anything to say, he won't.

13         THE COURT:  I suggest -- well, tomorrow is the wrong

14  day.  Monday.

15         MR. FRIEDMAN:  Monday.  If you want him here, he will

16  be here.

17         THE COURT:  I think he better be here on Monday.

18         MR. FRIEDMAN:  All right.

19         THE COURT:  OK.  Anything else this afternoon?

20         MR. MASTRO:  Just, your Honor, so the record is clear,

21  Chevron is not a party to those proceedings in Ecuador

22  involving that forensic examination.  Mr. Guerra is, and his

23  lawyer has sworn that he has been denied access to that report.

24  But I believe that Mr. Guerra's lawyer would stipulate release

25  the report so we can bring it here to the United States, but

DAV7CHE4

1    the ROE has not allowed it to be released even to Mr. Guerra's

2    lawyer.

3              THE COURT:  The what?

4              MR. MASTRO:  The Republic of Ecuador, ROE.

5              And, your Honor, on the additional grounds that your

6    Honor mentioned about the concerns here like rule of

7    completeness -- which I don't believe we addressed

8    previously -- we would appreciate being able to make a brief

9    supplemental submission.

10             THE COURT:  Both sides can supplement what you have

11   said about this witness.  You know, I would like to get to the

12   truth of this matter, and what's going on with relation to this

13   witness, and whatever has happened in Ecuador, is not conducive

14   to getting to the truth of this matter.  That couldn't be

15   clearer.

16             MR. MASTRO:  Thank you, your Honor.

17             THE COURT:  OK.  All right.  I will see you on Monday,

18   and I think that takes care of things for today.  Thank you.

19             (Trial adjourned to November 4, 2013 at 9:30 a.m.)

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    JEFFREY ISAAC SHINDER

 4    Direct By Mr. Brodsky  . . . . . . . . . . .1249

 5    Cross By Mr. Friedman  . . . . . . . . . . .1310

 6    Cross By Mr. Gomez . . . . . . . . . . . . .1316

 7    Redirect By Mr. Brodsky  . . . . . . . . . .1320

 8    Recross By Mr. Friedman  . . . . . . . . . .1323

 9    JAMES EBERT

10    Direct By Mr. Weitzman . . . . . . . . . . .1328

11    Cross By Mr. Booth . . . . . . . . . . . . .1332

12    Cross By Mr. Gomez . . . . . . . . . . . . .1344

13    Redirect By Mr. Weitzman . . . . . . . . . .1345

14    MICHAEL GREEN

15    Direct By Ms. Neuman . . . . . . . . . . . .1348

16    Cross By Mr. Booth . . . . . . . . . . . . .1350

17    YERIM KIM

18    Direct By Ms. Champion . . . . . . . . . . .1359

19    Cross By Ms. Littlepage  . . . . . . . . . .1360

20                        PLAINTIFF EXHIBITS

21    Exhibit No.                              Received

22     1165    . . . . . . . . . . . . . . . . . .1267

23     1213    . . . . . . . . . . . . . . . . . .1274

24     1224    . . . . . . . . . . . . . . . . . .1275

25     1244    . . . . . . . . . . . . . . . . . .1280
```

 1   1255   . . . . . . . . . . . . . . . . .1283

 2   1262   . . . . . . . . . . . . . . . . .1301

 3   1264   . . . . . . . . . . . . . . . . .1303

 4   1241   . . . . . . . . . . . . . . . . .1321

 5   4000   . . . . . . . . . . . . . . . . .1329

 6   4020   . . . . . . . . . . . . . . . . .1331

 7   4021   . . . . . . . . . . . . . . . . .1347

 8   5100   . . . . . . . . . . . . . . . . .1350

 9   4400 and 4400A  . . . . . . . . . . . . .1360

10                    DEFENDANT EXHIBITS

11   Exhibit No.                          Received

12   1256   . . . . . . . . . . . . . . . . .1313

13   1206   . . . . . . . . . . . . . . . . .1356

14   1207   . . . . . . . . . . . . . . . . .1357

15

16

17

18

19

20

21

22

23

24

25