DB48CHE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

          v.                           11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                    Defendants.

------------------------------x

                                       November 4, 2013
                                       9:45 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                       District Judge

                         APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     JEFFERSON E. BELL
     ANNE CHAMPION
     PETER E. SELEY

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

DB48CHE1

1          (Trial resumed)

2          THE COURT:  Good morning.

3          I have a few things to tell you all.

4          With respect to Chevron's in limine motion number one,

5     there are identified in the motion hundreds of exhibits that

6     Chevron asks be precluded.  I think possibly, although I don't

7     remember at the moment, a witness or more.  The defense has

8     made no effort in their response to that motion to

9     particularize any basis for admissibility of any of that

10    evidence.  I will handle them in exactly the same way I have

11    handled the voluminous evidence offered by Chevron.  I will

12    receive them on the same basis, subject to whatever objections

13    have been made, and I will say these additional points.

14         Given the nature of the evidence, or at least what I

15    am told is the nature of the evidence, I will be very

16    disinclined, for reasons already explained, to receive any of

17    it for the truth of any of the matters stated, although I will

18    obviously consider any exhibit that turns out to be material

19    individually.  To whatever extent the evidence is offered by

20    the defense for proof of state of mind, the foundation for the

21    receipt of the evidence, if it has not been established

22    already, and if it's objected to for lack of the relevant

23    foundation, is going to have to be established, or if it's

24    material, it's out.

25         That's a preliminary ruling.  It's subject to

DB48CHE1

1      reconsideration.  But that's the way I am going to handle that.

2              Secondly, with respect to the motion to add to the

3      defendants' witness list, Mr. Tarco, the motion is granted on

4      these conditions.  First, Mr. Tarco first will have to submit

5      to a deposition in New York in advance, and if you can't agree

6      on the terms of the deposition and the date and so forth,

7      either I or one of the special masters will deal with that.

8              Second, the defendants are directed, as a condition of

9      calling the witness, to produce the computers that allegedly

10     were examined and/or the clones or images of the hard drives

11     and the report referred to in Mr. Tarco's declaration or

12     affidavit, and to do so significantly in advance of the

13     deposition.  And if they fail to do any of that, to demonstrate

14     to my satisfaction that they used best efforts to accomplish

15     that.

16             Third, the motion by the defendants to expand the

17     witness list to include Ms. Calva Erazo -- I think I am saying

18     that correctly -- is granted on the condition that she submit

19     to a deposition in New York in advance of her testimony on the

20     same basis I alluded to earlier.

21             Is Mr. Gowan here today?

22             MR. GOWAN:  Yes.

23             THE COURT:  I will deal with that at a side bar later.

24             I think we are ready.

25             MR. GOMEZ:  May I inquire about one particular?  Mr.

DB48CHE1

1    Zambrano is on the list to testify today.  I have informed

2    plaintiff's counsel that I have instructed Mr. Zambrano as a

3    result of the four witnesses who are scheduled before him to

4    arrive in the courthouse at 1 p.m.  If it turns out during the

5    morning break that we will need his presence here earlier, I

6    can go down and make sure that he is notified to arrive

7    earlier.

8            With respect to the examinations, plaintiff is calling

9    Mr. Zambrano initially as an adverse witness, and defense was

10   wondering whether on our turn to examine him we would be

11   limited in scope with respect to adverse examination.  We are

12   asking ourselves that because we don't know if we need to call

13   Mr. Zambrano back separately later after their examination and

14   defense's examination or whether we will be allowed to go

15   beyond the scope for ours so we can finish the witness and be

16   done.

17           THE COURT:  Mr. Mastro.

18           MR. MASTRO:  Your Honor, it's not our intention to

19   have to bring back Mr. Zambrano.  We look forward to

20   cross-examining him, and if they need to cover some topics

21   outside the scope of ours, we have no problem with that.

22           THE COURT:  All right.  If you have no problem, then I

23   don't have a problem.

24           MR. MASTRO:  Thank you, your Honor.

25           THE COURT:  All right.  Next witness.

DB48CHE1

1           MR. MASTRO:  Chevron calls Joseph Kohn.  My colleague

2      Andrea Neuman will be putting on the witness.

3           THE COURT:  While we are waiting for Mr. Kohn to come

4      in, Mr. Friedman we are making an effort to solve the space

5      issue that has been raised on your side.  We lost some time

6      because Mr. Mohan was out sick for part of last week.

7       JOSEPH C. KOHN,

8           called as a witness by the plaintiff,

9           having been duly sworn, testified as follows:

10           THE DEPUTY CLERK:  State your name and spell your last

11      name for the record.

12           THE WITNESS:  Joseph C. Kohn, K-O-H-N.

13           THE COURT:  Proceed, Ms. Neuman.

14           MS. NEUMAN:  Before we start with Mr. Kohn, I would

15      like to let the Court know his counsel, Patricia Hamill, is

16      here this morning, and she is seated over to the right.

17           THE COURT:  Thank you.

18      DIRECT EXAMINATION

19      BY MS. NEUMAN:

20      Q.  Good morning, Mr. Kohn.

21      A.  Good morning.

22      Q.  Were you served with a subpoena commanding your appearance

23      in this action?

24      A.  Yes.

25      Q.  Is that subpoena the reason you're here testifying here

DB48CHE1                        Kohn – direct

1   today?

2   A.  Yes, it is.

3   Q.  Did you make the decision to submit a written witness

4   statement rather than sit for a direct examination?

5   A.  My counsel requested if we could have the opportunity to do

6   that.  As I understood the Court's rules, witnesses on direct

7   of the parties were permitted to do so, but as a nonparty we

8   asked if we could proceed that way.

9   Q.  Did you in fact prepare a written version of your direct

10  testimony?

11  A.  Yes.

12          MS. NEUMAN:  May I approach the witness?

13          THE COURT:  You may.

14  Q.  Mr. Kohn, do you have Plaintiff's Exhibit 5600 in front of

15  you?

16  A.  Yes.

17  Q.  Is this a true and correct copy of your witness statement

18  in this case?

19  A.  Yes, it is.

20  Q.  Is that your signature that appears on the last page?

21  A.  Yes.

22  Q.  Is everything that you put forth in Exhibit 5600 true and

23  correct?

24  A.  Yes, it is.

25          MS. NEUMAN:  Plaintiffs would move the admission of

DB48CHE1                          Kohn - direct

1    Exhibit 5600 as Mr. Kohn's direct testimony.

2              THE COURT:  Received on the same basis as previously.

3              (Plaintiff's Exhibit 5600 received in evidence)

4              MS. NEUMAN:  I would pass the witness.

5              THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. DONZIGER:

8    Q.  Good morning, Mr. Kohn.

9    A.  Good morning.

10   Q.  Is your witness statement true to the best of your

11   knowledge as you sit here today?

12   A.  Yes, it is.

13   Q.  Is there anything important related to the *Aquinda* case in

14   Ecuador that you left out of your witness statement?

15             MR. MASTRO:  Objection.  Form.  Scope.

16             THE COURT:  Sustained.

17   Q.  Sir, you signed your statement on October 15, correct?

18   A.  Yes.

19   Q.  Did you write your witness statement?

20   A.  I wrote -- yes, it is my statement.  I worked with my

21   counsel on it, and I wrote the statement as my testimony.

22   Q.  Was there any part of your witness statement that you did

23   not draft yourself?

24   A.  There is no part that is not my testimony.  I worked with

25   my counsel and they were the scriveners of some paragraphs,

DB48CHE1                    Kohn – cross

1  which I revised or accepted, and others that I wrote from

2  longhand initially myself.

3  Q.  Did you have any contact in the preparation of your witness

4  statement with your lawyers from Gibson Dunn?

5  A.  Yes.

6  Q.  Did your counsel have any contact in the preparation of

7  your witness statement with any lawyers from Gibson Dunn?

8        MS. HAMILL:  Objection.  Privilege.

9        MR. DONZIGER:  The fact that they had contact.

10        MS. HAMILL:  To the extent Mr. Kohn would know whether

11  his counsel had any contact with Gibson Dunn would only have

12  been communicated through his counsel, and we would object on

13  the grounds of privilege to that question.

14        THE COURT:  What is the question?

15        MR. DONZIGER:  The fact of the contacts as opposed to

16  the substance of the conversation is not privileged.  He has

17  already testified in his deposition.

18        THE COURT:  Mr. Kohn, were you ever present when your

19  counsel had contact with Gibson Dunn on the subject of the

20  question?  Yes or no?

21        THE WITNESS:  No, your Honor.

22        THE COURT:  Next question.

23        MR. DONZIGER:  What was the answer?

24        THE COURT:  The answer was no.

25  Q.  What paragraphs in your witness statement did you not

DB48CHE1                        Kohn - cross

1   draft -- what paragraphs in your witness statement did your

2   lawyer draft as opposed to you?

3              MS. HAMILL:  Objection.  Privilege.

4              THE COURT:  Sustained.

5              MR. DONZIGER:  Can I be heard?

6              THE COURT:  I have ruled.

7   Q.  Aside from your witness statement, have you had any contact

8   with any attorneys from Gibson Dunn over the last, say, three

9   years?

10  A.  Yes.

11  Q.  Can you describe the first such contact?

12  A.  The first contact was in the fall of 2010, prior to the

13  issuance or the commencement by our firm in the Eastern

14  District of Pennsylvania of the matter with respect to our

15  documents and preserving the privilege of those documents and

16  the fact that Chevron was going to initiate a 1782 proceeding

17  and issue a subpoena to our firm.

18  Q.  How was that contact initiated?

19  A.  Through our attorneys at the Conrad O'Brien firm.

20  Q.  Your attorneys initiated that contact on your behalf?

21  A.  Yes.

22  Q.  What was the purpose of initiating that contact?

23  A.  To inform Chevron's attorneys of the procedure that we

24  planned to utilize, and we were preparing a privilege log of

25  all of our documents and we would have that done promptly, and

DB48CHE1                          Kohn - cross

1   were prepared to submit that to a court so a court could rule

2   on whether or not those documents would be produced.  And we

3   were trying to do it in an efficient manner for all concerned.

4   Q.  Did you yourself have contact with the Gibson attorney?

5   A.  I was present at a discussion with them, yes.

6   Q.  Who was in the meeting for that discussion with Gibson

7   Dunn?

8   A.  Mrs. Neuman, Ms. Neuman, Mr. Edelman.  I believe those were

9   the only attorneys from Gibson Dunn.  There may have been more.

10  Q.  The second name was Edelman?

11  A.  I believe Edelman, the gentleman from the Los Angeles

12  office.

13  Q.  Where did that meeting take place?

14  A.  In the Gibson Dunn office in New York City.

15  Q.  Subsequent to that meeting, have there been any contacts

16  between you and attorneys from Gibson Dunn?

17  A.  I believe the next contact I had was at my deposition in

18  this matter.

19  Q.  So between the fall of 2010, the meeting in the New York

20  office at Gibson Dunn, and your deposition just a few weeks

21  ago, you had no direct personal contact with any attorney at

22  Gibson Dunn?

23  A.  That's correct.  I think the deposition was more than a few

24  weeks ago, but I can't place the date exactly as I sit here.

25  Q.  Your deposition in this case?

DB48CHE1                         Kohn - cross

```
 1    A.  Correct.

 2    Q.  When you say fall of 2010, can you be more specific?  Do

 3    you remember a specific date, what month it was?

 4    A.  I recall it was Election Day 2010, whatever day that was.

 5    So the first week of November.

 6    Q.  In between that meeting and your deposition, did your

 7    counsel have contact with Gibson Dunn?

 8              MS. HAMILL:  Objection.  Privileged.  Same grounds as

 9    before.

10              MR. DONZIGER:  I think the fact of the contacts goes

11    directly to that issue.  I am not going to inquire as to the

12    substance of any conversation.  I think the fact of the

13    contacts is very relevant.

14              THE COURT:  Do you, Mr. Kohn, have personal knowledge

15    by virtue of having been present or seeing or hearing any

16    contact between your counsel and Gibson Dunn in the intervening

17    period?

18              THE WITNESS:  No, sir, only what I have said.

19              THE COURT:  Proceed, counsel.

20    Q.  Ms. Hamlon represents you for purposes of this matter?

21    A.  Hamill.

22    Q.  Did she inform you of any contacts she had with any

23    attorney at Gibson Dunn during this time?

24              MS. HAMILL:  Objection.  Privilege.

25              THE COURT:  Any other ground?
```

DB48CHE1                        Kohn - cross

1           Strike that.  Let's deal with the privilege.  Mr.

2    Donziger.

3           MR. DONZIGER:  Sir, the degree of contacts between Mr.

4    Kohn directly or through his counsel with Gibson Dunn goes

5    directly to very important issues with regard to his affidavit.

6    I would like to be able to inquire at least as to the times and

7    the frequency.  It won't be very long.

8           THE COURT:  Do you have some authority for the

9    proposition that because a communication between lawyer and

10   client is important to the issues, you're therefore entitled to

11   get it?

12          MR. DONZIGER:  It is my understanding that issues like

13   who your lawyer is or the fact of certain aspects of

14   representation that don't go to the substance of any privileged

15   communications are fair game.

16          THE COURT:  You overstate the principle, sir.  You're

17   in fact asking for the substance of the communication.

18          MR. DONZIGER:  I am just asking if they occurred, not

19   the substance.

20          THE COURT:  The question was, "Did she inform you of

21   any contacts she had with any attorney at Gibson Dunn during

22   this time?"  You are asking, what did your lawyer tell you?

23   That's your question.

24          MR. DONZIGER:  Can I try to rephrase it?

25          THE COURT:  Sure.

DB48CHE1                    Kohn - cross

1   BY MR. DONZIGER:

2   Q.  Did your lawyer, Ms. Hamill, inform you of the fact of any

3   contact she had with Gibson Dunn without getting into the

4   substance of any conversation?

5           MS. HAMILL:  Objection.  Privilege.  Same grounds.

6   Communications from counsel for Mr. Kohn to Mr. Kohn.

7           THE COURT:  I am going to allow it, but do not view

8   this as opening any doors.

9   A.  Can you restate the time period you're inquiring about?

10  Q.  I am talking about the time period between your meeting in

11  the first week of November 2010 and your deposition in this

12  case.

13  A.  I was informed of some contacts counsel were together in

14  court proceedings, and other than reporting on court

15  proceedings, I don't recall any other report of contacts.

16  Q.  In preparation for your deposition in this case, your

17  counsel had contact with Ms. Neuman?

18  A.  Correct.

19  Q.  How many contacts, if you know, did she have with Ms.

20  Neuman in preparation for your deposition?

21  A.  I recall they had one meeting, which I was informed of, and

22  I assume there was a phone call or something to schedule that

23  meeting.

24  Q.  Do you know if Ms. Neuman reviewed your witness statement

25  that you have submitted in this case before it was submitted?

DB48CHE1                        Kohn - cross

1   A.  I assume --

2            MS. NEUMAN:  Objection.  Lacks foundation.  Calls for

3   speculation.

4            THE COURT:  Sustained.

5   Q.  Did Ms. Neuman review your witness statement, to the best

6   of your knowledge?

7            MS. NEUMAN:  Same objection.

8            THE COURT:  Same ruling.

9   Q.  When you reviewed your witness statement, you reviewed your

10  witness statement before signing it?

11  A.  Yes.

12  Q.  You went through every paragraph?

13  A.  Yes.

14  Q.  You read it carefully?

15  A.  Yes, I did.

16  Q.  Did you get any input from a Gibson Dunn attorney as to

17  what to put in your witness statement?

18  A.  All of my discussions were with Mr. Voss and Ms. Hamill at

19  the Conrad O'Brien firm.

20           THE COURT:  Is that a no, Mr. Kohn?

21           THE WITNESS:  Yes, your Honor, that's no.

22  Q.  Sir, was your witness statement given to any attorney at

23  Gibson Dunn before you signed it?

24  A.  I don't know.

25  Q.  When did you complete the first draft of your witness

DB48CHE1                          Kohn - cross

1   statement?

2            MS. HAMILL:  Objection.  Lacks foundation.

3            THE COURT:  Answer it to the best of your ability.

4   A.  It was late September or early October, my recollection.

5            THE COURT:  Ms. Hamill, you're entitled to object on

6   the ground of privilege, but you're not a litigant in this

7   case.

8            MS. HAMILL:  Thank you, your Honor.

9   Q.  Do you remember when you made the decision to do a written

10  witness statement?

11  A.  It was shortly before the witness statement was prepared.

12  It was all within a period of late in September to the time --

13  the document is dated October 15.  There was some time in

14  preparing it, a couple of weeks.

15  Q.  Why did you decide to do a written witness statement in

16  this case?

17  A.  Just to expedite the time that I would spend in this

18  courtroom.

19  Q.  Did anybody from Gibson Dunn request that you prepare a

20  written statement?

21            MS. NEUMAN:  Objection.  Lacks foundation.

22            THE COURT:  Rephrase it.

23  Q.  Did any attorney at Gibson Dunn request that you prepare a

24  written witness statement as opposed to testifying live?

25  A.  Not that I'm aware of.  Again, without getting into

DB48CHE1                         Kohn - cross

1    privileged discussion with my own counsel, it was something we

2    requested, as I stated.

3    Q.  Did you have an agreement with Chevron to testify today?

4    A.  No.  I am here under subpoena.

5    Q.  Is Chevron paying your expenses to travel to New York to

6    testify?

7    A.  No, sir.

8    Q.  Are they paying anything to your lawyer, her fees?

9    A.  No, sir.  I did receive the statutory witness fee check.

10   Nothing other than that.

11              THE COURT:  Is it still $40?

12              THE WITNESS:  I think it was something more than that

13   because of traveling from Philadelphia.

14   Q.  When you say you drafted your witness statement in

15   longhand, the parts you drafted yourself you wrote out on a

16   yellow legal pad?

17   A.  I think it was a white legal pad and/or on the draft that

18   Mr. Voss and Ms. Hamill also had been preparing.  We worked off

19   of that typewritten document.

20   Q.  Can you tell which paragraphs of your witness statement

21   that you did not draft in longhand?

22              MS. NEUMAN:  Objection.  Asked and answered.

23              THE COURT:  Overruled.

24   A.  Well, the first paragraph is some of my background.  I do

25   recall editing that and making changes in that.  The same with

DB48CHE1                         Kohn - cross

1    the second paragraph.  I think there are -- as I sit here now,
2    I can't recall that I did not have at least some comments or
3    some reordering or restating on.
4    Q.  But there are some paragraphs you didn't draft in full,
5    correct?
6    A.  Yes.  And there may be some that I didn't even make a
7    stylistic change on or a change of a date or something like
8    that.
9    Q.  Can I direct your attention to paragraph 4 in your witness
10   statement, please?
11   A.  Yes.
12   Q.  If you can just look at that and tell me whether or not
13   that is one of the paragraphs you drafted in longhand in full?
14   A.  I believe it is one that I at least had some comment upon.
15   Q.  You don't have any recollection of actually drafting that
16   whole paragraph?
17   A.  I don't have a recollection of who was the original
18   scrivener of that paragraph, whether it was me or one of the
19   other lawyers.
20   Q.  When did you hire your counsel at Conrad O'Brien in this
21   case?
22   A.  I believe it was in August or September of 2010.
23   Q.  Do you have any other counsel that you hired in relation to
24   this case?
25   A.  Yes.  We have also retained the Susman Godfrey firm.

DB48CHE1                         Kohn - cross

1    Q.   The purpose of Susman Godfrey was what?

2    A.   To provide legal advice on a range of matters.  They also

3    appeared in the 1782 -- I guess they appeared as counsel in

4    this matter with respect to the subpoena to our firm.

5    Q.   Any other counsel other than Susman Godfrey?

6    A.   We had also retained the Berger Montague firm with respect

7    to an action we commenced in state court in Philadelphia

8    against you.

9    Q.   Other than that firm, are there any other firms you

10   retained in connection with anything relating to the Ecuador

11   cases?

12   A.   I don't believe so.

13   Q.   Now, shifting gears a bit, you have been involved in the

14   *Aquinda* case since 1993?

15   A.   Yes.

16   Q.   Your name was on the original complaint filed in the

17   Southern District of New York in that year?

18   A.   Yes.

19   Q.   In the period of the 1990s, in the *Aquinda* case, your firm

20   drafted most of the pleadings when the case was in New York,

21   correct?

22   A.   Yes.

23            MS. NEUMAN:   Objection.  Relevance.

24            THE COURT:   What is the relevance of that?

25            MR. DONZIGER:   I wanted to establish what my role was

DB48CHE1                          Kohn - cross

1     in the case in the 1990s.

2              THE COURT:  All right.

3     Q.  There were various oral arguments at that time before trial

4     in the appellate courts in this jurisdiction?

5     A.  Yes.

6     Q.  Lawyers from your firm or Mr. Bonifaz's firm handled those

7     oral arguments, correct?

8     A.  Yes.

9     Q.  Back in the 1990s, you would agree I had a relatively

10    marginal role in the *Aquinda* case?

11    A.  I would not use the term marginal.  My recollection is you

12    were involved, I think initially, as a lawyer at the Bonifaz

13    firm, and your role was one of a lawyer, whether it be kind of

14    a younger partner or senior associate working on the matter,

15    and you were involved in different aspects at different times.

16    Q.  I was not working for your law firm during that time?

17    A.  No.

18    Q.  I have never been an employee in your law firm?

19    A.  Correct.

20    Q.  There came a point when the *Aquinda* case was transferred

21    from New York to Ecuador, right?

22              MS. NEUMAN:  Objection.  Lacks foundation.

23              THE COURT:  Sustained.  It's contrary to fact.  A fact

24    of which you will take judicial notice it was not transferred

25    to Ecuador.

DB48CHE1                          Kohn - cross

1   Q.  There came a point in time when Judge Rakoff, I believe,

2   granted a motion for forum non conveniens filed by Chevron to

3   move the case to Ecuador, correct?

4           THE COURT:  You're misstating it.  He granted a motion

5   to dismiss on the grounds of forum non conveniens.  That's

6   established fact.

7           MR. DONZIGER:  Or removal, dismissal.

8           THE COURT:  It does make a difference, Mr. Donziger.

9   They are different points.

10  Q.  There came a point in time that the *Aquinda* case was

11  dismissed on grounds of forum non conveniens?

12  A.  Correct.

13  Q.  At that point, you and your law firm had to make a decision

14  as to whether or not to continue the case in Ecuador, correct?

15  A.  Yes.

16  Q.  And you made the determination at that point that the case

17  could viably be brought in Ecuador's courts?

18  A.  Yes.

19  Q.  At that point, you thought that Texaco had committed some

20  sort of wrongdoing down in Ecuador that was actionable,

21  correct?

22          MS. NEUMAN:  Objection.  Relevance.  Scope.

23          THE COURT:  Sustained.

24  Q.  At that point, you were aware that Chevron and not Texaco

25  was the defendant in the *Aquinda* litigation that was refiled in

DB48CHE1                        Kohn - cross

1    Ecuador, correct?

2                MS. NEUMAN:  Objection.  Assumes facts not in

3    evidence.

4                THE COURT:  It's rather a convoluted question because

5    it presupposes that at the time the decision was made to

6    continue the case in Ecuador, Chevron was the defendant.  That

7    is to say, the question assumes that before there was a lawsuit

8    there was a defendant.

9                So you might rephrase it, Mr. Donziger.

10   Q.  You tell me, Mr. Kohn.  When the *Aquinda* case was refiled

11   in Ecuador, who was the defendant?

12               MS. NEUMAN:  Objection.  It assumes facts not in

13   evidence.  Contrary to the record.

14               THE COURT:  I take it that the problem is that the

15   *Aquinda* case in New York and the *Aquinda* case in Ecuador are

16   not properly described, the second being a refiling of the

17   first, because the parties were different, the claims at least

18   arguably are different.  Is that the gist of the objection?

19               MS. NEUMAN:  Right, your Honor.

20               THE COURT:  Sustained.

21   Q.  There was a case that was refiled in Ecuador that was

22   titled *Aquinda v. Chevron Texaco*, correct?

23               THE COURT:  Sustained.

24               There was a case that was filed in Ecuador, the first

25   named plaintiff in which was named Aquinda.  Is that right, Mr.

DB48CHE1                          Kohn - cross

1    Kohn?

2              THE WITNESS:  That's my recollection, your Honor.

3    There is a document that is the document.  I think it's a fact.

4              THE COURT:  Of course.

5    Q.  The Aquinda in the Ecuador case is the same person who is

6    the Aquinda in the New York case?

7    A.  That was my understanding, yes.

8    Q.  The New York case was seeking various remedies?

9    A.  Yes.

10             MS. NEUMAN:  Objection.  Relevance.

11             THE COURT:  Sustained.

12             Look, the record in the *Aquinda* case in New York is a

13   matter of public record in this court.  I take judicial notice

14   of it and all the filings in it, not for the truth of any of

15   the matters stated, unless there is another basis for doing so,

16   but for the fact that the papers are there.

17             Let's move on.

18   Q.  You felt that the *Aguinda* case that was filed in Ecuador,

19   at the time it was filed, was a bona fide litigation, didn't

20   you, sir?

21   A.  Yes, I did.

22   Q.  You talk in your witness statement about taking a trip to

23   Ecuador in 2006 or 2007?

24   A.  2007, I believe.

25   Q.  Do you remember the month you went to Ecuador?

DB48CHE1                    Kohn - cross

1   A.  I believe it was either September or October of 2007.

2   Q.  You also testified in your direct that that was the only

3   trip you took to Ecuador since the inception of the Ecuador

4   phase of the *Aquinda* case, correct?

5   A.  Correct.

6   Q.  Do you remember how long you were in Ecuador on that trip?

7   A.  I believe about three days, possibly four days.

8   Q.  Did you fly down alone, do you remember?

9   A.  I believe I did, yes.

10  Q.  Was I with you on that trip?

11  A.  You were in Ecuador, and I spent some time in Quito, and I

12  also spent some time in Lago and you did not make the side trip

13  to Lago.

14  Q.  It took you a day to travel down to Ecuador, approximately?

15  A.  Yes.  There is no time change, but it's a long flight, but

16  you still have time that day to do things.

17  Q.  Well, at a certain time during that trip to Ecuador, you

18  took a trip to the Amazon rainforest where Texaco operated?

19  A.  Yes.

20  Q.  You flew down to the Amazon?

21  A.  Yes.

22  Q.  Do you remember what town you flew into?

23  A.  I believe it was Lago or the airport that services that

24  area.

25  Q.  How long were you down in that area?

DB48CHE1                          Kohn - cross

```
 1   A.  One full day in the Lago area.

 2   Q.  You flew down in the morning and flew back in the

 3   afternoon?

 4   A.  Yes.

 5   Q.  You were down there approximately eight hours or so?

 6   A.  Yes.

 7   Q.  What did you do when you were down there?

 8              MS. NEUMAN:  Objection.  Relevance.

 9              THE COURT:  Sustained.

10   Q.  When you arrived in the airport in Lago, who met you?

11   A.  I do not recall the names of the individuals, but there was

12   a group of individuals who were active in the Frente.  And as I

13   recall, some were named plaintiffs in the lawsuit, and I am

14   trying to recall if Mr. Yanza was there.  I do not believe he

15   was.  Another gentleman had accompanied me from Quito to Lago,

16   and then we met the other people there and we like a small van

17   or small bus.  It was a group of six or seven or eight people.

18   Q.  Do you recall the person who accompanied you from Quito to

19   Lago?

20              MS. NEUMAN:  Objection.  Relevance.

21              THE COURT:  What is the relevance of this?

22              MR. DONZIGER:  Can we approach to the side?

23              THE COURT:  Yes.

24              (Continued on next page)

25
```

DB48CHE1                         Kohn – cross

1                (At the side bar)

2                THE COURT:  Mr. Donziger.

3                MR. DONZIGER:  He spends a very large amount of time

4       in his witness statement trying to say that he could not get

5       contact with the Ecuadorian plaintiffs except through me.  I

6       don't believe that's true.  I want to establish that he had

7       multiple contacts without me being around with the Ecuadorian

8       plaintiffs, not only on this occasion but on other occasions.

9                MS. NEUMAN:  Mr. Kohn already testified that Mr.

10      Donziger didn't go on the Lago portion of the trip.  Now he is

11      just asking detailed questions about who met him at the

12      airport, what he remembers about the people that met him at the

13      airport, where he has already established the only relevant

14      point he has articulated, that he wasn't on the Lago portion of

15      the trip.

16               THE COURT:  How long do you expect to go on this?

17               MR. DONZIGER:  Very short.

18               THE COURT:  Let's see how it goes.

19               (Continued on next page)

20

21

22

23

24

25

DB48CHE1                          Kohn - cross

 1              (In open court)

 2              THE COURT:  Overruled.

 3    BY MR. DONZIGER:

 4    Q.  Is there a pending question?

 5              THE COURT:  Yes.  The pending question is:

 6              Do you recall the person who accompanied you from

 7    Quito to Lago?

 8    A.  I recall his appearance.  I do not remember his name.

 9    Q.  Do you remember if he was a member of the legal team in

10    Ecuador?

11    A.  My recollection is he was not an attorney, but he was

12    someone who I believe had been described as a, quote, friend of

13    the case.  He may have been some other kind of a professional.

14    He was an Anglo and older gentleman, grayish hair.

15    Q.  Did that individual serve as your translator that day, do

16    you remember?

