DB5LCHE1                        Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   CHEVRON CORPORATION,

 4                  Plaintiff,

 5             v.                          11 Cv. 0691 (LAK)

 6   STEVEN R. DONZIGER, et al.,

 7                  Defendants.

 8   ------------------------------x
                                           November 5, 2013
 9                                         9:38 a.m.

10   Before:

11                     HON. LEWIS A. KAPLAN
                                           District Judge
12
                            APPEARANCES
13
     GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        JEFFERSON E. BELL
          ANNE CHAMPION
17        GEORGIA K. WINSTON

18   FRIEDMAN RUBIN
          Attorneys for Donziger Defendants
19   BY:  RICHARD H. FRIEDMAN
          DEE TAYLOR
20
     LITTLEPAGE BOOTH
21        Attorneys for Donziger Defendants
     BY:  ZOE LITTLEPAGE
22        RAINEY BOOTH

23   GOMEZ LLC
          Attorneys for Defendants Hugo Camacho, Javier Piaguaje
24   BY:  JULIO C. GOMEZ

25
```

DB5LCHE1                           Trial

```
1              (Trial resumed)
2              THE COURT:  Good morning.
3              MR. MASTRO:  Good morning, your Honor.
4              THE COURT:  I just thought I would give you an
5    indication of how we will wind this up.  I anticipate inviting
6    post-trial briefs.  I anticipate giving you 30 days to write
7    them and to exchange simultaneously and then a relatively brief
8    period to reply to one another's submissions.
9              Now, is there a lawyer present for the witness?
10             MR. GOMEZ:  No, your Honor.
11             THE COURT:  And will not be?
12             MR. GOMEZ:  I don't believe so, your Honor.
13             THE COURT:  Okay.  All right.  Are we ready to proceed
14   then?
15             MR. GOMEZ:  Yes, your Honor.
16             MR. MASTRO:  Your Honor, I just wanted to address one
17   point with the Court before we begin, and it has to do with
18   your Honor's rulings yesterday morning at the beginning of
19   trial as to Mr. Tarco and Ms. Calva.  We wanted to request of
20   the Court that in regard to those witnesses that we have that
21   your Honor consider imposing the additional condition similar
22   to those which were imposed on Mr. Zambrano that they agree if
23   they are going to be deposed that they will commit to coming to
24   the trial to testify so we get a true discovery deposition.
25             THE COURT:  I understand.  Any reason why I shouldn't
```

DB5LCHE1                    Trial

1    do that, counsel?

2            MS. FRIEDMAN:  I'm sorry, your Honor.  Someone

3    interrupted me just as Mr. Mastro was talking so I missed the

4    point.

5            THE COURT:  Tell Mr. Friedman what you said,

6    Mr. Mastro.

7            MR. MASTRO:  Certainly.  Mr. Friedman, the point I was

8    making was that as a condition of those two witnesses,

9    Mr. Tarco and Ms. Calva, being permitted to testify that they

10   commit in advance that they will appear at the trial to testify

11   so we get a true discovery deposition.

12           MS. FRIEDMAN:  Yes.  I don't see a problem with that,

13   your Honor.

14           THE COURT:  Mr. Gomez?

15           MR. GOMEZ:  No problem, your Honor.

16           THE COURT:  So ordered.

17           MR. MASTRO:  And, your Honor, additionally, as to both

18   Mr. Tarco and Ms. Calva, your Honor imposed certain conditions

19   on documents or computer hardware mirror imaging on Mr. Tarco.

20   We would ask that your Honor impose on both witnesses the

21   similar condition of that imposed on Mr. Zambrano that any

22   relevant documents that we give a document demand are in their

23   possessions.

24           THE COURT:  I'm sorry, you swallowed some of your

25   words.  Any relevant documents, blank, blank document.

DB5LCHE1                    Trial

1          MR. MASTRO:  Any relevant documents in their

2    possession in addition to the ones your Honor identified in

3    Mr. Tarco's case.  And we'll serve a demand as to both that

4    they be produced, as well, in advance of their depositions.

5          THE COURT:  Any reason why not, Mr. Friedman?

6          MS. FRIEDMAN:  Only that I don't know the realm of

7    what Ms. Calva might or might not have.  We're requesting

8    anything Mr. Tarco can bring that he bring and we're pursuing

9    that.  I'll check with Calva and see.  It's just a guess, but

10   my guess is she doesn't possess any documents.

11         THE COURT:  If she doesn't possess any, then it's not

12   much of a problem.

13         MS. FRIEDMAN:  That's true.

14         Mr. Gomez.

15         MR. GOMEZ:  Your Honor, my only addition would be any

16   demand for documents that the plaintiffs provide be provided in

17   the Spanish language as well.  Mr. Zambrano did not receive a

18   Spanish language translation of the document request until his

19   deposition.  So that we can provide that to these people

20   specifically so they can understand what's being asked of them,

21   I would ask for Spanish translation.

22         THE COURT:  Mr. Mastro, do you have a problem with

23   that?

24         MR. MASTRO:  I don't have a problem with that, your

25   Honor.  So we'll give them a Spanish translation too.

DB5LCHE1                    Trial

1          THE COURT:  All right.  So the application is granted

2     and I'll ask you to submit an order by tomorrow embodying the

3     substance of what I've just done.  See if you can't agree on

4     the form of it.

5          MR. MASTRO:  Certainly, your Honor.

6          The last thing is that I had communication with

7     Mr. Friedman last night.  Our trial is hopefully moving towards

8     a conclusion by next week.  Mr. Friedman informs me that it's

9     not -- Ms. Calva doesn't even have a visa.  And I don't know

10    what Mr. Tarco's status is.  So I'm wondering how those

11    witnesses they plan to call them if they can't even get here.

12         MS. FRIEDMAN:  We're wondering the same thing, your

13    Honor.  We are pushing hard to try to get things done, and I

14    have nothing else to say to the Court.  We're trying to get

15    them here.

16         THE COURT:  We'll see where we are.  It may be that

17    the trial will end before they get here.  Maybe not.  We'll

18    see.  That's premature.

19         MR. MASTRO:  Understood, your Honor.

20         The last thing that Mr. Friedman and I had an exchange

21    about last night was that he suggested to me that maybe they

22    would want to substitute a different witness for Mr. Tarco.  I

23    wanted the Court to be aware that we would oppose that.

24    Mr. Tarco has put in a declaration here.  An application was

25    made.  So I just wanted the Court to be aware of that exchange.

DB5LCHE1                         Trial

1          THE COURT:  I'm aware of it.

2          MS. FRIEDMAN:  Your Honor, two quick things.  At some

3     point today we would like to take up the Doe 3 issue yet again.

4     There's been a new filing.

5          THE COURT:  I suggest you respond to the new filing,

6     which I take it is a letter.

7          MS. FRIEDMAN:  It is a letter.  You want us to do that

8     in writing?

9          THE COURT:  Yeah.  I don't want to take time here.

10    I'd like to move this along.

11         MS. FRIEDMAN:  All right.  And I've been told there is

12    a lawyer for Mr. Zambrano here who I have not met.

13         THE COURT:  And who is it?

14         MS. FRIEDMAN:  Heather Shaner, your Honor.

15         THE COURT:  Is that Ms. Shaner?

16         MS. SHANER:  Yes, your Honor.

17         THE COURT:  Welcome, Ms. Shaner.

18         Ms. Shaner, I will repeat to you what I said to

19    counsel in the case last night, slightly modified to take

20    account of the fact that you're not representing a party.

21         You may during the examination of your client object

22    on grounds of privilege.

23         You may advise him to assert his privilege under the

24    Fifth Amendment.

25         If you feel you need a side bar, you can ask for it,

DB5LCHE1                    Trial

1    which you may or may not get either immediately or later

2    depending on the circumstances.

3         I want to hear this witness's testimony without

4    interruption to the maximum extent possible, and not to suggest

5    that you would have done it, but without the witness being in

6    one way or another assisted in one way or another by the

7    comments of counsel in the courtroom.

8         So your role is to represent him alone.  You're not an

9    advocate for either side.  And I'm sure we'll get along

10   splendidly.  So you're welcome to have a seat.

11        Okay.  Let's proceed.

12        MR. MASTRO:  Certainly, your Honor.

13        Your Honor, Chevron calls Nicolas Zambrano.

14    NICOLAS ZAMBRANO,

15        called as a witness by the Plaintiff,

16        having been duly sworn, testified through the certified

17        Spanish interpreters, Jesus Rivera and Elisa Cabal, as

18        follows:

19        THE WITNESS:  Nicolas Augusto Zambrano Lozada.

20   DIRECT EXAMINATION

21   BY MR. MASTRO:

22        THE COURT:  You may proceed, counsel.

23        MR. MASTRO:  May I approach the witness, your Honor?

24        THE INTERPRETER:  The witness was asked to spell his

25   last name too, your Honor.

DB5LCHE1                          Zambrano - direct

1          THE COURT:  Spell your last name.

2          THE WITNESS:  L-O-Z-A-D-A, Zambrano Lozada.

3          MR. MASTRO:  Just handing the witness a copy of his

4     deposition, your Honor, and a copy to the Court.

5          THE COURT:  Did you or did you not give him the

6     declaration?

7          MR. MASTRO:  I'm about to give him the declaration.  I

8     just gave him the deposition, your Honor.

9          I am now also handing him a copy of Plaintiff's

10    Exhibit 400 and 399.  That's both the Spanish and English

11    language versions of the judgment.

12         And, your Honor, now handing the witness a copy

13    Plaintiff's Exhibit 6330, which is his declaration both in

14    English and in Spanish, of March 2013.

15         Finally, your Honor, what's been marked as Plaintiff's

16    Exhibit 6391, which is Mr. Zambrano's statement of

17    September 2013 in connection with an investigation conducted in

18    Ecuador, both in English and in Spanish.

19         MR. BOOTH:  Excuse me, your Honor.  Can we get our

20    copies?  Thank you.

21         MR. GOMEZ:  Excuse me, your Honor, for the record, to

22    my knowledge I don't think we have ever been produced a copy of

23    Plaintiff's Exhibit 6391.

24         MR. MASTRO:  I'm happy to ask the witness if he can

25    identify it, your Honor.

DB5LCHE1                        Zambrano - direct

```
1               THE COURT:  I'm sure we'll get there.

2               MR. MASTRO:  Yes.

3               THE COURT:  It certainly wasn't within any document

4    request because document discovery closed last December and

5    this document counsel said was produced on the 20th of

6    September of this year.

7               MR. MASTRO:  Correct, your Honor.

8               May I proceed, your Honor?

9               THE COURT:  Go ahead.

10              MR. MASTRO:  Thank you, your Honor.

11   BY MR. MASTRO:

12   Q.  Mr. Zambrano, welcome to New York.  I'm going to ask you a

13   series of questions, typically a yes or no, and I ask you if

14   there's anything that I ask you that you don't understand,

15   please tell me and I'll try to clarify it for you.

16              Now, Mr. Zambrano, am I correct that it is your

17   testimony that you are the sole author of the Lago Agrio

18   Chevron judgment?

19   A.  Yes.

20   Q.  And that nobody else helped you write even a word of that

21   judgment, that's your testimony, correct, sir?

22   A.  No.

23   Q.  Who else helped you write even a word of that judgment,

24   sir?

25   A.  When I dictated it to the secretary, she would write what I
```

DB5LCHE1                    Zambrano - direct

1   was dictating.

2   Q.  Sir, I'm not talking about the secretary taking dictation.

3           It's your testimony, sir, that every word in that

4   judgment was your words that you dictated, correct, sir, that's

5   your testimony?

6   A.  Yes.

7   Q.  And it's your testimony that nobody else wrote any of those

8   words, only you dictated and wrote those words, that's your

9   testimony, correct, sir?

10  A.  Yes.

11  Q.  It's also your testimony, sir, that under Ecuadorian law it

12  would have been improper for you to have had anyone else help

13  you write the Lago Agrio Chevron judgment, correct, sir?

14  A.  No.

15          MR. MASTRO:  Your Honor --

16  Q.  Mr. Zambrano, you gave a deposition this past Saturday and

17  I asked you the following question and you gave the following

18  answer.

19          THE COURT:  Page and line, counsel.

20          MR. MASTRO:  Page 238, line 10 down to line 19.

21  Q.  The question, sir, is:  "Is it your testimony that under

22  Ecuadorian law it would have been improper for you to have had

23  anyone else help you write the Lago Agrio Chevron judgment?

24  Yes or no, please, sir.

25  "A.  Yes."

DB5LCHE1                        Zambrano - direct

1              Now, sir, you realized you were under oath at your

2    deposition on Saturday when you were asked that question and

3    gave that answer, correct, sir?

4              MR. GOMEZ:  Objection, your Honor.

5              THE COURT:  Overruled.

6    A.  Yes.

7    Q.  And you were sworn to tell the truth when you answered that

8    question and every other question I asked you on Saturday,

9    weren't you, sir?

10   A.  Yes.

11   Q.  And you told me the truth when I asked you that question

12   and you gave me that answer, didn't you, sir?

13   A.  Yes.

14   Q.  Now, sir, this was the most important decision you ever

15   issued in your life as a judge, wasn't it, the Lago Agrio

16   Chevron decision?

17   A.  Yes.

18   Q.  It's the longest opinion you ever wrote, 188-page,

19   single-spaced opinion, is that your testimony, that you wrote

20   that and it's the longest opinion you ever wrote in your life?

21             MR. BOOTH:  Objection.

22             MR. MASTRO:  I'll withdraw the question.

23   Q.  And isn't it a fact, sir, that you never before authored an

24   opinion anywhere close to the length of the Lago Agrio Chevron

25   judgment?

DB5LCHE1                    Zambrano - direct

1              MR. BOOTH:  Objection, form.

2              THE COURT:  Rephrase.

3    Q.  Sir, am I correct that the 188-page Lago Agrio Chevron

4    decision was the longest opinion ever issued under your

5    signature in your career as a judge?

6    A.  Yes.

7    Q.  Am I also correct, sir, that it was the largest damage

8    award, $18 billion plus, that was ever awarded in a decision

9    signed by you in your career as a judge?

10   A.  Yes.

11   Q.  In fact, as far as you know, it is the largest damage award

12   ever issued out of any court in Ecuador ever, correct, sir?

13   A.  No.

14   Q.  As you sit here today, can you name another damage award

15   ever issued by an Ecuadorian court in excess of the $18 billion

16   damage award in the Chevron Lago Agrio case?

17   A.  I only know about the judgment that I issued.

18   Q.  Sir, am I also correct that it's your testimony you worked

19   especially hard on the Lago Agrio Chevron case because it was

20   so important?

21   A.  Can you please clarify it?

22   Q.  Certainly.  It's your testimony that you worked very hard

23   on the Lago Agrio Chevron judgment because it was such an

24   important case, correct, sir?

25              MR. BOOTH:  Objection, form.

DB5LCHE1                          Zambrano - direct

1            THE COURT:  I think it would be helpful to drop the

2    preface about it being the witness's testimony.  It could be

3    confusing.

4            MR. MASTRO:  Certainly, your Honor.

5    Q.  Did you work very hard on the Lago Agrio Chevron judgment

6    because it was such an important case, sir?

7            MR. BOOTH:  Objection, form.

8            THE COURT:  Compound.

9    Q.  Sir, did you work very hard on the Lago Agrio Chevron

10   judgment?

11   A.  Could you please do me the favor and clarify what you mean

12   by very hard?

13   Q.  Did you work long hours to prepare the judgment, sir?

14   A.  Yes.

15   Q.  Did you pour your heart and soul into working on that

16   judgment, nights, weekends?

17           MR. BOOTH:  Objection, form.

18           THE COURT:  Are you laying the ground work for

19   something?

20           MR. MASTRO:  I am, your Honor.

21           THE COURT:  Overruled.

22   A.  I worked many hours, many days, including several weekends.

23   Q.  And nobody else provided assistance to you with the

24   research you say you needed to do to write the judgment,

25   correct, sir?

DB5LCHE1                    Zambrano - direct

1        MR. BOOTH:  Objection, foundation.

2        THE COURT:  Overruled.

3   A.  Could you please clarify what you mean by assistance, in

4   what sense?

5   Q.  Nobody else provided assistance to you in connection with

6   you preparing the Lago Agrio Chevron judgment, correct, sir?

7        MR. GOMEZ:  Objection, asked and answered.

8        THE COURT:  Overruled.

9   A.  No.

10  Q.  Other than the typist you mentioned earlier, am I correct,

11  sir, that nobody --

12  A.  No one has helped me to write the judgment.  I was the one

13  who exclusively drafted it.

14  Q.  And nobody helped you do the research you needed to do to

15  write and author the judgment, correct, sir?

16  A.  I did the research.

17  Q.  Thank you, sir.  So you know that judgment because you

18  authored every word, correct?

19       MR. GOMEZ:  Objection.

20       THE COURT:  Overruled.

21  A.  According to the evidence that is part of the record, I

22  decided.

23  Q.  So, sir --

24  A.  I ruled.

25  Q.  So, sir, please tell us what the judgment says on page 107

DB5LCHE1                           Zambrano - direct

