DB68CHE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                 Plaintiff,

5            v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                 Defendants.

8   ------------------------------x
                                         November 6, 2013
9                                        9:35 a.m.

10  Before:

11                  HON. LEWIS A. KAPLAN
                                    District Judge
12                          APPEARANCES

13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17
    FRIEDMAN RUBIN
18       Attorneys for Donziger Defendants
    BY:  RICHARD H. FRIEDMAN
19       DEE TAYLOR

20  LITTLEPAGE BOOTH
         Attorneys for Donziger Defendants
21  BY:  ZOE LITTLEPAGE
         RAINEY BOOTH
22
    GOMEZ LLC
23       Attorneys for Defendants Hugo Camacho, Javier Piaguaje
    BY:  JULIO C. GOMEZ
24

25

DB68CHE1

 1                (Trial resumed)

 2                THE COURT:  Good morning, everyone.

 3                Before we resume with the witness, one preliminary

 4     matter.

 5                The day before yesterday I think Chevron filed a

 6     motion with respect to the proposed witness statement of Karen

 7     Hinton.  I haven't had a response to it yet.  But in looking at

 8     it, I would say this and ask a question.

 9                At the beginning of the trial, the defendants, or at

10     least some of them, took issue with the content of some of

11     Chevron's witness statements, arguing that a lot of the

12     material was obvious hearsay, that a lot of it was

13     argumentative, that a lot of it was presented without a basis

14     to conclude that the witness had personal knowledge, and

15     various other objections of that character.  And they did so

16     quite properly in the main, and I chastised Chevron and

17     suggested to Chevron that it delete such material from the

18     witness statements, and for the most part that was done,

19     although there remained a few issues.

20                Subject to seeing what the defense has to say in

21     response to Chevron's motion, it appears to me that

22     Ms. Hinton's witness statement suffers from every flaw of which

23     the defense complained of Chevron's witness statements, and I

24     want to know before I spend any more time on this whether

25     you're going to revise it quite substantially or whether we are

DB68CHE1

1    going to go through a needless exercise.

2              MR. FRIEDMAN:  There would be two issues that I would

3    ask you to look at as you consider this.  One is, if you could

4    look at Ms. Zygocki's witness statement.  I can't characterize

5    exactly what her title is, but she is in charge of public

6    relations type issues for Chevron and is expected to testify

7    probably tomorrow.  I think the two have to be read together,

8    because we obviously don't know what the Court is going to

9    permit or not permit with regard to Ms. Zygocki, and in part

10   Ms. Hinton is directed to combat Ms. Zygocki.

11             THE COURT:  This is the first I am hearing of the

12   problem with Ms. Zygocki.

13             So I will certainly look at it and Chevron, if there

14   is a reason to do so, ought to make appropriate revisions to

15   that one.  But the best thing of all, of course, would be for

16   the two of you to talk to each other and come to some

17   understanding because there seemed to be some problems that may

18   be common.

19             MR. FRIEDMAN:  We are talking about lots of issues,

20   your Honor, and getting a lot done, but there is a lot to get

21   done.

22             THE COURT:  Well, I have no doubt.

23             My deputy has handed me a note that the witness wants

24   to wear his red wool hat because he is cold.

25             By all means, Mr. Zambrano, wear your hat if you wish

DB68CHE1

1       to do so.

2                   THE WITNESS:  Thank you.

3        NICOLAS ZAMBRANO, resumed.

4                   THE COURT:  The witness is reminded that he is still

5       under oath.

6                   You may proceed, Mr. Mastro.

7                   MR. MASTRO:  Thank you, your Honor.

8                   One piece of housekeeping before we resume.  I had

9       handwritten the word work over and handed it to the witness,

10      and we have marked it for identification as Plaintiff's Exhibit

11      6401.  I just wanted the record to be complete by offering it.

12                  THE COURT:  I don't think it you need it as evidence,

13      although I don't care much one way or the other.

14                  Does anybody else care?  So I will receive it.

15                  (Plaintiff's Exhibit 6401 received in evidence)

16      DIRECT EXAMINATION (Cont'd)

17      BY MR. MASTRO:

18      Q.  Mr. Zambrano, are you ready?

19      A.  Always.

20      Q.  Very good.  Let's resume.

21                  Mr. Zambrano, am I correct that in August 2010,

22      Chevron moved to have Judge Ordonez recused as presiding judge

23      of the Lago Agrio Chevron case?

24      A.  I don't recall the date, but it did file the motion.

25      Q.  Did you have any knowledge before Chevron filed that motion

1   that there would be a motion filed by Chevron to recuse Judge

2   Ordonez?

3   A.  No.

4   Q.  But when that motion to recuse Judge Ordonez was filed, you

5   viewed that as an opportunity, correct, sir?

6           MR. BOOTH:  Objection.  Form.

7           THE COURT:  Overruled.

8   A.  No.

9   Q.  Sir, returning to your second term on the Chevron case from

10  October 2010 until you issued the judgment in the Chevron case

11  in February 2011, that's the period when you were dictating to

12  Ms. Calva the draft judgment while she typed it into your new

13  computer, correct, sir?

14  A.  Yes.

15  Q.  Directing your attention to January 2011.

16          Sir, am I correct that by that time, you had already

17  concluded your review of the record in the Lago Agrio Chevron

18  case?

19  A.  Could you please repeat the question?

20  Q.  Certainly, sir.

21          Directing your attention to January 2011, am I correct

22  that by that time you had already concluded reviewing the

23  record in the Lago Agrio Chevron case?

24  A.  Way before.

25  Q.  By that time, January 2011, you were already polishing the

DB68CHE1                          Zambrano - direct

1    draft of the judgment; that's your testimony, sir, correct?

2    A.  Yes.

3    Q.  Am I also correct, sir, that in January 2011, you were

4    telling newspaper reporters that you still had approximately

5    500 cuerpos to review of the Lago Agrio Chevron case record?

6    A.  Yes.

7    Q.  That would mean you were telling reporters that you had

8    50,000 or more pages of the Lago Agrio Chevron case record

9    still to review, correct, sir?

10   A.  No.

11   Q.  Sir, when you told reporters in January 2011 that you still

12   had 500 cuerpos to review in the Chevron Lago Agrio case, that

13   translates into 50,000 or more pages of the Lago Agrio Chevron

14   case record, correct?

15   A.  No.

16           MR. MASTRO:  I will move on, your Honor.

17           THE COURT:  Did you ever establish what a cuerpo

18   means?

19           MR. MASTRO:  I think we did this earlier.

20   Q.  Cuerpo is a case file of 100 pages, correct, sir?

21   A.  Yes.

22   Q.  So if you said you had 500 cuerpos still to review, 500

23   times 100 pages per cuerpo equals 50,000 pages, correct, sir?

24           MR. BOOTH:  Objection.  Form.

25           THE COURT:  Overruled.

DB68CHE1                          Zambrano - direct

1    A.  It's likely.

2    Q.  So when you told reporters in January 2011 that you still

3    had 500 cuerpos to review in the Lago Agrio Chevron case, you

4    were lying to those reporters, correct, sir?  That's your

5    testimony?

6             MR. BOOTH:  Objection.  Form.

7             THE COURT:  Overruled.

8    A.  I said approximately.  I didn't say 500.

9    Q.  Sir, when you told reporters in January 2011 that you had

10   approximately 500 cuerpos still to review in the Lago Agrio

11   Chevron case, you were lying; that's your testimony, correct?

12   A.  Yes.

13   Q.  Sir, during the period from October 2010 through February

14   14, 2011, you had many other civil and criminal cases that were

15   assigned to you to decide besides the Lago Agrio Chevron case,

16   correct?

17   A.  Yes.

18   Q.  And you issued many other orders in your other cases during

19   the period from October 2010 through February 14, 2011,

20   correct, sir?

21   A.  Could you please repeat the question?

22   Q.  You issued many other orders in your other cases besides

23   the Lago Agrio Chevron case during the period October 2010 to

24   February 14, 2011, correct, sir?

25   A.  Yes.

DB68CHE1                        Zambrano - direct

1    Q.  In fact, it's possible that you issued more than 200

2    written orders or judgments in your other cases besides the

3    Lago Agrio Chevron case between October 2010 and February 14,

4    2011, correct, sir?

5              MR. GOMEZ:  Objection.  Form.

6              THE COURT:  Overruled.

7    A.  It's likely.

8    Q.  During the time you were working on the Lago Agrio Chevron

9    judgment between October 2010 and February 14, 2011, you were

10   also typing some of those orders in your other cases into your

11   new computer yourself, correct?

12   A.  Some of them.

13   Q.  Now, sir, you were aware before you issued the judgment in

14   the Lago Agrio Chevron case on February 14, 2011 that Chevron

15   had filed this RICO case here in New York, correct, sir?

16   A.  No.

17   Q.  Sir, were you aware before you issued the Lago Agrio

18   Chevron judgment on February 14, 2011 that Judge Kaplan had

19   entered a temporary restraining order against enforcement of

20   any anticipated judgment?

21   A.  I don't recall.

22   Q.  Sir, did Mr. Fajardo tell you before you issued the Lago

23   Agrio Chevron judgment on February 14, 2011, that he and others

24   representing the Lago Agrio plaintiffs had been sued here in

25   New York in a lawsuit that you're now testifying in today?

DB68CHE1                        Zambrano - direct

1   A.   Could you please repeat it?

2   Q.   Certainly.

3          Sir, did Mr. Fajardo tell you before you issued the

4   judgment in the Lago Agrio Chevron case that he and other

5   representatives of the Lago Agrio plaintiffs had been sued here

6   in New York?

7   A.   Never.

8   Q.   Sir, did you know that President Correa supported the Lago

9   Agrio plaintiffs' case before you issued the Lago Agrio Chevron

10  judgment on February 14, 2011?

11         MR. BOOTH:   Objection.   Form and other things.

12         THE COURT:   Overruled.

13  A.   No.

14  Q.   Did you ever see any press reports that President Correa

15  supported the Lago Agrio plaintiffs' litigation before you

16  issued the Lago Agrio Chevron judgment on February 14, 2011?

17         MR. GOMEZ:   Objection.   Form.

18         THE COURT:   Overruled.

19  A.   No.

20  Q.   So it's your testimony, sir, that you are not aware from

21  any source anywhere that President Correa supported the Lago

22  Agrio plaintiffs' litigation before you issued the Lago Agrio

23  Chevron judgment on February 14, 2011?

24         MR. GOMEZ:   Objection.   Form.

25         THE COURT:   Overruled.

DB68CHE1                    Zambrano - direct

1   A.  No.

2   Q.  So you were aware from some source that President Correa

3   supported the Lago Agrio plaintiffs' litigation before you

4   issued the judgment on February 14, 2011?  Yes or no, sir?

5   A.  No.

6   Q.  Now, sir, after you finished drafting the Lago Agrio

7   Chevron judgment on the new computer in your office, am I

8   correct that you then had to upload it on to a system called

9   Satje?

10  A.  Yes.

11  Q.  Tell the Court what the Satje system is.

12  A.  The Satje system consists in that after one has finished

13  working, processing court orders or decrees, findings or

14  judgments, this is a system that belongs to the judicial branch

15  exclusively.  Once the information has been uploaded into the

16  system, when it is issued, the system records the date and the

17  time.  That information is recorded in the big computer, the

18  brains of the system.  And from that it is processed so that

19  the public can become aware, and it automatically issues

20  notices to the parties in the proceedings.  That is the

21  responsibility of the clerk of the court, the notices.

22  Q.  Now, sir, when you were done writing the Lago Agrio Chevron

23  judgment, you logged into the Satje system, correct?

24  A.  You are permanently connected, logged on.

25  Q.  And you uploaded the judgment into the Satje system as your

DB68CHE1                    Zambrano - direct

1   judgment in the Lago Agrio case, correct, sir?

2   A.  It is my judgment, which is signed.

3   Q.  Sir, nobody made any changes to the Lago Agrio --

4           THE COURT:  Please answer the question, Mr. Zambrano.

5           If you don't remember it, we will have it read back.

6   Q.  You uploaded the judgment into the Satje system as your

7   judgment in the Lago Agrio Chevron case, correct, sir?

8           MR. GOMEZ:  Objection to the translation.

9           THE COURT:  Confer, gentlemen.

10          MR. MASTRO:  Your Honor, I think the translation was

11  fine.  The witness answered this question easily at the

12  deposition, but if the translator wants to make a modification.

13  I have been asking new questions but --

14          THE COURT:  Let's just get an answer to this one.  OK?

15  A.  Yes.

16  Q.  And nobody made any changes to the Lago Agrio Chevron

17  judgment after you uploaded it on to the Satje system, correct?

18  A.  No.

19          THE COURT:  Does that mean, no, somebody did make

20  changes, or does that mean, no, nobody made any changes?

21          THE WITNESS:  It is likely that I may have made

22  changes because up to the last minute you can make changes

23  regarding a word or a term.

24          THE COURT:  The question is whether anybody made any

25  changes after you uploaded the decision to the Satje system?

DB68CHE1                         Zambrano - direct

1   What is the answer to that, sir?

2            THE WITNESS:  Aside from myself, no one.

3            THE COURT:  Did you make changes to the judgment after

4   you uploaded it to the Satje system?

5            THE WITNESS:  I don't recall.

6            THE COURT:  Go ahead, counsel.

7   BY MR. MASTRO:

8   Q.  Sir, the file on your new computer into which the Lago

9   Agrio Chevron judgment was typed by Ms. Calva as you dictated

10  it, was that the only order or judgment that existed on that

11  file?

12  A.  No.

13  Q.  What other orders or judgments existed on that file, the

14  file on which the judgment in the Lago Agrio Chevron case was

15  typed by Ms. Calva as you dictated it to her?

16  A.  I don't recall.

17  Q.  But as you sit here today, you're sure there were other

18  orders and judgments typed into the same file as Ms. Calva

19  typed the judgment in the Lago Agrio Chevron case as you

20  dictated it to her?

21           MR. GOMEZ:  Objection.  Asked and answered.

22           THE COURT:  Overruled.

23  A.  No.

24  Q.  So as you sit here today, you cannot recall any other

25  orders or judgments that were typed into the same file as the

DB68CHE1                         Zambrano – direct

1   file on which the Lago Agrio Chevron judgment was typed by Ms.

2   Calva as you dictated it to her on your new computer, correct,

3   sir?

4           MR. GOMEZ:  Objection.  Asked and answered.

5           THE COURT:  Overruled.

6   A.  No.

7           THE COURT:  Does that mean that you can't recall or

8   that you can recall?

9           THE WITNESS:  I do recall, but the question wasn't

10  properly asked.

11          THE COURT:  Well, you and I agree on that one, sir.

12          This would be a whole lot easier if you simply framed

13  your question with the premise, and then is that correct, and

14  then you will get an unequivocal answer, and we will save a

15  day.

16  Q.  Do you recall that there were other orders and judgments on

17  the same file in your new computer as the file on which Ms.

18  Calva typed the Chevron Lago Agrio judgment as you dictated it

19  to her, sir?

20  A.  No.

21  Q.  Let's switch topics, sir.

22          THE COURT:  Before you leave that, I have one

23  question.

24          MR. MASTRO:  Certainly, your Honor.

25          THE COURT:  What word processing software was used to

DB68CHE1                        Zambrano - direct

1   type the judgment in the Chevron Lago Agrio case?

2              THE WITNESS:  The system uses Roman 11.  That's what

3   the system shows.

4              THE COURT:  Are you telling me that Roman 11 is a word

5   processing software?

6              THE WITNESS:  I don't know about software, but that's

7   what the system shows, that writing.

8              THE COURT:  You mean that it's a typeface called Roman

9   and the type size is 11?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.

12             Have you ever heard of Microsoft Word?

13             THE WITNESS:  I have heard it.

14             THE COURT:  Is that the software that was on your

15   computer that the judgment was written in?

16             THE WITNESS:  I wouldn't be able to remember.

17             THE COURT:  Proceed, counsel.

18             MR. MASTRO:  Thank you, your Honor.

19   BY MR. MASTRO:

20   Q.  Sir, am I correct that for each sentencia decided by an

21   appellate tribunal, there has to be a juez ponente?

22   A.  Could you please repeat the question?

23   Q.  Certainly, sir.

24             Am I correct that for an appellate panel in Ecuador,

25   there are three judges who sit on an appeal, first level

DB68CHE1                    Zambrano - direct

1  appeal?

2  A.  Yes.

3  Q.  On each appellate panel, there is one member of the panel

4  who becomes the juez ponente?

5        THE COURT:  Juez.

6        MR. MASTRO:  I will admit that I do not speak Spanish.

7  I will let the translator take it from there.

8  A.  Yes.

9  Q.  And that is the judge who delivers the opinion for the

10  appellate court, correct?

11  A.  No.

12  Q.  Tell me what the role is of the juez ponente.

13  A.  He is a judge in charge of drafting the draft of the

14  ruling, and he submits it to the other judges for their

15  consideration, the other judges who are part of the bench, so

16  that once there is consensus among all of them, it is issued

17  with their signature.

18  Q.  So, sir, am I correct that to select the juez ponente, that

19  a sorteo or lottery process has to be conducted?

20  A.  Internal among them.

21  Q.  So there is a lottery held to select which of the three

22  will serve in that role, correct?

23  A.  Yes.

24  Q.  Am I correct that Judge Toral was the judge who became the

25  juez ponente on the first appellate panel to hear the Lago

DB68CHE1                          Zambrano - direct

1    Agrio Chevron case appeal that was appointed in March 2011?

2    A.  No.

3    Q.  Am I correct that Judge Toral became the juez ponente on

4    the Chevron Lago Agrio case appeal?

5    A.  Yes.

6    Q.  Am I also correct that you publicly stated at the time that

7    Judge Toral had been unanimously elected or appointed by the

8    judges of the panel?

9    A.  It seems as if I did.

10   Q.  You even held a press conference with Judge Toral in March

11   2011 to congratulate him on his selection as juez ponente,

12   didn't you, sir?

13   A.  No.

14   Q.  Sir, you participated in a press conference on March 24,

15   2011, with Judge Toral at the time of his selection as juez

16   ponente, didn't you, sir?

17            MR. MASTRO:  I will rephrase it.

18   Q.  You participated in a press conference on March 24, 2011,

19   with Judge Toral at the time he became juez ponente on the Lago

20   Agrio Chevron case, correct?

21            MR. BOOTH:  Objection.  Form.

22            THE COURT:  Sustained.

23            Mr. Zambrano, were you present on or about March 24,

24   2011 at a press conference?

25            THE WITNESS:  Yes.

DB68CHE1                        Zambrano – direct

1            THE COURT:  Was Judge Toral present on that occasion?

2            THE WITNESS:  I think so.

3            THE COURT:  And was the subject of the Chevron case

4     mentioned on that occasion?

5            THE WITNESS:  Yes.

6            THE COURT:  Pick it up, Mr. Mastro.

7            MR. MASTRO:  Thank you, your Honor.

8     BY MR. MASTRO:

9     Q.  Was the subject of Judge Toral becoming the juez ponente on

10    the Lago Agrio Chevron case appeal addressed at that press

11    conference?

12    A.  No.

13    Q.  Sir, did there come a time when the Chevron Lago Agrio case

14    appellate panel had to be reconstituted?

15    A.  Yes.

16    Q.  Am I correct that when that occurred in November 2011,

17    Judge Toral once again became juez ponente on the Lago Agrio

18    Chevron case appeal?

19    A.  I don't recall.

20    Q.  Sir, you are a close friend of Judge Toral, correct?

21    A.  What do you mean by close?

22    Q.  You and Judge Toral are friends, correct, sir?

23    A.  No.

24    Q.  You're the person at the court who actually signed the

25    orders memorializing Judge Toral's appointments on the Chevron

DB68CHE1                         Zambrano – direct

1   Lago Agrio case appellate panels, correct?

2   A.  Yes.

3            MR. MASTRO:  I will move to another topic.

4   Q.  Sir, Liliana Suarez is your companion, correct?

5            MR. BOOTH:  Objection.  Form and other things.

6            THE COURT:  The objection to form is overruled.  Is

7   there anything else substantial?

8            MR. BOOTH:  If I can say it in open court, relevance.

9            THE COURT:  I will see you at side bar and you will

10  tell me where we are going.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB68CHE1                      Zambrano - direct

1          (At the side bar)

2          MR. MASTRO:  I am happy to explain the relevance.  I

3    am about to ask a short series of questions about the overture

4    that Liliana Suarez, his companion and then secretary to the

5    court, and his companion then, made to Adolfo Callejas back in

6    2009 to have a private meeting with Judge Zambrano.  So I am

7    setting up the personal relationship to then ask the question

8    that he should know the answer to.

