DB7LCHE1                    Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                    Plaintiff,

5              v.                        11 Cv. 0691 (LAK)

6    STEVEN R. DONZIGER, et al.,

7                    Defendants.

8    ------------------------------x
                                        November 7, 2013
9                                       9:37 a.m.

10   Before:

11                        HON. LEWIS A. KAPLAN
                                        District Judge
12
                              APPEARANCES
13
     GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        JEFFERSON E. BELL
          ANNE CHAMPION
17        GEORGIA K. WINSTON

18   FRIEDMAN RUBIN
          Attorneys for Donziger Defendants
19   BY:  RICHARD H. FRIEDMAN
          DEE TAYLOR
20
     LITTLEPAGE BOOTH
21        Attorneys for Donziger Defendants
     BY:  ZOE LITTLEPAGE
22        RAINEY BOOTH

23   GOMEZ LLC
          Attorneys for Defendants Hugo Camacho, Javier Piaguaje
24   BY:  JULIO C. GOMEZ

25

DB7LCHE1                         Trial

1                (Trial resumed)

2                THE COURT:  Good morning, all.

3                MR. MASTRO:  Good morning, your Honor.

4                THE WITNESS:  Good morning.

5                THE COURT:  I hope it's not raining in here, Andy.

6                Good morning, Mr. Zambrano.  You're still under oath.

7                Let's continue, folks.

8                MR. BOOTH:  Yes, your Honor.  Good morning.

9                THE WITNESS:  Good morning.  Thank you.

10    NICOLAS ZAMBRANO, resumed.

11    CROSS-EXAMINATION (cont'd)

12    BY MR. BOOTH:

13    Q.  Good morning, Dr. Zambrano.

14    A.  Good morning.

15    Q.  I want to talk to you this morning about the process you

16    went through of actually dictating the judgment in the

17    Ecuadorian Lago Agrio case.

18                First of all, who actually typed the words into the

19    new computer in your office?

20    A.  Ms. Calva.

21    Q.  Did you ever type any of the judgment in the Lago Agrio

22    Chevron case yourself into the computer?

23    A.  Yes.

24    Q.  Will you estimate for us how much of the judgment in the

25    Chevron Lago Agrio case Ms. Calva typed compared to you?

DB7LCHE1                          Zambrano - cross

1   A.  Could you please clarify the percentage that I typed or the

2   percentage that Ms. Calva typed?

3   Q.  The percentage that Ms. Calva typed, please.

4   A.  Between 80 and 85 percent.

5   Q.  Other than Ms. Calva and you, did anyone else type any of

6   the words in the Lago Agrio Chevron judgment?

7   A.  No.

8   Q.  Now, I think you described or used the term dictating in

9   describing the writing of the judgment.  I want to ask you to

10  describe that process.  Tell the Court, please, how you went

11  about dictating the judgment in this case.

12  A.  Yes.  From the cases that I had, from the cuerpos, from the

13  notebooks that I had pertaining to this case, from the notes

14  that I had gathered, from all the documentation that was

15  available to me, I proceeded to dictate it and I would form the

16  concept, the idea, and that way it would be gathered in the

17  computer, collected in the computer.

18  Q.  And when you dictated, did you dictate into a machine?

19  A.  What do you mean dictated into a machine?

20  Q.  When you dictated as you just described, did you dictate

21  into any type of machine or did you dictate directly to

22  Ms. Calva?

23  A.  I would dictate directly to Ms. Calva.

24  Q.  Can you -- sorry.

25          Will you please describe for the Court when you talk

DB7LCHE1                          Zambrano - cross

1    about notes and pages from the cuerpos, will you please give

2    the Court some idea of how much information you're talking

3    about?

4    A.   A lot of documentation.  I had the cuerpos scattered,

5    notes, my notations, the documentation.  I would grab one, I

6    would refer to it, and I would dictate parts of a document.  I

7    would place the page where it had been found, I would cite.

8    Q.   Please tell the Court how you decided what documents to use

9    in your dictation.

10   A.   Those documents were relevant to the environmental trial

11   that was being heard, from the evidence gathered during the

12   trial, and that in the record in the trial.

13   Q.   And, sir, will you tell the Court whether it was your

14   decision what documents you used or did someone else tell you

15   what documents to use?

16          MR. MASTRO:  Objection to form, compound.

17          THE COURT:  Sustained.

18   Q.   Will you please tell the Court who made the decision what

19   documents you would use to dictate the judgment.

20   A.   I always made a decision of taking this or that document.

21   And all these references, all these citations, I have a record

22   for them in the judgment.

23   Q.   Dr. Zambrano, did you ever show Ms. Calva any document for

24   her to type from?

25   A.   No.

DB7LCHE1                        Zambrano - cross

1              MR. BOOTH:  Your Honor, may I approach?

2              THE COURT:  You may.

3              MR. MASTRO:  There's no English.  Your Honor, this is

4    in Spanish.  We have typically proceeded on the basis that

5    there's a certified translation of documents in English when

6    we're going to present a witness with Spanish.

7              MR. BOOTH:  May I lay some foundation, your Honor?

8              THE COURT:  You can try.  Yes, go ahead.

9    Q.  Dr. Zambrano, I've handed you what has been marked as

10   Defendant's Exhibit DX1554.  Would you look at that document,

11   please.

12             First of all, do you recognize what that document is?

13   A.  Yes.  This is a jurisprudence from the Supreme Court of

14   Justice.

15             MR. BOOTH:  And, your Honor, we would move into

16   evidence Defendant's Exhibit 1554, not for the truth of the

17   matter asserted.  I apologize there's no English translation.

18   I will not go into the document in light of the fact there is

19   no English translation.  I just couldn't find one.

20             THE COURT:  What's the point of it?

21             MR. BOOTH:  I can discuss it at side bar if you'd

22   like.  I don't want to say it in front of the witness.

23             THE COURT:  Secret code would be just about as useful.

24             MR. BOOTH:  Because, your Honor, you didn't want me to

25   say things in front of the witness and I'd rather not say it in

DB7LCHE1                          Zambrano - cross

1    front of the witness.

2              THE COURT:  All right.  Come up to the side bar.

3              (At the side bar)

4              THE COURT:  You know, first of all, right at the

5    bottom it seems to indicate that this is something you printed

6    off Lexis.

7              MR. BOOTH:  Yes, your Honor.

8              THE COURT:  So.

9              MR. BOOTH:  There is no English.  I mean we couldn't

10   find any English translation of it and we didn't have time.

11             THE COURT:  What's the point of this exercise?

12             MR. BOOTH:  The point of it, your Honor, is that this

13   is a common source for parts of the judgment.  In other words,

14   this is there are pages in here that he -- who the author of

15   the judgment dictated portions of.  And I don't know that -- I

16   think it's probably not fair for me to go into that since there

17   is no English translation, but I do want to identify the

18   document and have it in evidence not for the truth of the

19   matter asserted.

20             I will remind the Court that much of the expert

21   reports in the case establish the comparison of language used

22   Spanish similarities.  Again, we're not offering this to show

23   that it's right or what they argued in English or anything but

24   the case in English, but in terms of matching up the

25   similarities.

DB7LCHE1                        Zambrano – cross

1              THE COURT:  What exactly is the objection if there is
2    one?
3              MR. MASTRO:  Your Honor, the objection, in addition to
4    the fact that I can't read it so I can't at this point
5    knowledgably be able to question the witness on it, more
6    importantly is relevance.  This is probative of nothing.  He
7    got this off of Lexis and Mr. Fajardo and Mr. Donziger, writing
8    the judgment back home in the comfort of their homes, could
9    have pulled this off Lexis too.  This proves nothing that they
10   pulled a source document off of Lexis from 2002, proves
11   nothing.  And it's misleading to have this come in under these
12   circumstances when it is probative of nothing.  It doesn't show
13   he wrote the judgment.
14             MR. BOOTH:  It goes to a specific issue.  On the first
15   day of the testimony, first of all, the fact that he has an
16   argument against it doesn't mean it's not probative.
17             Secondly, on the first day there was a big discussion
18   about French law and how in the world can anyone cite French
19   law because you'd have to speak French because that's the only
20   language French law would ever be discussed in.  In this case
21   it discusses French, Colombian, Argentine law.
22             MR. GOMEZ:  In fact, your Honor, that various passage
23   appears verbatim in the sentencia.
24             THE COURT:  I'm sorry?
25             MR. GOMEZ:  The very passages about discussions of

French law also appear verbatim in the judgment.  And we do
have the pages that are similar translated.  We have those four
or five pages translated in English.  We do not have the entire
thing translated.

        MR. MASTRO:  Your Honor, also haven't laid a proper
foundation.  There's nothing that says he even knows what this
document is or would have any recollection of it.

        MR. BOOTH:  He did recognize it.  He said I recognize
it.

        MR. MASTRO:  Because you put it in front of him.  If
you asked him --

        THE COURT:  The foundation is inadequate.  There's
nothing on the face of this that even establishes that it is
what he says it is.  I don't know if it's a decision of the
Supreme Court of Ecuador.  For all I know, somebody typed this
up in his basement and he looks at it and he said, well, it
looks like a decision of the Supreme Court of Ecuador.  So I
think you have to do a little better than that.

        MR. MASTRO:  Thank you, your Honor.

        (In open court)

        MR. MASTRO:  Just before we continue, there is some
highlighting on the first page of what we received.  Mr. Booth
had highlighting on other pages.  I don't know whether the
witness's has any highlighting other than the first page.

        MR. BOOTH:  There shouldn't be.

DB7LCHE1                          Zambrano - cross

1        THE COURT:  I'm looking at it in front of the witness

2   and it does have the highlighting.

3        MR. MASTRO:  I meant after the first page.

4        THE COURT:  After the first page.

5        MR. MASTRO:  Which is what Mr. Booth referred to at

6   the side bar.

7        THE COURT:  The copy I was given does not.

8        MR. MASTRO:  I see only the highlighting on the first

9   page of what was handed to the witness, your Honor.  Thank you,

10  your Honor.

11        Thank you, Mr. Booth.

12        MR. BOOTH:  May I continue, your Honor?

13        THE COURT:  Yes.

14  BY MR. BOOTH:

15  Q.  Dr. Zambrano, do you recognize this document or what -- let

16  me ask -- can you tell us, do you recognize this case?

17  A.  Yes.  I recall more or less.

18  Q.  And in dictating your judgment in the Lago Agrio Chevron

19  case, did you rely on Ecuadorian law at all?

20  A.  Yes.  This is one of the case law that was very useful to

21  me in the Ecuadorian case.

22  Q.  Let me ask that question.  Did you, in drafting your

23  judgment in the Lago Agrio Chevron case, actually, can you tell

24  us whether or not you relied on this particular case?

25  A.  Yes.

DB7LCHE1                          Zambrano - cross

1  Q.  Do you know the name, can you tell us the name of this case
2  or will tell us the name of this case, I should say?
3  A.  Well, this was a complaint brought by the communities of
4  Esmeraldas Province against Petroecuador.
5          MR. BOOTH:  Your Honor.
6          MR. MASTRO:  Objection, move to strike.
7  Nonresponsive.
8          THE COURT:  The answer is stricken.  It is
9  nonresponsive.
10 Q.  Dr. Zambrano, is what you just told us the way the case is
11 named in Ecuador?
12         MR. MASTRO:  I haven't been objecting to leading, your
13 Honor, but it's leading.  Objection.
14         MR. BOOTH:  Let me ask it a different way.
15 Q.  Dr. Zambrano, will you tell the Court how this case is
16 referred to in Ecuador?
17         THE COURT:  If indeed it is a case.
18 A.  This case is so unique because it was one of the first ones
19 dealing with environmental pollution and this is definitely
20 where one observes that the burden of proof is inverted.
21         MR. MASTRO:  Objection, your Honor.  Move to strike.
22         THE COURT:  Granted.
23 Q.  Sorry, Dr. Zambrano, let me try to ask a question.
24         In Ecuador, first of all, I think you've answered
25 this, but let me ask you, is this -- does this document refer

DB7LCHE1                    Zambrano - cross

1   to a particular case in Ecuador?

2   A.  Yes.

3   Q.  And when this case is referred to in Ecuador, what do

4   people in Ecuador name or call this case?

5   A.  I don't recall exactly.

6   Q.  Earlier when you were describing the parties to the case --

7          THE COURT:  Dr. Zambrano, have you in conversation or

8   in a document you wrote ever referred to this case anywhere?

9          THE WITNESS:  Yes, in the judgment.

10         THE COURT:  And when you did so, what did you refer to

11  the case as?

12         THE WITNESS:  I don't recall right now.

13         THE COURT:  In Ecuadorian practice, is the party who

14  brings a case the plaintiff?

15         THE WITNESS:  Plaintiff.

16         THE COURT:  And is the party who is sued referred to

17  as a defendant?

18         THE WITNESS:  Yes.

19         THE COURT:  And is it customary on your part in

20  referring to a case in Ecuador to refer to it by the name of

21  the plaintiff and the name of the defendant?

22         THE WITNESS:  On many occasions I refer to it that way

23  and I made the citation.

24         THE COURT:  And you referred to the case that was

25  before you in Ecuador as Aguinda against or versus Chevron,

DB7LCHE1                          Zambrano - cross

1    true?

2              THE WITNESS:  It is more commonly known as Chevron,

3    but it is also perfectly known as Aguinda v. Chevron.

4              THE COURT:  All right.  And this document that the

5    lawyer placed before you, Defendant's Exhibit 1554, assuming it

6    is in fact a judicial decision, what is the name of it?

7              THE WITNESS:  I don't recall right now.

8              THE COURT:  Okay.  Go ahead, Mr. Booth.

9              MR. BOOTH:  Thank you, your Honor.

10   Q.  Dr. Zambrano, do you recall the name of the plaintiffs in

11   this case, the case before you?

12   A.  It was an Esmeraldan town, a community of Esmeralda.

13   Q.  And do you recall the name of the defendant in this case?

14   A.  Petroecuador.

15   Q.  And, Dr. Zambrano, if you look at the highlighted portion

16   on the first page where it says Corte Suprema de Justicia, what

17   court is that?

18   A.  That is the court of Esmeralda province.  Excuse me.  The

19   Corte Suprema is what is now the current national court.  There

20   is no longer a Supreme Court.

21   Q.  And where it says Primer a Sala de lo Civil y Mercantil,

22   what does that mean, if anything?

23   A.  That is a specialized chamber of the national court.

24   Q.  Is the national court Corte Supreme de Justicia, is that

25   the highest court in Ecuador?

DB7LCHE1                          Zambrano – cross

1    A.   This is the cassation entity.   This is maximum entity.

2    Q.   I don't understand maximum.   Can you explain what that

3    means?

4                THE INTERPRETER:   Interpreter correction:   Highest.

5                MR. BOOTH:   I understand now.   Thank you.

6                Your Honor, we would move into evidence Defendant's

7    Exhibit 1554 not for the truth of the matter asserted and

8    subject if, obviously, if the Court wants us to prove up

9    somehow that it is what we've said it is, I'm not going to use

10   it any more today, but we would move it into evidence.

11               THE COURT:   Well, if you're not going to use it any

12   more today, well let me hear from Mr. Mastro.

13               MR. MASTRO:   I have an objection, your Honor, and I'd

14   like to come to the side bar about it.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  Mr. Mastro.

3              MR. MASTRO:  I object, your Honor.  I still think we

4    have the same foundation issues and relevance issues.  We would

5    now prove up that in fact this was a case that was cited by

6    Chevron in its briefs in the case.  This isn't something this

7    judge came up with.  He showed him the document.  The guy reads

8    the first page and it took him almost half an hour to get out

9    some description in a general sense of who the plaintiff was.

10             THE COURT:  Could you be a little more concise.

11             MR. MASTRO:  I don't think they have either laid

12   foundation or this is relevant at all or probative of anything.

13   So I object.

14             THE COURT:  Do you dispute that this is what they seem

15   to claim it is, that is to say, a reported decision of this

16   court in the province of Esmeraldas?

17             MR. MASTRO:  We do not dispute that.  I can't read it

18   because it's in Spanish, but it looks to be that case.  But to

19   us it's probative of nothing to have that come into evidence

20   here.

21             THE COURT:  The argument, I take it, from Mr. Booth --

22   and he'll correct me if I'm wrong -- is that there's language

23   in the decision that appears also in Plaintiff's Exhibit 399.

24             Is that right, Mr. Booth?

25             MR. BOOTH:  Yes, your Honor.

1          THE COURT:  And that is intended to prove that there

2     was a source either in the record before this judge or

3     otherwise properly available to him from which that particular

4     passage, whatever it is, could have come.  Is that correct?

5          MR. BOOTH:  Yes, your Honor.

6          THE COURT:  All right.

7          MR. BOOTH:  More as well, but, yes, that's correct.

8          THE COURT:  What else?

9          MR. GOMEZ:  In particular, your Honor, the point that

10    that particular passage makes reference to French law, which

11    was an issue that was raised by the plaintiffs as demonstrating

12    the witness's lack of authorship for his failure to speak

13    French law.  If the source of the French law cited in the

14    sentencia comes from an Ecuadorian court decision, then it

15    undermines the argument that his lack of facility with the

16    French language --

17         THE COURT:  It might or it might not depending on

18    what's in the decision and what he wrote, if he wrote anything.

19         MR. MASTRO:  Right.

20         THE COURT:  But that's another issue.

21         MR. MASTRO:  And there multiple references to French

22    law in the decision, your Honor, that are unrelated to this

23    case.

24         THE COURT:  All right.  Look, if there is no dispute

25    as to authenticity, that is, as to the assertion that this is a

DB7LCHE1                    Zambrano - cross

 1  report of a decision by this court in the Province of

 2  Esmeraldas, then I don't see why I shouldn't take it for what

 3  it's worth.  But the defense is going to have to provide an

 4  English translation.

 5          MR. BOOTH:  Absolutely.

 6          MR. MASTRO:  Exactly, your Honor.  That's what I was

 7  going to say.

 8          THE COURT:  While on the subject of translation,

 9  Plaintiff's Exhibit 400 and the English part of the

10  clarification, my recollection is that at least as to the

11  first, that is to say, the judgment, and possibly as to the

12  second, that is to say, the causation, I insisted early in this

13  litigation that the parties attempt to agree a translation.

14  And my memory is that at least as to the judgment you did.

15          MR. MASTRO:  That's correct, your Honor.

16          MR. GOMEZ:  That's correct.

17          THE COURT:  Now, is that true also with respect to the

18  clarification which --

19          MR. MASTRO:  I believe so, your Honor.

20          MR. GOMEZ:  Yes, I believe so.

21          MR. MASTRO:  What we submitted.

22          THE COURT:  Am I being told by all counsel that

23  Plaintiff's 399, 400, and I think it's 429 to 431 is the

24  clarification stuff, the English translations that are in

25  evidence are in fact the translations that were agreed among

DB7LCHE1                    Zambrano – cross

1      all counsel?

2              MR. MASTRO:  Yes, your Honor.

3              MR. GOMEZ:  Yes, your Honor.

4              MS. LITTLEPAGE:  Yes.

5              THE COURT:  That clears that up.  Okay.

6              (In open court)

7              THE COURT:  The parties are agreed that there is no

8      dispute over the fact that Defendant's Exhibit 1554 is a copy

9      of a report of a judicial decision by the Superior Court of

10     Justice of Esmeraldas.  It is offered not for the truth of

11     anything contained therein, but simply for the fact of what it

12     contains, the statements it contains, not for the truth.

13             MR. BOOTH:  Your Honor, may I.  I apologize for

14     interrupting.  I don't think that's what he called it.  This is

15     from the national court, not from the local court.

16             THE COURT:  Is that the agreement?

17             MR. MASTRO:  Yes, your Honor.

18             THE COURT:  All right.  I stand corrected as to that.

19     It's from the national court.  It's received not for the truth

20     of the matters asserted, and it's received subject to the

21     condition that I be provided with an English translation.

22             (Defendant's Exhibit 1554 received in evidence)

23             THE COURT:  Let's move along.

24             MR. BOOTH:  Yes, your Honor.

25     Q.  Dr. Zambrano, will you tell the Court whether the judgment

1    in the Lago Agrio Chevron case dated February 14, 2011 is or

2    was your decision as the judge on that case?

3            MR. MASTRO:  Objection, asked and answered, your

4    Honor.

5            THE COURT:  I think so.

6    Q.  Will you tell the Court whether in deciding the Lago Agrio

7    Chevron case you were influenced by any promises or threats

8    from anybody?

9            MR. MASTRO:  Objection to form, leading, asked and

10   answered.

11           THE COURT:  Overruled.

12   A.  No.

13           MR. BOOTH:  Thank you, your Honor.  No more questions.

14           Thank you, Dr. Zambrano.

15           THE COURT:  Okay.  Redirect.  I'm sorry.

16           Mr. Gomez, do you want to examine?

17           MR. GOMEZ:  Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MR. GOMEZ:

20   Q.  Good morning, Dr. Zambrano.

21   A.  Good morning.

22   Q.  Dr. Zambrano, how old are you?

23   A.  I will turn 58.

24   Q.  Where were you born?

25   A.  In Guayaquil, Ecuador.

DB7LCHE1                        Zambrano - cross

1    Q.  Where did you grow up?

2    A.  In Guayaquil.

3    Q.  What did your parents do for a living, Dr. Zambrano?

4    A.  Working.

5    Q.  What did they work in?

6    A.  My father was the administrator of the water company.  And

7    my mother worked in the national hygiene institute.

8    Q.  When you were growing up, were there any lawyers in your

9    family, sir?

10   A.  No.

11   Q.  Were you the first person in your family to become a

12   lawyer?

