DBC8CHE1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                    Plaintiff,

5              v.                          11 Cv. 0691 (LAK)

6    STEVEN R. DONZIGER, et al.,

7                    Defendants.

8    ------------------------------x
                                          November 12, 2013
9                                         9:35 a.m.

10   Before:

11                      HON. LEWIS A. KAPLAN
                                          District Judge
12                              APPEARANCES

13
     GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        JEFFERSON E. BELL
          ANNE CHAMPION
17
     FRIEDMAN RUBIN
18        Attorneys for Donziger Defendants
     BY:  RICHARD H. FRIEDMAN
19        DEE TAYLOR

20   LITTLEPAGE BOOTH
          Attorneys for Donziger Defendants
21   BY:  ZOE LITTLEPAGE
          RAINEY BOOTH
22
     GOMEZ LLC
23        Attorneys for Defendants Hugo Camacho, Javier Piaguaje
     BY:  JULIO C. GOMEZ
24

25

DBC8CHE1

1              (Trial resumed)

2              THE COURT:  Good morning, everyone.

3              MR. MASTRO:  Good morning, your Honor.

4              MS. LITTLEPAGE:  Good morning.

5              THE COURT:  My recollection is that the plaintiff

6    tendered the witness last week and we are ready for cross, is

7    that right?

8              MR. MASTRO:  Yes.  Obviously, the witness was quite

9    emotional at the end of the day, but he is ready to continue

10   and give his cross-examination testimony.

11    VLADIMIRO ALVAREZ GRAU, resumed.

12             THE COURT:  The witness is reminded that he is still

13   under oath.

14             Ms. Littlepage, was there an issue with the

15   interpreter about electronics?

16             THE INTERPRETER:  As I understand it, your Honor, the

17   witness was having trouble hearing the colloquy when the Court

18   was speaking to the attorneys over objections waiting for a

19   ruling.

20             THE COURT:  Was there something about headsets for

21   somebody in the audience?

22             THE INTERPRETER:  The witness says he prefers not to

23   use a headset, but his wife and his son are here.

24             THE COURT:  Is there someone in the audience with

25   headsets?

DBC8CHE1

| | |
|---|---|
| 1 | THE INTERPRETER:  His wife and his son have headsets. |
| 2 | THE COURT:  It's the court interpreter's equipment? |
| 3 | THE INTERPRETER:  Yes. |
| 4 | THE COURT:  Let's proceed. |
| 5 | CROSS-EXAMINATION |
| 6 | BY MS. LITTLEPAGE: |
| 7 | Q.  Is it preferable that I call you Professor Alvarez or |
| 8 | Professor Grau?  What do you prefer? |
| 9 | A.  Alvarez. |
| 10 | Q.  Professor Alvarez, your opinion is that the Ecuadorian |
| 11 | judicial system is not impartial or independent because of |
| 12 | President Correa and his government, is that correct? |
| 13 | A.  No. |
| 14 | Q.  You have never been a judge, is that correct? |
| 15 | A.  Many times I have been an arbitration judge. |
| 16 | Q.  Have you ever been an elected or appointed judge? |
| 17 | A.  No. |
| 18 | Q.  Your witness statement, do you have a copy of your witness |
| 19 | statement in front of you?  It's called direct testimony of -- |
| 20 | THE COURT:  It's Exhibit 6200. |
| 21 | A.  It's here in English and it is here in Spanish.  Here it |
| 22 | is. |
| 23 | Q.  I counted in about 200 of your 214 footnotes are references |
| 24 | to newspaper articles.  Does that seem fair? |
| 25 | A.  They are references to facts that are reported in the press |

DBC8CHE1                    Alvarez - cross

1   in some instances and references to opinion articles published

2   in the press in other instances.

3   Q.  In the instances of facts, you have not gone back and

4   looked at the original source material for the factual

5   information, isn't that correct?

6   A.  When a number of various media sources have published

7   corroborating accounts of facts, I have not considered it

8   necessary to consult primary documents because my work is not

9   as a journalist nor as a historian.

10  Q.  And you have not done any scientific studies yourself on

11  the issues discussed in your report?

12  A.  I have personally experienced the functioning of the

13  judicial system in 43 years of professional practice as a

14  lawyer and in 35 years as a law professor on the university

15  faculty as well as in the experience of lawyers whose work I

16  supervised.

17  Q.  Let me ask you my question.  My question was, you did not

18  refer or rely on any published scientific studies in the

19  forming of your opinions, is that correct?

20  A.  As far as I know, there is not -- there is in Ecuador no

21  scientific study nor laboratory analysis of the judiciary, but

22  rather the daily experience of lawyers who work in the courts.

23  Q.  And you, sir, did not do a scientific study on any of the

24  issues discussed in your expert report, isn't that correct?

25  A.  My direct witness testimony refers to the experiences that

DBC8CHE1                    Alvarez - cross

1   I have had throughout my professional practice and my career.

2   Q.  Isn't it correct that you have not done any scientific

3   study that forms the basis of any of your expert opinions,

4   correct?

5   A.  No.

6   Q.  And you did not compare Ecuador's legal system to the legal

7   system of any other country, correct?

8   A.  My witness statement concerns the lack of impartiality in

9   the Ecuadorian legal system and not in any other country in

10  which I am not a lawyer.

11  Q.  And you are here to offer your opinions about the judicial

12  system based upon your observations and personal experiences

13  over the years, is that correct?

14  A.  Yes.

15  Q.  You have provided an expert report in the case of *Chevron*

16  *v. The Republic of Ecuador*, the arbitration case, correct?

17  A.  I presented reports regarding this with three law firms

18  here in the United States, and I have authorized them to use

19  them in any proceeding or trial in which they need it.

20  Q.  And you know, sir, that your expert opinions have been used

21  by Chevron in the case that Chevron brought against the

22  republic, an arbitration case, correct?

23  A.  I understand that that is the case.

24  Q.  And in that case, the republic is defending itself against

25  a case that Chevron brought against it; you understand that,

DBC8CHE1                        Alvarez - cross

1    correct?

2    A.  I'm sorry.  I don't understand the question.

3    Q.  In the arbitration case, the republic is defending itself

4    against a case brought by Chevron; you understand that,

5    correct?

6    A.  I don't know the details of any case, but it's to be

7    expected that if the Republic of Ecuador is the defendant

8    party, then it is defending itself against the plaintiff, yes.

9    Q.  And on Thursday, you told us that President Correa has

10   recently talked about that case in his public address to the

11   nation in Ecuador, correct?

12             MR. MASTRO:  Objection.  It misstates his prior

13   testimony.

14             THE COURT:  Sustained.

15   Q.  On Thursday, you told us about President Correa discussing

16   the Chevron case in his public address, correct?

17             MR. MASTRO:  Objection.  Vagueness.  Chevron case.

18             THE COURT:  Sustained.

19   Q.  On Thursday, when you told us President Correa had

20   discussed a case in his public address, which case were you

21   referring to?

22             MR. MASTRO:  Objection.  It misstates prior testimony.

23             THE COURT:  Give me a second, please.

24             Sustained as to form.

25   Q.  On Thursday, when you talked about President Correa's

DBC8CHE1                    Alvarez – cross

1   address to the nation, did you tell us that he was discussing

2   Chevron?

3   A.   On a number of occasions, President Correa in his addresses

4   to the nation has referred to the interest of the government in

5   the Chevron case.  Moreover, he managed or was able to on the

6   15th of October, a month or so, a little less than a month ago,

7   to get the national assembly to issue a resolution against

8   Chevron calling on the country to take action against Chevron

9   and against those who defend Chevron.

10  Q.   Did you review that resolution?

11  A.   Yes.  I have it and I have read it on a number of

12  occasions.  It's signed by the president, the woman president

13  of the national assembly, and the secretary as well.

14  Q.   In 1992, you ran for president, is that correct?

15  A.   Yes.

16  Q.   And you are in a different political party than President

17  Correa, correct?

18  A.   I do not belong at this time to any political party.

19  Q.   Were you when you ran for president in a different

20  political party than President Correa?

21  A.   In 1992, President Correa was not publicly known and did

22  not belong to a party.  So when I was a candidate, my party,

23  the Christian Democratic Party, was not a party that was in

24  opposition to President Correa, as that party did not exist at

25  the time.

DBC8CHE1                          Alvarez – cross

1   Q.  Is it fair to say that you do not support President Correa?

2            MR. MASTRO:  Objection, your Honor.  Relevance.

3   Vagueness.  That's enough.

4            THE COURT:  Overruled.

5   A.  I do not object to the person of the President Rafael

6   Correa Delgado, and I acknowledge the positive actions or

7   undertakings that he has carried out on behalf of Ecuador.  But

8   as an Ecuadorian citizen, as an attorney, and as a university

9   professor, as a father and grandfather in my family, I cannot

10  hold back from analyzing and criticizing President Correa's

11  actions, which constitute violations of the rule of law that

12  lead to a lack of independence in the branches or powers of the

13  state and interference in the functioning of the Ecuadorian

14  judiciary.

15  Q.  So would it would be fair to say, sir, you do not support

16  President Correa, correct?

17           MR. MASTRO:  Objection.  Asked and answered.

18           THE COURT:  Sustained.

19  Q.  President Correa was first voted into power in 2006, is

20  that correct?

21  A.  Yes.

22  Q.  He was reelected in 2009, is that correct?

23  A.  Yes.

24  Q.  And then he was reelected again in 2013, correct?

25  A.  Yes.

DBC8CHE1                         Alvarez – cross

 1   Q.  And he has got approval ratings above 75 percent

 2   consistently, is that correct?

 3              MR. MASTRO:  Objection.  Relevance.

 4              THE COURT:  Sustained.

 5   Q.  Sir, you are a columnist for a newspaper, is that correct?

 6   A.  I am a columnist in two newspapers.

 7   Q.  And you are a columnist on legal and political matters, is

 8   that correct?

 9   A.  And social.

10   Q.  Some of your articles are critical of President Correa and

11   his government, is that correct?

12   A.  When I analyze violations of the rule of law and analyze

13   the concentration of the powers of the state and the lack of

14   impartiality of the judicial system due to political pressure,

15   I am in those cases critical.  In other instances, I recognize

16   the virtue or the benefit of some of his actions.

17   Q.  And there is a debate in the Ecuadorian newspapers

18   frequently for President Correa and his government and against

19   President Correa and his government, correct?

20              MR. MASTRO:  Objection.  Relevance.

21              THE COURT:  Sustained.

22   Q.  To be a judge in Ecuador, you must do a competitive exam,

23   is that correct?

24   A.  Yes.

25   Q.  And are there any judges that are appointed for life?

DBC8CHE1                          Alvarez – cross

1    A.   Presently, no.  According to the 1998 constitution, which

2    was in effect up until the 20th of October 2008, judges did

3    have life appointments.

4    Q.   And in 2008 that was changed so that judges did not get

5    lifetime appointments, correct?

6    A.   Yes, exactly, which led to a return to the politicization

7    of the judges and supreme court judges.

8    Q.   And the current constitution calls for an independent

9    judicial branch, isn't that correct?  Yes or no, please.

10   A.   Yes.  But it's not fulfilled.

11   Q.   In May of 2011, there was a referendum that dealt with

12   changing some things about the judiciary, is that correct?

13   A.   Yes.

14   Q.   And the referendum was passed by democratic vote, correct?

15   A.   Yes.

16   Q.   And the president, President Correa, put in place an

17   international oversight committee after that referendum passed,

18   correct?

19   A.   Yes.  But it would be important to know what the

20   conclusions were by that international commission.

21        MS. LITTLEPAGE:  Objection.  Motion to strike

22   everything after "yes."

23        THE COURT:  Granted.

24   Q.   The international oversight committee had six observers,

25   correct?

DBC8CHE1                    Alvarez - cross

1    A.  Yes.

2    Q.  The observers were from Spain, Guatemala, Chile, Brazil,

3    Argentina, and Mexico, correct?

4    A.  Yes.

5    Q.  Your witness statement discusses the judicial system in

6    Ecuador as a whole, you do not have opinions about any

7    particular case, isn't that correct?

8    A.  That's not the case.  There is analysis of specific cases.

9    Q.  You are not here to say that all of the courts or all of

10   the judges in Ecuador act only under pressure, correct?

11   A.  I assert in my witness statement that the judicial system

12   of Ecuador does not guarantee impartiality when there is

13   political or a governmental interest at stake or when there is

14   a social mobilization or financial or economic temptations.

15            MS. LITTLEPAGE:  May I approach, Judge?

16            THE COURT:  Yes.

17   Q.  Let me hand you a copy of your deposition.

18            I want to direct your attention to page 126, starting

19   at line 8.

20            THE INTERPRETER:  This is all in English?

21            MS. LITTLEPAGE:  I will read and have you translate.

22   Q.  Page 126, starting at line 7, in your deposition, sir, did

23   you say --

24            THE COURT:  No, Ms. Littlepage.

25            MS. LITTLEPAGE:  We don't have it translated.

DBC8CHE1                      Alvarez - cross

1           THE COURT:  There is a way to do that.  It's to speak

2    it.

3    Q.  Isn't it true, sir, that it would be absurd for you to

4    maintain the opinion that thousands of judges in Ecuador and

5    that all of the courts and tribunals of Ecuador act only under

6    pressure or according to the pressure and threats, correct?

7           MR. MASTRO:  Objection to form, your Honor.  She has

8    left off the entire second half of the answer.

9           MS. LITTLEPAGE:  I am coming to that.  I thought it

10   would be compound if I read the whole thing.

11          THE COURT:  Answer the question, please, Mr. Alvarez.

12   A.  I have not maintained nor could I maintain that all judges

13   in Ecuador act only under pressure or are corrupt.  But when

14   one files a lawsuit, you don't know if the judge will be

15   vulnerable or not to a political, social or economic pressure.

16   Q.  Isn't it true, sir, that unquestionably there are honest

17   judges, unquestionably there are courageous judges in Ecuador?

18          MR. MASTRO:  Objection to form.  Same objection as

19   before.

20          THE COURT:  Overruled.

21          Please answer.

22   A.  I am thinking about the question.

23          In reality, there is an exception to every rule.  So,

24   therefore, there are judges who have the moral strength and the

25   human capacity to rule based on procedures and the law.  But we

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBC8CHE1                    Alvarez – cross

1    also have to see what happens later on with those judges who

2    are then sanctioned in one way or another when they dare issue

3    a ruling that does not benefit the government.  And in my

4    report, in my testimony, I include some examples of concrete

5    facts regarding this.

6    Q.  If you turn to page 137, starting at line 22 of the

7    deposition, isn't it true, sir, that it would be irresponsible

8    for you or anyone to generalize that all of the judges and all

9    of the justices are corrupt, that type of generalization is

10   irresponsible, isn't that true?

11   A.  I have said so in my testimony, and I have answered that

12   several times this morning.

13   Q.  When you said that in your testimony, you were telling the

14   truth, correct, sir?

15   A.  Yes.

16          MS. LITTLEPAGE:  Those are my questions.  Thank you,

17   sir.

18          THE COURT:  Thank you.

19          Mr. Gomez.

20   CROSS-EXAMINATION

21   BY MR. GOMEZ:

22   Q.  Good morning, Dr. Grau.

23   A.  Alvarez.

24   Q.  Sorry.  Alvarez.

25          Dr. Alvarez, how much have you been compensated by

DBC8CHE1                         Alvarez - cross

1    Chevron for your work in this matter, sir?

2    A.  I have not signed an agreement with Chevron but with three

3    different law firms, and this was the case with Gibson Dunn &

4    Crutcher, and they pay me $750 per hour of work performed, not

5    for my opinions.

6    Q.  To date, what is the total amount that you have been paid

7    by Gibson Dunn for your work?

8    A.  For this case, for the work all these years, it should be

9    around $150,000 at several times.

10   Q.  Are you owed any money for your work on this case?

11   A.  I understand that there is still an outstanding invoice.

12   Q.  For how much, sir?

13   A.  I don't recall, but I think it's around 30 or 35 hours of

14   work.

15   Q.  In private practice as an attorney, how much do you charge

16   per hour?

17   A.  I do not bill per hour.  In my country, there are attorneys

18   who do bill per hour, but in my case I have an agreement with a

19   consortium that includes several companies, and I am paid a

20   fixed fee per month.

21   Q.  How much is that fixed monthly fee?

22   A.  On average, if I divide what I earn annually by 12 months,

23   it comes to about $15,000 monthly.  Plus what I may earn on

24   trials in which I may be involved which, according to

25   Ecuadorian law, it's about 5 percent of the amount in dispute

DBC8CHE1                        Alvarez – cross

1    in each trial.

2    Q.  Does your monthly fixed fee with the consortium require you

3    to expend a minimum number of hours per month?

4    A.  It gives me freedom to practice my profession.  So it does

5    require that I attend to the consultations made of me for

6    writing any documents or any necessary contracts or for

7    supervising -- and also to supervise the work of other working

8    attorneys.

9    Q.  On average, how many hours per month do you work on behalf

10   of the consortium?

11   A.  Multiply six hours times 20.

12   Q.  Sir, what were the instructions that you received from

13   Gibson Dunn when you first began to work on this matter for

14   purposes of your analysis?

15   A.  That I should issue my independent opinion on the real rule

16   of law or lack thereof of the rule of law in Ecuador.  Also, on

17   the independence or the autonomy of the branches of government

18   in Ecuador, and on the reliability of the impartiality of the

19   judicial system.

20   Q.  Did Gibson Dunn provide you with any steps to undertake

21   that analysis?

22   A.  None at all.

23   Q.  Did Gibson Dunn ask you to speak to any of the judges that

24   presided over the Lago Agrio case for purposes of your

25   analysis?

DBC8CHE1                         Alvarez - cross

1    A.  I don't know anything at all regarding the Lago Agrio case

2    other than what is made public.  I don't know anything about

3    the lawsuit, the response to the lawsuit.  I don't know

4    anything of the writings or the pleadings submitted.  And I

5    know nothing about the judgment, only that the final judgment

6    was issued in this case in the press.

7    Q.  Sir, my question was, did Chevron ask you to speak to any

8    of the judges that presided over the Lago Agrio case for

9    purposes of your analysis?

