DBDLCHE1                    Trial

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                 Plaintiff,

            v.                      11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                 Defendants.

------------------------------x
                                    November 13, 2013
                                    9:35 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                    District Judge

                        APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     ROBERT C. BLUME
     ANNE CHAMPION

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ
```

DBDLCHE1                          Trial

1           (Trial resumed)

2               THE COURT:  Good morning.

3               MR. MASTRO:  Good morning, your Honor.

4               THE COURT:  The letters from both sides, sort of

5     commentaries on the trial letters are over.  They are done, no

6     more will be received.  Clear?

7               MR. MASTRO:  Certainly, your Honor.

8               THE COURT:  Okay.  Next witness.

9               MS. LITTLEPAGE:  Judge, the defendants call Karen

10    Hinton.

11     KAREN HINTON,

12          called as a witness by the Defendants,

13          having been duly sworn, testified as follows:

14              THE COURT:  You may proceed, counselor.

15              MS. LITTLEPAGE:  Thank you.

16    DIRECT EXAMINATION

17    BY MS. LITTLEPAGE:

18    Q.  Ms. Hinton, I'm going to show you what's been marked as

19    Defendant's Exhibit 1500.

20              Do you identify that as your direct witness testimony?

21    A.  Yes.

22              MS. LITTLEPAGE:  Judge, we move to admit Defendant's

23    Exhibit 1500.

24              THE COURT:  That part of it was that was not

25    previously stricken is received and the rest is not received.

DBDLCHE1                    Hinton - direct

1              (Defendant's Exhibit 1500 received in evidence)

2              MS. LITTLEPAGE:  And we pass the witness.

3              THE COURT:  Thank you.

4              Cross-examination.

5              MR. BLUME:  Good morning, your Honor.  Robert Blume,

6    B-L-U-M-E.

7              THE COURT:  Before Mr. Blume gets started, the version

8    that's to be received is the version that shows the portion

9    that was stricken so it's clear to anyone reading the docket

10   what was stricken and what was not.

11             Okay.  Go ahead, Mr. Blume.

12   CROSS-EXAMINATION

13   BY MR. BLUME:

14   Q.  Ms. Hinton, are you a lawyer?

15   A.  No.

16   Q.  You're a journalist; is that right?

17   A.  A journalist, no.

18   Q.  You trained in your studies in journalism; is that right?

19   A.  I was graduated from the University of Mississippi with a

20   degree in journalism and political science.

21   Q.  And you were hired in this case, were you not, Ms. Hinton,

22   to do press relations, among other things?

23   A.  Yes.

24   Q.  Was it your job, Ms. Hinton, to decide at any point in time

25   on behalf of the Lago Agrio plaintiffs whether or not to take

1   the Lago Agrio Chevron case to trial?

2   A.  No.

3   Q.  Was it your job, Ms. Hinton, at any point in time on behalf

4   of the Lago Agrio plaintiffs to decide whether or not to settle

5   the Lago Agrio Chevron case?

6   A.  No.

7   Q.  So directing your attention, Ms. Hinton, to Defendant's

8   Exhibit 1500, that's your witness statement.

9           On paragraph 11 -- do you have that in front of you?

10  A.  Yes.

11  Q.  So when you say in paragraph 11, Ms. Hinton, that, the very

12  last sentence, throughout the time I worked on the case the

13  team prepared the case for trial and not settlement, that's

14  your opinion of their legal strategy; is that correct?

15  A.  That's correct.

16  Q.  And by preparing the case for trial, you mean that you

17  believe Mr. Donziger was after a full recovery of all damages;

18  is that right?

19  A.  That's correct.

20  Q.  Not a compromised discovery is how you put it; is that

21  right?

22  A.  The way I put it was he wanted a complete cleanup and

23  remediation of the contamination in Ecuador.

24  Q.  After a full trial?

25  A.  He wanted a complete and full remediation of the

DBDLCHE1                    Hinton - cross

1    contamination in Ecuador.

2    Q.  He wanted that complete remediation after, in your view,

3    after a full trial; is that right?

4    A.  In Ecuador, yes.

5    Q.  And a full verdict in Ecuador; is that right?

6    A.  That's correct.

7    Q.  And it's your testimony, Ms. Hinton, that Mr. Donziger

8    believed that it was only after a full and complete trial that

9    he could recover for cleanup in the Oriente; is that right?

10            THE COURT:  What are we doing here, Mr. Blume?  You

11   really just want to elicit her opinions about what was going

12   through somebody else's mind?

13            MR. BLUME:  In a moment, your Honor, we'll get to our

14   proffer to you that in fact the statement is simply incorrect.

15            THE COURT:  Go ahead.

16   Q.  Did Mr. Donziger tell you, Ms. Hinton, that he in fact

17   wanted someone to contact President Correa to stop any

18   remediation efforts in the Oriente?

19   A.  I'm sorry, I didn't hear you.  I couldn't understand you.

20   Q.  Did Mr. Donziger tell you at any point in time that he

21   wanted to -- the Republic of Ecuador to stop remediation

22   efforts in 2009 in the Oriente?

23            MR. GOMEZ:  Objection, form.

24            THE COURT:  Overruled.

25   A.  No.

DBDLCHE1                    Hinton – cross

1   Q.  From the moment you started working on this case,

2   Ms. Hinton, in fact, Mr. Donziger told you that he wanted to

3   push Chevron to settle the lawsuit, that was his goal; isn't

4   that right?

5   A.  No.  His goal was to get a full and complete remediation of

6   the contamination in the rain forest.

7        MR. BLUME:  Your Honor, may I approach?

8        THE COURT:  You may.

9   Q.  Ms. Hinton, I'm placing before you what has been previously

10  marked as Plaintiff's Exhibit 1034, ask you to take a look at

11  that and tell me if you recognize that as a cover email and

12  proposal dated 28 April 2008 from you to Mr. Donziger?

13  A.  Yes.

14  Q.  And, in fact, that was your proposal to begin your work on

15  the Lago Agrio case, isn't that right, Ms. Hinton?

16  A.  Yes.

17  Q.  I want to direct your attention, if I can, to page 2 of

18  that document, of the actual proposal, not the email.

19       Do you see that at the top it says introduction?

20  A.  Yes.

21  Q.  The second sentence of that proposal talks about

22  preliminary conversations; do you see that?

23  A.  Yes.

24  Q.  Those preliminary conversations took place in Washington,

25  D.C., is that correct, among other places?

DBDLCHE1                    Hinton - cross

1   A.  Yes.

2   Q.  And it's during those preliminary conversations,

3   Ms. Hinton, that Mr. Donziger told you about what you later

4   referred to in that paragraph as his stated goal; is that

5   correct?

6   A.  Yes.

7   Q.  And, in fact, it mentions in the plural preliminary --

8   well, strike that.

9           In fact, the stated goal was, as you understood it in

10  the beginning of your engagement, to push Chevron Texaco to

11  settle the lawsuit in the near future; isn't that right?

12          MR. GOMEZ:  Objection, asked and answered.

13          THE COURT:  Overruled.

14  A.  Would you repeat the question.

15  Q.  The preliminary conversation that you had with

16  Mr. Donziger -- strike that.

17          During the preliminary conversation you had with

18  Mr. Donziger, he revealed to you his goal of "pushing Chevron

19  Texaco to settle the lawsuit in the near future"; isn't that

20  right?

21  A.  To settle the lawsuit with a complete and full remediation

22  of the contamination in the rain forest.

23  Q.  But not a trial, right?

24  A.  But not tried?  I don't understand.

25  Q.  Settle, you know the difference -- strike that.

DBDLCHE1                    Hinton - cross

1   A.  I couldn't hear you when you put your head down.  I'm

2   sorry.

3   Q.  I'll use that microphone.

4   A.  That's much better.  Yes.  Thank you.

5   Q.  Mr. Donziger's stated goal, Mr. Donziger told you during

6   his preliminary conversation his stated goal was to settle the

7   lawsuit; isn't that right?

8            MR. GOMEZ:  Objection, asked and answered.

9            THE COURT:  Overruled.

10  A.  To settle for a full and complete remediation of the

11  contamination in the rain forest.  That's what he said.

12  Q.  Sorry.  Your proposal says to settle the lawsuit; is that

13  right?

14           MR. GOMEZ:  Objection.  Document speaks for itself.

15           MR. BLUME:  Strike that.

16  Q.  During the conversation, he actually said specifically he

17  wanted to settle the lawsuit; isn't that correct?

18  A.  But only for a full and complete remediation of the rain

19  forest.

20  Q.  Further down in that document on the same page,

21  paragraph 3, incidentally, page 2, paragraph 3, you mention

22  a -- second sentence -- credible third party report.

23           That was speaking to the Cabrera report, was it not?

24  A.  Show me again where I write that?

25  Q.  First four words of the second sentence in the paragraph

DBDLCHE1                         Hinton - cross

1    number three on page 2 of your proposal.

2    A.   Oh, I see.  And what was your question?

3    Q.   That credible third party report to which you refer in this

4    document was the Cabrera expert report, was it not?

5    A.   Yes.

6    Q.   And did Mr. Donziger tell you during those preliminary

7    conversations that that credible third party report indeed left

8    no doubt about the culpability of Chevron Texaco?

9    A.   Are you talking about did he say that in the meeting that I

10   was in with him for the first meeting that I had with him?

11   Q.   In any of the meetings that predated your proposal in April

12   of 2008, yes.

13   A.   And state your question again.

14   Q.   During those meetings, Ms. Hinton, did he tell you that

15   indeed the credible third party report left no doubt about the

16   culpability of Chevron Texaco?

17   A.   I don't know if he used those exact words.  I think he felt

18   that there was no doubt about the culpability of Chevron.

19            THE COURT:  Strike what he felt.

20   Q.   But he mentioned, did he not, this Cabrera report --

21   A.   Yes.

22   Q.   -- as a basis, as supporting whatever he told you during

23   this conversation; is that correct?

24            MR. GOMEZ:  Objection, vague.

25            THE COURT:  Sustained.

DBDLCHE1                    Hinton - cross

1   Q.  Did he tell you during the conversation that he felt it was

2   that report upon which he based this damage number of

3   $16 billion?

4   A.  He told me that there were about 60,000 samples of

5   contaminated tests been taken, the majority of which were

6   Chevron's and that they -- most of them showed illegal levels

7   of contamination.

8           In addition to that, he said there were an additional

9   hundred or so reports from experts that documented

10  contamination not only at the obvious places where you could

11  see the contamination, but also in the so-called remediated

12  pits and he said and he also mentioned the Cabrera report.

13          THE COURT:  Answer is stricken.  Unresponsive.

14          Ms. Hinton, answer the questions and just answer the

15  questions.

16          THE WITNESS:  So repeat the question.

17  Q.  Question was did he mention the Cabrera report specifically

18  as a basis for the $16 billion damage claim?

19  A.  Yes.

20  Q.  During those conversations, did Mr. Donziger tell you that

21  the Cabrera report in fact would create leverage in order to

22  get a settlement from Chevron Texaco?

23          MR. GOMEZ:  Objection, vague.

24          THE COURT:  Overruled.

25  A.  No.

DBDLCHE1                          Hinton - cross

1    Q.  Do you know who New Partners, a company called New

2    Partners, have you heard of them?

3    A.  Yes.

4    Q.  They're a public relations firm; is that correct?

5    A.  Yes.

6    Q.  Did you recommend them to Mr. Donziger?

7    A.  I think I did, yes.

8    Q.  Was that to replace you?

9    A.  No, I didn't actually.  I wasn't the one who recommended

10   them.

11   Q.  Okay.  Did Mr. Donziger tell you that he was hiring New

12   Partners to replace you in 2009?

13   A.  No.

14   Q.  Did Mr. Donziger tell you in around August 2009, now after

15   you had been retained, that his primary objective was to

16   pressure Chevron such that they will have to settle?

17   A.  I believe his primary objective was to shed light on

18   Chevron's misconduct in Ecuador.

19          THE COURT:  Answer is stricken.  Unresponsive.

20          Answer the question, Ms. Hinton.  No speeches.

21          THE WITNESS:  Can you repeat the question.

22   Q.  Did Mr. Donziger tell you -- I'm sorry, strike that.

23          Question was did Mr. Donziger tell you in and around

24   August of 2009 that his primary objective was to pressure

25   Chevron such that they would have to settle?

DBDLCHE1                    Hinton - cross

1   A.  Pressure Chevron to settle for a full and complete

2   remediation of the contamination.

3   Q.  And at any time did Mr. Donziger tell you that his goal was

4   to get more press, increase the pressure in order to get that

5   settlement price higher?

6   A.  Are you speaking about a particular time frame?

7   Q.  At any time, Ms. Hinton.

8   A.  Repeat it again.

9   Q.  At any time, ma'am, did Mr. Donziger tell you that his goal

10  was to increase press so that he could increase the pressure in

11  order to get the settlement price higher?

12  A.  Yes.

13  Q.  At any point in time, Ms. Hinton, did Mr. Donziger tell you

14  that he wanted to force Chevron to the table for possible

15  settlement?

16          MR. GOMEZ:  Objection, vague.

17          THE COURT:  Overruled.

18  A.  Not in those words.

19  Q.  Did he ever tell you, Ms. Hinton, that he wanted to get

20  Chevron, quote, to the breaking point?

21          MR. GOMEZ:  Objection, vague.

22          THE COURT:  Overruled.

23  A.  Not to me that I remember.

24  Q.  Grace Fremlin is a lawyer from Steptoe; is that correct?

25  A.  Yes.

DBDLCHE1                        Hinton - cross

1   Q.  And you hired Ms. Fremlin to represent you in 2009; is that
2   correct?
3   A.  Yes.
4   Q.  And that was to represent you in discussions you were
5   having with Mr. Donziger about seeking an equity stake in the
6   outcome of the litigation; is that right?
7   A.  No.
8   Q.  You hired her to discuss your employment arrangement with
9   Mr. Donziger in and around 2009; isn't that right?
10  A.  No.
11  Q.  Did Ms. Fremlin contact Mr. Donziger and his -- and
12  Mr. Kohn on your behalf in 2009?
13  A.  She contacted Mr. Kohn.
14  Q.  And did you hire Ms. Fremlin to contact Mr. Kohn to discuss
15  your equity stake in the litigation?
16  A.  No.
17  Q.  In fact, did Ms. Fremlin on your behalf discuss with
18  Mr. Kohn a potential equity stake in the litigation?
19  A.  Not at my direction.
20  Q.  So your lawyer it's your testimony is acting on her own,
21  not on your direction; is that right?
22  A.  I can't explain what happened.  I don't know how to answer
23  that yes or no.
24          MR. BLUME:  May I approach, your Honor?
25          THE COURT:  You may.

DBDLCHE1                    Hinton - cross

1    Q.  Ms. Hinton, I placed before you what's been previously

2    marked as Plaintiff's Exhibit 1145.  It is a cover email from

3    Mr. Donziger and Mr. Kohn dated June 26, 2009, with the first

4    email in the chain from Ms. Grace Fremlin to Joseph Kohn, copy

5    you and Mr. Kantor, on June 25, 2009.

6         Do you recognize that or do you see that in front of

7    you?

8    A.  Yes.

9    Q.  And I want to direct your attention, if I can, to what is

10   page 2 of 3 of Plaintiff's Exhibit 1145, the paragraph begins

11   Dear Joe.  Do you see that?

12   A.  What page is it on?

13   Q.  That's page 2 of 3 of the exhibit --

14   A.  Dear Joe, yes.

15   Q.  -- email copying you and Mr. Kantor on 25 June.

16   A.  Yes.

17   Q.  Did in fact and this is -- do you recall receiving this

18   email on the 25th of June, 2009?

19   A.  Yes.

20   Q.  Do you recall the conversation that Ms. Fremlin and

21   Mr. Kantor had with you to which he refers, Doug and I have

22   conferred with Karen; do you recall that conversation?

23   A.  Yes.

24   Q.  And, in fact, this email sets out the proposal for what

25   they call your "success bonus compensation"; is that right?

DBDLCHE1                    Hinton – cross

1    A.  Yes.

2    Q.  And this reflects, does it not, Ms. Hinton, the proposal

3    that you and Grace Fremlin and Douglas Kantor discussed in and

4    around June of 2009, does it not?

5    A.  No.

6    Q.  Directing your attention to the first sentence of the

7    second paragraph, the Karen in that sentence is you, is it not,

8    Karen Hinton?

9    A.  Yes.

10   Q.  The proposal, Ms. Hinton, sets forth a series of tiered

11   percentage compensation based on the net of settlement and

12   damage award.

13            Do you see that?

14   A.  Yes.

15   Q.  And it details out a level of tiers in paragraphs A through

16   D; do you see that?

17   A.  Yes.

18            THE COURT:  Look, counselor, I assume that everyone

19   concerned can read it.

20            MR. BLUME:  Very well.

21   Q.  Was that the proposal, does that accurately reflect the

22   proposal that you set forth through your lawyers to Mr. Kohn

23   for potential compensation for your work in the Lago Agrio

24   Chevron case?

25            MR. GOMEZ:  Objection, asked and answered.

DBDLCHE1                    Hinton - cross

1              THE COURT:  Overruled.

2    A.  No.

3    Q.  Ms. Hinton, you never in or around June of 2009 sent a

4    corrected, a correction to this email, did you?

5    A.  I don't remember if I sent a correction.  I had a

6    conversation with Grace and Doug about it.

7    Q.  Let me direct your attention to what has been marked as

8    Defendant's Exhibit 1500.  That's your witness statement,

9    Ms. Hinton.  Direct your attention to paragraph 47 of that

10   statement.  And if I could direct your attention to the 6th

11   line up from the bottom that begins I abandoned that effort.

12              Do you see that?

13   A.  Yes.

14   Q.  Is the "I" in that sentence you?

15   A.  Yes.

16   Q.  Who is Orin Kramer, Ms. Hinton?

17   A.  Who is Orin Kramer, he is someone who supported the

18   lawsuit, I believe.

19   Q.  Worked for Mr. Donziger?

20   A.  Worked for Mr. Donziger, no.

21   Q.  Worked with Mr. Donziger?

22   A.  I really don't know how to characterize the relationship.

23   Q.  Do you remember discussing with Mr. Kramer in 2010 a

24   "silver bullet" that might bring Chevron to the settlement

25   table?

DBDLCHE1                        Hinton - cross

1   A.  I don't remember discussing that what him.  I may have

2   discussed it at some point, but I don't remember having any

3   conversations with him about it.

4           MR. BLUME:  May I approach, your Honor?

5           THE COURT:  You may.

6   Q.  Ms. Hinton, I'm placing before you what has been now marked

7   as Plaintiff's Exhibit 6878.  It is an email from you to

8   Mr. Kramer dated February 7, 2010, on the first of the chain,

9   and it is a three-page email.

10          Do you see that?

11  A.  Yes.

12  Q.  Let me direct your attention, if I can, to the second

13  paragraph of your email to Mr. Kramer on the top of the chain.

14          Does this refresh your recollection that you told him

15  that "we should accept the fact that there is no silver bullet

16  or person that will bring Chevron to the table"?

17  A.  I'll need to read the entire email exchange.

18  Q.  You may.

19  A.  I don't remember.

20  Q.  Just look up when you're done.

21  A.  I'm a slow reader.

22  Q.  No worries.

23          MR. BLUME:  While she's reading, your Honor, we offer

24  6878.

25          MS. LITTLEPAGE:  No objection.

DBDLCHE1                    Hinton - cross

1     MR. GOMEZ:  No objection.

2  Q.  Let me do it this way.

3     THE COURT:  It's received.

4     (Plaintiff's Exhibit 6878 received in evidence)

5  Q.  When you say bring Chevron to the table, Ms. Hinton, you

6  meant the settlement table, did you not?

7  A.  I meant so they would pay an amount, whether it was a

8  settlement or damage award, that would clean up the

9  contamination.

10  Q.  Let me direct your attention, Ms. Hinton, to paragraph 2 of

11  your witness statement.  You indicate Mr. Donziger and

12  Mr. Fajardo hired you in May 2008.

13     In fact, Mr. Fajardo did not actually hire you; is

14  that right?

15  A.  No.

16  Q.  That was a bad question.  Let me turn instead to what you

17  have before you as Plaintiff's Exhibit 1034.  That is your

18  proposal.

19     When we looked at this earlier, Ms. Hinton, this was,

20  just so we're clear, this was your proposal for your work, to

21  begin your work on the Lago Agrio Chevron case; is that

22  correct?

23  A.  Yes.

24  Q.  And direct your attention to the cover page where you

25  address it to Steven Donziger/Permutter & Gimpel PLLC.  That

DBDLCHE1                    Hinton - cross

1   was Mr. Donziger's law firm at the time; is that right?

2   A.  I guess so.  I don't really remember.

3   Q.  And direct your attention to page 8 of 8 of the exhibit,

4   there is two signature blocks.

5           Ms. Hinton, was there another signature block that is

6   not attached to this that was attached at some point that had

7   Mr. Fajardo's signature on it?

8   A.  No.

9   Q.  During your engagement on this case between May of 2008 and

10  August 2013, while you traveled to Ecuador on a number of

11  occasions, most of your work occurred in the United States; is

12  that correct?

13  A.  Most of my work, yes.

14  Q.  And most of the -- during the course of your engagement,

15  you met often with Mr. Donziger; is that right?

16  A.  I mostly spoke with him over the phone, through email

17  because I was in Washington, D.C. and he was in New York.

18  Q.  Okay.  And when you say you were in Washington, D.C. and he

19  was in New York, you were both in those respective places while

20  you were speaking on the phone and emailing?

21  A.  Right, I was in Washington, D.C. and he was in New York

22  City.

23  Q.  Between May of 2008 and March of 2013, you charged

24  Mr. Donziger $10,000 a month for your work; is that right?

25  A.  That's correct.

DBDLCHE1                         Hinton - cross

1   Q.  And some of those payments came directly from

2   Mr. Donziger's own bank account; is that correct?

3   A.  I don't know.  I received, at some point in time I received

4   checks from Mr. Kohn.  And then after that period of time, I

5   received wire transfers.

6   Q.  And while we looked at it earlier, Mr. Donziger at some

7   point had -- Mr. Donziger at some point had promised you a

8   success fee; isn't that right?

9   A.  He didn't refer to it as a success fee.  He referred to it

10  as a bonus.

11  Q.  As a bonus.  And, in fact, you told Mr. Donziger at some

12  point that his failure to give you a bonus might cause you to

13  stop working on the matter; isn't that right?

14  A.  I don't remember saying that.

15          MR. BLUME:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  Ms. Hinton, I'm showing you what's marked as Plaintiff's

18  Exhibit 6810.  It is an email from Mr. Donziger to Mr. Woods

19  dated June 26, 2009.  I'd ask you to look through that email

20  and tell me if it refreshes your recollection as to whether or

21  not you ever told Mr. Donziger that your failure to receive a

22  bonus would cause you to stop working on the Lago Agrio Chevron

23  matter.

24  A.  Ask me again what you want to know.

25  Q.  Does reading that email refresh your recollection that you

DBDLCHE1                      Hinton - cross

```
 1   told Mr. Donziger that a failure to get a bonus would cause you

 2   to stop working on the Lago Agrio Chevron matter?

 3   A.  Based on this email, no.

 4             MR. BLUME:  Your Honor, we'd move --

 5             THE COURT:  6810.

 6             MR. BLUME:  -- 6810 into evidence.

 7             MS. LITTLEPAGE:  No objection.

 8             MR. GOMEZ:  No objection.

 9             THE COURT:  Received.

10             (Plaintiff's Exhibit 6810 received in evidence)

11   Q.  According to your witness statement, Mr. Donziger stopped

12   paying you for your work in March of 2013; is that right?

13   A.  No.

14   Q.  Is he still paying you for your work, Ms. Hinton?

15   A.  No.

16   Q.  When did he stop paying you for your work?

17   A.  Well, he wasn't paying me, so he couldn't stop paying me.

18   Q.  When did you receive your last payment from Mr. Donziger?

19   A.  I didn't get paid by Mr. Donziger, so I can't receive a

20   last payment from Mr. Donziger.

