DBI8CHE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5           v.                          11 Cv. 0691 (LAK)

6   STEVEN R. DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x
                                        November 18, 2013
9                                       9:35 a.m.

10  Before:

11                      HON. LEWIS A. KAPLAN
                                        District Judge
12
                            APPEARANCES
13
    GIBSON, DUNN & CRUTCHER LLP
14       Attorneys for Plaintiff
    BY:  RANDY M. MASTRO
15       ANDREA E. NEUMAN
         REED M. BRODSKY
16       JEFFERSON E. BELL
         ANNE CHAMPION
17
    FRIEDMAN RUBIN
18       Attorneys for Donziger Defendants
    BY:  RICHARD H. FRIEDMAN
19       DEE TAYLOR

20  LITTLEPAGE BOOTH
         Attorneys for Donziger Defendants
21  BY:  ZOE LITTLEPAGE
         RAINEY BOOTH
22
    GOMEZ LLC
23       Attorneys for Defendants Hugo Camacho, Javier Piaguaje
    BY:  JULIO C. GOMEZ
24

25

DBI8CHE1

1              (Trial resumed)

2              THE COURT:  Good morning.

3              What is next?  Do you have a witness?

4              MR. GOMEZ:  Yes.  Good morning, your Honor.

5              THE COURT:  Good morning.

6              MR. GOMEZ:  Defendants call defendant Javier Piaguaje

7     Payaguaje.

8      JAVIER PIAGUAJE PAYAGUAJE,

9          called as a witness by the defendants,

10          having been duly sworn, through Spanish

11          interpreter, testified as follows:

12              THE DEPUTY CLERK:  State your name for the record.

13              THE WITNESS:  Javier Piaguaje.

14    DIRECT EXAMINATION

15    BY MR. GOMEZ:

16    Q.  Good morning, Mr. Piaguaje.

17    A.  Good morning.

18              MR. GOMEZ:  Your Honor, may I approach?

19              THE COURT:  Yes.

20              MR. GOMEZ:  Your Honor, I have handed the witness

21    Defendants' Exhibit 1800 and a copy of the exhibits that are

22    referenced therein.

23              THE COURT:  Let's separate them.  Defendants' Exhibit

24    1800 will be the statement.

25              MR. GOMEZ:  Yes, your Honor.

DBI8CHE1                         Piaguaje – direct

1    Q.  Mr. Piaguaje, would you please take a look at Defendants'

2    Exhibit 1800 that is before you, sir?  The first eight pages

3    are in Spanish, followed by an English translation and a

4    certificate of translation.

5           Sir, do you recognize this document?

6    A.  Yes.

7    Q.  What is this document, sir?

8    A.  This document is my testimony.

9    Q.  Sir, would you please turn to page 8 of the document?

10          Do you see a signature there, sir?

11   A.  Yes.

12   Q.  Is that your signature?

13   A.  Yes, sir.

14   Q.  Did you review this document before you signed it, sir?

15   A.  Yes.

16   Q.  When you reviewed it and signed it, were all of the

17   statements therein true and accurate to the best of your

18   knowledge?

19   A.  Yes, sir.

20   Q.  And as of now, do all of those statements remain true and

21   accurate?

22   A.  Yes.

23          MR. GOMEZ:  Your Honor, at this time, I would like to

24   move in Defendants' Exhibit 1800.

25          Paragraph 13 references five exhibits:  Defendants'

DBI8CHE1                          Piaguaje - direct

1  Exhibit 227, 229, 231, 234 and 236.  I would ask that all of

2  those also be moved in at this time.

3              THE COURT:  Well, 1800 is received on the same basis

4  as other statements, that is, subject to objections that will

5  be, I take it, filed if they haven't been already.

6              Right, Mr. Brodsky?

7              MR. BRODSKY:  I believe they have been filed by us,

8  but if they haven't yet yesterday, they will be this morning,

9  unless your Honor wants to hear from us on the objections

10 specifically on that basis.

11             (Plaintiff's Exhibit 1800 received in evidence)

12             THE COURT:  Not now.  The exhibits that were handed

13 up, what about that Mr. Brodsky?

14             MR. BRODSKY:  These are a select portion of the

15 asamblea minutes that the defendants produced in selective

16 fashion weeks ago, prior to the start of the trial, having

17 denied Chevron's repeated requests and subpoenas for the

18 production of documents falling squarely, these falling

19 squarely within those subpoenas.  Your Honor has that motion

20 before you with respect to redactions that have been made in

21 some of the asamblea minutes.  So our objections are as follows

22 in sum.

23             First, it appears that they are using these asamblea

24 minutes as a sword and a shield.  They are shielding what they

25 don't want to be disclose, and they are selectively producing

DBI8CHE1                      Piaguaje - direct

1   the minutes that they believe help their case.  And your Honor

2   has a sanctions opinion that lays out a lot of the arguments

3   that they make which are frivolous.

4          Second, many of the items in here are hearsay within

5   hearsay, statements made by certain people about actions that

6   are being taken or taken.  So there may be some problems with

7   respect to them on that basis as well.

8          Finally, your Honor, we have our motion before you

9   seeking to view some of the minutes that have been redacted.

10  Some of them may complete these minutes.  It's hard to tell

11  from just receiving a subset.

12          THE COURT:  You want to be heard, Mr. Gomez?

13          MR. GOMEZ:  Yes, your Honor.

14          To begin with, none of the minutes that are attached

15  to Mr. Piaguaje's statement contain redacted materials.

16          In addition, as we have stated before, defendants, Mr.

17  Piaguaje and Mr. Camacho, do not control the asamblea.  They

18  don't have control over these documents.  We have requested all

19  of the minutes of the asamblea to be produced here.  We have

20  not provided anyone with instructions to select which minutes

21  to be provided to us or not.  And we have produced all of the

22  minutes we have received, including those that contain

23  privileged material, which currently has been filed with the

24  Court for in camera review on the privilege redactions.

25          In terms of hearsay, I would say that these documents

1   are not being submitted for the truth of the statements that

2   they contain by various persons.  They are being submitted for

3   the sole purpose of demonstrating that certain matters were

4   discussed at the meetings that Mr. Piaguaje was in attendance

5   in and certain decisions were taken.

6          Now, whether action in conformance with those

7   decisions was actually undertaken is a different question.  Mr.

8   Piaguaje was present during the meetings, the five minutes that

9   are attached to his statement.  He participated in those

10  discussions.  And he voted on the decisions that took place at

11  those meetings.  That's the limited purpose for their use, and

12  we would ask that they be admitted in evidence.

13         THE COURT:  I am not going to rule now.  I would note

14  at least this.  That to the extent they are offered for the

15  purpose of demonstrating that certain matters were discussed at

16  the meetings, they are offered for the truth of the statements

17  contained therein, and they are therefore hearsay, but I will

18  consider that further in the fullness of time.  Decision is

19  reserved on the exhibits.

20         I note, I think, please correct me if I am wrong, that

21  the January 15 minutes are not among those you're offering.

22         MR. GOMEZ:  That is correct.  Not with this witness.

23         THE COURT:  All right.  Let's proceed.

24         MR. GOMEZ:  Mr. Brodsky, I assume I don't need to

25  establish through each one that he was present for these five,

DBI8CHE1                         Piaguaje - direct

1    and I can hand over the witness.

2              THE COURT:  I'm sorry?

3              MR. GOMEZ:  I don't think there is a dispute that Mr.

4    Piaguaje was present during the five meetings that are

5    referenced in the statement.  I can either do a small direct

6    and confirm that or he can stipulate that particular point and

7    I can hand over the witness.

8              THE COURT:  Mr. Brodsky.

9              MR. BRODSKY:  We have never received these minutes

10   until recently before trial.  There was a deposition of Mr.

11   Piaguaje made this year.  He was never questioned about any

12   minutes because we didn't have any.  I have no idea whether or

13   not Mr. Piaguaje was present simply because the document says

14   it's so.  So I think if Mr. Gomez wants to establish that Mr.

15   Piaguaje was present, he should do so.

16             THE COURT:  Go ahead, Mr. Gomez.

17   BY MR. GOMEZ:

18   Q.  Mr. Piaguaje, you have before you Defendants' Exhibit 227.

19   Would you please locate that exhibit?

20             MR. GOMEZ:  Your Honor, may I approach so I can help

21   the witness separate everything out?

22             THE COURT:  Yes.

23   A.  Which one?

24   Q.  227.

25             Mr. Piaguaje, I would like to direct your attention to

1    Defendants' Exhibit marked DX 0227.  Do you have that in front

2    of you?  The number appears in the lower right-hand corner.

3    The Spanish version of that appears on page 6 of 9.  Do you

4    have that before you, sir?

5    A.  Yes.

6    Q.  Sir, would you please take a moment to look at that

7    document and tell me if you recognize it?

8           Mr. Piaguaje, do you recognize the document, sir?

9    A.  Yes.

10   Q.  What is this document, sir?

11   A.  This document is the minutes of the assembly in which we

12   reached a resolution.

13   Q.  At the top paragraph of this document, there is a reference

14   to March 10, 2012.  Were you present at this meeting on March

15   10, 2012, sir?

16   A.  Yes.

17   Q.  Why were you there?

18   A.  I was here because I am the president of the nationality so

19   I had to represent them here.

20   Q.  Sir, does this document accurately reflect the statements

21   that were made and the decisions that were taken at this

22   meeting?

23   A.  Yes.

24           MR. GOMEZ:  I would move in Exhibit 227.

25           THE COURT:  The decision is reserved.

DBI8CHE1                           Piaguaje – direct

1  Q.  Mr. Piaguaje, I would like to direct your attention to

2  exhibit marked 0229 that is before you.  The Spanish language

3  of this exhibit appears on the last page.

4        Sir, I would ask you to look at this document and tell

5  me if you recognize it?

6        Mr. Piaguaje, do you recognize this document,

7  Defendants' Exhibit 229?

8  A.  Yes.

9  Q.  What is this document, sir?

10  A.  This is also minutes in which we make decisions in the

11  meeting.

12  Q.  This document makes reference to the date April 15, 2011.

13  Were you present for this meeting, sir?

14  A.  Yes.

15  Q.  Does this document accurately reflect the discussions and

16  the decisions made during that meeting?

17  A.  Yes, sir.

18        MR. GOMEZ:  I would ask to move in Defendants' Exhibit

19  229.

20        THE COURT:  Decision is reserved.

21  Q.  Mr. Piaguaje, I would now like to direct your attention to

22  Defendants' Exhibit 231.  The Spanish language of this exhibit

23  appears on page 5 of 7.

24        Would you please take a moment to look at that

25  document and tell me if you can recognize it?

1          Do you recognize Defendants' Exhibit 231, sir?

2    A.  I'm still reading it.

3    Q.  Do you recognize Defendants' Exhibit 231, sir?

4    A.  Yes.

5    Q.  What is it?

6    A.  It is also the minutes from the assembly.

7    Q.  This document makes reference to the dates of February 17

8    and 18 of 2011.  Were you present for this meeting, sir?

9    A.  Yes.

10   Q.  Does this document accurately reflect what was stated and

11   decided at that meeting?

12   A.  Yes.

13          MR. GOMEZ:  I would ask to move in Defendants' Exhibit

14   231.

15          THE COURT:  Decision is reserved.

16   Q.  Mr. Piaguaje, I would like to direct your attention to

17   Defendants' Exhibit 234 in front of you.  The Spanish language

18   version appears on page 4 of 5 of this exhibit.

19          Would you kindly take a moment to look at that

20   document and tell me if you recognize what it is, sir?

21          Mr. Piaguaje, do you recognize Defendants' Exhibit

22   234?

23   A.  Yes.

24   Q.  What is it, sir?

25   A.  This is regarding a meeting.

DBI8CHE1                        Piaguaje – direct

1   Q.   A meeting of what, sir?

2   A.   This document is regarding this meeting in which we decide

3   the working points.

4   Q.   When you say "we," who are you referring to?

5   A.   What was that again?

6   Q.   When you say "we," who are you referring to?

7   A.   Well, us, for example, the assembly.

8   Q.   This document makes reference to the date March 21, 2011.

9   Were you present on that day for this meeting?

10  A.   Yes.

11  Q.   Do these minutes accurately reflect what was stated and

12  what was decided during that meeting, sir?

13  A.   Yes, sir.

14          MR. GOMEZ:  I would move into evidence Defendants'

15  Exhibit 234.

16          THE COURT:  Decision is reserved.

17  Q.   Mr. Piaguaje, I would like to now direct your attention to

18  the last exhibit in front of you, Defendants' Exhibit 236.  The

19  Spanish language of which appears on page 4 of 5 of this

20  exhibit.

21          Would you please take a moment to look at that

22  document and tell me if you can recognize it?

23          Mr. Piaguaje, do you recognize Defendants' Exhibit

24  236?

25  A.   Yes.

DBI8CHE1                          Piaguaje - direct

 1  Q.  This document makes reference to a meeting of June 27,

 2  2011.  Were you present at this meeting on that date?

 3  A.  Yes.

 4  Q.  Does this document accurately reflect what was stated and

 5  what was decided during that meeting, sir?

 6  A.  Yes.

 7          MR. GOMEZ:  Your Honor, I would ask to move into

 8  evidence Defendants' Exhibit 236.

 9          THE COURT:  Decision is reserved.

10  Q.  Mr. Piaguaje, whose responsibility was it to prepare all of

11  these minutes for the asamblea?

12  A.  The secretary and the coordinators.

13  Q.  To your knowledge, were minutes always prepared of all the

14  meetings in which you were in attendance?

15          THE COURT:  It might be more helpful if you rephrase

16  that question because an answer "yes" would mean conceivably,

17  as far as he knows, that's true, or it might be an

18  all-encompassing declaration, and it might be significant as to

19  which it is.

20  Q.  Mr. Piaguaje, were minutes prepared of all the meetings in

21  which you were in attendance?

22  A.  Yes.  After the meeting was over, everything that was

23  resolved at the meeting was written down, and then it was read

24  so we could all hear it.

25  Q.  Was it the regular practice of the asamblea to prepare

DBI8CHE1                         Piaguaje – direct

1    these minutes?

2    A.  Yes, so we could then remember it, have a record.

3    Q.  Was it the practice of the asamblea to file and save these

4    documents, these minutes?

5    A.  Yes.  The secretary.

6             MR. GOMEZ:  Your Honor, I pass the witness.

7             THE COURT:  Thank you.

8             Mr. Brodsky.

9             MR. BRODSKY:  Just a moment so I can set up.

10   CROSS-EXAMINATION

11   BY MR. BRODSKY:

12   Q.  Good morning, Mr. Piaguaje.

13   A.  Good morning.

14   Q.  You know Pablo Fajardo Mendoza?

15   A.  Yes.

16   Q.  He is an attorney, correct?

17   A.  He is an attorney.

18   Q.  He is your attorney in the case of *Maria Aguinda v. Chevron*

19   *Corporation* in the Lago Agrio courthouse?

20   A.  Yes.

21   Q.  And there are 47 plaintiffs, including you, in the case of

22   *Maria Aguinda v. Chevron*?

23   A.  Yes.

24   Q.  In 2006, sir, you and the other plaintiffs authorized

25   attorney Pablo Fajardo Mendoza to represent you and the other

DBI8CHE1                    Piaguaje – cross

1   plaintiffs as the common attorney, or procurador comun, in the

2   case of *Maria Aguinda v. Chevron Corporation*?

3   A.  In 2006, I don't recall.

4              MR. BRODSKY:  May I approach, your Honor?

5              THE COURT:  All right.

6   Q.  Mr. Piaguaje, I am going to show you two documents,

7   Plaintiff's Exhibit 323 in evidence and Plaintiff's Exhibit

8   323B in evidence.  If you wouldn't mind, I am going to direct

9   your attention to a particular portion of the document.

10             With respect to 323B, you see the second document I

11  handed you, the larger of the two?

12             Do you have that in front of you, sir?

13             MR. BRODSKY:  May I approach to help him identify the

14  document?

15             THE COURT:  Yes.

16  Q.  If you would take a look at the second page, Mr. Piaguaje,

17  of that very document I just handed you, do you recognize on

18  that document your signature on the seventh column down?

19             THE COURT:  I think you meant row.

20             MR. BRODSKY:  Row.  Thank you.

21  A.  Yes.

22  Q.  This is something you signed authorizing Pablo Fajardo to

23  represent you in the Lago Agrio Chevron case, correct?

24  A.  Yes.

25  Q.  Then, sir, since that time, 2006 -- you can put the

1   document down, Mr. Piaguaje.  Since that time, 2006, Pablo

2   Fajardo has been one of the lawyers representing you in the

3   Lago Agrio Chevron case?

4   A.  Yes.

5   Q.  Then in 2006, you also signed a document -- withdrawn.

6        In 2006, sir, you gave Mr. Fajardo the authority to

7   file motions and make presentations on behalf of the Lago Agrio

8   plaintiffs, correct?

9        MR. GOMEZ:  Objection to form.

10        THE COURT:  Overruled.

11   A.  Yes.

12   Q.  In 2006, you also gave Mr. Fajardo the authority to waive

13   all the judicial inspections, right?

14   A.  I don't recall.

15   Q.  You remember the judicial inspections, correct?

16   A.  Yes.

17   Q.  And you remember Pablo Fajardo telling you that he didn't

18   want judicial inspections conducted anymore?

19   A.  No.

20   Q.  Mr. Fajardo, did he tell you about any threats being made

21   to the presiding judge of the Lago Agrio Chevron case in

22   2010 -- withdrawn.

23        Did he tell you in 2006, did Mr. Fajardo tell you

24   about any threats being made to the presiding judge in the Lago

25   Agrio Chevron case?

DBI8CHE1                    Piaguaje - cross

1    A.  No.

2    Q.  In November 2010, you and the other Lago Agrio plaintiffs

3    in the *Aguinda v. Chevron* case approved of each and every

4    action that Mr. Fajardo had undertaken in the case, right?

5              MR. GOMEZ:  Objection.  Form.

6              THE COURT:  Overruled.

7    A.  What was that again?

8    Q.  In November 2010, Mr. Piaguaje, you and the other Lago

9    Agrio plaintiffs in the *Maria Aguinda v. Chevron* case approved

10   of each and every action that Mr. Fajardo had undertaken in the

11   case, right?

12   A.  I don't understand the question exactly.

13   Q.  Would you mind moving the microphone a little bit closer to

14   you, Mr. Piaguaje, and speaking into the microphone, if you

15   don't mind?

16             Sir, in November 2010, you signed a document in

17   connection with Pablo Fajardo's representation of you, correct?

18   A.  I don't recall.

19   Q.  How many documents, sir, have you signed in connection with

20   Mr. Fajardo's representation of you?

21   A.  I have signed documents, but I don't recall how many

22   documents I have signed.

23   Q.  Mr. Fajardo has asked you to sign some documents over the

24   years?

25   A.  We have signed documents when we have granted him power of

DBI8CHE1                    Piaguaje - cross

1    attorney.

2    Q.  Do you remember granting him this power of attorney in

3    2010?

4    A.  Well, for example, I want to understand exactly the

5    question.  I want to understand exactly what power of attorney

6    we had granted because I want to understand the question

7    exactly.

8    Q.  Sir, you just said, we have signed documents when we have

9    granted him, Pablo Fajardo, power of attorney.  What did you

10   mean by power of attorney?

11   A.  So that he can get -- well, so that he can defend part of

12   us, the plaintiffs, what we are asking for regarding the

13   contamination.

14           MR. BRODSKY:  May I approach, your Honor?

15           THE COURT:  Yes.

16   Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 390 in

17   evidence.

18           MR. BRODSKY:  For the record, it's entitled, "Special

19   Power of Attorney and Agency for Judicial Matters.  Executed by

20   Armando Wilfrido Piaguaje Payaguaje, et al., in favor of

21   attorney Pablo Estenio Fajardo Mendoza."

22           It's 49 pages.  The first 24 pages in English and

23   pages 26 through 49 in Spanish.

24   Q.  Mr. Piaguaje, let me direct your attention to a particular

25   page.

DBI8CHE1                         Piaguaje - cross

1           Would you turn to page 34 of 49 at the bottom of the
2    page?  Or you could look up at the screen.
3           If we look at this section right here that's
4    highlighted, Mr. Piaguaje, is that your signature on the
5    document?
6    A.  Yes, sir.
7    Q.  Let me ask you to turn to certain pages.
8           Do you remember signing this document, Mr. Piaguaje?
9    A.  Yes, but I don't recall the year.  I mean, I did sign it,
10   but I don't recall the year.  I don't have the documents with
11   me, but I don't recall the year, but this is my signature.
12   Q.  I understand Mr. Piaguaje.  Mr. Piaguaje, before you signed
13   it, you read the document, right?
14   A.  Yes.  But no -- of course, it was explained to me a little.
15   Q.  Mr. Piaguaje, you read your witness statement before you
16   signed that, correct, in connection with this case?
17          MR. GOMEZ:  Objection.  Asked and answered.
18          THE COURT:  Overruled.
19   A.  Regarding my testimony from today?
20   Q.  Yes, sir.  This morning, when Mr. Gomez showed you Defense
21   Exhibit 1600, your witness statement -- 1800, you read that
22   document before you signed it?
23   A.  Yes.
24   Q.  And looking at this document 390 --
25          MR. BRODSKY:  Your Honor, just for the record, we will

DBI8CHE1                          Piaguaje – cross

1   move into evidence 323 and this document 390.

2              THE COURT:  Aren't they in?

3              MR. BRODSKY:  I thought they were in, but I received a

4   note from my colleagues to move them in.

5              THE COURT:  Are you including 323B or not?

6              MR. BRODSKY:  And 323B as well.

7              THE COURT:  Any objection?

8              MR. GOMEZ:  No objection.

9              MR. FRIEDMAN:  No.

10             THE COURT:  They are received.

11             (Defendant's Exhibits 323, 323B and 390 received in

12  evidence)

13  Q.  Let me ask you, Mr. Piaguaje, on page 29 of the document in

14  Spanish -- we can put it up on the screen for you in Spanish on

15  the left-hand side, page 4.  So on one side 4 and the other

16  side page 49.

17             Directing your attention to where it says, Second,

18  special power of attorney, do you see that?

19  A.  Yes.

20  Q.  This is where you're giving Mr. Fajardo the power of

21  attorney for judicial matters, correct?

