DBJLCHE1                    Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                Plaintiff,

          v.                        11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                Defendants.

------------------------------x
                                    November 19, 2013
                                    9:36 a.m.

Before:

                    HON. LEWIS A. KAPLAN
                                    District Judge

                        APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     ANNE CHAMPION

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

DBJLCHE1                          Trial

1          (Trial resumed)

2          THE COURT:  Good morning, folks.

3          MR. MASTRO:  Good morning, your Honor.

4          THE COURT:  Ready to continue?

5          MR. MASTRO:  Yes, your Honor.

6          Your Honor, before we started today --

7          THE COURT:  I'm sorry, I can't hear you.

8          MR. MASTRO:  I did, your Honor, before we started

9     today want to briefly discuss the schedule for the week.

10         I'm very hopeful, your Honor, no guarantees, but I'm

11    very hopeful of concluding Mr. Donziger's cross-examination

12    today.  I'm sure there will be some redirect, whether we get to

13    any of that today or tomorrow morning.

14         But I was hoping for guidance from the Court and the

15    defendants.  They're supposed to know by tomorrow I believe

16    Mr. Gomez has said whether Ms. Calva and Humberto Piaguaje

17    would actually come to the United States.  So we should have a

18    clear idea by the end of the day tomorrow -- actually today

19    he's supposed to let us know by the end of the day whether

20    there's any more defense witnesses.

21         Correct, Mr. Gomez?

22         MR. GOMEZ:  That's correct.

23         MR. MASTRO:  So we could be concluding the defense

24    case by tomorrow.  I was hoping that the Court would permit us

25    then -- and our case depends in part on whether Ms. Calva comes

DBJLCHE1                    Trial

1    or not.  We'll know that by the end of the day, but we will

2    have I think at least one, maybe two rebuttal witnesses.  They

3    should be brief.  We should be able to complete them in the

4    course of a day, probably only part of a day.  And I was hoping

5    that we could schedule that they should be here on Thursday to

6    do the rebuttal case, so, because one of them is coming in from

7    out of town, your Honor.

8              THE COURT:  Well, it seems this discussion is about

9    seven or eight hours premature, right?

10             MR. MASTRO:  I was just trying to plan ahead whether

11   to tell somebody to travel today or tomorrow.

12             THE COURT:  Well, look, if we're all done with

13   Mr. Donziger today and these people that -- Calva and Piaguaje

14   is it?

15             MR. MASTRO:  Humberto.

16             THE COURT:  Are not coming, you may have to start your

17   rebuttal case tomorrow.

18             MR. MASTRO:  That's really what I was asking for, your

19   Honor.  If we could do it first thing Thursday morning, I think

20   we'd be done by the lunch break.

21             THE COURT:  This was the trial that was going to be

22   over in three weeks, remember?

23             Mr. Gomez?

24             MR. GOMEZ:  I have no objection to the request for

25   Thursday.  Your Honor, I have a conference call this evening

DBJLCHE1                      Trial

1   regarding Mr. Humberto Piaguaje.  And just so it's not

2   misunderstood, I wouldn't be able to report on him while we're

3   in court, but I would be able to report to Mr. Mastro tonight

4   on Mr. Humberto Piaguaje.

5           With respect to Ms. Calva, her sister is supposedly at

6   the embassy right now.  If her sister gets a visa, I'm assuming

7   she's coming.  If she does not, I'm assuming she's not coming

8   at all.  I will be able to report on that hopefully by lunch

9   hour.

10          THE COURT:  Okay.  That will advance the ball.

11          MR. MASTRO:  The only other thing I wanted to say,

12  your Honor, was assuming those witnesses aren't coming and our

13  case were completed, our rebuttal case were completed by

14  Thursday morning, we'd be prepared to do closings on Friday if

15  your Honor were willing to entertain us.

16          MR. FRIEDMAN:  I would like to do that if we can, your

17  Honor.

18          THE COURT:  I remember trying cases on the west coast

19  and wanting to do anything I could to return to the east coast

20  and never go back.  No offense to the west coast, which is very

21  lovely, but not for trying cases.

22          MR. FRIEDMAN:  We'll be ready.

23          Your Honor, I did want to ask.

24          THE COURT:  For a New Yorker.

25          MR. FRIEDMAN:  Yes.  Your Honor, I would ask if we

DBJLCHE1                    Trial

1       could get some indication who the rebuttal witnesses are and

2       some offer of proof to indicate that they are true rebuttal

3       witnesses.

4                THE COURT:  You're not going to get an offer of proof,

5       I imagine, very willingly before the defense case is done.

6                MR. MASTRO:  That would be correct, your Honor.

7       Unless your Honor required us to, we're not planning to do

8       that.

9                MR. FRIEDMAN:  But we'll have some notice as to who

10      they are so we can prepare?

11               THE COURT:  I'm sure you will.

12               MR. FRIEDMAN:  All right.  Thank you.

13               MR. MASTRO:  Thank you, your Honor.

14               THE COURT:  Okay.  Let's go.

15               MR. MASTRO:  Thank you.

16               The last thing before we begin, your Honor, was my

17      outstanding question on the name of the funding firm for the

18      plaintiffs and a brief examination on that.

19               THE COURT:  Well, as to the question that's pending,

20      the objection is overruled.

21               MR. MASTRO:  Thank you, your Honor.

22       STEVEN DONZIGER, resumed.

23          called as a witness by the Plaintiffs,

24          having previously been duly sworn, testified as follows:

25      CROSS-EXAMINATION (cont'd)

DBJLCHE1                         Donziger - cross

```
 1   BY MR. MASTRO:
 2   Q.  Mr. Donziger, I wanted to follow up with a few questions
 3   where we left off yesterday afternoon.
 4          What is the name of the funding firm that this past
 5   spring agreed to fund the Lago Agrio plaintiffs litigation?
 6          THE WITNESS:  Your Honor, I have an issue with this
 7   question.  Could I see you at side bar?
 8          THE COURT:  No.  If Mr. Friedman wants a side bar,
 9   I'll see Mr. Friedman.
10          MR. FRIEDMAN:  Your Honor, I think I know what
11   Mr. Donziger is concerned about.  I would ask for a side bar.
12          THE COURT:  All right.
13          (At the side bar)
14          MR. FRIEDMAN:  Your Honor, Mr. Donziger, I believe,
15   has a confidentiality agreement with this funder --
16          THE COURT:  We can solve that very readily.
17          MR. FRIEDMAN:  -- and is concerned that funders will
18   be harassed in various ways by Chevron if their names become
19   public.  So he feels compelled not to reveal the names for both
20   of those reasons.
21          MR. MASTRO:  Your Honor, Ms. Hinton was asked
22   questions about funding and named the firm during her
23   testimony.  So, and no objection was made at that time.  So
24   it's --
25          THE COURT:  She named the firm?
```

DBJLCHE1                    Donziger - cross

1        MR. MASTRO:  I think she named the funding firm.

2        THE COURT:  The answer which you expect is his answer

3   to the question.

4        MR. MASTRO:  Correct.

5        THE COURT:  Is that right?

6        MS. LITTLEPAGE:  That's not true.  She said she didn't

7   know the name of the firm.  It started with a W.

8        MR. MASTRO:  I'm sorry.  She knew they got funding in

9   the spring.  I'm sorry, your Honor, if she didn't give the

10  name.  It's been publicly reported what the name of the firm

11  is.

12       THE COURT:  Certainly there has been a name reported

13  in Business Week.

14       MR. FRIEDMAN:  I don't doubt that.

15       THE COURT:  You're telling me it's somebody else?

16       MR. FRIEDMAN:  No, I'm not telling you it's somebody

17  else.

18       THE COURT:  Come on.  And if your concern is with the

19  confidentiality agreement he can decline to answer, I'll order

20  him to answer.  He will do it under judicial compulsion and

21  there it is.

22            (Continued on next page)

23

24

25

DBJLCHE1                    Donziger - cross

1          (In open court)

2          THE COURT:  I was advised in substance at the side bar

3   that a concern here is that there is a confidentiality

4   agreement of some sort.

5          Mr. Donziger, I direct you to answer the question.

6          THE WITNESS:  I'm sorry, can you repeat the question,

7   please.

8   BY MR. MASTRO:

9   Q.  Certainly, I'll repeat it, Mr. Donziger.

10          What is the name of the funding firm that agreed to

11   fund the Lago Agrio plaintiffs' litigation this past spring?

12   A.  Woodsford.

13   Q.  And can you tell the Court how much money Woodsford has

14   agreed to provide to fund the Lago Agrio plaintiffs'

15   litigation?

16          MR. FRIEDMAN:  And, your Honor, we maintain our

17   objection on relevancy grounds.

18          THE COURT:  This is relevant at least to the question

19   of the credibility of the representations made to this Court by

20   this witness and by Mr. Gomez.  Overruled.

21   Q.  Mr. Donziger, please answer the question.

22   A.  $2.5 million.

23   Q.  And has Woodsford already provided that 2.5 million?

24   A.  Yes.

25   Q.  Did they provide that 2.5 million this past spring 2013?

DBJLCHE1                    Donziger - cross

1    A.  They made an investment earlier this year, I believe March

2    or April.

3    Q.  Have they agreed to provide any further funding after the

4    first 2.5 million they provided this past spring 2013?

5    A.  No.

6    Q.  Have they made any commitments to consider additional

7    amounts of funding in whatever agreement you have with them

8    after this initial $2.5 million investment that they already

9    made this past spring 2013?

10   A.  Well, there's ongoing discussions with Woodsford and a

11   number of potential funders about additional investments.

12   Q.  Now, sir, I want to return to the subject of your

13   supervision of the local Ecuadorian legal team.

14          Sir, am I correct that until recently you've traveled

15   to Ecuador on a regular basis, correct?

16   A.  I don't know what you mean by until recently.  I've

17   testified that I traveled through over the course of many years

18   on roughly a monthly basis.

19   Q.  When was the last time you were there, sir?

20   A.  I believe in the summer, June or July.  I'm sorry, July or

21   August of this year.

22   Q.  Sir --

23          MR. MASTRO:  May I approach, your Honor?

24          THE COURT:  Yes.

25   Q.  -- I'd like to show you what's been marked as Plaintiff's

DBJLCHE1                    Donziger - cross

1   Exhibit 1509.

2            MR. MASTRO:  Also showing to Mr. Friedman and

3   Mr. Gomez that we have an apostille for this document.

4            THE COURT:  You mean apostille?

5            MR. MASTRO:  Apostille.

6            THE COURT:  I thought you were talking about where the

7   Dodgers used to play.

8            MR. MASTRO:  Very close, your Honor.

9            And I will represent for the record that this is a

10  copy of the migration report for Mr. Donziger's travels to and

11  from Ecuador provided by Ecuadorian authorities covering the

12  period from October 2005 to March 2013.

13  Q.  Mr. Donziger, these are your migration records to and from

14  Ecuador over that eight-year period, correct, sir?

15  A.  I don't know, sir.  I haven't looked at them.

16           MR. MASTRO:  Your Honor, we ask this be received into

17  evidence.

18           MR. FRIEDMAN:  No objection.

19           MR. GOMEZ:  No objection.

20           THE COURT:  Received.

21           (Plaintiff's Exhibit 1509 received in evidence)

22  Q.  Mr. Donziger, you say you have traveled to Ecuador about

23  once a month over that period, correct, sir?

24  A.  I believe that's correct, up until maybe about a year ago.

25  Q.  But you haven't traveled there every month, just roughly

DBJLCHE1                    Donziger - cross

1   about once a month, correct?

2   A.   That's correct.

3   Q.   Now, Mr. Donziger, I'd like to return to your testimony

4   yesterday about some of your expense records.  And if I may

5   approach, your Honor, I'd like to hand the witness again

6   Plaintiff's Exhibit 7700.

7        Now, you'll recall, Mr. Donziger, I asked you

8   yesterday about a breakfast expense on June 28, 2012 for

9   $443.36 that you had with Pablo Fajardo reflected on page 25 of

10  this document.

11       Do you recall that testimony, sir?

12  A.   Yes.

13  Q.   And you testified, sir, that we -- meaning you and

14  Mr. Fajardo -- had a press breakfast in Quito on that date and

15  that's what this $443 was for, correct, sir?

16  A.   I believe I said that, yes.

17  Q.   Now, sir, I want to ask you again.  Isn't it a fact that

18  you weren't even in Ecuador in June 2012?

19  A.   I don't know.

20  Q.   Let's go back to the migration record, please, page 5.

21       Sir, referring you to the period April 2012 through

22  July 2012, isn't it a fact, sir, that you were not in Quito,

23  you were not in Ecuador in June 2012, isn't that a fact, sir?

24  A.   Sir, I don't know.  And as I testified, Mr. Rizack's

25  records were rough approximations.  We often did have $400

DBJLCHE1                    Donziger - cross

1    meals for press events in Quito.  I don't know if that was one

2    or not.

3            MR. MASTRO:  Move to strike after he said he doesn't

4    know, your Honor.

5            THE COURT:  Granted.

6    Q.  Thank you, Mr. Donziger.  We'll move on.

7            Am I correct, Mr. Donziger, that Purrington Moody,

8    that's a law firm, correct?

9    A.  Yes.

10   Q.  Purrington Moody did the legal work to create NewCo or

11   Amazonia, the Gibraltar company I asked you some questions

12   about yesterday?

13   A.  That's correct, they did a substantial portion of it, not

14   all.

15   Q.  And NewCo, now known as Amazonia, that was created

16   approximately a year, year and a half ago?

17   A.  I don't know the exact date, several months ago.

18   Q.  Thank you, Mr. Donziger.

19           Now, Mr. Donziger, I want to show you four documents

20   that we received from Mr. Rizack.  Just ask you to identify

21   them for the record, we can put them into evidence.

22           MR. MASTRO:  Your Honor, may I approach?

23           THE COURT:  Yep.

24           MR. MASTRO:  Thank you, your Honor.

25   Q.  These are marked as Plaintiff's Exhibit 7571, 7572, 7787,

DBJLCHE1                    Donziger - cross

```
 1   and 7788.

 2              THE COURT:  7788?

 3              MR. MASTRO:  Yes, your Honor.

 4   Q.  Mr. Donziger, I want to start with 7571.  Can you identify

 5   what that is for the record, please?

 6   A.  I believe it's materials Josh Rizack prepared for me.

 7              MR. MASTRO:  Your Honor, I ask it be received in

 8   evidence.

 9              THE COURT:  Received.

10              (Plaintiff's Exhibit 7571 received in evidence)

11              MR. FRIEDMAN:  No objection, your Honor.

12   Q.  Mr. Donziger, can you identify for us what 7572 is?

13   A.  Well, I've never -- I don't think I've ever seen a bunch of

14   the pages in this particular exhibit.

15   Q.  Sir, these are materials that we received from Mr. Rizack.

16   Do you recognize the first page as a spreadsheet reconciliation

17   of expenditures and credits on your account?

18              MR. FRIEDMAN:  Your Honor, I'd object.  If he hasn't

19   seen them before, then I don't think it's -- there's no

20   foundation, it's not proper to question him about them.

21              THE COURT:  This does not necessarily follow.

22   Overruled.

23   A.  I don't think I've ever seen these pages before.  But, in

24   any event, I'm having trouble reading the type.  The font size

25   is really small.
```

1    Q.  We can call Mr. Rizack if necessary, but does this look

2    like something to you, based on your experiences with

3    Mr. Rizack doing work for you, that it's his work product on

4    your behalf?

5    A.  It could be.  Some of the pages look familiar.

6              THE COURT:  Look, Mr. Friedman, have a word with

7    Mr. Mastro and see if you can work this out without the need of

8    dragging in Mr. Rizack.

9              MR. MASTRO:  I would, your Honor, if we can admit it

10   subject to connection.

11             THE COURT:  Just do it.  Don't talk about it.

12             (Pause)

13             MR. MASTRO:  Your Honor, we'll try to work out a

14   stipulation on this.

15             THE COURT:  Thank you.

16   Q.  Mr. Donziger, turning to 7787, you recognize that, sir,

17   this expenditure report prepared by Mr. Rizack, consistent with

18   the documents that you recognized yesterday, correct, sir?

19   A.  That's correct.

20             MR. MASTRO:  Your Honor, I ask that be received into

21   evidence.

22             THE COURT:  Received.

23             MR. FRIEDMAN:  No objection.

24             THE COURT:  I'm sorry, did you say objection?

25             MR. FRIEDMAN:  No objection.

DBJLCHE1                    Donziger - cross

```
 1              THE COURT:  Received.

 2              (Plaintiff's Exhibit 7787 received in evidence)

 3   Q.  And, Mr. Donziger, looking at 7788, sir, am I correct these

 4   are receipts of some of your expenditures?

 5   A.  They're some of mine and some others I don't recognize.

 6              MR. MASTRO:  Your Honor, I ask that be received.

 7              MR. FRIEDMAN:  Again, your Honor, I think his are

 8   properly admissible and proper to question him about, but ones

 9   he doesn't recognize.

10              MR. MASTRO:  We'll go over this with Mr. Friedman,

11   your Honor.  It's all from Mr. Rizack.  I'm sure we can work it

12   out.

13   Q.  Mr. Donziger, referring you back to 7787, page 4, these are

14   case expenditures by entity that you all made on the Lago Agrio

15   Chevron case between 2007 and 2013, correct, sir?

16   A.  I think this is an approximation based on records that

17   Mr. Rizack had access to, so I would not vouch for its exact

18   accuracy.

19   Q.  Am I correct here that it reflects payments to a number of

20   parties for which you call advocacy/PR, do you see that, sir?

21   A.  Yes.

22   Q.  It reflects that you paid during that five- to six-year

23   period over 272,000 to Amazon Watch, correct, sir?

24   A.  No.

25   Q.  Does it not reflect expenditures to Amazon Watch of
```

DBJLCHE1                    Donziger - cross

1   272,000, sir?

2   A.  It does.

3   Q.  Can we go down a little further on the page, please, on

4   advocacy, it reflects $50,000 to Kerry Kennedy, sir?

5   A.  Yes.

6   Q.  And about half a dozen other advocacy/PR parties, correct,

7   sir?

8   A.  Yes.

9            THE COURT:  It says what it says, Mr. Mastro.

10            MR. MASTRO:  I understand, your Honor.  I'm ready to

11   move on.

12   Q.  Mr. Donziger, am I also correct that you have had -- strike

13   that.

14            Am I also correct you've come into other money over

15   the last two years besides what you've earned on the Lago Agrio

16   Chevron case?

17            MR. FRIEDMAN:  Object, vague.

18            MR. MASTRO:  Your Honor, I'm happy to go on and

19   connect it.  I don't think it's that vague.  This witness knows

20   what I'm talking about.

21            THE WITNESS:  Sir, I'm not getting into this.  I think

22   we should move on.

23            THE COURT:  I'm sorry, you're telling me to move on,

24   Mr. Donziger?

25            THE WITNESS:  You understand what the issue is and

DBJLCHE1                    Donziger - cross

1    it's in the record.

2              THE COURT:  Well, I don't know what the issue is.  I

3    have a good suspicion, but I haven't heard the question yet.

4    Q.  Isn't it a fact, sir, that you have received one point --

5    strike that.

6              Isn't it a fact, sir, that you have received close to

7    $2 million in connection with litigations you've pursued over

8    estate matters involving your father, your grandparents, and

9    your stepmother?

10             MR. FRIEDMAN:  I object, your Honor, on relevance

11   grounds.  I think the funding of the litigation, the things of

12   that kind, the lawyers are not required to put their own

13   personal money in.

14             THE COURT:  When a lawyer comes in and says to a

15   federal judge I want relief because I haven't got enough money

16   to pursue this matter, he puts it right on the line.

17   Overruled.

18   Q.  Please answer the question, sir.

19   A.  No.

20   Q.  How much money have you received as a result of the

21   litigations you filed in Florida involving your father,

22   father's estate, stepmother, grandparents, and the lawyer

23   representing the estate as trustee, how much money have you

24   come into over the last two years through those litigation

25   efforts, sir?

DBJLCHE1                          Donziger - cross

1        MR. FRIEDMAN:  Same objection.

2        THE COURT:  Same ruling.

3   A.  Which one of those questions do you want me to answer?

4   Q.  Just give me the total.  How much money over the last two

5   years have you received as a result of your successful

6   litigation efforts against those family members and the lawyer

7   representing the estate?

8   A.  None, nothing.

9   Q.  You've not received any money as a result of those

10  litigations; is that your testimony?

11  A.  No.  I mean, excuse me, I have not received any money as a

12  result of litigation.

13  Q.  I will rephrase the question, sir.

14       How much money have you received from family estate

15  related matters over the last two years?

16  A.  I don't know the exact amount.  It's about $600,000 in

17  liquid assets, and I'm told it's about one point two or

18  three million in illiquid real estate assets.

19  Q.  And you hired lawyers to represent you in those multiple

20  litigations, in Florida, correct, sir?

21  A.  I hired a lawyer to represent me in a very specific,

22  discrete aspect of this.

23  Q.  And the very discrete, specific aspect you're referring to

24  is a case where you alleged that your deceased father had

25  forged or misused your signature on trust documents, correct,

DBJLCHE1                    Donziger - cross

1   sir?

2   A.  That's correct.

3   Q.  So you appreciate that it is wrong to forge or misuse

4   someone's signature on court filing documents, correct, sir,

5   you appreciate that?

6   A.  Of course.

7   Q.  Thank you.  Now, Mr. Donziger, I want to turn our attention

8   to Mr. Cabrera.

9         Now, sir, in your witness statement you say that you

10  have been "confused" in the past about the propriety of the

11  "process used to create the Cabrera report," but you say you

12  now "believe the process used to create the executive summary

13  of the Cabrera report was fundamentally consistent with Ecuador

14  law, custom, and practice as it was occurring in the Aguinda

15  case."

16        That's your testimony, correct, sir?

17        MR. FRIEDMAN:  Paragraph number?

18        MR. MASTRO:  Paragraph 91.

19  Q.  That's your testimony?

20        THE COURT:  And the exhibit number, please?

21        MR. MASTRO:  It's Donziger witness statement, your

22  Honor.

23        THE COURT:  I know that.  I'm asking you for the

24  exhibit number.

25        MR. GOMEZ:  1750, your Honor.

DBJLCHE1                    Donziger - cross

1           THE COURT:  Thank you.

2    Q.  That's your testimony, correct, sir?

3    A.  I believe it is.

4    Q.  Now, sir, the Aguinda litigation you're referring to there

5    is the Lago Agrio Chevron litigation in Ecuador, correct, sir?

