DBPLCHE1                    Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   CHEVRON CORPORATION,

 4                  Plaintiff,

 5            v.                          11 Cv. 0691 (LAK)

 6   STEVEN R. DONZIGER, et al.,

 7                  Defendants.

 8   ------------------------------x
                                         November 25, 2013
 9                                       9:39 a.m.

10   Before:

11                        HON. LEWIS A. KAPLAN
                                           District Judge
12
                              APPEARANCES
13
     GIBSON, DUNN & CRUTCHER LLP
14        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
15        ANDREA E. NEUMAN
          REED M. BRODSKY
16        ANNE CHAMPION

17   FRIEDMAN RUBIN
          Attorneys for Donziger Defendants
18   BY:  RICHARD H. FRIEDMAN
          DEE TAYLOR
19
     LITTLEPAGE BOOTH
20        Attorneys for Donziger Defendants
     BY:  ZOE LITTLEPAGE
21        RAINEY BOOTH

22   GOMEZ LLC
          Attorneys for Defendants Hugo Camacho, Javier Piaguaje
23   BY:  JULIO C. GOMEZ

24

25
```

DBPLCHE1                     Trial

```
1              (Trial resumed)
2              THE COURT:  Good morning, everyone.
3              MS. NEUMAN:  Good morning, your Honor.
4              THE COURT:  Okay.  Let's proceed.
5              MR. GOMEZ:  Your Honor, defendants call Humberto
6    Piaguaje.  I'll go get him, your Honor.
7     HUMBERTO PIAGUAJE,
8          called as a witness by the Defendants,
9          having been duly sworn, testified through the Spanish
10         interpreters, Jesus Rivera and Elisa Cabal, as follows:
11   DIRECT EXAMINATION
12   BY MR. GOMEZ:
13   Q.  Good morning, Mr. Piaguaje.
14   A.  Good morning.
15             MR. GOMEZ:  Your Honor, may I approach?
16             THE COURT:  You may.
17   Q.  Mr. Piaguaje, I have handed you the document that has been
18   marked as Defendant's Exhibit 1900.
19             Do you have that in front of you, sir?
20   A.  Yes.
21   Q.  Do you recognize that document?
22   A.  Yes, sir.
23   Q.  Would you please state what it is?
24   A.  It is my testimony.
25   Q.  Would you please turn to the page 10 of that document in
```

DBPLCHE1                    H. Piaguaje - direct

1    Spanish.

2    A.  Yes, I have it.

3    Q.  Is your signature there?

4    A.  Yes, I recognize my signature.

5    Q.  Sir, did you review this document before you signed it?

6    A.  Yes, sir.

7    Q.  Was everything true and accurate in this document when you

8    signed it?

9    A.  Yes.

10   Q.  And to the best of your knowledge, is everything stated in

11   that document still true and accurate today?

12   A.  Yes.

13             MR. GOMEZ:  Your Honor, I pass the witness.

14             THE COURT:  Are you offering the testimony?

15             MR. GOMEZ:  Yes.  I offer Defendant's Exhibit 1900,

16   your Honor.

17             THE COURT:  All right.

18             MS. NEUMAN:  Your Honor, we had objections to

19   Mr. Piaguaje's testimony, which we put in in a written form

20   last night.  We didn't receive the signed statement until last

21   night.

22             THE COURT:  I haven't seen them.  Do you have them

23   with you?

24             MS. NEUMAN:  We can get copies, your Honor.  The

25   primary objections are to paragraphs 15 through 22, which

DBPLCHE1                        H. Piaguaje – direct

1    purport to discuss environmental conditions which are of no

2    relevance in this matter.  They also, Mr. Piaguaje goes on to

3    also purport to describe the decision-making process of the

4    asamblea, namely at paragraphs 29, 30, 31, 33, 35, and 39

5    through 40.  And then he purports to speak in a representative

6    capacity on behalf of that organization and make legal and

7    other conclusions in paragraphs 41 through 49.

8              THE COURT:  Mr. Gomez, do you want to address them?

9              Are there others in whatever you filed, Ms. Neuman?

10             MS. NEUMAN:  Yes.  Those are the primary paragraphs,

11   your Honor.  We do have a few others where we object to certain

12   phrases in other paragraphs.

13             THE COURT:  We'll deal with that later.  It may be

14   possible to deal with this now.

15             MR. GOMEZ:  Your Honor, I have not had an opportunity

16   to review the papers filed this morning yet.  But I will say

17   that with respect to, with respect to the paragraphs 15 to 22,

18   they're not offered for the truth.  They're offered to

19   demonstrate the witness's state of mind and his participation

20   over the course of a long period of time.  As the testimony

21   states, Mr. Piaguaje has testified that he has participated and

22   is one of the leaders and activists of the grassroots movement

23   which resulted in the asamblea and has essentially served as

24   the client representative for the 30,000 indigenous people.

25             THE COURT:  None of that is in paragraphs 15 to 22.

DBPLCHE1                        H. Piaguaje - direct

1          MR. GOMEZ:  The paragraphs 15 and 22 speak to good

2     faith belief in the validity of the suit that Mr. Piaguaje

3     possesses and that is at issue in this case.

4          In terms of --

5          THE COURT:  Anything else on those paragraphs?

6          MR. GOMEZ:  No, your Honor.

7          THE COURT:  The objection is sustained as to

8     paragraphs 15 to 21, entirely irrelevant to this case.

9          Now let's go on to the next group.

10         MR. GOMEZ:  With respect to paragraphs speaking to the

11    decision-making of the asamblea, Mr. Piaguaje has testified

12    that he has served as leader of the movement which became known

13    as the asamblea in 2001.  He's been involved since 1994.  He

14    then held various positions in the asamblea from 2001 to

15    present.

16         The name of the asamblea changed to the union in 2012,

17    and he is its current chief executive or president of the

18    union.  He has personal knowledge of most of the meetings of

19    the asamblea, participated in them, was present for the

20    resolutions that were voted upon, and is more than qualified to

21    speak about the decision-making process and the resolutions and

22    decisions that were made when he was president.

23         Paragraph 6 and 7 speak to the time periods of his

24    involvement.

25         THE COURT:  I understand that.

DBPLCHE1                          H. Piaguaje - direct

1              MR. GOMEZ:  And the exhibits that are cited throughout

2       his witness statement all mention or make reference to

3       Mr. Piaguaje being present during these particular meetings.

4              THE COURT:  Well, we weren't talking about this

5       subject at the moment, at least I didn't think we were.

6              The objection to paragraphs 42 and 43 are sustained

7       both on grounds of relevance and on the ground of the witness's

8       lack of competence to testify as to what the intention of a

9       collectivity of many people may have been at various times.

10             Paragraph 49, the objection is sustained both because

11      it's a statement as to the collective intention of a large

12      group of people and it is also irrelevant.

13             And let's go to the remaining paragraphs.

14             The objection to paragraph 35 is sustained.  Once

15      again, it purports to be a statement as to the collective

16      intentions of a large number of people as to which this witness

17      can't possibly be competent.

18             The objection to paragraph 40 is sustained.  It's

19      completely irrelevant.

20             And so those rulings I make now.  I will reserve

21      judgment as to the other points raised by the papers Chevron

22      filed, to which, Mr. Gomez, of course, you may respond.  But I

23      thought it important to rule on those to keep the

24      cross-examination within some reasonable semblance of material

25      relevant to the case.

DBPLCHE1                         H. Piaguaje - direct

1                   Okay.  Ms. Neuman.

2                   MS. NEUMAN:  Thank you, your Honor.

3                   THE COURT:  So the statement is received subject to

4      the remaining objections and exclusive of those paragraphs as

5      to which I've sustained objections.

6                   Okay.  Sorry to interrupt.

7                   (Defendant's Exhibit 1900 received in evidence)

8      CROSS-EXAMINATION

9      BY MS. NEUMAN:

10     Q.  Good morning, Mr. Piaguaje.

11     A.  Good morning.

12     Q.  When did you arrive in New York, sir?

13     A.  On Friday.

14     Q.  On how many occasions have you previously been to New York?

15     A.  Many times, around seven times I recall being here.

16     Q.  And were all your trips to New York in connection with the

17     Ecuador litigation, the Lago Agrio litigation?

18     A.  Yes.

19     Q.  You have a graduate degree, sir; is that right?

20     A.  I don't know about graduate degree, but I do have a degree

21     as a technologist, yes.

22     Q.  And you speak three languages; is that correct?

23     A.  Yes.

24     Q.  Have you traveled internationally in support of the Ecuador

25     litigation to countries other than the United States?

DBPLCHE1                          H. Piaguaje

1   A.   To testify in other countries, yes.

2   Q.   How many countries would you say you traveled to in support

3   of the litigation?

4   A.   I've traveled to Norway, to England, and Switzerland.

5   Q.   And you're currently supporting the ongoing efforts to

6   enforce the Lago Agrio judgment; is that right?

7   A.   Yes.

8   Q.   And the asamblea, which you referred to in your direct

9   testimony, that also supports the efforts to enforce the

10  judgment taking place abroad; is that right?

11  A.   Yes.

12  Q.   Now are you currently a 40 percent shareholder in Selva

13  Viva?

14  A.   Yes.  But I must clarify that represents not just myself

15  but that's also in representation of my indigenous nation, the

16  Siekopai.  And I must say that Selva Viva deals exclusively

17  with the handling of money and also with technical and legal

18  issues in Ecuador.

19  Q.   Is your ownership share in Selva Viva held in your own name

20  or held in the same of some other organization?

21  A.   Selva Viva is represented by other organizations such as

22  Amazon Defense Front, which represents the settlers, Ermel

23  Chavez.  There is Toribio Aguinda, the colleague of the Cofan

24  nation who represents the Cofan nation.  And myself, Humberto

25  Piaguaje, I represent the Siekopai nation.

DBPLCHE1                         H. Piaguaje

1    Q.  And is your 40 percent interest held in your own name or is

2    it held in the name of the Siekopai in Selva Viva?

3    A.  In my name, Humberto Piaguaje.

4    Q.  You're not one of the 48 named plaintiffs in the *Aguinda v.*

5    *Chevron* Lago Agrio case, correct?

6    A.  I am not a signatory, but I am an affected party in this

7    lawsuit.

8    Q.  But you're not a named plaintiff, right, sir?

9    A.  No.

10   Q.  You're currently executive coordinator of the asamblea; is

11   that correct?

12   A.  I am executive coordinator of the union of those affected

13   by Texaco, by Texaco's operations.

14   Q.  But you cannot speak on behalf of the asamblea, correct?

15   A.  On behalf of the assembly, but within the union I can

16   speak.  I am, I represent the union of the affected.

17   Q.  So you cannot speak on behalf of the asamblea, but you can

18   speak on behalf of the union; is that your testimony?

19   A.  On behalf of the assembly, I want to explain to you why.

20           THE COURT:  Excuse me, sir, could we just start by

21   answering the question and then possibly an explanation.

22           THE WITNESS:  Very well.

23           THE COURT:  Try again, Ms. Neuman.

24           MS. NEUMAN:  Thank you, your Honor.

25   Q.  Is it accurate, Mr. Piaguaje, that you cannot speak on

DBPLCHE1                       H. Piaguaje

1   behalf of the asamblea?

2   A.   I represent the assembly because I am elected within

3   assembly that represents the union of those affected.

4   Q.   Have you testified, Mr. Piaguaje, that you cannot speak on

5   behalf of the asamblea?

6   A.   Could you please repeat the question?

7   Q.   Yes.  Have you testified, sir, that you cannot speak on

8   behalf of the asamblea?

9   A.   Is the question have I testified elsewhere or at this

10  moment, is that the question?

11  Q.   Did you testify to that on Saturday?

12  A.   Yes.

13  Q.   The assembly did not become a legal entity in Ecuador until

14  January of 2011, correct?

15  A.   That's true.  The assembly of the Afectados was a de facto

16  society until it was constituted as a union of the Afectados in

17  2012.

18  Q.   And the assembly has never had a meeting with the 47 named

19  plaintiffs in the Lago Agrio case, correct?

20  A.   We have never had a meeting with the -- with the named

21  plaintiffs or the signing plaintiffs.

22  Q.   And there's no written agreement between the named

23  plaintiffs and the asamblea, correct?

24  A.   There is no written document, but they, by association, the

25  47 named plaintiffs represent associations of those affected.

DBPLCHE1                           H. Piaguaje

1       MS. NEUMAN:  Move to strike everything after document,

2   your Honor, as nonresponsive.

3       THE COURT:  Granted.

4   Q.  Mr. Piaguaje, there's no written -- withdrawn.

5       The 48 plaintiffs have never executed any document

6   giving the asamblea control of the Lago Agrio litigation,

7   correct?

8   A.  Please I request that you repeat the question.

9       MS. NEUMAN:  Could the court reporter read the

10  question back.

11      (Record read)

12  A.  Yes, there are documents that grant that for the

13  enforcement process.

14      MS. NEUMAN:  For impeachment, your Honor, I would

15  offer from the November 23, 2013 transcript of Mr. Piaguaje's

16  deposition page 42, lines 4 through 12:

17  "Q.  Now I want to talk about the relationship between the 48

18  plaintiffs, the people whose names are on the complaint in

19  Ecuador, and the asamblea.  Have the 48 plaintiffs ever signed

20  a document giving the asamblea control of the litigation in

21  Ecuador?"

22      THE COURT:  You're going too fast, Ms. Neuman.

23      MS. NEUMAN:  I apologize.  Starting at line 4:

24  "Q.  Now I want to talk about the relationship between the 48

25  named plaintiffs, the people whose names are on the complaint

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBPLCHE1                    H. Piaguaje

1    in Ecuador, and the asamblea.  Have the 48 named plaintiffs

2    ever signed a document giving the asamblea control of the

3    litigation in Ecuador?

4    "A.  No, I don't believe so.  I don't recall."

5            Was that testimony true when you gave it on Saturday,

6    Mr. Piaguaje?

7            MR. GOMEZ:  Objection, your Honor.  It's not proper

8    impeachment.  The witness qualified his response with respect

9    to enforcement and the transcript speaks to his belief at the

10   time and his recollection at the time.  It's not definitive.

11           THE COURT:  It's offered as substantive evidence, is

12   it?

13           MS. NEUMAN:  I believe it's substantive evidence and

14   impeachment, your Honor.

15           THE COURT:  Objection overruled.

16   Q.  Mr. Piaguaje, in the Lago Agrio litigation, the lawyers,

17   Mr. Fajardo and others, make the tactical decisions in the

18   case, correct?

19   A.  As a legal team, that is carrying out everything that has

20   to do with the tactical legal strategy of the case, they are in

21   charge of doing all the legal issues.

22   Q.  And you're not aware to what extent Mr. Donziger worked

23   with the Ecuadorian legal team to determine litigation

24   strategy, correct?

25   A.  Yes.  And I must clarify that Mr. Donziger was more

DBPLCHE1                    H. Piaguaje

1    involved or was more often in Ecuador when the case was here in

2    the United States.  But when the court transferred the case to

3    Ecuador upon Chevron's request, he was no longer a litigating

4    attorney because by that time, there were Ecuadorian attorneys

5    in Ecuador.

6    Q.  So is it your testimony, Mr. Piaguaje, that Mr. Donziger

7    visited Ecuador more frequently between 1993 and 2003 than he

8    did between 2003 and the present?

9    A.  Yes, that's what I am saying because when the case was

10   taking place, he was there.

11   Q.  And if Mr. Donziger visited Ecuador at least once a month

12   between 2003 and 2013, you were unaware of that; is that right?

13   A.  He would visit when he was doing coordinating work with the

14   legal teams, also when we would call him so he could inform

15   regarding the strategic work and communication work and the

16   strategic work.

17   Q.  Mr. Donziger did political work in Ecuador?

18   A.  No.

19   Q.  Where was Mr. Donziger doing his political work?

20   A.  I did not understand.

21   Q.  You testified that Mr. Donziger did political work, right?

22   A.  Political, it's more the strategic work of carrying out the

23   case.  What I mean is that the attorneys in the United States

24   in their work with the Ecuadorian attorneys were carrying out

25   work that had to do with motions, motions that I as being in

DBPLCHE1                         H. Piaguaje

1    the assembly cannot talk about.

2              MS. NEUMAN:  Move to strike as nonresponsive, your

3    Honor.

4              THE COURT:  The portion that starts with the phrase

5    "what I mean" is stricken as nonresponsive.

6    Q.  Mr. Piaguaje, you do not know how much Mr. Donziger worked

7    with the Ecuadorian legal team to determine litigation

8    strategy, correct?

9    A.  I recall that he started working he would say when the case

10   was in the United States.  But when the case was in Ecuador,

11   but then it was the work was exclusively done by the Ecuadorian

12   attorneys.

13             MS. NEUMAN:  For impeachment, your Honor, I would

14   offer Mr. Piaguaje's testimony from Saturday, page 114, lines

15   16, through page 115, line 5:

16   "Q.  So you don't know how much he -- referring to

17   Mr. Donziger -- worked with the Ecuadorian legal team to

18   determine litigation, for example?

19   "A.  I don't know because perhaps, because I am located in

20   Sucumbios, and Selva Viva as a technical entity is in Quito.

21   "Q.  Were you aware that Mr. Donziger went to Ecuador at least

22   once a month the entire time the case was pending in Ecuador to

23   work with the Ecuadorian lawyers?

24   "A.  No."

25             MR. GOMEZ:  Your Honor, on the impeachment, first of

DBPLCHE1                           H. Piaguaje

1    all, there are two objections there, there were no rulings upon

2    by the special master nor requests by Chevron to seek a ruling

3    by the special master.  Those objections as to vagueness to the

4    first and as to speculative to the second have not been ruled

5    upon.

6              THE COURT:  Both of those are now ruled upon.  They're

7    overruled.

8              Now, are you offering this?

9              MS. NEUMAN:  Yes.

10   Q.  Mr. Piaguaje, was this testimony truthful when you gave it

11   on Saturday?

12   A.  On Saturday what I told you, and I don't know if I

13   understood, but, yes, on Saturday I told you the truth.

14   Q.  You mentioned the FDA, that is a colonos organization,

15   correct?

16   A.  The Amazon Defense Front, yes, it is an entity that

17   exclusively represents colonos or settlers.

18   Q.  I want to return to the asamblea.  The asamblea has

19   meetings and it maintains minutes of those meetings, correct?

20   A.  Correct.

21   Q.  And to the extent those minutes include statements by

22   people made during the meeting, the minutes accurately reflect

23   those statements; is that true?

24   A.  Sometimes before starting our meeting, there's a reading

25   done of the previous meeting.  The reading is made and it is

DBPLCHE1                    H. Piaguaje

1   what has been talked about is corrected.  Once it has been read

2   and if all of us are in agreement, then it is approved by the

3   assembly.

4   Q.  And pursuant to that process, the final minutes to the

5   extent they include statements made by people during the

6   meetings accurately reflect those statements, correct?

7   A.  Yes.

8   Q.  You have produced some of the asamblea minute meetings but

9   not all of them; is that true?

10  A.  Yes.

11  Q.  Did Mr. Fajardo assist you in selecting which of the

12  asamblea minutes to produce?

13  A.  The most important ones which we believed that we had to

14  produce, yes.

15  Q.  And the "we" is you and Mr. Fajardo; is that right?

16  A.  It could be as a team, teamwork including legal team,

17  technical team, the political and organizational team,

18  including the union of the Afectados which I represent.

19          MS. NEUMAN:  Move to strike as nonresponsive, your

20  Honor.

21          THE COURT:  Well, he said a mouthful.

22          MR. GOMEZ:  Your Honor, he's trying answer the

23  question as to who he's referring to.

24          THE COURT:  I never met a lawyer who, when faced with

25  a motion like that, who didn't say the witness was trying to

DBPLCHE1                      H. Piaguaje

1    answer the question.  Possibly he was and possibly he wasn't.

2    Maybe I'll decide that some day, but it certainly wasn't a

3    crisp, clear answer.

4              So I'll let the answer stand and Ms. Neuman may pursue

5    it.

6              MS. NEUMAN:  Thank you, your Honor.

7    Q.  Mr. Piaguaje, with regard to the minutes that you produced

8    in this action, did Mr. Fajardo assist in the selection of

9    those minutes?

10   A.  I didn't see it, but all the same, I imagine these are

11   documents that were chosen because I'm not involved in the

12   management.

13   Q.  The minutes that were produced in this action, you're not

14   the person that selected those minutes for production?

15   A.  I did not personally, not I.

16   Q.  And do you know who personally did select those minutes for

17   production?

18   A.  I cannot confirm it because I didn't see that.

19   Q.  Now, you're familiar with Hugo Camacho, a plaintiff in the

20   Lago Agrio case?

21   A.  Yes.

22   Q.  If Mr. Camacho wanted to get copies of the asamblea meeting

23   minutes, he could do that, correct?

24   A.  He can do so as long as that has been authorized by the

25   assembly.

DBPLCHE1                        H. Piaguaje

1    Q.  Mr. Camacho never requested a copy of the assembly minutes
2    to your knowledge, did he?
3    A.  I'm not aware regarding the legal process because everyone
4    has his own attorney who can advise him and I don't know that.
5    Q.  You don't have any information of Mr. Camacho ever asking
6    for a copy of the asemblea's minutes?
7    A.  I don't know that.
8    Q.  And you don't have any information that Mr. Javier Piaguaje
9    ever requested a copy of the asamblea's minutes, correct?
10   A.  No.
11   Q.  Mr. Javier Piaguaje is related to you, sir?