17    A.  Yes.

18    Q.  Do you remember meeting a gentleman when you arrived at

19    Lago named Donald Moncayo?

20    A.  I don't recall the name.

21    Q.  You know who Humberto Piaguaje is, don't you?

22    A.  Yes.

23    Q.  Describe to the Court who Humberto Piaguaje is, please.

24    A.  He is an individual who lived in the Oriente, who had been

25    involved in the litigation from its inception in New York or

DB48CHE1                    Kohn - cross

1   before in '93.  I believe he and his family members were named

2   plaintiffs in the New York case, and perhaps he or some subset

3   of his family may have also been listed as the plaintiffs in

4   the case that was filed in Lago.  He also holds some positions

5   with respect to his community, and he was one of the leaders in

6   the Frente and in the communities that were affected by the oil

7   exploration.

8   Q.  Do you remember if he was with you that day when you toured

9   the region?

10  A.  I don't recall Humberto being there that day, but he may

11  have been.  I spent some occasions with him.

12  Q.  Now, on that trip, did you see any oil contamination?

13           MS. NEUMAN:  Objection.  Relevance.

14           THE COURT:  Sustained.

15           MR. DONZIGER:  Can I make a proffer?

16           THE COURT:  Yes.

17           MR. DONZIGER:  The reason I think this is relevant is

18  because Chevron's view is that Mr. Kohn was filing a fraudulent

19  lawsuit.  They are seeking damages or costs relating to

20  uncovering that which were linked to fees he paid to fund the

21  lawsuit.  And I think establishing when he believed the lawsuit

22  turned from bona fide to what he calls fraudulent is highly

23  relevant to a number of issues.

24           THE COURT:  I have made my ruling.

25  Q.  On that trip to Ecuador in 2007, you also were in Quito?

DB48CHE1                      Kohn - cross

1    A.  Correct.

2    Q.  Do you remember how many days you were in Quito?

3          MS. NEUMAN:  Objection.  Asked and answered.

4          THE COURT:  I think it has been.  The trip was three

5    to four days.  He spent a day on the plane going down.  He was

6    eight hours in Lago, plus travel time.  It's a matter of

7    subtracting.

8    Q.  You were in Quito at least a day?

9    A.  It was more than a day, two days in Quito, one day in Lago

10   and traveling.

11   Q.  When you were in Quito, did you meet with Pablo Fajardo?

12   A.  Yes.

13   Q.  Did you meet with any other representatives of the Lago

14   Agrio plaintiffs?

15   A.  Mr. Yanza, Mr. Saenz, his name was Juan Pablo, and there

16   were several other individuals working on the lawsuit who were

17   in and out of meetings.

18   Q.  Did you meet them in the office where Selva Viva was

19   headquartered?

20   A.  There.  And also there were meetings in restaurants or in

21   the hotel afterwards.

22   Q.  In these meetings, you were able to communicate through a

23   translator?

24   A.  Yeah.  Either you would translate or Juan Pablo.

25   Q.  During these discussions in Ecuador, you don't remember me

DB48CHE1                         Kohn - cross

1    trying to interfere in any way with your discussions with the

2    clients, do you, on that trip?

3    A.  I recall, and it didn't strike me at the time, that there

4    were particular times where you would say, I have to go over

5    some detailed things with the guys in Spanish and it's

6    technical; if you want to make some phone calls or take a break

7    or something like that, sort of side discussions.  But that's

8    my recollection.  So there were some separate discussions.  I

9    understood they were about technical matters, or you would give

10   me some sort of summary of what was occurring or we were going

11   to talk about this or that.  Then we would have other

12   discussions where they were slower going with the translation

13   back and forth.

14   Q.  You were able to ask the client representatives on that

15   trip anything you wanted to ask, correct?

16   A.  Yes, I was.

17   Q.  You had a retainer agreement directly with the clients,

18   your law firm?

19   A.  With the Frente, our agreement was with the Frente.

20   Q.  It wasn't with my law firm?

21   A.  No, sir.

22   Q.  How many lawyers were in your law firm in 2003?

23   A.  Approximately 16, I believe, 16 or 17.

24   Q.  How many lawyers are in your law firm today?

25   A.  13.

DB48CHE1                         Kohn - cross

1    Q.   In the 2008-2009 period, how many lawyers were in your law

2    firm?

3    A.   I don't know.  It was in that range.  We have been in that

4    range, 15 plus or minus, for ten years or so.

5    Q.   Just to be clear, during the time period of your law firm's

6    involvement in the *Aquinda* case, your law firm had no

7    particular expertise in enforcing foreign judgments, did it?

8    A.   No.

9    Q.   You personally had no expertise, correct?

10   A.   Correct.

11   Q.   And your law firm as -- let me ask you.  Your law firm had

12   no particular expertise litigating anywhere in Latin America?

13   A.   Correct.

14   Q.   Now, you remember the filing of the complaint in this

15   matter that we are dealing with in Judge Kaplan's courtroom?

16   A.   The filing by Chevron of this RICO litigation?

17   Q.   Yes.

18   A.   I recall it being filed, yes.

19   Q.   You remember that was filed on February 1, 2011?

20   A.   I wouldn't have recalled that day.

21   Q.   Thereabouts though, February 2011?

22           THE COURT:  It's a matter of public record.  Let's

23   move on.

24           MR. DONZIGER:  I am trying to situate the time period.

25   Q.   You read that complaint, right?

DB48CHE1                          Kohn - cross

1  A.  It's very lengthy.  I read through it.  I did not study it.

2  Q.  You know your law firm was named in that complaint?

3       MS. NEUMAN:  Objection.  It misstates the pleading.

4       THE COURT:  Sustained as to form.

5  Q.  You know your law firm was mentioned in the complaint?

6  A.  Yes.

7  Q.  It was mentioned as what Chevron called a, quote, nonparty

8  co-conspirator, correct?

9  A.  Something like that.  It was co-conspirator is what I

10 remember.

11 Q.  You also noticed that you were named in the complaint

12 personally, correct?

13 A.  In the same capacity, yes, as co-conspirator.

14 Q.  When you read that your law firm and you personally had

15 been named, or mentioned I should say, in this complaint, that

16 upset you, didn't it?

17 A.  It concerned me.

18 Q.  Well, you learned at a certain point that lawyers who

19 represented the Ecuadorian communities in the *Aquinda* case had

20 been sued by Chevron, correct?

21 A.  Yes.

22 Q.  By reading that complaint you knew I was a defendant,

23 right?

24 A.  Yes.

25 Q.  You knew Pablo Fajardo was a defendant?

DB48CHE1                        Kohn - cross

1   A.  Yes.

2   Q.  And subsequently you learned that Patton Boggs has been

3   sued by Chevron?

4   A.  Yes.  I have become aware of that.

5   Q.  And you knew at some point that Cristobal Bonifaz has been

6   sued by Chevron?

7   A.  I was aware of that from -- that was unrelated to the

8   action in Ecuador, that was related to some action Mr. Bonifaz

9   commenced in California as I recall, but I know he had been

10  sued in that or there was a claim in that case for sanctions.

11  Q.  You knew that Chevron was the plaintiff in that case?

12  A.  Either plaintiff or the complainant on a sanctions

13  petition.

14  Q.  Do you know a man named Russell Deleon, don't you?

15  A.  I know who he is.  I have spoken to him on the phone.  I

16  never met him.

17  Q.  You know that he was a person who had provided financing to

18  the Ecuador *Aquinda* case, right?

19  A.  Yes.

20  Q.  You know as you sit here today he has been sued by Chevron?

21  A.  I did not know that.

22  Q.  Is it fair to say that the RICO case filed by Chevron has

23  put your law firm under some degree of pressure?

24  A.  I don't view it that way, no.

25  Q.  You haven't felt any pressure from Chevron mentioning your

DB48CHE1                          Kohn - cross

1  name in this RICO complaint?

2  A.  I did not feel pressure, no.  We had been subpoenaed in a

3  1782 case.  We had litigated that.  There were certain costs

4  and efforts that went into preparing the privilege log, etc.,

5  and I understood what the facts were and that they would come

6  out.

7  Q.  You knew, sir, that Chevron could always name your law

8  firm, or I should say amend its complaint to name your law firm

9  as a defendant in the RICO, correct?

10            MS. NEUMAN:  Objection.  Form.

11            THE COURT:  I will allow it.

12  A.  I did not believe they would, because as the records were

13  produced in the discovery, I understood, I knew what we knew

14  and what had been disclosed to us, and I did not believe that

15  they would violate Rule 11 and name us.

16  Q.  You knew they would amend their complaint and name you?

17            MS. NEUMAN:  Objection.  Form.

18  A.  There was a rule about amending complaints.  There are also

19  rules about having factual support.  I knew that.  And there

20  was a deadline for such amendment, which has long since passed,

21  as I understand the schedule in this case.

22  Q.  You understood, did you not, that at the time Chevron filed

23  a RICO complaint, they were seeking money damages from the

24  defendants?

25  A.  Yes.

DB48CHE1                         Kohn – cross

1   Q.   The amount of money damages under the civil RICO statute

2   would treble on the actual damages, you understood that?

3   A.   Yes.

4   Q.   They were suing based on a $19 billion underlying judgment

5   in Ecuador for money damages from defendants?

6           MS. NEUMAN:   Objection.   It misstates the record.

7           THE COURT:   I think it does.   Sustained.   Rephrase it.

8   Q.   You understood they were seeking, at a minimum, billions of

9   dollars of money damages against the defendants in the civil

10  RICO case, correct?

11          MS. NEUMAN:   Objection.

12          THE COURT:   Let me look back at the complaint.   I

13  think that's right.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DB47CHE2                      Kohn - cross

1          THE COURT:  Well, I am afraid that the record in this

2     case is so gigantic that even the computer can't search it very

3     quickly.  But my recollection of the complaint is rather

4     different.  Does anybody have it here?

5          MS. NEUMAN:  Yes, your Honor.

6          MR. DONZINGER:  I will rephrase the question.

7     BY MR. DONZINGER:

8     Q.  Mr. Kohn, what was your understanding of the damages that

9     Chevron was seeking when it filed its RICO complaint?

10          MS. NEUMAN:  Objection.  Relevance.

11          THE COURT:  Overruled.

12    A.  My understanding was they were seeking certain expenses

13    they had incurred in the litigation, defending the underlying

14    case, and I gather -- and also perhaps anything they might have

15    been obligated to pay in Ecuador, although that sort of didn't

16    make sense to me.  If they ultimately determined they have to

17    pay it, then how could it have been something they shouldn't

18    have paid?

19    Q.  But you knew at that time just the amount of money Chevron

20    was spending on the litigation was substantial, correct?

21    A.  Yes.

22    Q.  When Chevron's RICO case was filed, was there a concern

23    among the partnership at Kohn Swift & Graf that this could have

24    a negative impact on the law firm?

25    A.  There was not a concern that the fact of the RICO case had

DB47CHE2                         Kohn - cross

1    changed anything.  There had already been the 1782 proceedings,

2    which had begun in December of 2010.  With respect to our firm,

3    we had already taken certain action with respect to our

4    involvement in the underlying case, so it had been an ongoing

5    issue.

6           The filing of the RICO case was not a particular -- we

7    were not named as a defendant.  There was recitation of its

8    history.  Any lawyer who had ever had any association with the

9    case was named a coconspirator, so ...

10   Q.  Were you surprised when the RICO case was filed?

11   A.  No.  My recollection is that Chevron had been publicly

12   saying that it was getting ready to file such a case.  That's

13   my recollection.  I was not surprised that it had happened.

14   Q.  Well, you did have at least some level of concern for your

15   law firm after the RICO case was filed, correct?

16          MS. NEUMAN:  Objection.  Asked and answered.

17          THE COURT:  Overruled.

18   A.  I was actually somewhat pleased that we were not named as a

19   defendant.

20   Q.  There came a point in time when your law firm was the

21   subject of an article published in the Philadelphia Inquirer

22   about this case, correct?

23   A.  There had been several articles in the Philadelphia

24   Inquirer, I believe.

25   Q.  Do you remember specifically an article published in

DB47CHE2                          Kohn - cross

1    December of 2010 with the title Venerable Center City Law Firm

2    Embroiled in Chevron Fraud Case?

3    A.   I recall an initial article during the 1782 proceedings.

4    If that is the date of that article, then I do recall it.

5              MR. DONZINGER:  Your Honor, I have a copy of this

6    article; I would like to give it to the witness.  I don't have

7    a binder.  Can I just approach and ask him a couple of

8    questions?

9              THE COURT:  Well, the first thing we do is we mark it

10   as an exhibit.

11             MR. DONZINGER:  It's marked as DX 1387.

12             THE COURT:  Defendant's Exhibit?

13             MR. DONZINGER:  Yes.

14             THE COURT:  Let's use the viewer, please.

15             MR. DONZINGER:  I'm sorry.  Say that again.

16             THE COURT:  Use the viewer.  We will see if it works

17   this week.

18             THE WITNESS:  I see it now.

19   BY MR. DONZINGER:

20   Q.   Have you seen this article before?

21   A.   Not in this format.  I saw it in the actual printed paper.

22   Q.   Was it on the front page of the paper, of the Philadelphia

23   Inquirer, when it came out?

24   A.   It may have been either that or the front page of the

25   business section.  I can't recall.

DB47CHE2                          Kohn - cross

1    Q.  And this story -- or I should say this story created --
2    well, let me rephrase.

3           This story created attention to your law firm that you
4    really didn't want.  Isn't that correct?
5    A.  I was not happy with -- well, a story I did not want.  This
6    is not the kind of story one wants to have.
7    Q.  And when you read it, you assumed, didn't you, that someone
8    from Chevron had some involvement in that story being written?

9           MS. NEUMAN:  Objection.  Lacks foundation.  Calls for
10   speculation.

11          THE COURT:  No, I think I will allow it.  It goes to
12   the witness's state of mind.
13   A.  I only have the one page up here.  I don't know if the
14   Chevron people were quoted in this article, in which case --

15          THE COURT:  The question, sir, was whether you assumed
16   that Chevron had some involvement in the story appearing.
17   A.  I don't recall having an assumption one way or the other.
18   Again, if there's quotes in there, I would assume they talked
19   to them.  Beyond that, I have no other assumption that I can
20   remember.
21   Q.  Did this article cause any conversations among your law
22   firm's partnership about how to deal with future negative
23   publicity about Chevron's fraud allegations?
24   A.  Not that I recall, no.
25   Q.  Well, you certainly would want to do everything possible to

DB47CHE2                        Kohn - cross

1   avoid having your law firm's name associated with Chevron's

2   fraud allegations, correct?

3   A.  Yes.

4   Q.  Now, you state in your witness statement that your law firm

5   was pretty much the sole financing entity for the Aguinda case

6   from roughly 1993 to 2007?

7   A.  We were certainly the primary one.  There were some other

8   payments by others, but we were the overwhelming majority, yes.

9   Q.  Now, in your witness statement you testified that I

10  directed your law firm to make payments, isn't that correct?

11  A.  Yes.

12  Q.  You're not testifying that I controlled payments out of

13  your law firm, are you?

14  A.  No.

15  Q.  And you and I did not have a contracted that required you

16  to fund the Aguinda case.

17  A.  No, there was no such contract as between you and I.

18  Q.  So directing your attention to paragraph 37 of your

19  statement.

20  A.  What paragraph again, please?

21  Q.  37.

22  A.  Yes.

23  Q.  When you say at Mr. Donzinger's direction you made a series

24  of wire transfers to Ecuador, that's not accurate, is it, sir?

25  A.  No, it is accurate.

DB47CHE2                    Kohn - cross

1  Q.  Let me rephrase.  Money going out of your law firm to any

2  entity involved in the Aguinda case was a decision that

3  somebody in your law firm made ultimately, correct?

4  A.  Correct, I believe we did, yes.

5  Q.  And there were many times, were there not, where I

6  requested that your law firm fund aspects of the Aguinda case

7  and you refused to fund those aspects, correct?

8  A.  I would not say there were many cases.  Towards the end of

9  the relationship there were several specific instances I recall

10 where you either indicated you had already made a commitment,

11 or you were requesting some other contractor or payment, which

12 we did not agree to proceed with.

13         But in this timeframe, what paragraph 37 is referring

14 to was the monthly agreed-upon procedure for transferring funds

15 to Selva to deal with the ongoing inspection process and the

16 other expenses in litigation.  Those were changed from time to

17 time.  There is e-mails from you with respect to specific

18 amounts.  We had phone calls with respect to specific amounts.

19 And that's what paragraph 37 is referring to.

20 Q.  The wire transfers you refer to in paragraph 37 were wire

21 transfers that you approved personally out of your law firm,

22 correct?

23 A.  Yes.

24 Q.  And I never made a request for your law firm to wire money

25 to any entity related to the Aguinda case without you first

1    reviewing it, isn't that correct?

2    A.  We reviewed the amount, as I understand -- well, yes, we

3    would review the amount, and we would pay it.  We would receive

4    backup for such payments on a delayed basis, which became

5    increasingly delayed over time; so, yes, the fact that the

6    payment, the total amount, was requested, approved, made.  The

7    dispersion of those funds is a different matter.

8    Q.  And you would occasionally have your law firm make payments

9    related to the Aguinda litigation which I knew nothing about,

10   isn't that correct?

11   A.  I'm sure there is some, but certainly the dominant features

12   of the budget were things that you were involved in.  There may

13   have been some other I would categorize them as minor payments

14   that you were not involved.

15   Q.  Do you recognize this individual right here two seats in?

16   A.  I believe that is Mr. Page.

17   Q.  Yes.  And you remember, don't you, that Mr. Page worked in

18   Ecuador around 2005/2006 as an intern on the case?

19   A.  I remember his involvement.  I wouldn't have been able to

20   pin the date down without your reference.

21   Q.  And do you remember at one point I asked on his behalf if

22   you or your law firm could pay Mr. Page and his then partner

23   who was also a lawyer working on the case an amount of money so

24   they could keep working on the case?

25   A.  I remember he did work for a period of time, I remember he

DB47CHE2                          Kohn - cross

1    was paid for a period of time, and I remember that he was sort

2    of in and out.  At some period of time we may have -- so that's

3    my recollection.

4    Q.  You turned down my request that Mr. Page be paid for

5    working on the case at that time, didn't you?

6    A.  I recall that he worked for a period of time.  I do not, as

7    I sit here today, have a specific recollection of turning down

8    or making a decision that for whatever reason we did not choose

9    to pay Mr. Page's time going forward.

10           I thought he was also in and out of school or had some

11   other commitments.  He was in for a period, he's been out for a

12   period, I think he's been back in.  I don't recall a specific

13   decision being made on it.

14   Q.  But that would be the kind of request I would make that you

15   would personally review before granting, correct?

16   A.  Yes.

17   Q.  And you did the same thing with regard to a request I made

18   for reimbursement for expenses of another associate I had named

19   Andrew Woods, correct?

20   A.  Well, Mr. Woods, I just received -- I started receiving

21   invoices from Mr. Woods without having any foreknowledge that

22   Mr. Woods was working on the matter or was working with you.  I

23   inquired about it, and we had some back and forth, and during

24   periods of time we did pay money for Mr. Woods' time, and other

25   times we did not.

DB47CHE2                         Kohn - cross

1   Q.  And when you did not, you were turning down a request I

2   made that he be reimbursed, correct?

3   A.  Correct.

4   Q.  There came another point in time where I made a request

5   that you fund a person who could write op-eds about the case.

6   Do you remember that?

7   A.  Yes.

8   Q.  And you turned down that request, didn't you?

9   A.  Yes, that was one of the things I was referring to in terms

10  of the sort of summer/fall 2009 time period.  That's my

11  recollection.

12  Q.  Now, we always -- you and I would meet on a regular basis

13  from the inception of the Aguinda litigation in Ecuador up

14  until approximately 2009, would you say?  2008?

15  A.  Through November of 2009.

16  Q.  And during that time, a lot of what we talked about was

17  budget issues, correct?

18  A.  Yes, it was some of what we talked about.  It was --

19  Q.  And I was always mindful, was I not, that your firm had

20  limited resources with regard to funding this case?

21  A.  I don't know what you were quote mindful of.  The topic

22  would come up.  We had issues that we discussed about ranges

23  and, you know.

24  Q.  We agreed during those meetings that we were always trying

25  to keep costs at reasonable levels, correct?

DB47CHE2                        Kohn - cross

1    A.  I agreed.  I think there were times when budgets were not

2    followed, and other commitments were made that I would then

3    receive word that this commitment had been made and now we

4    needed to deal with it.

5    Q.  At times you had direct contact with a company called -- or

6    representatives of a company called E-Tech, didn't you?

7    A.  Yes.

8    Q.  And describe your recollection of what E-Tech was?

9    A.  E-Tech was a group of scientists or engineers who were

10   involved in the process both of, as I recall, the judicial

11   inspection phase of the case as well as pulling together the

12   evidence with respect to the final global phase of the case.

13   Q.  Do you remember the names of the individuals who worked for

14   E-Tech?

15   A.  There were some individuals that then also became involved

16   with the Stratus operation, so I can't recall whether

17   Mr. Beltman and Ms. Maest were also with E-Tech, although I

18   thought they had some relationship at one time.  There was a

19   Mr. Champ, and another individual whose name escapes me.

20   Q.  Do you remember a gentleman named Dick Kamp?

21   A.  Yes, I do remember Mr. Kamp.

22   Q.  He was with E-Tech, right?

23   A.  Yes, that was the other name I was thinking of.

24   Q.  And Ann Maest was with E-Tech?

25   A.  There was a transition from E-Tech to Stratus.  Again, I

DB47CHE2                    Kohn - cross

1  don't remember if she was involved with E-Tech as well as

2  Stratus, or substituted.

3  Q.  But it was important to you as a plaintiff's lawyer to

4  understand who the experts were that you were paying to perform

5  technical work in Ecuador, correct?

6  A.  Yes.

7  Q.  And you had conversations with people in E-Tech, before you

8  paid them, about the work they were going to do, correct?

9  A.  Yes.

10 Q.  And some of those conversations concerned issues of budget,

11 where they made requests to you for financing certain

12 activities, correct?

13 A.  Correct.

14 Q.  And you reviewed those requests yourself, didn't you?

15 A.  Yes.

16 Q.  And you did not grant all of the requests that E-Tech made

17 to do technical work in Ecuador, did you?

18 A.  I recall a process of discussing things, and both, you

19 know, with you and I and them either on conference calls,

20 sometimes then separately you and I, over what made sense, what

21 was achievable, what was efficient, and then a conclusion was

22 reached for certain phases.

23          There was a frustration on our part that those budgets

24 were frequently not followed, or upon proceeding with the work

25 or being on the ground, other problems would rear their head or

DB47CHE2                         Kohn - cross

1   other contingencies arose, etc.  So, there was sort of a

2   constant going back and revising and re-evaluating a new

3   request in that process.

4   Q.  And you were very much involved in that process, correct?

5   A.  I was involved in some of those discussions.  I think I

6   found out now there was a number of discussions that I was not

7   aware of.  But I thought -- it was certainly my hope that I was

8   being apprised of the significant ones.  But again there was a

9   sort of frustration that things had happened, or things had

10  changed, and then we had to take certain actions as a result of

11  that.

12  Q.  But you always had access to the American technical

13  advisors that you were paying, correct?

14  A.  Correct.

15  Q.  In terms of talking to them.

16  A.  Correct.

17  Q.  Was the financing of the Aguinda case by your law firm an

18  important activity in your law firm?

19  A.  Yes.

20  Q.  Was the Aguinda case considered by your law firm to be an

21  important litigation relative to the other litigations in your

22  law firm?

23  A.  It was an important case.  One of the most important?  We

24  like to think they are all important, but this was certainly

25  large, and novel, and long-running, and for all of those

DB47CHE2                          Kohn - cross

1   reasons, yes, it was important.

2   Q.  Did you ever have a Spanish-speaking attorney in your law

3   firm during the time you financed the Aguinda case?

4   A.  At the outset of the case in '93 Mr. Malmon was on the

5   case.  He was Spanish speaking.  From the time of 2003 forward

6   we did not have a Spanish speaking attorney in the office.

7   Q.  Did you ever consider hiring a Spanish speaking attorney to

8   help your law firm manage or be involved in the Aguinda case in

9   Ecuador court?

10  A.  I never gave it much consideration because of your

11  involvement, and our relationship, and the time you were

12  spending supervising the matter, and the relationship that I

13  understood that we had.

14  Q.  You didn't pay very close attention to the developments in

15  the Aguinda litigation during the time it was in Ecuador, did

16  you?

17  A.  I did not spend time on the detail of the litigation, the

18  motion practice.  I relied upon your information and reports.

19  I relied on the progress that was being made in the case.  The

20  inspections were going forward.  The inspections were

21  ultimately completed.  And I did not get involved in reviewing

22  particular pleadings or motions up until sort of the beginning

23  of 2009 when our firm did make some requests repeatedly to be

24  more involved in those issues.

25  Q.  Did you ever read any of the pleadings that were being

DB47CHE2                          Kohn - cross

1   filed in the Ecuador court before 2009?

2   A.  I certainly read the initial complaint.  I think I read

3   some of the matters.  There was right away some motion practice

4   by Chevron with respect to whether the proper defendant had

5   been named in that court.  I was involved in some of that.

6   Q.  You know that I was not a lawyer in Ecuador, correct?

7   A.  That was my understanding, that you were not practicing but

8   -- that was my understanding.

9   Q.  You know I did not appear in the Aguinda litigation in

10  Ecuador, correct?

11            THE COURT:  Define appear, Mr. Donzinger.

12            MR. DONZINGER:  Appear formally in court.

13            MS. NEUMAN:  Objection.  Misstates the facts, your

14  Honor.

15            THE COURT:  Sustained.

16            MR. DONZINGER:  Are you talking about my physical

17  presence?  I was obviously around.  I did not appear as a

18  lawyer before the Ecuador court.

19            THE COURT:  I think you better ask a different

20  question, counselor.

21            MR. DONZINGER:  What's that?

22            THE COURT:  You better ask a different question.

23  Q.  You knew I was not the lead lawyer in Ecuador, correct?

24  A.  My understanding was that at the outset of the case Alberto

25  Wray was the quote lead counsel.  You were present.  I think

DB47CHE2                          Kohn - cross

1    Mr. Bonifaz was present for the first phase of that trial.

2              There were other matters that you had related to me

3    where, as I understood, you had some sort of a speaking role in

4    the case.  Whether you were there as a nonlawyer advisor or

5    under some sort of pro hac vice, I didn't get into that detail.

6    But I always understood that either Dr. Wray, or Monica, who

7    was affiliated with his office, and Mr. Fajardo, were, if you

8    would, the lead lawyer; but you were present, you would go to

9    court; you weren't excluded from court proceedings.  But I knew

10   you were not a member of the Ecuadorian bar.

11   Q.  You know I'm not an expert in Ecuadorian law, correct?

12             MS. NEUMAN:  Objection.  Argumentative.

13             THE COURT:  Sustained.

14   Q.  Now, when Alberto Wray -- well, I'll back up.  Who is

15   Alberto Wray?

16   A.  Alberto Wray was an attorney.  He was, as I say, one of the

17   lawyers who filed the case in 2003.  He had also submitted

18   declarations or affidavits with respect to the forum non

19   litigation in the '90S.  He was, as I understood it, a former

20   member of the Ecuador supreme court, a law professor, and I

21   believe he's affiliated with one of the major U.S. law firms

22   now as well.

23   Q.  At the beginning of the Aguinda case he became what in

24   Ecuador was called the *procurador comun*, which means the lead

25   lawyer, correct?  That's your understanding?

DB47CHE2                         Kohn - cross

1    A.   I don't recall hearing that Spanish term.  I remember him

2    being presented as the guy who signed the complaint, the one

3    who stood up in court and made the opening arguments and

4    presented the evidence in the first phase of the trial.

5    Q.   And you were not present during the initial phase of the

6    trial in Ecuador, were you?

7    A.   I was not.

8    Q.   And did you ever have any independent conversations with

9    Alberto Wray during the time that he was the lead lawyer in

10   Ecuador?

11   A.   I was part of some group conversations with him.  I don't

12   recall a one-on-one conversation with him during that time

13   period, but I recall conversations with he, Mr. Bonifaz, you,

14   John Bonifaz, Monica, others.

15   Q.   In general you would rely on others to report to you what

16   was happening with the Ecuador case, correct, during that time?

17   A.   Yeah, that was essentially the agreement we had with Mr.

18   Bonifaz from the beginning of the case, then with Mr. Bonifaz

19   and Mr. Wray.  In the agreements in terms of dividing the

20   responsibilities, we were primarily responsible for U.S.-based

21   litigation; they were responsible for the client relations, the

22   translations.  Then obviously Dr. Wray had his own contract

23   with respect to prosecuting the case in Lago.

24   Q.   You realized at a certain point in time Dr. Wray stopped

25   being the lead lawyer in Ecuador, correct?

DB47CHE2                         Kohn - cross

1   A.  I realized he was no longer going to be the day-to-day

2   lawyer particularly in the inspection phase.  But up until our

3   withdrawal in November of 2009 it was my understanding he was

4   still involved, and it was being represented that if there was

5   sort of a closing argument type of presentation, he would

6   handle that; that he was being consulted with respect to the

7   preparation of sort of a final trial brief; and that he was

8   onboard to argue that or make that presentation to the trial

9   court and any appeals.  But he was not the guy out in the

10  jungle week after week with the inspection process.

11  Q.  And there came a point in time when somebody took Alberto

12  Wray's place, correct?  That was Pablo Fajardo?

13          MS. NEUMAN:  Objection.  Misstates the testimony.

14          THE COURT:  Well, the witness can answer if he knows.

15  A.  Pablo became involved with the day-to-day lawyer in Lago,

16  primarily at the point where the inspections were going

17  forward.  I did not view that he had replaced Dr. Wray, because

18  as I understood it, what I just said, for example, appeals,

19  that would be something Alberto Wray would do, closing

20  argument.