```
 1   is "the most powerful carcinogenic agent considered in this
 2   decision."  Please tell us what that was.
 3            Sir, I don't want you to look at the judgment.  I want
 4   you to tell us what is the most powerful carcinogenic
 5   considered in this decision that you said you authored every
 6   word of.
 7            MR. BOOTH:  Objection.  Side bar, your Honor.
 8            THE COURT:  Mr. Gomez?
 9            MR. GOMEZ:  Same request, your Honor.
10            THE COURT:  No side bar.  Overruled.  I understand
11   your point.
12   Q.  Sir, do not look at the judgment.  Please tell us --
13            THE COURT:  The record will reflect that the witness
14   has been leafing through the document.
15   Q.  Please tell us what the judgment says is "the most powerful
16   carcinogenic agent considered in this decision."
17            MR. BOOTH:  Your Honor.
18            THE COURT:  I've already ruled.
19            MR. BOOTH:  I object to the Court's comment.  I
20   apologize, but I object to the Court's last comment.
21            THE COURT:  And what comment was that?
22            MR. BOOTH:  The reference to the record, your Honor,
23   with all respect.
24            THE COURT:  The reference to the record?
25            MR. BOOTH:  I don't want to say it in open court if
```

DB5LCHE1                    Zambrano - direct

1   you don't want me to.

2          THE COURT:  Sir, the fact of the matter is I'm right

3   here and when the question was first put, the witness reached

4   in front of him and picked up the exhibits before him which

5   include the judgment.

6          Now, I'll stand amended to this extent.  I'm not sure

7   which piece of paper he was leafing through because there's a

8   big pile of them, but one can draw inferences.

9          MR. BOOTH:  Thank you, your Honor.

10  Q.  Please, sir, answer that question.

11         THE COURT:  Read the question to him again.

12  A.  First of all, I grabbed the judgment but it's in English.

13  And I tried to look for it here but I wasn't even able to find

14  the page.

15         THE COURT:  Okay.

16  A.  So, therefore, it's not that I reviewed even that page.

17         And regarding what I'm being asked, I don't recall

18  exactly, but if you give me the names, perhaps I could

19  remember.

20         THE INTERPRETER:  I need to inquire.

21  A.  The hexavalent is one of the chemicals that if it is

22  exceeded in its limits, it becomes cancer causing,

23  carcinogenic.

24         THE INTERPRETER:  And just for the record, the witness

25  used the word E-X-A-V-A-L-A-N-T-E.

DB5LCHE1                        Zambrano - direct

1           THE COURT:  Now, Mr. Zambrano, I expect you haven't

2    been in American court before, as I have not been in an

3    Ecuadorian court before.  I suspect they work differently.

4           You are to answer the questions that are put to you

5    and you are not to engage in a discussion beyond answering the

6    questions with either the lawyers or with me.  Mr. Mastro is

7    entitled to direct answers to his questions.  You may wish to

8    add something, but you may not do so unless and until another

9    lawyer asks you a question to which whatever you happen to want

10   to say is responsive.

11          Do you understand that?

12          THE WITNESS:  Understood.  Thank you.

13          THE COURT:  Thank you.

14          Go ahead, Mr. Mastro.

15   Q.  So, Mr. Zambrano, just to be crystal clear, can you tell me

16   what substance the judgment says is, quote, the most powerful

17   carcinogenic agent considered in this decision, yes or no?

18   A.  I don't recall.

19   Q.  And can you tell me, Mr. Zambrano, what report the judgment

20   says at page 134 is the "statistical data of highest importance

21   to delivering this ruling," yes or no?  Yes or no?

22          MR. MASTRO:  He's leafing through the document, your

23   Honor.

24          THE COURT:  Mr. Zambrano, stop.  Put the document down

25   and answer the question.

DB5LCHE1                    Zambrano - direct

 1          The record will reflect that the witness was going
 2     through the document.
 3          Would you hand me what you were going through please,
 4     Mr. Zambrano.
 5          The witness has just handed me Plaintiff's
 6     Exhibit 400, English.
 7          MR. MASTRO:  He also has 399.
 8          THE COURT:  I understand.  That's what he handed me.
 9     That's what I saw him looking at.
10          Now, I think it might be better for this line of
11     questioning to take the documents away from the witness stand
12     and end this controversy.
13          MR. MASTRO:  Certainly, your Honor.  May I approach?
14          THE COURT:  Yes.
15          MR. BOOTH:  Your Honor, may I have a continuing
16     objection along the lines that I asked for the side bar on?  I
17     don't want to keep standing up and interrupting, but I do
18     object to each one of these types of questions.
19          THE COURT:  The answer is yes, questions that are
20     testing his memory and/or knowledge of the contents of the
21     document --
22          MR. BOOTH:  Thank you, your Honor.
23          THE COURT:  -- in this line of questioning this
24     morning.
25          MR. BOOTH:  Thank you.

DB5LCHE1                     Zambrano - direct

1   Q.  Mr. Zambrano, I repeat my question.  Can you tell us, sir,

2   what report the judgment says is the "statistical data of

3   highest importance to delivering this ruling"?  Yes or no?

4   A.  Yes.

5   Q.  What is that, sir?

6   A.  The report by expert Barros.

7        THE INTERPRETER:  B-A-R-R-O-S.

8   Q.  Sir, I'm going to approach you again and I'm going to hand

9   you Plaintiff's Exhibit 399, which is the Lago Agrio Chevron

10  judgment in Spanish, and I'm going to ask you to turn to that

11  page, page 134 of the judgment.

12       Sir, isn't it a fact that the report, statistical data

13  of highest importance to delivering this ruling is the San

14  Sebastian Cancer in the Amazon in Ecuador?  Do you see that,

15  sir, page 134, study entitled Cancer en la Amazonia

16  Ecuatoriana, Cancer in Ecuadorian Amazonia, that's what the

17  judgment says is the report of the statistical data of highest

18  importance to delivering this ruling, correct, sir?

19       MR. BOOTH:  Objection, form.

20       THE COURT:  Overruled.

21  A.  Yes.

22  Q.  Sir, can you tell me what theory of causation the judgment

23  says its author agrees with and that the majority of writers on

24  legal doctrine in case law of foreign courts are inclined to

25  adopt, can you tell us what that theory of causation is, sir?

DB5LCHE1                          Zambrano - direct

1                THE COURT:  Sustained.  It's compound.

2                MR. MASTRO:  Sorry, your Honor.  I'll rephrase it.

3   Q.  Sir, can you tell us what theory of causation the judgment

4   says its author agrees with on page 88 of the judgment?

5                Do not look at the judgment, sir.  Do not look at the

6   judgment, please.

7                Can you tell us without looking at the judgment what

8   theory of causation the judgment says its author agrees with on

9   page 88 of the judgment?  Yes or no, sir.

10  A.  I don't recall.

11  Q.  Sir, you don't speak English, correct?

12  A.  No.

13  Q.  You don't speak French, you do, sir?

14               THE COURT:  I'm sorry, the answer is ambiguous.

15               MR. MASTRO:  I'll rephrase it, your Honor.  Let me

16  just add one more point before I move on.

17  Q.  Isn't it a fact, sir, that when I deposed you this past

18  weekend, you couldn't even tell me what TPH stands for,

19  correct, sir?

20               MR. GOMEZ:  Objection.

21               THE COURT:  Sustained.  You may offer the relevant

22  part of the deposition.

23               MR. MASTRO:  I will, your Honor.  Should I give you

24  the cite now?

25               THE COURT:  You may.

1          MR. MASTRO:  Thank you, your Honor.  Zambrano

2     deposition, page 30, lines 13 through 21:

3     "Q.  Tell us what TPH stands for, sir.

4     "A.  I'm trying to.  Well, it pertains to hydrocarbons, but I

5     don't recall exactly.

6     "Q.  It is a simple question, sir:  What does TPH stand for?

7     Do you know or not?

8     "A.  Yes.

9              "Do you want to tell us what TPH stands for?

10    "A.  No."

11             MR. BOOTH:  I'm sorry, where did you start?

12             MR. MASTRO:  Line 13.

13             MR. BOOTH:  Your Honor, for completeness, objection.

14    I would like the Court to read the next few lines.

15    "Q.  Tell us, sir, what TPH stands for, sir.

16             "I'm trying to.  Well, it pertains to hydrocarbons,

17    but I don't recall exactly.

18             "Sir, when did you first start writing the judgment?

19             "I don't recall exactly."

20    Q.  Now, sir, do you speak English?

21    A.  No.

22    Q.  Can you read English, are you literate in reading English?

23    A.  No.

24    Q.  Can you speak French?

25    A.  No.

DB5LCHE1                        Zambrano - direct

1   Q.  Are you literate in reading French?

2   A.  No.

3   Q.  Can you read any French?

4   A.  No.

5   Q.  Now, sir, you testified earlier today that no one else

6   assisted you with researching the Lago Agrio Chevron judgment,

7   correct?

8           THE COURT:  Sustained.  Asked and answered.

9           MR. MASTRO:  Certainly, your Honor.

10  Q.  Can you offer any explanation to this Court how it was that

11  you were able to cite in this judgment French law and French

12  authorities in French?

13  A.  Yes, of course.

14  Q.  You couldn't read the French, correct?

15  A.  No.

16          THE COURT:  No, it's not correct, or, no, he couldn't

17  read the French?  Straighten this out.

18  Q.  Sir, am I correct that case law you cited in French you

19  couldn't read?

20  A.  That's not true.

21  Q.  Tell me how you read French decisions that are in French to

22  prepare your opinion.

23  A.  As I stated in my deposition, the young woman who would

24  help me to type the judgment, she's the one who would go on to

25  the internet.  She would look for a specific subject.  It was

DB5LCHE1                        Zambrano – direct

1    obvious that I had to choose the Spanish option, version, and

2    that is how I would become aware or informed as to the subject

3    I was interested in.  Because there were many pages, she would

4    print them so that I would read them later.

5    Q.  So, sir, this was a teenage girl who was doing this typing

6    for you, correct, while you were working on the Lago Agrio

7    Chevron judgment?

8            MR. GOMEZ:  Objection to the translation.

9            THE COURT:  Mr. Interpreter, go talk to Mr. Mastro,

10   Mr. Gomez, and Mr. Booth.  See whether you can't resolve the

11   problem.

12           (Pause)

13           MR. MASTRO:  Your Honor, I'll ask another question so

14   we have no doubt about it.

15   Q.  The young woman or girl who you testified earlier who did

16   the typing into your office computer as you dictated the Lago

17   Agrio judgment, how old was she at the time you were preparing

18   the Lago Agrio judgment back in 2010 and 2011?

19   A.  Eighteen years old, approximately.

20   Q.  To your knowledge, can she speak French?

21   A.  I don't know.

22   Q.  To your knowledge, can she speak English?

23   A.  I don't know.

24   Q.  But it's your testimony that she searched the internet and

25   found you French cases to print out for you to use in your

DB5LCHE1                          Zambrano - direct

 1  judgment, that's your testimony, sir?

 2              MR. GOMEZ:  Objection.

 3  A.  Yes.

 4  Q.  Sir, did you have a Spanish/English dictionary in your

 5  office or not while you were dictating the Lago Agrio Chevron

 6  judgment?

 7  A.  No.

 8  Q.  So it's your testimony that this 18-year-old girl also

 9  searched the internet to find you American cases to print out

10  to cite in the Lago Agrio Chevron judgment; is that your

11  testimony?

12  A.  Could you please clarify the question?

13  Q.  I will make it really simple.  It's your testimony that

14  this 18-year-old girl would search the internet and print out

15  American cases for you to be able to cite in the Lago Agrio

16  Chevron judgment, correct, sir?

17              MR. GOMEZ:  Objection.

18              THE COURT:  Overruled.  Please answer.

19  A.  No.

20  Q.  Who -- strike that.

21              Did you yourself find American cases to cite in the

22  Lago Agrio Chevron judgment?

23  A.  No.

24  Q.  Who was it who found for you the Australian cases and case

25  law that you say you used in authoring the Lago Agrio Chevron

DB5LCHE1                         Zambrano - direct

1    judgment?

2              MR. BOOTH:  Objection.

3              THE COURT:  Overruled.

4    A.  As I've stated, the young lady who was helping me, once she

5    translated into Spanish the subject that I wanted, by then I

6    could read it in whatever language.

7    Q.  So just so we're clear, Mr. Zambrano, now it's your

8    testimony that she not only typed for you, she translated cases

9    in other languages into Spanish so you could read them, that's

10   your testimony, sir, this 18-year-old girl?

11             MR. GOMEZ:  Objection.

12             THE COURT:  Rephrase the question without the

13   sarcastic comment at the end.

14             MR. MASTRO:  I'm sorry, your Honor.

15   Q.  It's your testimony that this 18-year-old girl not only

16   typed for you, she translated cases in other languages into

17   Spanish so you could read them, that's your testimony, sir?

18   A.  It's false.

19             THE COURT:  What?

20   Q.  Sir, who translated -- strike that.  Strike that.

21             It's your testimony that this 18-year-old girl found

22   English language cases on the internet from America and

23   Australia and England for you to be able to cite in the Lago

24   Agrio judgment, correct, sir?

25   A.  It's false.

DB5LCHE1                        Zambrano – direct

1   Q.   Who found the English language cases from America,

2   Australia, and England that you then cited in the Lago Agrio

3   Chevron judgment?

4   A.   The young lady who was helping me.

5   Q.   That's the same young lady who was typing for you, correct?

6   A.   Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB58CHE2                         Zambrano - direct

1   Q.   Now, Mr. Zambrano, am I correct that you made lots of

2   notes -- strike that.

3            Mr. Zambrano, am I correct that it's your testimony

4   that you made lots of notes to prepare to draft the Lago Agrio

5   Chevron judgment, handwritten notes, correct, sir?

6            MR. GOMEZ:  I am having difficulty hearing the

7   translation.  Is there a way we can put a microphone near the

8   interpreter?

9            THE COURT:  He just has to do the best he can with the

10  equipment that we have.

11  A.   Some notes.

12  Q.   In fact, it's your testimony that you started to make these

13  notes to prepare the Lago Agrio Chevron judgment going back to

14  your first term on the case from October 2009 to February 2010,

15  correct, sir?

16  A.   Yes.

17  Q.   In fact, you kept a great deal of handwritten notes that

18  you made to help you prepare the Lago Agrio Chevron judgment,

19  correct, sir?

20           MR. BOOTH:  Objection.  Form.

21           THE COURT:  Sustained as to form.

22  Q.   Am I correct, sir, that you kept a great deal of notes,

23  handwritten notes, that you made to help prepare for drafting

24  the Lago Agrio Chevron judgment?

25           MR. BOOTH:  Same objection, your Honor.  Form.

DB58CHE2                         Zambrano - direct

1            THE COURT:  Same ruling.  Sustained.

2            MR. MASTRO:  The language comes from his deposition.

3            THE COURT:  Overruled.

4   A.  Yes.

5   Q.  Even after your first term and the Lago Agrio case ended,

6   you did not throw away the notes you had made; that's your

7   testimony, correct, sir?

8   A.  Yes.

9   Q.  Then when you came back on to the case, the Chevron case,

10  in October 2010, you made even more handwritten notes to help

11  you prepare to draft the judgment, correct, sir?

12  A.  Yes.

13  Q.  And you collected research, these printouts from the

14  Internet that you just testified about, documents of research

15  that helped you prepare the Lago Agrio Chevron judgment,

16  correct, sir?

17  A.  What happened to the documents?  What is the specific

18  question?

19  Q.  You also collected other documents, computer printouts,

20  research, to help you draft the Lago Agrio Chevron judgment,

21  correct, sir?

22  A.  I don't recall.

23  Q.  Sir, you testified earlier that this 18-year-old girl who

24  was typing for you also printed out research from the Internet

25  for you to use in preparing the judgment, correct, sir?

DB58CHE2                         Zambrano - direct

1   A.   Yes.

2   Q.   And you collected and kept those documents to help you

3   draft the Lago Agrio Chevron judgment, correct, sir?

4   A.   Yes.

5   Q.   Sir, you were served with a document subpoena in this case

6   to produce all of your documents relating to the drafting of

7   the Lago Agrio judgment, weren't you, sir?

8   A.   They were in English.  Supposedly they were documents.

9   Q.   But you know, sir, that you received a subpoena that

10  requested you produce all of the documents in your possession

11  relating to your work on the Lago Agrio judgment, correct, sir?

12          MR. GOMEZ:  Objection.  Time period.

13          THE COURT:  Be more specific.

14  Q.   Mr. Zambrano, you know that you received a subpoena that

15  required you to produce any documents that you still had in

16  your possession proving that you had worked on drafting the

17  Lago Agrio Chevron judgment, correct, sir?

18          MR. GOMEZ:  Same objection.  Form and foundation.

19          THE COURT:  Time period.

20  Q.   Mr. Zambrano, you know that you received a subpoena that

21  you produce any documents proving that you participated in the

22  drafting of the Lago Agrio Chevron judgment between 2009 and

23  2011?

24          THE COURT:  That's not the time period that we are

25  concerned about.

DB58CHE2                          Zambrano - direct

1          MR. MASTRO:  I am sorry, your Honor.

2          THE COURT:  Received the subpoena when?

3          MR. MASTRO:  I am sorry.

4   Q.  Mr. Zambrano, you received a subpoena regarding your

5   deposition to produce documents at your deposition reflecting

6   any work that you had done to produce the Lago Agrio Chevron

7   judgment, correct, sir?

8          MR. GOMEZ:  Same objection.

9   Q.  You received that back in early October, correct, sir?

10         THE COURT:  Overruled.

11  A.  No.

12  Q.  You received that subpoena delivered to you by Mr. Gomez in

13  Ecuador about a month ago, didn't you, sir?

14  A.  No.

15  Q.  Didn't Mr. Gomez visit you in Ecuador about a month ago?

16  A.  No.

17  Q.  Did you meet with Mr. Gomez anywhere, approximately a month

18  ago, to discuss testifying in this case?

19  A.  When I arrived in the United States.

20  Q.  Mr. Zambrano, who told you about Judge Kaplan's order

21  permitting you to testify in this case on certain conditions?

22  A.  Attorney Pablo Fajardo.

23  Q.  Am I correct that Mr. Fajardo told you that about a month

24  ago?

25  A.  False.

DB58CHE2                          Zambrano - direct

1    Q.   How long ago was it that Mr. Fajardo told you about Judge

2    Kaplan's order permitting you to testify in this case on

3    certain conditions?

4    A.   The first time when I had to go to Peru.  And then the

5    other one, that communication was delivered to me.

6    Q.   Sir, did anyone representing the Lago Agrio plaintiffs tell

7    you before you came to New York that Chevron's lawyers had

8    requested you produce any documents that you have in your

9    possession showing that you did any work on the Lago Agrio

10   Chevron judgment?

11   A.   No.

12   Q.   At your deposition this past weekend, you were served with

13   a trial subpoena that demanded you produce any documents

14   showing you had actually done any work on the Lago Agrio

15   Chevron judgment, correct, sir?

16   A.   It was in English and counsel told me that I had to appear

17   on Monday.

18   Q.   Sir, am I correct that you do not have any documents in

19   your possession that prove you did any work whatsoever in

20   authoring the Lago Agrio Chevron judgment?

21              MR. GOMEZ:  Objection.

22              THE COURT:  What is the objection?

23              MR. GOMEZ:  It calls for speculation.

24              THE COURT:  Overruled.

25   A.   No.

DB58CHE2                         Zambrano - direct

1    Q.  And that's because you destroyed your notes, correct, sir?

2    A.  Yes.

3    Q.  And you threw out all of those documents and research you

4    testified about earlier that this 18-year-old girl helped you

5    collect while she was typing for you, correct, sir?

6    A.  These were notes and the whole essence of that and the

7    detail is in the judgment.

8    Q.  Sir, so the record is crystal clear, you don't have a

9    single shred of evidence, a single piece of paper in your

10   possession today that proves you did anything to author the

11   Lago Agrio Chevron judgment, correct, sir?  Yes or no?

12             MR. BOOTH:  Objection.  Form.

13             There are additional objections, but you asked me not

14   to say anything in open court.

15             THE COURT:  The objection as to form is overruled.

16             Come to the side bar and tell me what else is on your

17   mind.

18             (Continued on next page)

19

20

21

22

23

24

25

DB58CHE2                          Zambrano - direct

1            (At the side bar)

2            THE COURT:  Mr. Booth.

3            MR. BOOTH:  The question, first of all, said you have

4    no evidence.  That's the first part.  Evidence is not just

5    pieces of paper.  Evidence is testimony.  Evidence would be, as

6    he indicated, the judgment that he wrote.  So he is lumping

7    together and saying, you have no evidence.

8            Then he goes into the next part of the sentence saying

9    pieces of paper.  The man just testified that in his opinion

10   the judgment is evidence because it contains all the things

11   that he worked on.

12           THE COURT:  All right.  Counsel, rephrase the

13   question.  The problem, of course, is that some of the

14   questions are very imprecise and the witness is being, shall we

15   say, not totally responsive.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

DB58CHE2                         Zambrano - direct