9          THE COURT:  What about that?

10         MR. BOOTH:  I have nothing to say about that.

11         THE COURT:  Just to make this a little simpler, and

12   minimize side bars, I would have no objection if when you're

13   objecting on a ground other than form or privilege, to your

14   citing the particular rule of evidence.

15         MR. BOOTH:  Sorry, Judge.

16         THE COURT:  We will do the best we can.  Maybe you can

17   try TPH.  That's a joke.

18         MR. BOOTH:  I don't know the rules of evidence, but am

19   I allowed to say relevance in open court?

20         I don't mean to be flip when I say other things.

21   There are other things.  Sometimes vague.

22         THE COURT:  Form is adequate for objections as to

23   form.  If the sole objection is relevance, you can say that.

24         So can you, Mr. Gomez.

25         (Continued on next page)

DB68CHE1                          Zambrano - direct

1              (In open court)

2              THE COURT:  Objection is overruled.

3    BY MR. MASTRO:

4    Q.  Mr. Zambrano, do you remember the question?

5              THE INTERPRETER:  The interpreter did not interpret

6    it.

7    Q.  Liliana Suarez is your companion, correct, sir?

8    A.  Yes.

9    Q.  And she was your companion back in 2009, correct?

10   A.  False.

11   Q.  She was the secretary to the court in 2009, correct, Lago

12   Agrio Sucumbios court?

13             THE INTERPRETER:  The interpreter seeks a

14   clarification.  Meaning clerk of the court or his secretary to

15   one of the courtrooms?

16             MR. MASTRO:  I will make it simple.

17   Q.  What role or job did Liliana Suarez have at the Lago Agrio

18   Sucumbios court back in 2009?

19   A.  I believe she was the clerk of the court.

20   Q.  Sir, in October 2009, did you have Liliana Suarez contact

21   Adolfo Callejas, Chevron's counsel?

22             MR. BOOTH:  Objection.  Form.

23             THE COURT:  Overruled.

24   A.  False.

25   Q.  Sir, do you know whether in October 2009, Liliana Suarez

DB68CHE1                         Zambrano – direct

1    contacted Adolfo Callejas, Chevron's counsel, to request that

2    he meet privately with you to discuss the Lago Agrio Chevron

3    case?

4              MR. BOOTH:  Objection.  Form.

5              THE COURT:  Sustained.

6    Q.  Do you have any personal knowledge of whether Liliana

7    Suarez contacted Adolfo Callejas back in October 2009 to

8    request a private meeting with you?

9    A.  No.

10   Q.  Do you have any personal knowledge of whether Liliana

11   Suarez contacted Mr. Callejas for any reason back in October

12   2009?

13   A.  I don't know.

14   Q.  Are you aware that Mr. Callejas swore a contemporaneous

15   declaration back in October 2009 saying that Ms. Suarez had

16   contacted him on your behalf in October 2009?

17             MR. BOOTH:  Objection.  Form.

18             THE COURT:  Sustained.

19   Q.  Mr. Zambrano, have any of the lawyers for the Lago Agrio

20   plaintiffs or Mr. Donziger told you that Mr. Callejas swore out

21   a contemporaneous declaration back in October 2009 swearing

22   that Liliana Suarez had contacted him in October 2009 to

23   request that he meet with you privately?

24   A.  No.

25             MR. MASTRO:  I will move on, your Honor.

DB6LCHE2                         Zambrano – direct

```
 1    Q.  Sir, when you were a prosecutor, you accepted or solicited
 2    bribes to release criminal defendants and quash investigations
 3    against them, didn't you, sir?
 4             THE INTERPRETER:  Can you please repeat the second
 5    part.
 6             THE COURT:  Break it down, counselor.
 7    Q.  When you were a prosecutor, sir, you accepted bribes to
 8    release criminal defendants, correct?
 9    A.  No.
10    Q.  When you were a prosecutor, you solicited bribes to release
11    criminal defendants, correct, sir?
12    A.  No.
13    Q.  When you were a prosecutor, you accepted bribes to quash
14    investigations against criminal suspects, correct?
15    A.  No.
16    Q.  When you were a prosecutor, you solicited bribes to quash
17    investigations against criminal suspects, correct?
18    A.  No.
19    Q.  When you were a judge, you accepted bribes from litigants
20    to rule in their favor?
21    A.  No.
22    Q.  When you were a judge, you solicited bribes from litigants
23    to rule in their favor?
24    A.  No.
25    Q.  Sir, you were removed from your position as a judge in Lago
```

DB6LCHE2                          Zambrano - direct

 1   Agrio by the judicial council as a result of you releasing a

 2   suspected drug dealer on his own recognizance on appeal after

 3   he had been detained in the Aniversario case correct, sir?

 4          MR. BOOTH:  Objection, relevance, propensity.

 5          THE COURT:  I don't think it's offered for propensity.

 6          MR. MASTRO:  It's not, your Honor.

 7          MR. BOOTH:  Well, then relevance, your Honor.

 8          THE COURT:  I think it's relevant.  Overruled.  Your

 9   side certainly asked these kinds of questions of Mr. Guerra and

10   I allowed it.

11          THE WITNESS:  Could you please repeat the question.

12   Q.  Certainly, Mr. Zambrano.  The judicial council removed you

13   from office as a judge in Lago Agrio as a result of you

14   releasing a suspected drug dealer on his own recognizance as an

15   appellate judge in the Aniversario case, correct, sir?

16   A.  False.

17   Q.  Sir, the judicial council ordered you removed from office

18   as a result of the rulings you made in the Aniversario case,

19   correct?

20   A.  False.

21          MR. MASTRO:  Your Honor, may I approach the witness?

22          THE COURT:  You may.

23          MR. MASTRO:  I'm handing the witness what's been

24   marked as Plaintiff's Exhibit 411 already submitted into

25   evidence.

DB6LCHE2                        Zambrano - direct

1    Q.  Sir, the Spanish language version of this document starts

2    on page 13.

3           Am I correct, sir, that this is a copy of the judicial

4    council's February 29, 2012 decision ordering you removed from

5    office as a judge?

6    A.  May I see the end of the document to see if this is the

7    one?

8    Q.  Certainly, Mr. Zambrano.  Would you look at pages 10 and 11

9    under resolution.  In the Spanish language version that's pages

10   22 and 23.

11   A.  Yes.  It says right here the reasons for my removal.

12   Q.  And it says, sir, that the reasons for your removal --

13          THE COURT:  It's not in evidence, counselor.

14          MR. MASTRO:  Your Honor, I offer it into evidence.

15   The witness has identified it as the decision.

16          THE COURT:  I understand he identified it.  I was

17   here.

18          MR. BOOTH:  Objection, relevance, hearsay.

19          THE COURT:  I'll hear counsel at the side bar.

20          (At the side bar)

21          THE COURT:  Relevance first.  What's the relevance?

22          MR. MASTRO:  Your Honor, I think that this is relevant

23   for several reasons.

24          First, it should come in in any event for the reasons

25   for his removal.

DB6LCHE2                    Zambrano - direct

1          But, second, it goes to under both 404(b) and under

2     608(b), it goes to probity.  The circumstances here, you know,

3     suggest that he was removed from office under questionable

4     circumstances as to whether he released a drug dealer and

5     potentially was improperly influenced.  It's called malice and

6     inexcusable error.  And it describes the circumstances of him

7     releasing this drug dealer on his own recognizance.

8          So I think it goes to related issues.  He's now denied

9     that he committed any improprieties.  Meanwhile he's removed

10    from office for what's called inexcusable error, which means

11    there's no legitimate excuse for the behavior.

12         And it's also the case that I think it reflects in

13    terms of the circumstances, and I'll go into them in more

14    detail, it goes to his character, his reputation, his

15    trustworthiness, the circumstances in which he was removed from

16    this case and what he did in this case.

17         It's also the case, your Honor, that certainly the

18    fact that he was removed and the basis for it, you know, is

19    something relevant to these proceedings as your Honor evaluates

20    this case and this witness.

21         So this is somebody who has had a history, and I will

22    be going into it now, of being accused of taking bribes and

23    taking bribes.  He's going to deny the allegations, I'm going

24    to go -- I'm going to go through.  Deny it and impeach him with

25    the charge.

DB6LCHE2                        Zambrano - direct

1          THE COURT:  I'm not worried about what comes next.

2     I'm worried about this.  Am I not correct that everything you

3     said so far presupposes the truth of the findings and so forth

4     in this document?

5          MR. MASTRO:  Well, but, your Honor, this is a decision

6     of a judicatory body.  There are findings made.  Your Honor is

7     allowed to consider those findings --

8          THE COURT:  You have strenuously objected to my

9     considering the findings in the Lago Agrio case.

10          MR. MASTRO:  It's really also the finding itself is

11     notice to the defendants that the kind of person you're dealing

12     with and I think your Honor has the right to take into

13     consideration -- it's not, it doesn't have to be offered for

14     its truth.  I think your Honor has a right.

15          THE COURT:  If it's not offered for its truth, what is

16     it offered for?

17          MR. MASTRO:  Well, I am offering it both for its

18     truth, but I'm also saying that your Honor has a right to

19     consider it under these circumstances because it's something

20     that the defendants and the public are on notice of about this

21     person's conduct.

22          THE COURT:  So what?

23          MR. MASTRO:  Well, your Honor, at the core here is

24     whether this man is telling the truth and performed his

25     services honestly.  He was removed from the bench for a

1    dishonest, illegitimate, inexcusable error.

2            THE COURT:  Well, if it happened, maybe he was removed

3    from the bench because he offended somebody in a position to

4    remove him.  How do I know?

5            MR. MASTRO:  The circumstances, your Honor, as you

6    will see, are and the findings made here are that he's sitting

7    on an appellate panel.  A major drug dealer is --

8            THE COURT:  Look, do you have any other arguments for

9    the relevance?

10           MR. BRODSKY:  Your Honor, if we offer it not for its

11   truth but for the fact that the defendant is removed, has been

12   told he's removed for these reasons, and we can question him as

13   to whether or not those reasons are valid or not, we can accept

14   those answers.  But he may acknowledge, once he sees the

15   reasons, he may acknowledge those are true.

16           And so what the relevance is it makes the following

17   facts of consequence more likely than not.  It makes the fact

18   that he's, first of all, we can impeach him with it on his

19   credibility.  Second, it makes it more likely that he's been

20   removed under these circumstances.  Well, your Honor, we'll lay

21   the foundation.  He's been removed.  He eventually gets a job

22   with the entity of the government.

23           MR. MASTRO:  With the government entity.

24           MR. BRODSKY:  And it's our argument, your Honor, that

25   after his removal, he then goes to bat, essentially, in

DB6LCHE2                          Zambrano - direct

1    defending the judgment vociferously and coming here as a

2    consequence of getting a job and a position with the Ecuadorian

3    government.  And so this lays the factual predicates for that.

4              MR. MASTRO:  He's lost his job.  The government knows

5    the reasons why.  And, nevertheless, somehow, removed under

6    this cloud for inexcusable error, he ends up getting the cushy

7    government job later.

8              THE COURT:  Okay.  Mr. Booth.

9              MR. BOOTH:  Yes, your Honor.  It is clearly propensity

10   evidence.  It goes to, as he said, establish bad character.

11   He's using innuendo to suggest that his removal was for some

12   dishonesty or bribery, I guess because it was in a list of

13   questions after the bribery allegations that he made, that the

14   witness denied.

15             It is absolutely nothing but propensity evidence.  It

16   is a collateral issue.  You don't get to open the door to

17   collateral issue just by asking the witness questions, him

18   saying no, and then you get to impeach with something that

19   would otherwise be completely irrelevant collateral.

20             This is very prejudicial to this witness.  It is

21   not -- in this country, if you have a criminal felony

22   conviction for fraud or dishonesty, you can ask that simple

23   question.  You can't ask about bad acts.  You can't go into bad

24   acts.  You can't.  It's all propensity.

25             THE COURT:  I'm dealing with not questions about bad

DB6LCHE2                        Zambrano - direct

1    acts now.  I'm dealing with the admissibility of Plaintiff's

2    Exhibit 411.  Can we focus on that.

3              MR. BOOTH:  I believed I was.  That is a bad act

4    collateral.

5              THE COURT:  No, it's a document.

6              MR. BOOTH:  Well, apologize.

7              THE COURT:  And it's offered for two purposes at

8    least.  It's offered for one or more purposes, all of which

9    presuppose the truth of the statements in the document.

10             It is offered also for the nonhearsay purpose of

11   establishing, as I understand it, a ground for bias on the part

12   of the witness, namely, that having been removed by the

13   Ecuadorian government as a judge for misconduct, whether that's

14   an accurate and true fact or not, that is to say, whether he

15   actually was guilty of misconduct or not, the government, which

16   is an avowed supporter of your client's case, then proceeded

17   directly or indirectly to hire him as a lawyer.

18             Now, it seems to me you need to address that point

19   because there the document is not offered for the truth and it

20   seems to me it arguably does go to bias.

21             MS. FRIEDMAN:  Your Honor, may I speak to that?

22             THE COURT:  Of course.

23             MS. FRIEDMAN:  Excuse me, I haven't been talking

24   today.

25             THE COURT:  You deserve a rest.

DB6LCHE2                          Zambrano - direct

1          MS. FRIEDMAN:  I don't think it's clear or has been

2     established that who he works for is the government.  I think

3     what we've heard is the government owns some shares in the

4     company, as does some other, Petroecuador and I think a Chinese

5     company.

6          THE COURT:  And who owns Petroecuador?

7          MS. FRIEDMAN:  I understand.

8          THE COURT:  That was a serious question.  Who owns

9     Petroecuador?

10          MS. FRIEDMAN:  I don't know the answer to that.

11          MR. MASTRO:  The government.

12          MS. FRIEDMAN:  I'm assuming the government does, but I

13     don't know that.  Also, they have other shareholders.  I don't

14     know what the percentages is.  So that would be No. 1.

15          No. 2 -- neither did Mr. Zambrano.  The bias that they

16     want to show is shown by he lost his job and then got hired by

17     the government.  That would be shown.  The bad acts are not

18     necessary.  Calling them bad acts are not necessary.  The fact

19     that he's out of a job and he's working for the government --

20          THE COURT:  The fact that he's out of a job because

21     the government found he was untrustworthy, whether they were

22     right or wrong, is essential to this.

23          MS. FRIEDMAN:  That would impeach the government but

24     not him.  That would be saying basically the government is

25     hiring someone that they shouldn't have hired.  It's not

DB6LCHE2                          Zambrano - direct

1    impeaching him for --

2              THE COURT:  What it really shows, potentially,

3    assuming it's all connected, is that his next paycheck depends

4    on the continued good will of the government which is a

5    partisan with respect to this case.  That's what it arguably

6    shows.

7              MS. FRIEDMAN:  That would be true irregardless of what

8    this document shows.  His next paycheck is dependent on the

9    government regardless.

10             THE COURT:  I understand that point.  But the

11   likelihood, given this finding, whether the finding is right or

12   wrong, that the government would ever countenance his

13   employment absent his position as a defender of this judgment,

14   which is in the interest of the government as it has announced

15   them, is to me significant.

16             MS. FRIEDMAN:  But all of that would be true, your

17   Honor, regardless of this document.  In other words --

18             THE COURT:  Not at all.  Not at all.  If it had not

19   been the government who discharged him for misconduct, it's a

20   whole different equation.

21             The document is going to be received not for the truth

22   of the matter and subject to connection on the ground that it

23   goes to the witness's interest.

24             MR. MASTRO:  Your Honor.

25             THE COURT:  And you better connect it up or I'll

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB6LCHE2                        Zambrano - direct

1    strike it.

2              MR. MASTRO:  I will connect it up, your Honor.

3              THE COURT:  I'm assuming you're representing to me

4    that you will.

5              MR. MASTRO:  I am representing that, your Honor.  And

6    while it is true that the witness said he doesn't know, even

7    though he works for this joint venture, what percentage -- he

8    knows the government owns, Petroecuador owns part of it.  He

9    doesn't know what percentage.  We will prove that the

10   government by law has to own over 50 percent of it.  And we

11   will try to refresh his recollection as to the place he works

12   knowing Petroecuador, government-owned oil company, owns

13   51 percent of the company.

14             THE COURT:  Well, look, that remains to be proved, but

15   you have my ruling and I'll strike it if you don't deliver.

16             MR. MASTRO:  But, your Honor, will I be allowed on the

17   first basis to confront him about the allegations in here and

18   see if he acknowledges?

19             THE COURT:  One question at a time.  I've only focused

20   on this.

21             (In open court)

22             THE COURT:  All right.  The ruling is as follows, just

23   to summarize the side bar.

24             Plaintiff's Exhibit 411 is received not for the truth

25   of anything stated therein, but for nonhearsay purposes,

DB6LCHE2                          Zambrano - direct

1    subject to connection.

2                (Plaintiff's Exhibit 411 received in evidence)

3                THE COURT:  And if the representations that were made

4    as to the connection at side bar or other satisfactory

5    connection is not proved, I will strike it.

6    BY MR. MASTRO:

7    Q.  Mr. Zambrano, am I correct that the judicial council

8    ordered you removed from your job as a judge for "malice,

9    manifest negligence, and inexcusable error"?

10               MR. BOOTH:  Objection, form.  The document is in

11   evidence.

12               THE COURT:  Well, but it's not in evidence for the

13   truth because to that extent I sustained your objection.

14               MR. BOOTH:  Yes, your Honor.  And, again, I don't want

15   to say things in open court I'm not supposed to, but that would

16   go to the relevance of this question.  This is a question that

17   goes to the issue of truth, as I understand the question.

18               MR. MASTRO:  It goes to the basis.

19               THE COURT:  I take your point.  Sustained.

20               The document says what it says.  It's not taken for

21   the truth of what it says, but it purports to state a reason

22   for his removal.  Whether that reason is accurate or not,

23   that's what they said.

24   Q.  Sir, is it true that you ordered the release of a criminal

25   defendant named Christian Suquisupa, S-U-Q-U-I-S-U-P-A, who had

                       SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

DB6LCHE2                          Zambrano - direct

1     been arrested on a drug conspiracy charge?

2              MR. BOOTH:  Objection, relevance, truth of the matter.

3              THE COURT:  Look, Mr. Mastro, I guess I better see

4     counsel at side bar again.

5              (At the side bar)

6              THE COURT:  As I understand Rule 608(b), you are

7     allowed on cross to inquire into specific instances of conduct

8     if probative of the character for truthfulness or

9     untruthfulness of the witness.

10             Now, where are you going with this?

11             MR. MASTRO:  I'm going with going through these

12    circumstances and then asking him flat out, going through these

13    circumstances, didn't you get bribed, okay.  And that goes to

14    truthfulness for sure.  It also goes to potential issues under

15    404, but it's really a 608(b) issue.  I want to go through the

16    circumstances.

17             THE COURT:  Okay.  Now, Mr. Booth, assume for the sake

18    of argument, A, that there's good faith basis for asking the

19    question of whether he did this because he took a bribe; and

20    assume further that the answer to that question, the truthful

21    answer, is that he was bribed; does that go to truthfulness or

22    untruthfulness?

23             MR. BOOTH:  Does it go to truthfulness or

24    untruthfulness, just the question you just asked, in other

25    words, if he gets him on the stand and just says anything in

DB6LCHE2                        Zambrano - direct

1    this case did you do because you took a bribe and he says no.

2                THE COURT:  No, I didn't say anything in this case.

3                MR. BOOTH:  I mean in the case that we're talking

4    about here.

5                THE COURT:  If the witness were to say, yes, I let him

6    go because I was bribed, would that fact go to his

7    truthfulness?

8                MR. BOOTH:  Yes.

9                THE COURT:  Okay.  Now, what's the good faith basis

10   for going there?

11               Just a minute, we'll get back to you.

12               What's the good faith basis for asserting or

13   questioning that he took a bribe?

14               MR. MASTRO:  Your Honor, there were public press

15   reports at the time from sources that appear to be from the

16   police department reported in the press that the only

17   conceivable explanation for why he did what he did was either

18   was that the FARC, which was this was a FARC drug conspiracy,

19   that the FARC had threatened the judge or he took a bribe.

20   That's flat out in the press reports from a source from law

21   enforcement.

22               So I think I have a right to ask that question, not

23   that I'm saying I know what his answer is going to be.