13   A.  Yes.

14   Q.  Why did you choose to become a lawyer, sir?

15   A.  Because I liked to behave with probity and always with the

16   truth.

17   Q.  What do you enjoy most about the practice of law?

18   A.  To try to give each person what is his or hers.

19   Q.  What degrees do you hold, sir, that allow you to practice

20   law in Ecuador?

21   A.  Bachelor's of political and social sciences, a degree as an

22   attorney for the courts of the republic, a higher degree in

23   fundamental and constitutional rights, and a specialization in

24   criminal law and indigenous justice.

25   Q.  When did you obtain each of those degrees, sir?

1    A.  The bachelor's degree in 1980; the attorney degree, the

2    attorney degree in 1982; the certification in 2006, if I'm not

3    mistaken; and the specialization in 2007.

4    Q.  What institution bestowed these degrees on you, sir?

5    A.  The bachelor's degree and the attorney's degree, it was

6    conferred by the State University of Guayaquil; the

7    certification by the State University of Guayaquil; and the

8    certification, the specialization by the Autonomous University

9    of the Andes.

10   Q.  Where is that last university located?

11   A.  In the city of Ambato.

12   Q.  How long did you practice law before becoming a prosecutor,

13   sir?

14   A.  May I answer with an explanation?

15   Q.  Absolutely.

16          THE COURT:  Well, let's back up.

17          Did you, sir, before you became a prosecutor practice

18   law?

19          THE WITNESS:  Yes.

20          THE COURT:  Would you describe for us what you meant

21   in saying that you practiced law, what did you do and for whom?

22          THE WITNESS:  Yes.  Initially I was in the Air Force.

23   And while there, even though I was a secretary and a prosecutor

24   of the criminal court of the second Air Force area when I was

25   authorized to practice this profession outside the military

1   institution, but I did begin to practice law once I left the

2   Air Force.  And during that time, that was for about two or

3   three years, if we add all this, it comes to about six, about

4   nine years, more or less.

5              THE COURT:  Excuse me, sir.

6              So is it accurate that you were in the Air Force for

7   six or seven years; is that right?

8              THE WITNESS:  Six years approximately.

9              THE COURT:  All right.  And is it correct that during

10  that period, you to some extent engaged in the practice of law

11  outside of the Air Force?

12             THE WITNESS:  I did practice it, but currently

13  military personnel cannot practice law.

14             THE COURT:  When you were in the Air Force, were you

15  permitted to practice law outside the Air Force?

16             THE WITNESS:  Indeed I had to practice it because the

17  civil matters I would have to, to conduct as an advisor of the

18  members of the institution.

19             THE COURT:  What institution?

20             THE WITNESS:  The Air Force in its totality, the

21  second Air Force area, zone.

22             THE COURT:  Am I correct in understanding that while

23  you were in the Air Force, you sometimes represented military

24  personnel in matters outside of the Air Force; is that

25  accurate?

DB7LCHE1                    Zambrano - cross

1           THE WITNESS:  Yes.

2           THE COURT:  And other than representing members of the

3   Air Force, did you engage in the practice of law outside of the

4   Air Force while you were in the Air Force?

5           THE WITNESS:  In some cases.

6           THE COURT:  How much of your time while you were in

7   the Air Force did you spend representing or advising people in

8   legal matters where the people who you advised or represented

9   were not members of the military?

10          THE WITNESS:  When a member of the Air Force -- well,

11   let's see.  When a relative of theirs needed some sort of legal

12   assistance, even though they were not members of the Air Force,

13   I would give them legal advice.

14          THE COURT:  Now, after you left the Air Force, if I

15   understand you accurately, you engaged in the practice of law

16   for two or three years before you became a prosecutor; is that

17   right?

18          THE WITNESS:  Yes.

19          THE COURT:  Describe the nature of that practice you

20   did, please.

21          THE WITNESS:  Different cases.

22          THE COURT:  What percentage of them were criminal?

23   Approximately.

24          THE WITNESS:  In practicing my profession, I could see

25   all kinds of cases.  I couldn't give you an estimate.  It's

1    different from having a specific specialty.

2            THE COURT:  That's true here too, Mr. Zambrano.  But

3    were you principally a practitioner on behalf of defendants in

4    criminal cases or not when you were in private practice after

5    you left the Air Force?

6            THE WITNESS:  No.  Civil cases and criminal cases.

7            THE COURT:  What kind of civil cases did you handle

8    when you were in private practice after the Air Force?

9            THE WITNESS:  In fact I was in charge of

10   representation at the Rivadeneira, the Rivadeneira Consultora,

11   consulting firm Rivadeneira.  It's three companies, Coequipos,

12   and Brisas del Rio.  It's three different companies.  Those

13   were exclusively civil matters.

14           THE COURT:  And what kind of civil matters?

15           THE WITNESS:  It was disputes regarding housing,

16   nonpayment of rents.

17           THE INTERPRETER:  I need to look in my dictionary,

18   your Honor.

19           THE WITNESS:  Statute of limitations on property

20   acquisitions, effective possession of property, etc.

21           THE COURT:  What does "etc." include, sir?

22           THE WITNESS:  Labor and different issues that would

23   come up and the manager would have me take care of them.

24   Collection matters, as well.

25           THE COURT:  So this was all for these three companies;

DB7LCHE1                    Zambrano – cross

```
 1   is that right?
 2            THE WITNESS:  Yes.
 3            THE COURT:  Did you have other private clients other
 4   than the three companies?
 5            THE WITNESS:  Yes.
 6            THE COURT:  What kinds of matters did you represent
 7   those clients in in the two or three years after you left the
 8   Air Force?
 9            THE WITNESS:  Different matters but mainly dependency,
10   executory or executive trials.
11            THE INTERPRETER:  I need to inquire, your Honor.
12            I need to look it up, your Honor.
13            THE WITNESS:  Protest or noting of checks.
14            THE COURT:  Can you explain what dependency meant?
15            THE WITNESS:  Prenatal care, child support.
16            THE COURT:  And what did executive trials involve?
17            THE WITNESS:  The lawsuits for collection drafts,
18   IOUs, so it can be understood.
19            THE COURT:  Thank you very much.
20            Mr. Gomez.
21   BY MR. GOMEZ:
22   Q.  Dr. Zambrano, why did you choose -- when did you become a
23   prosecutor, sir?
24   A.  In 1994.
25   Q.  Why did you make the decision to become a prosecutor in
```

DB7LCHE1                    Zambrano – cross

1  1994?

2  A.  It was an opportunity to investigate in depth and to avoid

3  cases remained unpunished and this is how I can contribute to

4  society.

5  Q.  As a prosecutor was your work focused or specialized in a

6  particular area?

7  A.  Could you please repeat the question?

8  Q.  Yes.  As a prosecutor, was your practice focused on a

9  particular area?

10  A.  Initially I was appointed traffic prosecutor.  Later, first

11  prosecutor, second prosecutor, deputy, and then lead

12  prosecutor.  Then I was deputy, equivalent would be district

13  attorney, in the Napo Province, and alternate prosecutor in the

14  Sucumbios Province.

15  Q.  What types of cases did you handle as a lead prosecutor?

16  A.  At what time?

17  Q.  You testified that you first started as a first prosecutor,

18  a second prosecutor, and ultimately in the position of lead

19  prosecutor.

20      When you were in the position of lead prosecutor, what

21  sorts of cases were you responsible for?

22  A.  Exclusively criminal matters.

23  Q.  Were they criminal matters that involved a higher degree of

24  charge or a higher penalty?

25  A.  Much higher.

1    Q.  Can you give us some examples?

2    A.  On many occasions I made statements against the guerrillas

3    and even brought charges against the person who at that time

4    was the president's cousin and other very delicate cases.

5    Q.  When you said president's cousin, who were you referring

6    to, sir?

7    A.  Engineer Lucio Gutierrez was the president at that time.

8    Q.  What sort of accusation did you make against that

9    gentleman?

10            MR. MASTRO:  Objection, relevance.

11            THE COURT:  Overruled.

12   A.  Embezzlement, misuse of public funds.

13   Q.  How was that matter resolved?

14   A.  As a prosecutor, I render my accusatory document, but I do

15   not know as to how that was resolved.

16   Q.  What sort of cases did you handle as deputy district

17   attorney in Napo?

18            THE COURT:  I think we're beginning to press the

19   bounds of relevance pretty extensively, sir.  It's very helpful

20   to get a sense of who Mr. Zambrano is and what his experience

21   is, but there is a limit.

22            MR. GOMEZ:  I'll move on, your Honor.

23   Q.  Dr. Zambrano, why did you -- when did you become a judge

24   for the first time?

25   A.  In 2008.

1   Q.  Why did you decide to become a judge?

2   A.  It was a kind of promotion.  I was involved in a selection

3   process and out of all the participants at the national level,

4   I came in second.

5   Q.  And as a result of you coming in second, what occurred

6   next?

7           THE COURT:  Sustained as to form.  What happened next.

8   Q.  Is this process that you described the method by which you

9   obtained employment as a judge for the first time, sir?

10  A.  Yes.

11  Q.  Dr. Zambrano, I want to direct your attention to the moment

12  before your second term presiding over the Lago Agrio case when

13  Judge Ordonez was in charge of the case.

14          Do you recall the specific grounds that Chevron

15  asserted for Judge Ordonez's recusal at that time?

16  A.  That he had not ruled on many motions.

17  Q.  Motions filed by who, sir?

18  A.  By Chevron.

19  Q.  Do you recall how many motions had not been acted upon at

20  that time?

21          THE COURT:  I take it -- Mr. Mastro, you were rising

22  or not?

23          MR. MASTRO:  I was going to object, your Honor.

24          THE COURT:  Sustained.

25          I take it this is all a matter of record.

DB7LCHE1                          Zambrano - cross

1           MR. GOMEZ:  Your Honor, I'd like to use a document.

2    May I approach?

3           THE COURT:  Yes.  This is not marked, counselor, as

4    far as --

5           MR. GOMEZ:  This is Defendant's Exhibit DX --

6           THE COURT:  Forgive me, I misspoke.

7           MR. GOMEZ:  -- 1561.

8           THE COURT:  1561.

9           MR. GOMEZ:  Yes.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GOMEZ:  For the record, the first three pages are

2     an English translation, page 4 purports to be a certification

3     of the translation, and pages 5, 6 and 7 are the same document

4     in Spanish.

5     Q.  Dr. Zambrano, I would like to direct your attention to

6     pages 5, 6 and 7 of this document.  Can you tell me if you

7     recognize it, sir?

8          THE COURT:  Is there any dispute about authenticity

9     and about what it is?

10         MR. MASTRO:  No, your Honor.

11         THE COURT:  It's agreed between counsel that this is a

12    copy of a paper filed in the court in Lago Agrio, is that

13    right?

14         MR. GOMEZ:  Yes, your Honor.

15         THE COURT:  Mr. Friedman?

16         MR. BOOTH:  Yes, your Honor.

17         THE COURT:  Mr. Mastro?

18         MR. MASTRO:  Yes, your Honor.

19         THE COURT:  Next question.

20    Q.  Dr. Zambrano, is this an order that you issued in the Lago

21    Agrio case?

22    A.  This is a notification made by the clerk of an order, which

23    was issued in a separate notebook, which is a motion for

24    recusal of Judge Ordonez.

25    Q.  Is that motion for recusal of Judge Ordonez in the Lago

DB78CHE2                         Zambrano - cross

1   Agrio case, sir?

2   A.  Yes.  This was the basis for removing Judge Ordonez.

3            MR. GOMEZ:  I would move this into evidence DX 1561.

4            THE COURT:  Is there any objection?

5            MR. MASTRO:  As long as it's not for the truth of the

6   matters asserted, we have no objection.

7            THE COURT:  Received but not for the truth.

8            (Defendant's Exhibit 1561 received in evidence)

9   Q.  Dr. Zambrano, I would like to direct your attention to the

10  second page of the Spanish, under a heading marked number 5, or

11  *quinto*.  I would like you to read that section to yourself,

12  sir.

13           THE COURT:  Is there a question?

14  Q.  Sir, is it true that at this time Judge Ordonez had failed

15  to act on 47 briefs that Chevron filed between April and August

16  of 2010?

17           MR. MASTRO:  Objection, your Honor.

18           THE COURT:  What is the objection?

19           MR. MASTRO:  Your Honor, relevance, and this is not

20  what we are supposed to do.  The document speaks for itself.

21  It is in evidence.  He asked the witness what it says.  I don't

22  think that's a proper question.

23           THE COURT:  Mr. Gomez.

24           MR. GOMEZ:  The document is not in for the truth.

25           THE COURT:  I know.  There is a reason for that.

DB78CHE2                         Zambrano – cross

1           MR. GOMEZ:  I am asking the witness whether the

2      material stated in the document is true, whether he was the

3      person who issued this order, and so he should have knowledge

4      of that fact.

5           MR. MASTRO:  Your Honor has already ruled that the

6      defense allegation about the number of motions filed in the

7      case is not relevant to a defense.

8           THE COURT:  What is the relevance of it, Mr. Gomez?

9           MR. GOMEZ:  I can address that at a side bar.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MR. GOMEZ:  Your Honor, we have heard testimony in

3     this case that in a year prior to this recusal Mr. Guerra, at

4     the insistence of Mr. Zambrano, had made approaches to Chevron

5     to fix the case.  Here is a time in September of 2010 when

6     Judge Ordonez is presiding over the matter.  The subsequent

7     judge who will necessarily have to take over is Judge Zambrano.

8     And Chevron is filing a motion to recuse Judge Ordonez, knowing

9     what I think this witness will establish that Judge Zambrano

10    would then assume the position and preside over the case.

11             THE COURT:  How is he going to testify that's what

12    Chevron knew?

13             MR. GOMEZ:  He will testify, I believe, because of the

14    position that he held in the court at the time that Judge

15    Zambrano was recused, that he would be the next in line -- once

16    Judge Ordonez was recused.

17             THE COURT:  How does the answer to the question, Were

18    the facts stated in this order true, get you in that direction?

19             MR. FRIEDMAN:  Can I say something?

20             THE COURT:  Yes.

21             MR. FRIEDMAN:  This also goes to another point, which

22    is that the -- I just lost my point.  There was all this

23    backlog of motions, if you will, and if I recall it correctly,

24    Chevron is the one that --

25             THE COURT:  I can't hear you, sir.

DB78CHE2                          Zambrano – cross

1           MR. FRIEDMAN:  Chevron is the one who asked that Judge

2    Ordonez be recused with this backlog of all these motions.  The

3    fact that it's true that there was this backlog of all these

4    motions, and then he very promptly ruled on these motions, they

5    are arguing is some sort of impropriety on his part.  This goes

6    back to earlier testimony in the trial.

7           THE COURT:  The question that was put to the witness

8    doesn't have anything to do with whether he promptly ruled on

9    these motions.

10          MR. FRIEDMAN:  I don't know where Mr. Gomez is going,

11   but it's relevant to that point.

12          THE COURT:  The objection is sustained.  I haven't

13   heard any good reason.

14          MR. MASTRO:  We have the English translation.  It's in

15   evidence as Plaintiff's Exhibit 1141 of the case that Mr. Booth

16   was questioning the witness about this morning.

17          THE COURT:  Thank you.

18          MR. MASTRO:  His DX 1544.

19          (Continued on next page)

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  Next question.

 3    BY MR. GOMEZ:

 4    Q.  Dr. Zambrano, when Chevron moved to recuse Judge Ordonez,

 5    who would have been the next judge that would have taken over

 6    presiding over this case?

 7              MR. MASTRO:  Objection to form.

 8              THE COURT:  Sustained.

 9    Q.  When Chevron moved to recuse Judge Ordonez, which judge

10    would have taken over the Lago Agrio case?

11              MR. MASTRO:  Same objection.

12              THE COURT:  Exactly the same question.  Exactly the

13    same objection.  Exactly the same ruling.

14              Next.  There are ways to prove what you're trying to

15    prove, if it's correct, but this isn't it.

16    Q.  Dr. Zambrano, according to the procedures in place at the

17    time that Chevron moved for Judge Ordonez's recusal, what

18    judge, if any, would have been assigned to the case upon his

19    recusal?

20              MR. MASTRO:  Objection.

21              THE COURT:  What is the objection?

22              MR. MASTRO:  He is asking in the subjunctive.

23              THE COURT:  Well, it's a conditional question.

24    Overruled.

25              MR. MASTRO:  It's fine, your Honor.

1    A.  Me.

2    Q.  Why?

3    A.  Because I was the alternate president of the court.  This

4    means that if the sitting president is not hearing the case, I

5    would then have to hear the case.

6    Q.  Were the procedures that would have required you to hear

7    the case in Judge Ordonez's stead known to the public?

8            THE COURT:  Sustained.

9    Q.  Once you began to preside over the Lago Agrio case, did you

10   have an opportunity to rule on the outstanding motions that

11   Judge Ordonez had failed to act upon?

12   A.  Yes.

13   Q.  How did you do that?

14   A.  That is included in the content of the corresponding order,

15   and in order to do that I had to review the records so that I

16   could then look into the relevance or not of the motion or

17   request.

18   Q.  Were each of those motions unique?

19           THE INTERPRETER:  I'm sorry.

20   Q.  Were each of those motions unique?

21   A.  They were motions or requests that were disguised as other

22   motions or requests.  They were repetitive in different words.

23   Q.  How long did it take you, upon review of these motions, to

24   act upon them?

25           MR. MASTRO:  Objection.  Relevance.

DB78CHE2                           Zambrano - cross

1          THE COURT:  Sustained.

2   Q.  Dr. Zambrano, what is autos para sentencia?

3   A.  It is the judge's decision in which he declares that the

4   evidentiary period has concluded, and he requests that the

5   record be sent to him in order to rule.

6   Q.  Do you recall if prior to his recusal, Judge Ordonez issued

7   autos para sentencia in the Lago Agrio case?

8          MR. MASTRO:  The record speaks for itself, your Honor.

9          THE COURT:  Folks, that would be right, wouldn't it,

10  Mr. Gomez?

11         MR. GOMEZ:  If the plaintiff will stipulate that that

12  was so, I can move on.

13         THE COURT:  I don't know if they will.  But the record

14  will show it one way or the other, right?

15         MR. MASTRO:  We will stipulate to when that date was.

16         THE COURT:  Let's move on.

17         Do you know what the date was?

18         MR. GOMEZ:  I have a document that I was going to show

19  the witness.

20         THE COURT:  Why don't you show it to Mr. Mastro

21  instead of taking all of this time.

22         MR. GOMEZ:  For the record, I have handed Mr. Mastro

23  Defendants' Exhibit 1560.

24         MR. MASTRO:  We have no objection to it being received

25  on the same basis as the others, not for the truth of the

DB78CHE2                    Zambrano – cross

1  matters asserted.

2          THE COURT:  Is that satisfactory?

3          MR. GOMEZ:  Yes, your Honor.

4          THE COURT:  Mr. Friedman.

5          MR. FRIEDMAN:  Yes, your Honor.

6          THE COURT:  Defendants' 1560 is received not for the

7  truth of the matter.  Let's go.

8          (Defendant's Exhibit 1560 received in evidence)

9  Q.  Dr. Zambrano, when you took over presiding the Lago Agrio

10 case on your second term, did you know whether Judge Ordonez

11 had issued an autos para sentencia by that time?

12 A.  I don't recall.

13 Q.  Sir, did anyone associated with Chevron ever express to you

14 at the time that Judge Ordonez was asked to be recused that

15 they would like you to replace Judge Ordonez?

16         MR. MASTRO:  Objection, your Honor.

17         THE COURT:  Ground.

18         MR. MASTRO:  Form.  Vagueness.  Hearsay.

19         THE COURT:  Overruled.

20 A.  No.

21 Q.  Did Chevron take any action to block you from presiding

22 over the Lago Agrio case after Judge Ordonez's recusal in

23 September 2010?

24 A.  No.

25 Q.  Before you began to preside over the Lago Agrio case in

DB78CHE2                    Zambrano - cross

1    October 2012, do you know whether Chevron ever complained to

2    anyone about you as a judge?

3           MR. MASTRO:  Objection.  Hearsay.  Speculation.

4    Vagueness.

5           THE COURT:  Sustained on foundation grounds.

6    Q.  Prior to you presiding over the Lago Agrio case October

7    2010, were you aware of any complaints by Chevron against you

8    for your conduct as a judge?

9    A.  No.

10   Q.  Did Chevron ever take any action to have you recused after

11   you began to preside over the Lago Agrio case in October 2011?

12          MR. MASTRO:  Objection.

13   A.  No.

14   Q.  I want to turn your attention, sir, to the time period

15   after you issued the judgment, after you --

16          THE COURT:  We will take our morning break now.

17          (Recess)

18          THE COURT:  Mr. Gomez, how much longer do you expect

19   to be with the witness?

20          MR. GOMEZ:  Probably another hour or so.

21          THE COURT:  Then you, Mr. Mastro, how much longer with

22   the witness?

23          MR. MASTRO:  Your Honor, we are going to finish him

24   before lunch.  I am going to be brief.

25          THE COURT:  If he goes more than an hour.  From your

1    lips to God's ears, both of you.  That's all I can say.

2            Let's go, Mr. Gomez.

3    BY MR. GOMEZ:

4    Q.  Judge Zambrano, I want to get a little bit more on the

5    subject of the OCP case.

6            Yesterday you had testified that as an appeals judge

7    with two other judges you dismissed that case.  Do you remember

8    that testimony, sir?

9    A.  Yes.

10   Q.  Can you give us an explanation of the grounds by which you

11   decided to dismiss that case?