10   A.  No.

11   Q.  Did Chevron prohibit you from speaking to any of the judges

12   that presided over the Lago Agrio case for purposes of your

13   analysis?

14   A.  I have not spoken to any Chevron official, nor has any

15   Chevron official forbidden me from speaking to anyone.

16   Q.  Did anyone at Gibson Dunn prevent you from speaking to any

17   of the judges that presided over the Lago Agrio case for

18   purposes of your analysis?

19   A.  Sir, my analysis refers to the Ecuadorian judicial system;

20   it does not deal with any of the details of the Lago Agrio

21   Chevron case in Lago Agrio nor anywhere else in the world.

22   Q.  Sir, my question is a much simpler, more specific question.

23        Did Gibson Dunn prevent you from speaking to any of

24   the judges that presided over the Lago Agrio case for purposes

25   of your analysis, yes or no?

1              MR. MASTRO:  Objection.  Asked and answered.

2              THE COURT:  Overruled.  But it's the very last time

3        you're asking it.

4        A.  No.

5        Q.  And you made no attempt to speak to any of those judges, is

6        that correct?

7        A.  I made no effort to talk to any of the judges because in

8        any case I didn't need to do so for my analysis.

9        Q.  Isn't it relevant to your analysis to find out whether the

10       judges that presided over the Lago Agrio case actually felt

11       pressure to rule against Chevron?

12       A.  No, because my testimony in my report refers to my own

13       experiences and others that have been publicly informed upon

14       regarding the Ecuadorian legal system, not regarding the Lago

15       Agrio Chevron case.

16       Q.  So you have no knowledge whatsoever whether any of the

17       judges felt pressured or were actually influenced by the Correa

18       administration, is that correct?

19       A.  In my testimony, I make a clear reference that before the

20       judgment was issued and before a judgment was enforced in the

21       Lago Agrio case in Ecuador, the president of the republic,

22       Rafael Correa, made a public statement stating his sympathy

23       with the Lago Agrio plaintiffs and with the justice of their

24       claims, which in my opinion, knowing the judges' weakness and

25       fear regarding their job security, definitely could have

DBC8CHE1                    Alvarez - cross

1    influenced on the ruling or the rulings that may have taken

2    place in the Lago Agrio Chevron case.

3    Q.  Sir, you do not know -- strike that.

4         Sir, you have no opinion whether any of the specific

5    judges who presided over the case were actually influenced or

6    actually pressured, is that correct?

7    A.  I believe that President Correa's public statements

8    constituted an undue public influence and unconstitutional

9    interference in the judicial branch, something that is outside

10   his purview.

11   Q.  Do you have any information that Judge Nicolas Zambrano --

12        THE COURT:  Mr. Gomez, move on.  This is getting us

13   absolutely nowhere.

14   Q.  Sir, you do not define in your report what an important

15   political issue is for purposes of your analysis, do you?

16   A.  I refer to the government's interests as important

17   political events.  I refer to the statements by the state's

18   highest officials regarding specific cases in which the

19   government has an interest.  In my testimony, I refer to the

20   intimidation and the threats that are publicly made to judges

21   who hear cases where the government has an interest, and I

22   include personal testimony, when I was a member and the

23   president of an arbitration court, in a case in which one of

24   the two parties was a state owned company and the minister of

25   telecommunications came to visit me in my private office to

1    pressure me to rule in favor of the state owned company.

2          Once the ruling was issued unanimously by the

3    arbitration court, that minister, along with other officials,

4    in a news conference stated that the arbitrators, the three

5    arbitrators, should be subject to criminal proceedings because

6    of the ruling we had issued, that we should be branded traitors

7    of the fatherland, because the case had to do with a state

8    owned company, and that the ruling should be nullified.  And

9    after the follow-up procedures, the higher court ruled that the

10   ruling had been issued in accordance with the law, but that

11   case set a negative precedent because many arbitrators refused

12   to hear cases in which the government had an interest for fear

13   of being sanctioned.

14          That's what I comment about and what I testify about

15   in my testimony.

16   Q.  Did you speak to any of those judges?

17   A.  What judges?

18   Q.  The ones to which you refer, the decision-makers to which

19   you refer?

20   A.  I was one of them.  I was the president of the arbitration

21   court, and there were two arbitrators, one who had been

22   appointed by the state owned company, the other arbitrator had

23   been appointed by the private company, and obviously the three

24   of us, three arbitrators who issued a unanimous ruling, were

25   dealing with the intimidation in the government's statements.

DBC8CHE1                          Alvarez - cross

1   Q.  In that instance you set that pressure aside and ruled

2   according to your conscience, isn't that right?

3   A.  But that's because the three of us had the strength and the

4   courage to face the pressure.  However, there are many cases

5   when the judge is not honest, doesn't have the strength, and

6   may the Court forgive me, but they don't have the courage, and

7   regrettably that is not something that happens very often in

8   Ecuadorian justice, especially at the ordinary level of

9   justice.

10  Q.  Dr. Alvarez, in the 12 months preceding the issuance of

11  your report, have you been able to determine in any way, in all

12  of the cases that have been heard in Ecuador, how many of the

13  judges who ruled in those cases had the strength that you

14  described and how many did not?

15          MR. MASTRO:  Objection to form.

16          THE COURT:  Sustained as to form.

17  Q.  Dr. Alvarez, have you been able to make any determination

18  as to the cases decided in the 12 months preceding your report

19  in which instances judges had the strength to rule according to

20  their conscience and in which instances they were influenced by

21  the executive branch?

22          MR. MASTRO:  Objection.

23          THE COURT:  Sustained.

24  Q.  Sir, when were you first approached by Gibson Dunn to do

25  work on this matter?

1   A.  I don't recall if it was 2010 or 2011.

2   Q.  Is it fair to say that at that time, whether it was 2010 or

3   2011, Chevron was not popular in Ecuador?

4   A.  That's not an issue I have any knowledge about.  I didn't

5   do any popularity polls.

6   Q.  When you were retained to do work on behalf of Chevron, did

7   you understand that you would likely be criticized for taking

8   that entity on as a client?

9   A.  When I decided to become an attorney, I considered that my

10  first mission was to fight so that truth would become known for

11  the full rule of law, in the respect of the law and the

12  application of law by those who govern and those who are

13  governed.  And when I have an opportunity to fight for that

14  mission, whether it is as a university professor, in

15  conferences, in reports, I do so, or also in my daily

16  profession.

17             MR. GOMEZ:  Move to strike as nonresponsive.

18             THE COURT:  I am not sure he is finished.

19             THE WITNESS:  Finished.

20             THE COURT:  Stricken.

21  Q.  Mr. Alvarez, when you were retained by Gibson Dunn to do

22  work on behalf of Chevron, did you understand you might be

23  criticized for taking Chevron on as a client?  Yes or no?

24  A.  No.  Sir, you should know that in my contracts, I state

25  that I will give my opinion and arrive at my conclusions

DBC8CHE1                          Alvarez - cross

1    regardless of whether they are agreeable or of benefit or not

2    to anyone.  Therefore, I do not care if as a result of my

3    opinion I am criticized or attacked, as I am presently by the

4    president of the republic who has spoken out against me.

5    Q.  Isn't it correct, sir, that every citizen in Ecuador has a

6    right to criticize others in public?

7             MR. MASTRO:  Objection.  Relevance.

8             THE COURT:  Sustained.

9    Q.  When Ecuadorians are critical of the opinions you have

10   taken in this case, Dr. Alvarez, are those people exercising

11   their right of free speech under the Ecuadorian constitution?

12            MR. MASTRO:  Objection.  Relevance.

13            THE COURT:  Sustained.

14            MR. GOMEZ:  I have nothing further, your Honor.

15            THE COURT:  Thank you.

16            MR. MASTRO:  Very briefly.

17            THE COURT:  Yes.

18   REDIRECT EXAMINATION

19   BY MR. MASTRO:

20   Q.  Dr. Alvarez, Ms. Littlepage asked you about the

21   international oversight committee.  Do you remember those

22   questions, sir?

23   A.  Yes, sir.

24   Q.  You said, "It was important to know what the conclusions

25   were of that international oversight committee."  Do you know

DBC8CHE1                          Alvarez – redirect

1   what those conclusions were, sir?

2   A.  Yes.

3   Q.  Please tell the Court what that international oversight

4   committee concluded.

5   A.  The president of the commission Leandro Despouy and other

6   members of the commission pointed out that the methodology as

7   well as the procedure for selecting new justices of the supreme

8   court, through a system of merit as well as opposition by the

9   citizenship, was a good system.  But then went on to object

10  that at the end of the procedure, the procedure in which there

11  was a practical and a theoretical examination, there was a

12  hearing of a more personal nature, and that part was subject to

13  highly subjective criteria, and which benefited by giving

14  points to those candidates who were sympathetic to the views of

15  the government and taking points off of those who in one way or

16  another would be critical of the government.

17  Q.  Sir, am I correct that that international oversight

18  committee found "serious faults in Ecuador's judicial reform"?

19            MR. GOMEZ:  Objection.  Leading.

20            THE COURT:  Overruled.

21  A.  Yes.  There were serious faults in the final selection of

22  the justices which tried to benefit those who were close to the

23  government.

24  Q.  Sir, you were asked some questions by Ms. Littlepage, you

25  were asked some questions about your deposition testimony, the

DBC8CHE1                        Alvarez – redirect

1   deposition you gave on September 7, 2011.  Do you recall those

2   questions, sir?

3   A.  I don't recall the question, but I recall that I was

4   questioned about that matter.

5   Q.  She asked you particularly about answers you gave on pages

6   126, and then again on page 137 and 38 of your deposition.

7          MR. MASTRO:  Your Honor, I objected for context.  So

8   under Federal Rule of Evidence 106, I ask your Honor to look at

9   pages 137 and 138, permit me to read the question and the

10  complete answer into the record, and then ask the witness some

11  questions about it.

12         137, starting on line 7, over to page 138, down to

13  line 19.

14         THE COURT:  Any objection?

15         MS. LITTLEPAGE:  No, sir.

16         THE COURT:  Mr. Gomez.

17         MR. GOMEZ:  No.

18         THE COURT:  Go ahead, Mr. Mastro.

19         MR. MASTRO:  I will read it slowly so that the

20  translation can be done.

21         Starting on page 137, line 7:

22  BY MR. MASTRO:

23  "Q.  Dr. Alvarez, in responding to one of Mr. Veselka's

24  questions earlier, you testified that there may be individual

25  judges who are impartial but 'regrettably the system doesn't

DBC8CHE1                     Alvarez - redirect

allow one to know when you are going to have access to one of

those judges with these characteristics.  And justice cannot be

subjected to a game of dice.'

          "Can you please explain what you meant by that

answer?"

          Dr. Alvarez, you gave this answer:

"A.  I wanted to point out, and I did so in a precise manner,

that the legal system in its totality is lacking legal security

when it comes to independence and impartiality and it would be

irresponsible from me or irresponsible by anybody else to

generalize that all of the judges and all of the justices, that

all of the members of the legal branch are corrupt.  That type

of generalization is irresponsible.

          "I have said that there can be judges who are

impartial, fair and impartial, but they are the exception.  But

as I have expressed in my reports and I've stated so for

several hours throughout the day today, and I've been very

happy to share this with you, the Ecuadorian legal system does

not provide the security of independence and impartiality that,

given the case of a judge who might be honest, a political,

social or economic pressure over him could weaken his intention

for impartiality and would end up subjecting himself to the

political interference."

          When you answered that question and gave that answer

at your deposition on September 7, 2011, were you telling the

DBC8CHE1                         Alvarez – redirect

1   truth?

2   A.  Yes.  Absolutely.

3              MR. MASTRO:  No further questions, your Honor.

4              THE COURT:  Thank you.

5              Anything further?

6              MS. LITTLEPAGE:  No, sir.

7              MR. GOMEZ:  No, your Honor.

8              THE COURT:  Thank you, Dr. Alvarez.  You're excused.

9              (Witness excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBCLCHE2

1          MR. MASTRO:  Your Honor, that concludes Chevron's case

2     with the following exceptions.  As we previously notified the

3     Court and as defendant's counsel have agreed, we also intend to

4     call Josh Lipton from Stratus.  He's not available until the

5     14th, so we will be calling him on the 14th.

6          It is also the case, your Honor, that the defendants

7     advised that they intended to call two witnesses, Mr. Tarco and

8     Ms. Calva.  Last night we learned for the first time that they

9     have withdrawn Mr. Tarco as a witness but it's still their

10    intention to call Ms. Calva.  We will have a rebuttal case in

11    response to what has been said by Mr. Zambrano, Mr. Tarco, and

12    Ms. Calva.

13         THE COURT:  If Tarco is not a witness, how do you have

14    a rebuttal case to that?

15         MR. MASTRO:  Your Honor, he has sworn to certain

16    statements and we will be explaining why what he has sworn to

17    in his declaration cannot be the case.  We'll be explaining why

18    Mr. Zambrano's testimony cannot be the case.  And Ms. Calva is

19    still to appear, so we'll be explaining why her anticipated

20    testimony as reflected in her declaration cannot be the case.

21         THE COURT:  We'll deal that and as to the extent it

22    arises.

23         MR. MASTRO:  I understand.  I simply wanted to make

24    point, your Honor, instead of continuing our case to rebut

25    those points now when they still say they intend to call

DBCLCHE2

1    Ms. Calva, we do intend to present certain rebuttal evidence in

2    that regard.

3            THE COURT:  I got that.

4            MR. MASTRO:  Thank you, your Honor.

5            THE COURT:  Is it correct that Tarco will not be

6    called?

7            MS. FRIEDMAN:  That's correct, your Honor.

8            THE COURT:  Mr. Gomez?

9            MR. GOMEZ:  Yes, your Honor.

10           THE COURT:  In just a moment, we'll take a break, but

11   there is a point raised by one of those cross-examinations that

12   I would like the parties to see if they can't agree on an

13   appropriate stipulation on, failing which I may, if I think

14   it's useful, propose to take judicial notice.

15           A line of examination I think by Mr. Gomez went to the

16   issue of whether this Lago Agrio case is important to the

17   government of Ecuador.  I understand that the gross domestic

18   product of the Republic of Ecuador in 2011 or '12 was about

19   $84 million, excuse me, billion dollars, and thus the judgment,

20   if paid by Chevron, assuming the accuracy of these figures --

21   and that's what I want to talk to counsel about -- would be an

22   influx of foreign exchange to the Republic of Ecuador in excess

23   of 20 percent of its gross domestic product, which sounds

24   possibly important.

25           By way of comparison, I gather that the U.S. gross

DBCLCHE2

1   domestic product for the same or an adjacent year was about

2   $15.7 trillion and, thus, to translate a judgment in favor of

3   entities in the United States at the expense of some foreign

4   entity, assuming the judgment were paid, would be an influx of

5   more than $3 trillion to the United States.

6          To put some perspective on that, the president's

7   budget for fiscal year 2012, which I understand was never

8   passed but it was a budget, called for total expenditures by

9   the United States government of $3.7 trillion in that year.

10  And, thus, the payment of a proportionally sized judgment into

11  the United States from a foreign source would have been nearly

12  enough to run the entire U.S. government for a year.

13         Now, my figures may be wrong at the moment.  I may

14  have missed something.  But if there's going to be any serious

15  contention that this is not a matter of importance to the

16  Republic of Ecuador, I'd like counsel to agree on what the

17  correct comparable figures are and stipulate.  If you can't

18  stipulate, I'll see whether it's appropriate to take judicial

19  notice after giving you an opportunity to be heard on it.

20         Okay.  We'll take our morning break.

21         (Recess)

22         THE COURT:  Okay.  Ms. Littlepage, who will be the

23  first defense witness?

24         MS. LITTLEPAGE:  The first defense witness will be

25  Donald Rafael Moncayo Jimenez.

DBCLCHE2

```
 1                THE COURT:  All right.  Do you have the witness
 2     statement?
 3                MS. LITTLEPAGE:  Yes, sir.
 4                THE COURT:  When was this served?
 5                MS. LITTLEPAGE:  Judge, the initial statement was
 6     served October 30.  The revised statement was served
 7     November 10.
 8                THE COURT:  All right.  Are there objections filed or
 9     not?
10                MR. BRODSKY:  Yes, your Honor, we did.  We filed
11     objections -- originally we filed objections to the statement
12     on --
13                THE COURT:  Be seated, sir.
14                MR. BRODSKY:  -- November 1 on a number of grounds.
15     And your Honor last week, I believe, had ruled that the
16     statements that Mr. Moncayo was making relating to toxic tours,
17     essentially, and his observations of contamination which appear
18     in paragraphs two, four, seven, 23 through 28 are not in this
19     case, are not relevant to this case.
20                We filed a motion last night, your Honor, November 11,
21     and in substance said, we repeated an argument, your Honor, we
22     made on November 1 which is that we had moved for the
23     production of documents relating to these meetings of the
24     assembly of the Afectados.  Your Honor I know has written on
25     this recently in docket No. 1529 regarding the failure to
```

DBCLCHE2

1    produce those documents that were specifically asked.  And

2    Mr. Moncayo incorporated paragraphs 12 through 14 this past

3    weekend a number of additional statements relating to making

4    decisions at the assembly of the Afectados.

5           The difficulty we have, as your Honor knows, is

6    shortly before trial they marked a number of exhibits that are

7    minutes of the assembly of the Afectados meeting.  They

8    redacted them heavily and now they're using witnesses as a

9    sword, essentially, to get in statements regarding decisions

10   made by the union of the assembly of the Afectados without

11   giving us the ability to examine them and the validity of those

12   statements by failing to produce the documents.

13          Mr. Moncayo, respectfully, your Honor, works for Selva

14   Viva, and Selva Viva is a defaulted defendant who has failed to

15   produce any documents in the case.

16          THE COURT:  Is there anything in this version of the

17   statement that wasn't in the last that would materially affect

18   cross-examination?