21   Q.  So your trouble is with my use of "Mr. Donziger."

22             From whom did you receive payment for your work on the

23   Lago Agrio Chevron case?

24   A.  Different people at different times is my understanding.

25   Q.  To include whom?
```

DBDLCHE1                          Hinton - cross

1   A.  Joe Kohn, Burford, and then I understand a third litigation

2   funder and I am blanking on the name.  I think it starts with a

3   "W."  Maybe Woodsworth or something like that.

4   Q.  When did you stop receiving payment from any of those

5   people for your work on the Chevron, on the Lago Agrio Chevron

6   case?

7   A.  March of, well, when I stopped billing was March of 2013.

8   Q.  And just so I'm clear, your work, Ms. Hinton, I've been

9   mentioning it as in relation to the Lago Agrio Chevron case.

10  It encompassed all of the activities surrounding Mr. Donziger

11  and the Lago Agrio plaintiffs to include things that were going

12  on in the United States.  Is that correct?

13  A.  No.

14  Q.  You did work, publicity work, did you not, related to the

15  1782 actions that were going on, for example?

16  A.  Publicity work, that's not the way I would describe it, but

17  I was handling media calls about the 1782s.

18  Q.  You were hired by, in and around March of this year, by

19  Mercury Public Affairs; is that right?

20  A.  Yes.

21  Q.  And just so I'm clear, you joined them as a managing

22  director; is that right?

23  A.  Yes.

24  Q.  You're now of counsel?

25  A.  Yes.

DBDLCHE1                    Hinton - cross

1   Q.  And it was during that time you say that you were actually

2   working for Mr. Donziger for free?

3   A.  Yes, from March to August.

4   Q.  And so was Mercury Public Affairs working for Mr. Donziger

5   for free?

6   A.  No.

7   Q.  You mentioned that you had stopped billing that group of

8   people.

9        Did you receive any payments after you stopped

10  invoicing them?

11  A.  I believe I -- I received a payment in March that was

12  catching -- in part catching me up from not being paid for

13  about eight months.

14  Q.  And when you mentioned you got paid from Mr. Kohn or the

15  Burford group, was that by check or by wire?

16  A.  By check from Mr. Kohn, by wire from the litigation

17  funders.

18  Q.  Like Burford?

19  A.  Like Burford.

20  Q.  Those were direct payments from Burford to your account?

21  A.  Well, they were to my account.  I assumed they were from a

22  Burford account.  I don't know that they were.  I know the

23  source of the money was Burford.

24  Q.  How do you know that?

25  A.  I was told that.

DBDLCHE1                    Hinton - cross

1   Q.  By whom?

2   A.  By Steven Donziger.

3   Q.  You're still owed approximately $30,000; is that right?

4   A.  Yes.

5   Q.  And so when you were paid to catch up, you said, for a

6   number of months, that didn't fully catch you up?

7   A.  That's correct.

8   Q.  Who paid you in March to catch you up for those times?

9   A.  It's my understanding that it was from resources provided

10  by this Woodsworth and I may have the name wrong.

11  Q.  Sitting here today, Ms. Hinton, you still hope to recover

12  some of that outstanding $30,000, do you not?

13  A.  We wouldn't say I hope to.  I really don't particularly

14  care one way or the other.  It's fine if I do; it's fine if I

15  don't.

16  Q.  It's just 30,000?

17  A.  $30,000 is a lot of money, but I never worked on this case

18  because of the money.

19  Q.  Sitting here today, Ms. Hinton, you still expect to receive

20  a bonus, do you not?

21  A.  No.

22  Q.  Still expect to receive a piece of the judgment should

23  Mr. Donziger receive one?

24  A.  Absolutely not.

25  Q.  Or any portion of any fee that Mr. Donziger might make?

DBDLCHE1                    Hinton - cross

1   A.  Absolutely, 100 percent not.

2   Q.  During the course of your work, Ms. Hinton, you frequently

3   relied on Mr. Donziger to provide you certain facts that you

4   would then incorporate into your press release; is that right?

5   A.  Could you repeat the question.

6   Q.  During the course of your work on this matter, Ms. Hinton,

7   you frequently relied on Mr. Donziger to provide you with

8   certain facts that you would then incorporate into your press

9   releases; is that right?

10  A.  He was one of many people that who I depended on.

11  Q.  So yes?

12  A.  Yes.

13  Q.  And among some of those other people you depended on were

14  the -- his environmental, technical people; is that right?

15  A.  Yes.

16  Q.  Mr. Beltman, for example?

17  A.  Yes.

18  Q.  In fact, you would rely on Mr. Donziger to help in fact

19  edit and draft many of your press releases; is that right?

20  A.  He along with others, yes.

21  Q.  And those others included the environmental technicians

22  like Mr. Beltman?

23  A.  I wanted to make sure the press releases were accurate so

24  Mr. Beltman helped me do that.  He didn't edit or write press

25  releases.

1    Q.  But Mr. Donziger helped you edit and write press releases;

2    is that right?

3    A.  He among others.

4    Q.  And when you say among others, others within Mr. Donziger's

5    legal team; is that right?

6    A.  That's correct.

7    Q.  You say you wanted to make sure that the press releases

8    were true.

9         Are you -- do you happen to be a member of the Public

10   Relations Society of America, Ms. Hinton?

11   A.  No.

12   Q.  Are you aware are you bound in your job by any code of

13   ethics at all?

14   A.  Yes.

15   Q.  Professional code of ethics?

16   A.  Yes.

17   Q.  And that's -- is it fair to say that's generally a code of

18   ethics to maintain a standard of accuracy and truth in your

19   press releases?

20   A.  Absolutely.

21   Q.  And just so we're clear, the truth that you're discussing

22   in your press release, is that similar to one that you live

23   similarly by the, for example, the oath you took today that

24   everything in your press releases must be true, the whole

25   truth, and nothing but the truth?

1              MR. GOMEZ:  Objection.  Form.

2              THE COURT:  Sustained.  I don't know how helpful this

3    is, Mr. Blume.

4    Q.  You mentioned, Ms. Hinton, that you performed your role

5    with as little puffery as possible.

6              Do you recall that in your witness statement on

7    paragraph 30?

8    A.  Correct.

9    Q.  And by puffery, is that another word for exaggeration

10   perhaps?

11   A.  Yes.

12   Q.  Is it fair to say sitting here today, Ms. Hinton, that you

13   were successful in that effort to submit or release press

14   releases with little exaggeration?

15   A.  Most of the time.

16   Q.  And part of putting out a truthful press release is to make

17   sure that it reveals a complete picture of the facts as you

18   know them at the time; is that right?

19             MR. GOMEZ:  Objection.

20             THE COURT:  It's cross-examination.  Overruled.

21   A.  Could you repeat it again?  I'm sorry.

22   Q.  As part of putting out a truthful press release, part of

23   that is to make sure it reveals a complete picture of the facts

24   as you knew them at the time?

25   A.  Yes.

DBDLCHE1                    Hinton - cross

1   Q.  Ms. Hinton, have you ever been accused during your career

2   of misattributing quotes in any of the press releases that you

3   issued?

4   A.  What do you mean by misattributing quotes exactly?

5   Q.  Take a quote from someone or submit a quote from someone

6   who did not actually make that quote?

7   A.  Not that I can remember.

8           MR. BLUME:  May I approach?

9   Q.  Ms. Hinton, I'm placing before you what's marked as

10  Plaintiff's Exhibit 6887, email from you to Mr. Donziger dated

11  Friday, November 26, 2010.  It's a four-page document which

12  sends to Mr. Donziger an exchange you had with a man named Jon

13  Entine.

14  A.  Well, I'm going to have to read this.

15  Q.  Okay.

16          MR. BLUME:  Your Honor, while she's reading, we move

17  6887 into evidence.

18          MS. LITTLEPAGE:  No objection.

19          MR. GOMEZ:  No objection.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 6887 received in evidence)

22  Q.  In fact, Ms. Hinton, now that it's in evidence we can move

23  on.

24  A.  Do you have a question?

25  Q.  No.  Let me ask you, Ms. Hinton, do you believe that the

DBDLCHE1                    Hinton - cross

1   practice of blogging or writing articles on behalf of clients

2   without disclosing payments is considered highly unethical?

3   A.  I'm sorry, repeat the question.

4   Q.  Do you believe that the practice of blogging or writing

5   articles on behalf of clients without disclosing payments is

6   considered highly unethical?  Payments to the author.

7   A.  Right.  It depends on the circumstance.

8   Q.  When would it be appropriate, Ms. Hinton, to blog or write

9   an article without disclosing, without the author disclosing

10  payments from a client?

11            MR. GOMEZ:  Objection, vague.

12            THE COURT:  Overruled.

13  A.  Well, I mean every day I pick up the New York Times and

14  there are op-eds in the New York Times written by people who

15  have a self-interest in the issue they're writing about and

16  sometimes that self-interest is payment from a client and they

17  don't always say that they're paid by a client.

18            THE COURT:  Answer is stricken.  Please answer the

19  question that was asked.

20            THE WITNESS:  If you would repeat it again.

21  Q.  When would it be appropriate, Ms. Hinton, to blog or write

22  an article without disclosing, without the author disclosing a

23  payment from a client?

24  A.  If the publisher of the article doesn't require it, then it

25  would be proper.

DBDLCHE1                    Hinton - cross

1   Q.  Was it a practice of yours, Ms. Hinton, to verify with any

2   publication that published your press releases or your

3   statements as to whether or not they required disclosure of

4   payments made on behalf of your clients?

5   A.  I'm really confused by that question.

6          THE COURT:  You're not alone, Ms. Hinton.  Let's try

7   again.

8   Q.  The press releases you issued you issued over business over

9   the wire service; is that right?

10  A.  Yes.

11  Q.  And you also often linked some of your press releases to

12  your own personal Twitter account; is that correct?

13  A.  No.

14  Q.  You discussed your activities, your work on this case on

15  your Twitter account?

16  A.  Yes.

17  Q.  And you often discussed your work and activities on this

18  case on your Facebook page; isn't that right?

19  A.  My Twitter account is linked to my Facebook page.

20  Q.  In fact, you continued up until the first day of this trial

21  to post about this matter on your Twitter account and your

22  Facebook page; is that right?

23  A.  I exercised my First Amendment, expressed my views, and I

24  did it on Twitter which is linked to my Facebook account.

25         MR. BLUME:  Your Honor, I move to strike First

DBDLCHE1                    Hinton - cross

1    Amendment discussion.

2              THE COURT:  Yes, that portion is stricken.

3    Q.  There came a point in May of 2011, Ms. Hinton, when there

4    were lawyers on Mr. Donziger's team who no longer were willing

5    to put their names on any press releases; is that correct?

6    A.  There were very few of our lawyers outside of Steven and

7    Pablo who would put their names in our press releases.  So I

8    don't know anybody who refused to because they never did.

9    Q.  By Steven you mean Steven Donziger, and Pablo, Pablo

10   Fajardo?

11   A.  Yes, yes.

12             MR. BLUME:  May I approach, your Honor?

13             THE COURT:  Yes.

14   Q.  Ms. Hinton, I placed before you what's been previously

15   marked as Plaintiff's Exhibit 1479.  It's an email from you to

16   Mr. Donziger and Mr. Woods dated May 4, 2011, subject, while

17   I'm away.  Ask you to read that to yourself.

18   A.  Okay.  What was the question?

19   Q.  Direct your attention to the fifth sentence beginning since

20   there is no one willing to put their name, do you see that?

21   A.  Yes.

22   Q.  In fact, by "no one" in that email you're referring to not

23   only Mr. Fajardo and Mr. Donziger, but anyone on Mr. Donziger's

24   legal team; is that correct?

25             MR. GOMEZ:  Objection.

DBDLCHE1                    Hinton - cross

1           THE COURT:  Overruled.

2  A.  I can't remember exactly what was in my mind when I wrote

3  it.  But I do know that none of the lawyers outside of Steven

4  Donziger and Pablo Fajardo -- and there may be some exceptions

5  here; I just can't remember -- but none of them was ever

6  interested in being quoted in a press release.  So I was

7  saying, that's what I was saying.

8  Q.  And when you referred to these days in May of 2011, are you

9  then, are you therefore basing your answer referring to these

10  days as any time between May of 2008 and up to and including

11  May of 2011?

12  A.  I'm sure I'm not.  I'm sure it has to do with the fact that

13  Chevron had filed a lawsuit trying to block enforcement of the

14  judgment.  I'm trying to get my dates straight.  And so there

15  was all the lawyers were very sensitive to being quoted about

16  the litigation.

17  Q.  And, in fact, May of 2011 is well after the 1782 discovery

18  came out; is that correct?

19  A.  I'll take your word for it, yes.

20  Q.  Ms. Hinton, you mention on paragraph 35 of your witness

21  statement that after you started working the case you did a

22  great deal of research about the Cabrera report.

23           Do you remember saying that?

24  A.  Yes.

25  Q.  Did that research -- strike that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBD8CHE2                         Hinton - cross

1    Q.  Much of the discussion of the Cabrera report, which we will

2    get to in a little more detail in a minute, and much of your

3    client's position on the Cabrera report, was posted on a number

4    of Web sites, is that correct?

5    A.  To my knowledge, it was posted on two Web sites.  One

6    Chevron Toxico, and then I believe there was another one that

7    would have been in Spanish.

8    Q.  Was that Caso Toxico or Caso Texaco?

9    A.  Maybe, something.  There was another one in Spanish.

10   Q.  And you had oversight over these two Web sites, is that

11   right?

12   A.  No.

13   Q.  You had oversight over -- you are aware of the

14   content -- strike that.

15          You participated in posting content to these Web

16   sites, is that right?

17   A.  Content I created.

18   Q.  And Mr. Donziger had oversight over posting content to

19   these Web sites, isn't that right?

20   A.  I wouldn't say he had oversight.  He submitted materials to

21   be posted.

22   Q.  In fact, submitting materials to these Web sites was an

23   important component of your press campaign, wasn't that right?

24   A.  Yes.

25   Q.  And that included, in addition to Chevron Toxico, posting

DBD8CHE2                        Hinton - cross

1    content of things like the Chevron Pit blog, is that right?

2    A.  Yes.

3    Q.  And you're still in fact to this day the administrator of

4    that blog, right?

5    A.  No.

6    Q.  You are still listed, are you not, as the media contact

7    person for the Chevron Toxico Web site, is that right?

8    A.  No.

9    Q.  When was your name removed from that?

10   A.  I believe March of 2013.

11   Q.  When do you recall being removed as administrator of the

12   Chevron Pit blog?

13   A.  In August of 2013.

14   Q.  Ms. Hinton, before you posted materials to these Web sites,

15   you cleared that through Mr. Donziger, correct?

16   A.  Not always.

17   Q.  Most of the time?

18   A.  Most of the time.

19   Q.  In fact, Mr. Donziger and his team technically owned the

20   Chevron Pit blog, is that correct?

21           MR. GOMEZ:  Objection.  Leading.

22   A.  I don't know what you mean by owned.

23   Q.  Run the blog?

24   A.  The blog was written in a collaborative effort with several

25   people and up until August of 2013 I posted the blogs.

DBD8CHE2                    Hinton - cross

1    Q.  And lawyers working on the case ran the blog and operated

2    the blog, is that right?

3    A.  They wrote materials for the blog.

4    Q.  They never publicly stated that they were in fact lawyers

5    on behalf of the Lago Agrio plaintiffs, did they, on that blog?

6    A.  I believe the top of the blog said something about human

7    rights lawyers working on the case, or involved in the case.

8    Q.  Are you aware that at least as of June of 2009, the lawyers

9    on behalf of the Lago Agrio plaintiffs never publicly stated

10   that they ran the blog?

11   A.  Repeat the question.

12   Q.  Are you aware that at least as of June of 2009, the lawyers

13   on behalf of the Lago Agrio plaintiffs had never publicly

14   stated that they ran the Chevron Pit blog?

15            MR. GOMEZ:  Objection.  Leading.

16            THE COURT:  Sustained as to form.

17            How much longer do you expect to be, counselor?

18            MR. BLUME:  20 minutes.

19   A.  What do you mean by --

20            THE COURT:  There is no pending question.

21            Next question.

22   Q.  Did you post materials or oversee the posting of materials

23   to other Web sites that were linked to Chevron Toxico?

24   A.  No.

25   Q.  Other than the ones you discussed today?

DBD8CHE2                    Hinton – cross

1    A.  I had no involvement with the Spanish Web site.

2    Q.  Ms. Hinton, going back to the research you did on Mr.

3    Cabrera, did that research include reviewing the court orders

4    that were issued out of Ecuador that related to Mr. Cabrera's

5    role in that case?

6            THE COURT:  Counselor, I don't understand the

7    relevance of this.

8            Come to the side bar.  Where is this going?

9            (At the side bar)

10           MR. BLUME:  Your Honor, it is our belief Mr. Donziger

11   never revealed to Ms. Hinton any of the underlying facts

12   relating to the Cabrera report or supplemental report.

13           THE COURT:  Why don't you ask her that?

14           MR. BLUME:  OK.

15           (In open court)

16           THE COURT:  Go ahead.

17   BY MR. BLUME:

18   Q.  Ms. Hinton, as part of your research into the Cabrera

19   report, you spoke with Mr. Donziger to get certain information,

20   did you not?

21   A.  Yes.

22   Q.  Did Mr. Donziger at any point in time tell you that Stratus

23   Consulting had drafted a significant portion of the Cabrera

24   report prior to its issuance on April 1, 2008 -- strike that.

25           Did Mr. Donziger tell you at any point in time that

DBD8CHE2                    Hinton – cross

1   Stratus Consulting had written portions of the Cabrera report?

2   A.  Yes.

3   Q.  Did he tell you that Mr. Beltman in fact drafted the

4   entirety of Cabrera's summary report?

5   A.  I don't know that he ever put it that way.  I eventually

6   learned that.

7   Q.  When?

8   A.  Probably around the time Doug Beltman gave his deposition,

9   which would have been in 2010 I think.

10  Q.  Prior to Mr. Beltman's deposition, Mr. Donziger never

11  informed you that Stratus had written Cabrera's supplemental

12  report, did he?

13  A.  What do you mean by supplemental?

14  Q.  The report issued by Mr. Cabrera in the fall of 2008.

15  A.  No.

16  Q.  Mr. Donziger never told you that Stratus, by commenting on

17  the Cabrera report in December 2008, was in fact commenting on

18  its own work, did he?

19  A.  Well, he didn't tell me about the supplemental as you

20  described it, so no.

21  Q.  Do you know who Mr. Clapp is?

22  A.  Yes.

23  Q.  Richard Clapp?

24  A.  Yes.

25  Q.  He was an expert working on behalf of the Lago Agrio

DBD8CHE2                    Hinton - cross

1   plaintiffs, is that right?

2   A.  Yes.

3   Q.  Directing your attention to around May 2008, there came a

4   point in time when you wanted to circulate publicly your report

5   drafted by Richard Clapp, is that correct?

6   A.  Yes.

7   Q.  And Mr. Beltman instructed you not to do so, is that right?

8   A.  I don't think those were his exact words.

9   Q.  He said, I don't think that we can give that one out; I am

10  not sure of its pedigree.  Do you recall him telling you that?

11  A.  Something to that effect.

12          MR. BLUME:  Your Honor, may I approach?

13  Q.  I have placed before you what is marked 6862, and you are

14  free to read it if you would like, although I would simply ask

15  you to identify it as an e-mail from Mr. Beltman to Mr.

16  Donziger, dated 14 May 2008, above an e-mail from Beltman to

17  you, and before that e-mails between you and Mr. Beltman, and

18  beginning with e-mails from you to a Lucy Mayhew.  And if you

19  can confirm with me that that is what I say it is, we would

20  move 6862 in evidence.

21  A.  Yes.

22          MS. LITTLEPAGE:  No objection.

23          MR. GOMEZ:  No objection.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 6862 received in evidence)

DBD8CHE2                         Hinton - cross

1   Q.  Mr. Donziger told you that revealing the Clapp report

2   publicly would in fact reveal the true authorship of the

3   Cabrera report, did he not?

4   A.  Mr. Donziger, no.

5   Q.  Mr. Donziger never told you that revealing the Clapp report

6   would reveal the true authorship of the Cabrera report?

7              MR. GOMEZ:  Objection.  Leading.

8              THE COURT:  Overruled.

9   A.  No.

10  Q.  Mr. Beltman didn't tell you that either, did he?  No one

11  told you that?

12  A.  No one, correct.

13  Q.  In fact, in July of 2008, do you remember wanting to send

14  annexes to the Cabrera report to a Wall Street Journal

15  reporter?

16  A.  I don't remember specifically, but that's likely to happen.

17  Q.  Do you recall Mr. Donziger instructing you not to do so,

18  not to make the annexes available in or around July of 2008?

19  A.  I don't remember.

20             MR. BLUME:  May I approach?

21             THE COURT:  Yes.

22  Q.  Ms. Hinton, I am placing before you two documents.  One is

23  Plaintiff's Exhibit 6833.  The other is Plaintiff's Exhibit

24  6835.  And I would ask you simply on 6833, do you recognize

25  that as an e-mail from Mr. Donziger to Mr. Beltman, copying

DBD8CHE2                    Hinton - cross

1   you, on June 27, 2008, and a series of e-mails on which you are

2   either the recipient or the sender to a reporter at the Wall

3   Street Journal?

4   A.  Yes.

5           MR. BLUME:  I move 6833 in evidence.

6           MS. LITTLEPAGE:  No objection.

7           THE COURT:  Received.

8           (Plaintiff's Exhibit 6833 received in evidence)

9   Q.  Similarly, Ms. Hinton, on Plaintiff's Exhibit 6833, an

10  e-mail from Mr. Donziger to Mr. Beltman, copying you -- I'm

11  sorry.  6835, an e-mail from you to Mr. Donziger, forwarding an

12  e-mail discussion between you and Mr. Partlow at the Washington

13  Post.  Do you recognize those e-mails?

14  A.  Yes.

15          MR. BLUME:  I move 6835 into evidence.

16          MS. LITTLEPAGE:  No objection.

17          MR. GOMEZ:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 6835 received in evidence)

20          MR. BLUME:  May I approach, your Honor?

21          THE COURT:  Yes.

22  Q.  Ms. Hinton, I am placing before you Plaintiff's Exhibit

23  1291.  It is a five page document.  You're free to read it.  I

24  would simply direct your attention to only a single paragraph

25  that I am going to ask you about, and that is the paragraph

DBD8CHE2                    Hinton - cross

1    labeled, "The Cabrera report and the role of Stratus:  Ecuador

2    law."

3                I will tell you my question, and that is simply if you

4    could read it to yourself and tell me whether at any point in

5    time -- strike that -- in April of 2010, Mr. Donziger told you

6    anything consistent with the facts in this paragraph?

7                THE COURT:  Sustained as to form.

8    Q.  I ask you to read that paragraph to yourself.

9    A.  This is very long here.

10   Q.  It's a question about that one paragraph.

11   A.  The first paragraph.

12   Q.  If you need to read the rest for context you, you are free

13   to do so, but my question is this.  At the time that the

14   Cabrera report was filed in April of 2008, Mr. Donziger never

15   told you that, quote, stratus wrote the bulk of that report

16   adopted by Cabrera and submitted it to the court, isn't that

17   right?

18   A.  Yes.

19               MR. GOMEZ:  Objection to form.

20   Q.  At the time the Cabrera report was issued in April 2008,

21   Mr. Donziger never told you that there was at least one ex

22   parte meeting between Stratus and Cabrera at which U.S. counsel

23   was present, right?

24               MR. GOMEZ:  Objection.  Form.

25               (Record read)

DBD8CHE2                    Hinton - cross

1            THE COURT:  Objection overruled.

2            Answer the question.

3   A.  Well, just so we are clear, I wasn't hired until May of

4   2008.  So I had not met Mr. Donziger.

5   Q.  I appreciate that correction.  In or around May of 2008,

6   when you were hired, Mr. Donziger never told you that there had

7   been at least one ex parte meeting between Stratus and Cabrera

8   at which U.S. counsel was present?

9   A.  I did not know that in May of 2008.

10  Q.  Mr. Donziger never told you that any time before April

11  2010, is that right?

12  A.  Well, the information about the Cabrera report unfolded

13  over time, and to be honest, I can't remember exactly when I

14  knew what -- I mean, I was never that concerned about all these

15  issues that you are raising because I found the report to be

16  accurate, and that's all I cared about in terms of writing

17  press releases, is that the underlying data behind the report

18  was accurate.

19          MR. BLUME:  Move to strike.

20          THE COURT:  Granted.  The testimony is stricken.

21  Q.  When you say that the details of the drafting of the

22  Cabrera report unfolded over time, what you mean is that they

23  unfolded publicly over time, is that correct?

24  A.  Yes.

25  Q.  And you learned of the details of the drafting of the

DBD8CHE2                    Hinton - cross

1    report contemporaneous with the public disclosures, is that

2    right?

3    A.  Mostly.

4    Q.  Mr. Donziger never told you privately the details of the

5    drafting of the Cabrera report, that is, that Stratus was

6    involved in drafting, for example, the summary report

7    attributed to Cabrera, correct?

8             MR. GOMEZ:  Objection to form.

9             THE COURT:  Sustained.

10   Q.  Prior to the public disclosure of Stratus's role, Mr.

11   Donziger never told you about Stratus's role in drafting the

12   Cabrera report?

13            MR. GOMEZ:  Objection to form.

14            THE COURT:  Sustained.

15            Move on, counsel.  This is not useful.

16   Q.  You're aware that Stratus submitted public comments about

17   the Cabrera report in December of 2008, is that right?

18   A.  What do you mean by public comments?

19   Q.  You issued press releases touting a review of the Cabrera

20   report by 20 independent scientists.  Do you recall that?

21   A.  Yes.

22   Q.  At the time that you issued those press releases, you were

23   not aware, were you, that Stratus was commenting on portions of

24   the Cabrera report that they had actually drafted themselves,

25   right?

DBD8CHE2                      Hinton - cross

1         MR. GOMEZ:  Objection.  Form.

2         THE COURT:  It's already been answered.  Let's get on

3    with it, counselor.

4    Q.  Let me ask you this, Ms. Hinton.  In May of 2009, you

5    recall being involved in the 60 Minutes report?

6    A.  Yes.

7    Q.  At no time during the seven months you worked with the

8    producers with 60 Minutes did you ever reveal to them or did

9    you ever reveal to them Stratus's role in the drafting of the

10   Cabrera report, did you?  You never revealed to them --

11        THE COURT:  Which of the last paragraph is the

12   question part?

13   Q.  During the seven months that you worked with the 60 Minutes

14   producers, Ms. Hinton, you never told them about Stratus's role

15   in the drafting of the Cabrera report, is that correct?

16        MR. GOMEZ:  Objection.  Form.

17        THE COURT:  Sustained.

18   Q.  You never heard Mr. Beltman mention to any of the producers

19   at 60 Minutes about his role in the drafting of the Cabrera

20   report, did you?

21        MR. GOMEZ:  Objection.

22        THE COURT:  Overruled.

23   A.  Mr. Beltman discussed with 60 Minutes the Cabrera report,

24   and I believe by then I was saying that Stratus had submitted

25   materials to Mr. Cabrera for consideration and that he had

DBD8CHE2                     Hinton - cross