22  A.  Yes.

23             MR. BRODSKY:  Where it says "the principals," right

24  over here, can we highlight that?  Down a little bit below.

25  Q.  Do you see where it says, "The principals," Mr. Fajardo may

DBI8CHE1                    Piaguaje - cross

1    on behalf of the principals appear before judges or courts of

2    justice, arbitration or mediation in Ecuador, in the United

3    States of America, or any other country to defend the interests

4    of the principals?

5    A.  Yes.

6    Q.  That's where you were giving Mr. Fajardo the power to

7    represent you and the other Lago Agrio plaintiffs in the Lago

8    Agrio Chevron case, right, Mr. Piaguaje?

9            MR. GOMEZ:  Objection.

10           THE COURT:  Sustained.

11   Q.  Mr. Piaguaje, you authorized with this power of attorney

12   Mr. Fajardo to appear before courts throughout the world,

13   correct?

14   A.  Yes.

15   Q.  And Mr. Fajardo on your behalf, and on behalf of the other

16   Lago Agrio plaintiffs, could seek to get the judgment

17   recognized around the world, right?

18   A.  Yes.

19   Q.  You haven't revoked Mr. Fajardo's power of attorney to seek

20   recognition of the judgment in the Lago Agrio Chevron case,

21   right?

22   A.  What was that?

23   Q.  Mr. Fajardo still has the power to represent you and the

24   other Lago Agrio plaintiffs around the world to get the Lago

25   Agrio Chevron judgment recognized?

 1              MR. GOMEZ:  Objection.  Form.

 2              THE COURT:  Overruled.

 3    A.  Yes.

 4    Q.  Sir, let me direct your --

 5              THE COURT:  Just a second.  It's not just a matter of

 6    what the documents says.  It's a matter of whether this

 7    gentleman has ratified what is going on.

 8    Q.  Mr. Piaguaje, let me ask you to look at the bottom of this

 9    document, the last sentence.

10              MR. BRODSKY:  Can we highlight from "the" through the

11    bottom?

12    Q.  Would you read that silently to yourself, Mr. Piaguaje,

13    that last sentence?

14    A.  OK.  I have read it.

15    Q.  Mr. Piaguaje, in this document that you signed, you

16    approved of each and every one of the actions undertaken by

17    attorney Pablo Fajardo Mendoza in the Lago Agrio Chevron case,

18    right?

19              MR. GOMEZ:  Objection.

20    A.  Yes.

21              THE COURT:  Overruled.  The same point I made a minute

22    ago.

23    Q.  You approved of each and every one of the actions

24    undertaken by Mr. Fajardo in all the courts in which he

25    represented you, correct?

DBI8CHE1                    Piaguaje - cross

1   A.  Yes.

2   Q.  And if we go to the next page?

3           MR. BRODSKY:  And if we can highlight where it begins

4   "all financial" through the end of the sentence?

5           You see that on the top?  It says "all financial

6   administrative acts."

7   Q.  Mr. Piaguaje, you approved of all the financial and

8   administrative acts which Mr. Fajardo carried out for your

9   defense in the Lago Agrio Chevron case?

10  A.  Yes.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBILCHE2                     Piaguaje - cross

1  Q.  And you approved of all the financial acts Mr. Fajardo

2  carried out through other people that he legally authorized on

3  your behalf?

4           MR. GOMEZ:  Objection.

5           THE COURT:  Overruled.

6  A.  Yes.

7  Q.  That includes Mr. Fajardo -- withdrawn.

8           That includes, Mr. Piaguaje, how Mr. Fajardo raised

9  money to litigate the Chevron, the Lago Agrio Chevron case?

10 A.  I do not understand that question.

11 Q.  You have approved of how Mr. Fajardo and others working

12 with him have raised money in connection with the Lago Agrio

13 Chevron case?

14          MR. GOMEZ:  Objection.

15          THE COURT:  Overruled.

16 A.  No.

17 Q.  Does Mr. Fajardo tell you how the money is raised?

18 A.  Yes, to pay the attorneys for that defense.

19 Q.  And you know Mr. Fajardo is working with other people to

20 raise money to pay for lawyers?

21 A.  Yes, so that they will move forward with this process, with

22 this case, the trial.

23 Q.  And you approve of Mr. Fajardo's actions to raise money,

24 correct?

25          MR. GOMEZ:  Objection.

DBILCHE2                    Piaguaje - cross

```
 1                THE COURT:  Overruled.
 2    A.  Yes, because we want to accomplish our goal.
 3    Q.  Let me ask you to turn to two pages later, page 7 in
 4    English, and page 32 in Spanish.  Let me direct your attention
 5    to where it says three term and if we can highlight that
 6    sentence.
 7                Mr. Piaguaje, you agree with me that you and the other
 8    Lago Agrio plaintiffs gave Mr. Fajardo this power of attorney
 9    for an indefinite period of time?
10    A.  I don't understand Spanish that well, but still I need to
11    know a little more.
12    Q.  Mr. Piaguaje, when you gave Mr. Fajardo this power in 2010,
13    there was no termination or end date?
14    A.  Right, for what?
15    Q.  To represent you, correct?
16    A.  No, there was no end.
17    Q.  And this, under this power of attorney, you and the other
18    Lago Agrio plaintiffs had the right to revoke Mr. Fajardo's
19    power, correct?
20    A.  Yes, we were -- we could do that.  But if we did that, then
21    we wouldn't have, we would no longer have a person that would
22    be helping us.
23    Q.  You would no longer have the person you want most to
24    represent you; is that right?
25    A.  What was that again?
```

DBILCHE2                    Piaguaje - cross

1    Q.  Pablo Fajardo is the person you most want -- withdrawn.

2            Pablo Fajardo, Pablo Fajardo is the person you and the

3    other Lago Agrio plaintiffs have chosen as the person best

4    suited to represent you?

5    A.  Yes.

6    Q.  You know there are other lawyers in Ecuador?

7    A.  Yes.

8    Q.  You've chosen him?

9    A.  Yes.

10   Q.  You trust him?

11   A.  Yes.

12   Q.  You like what he's done for you so far?

13           MR. GOMEZ:  Objection, vague.

14           THE COURT:  Sustained.

15   Q.  You approve -- withdrawn.

16           Now, you've spoken with Mr. Fajardo about the Lago

17   Agrio Chevron litigation at several meetings of the asamblea

18   over the years, right?

19   A.  Yes, he has reported during the assembly.

20   Q.  And outside of those asamblea meetings, you've met with him

21   in person on several occasions?

22   A.  No.

23   Q.  Is it your testimony that outside the asamblea meetings

24   you've never met with Mr. Fajardo?

25   A.  Well, yes, stops by to say hello.

DBILCHE2                    Piaguaje - cross

1   Q.  And besides stopping by to say hello, you've had meetings

2   with him outside the assembly, right?

3   A.  No, because I live inside, I live in the community.  I'm

4   hardly ever outside.

5   Q.  On sometimes you're outside the community, right?

6   A.  Yes.

7   Q.  And on some occasions you actually have traveled abroad?

8   A.  Me?

9   Q.  Yes, you, sir.

10  A.  Yes.

11  Q.  And there are some occasions when you've had meetings with

12  Mr. Fajardo outside your community?

13  A.  You mean just Pablo and myself?

14  Q.  Pablo, yourself, and other people, or just Pablo and

15  yourself.

16  A.  We haven't had meetings like that like outside of the

17  meeting, nothing, no.

18          MR. BRODSKY:  May I approach, your Honor?

19          THE COURT:  Yes.

20  Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 2407R.

21  Let me ask you to turn to the last page.  Do you recognize your

22  signature on that, sir?

23  A.  Yes.

24  Q.  Is it accurate when it says that you certified that before

25  signing this, the contents of the document were translated to

DBILCHE2                         Piaguaje - cross

 1   you in Spanish?

 2   A.  Let me read that for a minute.

 3   Q.  Please, sir.

 4   A.  Yes.

 5   Q.  Am I correct, sir, that you read that -- it's accurate that

 6   you, the contents of this document were translated to you in

 7   Spanish before you signed it?

 8   A.  Yes.

 9   Q.  And it's correct, sir, that in that certification, you

10   certified that, among other things, the response No. 6 in this

11   document contained facts and matters that were within your

12   personal knowledge?

13   A.  Yes.

14   Q.  Can I ask you to --

15            MR. BRODSKY:  Your Honor, I just want to read

16   something into the record on page 24.  Page 24, this paragraph

17   right here, Randall, if we could blow that up.

18            THE COURT:  And you're offering that?

19            MR. BRODSKY:  I'm offering the paragraph, yes, the

20   supplemental response to interrogatory No. 6 between these

21   three paragraphs right there.

22            THE COURT:  Any objection?

23            MR. GOMEZ:  No, your Honor.

24            MR. FRIEDMAN:  No.

25            THE COURT:  Received.

DBILCHE2                    Piaguaje - cross

 1              (Plaintiff's Exhibit 2407R, specified paragraphs
 2    received in evidence)
 3              MR. BRODSKY:  Should I read it, your Honor, for the
 4    record?
 5              THE COURT:  It's not necessary.
 6              MR. BRODSKY:  Okay.  We can take that down.  Thank
 7    you.
 8    Q.  You know Steven Donziger, correct?
 9    A.  Yes.
10    Q.  You see him in this courtroom?
11    A.  Yes.
12    Q.  Without pointing, would you tell us where he is by
13    describing an article of clothing that he's wearing and where
14    he is in the courtroom?
15    A.  He's sitting beside my attorney, Julio Gomez.
16              THE COURT:  Indicating Mr. Donziger.
17    Q.  Mr. Fajardo told you that he hired Mr. Donziger to work on
18    your behalf?
19    A.  Well, we have authorized my attorney, Pablo Fajardo, to do
20    that.
21    Q.  And Mr. Fajardo told you that he hired Mr. Donziger to work
22    on your behalf, right?
23    A.  Well, he didn't tell me on my behalf for myself as a
24    plaintiff, but for the group, for the group of plaintiffs.
25    Q.  Mr. Fajardo told you he had hired Mr. Donziger to represent

DBILCHE2                      Piaguaje - cross

1   you and all the other Lago Agrio plaintiffs?

2   A.  Yes.

3   Q.  And you met Mr. Donziger in person several years ago,

4   right?

5   A.  Yes.

6   Q.  In fact, you met Mr. Donziger on at least three occasions,

7   right?

8   A.  Yes.

9   Q.  Several years ago, correct?

10  A.  Years back.

11  Q.  And the purpose of each of those meetings -- withdrawn.

12       The purpose of each of those three meetings that you

13  had with Mr. Donziger was to discuss the lawsuit against

14  Chevron in Lago Agrio?

15  A.  Well, when I, well, at that time when I met him, it's not

16  like I knew all of that much.  But what we did know and what

17  all of us did know is all about the contamination and the fact

18  that we all wanted to get help to resolve that contamination,

19  which is what we were doing.

20  Q.  Sir, is the answer to my question that the purpose of each

21  of those three meetings that you had with Mr. Donziger was to

22  discuss the lawsuit against Chevron in Lago Agrio yes?

23  A.  Not all of them, because it's not like I had a meeting

24  together with Mr. Steven, but it was --

25  Q.  Sorry.

DBILCHE2                    Piaguaje - cross

1   A.  -- I did not have a direct conversation with Steven.

2   Q.  You were in a meeting with Mr. Donziger and other

3   individuals?

4   A.  Yes, but I wasn't there with him for a long time, just for

5   a while.  But, yes, I did see him there.

6   Q.  And putting aside the amount of time, Mr. Piaguaje, that

7   you spent with Mr. Donziger and others on the three occasions

8   that you were meeting with Mr. Donziger and other people, the

9   purpose was to discuss the lawsuit against Chevron in Lago

10  Agrio, right?

11  A.  Yes.

12  Q.  Now, you know, sir, that documents have been filed in

13  foreign countries seeking recognition of the judgment issued in

14  the Lago Agrio Chevron case?

15  A.  I don't understand that very well.

16  Q.  Are you aware that your -- withdrawn.

17          Are you aware that your name and the name of the other

18  Lago Agrio plaintiffs appears on a document filed in Brazil

19  seeking the recognition of the judgment in Lago Agrio?

20  A.  Well, I haven't exactly seen the document, but I was told,

21  they explained something about that.  I know that.

22  Q.  Who's they?

23  A.  They were talking at the assembly.

24  Q.  Who is they?

25  A.  For example, Pablo was speaking, but it was almost like the

DBILCHE2                      Piaguaje - cross

1   time to leave and I was already on my way out so I wasn't able

2   to hear it all very well.

3   Q.  When you say Pablo, you mean Pablo Fajardo?

4   A.  Yes.

5   Q.  And I take it that because you were on your way out of that

6   meeting -- withdrawn.

7          Was it towards the end of the meeting that Mr. Fajardo

8   reported to you and others that a lawsuit was filed in Brazil

9   seeking recognition of the judgment?

10  A.  That I have heard.

11  Q.  Who did you hear that from?

12  A.  It's what I was just saying about the meeting, but I have

13  not seen documents.

14  Q.  I see.  Mr. Fajardo reported -- withdrawn.

15         Mr. Fajardo told you and others at this meeting that a

16  document was filed in Brazil seeking recognition of the

17  judgment?

18  A.  Yes.

19  Q.  And prior to Mr. Fajardo informing you of that, there

20  wasn't a vote by the assembly, right?

21         MR. GOMEZ:  Objection, vague.

22         THE COURT:  Overruled.  Sustained.  Be more specific.

23  Q.  Mr. Piaguaje, prior to Mr. Fajardo telling you that papers

24  were being filed in Brazil seeking recognition of the judgment,

25  you and others at this meeting did not take a vote about

DBILCHE2                      Piaguaje - cross

1   whether to file those papers?

2   A.  Well, no, I haven't seen that vote, but we do want to

3   accomplish what we are seeking.

4   Q.  And Mr. Fajardo has the power that you've conferred on him

5   and others in the Lago Agrio case have conferred on him to file

6   these lawsuits around the world to seek recognition of the

7   judgment?

8   A.  Yes.

9   Q.  And you know, sir, that Mr. Fajardo -- withdrawn.

10          Mr. Fajardo, did Mr. Fajardo tell you that he and

11  others filed a claim against Chevron in Canada?

12  A.  Well, the truth is I can talk about what I know.  We have,

13  we have said like here the big company, they don't want to

14  admit, they don't want to pay.  We want to find a way.

15  Q.  Mr. Piaguaje, let me interrupt you because my question is,

16  sir, did Mr. Fajardo tell you that he and others filed a claim

17  against Chevron in Canada?

18  A.  I'm -- I don't understand what the question is saying.

19  Q.  Were you present for any discussions, sir, with Mr. Fajardo

20  and others in which Mr. Fajardo discussed that papers were

21  filed in Canada seeking recognition of the judgment in Lago

22  Agrio?

23  A.  Yes, I've heard.

24  Q.  Did Mr. Fajardo tell you that?

25  A.  Yes.

DBILCHE2                          Piaguaje - cross

1   Q.  And did Mr. Fajardo tell you also that a petition was filed

2   in Argentina seeking recognition of the Lago Agrio judgment?

3   A.  Yes, I have heard.

4   Q.  And isn't it true, sir, that Mr. Fajardo has told you and

5   the other Lago Agrio plaintiffs that he will continue to seek

6   enforcement of this judgment in Lago Agrio in other countries?

7   A.  I haven't heard that.

8   Q.  Are you aware one way or the other whether there's a list

9   of approximately 30 countries in which Mr. Fajardo and others

10  working with him are trying to -- withdrawn.

11          Are you aware, sir, of a list of approximately 30

12  countries around the world in which Mr. Fajardo and others have

13  said they will seek to enforce the judgment in Lago Agrio?

14          MR. GOMEZ:  Objection, privilege, your Honor.

15          THE COURT:  Sustained as least at to form and then

16  we'll see what happens.

17  Q.  Has Mr. Fajardo spoken to the asamblea about seeking to

18  enforce the Lago Agrio judgment against Chevron in 30 countries

19  around the world?

20          MR. GOMEZ:  Objection, privileged.

21          THE COURT:  Answer yes or no, please.

22  A.  What, 30 countries?

23  Q.  Yes.

24  A.  No, I haven't heard that.

25  Q.  You haven't heard -- do you know who Juan Pablo Saenz is?

DBILCHE2                         Piaguaje - cross

1    A.  No.

2    Q.  Have you heard Mr. Fajardo speaking to the press or the

3    media as recently as November 13, 2013, last week, about trying

4    to get recognition for the judgment in Lago Agrio around the

5    world?

6              MR. GOMEZ:  Objection, relevance.

7              THE COURT:  Overruled.  Goes to threatened irreparable

8    injury at least.

9    A.  No, I'm not updated.  I didn't understand.

10   Q.  Did you not understand my question, sir?

11   A.  Yes.

12   Q.  Have you heard Pablo Fajardo speaking to the media, the

13   press, about --

14   A.  No, I haven't heard, no, no.

15   Q.  Okay.  Now you're a defendant in this case, in this RICO

16   action, in this courthouse, correct?

17   A.  Yes.

18   Q.  And Chevron has filed a lawsuit against you and other

19   people, correct?

20   A.  Yes.

21   Q.  And you of course have read the allegations against you,

22   right?

23   A.  Excuse me, I didn't understand your question exactly, the

24   question.

25   Q.  You know -- withdrawn.

DBILCHE2                          Piaguaje - cross

1          You're aware of the allegations that Chevron has made

2     in this case, in this courthouse, against you, sir?

3     A.  Regarding the whole trial?

4     Q.  Sir, you're aware Chevron has filed allegations in a

5     complaint against you?

6     A.  Where, in Ecuador?

7     Q.  In this courthouse.

8     A.  No.

9     Q.  You have lawyers who have been representing you in this

10    case, right?

11    A.  Yes.

12    Q.  Mr. Julio Cruz -- withdrawn.

13          Mr. Julio Gomez is one of your lawyers, correct?

14    A.  Yes.

15          THE COURT:  Let's take a break here.

16          (Recess)

17          THE COURT:  Let's continue.

18          MR. BRODSKY:  Thank you, your Honor.

19    Q.  Mr. Piaguaje, in addition to Julio Gomez, you've been

20    represented in connection with this case by Larry Veselka,

21    correct?

22    A.  Larry?

23    Q.  Yes.

24    A.  Yes.

25    Q.  And Jarrod Stewart as well?

DBILCHE2                    Piaguaje – cross

1    A.  Yes.

2    Q.  Mr. Veselka and Mr. Stewart visited you in Ecuador in

3    connection with this case?

4    A.  Yes.

5    Q.  And you've received updates about what's happening in this

6    case, correct?

7    A.  What do you mean?

8    Q.  You have learned about Chevron's allegations against you in

9    this case?

10   A.  Complaints.

11   Q.  You've learned about those complaints?

12   A.  Complaints, yes.

13   Q.  And you've discussed those complaints in this case with

14   Pablo Fajardo, correct?

15           MR. GOMEZ:  Objection, vague.

16           THE COURT:  Overruled.

17   A.  No.

18   Q.  Hasn't Mr. Fajardo provided you with legal advice in

19   connection with this case?

20           MR. GOMEZ:  Objection, privilege.

21           THE COURT:  The question doesn't call for the

22   substance.  Overruled.

23           Answer yes or no.

24   A.  No.

25           MR. BRODSKY:  One moment, your Honor.

DBILCHE2                    Piaguaje - cross

1   Q.  We'll come back to that, Mr. Piaguaje.

2           Did you inform Mr. Fajardo you were coming here to

3   testify?

4   A.  This time, for this time, for this testimony?

5   Q.  Yes, for this time, this week.

6   A.  Yes.

7   Q.  And the last time you testified earlier this year in this

8   courthouse, you informed Mr. Fajardo you were testifying,

9   correct?

10  A.  Yes.

11  Q.  Did you seek Mr. Fajardo's permission to testify?

12  A.  Well, I didn't seek it.  I was told I had to come here to

13  testify before this judge to testify and that's what I'm doing,

14  testifying to what I know, what is the truth.

15  Q.  Did Mr. Fajardo tell you he was not going to testify?

16  A.  No.

17  Q.  Did Mr. Fajardo inform the asamblea that he was not going

18  to testify?

19  A.  No, I didn't hear that.

20  Q.  Did the asamblea make any decisions in connection with

21  whether with Mr. Fajardo would come here to testify?

22  A.  Well, I have not been involved in the assembly recently.  I

23  don't know.

24  Q.  When did you stop being involved in the asamblea?

25  A.  2012.

DBILCHE2                    Piaguaje - cross

1    Q.  When in 2012?

2    A.  Well, I've been participating in the meetings in Lago

3    Agrio.

4    Q.  When in 2012?

5    A.  What do you mean what part?

6    Q.  When in 2012 did you stop participating in the asamblea?

7    A.  I don't recall exactly the month because it was when, well,

8    I finished my term as president of my nationality in the first

9    half of the month of June.

10   Q.  Did you participate in any asamblea meetings this year?

11   A.  I don't think so, no, I don't think so.

12   Q.  And nobody from the asamblea -- withdrawn.

13        Did you tell Mr. Yanza you were coming here to

14   testify?

15   A.  No.

16   Q.  Mr. Yanza is the coordinator of the asamblea, correct?

17   A.  Yes.

18   Q.  Sir, just before we move on to one other topic, I wanted to

19   ask you with respect to the power of attorney, do you remember

20   the questions I asked you and the answers you gave regarding

21   the power of attorney and you gave to Mr. Fajardo?

22   A.  Yes.

23        MR. GOMEZ:  Objection, form.

24        THE COURT:  The objection as to form is overruled.

25   Q.  Mr. Piaguaje, since conferring that power of attorney on

DBILCHE2                    Piaguaje – cross

1   Mr. Fajardo, you and the other Lago Agrio plaintiffs have never

2   revoked it, correct?

3   A.  No.

4   Q.  No, you've never revoked it, right?

5   A.  Yes.

6   Q.  Okay.  Mr. Piaguaje, let's go on to one other thing, couple

7   other things.