6    A.  My testimony related to Mr. Cabrera was related to the

7    Ecuador Aguinda litigation, yes.

8    Q.  Now, sir, I want to ask you about the process you were

9    referring to.  The process you're referring to there is the

10   drafting of the executive summary of the Cabrera report,

11   correct, sir?

12   A.  I think that and other aspects.

13   Q.  Including the drafting of the annexes to that report,

14   correct?

15   A.  It's a more nuanced issue for me.

16   Q.  And even the appointment process for Mr. Cabrera, correct?

17   A.  I believe that was consistent with Ecuadorian practice,

18   yes.

19   Q.  I just asked you, sir, whether that's what you were

20   referring to in your witness statement.  Correct, sir?

21   A.  Yes.

22   Q.  Now, sir, let's explore that.

23           Am I correct that Stratus drafted the executive

24   summary of the Cabrera report?

25   A.  For the most part.  I don't know if it's a hundred percent,

DBJLCHE1                    Donziger – cross

1   but, yes, they were asked to draft an executive summary.

2   Q.  And that executive summary that Stratus drafted for

3   Mr. Cabrera was substantially the same as what Mr. Cabrera

4   signed and filed with the court in Ecuador, correct?

5   A.  Yes.

6   Q.  Verbatim, correct?

7   A.  I don't believe it was verbatim.

8   Q.  Have you ever compared the draft that Stratus prepared and

9   that you reviewed before it was sent to Mr. Cabrera and that

10  which Mr. Cabrera actually filed with the Ecuadorian court?

11  A.  I don't think I did, but I think others did.

12  Q.  And, sir, isn't it the case that it is word-for-word

13  verbatim exactly the same document, what was given to

14  Mr. Cabrera was filed as is, word for word, correct, sir?

15  A.  I don't know the answer to that.

16  Q.  And, sir, isn't it a fact, isn't it a fact that it was

17  written in the first person for Mr. Cabrera so he could just

18  sign it and file it, isn't that a fact?

19  A.  No.

20  Q.  It's your testimony that the Cabrera report, the executive

21  summary of the Cabrera report was not written in the first

22  person, "I, Richard Cabrera," is that your testimony, sir?

23  A.  No.

24  Q.  Am I correct that the executive summary of the Cabrera

25  report was written, drafted for him, first line, "I, Richard

DBJLCHE1                    Donziger - cross

1    Stalin Cabrera Vega," correct, sir?

2    A.  It was written in the first person consistent with practice

3    for expert reports this Ecuador.

4    Q.  Sir, I just asked you a yes or no question.

5    A.  Yes.

6    Q.  Thank you.  Now, sir, am I also correct that Stratus wrote

7    the vast majority of the annexes in the Cabrera report?

8    A.  I don't know if that's correct.  They did organize the

9    annexes, and I think they wrote some of them.

10   Q.  Isn't it a fact that Stratus drafted 11 of the 17 annexes

11   in Cabrera's report to be submitted under Cabrera's name?

12   A.  I don't know the exact number, sir.

13   Q.  It was most of them, wasn't it, sir?

14   A.  I don't know.

15   Q.  And, sir, isn't it also a fact that Stratus oversaw the

16   drafting of every one of those annexes that was attached to

17   Cabrera's report?

18   A.  Stratus was in charge of organizing the annexes, all of the

19   annexes.  I don't know if they oversaw the drafting each one of

20   them.

21   Q.  And who did Stratus report to in drafting the executive

22   summary of Cabrera's report and in overseeing the preparation

23   of all the annexes to that report, who did they report to, sir?

24   A.  Well, ultimately this was a decision by local counsel, sir.

25   But I had a role in trying to get it done because that was a

DBJLCHE1                    Donziger - cross

1    decision the legal team made to do it this way.

2    Q.  And you reviewed every one of those documents, didn't you,

3    sir?

4    A.  No.

5    Q.  You commented on the executive summary, didn't you, sir?

6    A.  I did.

7    Q.  In fact, you made edits to the damage calculation charts

8    attached to that summary right up until the morning of

9    March 31, 2008, didn't you, sir?

10   A.  I don't know.  I did edit parts of that aspect of the

11   document.

12   Q.  Right up until the morning of March 31, 2008, the day

13   before Cabrera filed that report with the court on April 1,

14   2008, didn't you, sir?

15   A.  It's possible.

16   Q.  And, sir --

17            THE COURT:  What is your best recollection, sir?

18            THE WITNESS:  It was toward the end.

19            THE COURT:  It's possible that the Archbishop of New

20   York did it.

21            What is your best recollection?

22            THE WITNESS:  It was toward the very end of the

23   process.  It might have been that day, might have been the day

24   before, might have been three days before, might have been the

25   next day.  I don't know.  It was toward the very end of the

DBJLCHE1                    Donziger - cross

1   process I participated in edits of the particular section of

2   this report.

3              THE COURT:  Thank you.

4   Q.  Isn't it a fact, sir, that there were parts of

5   Mr. Cabrera's report that went directly to local counsel in

6   Ecuador and simply got printed out the last 24 hours to be

7   delivered to the report -- sorry?

8              THE COURT:  Start again.  Would you ask a simple

9   question.

10             MR. MASTRO:  Yes, I'm going to ask a simple question.

11  Q.  Isn't it a fact, sir, that there were annexes to Cabrera's

12  report that were sent directly to local counsel, correct?

13  A.  There were a bunch of materials sent to local counsel -- I

14  really wasn't involved at that level of detail -- I believe

15  that was sent directly from Stratus to local counsel, and some

16  of those details I'm not familiar with.

17  Q.  And that local counsel literally printed them out and

18  brought them with them the day Cabrera filed his report on

19  April 1, 2008, without Cabrera ever having even seen them;

20  isn't that a fact, sir?

21  A.  No, I have no knowledge of that.

22  Q.  And isn't it a fact, sir, that it was your team, Stratus

23  and the consultants working with you, that prepared and drafted

24  Mr. Cabrera's report?

25  A.  When you say the report, you need to be more specific.  The

DBJLCHE1                    Donziger - cross

```
 1   executive summary, yes, and there were other aspects of his
 2   report --
 3   Q.  And most of the annexes --
 4            THE COURT:  Let him finish the answer, Mr. Mastro.
 5            MR. MASTRO:  Certainly, your Honor.  Certainly.
 6   Q.  And am I also correct?
 7            THE COURT:  Mr. Mastro, that means stop and let him
 8   finish.
 9   Q.  Please, if you had more to say.
10   A.  I think I finished my answer.
11            THE COURT:  Thank you.
12   Q.  And isn't it a fact that it was Stratus and your team of
13   consultants who drafted the annexes to Cabrera's report?
14   A.  As I said, we organized the annexes, Stratus organized the
15   annexes.  I asked them to do that on instructions of local
16   counsel, and I don't believe I had a great deal of
17   participation personally in the preparation of those aspects of
18   the materials.
19   Q.  So isn't it a fact, sir, that Cabrera's team was your team
20   of consultants, Stratus, and those that Stratus oversaw, isn't
21   that a fact, sir, yes or no?
22   A.  I can't answer that yes or no.  If you'd like me to
23   explain, I'm happy to.
24   Q.  It's a simple question.
25   A.  I can't answer that yes or no.
```

DBJLCHE1                    Donziger - cross

Q.  Can you name anybody, any consultant, who worked only for
Mr. Cabrera, not for your team?

A.  There were many.

Q.  Can you name any consultant who drafted -- strike that.

        Mr. Donziger, isn't it a fact that it was your team,
that's Stratus and those working at Stratus's direction, who
drafted the executive summary and the annexes to Cabrera's
report?

A.  No.  I can't, I wouldn't characterize it that way.  I could
explain it, but I wouldn't characterize it that way.

Q.  You admit it was your team, Stratus, that drafted this
executive summary, correct?

A.  Yes.

Q.  And you admit that it was your team, Stratus and those
working under Stratus's supervision, who drafted most of the
annexes to Cabrera's report, correct, sir?

A.  No, that's not my testimony.

Q.  Sir, isn't it a fact that a substantial number of the
annexes that Cabrera adopted verbatim were drafted by Stratus?

A.  There's too many assumptions in your question.  Stratus had
a role in putting together all the annexes.  Some were written
by various people, not Stratus.  Stratus also, as I understand
it, wrote some of them.  I don't know precisely which ones
Stratus wrote of the 17, but Stratus generally organized the
preparation of the annexes and pulling them together for

DBJLCHE1                    Donziger - cross

1   Mr. Cabrera.

2   Q.  And, sir, isn't it a fact that Stratus also drafted

3   Mr. Cabrera's work plan?

4   A.  Well, I know that our team drafted a work plan for his

5   field work.  I don't know if it was Stratus or our local

6   technical team, but we felt that was completely appropriate.

7          MR. MASTRO:  Move to strike after "we felt that was."

8          THE COURT:  Look, it's going to come out on redirect

9   anyway.  It is what it is.

10  Q.  Mr. Donziger, when Mr. Cabrera submitted his report to the

11  court on April 1, 2008, he didn't mention anywhere in that

12  report that Stratus was involved in any way, did he, sir?

13  A.  That's correct.

14  Q.  And when Mr. Cabrera filed his work plan with the court, he

15  didn't mention anywhere in any way that Stratus or your local

16  legal team was involved in the drafting of his work plan, did

17  he, sir?

18  A.  He did not, but my understanding was that was consistent

19  with the practice.

20         MR. MASTRO:  Move to strike.

21         THE COURT:  Look, I'll let it stand.

22  Q.  And, sir, am I also correct that it was your team that

23  picked the sites that Mr. Cabrera would inspect?

24  A.  When you say "your team," we had a team that I was a part

25  of.  It was not Steven Donziger's team, sir.  But, yes, the

DBJLCHE1                     Donziger - cross

1    team that litigated the case in Ecuador helped Mr. Cabrera

2    choose the sites to inspect so we could get as much evidence as

3    we could into the record about your client's contamination,

4    yes, we did that.

5    Q.  Sir, isn't it a fact that the team with which you worked on

6    the Lago Agrio Chevron litigation picked all of the sites that

7    Mr. Cabrera inspected, yes or no?

8    A.  I don't know.

9    Q.  Can you name a single site that Mr. Cabrera decided to

10   inspect that wasn't selected by the team that you worked with

11   in the Lago Agrio Chevron litigation?

12   A.  I wasn't involved in that level.  I don't know the sites he

13   even did inspect.  I couldn't name one site we recommended he

14   inspect, and I can't name a site if he chose his own that he

15   chose to inspect.  I don't know.

16   Q.  So your answer is you don't know, correct?

17   A.  That's correct.

18   Q.  Now, sir, I want to go back to your statement.  You say now

19   you believe that the process involved with Mr. Cabrera was

20   okay, but I want to ask you questions about how you acted

21   during the process when he was selected and then doing his job.

22          Now, sir, isn't it a fact that you and your Ecuadorian

23   legal team used code names to conceal your team's involvement

24   with Cabrera?

25   A.  We often --

DBJLCHE1                     Donziger - cross

1    Q.  Yes or no, sir.

2    A.  We often used nicknames.  I wouldn't characterize them as

3    code names.  That's your characterization.

4    Q.  Sir, isn't it a fact that at the time you were seeking to

5    get Mr. Cabrera appointed as the global damages expert that you

6    used code names for the judge, "cook," for Cabrera, "waiter,"

7    for yourself --

8              THE COURT:  How about one question at a time.

9              MR. MASTRO:  Certainly, your Honor.

10   Q.  Isn't it a fact, sir, that at the time you were trying to

11   get the court to appoint Richard Cabrera as the global damages

12   expert, you sent emails within your team using code names for

13   the judge as the cook, isn't that a fact, sir?

14   A.  There were emails sent by Mr. Fajardo, if I remember

15   correctly, that used what you call code names.  It could be

16   code names, nicknames, jokes.  But, yes, there were emails sent

17   by Mr. Fajardo, as it was done in a variety of different

18   contexts throughout the trial, giving people nicknames, yes.

19   Q.  Referring to the judge as the cook, correct?

20   A.  I believe that's true.  I don't remember exactly.

21   Q.  And referring to Mr. Cabrera as the waiter, correct, sir?

22   A.  I don't know.  I think that's -- you want to show me an

23   email, I'm happy to.

24   Q.  And referring to yourselves as the restaurant and Chevron

25   as the other restaurant, correct?

DBJLCHE1                    Donziger - cross

1    A.  I don't know.

2    Q.  Let's see if we can refresh your recollection,

3    Mr. Donziger.  Let's put up PX845.  It's an email dated

4    March 26, 2007.  It's an email from Mr. Fajardo to you.  It's a

5    chain between you and Mr. Fajardo.

6         Do you see that, sir?

7    A.  Yes.

8    Q.  Does that refresh your recollection whether code names were

9    used for Mr. Cabrera as the waiter, you and Chevron as the

10   restaurant and the other restaurant?

11   A.  It refreshes my recollection that what you call code names,

12   we called nicknames, were used, yes.

13   Q.  And, sir, am I also correct that in your subsequent

14   communications about Mr. Cabrera you used a code name for him,

15   the Wao?

16   A.  Yes, that I remember.

17   Q.  And the Wao refers to the Huaorani or literally means the

18   man, correct?

19   A.  I don't know.  I think it's abbreviation for Waorani.

20   Q.  And, sir, isn't it a fact that your local Ecuadorian team

21   set up a what they called "secret account" to pay Cabrera

22   directly, not through the court?

23   A.  There was a second account to pay him for work performed

24   outside of the court process due to the paralysis that existed

25   in the court, yes.

DBJLCHE1                    Donziger - cross

```
 1   Q.  So isn't it a fact that you paid Mr. Cabrera in advance of
 2   him even being sworn in, correct, sir, yes or no?
 3   A.  When you say "you," I did not pay Mr. Cabrera.  The team.
 4   Q.  Your team paid Mr. Cabrera in advance before he was even
 5   sworn in correct, sir?
 6   A.  When you say "your team," I really I'm not going to agree
 7   with that characterization.  So why don't you try to
 8   recharacterize your question.
 9   Q.  Sir, I'll be happy to recharacterize it for you.
10          Isn't it a fact that the local Ecuadorian legal team
11   with which you worked told you and did in fact pay Mr. Cabrera
12   in advance before he had even been sworn in by the court?
13          MR. FRIEDMAN:  Object, compound.
14          THE COURT:  Sustained, compound.
15          MR. MASTRO:  I'll break it down.
16   Q.  Isn't it a fact, sir, that you, your local Ecuadorian legal
17   team with which you worked, told you it was going to pay
18   Mr. Cabrera in advance before he was even sworn in?
19   A.  That's my understanding, and my understanding was it was
20   appropriate.
21   Q.  And isn't it a fact, sir, that later your local Ecuadorian
22   team with which you were working after Mr. Cabrera's
23   appointment told you that you need to send money because
24   Mr. Cabrera needed to be paid to not stop the work, correct,
25   sir?
```

DBJLCHE1                    Donziger - cross

1   A.  Look, we paid him for work so he would continue to work,

2   yes.  We wanted to finish the global assessments, so, yes, we

3   did --

4           THE COURT:  Let him finish the answer, Mr. Mastro.

5           MR. MASTRO:  Certainly, your Honor.

6   Q.  Go ahead.

7   A.  We paid him to do the work.  We were trying to get the work

8   done.  And there were various times throughout this process

9   where there was a -- where the court on this particular case

10  closed down because of recusal motions that your client had

11  filed, and at that point he had to continue to be paid so that

12  work would continue.  Otherwise, we were worried he might have

13  left the case and really set the case back one or two years.

14  So those were the reasons why he was paid outside the court

15  process.

16  Q.  And you paid him out of -- sorry.  Your local Ecuadorian

17  legal team with which you worked had you send the money to the

18  secret account to pay him out of the secret account, correct?

19  A.  Look, I didn't send the money.  There was a second account

20  that was used to pay Mr. Cabrera for this particular purpose,

21  yes.

22  Q.  And am I also correct that even after he had completed his

23  work and filed his reports in 2009, your local Ecuadorian team

24  with which you were working had you send money to pay Cabrera

25  to "calm down," isn't that a fact, sir?

DBJLCHE1                    Donziger - cross

1  A.  I don't know.  I do know there was money still owed to him

2  after the completion of his work that we had not paid.

3  Q.  Let's go to PX1147.  This is July 3, 2009 email from

4  Mr. Yanza to you.  Correct, sir?

5  A.  Yes.

6  Q.  And he says it's very urgent that you pay Cabrera 10,000

7  today to calm him down, correct, sir?

8  A.  Yes.  That related to --

9  Q.  I just asked you yes or no, sir.

10  A.  That's what Mr. Yanza says in this email.

11  Q.  Thank you, sir.

12         And am I also correct that you had a contract with

13  Mr. Cabrera?

14  A.  Sir, I did not have a contract with Mr. Cabrera.

15  Q.  Am I correct that the Lago Agrio plaintiffs' legal team had

16  a contract with Cabrera?

17  A.  I believe it was a work contract for the work he was going

18  to perform.

19  Q.  Thank you, sir.  And we've never actually seen that

20  contract produced in this litigation, have we, sir?

21  A.  Sir, I don't know.  You have all my case file.  If it's not

22  in there, it means I never got it.

23  Q.  And you also got him an office, correct?

24  A.  I did not get Mr. Cabrera an office, no.

25  Q.  Your Ecuadorian legal team got Mr. Cabrera an office,

DBJLCHE1                    Donziger - cross

```
 1   right?
 2   A.  It was our obligation to, given that we had asked for this
 3   report unilaterally, to give him the tools he needed to do the
 4   work to complete the report and I believe as part of that we
 5   did, our local team did get him an office space.
 6   Q.  And you installed one of your local Ecuadorian counsel's
 7   girlfriends into Mr. Cabrera's office as his assistant to "have
 8   this situation more or less controlled," didn't you, sir?
 9   A.  I didn't do that.
10   Q.  Your local Ecuadorian team told you that that's what they
11   were going to do, install one of their girlfriends into
12   Cabrera's office as his assistant to "have this situation more
13   or less controlled," isn't that a fact, sir?
14   A.  I vaguely remember something like that.  I don't know.  I
15   mean it wouldn't surprise me.  I'm sure he needed an assistant.
16   Q.  Mr. Donziger, isn't it also a fact that you used special
17   password protected email accounts to communicate about the
18   drafting of Cabrera's report and work plan?
19   A.  I remember Mr. Fajardo set up such accounts.  I think I
20   scarcely used them, maybe once or twice, but it was done for
21   reasons of confidentiality and out of fear that we were being
22   surveilled.
23   Q.  And, sir, wasn't one of those accounts called -- sorry.
24   Wasn't your password for one of those accounts lagarto 3?
25   A.  In preparation for my testimony today, I reviewed some
```

DBJLCHE1                         Donziger - cross

1    documents that suggested that that was my password, but I don't

2    have any recollection of it from the time.

3    Q.  And doesn't that mean lizard in Spanish, sir?

4    A.  I don't know actually.

5    Q.  And isn't it also a fact, sir, that on April 1, 2008, you

6    downloaded the final version of Cabrera's report from another

7    one of these password protected email accounts, correct?

8    A.  I don't know.  I remember wanting to get the report that

9    had been submitted as soon as possible.  I don't remember.

10   Q.  Isn't it a fact, sir, that the name of that account was

11   gringograndote@gmail.com, correct, sir?

12   A.  I don't remember.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

DBJ8CHE2                          Donziger - cross

1    Q.  And wasn't gringograndote a reference to you as the

2    gringograndote of the Lago Agrio plaintiffs' legal team?

3    A.  I don't remember.  It certainly would be sort of consistent

4    with a description Fajardo would give me.

5    Q.  As the leader of the team?

6    A.  I didn't say that.

7    Q.  Isn't it also a fact that the file you downloaded that day

8    to get the final version of the Cabrera report from that

9    special e-mail account was called "Informe Sumario Version

10   Final (Steve).doc"?  Isn't that the name of the file that you

11   downloaded from that special site?

12   A.  Sir, I don't know.  If it was put up there for me to

13   download, it probably would not be surprising that my name

14   would be attached to it, but I don't know.

15   Q.  Isn't it a fact that that was the file name on which the

16   Lago Agrio plaintiffs' team worked on the Cabrera report,

17   Informe Sumario Final Version (Steve).doc?  That was the name

18   of the file on that special site, correct, sir?

19   A.  I don't remember.

20   Q.  And, sir, isn't it also a fact that even before Cabrera's

21   appointment was announced by the court, your legal and

22   technical team met secretly with him on March 3, 2007, isn't

23   that a fact, sir?

24   A.  No.

25   Q.  Isn't it a fact, sir, that your legal and technical team

DBJ8CHE2                    Donziger - cross

1   met with Cabrera on March 3, 2007, to discuss the plan for the

2   global damages assessment?

3   A.   That we did do, but the meeting was not secret given

4   that --

5            THE COURT:   Let him finish the answer.

6   A.   Given that there were cameras rolling and there were about

7   30 people there.

8   Q.   Isn't it a fact, sir, that Mr. Cabrera's appointment had

9   not yet even been announced by the court when you had that

10  meeting on March 3, 2007?

11  A.   Look, we knew that he would likely be appointed at that

12  point, but you're correct, it had not actually been announced.

13  Q.   That was a seven-hour meeting, correct, sir?

14  A.   It lasted many hours.  I don't know exactly how many.

15  Q.   Isn't it a fact that Mr. Cabrera was only captured on film

16  at that meeting for less than five seconds?

17  A.   Sir, I haven't reviewed the film.  I don't know.

18  Q.   Didn't you tell the cameramen, the filmmakers of the crew,

19  not to film Mr. Cabrera that day?

20  A.   I don't recall.

21  Q.   Didn't you meet the very next day with three of your U.S.

22  technical team for lunch?

23  A.   If you're talking about the Crude outtake with Champ, Maest

24  and Camp?

25  Q.   Isn't that the very next day?

DBJ8CHE2                    Donziger - cross

1   A.  I don't know if it was the next day.  You have to be more

2   specific or give me something to refresh my recollection.

3   Q.  Isn't it a fact, sir, that when you met with those three

4   U.S. technical experts of the Lago Agrio plaintiffs, that one

5   of them said to you it was weird that you had been meeting with

6   the perito, meaning Cabrera, the day before, correct, sir?

7   A.  I think I remember Richard Camp saying that to me, yes.

8   Q.  Isn't it a fact that you responded, don't talk about it,

9   and turned to the cameramen and said, that's off the record,

10  isn't that a fact, sir?

11  A.  It's possible.  I was under instructions from local counsel

12  to keep that kind of stuff confidential.

13          MR. MASTRO:  I am not going to move to strike.  I will

14  just move on, but it's not responsive to my question, the last

15  sentence out of there.