12   A.  There's some relationship but it's not -- it's not a
13   familial link.
14   Q.  You know who Mr. Javier Piaguaje is?
15   A.  Yes, ma'am.
16   Q.  The minutes for the asamblea are kept in the Selva Viva
17   offices, correct?
18   A.  Yes.
19   Q.  And there are lots of other documents related to litigation
20   that are kept in that office as well?
21   A.  Yes.
22   Q.  Do you have access to those documents, the documents in the
23   Selva Viva offices?
24   A.  There are quite a lot of documents and I don't have easy
25   access to that.

DBPLCHE1                         H. Piaguaje

1    Q.  Have you ever been denied access to any Selva Viva

2    documents that you wanted to see?

3    A.  I have not attempted to -- excuse me.  I have not requested

4    documents.  We believe that those are technical and legal

5    documents and it's not our custom to request documents.

6              MR. GOMEZ:  Objection to the translation.

7              THE COURT:  Mr. Interpreter, consult with counsel

8    about the translation.

9              And, Ms. Neuman, you may want to inquire as to what he

10   means by "documents."

11             MS. NEUMAN:  Yes, your Honor.

12             (Pause)

13             MR. GOMEZ:  I withdraw the objection.

14             THE COURT:  All right.

15   Q.  Mr. Piaguaje, when you say there were technical and legal

16   documents that it's not your custom to request, what documents

17   are you referring to?

18   A.  I'm referring to the documents that are part of the

19   litigation of the trial that was heard in Ecuador.

20             MS. NEUMAN:  May I approach, your Honor?

21             THE COURT:  Yes.

22             MS. NEUMAN:  Hand the witness what's marked PX7000.

23             THE COURT:  Before we go to that, Mr. Piaguaje, when

24   you referred a few moments ago to documents at the Selva Viva

25   office, were you referring to documents on paper?

DBPLCHE1                          H. Piaguaje

1          THE WITNESS:  Yes.

2          THE COURT:  Thank you.

3          Go ahead, Ms. Neuman.

4          MS. NEUMAN:  Thank you, your Honor.

5   Q.  Can you estimate the amount of paper documents that are

6   kept at Selva Viva, is it a whole roomful?

7   A.  There is a roomful, but there's also any number.  I don't

8   know because there are so many.

9   Q.  Mr. Piaguaje, do you have Plaintiff's Exhibit 7000 in front

10  of you, sir, do you have that document there?

11  A.  Yes.

12  Q.  Plaintiff's Exhibit 7000 is a subpoena signed on

13  November 10, 2013.

14          Did you ever receive a copy of this subpoena while you

15  were still in Ecuador?

16  A.  No.

17  Q.  And is it accurate that you had never seen Plaintiff's

18  Exhibit 7000 before your deposition that took place this

19  weekend?

20  A.  No.

21          THE COURT:  I'm sorry.  The question was is it

22  accurate, so the answer in that context introduces a certain

23  ambiguity, don't you think?

24          MS. NEUMAN:  Yes, your Honor.

25  Q.  You never saw Plaintiff's Exhibit 7000 prior to your

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

DBPLCHE1                          H. Piaguaje

1   deposition, correct, Mr. Piaguaje?

2   A.  No.

3            THE COURT:  Same problem.

4            MS. NEUMAN:  Yes, your Honor.  I'll rephrase.

5   Q.  Had you ever seen Plaintiff's Exhibit 7000 prior to your

6   deposition?

7   A.  I saw it on Saturday.

8   Q.  And that was the first time you saw it, correct?

9   A.  That's right.

10  Q.  And you have documents that you have written to Steven

11  Donziger in your possession, either hard copy documents or

12  emails; is that right?

13  A.  Yes, I remember I did write them via internet, but

14  physically I don't have them.

15  Q.  Do you have Mr. Donziger's email address?

16  A.  Yes.

17  Q.  And you've exchanged email correspondence with

18  Mr. Donziger?

19  A.  For matters of communication to invite to the meetings,

20  yes.  But regarding the process, the litigation, and other

21  motions, no.

22  Q.  Have you ever searched your email account, Mr. Piaguaje, to

23  see how much correspondence you have with Mr. Donziger?

24  A.  No.

25  Q.  Do you have email communications with Mr. Fajardo?

DBPLCHE1                         H. Piaguaje

1    A.   Yes.

2    Q.   Do you have email communications with Mr. Yanza?

3    A.   Yes.

4    Q.   Do you view the Lago Agrio litigation as a collective

5    action, sir?

6    A.   Yes.

7    Q.   You mentioned inviting Mr. Donziger to asamblea meetings.

8         On how many occasions have you invited Mr. Donziger to

9    the asamblea meetings?

10   A.   I remember inviting him twice.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBP8CHE2                          H. Piaguaje - cross

1   Q.  Did he go to the meetings on both occasions you invited

2   him?

3   A.  He came at the third invitation, if I am not mistaken, in

4   the month of January.

5   Q.  January of 2013?

6   A.  Yes.

7   Q.  Am I understanding you correctly that you invited him three

8   times before he actually came?

9   A.  I made reference to the first two when he did not come,

10   then the third one when he did.

11   Q.  Now, when Mr. Donziger -- let me withdraw that.

12           When Mr. Donziger did come to the asamblea meeting in

13   2013, he reported that over $25 million had been raised for the

14   litigation after Mr. Kohn had stopped funding, correct?

15           MR. GOMEZ:  Objection.

16           THE COURT:  Basis.

17           MR. GOMEZ:  This matter is one that we consider to be

18   attorney-client privilege.  We understand that the Court has

19   reviewed minutes of this meeting in camera and has ruled to

20   overrule the objection.  We simply want to preserve the record.

21           THE COURT:  You have done so, to whatever extent that

22   does it.

23           The objection is overruled.

24   A.  Please repeat.

25   Q.  When Mr. Donziger came to the asamblea meeting in January

DBP8CHE2                    H. Piaguaje - cross

1    of 2013, he reported that over $25 million had been raised for

2    litigation after Mr. Kohn had stopped funding, is that right?

3    A.  He didn't report that, but he did give an accounting of the

4    activities that he was involved in, given that they were of

5    interest to us, because it was of interest to us to know if he

6    was truly acting in the interests of the team throughout the

7    entire litigation process.

8    Q.  You don't recall Mr. Donziger reporting that $25 million

9    had been raised to fund the litigation?

10   A.  He did not inform us of the amount, but he did make

11   reference to the efforts to raise funds for the struggle that

12   we are involved in.

13            MS. NEUMAN:  May I approach the witness, your Honor?

14            THE COURT:  You may.

15            MS. NEUMAN:  I am going to hand him a document that

16   has been marked as Plaintiff's Exhibit 7033A.

17   Q.  Mr. Piaguaje, can you turn to the last page of Exhibit

18   7033A?

19   A.  Yes.

20   Q.  Is that your signature that appears above Humberto

21   Piaguaje, coordinator?

22   A.  Yes.

23   Q.  Did you sign these minutes after reviewing and approving

24   them?

25   A.  Yes.

DBP8CHE2                         H. Piaguaje - cross

1   Q.  Can you turn to the second page of the minutes, the Spanish

2   section of the document?

3   A.  Yes.

4   Q.  Do you see halfway down the paragraph that begins "Mr.

5   Donziger continues," where it says "since that time

6   approximately 25 million has come in"?

7   A.  Yes.

8   Q.  Does that refresh your recollection that Mr. Donziger

9   reported the raising of $25 million to finance the litigation

10  to the asamblea?

11  A.  It does remind me somewhat, but it is confirmed in the

12  document.

13  Q.  Thank you, sir.

14          Is the asamblea currently represented by 12 law firms?

15  A.  I don't recall.

16  Q.  The money that has been provided to finance the litigation,

17  the asamblea has never demanded control of that money, is that

18  true?

19  A.  As far as the handling of the litigation, the assembly of

20  the affected, we never make decisions.  We believe that that is

21  why there is a legal team who planned the work according to the

22  legal work and the motions that they consider proper.

23  Q.  The asamblea has never received any of the millions of

24  dollars that have been invested in the litigation, correct?

25  A.  The asamblea has received only what belongs to the

DBP8CHE2                         H. Piaguaje - cross

1   management of payments, of technical and legal payments.

2   Q.  Is it your testimony that the asamblea has received money

3   from the funders of the litigation?

4   A.  It's through Selva Viva, that is where the funds go to, not

5   to the asamblea.

6   Q.  All the funds -- let me withdraw that.

7          The asamblea has never demanded to take over control

8   of the money from Selva Viva, correct?

9   A.  Well, as the asamblea, we provide the guidance as to where

10  the funds should go.  They have to go directly to the work that

11  is considered for legal purposes.  So we do not know exactly

12  the needs and the administration that the attorneys may have.

13  Q.  The asamblea has not received any accountings as to how the

14  millions of dollars that funders have put into the case have

15  been spent, correct?

16  A.  No.

17  Q.  No, you have never received an accounting?

18  A.  We have not received any detail as to those moneys, but we

19  do have knowledge of the team that the funds were directed to,

20  for example, communications, legal, and technical activities.

21  Q.  Have you repeatedly requested accountings as to how the

22  money was spent from Mr. Donziger?

23  A.  We have requested specifically the one that he delivered

24  about how the money was being used.

25  Q.  You're saying Mr. Donziger gave you an accounting in

DBP8CHE2                        H. Piaguaje – cross

1   writing?

2   A.  I remember that at that time he was putting something up on

3   the screen, but I don't know if he left all that documentation

4   there.  I don't recall that very well.

5            MS. NEUMAN:  For impeachment, your Honor, I would

6   offer deposition transcript of Mr. Piaguaje starting at page

7   117, line 24, through page 118, line 10.

8   "Q.  Has Mr. Donziger ever given the assembly a detailed

9   accounting in writing?

10  "A.  No.  And for that same reason, it's why we brought it to

11  his attention.

12  "Q.  And since you brought it to his attention, has he given

13  you a detailed accounting for where all the millions have gone

14  in writing?

15  "A.  No.  He didn't give us one.  And for that same reason, we

16  also had to terminate his functions."

17           MR. GOMEZ:  Once again, the deposition testimony is

18  not inconsistent with the witness's testimony.

19           THE COURT:  Overruled.

20  Q.  Mr. Piaguaje, was that testimony true and accurate when you

21  gave it on Saturday?

22  A.  It is true because we also took action because of Mr.

23  Donziger's attitude.

24  Q.  Do you know who Russell Deleon is, Mr. Piaguaje?

25  A.  No.

DBP8CHE2                          H. Piaguaje - cross

1    Q.  Have you ever heard of a company called Torvia?

2    A.  No.

3    Q.  Have you ever heard of a company called Burford?

4    A.  No.

5    Q.  You are aware, Mr. Piaguaje, that the funders of the Lago

6    Agrio litigation made the decision that any money collected on

7    the judgment would go to a company in Gibraltar, correct?

8    A.  Yes.

9    Q.  And the asamblea agreed that any money collected on the

10   judgment would go into a company set up in Gibraltar?

11   A.  Yes.

12   Q.  Is Mr. Fajardo on the board of the Gibraltar company?

13   A.  Yes.

14   Q.  Is Mr. Yanza on the board of the Gibraltar company?

15   A.  Yes.

16   Q.  Do you know Joseph Kohn?

17   A.  Yes.

18   Q.  Mr. Kohn funded the Lago Agrio litigation for many years?

19   A.  Yes.

20   Q.  In the fall of 2009, Mr. Kohn stopped funding the case.  Do

21   you recall that?

22   A.  Yes.

23   Q.  And that was a problem for the litigation?

24   A.  Yes.

25   Q.  Now, you personally met with Mr. Kohn in Philadelphia in

DBP8CHE2                        H. Piaguaje - cross

1    April 2010, is that right?

2    A.  Yes.

3    Q.  Did you discuss with him at that time the need for him to

4    continue to fund the case?

5    A.  There were agreements.  We had set certain guidelines that

6    he was to abide by.  And before that, also, we had recommended

7    all of this, that the decisions of the assembly be taken into

8    account and not just independent actions by the attorneys.

9    Q.  Did you discuss with Mr. Kohn in that meeting needing

10   funding for the case in April of 2010?

11   A.  Well, there were many subjects.  It was not only about

12   money.  And I don't recall exactly what the conversation was at

13   this moment, but it was more about the conflicts regarding the

14   decisions that he made that were above the interests of the

15   members of the assembly for the struggle that they were

16   involved in.

17           MS. NEUMAN:  For impeachment, I would offer deposition

18   testimony transcript page 72, lines 15, through page 73, line

19   2.

20   "Q.  The in-person meeting that you had with Mr. Kohn in

21   Philadelphia in 2010, what topics were discussed at that

22   meeting?

23   "A.  We talked about, about the good relationship that has to

24   exist above anything else between Donziger and Joe Kohn, above

25   all teamwork.  And we also talked about he has to continue with

DBP8CHE2                          H. Piaguaje - cross

1   the financing, and not leave it after three or four months, but

2   to continue with it based on what was talked about.  So that's

3   what we agreed on with him."

4            MR. GOMEZ:  Once again, no inconsistency between the

5   testimony given here and the testimony given in the deposition.

6            THE COURT:  Ms. Neuman, what about it?

7            MS. NEUMAN:  I asked him twice if a topic of the

8   meetings was the need for Mr. Kohn to continue funding the

9   litigation, and he gave two fairly unresponsive answers, and he

10   certainly didn't admit that that was a topic or acknowledge

11   that was a topic in either answer.

12            THE COURT:  You can go back and try to pin him down,

13   and then if you can't, you can try again.

14            Sustained for the moment.

15   BY MS. NEUMAN:

16   Q.  Mr. Piaguaje, in your April 2010 meeting with Mr. Kohn, did

17   you talk about the fact that he has to continue with the

18   financing of the litigation?

19   A.  Yes.

20   Q.  And was it after your April 2010 meeting with Mr. Kohn that

21   you sent a letter indicating the asamblea was terminating his

22   services?

23   A.  Correct.  Because he did not abide by some of the things

24   that had been suggested at the meeting.

25   Q.  At no time prior to 2010 had the asamblea decided to

DBP8CHE2                        H. Piaguaje - cross

1   terminate Mr. Kohn, correct?

2   A.   No.

3   Q.   The asamblea first made that decision in 2010?

4   A.   Are you talking about previously?  Are you talking about

5   the same attorney?

6   Q.   Yes.  Mr. Kohn.  You first decided to terminate him in

7   2010?

8   A.   Yes.

9   Q.   Do you recall receiving a letter from Mr. Kohn in August of

10  2010?

11  A.   I don't recall.

12          MS. NEUMAN:  For impeachment, your Honor, I would

13  offer Mr. Piaguaje's deposition testimony at page 76, lines 22

14  to 25.

15  "Q.   Do you recall, Mr. Piaguaje, receiving a letter from Joe

16  Kohn on or about August 9th of 2010?

17  "A.   Yes, I do recall."

18  Q.   Was that testimony accurate when you gave it on Saturday,

19  Mr. Piaguaje?

20          MR. GOMEZ:  Objection to this impeachment.  At the

21  time of his deposition, the witness had first been handed a

22  copy of a letter.

23          THE COURT:  Mr. Gomez, this objection is not

24  appropriate.  You can make that argument later, but to do it in

25  front of the witness, you understand.

DBP8CHE2                          H. Piaguaje – cross

1              MR. GOMEZ:  Understood.

2              THE WITNESS:  May I say something?

3              THE COURT:  If there is a question.

4    Q.  The question was, is the testimony you gave on Saturday

5    accurate?

6    A.  Yes.  Because I remember at that moment you had given me

7    the document that Donziger had sent.

8              THE COURT:  The next time you have an idea like that,

9    Mr. Gomez, the thing to do is to ask for a side bar.

10             We will take our break here.

11             (Recess)

12             THE COURT:  Ms. Neuman.

13             MS. NEUMAN:  Before the break, I neglected to move in

14   Plaintiff's Exhibit 7033A.  So I would like to move that in.

15             MR. GOMEZ:  No objection.

16             MR. FRIEDMAN:  No objection.

17             THE COURT:  Received.

18             (Plaintiff's Exhibit 7033A received in evidence)

19             MS. NEUMAN:  I would also like to move in Plaintiff's

20   Exhibit 7000.

21             THE COURT:  Received.

22             (Plaintiff's Exhibit 7000 received in evidence)

23   Q.  Mr. Piaguaje, do you still have Exhibit 1406A in front of

24   you?

25   A.  Yes.

DBP8CHE2                          H. Piaguaje - cross

1    Q.  Is that the August 9, 2010 letter you received from Mr.

2    Kohn?

3    A.  I did not receive the document personally.

4    Q.  This is the document that I provided to you in your

5    deposition on Saturday, correct?

6    A.  Yes.

7    Q.  And this is the document you had in front of you on

8    Saturday when you testified you recalled receiving a letter

9    from Joe Kohn on or about August 9th of 2010, correct?

10   A.  I don't recall having said that.

11          MS. NEUMAN:  We have already offered that testimony,

12   your Honor.

13          Move PX 1406A in evidence.

14          MR. FRIEDMAN:  I think it's already in, but no

15   objection.

16          THE COURT:  I am not sure if it is or isn't, but if it

17   is not, it's received.

18          (Plaintiff's Exhibit 1406A received in evidence)

19   Q.  Mr. Piaguaje, do you recall Mr. Kohn ever telling you that

20   Mr. Fajardo, Mr. Yanza, and Mr. Donziger had told him blatant

21   lies?

22   A.  I don't recall.

23   Q.  Do you recall Mr. Kohn recommending to you that an

24   investigation be done into how the litigation in Ecuador was

25   being handled?

DBP8CHE2                    H. Piaguaje - cross

1   A.  I don't recall.

2   Q.  Did you attend a meeting with Judge Yanez and Mr. Fajardo

3   and Mr. Yanza while Judge Yanez was handling the Lago Agrio

4   litigation?

5   A.  With Mr. Yanez, yes.

6   Q.  And you approved of Pablo Fajardo and Luis Yanza's meetings

7   with Richard Cabrera prior to Mr. Cabrera's appointment as an

8   independent expert for the court, correct?

9   A.  Yes.  There was a time when the court was asking the

10  parties or telling the parties that they had to submit experts.

11  So I recall that perhaps he had previously worked as a

12  technician.

13  Q.  And you recall approving Mr. Yanza and Mr. Fajardo meeting

14  with Mr. Cabrera before his appointment as the court's

15  independent expert?

16  A.  No.

17          MS. NEUMAN:  For impeachment, your Honor, I would

18  offer page 215, starting at line 5 through 9.

19  "Q.  And you approve of Pablo Fajardo and Luis Yanza's meetings

20  with Richard Cabrera prior to Mr. Cabrera's appointment as an

21  independent expert?

22  "A.  Yes."

23  Q.  Was that testimony accurate when you gave it, Mr. Piaguaje?

24  A.  I don't recall, but that's how it appears there.

25  Q.  You don't recall this testimony you gave yesterday?

DBP8CHE2                    H. Piaguaje – cross

1    A.  I do recall the testimony I gave yesterday and the day

2    before yesterday.

3    Q.  Did Mr. Fajardo tell you you had to come to New York to

4    testify?

5    A.  Could you please repeat that?

6    Q.  Did Mr. Fajardo tell you that you had to come here to New

7    York to testify?

8    A.  Yes.

9    Q.  Mr. Fajardo is your attorney?

10   A.  Yes.

11   Q.  And Mr. Fajardo has personally represented other members of

12   the executive committee and the asamblea, correct?

13   A.  Yes.

14   Q.  And Mr. Fajardo personally represented Emergildo Criollo on

15   a drug trafficking charge, is that correct?

16            MR. GOMEZ:  Objection.  Relevance.

17            THE COURT:  What is the relevance?

18            MS. NEUMAN:  It goes to the extent of the relationship

19   between Mr. Fajardo and the members of the executive committee

20   of the asamblea, on both their personal and professional

21   relationships.

22            THE COURT:  And that's relevant why?

23            MS. NEUMAN:  To the extent the defendants are offering

24   this organization as having made any sort of relevant

25   decisions, which we don't agree with, obviously, their

DBP8CHE2                          H. Piaguaje - cross

1    relationship with Fajardo and their failure to investigate him

2    to have an explanation other than they actually believe he

3    hasn't done anything wrong.

4              THE COURT:  Is there a suggestion of conspiracy or

5    not?

6              MS. NEUMAN:  Well, yes, your Honor.  I think the use

7    of the asamblea as a front organization is certainly in

8    furtherance of the conspiracy.  And it goes to the bias of the

9    asamblea when Mr. Fajardo also serves as their personal

10   attorney.

11             MR. GOMEZ:  There has been no allegation in the

12   complaint that I am aware of against the asamblea itself.  I am

13   not aware that it's an unnamed co-conspirator either.

14   Plaintiffs had an opportunity to amend its complaint.  It never

15   brought any such claims against the asamblea.

16             Additionally, to the extent that they want to

17   establish the relationships, the witness has already testified

18   what the relationships are, and there is no need to go into

19   private legal matters that are completely irrelevant to the

20   issues in this case.

21             THE COURT:  He testified to those relationships which

22   he thought were appropriate.  Your having done that, it seems

23   to me they are entitled to go into what the full scope of the

24   relationships are.  It certainly does go to bias at least.

25             So the objection is overruled.

DBP8CHE2                          H. Piaguaje – cross

1              MS. NEUMAN:  Can the court reporter read the question

2       back to the witness, please.

3              (Record read)

4       A.  What I have heard is Emergildo, who is a Cofan leader, had

5       that problem.  He was accused of being a drug trafficker, but

6       that was never true.  So, therefore, law firms, our attorneys

7       had to recommend to represent Emergildo.  I cannot tell you if

8       it was Pablo Fajardo or somebody else.  So from what I

9       understand, this case has resolved, from what I understand from

10      an attorney, who in setting somebody else free accused an