21          But Pablo really, as I understand it, had assumed the

22  role of Monica, who had been a more junior lawyer in Dr. Wray's

23  office, and who was the day-to-day lawyer arguing motions,

24  dealing with issues on the inspection, and she would travel

25  back and forth from Quito.  That became untenable for her, and

DB47CHE2                          Kohn - cross

1    significantly more of an expense than having Mr.Fajardo, who

2    lived in the region, who was represented as hard working and

3    dedicated and capable, and he took on that role of the

4    day-to-day lawyer.

5              THE COURT:  And the Monica to whom you were referring,

6    what was the last name, please?

7              THE WITNESS:  I do not recall her last name.

8              THE COURT:  Was it Parejas?

9              THE WITNESS:  That sounds right.

10             THE COURT:  P-a-r-e-j-e-s, I believe.

11             Go ahead, Mr. Donzinger.

12   Q.  Mr. Kohn, you never met Pablo Fajardo before he became the

13   lawyer in the role you just described, did you?

14   A.  No.

15   Q.  And you know what a judicial inspection is, don't you?

16   A.  I have an understanding of it.  You're not an expert on

17   Ecuadorian law; I'm not an expert on Ecuadorian law, but I

18   understand the process that occurred.

19   Q.  You know judicial inspections were a critical part of the

20   evidence gathering process in Ecuador, correct?

21   A.  Yes.

22   Q.  And you never attended a judicial inspection, did you?

23   A.  I did not.

24   Q.  And you never met any of the Ecuadorian technical experts

25   on the plaintiff's team during the Aguinda case, did you?

DB47CHE2                         Kohn - cross

1    A.  I don't believe so, unless at the meeting in the fall of

2    2007, the several days in Quito, there were some of those

3    folks.

4            We certainly reviewed a lot of the -- or was shown

5    records that were developed during the inspection process, and

6    there was an individual who was sort of like the librarian, if

7    you will, of those documents.  Now, whether that person also

8    was one of the technical experts or not, I don't remember.

9    Q.  When you saw those records, what did you conclude after you

10   looked at them?

11           MS. NEUMAN:  Objection.  Relevance.  Form.

12           THE COURT:  I'm looking at you, Mr. Donziger.

13           MR. DONZINGER:  I'm trying to show if Mr. Kohn had a

14   belief at that point that the case was a bona fide litigation.

15           THE COURT:  Sustained.

16   Q.  As you sit here today, can you name one Ecuadorian

17   technical expert that was employed by the plaintiffs in the

18   Aguinda case?

19   A.  There was a gentleman, Camino Castro, who was briefly

20   involved or involved for some period of time.

21   Q.  Camino Castro?

22   A.  I believe that was his name.  It was an individual who

23   worked for a time period, and then he was unhappy that he was

24   no longer working, or he was discharged and brought some claim

25   in Ecuador which was denied.

DB47CHE2                        Kohn - cross

1    Q.  Other than him, you can't name anybody?

2              MS. NEUMAN:  Objection.  Argumentative.

3    A.  No.

4              THE COURT:  Sustained.

5              How much longer do you expect to be, Mr. Donzinger?

6              MR. DONZINGER:  It's hard to estimate.  It depends

7    on --

8              THE COURT:  Do your best.  Do your best to estimate,

9    please.

10             MR. DONZINGER:  To estimate?  To speed up?  To

11   estimate?

12             THE COURT:  To estimate.

13             MR. DONZINGER:  At most an hour.

14             THE COURT:  All right.  We will take a break.

15             (Recess)

16             THE COURT:  All right.  Let's continue.  You may

17   proceed, Mr. Donzinger.

18             MR. DONZINGER:  Thank you.

19   JOSEPH KOHN, resumed.

20   CROSS-EXAMINATION (Continued)

21   BY MR. DONZINGER:

22   Q.  Mr. Kohn, you don't know the Ecuador civil code provisions

23   on which the Aguinda lawsuit that was filed in Ecuador are

24   based, do you sir?

25   A.  I saw references to them in the complaint, but I do not

1    know them or purport to be knowledgeable about them.

2    Q.  And do you know that the issues related to the fraud

3    alleged by Chevron in this case implicate questions of Ecuador

4    law, isn't that correct?

5              THE COURT:  Sustained.

6              MR. DONZINGER:  Can I be heard?  I think this is

7    important, if I may.

8              THE COURT:  All right.  Briefly.

9              (At the side bar)

10             THE COURT:  Mr. Donzinger?

11             MR. DONZINGER:  He spends a lot of time in his witness

12   statement talking about how he was completely dependent on me

13   for judgments he was making about the case in Ecuador and for

14   information he was receiving.  I want to show and establish

15   that he could have and probably should have taken his own steps

16   to do due diligence and not just rely on me.  What I can

17   establish in this line of questioning, which will be very

18   short, is just going to undermine his credibility for saying

19   some of the things he is saying in his witness statement on

20   this issue.

21             MS. NEUMAN:  Your Honor, what Mr, Kohn should have

22   done is not relevant.  Here Mr. Kohn did in fact rely on Mr.

23   Donzinger, and he testified that Mr. Donzinger lied to him and

24   misled him.  So, whether Mr. Donzinger would have been

25   successful in doing that had Mr. Kohn done more due diligence

DB47CHE2                          Kohn - cross

1   doesn't seem to be relevant.

2           THE COURT:  And your response is?

3           MR. DONZINGER:  First of all, I despite with the

4   characterization that I lied to him.  But his whole basis to

5   draw the conclusions he draws, the main conclusions that I was

6   lying to him and he was therefore funding a fraudulent lawsuit

7   were based on not only his reliance on me but the fact he did

8   virtually nothing on his own to check out what was going on

9   with the Ecuador case.

10          I just want to establish through a couple of questions

11  that he could have done some very simple things to get his own

12  information independent of me.  I think that's very relevant.

13          THE COURT:  The question to which the objection was

14  sustained was not in my view a proper question.  The ruling on

15  that question stands.  We will see where we go.

16          (In open court)

17          THE COURT:  Next question, please.

18  BY MR. DONZINGER:

19  Q.  Sir, did you or your law firm ever consider hiring an

20  Ecuador law expert to advise you on Ecuador law issues relating

21  to the Aguinda litigation?

22  A.  Yes.

23  Q.  And did you ever hire an Ecuador law expert?

24  A.  We did engage a professor Gidi or Gidi.  G-i-d-i is the way

25  he spelled his name.  He was -- so for a brief period of time

DB47CHE2                          Kohn - cross

1    in 2009 is my recollection.

2    Q.   And is this individual American, I mean in the United

3    States?

4    A.   He was in the United States.  At that time it was my

5    understanding that he was Brazilian by birth, and he was

6    visiting as a professor, I believe, at a U.S. law school or

7    university during that time.

8    Q.   And did this professor Gidi actually advise your law firm

9    on questions of Ecuadorian law?

10   A.   He tried to, and we started a process, but that coincided

11   with the roadblock of our inability to get a meeting or

12   meaningful discussions with you and the lawyers in the Ecuador

13   legal team about the status of the case, the pending motions,

14   what was taking the time to get to a conclusion, what were the

15   procedures with respect to bringing the case to finality, which

16   were all the reasons we wanted to engage that gentleman or

17   someone with those abilities.

18   Q.   Before 2009 your firm never hired an Ecuador law expert to

19   advise you on issues related to the Aguinda case, did it?

20   A.   Not separate from Dr. Wray and to a certain extent, lesser

21   extent, Dr. Bonifaz.  But I certainly viewed Dr. Wray as an

22   expert in Ecuadorian law, and I had discussions with him with

23   respect to the overall outline of the proof and the process in

24   Ecuador, which appeared to be moving forward on a slow pace but

25   moving as he outlined it to me in the 2003/2004 time period.

DB47CHE2                         Kohn - cross

1    Q.  But your law firm never hired an Ecuador law expert to

2    advise you on what you were being told by any Ecuadorian lawyer

3    on this case, on the Aguinda case, correct?

4    A.  Not prior to 2009, other than what I have already testified

5    to.

6    Q.  And you knew that the Aguinda case in Ecuador has a public

7    record that's available for anyone to inspect, right?

8    A.  That was my understanding, yes.

9    Q.  The conclusions you draw in your witness statement do not

10   rely on any independent assessment of Ecuador law issues, do

11   they?

12   A.  No.

13   Q.  You law firm never hired an Ecuador law expert to do an

14   independent analysis to determine whether any of Chevron's

15   claims about fraud were true or not, correct?

16   A.  Correct.

17   Q.  And to this day, apart from what Chevron has pled and

18   argued, you don't know independently, for example, whether the

19   process that created the Cabrera report was in conformity with

20   Ecuador law or not, right?

21   A.  I have an understanding that it appeared not to be because

22   of the denials of that process by members of the plaintiffs'

23   team when the issue was raised.

24           On the other hand, it is my understanding that no

25   court in Ecuador has yet said it was improper.  So I have those

DB47CHE2                              Kohn - cross

1    competing facts, and I have not reached a conclusion about what

2    the Ecuadorian courts might ultimately determine.

3    Q.  So, your testimony is that you do not know of a single

4    decision from any court in Ecuador that the process that

5    created the Cabrera report was fraudulent, correct?

6              MS. NEUMAN:  Objection.  Relevance.  Scope.

7              THE COURT:  Sustained.  It's effectively been

8    answered, and it's argumentative.

9    Q.  Have you read the Cabrera report, sir?

10   A.  I have read portions of it.  I have not read every page of

11   it.

12   Q.  Do you have any reason to dispute that the science in the

13   Cabrera report is anything other than valid?

14   A.  Yes, I do.

15             MS. NEUMAN:  Objection.

16             THE COURT:  The objection is sustained; the answer is

17   stricken.

18   Q.  Directing your attention to paragraph 12 of your witness

19   statement.

20   A.  Yes, sir.

21   Q.  Do you see there you testified that around 2005 or 2006 --

22   I'm sorry -- you say on the bottom, the last sentence of your

23   paragraph, you say that I -- from 2005 onwards I was the person

24   primarily responsible for making day-to-day decisions in the

25   management of the case.  Correct?

DB47CHE2                          Kohn - cross

1    A.  Yes, among those.  That's a portion of the sentence, but,

2    yes, that was correctly read.

3    Q.  And you still believe that today?

4    A.  Yes.

5    Q.  Now, you know that during the time period between the

6    filing of the Aguinda case in Ecuador and when you effectively

7    were no longer counsel to the Ecuadorian community-- I believe

8    that was 2010, correct?  Well, when did your law firm cease

9    becoming counsel to the Ecuadorian community?

10   A.  It was a letter that I sent in November of 2009, I believe

11   it was the 17th or it may be the 27th of November, where we

12   stated our position that given everything set forth in that

13   letter, we could no longer function as counsel.

14        I sent several other letters and communications to the

15   plaintiffs as events unfolded in the U.S., to try to bring

16   their attention to it, and stated our position and possible

17   involvement going forward.

18   Q.  Do you consider your letter to the Ecuadorian clients of

19   November 17, 2009 an effective withdrawal of your law firm from

20   the Aguinda case?

21   A.  Yes, I do.  It so states.

22   Q.  So, between the time the Aguinda case was filed in Ecuador

23   and the effective withdrawal of your law firm from the case in

24   November of 2009, you knew that I took many trips to Ecuador,

25   right?

DB47CHE2                         Kohn - cross

1    A.  Yes.

2    Q.  And you knew that because I would tell you.

3    A.  Yes.

4    Q.  And I would also submit invoices for those trips, and you

5    would reimburse me, correct?

6    A.  Yes, sir.

7    Q.  And you know during that period of time I was going down to

8    Ecuador usually at least once a month, correct?

9    A.  Yes.  Sometimes more, sometimes less.

10   Q.  And obviously since you were only down there one time, you

11   did not observe what I was doing on the vast, vast majority of

12   those many trips I took, correct?

13   A.  Correct.  I would receive reports, but I did not personally

14   observe it since I was not there.

15   Q.  And other than that one trip you took in 2007, you never

16   sat in on any strategy session with the Ecuadorian legal team,

17   did you?

18   A.  There were several discussions in the U.S. that I

19   participated in or sat in.  One I recall -- well, so there were

20   several in the U.S., but none in Ecuador other than the one in

21   2007.

22   Q.  And other than the one trip you took to Ecuador when we

23   were together, you never observed any interaction I had with

24   Pablo Fajardo in Ecuador, correct?

25   A.  Not in Ecuador, correct.

DB47CHE2                        Kohn - cross

1    Q.  Or any other member of the Ecuadorian legal team, correct?

2    A.  Correct.

3    Q.  And other than what you could glean from what others would

4    tell you, you had no personal knowledge of how day-to-day

5    decisions were being made in Ecuador with regard to the Aguinda

6    litigation, correct?

7    A.  That is correct.  You know, we reposed tremendous

8    confidence -- I did personally -- in your abilities and your

9    integrity and your supervision of the matter.  We would receive

10   reports, and the case was progressing as reported.  And there

11   was litigation in the U.S. that had been spawned by that, which

12   we reviewed those materials as well.

13   Q.  Now, when I would work on the Aguinda case -- well, you

14   knew during this period of time I was working either full-time

15   or close to full-time in the Aguinda case, correct?

16   A.  Yes.

17   Q.  And you knew that the times I was not in Ecuador I was

18   usually in New York or somewhere in the United States?

19               MS. NEUMAN:  Objection.  Lacks foundation.

20               THE COURT:  Overruled.

21   A.  Yes, I understood that you lived in New York but that you

22   might have also traveled to other places, but, yeah, primarily

23   that was your work location when not in Ecuador.

24   Q.  And other than our meetings now and again and usually in

25   Philadelphia, you never knew what I was doing in New York day

DB47CHE2                      Kohn - cross

1    to day working on the Aguinda case, did you?

2    A.   Not in the sense of a day to day.  I believed during that

3    time period that I was getting a fair and accurate assessment

4    of the tasks at hand; and if, for example, there were issues

5    with respect to the litigation before Judge Sand, we would talk

6    about those.  If there was issues with respect to the progress

7    of the inspections, we would talk about those.  If there was

8    some proposal for a new or different public relations firm to

9    work on the matter, we would talk about that.  But I didn't get

10   day-to-day or, you know, hour-to-hour reports of how you were

11   spending your time.

12   Q.   Those interactions were usually by phone or e-mail,

13   correct?

14   A.   Primarily phone, secondarily meeting in person, and e-mail

15   third, I would say.

16   Q.   You never have been to my New York law office, have you,

17   sir?

18   A.   No.  As I understood, during that time period you had an

19   office in your apartment or in your home.

20   Q.   You have never been to my apartment, have you?

21   A.   No, sir.

22   Q.   Now, there came a point in time in 2009 when you sent a

23   letter to the client representatives in Ecuador proposing that

24   they consider a settlement with Chevron, correct?

25   A.   There was not a quote settlement to consider.  It was some

DB47CHE2                         Kohn - cross

1    advice or guidelines I gave with respect to a settlement

2    process or a negotiation.  Excuse me.

3    Q.  Now, you sent -- well, do you remember the letter?

4    A.  Yes, I do.

5    Q.  Would it help if I gave you a copy?  Because I'm going to

6    ask you a few questions about it.

7    A.  I remember, but if you want to put it up here.

8            MR. DONZINGER:  Your Honor, this is PX 1184.

9            THE COURT:  Put it on the viewer.

10           MR. DONZINGER:  I have copies.  It looks like it's on

11   the viewer, but I have hard copies.  I don't need to deal with

12   the hard copies.

13           THE COURT:  I think that's right, at least at the

14   moment.

15   Q.  Now, in this letter you proposed on page 2 -- if I'm

16   reading it correctly -- that you said we should approach

17   Chevron to see if a settlement can be reached before the end of

18   the year.  Right?

19           THE COURT:  Well, we are not going to do responsive

20   readings, Mr. Donzinger.  You've got it on the screen.  If you

21   want to invite his attention to that and then go on and ask a

22   question about it, please feel free.

23   Q.  Page 2, please.

24   A.  Yes, I see it.

25   Q.  So, at that time you were proposing to the clients that

DB47CHE2                         Kohn - cross

```
1    they authorize you to approach Chevron for settlement, correct?
2    A.  I was suggesting that they think about it, not necessarily
3    to authorize me, but to authorize someone or some group to
4    proceed as I had recommended, yes.
5    Q.  And you thought at that point in time in the history of the
6    Aguinda case it was propitious to approach Chevron, right?
7              MS. NEUMAN:  Objection.  Relevance.
8              THE COURT:  What's the relevance?
9              MR. DONZINGER:  I would rather not say in front of the
10   witness.
11             THE COURT:  Then come to the side bar.
12              (At the side bar)
13             THE COURT:  What's the relevance?
14             MR. DONZINGER:  First of all, it's hard to argue that
15   I am trying to orchestrate an extortion of a settlement with
16   Chevron if the person who is funding the case is proposing to
17   go get a settlement.  That's number one.
18             THE COURT:  If what?
19             MR. DONZINGER:  If the person who is funding the case
20   is proposing to approach Chevron for settlement.
21              The second issue is this goes to the core of why I
22   believe we can establish he withdrew from the case and turned
23   on me, because he very much wanted to achieve an early
24   settlement that a number of clients considered too low, and I
25   wanted to establish that fact through a couple of questions.
```

DB47CHE2                       Kohn - cross

1    It would be very fast.

2               THE COURT:  What's the response?

3               MS. NEUMAN:  Your Honor, this timeframe is prior to

4    any 1782s, it's prior to any contact between Mr. Kohn and

5    Chevron, and it's prior to him discovering the underlying

6    facts.  So, the facts that he is recommending to his clients, a

7    settlement of a piece of litigation at this point in time, does

8    not appear to me to be probative of anything.

9               THE COURT:  Well, as to the first of the arguments, I

10   am unpersuaded.

11              As to the second of the arguments, if the theory is

12   that he turned on Mr. Donzinger -- if that's the way Mr.

13   Donzinger wants to characterize it -- because of a spurned

14   settlement proposal or strategy rather than some other reason,

15   I think I will allow that within limits.

16              (In open court)

17              THE COURT:  The objection is overruled.

18              THE WITNESS:  Sorry.  Could the reporter reread the

19   question?

20              THE COURT:  Yes.  Could the reporter please read the

21   question back.

22              (Record read)

23   A.  I thought for all the reasons set out in the letter it was

24   one of the times, and, yes, that was a time to, for those

25   reasons, to make a phone call, or try to set up a meeting, or

DB47CHE2                      Kohn - cross

1    have some discussion among the plaintiffs to determine how best

2    to proceed.

3    Q.  And you sent this letter to Luis Yanza and Pablo Fajardo?

4    A.  Yes, sir.

5    Q.  By e-mail?

6    A.  I believe so, possibly with a paper copy as well.

7    Q.  You didn't copy me on this letter, did you, sir?

8    A.  I would have to look at the cc at the bottom, but you are

9    not an addressee.

10            MR. DONZINGER:  Can you show the last page, please.

11   A.  It appears I did not send a copy to you.

12   Q.  And you knew that when you would send correspondence to the

13   clients in Ecuador in English, that you knew there was somebody

14   in the office who was bilingual who can could translate it for

15   its intended recipients, correct?

16   A.  My recollection is I sent a Spanish translation with it.

17   We had a paralegal in our office at that time who was fluent in

18   Spanish, but it may be that I did not send with this letter.  I

19   know with some of the correspondence in that time period I

20   would send an English version and our own translated version,

21   not a certified translation but a translation.

22   Q.  And there were times you asked someone in the Quito office,

23   like Juan Pablo Saenz, to translate your English correspondence

24   into Spanish for Pablo Fajardo and Luis Yanza?

25   A.  I do not recall having a discussion with Juan Pablo about

DB47CHE2                         Kohn - cross

1    that.  My recollection is either we would send the translation,

2    or we simply sent an English version and assumed it would be

3    translated.

4    Q.  And how would your law firm translate it?  Did you have

5    someone inhouse who speaks Spanish?

6    A.  During that period of time there was a paralegal named

7    Sophia Lopez, who is in some of the documents, who was fluent

8    in Spanish.

9    Q.  And Mr. Yanza and Mr. Fajardo responded to this letter at a

10   certain point, correct?

11   A.  Yes.

12   Q.  And what was their response?

13   A.  Their response was in writing, and it was --

14            THE COURT:  Well, if it's in writing, I will see it.

15            MR. DONZINGER:  Your Honor, DX 1390 is the response,

16   but unfortunately it's in Spanish, and we do not have a

17   translation.  Can I just elicit -- I think Mr. Kohn had it

18   translated in his law firm and can answer questions about the

19   response.

20            THE COURT:  Well, let's see what we can accomplish.

21            MR. DONZINGER:  OK.

22            MS. NEUMAN:  Your Honor, we have not previously seen a

23   copy of this document and don't have a translation of it.

24            THE COURT:  May I see a hard copy, please.

25            Ms. Neuman, was this document called for by Chevron's

DB47CHE2                         Kohn - cross

1   document request?

2            MS. NEUMAN:  Yes, your Honor, it would have been

3   responsive.

4            THE COURT:  Any dispute about that, Mr. Donzinger?

5            MR. DONZINGER:  I'm having a hard time believing I

6   didn't produce this to them.

7            THE COURT:  Well, you don't see the Bates numbers on

8   it, do you?

9            MR. DONZINGER:  Maybe I didn't.  I mean, I was relying

10  on my then counsel to turn over what I thought was everything,

11  so...

12           THE COURT:  And when you refer to your then counsel,

13  which counsel are you talking about?

14           MR. DONZINGER:  Bruce Kaplan.

15           THE COURT:  So that was in the 1782 proceeding several

16  years ago.

17           MR. DONZINGER:  I believe so.

18           THE COURT:  And then there was another document

19  request in this case, is that right?

20           MR. DONZINGER:  Yes.  And again I turned over all my

21  stuff to my then counsel in this case, John Keker.  So, I don't

22  know why this would not have been produced.  Maybe it just fell

23  through the cracks.  I don't know.

24           THE COURT:  And you are saying this was in your

25  possession in this case?  Is that right?

DB47CHE2                          Kohn - cross

1           MR. DONZINGER:  Actually I can't say that, because it

2    was sent to Mr. Kohn.  I'm not even copied on it.  I don't know

3    if I have it.  I assume.

4           THE COURT:  Well, where did you get it from for the

5    purpose of bringing it into this courtroom today?

6           MR. DONZINGER:  I don't know.  I rely on people who

7    help me with documents.  I don't manage documents hardly at

8    all.  I don't know where I got it.

9           THE COURT:  Did you get this from Ecuador?

10          MR. DONZINGER:  It's quite possible, but I don't know

11   for sure.  I don't know.  I mean I don't know.  I mean just so

12   you know, when I made my production I had many, many, many

13   documents from Ecuador in my production.

14          THE COURT:  Back in 2010 and '11.

15          MR. DONZINGER:  Yeah.  And I assume also with what the

16   Keker firm produced in this case.

17          THE COURT:  My memory firm is that the Keker firm made

18   it abundantly clear on many occasion that they were not going

19   to produce so much as a single gum wrapper that was in Ecuador,

20   notwithstanding the orders of this court.

21          MR. DONZINGER:  This letter predates --

22          THE COURT:  Oh, I see the date on it, but it doesn't

23   say anything about when it came into your possession in New

24   York.

25          Why don't you proceed with your examination of the

DB47CHE2                        Kohn - cross

1    witness, and we will deal with this document if, as and when it

2    is offered.

3    BY MR. DONZINGER:

4    Q.  Mr. Kohn, you remember getting a response from the clients

5    to your letter, correct?

6    A.  Yes.

7    Q.  And that response is in writing?

8    A.  Yes.

9    Q.  Do you remember if that response was in Spanish?

10   A.  I believe so.  And again my recollection is that Ms. Lopez

11   in our office provided a translation to me and the other

12   lawyers in our firm.

13   Q.  And so you read the response in English after it was

14   translated?

15   A.  Yes.

16   Q.  And what did the response say to your letter about

17   settlement?

18   A.  It was a paragraph, a short paragraph, that simply said we

19   have discussed this with the plaintiff communities, and we do

20   not desire to discuss or approach settlement with Chevron at

21   this point in time; we are confident they will come to us at

22   some point.  And it also I believe expressed confidence in the

23   outcome of the litigation.  That was the first paragraph.  Then

24   there was the body of the letter that dealt with other issues

25   in terms of the management of the case, dealing with the

DB47CHE2                        Kohn - cross

1    multiple requests we had made to meet with the legal team to

2    get an understanding of every pending motion, what were the

3    responses, how could we work together to bring the case to a

4    successful conclusion.  It dealt budget issues.  It basically

5    stated that the plaintiffs were designating you as the sole

6    decision maker, the sole lead counsel, if you will -- it used

7    U.S. nomenclature -- and our role would be to continue to fund

8    an undefined budget that they estimated to be a million dollars

9    a year or more.  They raised certain issues about slowness in

10   our payment of certain bills over time, or that we had not

11   funded certain things or met certain commitments.

12         They made a point that we had been asking for backup

13   material for the monthly payments we had been making, and they

14   said they found that insulting that we were asking for such

15   backup, because it meant we didn't trust them.

16         And that then resulted in my letter of November 17th,

17   which was both a statement of where we stood in particular

18   response to a number of points in their letter.

19         (Continued on next page)

20

21

22

23

24

25

DB48CHE3                    Kohn - cross

1   Q.  In their response, they never said you couldn't contact

2   Chevron for settlement, they always said they couldn't do it

3   without their authorization, correct?

4           MS. NEUMAN:  Objection.  Best evidence.

5           THE COURT:  Sustained.

6   Q.  You then sent a letter in English back to them in response,

7   correct?

8   A.  Again, my recollection is I did provide a Spanish

9   translation at that point, but I could be wrong about that, but

10  my recollection is I did.

11  Q.  I am going to refer you to Plaintiff's Exhibit 1187, which

12  is a letter sent from Joe Kohn to Luis Yanza and Pablo Fajardo,

13  dated November 19, 2009.

14          This is a correspondence you sent directly to the

15  clients in Ecuador without going through me, correct?

16  A.  It was sent directly to them.  I don't know whether you

17  were CC'd on this one.

18  Q.  In this letter, you called the position of the clients with

19  regard to the idea of a settlement --

20          THE COURT:  Excuse me.  Just a second.

21          I think there was a transcription error with respect

22  to the witness's answer.

23          The question a moment ago was:  This is a

24  correspondence you sent directly to the clients in Ecuador

25  without going through me?

DB48CHE3                         Kohn - cross

1          Please repeat your answer.

2   A.   It was directly to Mr. Yanza and Mr. Fajardo, but I do

3   believe there is a CC to Mr. Donziger.  I believe we sent it to

4   the three people simultaneously.

5          THE COURT:  Go ahead.

6          MS. NEUMAN:  Our screen is not working.

7          THE COURT:  Mr. Donziger, please proceed.

8   Q.   In this letter that you sent, dated November 19, you

9   characterized the position of Mr. Yanza and Mr. Fajardo with

10  regard to a possible settlement approach to Chevron as naive

11  and impractical?

12         THE COURT:  Draw his attention to the passage.  We are

13  not going to have him just read it back to you, either by

14  affirming your reading or otherwise.

15  Q.   Directing your attention to the bottom of page 2 of your

16  November 19 letter.  Do you see that?

17  A.   Yes.

18  Q.   You see where it says, "A. Settlement"?

19  A.   I do see that paragraph.

20  Q.   At that point you were telling the clients that your advice

21  to them with regard to settlement was better than mine?

22         THE COURT:  Your Honor, it says what it says.  The

23  answer is stricken.  Move on.

24  Q.   Do you recognize in this part of the letter that I do not

25  have a lot of experience as a civil litigant, correct?

DB48CHE3                          Kohn - cross

1          THE COURT:  Mr. Donziger, we set up these ground rules

2     in the pretrial conference before the trial started.  You're

3     entitled to draw his attention to the passage, and then if you

4     have a new question, you may ask it.  But you just can't try to

5     get a characterization of what is already on the page.  That's

6     for closing argument.

7     Q.  What was the basis for your belief at that time that

8     Chevron would be open to a settlement?

9     A.  The November 10 letter.

10          THE COURT:  Is there an objection or not?

11          MS. NEUMAN:  Yes, your Honor.  Objection.  Relevance.

12     Speculation.

13          THE COURT:  Sustained.

14          It doesn't help to stand up halfway, Ms. Neuman, and

15     kind of bob.

16          MS. NEUMAN:  Understood.

17     Q.  At the time you sent this letter about settlement to the

18     clients, your firm was experiencing a rough patch economically,

19     was it not?

20     A.  I don't know that it was any rougher than any other year in

21     the time period we have talked about.  We are primarily a

22     contingency fee firm.  We have peaks and valleys.  I would

23     have -- I don't know if there was any particular, quote, rough

24     patch at that moment or that time.

25     Q.  Is it fair to say your firm would have made a substantial

DB48CHE3                    Kohn - cross

1     fee had the settlement number you proposed in your letter had

2     been accepted by Chevron at that time, correct?

3     A.  We had agreements with the clients, with the other lawyers,

4     yes, that with that number the clients would have had

5     tremendous relief, the lawyers would have been paid, and it

6     would have been a result, as I state in my letter, that

7     everyone could be proud of achieving, and I stand by the

8     recommendations and the advice that I provided at that time to

9     the clients.

10    Q.  You know that about, I don't know, roughly 15 months after

11    you sent that letter there was a judgment handed down in

12    Ecuador in favor of the plaintiffs, correct?

13    A.  Right.

14    Q.  Do you know the amount of that judgment was roughly between

15    8 and 9 billion dollars in actual damages?