```
 1              (In open court)
 2              THE COURT:  The objection to form is sustained.
 3    Rephrase the question.
 4    BY MR. MASTRO:
 5    Q.  Mr. Zambrano, do you still have in your possession any of
 6    the notes, handwritten notes, you say you made to help you
 7    draft the Lago Agrio judgment?  Yes or no, sir?
 8    A.  No.
 9    Q.  Do you still have in your possession any of the documents
10    reflecting research that was done to help in the preparation of
11    the Lago Agrio Chevron judgment?
12    A.  No.
13    Q.  Do you have any documents at all in your possession that
14    show you did any work at all on the Lago Agrio Chevron
15    judgment?
16    A.  Yes.
17    Q.  What documents do you have, sir?
18    A.  The judgment that has my signature.
19    Q.  Sir, besides the judgment that was issued in the Lago Agrio
20    Chevron case, do you have any other documents at all that show
21    you did any work preparing the Lago Agrio Chevron judgment?
22    A.  Yes.
23    Q.  What documents are those?
24    A.  The clarification and supplemental orders to the judgment.
25    Q.  Sir, besides the court orders themselves in the Lago Agrio
```

DB58CHE2                    Zambrano – direct

1   Chevron case, do you have in your possession today any

2   documents at all that show you did any work at all on the Lago

3   Agrio Chevron judgment?

4   A.  No.

5   Q.  Sir, I want to turn to a different subject.

6          THE COURT:  Let's take our morning break here.

7          (Recess)

8          THE COURT:  Before we resume, I neglected to mention

9   that I gathered for a motion this morning that the defense had

10  served some or all of its witness statements for the defense

11  case.  Is that right, Mr. Friedman?

12         MR. FRIEDMAN:  We served some, not all.

13         THE COURT:  Nobody gave me any.

14         MR. FRIEDMAN:  I don't know why they didn't.  We will

15  fix that.

16         THE COURT:  Let's continue.

17         The witness is reminded he is still under oath.

18  BY MR. MASTRO:

19  Q.  Mr. Zambrano, you know Alberto Guerra Bastidas, correct,

20  sir?

21  A.  Yes.

22  Q.  You have known him for many years going back to when you

23  were a prosecutor in Lago Agrio, correct, sir?

24  A.  When the court in Sucumbios was opened.

25  Q.  Sir, you two were very friendly when you were a prosecutor

DB58CHE2                         Zambrano - direct

1    in Lago Agrio, correct?

2    A.  Yes.

3    Q.  In fact, he was someone you came to trust, correct?

4    A.  Yes.

5    Q.  And you were experienced in criminal cases as a prosecutor,

6    correct?

7    A.  Yes.

8    Q.  So you helped him to understand his criminal cases when he

9    was a judge, correct?

10   A.  No.

11   Q.  He was experienced in civil cases, correct?

12   A.  Yes.

13   Q.  Am I correct, sir, that when you became a judge, you would

14   sometimes look to Judge Guerra to help you on civil matters?

15   A.  No.

16   Q.  Sir, did there come a time when Mr. Guerra was no longer a

17   judge?

18   A.  Yes.

19   Q.  And you were still a judge when Mr. Guerra left the bench,

20   correct?

21   A.  Yes.

22   Q.  Am I correct, sir, that Mr. Guerra helped you with the

23   drafting of orders in your cases back in 2010 and 2011?

24   A.  Yes.

25   Q.  At the time he was helping you draft orders in your cases

DB58CHE2                          Zambrano - direct

1   as a judge in 2010 and 2011, he was facing a great financial

2   need, correct, sir?

3   A.   That is what he said to me.

4   Q.   So you paid him to help with the drafting of orders in your

5   cases as a judge in 2010 and 2011, correct, sir?

6   A.   No.

7   Q.   Sir, is it your testimony that it would have been improper

8   for you under Ecuadorian law to have paid somebody else to help

9   you draft your orders in the cases you had assigned to you as a

10  judge?

11  A.   Would you please repeat that question?

12  Q.   Sure.  Would it have been improper for you as a sitting

13  judge to pay someone else to help draft the orders in the cases

14  that were assigned to you?

15          MR. GOMEZ:  Objection to the translation.

16          THE COURT:  Madam interpreter, please confer with the

17  lawyers over at the lectern and see if you can resolve any

18  dispute.

19  Q.   The question, sir, is, would it have been improper for you

20  as a sitting judge under Ecuadorian law to pay someone else to

21  help draft the orders in the cases that were assigned to you?

22          MR. GOMEZ:  Same objection, your Honor.

23  A.   No.

24          THE COURT:  What is the same objection?

25          MR. GOMEZ:  The translation.

DB58CHE2                           Zambrano - direct

1              THE COURT:  Madam, speak to the lawyers again.

2              MR. MASTRO:  I will move on.

3    Q.  Sir, you gave a statement to Ecuadorian prosecutors in

4    September of 2013.  Do you recall giving that statement, sir?

5    A.  Yes.

6    Q.  And you knew that was in connection with an investigation

7    of Mr. Guerra by Ecuadorian prosecutors, correct, sir?

8    A.  Yes.

9    Q.  But you never said anywhere in that statement that

10   Mr. Guerra helped draft orders for you when you were a sitting

11   judge in 2010 or 2011, did you, sir?

12             MR. GOMEZ:  Objection.  The document speaks for

13   itself.

14             THE COURT:  I have no document in evidence, counsel.

15             MR. MASTRO:  It's not in evidence.

16             MR. GOMEZ:  Objection to form.

17             THE COURT:  Overruled.

18   A.  Could you please repeat the question?

19   Q.  You never said anywhere in that statement that Mr. Guerra

20   helped draft orders for you when you were a sitting judge in

21   2010 and 2011, did you, sir?

22   A.  I do not remember.

23             MR. MASTRO:  Your Honor, may I approach the witness?

24             THE COURT:  Yes.

25   Q.  I am handing the witness what has been marked as

1   Plaintiff's Exhibit 6391, both the English and the Spanish

2   versions of the witness's statement, dated September 20, 2013.

3           Sir, can you please identify that for the record, what

4   that statement is?

5   A.   This is a simple copy, which has not been signed by the

6   prosecutor.  It was introduced in an investigation which is

7   confidential.

8           MR. BOOTH:  Your Honor, I have a matter that I suppose

9   I need to take up at the side bar.

10          THE COURT:  Come on up.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB58CHE2                        Zambrano - direct

1           (At the side bar)

2           THE COURT:  What is it, Mr. Booth?

3           MR. BOOTH:  Going back to when Mr. Guerra was on the

4    stand, the way this was handled is some of the same things Ms.

5    Littlepage was trying to do, trying to test memory and do that

6    type of thing.  The Court's order, as I recall, was that the

7    document that is going to be talked about gets put into

8    evidence.  We don't talk about documents not in evidence.  And

9    once the document is in evidence, the document speaks for

10   itself.

11          So I think there were a lot of questions by Ms.

12   Littlepage attempting to draw a distinction between what he was

13   saying at one point, what he was saying at another point, how

14   the story changed, his recollections, and she was not allowed

15   to do that.  The Court indicated that the Court can make those

16   determinations when the documents are in front of the Court.

17   So if we are going down that path, it seems like we are doing a

18   very different thing.

19          THE COURT:  So far we have had one question.

20          MR. BOOTH:  Because the Court prefers that it be done

21   here, I thought it might be appropriate to deal with it now.

22          THE COURT:  Perfectly fair point.

23          MR. MASTRO:  When the witness answers my question and

24   acknowledges his statement, I am just going to put it into

25   evidence and it will speak for itself.

DB58CHE2                        Zambrano - direct

```
1          THE COURT:  Do the defendants all agree that this is a

2    true and correct copy of a statement made by the witness to the

3    Ecuadorian authorities, and it is exactly what it purports to

4    be, and stipulate that it can go into evidence?

5          MR. GOMEZ:  I can't agree to that.  For one, the

6    witness has pointed out it's not signed by the fiscal.

7          THE COURT:  It is not signed by the what?

8          MR. GOMEZ:  The fiscal, the prosecutor.  I don't know

9    if this is an initial draft that then has to be certified.

10          The other thing I have an issue with --

11          THE COURT:  Mr. Gomez, let me tell you my problem.  It

12    appears to be signed by the witness.  I don't care if it's not

13    signed by the fiscal or by the Archbishop of Canterbury.  It's

14    a statement by the witness, if the signature is genuine.

15          MR. GOMEZ:  The other question I have is I don't know

16    how this document was obtained.  My understanding is that these

17    proceedings are secret, like the report we are trying to get

18    for the forensic analysis, the parties are not entitled to have

19    these kinds of documents.  Mr. Mastro has represented

20    previously that Chevron has not had access to these proceedings

21    and yet today appears with a copy of this report.  So I don't

22    know whether some is available, some is not available, whether

23    this we are supposed to have and use.  I don't know any of

24    these questions, and I would like to have some answers if

25    possible.
```

DB58CHE2                         Zambrano - direct

1              THE COURT:  I don't doubt you would.

2              You're unwilling to stipulate to the document into

3    evidence or to its authenticity, is that right?

4              MR. FRIEDMAN:  We are willing to.

5              MR. BOOTH:  We are willing to stipulate it in.

6              MR. GOMEZ:  I will stand corrected.  I will submit to

7    the stipulation.

8              THE COURT:  All right.

9              MR. MASTRO:  We are not offering it for the truth of

10   the matters asserted obviously.

11             THE COURT:  So Plaintiff's Exhibit 6391 is stipulated

12   to be an authentic copy of a statement made by the witness that

13   is admissible evidence offered not for the truth of the matters

14   stated, but for the fact that the witness made the statements.

15             Agreed, Mr. Mastro?

16             MR. MASTRO:  Yes.

17             THE COURT:  Mr. Friedman.

18             MR. FRIEDMAN:  Yes.

19             THE COURT:  Mr. Gomez.

20             MR. GOMEZ:  Agree.

21             THE COURT:  OK.

22             (Continued on next page)

23

24

25

DB58CHE2                        Zambrano - direct

 1              (In open court)

 2              THE COURT:  Plaintiff's 6391 is received, but not for

 3    the truth of the matters asserted.

 4              (Plaintiff's Exhibit 6391 received in evidence)

 5              THE COURT:  Proceed.

 6    BY MR. MASTRO:

 7    Q.  Sir, you also gave a declaration in this case back in March

 8    of 2013, correct, sir?

 9    A.  I don't recall the date, but I did send a written

10    statement.

11    Q.  One that you swore to under oath, correct, sir?

12    A.  Yes.

13    Q.  Sir, am I correct that before your deposition this past

14    weekend, you never before admitted publicly in any statement or

15    sworn statement you ever made that Judge Guerra helped draft

16    orders for you when you were a sitting judge back in 2010 and

17    2011?

18    A.  He never helped me to write court orders.  What he prepared

19    were the drafts.

20    Q.  That's what I asked you, sir.  You never before in any

21    public statement that you had made, before your deposition this

22    past weekend, admitted that Mr. Guerra helped draft orders for

23    you when you were a sitting judge in 2010 and 2011?

24              MR. BOOTH:  Objection.  Form.

25              THE COURT:  Overruled.

DB58CHE2                        Zambrano - direct

 1              MR. GOMEZ:  Objection to the translation.

 2              MR. MASTRO:  I will rephrase it, your Honor.

 3   Q.  Isn't it a fact, sir, that before your deposition this past

 4   weekend, you had never before admitted that Judge Guerra helped

 5   you with drafts when you were a sitting judge in 2010 and 2011?

 6   A.  I don't remember.

 7   Q.  Am I correct, sir, that you were made aware before your

 8   deposition that more than 100 draft orders in cases assigned to

 9   you as a judge, and later were issued under your signature,

10   were found on Judge Guerra's personal computer?

11   A.  No.

12   Q.  Has anyone made you aware -- strike that.

13              Had anyone made you aware prior to your deposition

14   that draft orders in cases assigned to you as a judge that were

15   later issued under your signature were found on Mr. Guerra's

16   personal computer?

17   A.  No.

18   Q.  Isn't it a fact, sir, that Mr. Gomez told you before your

19   deposition that there was evidence submitted in this court that

20   Mr. Guerra had draft orders in cases assigned to you, later

21   issued under your signature, on his personal computer?  Yes or

22   no sir?

23   A.  No.

24              MR. MASTRO:  Your Honor, page 222, line 20, through

25   223, line 18.  It actually starts on line 19 on page 222.

DB58CHE2                       Zambrano - direct

1    "Q.  Has anyone made you aware that more than 100 draft orders

2    in cases assigned to you as a judge and were later issued under

3    your signature were found on Judge Guerra's personal computer?

4    "A.  With a clarification, I was told by someone, but I was not

5    told the amount, the number.

6    "Q.  Am I correct that it is Mr. Gomez who told you that

7    information?

8    "A.  There were many accusations that had been made by

9    Dr. Guerra.

10   "Q.  I just asked you, who told you that many of the orders

11   that were eventually issued under your name in cases assigned

12   to you as a judge were found in draft form on Mr. Guerra's

13   personal computer?  Who told you that?

14   "A.  That some evidence regarding that had been submitted and

15   some of that evidence had been stated, Dr. Gomez told me."

16            THE COURT:  That was from the deposition on November

17   2nd, is that right?

18            MR. MASTRO:  Correct, your Honor.

19            MR. BOOTH:  May I request a reading with the

20   deposition -- would you rather do a side bar?  It's the same

21   issue I addressed with you at the side bar, the impeachment

22   with the deposition.

23            THE COURT:  I made very clear in the pretrial

24   conference and have consistently applied the rule.  The

25   attorney can read from the deposition.  He is offering it in

DB58CHE2                          Zambrano - direct

1   evidence.  He now is at liberty to ask a question.  He may want

2   to ask the witness whether he told the truth on November 2nd.

3   He may want to ask him whether he told the truth today or

4   whether somehow he told the truth both times.

5   BY MR. MASTRO:

6   Q.  When you gave that testimony under oath at your deposition,

7   sir, this past Saturday, were you telling the truth about what

8   Mr. Gomez had told you before your deposition?

9   A.  Well, with the clarification that was made, yes.

10  Q.  When, approximately, was it that Mr. Gomez told you about

11  draft orders in your cases having been found on Mr. Guerra's

12  personal computer?

13  A.  In the course of last week.

14  Q.  So when you gave your statement to the Ecuadorian

15  authorities in September of this year, you didn't know that

16  draft orders in your cases had been found on Mr. Guerra's

17  personal computer?

18  A.  No.

19              MR. MASTRO:  You want to know what the "no" means?

20              THE COURT:  Yes.

21              MR. MASTRO:  I will try to ask it a better way, your

22  Honor.

23  Q.  Am I correct, sir, that when you gave your statement to

24  Ecuadorian authorities in September 2013 -- strike that.

25              Did you know when you gave your statement to

DB58CHE2                        Zambrano - direct

1   Ecuadorian authorities in September 2013 that draft orders in
2   your cases as a judge had been found on Judge Guerra's personal
3   computer?
4   A.  No.
5   Q.  Now, sir, I asked you earlier about whether you paid Judge
6   Guerra to draft orders for you in your cases as a sitting judge
7   in 2010 and 2011.  Do you recall that testimony, sir?
8   A.  Yes.
9   Q.  But you did pay Judge Guerra on at least one occasion,
10  correct, sir?  You admit that, correct?
11  A.  No.
12  Q.  Sir, I would like to show you what has been marked as PX
13  1713, page 9 of 32.  It is coming up on the screen, and I will
14  represent to you that it is a bank deposit slip into
15  Mr. Guerra's bank account.
16          Do you see that on the screen, sir?
17  A.  Yes.
18  Q.  Do you see the ID number on that bank deposit slip, also
19  called a cedula number, sir?
20  A.  I see a number.
21  Q.  That's your cedula number, correct, sir?
22  A.  Yes.
23  Q.  Right above it, do you see the signature on the signature
24  line of the person making the deposit?  Do you see that, sir?
25  A.  Yes.

DB58CHE2                         Zambrano - direct

1    Q.  That's your signature, isn't it, sir?

2    A.  It is similar to mine.

3    Q.  Sir, can you tell us whether you can identify that as your

4    signature on that bank deposit slip above your cedula number?

5    A.  Yes.

6    Q.  Sir, this is a direct deposit into Mr. Guerra's bank

7    account by you for $300, correct, sir?

8    A.  Yes.

9    Q.  Now, sir, can you offer any explanation to this Court why

10   Judge Guerra's personal day planners or diaries would reflect

11   that -- strike that.

12          Do you have any explanation for this Court why Judge

13   Guerra's day planners for 2011 and 2012 show entries for

14   $1,000, $2,000, coming from you on multiple occasions during

15   that period?

16          MR. GOMEZ:  Objection.

17          THE COURT:  Overruled.

18   A.  I do not know.

19   Q.  Sir, did anyone tell you before your deposition that

20   Mr. Guerra had bank deposit records showing a direct deposit by

21   you into his bank account?

22   A.  Yes.

23   Q.  Am I correct that it was Mr. Gomez who told you that before

24   your deposition?

25   A.  Yes.

DB58CHE2                          Zambrano - direct

1    Q.  When did Mr. Gomez tell you that there was a bank deposit

2    slip reflecting a direct deposit by you into Dr. Guerra's

3    account?

4    A.  He asked me whether I had an explanation for some deposits,

5    and I told him I did.

6    Q.  When was that, sir?

7    A.  It was in the course of the week prior to my deposition.

8    Q.  In any of the public statements you made with the

9    Ecuadorian prosecutors or anywhere else, before your deposition

10   this past weekend, did you ever acknowledge that you had made a

11   direct deposit into Mr. Guerra's bank account?

12   A.  Could you please repeat that question?

13   Q.  Certainly, Mr. Zambrano.

14         In any of the public statements you ever made before

15   your deposition this past weekend, did you ever say that you

16   had made a direct deposit into Mr. Guerra's bank account?

17   A.  No.

18   Q.  Sir, I am going to ask you about TAME shipping records.

19         Mr. Guerra shipped you drafts of court orders in your

20   cases using TAME shipping, didn't he, sir?

21   A.  Sometimes.

22   Q.  In fact, you and he would ship information about draft

23   orders back and forth using TAME shipping, correct, sir?

24             MR. GOMEZ:  Objection.  Form.

25             THE COURT:  Overruled.

DB58CHE2                          Zambrano - direct

1    A.   No.

2    Q.   He would ship drafts to you using TAME, correct?

3    A.   Not always.

4    Q.   Sometimes, correct, sir?

5    A.   Yes.

6    Q.   What was it that you would ship to him using TAME shipping?

7    A.   Because he was practicing the profession, he would request

8    copies of different documents, and I would do him the favor of

9    obtaining them and sending them.

10   Q.   Sometimes, sir, that information that you would ship to him

11   was to help him draft orders for you, correct, when you were

12   shipping to him?

13   A.   Regarding his issues, I don't know what he was doing with

14   that.

15   Q.   So, sir, am I also correct that it's your testimony that

16   while Judge Guerra helped you draft orders in other of your

17   cases, he didn't help you draft orders in the Chevron case?  Is

18   that correct, sir, that's your testimony?

19            MR. BOOTH:  Objection.  Form.

20            THE COURT:  Overruled.

21   A.   Could you please repeat the question?

22   Q.   Certainly.

23            Mr. Zambrano, am I correct that it's your testimony

24   that while Mr. Guerra helped you draft orders in other of your

25   cases, he did not help you draft orders in the Chevron case?

DB58CHE2                        Zambrano - direct

1    A.   That's false.

2    Q.   Is it your testimony, sir, that Judge Guerra helped you

3    draft orders in the Chevron case?

4    A.   No.

5    Q.   So I am correct that it's your testimony that Judge Guerra

6    did not help you draft orders in the Chevron case, even though

7    he was helping you draft orders in other cases?

8             MR. MASTRO:   I will make it simpler, your Honor.

9    Q.   Am I correct, Mr. Zambrano, that it is your testimony that

10   Judge Guerra did not help you draft orders in the Chevron case?

11   A.   Yes.

12   Q.   Even though at the same time he was helping you draft

13   orders on other of your cases, correct, sir?

14   A.   That's false.

15   Q.   Sir, I am going to back up for a second.

16            Are you aware that at least nine orders in the Chevron

17   case were found in draft form on Mr. Guerra's computer?

18            MR. GOMEZ:   Objection, your Honor.   May I request a

19   side bar, please?

20            THE COURT:   Yes.

21            (Continued on next page)

22

23

24

25

DB58CHE2                          Zambrano – direct

1              (At the side bar)

2              MR. GOMEZ:  Your Honor, there is a distinction between

3    drafting the orders and helping with drafts, prepare drafts of

4    orders.  Sometimes that distinction gets lost in the

5    translation, and I think the witness draws a distinction

6    between the two, because he considers drafting the order, that

7    he just signs it and issues it, whereas the latter is preparing

8    drafts.  He testified at the deposition he would revise, make

9    edits to them, and then issue a judgment according to his view.

10             THE COURT:  Mr. Mastro, you now know that you will

11   probably have to ask it both ways.

12             MR. MASTRO:  I understand, your Honor.

13             (In open court)

14             THE COURT:  Objection sustained as to form.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DB5LCHE3                         Zambrano - direct

1    BY MR. MASTRO:

2    Q.  Mr. Zambrano, Mr. Guerra was helping you with drafts in the

3    cases you were assigned to decide during 2010 and 2011,

4    correct, sir?  Let me back up for one second.  I'll rephrase

5    it.

6         Mr. Zambrano, am I correct that Mr. Guerra was helping

7    you with drafts in the cases you were assigned to decide in the

8    period from 2009 through 2012, correct, sir?

9    A.  Correct.

10   Q.  And it was during that same period, 2009 to 2011, that you

11   were issuing orders in the Chevron case and ultimately deciding

12   the Chevron case, correct, sir?

13        MR. GOMEZ:  Objection, compound.

14        THE COURT:  Overruled.

15   A.  Would you have the kindness to repeat the question, please.

16   Q.  Certainly, Mr. Zambrano.  From 2009 to 2011, you were

17   issuing orders -- strike that.

18        Am I correct that during that same period there were

19   times when you were issuing orders in the Chevron case, I mean

20   2009 to 2011?

21   A.  Could you please state the months?

22   Q.  Am I correct, sir, that from October 2009 to February 2010,

23   and then again from October 2010 to February 14, 2011, you were

24   issuing orders and then issuing the judgment in the Chevron

25   case?

DB5LCHE3                          Zambrano - direct

1    A.  Yes.

2    Q.  Did Mr. Guerra help you with drafts in connection with the

3    orders you issued in the Chevron case?

4    A.  Never.

5    Q.  And am I correct, sir, that that's because you thought it

6    would be improper under Ecuadorian law for anyone else to have

7    helped you write the Lago Agrio Chevron case judgment?

8              Let me rephrase it, your Honor.

9              Am I correct, sir, that it would have been improper

10   under Ecuadorian law to have anyone else help you author the

11   Lago Agrio Chevron judgment?

12             MR. GOMEZ:  Objection, form, asked and answered.

13             THE COURT:  I think it has been answered, Mr. Mastro,

14   has it not?

15             MR. MASTRO:  Your Honor, with distinctions that have

16   been made about certain words like write and author, I wanted

17   to just make sure --

18             THE COURT:  All right.  Overruled.

19             MR. MASTRO:  -- that we covered that landscape.

20             THE COURT:  It's a fair point in light of the side bar

21   most recently especially.

22             MR. GOMEZ:  Your Honor, with all respect, the question

23   now being asked doesn't draw those distinctions in the

24   question.

25             THE COURT:  I think the point that comes out of the

DB5LCHE3                          Zambrano - direct