24               THE COURT:  I understand that.

25               MR. MASTRO:  I'm happy to show your Honor the article.

DB6LCHE2                        Zambrano - direct

1           THE COURT:  You understand, of course, as I understand
2      it, you're stuck with his answer, whatever it is.
3           MR. MASTRO:  I do understand that, your Honor.  But
4      I'm hoping that by laying out the factual circumstances, he
5      will feel compelled to admit he took a bribe.
6           THE COURT:  Okay.  Mr. Booth, what else you got?
7           MR. BOOTH:  Your Honor, the question is not evidence.
8      This is a collateral matter to get -- he wants to get in all
9      this other stuff because he says ultimately he's going to ask
10     the question did you take a bribe.  But the real effort is to
11     get in all this collateral stuff which has nothing to do with
12     bribery.  There's nothing about that in here.  He's relying his
13     good faith on press reports in another country which I haven't
14     seen.  This is completely --
15          THE COURT:  Show him the press reports.
16          MR. MASTRO:  I'll be happy to show him.
17          MR. BOOTH:  This is triple hearsay, your Honor.
18     That's not a good faith basis to get into all this other
19     evidence just because you say at the end you're going to ask
20     about a bribe.
21          THE COURT:  Sir, the questions, as you say, are not
22     evidence.  And there's no jury and I've already heard it all.
23     Now, it's not part of the trial record yet, but it's his
24     answers that will be the evidence.
25          MR. BOOTH:  My point was questions about this which

DB6LCHE2                     Zambrano - direct

1   we're now going to the truth of this, we're now having him have

2   to answer for truth or not of this, then this is going to be

3   used to impeach him on the issue of truth.

4               THE COURT:  You're pointing at the document.

5               MR. BOOTH:  Yes, I apologize, the document.

6               THE COURT:  But it's not going to be used to impeach

7   him for the truth because it's not received for the truth of

8   the matters asserted.

9               MS. FRIEDMAN:  I just say 403, your Honor.

10              THE COURT:  Yes, well, I'm not going there.  I'll

11  judge the probative value and I'll judge it appropriately and I

12  can judge it fairly.

13              MR. BOOTH:  Judge, I'm not sure I understand.  I would

14  still stand up based on what I've just heard you say and object

15  if he asked him questions, seeks to impeach him with this

16  document.  Are you telling me that you've ruled that's

17  appropriate?  Because I don't --

18              THE COURT:  No, I have not told you that.  I think I

19  made it pretty clear exactly the opposite is what I ruled.

20              MR. BOOTH:  Thank you, Judge.

21              THE COURT:  Okay.  We'll take our morning break.  You

22  show adverse counsel the material you rely on for the good

23  faith basis.  When I come back, if there's any claim that

24  there's not a good faith basis, I will hear it, but my

25  understanding now is the purpose of the questions is to get to

DB6LCHE2                          Zambrano - direct

1  the ultimate question:  Didn't you take a bribe?

2          And who knows.  Maybe he'll say yes.  I guess he'll

3  say no.  The examiner is going to be bound by that answer, as I

4  understand it, unless I hear something I haven't heard, and

5  that's where we're going to be.  And the document is in only

6  for the limited purpose previously discussed and not for the

7  truth.

8          MR. MASTRO:  Understood.

9          THE COURT:  That's where I am.

10         MR. MASTRO:  Your Honor, I want to try and cut through

11  the side bars.  I don't want to --

12         THE COURT:  So do I.

13         MR. MASTRO:  So I'm going to show some of my cards and

14  maybe we can.

15         THE COURT:  Do what you're going to do.  But let's not

16  have a side bar about what you're going to do to prevent having

17  side bars.

18         MR. MASTRO:  I was going to tell you about the line of

19  questioning.

20         THE COURT:  We'll see where we get.

21         (In open court)

22         THE COURT:  We'll take a 15-minute break.

23         (Recess)

24         THE COURT:  Just give me a moment to look at something

25  in the transcript.

DB6LCHE2                          Zambrano - direct

1           (Pause)

2           THE COURT:  I think I can do this in open court in the

3    presence of the witness.

4           I'm going to limit further, subject to

5    reconsideration, the purpose for which Plaintiff's 411 has been

6    received and it is limited further to this extent.

7           Referring to the draft transcript, page 23, lines 10

8    to 14, the witness testified that pages 10 and 11 in the

9    Spanish language version, which are pages 22 and 23 of the

10   exhibit, states the reasons for his removal.  Thus, he adopted

11   to that extent at least the written statement of the judicial

12   council or whatever body produced that document of its reasons,

13   true or false, for removing him.  I don't think that ultimately

14   changes where we go with this, but we'll see as we move along.

15          Now, is there anything else?

16          MR. BOOTH:  Your Honor, you asked me to look at the

17   good faith basis.

18          THE COURT:  Yes.

19          MR. BOOTH:  And I do not agree with the way they

20   interpreted it.

21          THE COURT:  Hand it up.  Mark it for identification.

22          MR. BOOTH:  This is the copy they handed me, your

23   Honor, and it has a Plaintiff's Exhibit sticker on it.

24          THE COURT:  So I'm looking at Plaintiff's

25   Exhibit 2495.

DB6LCHE2                          Zambrano - direct

1              I think it's enough.

2              MR. BOOTH:  May I have?

3              THE COURT:  Sure.

4              MR. MASTRO:  Thank you, your Honor.

5              THE COURT:  Let's proceed.

6    BY MR. MASTRO:

7    Q.  Mr. Zambrano, you were one of the appellate judges assigned

8    to hear the appeal of the order to detain criminal defendant

9    Christian Ricardo Suquisupa Rosero, correct, sir?

10   A.  Yes.

11   Q.  And you and Judge Ordonez ordered his release on his own

12   recognizance over the dissent of another judge, correct?

13   A.  No.

14   Q.  You and Judge Ordonez ordered his release over the dissent

15   of another judge, correct?

16             MR. GOMEZ:  Objection, asked and answered.

17   A.  No.

18   Q.  You and Judge Ordonez ordered that -- strike that.

19             You and Judge Ordonez vacated his pretrial detention

20   pending trial over the dissent of a third judge, correct?

21   A.  No.

22   Q.  You and Judge Ordonez decided to substitute the

23   precautionary measure of pretrial detention ordered by the

24   trial court against this defendant, correct?

25             MR. GOMEZ:  Objection, form.

DB6LCHE2                      Zambrano - direct

 1              THE COURT:  Overruled.

 2   A.  No.

 3   Q.  Sir, why don't you look at the first page of the judicial

 4   council's decision.  It's on page 13 in the Spanish, page 1 of

 5   the English under background.

 6   A.  It's here?

 7   Q.  Yes.  Sir, second paragraph, last sentence, referring you

 8   to Judges Nicolas Zambrano and Leonardo Ordonez decided to

 9   substitute the precautionary measure of pretrial detention

10   ordered by the First Court of Criminal Guarantees of Sucumbios

11   against Christian Ricardo Suquisupa Rosero without taking into

12   consideration the dangerousness and the compound nature of the

13   crime the accused allegedly committed.

14              Do you see that, sir?

15              THE COURT:  Not interested in whether he sees it.  If

16   you have a question, let's get on with it.

17              MR. BOOTH:  Objection, relevance, use of the document.

18              THE COURT:  I'm sorry, I can't hear what you say.

19              MR. BOOTH:  Objection, relevance, the way the document

20   is being used, truth of the matter.

21              THE COURT:  The document is not in for the truth of

22   the matter.  He is entitled to ask the question.

23   Q.  Isn't it correct, sir, that you and Judge Ordonez decided

24   to substitute the precautionary measure of pretrial detention

25   ordered by the First Court of Criminal Guarantees of Sucumbios

DB6LCHE2                         Zambrano - direct

 1   against Christian Ricardo Suquisupa Rosero?

 2              MR. GOMEZ:  Objection, asked and answered.

 3              THE COURT:  Overruled.

 4   A.  Yes.

 5   Q.  And Mr. Suquisupa was a Colombian charged with drug

 6   trafficking, correct, sir?

 7   A.  No.

 8   Q.  Mr. Suquisupa was caught escorting a truck filled with more

 9   than 500 kilograms of cocaine, correct, sir?

10              MR. GOMEZ:  Objection.  Speculation, your Honor.

11              THE COURT:  Sustained in that form.

12   Q.  Mr. Zambrano, isn't it a fact that the judicial council

13   found that Mr. Suquisupa was caught escorting a truck filled

14   with more than 500 kilograms of cocaine -- strike that.  I'll

15   rephrase it.

16              Isn't it a fact that the allegation was that

17   Mr. Suquisupa was caught escorting a truck full of more than

18   500 kilograms of cocaine?

19              MR. BOOTH:  Objection, form, relevance.

20              THE COURT:  Look, Mr. Mastro, I think you can get in

21   this point a lot easier without all of this.

22              MR. MASTRO:  I understand, your Honor.  I'm trying to

23   lay a foundation for asking the question in a way that I might

24   actually get the right answer.  But I'm happy to move on if

25   your Honor wants me to move on.

DB6LCHE2                          Zambrano - direct

1           THE COURT:  You're trying your case, as they're trying

2    their case.  I'm only suggesting maybe we can save some time.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Am I correct, Mr. Zambrano, that it was alleged that

2    Mr. Suquisupa was associated with the FARC?

3            MR. BOOTH:  Objection.  Relevance.

4            THE COURT:  Overruled.

5    A.  I don't recall.

6    Q.  And that he was armed at the time of his arrest and fleeing

7    the scene?

8            MR. BOOTH:  Objection.  Form.  Relevance.

9            THE COURT:  Can I hear the question?

10           (Record read)

11           THE COURT:  Overruled.

12   A.  Yes.

13   Q.  Am I also correct that the police investigation ultimately

14   led them to recover eight tons of drugs?

15           MR. BOOTH:  Objection.  Form.

16           THE COURT:  Sustained.

17   Q.  Sir, am I correct that upon his release, Mr. Suquisupa left

18   the country and avoided prosecution in Ecuador?

19           MR. BOOTH:  Objection.  Form.

20           THE COURT:  If you know, sir.

21   A.  I don't know.

22   Q.  Am I correct, sir, that the Ecuadorian prosecutors wanted

23   Mr. Suquisupa to be detained pending trial?

24           MR. BOOTH:  Objection.  Form.

25           THE COURT:  Sustained as to form.

DB68CHE3                          Zambrano - direct

 1    Q.  Did you know at the time you issued your appellate ruling
 2    that Ecuadorian prosecutors argued in favor of detaining
 3    Mr. Suquisupa pending trial?
 4              MR. BOOTH:  Objection.  Form.
 5              THE COURT:  Sustained as to form.
 6    Q.  Sir, isn't it a fact that the reason you released
 7    Mr. Suquisupa is because you received a bribe from the FARC?
 8    A.  No.
 9    Q.  Sir, this isn't the only time that the judicial council
10    found you to have committed a violation that required your
11    removal from your judicial post, is it, sir?
12              MR. BOOTH:  Objection.
13              THE COURT:  I take it this is offered for the same
14    purpose that we had the long side bar.
15              MR. MASTRO:  Correct.
16              THE COURT:  Overruled.
17    Q.  Sir, do you remember the *Mancheno* case?
18    A.  More or less.
19    Q.  Sir, isn't that a case that came before the judicial
20    council?
21              Is that a case that came before the judicial council
22    on disciplinary charges against you?
23    A.  Yes.
24              MR. BOOTH:  Objection.  Relevance.
25              MR. MASTRO:  May I approach the witness, your Honor?

1           THE COURT:  Yes.

2                The relevance is what I previously discussed.

3    Q.  I am handing the witness what has been marked as

4    Plaintiff's Exhibit 6321.  The Spanish starts on page 10.  The

5    resolution starts at the bottom of page 7 onto page 8.

6           MR. GOMEZ:  My understanding is this document is not

7    in evidence, but it is being displayed.

8    Q.  Mr. Zambrano, is this a copy of the judicial council's

9    decision, dated May 22, 2012, in which the judicial council

10   imposed on you the sanction of removal?

11          MR. BOOTH:  Objection to discussion of the document.

12   It's not in evidence.

13          THE COURT:  Rephrase the question.

14   Q.  Mr. Zambrano, is this the judicial council's May 22, 2012

15   decision regarding a disciplinary complaint against you in the

16   *Mancheno* case?

17   A.  Yes.

18          MR. MASTRO:  I ask that it be received in evidence.

19          MR. BOOTH:  Objection.  Relevance.  Hearsay.

20          THE COURT:  Is this being offered for the limited

21   purpose on the basis of which I received 411?

22          MR. MASTRO:  Yes, it is.

23          THE COURT:  Do you propose to go the same place with

24   this that you went with the other one?

25          MR. MASTRO:  It won't be necessary.

DB68CHE3                          Zambrano - direct

1          THE COURT:  Then I need to understand what you're

2     doing.

3          (Continued on next page)

1                (At the side bar)

2                MR. MASTRO:  Your Honor, on this particular

3    disciplinary infraction, I am not planning to do the same line

4    of questioning.  It's only being offered on the basis that, not

5    for the truth of the matters asserted, but it relates to the

6    conundrum we described before.  The situation of he is removed

7    from his office by the government for inexcusable conduct and

8    then he gets this cushy government job and is totally beholden

9    to the government.  So he has got two situations.  Not just the

10   first, not just the drug case, but also this case, where he has

11   been removed from office, the government has found him to have

12   engaged in misconduct, and yet the sequence of events occurs

13   where he gets his government job back and now he is testifying.

14   I intend to impeach him later with him getting the government

15   job and this shows his bias.

16                THE COURT:  Mr. Booth.

17                MR. BOOTH:  It's hearsay.  He says it's not for the

18   truth of matter, but he is offering it for the truth of the

19   matter.

20                THE COURT:  No, he is not.

21                MR. BOOTH:  It sounds to me like he was, in the sense

22   that he can do the same thing by talking about the fact that he

23   doesn't have his job.  I would make the same arguments I made

24   earlier.

25                THE COURT:  The essence of the argument, as I

DB68CHE3                        Zambrano – direct

1   understand it, essentially is that it's a matter of bias and

2   interest on the part of the witness, not only because he has a

3   job and because the government is his employer and has taken a

4   position on this case, but it goes also to the likelihood that

5   there is any other source of professional employment for this

6   man having been removed from office twice for professional

7   misconduct by the government.

8           I remember your side suggesting, and possibly making

9   outright, the argument that Guerra's motive here was that,

10  having been removed from office, he was essentially

11  unemployable, and he sold himself to Chevron.  Well, I perceive

12  a parallel argument here that this man, having been removed

13  from office is essentially unemployable, at least

14  professionally, and along comes the government, which clearly

15  has a horse in this race, and gives him a job.  It seems to me

16  it's relevant.

17          (Continued on next page)

18

19

20

21

22

23

24

25

DB68CHE3                        Zambrano - direct

1                   (In open court)

2                   THE COURT:  Plaintiff's 6321 is received not for the

3          truth of the matters asserted, but on the limited basis

4          referred to at the side bar on this and in the discussion of

5          Plaintiff's Exhibit 411.

6                   (Plaintiff's Exhibit 6321 received in evidence)

7          BY MR. MASTRO:

8          Q.  Mr. Zambrano, you have denied ever receiving or soliciting

9          a bribe in your career as a prosecutor or a judge; that's your

10         testimony, right?

11                  MR. BOOTH:  Objection.  Asked and answered.

12                  THE COURT:  I don't think it was asked and answered,

13         but I am going to sustain the objection on other grounds, as to

14         form.

15         Q.  Sir, isn't it a fact that you have been publicly accused on

16         a dozen or more occasions of soliciting or accepting bribes?

17                  MR. BOOTH:  Objection.  Relevance.

18                  THE COURT:  Sustained.

19         Q.  Sir, isn't it a fact that while you were a prosecutor, you

20         had a reputation in the legal community for taking bribes?

21                  MR. BOOTH:  Objection.  Relevance.

22                  THE COURT:  Sustained.

23                  MR. MASTRO:  Your Honor, may I approach the side bar?

24                  THE COURT:  Yes.

25                  (Continued on next page)

DB68CHE3                          Zambrano - direct

1              (At the side bar)

2              MR. MASTRO:  Your Honor, this is really a 608(a)

3    issue.

4              THE COURT:  Then let me get my rule book.  I am not

5    going to submit to a quiz.

6              MR. MASTRO:  I love your quizzes every day, your

7    Honor.

8              THE COURT:  I bet you do.

9              MR. MASTRO:  Bribery case law, *United States v.*

10   *Wilson*, Seventh Circuit --

11             THE COURT:  I am just reading the rule.

12             OK.  Go ahead, Mr. Mastro.

13             MR. MASTRO:  Bribery and other accusations of similar

14   abuse of power in office are probative of a witness's character

15   for truthfulness or untruthfulness in a permissible area of

16   inquiry under Rule 608(a).  *United States v. Wilson* and *United*

17   *States v. Bustamante*.

18             What I am about to do is I am going to ask him these

19   questions about his reputation in the legal community.  And

20   then we have complaints against him, when he was in the NAPO

21   prosecutor's office, from over 30 members of the bar in one

22   instance in a small legal community, and then the bar

23   association itself, that he is a person who has a professional

24   career of extortion, blackmail and shame and should be removed

25   from office.  And then the bar association saying that he lacks

DB68CHE3                           Zambrano - direct

1    the integrity and has lost credibility to perform the job of

2    NAPO district prosecutor.  So I believe that under 608(a),

3    that's his reputation in the community.

4              THE COURT:  How is he competent to testify what his

5    reputation in the community is?

6              MR. MASTRO:  I have right to impeach when he denies

7    it.  I have the right to impeach him with these documents.

8              MR. BOOTH:  This is complete hearsay.  There is no way

9    you can impeach him with something.  We can't cross-examine

10   these people.  He didn't write these things.  This is just

11   trying to backdoor in just slanderous stuff that we don't even

12   know where this comes from.

13             THE COURT:  We are not going here, Mr. Mastro.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. MASTRO:

3     Q.   Mr. Zambrano, directing your attention back to the

4     *Aniversario* case, were you aware in November 2009 that the

5     commander of the organized crime prevention unit had filed a

6     disciplinary complaint with the prosecutor general against you

7     and Judge Ordonez?

8              MR. BOOTH:   Objection.  Form and relevance.

9              THE COURT:   Certainly sustained as to form.

10    Q.   Sir, back in November of 2009, did you become aware that a

11    disciplinary complaint had been filed against you?

12             MR. BOOTH:   Same objection, your Honor.

13             THE COURT:   Back in November of 2009, Mr. Zambrano,

14    did you become aware whether a disciplinary complaint had been

15    filed against you?

16             MR. BOOTH:   I would object.  Relevance.

17             THE COURT:   Now we get into the substance.

18             Now, I hate to do this.  This is eating up time like

19    crazy, but side bar.

20             (Continued on next page)

21

22

23

24

25

DB68CHE3                          Zambrano - direct

1               (At the side bar)

2               THE COURT:  Just in case nobody knew, there are no

3    frequent flier miles for coming to the side bar.

4               MR. MASTRO:  I appreciate that, your Honor.

5               THE COURT:  We don't even offer kosher meals.

6               MR. MASTRO:  I understand.

7               THE COURT:  Get on with it.  What is this?

8               MR. MASTRO:  I believe that I will be able to

9    establish, if I get honest answers, that the witness was aware

10   that such a disciplinary charge was pending against him.  In

11   fact, your Honor, the time sequence is such he became the

12   provincial representative on the judicial council.  The case

13   was at one time assigned to him to review his own disciplinary

14   case.

15              THE COURT:  So what?

16              MR. MASTRO:  Because, your Honor, the case got put in

17   limbo at the judicial council from 2010 to two days after the

18   judgment issued on February 16, 2011, and only then was there a

19   full investigation of the charge.  So that this was hanging

20   over his head for the entire time that he was drafting the Lago

21   Agrio judgment.

22              THE COURT:  This is a disciplinary charge by?

23              MR. MASTRO:  This is the *Aniversario* case, the drug

24   case.  The local prosecutors and police and drug enforcement

25   had filed the charge with the prosecutor's office.  The

DB68CHE3                        Zambrano - direct

prosecutor refers it to the judicial council.  And then the
judicial council assigns it out first to Ordonez, then to
Zambrano.  There is a recommendation internally at the judicial
council by staff for this gentleman to have formal charges
investigated against him.  It sits in limbo from late 2010,
when he went on the judicial council, until two days after the
judgment.

         THE COURT:  It seems to me you're making two arguments
or two suggestions.  One suggestion is he had something to do
with keeping the charge against himself on the back burner.
The second suggestion is that, independent of whether it was on
the back burner, it was out there when he decided the Chevron
case, and that's significant.