12   A.  Yes.

13   Q.  Please do so.

14   A.  Yes.  The plaintiffs reformed or modified the claim in the

15   hearing.

16   Q.  What is the significance of that?

17   A.  The law does not allow for a claim to be modified, and it

18   was dismissed for that reason.

19   Q.  Now, sir, going to the time period after you were no longer

20   presiding over the Lago Agrio litigation, after you had issued

21   the judgment, did Chevron make any attempt to contact you?

22   A.  Yes.

23   Q.  Explain how that came about.

24   A.  It was through Dr. Guerra.

25   Q.  What did Dr. Guerra do in that respect?

1  A.  He said that Chevron was willing to give me a minimum of $1

2  million or whatever I wanted.

3  Q.  Did Mr. Guerra say this to you in person or over the

4  telephone?

5  A.  In person.

6  Q.  Approximately when did he make this statement to you, sir?

7  A.  Well, most could have been the month of August 2012.  He

8  handed me some documents, which made it apparent that a certain

9  Dr. Rivero, Andres Rivero, was an attorney for Chevron, and

10  wanted to speak to me.

11  Q.  Where did you meet Mr. Guerra when he gave you these

12  documents?

13  A.  He met me at the airport.

14  Q.  When he gave these documents to you, did he say anything

15  else?

16         MR. MASTRO:  Objection.  Hearsay, your Honor.

17         THE COURT:  It calls for a yes or no.

18  A.  Would you please repeat the question?

19         MR. GOMEZ:  Would the court reporter kindly read the

20  question back?

21         THE COURT:  Yes.

22         (Record read)

23  A.  Yes.

24  Q.  What did he say?

25         MR. MASTRO:  Objection.  Hearsay.

DB78CHE2                    Zambrano - cross

1           THE COURT:  Mr. Gomez.

2           MR. GOMEZ:  Your Honor, we have heard testimony from

3    Mr. Guerra that he was acting as an agent of Chevron at the

4    time, and under evidence rule 801(d)(2) we ask --

5           THE COURT:  Please draw my attention to the transcript

6    where that was said, that he was acting as an agent for

7    Chevron.

8           Don't say anything, please, Mr. Zambrano.  Wait.

9           (Pause)

10          THE COURT:  Would one of you remind me what day

11   Mr. Guerra started to testify.

12          MR. FRIEDMAN:  Your Honor, if we could do a side bar.

13          THE COURT:  I would just like the answer first.

14          Last week, right?

15          MS. LITTLEPAGE:  He started on October the 23rd.

16          MR. GOMEZ:  Your Honor, I am going to withdraw that

17   question.

18          THE COURT:  All right.

19   BY MR. GOMEZ:

20   Q.  I am going to show the witness a document.  This is

21   Defendants' Exhibit 92.

22          Dr. Zambrano, I am showing you what has been marked as

23   Defendants' Exhibit 92.  The Spanish translation begins at page

24   131 of this 250 page exhibit.

25          Please turn to page 131, sir.

1          THE COURT:  This appears to correspond to page 2 of

2    the English.

3          MR. GOMEZ:  Thank you.

4    Q.  From pages 131, sir, through 135, what do you recognize

5    that to be?

6          MR. GOMEZ:  For the record, the corresponding pages

7    are 2 through 6 in the English.

8    A.  This is the sworn statement that I gave.

9    Q.  Mr. Zambrano, if you will now turn to the page marked 138,

10   do you recognize that?

11   A.  The portion that is in the upper center portion of the

12   page, I do recognize that.

13   Q.  What do you recognize that to be, sir?

14   A.  It is a business card that was inside the documents that

15   Dr. Guerra gave to me and that were from Mr. Andres Rivero.

16   Q.  Are these the same documents --

17          THE COURT:  Just a minute.

18          You say they were from Andres Rivero.  How do you know

19   that?

20          THE WITNESS:  Because Dr. Guerra told me that all

21   those documents were proof of the fact that Dr. Andres Rivero

22   was an attorney for Chevron, and in that folder there was also

23   this little card.

24   Q.  Dr. Zambrano, do you recognize the rest of the documents

25   behind that copy of a business card, pages 139 through 250?

1           THE COURT:  We are now to have a recess so that he can

2    read 140 pages of material, is that the idea?

3           MR. GOMEZ:  No.

4           THE COURT:  What are we doing?

5    Q.  Mr. Zambrano, are these documents familiar to you?

6    A.  Yes.

7    Q.  What do you identify them to be?

8           THE COURT:  Before we do that, pages 141 to 250 are

9    all in English.  Am I correct, Mr. Zambrano, you can't read any

10   of it, right?

11          THE WITNESS:  Yes.

12          THE COURT:  Go ahead, Mr. Gomez.  Put your question.

13   Q.  How do you recognize these documents, Dr. Zambrano?

14   A.  Because they were highlighted in yellow.

15          THE INTERPRETER:  I need to inquire, your Honor.

16   A.  It was highlighted in yellow and different documents that

17   stated that he had acted on Chevron's behalf, representing

18   Chevron.

19   Q.  You had testified earlier that Mr. Guerra provided you with

20   documents.  Are these the documents, copies of the documents

21   that Mr. Guerra provided to you at the airport on or about

22   mid-August 2012?

23   A.  Yes.  These are copies because these ones are not

24   highlighted in yellow as the papers were which he had

25   highlighted, in which you would mainly see the name Andres

DB78CHE2                        Zambrano - cross

1    Rivero, and he was matching it up with the business card which

2    was Andres Rivero, attorney for Chevron.

3              MR. GOMEZ:  I ask that we move these documents into

4    evidence DX 92.

5              THE COURT:  I'm sorry.

6              MR. GOMEZ:  DX 92.

7              MR. MASTRO:  Your Honor, we have no objection so long,

8    obviously, as it's not being offered for the truth.

9              THE COURT:  It will be received not for the truth, but

10   just to clarify something.

11             Mr. Zambrano, you say that the documents Mr. Guerra

12   gave you on the occasion at the airport were highlighted in

13   yellow, right?

14             THE WITNESS:  Yes.  He had highlighted them.

15             THE COURT:  Did you see him highlight them?

16             THE WITNESS:  He gave them to me highlighted.

17             THE COURT:  So somebody highlighted them.

18             Now, where are those highlighted documents today?

19             THE WITNESS:  I had them.

20             THE COURT:  Yes.  But where are they today?

21             THE WITNESS:  In Ecuador.

22             THE COURT:  And they were among the documents you were

23   asked to bring here to the United States to testify, isn't that

24   true?

25             THE WITNESS:  I have never been asked to bring

DB78CHE2                         Zambrano - cross

1     documents here.

2             THE COURT:  All right.

3             Now, the first several pages of the Spanish part of

4     this document is your, I think you called it sworn statement.

5     And then behind the page that has your signature, which is page

6     135, there is the big pile of documents, none of which is

7     highlighted, right?

8             THE WITNESS:  The sworn statement was not highlighted.

9     This was mine.

10            THE COURT:  Yes.  Pages 136 to 250 are not

11    highlighted, right, not in a single place?

12            THE WITNESS:  There are some like black things there,

13    and it is there which was highlighted.  Because this is a copy

14    in black and white, it couldn't show in yellow.

15            THE COURT:  Well, did you copy the highlighted pages

16    in Ecuador?

17            THE WITNESS:  Yes.

18            THE COURT:  What did you do with the copies?

19            THE WITNESS:  I turned them over along with this sworn

20    statement.

21            THE COURT:  To whom did you turn them over?

22            THE WITNESS:  To attorney Pablo Fajardo.

23            THE COURT:  So when you say here today that pages 136

24    to 250 -- I guess, 138 to 250 are documents that you were given

25    by Mr. Guerra at the airport, you're simply assuming that those

DB78CHE2                    Zambrano - cross

1       documents are what you gave to Pablo Fajardo, is that true?

2                  THE WITNESS:  Yes.

3                  THE COURT:  You can't read them, right?

4                  THE WITNESS:  It was not necessary because Dr. Guerra

5       only wanted to show me that Dr. Andres Rivero had appearances

6       on behalf of Chevron, and that's why the words Chevron were

7       also highlighted.

8                  THE COURT:  I think the point is reasonably clear, at

9       least it is to me.

10                 It is in evidence for what it is worth.

11                 (Defendants' Exhibit 92 received in evidence)

12      Q.  Mr. Zambrano, when Mr. Guerra gave these documents to you,

13      was it during that same meeting that he mentioned Chevron's

14      proposal to pay you a million dollars?

15                 MR. MASTRO:  Objection, your Honor.

16                 THE COURT:  Sustained.

17      Q.  When did Mr. Guerra communicate to you Chevron's proposal

18      to pay you a million dollars?

19                 MR. MASTRO:  Objection, your Honor.  Hearsay.

20                 MR. GOMEZ:  I am asking for a time.

21                 THE COURT:  Sustained.

22                 Look, precision is extraordinarily important here, and

23      you are saying Chevron's proposal.  Maybe it was Chevron's

24      proposal.  Maybe it was Guerra's proposal independent of

25      Chevron.  Let's stick to the facts.  Let's not build into the

DB78CHE2                          Zambrano – cross

1   question assumptions in the hope that sooner or later the

2   witness will buy in.

3   Q.  Mr. Zambrano, when did Mr. Guerra communicate to you the

4   one million dollar proposal that you have described in your

5   testimony?

6   A.  He said it to me at the airport.

7   Q.  Did he say it to you at the airport at the same time in the

8   same meeting when he gave you these documents?

9   A.  Yes.

10  Q.  What else, if anything, did he say to you with regard to

11  the proposal that you have described?

12             MR. MASTRO:  Objection.  Hearsay.

13             THE COURT:  What is the proof of agency?

14             MR. FRIEDMAN:  Can we approach the bench on that, your

15  Honor?

16             THE COURT:  Sure.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1           (At the side bar)

2           MR. FRIEDMAN:  We have recorded statements in evidence

3    from Mr. Guerra being interviewed by Chevron in June or July of

4    2012, in which they discuss wanting him to be a bridge to

5    Zambrano.

6           MS. LITTLEPAGE:  Mr. Rivero in his sworn deposition on

7    page 144 and 145 confirms that he, on behalf of Chevron, asked

8    Mr. Guerra to approach Mr. Zambrano to give Mr. Zambrano a

9    series of documents, including his business card, and to have a

10   discussion with Mr. Zambrano about finalizing the terms of a

11   cooperation agreement.

12          MR. MASTRO:  Your Honor, all that that testimony was

13   was that Mr. Rivero wanted to speak to Mr. Zambrano.  So he was

14   providing documents that confirmed he had been an attorney who

15   represented Chevron.

16          For agency purposes, it has to be someone acting

17   within the scope of the relationship.  Guerra wasn't at that

18   point doing anything other than talking to Chevron and

19   considering gathering evidence.

20          THE COURT:  Is the deposition in evidence?

21          MR. MASTRO:  The Rivero deposition is not in our case.

22   They intend to offer portions of it.

23          THE COURT:  Can I see it?

24          MS. LITTLEPAGE:  Yes.  I think it starts towards the

25   bottom of the page.

DB78CHE2                     Zambrano - cross

1           THE COURT:  Does anybody have a hard copy of this?

2           MR. MASTRO:  We will get it for you.

3           If I could just say, Mr. Rivero also answered

4    questions about, and said absolutely not, was Mr. Guerra asked

5    to go to Mr. Zambrano with any offers of money.  He said all

6    that was discussed with Guerra was I would like to meet with

7    Zambrano to ask him questions.

8           THE COURT:  Let me see the deposition.

9           MR. MASTRO:  Certainly, your Honor.

10          We are trying to find it in the back room, the hard

11   copy.

12          THE COURT:  In the meantime, let's go to Mr.

13   Friedman's point.  Show me the tape-recorded meeting where you

14   say which constitutes the authorization in your view.

15          MR. MASTRO:  I just wanted to add, Guerra's witness

16   declaration of his direct in this case expressly says Chevron

17   did not authorize him to make any sort of financial proposal to

18   Mr. Zambrano.

19          MS. LITTLEPAGE:  I have the page number, but I don't

20   have the actual document.  It's page number 45.

21          THE COURT:  Of what?

22          MS. LITTLEPAGE:  Of the July 13, 2012 tape-recorded

23   conversation.

24          THE COURT:  What exhibit is that?

25          MS. LITTLEPAGE:  I do have that.  That would be

DB78CHE2                    Zambrano – cross

1    Exhibit DX 1361.

2              THE COURT:  Is that in?

3              MS. LITTLEPAGE:  Yes.  It came in with Mr. Guerra.

4              THE COURT:  1361.

5              MS. LITTLEPAGE:  1361.

6              THE COURT:  You're going to have to find me the

7    exhibit because the electronic version that you gave me of the

8    defense exhibits doesn't go that high.

9              Mr. Mastro, Ms. Littlepage, come up here, please.

10             MS. LITTLEPAGE:  I also found where Mr. Guerra said it

11   in his trial transcript.

12             "Did Chevron tell you you were the bridge to

13   Zambrano?"

14             THE COURT:  That's fine.

15             Let's go back to 1361, which you tell me is the

16   transcript of the July 13 meeting.

17             MR. FRIEDMAN:  The recorded statement, yes.

18             THE COURT:  Transcription.

19             MS. LITTLEPAGE:  66.  You are the bridge, the bridge

20   to Zambrano.

21             THE COURT:  Bridges are very nice, but is there

22   anything anywhere that says that Rivero authorized him to make

23   a proposal, a monetary proposal, to Zambrano about anything?

24             MR. FRIEDMAN:  No.  I think what we have is

25   authorization that he go to Zambrano and try to get him to

DB78CHE2                        Zambrano - cross

1   cooperate with Chevron.

2           MR. MASTRO:  This is Guerra's sworn statement on the

3   subject, which they could have cross-examined him on.

4           THE COURT:  What am I looking at here on this

5   computer?  This is his witness statement?

6           MR. MASTRO:  Yes.

7           MS. NEUMAN:  Paragraph 58.

8           MS. LITTLEPAGE:  In his deposition on page 169, he

9   says, "I was the bridge to Zambrano."

10          THE COURT:  And at paragraph 58 of his direct he said,

11  "That is why I took it upon myself to suggest to Mr. Zambrano

12  that he attempt to negotiate a substantial million dollar

13  payment from Chevron on his own behalf, even though Chevron

14  never suggested any such thing."

15          MS. LITTLEPAGE:  But on page 66 of the July 13

16  transcript he says that, "You get yours when a deal is reached

17  with Zambrano."  That's what Chevron told him.  Chevron said,

18  "You get yours when a deal is reached with Zambrano."

19          MR. FRIEDMAN:  I think our point, your Honor, is the

20  scope of the agency is they clearly asked him to make a deal

21  with Zambrano.  It's within the scope of the agency under

22  801(d)(2).  I don't want to characterize it.  They sent him to

23  make a deal with Zambrano.

24          MS. LITTLEPAGE:  He said in his trial testimony, "Did

25  Chevron tell you you will get yours when a deal is reached with

1    Zambrano?"  "They did say that."

2              MR. MASTRO:  Both Guerra and Rivero testified Guerra

3    was never authorized to make a financial proposal to Zambrano.

4    Guerra was asked to try and set up a meeting so Chevron can

5    talk to Zambrano which never happened.

6              THE COURT:  Is there anything else that anyone wants

7    me to look at here?

8              MR. MASTRO:  No, your Honor.  I did want to say one

9    other thing.  I was going to wait until this line was done.

10             The question that elicited the hearsay from this

11   witness about Guerra saying a million dollars was in a question

12   about what did Guerra do, not what did Guerra say.  So I think

13   that part of the answer should be stricken as well.  The

14   question elicited hearsay that shouldn't have been said because

15   it was a question.

16             We have the Rivero deposition here if your Honor wants

17   it.  We will try and find the specific pages.

18             MS. LITTLEPAGE:  It was not objected to.

19             MR. MASTRO:  The question was what Guerra did, if you

20   want to read the question.

21             MS. LITTLEPAGE:  I don't have the transcript.

22             THE COURT:  Stop arguing.

23             MR. MASTRO:  Sorry, your Honor.

24             THE COURT:  I think what I will do is I will listen to

25   the testimony and I will defer ruling on whether it comes in

DB78CHE2                          Zambrano – cross

1    for the truth.  If at the end of the day I don't believe it

2    anyway, which might occur, it doesn't matter.  If I believe it,

3    I will decide whether it's admissible against the plaintiff.

4              MR. MASTRO:  Understood, your Honor.  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB78CHE2                    Zambrano – cross

```
 1                (In open court)
 2                THE COURT:  I have decided to hear the testimony
 3   without the determining whether it's admissible against Chevron
 4   for the truth of the matter asserted.  I will reserve on that
 5   question.  Depending on my judgment at the end of the trial as
 6   to the credibility of the witnesses, it may be immaterial.
 7                Let's proceed.
 8                MR. GOMEZ:  Your Honor, to get my bearings, may I have
 9   the last two questions and answers.
10                THE COURT:  Yes.
11                (Record read)
12                THE COURT:  Go ahead.
13   Q.  Can you answer that question, sir?
14   A.  He even told me it was necessary, I could travel to the
15   United States in order to speak over there with Chevron's
16   representatives.
17   Q.  How did you respond?
18   A.  I was about to take my flight, and I left.  I didn't say
19   anything to him absolutely.
20   Q.  Did you have any subsequent conversation with Mr. Guerra
21   about this subject?
22   A.  He insisted over the phone, and I would be evasive so that
23   he would not insist.
24   Q.  When did he call you?
25   A.  I don't recall the dates.
```

DB78CHE2                    Zambrano - cross

1    Q.  Approximately how much time passed between your meeting at

2    the airport and Mr. Guerra's first telephone call on this

3    subject?

4    A.  About, perhaps, a week.

5    Q.  Did he only call you once or more than once?

6    A.  The last two times when he called me I definitely had to

7    talk to him firmly, and he didn't call me again anymore.

8    Q.  How many total times did he call you on this subject?

9    A.  About two times.

10   Q.  Have you ever spoken to Andres Rivero?

11   A.  Never -- oh, excuse me, yes.  One time, but on the phone,

12   he said he was Andres Rivero.

13   Q.  Approximately when did you have that conversation?

14   A.  At the beginning of the year, in January.

15   Q.  January 2012?

16   A.  Of this year.

17   Q.  January 2013?

18   A.  Yes.

19   Q.  What did you discuss with the person who identified himself

20   as Mr. Rivero on this call?

21   A.  He told me he was Andres Rivero, that he was an attorney

22   for Chevron, that he was in Manta, that he wanted to talk to me

23   in person, that he knew that I was not alone at home, that we

24   could talk in a hotel or some other place, and that it was

25   important that they already had Dr. Guerra in the United

DB78CHE2                          Zambrano - cross

1    States.

2    Q.  Approximately how long did this telephone conversation

3    last?

4    A.  It wasn't very long.

5    Q.  Did you record this conversation?

6    A.  Yes.

7    Q.  How did you record the conversation?

8    A.  I put something on my phone to record it because this phone

9    call included very indecorous proposals.

10   Q.  Did you ever provide a copy of that recording to counsel

11   for the defendants in this case?

12   A.  Yes.

13   Q.  Is that recording attached to your written declaration

14   which we have identified during your testimony?

15   A.  Yes.

16        MR. GOMEZ:  Your Honor, we have the recordings marked

17   as Defendants' Exhibit 85.

18        THE COURT:  First of all, is a transcription attached

19   in Defendants' Exhibit 92?

20        MR. GOMEZ:  Defendants' Exhibit 84 is the

21   transcription.  We have marked that.  We have the recording on

22   an audio CD which we have marked.  And what I would like to do

23   is to play the recording and have him authenticate the

24   recording.

25        THE COURT:  It's in Spanish, right?

DB78CHE2                         Zambrano – cross

1              MR. GOMEZ:  Yes, it is.

2              THE COURT:  You say he hasn't listened to it before?

3              MR. GOMEZ:  I am not telling you that.  I would like

4    him to authenticate it here in court and then offer it into

5    evidence.

6              THE COURT:  You can play it for him over the lunch

7    break.

8              MR. GOMEZ:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DB7LCHE3                        Zambrano - cross

 1            MR. GOMEZ:  Thank you.

 2    Q.  Mr. Zambrano, did you ever --

 3            THE COURT:  The way this is normally done is that it's

 4    played for the witness in advance.  The witness initials the CD

 5    or the recording so that it establishes it's the same thing.

 6    That's the way it's normally done.

 7            MR. GOMEZ:  Understood.  Thank you.

 8    Q.  Mr. Zambrano, turning to a different topic.

 9            THE COURT:  Excuse me.  Before we leave there, I just

10    want to -- well, no, I'll leave it.  Thank you.

11            THE INTERPRETER:  Your Honor, the interpreter would

12    like to propose a better rendering:  unseemly proposals in the

13    previous answer.

14            THE COURT:  Okay.  Thank you.

15            MR. GOMEZ:  Your Honor, may I move into evidence

16    Plaintiff's Exhibit 84, which is the transcription.

17            THE COURT:  Well, certainly not until you have the

18    recording in.  I mean you can move it but it's overruled.

19    You're not going to get it in until you get the recording in.

20    Q.  Mr. Zambrano, moving to a different topic.

21            THE COURT:  The way you do this, Mr. Gomez, is you

22    authenticate the recording and then you authenticate the

23    transcription and then you, after the recording is in, you can

24    get the transcription in.