19          MR. BRODSKY:  We're prepared to cross-examine, your

20   Honor.  They added paragraphs 12 through essentially 15, and

21   we're prepared to cross-examine on it.  We have objections to

22   the toxic tours and I think your Honor already ruled on that

23   with respect to the assembly of the Afectados and Ms. Calva,

24   testimony relating to Ms. Calva, which is I believe in

25   paragraph -- let me find it for your Honor -- 11.  We're

DBCLCHE2

1    prepared to cross-examine on those topics.

2              THE COURT:  All right.  Let's proceed.  Then I'll rule

3    on all this later.

4     DONALD RAFAEL MONCAYO JIMENEZ,

5         called as a witness by the Defendants,

6         having been duly sworn, testified through the certified

7         Spanish interpreters, Selva Nebbia and Vivian Goa, as

8         follows:

9    DIRECT EXAMINATION

10   BY MS. LITTLEPAGE:

11   Q.  Mr. Moncayo, in front of you is a document marked

12   Defendant's Exhibit 1600.  Do you have that, sir?

13   A.  Yes.

14   Q.  And if you look at the page before the last page, is that

15   your signature?

16   A.  Yes.

17   Q.  And is this your witness statement?

18             Let me ask a better question:  Is this your direct

19   testimony?

20   A.  Yes.

21             MS. LITTLEPAGE:  Judge, we offer Defendant's

22   Exhibit 1600.

23             THE COURT:  Received on the same basis as others.

24             (Defendant's Exhibit 1600 received in evidence)

25             MS. LITTLEPAGE:  We pass the witness.

CBCLCHE2                        Moncayo - direct

1          THE COURT:  Thank you.  Cross-examination.

2          MR. BRODSKY:  Yes, your Honor.  Thank you very much.

3     Just for the record, your Honor, I will go into one or two of

4     the areas which we have objections to, but we want to preserve

5     our objections to those areas.

6          THE COURT:  All right.

7          MR. BRODSKY:  Thank you.

8          THE COURT:  You may proceed.

9     CROSS-EXAMINATION

10    BY MR. BRODSKY:

11    Q.  Good morning, Mr. Moncayo.

12    A.  Good morning.

13    Q.  Mr. Moncayo, you don't know what the words ex parte mean,

14    correct?

15    A.  I don't understand the word ex parte.

16    Q.  At some point, sir, Pablo Fajardo told you that it was

17    forbidden for only one party to meet with a judge, correct?

18    A.  If you would like -- I don't understand the question very

19    well.  If you would like, I could repeat you to you what Pablo

20    Fajardo said.

21    Q.  You know who Pablo Fajardo is, correct?

22    A.  Of course I do.

23    Q.  You work for Selva Viva, right?

24    A.  Yes.

25    Q.  Mr. Fajardo works for Selva Viva as well?

DBCLCHE2                         Moncayo – cross

1   A.  He works as an attorney for the -- those who are -- those

2   who are the Afectados.

3   Q.  Mr. Fajardo told you at some point that it was forbidden

4   for only one party in the Lago Agrio Chevron case to meet with

5   a judge, correct?

6   A.  He never said that to me.  He said that only, only one of

7   the parties could never meet by themselves with the judge.

8   Q.  He told you that -- Pablo Fajardo told you that only -- it

9   was prohibited for only one party to meet with a judge without

10  the presence of the other party?

11  A.  Yes.  That is what he said to me.

12  Q.  Approximately when did Mr. Fajardo tell you that?

13  A.  Around 2009, around that period of time.

14  Q.  Prior to that time, you observed yourself meetings between

15  the Lago Agrio plaintiffs' lawyers and judges presiding over

16  the Lago Agrio Chevron case without the participation of

17  Chevron's lawyers?

18  A.  Yes.

19  Q.  And you yourself participated in some of those meetings,

20  right?

21  A.  Yes, about two or three of them.

22  Q.  And one of those meetings was in approximately June 2007,

23  right?

24  A.  I don't recall.

25          MR. BRODSKY:  May I approach, your Honor?

DBCLCHE2                         Moncayo – cross

1           THE COURT:  Yes.

2   Q.  Mr. Moncayo, I'm showing you what's marked as Plaintiff's

3   Exhibit 6913 for identification which is a one-page photograph.

4   Would you take a moment to look at that, please.

5   A.  Yes, I saw it.

6   Q.  You recognize yourself in the photograph?

7   A.  Yes.

8   Q.  You recognize the other gentleman in the photograph?

9   A.  Yes, Mr. Yanez.

10  Q.  Judge Yanez?

11  A.  Yes.

12  Q.  The judge presiding over the Lago Agrio Chevron case in

13  2007?

14  A.  Yes.

15          MR. BRODSKY:  Your Honor, we offer 6913.

16          MS. LITTLEPAGE:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 6913 received in evidence)

19  Q.  Prior to this meeting with Judge Yanez, you called Judge

20  Yanez from your cellular telephone, correct?

21          MR. GOMEZ:  Objection, form.

22          THE COURT:  Overruled.

23  A.  I didn't call the judge.  That I, that I remember, I

24  didn't.

25  Q.  Do you ever remember calling any of the judges who were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBCLCHE2                    Moncayo - cross

1    presiding over the Lago Agrio Chevron case using your phone?

2    A.  No, no.

3    Q.  You have no recollection of ever doing that?

4    A.  No, sir, I don't remember.

5    Q.  Are you testifying you don't know one way or the other

6    whether you ever called, or to the best of your recollection

7    you never called a judge presiding over the case?

8    A.  I don't recall remember having called them through my cell

9    phone.  Well, and if I did do that, if I did call, it was

10   because I was in charge of the Selva Viva logistics.  And in

11   the time of the logistics inspections taking place, I was the

12   one, like the Chevron people had to do as well, who had to

13   coordinate that.

14   Q.  So you generally recall from time to time using your

15   cellular telephone to call a judge presiding over the Lago

16   Agrio Chevron case?

17             MR. GOMEZ:  Objection.

18             THE COURT:  Overruled.

19   A.  Frankly, I do not remember having called.

20             MR. BRODSKY:  May I approach, your Honor?

21             THE COURT:  Yes.

22   Q.  Mr. Moncayo, I'm showing you a one-page document marked

23   Plaintiff's Exhibit 6924A for identification, which is a

24   transcript of a recording that took place on June 4, 2007.

25   Would you take a moment to look at the Spanish portion on the

DBCLCHE2                    Moncayo - cross

1    left-hand side corresponding to your name and let me know when

2    you're done, if you don't mind, Mr. Moncayo, reviewing it.

3              MS. LITTLEPAGE:  Judge, objection, foundation.  Can we

4    have a representation from someone on Chevron's side as to what

5    this even is?

6              THE COURT:  I imagine it's a prelude to the familiar

7    question, Does this refresh your recollection?  And as you're

8    well aware, he could show him a spoiled thing of cream cheese

9    for that purpose.

10             MR. BRODSKY:  I don't have any cream cheese with me

11   this morning.

12             MS. FRIEDMAN:  Your Honor, could I -- he could --

13             THE COURT:  This is Ms. Littlepage's witness.  One

14   lawyer per witness.

15             MS. LITTLEPAGE:  Can I have a moment, Judge.

16             Judge, I don't believe he can show him a document that

17   is not accurate or false and represent to Mr. Moncayo that it's

18   true and I can't -- I don't have any understanding --

19             THE COURT:  Ms. Littlepage.

20             MS. LITTLEPAGE:  -- why Chevron would have a recording

21   of Mr. Moncayo's phone call.

22             THE COURT:  I'm as curious as you are.  But this

23   suggestion to the witness in open court that it may not be true

24   is called coaching the witness.

25             MS. LITTLEPAGE:  She's not translating, Judge.  So he

DBCLCHE2                    Moncayo – cross

1    doesn't speak a word of English.

2            THE COURT:  You didn't know when you uttered the words

3    that she wouldn't.  But be that as it may, they are entitled to

4    do this for the purpose of refreshing recollection, which is

5    what I think they're doing.

6            Right, Mr. Brodsky?

7            MR. BRODSKY:  Yes, your Honor.

8            THE COURT:  As to the rest of it, I'm as curious as

9    you are, but this isn't the time for it.

10           Do you have a question, Mr. Brodsky?

11           MR. BRODSKY:  Yes.

12   Q.  Mr. Moncayo, does the statements made on this document

13   refresh your recollection that you called Judge Yanez from your

14   cellular telephone on or about June 4, 2007 prior to meeting

15   with him?

16   A.  I don't recall really, I don't recall.  But it's not the

17   first time that I took North Americans to the court to observe

18   the proceedings because it's a public trial.

19   Q.  Mr. Moncayo, you're not aware of whether Chevron's contacts

20   with judges that you testify about in your statement were

21   procedural or about scheduling matters?

22   A.  The two or three times that I went into the judge's

23   chambers were around 2007, it was a time when Mr. Novillo was

24   there, and when I went in they turned off the cameras since

25   they had –– I had already had had a couple run-ins.

DBCLCHE2                    Moncayo - cross

1   Q.  Mr. Moncayo, I don't mean to interrupt you, but that wasn't

2   my question.

3           My question, sir, is you're not aware of whether

4   Chevron's contacts with judges presiding over the Lago Agrio

5   Chevron case were about procedural or scheduling matters,

6   correct?

7   A.  I was getting to that but I wanted to explain further.

8   Q.  Mr. Moncayo, my question is yes or no, sir.  You are not

9   aware --

10          THE COURT:  Mr. Moncayo, wait until he finishes the

11  question before you answer it.

12          THE WITNESS:  Because there are two conversations that

13  I had with them and both --

14          THE COURT:  Stop.

15          THE WITNESS:  -- are different.

16          THE COURT:  The witness's statements are stricken.

17          Mr. Moncayo, wait until the lawyer finishes asking the

18  question before you try to answer it.  Okay?

19          THE WITNESS:  Okay.

20          THE COURT:  Let's go.

21  Q.  Mr. Moncayo, yes or no, sir, you are not aware of whether

22  Chevron's contacts with judges presiding over the Lago Agrio

23  Chevron case were about procedural or scheduling matters?

24          MS. LITTLEPAGE:  Objection, form.

25          THE COURT:  Overruled.

DBCLCHE2                    Moncayo – cross

1   A.  Neither yes nor no.

2              MR. BRODSKY:  May I approach, your Honor?

3              THE COURT:  Yes.

4              MR. BRODSKY:  Your Honor, since the deposition

5   transcript that I'm handing up is only in English, I can hand

6   one to the witness or I can just read.

7              THE COURT:  Read.

8              MR. BRODSKY:  Page 69, lines 5 through 17.  May I

9   read, your Honor?

10             THE COURT:  Yes, you may.

11  Q.  Mr. Moncayo, at your deposition held on September 13, 2011,

12  in Quito, Ecuador, page 69, lines 5 through 17, the following

13  question was asked:

14             Do you agree with that allegation by Chevron that all

15  of its ex parte contacts with the judges presiding in the Lago

16  Agrio case were procedural or scheduling matters?

17             And, Mr. Moncayo, your answer on line 11 through 17:

18  I'm really unaware.  I don't know.  I can't tell you about that

19  because the times that I was in and I had listened, it was just

20  very brief words.  But what I can tell you is that they also

21  met with the judge, as we also met with the judge.  I cannot

22  tell you that we didn't.

23             THE COURT:  Is there a question?

24  Q.  Were you telling the truth, Mr. Moncayo, when you gave that

25  answer at your deposition on September 13, 2011?

DBCLCHE2                        Moncayo - cross

1   A.  Yes.  That's exactly what I was going to say.

2   Q.  Mr. Moncayo, let me direct your attention to Defense

3   Exhibit 1600.  Do you have that in front of you?  And if I

4   could ask you to turn to page 5 at the bottom of the page,

5   paragraphs 19 and paragraph 20 on page 6.

6           Your testimony -- do you have that, Mr. Moncayo?

7   A.  Yes.

8   Q.  Mr. Moncayo, your testimony in those paragraphs relate to

9   photographs you took on July 30, 2010, correct?

10  A.  Yes.

11  Q.  And you observed Dr. Enrique Carvajal greeting Judge

12  Ordonez, correct?

13  A.  Yes.

14  Q.  You overheard Dr. Carvajal telling Judge Ordonez that he

15  wanted to have a word with him, correct?

16  A.  Yes.

17  Q.  You then attempted to enter Judge Ordonez's office?

18  A.  Yes.

19  Q.  Judge Ordonez then told you you could not come in?

20  A.  Yes.

21  Q.  It was Judge Ordonez who stopped you from entering?

22  A.  Yes.

23  Q.  Dr. Carvajal didn't say a word?

24  A.  No.

25  Q.  So because Judge Ordonez didn't let you enter, you

DBCLCHE2                          Moncayo – cross

1   retreated into the hallway?

2   A.   No.   I was at the door and he did not let me go in because

3   he didn't know I was from the other side.   That's what I

4   believe.

5   Q.   And you went to the hallway?

6   A.   Perfect, correct.

7   Q.   And there were two other people in the hallway also?

8   A.   Yes.

9   Q.   And those two people came with Dr. Carvajal?

10  A.   Carvajal, yes.

11  Q.   Thank you, sir, Carvajal.

12          And those two people were with Chevron, correct?

13  A.   Yes.

14  Q.   And they stayed in the hallway where you were as well?

15  A.   No, by the door of Dr. Ordonez, door to the president's

16  office, presidency office of Ordonez.

17  Q.   And the door was open?

18  A.   From what I recall, yes, yes.   I don't really remember.

19          MR. BRODSKY:   May I approach, your Honor?

20          THE COURT:   Yes, you may.

21  Q.   Mr. Moncayo, I'm showing you one of your photographs,

22  Defense Exhibit 2.   That's one of the photographs you took on

23  this day, July 30, 2010, right?

24  A.   Yes.

25  Q.   And that shows the door -- the individual sitting down

DBCLCHE2                    Moncayo – cross

1    there is Dr. Carvajal, correct?

2    A.  Yes.

3    Q.  And that shows the door is open, correct?

4    A.  Yes.

5    Q.  And you took the photographs from the hallway, correct?

6    A.  Yes, from the other side of the hallway.

7    Q.  And you say you observed him there for about 20 minutes,

8    right?

9    A.  Yes more or less, approximately.

10   Q.  And you didn't hear anything said?

11   A.  No.  I was at a distance of ten, between eight and 10

12   meters.

13   Q.  Let me direct your attention now, sir, to your witness

14   statement, the next paragraph, paragraph 21.

15            MR. GOMEZ:  Excuse me, your Honor, before we move on,

16   this last photograph is actually Defendant's Exhibit 598.

17            MR. BRODSKY:  My apologies.

18            MR. GOMEZ:  This is in reference to the deposition.

19   It was Exhibit 2 at the deposition, but it's Exhibit 598 for

20   the record.

21            MR. BRODSKY:  Mr. Gomez is correct.  I apologize, your

22   Honor.

23            THE COURT:  Let's mark it correctly.  Is it being

24   offered, Mr. Brodsky?

25            MR. BRODSKY:  Not by Chevron, your Honor.

DBCLCHE2                    Moncayo - cross

```
 1              THE COURT:  Okay.
 2    Q.  Mr. Moncayo, in paragraph 21 of your witness statement, you
 3    discuss a contact that you say you observed in 2009 or 2010,
 4    right?
 5    A.  On page No. 6?
 6    Q.  Yes.  Page 6, paragraph 21, it begins with -- go to the
 7    English version -- it begins with I have also witnessed another
 8    incident.
 9    A.  Yes.
10    Q.  You're not sure it took place in 2009 or 2010, correct?
11    A.  Certainly, I'm not sure.  That's why the date that I give
12    was 2009 or 2010.
13    Q.  It's a broad range because you're not sure when it took
14    place?
15    A.  Exactly.  I don't remember the date nor the time.
16    Q.  And it's your testimony, sir, that you believe it occurred
17    prior to Culebra, Auca, Yuca 9, and Auca Sur station site
18    inspections, right?
19    A.  I didn't understand you very well.
20    Q.  You say that what you observed occurred prior to Culebra,
21    Auca, Yuca 9, and Auca Sur station site inspections, right?
22    A.  Yes.
23    Q.  But you're not sure about that?
24    A.  I'm certain that it was before the inspections.
25    Q.  And you're sure Alberto Racines was there?
```

DBCLCHE2                        Moncayo – cross

1   A.  Yes.

2   Q.  But you're not sure Dr. Diego Larrea was present, right?

3   A.  Yeah, I wasn't certain about him.  But I do remember about

4   Alberto Racines because he's the one that spoke with the judge,

5   but I'm almost certain it was him.

6   Q.  You're almost certain it was Dr. Racines?

7   A.  Yes, him for sure.

8   Q.  So your statement that says with certainty that Dr. Nunez

9   was talking with Diego Larrea is inaccurate, correct?

10  A.  No.

11  Q.  Mr. Moncayo, let me direct you to your testimony on

12  September 13, 2011.

13          MR. BRODSKY:  Page 222, your Honor, line 7 through 15.

14          THE INTERPRETER:  I'm sorry, what is the page number?

15          MR. BRODSKY:  222.

16  "Q.  So your declaration is incorrect in this regard; is that

17  correct?

18  "A.  Mr. Moncayo:  Regarding after I signed this document

19  regarding this issue, I don't recall if it was Dr. Larrea or

20  Dr. Campuzano, but it was Dr. Racines because he was the one

21  doing the talking."

22  A.  Can I explain?

23  Q.  Was your answer there truthful, sir?

24  A.  Yes, it's true.  It was Alberto, the lawyer Alberto Racines

25  who was talking to the judge.  And the other lawyer,

DBCLCHE2                         Moncayo – cross

1    Dr. Campuzano, was next to him.  I'm sorry.  Dr. Larrea.

2    Q.  On this occasion, whenever it was, you were at the Lago

3    Agrio courthouse, correct?

4    A.  In the courthouse, yes.

5    Q.  And you went to Judge Nunez's office, right?

6    A.  Yes.  I asked for permission to go in and he told me to go

7    in.

8    Q.  And when you came in, you saw Dr. Racines there?

9    A.  Yes.

10   Q.  And that was towards the end of the meeting, right?

11   A.  Yes, it was towards the end of the meeting.  I was there

12   and he told me to come in.