```
 1    reviewed it and adopted it and signed the report.  So I believe
 2    that's what Mr. Beltman said.
 3              MR. BLUME:  Move to strike what she had said.
 4              THE COURT:  The answer is stricken.
 5              MR. BLUME:  May I approach, your Honor?
 6    Q.  Ms. Hinton, knowing what you know --
 7              MR. BLUME:  First of all, your Honor, I showed
 8    Plaintiff's Exhibit 6889 to plaintiff's counsel.  They have no
 9    objection to its admission.  We move to admit it.
10              MS. LITTLEPAGE:  No objection.
11              MR. FRIEDMAN:  Hold on a second.
12              MR. GOMEZ:  There is no objection to presenting the
13    document to the witness, but we haven't stipulated to its
14    admission.
15    Q.  Directing your attention to that exhibit, Ms. Hinton,
16    Plaintiff's Exhibit 6889, among those checks are checks to you
17    from Mr. Donziger's account.  Does that refresh your
18    recollection that you had been paid directly from Mr. Donziger
19    from his personal account?
20              MR. GOMEZ:  Objection.  I don't recall the witness
21    stating that she needed her memory refreshed at this point.
22              THE COURT:  I thought that she did.  But is it beyond
23    hope that you people could agree even on putting into evidence
24    checks signed by your own client?  Is it really that hopeless?
25              MR. FRIEDMAN:  We just had a misunderstanding.  We are
```

DBD8CHE2                        Hinton - cross

1   not going to object to the documents.  We just wanted the

2   foundation laid so the witness can say what they were.  For all

3   I know, this was movie tickets.

4          THE COURT:  I don't think they are copies of the

5   Koran.  They seem to be checks drawn on Chase Manhattan.

6          MR. FRIEDMAN:  Right.

7   A.  I stand corrected.  I had forgotten about this.  I really

8   have no memory of it.  But it looks like he did.

9   Q.  After the 60 Minutes report came out, you issued press

10  releases about it, ma'am?

11  A.  Yes.

12  Q.  And to this day, have you ever issued a press release

13  correcting any of the facts in that report?

14  A.  No.

15          MR. BLUME:  I have nothing further.

16          THE COURT:  Are you offering this document?

17          MR. BLUME:  I would offer 6889.

18          THE COURT:  Any objection?

19          MS. LITTLEPAGE:  No.

20          THE COURT:  6889 is received.

21          (Plaintiff's Exhibit 6889 received in evidence)

22          THE COURT:  Ms. Littlepage, how long do you expect to

23  be?

24          MS. LITTLEPAGE:  15, 10.

25          THE COURT:  Go ahead.

DBD8CHE2                     Hinton - cross

1          MS. LITTLEPAGE:  Do you want me to go before Mr.

2     Gomez?

3     REDIRECT EXAMINATION

4     BY MS. LITTLEPAGE:

5     Q.  Ms. Hinton, can you tell us what Mr. Donziger did tell you

6     about seeking a settlement from Chevron?

7     A.  He was very clear that he was not interested in a

8     settlement unless it would ensure the full and complete

9     remediation of the contamination in the rainforest, and that

10    would include medical facilities for people who are sick and

11    clean drinking water.

12         MR. BLUME:  I was a bit tardy, but we would object on

13    hearsay.

14         THE COURT:  Why isn't it hearsay, Ms. Littlepage?

15         MS. LITTLEPAGE:  I think Mr. Donziger's state of mind

16    and Ms. Hinton's state of mind as a co-conspirator is relevant.

17         THE COURT:  Ms. Hinton's state of mind is about as

18    relevant to this proceeding, at least in this context, as Alex

19    Rodriguez is.  So that one is not going to fly.

20         Now, as to Mr. Donziger's state of mind, why is this

21    any more relevant than whether he roots for the Yankees or the

22    Red Sox?

23         MS. LITTLEPAGE:  I think it's relevant on a specific

24    issue that is raised in the complaint.

25         THE COURT:  And that would be what?

DBD8CHE2                    Hinton - redirect

1              MS. LITTLEPAGE:  That he was putting a pressure

2      campaign on Chevron in order to extort a settlement.  And I

3      think this shows that his press campaign was designed to get

4      full remediation, whether that was through a verdict or

5      settlement, he didn't care which way, but it was not designed

6      to extort something that he didn't think he deserved or was

7      unmeritorious.

8              THE COURT:  So this is a Robin Hood defense.

9              MS. LITTLEPAGE:  It's a defense that is supported by

10     the case law that says the state of mind of someone who is

11     accused of extortion is relevant, especially when the extortion

12     is extortion of economic pressure as opposed to threats of

13     violence.  There is a distinction in the case law on those two

14     things.  And when you're looking at extortion where the

15     underlying claim is extortion through economic pressure, which

16     I think is the allegation here as I read the complaint, then it

17     is important to look to see the state of mind of the alleged

18     extortionist and whether he believed there was merit.

19             THE COURT:  Which element of the offense of extortion

20     would this testimony be relevant on?

21             MS. LITTLEPAGE:  I think one of the elements of

22     extortion is the wrongfulness of the conduct.  That the conduct

23     of extorting through press releases, in order to extort through

24     economic pressure, does allow state of mind evidence, not only

25     from Mr. Donziger but from someone who worked closely with him.

DBD8CHE2                    Hinton - redirect

 1   This issue was raised on cross.  I think I am allowed to

 2   readdress it on redirect.

 3           THE COURT:  We are talking about hearsay; we are not

 4   talking about the scope of the examination.

 5           This is an out-of-court statement by Mr. Donziger

 6   offered to prove the truth of the statement, is it not?

 7           MS. LITTLEPAGE:  It's offered to prove his state of

 8   mind.  It's not offered for the truth of the statement, but

 9   what he believed.

10           THE COURT:  As to which element is that relevant?

11           MS. LITTLEPAGE:  Judge, I think it's relevant as to

12   the wrongfulness that's been accused of his conduct.

13           THE COURT:  And so in your submission, it would be OK

14   to issue press releases, which hypothetically were false and

15   misleading, to generate economic pressure to induce the payment

16   of money, as long as the party responsible for that had a

17   laudable motive in his mind?

18           MS. LITTLEPAGE:  I think there is a line of case law

19   that says --

20           THE COURT:  Could you answer my question, please?  I

21   am quite familiar with the line of case law.

22           MS. LITTLEPAGE:  Sorry.  Can I read the question back?

23           Well, Judge, I take issue with your hypothetical.

24           THE COURT:  But you don't get to change my

25   hypothetical.  You get to answer it.  It may fit the facts or

DBD8CHE2                    Hinton - redirect

1    it may not, but I would like to hear your answer.

2                MS. LITTLEPAGE:  Judge, I think if there was proof,

3    which we are trying to rebut, that the press releases were

4    false and misleading and designed solely for the purpose to

5    extort, I believe that would be relevant evidence.  I don't

6    think it's conclusive evidence, but I think it would be

7    relevant.  But I think equally relevant would be an opportunity

8    to rebut that accusation with the fact that the press releases

9    were not false.

10               THE COURT:  And so how does the answer to the question

11   you pose to the witness go to the issue of whether the press

12   releases were or were not false and misleading?

13               MS. LITTLEPAGE:  This question doesn't go to that

14   issue.  This question goes to the issue that was asked on cross

15   of her, which was what Mr. Donziger did or didn't say to her

16   about settlement.  I wanted to ask her what he did or didn't

17   say so the record could be clear what he did or didn't say, as

18   opposed to allowing merely cross on an issue without allowing

19   redirect.

20               THE COURT:  Let's do it this way.  I'm certainly not

21   going to take it for the truth of the matters.  I will

22   ultimately decide whether I am going to take it even for state

23   of mind, and I will ultimately decide whether it's believable

24   anyway.  But let's proceed.

25               So the witness will answer the question.  And I am

DBD8CHE2                          Hinton - redirect

1    sure you don't remember it, Ms. Hinton, so we will get the

2    court reporter to read it back.

3              MR. BLUME:  The answer is in the record.

4              THE COURT:  Go ahead.  Thank you for that.

5    BY MS. LITTLEPAGE:

6    Q.  Ms. Hinton, do you have in front of you PX 1034?  I think

7    it's your proposal to Mr. Donziger when you were first hired.

8    A.  I have got a lot of stuff here so hang on.  Here it is.

9    Q.  Was this proposal ever signed?

10   A.  No.

11   Q.  Can you tell us the circumstances surrounding this proposal

12   in your e-mail to Mr. Donziger?

13   A.  He asked me --

14             MR. BLUME:  Objection.  Vague.

15             THE COURT:  You can answer the question.  Go ahead.

16   A.  He asked me for a proposal.  I sent him a proposal and that

17   was the end of it.

18   Q.  Did you start working on the case?

19   A.  Yes.

20   Q.  What did you understand your role would be when you started

21   working on the case?

22             MR. BLUME:  Objection.

23             THE COURT:  Sustained.

24             THE WITNESS:  Does that mean I can answer it or not?

25             THE COURT:  That means you cannot.

DBD8CHE2                          Hinton - redirect

1                THE WITNESS:  Sorry.

2                THE COURT:  That's all right.

3   Q.  Can you explain the circumstances surrounding the June 2009

4   e-mail by your lawyer to Joe Kohn?

5   A.  Yes.  I asked my lawyer to negotiate a contract for me

6   because Steven Donziger never signed this proposal, which is

7   normal in the public relations industry.

8                THE COURT:  What is normal, that the clients do or

9   don't sign?

10               THE WITNESS:  That they do sign.

11  A.  And Steven -- in the meantime, Steven had said to me, that

12  because I was only being paid 10,000 a month, which was low in

13  the industry, considering the amount of hours I was working on

14  the case, because it was mostly full time, that perhaps he

15  could pay me a bonus.  So I asked my attorneys, I said to them,

16  look, I don't know how you do this, could you talk to them and

17  figure out something that's fair?  They said, OK.

18               I got this e-mail and I told them, look, I don't feel

19  right about this.  This is not what I want in a bonus.  I don't

20  like to be tied to the damage award or a settlement amount.  So

21  forget it.  I am not going to get a contract signed, much less

22  a bonus, so just stop.

23  Q.  Did you ever get a signed contract or an agreement for a

24  bonus?

25  A.  No.

DBD8CHE2                    Hinton - redirect

1   Q.  Did you keep working on the case?

2   A.  Yes.

3   Q.  Did you receive payment for your work from time to time?

4   A.  From time to time.  It was hit and miss.

5   Q.  Do you have PX 6878?  It's an e-mail exchange between you

6   and Orin Kramer.

7   A.  OK.  I have got it.

8   Q.  Can you tell us what were the circumstances surrounding

9   this e-mail exchange?

10          MR. BLUME:  Objection.  Vague.

11          THE COURT:  Overruled.

12  A.  If I recall correctly, I think I was accidentally copied on

13  an e-mail from Mr. Kramer, who I don't know.  And for whatever

14  reason at the time, something he said in his e-mail set me off,

15  said something about a purely existential exercise.  And I

16  can't remember what I was thinking at the time I wrote it, but

17  I think I was basically saying that no one person, no one press

18  release, no one anything was going to ever convince Chevron to

19  take responsibility for what it had done in Ecuador.

20  Q.  Who was Mr. Kramer?

21  A.  As I understand it, Mr. Kramer was a supporter of the

22  lawsuit.

23  Q.  Was there a discussion in February of 2010 of Mr. Kramer

24  helping to fund some of the lawsuit?

25          MR. BLUME:  Objection.  Calls for hearsay.

DBD8CHE2                          Hinton - redirect

1          THE COURT:  Sustained.

2   Q.  Do you have any personal knowledge of whether or not

3   Mr. Kramer was considering being involved in the lawsuit as a

4   funder?

5          MR. BLUME:  Objection.  Calls for hearsay.

6          THE COURT:  Sustained.

7          Lay a proper foundation if you can.

8   Q.  Did you ever have a discussion with Mr. Kramer or Mr.

9   Donziger about what would be Mr. Kramer's proposed role in the

10  lawsuit?

11  A.  No.

12  Q.  Was there any further e-mail discussion between you and

13  Mr. Kramer other than what is captured on Plaintiff's Exhibit

14  6878, if you remember?

15  A.  I don't believe so.

16  Q.  Plaintiff's Exhibit 1479 is an e-mail between you and Mr.

17  Donziger called "while I'm away."  Can you tell us the

18  circumstances surrounding this e-mail?

19  A.  I believe I was going maybe on vacation or I guess

20  vacation, and I wanted to make sure that everyone knew how to

21  distribute any press releases or press statements that may be

22  made while I was gone.

23  Q.  You were asked some questions about the Cabrera report.

24  Can you explain how you dealt with the Cabrera report in press

25  releases?

DBD8CHE2                          Hinton - redirect

1            MR. BLUME:  Objection.

2            THE COURT:  Sustained.

3   Q.  Do you recall when you first issued a press release about

4   the Cabrera report?

5   A.  Actually, no, I don't recall.

6   Q.  Was the Cabrera report already filed when you started

7   working?

8   A.  Yes.

9   Q.  Did you discuss the Cabrera report in press releases?

10  A.  Yes.

11  Q.  Did the way you discuss the Cabrera report change over

12  time?

13           THE COURT:  I imagine the way to find that out is to

14  read the press releases, don't you think?

15           MS. LITTLEPAGE:  If I had them, that would probably be

16  true.  But she is here so I can just ask her.

17           MR. BLUME:  They are all in evidence.

18           THE COURT:  There is a best evidence issue, isn't

19  there?

20           MS. LITTLEPAGE:  No further questions.

21           THE COURT:  Thank you.

22           Mr. Gomez, how long do you expect to be?

23           MR. GOMEZ:  I have no further questions.

24           THE COURT:  Thank you.

25           Is there any redirect?

DBD8CHE2                    Hinton - redirect

1           MR. BLUME:  No, sir.

2           THE COURT:  Ms. Hinton, you are excused.  Thank you.

3           (Witness excused)

4           THE COURT:  We will take our morning break.

5           (Recess)

6           THE COURT:  Mr. Friedman, next witness, please.

7           MR. FRIEDMAN:  If I could, I wanted to introduce you

8    to you Mr. Yankwitt.  He is the lawyer that Mr. Moncayo has

9    retained, and he just has a quick matter he wanted to address

10   the Court about about the order from yesterday.

11          THE COURT:  If it's very brief.

12          MR. YANKWITT:  Good morning, your Honor.  We have

13   spoken with plaintiff's counsel, and with your Honor's

14   permission, we would like to take the computer into my custody

15   today, make two copies of the hard drive, put one in a safe,

16   and I will start reviewing the documents tomorrow morning, your

17   Honor.  And we have already agreed that their forensic expert

18   can sit next to our IT department to make sure the copying is

19   appropriate.

20          MR. MASTRO:  I appreciate Mr. Yankwitt's

21   representation, but your Honor I think rightly ordered that one

22   of the forensic imaging be deposited with the court for its

23   safekeeping, and I think that should continue to apply.  He is

24   proposing to make one for him to use to review and put one in

25   his office safe.

DBD8CHE2

1        THE COURT:  What is the problem with filing one with

2    the clerk?

3        MR. YANKWITT:  I was told that it could be a violation

4    of Ecuadorian law to produce documents to a U.S. district

5    court.

6        THE COURT:  It's to be filed with the clerk of this

7    court.  The article is in the United States.  It was brought

8    here voluntarily.  He is subject to the compulsory process of

9    the United States court and that is the order.

10       Now, I expect all counsel to work out appropriate

11   arrangements so that a chain of custody is established, and

12   beyond that, of course, it's perfectly satisfactory for

13   Mr. Yankwitt to retain one of the two images of the hard drive.

14   But the other must be filed with the clerk.

15       MR. YANKWITT:  Will do, your Honor.

16       THE COURT:  Thank you.

17       MR. BRODSKY:  I believe they are going to be calling

18   Mr. Ponce as their next witness.  We had a similar issue with

19   respect to Mr. Ponce's witness statement that your Honor

20   addressed with Ms. Hinton's witness statement.  I know there

21   are various issues we could deal with.  I thought I would focus

22   your Honor's attention on a couple of paragraphs that stood

23   out.

24       THE COURT:  Would you hand a copy up to me, please?

25       MR. BRODSKY:  Now, I appreciate the defense has

DBD8CHE2

1    informed us they are offering a lot of what Mr. Ponce has to

2    say not for its truth, but for the mere fact that information

3    was provided to Mr. Donziger.  I know your Honor has ruled on

4    that with respect to Ms. Hinton in several respects.  I don't

5    want to take up much of the Court's time to go through it

6    paragraph by paragraph, but to highlight the most what seem to

7    be egregious examples are paragraph 14, which discusses the

8    Guanta inspection.

9           In connection with that, Mr. Ponce apparently has

10   suspicions, which if you read this last sentence of the

11   paragraph he says, "I discussed these matters with Steven, and

12   I discussed my suspicions that Chevron was behind or at least

13   involved in the break-in."

14          The paragraph is essentially, in substance, statements

15   by Mr. Ponce that he suspected the Guanta inspection was

16   stopped because of Chevron's involvement, but he has no

17   personal knowledge.  And then there was a break-in his office,

18   and he received calls at 5 a.m. on multiple occasions, and he

19   says he suspected that to be Chevron, although he had no

20   personal knowledge of that.  Then he says he discussed these

21   matters with Mr. Donziger.

22          I imagine what they are going to argue is that Mr.

23   Donziger discussed them with Mr. Ponce and may or may not have

24   believed them to be true, but it seems completely inadmissible

25   under the hearsay rules.  It doesn't seem to be relevant, as

DBD8CHE2

1    your Honor has pointed out with respect to Ms. Hinton, and

2    that's an area I prefer not to go into on cross-examination

3    since it seems to be baseless.

4         THE COURT:  Was there another paragraph that you think

5    I ought to address now rather than later?

6         MR. BRODSKY:  Paragraph 17 is important, because in

7    that paragraph Mr. Ponce, who is a lawyer as part of the Lago

8    Agrio plaintiffs' team, says that, in his opinion, he provides

9    an opinion about what he believes Ecuadorian law is with

10   respect to an ex parte contact, and he then says Chevron did it

11   repeatedly, although as I understand it, not based on personal

12   knowledge, and then he goes on to say he discussed those

13   matters with Mr. Donziger.

14        There are two problems with this.  First of all, he is

15   offering a legal opinion.  Second of all, it seems that the

16   defense here is reliance on the advice of counsel.  That is,

17   Mr. Ponce, as one of the lawyers for the Lago Agrio plaintiffs,

18   provided legal advice to Mr. Donziger and exchanged information

19   about the law.

20        You can use the reliance on advice of counsel defense,

21   but it has to be appropriate, and they have to produce all

22   documents related to it, and they have subject themselves to

23   discovery relating to the scope of the advice provided and any

24   information relating to it.  They can't use it as a sword,

25   which they are doing in this paragraph, and then shield the

DBD8CHE2

 1    discovery of any information relating to it.  So that seems to

 2    be a particularly egregious issue for us.

 3              Then, finally, your Honor, I would say that in

 4    paragraph 21, he talks about, Mr. Ponce, a personal experience

 5    he had in connection with the litigation, that Chevron hired an

 6    expert who opined about his involvement.  And he then goes on

 7    to provide his own view of that evidence, and it seems, A,

 8    completely irrelevant, and, B, based on hearsay.  That expert

 9    was never called at trial, and whether or not it's true, it

10    seems to be completely irrelevant and hearsay.

11              THE COURT:  Well, I don't want to spend an amount of

12    time on this, but from what you say, the first two affect the

13    cross-examination in a material way.  Is that a fair statement,

14    Mr. Brodsky?

15              MR. BRODSKY:  That is a fair statement.

16              THE COURT:  So Mr. Booth, what about paragraph 14?

17              MR. BOOTH:  Yes, your Honor.

18              I will speak generally, if I could, but I then will

19    talk specifically about this.

20              There's a number of e-mails.  There's a number of

21    statements in the Crude outtakes.  And my perception of the

22    plaintiff's case relies largely on things that Mr. Donziger

23    said, things that he hasn't said, and snippets of things at

24    different times that has come out of his mouth or out of his

25    e-mail.  I think what is in his mind, both because he knows it

1    or because he is told about it, and the context of when the

2    statements were made, what is going on, what he is aware of,

3    what he believes he is aware of at the time, all of that is

4    important context for what he is saying and what he is doing.

5         So I think that this is a perfect example of something

6    that obviously the people in Ecuador, the lawyers on the team,

7    felt very raw about.  They felt like it was an example of

8    Chevron doing wrong things.  It's not offered for the truth of

9    whether that in fact happened.  But it is an example of context

10   for decisions being made there, press releases being issued,

11   e-mail statements being made, certain times an angry response

12   from Mr. Donziger at different times based on what he perceived

13   was going on.

14        THE COURT:  Mr. Donziger presumably knows what he was

15   told at the time, is that right?

16        MR. BOOTH:  I would think he would, your Honor.

17        THE COURT:  So to whatever extent his state of mind is

18   relevant to the case, the best source of the information is

19   him, is that not true?

20        MR. BOOTH:  That may be true.

21        THE COURT:  And it seems to me that in some part you

22   have got the cart very much before the horse here.  That's one

23   problem with it.

24        A second problem with it is that I have serious

25   reservations about the relevance of most of this.

DBD8CHE2

1              The third part of this is that at least some

2    significant part of it seems to be speculation by the witness

3    as to what might have happened, gossip he heard from other

4    people perhaps, which is pure hearsay as to him.  So I have

5    some serious problems with this.

6              Now, you have talked in very general terms.  Let's

7    just look at some specifics.

8              The third sentence, "I have been told that a number of

9    reporters were planning on being present."  If that's offered

10   to prove that a number of reporters were planning to be

11   present, it's hearsay.

12             MR. BOOTH:  Absolutely.  And I am not offering any of

13   this for the truth of the matter because it would be hearsay

14   for that purpose.

15             THE COURT:  And then he said, "I discussed these

16   matters," skipping over a sentence.  Well, the intervening

17   sentence is similar.  "The afternoon before the inspection I

18   was told that Chevron had gotten the judge to cancel the

19   inspection," etc.  Obviously not admissible for the truth.

20             MR. BOOTH:  Yes, your Honor.

21             THE COURT:  Now he says, "I discussed these matters

22   with Steven."  What did he say to Steven?  What did Steven say

23   to him?  That we don't know.

24             And one could go through the rest of this.  This is

25   essentially a press release.  That's about what it is, this

DBD8CHE2

1    paragraph anyway.

2            MR. BOOTH:  I would disagree only because I don't know

3    what a press release really is, and I don't say that jokingly.

4            THE COURT:  There are probably 200 of them in the

5    record in this case.

6            MR. BOOTH:  I just haven't read any of them.  But to

7    deal with your point, it is hearsay.  It is being offered to

8    corroborate a witness who, as you pointed out, whose

9    credibility will be attacked, and is an issue in this case, Mr.

10   Donziger.  The fact that another witness says that these are

11   matters he discussed, these are matters Mr. Donziger was aware

12   of and were discussed with him, to the extent it goes to

13   corroborate what Mr. Donziger said he thought, his explanations

14   to things that they have him saying, e-mails they have him

15   writing, diary entries that they have him writing, to the

16   extent that these things corroborate --

17           THE COURT:  They were diary entries that Mr. Donziger

18   wrote, not that they have him writing.  He wrote them.  Purely

19   voluntarily.  They knew nothing about it.

20           MR. BOOTH:  That was a bad way to say it.  That he

21   wrote.  Sorry.

22           THE COURT:  Look, as to 14, I am going to reserve

23   decision on that.

24           Mr. Brodsky, if you want to cross-examine him, you

25   will cross-examine him.  It may well be that I am not going to

DBD8CHE2

 1    wind up regarding it as relevant, but I will reserve, and we

 2    will see where we are.

 3         As to paragraph 17, this man purports to state that

 4    Chevron repeatedly had ex parte contacts.  Did he ever see or

 5    hear one?  Was he ever present at one?

 6         MR. BOOTH:  I don't know that, but that would not be

 7    offered for the truth of the matter.  We would not offer that

 8    statement for the truth of the matter, sir.  It does not

 9    indicate his personal knowledge so it would not be offered for

10    the truth.

11         THE COURT:  So Mr. Brodsky, is correct on this one,

12    that you're, in effect, trying to raise on your client's behalf

13    an advice of counsel defense.

14         MR. BOOTH:  No.  This again is discussions with Mr.

15    Donziger that would go to his knowledge of Ecuadorian

16    procedure, practice.  You have an American lawyer in Ecuador.

17    From the outtakes of Crude, he expresses some frustration.  He

18    expressed a lack of understanding.

19         THE COURT:  Why is it relevant to this case that

20    someone told him this was legal in Ecuador, if that happened,

21    unless it goes to whether he had a culpable state of mind?

22    It's absolutely not relevant for any other purpose, is it?

23         MR. BOOTH:  I have not worked with Mr. Donziger so I

24    don't know what his statement looks like.  I don't know what he

25    says.  This witness recalled certain conversations where he

DBD8CHE2

1    discussed certain things, and that's what he put in his

2    statement.  I believe it is relevant that this is a

3    conversation he has with Mr. Donziger discussing some of the

4    matters that have been raised, ex parte contact being one.  It

5    goes to his knowledge, his understanding.  It goes to his

6    having conversations about Ecuadorian procedure.  Again, I

7    haven't watched all the outtakes of Crude, but there is a

8    number of times where he speaks about things that I think are

9    covered to some extent in the statement.

10         THE COURT:  Who speaks about?

11         MR. BOOTH:  Mr. Donziger from the outtakes discusses

12   things which this witness is discussing in his statement, which

13   was the purpose --

14         THE COURT:  Let me put it to you this way.  I am going

15   to leave it there for now, I will rule later, if you want it

16   there.  But you are at peril that if it stays there past 5:00

17   today, any privilege that Mr. Donziger may have on this

18   subject, and he may well have waived it already, is gone.

19         MR. BOOTH:  If that's the way you see it, we will take

20   it out right now.

21         THE COURT:  I had a feeling.  It's out.

22         MR. BOOTH:  So the record is clear, I understand you

23   have told me that's your feeling.  That's not my feeling when

24   it was written and that's not my belief.  But I understand and

25   we will take it out.  I will also take out number 21.

DBD8CHE2