8           Before we get to the asamblea a little bit, I want to

9   talk a little bit about your background and experience.  Let me

10  direct your attention to your declaration.  Do you have that in

11  front of you, Defense Exhibit 1800?  I always get the number

12  wrong.  Here is Defense Exhibit 1800.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DBI8CHE3                    Piaguaje - cross

1  Q.  Let me direct your attention to paragraph 5.

2            MR. BRODSKY:  Can we put the English and the Spanish

3  side by side?

4  Q.  You testified at your deposition in May of this year in

5  Spanish, right?

6  A.  Yes.

7  Q.  You wrote your direct testimony today in Spanish, right?

8  A.  Yes.

9  Q.  And let me direct your attention to page 2, paragraph 7,

10  the last sentence.

11            What were your responsibilities as president of the

12  entire Siekopai nation during those two two-year terms?

13  A.  I was president two times.

14  Q.  What were your responsibilities?

15  A.  Well, the people of my nationality elected me president so

16  that I could obtain benefits for our community.

17  Q.  What did you do to obtain those benefits?

18  A.  I was making efforts to obtain benefits which we weren't

19  able to obtain yet, regarding issues such as water, education,

20  many other things.

21  Q.  You have travelled outside -- withdrawn.

22            You travelled to the United States in 1997, right?

23  A.  Yes.

24  Q.  That was during your first term as president of the

25  Siekopai nation?

DBI8CHE3                        Piaguaje - cross

1   A.  Yes.

2   Q.  During that trip you visited Miami, right?

3   A.  Miami, Boston, and Washington.

4   Q.  By Washington you mean, Washington, D.C.?

5   A.  Yes.

6   Q.  And in 1998 you visited Peru?

7   A.  Yes.

8   Q.  In 2010, approximately, you visited Venezuela?

9   A.  Yes.

10  Q.  In 2010, you visited Brazil?

11  A.  Yes.

12  Q.  And you have an e-mail account, right, Mr. Piaguaje?

13  A.  Yes.

14  Q.  You have a Facebook account, right?

15  A.  That too.

16          MR. BRODSKY:  May I approach, your Honor?

17          THE COURT:  Yes.

18          MR. BRODSKY:  One moment, your Honor.  I have just got

19  to do a quick organization here.

20          Let me ask my colleague to do that while I move on to

21  something else.

22  Q.  We will get back to your Facebook in a moment, Mr.

23  Piaguaje.

24          Mr. Piaguaje, your Facebook account is in Spanish,

25  right?

DBI8CHE3                      Piaguaje - cross

1   A.  Yes.

2   Q.  We will get back to that in a minute.

3           Staying with your declaration, sir, let me direct your

4   attention to page 2, paragraph 11.

5           What do you mean by settlers in paragraph 11?

6           Sir, what do you mean by settlers?

7   A.  Settlers are the people from outside who want to live there

8   in the Amazon region.

9   Q.  Would you agree, sir, that the only purpose of the Asamblea

10  de Afectados por Texaco is to address the case in Ecuador

11  against Chevron, right?

12  A.  Yes.

13  Q.  You mentioned the Tarapoa field at least twice in your

14  declaration, right?

15          THE INTERPRETER:  What is the name of the field?

16          MR. BRODSKY:  T-A-R-A-P-O-A.

17  Q.  Let me direct your attention to paragraph 8.  You want

18  Chevron to clean up that field, right?

19  A.  Yes.

20  Q.  Was the Tarapoa contaminated by Texaco or TexPet?

21  A.  At that time, I was young, I didn't do anything.  I would

22  say it was the Texaco company.

23  Q.  Do you have any idea of who actually operated the Tarapoa

24  field?

25  A.  Well, I really cannot say because at that time I didn't

DBI8CHE3                        Piaguaje - cross

1   know anything.

2   Q.  Sir, have you made any effort, you yourself, to find out

3   who operated the Tarapoa field?

4   A.  Yes.  I first started to find out about this subject who

5   was causing the spills, I have heard some settlers mention the

6   Texaco company, because that's how I started to find out a bit

7   at a time.

8   Q.  Let me direct your attention to the Tarapoa field itself,

9   just isolated to the Tarapoa field.  Do you have any personal

10  knowledge as to who contaminated that field?

11          MR. GOMEZ:  Objection.  Relevance, your Honor.

12          THE COURT:  Overruled.

13  A.  That's what I told you earlier that some persons, settlers,

14  told me it was Texaco, but I can't tell you personally.  That's

15  why I trusted in them that it was Texaco.

16  Q.  Sir, the asamblea has nothing to do with addressing

17  contamination by Petroecuador, right?

18  A.  To start a trial again?

19  Q.  The asamblea, you're a member of, right?

20  A.  Yes.

21  Q.  The asamblea that has the name Texaco in it, right?

22  A.  What do you mean?  Of course I hear the title, but what do

23  you mean?  I don't know.

24          THE COURT:  You're belaboring this point.

25          MR. BRODSKY:  Yes, your Honor.  Understood.

DBI8CHE3                         Piaguaje - cross

1   Q.  Is it your testimony, sir, that each affected field, and

2   directing your attention to paragraph 11, each affected field

3   or region is part of the asamblea?

4           MR. GOMEZ:  Objection.  Form.

5           THE COURT:  Overruled.

6   A.  What is in my statement, what I have written, for example,

7   in my statement and what is written is what I have seen

8   personally.

9   Q.  Are you familiar with the Huaorani?

10  A.  Yes.

11  Q.  Aren't they one of the indigenous groups in this region?

12          MR. GOMEZ:  Objection.  Vague.

13          THE COURT:  Overruled.

14  A.  In Orellana, but on the other side of the Napo River.

15  Q.  Would they fall within, your words in paragraph 11,

16  affected field or region or indigenous nation affected by

17  petroleum contamination?

18          MR. GOMEZ:  Objection.  Form.

19          THE COURT:  Overruled.

20  A.  Yes.

21  Q.  And they are not part of the asamblea, correct?

22  A.  Yes, they do belong to it.

23  Q.  Sir, isn't it a fact that the Huaorani have sued, filed a

24  lawsuit, against Steven Donziger and the Amazon defense front

25  in this courthouse stating they are not part of the asamblea?

DBI8CHE3                           Piaguaje - cross

1   A.  Well, I don't know anything about that part.

2   Q.  Have you seen any representatives of the Huaorani at your

3   asamblea meetings?

4   A.  Yes.

5   Q.  When did you see them?

6   A.  When I was there in 2012, in early 2012.

7   Q.  So it's your testimony, sir, that they are part of the

8   assembly?

9   A.  Yes.  Because the Huaorani do participate there, at least

10  as far as I saw.

11  Q.  Your witness statement, sir, does not mention the Amazon

12  Defense Front, correct?

13          THE COURT:  It either does or it doesn't.

14  Q.  You're not a member of the Amazon Defense Front, correct?

15  A.  No.

16  Q.  You have never been a member?

17  A.  No.

18  Q.  Who runs the Amazon Defense Front?

19  A.  The truth is I don't know.  It's administered or run by the

20  president of the Amazon Defense Front.

21  Q.  Who is the president?

22  A.  Well, when I was there, it was always the president Ermel

23  Chavez, but I don't know now.

24  Q.  You have agreed to give a portion of the judgment in the

25  Lago Agrio Chevron case to the ADF, the Amazon Defense Front,

1  right?

2  A.  You mean when we win?

3  Q.  You understand that a judgment was issued in the Lago Agrio

4  Chevron case, right?

5  A.  Yes.

6  Q.  And you understand you have agreed, you and the other Lago

7  Agrio plaintiffs, have agreed to give a portion of the judgment

8  in that case to the Amazon Defense Front?

9  A.  Are you asking me if I have heard that?

10  Q.  I am asking if you agree with me that you have agreed to

11  give a portion of the judgment in the Lago Agrio Chevron case

12  to the Amazon Defense Front?

13         MR. GOMEZ:  Objection.  Form.  Vague.

14         THE COURT:  Overruled.  There is nothing vague about

15  it.

16  A.  No.

17  Q.  Sir, is it fair to say you do not want to give the Amazon

18  Defense Front 10 percent or more of the judgment?

19  A.  No.

20         THE COURT:  Ambiguous.

21  Q.  Is that no, you do not want to give the Amazon Defense

22  Front 10 percent or more of the judgment?

23  A.  Well, at the moment or up to now, I haven't heard anything

24  about that from my group of giving them 10 percent or anything.

25  I myself haven't heard that.

DBI8CHE3                          Piaguaje - cross

```
 1    Q.  So in none of the asamblea meetings that you attended,

 2    nobody ever informed you that the Amazon Defense Front was

 3    going to receive at least 10 percent of the judgment?

 4    A.  No.

 5    Q.  Isn't it a fact, sir, that you have ceded all rights to the

 6    Lago Agrio judgment to the Amazon Defense Front?

 7               MR. GOMEZ:  Objection.

 8               THE COURT:  Overruled.

 9    A.  I didn't understand your question very well.

10    Q.  Sir, isn't it a fact that you have ceded, given up, all

11    rights to the proceeds from the Lago Agrio judgment to the

12    Amazon Defense Front?

13               MR. GOMEZ:  Objection.  Vague.

14               THE COURT:  There is nothing vague about it, sir.

15    Overruled.

16    A.  I'm sorry.  I don't understand the question.

17    Q.  You understand what the Lago Agrio judgment is, correct?

18    A.  Yes.

19    Q.  You understand that the Lago Agrio judgment has

20    states -- withdrawn.

21               You understand that, according to the Lago Agrio

22    judgment, money will be given to certain people, correct?

23    A.  No.

24    Q.  You understand that the Lago Agrio judgment -- withdrawn.

25               You understand, sir, that a judge in Lago Agrio issued
```

1   a judgment ordering Chevron to pay billions of dollars to

2   certain people and groups, correct?

3   A.  I would like to hear the question again, please.

4          MR. BRODSKY:  Can we ask the court reporter to read

5   back the question?

6          THE COURT:  Yes.

7          (Record read)

8   A.  Well, what I don't understand here -- what I understood was

9   that Chevron wanted to pay a judge money.  So I am not

10  understanding this question.

11         MR. BRODSKY:  Move to strike, your Honor.

12         THE COURT:  Stricken, apart from his statement that he

13  doesn't understand the question.

14  Q.  Let's do it this way, Mr. Piaguaje.  Do you have

15  Plaintiff's Exhibit 2407R?  Do you have that in front of you?

16         We will put it on the screen, sir.  It's in English

17  anyway.

18         MR. BRODSKY:  Can we go to the last page.

19  Q.  Sir, do you remember I asked you questions about this

20  certification that you made?

21  A.  Yes.

22  Q.  And you agree, sir, that you certified that response number

23  11, among others, contain facts within your personal knowledge?

24  A.  Yes.

25         MR. BRODSKY:  Can we turn to page 29, supplemental

DBI8CHE3                        Piaguaje - cross

 1   response to interrogatory number 11, and blow up where it says

 2   "respondent has ceded."

 3   Q.   You agree, sir, that you certified that you, the

 4   respondent, had ceded all rights to the proceeds from the Lago

 5   Agrio judgment to the Amazon Defense Front, correct?

 6              MR. GOMEZ:  Objection.  The witness has been asked and

 7   answered the question, and he cannot understand the document

 8   that's on the video screen.

 9              THE COURT:  He has been asked the question many times,

10   and he has repeatedly responded that he doesn't understand it.

11   So that portion of the objection is overruled.

12              The point about the language of course is apt.  So

13   let's go to the Spanish.  Put them both up there and direct his

14   attention to the Spanish.

15              MR. BRODSKY:  I do not have the Spanish version.  He

16   certified in the document on page 43 that before signing the

17   responses, the contents were translated to him in Spanish.

18              THE COURT:  So you're offering that first sentence of

19   the second paragraph of the supplemental response to

20   interrogatory number 11.

21              MR. BRODSKY:  I am, your Honor.

22              THE COURT:  Received.

23              (Plaintiff's Exhibit 2407R received in evidence)

24   Q.   Sir, when you attended the meetings of the asamblea, they

25   were at Selva Viva's offices, right?

DBI8CHE3                        Piaguaje - cross

1    A.  Yes, when there were meetings of the committee.

2    Q.  You received notification of the meetings by e-mail,

3    correct?

4    A.  No, by telephone.

5    Q.  Did you ever receive notification of an asamblea meeting by

6    e-mail?

7    A.  No.

8           MR. BRODSKY:  May I approach, your Honor?

9           THE COURT:  Yes.

10   Q.  I am showing you, Mr. Piaguaje, a multipage document,

11   Plaintiff's Exhibit 6724 for identification, Bates number JP55.

12   The first page is in English and the third page is the

13   translation in Spanish.  So please turn to the third page.

14   It's an e-mail, dated November 8, 2010, from Luis Francisco to

15   a number of e-mail addresses.

16          Have you had a chance to read it?

17   A.  Yes.

18   Q.  Does your e-mail address appear as a recipient of this

19   e-mail?

20   A.  Yes.

21   Q.  Does this relate to an asamblea meeting?

22   A.  I think it was about a meeting of the committee.

23   Q.  A meeting of the committee of the asamblea?

24   A.  Yes.  Part of the assembly, but only the presidents of the

25   indigenous nations and the settlers.

```
 1            MR. BRODSKY:  We offer 6724.

 2            THE COURT:  Received hearing no objection.

 3            MR. GOMEZ:  No objection.

 4            MR. FRIEDMAN:  No objection.

 5            (Plaintiff's Exhibit 6724 received in evidence)

 6   Q.  Did this committee meeting of the asamblea take place on

 7   November 12, 2010?

 8   A.  I'm not familiar with this document very much, and I don't

 9   remember the exact date of when it was.

10   Q.  You produced this document, did you not?

11   A.  To whom?

12   Q.  You gave it to your lawyers who gave it to Chevron

13   Corporation in this case.

14   A.  Yes.

15   Q.  Do you know whether or not there are minutes -- regardless

16   of whether you remember the exact date, do you know whether or

17   not there are minutes to this meeting that took place in

18   Plaintiff's Exhibit 6724?

19            MR. GOMEZ:  Objection.  It assumes facts.

20            THE COURT:  Overruled.

21   A.  Yes.  There may be, but I don't remember exactly.  When we

22   have meetings, there are minutes taken, but I don't remember

23   the exact date.

24   Q.  In collecting documents in connection with this case, did

25   you ask anyone for the minutes of the asamblea meetings?
```

1   A.  Did I ask the secretary?

2   Q.  Or anybody at the asamblea.

3   A.  Yes.

4   Q.  Who did you ask?

5   A.  Once I told Luis I think.  No, it was Pablo.  I told Pablo

6   to give me the minutes of the meeting so that I can remember

7   because I live far away and I haven't yet gotten them.

8   Q.  By Pablo, you mean Pablo Fajardo?

9   A.  Yes.

10          MR. BRODSKY:  May I approach, your Honor?

11  A.  When I say Pablo, it's Pablo Fajardo.

12  Q.  Mr. Piaguaje, I am going to show you another document you

13  produced in this case, Plaintiff's Exhibit 6714 for

14  identification, Bates labeled JP 65.  The third page is in

15  Spanish Mr. Piaguaje.

16          Do you recognize the document, Mr. Piaguaje?

17          Mr. Piaguaje, do you recognize your e-mail address?

18  A.  Yes.

19  Q.  That's an e-mail exchange that you had with Luis Yanza,

20  correct?

21  A.  Yes.

22  Q.  Relating to an asamblea meeting?

23  A.  Yes.  He sent me these, but this was some time ago, these

24  e-mails back before, and I don't really pay a lot of attention

25  to my e-mail.  I read them quickly and then I move on.  I don't

1   spend a lot of time reading e-mail.

2            MR. BRODSKY:  We offer 6714.

3            MR. GOMEZ:  No objection.

4            MR. FRIEDMAN:  No objection.

5            THE COURT:  Received.

6            (Plaintiff's Exhibit 6714 received in evidence)

7   Q.  Now, sir, directing your attention to Luis Yanza's e-mail

8   to you on November 15, 2010, you remember, sir, there were

9   discussions in the asamblea meetings when you were on the

10  executive committee about legalizing the existence of the

11  asamblea?

12  A.  Yes, I do remember that.

13  Q.  These discussions started in late 2010, right?

14           MR. GOMEZ:  Objection.  Vague.

15           THE COURT:  Overruled.

16  A.  Well, as I said to you earlier, when I was president of my

17  nation, I began attending to these things.

18  Q.  And the discussions about legalizing the existence of the

19  asamblea started in the latter half of 2010, correct?

20           MR. GOMEZ:  Objection.  It calls for a legal

21  conclusion.

22  A.  Yes.

23           THE COURT:  Overruled.

24           MR. BRODSKY:  May I approach?

25           THE COURT:  Yes.

1    Q.  Mr. Piaguaje, let me show you another e-mail that you

2    produced in this case, JP 77 to JP 79.  The last three pages

3    are in Spanish.

4            This is another e-mail exchange, sir, you had,

5    correct, with Luis Yanza?

6    A.  Yes.

7    Q.  Directing your attention to the bottom of the first page,

8    starting with "the main purpose of this workshop," you

9    attended, Mr. Piaguaje, this workshop on December 3 and

10   December 4, 2010, right?

11   A.  Let me try to remember.  Yes, it seems so.

12   Q.  And that workshop was about getting ready to receive money

13   in the Lago Agrio Chevron case, right?

14           MR. GOMEZ:  Objection.

15           THE COURT:  Overruled.

16   A.  Yes.  It was for all manner of work, of planning work.

17   Q.  Planning to manage the money from a judgment in the Lago

18   Agrio Chevron case, right?

19   A.  Yes, it seems so.  That's what I recall.

20   Q.  And if you look at the second page, sir, you see how Luis

21   Yanza's title is coordinator of the Texaco case, the ADF?  Do

22   you see that?

23   A.  Yes.

24   Q.  What was Mr. Yanza's responsibilities as the coordinator of

25   the Texaco case, the ADF?

DBI8CHE3                    Piaguaje – cross

1            MR. BRODSKY:  Withdrawn.

2            THE COURT:  I think you may be misreading the

3   document.

4   Q.  Does it say there, Luis Yanza, coordinator of the Texaco

5   case?

6            MR. BRODSKY:  Let me withdraw that question and ask a

7   better one.

8   Q.  What were Mr. Yanza's responsibilities as coordinator of

9   the Texaco case at asamblea meetings?

10  A.  Luis Yanza's job?

11  Q.  Yes.

12  A.  He coordinates us, the indigenous nations, when we have

13  assemblies, so that we can express our views.

14  Q.  Is it fair to say --

15           THE COURT:  Let him finish.

16           MR. BRODSKY:  I apologize.

17  A.  For the indigenous nations and the settlers.

18  Q.  Is it fair to say, Mr. Piaguaje, that Mr. Yanza and Mr.

19  Fajardo set the agenda for the asamblea meetings?

20  A.  Yes.  Well, at the first meeting, we decide what we are

21  going to address, and then Luis Yanza, he is our coordinator,

22  he does that.  My lawyer, Pablo Fajardo, deals with the legal

23  aspects, and as far as the legal aspects, I don't know much

24  about that.  That's up to the attorneys.

25  Q.  Sir, is it fair to say the executive committee of the

DBI8CHE3                      Piaguaje - cross

1    asamblea made the decisions, according to you, about how the

2    funds that are raised to finance the judgment for collection of

3    the judgment are spent?

4    A.  Yes.

5    Q.  Did the asamblea determine what percentage of the judgment

6    was going to go to the attorneys?

7    A.  Yes.

8    Q.  Did the asamblea determine how much money Mr. Donziger

9    would be paid on a monthly basis?

10   A.  No.

11   Q.  Did the asamblea determine how much money Fajardo, Pablo

12   Fajardo was paid on a monthly basis?

13   A.  No.

14   Q.  Before the Lago Agrio judgment was issued in February 2011,

15   did the asamblea discuss whether to give Pablo Fajardo 10

16   percent of the total fees going to the lawyers?

17           MR. GOMEZ:  Objection.  It assumes facts.

18           THE COURT:  Overruled.

19   A.  No.

20   Q.  Did you know, prior to the issuance of the Lago Agrio

21   judgment in February 2011, that Pablo Fajardo signed an

22   agreement with the representative of the asamblea giving Pablo

23   Fajardo the right to 10 percent of all of the attorneys' fees?

24   A.  No.

25           MR. BRODSKY:  May I approach, your Honor?

DBI8CHE3                         Piaguaje - cross

 1              THE COURT:  You may.

 2   Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 559A for

 3   identification, which is a multipage document.  The first 11

 4   pages, sir, are in Spanish and pages 13 through 23 are in

 5   English.

 6              MR. BRODSKY:  For the record, the title of the

 7   document is retainer agreement.  The Bates number is Woods

 8   45416 to 45426.

 9   Q.  Have you ever seen this document before?

10   A.  No.

11   Q.  Let me ask you to turn to page 10 of the document, the

12   signature page.

13              I would like you to turn to the signature page in the

14   English version, sir.  So it's page 22 of 23.

15              MR. BRODSKY:  Your Honor, with your permission, may I

16   help the witness?

17              THE COURT:  Yes.

18   Q.  It's also on the screen, Mr. Piaguaje.

19              Do you recognize that distinct signature of Ermel

20   Gabriel Chavez Parra, president it says of Frente de Defensa de

21   la Amazonia?

22   A.  I don't recall the signature very well because I haven't

23   seen it much.

24   Q.  Do you know who Ermel Gabriel Chavez Parra is?

25   A.  Ermel Chavez, I know who he is.

1    Q.   Who is he?

2    A.   Well, I have seen that Ermel Chavez was the president of

3    the Amazon Defense Front.

4    Q.   Have you seen Luis Yanza's signature in the past?

5    A.   Of course I have seen it, but I don't recall what his

6    signature looks like.

7    Q.   What about Pablo Fajardo?

8    A.   Likewise, I couldn't say because I don't know it very well.

9    Q.   Did Mr. Chavez ever mention to the asamblea, prior to the

10   issuance of the judgment in the Lago Agrio case in February

11   2011, that Pablo Fajardo was going to receive 10 percent of the

12   attorneys' fees in the case?

13   A.   I didn't hear that.

14   Q.   Did Mr. Yanza ever tell the Asamblea de Afectados por

15   Texaco that he was going to sign an agreement giving Pablo

16   Fajardo 10 percent of the attorneys' fees in the case?

17   A.   I didn't hear that.

18   Q.   Now, Mr. Donziger never provided you and the Lago Agrio

19   plaintiffs with an accounting of how money was spent by him in

20   connection with the Lago Agrio Chevron case, right?