16  Q.  Isn't it a fact, sir, that you instructed Stratus, and all

17  those associated with the preparation of the Cabrera report, to

18  keep their work highly confidential?

19  A.  Yes.  We did not want Chevron to know what we were doing.

20  That's absolutely correct.

21  Q.  Isn't it a fact, sir, when your legal team was drafting the

22  work plan for the Cabrera report, the last entry on the

23  schedule that Mr. Fajardo proposed for the filing deadline was

24  followed by the notation, "everyone silent"?  Isn't that a

25  fact, sir?

DBJ8CHE2                    Donziger - cross

1   A.  I have no knowledge of that, sir.

2          MR. MASTRO:  Let's show Exhibit 804, also in evidence,

3   PX 804.  Sorry.  843.

4   Q.  Mr. Donziger, you see this is an ex e-mail from Pablo

5   Fajardo, dated March 21, 2007, plans for expert examination, to

6   you, a copy to Luis Yanza.  This is relating to the first draft

7   of the plan and the schedule of activities.

8          Referring you to page 4, you see the last entry there,

9   "Deliver report to the court, everyone silent."  Isn't it a

10  fact that Mr. Fajardo wrote that memo and those words about

11  what everyone should be when the report of Mr. Cabrera was

12  actually delivered to the court, everyone silent, correct, sir?

13  A.  I don't know.  I'd have to look at the original.  I don't

14  have any recollection of having read this at the time, but yes,

15  generally, the policy, as instructed by Mr. Fajardo, was to

16  keep all of this information confidential.

17  Q.  Isn't it a fact, sir, that you even concealed the role that

18  Stratus and your team had played in drafting Cabrera's report

19  from your own new press secretary, Karen Hinton, in May 2008?

20  Isn't that a fact, sir?

21  A.  No.  I wouldn't characterize it that way.

22  Q.  All right.  Sir, I will show you Plaintiff's Exhibit 2438,

23  also in evidence.  It's an e-mail from Doug Beltman to you,

24  dated May 14, 2008.

25          Sir, am I correct that Mr. Beltman apprised you that a

DBJ8CHE2                    Donziger – cross

```
 1   reporter -- sorry.  Isn't it a fact that Mr. Beltman was

 2   apprising you that Karen -- that's Karen Hinton, correct?

 3   A.  Sir, can I get a hard copy of this?  It's very hard to see

 4   little pieces of it on the screen.

 5   Q.  I will be happy to.

 6           MR. MASTRO:  May I approach, your Honor?

 7   Q.  Ready, Mr. Donziger?

 8   A.  Yes.

 9   Q.  Am I correct that you understood the Karen that Mr. Beltman

10   was referring to there to be Karen Hinton?

11   A.  Yes.

12   Q.  Isn't it a fact that Mr. Beltman was telling you that Karen

13   wanted to give the Clapp report to a reporter?

14   A.  Yes, he did tell me that.

15   Q.  But that we, meaning you and he, the Lago Agrio plaintiffs'

16   team, can't do that since it's an annex, correct, sir?

17   A.  Well, that's how Mr. Beltman characterized it in his

18   e-mail.

19   Q.  What Mr. Beltman was referring to, sir, was that Mr. Clapp

20   had written one of the annexes, but was not identified as the

21   author of the annex, correct, sir?

22           MR. FRIEDMAN:  Object to form.  He is not in a

23   position to say what Mr. Beltman said.

24           MR. MASTRO:  He is in a position to say what his

25   understanding was.
```

DBJ8CHE2                    Donziger - cross

```
 1          THE COURT:  Possibly you should ask that question.
 2   Q.  Sir, am I correct, Mr. Donziger, that you understood
 3   Mr. Beltman, when he wrote "we can't do that since it's an
 4   annex" to be saying that Clapp had written one of Cabrera's
 5   annexes, but wasn't identified as author of the annex so it
 6   couldn't be released publicly under Clapp's name?
 7   A.  All of this information was intended to be kept
 8   confidential, and I do know that the report Dr. Clapp wrote was
 9   submitted as an annex to the Cabrera report.
10   Q.  And his name was not on it, correct?
11   A.  I don't believe it was.
12   Q.  So you weren't going to give Clapp's report to Karen Hinton
13   for that reason, correct?
14   A.  I don't know.
15   Q.  So you kept from Karen Hinton that Clapp had written one of
16   the annexes to Cabrera's report, but was not identified as the
17   author of the annex, correct?
18   A.  Sir, I don't know.  I did not disclose all information to
19   all people all the time who worked on this case.  I mean, it
20   just didn't go down that way, and I don't think any lawyer
21   operates that way in a complicated case.  So, no, Karen Hinton
22   did not know everything I knew over the course of this case.
23   Q.  Isn't it a fact, sir, that Mr. Cabrera and Mr. Fajardo
24   repeatedly made representations to the Lago Agrio court about
25   the extent to which your Lago Agrio plaintiffs' team was
```

DBJ8CHE2                    Donziger - cross

1    working so closely with Cabrera that even you were

2    characterized as inaccurate?

3                MR. FRIEDMAN:  Objection.  Vague.  Form and vague.

4                THE COURT:  Rephrase it, counselor.

5    Q.  Isn't it a fact that Mr. Cabrera and Mr. Fajardo both made

6    misrepresentations to the Lago Agrio court about the extent to

7    which your team was working so closely with Cabrera?

8    A.  I have testified to the fact that I think some of those

9    representations were not accurate.

10   Q.  Am I correct that one of those representations that Mr.

11   Cabrera made in a July 23, 2000 letter to the Ecuadorian court,

12   that you considered to be inaccurate, was that, "I do not have

13   any relation or agreements with the plaintiff, and it seems to

14   me to be an insult against me that I should be linked with the

15   attorneys of the plaintiffs"?

16   A.  You're confusing these.  That's something you're saying Mr.

17   Cabrera submitted to the Ecuador court?

18   Q.  Yes.  That you considered to be inaccurate, correct, sir?

19   A.  If that's what he submitted to the Ecuador court, yes, I

20   would consider that to be inaccurate.

21   Q.  And his representation to the Ecuadorian court on October

22   11, 2007, that "the names of all the technicians that have

23   collaborated in the study under my responsibility will be

24   public," that wasn't accurate either, was it, sir?

25   A.  I think that might have been accurate.  I think what he was

DBJ8CHE2                    Donziger - cross

1    referring to there were the names of the technicians who worked

2    with him when he was doing his field work, not those who were

3    working on his annexes or helped prepare his annexes.

4               MR. MASTRO:  Your Honor, for impeachment purposes,

5    Donziger deposition 2289, 3, to 2290, 15.

6    "Q.  In paragraph 6, second sentence, Mr. Cabrera states, 'It

7    is clear that I could not perform the job of this magnitude

8    alone and therefore employed several technicians and experts to

9    perform these tasks under my coordination and responsibility.

10   Once I submit my report to this court, your Honor, the names of

11   all the technicians that have collaborated in my study under my

12   responsibility will be public.'

13              "Do you see that?

14   "A.  Yes.

15   "Q.  Mr. Cabrera's report as submitted did not disclose that

16   plaintiff team members had collaborated on his report, correct?

17   "A.  I think those are two different things.  I don't think --

18              "THE SPECIAL MASTER:  Different or not, can you answer

19   her direct question, please?

20              "THE WITNESS:  The short answer is no.

21              "THE SPECIAL MASTER:  Wait, wait, wait.

22              "What about the statement by Mr. Cabrera, 'The names

23   of all the technicians that have collaborated in the study

24   under my responsibility will be public,' that statement is

25   inaccurate also, isn't it, in light of your testimony about

DBJ8CHE2                      Donziger - cross

1    Stratus, isn't that so?

2            "THE WITNESS:  It is not fully accurate in my

3    opinion."

4    A.  Sir --

5            THE COURT:  There is no question pending, sir.

6    Q.  Was that testimony truthful at the time you gave it, sir?

7    A.  That testimony, as I read it, is not the least bit

8    inconsistent with what I just testified to.  Yes, it was

9    truthful then, and I am testifying truthfully right now.

10   Q.  Isn't it a fact, sir, that the Cabrera report as filed

11   failed to reveal that it was drafted by Stratus or even

12   mentioned Stratus by name as a contributor in any way?

13           THE COURT:  Mr. Mastro, it's one compound question

14   after another, and we are taking a whole lot of time to unravel

15   these convoluted questions.

16           MR. MASTRO:  I will break it down.

17   Q.  Isn't it a fact that the Cabrera report as filed did not

18   reveal that Stratus drafted the executive summary?

19   A.  Yes.

20   Q.  Isn't it a fact, sir, that the Cabrera report as filed did

21   not mention Stratus's name as a contributor?

22   A.  I believe that's correct.

23   Q.  Isn't it a fact, sir, that the Cabrera report as filed did

24   not mention Stratus's name at all?

25   A.  I don't know the answer to that.  I know that Stratus's

DBJ8CHE2                        Donziger – cross

1   name and Stratus's role was not disclosed by Mr. Cabrera.

2   Q.  Isn't it a fact, sir, that after Cabrera filed his report

3   on April 1, 2008, Stratus then wrote comments on that report

4   that it had drafted?

5   A.  You're going to have to break your question down.

6   Q.  Isn't it a fact, sir, that after Cabrera filed his report,

7   Stratus wrote comments on that report?

8   A.  Yes.

9   Q.  Isn't it a fact, sir, that Stratus did not reveal in the

10  comments it wrote that it had drafted the executive summary of

11  the Cabrera report?

12  A.  I wouldn't characterize it that way.  Stratus did not

13  disclose its role.  I believe Stratus, as did we and do I,

14  always felt that Cabrera had adopted the material Stratus sent

15  him using his independent judgment.  So I wouldn't characterize

16  it the way you characterize it in your question.

17  Q.  Isn't it a fact, sir, that in Stratus's comments on the

18  Cabrera report, written after the report had been filed,

19  Stratus recommended that the damages figure be increased from

20  16 billion to 27 billion?

21  A.  I'm a little confused.  When you say comments, you mean

22  comments that Stratus drafted that were used by our local

23  counsel?

24  Q.  Correct, sir.

25  A.  Yes.  I believe Stratus recommended the damages figure go

DBJ8CHE2                    Donziger - cross

```
 1   up.
 2   Q.  Isn't it a fact, sir, that Stratus then drafted Cabrera's
 3   response to those comments?
 4   A.  My understanding is Stratus operated on the same procedure
 5   that it operated on in the original executive summary.  Yes, it
 6   drafted it, and Cabrera, at least my understanding is he read
 7   it and adopted it using his own judgment.
 8   Q.  And he filed word for word what Stratus drafted for him as
 9   his response to those comments, correct, sir?
10   A.  That I don't know.
11   Q.  Pretty much verbatim, that's your testimony, isn't it, sir?
12   A.  I don't know.  I would hope so because I think Stratus was
13   putting accurate information before him, but I don't know if it
14   was verbatim.
15   Q.  Sir, the response that Cabrera filed raised the damages
16   assessment from 16 billion to 27 billion, correct, sir?
17   A.  That's roughly correct based on actual evidence that we
18   considered to be valid.
19   Q.  Isn't it a fact, sir, that Mr. Cabrera did not reveal in
20   that response that Stratus had drafted the response?
21   A.  Well, as I understand it, he operated consistently with how
22   he operated with the executive summary in the other parts of
23   the report.  So I believe that's correct.  I believe he did not
24   disclose Stratus's role in that part of the report that he
25   adopted.
```

DBJ8CHE2                    Donziger - cross

1    Q.  Isn't it a fact, sir, that one of your local counsel in

2    Denver, when he learned that that is what had happened in

3    connection with Cabrera's response, wrote to you and others

4    that "it appears not only that Cabrera and plaintiffs can be

5    charged with a fraud respecting the former's report, but that

6    Stratus was an active conspirator," isn't that a fact, sir?

7    A.  No.  That comment, you're taking that comment out of

8    context, sir.

9    Q.  I simply asked whether that was written to you on May 16,

10   2010, by your co-counsel in Denver, Colorado?  Correct, sir,

11   yes or no?

12   A.  No.  First of all, this person is not my co-counsel.  I

13   don't know what you're talking about.  But, second of all,

14   there was a lot of discussion at that time, as you know, among

15   U.S. counsel to try to decipher under Ecuador court rules what

16   was appropriate and what was not.  I participated in those

17   discussions.  There were different opinions from different

18   lawyers, U.S. lawyers who are not experts in Ecuadorian law.

19   That was one opinion of many.  There were many contrary

20   opinions.  I do remember generally that one lawyer expressing

21   that opinion at that time and he later retracted it.

22   Q.  Isn't it a fact that when the original version of Crude

23   came out in January 2009, that Pablo Fajardo asked Joe

24   Berlinger to edit a scene out of the film?

25   A.  Yes.

DBJ8CHE2                         Donziger - cross

1    Q.  And the scene he wanted edited out of the film was showing

2    someone who Cabrera had identified as part of his technical

3    team in his report meeting with the Lago Agrio plaintiffs'

4    team, correct, sir?

5    A.  Yes.

6    Q.  Am I also correct that Mr. Fajardo wrote to Mr. Berlinger

7    that this was "so serious" that your team "could lose

8    everything" if that scene weren't edited out of the film?

9    A.  I don't remember.  That's certainly was not my view.  I

10   understand he wrote an e-mail that expressed some consternation

11   about that scene being in the film.

12   Q.  And that scene got edited out of the film, didn't it?

13   A.  My understanding is it did, yes.

14   Q.  You, in fact, and the Lago Agrio plaintiffs' team, paid

15   half the costs of editing that scene out of the film, didn't

16   you?

17   A.  I don't remember.  Mr. Berlinger was always hitting us up

18   for money.  So we might have paid half the costs of that edit.

19   Q.  Isn't it a fact, sir, that in March 2010, the federal court

20   in Colorado ordered disclosure of Stratus's documents in

21   connection with a 1782 proceeding that Chevron filed against

22   Stratus there?

23   A.  There came a time when Stratus was ordered to produce

24   documents.  I don't know the exact date.  I personally was not

25   representing Stratus.

DBJ8CHE2                           Donziger - cross

1    Q.  Isn't it a fact, sir, that you hired local counsel in

2    Denver to represent the Lago Agrio plaintiffs' interests in

3    connection with that Stratus 1782 proceeding?

4    A.  My role at the time was to try to organize legal

5    representation for those involved, and I hired different

6    counsel at different times at that time for the Lago Agrio

7    communities.

8    Q.  The first counsel you hired there was Mr. McDermott,

9    correct?

10   A.  Yes.

11   Q.  And you also hired Jeff Shinder from the Constantine Cannon

12   firm to oversee 1782 action defenses on behalf of the Lago

13   Agrio plaintiffs in or about that same time, March 2010,

14   correct, sir?

15   A.  We engaged with Jeff and his firm to do that and other

16   broader types of activities.

17   Q.  Isn't it a fact, sir, that both Mr. Shinder and -- strike

18   that.

19             Isn't it a fact, sir, that Mr. Shinder -- strike that.

20             Isn't it a fact, sir, that both Mr. Shinder -- strike

21   that.

22             Isn't it a fact, sir, that Mr. McDermott asked you for

23   information about Stratus's role in the drafting of the Cabrera

24   report?

25   A.  Of course.

DBJ8CHE2                      Donziger - cross

1   Q.  Isn't it a fact that Mr. Shinder asked you for information

2   about Stratus's role in drafting the Cabrera report?

3   A.  Yes.

4   Q.  Isn't it a fact that both of them complained to you about

5   the lack of information they were getting on that subject?

6   A.  Look, at that time I felt like I did not have complete

7   information or anything close to it, and I was trying to figure

8   out what exactly had happened relative to the rather incendiary

9   allegations being made by Chevron against the lawyers in

10  Ecuador and myself, and I proceeded as carefully as I could.  I

11  was uncertain about a lot of things, and we did what we could

12  as quickly as we could, with very limited resources, and

13  frankly I am proud of what we pulled together, as reflected in

14  various documents, and ultimately there was a huge amount of

15  information available to these lawyers, based on filings that

16  your firm had done in Colorado and elsewhere, and I am

17  comfortable with the level of disclosure.

18  Q.  Are you done, sir?

19           MR. MASTRO:  I move to strike, your Honor, as

20  nonresponsive.

21           MR. FRIEDMAN:  I think it was responsive.

22           THE COURT:  The motion is granted.

23           We are going to take our morning break.  But, Mr.

24  Mastro, why don't you see if you can focus on something that is

25  not already well-known.

DBJ8CHE2                    Donziger - cross

1            MR. MASTRO:  Certainly, your Honor.

2            THE COURT:  That's not to say that Mr. Donziger at an

3       appropriate point, with respect to any of the matters you have

4       raised, can't on redirect say whatever is appropriate.  We have

5       got this gigantic witness statement that goes through all of

6       this, his side of it.  We have got tons of other evidence.  I

7       don't understand the point of the way this examination is going

8       from anybody's point of view.

9            MR. MASTRO:  OK.  Certainly, your Honor.  Thank you.

10           (Recess)

11           THE COURT:  All right.  Let's continue.

12      BY MR. MASTRO:

13      Q.  Isn't it a fact, Mr. Donziger, that after your local

14      Ecuadorian lawyers found out in the spring of 2010 about the

15      Colorado 1782 proceedings, that they filed an application with

16      the Ecuadorian court to try to block any further 1782 discovery

17      from happening in the United States?

18      A.  I remember there was an effort made to protect what they

19      considered to be their legal rights, as well as the rights of

20      their clients, with regard to violations that they felt would

21      happen as a result of discovery that might result from the 1782

22      actions.

23           THE COURT:  Mr. Donziger, would you please answer the

24      question?

25      Q.  Yes or no, sir, isn't it a fact that the local Ecuadorian

DBJ8CHE2                          Donziger - cross

1    counsel made such an application to the Ecuadorian court to bar

2    any of the 1782 discovery in the United States?

3    A.   I answered the question.  I don't know of any specific

4    application made.

5    Q.   Isn't it a fact that after that point, you and your

6    co-counsel in the U.S. continued to see to it that filings were

7    made in U.S. courts on behalf of the Lago Agrio plaintiffs that

8    sought to prevent the fact that Stratus had drafted the Cabrera

9    report from coming out publicly?

10             MR. FRIEDMAN:  Objection.  Vague and compound.

11             THE COURT:  Sustained.

12   Q.   Isn't it a fact, sir, there were filings made in U.S.

13   courts on behalf of the Lago Agrio plaintiffs to try and

14   prevent disclosure of Stratus's role in drafting the Cabrera

15   report?

16   A.   There were filings made on that issue.  I wouldn't

17   characterize it the way you do in your question.

18             MR. MASTRO:  Your Honor, for impeachment purposes,

19   Donziger deposition testimony 3363, lines 8 through 20.

20   "Q.   Am I also correct that even after you got this e-mail from

21   Julio Prieto, dated March 30, 2010, that you and the Emery

22   Celli lawyers continued to see to it that filings were made in

23   federal court in Colorado and in the Southern District of New

24   York, on behalf of the Lago Agrio plaintiffs, that sought to

25   prevent the fact that Stratus had drafted the Cabrera report

DBJ8CHE2                      Donziger – cross

1   from coming out publicly?

2   "A.  Sought to prevent Stratus's role relative to the Cabrera

3   report from coming out, yes."

4          Sir, was that testimony truthful at the time you gave

5   it?

6   A.  Yes.  But the explanation runs deeper.  It's more

7   complicated.

8   Q.  Sir, am I also correct that thereafter, you and your

9   co-counsel representing the Lago Agrio plaintiffs adopted a

10  strategy of fighting Chevron on everything?  Yes or no, sir?

11  A.  I can't really answer that yes or no.

12  Q.  And conceding nothing, even if you expected to ultimately

13  lose?

14  A.  Generally, we try to fight as hard as we can for our

15  clients.  I don't believe we fight on every front.

16         THE COURT:  Could you answer the question now, please?

17  Q.  Yes or no, sir?

18  A.  What is the question?

19  Q.  Am I correct that during this period 2010, you and your

20  co-counsel adopted a strategy conceding nothing, even if you

21  expected to ultimately lose?

22  A.  I don't know if that's exactly accurate.  I remember there

23  being an e-mail to that effect from one particular lawyer on a

24  much broader team.

25  Q.  And buying as much time as possible.  That was your

DBJ8CHE2                    Donziger - cross

1    strategy, correct, sir?

2    A.  We were trying to litigate as hard as we could for our

3    clients.

4    Q.  The buying as much time as possible was to prevent

5    Stratus's role in drafting the Cabrera report from coming out

6    for as long as possible, correct, sir?

7    A.  I don't recall that.

8    Q.  Sir, let's see if we can refresh your recollection.

9         MR. MASTRO:  Let's put up PX 1348.

10   Q.  Sir, actually, the lawyer who wrote this e-mail is you,

11   correct?

12   A.  Yes.

13   Q.  The Jim you're referring to there is --

14        MR. MASTRO:  This is in evidence, your Honor.

15   Q.  The Jim you're referring to there is Jim Tyrrell of the

16   Patton Boggs firm, correct, sir?

17   A.  I believe it is.  I'm not 100 percent sure.

18   Q.  You endorsed this strategy, "Fight hard on all fronts all

19   the time and concede nothing, buy as much time as possible,"

20   correct, sir?

21   A.  We were trying to determine the best strategy and best

22   course of action at that time.  That strategy did have appeal

23   to me, I remember that.  I don't know if I endorsed it.  I

24   think there was a debate going on on what would be the best

25   strategy at this time.

DBJ8CHE2                      Donziger - cross

1   Q.  That is May 17, 2010.  Let's go to Plaintiff's Exhibit 1360

2   on May 27, 2010.

3          It's another e-mail from you, right, sir?  Now it's

4   pretty clear you're endorsing saying, We should adhere to Jim's

5   strategy, correct?

6   A.  Yes.

7   Q.  And the Jim you're referring to is Jim Tyrrell of Patton

8   Boggs?

9   A.  I believe so.

10  Q.  The strategy you're endorsing is "fighting them" -- the

11  "them" being Chevron, correct?

12  A.  Yes.

13  Q.  -- "on everything and tying them up and not conceding any

14  one thing, even if we expect ultimately to lose that one thing

15  down the road."

16          You're endorsing that strategy, correct, sir?

17  A.  Yes.  I think it was appropriate strategy.

18  Q.  Thank you, Mr. Donziger.

19          At or about this same time, you were pursuing another

20  strategy of trying to cleanse the Ecuadorian record of the

21  Cabrera tape, correct, sir?

22  A.  I would not characterize it that way.

23  Q.  Isn't it a fact that you and the co-counsel representing

24  the Lago Agrio plaintiffs in mid-2010 repeatedly referred to a

25  strategy of hiring cleansing experts?