11      innocent person of being a drug trafficker.

12             MS. NEUMAN:  Move to strike everything other than, I

13      can't tell you if it was Pablo Fajardo or someone else, it was

14      one of our attorneys.

15             THE COURT:  Granted.

16      Q.  Do you recall, Mr. Piaguaje, whether the prosecutor in

17      Mr. Criollo's case was Nicolas Zambrano?

18      A.  No.

19      Q.  The salary that Mr. Fajardo makes, that is not set by the

20      asamblea, correct?

21      A.  No.

22      Q.  You were unaware of Mr. Donziger paying Mr. Fajardo a

23      $10,000 bonus, correct?

24      A.  No.

25      Q.  You were not aware of the bonus being paid?

DBP8CHE2                         H. Piaguaje - cross

1    A.   I don't know.

2    Q.   You were also not aware of Mr. Donziger paying a $10,000

3    bonus to Mr. Yanza from case funds?

4                MR. GOMEZ:   Objection.

5                THE COURT:   What is the objection?

6                MR. GOMEZ:   Can we have a side bar?

7                THE COURT:   Yes.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBP8CHE2                         H. Piaguaje - cross

1                 (At the side bar)

2                 MR. GOMEZ:  Your Honor, the question is misleading, in

3      the sense that it assumes a fact has occurred, and so purports

4      to compel the witness to answer on the basis of that assumption

5      of the fact.  If the question is asked differently, perhaps we

6      wouldn't have an objection to it.  He has already testified at

7      least to one instance on the same form of that question, that

8      he is not aware of it.  There is an assumption there that that

9      payment was actually made.

10                THE COURT:  Ms. Neuman.

11                MS. NEUMAN:  That's based on Mr. Donziger's testimony.

12     He confirmed a bonus was paid to Mr. Yanza and Mr. Fajardo,

13     $10,000 in 2010, and Mr. Yanza received another 12,000 in

14     September of '07 in the 1782 proceeding.

15                THE COURT:  Well, look, it seems to me you can ask the

16     question a different way and resolve Mr. Gomez's issue without

17     the need for a ruling.

18                (Continued on next page)

19

20

21

22

23

24

25

DBP8CHE2                         H. Piaguaje - cross

1                (In open court)

2       BY MS. NEUMAN:

3       Q.  Mr. Piaguaje, do you know whether Mr. Donziger paid a

4       $10,000 bonus to Mr. Yanza from case funds in October of 2010?

5       A.  I don't know.

6       Q.  Do you know whether Mr. Donziger paid Mr. Yanza $12,000

7       from case funds in September of 2007?

8       A.  No.

9       Q.  Are you aware of Mr. Yanza purchasing a new house during

10      the course of the litigation?

11      A.  No.

12      Q.  You're aware that Mr. Fajardo was named as a defendant in

13      this case, correct?

14      A.  Yes.

15      Q.  And you were not aware prior to your deposition this

16      weekend that Mr. Fajardo had refused to testify, is that right?

17      A.  I don't know.

18      Q.  You're aware that Mr. Yanza is a defendant in this case, a

19      defaulted defendant?

20      A.  Yes.

21      Q.  You were unaware prior to your testimony that Mr. Yanza had

22      refused to testify?

23      A.  I did not know.

24      Q.  Have you read the complaint in this case, sir?

25      A.  Read it, no.

DBP8CHE2                         H. Piaguaje – cross

1    Q.  Have you ever read any of the documents that have been

2    submitted in the case, the evidence?

3            MR. GOMEZ:  Objection.  Compound.

4            THE COURT:  Sustained.

5    Q.  Have you read any of the rulings that have been issued in

6    this case?

7    A.  Could you please repeat that?

8    Q.  Have you read any of the rulings by the Court in this case?

9    A.  Previously, yes.

10   Q.  When did you read a ruling by this Court?

11   A.  I don't recall the year, but I recall the ruling regarding

12   not enforcing the judgment in other countries, something like

13   that.

14   Q.  You have watched the outtakes from the movie Crude that are

15   on the Chevron Web page?

16   A.  Yes.

17   Q.  Have the asamblea done any investigation into the

18   allegations that Mr. Fajardo has committed fraud during the

19   course of the Ecuador litigation?

20   A.  We do not investigate any of our attorneys nor technicians,

21   but, rather, that is for the defendants, for Chevron in Ecuador

22   to file the complaints in court in Ecuador.  So perhaps it is

23   an obligation or perhaps there should be sanctions by the

24   courts in case there has been this corruption you could say.

25   Q.  But the asamblea has not undertaken to investigate whether

DBP8CHE2                          H. Piaguaje – cross

1    any of its attorneys, including Mr. Donziger and Mr. Fajardo,

2    committed fraud?

3    A.  No.

4    Q.  Mr. Donziger is still a lawyer for the plaintiffs, correct?

5    A.  Yes.

6    Q.  Mr. Piaguaje, did you and Mr. Fajardo bring a criminal

7    complaint against former Judge Guerra in February of 2013?

8    A.  Yes.

9    Q.  Mr. Fajardo drafted that complaint?

10   A.  Yes.

11   Q.  And you signed it, sir?

12   A.  Yes.

13   Q.  You did not do any investigation of your own into the

14   validity of Mr. Guerra's statement prior to filing that

15   criminal complaint, is that true?

16   A.  No.

17          THE COURT:  Meaning no, it's not true, you did do an

18   investigation, or meaning no, you didn't do an investigation?

19          THE WITNESS:  We did not do an investigation of this.

20   It's up to the legal team.

21          MS. NEUMAN:  May I approach, your Honor?

22          THE COURT:  Yes.

23   Q.  Mr. Piaguaje, can you turn to the last page of Exhibit

24   1758, please?

25   A.  Yes.

DBP8CHE2                         H. Piaguaje - cross

1   Q.   Is that your signature that appears above the phrase

2   "Technologist, Humberto Piaguaje Lucitante, the plaintiff"?

3   A.   Yes.

4   Q.   Did you read this document before you signed it?

5   A.   I did not read it, but because of what he was stating, we

6   knew what Alberto Guerra was saying.

7   Q.   You didn't read this criminal complaint before you signed

8   it?

9   A.   No.

10  Q.   Were you aware prior to signing this criminal complaint

11  that Judge Guerra had deposit slips showing deposits into his

12  bank account from an employee of Selva Viva?

13  A.   No.

14  Q.   Were you aware prior to signing this criminal complaint

15  that Judge Guerra had shipping records showing shipments

16  between himself and former Judge Zambrano?

17          MR. GOMEZ:  Objection, your Honor.

18          THE COURT:  What is the objection?

19          MR. GOMEZ:  Side bar, please.

20          (Continued on next page)

21

22

23

24

25

DBP8CHE2                          H. Piaguaje - cross

1              (At the side bar)

2              MR. GOMEZ:  Your Honor, this is similar to the

3     previous side bar.  The question is misleading.  It assumes

4     that facts are established.  These are disputed facts, and I

5     think the question should be asked in a different manner.

6              THE COURT:  There is a whole stack of these shipping

7     records, isn't there?

8              MR. GOMEZ:  There is existence of shipping records,

9     yes.  The suggestion of the shipping records, their mere

10    existence, or their authenticity is in dispute by the parties.

11             THE COURT:  I don't think authenticity is disputed at

12    all.  I know that there may be an outstanding admissibility

13    issue, but that's different.

14             MR. GOMEZ:  I think the question was posed to the

15    witness to suggest that the shipping records go to the

16    credibility of the statements in the complaint.  I prefer

17    another question to the witness whether he is aware.

18             THE COURT:  This one is overruled.

19             (Continued on next page)

20

21

22

23

24

25

DBP8CHE2                         H. Piaguaje - cross

 1              (In open court)

 2              THE COURT:  Objection is overruled.

 3              MS. NEUMAN:  Can the court reporter read that question

 4      back, please?

 5              THE COURT:  Yes.

 6              (Record read)

 7      A.  No.

 8      Q.  Prior to filing this complaint, were you aware that former

 9      Judge Guerra had on his own computer drafts of judgments

10      subsequently issued by Judge Zambrano?

11      A.  I heard that in the news.

12      Q.  Did you hear that before you signed this complaint?

13      A.  I apologize.  I was focusing on something else.  Could you

14      please repeat that?

15      Q.  Did you hear in the news that Judge Guerra had drafts of

16      orders that were later issued by Judge Zambrano on his computer

17      before you signed the criminal complaint against Judge Guerra?

18      A.  Well, first of all, the decisions by the court had already

19      been issued.  But after that, Alberto Guerra mentioned many

20      things, like he had drafted the judgment.  So that was when we

21      filed a complaint.

22      Q.  Was it prior to the filing of the complaint that you heard

23      in the news that Judge Guerra had on his own computer drafts of

24      orders and judgments that were subsequently issued by Judge

25      Zambrano?

DBP8CHE2                         H. Piaguaje - cross

1   A.  Yes.  Because then this would take its course and that

2   would affect all of us in our process.  That is why we had to

3   file that complaint against Alberto Guerra, with the purpose of

4   having him clarify that and tell the truth.

5   Q.  As part of your criminal complaint against former Judge

6   Guerra, did you ask that a forensic examination of Judge

7   Zambrano's computers be conducted?

8   A.  We had written into the complaint that they could do all of

9   the necessary and proper investigations.

10  Q.  Including a forensic investigation of the computers,

11  correct?

12  A.  Yes.

13  Q.  And you're aware that forensic examiners issued a report on

14  Judge Zambrano's computers in response to the criminal

15  complaint you had filed?

16  A.  I don't know.

17  Q.  Did you ever comment in the press about the forensic report

18  being issued in the criminal case against Judge Guerra?

19  A.  No.

20          MS. NEUMAN:  I move the admission of PX 1758.

21          THE COURT:  For what purpose is it offered?

22          MS. NEUMAN:  To show the threatening and intimidation

23  of witnesses as a continuation of the conspiracy, and also to

24  show that the forensic examination of Judge Zambrano was

25  requested pursuant to this complaint and was subsequently

DBP8CHE2                         H. Piaguaje - cross

1    carried out.  But not for the truth.

2              THE COURT:  How does it show that it was subsequently

3    carried out?

4              MS. NEUMAN:  Well, it doesn't show the subsequently

5    carried out part.

6              THE COURT:  Mr. Gomez.

7              MR. GOMEZ:  Your Honor, so the first use proposed,

8    there is no foundation for that.

9              As to the second, we have no objection as evidence of

10   the complaint being filed, and certainly not for the truth.

11             THE COURT:  Received not for the truth of the matters.

12             (Plaintiff's Exhibit 1758 received in evidence)

13             MS. NEUMAN:  May I approach, your Honor?

14             THE COURT:  Yes.

15   BY MS. NEUMAN:

16   Q.  Mr. Piaguaje, Plaintiff's Exhibit 7086 is an October 22,

17   2013 "El Telegrafo" article entitled, "Expert Examination

18   Confirms Judgment Authorship and Lawsuit Against Chevron."

19             Have you seen this article before, sir, the Spanish

20   version?

21   A.  No.

22   Q.  At the bottom of the first page of the article, the author

23   states, "For Humberto Piaguaje, coordinator of those affected

24   by the oil company, through former Judge Zambrano's testimony

25   and the expert report both, it is revealed and confirmed that

DBP8CHE2                           H. Piaguaje - cross

1    the witnesses Chevron is presenting against the Ecuadorians

2    have been paid by the oil company to lie and to provide Judge

3    Lewis Kaplan with the arguments to condemn the residents who

4    have been victims of the irresponsible and criminal actions of

5    the oil company as extortionists."  Do you see that?

6    A.  Yes.

7    Q.  Did you make that statement to the press, sir?

8    A.  They called me many times, not only that newspaper, many

9    times they called me.  They called me on my cell phone, they

10   called me on my landline, to ask what position those affected

11   were taking.  And as victims, we, in the operations of Chevron

12   and previously Texaco, and victims of our efforts to seek

13   justice having not been acknowledged, we then had to consider

14   in that sense the complaint against Mr. Alberto Guerra.

15            MS. NEUMAN:  Move to strike as not responsive, your

16   Honor.

17            THE COURT:  Granted.  Stricken.

18            The question, Mr. Piaguaje, is did you make the

19   statement to the press that is reported in the last paragraph

20   of this exhibit?

21            THE WITNESS:  Yes.

22            THE COURT:  Thank you.

23   Q.  Are you aware, Mr. Piaguaje, that as a complainant on the

24   criminal complaint, you have a right to review the copy of the

25   expert forensic report?

DBP8CHE2                          H. Piaguaje - cross

1   A.  I don't know the procedure of how that is done, but I would

2   imagine that that is so.

3   Q.  Has anyone asked you to go and get a copy of the forensic

4   expert report in the Guerra criminal investigation?

5   A.  No.

6           MS. NEUMAN:  Nothing further, your Honor.

7           THE COURT:  Do you intend to offer 7086, Ms. Neuman?

8           MS. NEUMAN:  Yes.  I move that in, but not for the

9   truth.

10          THE COURT:  Any objection?

11          MR. GOMEZ:  No objection.

12          MR. FRIEDMAN:  No objection.

13          THE COURT:  Received not for the truth.

14          (Plaintiff's Exhibit 7086 received in evidence)

15          THE COURT:  Mr. Gomez, you may proceed.

16  REDIRECT EXAMINATION

17  BY MR. GOMEZ:

18  Q.  Mr. Piaguaje, in response to questions by Ms. Neuman, you

19  testified at one point that Mr. Donziger's functions had been

20  terminated.  And then in response to other questions, you

21  testified that he is still a lawyer for the Lago Agrio

22  plaintiffs.  What did you mean by those two statements, sir?

23          MS. NEUMAN:  Objection.  I think it misstates his

24  testimony.

25          THE COURT:  No.  I think it's pretty accurate.

DBP8CHE2                         H. Piaguaje – redirect

1   A.   Yes.   Actually, when Steven Donziger was in charge of

2   communications and seeking financing, in that date, in January

3   of 2011, at that time, once it was understood what problem he

4   was having in the United States, he was suspended from his

5   functions.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBPLCHE3                         H. Piaguaje - redirect

1    Q.   What problems are you referring to?

2    A.   Problems that have not been considered nor approved by the

3    assembly, administrative issues.  He was not giving an

4    accounting, not even to the assembly.  And other problems that

5    we saw that even though he was not an attorney, he was, he was

6    being a target of many attacks by Chevron.  And us as the

7    Afectados could see this was an issue involving Steven but it

8    was rather an issue involving us, the Afectados, and the

9    settlers in Ecuador.  And that's why we had to relieve him of

10   his duties, but that doesn't mean we removed him as an

11   attorney.  We let Steven focus, deal with his case in the

12   United States, the RICO case.

13   Q.   When was that decision made?

14   A.   In November of 2013 -- excuse me, excuse me.  In January of

15   2013.

16   Q.   Mr. Piaguaje, in response to other questions by Ms. Neuman,

17   you testified with reference to a company in Gibraltar.

18        Do you remember that testimony, sir?

19   A.   Yes.

20   Q.   Does that company in Gibraltar have anything to do with the

21   trust that the judgment requires to be set up to receive the

22   funds, if any, that are paid by Chevron?

23        MS. NEUMAN:  Objection, calls for a legal conclusion.

24        THE COURT:  Sustained.

25   Q.   Mr. Piaguaje, are you aware, do you know -- withdrawn.

DBPLCHE3                     H. Piaguaje – redirect

1           Mr. Piaguaje, do you know whether the judgment in the

2   Lago Agrio case requires the establishment of a trust?

3           MS. NEUMAN:  Same objection.

4           THE COURT:  Sustained.  Speaks for itself.

5   Q.  Mr. Piaguaje, has the assembly taken any action to

6   establish a trust in meetings where you personally

7   participated?

8   A.  Yes.  We have first of all come up with a profile as to who

9   should set up that trust.  So they've been chosen in the

10  assemblies by each of the associations of the indigenous

11  nations and the settlers.

12  Q.  What is the purpose of that trust?

13  A.  The trust is set up exclusively to handle and execute and

14  enforce judgment and to take the judgment and the funds and to

15  use those funds for cultural issues, remediation, health, and

16  other issues that are established in the judgment.

17  Q.  Are the moneys paid by Chevron from an enforcement action

18  supposed to go into that trust, as you understand it?

19          MS. NEUMAN:  Objection, lacks foundation.

20          THE COURT:  Sustained.

21  Q.  Do you know where that trust is supposed to receive funds

22  from to fulfill that purpose?

23          MS. NEUMAN:  Same objection.

24          THE COURT:  Sustained.

25          Look, there must be a mountain of documents containing

DBPLCHE3                    H. Piaguaje – redirect

the answers, if there are answers to these questions.  Right,
Mr. Gomez?

          MR. GOMEZ:  There are in the minutes of the asamblea
meetings, your Honor, that I'm aware of.

          MS. NEUMAN:  I don't think the trust documents, if
there are any, have been produced.

          MR. GOMEZ:  I'm sorry?

          MS. NEUMAN:  I don't think the trust documents, if
there are any, have been produced, unless I'm mistaken.

          MR. GOMEZ:  I am not aware if they have or not at this
time.

          THE COURT:  Well, I'd rather imagine they haven't.  I
don't see any basis of personal knowledge.  I think there's a
best evidence problem.  Maybe there's some way you can get at
this, but you haven't so far.

          Was it raised on the cross?

          MS. NEUMAN:  No, your Honor.  Beyond the scope.  I
only questioned the witness about the Gibraltar company that he
testified today and testified previously was to receive the
proceeds of the judgment.
Q.  Mr. Piaguaje, is the Gibraltar company supposed to receive
funds from the enforcement of the judgment or from a settlement
of the judgment?

          MS. NEUMAN:  Objection, calls for a legal conclusion.

          THE COURT:  Sustained.

DBPLCHE3                    H. Piaguaje - redirect

1   Q.  Mr. Piaguaje, what was your basis in response to

2   Ms. Neuman's questions for saying that the Gibraltar company is

3   supposed to receive funds or money collected from the judgment?

4   A.  Well, Gibraltar, we know something that we consider in the

5   assembly.  As an entity, we know that Gibraltar is in southern

6   Spain and we know that they have experience and they have

7   handled these sums of money in that area.  So, therefore, so we

8   consider that at any moment when this is concluded, whether via

9   the courts or in an out-of-court settlement, it could be

10  received by that company which is made up of our

11  representatives and also by made up by some of the investors.

12         And why is it so?  Because we want, before it goes

13  into a trust, we want to settle the debts that can remain from

14  the trial, meaning if it's an out-of-court settlement, there

15  could be a guarantee to make those payments through that

16  company.

17  Q.  Does the assembly exercise control over the Gibraltar

18  company?

19         MS. NEUMAN:  Objection, calls for a legal conclusion.

20         THE COURT:  Yes.  Sustained.  At least in that form.

21  Q.  Who does the Gibraltar company answer to?

22         MS. NEUMAN:  Objection, calls for a legal conclusion,

23  lacks foundation.

24         THE COURT:  Sustained.

25  Q.  What control if any does the asamblea have over the

DBPLCHE3                         H. Piaguaje - redirect

1    Gibraltar company?

2              MR. MASTRO:  Same objection.

3              THE COURT:  I'll let him testify to his understanding,

4    whatever it may be.  Overruled to that extent.

5    A.  We have control because it is made up by our people who

6    represent the indigenous nations and they are authorized.

7    Q.  Authorized by whom?

8    A.  By the assembly of the Afectados, in this case, the union

9    of those affected.

10   Q.  Mr. Piaguaje, did there ever come a time when there was a

11   conflict between Joseph Kohn and the interests of the asamblea

12   in 2010?

13             MS. NEUMAN:  Objection, leading.

14             THE COURT:  Overruled.

15   A.  Yes.

16   Q.  What was the nature of that conflict, sir?

17   A.  The nature of the conflict was that Mr. Kohn had his own

18   interests, interests of reaching an out-of-court settlement

19   with Chevron.  Whereas the assembly, we said that out-of-court

20   settlement that he is going to reach will not remediate the

21   environmental damages that we have suffered.  That's why there

22   was a very different interest that we had with Joseph Kohn and

23   the affected.

24   Q.  What did you understand Mr. Kohn was trying to achieve by

25   proposing a settlement?

DBPLCHE3                    H. Piaguaje - redirect

1            MS. NEUMAN:  Objection.

2            THE COURT:  Sustained.

3   Q.  Was Mr. Kohn trying to settle the case to recoup his

4   expenses in the lawsuit?

5            MS. NEUMAN:  Objection.

6            THE COURT:  Sustained.  You're asking him to speculate

7   or give his opinion on what someone else's motives were and

8   that's not appropriate.

9   Q.  What did you believe Mr. Kohn was trying to achieve in

10  proposing a settlement in 2010?

11           MS. NEUMAN:  Objection, lacks foundation, relevance.

12           THE COURT:  Sustained.  Not for lack of foundation.

13  Q.  Mr. Piaguaje, who made the final decision to terminate

14  Mr. Kohn as an attorney for the Lago Agrio plaintiffs?

15  A.  The final decision was made by the assembly of the union of

16  the affected.

17           MR. GOMEZ:  I have nothing further.

18           THE COURT:  Thank you.

19           Mr. Friedman?

20           MR. FRIEDMAN:  Nothing, your Honor.  Thank you.

21           THE COURT:  Ms. Neuman.

22           MS. NEUMAN:  Just a couple questions, your Honor.

23  RECROSS EXAMINATION

24  BY MS. NEUMAN:

25  Q.  Mr. Piaguaje, is the name of the corporation in Gibraltar

DBPLCHE3                    H. Piaguaje - recross