16         THE COURT:  Mr. Donziger, this is all very

17    interesting, but everybody knows the amount of the judgment,

18    and so does the witness, and you can make your closing argument

19    when the time comes.

20    Q.  There came a point in time, Mr. Kohn, in the next year,

21    2011 --

22    A.  2010 you mean.

23    Q.  I apologize.  2010.  When you had a meeting with client

24    representatives in your office in Philadelphia?

25    A.  I recall that, yes.

DB48CHE3                        Kohn - cross

1   Q.  That was, roughly, in April of 2010?

2   A.  Yes.

3   Q.  Who was at that meeting?

4   A.  Mr. Fajardo was there, Mr. Yanza was there, Mr. Humberto

5   Piaguaje was there.  I was there.  Mr. Glazer in our law firm

6   was there and Mr. Hillwig in our law firm was there.  And Ms.

7   Lopez who acted as a translator.

8   Q.  Mr. Glazer was a lawyer in your law firm?

9   A.  Yes.

10  Q.  So was Mr. Hillwig?

11  A.  Yes.

12  Q.  I was not present at that meeting, was I?

13  A.  No.

14  Q.  At that meeting, did you feel constricted in any way in

15  terms of what you could talk to the Ecuadorians about?

16  A.  No.

17  Q.  At that point you preferred to meet with the Ecuadorians

18  without me present, didn't you?

19  A.  I had been requesting an opportunity to meet with them

20  separately.  I had met with you separately shortly before that

21  with Mr. Susman and some other people from your office.  Would

22  I have also met with you there if you had asked for it?  I

23  suppose I would have, but I was perfectly happy to go ahead on

24  this basis.

25  Q.  In that meeting in April of 2010, you had discussions with

DB48CHE3                    Kohn - cross

the Ecuadorians about creating a role for your law firm in the
*Aquinda* litigation, right?

A.   Not as you state it.  I gave them my best advice that the
case appeared to be running over a cliff.  I reported that I
had stated directly to you at the meeting a week or two or
three earlier that I believed you should withdraw from the case
in a definitive and public manner, that there should be a
smooth transition to other counsel.  I said our firm was happy
to meet with them, to try to introduce them to capable U.S.
lawyers who could fill that role.  I gave them my reasons for
making those recommendations.

     I asked them specifically about what was transpiring
in the 1782 proceedings involving Stratus in Denver, and that I
had concern about that given my meeting with you and the
conversation that I had with another attorney at the
Constantine firm.  Yes, we were open to doing something to try
to salvage this case in a way that would be appropriate and
lawful and ethical, and I recall I left them with some other
materials from some other firms that I had contacted or
discussed in a general way about the litigation.

Q.   At the time of that meeting in April of 2010, your firm
still maintained its economic interest in the *Aquinda*
litigation, didn't it?

A.   We had reserved all rights, as I say in the letter of
November 19.

DB48CHE3                        Kohn - cross

1    Q.  To try to get more concrete about it, in April of 2010 when

2    you met with the Ecuadorians in your office, your firm still

3    maintained at that point its economic interest, whatever it may

4    have been, in the *Aquinda* litigation?

5    A.  We reserved all of our rights to assert those interests at

6    any time we deemed.

7    Q.  At that point?

8    A.  Yes.

9    Q.  Now, at that meeting you told the Ecuadorians that you

10   thought the case had gone off the rails, or something to that

11   effect?

12   A.  Yes.  I think Mr. Yanza used the expression of, the lawsuit

13   is like a train running down a track, it's been going a long

14   way, and I said you're about to drive it over a cliff.

15   Q.  Subsequent to that comment, you know that the Ecuadorian

16   trial court issued a judgment against Chevron, correct?

17              MS. NEUMAN:  Objection.

18              THE COURT:  Sustained.

19   Q.  Now, you would agree, wouldn't you, Mr. Kohn, that it would

20   be unethical to seek a percentage of the recovery in the

21   *Aquinda* case if you believe the case is fraudulent, correct?

22   A.  Yes.

23   Q.  You have already stated that your law firm has renounced

24   any claim it might have over attorneys' fees in the *Aquinda*

25   litigation, correct?

DB48CHE3                    Kohn - cross

1    A.  Yes.  And expenses as well.

2    Q.  And expenses?

3    A.  Yes.

4    Q.  Didn't you say in your witness statement that you were

5    still seeking recovery for expenses?

6    A.  I do not believe my witness statement says that.  I believe

7    I testified at the deposition that we are no longer seeking or

8    have waived any possible right to expenses, and there is a

9    writing to the client so confirming.  I believe the statement

10   may say, quote, fees without specifying expenses as well.

11   Q.  I apologize.  Do you know what paragraph in your statement

12   that you talk about that?

13           THE COURT:  Maybe there is something that needs to be

14   clarified first.

15           Mr. Kohn, whatever it is that you said, did it apply

16   to fees from the plaintiffs in the Ecuadorian litigation, did

17   it apply to a possible recovery against Mr. Donziger

18   personally, or did it apply to both?

19           THE WITNESS:  It only applied as to any recovery that

20   the plaintiffs obtained in the underlying lawsuit.

21           THE COURT:  Did I understand you earlier today,

22   correct me if I am wrong, to say that you either have a lawsuit

23   against Mr. Donziger personally or that you have reserved the

24   right to bring one?

25           THE WITNESS:  I testified that we commenced an action

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB48CHE3                          Kohn - cross

 1   in state court under procedures in Pennsylvania.  That action

 2   has been withdrawn in light of a tolling agreement that has

 3   been entered into.

 4              THE COURT:  By tolling agreement, explain what you

 5   mean.

 6   A.  An agreement to hold any statute of limitations issues in

 7   abeyance until such time as either party determines to withdraw

 8   from the tolling agreement.

 9              THE COURT:  So do I understand correctly that it is

10   your view that you still have the right to bring a claim

11   against Mr. Donziger personally for damages quite apart from

12   any right to participate in any recovery in the Ecuadorian

13   case, is that accurate?

14              THE WITNESS:  Yes, sir.  Not only Mr. Donziger, but

15   any of the law firms.

16              THE COURT:  Let's go on, Mr. Donziger.

17   BY MR. DONZIGER:

18   Q.  You and I signed a fee sharing agreement in 2008?

19   A.  Yes.

20   Q.  This fee sharing agreement that we signed memorializes a

21   split in attorneys' fees from any recovery that my company

22   recovers?

23              MS. NEUMAN:  Objection.  Best evidence.

24              I believe it's Plaintiff's Exhibit 2352.  And we have

25   also located a copy of DX 1390 with a Donziger Bates stamp on

DB48CHE3                    Kohn - cross

1   it, and a translation, your Honor.

2            MR. DONZIGER:  Is that the previous letter?

3            THE COURT:  It is.

4            MR. DONZIGER:  Does that mean I can use it?

5            THE COURT:  I assume it doesn't have your Bates stamp

6   on it otherwise.

7   Q.  With regard to our agreement between you and me, or your

8   law firm and my law firm, do you still maintain as you sit here

9   today that you have a claim against any attorneys' fees I might

10  recover personally from any recovery in the *Aquinda* case?

11  A.  I believe our firm has disavowed any claim to fees received

12  in the case.  I think Judge Kaplan has stated our position that

13  we reserve our rights with respect to possible damages or

14  claims that we have suffered.  But I have waived -- our firm

15  has waived any claim to share in legal fees recovered that you

16  might ultimately recover in the underlying case.

17  Q.  Do you still consider the agreement signed between your

18  firm and my firm in 2008 to be a valid agreement?

19  A.  It was valid at the time.  I think it imposed certain

20  duties and obligations on the party to that contract.  I have

21  said we have waived any claim to fees that the plaintiffs might

22  ultimately recover, but I am not going to say that that's

23  somehow a nullity or null and void or we have no rights that

24  might pertain to that document in some future litigation.

25  Q.  As you sit here today, in your opinion, is that document

DB48CHE3                       Kohn - cross

1   valid?

2            MS. NEUMAN:  Objection.  Relevance.

3            THE COURT:  Sustained.

4            Obviously, given the history between the witness and

5   Mr. Donziger, it's not surprising that some of these questions

6   possibly go to some future lawsuit that may or may not be

7   brought.  But let's try to confine it to this lawsuit.  We are

8   having enough trouble doing one at a time.

9   Q.  You hired Steve Susman to represent your interests with

10  regard to -- one of the things you hired Steve Susman for was

11  to represent your interests with regard to any fee recovery you

12  might have in the *Aquinda* litigation?

13  A.  We retained Mr. Susman and his firm to advise us and

14  represent us in connection with all issues in November of 2009.

15  I did not know what the future held, and I wanted his advice

16  and counsel for all the reasons that he is a great lawyer.

17  Q.  Mr. Susman sent a correspondence to me in January 2010,

18  correct?

19  A.  I recall there was some back and forth with correspondence

20  between you or your lawyer and Mr. Susman.

21  Q.  At a certain point you authorized Mr. Susman to communicate

22  with my counsel in an effort to achieve a settlement of your

23  claims regarding the *Aquinda* case, correct?

24  A.  I know there were discussions with respect to a resolution.

25  I don't know whether it was with your counsel.  There was

 1  another firm that was involved that Mr. Susman had some
 2  relationship with, and he had some preliminary discussions
 3  with.
 4  Q.  And those discussions related to you receiving a monetary
 5  payment in exchange for the settlement of all of your
 6  outstanding fee claims against the *Aguinda* litigation?
 7  A.  I think those discussions were related to our expense
 8  payments that we had made by the time Mr. Susman got involved,
 9  but I couldn't be sure.  It was some payment from which we
10  would resolve and forever waive any and all claims relating to
11  the underlying litigation, relating to you, other people, and
12  you would be free to try to get new firms into the case, and we
13  would go on.
14  Q.  These discussions took place in late 2011, didn't they?
15  A.  I cannot place it.  My recollection is they were earlier,
16  but I could be wrong.
17  Q.  They were in 2011 at some point, right?
18  A.  My recollection is they were 2010, but they could have
19  continued.  I know at one point Mr. Susman spoke to
20  Mr. Schmeiser.  I don't know when that took place.
21  Q.  At some point Mr. Susman told you that his conversations
22  with Mr. Schmeiser had produced an actual number that would be
23  acceptable to me and the Ecuadorian plaintiffs as regard to
24  settlement of the claims, correct?
25  A.  I don't recall that it ever crystallized.  There was some

DB48CHE3                         Kohn – cross

1   bandying about with numbers.  What I recall Mr. Susman telling

2   me, and again, not to waive my privilege --

3          MS. HAMILL:  Objection.  This is getting into

4   privileged areas.

5          THE COURT:  It certainly seems that way to me.

6          Why not, Mr. Donziger?

7          MR. DONZIGER:  Should I say it in front of the

8   witness?

9          THE COURT:  If you want a side bar, you know how to

10  ask for it.  Do you want a side bar?

11         MR. DONZIGER:  Yes.

12         THE COURT:  All right.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DB48CHE3                          Kohn - cross

1              (At the side bar)

2              THE COURT:  Why isn't it privileged, Mr. Donziger?

3              MR. DONZIGER:  Mr. Kohn holds himself out to be a

4    highly ethical lawyer, and the fact that he was willing to go

5    as far as to get an actual number that I believe he was willing

6    to accept to settle all his claims goes directly to the issue

7    that he did not believe that this is a fraudulent lawsuit,

8    which is what he asserts in his witness declaration.

9              THE COURT:  Ms. Hamill.

10             MS. HAMILL:  Two things.  One is the time period of

11   those discussions was well before many things came out in this

12   litigation, which absolutely sealed the deal in terms of the

13   fraud here.  And the way that your questions are being phrased,

14   you're going into what Mr. Susman told Mr. Kohn in connection

15   with settlement discussions and it's absolutely privileged.

16             THE COURT:  Anyone else want to be heard on this?

17             MS. NEUMAN:  No, your Honor.

18             THE COURT:  Objection sustained.

19             You are just going directly into the attorney-client

20   communications.

21             (Continued on next page)

22

23

24

25

DB48CHE3                              Kohn - cross

1              (In open court)

2              THE COURT:  Objection is sustained.

3    BY MR. DONZIGER:

4    Q.   There came a point in time, sir, in 2011 when you were

5    willing to accept some amount of money in exchange for release

6    of all the claims you had against the *Aquinda* case, correct?

7    A.   Yes.  I think there was some discussion in the realm of

8    some fraction of the out-of-pocket expenses was the range that

9    was bandied about.  It never got to a serious discussion.

10   Q.   But the release would also include your claim on attorneys'

11   fees?

12   A.   Yes.  I believe the firm had stated we were not seeking

13   fees at that time.

14   Q.   Now, you testified that you and I signed a tolling

15   agreement?

16   A.   Yes.

17   Q.   Is there a reason you did not attach the tolling agreement

18   to your witness statement?

19   A.   I did not think it had anything to do with the testimony

20   that I was being asked pursuant to the subpoena to offer.

21   Q.   The tolling agreement was executed, was it not, in May of

22   2012?

23              MS. NEUMAN:  Objection.  Best evidence.

24              THE COURT:  Overruled.

25   A.   I don't recall the date.  That sounds the approximate time.

DB48CHE3                         Kohn - cross

1            MR. DONZIGER:  I am going to offer DX 1388.  Can I
2    give copies?
3            THE COURT:  I am looking at it right on the screen
4    here.
5            Ms. Neuman, is there any objection to Exhibit 1388?
6            MS. NEUMAN:  I have not seen it before, but I don't
7    think I have any objection.
8            THE COURT:  Do you want to look at it first?
9            MS. NEUMAN:  I would like to take a moment to look at
10   it, your Honor.
11           No objection.
12           THE COURT:  1388 is received.
13           (Defendants' Exhibit 1388 received in evidence)
14   Q.  Have you had a chance to review it?
15   A.  Yes, I have.
16   Q.  That's the tolling agreement -- tolling and standstill
17   agreement signed by you and the respective counsel?
18   A.  Yes.
19   Q.  The date it was signed by me was May 9, 2012, correct?
20           THE COURT:  If you are asking whether that's what it
21   says, it's an unnecessary question.  And if you're asking if he
22   has personal knowledge of when you put your signature on it, I
23   have a feeling we are not going to find out from this witness.
24   Q.  This agreement was executed in May 2012, correct?
25   A.  It appears to be, yes.

DB48CHE3                         Kohn - cross

1   Q.  This agreement tolls any claims you might have against me

2   for reimbursement of your litigation costs or the money you

3   spent on funding the *Aquinda* litigation?

4           THE COURT:  It speaks for itself, Mr. Donziger.

5   Q.  This tolling agreement is still in effect, isn't it, sir?

6   A.  Yes.

7   Q.  You have never terminated this tolling agreement, have you?

8   A.  No.

9           THE COURT:  Not if it's still in effect.

10  Q.  So based on this tolling agreement as of today, you are

11  still asserting, at least against me, your claims for

12  attorneys' fees from the *Aquinda* litigation, aren't you?

13          MS. NEUMAN:  Objection.  Asked and answered.

14          THE COURT:  Sustained.

15  Q.  Directing your attention to paragraph 25 of your witness

16  statement.

17  A.  Yes.

18  Q.  How could this tolling agreement not be relevant to the

19  issues you're discussing in paragraph 25?

20          MS. NEUMAN:  Objection.  Argumentative.

21          THE COURT:  Sustained.

22  Q.  Is there a reason you didn't disclose the tolling agreement

23  when you put together your witness statement?

24          MS. NEUMAN:  Objection.  It misstates his statement

25  and the evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB48CHE3                        Kohn - cross

1           THE COURT:  I don't think it does that.  I think the

2    question was asked and answered a little earlier.  At page 84

3    of the draft transcript of today.

4           You're up, Mr. Donziger.  The objection was sustained.

5    Q.  Sir, how did you decide what documents you wanted to attach

6    to your witness statement and what documents you wanted to

7    exclude?

8           MS. HAMILL:  Objection.  Privileged to the extent it

9    relates to any communication with counsel.

10          THE COURT:  Exclude from your answer, Mr. Kohn,

11   anything that would disclose the substance of any

12   communications with counsel.  As modified, you may answer.

13   A.  It was a process, as I have described earlier, of working

14   with my lawyers, who knew the facts, who knew the case, who

15   knew my testimony, and my judgment of what were the subject

16   matters for which I had been subpoenaed, for which the

17   statement is prepared in the first instance.  It is in lieu of

18   direct testimony.  So we worked through the deposition and we

19   went through this.  I believe I testified about this at the

20   deposition as well.

21   Q.  One of those issues, though, in the subpoena was your fee

22   arrangements of the *Aquinda* plaintiffs, correct?

23   A.  There is some reference to it in the document, yes.

24   Q.  Just one final area.  In November of 2009, you sent a

25   settlement letter to the Ecuadorian plaintiffs, correct?

DB48CHE3                         Kohn - cross

1   A.  Correct.

2   Q.  You also sent a second letter after they responded that

3   they don't wish to pursue settlement?

4   A.  Yes.

5   Q.  In their letter to you, they made numerous complaints about

6   what they felt was the failure to make timely payments to

7   sustain litigation?

8   A.  Yes, they did.

9            MR. DONZIGER:  No further questions.

10           THE COURT:  Mr. Gomez.

11           MR. DONZIGER:  Just one little housekeeping.

12           During Mr. Kohn's testimony, I asked a couple of

13   questions that Chevron objected to and you sustained the

14   objection, and I don't feel like I made an adequate proffer.

15   Can I just make one?  It will take me all of 15 seconds.

16           THE COURT:  OK.

17           MR. DONZIGER:  Mr. Kohn testified he saw data -- when

18   he was in Ecuador on that one trip, he was shown data or

19   reports, technical reports, from our team in the Quito office.

20   Then I believe I asked him what did he get from those reports,

21   what data?  At that point, there was an objection that I

22   believe was sustained by the Court, and I want to make a

23   proffer as to what I think Mr. Kohn would testify to had he

24   been allowed to answer that question.

25           THE COURT:  Let's find the question first.

DB48CHE3                           Kohn - cross

1           I believe the question that you're referring to was on

2    page 51 of the draft transcript of today's proceedings.  And

3    the witness immediately before that said in response to a

4    question, the substance of which isn't pertinent, "I don't

5    believe so, unless at the meeting in the fall of 2007, several

6    days in Quito, there was some of those folks.  We certainly

7    reviewed a lot of the -- or were shown records that were

8    developed during the inspection process, and there was an

9    individual who was sort of like the librarian, if you will, of

10   those documents.  Whether that American was one of the

11   technical experts, I don't remember."

12          Question -- and this is the one to which I sustained

13   the objection -- "When you saw those records, what did you

14   conclude after you looked at them?"

15          What is your proffer as to what he would have said he

16   concluded after looking at them, if indeed he did any more than

17   cast his eye over a bookshelf full of them for all I know?

18          MR. DONZIGER:  My proffer is that he would have

19   concluded that that data showed that scientific data produced

20   by the plaintiffs in the *Aquinda* case in Ecuador showed levels

21   of contamination that exceeded Ecuadorian norms.  And he also

22   would have testified that Chevron's data from the *Aquinda*

23   litigation from soil samples would have shown exceedings of

24   Ecuadorian norms in contamination.

25          THE COURT:  Mr. Kohn, would you have testified to any

DB48CHE3                          Kohn - cross

1    of that if I had overruled the objection?

2            THE WITNESS:  My recollection is refreshed having had

3    this exchange.  Certainly, the statements that counsel just

4    made with respect to what data showed, I do recall those facts.

5    Whether it was from that meeting, from other meetings, or from

6    the materials we submitted to a mediation which was occurring

7    right at that time, we had a mediation brief that made those

8    allegations.  So as part of that broader process, I can recall.

9    What I said just from that day looking in the office, I

10   couldn't say one or way or the other.

11           THE COURT:  Anything else, Mr. Donziger?

12           MR. DONZIGER:  In light of the fact that you got into

13   that area, can I ask more questions about it?

14           THE COURT:  Within limits.

15   BY MR. DONZIGER:

16   Q.  You referred to a document that was I believe used in a

17   mediation?

18   A.  Yes.

19   Q.  What was that mediation?

20   A.  When?

21   Q.  What was the mediation, who was it between?

22   A.  It was between the plaintiffs and Chevron.

23   Q.  What year was that?

24   A.  It began in 2007, and there were sessions with the mediator

25   in November of 2007, and it continued thereafter.

DB48CHE3                    Kohn - cross

1   Q.  Did the plaintiffs in the *Aquinda* case have documents

2   prepared for that mediation that summarized sampling data that

3   was being produced in the *Aquinda* trial in Ecuador?

4            MS. NEUMAN:  Objection.  Relevance.

5            THE COURT:  Did you read any such documents, Mr. Kohn?

6            THE WITNESS:  Yes, I did.

7            THE COURT:  Documents that plaintiffs had prepared?

8            THE WITNESS:  That plaintiffs prepared with respect to

9   mediation, yes, I did, and I participated in the mediation.

10           THE COURT:  Go ahead.

11  Q.  Can you tell us what the conclusions were with respect to

12  any documents you read in preparation for that mediation with

13  respect to contamination levels in Ecuador?

14           MS. NEUMAN:  Objection.  Lack of foundation,

15  relevance.  Best evidence.

16           THE COURT:  You want to be heard?

17           MR. DONZIGER:  This goes to the issue of Kohn's state

18  of mind.

19           THE COURT:  Which is relevant for this purpose for

20  what reason?

21           MR. DONZIGER:  Because Chevron is claiming that all

22  the money it put in for the entirety of the case is not

23  justified because the case was a fraud.  There came a point in

24  time, I believe, when Mr. Kohn began to believe, based on facts

25  that happened after this year when this mediation took place,

DB48CHE3                       Kohn - cross

1    that the case was a fraud.

2            In 2007, he read documents, I believe, and he will

3    testify that this was a bona fide case and that we were winning

4    the case and there was very significant or overwhelming

5    evidence to show that they had contaminated the rainforest in

6    Ecuador, and I would like him to be able to testify to that.

7            MS. NEUMAN:  I don't think this witness has any

8    expertise to interpret scientific or technical data in any

9    respect in the way that Mr. Donziger is describing.

10           In addition, on the issue of relevance, the complaint

11   makes quite clear, and I think Mr. Kohn's witness statement

12   makes quite clear, that he was defrauded with regard to the

13   Calmbacher and Cabrera frauds, and that he would not have

14   funded Stratus ghostwriting of the Cabrera report if he knew

15   that was what they were doing.  He would not have funded the PR

16   campaign if he had known it was all lies.  It's not the

17   allegation of him being defrauded from the outset.  The fraud

18   allegations as to Mr. Kohn are very time specific.

19           THE COURT:  The objection is sustained.

20           MR. DONZIGER:  For the record, the characterizations

21   that Ms. Neuman just made, I dispute every one of them, and I

22   think the witness would not agree with the characterizations

23   just made.  I think the Court would be better served if you

24   heard from the witness.

25           THE COURT:  The objection is sustained.  We are not

DB48CHE3                    Kohn - cross

1    trying the Ecuadorian pollution case and you are not going to

2    get it in the back door through this witness.

3              MR. DONZIGER:  I offer it for his state of mind.

4              THE COURT:  I understand that.  And when you and he

5    tee off some day in some distant courtroom I hope, should that

6    ever occur, you can have at it, but not now and not here.

7              Mr. Gomez, anything for this witness?

8              MR. GOMEZ:  Yes, your Honor.

9              THE COURT:  Give me an idea how long you expect to be.

10             MR. GOMEZ:  I would say at least a half an hour.

11             THE COURT:  Go ahead.

12   CROSS-EXAMINATION

13   BY MR. GOMEZ:

14   Q.  Mr. Kohn, when you received the subpoena from Chevron to

15   testify in this case, did that subpoena identify subject

16   matters or topics upon which you would be required to testify?

17   A.  I do not believe it did.

18   Q.  Did you receive any instructions from anyone other than

19   your attorney -- I will withdraw that.

20             Did you receive any instructions from Chevron's

21   attorneys as to what to include or not include in your witness

22   statement?

23             MS. NEUMAN:  Objection.  Asked and answered.

24             THE COURT:  Sustained.  At length, Mr. Gomez.

25   Q.  Has Chevron reimbursed you or your firm for any expenses

DB48CHE3                         Kohn – cross

1    incurred in responding to the document production in the 1782

2    proceeding?

3    A.  No.

4    Q.  Has Chevron reimbursed you or your firm in any way for the

5    investment you made in the Lago Agrio litigation?

6    A.  No.

7    Q.  Has Chevron reimbursed you or your firm in any way for any

8    expenses it incurred to prepare your testimony in this case?

9    A.  No, sir.

10   Q.  Sir, how much has your firm incurred in attorney fees

11   responding to the requests in the 1782 proceedings?

12           MS. NEUMAN:  Objection.  Relevance.

13           THE COURT:  Why is that relevant, Mr. Gomez?

14           MR. GOMEZ:  I would like a side bar, your Honor.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DB48CHE3                          Kohn – cross

1              (At the side bar)

2              MR. GOMEZ:  Your Honor, the amount of money the firm

3      has incurred in responding to 1782 proceedings and preparing

4      for testimony is an incentive that the Kohn firm has to get

5      this behind them as quickly as possible and to cooperate with

6      Chevron as much as possible to achieve that end and reduce its

7      costs and be done.  I think it's relevant to the extent of the

8      cooperation Mr. Kohn has given in this case, and I think we

9      should be able to elicit that kind of information.

10             THE COURT:  You're going to get an answer to this

11     question and then you're done with it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DB48CHE3                        Kohn - cross

1              (In open court)

2              MR. GOMEZ:  I will rephrase my question.

3    BY MR. GOMEZ:

4    Q.  Mr. Kohn, what is the total amount of fees that your firm

5    has incurred responding to Chevron's request either in the 1782

6    proceeding, in depositions, or in this matter?

7              MS. NEUMAN:  Objection.  Relevance.

8              THE COURT:  Overruled.

9    A.  I don't know the precise amount.  It is substantial.  There

10   was a lot of work.  Certainly -- I have a general recollection

11   or general knowledge, but I don't have it to the penny.

12   Q.  Can you estimate if we are talking about hundreds of

13   thousands of dollars or more than a million dollars in fees?

14   A.  It's hundreds of thousands of dollars.

15   Q.  Is it more than half a million in fees to the best of your

16   knowledge?

17             THE COURT:  OK, Mr. Gomez, you have made your point.

18   Move on.

19   Q.  Sir, what was your understanding of Pablo Fajardo's role in

20   the litigation in Lago Agrio?

21   A.  He was an attorney for the plaintiffs and became the prime

22   and a courtroom lawyer for the plaintiffs, primarily with the

23   judicial inspection process, where the courtroom was out in the

24   field at these various well sites.

25   Q.  In 2009, when you were exchanging correspondence with him

DB48CHE3                           Kohn - cross

1    and Mr. Yanza, such as, for example, your letter regarding your

2    settlement proposal, what was his role at that time?

3    A.   The same as I have described, counsel, day-to-day lawyer in

4    the case for the plaintiffs.

5    Q.   Wasn't it true that he was the lead lawyer in Ecuador in

6    2009?

7               MS. NEUMAN:   Objection.   Asked and answered.

8    Argumentative.

9               THE COURT:   Sustained as to form.

10   Q.   Was Pablo Fajardo in 2009 the lead lawyer in charge of the

11   Lago Agrio litigation, sir?

12   A.   He was a lawyer who was a day-to-day lawyer running the

13   case.   I don't believe there is a term or an order of lead

14   counsel the way we use that term in our litigations in the

15   United States.   As I understood it, he was an important lawyer.

16   He was the one who was running the thing on a day-to-day basis.

17   He was the one who had the relationship with the client groups

18   and was looked to for their advice.   I also understood that Dr.

19   Wray was still involved in participating or would be available

20   to participate going forward.

21   Q.   Was he the principal lawyer to speak on behalf of the

22   clients during the judicial inspections in 2009?

23               MS. NEUMAN:   Objection.   Asked and answered.

24               THE COURT:   Yes.   It would be quicker if he answers it

25   once more.

DB48CHE3                         Kohn - cross

1    A.  Yes, and thereafter.  The inspections ended and he was

2    continuing a role as the principal spokesperson.

3    Q.  Was he the attorney responsible for making the final

4    decisions to what legal positions to take in the litigation in

5    2009 in Ecuador?

6              THE COURT:  Do you know that, Mr. Kohn, one way or the

7    other?

8              THE WITNESS:  I do not know the answer to that

9    particular question as phrased.

10   Q.  What was Luis Yanza's role in the litigation in 2009?

11   A.  Luis Yanza had been a founding participant in the Frente,

12   in the community organization that was both a beneficiary slash

13   party of the 2003 case.  He was, as I understood it, a

14   respected leader of the various constituencies and community

15   groups and indigenous groups that formed together to pursue

16   this case and other matters.  They had other projects and

17   matters that they worked on separate from the lawsuit.  I

18   understood he was an accountant by training and that he really

19   was kind of the executive director, if you will, of the Frente.

20   Q.  Why did you address your letters to Pablo Fajardo and Luis

21   Yanza?

22   A.  Because to me they were the principal contacts with Mr.

23   Donziger to then the other people in the Ecuadorian legal team

24   and communities.  They had been represented to me as the

25   leaders of that project in its broadest sense.  I had met both

DB48CHE3                        Kohn - cross

1    of them and communicated with them.  I spent some time with

2    them.  They had participated in the mediation which began in

3    November 2007.  They were present in Washington for those

4    sessions.  And to me after Mr. Donziger they were the next

5    contacts in line that I had interfaced with in the case.