```
 1   side bar is that some very interesting distinctions are perhaps
 2   drawn from time to time by the witness.
 3   Q.  Sir, am I correct, sir, that it would have been improper
 4   under Ecuadorian law to have anyone else help you author the
 5   Lago Agrio Chevron judgment?
 6   A.  Yes.
 7   Q.  Now, Mr. Zambrano, I want to ask you about the OCP case,
 8   that appellate decision I showed you over the weekend, do you
 9   remember that, your Honor?  Not your Honor.
10          THE COURT:  I don't remember it, Mr. Mastro, I
11   promise.
12          MR. MASTRO:  I meant to refer to a different former
13   judge.
14          THE COURT:  I have enough to do in this case.
15          MR. MASTRO:  Sorry.  I'll rephrase the question.
16   Q.  Mr. Zambrano, I want to ask you some questions about the
17   OCP appeal, the decision I showed you at your deposition.
18          Do you recall that, sir?
19   A.  Yes.
20   Q.  And that's an appellate ruling where you reversed a damage
21   judgment against OCP, correct?
22   A.  No.
23   Q.  Do you recall what your ruling was in that case when you
24   sat on the appellate panel in the OCP case, Mr. Zambrano?
25   A.  More or less.
```

DB5LCHE3                          Zambrano - direct

1   Q.  Isn't it a fact, sir, that the trial court entered a large

2   judgment against OCP, money judgment?

3   A.  Yes.

4   Q.  And on appeal, you reversed that money judgment?

5   A.  No.

6   Q.  What did you rule on that appeal, sir, if you can recall?

7   A.  It was ruled --

8          THE INTERPRETER:  I need to look it up, your Honor.

9   A.  It was dismissed.

10  Q.  In other words, the case against OCP was dismissed on the

11  appeal, correct?

12         MR. GOMEZ:  Objection, asked and answered.

13         THE COURT:  Overruled.

14  A.  It was dismissed.

15  Q.  Sir, am I correct that Mr. Guerra helped draft the decision

16  that you issued on appeal in the OCP case?

17  A.  I don't recall.

18  Q.  Do you have any explanation to offer this Court other than

19  Mr. Guerra helped draft your appellate decision in the OCP case

20  as to why that order appears in draft on his personal computer?

21         MR. GOMEZ:  Objection, form.

22         MR. MASTRO:  I'll rephrase it, your Honor.

23  Q.  Sir, do you have any explanation to offer to this Court as

24  to why the draft of the decision you issued in the OCP case is

25  on Mr. Guerra's personal computer?

DB5LCHE3                        Zambrano - direct

```
 1              MR. BOOTH:  Objection.  Can we have a side bar on this
 2     issue, your Honor?
 3              THE COURT:  No.
 4              MR. BOOTH:  May I be heard on this issue?
 5              THE COURT:  Come to the side bar.
 6              (At the side bar)
 7              MR. BOOTH:  I'm going by recollection, and I apologize
 8     if I'm wrong, but I do not believe the OCP was on the hard
 9     drive.  My recollection is that it was on a jump drive that
10     came from Mr. Guerra's media, but my recollection of the
11     testimony was that it was not on his hard drive --
12              THE COURT:  All right.  Let me check.
13              MR. BOOTH:  -- on that sheet.
14              THE COURT:  Let me check.
15              MR. BOOTH:  Unless you all have a different
16     recollection.
17              MS. NEUMAN:  You're wrong.
18              MR. MASTRO:  We have a different recollection, your
19     Honor.
20              MR. BOOTH:  Its path is on the hard drive?
21              THE COURT:  Is there a document?  We'll look.
22              MR. BOOTH:  Do you have the document?  I thought this
23     is the one that was on the jump drive.
24              MR. MASTRO:  Your Honor, I can rephrase the question
25     to avoid the whole thing.
```

1           THE COURT:  All right.  Fine.

2           (In open court)

3    BY MR. MASTRO:

4    Q.  Mr. Zambrano, can you offer any explanation to this Court

5    as to how a draft of the OCP decision that you later issued

6    happened to be in the personal possession of Mr. Guerra?

7    A.  I don't know.

8    Q.  Now, sir, the Chevron case was something that received a

9    lot of press attention, correct, sir?

10   A.  Yes.

11   Q.  And you took great pains to see to it that your work on the

12   Chevron case was kept confidential; is that your testimony?

13   A.  Could you please clarify.  What do you mean, great pains?

14   Q.  You didn't leave people alone in your office very often,

15   did you, sir?

16   A.  Yes.

17   Q.  Yes, you didn't leave them alone in your office, correct,

18   sir?

19          MR. BOOTH:  Objection form.

20          THE COURT:  Overruled.

21   A.  It depends on the person.

22   Q.  Am I correct that you trusted Mr. Guerra enough that you

23   allowed him to be alone in your office, correct, sir?

24   A.  Yes.

25   Q.  And he would sometimes work on drafting for you in your

DB5LCHE3                          Zambrano - direct

 1   office, correct?

 2   A.  No.

 3   Q.  But he would visit you often in Lago Agrio while you were a

 4   sitting judge, correct, sir?

 5   A.  Every now and then.

 6   Q.  He would see you in your office working, correct?

 7          MR. BOOTH:  Objection, form.

 8          MR. MASTRO:  I'll rephrase it, your Honor.

 9   Q.  He would visit you in your office, correct?

10   A.  Sometimes.

11   Q.  And he saw you and Ms. Calva, this is the 18-year-old who

12   typed for you while you were dictating the judgment, he would

13   see her taking dictation from you on occasion, correct?

14          Let me rephrase it, your Honor.  It was too long a

15   question.  Or, as Mr. Booth would say, let me ask a better

16   question.

17          THE COURT:  Very gracious formulation.

18   Q.  Mr. Zambrano, am I correct that Mr. Guerra would sometimes

19   see Ms. Calva at your office typing for you?

20          MR. GOMEZ:  Objection.

21          THE COURT:  Rephrase it in something other than the

22   subjunctive.

23          MR. MASTRO:  Certainly, your Honor.  I'll try to ask

24   an even better question.

25   Q.  Mr. Zambrano, am I correct that there were times when

DB5LCHE3                      Zambrano - direct

 1    Mr. Guerra was at your office and would see Ms. Calva there
 2    working for you?
 3              THE COURT:  Time for grammar too.  Try again.
 4              MR. MASTRO:  I'll try again.
 5    Q.  Mr. Zambrano, were there ever times that you can recall
 6    where Mr. Guerra visited you at your office and saw Ms. Calva
 7    at your office with you?
 8    A.  No.
 9    Q.  Can you offer any explanation to this Court as to how
10    Mr. Guerra knew that Ms. Calva did typing for you at the
11    courthouse?
12              MR. GOMEZ:  Objection, foundation, your Honor.
13              THE COURT:  Well, that's overruled.
14              MR. GOMEZ:  Calls for speculation.
15              THE COURT:  He's asked whether -- all right.
16              Rephrase.
17    Q.  Mr. Zambrano, can you offer any explanation to this Court
18    as to how Mr. Guerra --
19              THE COURT:  How about "do you know."
20              MR. MASTRO:  That's fine, your Honor.
21    Q.  Do you know how Mr. Guerra knew that Ms. Calva did typing
22    for you?
23    A.  I don't know.
24    Q.  And just so the record is clear, and we'll come back to
25    this later, but Ms. Calva is the 18-year-old who can did the

DB5LCHE3                          Zambrano - direct

1  typing while you say you dictated the Lago Agrio Chevron

2  judgment, correct, sir?

3  A.  Yes.

4  Q.  Sir, in January and February 2011, when you stayed in Lago

5  Agrio, did you stay in the same place?

6  A.  Can you please clarify that?

7  Q.  Sir, did you stay in the same one-room place when you

8  stayed overnight in Lago Agrio in January and February 2011?

9  A.  Yes.

10  Q.  Am I also correct that Mr. Alban was your neighbor in the

11  same complex where you stayed overnight in Lago Agrio in

12  January and February 2011?

13  A.  No.

14  Q.  Sir, was Mr. Alban, Judge Alban, your neighbor during

15  January and February 2011 in the same complex where you stayed

16  overnight in Lago Agrio?

17  A.  Yes.

18  Q.  Sir, you did not have a computer -- strike that.

19          Sir, did you have a computer, your own computer, in

20  this one room you rented in Lago Agrio in January and

21  February 2011 when you would stay overnight there?

22  A.  No.

23  Q.  Did you have a laptop that you carried around with you in

24  January and February 2011?

25  A.  No.

DB5LCHE3                         Zambrano - direct

1   Q.  Did you have a printer to print out documents in this one

2   room that you rented and would stay over in in Lago Agrio in

3   January and February 2011?

4   A.  No.

5   Q.  Sir, were you in touch with Mr. Guerra in mid-2012?

6           MR. BOOTH:  Objection, form.

7           THE COURT:  Overruled.

8   A.  I don't recall.

9   Q.  Sir, did Mr. Guerra tell you in mid-2012, June, July,

10  August time frame, that he was talking to Chevron about turning

11  over evidence to Chevron?

12  A.  Yes.

13  Q.  Sir, do you know a man named James Craig?

14  A.  No.

15  Q.  Sir, do you know whether a gentleman named James Craig has

16  been Chevron's press spokesman in Latin America, including

17  Ecuador?

18  A.  No.

19  Q.  Didn't you tell Mr. Guerra on July 6, 2012, that you'd be

20  willing to meet with James Craig?

21  A.  No.

22          MR. MASTRO:  Your Honor, I'm now going to show the

23  witness PX1734, page 105.  That's Mr. Guerra's day planner,

24  already in evidence, for July 6, 2012.

25  Q.  Mr. Zambrano, directing you to the entry that we just

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB5LCHE3                    Zambrano - direct

1   highlighted in yellow where it says, quote, I speak with

2   Nicolas about Mr. James Craig, advisor spokesman for CV for

3   Latin America.

4           Do you see that entry in Mr. Guerra's day planner for

5   July 6, sir?  Does that refresh your recollection, sir, as to

6   whether you told Mr. Guerra that you would speak with James

7   Craig on or about July 6, 2012?

8           MR. BOOTH:  Objection to form.

9           THE COURT:  Sustained as to form.

10  Q.  Mr. Zambrano, seeing that entry in Mr. Guerra's day planner

11  for July 6, 2012, does that refresh your recollection as to

12  whether you told Mr. Guerra on that date you would meet with

13  James Craig?

14          MR. BOOTH:  Same objection.

15          THE COURT:  Sustained.  He didn't indicate any lack of

16  recollection.  He flatly denied it.

17          MR. MASTRO:  Fine, your Honor.

18  Q.  Do you have any explanation for why Mr. Guerra --

19          THE COURT:  Rephrase it.

20          MR. MASTRO:  Your Honor.

21  Q.  Do you know why Mr. Guerra's day planner for July 6, 2012

22  would have an entry saying that Nicolas had spoken to him about

23  Mr. James Craig?

24          MR. BOOTH:  Objection, form.

25          THE COURT:  Sustained.  Calls for the state of mind of

1    another.

2    Q.  Do you know how Mr. Guerra would know that you wanted to

3    speak to James Craig?

4            MR. BOOTH:  Objection, form.

5            THE COURT:  No, it calls for his personal knowledge.

6    Well, no, there's a further objection.  You're right.

7    Sustained as to form.

8            MR. MASTRO:  I have nothing further on this topic,

9    your Honor.

10           THE COURT:  All right.

11           MR. MASTRO:  Now I'm going to go to another topic.

12   Q.  Mr. Zambrano, I want to ask you some questions about the

13   work that Ms. Calva did for you.

14           You say she typed into the computer as you dictated

15   the Lago Agrio Chevron judgment to her; is that correct, sir?

16   A.  Yes.

17   Q.  And by dictate, you mean that you would speak the words and

18   she would type them into the computer in your office, correct,

19   sir?

20   A.  Yes.

21   Q.  And this was the -- strike that.

22           And she was working at the new computer you had

23   received from the judicial council that was in your office,

24   correct, sir?

25   A.  Yes.

DB5LCHE3                    Zambrano - direct

1    Q.   Not the old computer you had during some periods still in
2    your office, correct?
3    A.   That one was used very little.
4    Q.   But you didn't use the old computer at all for typing and
5    dictating the Lago Agrio Chevron judgment, correct, sir?
6    A.   Yes.
7    Q.   Now, sir, Ms. Calva did not work in the courthouse as part
8    of the courthouse staff, correct?
9    A.   No.
10            MR. MASTRO:  I have to make sure I have the record
11   straight, your Honor.
12   Q.   Did Ms. Calva work in the courthouse for the court?
13   A.   No.
14   Q.   But there were secretaries who worked for the court,
15   correct?
16   A.   Yes.
17   Q.   But Ms. Calva worked only for you exclusively, correct,
18   sir?
19   A.   Yes.
20   Q.   And you paid her $15 a day out of your own pocket, correct,
21   sir?
22   A.   Yes.
23   Q.   Ms. Calva's father is a lawyer in Lago Agrio, correct, sir?
24   A.   Yes.
25   Q.   And you knew her father -- strike that.

DB5LCHE3                      Zambrano - direct

1            You knew her father then when she was working for you,

2      and you now her father today as a lawyer who has appeared

3      before you when you were a judge?

4            MR. GOMEZ:  Objection, form.

5            MR. MASTRO:  I'll rephrase it, your Honor.

6            THE COURT:  Compound.  Sustained.

7  Q.  You know Ms. Calva's father, correct?

8  A.  Yes.

9  Q.  You knew him as a lawyer who appeared before you when you

10     were a judge, correct?

11 A.  In the hearings.

12 Q.  And he appeared before you on criminal cases, correct, sir?

13 A.  Several cases.

14 Q.  Am I correct that his clients won those cases?

15 A.  No.

16 Q.  Can you name me any case as you sit here today in which

17     Mr. Calva's client lost in front of you?

18           MR. BOOTH:  Objection, form, and more than that.

19           THE COURT:  Overruled.

20 A.  I don't recall.

21 Q.  Sir, have there ever been any accusations made against you

22     about favoritism to Mr. Calva's clients?

23           MR. BOOTH:  Objection, form, and more than that.

24           THE COURT:  Sustained.

25           MR. MASTRO:  I'll move on, your Honor.

DB5LCHE3                          Zambrano - direct

1   Q.  Sir, can you describe for me what -- strike that.

2           Sir, when you were dictating the Lago Agrio Chevron

3   judgment to Ms. Calva to type into your new computer in your

4   office, am I correct that she would arrive at work around

5   8 o'clock in the morning?

6   A.  No.

7   Q.  Why don't you describe for us then, sir, what a typical

8   work day would be like when you were dictating the Lago Agrio

9   judgment to Ms. Calva and she would type it into the new

10  computer in your office.

11  A.  Could you please repeat the question?

12  Q.  Sir, please tell us what the typical work day would be like

13  when you were dictating the Lago Agrio judgment, what hours you

14  and Ms. Calva would work during the day as she typed into the

15  new computer in your office and you dictated to her?

16  A.  For starters, I would arrive at the office at six, 6:30 in

17  the morning, or seven, depending if it was raining.  She would

18  normally arrive at eight in the morning.

19          She would sit at the computer at the chair that's in

20  front of the table where the computer was, and she would begin

21  the day by taking some of the extracts of items that I had

22  already singled out in some of the cuerpos, the annotations I

23  had made.

24          I would begin dictating by taking a document from

25  here, another one from over here.  So you have an idea as to

DB5LCHE3                        Zambrano - direct

1   what the office was set up, the cases, I'm sorry, the cuerpos

2   of the trial were laid out.  On some of them I had the

3   corresponding annotations.  On some occasions I would sit on

4   the piece of furniture that was next to her desk.  I would

5   dictate.

6           Other times I would stand up because I would reach for

7   a document or refer to a cuerpo or to some other writing.  I

8   would refer to notes that I had made and in my mind I was

9   developing the idea I wanted to state so she would type it

10  accurately.

11  Q.  Now, sir, I want to make sure this is crystal clear.

12  A.  I have not yet finished.

13  Q.  I'm going to come back to it, sir.  We're going to go

14  through your normal day.

15          THE COURT:  Yes, and the question, just to refresh the

16  witness's recollection, was what hours you and Ms. Calva would

17  work during the day as she typed into the new computer in your

18  office and you dictated to her.  That was the question.

19          MR. MASTRO:  That was, your Honor.

20  Q.  Now, sir, to be crystal clear, you dictated the words to

21  her that you wanted her to type into the computer, correct?

22  A.  Logically I would form that concept and I would dictate it.

23  Q.  Did you ever write out exactly what you wanted the judgment

24  to say in longhand and then hand her your handwritten product

25  to just type into the computer?

DB5LCHE3                        Zambrano - direct

1    A.  No.

2    Q.  No.  You dictated word for word to her what was typed into

3    that computer as the judgment in the Lago Agrio Chevron case,

4    correct, sir, that's your testimony?

5    A.  When there was a document, I would refer to the document

6    and I would dictate from it to be more specific.

7    Q.  Understood.  That's your testimony, sir.  Just trying to

8    make sure it's crystal clear.

9         The words that were typed into that computer by

10   Ms. Calva as the Lago Agrio Chevron judgment were all words

11   that you dictated to her, correct?

12   A.  As I stated, on many occasions I would read a document out

13   loud and that's what she would type.

14   Q.  I understand, sir.  All I'm asking is a simple question.

15        The words that Ms. Calva typed into the computer as

16   the Lago Agrio Chevron judgment were all words that you spoke

17   out loud as dictation to her and she then typed them into the

18   computer, correct?

19        MR. BOOTH:  Objection, form.

20        THE COURT:  Overruled.

21   A.  It was what I was dictating to her.

22   Q.  Sir, is it fair to say that Ms. Calva started working with

23   you typing the Lago Agrio Chevron judgment in or about

24   mid-November 2010?

25   A.  No.

DB5LCHE3                          Zambrano - direct

1    Q.  Is it likely that that's when Ms. Calva started working

2    with you typing the Lago Agrio judgment, in or about

3    mid-November 2010?

4    A.  I don't recall.

5            MR. MASTRO:  Your Honor.

6    Q.  Mr. Zambrano, your deposition on November 2, 2013, page

7    201, line 7 through line 11.

8            Does that sound about right to you that Ms. Calva

9    started working --

10           THE COURT:  Slow down.  All right.  Question.

11           MR. MASTRO:  Certainly, your Honor.

12   "Q.  Does that sound about right to you that Ms. Calva started

13   working with you typing the Lago Agrio judgment in or about

14   mid-November 2010?

15   "A.  It is likely."

16           THE COURT:  Is there a further question?

17           MR. MASTRO:  Yes, your Honor.

18   Q.  Mr. Zambrano, when you gave that testimony at your

19   deposition this past Saturday, was that answer true at the time

20   you gave it?

21   A.  Yes.

22   Q.  Am I also correct that you started dictating the Lago Agrio

23   judgment to Ms. Calva before you issued autos para sentencia in

24   the Lago Agrio Chevron case?

25           THE COURT:  Spell it for the reporter.

DB5LCHE3                    Zambrano - direct

1              MR. MASTRO:  Certainly.  I'll rephrase the question.

2     Q.  Am I also correct, sir, that you started dictating the Lago

3     Agrio Chevron judgment to Ms. Calva before you issued autos,

4     A-U-T-O-S, para, P-A-R-A, sentencia, S-E-N-T-E-N-C-I-A, in that

5     case on December 17, 2010?

6     A.  Yes.

7     Q.  Now, sir, am I correct that in all the public statements

8     that you made before your testimony this past weekend, you

9     never once mentioned Ms. Calva typing the Lago Agrio Chevron

10    judgment for you as you dictated it to her?

11    A.  I don't recall.

12    Q.  Sir, didn't you swear in your declaration in this case that

13    no one else -- strike that.

14             Didn't you swear in your declaration in this case that

15    you did not receive support or assistance from anyone in

16    connection with your preparation of the Lago Agrio Chevron

17    judgment?

18             MR. GOMEZ:  Objection.  I'm going to request a side

19    bar.  I don't want to go further.

20             THE COURT:  I take it it has to do with the document;

21    is that correct?

22             MR. GOMEZ:  That's correct, your Honor.

23             THE COURT:  Are you offering the document or is it in?

24    6330.

25             MR. MASTRO:  I'm happy to show it.  I'm happy to offer

DB5LCHE3                          Zambrano - direct

1    it not for the truth of the matter asserted, your Honor.

2              THE COURT:  Is there any objection to it on that

3    basis?

4              MR. BOOTH:  No, your Honor, once we have both language

5    versions.  I assume it's in both languages.

6              THE COURT:  Plaintiff's 6330 is in both languages.

7              Mr. Gomez?

8              MR. GOMEZ:  None, your Honor.

9              THE COURT:  Plaintiff 6330, the declaration by the

10   witness, is admitted in this case, and dated March 28, 2013, is

11   received not for the truth of the matter.

12             (Plaintiff's Exhibit 6330 received in evidence)

13             THE COURT:  Continue.  Give me an idea how much

14   further in terms of time you have.

15             MR. MASTRO:  Certainly, your Honor.  I'm wrapping up

16   this subject and then I was going to go on to a new subject

17   after that.  And I do hope to conclude by the end of the day

18   today, as I told the Court before.

19             THE COURT:  All right.  Go ahead.

20   Q.  Sir, isn't it a fact that you publicly stated before that,

21   quote, you did not have help from any other person in preparing

22   the Lago Agrio Chevron judgment?

23   A.  Yes.

24   Q.  When was the first time you told -- strike that.

25             Did there come a time when you told the Lago Agrio

DB5LCHE3                        Zambrano - direct

1   plaintiffs' lawyers that Ms. Calva had typed the judgment for

2   you as you dictated it to her?

3   A.  Never.

4   Q.  Did you discuss with Mr. Gomez during the week before this

5   deposition that Ms. Calva had typed the Lago Agrio Chevron

6   judgment as you dictated it to her?

7   A.  I don't recall exactly.

8   Q.  I'm asking you, sir, about the past week.  Can you recall

9   as you sit here now whether at any point over the past week you

10  discussed with Mr. Gomez your testimony here today that

11  Ms. Calva typed the Lago Agrio Chevron judgment into the

12  computer as you dictated it to her?

13          MR. BOOTH:  Objection, form.

14          THE COURT:  Sustained as to form.  It would be hard to

15  discuss his testimony of this morning earlier.

16          MR. MASTRO:  Obviously I have to ask a better

17  question.  Sorry.

18          THE COURT:  Obviously.

19          MR. MASTRO:  Yes.

20  Q.  Mr. Zambrano, at any point during the past week did you

21  discuss with Mr. Gomez that Ms. Calva had typed the Lago Agrio

22  Chevron judgment as you dictated it to her?

23  A.  I don't recall.

24  Q.  Sir, have you had any conversations with Ms. Calva about

25  her providing a declaration in this case?

DB5LCHE3                         Zambrano - direct

1   A.  Never.

2   Q.  Sir, I want to come back -- strike that.

3          Have you had any conversations with Ms. Calva over the

4   past month or so about her testifying in this case?

5   A.  I have not spoken to her for about two years.

6   Q.  Sir, coming back to the schedule that you would work on a

7   normal day while Ms. Calva was typing and you were dictating

8   the Lago Agrio judgment to her, am I correct that it's your

9   testimony, "Normally she would arrive at eight in the morning

10  until noon, when she would go to lunch, and then she would

11  return at 2 p.m. and she would stay until six, seven, eight,

12  perhaps even nine in the evening."

13         Is that your testimony, sir?

14  A.  Yes.

15  Q.  And has anyone told you that Ms. Calva has given a

16  declaration in this case in which she says, "My starting

17  schedule was from 8 a.m. to 12 p.m. and from 2 p.m. until

18  6 p.m., 7 p.m., 8 p.m., sometimes until 9 p.m."?

19  A.  He himself, you, yourself said something to me that day

20  about her schedule.

21  Q.  After you gave the testimony you just did about her

22  schedule, correct, sir?

23  A.  At the moment when I was giving my testimony, you referred

24  to the fact that she had said that and that's recorded.  That

25  can be seen.

DB5LCHE3                    Zambrano - direct

1  Q.  And, sir, is it your testimony that no one showed you

2  before your deposition the declaration that Ms. Calva gave in

3  this case; is that your testimony?

4  A.  Yes.

5            MR. MASTRO:  Your Honor, I'm going to move on to

6  another topic.

7            THE COURT:  We'll break.  But just so that I'm sure I

8  have the point here, would you invite my attention to the

9  particular passage of the deposition, the pages at which the

10  testimony to which you just referred took place?

11            MR. MASTRO:  I will, your Honor.  I'm not exactly sure

12  what he meant because I don't think I confronted him with the

13  exact quote at his deposition.  But I asked him first about how

14  he described it and then we had some dialogue.

15            THE COURT:  Direct me to the relevant pages.

16            MR. MASTRO:  I will, your Honor.

17            THE COURT:  You can do it now or do it after lunch.

18            MR. MASTRO:  Your Honor, where he gave the testimony

19  was on page 95, line 14, through 96, line 6, although the

20  testimony I was quoting goes through line 23 on page 95.

21            THE COURT:  Give me just a second to look at it.

22            And do you have the Calva affidavit in the courtroom?

23            MR. MASTRO:  I'm sure I do, your Honor.

24            THE COURT:  You're sure somebody has it.

25            MR. MASTRO:  I have it, your Honor.

DB5LCHE3                          Zambrano - direct

1              Your Honor, it's been marked Plaintiff's Exhibit 6394

2      and the relevant portion is on page 2 where she says, quote --

3              THE COURT:  May I just see it.

4              MR. MASTRO:  Certainly, your Honor.

5              THE COURT:  Thank you.

6              MR. MASTRO:  It's right there.

7              THE COURT:  Okay.  I thank you for that.

8              MR. MASTRO:  Thank you, your Honor.

9              THE COURT:  2 o'clock.

10             MR. MASTRO:  Thank you, your Honor.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DB58CHE4