         MR. MASTRO:  I am suggesting, your Honor, actually
something that's a hybrid of the two.  He knew the charge was
out there against him and the government, the judicial council,
kept this hanging over his head to make sure that he did their
bidding on the case, and only pursued the disciplinary charge
to full investigation and action after he had done their
bidding.  So this man had an incentive to lie and roll over and
do whatever the government wanted him to because the Lago Agrio
plaintiffs were in collusion with the government.

         So I think that sequence shows a sword of Damocles
hung over this guy's head while he was doing the government's
bidding on the Lago Agrio case.

DB68CHE3                         Zambrano - direct

 1          THE COURT:  Do you have any evidence of any

 2   interaction between the plaintiffs in Ecuador and the

 3   government on this issue?

 4          MR. MASTRO:  I don't have specific evidence of

 5   interaction between the government and the Lago Agrio

 6   plaintiffs on this particular issue.  We have highly suspicious

 7   circumstances, your Honor, where the charge is actually

 8   referred to him to investigate himself.

 9          MR. FRIEDMAN:  I am reminded, your Honor, of your

10   comments earlier in the trial about how a corporation doesn't

11   have a state of mind.  It's not a unitary thing, if you will.

12          Mr. Mastro keeps referring to the Ecuadorian

13   government as if it's a unitary, single-minded thing, with no

14   connecting up between the plaintiffs and the judicial council

15   or whoever it is that made this complaint.  I don't think he

16   has made the connection that makes any of this relevant.

17          THE COURT:  The problem is there is evidence in the

18   record already about a lack of judicial independence in

19   Ecuador, and whether it's enough to draw the inference that he

20   wants to draw is another matter, but there is some evidence.

21          Now, you were bursting, Mr. Booth.

22          MR. BOOTH:  I don't find it relevant.  My perception,

23   rightly or wrongly, is that these seem like wild stories that

24   are being concocted to get in evidence that would not otherwise

25   be appropriate under the rules as other bad acts, and we have

DB68CHE3                         Zambrano - direct

now given the government this, as Mr. Mastro said, mind-set to

hold a sword of Damocles over his head so he would do what they

wanted him to do.

             THE COURT:  It could actually be as simple as his

understanding that it was out there and fearing the government,

whether the government thought about it for two seconds or not.

             MR. BOOTH:  You asked me.  I think it's a wild reach.

I don't think it makes any of this relevant.  I don't think

coming up with a possible story of what could have been is an

inference.  I don't think it's supported in any way in good

faith by any of the evidence.  If they had a witness come in to

say any of this, that he did something, or somebody on his

behalf did something, but just accusing him with a question now

becomes the evidence because they just say it.

             THE COURT:  Look, I understand that if there were a

jury here, that would be an argument a lawyer appropriately

would make, but there isn't.  It wouldn't be right anyway, but

it would be an appropriate argument.  I have heard the whole

story here at the side bar, and now we are arguing about the

question being the evidence.  That's silly.  I don't mean to be

unkind.  I just don't find it persuasive.

             MR. BOOTH:  This witness has been on the stand.  My

perception is this is also intended potentially to beat him up,

to try to get answers or change his demeanor, and I do think

this is an unfair line to make these being accusations, which I

1   don't believe are founded in the evidence.  And that would be

2   the last point I would make.

3       MR. GOMEZ:  If there were connections like you asked

4   for, then there would be something to go here, but it is just

5   innuendo.  There are two sequence of events, they are

6   unrelated, and there is no evidence whatsoever connecting the

7   two except argument.

8       THE COURT:  What is the best you have to draw the

9   connection?

10      MR. MASTRO:  There is evidence in the documents of Mr.

11  Fajardo supporting Mr. Zambrano to get the position as the --

12      THE COURT:  I'm sorry.  Mr. Fajardo?

13      MR. MASTRO:  Mr. Fajardo supporting Mr. Zambrano in

14  getting the position of being the provincial representative on

15  the judicial council, which obviously helps scotch the

16  disciplinary action from going forward.

17      In any event, the principal reason I am trying to

18  establish is he knew this charge was hanging over him, and he

19  said he knew there was always that pressure that he better do

20  what the government wanted him to do.

21      THE COURT:  What else do you have of this kind?

22      MR. MASTRO:  This is my last area before I go into new

23  employment.

24      THE COURT:  I think we are not going to go down this

25  path.

DB68CHE3                         Zambrano - direct

1            (In open court)

2            THE COURT:  Mr. Zambrano, I gather my colleague here

3    has provided you with a space heater, is that right?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Would you like a cup of hot tea?  You look

6    like you are very cold.

7            THE WITNESS:  You're very kind, but I have it here.

8            THE COURT:  Let's proceed.

9            MR. MASTRO:  Thank you, your Honor.

10           THE COURT:  OK, Mr. Mastro.

11           MR. MASTRO:  Thank you, your Honor.

12   BY MR. MASTRO:

13   Q.  Mr. Zambrano, what was your starting salary as a

14   prosecutor?

15           MR. BOOTH:  Objection.  Relevance.

16           THE COURT:  I think it's too remote in time.

17   Sustained.

18   Q.  When you became a judge in 2008, what was your starting

19   salary as a judge, sir?

20           MR. BOOTH:  Objection.  Relevance.

21           THE COURT:  Overruled.

22   A.  3500.

23           THE COURT:  3500 what?

24           THE WITNESS:  $3500 per month.

25           THE COURT:  Is that U.S. dollars?

DB68CHE3                           Zambrano - direct

1          THE WITNESS:  Yes.

2   Q.  Am I correct, sir, that you're currently working at the

3   Refinery of the Pacific?

4   A.  Yes.

5   Q.  And you are a legal analyst for the Refinery of the

6   Pacific, correct, sir?

7   A.  No.

8   Q.  Am I correct, sir, that you're a legal adviser with the

9   Refinery of the Pacific?

10  A.  Yes.

11  Q.  That's a job you assumed around May of this year 2013?

12  A.  Yes.

13  Q.  Sir, am I correct that the Refinery of the Pacific is a

14  joint venture?

15          MR. BOOTH:  Objection.  Form.

16          THE COURT:  Overruled.

17  A.  Can you please clarify joint, with whom, with what?

18  Q.  The Refinery of the Pacific has more than one owner,

19  correct?

20  A.  Yes.

21  Q.  And Petroecuador is one of the owners of Refinery of the

22  Pacific, correct?

23  A.  No.

24  Q.  Does Petroecuador have any ownership interest in the

25  Refinery of the Pacific?

DB68CHE3                    Zambrano – direct

1           MR. BOOTH:  Objection.  Form.

2           THE COURT:  Overruled.

3  A.   It is a stockholder.

4  Q.   Petroecuador is owned by the Ecuadorian government,

5  correct?

6  A.   Yes.

7  Q.   Am I also correct that under Ecuadorian law, that companies

8  that have multiple owners in a strategic sector, the Ecuadorian

9  government must always have a majority share?

10          MR. BOOTH:  Objection.  Form.

11          THE COURT:  See if you can phrase it more clearly, Mr.

12  Mastro.

13  Q.   Am I correct, sir, that under Ecuadorian law, companies

14  where the state has an ownership share with others in strategic

15  areas, the state must always have the majority share of

16  ownership?

17          MR. GOMEZ:  Same objection.

18          THE COURT:  Overruled.

19  A.   Yes.

20  Q.   And the oil industry is a strategic sector, correct, sir?

21  A.   Yes.

22  Q.   Am I correct, sir, that Petroecuador owns more than 50

23  percent of the shares of Refinery of the Pacific?

24  A.   I don't know that for a fact.

25  Q.   You work there as a legal analyst, correct, sir?

DB68CHE3                          Zambrano - direct

```
 1              MR. BOOTH:  Objection.  Form.

 2              THE COURT:  Sustained to form.

 3   Q.  Is it your testimony that you work for Refinery of the

 4   Pacific but don't know whether Petroecuador owns a majority of

 5   the shares?

 6              MR. BOOTH:  Objection.  Form.

 7              THE COURT:  Overruled.

 8   A.  Yes.

 9   Q.  Sir, is there some reason why you don't know whether

10   Petroecuador owns a majority of the shares of Refinery of the

11   Pacific?

12              MR. BOOTH:  Objection.  Form.

13              THE COURT:  Sustained.

14   Q.  Sir, to your knowledge, did Petroecuador own a majority of

15   the shares of Refinery of the Pacific before the Chinese

16   invested in Refinery of the Pacific?

17              MR. GOMEZ:  Objection.  Form.

18              THE COURT:  Overruled.

19   A.  Would you kindly repeat the question?

20   Q.  Sir, did Petroecuador, to your knowledge, own a majority of

21   the shares of the Refinery of the Pacific before the Chinese

22   invested in the Refinery of the Pacific?

23   A.  I don't know that for a fact personally.

24   Q.  Sir, isn't it a fact that Refinery of the Pacific posts on

25   its Web site the company directory of the employees and
```

DB68CHE3                        Zambrano - direct

1   positions of the company?

2            MR. BOOTH:  Objection.  Form.

3            THE COURT:  Overruled.

4   A.  I don't know.

5   Q.  Sir, I would like to show you what has been marked as PX

6   6357 and ask you, sir, if you can identify that as from the Web

7   site of Refinery of the Pacific?

8   A.  I don't know.

9            MR. MASTRO:  Can we scroll down the page?

10  Q.  Do you see where it identifies you as a legal analyst and

11  gives your e-mail address at the Refinery of the Pacific?

12           MR. BOOTH:  Objection.  Form.  The document not in

13  evidence.

14           THE COURT:  Sustained.

15  Q.  Sir, have you ever gone on the Web site of Refinery of the

16  Pacific?

17           Have you ever been on the Web site of the Refinery of

18  the Pacific?

19  A.  No.

20  Q.  Sir, is that your e-mail address at Refinery of the Pacific

21  on the right-hand side of this document?

22           MR. BOOTH:  Objection to form.  Discussing a document

23  not in evidence.

24           THE COURT:  Let's see if we can imagine another way to

25  get what his Internet address is.

DB68CHE3                    Zambrano - direct

1              MR. MASTRO:  I am going to connect this.

2              THE COURT:  I have no doubt about that.  But can't you

3    all agree on what these rather basic and apparently publicly

4    available facts are?

5              MR. MASTRO:  I am happy to discuss it with them.

6              THE COURT:  Why don't you do that?

7              MR. BOOTH:  Right now?

8              THE COURT:  The name of the game is not how long we

9    can run this out.

10             MR. BOOTH:  I don't have personal knowledge of this.

11             THE COURT:  There ought to be a way to deal with this.

12             MR. MASTRO:  I will be very quick.

13   Q.  Mr. Zambrano, what is your e-mail address?

14   A.  ████████████████████.

15   Q.  Sir, what is your e-mail at Refinery of the Pacific?

16   A.  I don't have one.

17   Q.  What is your work address at the Refinery of the Pacific?

18             THE COURT:  Just a minute.

19             Is there any objection to my telling the reporter to

20   seal the fragment of the transcript with his e-mail address so

21   it doesn't wind up on the Internet?

22             MR. MASTRO:  There is no objection.

23             MR. BOOTH:  No objection.

24             THE COURT:  That much will be sealed.  I will ask the

25   press, if there are any here, to exercise restraint, lest this

1    man get more e-mails than anyone.

2              THE WITNESS:  Thank you.

3    Q.  Mr. Zambrano, what is your work address, sir, at Refinery

4    of the Pacific?

5    A.  Flavio Reyes Avenue, between 28th and 29th Street, 8th

6    floor, at the Platinum Building.

7    Q.  The same address that appears on this document, correct,

8    sir?

9              MR. BOOTH:  Objection.

10   A.  It's missing the 8th floor there.

11   Q.  Thank you.

12             Sir, do you know whether you have an e-mail address at

13   Refinery of the Pacific and you just don't use it?

14   A.  I'm not aware that I have had an e-mail.

15   Q.  Sir, on this same line, it refers to analista legal, number

16   73.  Is that accurate description of your job, sir, at Refinery

17   of the Pacific?

18             MR. BOOTH:  Objection, your Honor.  Use of a document

19   not in evidence.

20             THE COURT:  Overruled.

21             He is allowed to ask questions from it.  He is not

22   allowed to put the substance of the document in.  If somebody

23   wants to ask a question about Henry VIII, it is permissible to

24   look him up in the Encyclopedia Britannica without offering the

25   Encyclopedia Britannica into evidence.

DB68CHE3                           Zambrano – direct

1              MR. BOOTH:  My objection was he is referring to the

2     document.

3              THE COURT:  Let's focus on what is important, please.

4     A.  No.

5     Q.  Sir, I would like to show you what has been marked as

6     Plaintiff's Exhibit 6360.

7              Sir, do you recognize this as a document coming from

8     the Refinery of the Pacific Web site?

9     A.  No.

10    Q.  The document on line 73 legal, legal analyst, it says 1500

11    as the salary.  Do you see that, sir?

12             MR. BOOTH:  Objection.

13    Q.  Sir, the document on line number 73 --

14             THE COURT:  What is the question, Mr. Mastro?

15    Q.  The question, your Honor, is, the document at line 73

16    identifies the legal analyst salary as 1500 a month.  Is that

17    your salary, sir?

18             MR. BOOTH:  Objection.

19             THE COURT:  Sustained.  He already told us his salary.

20    Q.  What is your annual salary at Refinery of the Pacific?

21             MR. BOOTH:  Objection.  Relevance.

22             THE COURT:  Overruled.

23    A.  The contract states that it is 46,000 per year.

24    Q.  Sir, I would like to show you what has been marked as

25    Plaintiff's Exhibit 6361.

DB68CHE3                    Zambrano - direct

1              Sir, am I correct that you have a contract with

2    Refinery of the Pacific that guarantees you an annual salary of

3    $46,000?

4              THE COURT:  That's what he just said.

5    Q.  Is your position, sir, defined as providing legal advice

6    specializing in international relations?

7              MR. BOOTH:  Objection if it is referring to the

8    document.

9              THE COURT:  Overruled.

10             What do you mean if it's referring to the document?

11   He asked him a question.

12             MR. BOOTH:  I think he is referring to a document not

13   in evidence.  I apologize.

14             THE COURT:  Henceforth, all lawyers must ask questions

15   without any notes and without any outlines and without

16   reference to any books.  That's the implication you are making.

17             MR. BOOTH:  I apologize.

18   A.  Could you please repeat the question?

19   Q.  Yes, sir.

20             Is your position, sir, at Refinery of the Pacific

21   defined as providing legal advice specializing in international

22   relations?

23   A.  It's false.

24   Q.  Sir, what legal advice is it that you provide for Refinery

25   of the Pacific?

1   A.   Relating to community relations, labor issues,

2   constitutional, and pertaining to activities in which the

3   employees have an interest or are interested in.

4   Q.   Sir, am I correct that in the Lago Agrio Chevron judgment,

5   you excluded Petroecuador from any responsibility for the harms

6   found in the judgment?

7            THE COURT:  That would be in the judgment, would it

8   not?

9            MR. MASTRO:  I am asking if he knows that.

10           THE COURT:  All right.

11  A.   Yes.

12  Q.   Mr. Zambrano, based on your knowledge of the facts of the

13  Lago Agrio case, and the research that you did to prepare the

14  judgment in the Lago Agrio Chevron case, can you provide any

15  estimate of how much money you saved Petroecuador by making

16  that finding in the judgment?

17           MR. BOOTH:  Objection.  Form.

18           THE COURT:  Overruled.

19           MR. GOMEZ:  Objection.  It assumes.

20           THE COURT:  I couldn't understand the second word.

21           MR. GOMEZ:  It assumes facts.

22           THE COURT:  Rephrase it.  Sustained.

23  Q.   Did you save Petroecuador money by that finding you made in

24  the judgment?

25           MR. BOOTH:  Objection.  Form.

DB68CHE3                    Zambrano – direct

1            THE COURT:  Overruled.

2   A.  No.

3   Q.  Sir, I want to take you back to February 14, 2011.

4            That was a big day in your life, correct, sir?

5            THE COURT:  Sustained.

6   Q.  Sir, were you at a press conference on February 14, 2011?

7   A.  Yes.

8   Q.  Was the president of the judicial council, Benjamin

9   Cevallos, also at that press conference?

10  A.  Yes.

11  Q.  And do you recall him saying that day in your presence to

12  the press that today you are a star?

13           MR. BOOTH:  Objection.  Relevance.

14  A.  I don't recall.

15  Q.  Do you recall him saying in your presence that day that you

16  are "a judge who knows how to fulfill his obligations"?

17  A.  I don't recall.

18  Q.  Do you recall him saying in your presence that day that

19  "you have not received any guidance of any sort"?

20  A.  I don't recall.

21  Q.  Do you recall him saying that day in your presence that you

22  had issued "an outstanding ruling that meets the needs of all

23  citizens of Ecuador"?

24  A.  I don't recall.

25  Q.  Isn't it also the case, sir, that that same day you heard

DB68CHE3                          Zambrano - direct

1   President Correa say that your judgment in the Lago Agrio

2   Chevron case was "the most important judgment in the history of

3   the country"?

4   A.  I don't recall.

5   Q.  But a year later, February 2012, you were removed from your

6   judicial post by the judicial council, correct?

7   A.  Yes.

8   Q.  And by mid-2012, you knew how important your testimony

9   would be in this case, correct, sir?

10          MR. BOOTH:  Objection.  Form.

11          THE COURT:  Rephrase it.

12  Q.  By mid-2012, Mr. Zambrano, you realized that you had

13  testimony to give in this case, correct, sir?

14  A.  No.

15  Q.  Isn't it a fact, sir, that in June, July, August of 2012,

16  you spoke to Mr. Guerra about giving evidence in this case?

17  A.  I don't recall.

18  Q.  Isn't it a fact, sir, that during that same period, June,

19  July, August 2012, you were talking to Mr. Fajardo and the U.S.

20  lawyers for the Lago Agrio plaintiffs about giving testimony in

21  this case?

22  A.  I don't recall.

23  Q.  Sir, you were out of a job in 2012 after you got removed

24  from your judicial post, correct?

25  A.  Yes.

DB6LCHE4                          Zambrano - direct

1   Q.  And then in March 2013, you gave the Lago Agrio plaintiffs'

2   lawyers a declaration, correct?

3   A.  I did give one, but I don't recall the date.

4   Q.  And by May 2013, you had yourself a job for $46,000 a year

5   at Refinery of the Pacific, which is owned in large part by

6   Petroecuador, correct, sir?

7              MR. GOMEZ:  Objection, form.

8              THE COURT:  Sustained as to form.  Break it down.

9   Q.  Sir, by May of 2013, you had a job with Refinery of the

10  Pacific, correct?

11             MR. GOMEZ:  Objection, asked and answered.

12             THE COURT:  Overruled.

13  A.  False.

14  Q.  In mid-2013, you got a job with Refinery of the Pacific,

15  correct?

16  A.  False.

17  Q.  Sir, you work for Refinery of the Pacific today, correct?

18  A.  Yes.

19  Q.  And you got that job a few months ago, correct?

20             MR. GOMEZ:  Objection, form.

21             THE COURT:  Overruled.

22  A.  I started in the month of April and the contract was signed

23  in May.

24  Q.  Thank you for that clarification, sir.  And Refinery of the

25  Pacific is owned in substantial part by Petroecuador, correct?

1          MR. GOMEZ:  Objection, form, asked and answered.

2          THE COURT:  Rephrase it.

3  Q.  Refinery of the Pacific is owned in part by Petroecuador,

4  correct?

5          MR. GOMEZ:  Objection, asked and answered.

6          THE COURT:  Overruled.

7  A.  Yes.

8  Q.  And Petroecuador is owned by the Ecuadorian government,

9  correct?

10         THE COURT:  Haven't we established that?

11         MR. MASTRO:  Yes, your Honor.

12         THE COURT:  Next question.

13 Q.  And now you're here today testifying in this case?

14         THE COURT:  Well, that's evident.

15         MR. MASTRO:  Thank you, your Honor.  Thank you, your

16 Honor.

17 Q.  And you know today that the Republic of Ecuador is

18 supporting the Lago Agrio plaintiffs in this litigation,

19 correct, sir?

20         MR. BOOTH:  Objection, form.

21         THE COURT:  Overruled.

22 A.  I don't know.

23 Q.  And you know today that the Republic of Ecuador is

24 litigating against Chevron in an international treaty

25 arbitration, correct, sir?

DB6LCHE4                          Zambrano - direct

1              MR. BOOTH:  Objection, relevance, form.

2              THE COURT:  Overruled.

3    A.  No.

4    Q.  And you know today, sir, that your job literally hangs in

5    the balance by your testimony, correct?

6    A.  No.

7              MR. MASTRO:  No further questions of this witness,

8    your Honor.