25            MR. GOMEZ:  Understood, your Honor.  Thank you.

DB7LCHE3                    Zambrano – cross

1   Q.  Turning to a different topic, Mr. Zambrano, did you ever

2   make any reports to the police in Ecuador related to the Lago

3   Agrio case?

4            THE COURT:  The record should reflect there's a very

5   long pause going on.

6   A.  Can you please clarify to what you are referring to?

7   Q.  Did you ever contact the police in Ecuador regarding

8   surveillance of you and your companion?

9            MR. MASTRO:  Objection, leading.

10           THE COURT:  Sustained.

11  Q.  Have you ever made any reports to the police, Mr. Zambrano,

12  on your behalf or your companion's behalf?

13           MR. MASTRO:  Objection, relevance.

14           THE COURT:  Sustained.

15  Q.  Mr. Zambrano, after you issued the judgment in the Lago

16  Agrio case, did you ever come to notice anyone following you?

17           MR. MASTRO:  Objection, relevance, leading.

18           THE COURT:  Pardon me?

19           MR. MASTRO:  Objection, relevance, leading.

20           THE COURT:  Sustained.

21           MR. GOMEZ:  Your Honor, may we have a side bar,

22  please?

23           THE COURT:  No.

24           MR. GOMEZ:  May --

25           THE COURT:  Maybe when we break.

 1              MR. GOMEZ:  May I address the objection on relevance?

 2              THE COURT:  No.  We've been up and down this mountain

 3    so many times, Mr. Gomez, I'll hear what you have to say later.

 4              MR. GOMEZ:  I'll move on for the time being.

 5              THE COURT:  Not a good use of time.

 6              MR. GOMEZ:  Thank you.

 7    Q.  Mr. Zambrano, turning to a different topic, in response to

 8    Mr. Mastro's questions, you testified that you secured your

 9    current employment in April of 2013 and executed an employment

10    contract in May of 2013.

11              Do you remember that testimony, sir?

12    A.  Yes.

13    Q.  How did you apply for that position?

14    A.  In the internet, well, I'm qualified as a contractor.  And

15    in the portal of public acquisitions, there was an invitation

16    so that I could submit a bid regarding legal, as a legal

17    advisor.  I made my bid and after a procedure that is carried

18    out, I was granted the contract.

19    Q.  What do you mean by qualified contractor?

20    A.  In the internet, well, not in the internet, but in the

21    website of for public state acquisitions, you register and you

22    offer your services as a contractor and all companies have

23    access to that information.  And when they require a certain

24    service, they choose and they issue an invitation to the person

25    who has been selected so that one can then submit his bids.

DB7LCHE3                         Zambrano - cross

```
1    Q.  And what is the procedure that is used to select the
2    winning bid, if you know?
3              THE COURT:  I think it might be useful to lay a
4    foundation of how he might know that.
5    Q.  You referred in your testimony to after a procedure.  What
6    did you mean by that?
7              THE COURT:  Look, Mr. Gomez, I understand the effort.
8    If somebody applies for a civil service job in the state of New
9    York, the person can certainly say, for example, I took a test
10   and there was a procedure and I got the job, right?  That does
11   not mean the person has any clue, let alone a clue based on
12   personal knowledge, of what the procedure was in the hiring
13   agency as to how they selected a candidate.  That's the problem
14   with your question.
15             MR. GOMEZ:  I'll ask a different question, your Honor.
16             THE COURT:  Thank you.
17   Q.  Mr. Zambrano, how were you notified that you were hired?
18   A.  Through the internet.
19   Q.  And did you have to interview for the position before you
20   were hired?
21   A.  I received in my email the granting of the contract.  And
22   after that, there is an interview to finalize the details.
23   Q.  Did you participate in such an interview?
24   A.  Yes.
25   Q.  How many people did you meet?
```

DB7LCHE3                         Zambrano – cross

1    A.   The administrative manager, the manager from human

2    resources, and another person whom I don't recall.

3    Q.   Now, you signed -- you executed an employment contract for

4    this position, correct?

5    A.   Yes.

6    Q.   Does that contract mention or make reference to the Lago

7    Agrio case?

8    A.   No.

9    Q.   Does that contract require you to give testimony on behalf

10   of the Republic of Ecuador in any case?

11   A.   No.

12   Q.   Was there any discussion during your interviews for the

13   position that you would be required to cooperate with the

14   Republic of Ecuador in litigation regarding the Lago Agrio

15   case?

16   A.   No.

17   Q.   Now, sir, you were supposed to appear for a deposition in

18   Lima, Peru in May of this year; is that correct?

19            MR. GOMEZ:   Let me withdraw that, your Honor.

20   Q.   Mr. Zambrano, you were asked to appear for a deposition in

21   Lima, Peru in May of 2013 in this case, correct?

22   A.   Yes.

23   Q.   Did you inform your employer that you had received that

24   request?

25   A.   I just obtained the job and for that reason I could not

DB7LCHE3                          Zambrano - cross

1    attend.

2    Q.  What did you just obtaining employment have to do with you

3    being able to attend the deposition exactly?

4            THE COURT:  Could we go back to the question you asked

5    to which we've not had an answer yet, unless you're withdrawing

6    it.

7            MR. GOMEZ:  Will the court reporter please read back

8    the last question.

9            THE COURT:  The question was:  Did you inform your

10   employer that you had received that request?  I assume you

11   asked it because you'd like an answer.

12           MR. GOMEZ:  Yes, your Honor.  Thank you.

13           THE COURT:  I'm curious too.

14           THE WITNESS:  No.  This was a personal matter.

15   Q.  Do you have any knowledge whether your employer was aware

16   that your presence was requested in Lima for a deposition in

17   this case?

18           MR. MASTRO:  Objection.

19           THE COURT:  The objection is sustained.  Calls for a

20   state of mind of someone else.

21   Q.  Did your employer or supervisors ever tell you that they

22   knew your appearance had been requested for a deposition in

23   Lima in this case?

24   A.  No.

25   Q.  You never attended that deposition, correct, Mr. Zambrano?

DB7LCHE3                        Zambrano - cross

1   A.  Yes.

2   Q.  Did anyone at your employment ever ask you why you did not

3   attend your deposition in Lima?

4   A.  No.

5   Q.  Has anyone at your place of employment since May 2013 until

6   the present ever made any inquiry of you regarding your failure

7   to appear for a deposition in Lima?

8               MR. MASTRO:  Objection.  Asked and answered.

9               THE COURT:  Overruled.

10  A.  No.

11  Q.  Turning to a different subject, you have identified in your

12  testimony, Mr. Zambrano, your written declaration.

13              Has anyone paid you any money in exchange for signing

14  that declaration?

15  A.  No.

16  Q.  Has anyone representing the defendants in this case ever

17  offered to pay you money for your written declaration?

18  A.  No.

19  Q.  Have you received any money from anyone in exchange for

20  your written declaration in this case?

21  A.  No.

22  Q.  Has anyone paid you for the time you spent preparing your

23  declaration?

24  A.  No.

25  Q.  Has anyone paid you for the documents, copies of the

DB7LCHE3                    Zambrano – cross

1    documents that were attached to your declaration?

2    A.  No.

3    Q.  Has anyone representing the defendants in this case ever

4    offered to pay you money for your testimony in this case?

5    A.  No.

6    Q.  Have you received any money from anyone in exchange for the

7    testimony you have given in this case?

8    A.  No.

9    Q.  Has anyone reimbursed you for your time to come to the

10   United States and testify in this case?

11   A.  No.

12   Q.  Has anyone paid you for your time to prepare to testify in

13   this case?

14   A.  No.

15   Q.  Mr. Zambrano, moving to a different topic, you've testified

16   that you issued orders and rulings in other cases during your

17   second term when you presided over the Lago Agrio case between

18   October 2010 and February 2011.

19           My question to you is:  Can you please identify for me

20   the various types of orders that you issued in other cases

21   during that time period?

22           THE COURT:  Didn't we cover this yesterday?  Mr. Booth

23   asked and he said, well, mostly procedural.  Didn't we cover

24   this?

25           MR. GOMEZ:  Maybe I'll be more precise, your Honor.

1    Q.  Mr. Zambrano, are you familiar with a minute order or razon

2    type of order?

3    A.  Could you please repeat the question?

4    Q.  Yes.  Are you familiar with a type of order known as a

5    minute order or razon, R-A-Z-O-N?

6    A.  I don't know if I am understanding you.  You're asking me

7    if I know what a minute order is?

8    Q.  Yes.

9    A.  Yes.

10   Q.  What is a minute order?

11   A.  The minute order is the certification issued by the Court's

12   clerk that there should be a notification or for any other

13   reason and she's the one who certifies it.

14   Q.  How would you describe that kind of order in terms of the

15   amount of work you need to do to issue such an order?

16   A.  Depending of the issue at hand.

17   Q.  Are minute orders considered extensive orders?

18           THE COURT:  Sustained.

19   Q.  Can you estimate for me the amount of time it might take

20   you to prepare a minute order?

21   A.  Five minutes.

22   Q.  Sir, do you know my client, Hugo Camacho, plaintiff in the

23   Lago Agrio case who is also a defendant in this case?

24   A.  No.

25   Q.  Do you know my other client, Javier Piaguaje, also a

1    plaintiff in the Lago Agrio case who is a defendant in this

2    case?

3    A.  I don't know him.

4    Q.  Did any plaintiff in the Lago Agrio case ever offer you

5    anything of value in exchange for you issuing a favorable

6    judgment to the plaintiffs?

7    A.  No, nor would I ever allow it.

8    Q.  Sir, did anyone who claimed to be acting on behalf of the

9    Republic of Ecuador ever offer you anything of value in

10   exchange for issuing a judgment favorable to the plaintiffs in

11   the Lago Agrio case?

12   A.  No.

13           THE COURT:  Mr. Gomez, what you're doing could be done

14   in two questions.  Please do it.

15   Q.  Dr. Zambrano, has the Republic of Ecuador offered or

16   granted you any immunity for any testimony regarding any matter

17   related to the Lago Agrio case?

18   A.  No.

19   Q.  Has the Republic of Ecuador offered or granted you any

20   immunity for any testimony you might give in this case?

21           MR. MASTRO:  Objection.  Asked and answered --

22   withdrawn.

23   A.  No.

24   Q.  Has the Republic of Ecuador offered or granted you

25   diplomatic immunity for this trip to Ecuador -- to the United

1    States?

2              THE COURT:  Mr. Gomez, look.  I've given you and your

3    colleagues great latitude and you're now abusing it, all right.

4              MR. GOMEZ:  Your Honor, I have one more question and

5    then we can deal with the recording.

6              THE COURT:  Ask your question.

7              MR. GOMEZ:  Break for lunch.

8    Q.  Mr. Zambrano, has anyone representing the Republic of

9    Ecuador ever suggested to you that you would not be prosecuted

10   for anything you may testify to in this case?

11   A.  No.

12             MR. GOMEZ:  Your Honor, at this time I'd like to, if

13   we could, proceed with the break for lunch.  I can take care of

14   the recording and --

15             THE COURT:  Are you finished?

16             MR. GOMEZ:  -- check my notes.

17             THE COURT:  Are you finished with the witness but for

18   this issue related to the recording?

19             MR. GOMEZ:  Yes, that and a proffer.

20             THE COURT:  What's the proffer?

21             Well, I guess we'll get the witness out of the room

22   for that.

23             MR. GOMEZ:  And that would be it.

24             THE COURT:  All right.  Mr. Zambrano, you can go to

25   lunch.  You need to be back here at 2 o'clock.

DB7LCHE3

1          MS. FRIEDMAN:  Your Honor, could I ask for permission

2     from Mr. Gomez to talk to Mr. Zambrano for the purpose of

3     playing that tape?  That's the logistical issue we have.

4          THE COURT:  Any objection?

5          MR. GOMEZ:  No.

6          MR. MASTRO:  No objection, your Honor.  I assume

7     Mr. Gomez didn't.

8          THE COURT:  I know, Mr. Gomez, you speak for

9     Mr. Mastro as if of one mind.

10         Any objection, Mr. Mastro?

11         MR. MASTRO:  No, your Honor.

12         THE COURT:  Okay.  For that limited purpose,

13    Mr. Gomez.

14         Mr. Zambrano, you can go to lunch, and I'll continue

15    with the lawyers briefly.

16         THE WITNESS:  Thank you.

17         (Witness not present)

18         MR. GOMEZ:  Could we ask the witness to wait in the

19    hallway so that --

20         THE COURT:  Ask the witness to wait in the hallway.

21         Okay.  The proffer first.

22         MR. GOMEZ:  Your Honor, had we been permitted to

23    question the witness with respect to surveillance, it is our

24    belief that the witness would have testified that he has

25    noticed persons following both him and his companion subsequent

DB7LCHE3

1     to his issuance of the judgment in Ecuador, that he has

2     reported his observations to the police, and, furthermore, and

3     these are similar -- this is similar to the declarations that

4     appear in his written declaration.

5          Furthermore, we would have probed him about his

6     arrival to the United States and the similar observations that

7     he made upon arrival to JFK when he came for testifying in this

8     case.

9          THE COURT:  And this is relevant to what?

10          MR. GOMEZ:  This is relevant --

11          THE COURT:  And his competence to be able to figure

12     out whether he's being followed would be what?

13          MR. GOMEZ:  His competence as to being followed would

14     be the description of the actions that unknown persons took

15     when he was entering in and out of the airport to confirm that

16     he was being followed and similar observations when he was in

17     Ecuador.  He tested his observations is what would make him

18     competent to testify to this.

19          In terms of relevance, your Honor, we think it would

20     go to unclean hands.

21          THE COURT:  Well, I don't.  So that takes care of

22     that.

23          Moreover, your proffer went way beyond the question to

24     which I sustained an objection, but, in any case, that's where

25     we are.

DB7LCHE3

1      Now, there was another issue as I remember, was there,

2   or am I just reliving this one because it's --

3      MR. MASTRO:  I think the other issue, your Honor, was

4   the one where you agreed to take the testimony and you'll

5   decide later whether it's --

6      THE COURT:  So we've covered this all for now.  Is

7   that it?

8      MR. MASTRO:  Yes, your Honor.

9      MR. GOMEZ:  Yes, your Honor.

10      THE COURT:  Okay.  So 2 o'clock.  And I'll see you

11   then.

12      MR. MASTRO:  Thank you, your Honor.

13      THE COURT:  Thank you.

14      Let me add one thing to what I said.  Obviously,

15   there's a question as to whether the witness is in a position

16   actually to say that he was being followed.  But passing over

17   that and assuming that he would say that, there's nothing to

18   connect it to anybody, nothing whatsoever.

19      And even if there were, I ruled in a decision reported

20   at 2011 WL 3628843 with respect to the unclean hands defense.

21   I recognize that was in the Salazar case.  The pleading to

22   which it relates is the same pleading in this case.  This was

23   never a part of that pleading in any way.  Of course, I

24   understand the events are subsequent.

25      But the key point is that both sides argued that in

DB7LCHE3

 1    order to be pertinent or sufficient for unclean hands purposes,

 2    the conduct has to have an immediate and necessary relation to

 3    the equity that the plaintiff seeks in respect of the matter in

 4    litigation.  I see no sufficient relationship between any

 5    following of this witness either in Ecuador or in New York,

 6    where, as far as I know, it is perfectly lawful, and the

 7    question of whether a judgment, assuming it was obtained by

 8    fraud, is enforceable or whether equitable relief ought to be

 9    granted in relation to all of that.  So this is just something

10    that has no legitimate bearing in this case.

11              Mr. Friedman, what's on your mind?

12              MS. FRIEDMAN:  Your Honor, if I could just mention as

13    to the Ecuadorian surveillance, that relates to the pressure on

14    judges.  He was still -- there's accusations against him after

15    he issued this judgment.  There was surveillance of him after

16    he issued the judgment and that's -- the pressure on judges --

17    that's the connecting.

18              THE COURT:  Look.

19              MS. FRIEDMAN:  I just wanted to say that on the

20    record.

21              THE COURT:  Your view is you made a complaint to the

22    Ecuadorian police.  Let them deal with it.

23              MR. MASTRO:  Thank you, your Honor.

24              (Luncheon recess)

25              (Continued on next page)

DB78CHE4                    Zambrano – cross

1                         AFTERNOON SESSION

2                              2:10 p.m.

3            THE COURT:  Mr. Gomez.

4            MR. GOMEZ:  During the break, with the assistance of

5   Mr. Reed Brodsky, counsel for the plaintiff, the witness

6   listened to the audio recording, authenticated it.  He

7   initialed the CD that he listened to, and, also, he initialed

8   the transcript, which he followed along as he heard the

9   recording authenticating that as well.

10           I offer these up as Defendants' Exhibit 84 and

11  Defendants' Exhibit 85, which have already been provided to the

12  plaintiffs.

13           THE COURT:  Any objection?

14           MR. MASTRO:  No objection.

15           THE COURT:  Is it stipulated they are what they are

16  said to be?

17           MR. MASTRO:  Yes, it is, your Honor.

18           THE COURT:  Mr. Friedman.

19           MR. FRIEDMAN:  Yes, your Honor.

20           THE COURT:  Mr. Gomez.

21           MR. GOMEZ:  Yes, your Honor.

22           THE COURT:  They are received.

23           (Defendants' Exhibits 84 and 85 received in evidence)

24           MR. GOMEZ:  With that I pass along the witness.

25           THE COURT:  Redirect, Mr. Mastro.

1            MR. MASTRO:  Just before I begin, Mr. Friedman did

2   produce a letter that was given by a lawyer to Mr. Zambrano in

3   connection with his visa application.  I would like to mark it

4   as an exhibit for these proceedings and the parties are willing

5   to stipulate that it is a letter that was produced in regard to

6   this witness.

7            THE COURT:  This is plaintiff's exhibit what?

8            MR. MASTRO:  Plaintiff's Exhibit 6407.  It is a letter

9   from Pablo Fajardo to the embassy, dated October 7, the U.S.

10  Embassy.

11           THE COURT:  Does the defense stipulate that the letter

12  is, in fact, a letter from Mr. Fajardo to the embassy?

13           MR. FRIEDMAN:  We do.

14           MR. GOMEZ:  Yes.

15           THE COURT:  Any objection to its receipt?

16           MR. FRIEDMAN:  No.

17           MR. GOMEZ:  No.

18           THE COURT:  It's received.  Pass it up.

19           (Plaintiff's Exhibit 6407 received in evidence)

20           THE COURT:  Let's proceed.

21  REDIRECT EXAMINATION

22  BY MR. MASTRO:

23  Q.  Mr. Zambrano, before just the break, you were explaining to

24  Mr. Gomez how you applied for your current job at the public

25  company Refinery of the Pacific.  Do you recall that testimony,

1  sir?

2  A.  Yes.

3  Q.  Sir, you said that you had to go online and fill out a

4  proposal for the job, correct?

5  A.  No.

6  Q.  How did you apply for the job, Mr. Zambrano?

7  A.  I'm already registered on the Internet at the portal, which

8  is INCOP.  That is the portal for public acquisitions.

9  Q.  It is the portal for public jobs, and you go on that portal

10  to apply for a public job, right?

11  A.  No.

12  Q.  What kind of jobs does that portal that you apply for?

13  A.  One does not apply for positions by that portal.  One

14  registers at that portal, and then the entire public has access

15  to that portal and can look at the services that one offers,

16  and that is how professional services are then retained.

17  Q.  These are professional services for public sector jobs,

18  correct, sir?

19  A.  No.

20  Q.  Refinery of the Pacific, you are on the portal potentially

21  to get a job at the Refinery of the Pacific, correct?

22  A.  I did not understand that question.  Could you please

23  repeat it?

24  Q.  I will rephrase it, and I just want to cut right to the

25  chase.

1              On this portal you had to fill out information about

2      your background, correct?

3      A.   Previously, of course.

4      Q.   And you filled out that information about your background

5      after you ceased to be a judge, correct?

6      A.   No.

7      Q.   When you were trying to get the job at Refinery of the

8      Pacific, did you have to disclose any additional information

9      about your background in connection with that job application?

10     A.   No.

11     Q.   Did you ever disclose to anyone at Refinery of the Pacific

12     that you had been a judge before you got the job?

13     A.   No.

14     Q.   So you didn't disclose to anybody at Refinery of the

15     Pacific that you were removed from your judgeship by the

16     judicial council, is that your testimony?

17     A.   No.

18     Q.   When you had your interview --

19              THE COURT:  It is his testimony?  It's not his

20     testimony?  What are we doing here?

21              MR. MASTRO:  Sorry, your Honor.

22     Q.   Mr. Zambrano, at any point in the job application process

23     at Refinery of the Pacific, did you disclose to anyone at

24     Refinery of the Pacific that you had been removed from your

25     judgeship by the judicial council?

DB78CHE4                        Zambrano - redirect

1    A.  No.

2          THE COURT:  Mr. Mastro, I apprehend the possibility

3    that the use of the word "job" may be rendering this

4    examination less than entirely useful.

5          MR. MASTRO:  I understand.  I am going to move on.

6    Q.  Mr. Zambrano, when Mr. Booth was asking you questions, he

7    asked you about what happened to your notes and documents when

8    you were working on the Lago Agrio Chevron judgment.  Do you

9    recall those questions, sir?

10   A.  Yes.

11   Q.  You told him that you kept in your possession those notes

12   and those series of documents approximately for about a year.

13   After that I discarded them, it was no longer necessary for me

14   to have it in my possession, end quote.  Do you recall that

15   testimony?

16   A.  Yes.

17   Q.  So that would mean you discarded those notes and documents

18   sometime in February 2012, correct, sir?

19   A.  No.

20   Q.  When, approximately, did you discard them in 2012, sir?

21   A.  I don't recall.

22   Q.  Sir, you're the judge who certified the Lago Agrio Chevron

23   judgment to go up on appeal in mid-2011, correct, sir?