13   Q.  You don't know when the meeting started, correct?

14   A.  No, I don't know.

15   Q.  And you didn't hear anything specific that was said at this

16   meeting, right?

17   A.  No.

18   Q.  You heard three statements, right?

19   A.  I just heard him say, Doctor, okay, so we're agreed on

20   this.

21   Q.  And that's all you heard, correct?

22   A.  That's what I managed to hear.

23   Q.  And then the meeting ended?

24   A.  Yes, the meeting ended.

25   Q.  And Dr. Racines left?

DBCLCHE2                    Moncayo - cross

1    A.  Yes, both of them left with the guards.  The guards were

2    outside.

3    Q.  And did you leave or did you stay?

4    A.  No, I also left.

5    Q.  And you don't know whether they were having a discussion

6    about inspections, right?

7    A.  No, I don't know.

8    Q.  I'd like to turn to something else.

9            MR. BRODSKY:  One moment, your Honor.

10   Q.  Mr. Moncayo, you started working for Selva Viva in 2005,

11   right?

12           THE INTERPRETER:  I'm sorry, could you please repeat

13   the question.

14   Q.  You started working for Selva Viva in 2005, right?

15   A.  Yes, without a salary.

16   Q.  Luis Yanza hired you?

17   A.  Yes.

18   Q.  A key part of your job was to provide logistical support to

19   the Lago Agrio plaintiffs' lawyers?

20   A.  Yes.

21   Q.  And Mr. Yanza is one of -- is a manager at Selva Viva,

22   right?

23   A.  Yes.

24   Q.  He's one of your bosses?

25   A.  Yes.

DBCLCHE2                      Moncayo - cross

1   Q.  He's one of the people you report to today?

2   A.  We could say so.

3   Q.  Do you say so, sir?

4   A.  Yes, because now I'm president of the executive committee

5   of the UDA.

6   Q.  The assembly?

7   A.  Yes.

8   Q.  We'll get to that in a minute, sir.

9   A.  Perfect.

10  Q.  Selva Viva is a for-profit company, right?

11  A.  I don't, I don't know what to answer to that.  I have no

12  knowledge.

13  Q.  You know Mr. Steven Donziger?

14  A.  Of course.

15  Q.  You met him many years ago, correct?

16  A.  Yes.

17  Q.  And he's been the president of Selva Viva, right?

18  A.  As far as I know, no, not that I know of.

19  Q.  When you joined Selva Viva?

20  A.  He works for us, for the ones, the people who are affected,

21  yes.

22  Q.  When you joined Selva Viva, did you know Mr. Donziger was

23  the president?

24  A.  No.  No, there was no president in Selva Viva.  When I

25  joined, the Selva Viva didn't even exist.

DBCLCHE2                    Moncayo – cross

1   Q.  You joined in 2005, right?

2   A.  To Selva Viva, yes, but it was just becoming legalized.

3            MR. BRODSKY:  May I approach, your Honor?

4            THE COURT:  Yes.

5   Q.  Mr. Moncayo, I'm showing you Plaintiff's Exhibit 6906 for

6   identification, which is a three-page document dated at the top

7   of the first page as October 8, 2004, Quito, in English, and

8   then the certification of the translation is the second page

9   and the third page is the Spanish.

10           Would you take a moment to read that, the Spanish

11  version on page 3.

12  A.  I didn't know.

13  Q.  Do you recognize this document at all?

14  A.  I'm just finding out about this now.

15  Q.  At no time, sir, did you know Mr. Donziger was the

16  president of Selva Viva where you worked?

17  A.  No, I didn't know.  I spoke with Don Luis and Don Luis was

18  the manager of Selva Viva.

19           MR. BRODSKY:  We offer 6906, your Honor.

20           MS. LITTLEPAGE:  No objection.

21           THE COURT:  Received.

22           (Plaintiff's Exhibit 6906 received in evidence)

23  Q.  Juan Pablo Saenz also works for Selva Viva, correct?

24  A.  Yes.

25  Q.  He's one of your bosses, right?

DBCLCHE2                          Moncayo - cross

1    A.  Juan Pablo, as far as I know he isn't.

2    Q.  He represented you before you were deposed, right?

3    A.  As a lawyer.

4    Q.  Does he represent you today?

5    A.  Not here.

6    Q.  Did he prepare you before you came to testify today?

7    A.  No.  He just helped me to process my visa in Quito.

8    Q.  Pablo Fajardo works for Selva Viva as well -- withdrawn.

9         Pablo Fajardo helped you draft your witness statement

10   in 2010, right?

11   A.  No.

12   Q.  Did you speak to Pablo Fajardo in 2010 prior to preparing

13   your witness statement in 2010?

14   A.  Can I explain something?

15             THE COURT:  Please just answer the question.

16             THE WITNESS:  Can you repeat it, please?  Please.

17   Q.  In 2010, Mr. Moncayo, you gave a statement, a sworn

18   declaration in this case, correct?

19   A.  Yes.

20   Q.  It was a case in the United States, right?

21   A.  Yes.

22   Q.  And Mr. Fajardo helped you draft that declaration, correct?

23   A.  To write it, yes.

24   Q.  You know Richard Stalin Cabrera Vega, sir?

25   A.  I don't remember knowing him.

DBCLCHE2                    Moncayo - cross

1   Q.  Do you recall meeting Richard Stalin Cabrera Vega, sir?

2   A.  I don't remember.

3   Q.  Do you recall -- you know, sir, that Richard Cabrera,

4   Richard Stalin Cabrera Vega or Richard Cabrera was appointed in

5   2007 as the global expert in the Lago Agrio Chevron case,

6   right?

7   A.  For me it's difficult to remember people's names.  And I

8   want to clarify that Pablo, that Pablo drafted what I told him

9   to draft on that document for 2010.

10  Q.  Pablo Fajardo asked you to make that statement, right?

11  A.  Because I took those pictures, they told me, Donald, since

12  you took those pictures, you have to tell the truth.

13             MR. BRODSKY:  May I approach, your Honor?

14             THE WITNESS:  And if you want do it and I told him

15  yes.

16  Q.  Mr. Moncayo, I'm showing you Plaintiff's Exhibit 636 for

17  identification, which is a photograph.

18             Do you recognize this?

19  A.  Yes, I do recognize it.

20  Q.  You recognize the people in the photo, correct?

21  A.  Yes.

22  Q.  Tell us who -- you recognize in the middle it's Richard

23  Cabrera, right?

24  A.  Yes.

25  Q.  Which one is Mr. Yanza?

DBCLCHE2                    Moncayo - cross

1  A.  The one who's on the right.

2  Q.  Mr. Fajardo is the other one, correct?

3  A.  That's right.

4           MR. BRODSKY:  We offer 636, your Honor.

5           MS. LITTLEPAGE:  No objection.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 636 received in evidence)

8           THE COURT:  Just so I'm clear, you're saying that it's

9  Mr. Fajardo on the left; is that correct?

10           THE WITNESS:  Yes.

11           THE COURT:  And it's Mr. Yanza on the right, your

12  right?

13           THE WITNESS:  Just a minute.  If I place the picture

14  like this, Dr. Yanza is on the right, and Pablo Fajardo is on

15  the left.

16           THE COURT:  Okay.  Just so the record is abundantly

17  clear, the witness picked up the photograph, held it with the

18  back of the photograph to his chest and indicated that with the

19  picture in that reversed direction, it was Fajardo on the left

20  and Yanza on the right, not as one would look at the

21  photograph.  So it was the other left and the other right.  And

22  let's go on.

23  Q.  You -- does this photograph of Mr. Cabrera refresh your

24  recollection that you assisted him in 2007?

25           MR. GOMEZ:  Objection, form.

DBCLCHE2                    Moncayo - cross

1   A.  Yes.

2            THE COURT:  Overruled.  Answer the question.

3   A.  I worked for Selva Viva and Selva Viva gave the logistics

4   part to Mr. Cabrera.

5   Q.  We'll get to that in a moment, Mr. Moncayo.

6            Did you attend this meeting in the photograph, sir?

7   A.  No, sir, I don't remember having attended.  Maybe if it was

8   in Lago Agrio possibly because I hardly ever leave Lago.

9   Q.  Do you recall Mr. Donziger being present at that meeting?

10           MR. GOMEZ:  Objection, form.

11  A.  I probably wasn't at that meeting.  I don't remember.

12  Q.  You provided logistical support to Mr. Cabrera in 2007,

13  right?

14  A.  Yes, at Selva Viva.

15  Q.  The people at Selva Viva told you to provide logistical

16  support to Mr. Cabrera?

17  A.  Yes.

18  Q.  That's Mr. Yanza?

19  A.  I don't remember who told me.  They said we're going to

20  give them the logistical support.  So they told me to get ready

21  to see what else they need.

22  Q.  And logistical support included providing materials to

23  Cabrera, correct?

24           MR. GOMEZ:  Objection, form.

25           THE WITNESS:  Yes.

DBCLCHE2                    Moncayo - cross

1          THE COURT:  Sustained as to form.  Answer is stricken.

2     Be more precise.

3     Q.  You rented vehicles for Mr. Cabrera, right?

4     A.  I hired vehicles because I don't have any vehicles to rent.

5     Q.  You know, sir, that Mr. Cabrera had requested that

6     logistical support from Selva Viva, right?

7     A.  To both parties.

8     Q.  And let me show you, sir --

9          MR. BRODSKY:  May I approach, your Honor?

10          THE COURT:  Yes.

11    Q.  Let me show you Plaintiff's Exhibit 843.

12          MR. BRODSKY:  I believe it's in evidence, your Honor.

13    Q.  For the record, it's an email from Pablo Fajardo, March 21,

14    2007, to Steven Donziger, copy to Luis Yanza, subject, plans

15    for expert examination.

16          Let me know when you've taken a moment to look at

17    that, Mr. Moncayo.  It starts on the Spanish part on page 8.

18    And if I could ask you to turn to page 10.  Maybe we can

19    highlight the column with Don Moncayo's name, March 7, I'm

20    sorry, March 27.  Here it is.  I can do it.

21          Do you see that, Mr. Moncayo?

22          Is it accurate, sir, that you were responsible for

23    acquiring the materials necessary for the field work of Richard

24    Cabrera?

25    A.  Yes, I was.

DBCLCHE2                              Moncayo – cross

1    Q.  If you turn to the next page.

2    A.  What could be acquired in Lago Agrio.

3    Q.  If you turn to the next page, sir, do you see where it

4    discusses the create expert report, create first draft of the

5    global report review of the first draft, do you see that there,

6    sir?

7    A.  Review of the first draft, to create the first global

8    report, yes.

9    Q.  Do you see that there, sir?

10   A.  Yes, I'm seeing it.

11   Q.  Did you assist Mr. Fajardo and others in connection with

12   the preparation of Mr. Cabrera's report?

13   A.  No.

14   Q.  Mr. Moncayo, you went to school when you were a child,

15   right?

16   A.  Yes.  Yes, I did.  I had six years of schooling.

17   Q.  And you read Spanish but not so well, correct?

18   A.  You're totally correct.

19   Q.  I want to direct your attention to Defendant's Exhibit

20   1600, turn to another one of the paragraphs in your witness

21   statement.

22            (Continued on next page)

23

24

25

DBC8CHE3                          Moncayo – cross

 1   Q.  Would you turn, sir, to paragraph 11 on page 3 to 4?

 2          Sir, you knew Ms. Calva in 2010?

 3   A.  Could you repeat the location?

 4   Q.  Let me locate my copy.

 5          THE COURT:  Paragraph 11 of Defendants' 1600.

 6   Q.  Turn to the Spanish version.

 7          Mr. Moncayo, you knew Ms. Calva in 2010?

 8   A.  No.

 9   Q.  You knew her name then?

10   A.  No.

11   Q.  When is the first time you learned Ms. Calva's name?

12   A.  It must have been 20 days ago, not more than that.

13   Q.  Who told you Ms. Calva's name?

14   A.  Pablo called me to let me know.

15   Q.  Pablo Fajardo?

16   A.  He had spoken with her father because, if you wish I can

17   explain.

18   Q.  Pablo Fajardo had spoken to Ms. Calva's father, correct?

19   A.  Yes.

20   Q.  Pablo Fajardo had asked Ms. Calva's father for assistance,

21   correct?