```
 1              THE COURT:  You have not been able to articulate to me
 2      any way in which the statement that Ponce told Donziger that in
 3      his judgment it was OK under Ecuadorian law for the parties to
 4      have ex parte contact with judges back in 2009 has any
 5      relevance here except as an advice of counsel defense.
 6              MR. BOOTH:  I don't assert it's an advice of counsel
 7      defense.
 8              THE COURT:  I don't care whether you call it a
 9      giraffe, but I can conceive of no relevance to this statement,
10      except as an advice of counsel defense, and I am giving you a
11      last opportunity to tell me why it is relevant to an issue in
12      this case for any purpose other than showing that Donziger did
13      not act with a culpable state of mind in engaging in ex parte
14      communications.
15              MR. BOOTH:  Can Mr. Friedman respond to this?
16              THE COURT:  All right.
17              MR. FRIEDMAN:  The reason it is not an advice of
18      counsel defense -- I incorporate everything Mr. Booth said.
19      The reason it's not an advice of counsel defense is, for
20      example, Mr. Booth and I are working on this case together.  If
21      I tell him something that may affect his state of mind, it's
22      not advice of counsel.  We are just on the case together.
23              THE COURT:  Mr. Friedman, state of mind is not a free
24      floating admission to the subset of human knowledge known as
25      relevant evidence, right?  You can't come in here in this case
```

DBD8CHE2

1   and produce evidence as to who Mr. Donziger thought was the

2   best center fielder in New York in the 1950s, Mantle, Mays or

3   The Duke.  You can't.  It affects his state of mind all right.

4   It's part of the corpus of beliefs and knowledge that was his

5   state of mind.  But it's not relevant here because it doesn't

6   make any fact in issue more or less probable by virtue of who

7   he thought was the best center fielder.

8           Now, you come in here and you want to put in that a

9   lawyer told him that it was legal in Ecuador to have ex parte

10  contacts with judges in 2009.  Now, I put it to you, sir, that

11  I cannot imagine any fact at issue in this trial, other than

12  whether Mr. Donziger acted with a culpable intent in having and

13  promoting ex parte contacts in this time period, except --

14  strike except.  That's the only conceivable issue that's

15  relevant, isn't it?

16          MR. FRIEDMAN:  I think so, your Honor.  If I could

17  address that, that's what Chevron has put in issue in this case

18  through their complaint, through their evidence.  I think this

19  is the point Mr. Booth was trying to make, is they said he has

20  a culpable state of mind in those ex parte contacts, when he

21  pressures judges, all the various things, when he made these

22  statements on Crude, they are saying he has a culpable state of

23  mind.  We should be able to meet that evidence to say it was

24  not a culpable state of mind.

25          THE COURT:  You can meet it with whatever you want,

1    but the minute you say, I am meeting it by saying a lawyer told

2    him it's OK, you now open up the subject of everything having

3    to do with the legal advice he got.  Because it goes to the

4    question of exactly what he told the lawyer, what the lawyer

5    told him, the reasonableness of the advice, where all the

6    documents are that may be relevant to this.  That's what it's

7    all about.

8         MR. FRIEDMAN:  I would say, for example, your Honor,

9    obviously there is overlap.  I understand that.  But Mr.

10   Donziger was not their client, these lawyers who are talking to

11   him, not their client.  He was an American lawyer in Ecuador

12   working on the team trying to assess various things that were

13   being done, and that influenced his conduct in the press

14   releases, his conduct in the U.S.

15        THE COURT:  If they weren't his lawyers, this guy

16   wasn't his lawyer, and you're not claiming any privilege as to

17   communications with this guy, then I guess there is no issue of

18   waiver.  And what you have is this guy being wide open, right?

19        MR. FRIEDMAN:  I think he is wide open as to this guy,

20   what he said to Mr. Donziger and what Mr. Donziger said back to

21   him, yes.

22        THE COURT:  And he worked on the *Aquinda* case on

23   behalf of the Lago Agrio plaintiffs, right?

24        MR. FRIEDMAN:  That is correct.

25        THE COURT:  Mr. Brodsky, what has Chevron requested

DBD8CHE2

1    the defendants to produce from Ecuador that they have refused

2    to produce that's relevant to this question, if anything?

3              MR. BRODSKY:  May I consult with my colleagues?

4              THE COURT:  Yes.

5              MR. BRODSKY:  We requested, among other things, we

6    sought documents from the Lago Agrio plaintiffs' team of all

7    communications and documents relating to ex parte

8    communications.  That would encompass clearly this subject.  We

9    haven't received any documents.

10             So, for example, if Mr. Ponce is on a lot of e-mails

11   with Mr. Fajardo and Mr. Donziger and Mr. Prieto and Mr. Saenz,

12   and if there are e-mail communications in their possession down

13   in Ecuador that relate to speaking to judges and what advice

14   Mr. Donziger is getting, all of that should be produced.  All

15   of that should be the subject of production.  We should have

16   it.  We should analyze it before they send Mr. Ponce up here to

17   testify.

18             We are sort of put in a box here.  They say, sure, you

19   can go ahead and ask Mr. Ponce any questions you want about

20   these conversations, but we don't have the documents.  We don't

21   have any documents from Ecuador other than what we obtained

22   from Mr. Donziger, and it constrains us.

23             MR. FRIEDMAN:  That's a different issue, your Honor,

24   that I guess I didn't fully appreciate.  Neither Mr. Booth nor

25   I, as you know, know the history of the discovery requests.  I

DBD8CHE2

1    have a better insight into the issue now.

2         Could I just have a minute to talk to Mr. Booth?

3         THE COURT:  Please.

4         MR. FRIEDMAN:  Here is where I come out on this, your

5    Honor.  I think we are right on this issue, but I don't think

6    it's worth spending the rest of the day or however long we

7    would argue about it.

8         THE COURT:  We weren't going to spend much more time

9    on it.

10        MR. FRIEDMAN:  I will go with what Mr. Booth said.  We

11   will pull out 17 and 21 and just be done with that.

12        What I do want to say, though, your Honor, is that we

13   are not waiving our position that Mr. Booth articulated about

14   state of mind in general.  In other words, if Mr. Donziger is

15   told something by somebody that's not, quote, legal advice,

16   whether it's from a lawyer or somebody else, we still believe

17   that is relevant and the Court should consider that.

18        THE COURT:  Look, it may be, and it may not be,

19   depending on what it is, and whether it meets the test of

20   relevance.

21        MR. FRIEDMAN:  I just want it to be clear, our

22   position is based on the attorney-client issue that the Court

23   raised.

24        THE COURT:  And I appreciate your clarification that

25   you weren't claiming that Ponce was Donziger's lawyer.  But it

DBD8CHE2

1    certainly does implicate the problem caused by the discovery,

2    and it certainly would open testimony of this type, even if not

3    from his lawyer, it would open up whatever went on between

4    Fajardo and Saenz and Donziger, if anything, as to which there

5    has been an absolute stonewall on discovery from day one.

6              MR. FRIEDMAN:  I understand what you're saying.  It is

7    incumbent upon me to ask, given our discussion that we just

8    had --

9              THE COURT:  I should add, by the way, that there was

10   never any claim of privilege that I remember, as I sit here

11   today, with respect to any materials that the defendants

12   declined to produce from Ecuador.

13             MR. FRIEDMAN:  Right.  I think, having worked with Mr.

14   Donziger on his statement, I think he is intending to talk

15   about many of these issues, and where that will lead us I don't

16   know.  I don't have the intellect to figure that out right now.

17             THE COURT:  You undersell yourself, sir.

18             MR. FRIEDMAN:  My point now is for Mr. Ponce.

19             THE COURT:  You're withdrawing 17 and 21 is the bottom

20   line.

21             MR. FRIEDMAN:  Yes.  I do think it is incumbent upon

22   me to ask the Court whether this next witness, given that we

23   have pulled that out, are we going to have a similar laptop

24   issue with him as we had with Mr. Moncayo?

25             THE COURT:  I don't know.  Did he bring his laptop?

DBD8CHE2

1          MR. FRIEDMAN:  I think he did.  I feel like, if that's

2     where we are heading with this, we should at least tell him

3     that's what he is getting into.

4          THE COURT:  I don't know where we are heading.  It was

5     an enormous surprise to everybody in the courtroom yesterday.

6     It certainly was surprising to me.

7          I mean, just step back a minute.  For three years

8     there has been a flat refusal to turn over in discovery any

9     documents or records from Ecuador, and then they get Mr.

10    Moncayo and send him up to testify, and they put him on the

11    plane with his laptop with the e-mails?  I mean, you know, but

12    stuff happens all the time.

13         MR. FRIEDMAN:  I think the rest of the statement

14    doesn't implicate any of those things, and I guess we can deal

15    with it as it comes up.

16         THE COURT:  We will deal with it in due course.

17         Let's proceed.

18         MR. BOOTH:  We call Alejandro Ponce.

19    ALEJANDRO PONCE VILLACIS,

20         called as a witness by the defendants,

21         having been duly sworn, testified as follows:

22         THE DEPUTY CLERK:  State your name and spell your last

23    name for the record.

24         THE WITNESS:  My name is Alejandro Ponce Villacis,

25    P-O-N-C-E, V-I-L-L-A-C-I-S.

DBD8CHE2

1    DIRECT EXAMINATION

2    BY MR. BOOTH:

3    Q.  Good morning, Mr. Ponce.

4            MR. BOOTH:  May I approach, your Honor?

5            THE COURT:  You may.

6    Q.  Mr. Ponce, will you look at what I have handed you as

7    Defendants' Exhibit 1601.  Can you confirm for the Court that

8    that is a copy of your direct testimony, your witness statement

9    in this case?

10   A.  Yes, it is.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBDLCHE3                    Ponce - direct

1   Q.  And on page 7, is that your signature?

2   A.  Yes, it is.

3            MR. BOOTH:  Your Honor, we would move into evidence

4   Defendant's Exhibit 1601.

5            THE COURT:  1601, specifically paragraphs one through

6   16, 18 to 20, and 22 are received on the same basis as the

7   other statements, that is, subject to the filing of objections,

8   if they haven't already been filed, and if they have been

9   filed, to the objections on file, and subsequent rulings as to

10  the admissibility of the materials contained therein.

11           (Defendant's Exhibit 1601 received in evidence)

12           MR. BOOTH:  Thank you, your Honor.  Pass the witness.

13           MR. BRODSKY:  Thank you, your Honor.

14           THE COURT:  Mr. Brodsky.

15           MR. BRODSKY:  Yes, your Honor.

16  CROSS-EXAMINATION

17  BY MR. BRODSKY:

18  Q.  Good afternoon, Mr. Ponce.

19  A.  Good afternoon.

20  Q.  I notice you were looking over your statement for a little

21  bit of time.  When is the last time you read the full

22  statement?

23  A.  Last time I read my statement was yesterday morning.

24  Q.  Mr. Ponce, and when was the first time you read the

25  statement?

DBDLCHE3                      Ponce - cross

1    A.  When I wrote it.

2    Q.  Yes.

3    A.  Probably it was on -- I started writing it on the early

4    morning, sorry, late night of November 1.

5    Q.  You were part of the Lago Agrio plaintiffs' legal team from

6    June 2005 through November of 2008?

7    A.  That's correct.

8    Q.  And that was an important case to you?

9    A.  Yes, it was.

10   Q.  You paid a lot of attention to that case during that period

11   of time?

12   A.  That's not entirely correct.

13   Q.  You paid attention to the case during that period of time?

14   A.  I paid attention through that time, yes.

15   Q.  At some points between June 2005 and November 2008 you paid

16   a lot of attention to the case?

17   A.  Through some times, yes.

18   Q.  And other times you did not?

19   A.  Through other times I did not.

20   Q.  And you paid attention to developments in the case between

21   June 2005 and November 2008?

22   A.  Yes, I did.

23   Q.  You reviewed the filings that the Lago Agrio plaintiffs

24   made and that Chevron made in the Lago Agrio courthouse in

25   connection with the case?

1    A.   That's not necessarily true.

2    Q.   There were times when the Lago Agrio plaintiffs made

3    filings with the court in the Lago Agrio Chevron case when you

4    were representing them that you did not review before they were

5    filed?

6    A.   Yes, that's correct.

7    Q.   And there were times when the Lago Agrio plaintiffs' legal

8    team filed briefs or other documents in the case that you never

9    read?

10   A.   Yes, that's correct.

11   Q.   And, well, when the court, the presiding judge in the Lago

12   Agrio Chevron case between June 2005 and November 2008 issued

13   orders, surely you read those orders?

14   A.   In some cases I read those orders, yes.

15   Q.   So in some cases between June 2005 and November 2008 you

16   read the court's orders issued in the Lago Agrio Chevron case?

17   A.   Yes, in some cases.

18   Q.   In some cases you did not?

19   A.   I did not, yes.

20   Q.   You were in Quito during this period of time for the most

21   part?

22   A.   I was in Quito for most of the part, that's correct.

23   Q.   Pablo Fajardo was in Lago Agrio, correct?

24   A.   Yes, he was in Lago Agrio.

25   Q.   And Mr. Donziger for the most part was in Manhattan?

DBDLCHE3                    Ponce - cross

1   A.  Yes.

2   Q.  But he would often take trips to Ecuador?

3   A.  Yes, that's correct.

4   Q.  And while Mr. Donziger was in Manhattan, you communicated

5   with him between June 2005 and November 2008 by telephone?

6   A.  In some occasions we communicate through telephone.

7   Q.  While Mr. Donziger was in Manhattan?

8   A.  While he was in Manhattan, yes.  But it was not a very

9   common way of communication.

10  Q.  Was it more common for you to communicate by Skype between

11  June 2005 and November 2008 when Mr. Donziger was in New York?

12  A.  No.  We rarely used Skype.

13  Q.  On occasion you did?

14  A.  Very few occasions.  Probably two or three times during

15  that period of time.

16  Q.  More common was the use of email between you and

17  Mr. Donziger and others on the Lago Agrio plaintiffs' team

18  during this period of time?

19  A.  No.  The most common way to communicate with him was when

20  he was in Ecuador.

21  Q.  And fair to say when Mr. Donziger was in Manhattan, you

22  did, you and others on the Lago Agrio plaintiffs' team

23  communicated with him by email?

24  A.  In my case I used email, yes.

25  Q.  And you expected Mr. Fajardo to keep you informed of

DBDLCHE3                    Ponce - cross

1   developments in the case between June 2005 and November 2008,

2   right?

3   A.   Yes, that's correct.

4   Q.   You expected Mr. Donziger to keep you informed as well?

5            MR. BOOTH:   Objection, form, timing.

6            THE COURT:   Time period.

7   Q.   You expected Mr. Donziger to keep you informed of

8   developments in the Lago Agrio Chevron case between June 2005

9   and November 2008?

10  A.   No, I didn't expect that.

11  Q.   But he did keep you informed from time to time during that

12  period of time?

13  A.   Steven Donziger did not keep me informed about the case

14  that I was handling.

15  Q.   After you left the case in November 2008, you continued to

16  follow the case, right?

17  A.   After that I just have followed the case through the media.

18  Q.   Not through any communications with anybody on the Lago

19  Agrio plaintiffs' team?

20  A.   No, I have not communicated with them.

21  Q.   I'm sorry, I didn't hear you.

22  A.   I have not communicated with them in connection with the

23  case.

24  Q.   Since November 2008?

25  A.   Since December 1, 2008.

DBDLCHE3                    Ponce - cross

1  Q.  You testified in your direct statement that you supported

2  ending the judicial inspections, correct?

3  A.  Yes, that's correct.

4  Q.  And you supported the court's appointment of a single

5  global expert?

6  A.  Yes, that is correct.

7  Q.  Richard Stalin Cabrera Vega was that court-appointed

8  expert?

9  A.  To my understanding, that was the person appointed by the

10  court in Lago Agrio, yes.

11  Q.  You said to your understanding.  Fair to say that in 2007,

12  you knew Richard Stalin Cabrera Vega was appointed as the

13  independent court-appointed expert in the case?

14  A.  He was appointed by the court, yes.

15  Q.  And you knew that at the time?

16  A.  Yes, I knew.

17  Q.  And he was supposed to be independent?

18  A.  He was supposed to be an expert, according to law in

19  Ecuador.

20  Q.  He was supposed to be independent?

21  A.  The law does not provide to be independent, just provides

22  to be an expert.

23  Q.  Sir.

24          MR. BRODSKY:  Move to strike, your Honor.

25          THE COURT:  Stricken.

DBDLCHE3                    Ponce - cross

```
1    Q.  Sir, Mr. Richard Cabrera was supposed to be an independent
2    court-appointed expert, yes or no?
3              MR. BOOTH:  Objection, form, vague.
4    A.  No.
5    Q.  It's your view that Mr. Cabrera was not supposed to be
6    impartial?
7              MR. BOOTH:  Objection, form.
8    Q.  Correct?
9              THE COURT:  Overruled.
10   Q.  That's your view, Mr. Ponce, that Mr. Cabrera was not
11   supposed to be an impartial participant in the Lago Agrio
12   Chevron case?
13   A.  It's not my view.  It's law.
14   Q.  So the answer to my question --
15             THE COURT:  Excuse me.  Is it your testimony that the
16   law forbid him from being independent as you understood it; is
17   that what you're saying?
18             THE WITNESS:  I'm saying that the law does not require
19   to be independent.  It requires to know about the subject that
20   he's being asked to provide his expertise.
21             THE COURT:  Mr. Brodsky.
22   Q.  According to you, Mr. Ponce, Mr. Cabrera did not have to be
23   impartial, correct?
24   A.  It's not a requirement established by law.
25   Q.  Sir.
```

DBDLCHE3                          Ponce - cross

1              MR. BRODSKY:  Move to strike, your Honor.

2              MR. BOOTH:  Objection.

3              THE COURT:  I'm going to let it stand.

4              MR. BRODSKY:  I'm sorry, your Honor.  I thought you

5      were going to say something else so I was waiting.

6              THE COURT:  No, I'm just being my reticent self.

7      Q.  Mr. Ponce, according to you, Mr. Cabrera could be partial

8      to one party in the Lago Agrio Chevron case, right?

9      A.  Yes.

10     Q.  And according to you, Mr. Cabrera could meet with only one

11     party in the case, correct?

12     A.  Yes.

13     Q.  According to you, Mr. Cabrera could have the Lago Agrio

14     plaintiffs' legal team write his report and submit it to the

15     court as if Mr. Cabrera wrote it himself?

16     A.  No.

17     Q.  It would be improper, correct, Mr. Ponce for the Lago Agrio

18     plaintiffs' legal team to ghostwrite the Cabrera report and

19     submit it to the court as if Mr. Cabrera wrote it?

20     A.  Improper is not the right word that I would use.

21     Q.  A violation of the court's own orders, correct?

22     A.  No, either.

23     Q.  A violation --

24             THE COURT:  Mr. Brodsky.

25             What word would you choose?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBDLCHE3                    Ponce - cross

1               THE WITNESS:  I would say that it's not technical.

2               THE COURT:  It's not technical.  Okay.

3               Go ahead, Mr. Brodsky.

4   Q.  Not technically -- not technical but okay to do, or not

5   technical but not okay to do?

6   A.  It would be just not technical considering that an expert,

7   according to Ecuadorian law, shall give its opinion based on

8   his knowledge of the technique, the science, or the act as it

9   is provided on the civil procedure code of Ecuador.

10  Q.  Now, Mr. Ponce, we're going to get into this a little bit,

11  Mr. Ponce, but you know, correct, that Mr. Cabrera submitted a

12  court filing in which he said he did not have any relation or

13  agreements with the Lago Agrio plaintiffs, you know that,

14  right?

15  A.  I haven't seen such document.

16  Q.  But you knew it at the time in 2007?

17  A.  I haven't seen such document, not now, not in 2007.

18  Q.  You've never heard that Mr. Cabrera submitted such a

19  document making that statement in court?

20  A.  I should have seen the document, but I never seen the

21  document so it's not a question of hearing that.

22  Q.  And would you disagree with Mr. Cabrera's own statement

23  that if Mr. Cabrera made the statement, I do not have any

24  relation or agreements with the plaintiffs and it seems to me

25  to be an insult against me that I should be linked with the

DBDLCHE3                    Ponce - cross

```
 1   attorneys of the plaintiffs, you would disagree with that
 2   statement?
 3              MR. GOMEZ:  Objection.
 4              MR. BOOTH:  Objection to form.
 5              THE COURT:  Sustained.
 6   Q.  Let me show you.
 7              MR. BRODSKY:  May I approach, your Honor?
 8              THE COURT:  Yes.
 9   Q.  Let me show you, Mr. Ponce, what's marked as Plaintiff's
10   Exhibit 281, dated July 23, 2007, which is a multipage
11   document, at the top of it saying Chief Justice of the Superior
12   Court of Justice of Nueva Loja, I, Richard Cabrera Vega.
13              Would you take a minute to look at that.
14   A.  Yes.
15   Q.  Did you have a chance to read it?
16   A.  Yes, I already read it.
17   Q.  Directing your attention to the second paragraph, "I should
18   clarify," do you see that?
19   A.  Yes, I have seen the second paragraph.
20   Q.  Is it your testimony, sir, you never read this document
21   before today, before sitting there right now?
22   A.  Yes, that's correct.
23   Q.  It's your testimony, sir, that you never knew Mr. Cabrera
24   said those words before sitting here today?
25   A.  I do not recall of listening that before.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBDLCHE3                    Ponce - cross

1  Q.  You agree, sir, that Mr. Cabrera did have a relationship

2  and agreement with the Lago Agrio plaintiffs' legal team in

3  July 2007?

4          MR. GOMEZ:  Objection, form.

5          THE COURT:  Sustained as to form.

6  Q.  You're aware that the Lago Agrio plaintiffs' legal team --

7  withdrawn.

8          You're aware, sir, that Pablo Fajardo and Mr. Steven

9  Donziger and others had a relationship and agreement with

10 Richard Cabrera Vega in July 2007?

11         MR. GOMEZ:  Same objection.

12         THE COURT:  Overruled.

13 A.  I don't know.

14         THE COURT:  Excuse me, sustained.  It's the same

15 question.  It's compound.

16 Q.  You're aware that Mr. Donziger -- withdrawn.

17         You're aware that Mr. Pablo Fajardo and others on the

18 Lago Agrio plaintiffs' legal team had an agreement with

19 Mr. Richard Cabrera Vega in July 2007?

20 A.  I am not aware of any agreement.

21 Q.  You're aware that in July 2007, Mr. Richard Cabrera had a

22 relationship with the Lago Agrio plaintiffs?

23         MR. GOMEZ:  Objection.

24         THE COURT:  Overruled.

25 A.  I am not aware of such relationship.

DBDLCHE3                    Ponce - cross

1   Q.  Fair to say, sir, that you yourself in the past described

2   Mr. Cabrera as an independent expert?

3   A.  Not that I recall but it could be.  I don't recall saying

4   that.

5   Q.  It could be you described him as an independent expert even

6   though it's your contention today he didn't have to be an

7   independent expert?

8            MR. BOOTH:  Objection, form.

9            THE COURT:  Sustained.

10  Q.  Do you remember writing to Mr. Donziger that Mr. Cabrera

11  was an independent expert?

12  A.  I don't recall, but if you have a document I could look at

13  it and confirm or not that I have done so.  I don't recall at

14  this time.

15  Q.  At this time sitting here today, you never recall ever

16  saying Mr. Cabrera was an independent expert, right?

17  A.  I don't recall at this time.  I could have said it, but I

18  don't recall.

19  Q.  Sir, you remember that Mr. Cabrera filed his report --

20  withdrawn.

21            Mr. Cabrera filed a report under his name on April 1,

22  2008, in the Lago Agrio Chevron litigation, right?

23  A.  I recall the filing, don't recall the exact date.

24  Q.  That was an important filing for the Lago Agrio plaintiffs,

25  correct?

DBDLCHE3                      Ponce - cross

1    A.  Certainly was.

2    Q.  And it was important because Mr. Cabrera was viewed as an

3    independent expert, right?

4            MR. GOMEZ:  Objection.

5            THE COURT:  Sustained as to form.

6    Q.  It was an important filing because Mr. Cabrera was an

7    independent expert, correct?

8            MR. GOMEZ:  Objection.

9    A.  That's not correct.

10   Q.  And you believed, sir, at that time that the risk to

11   Chevron losing the litigation was higher because Mr. Cabrera

12   was an independent expert issuing his report, right?

13           MR. GOMEZ:  Objection.

14           THE COURT:  Overruled.

15   A.  I considered that the expert report was important for

16   winning the case since it proved the damages.

17   Q.  And you believed that it was important because it was a

18   report issued by someone designated by the court and not by the

19   parties, right?

20   A.  Certainly that's the law in Ecuador since 2005.

21           MR. BRODSKY:  May I approach, your Honor?

22           THE COURT:  You may.

23   Q.  Mr. Ponce, I'm showing you Plaintiff's Exhibit 6503, which

24   is an email at the top from Alejandro Ponce Villacis, dated

25   April 2, 2008, to Steven Donziger, subject, look at these two

DBDLCHE3                    Ponce - cross

1    things, with the Bates number DONZ26017.  Would you take a

2    moment to look at that.  That's the English in the first two

3    pages and the Spanish original that you wrote starting on

4    page 7.

5           Did you finish reading?

6    A.  Yes, I finished reading my email of April 2, 2008.

7    Q.  Does it refresh your recollection, Mr. Ponce, that you

8    described --

9           MR. BRODSKY:  Your Honor, we move it into evidence.  I

10   believe it's probably already in evidence, but we move 6503

11   into evidence.

12          MR. BOOTH:  No objection.

13          MR. GOMEZ:  No objection.

14          THE COURT:  6503 is received.

15          (Plaintiff's Exhibit 6503 received in evidence)

16   Q.  Does it refresh your recollection, Mr. Ponce, that you said

17   to Mr. Donziger the day after Mr. Cabrera's report was filed

18   that the risk to Chevron is very high now because an

19   independent expert designated by the court and not by the

20   parties has issued this report?

21   A.  Yes.

22   Q.  Does this refresh any recollection that you used the word

23   independent expert to describe Mr. Cabrera on other occasions

24   as well?

25   A.  Yes.

DBDLCHE3                    Ponce - cross

1  Q.  Now, when -- you're aware, sir, that Chevron made

2  allegations in 2007 that Mr. Cabrera was not independent,

3  right?

4  A.  I recall such allegations.

5  Q.  And Mr. Donziger denied those allegations to you, right?

6  A.  I don't remember such assertions.

7  Q.  You remember Chevron alleged that Mr. Cabrera was not truly

8  impartial, right?

9  A.  I don't remember right now such specific allegations, but I

10  remember that Chevron complained about having Mr. Cabrera as an

11  expert.

12  Q.  You and others on the Lago Agrio plaintiffs' legal team

13  responded to those allegations by asserting that Cabrera was an

14  independent expert of the court, right?

15          MR. BOOTH:  Objection, form.

16          THE COURT:  Overruled.

17          Answer the question, please.

18  A.  What we argued then, it was that Cabrera had been qualified

19  before the superior court of Nueva Loja as an expert as it was

20  required by law in Ecuador.  Consequently, if he had been

21  qualified by court as an expert, it was proper to have him act

22  in the case.

23  Q.  My question, sir, again, was you and others on the Lago

24  Agrio plaintiffs' legal team responded to those allegations of

25  Chevron by asserting that Cabrera was an independent expert of

DBDLCHE3                    Ponce - cross

```
 1   the court, right?
 2   A.  Yes.
 3   Q.  And by independent, what you and others on the team meant
 4   somebody impartial to both sides, right?
 5   A.  That's not correct.
 6   Q.  You meant somebody independent but could be partial to one
 7   side?
 8   A.  Certainly someone could be partial when deciding on science
 9   to one or the other side.
10   Q.  And that's what you meant?
11   A.  Yes.
12   Q.  So you were aware, correct, that Mr. Cabrera, before even
13   being appointed by the court as an independent expert, was
14   meeting with Mr. Donziger, Mr. Fajardo, Mr. Saenz, Mr. Prieto,
15   and others on the Lago Agrio legal team?
16   A.  Yes.
17   Q.  You were aware they had a meeting on or about March 3,
18   2007, planning how to write his report, right?
19   A.  No.
20   Q.  You remember a meeting occurred on or about that date,
21   right?
22   A.  I don't remember a meeting on those dates.
23   Q.  Were you aware in early March 2007 that Mr. Donziger,
24   Mr. Fajardo, Mr. Yanza, and others on the Lago Agrio
25   plaintiffs' legal team were meeting with Mr. Cabrera to plan
```

DBDLCHE3                    Ponce - cross

1   the expert report to be written by Mr. Cabrera?

2   A.  I don't remember such meetings.

3           MR. BRODSKY:  May I approach, your Honor?

4           THE COURT:  Yes.

5   Q.  Do you see that photograph, Mr. Ponce, Plaintiff's

6   Exhibit 636 in evidence?

7   A.  Yes, I see the photo.

8   Q.  Do you see Mr. Cabrera there, do you recognize him?

9   A.  I have never seen Mr. Cabrera so I don't know who of the

10  three persons is, but I can assume that it is the person in the

11  middle.  But I hadn't seen until now this person.

12  Q.  So you definitely didn't attend the meeting, right?

13  A.  I don't recall being in a meeting.

14  Q.  Do you recall being informed that Mr. Donziger and

15  Mr. Yanza, Mr. Fajardo, were meeting with Mr. Cabrera prior to

16  his appointment?

17  A.  I don't recall at this time.

18  Q.  Do you recall -- withdrawn.

19          Did you know that Mr. Donziger was interviewing

20  candidates for the position of global expert prior to the

21  appointment of Mr. Cabrera?

22  A.  Yes.

23  Q.  You knew he interviewed Fernando Reyes for that position?

24  A.  Yes.

25  Q.  You knew he interviewed Mr. Cabrera for that position?

DBDLCHE3                    Ponce - cross

1   A.  No.

2   Q.  Now, did -- you helped Mr. Donziger draft a report by

3   Gustavo Pinto and Fernando Reyes, right?

4   A.  What report are you talking about?  I don't know.

5   Q.  In April 2006, did Gustavo Pinto and Fernando Reyes issue a

6   report and file, at or about that time, file it with the court?

7   A.  I don't recall what document are you talking about.

8   Q.  Were you aware that Mr. Donziger had cut a deal with

9   Gustavo Pinto and Fernando Reyes to work secretly for the Lago

10  Agrio plaintiffs?

11  A.  I don't recall what are you talking about.

12  Q.  Mr. Donziger never mentioned that to you?

13  A.  I don't recall what is all this about.

14  Q.  Did Mr. Donziger ever tell you that he was paying Mr. Pinto

15  and Mr. Reyes secretly?

16  A.  Not that I'm aware of.

17  Q.  Did you ever attend any of these interviews for candidates

18  for the position of global expert in the Lago Agrio Chevron

19  case?

20  A.  No.

21           MR. GOMEZ:  Objection.

22           MR. BRODSKY:  Can I have 304.

23           May I approach, your Honor?

24           THE COURT:  You may.

25  Q.  I'm showing you, Mr. Ponce, Plaintiff's Exhibit 304 in

DBDLCHE3                    Ponce - cross

1  evidence.  This is a multipage document with the Bates number

2  TRCVX RICO 1171619.  At the top it's dated March 4, 2009.

3          Do you see that?

4  A.  Yes, I see this document.

5  Q.  Would you take a moment to review it.  Let me know when

6  you're done reviewing it, Mr. Ponce.  My questions are going to

7  relate to the first two pages.

8  A.  I have reviewed the first two pages.

9  Q.  Have you ever seen this document before?

10 A.  Not before.

11 Q.  Have you ever discussed Mr. Cabrera's filing on or about

12 this date with anyone before today?

13 A.  No.

14 Q.  You had no idea Mr. Cabrera filed a document stating that,

15 in part, I have done my work with my technical team in

16 adherence to my principles and my integrity without a desire to

17 negatively affect or benefit either party?

18 A.  As I said, I hadn't seen this document before.

19 Q.  Is Mr. Cabrera's statement there -- withdrawn.

20         Did you understand that Mr. Cabrera was ordered by the

21 Lago Agrio Chevron court to be independent?

22         MR. GOMEZ:  Objection.

23         THE COURT:  Sustained.

24 Q.  Did you know the presiding judge that appointed Mr. --

25 withdrawn.

DBDLCHE3                         Ponce - cross

1          Did you know Mr. Cabrera when he was appointed was

2     supposed to be independent?

3     A.  Yes.

4     Q.  And the court directed him to be independent?

5     A.  Yes.

6     Q.  The court directed him, as Mr. Cabrera puts it, not to have

7     be negatively affected or benefiting either party, right?

8     A.  That's his words.

9     Q.  And fair to say Mr. Cabrera was required to follow those

10    orders, right?

11    A.  He was expected to.

12    Q.  Required to?

13    A.  He was expected to.

14    Q.  You can be expected to do something but not do something;

15    is that what you're testifying?

16    A.  Certainly.

17    Q.  And if Mr. Cabrera, but if you -- withdrawn.

18          Not only was he expected to comply with the court's

19    orders, he was required to do that, right?

20    A.  As I said before, he was expected to.

21    Q.  And you know he did not comply, correct?

22    A.  I know that he complied with the orders.

23    Q.  It's your testimony Mr. Cabrera did not show any partiality

24    to any side?

25    A.  He was not a judge.  He had to decide on his technical

DBDLCHE3                          Ponce - cross

1    knowledge, so he had to decide on those grounds.  The judge was

2    the one required to decide on the discussion.

3    Q.  It's your understanding that Mr. Cabrera's report was not

4    ghostwritten by the Lago Agrio plaintiffs' team, right?

5              MR. GOMEZ:  Objection.

6              THE COURT:  Overruled.

7    A.  I don't know if it was written or not by the Lago Agrio

8    team.

9    Q.  I'm sorry, what was your answer?

10             THE COURT:  He said he doesn't know.

11   A.  I don't know.

12   Q.  You didn't participate with the Lago Agrio plaintiffs'

13   legal team in writing, drafting, editing, or any one of those

14   three, the Cabrera report?

15   A.  Not at all.

16   Q.  Did you know, do you know whether or not Mr. Fajardo helped

17   write the report issued by Richard Cabrera on April 1, 2008?

18   A.  I don't know.

19   Q.  Did you know that Mr. Donziger arranged to hire Stratus

20   Consulting?

21   A.  I don't know.

22   Q.  Did you ever meet Stratus Consulting or anyone from Stratus

23   Consulting?

24   A.  Yes, I met them.

25   Q.  Who did you meet from Stratus Consulting?

DBDLCHE3                    Ponce - cross

1    A.  Ann.

2    Q.  What's Ann's last name?

3    A.  Ann -- I don't recall her last name -- Ann Maest.

4    Q.  You met her how many times?

5    A.  A couple times I met her in Quito.

6    Q.  What year?

7    A.  I don't recall the year.  It's been over eight years since

8    I got involved with the case.  I don't recall the year I met

9    with her.

10   Q.  Did you meet Ms. Mast before Mr. Cabrera issued his report

11   on April 1, 2008?