21              MR. DONZIGER:  Objection.  Vague.  Lago Agrio

22   plaintiffs.

23              THE COURT:  Mr. Friedman is the lawyer on this

24   witness.

25              MR. DONZIGER:  I don't know if it is clear.

1        THE COURT:  Well, it is clear, because he is the one

2   who has indicated no objection to various exhibits.  If Mr.

3   Friedman has an objection, I will hear it.  You know this rule.

4   We set it up before the trial.

5        MR. DONZIGER:  I represent another party per the

6   Court's order.

7        THE COURT:  Mr. Friedman is the lawyer.

8        Mr. Friedman, do you have a problem?

9        MR. FRIEDMAN:  I guess I would say vague, your Honor.

10       THE COURT:  I guess I would say overruled.

11       MR. BRODSKY:  Your Honor, can I ask the reporter to

12   read back the question.

13       THE COURT:  Yes.

14       (Record read)

15   A.  No.

16   Q.  Did you ever ask Mr. Donziger for an accounting of how he

17   spent the money in connection with the Lago Agrio Chevron case?

18   A.  No.

19   Q.  Did the asamblea ever ask Mr. Donziger for an accounting of

20   how he spent funds raised in connection with the Lago Agrio

21   Chevron case?

22       MR. GOMEZ:  Objection, your Honor.  During his

23   service?

24       THE COURT:  He is capable of answering to the best of

25   his knowledge.

DBI8CHE3                    Piaguaje - cross

1    A.  I have not heard that.

2    Q.  Did you ever hear of the Amazonia Recovery Limited?

3    A.  From whom?

4    Q.  From anybody at the asamblea.

5    A.  Because of this trial?

6    Q.  Have you ever heard of a company called Amazonia Recovery

7    Limited ever?

8    A.  No.

9    Q.  Did you hear from anyone at the asamblea, including

10   Mr. Yanza and Mr. Fajardo, that an entity was going to be

11   formed in Gibraltar that was going to receive the money from

12   the Lago Agrio Chevron judgment?

13   A.  Yes.  What we have set up is a trust that would, if we win,

14   would manage the money that we would receive.

15   Q.  Pablo Fajardo told you this?

16   A.  Well, yes, Pablo Fajardo, yes.  If we win, if we win money

17   from this, to be able to manage it properly, we set up a fund

18   so it would be a good accounting and good management of the

19   money.

20   Q.  Did you participate in any discussion with Mr. Fajardo or

21   others at the asamblea that any money received from the Lago

22   Agrio Chevron judgment would be managed in a trust outside of

23   Ecuador?

24   A.  No, in Ecuador itself.

25   Q.  Are you aware one way or the other whether -- withdrawn.

DBI8CHE3                         Piaguaje - cross

1              Who told you that the money would be received in

2     Ecuador as opposed to outside of Ecuador?

3              MR. GOMEZ:  Objection.  It assumes facts.

4              THE COURT:  The witness just testified that the trust

5     was set up to handle the money and it would be in Ecuador.

6     Overruled.

7     A.  Could you please repeat the question?

8     Q.  Who told you that any money received from the Lago Agrio

9     Chevron judgment would be managed in a trust in Ecuador itself?

10    A.  Well, we have the coordinators.  You have Luis Yanza and

11    you have Humberto Piaguaje as coordinators, and they inform us

12    of what is going on, because for my part I don't know anything

13    about this so they inform us.

14             MR. BRODSKY:  May I approach, your Honor?

15             THE COURT:  Yes.

16    Q.  I am showing you, Mr. Piaguaje, two exhibits, Plaintiff's

17    Exhibit 7701 and Plaintiff's Exhibit 7700.

18             If we take the first one, 7701 first, it's Bates

19    labeled JRIZACK 35 through 42, and the first eight pages are in

20    Spanish and pages 10 through 17 are in the original English.

21             Have you ever seen this document before, sir?

22    A.  No.

23    Q.  Did you, sir, have any knowledge that 21 million, more than

24    $21 million has been spent in connection with the Lago Agrio

25    litigation by your attorneys between 2007 and 2013?

 1            MR. GOMEZ:  Objection.  It assumes facts.

 2            THE COURT:  Sustained as to form.

 3   Q.  Are you aware, sir, of how much money has been spent in the

 4   Lago Agrio Chevron case and related litigation by Mr. Donziger

 5   and those working with him between 2007 and 2013?

 6   A.  No.

 7   Q.  In looking at Plaintiff's Exhibit 7700, would you take a

 8   moment to look at the Spanish portion?  This is Bates number

 9   JRIZACK 14 –– it's got different Bates numbers on it, but we

10   will just go with, at the top it says Steven Donziger &

11   Associates.  It has an address in New York, New York.

12            On the first page it has the date of February 2, 2012.

13   And then it has a different date every month from February 2012

14   through July 2012.

15            Have you ever seen this document before, Mr. Piaguaje?

16   A.  No.

17   Q.  Did you know Mr. Donziger was receiving $35,000 a month

18   from January 2012 through at least July 2012 in professional

19   service fees?

20            MR. FRIEDMAN:  I would object.  I don't think that

21   fact has been established.

22            THE COURT:  Sustained as to form.

23            MR. BRODSKY:  If I can offer this document subject to

24   connection, 7700 and 7701.

25            THE COURT:  Any objection?

DBI8CHE3                          Piaguaje - cross

 1              MR. FRIEDMAN:  To offering the document, no.

 2              MR. GOMEZ:  Subject to connection.

 3              THE COURT:  All right.  They are both received subject

 4    to connection.

 5              (Plaintiff's Exhibits 7700 and 7701 received in

 6    evidence)

 7    Q.  Mr. Piaguaje, if you look at the first page of 7700, in

 8    Spanish, you see where it says Steven Donziger & Associates at

 9    the top?

10    A.  This here?

11    Q.  Yes.

12              Did you know, sir, that Mr. Donziger received $35,000

13    a month from at least February 2012 through July 2012 in

14    professional service fees?

15              MR. FRIEDMAN:  Objection again, your Honor.

16              THE COURT:  Sustained as to form.

17    Q.  Were you aware, sir, of how much Mr. Donziger received per

18    month from February 2012 to July 2012 in professional service

19    fees?

20    A.  No.

21              MR. FRIEDMAN:  I would object as to form.

22              THE COURT:  That's not objectionable as to form, but

23    it might be helpful and more expeditious if counsel remembered

24    that in the practice of law, there can sometimes be a

25    difference between billed and received, like in most other

DBI8CHE3                        Piaguaje – cross

1    economic activities.  After you're out of the U.S. attorney's

2    office a couple of more years, you will remember.

3              MR. BRODSKY:  I never did a securities fraud case,

4    your Honor.  That was a joke for the record, a bad one.

5    Q.  Mr. Piaguaje, were you aware that Mr. Donziger and

6    associates charged $35,000 a month in professional service fees

7    each month from February 2012 through at least July 2012?

8              MR. FRIEDMAN:  Object, your Honor, on form.

9              THE COURT:  What is the objection?  Obviously, you can

10   see its authenticity.  So it's in.  It looks like a bill from

11   Mr. Donziger.  And who do you suppose that bill would be

12   rendered to other than the Lago Agrio plaintiffs?

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DBILCHE4                    Piaguaje - cross

```
 1              MS. FRIEDMAN:  Well, that's exactly the point, your
 2    Honor.  I don't think it's clear who that bill is rendered to
 3    and --
 4              THE COURT:  Do you have another candidate?
 5              MS. FRIEDMAN:  Well, there's not even -- I don't
 6    think -- my understanding of the source of these documents,
 7    your Honor, is a -- it's not actually an accountant, but
 8    Mr. Rizack, who kept various financials for Mr. Donziger.  I
 9    don't even know, I don't think it's been established these were
10    ever even sent.
11              THE COURT:  It seems to me that the document is
12    sufficient to permit the question.  And then if you want to
13    deal with it in some other way, that's your privilege, of
14    course.
15              MS. FRIEDMAN:  All right.
16    A.  No.
17              MR. BRODSKY:  Your Honor, I was going to go to a
18    different part.  Happy to do it now.  I'll go forward.
19    Q.  Mr. Piaguaje, can you turn back to your witness statement,
20    Defendant's Exhibit 1800.  We'll put it up on the screen for
21    you.  Let me direct your attention to paragraph 40, which is on
22    page 7.  Do you see where it says I have -- withdrawn.
23              Directing your attention to that paragraph,
24    Mr. Piaguaje, what did you mean by "ratify"?
25    A.  It would be to repeat again it means.
```

DBILCHE4                    Piaguaje – cross

1    Q.  Did you choose -- I'm sorry.

2           Did you choose that word, Mr. Piaguaje, or did your

3    lawyer choose that word, ratify?

4    A.  My attorney.

5    Q.  What did you mean, what court rules are you talking about

6    in paragraph 40 where you say violation of court rules by

7    anyone?

8    A.  With the rules it means, how can you explain this, well,

9    you have to follow -- you have to follow what is being done,

10   for example.

11   Q.  Were you referring to court rules in Ecuador or court rules

12   in the United States or both?

13   A.  Well, in Ecuador.

14   Q.  Let me ask you to turn to paragraph 18, page 4.  The first

15   sentence there, what did you mean by extort money?

16   A.  To lie.

17   Q.  Let me ask you to turn to paragraph 36, page 6.  When you

18   wrote this, sir, in paragraph 36, you meant, of course, that

19   you've never had knowledge of actions taken by Mr. Donziger

20   prior to Chevron filing its complaint against you in 2011,

21   right?

22   A.  Once again?

23   Q.  Sir, did you, when you wrote this that you'd never had any

24   knowledge of actions taken by Mr. Donziger in New York, did you

25   mean you don't have any personal knowledge?

DBILCHE4                    Piaguaje - cross

1   A.  No.  I'm aware that he's supporting with this part of the

2   trial.

3   Q.  Since the complaint against you by Chevron and --

4   withdrawn.

5            Since the complaint by Chevron against you and others

6   was filed, you've learned about the documentary film Crude,

7   right?

8   A.  What do you mean, if I had seen the movie Crude?

9   Q.  Did you, sir, in your deposition, did you view a portion of

10  the outtakes or of the movie Crude?

11  A.  The photographs?

12  Q.  Did you watch any movie, a video clip during your

13  deposition, sir?

14  A.  Where, in Lima?

15  Q.  Yes.

16  A.  No.

17  Q.  Let me direct your attention to paragraph 31.  You were a

18  plaintiff, sir, in the Aguinda v. Texaco case filed in this

19  very courthouse in Manhattan, New York, in 2003, right?

20            THE COURT:  I think, Mr. Brodsky, you've got the year

21  wrong by about a decade.

22            MR. MASTRO:  '93.

23            MR. BRODSKY:  Thank you, your Honor.

24  Q.  You were a plaintiff in the Aguinda v. Texaco case filed in

25  this very courthouse in 1993?

```
 1              THE COURT:  Let me help you a little further, sir.
 2    This courthouse didn't exist in 1993.
 3              MR. BRODSKY:  I meant metaphorically, your Honor.
 4              THE COURT:  Let's stick to the real analog world.
 5              MR. BRODSKY:  I'll move on, your Honor.  I'll move on.
 6    Q.  Mr. Piaguaje, let me direct your attention to other
 7    paragraphs.  Paragraph 18, page 4, last sentence, prior to
 8    Chevron complaining.
 9              Sir, when did you learn Chevron was complaining about
10    your attorneys intimidating or pressuring a judge?
11    A.  I don't know the date.
12    Q.  Was it in 2011?
13    A.  Yes, after the judgment.
14    Q.  When Chevron filed this complaint against you and others?
15    A.  For example, yes, here where it says, yes, exactly.
16    Q.  And in paragraph 19, is your answer the same, that you
17    learned about Chevron's complaining about your attorneys
18    drafting a complaint against an Ecuadorian judge when the
19    allegations were filed against you and others?
20              MR. GOMEZ:  Objection, vague.
21              THE COURT:  Rephrase it.
22    Q.  In paragraph 19 where you state prior to Chevron's
23    complaining about it, do you see that, the "it" is what you
24    mentioned, correct, that your attorneys, that you never
25    authorized your -- withdrawn.
```

DBILCHE4                    Piaguaje - cross

1          That you learned Chevron was complaining your

2     attorneys drafted a complaint against an Ecuadorian judge,

3     correct?

4          THE COURT:  Sustained as to form.  Please, a cleaner

5     question.

6          MR. BRODSKY:  Sorry.

7          THE COURT:  It's hard enough to get it in English.

8     Q.  Paragraph 20, do you see that, Mr. Piaguaje, did you learn

9     that Chevron was complaining that your attorneys put pressure

10    over the judge presiding over the Lago Agrio case when Chevron

11    filed allegations against you and others?

12    A.  Yes.

13    Q.  In paragraph 21, did you learn about Chevron's allegation

14    that your attorneys threatened to file a complaint against

15    Judge Yanez unless your attorneys -- unless Judge Yanez allowed

16    the plaintiffs to waive the judicial inspections when Chevron

17    filed its complaint against you and others?

18    A.  Let's see.  I can't answer because I'm not understanding

19    the question very well.

20         THE COURT:  Let's take our lunch break.  2 o'clock,

21    please.

22         (Luncheon recess)

23

24

25

DBILCHE4b

<pre>
 1                          AFTERNOON SESSION

 2                              2:09 p.m.

 3             THE COURT:  There's a matter that I want to discuss

 4     before we resume and the witness should leave the room for the

 5     time being.

 6             (Witness not present)

 7             THE COURT:  I received over the lunch hour a request

 8     from Chevron for an order to show cause with respect to the

 9     hard drives, hard drive, or, I think to be more precise, the

10     images of the hard drive of Mr. Moncayo's computer.  Among

11     other things, the papers represent that Mr. Gomez is now

12     representing Mr. Moncayo.

13             First of all, is that right, Mr. Gomez?

14             MR. GOMEZ:  That's correct, your Honor.  I was

15     informed yesterday that we are out of funds to pay for

16     Mr. Russell Yankwitt to continue representation.  Given that

17     the amount of work involved has exceed our expectations, there

18     being no other person that could step in, I've elected to step

19     in.  And I had a discussion with Mr. Russell yesterday evening

20     at 11 p.m. to understand what the current status is of the

21     reviews and to arrange for transfer of the file today.

22             THE COURT:  Has the hard drive been imaged?

23             MR. GOMEZ:  The hard drive was copied.  And my

24     understanding, your Honor, is that a firm, RVM, has possession

25     of the drive and is indexing its contents.  As of last night, I
</pre>

DBILCHE4b

1    recall seeing an email that that process was still underway and

2    was expected to be completed at some point today, but I don't

3    know that it's been completed yet or when it's expected to be

4    completed exactly.

5              THE COURT:  And there are two copies or one?

6              MR. GOMEZ:  My understanding is that there are I

7    believe three copies, your Honor:  one that's filed under seal

8    with the court last week, one in the possession of RVM, and one

9    that went back with Mr. Moncayo.

10             THE COURT:  So you're telling me that one is with the

11   clerk of the court; is that right?

12             MR. GOMEZ:  That's my understanding, your Honor, that

13   it was filed under seal last week.

14             THE COURT:  And the indexing, tell me what that's

15   about.

16             MR. GOMEZ:  I haven't had any of these communications,

17   your Honor.  My understanding is that there is a vendor that

18   plaintiff has agreed to pay for who has received the one of the

19   copies of the drives and is required to index, essentially

20   create a list of all of the computer files that are on the

21   drive.

22             THE COURT:  And that's RVM.

23             MR. GOMEZ:  That's RVM.

24             THE COURT:  All right.  And where is it intended that

25   this index go?

DBILCHE4b

1          MR. GOMEZ:  My understanding is that index was to have

2     gone to Mr. Russell Yankwitt for him to use in his review of

3     the contents of the drive.

4          THE COURT:  And where is Mr. Moncayo?

5          MR. GOMEZ:  Mr. Moncayo is in Ecuador.

6          THE COURT:  All right.  Now, Mr. Mastro, I read your

7     proposed order.  You're asking me to order various people or

8     organizations who are not parties to this case to do things.

9          MR. MASTRO:  Well, the difficulty, your Honor, is that

10     an organization called Earth Rights is claiming some kind of

11     privilege claim.  We don't know how they possibly could.  But,

12     you know, we're trying to deal with these issues so that we get

13     the documents in a timely way to be able to use in these

14     proceedings.  It's also the case, your Honor, so we've spelled

15     out in our application why we think they have no rights and

16     they haven't tried to appear here.

17          THE COURT:  I understand that.  I understand that.

18     But they're not even parties to the case.

19          MR. MASTRO:  I understand.

20          THE COURT:  There's no standing here.

21          MR. MASTRO:  They have been very litigious in the

22     past, your Honor, in trying to obstruct discovery of Amazon

23     Watch and otherwise.  So, therefore, we felt we needed to make

24     application to the Court about being able to receive these

25     documents, including, your Honor, the emails which were also

DBILCHE4b

1    imaged but not deposited with the Court.  And Mr. Yankwitt told

2    us last night that he was prepared to produce emails and a

3    privilege log this morning.  So that's something that should be

4    able to go forward forthwith, but for Earth Rights which we

5    think has no understanding here saying, oh, we should have to

6    review it first.

7         THE COURT:  If, as, and when they intervene in this

8    case, I'll deal with any assertions they may make.  I would

9    simply say this.  All concerned ought to take very careful

10   legal advice before anything further happens.

11        Mr. Gomez, you are directed forthwith, as soon as you

12   leave this courtroom today, to complete whatever review you

13   feel you need to make on behalf of Mr. Moncayo and, if

14   Mr. Moncayo has any privileges to assert, to do it as you see

15   fit and forthwith.  And I am going to entertain an application,

16   to which you will have an opportunity to respond, and it may be

17   orally, to direct you forthwith to turn over any responsive

18   materials as to which no privilege is claimed and to move on an

19   extremely expedited schedule as to anything else.

20        Do you understand me?

21        MR. GOMEZ:  I understand, your Honor.

22        THE COURT:  All right.  Let's proceed.  Let's get the

23   witness back.

24        MR. BRODSKY:  Just for your information on scheduling,

25   your Honor, I have maybe 15, 20 minutes left.

DBILCHE4b                    Piaguaje - cross

1            THE COURT:  Thank you.

2            (Witness present)

3            THE COURT:  All right.  The witness is reminded he's

4    still under oath.

5            Let's proceed, Mr. Brodsky.

6            MR. BRODSKY:  May I approach, your Honor?

7            THE COURT:  Yes.

8    BY MR. BRODSKY:

9    Q.  I'm showing you, Mr. Piaguaje, Plaintiff's Exhibits 2241

10   through 2247 and 6730 for identification.  Would you take a

11   moment to look at those photographs.

12           Mr. Piaguaje, these are photographs, correct, from

13   your Facebook account?

14   A.  Yes.

15   Q.  And you updated your Facebook page frequently, correct?

16   A.  When, when I leave where there is a internet signal.

17   Q.  So in, for example, Plaintiff's Exhibit 6730 for

18   identification, those are photographs that you uploaded during

19   your trip here late last week?

20   A.  Yes.

21   Q.  And you access the internet to upload these photographs,

22   correct?

23   A.  Yes, in Facebook.

24   Q.  And on a regular -- withdrawn.

25           When you have the ability to access the internet, you

DBILCHE4b                    Piaguaje – cross

1    know how to do that, correct?

2    A.  A little.

3           MR. BRODSKY:  Your Honor, we offer 2241 through 2247

4    and 6730.

5           MR. GOMEZ:  Your Honor, I have an objection to these

6    documents on the grounds of relevance.

7           THE COURT:  The relevance, Mr. Brodsky?

8           MR. BRODSKY:  At least in two respects.  First, I

9    think they reflect evidence of a sophistication in terms of

10   uploading and using and accessing the internet.  And, your

11   Honor, reasonable inferences can be drawn from that that if

12   Mr. Piaguaje wanted to learn information about the case or the

13   allegations or what steps are being taken or the Court's

14   findings, he can do that.

15          And, second, these are all uploaded by him in Spanish,

16   and I think they're his messages in Spanish which reflect that

17   that's the language that he's using when he's uploading images

18   to his Facebook account.

19          MR. GOMEZ:  Your Honor, for one, I don't think the

20   images establish the kind of understanding of the internet that

21   one would need to conduct searches of various items using

22   search engines.  I think they're two different things, or at

23   least the questioning hasn't established that he possesses that

24   kind of expertise in terms of use of the internet.

25          And, two, with respect to the language, I think

DBILCHE4b                    Piaguaje - cross

1   Mr. Piaguaje has been testifying today in Spanish.  I don't

2   think there's a dispute that he speaks and understands the

3   language.

4               THE COURT:  Well, actually he said earlier that he

5   spoke it a little or understood it a little, something to that

6   effect.

7               MR. GOMEZ:  Yes, that's correct, your Honor.  I don't

8   think that the photographs or Facebook pages one way or the

9   other really add to that particular testimony.

10              THE COURT:  That all goes to the weight.  They're all

11  received.

12              (Plaintiff's Exhibits 2241 through 2247 and 6730

13  received in evidence)

14  Q.  Mr. Piaguaje, just a few final questions focusing on the

15  period of late 2010.

16              Do you recall attending asamblea meetings in the

17  latter half of 2010?

18  A.  I do not remember.

19  Q.  Do you remember --

20              MR. BRODSKY:  Well, may I approach, your Honor?

21              THE COURT:  Yes.

22  Q.  Let me show you, Mr. Piaguaje, Plaintiff's Exhibit 7019 for

23  identification, Bates labeled LAP1660 through 1662.  And the

24  first few pages, Mr. Piaguaje, are in English.  And if you go

25  to the back, the last three pages are the Spanish original.

1          Does this refresh your recollection, Mr. Piaguaje,

2     regarding topics of conversation at asamblea meetings in late

3     2010?

4     A.  Well, I don't remember.

5     Q.  If I can direct your attention to the first page of the

6     minutes where it says confirmation of quorum and direct your

7     attention to OISE.  Do you recognize what OISE is?