DBJ8CHE2                    Donziger - cross

1   A.  I think that word was used often.  I don't think that word

2   was, as I look back on it, accurate, but yes, it was used.

3   Q.  And the strategy was to hire cleansing experts to get new

4   reports into the record in Lago Agrio, correct, sir?

5   A.  The idea was to get supplemental expert reports so we

6   wouldn't lose the whole case if the court were to throw out the

7   Cabrera report.

8   Q.  Am I correct that the experts you did ultimately retain in

9   that regard never went to Ecuador, correct, sir?

10  A.  I believe that's correct, yes.

11  Q.  They never did any independent sampling or environmental

12  testing, correct, sir?  Yes or no, sir?

13  A.  That was not their mandate, sir.  But they did not, you're

14  right.

15  Q.  In fact, some of their reports were even ghostwritten by a

16  coordinating firm, just like Stratus had drafted the Cabrera

17  report, correct, sir?

18  A.  I completely dispute the characterization of the question.

19  Q.  Am I correct that a coordinating firm, The Weinberg Group,

20  drafted some of those cleansing experts' reports?  Yes or no,

21  sir?

22  A.  No, I believe every -- first of all, I dispute the

23  characterization of the question.  But the supplemental reports

24  that were submitted to the court, each of them, as I understand

25  it, was drafted by the person who signed it.  The Weinberg

DBJ8CHE2                    Donziger - cross

1   Group did have a role in helping edit, maybe draft some

2   sections, but ultimately these were signed by independent

3   experts based on their review of the report.

4   Q.  And these cleansing experts received copies of the Cabrera

5   report, correct?

6   A.  This group of experts who were preparing supplemental

7   reports for the Ecuador court --

8   Q.  Received the Cabrera report, correct?

9   A.  At least some of them received the Cabrera report and the

10  data, the scientific data that was contained in the Cabrera

11  report, much of which came from Chevron.

12  Q.  Am I correct that you and your co-counsel feared at the

13  time that the decision in Ecuador might be based entirely on

14  the Cabrera report, correct?  Yes or no, sir?

15  A.  We had a concern that the court -- some court would throw

16  out the Cabrera report at some point due to the allegations

17  being made by Chevron.  So we wanted supplemental evidence to

18  be put into the court.

19  Q.  Thank you, sir.

20          Isn't it a fact, sir, that you have admitted conduct

21  in which you engaged in Ecuador is something you would never do

22  in the United States?  Isn't that a fact, sir?

23          MR. FRIEDMAN:  Objection.  Vague.

24          THE COURT:  Sustained.

25  Q.  Isn't it a fact, sir, that you admitted on camera in Crude

DBJ8CHE2                    Donziger - cross

1   that conduct in which you engaged in Ecuador is "something you

2   would never do in the United States"?

3            MR. FRIEDMAN:  Objection.  Vague.

4            THE COURT:  Overruled.

5   A.  There were things that I did in Ecuador in the foreign

6   legal system that were I felt appropriate for the foreign legal

7   system based on what I observed as an American lawyer.  And

8   there are things down there that, no, would not be appropriate

9   here.  And I would also say the opposite is true.  There are

10  things that are done up here that would not be appropriate in

11  Ecuador.

12  Q.  There are things that you did in Ecuador that in your own

13  words were "just way out-of-bounds", correct, sir?  Yes or no?

14  A.  I remember having thoughts to that effect.  I don't know

15  what you're specifically referring to.

16  Q.  Isn't it a fact, sir, that you have acknowledged in your

17  own writings that from a traditional Ecuadorian law

18  perspective, the level of cooperation between the Lago Agrio

19  plaintiffs' team and Cabrera was problematic and improper?

20  Isn't that a fact, sir?

21  A.  No, that's not accurate.

22  Q.  Haven't you also admitted in writing that -- strike that.

23            Haven't you also admitted, Mr. Donziger, that treating

24  Cabrera like a U.S. style expert, as the Lago Agrio plaintiffs'

25  team did, would be seen as a violation of local court rules in

DBJ8CHE2                    Donziger – cross

1   Ecuador?  Haven't you written that, sir?

2   A.  It's possible.  I was often engaged in a conversation with

3   myself when I was in Ecuador about what was right or

4   appropriate under that country's rules and procedures, and it's

5   possible I wrote that.

6   Q.  Haven't you admitted in writing in the past that "by

7   working so closely with our local counsel and Stratus, Cabrera

8   violated his duties to the court"?  You have written those

9   words, haven't you, sir?

10  A.  Not as my opinion, but to express a school of thought about

11  how some people in Ecuador viewed the Cabrera report process.

12  Q.  Now, sir, isn't it also a fact that your own Ecuadorian law

13  experts proffered in this case, have testified that your Lago

14  Agrio plaintiffs' team's collaboration with Cabrera, in

15  actually drafting the report but not disclosing their role, was

16  illegal under Ecuadorian law?

17  A.  I don't think that's accurate.  I think they were asked

18  hypothetical questions to elicit a certain answer.  But I

19  think, generally, our Ecuador law expert made it clear that the

20  types of contacts that we had with Mr. Cabrera were

21  appropriate, and other lawyers in our case in Ecuador have said

22  the same.

23  Q.  Sir, you say now you believe the process used to create the

24  Cabrera report was consistent with Ecuadorian law, custom and

25  practice as it was occurring in the *Aguinda* case.  Those are

DBJ8CHE2                    Donziger - cross

1    your words, correct?

2    A.   Yes.  I stand by my written testimony.

3    Q.   Was there ever a point in time in which any Ecuadorian

4    court ruled that traditional Ecuadorian law didn't apply to the

5    *Aguinda* case?  Yes or no, sir?

6    A.   I can't answer that yes or no.  There were times the court

7    in the *Aguinda* case adjusted what I understood to be

8    traditional Ecuadorian rules with regard to experts to

9    accommodate what it saw as an unusual and really unprecedented

10   type of litigation for that country.

11   Q.   According to your statement, again, in paragraph 91, you

12   say the Ecuadorian court actually struck the Cabrera report,

13   your words, the court's striking of the Cabrera report,

14   correct, sir?

15   A.   That's my understanding.

16   Q.   So, sir, isn't it a fact that the only person who now says

17   that your team's collaboration with Cabrera didn't violate

18   Ecuadorian law is you?

19   A.   That's not true, sir.

20   Q.   Sir, I want to ask you some questions about how Mr. Cabrera

21   got appointed.

22           Directing your attention to the latter half of 2006,

23   you say in your witness statement you, quote, were aware of the

24   sexual harassment complaint against Judge Yanez, correct?

25   A.   Can you direct me to the paragraph?

DBJ8CHE2                        Donziger - cross

1   Q.  Certainly.  Paragraph 122.  I am not asking you to look at

2   the paragraph, sir.  I am just asking whether you recall that's

3   your testimony?

4   A.  That I was aware of a sexual harassment complaint?

5   Q.  Yes.

6   A.  I was at some point in time.

7   Q.  And your legal team was too, in the second half of 2006,

8   correct?

9   A.  Yes.

10  Q.  And you believe that Judge Yanez was aware of your legal

11  team's intention to file a complaint against him, correct?

12  A.  A complaint about an entirely different issue, yes.

13  Q.  Understood.  But it's your testimony that at the very time

14  Judge Yanez was facing a sexual harassment complaint, that

15  could have resulted from his removal from the bench, your team

16  may have been aware of its intention to file a separate

17  complaint against him, correct?

18  A.  I think those two complaints were coincident in time, but

19  our complaint about the cancellation of the judicial

20  inspections was written up, and yes, we made it known to him.

21  Q.  You had something you wanted at the time.  You wanted to

22  cancel the judicial inspections that you had requested and have

23  a single global damages expert appointed by the court, correct?

24  A.  Yes.

25  Q.  Yes or no, sir?

DBJ8CHE2                        Donziger - cross

```
1   A.  With the caveat that we wanted all of Chevron's remaining
2   inspections to take place.
3   Q.  Simple question.  You were asking of the judge, in the
4   second half of 2006, to cancel the judicial inspections and
5   appoint a single global damages expert, correct?
6   A.  That was our position at that time because we had felt that
7   we had met our burden of proof in the case, yes.
8   Q.  You made the judge aware of that, correct, sir?
9   A.  Yes.
10  Q.  You also made the judge aware, at the time he was facing a
11  sexual harassment complaint, that you also had prepared a
12  complaint to file against him on other grounds, correct?
13  A.  When you say "you," the people --
14  Q.  Your legal team.
15  A.  It's not my legal team.  This was the legal team in Ecuador
16  led by Mr. Fajardo at the time.
17  Q.  Your Ecuadorian legal team during the same period made the
18  judge aware that you prepared a complaint to file against him
19  on other grounds while the sexual harassment charge was
20  pending, correct, sir?
21  A.  It was not my team, and I have already testified to the
22  fact that, yes, we had a complaint based on what we felt was
23  his failure to discharge his duties about evidence that we had
24  prepared, and we showed him or I understand our local team
25  showed it to him at the time; and yes, at the same time there
```

DBJ8CHE2                     Donziger - cross

1   was some other complaint, as I understand it, pending against

2   him filed by some other person or persons.

3   Q.  Isn't it a fact, sir, that when Judge Yanez let your legal

4   team know that he was going to grant your request, that he told

5   Luis Yanza that you needed to back him now as he fights for

6   survival on the court in connection with his sexual harassment

7   charge?

8           MR. FRIEDMAN:  Objection.  No foundation.  Personal

9   knowledge.

10          THE COURT:  Overruled.

11  Q.  Isn't that a fact sir?

12  A.  I don't know.  We were trying to strengthen this judge so

13  he would do the right thing by the law, and this particular

14  judge always struck me as being very scared of Chevron and he

15  felt like he was being followed, and we were trying to do all

16  we could to get him to move the case forward at that time.

17  Q.  Sir, it's a simple question.  Isn't it a fact that the

18  judge told Luis Yanza that the Lago Agrio plaintiffs' team

19  needed to back him now, as he was granting the relief you

20  requested, as he fought for survival on the court?  Isn't that

21  a fact, yes or no?

22  A.  Sir, I don't know.  If you want to show me a document, I am

23  happy to read it.

24  Q.  Let's go to your own notebook, sir.  Plaintiff's Exhibit

25  169, at page 54.

DBJ8CHE2                    Donziger - cross

```
 1              THE COURT:  We had this whole discussion last night,
 2     right?  Can't we go to the exhibit that's been received for the
 3     truth?  Isn't it 180 something?
 4              MR. MASTRO:  We will look it up, your Honor.
 5              If I may, your Honor, just for this one, because I
 6     don't want to delay the Court while he looks it up.
 7              THE COURT:  All right.  But let's be consistent with
 8     what we have done here.
 9              MR. MASTRO:  Exhibit 169, go to page 58.
10              THE COURT:  Of 92.
11              MR. MASTRO:  Page 54, in the lower right-hand corner.
12     Q.  You see, Mr. Donziger, where you write to yourself that the
13     worst part is that after the decision -- that's Judge Yanez's
14     decision to cancel the inspections -- the judge told Luis --
15     that's Luis Yanza, correct?
16              Do you see that, sir?
17     A.  I would like to read the whole paragraph.  Please give me
18     15 seconds.
19     Q.  Have you read it, Mr. Donziger?
20     A.  Yes.
21     Q.  The Luis referred to there is Luis Yanza, correct?
22     A.  Yes.
23     Q.  And the judge told him, after he made his decision to
24     cancel the inspections, that "we needed to back him now as he
25     fights for survival on the court."  You wrote those words to
```

DBJ8CHE2                    Donziger - cross

1    yourself, correct, Mr. Donziger?

2    A.  Yes, I did write those words.

3    Q.  Sir, you say in your statement that this paragraph is the

4    only piece of evidence that Chevron has offered you of you

5    threatening -- strike that.

6           You say in your witness statement that this paragraph

7    is the only piece of evidence that Chevron has offered of the

8    Lago Agrio plaintiffs' team threatening to file a disciplinary

9    charge against Judge Yanza, correct?

10   A.  I don't know.  It's Judge Yanez.

11   Q.  Yanez.

12   A.  I think it does, yes.

13   Q.  Do you know, sir?

14   A.  I don't know.  The statement is long, and if you can refer

15   me to the paragraph you're talking about, I am happy to read it

16   and answer your question.

17   Q.  Didn't you also write to Joe Kohn on June 26, 2006, and

18   tell him that Pablo met with the judge, Judge Yanez, today?  Do

19   you remember that, sir?

20   A.  I very well might have.  If you want to give me a document

21   to refresh my recollection, please do.

22   Q.  I am asking you whether you recall as you sit here.

23   A.  I don't recall that.

24   Q.  Sir, didn't you write to Joe Kohn in July 2006 that "the

25   judge who is on his heels from the charges of trading jobs for

DBJ8CHE2                    Donziger - cross

1    sex in the court said he is going to accept our request to

2    withdraw the rest of the inspections."

3            MR. FRIEDMAN:  If Mr. Mastro is going to quote from

4    documents, can I provided with what he is quoting?

5            MR. MASTRO:  Since he has given certain testimony, I

6    am putting to him classic impeachment of whether he recalls and

7    who did this.

8            THE COURT:  You do have all these documents, Mr.

9    Friedman.

10           MR. FRIEDMAN:  Yes.

11           THE COURT:  He is entitled to ask this question.

12   Q.  Didn't you write that to Mr. Kohn in July 2006, sir?

13   A.  I remember having a lot of interactions with Mr. Kohn about

14   a lot of issues, including this issue related to the

15   cancellation of the judicial inspections.  I very well might

16   have written that.  I don't recall specifically as I sit here

17   today several years later having written that.

18   Q.  Didn't you also write to Mr. Kohn at that same time, "The

19   judge also I believe wants to forestall the filing of the

20   complaint against him by us which we have prepared but not yet

21   filed"?  Didn't you write those words to Mr. Kohn in July 2006?

22   A.  I don't know.  I very well might have because that's what

23   was happening at that time.

24           MR. MASTRO:  Just for the record, that's reflected in

25   Plaintiff's Exhibit 785, which is in the record.

DBJ8CHE2                    Donziger – cross

Q.  Mr. Donziger, didn't you also, after the plan was complete
and Richard Cabrera was sworn in in June 2007, say that this
never would have been done had we not really pushed Judge
Yanez?  Didn't you say those words, sir, it never would have
been done had we not really pushed him to?
A.  I don't know, but we pushed judges all the time in Ecuador
to fulfill their obligations, so I wouldn't be surprised if I
said that.

            (Continued on next page)

DBJLCHE3                        Donziger - cross

1    Q.  Simple question, sir:  Didn't you say those words?

2    A.  I don't remember.

3    Q.  And didn't you also say, sir, that the appointment of

4    Richard Cabrera, the swearing in of Richard Cabrera was a huge

5    victory, your words, correct, sir?

6    A.  I don't know, but I certainly felt that it was a huge step

7    forward for the case, absolutely.

8    Q.  You said at the time, "We are going to end the trial,"

9    correct, sir?

10   A.  I've been saying that for more years than I can count.

11   Q.  Because you knew then, sir, that Richard Cabrera would be

12   issuing whatever multibillion dollar report you and your legal

13   team wanted him to issue, correct?

14   A.  We had an expectation he would produce an accurate report

15   with an accurate damages assessment, so, yes.

16   Q.  Sir, I want to ask you some questions about a different

17   topic.  I want to ask you about Alberto Guerra.

18          Sir, you knew Mr. Guerra well, didn't you?

19   A.  No.

20   Q.  Back in 2008, while he was still a judge, he had your phone

21   number, correct?

22   A.  That's what I understand from your documents.

23   Q.  And you had his phone number, correct?

24   A.  I don't know that.  I know I never had a phone conversation

25   with him.

DBJLCHE3                    Donziger - cross

1   Q.  He had your email address, correct, sir?

2   A.  Yes.

3   Q.  And you had his email address, correct?

4   A.  Well, that's because he sent me his email.

5   Q.  In your witness statement, sir, you say that when you

6   received several emails from Mr. Guerra between 2008 and 2010,

7   you thought they were spam?

8   A.  They were emails that were sent to me that appeared to be

9   like from like a spam account.  So, yeah, I did think some of

10  those or all of them were spam.

11  Q.  And that basically you ignored his emails, that's your

12  testimony, right, sir?

13  A.  Yes.

14  Q.  Isn't it a fact, sir, that when you received an email from

15  Mr. Guerra on March 1, 2008, you immediately communicated with

16  Mr. Fajardo under a heading that it was urgent, isn't that a

17  fact, sir?

18  A.  As I hear you ask the question, I sort of have a vague

19  recollection I might have done that, but I don't specifically

20  remember.

21  Q.  And didn't Mr. Fajardo contact you to say that Dr. Guerra

22  had tried to call you and he's going to call again later?

23  A.  I have a vague recollection of that being told to me.

24  Q.  And didn't you respond "should I call him?"

25  A.  I may have.  I don't remember.

DBJLCHE3                    Donziger – cross

1    Q.  And, sir, let me ask you some questions about the fall of

2    2009.  By the fall of 2009, you and the Lago Agrio plaintiffs'

3    team realized that Judge Nunez was going to be leaving the case

4    and Judge Zambrano was going to take over the Lago Agrio

5    Chevron case, correct, sir?

6    A.  I really was not very involved with the case in Ecuador at

7    that point due to an illness in my family, and I have a vague

8    recollection toward the end of the trial there were a bunch of

9    changes with the judges for various reasons.  I don't remember

10   the specifics as I sit here right now.

11   Q.  Sir, you recall in August 2009, Judge Nunez was the subject

12   of recusal proceedings, correct, sir?

13   A.  I remember due to the Borja scandal that Judge Nunez, I

14   think he removed himself from the case.

15   Q.  And you knew that Judge Zambrano would be the person taking

16   over the case from Judge Nunez, correct?

17   A.  I think I might have been told that by local counsel.

18   Q.  And isn't it also the fact that at the time your local

19   Ecuadorian legal team told you that Zambrano was talking to

20   Nunez about Nunez potentially helping him with orders?

21   A.  It's possible.  I don't remember specifically.

22   Q.  And at about this same time, September 2009, your local

23   Ecuadorian counsel was telling you the issue is who will carry

24   more weight, Nunez on the one hand, or Liliana and Guerra on

25   the other.

DBJLCHE3                    Donziger - cross

1            Do you recall receiving a message from local

2   Ecuadorian counsel to that effect, sir, in September 2009?

3   A.  It's possible.

4   Q.  The Liliana --

5   A.  If I could finish.

6            THE COURT:  Let him finish.

7   Q.  I'm sorry.

8   A.  There was a general effort to communicate to me the comings

9   and goings of what was going on with the judges and levels of

10  influence due to a generalized feeling that Chevron was trying

11  to improperly influence the court.

12  Q.  And the Liliana the local Ecuadorian counsel, Mr. Fajardo,

13  was referring to was Liliana Suarez, correct, sir?

14  A.  I believe that's correct.

15  Q.  And that person was the secretary to the court, correct, in

16  Lago Agrio?

17  A.  I know she had been a secretary for a period of years.  I

18  don't know if she was at that particular time.

19  Q.  And it's the same Liliana Suarez who had a personal

20  relationship with Judge Zambrano, correct?

21  A.  Well, my understanding is they're married or together at

22  this point.  I don't know what it was like at that period of

23  time.

24  Q.  And the Guerra that Mr. Fajardo was referring to when he

25  referred to Liliana and Guerra was Alberto Guerra, correct,

DBJLCHE3                   Donziger - cross

1    sir?

2    A.  I assume.  I would be hesitant to answer these questions

3    without seeing the document.

4    Q.  Isn't it also the case that within days after Mr. Fajardo

5    communicating to you that particular message, you received an

6    email from Mr. Fajardo entitled puppeteer?

7    A.  I don't know.  I remember receiving such an email.

8    Q.  And Mr. Fajardo told you, "There won't be anything to worry

9    about," do you recall getting that email in mid-September 2009,

10   sir?

11   A.  I've seen that email on multiple occasions.

12   Q.  And do you recall -- so you recall receiving multiple

13   emails referring to the puppeteer and the puppet, correct, sir?

14   A.  I don't really think there were that many.  I think it was

15   a nickname Fajardo had created.

16   Q.  And this September 15, 2009 email where Mr. Fajardo told

17   you there won't be anything to worry about, he also wrote to

18   you, "The puppet will finish the entire matter tomorrow."

19          Do you recall that, sir?

20   A.  Not really.

21   Q.  And do you recall him writing to you, "The puppeteer is

22   pulling the string and the puppet is returning the package"?

23   A.  No.

24   Q.  Sir, "puppet" and "puppeteer" are code names that

25   Mr. Fajardo was using with you, correct?

DBJLCHE3                      Donziger - cross

A.  They're what you call code names.  They were nicknames,

jokes, that kind of stuff, code, all designed -- they were all

designed for I think generally for reasons of confidentiality

or humor.

Q.  And the puppeteer that Mr. Fajardo was referring to in

writing to you was Alberto Guerra, correct?

A.  That's not my recollection.

Q.  Do you have a recollection of who the puppeteer was, yes or

no?

A.  I don't have an independent recollection, as I've

testified.  I do have some understanding now as to who I think

it was, but it was not Guerra.

Q.  And that's something that you say now you have an

understanding of because Mr. Fajardo told you that?

A.  Well, members of our local team have explained it to me.

Q.  Sir, I'm just going to ask you yes or no questions.

        Is the puppet Mr. Zambrano that's referred to in these

emails?

A.  As I've testified, I have no recollection of who it

referred to.  I don't even know if I knew at the time.  I don't

think I paid a whole lot of attention to these emails.

However, as I sit here today, I have an understanding of who I

think it was and it's not, it is not Zambrano.

Q.  Sir, I'm going to ask you the following questions.

        Isn't it the case that Mr. Fajardo then wrote to you

DBJLCHE3                     Donziger - cross

1    later that month and said that everything remains more or less

2    under control, we're using all of our influence?

3    A.  Sir, you're asking me about emails from years ago.  There's

4    so many emails.  If you want to show me an email, I can answer

5    your question.

6    Q.  I'm just asking you if you recall, sir.

7    A.  I don't recall.

8    Q.  Isn't it a fact that by October, Mr. Zambrano had taken

9    over presiding over the Lago Agrio Chevron case, October 2009?