```
 1    Amazonia Recovery Limited?
 2    A.  Yes.
 3    Q.  Mr. Donziger, he's still within your team of attorneys to
 4    this day, correct?
 5    A.  Yes.
 6    Q.  Mr. Donziger is still entitled to benefit from the
 7    collection of the judgment, correct?
 8    A.  Yes.
 9    Q.  And you gave an interview supporting Mr. Donziger on the
10    first day of this trial; do you recall that?
11    A.  Yes.
12            MS. NEUMAN:  Nothing further, your Honor.
13            THE COURT:  Thank you.
14            Mr. Gomez?
15            MR. GOMEZ:  Nothing further.
16            THE COURT:  Mr. Friedman?
17            MR. FRIEDMAN:  Nothing further.
18            THE COURT:  Thank you, Mr. Piaguaje.  You're excused.
19            THE WITNESS:  Thank you.
20            (Witness excused)
21            THE COURT:  Mr. Gomez.
22            MR. GOMEZ:  Your Honor, my clients rest.
23            THE COURT:  Okay.  Mr. Friedman, I think you have
24    previously, right?
25            MR. FRIEDMAN:  Your Honor, the only thing that
```

DBPLCHE3

1    remained is to move our trial exhibits with the statements and

2    deposition designations into evidence.  We brought the hard

3    drives today to move into evidence, and Chevron had some

4    questions that we said we'd address over the noon hour.

5              So with that exception, we don't have any other

6    witnesses.  We just need to get that housekeeping done.

7              THE COURT:  All right.  So you're resting subject to

8    the exhibit issue which you're going to resolve today.

9              MR. FRIEDMAN:  Yes.

10             MR. MASTRO:  Yes, your Honor, and obviously subject to

11   our objections, which is the way the Court has received --

12             THE COURT:  Most things.

13             MR. MASTRO:  -- deposition exhibits thus far, and we

14   have objections to a lot of them.  Thank you.

15             THE COURT:  All right.  Now, I have a note here to ask

16   if you can supply something else.  Plaintiff's Exhibit 1 is the

17   Berlinger outtake log.

18             MR. MASTRO:  Yes, your Honor.

19             THE COURT:  If it is possible with reasonable

20   convenience for the plaintiff to supply that with the addition

21   of a column indicating as to each item what the trial exhibit

22   number, if any, is in the spreadsheet form that can be sorted,

23   that would be helpful.  Of course, anything you supply has to

24   be provided to the other side.

25             MR. MASTRO:  Absolutely, your Honor, we can do that.

DBPLCHE3

1    And as you know, all the Crude exhibits now have been submitted

2    and received without objection.

3              THE COURT:  Well, you know, I guess I think I know

4    that or I think I guess I know that or something.

5              MR. MASTRO:  Yes, your Honor.

6              THE COURT:  But I'm happy to hear it.  Something

7    without objection in this case may rival an agreement with the

8    ground.  That was a joke.

9              MR. MASTRO:  Got it.

10             THE COURT:  Okay.  Mr. Friedman.

11             MR. FRIEDMAN:  Your Honor, Chevron had indicated I

12   think it was last week an intent to provide the Court with the

13   English translation of the Ecuadorian Supreme Court opinion,

14   and I'm just questioning where that is procedurally.

15             THE COURT:  Well, I certainly don't know where it is,

16   and if anybody wants it before me for anything other than

17   informational purposes, somebody is going to have to offer it

18   and address any objections to it.

19             MR. MASTRO:  And, your Honor, we have been trying to

20   get a translation finalized.  It should be imminent.  We were

21   hoping to have that last night, maybe today.

22             THE COURT:  Okay.  All right.

23             Now, you have some witnesses, is that right,

24   Mr. Mastro?

25             MR. MASTRO:  Yes, your Honor, we do, proceeding to our

DBPLCHE3

1   rebuttal case?

2          THE COURT:  Well, yes, that's what normally happens

3   after the defense case.  But something got filed very late, not

4   that I'm faulting anybody because everything about this is very

5   late, but.

6          MR. MASTRO:  Your Honor, our first rebuttal witness

7   would be Mr. Dan Blank.  He'll be put on by my colleague Reed

8   Brodsky.

9          MR. BRODSKY:  Just one moment, your Honor, to set up.

10          MR. FRIEDMAN:  Your Honor, I wonder if we could be

11   heard on our objections to the rebuttal case itself.  I don't

12   know if you had a chance to read our motion, but essentially

13   what we argued is that they're not rebutting anything that we

14   presented in our case and they're rebutting things we didn't

15   put into evidence that aren't in evidence at all.

16          THE COURT:  Well, I did read it and I read Chevron's

17   response early this morning.  My initial reaction to it is on

18   several levels.

19          First of all, they propose to call, independent of

20   Mr. Blank, Mr. Lynch to testify that 30 percent of the judgment

21   in Ecuador falls within quotation marks, which they argue is

22   rebuttal to Zambrano.  Now, I understand the technical

23   argument.  They called Zambrano on their case in chief.  I

24   understand also, if you'll remember, perhaps, that the defense

25   asked for permission to go beyond the scope of the direct and

DBPLCHE3

1    make Zambrano your witness as well on cross in order to avoid

2    bringing him back on the defense case.  So my preliminary

3    reaction is not to stand too much on ceremony about that

4    sequence.

5         And as to the 30 percent, it seems to me not a very

6    controversial issue.  I could sit down with the 188 pages and

7    count myself.  So if there's no -- and you guys could probably

8    stipulate as to whatever that figure is if you don't want to

9    hear a witness.  So in one way or another, it seems to me that

10   whatever anybody wants in the record on that point I ought to

11   have.

12         Anybody disagree with that?

13         MR. MASTRO:  No, your Honor.

14         MR. FRIEDMAN:  I think that's a minor point, your

15   Honor.  No, I won't disagree with that.

16         THE COURT:  Mr. Gomez?

17         MR. GOMEZ:  Same, your Honor.

18         THE COURT:  And I bet over lunch you can work out a

19   stipulation as to that.

20         Now, the more substantial problem relates to

21   Mr. Lynch's testimony.  And while I don't profess in the couple

22   of hours that I've seen the full dimensions of this to

23   understand every conceivable nuance, it seemed to me

24   preliminarily that there were two fundamental propositions that

25   Chevron, apart from the 30 percent business, is endeavoring to

DBPLCHE3

1    establish through the rebuttal testimony.

2          First of all, Mr. Zambrano testified that the Lago

3    Agrio judgment was created entirely on what he referred to as

4    his new computer, not his old computer.  And I gather that

5    Mr. Lynch would testify that given what's in the Tarco

6    declaration as to which computer the file "providencias.docx"

7    was found on, the judgment, to the extent it exists on a

8    computer down there, is on the other computer, not the computer

9    Zambrano said he used to create it.

10         And my understanding of all of that is that that

11   doesn't depend on the 25 pages of the report that was made to

12   the prosecutor in Ecuador.  It depends I think only on

13   paragraphs 5 and 10 of the Tarco declaration that the

14   defendants submitted in support of the motion for permission to

15   call him.

16         MR. FRIEDMAN:  I think that's right, your Honor.

17         THE COURT:  Okay.  The next point is that I think it's

18   the report, not the declaration or at least not the declaration

19   all by itself indicates that the providencias.docx file had a

20   file system creation date of October 11, 2010, which the

21   defense argues is consistent with Zambrano's account of when

22   the judgment was prepared, I think, and Lynch would testify

23   that whatever Mr. Tarco or the report otherwise may have said,

24   the report reveals that the same file has an embedded creation

25   date of January 21, 2011, which is three months later, that

DBPLCHE3

1    that is a weird anomaly, and that at least in Mr. Lynch's view,

2    a possible or the most possible -- I'm not sure which --

3    explanation for that is that somebody monkeyed with the

4    computer and that the file system creation date is not the real

5    live McCoy.

6            I think those are the key points.  Does anybody have a

7    view as to what other key points or different key points or any

8    corrections?

9            MR. BRODSKY:  I think there are some additional

10   points.  Ms. Neuman can address them.  There are some addition

11   points.

12           MS. NEUMAN:  Yes, your Honor.  Mr. Lynch would also in

13   addition to opining that the judgment was -- that Mr. Tarco

14   discusses a document found on the old computer with anomalous

15   metadata, he would also reveal that the judgment was put on the

16   new computer for the first time in 2012, according to the Tarco

17   report filed in Ecuador, that the edit time that Mr. Tarco says

18   the document has of 3,571 hours is physically impossible given

19   Mr. Zambrano's testimony and given a calendar and that --

20           THE COURT:  You don't need an expert for that, do you?

21           MS. NEUMAN:  Well, not --

22           THE COURT:  We can all count the number of hours.

23           MS. NEUMAN:  Yes.  But Mr. Lynch, and perhaps we can

24   stipulate to this, would testify that edit time only

25   accumulates from the embedded create date and not the file

DBPLCHE3

1    system create date which cuts the time down by a significant

2    margin.  And he would also testify as to the misleading way

3    that information was presented in the Tarco declaration that

4    was filed with the court.

5          THE COURT:  Okay.  I appreciate the elucidation.

6          What is Chevron's contention and support for the

7    proposition that I should consider any rebuttal evidence from

8    Lynch that rests on 25 selected pages of a 400-page report?

9          MR. BRODSKY:  Your Honor, I can address that.  The

10   objection seems to first be to the authenticity of what

11   Mr. Blank viewed in Ecuador and took scanned images and

12   photographic images of, which is the Tarco report.

13         400 pages is a little misleading.  Mr. Blank will

14   testify that although not with exact precision, the report

15   itself contains eight sections or was approximately 40 pages

16   and then contained attachments including the providencias.docx

17   and the judgment, which your Honor knows are hundreds of pages

18   long.

19         And so we have 25 pages of a 40-page, approximately

20   40-page report which don't contain the beginning sections which

21   contain definitions, but include in that metadata, which is not

22   hearsay.  But as to the authenticity, it's Mr. Blank himself

23   who asked for and was given.

24         THE COURT:  I'm not addressing authenticity right now.

25   I'm addressing what either is or is analogous to the rule of

DBPLCHE3

1    completeness, or I guess in this context, to the question of

2    whether an expert ought to be heard to offer an opinion based

3    on what the expert knows in advance is only part of the

4    underlying document, which is a premise of at least some part

5    of what he has to say.

6         MR. BRODSKY:  Your Honor, I think that goes to the

7    weight, not to its admissibility.  The scanned images and the

8    photographs that Mr. Blank took from Mr. Tarco's report in

9    Ecuador pass the authenticity rules.  They are certainly

10   relevant, and they're admissible under the hearsay rules.

11        And so one of the things the defense may cross-examine

12   Mr. Lynch about is the extent to which he can reach those

13   opinions based on only having certain metadata or certain

14   information from this report in Ecuador and that's a fair point

15   for them to make.  I don't think it's effective given that what

16   Mr. Lynch will be testifying about is metadata that -- images

17   of this metadata coming from these computers.

18        THE COURT:  All right.  Mr. Friedman, you want to

19   address that, and then we're going to get to the issue of the

20   declaration separately.

21        MR. FRIEDMAN:  All right.  Yes.  Your Honor, we have I

22   guess eight sections, 40 pages long.  The beginning, including

23   the definitions, are missing.  The conclusion is missing.  The

24   expert is saying that the report he's trying to offer is

25   misleading, mistaken, and/or unsubstantiated.  I don't know

DBPLCHE3

1    even what to say beyond that.

2              THE COURT:  Well, he's got other things to say about

3    it.

4              MR. FRIEDMAN:  Well, with regard to the report.  To

5    the extent he's relying upon an incomplete report, which he

6    acknowledges is unreliable, I think there's a real problem

7    under Daubert and the evidence rules to let that in.  I have

8    another --

9              THE COURT:  Let me just, he proposes to say a bunch of

10   things.

11             MR. FRIEDMAN:  Yes.

12             THE COURT:  But I'm trying to focus on particular

13   things because you may be totally right as to some of the

14   things.  You may be totally right as to all of them.  I haven't

15   made up my mind.  But as to some of them, you may be more

16   clearly right than others.

17             MR. FRIEDMAN:  All right.

18             THE COURT:  So the second point on my list was that he

19   proposes to say, and I think it's in paragraph 22B of this

20   supplemental report or whatever it is -- I'm mistaken.  It's

21   not 22B.  But somewhere in here is the business about the

22   embedded creation date.

23             Now, for that, what does he rely on?

24             MR. FRIEDMAN:  He's relying upon the report, your

25   Honor, the 25 pages that's been offered.

DBPLCHE3

1              THE COURT:  Mr. Brodsky, do you know what paragraph he

2      talks about that in?

3              MR. BRODSKY:  Your Honor, I apologize.  What paragraph

4      are we on, 22B?

5              THE COURT:  I'm asking you what paragraph Lynch talks

6      about the embedded creation date in.

7              MR. BRODSKY:  That's on paragraph 22C where he talks

8      about the old computer embedded creation date is months after

9      the file creation date.

10             While your Honor reviews that, this report, your

11     Honor, in our view is a whitewash.  Okay, your Honor.

12             THE COURT:  Stop right there.  I can't both listen to

13     you and review it.

14             MR. BRODSKY:  Understood.

15             THE COURT:  Back to you, Mr. Friedman.  Suppose in the

16     25 pages it simply says we examined the computer and the

17     embedded creation date is X.  Now, what's the argument that

18     even given the incompleteness of the 25 pages we have that that

19     couldn't be an appropriate basis to express his opinion?

20             MR. FRIEDMAN:  Well.

21             MR. BOOTH:  May I respond, your Honor?  I'm going to

22     do the witness.

23             MR. FRIEDMAN:  I'm sorry for this.

24             THE COURT:  The last day I'll make this exception to

25     the one lawyer.

DBPLCHE3

1          MR. FRIEDMAN:  Mr. Booth is the one who sort of

2     learned this material.

3          MR. BOOTH:  I didn't really want to do it, Judge.

4          THE COURT:  You know, I didn't want to be reading this

5     stuff at five in the morning either.

6          MR. BOOTH:  I understand.  I take your point if it was

7     just a piece of data standing alone could he opine on that

8     data.  This, in answer to that question, it's just a screen

9     shot to me and without the full report, it would be impossible

10     for me, a nonexpert, to tell whether the report itself deals

11     with that data and has an explanation.

12          THE COURT:  But your side has had the ability to get

13     that report for a long time.

14          MR. BOOTH:  Well, I don't believe that's true.  I've

15     never seen it.  No one has ever offered it to me.

16          THE COURT:  That's a whole other story.  Maybe certain

17     people don't want you to have it.  But Mr. Piaguaje just

18     testified that it was his understanding as the complainant he

19     had the right to get it.  And certainly Mr. Fajardo, who signed

20     it, presumably had the right to get it and to have access to

21     it.  And you could have checked this out a long time ago.

22          MR. GOMEZ:  Your Honor, if I may, with all due

23     respect, I think the distinction is a right to review it but

24     not a right to secure a copy of their report and take it out of

25     the fiscalia.

DBPLCHE3

1          THE COURT:  Do you agree that they had a right to

2     review it?

3          MR. GOMEZ:  To review it.  Mr. Piaguaje and

4     Mr. Fajardo had a right to review it.

5          THE COURT:  That's been true for a long time.

6          MR. GOMEZ:  That's correct, your Honor.

7          MR. FRIEDMAN:  Can I say, your Honor, as to going

8     right to your point, the report uses the term embedded data,

9     apparently, and then says this is the start date.  I'm not

10    trying to split hairs here, but between the language issues and

11    the computer technical issues, the very fact that the

12    definition section is not and no reason has been given for why

13    that wasn't copied.  If they're copying the 25 select pages,

14    why not the definition pages that would define --

15         THE COURT:  I imagine that Mr. Blank, do I understand

16    he's the guy who did the copying?

17         MR. BRODSKY:  Yes, your Honor, he is.

18         THE COURT:  So I imagine you're going to find out as

19    to that and it may put this in one light or another.

20         MR. FRIEDMAN:  Yes.  But it seems like whatever he

21    says, whatever, I mean if he got interrupted, whatever the

22    reason is, we're still left without the definitions of embedded

23    data, start date.  I don't know if they're there or not.  I'm

24    arguing in the blind here, but that's kind of the point.

25         THE COURT:  Maybe he remembers what it said.

DBPLCHE3

1              MR. FRIEDMAN:  He might, and maybe he remembers the

2    conclusion.  But, again, we're back to best evidence, the rule

3    of completion.

4              THE COURT:  Well, best evidence has an exception for

5    this, doesn't it?  I have a feeling you may have brought that

6    to my attention.

7              MR. FRIEDMAN:  Rule 101 -- definitely you can use a

8    duplicate, but I was going to actually point the Court to

9    1001(e) that contemplates if a duplicate is going to be used,

10   it has to accurately reproduce the original.

11             THE COURT:  Oh, yeah, but the relevant rule is 104,

12   1004, as I remember, 104(b) would be the relevant one, wouldn't

13   it, an original cannot be obtained by any judicial process.

14             MR. FRIEDMAN:  Right.  That's still not contemplating

15   a partial document.  That would get a copy in, a duplicate in,

16   something that, you know -- to bring in -- there's sort of a

17   two-fold problem here in that we've got an incomplete document

18   that the expert himself is saying is unreliable.

19             THE COURT:  Yeah, he's saying the document's

20   conclusions are unreliable.  That's what he's saying.

21             MR. FRIEDMAN:  Well, it's hard to tell.

22             THE COURT:  He's not saying that the letters, symbols,

23   and words on the page are unreliable as evidence of what those

24   words are.

25             MR. FRIEDMAN:  No.  What he is saying is it's an

DBPLCHE3

1    untrustworthy document and that's kind of the point is we've

2    got 25 out of 40 pages.  We don't know whether those other

3    pages explain, add substance to what they're offering.

4              THE COURT:  That point I certainly understand.  I

5    understand that point.

6              MR. FRIEDMAN:  All right.  That's my point.

7              THE COURT:  Let's go to the other matter.

8              MR. BRODSKY:  Your Honor, just to that point, if we

9    can respond, I think the Court has raised the key response to

10   that, first, that they have the right of access through

11   Mr. Fajardo and through Humberto Piaguaje to review the entire

12   report.  And if they have any questions about that, they

13   certainly can review it and they can certainly provide the

14   Court with responses to that.

15             Second, your Honor, so their complaint that they don't

16   have access to the complete report is really on them.  They

17   have access.  They just have not obtained the access.

18             THE COURT:  Well, look, the fact of the matter is they

19   were all ready to call this witness if -- and I'm not

20   questioning the veracity of anybody in the courtroom.  They

21   were all ready to call him in circumstances where they knew

22   there was a 400-page report.  They knew they had access to it.

23   And litigation counsel, at least, knew nothing about what was

24   in it beyond whatever Mr. Tarco told them and they were going

25   to produce Mr. Tarco as a witness in that circumstance.

DBPLCHE3

1            Now the shoe is on the other foot and they like it a

2    little less and that's not to say who's right or wrong.  I mean

3    the worm has turned.  It's kind of like who wanted to be in

4    Ecuador in the first place -- 180 degree shift in positions.

5            MR. FRIEDMAN:  And the Court said at that time, your

6    Honor, if we wanted to bring him, we had to show best efforts

7    to bring the 400-page -- we didn't know it was 400 pages at the

8    time.

9            THE COURT:  Which you didn't.

10           MR. FRIEDMAN:  Which we didn't.  But the shoe is on

11   the other foot as well in that they should be presenting -- we

12   wouldn't be having this argument if they had the whole 400

13   pages or even presumably the 40 pages.

14           THE COURT:  I hear you and I understand the issue as

15   to the report.  And as to the report piece of this, I think I

16   want to hear the witnesses that come before the expert because

17   I may be better informed after I hear them.  And that testimony

18   doesn't go to the bottom line; it goes to which pieces of paper

19   and how they were obtained and why others weren't obtained and

20   I think I need to know that.

21           Now, the other substantive question is a somewhat

22   different one.  Unless I am misunderstanding here, insofar as

23   the proposal is to call Mr. Lynch to testify that the

24   providencias.docx file, which is said to contain something very

25   like the judgment, is on the old computer, not the new

DBPLCHE3

computer, it seems to me that if I understand what's been put

before me overnight, that rests on a couple of records from

Hewlett Packard as to the sequence of the creation of the two

devices, some inventory records from the Ecuadorian government

as to when these computers were assigned to Judge Zambrano, and

one other piece of data or two pieces of data.

The two pieces of data are the serial numbers of the

two computers and which one is the one that corresponds to what

Zambrano called the old and which one corresponds to the new

and that, unless I misunderstand it, comes out of paragraphs 5

and 13 of the Tarco affidavit without any regard to the report,

the 400-page report.

Do I misunderstand that?

MR. FRIEDMAN:  Just a second, your Honor.

MS. NEUMAN:  That's correct, your Honor.

MR. MASTRO:  That's correct, your Honor.

MR. BOOTH:  Yes, I think that's correct, when you take

into account the other documents you just mentioned from

Ecuador and those other things.  The Hewlett Packard documents

we stipulated to authenticity without a witness.  The Ecuador

documents we have not.

THE COURT:  So the Ecuador documents are yet to be

dealt with.  And so now the question as to that piece of the

Lynch testimony would appear to turn not on this 400-page

report in any degree whatsoever.  It appears to turn only on

DBPLCHE3

1    those two portions of the Tarco affidavit that you submitted to

2    this Court in support of a motion that I granted.

3            And Chevron has made some arguments and I think, if I

4    understand correctly having read very quickly, I must confess,

5    what I'm essentially getting from that, in addition to some

6    other arguments, is the argument is adoptive admission by the

7    defense.