6    Q.  Did Pablo Fajardo and Luis Yanza have more direct contact

7    with the plaintiffs in the Lago Agrio litigation than Mr.

8    Donziger?

9              MS. NEUMAN:  Objection.  It lacks foundation.

10             THE COURT:  Sustained.

11   Q.  Do you know whether Pablo Fajardo or Luis Yanza had more

12   direct contact with the plaintiffs in the Lago Agrio litigation

13   than Mr. Donziger?

14             THE COURT:  Do you know of your own personal knowledge

15   by virtue of having observed?

16   A.  To a certain extent, I did have personal observations, and

17   I also learned from communications.

18             THE COURT:  What people told you?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  You want to try again, Mr. Gomez.

21   Q.  What did you observe that gave you the understanding that

22   Pablo Fajardo and Luis Yanza had the most direct contact with

23   the plaintiffs in the Lago Agrio litigation?

24             MS. NEUMAN:  Objection.  It misstates the testimony.

25             THE COURT:  Sustained as to form.

DB48CHE3                         Kohn - cross

1    Q.  Did you ever observe Pablo Fajardo and Luis Yanza have more

2    direct contact with the Lago Agrio plaintiffs than Mr.

3    Donziger?

4    A.  Yes.

5    Q.  Please describe your observation.

6    A.  As to Mr. Yanza, in addition to the time I was in Ecuador

7    in 2007, I was there on several occasions when the case was

8    pending in the Southern District of New York, and he, A, lived

9    there; B, he would join meetings with myself and Mr. Bonifaz

10   and Mr. Donziger, accompanied by other plaintiffs and other

11   leaders of the different communities or indigenous groups.

12   When he travelled to the United States on occasion with certain

13   smaller groups of the plaintiffs to attend some of the hearings

14   in the Southern District, he was with them.  He coordinated

15   their activities.  He spoke to them.  For all those reasons, he

16   was from those groups.  Mr. Donziger, despite the amount of

17   time he was spending there, was not.

18   Q.  What about Mr. Fajardo, did you make similar observations

19   as to him?

20   A.  He came into the picture later.  I did not interact with

21   him as much, but I would place him in the same way as I

22   described for Mr. Yanza.  He would arrive at a meeting with

23   other plaintiffs; he was their neighbor, spoke their language,

24   etc.

25   Q.  Did Humberto Piaguaje have direct contact with the Lago

DB48CHE3                    Kohn - cross

1  Agrio plaintiffs?

2  A.  I believe he did.

3  Q.  You have met with Humberto Piaguaje, is that correct?

4  A.  Yes.

5  Q.  What was your understanding of his role with respect to the

6  Lago Agrio litigation?

7            MS. NEUMAN:  Objection.  Relevance.

8            THE COURT:  Sustained.

9  Q.  Do you know Alejandro Ponce Villacis?

10  A.  Yes, I have met him.

11  Q.  Who is he?

12  A.  He is an attorney who, as I understand it, lives and

13  practices in Quito, who was one of the counsel or was involved

14  as a lawyer for the plaintiffs in the Ecuador case for some

15  limited period of time.

16  Q.  Do you remember that period of time, sir?

17  A.  It was in or about the time of the mediation we have been

18  talking about.  Some before that, and I think it ended shortly

19  thereafter.  I believe it just ended shortly thereafter.

20  Q.  Do you know whether Pablo Fajardo took instructions from

21  Mr. Ponce Villacis or was it the other way around?

22            MS. NEUMAN:  Objection.

23            THE COURT:  Or was it some other alternative?

24  Sustained as to form.

25  Q.  Do you know whether Mr. Alejandro Ponce Villacis reported

DB48CHE3                     Kohn - cross

1      to Mr. Fajardo?

2      A.  I do not know.

3      Q.  Sir, I would like to direct your attention to your letter

4      that has been marked as Plaintiff's Exhibit 1184.

5           Specifically turning to the second page of your

6      letter, the second full paragraph, you write the following

7      sentence:  "That is a range that would provide sufficient funds

8      for major remediation, pit clean up, health care, water

9      treatment and other remedies."  Do you see that sentence, sir?

10     A.  Yes, I do.

11     Q.  What were you referring to there when you speak of a "major

12     remediation, pit clean up, health care, water treatment and

13     other remedies"?

14          MS. NEUMAN:  Objection.  Relevance.  The document

15     speaks for itself.

16          THE COURT:  I think the last objection is correct.

17     Sustained.

18          MR. GOMEZ:  Your Honor, there is an allegation in this

19     case that the defendants engaged in sham litigation.  As part

20     of that allegation, under the docket 720 in this case, one of

21     the components is that defendants fabricated what they claimed

22     were expert findings.

23          Mr. Kohn's letter suggests that he has knowledge of

24     conditions and remedies that would be necessary, and I think

25     that those are probative to the issue of whether defendants

DB48CHE3                     Kohn - cross

1    fabricated this particular evidence.  And I think I should be

2    allowed to question Mr. Kohn as to his personal knowledge about

3    items he mentions in letters that he wrote.

4              MS. NEUMAN:  The specific fabricated evidence is not

5    generic in the way that Mr. Gomez is describing it.  In

6    addition, the fact that Mr. Kohn may or may not have had

7    opinions outside his area of expertise don't seem at all

8    relevant.  This isn't even offered for his state of mind.

9              THE COURT:  And this was, to my recollection, ruled

10   out of the case months ago, was it not?

11             MS. NEUMAN:  Yes, your Honor.

12             THE COURT:  Many months ago.

13             MS. NEUMAN:  Many.

14             MR. DONZIGER:  Your Honor --

15             THE COURT:  I am speaking to Mr. Gomez.

16             MR. GOMEZ:  Your Honor, I think there hasn't been this

17   sufficient precision as to the fabrication or the extent of

18   fabrication.  It's our view that plaintiffs are attempting to

19   show that everything has been fabricated including, quite

20   frankly, the existence of real clients in the case.

21             THE COURT:  Well, Mr. Gomez, if that's your argument,

22   the objection is sustained.

23   BY MR. GOMEZ:

24   Q.  Mr. Kohn, the clients in Ecuador are not just a list of

25   fictitious names, is that correct?

DB48CHE3                         Kohn - cross

1   A.  To my knowledge, they are not fictitious names.

2   Q.  The plaintiffs in the Lago Agrio litigation are real

3   people, correct?

4   A.  That was certainly my understanding.

5   Q.  And you have met some of those people, isn't that correct?

6   A.  Yes, I have.

7   Q.  And they are actual people who, to your knowledge, are

8   affected by the actions of Chevron, is that correct?

9            MS. NEUMAN:  Objection.  Relevance.

10           THE COURT:  Sustained.

11           MR. GOMEZ:  There are allegations in the complaint --

12           THE COURT:  Possibly you didn't hear me.  Go on.

13  Q.  Turning to the next page of the same correspondence, Mr.

14  Kohn, in the paragraph marked with item number 1.

15  A.  It's not yet on my screen.

16  Q.  It's 1184, same exhibit, Plaintiff's Exhibit 1184.

17           It's the third page, the paragraph that is marked as

18  item number 1.  Towards the bottom you write the following

19  sentence:  "No amount of public pressure or press coverage will

20  convince Chevron to pay a settlement if it gets a favorable

21  legal decision on a dispositive issue."

22           Mr. Kohn, what did you mean by that?

23  A.  I think it speaks for itself.  I stand by it.  You could

24  have all the press conferences and scream outrage as much as

25  you wanted.  At bottom, this was a lawsuit, and if Chevron won

DB48CHE3                         Kohn - cross

1     the lawsuit, or got some sort of favorable ruling, they weren't

2     going to offer you 100 cents in settlement, let alone the kind

3     of recommendation I was making to consider in this letter.

4     Q.  So your understanding at the time was it didn't matter what

5     was said in the press, or how many public relations campaigns

6     there were, Chevron was not going to settle this case, is that

7     correct?

8              MS. NEUMAN:  Objection.  It calls for speculation.

9     Lack of foundation.  It misstates the letter.

10             THE COURT:  That was the opinion he expressed.

11    Q.  What was your basis for expressing that opinion Mr. Kohn?

12    A.  30 years --

13             MS. NEUMAN:  Objection.

14    A.  -- of litigation.

15             THE COURT:  I think you just got your answer.

16    Overruled.

17    Q.  Turning to the next page of the same correspondence, Mr.

18    Kohn, the paragraph labeled as number 2, the last sentence in

19    that paragraph, sir.  Would you please read that to yourself?

20             Why did you refer to the Exxon Valdez case in this

21    correspondence?

22    A.  For a variety of reasons or a number of reasons.  It was a

23    matter that I had discussed or raised with these gentlemen when

24    we were discussing at other times.

25    Q.  Which gentlemen?

DB48CHE3                         Kohn - cross

1    A.  The addressees on this, Mr. Yanza, Mr. Fajardo, and

2    co-counsel.

3          Obviously, it's a case involving a very large verdict

4    against an oil company, and I was pointing out that -- well, it

5    speaks for itself, but that was the reason I referred to that

6    case.  It's well-known case.

7    Q.  Did you see similarities between the Exxon Valdez case and

8    the Lago Agrio litigation, sir?

9          MS. NEUMAN:  Objection.

10         THE COURT:  Sustained.

11         Go to your next subject, sir.

12   Q.  Mr. Kohn, you testified that you didn't send a copy of this

13   letter to Mr. Donziger.  Is it fair to say that you excluded

14   Mr. Donziger because you understood that both Pablo Fajardo and

15   Luis Yanza were in the best position to convey to the clients

16   in Lago Agrio your proposal for settlement of the case?

17         MS. NEUMAN:  Objection.  Form.

18         THE COURT:  Overruled.

19   A.  Yes.  I thought I had -- the reason I sent it directly to

20   them is I had had these kind of conversations sometimes with

21   them, but to a greater extent with Donziger.  I had had a

22   meeting fairly recently before this letter with just myself and

23   Donziger when I raised these very issues.  In that meeting

24   Donziger said, well, maybe you should send a letter to the

25   clients and to, quote, vet this, which is what I did.  I don't

DB48CHE3                    Kohn - cross

1    understand why I didn't also copy him as I did on the letter a

2    week later.  But there was no consciousness that they were the

3    better ones to communicate with.  That was the reason why I

4    structured it that way.

5    Q.  But it was your understanding, was it not, if someone was

6    going to persuade the client to engage in settlement

7    discussions, the best people to do that would be Pablo Fajardo

8    and Luis Yanza, isn't that correct?

9                MS. NEUMAN:  Objection.

10               THE COURT:  Overruled.

11   A.  I didn't make the decision of who was best.  I knew they

12   had to be involved; they had a very important role to play.  I

13   thought they would also very much look to Donziger, and I was

14   hoping they would also look to and want to hear my advice.

15   Q.  Do you know one way or the other whether the clients in the

16   Lago Agrio litigation paid greater attention to the

17   recommendations of Mr. Fajardo or Mr. Yanza than Mr. Donziger?

18               THE COURT:  Is that question intended to elicit his

19   view as to each one of the 47 plaintiffs individually, or a

20   majority view, or what else?

21               Could you please phrase a question that has a

22   meaningful answer, should you get one?

23   Q.  Sir, do you know whether the leaders of the plaintiffs'

24   group were more likely to be persuaded to engage in settlement

25   discussions if the request or proposal came from Mr. Fajardo or

DB48CHE3                        Kohn - cross

1     Mr. Yanza as opposed to Mr. Donziger?

2                MS. NEUMAN:  Objection.  Form.

3                THE COURT:  Sustained.

4     Q.  Were the clients in the Lago Agrio litigation more likely

5     to follow your advice if it was communicated through Mr.

6     Fajardo or Mr. Yanza than through Mr. Donziger?

7                MS. NEUMAN:  Objection.  Form.

8                THE COURT:  Sustained.

9     Q.  Did you believe that the clients in the Lago Agrio

10    litigation would be more willing to entertain settlement

11    discussions if those discussions were proposed through Mr.

12    Fajardo and Mr. Yanza as opposed to Mr. Donziger?

13                MS. NEUMAN:  Objection.  Form.

14                THE COURT:  Sustained.

15    Q.  Sir, I would like to direct your attention to Plaintiff's

16    Exhibit 1187.

17                MR. GOMEZ:  Can we have that on the screen, please?

18                THE COURT:  Is there a question?

19                MR. GOMEZ:  I am waiting for the document to go up.

20    Q.  Mr. Kohn, do you have before you Plaintiff's Exhibit 1187?

21    A.  Yes.

22    Q.  I would like to direct your attention to the sentence

23    marked item number 1, the key points you're summarizing?

24    A.  Yes.

25    Q.  Can you describe for us whether you had the utmost respect

DB48CHE3                         Kohn - cross

1     for Mr. Fajardo and Mr. Yanza at the time that you wrote this

2     letter, November 19, 2009?

3               MS. NEUMAN:  Objection.  Relevance.

4               THE COURT:  Sustained.

5               It's just not a useful exercise that question, Mr.

6     Gomez.  You don't persuade somebody of anything, if it actually

7     is your opinion, by saying I have no respect for your

8     standpoint.

9               Let's move on from there.

10              How much longer, Mr. Gomez?

11              MR. GOMEZ:  15 more minutes.

12              THE COURT:  We will take our lunch break here.  10

13    after 2.