```
1                        AFTERNOON SESSION

2                             2:00 p.m.

3              (In robing room)

4              THE COURT:  All right.  I understand, ma'am, you

5      wanted to raise something with me.

6              MS. SHANER:  Yes.  Dr. Zambrano is very concrete and

7      is an attempting to answer accurately and truthfully the

8      questions that he is getting.  Because of translation, it is

9      incumbent upon the attorneys to ask questions where the

10     language is very specific, because otherwise we get in the

11     translation a translation that might be one of the meanings of

12     the word, but he hasn't heard what was asked in English, so he

13     cannot necessarily answer the question accurately.

14             For instance, when the woman, what she is doing is she

15     is entering data in the computer, and when they use the word

16     writing, that's sounds like composing in Spanish.  If they want

17     to use the word composing, that would be more accurate.  Did

18     anyone help you to compose?  That goes to content.  That

19     doesn't go to data entry.

20             Other words that are very kind of difficult, has

21     anyone in the drafting?  In Spanish, "borrador" is a draft, and

22     anybody is allowed to do a draft.  But if they ask you

23     nonspecific questions using like the word draft, it has a legal

24     meaning and it has an English, a composing meaning, but doesn't

25     mean the same thing in Spanish.
```

DB58CHE4

1          So I would just ask that perhaps the trial counsel can

2     agree on what words to use so that Dr. Zambrano is not

3     confounded and disabled in making an accurate response to

4     questions.

5          THE COURT:  Ma'am, you were in the courtroom this

6     morning when Mr. Gomez, who, correct me if I am wrong, Mr.

7     Gomez is a fluent Spanish speaker.  Am I right?

8          MR. GOMEZ:  That's correct.

9          THE COURT:  Objected on a number of occasions to

10    translations, and when that occurred, the lawyers conferred and

11    whatever the problems were were resolved to the satisfaction of

12    the lawyers.

13         Now, I can perhaps appreciate that you on occasion

14    shared similar concerns.  I can also, without making any

15    accusation or judgment, understand why, in light of the

16    morning, a lawyer, hopefully one other than your good self,

17    might be concerned about some of the testimony this morning.

18         We are not going back over this whole transcript.  We

19    just aren't.  There is a fluent Spanish speaker on the defense

20    side.  To whatever extent you are fluent, you had the

21    opportunity --

22         MS. SHANER:  I can't hear the translator is the

23    problem.

24         THE COURT:  Well, then you ought to sit somewhere else

25    in the courtroom.  And if you can't hear the translator, I

DB58CHE4

1      question the basis for what you're telling me.

2              MS. SHANER:  The confusion on my client's face and the

3      confusion in his responses.

4              THE COURT:  So it's not because you heard the

5      translator and you think he translated inaccurately, it's

6      because of your perception of the client.

7              MS. SHANER:  It's because what I saw when I watched

8      him, and also, the interpretation that I could hear was

9      confusing.

10             You're right, I shall move so I can hear better.

11             THE COURT:  I suggest that you do that.  If there is

12     any issue going forward, we will deal with it as we have dealt

13     with it up to now.  The testimony is the testimony.  That's

14     where we are.

15             It would help, Mr. Mastro --

16             MR. MASTRO:  I understand, your Honor.  You don't even

17     have to say it.

18             Your Honor, I did go over at the lunch break what I

19     still have left to go.  I am going to do everything I can to

20     try and finish by the end of the day, but I may go into

21     tomorrow briefly.

22             THE COURT:  There is one thing that I meant to pick up

23     this morning and didn't.  As long as you are all sitting here,

24     I will do it.

25             Plaintiff's 1291 I think came into evidence yesterday,

DB58CHE4

1    and I asked if there was a stipulation.  And what I recall

2    asking was whether it was stipulated that Mr. Donziger wrote it

3    on his computer.  Is that right?  Or whether he wrote it.

4                MR. MASTRO:  I think that's right.

5                MR. FRIEDMAN:  I think the stipulation was the date.

6                THE COURT:  It was more than the date.

7                MR. FRIEDMAN:  That's what I remembered was the date

8    issue.

9                THE COURT:  I am sure it was the date now that you

10   refresh my recollection.  Is it agreed also that Mr. Donziger

11   wrote it?

12               MR. FRIEDMAN:  Yes.

13               THE COURT:  Mr. Gomez?

14               MR. GOMEZ:  Yes.

15               THE COURT:  Do all three of you agree on the date?

16               MR. FRIEDMAN:  Yes.

17               MR. GOMEZ:  Yes.

18               MR. MASTRO:  Yes, your Honor.

19               THE COURT:  All right.  Let's go.

20               (Continued on next page)

21

22

23

24

25

DB58CHE4

```
 1              (In open court).
 2    NICOLAS ZAMBRANO, resumed.
 3              THE COURT:  The witness is reminded he is still under
 4    oath.
 5              THE WITNESS:  Very well.
 6              THE COURT:  Proceed, Mr. Mastro.
 7    BY MR. MASTRO:
 8    Q.  Mr. Zambrano, just a few follow-ups to your testimony this
 9    morning.
10              Ms. Calva's father's name is Arturo Calva, correct,
11    sir?
12    A.  Yes.
13    Q.  When you would receive drafts from Mr. Guerra, am I correct
14    that you would take those drafts and polish them?
15    A.  Yes.
16    Q.  Sir, in authoring the Lago Agrio Chevron judgment --
17    withdrawn.
18              The Lago Agrio Chevron judgment is based on expert
19    reports, correct, sir?
20              MR. BOOTH:  Objection.  Form.
21              THE COURT:  Sustained as to form.
22    Q.  Mr. Zambrano, did you rely on expert reports in authoring
23    the Lago Agrio judgment?
24    A.  To all of the evidence as a whole.
25    Q.  Including expert reports, correct, sir?
```

DB58CHE4

1    A.  Yes.

2    Q.  And you needed those expert reports to decide the

3    complicated issues in the Lago Agrio Chevron judgment, correct?

4              MR. BOOTH:  Objection.  Form.

5              THE COURT:  Overruled.

6              Answer the question, please.

7    A.  Yes.

8    Q.  Can you explain then why, Mr. Zambrano, you wrote on page

9    94 of the judgment that, "We must first clarify that this court

10   has not considered the conclusions presented by the experts in

11   their reports."  Can you explain that, sir?

12             MR. BOOTH:  Objection.  It's really a clarification.

13   Is he allowed to look at it or not look at it?

14             THE COURT:  First, Mr. Mastro, invite my attention to

15   where on this page I should look.

16             MR. MASTRO:  Certainly, your Honor.  I am happy to

17   have him look at it.  Let's display it.

18             I will explain it to you since we are having technical

19   difficulties.  It's up.

20             THE COURT:  Page 94.

21             MR. MASTRO:  About ten lines down, "We must first

22   clarify that this court has not considered the conclusions

23   presented by the experts in their reports."

24             THE COURT:  Just so that the record is clear, there is

25   displayed on the screen two pages.  The left is page 94 of the

DB58CHE4

1   Spanish language version.  The right is page 94 also, but of

2   the English language version.  I am assuming that we are

3   talking about Plaintiff's 399 on the left and 400 on the right.

4           MR. MASTRO:  That's correct.

5           THE COURT:  And you have highlighted a sentence or

6   two, presumably corresponding, but we will find out, on the two

7   pages.

8           MR. MASTRO:  Correct, your Honor.

9   BY MR. MASTRO:

10  Q.  Mr. Zambrano, given the testimony you just gave, can you

11  explain why you concluded in the judgment that "this court has

12  not considered the conclusions presented by the experts in

13  their reports," sir?

14          MR. GOMEZ:  Objection.  Form.

15          MR. MASTRO:  I will rephrase it.

16  Q.  Mr. Zambrano, isn't it a fact that the author of the

17  judgment concluded that "this court has not considered the

18  conclusions presented by the experts in their reports"?

19          MR. BOOTH:  Objection.  Form and other things.

20          THE COURT:  Can I hear the question back, please?

21          (Record read)

22          THE COURT:  Overruled.

23  A.  Yes.

24          MR. MASTRO:  It was a yes or a no, your Honor.

25  A.  No.  You asked me to explain.

DB58CHE4

```
 1    Q.  I did not, sir.  I asked you isn't it a fact, and you
 2    answered yes.
 3              MR. MASTRO:  I am ready to move on, your Honor.
 4              THE COURT:  What is it, Mr. Gomez?
 5              MR. GOMEZ:  Objection, your Honor.  The question
 6    called for an explanation.
 7              THE COURT:  Let me hear the question once more?
 8              (Record read)
 9              THE COURT:  It did not call for an explanation.  The
10    document is clear on its face.  Move on.
11              MR. MASTRO:  Thank you, your Honor.
12    Q.  Mr. Zambrano, I wanted to ask you some questions about the
13    computer in your office on which you dictated to Ms. Calva the
14    judgment in the Lago Agrio Chevron case.
15              Sir, was this computer an office computer assigned to
16    you by the judicial council?
17    A.  Yes.
18    Q.  Was this a desktop computer?
19    A.  Yes.
20    Q.  All of the typing of the judgment was done on this one
21    computer, not any other, correct?
22    A.  Yes.
23    Q.  When you first became a judge in Lago Agrio in 2008, you
24    were assigned a different computer by the judicial council,
25    correct?
```

DB58CHE4

```
 1    A.  Yes.

 2    Q.  And then when the court equipment was modernized, you

 3    received a new computer from the judicial council, correct?

 4    A.  Yes.

 5    Q.  It was on this new computer that the whole writing of the

 6    judgment was done, correct?

 7    A.  Yes.

 8    Q.  And because this new computer was a desktop computer, you

 9    couldn't take it out of your office on nights and weekends,

10    correct, sir?

11    A.  Yes.

12    Q.  So all of the work that you did dictating the judgment into

13    that computer had to be done in your office in the Lago Agrio

14    courthouse, correct?