9              THE COURT:  Thank you, Mr. Mastro.  I think maybe it's

10   a good time to break for lunch.  2 o'clock.

11             (Luncheon recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

DB6LCHE4

```
1                          AFTERNOON SESSION

2                              2:18 p.m.

3              THE COURT:  Do I take it we've concluded the cross?

4              MR. MASTRO:  Yes, your Honor.

5              THE COURT:  Let me ask one other question then before

6    we proceed.  I guess we concluded the direct.

7              I was just given a proposed order imposing conditions

8    on Mr. Tarco and Ms. Calva.

9              Does everybody agree that this accurately reflects the

10   order I issued?

11             MS. FRIEDMAN:  Yes, your Honor.

12             THE COURT:  Mr. Gomez?

13             MR. GOMEZ:  Yes, your Honor.

14             THE COURT:  Mr. Mastro?

15             MR. MASTRO:  Yes, your Honor.

16             THE COURT:  Okay.  I'm signing it then.

17             All right, Mr. Booth.  You may proceed.

18             MR. BOOTH:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. BOOTH:

21   Q.  Good afternoon.

22   A.  Good afternoon.

23   Q.  How do you like to be referred, doctor or mister or judge?

24   A.  It's whatever you like.

25   Q.  All right.  Dr. Zambrano, I'm Rainey Booth.  I'm going to
```

1  ask you a few questions this afternoon.

2         Dr. Zambrano, did you ever solicit a bribe in the Lago

3  Agrio Chevron case from anyone?

4  A.  Never, from no one.

5  Q.  Did you ever agree to accept a bribe in the Lago Agrio

6  Chevron case from anyone?

7  A.  I would never do so because it would go against my

8  principles.

9  Q.  Did you ever agree for payment or the promise of payment to

10  allow someone else to write a part of the Lago Agrio Chevron

11  judgment?

12  A.  No.

13  Q.  Can you tell us whether or not you ever agreed in exchange

14  for payment or the promise of payment to, in the Lago Agrio

15  Chevron case, to rule in favor of one particular party?

16         MR. MASTRO:  Objection, asked and answered.

17         THE COURT:  Overruled.

18  A.  Never.  As I've stated, that would go against my

19  principles.

20  Q.  Dr. Zambrano, why did you agree to come to New York to

21  testify in this case?

22  A.  There were many reasons.  Mainly because Dr. Alberto Guerra

23  had made or given statements that were not, that were not close

24  to reality.

25  Q.  Any other reasons why you agreed to come testify in New

DB6LCHE4b                    Zambrano - cross

1    York?

2    A.   Initially when I had to give a deposition in Peru, that was

3    not feasible.  When I was summoned once again, I stated that I

4    wanted it to be a order by the judge, through an order by the

5    judge and not from one of the parties because I have nothing to

6    discuss with anyone regarding the judgment that I issued.

7    However, if the judge were to order my appearance, I am willing

8    to continue stating the truth.

9    Q.   Dr. Zambrano, can you tell us whether or not you are here

10   in New York testifying because someone is paying you to give

11   testimony?

12   A.   I am testifying as to the truth because, as I have stated,

13   because, as I have stated, Dr. Alberto Guerra made false

14   statements and that's what I stated in writing and that is why

15   I am here testifying to the truth.

16   Q.   Dr. Zambrano, I represent Mr. Donziger.  Have you ever met

17   Steven Donziger?

18   A.   Personally, never.

19   Q.   Have you ever spoken to Steven Donziger personally?

20   A.   Never.

21   Q.   I need to go back and get an answer to an earlier question.

22        Can you tell me, Dr. Zambrano, whether or not you are

23   here in New York testifying because someone is paying you to

24   testify?

25   A.   No one has paid me, nor would I accept that.

DB6LCHE4b                    Zambrano – cross

Q.  Dr. Zambrano, I want to go through and ask you about some

facts and ask you to tell me if they are true or not.

        First, can you tell me whether or not at any time

prior to February 14, 2011, you met Mr. Guerra at the Quito

airport and gave him a thumb drive with a draft version of the

judgment in the Lago Agrio Chevron case, did that ever happen?

        MR. MASTRO:  Objection, leading.  And form.

        THE COURT:  Well, Mr. Booth?

        MR. BOOTH:  I asked whether or not, your Honor.  Look,

I'm being very specific, but I asked whether or not.  I didn't

suggest an answer, but I am being specific because it is a

specific question I'm asking.

        THE COURT:  Leading questions always are.

        MR. BOOTH:  Your Honor, a leading question suggests an

answer.  I'm asking whether or not that happened, but I'm not

suggesting which answer.

        MR. MASTRO:  Your Honor, I will be educated on the

subject to use that same formulation every time I want to lead

a witness if he can do that.  It's leading.

        THE COURT:  I'm going to allow this question.  We'll

see where it goes.  I would state, Mr. Booth, that among the

factors that I may ultimately consider in evaluating the

credibility of the testimony is the extent to which I believe

the questions have suggested answers.  If you want this

question, you've got it.

1          MR. BOOTH:  I do, your Honor.  Thank you.

2          THE COURT:  Go ahead.

3   Q.  Do you recall the question or would you like me to repeat

4   it?

5          THE INTERPRETER:  Could you please repeat it.

6   Q.  Dr. Zambrano, you can tell me whether or not you at any

7   time prior to February 14, 2011, met with Mr. Guerra at the

8   Quito airport and gave him a thumb drive with a draft version

9   of the judgment in the Lago Agrio Chevron case, did that ever

10  happen?

11  A.  No.

12  Q.  Dr. Zambrano, can you tell me whether you ever, ever gave

13  Mr. Guerra a thumb drive with the Lago Agrio Chevron judgment

14  on it and asked him to revise that judgment?

15         MR. MASTRO:  Objection, leading, form, compound.

16         THE COURT:  Sustained as to compound.

17  Q.  Dr. Zambrano, did you ever give Mr. Guerra or can you tell

18  me -- strike that.

19         Dr. Zambrano, can you tell me whether or not you ever

20  gave Mr. Guerra a thumb drive or flash drive with the Lago

21  Agrio Chevron judgment on it asking -- sorry, I did it again.

22         Can you tell me whether or not you ever gave

23  Mr. Guerra a thumb drive or flash drive with the Lago Agrio

24  Chevron judgment on it, ever?

25  A.  Never.

1    Q.  Dr. Zambrano, can you tell me whether or not you ever asked

2    Mr. Guerra to make revisions to the Lago Agrio Chevron verdict,

3    judgment, before it was signed by you February 14, 2011?

4    A.  Never.

5    Q.  Can you tell me whether or not Mr. Guerra ever gave you a

6    flash drive or thumb drive with the Lago Agrio Chevron judgment

7    or any draft of that judgment, ever?

8             MR. MASTRO:  Objection, leading, form, compound.

9             THE COURT:  I'll allow it.

10   A.  No.

11   Q.  Can you tell me whether or not at any time you asked

12   Mr. Guerra to come to Lago Agrio to work on revising the

13   judgment in the Lago Agrio Chevron case?

14   A.  No.

15   Q.  Did Mr. Guerra -- can you tell me whether or not Mr. Guerra

16   ever worked in your apartment in Lago Agrio on the Lago Agrio

17   Chevron judgment?

18   A.  Never.

19   Q.  Did Pablo Fajardo -- strike that.

20            Can you tell me whether or not Pablo Fajardo ever

21   provided Mr. Guerra with a laptop computer in your apartment in

22   Lago Agrio?

23   A.  No.

24   Q.  To your knowledge, can you tell me whether or not

25   Mr. Guerra ever worked on the Chevron Lago Agrio judgment on a

DB6LCHE4b                        Zambrano - cross

1   laptop computer in your apartment?

2   A.  He never did that.

3   Q.  Can you tell me whether or not to your knowledge Mr. Guerra

4   ever worked on the Lago Agrio Chevron judgment at any time?

5   A.  Never.

6   Q.  I want to ask you just a few questions about your

7   relationship with Mr. Guerra, Mr. Alberto Guerra.

8          Was there a time in -- well, was there a time when you

9   trusted Mr. Guerra?

10  A.  Yes.

11  Q.  And can you briefly describe your relationship with

12  Mr. Guerra during that period of time?

13          MR. GOMEZ:  Objection to the translation.

14          MR. BOOTH:  I'll rephrase the question.

15  Q.  Can you tell us, give us a time frame when you -- that

16  you've known Mr. Guerra?

17  A.  Since the time he arrived as a provincial judge of the

18  Sucumbios court and I had the position as a prosecutor.  I've

19  known him since that time.

20  Q.  Do you recall about what date that was, what year that was?

21  A.  I was appointed in 1994 and he arrived around -- it could

22  be around three years after I had been appointed he arrived,

23  approximately.

24  Q.  During the time that you were acting as a judge in Lago

25  Agrio, were there ever occasions where you allowed Mr. Guerra

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB6LCHE4b                         Zambrano - cross

1   to remain in your office when you were not there?

2   A.  Yes.

3   Q.  Under what circumstances would that have happened?

4            MR. MASTRO:  Objection, form.

5            THE COURT:  Sustained.  Form.

6   Q.  Under what circumstances did that happen?

7   A.  Regularly when I would go to a hearing, to the oral

8   hearings.

9   Q.  And did you trust Mr. Guerra to allow him to remain in your

10  office while you were not there?

11  A.  Yes.

12  Q.  During the time you were a judge in Lago Agrio, did you

13  ever allow Mr. Guerra to use your office computer?

14  A.  Yes.

15  Q.  Under what circumstances did you do that?

16  A.  Because he was practicing the profession and by chance he

17  was in the courthouse and he would ask me to work while I was

18  at the hearings saying that he had to do some writing or

19  something like that.  And because I trusted him, I allowed him

20  to be there with the condition that nobody else would go in.

21  Q.  Do you recall what time frame it would have been that you

22  allowed Mr. Guerra to remain in your office and use your

23  computer?

24            MR. MASTRO:  Objection to form.

25            THE COURT:  Sustained as to form.

DB6LCHE4b                    Zambrano – cross

1  Q.  Do you recall during what time frame, during what period of

2  time you would allow Mr. Guerra to remain in your office

3  without you being there?

4          MR. MASTRO:  Same objection, your Honor.

5          THE COURT:  Same ruling.  During what period did you

6  allow him to do that.

7          MR. BOOTH:  You're right, Judge.

8  Q.  During what period of time did you allow Mr. Guerra to

9  remain in your office while you were weren't there?

10 A.  At different times when by chance we would be in Lago Agrio

11 and he would ask me to as a favor to let him be there because

12 he had to do some work.  And using the opportunity that I was

13 going to a hearing, I would leave him there without any

14 problem.

15         MR. MASTRO:  Your Honor, nonresponsive.  Move to

16 strike.

17         THE COURT:  Strike everything after "at different

18 times."

19 Q.  Do you recall whether you allowed Mr. Guerra to remain in

20 your office while you weren't there during the year 2009?

21 A.  I don't recall.

22 Q.  Do you recall whether you allowed Mr. Guerra to remain in

23 your office when you weren't there during the year 2010?

24 A.  I don't recall.

25 Q.  Dr. Zambrano, do you recall being shown a deposit slip to

1  Mr. Guerra's account that bore your signature yesterday when

2  you were being questioned?

3  A.  Yes.

4  Q.  Can you explain to the Court why there is a deposit slip to

5  Mr. Guerra's account with your name on it?

6  A.  Yes.

7  Q.  And will you do that, please.

8  A.  Alberto Guerra would always tell me that he was facing a

9  very delicate financial situation and he asked me as a favor if

10 I could loan him around $300.  I had no problem with that.  He

11 gave me the account number and I deposited it.

12 Q.  Dr. Zambrano, you were asked about a case that I believe

13 had the initials OCP as or in the title of the case yesterday.

14      Do you remember those questions and your answers

15 regarding that case?

16 A.  More or less.

17 Q.  Can you explain to the Court -- well, strike that.

18      Do you recall your testimony yesterday about your

19 participation as a judge in the OCP case?

20 A.  Yes.

21 Q.  Can you explain to the judge, focusing on your

22 participation in the case, what happened in that case?

23      MR. MASTRO:  Objection, calls for a narrative.

24      THE COURT:  That's what testimony does.

25 A.  Yes.

DB6LCHE4b                         Zambrano - cross

1  Q.  Will you do that, please.

2  A.  It's a simple case.  The lawsuit was dismissed because what

3  was being claimed were not environmental damages by those who

4  had filed the lawsuit, but rather they were personal damages

5  that have nothing to do with environmental issues.  That's a

6  different procedure that has to be carried out.  That's why it

7  was dismissed, as simple as that.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB68CHE5                        Zambrano - cross

1   Q.  Was what you just described to us the basis of your

2   decision to dismiss the case?

3   A.  That is how it's stated in the unanimous, unanimity ruling

4   that was issued, and I was a member of the appellate court.

5   Q.  How many other members of the appellate court were there on

6   this particular case, the OCP case?

7   A.  Two other people.

8   Q.  I want to ask you about Ms. Calva but first -- strike that.

9           Do you recall yesterday being asked about staff at the

10  courthouse in Lago Agrio?

11  A.  Yes.

12  Q.  Are there secretaries that work for the

13  courthouse -- strike that.

14          During the time you were a judge in Lago Agrio, were

15  there secretaries that worked at the courthouse for the

16  courthouse?

17  A.  Yes.

18  Q.  Let me focus you specifically on the period of time between

19  October 2010 and February 2011.  Was what you just said have

20  been true for that period of time as well?

21          MR. MASTRO:  Objection.  Form.

22          MR. BOOTH:  I did it again.  I will rephrase.

23  Q.  Specifically as to the time period of October 2010 to

24  February 2011, was what you said yesterday, did it apply to

25  that time period as well -- strike that.

DB68CHE5                         Zambrano - cross

1          Between October 2010 and February 2011, were there

2    secretaries that worked at the courthouse in Lago Agrio?

3    A.  Yes.

4    Q.  Can you explain, to the best of your knowledge, what the

5    responsibilities of those secretaries were who worked for the

6    courthouse in Lago Agrio?

7    A.  Yes.

8    Q.  Would you do that, please?

9    A.  In the courthouse includes the trial courts -- the

10   courthouse includes the trial courts, the tribunals of

11   guarantees where people are tried, and then the sole chamber,

12   and each one has its own secretary and assistant.

13   Q.  Were the secretaries that worked at the courthouse in Lago

14   Agrio between October 2010 and February 2011, were they

15   available to help you with typing on your orders?

16          MR. MASTRO:  Objection.  Leading and asked and

17   answered.

18          THE COURT:  Overruled.

19          But, Mr. Booth, remember what I said earlier.

20          MR. BOOTH:  Yes, your Honor.  Thank you.

21   A.  No, because each fulfills different roles in their

22   respective offices.

23   Q.  Can you explain to the Court why you made the decision to

24   hire Ms. Calva to assist you?

25   A.  If I can tell him?

DB68CHE5                    Zambrano - cross

1    Q.  That's a bad question.

2              Will you explain to the Court why you made the

3    decision to hire Ms. Calva?

4    A.  I haven't explained that.

5    Q.  Will you do it now, please?

6    A.  I can explain it.

7    Q.  Please do.

8    A.  Because it was a very voluminous trial.  This young lady,

9    she was an excellent typist; she was very good at typing.  She

10   also knew very much about the computing system.  She had just

11   graduated or had just recently graduated, and her mother asked

12   me if she could help me in some kind of situation, and

13   precisely I needed help.  That's why I made the proposal to her

14   that I could give her the $15 per day, and the mother accepted

15   willingly.

16   Q.  I want to ask you now about any notes or documents that you

17   used in drafting the judgment in the Lago Agrio Chevron case.

18   What happened to any such documents?

19   A.  I kept in my possession all those notes and those series of

20   documents approximately for about a year.  After that I

21   discarded them.  It was no longer necessary for me to have it

22   in my possession.

23   Q.  Was there any requirement under Ecuadorian law that you are

24   aware of that required you to keep any such notes or documents

25   longer than you kept them in this case?

1          MR. MASTRO:  Objection.  Form.  Leading.

2          THE COURT:  Sustained.

3  Q.  Can you tell me whether or not there is, to your knowledge,

4  any requirement under Ecuadorian law for you to maintain such

5  notes or documents for any prescribed period of time?

6          MR. MASTRO:  Objection.  Form.  Leading.

7          THE COURT:  I will take it for his state of mind.

8  A.  No.

9  Q.  Can you tell me whether or not you were aware of any reason

10  that you needed to keep such notes or documents for any

11  specific period of time?

12          MR. MASTRO:  Objection.  Form.  Leading.  Vague.

13  Asked and answered.

14          THE COURT:  Overruled.  If the examiner wants the

15  question, he can have the question.

16  A.  Can you please repeat the question?

17  Q.  Yes.  Can you tell me whether or not you're aware of any

18  reason to have kept such notes or documents for any prescribed

19  period of time?

20  A.  No.

21  Q.  I want to take you to January 2011.  Do you recall giving

22  some testimony about things you said to newspaper reporters in

23  January of 2011?  Do you recall those questions and your

24  answers?

25  A.  Yes.

1  Q.  When you indicated that you had lied to the newspaper

2  reporters that were asking you questions, can you explain to

3  the Court why you did that?

4  A.  Yes.

5  Q.  Would you do that?

6  A.  One thing is to have a conversation, it's something else to

7  live at the moment.  The reporters were harassing me

8  constantly, all the journalists, when am I going to issue the

9  judgment, when am I going to issue the judgment?  And I said I

10  need approximately to read about 500 cuerpos still.

11  Specifically, to keep them from continuing to harass me, that

12  gave me the opportunity so they would believe that and they

13  wouldn't keep bothering me.

14  Q.  Let me ask you about the orders that you issued in your

15  other cases during the time period October 2010 to February

16  2011.

17       Can you tell the Court, if you recall, the types of

18  orders in other cases that you were considering and ruling on

19  during that time period?

20  A.  In various cases.

21  Q.  During that period of time, were all the orders that you

22  worked on as a judge in Lago Agrio as long as the order you

23  issued in the Lago Agrio Chevron case?

24  A.  No.

25  Q.  If you recall, can you describe either the length or how

DB68CHE5                        Zambrano - cross

1    complicated the other orders in those other cases were during

2    that period of time?

3              MR. MASTRO:  Objection.  Form.  Compound.  Vague.

4              THE COURT:  Overruled.

5    A.  They were mainly procedural and the rulings when I had to

6    be the lead or reporting judge, when the hearings would be

7    held.

8    Q.  Can you explain to the Court, during the period of time

9    between October 2010 and February 2011, how were you able to do

10   work on your other cases?

11   A.  Dr. Alberto Guerra would help me in the other cases by

12   making the drafts of some of those cases, which after I

13   polished them, reviewed them and compared them, or matched it

14   up to the evidence that was on the record for those cases, I

15   would then take or make the final ruling.  And once I would

16   print them in the Satje system, I would stamp my signature on

17   them.

18   Q.  Dr. Zambrano, is this the first time you have testified in

19   a United States courtroom?

20   A.  Yes.

21   Q.  Have you ever given a deposition in a United States case

22   before the one you gave last week?

23   A.  Never.

24   Q.  Can you tell me whether or not you -- strike that.

25              Let me ask you about some of your testimony yesterday

1    about your judgment.  Before testifying yesterday, can you tell

2    me whether or not you took any steps to review your judgment of

3    February 14, 2011?

4              MR. MASTRO:  Objection to form.

5              THE COURT:  I will allow it if the questioner wants

6    that question.

7    A.  Could you please repeat the question?

8    Q.  Yes.  Let me change the question.

9              Prior to yesterday, when was the last time you had

10   read your judgment in the Lago Agrio Chevron case of February

11   14, 2011 in its entirety?

12   A.  When I issued it.

13   Q.  Prior to testifying yesterday, had you taken any steps to

14   memorize any parts of your judgment of February 14, 2011, in

15   preparation for testifying at the trial?

16   A.  That's not necessary.

17             MR. BOOTH:  Your Honor, I have some books.  May I

18   approach?

19             THE COURT:  Are you near the end or is this a good

20   time for a break?

21             MR. BOOTH:  I am not near the end and I am starting a

22   new point.

23             THE COURT:  We will break.

24             (Recess)

25             THE COURT:  Continue.

DB68CHE5                          Zambrano - cross

1   BY MR. BOOTH:

2   Q.  Dr. Zambrano, do you recall referencing an expert named

3   Barros yesterday in your testimony?

4   A.  Yes.

5   Q.  Will you please explain to the Court who expert Barros was?

6   A.  Expert Barros submitted a report because of the

7   contamination in the Chevron case, but he calculated the

8   contamination that had been done by Petroecuador.  So when I

9   was asked a question regarding environmental contamination, I

10  referred to expert Barros.