24   A.  No.

25   Q.  Sir, did you ever see any of Chevron's appellate briefs

DB78CHE4                         Zambrano – redirect

1    during 2011 appealing the Lago Agrio Chevron judgment?

2    A.  Yes.

3          MR. MASTRO:  Your Honor, may I approach the witness?

4          THE COURT:  You may.

5          MR. MASTRO:  I am showing the witness what has been

6    marked as Plaintiff's Exhibit 6408, both the English and the

7    Spanish language version of Chevron's appeal brief, dated July

8    2011.

9    Q.  Sir, do you recognize this as a copy of Chevron's appeal

10   brief?

11   A.  No.

12   Q.  Sir, you read the appellate decision issued on January 3,

13   2012, affirming your Lago Agrio Chevron judgment, correct?

14   A.  Can you please repeat that question?

15   Q.  At the time the appellate court affirmed your Lago Agrio

16   Chevron judgment on January 3, 2012, did you read the appellate

17   ruling affirming your judgment?

18   A.  No.

19          THE COURT:  Did you ever read it?

20   Q.  Did you ever read the appellate decision?

21   A.  No.

22   Q.  Sir, did you disclose to anyone at Refinery of the Pacific

23   at any time that you had been removed from your judgeship by

24   the judicial council?

25   A.  No.

1  Q.  Sir, do you have a copy of your current employment

2  contract?

3  A.  Yes.

4  Q.  Do you have any other documents relating to your current

5  employment and how you got that employment?

6  A.  In Ecuador.

7  Q.  Sir, you were served with a subpoena to produce documents

8  at this trial, correct?

9  A.  No.

10 Q.  Did I not serve you with a subpoena at your deposition to

11 bring documents -- strike that.

12       Do you recall that I gave you a subpoena in English

13 and in Spanish at your deposition to produce documents in

14 connection with this trial?

15 A.  That was in English.

16 Q.  You were also served the next day with a document subpoena

17 in Spanish, correct, sir?

18 A.  False.

19       MR. MASTRO:  Your Honor, there is a paragraph 22 that

20 asks for all documents relating to his current employment.

21       THE COURT:  Let's not get ahead of ourselves.

22       Just a minute.  The transcript of the deposition on

23 November 2, at page 142, appears to reflect the service of the

24 subpoena in English and in Spanish.  The witness was asked

25 whether he saw what had just been handed to him.  He said he

 1    was becoming aware of it.  It's extensive document.  I would

 2    have to read it.  And it goes on on the next page.

 3              Can't counsel stipulate at least that he was served

 4    with the subpoena at the deposition in English and in Spanish?

 5              MR. BOOTH:  Absolutely.  And he was at the deposition

 6    after he came to New York, in New York, and he has not been

 7    home since, and he was given a version of the subpoena in

 8    English and in Spanish.

 9              THE COURT:  So stipulated, Mr. Gomez?

10              MR. GOMEZ:  Yes.

11              THE COURT:  Go ahead, Mr. Mastro.

12              MR. MASTRO:  My only request, Mr. Zambrano, is that

13    any documents that you have that are responsive relating to

14    this case, to your current employment, that you produce those

15    through the attorneys for the defendants so that we have them

16    available to us at this trial when you return to Ecuador.

17              Thank you, sir.

18              THE COURT:  Just a minute, Mr. Mastro.

19              There is a long dialogue going on between the witness

20    and the interpreter.  I would like to know what it is.

21              THE INTERPRETER:  The interpreter will state that the

22    interpreter was interpreting into Spanish what Mr. Mastro just

23    said.

24              THE COURT:  What did Mr. Zambrano say to the

25    interpreter?

DB78CHE4                    Zambrano - redirect

```
 1              THE INTERPRETER:  This is the second interpreter.  I
 2    added --
 3              THE COURT:  It was you?  Forgive me.
 4              There are two interpreters next to the witness, one
 5    standing, one sitting.
 6    BY MR. MASTRO:
 7    Q.  Mr. Zambrano, will you produce documents you have in your
 8    possession when you get back to Ecuador that are responsive to
 9    the subpoena, give them to the defendants' lawyers so that they
10    can be used here at this trial?
11              MR. BOOTH:  Objection, your Honor.  Form.
12              THE COURT:  Overruled.
13    A.  I don't know what documents you're requesting.  If you're
14    asking me for the contract, I can give you that.
15    Q.  Sir, simple question.  Mr. Zambrano, the subpoena you
16    received at your deposition requests that you produce documents
17    in your possession in a number of categories.  I am asking you
18    whether, when you get back to Ecuador, you will review your
19    records and produce to us here in New York any documents you
20    have that are responsive to the requests in the subpoena.
21    A.  I cannot.
22    Q.  Mr. Zambrano, I am going to ask you now some questions
23    about Mr. Guerra.
24              Do you recall Mr. Booth asking you about Mr. Guerra
25    helping you draft orders in some of your cases during your
```

1   second term on the Chevron case while you were working on the

2   Lago Agrio Chevron judgment?

3   A.  Yes.

4   Q.  How many cases did Mr. Guerra help you draft orders on

5   during the period October 2010 through mid-February 2011?

6   A.  I don't recall.

7   Q.  How many days in October 2010 did Mr. Guerra work helping

8   you draft orders in your other cases besides the Chevron case,

9   approximately?

10  A.  I don't know.

11  Q.  How about in November, how many days did he help drafting

12  orders for you in November, approximately?

13  A.  I don't know.

14  Q.  Is it the same answer for December, January and February,

15  sir?

16  A.  Yes.

17  Q.  He worked many days helping you draft orders during that

18  period, October 2010 through mid-February 2011, correct, sir?

19          MR. BOOTH:  Objection.  Form.

20          THE COURT:  Overruled.

21  A.  I don't know.

22  Q.  You told Mr. Booth that Mr. Guerra was in a very delicate

23  financial situation.  Do you recall that testimony, sir?

24  A.  Yes.

25  Q.  How much did you pay Mr. Guerra for helping you during that

DB78CHE4                    Zambrano - redirect

1    period, October 2010 through February 2011, in drafting orders?

2              MR. GOMEZ:  Objection.  Asked and answered.

3              THE COURT:  Overruled.

4    A.  Nothing.

5    Q.  Sir, you say that Mr. Guerra worked only on your other

6    cases during that period, October 2010 to mid-February 2011,

7    not on the Lago Agrio Chevron case, correct?

8              MR. BOOTH:  Objection.  Compound.

9              THE COURT:  Rephrase it.

10             MR. MASTRO:  Certainly.

11   Q.  Mr. Zambrano, Mr. Guerra helped draft orders on your other

12   cases besides the Chevron Lago Agrio case between October 2010

13   and mid-February 2011, correct, sir?

14   A.  No.

15             MR. GOMEZ:  Objection.  Asked and answered.

16             THE COURT:  Overruled.

17   A.  No.

18   Q.  Did Mr. Guerra help you draft the Lago Agrio Chevron

19   judgment between October 2010 and February 2011, sir?

20   A.  Could you please repeat the question?  And may the

21   interpreter speak a little bit louder.

22   Q.  Mr. Zambrano, isn't it a fact that Mr. Guerra had a

23   master's in international environmental law, to your knowledge?

24   A.  I don't know.

25   Q.  Are you aware, sir, that Mr. Guerra studied environmental

DB78CHE4                        Zambrano - redirect

1   law as part of his law studies?

2   A.  No.

3   Q.  Sir, Mr. Booth asked you whether anyone had influenced you

4   in any way in connection with your deciding the Lago Agrio

5   Chevron case.  Do you remember that, sir?

6   A.  Yes.

7   Q.  And it's your testimony that you were unaware President

8   Correa supported the Lago Agrio plaintiffs' case, correct, sir,

9   before you issued the Lago Agrio Chevron judgment?

10              MR. BOOTH:  Objection.  Asked and answered several

11   times.

12              THE COURT:  I am very sympathetic to that objection,

13   but the fact is that there have been a number of occasions when

14   the witness has answered identical questions in absolutely

15   irreconcilable ways.  So I am going to permit it.  It happened

16   within the last five minutes.

17   A.  No.

18   Q.  You were aware that President Correa supported the Lago

19   Agrio plaintiffs' case before you issued the Lago Agrio Chevron

20   judgment?

21   A.  No.

22   Q.  Sir, you read the parties' --

23              THE COURT:  You see Mr. Booth.

24              Go ahead.

25              MR. MASTRO:  May I approach the witness?

DB78CHE4                    Zambrano - redirect

1            THE COURT:  Yes.

2    Q.  Now, Mr. Zambrano, I am showing you what has been marked as

3    Plaintiff's Exhibit 6405, and I will represent to the Court

4    that it is excerpts from Chevron's alegato in the Lago Agrio

5    Chevron case.

6            Mr. Zambrano, you know what an alegato is, correct?

7    A.  Yes.

8    Q.  You know that an alegato is a party's closing written

9    argument in a case, correct?

10   A.  No.

11   Q.  Tell the Court what an alegato is, sir.

12   A.  It is a statement of position by one of the parties

13   regarding a specific point that is in dispute in that

14   litigation.

15   Q.  So, sir, you read the parties' alegatos in the Chevron case

16   before you issued the Lago Agrio Chevron judgment on February

17   14, 2011, correct?

18   A.  Yes.

19   Q.  It would have been improper for you under Ecuadorian law

20   not to have read the parties' alegatos before you issued the

21   Lago Agrio Chevron judgment, correct?

22            MR. BOOTH:  Objection.  Form.

23            THE COURT:  Overruled.

24   A.  Could you please repeat the question?

25   Q.  It would have been improper under Ecuadorian law for you

1    not to have read the parties' alegatos before you issued the

2    judgment in the Lago Agrio Chevron case, correct, sir?

3    A.  No.

4    Q.  But you did read those alegatos in the Chevron case,

5    correct, sir, before you issued your judgment?

6    A.  Yes.

7    Q.  So you know that in Chevron's -- strike that.

8            So you knew before you issued the Lago Agrio Chevron

9    judgment from Chevron's alegato that President Correa and other

10   government officials have repeatedly offered their public

11   support for the Lago Agrio plaintiffs, didn't you, sir?

12           MR. BOOTH:  Objection.  Form.  The document speaks for

13   itself.

14           THE COURT:  Overruled.

15           He said earlier that he had no information on this

16   subject.  It's appropriate cross.

17   A.  No.

18   Q.  Sir, you knew from page 12 of Chevron's alegato --

19           THE COURT:  You got your answer.  Is there any

20   objection to the document being offered not for the truth of

21   the matter but for what it says?

22           MR. BOOTH:  There is no objection to the entire

23   alegato, not just pieces.

24           THE COURT:  Do you have it, Mr. Mastro?

25           MR. MASTRO:  We can enter the entire alegato.  I am

1    only going to refer to three or four pages, but we will enter

2    the entire alegato.

3            THE COURT:  So we will have as Plaintiff's 6405 the

4    entire alegato, English and Spanish.  It is stipulated among

5    all counsel that this exhibit, which will be provided in due

6    course here, is the alegato and that it's admissible.

7            Correct, Mr. Gomez?

8            MR. GOMEZ:  Not for the truth.

9            THE COURT:  Not for the truth.

10           MR. GOMEZ:  Yes.

11           THE COURT:  Mr. Booth.

12           MR. BOOTH:  Yes, your Honor.

13           THE COURT:  Mr. Mastro.

14           MR. MASTRO:  Yes, your Honor.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 6405 received in evidence)

17   BY MR. MASTRO:

18   Q.  Mr. Zambrano, you knew from page 12 of Chevron's alegato,

19   that you say you read before the Lago Agrio Chevron judgment

20   issued, that, quote, President Correa and other government

21   officials have repeatedly offered their public support for the

22   plaintiffs.

23           THE COURT:  Mr. Mastro, first of all, I think you mean

24   to refer to 109.  But in any case, it's right there.

25           MR. MASTRO:  I simply wanted to point out to the

1   Court --

2               THE COURT:  I have got it.

3               MR. MASTRO:  Multiple pages of the alegato.

4   Q.  I ask you one last time before you end your testimony here

5   today.  Isn't it a fact that you knew when you issued the Lago

6   Agrio Chevron judgment that President Correa and his government

7   supported the Lago Agrio plaintiffs' case and wanted them to

8   win?

9               MR. BOOTH:  Objection.  Asked and answered.  Compound.

10              THE COURT:  I think it appropriately in this

11  circumstance goes to credibility.  He is effectively being

12  given a last chance.

13  A.  No.

14              MR. MASTRO:  I have no further questions for this

15  witness.

16              THE COURT:  Thank you.

17              Mr. Booth, anything further for the witness.

18              MR. BOOTH:  Yes, your Honor.

19  RECROSS-EXAMINATION

20  BY MR. BOOTH:

21  Q.  Hello, Dr. Zambrano.

22              Just a moment ago you were asked a question if

23  Dr. Guerra helped draft or helped you in preparing drafts of

24  orders in other cases for you.

25              MR. BOOTH:  Let me ask a better question.

DB78CHE4                    Zambrano - recross

1   Q.  Did Dr. Guerra ever draft orders for you in any case?

2   A.  Never.

3   Q.  Did Dr. Guerra ever assist you by preparing drafts of

4   orders for you to then use in your case?

5   A.  Yes.

6   Q.  The cases where Dr. Guerra would have helped you by

7   providing drafts for you to then use in those cases, did he

8   ever do that for you in the Chevron case?

9   A.  Never.

10  Q.  The alegato that you were just discussing, the Chevron

11  alegato, as judge in the Chevron case, were you required to

12  accept what either party argued to you in an alegato as being

13  true?

14  A.  No.

15           MR. BOOTH:  No more questions.  Thank you.

16           THE COURT:  Mr. Gomez.

17           MR. GOMEZ:  No more, your Honor.

18           THE COURT:  Thank you.

19           Mr. Mastro.

20           MR. MASTRO:  Nothing further for this witness, your

21  Honor.

22           THE COURT:  Mr. Zambrano, this completes your

23  testimony for the moment.  You have, I gather, been served with

24  a subpoena that it imposes legal obligations upon you.  It may

25  be necessary for you to appear again in connection with that

1   subpoena.  Subject to all of that, you may now go.

2               THE WITNESS:  Thank you.

3               THE COURT:  Thank you.

4               (Witness excused)

5               THE COURT:  Next witness.

6               MR. MASTRO:  Chevron calls Professor Keith Rayner.

7    KEITH RAYNER,

8         called as a witness by the plaintiff,

9         having been duly sworn, testified as follows:

10              THE DEPUTY CLERK:  State your name and spell your last

11   name for the record.

12              THE WITNESS:  My name is Keith Rayner, R-A-Y-N-E-R.

13              MR. MASTRO:  Your Honor, may I approach the witness?

14              THE COURT:  You may.

15              MR. MASTRO:  I am handing the witness what has been

16   marked as Plaintiff's Exhibit 4200.  It is the revised and

17   supplemental declaration of Keith Rayner, Ph.D.

18   DIRECT EXAMINATION

19   BY MR. MASTRO:

20   Q.  Dr. Rayner, is this a copy of your revised and supplemental

21   declaration in this case?

22   A.  Yes, it is.

23   Q.  Can I ask you to please turn to the last page, not the page

24   19, the lovely demonstrative.  I am referring to page 17 of

25   your declaration, the last page of your declaration.  Do you

DB78CHE4                          Rayner - direct

 1   see that, sir?

 2   A.  Page 19.

 3   Q.  Is that your signature, sir?

 4   A.  Page 17.  Yes, it is.

 5   Q.  Was this revised and supplemental declaration true and

 6   correct at the time you executed it?

 7   A.  Yes.

 8   Q.  Is this declaration true and correct today?

 9   A.  Yes.

10   Q.  Did you also prepare what has been marked 4200A, the very

11   last page, page 19, this demonstrative?

12   A.  Yes.

13            MR. MASTRO:  I will identify for the record the

14   demonstrative entitled, "Judge Zambrano could not have read the

15   Lago Agrio record."

16   Q.  Is that a true and correct copy of your demonstrative

17   attached to this exhibit?

18   A.  Yes.

19            MR. MASTRO:  I offer Plaintiff's Exhibit 4200 and

20   4200A into evidence as direct testimony of Professor Rayner.

21   And I am prepared to turn over the witness.

22            THE COURT:  Any objections?

23            MR. BOOTH:  No, your Honor.

24            MR. GOMEZ:  None, your Honor.

25            THE COURT:  They are received.

DB78CHE4                    Rayner - direct

1            (Plaintiff's Exhibits 4200 and 4200A received in

2     evidence)

3            MR. MASTRO:  Thank you, your Honor.

4            Thank you, Professor.

5     CROSS-EXAMINATION

6     BY MR. BOOTH:

7     Q.  Good afternoon, Dr. Rayner.  My name is Rainey Booth.

8            Dr. Rayner, how much have you been paid to date for

9     your work on this case?

10    A.  To date I have received about $11,000.

11    Q.  Do you have any bills outstanding in this case for work you

12    have done?

13    A.  Yes.

14    Q.  How much?

15    A.  About 30,000.

16    Q.  To orient us, can you look at, I guess, the attachment at

17    the back of your report.

18           The phrase, "Judge Zambrano could not have read the

19    Lago Agrio record."  When you used the term "could not have

20    read" there, can you explain how you're using the term "read"?

21    A.  Sure.  I am using the term read to mean the standard

22    definition of reading, that one reads and understands the words

23    in the text with a good level of comprehension.

24    Q.  If I understand your report, the way you approached this

25    issue that you looked at was whether Judge Zambrano could have

DB78CHE4                        Rayner - cross

1    read and understood all of the material in the record; is that

2    the way you approached the question?

3    A.  Yes.

4    Q.  By all the material, did you mean all the text materials as

5    opposed to photographs?

6    A.  I meant primarily the text, although I think the

7    photographs, tables, graphs would take quite a bit of

8    processing to comprehend as well.

9    Q.  In doing your analysis, did you read the entire Ecuadorian

10   Lago Agrio record?

11   A.  There are two reasons why I didn't.  May I?

12   Q.  You may.

13   A.  The first is I wasn't asked to read it.  I was asked to

14   evaluate how many words were in the document.

15            Second, if I did read it, it would take me a year and

16   a half to read it reading eight hours a day.  It's a long

17   record.

18   Q.  So your answer is, no, you did not, is that right?

19   A.  I did not read it, and I explained why.

20   Q.  What you just told us about how long it would have taken

21   you, that's your opinion based on the assumptions you made, is

22   that correct?

23   A.  Based on the assumptions of normal reading rates and

24   comprehension.

25   Q.  Is it fair to say that in this case, you were asked to form

1    an opinion on a particular issue by the attorneys for Chevron,

2    is that fair?

3    A.  Yes.

4    Q.  Is it fair to say that you decided what would be the best

5    way to approach that issue in terms of doing an analysis, is

6    that fair?

7    A.  Yes.

8    Q.  In forming your opinion in this case, did you attempt to

9    determine what would have been the best way for Judge Zambrano

10   to have approached the Ecuadorian record to form his opinions

11   in that case?

12   A.  My understanding is that Judge Zambrano was supposed to

13   read the record.

14   Q.  That wasn't my question.  I appreciate your answer.

15        Did you, as an expert in this field, did you make any

16   attempt to determine in your own mind what would have been the

17   best way for Judge Zambrano to approach the record to decide

18   the issues he had to decide in the Ecuadorian court below?

19   A.  No.

20   Q.  The primary focus of your work outside the courtroom, can

21   you briefly describe it for us, please?

22   A.  I am a professor at the University of California, San

23   Diego.  I teach courses on the psychological of language,

24   psychological of reading, and cognitive psychological, and I do

25   a lot of research on reading processes and language processes.

DB78CHE4                         Rayner - cross

1   Q.  In terms of your primary focus in the work you do, does it

2   primarily involve the study of how people read and comprehend;

3   is that at least a primary part of it?

4   A.  Yes.

5   Q.  Is one of the primary fields that you study is to

6   help -- strike that.

7            Is one of the primary reasons for your work to help

8   people read better, is that one of the reasons?

9   A.  That may be a long-term goal.  The more immediate goal is

10  to try and understand what the mental processes are when people

11  read to form, for example, a model of the reading process.

12  Q.  Now, I think you covered some of this in your report.  Let

13  me ask you, the speed at which someone can read a document

14  depends on various things, right?

15  A.  Correct.

16  Q.  One of the things that might impact the speed would be the

17  type of document itself, correct?

18  A.  Yes.  Reading rates will vary at the functions of the

19  material one is reading.

20  Q.  That may have to do with how complicated the material is?

21  A.  Yes.

22  Q.  How dense the words are on the page, how many words per

23  page?

24  A.  Yes.

25  Q.  Another factor that might impact the speed at which someone

DB78CHE4                          Rayner - cross

1    might read a document would have to do with the person

2    themselves, right?

3    A.   There is variability among people in terms of how fast they

4    read.

5    Q.   Did you have any information about Judge Zambrano, any

6    specifics about him in his reading abilities in this case?

7    A.   I think I can assume that Judge Zambrano probably reads

8    between 200 and 400 words per minute since about 98 percent of

9    the population reads in that range.

10   Q.   Thank you for that answer.  That wasn't my question.

11   A.   I have not met Judge Zambrano.

12   Q.   Isn't it true another factor that will affect the speed at

13   which someone reads a page would be how much information the

14   person is trying to extract from that page, correct?

15   A.   You're getting into a distinction now between reading and

16   skimming.  So if you're skimming, you can go a lot faster than

17   if you're reading, but skimming comprehension goes to pieces.