22   A.  Yes.  Because he found out that they had mentioned Ms.

23   Calva's name here and the father's.

24          THE COURT:  Excuse me, Mr. Moncayo.  Is that what Mr.

25   Fajardo told you what you have just related?

DBC8CHE3                        Moncayo - cross

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Proceed.
 3              Thank you.
 4   Q.  Were you present for the conversation between Mr. Fajardo
 5   and Ms. Calva's father?
 6   A.  No.
 7   Q.  Do you know how many times they met in connection with Ms.
 8   Calva coming here to testify?
 9              MR. BRODSKY:  Withdrawn.
10   A.  No.
11              THE COURT:  It's withdrawn.  The answer is stricken.
12   Q.  Do you know how many times, Mr. Moncayo, Pablo Fajardo
13   spoke to Ms. Calva's father about the case going on here in New
14   York?
15   A.  No.
16   Q.  Pablo Fajardo then spoke to you about Ms. Calva, correct?
17   A.  Yes.
18   Q.  It was Pablo Fajardo who told you that you saw Ms. Calva in
19   attorney Zambrano's office, correct?
20   A.  No, I saw her.  It was 15 days ago is when I found out
21   that -- 15, 20 days ago that I found out what her name was.
22   Q.  When exactly did Mr. Fajardo raise Ms. Calva's name with
23   you for the first time?
24   A.  About 20 days ago when he said to me, listen, do you know
25   her?  And I said, no.
```

DBC8CHE3                    Moncayo - cross

1   Q.  You testified about three occasions you say you observed a

2   woman you now say is Ms. Calva in attorney Zambrano's office,

3   right?

4   A.  Yes.

5   Q.  And you don't know what Ms. Calva was doing in Judge

6   Zambrano's office, right?

7   A.  That's true.

8   Q.  The first occasion you say you observed Ms. Calva through

9   open curtains of attorney Zambrano's office, right?

10  A.  Correct.

11  Q.  That was in November or December 2010?

12  A.  Yes.

13  Q.  Approximately what time of day?

14  A.  I think it was in the afternoon, in the morning -- I think

15  it was in the afternoon.  I don't remember very well.  I think

16  it was in the afternoon.

17  Q.  How long did you observe Ms. Calva and attorney Zambrano

18  through those open curtains on that occasion?

19  A.  Three seconds, two seconds.  It was as I was going by

20  through the hallway to the office of the secretaria.

21  Q.  How open were the curtains?

22  A.  I would think that approximately they were about this much.

23          THE COURT:  Indicating 3 to 4 feet.

24  Q.  Mr. Moncayo, in those three seconds that you walked by

25  attorney Zambrano's office on this first occasion in 2010, you

DBC8CHE3                        Moncayo - cross

1  weren't able to see anything that this woman, Ms. Calva, was

2  doing, correct?

3  A.  Well, no.  In fact, she was behind the television screen.

4  She was at the keyboard and Dr. Zambrano was beside her.

5  Q.  You saw her typing?

6  A.  The computer, yes.

7  Q.  You saw attorney Zambrano talking?

8  A.  Yes.  And he was indicating with his finger on the monitor.

9  Q.  What was on the monitor?

10 A.  You can only see from the outside the back part of the

11 computer, not the screen.

12 Q.  On the second occasion you went by attorney Zambrano's

13 office and saw this woman, Ms. Calva, in attorney Zambrano's

14 office?

15 A.  Yes.

16 Q.  The curtains open about the same length?

17 A.  Frankly, I don't know if it was open the same or less or

18 less.  All I know is that there was a space for which you could

19 see.

20 Q.  And this time are you saying it took place in the morning

21 or the afternoon?

22 A.  I don't remember.

23 Q.  How long were you looking through the curtains of attorney

24 Zambrano's office on the second occasion?

25 A.  I was just passing by.  You're walking and you take a look.

DBC8CHE3                         Moncayo - cross

1    Q.  Two seconds?

2    A.  I don't know.  I didn't keep track of the time.

3    Q.  You kept moving as you passed by?

4    A.  Yes.  I stopped, I looked for a second, and I moved on

5    right away.

6    Q.  So the total time that you were looking through the

7    curtains, through the Windows, seeing Ms. Calva with attorney

8    Zambrano was about a second?

9           MR. GOMEZ:  Objection.

10          THE COURT:  Overruled.

11   A.  I don't know.  I was walking.  I looked.  I looked in for a

12   minute.  I stopped for a minute, I looked, and I left before

13   they spoke with me.

14   Q.  On that second occasion when you looked, describe exactly

15   what you saw Ms. Calva doing.

16   A.  She was sitting basically at the monitor.  I didn't see

17   anything else.

18   Q.  You saw the monitor and then she was behind it?

19   A.  Yes.  If you wish, I could draw it for you.

20   Q.  But I am accurately describing it, sir, that when you

21   looked for a second through the window, you saw a computer

22   screen and then Ms. Calva behind it, correct?

23   A.  I didn't see the screen.

24   Q.  You saw the back of the computer?

25   A.  Yes, I did, and she was in front of the monitor.

DBC8CHE3                      Moncayo - cross

1   Q.  And so when you're looking through the window, sir, and

2   you're looking at the computer, you're seeing the back of the

3   computer, correct, not the front screen but the back of it?

4   A.  Yes.

5   Q.  Ms. Calva is sitting on the second occasion, correct?

6   A.  In the two occasions when I saw her, because on the other

7   occasion she was on the other desk, she was standing.

8   Q.  The third occasion?

9   A.  I don't recall exactly, but it was on three occasions that

10  I saw her.

11  Q.  On that second occasion when you looked through the window

12  for a second, were you able to see her face?

13  A.  Well, it was almost, you could see her profile, the side of

14  her face a little bit.  The third time I was able to see her

15  face.

16  Q.  On none of these occasions, sir --

17  A.  The third time perfectly well, I saw her face perfectly

18  well.

19  Q.  On none of these three occasions were you able to observe

20  what she was doing, correct?

21          MR. GOMEZ:  Objection.  Form.

22          THE COURT:  Overruled.

23  A.  No, I was not able to see.

24  Q.  Is it fair to say, Mr. Moncayo, that you trust Pablo

25  Fajardo, correct?

DBC8CHE3                        Moncayo - cross

1    A.  Yes, sir.

2    Q.  And you trust Steven Donziger?

3    A.  Yes, sir.

4    Q.  And Luis Yanza as well?

5    A.  Yes, sir.

6    Q.  Mr. Fajardo asked you to come to New York to testify,

7    right?

8    A.  No.  They asked me back in Quito in 2010 when I made my

9    deposition.

10   Q.  20 days or so ago you spoke to Mr. Fajardo again about

11   coming here to New York, correct?

12   A.  No.  He knew from way back about that.

13   Q.  Did you speak to Mr. Fajardo prior to coming to testify

14   today about what you would testify?

15   A.  No.

16   Q.  Did Mr. Yanza ever ask you to open a bank account in your

17   name?

18            THE COURT:  Are you passing from that subject?

19            MR. BRODSKY:  Yes, sir.

20            THE COURT:  I just want to clarify something in my own

21   mind.

22            Mr. Moncayo, have you ever met the person you're

23   calling Ms. Calva?

24            THE WITNESS:  Physically, not by name, at the

25   courthouse.

DBC8CHE3                        Moncayo - cross

1            THE COURT:  When for the first time did that happen?

2            THE WITNESS:  In the court.

3            THE COURT:  When was that?

4            THE WITNESS:  When I saw her working in the offices of

5     Dr. Zambrano's.

6            THE COURT:  That would be on the first of the three

7     occasions you told us about today, is that correct?

8            THE WITNESS:  Sorry, the first one?

9            THE COURT:  You said you saw this woman in Mr.

10    Zambrano's office three times?

11           THE WITNESS:  Yes.

12           THE COURT:  Apart from those three occasions when you

13    saw this woman in that office, have you ever met her?

14           THE WITNESS:  Some 20 days ago possibly.  That's where

15    we introduced ourselves to each other and she gave me her name

16    and I gave her mine.

17           THE COURT:  Where did that occur?

18           THE WITNESS:  In her father's office.

19           THE COURT:  Mr. Brodsky.

20    BY MR. BRODSKY:

21    Q.  Who else was present for this meeting with Ms. Calva in her

22    father's office?

23    A.  There were three other people who were clients of her

24    father's.

25    Q.  Who were they?

DBC8CHE3                          Moncayo - cross

1   A.  I don't know them.

2   Q.  Men or women?

3   A.  Two women, one man.

4   Q.  How did they introduce themselves to you?

5   A.  Who?

6   Q.  The two women and one man who you don't remember their

7   names?

8   A.  No, I just saw them there.  The one I introduced myself was

9   to her because her father said she is my daughter.

10  Q.  How long were you at this meeting with Ms. Calva's father

11  and Ms. Calva?

12  A.  I went to take a look at some documents that -- her

13  documents that she was going to -- regarding her statement.  I

14  went to take a look at them before I came here.  I was on my

15  way here.  That's when Pablo had told me, go to Calva's office

16  to talk to him.  Did you know that he is Ms. Calva's father?  I

17  said, No, I didn't know that.  Well, you know, she is going to

18  do a deposition or she is going to do a witness declaration on

19  this.  And I went there in the morning and her dad told me she

20  wasn't there because she was going to look for a document in

21  the supreme electoral board, and that it was a document that

22  she didn't have and that she needed in order to have it

23  notarized.

24          He told me that she would be there in the afternoon so

25  I came back in the afternoon.  And that's when the father said,

DBC8CHE3                        Moncayo - cross

1    she is my daughter.  He said, my daughter, you already know

2    what you need to do, go to the notary's office.  We went to the

3    notary's office and her boyfriend was there, and she left with

4    her boyfriend.  The three of us went to the notary's office.

5    In the notary's office, they said she was lacking some things

6    and she had to go back, and she didn't turn the document over

7    to me.  And I haven't seen her since.

8    Q.  You said you went to look at her documents.  What

9    documents?

10   A.  I mentioned to you it was the same thing that I did here,

11   sworn statement.

12   Q.  You read her statement?

13   A.  No.

14   Q.  You looked at her statement?

15   A.  No, I didn't look at her statement.

16   Q.  You testified you went there to look at her documents.

17   What documents?

18   A.  I'm saying that I didn't have access to the documents

19   because she was missing some things that she had to add and she

20   didn't give me the documents.

21   Q.  In the afternoon, did she give you the documents after she

22   found the things that she needed?

23   A.  As I explained to you, in the morning when I went, she was

24   getting some documents and I never saw the documents.  I

25   returned in the afternoon to see the documents, but she didn't

1   give them to me then either because there were some things that

2   were missing at the notary and that had to be taken care of so

3   I didn't see it.

4   Q.  During the time you spent with her that afternoon, did you

5   speak to her?

6   A.  She was with her boyfriend.

7   Q.  Does that mean you did speak to her or you didn't speak to

8   her?

9   A.  No, I didn't speak to her.

10          THE COURT:  Was the boyfriend at her father's office

11   when you got there?

12          THE WITNESS:  He was on the outside.  After we went in

13   and we introduced each other and we left, he was outside.  What

14   I mean is outside her father's office.

15   Q.  When you were in the father's office with Ms. Calva, did

16   you speak to her?

17   A.  Yes.  I introduced myself to her.  I told her that I was

18   Don Moncayo, that I was going to get some documents that she

19   was going to give to send here.

20   Q.  Did you speak with Ms. Calva about coming to testify in New

21   York?

22   A.  When I introduced myself to her, I said I was coming to see

23   some documents about the statement that she was going to make.

24          THE INTERPRETER:  Your Honor, may I clarify something?

25          THE COURT:  Yes.

DBC8CHE3                          Moncayo - cross

 1          THE INTERPRETER:  Interpreter's correction.

 2   A.  I was going to pick up the document that she was going to

 3   give to me.

 4   Q.  Did you speak to Ms. Calva about how both of you were going

 5   to come to New York to testify?

 6   A.  No.  I asked her if she was going to come and testify here

 7   because she was giving me a sworn statement.  And I was also

 8   sending something that I had sworn to and that I had to come

 9   here.  So I asked her if she was coming here too.

10   Q.  What did she say?

11   A.  That she was going to speak with her mother and father.

12   That's all.

13   Q.  Mr. Fajardo also spoke to Ms. Calva, correct?

14   A.  I don't know.

15   Q.  Did the three people in the office of Ms. Calva's father

16   speak English or Spanish?

17   A.  Spanish.

18   Q.  Were they from Ecuador or from elsewhere?

19   A.  I never asked them for their nationality.

20   Q.  Did they work for the government of Ecuador?

21   A.  I don't know, sir.

22          THE COURT:  Did they give you their names or did any

23   of them?

24          THE WITNESS:  No.

25          THE COURT:  Did you tell them your name?

DBC8CHE3                          Moncayo – cross

1            THE WITNESS:  No, not to them, just to the daughter,

2    to the daughter of Mr. Calva.  To Ms. Calva, just to make

3    things clear.

4    Q.  Did you talk to Mr. Fajardo about the fact that he is not

5    coming to New York to testify in this case?

6    A.  He told me that he wasn't going to come here to testify

7    now.

8    Q.  Did he tell you that he was sending you instead?

9    A.  No.  He really has the wish to come and testify in New

10   York.

11           MR. BRODSKY:  I am moving to a new topic, your Honor.

12           THE COURT:  We will break now for lunch until 2:00.

13           MR. FRIEDMAN:  Your Honor, could we assign someone to

14   help him through the lunch hour?  We are not supposed to talk

15   to witnesses, but can we assign a staff person to help him get

16   through the lunch hour?

17           THE COURT:  Any objection?

18           MR. BRODSKY:  No.

19           THE COURT:  OK.  That's fine.

20           (Luncheon recess)

21

22

23

24

25

DBC8CHE3                          Moncayo – cross

1                              AFTERNOON SESSION

2                                   2:00 p.m.

3       DONALD MONCAYO, resumed

4              THE COURT:  The witness is reminded that he is still

5       under oath.

6              Proceed, Mr. Brodsky.

7       BY MR. BRODSKY:

8       Q.  Good afternoon, Mr. Moncayo.

9              Mr. Moncayo, I forgot to ask you about your drawing.

10      The last page attached to Defendants' Exhibit 1600, do you have

11      that in front of you?

12      A.  Yes.

13      Q.  By the way, Mr. Moncayo, the mailbox that you talk about in

14      your witness statement, where you go to get documents, to check

15      to see if there are new documents, what floor is that on in the

16      courthouse?

17      A.  Mailbox?  There is no mailbox there.

18      Q.  The locker or the place in your witness statement where you

19      say you go to pick up new documents?

20      A.  Oh, yes.  The box.

21      Q.  Yes.

22      A.  Yes.  It's on the ground floor, on the ground floor of the

23      building.

24      Q.  Thank you.

25              This drawing, did you draw Defendants' Exhibit 1600,

DBC8CHE3                         Moncayo - cross

1    the last page?

2    A.  Yes.

3    Q.  You didn't describe it to somebody else and somebody else

4    drew it, you drew it yourself?

5    A.  Yes, I drew it.

6    Q.  How many computers were in attorney Zambrano's office in

7    late 2010 when you were looking through the curtain as you were

8    passing by for a few seconds?

9    A.  I only saw two computers, as far as I can remember.

10   Q.  On each occasion that you passed by?

11   A.  I think it was the first or second time that I saw the

12   computers.  On the other occasions I didn't notice.

13   Q.  You noticed them on the first occasion and the second

14   occasion, but not the third occasion?

15   A.  No.  I think I noticed it the third time when --

16            THE INTERPRETER:  May I inquire, your Honor, please?

17            THE COURT:  Yes.

18   A.  -- when Ms. Calva was standing, and I can call her by that

19   name now.

20   Q.  Putting aside the time that Ms. Calva was standing, did you

21   notice that there were two computers in attorney Zambrano's

22   office on the prior two occasions?

23   A.  No.  What I noticed was she was working and the files from

24   the trial were there; they were working.

25   Q.  You noticed passing by the files from the Lago Agrio

DBC8CHE3                          Moncayo – cross

1   Chevron trial were on the desk?

2   A.  Yes.

3   Q.  You could tell from passing by that they related to the

4   Lago Agrio Chevron trial?

5   A.  There was another occasion when Juan, the clerk for the

6   court, he was carrying the files to the office of the president

7   from the warehouse where the documents, where they were being

8   stored.  And he was going towards the president's room or

9   office, and I asked him if it was from our case, and he said I

10  don't know, but it said it was *Maria Aquinda v. Chevron*.

11  Q.  When was this?

12  A.  I don't remember anymore, but it was way before I saw Ms.

13  Calva, way before.

14  Q.  In the same year or prior year?

15  A.  That same year, but two or three months before, or four

16  months.  I don't remember, but there was a space of time, a

17  space of time.

18  Q.  And you saw this individual passing by one of the hallways

19  of the courthouse with these cuerpos?

20  A.  It's the messenger, the messenger who works for the

21  president of the court who was carrying the files or the

22  cuerpos.

23  Q.  And that's who you saw?

24  A.  Yes.

25  Q.  And he was carrying them in his hands, right?

DBC8CHE3                    Moncayo – cross

1    A.  Yes.

2    Q.  And is it your testimony, sir, that several months later,

3    passing by attorney Zambrano's office when the curtain was open

4    a few feet, you were able to see in a few seconds those same

5    cuerpos that the messenger was carrying months before in

6    attorney Zambrano's office?

7    A.  I was able to see some files, some cuerpos, but I wasn't

8    able to read, but I figured they were ours because there were

9    lots of them.

10   Q.  I see.  So you don't know whether the cuerpos that you saw

11   on the three occasions you say you passed by attorney

12   Zambrano's office and looked through the curtain, whether any

13   of them had to do with the Lago Agrio Chevron case, right?

14   A.  Yes.  I wasn't able to see.  You couldn't read it either.

15   It was just my imagination that those were the cuerpos from our

16   trial.

17   Q.  You imagined that the cuerpos would be there in attorney

18   Zambrano's office, that's your testimony?

19   A.  I imagined so because that's where Juanito took them and

20   those were the cuerpos that I was able to read.

21   Q.  Have you been inside attorney Zambrano's office?

22   A.  No.

23   Q.  Never on a single occasion?

24   A.  No.

25   Q.  What floor is attorney Zambrano's office on?

DBC8CHE3                    Moncayo - cross

1    A.  I think it's on the third floor.

2    Q.  Would you turn to paragraph 11 of your statement in Defense

3    Exhibit 1600?

4         You agree, don't you, Mr. Moncayo, that the mailbox or

5    the locker is not on the same floor as attorney Zambrano's

6    office, right?

7         I notice you are smiling, Mr. Moncayo, when I am

8    asking you that question.

9    A.  You called me Zambrano.

10   Q.  That's a good reason to smile.  I can't believe I have

11   mistaken you with a person wearing a red hat.

12        Mr. Moncayo, my apologies.

13        You agree with me, Mr. Moncayo, that attorney

14   Zambrano's office is not on the same floor as where the mailbox

15   is located, right?

16   A.  No.  The mailbox is downstairs.

17   Q.  So in your written statement when you say in November and

18   December of the year 2010, I would go to the court to check the

19   locker to see if there were new documents, and go on to say you

20   passed by the office of Judge Zambrano, you went to check the

21   new documents on one floor and then went to a different floor

22   to pass by Judge Zambrano's office, right?

23   A.  That's right.  If you allow me, I could explain.

24   Q.  I have some other questions for you, Mr. Moncayo, and we

25   are short on time.

DBC8CHE3                         Moncayo – cross

1        I just want to ask you about the three other people
2   that was in Ms. Calva's father's office.
3        You said that they were clients of Ms. Calva's father,
4   right?
5   A.  I said that they were clients because they were there
6   speaking with him, and he is a lawyer.  I don't know if he
7   works for them.  That's my imagination.
8   Q.  Did you pick up attorney Zambrano's witness statement
9   before he came to New York?
10  A.  No.
11  Q.  Did Pablo Fajardo ask you to speak to or send you to speak
12  to any other people who were coming up to New York to testify?
13  A.  Just with Ms. Calva.  And I need to clarify something that
14  I forgot about before about Ms. Calva.  Can I clarify?
15  Q.  Which part of your story about Ms. Calva do you want to
16  clarify?
17  A.  About a phone call that was made to my phone to talk with
18  her.
19  Q.  Who called you?
20  A.  The lawyer Marissa from the team here.
21  Q.  A lawyer from the United States called you about Ms. Calva?
22  A.  Yes.  But I clarified to Pablo that Ms. Calva was just now
23  going to give me the documents, and Pablo told me to ask her if
24  she wanted to travel.  And since she had told me she needed to
25  speak to her father and her mother, I told that to Pablo.  I

DBC8CHE3                         Moncayo - cross

1  think Pablo spoke with the lawyer here, and they called my

2  phone number to talk to her.

3          THE COURT:  How do you know that Pablo spoke to a

4  lawyer here?

5          THE WITNESS:  Because they called me -- afterwards

6  they called me on my phone from here.

7          THE COURT:  Did Pablo tell you that he spoke to a

8  lawyer here?

9          THE WITNESS:  No.  But Marissa introduced herself as

10  the lawyer.

11          THE COURT:  How did she introduce herself exactly?

12          THE WITNESS:  She helped me.  I sent her the

13  questions.  To be more clear, my deposition in writing, and

14  that happened before so I already had her contact.

15  Q.  You sent this woman your witness statement, is that what

16  you're saying?

17  A.  Yes, because when Pablo had already told me or warned me.

18  Q.  Later this woman contacted you to get in touch with Ms.

19  Calva?

20  A.  Yes.

21  Q.  This is after you had spoken to Pablo Fajardo and Mr.

22  Fajardo told you to go to Ms. Calva's father's office?

23  A.  When I was in Ms. Calva's office, because I was told to go

24  at 3 in the afternoon because the documents would be ready.

25  Before that I had already called Pablo to let him know that the

1    documents had not been ready in the morning because she was

2    getting a document at the supreme court.  So it was in the

3    afternoon that I let them know that Ms. Calva said that she

4    needed to speak to her mother and father.

5    Q.  You don't remember the woman's name who spoke to you by

6    phone?

7    A.  Marissa.

8    Q.  Who did she say she was?

9    A.  Pablo told me she is going to call me, and when she called

10   me, that's how she introduced herself.  Or maybe it was through

11   mail.  I don't really remember, but we got in touch with her.

12   Q.  Have you seen that woman since coming to New York?

13   A.  Yes.

14   Q.  Who is she?

15   A.  She is a lawyer from the team who works for us.  She is a

16   volunteer.

17   Q.  When Mr. Fajardo first raised Ms. Calva with you, did he

18   tell you that that's the woman who was in attorney Zambrano's

19   office in 2010?

20   A.  Like I said before, Pablo said, do you know who this lady

21   is?  And as I said before, I had only seen her three times in

22   the past before.  He said, she is the daughter of Mr. Calva,

23   and she is going to hand over some documents.  I went in the

24   morning.

25   Q.  Mr. Moncayo, I want to move to a different topic.

DBC8CHE3                          Moncayo - cross