12   A.  Certainly was before that date.

13   Q.  Did you meet anybody else from Stratus Consulting?

14   A.  I don't recall meeting with anyone else.

15   Q.  Were you aware that Mr. Fajardo and others on the Lago

16   Agrio plaintiffs' legal team were using code words in email

17   communications among each other?

18         MR. GOMEZ:  Objection, form.

19         THE COURT:  Be more specific.

20   Q.  Were you aware, Mr. Ponce, that Mr. Fajardo had used the

21   word "the cook" in email communications to refer to a judge

22   presiding over the Lago Agrio Chevron case?

23   A.  I am not aware of that.

24   Q.  Did you ever receive an email communication referring to

25   "the cook" from Pablo Fajardo, Luis Yanza, or anyone else on

DBDLCHE3                     Ponce - cross

1   the Lago Agrio plaintiffs' legal team?

2   A.  I could have received.  I don't recall at this moment of

3   such emails.

4   Q.  Did you know that -- did you know Mr. Fajardo and others on

5   the Lago Agrio plaintiff's team used the word "the boss" to

6   refer to a judge presiding over the Lago Agrio Chevron case?

7   A.  Not that I'm aware of.

8   Q.  Did you know that Mr. Fajardo, Mr. Yanza, Mr. Donziger, and

9   others on the Lago Agrio plaintiffs' team had a code word for

10  Mr. Cabrera?

11  A.  No, I'm not.

12  Q.  Did you ever receive any written communication from anyone

13  on the Lago Agrio plaintiffs' legal team using the word -- I'll

14  spell it out -- W-A-O or W-U-A-O?

15  A.  Not that I can recall at this time, but there could be an

16  email with such letters.

17  Q.  It could be?

18  A.  Could be.  I don't recall.  That's my answer.

19  Q.  And do you have any recollection in 2007 of the use of

20  words like that to refer to people involved in the Lago Agrio

21  Chevron litigation?

22  A.  That's right, I don't have recollection.

23          MR. BRODSKY:  May I approach, your Honor?

24          THE COURT:  Yeah.

25  Q.  Mr. Ponce, let me show you Plaintiff's Exhibit 845 in

DBDLCHE3                    Ponce - cross

1  evidence.  At the top it's from Pablo Fajardo, March 26, 2007,

2  to Steven Donziger, copy to Luis Yanza, Julio Prieto, Juan

3  Pablo Saenz, Anchundia Alexandra, subject, orange alert.

4         Do you see that document?  Take a moment to look at

5  it, please.  When you're done, just let me know.

6  A.  I have read the emails.

7  Q.  You're not on this email, right?

8  A.  I'm not in that email, yes, that's right.

9  Q.  Does this refresh any recollection that Mr. Fajardo and

10 others used the word "the cook" in email communications?

11 A.  I don't know what they are talking about.  I don't have a

12 recollection after reading this.

13 Q.  You have no idea what Mr. Fajardo means -- withdrawn.

14        You don't remember Mr. Fajardo ever having

15 conversations with you either in person or by writing about the

16 cook meeting with the waiter to coordinate a menu?

17 A.  I don't have recollection of this, as I said.

18        MR. BRODSKY:  One moment, your Honor.

19        May I approach?

20        THE COURT:  Yes.

21 Q.  Mr. Ponce, let me show you an email that you are on,

22 Plaintiff's Exhibit 6506, at the top from Pablo Fajardo to you,

23 Alejandro Ponce, Anchundia Alexandra, Juan Pablo Saenz, Julio

24 Prieto, Luis Yanza, and Steven Donziger, on October 8, 2007,

25 subject, motions.

DBDLCHE3                    Ponce - cross

1          Do you see that?  Would you take a moment to review

2    it.

3    A.  Okay.

4          MR. BRODSKY:  Your Honor, forgive me.  I forgot to

5    offer 6506.

6          MR. BOOTH:  No objection, your Honor.

7          THE COURT:  It's received.

8          (Plaintiff's Exhibit 6506 received in evidence)

9          MR. BOOTH:  Sorry, your Honor.  We got our documents

10   mixed up.  Can we just have one moment.

11         No objection, your Honor.  Thank you for the moment.

12         THE COURT:  Proceed.

13   Q.  Mr. Ponce, have you had a chance to review it?

14   A.  I'm finishing.

15   Q.  I'm sorry?

16   A.  I'm finishing it.

17   Q.  Okay.

18   A.  Okay.  I'm done.

19   Q.  Does this refresh any recollection -- let's highlight the

20   capital letters where it says "let's also."

21         Do you see the words there "the cook," does this

22   refresh any recollection that you are a recipient of emails

23   referring to the cook?

24   A.  I probably had seen it, but I don't remember seeing it

25   before.

DBDLCHE3                    Ponce - cross

1    Q.  Is it your testimony you saw it at the time and didn't read

2    it, or you saw it at the time and you just don't remember

3    reading it today?

4    A.  I could have read it before or I could have not read it

5    before.  I don't remember this document in the past, from the

6    past.

7    Q.  What was your general practice in 2007 when you were

8    representing the Lago Agrio plaintiffs in the Chevron Lago

9    Agrio case, did you read email communications from your fellow

10   lawyers generally or not read them?

11   A.  On those specific dates, October --

12   Q.  Generally.

13   A.  I'm talking about those specific dates, October 10,

14   October 8, apparently, 2008, I was preparing a hearing before

15   the Inter-American Court on Human Rights for a case which I had

16   hearing the week after that.  So probably I didn't read those

17   documents at the time.

18           THE COURT:  Mr. Ponce, at any time in the second half

19   of 2007, were you aware of any instance in which the judge then

20   presiding over the Chevron case, whoever that may have been,

21   had to respond to something before the judicial council?

22           THE WITNESS:  Not that I can recall, your Honor.

23           THE COURT:  All right.  Go ahead, sir.

24   Q.  You mentioned the date you were preparing for the

25   Inter-American court in October 8, 2008?

DBDLCHE3                    Ponce - cross

1   A.  2007.

2   Q.  2007.

3   A.  Yes.

4   Q.  So you don't remember one way or the other reviewing this

5   document?

6   A.  I don't remember reviewing this document.

7   Q.  Let me direct your attention to where it says Maria

8   Alexandra, that paragraph, do you see that?

9   A.  Yes.

10  Q.  Do you see at the bottom where it says from the word

11  "clarify" through the end of the paragraph, would you read that

12  silently to yourself.

13  A.  You mean by the end of paragraph 2?

14  Q.  Yes.  Where it says "clarify that the expert is the

15  court's" through "motion."

16  A.  Yes.

17  Q.  Do you recall having conversations with your fellow counsel

18  on the Lago Agrio plaintiffs' litigation team about responding

19  to Chevron's allegations that Mr. Cabrera was not independent?

20  A.  I don't recall conversations, but they could have taken

21  place.

22  Q.  In the second page, directing your attention to B, do you

23  remember your fellow counsel responding to the allegations by

24  asserting Mr. Cabrera is the court's expert and not appointed

25  by them?

DBDLCHE3                        Ponce - cross

1   A.  I don't recall.

2   Q.  Do you recall them responding that they merely cooperated

3   with Mr. Cabrera?

4   A.  I don't recall.

5   Q.  And do you have any understanding what Mr. Fajardo was

6   saying to you in this email, among others, when he said, let's

7   also cooperate with the cook so that he can respond before the

8   judicial council?

9   A.  I had never seen this before.  But from reading this text,

10  apparently he refers to someone who is under the control of the

11  council of the judiciary.

12  Q.  Did you --

13          THE COURT:  And I don't imagine they had jurisdiction

14  over restaurants, right?

15          THE WITNESS:  It has no jurisdiction over restaurants,

16  but it has jurisdiction over all members of the judiciary,

17  which not only includes judges, but also clerks and other

18  officers.

19          THE COURT:  Okay.  Thank you.

20  Q.  Mr. Ponce, you are aware as a fellow counsel of the Lago

21  Agrio plaintiffs' legal team in 2007 that Mr. Donziger and

22  Mr. Fajardo and others on the team wanted to remove Judge Yanez

23  as the presiding judge in the Chevron Lago Agrio case?

24          MR. BOOTH:  Objection, form.

25          THE COURT:  What's the objection as to the form?

DBDLCHE3                         Ponce - cross

1        MR. BOOTH:  I think it calls -- it used the word

2   aware, calls for speculation, hearsay.  Does not ask for --

3   it's not a question that asks for personal knowledge.  I think

4   it's also compound.

5        MR. BRODSKY:  That's every objection.  You forgot best

6   evidence.

7        MR. BOOTH:  And best evidence.  Thank you.

8        THE COURT:  Rephrase it, Mr. Brodsky.

9   Q.  Mr. Ponce, did you know that Mr. Donziger and Mr. Fajardo

10  and others on the Lago Agrio plaintiffs' legal team tried to

11  remove -- withdrawn.

12       Did you know that Mr. Donziger and Mr. Fajardo and

13  others on the Lago Agrio plaintiffs' legal team took action to

14  remove Judge Yanez from presiding over the Lago Agrio Chevron

15  case in 2007?

16       MR. BOOTH:  Objection, form.

17       THE COURT:  Overruled.

18  A.  Could you explain what you mean with the word remove?

19  Q.  Did you know they filed complaints with the judicial

20  council about Judge Yanez?

21  A.  I recall about having complaints before the council of

22  judiciary, but that doesn't mean to have removed necessarily.

23  Q.  You participated in the effort to file these complaints

24  against Judge Yanez, right?

25  A.  I could have.  I don't recall, but I could have.

DBDLCHE3                    Ponce - cross

1   Q.  And do you remember whether you and others took steps to

2   keep your complaints about Judge Yanez a secret?

3   A.  I don't recall having it secret.

4   Q.  We'll get back to that, Mr. Ponce.  Let me show you --

5         MR. BRODSKY:  May I approach, your Honor?

6         THE COURT:  I'm sorry.  Just a minute.

7         Mr. Ponce, I asked you this question five minutes or

8   so ago:  At any time in the second half of 2007, were you aware

9   of any instance in which the judge then presiding over the

10  Chevron case, whoever that may have been, had to respond to

11  something before the judicial council?

12        And you said not that you recall.

13        Do you want to change that answer?

14        THE WITNESS:  I don't recall any situation in which

15  the judge had to respond to the council of the judiciary.

16        THE COURT:  I see.  But you knew there were complaints

17  against Judge Yanez before the council on the judiciary in that

18  time period, true?

19        THE WITNESS:  I don't recall the time period.  There

20  could have been these complaints, but I don't recall the time

21  period.

22        THE COURT:  Well, there was a time when complaints

23  were made to the council on the judiciary about Judge Yanez,

24  true?

25        THE WITNESS:  There were times where there were

DBDLCHE3                          Ponce - cross

1    complaints against the Judge Yanez, and I believe in some other

2    point we also discussed about complaint about other judges

3    before the council of the judiciary.

4            THE COURT:  Let's just talk about Judge Yanez.

5            And you knew those complaints were made on behalf of

6    your clients, true?

7            THE WITNESS:  I recall having complaints regarding the

8    case.  I don't know on behalf of whom they were filed.

9            THE COURT:  Really.  You think they were by Chevron?

10           THE WITNESS:  No, it could be filed just by the

11   attorneys or by themselves, or could be have been filed by the

12   attorneys on behalf of the clients.  They are two different

13   situations in which a complaint can be filed before the council

14   of the judiciary.

15           THE COURT:  But you knew that they were filed, either

16   by the attorneys for your clients on their own behalf or by the

17   attorneys for your clients on behalf of your clients, isn't

18   that true?

19           THE WITNESS:  Yes.

20           THE COURT:  And you knew that a consequence of that

21   could have been the removal of Judge Yanez from presiding over

22   the Chevron Lago Agrio case, true?

23           THE WITNESS:  That's not entirely true.

24           THE COURT:  Well, what part of it is not true?

25           THE WITNESS:  The result.  According to the law, the

DBDLCHE3                         Ponce - cross

1   sanction could be just a short suspension of the judge,

2   suspension for a longer period, the removal, or just could be a

3   request from the judiciary to not repeat the actions, or it

4   could be the dismissal of the complaint.  So the result was not

5   certain.

6           THE COURT:  And when you answered my question a few

7   minutes ago, the one I just read back to you, you understood

8   all that, right?

9           THE WITNESS:  I understood that if he had to answer to

10  something -- and I don't recall if he had to answer

11  something -- I don't know what the procedure was.  I don't know

12  how much advance before the council of the judiciary, I don't

13  recall that.

14          THE COURT:  Okay.  Thank you very much.  I think I

15  have the picture.

16  BY MR. BRODSKY:

17  Q.  Did you know there were complaint -- there was a complaint

18  against Judge Yanez in a potential sex scandal in 2007?

19  A.  I recall that there was a discussion about that, but I

20  never seen such complaint.

21  Q.  You recall the discussion with Mr. Donziger, right?

22  A.  I remember discussion with Pablo Fajardo.

23  Q.  Who else besides Pablo Fajardo?

24  A.  I don't recall who else was there.  I remember Pablo

25  telling me about that.

DBDLCHE3                    Ponce - cross

1   Q.  And you knew that Pablo Fajardo and others on the Lago

2   Agrio plaintiffs' legal team were using this allegation as a

3   way to get Judge Yanez to issue orders that they wanted in the

4   case?

5   A.  I don't recall that.

6   Q.  Do you recall this -- did you recall this conversation with

7   Mr. Fajardo in 2006?

8   A.  I recall the allegations made against the judge on this sex

9   scandal.  That's what I recall.

10  Q.  You have no knowledge one way or the other whether

11  Mr. Donziger or others on the Lago Agrio plaintiffs' litigation

12  team used this allegation of a sex scandal against Judge Yanez

13  to get him to end the judicial inspections?

14  A.  Not that I can recall.

15  Q.  And you don't have any recollection, sir, that --

16  withdrawn.

17          It's your testimony, sir, you did not know that

18  Mr. Donziger, Mr. Fajardo, and others on the Lago Agrio

19  plaintiffs' litigation team used this allegation of a sex

20  scandal against Judge Yanez to get him to appoint Richard

21  Cabrera as the single global expert in the case?

22          MR. GOMEZ:  Objection, assumes facts.

23          THE COURT:  Overruled.

24          I think actually it's undisputed that that occurred.

25  Q.  Mr. Ponce, do you want me to read the question back?

DBDLCHE3                    Ponce - cross

1  A.  Can you repeat the question, please.

2  Q.  It's your testimony, sir, that you did not know that

3  Mr. Donziger, Mr. Fajardo, and others on the Lago Agrio

4  plaintiffs' litigation team used this allegation of a sex

5  scandal against Judge Yanez to get him to appoint Richard

6  Cabrera as the single global expert in the case?

7  A.  Yes, that's correct.

8            THE COURT:  Could I just inquire of counsel just to

9  clarify something.

10           I understand there's no dispute about who followed

11  Judge Yanez, which judge.  Can you just remind me?

12           MS. NEUMAN:  Judge Novillo, your Honor.

13           THE COURT:  No dispute about that?

14           MS. FRIEDMAN:  That's right.

15           THE COURT:  Go ahead.

16  Q.  You don't remember any conversations with Mr. Fajardo about

17  using the allegation of a sex scandal to get Judge Yanez to

18  appoint Richard Cabrera as the global expert?

19  A.  Yes, that is correct, I don't remember.

20           MR. BRODSKY:  May I approach, your Honor?

21           THE COURT:  Would you just pause for a second.

22           MR. BRODSKY:  Yes.

23           THE COURT:  Mr. Ponce, a short time ago you were asked

24  whether you knew there was a complaint against Judge Yanez and

25  a potential sex scandal in 2007.

DBDLCHE3                    Ponce - cross

1          You said you recalled that there was a discussion

2     about that.

3          You were then asked this question:  "You recall the

4     discussion with Mr. Donziger, right?"

5          You answered:  I remember discussion with Pablo

6     Fajardo.

7          What did he say to you and what did you say to him in

8     the discussion with Pablo Fajardo on that subject to which you

9     referred a few moments ago?

10         THE WITNESS:  I remember Pablo Fajardo telling me

11    about the sex scandal with the judge.  I don't remember

12    anything else but the existence of this sex scandal.

13         THE COURT:  All right.  Go ahead, Mr. Brodsky, or

14    maybe we should break for lunch.  2 o'clock.

15         (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

DBD8CHE4

AFTERNOON SESSION

2:00 p.m.

ALEJANDRO PONCE VILLACIS, resumed.

THE COURT:  Before we continue, I of course have
gotten the usual daily letters, the most recent relating to Mr.
Donziger's testimony and the long overdue witness statement.  I
will discuss the subject with counsel before the day is out.
Please remind me if I neglect to.  You should both be aware
that in all the circumstances I am considering, among other
options, having Mr. Donziger testify on direct in the ordinary
fashion, dispensing with any witness statement, requiring that
he go forward on Monday.  I think benefits that could possibly
be achieved by doing that are that I might get a broader sense
of the man that may be helpful in judging the veracity and
accuracy of his testimony, any excuse for further delay would
be eliminated, I would be getting more spontaneous testimony
than otherwise, and it might well eliminate unnecessary
bickering about objections to a witness statement.  I haven't
made up my mind.  I will hear you, but it's going to be fish or
cut bait today on this.

Let's go on.

MR. BRODSKY:  Thank you, your Honor.

THE COURT:  The witness is reminded he is still under
oath.

BY MR. BRODSKY:

DBD8CHE4

1    Q.  Mr. Ponce, you advocated for ending the judicial

2    inspections?

3    A.  Yes.

4    Q.  At one point Judge German Yanez denied the request by the

5    Lago Agrio plaintiffs to end the judicial inspections, right?

6    A.  Yes.

7    Q.  Actually, in fact, Judge Yanez denied the request of the

8    Lago Agrio plaintiffs to end the judicial inspections four

9    times?

10   A.  I don't remember the number of times.

11   Q.  It was more than one though, right?

12   A.  I believe so.

13   Q.  That's not what you and others on the Lago Agrio

14   plaintiffs' team wanted?

15   A.  I didn't understand what you said.  I'm not listening well

16   what you say.

17   Q.  You did not like Judge Yanez's orders denying your requests

18   to end the judicial inspections?

19            MR. BOOTH:  Objection to form.

20            THE COURT:  Overruled.

21   A.  It was not a matter of liking or disliking; it was a matter

22   of law.

23   Q.  It was in this period when Judge Yanez was denying your

24   requests to end the judicial inspections that Pablo Fajardo

25   spoke to you about the allegation of a sex scandal relating to

DBD8CHE4

1    Judge Yanez?

2    A.  Yes, I think so.

3    Q.  And at some point, after denying your requests for ending

4    the judicial inspections, Judge Yanez granted your request,

5    correct?

6    A.  That's not entirely correct.

7    Q.  At some point Judge Yanez ended the judicial inspections by

8    the Lago Agrio plaintiffs, right?

9    A.  Yes, he did.

10            MR. BRODSKY:  May I approach, your Honor?

11            THE COURT:  Yes.

12   Q.  I am showing you, Mr. Ponce, Plaintiff's Exhibit 843 in

13   evidence, and it's a 13 page exhibit.  Page 8 through 13 is in

14   Spanish and the first six pages are in English.  It's an e-mail

15   and an attachment, an e-mail from Pablo Fajardo, March 21,

16   2007, to Steven Donziger, copy to Luis Yanza, subject plans for

17   expert examination.  Do you see that?  Would you take a moment

18   to review it?

19            Let me know, Mr. Ponce, when you're finished reviewing

20   it.

21   A.  I have finished reviewing it.

22   Q.  You're not on this e-mail right?

23   A.  I'm not on this e-mail, that's correct.

24   Q.  Directing your attention to page 3 of the document in

25   English and page 10 of the document in Spanish.

DBD8CHE4

```
 1              THE COURT:  There are two sets of page numbers on

 2     this.

 3              MR. BRODSKY:  At the very bottom, 3 of 13 in English

 4     and 10 of 13 in Spanish.

 5     Q.  Which version do you want to use, Mr. Ponce?

 6     A.  I will use the Spanish version.

 7              MR. BRODSKY:  Maybe you can put both up on the screen

 8     side by side.

 9     Q.  Directing your attention to this schedule with

10     responsibility, were you involved with Pablo Fajardo and others

11     on the Lago Agrio plaintiffs' team in creating this schedule

12     relating to Richard Cabrera?

13     A.  No, I was not.

14     Q.  Did you have conversations with Pablo Fajardo and others on

15     the team about it?

16     A.  Not that I can recall.

17     Q.  Did you have any awareness whatsoever that your fellow

18     counsel on the team were drafting a plan relating to the report

19     of Richard Cabrera?

20     A.  Yes.

21     Q.  Directing your attention to page 4 of 13 or 11 of 13 in

22     Spanish, I think it's 11 of 13, if we can just blow up July 10

23     right here, all the way through.

24              You see where it says, "July 10, create the first

25     draft of the global report"?
```

DBD8CHE4

1  A.  Yes.

2  Q.  And right below it, "Review of the first draft, legal team,

3  July 11 through August 27"?

4  A.  Yes, I do.

5  Q.  Do you recall reviewing a draft of the report issued by

6  Richard Cabrera before April 2, 2008?

7  A.  No, I don't recall.

8  Q.  Did you have any conversations with anybody about creating

9  the first draft of this report?

10  A.  Not that I can recall.

11  Q.  Or reviewing the report?

12  A.  Not that I can recall.

13  Q.  You see at the bottom --

14         MR. BRODSKY:  Just blow up the last September 24 part.

15  Q.  You see where it says, "September 24, deliver report to the

16  court."  And then the last column, "everyone silent."

17  A.  Yes, I see that.

18  Q.  Did you have any conversations with members of the Lago

19  Agrio plaintiffs' team about being silent when the report of

20  Richard Cabrera came out?

21  A.  Not that I can recall.

22  Q.  Do you remember speaking to Judge Yanez at a conference in

23  April 2007?

24  A.  What do you mean with conference?

25  Q.  Do you remember Judge Yanez inviting you to a conference in

DBD8CHE4

1    April of 2007?

2    A.  What kind of conference?  Refresh my memory.

3    Q.  Without knowing what type of conference, do you recall

4    sitting here right now being invited to a conference by Judge

5    Yanez in April 2007?

6    A.  Not that I can recall a conference.

7    Q.  Do you remember speaking to Judge Yanez at any event in

8    April 2007?

9    A.  I don't recall speaking at any event with him.

10   Q.  Do you recall speaking to him at all?

11   A.  Yes.  I have spoken -- I spoke to him during inspections, I

12   believe, and probably in the court.

13   Q.  What about outside the presence of Chevron's lawyers or

14   representatives, do you recall speaking to Judge Yanez?

15   A.  Yes.

16   Q.  You recall talking to him about ending the judicial

17   inspections?

18   A.  Yes.

19   Q.  Do you recall advocating for the appointment of Richard

20   Cabrera?

21   A.  I don't recall that.  I recall the first part.

22   Q.  You remember Judge Yanez worried about issuing an order

23   ending the judicial inspections?

24   A.  I don't recall him worried.  I recall him not -- sorry.  I

25   recall him complaining about the language we used in our

DBD8CHE4

1    request for finishing the judicial inspections.

2    Q.  What did he complain about with respect to that language?

3    A.  We had used the word desist from the judicial inspections,

4    and he said that we cannot desist from judicial inspections

5    considering that that wording could only be used for the

6    complaint and not for a judicial proceeding.

7    Q.  Do you remember him being worried about anything relating

8    to Richard Cabrera?

9    A.  I don't recall that.

10           MR. BRODSKY:  May I approach, your Honor?

11           THE COURT:  You may.

12   Q.  I am showing you, Mr. Ponce, Plaintiff's Exhibit 858, which

13   is a multipage document.  Again, the back of it is in Spanish

14   and the front is in English.  It's an e-mail from Steven

15   Donziger, the last one in the chain, dated May 10, 2007, to

16   Estenio Fajardo Mendoza, copied to another e-mail address, and

17   the subject line is "concern confidential."

18           Can you take a minute to review that page and a half

19   e-mail?

20   A.  OK.  I have reviewed it.

21   Q.  You're not on this e-mail?

22   A.  No, I am not.

23   Q.  Directing your attention to the bottom half, right below

24   "also confidential, Luis and Steven.  Today I met with the

25   boss."

DBD8CHE4

1          Do you remember communicating with your fellow counsel

2     on the Lago Agrio plaintiffs' team using the word "the boss"?

3     A.  Not that I can recall.

4          THE COURT:  Who is Estenio Fajardo Mendoza, Mr. Ponce,

5     if you know?

6          THE WITNESS:  I believe it's Pablo.

7          THE COURT:  Pablo Fajardo?

8          THE WITNESS:  Yes, I believe so.

9          THE COURT:  Thank you.

10    Q.  If you go down to the second page, who signs this?  Whose

11    name is at the bottom, Pablo F?

12         MR. GOMEZ:  Objection.

13         THE COURT:  We can all read that.

14    Q.  Going back to the part below the boss, read silently to

15    yourself from "today I met with the boss" through "he will

16    ratify Richard," if you could.

17         MR. BRODSKY:  We could just highlight it on the

18    screen.

19    Q.  Do you recall any conversations with Mr. Fajardo, Mr.

20    Donziger, or Mr. Yanza about how Judge Yanez will issue the

21    order to appoint the global expert?

22    A.  I don't recall that.

23    Q.  The next page, directing your attention to the sentence

24    that begins with "I think," the last sentence of that first

25    full paragraph, did you speak with Mr. Fajardo and others on

DBD8CHE4

1    the Lago Agrio plaintiffs' legal team about meeting social,

2    political, informational, and guerilla-like pressure?

3    A.  Not that I can remember.

4              MR. BRODSKY:  May I approach, your Honor?

5              THE COURT:  Yes.

6    Q.  Mr. Ponce, let me show you an e-mail that you are on,

7    Plaintiff's Exhibit 821 in evidence.  It's from Steven

8    Donziger, dated January 10, 2007, to Pablo Fajardo, copy to

9    Julio Prieto, Anchundia Alexandra, Juan Pablo Saenz, Alejandro

10   Ponce, and Luis Yanza, subject news from the court.  Do you see

11   that?  Again, the first two pages are in English and the last

12   pages are in Spanish.

13   A.  OK.

14   Q.  You recall receiving this e-mail?

15   A.  Not that I can recall this specific e-mail.

16   Q.  In January 2007 you weren't involved in inter-American

17   court litigation at that time?

18   A.  Actually, yes.  At the time we were preparing our complaint

19   that had been filed in the beginning of February in the same

20   case I was referring to before, if I am not wrong.  But

21   specifically to this e-mail, I don't recall receiving.

22   Q.  You don't remember reading this e-mail?

23   A.  Not at this time.

24   Q.  At any time do you remember reading this e-mail up until a

25   few moments ago when I gave it to you?

DBD8CHE4

```
1    A.  Not until you gave me the e-mail.

2    Q.  You see where it says from Pablo Fajardo "dear friends"?

3            What is your understanding of what he meant when he

4    said to you and others, "I had a short meeting today with the

5    big boss (you know who I'm talking about)"?

6    A.  I don't know who he is talking about.

7    Q.  Do you remember when Mr. Cabrera was sworn in?

8    A.  I don't remember the date that he was sworn in.

9            MR. BRODSKY:  Your Honor, may I approach?

10           I don't have hard copies of this exhibit.  It's in

11   evidence.  We can put it up on the screen for everybody, the

12   particular page.

13           THE COURT:  Put it on the screen.

14           MR. BRODSKY:  Plaintiff's Exhibit 342.

15           We do have some copies.

16   Q.  I want to ask you about page 3, and up at the top read

17   silently to yourself starting with right here, "the expert,"

18   through the end of that sentence.  It's also highlighted on

19   your screen for you.

20   A.  I have read it.

21   Q.  Does this refresh your recollection that Mr. Cabrera swore

22   to perform his duties faithfully and in accordance with

23   science, technology, and the law, with complete impartiality

24   and independence vis-a-vis the parties?

25   A.  Yes.  That's what says the translation that you showed me.
```

DBD8CHE4

```
 1   Q.  Does that refresh your recollection that at the time the
 2   Lago Agrio court had ordered Mr. Cabrera --
 3   A.  This is the first time I see this document.  I haven't seen
 4   the Spanish version even of that document.
 5        THE COURT:  Why don't you listen to the question and
 6   then answer it, please.
 7        THE WITNESS:  If the question was --
 8        THE COURT:  He is going to ask you a question.  Listen
 9   to it and then please answer it.
10   Q.  Does that refresh your recollection, sir, that Mr. Cabrera
11   was sworn in by the Lago Agrio court to perform his duties with
12   complete impartiality and independence vis-a-vis the parties?
13   A.  There is no recollection to refresh.
14   Q.  That was your understanding then?
15   A.  My understanding of what?
16   Q.  That Mr. Cabrera swore that he would faithfully perform his
17   duties, with complete impartiality and independence vis-a-vis
18   the parties?
19   A.  Yes, that's what it says this document, but it's the first
20   time I see it.
21   Q.  But understanding that's the first time you have seen this
22   document, does it refresh your memory that Mr. Cabrera swore to
23   that?
24   A.  If this is the first time I see the document, there is
25   nothing to recollect.
```

DBD8CHE4

1    Q.  Does this document help trigger a memory that you have from

2    2007 that you knew back then Mr. Cabrera swore to be impartial

3    and independent vis-a-vis the parties?