8     A.  Yes.

9     Q.  What is it?

10    A.  That's the indigenous organization of the Secoya of

11    Ecuador.

12    Q.  And at this time in 2010, you were the delegate from OSIE,

13    correct?

14    A.  Yes, from June on.

15    Q.  From June 2010 through 2012?

16    A.  Yes.

17          MR. BRODSKY:  We offer 7019, your Honor.

18          THE COURT:  Received without objection.

19          (Plaintiff's Exhibit 7019 received in evidence)

20    Q.  And directing you to the third page, at the top of the

21    page, do you remember Mr. Yanza presenting a proposal of

22    support for Steven Donziger?

23    A.  No.

24    Q.  Does this document refresh your recollection at all of a

25    discussion in late 2010 at asamblea meetings regarding attacks,

DBILCHE4b                    Piaguaje - cross

1   so-called attacks on Mr. Donziger?

2   A.  I'm sorry, I didn't hear it very well.  Could you repeat

3   the question.

4   Q.  Does this document refresh your recollection at all that

5   there was discussion at asamblea meetings in late 2010 about

6   Chevron's allegations relating to Steven Donziger?

7   A.  Yes.  Humberto Piaguaje commented that to me.

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And the asamblea issued an agreement of support for Mr.

2   Donziger?

3   A.  I don't know.  I don't know.

4          MR. BRODSKY:  May I approach for the final time, your

5   Honor?

6          THE COURT:  Yes.

7   Q.  Let me show you, Mr. Piaguaje, a document that you

8   produced.  It's Plaintiff's Exhibit 6703.  The first part is in

9   English.  The document you produced starts from pages 6 through

10  9 in Spanish and it's Bates number JP 3 through JP 6.

11          Do you remember producing this document, Mr. Piaguaje?

12  A.  Yes.

13  Q.  This is an informational bulletin put out by the assembly

14  of the affected by Texaco?

15  A.  Yes.

16  Q.  Directing your attention to the third page, paragraph 4.

17  We will put it up on the screen for you, too, Mr. Piaguaje.

18          Does this refresh your recollection, Mr. Piaguaje,

19  that the asamblea expressed support for Mr. Donziger in late

20  2010?

21  A.  Well, at that time, I wasn't aware of this.  When I was

22  asked, I gave this document but I didn't have a thorough

23  knowledge of it.

24  Q.  You don't recall reading the document at the time?

25  A.  Well, yes, about struggling for 17 years or fighting for 17

1    years, but not much more detail than that.

2              MR. BRODSKY:  No further questions, your Honor.

3              THE COURT:  Thank you.

4              Redirect, Mr. Gomez.

5              MR. GOMEZ:  Before I begin, for the sake of

6    completeness, Mr. Brodsky made reference to Plaintiff's Exhibit

7    6407R.  In particular, Mr. Piaguaje's response to

8    interrogatories number 6 and 11.  I would ask that the entirety

9    of those responses be moved into evidence for the Court's

10   consideration as opposed to just portions or one sentence.

11             THE COURT:  Any problem, Mr. Brodsky?

12             MR. BRODSKY:  When Mr. Gomez says the entirety, if he

13   means the portion below supplemental response to the

14   interrogatory and above the next interrogatory, no objection.

15             MR. GOMEZ:  That's what I mean.

16             THE COURT:  Those additional portions are received.

17             Was there an intention to offer 6703?

18             MR. BRODSKY:  Yes, your Honor.  We offer that.  I

19   believe I may have omitted offering 559A.

20             THE COURT:  One thing at a time.

21             Is it offered for the truth or is it offered simply as

22   a statement?

23             MR. BRODSKY:  Simply as a statement.

24             THE COURT:  6703 is received not for the truth.

25             (Plaintiff's Exhibit 6703 received in evidence)

DBI8CHE5                    Piaguaje - cross

1              THE COURT:  What was the other one?

2              MR. BRODSKY:  559A is the agreement between Mr.

3    Fajardo, Mr. Yanza, and the leader of the asamblea.

4              THE COURT:  Any objection?

5              MR. GOMEZ:  No objection.

6              THE COURT:  Received.

7              (Plaintiff's Exhibit 559A received in evidence)

8    REDIRECT EXAMINATION

9    BY MR. GOMEZ:

10   Q.  Goods afternoon, Mr. Piaguaje.

11   A.  Good afternoon.

12   Q.  Mr. Piaguaje, who is Humberto Piaguaje?

13   A.  He is the vice coordinator or sub-coordinator of the

14   assembly of the affected.

15   Q.  Is that the position he held when you were a member of the

16   executive committee or the position he holds presently?

17   A.  Yes.

18   Q.  Did Humberto Piaguaje hold the position of vice

19   sub-coordinator of the asamblea when you were on the executive

20   committee in year 2010 through 2012?

21   A.  Yes.

22   Q.  Does Mr. Piaguaje, Mr. Humberto Piaguaje, hold the position

23   of vice sub-coordinator of the asamblea at present?

24   A.  No.  Now he is the coordinator.

25   Q.  What is the responsibility of the sub-coordinator of the

 1    asamblea?

 2            MR. GOMEZ:  Withdrawn.

 3    Q.  What is the responsibility of the coordinator of the

 4    asamblea?

 5    A.  That person coordinates all matters related to this trial,

 6    that is, he is a liaison or a link with the attorneys, as well

 7    as with us, with the communities.

 8    Q.  Is he responsible for preparing the agendas of the asamblea

 9    meetings?

10            MR. BRODSKY:  Objection.  Leading.

11            THE COURT:  Sustained.

12    Q.  What are the specific tasks that he is required to perform

13    as coordinator?

14    A.  Well, as the category, I am not very familiar.  It's not a

15    position that I myself have held.  But he works with the

16    indigenous communities and with the attorneys deciding or

17    working with us to decide what we will do, the presidents of

18    all of the indigenous nations and the settlers as well.

19    Q.  Why was the asamblea created?

20            MR. BRODSKY:  Objection.

21            THE COURT:  Sustained.

22    Q.  What is the purpose of the executive committee in the

23    asamblea?

24    A.  The executive committee holds meetings with representatives

25    of all of the indigenous nations as well as the cooperative,

DBI8CHE5                        Piaguaje - redirect

1     part of the affected, the persons affected.

2     Q.  How many persons sat on the executive committee of the

3     asamblea when you were a member of it between 2010 and 2012?

4     A.  I don't know how to tell you exactly how many.  There is a

5     representative from all of the indigenous nationalities, as

6     well as the coordinator and the representative of the Amazon

7     Defense Front.  So exactly I don't know, 10, 12.

8     Q.  You mean 10 to 12 people?

9     A.  Yes.

10    Q.  Which indigenous nationalities were represented on the

11    executive committee on the asamblea when you were a member of

12    it between 2010 and 2012?

13    A.  The Kofan and the Siona, the Kichwa, the Siekopai, my own,

14    the settlers.  Those all meet in the committee.

15    Q.  Who did the settlers represent?

16    A.  Themselves.

17    Q.  How were they selected, the settlers, to participate on the

18    executive committee?

19    A.  Each one of the cooperatives was given a chance to be

20    represented on the executive committee.

21    Q.  When you say cooperative, what are you referring to?

22    A.  In Ecuador, when settlers get together and form a group in

23    a community of sorts, that's what a cooperative is.  We use the

24    word comunidad in Ecuador really to refer to indigenous people

25    so it's a cooperative.

DBI8CHE5                        Piaguaje - redirect

 1   Q.  Can you identify some of the cooperatives that were

 2   represented in the executive committee when you were a member

 3   between 2010 and 2012?

 4   A.  Yes.  I know the communities, but I don't know the names of

 5   all of the cooperatives, the settler communities.

 6   Q.  How were the representatives of the indigenous groups who

 7   sat on the executive committee of the asamblea selected?

 8            MR. BRODSKY:  Objection.  Foundation.

 9            THE COURT:  Sustained.

10   Q.  Who selected the representatives of indigenous groups to

11   sit on the executive committee of the asamblea?

12            MR. BRODSKY:  Same objection.

13            THE COURT:  Sustained.

14            MR. GOMEZ:  What is the objection?

15            THE COURT:  There is no foundation.  No showing that

16   he has personal knowledge.

17   Q.  Sir, how were you selected to sit on the executive

18   committee of the asamblea?

19   A.  Because I was president, that's why I had to join in the

20   executive committee.

21   Q.  At the time that you were sitting on the executive

22   committee of the asamblea, were there representatives of other

23   indigenous nations sitting on that committee?

24   A.  Of other indigenous nationalities?

25   Q.  Yes.

DBI8CHE5                      Piaguaje - redirect

1   A.   Yes.

2   Q.   How were they selected to participate on this committee?

3        MR. BRODSKY:   Objection.

4        THE COURT:   Sustained.   It's the same question you

5   have asked twice before.

6   Q.   Mr. Piaguaje, do you know how representatives of other

7   indigenous groups were selected to sit on the executive

8   committee of the asamblea between 2010 and 2012?

9   A.   Yes.   Because each community, they will elect who their

10  candidate is, who becomes like a president, and that president

11  is on the executive committee representing that community.

12  Q.   Mr. Piaguaje, was a quorum always taken at every executive

13  committee meeting that you attended?

14  A.   Yes.

15  Q.   How was that done?

16  A.   It had to be one more than half.

17  Q.   Whose responsibility was it to identify sufficient

18  participation to constitute a quorum for a meeting of the

19  executive committee?

20  A.   Well, those of us who are there can see ourselves because

21  we know who is there, and we can tell if there is more than

22  half of the number and put in from among ourselves.   We appoint

23  somebody to do that.

24  Q.   Did you ever read the minutes of previous executive

25  committee meetings?

DBI8CHE5                        Piaguaje - redirect

1   A.  I didn't, but I did hear when others were reading them.

2   Q.  When an executive committee meeting of the asamblea

3   started, were the minutes of a previous executive committee

4   meeting read and approved?

5   A.  Yes.

6   Q.  When you were a member of the executive committee between

7   2010 and 2012, you testified in response to Mr. Brodsky's

8   questions that a trust was discussed.  Do you remember that

9   testimony?

10  A.  Yes.

11  Q.  What was discussed at the executive committee meetings that

12  you attended between 2010 and 2012 regarding a trust?

13          MR. BRODSKY:  Objection.  Time period, your Honor.

14          THE COURT:  No.  He said 2010 to 2012.  Overruled.

15  A.  Well, we began working to build together with those

16  affected and together with our supporters, the coordinator, the

17  attorneys and other colleagues, participants, representatives

18  of the Amazon Defense Front, and we understood that we needed

19  to set up a trust in order to manage money and not waste it and

20  focus on the projects for which we had started this lawsuit and

21  the four issues that we had set out to address.

22  Q.  Who was supposed to manage the trust to which you refer?

23  A.  Who started using that word?

24  Q.  No.  Who was supposed to manage the trust that you are

25  talking about?

1    A.  Well, what we talked about in the executive committee was

2    that we would need to hire outside persons, professionals, but

3    that they couldn't just spend the money any way, and that there

4    should be one person from each indigenous nationality, as well

5    as a settlers there, to have oversight over that.

6    Q.  Has the assembly identified specific people to perform

7    oversight of the trust that you were talking about?

8                MR. BRODSKY:  Objection.

9                THE COURT:  Sorry.  Did you say objection?

10               MR. BRODSKY:  Yes.

11               THE COURT:  Ground.

12               MR. BRODSKY:  Relevance.

13               THE COURT:  Why is it relevant?

14               MR. GOMEZ:  Your Honor, there is an allegation --

15               THE COURT:  And why wasn't it in the witness

16   statement?

17               MR. GOMEZ:  First of all, there is an allegation that

18   all of these decisions are being made or at least directed by

19   Mr. Donziger.  I would like to elicit testimony from the

20   witness that contradicts that allegation.

21               As for the reason it was not in the witness statement,

22   your Honor, the questions about the trust were raised on cross.

23   It revealed to me that the witness possesses a greater

24   understanding of this than I once imagined, and I would like to

25   ask him questions to elicit his knowledge.

DBI8CHE5                        Piaguaje - redirect

1              THE COURT:  Confine it to the relevant time period.

2    BY MR. GOMEZ:

3    Q.  Mr. Piaguaje, after 2011, did the asamblea select specific

4    individuals to provide oversight of a trust that you were

5    talking about?

6    A.  Yes.

7    Q.  Can you identify who those persons were?

8    A.  Well, I only know as to my indigenous community.

9    Q.  Who would that be, sir?

10   A.  His name is Felipe Lusitande.

11             MR. GOMEZ:  Your Honor, may I confer with co-counsel?

12             THE COURT:  Yes.

13             MR. GOMEZ:  Nothing further.

14             THE COURT:  Mr. Friedman?

15             MR. FRIEDMAN:  Nothing for us.

16             THE COURT:  Recross?

17             MR. BRODSKY:  No, your Honor.

18             THE COURT:  All right.  Thank you, Mr. Piaguaje.  You

19   are excused.

20             (Witness excused)

21             MR. FRIEDMAN:  Can we have a side bar before we call

22   our next witness?

23             (At the side bar)

24             MR. FRIEDMAN:  Your Honor, Mr. Donziger wanted to

25   address the Court, and I thought it would be more appropriate

DBI8CHE5

1    that he do it at the side bar than in open court, if that's OK.

2              MR. DONZIGER:  I don't know if it's more appropriate

3    to do it at the side bar.

4              I am the next witness.  Really, two issues.  One is my

5    witness statement is in.  Chevron has a motion to strike

6    portions of it.  So there is that issue.  I would like to get

7    some clarity on that before I testify.

8              The second issue is we would like to do a relatively

9    brief direct before they start on cross, on the theory that my

10   credibility is obviously very much at issue.  The Court allowed

11   Judge Guerra to put in a statement and also testify on direct

12   before the cross.

13             So I would like to ask the Court to allow Mr. Friedman

14   to do a relatively brief direct to start before Chevron does

15   the cross, but I also would like some clarity on the issue of

16   what I am going to be allowed to testify about in terms of what

17   was in my statement or the scope of it given their motion.

18             THE COURT:  Define relatively brief.

19             MR. DONZIGER:  A couple of hours.

20             MR. FRIEDMAN:  I was going to say 45 minutes.

21             THE COURT:  The answer is no.  I have ruled on that.

22   Obviously, it would have been different had you complied with

23   the directions about your witness statement, but you didn't.

24             As to the other, what I am prepared to say now,

25   inasmuch as you have filed your witness statement yesterday or

DBI8CHE5

1    possibly even this morning, and thus, I have had relatively

2    little time to consider Chevron's motion and your counsel

3    hasn't even responded to it, I guess I will do this.

4           Mr. Friedman, do you want to address the motion

5    briefly now?

6           MR. FRIEDMAN:  Yes.  I don't know that we need to do

7    this at side bar.  I have notes to address it.

8           THE COURT:  Go ahead now.

9           MR. FRIEDMAN:  Your Honor, here are the main points in

10   opposition to Chevron's brief.

11          Chevron has alleged extortion.  As I understand the

12   law of extortion, it is incumbent upon Chevron to prove that

13   there was no valid claim to the damages that were supposedly

14   being extorted from Chevron or trying to be extorted, and also

15   has to prove that Mr. Donziger did not believe, or did not

16   believe reasonably in good faith, that the plaintiffs had a

17   valid claim to damages.

18          I think the bulk, as I remember it, the bulk of

19   Chevron's motion is addressed to issues relating to

20   contamination and to the corporate relationship between Texaco,

21   Chevron and Petroecuador.  All of that goes to the point of Mr.

22   Donziger having a good faith belief that there was in fact a

23   valid claim for the Ecuadorian plaintiffs for the money he was

24   supposedly trying to extort.  So that's the heart of our

25   opposition.  I can't recall if there were other points in their

DBI8CHE5

1    brief, but I think they were mainly trying to keep out

2    contamination and legal status issues.

3         MR. DONZIGER:  Can I make one quick point of

4    clarification?  You might not be aware of it.  My witness

5    statement was turned in Thursday evening.  The statement that

6    we sent over yesterday evening was exactly the same but for one

7    paragraph at the very end.

8         THE COURT:  But for your addition of a large number of

9    exhibits, which in some respects make it a significantly

10   different ball game.  And that's simply where it is.  Even if

11   it were last whenever, it was way late, and you have been given

12   extraordinarily great latitude, and I have no doubt that I will

13   have the opportunity to assess your credibility fully through

14   an extensive cross-examination and redirect.  So that takes

15   care of that.

16        Now, what I am prepared to do right now vis-a-vis

17   Chevron's motion is this, subject to the possibility that on

18   further consideration there may be some alterations.  As a

19   general matter, statements attributed in the witness statement

20   to persons other than Mr. Donziger, or references to statements

21   in writings by persons other than Mr. Donziger, will not be

22   considered for the truth of the matters asserted.  All or

23   substantially all are hearsay to the extent they are offered

24   for the truth of the matters, and there is nothing in the

25   witness statement that establishes the applicability of any

DBI8CHE5

1    exception to the hearsay rule.  That is not to say it

2    necessarily will be considered for nonhearsay purposes, only

3    that it will not be considered for the truth of the matters

4    asserted.  I will rule on this other issue later.

5           The statement, moreover, contains and refers

6    extensively to exhibits and other materials relating to

7    environmental conditions in the Oriente.  I see nothing in the

8    statement and nothing in what counsel has said or submitted to

9    suggest that any of that information is relevant if and to the

10   extent it is offered to prove the truth.

11          That's what I am prepared to say now.  You will have a

12   ruling on the motion in full before very long.

13          MR. FRIEDMAN:  Could I address just two quick points?

14          One, there are some exhibits listed in the witness

15   statement that are documents of Chevron's that we would ask be

16   admitted for the truth.  I just wanted to make that clear.

17          THE COURT:  Fair enough.  That's why I left some

18   flexibility here.  I can't be expected to have in mind each and

19   every exhibit referred to in there, particularly since it's

20   been a moving target as late as 8:00 this morning.  I will deal

21   with that in the fullness of time.  But you wanted guidance,

22   you have got it.

23          (Continued on next page)

24

25

DBI8CHE5

1                    (In open court)

2                    THE COURT:  Why don't we take our afternoon break

3     before we start.

4                    (Recess)

5                    THE COURT:  Next witness, Mr. Friedman.

6                    MR. FRIEDMAN:  Steven Donziger, your Honor.

7      STEVEN DONZIGER,

8          called as a witness by the defendants,

9          having been duly sworn, testified as follows:

10                    THE DEPUTY CLERK:  State your name for the record.

11                    THE WITNESS:  Steven Donziger.

12                    MR. FRIEDMAN:  May I approach the witness, your Honor?

13                    THE COURT:  You may.

14     DIRECT EXAMINATION

15     BY MR. FRIEDMAN:

16     Q.  Mr. Donziger, do you recognize Defendants' Exhibit 1750?

17     A.  I do.

18     Q.  Could you tell us what it is?

19     A.  It's my witness statement.

20     Q.  Who prepared it?

21     A.  I did.

22     Q.  Who signed it?

23     A.  I did.

24     Q.  Is it true and accurate to the best of your ability?

25     A.  Yes, it is.

DBI8CHE5                    Donziger - direct

1          MR. FRIEDMAN:  I move into evidence DX 1750.

2          MR. MASTRO:  Your Honor, subject to the motion to

3   strike that we have already made in so many respects, we have

4   objected to major portions of it.

5          THE COURT:  Received subject to the motion.

6          (Defendant's Exhibit 1750 received in evidence)

7          MR. FRIEDMAN:  Pass the witness, your Honor.

8          MR. MASTRO:  Thank you, your Honor.

9   CROSS-EXAMINATION

10  BY MR. MASTRO:

11  Q.  We meet again, Mr. Donziger.  Good afternoon.

12          Sir, am I correct that you only served on us last

13  night around 6:30 a final version of your witness statement,

14  the declaration that was just offered into evidence, correct,

15  sir?

16  A.  Yes.

17  Q.  And that you served on us a draft of that statement on

18  Thursday evening, around 8:00, correct, sir?

19  A.  That's correct.

20  Q.  In the evening, correct?

21  A.  Yes.

22  Q.  But you had already given it out, that draft, to the press

23  before you ever gave it to us or to the Court, correct, sir?

24  A.  No.

25  Q.  Did you not give your statement to The New York Times the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBI8CHE5                       Donziger - cross

1   day before or earlier before you gave it to us or to the Court?

2   A.  I gave an earlier version to The New York Times.

3   Q.  Thank you for that clarification.  I appreciate it.

4          Am I correct that you yourself describe yourself as

5   someone who could have been a propagandist?

6   A.  I don't know.

7   Q.  You recall saying that on the Crude outtakes, sir, that you

8   could have been a propagandist?

9   A.  No.

10  Q.  We will refresh your recollection later.

11         Mr. Donziger, this is not the first time you have

12  testified, is it, sir, in this case?

13  A.  No.

14  Q.  You also gave a deposition in your 1782 proceeding,

15  correct?

16  A.  Many days, yes.

17  Q.  Sir, you prepared yourself to give that testimony in your

18  1782 proceeding, correct?

19  A.  I don't understand your question.

20  Q.  You prepared yourself to give testimony at your deposition

21  in your 1782 proceeding, correct?  You didn't just go in cold,

22  you prepared, correct?

23  A.  I prepared with my then counsel.

24  Q.  And you prepared responses to give to questions in your

25  1782 proceeding, correct, sir?

DBI8CHE5                    Donziger - cross

1   A.  Well, I did a preparation where I tried to think of

2   truthful responses to questions that I expected to be posed.

3   Q.  Isn't it a fact, sir, that one of the responses you

4   prepared for yourself to give when you were about to give

5   testimony then was to respond to questions, "It's possible, but

6   I don't think so"?

7   A.  If that were to be an accurate response, yes, I would give

8   that response.

9   Q.  Didn't you also prepare yourself to give the response, "I

10  guess it's possible, but to the best of my recollection I

11  didn't"?

12  A.  If that would be accurate, yes, I would give that response.

13  Q.  I am going to show you, sir, what has been marked as

14  Plaintiff's Exhibit 2457.

15          MR. MASTRO:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  I am referring you, Mr. Donziger, to the very top part of

18  the page where it says, "Comments:  It's possible, but I don't

19  think so.  I guess it's possible, but to the best of my

20  recollection I didn't."  Do you see that, sir?