10   A.  I don't have any recollection of following events that

11   closely at the time.  I know there's a stipulation in this case

12   that I signed yesterday that has the dates he presided.  I

13   don't even know if that coincides with your question, but I

14   know there were two different occasions that Judge Zambrano

15   presided over the Aguinda case in Ecuador.

16   Q.  And that the day Judge Zambrano took over the Lago Agrio

17   Chevron case on October 21, 2009, Mr. Fajardo wrote to you that

18   "things here are under control," do you recall that, sir?

19   A.  No.  But I do recall always wanting to know when a new

20   judge came in, if he would move the case forward in accordance

21   with the law and not be subject to what we perceived to be

22   Chevron's efforts to paralyze the case.  So I would often get

23   emails from Mr. Fajardo about judges and, you know, where they

24   stood on this critical of issues for us.

25   Q.  Isn't it a fact, sir, that days after Judge Zambrano took

DBJLCHE3                    Donziger - cross

1   over the Lago Agrio Chevron case, Mr. Fajardo wrote to you that

2   "the puppeteer won't move his puppet unless the audience pays

3   him something," isn't that a fact, sir?

4   A.  I don't know.

5   Q.  And isn't it a fact, sir, that two days later, a thousand

6   dollars was withdrawn from Selva Viva's bank account, isn't

7   that a fact, sir?

8   A.  No.

9   Q.  You're saying no, that's not a fact, or you don't know?

10  A.  Let me clarify.  I don't know whether a thousand dollars

11  was withdrawn on that day from Selva Viva's account.  I did not

12  run Selva Viva's account, and I generally had nothing to do

13  with that account other than to make sure it was funded.

14  Q.  And, sir, do you recall in December 2009, December 21,

15  2009, Mr. Saenz writing to you to remind you about wiring money

16  today?

17  A.  No.

18  Q.  Are you aware, sir, that on December 22, 2009, there was

19  another thousand dollar withdrawal from the Selva Viva bank

20  account, are you aware of that, sir?

21  A.  No.

22  Q.  And are you aware, sir, that on December 23, 2009, Ximena

23  Centeno made a thousand dollar deposit directly into the bank

24  account of Alberto Guerra?

25  A.  No.

DBJLCHE3                     Donziger - cross

1   Q.  Ximena Centeno is an employee of Selva Viva at the time,

2   correct, sir?

3   A.  My understanding was that she worked for Selva Viva at that

4   time, yes.

5   Q.  And, sir, am I correct that you were president of Selva

6   Viva?

7   A.  That was -- there was a time I was.  It was almost a purely

8   ceremonial post.  It didn't mean I had any involvement in the

9   administration of Selva Viva other than to try to get Selva

10  Viva's account funded.

11  Q.  Have you ever spoken to Ms. Centeno about the direct

12  deposit she made into Mr. Guerra's bank account?

13  A.  I don't accept the premise of your question, but I have not

14  spoken to her and I don't think it's appropriate given my

15  position in this case to do so.  So, no, I have not.

16  Q.  Have you made any attempt to determine how it came about

17  that Ms. Centeno made a direct deposit into Alberto Guerra's

18  bank account?

19  A.  I don't accept the premise of your question, but there are

20  lawyers who represent me on this legal team who have taken

21  responsibility for that.  That is not a responsibility I'm

22  taking on myself.

23  Q.  Isn't it a fact, sir, that literally days after, on

24  December 29, 2009, Mr. Fajardo wrote to you that "the plan for

25  the judgment will be fulfilled," do you recall that, sir?

DBJLCHE3                    Donziger - cross

1    A.  I remember receiving such an email.  I don't remember the

2    date, but we always had a plan to get a judgment against your

3    client --

4    Q.  Simple question.

5    A.  -- and --

6    Q.  Do you recall that?  Yes or no, Mr. Donziger.

7    A.  I remember receiving such an email at some point.

8    Q.  Now, Mr. Donziger, I want to ask you some questions about a

9    meeting you admit you had with Mr. Guerra in late 2010.

10          You admit, sir, that you met with Mr. Guerra a

11   restaurant called the Honey Honey in late 2010, correct, sir?

12   A.  I met with him at a restaurant in Quito.

13   Q.  And it was Mr. Fajardo who arranged that meeting, correct,

14   sir?

15   A.  I believe so.

16   Q.  You made a special trip just for that meeting, didn't you,

17   sir?

18   A.  No.

19   Q.  But you agreed to meet with Mr. Guerra and you did meet

20   with Mr. Guerra, correct?

21   A.  Yes.

22   Q.  And am I correct, sir, that that meeting lasted for 30 to

23   45 minutes, correct?

24   A.  About that.

25   Q.  And by your own admission, Mr. Guerra just floated out

DBJLCHE3                    Donziger - cross

1    there a solicitation of a $500,000 bribe, correct?

2    A.  We had a conversation.  In the conversation he put it out

3    there, yes.

4    Q.  And he told you that that $500,000 bribe would be paid in

5    exchange for the judgment in the Lago Agrio case coming out in

6    your favor, correct?

7    A.  That was the idea, yes.

8    Q.  And you knew at the time that the judge on the Lago Agrio

9    Chevron case was Judge Zambrano, correct?

10   A.  I don't remember if I knew it was him.  I knew there was

11   some judge that he felt he had influence with.

12   Q.  So he made clear to you in exchange for a $500,000 bribe,

13   he could fix the case with the judge on the Lago Agrio case at

14   the time, correct, sir?

15   A.  Something to that effect, yeah.  He basically said he could

16   get it done for a payment.

17   Q.  And he says you told him at the time can't do that, we

18   don't have that kind of money.

19           That's his testimony, right, sir?

20           THE COURT:  His testimony is what it is.

21   Q.  And your testimony, sir, is you told him no, we can't do

22   that, correct, that's your testimony?

23   A.  Yes.

24   Q.  And at that time you didn't have 500,000 to give anyway,

25   isn't that correct, sir?

DBJLCHE3                    Donziger - cross

1   A.  Sir, I would never do that.

2   Q.  I just asked you whether you had 500,000 to give.

3           THE COURT:  Mr. Donziger, answer the question.  You'll

4   have --

5   A.  I don't know if we had, how much money the case had at that

6   point.  Whatever money we had we would not -- it would not be

7   used to bribe a judge, sir.

8   Q.  Here's my question, Mr. Donziger:  You say it concerned you

9   that Mr. Guerra had solicited a bribe, correct?

10  A.  Concerned me, absolutely.

11  Q.  Yet you had a 30 to 45 minute meeting with him anyway,

12  correct, sir, that's your testimony, correct?

13  A.  That was about the length of the meeting.  There wasn't,

14  there wasn't -- can I please finish my answer?

15          THE COURT:  Let him finish, Mr. Mastro.

16  A.  I don't remember there being a whole lot of the meeting

17  that took place after that topic came up.

18  Q.  And you sat around for those 30 to 45 minutes and drank

19  coffee, correct, sir?

20  A.  Sir.

21  Q.  That was your testimony?

22  A.  We had a meeting.  If I remember correctly, the latter part

23  of the meeting he floated this out and we didn't really meet

24  too much longer after that.

25  Q.  And am I correct, Mr. Donziger, what you say happens next

DBJLCHE3                    Donziger - cross

1   is a few weeks later, a judgment comes out from Judge Zambrano

2   in the Lago Agrio plaintiffs' favor awarding them over

3   $18 billion, correct?

4   A.  What I say happened?  I mean that happened, February 14,

5   2011.

6   Q.  And, sir, you have no explanation whatsoever for how so

7   much of the LAPs' internal work product showed up word for word

8   in the Lago Agrio judgment, do you, sir?

9   A.  That's not true.  I have, I have a variety of explanations.

10  Q.  Didn't you testify at your deposition that you have no

11  personal knowledge of how the LAPs' internal work product ended

12  up in the Lago Agrio Chevron judgment?

13  A.  I testified to what I believe to be at the time my

14  explanation as to how it could have happened, if indeed it did

15  happen.  I'm not conceding that it did happen, but how it could

16  have happened if indeed it did happen.

17  Q.  And isn't it a fact, sir, that when the Lago Agrio

18  plaintiffs' litigation team wanted to prepare a complaint

19  against the judge, it was perfectly prepared to do that in the

20  past, correct?

21  A.  If the complaint --

22           MR. FRIEDMAN:  Objection, your Honor, vague.

23           MR. MASTRO:  I'll withdraw it.  I'll withdraw it.

24  Q.  You filed no complaint about the bribe solicitation,

25  correct, sir?

DBJLCHE3                    Donziger - cross

1   A.  I did not for various reasons.

2   Q.  Nobody on the Lago Agrio plaintiffs' legal team filed any

3   complaint about the bribe solicitation, correct?

4   A.  There were reasons for that, but, yes, that's correct.

5   Q.  You filed complaints in the past against judges on the Lago

6   Agrio Chevron case, correct?

7   A.  First of all, when you say "you," I never filed a

8   compliant.

9   Q.  The Lago Agrio plaintiffs' legal team filed complaints

10  against judges in the past?

11  A.  I think we did on occasion, rare occasion.

12  Q.  You filed a complaint against Judge Nunez when he was

13  accused of being part of a bribery scandal, didn't you, sir?

14  A.  I don't know.  I didn't.

15  Q.  And you prepared a complaint to file against Judge Yanez

16  that you ended up never filing, correct, sir?

17  A.  Well, I didn't.  I understand that the local team did.

18  Q.  Now, sir, I want to dial forward to the summer of 2011.

19          Am I correct that the Lago Agrio plaintiffs' legal

20  team spoke with Judge Guerra about becoming an expert on the

21  Ecuadorian judicial system in connection with the count nine

22  proceedings here before Judge Kaplan?

23  A.  Sir, the record speaks for itself.  I had nothing do with

24  that.  That was done out of the Smyser firm in Houston.  And my

25  understanding is, yes, he was contacted by the Smyser firm.

DBJLCHE3                    Donziger - cross

1   Q.  And you become aware that the Smyser firm had contacted him

2   correct, sir?

3   A.  I did at some point, yes.

4   Q.  That was arranged by Mr. Fajardo, correct, sir?

5   A.  What was arranged, the meeting?

6   Q.  For the Smyser firm to meet with Mr. Guerra to become an

7   expert on the Ecuadorian judicial system in the count nine

8   case, correct, sir?

9   A.  I don't know.  But if it was, it wouldn't be the least bit

10  unusual.

11  Q.  And, sir, did you ever tell the Smyser firm when you found

12  out they were considering using Judge Guerra as an expert on

13  the Ecuadorian judicial system in the count nine action that

14  Judge Guerra had solicited a bribe from you and Mr. Fajardo,

15  did you tell the Smyser firm that, sir?

16  A.  I don't recall.  I really was not involved in the

17  preparation of the count nine case for reasons that I think are

18  pretty apparent.  I was not a party in that case, and there

19  were a lot of things the Smyser firm did in direct contact with

20  the clients in Ecuador that I knew nothing about.  I don't

21  think I found out about that until after the fact.

22  Q.  So the answer is you didn't tell the Smyser firm that, did

23  you, sir?

24  A.  I don't know if I did or didn't.

25          MR. MASTRO:  Your Honor, if I could have just a short

DBJLCHE3                     Donziger - cross

```
 1   break, I'm trying to expedite the examination.
 2              THE COURT:  Okay.  We'll take ten.
 3              (Recess)
 4              THE COURT:  Continue.
 5              MR. MASTRO:  Thank you, your Honor.
 6              THE COURT:  For the benefit of the break, do you have
 7   an estimate of how much longer?
 8              MR. MASTRO:  Yes, your Honor.  I'm going to try to
 9   wrap up in the next 15 minutes.  We offered a lot of
10   Mr. Donziger's deposition testimony, so I'm going to try to
11   wrap up quickly.
12   BY MR. MASTRO:
13   Q.  Mr. Donziger, coming back to the meeting you had with
14   Mr. Guerra in late 2010 that you testified Mr. Fajardo
15   arranged, am I correct that present were you, Mr. Guerra, and
16   Mr. Fajardo, correct, sir?
17   A.  I'm not certain about that.  I have a vague recollection at
18   one point I met with him alone and the other two might have
19   been there -- I mean Mr. Fajardo and Mr. Yanza.  We had
20   meetings with various people at that restaurant.  It all seems
21   kind of foggy.  I remember meeting with him.  I don't remember
22   if I was alone or with other people.
23   Q.  Sir, directing your attention to April 4, 2008, this is
24   just after the Cabrera report has been filed with the Lago
25   Agrio court, correct, sir?
```

DBJLCHE3                    Donziger – cross

1   A.  Yes.

2   Q.  And it's not yet publicly available because copies have not

3   been released by the court, correct, sir?

4   A.  I don't know that to be the case.

5   Q.  Am I correct that you drafted a press release to be issued

6   about the Cabrera report on April 4, 2008, that you forwarded

7   to Joseph Kohn to review?

8   A.  I often drafted press releases, and I don't remember if I

9   drafted what you describe.  I'm happy to take a look at the

10  document to refresh my recollection.

11  Q.  I'm just asking for your recollection right now.

12          And you drafted that press release for you to be the

13  press spokesperson about the Cabrera report's issuance,

14  correct, sir?

15  A.  I just said I don't remember doing that, so please ask me a

16  question that takes that into account.

17  Q.  Sir, do you remember drafting a press release in which you

18  wrote, "Chevron's claim that Professor Cabrera is cooperating

19  with the plaintiffs is completely false," do you recall

20  drafting such a press release, sir?

21  A.  No.  But I do think that there were times I was not fully

22  accurate at that time in describing that relationship.  That

23  might have been one of them.

24  Q.  Did you have a habit of drafting press releases in which

25  you were inaccurate to the press?

DBJLCHE3                    Donziger - cross

1    A.  No.

2    Q.  Sir, I'm going to show you what's been marked as

3    Plaintiff's Exhibit 1032.

4              MR. MASTRO:  May I approach, your Honor?

5              THE COURT:  You may.

6              MR. MASTRO:  And, your Honor, this is also a document

7    in evidence not for the truth of the matters asserted,

8    obviously.

9              THE COURT:  Thank you.

10   Q.  Mr. Donziger, does this refresh your recollection that you

11   sent a draft press release to Joseph Kohn on April 4, 2008?

12   A.  Yes.

13   Q.  Sir, I'm going to direct your attention to the bottom of

14   page 2 where you drafted a quote from Mr. Fajardo and you

15   wrote, "Chevron's claim that Professor Cabrera is cooperating

16   with the plaintiffs is completely false."

17             Do you see that, sir?

18   A.  Yes.

19   Q.  Does that refresh your recollection as to whether you

20   drafted such a thing in this press release, sir?

21   A.  It doesn't, but this is my email that I sent to Mr. Kohn

22   and I would often draft press releases and I'm happy to answer

23   any questions about this.

24   Q.  Sir, I want to ask you some questions about and some

25   further questions about Woodsford.

DBJLCHE3                    Donziger - cross

1          Did you sign the agreement with Woodsford?

2    A.  I was not the counterparty.  I don't believe I signed it.

3    I might have, might have signed it just because they wanted me.

4    I don't believe I signed it.  The agreement was not with me; I

5    can testify to that.

6    Q.  I didn't ask whether it was with you, sir.  I asked you

7    whether you are one of the signatories, in whatever capacity,

8    to the agreement that the Lago Agrio plaintiffs have with

9    Woodsford?

10   A.  I don't recall one way or another.

11   Q.  And, sir, am I correct that you personally met with

12   Woodsford prior to the execution of that funding agreement?

13   A.  I met with individuals in Woodsford, yes.

14   Q.  And that was sometime after January 15, 2013, but before

15   the agreement with Woodsford was consummated sometime in the

16   spring of 2013, correct, sir?

17   A.  I don't recall the specific dates.  I mean there were

18   different meetings at different times.  My best recollection is

19   we did not have meetings or I did not have a meeting with

20   anyone at Woodsford during that period of time.

21   Q.  How many meetings did you have with persons from Woodsford,

22   sir?

23   A.  A handful, maybe, excuse me, maybe three to four.

24   Q.  Did you have any conversations with anyone from Woodsford

25   between January 15, 2013 and consummation of the agreement with

DBJLCHE3                    Donziger - cross

1    Woodsford in the spring of 2013?

2    A.  It's possible.  I have had conversations with people in

3    Woodsford.

4    Q.  And have you continued to have conversations with

5    representatives of Woodsford since consummation of that funding

6    agreement?

7    A.  Yes.

8    Q.  Have you, the Lago Agrio plaintiffs, raised any other funds

9    to support the litigation in 2013?

10              MR. FRIEDMAN:  Objection, relevance and vague.

11              THE COURT:  Overruled.

12   A.  I can only speak for myself.  The answer is yes.

13   Q.  And can you tell us who else you raised funds from in 2013

14   to support the Lago Agrio litigation?

15              MR. FRIEDMAN:  I'll make the same objection that I

16   also made at side bar, your Honor.

17              THE COURT:  Same ruling.

18   A.  I have not raised funds for the Lago Agrio litigation.  The

19   funds I raised have been for my defense in this litigation.

20   Q.  And from whom have you raised funds for your defense in

21   this litigation, Mr. Donziger?

22              MR. FRIEDMAN:  Same objection.

23              THE COURT:  Same ruling.

24   A.  Sir, I don't feel comfortable answering that question and I

25   can't because it completely cuts into my ability to defend

DBJLCHE3                    Donziger - cross

1    myself in this case.  I just can't answer that question.

2    Q.  Can you tell us how much you have raised, Mr. Donziger?

3    A.  It's a pittance, sir, compared to what your client is

4    spending.

5    Q.  Tell us how much you've raised, Mr. Donziger.  What's the

6    amount of money in 2013 you have raised for your defense?  Just

7    give us a number.

8            MR. FRIEDMAN:  Same objection.

9            THE COURT:  Same ruling.

10   A.  Well, the costs for my defense in this case are being borne

11   by myself, my family, meaning my immediate family, and another

12   couple of people have helped me with very small amounts of

13   money.

14           MR. MASTRO:  Your Honor, I'm not going to press the

15   point.  I think we've done enough on this.

16   Q.  Mr. Donziger, am I correct that your father, now

17   deceased --

18           THE COURT:  Just a minute.  I'm going to give the

19   witness a final chance to answer because he's inviting, he's

20   absolutely inviting a conclusion.

21           MR. MASTRO:  I understand, your Honor, but go ahead.

22           THE WITNESS:  I don't know what you mean by inviting a

23   conclusion.  Can we do a quick side bar?

24           THE COURT:  No.

25           THE WITNESS:  Final chance to answer what?

DBJLCHE3                    Donziger – cross

```
 1              THE COURT:  The question Mr. Mastro asked you.
 2              THE WITNESS:  Can you repeat it.
 3   Q.  The amount, the amount you've raised to support your
 4   defense in 2013, this case.
 5   A.  Roughly $250,000.
 6   Q.  Mr. Donziger, I want to cover one final point and then I'm
 7   going to turn you over to your counsel.
 8              In your witness statement, you concede you "made
 9   errors along the way."  It's paragraph 15.
10              Do you recall that, sir?
11   A.  Yes.
12   Q.  Am I also correct that just before this trial you gave an
13   interview to the Wall Street Journal, do you recall doing that,
14   sir?
15   A.  I do.
16   Q.  And you told the Wall Street Journal, "I have no apologies
17   to make about anything I did."
18              Do you recall telling that to the Wall Street Journal,
19   sir?
20   A.  I do.
21   Q.  And is that your testimony here today, that you have no
22   apologies to make about anything you did?  Yes or no.
23   A.  I have absolutely no apologies to make about advocating all
24   the years I have for my clients in Ecuador.
25   Q.  Yes or no, sir.
```

DBJLCHE3                    Donziger – cross

1    A.  I have no apologies to make.  It doesn't mean along the way

2    I committed some inconsequential errors, sir, which I have, as

3    any human being would in a long litigation.

4            MR. MASTRO:  Mr. Donziger, I have nothing further for

5    you.

6            THE COURT:  Thank you, Mr. Mastro.

7            Redirect, Mr. Friedman.

8            MR. FRIEDMAN:  Thank you, your Honor.

9            THE COURT:  You may proceed.

10           MR. FRIEDMAN:  Thank you, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. FRIEDMAN:

13   Q.  Mr. Donziger, I want to talk about the funds for your

14   defense issue if we could.

15           Of that 2.5 million in funding that you got in the

16   spring of this year, generally speaking, not penny for penny,

17   but generally speaking, where did that go?

18   A.  Well, first of all, I want to be clear that the money did

19   not come to me.  It went to the client group in Ecuador for

20   their account and they determined the budget for the spending

21   of that money, not myself.  My understanding is that money was

22   split between paying a very large amount of debt the case had

23   at that point, as well as some moneys for enforcement actions

24   in other countries, and a very, very small amount for then

25   counsel in this particular case, meaning the Smyser firm and

DBJLCHE3                     Donziger - redirect

1   the Keker firm.

2   Q.  By the time Mr. Keker got out of the case, did you still

3   owe him money?

4   A.  Yes.

5   Q.  Approximately how much?

6   A.  At the time it was about -- I think it was $1.4 million and

7   it's since gone up.

8   Q.  How could it go up if he's out of the case?

9   A.  Because there was some assistance that people in his firm

10  were giving me during the time I was pro se, limited, but they

11  were billing for it.

12  Q.  Of the 250,000 you raised from other funders, let me ask it

13  this way.  What source of expenses or what sort of -- yeah,

14  I'll just ask -- how did you spend the $250,000?

15  A.  I had to pay your law firm $150,000 for expenses.  I had to

16  pay expenses for other people who are working on the case for

17  their housing in New York, all sorts of litigation related

18  expenses like copying and supplies, food, experts, travel of

19  witnesses and that sort of thing.

20  Q.  Was any of that 250,000 given directly or indirectly to

21  Mr. Gomez or his firm?

22  A.  No.

23          MR. FRIEDMAN:  Your Honor, before I move on, I wonder

24  if I could get some guidance from the Court about the issue, I

25  think we addressed it yesterday, it's basically the Hobbs Act

DBJLCHE3                      Donziger - redirect

1    extortion issue and what is permissible to go into with regard

2    to Mr. Donziger's belief that the plaintiffs were entitled to

3    the money he was asking Chevron for.

4              THE COURT:  I've given the guidance that I'm prepared

5    to give in the circumstances already.  I'll rule on individual

6    questions as they come up.

7              MR. FRIEDMAN:  All right.

8    Q.  Mr. Donziger, can you tell us where you were born?

9    A.  Jacksonville, Florida.

10   Q.  And were you raised in Florida?

11   A.  Yes.

12   Q.  What did your parents do?

13   A.  My father was a small businessman.  And my mother was a

14   sort of a combination of a stay-at-home mom and she did some

15   work in the community.  She edited a newspaper for the Jewish

16   community in Jacksonville.