8            Isn't that right?

9            MR. FRIEDMAN:  I wouldn't want to call it that, but we

10   agree that's there and he can testify as to those two things

11   out of the Tarco.

12           THE COURT:  He who?

13           MR. FRIEDMAN:  Mr. Lynch can rely on those two serial

14   numbers in the Tarco declaration.

15           THE COURT:  Okay.  So that part of Lynch you have no

16   problem with, subject to the Ecuadorian inventory records; is

17   that right?

18           MR. FRIEDMAN:  Well, we still have our objection that

19   we don't believe it's rebutting anything that was presented in

20   our case.

21           THE COURT:  Well.

22           MR. FRIEDMAN:  But I understand your inclination to

23   rule on that, but I wanted to say that is our position on that.

24           THE COURT:  Look, your position is that even though

25   you examined Zambrano at least in part as your own witness and

DBPLCHE3

1    even though you brought him here and so forth, the fact that

2    Chevron called him as an adverse witness on its case means they

3    can't rebut it even in circumstances where the evidence comes

4    to hand very late in the game.

5         MR. FRIEDMAN:  Actually our position would be they

6    called, they made the decision to call him in their case in

7    chief, which they had the right to do, before their case was

8    over.  They had the Tarco declaration.  They had anything they

9    needed to present in their case, anything related to old versus

10   new computer.  We then presented evidence for many more days.

11        So that's our position on that.  I don't want to

12   belabor it, but it's clearly discretionary.  I don't want to.

13        THE COURT:  I understand.  Let's put that piece to one

14   side.  Assuming you lose on that piece, and I'm not saying you

15   do or you don't, but assuming you do, then as to the one piece

16   of the Lynch testimony, subject to the Ecuadorian documents

17   coming in, perhaps, you don't have a problem with his

18   testifying as to which computer was the old and the new, what

19   the sequence of their acquisition by Zambrano was, and I may be

20   not totally fully describing the testimony, but that piece of

21   it.

22        Is that right?

23        MR. FRIEDMAN:  That is right.

24        THE COURT:  Is that right, Mr. Gomez?

25        MR. GOMEZ:  That's correct, your Honor.

DBPLCHE3

1          THE COURT:  All right.  Well, I think what we're going

2     to do is I'll hear the authentication witnesses and then I'll

3     see where we are.  And it may be that what I'll do is take

4     whatever he's got to say or part of what he's got to say

5     subject to your pending motion and think about it some more and

6     rule on it.  But I may conceivably come to the view, just so

7     you are all aware, that anything that depends on the 400-page

8     report is not going to come in and this other piece and the

9     30 percent piece may come in.  That's just a preliminary

10     feeling.  I reserve total right to change my view on it.  I

11     want to think about it some more.

12          Okay.  Given the hour and given that you're going to

13     try to resolve some things, we'll break now until 2 o'clock.

14     Thank you.

15               (Luncheon recess)

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

DBP8CHE4                    Blank - direct

                        AFTERNOON SESSION

1                            2:30 p.m.

2

3            THE COURT:  Sorry for the delay.  You gave me some

4   things to think about.

5            Let's start with Mr. Blank and let's see where we go.

6            MR. BRODSKY:  Chevron calls Daniel Blank.

7    DANIEL BLANK,

8        called as a witness by the Plaintiff, in rebuttal,

9        having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. BRODSKY:

12  Q.  Mr. Blank, where do you work?

13  A.  I work for Stroz Friedberg.

14  Q.  How long have you worked at Stroz Friedberg?

15  A.  A bit over two years.

16  Q.  Approximately when did you graduate from college?

17  A.  I graduated in 2008.

18  Q.  After graduating from college, where did you work?

19  A.  I worked for KPMG.

20  Q.  What did you do there?

21  A.  I was in the IT advisory practice there.

22  Q.  After working at KPMG, what did you do?

23  A.  I was a senior IT systems analyst at Avon Cosmetics.

24  Q.  For how long?

25  A.  Approximately two years.

DBP8CHE4                        Blank - direct

1    Q.  After you were at Avon, where did you go?

2    A.  I joined Stroz Friedberg.

3    Q.  Describe generally what the nature of your job

4    responsibilities are at Stroz Friedberg.

5    A.  My job responsibilities at Stroz Friedberg include the

6    acquisition, analysis, preservation, and reporting on of

7    digital forensic evidence.

8    Q.  Did there come a time when you were asked to travel to

9    Ecuador?

10   A.  Yes.

11   Q.  Who asked you to travel to Ecuador?

12   A.  Gibson Dunn.

13   Q.  When did Gibson Dunn ask you to go there?

14   A.  Saturday, November 16.

15   Q.  What was your understanding of the purpose of the proposed

16   trip to Ecuador?

17   A.  I was to review a forensic report prepared by a Milton

18   Tarco.

19   Q.  Did you travel to Ecuador?

20   A.  Yes, I did.

21   Q.  When did you do that?

22   A.  On Sunday, November 17.

23   Q.  Directing your attention to the next day, November 18,

24   2013, where were you?

25   A.  I was at the prosecutor's office in Lago Agrio, Ecuador.

DBP8CHE4                          Blank - direct

1    Q.  Were you alone at the prosecutor's office or with others?

2    A.  No, I was with others.

3    Q.  How many people were you with?

4    A.  Three others.

5    Q.  Was one of those people Vladimir Andocilla, an attorney for

6    Alberto Guerra?

7    A.  Yes, one of those people was Vladimir Andocilla.

8    Q.  Were the other two people working for Kroll?

9    A.  Yes.

10   Q.  Describe in general where the prosecutor's office in Lago

11   Agrio Ecuador was located.

12   A.  The prosecutor's office in Lago Agrio was located in the

13   town proper of Lago Agrio, on the fourth floor of a walk-up

14   building containing other offices.

15   Q.  Do you speak or write Spanish?

16   A.  No, I do not.

17   Q.  Did anyone translate for you Spanish while you were in the

18   prosecutor's office in Lago Agrio?

19   A.  Yes.

20   Q.  How long were you in the prosecutor's office that day?

21   A.  Approximately six hours.

22   Q.  What happened upon your arrival?

23   A.  Upon my arrival, I met with Mr. Andocilla.  We walked up to

24   the fourth floor of the prosecutor's office.  Upon entering the

25   office, some tables and chairs were rearranged and a series of

DBP8CHE4                        Blank - direct

1    bound documents was presented to me on the table.

2    Q.   Approximately how many bound volumes of documents?

3    A.   Approximately six bound volumes.

4    Q.   Describe them in general.

5    A.   These bound documents were bound in a thicker blue paper.

6    They bore unique identifiers on the covers of each one.  They

7    contained approximately 50 or 75 pages each.

8    Q.   What do you mean by unique identifiers on the cover of each

9    bound volume?

10   A.   On the covers there were a series of identifiers in

11   Spanish, some of which said Denunciante Pablo Fajardo Mendoza,

12   Denunciado Alberto Guerra Bastidas.

13   Q.   Did you write down what was in Spanish on the front covers

14   of these bound volumes?

15   A.   Yes, I did.

16          MR. BRODSKY:  May I approach, your Honor?

17          THE COURT:  Yes, you may.

18   Q.   I am showing you, Mr. Blank, a one-page document,

19   Plaintiff's Exhibit 4129 for identification.  Do you recognize

20   it?

21   A.   Yes, I do.

22   Q.   What is it?

23   A.   This is the information I wrote down from the cover of the

24   bound documents while at the prosecutor's office.

25   Q.   Prior to coming to court today, did you review this

DBP8CHE4                        Blank – direct

1    document and determine that what is written here reflected what

2    you saw on each of the bound volumes that was in the

3    prosecutor's office?

4    A.  Yes, I did.

5    Q.  How do you know this document reflects that?

6    A.  I initialed the bottom of this document indicating as such

7    that the information contained here is as I saw it on that

8    volume.

9            MR. BRODSKY:  Your Honor, we offer 4129.

10           MR. FRIEDMAN:  I object on foundation, your Honor.

11           I could ask a question to clarify or I can wait till

12   later.  The issue is, was this the cover for each one, or was

13   this on each of the six, or were there separate ones?

14           THE COURT:  Clarify.

15   Q.  Mr. Blank, the information that appears in 4129,

16   Denunciante Pablo Fajardo Mendoza, Denunciado Alberto Guerra

17   Bastidas, and the other information there, was that on each

18   cover of the bound volumes that you observed in the

19   prosecutor's office, on one of them, or on several of them?

20   A.  No.  To the best of my recollection, on every one of those

21   bound volumes the same information appeared.

22   Q.  That information is on 4129 for identification, correct?

23   A.  Yes.  That information is on 4129.

24           MR. BRODSKY:  We offer it.

25           MR. FRIEDMAN:  I have all the same objections we

DBP8CHE4                        Blank - direct

1   discussed earlier.

2              THE COURT:  And which ones were those?

3              MR. FRIEDMAN:  Best evidence, hearsay, incompleteness.

4        Obviously, this one is not that important, but I would

5   prefer if the Court could reserve ruling until we have all the

6   foundation and we can argue it as one set of documents,

7   whatever that set turns out to be.

8              THE COURT:  It's more likely than not different as to

9   different documents, don't you think?

10             MR. FRIEDMAN:  I think we may have the same arguments

11  as to all of them.  What you have here is, I assume, something

12  somebody typed out.

13             THE COURT:  What I have here is past recollection

14  recorded of what the label on each of the folders was or bound

15  volumes was, right?

16             MR. FRIEDMAN:  Yes.

17             THE COURT:  So what is the problem with that?

18             MR. FRIEDMAN:  None I guess.  I will let it go.

19             THE COURT:  It's received.

20             (Plaintiff's Exhibit 4129 received in evidence)

21  BY MR. BRODSKY:

22  Q.  Mr. Blank, the fiscal there, Dr. Carlos Jimenez T., do you

23  recall whether you met him at the prosecutor's office on

24  November 18, 2013?

25  A.  No, I don't recall if I specifically met a Dr. Carlos

DBP8CHE4                          Blank – direct

1    Jimenez T.

2              MR. BRODSKY:  May I approach, your Honor?

3              THE COURT:  Yes.

4    Q.  Mr. Blank, approximately how many pages were in each of

5    those volumes?

6    A.  There were approximately 50 to 75 pages in each of those

7    volumes.

8    Q.  During your review, did you observe the name Milton Jaque

9    Tarco?

10   A.  Yes.

11   Q.  Where did you observe that name?

12   A.  I recall seeing that name in the beginning of the report,

13   where it was discussed that the report was a forensic report

14   concerning PC 1 and PC 2, as well as providencias.docx, in

15   accordance with the court order, as well as within the

16   conclusion section next to a signature block.

17   Q.  Approximately how many pages were there between the

18   beginning of this document and the signature block containing

19   the name of Milton Jaque Tarco?

20   A.  There were about 40 pages.

21   Q.  Did any of the volumes include attachments to this report?

22   A.  Yes, they were labeled anexos.

23   Q.  Did you say anexos?

24   A.  Yes, I did.

25   Q.  Approximately how many anexos or attachments were there?

DBP8CHE4                         Blank - direct

1   A.  There were approximately eight anexos.

2   Q.  Did you copy all of the volumes of the report and the

3   attachments?

4   A.  No, I did not.

5   Q.  Why not?

6   A.  I was not given permission to do so.

7   Q.  Did there come a time when you were permitted to copy any

8   part of the report and its attachments?

9   A.  Yes.

10  Q.  Were you able to copy the entire report and attachments at

11  some point or a portion of them.

12  A.  I was only permitted to copy a portion of them.

13            MR. BRODSKY:  May I approach, your Honor?

14            THE COURT:  Yes.

15  Q.  I am showing you, Mr. Blank, what is marked as Plaintiff's

16  Exhibit 4125A, which is a 24 page document.  Would you take a

17  moment to look at it, please?

18            Do you recognize this, Mr. Blank?

19  A.  Yes, I do.

20  Q.  How do you recognize this document?

21  A.  This is the document I saw in the prosecutor's office.

22  Q.  How do you recognize this very one marked Plaintiff's

23  Exhibit 4125A for identification as the one that you saw in the

24  prosecutor's office?

25  A.  This one I observed printed and then initialed as such on

DBP8CHE4                    Blank - direct

1   the bottom.

2   Q.  How were these pages copied from -- withdrawn.

3           Did you identify these pages for copying or scanning?

4   A.  Yes.

5   Q.  How did you identify them if they were in Spanish?

6   A.  With the help of the translator while in the prosecutor's

7   office.

8   Q.  How were these pages copied?

9   A.  These particular pages were copied with the help of

10  Mr. Andocilla using his scanner.

11  Q.  How do you know Mr. Andocilla scanned them?

12  A.  I observed Mr. Andocilla scanning these pages.

13  Q.  Was that with the permission or without the permission of

14  the prosecutor's office?

15  A.  This occurred with the permission of the prosecutor's

16  office.

17  Q.  How do you know the prosecutor's office gave permission to

18  scan these pages in 4125A for identification?

19  A.  After identifying certain pages to be scanned, I asked

20  Mr. Andocilla if we had permission to do so.  He spoke with an

21  official in the prosecutor's office in the same room as myself.

22  After he returned and told me that we had approval to do so,

23  the report was walked over to the official's desk and the

24  scannings were done in front of the official in the

25  prosecutor's office.

DBP8CHE4                    Blank - direct

1    Q.  Were you and the other three people you went with to the

2    prosecutor's office ever alone with these bound volumes or was

3    there always someone from the prosecutor's office present?

4    A.  There was always at least one other person at the

5    prosecutor's office present with us and the documents.

6    Q.  After the pages were scanned, what happened to the pages

7    after they were put on the scanner that Mr. Andocilla had?

8    A.  I copied them to my computer while in the prosecutor's

9    office.

10   Q.  Was that your laptop computer?

11   A.  Yes, it was.

12   Q.  Did you bring that laptop back with you to the United

13   States?

14   A.  Yes.

15   Q.  Did you observe the images that were scanned in the

16   prosecutor's office being printed in New York?

17   A.  Yes.

18   Q.  Did you initial them right after they were printed?

19   A.  Yes.

20   Q.  Approximately how many sections were there to the report?

21   Setting aside the attachments, approximately the 40 pages, how

22   many sections were there?

23   A.  There are approximately eight sections of the report.

24   Q.  What sections, if any, did you copy in 4125A for

25   identification?

1   A.  I copied sections 3 and 4, as well as 6 and 7.  There are

2   portions of additional sections, but those I copied in their

3   entirety.

4   Q.  When you say portions of additional sections, which section

5   are you talking about, section or sections?

6   A.  There is a portion of section 5 visible in the scans, as

7   well as the beginning of the conclusion section, section 8.

8   Q.  What was section 1 of the report?

9   A.  Section 1 was an introductory section to the report.

10  Q.  What was section 2?

11  A.  To the best of my recollection, section 2 concerned

12  definitions concerning the digital forensic terminology.

13  Q.  Directing your attention to page 4 of 4125A, does that

14  contain a portion of section 5?

15  A.  Yes.  This is a portion towards the end of section 5.

16  Q.  Describe generally what section 5 contained.

17  A.  Section 5 contained photos of the computers, PC 1 and PC 2

18  and the hard drives, as well as hash values concerning their

19  acquisition, forensic acquisition.

20  Q.  When you say photographs of the computers and the hard

21  drives, do you mean externally, a photograph of the external

22  part of the computer and the external part of the hard drive?

23  A.  That's correct.  There were photos of the computer cases

24  and of the outside of the hard drives.

25  Q.  The hash values, is that contained in the pages that you

DBP8CHE4                          Blank - direct

1   were able to scan?

2   A.   Yes.   That is one of the hash values that is present in

3   section 5.

4   Q.   How did you decide what to scan?

5   A.   I first attempted to scan -- I first asked to scan the

6   entire report.

7   Q.   What happened when you asked to scan the entire report?

8   A.   After speaking with Mr. Andocilla, and he spoke with the

9   official at the prosecutor's office, they denied my request to

10  scan the entire report.

11  Q.   Then what happened?

12  A.   Then with the help of the translator, we reviewed the

13  report looking for information concerning the analysis, as well

14  as the screen shots covering the file or system metadata

15  available in the report.

16  Q.   What happened next?

17  A.   After identifying these screen shots and pages within the

18  report that contained verbose information that would have been

19  difficult to type or transcribe by hand, we asked -- I'm sorry,

20  I asked Mr. Andocilla if I could get a scan of these pages, and

21  he in turn asked the official at the prosecutor's office who

22  gave approval to do so.

23  Q.   Did Mr. Andocilla scan all of the screen shots with

24  metadata in the approximately 40 page report, some of them or

25  otherwise?

DBP8CHE4                        Blank - direct

1   A.  All of the screen shots containing file metadata within the

2   report were scanned by Mr. Andocilla while in my presence.

3   Q.  Are they all contained within 4125A for identification?

4   A.  Yes.

5   Q.  Let me direct your attention to page 8 of 4125A for

6   identification, screen shot number 2.  Is that an example in

7   the red boxes of metadata?

8   A.  Yes.  This is an example of metadata.

9                MR. BRODSKY:  We offer 4125A.

10               MR. FRIEDMAN:  Your Honor, I would make the same

11   objections that we made before the break as to these.

12               THE COURT:  In and of itself this is meaningless,

13   right?

14               MR. FRIEDMAN:  Well, I think Mr. Lynch would disagree

15   with that.

16               THE COURT:  But unless he is permitted to give us that

17   disagreement, it's meaningless, isn't it?

18               MR. FRIEDMAN:  I don't know if it's meaningless or

19   not.  I can't make meaning of it.

20               THE COURT:  We are on the same team here.

21               MR. FRIEDMAN:  But at this point, what we do know is

22   it is an incomplete document.  So the same objections.  I don't

23   want to belabor it, but the same objections I made this

24   morning.

25               THE COURT:  I am going to reserve decision on that.

DBP8CHE4                         Blank - direct

1          MR. BRODSKY:  May I approach, your Honor?

2          THE COURT:  Yes.

3   Q.  I am showing you, Mr. Blank, Plaintiff's Exhibit 4125 for

4   identification.  I would ask you to turn to page 27 through

5   page 50.  Are those a shrunk down version of 4125A?

6   A.  Yes, it is.

7          MR. BRODSKY:  We offer 4125 as the English

8   transcription of 4125A.

9          THE COURT:  I will reserve decision on that.

10         MR. BRODSKY:  May I approach one more time, your

11  Honor?

12         THE COURT:  You may.

13  Q.  I am showing you, Mr. Blank, Plaintiff's Exhibit 8075A for

14  identification.  Do you recognize this one?

15  A.  Yes, I do.

16  Q.  How do you recognize it?

17  A.  This is anexo 5 from the forensic report that I saw in the

18  prosecutor's office in Ecuador.

19  Q.  How did you obtain a portion or all of anexo 5?

20  A.  Again, as I did with the other sections, I asked through

21  Mr. Andocilla the prosecutor's office for permission to scan or

22  photograph the section.  I received approval to do so, and this

23  section I photographed with my camera while Mr. Andocilla held

24  the pages open on the desk of the official at the prosecutor's

25  office.

DBP8CHE4                           Blank - direct

1    Q.  Was that in the presence of an official from the

2    prosecutor's office?

3    A.  Yes, there was someone there.

4    Q.  Whose camera took these photographs?

5    A.  My camera.

6    Q.  You took the photographs?

7    A.  Yes.

8    Q.  On these photographs there is a date October 18, 2013

9    embedded in each of the photographs.  Is that the correct date

10   or the incorrect date when these photographs were taken?

11   A.  That date is incorrect.

12   Q.  What was the correct date again?

13   A.  The date was November 18, 2013.

14   Q.  Why was there an incorrect date embedded in each of the

15   photos?

16   A.  Because my camera was set with an incorrect date when I

17   took these pictures.

18   Q.  How do you know these photographs right here are the ones

19   that you took on November 18, 2013 in the prosecutor's office?

20   A.  I recognize these pictures by sight, and I observed them

21   printed.

22   Q.  Did you initial them and date when the photo was taken on

23   each page?

24   A.  Yes, I initialed and dated them on the bottom right.

25   Q.  Generally describe what are these photographs of in 8075A

DBP8CHE4                         Blank - direct

1   for identification.

2   A.   These photographs are of a Windows log file API containing

3   information by USB device connections.

4   Q.   Does this contain all of the USB device connection

5   information in the report and the attachments or only part of

6   it?

7   A.   This is the entirety of anexo 5 for this attachment for

8   this USB device log.

9             MR. BRODSKY:  We offer 8075A.

10            MR. FRIEDMAN:  Same objection.

11            THE COURT:  Reserved.

12            MR. BRODSKY:  May I approach, your Honor?

13            THE COURT:  You may.

14  Q.   I am showing you, Mr. Blank, 8075 for identification.  Do

15  you recognize it?

16            Let me stop you there.  Bad question.  Let me ask you

17  to turn to page --

18            MR. BRODSKY:  This is just the English translation.

19            THE COURT:  Any objection other than the ones I am

20  reserving over and over on?

21            MR. FRIEDMAN:  No.

22            MR. GOMEZ:  No.

23            THE COURT:  You're offering it.  I reserve.

24            Does that satisfy everybody for the time being?

25            MR. FRIEDMAN:  Yes.

DBP8CHE4                    Blank - direct

1           THE COURT:  Let's move it along.

2      BY MR. BRODSKY:

3      Q.  If you turn to 4125A, Mr. Blank, let me direct your

4      attention to page 11, screen shot number 7.

5           Prior to coming to court today, did you compare screen

6      shot number 7, the language in there, with Plaintiff's Exhibit

7      429?

8           MR. BRODSKY:  Which maybe we can ask Randall to put up

9      on the screen in evidence, the first page of 429.

10     Q.  Prior to coming to court today, did you compare the two,

11     Mr. Blank?

12     A.  I compared screen shot 7 to a Spanish language version of

13     what appears to be 429.

14     Q.  You looked at the Spanish language of 429?

15     A.  Yes, I believe so.

16     Q.  How did they compare, the Spanish language section of 429

17     with the screen shot number 7 on page 11 of 4125A?

18     A.  The two documents were similar.  They contained

19     approximately five sections that I identified that were

20     somewhat different.

21     Q.  When you say five sections, do you mean five words or five

22     parts?

23     A.  Five parts, groupings of words or phrases that had differed

24     between the two in what is visible.

25     Q.  Did you see screen shot number 7 on page 11 of 4125A

DBP8CHE4                    Blank – direct