14              (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A F T E R N O O N   S E S S I O N
 2                              2:10 p.m.
 3               THE COURT:  Continue, Mr. Gomez.
 4               MR. GOMEZ:  Your Honor, before I continue, there were
 5      three documents I would like to move into evidence that were
 6      mentioned during my colleague's examination of the witness.
 7      These are Defendant's Exhibits DX 1387, which was the article;
 8      DX 1388, which was the tolling and the stand-still agreement;
 9      and then DX 1390, which was the Spanish version of the letter
10      over which it isn't clear whether it had been produced.
11               Plaintiff's counsel has provided me with a copy of the
12      version that was produced as Plaintiff's Exhibit 5609.  I would
13      like to mark the version that Mr. Donziger introduced as 5609A
14      and enter into evidence 5609 and 5609A.
15               THE COURT:  First of all, 1388 is in evidence.  That
16      disposes of that.
17               Now, as to 1387, that's the letter from Mr. Kohn to
18      Fajardo and Yanza, right?
19               MR. GOMEZ:  No, that's the article --
20               THE COURT:  I'm sorry, I misspoke.  You are correct.
21      What is it?  It's a Philadelphia Inquirer article?
22               MR. GOMEZ:  Yes, your Honor.
23               THE COURT:  What's the purpose of the offer?
24               MR. GOMEZ:  The offer is that this article had been
25      published and Mr. Kohn was aware of it at the time.
```

DB47CHE4                         Kohn - cross

1           THE COURT:  So, you are not offering it for the truth

2     of the matter.

3           MR. GOMEZ:  Correct.

4           THE COURT:  Any objection on that basis?

5           MS. NEUMAN:  No, your Honor.

6           THE COURT:  It's received not for the truth.

7           (Defendant's Exhibit 1387 received in evidence)

8           THE COURT:  Now, you lost me on the excursion through

9     the various other exhibit numbers.

10          MR. GOMEZ:  OK.  So, Mr. Donzinger offered a document

11    which he referred to as Defendant's Exhibit DX 1390.  DX 1390

12    purports to be a letter dated November 13, 2009 to Mr. Kohn

13    from Messrs. Fajardo and Yanza.  There was a question as to

14    whether the document had been produced.  Subsequently

15    plaintiff's counsel found what has been marked as Plaintiff's

16    Exhibit 5609, which has appended to it the same document that's

17    DX 1390 but with a Bates number, a Donzinger Bates number, and

18    also a translation with a certification of the translation.

19    That entirety has been marked as Plaintiff's Exhibit 5609.  So

20    I would like to enter 5609 into evidence.

21          THE COURT:  And what is 5609A which you mentioned?

22          MR. GOMEZ:  So the record is clear, 5609A would be the

23    document that Mr. Donzinger was speaking of in his examination.

24          THE COURT:  Can I see these?  Because this is still

25    not clear, and maybe it will be clearer if I see them.

DB47CHE4                          Kohn - cross

1          All right.  Let's just focus on 5609 as it is

2     currently marked, which contains both a Spanish language

3     version and a translation.  Now, is there any objection to

4     5609?

5              MS. NEUMAN:  Going in not for the truth, there is no

6     objection, your Honor.

7              THE COURT:  Any objection on that basis?

8              MR. GOMEZ:  No, your Honor.

9              THE COURT:  5609 is received but not for the truth.

10             (Defendant's Exhibit 5609 received in evidence)

11             MR. GOMEZ:  Then, your Honor, I have a proffer with

12    respect to my questioning on Plaintiff's Exhibit 1184.  That

13    proffer is that --

14             THE COURT:  Just a minute.

15             MR. GOMEZ:  I'm sorry.

16             THE COURT:  So, you are now going to proffer as to

17    what the witness would have said if he had been permitted to

18    answer the question "What were you referring to there when you

19    speak of a major remediation" and some other language?  Is that

20    what I am to understand?

21             MR. GOMEZ:  Yes, your Honor.

22             THE COURT:  All right.  And you are representing to me

23    that you have a good faith basis for knowing what he would have

24    said.

25             MR. GOMEZ:  Yes, your Honor.

DB47CHE4                         Kohn - cross

1              THE COURT:  All right, go ahead.

2              MR. GOMEZ:  My proffer is that Mr. Kohn would have

3      testified that he believed that his clients, in order to be

4      made whole, were entitled to remediation, pit clean-up, health

5      care, water treatment and other remedies, and the basis for

6      that belief.

7              THE COURT:  Well, for what it's worth, I don't think

8      the proffer is actually responsive to the question, but you

9      have made your record.

10             MR. GOMEZ:  Thank you, your Honor.

11     JOSEPH KOHN, resumed.

12     CROSS-EXAMINATION (Continued)

13     BY MR. GOMEZ:

14     Q.  Mr. Kohn, isn't it correct, sir, that you do not know one

15     way or the other whether legal decisions regarding the Lago

16     Agrio litigation were made either by consensus of the attorneys

17     working on the matter or by one particular attorney?

18     A.  I do not know as to every decision in the case.

19     Q.  Well, specifically --

20             THE COURT:  The question of course postulates that

21     those are the only options, so the answer is worth what it's

22     worth.

23     Q.  And, sir, you don't know whether final decisions regarding

24     which issues to bring to the attention of the Lago Agrio court

25     in that case were determined either by consensus or by one

DB47CHE4                          Kohn - cross

1    particular person.

2    A.  No, I don't.

3              MS. NEUMAN:  Object to form.

4              THE COURT:  I'm sorry?

5              MS. NEUMAN:  Form.

6              THE COURT:  Sustained as to form.  The answer is

7    stricken.

8    Q.  Sir, isn't it correct that you do not know one way or the

9    other whether final decisions regarding which issues to bring

10   to the attention of the Lago Agrio court were made either by

11   consensus of the attorneys working on the matter or a single

12   attorney?

13   A.  That's right, I do not.

14             MS. NEUMAN:  Same question.

15             THE COURT:  Same ruling.  The answer is stricken.

16             Mr. Gomez, if you insist on putting questions that say

17   you don't know if A and B, where A and B are not the only

18   conceivable alternatives, we will spend a great deal of time

19   with objections being sustained.  I am just trying to help you

20   out, sir.  It's a problem that you can fix.

21   Q.  Sir, you do not know one way or the other how final

22   decisions were made regarding which issues to bring to the

23   attention of the Lago Agrio court, is that correct?

24   A.  As a general matter, yes, that is correct.

25   Q.  You also don't know how decisions were made in the Lago

DB47CHE4                    Kohn - cross

1   Agrio litigation with respect to what material to provide to

2   experts in that case, is that correct?

3   A.  Yes, that is correct.  Again it's a broad question, but as

4   a general proposition, yes.

5   Q.  And you also don't know one way or the other how decisions

6   were made as to what evidence to highlight in briefs to the

7   Lago Agrio courts, is that correct?

8   A.  Yes.

9   Q.  Sir, is it correct that Cristobal Bonifaz was terminated by

10  the plaintiffs?

11  A.  That is my understanding, yes.

12  Q.  How was that decision made, do you know?

13  A.  I have received some information.  I received an

14  explanation from certain individuals, so I know what someone

15  else told me, but I will be happy to pass that along.

16  Q.  Is it accurate, sir, that a plaintiffs group known as the

17  Assembly of the Affected made that determination?

18          MS. NEUMAN:  Objection.

19          THE COURT:  The objection is sustained.  The witness

20  just told you that he has no firsthand knowledge.

21  Q.  Sir, do you know that Alberto Wray was terminated by the

22  plaintiffs in the Lago Agrio litigation?

23  A.  I do not know that.

24  Q.  And isn't it a fact, sir, that Kohn Swift & Graf was

25  terminated as counsel for the plaintiffs by the plaintiffs,

DB47CHE4                      Kohn - cross

1    sir?

2    A.   We received a letter about six months after we withdrew

3    stating that they were terminating us, yes.

4    Q.   Would you please turn to Plaintiff's Exhibit 1406.

5            Can we bring that up on the screen, please.

6            Looking at the first paragraph, Plaintiffs Exhibit

7    1406, Mr. Kohn, you make reference to a letter on July 29,

8    2010.  Is that the letter to which you were just referring in

9    your testimony?

10   A.   Yes.

11   Q.   Mr. Kohn, is it correct that plaintiffs in the Lago Agrio

12   case were members of a larger group called the Assembly of the

13   Affected that represented the 30,000 people alleged to be

14   affected by the contamination that was the subject of that

15   case?

16           MS. NEUMAN:  Objection.  Relevance.

17           THE COURT:  Sustained.  Also lack of personal

18   knowledge.

19           Look, Mr. Gomez, I don't know what you are doing, but

20   the fundamental rule is personal knowledge.  And just asking

21   what did you understand -- you know, what do you understand

22   Einstein's principle of relativity is?  Well, if your state of

23   knowledge is relevant, that's one thing; if it's not, you are

24   not somebody who is going to explain it to us.

25   Q.   Mr. Kohn, when you visited Ecuador, did you meet with any

DB47CHE4                          Kohn - cross

1    members of the Assembly of the Affected?

2    A.  I believe that I did, yes.

3    Q.  And what was the purpose of this group, the Assembly of the

4    Affected?

5              THE COURT:  Sustained.

6    Q.  Did you observe these members interact as a formal body

7    when you were in Ecuador?

8              MS. NEUMAN:  Objection.  Relevance.  Scope.

9              MR. GOMEZ:  I withdraw the question.

10   Q.  Mr. Kohn, who did you meet who was a member of the Assembly

11   of the Affected when you were in Ecuador?

12   A.  Other than -- I believe Mr. Yanza was a member.  I believe

13   Mr. Payaguaje was a member.  There were other meetings that I

14   attended I am recalling the period while the case was pending

15   in New York in the '90s where there were large groups of

16   individuals that I understood were either some portion of or

17   some representatives of Community of the Affected, and I

18   understood there were perhaps larger groups or sort of plenary

19   sessions, which I was not present, but that this was a

20   representative council or committee of the leadership of those

21   groups, groups of 20, 30, 40 people.

22   Q.  Did the Assembly of the Affected play any role in the Lago

23   Agrio litigation, sir?

24             THE COURT:  Do you have personal knowledge, sir?

25             THE WITNESS:  Not as to the time in Lago Agrio.

DB47CHE4                          Kohn - cross

1           THE COURT:  Look, Mr. Gomez, this is going to stop

2    what you are doing now.  All right?  So, go on to something as

3    to which there is some reason to think the witness has personal

4    knowledge or is competent to testify to, or else conclude your

5    examination.  You know what the rules are.

6    Q.  Mr. Kohn, how many times has Kohn Swift & Graf been named a

7    nonparty coconspirator in a RICO action?

8    A.  Just this once.

9    Q.  How many times have you been named a nonparty coconspirator

10   in a RICO action?

11   A.  Once.

12   Q.  How did you find out about the filing of this particular

13   action?

14   A.  Either through counsel, or it was very public, things were

15   being announced in the media, and they were available online

16   probably.

17   Q.  Were you the first partner in your firm to learn about the

18   existence of this case?

19   A.  I don't know.  I mean it happened on a certain date, and

20   within 24 hours I assume everybody in the firm was aware of it.

21   Q.  How soon after you learned about the RICO case did you

22   discuss it with your partners?

23   A.  I would assume as soon as we received it, at least as to

24   those who had worked and been involved in this litigation, we

25   talked about it right away.

DB47CHE4                        Kohn - cross

1   Q.  Did your partners express concern about the allegations in

2   the complaint?

3   A.  I do not recall people expressing quote concern.  I think

4   there was expression of some disappointment that Chevron had

5   chosen to list us as a coconspirator.  We assumed that they had

6   understood the record and what was being produced, such that

7   they would not have taken that position, which ultimately, as

8   all the discovery proceeded, is my understanding of their

9   position as of today.

10  Q.  Did your partners have a copy of the RICO complaint?

11          MS. NEUMAN:  Objection.  Relevance.

12          THE COURT:  No, I think it's relevant, but there is no

13  predicate for personal knowledge.

14  Q.  Do you know --

15          THE COURT:  And the question is vague.  One partner?

16  Two partners?  Three partners?

17  Q.  Did you provide copies of the RICO complaint to your

18  partners to review?

19  A.  No.  My assumption was everything was available online in a

20  very public manner.  I did not make paper copies and distribute

21  them throughout the office.

22  Q.  The complaint reads "Kohn Swift has bankrolled the Lago

23  Agrio litigation as one of its flagship cases and funded the

24  coconspirators' other illegal activities."

25          Did you discuss that particular allegation with your

DB47CHE4                        Kohn - cross

1    partners, sir?

2    A.  I don't recall that particular allegation.  I certainly

3    recall the general theme of the complaint, the tone.  There

4    were general discussions.  We had very able counsel that had

5    been representing the firm in the 1782 proceedings; they were

6    aware of the complaint.  We were following their advice, and

7    that was the way we dealt with it.

8    Q.  Did you receive telephone calls from colleagues about the

9    fact that Kohn Swift & Graf had been named in this complaint,

10   sir?

11   A.  I don't remember receiving phone calls from other

12   colleagues at the time the complaint was filed.

13   Q.  Did you receive any calls from any client bringing to your

14   attention their knowledge that Kohn Swift & Graf had been named

15   in this complaint?

16   A.  I don't recall any.

17   Q.  Isn't it true that your partners agreed that Kohn Swift &

18   Graf should cooperate with Chevron to ensure that the matter

19   did not escalate any further than being named a nonparty

20   coconspirator?

21   A.  That is not true.

22   Q.  You testified that you were pleased Kohn Swift & Graf was

23   not named as a direct defendant in this case, is that correct?

24   A.  Yes.  I would have been happier if we weren't mentioned at

25   all, but in terms of being named a party defendant or being

DB47CHE4                         Kohn - cross

1    listed with a bunch of other lawyers as an unnamed

2    coconspirator, I was happier to be in that category than to be

3    a named defendant.

4    Q.  Didn't you and your partners agree that you would cooperate

5    with Chevron to ensure that you would only remain as unnamed

6    defendants in the case?

7              MS. NEUMAN:  Asked and answered.

8    A.  No.

9              THE COURT:  Sustained.

10             Mr. Gomez, I have your point; I had it actually by

11   about 11 o'clock this morning, some hours ago.  Your argument

12   in substance is that the testimony should not be credited

13   because, among other things, they are trying to curry favor

14   with Chevron to avoid being sued.  Got it.

15             Now, I imagine it is theoretically possible to ask

16   questions having that point for several more days, but we're

17   not going to do it.  Move on.

18   Q.  Mr. Kohn, you have no knowledge that plaintiffs in the Lago

19   Agrio litigation, or their attorneys, paid anyone to ghostwrite

20   orders for any judge in that case, do you, sir?

21   A.  I have no knowledge of it, other than what I have seen in

22   the press accounts of this litigation.

23             THE COURT:  And you have no knowledge to the contrary,

24   isn't that right?

25             THE WITNESS:  Yes, sir.

DB47CHE4                          Kohn - cross

1          THE COURT:  Move on, Mr. Gomez.

2    Q.  And, sir, you also have no knowledge that plaintiffs or

3    their attorneys bribed the judge who issued the decision in

4    that case, isn't that right?

5    A.  Same answer, only from what I have seen in the press

6    reports.

7    Q.  And you have no knowledge to the contrary, is that correct?

8    A.  Right.

9          MR. GOMEZ:  Your Honor, I'm done.

10          THE COURT:  Thank you.  Is there any redirect?

11          MS. NEUMAN:  A little bit, your Honor.

12          THE COURT:  Go right ahead.

13   REDIRECT EXAMINATION

14   BY MS. NEUMAN:

15   Q.  Good afternoon, Mr. Kohn.

16   A.  Good afternoon.

17   Q.  Do you recall Mr. Donzinger asked you a number of questions

18   relating to his role in the Ecuador litigation?

19   A.  Yes.

20   Q.  I am going to ask that we put on the screen Plaintiff's

21   Exhibit 1181, which is in evidence.  I'd like to direct your

22   attention, Mr. Kohn, to the second page of Exhibit 1181.  Do

23   you recognize Exhibit 1181 as an e-mail exchange between

24   yourself and Mr. Donzinger November 2009?

25   A.  Yes, I do.

DB47CHE4                    Kohn - redirect

1   Q.  I would like to direct your attention to the paragraph

2   beginning with the number 1.  Would you please read that

3   paragraph to yourself for a moment.

4   A.  OK.

5   Q.  In November of 2009 did Mr. Donzinger's primary obligations

6   include running the case on a day-to-day basis, as he states in

7   Exhibit 1181?

8   A.  It did.  And the issues we were having was to whether or

9   not our firm also needed additional information and more

10  participation and more involvement in those things, but at that

11  point, yes, he was.

12  Q.  And did Mr. Donzinger's responsibilities include, as he

13  states in Exhibit 1181, handling press and political aspects

14  both in Ecuador and the U.S.?

15  A.  Again, same answer, he was involved.  We had some role.  We

16  were seeking to be more involved with those activities.

17  Q.  And am I understanding you correctly that part of the issue

18  that you were having with Mr. Donzinger, including in November

19  of 2009, was that he took the position that it was his job to

20  run the case and your firm's job to pay the bills?

21  A.  Essentially, yes.

22  Q.  I would like to direct your attention, Mr. Kohn, to Exhibit

23  1185, also in evidence.  In the middle of the page there is an

24  e-mail exchange between yourself and Juan Pablo Saenz also from

25  November of 2009.  Do you see that, sir?

DB47CHE4                          Kohn - redirect

1    A.  Yes, I do.

2    Q.  Is that the gentleman that you were referring to as Juan

3    Pa?

4    A.  Yes, it is.

5    Q.  And in November of 2009 were the Ecuadorian attorneys

6    refusing or declining to meet with you and your firm?

7    A.  And had been for a period of some time before then as well.

8    Q.  In Exhibit 1185 Mr. Saenz tells you that Steven is our

9    point of contact, so please coordinate with him about the best

10   way to proceed.

11          Do you see that?

12   A.  Yes, I do.

13   Q.  And was this the response you were generally receiving from

14   Ecuadorian counsel at this point in time, that you should deal

15   with Mr. Donzinger?

16   A.  At that point and some time before then.

17   Q.  Now, I would like to go back a little bit in time to

18   earlier in the fall of 2009.

19          Could you please put Plaintiff's Exhibit 1155 on the

20   screen.  This is also already in evidence.

21          Mr. Kohn, do you recognize Plaintiff's Exhibit 1155?

22   A.  Yes.

23   Q.  Could you tell me what this is, sir.

24          MR. DONZINGER:  Objection, your Honor.  This isn't in

25   the direct testimony.

1           THE COURT:  This is redirect.

2           MR. DONZINGER:  What?

3           THE COURT:  This is redirect.

4           MR. DONZINGER:  It wasn't crossed on.

5           THE COURT:  Oh, I don't know about that.  It seems to

6    me we heard an awful lot from you on cross about Mr. Kohn not

7    making any efforts to look into what was going on in Ecuador.

8    You opened this door very wide.

9    Q.  Mr. Kohn, could you tell us what Exhibit 1155 is, please.

10   A.  Yes.  It is a first -- or a draft on a final form document

11   of a proposed retention agreement between the plaintiffs group

12   or our law firm -- just our law firm -- and the Trujello

13   Rodriguez & Richards law firm in Philadelphia, specifically

14   Kenneth Trujello, who is the named partner and founder of the

15   firm.

16   Q.  And had you reached out to Mr. Trujello to do an

17   investigation in connection with the Ecuador litigation?

18   A.  Yes.

19   Q.  And among the things you wanted Mr. Trujello to

20   investigate, did they include the allegations that the

21   plaintiffs team had had improper contact with court-appointed

22   experts, including Mr. Cabrera?

23   A.  I just have the first page of this in front of me.  I

24   believe at some point that was included in a list of tasks.

25   The genesis of this was the publicity surrounding the

DB47CHE4                    Kohn - redirect

1    allegations about Judge Nunez and the people who recorded his

2    conversation with the camera in the pen.  But I believe there

3    is references also to other issues or other contentions that

4    had been made by Chevron that we were interested in trying to

5    get a fresh and detailed investigation of.

6    Q.  Directing your attention to the second sentence in the

7    first paragraph, where you state, "More specifically, we

8    request that your firm make inquiries into what knowledge

9    members of the legal team prosecuting the Aguinda litigation

10   may have of improprieties involving the judge and/or government

11   or ruling party officials ..."

12           Do you see that?

13   A.  Yes.

14   Q.  Is that referring to an investigation into the Nunez tapes

15   and why Judge Nunez would have been meeting with people

16   discussing the case outside of the courtroom?

17           MR. GOMEZ:  Objection.  Leading.

18           THE COURT:  Sustained.

19   Q.  What does that refer to, Mr. Kohn, the highlighted

20   sentence?

21   A.  I think the genesis of it was the Nunez controversy, but it

22   was worded in such a way here to be more broad than that.

23   There had been other contentions sporadically over the years

24   from Chevron.  Some were reported in the press, some reported

25   otherwise, of just general impropriety, general unfairness,

DB47CHE4                         Kohn - redirect

1    general lack of due process in the Ecuadorian legal system, and

2    this in my view is broad enough to cover those things.  Had it

3    gone forward, they would have been pressed on a more specific

4    task list or agenda for Mr. Trujello to follow.

5    Q.  In the second half of the same sentence, the draft

6    agreements statements "as well as with respect to allegations

7    leveled by Chevron corporation, the defendant in that

8    litigation, of improper contacts between the Aguinda legal team

9    and various Ecuadorian judge's, court appointed experts or

10   government officials," what did that refer to?

11   A.  The same thing I had been discussing.  Certainly the court

12   appointed experts, in my view, was the charges that Chevron was

13   making not with the detail that they make now, but some kind of

14   contact, or some kind of influence, or something not right with

15   Cabrera.

16   Q.  And who was Mr. Trujello such that you felt he was the

17   appropriate person to conduct such an investigation?

18   A.  Well, I felt he was one of the people who could do so.  He

19   is a lawyer in Philadelphia.  He is a professional colleague

20   and professional friend.  We are not close personal friends.

21   He is fluent in Spanish.  He was a former prosecutor, either a

22   U.S. attorney, district attorney, or possibly both at different

23   times in his career.  He had worked at large firms doing

24   corporate defense litigation, with the Schnader firm in

25   Philadelphia.  He understood class action litigation.  The

1   Trujillo Rodriguez firm is a plaintiff class action firm, and

2   he understood that.

3           When I first contacted him about this, he said he is

4   actually doing internal investigation work of various kinds for

5   corporations, including a number of times in South America, and

6   he seemed to be an ideal fit, and he is just a person of skill

7   and integrity.

8   Q.  And was it your intention to allow Mr. Trujello to

9   investigate fully what knowledge the members of the legal team

10  prosecuting the Aguinda litigation may have had of

11  improprieties involving the judge and/or the government or

12  ruling parties, and/or the court-appointed experts?

13          MR. GOMEZ:  Objection.  Leading.

14          THE COURT:  Sustained.

15  Q.  Mr. Kohn, was it your intention to allow Mr. Trujello to

16  conduct the investigation as he saw fit, or did you plan to

17  limit him in some way?

18  A.  I anticipated there would be a process, not simply as he

19  quote saw fit, but that he would discuss with us ahead of time

20  how he would go about such an investigation and what his

21  recommendations would be, and then to proceed.

22  Q.  Did you feel there was an investigation that should be

23  undertaken at this point in time, the fall of 2009?

24  A.  I felt it was in the best interests of the clients, of the

25  case, and of our law firm separately and indeed of the U.S.

DB47CHE4                        Kohn - redirect

1    counsel.  I thought it was in the best interests of Mr.

2    Donzinger and his firm at that point to get a handle on what

3    was going on, who was saying what to whom, and where these

4    charges were coming from.

5    Q.  And did you propose to Mr. Donzinger that Mr. Trujello be

6    hired and proceed with the investigation as is described in the

7    draft retainer, Exhibit 1155?

8    A.  Yes, I recommended it.  I recommended it in an initial

9    conference call.  Mr. Donzinger's initial reaction was

10   favorable, that's a good idea, go ahead.  That was before I

11   ever reached out to Mr. Trujello.

12          Then I contacted him, gave him the outline of the

13   situation.  Was he interested in talking about it further?

14   Yes, he was.  And then we had I recall at least one three-way

15   call, myself, Mr. Donzinger and Mr. Trujello.  There may have

16   been more, but I remember at least one.

17   Q.  Did Mr. Donzinger subsequently change his mind about

18   agreeing to go forward with this investigation?

19          THE COURT:  Sustained in that form.

20   Q.  Did the investigation go forward, Mr. Kohn?

21   A.  No.

22   Q.  Why not?

23   A.  Ultimately after a conversation with Mr. Trujello Mr.

24   Donzinger over a period of time had several points or arguments

25   he made as to why he did not think it was a good idea.  We had

DB47CHE4                    Kohn - redirect

1   some back and forth on those in several conversations, and

2   ultimately it reached a point of he would not cooperate with

3   it, the people in the Ecuador legal team would not cooperate

4   with it; if that was something we insisted upon, then maybe we

5   should just withdraw from the case.

6         THE COURT:  Is that something he told you?

7         THE WITNESS:  Yes, your Honor.  It was in a

8   conversation.

9   Q.  Did Mr. Donziger also convey that to you in writing, Mr.

10  Kohn?

11  A.  I believe that there are -- there is a short e-mail or

12  letter that conveys some of that, certainly the ultimate

13  conclusion, but in my prior answer was from conversations.

14        MS. NEUMAN:  Show the witness Exhibit Plaintiff's

15  Exhibit 1156, already in evidence, please.

16  Q.  Is this the writing in which Mr. Donziger conveyed that

17  neither he or the legal team in Ecuador would cooperate in the

18  Trujello investigation, Mr. Kohn?

19  A.  This is a writing.  I recall there may have been another

20  one.  My recollection is there was still some further

21  discussions after receiving this.  There may have been

22  something else that sort of was an even more finality, if you

23  will.

24  Q.  And was the final position that Mr. Donziger took that he

25  would not cooperate in such an investigation?

DB47CHE4                        Kohn - redirect

1    A.  Yes.

2    Q.  Were you able to proceed with such an investigation given

3    that Mr. Donzinger indicated neither he nor the Quito team

4    would cooperate?

5               MR. GOMEZ:  Objection.  Leading.

6               THE COURT:  Sustained.  Rephrase.

7    Q.  Did you continue to retain Mr. Trujello despite Mr.

8    Donzinger's refusal to cooperate?

9    A.  No, it never reached the point of a signed agreement with

10   Mr. Trujello.  There was the exchange of the draft, discussion

11   of the draft, but this intervened, so we never moved forward.

12   Q.  And why didn't you retain him after Mr. Donzinger told you

13   he would not cooperate?

14   A.  Well, I viewed it would, A, be putting Mr. Trujello in a

15   very difficult situation; B, it would probably be a futile

16   exercise.  And within, you know, several weeks of this we had

17   withdrawn as counsel.  This was a rapid downhill slope at this

18   point in terms of the relationship.

19              MS. NEUMAN:  Can you please show the witness

20   Plaintiff's Exhibit 1290, please.

21   Q.  Is this a correspondence that you sent to Mr. Fajardo, Mr.

22   Saenz and Mr. Yanza in April 2010, Mr. Kohn?

23   A.  Yes.

24   Q.  Were the statements in this letter true and accurate when

25   you sent it?

DB47CHE4                    Kohn - redirect

1    A.  Yes.

2    Q.  On page 2 of the letter, I direct your attention to

3    paragraphs 2 and 3.  Take a minute to read that, sir.

4    A.  Yes.

5    Q.  There you are recommending that the facts surrounding

6    Stratus and Cabrera be provided to everyone including the Kohn

7    firm.  Did you ever receive all of those facts from Mr.

8    Donzinger?

9    A.  No.

10   Q.  You are also recommending there again that the Ecuadorians

11   be interviewed by a lawyer on behalf of the plaintiffs.  Do you

12   know if those interviews ever took place after you sent your

13   April 13, 2010 correspondence?

14   A.  Not by anyone we were ever aware of or involved with.

15   Whether -- well, nothing that I know of.

16          MS. NEUMAN:  I would like to show the witness

17   Plaintiff's Exhibit 1291.

18   Q.  Mr. Kohn, have you ever seen Exhibit 1291 before?

19   A.  Yes, I believe I have.

20   Q.  The metadata indicates that it was drafted by Mr. Donzinger

21   on April 16th of 2010.  Did you receive it from Mr. Donzinger

22   in or about April of 2010?

23   A.  No.

24   Q.  Do you know if you received it -- do you know when you

25   received it?

DB47CHE4                      Kohn - redirect

1              THE COURT:  If ever.

2      A.  I did not receive it in the ordinary course.  I have seen

3      it as a proposed exhibit or an exhibit in this litigation in

4      preparation for testifying, but I did not receive it at the

5      time.

6      Q.  I would like to direct your attention to the paragraph with

7      the heading "The Cabrera Report and the Role of Stratus,

8      Ecuador Law".  Can you take a moment to read that paragraph and

9      let me know when you are done, just the first paragraph under

10     that heading.

11     A.  OK.

12     Q.  While you were counsel for the Ecuador plaintiffs, Mr.

13     Kohn, did Mr. Donzinger ever tell you -- as he sets forth in

14     Exhibit 1291 -- that "e-mails between Stratus and U.S. counsel

15     show U.S. counsel approved of the process whereby Stratus wrote

16     the bulk of the Cabrera report"?

17     A.  No.

18             THE COURT:  Ms. Neuman, you said something in a

19     preamble to a question a minute ago that I want to go back to.

20     You said the metadata indicates that it was drafted by Mr.

21     Donzinger on April 16, 2010.  Is there evidence or a

22     stipulation to that effect, or is there going to be?

23             MS. NEUMAN:  It is -- the last page of Exhibit 1291 is

24     the printed metadata.  My recollection from Mr. Donzinger's

25     deposition -- though I'm happy to check -- is that he did not

1    have a contrary recollection of the date, didn't recall when he

2    wrote it versus the metadata.

3           THE COURT:  Is this a matter in dispute or not a

4    matter in dispute?  Mr. Donzinger?  Mr. Friedman?

5           MR. FRIEDMAN:  Your Honor, if we could have until

6    tomorrow.  I don't think we're going to dispute it, but we need

7    to check one thing first.

8           THE COURT:  Mr. Gomez?

9           MR. GOMEZ:  Agreed.

10          THE COURT:  Agreed what?

11          MR. GOMEZ:  We should be given some time, your Honor.

12          THE COURT:  All right, counsel.  Tomorrow morning.

13   Let's go.

14          MR. GOMEZ:  Thank you.

15   Q.  Mr. Kohn, are you aware of any e-mails involving any

16   attorney from Kohn Swift & Graf that show that your firm as one

17   of the U.S. firms representing the plaintiffs --

18          Can we put that exhibit back up, please.

19          -- approved of a process whereby Stratus wrote the

20   bulk of the Cabrera report?

21   A.  No.

22   Q.  While you were still counsel for the Ecuadorian plaintiffs,

23   did Mr. Donzinger ever tell you -- as he sets forth in Exhibit

24   1291 -- that there was also at least one ex parte meeting

25   between Stratus and Cabrera at which U.S. counsel was present?

DB47CHE4                        Kohn - redirect

1    A.  No.

2    Q.  Did anyone from Kohn Swift & Graf attend any ex parte

3    meeting between Stratus and Mr. Cabrera?

4    A.  No.  No, we did not.

5    Q.  Besides Mr. Donzinger's firm and your firm, was anyone else

6    acting as U.S. counsel to the Ecuadorian plaintiffs during the

7    2007-2008 timeframe?

8    A.  There may have been some other individual lawyers generally

9    in the nature of interns, legal interns who were working with

10   Mr. Donzinger under his general supervision.  I do not believe

11   there were any others other than that.

12   Q.  Prior to your withdrawal as counsel for the Ecuadorian

13   plaintiffs, did Mr. Donzinger ever disclose to you that there

14   was "some effort to keep the extent of this ex parte

15   collaboration between our local counsel and the Cabrera from

16   being disclosed"?

17   A.  No.

18   Q.  Prior to you withdrawing as counsel to the Ecuadorian

19   plaintiffs, did Mr. Donzinger ever tell you that by working so

20   closely with our local counsel and Stratus, Cabrera violated

21   his duties to the court?

22   A.  No.

23   Q.  Was Mr. Donzinger's failure to convey that information to

24   you at the time it was happening material to you?

25   A.  It certainly would have been and is now, yes.

DB47CHE4                    Kohn - redirect

1   Q.  I am going to direct your attention, Mr. Kohn, to

2   Plaintiff's Exhibit 1406.

3            THE COURT:  Sorry.  Could you just give me the date of

4   1291 again.

5            MS. NEUMAN:  April 16, 2010, your Honor.

6            THE COURT:  And just to help my thinking, is this

7   before or after the Fajardo affidavit was filed in Denver?

8            MS. NEUMAN:  My recollection is it's shortly before,

9   but I want to -- yes.

10            THE COURT:  And it's two weeks after the "we'll all go

11   to jail" memo, is that right?

12            MS. NEUMAN:  Yes, more or less.  And it's three days

13   after prior Kohn letter.

14            THE COURT:  All right.  Let's go ahead.

15   Q.  Mr. Kohn, is Plaintiff's Exhibit 1406 a letter that you

16   sent to Mr. Fajardo and Mr. Yanza, Mr. Humberto Piaguaje, Emel

17   Chavez, Hugo Payaguaje and Emergildo Criollo on August 9th of

18   2010?

19   A.  Yes, it is.

20   Q.  Were the statements in Exhibit 1406 true and correct when

21   you sent this letter?

22   A.  Yes, they are -- or were.

23   Q.  This letter is sent prior to the November 2010 first

24   contact you testified that your lawyers had with Chevron's

25   counsel related to this matter, correct?

DB47CHE4                         Kohn - redirect

1    A.  Yes.

2    Q.  And in this letter, I direct your attention to the bottom

3    of the first paragraph where you state that you are shocked by

4    recent disclosures.  Take a moment to read that.

5    A.  Yes, I see it.

6    Q.  The disclosures that you saw -- the statements that you saw

7    in Exhibit 1291 regarding the contact between Mr. Donzinger's

8    U.S. counsel and Stratus and Mr. Cabrera, were any of those the

9    ones that you are referring to here as being contrary to the

10   assurances that you had received from Mr. Donzinger?

11              MR. GOMEZ:  Objection.  Calls for speculation.

12              THE COURT:  It certainly doesn't call for speculation.

13              MR. GOMEZ:  Your Honor, he didn't write 1291, and he

14   didn't receive it at the time.  He would only be speculating.

15              THE COURT:  I suppose if he didn't receive it at the

16   time -- which is my recollection of the testimony -- then he

17   couldn't possibly have been referring to that here.  But I

18   imagine we will find out what the witness has to say.

19              Maybe there are things in 1291 that he heard from

20   another source.  I don't know.  Let's see what the testimony

21   is.

22   A.  What I am referring to in the August 9, 2010 letter are

23   facts and information that was coming out of the 12 1782

24   proceeding in Denver regarding Stratus, some of which was

25   coming out at that point could be subsumed within the Donzinger

DB47CHE4                         Kohn - redirect

1    April 2010 document.  But the April 2010 document goes even

2    further with describing the conduct and the activity beyond

3    what at that point had come out of the 1782.  There was some

4    portion of it which was starting to come out of the 1782 but

5    not the entire story as laid out in that other document.

6    Q.  The details about the contact with Cabrera that are in

7    Exhibit 1291, are those contrary to what Mr. Donziger was

8    telling you at the time about the plaintiff team's contact with

9    Mr. Cabrera?

10             MR. GOMEZ:  Objection.  Leading.

11             THE COURT:  Overruled.

12   A.  Yes, they are contrary to what he had said to me at a

13   meeting sometime in or about March or April 2010, the meeting I

14   referred to earlier at Mr. Sussman's office in New York, and

15   contrary to things that had been said over the period, you

16   know, years before that as well.

17   Q.  I am going to turn your attention to the fourth page of

18   Exhibit 1406, further down the paragraph that begins "When

19   Chevron first started making these allegations..."

20   A.  Accusations.

21   Q.  "Accusations, Donziger assured me repeatedly ..."

22             Do you see that one?

23   A.  Yes.

24   Q.  Can you read the first three sentences of that paragraph to

25   yourself.

DB47CHE4                    Kohn - redirect

1   A.   OK.

2   Q.   And was it accurate in August of 2010, Mr. Kohn, that you

3   had reached the conclusion that Mr. Donzinger had told you

4   blatant lies intended to induce your firm into paying more

5   money for litigation expenses?

6            MR. DONZINGER:   Objection, your Honor.  The document

7   speaks for itself.

8            THE COURT:   Sustained.

9   Q.   Why did you reach the conclusion set forth in Exhibit 1406,

10  Mr. Kohn, that Mr. Donzinger had told you blatant lies intended

11  to induce your firm into paying more money for litigation

12  expenses?

13  A.   Well, because on a number of separate occasions where the

14  subject of Chevron's first more vague contentions about

15  something improper with Cabrera, later becoming more

16  crystalized were made, and I raised them in a way of saying

17  what are they talking about, what's this about, they were met

18  with there is absolutely nothing to it, they are just making

19  stuff up to try to win the case or smear the whole process.

20           When we had the meeting, as I said, at Mr. Sussman's

21  office, where there was the beginning of some things trickling

22  out of the Denver case, and I said, you know, you need to come

23  clean, I think was the term I used, about what went on with

24  Cabrera and Stratus, it was kind of, well, maybe somebody on

25  the Ecuadorian local group gave some things to Cabrera that are

DB47CHE4                         Kohn - redirect

1    not going to look good if it comes out.  There was no statement

2    of Stratus wrote the Cabrera report and it's perfectly fine to

3    do that, what are you talking about.  You know, it was the

4    opposite of that.

5          And then it also refers to the similar discussion with

6    Mr. Fajardo and Mr. Yanza about April of 2010 as well.  And I

7    then reached the conclusion there was a reason why someone had

8    not disclosed the truth, and instead said there was nothing to

9    worry about, everything is fine.

10         The discussion I had with Mr. Donzinger at about the

11   time of our discussions with Mr. Trujello, where he stated in a

12   telephone conversation that he wanted to give me his personal

13   assurance that there was nothing conducted and nothing went

14   wrong in the case that could be embarrassing, he prefaced that

15   by saying he understood that we had a firm with a number of

16   lawyers, and he was one guy in a solo practice, and we had

17   different issues, but he wanted to give us personal assurance

18   that nothing wrong or embarrassing had occurred.  That was in

19   September of '09, August or September, in that timeframe.  So

20   as this stuff started bleeding out of Denver, despite motions,

21   etc., I think it was a pretty obvious conclusion.

22         MS. NEUMAN:  Nothing further, your Honor.

23         THE COURT:  Thank you.  We will take our break here,

24   about ten minutes.

25         (Recess)

DB47CHE4                    Kohn - redirect

1              THE COURT:  All right.  Let's continue.

2     RECROSS EXAMINATION

3     BY MR. GOMEZ:

4     Q.  Mr. Kohn, you didn't need Mr. Donzinger's approval to hire

5     Mr. Trujello, is that correct?

6     A.  Yes, to do the purpose of the retention, we absolutely did

7     need his cooperation and agreement.

8     Q.  That's not what I asked you, sir.  I asked you whether you

9     needed his approval to hire Mr. Trujello.

10    A.  The answer is yes.  For the purpose for which we were

11    proposing to hire Mr. Trujello, it would have been an utter

12    futile waste of time to do anything else.

13    Q.  Was there anything in the retainer agreements that you had

14    with the plaintiffs that required you to get approval from Mr.

15    Donzinger before you could make a decision to hire someone to

16    work on the case?

17             THE COURT:  Mr. Gomez, no one's approval for your

18    clients to have a recross examination of this witness is

19    required, but if you as their lawyer refuse to go forward with

20    it, that's pretty dispositive.  So, let's not waste anymore

21    time on this point, unless of course I'm misapprehending what

22    your point is, in which case I invite you to enlighten me.

23             MR. GOMEZ:  Nothing further, your Honor.

24             THE COURT:  Thank you.

25             Mr. Donzinger?

DB47CHE4                         Kohn - recross

1              MR. DONZINGER:  Nothing further.

2              THE COURT:  Thank you.

3              Mr. Kohn, you are excused.

4              THE WITNESS:  Thank you, your Honor.

5              THE COURT:  Next witness.

6              MR. MASTRO:  Your Honor, Chevron calls Dr. Patrick

7    Juola.  My colleague Pete Seley will be putting on Dr. Juola.

8     PATRICK JUOLA,

9          called as a witness by the plaintiff,

10         having been duly sworn, testified as follows:

11             DEPUTY COURT CLERK:  Thank you.  Please be seated.  If

12   you can please state your name and spell your last name for the

13   record.

14             THE WITNESS:  My name is Patrick Juola.  The last name

15   is spelled J, as in Julien, U, as in Uniform, O, as in Oscar,

16   L, as in Lima, A, as in Alpha.

17             MR. SELEY:  May I proceed?

18             THE COURT:  You may.  I am just reminded of a funnily

19   Lily Tomlin bit, but I will share it with counsel on another

20   occasion.

21   DIRECT EXAMINATION

22   BY MR. SELEY:

23   Q.  Good afternoon, Dr. Juola.

24             May I approach, your Honor?

25             THE COURT:  You may.

DB47CHE4                        Juola - direct

1    Q.  I marked for identification Plaintiff's Exhibit 3800 and

2    placed it before the witness.

3             Can you take a moment to take a look at that, please.

4             Is Plaintiff's Exhibit 3800 your written direct

5    testimony in this case?

6    A.  It is.

7    Q.  Please turn to the last page.  Is that your signature on

8    the last page?

9    A.  It is.

10   Q.  At the time you signed your written direct testimony, was

11   it true and accurate?

12   A.  It was.

13   Q.  As you sit here today, is your written direct testimony

14   true and accurate?

15   A.  Yes.

16            MR. SELEY:  I offer 3800 into evidence as Dr. Juola's

17   direct testimony.

18            THE COURT:  Received on the same basis as others.

19            MR. SELEY:  With your permission, I would ask just a

20   few brief questions to clarify something in the witness's

21   written statement.

22            THE COURT:  Go ahead.

23   Q.  Doctor, I direct your attention to paragraph 25 of your

24   direct testimony on page 8.

25   A.  Yes.

DB47CHE4                    Juola - direct

1    Q.  In particular, in paragraph 25 you refer to an example 1

2    from the June 27, 2011 expert report of Dr. Leonard, which you

3    describe as a block of text with more than 90 identical words

4    appearing in the Fusion memo and in the Ecuadorian judgment.

5    Do you see that?

6    A.  I do.

7              MR. SELEY:  Your Honor, may I approach, please?

8              THE COURT:  Yes.

9              MR. SELEY:  Thank you.

10   Q.  I place before the witness Plaintiff's Exhibit 2164,

11   already in evidence.  Dr. Juola, I direct your attention to

12   Plaintiff's Exhibit 2164, figure 1.

13   A.  Yes.

14   Q.  Is figure 1 in Plaintiff's Exhibit 2164 the same as the

15   example 1 from Dr. Leonard's report that you described in your

16   direct testimony?

17   A.  Yes, it is.

18   Q.  Dr. Juola, in paragraph 26 of your direct testimony you

19   refer to an example 2 from the expert report of Dr. Leonard.

20   Do you see that?

21   A.  I do.

22   Q.  Can I direct your attention to Plaintiff's Exhibit 2164,

23   figure 2, which is on page 2.  Do you see that?

24   A.  I do.

25   Q.  Is figure 2 in Plaintiff's Exhibit 2164 the same as the

DB47CHE4                    Juola – direct

1    example from Dr. Leonard's report you describe in your direct

2    testimony?

3    A.  Yes, it is.

4            MR. SELEY:  No further questions.  I pass the witness,

5    your Honor.

6            THE COURT:  Thank you.  Cross-examination.

7    CROSS EXAMINATION

8    BY MR. BOOTH:

9    Q.  Good afternoon.  I am Randy Booth.  I have a few questions.

10   Can you turn to your expert report, Plaintiff's Exhibit 3800,

11   please.  I'm sorry.  Your witness statement.

12   A.  Yes, sir.

13   Q.  Can you turn to -- actually before we get there, let me ask

14   you a couple of things.

15           Has your firm been compensated to date for the work

16   you have done on this case?

17   A.  We have received compensation, yes.

18   Q.  And how much have you received to date in compensation?

19   A.  The firm has received approximately $800,000.  I would need

20   to check the books for the exact figure.

21   Q.  And do you have any outstanding bills currently?

22   A.  We do.

23   Q.  Do you know what your outstanding bills total up to

24   currently?

25   A.  Not offhand.

DB47CHE4                    Juola - cross

1   Q.  Can you tell me when you received your last payment?

2   A.  Actually I can't.  The person who handles the business

3   aspects of the company is not me.

4   Q.  You can't give me even an estimate of what is outstanding,

5   is that right?

6   A.  No, I can't.

7   Q.  And what do you charge per hour for your time?

8   A.  The firm charges $500 per hour.

9   Q.  Is that for all the people working on the project?

10  A.  I'm sorry?

11  Q.  Each person working on the project would charge at a rate

12  of $500 an hour?

13  A.  Not quite.  There are some contract employees who we hired

14  at a reduced rate for some short-term tasks, and we billed out

15  at a reduced rate, I believe, of $50 an hour, although I don't

16  remember exactly.

17  Q.  OK.  Now I'm going to turn to your witness statement.  Can

18  you turn to paragraph 7, page 3, please.  I want to ask you a

19  few questions about your specialty, your experience, your

20  training, that type of thing.

21       At the end of paragraph 7 it makes reference to

22  computational and forensic analysis of linguistic features.

23  Can you explain to the court what that is.

24  A.  Basically nobody speaks or writes identically to anyone

25  else.  For example, if you told me that you had parked your

DB47CHE4                         Juola - cross

1    lorry on the pavement, that wouldn't indicate to me that you

2    were probably not from around here.  Around here we park trucks

3    on sidewalks.

4    Q.  And when you talk about computational, is that a particular

5    type of analysis that you do?

6    A.  It is.  It means doing the analysis by a computer instead

7    of by hand with a highlighter, for example.

8    Q.  And the next sentence you indicate you specialize in the

9    area of authorship attribution.  First of all, what is

10   authorship attribution?

11   A.  Authorship attribution is the determining of an author of

12   an unknown or questioned document.

13   Q.  And when you say specialize, is there a recognized

14   specialty or subspecialty in your field dealing with authorship

15   identification?

16   A.  I'm not sure what you mean by a recognized specialty.

17   There is no official organization of authorship.

18   Q.  Then I should ask you, what do you mean by the term

19   specialize as you use it there in that sentence?

20   A.  Most of my publications have been in the area of authorship

21   attribution.  Most of my conference presentations have been in

22   the area of authorship attribution.  I run conferences focused

23   on the attribution of authorship.

24   Q.  OK.  Can you go down to paragraph 11, still on page 3.  It

25   indicates the types of projects that your firm handles.  Can

1    you tell us which, if any, of those types of projects in that

2    last sentence of paragraph 11 you did in this particular case.

3    A.  This case is primarily a case about plagiarism and large

4    scale document searching.

5    Q.  Paragraph 12 talks about it appears to be -- well, you will

6    tell me.  What is paragraph 12 discussing?  What type of system

7    is that?

8    A.  It's discussing a computer program that I and my staff had

9    written over the past more than a decade.

10   Q.  This is something you developed yourself?

11   A.  Along with others, yes.

12   Q.  And it says it's an authorship analysis system.  Is this

13   the system you use in your work as an authorship analysis

14   expert?

15   A.  One of the systems I use.

16   Q.  Did you use this system in this case at all?

17   A.  I did not.

18   Q.  Are you fluent in Spanish?

19   A.  I am not.

20   Q.  Are you comfortable rendering expert opinions in a case

21   that involves documents written in Spanish?

22   A.  I am.  Partly because one of my staff is fluent in Spanish

23   and partly because the computational approach does not hinge on

24   any particular understanding of the language.  It hinges

25   instead on textual properties that are language independent,

DB47CHE4                         Juola - cross

1    such as whether the same string appears in multiple locations.

2    Q.  Looking at paragraph 11, again the last sentence, the

3    projects your firm handles, are there any projects in that list

4    that you are unable to handle if the documents are in Spanish?

5    A.  One moment, please.

6    Q.  Page 3, paragraph 11, the last sentence.

7    A.  Some of the profiling of authorship characteristics we

8    would be unable to do because we do not have the training

9    documents.  For example, in English we can infer personality

10   from a person's writing, but we don't have the training data to

11   do the same thing for Spanish.

12   Q.  Other than that, everything else you could do if the

13   documents were in Spanish, is that fair?

14   A.  That is fair.

15   Q.  Can you tell us briefly, what -- you make reference to OCR.

16   Can you just briefly describe what OCR stands for or refers to?

17   A.  OCR stands for optical character recognition.  It's the

18   process of taking an image which is -- if you think about how a

19   newspaper photo is constructed it's essentially a collection of

20   black dots or white dots, and from that black or white dots,

21   extracting the text, the characters that would actually

22   comprise the language inside that document.

23   Q.  And did you also have people at your behest go through

24   parts of the Ecuadorian record by hand?

25   A.  I did.

DB47CHE4                          Juola - cross

1    Q.   Did you go through the Ecuadorian record yourself to look

2    at documents by hand?

3    A.   I did.

4              (Continued on next page)

DB48CHE5                    Juola - cross

1   Q.  The documents you looked at, were they translated for you

2   into English or did you look at them in Spanish?

3           That's a bad question.  The documents from the

4   Ecuadorian records you looked at by hand, were they translated

5   into English or did you look at them in Spanish?

6           MR. SELEY:  Objection to form.

7           THE COURT:  What is your objection?

8           MR. SELEY:  The assumption that the documents are all

9   text.

10          THE COURT:  Sustained.

11  Q.  Are there some documents that are text and some documents

12  that are not text?

13  A.  Yes.  For example, some of the documents were photographs.

14  Q.  The documents that had text, that you looked at by hand as

15  opposed to with a computer, were those documents translated

16  into English or did you look at them in Spanish?

17          MR. SELEY:  Objection to form.

18  Q.  The documents that were text that you looked at by hand,

19  were those documents translated into English or did you look at

20  them in Spanish?

21  A.  I looked at the documents as they occurred in the court

22  record in Ecuador.  Some of the documents were in English.

23  Some of the documents were in Spanish.  Some of the documents

24  were entered into the court record as translations of English

25  documents.

DB48CHE5                     Juola - cross

1    Q.  Did you select the documents that you looked at?

2    A.  I, personally?

3    Q.  Yes.

4    A.  The computer did.

5    Q.  In terms of sort of the body of documents that you were

6    asked to look at, did you select that or were those documents

7    selected for you?

8            Bad question.  The documents that you ran the OCR

9    program on, were those documents selected for you or did you

10   select those documents?

11   A.  I think you have a -- you're laboring under a

12   misapprehension, sir.

13   Q.  Did you run the OCR program on the entire Ecuadorian

14   record?

15   A.  No.  I didn't run the OCR program at all.  The OCR was done

16   by someone else.

17   Q.  Did that person do the OCR program on the entire Ecuadorian

18   record?

19   A.  I believe so.

20   Q.  Now, if you look at paragraph 13 on page 4 under

21   methodology, you refer to the findings of other experts in this

22   case.  Other than Dr. Leonard, did you look at any other expert

23   reports or statements in this case?

24   A.  I did.

25   Q.  What experts were those?

DB48CHE5                    Juola - cross

1    A.  One of them was a report by, I think his first name was

2    Michael Younger of Stroz Friedberg.  I understand he has since

3    been replaced as a testifying expert by Mr. Lynch.

4              I also received and reviewed a report by a Maite

5    Turrel, who has since passed away and is therefore unavailable

6    for testimony.

7    Q.  What was that name, the last name?

8    A.  Turrel, T-U-R-R-E-L.  The first name is spelled M-A-I-T-E.

9              MR. BOOTH:  Those are my questions.  Thank you.

10   CROSS-EXAMINATION

11   BY MR. GOMEZ:

12   Q.  Good afternoon, Mr. Juola.

13   A.  Good afternoon.

14   Q.  Excuse me, doctor.

15             Doctor, how many people assisted you with your

16   analysis?

17   A.  In total?

18   Q.  Yes.

19   A.  Five, aside from myself.

20   Q.  Sir, did you perform an authorship analysis on the February

21   14, 2012 judgment to determine if it was in fact drafted by

22   Judge Nicolas Zambrano?

23   A.  That was not part of my agreement.

24             MR. GOMEZ:  Nothing further.

25             THE COURT:  Anything else, Mr. Seley.

DB48CHE5                    Juola - cross

1              MR. SELEY:  No questions.

2              THE COURT:  Dr. Juola, you are excused.

3              (Witness excused)

4              MR. MASTRO:  Chevron calls Mr. Samuel Hernandez.

5    SAMUEL HERNANDEZ, JR.,

6         called as a witness by the plaintiff,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  State your name and spell your last

9    name for the record.

10             THE WITNESS:  My name is Samuel Hernandez, Jr.,

11   S-A-M-U-E-L, H-E-R-N-A-N-D-E-Z, J-R.

12   DIRECT EXAMINATION

13   BY MR. SELEY:

14   Q.  Good afternoon, Mr. Hernandez.

15   A.  Good afternoon.

16             MR. SELEY:  Your Honor, may I approach?

17             THE COURT:  Yes, you may.

18   Q.  I have marked for identification Plaintiff's Exhibit 3900.

19   Mr. Hernandez, would you take a moment and look at that?

20             Is Plaintiff's Exhibit 3900 your written direct

21   testimony in this case?

22   A.  Yes.

23   Q.  Would you please turn to page 15.  Is that your signature,

24   sir?

25   A.  Yes, it is.

DB48CHE5                    Hernandez - direct

1    Q.  Since signing this document on October 8, you made a change

2    to this document, is that correct?

3    A.  Yes, that's correct.

4    Q.  Can you turn to page 9, paragraph 22B?

5            Is that the change you made, sir?

6    A.  Yes, it is.

7    Q.  Why did you make that change?

8    A.  Because there was a typo.  There were three selections of

9    text with two versions, not three versions.

10   Q.  Other than that correction, at the time you signed your

11   witness statement on October 8, was it true and accurate?

12   A.  Yes.

13   Q.  With that correction, is everything in your witness

14   statement true and accurate as of today?

15   A.  Yes, it is.

16           MR. SELEY:  I would offer Plaintiff's Exhibit 3900 in

17   evidence as Mr. Hernandez's direct testimony.

18           THE COURT:  Received on the same basis as the others.

19           (Plaintiff's Exhibit 3900 received in evidence)

20           MR. SELEY:  Pass the witness, your Honor.

21           THE COURT:  Mr. Booth.

22   CROSS-EXAMINATION

23   BY MR. BOOTH:

24   Q.  Good afternoon.  I am Rainey Booth.  Nice to meet you.

25           First of all, has your firm charged for your work done

DB48CHE5                         Hernandez - cross

1    to date in this case?

2    A.  Yes, it has.

3    Q.  How much have you charged to date or your firm charged to

4    date?

5    A.  My firm has charged approximately a total of about

6    $400,000.

7    Q.  Have you received that entire amount in payment to date,

8    the 400,000?

9    A.  I can't confirm that, if my company has received that

10   money.

11   Q.  You believe $400,000 is the total charges up to today, is

12   that fair?

13   A.  Could you repeat the question?

14   Q.  $400,000 you believe would be the total charges by your

15   firm for this case up to today?

16   A.  That is correct.

17   Q.  What is your hourly rate for working in this case?

18   A.  Well, the hourly rate that I bill on behalf of my company

19   is $350.

20   Q.  How many people from your company worked on this project in

21   this case?

22   A.  There were a total of four of us.

23   Q.  If you look at your witness statement, which is Plaintiff's

24   Exhibit 3900, do you have that in front of you, would you go to

25   paragraph 8 on page 3.

DB48CHE5                         Hernandez – cross

1          The second sentence, it discusses how the company

2   Morningside, and that's the company you work for, is that

3   right?

4   A.   I'm sorry.  Can you clarify what paragraph we are on?

5   Q.   Paragraph 8, second sentence.

6          Do you see it, paragraph 8 on page 3?

7   A.   Yes.

8   Q.   Morningside is the company you work for, is that correct?

9   A.   That's correct.

10  Q.   It indicates that Chevron provided Morningside with two

11  sets of documents.  Did you or anyone else at Morningside, to

12  your knowledge, play any role in the selection of those

13  documents?

14  A.   No.

15  Q.   Did you personally review the entire Ecuadorian trial

16  record, you personally?

17  A.   No, I personally did not.

18  Q.   Did your firm review the entire Ecuadorian trial record?

19  A.   No.  What we reviewed was known as the reviewed record.  It

20  included all of the documents that had been filed by the Lago

21  Agrio plaintiffs and the parties through the first date of the

22  filing through the judgment for the first review, and it

23  included all of the documents that had been filed by Chevron

24  and Texaco.  This was after May 28, 2010, which was the first

25  day in which they had received documents from the Lago Agrio

DB48CHE5                     Hernandez - cross

1   plaintiffs.

2   Q.  Paragraph 12 of your witness statement, there is a

3   reference to 236,000 individual pages.

4   A.  Yes.

5   Q.  Did your firm review that entire 236,000 number of

6   individual pages from the Ecuadorian record?

7              MR. SELEY:  Your Honor, asked and answered.

8              THE COURT:  I thought so.

9              Go ahead and answer it.

10  A.  We did not.  Again, we reviewed a reviewed record or a

11  portion of that, which included the documents that I just

12  mentioned.

13  Q.  I apologize.  So it would be your understanding that the

14  236,000 individual pages would be the entire Ecuadorian record,

15  is that your understanding?

16  A.  Yes, it is.

17  Q.  If we go to paragraph 13 then, there is a discussion about

18  97,058 individual pages.  Do you see that?

19  A.  Yes, I do.

20  Q.  Is that the reviewed record that your firm worked with in

21  doing your analysis in this case?

22  A.  That was the reviewed record for the first review, yes.

23  Q.  Do you know how many pages of the Ecuadorian record you

24  personally reviewed?  Did you keep track of that in any way?

25  A.  I did not personally review that record.

DB48CHE5                        Hernandez - cross

1   Q.  Did you keep track in any way of how many pages any

2   individual at your firm reviewed of the Ecuadorian record?

3   A.  We kept track of all of the documents that we reviewed from

4   the reviewed record, yes.

5   Q.  Did you keep track in any way of how long it took you to

6   review a certain number of pages, anything like that, where you

7   kept track of the time per page or how many pages you reviewed

8   in an hour, did you make any assessment like that in this case?

9             MR. SELEY:  Object to form, your Honor.

10            THE COURT:  Overruled.

11  A.  Would you please repeat the question?

12  Q.  Did you or any member of your firm, to your knowledge, keep

13  track of how long it took you to review the Ecuadorian record

14  per page or how many pages you were able to review in an hour,

15  any kind of record of that effort?

16  A.  We did not.

17            MR. BOOTH:  No more questions, your Honor.

18            THE COURT:  Mr. Gomez.

19            MR. GOMEZ:  Nothing further, your Honor.

20            THE COURT:  You're excused, sir.  Unless there is a

21  redirect.

22            MR. SELEY:  No, your Honor.

23            THE COURT:  You're excused, sir.  Thank you.

24            (Witness excused)

25            THE COURT:  Next witness.

DB48CHE5                     Hernandez - cross

1           MR. MASTRO:  Chevron calls Sandra Elena.

2           MR. BOOTH:  Before we go too far, we had filed a

3   motion regarding this witness.  I don't know if the Court

4   received it or has seen it.

5           THE COURT:  You filed it sometime in the wee hours of

6   the morning, isn't that right?

7           MR. BOOTH:  Someone on my behalf.  I just wanted to

8   make sure the Court had seen it and call it to your attention

9   before the witness testifies.

10          THE COURT:  I am aware that it's there.

11          MR. BOOTH:  So I don't waive anything, would the Court

12  want me to briefly express our motion orally so you have a

13  chance to rule on it or you will rule on the papers?

14          THE COURT:  I will rule on the papers.  I am going to

15  take the testimony.  I am aware that, in substance, your motion

16  was an in limine motion to preclude the witness, and I think

17  the time for filing that was a couple of months ago, but it may

18  still be available to you, and I will decide in due course.

19          MR. BOOTH:  Thank you.

20          MR. MASTRO:  Thank you, your Honor.

21   SANDRA ELENA,

22       called as a witness by the plaintiff,

23       having been duly sworn, testified as follows:

24          THE DEPUTY CLERK:  State your name and spell your last

25  name for the record.

DB48CHE5                          Hernandez – cross

1              THE WITNESS:  Sandra Elena, S-A-N-D-R-A, last name

2    E-L-E-N-A.

3              THE COURT:  You may proceed, Mr. Mastro.

4              MR. MASTRO:  May I approach the witness?

5              THE COURT:  You may.

6              Proceed.

7    DIRECT EXAMINATION

8    BY MR. MASTRO:

9    Q.  Ms. Elena, I have handed you what has been marked as

10   Plaintiff's 4700.  Is that your declaration?

11   A.  Yes, it is.

12   Q.  Can I ask you to please turn to page 41?  Do you see the

13   signature there?

14   A.  Yes.

15   Q.  Is that your signature, Ms. Elena?

16   A.  Yes, it is.

17   Q.  Was this declaration true and correct at the time you

18   executed it on October 18, 2013?

19   A.  Yes.

20   Q.  Is it true and correct today?

21   A.  Yes.

22   Q.  Is this your direct testimony in this case reflected in

23   this declaration?

24   A.  Yes, it is.

25             MR. MASTRO:  Your Honor, I offer Plaintiff's Exhibit

DB48CHE5                    Elena - direct

1    4700.

2              THE COURT:  Received on the same basis as before.

3              (Plaintiff's Exhibit 4700 received in evidence)

4              MR. MASTRO:  I turn over the witness.

5              THE COURT:  Mr. Booth.

6              MR. BOOTH:  I have some books.  May I approach?

7              THE COURT:  Yes, sir.

8    CROSS-EXAMINATION

9    BY MR. BOOTH:

10   Q.  Good afternoon.  Is it Ms. Elena or Dr. Elena?

11   A.  Ms. is fine.

12   Q.  I am Rainey Booth.  Nice to meet you.

13   A.  Nice to meet you.

14   Q.  I want to first ask you, have you received payment for your

15   work in this case to date, have you received any payments?

16   A.  Yes, I did.

17   Q.  How much have you been paid so far up to this point in time

18   for your work in this case?

19   A.  I received approximately $55,000 so far.

20   Q.  Do you have any outstanding bills that have not yet been

21   paid in this case?

22   A.  Yes, I do.

23   Q.  Can you tell me how much is outstanding currently in terms

24   of bills?

25   A.  I can calculate, probably is still $40,000.

DB48CHE5                    Elena - cross

1   Q.  An additional 40,000, is that right?

2   A.  Yes.

3   Q.  What is your hourly rate for your work in this case?

4   A.  It is $300.

5   Q.  Now, I have given you a notebook.  Would you mind opening

6   that and turning to tab 2?

7           Let me ask you, for the purpose of forming your

8   opinions in this case, did you review any affidavits filed on

9   behalf of Texaco in the New York *Aquinda v. Texaco* case?

10          They would be those affidavits behind tab 2.  Can you

11  just look at those and tell me if you have reviewed or relied

12  on any of those in forming your opinions in this case?

13  A.  No.

14          THE COURT:  These are defendants' exhibits?

15          MR. BOOTH:  These are Defendants' Exhibits DX 0362 is

16  the first one, DX 0363, DX 0364, DX 0365, DX 0366, DX 0367, DX

17  0368, DX 0369, and DX 0382.

18          We would move these into evidence.

19          THE COURT:  Mr. Mastro.

20          MR. MASTRO:  We would want to review them first before

21  we agree to move them into evidence.

22          THE COURT:  All right.

23          MR. MASTRO:  And this witness has said she hasn't seen

24  them.

25          THE COURT:  We will deal with that tomorrow, or at

DB48CHE5                          Elena - cross

1   some other appropriate time.

2             MR. MASTRO:  Thank you, your Honor.

3   BY MR. BOOTH:

4   Q.  Ms. Elena, did you consider any information in forming your

5   opinions from the case, it was a case filed in New York, the

6   *Aquinda v. Texaco* case, did you look at any information from

7   that particular case in forming your opinions here?

8   A.  No.

9   Q.  OK.  If you will turn in your written statement to page 27

10  of your witness statement.  That would be again DX 4700.

11            Specifically, looking at the section that begins,

12  paragraph 67, the title "Judicial Corruption in Ecuador."  Are

13  you there?

14  A.  No.  Please, can you tell me the page again?

15  Q.  Page 27.  I assume the version that you have is the same as

16  the version I have.  On mine it's page 27.  At the very bottom

17  of that page is paragraph 67.  Is that what you have as well?

18  A.  Yes.

19  Q.  So beginning with this section, which deals with judicial

20  corruption in Ecuador, and I want to go forward just a minute

21  and ask you a few questions about that section of your witness

22  statement.  All right?

23            In this case, do you have personal knowledge of any of

24  the facts of this specific case, of what is alleged or claimed

25  to have actually happened in this case?

1       MR. MASTRO:  Objection.  Vagueness, your Honor.  What

2   does he mean by "this case"?

3       THE COURT:  Overruled.

4   A.  I did not analyze any of the facts of this case.

5   Q.  And you were not asked to make any assumptions about the

6   particular facts of this case we are here about, correct?

7   A.  I did not make any assumption on this case.

8   Q.  You discuss on page 28, paragraph 70, some of the indices

9   you used in forming your opinion about corruption, and you

10  discuss these indices as being indirect.  Can you explain to

11  the Court what you mean by the indices you used being indirect?

12  A.  Corruption is clandestine and is performed in secret.  So

13  you won't find direct measures of corruption that you can use

14  to assess actual corruption in a country.  So in the academic

15  field, corruption experts use indices that show the corruption

16  in a country, and I am saying that there is a process, there

17  are good measures to understand corruption, but they are not

18  direct cases of corruption.

19  Q.  In your field, in your academic field of looking at this

20  issue, the types of indices that you refer to in your witness

21  statement, are these the types of indices you use in your

22  academic work as well?

23  A.  Yes.

24  Q.  You consider these indices to be good and reliable indices

25  to look at this issue of corruption?

DB48CHE5                    Elena - cross

1   A.  Yes.

2   Q.  If you turn to page 30 of your witness statement, beginning

3   in paragraph 75, can you explain to the Court what the global

4   corruption barometer is?

5   A.  The global corruption barometer is an index that measures

6   corruption.  It's developed by a very well-known international

7   organization called Transparency International, which is the

8   leading organization combating corruption around the world, and

9   it produces an index to assess corruption, and one portion of

10  the index is the perception of corruption in legal system and

11  judiciary.

12  Q.  If you turn to page 31 of your report, page 76, do you see

13  that you refer to three years of this global corruption

14  barometer, 2004, 2005 and 2007?  Do you see that?

15  A.  Yes.

16  Q.  If you turn to tab 3 of the binder I have handed you, can

17  you look at the document behind tab 3, which is DX 1208, and

18  tell me if that is the global corruption barometer from the

19  year 2004 that you refer to in your report?

20  A.  Yes.

21          MR. BOOTH:  We would move in Exhibit 1208 into

22  evidence.

23          MR. MASTRO:  No objection.

24          THE COURT:  Received.

25          (Defendants' Exhibit 1208 received in evidence)

DB48CHE5                      Elena - cross

1   Q.  Ms. Elena, can you turn to tab 4 of the binder I handed you

2   and tell me whether that document, which is DX 1209, is the

3   2005 report that you reference in paragraph 76 of your report?

4            THE COURT:  I take it you're going to do the same

5   thing with the next two exhibits?

6            MR. BOOTH:  The next one after this one.

7            THE COURT:  Can we stipulate that 1209 and 1210 are

8   the comparable reports of 2005 and 2007, and that they are

9   going to be received, Mr. Mastro?

10           MR. MASTRO:  I have no objection.

11           THE COURT:  Mr. Gomez?

12           MR. GOMEZ:  No objection.

13           THE COURT:  They are received, Defendants' 1209 and

14  1210.

15           (Defendants' Exhibits 1209 and 1210 received in

16  evidence)

17  Q.  Ms. Elena, can you turn to tab 5 of the binder?  I want to

18  ask you specifically about the 2007 report.  That is the report

19  you reference specifically in paragraph 76 of your witness

20  statement, is that right?

21           THE COURT:  It's one of them.

22           MR. BOOTH:  That was a bad question.

23  Q.  That's the report you specifically give us a number, a

24  corruption number, a score for, correct?

25           THE COURT:  Yes.  That's what the document says, Mr.

DB48CHE5                          Elena - cross

1   Booth.  Can we move?

2               MR. BOOTH:  Thank you, your Honor.

3   Q.  Can you turn to page 23 of Defendants' Exhibit 1210, which

4   is the 2007 global barometer?

5               Can you verify that's the chart you took your number

6   from, the 4.1 number for Ecuador?

7               THE COURT:  The numbers match.

8               Next question.

9   Q.  Can you turn to page 25 of that same document, and let me

10  ask you, it's table 4.4.  On the document it's labeled as page

11  24.  On the exhibit number it should be 25.  I know it's

12  confusing.  It would be table 4.4.  Do you see that?

13  A.  On page 24, you mean the table on page 24?

14  Q.  Table 4.4.

15  A.  Yes.

16  Q.  Is this a table you relied on in forming opinions in this

17  case?  The title of the table being "Respondents' Evaluation of

18  their Government's Efforts to Fight Corruption."

19  A.  No.

20  Q.  Ms. Elena, can you turn to tab 6 of the binder that I gave

21  you?  Ignore the first page.  That's a chart that I made.

22              If you would turn to the second page and tell me if

23  these documents are from the same organization you mentioned

24  earlier, Transparency International.  This would be DX 1211.

25              THE COURT:  Are you asking any more than whether these

1  pages have the name of that organization on it?

2          MR. BOOTH:  I just want to make sure it is the same

3  organization and not one with a similar name.  I have a good

4  faith belief they are the same organization.  I want to move

5  into evidence Defendants' Exhibit 1211.

6          THE COURT:  Any objection?

7          MR. MASTRO:  I have not seen these before.  If the

8  witness is familiar with these, that's one thing, but I am not

9  in a position to stipulate to them coming into evidence right

10 now.

11         THE COURT:  All right.

12 Q.  Ms. Elena, do you recognize these documents as coming from

13 the same organization you referenced earlier as being one of

14 the leading agencies fighting corruption, Transparency

15 International?

16 A.  The only thing that I can recognize is the logo of the

17 organization, it says Transparency International, but I can't

18 affirm that this table was retrieved from the database.

19 Q.  You did not consider these materials in forming your

20 opinion in this case?  For the record, this is Transparency

21 International archive site and it deals with corruption

22 perceptions index.

23         THE COURT:  Is that all part of the question?

24         MR. BOOTH:  Sorry, your Honor.  I will ask another

25 question.

DB48CHE5                         Elena - cross

1   Q.   Identifying this document DX 1211, Transparency

2   International archive site, would you agree with me that it

3   references corruption perceptions index for various years?

4             THE COURT:  It purports to do that.  Is the objective

5   to get this into evidence?

6             MR. BOOTH:  Yes.

7             THE COURT:  Maybe you want to ask questions that might

8   get you there.

9   Q.   Do you recognize any of this data or these charts as being

10  from Transparency International, the archive site dealing with

11  corruption?

12  A.   As I said, I recognize the logo up front in the page.  To

13  agree to affirm that this is the correct data, I have to

14  confront these to the web page.

15  Q.   Would you turn to tab 7, DX 1219, which for the record it's

16  corruption perceptions index 2011.

17            Do you recognize that document as also coming from

18  Transparency International?

19            THE COURT:  Are you asking whether that name appears

20  on it or are you asking whether she really knows anything about

21  it?

22            MR. BOOTH:  I asked if she recognized that as coming

23  from Transparency International; not whether she just sees it

24  on the page, but actually if she recognizes it as coming from

25  that organization was my question.

DB48CHE5                    Elena - cross