15    A.  Not necessarily.

16    Q.  In dictating the Lago Agrio judgment so that it could be

17    typed into that new computer, you had to do all of that

18    dictation in your office, correct, sir?

19              MR. GOMEZ:  Objection.  Asked and answered.

20              THE COURT:  Overruled.

21    A.  The final writing was dictated just as was stated.

22    Q.  In your office, correct, sir?

23    A.  Yes.

24    Q.  Now, you know that you used the new computer for the typing

25    of the judgment because it was the more modern computer in your
```

DB58CHE4

1    office, correct, sir?

2    A.   Would you please repeat that question?

3    Q.   You know that you used the new computer in your office for

4    the typing of the judgment because it was the more modern

5    computer, correct, sir?

6    A.   Yes.

7    Q.   And it was the one on which you could do Internet research,

8    correct, sir?

9    A.   In the other one also.

10   Q.   But the newer computer was better for doing Internet

11   research, correct, sir?

12   A.   It could be.

13   Q.   And because it was the easier computer to use, the new

14   computer, correct, sir?

15   A.   Yes.

16   Q.   Sir, at some point, while you were working on drafting the

17   Lago Agrio Chevron judgment, your old computer was taken out of

18   your office for maintenance, correct, sir?

19   A.   Yes.

20   Q.   Sir, when you and Ms. Calva were working on typing the Lago

21   Agrio Chevron judgment into that new computer, you would turn

22   on the computer in the morning, correct, sir?

23   A.   No.

24   Q.   Sir, who turned on the computer in the morning?

25   A.   I did.

DB58CHE4

1   Q.  Who turned off that new computer at night after you and Ms.

2   Calva would leave?

3            THE COURT:  Sustained as to form.  It assumes that it

4   was turned off after they left.

5            MR. MASTRO:  Sorry, your Honor.

6   Q.  Sir, you had to enter a password after you turned on the

7   new computer in the morning, correct?

8   A.  Yes.

9   Q.  Who would turn off the computer -- strike that.

10            Did the computer, this new computer, get turned off at

11   night?

12   A.  It was not automatic.

13   Q.  Who would turn off the new computer at night?

14            MR. MASTRO:  Strike that.

15   Q.  Who turned off the new computer at night?

16   A.  I did.

17   Q.  So every morning you turned it on before you started

18   dictating the Lago Agrio Chevron judgment, and every night

19   after you finished your work for the day you turned it off,

20   correct?

21            MR. BOOTH:  Objection.  Form.

22            THE COURT:  Overruled.

23   A.  Yes.

24   Q.  On weekends, you typically would go out of town to your

25   home in Manta, correct, sir?

DB58CHE4

```
1    A.  Not always.

2    Q.  Most weekends you went out of town to your home in Manta

3    while you were working on your Lago Agrio Chevron judgment,

4    correct, sir?

5    A.  I don't remember.

6    Q.  You don't remember whether it was most weekends, but it was

7    some weekends, correct, sir?

8             MR. BOOTH:  Objection.  Form.

9             THE COURT:  Rephrase it.

10   Q.  Some weekends, while you were working on the Lago Agrio

11   Chevron judgment, you went out of town to your home in Manta,

12   correct, sir?

13   A.  Yes.

14   Q.  And on those weekends, while you were working on the Lago

15   Agrio Chevron judgment that you went out of town to your home

16   in Manta, the computer was turned off, correct, sir?

17            MR. GOMEZ:  Objection.

18            THE COURT:  Sustained.

19   Q.  Mr. Zambrano, on weekends, when you were not in Lago Agrio,

20   the computer on which you were working on the Lago Agrio

21   Chevron judgment was turned off, correct, sir?

22            MR. GOMEZ:  Objection.

23            THE COURT:  Turned off when he left I think is what

24   you're getting at.

25            MR. MASTRO:  Certainly, your Honor.
```

DB58CHE4

```
 1   Q.  On weekends, Mr. Zambrano, when you were not in Lago Agrio,
 2   you turned off the computer in which you had been working with
 3   for drafting the Chevron Lago Agrio judgment?
 4              MR. GOMEZ:  Objection.  Form.
 5              THE COURT:  Overruled.
 6   A.  When I left in the evenings, I turned it off.
 7   Q.  Thank you, Mr. Zambrano.
 8              While you were working on the Lago Agrio Chevron
 9   judgment, who conducted the Internet searches on the new
10   computer?
11   A.  I have stated that it was Ms. Calva.
12   Q.  You didn't conduct any of those Internet searches yourself,
13   did you, sir?
14   A.  Yes.
15              MR. MASTRO:  I just have to be clear.  Sorry, your
16   Honor.
17   Q.  The only person who conducted Internet searches on the new
18   computer while you were working on the Lago Agrio judgment was
19   Ms. Calva, correct?
20   A.  No.
21   Q.  Who else conducted Internet searches on the new computer on
22   which you were working on drafting the Lago Agrio judgment?
23   A.  I would give the topic to Ms. Calva.  She would find it for
24   me.  Even when it was very late, she would take that topic and
25   then bring it back to me.
```

DB58CHE4

```
1    Q.  To be clear, she was the only person who would do the
2    Internet -- strike that.
3            She is the only person who did the Internet searches
4    you requested on the new computer that you used to draft the
5    Lago Agrio Chevron judgment, correct, sir?
6    A.  Yes.
7    Q.  Did you do any Internet searches yourself to help you
8    research the Chevron case, without Ms. Calva's help, on that
9    new computer?
10   A.  No.
11   Q.  On that same new computer, you kept case files for your
12   other cases, correct, sir?
13   A.  Yes.
14   Q.  There were times during the day while you were working on
15   the Lago Agrio Chevron judgment that you would -- strike that.
16           Were there times while you were working on the Lago
17   Agrio Chevron judgment where you accessed other case files on
18   that same new computer?
19   A.  Sometimes.
20   Q.  In fact, all of the information on all of your cases was on
21   that new computer while you were working on the Lago Agrio
22   Chevron judgment, correct?
23   A.  Yes.  The new computer and the old computer did have the
24   information.
25   Q.  In fact, you kept judgments, court orders, and general
```

DB58CHE4

1   documents on the new computer during this entire period,

2   correct, sir?

3   A.  Yes.

4   Q.  You opened other case files on the new computer every day,

5   correct?

6   A.  False.

7   Q.  You opened other files relating to everyday work every day

8   while you were working on the Lago Agrio Chevron judgment,

9   correct, sir?

10  A.  Sometimes.

11  Q.  I asked you whether you opened other files that you were

12  working on every day while you were working on the Lago Agrio

13  Chevron judgment?  You did that, correct, every day?

14  A.  No.

15          MR. MASTRO:  Your Honor, I am going to refer the

16  witness to his deposition.

17  Q.  Mr. Zambrano, did you give a deposition on November 2nd?

18  A.  Yes.

19          MR. MASTRO:  I am going to refer to page 250, lines 9

20  through 14, and lines 17 through 22.

21          "THE SPECIAL MASTER:  During the period of time that

22  you were working on the Lago Agrio judgment, did you open files

23  that contained documents in other cases that were on the new

24  computer?

25          "THE WITNESS:  Files related to everyday work, of

DB58CHE4

1    course.

2              "THE SPECIAL MASTER:  Other cases?

3              "THE WITNESS:  Regular.  Those files were opened every

4    day."

5    Q.  Sir, when you gave those answers to the special master at

6    your deposition last Saturday, were you telling him the truth?

7    A.  Yes.

8    Q.  Sir, you also could send and receive -- strike that.

9              During the time you were working on the Lago Agrio

10   judgment on the new computer, you sent and received e-mails

11   using the new computer, correct?

12   A.  Yes.

13   Q.  Sir, when you left at night during the period you were

14   working on the Lago Agrio judgment -- strike that.

15             After you had finished working at the end of the day,

16   during the period while you were working on the Lago Agrio

17   Chevron judgment, you're the person who shut down both your old

18   computer and your new computer each night, correct, sir?

19   A.  That's what I have stated.

20   Q.  Sir, at your deposition, I asked you to make a drawing of

21   your office.  Do you remember that, sir?

22   A.  Yes.

23             MR. MASTRO:  Your Honor, may I approach the witness?

24             THE COURT:  Yes.

25             MR. GOMEZ:  Excuse me.  Is the original of this

DB58CHE4

1    document available?

2              THE COURT:  I don't know.

3              MR. MASTRO:  Do we have the original in the courtroom?

4              I will be happy to substitute the original.

5    Q.  Mr. Zambrano, do you recognize this as the drawing that you

6    made during your deposition?

7    A.  It looks like it.

8    Q.  Sir, can I draw your attention to the upper left-hand

9    corner?

10             MR. MASTRO:  I ask that it be received, your Honor.

11             THE COURT:  Any objection?

12             MR. BOOTH:  No objection.

13             THE COURT:  Mr. Gomez?

14             MR. GOMEZ:  Can I have a side bar?

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DB58CHE4

1                    (At the side bar)

2                    MR. GOMEZ:  The reason for my question for the

3      original, your Honor, is I remember Mr. Zambrano drew the

4      diagram on lined paper.  Now, it's possible, I suppose, it

5      didn't copy properly.  But if something didn't copy properly on

6      the pad I saw, maybe something didn't copy properly on the

7      drawing.

8                    THE COURT:  I am sure the witness can deal with the

9      drawing.  And I think it's pretty much common experience faint

10     blue lines on legal pads don't always copy.  But the original

11     will be made available to you in due course.

12                   MR. MASTRO:  Absolutely.  I think it's with the court

13     reporter and we will have it when we have the final deposition.

14                   (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DB58CHE4