11          THE COURT:  Mr. Zambrano, the question was who he was.

12  It may be that Mr. Booth wants to ask you something else.

13  Q.  Will you tell us whether expert Barros was an expert in the

14  Lago Agrio Chevron case?

15          THE COURT:  He already said that.

16  Q.  The report done by expert Barros, was that a report that

17  you considered as the judge of the Lago Agrio Chevron case?

18  A.  Yes.

19  Q.  Will you explain to the Court the issues or subjects that

20  the Barros expert report pertained to?

21  A.  Yes.

22  Q.  Will you, please?

23  A.  Of course.  This report reflected the damage suffered by

24  the Ecuadorian Amazon region due to contamination caused by oil

25  exploration.

DB68CHE5                    Zambrano - cross

1   Q.  Dr. Zambrano, I put a white notebook in front of you.

2              MR. BOOTH:  Your Honor, you should have a copy.

3              THE COURT:  I do.  Thank you.

4   Q.  Can you look at the first document?

5              MR. BOOTH:  Your Honor, this should be Plaintiff's

6   Exhibit 400 for us in English and the witness should have

7   Plaintiff's Exhibit 399 in Spanish just for the record.

8   Q.  Dr. Zambrano, can you turn to page 134 of this document?

9              First of all, do you recognize what this document is?

10             THE COURT:  We know what it is, counselor.

11             MR. BOOTH:  I will ask the next question.

12             THE COURT:  What is the next question?

13  Q.  My next question, will you please turn to page 134?

14             I want to ask you about a phrase you were asked about

15  yesterday during your testimony.  The phrase I am referring to

16  is towards the bottom of the page and it is "established in

17  this report is statistical data of highest importance."

18             Will you let me know when you have found that phrase,

19  please?

20  A.  Can you please repeat the sentence to me?

21  Q.  It should be on the monitor, but it is in English.  The

22  phrase is, "Established in this report is statistical data of

23  highest importance."

24             MR. MASTRO:  Your Honor, it's not the entire clause.

25             THE COURT:  I don't understand you, Mr. Mastro.

```
 1              MR. MASTRO:  "To delivering this ruling."
 2              THE COURT:  Fair point.
 3   Q.  The rest of the sentence I am asking you about says -- the
 4   entire phrase that was used yesterday, "Established in this
 5   report is statistical data of highest importance to delivering
 6   this ruling."
 7              Have you found it?
 8   A.  Yes.
 9   Q.  I want to ask you, will you please explain to the Court
10   what issue you are discussing in this area on this page of your
11   judgment?
12              MR. MASTRO:  Objection.  Relevance, your Honor.  He is
13   reading the judgment.
14              THE COURT:  What exactly is the objection?
15              MR. MASTRO:  Can we please approach the side bar?
16              (Continued on next page)
17
18
19
20
21
22
23
24
25
```

DB68CHE5                    Zambrano - cross

```
 1              (At the side bar)

 2              THE COURT:  Mr. Booth, what is the point?

 3              MR. BOOTH:  The point is this was the phrase he was

 4    asked about yesterday when he was not allowed to look at the

 5    actual judgment, and the issue raised and the reason for that

 6    display yesterday was that he must not have written it if he

 7    can't remember the phrase.  Today I am offering him the

 8    opportunity --

 9              THE COURT:  That actually isn't correct, but you can

10    continue your argument.

11              MR. BOOTH:  Thank you, your Honor.

12              The way I interpreted what happened yesterday I should

13    say is the suggestion was, because he couldn't remember things,

14    he must not have been the author.  Today I would like to give

15    him the opportunity to discuss some of the portions of the

16    sentencia that he was asked about yesterday and let him

17    describe what issues he was considering, what relevance that

18    was to the entire sentencia.  I think it's fair for him as the

19    author of the verdict, since that has been put in dispute, to

20    discuss those issues.  This is not a document that speaks for

21    itself kind of thing, in my opinion.

22              THE COURT:  The question you asked, putting aside the

23    rest of what you said, is, I can read what he wrote here and

24    what he was discussing as well as the next guy.  And for him to

25    put a different spin on what he wrote now is not at all
```

DB68CHE5                         Zambrano - cross

helpful.  But that's not the point of what you're saying I

think.

            You want him, if I understand it, to explain what was

going through his head at the time he wrote the report in order

to rebut the anticipated argument that because of the direct he

gave yesterday it's not credible to believe that he wrote the

report.  That's a different matter than pointing him to a

phrase on a particular page and saying, what were you

discussing here?

            If you, in effect, want to do your own examination of

what he can tell us, independent of the report, I will deal

with that separately.  But if what you want him to do is to

interpret what he wrote in the report now, or basically to read

it and then spit it back to us in different words, I don't know

that we are accomplishing anything.

            MR. BOOTH:  This is the first time I have tried it.

He and I have not talked about it.  I don't know what he is

going to say.  What I would like him to do is put it in context

of the report.  This is just one phrase in one part of the

medical part which is many pages.  So I would like to ask him

to explain to the Court.  If the Court finds it is not helpful

and the Court asks me to move on, obviously I will.  But I

believe, in fairness, I should be allowed to ask him to put it

in context and explain the issues he was dealing with in this

section of his report.

DB68CHE5                          Zambrano - cross

1            MR. MASTRO:  I think you had absolutely right, and

2      that's why I made a relevance objection.  He is pointing him to

3      the document.  He is reading the document and then he is going

4      to regurgitate what is in the document.  How does that advance

5      us?  It doesn't respond to what happened yesterday and it

6      doesn't advance us one whit.

7            THE COURT:  I will try to go, at least on a

8      provisional basis, if you wish to do it, examine him with a

9      view to showing he is highly conversant on all these issues,

10     whatever description you want to put to it.  But it would not

11     be helpful to me for you to point him to a sentence in the text

12     that he wrote and say, Well, what does that really mean, in

13     effect?

14            MR. BOOTH:  Yes, your Honor.  That was not my

15     intention.  It was to get a broader discussion of the issue.

16     And I would argue it's at least disapprobative of the memory

17     test that he was put through yesterday, at least.

18            MR. MASTRO:  To do that with the document in front of

19     him, and he was obviously then reading the page and trying to

20     read around it, it's like leading him entirely to regurgitate

21     the page.  If Mr. Booth wants to read that line to him, without

22     him looking at the judgment, and then ask him what he meant by

23     that, that's a different inquiry.  But that's not what he is

24     doing.  This is a classic leading.  He is pointing him to the

25     thing he couldn't get right yesterday with the judgment in

DB68CHE5                          Zambrano - cross

1   front of him reading the judgment.

2             THE COURT:  Look, I understand both sides' point of

3   view on this.  I will say also that it would not be reasonable

4   to expect total recall two years after the fact of everything

5   in a 188-page, single-spaced decision even from Cardozo or

6   Hand.  That's clear.

7             I think you're entitled to go at least a little way,

8   Mr. Booth.  The question that you asked with the thing in front

9   of him I don't think is at all helpful, because I have no

10  doubt -- well, I take that back, because I assume he may very

11  well be able to skim, or read slowly, a page and then to say,

12  well, OK, I will now put it in different words, and at the end

13  of that process I don't know what we have accomplished.  So

14  maybe you ought to try it a different way.  I have an open

15  mind.  We will see.

16            MR. FRIEDMAN:  Can you just give us a minute to

17  confer.

18            THE COURT:  Absolutely.

19            (Continued on next page)

20

21

22

23

24

25

DB68CHE5                              Zambrano - cross

```
 1              (In open court)
 2    BY MR. BOOTH:
 3    Q.  Dr. Zambrano, can you briefly describe for the Court -- bad
 4    question.
 5              Will you please briefly describe for the Court the
 6    context of what you're discussing on this page and specifically
 7    the phrase that I referred you to?
 8              MR. MASTRO:  Same objection.  Form.  Relevance.
 9    Leading.
10              THE COURT:  We will try it.  The record will reflect
11    that the witness has the decision open before him.
12    A.  The study that appears here is related to health, and the
13    statistics are regarding the incidence of cancer in the
14    Ecuadorian Amazon region, which is not the same -- it's not the
15    same to live in an area where there is no oil exploration.  The
16    incidence of cancer in areas where there is oil exploration is
17    greater.
18              MR. MASTRO:  Your Honor, I think the record should
19    reflect he looked down at the document multiple times while he
20    gave that answer.
21              MR. GOMEZ:  The defendants dispute the
22    characterization.
23              THE COURT:  The judge doesn't.
24              I will let you go a little further, but I am not sure
25    this is productive.
```

DB68CHE5                          Zambrano - cross

1  Q.  Will you tell the Court why, if at all, the issue of cancer

2  was an issue you discussed in this judgment?

3            MR. MASTRO:  Objection.  Relevance.

4            THE COURT:  Sustained.

5  Q.  Will you close the book for me, Dr. Zambrano?

6            Please tell the Court whether the incidence of cancer

7  was an issue that you considered in drafting this judgment?

8  A.  I have detailed that specifically in the judgment.

9  Q.  Will you tell me why that was an issue you considered in

10 drafting your judgment?

11           MR. MASTRO:  Objection.  Relevance.

12           THE COURT:  Sustained.

13           MR. BOOTH:  Your Honor, may I be heard?

14           THE COURT:  We have been up and down this mountain a

15 hundred times, not you and me, but your side of the case and

16 Chevron before you.

17           MR. BOOTH:  May I say something about that?  Not the

18 issue you're raising, but why I am asking the question.  It has

19 to do with the side bar, the issue at the side bar.  I am

20 asking him to close the book.  I am asking him for the context.

21           THE COURT:  The point is that his subjective

22 motivation as to why he discussed it has nothing to do with

23 this.

24           MR. BOOTH:  As was discussed at side bar, this was the

25 phrase they chose yesterday, I didn't choose it, but it is the

DB68CHE5                          Zambrano - cross

1   phrase they chose.  Now I am asking him to speak to the context

2   of it with the book closed.

3          THE COURT:  I understood fully.  I sustained the

4   objection to that question.

5   Q.  Can you turn, Dr. Zambrano, to page 88 of the sentencia?

6          Would you look at the top of the page, after the

7   number 4, the phrase, "Theory of sufficient causation."  "This

8   theory with which we agree is the one toward which the majority

9   of writers on legal doctrine," and then it goes on.

10         Dr. Zambrano, would you look briefly at that page, and

11  I would ask you to describe for the Court the causation issues,

12  if any, that you were considering in writing your sentencia.

13         MR. MASTRO:  Objection.  Form.  Relevance.  Leading.

14  The witness is reading.

15         THE COURT:  The witness is looking down at the page.

16  Whether he is reading or not, I don't know.

17         MR. BOOTH:  I asked the witness to read.

18  A.  You told me to look at this page.

19  Q.  I did, yes.

20  A.  Thank you.

21         THE COURT:  You may answer the question.

22  A.  What is the question?

23  Q.  The question is, can you explain for the Court -- bad

24  question.

25         Will you please explain to the Court the context of

DB68CHE5                          Zambrano - cross

1   the causation issues, if any, that you were considering while

2   drafting this sentencia?

3          MR. MASTRO:  Different question.  Same objection.

4   Form.  Relevance.

5          THE COURT:  Sustained as to form.  We are not going to

6   have testimony about the context.

7   Q.  Please describe for the Court what causation issues, if

8   any, you considered when drafting this sentencia?

9          MR. MASTRO:  Same objection.

10         THE COURT:  Overruled at least for the moment.

11  Q.  Doctor, would you close the book while you do this?

12  A.  Would you please repeat the question?

13  Q.  Will you please explain to the Court what causation issues,

14  if any, you considered when drafting your sentencia?

15         MR. MASTRO:  Same objection, your Honor.

16         THE COURT:  I will hear it.

17  A.  The theory of the causality, mainly here in the United

18  States, in England and in France, deals with the difference

19  between causality -- causation, legal causation and scientific

20  causation, and the judge has discretional authority, the judge

21  has the discretion, if I am properly recalling this.

22         THE COURT:  The judge has discretion to do what?

23         THE WITNESS:  Of looking into the greater harm or

24  damage, but I cannot recall exactly.  But in any event, in the

25  judgment I did develop that topic with the research that was

DB68CHE5                          Zambrano - cross

1    done, and the judge is exactly an investigator.

2              THE COURT:  Sir, you said the judge has discretion of

3    looking into the greater harm or damage.  Would you agree with

4    me that the use of the word greater involves a comparison of

5    the amount of damage on one alternative with the amount of

6    damage on one or more other alternatives?  Do you agree with

7    that?

8              THE WITNESS:  Yes.

9              THE COURT:  And when you said that the judge has the

10   discretion of looking into the greater harm or damage, what

11   were the various alternatives that you had in mind?

12             THE WITNESS:  That I did not need to establish whether

13   this or that damage had been done as to an amount, but rather

14   that it was whether or not there was contamination.

15             THE COURT:  And that was true in your understanding

16   and consideration, regardless of whether the contamination

17   injured anybody?  That was your view?

18             THE WITNESS:  Yes.  That was exactly the basis for

19   establishing whether or not there was contamination and not the

20   amount of the same.

21             THE COURT:  And one final question from me, at least

22   for now.  And that you say through your research you determined

23   was the law here in the United States, is that true?

24             THE WITNESS:  There are theories, and I took those

25   principles, not only from the United States, but also France

1    and England.

2              THE COURT:  Are you saying that you concluded that

3    that theory was the one applied, or among the ones applied, in

4    the United States, possibly among other countries?

5              THE WITNESS:  It is the principle that is taken.

6              THE COURT:  In the United States, is that correct?

7              THE WITNESS:  Yes.

8              THE COURT:  And that principle is taken, according to

9    your analysis, by courts in the United States, is that so?

10             THE WITNESS:  Well, the research that I did was about

11   the principles that there were in the United States in the

12   doctrine.  I have only taken the principle.  I am not saying

13   that is what is applied here.  This is a principle that has

14   been developed.

15             THE COURT:  By courts or by others?

16             THE WITNESS:  Could you please clarify that?

17             THE COURT:  Yes.  You said, "This is a principle that

18   has been developed."  By whom in the United States has that

19   principle, in your estimation, been developed?

20             THE WITNESS:  I do not remember.

21             THE COURT:  Go ahead, Mr. Booth.

22             MR. BOOTH:  Thank you, your Honor.

23   BY MR. BOOTH:

24   Q.  Dr. Zambrano, I want to now turn to your first term as

25   judge on the Lago Agrio Chevron case.

DB68CHE5                        Zambrano - cross

1           Will you explain for the Court what, if any, steps you

2    took during your first term to prepare yourself to write the

3    judgment in that case?

4    A.  I was the alternate judge, alternate president of the

5    court.  The alternate president is the one who replaces the

6    sitting president at any time when the sitting president cannot

7    fulfill his duties.  For this reason, when I came to hear the

8    Chevron case, I made notes which were going to be useful to me,

9    in case at a certain point I could come to rule on the matter,

10   the case.  Because as the second sitting judge, during the

11   following term, it was possible that I could be appointed

12   president of the court, and for this reason, I did not discard

13   the various notes which I was making as I was reviewing the

14   record.

15   Q.  Now, I want to ask you about your second term as presiding

16   judge over the Lago Agrio --

17           THE COURT:  Did you want an answer to the question you

18   asked, Mr. Booth?

19           MR. BOOTH:  He not only answered the one I asked, but

20   the next two or three.

21           THE COURT:  All right if you're fine with it.

22           MR. BOOTH:  Having heard you say that, maybe I will

23   ask another question.

24   Q.  Specifically, Dr. Zambrano, other than making notes that

25   you just indicated, did you take any other steps to prepare

DB68CHE5                          Zambrano - cross

1    yourself --

2              THE COURT:  Excuse me.  I think you ought to go over

3    and oblige Mr. Mastro and look over his shoulder again and see

4    what the witness actually said.

5              MR. BOOTH:  I will rephrase it.

6    Q.  Dr. Zambrano, will you please tell the Court what specific

7    steps, if any, you took during your first term as judge of the

8    Lago Agrio Chevron case to prepare yourself for writing the

9    judgment in that?

10   A.  Make notes, research, in any way possible, all the issues

11   that were in dispute.

12   Q.  Now I want to go to your second term as presiding judge of

13   the Lago Agrio Chevron case, and I want to focus on the period

14   of time of October 2010 to February 2011.

15             Please describe for the Court the steps, if any, that

16   you went through to prepare yourself to write and eventually

17   then to write the sentencia in that case.

18   A.  Could you please explain the question to me?

19   Q.  I will try it again.

20             During the period of time between September of 2010

21   and February 2011, please describe for the Court what, if any,

22   steps you took to prepare to write the sentencia in the Chevron

23   Lago Agrio case.

24   A.  From September 2010?

25   Q.  October 2010.  Well, let's do September 2010.

DB68CHE5                      Zambrano - cross

1   A.  September of 2010 to 2011?

2   Q.  To February 2011.

3   A.  There was a second time I heard this case, and by the time

4   I heard it again, all the evidentiary period was already

5   concluded.

6   Q.  Let me ask you, please explain to the Court what the

7   evidentiary period, what does that term mean under Ecuadorian

8   law?

9   A.  For summary oral trials in Ecuador, there are six days in

10  which evidence must be submitted.  In this case, the evidence

11  that the parties had requested had already been submitted,

12  including the previous judge had already ruled on the essential

13  errors.  All that was left to me was to hear on various

14  motions, repetitive ones, that one of the parties mainly was

15  submitting, insisting on the same issue, to carry out other

16  procedures that were no longer necessary.

17  Q.  So tell the Court, please, beginning in the September 2010

18  time frame what, if anything, specifically you did as judge of

19  the Lago Agrio Chevron case.

20  A.  Polishing the judgment very soon and in a final way would

21  be included in the definitive document.

22              (Continued on next page)

23

24

25

DB6LCHE6                    Zambrano - cross

1  Q.  So I want to focus on the efforts you made towards drafting
2  the final document of the sentencia.
3        Will you explain to the Court -- I'd like you to do it
4  step by step -- the steps you went through during that period
5  towards writing the final judgment in the Lago Agrio Chevron
6  case, please?
7        MR. MASTRO:  Objection, asked and answered, subsumed
8  in the prior question.
9        THE COURT:  I'm sorry, I can't hear you.
10       MR. MASTRO:  Objection, asked and answered, your
11  Honor, subsumed within the prior question.
12       THE COURT:  Overruled.
13  A.  I want you to be specific as to what you mean by steps,
14  what do you mean by steps?
15  Q.  The process you went through, the things you did, if any,
16  during that period of time to prepare to write the judgment in
17  the Lago Agrio Chevron case.
18  A.  Do research, to continue researching.
19  Q.  And can you explain what type of researching or
20  investigation you did during that period of time?
21        That was a bad question.
22        Will you please explain what type of investigation or
23  research you did during that time period.
24  A.  Well, I carried out research constantly during all the
25  periods, but I don't recall exactly at that time.

DB6LCHE6                    Zambrano - cross

1    Q.  During that period of time --

2    A.  Strike that -- at that time frame.

3    Q.  During that period of time between September 2010 and

4    February 2011, will you tell the Court whether you reviewed any

5    part of the official record of the Lago Agrio Chevron case?

6    A.  I always had to read the case because I had to rule on the

7    motions filed by the parties.

8    Q.  Now, during your second term, the second term between

9    October 2010 and February 2011, Ms. Calva worked with you -- I

10   think you testified to that already -- is that right?

11   A.  Yes.

12   Q.  Did Ms. Calva assist you in working on any cases other than

13   the Lago Agrio Chevron case?

14   A.  I don't recall.

15   Q.  Now, in terms of the official record of the case, the

16   Chevron case, Lago Agrio case, can you -- will you explain to

17   the Court the process if any you used in selecting the portions

18   of the record you reviewed?

19        MR. MASTRO:  Objection, form, asked and answered,

20   leading, assumes facts not in evidence.

21        MR. BOOTH:  I'll try to ask a better question.

22   Q.  Dr. Zambrano, will you tell the Court what types of

23   documents would have been included, what type of documents were

24   included in the official record of the Lago Agrio Chevron case

25   in Ecuador?

DB6LCHE6                         Zambrano - cross

1    A.  Well, this case became exceedingly voluminous because

2    specifically those who were defending the oil company would

3    constantly file repetitive motions, would file copies of copies

4    of copies, and that is practically unnecessary, but the motions

5    had to be ruled on.  It contained way too many copies of the

6    copies of the copies.  Surely, it must have been the strategy

7    by that party.