18   Q.   Can you define skimming, as you're using the term?

19   A.   Skimming means going at rates over 400 words per minute.

20   You're not really processing all of the words, you're trying to

21   get the gist, but you're not getting any of the details.

22   Q.   Is there a word for the process, for example, if I had a

23   page and on the page I was looking for a specific thing, for

24   example, a phrase, and I am not trying to read the page for

25   content, either reading or skimming, I am just looking for

1    specific phrases, is there a word for that?

2    A.  It's sort of an example of a digital search.

3    Q.  Did you make any assumptions in this case of how long it

4    would take a person to search documents looking for particular

5    things?

6    A.  Again, the task that I was assigned was how long would it

7    take to read this material.

8    Q.  So the answer to the question is you did not consider that

9    variable, is that right?

10   A.  That's right.

11   Q.  For the purpose of doing your analysis, did you account at

12   all for the possibility that Judge Zambrano might have spent a

13   longer period of time with certain documents?

14   A.  With certain documents?

15   Q.  Right.

16   A.  Can you explain what you mean?

17   Q.  That was a bad question.  For example, if the person was to

18   read the document and then also take notes from the document,

19   did you account in your analysis for Dr. Zambrano spending

20   additional time for something like that, taking notes on a

21   document or rereading a document for content?

22   A.  No, I didn't, but obviously that's going to add to the

23   amount of time it's going to take to get through a document.

24            (Continued on next page)

25

DB7LCHE5                      Rayner - cross

1   Q.  Did you in your analysis account for the possibility that

2   Dr. Zambrano would find some documents he didn't need to read

3   at all once he looked at the document and said I don't need to

4   read that at all, did you account for that?

5   A.  Not directly, no.

6   Q.  There's an indication in your report that you excluded for

7   the purpose of your calculation about 5 percent of the pages;

8   is that right?

9   A.  That's correct.

10  Q.  And what was the reason for that?

11  A.  Because they contained photographs or graphs, tables.

12  Q.  And how did you arrive at 5 percent?

13  A.  By sampling the text.

14  Q.  What was page 7 on the version I had, paragraph 11E.  I

15  think this is a different version.  Let me see if I can find

16  it.  Can you look at your report and help me.  Here it is, here

17  it is.  It is page 7.  It is paragraph 11E.

18          There's an indication, first of all, let me let you

19  get there.  Can you tell me when you're there?

20  A.  I just want to make sure I'm in 11E, you said, yes?

21  Q.  I think it's at the bottom of paragraph 11E.

22  A.  Yeah.

23  Q.  Talks about, for example, on page 39, do you see that

24  sentence, the last sentence in the paragraph?

25  A.  Yeah.

1  Q.  And it indicates more than 100 expert reports submitted,

2  and then it uses the word or it says the phrase, have been

3  considered by the judge in handing down this ruling.

4          Did you have any information as to what was meant by

5  considered?

6  A.  No.  I do not know for sure.

7  Q.  Did you make any assumptions about what the word considered

8  meant in that context?

9  A.  No.

10  Q.  Did you make -- did you do anything to try to compare

11  considered with the definition of reading that you've given us

12  to use in this case?

13  A.  Again, I repeat, the task that was assigned to me was to

14  figure out how long it would take to read this document.

15  Q.  Did you in doing your analysis make any attempt to

16  determine what portion of the record, the Ecuadorian record,

17  contained documents that were copies of other documents?

18  A.  I must say I'm not sure about that.  In skimming through

19  the text, I didn't see a lot of duplications, but I can't say

20  that I know for sure.

21  Q.  And how much of the text did you skim through -- I mean --

22  I'm sorry.

23          What percentage of the Ecuadorian record do you

24  believe you skimmed through?

25  A.  I think I've looked at about a fourth of the total pages.

DB7LCHE5                    Rayner - cross

1   Q.  And was it any particular year, year set, or was it random,

2   your selection?

3   A.  It was pretty random, totally random actually.

4           MR. BOOTH:  May I have one second.

5           No more questions.

6           THE COURT:  We'll take our break here.

7           (Recess)

8           THE COURT:  All right, Mr. Gomez.

9           MR. GOMEZ:  Thank you, your Honor.

10  CROSS-EXAMINATION

11  BY MR. GOMEZ:

12  Q.  Good afternoon, Dr. Rayner.

13          Just to clarify part of the record.  In your earlier

14  testimony in response to questions by Mr. Booth where Mr. Booth

15  asked you about searching a document for certain phrases, did

16  you use the term visual search or digital search?

17  A.  Visual search.

18  Q.  Thank you.  Sir, were you provided for purposes of your

19  analysis any information as to what amount of the record

20  constituted evidence and what amount constituted legal argument

21  under Ecuadorian law?

22  A.  I was provided the entire record but not provided that

23  information specifically.

24  Q.  Were you provided any information as to what portion of the

25  record was relevant to the issues that Judge Zambrano had to

DB7LCHE5                      Rayner - cross

1   decide in the judgment?

2   A.  No.  I assumed the entire record was relevant.

3           MR. GOMEZ:  Nothing further, your Honor.

4           MR. MASTRO:  Nothing further, your Honor.

5           THE COURT:  You're excused, Mr. Rayner or Dr. Rayner.

6   Thank you.

7           (Witness excused)

8           MR. MASTRO:  Thank you, Professor.

9           THE COURT:  Next witness.

10          MR. MASTRO:  Your Honor, Chevron calls Rhonda Zygocki.

11  And Ms. Zygocki will be put on the stand by my colleague Chris

12  Joralemon.

13          THE COURT:  You spell it like Brooklyn?

14          MR. JORALEMON:  Correct, your Honor.

15   RHONDA ZYGOCKI,

16      called as a witness by the Plaintiff,

17      having been duly sworn, testified as follows:

18  DIRECT EXAMINATION

19  BY MR. JORALEMON:

20          THE COURT:  Go ahead, Mr. Joralemon.

21          MR. JORALEMON:  Thank you.  May I approach, your

22  Honor?

23          THE COURT:  You may.

24  Q.  Good afternoon, Ms. Zygocki.  I've handed you what's been

25  marked Plaintiff's Exhibit 5800.

DB7LCHE5                        Zygocki - direct

1              Do you recognize this document?

2    A.  I do.

3    Q.  What is it?

4    A.  It is my testimony submitted to this court.

5    Q.  Okay.  If you turn to page 10 of Exhibit 5800, the last

6    page of the document, is that your signature?

7    A.  It is.

8    Q.  And, Ms. Zygocki, when you executed this document on

9    October 30, 2013, as indicated on page 10, were all the

10   statements in there true and accurate to the best of your

11   knowledge?

12   A.  They are.

13   Q.  And as you sit here today, are all the statements contained

14   in Exhibit 5800 true and accurate to the best of your

15   knowledge?

16   A.  Yes, they are.

17             MR. JORALEMON:  Your Honor, Chevron offers Plaintiff's

18   Exhibit 5800.

19             MS. FRIEDMAN:  Your Honor, we have some issues about

20   this.

21             THE COURT:  I know.  Why haven't they been solved?

22   I'm not blaming you.

23             MS. FRIEDMAN:  I can tell the Court we did have some

24   meetings about this and both sides have different views on

25   things.  That's what we have judges for, I guess.

DB7LCHE5                      Zygocki - direct

1              THE COURT:  But we don't have judges to decide

2     disputes about what number you call to get information to find

3     somebody else's phone number.  That's about what we're down to

4     here.

5              MS. FRIEDMAN:  Well, if I could phrase the issue for

6     the Court as I see it, what would be helpful to us is to have

7     some guidance on, as I see it, paragraph 6 through 18 are

8     essentially just repeating press releases or paraphrasing press

9     releases and --

10             THE COURT:  Without holding me precisely to the

11    paragraph numbers, I have a general sense that you're right

12    about that.  And it's an argument.  It's somebody's trial

13    brief.

14             MS. FRIEDMAN:  And, again, I don't want to create more

15    trouble.  But my point, your Honor, is if the Court could make

16    a decision about whether it wants to police the media war that

17    took place between these people, that's what I see shaping up

18    here is, you know, press releases on both sides and each side

19    arguing about what they mean.  You have in the record the press

20    releases themselves.

21             So that's our position, your Honor.  But if it comes

22    in and I cross-examine her on this, I will.  But I just think

23    it doesn't add anything.

24             THE COURT:  Mr. Joralemon.

25             MR. JORALEMON:  With all due respect to Mr. Friedman,

DB7LCHE5                          Zygocki - direct

1    this is not simply a PR war.  Your Honor said on the first day

2    of trial Chevron did not, is not bringing this action because

3    there is a public relations strategy on the other side.

4           Ms. Zygocki is a senior executive at Chevron, had

5    oversight responsibilities for public relations and government

6    affairs during the relevant period.

7           The paragraphs cited by Mr. Friedman are specific

8    press releases quoted, not paraphrased, quoted that were issued

9    by Mr. Donziger and those working with him and they

10   specifically relate to Mr. Cabrera's independence and

11   escalating damages figures that originated with Mr. Russell and

12   later with Mr. Cabrera.

13          We are not putting Ms. Zygocki's statement in to

14   establish the falsity of those statements.  There's plenty of

15   other evidence for that.  Ms. Zygocki is simply testifying

16   these statements were made.  She was aware of them.  Chevron

17   was aware of them contemporaneously.  She's testifying about

18   the impact those statements had on Chevron.

19          THE COURT:  The press releases are all in the record,

20   true or false?

21          MR. JORALEMON:  All of the press releases are, yes.

22   Mr. Donziger's testimony before Congress where he cites

23   Mr. Cabrera is not in the record, as I understand it.

24          THE COURT:  Why not?

25          MR. JORALEMON:  We will move it into the record as

1    part of Ms. Zygocki's testimony.

2              THE COURT:  Do you have any objection to the testimony

3    coming in?

4              MS. FRIEDMAN:  No, your Honor.

5              THE COURT:  All right.  So, look, Mr. Joralemon, what

6    you're seeing in my hesitation is the stupendous level of

7    frustration with both sides about stuff like this.

8              MS. FRIEDMAN:  Can I ask, can I suggest something,

9    your Honor?

10             THE COURT:  Yeah.

11             MS. FRIEDMAN:  If you look at the last I think

12   paragraphs 22 and 23, if you would give us some guidance.  If

13   you think those paragraphs are helpful to anything you have to

14   decide, we can put them in issue and I can cross-examine her

15   about those.  And if they're not, I don't think there's

16   anything to talk about here.

17             THE COURT:  Who wants to address paragraphs 22 and 23

18   from the plaintiff's side?

19             MR. JORALEMON:  I'd be happy to speak to those

20   paragraphs.  You mean other witnesses?

21             THE COURT:  No, no, no.  Lawyer.

22             MR. JORALEMON:  That would be me.  And, your Honor, as

23   I just said, Ms. Zygocki's testimony is being offered to

24   discuss the impact that defendant's public pressure campaign

25   had on Chevron.

1          Now, to be clear once more, when I say public pressure

2     campaign, I'm not talking about a public relations strategy.

3     There are very specific allegations about falsehoods that

4     defendants here have spread.  And Ms. Zygocki is not being

5     offered to prove the falsity or truth of those statements but,

6     rather, the statements were made about Mr. Cabrera's

7     independence, about the damages figure that Mr. Cabrera offered

8     and then Mr. Russell offered that they used.

9          THE COURT:  Mr. Joralemon, I appreciate the

10     earnestness and the commitment to the client, I do, for the

11     lawyers on both sides in this case.

12          A sentence such as, Chevron's core values place the

13     highest strategic importance on protecting its people, what

14     does that actually mean that this witness can testify to of her

15     personal knowledge?  Does this mean she's here as an expert

16     witness about what each and every person at Chevron believes

17     are the core values?  What core values mean?  What level of

18     importance each one attached to whatever that person thought

19     were core values?

20          MR. JORALEMON:  Sure.  I understand your question,

21     your Honor.

22          Ms. Zygocki has been with the company for over 33

23     years.  She is a senior executive.  She is offering testimony

24     under 701 to this point.  It certainly is a rational view that

25     she has based on her experience, and it helps put the context

DB7LCHE5                    Zygocki - direct

1    of her testimony.

2              THE COURT:  Look, no disrespect to Ms. Zygocki.

3    Enough already with this stuff on both sides.  All right.  You

4    want to offer the testimony to Congress, offer it.

5              MR. JORALEMON:  Okay.

6              THE COURT:  What is it?

7              MR. JORALEMON:  There are a couple other things that I

8    believe are not quite in the record, your Honor.

9              THE COURT:  So let's deal with that.

10             MR. JORALEMON:  Okay.  So the congressional testimony

11   is at paragraph 12.  The other --

12             THE COURT:  So that's Exhibit 1130.  Now, isn't that

13   actually in the record?

14             MS. FRIEDMAN:  I think it is, your Honor.

15             THE COURT:  Yes?

16             MR. JORALEMON:  All of the exhibits?

17             MS. FRIEDMAN:  Yes.

18             THE COURT:  So all the exhibits are in the record.  So

19   let's go through and see what actually this witness, who I

20   assume is quite a distinguished and experienced executive, no

21   disrespect intended to her or anybody else, has to contribute

22   to the resolution of any facts in issue.

23             MR. JORALEMON:  If I can clarify one point, your

24   Honor.  Sorry I wasn't clear.  When I speak about the impact

25   within Chevron that the public pressure campaign, I'm speaking

1  directly to the issue of irreparable harm.  As you know,

2  Chevron is seeking injunctive relief here.  So this goes beyond

3  the issue of the monetary impact.  Ms. Zygocki as a senior

4  executive can speak to the irreparable harm of the public

5  pressure campaign.

6          THE COURT:  All right.  I hate to do this.  This is a

7  waste of time and both sides are guilty of this, but I'm really

8  at my wit's end with it.

9          Let's look at paragraph 4, the last two sentences.

10  There's no dispute that Mr. Donziger and others have made these

11  various statements, right?  They're all in the record.

12          MS. FRIEDMAN:  Absolutely.

13          THE COURT:  Right, Mr. Joralemon?

14          MR. JORALEMON:  Agreed.

15          THE COURT:  So we don't need that.

16          That she received internal communications circulating

17  copies of them.  Don't need that either, right?

18          MR. JORALEMON:  That was offered for the foundation of

19  this witness.

20          THE COURT:  It was just offered because you'd like it

21  in the trial brief and you'd prefer to have something in a

22  witness statement.  It's obvious.  It's blindingly obvious.

23          Paragraph 5.  She's observed patterns.  What is she, a

24  pattern recognition expert?

25          Please understand this is not personal, Ms. Zygocki.

 1              MR. JORALEMON:  No, but, again.

 2              THE COURT:  You haven't sat through what I've sat

 3     through.

 4              MR. JORALEMON:  Your Honor, that's a perfect example

 5     of 701 testimony.  Ms. Zygocki in her role and her experience

 6     has a rational basis for observing a pattern of their public

 7     pressure campaign and it goes again to irreparable harm.

 8              THE COURT:  I'll decide if there was a pattern.  You

 9     put the statements in.  There is or there isn't.

10              MR. JORALEMON:  Correct.

11              THE COURT:  All right.  I don't need that.

12              Paragraph 6.  You want her to testify that he issued

13     press releases.

14              That's undisputed, right, Mr. Friedman?

15              MS. FRIEDMAN:  Yes.

16              THE COURT:  Okay.

17              Paragraph 7, talking about an Amazon defense

18     coalition.  Ms. Hinton and Amazon Watch issuing a press

19     release.  No dispute about that, right?

20              MS. FRIEDMAN:  Correct.

21              THE COURT:  Paragraph 8.  What in there is disputed,

22     sir?

23              MS. FRIEDMAN:  Nothing.

24              THE COURT:  Mr. Joralemon?

25              MR. JORALEMON:  Your Honor, I will try to expedite

DB7LCHE5                        Zygocki - direct

this.  If they're willing to stipulate to paragraphs 1 through

18 that they're not in dispute, then we certainly don't need to

have Ms. Zygocki testify about those things.

            MS. FRIEDMAN:  It's a little different.  As we go on,

your Honor, there are some characterizations of things that

we're not willing to stipulate to.

            THE COURT:  Look, the documents are all in.  They're

all stipulated as authentic.  They are what they purport to be,

right?

            MS. FRIEDMAN:  Correct.

            THE COURT:  Mr. Gomez?

            MR. GOMEZ:  Correct.

            THE COURT:  Right.  Are you willing to trust me to

just disregard the advocacy and the stuff that I would describe

privately in different terms?

            MR. JORALEMON:  We certainly trust you, your Honor,

yes.

            THE COURT:  Mr. Friedman?

            MS. FRIEDMAN:  Well, I don't know what that means.

What we're asking is that you either strike this or tell us

which part you think is relevant and then I'll address that in

cross.  I think it ought all be stricken and you've got the

documents.

            THE COURT:  Look, you are wasting my time, both of

you.  It's gratuitous and it's nonsense.  I brought this up

DB7LCHE5                         Zygocki - direct

1    with respect to Hinton.  You said it was justified by Zygocki.

2    I said get together and resolve it.  It is so obvious as to how

3    it should be resolved that a first year law student could get

4    this resolved and I want it resolved without my sitting here

5    having to edit it.

6              And do you read me, both of you?

7              MR. JORALEMON:  Absolutely.

8              MS. FRIEDMAN:  I do too, your Honor.

9              THE COURT:  All right.  Do it.

10             Now, Mr. Joralemon, if there is anything in here that

11   you think you need as to which this is a competent witness, I

12   want to hear what it is now.

13             MR. JORALEMON:  Certainly.  It begins at paragraph 19.

14   It's the section entitled Effects of Defendant's Public

15   Pressure Campaign.  Nineteen through 23, your Honor.

16             THE COURT:  All right.  I'll take those paragraphs for

17   what they're worth, as well as paragraphs 1 through 3.  Let's

18   go ahead.

19             MR. JORALEMON:  Thank you, your Honor.  Pass the

20   witness.

21             THE COURT:  Understand, Mr. Joralemon, I understand

22   you were carrying out orders.

23             MR. JORALEMON:  Thank you, your Honor.

24             THE COURT:  I don't hold this as a personal -- what's

25   the right word -- failure on your part.

DB7LCHE5                        Zygocki - direct

1           MR. JORALEMON:  Thank you.  I appreciate that.

2           THE COURT:  Okay.  Now let's go and let's keep it

3     short.

4           MS. FRIEDMAN:  Yes, your Honor.  So, your Honor,

5     what's in play, as I understand it, is 1 through 3 and 19 to

6     23.  Is that correct?

7           THE COURT:  Correct.

8           You earned a drink tonight, Mr. Joralemon.

9           MR. MASTRO:  I'm buying and apologizing.

10          THE COURT:  You better.  You better buy one for

11    Mr. Friedman too because, you know, after yesterday or the day

12    before you owe him one.

13          MR. MASTRO:  I will buy him one too, your Honor, in

14    the spirit of harmony here.

15    CROSS-EXAMINATION

16    BY MS. FRIEDMAN:

17    Q.  Ms. Zygocki, my name is Rick Friedman.  I represent

18    Mr. Donziger.

19          Do you have your witness statement up there with you?

20    A.  I do.

21    Q.  Would you mind turning to paragraph 20, please.  On page 9,

22    you say, I personally have expended and continue to expend

23    incalculable hours and resources.

24          Do you see that sentence?

25    A.  Yes.

DB7LCHE5                        Zygocki – cross

1   Q.  Working to mitigate the unjustified threats and harm posed

2   by the misinformation campaign.

3           Can you tell us what you mean when you are referring

4   to unjustified threats and harm?

5   A.  I believe it refers directly to the unjustified threats to

6   the company's reputation and financial stature that a

7   $19 billion judgment would create for the company.

8   Q.  Did you, before the judgment came out, did you view the

9   lawsuit itself down in Ecuador as an unjustified threat?

10  A.  Yes, we did.

11  Q.  And unjustified harm?

12  A.  Yes, we did.

13  Q.  All right.  And you're not in your testimony making any

14  distinction in terms of the harm caused by the lawsuit itself

15  versus the judgment versus the Cabrera false statements that

16  you've alleged, you're not making those kinds of distinctions

17  in your testimony or are you?

18           MR. MASTRO:  Objection to the form, your Honor.

19           THE COURT:  Overruled.

20  A.  I see them as all connected in that regard.

21  Q.  All right.  And when you talk about misinformation, without

22  going through all the underlying material, just so we

23  understand your position, you're not saying -- well, let me ask

24  it this way:  Are you saying there was no pollution in the

25  Oriente region?

DB7LCHE5                    Zygocki - cross

1              MR. MASTRO:  Objection, your Honor, scope.

2              THE COURT:  Sustained.  We are not doing that,

3     Mr. Friedman.  We are not trying the Ecuadorian pollution case

4     through the head of public affairs at Chevron.

5              MS. FRIEDMAN:  I am just trying to get at what

6     misinformation she's referring to, your Honor.  Maybe I'll ask

7     it a different way.

8              THE COURT:  Look, Mr. Friedman, it's Chevron's

9     position that this, subject to various limitations that were

10    articulated in pretrial, your client has done 'em wrong, sir,

11    and vice versa.  Now, I understand that that's what she's

12    talking about.

13             MS. FRIEDMAN:  All right.

14    Q.  Ms. Zygocki, are you a stockholder in Chevron?

15    A.  Yes, I am.

16    Q.  And can you tell us when the pressure campaign started?

17    A.  I would say the campaign, there has always been an element

18    of the pressure campaign from the time the $6 billion number

19    was first put out by the plaintiffs.