```
1              THE COURT:  Before you do.
2              Mr. Moncayo, did I correctly understand you to say
3     that you sent a document or documents to this woman named
4     Marissa?
5              THE WITNESS:  Yes, my statement.
6              THE COURT:  How did you send them to her?
7              THE WITNESS:  Through the mail.
8              THE COURT:  Did you put the document in an envelope to
9     send it through the mail?
10             THE WITNESS:  Electronically.
11             THE COURT:  So you sent the document by e-mail, is
12    that right?
13             THE WITNESS:  Yes, I have a page.
14             THE COURT:  You have a page?
15             THE WITNESS:  An e-mail address.
16             THE COURT:  What was the e-mail address?
17             THE WITNESS:  I don't recall hers.  I only have the
18    name that they had given me.
19             THE COURT:  Finish, please.
20             THE WITNESS:  My e-mail?
21             THE COURT:  Her e-mail.
22             THE WITNESS:  I would have to look into my computer
23    for that.
24             THE COURT:  Where is that?
25             THE WITNESS:  My computer?
```

1          THE COURT:  Yes.

2          THE WITNESS:  I have it at the hotel.

3          THE COURT:  Here in New York?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Mr. Brodsky.

6   BY MR. BRODSKY:

7   Q.  Mr. Moncayo, you have on that computer documents from Selva

8   Viva?

9   A.  No, sir.

10  Q.  Do you have any documents on that computer relating to the

11  Lago Agrio Chevron case?

12  A.  No, sir.  I don't have those documents.

13  Q.  Do you have any e-mail communications on that computer with

14  Pablo Fajardo?

15  A.  I think so, yes.

16  Q.  Do you save old e-mails?

17  A.  I don't think up to today I ever erased any e-mails.

18  Q.  Who else do you communicate on the Lago Agrio plaintiffs'

19  team, legal team, other than Mr. Fajardo by e-mail?

20  A.  Well, I don't know.  I don't remember.  Don Luis also sends

21  me e-mails.

22  Q.  Luis Yanza?

23  A.  Yes.

24  Q.  Anybody else?

25  A.  Veronica Asimbaya who is a secretary who works in Selva

DBC8CHE3                        Moncayo - cross

1    Viva.

2    Q.  What about Juan Pablo Saenz?

3    A.  I don't think he usually sends me e-mails, a few, almost

4    none.

5    Q.  Julio Prieto?

6    A.  It's been a while since I have seen him or that we have

7    exchanged correspondence.

8    Q.  Steven Donziger?

9    A.  No.  I have no e-mails from him either.

10         MR. BRODSKY:  Your Honor, we would ask for the

11   production of those materials on Mr. Moncayo's computer.  We

12   intend to serve a subpoena for those materials since they are

13   in New York.

14         THE COURT:  Counsel.

15         MR. FRIEDMAN:  I guess they have got a right to serve

16   him with a subpoena, and we can address what they have asked

17   for.  He probably needs a lawyer.

18         THE COURT:  That could be.

19         All right.  You will serve him with a subpoena if you

20   wish.

21   Q.  Mr. Moncayo, do you know David Russell?

22   A.  No, no.  And if I do know him, I don't remember his name.

23   Q.  Do you know Dr. Charles Calmbacher?

24   A.  Names in English are very difficult for me.

25   Q.  Did Mr. Yanza ever ask you to open a bank account in your

DBC8CHE3                         Moncayo - cross

1   name?

2   A.  No.

3   Q.  Did he ever talk to you about opening a bank account in

4   your name?

5   A.  No, sir.  I have three accounts.

6   Q.  Did you ever deposit money in a bank account at the

7   direction of anybody at Selva Viva?

8   A.  Don Luis.

9   Q.  Luis Yanza that is?

10  A.  Yes.

11  Q.  Other than depositing money in Luis Yanza's account, did

12  you deposit money in anybody else's bank account at Selva

13  Viva's direction?

14       THE INTERPRETER:  Could you repeat the question?

15  Q.  Other than depositing money in Luis Yanza's bank account,

16  did you deposit money in any other bank account at the

17  direction of somebody at Selva Viva?

18  A.  Not that I recall, no.

19       MR. BRODSKY:  May I approach, your Honor?

20       THE COURT:  Yes.

21  Q.  Mr. Moncayo, I am showing you a multipage document,

22  Plaintiff's Exhibit 871.  At the top of the first page, it says

23  an e-mail toxico@ecuanex.net.ec, June 13, 2007, to Steven

24  Donziger.

25       The first three pages are in English, Mr. Moncayo, but

DBC8CHE3                         Moncayo – cross

```
 1   if you turn to page 5, it's in Spanish.  After you have looked
 2   at it, I want to direct your attention to it.
 3   A.  I think it's too much for me to read.  I'd rather you say
 4   it.
 5   Q.  Understood, Mr. Moncayo.
 6            Just directing your attention on the bottom of page 5,
 7   where it says, "The other option is to open it in Lago in the
 8   name of someone from there, for example, Donald."
 9   A.  I have a question.  Excuse me.  Could I ask it?
10   Q.  Sure.
11   A.  I would like for you to underline.
12   Q.  If you look at the top of the screen on the right-hand
13   side, we have highlighted the words in Spanish in Plaintiff's
14   Exhibit 871.  Do you see the highlighting?
15            Did Mr. Yanza or anyone from Selva Viva ask you to
16   open a bank account in your name or someone else's name in Lago
17   Agrio?
18   A.  Not that I remember.  As I said before, the three accounts
19   that I have opened are for my own use.
20   Q.  If you turn to the next page, the second to last page, you
21   see it's highlighted where it says, "I will transfer it to the
22   new secret account"?
23   A.  I'm unaware.
24   Q.  You're unaware of a secret account opened by people at
25   Selva Viva?
```

DBC8CHE3                     Moncayo - cross

 1   A.  Yes, sir.

 2              MR. BRODSKY:  May I approach, your Honor?

 3   Q.  Mr. Moncayo, I am showing you what is marked as Plaintiff's

 4   Exhibit 1279, which is Bates number DONZ 55225.

 5              On top of the first page it says from Julio Prieto to

 6   Steven Donziger, Juanpasaenz@hotline.com, Luis; Yanza, from

 7   Pablo Fajardo Mendoza.

 8              Let me direct your attention to where it says, "But

 9   the problem, my friend, is that the effects are potentially

10   devastating in Ecuador.  Apart from destroying the proceeding,

11   all of us who are attorneys might go to jail."

12              Did you participate in any conversation with Julio

13   Prieto, Steven Donziger, Juan Pablo Saenz, Luis Yanza, or Pablo

14   Fajardo about possibly going to jail?

15   A.  No.

16   Q.  Did Mr. Fajardo ever bring up at a meeting of the assembly

17   of the affected the possibility that the disclosure that they

18   had written Richard Cabrera's expert report might cause them to

19   go to jail?

20   A.  There were two or three meetings of the assembly at which I

21   was at.

22   Q.  Go ahead.  Sorry.

23   A.  And at those meetings nothing was raised about ending up in

24   jail.

25   Q.  Approximately when did you attend these two or three

DBC8CHE3                        Moncayo - cross

1    meetings of the assembly of the afectados?

2    A.  I have always been present at the assemblies.  I think it

3    was 2009.  It's hard to remember since I have always been at

4    them.  And if you wish, I could clarify to you and explain to

5    you what an assembly is, what is an executive committee

6    meeting, and what is a meeting.

7    Q.  Please go ahead.

8    A.  The assembly of the affected is made up of 42 delegates of

9    the fields that have been affected.

10   Q.  Mr. Moncayo, my question is, how many meetings did you

11   attend?  So let me break it down.

12       How many meetings did you attend of the assembly

13   itself, putting aside the executive committee?

14       MR. GOMEZ:  Objection.  The witness asked to explain.

15   He was told, please go ahead, and he was interrupted.

16       THE COURT:  Overruled.

17   A.  I had said that in some assemblies and meetings.  I am

18   unaware of the number, but I know that it's been many.

19   Q.  When was the last time you were at an assembly meeting?

20   A.  I think it was like around two months ago.

21   Q.  Approximately when was the first assembly meeting you went

22   to?

23   A.  I think it was around 2004, 2003.

24   Q.  How many meetings of the executive committee of the

25   assembly have you attended?

DBC8CHE3                        Moncayo - cross

```
 1   A.  I am a member of the executive committee of the assembly.

 2   Q.  How many meetings of the executive committee have you

 3   attended, apart from the assembly meeting -- withdrawn.

 4           Does the executive committee of the assembly have

 5   meetings separate and apart from the assembly?

 6   A.  Yes.

 7   Q.  How many of those meetings did you attend of the executive

 8   committee of the assembly which is apart from the assembly

 9   meeting?

10   A.  It's very hard to say.  Sometimes we meet every 15 days,

11   sometimes every 20, whenever the situation calls for it.

12   Q.  You have a leadership role on the assembly now, right?

13   A.  I am the president of the union of those who have been

14   affected by Texaco in Lago Agrio.

15   Q.  And you as the president on that committee from time to

16   time receive documents relating to the business of the assembly

17   of the afectados, right?

18   A.  We are informed as to what happens, yes.

19   Q.  And you're informed by whom?

20   A.  Pablo, who is the procurador of our case.

21   Q.  Pablo meaning Pablo Fajardo?

22   A.  Fajardo.

23   Q.  You have those documents on the computer back in your hotel

24   room in New York, right?

25   A.  Documents?  My computer is there.  I have no fear that you
```

DBC8CHE3                          Moncayo - cross

```
 1    can take a look at it.  Just don't erase anything that is
 2    there.
 3    Q.  Are the meetings of the executive committee of the assembly
 4    that you're on held at Selva Viva's offices?
 5            THE INTERPRETER:  Can you repeat the question for the
 6    interpreter?
 7    Q.  Are the meetings of the executive committee of the assembly
 8    held at Selva Viva's offices?
 9    A.  Lago Agrio, yes.
10    Q.  There are minutes kept of these meetings, right?
11    A.  Of course we take minutes.
12    Q.  And, of course, from time to time, Pablo Fajardo sends
13    e-mail communications to you and other members of the assembly
14    informing them of developments in the Lago Agrio Chevron case?
15    A.  No.
16    Q.  Where are the minutes of the meetings of the assembly kept?
17    A.  We hold the meetings.  We are convened at the meetings and
18    the secretary take minutes of what is taking place at the
19    meeting.  And from there the president of the organization,
20    Humberto Piaguaje, who is a coordinator, he has to sign them in
21    order for them to be legal.
22    Q.  Then they are kept at Selva Viva's offices?
23    A.  Yes.
24    Q.  Were you present at any meeting of the assembly --
25            THE COURT:  I'm sorry.
```

DBC8CHE3                         Moncayo - cross

1              The minutes that are at Selva Viva, they are physical

2      documents, is that true?

3              THE WITNESS:  Physical documents.

4              THE COURT:  Go ahead, counsel.

5      Q.  At any of the assembly meetings and the executive committee

6      meetings of the assembly that you attended, did Pablo Fajardo

7      inform you of Chevron's allegations that the report issued by

8      Richard Cabrera was actually written by the Lago Agrio

9      plaintiffs' team along with Steven Donziger and others?

10     A.  No.  The only thing that Pablo informed us about was that

11     there was a ruling that the court had made, that if anybody had

12     any information that could be of use to the expert in order for

13     him to carry out his work, could we please give it to them.

14     Q.  When was that?

15     A.  I no longer remember, but it was around 2008.

16     Q.  And Pablo Fajardo told you, correct, that it was

17     permissible and appropriate for the Lago Agrio plaintiffs to

18     provide information to Richard Cabrera, right?

19     A.  Yes.  That the court had given us -- had authorized us to

20     give him information.

21     Q.  Did Pablo Fajardo ever tell you at any of these meetings

22     that he and others were actually writing the report for the

23     independent expert, Richard Cabrera?

24     A.  No.

25     Q.  When Chevron alleged that Pablo Fajardo and others on the

DBC8CHE3                        Moncayo - cross

 1  Lago Agrio plaintiffs' team had written Richard Cabrera's

 2  supposedly independent expert report, were you aware of that?

 3              MR. GOMEZ:  Objection.  Form.

 4              THE COURT:  Overruled.

 5              Please answer.

 6  A.  Can you please repeat the question?

 7  Q.  Sure.

 8              THE COURT:  Read it back.

 9              (Record read)

10  A.  No.

11  Q.  Was the assembly ever informed that the Lago Agrio

12  plaintiffs' legal team was making payments to Richard Cabrera

13  outside the court procedures?

14  A.  No.

15  Q.  Sir, had you been told that Pablo Fajardo and other people

16  on the Lago Agrio plaintiffs' legal team wrote Richard

17  Cabrera's report, you would have been upset about that, right?

18              MR. GOMEZ:  Objection.

19              THE COURT:  Sustained as to form.

20  Q.  Had you been informed, Mr. Moncayo, that Pablo Fajardo and

21  other people on the Lago Agrio plaintiffs' team wrote Richard

22  Cabrera's report, you would have fired him, right?

23              MR. GOMEZ:  Objection.

24              THE COURT:  Sustained.  Form.

25  Q.  If you knew, sir, that Pablo Fajardo and other people on

DBC8CHE3                        Moncayo - cross

```
 1   the Lago Agrio plaintiffs' team wrote Richard Cabrera's report,

 2   you would fire Pablo Fajardo, right?

 3            MR. GOMEZ:  Objection.

 4            THE COURT:  Sustained.  Same question.  Same ruling.

 5            MR. BRODSKY:  What is the nature of the form problem?

 6            THE COURT:  It's sort of speculative.  Maybe he would

 7   have thought it was a great thing.

 8   Q.  Did you know, Mr. Moncayo, that Mr. Donziger, Pablo

 9   Fajardo, Juan Pablo Saenz, Julio Prieto, and Luis Yanza wanted

10   to stop Petroecuador in 2009 from cleaning up oil

11   contamination?

12            MR. GOMEZ:  Objection.

13            THE COURT:  What is the objection?

14            MR. GOMEZ:  Foundation.

15            THE COURT:  I think there is a good faith basis for

16   this question.  Overruled.

17   A.  No, I didn't know.

18   Q.  Was that ever brought up, that topic of stopping

19   Petroecuador from cleaning up oil contamination in 2009 ever

20   raised at a meeting of the assembly of the affected?