4    A.  No, because it's the first time I see the document and

5    there is no recollection to recollect.  I cannot remember

6    something I have not seen before.

7               THE COURT:  He is not asking you now whether you have

8    seen the document before.

9               THE WITNESS:  He is asking me if I have recollection.

10   That's the question.  I don't have a recollection.

11   Q.  Did you have conversations in 2007 with other members of

12   the Lago Agrio plaintiffs' legal team that Mr. Cabrera was

13   supposed to be independent vis-a-vis the parties?

14   A.  I don't remember having any conversation at this point.

15              MR. BRODSKY:  May I approach, your Honor?

16              THE COURT:  Yes.

17   Q.  I am showing you, Mr. Ponce, Plaintiff's Exhibit 877 in

18   evidence, which is a two page e-mail, again in English at the

19   beginning and Spanish at the end, dated July 1, 2007, from

20   Steven Donziger to Pablo Fajardo, copied to Luis Yanza, subject

21   worried.

22              Would you take a moment to review that two page

23   e-mail?

24   A.  OK.  I have read it.

25              MR. BRODSKY:  The third paragraph, can we highlight

DBD8CHE4

```
1   that on the screen?
2   Q.  Am I correct, sir, that you have no idea whether anybody on
3   the Lago Agrio plaintiffs' legal team entered into a contract
4   with Richard Cabrera?
5   A.  Not that I can recall.
6   Q.  Looking at the bottom here, number 1, is it your testimony,
7   sir, that you have no idea whether anybody on the Lago Agrio
8   plaintiffs' legal team helped Mr. Cabrera get an office?
9   A.  Can you repeat the question, please?
10  Q.  It's your testimony you have no idea whether anyone on the
11  Lago Agrio plaintiffs' legal team helped Mr. Cabrera get an
12  office?
13  A.  Not that I can recall about that.
14  Q.  Then on the second page, looking at number 2, did you have
15  any idea that Julio's girlfriend was -- that there was
16  discussion of Julio's girlfriend becoming an assistant to
17  Richard Cabrera?
18  A.  No, I didn't know.
19  Q.  Then paragraph 3 --
20          THE COURT:  Just one moment.
21          Julio, who was he?
22          THE WITNESS:  I assume he is Julio Prieto, a member of
23  the legal team at the time.
24          THE COURT:  Thank you.
25  Q.  What was Julio's girlfriend's name at the time?
```

DBD8CHE4

1    A.  I don't recall her name now.  I don't know who was the

2    girlfriend at that time.

3    Q.  Number 3, looking at that, do you know whether or not the

4    Lago Agrio plaintiffs' legal team helped Mr. Cabrera get

5    insurance?

6    A.  I don't know.

7              MR. BRODSKY:  May I approach, your Honor?

8              THE COURT:  Yes.

9    Q.  Showing you, Mr. Ponce, Plaintiff's Exhibit 913 in

10   evidence, which is a one page e-mail.  Again, English in the

11   front, Spanish in the back.  It's an e-mail from Luis Yanza,

12   dated September 12, 2007, to sdonziger@gmail.com, copy to

13   pafam@ecuanex.net.ec, subject "let's not give Texaco the

14   pleasure of stopping the PG."

15             Let me draw your attention to in the first paragraph

16   the use of this word "Wao," and direct your attention to the

17   third paragraph to the use of that word "Wuao."  Do you see

18   that?

19             Does seeing those words in writing, Mr. Ponce, refresh

20   any recollection that the Lago Agrio plaintiffs' legal team

21   used the word Wao in communications?

22   A.  Not that I can recall.

23   Q.  You have no understanding of what Wao means, right?

24   A.  From reading this document, no.

25             THE COURT:  Do you have any understanding other than

DBD8CHE4

1   from reading this document?

2           THE WITNESS:  No.

3   Q.  The same question for Wuao, do you have any understanding

4   of what Wuao means?

5   A.  No.

6   Q.  In the paragraph that begins "in conclusion," I would like

7   to direct your attention to that paragraph and the words "the

8   secret account."

9           Were you aware of a secret account being used by the

10  Lago Agrio plaintiffs' litigation team?

11  A.  I was not aware of any secret account.

12  Q.  Were you aware of any account that was referred to as the

13  secret account?

14  A.  No.

15          MR. BRODSKY:  May I approach again, your Honor?

16          THE COURT:  Yes.

17  Q.  Mr. Ponce, let me show you a document that you are on.  At

18  the bottom of the page, there are two e-mails -- several

19  e-mails here.  This is Plaintiff's Exhibit 6505.  At the top of

20  the page, it's an e-mail from Pablo Fajardo, dated July 8,

21  2007, to Julio Prieto and junapassaenz, subject incident.  And

22  below that is an e-mail from Julio Prieto to Pablo Fajardo,

23  Alejandro Ponce Villacis, dated July 8, 2007, 11:30 a.m.,

24  subject FW: report.

25          Would you read that e-mail from Julio Prieto to Pablo

DBD8CHE4

1    Fajardo and you and Juan Pablo Saenz silently to yourself?

2            That's your name on this e-mail, right?

3    A.  Yes, that's right.

4    Q.  Matteo Borrero, who is he?

5    A.  Matteo was an associate that work with me at the time.

6    Q.  Were you a partner at the firm at the time when he worked

7    with you?

8    A.  I was a partner at the firm when he worked with me.

9    Q.  So you employed him?

10   A.  Yes.

11   Q.  You assigned him work relating to the Lago Agrio Chevron

12   litigation?

13   A.  Eventually, yes.

14           MR. BRODSKY:  We offer 6505.

15           MR. BOOTH:  No objection.

16           THE COURT:  Received.

17           (Plaintiff's Exhibit 6505 received in evidence)

18   Q.  Directing your attention to the e-mail you're on, on July

19   8, 2007, from Julio Prieto, the last paragraph, "With respect

20   to the vacancy."  Do you see that there?

21   A.  Yes, I see that.

22   Q.  What is your understanding of what Mr. Prieto was telling

23   you when he said, "With respect to the vacancy, I think we must

24   discuss with the Wao"?

25   A.  First of all, he is not saying anything to me.  He is

DBD8CHE4

1  saying it to Pablo.

2  Q.  You are on the to column as a recipient of this e-mail,

3  correct?

4  A.  Yes.  But the beginning of the e-mail it says, "How's it

5  going, Pablo?"  So, basically, I am part of the recipients, but

6  it's not directed to me.

7  Q.  You're a recipient but not somebody who Julio Prieto is

8  talking to?

9  A.  Exactly.

10  Q.  You're on the e-mail, but you're not really on the e-mail?

11  A.  I am on the e-mail.  The e-mail is not directed to me.

12  Q.  Putting aside whether it's directed to you or not, what is

13  your understanding of what Julio Prieto was saying to Mr.

14  Fajardo when he said, "With respect to the vacancy, I think we

15  must discuss with the Wao"?

16  A.  I understand that they have to discuss this issue with

17  someone who they are calling the Wao.

18  Q.  You have no idea, though, looking at this document what

19  they were talking about?

20  A.  I don't understand what they mean with Wao, as I said

21  before.

22  Q.  Was the Lago Agrio litigation at this time in July 2007

23  something that wasn't really important to you?

24  A.  July 2007, I already was somehow away from the litigation

25  in Lago Agrio since there was a complete team working then and

DBD8CHE4

1    they had been trained to work on the case.

2    Q.  Did the case after the employment of Richard

3    Cabrera -- withdrawn.

4            After Richard Cabrera was appointed, is it your

5    testimony you had very little involvement in the case?

6    A.  Yes.  There was very little involvement in the case.

7    Q.  You had very little involvement?

8    A.  Very little involvement, yes.

9    Q.  You don't recall one way or the other whether you read this

10   e-mail, correct?

11   A.  I don't recall at this time whether I read this e-mail.

12           THE COURT:  I thought you were hired to develop the

13   strategy for the case, right?

14           THE WITNESS:  Yes.  That's right.

15           THE COURT:  And there was a discussion about meeting

16   someone also in Lago Agrio because you were in Quito, right?

17   Is that correct?

18           THE WITNESS:  I want to see the --

19           THE COURT:  You don't remember whether that's correct?

20           MR. BOOTH:  Objection.

21           THE WITNESS:  I don't know what you're referring to.

22           THE COURT:  I am asking you a question.

23           THE WITNESS:  Yes.  I know you're asking a question.

24           THE COURT:  Yes.  I thought it was a fairly simple

25   one.  The question was whether after you were engaged to

DBD8CHE4

1    develop the strategy, you were involved in a discussion about

2    the need to have a lawyer in Lago Agrio because you were in

3    Quito?  Were you involved in such a discussion?

4              THE WITNESS:  If you're referring to my assertion in

5    my written statement, yes, that was part --

6              THE COURT:  Suppose I am just asking without regard to

7    your statement, is the answer still yes?

8              THE WITNESS:  Partially, yes.

9              THE COURT:  Partially, yes.  OK.

10             And a decision was made, partially or fully, that

11   Pablo Fajardo would be the lawyer in Lago Agrio, is that true?

12             THE WITNESS:  Yes.  That was the decision that was

13   taken in 2005.

14             THE COURT:  He was a recently admitted lawyer at that

15   time, right?

16             THE WITNESS:  Yes.

17             THE COURT:  And you were more experienced, true?

18             THE WITNESS:  Yes.

19             THE COURT:  And you had been a qualified lawyer longer

20   than he had, is that true?

21             THE WITNESS:  Yes.

22             THE COURT:  And is it true that while you were on the

23   case, there were constant meetings to discuss the prosecution

24   of the case, is that true?

25             THE WITNESS:  Yes, that is true.

DBD8CHE4

```
1          THE COURT:  And you participated in all or most of
2   those constant meetings, isn't that true?
3          THE WITNESS:  That is not true.
4          THE COURT:  OK.  Mr. Brodsky.
5          MR. BRODSKY:  I was going to direct him to a different
6   part of this.  Understood.
7   BY MR. BRODSKY:
8   Q.  Mr. Ponce, directing your attention to your witness
9   statement on paragraph 6.  Do you have your witness statement
10  in front of you, Defense Exhibit 1601?  That's your witness
11  statement in front of you, right?
12  A.  Yes.
13  Q.  There are many portions of your witness statement that you
14  make assertions but they are not based on personal knowledge,
15  right?
16  A.  What are you referring to?
17  Q.  There are statements you make in here that are based on
18  information that other people told you about, right?
19  A.  That's not true necessarily.
20  Q.  There are statements in your witness statement that's based
21  on documents you read or reviewed?
22  A.  Yes.
23  Q.  But not events that you participated in yourself
24  personally?
25  A.  Exactly.
```

DBD8CHE4

1   Q.  Is it fair to say all the information you provide in

2   paragraph 6 is information that you read about or learned about

3   from others?

4   A.  I read from the documents, yes.

5   Q.  Let me ask you about paragraph 14, the Guanta inspection.

6          You didn't personally observe the shutting down of the

7   inspection of Guanta, right?

8   A.  Yes, I did.

9   Q.  You don't have any personal knowledge, based on what you

10  observed and you saw, as to how it got shut down, right?

11  A.  I was there.

12  Q.  Let me direct your attention to your third sentence:  "I

13  have been told that a number reporters were planning on being

14  present."  Who told you that?

15  A.  Pablo Fajardo and Steven Donziger.

16  Q.  Then you said, "The afternoon before the inspection I was

17  told that Chevron had gotten the judge."  Do you see that

18  sentence?

19  A.  Which line?

20  Q.  That's the fourth sentence on paragraph 14.

21  A.  OK.  Yes.

22  Q.  You wrote that sentence, right?

23  A.  Yes, I wrote that sentence.

24  Q.  You wrote it in English?

25  A.  Yes.

DBD8CHE4

```
1   Q.  That's information that you didn't personally observe, it
2   was information you learned from others, right?
3   A.  Yes and no, because I am referring to that afternoon.
4   Later on, the next day, I went to the court, and I confirmed
5   that information personally.
6           THE COURT:  How did you do that?
7           THE WITNESS:  By talking to the judge.
8           THE COURT:  So it's what the judge told you?
9           THE WITNESS:  He had ordered.
10          THE COURT:  It's what the judge told you, true?
11          THE WITNESS:  Yes.
12          THE COURT:  Not something that you saw with your own
13  eyes, right?
14          THE WITNESS:  Yes.
15          THE COURT:  And was anyone from Chevron there with you
16  when you had the conversation with the judge?
17          THE WITNESS:  No.
18  Q.  You say later in your statement your office was broken
19  into?
20  A.  Yes, it was.
21  Q.  Were you present when the office was broken into?
22  A.  I was not present, but I saw the consequences afterwards.
23  Q.  You say you had suspicions of who was involved, right?  You
24  used the word suspicions?
25  A.  I used the word suspicions, yes.
```

DBD8CHE4

1   Q.  Because you don't actually know who broke into your office,
2   right?
3   A.  No.
4           THE COURT:  The answer is ambiguous, Mr. Brodsky.
5   Q.  Mr. Ponce, am I correct, sir, that you do not have any
6   personal knowledge as to who broke into your office?
7   A.  No, I don't.
8   Q.  You do not have personal knowledge, right?
9   A.  I don't have personal knowledge.
10  Q.  Mr. Ponce, you advocated attacking Judge Yanez in the Lago
11  Agrio litigation case, correct?
12  A.  Yes.
13  Q.  You advocated among your counsel that he should be attacked
14  politically, right?
15  A.  Yes.
16  Q.  You, sir, actually at one point in Quito threatened to file
17  a complaint against a clerk of the court in Quito, correct?
18  A.  I don't understand what you're referring to.
19  Q.  You remember being filmed for a movie Crude?
20  A.  Yes, I remember that.
21  Q.  In connection with that movie, were your conversations with
22  Mr. Donziger and other lawyers on the team filmed?
23  A.  Yes, they were.
24  Q.  With your permission?
25  A.  Yes.

DBD8CHE4

1    Q.  And you had an understanding that that film would be

2    brought back to the United States, right?

3    A.  Yes.

4    Q.  Shown around the world?

5    A.  Yes.

6    Q.  And the cameras were allowed into your discussions with

7    other lawyers?

8    A.  In some of the discussions.

9    Q.  Without your objection?

10   A.  Yes.

11   Q.  In fact, with your consent and approval?

12   A.  Yes.

13   Q.  On one occasion do you remember the cameras following you

14   into a courthouse in Quito where you approached a judge in

15   connection with the inspection the judge had ordered of HAVOC

16   labs?

17   A.  Yes, I do.

18   Q.  And you remember this because you were actually the lawyer

19   in charge on the Lago Agrio litigation team of opposing

20   Chevron's requests to inspect the HAVOC labs?

21   A.  That is not entirely correct.

22   Q.  Partially correct?

23   A.  Partially correct.

24   Q.  The part that's correct is that you were part of a team

25   that was opposing Chevron's requests to inspect the HAVOC labs?

DBD8CHE4

1   A.  The part that is correct is the one in which I represented

2   one of the Lago Agrio plaintiffs in that specific matter, and I

3   appeared before the court on such condition.

4           THE COURT:  You represented one of the Lago Agrio

5   plaintiffs, is that what you said?

6           THE WITNESS:  Yes.  I represented in that specific

7   proceeding one of the Lago Agrio plaintiffs, in that specific

8   proceeding.

9   Q.  Did Mr. Donziger represent another Lago Agrio plaintiff in

10   that proceeding?

11   A.  He didn't represent anyone in that proceeding.

12   Q.  Did Mr. Fajardo represent anybody in that proceeding?

13   A.  I don't recall whether Pablo Fajardo was in that

14   proceeding.

15   Q.  Mr. Yanza, did he represent anybody?

16   A.  He didn't represent anybody.

17   Q.  On this occasion you remember going to the courthouse,

18   right?

19   A.  Yes.

20   Q.  Cameras were following you?

21   A.  Yes.

22   Q.  You were there with Mr. Donziger?

23   A.  Yes.

24   Q.  You were there with Mr. Yanza, right?

25   A.  Yes.

DBD8CHE4

1   Q.  And you and Mr. Donziger and Mr. Yanza went into the

2   judge's office, right?

3   A.  With other persons, including Chevron attorneys, yes.

4   Q.  Before Chevron's attorneys arrived, you were there,

5   correct?

6   A.  Yes.

7   Q.  And Mr. Donziger was advocating a position on behalf of

8   shutting down the inspection, right?

9   A.  Yes.

10  Q.  He actually spoke to the judge?

11  A.  Yes.

12  Q.  After you left the judge's office, did you not go to the

13  clerk's office and attempt to speak to the clerk?

14  A.  I just remember speaking to the judge.  I don't remember

15  speaking to a clerk.

16  Q.  Do you remember you didn't speak to the clerk because a

17  police officer actually had to intervene and prevent you from

18  going into the clerk's office?

19  A.  Actually, it was not the clerk's office.

20  Q.  So you remember what the office was.  What was the office?

21  A.  The judge's office.

22  Q.  The clerk was in a judge's office?

23  A.  I was attempting to talk to the judge.

24  Q.  And you did talk to the judge?

25  A.  Finally I did, yes.

DBD8CHE4

1    Q.  So the police officer didn't intervene in that, right?

2    A.  I recall that the police officer intervened afterwards.

3    Q.  Do you remember a point where the police officer stopped

4    you from getting into an office?

5    A.  Yes.

6    Q.  And that office was an office where a clerk worked, right?

7    A.  If I am not wrong, it was the judge's office.

8    Q.  Why did the police officer stop you from going into that

9    judge's office?

10   A.  Because he didn't want me.

11   Q.  Why did you want to go into that judge's office --

12   A.  To talk to the judge.

13   Q.  -- even though the police were trying to stop you?

14   A.  To talk to the judge.

15   Q.  So you don't have any recollection of threatening to file a

16   complaint against the clerk of the court in connection with you

17   trying to shut down Chevron's request to inspect the HAVOC

18   labs?

19   A.  Not in connection with the clerk.

20   Q.  Mentioning HAVOC labs, you talked a little bit about HAVOC

21   labs in your witness statement, right?

22   A.  Yes, I did.

23   Q.  You talked about how Chevron filed a motion back in 2005

24   requesting an inspection of that lab?

25   A.  That is not correct.

DBD8CHE4

```
 1   Q.  In 2005, sir, did Chevron file a motion in Quito requesting
 2   an inspection of the lab you and others on the Lago Agrio
 3   plaintiffs' litigation team had hired to do your testing?
 4   A.  Yes.  I thought I used a different word, but the correct
 5   thing is saying it was a pre-judicial proceeding rather than a
 6   motion.  It was not exact using the word motion.
 7   Q.  You used the word motion?
 8   A.  It's my mistake.  I used the word motion.
 9   Q.  Motion, pre-judicial proceeding, whatever you want to call
10   it, you were trying to shut down Chevron's request to inspect
11   the HAVOC labs.  You can agree on that?
12   A.  Yes.
13   Q.  Certain Lago Agrio plaintiff experts were using the HAVOC
14   lab, right?
15   A.  Yes.
16   Q.  And they were sending samples for testing them?
17   A.  Yes.
18   Q.  But their reports didn't include the lab accreditation,
19   right?
20   A.  My belief is that there were certain certifications, but
21   not all of them, but there were certain certifications, if I'm
22   not wrong.
23   Q.  The HAVOC lab wasn't accredited, right?  Do you understand
24   what I mean by that?
25   A.  In my belief, it was partially accredited.
```

DBD8CHE4

1  Q.  But partially not?

2  A.  According to my recollection, there were accreditations for

3  certain portions to perform certain examinations of samples,

4  but at the time no other lab was accredited for all the

5  requested exams that we have asked the expert in the case.

6        MR. BRODSKY:  May I approach, your Honor?

7  Q.  I am showing you, Mr. Ponce, Plaintiff's Exhibit 6513,

8  which is an e-mail from Steven Donziger on April 17, 2006.

9  There are a number of e-mail addresses.  Subject:  Work for the

10  legal team.  It's Bates stamped DONZ 40435.  Again, the Spanish

11  is in the back, the English is in the front.

12        Let me know when you have had a chance to review it.

13  I am just going to focus your attention on paragraph 5.

14  A.  Yes.

15  Q.  Mr. Donziger told you in April 2006 that it was vital for

16  the accreditation process of HAVOC labs to begin, correct?

17  A.  Yes.

18        MR. BRODSKY:  We offer 6513.

19        MR. BOOTH:  No objection.

20        THE COURT:  It's received.

21        (Plaintiff's Exhibit 6513 received in evidence)

22        MR. BRODSKY:  We offer 6573, which was a prior

23  document.

24        THE COURT:  6573?

25        MR. BRODSKY:  Let me try to find the prior document.

DBD8CHE4

1           6513.  Is that the one I just admitted?

2           THE COURT:  Yes.

3           We are going to take our break here.  I have to take a

4    conference call in another case, and I will be back as soon as

5    I can.

6           (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBDLCHE5                    Ponce - cross

1          THE COURT:  Before we resume, I inquired earlier who

2     succeeded Judge Yanez on the case, and I think I was told that

3     it was Judge Novillo.

4          MR. MASTRO:  Novillo then Nunez, your Honor.

5          THE COURT:  Everybody agrees on that?

6          MS. FRIEDMAN:  I don't know.

7          MR. BOOTH:  Sorry, Judge, don't know.

8          MR. BRODSKY:  We have a chart we can put up.

9          MS. FRIEDMAN:  We'll agree to their chart.

10         THE COURT:  Look, I'd like a stipulation on the dates,

11    please, because what I've had for some time was that Judge

12    Nunez succeeded Yanez and that occurred on August 25, 2008, and

13    it would be helpful for me to know if that was correct or not.

14         MS. FRIEDMAN:  Chevron admitted an exhibit that we did

15    not disagree with.

16         THE COURT:  We don't have to discuss it.  I just want

17    you to work it out.

18         MR. MASTRO:  We'll do it, your Honor.

19         THE COURT:  Thank you.

20         Okay.  Let's continue.

21    BY MR. BRODSKY:

22    Q.  I'm going to come back to 6513 in a minute, Mr. Ponce, but

23    let me digress for a minute and ask you, Mr. Donziger told you

24    that it would be a disaster if the inspection of HAVOC lab took

25    place, right?

DBDLCHE5                    Ponce - cross

1    A.  I don't remember his exact words, but he didn't like the

2    idea.

3    Q.  I'm sorry?  I just didn't hear you.

4    A.  I said that -- you want me to repeat?

5    Q.  Yes, please.

6    A.  I said that I don't remember the exact words, but he didn't

7    like the idea of having the inspection in HAVOC.

8    Q.  It's not -- well, withdrawn.

9             Didn't he tell you that it was a dangerous situation

10   to have the inspection take place?

11   A.  Yes.

12   Q.  You remember him using that word, danger?

13   A.  I recall, I think, the word danger.

14   Q.  And that's because, correct, the reason it was dangerous

15   was because HAVOC lab was issuing results for which it did not

16   have the equipment to perform?

17   A.  That's not correct what he said.

18             MR. BRODSKY:  May I approach, your Honor?

19             THE COURT:  Yes, you may.

20   Q.  I'm going to show you two documents, Mr. Ponce.  We'll take

21   them one at a time, Plaintiff's Exhibit 3339 and then

22   Plaintiff's Exhibit 1642.

23             Plaintiff's Exhibit 3339 is an email from Julio

24   Prieto, on August 31, 2007, to Steven Donziger, Pablo Fajardo,

25   Juan Pablo Saenz, and Luis Yanza.  Do you see that at the top?

DBDLCHE5                         Ponce - cross

1   A.  Yes, I see that at the top.

2   Q.  And below that is an email that includes you, right?

3   A.  Yes.

4   Q.  We won't go through all the entire email exchange, but were

5   you the one responsible for preventing the inspection from

6   taking place?

7              MR. GOMEZ:  Objection.

8              THE COURT:  Sustained as to form.

9   Q.  Were you responsible for arguing the Lago Agrio plaintiff

10  case that the inspection of HAVOC lab should not take place?

11             MR. GOMEZ:  Objection.

12             THE COURT:  Overruled.

13  A.  That is not correct what you said.

14  Q.  Now, Mr. Donziger was upset with you because he didn't

15  think you were doing enough to stop the inspection, right?

16  A.  To which part of the email are you referring because I

17  don't see that part of he being upset.

18  Q.  Just directing your attention to this all-caps email, from

19  SDonziger, saying Alejandro, I don't understand --

20  A.  Okay.

21  Q.  -- what is happening here.  Who is following this dangerous

22  situation?

23             Do you see that?

24  A.  Okay.

25  Q.  Right?

DBDLCHE5                         Ponce - cross

```
 1   A.  Yes, I see that.
 2   Q.  Mr. Donziger thought this was a situation so dangerous it
 3   required immediate action to prevent any inspection of the
 4   HAVOC labs, right?
 5           MR. GOMEZ:  Objection.
 6           THE COURT:  Sustained certainly as to form.
 7   Q.  Mr. Donziger wanted you to take action to prevent the
 8   dangerous situation of the inspection of HAVOC labs?
 9   A.  Yes.
10           MR. GOMEZ:  Objection.
11           THE COURT:  And what's the objection?
12           MR. GOMEZ:  Calls for speculation as to what
13   Mr. Donziger wanted.
14           THE COURT:  Sustained as to form.
15   Q.  Mr. Donziger told you that the situation was so dangerous
16   it required action to prevent the inspection of HAVOC labs?
17   A.  He is not saying that in the email.
18   Q.  He told you that, right, in sum and substance?
19   A.  Yes.
20   Q.  Not necessarily using those words, but that was his message
21   to you, right?
22   A.  Yes.
23   Q.  And looking at the other email --
24           MR. BRODSKY:  I offer 3339.
25           MR. BOOTH:  No objection, your Honor.
```

DBDLCHE5                    Ponce - cross

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 3339 received in evidence)

3   Q.  Plaintiff's Exhibit 909 -- which is right next to you, yes?

4   Thank you, Mr. Ponce -- an email dated September 3, 2007, from

5   Steven Donziger to Pablo Fajardo and others.  Would you take a

6   moment to look at the recipients and tell me whether you're on

7   there.

8          And for the record, the subject is "pissed off with

9   the HAVOC situation."

10         THE COURT:  Do you have a copy of the complete

11  exhibit?  I have it.  Sorry.  Thanks.

12  A.  Okay.  I have read this.

13  Q.  Mr. Ponce, does this refresh any recollection that

14  Mr. Donziger not only called it a dangerous situation, but a

15  disaster if the inspection took place?

16  A.  Yes.

17  Q.  And it was a disaster to the Lago Agrio case if the

18  inspection took place, right?

19  A.  Yes.

20  Q.  It was a disaster because of what the inspection would show

21  regarding the type of testing being done there, right?

22  A.  No.

23  Q.  And I want to go back to the Plaintiff's Exhibit 6513.  Do

24  you have that in front of you?  That's that email from

25  Mr. Donziger on April 17, 2006.

DBDLCHE5                         Ponce - cross

1          I want to direct your attention to No. 1, and we can

2     highlight that whole sentence.  Would you read that silently to

3     yourself.