21  A.  Yes.

22  Q.  You wrote this document yourself to prepare yourself to

23  give testimony in a courtroom, correct, sir?

24  A.  I did write the document myself.

25  Q.  And you didn't write that paragraph in response to any

DBI8CHE5                         Donziger – cross

1   particular question, did you, sir?

2   A.  I wrote it in response to what could be questions that I

3   anticipated.

4   Q.  Sir, simple question.  You didn't write that paragraph

5   about giving those responses in response to any specific

6   question, did you, sir?

7            MR. GOMEZ:  Objection.  Asked and answered.

8            THE COURT:  Overruled.

9   A.  I wrote it in response to specific questions that might

10  come up that that would be an appropriate response to.

11  Q.  You didn't cite any specific questions that you had in mind

12  to give those responses to, "It's possible, but I don't think

13  so.  I guess it's possible, but to the best of my recollection

14  I didn't," correct, sir?

15           MR. GOMEZ:  Objection.  The document speaks for

16  itself.

17           MR. MASTRO:  I will withdraw, your Honor.

18  Q.  Mr. Donziger, can you tell the Court how many times during

19  your deposition you responded to questions with, it's possible,

20  but I don't think so, or, I guess it's possible, but to the

21  best of my recollection I didn't, in words or substance?  Can

22  you tell the Court how many times you did that in your

23  deposition?

24  A.  Given that I was deposed 19 days, and I don't have the 19

25  days and thousands of pages in front of me, no, I can't answer

1   that question right now.

2   Q.  Was it more than 100 times, sir?

3   A.  I have no idea, sir.

4   Q.  More than 200 times?

5   A.  I don't know.

6            MR. MASTRO:  I will move on, your Honor.

7   Q.  Mr. Donziger, referring to your witness statement, you

8   claim that Pablo Fajardo has been the "lead lawyer" in the Lago

9   Agrio case "from 2005 until the present"?

10           THE COURT:  Can I have the paragraph, please?

11           MR. MASTRO:  Paragraph 10.

12   Q.  That's your testimony to this Court, correct, sir?

13   A.  Yes.

14   Q.  And that he is the sole representative, that's your

15   testimony?

16   A.  Before the court in Ecuador, yes.

17   Q.  And that you have "served on the case at the pleasure of

18   the plaintiffs and their representative," correct, sir?

19   A.  Yes.

20   Q.  And their representative is Mr. Fajardo, you serve at his

21   pleasure, that's your testimony here, correct?

22   A.  I serve at the pleasure of the clients and Mr. Fajardo as

23   their representative.

24   Q.  So you work for Mr. Fajardo, he doesn't work for you,

25   that's your testimony?

1    A.  In that time frame, yes.

2    Q.  2005 to the present, correct?

3    A.  Yes.

4    Q.  Sir, I want to ask you a few questions about that.

5           First, in terms of serving at the pleasure of the Lago

6    Agrio plaintiffs.  You were just here for Mr. Piaguaje's

7    testimony, weren't you, sir?

8    A.  Yes.

9    Q.  So you know that he just told the Court in his statement

10   that, "I have never had the direct authority, discretion or

11   control of the actions taken by Steven Donziger."

12          That's paragraph 36 of his statement.  Isn't that

13   correct, sir, that's the testimony he just gave to the Court?

14   A.  I don't know.  I don't have his statement in front of me,

15   but if it is, it's not what I'm talking about.

16   Q.  And you know that Mr. Camacho, the other defendant in this

17   case, also a Lago Agrio plaintiff, has testified that he has

18   never even met you, correct, sir?

19          THE COURT:  Mr. Mastro, they have said whatever they

20   have said.

21   Q.  Mr. Donziger, I want to ask you about how you have

22   described yourself since 2005.

23          Isn't it a fact that you have described yourself since

24   2005 as "the lead lawyer in the class action trial that seeks

25   damages for a cleanup, *Aguinda v. Chevron Texaco*, currently

DBI8CHE5                    Donziger - cross

1    being heard by the superior court in Nueva Loja, in Ecuador,

2    before German Yanez."

3            You have described yourself since 2005 as the lead

4    lawyer in that class action trial, haven't you, sir?

5    A.  At times I have.

6    Q.  And you have described yourself since 2005 as "the person

7    primarily responsible for putting this team together and

8    supervising it," correct, sir?

9    A.  This team not being the Ecuadorian team; the team outside

10   of Ecuador, yes.

11   Q.  Sir, haven't you also described yourself since 2005 as

12   "playing an integral role in designing the trial strategy and

13   working closely with the local team of lawyers," correct, sir?

14   A.  I don't know.

15   Q.  Sir, the integral role in designing the trial strategy,

16   that would be the Lago Agrio Chevron trial, correct, sir?

17   A.  Well, not necessarily.

18   Q.  So let me put up on the screen Plaintiff's Exhibit 806 and

19   go to page 21.

20           This is a book proposal that you prepared yourself

21   since 2005, correct, sir?

22   A.  I am seeing one paragraph.  I don't know if there is a

23   complete document.

24   Q.  Let's hand him the complete document.

25           MR. MASTRO:  May I approach, your Honor?

DBI8CHE5                    Donziger - cross

1            THE COURT:  Yes.

2   Q.  On the first page of Plaintiff's Exhibit 806, that's an

3   e-mail from you to someone named David Kuhn, dated November 3,

4   2006, correct, sir?

5   A.  Yes.

6   Q.  So this is your draft book proposal, correct?

7   A.  Yes.

8   Q.  Let's go, sir, to page 21 of that proposal.

9            THE COURT:  Which number, counsel?

10           MR. MASTRO:  It's page 21.

11           THE COURT:  There are two page 21s.  You're going off

12   the bottom numbers or the other numbers?

13           MR. MASTRO:  I am going by the bottom numbers, your

14   Honor.  Not 22.  I am going on the one in the lower right-hand

15   corner.

16           THE COURT:  Thank you.

17   Q.  Sir, am I correct that you have described yourself as a

18   person supervising -- strike that.

19           Am I correct that you have described yourself as

20   playing an integral role in designing the trial strategy and

21   working closely --

22           THE COURT:  The document says what it says.  If you

23   want to read something to him and ask him something based on

24   it, go ahead.  But no responsive readings.

25   Q.  Where in your book proposal you refer to playing an

1   integral role in designing the trial strategy and working

2   closely with the local team of lawyers, you are referring to

3   the trial strategy in the Lago Agrio Chevron case, correct,

4   sir?

5   A.  No.  Yes, but I refer in the same paragraph to Mr. Fajardo

6   as the lead lawyer.

7   Q.  Sir, the lead local lawyer in the Ecuadorian case, correct?

8   A.  That's an accurate description.

9   Q.  Isn't it a fact that you have also described yourself since

10  2005 as being "at the epicenter of the legal, political and

11  media activity surrounding the case, both in Ecuador and in the

12  U.S," correct, sir?

13  A.  I don't know if you're reading from the proposal.  Feel

14  free to point it out to me and I can answer it.

15  Q.  Do you recall describing yourself in those terms, sir?

16  A.  No.

17  Q.  Sir, isn't it a fact that you wrote to Joseph Kohn in 2009

18  and described your firm's role as a primary obligation is to

19  run the case on a day-to-day basis?

20  A.  I believe I did, but --

21  Q.  Isn't it a fact, sir, that you described yourself as doing

22  "the overwhelming amount of work on this case"?

23  A.  Yeah.  But that's a very incomplete description of my

24  actual role.  My role was much more nuanced than that.

25          THE COURT:  Mr. Donziger, answer the questions and

DBI8CHE5                         Donziger - cross

1   then stop when you have answered them.  Your counsel will have

2   the opportunity on redirect to ask you anything he wants to ask

3   you to clarify.

4   Q.  Isn't it a fact, Mr. Donziger, that you would give

5   directions to local counsel in Ecuador on what to do with the

6   litigation?

7   A.  On occasion I would express my opinion as to what they

8   should do, and I would do it in forceful terms.  It didn't

9   change the fundamental relationship, which is I worked for

10  them.

11  Q.  Isn't it a fact, Mr. Donziger --

12          MR. MASTRO:  And I apologize in advance, your Honor,

13  for using this language.  It is not my language, his.

14  Q.  But isn't it a fact, Mr. Donziger, that there were times

15  when since 2005, you gave instructions to Mr. Fajardo and other

16  local counsel in Ecuador to just get this done on time and

17  don't fuck it up?

18  A.  Is your question did I say that?

19  Q.  Yes.

20  A.  I would often use very forceful language, yes.  I don't

21  know if I said that.

22  Q.  Mr. Donziger, isn't it also a fact that in your own

23  notebook, that you call a memoir, you describe personally

24  meeting privately with the Ecuadorian judges on the Lago Agrio

25  case at least eight separate times between March 2006 and May

DBI8CHE5                    Donziger - cross

1    2007?

2    A.  I met with judges in Ecuador when it was appropriate to do

3    so on occasion.  I don't know the exact number.

4    Q.  The judge in the Lago Agrio Chevron case, you document in

5    your notebook meeting with the judge overseeing the Lago Agrio

6    Chevron case privately, without Chevron present, eight separate

7    occasions between March 2006 and May 2007, correct, sir?

8             MR. GOMEZ:  Objection.  The document speaks for

9    itself.

10            THE COURT:  Overruled.

11   A.  I don't know the exact number.  There were occasions that I

12   met with the judge.

13   Q.  Sir, isn't it a fact that you have described yourself as

14   the cabeza on the Lago Agrio Chevron case?

15   A.  I don't have any recollection of that.

16   Q.  And cabeza means head, correct?

17   A.  Cabeza means head in Spanish.

18   Q.  That's the way Pablo Fajardo has introduced you since 2005,

19   as the cabeza on the case, correct?

20   A.  I don't know.  He certainly hasn't in recent years.

21   Q.  Sir, I would like to show you your notebook.

22            Sir, directing your attention to page 27 of 119.

23            MR. MASTRO:  That's at the bottom center of the page,

24   your Honor.

25   Q.  Directing your attention to the passage, "Pablo is

1  obviously single-handedly providing the glue to hold much of

2  the left together.  Still introduces me as the cabeza of the

3  lawsuit, which I don't like, but that is fixable."  Do you see

4  that, sir?

5          Do you see that, sir?

6  A.  Yes.

7  Q.  Does that refresh your recollection that Pablo Fajardo

8  referred to you in 2007 as the cabeza of the lawsuit?

9  A.  I don't have any independent recollection other than my

10  notes.

11  Q.  Now, sir, isn't it a fact that Pablo Fajardo also used to

12  refer to you as the commander-in-chief of the Ecuadorian legal

13  team?

14  A.  Pablo had a lot of nicknames for me.  That might have been

15  one of them.

16  Q.  He did that as recently as October 2009, when the final

17  plan for the case, his words, was to be done and our

18  "commander-in-chief Steven Donziger must be at that workshop."

19  Isn't that true, sir?

20  A.  I vaguely remember that, but I think he was joking.

21  Q.  Sir, when you're putting together the final plan for the

22  case, he is calling you commander, and your testimony to this

23  Court is that was a joke?

24  A.  We had a lot of jokes among us about authority.  So I think

25  that was a joke.

1  Q.  Isn't it a fact that Mr. Fajardo referred to you as

2  commander repeatedly from 2007 to the present?  Isn't that

3  true, sir?

4  A.  He used the word comandante.

5  Q.  Which means commander in Spanish, correct?

6  A.  It was done more as a term of affection, akin to like good

7  buddy or something like that.

8  Q.  Isn't it a fact since 2005, you referred to Mr. Fajardo in

9  discussions with others as "your young field lawyer in Lago"?

10  A.  I don't have any recollection of that.

11           MR. MASTRO:  May I approach, your Honor?

12           THE COURT:  Yes.

13  Q.  Mr. Donziger, this is an e-mail that you sent to Raul

14  Herrera in August 2006, correct, sir?

15  A.  Yes.

16  Q.  Raul Herrera was the lawyer representing the Republic of

17  Ecuador, correct?

18  A.  I believe he was at that time.

19  Q.  He was at Winston & Strawn, correct?

20  A.  I believe so.

21  Q.  When you're communicating to Raul Herrera of Winston &

22  Strawn representing the Republic of Ecuador, you called Pablo

23  Fajardo "a young field lawyer in Lago," correct?

24  A.  Yes.

25  Q.  Does that refresh your recollection whether that is the way

DBI8CHE5                        Donziger – cross

1    you used to refer to him in the period in 2005?

2    A.  No.

3    Q.  Is it also the case that Mr. Fajardo only became a lawyer

4    and graduated from school sometime in 2004?

5    A.  I have a recollection he became a lawyer in the early 2000s

6    and the Lago case was his first case.  I don't know if it was

7    that particular year or not.

8    Q.  Isn't it correct that you told Vanity Fair that Pablo

9    Fajardo only became a lawyer in 2004?

10   A.  I don't recall.

11   Q.  Isn't it a fact, sir, that you are the one who installed

12   Pablo Fajardo as the person to be the lead local lawyer in late

13   2005 when you and Joe Kohn were forcing Christopher Bonifaz out

14   of the case?

15            THE COURT:  Sustained as to form.  Break it up.

16   Q.  Isn't it a fact, sir, that you're the person who directed

17   that Pablo Fajardo become the lead local lawyer in the Lago

18   Agrio Chevron case in December 2005?

19   A.  I remember recommending him.  I did not direct it.  The

20   decision was made by others.

21   Q.  At the time, you and Mr. Kohn were forcing Christopher

22   Bonifaz out of the representation, correct?

23   A.  First of all, it's Cristobal Bonifaz.  And the answer is,

24   no, we were not at that time.

25   Q.  Am I right that you directed that Pablo become the joint

DBI8CHE5                      Donziger - cross

1    counsel of record in December 2005 to take control of the case

2    within the current team -- strike that.

3              Am I correct that up until December 2005, Pablo

4    Fajardo had not been the person speaking as lead local counsel

5    in the Lago Agrio Chevron case?

6    A.  I don't recall the specific dates, but at the beginning of

7    the trial he was not, and then he replaced the person who was.

8    Q.  And that in December 2005, you instructed that it was

9    important for Pablo to become the joint counsel of record as

10   soon as possible to take control of the case within the current

11   team?

12   A.  I don't recall.

13             MR. MASTRO:  Your Honor, may I approach?

14             THE COURT:  Yes.

15             MR. MASTRO:  I will show the witness what has been

16   marked as Plaintiff's Exhibit 7673.

17   Q.  Mr. Donziger, am I correct that this is an e-mail from you

18   to Alejandro Ponce and Pablo Fajardo, copy to Luis Yanza, dated

19   December 7, 2005?

20   A.  That's correct.

21   Q.  I am referring you to the bottom of the first page.

22             Does that refresh your recollection on December 7,

23   2005, that you wrote to the local Ecuadorian legal team that it

24   was "even more important for Pablo to become the joint counsel

25   of record as soon as possible to take control of the case

DBI8CHE5                         Donziger – cross

1   within the current team"?

2   A.  Yes.

3   Q.  That was because you were upset with something that Alberto

4   Wray had just done on the case, correct, sir?

5   A.  I think it was a variety of reasons, that being one of

6   them.

7   Q.  Mr. Donziger, am I correct that you have been practicing

8   law for over 25 years?

9   A.  No, not that long.

10  Q.  You're in your early 50s, correct?

11  A.  Yes.

12  Q.  And Mr. Fajardo, is he even 40 years old now?

13  A.  He is 40, or 41.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

DBILCHE6                    Donziger - cross

```
 1   Q.  And, sir, am I correct that you still refer to him today as
 2   local counsel, correct?
 3   A.  There's different descriptive terms I use and that is one
 4   that I think I do use and is accurate.
 5   Q.  Let me ask you about financial terms between you and
 6   Mr. Fajardo.
 7          Am I correct that you stand to make more than three
 8   times what Mr. Fajardo stands to make on a contingency fee
 9   basis in this case?
10   A.  I don't know.
11          MR. MASTRO:  Your Honor, referring to the sanctions
12   hearing testimony, page 136, lines 10 through 13:
13          "So you make more than three times what Mr. Fajardo
14   makes on this case but you work for him.  That is your
15   testimony in this court?
16          "Answer:  Yes, it is."
17   Q.  Now, Mr. Donziger --
18          THE COURT:  Are you offering that?
19          MR. MASTRO:  I am offering it as impeachment, your
20   Honor.
21          THE COURT:  Is there an objection to its being
22   received?
23          MR. FRIEDMAN:  Your Honor, if the whole page is put in
24   for context, there's no objection.
25          MR. MASTRO:  No problem, your Honor.
```

DBILCHE6                    Donziger - cross

1           THE COURT:  Page 13 in its entirety of the sanctions

2    hearing is in.

3    Q.  Mr. Donziger, am I correct that Mr. Fajardo makes

4    approximately 2,000 a month?

5    A.  I don't know at this point what he makes.

6    Q.  You're the person who doles out the checks to pay the

7    Ecuadorian legal team, correct, sir?

8    A.  No.

9    Q.  You've done that historically, haven't you, sir, you've

10   arranged for them to get their pay, correct?

11   A.  Yes, but I don't dole out the checks.

12   Q.  And so you know that the lawyers on your local Ecuadorian

13   team -- Mr. Fajardo, Mr. Saenz, Mr. Prieto -- make around

14   $2,000 a month, correct?

15   A.  I think that was the case at a certain point in time and I

16   think I testified to that.  I don't know if that's the case

17   today.

18   Q.  And, sir, you have made on this case typically 15,000 or

19   more a month, correct?

20   A.  No.

21   Q.  Isn't it a fact that when Joe Kohn was funding this case

22   that you made about 150,000 a year in salary during that period

23   of time up to 2009, correct?

24   A.  It's roughly the case, but a lot of that money was went

25   back out to pay other people.

DBILCHE6                    Donziger - cross

1    Q.  So, sir, you made 150,000 a year in 2009, Mr. Fajardo made

2    about 24,000 a year in 2009, correct?

3    A.  I don't know.

4    Q.  So would it be fair to say that you made in a typical year

5    salary-wise on the case six or seven times more than

6    Mr. Fajardo typically made on the case, correct, sir?

7    A.  It's roughly correct, but it reflects also cost of living

8    in New York as opposed to Lago Agrio.

9              MR. MASTRO:  Move to strike after cost of living.

10             MR. FRIEDMAN:  Your Honor, he could be allowed to

11   finish his answer before there's a move to strike.

12             THE COURT:  Well, the problem is the answer is

13   supposed to be responsive and only responsive, not an argument.

14   And, therefore, the motion to strike is granted, everything

15   after it's roughly correct.  You can ask him on redirect.

16   Q.  Sir, I want to make sure I understand your testimony.

17             On a contingency fee basis, you make three times or

18   more what Mr. Fajardo stands to make if you collect on this

19   judgment, correct, sir?

20   A.  I think that's roughly correct.  I don't know his exact

21   arrangement at this point.

22   Q.  And you make, you have made on this case typically six,

23   seven times more in salary each year than Mr. Fajardo has made,

24   correct, sir?

25   A.  I just testified to that.

DBILCHE6                    Donziger - cross

1    Q.  But you say you work for him, he doesn't work for you;

2    that's your testimony?

3    A.  It is.

4    Q.  He must be a very generous boss, Mr. Donziger.

5            THE COURT:  Let's cut it out, Mr. Mastro.

6            MR. MASTRO:  I'm sorry, your Honor.

7    Q.  Now let's talk about your retainer agreement and the

8    authority you have under your retainer agreement.

9            Am I correct that your retainer agreement is signed by

10   Mr. Fajardo and Mr. Yanez, correct?

11   A.  Yanza.

12   Q.  Withdraw that.

13           Your retainer agreement was signed in January 2011 by

14   Mr. Fajardo and Mr. Yanza, correct, sir?

15   A.  I think others or another or yes.

16   Q.  Your retainer agreement gives you the responsibility to

17   exercise "overall responsibility for the strategic direction of

18   the litigation and the day-to-day management of the

19   litigation."

20           Isn't that right, sir?

21   A.  I don't know.

22   Q.  Isn't it a fact, sir, that the litigation that you have

23   overall responsibility for the strategic direction of and

24   day-to-day management of includes Lago Agrio Chevron case, the

25   1782 actions in the United States, and this litigation,

DBILCHE6                    Donziger - cross

1   correct?

2   A.  No, that's not correct.

3   Q.  Now, sir, I'm going to show you --

4           MR. MASTRO:  May I approach, your Honor?

5   Q.  -- what's been marked as Plaintiff's Exhibit 558.

6           Mr. Donziger, referring you to page 2 of this

7   document, this is your retainer agreement, correct, sir?

8   A.  Yes, it is.

9   Q.  This is the one you signed on January 5, 2011, correct?

10  A.  It's January 2011.  It does not have a date next to my

11  name.

12  Q.  And the first signatory on behalf of the plaintiffs is

13  Pablo Fajardo, correct?

14  A.  Yes.

15  Q.  And, sir, referring you specifically to page 2,

16  subparagraph 2B, where it says that you as the plaintiffs' U.S.

17  representative are authorized "to exercise overall

18  responsibility for the strategic direction of the litigation

19  and the day-to-day management of the litigation."

20          Does that refresh your recollection as to, you know,

21  whether you have that authority under your retention agreement?

22  A.  I'm going to read the other subsections real quick before I

23  answer that question, if that's okay.

24  Q.  Well, while you're on it, Mr. Donziger, please also read

25  section 2BI where it says that you have authority to

DBILCHE6                    Donziger – cross

1    "coordinate the overall legal strategy to pursue and defend all
2    aspects of the litigation."
3            Does that refresh your recollection, sir, whether you
4    have that authority?
5    A.  Yeah, but I would say reading this it's not an accurate
6    depiction.
7            MR. MASTRO:  Your Honor, move to strike after --
8            THE COURT:  Everything after "yeah" is stricken.
9    Q.  Sir, am I also correct, directing your attention to page 1,
10   that the litigation is defined as including the Maria Aguinda
11   v. Chevron corporation litigation, that's the Lago Agrio
12   Chevron litigation, correct?
13   A.  Where are you reading from?
14   Q.  Page 1.  The term litigation is defined in the first three
15   paragraphs of your retention agreement, correct, sir?
16   A.  Can you --
17   Q.  Under witnesseth.
18   A.  Okay.
19   Q.  See there where it defines in the third paragraph
20   collectively all of the above are litigation, the first,
21   second, and third paragraphs, starting whereas, do you see
22   that, sir?
23   A.  Yes.
24   Q.  So your authority to exercise overall responsibility for
25   the strategic direction of the litigation and day-to-day

DBILCHE6                    Donziger - cross

1   management of the litigation includes the Lago Agrio Chevron

2   litigation, the 1782 actions, and any related litigations,

3   including this one, correct, sir?