17   Q.  Where did you go to college?

18   A.  American University.

19   Q.  What did you do after leaving college?

20   A.  I became a journalist.

21   Q.  And were you employed by a specific agency or how did you,

22   how did you work as a journalist?

23   A.  I worked for United Press International upon graduating

24   from college in Washington, D.C.  And then I moved to

25   Nicaragua, where I continued to work for UPI as a stringer, and

DBJLCHE3                    Donziger - redirect

 1    then I became a freelance journalist.

 2            THE COURT:  Mr. Friedman, look, the testimony so far

 3    is paragraph 1, two, three, four of the direct testimony in

 4    written form which you and Mr. Donziger had weeks to prepare

 5    and it was not touched on cross.  Now, let's get along.

 6    Q.  Mr. Donziger, I'd like to ask you about your original role

 7    in the case when the case, well, let me back up.

 8            When did you first hear about this, about the fact

 9    that there were Ecuadorian plaintiffs wanting to file a lawsuit

10    about contamination in the Amazon?

11    A.  I think I first heard about it in 1993.

12    Q.  What was the context in which you heard about it?

13    A.  I heard about it when I was in law school from -- actually,

14    that's not true as I think back.  I heard about it before then.

15    I heard about it probably in 1991 when I was in law school from

16    a friend of mine whose father was a native of Ecuador and had

17    heard about it.

18    Q.  And eventually a case was filed here in New York?

19    A.  Yes.

20    Q.  And what involvement, what was your original role when the

21    case was filed in New York?

22    A.  I was working under the auspices of Cristobal Bonifaz, who

23    was the Ecuadorian native, who was at the time practicing law

24    in Massachusetts and he was the lead lawyer on the case and my

25    role was to assist him.  I had another job at the time.

DBJLCHE3                     Donziger - redirect

1    Q.  What was the other job that you had?

2    A.  I was working at the District of Columbia Public Defenders

3    Service.

4              MR. MASTRO:  Your Honor, this is way beyond the scope

5    of the cross.  The cross was very targeted.

6              MR. FRIEDMAN:  Your Honor, the cross does go into and

7    did go into in great detail Mr. Donziger's role, his being the

8    cabeza, etc., etc.

9              THE COURT:  All of which pertained to the Ecuadorian

10   litigation from 2003 subsequently.  Now you've gone back

11   another ten years and it's beyond the scope of the cross and of

12   dubious relevance beyond that, but it's beyond the scope of the

13   cross.

14             MR. FRIEDMAN:  If that's your ruling, I'll move on.

15             THE COURT:  I'm inviting.  I want to hear you, if you

16   think otherwise, argue your position.  If you don't think

17   otherwise, then the ruling is made, but I'm always receptive to

18   argument up to the point where I rule.

19             MR. FRIEDMAN:  Your Honor, the questions involve his

20   role in the litigation.  I understand there's different parties

21   have characterized the New York suit and the Ecuadorian suit

22   differently.  I'm not trying to get into that dispute of how

23   it's characterized, but the point is his role differed through

24   the years.  That's the point I'm trying to make.

25             THE COURT:  And the part that's relevant and was

DBJLCHE3                    Donziger - redirect

```
1  examined on cross was his role from 2003 to date.  Isn't that
2  correct?
3            MR. FRIEDMAN:  I would say things before that are
4  relevant and I think the relevance is to show his state of mind
5  about the case, about his role in the case.  I don't think
6  there's a bright line there I guess is what I'm saying.
7            MR. MASTRO:  Your Honor, it's actually I tried to draw
8  very bright lines on the cross.  2005 on were the questions I
9  asked about, 2005 on.
10           MR. FRIEDMAN:  That's the point of redirect, your
11 Honor.  The cross-examiner draws lines and then the redirect
12 person tries to tell the other half of the story.
13           THE COURT:  Well, as long as we focus on the other
14 half, not a different story.
15           MR. FRIEDMAN:  Fair enough.
16           THE COURT:  Okay.  Look, I assume that his role was
17 different when the case was in New York.  I don't know that it
18 matters, but I'll give you a little, tiny bit of leeway on
19 that.
20           MR. FRIEDMAN:  I'd like two questions on it.
21           THE COURT:  If you have two questions, you may as well
22 get on with it.
23 BY MR. FRIEDMAN:
24 Q.  Mr. Donziger, just generally, what was your role in the
25 case when it was here in New York?
```

DBJLCHE3                    Donziger - redirect

A.  I was a member of a much larger legal team with not a lot

of responsibility.  I would occasionally edit briefs and take

trips to Ecuador to meet with clients, mostly under the

direction of Mr. Bonifaz.

Q.  And who was the lead lawyer at that time, was it

Mr. Bonifaz?

A.  I believe it was.  I believe he was cocounsel in the case

with Mr. Kohn.

Q.  After the case was filed in Ecuador, or I should say when

the case was filed in Ecuador, the beginning stages, let's say

from the six months before filing to six months after filing,

that roughly year period, what was your role?

A.  I was assisting Mr. Bonifaz develop the case, develop the

facts, and I would occasionally have contact with the clients

and people in Ecuador who could put in affidavits and that sort

of thing.

Q.  Did you, after that roughly six months after the case was

filed, did your role change over time?

A.  Yes.

Q.  And can you give us, generally speaking, an account of how

that role changed?

A.  Well, generally speaking, throughout the 1990s, I was never

a lead lawyer.  What happened was at the time the case was

refiled in Ecuador in 2003, I became much more involved at that

point for various reasons.

DBJLCHE3                    Donziger - redirect

1  Q.  What were those reasons?

2  A.  Well, the reason, the main reason was it was very clear

3  that for the case to proceed with any hope of success, there

4  needed to be much more involvement from American counsel than I

5  think could be provided by either Mr. Kohn or Mr. Bonifaz.  And

6  I felt given my skill set and the fact I spoke Spanish and I

7  would be able to be effective in that kind of role, so, you

8  know, I took it upon myself and others wanted it to happen and

9  I ended up at that point starting to spend a fair amount of

10  time in Ecuador.

11  Q.  And I wonder if you could break out for us, well, let me

12  ask you this:  Let's say from 2003 to the present, has your,

13  have your roles varied over that time period?

14  A.  Yes.

15  Q.  And has your influence varied over that time period?

16  A.  Yes.

17  Q.  And before we get to specifics, generally speaking, what

18  happened in terms of your influence?

19  A.  Well, I would say at the beginning of the Ecuador phase of

20  the case I had a lot of influence.  I was working to pull

21  together the local team and trying to motivate people to think

22  that they could actually do this litigation and be successful

23  at it.  But over time, generally speaking, my influence become

24  diminished to the point where today, I have little influence

25  compared to what it used to be.  I'm really a member of a

DBJLCHE3                      Donziger - redirect

1   larger team that is led by Pablo Fajardo but involves a lot of

2   other lawyers other than myself.

3            MR. FRIEDMAN:  Your Honor, would this be an

4   appropriate time for lunch?  I can keep going if you like.

5            THE COURT:  You're moving to another subject?

6            MR. FRIEDMAN:  I am.

7            THE COURT:  Okay.  We'll break here.

8            (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBJ8CHE4                    Donziger - redirect

                        AFTERNOON SESSION

                            2:10 p.m.

1              THE COURT:  Let's continue.

2    STEVEN DONZIGER, resumed.

3    BY MR. FRIEDMAN:

4    Q.  Mr. Donziger, there has been references today to statements

5    you made to the Court about lacking resources to defend in this

6    case.  Do you believe those statements to the Court were

7    accurate?

8    A.  Yes.

9    Q.  Why were they accurate in light of the funding money you

10   described this morning?

11   A.  As a general matter in this case, this RICO case, I signed

12   retainer agreements or a retainer agreement with the Keker law

13   firm that I was partially responsible for paying, even though I

14   had a separate indemnification agreement with my clients in

15   Ecuador.  As this case went on, and the level of legal work

16   necessary increased, I was unable to keep pace with the bills

17   of the Keker firm, and I fell in arrears.  And at the time that

18   the Keker firm withdrew, I owed the Keker firm and other law

19   firms that I had previous debts from related to their work on

20   my behalf in the U.S. days of the litigation more money than I

21   had, even with the inheritance that I received.

22   Q.  Did you ever mean to communicate to Judge Kaplan that you

23   were destitute?

DBJ8CHE4                    Donziger - redirect

1   A.  No.

2   Q.  You were shown a couple of exhibits, maybe four or five

3   exhibits prepared by Mr. -- is it Rizack?

4   A.  Rizack.

5   Q.  How long have you worked with Mr. Rizack?

6   A.  I have known Mr. Rizack since the late 1990s, worked for

7   friends, and his involvement with me with regard to the Ecuador

8   litigation began roughly two years ago when I asked him to

9   assist me in managing a bunch of administrative matters related

10  to my involvement in the case.

11  Q.  The various spreadsheets charts, etc. that were shown to

12  you this morning, as far as you know, have those ever been

13  shown to anybody else besides you and Mr. Rizack?

14  A.  I don't believe they have.

15  Q.  Now I guess they have been shown in court, but before that.

16          What was the purpose of the various charts and

17  spreadsheets, what was the purpose of putting those together?

18  A.  I was trying to get a sense of the finances of the case

19  over a period of many years.  When the Kohn law firm was

20  involved in the case, I relied almost completely on the Kohn

21  law firm to keep the books of the case.  It was a relatively

22  uncomplicated time because there was no litigation other than

23  the Ecuador litigation.  By the time I asked Mr. Rizack to come

24  in, we had restructured the case and had received what we

25  considered to be a significant amount of investment moneys,

DBJ8CHE4                    Donziger - redirect

1    such that I needed help and the clients in Ecuador needed help

2    organizing the information and keeping track of the

3    expenditures.

4    Q.  There was reference, I think it was yesterday, some

5    questions by Mr. Mastro about one of the sheets shows 35,000 a

6    month.  Did you ever get paid 35,000 a month on this case?

7    A.  No.

8    Q.  Roughly speaking, looking back over the years, what would

9    you say is the most you ever got paid in a year on this case?

10   A.  I don't know.  It's a little complicated.  What was

11   happening is I would sometimes get significant payments, but

12   they were often then used to pay other people that I had hired.

13   So while on some years I reported an income that I would

14   consider substantial, in reality, my expenses would often

15   completely, or almost completely consume my income.  I think on

16   average my testimony that I made approximately $150,000 a year,

17   at least in recent years, is accurate.  However, I don't think

18   that takes into account moneys that I paid out during that

19   period of time to other people, so I actually think it was less

20   than that, but I can't verify that with any precision.

21   Q.  I want to ask you about Exhibit 7673, PX 7673.  Do you

22   still have that up there?  I think it was shown to you

23   yesterday.

24           MR. FRIEDMAN:  Your Honor, if you still have your

25   copy.

DBJ8CHE4                    Donziger - redirect

1              THE COURT:  I can't hear you.

2              MR. FRIEDMAN:  If you still have your copy, I have one

3      for the witness.

4              THE COURT:  Remarkably enough I have found it.

5              MR. FRIEDMAN:  Thank you.

6      Q.  This is dated December of 2005.  I want to direct your

7      attention to the first paragraph.  Do you see that there?

8      A.  Yes.

9      Q.  Why are you writing in that manner, using that tone?

10     A.  The cultural issues that I had with the clients and local

11     counsel in Ecuador were always in play, and often I would use

12     that tone to reinforce the notion that ideas coming out of the

13     north, as we called it, the American lawyers were really not

14     necessarily superior, in many cases were subordinate to what

15     was happening in the south, or out of Ecuador.  And while this

16     is in the form of a joke sort of, it does have a deeper

17     meaning, in that this was often reflective of the kind of

18     relationship that I had with local counsel.

19     Q.  Would you turn to page 2?  Towards the middle there is an

20     e-mail from Alejandro Ponce, is that right?

21     A.  Yes.

22     Q.  Around 2005, December 2005, what was his role in the case?

23     A.  He was a law professor in Ecuador, a prominent law

24     professor, and he was advising us.  I don't know if he actually

25     appeared in the court, but he was an important member of the

DBJ8CHE4                    Donziger - redirect

1  legal team in Ecuador at the time.

2  Q.  In the first paragraph, where he talks about the need to

3  change in the terms of reference, what is "terms of reference"?

4  A.  That referred -- I believe that referred to a document that

5  Alberto Wray, who was the first lead lawyer of the Ecuador

6  legal team that signed with Chevron lawyers related to a

7  proposed sampling, an analysis plan that was to be used during

8  the judicial inspections.

9  Q.  He continues to say it's urgent for Pablo to become the

10  counsel of record.  You were questioned a little bit about this

11  the other day.  Whose idea originally was it that Pablo become

12  the -- however you want to characterize it -- the lead lawyer

13  in Ecuador?

14  A.  At the time, when the judicial inspections started in

15  August of 2004, we didn't know how long they would last.  We

16  had no idea they would last years and years at that time.

17  After a few months, it became apparent that our first lead

18  lawyer in Ecuador, Alberto Wray, didn't want to continue to

19  work in the conditions of the Amazon rainforest during the

20  inspections; it was very hot and challenging to work down

21  there.  And the legal team would need a substitute, a new

22  lawyer to handle the inspections and really handle the case,

23  which at that point appeared to us to potentially have many

24  more years of litigation ahead of it.

25  Q.  I would like to ask you to look at PX 806.  This is your

DBJ8CHE4                     Donziger - redirect

1    book proposal.

2              MR. FRIEDMAN:  If we can go to page 26.

3              Next 26.

4    Q.  If you could direct your attention, Mr. Donziger, to the

5    middle paragraph.  Have you had a chance to look at that?

6    A.  Yes.

7    Q.  Did that all happen the way you described it?

8    A.  Yes.

9    Q.  I wonder if you could give us an overview of your

10   relationship with Mr. Fajardo over the years?

11   A.  In the very early years of the Ecuador phase of the case, I

12   would say our relationship was more like I was maybe like a big

13   brother to him.

14             I'd say starting around 2005, 2006, in that area, I

15   think our relationship became very collaborative.  I felt like

16   we were equals.  And generally he was someone I relied greatly

17   on for advice on how to function in Ecuador.  He relied for me

18   on how to deal with issues related to the United States, U.S.

19   lawyers, that kind of thing.

20             Over time, in the late, like 2008, 2009, and more

21   recently, his sense of his own control over the entire

22   litigation, not just in Ecuador, became much more apparent to

23   me, and I think to others, such that now he makes, as far as I

24   can tell, makes decision, in consultation with the clients, for

25   all aspects of the case, including Ecuador related aspects and

DBJ8CHE4                    Donziger - redirect

1   most international aspects of the case.

2   Q.  Going back to, I don't have the date in my mind, but

3   approximately, do you recall when the first 1782 actions were

4   filed, approximately?

5   A.  I think the first one was in December of 2009.

6   Q.  After that point in time, did your role in the litigation

7   change?

8   A.  Yes.

9   Q.  In what way?

10  A.  Well, when I was ordered by this Court to turn over my case

11  file, I lost a great deal of respect from the clients and their

12  representatives in Ecuador, such that I no longer had the

13  relationship I had with the representatives before that had

14  happened.

15  Q.  What were the practical effects of that?

16  A.  Well, there was very little information shared with me.

17  Certainly, the flow of information that had been in existence

18  before that time changed dramatically.

19  Q.  I want to ask about a couple of specific things that were

20  covered by Mr. Mastro in his questioning.

21       He asked you a question about a juicy check from

22  Chevron, and you said there was an explanation for that.  Can

23  you tell us the explanation for using the term juicy check?

24  A.  In the judicial inspection, I would estimate around 2005,

25  2006, Chevron's lawyer in Ecuador, Adolfo Callejas, made a

DBJ8CHE4                    Donziger - redirect

reference in an argument he was making to the judge that the

only thing that the Frente was interested in and their lawyers

were what he called "cheques jugosos," which translates into

juicy checks.  And at the time we thought it was a very funny

thing to say; we laughed at it.  And from that point forward we

had an internal joke on our team, where we would always say,

Aren't you looking forward to getting your cheque jugoso?  And

it was a joke because the reality is among all of us it really

was never about getting a check; it was always about fighting

to finish the case and try to get a cleanup for our clients.

Q.  Well, there has been testimony in this case, I think you

were asked a little bit about it, I may be wrong about it, but

there has been testimony about remediation and an effort at one

point when there was a remediation proposal that the

plaintiffs' group opposed.  Do you recall that?

A.  Yes.

Q.  To your knowledge, what was the reason that the plaintiffs'

group was opposed to that?

A.  Well, the example of that that I remember was a remediation

effort that Petroecuador, Ecuador's oil company, that had

assumed operational control of Texaco's oil operations when it

left was starting a remediation of some of the waste pits that

were the subject of the litigation in the *Aguinda* case in

Ecuador.

        We -- I should say the clients and their

DBJ8CHE4                    Donziger - redirect

representatives and myself had always wanted a remediation to

take place no matter who did it.  There had been meetings I

remember specifically with officials in Petroecuador to

discuss -- and with the government in general to discuss these

types of issues, different ministers.  However, we discovered

that this particular remediation, upon inspecting some of the

sites that supposedly had been remediated, it looked like it

was not a real remediation, that it was a remediation that we

thought was completely inadequate, basically, running dirt over

waste pits rather than cleaning them out.

        So as a result we took steps, I should say our local

team took steps, and I was involved in this, to communicate

with the appropriate authorities in Ecuador our concerns and to

get them to cease conducting this remediation until it could be

done properly.

Q.  I think there was a reference in Mr. Mastro's questioning

of you to some quote -- I don't think we saw the exhibit, but

some quote by you about jack up the amount to 30 billion or

something like that.  You said there was an explanation for

that comment.  Do you recall that comment first of all?

A.  Yes.

Q.  What was the context in which that comment was made?

A.  It was a meeting in Quito amongst some of our U.S. based

experts, and we were talking, among other things, about the

cost of remediation, and my personal commitment, as I believe

DBJ8CHE4                     Donziger - redirect

1   was the commitment of the local team, was to, through the

2   litigation, get adequate funds to do a proper and comprehensive

3   cleanup of the damage that had been caused by Texaco.  And I

4   had been told by experts, and also just via my own

5   understanding of what environmental disasters cost to clean up

6   of this magnitude, and in using hyperbole, I was trying to get

7   the team to understand that the people of Ecuador deserved a

8   full cleanup that would cost a significant amount of money.

9   But I never meant to suggest that it should be not based on

10  real metrics, real numbers, and empirical data.

11  Q.  Before you began working on this case, had you ever spent

12  time in Ecuador?

13  A.  No.

14  Q.  What was it like for you to work with the lawyers and the

15  people of Ecuador in this case in terms of your ability to

16  motivate them?

17  A.  Well, working in -- it was the first experience I had of

18  any significance working in a foreign country, really in any

19  capacity, other than when I had been a journalist in the early

20  part of my career, and it presented a number of challenges.

21  Q.  Let me ask you this.  You used the term "hyperbole."  If we

22  were to go through the Crude outtakes, would we see other

23  examples of hyperbole on your part?

24  A.  Yes.

25  Q.  E-mails?

DBJ8CHE4                         Donziger - redirect

1    A.  Yes.

2    Q.  Your diary?

3    A.  Yes.

4    Q.  Where does that come from?

5    A.  I think it comes, in part, from my desire to motivate

6    people to believe that this could get done, that a litigation

7    against a very, very powerful oil company, brought by people

8    who historically had very little power or money, could actually

9    happen, be sustained, and ultimately be successful based on

10   competent evidence and fairness.  And I think getting people to

11   believe, getting people in Ecuador to believe that they could

12   do this was a huge challenge, and it's something that I often

13   resorted to hyperbole to try to get people to believe.  But I

14   also think, in part, it comes from the nature of my personality

15   as well.  I think I can often speak from the hip in a way that

16   isn't necessarily productive.

17   Q.  When you first went down to Ecuador to work on this case,

18   were there people in the United States who said it was a waste

19   of time and not likely to be successful?

20   A.  Yes.

21   Q.  Were there people in Ecuador that took the same position?

22   A.  Yes.  There were a lot of people who told me in Ecuador

23   that we had, or that the people of Ecuador would have

24   absolutely no chance of winning the lawsuit because of the

25   nature of the power structure of the society, not because of

DBJ8CHE4                    Donziger - redirect

1   the validity of the evidence we felt we could adduce during the

2   trial.

3   Q.  Over the years, have there been people on the plaintiffs'

4   team who have had that attitude either for a short period of

5   time or a long period of time?

6   A.  Yes.

7   Q.  Was one of your roles to address that attitude?

8   A.  I think that a lot or part of what I did was to try to keep

9   the team motivated and united, understanding that a significant

10  portion of our adversary strategy was to divide us and put

11  pressure on the team such that people would quit or be

12  intimidated into working for the Ecuadorians.  And that was

13  always a huge challenge, for all of the lawyers on the team,

14  was to find people who were willing to put up with the pressure

15  that would almost always come from the other side.

16  Q.  I want to talk to you about the time period from 2003 up

17  until the present.

18          During that time period, did you believe that the

19  affected people had a legitimate liability claim against

20  Chevron?

21  A.  Yes.

22  Q.  Did you think it was factually supported?

23  A.  Yes, I did.

24  Q.  Why?

25  A.  The evidence that was being adduced during the trial via

DBJ8CHE4                     Donziger - redirect

1    the judicial inspections was such that it was very clear to me

2    that Chevron -- there was a basis to hold Chevron liable for

3    contamination of this area of Ecuador that was in violation of

4    Ecuadorian law as well as industry customs and industry

5    standards known internationally.

6    Q.  From 2003 to 2013, did you believe that the plaintiffs in

7    the litigation had a legitimate damages claim against Chevron?

8    A.  Yes.

9              MR. MASTRO:  Objection.  Asked and answered now.

10             MR. FRIEDMAN:  I said liability before, your Honor.

11             THE COURT:  Overruled.

12   Q.  Why did you believe they had a legitimate damages claim?

13   A.  Well, it was clear to me that there was contamination in

14   this area.  There was oil in waste pits and all related

15   by-products in many, many areas that I saw with my own eyes,

16   and that was confirmed by the sampling results through the

17   judicial inspections from both our side and Chevron.  And it

18   appeared to me that based on Ecuador law, as I understood it,

19   the people had a right to a clean environment and they had a

20   right to get this cleaned up.