```
1   anywhere else in the report or its attachments?
2            MR. FRIEDMAN:  I would object.  I think this witness
3   was offered to -- what we were told was that he was simply
4   going to lay a foundation for documents, not express opinions.
5            THE COURT:  I think so.
6            Why not, Mr. Brodsky?
7            MR. BRODSKY:  That's totally fine.  The document
8   speaks for itself, 429 and page 11.
9            THE COURT:  Let's move it along.
10  Q.  My question, Mr. Blank, is, did you see, your own personal
11  observation, on November 18, 2013, the language in screen shot
12  number 7 on page 11 of 4125A anywhere else in the report or its
13  attachments?
14  A.  Yes.
15  Q.  Where was it?
16  A.  It was contained within anexo 6 within the report.
17  Q.  Approximately how many pages were in anexo 6 of the report?
18  A.  Approximately 200 pages.
19  Q.  Let me direct your attention then to screen shot number 9
20  on the next page, page 12 of 4125A.
21            Did you see the language in screen shot number 9
22  elsewhere in the report or its attachments on November 18,
23  2013?
24  A.  Yes.
25  Q.  Where did you see it?
```

DBP8CHE4                         Blank - direct

1    A.  Also in anexo 6.

2    Q.  Did that part come after or before the document beginning

3    with screen shot number 7?

4    A.  Text contained in screen shot 9 came after that within

5    screen shot 7.

6    Q.  How many pages was the document in anexo 6 reflected in

7    screen shot number 7, approximately?

8    A.  The text within screen shot 7 went for approximately 24

9    pages before the text within screen shot 9 began.

10             MR. BRODSKY:  No further questions, your Honor.

11             THE COURT:  Thank you.

12             Mr. Friedman.

13             MR. FRIEDMAN:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. FRIEDMAN:

16   Q.  Mr. Blank, my name is Rick Friedman.

17             I wanted to ask you, who were the people from Kroll

18   who were with you when you visited the prosecutor's office?

19   A.  There was an individual named Juan Felipe Sanchez and

20   Jimmy -- forgive me if I misspeak his last name - Augusto.

21   Q.  What was your understanding as to their purpose being

22   there?

23   A.  They were there to assist me in the interpretation and

24   understanding of the Spanish language in the report.

25   Q.  Mr. Andocilla, did he speak English?

DBP8CHE4                     Blank - cross

1   A.  No.  Mr. Andocilla did not speak English.

2   Q.  It was your understanding that he was Mr. Guerra's lawyer?

3   A.  Correct.

4   Q.  Did you understand -- let me ask it this way.

5        Was it your role as you understood it to help

6   Mr. Guerra in his defense of the criminal case?

7   A.  No, that was not my understanding.

8   Q.  What was your understanding as to why Mr. Guerra's lawyer

9   was permitting you to look at these documents or taking you to

10  look at these documents?

11  A.  I was not aware of the relation prior to my arrival.  I

12  only understood him to be facilitating my access to review the

13  report.

14  Q.  Who is your supervisor on this project?

15  A.  My direct supervisor at Stroz or with Gibson Dunn?

16  Q.  Both.

17  A.  My supervisor at Stroz Friedberg is Bryan Rose, and my

18  supervisor with Gibson Dunn is Chris Spiker.

19  Q.  Who was it that directed you to go to Ecuador on this

20  mission?

21  A.  The initial request came directly from one of my managers

22  Lance Nudd.

23  Q.  Who was it that gave you your instructions on what you were

24  to do?

25  A.  My instructions came from Chris Spiker.

DBP8CHE4                        Blank - cross

1    Q.   What did Mr. Spiker tell you that he wanted you to do?

2    A.   He asked that I initially attempt to obtain a full copy of

3    the report, and barring that, I spoke with him about his

4    priorities in terms of what sections or what aspects of the

5    report were of most interest.

6    Q.   At the time you spoke with him, did you have an

7    understanding of how long or how big the report was?

8    A.   I understood the report to be a few hundred pages, but not

9    much else was told to me about the report.

10   Q.   Did you have any time limitations -- let me ask it this

11   way.  You said you were there about six hours?

12   A.   That's correct, about six hours.

13   Q.   So did you have an opportunity then to look through all the

14   annexes?

15   A.   Not in their entirety, I did not look through all of the

16   annexes.

17   Q.   Which ones did you look through, or did you look through

18   any of them?

19   A.   I did look at all of the headings of the annexes.  And I

20   did look at, for what I could in the time allotted, portions of

21   anexo 6, anexo 5, and anexo 7.

22   Q.   Was there a particular reason you selected those three to

23   look at as opposed to the others?

24   A.   Yes.

25   Q.   What was the reason?

DBP8CHE4                          Blank - cross

1    A.  Anexo 5 contained details about USB device connections.  It

2    contained information about time stamps of the machine's use.

3            Anexo 6 was what I understood to be a

4    providencias.docx.

5    Q.  That is ones you looked at?

6    A.  Yes.  Anexo 7 was told to me to be the sealed or final

7    version of the judgment contained within anexo 6.

8    Q.  What were in annexes 1 through 4?

9    A.  Annexes 1 through 4, I know that one contained a chain of

10   custody, though I cannot recall what the others contained.

11   Q.  Did you say there were eight all together?

12   A.  Yes.  There were approximately eight.

13   Q.  So what did annex 8 contain?

14   A.  I do not recall what annex 8 contained.

15   Q.  Did you take any notes while you were there?

16   A.  Yes.

17   Q.  Did you bring those with you here today to court?

18   A.  No, not in their entirety, no.

19   Q.  Parts of them?

20   A.  Parts of them, yes.

21   Q.  What did you bring?

22   A.  I brought one of the pages of notes I have.

23   Q.  Do you have that with you up on the stand or where would

24   that be?

25   A.  No.

DBP8CHE4                          Blank - cross

1          MR. BRODSKY:  We are happy to provide Mr. Friedman
2     with these notes.
3          MR. FRIEDMAN:  Thank you.
4     Q.  Could you give us a better idea of how you spent the six
5     hours?
6     A.  Certainly.  The report was very difficult to follow.  It
7     took some time working with the translator to understand what
8     information would be found where in the report.  Other times
9     there would be a discussion between Mr. Andocilla and the
10    prosecutor's office while it was decided whether or not we
11    could photograph or scan certain pages of the report.  Overall
12    it was a difficult and slow proceeding to work through the
13    report.
14    Q.  Did you attempt to copy any of the annexes?
15    A.  Yes.  I did request a copy of all the annexes.
16    Q.  Were you allowed to copy any of them?
17    A.  I was only permitted to take photos of anexo 5.
18    Q.  Was any information communicated to you about why certain
19    parts you were permitted to copy and other parts you weren't
20    permitted to copy?
21    A.  No.  I was not made aware what the restrictions were that
22    permitted me or did not permit me to make copies.
23    Q.  Was it your personal camera that you used to take the
24    photographs?
25    A.  It was the camera that's assigned to me through Stroz

DBP8CHE4                        Blank - cross

1    Friedberg.

2    Q.  Assigned to you as what you use in your work or in your

3    professional capacity?

4    A.  Yes.

5    Q.  You have used it in the past?

6    A.  Yes, I have.

7    Q.  When was the time most recently before this that you

8    used -- before your trip to Ecuador, when was the time that you

9    had recently used the camera?

10   A.  Within a month prior.

11   Q.  Was the date set wrong in that month prior as well?

12   A.  Most likely it was, yes.

13   Q.  When you took the photographs for that prior job, did you

14   notice the date was wrong?

15   A.  No, I did not.

16   Q.  How many trips have you made to Ecuador?

17   A.  That was my first trip to Ecuador.

18   Q.  I am not sure that I heard you.  I apologize if I got this

19   wrong.  Did you say that section 5 of the report dealt with

20   photos of the external parts of the computers?

21   A.  Yes.  To the best of my recollection, section 5 contained

22   photos of the outside of the computers.

23   Q.  Then you said it had hash values as well?

24   A.  Correct.

25   Q.  And could you just tell us quickly what a hash value is?

DBP8CHE4                        Blank - cross

1    A.  Sure.  A hash value is a unique value assigned to a series

2    of bytes, that should any of those bytes in that series change

3    or be rearranged, the hash value will ultimately change.

4    Q.  How many sets of hash values were there in section 5?

5    A.  There were at least one per computer, one set of hash

6    values per computer.

7    Q.  When you say at least, are you saying that there might have

8    been more?

9    A.  Oftentimes in forensic acquisitions, multiple types of hash

10   values are produced per acquisition per machine.

11   Q.  You don't recall today whether there were more hash values

12   in section 5?

13   A.  No, I do not.

14   Q.  Were there hash values in the various annexes?

15   A.  I cannot say one way or the other.  I cannot recall.

16   Q.  Have you presented to us today every page that was scanned

17   during your visit to the prosecutor's office?

18   A.  Yes, every page that I scanned was presented here.

19   Q.  Likewise, have you presented every photograph that was

20   taken during your time with the prosecutor?

21   A.  Yes.  All the photos of the report are presented here.

22              (Continued on next page)

23

24

25

DBPLCHE5                          Blank - cross

1   Q.  Do you still have PX8075A in front of you?

2   A.  Yes, I do.

3   Q.  And if you look at the numbers in the top right, the

4   handwritten numbers in the top right hand of this exhibit, was

5   it your understanding that these were page numbers?

6   A.  They did appear to be page numbers.  However, I recall them

7   not being entirely consistent and I did not, I did not rely

8   upon them.

9   Q.  All right.  To the best of your memory, were there 561

10  pages before the page that we have here as the first page of

11  8075A?

12  A.  I cannot say one way or the other that I can recall that

13  being the case.

14  Q.  Were there pages ahead of this page 562?

15  A.  Were there pages following 562?

16  Q.  That were before.  In other words, did you flip open a book

17  or a document and come to 562?

18  A.  Yes, this was not the first page.  There were pages before

19  it.

20  Q.  Can you give us any estimate as to how many pages ran

21  before this?

22  A.  At least three or 400 pages.

23  Q.  And if we talk about the end of this exhibit is I guess

24  583, were there pages after 583 in the document you were

25  reviewing?

DBPLCHE5                    Blank - cross

1   A.  After this document, after anexo 5 there were pages in the

2   report, yes.

3   Q.  And can you estimate for us how many pages came after?

4   A.  There were approximately three additional anexos following.

5   I'm not entirely sure.

6   Q.  All right.

7         MR. FRIEDMAN:  Can I have just a second, your Honor.

8   Q.  Mr. Blank, are you in a position to tell us today whether

9   the annexes you looked at contained other screen shots of

10  metadata other than what you've presented to us today?

11  A.  To the best of my recollection, no, there were no other

12  screen shots of metadata in the annexes.

13  Q.  And when you say other, as I understand it, what you've

14  shown us today does not contain photographs of screen shots

15  from the annexes; is that right?

16  A.  Correct.  The photos, the scans that are presented today

17  are from the report.

18  Q.  All right.  And were there screen shots of metadata in the

19  annexes?

20  A.  I don't recall seeing any screen shots of metadata in the

21  annexes.

22        MR. FRIEDMAN:  Your Honor, before I conclude, I wonder

23  if I could look at Mr. Blank's notes.

24        THE COURT:  Yep.

25        MR. FRIEDMAN:  Thank you.

DBPLCHE5                    Blank - cross

1            MR. BRODSKY:  Does he want to do it right now?

2            THE COURT:  Yes.

3            MR. BRODSKY:  I can try to locate them in the back.

4            THE COURT:  In the meantime, is Mr. Gomez going to

5    have any examination of the witness?

6            MR. GOMEZ:  Yes.

7            THE COURT:  All right.  Then we'll come back to you if

8    we need to.

9            MR. FRIEDMAN:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. GOMEZ:

12   Q.  Good afternoon, Mr. Blank.

13            Sir, you testified under questioning that the report

14   was difficult to read.  Is that correct?

15   A.  Yes.

16   Q.  What made it so difficult to read?

17   A.  That it was in Spanish and I don't have a understanding of

18   the Spanish language.

19   Q.  Did you, in order for the translators to explain to you the

20   contents of the report, did they have to flip back and forth

21   through the annexes?

22   A.  They had to flip back and forth through the report,

23   certainly.

24   Q.  Do you recall them flipping back and forth through the

25   annexes to interpret the report to you?

DBPLCHE5                         Blank - cross

1   A.   They did flip through the annexes, yes.

2            MR. GOMEZ:  I have nothing further.

3            THE COURT:  Thank you.

4            Mr. Brodsky, anything else?

5            MR. BRODSKY:  No, your Honor.

6            THE COURT:  All right.  We'll take, well, we'll hold

7   off on that.

8            Just tell me the next witness would be who and what is

9   the person going to say.

10           MR. BRODSKY:  Your Honor, what we can do before the

11  next witness is offer a stipulation to your Honor.  It's the HP

12  stipulation from Daniel -- testimonial stipulation of what

13  Daniel McGuire would say.  It's marked as Plaintiff's

14  Exhibit 7097.  He works at Hewlett Packard and he provides

15  business record, essentially, information regarding the serial

16  numbers and the tracking of two serial numbers of PC1 and PC2.

17           MR. FRIEDMAN:  And we've signed it, your Honor.

18           MR. GOMEZ:  Yes, we signed it.

19           THE COURT:  So Plaintiff's Exhibit 7097 is received.

20           (Plaintiff's Exhibit 7097 received in evidence)

21           THE COURT:  And I take it that eliminates the second

22  witness for the afternoon and what remains then is Mr. Lynch;

23  is that right?

24           MR. MASTRO:  Correct, your Honor.

25           MR. BRODSKY:  Yes, your Honor.

DBPLCHE5                    Blank - cross

1         THE COURT:  Okay.  Now, have you received yet --

2         MR. FRIEDMAN:  No.

3         THE COURT:  -- notes?

4         MR. FRIEDMAN:  No, your Honor.

5         THE COURT:  All right.  We'll take our break now.  And

6    how long do you expect to be with Mr. Lynch?  And I may make a

7    ruling that may affect that.

8         MS. NEUMAN:  Less than an hour, your Honor.

9         THE COURT:  All right.  What does the defense

10   anticipate in terms of cross?

11        MR. BOOTH:  Depends on a lot, depends on what they

12   cover and what your rulings are, your Honor.  I would think

13   less than half an hour.

14        THE COURT:  You heard preliminarily what I was

15   thinking about, case A and case B.  Case A is it all comes in;

16   case B is it's limited to the declaration.

17        MR. BOOTH:  I would think half an hour or less.  That

18   would be my prediction.

19        THE COURT:  As to case A, case B, or both?

20        MR. BOOTH:  Longest.

21        THE COURT:  Longest.  Thank you.

22        MR. BRODSKY:  Your Honor, I know you're stepping off

23   but just, your Honor, I'd like to ask you to keep in mind with

24   respect to Mr. Blank's testimony, the metadata certainly isn't

25   hearsay and what he testified to was all the metadata was

DBPLCHE5                    Blank - cross

1    captured.

2            THE COURT:  Listen, I was listening.

3            MR. BRODSKY:  Understood, your Honor.

4            THE COURT:  I really do pay attention.

5            MR. BRODSKY:  Thank you, your Honor.

6            MR. MASTRO:  Thank you, your Honor.

7            (Recess)

8            THE COURT:  Okay.  Anybody have any last new word they

9    want to add before I rule on the question with respect to

10   Mr. Lynch and the scope of his testimony?

11           MR. FRIEDMAN:  Actually, your Honor, there are a

12   couple more questions for Mr. Blank that I think might be

13   relevant based on his notes.

14           THE COURT:  Oh, okay.  Let's get the notes marked.

15           MR. FRIEDMAN:  Mark them as DX1901, your Honor.

16           THE COURT:  DX1901.

17   CROSS-EXAMINATION

18   BY MR. FRIEDMAN:

19   Q.  Mr. Blank, is DX1901 a copy of your notes?

20   A.  Yes.

21   Q.  And do I understand correctly you took handwritten notes

22   and then somebody typed them up later?

23   A.  I did have some handwritten notes that I later that evening

24   typed up.

25   Q.  And who typed them up for you?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

DBPLCHE5                          Blank - cross

1    A.  I typed them up.

2    Q.  And did you type up all your notes or just a portion?

3    A.  No, I had some shorthand notes that I then turned into full

4    sentences, but this is the entirety of my notes.

5         MR. FRIEDMAN:  Your Honor, I'd move for admission of

6    1901.

7         MR. BRODSKY:  No objection, your Honor.

8         THE COURT:  Received.

9         (Defendant's Exhibit 1901 received in evidence)

10        MR. FRIEDMAN:  That's all the questions.

11   Q.  Actually, I did want to ask you, Mr. Blank, then if no

12   one -- am I correct no one translated the entire report for

13   you; is that correct?

14   A.  Correct.  Nobody translated the entire report for me.

15   Q.  You would ask questions about a specific heading or a

16   specific sentence and then the translators would try to answer

17   your question?

18   A.  Either I would ask questions about a specific heading or

19   sections or vice versa.  I'd ask the translator to help me in

20   finding something within the report which I believed to be

21   there.

22   Q.  And you did work with one translator or a particular person

23   or both or two of them?

24   A.  There was one translator with me.

25   Q.  All right.  And if you wanted to get an understanding let's

DBPLCHE5                         Blank - cross

1    say of a particular sentence, would -- and that translator had

2    to flip around to look for things, you would rely upon him to

3    find what you needed; is that correct?

4    A.   Oftentimes there would be numbers involved and I'd be

5    looking over his shoulder, working with him to find what we

6    were looking for.

7    Q.   All right.  And were you restricted by the prosecutor in

8    terms of content -- let me start there -- in terms of content

9    or were the restrictions some other sort?

10            THE COURT:  That would presuppose knowledge of what

11   was in the head of the prosecutor.

12   Q.   Let me ask it this way:  Did you stay there as long as you

13   wanted to?

14   A.   I stayed there as long as I was allowed to stay there.

15   Q.   At some point you were told it was time to leave?

16   A.   Correct.

17            MR. FRIEDMAN:  And I think I'll leave it at that.

18   Thank you, Mr. Blank.

19            THE COURT:  Thank you.

20            Any further examination of the witness by anybody?

21            MR. BRODSKY:  No, your Honor.

22            THE COURT:  Mr. Gomez?

23   RECROSS EXAMINATION

24   BY MR. GOMEZ:

25   Q.   Sir, who told you it was time to leave, who gave you that

DBPLCHE5                    Blank - recross

1    instruction, was it Mr. Andocilla or was it the interpreter?

2    A.  It was not the interpreter.  It was Mr. Andocilla

3    explaining that we had to leave.  It was towards the end of

4    their day.

5    Q.  Did he explain why it was time to leave?

6    A.  No, he did not make it clear why it was time to leave,

7    other than there were people clearly getting ready to leave the

8    office around that time.

9    Q.  When you were taking the photographs, was someone from the

10   fiscalia examining what pages you were photographing as you

11   were taking them?

12   A.  Yes.  It was on his desk in front of him.

13   Q.  I don't know what you mean.  What was on his desk?

14   A.  The report was on the prosecutor official's desk while we

15   were taking pictures of it and he was present.

16          THE COURT:  You know, this is an opportunity to

17   examine with respect to the notes, Mr. Gomez.  You finished

18   your cross earlier.

19          MR. GOMEZ:  Nothing further, your Honor.

20          THE COURT:  Thank you.

21          Anything else?

22          MR. BRODSKY:  No, your Honor.

23          THE COURT:  All right.  The witness is excused.  Thank

24   you.

25          THE WITNESS:  Thank you, your Honor.

DBPLCHE5                         Blank - recross

1              (Witness excused)

2              MR. BRODSKY:  With respect to your prior question,

3    your Honor, I would like your Honor to consider, your question

4    before if I have any questions for Mr. Blank, I would like your

5    Honor to consider Plaintiff's Exhibit 7086, which I'm handing

6    up copies of, your Honor considers the ruling.

7              It is a press release issued in connection by

8    Mr. Fajardo and others associated with him issued in connection

9    with Mr. Tarco's report and it reflects that Mr. Fajardo is

10   talking about the contents of the report and is stating that

11   the report in his view supports with detail, some detail about

12   it, such as the hours, the 3,571 hours they claim Zambrano's

13   computer reflects his use, his writing of the judgment, it

14   reflects that they have access to it and they are making

15   statements in support of the fact that the report corroborates

16   Judge Zambrano and undermines, in their view, former Judge

17   Guerra.

18             In our view, these are statements in furtherance of

19   the conspiracy to cover up what their fraud in connection with

20   the judgment.

21             THE COURT:  I'm sorry, which are the statements in

22   furtherance?

23             MR. BRODSKY:  Mr. Fajardo's statements, essentially,

24   and of the report itself was in furtherance of the cover-up.

25             Your Honor, the reason for that is, to connect the

DBPLCHE5

1    dots, Mr. Fajardo initiated the criminal complaint against

2    Mr. Guerra.  Mr. Fajardo then initiates the forensic

3    examination.  It's Mr. Fajardo here talks about the results of

4    that forensic examination.  And the defense here submits

5    Mr. Tarco's declaration with perhaps the intent to -- with

6    their stated intent to call Mr. Tarco in support of Judge

7    Zambrano's testimony and the contents of the report itself

8    conflict with Mr. Tarco's declaration.

9            And it's our view the metadata within Mr. Tarco's

10   report, as Mr. Lynch would testify, is inconsistent with Judge

11   Zambrano's testimony and Mr. Tarco's own declaration offered in

12   this case but then withdrawn.

13           MS. NEUMAN:  Your Honor, may I?

14           THE COURT:  No, you may not.

15           Mr. Friedman.

16           MR. FRIEDMAN:  Your Honor, all I was going to ask you

17   to do is if you would just take a moment to look at DX1901, the

18   five bullet points on the bottom I think further support the

19   arguments we made to you this morning.

20           THE COURT:  All right.  I may well revise what I'm

21   about to say, the rationale for the ruling, but the bottom line

22   is this.  So much of the proposed testimony of Mr. Lynch

23   depends on the report in the prosecutor's office in Ecuador I'm

24   not going to entertain.

25           I think there are some extremely strong arguments for

DBPLCHE5

1    taking it.  There's absolutely no question that the defense had

2    access to it long ago.  Plaintiff's Exhibit 7086 is a press

3    release in which Mr. Fajardo spoke in some detail about the

4    contents of this report.  The defense has known since at least

5    as early as October 24 that they intended to call Mr. Tarco.

6    It was obvious that the report was going to be a key focus of

7    that.  I could well imagine an appellate court taking a

8    different view of the propriety of allowing Mr. Lynch to

9    testify on this subject, even in light of the fact that we do

10   not have the full report before us.

11          I think Mr. Blank, although he obviously acknowledges

12   that there are parts of the report he didn't copy, has made

13   clear that to the extent that he reviewed it over the course of

14   this six-hour period, he copied and took away with him all of

15   the metadata that was in the report.  And in my understanding,

16   Mr. Lynch's opinion, to the extent it rests on the report,

17   rests on the metadata.

18          Nonetheless, I've concluded that I'm going to exclude

19   it because I am concerned about allowing the testimony to come

20   in based on an incomplete document, and I'm especially

21   concerned about that in light of the fact that Mr. Blank is not

22   a Spanish speaker and, thus, was dependent on others for the

23   narrative content of the report as distinct from screen shots

24   of things like metadata which would have been readily

25   understandable to him.

DBPLCHE5

1          So all in all, I agree with the defense as to opinions

2     based on the report for those reasons, possibly others which I

3     may elaborate on later, but that's sufficient for now.

4          Now, that leaves the other part of the report, most

5     notably -- I misspoke.  That leaves Mr. Lynch's testimony based

6     on Tarco's declaration.

7          The first argument the defense puts is it's not proper

8     rebuttal.  Zambrano was called by the plaintiff, concededly as

9     a hostile witness, but called by the plaintiff nonetheless and,

10    thus, if they had anything else to say about Mr. Zambrano's

11    testimony, it should have been said on plaintiff's case in

12    chief.

13         The first point I would make about that is that the

14    order of proof is entirely within the discretion of the

15    district judge, and there are substantial considerations that

16    militate against the defendants' view on this.

17         One consideration is that the defense, in order to

18    avoid Mr. Zambrano returning on the defense's case in chief,

19    sought leave and was granted leave to examine him as their

20    witness, as well, when he was on the stand.  Thus, Mr. Zambrano

21    to that extent was offered as part of the defense case, as well

22    as part of the plaintiff's case.

23         But there are other considerations and the other

24    considerations support the same conclusion.  To begin with, it

25    is a mistake to focus on this as rebuttal to Mr. Tarco, which

DBPLCHE5

1    it isn't because he didn't testify, or as rebuttal to

2    Mr. Zambrano alone.  You have to have in mind the whole

3    chronology of the way this case developed at trial and that

4    chronology is this.

5            On October 24, the defense made a motion to expand

6    their witness list to allow them to call Mr. Tarco, and it was

7    in support of that motion that Mr. Tarco's affidavit or

8    declaration was put in.

9            Six days later, on October 30, they made another

10   motion on that occasion to expand their witness list to include

11   Ms. Calva, and it was on that motion that they put in a

12   declaration or an affidavit from Ms. Calva.

13           Both of these witnesses were said to be necessary, in

14   substance, to corroborate the defense view of Mr. Zambrano's

15   story.  The statements of both witnesses, Tarco and Calva, were

16   put before the Court to induce the Court to grant relief to the

17   defense.

18           And on November 4, at page 1395 of the trial

19   transcript, they prevailed on that.  Seeing the potential

20   importance of the testimony of both of those witnesses, I

21   allowed them to expand their witness list.  I reiterated that

22   in a written order on November 5, docket item 1681.

23           We then get into the trial testimony and how this all

24   developed.

25           On November 5, Mr. Zambrano testified at pages 1679

DBPLCHE5

1    and -80 that the judgment was typed on the new computer in his

2    office because it was the more modern one.  He added that at

3    some point while he was working on the judgment, the old

4    computer was removed from his office for maintenance, thus

5    leaving for some indeterminate period only one computer that

6    could possibly have been worked on.

7            Then at pages 1683 and -84, he testified that while he

8    was working on the judgment, Ms. Calva conducted internet

9    searches for him on the new computer.  She is the only one who

10   did internet searches on that computer that he used in drafting

11   the judgment.

12           He testified at 1658 and -59 that she was working at

13   the new computer that he received from the judicial council

14   that was in his office, not the old computer.  He didn't use

15   the old computer or no one used the old computer at all for

16   typing the judgment.

17           He testified at 1679 that the entire writing of the

18   judgment was done on the new computer.

19           Now, we then move forward to November 7, by which time

20   I had granted the defense leave to bring Mr. Tarco and

21   Ms. Calva on the defense case.

22           Mr. Mastro said at pages 2012 and -13, on November 7,

23   that the only other witness Chevron had to call was Dr. Lipton

24   and he would testify on the 14th during the defense case

25   because he wasn't available earlier.

DBPLCHE5

1            Mr. Mastro then added, The only other proviso on that,

2    your Honor, is it's not clear to us whether certain of the

3    Ecuadorian witnesses like Mr. Tarco are coming here or not.

4    Whether he comes here or not might affect whether we will need

5    to call an additional witness.  I take that to be a reference

6    also to Ms. Calva.  That was at pages 2012 to -13.

7            On November 11, Armistice Day, Veteran's Day, the

8    defense finally informed -- and I'm not faulting them; I'm just

9    simply saying this is when it happened -- that the defense no

10   longer intended to call Mr. Tarco.

11           On the following day Mr. Mastro said, and I'm

12   referring to pages 2052 to -53, Last night we learned for the

13   first time that they -- meaning the defense -- have withdrawn

14   Mr. Tarco as a witness, but it's still their intention to call

15   Ms. Calva.  We will have a rebuttal case in response to what

16   has been said by Mr. Zambrano, Mr. Tarco, and Ms. Calva.

17           I responded, If Tarco is not a witness, how do you

18   have a rebuttal case to that?  Essentially the argument the

19   defense is making now.

20           Mr. Mastro responded in part that they were going to

21   show that his declaration was incorrect, but he then added as

22   follows:  We'll be explaining why Mr. Zambrano's testimony

23   cannot be the case.  And Ms. Calva is still to appear, so we'll

24   be explaining why her anticipated testimony, that is to say,

25   what her declaration or affidavit said, cannot be the case.

DBPLCHE5

1        I interjected that we'd deal with that whenever it

2   came up.

3        Mr. Mastro responded, I simply wanted to make the

4   point, excuse me, to make the point, your Honor, instead of

5   continuing our case to rebut these points now when they still

6   say they intend to call Ms. Calva, we do intend to present

7   certain rebuttal evidence in that regard.

8        And at that point Mr. Friedman confirmed that Tarco

9   was not going to be called.

10       Now, in all of the circumstances here, it seems to me

11  as follows.  Chevron was led to believe until after it had

12  rested, subject to the calling of Dr. Lipton, that Tarco would

13  be a witness on the defense case and even later than that that

14  Ms. Calva would be a witness on the defense case.

15       I think in those circumstances that it was entirely

16  appropriate for them, even if they knew earlier what Mr. Lynch

17  was going to say, to withhold the rebuttal about what went on

18  in Mr. Zambrano's office with the new computer and the old

19  computer and so forth until they had the whole case on that

20  proposition, two pieces of which, apparently important pieces,

21  at least so I thought which is why I granted the defense leave

22  to call the witnesses, Mr. Tarco and Ms. Calva were yet to come

23  and then the defense decided not call them.

24       Now, I'm not accusing the defense of having

25  deliberately misled anybody, but the objective here is entire

DBPLCHE5

1    fairness all around.  And it seems to me that it was perfectly

2    appropriate decision for Chevron to delay rebuttal until the

3    defense case was in.  They did.  It would be manifestly unfair

4    to deprive them of the limited opportunity I'm giving them, and

5    it is very limited compared to what it is they have asked for,

6    to respond to what Mr. Zambrano said on the new computer/old

7    computer proposition.

8             The only piece of Mr. Lynch's proposed testimony that

9    remains standing in light of my ruling for the defense here

10   this afternoon is the piece that depends on paragraphs, if I

11   remember correctly, five and 13 of Mr. Tarco's declaration.  I

12   identified it earlier and if I'm mistaken now, I did so

13   accurately earlier.  It has to do with the serial numbers of

14   the two computers.

15            And the foundation evidence is all in now, and I think

16   I don't overstate to say that the defense substantially

17   conceded, subject to the rebuttal or nonrebuttal part of this,

18   that that's really not controversial anyway, but, of course,

19   the record will speak for what they said.  And so I'm going to

20   allow that small piece of it.

21            I would indicate also that if it were an issue, and

22   I'm not sure that it is at this point -- correct me if I'm

23   wrong -- those two little pieces of Tarco's declaration,

24   there's no contest that his statements about the serial numbers

25   and which computer the providencias.docx file was found on, the

DBPLCHE5

1      admissibility of those facts is not an issue.

2              Right, Mr. Friedman?

3              MR. FRIEDMAN:  Your Honor, if I'm understanding what

4      you said, the admissibility of that remains to be seen.  But if

5      you were asking us to stipulate to that --

6              THE COURT:  What I was doing was giving you my

7      understanding that you effectively had conceded it earlier, but

8      if I'm mistaken, please correct me.

9              MR. FRIEDMAN:  Well, Mr. Tarco's declaration says

10     what -- I don't have in my mind, your Honor, the actual serial

11     numbers and all that.  Mr. Booth has been working on that.

12             But the concept that Mr. Lynch, given your ruling that

13     they're allowed rebuttal, yes, we agree, Mr. Tarco's

14     declaration can be something Mr. Lynch relies upon.

15             THE COURT:  To the extent of the serial numbers and

16     the presence of the providencias.docx file on a particular

17     computer, right?

18             MR. FRIEDMAN:  Well, I think there's, at least in my

19     mind having looked at this, there's confusion about which

20     computer it's on.  So, I don't think I can agree with the

21     Court, but I see where you're going.  I think Mr. Lynch will

22     say what he's going to say on that issue and Mr. Booth will

23     cross-examine him.

24             THE COURT:  Do you want to add to this, Mr. Gomez?

25             MR. GOMEZ:  No, your Honor.  I just think there's not

DBPLCHE5

1    enough information at this time to take a position one way or

2    the other.  The declaration we received we in good faith

3    submitted.  But without a complete record, there's no way to

4    verify the accuracy.  Mr. Tarco would have testified.  His

5    understanding and recollection in his declaration would have

6    been tested.  It would have gone one way or the other and the

7    problem is we just don't have that here.

8              THE COURT:  Okay.  Let's go.

9              MS. NEUMAN:  Your Honor, if I may be heard, Mr. Lynch

10   does have an opinion also on paragraph 14 of Mr. Tarco's

11   declaration which relates to the edit time of providencias.docx

12   and how it conflicts or doesn't conflict.  Ultimately, it

13   conflicts with Mr. Zambrano's described usage of the computer.

14             And then I understand your Honor's ruling, but I would

15   ask for leave to ask Mr. Lynch just two authenticating

16   questions as to one page of the Tarco report on which the file

17   metadata appears, and I'll make an offer of proof to the Court.

18             THE COURT:  Look, you can ask the question, and I

19   imagine there may be an objection, and if there is, I'll rule

20   on it.  I may understand it a lot better then than I do now.

21             MS. NEUMAN:  Thank you, your Honor.

22             THE COURT:  Okay.  So let's go forward.  I view this

23   as quite narrow.

24    SPENCER LYNCH,

25        called as a witness by the Plaintiff, in rebuttal,

DBPLCHE5

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MS. NEUMAN:

4     Q.  Good afternoon, Mr. Lynch.

5     A.  Good afternoon.

6     Q.  Welcome back.

7     A.  Thank you.

8     Q.  Do you still have on the witness stand PX4125A, sir?

9     A.  I do, yes.

10    Q.  Could you turn to page 13.

11    A.  Okay.

12    Q.  Is there information on page PX4125A -- withdrawn.

13          Did you review, Mr. Lynch, a declaration of Mr. Tarco

14    filed in this matter that's been marked as Exhibit 6371?

15          MS. NEUMAN:  May I approach, your Honor?

16          THE COURT:  Yes.

17    A.  Yes, I reviewed this before.

18    Q.  And exhibit, Plaintiff's Exhibit 6371 is a declaration of

19    Mr. Tarco that you reviewed and relied upon?

20    A.  Yes.

21          MS. NEUMAN:  Plaintiff would move in 6371, your Honor,

22    not for the truth.

23          MR. BOOTH:  We object to this.

24          THE COURT:  And the ground?

25          MR. BOOTH:  Hearsay.

DBPLCHE5                         Lynch - direct

1           THE COURT:  It's not offered for the truth.  Next.

2           MR. BOOTH:  Then I'm at a loss.  I don't know what it

3    could be used for if not for the truth.  Your Honor, I

4    apologize.  He is going to rely on the truth of the statements,

5    I suppose, to contradict another witness.  I don't know how we

6    can do that.

7           THE COURT:  Let's find out if that is the case.

8           MR. BOOTH:  Well, in addition, your Honor, this was a

9    declaration.  This was not his witness statement.  This was

10   declaration we filed with the court to get permission to bring

11   the witness.  This was not a witness statement, and so we would

12   object on those grounds.  Thank you.

13          THE COURT:  I'm going to receive it subject to a

14   motion to strike if it's not connected up, not for the truth of

15   the matters asserted unless a subsequent offer is made for that

16   purpose or a part of it.  I'll rule on that if, as, and when it

17   happens.

18          (Plaintiff's Exhibit 6371 received in evidence)

19   Q.  Mr. Lynch, do you still have Plaintiff's Exhibit PX4125A in

20   front of you?

21   A.  I do, yes.

22   Q.  And what is your understanding of that document?

23          THE COURT:  Oh, please.  Come on, Ms. Neuman.

24          MR. BOOTH:  Objection, your Honor.

25          THE COURT:  What is your understanding of the

DBPLCHE5                         Lynch - direct