```
1              THE COURT:  All right.
2              Do you know, Ms. Elena?
3    A.  Which one are you asking me, which page?
4    Q.  Behind tab 7 of the binder, DX 1219, the title being
5    corruption perceptions index 2011.
6    A.  This map doesn't have the source.
7    Q.  The first page should be --
8              THE COURT:  Ms. Elena, apart from reading the name on
9    here, if there is a name, I don't even see it, but apart from
10   reading any name that's on here, do you know anything about
11   this document at all?
12             THE WITNESS:  I know that Transparency International
13   uses a corruption index every year.  I know that for sure.
14             THE COURT:  Do you know whether this is the index they
15   issued in 2011, this particular group of pages?
16             THE WITNESS:  It seems like it is.  It's similar, but
17   I cannot affirm that it is because I haven't compared these
18   pages to the web page.
19             THE COURT:  OK.  Thank you.
20             Mr. Booth.
21             Did you rely on this document in reaching any of your
22   conclusions, Ms. Elena?
23             THE WITNESS:  Actually, I used the corruption
24   barometer, but, specifically, the question related to the legal
25   system and the judiciary because it's more narrowed down and
```

DB48CHE5                        Elena - cross

1   specific to my work.

2              THE COURT:  But I am asking you about this particular

3   document, the one marked Defendants' Exhibit DX 1219.  Have you

4   ever seen it before today?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  Did you rely on this document

7   in forming your opinions in this matter?

8              THE WITNESS:  No.

9              THE COURT:  Mr. Booth, I know what you're trying to

10  do, and it may be that you can do it, but it sounds to me like

11  you can't do it with this witness.  And I have a feeling if you

12  and Mr. Mastro had a conversation, you might get somewhere, but

13  let's not take all this time if we can avoid it.

14  BY MR. BOOTH:

15  Q.  Ms. Elena, did you take any steps in forming your opinions

16  to compare the period of time 2001 and earlier in Ecuador, in

17  terms of corruption, with the period of time after 2008 in

18  Ecuador, in terms of corruption, did you take any steps to do

19  that?

20  A.  No.

21  Q.  Can you turn to page 33, paragraph 81 of your report, your

22  witness statement?

23             There is reference made to the opacity index.  Can you

24  tell the Court what the opacity index is, please?

25  A.  The opacity index is an index produced by the Milken

DB48CHE5                       Elena - cross

Institute, which is a recognized institute producing this kind

of studies, and it shows how opaque a legal and judicial

environment is, and I used this index because opacity is the

opposite to transparency and it is the lack of clear and

neutral rules.  And as I said, for analyzing corruption, you

need to understand also the environment, and I thought that

this was a useful index to include in my report.

Q.  Was this index an important index in the opinions you

formed in this case?

A.  Yes, as the other 16 indexes.

Q.  At the end of paragraph 82, you indicate it's based

entirely on empirical observations.  What do you mean by that?

A.  This index includes hard data, that is data that comes from

empirical observation as opposed to perception.  It derives

from the concrete observation of the laws, for example, of

actually how the laws are implemented and issues related to

transparency in a country.

Q.  If you look at paragraph 84 on page 34, you make reference

to a score from the year 2009, and the score is 57.

A.  Yes.

Q.  If you turn to tab 8 in the binder that I gave you, can you

confirm for me that DX 1212 is the document, the 2009 opacity

index, can you confirm that's the document you relied on to get

that score of 57?

A.  Yes.

DB48CHE5                         Elena - cross

1  Q.  On page 6 of the document, if you look at page 6 and

2  confirm that's where you got the number from?

3           THE COURT:  The numbers match.

4           MR. BOOTH:  I apologize.  Let's move on.

5  Q.  Ms. Elena, did you look at any other reports from this

6  agency looking at the opacity index for Ecuador for any other

7  years?

8  A.  If I can confirm with my March report I can tell you,

9  because I included in the exhibits of my previous report all

10  the historical series of the data I collected just for the

11  purpose of disclosure.

12           MR. MASTRO:  I have the report.

13           May I approach the witness?

14           THE COURT:  You may.

15  Q.  I will tell you what.  We may not need to do that.  I can

16  ask the next question.  If you need to do it, you certainly

17  can, but let me ask the next question.

18           Can you turn to tab 9 of the binder I gave you,

19  please?  And tell me if DX 1213 is the opacity index from

20  January of 2001?

21  A.  Yes.

22  Q.  This is the same organization, correct?

23  A.  No.

24  Q.  This is a different organization than the opacity index of

25  2009?

DB48CHE5                          Elena - cross

1    A.  Yes.

2    Q.  How are these organizations different?

3          That's a bad question.  They both are opacity indexes,

4    is that right?

5    A.  It is called opacity index.

6    Q.  Yes.

7    A.  It is not the same index that I was looking at.

8    Q.  Did you review this Price Waterhouse opacity index from

9    January 2001 in forming your opinions?

10   A.  No.

11   Q.  Do you consider Price Waterhouse Coopers, the opacity index

12   here, to be a reliable source?

13          THE COURT:  Of what, audited financial statements,

14   opacity indices?

15   Q.  Do you consider this document, Defendants' Exhibit 1213, to

16   be a reliable source of opacity indices for countries like

17   Ecuador?

18   A.  I know this index is not as good as the opacity index from

19   the Milken Institute.  It has a totally different methodology.

20   And on top of that, it is not from the time period of the

21   analysis I conducted, which is from 2003 to 2013.

22   Q.  I didn't understand the answer.  Do you consider this

23   document, this Price Waterhouse Coopers opacity index, to a

24   reliable source in terms of an opacity index?

25          MR. MASTRO:  Objection.  Asked and answered.

DB48CHE5                      Elena - cross

1          THE COURT:  Sustained.

2    Q.  Ms. Elena, who picked the time frame that you were looking

3    at in this case?  Did you pick it or did someone else pick it?

4    A.  I was hired to conduct a study within the time frame of

5    2003 and 2013.

6    Q.  So you were told which time frame to look at, is that

7    correct?

8    A.  Yes.

9    Q.  And you were asked not to look at any documents related to

10   your opinions prior to 2003, is that correct?

11   A.  No.

12   Q.  Did you look at any documents prior to 2003 in forming your

13   opinion?

14   A.  Yes.  For example, the length of ten year indicator.

15   Q.  Look at your witness statement, page 36.  You have a chart.

16   It's entitled, "Lack of Confidence in the Judiciary in

17   Ecuador."  Do you see it?

18   A.  Yes.

19   Q.  Now, this is something that you did by looking at a Web

20   site, correct?

21          That's a bad question.  The data that is represented

22   in this chart you obtained by looking at a Web site for a group

23   called Latinobarometro, correct?

24   A.  Yes.

25   Q.  It's an interactive Web site that you can use to get

DB48CHE5                    Elena - cross

1    exactly the years and the country that you want to look at,

2    correct?

3    A.  Yes.

4    Q.  If you turn to tab 10 in the binder I gave you, can you

5    confirm that Defendants' Exhibit 1214 is from that Web site,

6    Latinobarometro Web site?  Is it?

7    A.  Again, I can't confirm that.  You have the logo up front

8    and it seems to be, but to affirm that it is, I will have to

9    check and compare it to the Web site.

10   Q.  You actually used the Web site to do this graph, correct?

11   A.  I retrieved almost all the data of my report from Web

12   sites.

13   Q.  And you're telling me you don't recognize the sheet here as

14   the introductory page where you put in the name of the country

15   and then select the years that you want to retrieve data on,

16   the first page?

17   A.  As I said, it seems to be the page, but for being sure that

18   this is a picture of the Web site, I would like to compare to

19   the Web site.

20   Q.  Do you consider Latinobarometro to be a good and reliable

21   source of information on the topics that you're discussing in

22   your report?

23   A.  Yes.

24   Q.  If in fact these documents in DX 1214 are from that Web

25   site, you would consider them to be good and reliable documents

DB48CHE5                          Elena - cross

1    on the topics they discuss, correct?

2    A.  Assuming they are from Latinobarometro, yes.

3    Q.  Assuming they are from the Latinobarometro Web site, you

4    would have no concerns about relying on these documents for the

5    information they contain, correct?

6              MR. MASTRO:  Objection.  Asked and answered.

7              THE COURT:  It would depend on the information, don't

8    you think, Mr. Booth?

9              MR. BOOTH:  Bad question.  I think it's fine, but let

10   me just be sure.

11   Q.  As we go through each page, I am going to ask you some

12   things about the information.

13             I want you to assume for me that what I am going to

14   show you is actually from the Web site, all right, as I ask you

15   some questions about it.

16             If you recall, when you go to the Web site, on one of

17   the early pages, you can select the country and then you can

18   select the years that you want data on, correct?

19   A.  Yes.

20   Q.  And you chose for your report to select two groups of

21   years.  You selected 1996 to 2001 as one group, correct?

22   A.  No.

23   Q.  How did you do it then?  How did you retrieve information

24   off this Web site for your graph on page 36?

25   A.  I retrieved the information for all the years that are

DB48CHE5                         Elena - cross

1    available the same way I did for every index I used.

2    Q.  Right.  Then did you yourself then group the years into

3    these two sections, 1996 to 2001 and 2002 to 2010?

4    A.  Yes.

5    Q.  You made the decision to group the years in that way, is

6    that right?

7    A.  Yes.

8    Q.  And you chose to display it that way in your witness

9    statement, correct?

10   A.  Yes.

11   Q.  Was there any reason for drawing the separation between

12   2001 and 2002 of the two groups you identified here in your

13   witness statement?

14   A.  Because it struck me that the data was going up.  So this

15   is why I include this chart.

16   Q.  Did it have anything to do with the date that the original

17   New York case, *Aquinda v. Texaco*, was dismissed on forum

18   grounds in 2001, did that play any part in your decision?

19   A.  No.

20   Q.  Did any one of Chevron's attorneys indicate that would be

21   the right date separation for you to use in your opinion?

22   A.  No.

23   Q.  So you have an awareness then of how each individual year

24   looked if we just took it year by year, correct?

25   A.  Well, I don't know that from the top of my head, but I have

DB48CHE5                        Elena - cross

1    the data in my report.

2    Q.  If you turn to page 4 of tab 10 in the book I have given

3    you, can you look and see if the date we compiled, beginning

4    the year 1996 through the year 2010, if that looks to be right

5    to you?

6    A.  I need to check this chart with my data.

7    Q.  If you want to check the backup data, it's in the pages

8    behind the charts for each year.

9    A.  I need a moment to analyze the data.

10            MR. BOOTH:  Maybe I can save time.  I would move

11   Defendants' Exhibit 1214 into evidence, and I would be happy to

12   prove to Mr. Mastro after court today or tomorrow that this is

13   actually from the Web site, if that's a concern.

14            THE COURT:  Is there an objection or do you want an

15   opportunity to have it proved to you, Mr. Mastro?

16            MR. MASTRO:  I would, based on the witness's

17   testimony, like to have the opportunity to discuss it with Mr.

18   Booth, but I will certainly have an open mind, your Honor.

19            THE COURT:  Let's do that.

20            MR. BOOTH:  That will save us time.

21            THE COURT:  We are grateful for saving time.  How much

22   longer with the witness?

23            MR. BOOTH:  Five, six, maybe ten.

24            THE COURT:  Days, weeks or hours?

25            MR. BOOTH:  Minutes.

DB48CHE5                          Elena - cross

1              THE COURT:  That's the right answer.

2              I am teasing you, you understand.

3              MR. BOOTH:  Yes, your Honor.  I always believe you do.

4    BY MR. BOOTH:

5    Q.  Ms. Elena, just so we can save time, if you would briefly

6    look back at tabs 6 and 7 of the book I gave you that have the

7    words "Transparency International" on them.

8              If in fact these documents come from the Web site

9    Transparency International, would you consider them to be

10   reliable documents for the materials they discuss, for the

11   issues they discuss?

12   A.  I think that this is the global barometer, not the global

13   corruption barometer related to the judiciary.  So probably

14   what you're looking at and is included in this chart is the

15   global that includes not only the judiciary but the entire

16   government.  So I decided to use the specific indicator related

17   to the judiciary.

18   Q.  And if in fact these documents actually are from

19   Transparency International, actually from their Web site, you

20   would consider these documents to be reliable for the

21   information they contain, correct?

22   A.  Yes.

23             MR. BOOTH:  Again, I will do the same thing with

24   those, your Honor.

25             THE COURT:  Good.

DB48CHE5                    Elena - cross

1   Q.  Last area of questioning.  Can you turn to page 17 of your

2   witness statement, paragraph 40.

3          Are you with me?  Are you there?

4   A.  17, yes.

5   Q.  There is a discussion about a case involving *El Universo*

6   and a Judge Paredes.  Are you on that same paragraph in your

7   witness statement?

8   A.  Yes.

9   Q.  You use this example in discussing the Ecuadorian judiciary

10  in your witness statement, is that right?

11  A.  Yes.

12  Q.  If you look at the footnote, it indicates this information,

13  I suppose, became public about April 24, 2012, is that right?

14  A.  Footnote 31, yes?

15  Q.  Yes.  Footnote 31, yes.

16          I am going to ask you just a couple of things about

17  that.  You mentioned this case.  This is a case that involved

18  President Correa in Ecuador.  He was suing the El Universo,

19  which was a newspaper business, right?

20  A.  Yes.

21  Q.  And the issue there, or what came out in the press there in

22  April of 2012 was that one judge secretly recorded the other

23  judge, Judge Paredes, admitting that he had not actually

24  written the judgment in the case, correct?

25  A.  Yes.

DB48CHE5                    Elena - cross

1    Q.  In fact, what he said was he had been given the judgment on

2    a pen drive, that he had then used to put in his computer and

3    make a few changes, and then pretend it was his.  That's what

4    the story was about, correct?

5    A.  Can you rephrase your question?

6    Q.  Yes.  I have some newspaper articles about it at tab 10.

7    But my question is, in that case, Judge Paredes, who was being

8    taped, admitted on tape that he had received the judgment on a

9    flash drive, or a pen drive is the word they use, and then he

10   had put that in his computer, made a few changes, and signed it

11   as though he had written it.  That's what this case is about

12   that you reference in paragraph 40, correct?

13   A.  What I am referencing here is what Encalada said related to

14   the case.  And I would like to say that I am using the cases

15   just for illustration of my main points, but I did not analyze

16   any legal or judicial records related to the cases.  So this is

17   just an illustration of the high politically influenced

18   judicial system in Ecuador is, and that's it.  I don't know

19   much about the case itself.

20           MR. BOOTH:  Your Honor, we have at tab 11, which is DX

21   1215, DX 1216 at tab 12, DX 1217, and DX 1218, the Spanish and

22   then the English translation of articles from the newspapers

23   related to this topic.  I would like to move these into

24   evidence relative to this topic, and I won't ask the witness

25   any more about it.

DB48CHE5                      Elena - cross

1            THE COURT:  Relevant to what topic?

2            MR. BOOTH:  Relevant to paragraph 40 of her witness

3       statement, where she gives a specific example of what she

4       indicates is manipulating the judiciary to harass the media.

5       She references some press coverage in footnote 31.  And I would

6       move in these, not for the truth of the matters asserted, but

7       as related to the topic she addresses in paragraph 40, and then

8       I would be finished.

9            MR. MASTRO:  We are seeing them for the first time so

10      I need to review them.

11           THE COURT:  We will take this up tomorrow.

12           Anything else for the witness?

13      Q.  With this example that you give us here in paragraph 40 of

14      this judge not writing his own judgment, did you hear about

15      that at the time, were you aware of that when it happened, or

16      when it became public I should say?

17      A.  When I did my research to understand the situation related

18      to impartiality in Ecuador, I consulted several sources,

19      documents, studies, the indices, and I came to the conclusion

20      that Ecuador suffers from a severe instability in the judicial

21      system with a lot of problems with the judiciary itself.  For

22      example, to form my opinion, it was key to see that in the ten

23      year period that I analyzed, Ecuador had five different supreme

24      courts, four different judicial councils, two different

25      constitutions, and one amendment to the constitution.  So these

DB48CHE5                        Elena - cross

1    were aspects that show me the instability of the judiciary in

2    Ecuador that that really was a devastating situation for

3    impartiality.

4              Then I included this case just for illustration, a

5    concrete example of what I was presenting.  I did not study the

6    case itself because I conducted a systemic analysis, including

7    the analysis of indices, the institutional arrangements of the

8    system in Ecuador, and a comparative analysis.  I did not study

9    the cases per se or the cases themselves, but I just included

10   some of them, the ones that were more shocking, just for the

11   purpose of illustrating my points.

12   Q.  That wasn't my question.  My question was, when this

13   happened in April of 2012, were you aware of it at that time,

14   that a judge had admitted to not writing a verdict, but had in

15   fact just taken it from someone else?  Was that something you

16   were aware of in April of 2012 or did you only learn about it

17   later?

18   A.  I read articles in the media related to the *Universo* case

19   all the time.

20   Q.  On page 17 of your witness statement, what is cited at

21   footnote 31 is actually a press article, correct?

22             Page 17, footnote 31 is actually an article in the

23   press that you relied on to give your example, correct?

24   A.  Yes.

25   Q.  And this event with Judge Paredes, from your review of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB48CHE5                         Elena - cross

1    press materials, this was a big deal in Ecuador when it

2    happened, correct?

3              THE COURT:  Ms. Elena, do you live in Ecuador?

4              THE WITNESS:  No.

5              THE COURT:  Did you live there at the time?

6              THE WITNESS:  No.

7              MR. BOOTH:  I was very specific in my question.  I

8    said, from your review of the press materials you just

9    described, was it?

10             THE COURT:  So when I read The New York Times in the

11   morning, I am supposed to decide if something is a big deal in

12   America because I have read something in the paper?  I don't

13   think so.  Next question.

14   Q.  Was this incident in --

15             THE COURT:  The New York Times thinks that everything

16   that appears there is a big deal in America, but that's another

17   matter.

18   Q.  Last question, was this incident in Ecuador that you write

19   about, that came out in April of 2012, did you see that there

20   were a number of press articles about this event with Judge

21   Paredes?

22             MR. MASTRO:  Objection.

23             THE COURT:  Sustained.

24             MR. BOOTH:  Thank you.  No more questions.

25             THE COURT:  Thank you.

DB48CHE5                        Elena – cross

1          Mr. Gomez, anything?

2          MR. GOMEZ:  Just a few, your Honor.

3    CROSS-EXAMINATION

4    BY MR. GOMEZ:

5    Q.  Good afternoon, Ms. Elena.

6    A.  Good afternoon.

7    Q.  Based on the data that you reviewed, is it your opinion

8    that all judges in Ecuador are corrupt?

9    A.  No.

10   Q.  Based on the data that you reviewed, is it your conclusion

11   that there are no independent or impartial courts in Ecuador?

12   A.  I conducted a systemic analysis.  So I can tell you that

13   the judicial system in Ecuador is impartial nor independent.

14   And this is what I can say.

15          THE COURT:  I think there was a transcription error.

16          Please repeat your answer, Ms. Elena.

17   A.  I conducted a systemic analysis, and what I can say is that

18   the judicial system in Ecuador is not impartial and is not

19   independent.

20   Q.  Is it your professional opinion, Ms. Elena, that there are

21   no independent or impartial courts in Ecuador at all?

22   A.  Yes.  This is what I said, that Ecuador lacks an impartial

23   judicial system.

24          (Continued on next page)

25

DB47CHE6                         Elena - cross

1    BY MR. GOMEZ:

2    Q.  I'm asking you is it your opinion that there is not a

3    single court in Ecuador that is independent and impartial.

4            MR. MASTRO:  Objection.  Asked and answered.

5            THE COURT:  Sustained.

6    Q.  Ms. Elena, you testified that you were paid $300 an hour

7    for your work in this case.  That's correct, right?

8    A.  Yes.

9    Q.  Before you worked on this matter, had you ever been paid

10   $300 per hour for your services by anyone?

11   A.  No.  This is not a way that I get paid by hour.

12   Q.  What's normally the way that you get paid?

13   A.  I have a salary, a monthly salary, and I also get paid on a

14   daily rate.

15   Q.  What has been your average monthly salary prior to your

16   work in the Chevron case?

17   A.  I work in Argentina, and we have two different conversion

18   rates, so I really don't know how to answer that question.  I

19   can estimate following the official rate, which is not the

20   market dollar price, but it's complex.

21   Q.  I'm sorry.  Can you estimate using Argentinian currency

22   what your average monthly salary would be?

23   A.  Yes.  It's a part-time job, and I make 25,000 Argentinian

24   pesos a month.

25           MR. GOMEZ:  No further questions, your Honor.

DB47CHE6                        Elena - cross

1          THE COURT:  Thank you.  Mr. Mastro?

2          MR. MASTRO:  Your Honor, no further questions.  Thank

3    you, Ms. Elena.

4          THE COURT:  The witness is excused.  Thank you.

5          (Witness excused)

6          THE COURT:  All right.  That takes care of the

7    testimony for today.  What is on tap for tomorrow.  Mr. Mastro?

8          MR. MASTRO:  Your Honor, we look forward to welcoming

9    Mr. Zambrano to New York.

10         THE COURT:  How long do you expect to be with him?

11         MR. MASTRO:  Your Honor, with the translation issues,

12   and the experience we had over the weekend, I think that I will

13   take the better part of if not the entire day.

14         THE COURT:  On the other side?

15         MR. BOOTH:  Half a day.  I would estimate half a day.

16         MR. GOMEZ:  Yes, your Honor.  I will estimate,

17   depending on how it goes, either half a day or a quarter.

18         MR. MASTRO:  And I will do my best, your Honor, to go

19   faster.  I intend to ask only yes or no questions, but the

20   witness doesn't always --

21         THE COURT:  You don't have to go any further.  So we

22   are looking at the better part of two days, is that right?

23         MR. GOMEZ:  I think that's fair, your Honor.

24         THE COURT:  OK.

25         Now, let's get the ground rules straight.  All right?

DB47CHE6