```
 1              (In open court)
 2              MR. MASTRO:  Your Honor, I ask that Plaintiff's
 3     Exhibit 6392 be received in evidence.
 4              THE COURT:  Mr. Zambrano, do you have any doubt that
 5     this is an accurate copy of the drawing you made at your
 6     deposition?
 7              THE WITNESS:  No.
 8              THE COURT:  It's received.
 9              (Plaintiff's Exhibit 6392 received in evidence)
10     BY MR. MASTRO:
11     Q.  Mr. Zambrano, drawing your attention to the upper left-hand
12     corner of the drawing, do you see where you put the letter "C"?
13     A.  Yes.
14     Q.  The notation "C" is where Ms. Calva sat when she was typing
15     in the judgment on the new computer while you dictated to her,
16     correct?
17     A.  Yes.
18     Q.  Do you see also in the upper left-hand corner where in the
19     small box you wrote "NC" in front of the "C" notation?  Do you
20     see that, sir?
21     A.  Yes.
22     Q.  And that notation "NC" stands for new computer, correct,
23     sir?
24     A.  Yes.
25     Q.  Do you see there a little lower on the page the larger
```

DB58CHE4

1    table where you wrote an "OC" on the drawing?

2              MR. MASTRO:  Let me rephrase that, your Honor.

3    Q.  Do you see there a little lower on the page on the left

4    side where you wrote the letters "OC"?

5              MS. SHANER:  Your Honor, the exhibit as displayed to

6    Mr. Zambrano does not comport with any of the descriptions that

7    are being asked.  It's turned around, and he is referring to

8    left and right.

9              THE COURT:  Do you remember what I asked you this

10   morning?  No speaking objections.  Do you remember that?

11             MS. SHANER:  Yes.

12   Q.  Sir, do you see on the drawing lower down where you wrote

13   the initials "OC"?

14   A.  Yes.

15   Q.  And that notation "OC" is where your old computer was,

16   correct, sir?

17   A.  Yes.

18   Q.  Sir, you got your new computer when all the court equipment

19   was renewed and modernized, correct?

20   A.  Yes.

21   Q.  And you were the one responsible at the time for getting

22   the court equipment renewed and modernized during your term as

23   the provincial director to the judicial council, correct, sir?

24   A.  No.

25   Q.  Am I correct, sir, that you only became the provisional

DB58CHE4

1    director to the judicial council in November 2010?

2    A.  I don't recall the date.

3    Q.  Mr. Zambrano, it's your testimony that you occasionally

4    received documents related to the Lago Agrio Chevron case that

5    were not incorporated into the official court record when they

6    were left at the door of your office at the court, correct,

7    sir?

8              MR. GOMEZ:  Object.

9              MR. MASTRO:  I will rephrase.

10   Q.  Mr. Zambrano, it's your testimony that occasionally

11   documents related to the case that were not incorporated into

12   the court record were left at the door of your office at the

13   court, correct, sir?

14   A.  Yes.

15   Q.  It's also your testimony that you can't recall any of those

16   specific documents, correct, sir?

17             MR. MASTRO:  Let me rephrase it so we don't have the

18   confusion.  Sorry.

19   Q.  Can you specifically recall -- strike that.

20             Can you recall any of the specific documents that you

21   received in this manner left at the door of your office at the

22   court?

23   A.  No.

24   Q.  Am I correct that you never received any computer disks as

25   part of these documents left at the door of your office at the

DB58CHE4

1        court?

2                MR. MASTRO:  I will rephrase it, your Honor.

3        Q.  Did you ever receive any computer disks left at the door of

4        your office at the court?

5        A.  I don't recall.

6        Q.  Isn't it a fact, sir, that you did -- strike that.

7                Sir, you were asked at --

8                THE COURT:  There was a court reporter there.  Let's

9        get to it.

10               MR. MASTRO:  On page 278, your Honor, lines 12 through

11       16 and lines 21 through 25.

12       "Q.  Did you receive any disks as opposed to documents that you

13       were referring to when you said that documents were 'left at

14       the door to my office at the court'?

15       "A.  I received varied documentation.

16               "THE SPECIAL MASTER:  Was any of that in the form of a

17       computer disk?

18               "THE WITNESS:  No."

19               THE COURT:  You're offering that or do you have

20       another question?

21               MR. MASTRO:  I have a question.

22       Q.  Mr. Zambrano, were you telling the truth at your deposition

23       on Saturday when you gave those answers to those questions?

24       A.  Yes.

25       Q.  Sir, you say that when you found these documents left at

DB58CHE4

1   the door of your office at the courthouse, you always matched

2   it up with what already existed in the case, correct?

3   A.  Yes.

4   Q.  And that meant you looked to see whether the documents were

5   already in the bound cuerpos, the official record of the case?

6   A.  No.

7   Q.  Sir, did you look at the cuerpos to see if the documents

8   left outside your door were reflected in the cuerpos already?

9           MR. GOMEZ:  Objection.

10  A.  No.

11          MR. GOMEZ:  Form and translation, your Honor.

12          THE COURT:  As to form the objection is overruled.

13          Please confer with the lawyers about the translation.

14          (Pause)

15  Q.  Mr. Zambrano, is the official record of the case that which

16  is contained in the cuerpos?

17  A.  Can you please clarify the question?

18  Q.  Sir, simple question.  Is the official record of the case

19  that which is contained in the cuerpos?  Yes or no?

20          MR. BOOTH:  Objection.  Form.

21          THE COURT:  Overruled.  I am taking it for the

22  witness's understanding.

23  A.  Yes.

24  Q.  Sir, when these documents were left at the door of your

25  office at the courthouse, you checked the cuerpos to see if

DB58CHE4

1   those documents were already part of the record in the case,

2   correct?

3   A.  No.

4   Q.  Am I correct that you always matched up the documents to

5   what already existed in the case?

6   A.  Yes.

7   Q.  And if something left in the packages at your door was

8   different than what was in the cuerpos, you discarded it

9   because it wasn't useful to you, correct?

10           MR. GOMEZ:  Objection.  Vague.

11           THE COURT:  Overruled.

12  A.  No.

13           MR. MASTRO:  Your Honor, page 282 of the deposition,

14  lines 11 through 20.

15  "Q.  So it was just copies of things that were already in the

16  cuerpos in the case; is that your testimony?

17  "A.  In some cases it was information related to information

18  that was already in the case.

19  "Q.  But it was different than what was in the cuerpos,

20  correct?

21  "A.  When it was different, I would discard it because it

22  wasn't useful to me."

23           Mr. Zambrano, when you answered those questions at

24  your deposition on Saturday, were you telling the truth?

25  A.  Yes.

DB58CHE4

1   Q.  Now, sir, did you confirm which of the parties sent you

2   these documents you say you found at the door of your office at

3   the courthouse?

4   A.  No.

5   Q.  Sir, it's your testimony that some of the documents left at

6   your door came in packages that said courtesy of Chevron,

7   correct?

8   A.  No.

9   Q.  Did any of the documents left outside your door of your

10  office at the courthouse that you have just been testifying

11  about have any statement on them that they were "courtesy of

12  Chevron"?

13  A.  Yes.

14  Q.  Do you know who left those documents outside the door of

15  your office at the courthouse that had a statement on them

16  "courtesy of Chevron"?

17  A.  No.

18  Q.  Was any of the information that you say was left at the

19  door of your office at the courthouse that you claim had the

20  statement on it "courtesy of Chevron" important information to

21  you in deciding the Lago Agrio Chevron case?

22          MR. GOMEZ:  Objection.

23          MR. MASTRO:  It tracks the language of the deposition,

24  your Honor.

25          THE COURT:  Overruled.

DB58CHE4

1    A.  Would you kindly repeat the question?

2            (Record read)

3    A.  Yes.

4            MR. MASTRO:  Your Honor, page 283 of the deposition,

5    lines 13 through 19.

6    "Q.  Sir, was any of the information that you say was left at

7    the door to your office of the court that you claim was in

8    folders that said 'courtesy of Chevron,' was any of that

9    important information to you in deciding the case?

10   "A.  No."

11           Sir, when you were asked that question at your

12   deposition on Saturday, did you give a truthful answer in

13   response?

14   A.  Yes.

15   Q.  And you admit, sir, that the documents you say were left

16   outside the door of your office at the courthouse that said

17   "courtesy of Chevron" could have been courtesy copies of what

18   Chevron's lawyers had already made part of the official case

19   cuerpos, correct, sir?

20   A.  No.

21           MR. MASTRO:  Page 284, lines 2 through 13, your Honor.

22           The question starting at line 5, your Honor, through

23   line 13.

24   "Q.  Sir, simple question.  Is it possible the documents you

25   say were left outside your door that said 'courtesy of Chevron'

DB58CHE4

| | |
|---|---|
| 1 | on them were simply courtesy copies of documents that Chevron |
| 2 | filed with the court that were then made part of the cuerpos; |
| 3 | is that possible, sir? |
| 4 | "A.  It is possible, and other documents as well." |
| 5 |      Sir, the documents that you say were left outside your |
| 6 | office door at the courthouse -- |
| 7 |      THE COURT:  Mr. Mastro, excuse me. |
| 8 |      Mr. Zambrano, when you were asked that question and |
| 9 | gave that answer on Saturday, was it true? |
| 10 |      THE WITNESS:  Yes. |
| 11 |      THE COURT:  Proceed, counsel. |
| 12 |      MR. MASTRO:  Thank you, your Honor. |
| 13 | Q.  Mr. Zambrano, did you take the documents that you |
| 14 | received -- strike that. |
| 15 |      Did you take the documents that you say were left |
| 16 | outside your door to your office at the courthouse and make |
| 17 | them into cuerpos to be part of the official court record? |
| 18 | A.  No. |
| 19 | Q.  Sir, were there ever any Excel spreadsheets left outside |
| 20 | your door at the courthouse in these packages you say were left |
| 21 | there during the Lago Agrio Chevron case? |
| 22 | A.  I don't recall. |
| 23 |      (Continued on next page) |
| 24 | |
| 25 | |

DB5LCHE5                    Zambrano - direct

1   Q.  Do you even know what an Excel spreadsheet is, sir?

2   A.  No.

3   Q.  Sir, how then did you calculate the percentages of TPH

4   levels that are found on pages 101 and 102 of the judgment?

5              THE COURT:  Do you want him to look at it or not?

6              MR. MASTRO:  I'll be happy to do that, your Honor.

7   Q.  Please turn to page 101 and 102 of the judgment.  It's in

8   front of you, sir.  Bottom of page 101, top of page 102.

9              THE COURT:  You're referring to Plaintiff's 399,

10  English translation 400?

11             MR. MASTRO:  Correct, your Honor.

12  Q.  It's coming up on the screen, sir, in Spanish.  Bottom of

13  page 101, top of page 102.

14             MR. MASTRO:  Flip to 102, please, Randall.  Thank you.

15  Q.  Sir, how did you calculate the percentages of TPH levels

16  that are in this judgment at pages 101 and 102, if you recall,

17  sir?

18  A.  No.

19  Q.  Can't recall, correct?

20  A.  I don't recall exactly.

21  Q.  Thank you, sir.

22             THE COURT:  What is your best recollection, sir?

23             THE WITNESS:  This was taken from the reports that

24  were being submitted by the experts.

25  Q.  So, sir, it's your testimony that these percentages at the

DB5LCHE5                         Zambrano – direct

1   bottom of page 101 and 102 you think came from expert reports

2   that were filed in the case; is that your testimony?

3   A.   All the information that was taken was based on the

4   experts' reports.

5   Q.   Now, sir, would it be proper under Ecuadorian law for a

6   judge to consider a database of test results that was never

7   made part of the cuerpos on the official record in issuing a

8   judgment in a case?

9            MR. GOMEZ:  Objection, form.

10           THE COURT:  Overruled.

11  A.   No.

12  Q.   Sir, were parties permitted under Ecuadorian law to leave

13  anonymous packages outside the door of judges' offices for them

14  to consider in deciding their cases?  Yes or no, sir.

15  A.   Yes.

16  Q.   Sir, have you ever had any other case when you were a judge

17  that you can name as you sit here today where either of the

18  parties left documents outside the door of your office that

19  were not made part of the cuerpos in the case that you

20  nevertheless considered in deciding the case?

21  A.   Yes.

22           MR. MASTRO:  Your Honor, page 308, lines 4 through 12:

23  "Q.  Sir, have you ever had any other case when you were a

24  judge that you can name as you sit here now where either of the

25  parties left documents outside the door of your office that

DB5LCHE5                         Zambrano - direct

1    were not made part of the cuerpos in the case that you

2    nevertheless considered in deciding the judgment in the case?

3    "A.  I don't recall."

4              Sir, was that -- was your answer to that question that

5    I posed to you this past Saturday, was that a truthful answer,

6    sir?

7              MR. GOMEZ:  Objection, your Honor.

8    A.  Yes.

9              THE COURT:  Objection to whether it was true?

10             MR. GOMEZ:  Objection to whether there's inconsistency

11   between the impeaching material.

12             THE COURT:  It's a little late for that.  But in any

13   case, I would have overruled it.

14             MR. MASTRO:  Your Honor, I'm about to move to a new

15   subject.

16             THE COURT:  Let's take our afternoon break.

17             (Recess)

18             THE COURT:  Let's continue.  What is that?

19             MR. MASTRO:  Your Honor, I'm happy to report that we

20   were able to get the original of Plaintiff's Exhibit 6392 to

21   make it the official exhibit in the case.

22             THE COURT:  All right.  Show it to your adversaries.

23             MR. MASTRO:  Certainly.

24             THE COURT:  So I take it it's acceptable to everybody

25   to substitute the original for the previously marked

DB5LCHE5                          Zambrano - direct

1    Exhibit 6392, correct?

2              MR. GOMEZ:  Yes, your Honor.

3              MR. BOOTH:  Yes, your Honor.

4              THE COURT:  All right.

5              MR. GOMEZ:  Before we begin, I'd like to request a

6    side bar, if I may.

7              (At the side bar)

8              MR. GOMEZ:  What I'd like to do is put on the record,

9    your Honor, I have a concern.  I'm not sure to word it as an

10   objection or not.  The issue is the following.

11             Mr. Mastro is asking a very precise question

12   mimmicking the same language he used at the deposition.  The

13   problem we have is that there are variations in the

14   translation.  There's no way to guarantee that the translation

15   he receives today about a specific question is the exact same

16   translation he received at the deposition.  That variation

17   could explain the difference in his responses.

18             THE COURT:  If there is any variation.

19             MR. MASTRO:  It's the same translator.

20             THE COURT:  It's the same interpreter?

21             MR. GOMEZ:  Not all the time because the female was

22   not there at the deposition.  Only the male.

23             MR. MASTRO:  I'm not going to respond, your Honor.

24             THE COURT:  Neither am I.

25             (In open court)

DB5LCHE5                          Zambrano - direct

1          THE COURT:  Let's continue, please.

2          MR. MASTRO:  Thank you, your Honor.

3          Your Honor, may I approach the witness?

4          THE COURT:  Yes.

5          MR. MASTRO:  Thank you.

6          THE COURT:  I would just note in response to what was

7     said to me at the side bar and to all of us that in each and

8     every case in which Mr. Gomez has raised a translation

9     question, the attorneys conferred and the question was

10    withdrawn and another question asked to which no translation

11    issue was raised.

12         Let's continue.  At least that's true of all of the

13    ones I'm remembering.

14         MR. GOMEZ:  Your Honor, with all due respect, that

15    doesn't necessarily speak to the entirety of the issue that was

16    raised.

17         THE COURT:  That's enough, Mr. Gomez.  Thank you.  I

18    certainly understand and respect why you're making the point

19    that you're now making at this point on this day, or at least a

20    couple of possible reasons for it.  But there we are.

21         The fact of the matter is this is an American court

22    with American sworn translators.  I understand that one of the

23    two translators here today who was the translator at the

24    deposition, every effort has been made to deal with every

25    conceivable translation issue you have raised.  And as I

DB5LCHE5                      Zambrano - direct

1   instruct juries in cases involving evidence given in foreign

2   languages all the time, the evidence is the translation.  That

3   is the evidence.  That is the law of the United States and

4   that's where we are.

5              Let's proceed.

6   BY MR. MASTRO:

7   Q.  Mr. Zambrano, I have just handed you Plaintiff's

8   Exhibit 435, what we call in this litigation the fusion memo.

9              Do you remember me showing you this at your deposition

10  on Saturday, sir?

11             THE INTERPRETER:  Counsel, I missed the last part of

12  your question.  Interpreter requests a repetition.

13  Q.  Do you remember me showing you this at your deposition on

14  Saturday, sir?

15  A.  It seems so.

16  Q.  And I asked you whether this was one of the documents that

17  you say was left outside the door of your office at the

18  courthouse, and you said you didn't recall.

19             Do you remember that, sir?

20  A.  Because it was in English, everything you showed me.

21  Q.  Sir, go to the third page of the document in front of you,

22  which is the Spanish language cover email.

23  A.  This one?

24  Q.  Yes.  Do you see there, sir, cover email from Juan Pablo

25  Saenz, correct?  Sir?

DB5LCHE5                          Zambrano - direct

1   A.  I see one here but it's in English.

2              MR. MASTRO:  May I approach, your Honor?

3              THE COURT:  Yes.

4              MR. MASTRO:  Your Honor, I've directed the witness's

5   attention to the Spanish version of the email and the very last

6   page of the Spanish version of the document.

7   Q.  Mr. Zambrano, you know who Juan Pablo Saenz is, correct?

8   A.  Yes.

9   Q.  He's one of Lago Agrio plaintiffs' Ecuadorian lawyers,

10  correct?

11  A.  Yes.

12  Q.  And you know who Pablo Fajardo and Julio Prieto are,

13  correct, sir?

14  A.  Yes.

15  Q.  And you know who Mr. Steven Donziger is, correct?

16  A.  Yes.

17  Q.  Mr. Steven Donziger, you recognize him in this courtroom,

18  correct, sir?

19  A.  No.

20  Q.  You know that those gentlemen -- Mr. Fajardo, Mr. Prieto,

21  and Mr. Donziger -- are all lawyers representing the Lago Agrio

22  plaintiffs, correct, sir?

23  A.  Yes.

24  Q.  Sir, do you recognize this document that's been marked as

25  Plaintiff's Exhibit 435?  It's on the screen too, sir.

DB5LCHE5                          Zambrano - direct

1   A.   Would you please repeat the question.

2   Q.   Sure.  Is this a document that you recognize or have any

3   recollection of at all?

4   A.   No.

5   Q.   Do you see there on that cover email it says first draft

6   merger memo, correct, sir?

7            THE COURT:  It says what it says.

8            MR. MASTRO:  Certainly, your Honor.

9            THE COURT:  Would it not be helpful to find out if he

10  recognizes any part of it.

11           MR. MASTRO:  Yes, your Honor.

12  Q.   Can you please go to the Spanish language version of the

13  attached document, the first draft merger memo, starting on

14  page 28 of the document.

15  A.   What is the question?

16  Q.   Sir, from page 28 on of the document, do you recognize this

17  document as anything you have ever seen before?

18           MR. MASTRO:  Your Honor, let the record reflect that

19  the witness is paging through each page of the document, the

20  Spanish translation or the Spanish version.

21  Q.   Sir, do you have any recollection of ever having seen that

22  document before?

23  A.   Yes, it -- I believe so.

24  Q.   In what context do you believe you've seen that document

25  before?

DB5LCHE5                          Zambrano - direct

1    A.   Within the record of the proceedings that the Lago Agrio

2    plaintiffs were pursuing against the company.

3    Q.   So it's your testimony, sir, that you believed this

4    document was filed as part of the court record in the Lago

5    Agrio case; is that your testimony?

6              MR. GOMEZ:   Objection to the translation.

7              THE COURT:   Madam interpreter, please consult with the

8    lawyers.

9              THE INTERPRETER:   Yes, sir.

10             (Pause)

11             MR. MASTRO:   Let me rephrase the question.

12   Q.   Mr. Zambrano, do you know for sure whether this document

13   that you've just reviewed page by page in Spanish was actually

14   filed by the Lago Agrio plaintiffs' lawyers as part of the

15   official court record in the Lago Agrio Chevron case?

16   A.   No.

17   Q.   Was it common for the parties in the Lago Agrio Chevron

18   case to file documents that were first drafts?

19             MR. GOMEZ:   Objection, form.

20             THE COURT:   Sustained as to form.

21   Q.   Mr. Zambrano, do you know any other instance where a

22   party --

23             THE COURT:   Sustained as to form.

24   Q.   Mr. Zambrano, when you were presiding over the Lago Agrio

25   case, did you ever receive a draft memo from any of the

DB5LCHE5                        Zambrano - direct

1    parties?

2    A.  I don't remember.

3    Q.  And, sir, go to the last page, please.

4         Did you ever receive a document from either of the

5    parties that ended in the middle of a sentence?

6    A.  I don't recall.

7    Q.  Sir, I'd like to ask you some questions about this document

8    compared to the judgment.  I'm going to show you page 21 of the

9    judgment in Spanish on the left-hand side of the screen and

10   page 5 of this draft fusion memo that you just reviewed.

11        THE COURT:  I'm sorry, page 5?

12        MR. MASTRO:  Page 5.  Page 20 -- 21 and I'm sorry,

13   your Honor.  Page 20 and page 4 of the fusion memo.

14        THE COURT:  You're showing them in English?

15        MR. MASTRO:  I'm showing him in Spanish, your Honor.

16        THE COURT:  So it's -- all right.

17   Q.  Now, sir, I'm directing your attention to the highlighted

18   text in the judgment and the highlighted text in this draft

19   fusion memo.

20        Did you know before comparing these two documents

21   today that the highlighted text in these documents is the same?

22        THE COURT:  Excuse me.  The judgment, the Spanish

23   language version of the judgment is Plaintiff's 399; is that

24   right?

25        MR. MASTRO:  Correct, your Honor.

DB5LCHE5                        Zambrano - direct

1           THE COURT:  And that's not what's on the screen.

2           MR. MASTRO:  Your Honor, that is -- what's on the

3   screen is the Exhibit 2165, that is the highlighted version of

4   the judgment, to be able to compare it to 2166, the highlighted

5   version of the fusion memo.  These are exhibits to

6   Mr. Leonard's testimony.

7           THE COURT:  I understand now.  So just for clarity,

8   what's on the screen in the left is Plaintiff's 2165, page four

9   of 26.  And what's on the right is Plaintiff's Exhibit 2166,

10  page four of 22.  The one on the left is from an exhibit that

11  went in through Dr. Leonard.  Right?

12          MR. MASTRO:  That's correct, your Honor.

13          THE COURT:  And the one on the right also from

14  Dr. Leonard; is that right?

15          MR. MASTRO:  That's correct, your Honor.

16  Q.  Sir, did you know before comparing these two documents

17  today that the highlighted text in these documents is the same?

18          MR. GOMEZ:  Objection to form.

19          THE COURT:  Overruled.

20  A.  No.

21  Q.  Including a string of more than a hundred words in a row?

22          MR. GOMEZ:  Objection.

23          MR. MASTRO:  Strike that.

24          MR. GOMEZ:  Form.

25          THE COURT:  Sustained as to form.

1            MR. MASTRO:  I'll rephrase, your Honor.

2    Q.  Including word strings of a hundred words or more?

3            MR. GOMEZ:  Form.

4    Q.  Did you know before comparing these documents today that

5    they contained word strings of a hundred words or more?

6            THE COURT:  Sustained.  It's argumentative.  You can

7    do it another way.

8            MR. MASTRO:  Certainly, your Honor.

9    Q.  Sir, I want to point you to the top of the page of the

10   judgment page 20, and direct your attention to the number

11   sequence in blue at the top of the page.

12           Sir, do you see there how the numbers are out of

13   sequence and number 6826 appears second to last even though

14   it's first in number sequence among the citations there to the

15   cuerpos; do you see that, sir?

16   A.  Yes.

17   Q.  And how there is no space after the comma between number

18   6828 and 6830; do you see that, sir?

19   A.  Yes.

20   Q.  Sir, directing your attention to the draft fusion memo,

21   footnote 9 contains exactly the same two points that I just

22   pointed out to you, doesn't it, sir?

23           THE COURT:  It obviously does.  Do you have another

24   question?

25   Q.  Do you have any explanation for the Court?

DB5LCHE5                          Zambrano - direct

1            MR. GOMEZ:  Objection, your Honor.

2            MR. BOOTH:  Objection, your Honor.

3            MR. GOMEZ:  Side bar, please.

4            MR. BOOTH:  Sorry.

5            THE COURT:  I don't see a need for a side bar.

6            MR. MASTRO:  I'll rephrase the question, your Honor.

7   Q.  Do you see there, sir, where the number 6826 is not in