8            That's why the main part was read, the evidence,

9    jointly, the pleadings, the expert reports.  That was the basis

10   of the judgment.  That was -- that is what was decided on.

11           MR. MASTRO:  Your Honor, I move to strike everything

12   prior to that's why the main part was read, the evidence, etc.

13   Everything in the beginning of that answer was nonresponsive

14   and should be stricken.

15           THE COURT:  Granted.

16   Q.  Did the official record of the Lago Agrio Chevron case

17   contain motions?

18           MR. MASTRO:  Asked and answered.

19           THE COURT:  Overruled.

20   A.  Yes.

21   Q.  Did the official record of the Lago Agrio Chevron case

22   include orders in that case?

23   A.  Yes.

24   Q.  Did the official record of the Lago Agrio Chevron case

25   include pleadings in that case?

DB6LCHE6                          Zambrano - cross

1   A.  Yes.

2   Q.  Did that official record of the Lago Agrio Chevron case

3   include evidence for that case?

4   A.  Yes.

5   Q.  And will you please describe for the Court the type of

6   evidence that would -- that was in the official record of the

7   Lago Agrio Chevron case?

8              MR. MASTRO:  Objection, form.  The record speaks for

9   itself.

10             THE COURT:  Well, the entire record is not in

11  evidence.

12             MR. MASTRO:  It's the type of evidence, your Honor.

13  That's why I objected to form, that would.

14             THE COURT:  Sustained as to form.

15  Q.  Please describe for the Court, when you say there was

16  evidence in the record of the Lago Agrio Chevron case, what do

17  you mean by the term evidence?

18             MR. MASTRO:  Your Honor, I have an objection and I'd

19  like to approach the side bar, please.

20             THE COURT:  All right.

21             (At the side bar)

22             MR. MASTRO:  Your Honor, this is obviously an attempt

23  to get the witness to say, oh, there's evidence in the record

24  on which I relied, evidence of this and that and the other all

25  about the merits of the underlying case.  That's exactly what's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB6LCHE6                        Zambrano - cross

1    not supposed to be a part of this trial.  And they're trying to

2    get him through the back door to describe, you know, what he's

3    going to subjectively say was evidence that supported his

4    judgment and that's exactly what this trial is not supposed to

5    be about and certainly not from this witness, given the

6    testimony he's given here, to be able to start giving

7    subjective views on the evidence.

8            THE COURT:  Look, right now the only question is more

9    or less to the effect of what kinds of evidence were there.  Am

10   I correct in that?

11           MR. MASTRO:  You are, but I think he's about to give

12   another one of those long-winded speeches where he starts to

13   describe all sorts of things.

14           THE COURT:  If we get it, I'm perfectly capable of

15   striking it if it's improper.

16           MR. BOOTH:  It's not my intention to do that.  I'm

17   just trying to establish what types of things would be in the

18   record.  I'm not going to ask him --

19           THE COURT:  I don't for the life of me understand why

20   we're doing this through a witness at all because you both have

21   the record and you both know what's in it and if you're really

22   and genuinely interested in getting in an anodyne description

23   of the types of evidence, I'm sure it could be stipulated in

24   ten minutes.

25           But I'll let him answer this question.

DB6LCHE6                    Zambrano – cross

1              MR. BOOTH:  Thank you, Judge.

2              (In open court)

3              THE COURT:  Just for everyone's guidance, I'm going to

4    stop with the witness at 4:30.  I have to take a criminal

5    matter briefly, and then counsel remain because we're going to

6    deal in all likelihood with one or two other matters that don't

7    involve the witness.

8              MR. BOOTH:  Yes, your Honor.

9              I don't remember if there was a question pending.

10             THE COURT:  I hope there was because we have all

11   discussion of whether the objection to it ought to be

12   sustained.

13             MR. BOOTH:  I just don't remember what the question

14   was.

15             THE COURT:  That's another matter.

16             MR. BOOTH:  Yes, your Honor.  If there is one pending,

17   can I have it.

18             THE COURT:  You sure can.  I'll do it.

19             And will you please describe for the Court the type of

20   evidence that was in the official record of the Lago Agrio

21   Chevron case.

22             THE WITNESS:  Documentary evidence, testimony, and

23   material evidence, physical evidence.

24   BY MR. BOOTH:

25   Q.  Did the Lago Agrio Chevron official court record include

DB6LCHE6                          Zambrano - cross

1    expert reports?

2    A.  Yes.

3    Q.  In the Lago Agrio Chevron official court record, please

4    tell the Court whether there were, in any instance, more than

5    one copy of the same document, if you know.

6              MR. MASTRO:  Objection, relevance.

7              THE COURT:  Look, I know where he's going.  He's been

8    there before.  You were there.  It's in the deposition.  But

9    why not?  It's only time.

10             MR. MASTRO:  Just trying --

11             THE COURT:  Our life spans are all infinite.

12             MR. MASTRO:  I understand, your Honor.  But your Honor

13   actually had a ruling on this subject that it's an excluded

14   subject.

15             THE COURT:  I'm sorry?

16             MR. MASTRO:  I think your Honor actually had a ruling

17   on this subject about excessive motions being excluded as an

18   issue in this case.

19             THE COURT:  That's not where we are I think, right,

20   Mr. Booth?

21             MR. BOOTH:  Right, your Honor.  It's not my intention.

22             THE COURT:  Where I think we were is that about this

23   time last night -- so it's not surprising that perhaps it

24   slipped people's minds; it almost slipped mine -- there was an

25   attempt by Mr. Mastro to offer a snippet of testimony from the

DB6LCHE6                           Zambrano - cross

1    witness's deposition which, as memory serves, is at page 105 of

2    the deposition.

3              MR. MASTRO:  Yes, your Honor.

4              THE COURT:  And Mr. Booth objected, essentially, that

5    that was out of context.  And I said I would take the

6    deposition home and read it and I would rule on it.  And I did

7    and I will, if anyone cares anymore.

8              I believe the passage in full starts at page 103,

9    line 5, and it went on to 108, line 20.

10             Am I right, Mr. Booth?

11             MR. BOOTH:  That sounds exactly right, your Honor.

12             THE COURT:  Okay.  So why instead of beating this all

13   to death for a second or third time doesn't one or both of you

14   offer that portion of the deposition and we'll simply take it

15   and that will be the testimony on the subject.

16             MR. MASTRO:  Happy to do it, your Honor.

17             MR. BOOTH:  Yes, your Honor.  Thank you.

18             THE COURT:  Done.  The pages just indicated are

19   received for that purpose.

20             MR. MASTRO:  Thank you, your Honor.

21             THE COURT:  Let's go on.

22   BY MR. BOOTH:

23   Q.  Judge Zambrano, just as a last thing for us today, would

24   you open the book that you have and it should have at the end

25   of the book should be the clarification order in this case.

DB6LCHE6                         Zambrano - cross

1   There's a second tab.  It should be the second tab.

2                   THE COURT:  This would be Plaintiff's Exhibit 429, the

3   English version.

4                   MR. BOOTH:  Yes, your Honor.

5   Q.  Plaintiff's Exhibit 429, the English version.  And, I'm

6   sorry, I don't know the Spanish version number if we have one.

7                   MS. FRIEDMAN:  I think the Spanish, your Honor --

8                   THE COURT:  I think it's attached to the English

9   version, is it not?

10                  MR. BOOTH:  Yes, your Honor.  That is correct.  Thank

11  you.

12  Q.  Dr. Zambrano, do you have the clarification in front of you

13  in Spanish?

14  A.  Yes.

15  Q.  Please explain to the Court the procedure, the procedural

16  aspects of you having signed -- strike all that.

17                  Please explain to the Court what the clarification

18  order is in this case.

19                  THE COURT:  Are you asking him the substance or are

20  you asking him something else?

21                  MR. BOOTH:  I was trying to ask him something else.

22  Bad question, your Honor.

23  Q.  Dr. Zambrano, please describe for the Court why you issued

24  the clarification order in this case.

25                  MR. MASTRO:  Objection.

DB6LCHE6                    Zambrano - cross

1           THE COURT:  Ground?

2           MR. MASTRO:  Relevance, subjective reasoning, and why

3   he issued an order.

4           THE COURT:  Sustained at least in that form.

5   Q.  Dr. Zambrano --

6           THE COURT:  Look, Mr. Booth, what you're getting at is

7   a question of what the legal procedure is.

8           MR. BOOTH:  Yes.

9           THE COURT:  Work it out with Mr. Mastro.  I mean

10  you've got a whole council of lawyers down in Ecuador and he

11  seems to have experts, access to experts on the moon, among

12  other places.  Work it out.

13          MR. BOOTH:  Yes, your Honor.

14  Q.  Dr. Zambrano, this clarification order, who was the author

15  of this order?

16  A.  I was.

17  Q.  Who typed the words in this order?

18  A.  Ms. Calva.

19  Q.  Did you type any of the words that are in this order

20  yourself?

21  A.  Yes.

22  Q.  Please describe for the Court the process you went through

23  in drafting this clarification order.

24  A.  The motions for clarification and for the clarification and

25  supplemental order were heard, were submitted by both parties.

DB6LCHE6                    Zambrano - cross

1   Q.  And then the actual process of typing out this order,

2   please describe how you did that.

3   A.  I referred to the record in order to be able to answer,

4   reply, the parties' requests.  I dictated to Ms. Calva.  I

5   would dictate to Ms. Calva to the parts up until she left for

6   the day and that's how we continued doing it until I issued it.

7   Q.  Did anyone else author any part of the clarification order?

8   A.  Only I was.

9   Q.  Other than Ms. Calva, did anyone else help you draft the

10  clarification order?

11  A.  I would dictate only to her when it was necessary.

12  Q.  All right.  Just so I have an answer to the question, did

13  anyone else assist you in any way with the drafting of the

14  clarification order other than Ms. Calva who typed for you?

15  A.  No.

16          MR. BOOTH:  Your Honor, I'm about to go to a different

17  topic.

18          THE COURT:  All right.  We'll break with the witness

19  here.  We'll take a very short recess.  We'll take the Stelman

20  matter which shouldn't be very lengthy.  I'm told the AUSA is

21  not here yet.  We'll see.  This may be a very short recess.

22          Mr. Zambrano, we'll see you 9:30 tomorrow morning.

23          MR. MASTRO:  Thank you, your Honor.

24          (Recess)

25          THE COURT:  Mr. Booth, are you leaving us or just

DB6LCHE6b

 1   cold?

 2         MR. BOOTH:  I'm standing back here just in case.

 3         THE COURT:  I'm not going to ask just in case what.

 4         Look, what I wanted to deal with is Chevron's motion

 5   to preclude or limit certain defense witnesses at trial because

 6   the response I got from defense is we haven't got time to

 7   respond in writing, we'll do it orally.

 8         So here's your chance, folks.

 9         Let's start with Humberto Piaguaje.

10         MS. FRIEDMAN:  Can I pull out my motion, your Honor?

11         THE COURT:  Oh, yes.  Absolutely.  And you can tell us

12   the context of the phrase -- I'm teasing you again.  I

13   shouldn't do that.

14         MS. FRIEDMAN:  What was the phrase?

15         THE COURT:  I was referring to the context of the

16   phrase that Mr. Mastro examined Mr. Zambrano about and the

17   cross on that.  After the last criminal matter one can have a

18   little humor, I hope.

19         We ready on this?

20         MR. GOMEZ:  In all honesty, your Honor, I have not had

21   a chance to read the papers.  But I assume that the argument

22   being made by Chevron is that Mr. Humberto Piaguaje's proposed

23   testimony isn't relevant.

24         Our position is that there's a narrative being told

25   here that Mr. Donziger was in control of a great many decisions

DB6LCHE6b

1    in the history of this case.   Mr. Humberto Piaguaje has been

2    involved for quite some time going back to 2003.   The nature of

3    his involvement has been in the leadership of the organization

4    or group that represents the plaintiffs.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB68CHE7

1          MR. GOMEZ:  It started as a grass-roots movement that

2     has evolved over time.  It has participated in very important

3     decisions in the history of the case, some of which have been

4     attributed to Mr. Donziger, namely, the termination of

5     attorneys or hiring of attorneys working on the case.  It is

6     that organization that appears on the retainer agreement, and

7     we believe Mr. Humberto's testimony would be relevant to

8     disprove the idea that Mr. Donziger is in control of all of

9     these decisions, that in fact there is an existing client, not

10    a list of forged names, and we would offer him up for these

11    purposes.

12         THE COURT:  Mr. Mastro.

13         MR. MASTRO:  Your Honor, he is not one of the named

14    clients.  The other Mr. Piaguaje, who is a defendant in this

15    case, and also is part of the assembly, to the extent they

16    wanted to ask questions along those lines, this person has

17    nothing relevant to add to this case.  He is being called here

18    to talk about conditions in Ecuador and things that occurred

19    there, and to the extent he has something to say about the

20    assembly, which largely has been denied since we have not

21    received information in terms of Ecuadorian documents, except

22    some that they put on their exhibit list, they can call

23    Mr. Piaguaje, the actual defendant, who is part of the

24    assembly.  So there is no reason why this person should be

25    testifying.  There is nothing relevant he has to say at this

DB68CHE7

1    trial.

2              THE COURT:  What exactly, Mr. Gomez or Mr. Friedman,

3    is the offer of proof?

4              MR. GOMEZ:  He would say, your Honor, and the reason

5    why it doesn't overlap with Mr. Javier Piaguaje is his

6    involvement has been for a longer period of time and at a

7    higher leadership level.

8              THE COURT:  Please answer my question.

9              MR. GOMEZ:  He would say that it is the union of

10   afectados, formerly known as the assembly, that made the

11   decisions of which attorneys to hire and fire, and they were

12   not made by Mr. Donziger, that he was not in control of the

13   matter.  Indeed, when the time came, it was the same union who

14   curtailed and controlled the role of Mr. Donziger.  That would

15   be the offer of proof.  He is not at the top of the hierarchy.

16   The clients have been in control of the case through the

17   assembly and the union.

18             THE COURT:  Respond to that.

19             MR. MASTRO:  We saw the other Mr. Piaguaje here

20   talking about those assembly meetings when we had the sanctions

21   hearing.  So the notion that Humberto Piaguaje has to be here

22   to talk about those things, because he is also part of the

23   assembly and they prefer him to come here to testify, this is

24   not someone who offers anything unique to this case, and, your

25   Honor, I believe that it's pretty clear that what is really

DB68CHE7

1      intended here --

2                  THE COURT:  They are trying to retry the sanctions

3      motion.

4                  MR. MASTRO:  Correct your Honor.

5                  MR. FRIEDMAN:  If I could speak to that.  I don't

6      think what we are talking about is retrying the sanctions

7      motion, but pushing back against the allegations we have heard

8      in the trial about Mr. Donziger being the mastermind to all the

9      events that you have heard about.  That's the point if I

10     understood Mr. Gomez.

11                 THE COURT:  Look, I am enormously skeptical that this

12     man has anything material or not cumulative to say, but I will

13     let you call him and hold you to the offer of proof that you

14     just made.  That's it.

15                 Now, is there any need to depose him in light of the

16     fact that he was not identified in the 26(a)(1) disclosures?

17                 MR. MASTRO:  That is exactly what I was just about to

18     say, your Honor.  We would request the opportunity to depose

19     him under those circumstances.

20                 THE COURT:  Any reason why I shouldn't permit that?

21                 MR. FRIEDMAN:  Can we have just a second, your Honor?

22                 MR. GOMEZ:  Your Honor, to be frank, we have had one

23     deposition already.  We are facing two more in the midst of

24     trial.  The thought of another is a very complicated thing to

25     manage.  I would like 24 hours to consult with my clients and

DB68CHE7

```
1    to consult with my co-counsel and figure out if there is a way

2    for Mr. Piaguaje, Javier Piaguaje, the defendant, to cover as

3    much as is necessary, and then to report to the Court on a

4    decision perhaps to withdraw Mr. Piaguaje, Humberto Piaguaje,

5    strictly because of the logistical complication of having to

6    schedule yet another deposition, which, in fairness, I assume

7    the plaintiffs are entitled to.

8         THE COURT:  I appreciate the frankness on that point.

9    So the ruling on this one will be that if you want to call him,

10   you may, provided that his testimony will be limited to the

11   offer of proof you just made, and that he will have given a

12   deposition previously, and we will hear from you tomorrow about

13   whether you elect to drop him or go forward.  If you're going

14   to go forward, there will have to be a deposition.

15        Now we get to Escobar.  I gather the argument

16   essentially is that he is being called only to give hearsay

17   about the alleged Borja incident.

18        MR. FRIEDMAN:  If I could interrupt.  I gave Mr.

19   Mastro notice this afternoon that we have been unable to obtain

20   his attendance.  So he is dropping off our list.

21        THE COURT:  Thank you.  That solves that problem.

22        Donald Moncayo.  It would be helpful, Mr. Mastro, if

23   you summarized for your brethren at the bar what the argument

24   is.

25        MR. MASTRO:  Your Honor, briefly, Mr. Moncayo is a
```

DB68CHE7

1    Selva Viva employee, Selva Viva being a defaulting defendant in

2    this case.  Mr. Moncayo's limited testimony is about supposedly

3    seeing at the courthouse occasions through an open door of a

4    Chevron attorney having gone into a judge's chambers and having

5    some conversation and with the door open.  And he describes at

6    least one other meeting where --

7        THE COURT:  What is unbelievable about it inherently,

8    that he couldn't hear it through an open door, or if something

9    was going on, the door would have been closed?  I don't get it.

10        MR. MASTRO:  The notion of that being relevant

11   testimony on unclean hands, that there were occasions when he

12   saw really an incidental interaction, a door open in one

13   instance.  He described a situation where the Lago Agrio

14   plaintiffs' representatives were then invited into the room.

15   It is not something that can possibly rise to the level of

16   unclean hands evidence.

17        They also offer him on merits issues, like the toxic

18   tours that he gives.  So it's clear that this a backdoor way to

19   have someone come in and talk about conditions on the ground in

20   Ecuador under the guise of supposed unclean hands evidence that

21   couldn't possibly rise to the level of any kind of improper

22   contact that this person would have witnessed or seen.  He is

23   not able to actually describe any substantive interaction that

24   a Chevron person had with the judge for that to be unclean

25   hands evidence.

DB68CHE7

1          THE COURT:  Let me hear from the other side.

2          MS. LITTLEPAGE:  Yes, Judge.  I think we have provided

3    a copy of Mr. Moncayo's witness statement.

4          THE COURT:  I have it in front of me.

5          MS. LITTLEPAGE:  I don't want to repeat what the Court

6    probably already knows.  He lays out in his witness statement

7    the things that he testified to in-depth at his deposition.

8          THE COURT:  A deposition is a different case.

9          MR. MASTRO:  Count 9, in Ecuador.

10         MS. LITTLEPAGE:  I don't know that I can add anything

11   other than his witness statement because he doesn't speak

12   English and I don't speak Spanish.

13         THE COURT:  The witness statement speaks of three or

14   four incidents, perhaps more depending on what paragraph 13

15   means, in which he says something about alleged conversations

16   between Chevron counsel and one or another judge.  It's not

17   even in each case clear that the judge in question was the

18   judge on the case, which seems to be sort of a relevant fact.

19   I am certainly willing to hear what he has to say on that.

20   There is an unclean hands argument, and it may well be, Mr.

21   Mastro, that he has got no personal knowledge of anything that

22   would fall into the category of an improper ex parte contact.

23   He may on the other hand have something.  So that much I am

24   going to hear.

25         Then he goes on about conditions in the Oriente,

DB68CHE7

 1    pollution and illnesses that affect people that had contact
 2    with oil residues.  I take it from what you said, Ms.
 3    Littlepage, you're not pressing any of that, is that right?
 4              MS. LITTLEPAGE:  Well, Judge, as you know, we take the
 5    position that the contamination issues and the pollution should
 6    be in the case, and I understand the Court does not agree with
 7    me.  I asked Mr. Moncayo through an interpreter to write his
 8    personal knowledge of the issues.  He did.  I accept if the
 9    Court strikes that portion of his witness statement, but
10    obviously we wanted it in his witness statement so the
11    appellate record would be clear as to what he would have said
12    if he was allowed to testify fully.  If the Court doesn't
13    accept that testimony, I understand.
14              THE COURT:  I am not accepting it.  And, Mr. Mastro,
15    you and Ms. Littlepage can work out what gets stricken, and he
16    will be called on the limited basis indicated.  That takes care
17    of him.
18              MR. MASTRO:  Thank you, your Honor.
19              THE COURT:  Is this one where you had asked for a
20    deposition or not?  I think not, right?
21              MR. MASTRO:  We had not asked for a deposition, your
22    Honor.  I just wanted to point out, in case it wasn't clear, he
23    doesn't claim he heard or knows the substance of any of the
24    three or four encounters that he says he witnessed.
25              THE COURT:  Look, I am going to give them an

DB68CHE7

1    opportunity, which they are entitled to in my view, to try to

2    prove what they say.