20             But it escalated quite a bit first in the 2008 time

21    frame when the Cabrera report came out and the number was 16,

22    coupled with some very high profile kind of public recognition

23    of, for instance, Pablo Fajardo and Luis Yanza in terms of CNN

24    Heroes and Goldman awards for environmental excellence.

25             But in 2009, the campaign reached a very high heights

DB7LCHE5                    Zygocki - cross

when the second version, I guess, or the $27 billion Cabrera

report was out there, coupled with the movie Crude and the 60

Minutes segment, that it was the combination of the damages

claim and, you know, what we believed to be very misinformation

and false information in that regard with a very high profile

public media campaign that really exaggerated or I would call

described these harms in very strong terms.

On top of that media campaign, we were experiencing

between 2008 and 2010 on average a press release a week issued

through Chevron Toxico.  So every week there was a different

message coming out, many of them grounded in the Cabrera

report.  We didn't know which way they were coming from.  And

around this damages assessment there was descriptions accusing

us of everything from lying to shareholders, misleading

Congress, cultural genocide, and human rights abuses.

So it was the combination of those things that the

pressure came up and, as a result, more and more of our

stakeholders, whether they be employees, government partners,

community partners, and policymakers began to ask questions on

that and we were responding to these things in multiple

jurisdictions.

Q.  So is the answer to my question in 2007?

A.  I think the height of the campaign was in 2009 and the ramp

up began I would say 2007.

Q.  Okay.  That was my question, when did it start.  So the

DB7LCHE5                         Zygocki - cross

1   answer is 2007?

2   A.  Yes.

3   Q.  And how much has Chevron stock price increased since 2007?

4           MR. JORALEMON:  Objection, your Honor, relevance.

5           MS. FRIEDMAN:  They're arguing they've been harmed by

6   this campaign, your Honor.  She references stockholders and all

7   sorts of other things.

8           MR. JORALEMON:  That mischaracterizes her testimony.

9           THE COURT:  Look, unless you are proposing, and I

10  think it quite clear because you've indicated what the rest of

11  your evidence is going to be, to bring in a qualified expert to

12  testify that the stock price wouldn't have been higher but for

13  this campaign, assuming for the sake of discussion that that's

14  a relevant measure, this is going nowhere because it has no

15  value.  Right?

16          MS. FRIEDMAN:  Well, I think it would be plaintiff's

17  burden to show some harm, yes.  What I'm trying to show is that

18  they are unable to show any harm through the cross-examination.

19          We stipulate to that, stipulate to the stock price --

20          THE COURT:  I propose a deal.  They'll stipulate

21  there's no harm if you'll stipulate there's no merit to your

22  defense.

23          MS. FRIEDMAN:  I understand.

24          THE COURT:  I'm sure we could work that out.

25          MR. JORALEMON:  Your Honor, just for the record, we've

DB7LCHE5                        Zygocki - cross

1   already worked out a stipulation about certain harms,

2   attorneys' fees, and Chevron is not seeking stock price

3   differential as damages.

4           THE COURT:  Yes, we understand that.

5           MS. FRIEDMAN:  I'll sit down, your Honor.

6           THE COURT:  Mr. Gomez.  Thank you.

7   CROSS-EXAMINATION

8   BY MR. GOMEZ:

9   Q.  Good afternoon, Ms. Zygocki.

10          Ms. Zygocki, would you please direct your attention to

11  paragraph 20 of your statement, page 9, the sentence that

12  begins, as a senior executive with Chevron.

13          Do you see that sentence, ma'am?

14  A.  Yes, I do.

15  Q.  Ma'am, in that sentence you refer to hours and resources

16  working to mitigate the unjustified threats.

17          Do you see that phrase?

18  A.  Yes, I do.

19  Q.  Can you tell me, do you have any quantification of the

20  hours that you reference in that sentence?

21  A.  I can estimate that during the time, particularly I would

22  say 2009 and 2010, which I believe and observed as the height

23  of this PR campaign, I personally in my executive role spent

24  more than the majority of my time dealing with issues with

25  respect to the Ecuador case.

DB7LCHE5                         Zygocki - cross

1   Q.  Have you quantified in any written document as you spent

2   those hours how many hours per day you spent as you described?

3   A.  No, I have not.

4   Q.  And turning to the reference to resources in that same

5   sentence --

6   A.  Yes.

7   Q.  -- what quantification have you kept of the resources that

8   you refer to in that particular statement?

9   A.  I have not kept a quantification of those resources.

10  Q.  Thank you.  Moving further down into in that paragraph, the

11  last sentence begins with, these and other activities also have

12  demanded the time, attention, and focus of many other members

13  of the company's executive management.

14          Do you see that phrase, ma'am?

15  A.  Yes, I do.

16  Q.  Once again, with respect to the time that you refer to in

17  that phrase, what steps have you taken to quantify that time?

18  A.  I have not taken any steps to quantify that time.

19  Q.  And what steps have you taken to quantify the attention

20  that you refer to in that phrase?

21  A.  I have not taken steps to quantify the attention.

22  Q.  And have you taken any steps to quantify the focus that you

23  referred to in that phrase?

24  A.  No, sir, I haven't.

25  Q.  Moving to the next paragraph, there is the final sentence

DB7LCHE5                          Zygocki – cross

1    reads, some, including our lawyers, working on the litigation

2    in Ecuador.  Do you see that phrase, ma'am?

3    A.  Yes.

4    Q.  I want to direct your attention to the portion of the

5    phrase which reads, even have feared for their physical safety

6    or have been subjected to criminal charges brought against them

7    by the Ecuadorian government at the instigation of Mr. Donziger

8    and others working with him.

9              Do you see that, ma'am?

10   A.  I do.

11   Q.  Ma'am, do you -- is your basis for that statement

12   information that has been reported to you only or have you

13   actually observed that?

14   A.  It has been information reported to me.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

DB78CHE6                    Zygocki - cross

1    Q.  Moving to the next paragraph 22, you refer in the second

2    sentence to the phrase "personal attacks like those leveled by

3    Mr. Donziger and others working with him."  Do you see that

4    phrase?

5    A.  Yes, I do.

6    Q.  Again, is this information that has been reported to you,

7    ma'am?

8    A.  These are threats that I have observed.

9    Q.  Is it your testimony that Mr. Donziger has threatened you

10   personally, ma'am?

11   A.  Mr. Donziger has not threatened me personally.

12   Q.  So what have you observed?

13   A.  I have observed personal attacks on my CEO.  I have

14   observed personal attacks on a board member.

15   Q.  Is that all?

16   A.  I have observed personal attacks on members of our

17   government relations team, some of our government advisors,

18   political consultants.

19   Q.  These personal attacks that you have observed, have they

20   all been in press releases?

21   A.  They have been in press releases.  They have been through

22   attendance of some of these groups at our annual meetings.

23   Q.  In an annual meeting, have you seen someone attack the CEO

24   of your company, ma'am, is that your testimony?

25   A.  I have seen them attack our CEO with words.

DB78CHE6                    Zygocki – cross

1   Q.  So you have seen someone say something to your CEO that you

2   didn't like, is that correct?

3          MR. JORALEMON:  Objection.  Form.

4          THE COURT:  I think this witness is sufficiently

5   experienced to give an appropriate response.  Overruled.

6   A.  Yes, I have.

7   Q.  Would the same qualify for the personal attack against the

8   board member that you observed someone say something to the

9   board member that you didn't like?

10  A.  I received a letter from one of these groups that was sent

11  to a board member that referenced a threat.

12         THE COURT:  A threat of physical harm or some other

13  kind of threat?

14         THE WITNESS:  A threat of protest at their residence.

15         MR. GOMEZ:  I have nothing further.

16         THE COURT:  Thank you.

17         Mr. Joralemon.

18         JUROR:  Nothing further.

19         THE COURT:  Ms. Zygocki, thank you very much.  Sorry

20  you had to go through this, as I am sorry that any witness

21  called in in these circumstances for these kinds of unnecessary

22  purposes has to go through it.

23         (Witness excused)

24         THE COURT:  And that includes in large measure

25  Ms. Hinton.

DB78CHE6                    Zygocki - cross

 1           Let's go.  Anything else?

 2           MR. MASTRO:  Yes, your Honor.  Chevron calls Weston

 3   Anson.

 4    WESTON ANSON,

 5        called as a witness by the plaintiff,

 6        having been duly sworn, testified as follows:

 7           THE DEPUTY CLERK:  State your name and spell your last

 8   name for the record.

 9           THE COURT:  Before we commence the direct, just to be

10   absolutely clear about what I just said to Ms. Zygocki.  There

11   was almost nothing in her statement that was necessary, in

12   significant measure.  Whatever I allowed to come in was

13   argument.  In light of all of the discussion about larding up

14   the witness statements with characterizations, matters of which

15   witnesses lacked personal knowledge and argumentation, I am

16   sorry that Chevron's counsel called her.  The cross-examination

17   was tendentious, but it was provoked, and it was a waste.

18   That's fundamentally my point.

19           MR. FRIEDMAN:  Can I address this witness for a

20   second.  He is an unjust enrichment expert, which I think has

21   been taken out of the case.

22           THE COURT:  I have not seen a statement so I don't

23   know what it is.

24           MR. MASTRO:  Just to be clear, this witness is here as

25   a damages expert to speak to potential and actual harms and

DB78CHE6                        Anson - direct

1    future harms from both enforcement, and the potential that

2    enforcement activities are successful, to the extent they have

3    already gotten traction, how that adversely affects or harms

4    Chevron.  We tried to stipulate to his testimony too, just like

5    we did with Mr. Ryan.  We didn't want to have to call him.

6              THE COURT:  So the whole point is that, if and to the

7    extent judgment is enforced, there is irreparable harm?

8              MR. MASTRO:  That's part of it.  Also, the issues

9    would be the trademarks and the royalties associated with it is

10   causing and will cause harm to Chevron going forward from the

11   enforcement activity in Ecuador right now.  And that was the

12   point of his testimony, to establish there is irreparable harm

13   that will occur to Chevron.

14             THE COURT:  Mr. Friedman, isn't that obvious?

15             MR. FRIEDMAN:  He was designated as an unjust

16   enrichment expert.  The direct testimony we were given

17   addresses only the IP, the trademark stuff in Ecuador.

18             THE COURT:  Nobody has bothered to give me this direct

19   testimony so I don't really know what we are talking about.

20             MR. MASTRO:  It addresses that before your Honor had

21   ruled on unjust enrichment, because that's an issue in which

22   they have gotten some traction, but he speaks generally to

23   enforcement activities.  And we sent a bare-bones stip that

24   would have addressed this and Mr. Friedman rejected it.  We

25   tried to avoid having to call this witness at all, and we think

DB78CHE6                     Anson – direct

1    it is something that should be stipulated to.  We are not

2    attempting, your Honor, to reargue unjust enrichment through

3    this witness.

4              THE COURT:  What it is is you haven't revised the

5    statement in light of the fact that that is out of the case, or

6    never was in it.

7              MR. MASTRO:  What we did do was we sent a proposed

8    stipulation to try and get this witness's testimony.

9              THE COURT:  What is the problem, Mr. Friedman?

10             MR. FRIEDMAN:  Your Honor, I have five minutes or less

11   of questions.  If this is in the case, it's in the case.  I

12   will ask my five minutes of questions.

13             THE COURT:  I don't know what the "this" is.

14             MR. FRIEDMAN:  I don't see the relevance, but if it's

15   relevant, I have got questions.

16             THE COURT:  Just to take an example, the company owns

17   trademarks, right?

18             MR. FRIEDMAN:  It doesn't own these trademarks.

19             THE COURT:  A subsidiary owns the trademarks?

20             MR. FRIEDMAN:  A subsidiary owns the trademarks.

21             THE COURT:  The trademarks are what?

22             MR. FRIEDMAN:  Things relating to oil.  I don't think

23   it really matters what they are.

24             MS. MALONEY:  They are trademarks relating to

25   industrial lubricants in Ecuador only.

DB78CHE6                    Anson - direct

1           MR. FRIEDMAN:  I think it would be faster to just

2   submit his statement.  I will ask a few questions and we will

3   be done.

4           THE COURT:  Is that right, Mr. Gomez?

5           MR. GOMEZ:  Yes.

6           THE COURT:  Let's go.

7   DIRECT EXAMINATION

8   BY MS. MALONEY:

9   Q.  Good afternoon, Mr. Anson.

10  A.  Good afternoon.

11  Q.  Mr. Anson, did you submit a declaration in connection with

12  this case in this trial?

13  A.  Yes, I did.

14          MS. MALONEY:  May I approach, your Honor?

15          THE COURT:  Yes.

16  Q.  Mr. Anson, I am showing you what is marked as Plaintiff's

17  Exhibit 6000 for identification.  Would you take a moment to

18  look at it, please?

19          MS. MALONEY:  For the record, your Honor, 6000 for

20  identification is 20 pages under a heading direct testimony of

21  Weston Anson.

22  Q.  Do you recognize the document, Mr. Anson?

23  A.  I do.  It has my initials on each page and my signature at

24  the end.

25  Q.  So this is your declaration for this case, is that correct?

DB78CHE6                    Anson - direct

 1   A.  Yes, ma'am.

 2   Q.  At the time you signed the declaration, were your

 3   statements truthful and accurate?

 4   A.  Yes, of course.

 5   Q.  Is everything in your declaration truthful and accurate as

 6   of today?

 7   A.  Yes.

 8   Q.  Do you offer your declaration as your full and complete

 9   direct testimony?

10   A.  Yes.

11           MS. MALONEY:  Plaintiffs offer Exhibit 6000.

12           THE COURT:  Received on the same basis as the others.

13           (Plaintiff's Exhibit 6000 received in evidence)

14           MS. MALONEY:  No further questions.

15   CROSS-EXAMINATION

16   BY MR. FRIEDMAN:

17   Q.  Mr. Anson, my name is Rick Friedman.  I just have a few

18   questions for you.

19           Is it correct to say that all of the property that you

20   refer to in your report could be characterized as intellectual

21   property?

22   A.  Yes.

23   Q.  Is it also fair to say that all of the intellectual

24   property referenced in your witness statement is owned by

25   Chevron Intellectual Property LLC?

DB78CHE6                           Anson - cross

```
 1   A.  As I understand it, it was owned until recently when it was
 2   embargoed.
 3   Q.  Before it was embargoed, all the property referenced in
 4   your report was owned by Chevron Intellectual Property LLC?
 5   A.  That's my understanding, yes.
 6   Q.  And Chevron Intellectual Property LLC is an indirect
 7   subsidiary of Chevron Corporation?
 8   A.  Yes.
 9   Q.  What do you mean by indirect subsidiary in your witness
10   statement?
11   A.  Because I am not a lawyer, I cannot describe to you the
12   legal construct, but it is a subsidiary held through another
13   subsidiary is my understanding.
14   Q.  So what you at least meant in your report was there is at
15   least one layer of subsidiaries between Chevron Intellectual
16   Property and Chevron Corporation?
17   A.  That was my understanding.
18   Q.  None of the property you address in your report is or was
19   owned by Chevron Corporation, is that correct?
20   A.  My understanding is it's all owned by Chevron through
21   another subsidiary.
22   Q.  So is it your understanding then that arm to Chevron
23   Intellectual Property LLC equals arm to Chevron Corporation?
24   A.  Yes.  In the sense that, first, if Ford Motor Company held
25   its trademarks, as it sometimes does, through a subsidiary or
```

DB78CHE6                      Anson - cross

1   an indirect subsidiary in Delaware, for example, and those

2   trademarks were taken from it, Ford Motor Company, e.g. as an

3   example, would be harmed.

4          Similarly, there is injury here because these assets

5   are real assets.  If you think of them like a building, it's as

6   if a building has been taken from Chevron LLC, and that

7   building can no longer be used.  Chevron LLC, they can't rent

8   the building anymore; they can't sell the building anymore;

9   they can't modify the building anymore; they can't expand the

10  building anymore; they can't do anything with, quote, the

11  building anymore.

12         In a similar sense, these assets have been taken, and

13  they have suffered real damage, sir.

14  Q.  When you say "they," you're talking about Chevron

15  Corporation?

16  A.  Yes.  Ultimately that's correct.

17  Q.  Even though they were taken from a separate legal entity?

18  A.  Well, again, I am not an attorney, sir.

19         MS. MALONEY:  Objection, your Honor.  This is beyond

20  the scope of his report and it calls for a legal conclusion.

21         THE COURT:  I think Mr. Friedman just gave up on it.

22         MR. FRIEDMAN:  I just ended it.

23         THE COURT:  Thank you.

24         Mr. Gomez.

25         MR. GOMEZ:  One moment to confer, please.

DB78CHE6                         Alvarez - direct

1              Nothing further.

2              THE COURT:  Thank you.  Mr. Anson, you are excused.

3              (Witness excused)

4              MR. MASTRO:  We have one last witness if we have time

5     today.  Our next witness is Dr. Alvarez Grau.

6      VLADIMIRO ALVAREZ GRAU,

7          called as a witness by the plaintiff,

8          having been duly sworn through a Spanish

9          interpreter, testified as follows:

10             MS. LITTLEPAGE:  I have some issues with this

11    witness's testimony.  Do you want to hear them?

12             THE COURT:  Let's get on with the testimony.  I will

13    hear your issues another time.

14             MS. LITTLEPAGE:  It's about his testimony.

15             THE COURT:  Tell me what they are.

16             MS. LITTLEPAGE:  We have raised these same objections

17    in our written brief about the expert Elena, but Mr. Alvarez

18    Grau's entire statement is propensity evidence.  Basically, his

19    point is because President Correa and his government puts

20    pressure on the judicial system, you can assume or infer that

21    President Correa put pressure on this particular case and this

22    particular judge, without any evidence of that.

23             We also have a relevance objection to his testimony

24    because we, obviously, are here on a RICO case and a New York

25    State fraud case which has nothing to do with President Correa

DB78CHE6                     Alvarez - direct

1   who is not named as a co-conspirator.

2              MR. MASTRO:  Your Honor, we are a little late in the

3   day for a witness who has actually put in a witness statement

4   two and a half years ago.  We offer him not only for the

5   reasons that Sandra Elena was relevant, but there are also

6   broader implications for his testimony about the lack of

7   impartiality and independence and honesty within the Ecuadorian

8   judicial system that I think bear on the issues that they have

9   raised in the case, and defenses they have raised in the case.

10             So for both reasons, all three reasons, you should

11  hear Dr. Alvarez Grau's testimony.  It's kind of late in the

12  day to be raising this particular objection.

13             THE COURT:  I am certainly going to hear it.  I will

14  decide what, if any, relevance or significance it has down the

15  road.

16             MR. MASTRO:  May I approach the witness?

17             THE COURT:  Yes.

18             MR. MASTRO:  I am showing the witness what has been

19  marked as Plaintiff's Exhibit 6200.

20  DIRECT EXAMINATION

21  BY MR. MASTRO:

22  Q.  Dr. Alvarez, is this your declaration, your direct

23  testimony in this case, sir?

24  A.  Yes, it is.

25  Q.  Can you please turn, sir, to page 68 and tell me whether

DB78CHE6                      Alvarez - direct

1   that's your signature, sir?

2   A.  It is my complete signature on page 68, and each page also

3   has been initialized by me.

4   Q.  Thank you, Dr. Alvarez.

5           Was this true and correct at the time you executed

6   this declaration on October 29, 2013?

7   A.  Yes.  All of the matters on which I give my opinion and my

8   conclusions are truthful, yes, but there are some events that

9   have caused a personal impact on me, and they are not included

10  in my statement.

11  Q.  These are events that have happened over the past month or

12  so, sir?

13  A.  As of the month of September, September and October, yes.

14          MR. MASTRO:  Your Honor, we offer the declaration as

15  Dr. Alvarez's direct testimony, but I would like to do a brief

16  supplemental direct on these recent events.

17          MS. LITTLEPAGE:  Judge, I know it's late in the day

18  and it's not my fault.  I have noticed this part of Mr. Alvarez

19  Grau's witness statement.  I have asked Chevron to share with

20  me what these issues are.  They did not.  So I want to object

21  because I don't know what is coming, and I don't know that I

22  should have to hear for the first time from the stand what is

23  coming.

24          MR. MASTRO:  Actually, I did respond to Ms. Littlepage

25  and explained to her that they are public statements, either

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DB78CHE6                    Alvarez – direct

1    published or broadcast, by government officials about

2    Dr. Alvarez personally over the last several weeks.

3              THE COURT:  I understand in civil cases there is

4    ordinarily a lot of discovery, but that doesn't mean that

5    nobody can put in any evidence that the other side, for one

6    reason or another, hasn't heard before.

7              MS. LITTLEPAGE:  I understand.

8              THE COURT:  Welcome to trial courtrooms.

9              MS. LITTLEPAGE:  If we are now going to hear that

10   there were public statements about Mr. Alvarez Grau personally,

11   I would have liked to have had them so I could have looked at

12   them, seen the context of them, and maybe done some

13   investigation as to how those came about or what was the

14   context of them.  Instead, I am going to hear it for the first

15   time and then this witness is going to leave, and I will have

16   no opportunity to cross-examine him on whatever he is going to

17   say.  I don't know if it's true.  It's obviously going to be

18   hearsay even if it's coming out of newspapers or radio or TV.

19   I can't cross-examine on that.

20             THE COURT:  What precisely is the application and what

21   is the legal basis for it?

22             MS. LITTLEPAGE:  Objection.  Hearsay.

23             THE COURT:  To what in particular?

24             MS. LITTLEPAGE:  To whatever public statements he is

25   about to discuss that certainly are not part of his expert

DB78CHE6                    Alvarez - direct

1    report.