21   A.  I think I said that once in 2011.  And according to the

22   question, from my deposition in 2011, if I remember, I was

23   asked the same question.  And I remember having said that

24   during the assembly.  I asked that same question, why were they

25   stopping them?
```

DBCLCHE4                     Moncayo - cross

1   Q.  Who did you ask that question of?

2   A.  Pablo Fajardo.

3   Q.  And what did Pablo Fajardo say?

4   A.  The answer is very easy.  The thing is that Petroecuador is

5   cleaning up the evidence for Chevron.

6   Q.  And did the assembly approve the Pablo Fajardo, Pablo

7   Fajardo's efforts to stop Petroecuador from cleaning up oil

8   contamination in Ecuador?

9           MR. GOMEZ:  Objection.

10          THE COURT:  Overruled.  Please answer.

11          THE INTERPRETER:  Just a moment, Judge.  I haven't

12   interpreted the question.

13   A.  With the assembly, I don't think I participated in one of

14   those meetings because Pablo had already informed the assembly.

15   In fact, there was also a resolution regarding that.

16   Q.  And Pablo Fajardo obtained the resolution that he and

17   others should stop Petroecuador from cleaning up oil

18   contamination in Ecuador, correct?

19   A.  He had the authorization from the assembly to authorize it

20   and to and to map out -- and to map out the area that needed to

21   be cleaned.

22          THE COURT:  You said, sir, to authorize it.  What was

23   the "it" that was authorized?

24          THE WITNESS:  He was authorized to present a document,

25   what I just mentioned beforehand, to the environmental ministry

DBCLCHE4                    Moncayo – cross

 1   and that document also requested that they should demand that

 2   Petroecuador would clean up Campo Ecuador, which was their

 3   responsibility.

 4           MR. BRODSKY:  May I approach, your Honor?

 5   Q.  Mr. Moncayo, I'm showing you Plaintiff's Exhibit 1142,

 6   which is an email exchange dated June 22, 2009.  The last email

 7   in the chain is from Steven Donziger, June 22, 2009, to Juan

 8   Pablo Saenz, copy to Pablo Fajardo, Julio Prieto, Luis Yanza,

 9   and two other email addresses.  The subject line, worrisome.

10           Let me ask you to turn to the second page, sir.  We'll

11   put it up on the screen to make it easy for you and highlight

12   the words.  If you would highlight what's worrisome, that

13   paragraph.

14           Would you read what's highlighted where it says --

15   what's highlighted on the screen.

16           THE COURT:  Read it to yourself.

17           Question.

18   Q.  Yes.  Did Pablo Fajardo inform the assembly that the state

19   of Ecuador, Petroecuador, planned to spend $96 million to

20   remediate the environmental waste including that left by

21   Chevron in 2009?

22   A.  Yes.  I knew about this because it was mentioned in the

23   assembly.

24   Q.  And then directing your attention to the first page where

25   Mr. Donziger says, just highlight where he says at the top you

1   have to go to Correa to put an end to this S-H-I-T once and for

2   all.

3            Do you see that?

4   A.  Yes, I knew about that too.

5   Q.  You knew the assembly -- withdrawn.

6            You knew Pablo Fajardo, Steven Donziger, and other

7   people on the Lago Agrio plaintiffs' team were going to Correa

8   to put a stop to cleaning -- Petroecuador cleaning up oil

9   contamination, right?

10  A.  Yes.  Yes, but a report from PEPDA from 2007 they did the

11  same thing that Texaco did and we were not in agreement.

12           THE COURT:  Is it true that they told the assembly

13  that they wanted the remediation stopped because it would be

14  bad for the lawsuit, perhaps among other reasons?

15           THE WITNESS:  No.  After I found out about all of

16  this, the objective was to demand that they perform a real

17  remediation to repair properly.

18           MR. BRODSKY:  Your Honor, I just have one more area

19  left.  This might be a good time to afternoon break if you

20  would like.  I have probably 20 more minutes.

21           THE COURT:  Okay.  We'll take our break here.

22           (Recess)

23           THE COURT:  Mr. Brodsky.

24           MR. BRODSKY:  Yes.  Thank you, your Honor.

25  Q.  Mr. Moncayo, the Lago Agrio plaintiffs' team filed

DBCLCHE4                    Moncayo - cross

1    documents from time to time in the Lago Agrio Chevron case,

2    correct?

3            THE INTERPRETER:  Could you repeat the question.

4    Q.  The Lago Agrio plaintiffs' team, legal team, filed

5    documents from time to time in the Lago Agrio Chevron case,

6    correct?

7    A.  Where did we file them?

8    Q.  From time to time you filed them in the Lago Agrio

9    courthouse?

10   A.  Of course we filed documents.  You guys did it.

11   Q.  Of course Pablo Fajardo notified the assembly on occasions

12   that Fajardo and the legal team were going to file documents in

13   the Lago Agrio case?

14   A.  At the beginning, yes, but later the team, the legal team

15   would take care of this because we understand very little of

16   this.  Can I continue?

17           THE COURT:  Yes.

18   A.  Thank you.  What we were given was more of a summary of

19   what was going on, you see.  And from those summaries that we

20   got as the assembly of the Afectados, of the affected, we had

21   to decide as to what measures we would take or what, using as

22   based on the reports that the attorneys gave us.

23   Q.  Now, you're not a Lago Agrio plaintiff, right, in the Lago

24   Agrio Chevron case?

25   A.  I'm not a signer.  I am a plaintiff.

DBCLCHE4                    Moncayo – cross

1   Q.   Are you a named plaintiff in the case?

2   A.   There is more than 30,000 of us there.

3   Q.   Are you one of the named people in the lawsuit?

4   A.   In the one that they sign you mean?

5   Q.   Are you familiar with the complaint that was filed by the

6   Lago Agrio plaintiffs against Chevron in Lago Agrio courthouse?

7   A.   Yes, I am.  But what I am not is one of the signers of the

8   suit.

9   Q.   When you say you're not one of the signers, you're not one

10  of the named people listed as a plaintiff in the case?

11  A.   No, no.  My name does not appear among the list of the

12  plaintiffs.  My name and last name does not appear there.  But

13  I am not certain about what the name of the action in Lago

14  Agrio is called where others signed for the rest.  It's a class

15  action.

16  Q.   That's your understanding?

17  A.   Yes.

18  Q.   And Pablo Fajardo represents the Lago Agrio plaintiffs in

19  the lawsuit, right?  I'll withdraw it.

20          Have you been, have you ever attended an assembly

21  session where the assembly did not authorize Pablo Fajardo to

22  take some action that he requested?

23          MR. GOMEZ:  Objection.

24          THE COURT:  Sustained as to form.

25          Don't answer.

DBCLCHE4                         Moncayo – cross

1   Q.  Did you have an occasion, Mr. Moncayo, where Pablo Fajardo

2   asked for authorization to take an action in the Lago Agrio

3   Chevron case and the assembly refused?

4               MR. GOMEZ:  Objection.

5               THE COURT:  Overruled.

6   A.  I don't remember but, yes, on many occasions, the assembly

7   has asked him to clarify things.  And if social actions were

8   carried out in Lago Agrio, they were strictly as a result of

9   the decisions of the assembly.

10  Q.  A few minutes ago, Mr. Moncayo, you said it was you were --

11  withdrawn.

12              When you said, when the translator said class action,

13  did you mean collective action as opposed to class action?

14  Withdrawn.

15              When the interpreter said, interpreted what you said

16  as class action, did you mean to say collective action?

17              MR. GOMEZ:  Objection.

18              THE COURT:  Overruled.

19  Q.  I'm sorry, I didn't hear the answer.

20  A.  I don't know the word in English, hacks action or whatever.

21  Q.  What word did you say in Spanish when you were describing

22  what action you were jointly taking with others in the

23  assembly?

24  A.  Collective action.  It's -- can I continue?

25  Q.  I think you answered my question and I want to move on to

DBCLCHE4                       Moncayo - cross

1    the final thing.

2            Mr. Moncayo, did you know that Steven Donziger is

3    entitled to 31.5 percent of any money -- withdrawn.

4            Did you know that Steven Donziger is entitled to a

5    percentage of the money collected in the judgment issued under

6    the name attorney Zambrano?

7            MR. GOMEZ:  Objection, form.

8            THE COURT:  Overruled.

9    A.  Excuse me, the last words of Mr. Zambrano you said?

10   Q.  Let me ask the question, rephrase the question.

11           Did you know that Steven Donziger is entitled to a

12   percentage of the money collected in the judgment in the Lago

13   Agrio Chevron case?

14   A.  Yes.

15   Q.  And did you know Mr. Donziger is entitled to get --

16   withdrawn.

17           Did you know that if the full amount of the judgment

18   is collected, Mr. Donziger is entitled to receive approximately

19   $1.2 billion?

20           MS. LITTLEPAGE:  Objection, mischaracterizes evidence.

21           THE COURT:  I couldn't understand you, ma'am.

22           MS. LITTLEPAGE:  Objection, foundation,

23   mischaracterizes the evidence.

24           THE COURT:  Overruled.

25   A.  I know that he has a percentage that was also approved by

DBCLCHE4                    Moncayo – cross

1    the assembly for the work that he has carried out, but in fact

2    I really don't know what the amount is.

3         THE COURT:  Correct me if I'm wrong, Ms. Littlepage,

4    but doesn't the retainer agreement say that he gets 31 and a

5    half percent of the legal fees which are fixed at 20 percent?

6         MS. LITTLEPAGE:  Judge, I think in his deposition he's

7    explained what that means and I don't believe it adds up to

8    that.  But he'll be here to testify.

9         THE COURT:  Thirty-one and a half percent times

10   20 percent is six point something percent times $19 billion?

11   The math is pretty simple, isn't it?

12        MS. LITTLEPAGE:  Judge, I think he explains in his

13   deposition and I think he'll explain it again in the courtroom.

14        THE COURT:  Perhaps he will.  There's certainly a

15   basis for it.

16   Q.  Did you know that Pablo Fajardo is entitled to get

17   approximately $381 million if the entire amount of the judgment

18   is collected?

19   A.  I know he also has a percentage, but that is what is dealt

20   with over there.

21   Q.  And --

22   A.  And I did not know that Pablo had a percentage.

23   Q.  Did the assembly discuss the percentage Pablo Fajardo would

24   make if the entire amount of the judgment were collected --

25   withdrawn.

DBCLCHE4                    Moncayo – cross

1          Did the assembly discuss the percentage of the legal

2     fees Pablo Fajardo was going to collect?

3     A.  Yes.  Excuse me, yes, but we talk in terms of percentage

4     points.

5     Q.  What percentage points did Pablo Fajardo say he was going

6     to get?

7     A.  I don't know.  It's what it is.  But he, along with the

8     rest of the team, Juan Pablo, Julio, they get a percentage.

9     Q.  Mr. Moncayo, you had mentioned earlier a woman named

10    Marissa that you were in contact with?

11    A.  Yes.

12    Q.  Is she in the courtroom now?

13    A.  Yes.

14    Q.  Would you point her out, please?

15    A.  If I could ask her to stand up, your Honor.

16    Q.  Mr. Moncayo.

17          THE COURT:  The record will reflect that he identified

18    a lady sitting in the right rear of the courtroom as I face the

19    courtroom.

20          MR. BRODSKY:  Your Honor, that concludes the questions

21    I have on cross-examination.  I have a subpoena.  I don't know

22    if there's going to be redirect, but I do have a subpoena to

23    provide Mr. Moncayo, request the Court's permission to serve

24    him with the subpoena at the Court's --

25          THE COURT:  Is it in English or do you have a Spanish

DBCLCHE4

```
 1    translation as well?

 2              MR. BRODSKY:  We do.

 3              THE COURT:  And the fees?

 4              MR. BRODSKY:  We will make the arrangement to pay the

 5    fee.

 6              What we would respectfully ask, your Honor, is that

 7    Mr. -- I know Mr. Moncayo must want to return to Ecuador.  We

 8    would ask that he provide his computer for imaging at his

 9    earliest convenience, perhaps as early as tomorrow morning, and

10    then that --

11              THE COURT:  What does the subpoena require?

12              MR. BRODSKY:  It requires the production of documents,

13    your Honor, not an image of the computer.  I'm sorry.  It

14    requires an image of the computer.

15              THE COURT:  May I see it?

16              MR. BRODSKY:  Yes, your Honor.

17              (Pause)

18              THE COURT:  All right.  Come to the side bar.

19              (At the side bar)

20              THE COURT:  All right.  I've had the clerk issue the

21    subpoena.  Now, service is no good without the witness fee and

22    the mileage.  So somebody better open his wallet.

23              MR. MASTRO:  We're going to do that right away, your

24    Honor.  A check is being signed right now.

25              THE COURT:  So I note that the subpoena calls for the
```

DBCLCHE4

1   production of the computer for the purpose of having it imaged.

2   I don't know that the defense has any standing to object, but

3   I'll hear you if there's anything you want to say.

4           MS. LITTLEPAGE:  Judge, we do not represent the

5   witness.

6           THE COURT:  I understand.

7           MS. LITTLEPAGE:  The witness will need to get a

8   lawyer.

9           THE COURT:  Whose problem is that?

10          MS. FRIEDMAN:  I suspect since they're -- I don't

11  know.  I haven't had a chance to look at this closely.  But I

12  guess they're asking for communications from us to him which

13  would be work product protected, potentially.

14          THE COURT:  Potentially, maybe.

15          MS. FRIEDMAN:  Yeah.  I don't know what we said, but

16  so I guess it's partly our problem.  It's partly our problem

17  just out of a sense of fairness, your Honor.  We brought him up

18  here.  Now people want his computer.  It seems like we'd like

19  to make some efforts to help him get a lawyer and give him a

20  chance to respond.

21          Part of my discomfort, your Honor, is that I don't

22  know the history of this litigation in terms of the privilege

23  issues and things like that.  So I don't want to make arguments

24  that aren't meritorious.

25          THE COURT:  I understand.

DBCLCHE4

1           MS. FRIEDMAN:  If I were in a different situation, I

2     would say it seems a little unusual, but I don't know enough to

3     say that it's a little unusual.

4           So I guess does it require a time and place?  I didn't

5     see.  I guess what I would like to offer is that we will work

6     with him to get him a lawyer who can communicate with Chevron

7     and deal with this in an orderly way.

8           THE COURT:  Mr. Gomez?

9           MR. GOMEZ:  Well, your Honor, I think it's our

10    obligation, like Mr. Friedman said, to provide the witness some

11    guidance.  I don't know why though, just thinking off the top

12    of my head, why the plaintiff would be entitled to a mirror

13    image of the hard drive without some indication that

14    Mr. Moncayo has failed to undertake a reasonable effort to

15    review his computer and print out or generate whatever

16    documents the plaintiffs are requesting.

17          THE COURT:  Well, Mr. Gomez, your clients were ordered

18    to produce, among other things, a great many other things, all

19    documents relating to the assembly and your clients refused

20    notwithstanding a court order.  And it turns out that the

21    minutes are sitting in his office back in Ecuador.  And if they

22    turn up on this computer, they're certainly subject to an

23    outstanding order.  So that's just for starters.

24          Now, I'm not saying there aren't any meritorious

25    objections, but I surely am not highly receptive to the notion

DBCLCHE4

1    that this guy ought to be permitted to get on the airplane with

2    the computer and vanish.

3          MR. GOMEZ:  I understand the Court's position.  I

4    still think he should be given an opportunity to review the

5    subpoena with the assistance of counsel, review his computer

6    and be able to print out whatever materials there is.  We can

7    make a showing to the plaintiffs that a proper search of the

8    computer has been made before the additional burdensome step is

9    taken of actually mirror imaging everything that's on this

10   gentleman's private computer.

11         THE COURT:  The imaging is a lot less burdensome than

12   what you propose.  But it seems to me that what ought to be

13   done is it ought to be imaged and the image then ought to be

14   made available, one of the copies ought to be made available to

15   whomever is going to represent him, and the other ought to be

16   placed in the custody of the clerk of the court.  And then

17   we'll take it from there.

18         Now, we have a further problem and the further problem

19   is that if this man leaves the country, how do we know he comes

20   back if it turns out that on the basis of what's in the

21   computer there needs to be further examination.

22         MR. GOMEZ:  I understand the point, your Honor.  My

23   concern as to burdensomeness is the burdensomeness of his

24   privacy concerns, not the burdensomeness of the logistics of

25   removing the materials.

DBCLCHE4

1        THE COURT:  The privacy concerns are fully addressed

2   by having one copy under seal in the clerk's office and the

3   other in the hands of his lawyer, whoever that turns out to be.

4   Right?

5        MR. GOMEZ:  Correct.

6        THE COURT:  So let's not talk about that anymore.

7        What about the assurance, if any, that he shows up to

8   testify in the event that turns out to be required?

9        MS. FRIEDMAN:  Well, my reaction to that, your Honor,

10  is Chevron is willing to pay for him to stay until -- I'm not

11  speaking for him because I don't know his situation.  I do know

12  our situation in terms of finances.  If they're willing to pay

13  for him to stay here, we'd be willing to work with them on

14  that.  I don't know even when he's scheduled to leave.

15       MR. GOMEZ:  I don't.

16       MS. FRIEDMAN:  We can find that out.

17       MR. GOMEZ:  Probably Thursday, but I'd have to

18  confirm.

19       MS. FRIEDMAN:  So he's here until Thursday.  We'll

20  check.  But assuming he's here until Thursday, that may give us

21  time to sort this out.

22       THE COURT:  And what is your application, if any?

23       MR. MASTRO:  Your Honor, the manner in which your

24  Honor proposes to proceed is, excuse the pun, mirrors what I

25  would have proposed.

DBCLCHE4

1          As to the witness, there may be issues that arise once

2    he has counsel, once they assert whatever claims they have that

3    won't have this resolved by Thursday.  They brought this

4    witness here in the first place.  This witness should have to

5    confirm that if the Court, you know, wants him to come back,

6    they should say on the record that they will bring him back and

7    he should say he's willing to come back.

8          THE COURT:  And then what happens if he doesn't?

9          MR. MASTRO:  I think that your Honor has other

10   potential remedies or sanctions that you can impose, including

11   potentially striking his testimony if he were not to come back

12   after he committed to come back.  I don't think it's a question

13   of him staying here indefinitely at anyone's expense.

14         He came here voluntarily for them.  He's their

15   employee at Selva Viva, the very place that Mr. Gomez's clients

16   are affiliated with, they are and Donziger used to be president

17   of.  He works for them.  So he clearly can be able to come back

18   here if they ask him to come back here.  And he should commit

19   in open court that he's willing to come back here, and then we

20   have a chance to sort out the document issues.

21         THE COURT:  Conform yours.

22         All right.  Does somebody have another copy of this

23   for me other than the original?

24         MR. MASTRO:  We give one to the defense, your Honor.

25         THE COURT:  They're entitled to one.  They're entitled

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBCLCHE4

1    to two.

2           MR. MASTRO:  We're going to make more, your Honor.  We

3    did this pretty quickly.  We're having more copies printed out,

4    your Honor.

5           THE COURT:  They'll get me one.

6           What is the witness fee, $40?

7           MR. MASTRO:  Something like that.  They're putting

8    mileage on now.  Check is about to be delivered.

9           Your Honor, I think the correct assumption is mileage

10   from his hotel, since it's here in New York, so that would be

11   $45.

12          THE COURT:  All right.  Look, you're going to have to

13   give it to him.  So somebody is going to make service and then

14   I'll instruct him as to what this is all about and we'll go

15   from there.  Okay.

16          (In open court)

17          MR. BRODSKY:  Your Honor, I'm going to ask Priya

18   Narasimhan to serve Mr. Moncayo with a Spanish language --

19          THE COURT:  And an English language.

20          MR. BRODSKY:  -- and an English language subpoena for

21   the production of his computer, a mirror image of that to be

22   mirror imaged and other documents.  And we have a check that

23   will also be provided to him dated today for the amount of

24   $45.65.

25          THE COURT:  And you will file the original of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBCLCHE4

1    subpoena after exhibiting it to the witness with the clerk with

2    the return of service, right?

3              MR. BRODSKY:  Yes, your Honor.

4              THE COURT:  Okay.  Go ahead.

5              Now, Mr. Moncayo.

6              THE WITNESS:  What's this 45 for?

7              THE COURT:  Mr. Moncayo, I'm going to explain some

8    things to you.

9              The document you have been handed is called a

10   subpoena.  It requires that you turn over for the purpose of

11   its being copied your computer to the lawyers and to produce

12   certain other documents to the lawyers.

13             So far as the computer is concerned, it requires that

14   two identical copies of the hard drive be created.  I am

15   directing that one of those identical copies be turned over to

16   the clerk of this court and filed under seal pending further

17   order of the Court without counsel for Chevron looking at it.

18   The other copy will be turned over to whatever lawyer you

19   authorize to advise you with respect to this.

20             The check for $45 is the fee and certain expenses that

21   must be tended to any witness served with a subpoena.  That's

22   yours.

23             The subpoena requires compliance by 6 p.m. today.  I

24   am sure that if you are cooperative with the lawyers, they will

25   extend that for a reasonable period of time.

DBCLCHE4

1        You would be well advised to have a lawyer to advise

2   you about this subpoena.  You have various legal rights, at

3   least some of which are spelled out in the document.  You have

4   certain rights to object to the subpoena and if objections are

5   made, the Court will rule on them.

6        I understand from the lawyers for the defendants here

7   that although they represent clients other than you, they are

8   anxious to be helpful to you and I presume that may include

9   helping you find a lawyer, if you want one.

10       The subpoena is the equivalent of an order by the

11  Court.  Any disobedience of the subpoena could be a criminal

12  offense.  Any tampering with evidence that is the subject of

13  the subpoena could, depending on the circumstances, be a

14  criminal offense.

15       The lawyers have all expressed to me the desire to

16  work with you so that you can return to Ecuador if you wish to

17  at your earliest convenience, but that will involve cooperation

18  by you and by them.  And one of the things that I'm sure you'll

19  want to discuss with them and they with you is whether you are

20  prepared to give assurances that if further testimony is

21  required from you in consequence of the production of these

22  documents and the inspection of the computer drive, you would

23  return to the United States for that purpose.

24       Do you understand everything I have said?

25       THE WITNESS:  Yes.

DBCLCHE4