4     A.   The highlighted part?

5     Q.   Yeah, the highlighted part.  Do you need another copy, sir?

6     A.   It will be helpful having it because I want to see the

7     complete thing.

8     Q.   Here.  I'm going to give you another copy.  6513.  You

9     don't have to look for it.

10    A.   Thank you.

11            MR. BRODSKY:  It's in evidence, your Honor.

12            THE WITNESS:  Okay.

13            MR. BRODSKY:  It's in evidence?  We offer 6513.  I

14    don't know if it's in evidence.  We offer it.

15            MR. BOOTH:  I think it's in.

16            THE COURT:  It is in.

17            MR. BOOTH:  No objection.

18    Q.   Mr. Ponce, in this email Mr. Donziger in No. 1 is

19    addressing you, right?

20    A.   Yes, he is.

21    Q.   Where it says Alejandro.

22    A.   Yes.

23    Q.   And Gustavo refers to Gustavo Pinto, right?

24    A.   I could assume that, yes.

25    Q.   I'm not asking you to assume anything, sir.  I'm asking you

DBDLCHE5                          Ponce - cross

1    if Gustavo there refers to Gustavo Pinto?

2    A.  Yes.

3    Q.  And Fernando there refers to Fernando Reyes?

4    A.  I don't know if it's Fernando Reyes or not.  It just says

5    Fernando.  Let's assume yes.

6    Q.  Well, is it your testimony, sir, that this email to you and

7    others, in paragraph 1 addressed to you, you don't know what he

8    means, Mr. Donziger means when he says Gustavo's and Fernando's

9    report?

10   A.  I don't recall which report he is referring to.

11             THE COURT:  Well, who was Fausto?

12             THE WITNESS:  Fausto was a member of the technical

13   team that worked for the plaintiffs.

14   Q.  How many Fernandos were experts in the Lago Agrio

15   litigation?

16   A.  I don't know how many were there.

17   Q.  Give me all the names of all of them.

18   A.  I don't recall the names.

19             THE COURT:  Do you remember more than one?

20             THE WITNESS:  No.

21   Q.  How many experts worked with Gustavo Pinto in issuing a

22   report?

23   A.  I don't recall, but I guess was Fernando Reyes.

24   Q.  All right.  And what did Mr. Donziger, what did you

25   understand him to say to you in this email when he said,

DBDLCHE5                          Ponce - cross

1  Alejandro, could you redo it and turn it into a final version

2  with their voice as soon as possible, please?

3  A.  He's asking me to review a report and correct it and put it

4  in their voice.  I don't know which report he's referring to.

5  Q.  Now, does this refresh your recollection, sir, that you

6  helped draft a report by Gustavo Pinto and Fernando Reyes

7  submitted to the Lago Agrio court in their name?

8  A.  I don't recall doing this.  I don't remember which report

9  are referring to.

10  Q.  This doesn't refresh any recollection?

11  A.  No.

12  Q.  Now, in this email, sir, is it fair to say that

13  Mr. Donziger is directing you to do something?

14  A.  Yes.

15  Q.  And is it fair to say, for example, in No. 4 he's directing

16  Fausto to do something?

17  A.  Yes.

18  Q.  And is it fair that say in No. 5 he's directing Fausto and

19  Pablo Fajardo and Luis Yanza to do something?

20  A.  Yes.

21  Q.  These are directions from Mr. Donziger to the lawyers on

22  the litigation team in Ecuador, right?

23  A.  Yes.

24  Q.  All right.  Now we can take that down.

25          Mr. Donziger determined your compensation, right, when

DBDLCHE5                      Ponce - cross

1   you worked on the Lago Agrio litigation between June 2005 and

2   November 2008?

3   A.  He did what?

4   Q.  He determined your compensation?

5   A.  No, he didn't.

6   Q.  Who did you negotiate your compensation with?

7   A.  I negotiated with Luis Yanza and Manuel Pallares when they

8   visited in my office.

9   Q.  That was at the outset before June 2005?

10  A.  It was in June 2005.

11  Q.  Subsequent to June 2005, how much were you getting per

12  hour, Mr. Ponce?

13  A.  $120 per hour.

14  Q.  I'm sorry?

15  A.  $120 per hour.

16  Q.  Did that amount change?

17  A.  That amount never changed.

18  Q.  Did Mr. Donziger have any involvement, to your knowledge,

19  in how much you were being paid?

20  A.  He will canalize the payments to me.

21          THE COURT:  Does that mean he transmitted the money to

22  you?

23          THE WITNESS:  In some occasions he would transmit the

24  money to me, or on other occasions he will make Joe Kohn to

25  transmit that money to me.

DBDLCHE5                          Ponce - cross

1           THE COURT:  Is that what you meant by canalize?

2           THE WITNESS:  Yes, that's what I meant.

3    Q.  When you were owed money, you went to Mr. Donziger to get

4    it?

5    A.  I ask him to proceed with the payments, yes.

6    Q.  You understood the money was coming through Mr. Donziger?

7    A.  Yes.

8    Q.  Did you understand how the litigation was being funded?

9    A.  Yes.

10   Q.  How was the litigation being funded?

11   A.  At the time I was in the case, it was funded by the law

12   firm of Joseph Kohn.

13   Q.  Did you come to understand at any time what Mr. Donziger's

14   essential compensation would be if there were a judgment in the

15   case?

16   A.  Yes.

17   Q.  What did you understand his compensation?

18   A.  That he will receive a percentage of the 10 percent that

19   the court would award to the plaintiffs in the case.

20   Q.  What percentage?

21   A.  I don't know which percentage was for him.

22   Q.  Did you ever talk to him about his compensation?

23   A.  I talked to him, yes, but just knowing that he will receive

24   a percentage.  He never mentioned an amount.

25   Q.  Did you speak with Mr. Fajardo or anybody else on the Lago

DBDLCHE5                    Ponce - cross

1   Agrio plaintiffs' litigation team in Ecuador about

2   Mr. Donziger's compensation?

3   A.  No.

4   Q.  You never discussed with Mr. Fajardo that Mr. Donziger was

5   getting more compensation at a greater percentage interest in

6   the outcome, in the judgment, than anybody else?

7   A.  No, we never discussed that.

8   Q.  Before I move on to one or two final things, Mr. Ponce, I

9   wanted to ask you:  Who asked you to come here to testify

10  today?

11  A.  Steven Donziger.

12  Q.  He called you?

13  A.  We met in Quito.

14  Q.  When did you meet with him?

15  A.  I believe it was July this year.

16  Q.  And at this meeting in Quito with Mr. Donziger, was anyone

17  else present?

18  A.  Julio Gomez was present.

19  Q.  Anybody else?

20  A.  Not that I can recall.

21  Q.  How long was the meeting?

22  A.  I don't know, half an hour, 45 minutes.

23  Q.  Where was the meeting?

24  A.  It was at Hotel Quito.

25  Q.  I notice you're looking at Mr. Gomez.

DBDLCHE5                        Ponce - cross

1    A.  I was trying to remember where it was.  It was Hotel Quito.

2    Q.  And you don't have a recollection of where it was in Quito?

3           THE COURT:  He said Hotel Quito.

4    Q.  I'm sorry.  Hotel Quito?

5    A.  Yeah.

6    Q.  He have you talked to Mr. Donziger since that meeting?

7    A.  Yes.

8    Q.  How many times?

9    A.  One more time.

10   Q.  When?

11   A.  Yesterday.

12   Q.  How long?

13   A.  We had dinner together.

14   Q.  In Manhattan?

15   A.  Here in Manhattan, yeah.

16   Q.  Did you talk about what you would testify about today?

17   A.  No.

18   Q.  Did the trial come up at all?

19   A.  Yes.

20   Q.  What did -- withdrawn.

21          Did Mr. Donziger tell you about the testimony of any

22   other witnesses?

23   A.  No.

24   Q.  Did he tell you who else was coming to testify?

25   A.  No.

DBDLCHE5                    Ponce - cross

1    Q.  Did he talk to you about legal strategy for the trial?

2    A.  No.

3    Q.  I take it you came with a computer?

4    A.  Yes, I came with a computer from the firm.

5    Q.  Have you kept any documents on that computer relating to

6    the Lago Agrio litigation --

7    A.  No.

8    Q.  -- or your role?

9    A.  No.

10   Q.  Mr. Donziger mention to you at dinner last night that

11   questions might come up about your computer?

12   A.  No.

13   Q.  Has anyone ever asked you for documents, for you to collect

14   documents related to the Lago Agrio litigation?

15   A.  I was never requested that.

16   Q.  Never, ever?

17   A.  Not after my -- after December, after November 2008, no.

18   Q.  And did you ever make any effort to look for any documents

19   in connection with preparing your witness statement?

20   A.  Yes.

21   Q.  Because it happened so long ago, you needed documents to

22   assist you in preparing the statement, right?

23   A.  Yes.

24   Q.  And those documents are somewhere in Ecuador, right?

25   A.  Not necessarily.

DBDLCHE5                      Ponce - cross

1   Q.  Where are those documents?

2   A.  The documents I reviewed?

3   Q.  Yes.

4   A.  Are in the webpage of Juciocrudo.com.

5   Q.  What webpage is that?

6   A.  J-U-C-I-O-C-R-U-D-O.com.

7   Q.  Other than that webpage, did you look at any other

8   documents?

9   A.  Yes.

10  Q.  Where were those documents from?

11  A.  Webpage.

12  Q.  Another webpage?

13  A.  Yes.

14  Q.  What website was that?

15  A.  The judicial webpage of the Ecuadorian courts.

16  Q.  Other than those two websites that you just mentioned, any

17  other areas you looked at documents?

18  A.  No.

19  Q.  And did you speak to Mr. Donziger about your witness

20  statement in July of this year?

21  A.  When are you referring to?

22  Q.  July 2013, when you met with him -- was it July 2013?

23  A.  Yes.

24  Q.  Did you talk to him about your witness statement?

25  A.  Yes.

DBDLCHE5                         Ponce - cross

1    Q.   Who controls Juciocrudo.com?

2    A.   Chevron.

3    Q.   Let me ask you, Mr. Ponce, you, on or about March 20, 2007,

4    met with President Correa, right?

5    A.   Yes.

6    Q.   And you met with him to ask for his support in the Lago

7    Agrio Chevron case, right?

8    A.   No.

9    Q.   You -- what was your purpose of meeting with Mr. Correa,

10   President Correa, in March 2007?

11   A.   There were two purposes.  The first one was to show him and

12   expose to him the fact that the general comptroller's office

13   had issued a report regarding the reparation made by TexPet and

14   Texaco back in the late 1990s by which it was stated in this

15   document that there was some indicia of corruption.  That was

16   the first purpose.

17          The second purpose was to request the president as

18   head of executive to file an action to annul the agreement

19   signed between the government of Ecuador, the executive in that

20   sense, and Texaco or TexPet, regarding the reparation back in

21   the 1990s.

22   Q.   You knew Rafael Correa before he became president of

23   Ecuador, right?

24   A.   Yes.

25   Q.   In fact, you both were teaching at Universidad San

DBDLCHE5                        Ponce - cross

1   Francisco de Quito at the same time?

2   A.  Yes, that's correct.

3   Q.  Is that where you first met him?

4   A.  Yes, that's where I met him.

5   Q.  And you became friends with him there?

6   A.  We became friends.

7   Q.  And, in fact, you represented him, as you say in your

8   witness statement, you represented President Correa in a civil

9   suit as his attorney, right?

10  A.  Yes, that's correct.

11  Q.  In 2007, right?

12  A.  Yes, that's correct.

13  Q.  And you're still President Correa's lawyer to this day,

14  right?

15  A.  That's not correct.

16  Q.  From time to time you provide counsel to the Republic of

17  Ecuador?

18  A.  That's not correct.

19  Q.  And did you speak to President Correa before you came to

20  testify here today?

21  A.  No.

22  Q.  When is the last time you spoke to President Correa?

23  A.  Must been the beginning of 2008.

24  Q.  It's your testimony, sir, since the beginning of 2008

25  you've never spoken to him?

DBDLCHE5                      Ponce - cross

1    A.  I have never spoken to President Correa since then.

2    Q.  Have you spoken to people who work for President Correa

3    recently?

4    A.  No.

5    Q.  At this March 20 meeting with President Correa, the

6    secretary of the president was there, right?

7    A.  The judicial secretary of the president was there, that's

8    correct.

9    Q.  The attorney general was present?

10   A.  The attorney general I don't think was present.

11   Q.  A delegate from the ministry of energy was present?

12   A.  Who?

13   Q.  A delegate from the ministry of energy?

14   A.  I believe it was.

15   Q.  Delegate from the ministry of the environment?

16   A.  I believe it was.

17   Q.  You remember President Correa said he asked the attorney

18   general to do everything necessary to win the trial and the

19   arbitration in the United States, right?

20   A.  Yes.

21   Q.  And President Correa said he asked his team to urgently

22   work on the matter?

23   A.  Yes.

24   Q.  And that he would report the matter on national television?

25   A.  Yes.

DBDLCHE5                        Ponce - cross

1   Q.  Didn't he say that he would clarify several points in order

2   not to hurt you in the trial?

3   A.  I don't know those were his exact words, but yes.

4   Q.  And didn't he say he wanted to figure out the legal and

5   judicial way to try Texaco?

6   A.  I don't recall that.

7   Q.  Didn't he say he would call the presiding judge on the Lago

8   Agrio Chevron case?

9   A.  I don't recall that.

10              MR. BRODSKY:  844.

11              One moment, your Honor.

12              May I approach, your Honor?

13              THE COURT:  You may.

14  Q.  Let me show you, Mr. Ponce, Plaintiff's Exhibit 844, in

15  evidence, an email from Maria Eugenia Yepez Regalado, March 21,

16  2007, to SDonziger@gmail.com, subject, report.

17              Would you read that for a moment, please, and let me

18  know when you're done.

19  A.  Okay.  I have read it.

20  Q.  Who was Ms. Yepez at this time, March 2007?

21  A.  She's the person that worked for the media issues at the

22  Lago case.

23  Q.  She worked --

24  A.  For the plaintiffs, for the Lago plaintiffs.

25  Q.  She worked on behalf of the Lago Agrio plaintiffs'

DBDLCHE5                    Ponce - cross

1   litigation team in connection with public relations in Ecuador?

2   A.  Yes.

3   Q.  And does this document refresh your recollection, if we

4   highlight this part right over here --

5          MR. BRODSKY:  Yes, my understanding it's in evidence.

6   We offer it if it's not.

7          THE COURT:  I do believe it's in.

8          THE LAW CLERK:  It's in.

9   A.  I don't recall hearing that from the president.

10  Q.  You see where it says that.  That doesn't refresh your

11  recollection that he even said that he would call the judge?

12  A.  I don't recall that.

13         THE COURT:  Was Ms. Yepez at the meeting that you were

14  in with the president?

15         THE WITNESS:  I don't recall having her there.  But

16  she said that she was there, so I assume she was there.

17         THE COURT:  Excuse me.  Where does she say that she

18  was there, was that in this document?

19         THE WITNESS:  It's like in the sixth line of the

20  Spanish version.  After Manuel Pallares.

21         THE COURT:  Thank you.  Go ahead.

22         MR. BRODSKY:  May I approach, your Honor?

23         THE COURT:  Yes.

24  Q.  I'm showing you Plaintiff's Exhibit 2240.  Would you take a

25  look at those photographs, tell me if those are photographs

DBDLCHE5                          Ponce - cross

1    from that meeting with President Correa.

2    A.   Yes.

3    Q.   Do you see Ms. Yepez somewhere in that photograph, in one

4    of the photographs?

5    A.   Yes.

6    Q.   Which page?

7    A.   On page 2 of 6.

8    Q.   After this meeting, Mr. Ponce, didn't the Ecuadorian

9    government issue a press release?

10   A.   Yes, I believe it did.

11   Q.   And didn't it endorse the actions of the Assembly of the

12   Affected?

13   A.   Yes, it did.

14   Q.   Against Texaco?

15   A.   Yes, I believe it did.

16   Q.   And you were quoted in that press release, right?

17   A.   I don't recall my quotes, but I assume so.  I don't recall

18   the quotes.

19            MR. BRODSKY:  May I approach, your Honor?

20            THE COURT:  Yes.

21   Q.   This is Plaintiff's Exhibit 484.

22            MR. BRODSKY:  I think it's in evidence but not for its

23   truth, obviously.

24            We offer 2240, which are the photographs.

25   A.   I have reviewed and actually there's a quote of mine.

DBDLCHE5                          Ponce - cross

1              THE COURT:  2240 is received.

2              (Plaintiff's Exhibit 2240 received in evidence)

3   Q.  This refresh your recollection, sir, that you were quoted

4   in that --

5   A.  Yes.

6   Q.  -- press release, right?

7   A.  Yes.

8   Q.  So you coordinated with the Ecuadorian government in

9   connection with issuing this press release?

10  A.  I didn't coordinate it, but they took what I said.

11  Q.  Now, one last thing I want to get to, Mr. Ponce, is in

12  January 2005, you told Mr. Donziger it was your opinion that

13  the judges of the Supreme Court had been removed

14  unconstitutionally, right?

15  A.  Which date?

16  Q.  In January 2005.

17  A.  I could have said that at that time, yes.

18  Q.  You could have said it or you did say it?

19  A.  I don't recall saying, but considering the date you're

20  mentioning, probably true that I did.

21  Q.  You remember telling Mr. Donziger at that time that the

22  removal of the judges placed all Ecuadorian citizens in an

23  absolute defenseless position?

24  A.  Yes, probably I said that.

25  Q.  You don't have a specific recollection of saying that?

DBDLCHE5                          Ponce - cross

1   A.  I don't have a specific recollection of that.  But at that

2   time, due to the history of the country, it's very likely that

3   I said that.

4   Q.  Now, you had published several articles in Ecuador about

5   how bad, by 2007, you had published several articles in Ecuador

6   about how bad the administration of justice was, right?

7   A.  Yes.

8   Q.  And you had published articles in Ecuador about the way in

9   which there was no impartiality in Ecuador's judiciary system,

10  right?

11  A.  Yes.

12  Q.  By 2007, you had published articles in Ecuador about the

13  way in which there was no independence in Ecuador's judiciary

14  system?

15  A.  Yes.

16  Q.  You wrote in September 2007 that the administration of

17  justice in Ecuador was worse than it was ten years before in

18  1997?

19  A.  I can assume that I wrote that.  I don't have the document

20  here, but I can assume that I wrote that.

21  Q.  You don't have a recollection of that?

22  A.  I don't have recollection of that specific sentence.

23          MR. BRODSKY:  May I approach, your Honor?

24          THE COURT:  You may.

25          MR. BRODSKY:  For the last time.

DBDLCHE5                          Ponce - cross

1    Q.  Mr. Ponce, I'm showing you Plaintiff's Exhibit 6526, an

2    email exchange from SDonziger, September 13, 2007, to Alejandro

3    Ponce Villacis, subject, re urgent, read this please.

4            Take a moment to look at it again.  The first few

5    pages are in English and the last two pages are in Spanish,

6    Spanish translation.

7    A.  I have reviewed the document.

8    Q.  You've reviewed it, right?

9    A.  Yes.

10   Q.  And this is an exchange you were having with Mr. Donziger

11   in the last email, the last couple emails, and before that with

12   lawyers from Winston & Strawn, right?

13   A.  Yes, that's true.

14   Q.  The lawyers from Winston & Strawn representing the Republic

15   of Ecuador?

16   A.  Yes.

17   Q.  And this related to arguments you were making regarding the

18   judiciary, the independence or lack of independence of the

19   judiciary in Ecuador?

20   A.  Yes.

21           MR. BRODSKY:  We offer 6526.

22           MR. BOOTH:  No objection, your Honor.

23           THE COURT:  Received.

24           (Plaintiff's Exhibit 6526 received in evidence)

25   Q.  And, essentially, the lawyers from Winston & Strawn wanted

DBDLCHE5                          Ponce - cross

1    you to say, along with Mr. Donziger, they wanted you to say

2    that the judiciary in Ecuador in 2007 was better than it was

3    ten years before?

4              MR. GOMEZ:  Objection.

5              THE COURT:  I think the document speaks for itself in

6    that regard.

7    Q.  Putting aside the document, did you have conversations with

8    Winston & Strawn and Donziger about this very subject?

9    A.  No, I didn't have conversations.

10   Q.  This document refresh your recollection that you told them

11   administration of justice in Ecuador is worse now than it was

12   ten years ago?

13   A.  Yes.

14             MR. BRODSKY:  No further questions, your Honor.

15             THE COURT:  Thank you.

16             Mr. Booth.

17             MR. BOOTH:  Yes, your Honor.  Thank you.

18   REDIRECT EXAMINATION

19   BY MR. BOOTH:

20   Q.  Good afternoon, Mr. Ponce.

21   A.  Good afternoon.

22   Q.  In terms of this last email that you were shown,

23   Plaintiff's Exhibit 6526, in discussing this situation with

24   Mr. Donziger, did you discuss the state of the Ecuadorian

25   judicial system in the years 1999, 2000, 2001?

DBDLCHE5                    Ponce - redirect

1   A.  No.

2   Q.  Do you recall your opinion regarding the state of the

3   Ecuadorian judicial system during those years, 1999, 2000,

4   2001?

5   A.  I recall the situation of the judiciary at that time.

6   Q.  And would you explain that to the Court, please.

7           MR. BRODSKY:  Objection, relevance.

8           THE COURT:  What's the relevance?

9           MR. BOOTH:  It's relevant.  They just raised the issue

10  about the condition the judiciary over the period of time with

11  this witness and put in an exhibit discussing this issue.

12          THE COURT:  Discussing the issue of the independence

13  and so forth of the judiciary during the period in which the

14  case was pending, which was 2003 until now.  You're now going

15  back before that.

16          MR. BOOTH:  Yes, your Honor.  And I can explain if you

17  want in front of the witness or I can talk to you about it at

18  the side bar.

19          THE COURT:  I have no doubt that he's fully aware of

20  what you're about to say.

21          MR. BOOTH:  Well, I do doubt it, but, I have complete

22  doubt, in fact.

23          But what I would say is that it's our position that

24  when affidavits were made by Chevron in that period of time,

25  2000, 2001, 1999, the condition of the judiciary was the same

DBDLCHE5                    Ponce - redirect

1   as it was during the pendency of the litigation.  And the Court

2   recalls, I've moved those affidavits into evidence.  We still

3   have to consider them, the Court still has to consider those,

4   but.

5           THE COURT:  The witness wrote on September 13, 2007, I

6   have said that the administration of justice is worse now than

7   it was ten years ago.

8           MR. BOOTH:  Yes, your Honor.  And I'm not asking about

9   ten years before that date.  I'm asking him specific time

10  period when the Chevron affidavits were being done and the case

11  was being dismissed here.

12          THE COURT:  And that's relevant why?

13          MR. BOOTH:  Because that's our position on this is

14  that --

15          THE COURT:  Sir, we're going to go back to Willie,

16  Mickey, and the Duke.

17          It may be your position, but that doesn't make it

18  relevant.

19          MR. BOOTH:  Sorry, Judge.

20          I believe it is relevant because Texaco, which is now

21  Chevron, has taken a position in writing, their experts, that

22  they put before a court in this district, about the condition

23  of the Ecuadorian judiciary system.

24          They now are taking a position about the impartiality

25  of the Ecuadorian judicial system after that time.  It is

DBDLCHE5                         Ponce - redirect

1    relevant because we have evidence that the judiciary in Ecuador

2    did not change for the better or worse during that period of

3    time and, therefore, what Chevron is saying now about it was

4    true when Chevron filed their affidavits, made their motions,

5    made their judicial admissions back in the period of time '99,

6    2000, 2001.

7              THE COURT:  Assuming that's true, where does it get

8    you?

9              MR. BOOTH:  That their statements are inconsistent

10   now.  Their arguments and statements are inconsistent now with

11   the statements and arguments and judicial admissions they made

12   back during the early period of time.

13             THE COURT:  And where does that get you?

14             MR. BOOTH:  We agreed with the arguments they made

15   back in the 2000, 2001 period of time.

16             THE COURT:  And that's at the point where Mr. Donziger

17   was making clear his view that Ecuador was totally corrupt and

18   the judiciary was not adequate.

19             MR. BOOTH:  Well, I don't consider Mr. Donziger to be

20   an expert on the Ecuadorian judicial system.  So he said a lot

21   of things that I don't know if he knew what he was talking

22   about, your Honor, respectfully.

23             But we agree with the position Chevron took in this

24   case in terms of the Ecuadorian system back in the period of

25   time I mentioned.

DBDLCHE5                    Ponce - redirect

1              THE COURT:  I'm not sure they've taken any position in

2        this case with respect to the period you're talking about.

3              MR. BOOTH:  You're right.  That was my mistake.

4              We agree with the position that was taken by Texaco in

5        the case that was in this district before it was dismissed in

6        the year 2001, we agreed with the affidavits, we agreed with

7        the statements made on behalf of Texaco.

8              THE COURT:  Which is why you argued with them then,

9        right, because you agree with it?  You said they were all wrong

10       then.

11             MR. BOOTH:  Right, but we agree with it now.

12             THE COURT:  You agree with it now.  So you're taking

13       an inconsistent position.

14             MR. BOOTH:  I'm not taking an inconsistent position.

15       This has always been my position.

16             THE COURT:  Oh, come on.  I've been around this case a

17       whole lot longer than you are and the irony of all this, of

18       course, is not lost on me.

19             MR. BOOTH:  I know, your Honor.

20             THE COURT:  Chevron in the period from 1993 to 2001

21       argued that the first Aguinda case should go to Ecuador and

22       that the Ecuadorian system was adequate to the purpose.  And

23       your client and his clients argued that that was nonsense, that

24       the Ecuadorian judiciary was not up to the task, and it was not

25       an adequate forum.

DBDLCHE5                    Ponce - redirect

And now, lo and behold, here we are, in which you're taking absolutely opposite positions, opposite except for one important fact:  We're talking about two entirely different time periods.

Moreover, we're talking about two entirely different legal issues.  Legal issue in the forum non conveniens case was that the adequacy of the system in Ecuador for forum non conveniens purposes, and the potential relevance of this issue in this case, depending on where this all winds up, is not the forum non conveniens standard, but the question of whether Ecuador affords due process and suitably independent and so forth courts on a systemic basis for purposes of recognition of a foreign judgment, and they are different issues.

MR. BOOTH:  And, your Honor, that's where I do not agree with you.  I do not believe this Court is considering for the purpose of enforcement of judgment whether those courts are adequate.  This Court has heard testimony --

THE COURT:  Well, we'll see.  That depends on contingencies yet to be seen.

MR. BOOTH:  What I would say is this Court has heard testimony from at least one witness who said, if I remember her testimony, there was no honest judge in the country.  And my position is and the relevance --

THE COURT:  I must have been out that day.

MR. BOOTH:  That's what I heard her say, your Honor.

DBDLCHE5                    Ponce - redirect

1    From the relevant standpoint --

2              THE COURT:  It's not what she said and you know it,

3    Mr. Booth, please.  I have a lot of respect for you, but that's

4    just not right.

5              MR. BOOTH:  Your Honor, that's what I heard her say.

6    So if I'm wrong, I apologize.

7              THE COURT:  I know a good otolaryngologist.

8              MR. BOOTH:  Thank you, Judge.

9              The relevance is this.  Even if that's not what she

10   said, there's been an attack on the Ecuadorian system

11   suggesting it was not -- it was so systemically flawed that it

12   could not do its job in this case.

13             Our position is and the relevance to us is that has

14   not changed.  Whatever the condition is has not changed, and

15   the position taken by Texaco in the beginning contradicts that.

16   And that's the reason I believe this is relevant to this

17   witness.

18             THE COURT:  Oh, look, you know, I'll hear it.  But you

19   might as well get out your lance and head for the windmill.

20             MR. BOOTH:  Yes, your Honor.

21   Q.  Mr. Ponce, in terms of the Ecuadorian judicial system, the

22   impartiality, the independence, comparing the years 1999, 2000,

23   and 2001 with the period of time you discussed in this email,

24   can you tell the Court whether in your opinion the Ecuadorian

25   system has gotten better, gotten worse, how you would describe

DBDLCHE5                    Ponce - redirect

1    it?