4   A.  This contract is not an accurate depiction of my actual

5   authority.

6   Q.  Sir, isn't it a fact that this contract, this retention

7   agreement can't be changed other than in writing signed by all

8   parties, correct?

9   A.  I don't know.

10  Q.  Have you signed any new agreements since this one that

11  alter your rights and obligations and responsibilities under

12  this agreement one whit?

13  A.  There has been an alteration, yes.

14  Q.  Is that something signed in writing but you altering your

15  role?

16  A.  It's been signed by the plaintiffs or plaintiffs'

17  representatives.

18  Q.  Now, sir, I'm going to direct you to page 10 of this

19  agreement, paragraph 13, modification in writing, "No

20  modification, amendment, waiver or release of any provisions of

21  this agreement or of any right, obligation, claim or course of

22  action arising hereunder shall be valid or binding for any

23  purpose unless in writing and duly executed by the party

24  against whom same is asserted."

25          Now, sir, you haven't signed any modification

DBILCHE6                         Donziger - cross

1    amendment, waiver or release of any provision of this retention

2    agreement, correct, sir?

3    A.  That is correct.

4    Q.  So as far as you're concerned, under the terms of this

5    agreement, you continue to this day to have the rights,

6    responsibilities, and obligations that apply under this

7    agreement, correct?

8    A.  That's not correct.

9    Q.  Now, sir, let me ask you this:  Aren't you also responsible

10   under this agreement for assembling and organizing the various

11   United States lawyers and law firms representing the Lago Agrio

12   plaintiffs, correct?

13   A.  Yes.

14   Q.  Mr. Fajardo doesn't do that, you do that, correct, sir?

15   A.  I would say --

16   Q.  Yes or no, sir?

17   A.  I did do that.  I do not do that fully at this point, no.

18   Q.  Do you consider yourself to have fulfilled your obligations

19   to your clients, the Lago Agrio plaintiffs, under this

20   retention agreement?

21   A.  I haven't really thought about it.  I've tried my best, but

22   I don't know if I completely fulfilled all my obligations.  I'd

23   have to look at it.  It's been a while.

24          MR. MASTRO:  Your Honor, I offer for impeachment

25   sanctions hearing, page 49, starting line 6:

DBILCHE6                    Donziger - cross

1    "Q.  Do you consider yourself to have fulfilled your

2    obligations to your clients, the plaintiffs, under this

3    retention agreement, sir?

4    "A.  Yes, I do."

5              THE COURT:  Proceed.  What was the date of that

6    testimony?

7              MR. MASTRO:  Your Honor, that was on April 16, 2013.

8              THE COURT:  Thank you.

9    Q.  Mr. Donziger, was that testimony true and correct when you

10   gave it just a few months ago, was that true and correct, yes

11   or no?

12   A.  Yes, it was, but it was several months ago.

13   Q.  Thank you, sir.  Now, Mr. Donziger, am I correct, sir,

14   that -- strike that.

15              Is there anyone else besides Mr. Fajardo and the Lago

16   Agrio plaintiffs who you are telling this Court is your boss?

17   A.  Mr. Fajardo is the person I deal with.  But behind him he

18   has to answer to others who, in theory, would have authority

19   over me if they wanted to exercise it, in my opinion.

20   Q.  Now, sir, am I correct that you are the person who has

21   decided how much people working on the team in Ecuador get

22   paid?

23   A.  In the past I worked with the local team to, like Mr. Yanza

24   and others, to come up with amounts that we felt were

25   appropriate.

DBILCHE6                    Donziger - cross

1    Q.  And in Mr. Yanza's case, you not only paid him a monthly

2    salary -- correct, sir?

3    A.  I didn't pay him.

4    Q.  You approved of funds going to Mr. Yanza in amounts of 500

5    to 2,000 a month, correct, sir?

6    A.  We would set budgets jointly and in the budget would be a

7    salary for him.

8    Q.  And you also approved buying a house for Mr. Yanza, didn't

9    you, sir?

10   A.  Yes.

11   Q.  And you paid that out of your budget, correct, sir?

12   A.  I believe, yes, I believe that came out of the budget.

13   Q.  Now, sir, I want to ask you a few questions about financial

14   matters.

15          In your statement you claim that all of your efforts

16   on the Aguinda case have been to achieve a just result for your

17   clients.  That's your testimony, right?

18   A.  Yes.

19   Q.  But this isn't a pro bono case for you, is it, sir?

20   A.  No.

21   Q.  You expect to get paid and you're proud of that, aren't

22   you, sir?

23   A.  Yes.

24   Q.  You've even referred to looking forward to getting the

25   "juicy check" from Chevron, haven't you, sir?

DBILCHE6                    Donziger - cross

1   A.   That was a joke.

2   Q.   It's not only a term you've used, it's a term that

3   Mr. Fajardo and others on the Ecuadorian legal team have used,

4   to get juicy checks out of Chevron, correct, sir?

5   A.   That originated with Mr. Callejas at a judicial inspection.

6   Q.   Move to strike.

7   A.   He would make a joke about it, so it's not my term.

8         THE COURT:   Answer is stricken.

9   Q.   Mr. Donziger, haven't you written that you dream of

10  billions of dollars on the table?

11  A.   For the clients, yeah.

12  Q.   And haven't you spoken openly about jacking this thing up

13  to $30 billion if you could have, haven't you done that, sir?

14  A.   I did say that, but it comes with a certain context that it

15  was always based on the amounts of money needed for a cleanup.

16  Q.   Yes or no.  Yes or no.

17        THE COURT:   Answer is stricken after "I did say that."

18        MR. MASTRO:   Again, your Honor, I apologize for having

19  to use this language, but.

20  Q.   Isn't it a fact, sir, that you've described the business

21  you're in, the business of plaintiffs' law, as being about

22  "making fucking money"?

23  A.   I may have, I don't know.

24  Q.   Didn't you say that on the Crude outtakes as you were

25  leaving the San Francisco Chronicle after giving an interview

DBILCHE6                    Donziger - cross

1   there about your case, didn't you say that?

2   A.  It's possible.  I don't know if I said it.

3   Q.  We'll come back to it, sir.

4           Am I correct that between 2003 and 2009, Joseph Kohn

5   was funding the litigation?

6   A.  During those years he was the primary funder, but not the

7   only funder.

8   Q.  And am I also correct, sir, that over that period of time,

9   2003 to 2009, Mr. Kohn paid you over $1 million in connection

10  with this case, the Lago Agrio Chevron case?

11  A.  It sounds about right.  I don't know exactly.

12  Q.  And, sir, isn't it also the case that in 2007 and 2008 --

13  strike that.

14          Isn't it also the case that in late aughts Russ DeLeon

15  also became a funder on the Lago Agrio Chevron case?

16  A.  That is correct, yes.

17  Q.  And Mr. DeLeon is someone you know from school days?

18  A.  Yes.

19  Q.  And Mr. DeLeon now lives on Gibraltar, correct?

20  A.  No.

21  Q.  He's a fugitive from U.S. justice, isn't he, sir?

22  A.  No.

23  Q.  Isn't it a fact, sir, that in 2007 and 2008, Mr. DeLeon

24  also paid you over $800,000?

25  A.  For --

DBILCHE6                    Donziger - cross

1   Q.  Yes or no.

2   A.  For a different matter.

3   Q.  Yes or no, sir.

4   A.  I don't know the exact amount.

5   Q.  And isn't it a fact that you also received $10,000 for

6   appearing in the movie Crude?

7   A.  I think Mr. Berlinger bought my rights for documentary film

8   purposes and that might have been the amount of money he paid

9   me.

10  Q.  And that's money you put in your pocket, correct, sir?

11  A.  I don't recall.

12  Q.  And am I also correct, sir, that you have by far the

13  largest contingency fee interest of any lawyer or law firm in

14  the Lago Agrio Chevron case?

15  A.  No, it's not correct.

16  Q.  Isn't it a fact, sir, that you have the largest contingency

17  fee interest of any lawyer in the Lago Agrio Chevron case?

18  A.  No.

19  Q.  Now, sir, let's break it down.

20          Is there somebody else, some other lawyer or law firm,

21  that has a larger contingency fee interest in the Lago Agrio

22  Chevron case than you?

23  A.  I don't know.

24  Q.  So as you sit here today, you're not aware of any other

25  lawyer or law firm that has a larger contingency fee interest

DBILCHE6                    Donziger - cross

1   in the Lago Agrio Chevron case than you, correct, sir?

2   A.  I don't know.  I know what I have and I can estimate what

3   some others have and it's --

4   Q.  Let's ask you about what you have, sir, all right.

5            Again, under your retention agreement, the total

6   contingency fee payment to go to lawyers on the Lago Agrio

7   Chevron case is 20 percent, correct, sir?

8   A.  Yes.

9   Q.  And under your retention agreement, you are entitled to

10  31.5 percent of that 20 percent, correct, sir?

11  A.  Yes.

12  Q.  So when the judgment was over $19 billion, if the Lago

13  Agrio plaintiffs had been able to collect the entirety of the

14  judgment, you would have made approximately $1.2 billion,

15  correct?

16  A.  More or less, subtracting what I would owe other people.

17  Q.  And, sir, am I also correct that even today, after last

18  week's decision eliminating the punitive damage award, you

19  still stand to make approximately $600 million on the Lago

20  Agrio Chevron judgment if the Lago Agrio plaintiffs are able to

21  collect on the entirety of the judgment as it now stands?

22  A.  That's correct.

23  Q.  Mr. Donziger, I want to ask you a few questions about

24  Amazonia Recovery Limited.  That's a Gibraltar company,

25  correct, sir?

DBILCHE6                    Donziger - cross

1    A.  Yes.

2    Q.  And you're a shareholder in that company, correct?

3    A.  That's correct.

4    Q.  That's because of your contingency fee interest, correct?

5    A.  Yes.

6    Q.  Can you tell me what percentage of the shares of Amazonia

7    Recovery Limited you have, sir?

8    A.  The structure of the case was designed -- I mean the

9    structure of that entity was designed to reflect the

10   contingency fee equity in the lawsuit, so it's roughly the

11   equivalent.

12   Q.  And you own shares in Amazonia Recovery Limited because the

13   expectation is that amounts collected on the judgment will be

14   kept there and then able to be distributed to the lawyers based

15   on their different contingency fee interests, correct, sir?

16   A.  Not really.

17   Q.  Well, sir, I want to break it down because I want to

18   understand it.

19           You own shares in Amazonia Recovery Limited, correct?

20   A.  Yes.

21   Q.  You can't tell the Court what number of shares you own in

22   Amazonia Recovery Limited?

23   A.  I don't know the number.  It's the equivalent of what the

24   contingency fee interest was before it was created.

25   Q.  So --

DBILCHE6                    Donziger - cross

```
 1              THE COURT:  Is that 31 and a half percent,
 2    Mr. Donziger?
 3              THE WITNESS:  No, it was 31 and a half percent of the
 4    20 percent.
 5              THE COURT:  Thank you.
 6    Q.  So let me make sure I understand the structure of the
 7    pay-out on the judgment.
 8              Am I correct that off the top of the judgment or any
 9    moneys that are collected come payment of expenses and fees,
10    correct, sir?
11    A.  That's my understanding.
12    Q.  And you have a substantial amount of expenses and fees
13    you're still claiming off the top, correct?
14    A.  Yes.
15    Q.  And you have someone you've described as a quote/unquote
16    accountant, Mr. Rizack, correct, sir?
17    A.  Yes.
18    Q.  Who you referred us to to try to get documents about what
19    expenses you had and what you're claiming, correct?
20    A.  Yes.
21    Q.  And you know that Mr. Rizack didn't produce all of those
22    records to us, that privilege claims were asserted, correct,
23    sir?
24    A.  I know we asserted privilege claims, but I don't know how
25    it ended up.  I know you got documents from him.
```

DBILCHE6                    Donziger - cross

1   Q.  And you know that your cocounsel, Mr. Friedman, agreed to a

2   502 stip so we could see the rest of the documents, he agreed

3   to that last night, you know that, sir, correct?

4   A.  No.

5   Q.  You know, sir, that from Mr. Friedman because when he asked

6   you this morning for permission to sign the 502 stip, you told

7   him he couldn't sign it, correct, sir?

8          MR. FRIEDMAN:  Your Honor, I'll object on

9   attorney-client privilege.

10          MR. MASTRO:  It was disclosed to me, your Honor.  It

11   was hardly a secret.

12          MR. FRIEDMAN:  Well, we have a different idea of what

13   was disclosed and, your Honor, I guess you could take testimony

14   from me and Mr. Mastro but that -- I'd object on relevance

15   grounds at this point.

16   Q.  Mr. Donziger, are you aware that Mr. Rizack just today,

17   while we were here in court, midday, produced more financial

18   records to us about your accountant in the Lago Agrio Chevron

19   case (indicating)?

20   A.  I don't know what you mean by accountant (indicating).

21   Q.  He's not really an accountant --

22   A.  I'm not aware --

23   Q.  He's not really an accountant, correct?

24   A.  No, he is not an accountant.

25   Q.  But you, you're aware that just today midday he produced

DBILCHE6                    Donziger - cross

1    more documents to us, correct?

2    A.  No.

3    Q.  You're aware that he's still withholding hundreds of

4    documents on alleged privilege grounds, correct, sir?

5    A.  No.

6    Q.  Am I correct that you're not willing to sign a 502 stip to

7    allow us to see the rest of those records?

8    A.  Sir --

9           MR. FRIEDMAN:  Excuse me, your Honor.  I would object

10   on relevance grounds.  I'm happy to take this issue up, but I

11   don't think it's appropriate in the context of

12   cross-examination.  I'd be happy to tell you what our position

13   is.

14          THE COURT:  Well, if there's going to be an

15   application with respect to it, I'll be happy to hear what your

16   position is.  But at the moment the question, it seems to me,

17   goes to whether the witness is prepared to have whatever the

18   evidence is come out, whether it's privileged or not, and it

19   seems to me relevant, therefore.

20   Q.  Mr. Donziger, please answer the question.

21   A.  What's the question?

22   Q.  The question is whether you're willing to enter into a 502

23   stip so that Mr. Rizack will allow us to review the rest of

24   your financial records relating to the Lago Agrio case as to

25   which you've claimed privilege up until now.

DBILCHE6                    Donziger - cross

1    A.  Sir, I can't answer that.  I'd have to consult with my

2    counsel.  I don't know what the implications of that are.  I

3    have not talked to my counsel about that, so I can't answer

4    that until I talk to my counsel.  Sorry.

5              MR. MASTRO:  Your Honor, may we approach the side bar

6    for a moment on this point?

7              THE COURT:  Very briefly.

8              (At the side bar)

9              MR. MASTRO:  Your Honor, we are making an application

10   that because we thought we had an agreement last night.  We

11   didn't move before your Honor.  With Mr. Friedman we thought we

12   had an understanding under 502 stip.  I was told this morning

13   that that wasn't going to happen and, you know, we think the

14   Court should direct that.  There's been waiver here.  There's

15   clearly no privilege as to those documents.

16             THE COURT:  I'm not hearing this now.

17             MR. MASTRO:  I just want to make the point that the

18   way this has played out has been to deny us having full access

19   to those records for his cross-examination.  And I'm going to

20   continue to cross.  I'm not asking for any latitude that way,

21   but it's been clearly designed to prevent us from having the

22   full records to be able to cross-examine him on his financial

23   mismanagement.

24             THE COURT:  If, as, and when there's an application,

25   I'll deal with it.  If your intention is to make it now, I'm

DBILCHE6                    Donziger - cross

1    not going to hear it now.  Let's continue.

2              MR. MASTRO:  Thank you.

3              THE COURT:  Hear it at the end of the day, if need be.

4              MR. MASTRO:  Thank you, your Honor.

5              (In open court)

6    BY MR. MASTRO:

7    Q.  Mr. Donziger, I'd like to show you what's been marked as

8    Plaintiff's Exhibit 7700 and Plaintiff's Exhibit 7701.

9              MR. MASTRO:  May I approach, your Honor?

10   Q.  Mr. Donziger, before I ask you some questions about these

11   documents, in your statement to the Court, you claim you've

12   been "operating under constant pressure of lack of resources."

13             Do you recall that, sir?

14   A.  Yes, yes.

15   Q.  And you've been making that complaint since the inception

16   of this RICO case back in early 2011, correct, sir?

17   A.  That's correct.

18             MR. MASTRO:  Did the court reporter get that?

19   Q.  You have to speak up, Mr. Donziger.  That's correct.  Thank

20   you.

21             Mr. Donziger, can you explain to the Court what

22   Plaintiff's Exhibit 7700 is?

23   A.  This was an effort by Mr. Rizack to reconstruct my

24   financials over a period of time, and it was an effort to allow

25   me to potentially be paid for months that I had never been

DBILCHE6                    Donziger - cross

paid.  So we created invoices to submit to the clients that
were never sent.  These invoices were never sent, and they were
just sort of for my internal records to gain an understanding
of what I might be entitled to from the client should funds be
raised or recovery be had in the litigation.

Q.  Is it your testimony that these invoices have never been
sent to the client or any other client representative?

A.  These invoices, as far as I know, have never been sent.

Q.  Is it your intention, if the Lago Agrio plaintiffs are able
to collect on their judgment, to seek reimbursement for these
amounts?

A.  There is an amount of money that I put into the case
personally, as well as salaries that I am owed by the clients
that have never been paid.  And, yes, I intend to get
reimbursed for those amounts if funds become available.

Q.  And, sir, referring you to --

        THE COURT:  And, excuse me, and are these the amounts?

Q.  Are these the amounts you would intend to seek
reimbursement of?

A.  Mr. Rizack and I were engaged in a process to determine the
amounts.  This is roughly accurate.  I don't know if it's
exactly accurate and so it's roughly the amounts.

Q.  Let's go through some of that, sir.

        When Mr. Kohn was funding the litigation, you said you
were making about 15,000 a month, correct?

DBILCHE6                     Donziger - cross

1    A.  I think for most of the time I was making 10,000 a month.

2    Q.  Between ten and 15, correct, sir?

3    A.  I think it was 10,000 most of the time.

4    Q.  Sir, the amounts you claim here, let's look at page 14.

5    That's the English language version of these documents.

6            The amounts you claim here every month for every one

7    of these months in 2012 is 35,000 for your professional

8    services; is that correct, sir?

9    A.  That was the idea, yes, sir.

10   Q.  Am I correct that in January 2012 you're claiming that you

11   spent 24,000 on transportation expenses?

12   A.  I couldn't answer that question.  I think at that month I

13   had that amount of transportation expenses that was

14   unreimbursed.  I don't think it was from that particular month

15   only.

16   Q.  And, sir, can you please explain to the Court what is the

17   difference between the 35,000 in professional services you're

18   claiming for January 2012 and the 24,000 and change you're

19   claiming for professional fees and expenses; do you know what

20   the difference is?

21   A.  I think the answer is no.  Mr. Rizack put this together,

22   but I certainly was not double charging for professional fees.

23   There was some other expense involved.

24   Q.  And am I correct, sir, that you're claiming, as someone

25   under constant pressure of lack of resources, that in

DBILCHE6                    Donziger - cross

1    January 2012 you should be owed over a hundred thousand dollars

2    in fees, services, and expenses?

3    A.  Well, because I was owed that.  I had no resources.  I was

4    putting money out.

5    Q.  Sir, let me ask you this.  Can you turn to page 25 of this

6    document.

7             Can you see there, sir, these are the itemized

8    expenses for June of 2012, correct, sir, correct?

9    A.  I don't know, sir.  What are you looking at?

10   Q.  Well, first look at page 24, and that's the potential

11   invoice that's been created for you to cover expenses in June

12   and services and fees of June 2012, correct?

13   A.  Yes.

14   Q.  And then the next page itemizes the expenses, correct, sir,

15   for June 2012; do you see that, sir?

16   A.  I see a chart.  Oh, yes, I do.

17   Q.  Now, sir, can I ask you, do you see there where it says

18   purpose of meals and persons on the right-hand column, the

19   second to last one says Pablo.

20             Do you see that, sir?

21   A.  Mm-hmm.

22   Q.  That's Pablo Fajardo, correct?

23   A.  I assume.

24   Q.  And this is an expense, expenses for June 29, 2012,

25   correct, sir?

DBILCHE6                    Donziger - cross

1    A.  I think it's June 28.

2    Q.  June 28, 2012, correct, sir?

3    A.  That's what it says.

4    Q.  Can you tell us what you and Mr. Fajardo were doing that

5    you had a $443.36 breakfast on June 28, 2012 that you are

6    saying you're going to bill back to the clients later, can you

7    tell me what you were doing then?

8           MR. GOMEZ:  Objection, relevance.

9    A.  I can tell you what I was doing, yes.

10          THE COURT:  The objection is overruled.  It goes to

11   credibility.

12   Q.  Can you tell me where you incurred that $443 breakfast with

13   Mr. Fajardo?

14   A.  If I remember correctly, I think we, in Quito, we hosted a

15   breakfast for the press corps.

16   Q.  And, sir, can I also ask you, where it was that you had a

17   $437 lunch on June 5 that you're now planning to bill back to

18   the Lago Agrio plaintiffs?

19   A.  I don't think that's accurate.  It might have been an

20   accumulation of various meals that he put in that box, but I

21   haven't checked this for accuracy.

22   Q.  So you are planning to put in for $437 for lunch on June 5,

23   2012, but that may be multiple lunches?

24   A.  I don't know.  You know, everything that I instructed

25   Mr. Rizack to put together was backed up by receipts and credit

DBILCHE6                    Donziger - cross

1   card charges and I'm sure he could answer this, but I don't

2   know what that is for specifically.  I haven't looked at it.

3   Q.  We're going do come back to these, especially when we have

4   the rest of the documents.