21             At that time, or around the time that Stratus was

22   working for the Ecuadorians, and I was working very closely

23   with Stratus, I asked Doug Beltman to prepare an analysis of

24   what large environmental disasters in the world in the last

25   two, three decades generally cost to clean up, that he thought

DBJ8CHE4                    Donziger - redirect

1    would be roughly approximate to the magnitude of the disaster

2    that we felt the evidence had shown existed in Ecuador.  And

3    Mr. Beltman prepared a memo for our team that outlined several

4    other disasters and their costs that were on a scale of the

5    many billions of dollars.

6           I also had -- our local technical team, at the time

7    Dave Russell asked us to no longer use his estimate, to do its

8    own estimate based on data that had come in through the

9    judicial inspections, and based on various assumptions, that

10   estimate came in at somewhere between 15 and 20 billion

11   dollars.  So I felt that the damages estimate in the judgment,

12   as well as in our submissions, our final written submissions,

13   which were in the many billions of dollars, were appropriate

14   given the magnitude of the damage that had occurred.

15   Q.  At any time up to the present, have you ever had any doubts

16   about the legitimacy of the claims asserted by the plaintiffs

17   in the Ecuadorian case?

18           MR. MASTRO:  Objection.  Add asked and answered.

19           THE COURT:  Sustained.

20   Q.  Let me ask you this.  I am going to change topics.  If you

21   would focus on the years 2007, '08 and '09.

22           Could you describe to us the key players on what has

23   been referred to as the plaintiffs' Ecuadorian team?  Who were

24   the personalities and what, generally speaking, were their

25   roles?

DBJ8CHE4                    Donziger - redirect

1    A.  Well, at the time, Pablo Fajardo was the lead lawyer.  He

2    was the head of the team.  And there were two younger lawyers,

3    Juan Pablo Saenz and Julio Prieto, who worked with him.  And

4    then there were another couple of lawyers at a lower level who

5    were involved at that time.  And then the team and I relied to

6    a great degree on Alejandro Ponce Villacis, who was a law

7    professor in Quito and who was advising the team, but not

8    actually working on it full time on the case.

9    Q.  Are you saying that the team, when we talk about the legal

10   team in Ecuador, we are talking about Mr. Fajardo, Mr. Saenz,

11   Mr. Prieto, and did you say there were one or two other

12   lawyers?

13   A.  Yes.  There was a woman named Alexandria Achuanda, but she

14   is no longer on the team.  And there is a woman named Vanessa

15   Burham.  And occasionally there would be other lawyers come in

16   for discrete tasks for short periods of times.  The names of

17   those people I don't remember at the moment.

18   Q.  Was there a specific designation of tasks or authority

19   between the different lawyers on the Ecuadorian team, someone

20   would do brief writing?  I am just trying to get a sense of

21   what they would each be responsible for?

22   A.  A lot of the work up until around 2007 concerned the

23   judicial inspections, which was preparing to go out into the

24   field and working with the technical team to assess a site and

25   understand where to take soil and water samples.  Then there

DBJ8CHE4                    Donziger - redirect

1   was a huge amount of briefing.  It reminds me a little bit of

2   this case, in the sense that there were a huge number of docket

3   entries.  There were motions filed by Chevron constantly to try

4   to -- everything from trying to block our technical reports to

5   block what I would consider the progress of the trial, be it

6   our effort to cancel the inspections or have a global

7   assessment done.  So I would say a huge amount of work involved

8   responding to legal filings by our local legal team.

9   Q.  What I am trying to get at is, did all three of these main

10  lawyers you mentioned, did they all do briefing, did they all

11  do inspections, or was there a division of responsibilities

12  between them?

13  A.  I think everybody shared all the work.

14  Q.  I want to ask you about a couple of organizations that have

15  been mentioned.  Can you describe your understanding of the

16  Frente.

17  A.  The Frente was the original organization, the nonprofit

18  organization, known in Ecuador as a non-governmental

19  organization, that was formed in the early 1990s.  Mr. Yanza

20  was one of the founders.  With the main purpose of getting a

21  cleanup from the oil contamination that existed in that region,

22  and working with Mr. Bonifaz at the time and other U.S. lawyers

23  in terms of pursuing a legal remedy for claims that the people

24  had.  And at that time throughout the 90s, because the case was

25  in the United States, there was a need to have some sort of

1    mechanism or organization to serve as a voice for the people

2    and to interact with the American lawyers and to do other

3    things in Ecuador that would address their needs.

4    Q.  What is Selva Viva?

5    A.  Selva Viva is really an entity created under, I guess, the

6    corporate law of Ecuador that served as a funding vehicle for

7    the *Aguinda* case, when it was in Ecuador, to pay people in

8    Ecuador who worked on the case.  I think that came in existence

9    in approximately 2004.

10   Q.  Can you tell us your understanding of the asamblea?

11   A.  The asamblea, I would describe it as a grassroots

12   organization that was created by the affected communities that

13   exist in the Napo concession area, that is the area where

14   Texaco used to operate.  There is about 80 different

15   communities, some indigenous, some farmer communities, that

16   consider themselves to be the class of people that would

17   benefit from any cleanup of the environmental damage.  And they

18   organized an assembly in recent years to meet on a regular

19   basis and to monitor the lawsuit and to work with the lawyers

20   to make their views known about how they thought the lawsuit

21   should be litigated, or whatever issues that they wanted to

22   express themselves about they would.

23   Q.  Now, did you ever hold any office in the asamblea?

24   A.  No.

25   Q.  Would you be considered a member of the asamblea in any

DBJ8CHE4                         Donziger - redirect

1    way?

2    A.  No.  The asamblea did not have the lawyers as members.  The

3    asamblea was an assembly of the communities of people that

4    lived in the region.

5    Q.  What is the Amazon defense fund?

6    A.  Fund?

7    Q.  Is it front?

8    A.  The Amazon Defense Front?

9    Q.  Yes.  I'm sorry.

10   A.  I think the Amazon Defense Front is just the English name

11   for the Frente, for the FDA.

12   Q.  As you spent your time in Ecuador, how did you achieve your

13   understanding of Ecuador law and procedure?

14   A.  There were a variety of things I did to gain an

15   understanding.  One is I obviously relied heavily on my

16   conversations with local counsel in trying to understand how

17   the process worked, and it started with extensive conversations

18   with Alberto Wray, who was our first lawyer in Ecuador on the

19   case, and he was a former supreme court justice in Ecuador and

20   had a person with a deep and broad understanding of Ecuador

21   law.

22          I also relied on other lawyers on the team, including

23   Mr. Fajardo and Mr. Ponce Villacis, and other Ecuadorian

24   lawyers who I would have contact with, as well as my own

25   personal observations as to what I observed during the *Aguinda*

DBJ8CHE4                    Donziger – redirect

1    case, and, also, I learned a great deal about what the practice

2    was by watching Chevron's local legal team litigate the case.

3    Q.  Before 2009, were you aware of any restrictions on ex parte

4    contacts with judges in Ecuador?

5    A.  No.

6    Q.  Did your team, to your knowledge, have ex parte

7    conversations with judges in Ecuador before 2009?

8    A.  Yes.

9    Q.  Did Chevron, to your knowledge, have ex parte contacts with

10   judges before 2009?

11   A.  Yes.

12             MR. MASTRO:  Objection, your Honor.  Lack of

13   foundation.

14             THE COURT:  The objection is sustained.  The answer is

15   stricken.  You can try to lay a foundation.

16   Q.  During your work in Ecuador before 2009, did you ever see

17   or hear anything that would cause you to believe that Chevron

18   was having ex parte contacts with judges?

19             MR. MASTRO:  Objection.

20             THE COURT:  Sustained.

21   Q.  Were you ever told by judges that they had had ex parte

22   contacts with Chevron?

23             MR. MASTRO:  Objection.  Hearsay.

24             THE COURT:  Sustained.

25             MR. FRIEDMAN:  I don't know what the objection is.

DBJ8CHE4                        Donziger - redirect

1            THE COURT:  The objection is hearsay and it's

2     sustained.

3            MR. FRIEDMAN:  It's not offered for the truth but for

4     his state of mind about the propriety of what was going on.

5            MR. MASTRO:  It seems to me quite a stretch.  It's a

6     bootstrap.  He is going to now say he can engage in illegal

7     activity because he heard rumors about whether Chevron had ever

8     had an ex parte contact?  I think that's clearly outside the

9     bounds of what is proper under state of mind evidence.

10            MR. FRIEDMAN:  We are not talking about rumors, your

11     Honor.  I think we are talking about statements from the judges

12     themselves.

13            THE COURT:  Which are out-of-court statements offered

14     to prove the truth of the matters asserted, no?

15            MR. FRIEDMAN:  Yes.  And it would be directly relevant

16     to his state of mind about the propriety of what was going on.

17            THE COURT:  It's not coming in for the truth of the

18     matters asserted.  Whether it's admissible evidence of state of

19     mind and whether his state of mind on this subject is at all

20     relevant or persuasive, I will decide later.

21     A.  Yes.

22     Q.  In what context?

23            MR. MASTRO:  Can I have a continuing objection on this

24     line?

25            THE COURT:  In what context?  No.  Sustained.

DBJ8CHE4                    Donziger - redirect

Q.  The yes was to the question of whether judges had told you

there had been ex parte contacts with Chevron, correct?

A.  Yes.

Q.  Can you estimate for us approximately how many times you

heard references by judges to having had ex parte contacts with

Chevron before 2009?

          MR. MASTRO:  Your Honor, I don't want to object every

time.  Can I just have a continuing objection to these

questions?

          THE COURT:  Yes.

A.  The time period that I personally had met with a judge ex

parte that I remember most vividly was the issue related to the

cancellation of the judicial inspections, that would be Judge

Yanez around 2007 or 6, in that period of time.  And I remember

him telling me or making it clear that he had been visited by

Chevron's legal team to talk about -- to lobby him for why

Chevron felt the inspections -- we should be forced to do our

own inspections that we had requested, even though we didn't

want to do them.  So it was very clear to me that both based on

that and other information I got from other sources, as well as

my own observations, that Chevron was meeting ex parte with

judges to discuss substantive matters.

Q.  I want to ask you a few questions about Mr. Kohn.  You were

asked by Mr. Mastro about some statements you did or did not

make to Mr. Kohn.  Let me just get right to the point.  Did you

DBJ8CHE4                    Donziger - redirect

1    ever mislead Mr. Kohn about anything related to Mr. Cabrera?

2    A.  No.

3    Q.  Did you report to Mr. Kohn what was going on with Mr.

4    Cabrera, to the extent you knew it -- that's a terrible

5    question.  Let me start over.

6           Did you ever seek to hide any of the facts relating to

7    Mr. Cabrera from Mr. Kohn?

8    A.  No.  My relationship with Mr. Kohn was such that I would

9    report to him every few weeks about events in the case.  The

10   people of Ecuador were heavily dependent on Mr. Kohn for

11   financing the case at that point, and they were dependent on

12   Mr. Kohn -- relied on me, the clients in Ecuador, as sort of an

13   intermediary to tell him what was going on.  And the role of

14   Stratus and the preparation of the Cabrera report, as far as I

15   remember, was something that Mr. Kohn was aware of.

16          Let me say this.  Not every detail, because we never

17   discussed every detail of everything that was going on in the

18   case, but as a general matter, the basic issues, he was aware

19   of them.

20   Q.  At some point Mr. Kohn stopped funding the case, is that

21   correct?

22   A.  Yes.

23   Q.  If he had stopped the funding earlier than he did, would

24   that have prevented the case from going forward?

25   A.  Not in my opinion.

DBJ8CHE4                    Donziger - redirect

1   Q.  Why not?

2   A.  Well, various reasons.  One is the case at that time was

3   considered attractive to lots of law firms and funders.  And

4   the second reason is we received an investment in 2007 from

5   another funder that was quite substantial, in terms of our

6   level of expenses at that time, that had nothing to do with Mr.

7   Kohn.

8   Q.  I want to ask you some questions about Mr. Shinder.

9        What was the reason you arranged for him to go to

10  Colorado?

11  A.  I wanted Mr. Shinder to conduct due diligence on some of

12  the Cabrera related issues with Stratus as new counsel, in a

13  way that I felt I could not do personally.  And I asked him to

14  accompany me to Colorado at the beginning of his engagement to

15  talk to the Stratus people and have conversations with them and

16  try to determine their perspective on what had happened.

17  Q.  Did you make any effort to prevent Mr. Shinder from

18  learning the full facts about the Cabrera situation?

19  A.  Well, the purpose of the trip to Colorado was so he could

20  learn all the facts from the perspective of Stratus, and either

21  prior to that or subsequent to that, whenever he asked if he

22  could talk to other counsel, I always facilitated that and

23  tried to make sure he had complete access to the people he

24  wanted to talk to so he could satisfy his own due diligence.

25  Q.  You were asked some questions about Judge Yanez?

DBJ8CHE4                        Donziger - redirect

1    A.   Yanez.

2    Q.   You made a comment about, something to the effect of, we

3    were always pressuring judges.  What did you mean by that?

4    A.   I think I said we were always pushing judges.  Pressure,

5    push depends, I guess, on one's perspective.

6            As a general matter, in Ecuador, it was very evident

7    to those of us on our side that Chevron was exerting enormous

8    pressure on the court to slow down or even stop the trial.  And

9    it was very clear to our team, and to me personally, that if we

10   did not take all appropriate steps that we could within the law

11   to counter pressure the judges, that our clients would not get

12   a fair trial and we would lose the case, not on the merits, but

13   just because of pressure.

14           So when it became necessary at times to push the case

15   forward, because we were trying to win the case, it was taking

16   a really very, very long time to litigate this case, our team

17   would organize activities that would try to signal to the court

18   that our clients cared and were upset that they could not get

19   redress for their claims, and it was taking so long, and that

20   sort of thing.

21           (Continued on next page)

22

23

24

25

DBJLCHE5                    Donziger - redirect

1   Q.  During the course of the litigation, were you aware of

2   Chevron either filing complaints against judges or threatening

3   to file complaints against judges?

4   A.  Yes.

5   Q.  And were you able to form an impression about how common

6   that was in Ecuador legal procedure in general?

7             MR. MASTRO:  Objection.

8             THE COURT:  Sustained.

9   Q.  Why did you want to stop the judicial inspections?

10  A.  At that time in the trial, we came to the conclusion, well,

11  at that time in the trial there were already many such

12  inspections that had occurred, both our inspections and

13  Chevron's inspections.  I think a total of over 30 had

14  occurred.

15            And our team's analysis of the evidence that had been

16  adduced from those inspections was such that we felt that we

17  had more than met our burden of proof in the case, that every

18  inspected site was producing roughly the same type of evidence,

19  same quality of evidence, and we felt like to continue to do

20  the judicial inspections would not be necessary in terms of

21  what we needed to do to meet our burden of proof.

22            And balancing that against the amount of time it would

23  take to do all the inspections, we decided to withdraw our

24  request to do the remaining inspections that we had made

25  without impinging on Chevron's right to complete its

DBJLCHE5                        Donziger - redirect

 1    inspections.

 2    Q.   Now, there was some questioning of you this morning about

 3    the fact that, I forget exactly how you worded it, but that you

 4    thought it was very likely Mr. Cabrera would be appointed as

 5    the expert by the court.

 6              Do you recall that testimony?

 7    A.   Yes.

 8    Q.   Why was it the view, why was it your view that it was very

 9    likely he'd be appointed?

10    A.   The reason was there was a rule at the time, and I don't

11    know if it was a case rule or an agreement among the parties,

12    but the only people who in Ecuador who could be appointed the

13    global expert had to have served in some prior capacity in the

14    case as a court-appointed expert, and that reduced the pool of

15    potential candidates to a very small number once you discounted

16    all the experts that had been nominated by the parties.

17              So he was one of a handful of people and for various

18    reasons, through a process of elimination, it became apparent

19    that there were maybe a couple people who could actually be

20    appointed.

21    Q.   There was talk on cross-examination about the plaintiffs'

22    team paying him some money before he started working.

23              Do you recall that?

24    A.   Yes.

25    Q.   What was the point of that or the purpose of paying him

DBJLCHE5                    Donziger - redirect

1  before he started working?

2  A.  Well, I don't think this was my testimony.  My testimony

3  was that we paid him to start working but it was before his

4  formal appointment, before his formal swearing in, I think, as

5  the global damages expert.

6  Q.  So explain to us the timeline as best you remember it.

7  A.  Well, I think that he was named but he wasn't formally

8  sworn in until several weeks later because Chevron had been

9  objecting and I think they had filed motions to try to delay or

10  block his appointment.  And our team decided to pay him to

11  commence his work with the understanding that he would be sworn

12  in soon.  No one really knew how long it would take.

13          And I think Mr. Fajardo made the decision that we

14  shouldn't wait any longer, that if we were to wait longer, we

15  would be playing into Chevron's hands to delay the process even

16  further.

17  Q.  Did Mr. Cabrera do his own field work?

18  A.  Yes.

19  Q.  And there's been references to field work.  What was the

20  field work that he was doing as you understood it?

21  A.  For the first few weeks or months of the global process,

22  Mr. Cabrera spent time in the field with a team of technical

23  people visiting sites and taking soil and water samples and

24  having them analyze them in laboratories.

25  Q.  Was Chevron given notice of the field work he was doing?

DBJLCHE5                    Donziger - redirect

1   A.  My understanding is yes, and I believe Chevron had

2   representatives, lawyers, and technical people observe the

3   field work at every site it was conducted.

4   Q.  Now, were you ever with him when he did his field work?

5   A.  Mr. Cabrera?

6   Q.  Yeah.

7   A.  I remember spending very little time in that process.  I

8   might have been there once or maybe twice or maybe no times.  I

9   really don't remember specifically.  I was at a lot of judicial

10  inspections, and I can't remember if I might have been at one

11  of his inspections or not.

12  Q.  Can we look at PX913.  If you could just blow that up a

13  little.

14          MR. FRIEDMAN:  Can I have just a second, your Honor.

15  Q.  If you would go to the third paragraph down, the one that

16  begins "faced with this situation."

17          Did you approve of this idea to send the money through

18  the second or secret account to give to Mr. Cabrera?

19  A.  I was completely deferential to the local team on those

20  types of matters, and I understood that the purpose was to pay

21  Mr. Cabrera outside the court process for work actually

22  performed.  And given the desire of our team to get this work

23  done and not really cave in to pressure that Chevron was

24  putting on the court, I recognized that this was an effort to

25  pay him.  I never really understood completely at the time and

DBJLCHE5                    Donziger – redirect

1    probably didn't give it much thought as to why there was a

2    second account.

3    Q.  You address the second account in your witness statement,

4    so I'm not going to spend any more time on that today.

5            But was there another point in time after this when

6    money was paid to Mr. Cabrera outside the court process?

7    A.  I believe that there was a payment after he completed his

8    work.  I mean after, I should say, the report was put in

9    because of money that was still owed to him and that might have

10   been paid directly.

11   Q.  With either of these two payments we just discussed, did

12   you have any sense that there was anything improper or illegal

13   about those payments to Mr. Cabrera?

14   A.  No.

15   Q.  If you would look at PX1291, please.  I think it's been

16   stipulated that this was created by you in mid-April of 2010.

17           Did this accurately reflect your state of mind as of

18   that date?

19   A.  Yes, with the caveat that it didn't address, you know,

20   every nuance of every issue I was dealing with at that time,

21   yes, it did.

22   Q.  Would you look at PX1279, please.  Do you recall this

23   email?

24   A.  Yes.

25   Q.  Did everyone in Ecuador have the same feeling about the

DBJLCHE5                    Donziger - redirect

1    attorneys might go to jail as is explained here or expressed

2    here, I should say?

3              MR. MASTRO:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.  At this point in time were you getting other -- that is

6    March 30 of 2010 -- were you getting other opinions about the

7    propriety of what had happened with Mr. Cabrera other than

8    what's expressed in this email?

9              MR. MASTRO:  Objection, your Honor, and I also should

10   add this is outside the scope of my cross.  I never asked him a

11   question about this document.

12             THE COURT:  Mr. Friedman.

13             MR. FRIEDMAN:  That might be right, your Honor.  I

14   don't remember.

15             THE COURT:  Sustained.

16             MR. FRIEDMAN:  All right.

17             THE COURT:  We'll break here for a few minutes.

18             (Recess)

19             THE COURT:  Continue Mr. Friedman, please.

20             MR. FRIEDMAN:  Thank you, your Honor.

21   Q.  Mr. Donziger, the Court has received several documents, I

22   think a diary entry or a memoir entry of yours, some emails,

23   all on the subject of communications with Judge Yanza

24   regarding --

25             THE COURT:  Yanez.

DBJLCHE5                         Donziger - redirect

1          MR. FRIEDMAN:   Yanez, thank you.

2    Q.  -- all on the subject of talking to Judge Yanez about

3    stopping the judicial inspections.  You have that frame of time

4    in mind?

5    A.  Yes.

6    Q.  At the time those communications were going on between your

7    team and the judge, was the sexual harassment allegation

8    already public?

9    A.  What my understanding was that it became public at a

10   certain point in time prior to the time that we had -- our team

11   had most, if not all of its meetings with him.

12   Q.  And what was -- there's reference to your group preparing a

13   complaint against him.  What was the subject matter of that

14   complaint?

15   A.  My understanding is that it was about his failure to move

16   on our motion to cancel the judicial, our remaining judicial

17   inspections, not Chevron's, when the law seemed so clear that

18   we had that right.

19   Q.  And did you resort to having other people weigh in on that

20   issue?

21   A.  We did, yes.

22   Q.  What did you do?

23   A.  Our local team organized an amicus brief that I believe was

24   signed by 11 lawyers, academics in Ecuador, supporting our

25   legal position and it was submitted to the court.

DBJLCHE5                    Donziger - redirect

1    Q.  Your legal position about what?

2    A.  Regarding our right to withdraw our request to continue

3    with our own judicial inspections.

4    Q.  I want to turn to the fall of 2009.  You made -- well,

5    during the fall of 2009, was there an illness in your family?

6    A.  Yes.

7    Q.  And can you just briefly tell us what it was?

8    A.  My mother was ill with cancer.

9    Q.  And can you tell us the date she died?

10   A.  She died on December 7, 2009.

11   Q.  And how much time did you spend with her leading up to her

12   death in the weeks and months before?

13   A.  A lot of time.  She lived in the Washington, D.C. area, and

14   I would travel there very, very frequently and I would spend a

15   lot of time with her, particularly in probably the five, six

16   weeks before she passed.

17   Q.  I want to go to the time when you met with Mr. Guerra and

18   he offered to help fix the case for $500,000.