```
1    Encyclopedia Britannica.

2              MS. NEUMAN:  I'll ask a more precise question.

3    Q.  Is there metadata that's provided in the Tarco declaration

4    PX6371 that also appears on page 13 of PX4125A?

5              MR. BOOTH:  Objection.  Discussion of this document

6    you ruled not in evidence, your Honor.

7              THE COURT:  Overruled given the previous ruling.

8              Please answer the question.

9    A.  Yes.  The screen shot on the top of page 13 has metadata

10   for a file named providencias.docx that is also reflected in

11   the declaration marked 6371.

12   Q.  And how do you know that the metadata in the two documents

13   is the same?

14   A.  By comparing them.  6371 states that the file –– in

15   paragraph 13 states that the file providencias.docx was created

16   on October 11, was last modified March 18, and it states the

17   date it was last opened was September 10, 2012.

18             The screen shot in 4125A on the top of page 13

19   reflects a document named providencias.docx with a creation

20   date of October 11, 2010, a last access date of September 10,

21   2012, and a modification date of March 18, 2011.

22   Q.  And are there any hash values contained on the screen shot,

23   screen shot 10 on page 13 of PX4125A?

24   A.  Yes.  There are two hash values that appear about

25   two-thirds of the way down the screen shot for the file
```

DBPLCHE5                          Lynch – direct

1    providencias.docx.

2    Q.  And if you look at screen shot 11, is there a matching hash

3    value appearing in screen shot 11?

4              MR. BOOTH:  Same objection, document not admitted, not

5    allowed to rely on.

6              THE COURT:  Sustained.  What's the point of this?

7              MS. NEUMAN:  Authenticating the screen shots, your

8    Honor.

9              THE COURT:  I understand that.  But if it says cow at

10   the top of the page and it says cow at the bottom of the page,

11   I don't need an expensive expert witness to tell me that it

12   says cow in both places, right?

13             MS. NEUMAN:  Your Honor, may I have a side bar?

14             THE COURT:  All right.  Quickly.

15             (At the side bar)

16             MS. NEUMAN:  Your Honor, this screen shot contains the

17   file system metadata that matches the Tarco declaration that

18   the defendants submitted.  It has a hash value.  This screen

19   shot contains the document metadata.  It has a hash value.

20   Mr. Lynch will testify that based on the hash values, he knows

21   both sets of metadata to have come from the same file.

22             THE COURT:  Look, I made a ruling here and that is

23   that to the extent his testimony rests on this report, it's not

24   coming in.

25             MS. NEUMAN:  I just --

DBPLCHE5                          Lynch – direct

1           MR. MASTRO:  We'll go on, your Honor.

2           (In open court)

3    BY MS. NEUMAN:

4    Q.  Mr. Lynch, did you do any forensic analysis since you last

5    testified relating to Judge Zambrano's testimony and the Tarco

6    declaration, excluding the Tarco report?

7    A.  Yes, I have.

8    Q.  Could you describe the focus of your recent analysis.

9    A.  Yes.  I analyzed Mr. Zambrano's testimony that about how he

10   described the process of drafting the judgment on the new

11   computer against the forensic information provided in the Tarco

12   declaration.

13   Q.  And did you read the entirety of Mr. Zambrano's deposition

14   testimony?

15   A.  I did, yes.

16   Q.  Did you read the entirety of Mr. Zambrano's trial

17   testimony?

18   A.  I did, yes.

19   Q.  Were there particular portions of Mr. Zambrano's testimony

20   that you as a forensic examiner focused on?

21   A.  Yes, and I created a slide showing some of those sections.

22   Q.  Can we put Plaintiff's Exhibit 4128 for identification on

23   the screen, please.

24   A.  First, Mr. Zambrano described that he would arrive at the

25   office between 6 a.m. and 7 a.m., would stay until 11 or later,

DBPLCHE5                         Lynch - direct

1    that he had two desktop computers, one from the time he became

2    a judge and a second computer that was issued after the court

3    equipment was renewed, that he shut down both of his computers

4    every night and that he turned on his computers when he arrived

5    in the morning.

6              And then on the next slide, that him and his typist,

7    he would dictate to his typist and she would arrive at eight in

8    the morning and work until noon and then go to lunch and then

9    return and work until six or later, that the entire judgment

10   was drafted on his new computer, that he worked several

11   weekends, and that while he was working using the new computer,

12   the old computer was taken away for maintenance.

13   Q.  Were there also specific portions of the Tarco declaration,

14   Exhibit PX6371, that you focused on?

15   A.  Yes, and I actually also created a slide of those.  First

16   Mr. Tarco described there were two machines and that one of

17   them had a serial number MXJ64005TG.

18             MR. BOOTH:  Your Honor, I object to this.  It sounds

19   to me like they're relying on this for the truth.  He's relying

20   on it for factual evidence that he's now using to form an

21   opinion which to me sounds like the truth.  I can't think of

22   anything else it would be.

23             THE COURT:  Well, look, Ms. Neuman, first of all, I

24   was wrong in referring a moment ago to paragraphs 5 and 13.  I

25   meant 5 and 10.  You've zeroed in on exactly what I was talking

DBPLCHE5                      Lynch – direct

1    about.

2            Are you offering the quoted sentences from PX6371 from

3    paragraphs 5 and 10?

4            In the first case the sentence, or two sentences,

5    actually, the first machine CPU used by Dr. Zambrano has serial

6    number MXJ64005TG and was labeled in our analysis as PC02.  The

7    second machine used by Dr. Zambrano has serial number

8    MXL038123D and was labeled PC01.  That's paragraph 5.

9            And then the sentence or sentences from paragraph 10,

10   on the hard drive from computer PC02 we found a file named

11   providencias.docx which contains several hundred pages and it

12   continues for two more sentences.

13           Now, are you offering that for the truth?  If you're

14   not, on what basis are you proceeding?

15           MS. NEUMAN:  We're offering it for the truth, your

16   Honor, that that is the computer on which Mr. Tarco in his

17   signed declaration states that he found providencias.docx and

18   that that is the serial number of the computer that he looked

19   at.

20           THE COURT:  All right.  And what's your position,

21   Mr. Booth?

22           MR. BOOTH:  I'm sorry.

23           THE COURT:  You have something to say?

24           MR. BOOTH:  I was actually reading over his shoulder

25   because Ms. Littlepage was talking to me while she was talking.

DBPLCHE5                        Lynch - direct

1          THE COURT:  Read over his shoulder.  I could never

2    read over his shoulder from that distance.

3          MR. BOOTH:  Your Honor, we would object, hearsay.

4    It's being offered for the truth.  It's a hearsay document and

5    we believe it should not be admitted for the truth.  It

6    shouldn't be admitted at all and certainly not for the truth is

7    our position.

8          THE COURT:  Ms. Neuman.

9          MS. NEUMAN:  These are admissions, your Honor.  They

10   were offered by the defendants as accurate statements, and

11   they're also coconspirator statements to the extent Mr. Tarco

12   is participating in the cover-up.

13         THE COURT:  I'm not satisfied on the second point.

14         Mr. Booth, what's the response to the argument that by

15   putting the Tarco declaration before the Court it's an

16   admission?

17         MR. BOOTH:  He's not our agent, your Honor, and I

18   don't believe putting forward a statement of what a witness, a

19   factual witness that we hope to call, putting forth a

20   declaration to the Court of what we understand the factual

21   witness knows so that the Court can make a decision on allowing

22   us to amend the witness list means that we adopt what the

23   factual witness has put in the factual witness's statement.

24         THE COURT:  It was not a statement of your

25   understanding of what he knew.  It was a sworn statement by the

DBPLCHE5                     Lynch – direct

1   witness.

2             MR. BOOTH:  Right, your Honor.

3             THE COURT:  And you put it before me for what purpose?

4             MR. BOOTH:  We put it before you so that you would see

5   and we could show the parties and the Court what this witness

6   purported to talk about as we understood it because we don't

7   have the factual information he has.  He has that factual

8   information.  So we didn't want to tell the Court this is what

9   we think, so we had him do a declaration which we then provided

10  to the Court.

11            I don't think that has us adopting the factual

12  statements of that witness.  He's not our expert.  We have not

13  put forward an expert opinion by this person as an expert.

14  We're putting forth a factual witness.

15            MR. GOMEZ:  If I may add, your Honor, nor could we ask

16  the Court to adopt that statement.  We would have to bring that

17  witness here to testify.

18            I would suggest, your Honor, that if we were asking

19  the Court without this witness to accept this declaration

20  because it favored us, after everything that's happened, that

21  the plaintiffs would be arguing very strongly that it shouldn't

22  come in for the truth if they thought it actually favored the

23  defendants.

24            THE COURT:  Ms. Neuman.

25            MS. NEUMAN:  Well, your Honor, they obtained this

DBPLCHE5                    Lynch - direct

declaration from Mr. Tarco.  They had him sign it under penalty
of perjury.  They offered it to the Court.  Under Rule 11 it
had to be offered in a good faith basis.  I think having made a
representation to the Court after having obtained a declaration
signed under penalty of perjury that this is what Mr. Tarco
would testify to and that that's why he should be allowed to
come here and testify as a witness in their case that they did
adopt his statements in his -- the factual statements in his
declaration.  And which computer he looked at and what serial
number that computer had is certainly included within those, as
is the nature of the document that he found on that computer.

          I don't think this is the same as if we were objecting
to it due to a lack of ability to cross-examine.  They were
able to discuss whatever they wanted to discuss with Mr. Tarco
before they had him sign a declaration and submitted it to this
Court.  They now can't complain that they didn't get to
cross-examine their own witness before his statements are used
against them.

          MR. BOOTH:  Your Honor, I think there's a distinction
between something -- the concept that we would adopt the
statement of any witness whose evidence we would put before
you, I've never heard of such thing.  We do not adopt the
factual statements of witnesses we bring to the Court,
certainly not a declaration that he did that we brought to you
in that fashion.

DBPLCHE5                          Lynch - direct

1          I understand there could be times when you can adopt

2    the statement of an agent, can adopt the statement of an

3    expert, but that is not this circumstance.  We didn't file this

4    to support some factual argument in summary judgment.  We

5    simply were notifying the Court of what this person told us in

6    a declaration he would be able to testify to and we brought

7    that to the Court and the parties.

8          THE COURT:  That's not exactly right.  You submitted

9    this to the Court for the purposes of persuading me that

10   notwithstanding the fact that you had never identified him as a

11   witness previously, I should grant you dispensation from the

12   requirement that you have done so because the testimony was

13   material, important, and you should have the opportunity to

14   call him.

15         Not only that, you made that application after your

16   Mr. Fajardo and your Mr. Piaguaje had access to the full

17   report, after obviously somebody on the defense side of the

18   case had reached out to this individual and had persuaded him,

19   first of all, that he should give you a sworn statement under

20   penalties of perjury in the United States and, secondly, that

21   he should voluntarily appear here on your behalf for the

22   purpose of testifying.

23         Now, did you do that believing that what he was going

24   to say would be false?

25         MR. BOOTH:  Absolutely not, but I would have no way of

DBPLCHE5                    Lynch – direct

1   knowing that, your Honor.

2          THE COURT:  Well, your clients did.

3          MR. BOOTH:  My client is Steven Donziger.  My client

4   is not anybody else.  And I can tell you Steven Donziger didn't

5   have anything to do with any of this.

6          So this was something that I and we, these lawyers

7   here with me, the two representing Mr. Donziger, myself, we

8   believed this witness had factual knowledge.  He does not speak

9   the same language I speak and vice versa.  I understood he had

10  evidence about the computers.  We got, we asked him to do a

11  declaration because the Court would need that and the parties

12  would need that.  We presented that to the Court not having any

13  idea if he was right, wrong, or in between and that's what we

14  did.  And now the concept that we've adopted this I don't think

15  fits within any part of the law.

16         THE COURT:  Two days before you made your motion,

17  according to Plaintiff's Exhibit 7086, maybe more, maybe three

18  or four days before, Mr. Fajardo issued a press release stating

19  that Tarco's report destroys the arguments by Chevron in this

20  regard.  Think that's relevant?

21         MR. BOOTH:  Your Honor, not to be flip, but not to me.

22  Mr. Fajardo is not my client.  I have absolutely no control

23  over anything he does in any manner, shape, or form.  And I

24  don't know, I certainly say it's irritating, but I don't know

25  that his statements in Ecuador in a press release impact

DBPLCHE5                         Lynch – direct

1     whether this witness can rely on something that I provided to

2     the Court by a fact witness that I hoped would come and be able

3     to testify factually and I relied on him to make that

4     declaration.

5             THE COURT:  Would you have put it forward if his

6     testimony was going be that Zambrano had lied as proven by the

7     forensic evidence?

8             MR. BOOTH:  Would I have brought a witness that was

9     going to prove the case against me?

10            THE COURT:  That's my question.

11            MR. BOOTH:  I don't want to speculate, but I don't

12    think I would bring a witness.

13            THE COURT:  I wouldn't think so either.

14            So you thought he was a good witness for you, that he

15    was going to back up your side of the case, and that's why you

16    put the affidavit before me to get permission to call this good

17    witness.

18            MR. BOOTH:  Yes, your Honor.  And I can tell you a

19    hundred times where I've been wrong putting a witness on the

20    stand and they say something bad and everybody says that was

21    Booth's witness.  That doesn't mean Booth adopts what the

22    witness says.

23            THE COURT:  That's not the test.  It's not the test.

24    We do have rules of evidence and they matter sometimes.  And

25    this one says that a statement is not hearsay if it is offered

DBPLCHE5                    Lynch - direct

1    against an opposing party -- that would be your client and

2    Mr. Gomez's clients -- and the statement is one that the party

3    manifested that it adopted -- that's your word -- or believed

4    to be true.  That's the second part.

5            Now, unless you're prepared to stand here, both of

6    you, and tell me that you were calling this witness to give

7    testimony that neither of you believed was true, it seems to me

8    that quite possibly the rule reads right on the money on this.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBP8CHE6                         Lynch - direct

1            MR. BOOTH:  Sorry, your Honor.

2            THE COURT:  That's all right.  It's important that we

3    all get this right.

4            MR. BOOTH:  Your Honor, I do not believe that this

5    rule applies to me.  I do think that if there were a

6    circumstance, for example, in response to a summary judgment

7    motion or to support a summary judgment or something where I am

8    asserting to you the facts of this statement supports a legal

9    statement, that is certainly one thing.  And I think under

10   those circumstances I would be manifesting my belief that the

11   facts are actually true, and I would be manifesting that I have

12   adopted those facts.  I can see under those circumstances being

13   bound by such an adoption.

14           THE COURT:  Nobody is talking about bound.

15           MR. BOOTH:  But by adopting it, it's coming in under

16   my name.  All I am saying to you is, I did not have any belief

17   this was an untrue statement, but I would have had no ability

18   to verify as true or untrue what this man put in a declaration.

19   I assume that he is going to sign something under penalties of

20   perjury.  I assume that if he is a man who works in the

21   judicial system down there, that he would be truthful.

22           What I did was I got a factual witness to do a

23   declaration to bring to the Court.  I did not do anything that

24   separately represents to the Court I believe it's true, or that

25   I believe that it was adopted by me.  But I did want the Court

DBP8CHE6                         Lynch - direct

1    to know what this witness says he knows, I wanted the parties

2    to know what he says he knows, and I wanted the Court to

3    consider letting me call this witness.  Then I would have met

4    him, had his words translated, prepared a witness statement,

5    and put him on the stand.  But none of that happened.  So I

6    just don't believe this rule applies to me -- not to me, but to

7    this circumstance.

8              THE COURT:  If memory serves, Chevron's brief on this

9    motion you made to strike the anticipated testimony challenged

10   the defense as follows:  If you don't believe what Tarco said

11   in the declaration, why don't you say so?

12             MR. BOOTH:  Judge, I didn't not believe it.  I didn't

13   have any ability to believe or not.  I never met the man.  I

14   have never seen the computers.  I have never seen any of these

15   things that have now come in today.  I have never seen his

16   report beyond today.  I have never had a conversation with him.

17   I have no ability to make a judgment.  But I have a fact

18   witness who knows things about the computers.  He lives in

19   Ecuador.  We didn't list him.  We wanted the Court to allow us

20   to bring that fact witness.  So we got him to do a declaration.

21   I wanted the Court to know what he says he knows.  But it's not

22   me telling you that's what he knows.  I am telling you that's

23   what he says, and I want to bring him as a witness.  That's not

24   the same thing as me adopting the facts and making them

25   essentially mine through me telling you I know they are true,

DBP8CHE6                          Lynch - direct

1   because I don't know they are true.  I have no reason to think

2   they are false, but I cannot tell you they are true.  Even

3   standing here today I can't tell you that.

4          THE COURT:  Well, I understand your argument.

5          Ms. Neuman, any last thing on this?

6          MS. NEUMAN:  I would just add, your Honor, that both

7   Mr. Donziger and the labs have an agent in Ecuador for Mr.

8   Fajardo who has access to the report, and it hasn't been

9   represented whether or not he was involved in obtaining this

10  declaration, but he certainly can verify the facts for counsel

11  before they presented it, presumably in good faith after

12  appropriate diligence.

13         THE COURT:  Well, I am going to hear the testimony,

14  and I will eventually rule.  And you're welcome to brief the

15  adopted admission point.  It seems to be where the rubber meets

16  the road on this.  And I will be very interested to see what

17  both sides have to say on that.

18         Let's go ahead and let's try to finish this witness

19  this afternoon.

20         MS. NEUMAN:  Yes, your Honor.

21         MS. NEUMAN:  May I approach?

22         THE COURT:  Yes, you may.

23  BY MS. NEUMAN:

24  Q.  Mr. Lynch, do you have Exhibit 4108 in front of you?

25  A.  I do, yes.

DBP8CHE6                        Lynch - direct

1   Q.  Is this a document that you relied on in forming your

2   opinion?

3   A.  It is, yes.

4            THE COURT:  Could I have a copy, please?

5            I have 4110.

6            MS. NEUMAN:  They are bundled together for efficiency

7   but not in order.

8            THE COURT:  All right.

9   Q.  Mr. Lynch, for what purpose did you rely on Plaintiff's

10  Exhibit 4108?

11  A.  To identify the computers assigned to Mr. Zambrano.

12  Q.  Were you able to do that using Exhibit 4108?

13  A.  Yes, I was.

14  Q.  Can you explain?

15  A.  4108 --

16            MR. BOOTH:  Objection.  This is hearsay.  I would

17  object to hearsay and no authentication that it even is what it

18  purports to be.

19            THE COURT:  So far he didn't say what it said.

20            MR. BOOTH:  I thought he was about to.

21            THE COURT:  I can understand being over anxious.  Been

22  there myself.

23            Next question.

24            MS. NEUMAN:  We would move the admission of 4108, 4109

25  and 4110 as foreign Apostille documents under 902, subparagraph

DBP8CHE6                         Lynch – direct

1    3.

2              THE COURT:  OK.  Mr. Booth, your turn.

3              MR. BOOTH:  Pass.  Judge, I don't even know what that

4    means.

5              THE COURT:  It means it's got a little official

6    doohickey that says this is an official record down here in

7    Ecuador, which takes care of the authenticity problem, I think,

8    subject to your views.

9              We are all getting quite a lesson in foreign judicial

10   documents here.

11             MR. BOOTH:  I am so happy about that as well.

12             THE COURT:  It's one of those things that you just

13   have to have when you practice law in the United States.

14             MR. BOOTH:  I would argue foundational hearsay.  I

15   don't know this rule.  I did not see anything which triggered

16   that in my mind, and I apologize.

17             THE COURT:  No apology is necessary.

18             MR. BOOTH:  I feel like I probably should know the

19   answer to this, but I don't.

20             THE COURT:  902(3) seems to cover the case.

21             That's what you rely on, right, Ms. Neuman?

22             MS. NEUMAN:  Yes, your Honor.

23             THE COURT:  Are the technical requirements satisfied

24   in 902(3)?

25             MS. NEUMAN:  Yes, your Honor.  These documents have

DBP8CHE6                         Lynch – direct

1    all been Apostilled in Ecuador.

2              THE COURT:  I always thought Apostille was a noun.

3              MR. BOOTH:  The only thing I would say is I was just

4    pointed to the point where it says, if all parties have been

5    given a reasonable opportunity to investigate.

6              THE COURT:  If all parties have been given an

7    opportunity, then you don't need the little doohickey.

8              MR. BOOTH:  He pointed that to me.

9              THE COURT:  Good.  He is on his toes.

10             So it's authentic.

11             Now, let's explore hearsay.  Are you still making that

12   objection?

13             MR. BOOTH:  Yes.

14             THE COURT:  If memory serves, it's 803(8).

15             Now, these documents purport to be and are, in view of

16   the ruling on authenticity, records from the Provincial Office

17   of the Judicial Council of Sucumbios province of the delivery

18   of furniture and/or office equipment to Judge Zambrano.

19             I think it obviously on the face of it sets out a

20   record of the office's activities, right, the furniture

21   activity?

22             MS. NEUMAN:  Yes, your Honor.

23             THE COURT:  Anybody dispute that the Provincial Office

24   of the Judicial Council is under a legal duty to keep track of

25   where they assign the furniture and the office equipment?

DBP8CHE6                           Lynch - direct

1          MR. BOOTH:  I don't dispute that.

2          THE COURT:  Is there any reason to conclude that

3     either the source of the information, to wit, the Provincial

4     Office of the Judicial Council, or other circumstances indicate

5     that their records of who they assigned the equipment to are

6     not trustworthy?

7          MS. NEUMAN:  I am not aware of any.