```
1    There are no speaking objections by either side during his
2    testimony.  "Objection" is OK.  "Objection to form" is OK.
3    "Privilege" is OK.  Beyond that, nothing gets said in front of
4    the witness except at the side bar.  You can ask for a side
5    bar, which I may or may not grant.  I want to hear what this
6    man has to say, period, not what whatever else the lawyers want
7    to say, which I will hear in an appropriate setting.
8             Now, a separate question.  In my opinion, which I
9    think was dated October 10, I granted certain sanctions unless
10   documents -- all documents from Ecuador responsive to the
11   requests enumerated in footnote 183 -- were produced by October
12   24 of this year.  Were they produced?
13             MR. MASTRO:  No, your Honor.
14             THE COURT:  Mr. Friedman?
15             MR. FRIEDMAN:  I have no indication they were
16   produced, your Honor.
17             THE COURT:  Mr. Gomez?
18             MR. GOMEZ:  No, your Honor.
19             THE COURT:  All right.  That ruling subject to the
20   motion for reconsideration stands on that point.
21             Then I will see counsel and Mr. Gowan in the robing
22   room.
23             (In the robing room)
24             THE COURT:  Be seated, folks.
25             There was apparently an incident, at least it was so
```

DB47CHE6

1    reported to me, on October 31, Mr. Gowan, involving you and

2    Ms. Lachter, the attorney for Mr. Shinder.  I am going to say

3    to you exactly what I said to her.  I want you to tell me

4    exactly what happened, on the understanding that you are making

5    a statement to a federal judicial official and that any false

6    statement may be prosecutable under 18 U.S. Code 1001.  That's

7    what I said to her at page 1526 of the transcript.  Please

8    respond.

9              MR. GOWAN:  Yes, your Honor.  I had two conversations

10   with Ms. Lachter.  First, in the morning I introduced myself

11   and got her card.  I have her card with me today.  Then at the

12   break I consulted with my client, who is Aaron Page, about her

13   client's testimony about the final 15 minutes of the meeting,

14   or the latter end of the meeting where her client ha claimed

15   that Mr. Donzinger was present.  I asked her that I suspected

16   that that testimony was false, and I asked her if she wouldn't

17   mind checking it with her client.  She said to me who are you?

18   Probably in the middle of that she said who are you, and I said

19   my name is Chris Gowan and she said who do you represent, and I

20   said I'm on the side of Mr. Donzinger, employment to him.

21             THE COURT:  Was anything else said by either of you?

22             MR. GOWAN:  I don't -- not that I recall, no.

23             THE COURT:  Did you use the word perjury in either

24   conversation?

25             MR. GOWAN:  I don't believe I did.  I understand she

DB47CHE6

1    said that I used that word, but I may have used that word when

2    I was talking to Aaron Page next to me.  But I very clearly

3    said to her that I asked her if she could check the testimony

4    by her client on that one issue.  This is something that as a

5    criminal defense lawyer we do all the time.  This is a common

6    occurrence for me in my practice.

7              THE COURT:  Did you say to her in words or in

8    substance I suggest you tell your client to rethink that

9    testimony that Donzinger was in the room because that's

10   perjury?

11             MR. GOWAN:  That is certainly not my recollection.

12   Absolutely not.

13             THE COURT:  OK.  Anybody want to add anything,

14   including you, Mr. Gowan?  I did receive your letter, which I

15   will docket.

16             MR. GOWAN:  I conferred with lead counsel, my client,

17   and I am not aware of any rule that I'm breaking, that I

18   violated by my conduct, but if I did, I would ask your Honor

19   for some guidance, and I certainly will confer with lead

20   counsel on all matters before I speak to counsel.

21             THE COURT:  Well, you might consult the Rules of

22   Professional Responsibility in so far as they have to do with

23   threatening criminal proceedings for the purpose of gaining an

24   advantage in civil litigation.

25             Thank you, folks.

DB47CHE6

1          MR. FRIEDMAN:  Could I bring up just a minor

2     procedural point?  We could have done this outside but --

3          THE COURT:  All right.

4          MR. FRIEDMAN:  My impression is that Chevron will be

5     done with its case sometime this week.

6          THE COURT:  Well, I was hoping that.  I'm not sure

7     it's true anymore.

8          MR. MASTRO:  It's still our intention to try to do

9     that, your Honor.  I did not expect that it would be as long a

10    process questioning Mr. Zambrano, but I suspect now it will be

11    longer than I would have had to do before, given the nature of

12    translation and all of that.

13         MR. FRIEDMAN:  My point is simply this, your Honor:

14    It would be our intent to make a JMOL motion at the end of the

15    case, or at the end of their case.  I wonder if we could

16    reserve filing a written motion sometime later than that, in

17    other words, not have to file it as soon as they close their

18    case.

19         THE COURT:  You can make a JMOL without filing papers.

20         MR. FRIEDMAN:  I know that, but I would like to file

21    something, and I don't think we will have it done by the time

22    they close their case.

23         THE COURT:  Look, I don't think it's a useful

24    exercise, to tell you the truth.

25         MR. FRIEDMAN:  OK.

DB47CHE6

1          THE COURT:  You will make the motion.  I will reserve

2     or I will rule on it, and we're going to go on with the defense

3     case.

4          MR. FRIEDMAN:  Absolutely.

5          THE COURT:  Unless I hear something that I don't

6     expect to be hearing.

7          MR. FRIEDMAN:  Fair enough.  Thank you.

8          MR. MASTRO:  Just so the court knows, we will go back

9     tonight and try to pare back our witness list even more.

10          THE COURT:  OK.

11          MR. GOMEZ:  Just one issue.  This weekend during the

12     Zambrano deposition there were a number of translations that I

13     thought were inaccurate.  And I was wondering -- and I suppose

14     I could talk to the court reporter after we are done -- if

15     there is some way of preserving the audio of the Spanish

16     response in the event we have an issue with the translation.

17     The official record is obviously the transcription by the court

18     reporter, but there is no way then to go back after the fact

19     and confirm through some other means whether the response that

20     was given in Spanish, what it was.

21          So I don't know if there is a way of recording the

22     audio of the Spanish that's actually spoken by the witness so

23     that we can have a record of that for future use, if necessary.

24     If your Honor knows of some procedure in the court, I don't

25     know, but I certainly can confer with the court reporter after

DB47CHE6

1    about that, but there was an issue in the deposition.  And we

2    did have the videotape of the deposition that we can use, but

3    we won't have that in court.

4              MR. MASTRO:  I mean, your Honor, there is a video so

5    there is an audio associated with the video.

6              THE COURT:  From the deposition, I understand.  Do you

7    have a proposal to deal with this?

8              MR. MASTRO:  I will be happy to talk to Mr. Gomez.  He

9    made a record of three or four, maybe one or two instances

10   where he raised a point about the translation.  And sometimes

11   there was colloquy about it.  I think the record is pretty

12   clear where he raised a translation issue, very few instances,

13   and the special master dealt with it.  But the video and audio

14   related to the video should capture all of that.

15             THE COURT:  As to the deposition.  It doesn't capture

16   it as to the trial.

17             MR. GOMEZ:  The trial.

18             THE COURT:  Can you confer and see if you can in some

19   way satisfy one another on this?  As a general proposition I

20   know that I always instruct juries in cases involving

21   translations that it is the translation that is the evidence.

22   You have a sworn interpreter, and there it is.

23             In close to 20 years on the bench I have tried cases

24   with interpreters dealing with an astonishing number of

25   languages, some of which I never previously heard of.  There

DB47CHE6

1    have been almost no translation issues at trial.

2           The one I remember best -- and possibly there is a

3    precatory significance -- was a commercial case in which one

4    side or the other -- it was a Frenchman, and I think the

5    essence of the claim was that the Frenchman had been guiled

6    into a deal inappropriately by the fast-talking

7    English-speaking Americans, and he did not fully understand the

8    language or what he was doing.  I think that was the argument.

9    It was something like that.  And what I remember is that at

10   some point in the course of the trial, in which this particular

11   witness testified in French through an interpreter, there was a

12   big hullabaloo about the accuracy of the translation.  And as

13   the colloquy of counsel roared on, the witness on the witness

14   stand just turned to me and said in perfect English "We could

15   have avoided all the of this if they had let me testify in

16   English."

17          Now, whether that has any application here, I have no

18   idea, but there we are.  I hope you can work this out.  Never

19   in my experience has there ever been an audio recording of

20   testimony.

21          MR. MASTRO:  And, your Honor, I think we have

22   excellent translators.  The translator on Friday and Saturday

23   was the same one that both parties have used for their private

24   translations in depositions.

25          THE COURT:  So, all right.  Look, obviously if there

DB47CHE6

1    is an issue about a translation, you are at liberty to bring it

2    to my attention, and the chances are it will be resolved with a

3    colloquy with the translator.  And if it isn't, we will

4    confront any such problem.  But I'm hoping that we're not going

5    to get to that point.

6              MR. MASTRO:  Understood.  Thank you, your Honor.

7              THE COURT:  Thank you.

8              (Trial adjourned to November 5, 2013 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX OF EXAMINATION

2   Examination of:                           Page

3   JOSEPH C. KOHN

4   Direct By Ms. Neuman . . . . . . . . . . .1397

5   Cross By Mr. Donziger  . . . . . . . . . .1399

6   Cross By Mr. Gomez . . . . . . . . . . . .1488

7   Redirect By Ms. Neuman . . . . . . . . . .1517

8   Recross By Mr. Gomez . . . . . . . . . . .1536

9   PATRICK JUOLA

10  Direct By Mr. Seley . . . . . . . . . . .1537

11  Cross By Mr. Booth . . . . . . . . . . . .1540

12  Cross By Mr. Gomez . . . . . . . . . . . .1548

13  SAMUEL HERNANDEZ

14  Direct By Mr. Seley . . . . . . . . . . .1549

15  Cross By Mr. Booth . . . . . . . . . . . .1550

16  SANDRA ELENA

17  Direct By Mr. Mastro . . . . . . . . . . .1556

18  Cross By Mr. Booth . . . . . . . . . . . .1557

19  Cross By Mr. Gomez . . . . . . . . . . . .1582

20                     PLAINTIFF EXHIBITS

21  Exhibit No.                      Received

22   5600   . . . . . . . . . . . . . . . . . .1399

23   3900   . . . . . . . . . . . . . . . . . .1550

24

25

```
1    4700      . . . . . . . . . . . . . . . . . .1557

2                        DEFENDANT EXHIBITS

3    Exhibit No.                          Received

4    1388      . . . . . . . . . . . . . . . . .1480

5    1387      . . . . . . . . . . . . . . . . .1506

6    5609      . . . . . . . . . . . . . . . . .1507

7    1208      . . . . . . . . . . . . . . . . .1561

8    1209 and 1210    . . . . . . . . . . . . . .1562

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```