8   numerical order with the other citations on both documents,

9   correct, sir?

10           THE COURT:  Counsel, I think I see the point you're

11  making.  There's some variation in the spacing.

12           MR. MASTRO:  Yes, that's why I changed the question,

13  your Honor.

14           MR. GOMEZ:  Thank you.

15  Q.  Sir --

16           THE COURT:  On the other hand, 6826 certainly does

17  come before 6827 in anybody's normal use of numbers.  But go

18  ahead, counselor.

19  Q.  Sir, do you know how -- do you know how it came about that

20  these word strings of a hundred words or more and these number

21  sequences where one number is out of numerical sequence with

22  the rest came to end up in the judgment that are exactly the

23  same from this draft fusion memo?

24           MR. GOMEZ:  Objection to form.

25           THE COURT:  Sustained as to form.  Simplify, simplify,

DB5LCHE5                        Zambrano – direct

1      simplify.

2                  MR. MASTRO:  Certainly, your Honor.

3      Q.  Do you, sir, do you know how it came about that word

4      strings of a hundred words or more from the draft fusion memo

5      ended up in the judgment?

6      A.  I don't know.

7      Q.  Do you know, sir, how the number sequence for citations to

8      the record where number 626 is out of numerical order in the

9      draft fusion memo ended up in the same out of order number

10     sequence in the judgment?

11     A.  Well, since the page numbers are being pointed out there,

12     the page numbers where the documents are to be found, surely

13     when I was dictating to Ms. Calva so that she would write the

14     judgment, I noticed that I had skipped one of those pages and

15     then I later included it.

16     Q.  Sir, do you recall whether this draft fusion memo was one

17     of the documents that you say was left on the doorstep of your

18     office at the courthouse?

19                 MR. GOMEZ:  Objection, asked and answered.

20                 THE COURT:  Overruled.

21     A.  I do not remember.

22     Q.  Sir, do you know what the English word workover means?

23                 MR. GOMEZ:  Objection.

24                 THE COURT:  Overruled.  We'll find out.

25     A.  Could you please write it down for me so that I can see

DB5LCHE5                        Zambrano - direct

1   what it is?

2   Q.  I'd be happy to.

3               MR. MASTRO:  Your Honor, I will approach the witness.

4               THE COURT:  Make your handwriting better than mine.

5               MR. MASTRO:  So that everyone can see, I have written

6   the word workover.

7               THE COURT:  Mark it.

8               MR. MASTRO:  We will mark this as Plaintiff's

9   Exhibit 6401.  I'm handing it to the witness.

10              THE COURT:  For identification.

11              MR. MASTRO:  For identification.

12  Q.  Sir, can you tell us what that English word workover means?

13  A.  I don't know what it means in English.

14  Q.  Sir, I'd like to show you page 21 of the judgment on the

15  left --

16  A.  But.

17  Q.  -- and page 5 of the draft fusion memo on the right.

18              Did you know before comparing these two documents

19  today that the highlighted text in these documents is the same?

20  A.  Could you please repeat the question?

21  Q.  Did you know before comparing these two documents today

22  that the highlighted text in these documents is the same, yes

23  or no, sir?

24  A.  No.

25  Q.  Sir, directing your attention to the highlighted word

DB5LCHE5                        Zambrano - direct

1   workover.  Do you know how it is, sir, that an English word

2   that you couldn't even identify in court today ended up

3   appearing in the draft fusion memo and then in the judgment?

4            MR. BOOTH:  Objection, form.

5            THE COURT:  Sustained as to form.

6            MR. MASTRO:  I will revise it, your Honor.  I'll

7   revise the question.

8   Q.  Do you know, Mr. Zambrano, how the English word workover

9   that appears in the draft fusion memo ended up appearing in

10  English in the judgment?

11  A.  No.

12           MR. MASTRO:  I'll move on, your Honor.

13  Q.  Mr. Zambrano, your first term presiding over the Lago Agrio

14  Chevron case was between mid-October 2009 and

15  mid-February 2010, correct?

16  A.  Yes.

17  Q.  And it's your testimony that you began to prepare a draft

18  of the structure of the judgment during that time period,

19  correct?

20           MR. GOMEZ:  Objection, form.

21           THE COURT:  Sustained as to form.  You don't need the

22  "and it's your testimony."

23  Q.  Sir, you began to prepare a draft of the structure of the

24  judgment during that time period, correct?

25  A.  I was making notes.

1    Q.  Of a draft of the structure of the judgment, correct?

2    A.  Yes.

3    Q.  And, sir, am I also correct that you were reviewing the

4    cuerpos in the Lago Agrio Chevron case during that period?

5    A.  Could you please repeat the question?

6    Q.  Am I also correct that during that period you were

7    reviewing the cuerpos in the Lago Agrio Chevron case, the

8    cuerpos going back to when the case was filed in 2003, to

9    prepare the draft of the judgment?

10   A.  I was hearing the case.

11           THE COURT:  Please just answer the question,

12   Mr. Zambrano.

13   A.  Yes.

14   Q.  And you were preparing the draft of the judgment and

15   reviewing the cuerpos in the case because you hoped to be

16   writing in the judgment -- strike that.

17           You were preparing the draft of the judgment and

18   reading the cuerpos in the case because you hoped to issue the

19   judgment in the case, correct?

20   A.  No.

21   Q.  At the time -- strike that.

22           During your first term on the case, you believed you

23   might be elected president of the court and get to stay on the

24   case past your four-month term, correct, sir?

25   A.  Yes.

DB5LCHE5                          Zambrano - direct

1    Q.  You took over the case in October 2009 from Judge Nunez,

2    correct?

3    A.  Could you please repeat the date?

4    Q.  October 2009.

5    A.  Yes.

6    Q.  In fact, Judge Nunez decided to recuse himself from the

7    case, correct?

8    A.  No.

9    Q.  Judge Nunez was recused from the case, correct?

10   A.  No.

11   Q.  Am I correct that as early as the first week of September,

12   you were issuing orders -- strike that.

13         Am I correct that as early as the first week of

14   September 2009, you were issuing orders as a temporary judge on

15   the Chevron case?

16   A.  I don't recall.

17   Q.  And when you succeeded Judge Nunez as the judge on the

18   Chevron case, you were to serve the rest of his term on the

19   case until mid-February 2010, correct?

20   A.  Could you please repeat the question?

21   Q.  When you took over the Chevron case from Judge Nunez, you

22   were scheduled to go off the case by February 2010, correct?

23   A.  Yes.

24   Q.  Am I also correct that by January 2010, you knew that you

25   wouldn't be continuing on the Lago Agrio Chevron case because

DB5LCHE5                        Zambrano - direct

1   Judge Ordonez had by that time been elected the presiding judge
2   and would take over the case in February 2010?
3   A.  You're mentioning January and February.
4   Q.  Sir, am I correct that by January 2010, you knew that Judge
5   Ordonez had been elected presiding judge and would be taking
6   over the Chevron case?
7           THE COURT:  Mr. Mastro, this would go so much quicker
8   if you broke these questions down.
9           MR. MASTRO:  I'll break it down, your Honor.
10  Q.  Am I correct, sir, that by January 2010, you knew that
11  Judge Ordonez had been elected presiding judge?
12  A.  I wouldn't be able to remember.
13  Q.  Am I correct that because Judge Ordonez was elected
14  presiding judge, he took over the Chevron case in
15  February 2010?
16  A.  Yes.
17  Q.  But you nevertheless -- strike that.
18          Am I also correct that Judge Ordonez, when he took
19  over the Chevron case in February 2010, had a two-year term on
20  the case?
21  A.  No.
22  Q.  When Judge Ordonez took over the Chevron case in
23  February 2010, how long was his term as presiding judge
24  supposed to be?
25  A.  The term as president lasts two years.

DB5LCHE5                          Zambrano - direct

1    Q.  So you knew when he took over the Chevron case in

2    February 2010 that he was likely to issue the judgment in the

3    Chevron case over that two-year period?

4             MR. BOOTH:  Objection, form, and other things, your

5    Honor.

6             THE COURT:  Pardon me?

7             MR. BOOTH:  Objection, form, and other things that we

8    would need to do at side bar, but I think the form probably

9    covers it.

10            THE COURT:  I think it probably goes to state of mind

11   at the time.

12            MR. MASTRO:  Yes, your Honor.

13            THE COURT:  Overruled.

14   A.  I did not know.

15   Q.  But when you left --

16            THE COURT:  Excuse me.

17            Mr. Zambrano, in 2010, was the judge who was to

18   preside over the Chevron case whoever was the president of the

19   court?

20            THE WITNESS:  Yes.

21            THE COURT:  All right, counsel.

22   Q.  Sir, you kept the notes that you made to prepare a draft of

23   the Chevron judgment after you stopped working on the Chevron

24   case in February 2010, correct?

25            MR. GOMEZ:  Objection, asked and answered.

DB5LCHE5                          Zambrano - direct

1        THE COURT:  Overruled.

2   A.  Yes.

3   Q.  Did you give a copy of those notes to Judge Ordonez in

4   February 2010 when he took over the case?

5   A.  No.

6   Q.  Did there come a time later in 2010 when Judge Ordonez was

7   ordered recused from the case?

8   A.  Could you please repeat the question?

9   Q.  Certainly.  Did there come a time later in 2010 when Judge

10  Ordonez was ordered to get off the Chevron case?

11  A.  As of October.

12  Q.  And you're the judge who issued the order that Judge

13  Ordonez had to get off the Chevron case?

14  A.  Yes.

15  Q.  Did Mr. Guerra help you draft in connection with that

16  order?

17  A.  No.

18  Q.  Do you know how it is that nine orders in the Chevron --

19  strike that.

20        Do you know, Mr. Zambrano, how Mr. Guerra had in his

21  possession nine draft orders that you issued in the Chevron

22  case?

23  A.  I don't know.

24  Q.  Now, sir, between February 2010 and October 2010, did you

25  do any work drafting a judgment in the Lago Agrio Chevron case?

DB5LCHE5                          Zambrano - direct

1    A.  I was not hearing the case.

2    Q.  So the answer is no, you did not do any work drafting the

3    judgment in the Chevron case between February 2010 and

4    October 2010, correct?

5    A.  Yes.

6    Q.  And you were not reviewing any of the record, the cuerpos,

7    in the Chevron case between February 2010 and October 2010,

8    correct, sir?

9            I'll rephrase it.

10           Did you review any of the cuerpos in the Chevron case

11   between February 2010 and mid-October 2010, sir?

12   A.  There was no reason why I would do that.

13   Q.  So you didn't do that, correct, sir, yes, correct?

14   A.  No.

15           THE COURT:  I'm sorry.  I think, first of all, there

16   may have been a transcription error one answer ago and then you

17   got all tangled up in the double negatives.

18           Mr. Zambrano, the question is:  Did you review any of

19   the cuerpos in the Chevron case between February 2010 and the

20   middle of October 2010?

21           THE WITNESS:  No.

22           THE COURT:  Now put your next question, counselor.

23           MR. MASTRO:  Thank you, your Honor.

24   Q.  Sir, under Ecuadorian law, is a judge required to read all

25   the filings and all of the expert reports and all of the

DB5LCHE5                          Zambrano - direct

1  cuerpos in the case record before issuing a judgment?

2  A.  Yes.

3  Q.  Sir, am I correct that each cuerpos in the Chevron case

4  contained approximately a hundred pages of material?

5  A.  Yes.

6  Q.  And there were more than 2,000 cuerpos in the Lago Agrio

7  Chevron case record, correct?

8  A.  Yes.

9  Q.  And am I correct that before you issued the judgment in the

10  Chevron case on February 14, 2011, you read all the cuerpos?

11  A.  No.

12        MR. MASTRO:  Your Honor, November 1, page 105, lines 2

13  through 7:

14        "So did you read all the cuerpos before you issued an

15  order?

16  "A.  In order to rule on it, I had to read it and that's what I

17  did."

18        Now, sir --

19        MR. BOOTH:  Your Honor, objection.  May we have a side

20  bar on this?  I realize it's late in the day and I apologize

21  for doing it here, but this is an issue.

22        THE COURT:  Pardon me?

23        MR. MASTRO:  Your Honor, I'll be happy to read more of

24  the deposition.

25        THE COURT:  Is that the issue?

DB5LCHE5                              Zambrano - direct

1          MR. BOOTH:  It's part of the issue, your Honor.  I

2   don't want to say it in open court, but it's a lot of the

3   deposition.

4          (At the side bar)

5          MR. MASTRO:  Your Honor, I could start on page 104 and

6   I am about to go to other testimony that he gave about how he

7   says there were copies in the record and I was about to probe

8   him on that.

9          THE COURT:  Copies of what?

10         MR. MASTRO:  Copies of documents.  He said in the

11  record about cuerpos.  So he says --

12         THE COURT:  About what?

13         MR. MASTRO:  Cuerpos.  He said he read all the cuerpos

14  but he found lots of copies so he could read faster.  That was

15  his testimony.

16         THE COURT:  I don't understand that at all.

17         MR. MASTRO:  That's why I want to probe it.

18         THE COURT:  Could you not interrupt me.

19         MR. MASTRO:  That's why I was going to probe it, your

20  Honor.  He said he read all the cuerpos, but he testified there

21  were lots of copies of documents in the record.  So Chevron

22  filed lots of copies, so he was able to read things faster

23  because he saw copies.  And I was going to probe that, your

24  Honor.

25         THE COURT:  You mean duplicative files?

DB5LCHE5                        Zambrano - direct

1                   MR. MASTRO:  Exactly.  I was going to probe that.

2                   THE COURT:  I think we can leave that to tomorrow.

3                   Is there anything more than that?

4                   MR. BOOTH:  Yes, your Honor.  This was a long process

5    in the deposition.  It was many minutes.  It could have been

6    longer than that.  And what he said in the deposition was he

7    was asked:  Did you read every, basically, every page of the

8    record?  And he says no.  There were copies of copies of copies

9    I did not read.

10                   And the question was:  Do you believe that you read at

11   least one copy of everything there?  And I think I would trust

12   you to read it and you make a decision.  But impeaching him

13   with one little part -- this was a long part of discussion and

14   they missed each other for many minutes on this issue of

15   copies.  He kept trying to say I didn't read all the copies.

16                   THE COURT:  What pages do you want me to look at?

17                   MR. BOOTH:  I'd have to go back and look at it, your

18   Honor.

19                   THE COURT:  Okay.  Do that.

20                   MR. BOOTH:  I'll have that for you.  I'll do that for

21   you.

22                   THE COURT:  You give it to my staff tonight and I'll

23   read it.

24                   MR. MASTRO:  Sure.  I just wanted to say, your Honor,

25   this is exactly what I was about to probe.  He said he read all

1    of the cuerpos.  He saw copies because there were lots of

2    duplicates.  That means he had to look at the cuerpos to see

3    there were duplicates, and I planned to probe with him how

4    ludicrous some of the testimony was on this subject.  He said

5    he read all of the cuerpos.  And, your Honor, again, I'm happy

6    to put on the record.

7           THE COURT:  Look, you said that already.  I'm going to

8    look at this and then I'll deal with it tomorrow morning.

9           MR. MASTRO:  Understood.

10          THE COURT:  I have other cases to deal with right now.

11          Now, give me a status report on where you are in terms

12   of time.

13          MR. MASTRO:  So, your Honor, I think that I will

14   certainly finish tomorrow morning.  I probably have about an

15   hour and a half to two hours left.  But I will plan to finish

16   tomorrow.

17          THE COURT:  And then after that any more witnesses?

18          MR. MASTRO:  Your Honor, we have we withdrew a couple

19   witnesses last night.

20          THE COURT:  I understand that.

21          MR. MASTRO:  We have Mr. Rayner.  We have Ms. Zygocki.

22          THE COURT:  What was the second name?

23          MR. MASTRO:  Rhonda Zygocki.  She's a Chevron

24   executive.  And we have Mr. Alvarez.

25          THE COURT:  Are we still on track to finish?

DB5LCHE5                              Zambrano – direct

1              MR. MASTRO:  We should still finish by Thursday, your

2    Honor, since they say they only have half a day with this

3    witness.

4              THE COURT:  Is that right, still right?

5              MR. BOOTH:  I'd like to go back and look at

6    everything, your Honor.  I can't promise that.  I could give

7    you an estimate of half a day.  It might be correct in the

8    morning; it might not.  That would be my best estimate.

9              THE COURT:  Is that a collective half a day?

10             MR. BOOTH:  Just me.  He and I have not coordinated

11   this at all, so that would just be me.

12             MR. MASTRO:  I just wanted to point out, your Honor,

13   their witness statements for next week are due tomorrow, and we

14   don't see any reason why we can't finish the trial by next

15   week.

16             THE COURT:  We'll see.  I may very well not take

17   testimony on Friday, but you folks should count on working at

18   least part of Friday with my deputy so that we get to a point

19   where there's complete clarity about the documents that are in.

20   Now, the record is clear on that, the stenographic record.  But

21   I want, as I made clear right before we started, paper copies

22   of everything initialed by the clerk.  We'll keep custody of

23   those, at least for now, and that's in addition to whatever

24   electronic stuff.

25             Now, one other question on the electronics.  I think I

DB5LCHE5                         Zambrano - direct

1   asked at the beginning whether the exhibits and deposition

2   designations and the witness statements were going to be

3   provided not only in electronic form, which I have a good deal

4   of, at least, but in a text searchable form.  What's the story

5   on that?

6            MR. MASTRO:  We're happy to do that, your Honor.  If

7   we haven't done it already, we will do it forthwith.

8            THE COURT:  All right.  You can update me on that

9   tomorrow and you can do likewise.

10           MR. MASTRO:  Thank you, your Honor.

11           THE COURT:  Thank you.

12           (In open court)

13           THE COURT:  This trial is recessed until 9:30 in the

14   morning.

15           Mr. Zambrano, you're required to be back here at 9:30

16   ready to go.

17           Now, do we have agreement among counsel on what the

18   rule is about who if anyone he's entitled to talk to and who he

19   is not?  Because if there's any lack of clarity, I'll resolve

20   it right now.

21           MR. MASTRO:  Your Honor, certainly the rule we have

22   followed is that if a witness is on cross-examination that

23   neither we nor their counsel is supposed to be talking to them

24   during cross-examination.

25           THE COURT:  And do you include in that the witness's

1    counsel?

2              MR. MASTRO:  We have in how we proceeded with our

3    witnesses, those that were represented by counsel.  Mr. Clayman

4    certainly did that when he was here.

5              THE COURT:  Mr. Booth, any disagreement with that?

6              MR. BOOTH:  I'm not --

7              MS. FRIEDMAN:  Just to be clear, your Honor, what

8    you're saying is we should not be talking to his counsel.  He

9    obviously can talk to his counsel.

10             THE COURT:  I couldn't hear you.

11             MS. FRIEDMAN:  I'm sorry, your Honor.  I just wanted

12   to be clear as I'm understanding what you're saying, we're not

13   to talk to the witness's counsel but he would be permitted to

14   talk to his counsel.

15             MR. MASTRO:  That is not what I was saying, your

16   Honor.

17             THE COURT:  That's not what he was saying.  I haven't

18   said yet.

19             Everybody can sit down.

20             Your position, Mr. Friedman, is he ought to be able to

21   talk to his own counsel.

22             MS. FRIEDMAN:  Well, I guess she should speak to that.

23   That was my assumption.

24             THE COURT:  All right.  You don't have a horse in that

25   race.

DB5LCHE5                    Zambrano - direct

1          MS. FRIEDMAN:  That's right.

2          THE COURT:  Mr. Gomez, your position?

3          MR. GOMEZ:  Same position, your Honor.

4          THE COURT:  Ma'am, would you like to address that

5    question?

6          MS. SHANER:  Yes.  I think I have a right to talk to

7    him.  I won't advise him how to testify, but I do have a right

8    to answer his questions.

9          THE COURT:  Anybody have any authority for me on that

10   point?

11         MR. MASTRO:  Well, I don't have cases to cite to your

12   Honor right now, but it's certainly the practice that we

13   followed on our case.  Mr. Clayman did not speak to Mr. Guerra

14   while he was on cross-examination.

15         THE COURT:  That was a practice that Mr. Clayman

16   followed, you're telling me, as you understand it.

17         MR. MASTRO:  Absolutely, your Honor.  And with all due

18   respect, if I had probed this, the witness would have testified

19   that his counsel was referred by the Lago Agrio plaintiffs'

20   lawyers and met him for the first time last Thursday.

21         So I don't see them as having a separation of interest

22   in the sense of who should be able to talk to the witness

23   during cross-examination.

24         THE COURT:  Ma'am, who first contacted you about

25   representing this man?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MS. SHANER:  I was contacted by the Superior Court

2     Trial Lawyers Association in Washington, D.C.  They were

3     seeking Spanish-speaking counsel to appear pro bono in this

4     case.

5          THE COURT:  And do you have any information about who

6     contacted them?

7          MS. SHANER:  I think it was Christopher Gallen.

8          THE COURT:  One of the attorneys for Mr. Donziger.

9          MS. SHANER:  That's correct.

10          THE COURT:  I gather it was said at the deposition

11     that the witness's expenses and those of his companion in

12     coming to the United States are being paid by an American law

13     firm that he either could not or would not identify.

14          What law firm?

15          MS. FRIEDMAN:  Your Honor, I think my firm is paying

16     for his hotel, but I don't know who paid for his air fare.

17          THE COURT:  Who's paying for the air fare?

18          MR. GOMEZ:  My understanding is that Pablo Fajardo out

19     of Quito has purchased the ticket.

20          THE COURT:  Is anybody reimbursing him for that?

21          MR. GOMEZ:  Mr. Fajardo?

22          THE COURT:  Yes.

23          MR. GOMEZ:  Yes.

24          THE COURT:  Who?

25          MR. GOMEZ:  My firm or the Patton Boggs firm is my

DB5LCHE5                          Zambrano - direct

1    understanding.

2             THE COURT:  And I gather that a letter was provided to

3    the United States Embassy in order to get this witness a visa

4    and that letter addressed, as I understand it from the

5    deposition transcript, the question of who was responsible for

6    his expenses in the United States.

7             What did it say?

8             MR. GOMEZ:  I am not familiar with such a letter, your

9    Honor.

10            THE COURT:  Mr. Friedman?

11            MR. GOMEZ:  I did not prepare a letter.

12            MS. FRIEDMAN:  I didn't know there was such a letter.

13            THE COURT:  Mr. Donziger?

14            MR. DONZIGER:  I'm unfamiliar with such a letter.

15            THE COURT:  Well, you folks better get it by tomorrow.

16            MR. DONZIGER:  Where is it?

17            THE COURT:  Where is it?  I'd rather imagine you folks

18   are much better able to answer that question than I.

19            MR. DONZIGER:  Do you have a copy?

20            THE COURT:  I certainly don't have a copy.  I wouldn't

21   be asking for it, sir.

22            MS. FRIEDMAN:  Counsel, could I just ask, I didn't

23   think we were doing anything improper in paying for

24   Mr. Zambrano.

25            THE COURT:  I didn't suggest otherwise.  I'm trying to

DB5LCHE5                          Zambrano - direct

1   evaluate the question of interest here, and I'm trying to

2   decide the question of whether his counsel is actually --

3           MS. FRIEDMAN:  Independent.

4           THE COURT:  -- independent.  Right.  All right.

5           We'll do it this way.  Mr. Zambrano, you are not to

6   talk to any lawyers or anyone else associated with any of the

7   defendants in this case until you're excused as a witness, and

8   they are directed not to talk to you relating to this case.  I

9   am not including your personal lawyer, the lady sitting in the

10  jury box, at least at the moment.  Other than that, you may not

11  talk to anybody else until your examination is concluded.

12          Anybody have any objection to that?

13          MS. FRIEDMAN:  No, your Honor.

14          MR. GOMEZ:  No, your Honor.

15          THE COURT:  All right.  Thank you and good night.

16          MR. MASTRO:  Thank you, your Honor.

17          (Adjourned to November 6, 2013 at 9:30 a.m.)

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    NICOLAS ZAMBRANO

4    Direct By Mr. Mastro . . . . . . . . . . . .1601

5                         PLAINTIFF EXHIBITS

6    Exhibit No.                              Received

7     6391    . . . . . . . . . . . . . . 1637

8     6330    . . . . . . . . . . . . . . 1666

9     6392    . . . . . . . . . . . . . . 1689

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```