3         Now, I understand that the statement is, shall we say,

4    a little bit delphic in this area, but who knows.  We will see.

5         MR. MASTRO:  Understood, your Honor.

6         THE COURT:  Now, Alejandro Ponce Villacis.  I have no

7    Spanish so you will forgive my pronunciation.

8         MS. LITTLEPAGE:  We are going to get Mr. Ponce's.

9    Hopefully, it's on my computer when I get home tonight.  We are

10   going to be serving his actual witness statement tonight.  I

11   will be honest, I have not seen his complete witness statement.

12   I have spoken to him.  I don't believe anything in his witness

13   statement is going to address the issues raised in the motion

14   about the sting operation, but I haven't seen the statement.

15        My understanding of his statement is it's going to be

16   directed to some of the issues that were raised at the

17   beginning of the trial, on some of the issues that came about

18   in the underlying trial.  The HAVOC inspection labs, the

19   stopping of the judicial inspections.  He was the lawyer on the

20   case at that point and deals factually with some of those

21   issues.  The issues raised in their motion I don't believe are

22   part of his witness statement, but I haven't seen it.  But we

23   will all see it tonight and probably address it better

24   tomorrow.

25        THE COURT:  We will defer it.

DB68CHE7

1          Then we have Ms. Soltani.

2          MS. LITTLEPAGE:  She will not be able to attend.  She

3     has to go to New Zealand or Australia, somewhere far.

4          THE COURT:  Juan Pablo Alban.

5          MR. FRIEDMAN:  We are in a similar situation.  We are

6     hoping that when we get back today we will have a witness

7     statement from him.

8          THE COURT:  So we will defer on that.

9          MR. MASTRO:  He is being called as an Ecuadorian law

10    expert.

11         THE COURT:  Is that right?

12         MR. FRIEDMAN:  That's not exclusively.  Again, I

13    haven't seen his statement either, but he is responding to

14    other things that I can't say in open court.  I don't know if I

15    can say it.  Can we have just a quick side bar?

16         THE COURT:  We will see the statement.

17         What is the story about Berlinger?

18         MR. FRIEDMAN:  I also informed Mr. Mastro he is not

19    coming.

20         THE COURT:  That takes care of that.

21         Now, how long do we expect to be tomorrow?

22         MR. MASTRO:  Your Honor, we have two witnesses who

23    have been in town and really need to get on the stand tomorrow.

24    That's Mr. Rayner and Ms. Zygocki.  And I can tell you, based

25    on what happened here this afternoon, my additional examination

DB68CHE7

1    would be minimal at best.

2             THE COURT:  Your additional examination of?

3             MR. MASTRO:  Of Mr. Zambrano.

4             THE COURT:  How long are we going to be with Mr.

5    Zambrano with the defendants?

6             MR. GOMEZ:  Mr. Booth and I should be finished by the

7    end of the morning, perhaps sooner.

8             MR. MASTRO:  Can we have an estimate on the two

9    cross-examinations for Rayner and Zygocki?

10            MR. FRIEDMAN:  Zygocki is a half hour.

11            MR. MASTRO:  How about Rayner?

12            MR. BOOTH:  Half hour or less, but I could be wrong

13   because I haven't fully looked at it.

14            THE COURT:  Give me the current best estimate of what

15   the defense case looks like.  Who are the witnesses and how

16   long is it going to take?

17            MR. FRIEDMAN:  Can I have just a second, your Honor?

18            THE COURT:  I am assuming Ms. Hinton is going to be a

19   lot shorter than was initially thought.

20            MR. FRIEDMAN:  I can't speak to Ms. Hinton, your

21   Honor.  Ms. Littlepage can I hope.

22            MS. LITTLEPAGE:  Judge, obviously, it's depending on

23   the cross-examination.  Ms. Hinton, the main focus of her

24   testimony is on Mr. Donziger's state of mind.  Her testimony is

25   not offered for the truth of the press releases or what she is

DB68CHE7

1    doing, but she is in discussions with Mr. Donziger.  They are

2    discussing how to respond to different issues, and she was

3    there at the time and can talk about his understanding,

4    knowledge, instructions to her, and therefore it is some

5    insight into his state of mind at the time.

6            THE COURT:  Who are the witnesses overall on the

7    defense case?

8            MR. FRIEDMAN:  We have Hinton, Ponce, Moncayo, Alban,

9    Mr. Donziger, Calva, the computer person.  Having said all of

10   those people, your Honor -- then Mr. Gomez's clients.  Having

11   said all of those --

12           THE COURT:  One of them or both of them?

13           MR. GOMEZ:  Javier has a visa.  Hugo does not.  We

14   hope to have information on whether he received an appointment

15   to get his visa, but right now he does not have one.

16           THE COURT:  Of course, he has known the trial date for

17   a year.

18           So one week, four days?

19           MR. FRIEDMAN:  The two unknowns, your Honor, are --

20           THE COURT:  Mr. Donziger.

21           MR. FRIEDMAN:  That would be one.  The other big

22   unknown is many of our Ecuadorian witnesses, like Ms. Calva, I

23   think Mr. Moncayo, we don't have any certainty they are going

24   to get visas and be here on time.  The same with Tarco, the

25   computer person.  I am telling you our largest case at this

DB68CHE7

1   point.

2          THE COURT:  I appreciate that.  That's really what I

3   am looking for.

4          MR. FRIEDMAN:  The other issue is the Doe 3 issue.  We

5   gave the Court a pleading today that has not been formally

6   filed because we didn't have a computer disk.  We will file it

7   tomorrow.

8          THE COURT:  OK.  How long is Mr. Donziger going to be

9   on direct?

10          MR. FRIEDMAN:  I would say a day.

11          THE COURT:  Cross?

12          MR. MASTRO:  Your Honor, I am surprised to hear that a

13   supplemental direct would last a day for Mr. Donziger to talk

14   about his state of mind or his intent.

15          THE COURT:  I intend to give him a certain amount of

16   latitude.  His credibility is pretty important in this case, or

17   at least so it looks at the moment.

18          MR. MASTRO:  Understood, your Honor.  I am hopeful to

19   be as efficient as possible.  If he is really going to be on

20   the stand a day, I don't intend to go more than a day.  I

21   hopefully go less than a day, but I am going to have to

22   question him about some of the things that he is undoubtedly

23   going to say while he is on the stand.

24          I needed to add, so your Honor knows all the potential

25   witnesses, after the two that I named on our side who have to

DB68CHE7

1    testify tomorrow, and it sounds like they will get on, we also

2    have Mr. Anson and Alvarez Grau who is our last witness.  They

3    should be quick.

4            Then, finally, one witness out of turn for next week

5    on the 14th, Josh Lipton from Stratus.

6            THE COURT:  What is his name?

7            MR. MASTRO:  Josh Lipton.  He is the head of Stratus.

8            Finally, I just wanted to ask the defense if they

9    could let us know the status of Mr. Seidel as a witness, who

10   used to be at Burford.

11           MR. FRIEDMAN:  He is not going to be coming.

12           What I told Mr. Mastro is I would triple check that

13   tonight.  I am 90 percent sure he is not going to be here.

14           THE COURT:  Now that you mentioned Stratus, it prompts

15   me to ask, because I just haven't looked, has either side

16   designated any Maest or Beltman testimony?

17           MS. LITTLEPAGE:  Yes, sir.

18           THE COURT:  Both sides?

19           MR. MASTRO:  They have, your Honor.  We are going to

20   have counterdesignations to theirs when they offer them in the

21   case.  The counterdesignations would include, in responding to

22   their deposition designations which came at an earlier point in

23   time, the actual declarations that they signed.  We will

24   explain why.

25           THE COURT:  Help me understand here.  Were they

DB68CHE7

1    deposed before or after the settlement?

2           MR. MASTRO:  Before, your Honor.  And much of what has

3    been designated, what would be objected to, it goes to merits

4    types issues.  And of course in their declarations, they

5    explain that they are renouncing some of their prior testimony

6    and expressing their regret at having been a part of this.

7           THE COURT:  If their depositions get in, are you going

8    to call them on rebuttal?

9           MR. MASTRO:  Unlikely that we will, but we may have

10   to.  It depends on whether our counterdesignations and the

11   declarations are received.

12          THE COURT:  I understand.

13          Ms. Littlepage.

14          MS. LITTLEPAGE:  Can I raise one issue?  Mr. Mastro

15   has told us that he is going to be calling, I think, Dr. or

16   Mr. Grau.  I believe that Mr. Grau's testimony is virtually 100

17   percent cumulative and repetitive of Ms. Elena's.  Can we not

18   file a written motion and just ask the Court to look at those

19   two witness statements?  I am raising that objection because I

20   think they are very, very similar.

21          THE COURT:  This is a question, it's a leading

22   question, but I am not trying to suggest the answer.  Is the

23   Grau witness statement more or less along the lines of the

24   affidavit he put in on the preliminary injunction?

25          MR. MASTRO:  Yes, it is, your Honor, updated with

DB68CHE7

1    events that have happened over the last two years.

2            THE COURT:  It sounds to me it's not too cumulative,

3    and in any case, I think in light of some of the testimony

4    yesterday, I am not going to exclude it, even if there is some

5    overlap, unless, of course, the defense is in a position of

6    stipulating to the veracity and accuracy of Ms. Elena's

7    testimony and to her qualifications, etc., etc., which I assume

8    you're not doing, right?

9            MS. LITTLEPAGE:  That's correct.

10            THE COURT:  Fair enough.

11            Now, there was one other question that's been lurking

12    in my mind for a long time.  And if you don't know the answer

13    now, Mr. Mastro, you can let me know tomorrow.  Was the amended

14    complaint ever served on the defendants who never answered?

15            MR. MASTRO:  Your Honor, I believe that they had

16    defaulted by then, but I will confirm whether there was any

17    form of service or whether they had already defaulted by then

18    and essentially there was not.

19            THE COURT:  Does Chevron intend to move for a default

20    judgment against the non-answering defendants?

21            MR. MASTRO:  At the end of the case, your Honor, we

22    believe that we would be entitled to do that.

23            THE COURT:  I know that.  That's why I asked the

24    question.

25            MR. MASTRO:  I think that would be our intention to do

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB68CHE7

```
1    that.  I will consult with folks and let your Honor know for
2    sure tomorrow.
3             THE COURT:  OK.  Anything else this evening?
4             MR. FRIEDMAN:  Could I just ask if you did in fact
5    receive our Doe 3 brief?
6             THE COURT:  I did.
7             MR. FRIEDMAN:  Thank you.
8             THE COURT:  Oh, yes.  Why don't we try to dispose of
9    that right now.
10            Mr. Mastro, if you can, try to persuade me as to why
11   the reason I essentially ruled her out as a live witness,
12   unless I went further, in terms of giving access to her
13   identity and so forth, doesn't apply equally to deposition
14   testimony?
15            MR. MASTRO:  I think it really boils down to three
16   fundamental points.
17            Number one, the issues on which Doe 3 has testified at
18   length at a deposition, most of the time of which was taken by
19   the defendants -- I am not going to mention any names, don't
20   worry -- your Honor, involved all issues that had been in this
21   case since at least January of this year, for reasons that your
22   Honor is well aware of.  And issue was joined in all of these
23   particulars at that time.  All counsel, all parties knew.
24   Certain core issues about what went on in Lago Agrio and what
25   went on with Judge Zambrano were front and center in this case
```

```
 1   even earlier than January, but certainly from then on.  So

 2   every single aspect of this notion that there is something new

 3   that needs to be investigated is just not the case.  Number

 4   one.

 5            Number two, it's important corroborative testimony in

 6   a case where there is one witness who has very clear testimony

 7   about what happened here, another who is giving a very

 8   different version of events.  A corroborating witness who is

 9   going to be called, if that person will come here, to

10   supposedly support this --

11            THE COURT:  You told me she won't come here.

12            MR. MASTRO:  Maybe that would make some difference,

13   but I am just trying to explain why --

14            THE COURT:  Maybe it would make some difference?

15            MR. MASTRO:  If she does not come here.  But the fact

16   of the matter is --

17            THE COURT:  Am I misunderstanding, didn't I get a

18   letter from you saying, given what I have said, she is not

19   coming.

20            MR. MASTRO:  I'm sorry.  Doe 3 is not coming.  I

21   thought you meant Calva, the other witness.

22            THE COURT:  No, no.  We are talking about Doe 3's

23   deposition.

24            MR. MASTRO:  I understand.  And I am saying that you

25   have Doe 3 in many particulars corroborating one witness.
```

DB68CHE7

```
 1            THE COURT:  Believe me, you don't have to put any more
 2   on the record.  I know what she allegedly corroborates.  The
 3   question that I put to you is, why I should take the deposition
 4   any more than I should take the live testimony, except after
 5   further disclosures and so forth?  I got part of your answer,
 6   maybe all of your answer.  What I got was, had they been doing
 7   their homework, they would have tracked this down a long time
 8   ago all on their own.
 9            MR. MASTRO:  So there is no prejudice, your Honor.  It
10   really brings me to my third point here.  I think your Honor
11   should have the benefit of that testimony under oath, just like
12   your Honor is being asked to consider and is willing to
13   consider other witnesses coming forward very recently while the
14   trial is in progress, and I think your Honor should take the
15   evidence.
16            THE COURT:  There is a difference.
17            MR. MASTRO:  I understand there is a difference.  As
18   your Honor has already so aptly noted, it is not the case that
19   there is in civil cases, under these extraordinary
20   circumstances, where there are such grave security risks, that
21   there is a right to confrontation and disclosure of the
22   identity of every individual witness.  The fact of the matter
23   is I think your Honor took reasonable precautions under the
24   circumstances and should have the benefit of considering that
25   evidence.  I think your Honor could do what your Honor has done
```

DB68CHE7

1   in some other circumstances, which is that your Honor has made

2   rulings and said that you will consider an issue in a certain

3   light, but also, alternatively, explain in any ruling whether

4   that was the dispositive evidence on any particular point or

5   not.

6           THE COURT:  You're saying that I should just sort of

7   take it conditionally, and then if I decide that the defense is

8   right, I shouldn't consider the deposition and simply say I

9   didn't consider it.

10          MR. MASTRO:  That's exactly what I am saying.  I have

11   to say one last thing.

12          The problem here, and I have to say it, and I am going

13   to be careful with my words, but her unavailability has been

14   procured by parties acting in concert with the defendants.  And

15   we have a situation where it's really not right that, in our

16   view, that this individual, who had the courage to come

17   forward, is experiencing things even now where she is feeling

18   those pressures.  And I have to say, your Honor, there are

19   things that happened, we were going to write to your Honor

20   about tonight, things that just happened this week that

21   suggests to us there have been disclosures about her with the

22   parties with whom they are collaborating, and we will be happy

23   to make the Court aware of those.  But I think it would be a

24   shame for the Court to not have the ability to consider that

25   evidence, to keep that issue open.  Each side can designate

DB68CHE7

1  from that deposition, especially under these circumstances

2  where they were not prejudiced, in fact, and where the

3  witness's unavailability, in essence, is being procured by

4  those acting in concert with the other side.

5          THE COURT:  All right.  Mr. Friedman, let's cut to the

6  chase.  If I exclude this and rule for the defense, depending

7  on what the basis for the decision was, this is potentially

8  reversible error, right?

9          MR. FRIEDMAN:  If you rule in our favor?

10         THE COURT:  If I exclude her testimony and I say for

11 the sake of argument that the witnesses whom she allegedly

12 corroborates are not credible, and on that ground rule for you,

13 they have an argument on appeal that my excluding the

14 deposition was reversible error because I excluded the

15 corroboration that might have led me to come to a different

16 view on the credibility of others, right?

17         MR. FRIEDMAN:  No.  Well, I would say it's an awfully

18 weak argument.

19         THE COURT:  That's what I expect you to say.

20         MR. FRIEDMAN:  Your Honor, what they are saying is, we

21 should be allowed to corroborate these other witnesses with a

22 witness that the defense doesn't get to investigate, that we

23 don't get to know.  How much corroboration is provided by a

24 witness whose opportunity to see what she says she saw is not

25 going to be explored, whose bias is not going to be explored,

DB68CHE7

1      all the normal things.

2              THE COURT:  I understand all of those arguments.  But

3      if an appellate court were to say that, notwithstanding all

4      those arguments, it was error not to at least consider her

5      testimony, discounted for all of those arguments, but not to at

6      least have considered it, could be new trial, right?

7              MR. FRIEDMAN:  I suppose.  I think we both know that's

8      a long, long, long shot.

9              THE COURT:  We both know there have been longer shots

10     in this life.

11             MR. FRIEDMAN:  Fair enough.

12             THE COURT:  Right.

13             MR. FRIEDMAN:  Yes.

14             THE COURT:  It works the other way too, correct?

15             MR. FRIEDMAN:  It works the other way much more

16     strongly, but yes.

17             THE COURT:  Maybe, maybe not.  So why isn't the answer

18     for me to just take it conditionally and simply make clear when

19     I rule that I either have or have not considered it and why?

20             MR. FRIEDMAN:  Your Honor, there are, I would say,

21     huge due process problems to that.  You are a fact finder.

22     You're wearing two hats.

23             THE COURT:  I already know what it is.

24             MR. FRIEDMAN:  I understand.  The appellate court is

25     not going to be able to know -- let me step back.  You still

DB68CHE7

1    have the fundamental problem that you may make a decision -- I

2    guess this goes to the risk on appeal, if you will.  You may

3    say, in my view, my honest view, I can rely on this witness for

4    the following reasons, to corroborate these other witnesses,

5    without knowing anything about issues X, Y, Z.  But we don't

6    know what we don't know, and I think there is a huge due

7    process problem with having --

8              THE COURT:  That's rearguing.

9              MR. FRIEDMAN:  I am trying not to reargue, but there

10   is a point I do want to argue, your Honor, or at least raise

11   the issue, which is Mr. Mastro repeatedly has said there are no

12   new issues here, and I don't want the record to suggest that we

13   agree with that.  If we went into chambers, I can take you

14   through her statement, her deposition, and point to the new

15   issues.  I think it's not correct that there are not new issues

16   here.  In other words, if she says X, can we now bring a

17   witness to address X?  You're going to say, or Mr. Mastro is

18   going to say, well, we don't even know if the judge is going to

19   consider it.

20             THE COURT:  You have already told me the rest of your

21   case, and if any of those people has something to say that

22   without breaching the confidentiality might have a bearing, you

23   have got it, right?

24             MR. FRIEDMAN:  I appreciate that.

25             THE COURT:  I am not saying anything new.

DB68CHE7

1          MR. FRIEDMAN:  It wasn't clear to me.  There are

2     things that are in that deposition that we do have witnesses

3     who can address, at least one witness who can address, and if

4     you say we have got it, I will take that.

5          THE COURT:  That was not a ruling.  That was an

6     assumption because you have laid out who your witnesses are.

7     My strong inclination is to say the deposition is lodged with

8     me, and it has been offered, and I will rule on its

9     admissibility in the fullness of time.

10          MR. FRIEDMAN:  The problem I see is if you then say, I

11     am relying on X in this witness's statement, once you have made

12     that decision, we should be provided the opportunity to present

13     you with evidence that goes contrary to X.  Again, she wasn't

14     able to see or maybe she has got a huge bias against Mr.

15     Donziger.  Maybe she had an affair with Mr. Donziger and now

16     she is -- I am just making stuff up obviously.  We don't know.

17     We won't be given an opportunity, if you say in your order I

18     have relied on X, we won't ever be given the chance to respond,

19     to do the most basic fundamental investigation.  That's the

20     problem with that.

21          THE COURT:  All right.  You have persuaded me.  It's

22     out.

23          Have a good evening.

24          (Adjourned to November 7, 2013, at 9:30 a.m.)

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    NICOLAS ZAMBRANO

4    Direct By Mr. Mastro . . . . . . . . . . . .1735

5    Cross By Mr. Booth . . . . . . . . . . . . .1805

6                        PLAINTIFF EXHIBITS

7    Exhibit No.                               Received

8     6401   . . . . . . . . . . . . . . . . . .1735

9     411    . . . . . . . . . . . . . . . . . .1764

10    6321   . . . . . . . . . . . . . . . . . .1781

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```