2            THE COURT:  If you have a hearsay objection, it might

3    be useful to hear what the question is before you lodge it.

4            MR. MASTRO:  Thank you, your Honor.

5            We offer Plaintiff's Exhibit 6200.

6            THE COURT:  Received on the same basis as the others.

7            (Plaintiff's Exhibit 6200 received in evidence)

8    BY MR. MASTRO:

9    Q.  Dr. Alvarez, you said there are certain recent events in

10   Ecuador that you wanted to explain that bear on your testimony.

11   Would you please tell the judge what those are?

12   A.  Firstly, in the middle of the month of September, I

13   received a phone call from a reporter of a newspaper, a

14   government newspaper, which is El Telegrafo.  And in that phone

15   interview, I was told that the reporter had -- that he had a

16   privileged list from Chevron, or belonging to Chevron, about

17   the attorneys, aides, and persons who had given reports in

18   favor of Chevron, and that in that list Vladimiro Alvarez was

19   named with first and last name, which made it known to the

20   entire country that I was giving reports that in some way

21   disparaged the entire country.

22           Then after a few questions, I was asked if I didn't

23   care that my report on the lack of respect for the rule of law

24   in Ecuador, and the lack of the independence of the functions

25   of the state, as well as the lack of impartiality and the

1    function of justice in Ecuador, when faced with political,

2    social and economic pressure, if I didn't care that that would

3    be prejudicial to the lives of 30,000 indigenous persons and

4    many other Ecuadorians.  To which I answered that when I give

5    an opinion, or when I reach a conclusion, and do so based on my

6    deepest conviction, that it is not a concern of mine who will

7    be benefited or not by that opinion or conclusion, and that it

8    is based on my deepest conviction.

9            MR. GOMEZ:  Objection.  Move to strike the witness's

10   response.  With the exception of his statement to the

11   journalist, all testimony of what the person calling him told

12   him should be stricken as hearsay.

13           MS. LITTLEPAGE:  Objection.  Relevance.

14           MR. MASTRO:  It's not offered for the truth of what

15   the person said.  It's offered for the fact that was the kind

16   of statement that was being made to him by the government run

17   newspaper reporter who contacted him.

18           THE COURT:  It's offered for a nonhearsay purpose.

19   It's received for a nonhearsay purpose.  That disposes of Mr.

20   Gomez.  And as to relevance, I will decide in due course.

21   Q.  Dr. Alvarez, did there come a time in October of 2013, when

22   any government official made a public statement in a public

23   broadcast about you personally?

24           MS. LITTLEPAGE:  Objection.  Hearsay.

25           MR. MASTRO:  It's not offered for the truth.  It's

DB78CHE6                        Alvarez - direct

1   offered for the fact that the statement was made about his

2   person.

3   A.  Must I answer?

4            THE COURT:  Yes.

5   A.  In effect, the very president of the country, Rafael

6   Correa, in a press broadcast of radio and other media, in one

7   segment of his address, referred to the dirty hand of Chevron.

8   And he mentioned that the citizens of Ecuador should know that

9   Vladimiro Alvarez is an employee of Chevron, and he is paid by

10  Chevron to issue reports that cause the country to be

11  disparaged.

12           MS. LITTLEPAGE:  Objection.  Relevance.

13           THE COURT:  You have my ruling.

14  Q.  Dr. Alvarez, what effect, if any, have these incidents over

15  the past several weeks had on your willingness to testify in

16  this case?

17           MS. LITTLEPAGE:  Objection.  Relevance.

18           THE COURT:  I have said what I have to say on that

19  subject earlier, Ms. Littlepage.  Your record is preserved.

20  Q.  Please tell us, Dr. Alvarez.

21  A.  After the president's statements, other government

22  officials have referred to persons giving reports of various

23  kinds for Chevron, as well as to lawyers defending Chevron, as

24  traitors to the fatherland or traitors to the country.

25           And mysteriously, a Web page has also appeared that

DB78CHE6                    Alvarez - direct

1    goes by www.losvendepatria.com.  And in the list on that Web

2    page, which includes attorneys as well as other press

3    commentators, next to my name and under a photo of me there is

4    a phrase, which I consider to be offensive, which says, he sold

5    his country, he sold out his country.

6         The same Web page has then been repeated on Twitter

7    and Facebook, pointing me out as a traitor to my country, among

8    others.  I, who have worked all my life for the peace of my

9    country.  I, who have received the highest decoration of the

10   Ecuadorian state, the national merit order and the rank of

11   Grand Cross, for my work on the commission that brokered the

12   peace accords after centuries of war with Peru.

13        These events are offensive to my own personal

14   reputation.  They offend my patriotism in the eyes of future

15   generations and those students who I have taught for the 35

16   years that I have been a professor.  And they could affect me

17   professionally very seriously if clients of mine, who need to

18   maintain good relationships with the government, decide to no

19   longer use my services at this stage of my life.

20   Q.  Are you ready to go forward with your testimony, sir?

21   A.  Yes, sir.

22   Q.  Thank you, Dr. Alvarez.  Thank you for being here.

23            MR. MASTRO:  I turn over the witness.

24            THE COURT:  My next case is ready.

25            The witness will please return at 9:30 on Tuesday

DB78CHE6

1    morning.  And I need a word with counsel before that.

2              MR. FRIEDMAN:  Did you mean tonight?

3              THE COURT:  Right now.

4              Dr. Alvarez, you can step down for the moment.  We

5    will see you on Tuesday.

6              Let's address just for a moment a couple of logistical

7    problems or questions.

8              It seems to me that there needs by the end of this

9    trial the one indisputably authentic paper set of all the

10   evidence that's been received in evidence, all the exhibits

11   that have been received in evidence.

12             Now, I don't think there is actually a big problem,

13   but some work has got to be done.  The court reporters and my

14   deputy have been keeping track of the exhibits as they come in,

15   but it seems to me, given everything else that allegedly has

16   happened in this case, there should be a set of the exhibits in

17   which at least one lawyer on each side shall have initialed

18   what they agree is the exhibit that's been received.

19             Now, if we had to reconstruct it in my chambers, we

20   could do it, but I would be out of business for a considerable

21   period of time, or at least my staff would.

22             Then there is the matter of the electronic versions

23   which are indispensable given the volume.  And I want a set,

24   one set at least, that both sides have initialed, physically

25   initialed.  And then I want to make sure you're all up-to-date

DB78CHE6

1    with getting me the material.  Because some of these witness

2    statements, Anson and Zygocki, and I think this last witness,

3    it is conceivable one or more of them were in my chambers, but

4    I am not sure that they all were.

5         What I am going to propose is that somebody delegated

6    by each side meet with my deputy tomorrow, you can work out

7    exactly when, figure out how you're going to get this done so

8    that by the time we end the testimony it's indisputably done

9    and any disputes that there may be, and I surely hope there are

10   none, there is no reason to be any, are in a position to be

11   resolved then and there.  So before you all leave tonight, make

12   an appointment with my deputy for tomorrow and meet with him

13   and work out how we are going to accomplish this.

14        How long a cross are we anticipating for this witness?

15        MS. LITTLEPAGE:  I am awful with the translation

16   estimate.  I would say 30 minutes if he spoke English.  So

17   maybe 45 with the translation.

18        THE COURT:  Mr. Gomez.

19        MR. GOMEZ:  Probably 15, 25 minutes.

20        THE COURT:  So we should be done with him by 10:30 on

21   Tuesday.

22        Then other than Dr. Lipton, is that it?

23        MR. MASTRO:  He is our last witness next Thursday,

24   your Honor.

25        The only other proviso on that, your Honor, is it's

DB78CHE6

1   not clear to us whether certain of the Ecuadorian witnesses,

2   like Mr. Tarco, are coming here or not.  Whether he comes here

3   or not might affect whether we will need to call an additional

4   witness.

5              THE COURT:  I understand that.

6              Who are the first four or five defense witnesses?

7              MR. FRIEDMAN:  Ms. Hinton will be our first witness.

8   I am just looking for my list.

9              THE COURT:  Her witness statement you better clean up.

10              MS. LITTLEPAGE:  I am responsible for her.  So I would

11   like some guidance from the Court.  Because Ms. Hinton is a

12   co-conspirator, and there are specific allegations raised in

13   the complaint about her that she tried to address in her

14   witness statement.

15              THE COURT:  Mostly what she tried to do is essentially

16   what Ms. Zygocki tried to do, which is to write a trial brief,

17   without regard to what she had any personal knowledge of.

18              MS. LITTLEPAGE:  Ms. Zygocki is not a named

19   co-conspirator.

20              THE COURT:  Even named co-conspirators have to give

21   evidence that is admissible and competent.

22              MS. LITTLEPAGE:  I believe it makes Ms. Hinton's state

23   of mind relevant, whereas Ms. Zygocki's state of mind is not

24   relevant.

25              THE COURT:  That's a fair point.

DB78CHE6

1        MR. FRIEDMAN:  We are going to meet with her again

2   tomorrow to look at the statement.

3        THE COURT:  Clean it up.

4        After Hinton?

5        MS. LITTLEPAGE:  Will be Donald Moncayo.

6        Judge, we had a couple of witnesses that we are having

7   visa appointments today.  So when I get home tonight, we should

8   know whether they can travel over the weekend, but I can't tell

9   the Court right now because their appointments were while we

10  were in court today.

11       THE COURT:  Who are they?

12       MS. LITTLEPAGE:  Ms. Calva.

13       THE COURT:  She is going to have to give a deposition

14  anyway.

15       MS. LITTLEPAGE:  As soon as she can get her visa, we

16  will bring her in.

17       THE COURT:  Who is the other one?

18       MS. LITTLEPAGE:  We are waiting on Mr. Camacho and

19  Humberto Piaguaje.

20       THE COURT:  He has a visa, right?

21       MR. GOMEZ:  No.  Javier Piaguaje has a visa.  Humberto

22  Piaguaje, we spoke yesterday about him.  I conferred with

23  co-counsel, and we found that we are not going to be able to

24  cover Mr. Humberto with Javier's.  We considered the problem

25  with the deposition.  In any event, Humberto will sit for a

DB78CHE6

1    deposition if necessary.  I still have to check the Rule 26

2    disclosures.  My understanding was that Mr. Humberto Piaguaje

3    was disclosed in the Rule 26 disclosures.  In any event, he

4    will, if necessary, submit to a deposition.

5              THE COURT:  I already ordered it, as I remember it.

6              MR. MASTRO:  Yes, your Honor.

7              MR. GOMEZ:  I am informed that it's not expected he

8    will be informed of his visa at least until Tuesday or

9    Wednesday.

10             THE COURT:  So he is not going to be here on Tuesday.

11   So you have got Hinton and Moncayo.  Who is next?  You have got

12   on all the rest of them the visa contingency, whether they show

13   up, and in at least two, maybe three of the cases, depositions.

14   So none of those are possibly getting on until Thursday.

15             MS. LITTLEPAGE:  We are hoping Ms. Calva will be here

16   over the weekend and she can sit for a deposition on Monday.

17             Mr. Ponce and Mr. Alban both have visas and can

18   travel.

19             THE COURT:  So they will be ready to go on Tuesday if

20   you need them.

21             MS. LITTLEPAGE:  Yes, sir.

22             Then the only other person we have is Mr. Donziger.

23             THE COURT:  There was a letter that crossed my desk

24   today or yesterday from him saying that he would go on the

25   18th.  He is going to be ready to go when you have no more

DB78CHE6

1   witnesses to put on, unless you want to call him earlier.  I am

2   not going to adjourn for a couple of days to give him another

3   break.  He has not been here for two days already

4   consecutively, not that he was obliged to be, and he has got

5   Friday, Saturday, Sunday and Monday off, six days between his

6   last appearance in this courthouse and Tuesday.  So plenty of

7   time.

8           MR. MASTRO:  Your Honor, I am glad this came up

9   because Mr. Donziger has not yet provided a written declaration

10  by Wednesday before the week he is going to testify.  So we

11  have nothing from Mr. Donziger right now and it appears, and we

12  wrote to counsel last night, it appears he is going to get on

13  next week.

14          THE COURT:  Mr. Friedman, what is the story?

15          MR. FRIEDMAN:  Your Honor, the story is that -- well,

16  part one, I told Mr. Donziger to stay away from court and work

17  on his declaration.

18          THE COURT:  I wasn't faulting him for not being here.

19          MR. FRIEDMAN:  He and I have different views about how

20  long next week it is going to take.

21          THE COURT:  Seven days.

22          MR. FRIEDMAN:  How long our case will take.  I will

23  have him prepared to get on the stand.  I am very conscious of

24  the need to get a witness statement to the defense before we

25  put him on so they have a time to look.  We did not get a

DB78CHE6

```
 1    witness statement last night from Mr. Donziger.  If we had to,
 2    we can throw him on the stand tomorrow, but we don't have a
 3    witness statement, and that's the major impediment.  I plan to
 4    spend most of tomorrow with him, and all I can tell you is my
 5    number one priority is to get that done.  I don't know what
 6    else to say.
 7            THE COURT:  Well, he has had plenty of advance notice.
 8            MR. FRIEDMAN:  I know that.
 9            THE COURT:  Get it done.
10            Anything else tonight?
11            MR. MASTRO:  Your Honor, we talked yesterday about
12    Mr. Alban and Mr. Ponce and Mr. Piaguaje Humberto as witnesses
13    as to whom we had a motion to preclude their testimony.  I only
14    really want to come back to one of them, which is Mr. Alban.
15            He is a foreign law expert.  We have read his
16    statement.  There is absolutely nothing in there that doesn't
17    go to 44.1 issues.  To the extent he has addressed anything
18    new, if it's his view of Ecuadorian law, it should have been in
19    the 44.1 statement.  We are way past that deadline.  He doesn't
20    need to be called to testify live in the courtroom.  If they
21    are asking for permission to put in his declaration as a 44.1
22    additional submission, we should have the chance to respond to
23    the new issue.  But otherwise he shouldn't be called to testify
24    here, and it should have been put in the 44.1 before on the
25    deadlines your Honor set.
```

DB78CHE6

1           THE COURT:  What is the answer to that, folks?

2           MR. FRIEDMAN:  Your Honor, there is a distinction

3     between expert testimony on foreign law and expert testimony in

4     general.  I will tell you what the distinction is.  You can

5     accept it or not accept it.

6           There is expert testimony about laws, statutes

7     regulations, that sort of thing.  Mr. Alban is also offered as

8     custom and practice in the community.  I will just give one

9     example.  There may not be a law that says that briefs get laid

10    outside the judge's door, but he can address the custom and

11    practice.  Just like there are customs and practices in New

12    York federal court or New York state court or Alabama state

13    court, there are informal practices that aren't really issues

14    that I think are covered under 44.1.  So that is what Mr. Alban

15    would address independent of the foreign law 44.1 issue.

16          THE COURT:  So it's only this alleged practice of

17    leaving papers outside a judge's door, is that it?

18          MR. FRIEDMAN:  I think there are a couple of other

19    things.

20          THE COURT:  Tell me what the couple of others are.

21          MR. FRIEDMAN:  I am looking at Mr. Booth.

22          THE COURT:  By the way, I am glad you raised it and I

23    am going to digress for a minute because I will forget it

24    otherwise.  Both sides in this case have taken to the practice

25    of delivering papers directly to my chambers, and it is to

DB78CHE6

 1     stop.  The security practices in the building for a number of
 2     years require that anything that's headed for a judge's
 3     chambers be delivered to the marshal's service.  They have to
 4     get their extremely expensive bomb sniffing dog and God knows
 5     what else to review all of this material.  I am told, although
 6     I can't verify, that the dog is paid more than the judges.  But
 7     it's a very important dog, and we are going to stick to that.
 8     So no more papers to chambers.  My staff has the instruction to
 9     accept nothing that doesn't have the marshal service stamp on
10     it and has not come through the mailroom.

11            Now, let's go on to the other points.

12            MS. LITTLEPAGE:  I can tell you that we got
13     Mr. Alban's statement last night in Spanish.  I gave it to the
14     defendants as soon as we got it.  I haven't even read it.  It
15     came in this morning in English and I haven't had a chance to
16     read it.

17            THE COURT:  I am very sorry for that, but Mr. Friedman
18     was going to tell me what else is in there that falls under the
19     heading not of law, but of something like the alleged custom
20     and practice about filing court papers by leaving them on the
21     floor outside the judge's chambers.

22            Anything else?

23            MR. FRIEDMAN:  Yes.  Can I just have a minute?

24            MR. MASTRO:  Your Honor, while Mr. Friedman is
25     looking, if he was being offered for some other expert purpose,

DB78CHE6

1     the deadline for offering experts was in February.

2              THE COURT:  I said it.

3              MR. MASTRO:  I know.  I just reinforced it.  Thank

4     you, your Honor.

5              THE COURT:  I have been reinforced more than I need by

6     both sides.

7              MR. FRIEDMAN:  The three other issues are the custom

8     of how evidence is evaluated, that is, there is a distinction

9     between evidence and argument, and how that is customarily

10    viewed in the profession.  How things are cited.

11             THE COURT:  It might have been a good idea if he had

12    talked to counsel on both sides in this case.

13             MR. FRIEDMAN:  References to citations.  In other

14    words, attributing or non-attributing citations.  So if a judge

15    cites something, what is the custom of citation?

16             THE COURT:  Is he a judge?

17             MR. FRIEDMAN:  I don't think he is a judge.  I think

18    he is a law professor and a lawyer.

19             And the final issue has to do with the lottery system,

20    the lottery system for the appellate panels.  There is law on

21    that, but then also how it is customarily --

22             THE COURT:  How would he know how it is customarily?

23             MR. FRIEDMAN:  I will have to ask him.  I think he

24    teaches civil procedure.  I don't want to make representations

25    to the Court I don't know about, but what I am telling you is

DB78CHE6

1    those are the categories that I understand that would be

2    independent of sort of foreign law 44.1.

3         THE COURT:  Do you have anything to say tonight on

4    this or no?

5         MR. MASTRO:  Just, your Honor, even that last subject,

6    he talks about different provisions in Ecuadorian law.  I

7    understand the distinction that Mr. Friedman is trying to make,

8    but I don't think it is availing.  It's either a 44.1 foreign

9    law expert, or if he was supposed to be on for some other

10   purpose, it's way untimely.  As I read his declaration, it

11   reads all 44.1 and it's untimely to offer it for anything else.

12        Again, your Honor, we are not saying -- if they are

13   asking to put in something out of time on the 44.1 without

14   permission, and we had the opportunity to respond to it, so be

15   it, but they shouldn't be allowed to call the witness live

16   under these circumstances.

17        THE COURT:  See if you can work this out tonight.

18        MR. MASTRO:  Certainly, your Honor.

19        I also wanted to give you thumb drives of word

20   searchable versions of all of our witness declarations.

21        THE COURT:  I want to be sure that there is no

22   objection to this.

23        Anybody got a problem about that?

24        MR. MASTRO:  They are word searchable versions of the

25   witness statements so that they can be searched.

DB78CHE6

1           THE COURT:  The witness statements and anything else?

2           MR. MASTRO:  This is just relating to the witness

3    statements.

4           MR. FRIEDMAN:  As long as we get a copy as well.

5           MR. MASTRO:  I brought them for everybody.

6           MR. FRIEDMAN:  No objection, your Honor.

7           THE COURT:  Mr. Gomez?

8           MR. GOMEZ:  No objection, your Honor.

9           THE COURT:  You have got a free word searchable thing

10   from Chevron.

11          We thank you.

12          MR. FRIEDMAN:  I brought gifts as well.  You and your

13   clerks might enjoy this.  That's all I have got.

14          THE COURT:  I rather imagine I will.

15          (Adjourned to November 12, 2013, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    NICOLAS ZAMBRANO

 4    Cross By Mr. Booth . . . . . . . . . . . .1877

 5    Cross By Mr. Gomez . . . . . . . . . . . .1893

 6    Redirect By Mr. Mastro . . . . . . . . . .1949

 7    Recross By Mr. Booth . . . . . . . . . . .1963

 8    KEITH RAYNER

 9    Direct By Mr. Mastro . . . . . . . . . . .1965

10    Cross By Mr. Booth . . . . . . . . . . . .1967

11    Cross By Mr. Gomez . . . . . . . . . . . .1975

12    RHONDA ZYGOCKI

13    Direct By Mr. Joralemon . . . . . . . . . .1976

14    Cross By Ms. Friedman . . . . . . . . . .1987

15    Cross By Mr. Gomez . . . . . . . . . . . .1992

16    WESTON ANSON

17    Direct By Ms. Maloney . . . . . . . . . .2000

18    Cross By Mr. Friedman . . . . . . . . . .2001

19    VLADIMIRO ALVAREZ GRAU

20    Direct By Mr. Mastro . . . . . . . . . . .2005

21                       PLAINTIFF EXHIBITS

22    Exhibit No.                            Received

23     6407    . . . . . . . . . . . . . . 1949

24     6405    . . . . . . . . . . . . . . 1962

25     4200 and 4200A . . . . . . . . . . . . .1967
```

```
1    6000   . . . . . . . . . . . . . . 2001

2    6200   . . . . . . . . . . . . . . 2008

3                       DEFENDANT EXHIBITS

4    Exhibit No.                          Received

5    1554   . . . . . . . . . . . . . . 1892

6    1561   . . . . . . . . . . . . . . 1905

7    1560   . . . . . . . . . . . . . . 1912

8    92   . . . . . . . . . . . . . . 1921

9    84 and 85   . . . . . . . . . . . . . . . .1948

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```