```
1              THE COURT:  All right.  Does any counsel have any
2      objection to anything I have said to Mr. Moncayo or anything
3      you think I should say to him further?
4              MS. FRIEDMAN:  Your Honor, I may be missing it.  I'm
5      having trouble finding the 6 o'clock today part.
6              THE COURT:  I think it's on the front page, isn't it?
7      I don't have a copy in front of me.
8              MS. FRIEDMAN:  It's not on my copy, I guess.  It's got
9      a different time.
10             THE COURT:  May I see the one they handed you, please,
11     Mr. Moncayo?  Thank you.
12             Yes.  The original which has been handed to the
13     witness, Mr. Brodsky, which is the one that's supposed to be
14     filed ultimately, says 6 o'clock tonight.
15             MR. BRODSKY:  Yes, your Honor.
16             THE COURT:  Maybe there are duplicate originals.
17             MS. FRIEDMAN:  Your Honor, just as a practical matter,
18     I wonder if we could modify that to make it a more reasonable
19     time.  I just don't see how we could possibly --
20             THE COURT:  I understand.  I just got finished telling
21     him that I was sure you all would discuss a reasonable change.
22     I don't need to get involved in that negotiation.
23             MS. FRIEDMAN:  All right.
24             THE COURT:  Okay.  Now, are we all squared away?
25             Any objections to what I've told the witness, any
```

DBCLCHE4

1    proposed addictions?

2              MR. GOMEZ:  No, your Honor.

3              MS. FRIEDMAN:  No, your Honor.

4              MR. BRODSKY:  No, your Honor.

5              THE COURT:  Okay.  Now, that said, is there going to

6    be any redirect?

7              MS. LITTLEPAGE:  Yes, sir.

8              THE COURT:  All right.  You may proceed.

9              MS. LITTLEPAGE:  Should I proceed or should Mr. Gomez

10   go first and then I proceed, which would you prefer?

11             THE COURT:  Up to you.

12             MS. LITTLEPAGE:  Thank you, Judge.

13   REDIRECT EXAMINATION

14   BY MS. LITTLEPAGE:

15   Q.  Mr. Moncayo, in November or December of 2010, why were you

16   passing by Judge Zambrano's office?

17   A.  The secretary's office is further down and to go to the

18   secretary's office, you go by the front of Mr. Zambrano's

19   office.

20             MR. GOMEZ:  Objection to the translation.

21             THE COURT:  I'll ask the interpreter to consult with

22   counsel about the translation.  Don't answer yet.

23             THE WITNESS:  The clerk's office.

24             THE COURT:  Interpreter, please consult with counsel

25   about the translation.

DBCLCHE4                        Moncayo - redirect

1              (Pause)

2              THE INTERPRETER:  Interpreter correction.  Instead of

3    the secretary's office, it should be the clerk's office.

4    Q.  And did you draw on your map a box for where the clerk's

5    office is?

6    A.  The one that you gave me initially, yes.

7    Q.  And why would you have been walking by Judge Zambrano's

8    office to the clerk's office?

9    A.  In Lago Agrio I carry out many jobs within UDA.  Among

10   those is going to the court, to the mailbox, and also to be

11   present at the court so that they can see that we, the

12   plaintiffs, are present and that we are watching over our case.

13   Q.  And you said earlier that Pablo Fajardo called you 15 or 20

14   days ago about Ms. Calva; is that correct?

15   A.  Yes.

16   Q.  What did Mr. Fajardo say when he called you that day?

17   A.  That I should go pick up some documents from Ms. Calva.

18   I'm sorry, that I should go to her father's office to get some

19   documents from Ms. Calva.

20   Q.  And what were you supposed to do with the documents you

21   picked up from Ms. Calva's father's office?

22   A.  I was going to give them to Veronica for her to scan, and

23   she is the secretary at Selva Viva in Lago Agrio.

24   Q.  Is this part of your job duties to pick up documents or

25   materials for Selva Viva?

DBCLCHE4                        Moncayo - redirect

1    A.   It's also part of my job to pick up documents, take

2    documents to and from the court, to be in court, to be in the

3    countryside.

4    Q.   Who was -- did you know who Veronica was going to scan the

5    documents to or for?

6    A.   They were for here, for this court, to come and testify.

7    Q.   Did you have an understanding that the documents you were

8    going to pick up was Ms. Calva's declaration?

9              THE COURT:   Sustained.   Understanding doesn't cut it.

10   Q.   What document were you to pick up?

11   A.   It was a sworn statement that she was putting together.

12   Q.   When you got to Mr. Calva's office, was Ms. Calva there?

13   A.   Not in the morning.

14   Q.   Was she there in the afternoon?

15   A.   Yes.   In the afternoon she was.

16   Q.   Did you recognize Ms. Calva?

17   A.   Not in that moment.   I almost immediately began to realize

18   that it was her.

19   Q.   Realize it was her, what do you mean by that?

20   A.   The one who had been with Dr. Zambrano in his office.

21   Q.   Did you accompany Ms. Calva to the notary for her to get

22   the declaration notarized?

23   A.   That's right.

24   Q.   And you told us that the notary, she was missing some

25   documents.   Did you leave that day with Ms. Calva's signed

DBCLCHE4                    Moncayo – redirect

1   declaration?

2   A.  No.  Before she even handed it over to the notary, she was

3   reviewing the document with her boyfriend and she realized that

4   some documents were missing.

5   Q.  Did you ever pick up a signed declaration from Ms. Calva?

6   A.  No.

7   Q.  Did you ever read the declaration of Ms. Calva?

8   A.  No.

9           MS. LITTLEPAGE:  Those are my questions.  Thank you,

10  Mr. Moncayo.

11          THE COURT:  Thank you.

12          Mr. Gomez.

13  DIRECT EXAMINATION

14  BY MR. GOMEZ:

15  Q.  Mr. Moncayo, I'd like to direct your attention back to

16  Plaintiff's Exhibit 843.  Is that still in front of you, sir?

17  A.  843.

18  Q.  Directing your attention to page 10, which is the Spanish,

19  it appears in English on page 3 of the exhibit, you testified

20  about acquiring materials necessary for the field work of

21  Mr. Richard Cabrera.

22          Do you remember testimony, sir?

23          THE INTERPRETER:  Can you repeat it, please.

24  Q.  Acquiring materials for the field work of Mr. Cabrera, do

25  you remember that testimony, sir?

DBCLCHE4                    Moncayo - direct

1    A.  Yes.

2    Q.  Did you acquire materials and provide them to Mr. Richard

3    Cabrera for his field work as global expert in the Lago Agrio

4    case?

5    A.  Yes.

6    Q.  Why did you do that, sir?

7    A.  Because we were giving the logistical part.  In other

8    words, we, as Selva Viva, we were giving it to engineer Richard

9    Cabrera.

10   Q.  Did Chevron's representatives do the same thing for him?

11           MR. BRODSKY:  Objection.  Your Honor, objection.

12           THE COURT:  Just a moment.  And the ground?

13           MR. BRODSKY:  Foundation.

14           THE COURT:  Sustained.

15   Q.  Do you have any knowledge whether Chevron's representatives

16   ever provided materials to Mr. Cabrera necessary for him to

17   conduct his field work?

18           MR. BRODSKY:  Objection to form.

19           THE COURT:  Sustained.

20   Q.  Do you know whether or not Chevron's representatives ever

21   provided expert Richard Cabrera with any materials for him to

22   perform his field work?

23   A.  I don't know.

24   Q.  Sir, I want to direct your attention to your testimony

25   regarding the issue of Petroecuador's remediation.  You

1   testified that you understood that the assembly wanted a real

2   remediation.

3          Do you remember that testimony, sir?

4   A.  Yes.

5   Q.  What did you mean by real remediation?

6   A.  That the area that was affected be properly cleaned and not

7   just for them to cover up the oil and that it just remain

8   there.

9   Q.  When you say them, who are you referring to?

10  A.  When I refer to them, I'm referring to Texaco because of

11  what they did there.

12  Q.  You had also testified earlier that the asamblea carried

13  out decisions regarding social actions.

14         Do you remember that testimony, sir?

15  A.  Yes.

16  Q.  What social actions were you referring to?

17         MR. BRODSKY:  Objection, relevance.

18         THE COURT:  Overruled.

19  A.  The assembly makes decisions regarding social actions when

20  we have to do some kind of a demonstration, we place people to

21  watch over and have people go and talk to people who are linked

22  to them or to the assembly itself.  I'm referring to people or

23  to the authorities who are at the head of this, who are the

24  head of these topics that we deal with there.

25  Q.  People to watch over what are you referring to?

DBCLCHE4                    Moncayo - direct

1    A.  The assembly decides that we go out one Thursday per month,

2    in other words, two or three people go to Quito to be present,

3    but outside of the court because the trial is going forward.

4    That's one of the actions that the assembly takes.

5            Also, when we have demonstrations, the assembly

6    decides what kind of demonstration it's going to be and what

7    we're going to do and how many people should go out.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBC8CHE5

1          MR. GOMEZ:  Nothing further.

2          MR. BRODSKY:  Nothing further, your Honor.

3          THE COURT:  Mr. Moncayo, you may leave here right now,

4     but you are not released from the Court's process.  You are

5     subject to being recalled.  And you have obligations pursuant

6     to that subpoena that I have already explained.  Do you

7     understand that?

8          THE WITNESS:  Yes.

9          THE COURT:  You understand you may have to come back

10    to court further.  Do you understand that?

11         THE WITNESS:  Yes.

12         THE COURT:  All right.  Thank you.  You can go right

13    now.

14         Mr. Brodsky, was there something else you wanted to

15    add?

16         MR. BRODSKY:  We would ask Mr. Moncayo to just sign

17    our copy that he has received it.

18         THE COURT:  All right.  Mr. Moncayo, the lawyer is

19    going to give you another copy of the subpoena, and he would

20    appreciate it if you would just write that you received it and

21    sign your name.  That's up to you as to whether you do that.

22         THE WITNESS:  I think I need to consult with my

23    lawyer.

24         THE COURT:  OK.

25         THE WITNESS:  The other thing is I don't have money to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBC8CHE5

1    hire a lawyer.

2              THE COURT:  I suggest you talk to your employer.

3              MR. FRIEDMAN:  I will have someone talk to him.

4              THE COURT:  You can go for now.

5              THE WITNESS:  Thank you.

6              THE COURT:  Thank you.

7              All right.  Now, the next witness for the defense will

8    be who?

9              MS. LITTLEPAGE:  Ms. Hinton.

10             THE COURT:  We have a matter to deal with before she

11   gets on the stand.

12             Chevron has already filed two motions to strike much

13   of her testimony, one motion for each version of her witness

14   statement.  The most recent of them I think in the wee hours of

15   this morning.  The defense has not filed any response, as I

16   understand it.  But if there is anything that you want to say

17   on this subject, now is the time to do it.

18             MS. LITTLEPAGE:  Ms. Hinton is not only a named

19   co-conspirator, but she is also specifically referenced in a

20   number of the paragraphs in the amended complaint.  In fact,

21   the amended complaint raises allegations that she sought to

22   extort, defraud, and otherwise tortiously injure Chevron.  The

23   complaint alleges that she authored false and misleading press

24   releases and media statements in furtherance of the RICO

25   defendants' extortion scheme.  And the complaint states that

1    she was recruited to create and manage a campaign of false and

2    misleading public statements and to coordinate the efforts to

3    co-opt the media and well-meaning private citizens in the

4    conspirators' pressure campaign.

5            Judge, we filed a motion overnight that went through

6    some of the law on state of mind, especially as to the issue of

7    extortion, which is the specific claim that's raised in the

8    amended complaint related to Ms. Hinton among others, which

9    goes through some of the case law as to the elements of

10   extortion.  One of the elements of extortion is that an

11   extortion claim is putting pressure on, inducing -- hold on.

12   Let me get the exact words so I don't say it wrong.

13           In order for an extortion action to be actionable, the

14   alleged extortionist must have a belief that he or she is not

15   entitled to the property that he or she is obtaining by alleged

16   pressure; in other words, the alleged extortionist must have no

17   belief that there is a lawful claim to the property.

18           So because of both what is alleged in the complaint

19   against Ms. Hinton, as well as the underlying causes of action

20   that's alleged in the complaint, we believe Ms. Hinton's state

21   of mind is particularly relevant and appropriate for review and

22   for her direct testimony.  We also believe that all discussions

23   she had with Mr. Donziger, where together they decided how to

24   respond in the press, how to respond to questions by reporters,

25   how to deal with some of those issues, goes directly to Mr.

DBC8CHE5

1    Donziger's state of mind.

2           As I understand Chevron's motion that was filed, their

3    objections are to that precise type of testimony, where she

4    describes why she issued certain press releases, what research

5    she did before she issued those press releases, what was her

6    understanding of the underlying basis of the press releases,

7    which goes directly to her state of mind.  And then she talks

8    about discussing those specific issues with Mr. Donziger, which

9    directly impacts Mr. Donziger's state of mind.  And that's why

10   I believe their objections are not valid.

11          THE COURT:  Mr. Mastro.

12          MR. MASTRO:  Your Honor, just on that point, on the

13   extortion point, and then my colleague Rob Blume will argue the

14   specific paragraphs.

15          THE COURT:  I think not, but go ahead.

16          MR. MASTRO:  The defendants have grossly misstated the

17   law of extortion.  In fact, your Honor, the notion of a claim

18   of right defense is limited, and this is what one of your

19   colleagues here in the Southern District in *United States v.*

20   *Baudin*, 486 F.Supp. 403, page 405, held, that that claim of

21   right defense to an extortion claim is only where the claim of

22   right is manifest and beyond dispute.

23          The fact of the matter is that here we are not talking

24   about any such situation at all, and the notion that he has a

25   good faith belief he had a claim comes nowhere near

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBC8CHE5

1    establishing a defense to extortion.  And what we have here is

2    Ms. Hinton having her statement revised to add, I told these

3    things to Donziger, these things that are subjective on their

4    own part, that aren't based on her own personal knowledge, and

5    supposedly that informs Donziger's state of mind so he believes

6    even more about Chevron.  It can't possibly be a defense.

7            As your Honor knows, it is no defense or justification

8    to fraud or extortion for someone to say, I believe somebody

9    else was doing a bad thing so I am going to commit a crime

10   myself.  It just is not the state of the law and never has

11   been.

12           So what they are attempting to do through Ms. Hinton,

13   and some of the other witnesses they propose, like Mr. Ponce,

14   is not only not a defense to extortion or fraud, it's

15   tantamount to an admission that Mr. Donziger did wrong, and now

16   he is trying to justify it by saying, I had conversations about

17   speculation about Chevron, and I had a good faith belief that

18   Chevron did something wrong, so I can go out and commit fraud

19   and extortion.  It's not the state of the law, your Honor.

20           THE COURT:  All right.  As a general matter, I

21   disagree very profoundly with the arguments advanced by the

22   defendants on this point.  I think they misunderstand the law

23   of extortion.  They misunderstand the state of mind exception

24   to the hearsay rule.  And they misunderstand the significance

25   in particular of Ms. Hinton's state of mind, which for most

DBC8CHE5

1    purposes couldn't be less relevant here, and for such purposes

2    as it might be, I haven't heard one of them yet advanced.

3            I have just signed an order ruling on all of these

4    objections and counsel may pick up copies from my chambers in

5    about 10 or 15 minutes and we will post it tonight.

6            A good deal of this witness statement is out.  Parts

7    of it without prejudice to a renewed application, insofar as

8    the evidence, to the extent there is any foundation for it,

9    goes to Mr. Donziger's state of mind as to a relevant matter.

10   And I will leave it at that and the order speaks for itself.

11           There may at some future date, when I have more time,

12   the hours available to me since these papers were filed have

13   been only a few, write a good deal more on this subject, but

14   you will have the ruling in moments.  So that's that.

15           Now, I think in light of that, Ms. Hinton's testimony

16   is likely to be a lot shorter than either side, or at least the

17   defendants thought.

18           Who else do we have coming tomorrow?

19           MR. FRIEDMAN:  Can we just take a 60 second break?

20   Can we just pause?

21           THE COURT:  You can pause.  I have another matter

22   waiting.

23           MR. FRIEDMAN:  I will be fast.

24           Thank you, your Honor.

25           We have Mr. Ponce.  Obviously, Ms. Hinton.  We don't

DBC8CHE5

 1   know the scope of that at this point.  Mr. Ponce for tomorrow.

 2   I think that's all we have for tomorrow.

 3            THE COURT:  I trust you're going to be ready with

 4   somebody else if we don't fill the day.

 5            MR. FRIEDMAN:  I don't have anybody else.

 6            THE COURT:  I can think of one.

 7            MR. FRIEDMAN:  We do not have his statement done.  I

 8   assured Mr. Mastro that we would take the position that he was

 9   entitled to time after he got it.  So that's where we are.

10            THE COURT:  Mr. Donziger has known since the 7th of

11   October with certainty that he was going to have to file his

12   direct testimony in writing.  On the 7th of October, I denied

13   the defense motion to excuse him from that requirement.

14            On the 9th of October, I directed that he produce his

15   witness statement to Chevron a week before he planned to

16   testify.

17            On October 23rd, I made a further concession to Mr.

18   Donziger by saying I would permit him to supplement the

19   statement.

20            He is acting at his peril, Mr. Friedman.

21            MR. FRIEDMAN:  I understand.

22            THE COURT:  We will recess until 9:30 tomorrow

23   morning.

24            (Adjourned to November 13, 2013, at 9:30 a.m.)

25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                             Page

 3   VLADIMIRO ALVAREZ GRAU

 4   Cross By Ms. Littlepage  . . . . . . . . . .2028

 5   Cross By Mr. Gomez . . . . . . . . . . . . .2038

 6   Redirect By Mr. Mastro . . . . . . . . . . .2047

 7   DONALD RAFAEL MONCAYO JIMENEZ

 8   Direct By Ms. Littlepage . . . . . . . . . .2057

 9   Cross By Mr. Brodsky . . . . . . . . . . . .2058

10   Redirect By Ms. Littlepage . . . . . . . . .2133

11   Direct By Mr. Gomez  . . . . . . . . . . . .2136

12                          PLAINTIFF EXHIBITS

13   Exhibit No.                             Received

14    6913    . . . . . . . . . . . . . . 2060

15    6906    . . . . . . . . . . . . . . 2074

16    636   . . . . . . . . . . . . . . . 2077

17                          DEFENDANT EXHIBITS

18   Exhibit No.                             Received

19    1600    . . . . . . . . . . . . . . 2057

20

21

22

23

24

25
```