2    A.  I must say that between 1997 and 2004, the Ecuadorian

3    judiciary became stronger and more independent under the lead

4    of a Supreme Court that was formed with very important

5    attorneys and knowledgeable people.

6          Between 2004 and 2009, there was a complete

7    destruction of the Supreme Court of Justice due to the

8    intervention of the executive and the Congress that dismissed

9    this strong court in 2004.  Very recently, the Ecuadorian Court

10   of Justice had decided that such dismissal was illegal.

11         After 2009, the judiciary of Ecuador has become again

12   stronger.  The judges are better.  And certainly in cases

13   between, at least in cases between civil parties, the courts

14   are ruling in general adequate.

15   Q.  During the time you worked on the Lago Agrio Chevron case,

16   did you always have the same level of involvement as an

17   attorney?

18   A.  No.

19   Q.  Did that change at all over time?

20   A.  Yes.

21   Q.  And were there some times where you had more involvement in

22   the case and sometimes less?

23   A.  Yes.

24   Q.  You were asked about the judicial inspections and your

25   involvement in efforts to end or terminate the judicial

DBDLCHE5                        Ponce - redirect

1     inspections.

2              Do you recall those questions and your answers?

3     A.  Yes, I recall that.

4     Q.  First can you explain what a judicial inspection is?

5     A.  A judicial inspection is an evidence proceeding established

6     in the civil procedure code of Ecuador which allows the judge

7     to review the matter that's subject to discussion between the

8     parties.  In this judicial proceeding, the judge might appoint

9     an expert and might listen to witnesses regarding the matter as

10    being subject of inspection or judicial review.  This kind of

11    proceeding is very common proceeding to take place in civil

12    matters.

13    Q.  And the decision made by the Lago Agrio legal team or --

14    strike that.

15              The decision made by the legal team in the Lago Agrio

16    Chevron case, were you involved in that decision regarding the

17    judicial inspections?

18    A.  Yes, I was.

19    Q.  Explain to the Court why you -- well, did the Lago Agrio

20    Chevron legal team at some point make the decision to request

21    ending the judicial inspections?

22    A.  Yes, the legal team did.

23    Q.  Did you participate in that decision?

24    A.  I suggested that decision.

25    Q.  And can you explain to the Court why you suggested that

DBDLCHE5                      Ponce - redirect

1   decision?

2   A.   I suggested that decision based on two facts.  The first

3   one, it was that the evidence was so overwhelming regarding the

4   existence of contamination that there was no need to continue

5   obtaining the same results over and over.

6           Secondly, it was important for us to stop, terminate

7   at least judicial inspections due to the cost of each judicial

8   inspection had for the case.

9   Q.   And to your knowledge, was -- did anyone do -- anyone on

10  behalf of the Lago Agrio plaintiffs do anything that was in

11  your judgment inappropriate to try to get the judicial

12  inspections stopped?

13          MR. BRODSKY:  Objection.

14          THE COURT:  Sustained.

15  Q.   What if any steps are you aware of that were taken to end

16  the judicial inspections that you just discussed?

17  A.   We requested the judge to accept our withdrawal from the

18  inspections.

19  Q.   And did the judge, did the judge end the inspection process

20  at some point?

21  A.   First he denied our request for withdrawal.  And as I

22  explain, the judge finally accepted when we requested the

23  renounce of such inspections based on Article 11 of the Civil

24  Code of Ecuador.

25  Q.   Now, these judicial inspections, were these judicial

DBDLCHE5                          Ponce - redirect

1    inspections that were terminated, were they Chevron's requested

2    inspections?

3    A.  No.  They were requested by the plaintiffs.

4    Q.  And explain to the Court, would each party have a chance to

5    request a certain number of inspections?

6    A.  Within the evidence term, any of the parties can request

7    any number of judicial proceedings for obtaining evidence in a

8    case, including the judicial inspections.  Consequently, the

9    attorneys for the Lago Agrio case requested a certain number of

10   judicial inspections for the case.

11   Q.  Now, you were asked about using the term "attack" in

12   reference to a judge and I think it was Judge Yanez.

13          Do you remember those questions and your answer?

14   A.  Yes, I remember.

15   Q.  Do you remember using the term attack?

16   A.  Yes, I do.

17   Q.  Can you explain to the Court the context or the

18   circumstances under which you used that term regarding the

19   judge?

20   A.  I used that word in order to suggest taking legal actions

21   against the judge.  It was a legal attack what I was mentioning

22   when I refer and I used the word attack.

23   Q.  And what type of legal action were you suggesting?

24   A.  I was thinking on two different possibilities.  One was

25   filing a complaint before the council of the judiciary.  And

DBDLCHE5                    Ponce - redirect

1    the other one could have been to file damages action against

2    the judge based on the civil procedure code.

3    Q.  And what if anything had the judge done that would explain

4    you wanting to attack the judge in the way you just mentioned?

5    A.  It was an illegal act on the judge side.

6    Q.  Which was what?

7    A.  If I'm not wrong, it was the denial for the suspension of

8    the inspections.

9    Q.  I want to ask you about the HAVOC lab discussion you had

10   during your cross-examination.  You discussed an event I think

11   where you approached a judge in Quito regarding the HAVOC lab

12   issue.

13            Do you remember your testimony about that?

14   A.  Yes, I remember.

15   Q.  Can you tell the judge the circumstances of what was

16   happening in Quito regarding the HAVOC labs prior to the time

17   you went to see the judge?

18   A.  Well, the HAVOC labs were tried to be inspected through a

19   pre-judicial proceeding that has been created by law to provide

20   evidence either to prepare a complaint or answer a complaint,

21   and that proceeding was requested by Chevron in order to use as

22   evidence in the Lago Agrio litigation.

23            We had requested the judge that all plaintiffs in the

24   Lago Agrio litigation should have been previously served with

25   the request filed by Chevron.  And at the time, the judge was

DBDLCHE5                    Ponce - redirect

1    refusing to serve with the request filed by Chevron.

2    Q.  And when you went or when you approached the judge on the

3    videotape in Quito regarding this issue -- well, strike that.

4           When you approached the judge in Quito regarding the

5    HAVOC labs, can you tell the Court what issue you were

6    discussing with the judge at that point?

7    A.  I was discussing with the judge this fact that I just

8    mentioned.

9    Q.  Why were you on behalf of the Lago Agrio Chevron plaintiffs

10   opposing Chevron's request to inspect the HAVOC labs?

11   A.  I was opposing just on behalf of one of the plaintiffs

12   since it was required the service, the due service of process

13   to all the plaintiffs.

14   Q.  Now, you were asked some questions about some emails where

15   the words dangerous I think were used and the word disaster

16   were used.

17          Do you recall those questions and your answers?

18   A.  I recall that.

19   Q.  Why would it have been a disaster for Chevron to be able to

20   inspect the HAVOC labs?

21          MR. BRODSKY:  Objection, form.

22          THE COURT:  Sustained.  It was Mr. Donziger who used

23   that word, and it seems to me this witness is not in a position

24   to answer.

25          MR. BRODSKY:  I'll ask a better question.

DBDLCHE5                         Ponce - redirect

1  Q.  Did you believe at this time that it would have been a

2  disaster for Chevron to inspect the HAVOC labs?

3          MR. BRODSKY:  Objection, relevance.

4          THE COURT:  Sustained.

5  Q.  Did Mr. Donziger tell you why he thought it would be a

6  disaster for Chevron to inspect the havoc labs?

7  A.  Yes.

8  Q.  And what did he tell you?

9  A.  He told me that HAVOC labs were very uncomfortable with

10  having the inspection and it would have affected a lot the

11  case, considering that it was the only lab in Quito that was

12  willing to conduct the analysis of the samples taken during the

13  judicial inspections.

14  Q.  So when counsel for the plaintiff asked you on

15  cross-examination if the reason that it was dangerous was

16  because HAVOC lab was not -- strike that.

17          What impact if any did Mr. Donziger tell you it would

18  have if the HAVOC labs was uncomfortable with being inspected?

19  A.  The risk was that there would -- there wouldn't be any

20  other lab in which the samples could be analyzed in Ecuador for

21  the judicial inspections.

22          (Continued on next page)

23

24

25

DBD8CHE6                          Ponce - redirect

 1  Q.  To your knowledge, were there any other labs in Ecuador

 2  that weren't working for Chevron that could have inspected your

 3  samples?

 4              MR. BRODSKY:  Objection.

 5              THE COURT:  Sustained as to form.

 6  Q.  To your personal knowledge, were there any other labs that

 7  the Lago Agrio plaintiffs' legal team could have used during

 8  this time to look at the samples?

 9              MR. BRODSKY:  Objection.

10              THE COURT:  Sustained.

11              I don't think you have qualified the witness as a

12  person knowledgeable about the identity, capability and clients

13  of every laboratory in the Republic of Ecuador.

14              MR. BOOTH:  Yes, your Honor.  Thank you.

15              May I have just one moment, your Honor?

16              THE COURT:  Yes.

17              MR. BOOTH:  Thank you, Mr. Ponce.

18              No more questions your Honor.

19              THE COURT:  Thank you.

20              Just give me a moment.  I want to bring something to

21  your attention.

22              You referred to Ms. Elena's testimony before.  You

23  said to me, I think, that your recollection is that she said

24  there are no honest judges in Ecuador.  Do I misremember, Mr.

25  Booth?

DBD8CHE6                          Ponce - redirect

1            MR. BOOTH:  No, your Honor.  And they are telling me I

2    got it wrong.

3            THE COURT:  Right.  Starting at page 1582:

4    "Q.  Based on the data that you reviewed, is it your opinion

5    that all judges in Ecuador are corrupt?

6    "A.  No."

7            And she then went on and explained that she was giving

8    a systemic opinion.  The premise of your position was

9    incorrect.

10           MR. BOOTH:  Then I apologize.

11           THE COURT:  Thank you.

12           Mr. Gomez.

13           MR. GOMEZ:  No questions, your Honor.

14           THE COURT:  Thank you.

15           Mr. Brodsky.

16           MR. BRODSKY:  No further questions.

17           THE COURT:  You are excused, sir.  Thank you.

18           THE WITNESS:  Thank you.

19           (Witness excused)

20           THE COURT:  I take it no more witness today, is that

21    right?

22           MR. FRIEDMAN:  That is correct.

23           THE COURT:  Now, let's come back to the subject I

24    raised with you earlier, Mr. Donziger's testimony.

25           What are your views?

DBD8CHE6

1          MR. MASTRO:  Your Honor, I have heard what your Honor

2     said this afternoon, and I have a number of points I would like

3     to make in response.

4          THE COURT:  Then make them.

5          MR. MASTRO:  Because we think that it is imperative

6     for this record that Mr. Donziger provide his written

7     declaration.  He has now written the Court in the middle of the

8     night to say that he thinks he will be able to submit it this

9     evening.  But it's imperative for the following reason, your

10    Honor.

11         He should make a full proffer as to what his direct

12    is.  He has been violating and flouting this Court's rules.  He

13    hasn't met deadlines.  Your Honor has extended him repeated

14    courtesies throughout this process, and it is imperative that

15    this full and complete record, which has been developed at this

16    trial, include his proffer of what his full direct would be,

17    both for our cross-examination purposes and so there can be no

18    question later as to what his full direct would be.

19         If we proceed, your Honor, and I hope that we will

20    not, but if we proceed, your Honor, that he proceeds by direct

21    examination, I don't think that that will save the Court time,

22    and I don't think it will make the same full and complete

23    record so that Mr. Donziger can never say later on appeal that

24    his full direct was not a part of this record.

25         We will have repeatedly, and we have seen this

DBD8CHE6

1   throughout this trial, Mr. Donziger making submissions and

2   statements, not defending on the merits, but for other

3   audiences.  We will see repeated times when we have to go to

4   the side bar.  Objections as they arise, going to the side bar.

5   Objections as they arise, going to the side bar.  Having his

6   full direct in writing establishes what his proffered testimony

7   would be and allows the Court and all parties to properly

8   define the scope of what is relevant evidence.  It will

9   expedite the proceedings.  It will expedite the

10  cross-examination.

11         Now, your Honor, what I am finding particularly

12  troubling about all of this is Mr. Donziger hasn't followed the

13  rules, like every other party witness in this case and

14  virtually every witness in this case, of doing a written

15  direct.  And he now says he is prepared to do that imminently,

16  late but imminently.  There is nothing unfair about that

17  process.  It has served these proceedings well to define the

18  scope of testimony, allows certain rulings to be made, and

19  cross-examination to proceed in an orderly fashion based on the

20  scope of relevant direct testimony.

21         He has wanted throughout this trial to have the

22  soapbox of taking the witness stand.  For whatever reasons, he

23  has not wanted to do the written statement.  Perhaps that's why

24  he has dragged his feet.  It is almost as if allowing him to go

25  on the stand to do his direct testimony entirely on the stand

DBD8CHE6

1    is to permit him the very thing he has tried to engineer

2    throughout this trial.

3           Now, your Honor was going to extend him the further

4    courtesy of a supplemental direct.  I submit to your Honor

5    that, as every other party witness and virtually every witness

6    in this case has done their directs by written declaration,

7    that that is the proper, standard and fair procedure for Mr.

8    Donziger, and he is no longer in any way, shape or form, based

9    on the way he has conducted himself, entitled to the further

10   courtesy of even a supplemental direct examination on the

11   stand.

12          I submit to your Honor that there will be ample

13   opportunity, when I cross-examine Mr. Donziger, and I will, and

14   I look forward to it, and ample opportunity when there is

15   redirect after that cross-examination, for your Honor to

16   evaluate his demeanor and his credibility.  But to proceed with

17   Mr. Donziger doing his direct testimony on the witness stand is

18   to give him exactly what he has sought from the beginning, and

19   perhaps why he has dragged his feet on the written declaration.

20   It denies us that written declaration to be able to

21   cross-examine him on it.  And, your Honor, it would mean there

22   will always be questions that Mr. Donziger will raise, as

23   individual objections are made, about lines of inquiry on his

24   direct examination as to whether he had a full and fair

25   opportunity.  This is not about Mr. Donziger wanting to create

DBD8CHE6

1    a full and fair record.  Otherwise he would give us his full

2    direct written declaration.  That's why he should be required

3    to do it, so there can be no question later about what his full

4    proffer was on his direct examination.

5            I submit to you, your Honor, that Mr. Donziger has

6    engaged in the course of action that he has to do the very

7    thing that your Honor suggested you might require of him, which

8    is that he do his entire testimony on direct, and that is

9    something that I think is not going to create the full and

10   complete record throughout this case.

11           THE COURT:  We are going through your argument for the

12   second time.

13           MR. MASTRO:  I understand, your Honor.  I am simply

14   suggesting that I think the right and proper course here to

15   ensure that his direct testimony has been proffered is a

16   written declaration that he is required to produce tonight or

17   tomorrow.

18           THE COURT:  I have your point.

19           Mr. Friedman.

20           MR. FRIEDMAN:  Your Honor, I don't think the Court

21   wants me to respond to the comments of Mr. Mastro.  I will set

22   those aside and just address where we are right now.

23           I am in agreement with what Mr. Mastro said about the

24   efficacy of having a written statement from Mr. Donziger.

25           THE COURT:  What about you, Mr. Gomez?

DBD8CHE6

1         MR. GOMEZ:  I think that the Court has the power to

2    control Mr. Donziger's testimony once he is on the stand, and I

3    don't know what the status is of his direct testimony

4    preparation.  My view is that these proceedings would be better

5    served, as has always been the view of my clients, by direct

6    testimony by witnesses.  We believe that it creates a more

7    orderly record in terms of the parties being aware of what is

8    actually in the record because rulings are not delayed.  When

9    direct testimony comes in, we know exactly what is in the

10   record, because the objections are made contemporaneously, the

11   rulings occur at the same time, and then when cross-examination

12   occurs, it's limited by whatever those rulings were on direct.

13        My clients have always taken the position that that's

14   the way the proceedings should have been conducted.  Obviously,

15   the Court disagrees, and we have complied with the Court's

16   procedures, but it's our view and it's always been our view

17   that all witnesses should have testified on direct in this

18   case, and that Mr. Donziger and anyone else should be allowed

19   to do so.

20        MR. FRIEDMAN:  Your Honor, I didn't quite finish with

21   what I wanted to say.  I agree that it's going to be more

22   efficient and more efficacious for everybody involved if a

23   written statement gets filed.  I also believe that where I

24   depart with Mr. Mastro is I think it would be better to have

25   that supplemented by direct exam, for the reasons the Court

DBD8CHE6

said originally, which is the Court has to make credibility

decisions, and it's a very different thing to make a

credibility decision based on leading questions and yes and no

answers.

I can tell the Court we are not expecting a long

extended direct examination.  If a written statement goes in, I

am thinking an hour to an hour and a half of direct exam of Mr.

Donziger.

THE COURT:  What possible justification is there for

that given that he has been writing this direct theoretically

for five weeks now?

MR. FRIEDMAN:  The justification would be similar to

what the Court cited for Mr. Guerra and for I think -- it

wouldn't be Mr. Zambrano because he didn't do one, but for

Mr. Guerra, who testified, as the Court will recall, for quite

a long time on direct, over many of the materials that he had

covered in his written statement.  As I understood the Court,

the reason for that was you wanted to hear his story, the key

parts of the story, beginning to end, in his own words.  And I

would just ask that Mr. Donziger be given that opportunity as

well.

THE COURT:  Well, I guess all the bases are covered.

Everybody wants a little something different.

We are going to do it with the written direct.  It is

not going to be supplemented with a further direct orally,

DBD8CHE6

unless something happens between the service of the written

direct and the start of the direct examination, in which case I

will hear an application, limited only to events subsequent to

the service.

I have a feeling that I am going to hear a great deal

from Mr. Donziger through cross and redirect, and I would just

note that Mr. Gomez's assumption that if the direct proceeded

only orally, he would in all cases get rulings on all

objections and scope is actually incorrect, at least not

necessarily correct, because I have repeatedly taken testimony

orally subject to motions to strike, I have taken exhibits

subject to motions to strike, reserved decisions on various

evidentiary issues, I think in particular the issues that arose

with respect to the bank deposit slips during the testimony of

Mr. Guerra, and it's not the only example. So while it is true

that a lot of rulings can be made in real time if it's done

orally, that's by no means true of all of them in a bench

trial. That's just a side point.

So we will proceed as I have indicated. He goes on

the stand at 9:30 on Monday, if not earlier, but I won't force

him to go forward before that. If he wants to go forward

tomorrow, you should let everybody know.

MR. FRIEDMAN: I think I can say --

THE COURT: It's not going to happen, right, Mr.

Friedman?

DBD8CHE6

1          MR. FRIEDMAN:  Yes.

2          THE COURT:  Clarity is always useful.

3          Anything else this evening?

4          MR. MASTRO:  There is still the question of the other

5     witnesses on their witness list.  That's Mr. Gomez's two

6     clients, Humberto Piaguaje, and Ms. Calva, whom the Donziger

7     defendants have acknowledged they are withdrawing calling her,

8     but Mr. Gomez still says he wants to call her.

9          THE COURT:  We have your witness Lipton tomorrow,

10    right?

11         MR. MASTRO:  Correct, your Honor.

12         THE COURT:  So other than Mr. Donziger, Mr. Friedman,

13    you're done, is that correct?

14         MR. FRIEDMAN:  That is correct, your Honor.

15         THE COURT:  Mr. Gomez.

16         MR. GOMEZ:  Your Honor, Javier Piaguaje is on a plane

17    right now.  He arrives tonight.  My plan was to prep him

18    tomorrow and to put him on the stand on Friday.

19         Hugo and Humberto Piaguaje are supposed to be on

20    planes tonight and should arrive tomorrow night.  I would like

21    to put Hugo and Humberto on the stand --

22         THE COURT:  Who is Hugo?

23         MR. GOMEZ:  Hugo Camacho, the defendant.

24         I would like to put Hugo and Humberto on the stand on

25    Monday morning.  I do not think they will take more than the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBD8CHE6

1   morning.

2          There is a question about deposing Humberto Piaguaje.

3   My understanding is that his name was not disclosed in the Rule

4   26 disclosures, that was Chevron's position, but my

5   understanding is that it was, and that therefore Chevron is not

6   entitled to depose Humberto Piaguaje.

7          THE COURT:  This is not a matter of theology.  This is

8   a matter of where is the piece of paper.

9          MR. GOMEZ:  Yes, your Honor.  I have not had an

10  opportunity, unfortunately, to have that piece of paper.  I can

11  bring it in tomorrow and we can settle it.

12         The point being I can put Javier on the stand on

13  Friday, and I can put Hugo and Humberto on the stand Monday

14  morning, and then Mr. Donziger can take the stand, and then we

15  would be done.

16         THE COURT:  You're not calling Ms. Calva?

17         MR. GOMEZ:  Here is Ms. Calva's situation.  She

18  refuses to travel to the United States without the company of a

19  family member.  She, I am told, was going to get a passport for

20  her older sister and then seek to obtain a visa from the

21  embassy.  I do not know the status of getting a visa from the

22  embassy.

23         THE COURT:  This is a visa for the sister?

24         MR. GOMEZ:  Yes, that's correct.  The mother's visa

25  was denied last Thursday.  Ms. Calva has her own visa, but she

DBD8CHE6

1    does not wish to travel to the United States unaccompanied by a

2    family member.

3              THE COURT:  These things happen.

4              MR. GOMEZ:  I am still trying to get her here.  I am

5    trying to get her here as soon as possible.  I would like at

6    least have an opportunity to bring her here by the time Mr.

7    Donziger is done testifying.

8              MR. MASTRO:  Your Honor, it sounds like for the Calvas

9    it is a family affair.  But this has been an issue on the

10   table.  She is supposed to be deposed before she goes on the

11   stand.  I think there should be a firm deadline one way or the

12   other and the Donziger defendants were frank enough to

13   acknowledge and they are withdrawing her.  So I think Mr. Gomez

14   should have to fish or cut bait by a date certain as to Ms.

15   Calva.  This has been the status for now over a week about her

16   family visa and everything else.

17             THE COURT:  What is the status of the sister's visa

18   application?

19             MR. GOMEZ:  My understanding is the papers are being

20   submitted today after her sister obtained a passport, but I

21   have had no communication with anybody because I have been in

22   court all day.

23             THE COURT:  And if they have been submitted today?

24             MR. GOMEZ:  There was going to be an effort to try to

25   get into the embassy today for her interview.  I don't know if

DBD8CHE6

1   that was possible or not.  If not, to get the appointment as

2   soon as possible.

3          THE COURT:  What are we talking about in terms of when

4   there might be an answer?

5          MR. GOMEZ:  She may have a visa before the end of the

6   week.

7          THE COURT:  And she may have a visa for Easter, right,

8   or maybe not at all?

9          MR. GOMEZ:  That's correct, your Honor.  I just don't

10  know.

11         If I may, it's not a decision we have to make now.  We

12  have witnesses for Friday, witnesses for Monday.  I suspect Mr.

13  Donziger is going to be on the stand for at least two days.  It

14  gives us time to see where we are.  If the sister doesn't get a

15  visa, that may be it.  And we may know that by the end of the

16  week, and I may not be able to call her, and that settles it.

17  I don't think it's a decision that we have to necessarily set a

18  deadline or do anything about.

19         THE COURT:  If she comes, she is going to be deposed.

20  You're going to want time off from the trial to do the

21  deposition, right?

22         MR. GOMEZ:  Perhaps.

23         THE COURT:  We will revisit this on Friday.

24         MR. GOMEZ:  Thank you.

25         THE COURT:  Apart from the possibility of Calva,

DBD8CHE6

1    you're done with Camacho, Donziger, Piaguaje and Humberto

2    Piaguaje.

3              MR. GOMEZ:  Yes, your Honor.

4              THE COURT:  Definitively.

5              MR. GOMEZ:  Yes, your Honor.

6              THE COURT:  All right.  What can I expect in terms of

7    duration of a rebuttal case?

8              MR. MASTRO:  Your Honor, it will be brief.  It will be

9    less than a day, and it will depend in part on what we would

10   need to present or plan to present as to whether Ms. Calva

11   comes or not.  But we are planning a rebuttal case and right

12   now it will involve at least one, probably two witnesses, and

13   they certainly will be less than a day.

14             THE COURT:  OK.  I will see you tomorrow.

15             MR. MASTRO:  Very quickly.  In terms of witness

16   statements, I gather Mr. Gomez is saying that for the Friday

17   examination we will have the witness statement tonight?

18             MR. GOMEZ:  That's my plan.

19             MR. MASTRO:  By when?

20             MR. GOMEZ:  The problem is I just haven't had

21   sufficient opportunity to talk with these gentlemen because of

22   the distance, because of their location, and because of

23   preparing and being at the trial.  Javier arrives tonight.  I

24   will review his statement with him tonight and we can serve

25   that tonight.  Hugo and Humberto arrive tomorrow.  I would like

DBD8CHE6

```
 1   an opportunity to be able to go over those statements with

 2   them.  I can get them to you the next day, Friday, if that's

 3   adequate.

 4            MR. MASTRO:  That will be fine, your Honor.

 5            MR. GOMEZ:  Thank you.

 6            THE COURT:  Look, those of you working with witness

 7   statements, do everybody a favor and do not do with them what

 8   was done with Chevron's witness statements at the beginning of

 9   the trial, what was done with Ms. Hinton's witness statement,

10   and to some significant degree with Mr. Ponce's witness

11   statement.  This is not a summation.  It is not a trial brief.

12   It is a statement of fact of which the witnesses have personal

13   knowledge or some other proper foundation, devoid of argument,

14   devoid of point scoring, and all of that stuff.  We have wasted

15   far too much time with that stuff, and there is a lot more of

16   it on my desk once we complete this, and it is not helpful to

17   anybody.

18            MR. MASTRO:  Understood, your Honor.

19            In terms of our rebuttal case, the one or two

20   witnesses we would intend to call, obviously in that regard, we

21   would propose to put that one or two witnesses on the stand and

22   do their direct, but if your Honor wants statements in

23   advance --

24            THE COURT:  I don't.

25            MR. MASTRO:  Thank you, your Honor.  I just want to
```

DBD8CHE6

1      confirm.

2             MR. FRIEDMAN:  The only other thing, it occurred to me

3      you may already know this, but it seems incumbent upon us to

4      tell you if you don't know it, about the Ecuador supreme court

5      ruling.

6             THE COURT:  I know about it.

7             MR. FRIEDMAN:  I figured you probably did.

8             MR. MASTRO:  We are getting a translation.

9             Thank you, your Honor.

10            THE COURT:  Thank you.

11            (Adjourned to November 14, 2013, at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION
2    Examination of:                              Page
3    KAREN HINTON
4    Direct By Ms. Littlepage . . . . . . . . . .2149
5    Cross By Mr. Blume . . . . . . . . . . . . .2150
6    Redirect By Ms. Littlepage . . . . . . . . .2194
7    ALEJANDRO PONCE VILLACIS
8    Direct By Mr. Booth  . . . . . . . . . . . .2220
9    Cross By Mr. Brodsky . . . . . . . . . . . .2221
10   Redirect By Mr. Booth  . . . . . . . . . . .2309
11                        PLAINTIFF EXHIBITS
12   Exhibit No.                              Received
13     6878  . . . . . . . . . . . . . . . 2165
14     6810  . . . . . . . . . . . . . . . 2168
15     6887  . . . . . . . . . . . . . . . 2175
16     6862  . . . . . . . . . . . . . . . 2185
17     6833  . . . . . . . . . . . . . . . 2187
18     6835  . . . . . . . . . . . . . . . 2187
19     6889  . . . . . . . . . . . . . . . 2193
20     6503  . . . . . . . . . . . . . . . 2234
21     6506  . . . . . . . . . . . . . . . 2245
22     6505  . . . . . . . . . . . . . . . 2271
23     6513  . . . . . . . . . . . . . . . 2284
24     3339  . . . . . . . . . . . . . . . 2290
25     2240  . . . . . . . . . . . . . . . 2306
```

```
1   6526      . . . . . . . . . . . . . . . 2308

2                        DEFENDANT EXHIBITS

3   Exhibit No.                              Received

4   1500      . . . . . . . . . . . . . . 2150

5   1601      . . . . . . . . . . . . . . 2221

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```