5        Now, sir, I want to go to PX7701.  Can you tell the

6   Court what that is, sir, what is that document, sir?

7   A.  If I remember correctly, this is a document that I asked

8   Mr. Rizack to put together trying to reconstruct all the

9   expenditures in the case for these years.

10  Q.  These are actual expenses?

11  A.  Excuse me, can I finish?

12  Q.  Sure.

13  A.  That he could reconstruct from my records, but they

14  wouldn't necessarily be all the case expenditures because other

15  money was being spent through other sources.

16  Q.  But just so we're clear, these are actual expenditures that

17  were made and paid for, correct, sir?

18  A.  This was Mr. Rizack's best effort to reconstruct some

19  admittedly disorganized financial records that I had, and I

20  don't know if this is entirely accurate.  I was trying to get

21  at the time at least a rough sense of what had been spent so I

22  could convey that to the clients and so I could understand it

23  myself.

24  Q.  And you just testified that you've been "operating under

25  constant pressure for lack of resources" going back to the

DBILCHE6                    Donziger - cross

1    inception of this RICO case at the beginning of 2011, correct,

2    sir?

3    A.   That's correct.

4    Q.   And am I right that -- and this is turning now to page 11

5    of 17, this is the English language version -- that from 2007

6    to 2013, you on the Lago Agrio Chevron case spent over

7    $21.4 million, correct, Mr. Donziger?

8    A.   That's roughly accurate, but it was de minimis compared to

9    our expenses.

10   Q.   Sir, sir, I just asked you yes or no.

11          And, sir, I want you to go to page 16, this is 2011,

12   the year you just testified you were already operating under

13   constant pressure of lack of resources.  Am I correct, sir,

14   that you on the Lago Agrio Chevron team spent over

15   $10.4 million that year?

16   A.   Well.

17   Q.   Yes or no, sir?

18   A.   I don't know if that's accurate.  All I can say is there

19   were times during that year that I was flat-out broke and had

20   to borrow money.

21          MR. MASTRO:  Move to strike, your Honor.

22          MR. FRIEDMAN:  Your Honor, I think that's fairly

23   responsive to what he was asked.  It wasn't a yes or no

24   question.

25          THE COURT:  Denied.

DBILCHE6                    Donziger - cross

1   Q.  Mr. Donziger, isn't it a fact that in 2012, you on the Lago

2   Agrio Chevron team spent over $6.4 million?

3   A.  With the caveat that this is an estimate put together by

4   Mr. Rizack that is a rough approximation based on limited

5   records.  That's what Mr. Rizack came up with, yes.

6   Q.  Am I correct, sir, that in spring of this year, you found a

7   new funding source, a British firm, for the Lago Agrio Chevron

8   litigation, correct?

9   A.  There was a new funding source, but it was found not by me

10  but by the clients, directly with the clients.

11  Q.  Woodsbridge is the name of it, correct, sir?

12  A.  No.

13  Q.  What's the name of it, sir?

14      MR. FRIEDMAN:  Your Honor, I object on relevance

15  grounds.  I think funding sources at the present time don't

16  seem to have anything to do with allegations in the complaint.

17      THE COURT:  What's the relevance?

18      MR. MASTRO:  Your Honor, it has to do both with the

19  witness's credibility for having just sworn to your Honor that

20  he's been operating under constant pressure of lack of

21  resources.  It also has to do with not only questioning his

22  credibility, but also that they have plenty of resources even

23  though he's constantly claiming he can't comply with court

24  orders because he says he has none.

25      THE COURT:  What about it, Mr. Friedman?

DBILCHE6                    Donziger - cross

1              MR. FRIEDMAN:  I think both of Mr. Mastro's arguments

2    are that the fact that he has a funding source now relates to

3    his credibility.  I don't follow that.

4              THE COURT:  Well, the argument, it seems to me, is

5    pretty clear in the context of the case.

6              There was a withdrawal in May by his prior counsel

7    ostensibly on the ground that they weren't being paid.  Then

8    all through the spring and summer and fall, Mr. Donziger sought

9    relief of various kinds from the Court claiming that he

10   couldn't do one thing or the other because he lacked resources.

11             Over and over again the Court said I'd be happy to

12   consider this argument if you provide sworn evidence to back up

13   your claim.  Never was anything forthcoming.

14             And it seems to me that in that context, the question

15   of whether there was funding while he was seeking relief from

16   this Court on the ground that there wasn't is pertinent to

17   credibility.

18             Now, tell me why that isn't correct.

19             MR. FRIEDMAN:  Well, I guess I would raise a 403

20   issue, your Honor, in the sense that Mr. Donziger obviously

21   made a decision not to give you a sworn statement and have you

22   micromanage how he was going to spend his money.

23             THE COURT:  Which presupposes there was money there to

24   spend.

25             MR. FRIEDMAN:  Exactly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBILCHE6                    Donziger - cross

```
 1              THE COURT:  And the statement that there wasn't
 2     perhaps wasn't the entire truth, if the premise is right.
 3              MR. FRIEDMAN:  Well, and, your Honor, what I'm
 4     suggesting is that, you know, the money here for a year is what
 5     I -- I don't want to make -- it's all relative, your Honor.
 6     I've been to courts where we spent a hundred thousand dollars
 7     and that seemed like all the money in the world.  In this case,
 8     given the way it's been litigated, even $20 million is a drop
 9     in the bucket and I've seen what Chevron has submitted to the
10     Court and so I know that.
11              So my point is this, your Honor.  Unless we're going
12     to embark upon -- the Court kind of -- Mr. Donziger
13     acknowledges he's always had funding sources.  The issue isn't
14     does he have funding sources.
15              THE COURT:  I haven't heard that acknowledged.
16              MR. FRIEDMAN:  Well, he just did.
17              THE COURT:  He said that in the spring of 2013 his
18     client found a new funding source.  That's exactly what he
19     said.
20              MR. FRIEDMAN:  Right, right.  And there has been
21     funding along the way and how it's been spent has been laid out
22     for the Court up until, say until Mr. Keker left, you've got
23     various -- speaking of Mr. Dahlberg, your Honor, Mr. Dahlberg
24     testified to various expenditures in his report that were made
25     by our side.
```

DBILCHE6                    Donziger - cross

1          THE COURT:  I don't remember the exact language, but

2     doesn't Mr. Donziger's witness statement assert that

3     Mr. Dahlberg's testimony essentially was a fantasy or words

4     that that effect?

5          MR. FRIEDMAN:  It says much of it is a fantasy, yes.

6          THE COURT:  But now I'm to rely on it.

7          MR. FRIEDMAN:  I'm not saying -- no.  What I'm saying,

8     your Honor, is there's no question that there's been money.

9     The question is the extent of the money available to accomplish

10    and to meet the sort of litigation effort mounted by Chevron.

11    And if what Mr. Donziger did is he made a decision, at the

12    Court's prodding, said I'd be happy to consider granting you

13    relief if you want to present your funding situation to me and

14    he elected not to do that, I think that's privileged.  And for

15    the present time what his funding source is, that sort of thing

16    is privileged and doesn't really relate to credibility.

17         THE COURT:  I don't want to take all evening with

18    this.  But when a litigant comes into court and says I have no

19    money and the question is then put, well, what's your financial

20    situation?  You can't say that it's privileged.  You may have

21    other arguments, but privileged isn't one of them under

22    Bilzerian and you're very well familiar with all the cases.

23    It's the sword and shield doctrine.  You can't assert a

24    particular proposition and then invoke privilege to prevent

25    examination of the factual basis for the privilege.

DBILCHE6                    Donziger - cross

1          Mr. Bilzerian came into court and said I'm not guilty

2     of securities fraud because I acted in good faith.  And the

3     Court of Appeals said that by making that assertion, he had

4     waived any privilege there was as to what his lawyers told him

5     about the conduct with respect to which he said he was in good

6     faith.  It's an exact application of that rule.

7          MR. FRIEDMAN:  Here's what I think is the most

8     important argument, your Honor.  It's a 403 argument and it's

9     simply this, that if you're going to take testimony on funding

10    sources, it's like saying somebody is tall or they're short.

11    It's compared to what.

12         Here when Mr. Donziger says I have inadequate

13    resources, then it's compared to what.  And if we're going to

14    get into the compared to what, so be it.  But that's the

15    argument I'm trying to say to the Court is do we really want to

16    go here.  If you say, yes, we want to go here, we will go here.

17         MR. MASTRO:  Your Honor, it's not a -- excuse me --

18    it's not a compared to what.  It's the direct representations

19    made by Mr. Donziger and others on this side of the table right

20    up to the first week of this trial that they had no resources

21    to go forward, and they've never made any such showing.  I

22    intend to prove that is just demonstrably false and that's why

23    I have a right to ask these questions.

24         MR. FRIEDMAN:  So, your Honor, what we're going to get

25    into, if you want to go into that, is our arrangements for our

DBILCHE6                    Donziger - cross

1    copy machine and how we had to do it versus what's --

2              THE COURT:  I have a feeling nobody is interested in

3    your copy machine.

4              MR. MASTRO:  Not going to ask about that, your Honor.

5              MR. FRIEDMAN:  My point, your Honor, is if we get into

6    this and for whatever relevance it has, which I would suggest

7    is relatively minor in the big scheme of things, if we get into

8    this, then what it requires is no resources means compared to

9    what.  It's not an absolute.  Obviously, he has the resources

10   to buy a suit of clothes and come to court and to feed himself

11   and to make some copies.  Obviously he has some resources.  The

12   question is compared to what and that's the point I'm saying

13   under 403.  I think we're getting pretty far afield.  That's my

14   point.

15             THE COURT:  I'll sleep on this one.  And if anybody

16   wants to submit anything on it, I'll be happy to receive it.

17             We'll break with the witness now.

18             What if anything needs to be dealt with this evening

19   before we break?

20             MR. MASTRO:  Your Honor, just two things before we go.

21             THE COURT:  You can step down for now, Mr. Donziger.

22             MR. MASTRO:  My colleagues remind me I should have

23   moved in exhibits, or many of them I think might already be in

24   evidence, but Plaintiff's Exhibits 169, 558, 806, 2457, 7549,

25   and 7673.

DBILCHE6

1          I also move in 7700 and 7701 now that I -- they were

2     admitted subject to connection.  I believe I have connected

3     them.

4          And finally, your Honor, I believe that the sanctions

5     hearing page that should be coming into evidence is page 136.

6     I think the record might have said 13.

7          MR. FRIEDMAN:  And, your Honor, just a procedural

8     question, I would guess, though I haven't gone back and looked.

9          THE COURT:  One thing at a time.

10         The correction on the sanctions page, unless someone

11    has an objection, is accepted.  Any objection, page 136?

12         MR. FRIEDMAN:  No, your Honor.

13         MR. GOMEZ:  No, your Honor.

14         THE COURT:  All right.  Now.

15         MR. FRIEDMAN:  That was my question though, your

16    Honor, about that procedurally.  I think that's a page that's

17    been designated by Chevron as just like a deposition has been

18    designated.  I think it's gone to the Court, so I'm not exactly

19    sure what we're doing when you accept that into evidence.

20         THE COURT:  I think the answer is belt and suspenders,

21    is that right, Mr. Mastro?

22         MR. MASTRO:  Yes.  I don't think we designated the

23    entire page, your Honor.  We did designate many hours of

24    Mr. Donziger's deposition testimony.

25         THE COURT:  Please don't take many hours telling me

DBILCHE6

1     things I don't need to know.

2             MR. MASTRO:  No problem, your Honor.

3             THE COURT:  Is there any objection as to 7549, 7673,

4     7700 or 7701 at this point?

5             MR. FRIEDMAN:  No, your Honor.

6             THE COURT:  They are all received.

7             MR. MASTRO:  7559.

8             THE COURT:  7559.

9             MR. MASTRO:  Thank you, your Honor.

10            MR. FRIEDMAN:  No objection.

11            (Plaintiff's Exhibits 7549, 7673, 7700, 7701, 7559

12    received in evidence)

13            THE COURT:  We're not done yet.

14            Now, I'm glad you mentioned 169 and 806 because I had

15    a question about them.  I do believe they have come in earlier,

16    but Plaintiff's Exhibit 169 is listed twice in the plaintiff's

17    exhibit list, once with a hash mark after the letter number and

18    once with the letter R after the number.

19            MR. MASTRO:  Yes.

20            THE COURT:  Now, the one with the hash mark bears in

21    the heading under the heading exhibit description the words for

22    identification only.  But in the column in which Chevron

23    articulates the bases for admissibility, it seems obvious that

24    in some parts it is offered for the truth of the matters

25    asserted and in other parts it's not offered for the truth of

DBILCHE6

1    the matters asserted.

2             MR. MASTRO:  Yes, your Honor.

3             THE COURT:  And then there are various other arguments

4    about admissibility; and the only objections made with respect

5    to it are relevance, hearsay, and privilege.  The privilege has

6    already been disposed of.  Relevance I'll deal with later.

7             What is the significance, if any, of the legend for

8    identification only and why are there two versions of this

9    exhibit here and what is the meaning of these two little

10   different designations?

11            MR. MASTRO:  Certainly, your Honor.  Sorry for the

12   confusion.  What we did with the diary -- and we have a series

13   of exhibits that follow 169 that are excerpts from the diary,

14   but in originally preparing for a jury trial, we were not going

15   to offer the entire diary.  But now what we have done is

16   because it is a bench trial not offer it for the truth of the

17   matters asserted, but the entirety of the diary should be

18   available to the Court.  And then we have separately designated

19   particular entries that we're offering for the truth of the

20   matters asserted, your Honor, in sequence on the exhibit list.

21            THE COURT:  So that would be 170 and following?

22            MR. MASTRO:  Correct, your Honor.  So that was the

23   intention, not to offer it for the truth, only the individual

24   parts that follow for truth.

25            THE COURT:  Well, I think I understand.  So 169 hash

DBILCHE6

1    mark is the whole document.

2         MR. MASTRO:  Correct, your Honor.

3         THE COURT:  You're not offering that for the truth.

4         MR. MASTRO:  Correct.

5         THE COURT:  But in 170 and many following, you're

6    offering pieces of it for the truth.

7         MR. MASTRO:  Correct, your Honor.

8         THE COURT:  What's 169R?

9         MR. MASTRO:  That's a redacted version, your Honor.

10   It's a combined version of all the ones that follow.  So it's

11   the redacted 169 with all the little pieces that follow that we

12   marked separately as exhibits redacting.

13        THE COURT:  I'm so happy I have so many copies of it.

14        And then we have 806.

15        MR. MASTRO:  Same principle, your Honor.

16        THE COURT:  All right.  So 806 hash mark is the whole

17   document, but 806R is the part that you are offering for the

18   truth of the matters asserted.

19        MR. MASTRO:  Correct, your Honor.

20        THE COURT:  All right.  So that takes care of those.

21        Now, 2457.

22        MR. MASTRO:  It's not offered for the truth, your

23   Honor.  That's one Mr. Donziger prepared his responses not to

24   remember.

25        THE COURT:  Well, we can do without the sarcastic

DBILCHE6

1    comments from both sides.

2              MR. MASTRO:  Sorry, your Honor.

3              THE COURT:  All right.  So 2457 is received, the

4    document written by Mr. Donziger, but not for the truth of the

5    matter, right?

6              MR. MASTRO:  Yes, your Honor.

7              (Plaintiff's Exhibit 2457 received in evidence)

8              THE COURT:  And 558, remind me what that is?

9              MR. FRIEDMAN:  The retainer agreement, your Honor.

10             MR. MASTRO:  That's the retainer agreement, your

11   Honor.

12             THE COURT:  All right.  And unless there's objection,

13   that's received as an agreement between the parties.

14             MR. FRIEDMAN:  Yes.

15             MR. MASTRO:  Yes, your Honor.

16             THE COURT:  Right?

17             MR. GOMEZ:  Yes, your Honor.

18             THE COURT:  Right, Mr. Friedman?

19             MR. FRIEDMAN:  Yes, your Honor.

20             (Plaintiff's Exhibit 558 received in evidence)

21             THE COURT:  Okay.  That takes care of that.  What else

22   tonight?

23             MR. MASTRO:  Your Honor, I did want to be heard on the

24   issue with Mr. Rizack's documents.

25             THE COURT:  Fire away.

DBILCHE6

<pre>
 1              MR. MASTRO:  Your Honor, we don't see how there could
 2     at this point be any valid privilege claim, but the way we
 3     proceeded in this case throughout has been 502 stips.  We can't
 4     get a stip apparently from defendants as Mr. Donziger won't
 5     agree to let his counsel do that.
 6              So I think it's within the Court's right to direct in
 7     these extraordinary circumstances under 502 that we should be
 8     allowed to review them without any waiver on the defendant's
 9     part any privilege claim, and to the extent we wanted to offer
10     any of those documents, then the Court could rule on the
11     privilege claim then.  We have both issues of crime fraud and
12     waiver that should really answer this completely.
13              MR. FRIEDMAN:  Your Honor.
14              MR. MASTRO:  They haven't offered any showing it's
15     privileged.  Financial information in the hands of someone
16     denominated accountant.
17              MR. FRIEDMAN:  Here is my understanding, your Honor,
18     based on conversations and emails with Mr. Rizack.  He received
19     a subpoena for all accounting documents.  He produced a bunch.
20     He told me that he had withheld some bills and at the time I
21     didn't know what they were and I was --
22              THE COURT:  Bills by Rizack to Donziger or other
23     bills?
24              MR. FRIEDMAN:  Lawyer bills, mostly.
25              THE COURT:  Well, lawyer bills.  What lawyer for whom?
</pre>

DBILCHE6

1           MR. FRIEDMAN:  I'm about to say.  They're some of them

2     are bills for people who were hired to do 1782, like I think

3     one is from Tallahassee or someplace.  I can't remember where

4     it was from, but they're from all other the place.  Some of

5     them were from vendors that weren't getting paid, like court

6     reporters.

7           So there's a variety of bills and I told him turn over

8     all the bills and he had one question about Keker's bills

9     because they were -- Mr. Keker had bills and he said what I've

10    done is I redacted the itemization and just left the totals.

11          THE COURT:  This is Keker redacting or this is Rizack

12    redacting?

13          MR. FRIEDMAN:  This is Rizack redacting Keker's bills.

14    And I said I don't know and I didn't see a problem with the

15    totals going in, but there might be privileges to the

16    itemization.  That's what I think is in dispute.  Now, I have

17    to say --

18          THE COURT:  Are you telling me that the only thing in

19    dispute are the redactions from the Keker bills?

20          MR. FRIEDMAN:  That is my belief.  Now, if someone --

21    if I'm wrong on that, I don't have a hundred percent

22    confidence.  It was a tiny bit of what I've done over the last

23    couple weeks, but that's my understanding.

24          THE COURT:  You do have my sympathy, Mr. Friedman.

25          MR. MASTRO:  It's the first I'm hearing that is the

DBILCHE6

1    only thing.  We don't care about the substance of the Keker

2    bills.  But we understand that he's withheld, Mr. Rizack, over

3    200 separate documents.  That can't be Keker bills.  He wasn't

4    in the case that long.

5         MR. FRIEDMAN:  I didn't see -- what he showed me total

6    was maybe 200 pages.  But most of it my understanding is he was

7    going to turn over.  I think the only thing we dispute is the

8    Keker itemization.  If they don't want it, I think I can make a

9    call to Mr. Rizack and be done with it.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBI8CHE7

1          MR. MASTRO:  I have no problem with that, your Honor,

2     and Mr. Friedman I am sure will do that.  I am not asking for

3     the itemization of the Keker bills.

4          THE COURT:  Is there any doubt that I have the

5     authority under 502(d) to order disclosure of the Rizack

6     materials that have been withheld, without waiver of any

7     privilege in this or any other litigation, simply for the

8     purpose of allowing Mr. Mastro to see whether he really cares

9     about any of this stuff?  And if he doesn't, the whole thing

10    goes away.  And if he does, then that will then get litigated.

11    Is there any doubt about my authority to do that?

12         MR. FRIEDMAN:  No doubt about your authority to do

13    that.

14         THE COURT:  I am ahead of you I think.

15         You confirm with Mr. Rizack what the shape of the

16    table is and you and Mr. Mastro talk.  If this whole thing goes

17    away on that basis, a blessing on both your heads.  If it

18    doesn't, I am ordering disclosure now under 502(d), without

19    waiver, to Mr. Mastro so that he can see whether there is

20    anything left to fight about.  I am hopeful that that won't be

21    necessary, and I am hopeful that if it is necessary, it will be

22    easily and speedily resolved.  But let's get it done tonight if

23    we can.

24         MR. FRIEDMAN:  We should be able to.

25         THE COURT:  Anything else?

DBI8CHE7

1            MR. MASTRO:  Nothing else tonight, your Honor.

2       Thank you.

3       (Adjourned to November 19, 2013, at 9:30 a.m.)

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    JAVIER PIAGUAJE PAYAGUAJE

4    Direct By Mr. Gomez  . . . . . . . . . . . .2369

5    Cross By Mr. Brodsky . . . . . . . . . . . .2380

6    Redirect By Mr. Gomez  . . . . . . . . . . .2448

7    STEVEN DONZIGER

8    Direct By Mr. Friedman . . . . . . . . . . .2460

9    Cross By Mr. Mastro  . . . . . . . . . . . .2461

10                        PLAINTIFF EXHIBITS

11   Exhibit No.                              Received

12    1800    . . . . . . . . . . . . . . 2371

13    2407R, specified paragraphs  . . . . 2395

14    2407R  . . . . . . . . . . . . . . . 2416

15    6724  . . . . . . . . . . . . . . . 2418

16    6714  . . . . . . . . . . . . . . . 2420

17    7700 and 7701  . . . . . . . . . . . . .2430

18    2241 through 2247 and 6730  . . . . . . . .2443

19    7019  . . . . . . . . . . . . . . . 2444

20    6703  . . . . . . . . . . . . . . . 2447

21    559A  . . . . . . . . . . . . . . . 2448

22    7549, 7673, 7700, 7701, 7559  . . . . . . .2510

23    2457  . . . . . . . . . . . . . . . 2513

24

25

558    . . . . . . . . . . . . . . . 2513

DEFENDANT EXHIBITS

Exhibit No.                              Received

323, 323B and 390   . . . . . . . . . . . .2386

1750    . . . . . . . . . . . . . . 2461