19          Do you recall that testimony?

20   A.  Yes.

21   Q.  Why didn't you turn him in?

22   A.  I felt at the time that there were a couple reasons.  One

23   is I felt like his offer didn't have a lot of credibility.  And

24   I was very concerned that doing anything at that point to turn

25   him in would give Chevron an excuse to further use it against

DBJLCHE5                    Donziger - redirect

1    the court or against the process such that the trial could be

2    derailed.

3            At the time that this conversation happened, we had

4    been litigating just in Ecuador for seven years, and it was

5    very clear to me that Chevron's primary strategy was to delay

6    the trial as much as possible so that it would never end.  And

7    I had a fear that we would never finish the trial in a timely

8    manner if I turned him in and that combined with the fact that

9    I really didn't give it a lot of credibility led me to not take

10   any action.

11           MR. FRIEDMAN:  Thank you.  I don't have any other

12   questions.

13           THE COURT:  Thank you.

14           Mr. Gomez?

15           MR. GOMEZ:  Nothing, your Honor.

16           THE COURT:  Thank you.

17           Mr. Mastro.

18           MR. MASTRO:  Thank you, your Honor.

19           Your Honor, I'll be very brief.

20   RECROSS EXAMINATION

21   BY MR. MASTRO:

22   Q.  Mr. Donziger, Mr. Friedman asked you about the hyperbolic

23   language -- his words -- that you used in the past.

24           Do you recall those questions, sir?

25   A.  Yes.

DBJLCHE5                    Donziger - recross

1    Q.  And you testified that you used that language to motivate

2    people in Ecuador to believe in the case.  That was your

3    testimony, right, sir?

4    A.  In part, yes.

5    Q.  Was there somebody else you were motivating when you used

6    that kind of language in your own diary, sir?

7    A.  No.

8    Q.  Sir, Mr. Friedman asked you -- strike that.

9            In response to Mr. Friedman's questions you said, your

10   words, that you have no sense that there was anything improper

11   about the payments made to Mr. Cabrera directly by the Lago

12   Agrio plaintiffs' team outside the court process.

13           Do you remember that testimony, sir?

14   A.  Yes.

15   Q.  Isn't it a fact that your own Lago Agrio plaintiffs' team

16   in Ecuador was telling you they were going to make those

17   payments out of what they called our secret account, isn't that

18   a fact, sir?

19   A.  I've testified to that.

20   Q.  Thank you, sir.

21           Now, sir, you were asked some questions about what

22   Selva Viva is.  Do you recall those questions by Mr. Friedman?

23   A.  Yes.

24   Q.  Sir, wasn't Selva Viva also Lago Agrio plaintiffs' team

25   field laboratory, the name you gave your own field laboratory,

DBJLCHE5                    Donziger - recross

1    correct, sir?

2    A.  Mr. Russell was running that laboratory, and I remember

3    that he actually came up with the name Selva Viva.

4    Q.  That was before you started --

5             THE COURT:  Let him finish.

6             MR. MASTRO:  Certainly, your Honor.

7    A.  Just you asking me the question has sort of allowed me to

8    recall that I think he did call that lab Selva Viva.

9    Q.  And that was never an accredited laboratory in Ecuador,

10   correct, sir?

11   A.  It was never intended to be, but, no, it was not.  It was

12   our own lab that we used to sort of do field tests of samples.

13   Q.  And, in fact, you would use it, Selva Viva laboratory was

14   doing its test results in the Grand Hotel de Lago in Lago

15   Agrio, isn't that correct, sir?

16   A.  Sir, it wasn't -- the results of those lab tests were never

17   intended to be submitted to the court and they never were.

18   They were just for our internal purposes to determine what the

19   field tests were showing.  I think a lot of that work was done

20   in a room we had rented in a hotel.

21   Q.  Thank you, Mr. Donziger.

22             Now, sir, you were asked some questions by

23   Mr. Friedman about remediation damage estimates and what your

24   team did after David Russell told you to stop using his

25   $6 billion estimate.  Do you recall that testimony, sir?

DBJLCHE5                    Donziger - recross

1    A.  Yes.

2    Q.  And you testified here today and in paragraph 118 of your

3    witness statement about a $20 billion proposal that a junior

4    attorney working on the Lago Agrio plaintiffs' team came up

5    with.  Do you recall that, sir?

6    A.  I testified to that damage estimate, but that's not

7    accurate.  The premise of your question is not accurate.

8    Q.  Well, sir, referring you to your witness statement,

9    paragraph 118, you said that on April 16, 2006, in response to

10   some further inquiries I had about this report, a junior

11   attorney who had worked extensively on technical issues

12   reanalyzed the data and told me that "based on our current

13   numbers, the remediation proposal will come in at about

14   20 billion."

15          Do you see that, sir?

16   A.  Yes.

17   Q.  Now, sir, that junior attorney is Aaron Marr Page, sitting

18   three people in there at the defense counsel table, correct,

19   sir?

20   A.  I don't believe it was him.  But the point is this was

21   based on work that had been done by technical people.  It was

22   an analysis of that work.

23   Q.  Sir, simple question:  The junior attorney you're referring

24   to in your sworn statement to this Court is Aaron Marr Page,

25   correct, sir?

1    A.  No.

2    Q.  Sir, I'm going to ask you now, April 20, 2006, did you have

3    an exchange of emails with Aaron Marr Page about the

4    remediation estimate he was working on, do you recall that,

5    sir?

6    A.  No.

7    Q.  And didn't Mr. Page write to you, encouraging you to use

8    his remediation estimate, that "while 20 billion can be

9    attacked, it can't be destroyed in a way that will embarrass

10   us.  This" -- his words, not mine, your Honor -- "shit is

11   really unprecedented.  No one has ever pumped and treated an

12   ecosystem before, and I really think upping it will make media

13   court CVX itself start thinking in terms of billions, albeit

14   lower."

15           Didn't he write that to you, sir, on or about

16   April 20, 2006?

17   A.  I don't recall.  My testimony is the work being analyzed by

18   the lawyer -- be it Mr. Page, I thought it actually was Daria

19   Fischer -- was based on technical work and technical analysis

20   that had been done by our technical team in Ecuador.

21   Q.  Daria Fischer is his wife, right?

22   A.  Yes.

23   Q.  Also a lawyer?

24   A.  Yes.

25   Q.  So two junior lawyers are the ones who gave you this

DBJLCHE5                    Donziger - recross

1   estimate, correct?

2   A.  No.

3   Q.  Now, sir --

4           MR. MASTRO:  Your Honor, may I approach the witness?

5           THE COURT:  Yes.

6   Q.  Mr. Donziger, I'm showing you what's been marked as

7   Plaintiff's Exhibit 3240.  It's an email exchange that you had

8   with Aaron Marr Page on April 20, 2006.

9           Do you see that, sir?

10  A.  Yes.

11  Q.  And that came out of your files, you produced it in this

12  litigation correct, sir?

13  A.  I assume so.

14          MR. MASTRO:  Your Honor, I move it into evidence,

15  please.

16          THE WITNESS:  Haven't had a chance to look at this.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 3240 received in evidence)

19          MR. MASTRO:  Thank you.

20  Q.  Now, Mr. Donziger, during your redirect, Mr. Friedman asked

21  you about Mr. Kohn, Mr. Russell, Mr. Shinder, and you said, you

22  testified you never misled any of those people, correct, sir,

23  that was your testimony?

24  A.  That's correct.

25  Q.  They all testified against you at this trial correct, sir?

DBJLCHE5                     Donziger - recross

1    A.  They were your witnesses, yeah.

2    Q.  So all those people testified against you, but the only

3    person telling the truth at this trial is you, is that your

4    testimony, Mr. Donziger?

5            MR. FRIEDMAN:  Object, argumentative.

6            THE COURT:  Sustained.

7            MR. MASTRO:  No further questions, your Honor.

8            THE COURT:  Any redirect?

9            MR. FRIEDMAN:  No, thank you, your Honor.

10           THE COURT:  Mr. Gomez?

11           MR. GOMEZ:  No, thank you, your Honor.

12           THE COURT:  You're excused, Mr. Donziger.  Thank you.

13           (Witness excused)

14           THE COURT:  Next witness.

15           MR. FRIEDMAN:  Your Honor, we have some exhibits to

16   move in, but other than that, that's the end of our case

17   witness wise.

18           THE COURT:  So we're not going to hear from

19   Mr. Piaguaje and Ms. Calva; is that right?

20           MR. GOMEZ:  No, your Honor.  That's Mr. Friedman is

21   talking for the Donziger defendants.

22           With respect to the Ecuadorian defendants, your Honor,

23   I'm informed that Ms. Calva's sister was granted a visa today.

24   However, the embassy kept the passport in order to somehow

25   transpose the visa onto the passport physically, which is what

DBJLCHE5

1    they usually do.  I'm told that she may not get her actual

2    passport back until at least tomorrow.  She may not be able to

3    get on to a plane until Thursday, definitely Friday.

4            The problem I am in, your Honor, is that Chevron has

5    the right to take depositions of both Ms. Calva and

6    Mr. Piaguaje.  We would have to -- Mr. Piaguaje is able to

7    travel on Friday, which means I would have to figure out a way

8    to do two depositions this weekend if I'm to put him on the

9    strand on Monday.

10           I need to confer with my cocounsel, I need to confer

11   with Quito, and I need to make a decision whether these people

12   will actually take the stand or not.  I will make that decision

13   tonight on both.  I will inform counsel for plaintiffs tonight.

14   We can send a communication to the Court through your law

15   clerk, your Honor, by email so everyone is aware tonight what

16   the decision is.

17           And I would just ask the Court for that time to be

18   able to make that decision.  Either both will attend, one or

19   the other will attend, or none will attend, but I can't make

20   that call right now.

21           THE COURT:  All right.  Tonight.

22           MR. GOMEZ:  Thank you.

23           THE COURT:  Now, Mr. Friedman, we may as well take

24   advantage of the fact that it's not 4:30 yet to deal with your

25   exhibit issues.

DBJLCHE5

1              MR. FRIEDMAN:  Are we ready to move them in?

2              Your Honor, we're finishing up a stipulation.  Several

3    weeks ago you asked us to put a stipulation together about what

4    was in the Ecuadorian record.  We got a day behind; Mr. Seley

5    got sick.  But I think we're going to be able to do that

6    tonight and come in tomorrow and move the exhibits in, both the

7    stipulated ones.  They're also reviewing our group of exhibits.

8    I think -- I'm not exactly sure what they want to do, but I

9    told them we would give them time, more time to do that.

10             THE COURT:  I'm sorry, who is they and what are you

11   talking about?

12             MR. FRIEDMAN:  Mr. Seley.

13             MR. MASTRO:  My colleague, your Honor.

14             THE COURT:  So you'd rather deal with this tomorrow.

15             MR. FRIEDMAN:  If that's all right, yes.  I think we

16   can do it much more efficiently and just be able to do it in a

17   minute or two.

18             THE COURT:  So what you're telling me is tomorrow is

19   effectively a dark day, if I go along with this, right?

20             MR. FRIEDMAN:  He's telling you.  I'm not.

21             THE COURT:  Okay, I understand.

22             It's just the first divergence of view between the two

23   of you in many years.  I don't mean the two of you personally,

24   of course.

25             And assuming no more witnesses, you, Mr. Mastro, have

DBJLCHE5

1    zero, one, or two rebuttal witnesses ready to go when?

2              MR. MASTRO:  Thursday morning, your Honor, first

3    thing.  And we are planning to call at least one, probably two

4    rebuttal witnesses.  They should be relatively brief.  One, no

5    more than half an hour.  The other, maybe an hour and a half to

6    two hours.  There's no reason we shouldn't be able to finish by

7    midday.

8              THE COURT:  You still want these depositions if

9    they're calling more witnesses or not?

10             MR. MASTRO:  Oh, we definitely would want the

11   depositions, your Honor, absolutely.

12             There are some exhibits and additional deposition

13   designations we would move in on rebuttal.  That would only

14   take a few minutes, your Honor.

15             THE COURT:  All right.  So what I'm hearing is that

16   there's no way we finish this week.

17             Do you have any rebuttal witnesses if they don't call

18   any more witnesses?

19             MR. MASTRO:  Yes, we would still be calling at least

20   one and probably two rebuttal witnesses.

21             And, your Honor, I know hope springs eternal, but if

22   Mr. Gomez reports back that those two witnesses aren't coming,

23   there's no reason why we couldn't have closings on Friday and

24   finish this trial on Friday.

25             THE COURT:  If he says there are no more witnesses

DBJLCHE5

1    being called, you are or you're not putting in rebuttal

2    witnesses and, if so, when do you propose to do it?

3           MR. MASTRO:  Thursday morning.  Put them in, finish

4    midday or early afternoon and be ready to do closings on

5    Friday, your Honor.

6           THE COURT:  Just give me a second.

7           And give me an estimate of time on closings that you

8    want?  We may have covered this.  I may have just forgotten.

9           MR. MASTRO:  It's not a problem, your Honor.  I think

10   your Honor talked about before, they each asked for 45 minutes,

11   and your Honor said that I could have a similar amount of time

12   or reserve a little for response as well.

13          THE COURT:  All right.  We'll stay loose on this.

14          It may be that you're going to do depositions on

15   Friday and the weekend and finishing the testimony beginning of

16   the week.

17          I'm not sure whether, if we're not hearing testimony

18   on Friday, I'm going to hear closings on Friday.  Maybe I will,

19   maybe I won't.  I'll think about it.

20          So everybody needs to be flexible, but I think the

21   picture will clarify some tonight, at least I hope so.  And

22   then we'll see where we are.

23          So now one or two other things.  My collective

24   chambers' knowledge may know the answers to these questions but

25   I don't.

DBJLCHE5

 1            Some considerable length of time ago I asked for cross

 2    references between exhibits as they were designated during the

 3    pretrial proceedings and the trial exhibit designations.  Now,

 4    I do understand that in these big fat white books that Chevron

 5    submitted, Court Exhibits A and B, there's a column somewhere

 6    that indicates as to each exhibit, whether in chronological

 7    order or in numerical order, what the pretrial exhibit

 8    designation was.  But I didn't see anything that allowed me to

 9    look at a pretrial exhibit designation and find out whether

10    it's a trial exhibit and, if so, what number.

11            Have I missed something?

12            MR. MASTRO:  Your Honor, we hadn't done that, but we

13    can do that very readily and get that to you very promptly.

14            THE COURT:  All right.  I would like to have that from

15    both sides.

16            MR. MASTRO:  Certainly, your Honor.

17            THE COURT:  I suspect it's a much bigger problem for

18    Chevron because I don't remember getting very many exhibits

19    from the defense, but I know there was some.

20            MR. FRIEDMAN:  Are you talking about the ones that

21    have actually been -- we have well over a thousand exhibits.

22            THE COURT:  I know you have a thousand, whatever the

23    number, is trial exhibits.  Certainly, there's a big pile that

24    are marked for identification.  But I'm talking about stuff

25    that was submitted on summary judgment motions, preliminary

DBJLCHE5

1    injunctions, all of that stuff.

2                MR. FRIEDMAN:  I follow you.  I got it.

3                THE COURT:  I don't know if that's easy for you to do

4    or not easy for you to do.

5                MR. FRIEDMAN:  Nothing is easy for us to do.

6                THE COURT:  Nothing is easy.

7                MR. FRIEDMAN:  But, your Honor, if we can have a week,

8    I think we can get it to you.

9                THE COURT:  That's not a problem.

10               MR. FRIEDMAN:  All right.

11               THE COURT:  That's okay.

12               Now, I, at some point, I know both sides have

13   submitted in electronic form a lot of the trial exhibits, not

14   all.  Stuff was used on cross and otherwise that is not among

15   the things that were submitted in the plaintiff's case.  I

16   think there's nothing above something like No. 2561, and we're

17   now we've got stuff in the 7,000s now, not to suggest there are

18   no gaps.  And I asked for text searchable material from both

19   sides.

20               Now, I understand, I think, that individual exhibits

21   are text searchable.  What I don't think I have -- but if I'm

22   wrong, please enlighten me -- is the ability to search either

23   side's exhibits as a universe looking for particular text.

24   Rather, I have to know where I'm going first in terms of a

25   particular exhibit.

DBJLCHE5

1          Am I right I don't have that capability from either of

2     you?

3          MR. MASTRO:  I believe that your Honor has text

4     searchable for all of our exhibits, and we are willing to take

5     on the burden of ensuring that both sides' documents can be

6     text searchable to you.

7          THE COURT:  Sounds like a good offer, right,

8     Mr. Friedman?

9          MR. FRIEDMAN:  Great offer.

10          THE COURT:  Just so I'm sure I understand you,

11     Mr. Mastro, are you telling me that there is some way today

12     that if I want to sit down and say show me every time Guerra

13     was named in an exhibit, I have the ability to do that?

14          MR. MASTRO:  I believe so, your Honor, and that's what

15     we intended and I think we provided thumb drives to do that.

16          THE COURT:  All right.  I will get educated by my very

17     capable staff, and if they need help, I'm sure we'll be in

18     touch with you all.

19          MR. MASTRO:  And we'll promptly respond if there's a

20     problem.

21          THE COURT:  Now, I think the current state of play

22     with respect to an exhibit list from the defense, and I may be

23     mistaken, is that I have a listing of numbers that are not

24     attached to dates and other characteristics of the documents.

25          Am I mistaken about that?

DBJLCHE5

1              MR. MASTRO:  There are some that way, your Honor, and
2      we will try to address that.
3              THE COURT:  I'm talking to defense.
4              MR. FRIEDMAN:  Yes, you are correct, and some are like
5      that.  I don't have the exact number.  And that's part of what
6      we're trying to work on to get you a better set.
7              THE COURT:  All right.
8              MR. FRIEDMAN:  I'm hopeful we can do that.
9              THE COURT:  Thank you.  I appreciate that.  It's okay
10     if it takes a week.
11             Now, Mr. Mastro, attention.
12             MR. MASTRO:  Yes, your Honor.
13             THE COURT:  Is there in any one place that you think I
14     have -- you see I have problems here -- a list, at least a list
15     of all the deposition designations?
16             MR. MASTRO:  Yes, your Honor.  I believe you have that
17     both in hard copy and in disk, but there have been some
18     additional pieces of deposition testimony that have been
19     offered either as impeachment or otherwise.  So we probably
20     should get you an updated version.  There also will be
21     designated a little bit more on the rebuttal case.  So we'll
22     get you new disks, so, searchable everything.
23             THE COURT:  Now, of course, whatever either side
24     supplies me, you've got to supply to the other side.
25             MR. MASTRO:  Of course.

DBJLCHE5

1          THE COURT:  I'm not asking for anything that's not

2     available to everybody.

3          Okay.  I think those take care of those questions, and

4     I think that takes care of it for this afternoon.

5          Mr. Friedman.

6          MR. FRIEDMAN:  Your Honor, could we have a contingency

7     plan if Mr. Gomez makes the decision not to call those two

8     witnesses, could we get notice of who the rebuttal witnesses

9     are tomorrow so that we can prepare for them?

10          MR. MASTRO:  Certainly, your Honor.  We'll do that.

11          THE COURT:  Okay.

12          MR. MASTRO:  The only other thing that was left on our

13     end, your Honor, if I may, on the Moncayo documents, we gave

14     the Court a notice of the status, we only received a portion of

15     them from Mr. Gomez even though there's a Bates stamp sequence

16     that's much more extensive.  So we're not really sure what the

17     status of that is and Earth Rights has not asserted privilege

18     on any documents although it still -- are we okay now?

19          We still don't have some of those Moncayo documents.

20          THE COURT:  Look, I made a direction to Mr. Gomez.

21     I'm sure he is going to comply with it.  Right, Mr. Gomez?

22          MR. GOMEZ:  That's correct, your Honor.

23          MR. MASTRO:  And the only other thing left, your

24     Honor, I think we are on the Rizack documents largely resolved.

25     Mr. Friedman was supposed to bring three documents, I believe,

DBJLCHE5

1    Selva Viva related documents for us to receive and he's shaking

2    his head that he has them so we should be okay on Rizack.

3              THE COURT:  Okay.

4              MR. MASTRO:  Thank you, your Honor.

5              THE COURT:  So it sounds like we're in reasonable

6    shape this afternoon.

7              Anything else?

8              MR. FRIEDMAN:  Can I just have a minute with

9    Mr. Mastro.

10             MR. GOMEZ:  Your Honor, we're all aware that the

11   Supreme Court of Ecuador ruled last week.  That decision has

12   not been made part of the record in these proceedings.  We've

13   often filed those important cases with translations that have

14   been stipulated by both parties.  We have not had the ability

15   to translate that decision.  We were wondering if Chevron has

16   translated it.  We'd like to stipulate to its interpretation

17   and have it submitted into the record.

18             MR. MASTRO:  We're trying to get a final translation,

19   should have it imminently, and we'll be happy to work with them

20   on whatever is necessary in that regard.  I already told

21   Mr. Gomez that we would.

22             THE COURT:  Okay.  So my understanding is Chevron has

23   rested subject to the Moncayo stuff, right?

24             MR. MASTRO:  Yes, subject to the Moncayo stuff.

25             THE COURT:  The Donziger defendants have rested

DBJLCHE5

```
 1    subject to offering exhibits tomorrow.
 2               MR. FRIEDMAN:  That is correct.
 3               THE COURT:  And Mr. Gomez is where he is.  We've
 4    already discussed that.
 5               MR. GOMEZ:  Yes your Honor.
 6               MR. MASTRO:  The only thing left is our rebuttal case.
 7               THE COURT:  I understand that, I understand that.
 8    It's not my first trial.
 9               MR. FRIEDMAN:  And, your Honor, Mr. Mastro and I just
10    reached an agreement that if, as I hope, Mr. Gomez reports that
11    he's not calling the witnesses --
12               THE COURT:  I can't deal with all these contingencies.
13    Just let me know what's happening.
14               MR. FRIEDMAN:  All right.  Fair enough.
15               MR. MASTRO:  Thank you, your Honor.
16               THE COURT:  Thank you.
17               (Adjourned to date to be determined)
18
19
20
21
22
23
24
25
```

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   STEVEN DONZIGER

 4   Cross By Mr. Mastro  . . . . . . . . . . . .2526

 5   Redirect By Mr. Friedman . . . . . . . . . .2610

 6   Recross By Mr. Mastro  . . . . . . . . . . .2651

 7                    PLAINTIFF EXHIBITS

 8   Exhibit No.                            Received

 9    1509    . . . . . . . . . . . . . . 2530

10    7571    . . . . . . . . . . . . . . 2533

11    7787    . . . . . . . . . . . . . . 2535

12    3240    . . . . . . . . . . . . . . 2656

13

14

15

16

17

18

19

20

21

22

23

24

25
```