8          MR. BOOTH:  I am not aware of any, your Honor.

9          It's pointed out to me that this was signed in October

10    21, 2013.  I would use this to again assert that I don't

11    believe this is true rebuttal.  This is information that was in

12    their possession before, and certainly not something that just

13    happened, and could have been handled in their case in chief.

14    It would have given us a chance before we got this on Friday to

15    look at the issue.  I don't have any more than that to say

16    about it.

17         THE COURT:  Overruled.  They are received, 4108, 9 and

18    10.

19         (Plaintiff's Exhibits 4108, 4109 and 4110 received in

20    evidence)

21    BY MS. NEUMAN:

22    Q.  In addition to the Ecuadorian office inventories,

23    Mr. Lynch, did you review the testimonial stipulation from

24    Hewlett Packard?

25    A.  Yes, I did.

DBP8CHE6                          Lynch - direct

1   Q.  Taking that information together, the office inventories

2   and the Hewlett Packard stipulation, were you able to develop a

3   timeline as to when Judge Zambrano had possession of his old

4   computer?

5   A.  I did, yes, and I prepared a graphic showing the timeline.

6          MS. NEUMAN:  Can we put that graphic up, please?

7   Q.  Mr. Lynch, could you walk us through the timeline for Mr.

8   Zambrano's old computer as you determined it to be?

9          THE COURT:  What exhibit is this timeline?

10         MS. NEUMAN:  It was a page of Mr. Lynch's

11  demonstrative which were marked for identification.

12         THE COURT:  So it's page 5 of that.  What was the

13  exhibit?

14         MS. NEUMAN:  I'm sorry.  I lost track of the first

15  page.

16         4128.  We will have to remove some of the pages,

17  however, your Honor, because the slide deck included opinions

18  on the declaration.

19         THE COURT:  So this is page 5 of 4128 for

20  identification, correct?

21         MS. NEUMAN:  Yes, your Honor.

22  A.  The old computer had serial number MXJ 64005 TG.  It was

23  manufactured by HP October 5, 2006.  And then Mr. Zambrano

24  signed for that computer on December 30, 2008, as per one of

25  the office inventories.  It appears again on office inventory

DBP8CHE6                          Lynch – direct

1    for March 10, 2011.  And then finally on the final office

2    inventory from April 25, 2012, when Mr. Zambrano turned in his

3    equipment after being dismissed as a judge.

4    Q.  Mr. Zambrano and Mr. Tarco we notice in your earlier slides

5    use different terminology.  Mr. Zambrano talks about his old

6    computer and his new computer.  Mr. Tarco discusses PC 01 and

7    PC 02.  Have you identified how the old/new computer

8    terminology corresponds to the PC 01, PC 02 terminology?

9    A.  Yes.  The old computer Mr. Zambrano referred to was

10   identified by Mr. Tarco as PC 02.

11   Q.  How do you know that?

12   A.  The serial numbers match.

13   Q.  Were you also able to determine the history of the new

14   Zambrano computer?

15   A.  Yes, I was.  And I have a slide walking through a timeline

16   of that as well.

17   Q.  That would be page 6 of Exhibit 4128 for identification.

18         MS. NEUMAN:  Can we put that up, please?

19   A.  The new computer was manufactured by HP on September 27,

20   2010, was shipped to Miami on October 15, 2010, arrived in

21   Miami on October 21, 2010, and then was purchased by the

22   judicial council on November 26, 2010.

23         Then appears on an office inventory from March 10,

24   2011.  And then finally, like the old computer, was turned in

25   when Mr. Zambrano turned in his equipment after being dismissed

DBP8CHE6                         Lynch – direct

1    as a judge.

2    Q.   In terms of the Tarco terminology, is the new computer PC

3    01 or PC 02?

4    A.   The new computer is PC 01.

5    Q.   In his declaration filed with the Court, on which Zambrano

6    computer, old or new, did Mr. Tarco state a document containing

7    text very similar to the judgment was found?

8    A.   Mr. Tarco stated that the document containing text very

9    similar to the judgment was found on the old computer.

10   Q.   Having analyzed Mr. Zambrano's testimony about how the

11   judgment was drafted, can you forensically reconcile the

12   finding of providencias.docx with the old computer with Mr.

13   Zambrano's sworn testimony?

14   A.   No, I cannot.

15   Q.   Why not?

16   A.   First, Mr. Zambrano testified that he created the judgment

17   exclusively on the new computer.   At least from the Tarco

18   declaration, the only copy referenced of the judgment, or text

19   similar to the judgment, was found on the old computer.   Per

20   the Tarco declaration, that copy was created on October 10,

21   which is before the new computer was even shipped to Miami and

22   well before it was purchased by the judicial council.

23   Q.   So am I correct that Mr. Tarco found the providencias.docx,

24   the judgment-like document on the old computer, whereas Mr.

25   Zambrano testified he drafted it on the new computer?

DBP8CHE6                      Lynch – direct

1    A.  Yes, that's correct.

2    Q.  Did Mr. Tarco state the amount of edit time that

3    providencias.docx had in his declaration?

4    A.  Yes.  He stated it has 3,571 hours.

5    Q.  Does edit time accumulate from a file creation date or an

6    embedded creation date?

7    A.  It accumulates from the embedded creation date, when the

8    document was created.

9    Q.  Did Mr. Tarco provide a creation date in his declaration?

10   A.  His declaration wasn't clear as to what date he was

11   providing, but it appeared to be a file system date.

12   Q.  What creation date did he provide?

13   A.  It's not clear.  It appears to be a file system date.

14   Q.  What was the actual date?

15   A.  It is October 11.

16   Q.  Is that date, if it's a file system date, relevant to

17   determining the time period during which edit time can

18   accumulate?

19   A.  The embedded edit date is what dictates the edit time.  But

20   absent that, the only date I have is the file system date.

21   Q.  If the date in the Tarco report for the create date is the

22   embedded system date, would the --

23            THE COURT:  Ms. Neuman, aren't you going beyond my

24   ruling, even if the defense is not objecting?

25            MS. NEUMAN:  This is limited to information in the

DBP8CHE6                        Lynch - direct

1     declaration, your Honor.

2                THE COURT:  Where?

3                MS. NEUMAN:  We can go to that.

4     Q.  Mr. Lynch, did you do an analysis of the judgment, Exhibit

5     399, to determine the percentage of quoted material?

6     A.  I did, yes.

7     Q.  What did you determine?

8     A.  I determined that 30 percent of the words in the judgment

9     appeared in quotes.

10    Q.  Did you make that determination using generally accepted

11    methods?

12    A.  Yes.

13    Q.  I have one more question on edit time.

14               THE COURT:  That's confusing.  Generally accepted

15    methods?

16               You're just telling me what percentage of the phrases

17    or segments of the opinion had quotation marks around it,

18    right?

19               THE WITNESS:  Yes.

20               THE COURT:  So there is no generally accepted method

21    beyond looking for where the quotation marks are and counting

22    what comes in between, is that right?

23               THE WITNESS:  In some cases there was a hanging quote.

24               THE COURT:  You had to sort out the hanging quotes.

25    Q.  Mr. Lynch, does edit time accumulate when the computer is

DBP8CHE6                        Lynch - direct

1   off?

2   A.  No, it does not.

3         MS. NEUMAN:  I pass the witness, your Honor.

4         THE COURT:  Mr. Booth.

5   CROSS-EXAMINATION

6   BY MR. BOOTH:

7   Q.  Hello, Mr. Lynch.  Nice to see you.

8         Does edit time accumulate when the computer screen is

9   turned off but the computer is on?

10  A.  It can.

11  Q.  The particular computers we are talking about here in Mr.

12  Zambrano's office were desktop computers, correct?

13  A.  Yes.

14  Q.  Which means they would have had a screen separate from the

15  actual computer thing, right?

16  A.  Yes.  There is a separate screen and tower.

17  Q.  The tower would have an on and off button?

18  A.  Yes.

19  Q.  This type of tower would have an on and off button?

20  A.  Yes.

21  Q.  And the screen would have an on and off button?

22  A.  Yes.

23  Q.  The Tarco declaration that is Plaintiff's Exhibit 6371, is

24  this the type of document you would normally rely on in forming

25  opinions in your professional capacity?

DBP8CHE6                              Lynch - cross

1   A.   Normally I would have forensic evidence.

2   Q.   So normally this type of document with the type of

3   information it contains -- strike all that.

4         The type of information, the quality and the scope of

5   the information in this document, Plaintiff's Exhibit 6371, is

6   that the type of information you would normally rely on in

7   forming opinions?

8   A.   The metadata in it and the edit time and user name that

9   appears is of the type that I would normally rely on.

10  Q.   But the quality of what is reported, is that the type of

11  quality of evidence you would normally rely on?

12         THE COURT:  I think you have to be more specific, Mr.

13  Booth.

14  Q.   In looking at this declaration in the past, were you

15  critical of the quality of the information contained in

16  Plaintiff's Exhibit 6371?

17         MS. NEUMAN:  Objection.

18         THE COURT:  Sustained.

19         As I understand it, he has relied on three pieces of

20  data in here.  Data number one is the serial number of computer

21  number one.  Data number two is the serial number of the second

22  computer.  Data number three is the fact that there was found

23  on the hard drive of computer PC 02 a file named

24  providencias.docx.  I don't think he relied on anything else

25  during his testimony.

DBP8CHE6                          Lynch - cross

1           MR. BOOTH:  Yes, your Honor.  Thank you.

2           THE COURT:  If I am mistaken, please bring it to my

3      attention.

4           MS. NEUMAN:  He did speak to the 3,571 hours of edit

5      time, your Honor.

6           MR. BOOTH:  That's where I was going.

7           THE COURT:  Yes, I understand he spoke to it, but I

8      wasn't clear that he relied on it.  He said when edit time

9      accrues and doesn't, which is not in this declaration, right?

10          MS. NEUMAN:  Correct.  It just allows an

11     interpretation of the edit time that is in the declaration in

12     conjunction with Mr. Zambrano's testimony.

13          THE COURT:  OK.  Let's proceed.

14          MR. BOOTH:  May I have just a moment?

15          THE COURT:  Please.

16     BY MR. BOOTH:

17     Q.  Let me ask you about the computers, the computer you called

18     the old computer.

19     A.  Yes.

20     Q.  That computer, based on the materials you reviewed, would

21     have been in Dr. Zambrano's office between 2008, let's say,

22     sometime during 2008, and when he left the bench in February of

23     2012, is that right?

24     A.  Yes.

25     Q.  Now, the computer that you called the new computer, the

DBP8CHE6                         Lynch - cross

1    first time that appears on any inventory for Dr. Zambrano's

2    office is March 2011, is that right?

3    A.  Yes.

4    Q.  It wasn't even purchased until November 26, 2010, right?

5    A.  Yes.

6    Q.  You don't know when that computer actually made it to Dr.

7    Zambrano's office?

8    A.  I do not know.

9    Q.  Do you know if Dr. Zambrano had a different new computer in

10   his office on which he typed the sentencia?

11             MR. BOOTH:  Strike that.

12   Q.  Do you have any way of knowing whether Dr. Zambrano had a

13   different, quote unquote, new computer in his office, other

14   than the two computers you have referenced here in your slides?

15   A.  In his testimony he referenced that he had one from when he

16   became a judge and that he received a new one later.  At least

17   from his testimony, he didn't reference receiving multiple new

18   computers.

19   Q.  In his testimony, the Court will have this, but do you

20   recall whether he referenced a time frame when he had an old

21   one and got a new one?

22   A.  He referenced receiving the new one before he began typing

23   the judgment, but he didn't recall the specific time frame.

24   Q.  If he received it before he started typing the judgment,

25   and if the file creation date on the system is October 2010,

DBP8CHE6                          Lynch - cross

1    there is no way he got a new computer, this new computer that

2    was not even purchased until November 26, 2010, before he

3    started typing the judgment, right, if my dates are right?

4    A.  I am not sure I completely understood the question.

5    Q.  The file creation date for the providencias document was

6    October 2010, right?

7    A.  Yes.

8    Q.  Dr. Zambrano said he used the new computer that he received

9    just before he started typing the judgment, right?

10   A.  Yes.

11   Q.  If he is right, he would have gotten a new computer before

12   October 2010, right?

13   A.  His testimony.  The office inventory show and the HP

14   records show that the new computer was still in Miami when he

15   began typing based on the metadata.

16   Q.  This new computer -- let's go back.

17          When Mr. Tarco went to Judge Zambrano's office in

18   September of 2012, there were two computers.  Is that what you

19   understand to be true?

20   A.  In September 2012?

21   Q.  Yes.  Isn't that when he went to collect the two computers?

22   A.  The two computers were turned in after he had been

23   dismissed in April 2012.

24   Q.  So in April 2012, Dr. Zambrano had two computers?

25   A.  Yes.

DBP8CHE6                        Lynch - cross

1   Q.  And how many computers he had before that time, you are

2   relying on inventories, three inventories from the court,

3   correct?

4   A.  Yes.

5   Q.  And then you're looking at HP documents related to those

6   serial numbers from HP pertaining to those two computers?

7   A.  Yes.

8   Q.  You cannot say that Dr. Zambrano did not have a different

9   computer that he got in September or October of 2010 that he

10  used that was then replaced by a computer he received in March

11  of 2011, you cannot say that, can you?

12  A.  Well, he testified that he worked on the new computer

13  exclusively, and the metadata from the Tarco report shows that

14  the providencias file was created October 11 and last modified

15  on March 18.  And the inventory from 2011 showing the computer

16  manufactured and then purchased by the judicial council

17  November 26 was dated in that period; it was March 10.  So on

18  March 10 he had the new computer that was purchased by the

19  judicial council November 26.

20  Q.  My question is you cannot say, based on what you have in

21  front of you about two computers, you cannot say there was not

22  a third computer that was new to Dr. Zambrano in the fall of

23  2010, which was then replaced by a computer in March of 2011,

24  you cannot say that, can you, sir?

25          MS. NEUMAN:  Objection.  It assumes facts not in

DBP8CHE6                         Lynch - cross

1    evidence.

2            THE COURT:  No, it doesn't.  Overruled.

3    A.  Beyond his testimony that he had two computers, no, I can't

4    say that he didn't have three computers.

5    Q.  That is funny.  I heard some people laughing.

6            I guess it's important to look at his testimony for

7    the time frame, correct?  We will let the Court look back at

8    his testimony on that issue.

9            THE COURT:  Mr. Booth, I am giving you a lot of

10   latitude, but this is not cross-examination.  This is argument.

11           MR. BOOTH:  Yes, your Honor, it is.  It didn't start

12   out that way.

13           Just give me one minute.

14   Q.  Last thing, Mr. Lynch.  From your review of the declaration

15   and your forensic review of this information, there was a

16   document called providencias that was on a computer in Dr.

17   Zambrano's office, is that true?

18   A.  That is true.

19   Q.  That had a creation date of October 2010, true?

20   A.  True.

21   Q.  And that was a computer that was in Dr. Zambrano's office

22   in March of 2011, according to the inventory, correct?

23   A.  I'm sorry.  The computer containing a file with the text of

24   the judgment?

25   Q.  Yes.

DBP8CHE6                          Lynch - cross

1    A.  It's the text similar to the judgment, but true, it was in

2    his office March 2011.

3              MR. BOOTH:  Thank you.

4              THE COURT:  Thank you, Mr. Booth.

5              Mr. Gomez.

6              MR. GOMEZ:  Nothing further, your Honor.

7              THE COURT:  Thank you.

8              Ms. Neuman.

9              MS. NEUMAN:  Yes, your Honor.

10   REDIRECT EXAMINATION

11   BY MS. NEUMAN:

12   Q.  A few questions, Mr. Lynch.

13             The October 2010 date in the Tarco report, do you know

14   whether that's the date the document was created or that's the

15   date the document was purportedly put on that computer?

16             MR. BOOTH:  Objection.

17             THE COURT:  Sustained as to form.

18   Q.  Can you tell when providencias.docx was created based on

19   the Tarco declaration?

20   A.  Only that a file of that name was purportedly put on the

21   computer on October 11.

22   Q.  The Tarco declaration says that providencias.docx was

23   created on the old computer, is that right?

24             THE COURT:  It says what it says, Ms. Neuman.  This is

25   to be a very narrow examination, limited to opinions based on

DBP8CHE6                    Lynch - redirect

1    the three pieces of data that I articulated before.

2           Now, let's stick with that.  You both, quite

3    understandably but nonetheless, I think not usefully, are

4    trying to do your summations through this witness.  Let's get

5    it concluded.

6           MS. NEUMAN:  Nothing further.

7           THE COURT:  Thank you.

8           Anything else?

9           MR. GOMEZ:  No, your Honor.

10          THE COURT:  Thank you, Mr. Lynch.  You're excused.

11          Mr. Mastro.

12          MR. MASTRO:  Yes, your Honor.

13          THE COURT:  I take it you rest, is that correct?

14          MR. MASTRO:  We will have rebuttal exhibits and

15   deposition designations that we will offer to the Court at the

16   same time immediately after Mr. Friedman presents the defense

17   exhibits and deposition designations.

18          It's also the case, your Honor, and we will submit a

19   notice to the Court on this tonight, we still do not have the

20   Moncayo documents off the hard drive, and there have been some

21   privilege assertions, and we still do not have that.  So we are

22   going to ask the Court for the ability, once we finally receive

23   those from Mr. Gomez, to potentially supplement the record here

24   with that information.

25          THE COURT:  Mr. Gomez, what's the story?

DBP8CHE6

1          MR. GOMEZ:  The story, your Honor, is that the vendor

2    did not provide me access to the hard drive material until

3    yesterday because, as I understand it, because of the various

4    steps that Stroz Friedberg required them to undertake for

5    purposes of indexing the drive.

6          I must admit I haven't had a chance to review any of

7    the hard drive material yesterday and that's my next step.  I

8    can say this.  Out of the 5,000 files that are on the hard

9    drive, 3,000-some-odd are supposed to be photographs.

10   Yesterday, in the training that I had with the vendor, I was

11   informed that 77 are Word documents only.  So I suspect that

12   now that I have access to the material and can start reviewing

13   it, I should get through the review rather quickly.  I did get

14   through 1500 --

15         THE COURT:  E-mails?

16         MR. GOMEZ:  E-mails.  And we produced the e-mails that

17   were responsive and nonprivileged.  And we have also produced

18   to the plaintiffs a privilege log.  So that's been done.  And

19   those were Bates numbered from 1 to 1504.

20         MR. MASTRO:  There will be some documents from those

21   e-mails that will be part of our rebuttal submission as

22   exhibits, and we have questions we are considering on their

23   privilege log, whether those are really valid privilege

24   objections.  But we are waiting for the hard drive documents,

25   which could be a substantial production.

DBP8CHE6

1        THE COURT:  There can't be more than 77, unless you

2    want to look at photos of his kids.

3        MR. MASTRO:  I am not interested in photos of his

4    kids.

5        THE COURT:  I expect a report first thing in the

6    morning.

7        I expect counsel to get all outstanding exhibit and

8    related questions resolved tomorrow afternoon so that by the

9    end of Tuesday, or worst case first thing Wednesday morning,

10   this record is closed.

11       Any reason why that can't be done?

12       MR. FRIEDMAN:  No, your Honor.

13       MR. GOMEZ:  No, your Honor.

14       THE COURT:  Mr. Mastro?

15       MR. MASTRO:  There is no reason it can't be done from

16   our perspective.

17       THE COURT:  We will have closing argument tomorrow.  I

18   have a commitment that requires me to take a lunch break.  We

19   may be done by then, but if not, the rebuttal argument may go

20   over to after lunch or be interrupted.  Just so you know that

21   for planning purposes, I will have to be gone from between

22   12:45 to 2-ish.

23       The post-trial briefing schedule, I have in mind

24   post-trial submissions by December 23 and replies by January 6,

25   simultaneous exchange both times.  It's important that I deal

DBP8CHE6

 1    with this while everything is as fresh in my mind as it's ever

 2    going to be.  It's not going to get fresher with time and you

 3    are all aware I have other commitments.

 4           The last thing I have for you this afternoon, I would

 5    just like to see counsel at the side bar.

 6           (At the side bar)

 7           THE COURT:  I hope that this is not premature.  I am

 8    almost done.  I appreciate the efforts of all counsel in this

 9    trial.  It went beyond my expectations, without a doubt, and I

10    don't mean to damn with faint praise.  I mean, everybody did

11    their jobs and I am appreciative, and as far as I can see,

12    everybody acted responsibly and you get a lot of credit in

13    difficult circumstances, given the prior histories in this case

14    among counsel.

15           I also wanted to have you all here because I don't

16    want to have an ex parte communication with Ms. Littlepage,

17    even on a matter having nothing whatsoever to do with this

18    case.  I am handing Ms. Littlepage a copy of an order I entered

19    today, pretrial order number 469, in *In re Rezulin Products*

20    *Liability Litigation*, because I think the previous order I

21    entered with respect to her has in one respect outlived its

22    usefulness and I appreciate her contribution in this case.

23           MR. FRIEDMAN:  Ms. Littlepage and I had planned to

24    split our closings.  I wanted to see if that was OK.

25           THE COURT:  That's OK.

DBP8CHE6

1              MR. MASTRO:  We will do everything we can to complete

2     it before lunch, your Honor.

3              (Adjourned to November 26, 2013, at 9:30 a.m.)

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                        Page

 3    HUMBERTO PIAGUAJE

 4    Direct By Mr. Gomez  . . . . . . . . . . . .2671

 5    Cross By Ms. Neuman  . . . . . . . . . . . .2676

 6    Redirect By Mr. Gomez  . . . . . . . . . . .2718

 7    Recross By Ms. Neuman  . . . . . . . . . . .2725

 8    DANIEL BLANK

 9    Direct By Mr. Brodsky  . . . . . . . . . . .2746

10    Cross By Mr. Friedman  . . . . . . . . . . .2764

11    Cross By Mr. Gomez . . . . . . . . . . . . .2773

12    Cross By Mr. Friedman  . . . . . . . . . . .2776

13    Recross By Mr. Gomez . . . . . . . . . . . .2778

14    SPENCER LYNCH

15    Direct By Ms. Neuman . . . . . . . . . . . .2791

16    Cross By Mr. Booth . . . . . . . . . . . . .2817

17    Redirect By Ms. Neuman . . . . . . . . . . .2824

18                    PLAINTIFF EXHIBITS

19    Exhibit No.                        Received

20     7033A   . . . . . . . . . . . . . 2701

21     7000    . . . . . . . . . . . . . 2701

22     1406A   . . . . . . . . . . . . . 2702

23     1758    . . . . . . . . . . . . . 2716

24     7086    . . . . . . . . . . . . . 2718

25     4129    . . . . . . . . . . . . . 2751
```

1    7097      . . . . . . . . . . . . . . 2774

2    6371      . . . . . . . . . . . . . . 2792

3    4108, 4109 and 4110   . . . . . . . . . . .2811

4                         DEFENDANT EXHIBITS

5    Exhibit No.                              Received

6    1900      . . . . . . . . . . . . . 2676

7    1901      . . . . . . . . . . . . . 2777

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25