DBQ8CHE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

          v.                          11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                    Defendants.

------------------------------x
                                      November 26, 2013
                                      9:30 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                      District Judge

                         APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     JEFFERSON E. BELL
     ANNE CHAMPION

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

DBQ8CHE1                          Summation - Mr. Mastro

 1                (Trial resumed)

 2                THE COURT:  Good morning, everybody.

 3                Ready to proceed?

 4                MR. MASTRO:  Yes.

 5                THE COURT:  Mr. Mastro, you're up.

 6                MR. MASTRO:  Thank you.

 7                Those are some slides I will be referring to.  Not all

 8      of them, I promise.

 9                Good morning, your Honor.

10                THE COURT:  Good morning.

11                MR. MASTRO:  Your Honor, today really is judgment day.

12      This long trial is finally over.  The parties have presented

13      all of their evidence and now the verdict is in your Honor's

14      hands.

15                On behalf of Chevron, I want to thank your Honor for

16      your consideration and patience throughout this trial, and even

17      your gentle, and sometimes not so gentle, prodding to move us

18      along.  And I want to acknowledge my newer adversaries who

19      recently appeared here to try this case.  They zealously

20      represented their client and fought hard within the rules which

21      we respect.

22                What has happened in this courtroom over the past six

23      weeks is something Chevron was denied in Ecuador.  All parties

24      here have had a full and fair opportunity to make their case,

25      and that reflects the very best of the American justice system

1    and of its bar.  But we have also now seen exposed at this

2    trial the worst of the American bar.  Steven Donziger, an

3    American lawyer, who colluded with other American lawyers,

4    American consultants and American funders, to target a

5    deep-pocketed American victim, Chevron.

6              Now, Mr. Donziger admitted on Crude outtakes that he

7    did things in Ecuador "you would never do in the United

8    States," things that were just "out-of-bounds."  And he was

9    forced to admit on cross-examination at this trial that he did

10    things "down there that know would not be appropriate here."

11              Because Steven Donziger has shamed our profession.  In

12    the guise of practicing law, he has done shocking, stupefying

13    things, that even his own lawyer admitted in opening statements

14    might subject him to ethical charges.  But we lawyers don't

15    leave our ethical and legal obligations at the border when we

16    go overseas, and we surely don't abandon them altogether when

17    we come back home.

18              And Steven Donziger, your Honor, has shamed his

19    temple, this courthouse, this sacred place where we litigators

20    practice our profession.  He has obstructed justice, lied to

21    court after court, including this one, and showed utter

22    contempt for the rule of law.  Because lawyers don't threaten,

23    intimidate and blackmail judges.  They don't intentionally

24    deceive and defraud courts.  They don't bribe judges and court

25    officers.  They don't forge and ghostwrite official court

DBQ8CHE1                    Summation - Mr. Mastro

documents, including the judgment in their own favor.  And they
don't take the false narrative they have created in a corrupt
foreign court and then use it like a club in the U.S. to try to
extort billions of dollars out of a well-heeled U.S. victim.
Lawyers don't do those things.  Criminals do.

        We have proven at this trial by overwhelming evidence,
really beyond any reasonable doubt, even though that is not our
burden in this civil case, that the things Steven Donziger and
his co-conspirators did in Ecuador, and here in the United
States, to try to pressure a U.S. company into paying them off
are crimes and cry out for a remedy.

        Mr. Donziger's defense to this overwhelming evidence
reduces to this.  While he admits he made errors along the way,
inconsequential ones in his view, he claims he did so for a
worthy cause, or as his counsel put it in his opening, in the
tradition of Thurgood Marshall and other civil rights and human
rights lawyers before him.

        Well, let's get one thing straight.  Steven Donziger
is no Thurgood Marshall.  Indeed, it was Thurgood Marshall who
said, in words and substance, "Lawlessness is lawlessness.
Neither race nor color nor frustration is an excuse for
lawlessness."

        So, Mr. Donziger, there is no excuse for your
lawlessness, and it's time to hold Steven Donziger accountable
for the actions he has now been forced largely to admit he

DBQ8CHE1                      Summation - Mr. Mastro

1    committed.

2              Now, your Honor, while we will go into much greater

3    detail in our post-trial submissions, I want to talk briefly

4    about the claims Chevron has proven at this trial.

5              This is first and foremost a RICO case.  This is a

6    U.S. based scheme, hatched and predominantly executed by U.S.

7    lawyers, U.S. consultants and U.S. funders, acting in the U.S.

8    to target a U.S. victim.  At the heart and head of this

9    racketeering enterprise is Steven Donziger, a U.S. lawyer right

10   here in Manhattan, who masterminded and orchestrated this

11   scheme, largely put together a team of co-conspirators, and

12   continues to this day to be its driving force.  He and his

13   co-conspirators have engaged in a pattern of racketeering that

14   has including repeated acts of mail and wire fraud, extortion,

15   obstruction of justice, witness tampering, and money

16   laundering.

17             Now, Chevron comes here as a private party seeking

18   equitable relief under RICO.  In the first instance, we ask

19   this Court to make liability findings that Donziger and his

20   co-conspirators have violated the RICO statute.  And then we

21   ask this Court to impose equitable remedies to prevent Donziger

22   and his co-conspirators from profiting even one cent from their

23   crimes.  The same kind of equitable remedies that the Seventh

24   Circuit recognized in the *National Organization for Women v.*

25   *Scheidler* case, that Judge Rakoff recognized in the *Motorola v.*

DBQ8CHE1                    Summation - Mr. Mastro

*Uzan* case, and Professor Blakey, the architect of the RICO

statute, has written is available to private parties under

RICO.

Now, your Honor, Chevron also sues for fraud.  For

fraud against Burford and Kohn, against U.S. courts, against

U.S. federal and state authorities, against foreign enforcement

courts, and even against some Ecuadorian courts and

authorities, all of whom have been induced to take actions that

harm Chevron.  And defendants Piaguaje and Camacho are also

legally responsible for the frauds Donziger has committed on

their behalf.  Both because Mr. Donziger is their lawyer, and

therefore their agent, and regardless, because they ratified

Donziger's actions and those of his Ecuadorian co-counsel, both

through their affirmative acts of ratification and their

willful blindness to the fraud.

Now, at the beginning of this trial, your Honor, I

promised you would hear from at least a dozen witnesses who

would testify about the ways in which Donziger misled, lied and

manipulated them into participating in this scheme.  And we

delivered on that promise.  Your Honor, I want to break it down

briefly by category.

First, we produced the evidence of the early frauds,

the early frauds involving consultants and experts during the

judicial inspection process.  The frauds of David Russell whose

$6 billion remediation estimate he testified here was SWAG,

1    scientific wild ass guess.  The forgery and faking of

2    Dr. Charles Calmbacher's report, not his signature, not his

3    findings.  Donziger induces him to give signature pages where a

4    false report is filed in his name.  And the frauds involving

5    Fernando Reyes with whom Steve Donziger cut what he called his

6    bargain with the devil, going over to the dark side, having

7    Reyes pretend to be an independent monitor, when he was no such

8    thing, and he was on Donziger's payroll.

9         Then, your Honor, we proved the more audacious fraud

10   scheme.  When the case wasn't coming together, when the experts

11   were telling him it wasn't coming together, Steve Donziger got

12   bolder.  He engineered the Cabrera fraud, the appointment of a

13   single global damages expert, whose process would be hijacked,

14   who would be bribed, and whose product would be ghostwritten by

15   Donziger's team and the folks at Stratus Consulting, Doug

16   Beltman, Ann Maest, and Josh Lipton.

17        In fact, your Honor heard the testimony of Josh

18   Lipton, that when he came to realize what his own team had

19   done, he as the head of Stratus was so shocked and surprised

20   that he severed his relationship with Beltman and Maest.  And

21   that when he was told that only 5 percent of the Cabrera report

22   was ghostwritten by Stratus, and learned when in fact the

23   entire executive summary had been, he severed his ties with

24   Doug Beltman because that was a lie.

25        THE COURT:  Did you say only 5 percent of the Cabrera

1    report was written by Stratus?

2            MR. MASTRO:  That's what he was told by Doug Beltman

3    and Josh Lipton considered that to be a lot.

4            Your Honor, then we have the cover-up.  Because when

5    the truth was to be revealed, Steve Donziger covered up with

6    his own co-counsel.  You heard from Jeff Shinder and John

7    McDermott by deposition.  You heard from deposition testimony

8    of Stratus's counsel that Donziger pressured them to obstruct

9    the Stratus discovery from going forward and to slow it down.

10   These witnesses testified that they were appalled by what they

11   learned that Stratus had ghostwritten the Cabrera report.  And

12   when they learned that, Mr. Shinder and Mr. McDermott felt

13   ethically obligated to withdraw from the case.

14           And your Honor heard from Mark Quarles, another

15   consultant who worked for Donziger, that Donziger had him put

16   in an affidavit to courts saying that Cabrera was independent,

17   and if he had known the truth, he never would have done that.

18           And you heard even from his former employees, like

19   Andrew Woods, that they didn't know the truth about Stratus

20   ghostwriting the Cabrera report and were shocked to learn that

21   truth that had been kept from them by Mr. Donziger.

22           Finally your Honor heard from the former funders, the

23   lifeline to keep this scheme going, who Donziger defrauded with

24   lies about the Cabrera collaboration.  And Joe Kohn told you

25   that and Chris Bogart of Burford told you that, and that they

DBQ8CHE1                    Summation - Mr. Mastro

1    never would have continued to fund, or fund it at all, had they

2    known the truth.

3           Now, your Honor, we also proved other schemes

4    important to this racketeering enterprise.  We proved a

5    pressure campaign by Steve Donziger, orchestrated by Steve

6    Donziger, largely through his own words, writings, and those of

7    his collaborators.  It had three components, your Honor.

8           One, pressure, intimidation, threats, to control the

9    court in Ecuador in collusion with the Correa government.

10          Two, then taking their fraudulent judgment on a

11   foreign enforcement campaign to try and disrupt Chevron's

12   operations around the world.

13          And, three, and perhaps just as shocking, the scheme

14   here in the United States, the pressure campaign in the United

15   States, to take the false narrative that Steve Donziger and his

16   co-conspirators created in Ecuador, and then use it like a club

17   here in the United States.

18          Your Honor, don't take my word for it.  Steve Donziger

19   and his associates' words.  They themselves called it their

20   Chevron pressure campaign.

21          And, your Honor, their own words, Chevron pressure

22   chart, created by Donziger's associate Woods.  And literally it

23   is Chevron being the center of the universe, and every circle,

24   every circle, a U.S. target of the pressure campaign.  It was

25   that orchestrated, that intricate a campaign.

DBQ8CHE1                    Summation – Mr. Mastro

1           And who did they target with their false narrative,

2     their fraud, from Ecuador?  They targeted Congress, where

3     Donziger went up and lied to Congress.  New York State Attorney

4     General Andrew Cuomo, who Donziger and his cronies got to make

5     an inquiry of Chevron that it had to respond to.  The SEC,

6     through Amazon Watch, Chevron had to respond to that.  New York

7     State Comptroller Thomas DiNapoli, a shareholder as the

8     overseer of the pension fund, that Donziger and his cronies got

9     to insist that Chevron in public pronouncements settle, even

10    when the truth was coming out here in this courtroom about the

11    fraud.

12          Your Honor, what were the big lies that Donziger and

13    his surrogates told over and over again to those authorities?

14    The $6 billion remediation damages estimate.  This record, 22

15    times after David Russell said cease and desist, Steve Donziger

16    and his cronies were still using a $6 billion remediation

17    estimate that Russell said wrong, no longer valid, off by an

18    order of magnitude of ten or more, but they kept using it over

19    and over again with the SEC and everywhere they could and in

20    every one of their press releases.

21          Another one of Donziger's favorites.  He even got

22    President Correa to start saying it, that what happened in

23    Ecuador was 30 times worse than the Exxon Valdez.  In this

24    record, over 12 times, even after his own expert, Mr. Powers,

25    told him that was just flat-out wrong, Donziger and his cronies

DBQ8CHE1                    Summation - Mr. Mastro

1    kept using that false claim.

2           Your Honor, of course, Steve Donziger's favorite lie.

3    Cabrera was independent.  Cabrera gave the best independent

4    estimate of billions in damages.  A lie.  In this record, he

5    told to authorities and in a press releases 28 times after

6    Steve Donziger and his team met secretly with Cabrera before he

7    even had been appointed by the court.

8           Now, your Honor, I will not have time today to go

9    through all of the evidence, but there is one part of our case

10   that I must focus on and do a deep dive, and that is the

11   judgment fraud.

12          Your Honor, it's so important because at the beginning

13   of this case, Mr. Friedman told you this case comes down to

14   Guerra versus Zambrano and whether there was a bribe.  And we

15   told you the evidence will show, without question, that

16   Donziger's team ghostwrote the judgment in their own favor.

17   Guerra tells us why.  And when you see Guerra, and when you see

18   Zambrano, you will know who is telling the truth about the

19   bribe.  But one thing has always been certain.  This judgment

20   was ghostwritten by these plaintiffs, and we proved it in this

21   case.

22          Let's show you the evidence.  Because, your Honor, we

23   produced example after example after example of the internal

24   files of Steve Donziger and the plaintiffs' team showing up

25   word for word the Fusion memo, 150 word strings over and over

DBQ8CHE1                    Summation - Mr. Mastro

1    and over again in the judgment.  That is a draft memo that ends

2    in the middle of a sentence showing up in 150 word strings word

3    for word in the judgment.

4         We proved, your Honor, through our experts, not only

5    the ghostwriting of the judgment, but also that it is nowhere

6    in that court record.

7         And, your Honor, We proved it through the errors that

8    show up in the judgment, the errors in the Fusion memo that

9    show up word for word in the judgment, including number

10   sequencing that are out of sequence, yet they show up word for

11   word in the judgment, and even places where citations are

12   missing.  So in Spanish are the notations.  To fill in the

13   citation in the memo, the judgment shows up with fill in the

14   citation as well.  That's how ham-handed, that's how obvious,

15   that's how it's like fingerprints from the internal work

16   product on the judgment itself.

17        It's not just the Fusion memo though, your Honor.

18   It's also the Selva Viva database.  That's their internal

19   database.  There is nowhere in this court record that SV, Selva

20   Viva, is anywhere on the data compilations.  There is nowhere

21   where the SV or the TX for Texaco shows up in any of the data

22   compilations that are actually in the court record.  Yet they

23   show up more than 70 times in the judgment, including your

24   Honor, with errors, the fingerprints again.  Errors like in

25   their own Selva Viva database, they report mercury findings,

DBQ8CHE1                    Summation - Mr. Mastro

1    and they don't accurately report whether they are negative or

2    positive.

3           So when they transfer that data into the judgment,

4    that they ghostwrote themselves, they report mercury levels

5    that are problematic.  In fact, the real data was that there

6    were no mercury findings.  It's the errors, the fingerprints

7    that show up in their own internal product in the judgment

8    itself.

9           Your Honor, of course there is the Fajardo trust

10   e-mail.  Now, no lawyer would ever submit to a court an

11   internal e-mail purporting to analyze a case and quote from the

12   case and talk to his team about it.  This is really

13   significant, your Honor, because there is no discussion in

14   their complaint or in the record about setting up a trust, but

15   this became critically important to the scheme, as your Honor

16   heard in this case, because they decided they needed to set up

17   a trust offshore in Gibraltar so they can divvy up the money

18   outside the reach of Ecuadorian authorities.

19          THE COURT:  Mr. Mastro, the reason for that, according

20   to the evidence, is what?

21          MR. MASTRO:  The reason for that, your Honor, is that

22   they wanted to be outside the reach of Ecuadorian authorities

23   so that the funders and the lawyers could divide up the money

24   in the first instance and make sure that they got their piece.

25   That's why they wanted to be offshore.  And if there were any

DBQ8CHE1                    Summation - Mr. Mastro

1    issues, they did not want to be subject to the same corrupt

2    legal system that they corrupted to get their judgment in the

3    first place.

4              THE COURT:  Does it have to do in your submission with

5    any provision of the Ecuadorian statute under which they sue?

6              MR. MASTRO:  Well, your Honor, it does because that

7    statute speaks of his rights and how things have to be handled,

8    and they wanted to be outside the scope of that statute when

9    they actually divided up the money.

10             THE COURT:  Does it or does it not provide that

11   attorneys' fees will be up to one-tenth of one percent?

12             MR. MASTRO:  Correct.  And they wanted to get

13   ultimately up to 30 percent out of the judgment.  They said 20

14   percent, and you will see later in the summation I will come to

15   where they upped the percentages to 30 percent.

16             Now, your Honor, the key here on the trust e-mail,

17   again, Fajardo quotes the leading case on trusts, but he

18   misquotes it, and word for word the misquote shows up in the

19   judgment.  The real quote from the case at the bottom of the

20   page, you can see how the words are different.  Again, it's the

21   errors.  And Fajardo miscites a case when he says it is about

22   trusts where it has nothing to do with trusts.  And guess what?

23   In the judgment itself, the misquote from the leading trust

24   case, the same wrong citation to another case.  Your Honor,

25   this is like not only fingerprints, this is all ten fingers,

1    both palms.

2            Now, your Honor, what is their explanation for this

3    overwhelming evidence?  What is it?  Steve Donziger?  He has

4    nothing to say about this.  He admitted at his deposition he

5    has no idea how their internal work product got into the

6    judgment.  That's his testimony.  Yet here he tried to slough

7    it off by saying, I can offer explanations, and then offered

8    none.

9            So who did they produce here to try to create some

10   cover for this?  Mr. Ponce came here.  What did Mr. Ponce say?

11   Mr. Ponce said, at the judicial inspections there were

12   documents sometimes handed up to the court.  Well, there are

13   two problems with that, your Honor, because Mr. Ponce also said

14   the actas were basically a transcription or record of

15   everything that happened at those judicial inspections.  It was

16   kept word for word and the parties agreed to it.  Yet nowhere

17   in those transcripts is there any reference to any of these

18   documents being handed up to the court.  And Mr. Ponce

19   testified that he was largely out of the case by July 2007.

20   But the documents we are talking about are all post July 2007.

21   So Mr. Ponce's testimony not only undermines the notion that

22   these could have gotten to the court through some means, he

23   wasn't even there.

24            What is their other explanation?  This one I love.

25   Nicolas Zambrano.  The documents at the doorstep.  Oh, the

DBQ8CHE1                    Summation - Mr. Mastro

1    parties would just leave me documents at the doorstep.  It's a

2    ludicrous story, your Honor.  But when we dug down on Nicolas

3    Zambrano's testimony, he couldn't recall any of the documents.

4    He says that when they would be left there, he would match them

5    to the record, and that if they didn't match, he would discard

6    them.  And, your Honor, about the critically important Selva

7    Viva database that shows up over 70 times in the judgment, Mr.

8    Zambrano admitted he never got a computer disk, he doesn't even

9    know what an Excel spreadsheet is, and it would have been

10   improper under Ecuadorian law to have considered a database

11   outside the record.  End of story.  No explanation.  No

12   defense.  No expert came in here on their behalf to contest one

13   whit that their internal work product shows up word for word in

14   that judgment because they wrote it themselves.

15          Now, your Honor, let's come to Guerra versus Zambrano,

16   because Alberto Guerra came into this courtroom.  He admitted

17   his crimes.  He took forthrightly responsibility for his

18   actions.  We didn't pick him.  Steve Donziger and his cohorts

19   picked him.  And when he came in here, the reason we know he

20   told the truth is because he is corroborated by hard evidence

21   in every particular.  Let's go through it.

22          Guerra served as Zambrano's ghostwriter.  How do we

23   know that?  Zambrano himself admitted that Guerra served as his

24   ghostwriter.  How else do we know it?  And I have to say, that

25   admission came only because Mr. Gomez warned Mr. Zambrano just

1    before his deposition that his orders show up in draft form,

2    many, many, many of them, on Guerra's computer.  That's how

3    that admission occurs.

4         Second, your Honor, we know from Guerra's computer,

5    over 100 Zambrano draft orders on Guerra's computer.  Sometimes

6    99 percent matches what was ultimately issued under Zambrano's

7    signature.  Proof positive Guerra is telling the truth.

8         Next, Guerra says Zambrano paid Guerra to be his

9    ghostwriter.  What is the proof?  Zambrano directly deposited

10   into Guerra's account on one occasion.  Guerra's day planners,

11   his diary, his daily activities, they document time and time

12   again Guerra meeting with Zambrano, Guerra receiving money from

13   Nicolas, Guerra working on Zambrano cases, time and time again.

14        Your Honor, just one example, February 24, 2012,

15   that's days before Nicolas Zambrano is removed from office in

16   disgrace.  Guerra's day planner, Nicolas gives him $2,000.  And

17   what happens that same day?  Guerra deposits the $2,000 into

18   his bank account.

19        Guerra also testified that he and Zambrano shipped

20   ghostwritten materials to each other.  Hard evidence

21   corroboration.  The TAME shipping records, back and forth,

22   Guerra to Zambrano, Guerra to others in the courthouse, back to

23   him.  And Zambrano admitted that they shipped case related

24   materials to each other.

25        Guerra served as Zambrano's ghostwriter on the Chevron

1    case.  How do we know it?  The hard evidence.  Nine separate

2    opinions in the Chevron case in draft on Guerra's computer.

3          How else do we know it?  What better evidence is there

4    that Guerra was helping Donziger and his team than the

5    September 5, 2010 e-mail, "I will support the matter of Pablo

6    Fajardo so it will come out soon and well," as Zambrano was

7    about to resume his role presiding on the case and the judgment

8    day was near.

9          THE COURT:  But the date of this e-mail, how does that

10   relate to the time period in which Guerra testified there was

11   the meeting with Fajardo, Donziger and Yanza, followed by the

12   phone call related to him by Zambrano from Fajardo saying, in

13   substance, the fix was in?

14         MR. MASTRO:  Your Honor, this is close in time.

15         THE COURT:  It's earlier, isn't it?

16         MR. MASTRO:  Yes, your Honor, it is earlier.  It's

17   earlier, but I am going to come to the meeting that happens

18   late 2010.  But this is the precursor to let you know Donziger

19   knew Guerra is communicating to him that, I am there to help

20   you to see that the matter of Pablo Fajardo, the only matter

21   being the Lago Agrio case, will come out well.

22         Your Honor, the LAPs' legal team paid Guerra to

23   ghostwrite orders.  How do we know that?  We know it because of

24   the direct deposits by a Selva Viva employee, Ximena Centeno,

25   into Guerra's account on at least two occasions, a thousand

DBQ8CHE1                    Summation - Mr. Mastro

1    dollars each time.  You can see her signature on her national

2    ID card.  You can see her signature on the deposit slips.

3             THE COURT:  The national ID card, that's in the

4    record?

5             MR. MASTRO:  Yes, your Honor.

6             It's also the case that it's her national ID number on

7    one of the deposit slips.  And, of course, Mr. Donziger had to

8    admit that Centeno worked for Selva Viva, an organization that

9    he was president of.  And, your Honor, when you look at the

10   pattern of deposits, withdrawals from Selva Viva's account,

11   deposits into Guerra's account, it's shocking how often,

12   exactly what Guerra said, it occurs.  Month after month you

13   have got a thousand dollars a month from the LAPs' team.

14            Finally, we come to the bribery of Zambrano to

15   ghostwrite the judgment.  How do we know that's true?  We know

16   because Guerra's account is corroborated by both Chevron

17   attorneys at the time and even Mr. Donziger's testimony about

18   the initial solicitation.  Guerra approaches the Chevron team,

19   which says, no, with the bribe in exchange for ghostwriting the

20   judgment in your favor.

21            Guerra then on behalf of Zambrano goes to Fajardo and

22   then Donziger.  Donziger admits that that overture was made,

23   and we are going to come back to, your Honor, the ramifications

24   of admitting too much by Steve Donziger, but it corroborates

25   Guerra's attempt.  How do we know the ghostwriting that

1   occurred, as Guerra says, because Zambrano asked him to please

2   take a look at what Donziger's team had ghostwritten?  We know

3   because he said, I have got a memory aid from Fajardo that

4   helped me understand the procedural history.  He swore to that

5   even before he could find the memory aid.  And it was only

6   after they had attacked him to say there was no corroboration

7   and subpoenaed him that he goes back in his files and finds

8   that memory aid, and that memory aid clearly is from Fajardo

9   and company because it talks about the judges admonishing the

10  attorneys and my opposing party and names one of them, Patricio

11  Campuzano, a Chevron attorney on the Lago Agrio case.

12          Finally, we know it happened the way Guerra said

13  because all their internal work product shows up in the

14  judgment word for word in eight separate respects.  Imagine how

15  many more respects we could have proven if they actually

16  produced the documents in Ecuador that they filed a collusive

17  action to try and avoid doing.  Your Honor, Guerra is

18  corroborated in every particular.

19          How about Nicolas Zambrano, who we gave a warm New

20  York welcome to?  No corroboration in any respect of his story.

21  But impeachment galore.  Zambrano claims he did not pay Guerra

22  to ghostwrite his orders.  Let's start with that one.

23          He admits that Guerra wrote them.  He admits Guerra

24  was in financial distress.  He admits he gave him a single $300

25  loan.  But then says, I didn't give him anything else.

DBQ8CHE1                    Summation - Mr. Mastro

1            Well, your Honor, the one thing I can say is Alberto

2    Guerra didn't work for free.  And Nicolas Zambrano is lying.

3    And Nicolas Zambrano was warned again by Mr. Gomez just before

4    his deposition about the $300 deposit.  So he had to admit

5    that.  But he couldn't admit that he was paying somebody else

6    to ghostwrite his orders.  Blatantly illegal under Ecuadorian

7    law.  So he admitted too much, and he lied way too much.

8            Now, your Honor, it's also the case that Zambrano gave

9    a sworn statement to the other side.  Zambrano gave a statement

10   to prosecutors.  He never mentioned any payments to Guerra,

11   loan or otherwise.  He never mentioned Guerra drafting orders

12   in Zambrano's cases, but he had to admit those things after Mr.

13   Gomez warned him.

14           Zambrano lie number two.  He claims he is the only

15   author of the judgment.  Your Honor, he has no supporting

16   documents to show he wrote the judgment.  He tells the

17   ludicrous story of, oh, I kept careful notes and collected a

18   lot of documents, but I discarded all of them a year later.  In

19   the midst of a heated appeal, in the midst of our RICO action

20   here, when everyone in the world knew that there was a fraud

21   allegation and an allegation of ghostwriting of that judgment,

22   Nicolas Zambrano conveniently says, I threw away all of my

23   notes.

24           Your Honor, he admits he saw Chevron's appellate

25   briefs.  He knew that that allegation was out there, that that

1   judgment had been ghostwritten, but yet he makes the ludicrous

2   claim he threw away his notes.  There were no notes.

3          Could Nicolas Zambrano have been the author of this

4   opinion?  He didn't even know what TPH was.  My teenage

5   daughter knows what TPH is.

6          THE COURT:  I'm so sorry.

7          MR. MASTRO:  And I say to your Honor there is more of

8   a chance my teenage daughter wrote the 188 page Ecuadorian

9   opinion than Nicolas Zambrano did.  He didn't know what the

10  most carcinogenic agent was in the judgment, what the

11  statistical data of highest importance was in the judgment,

12  what the theory of causation was in the judgment.  He couldn't

13  explain how the English word workover appears twice in the

14  judgment that comes out of the Fusion memo, your Honor, when he

15  doesn't speak English and he had no idea what it meant or how

16  it got there.

17         Your Honor, he really gave testimony ludicrous in the

18  annals of courtroom history.  Certainly in my experience, that

19  man did not write this judgment.

20         Here is the most ludicrous piece of his story.  That

21  he orally dictated the 188 page, single-spaced judgment to Ms.

22  Calva, the 18-year-old typist and Internet researcher

23  extraordinaire, and he never provided her any written materials

24  at all to do that.  He dictated every word.

25         Well, let's dig a little deeper on that.  He gave a

1    sworn statement in this case.  He gave a statement to

2    prosecutors.  What he told this Court in his sworn statement

3    was, I did not receive support or assistance from any other

4    person.  What he told the prosecutors last September was, I

5    have not had any help from any person.  Magically, by the time

6    we get here, Ms. Calva has materialized, although she never

7    came here.

8            Now, your Honor, it is just ludicrous to think that

9    Mr. Zambrano dictated number sequences that show up out of

10   order from the Fusion memo to Ms. Calva in exactly the same out

11   of sequence number.  The true explanation is it was

12   ghostwritten by the plaintiffs and they just lift it from their

13   own work.  But you don't dictate out of number sequence from

14   internal work product of the plaintiffs and then it shows up

15   word for word in the judgment in exactly the wrong number

16   order.  It doesn't happen.  And you don't dictate, your Honor,

17   complex equations and test data sequences with dashes and

18   underlines and capitalizations and weird acronyms.  It would

19   have taken months and months and months to try to dictate such

20   a thing.  It would never have happened.

21           Of course, as you know from yesterday's testimony from

22   Mr. Lynch, 30 percent of the judgment is quotes from other

23   sources.  Yet he says he dictated every word to Ms. Calva.  And

24   of course he says, she, who apparently also couldn't speak any

25   other language but Spanish, did all of his Internet research,

DBQ8CHE1                    Summation - Mr. Mastro

finding all those U.S. and English and Australian and French
authorities that Judge Zambrano claims he then put into the
judgment.  It's ludicrous testimony, your Honor.

          Now, here is where Judge Zambrano really got caught
and where Mr. Donziger and his cronies really got caught.
Zambrano claims the judgment was written entirely on his new
computer.

          Your Honor, he says he only worked on the new
computer.  What did Tarco say?  A draft of something similar to
the judgment was found on the old computer.  What does Tarco
also say?  The delivery date.  He claims the providencias was
created October 2010.  We proved to your Honor that that new
computer never even got to the Quito courthouse until as early
as November 26, 2010.

          A ludicrous story, an impossible story.  Zambrano is
lying.

          Then the Republic of Ecuador puts up a phony Tarco
declaration, and of course Mr. Tarco didn't show up here.

          Finally, your Honor, Zambrano -- two more things, your
Honor.  Zambrano claims he read the entire record.  He could
not possibly have done that.  He had two four-month tenures on
the case.  A 236,000 page record.  He admits he has to read the
entire record.  He says there were a lot of copies, which means
you had to read them to see that they were copies.  And your
Honor, this is a man who claimed in January to a Reuters

DBQ8CHE1                    Summation – Mr. Mastro

reporter that he still had 50,000 pages to go.  He got caught

with that testimony because an expert testified it would have

been humanly impossible for him from late January to

mid-February to have read 50,000 pages and written the

judgment.

          So he has to tell a lie here.  He has to tell a

ludicrous lie that he made that up with the Reuters reporter

because he was being harassed by reporters.  Ludicrous because

he invites the Reuters reporter in to take photographs, with

all these stacks of paper in his office, to talk about how hard

he is working on the judgment.  And then what happened between

the end of January and February 14?  A RICO case gets filed

here in New York.  And a TRO gets entered here in New York.

And they have to rush out their ghostwritten judgment, with all

their errors from their internal work product still in there,

they didn't have a chance to scrub it, because they were trying

to get ahead of this court, and Zambrano is caught in his own

tangled web of lies in what he told to the Reuters reporter.

          Finally, your Honor, Mr. Zambrano claims that there

was no influence from the Correa admission.  He claims he

didn't even know that President Correa supported the LAPs

before Zambrano had signed that judgment.  He apparently is the

only person in Ecuador who didn't realize that President Correa

supported the LAPs, even ran for office on a platform of

supporting the LAPs.  But, your Honor, Zambrano admits that he

1    had read Chevron's alegato, which on more than a dozen

2    occasions talks about Correa's support for the plaintiffs and

3    how that is distorting the process.

4          And the Republic of Ecuador has come through with

5    Zambrano big time.  Because this is a man who left office in

6    disgrace, removed from office in February 2012.  He is out of

7    work for over a year.  But then, at the end of March, he signs

8    a declaration for Donziger's team, Donziger's team working with

9    the Republic of Ecuador, with President Correa's public

10   support.  What happens within a month?  Zambrano gets a new

11   job.  And it's the job of a lifetime, because he is being paid

12   $46,000 a year as a community relation specialist.  It's not

13   clear what he is doing there.  He doesn't realize he even has

14   an e-mail account.  He has never even seen their Web site.  He

15   can't even say how much of the company Petroecuador owns, even

16   though by law Petroecuador must own the majority share.  And

17   that's more than he ever made as a judge.  A judge, whose

18   office he disgraced, was removed from office for misconduct.

19         Your Honor, Nicolas Zambrano is getting paid more than

20   twice what the position calls for, and this is right off the

21   Web site of this public company.  They show you the position,

22   and the pay for the position, and then when what Zambrano's

23   contract is.  It's 1800 a month for the position, but somehow

24   Nicolas Zambrano is getting $46,000 a year.  The Republic of

25   Ecuador pays him off for the favor he is doing for the

DBQ8CHE1                    Summation - Mr. Mastro

1    plaintiffs in this case.

2            Now, your Honor, enough said about Guerra versus

3    Zambrano because only one of them was telling the truth in this

4    courtroom, and it was Alberto Guerra, and he is backed up in

5    every particular.

6            Your Honor, I want to come next to the defense case.

7    The defense case is more significant for who wasn't here than

8    who was here.

9            We didn't hear from Pablo Fajardo.  We didn't hear

10   from Julio Prieto, or Juan Pablo Saenz, or Luis Yanza, or

11   Ximena Centeno, who works for Selva Viva, or Atossa Soltani,

12   who they said couldn't be here, but she was in this courtroom

13   one day watching the proceedings, but she didn't get up on that

14   stand.  We didn't hear from Jim Tyrrell, the man behind the

15   curtain.  We didn't hear from Aaron Marr Page, up to his

16   eyeballs in Donziger's schemes.  He sat in this courtroom every

17   day and never got on that stand.  We didn't even hear from the

18   extraordinary Ms. Calva.  And we certainly didn't hear from

19   Mr. Tarco.

20           Your Honor, it's the missing evidence, the evidence

21   had it supported their case we would seen in a heartbeat, but

22   they have kept from this Court and from Chevron.  No

23   explanation for the code names, the secret bank accounts, the

24   e-mail accounts.  No explanation for the contemporaneous lies

25   about Cabrera's independence for the cover-up.  No explanation

1    for how their internal work product ended up in the judgment.

2    No explanation for why one of Selva Viva's employees is making

3    deposits directly into Guerra's account.  No explanation for

4    misleading public officials in the media.  And no Ecuadorian

5    documents produced in response to Chevron's demands, only the

6    belated filing of a collusive action in Ecuador to try and give

7    them cover for their contempt of this Court's orders, even

8    though Humberto Piaguaje yesterday testified to this Court that

9    there is a room full of documents at Selva Viva headquarters.

10   His words, "Too many to count."  Imagine what a treasure-trove

11   they would be if we had them here.  Adverse inferences are more

12   than appropriate on every major issue in this case.

13          Your Honor, let's talk about the witnesses who were

14   called.  We talked about Nicolas Zambrano.  Enough said about

15   him.  The other witnesses they called, they ended up only

16   calling six witnesses during their case.  They were largely

17   irrelevant, offered inadmissible testimony.  In fact, they made

18   many damning admissions while they were on cross-examination.

19   But at the end of the day, the one witness they offered, who

20   had to explain himself, who took that stand, was Steven

21   Donziger.  And when Steven Donziger took that stand, your

22   Honor, he told lies, big and small.

23          That's what criminals do.  They get trapped in their

24   own lies.  Lies as small as a $443 breakfast with Pablo

25   Fajardo, which he claimed was a press junket in Ecuador, and

never even was there.  And big lies, your Honor, and I am going
to go through those big lies now.  Because Mr. Donziger has a
philosophy about lying.  We know from his own internal
documents.  His philosophy.  If you repeat a lie a thousand
times, it becomes the truth.  He even trained himself to lie
through evasive answers when he was preparing for his
deposition, writing to himself to give answers like, "it's
possible, but I don't think so."  "I guess it's possible, but
to the best of my recollection, I didn't."

Then he gave them, those kind of evasive answers, over
and over and over again.  And, your Honor, he gave evasive
answers to my cross-examination questions, along the lines that
he trained himself to give, more than 100 times.  How many
times did he give evasive answers to his own attorney on
redirect?  Zero.

Now, your Honor, we are going to talk about some of
Mr. Donziger's big lies when he was up there on that stand.
One of the biggest whoppers of all is his role vis-a-vis Mr.
Fajardo.  Because Mr. Donziger is a control freak.  He has been
in control.  He remains in control.  But he had the audacity to
get up, the temerity to get up on that stand and say that the
lead lawyer in the Ecuador case from 2005 until the present has
been Pablo Fajardo and that Donziger serves at his pleasure.

Well, your Honor, the truth is told in Donziger's own
book proposal where he says, "I am the lead lawyer in the class

1    action trial."  The truth is told in Donziger's engagement

2    agreement with the LAPs; he is appointed to coordinate the

3    overall legal strategy of the plaintiffs.  The truth is told in

4    Donziger's own e-mail in 2009 to Joseph Kohn that my firm's

5    primary obligation is to run the case on a day-to-day basis.

6    The truth is told, your Honor, in Donziger's own notebook

7    entries.  Presumably, he was telling himself the truth when he

8    was writing to himself in his own notebook, Pablo still

9    introduces me as the cabeza of the lawsuit, the head in

10   Spanish.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DBQLCHE2                          Summation - Mr. Mastro

1              MR. MASTRO:  And supervising the legal work is a

2     full-time job.

3              THE COURT:  When he said that, didn't he go on and

4     write that he doesn't like that?

5              MR. MASTRO:  He did, your Honor, because he's trying

6     to cover in Ecuador that he's not the big gringo who shows up

7     all the time.  But this is a man who in every respect has been

8     manic about controlling every detail of public disclosure, of

9     hiding the Stratus involvement, of controlling the people in

10    Ecuador by writing things like -- excuse me, not my words, your

11    Honor -- don't fuck it up, do this.  You've seen the emails,

12    your Honor.

13             And the truth is told, your Honor -- next slide,

14    please -- in the fact that Pablo Fajardo didn't even graduate

15    from law school until 2004, and it wasn't until December 2005

16    that at Donziger's insistence he became for the first time,

17    Fajardo, joint counsel of record because Donziger was upset

18    with lead local counsel Alberto Wray.

19             And the truth, your Honor, is told in the money.  It's

20    all about the money.  Steve Donziger makes 6 percent times more

21    in salary than Pablo Fajardo, and on a contingency basis stands

22    to make more than three times more than Pablo Fajardo.  In any

23    universe I've ever been in, the guy who makes more money is

24    usually the boss and this world ain't no different that Steve

25    Donziger is in.

DBQLCHE2                    Summation – Mr. Mastro

1           Your Honor, let's talk about more of Mr. Donziger's

2     lies.  Your Honor, let's talk about Donziger's lies about the

3     legality of the LAP team's collusion with Cabrera because he

4     came into this court and he had the temerity to say in this

5     case that although he's been confused in the past, he now

6     believes the process used to create the executive summary of

7     the Cabrera report was fundamentally consistent with Ecuadorian

8     law and he never understood that any actions taken were

9     impermissible.  That's what he swore to on the witness stand

10    here.

11          The ghostwriter of the Cabrera report not revealing it

12    to the court and then having the same ghostwriting party,

13    Stratus, write the comments criticizing their own ghostwritten

14    product and then ghostwriting for Cabrera the response where

15    the damage estimates get jacked up.  I don't know what country

16    that would be permissible in, but it certainly wasn't

17    permissible in Ecuador and Donziger knew it at the time because

18    when the truth was about to come out in April 2010, he crafted

19    something to send to his cocounsel.  No evidence he actually

20    sent it, your Honor.

21          And what he admitted to himself when he did that was

22    that, quote, the traditional Ecuadorian law perspective would

23    hold that the level of collaboration between one party and the

24    expert is problematic and improper in that all court-appointed

25    experts in Ecuador should be independent and that Cabrera

DBQLCHE2                     Summation - Mr. Mastro

violated his duties to the court and treating him like a U.S.
style expert, as we did, will be seen as a violation of local
court rules.

          Now, your Honor, it goes to his state of mind at the
time, at the time Cabrera was being appointed, at the time
Cabrera was doing his work, and at the time it was going to
come out, the truth about the LAPs' team's collusion with
Cabrera, how they tried to cover it up.  And, your Honor, it's
that guilty state of mind about Cabrera that gives Donziger
away.

          If he didn't have a guilty state of mind, if he didn't
realize it was wrong, why did he use code names like Wao, cook,
waiter, restaurant?

          Why did he tell the Crude cameraman to go off the
record when one of his own U.S. experts told him it was bizarre
to meet with Cabrera before he was even appointed?

          Why did Donziger use secret bank accounts to make
undisclosed payments to Cabrera outside the court process?

          Why did Donziger use secret password protected email
accounts like lagarto3 and gringograndote?

          Why did Donziger make secret plans to install one of
his lawyer's girlfriends as Cabrera's assistant to keep him
"under control"?

          Why did Donziger enter into a secret contract with
Cabrera which defendants never produced?

DBQLCHE2                    Summation - Mr. Mastro

1            Why did Cabrera and Fajardo mislead the Ecuadorian

2    court by denying any relation or agreement?

3            Why did Donziger and his team conceal Stratus's

4    involvement?

5            Why did the Cabrera report fail to identify Stratus's

6    role?

7            Why did Donziger mislead the own members of his team:

8    Hinton, Woods, Garr?

9            Why did Donziger tell his team to keep all

10   communications highly confidential about Cabrera?

11           Why did they pay Crude filmmakers to edit out a scene?

12           Why did Donziger and his team obstruct discovery of

13   Stratus's role from coming out in the 1782s?

14           Why did Donziger and his team submit a misleading

15   Fajardo declaration to 17 U.S. courts?

16           Why did Donziger and his team implement the cleansing

17   strategy?

18           And why did Donziger and his team stonewall production

19   of Ecuadorian documents and file a collusive lawsuit to try to

20   prevent disclosure if he didn't know that what he'd done was

21   wrong?

22           And, your Honor, the surest proof that Steve Donziger

23   knew that under Ecuadorian law it was illegal what his team had

24   done is -- go to the next slide -- the email he got from Julio

25   Prieto on March 30, 2010, taken apparently from Donziger, that

DBQLCHE2                    Summation - Mr. Mastro

```
 1    it's normal in the U.S. to do what they did with Cabrera.  But
 2    the problem, my friend, is that "the effects are potentially
 3    devastating in Ecuador.  Apart from destroying the proceeding,
 4    all of us, your attorneys, might go to jail."
 5         Your Honor, this is a signed confession.  How could he
 6    have said with a straight face that he thought this was fine,
 7    that he never thought it was impermissible in Ecuador, that he
 8    relied on local counsel.  And what did local counsel tell him?
 9    We might all go to jail.  End of story.
10         Now, your Honor, Steve Donziger told big lies about --
11         THE COURT:  Before you leave that point.
12         MR. MASTRO:  Certainly, your Honor.
13         THE COURT:  He was asked about this memorandum, if I
14    remember correctly, either in an early deposition, maybe the
15    deposition in this case, or at the sanctions hearing or both.
16    And what did he say about it?
17         MR. MASTRO:  Well, your Honor, I'm glad you asked
18    because he has implied now, piggybacking off their contrived
19    collusive lawsuit, that this, this is a reference to them
20    fearing that disclosure of client confidences would cause them
21    jeopardy.  Your Honor, there's no reference here to client
22    confidences.  The documents they're talking about being
23    disclosed are documents of a U.S. party in the U.S., Stratus.
24    It couldn't possibly have meant that.  And there's no reference
25    to this.
```

1        And as your Honor knows, the first time in this case

2    ever they brought up the notion of some Ecuadorian law

3    prohibition on sharing client confidences without the

4    permission of all clients was after they had gotten their

5    collusive lawsuit together.  Indeed, as late as December 2012,

6    we were in this courtroom arguing those issues and Mr. Veselka

7    was here then on behalf of the LAPs and never made such an

8    argument and they never made such an argument before that.  And

9    it has no application to this email whatsoever which Ecuadorian

10   law would have no application to what Stratus, a U.S. party,

11   had to produce pursuant to a U.S. order in the U.S.

12        THE COURT:  But didn't he at some other time give an

13   entirely different explanation of what this meant?  Not the

14   client confidence explanation, but a different one?

15        MR. MASTRO:  Your Honor, I'm not, I'm not recalling

16   it.  Excuse me one second.

17        Your Honor, it speaks to, in the dear fellow counsel

18   letter, they are scared there's an admission there -- this is

19   the April 2010 letter Mr. Donziger wrote -- they're concerned

20   they all might go to jail because of the underlying fraud and

21   that Chevron would refer this to prosecutors.  I don't think

22   that mitigates one whit what this means.  What this means is

23   Mr. Donziger realized his own local counsel thought under

24   Ecuadorian law they could go to jail for what they did with

25   Cabrera.

DBQLCHE2                       Summation - Mr. Mastro

1          Now, your Honor, if I may briefly talk about the

2     contacts with Guerra.  Mr. Donziger told many lies about

3     Mr. Guerra.  They had a relationship.  Guerra would email him.

4     From 2008 to 2010, Guerra sent Donziger multiple emails.  Steve

5     Donziger got on that stand and he lied saying he thought the

6     emails going back to 2008 were spam and he ignored them.

7          The truth lies in the actual email communications that

8     Donziger had with Mr. Fajardo at the time in 2008 while

9     Mr. Guerra was still on the bench, far from ignoring them,

10    saying it's urgent, should I call him back, what should I do?

11    Email in 2010, September 2010 that we talked about before.

12    There is no way, no how anyone could have thought it was spam

13    when Mr. Guerra writes to Mr. Donziger, "I will support the

14    matter of Pablo Fajardo so it will come out soon and well."  A

15    lie, a transparent lie belied by Mr. Donziger's own

16    contemporaneous emails.

17         And, your Honor, another huge lie, a ludicrous lie.

18    He doesn't recall what was meant when his own Ecuadorian team

19    is communicating back and forth with him and asking for money

20    in connection with the puppeteer moving the puppet, but he

21    won't move his puppet unless the audience pays him something.

22    And it happens late October 2009, same date, two days later,

23    thousand dollars withdrawn from Selva Viva, thousand dollars

24    deposited into Guerra's account.  Same thing with the budget is

25    higher in relation to the previous months since we're paying

DBQLCHE2                  Summation - Mr. Mastro

the puppeteer.  At or about the same time, a thousand dollars

out of Selva Viva, a thousand dollars deposited into Guerra's

account.

         Who in their right mind is a U.S. lawyer receiving

email traffic like this using code names like puppeteer for

Guerra and puppet for Zambrano, and he says in this courtroom I

don't recall what that was, I don't know what that was.  Maybe

those were jokes.  It is ludicrous testimony, and it

corroborates Guerra's account, the money happening same time as

the code name.

         And, your Honor, this is the part where Mr. Donziger

admits too much, and criminals often do this.  They feel like

if they admit part of the story, they get away with lying about

the rest of the story because it's actually startling how much

Mr. Donziger's account and Mr. Guerra's account about the

infamous linked 2010 Honey Honey restaurant meeting coincide.

They both agree they met at the restaurant.  They both agree

Fajardo set it up.  They both agree that Guerra at the meeting

put right out there, floated it right out there, Mr. Donziger

says, $500,000 bribe solicitation, had to be on behalf of

Zambrano who was the judge at the time, and that they'd get to

ghostwrite the judgment in their own favor.

         Donziger says he said no.  Guerra says he said, no, we

don't have that kind of money now.  And, your Honor, Donziger

also says they sat around the 30 to 45 minutes shooting the

DBQLCHE2                     Summation - Mr. Mastro

1    breeze and having coffee.

2              I ask two questions as a threshold matter.  What

3    lawyer, what U.S. lawyer, having been told to go to a meeting

4    by Pablo Fajardo who obviously knew what the meeting would be

5    about and obviously would have told his cabeza what the meeting

6    was about, takes that meeting with Guerra knowing what's

7    coming?

8              But, second question, even if you accepted that

9    perhaps he didn't know going into the meeting, unlikely, but

10   even if you accepted that, what's he doing sitting around for

11   30 to 45 minutes having coffee after a bribe solicitation has

12   been made?  It's not what a lawyer would do.  It's what a

13   criminal does.

14             And guess what, how do we know who's telling the

15   truth?  Guerra's bribery account rings true because Donziger

16   admitted on that stand that in fact the LAPs didn't have the

17   500,000 to pay Zambrano them.  What deal ultimately gets

18   consummated?  The deal that's struck is they're going to pay

19   Zambrano 500,000 out of judgment proceeds.  That rings true.

20             Also, how do we know what happened?  Because weeks

21   later, exactly what Guerra offered the LAPs' legal team

22   happened.  They got to ghostwrite the judgment, and their

23   internal work product shows up word for word in the judgment.

24   And how do we know that Guerra's account rings true?  Because

25   Mr. Donziger, who now says he was concerned and uncomfortable

DBQLCHE2                    Summation - Mr. Mastro

about what had happened at the meeting, never reported it to

anyone.  No one on his Ecuadorian legal team reported it to

anyone, even though they knew how to file complaints against

judges or to threaten to file complaints against judges when it

suited their purposes, including when they blackmailed Judge

Yanez.

          And, your Honor, how do we know Guerra's account rings

true and he was in bed with his fellow criminals, Steve

Donziger, Fajardo, and company?  Because a few months later,

2011, when we're in the midst of the count nine proceedings,

the LAPs lawyers go to Alberto Guerra to ask him to be their

expert on Ecuadorian judicial system and its honesty and

impartiality.  Steve Donziger admits he knew about it and he

did nothing because they knew Guerra at that time was their

criminal confederate, end of story.

          Your Honor, I've got to tell you about a shocking big

lie Steve Donziger got caught at this very trial.  He took that

stand last Monday and Tuesday before your Honor ordered the

assembly minutes to be unredacted, the fateful January 15, 2013

assembly minutes to be unredacted.  He thought they'd never see

the light of day.  He thought no one would ever know what

happened in that January 15, 2013 meeting because virtually the

entirety of what he had to say had been redacted other than one

self-serving piece that he wanted to offer to this Court.  He

didn't know when he took that stand what your Honor would rule.

DBQLCHE2                    Summation - Mr. Mastro

1    He wasn't even thinking about that.  He thought he'd get away

2    with it before this trial ended.  And then what happened?

3    Later that same week, your Honor unredacted those minutes and

4    they were a revelation.

5         Many lies.  Donziger lied this past summer at his

6    deposition saying he didn't believe he attended any assembly

7    meetings.  Of course, he was at the January 15, 2013 meeting.

8    Donziger testified and his lawyers told you repeatedly that he

9    had been formally and officially removed as U.S. coordinator.

10   Mr. Keker -- fond farewell to Mr. Keker -- said Donziger had

11   become a pariah and separated and severed from those folks.

12        What's the truth from the asamblea minutes of

13   January 15?  It's a temporary withdrawal from the case for the

14   moment because he's going to go to trial on the RICO.  So

15   temporary withdrawal from the case.

16        THE COURT:  Mr. Mastro, let me ask you this.  Is it

17   Chevron's position that the minutes are accurate?

18        MR. MASTRO:  Your Honor, I think the minutes in these

19   regards are admissions, and I think your Honor has a right to

20   credit those admissions.

21        THE COURT:  I understand that, but what's your

22   position as to whether they're worthy of being credited?

23        MR. MASTRO:  Your Honor asked the right question.  And

24   in these regards, these admissions, I think your Honor should

25   credit them because they put the lie to Mr. Donziger's

DBQLCHE2                    Summation - Mr. Mastro

testimony and that they show he committed perjury over and over

again.

          And, your Honor, if I may just summarize the rest.

Your Honor, he lied about the effects of Joe Kohn's withdrawal.

He testified in this case that Kohn stopping funding was not

that big a deal because at the time the case was considered

attractive to lots of law firms and funders.  He told the

asamblea on January 15, 2013 that it was a serious crisis when

Joe Kohn withdrew and chose not to continue financing.  He lied

about lack of resources.  And, your Honor, he lied on the

witness stand about lack of resources and the asamblea minutes

also prove it.  He said he was under constant pressure for lack

of resources, extremely limited resources, that what happened

in this case effectively bankrupted me.

          And he even said in his witness statement that what

Mr. Dahlberg, Chevron's forensic accounting expert, said about

commitment amounts, including recognizing 2 million committed

by Russ DeLeon, was overstated and simply not accurate.

          What's the truth?  January 15, 2013 asamblea minutes,

he tells the assembly they've got approximately 25 million came

in since Kohn, they got 12 law firms and lobbyists, and the

25 million came from Russ DeLeon.  And the minutes reflect that

the No. 1 priority was enforcement, not that they didn't have

resources to pay for Donziger and the LAPs to defend themselves

here, but that they chose to pay for enforcement and to pull

DBQLCHE2                    Summation - Mr. Mastro

1    back on paying here.

2              THE COURT:  Let me come back to this January 15

3    meeting because I have questions in my mind about it.  At the

4    time that meeting allegedly occurred and these minutes were

5    created, there was a motion to compel Mr. Donziger and his

6    Ecuadorian clients to produce the relevant documents that were

7    in the hands of the Ecuadorians, including Mr. Fajardo and

8    Selva Viva and so forth.  I may have the chronology a little

9    off and I hope I'll be corrected if I do -- obviously, it's

10   verifiable.  But the argument was at some point being floated

11   on Mr. Donziger's behalf that he had no control over the

12   documents.

13             MR. MASTRO:  Correct, your Honor.

14             THE COURT:  He couldn't be made to produce them.  This

15   is in more or less the same time period, if my memory serves,

16   when the collusive Cordova lawsuit gets filed in Ecuador where,

17   contrary to everything else ever said in this court,

18   Mr. Fajardo tells an Ecuadorian judge I'm ready to turn over

19   all the Ecuadorian documents but, Judge, you should issue an

20   injunction preventing me from doing it.  And, of course, there

21   is no adverse party, really, and that's what happens.

22             The question arises as to, at least in my mind, as to

23   whether this temporary withdrawal or termination or whatever it

24   was, if indeed there was anything, was an effort to distance

25   Mr. Donziger from the documents and had no other purpose, or at

DBQLCHE2                    Summation - Mr. Mastro

1    least no other significant purpose, and is not credible as to

2    what went on there.

3           MR. MASTRO:  Exactly, your Honor, and that was one of

4    the points I was going to make in this sequence.  Cordova

5    collusive lawsuit, the order issues in Ecuador at or about this

6    same time.  This was clearly orchestrated to give him

7    additional cover not to produce documents here even though he

8    was in control, remains in control.

9           And, your Honor, the fact of the matter is that

10   ascribing it in these minutes, even in the self-serving way

11   that it's done as a temporary withdrawal, tells you all you

12   need to know, that this was an artifice, a contrivance, a

13   manipulation, a manipulation of this Court and the proceedings

14   here.  And, if I may, the admissions go deeper.  The admissions

15   go deeper than just that, your Honor.  They go to Mr. Donziger

16   here has told this Court he makes no apologies for anything

17   he's done and that he committed some -- his words --

18   inconsequential errors.

19          What did he say to the assembly?  He said there is no

20   doubt that what I did is serious, a direct contradiction.  And,

21   your Honor, he made the most damning admission of all, the

22   equivalent of a confession when he told the assembly the RICO

23   case did not spring only from the videos but also from Cabrera

24   and the judgment.  There is no doubt that what I did is

25   serious, but even without this, there would have been a RICO

DBQLCHE2                    Summation - Mr. Mastro

1   case.  I agree to step aside even though the core of the

2   problem is not only me.

3        They redacted that section because Steve Donziger is

4   talking to his fellow criminal confederates -- Fajardo, Yanza,

5   they're all there.  He's talking among the criminal

6   confederates and he is admitting there that it's not just about

7   what he did or what he did with Crude.  It's about what they

8   all did with the Cabrera fraud.  It's about what they all did

9   with the judgment fraud.  And he's going to temporarily step

10  aside, not really stepping aside, even though the core problem

11  is not only me.  It's what they all did together as criminals

12  to commit the Cabrera fraud and the judgment fraud.  This is a

13  confession, your Honor.

14       And if I may say, Steve Donziger has a world view.

15  His world view, everybody else is lying but me.  You saw in

16  this courtroom and in the depositions that were submitted in

17  evidence here, a dozen or more witnesses who testified that

18  Donziger misled, lied, or manipulated them into participating

19  in his scheme.

20       What's his testimony?  They're all lying; I'm telling

21  the truth.  I submit to your Honor that the biggest liar in

22  this courtroom besides Nicolas Zambrano was Steve Donziger.

23       Now, your Honor, how did this all happen?  How did

24  Steven Donziger go from idealistic Harvard law student to

25  criminal mastermind over the course of two decades?  We'll

DBQLCHE2                    Summation - Mr. Mastro

1    never get a straight answer from him, but the truth lies in the

2    contemporaneous words and writings he uttered himself, to him,

3    the ends came to justify the means.  The merits no longer

4    mattered.  In his own words, quote, this is all for the court

5    just a bunch of smoke and mirrors and bullshit.  We have enough

6    to get money.

7           He became all about the money, obsessed with it, in

8    fact.  He spoke openly of "jacking this thing up to

9    30 billion," of "juicy checks coming from Chevron," of

10   "billions of dollars on the table."  He even said -- and again,

11   your Honor, his words, not mine -- he even said the business

12   he's in, "the business of plaintiffs' law is to make fucking

13   money."  And like any criminal, he'd do just about anything to

14   get it.

15          So with single-minded focus, he set about to make the

16   big score and set his sights on Chevron, putting together a

17   racketeering enterprise consisting largely of U.S. lawyers,

18   U.S. consultants, and U.S. funders focused on defrauding and

19   extorting Chevron into paying billions to make them go away.

20   It was a scheme so audacious, so bold, it would make even a

21   mafia boss blush.

22          But there was one thing Steven Donziger didn't count

23   on.  Chevron didn't give into his pressure campaign.  It stood

24   up.  It refused to be extorted, and that's why we're here

25   today -- to right a wrong, to expose a fraud and extortion

DBQLCHE2                    Summation - Mr. Mastro

1    scheme, and to get justice, the justice that Steven Donziger

2    and his confederates denied Chevron in Ecuador through bribery,

3    fraud, and blackmail; the justice that comes from respect for

4    the rule of law, something that Steven Donziger and his

5    confederates want no part of.

6           And as he continues to claim here that's just an

7    advocate for a cause, pursuing, in his own words, a "new

8    paradigm" for how to do a case, he isn't fooling anyone

9    anymore.  This is no new paradigm for how to do a case,

10   Mr. Donziger.  It's a shakedown scheme and a crime.  And it

11   ends here with a resounding judgment that you can't get away

12   with this in America, Steven Donziger.  Your actions have

13   consequences, and you and your confederates can't profit one

14   penny from your crimes.

15          Your Honor, the truth has finally been told in this

16   courtroom about what Steven Donziger and his confederates did

17   here, and that's a truth that will now be heard around the

18   world.

19          Thank you, your Honor.

20          THE COURT:  Thank you.  We'll take a short break.

21          (Recess)

22          THE COURT:  All right.  Who's first on the defense

23   side?

24          MS. LITTLEPAGE:  I am, Judge.

25          THE COURT:  All right, Ms. Littlepage.

DBQLCHE2                    Summation - Ms. Littlepage

 1            MS. LITTLEPAGE:  Good morning.

 2            THE COURT:  Good morning.

 3            MS. LITTLEPAGE:  Judge, I'm going to cover some of the

 4    issues that impact, some of the factual issues that cross over

 5    the two defendants.  Mr. Friedman is going to address some

 6    issues unique to Mr. Donziger, and Mr. Gomez is going to talk

 7    about issues unique to his clients.

 8            THE COURT:  Okay.

 9            MS. LITTLEPAGE:  Judge, what I would start with is

10    sort of a question which is the question of proof and the

11    burden of proof which is on Chevron because as we started this

12    trial, we told the Court that now is no longer the time for

13    accusations, innuendo, or inferences.  Now is the time for

14    proof, and raw accusations or allegations are not proof.

15            Steven Donziger may well be a jerk; that's not a

16    crime.  He uses bad language; that's not a crime.  He's

17    disorganized and his accounting is a mess; that's not a crime.

18    Some people don't like Mr. Donziger; again, not a crime.  He

19    can be abusive to people that work for him or with him; again,

20    not a crime.  And it's not enough to just make accusations --

21    there must be proof that goes with it.

22            We told the Court at the beginning that basically the

23    evidence as we saw it fit into three different buckets.  There

24    was a bucket of random acts, and we weren't really sure what

25    was going to be in that bucket and some things we thought were

DBQLCHE2                    Summation - Ms. Littlepage

1    going to be there were there and some things weren't.   There

2    was a Cabrera bucket, and then there was the only bucket that

3    we thought was important which is the allegations of bribery of

4    a judge.

5            The first two have no causation.   There's no causal

6    connection between press releases or protests outside the

7    courthouse and the verdict.   There is also no causation between

8    the Cabrera report and the verdict.   And we know that because

9    Judge Zambrano specifically granted Chevron's motion to strike

10   the Cabrera report and not consider it in entering the verdict,

11   and then he relied on Chevron's evidence and predominantly

12   cited to Chevron's contamination data and to Chevron's experts

13   and to Chevron's expert reports when he wrote the verdict.

14           But we also know that just the underlying verdict

15   caused no harm to Chevron.   That's not an enforceable verdict

16   under Ecuadorian law.   You had to go to the next step in order

17   for Chevron to have any harm.

18           Well, then we get to the appellate court decision and

19   the appellate court's clarification.   Again, no evidence and no

20   proof and not even any allegations that Mr. Donziger had

21   anything to do with the appellate court, the appellate court's

22   decision, or the appellate court's clarification, breaking the

23   causal connection.

24           And now just last week we got the Ecuadorian Supreme

25   Court decision.   Again, not even an allegation or an inference

DBQLCHE2                   Summation - Ms. Littlepage

1    that Mr. Donziger had anything to do with the Ecuadorian

2    Supreme Court, their decision, their 220-page, single-spaced

3    decision.

4           But we know that the Ecuadorian Supreme Court dealt

5    with and looked at virtually every issue presented in this

6    courtroom.  We know specifically they dealt with Mr. Cabrera.

7           THE COURT:  At least as of this moment, that's not a

8    part of the record in this case.

9           MS. LITTLEPAGE:  Judge, we reached an agreement this

10   morning on admitting -- I think all the exhibits are going to

11   go in over the lunch hour and that is one of the exhibits that

12   is going to be admitted in the case.

13          The Ecuadorian Supreme Court dealt specifically with

14   Mr. Cabrera and all the allegations of Mr. Cabrera.  The

15   Ecuadorian Supreme Court said that the Court of Appeals had

16   adequately addressed the Cabrera issue taking into account the

17   fact that it was not considered by the trial judge.  And then

18   the Ecuadorian Supreme Court went on and said the trial judge

19   had expressly stated that the Cabrera report was excluded and

20   not considered.

21          THE COURT:  So what effect are you asking me to give

22   to the Ecuadorian Supreme Court exactly?

23          MS. LITTLEPAGE:  Well, Judge, I think you should give

24   the Ecuadorian Supreme Court decision the same weight and

25   consideration as the appellate court decision, which is there

DBQLCHE2                    Summation - Ms. Littlepage

1    is a break of causation between any allegation on the Cabrera

2    report and any harm to Chevron.  The Cabrera report didn't get

3    through to anything that that can cause Chevron harm.

4              THE COURT:  You're asking me to take those two

5    decisions -- how shall I put it -- as in some way

6    authoritative, conclusive, aren't you?

7              MS. LITTLEPAGE:  I'm asking you to take them as

8    evidence that there's no causal connection because the

9    underlying harm to Chevron that Chevron claims is based on a

10   verdict that was appealed and affirmed by an appellate court,

11   appealed and affirmed by an Ecuadorian Supreme Court, both

12   levels of appeal where there is no allegations of any fraud or

13   RICO action confirm that Cabrera had no impact on their

14   decisions.

15             So you take it for the evidence, as all evidence comes

16   in, as evidence that there is no injury that Cabrera report

17   bleeds through in a causal link.  That link is broken by the

18   verdict, by the appellate court, and by the Ecuadorian Supreme

19   Court, which makes those claims sort of claims to nowhere.

20             THE COURT:  You're in effect, are you not, asking me

21   to recognize those two decisions?

22             MS. LITTLEPAGE:  Judge, I think you recognize them as

23   evidence of what happened in Ecuador, just like a pleading was

24   filed in Lago Agrio.  You accept that evidence if that's what

25   was said or filed with that court.  You accept as evidence the

DBQLCHE2                    Summation - Ms. Littlepage

1    appellate decision and the Ecuadorian Supreme Court decision.

2            THE COURT:  Every word of it is hearsay, right?

3            MS. LITTLEPAGE:  Well, Judge, I think that they're

4    being offered not for the truth, but that doesn't mean that the

5    underlying -- hold on.

6            Judge, that doesn't mean that the underlying issues of

7    comity, which is one of our affirmative defenses, the

8    underlying issue of what's actually in the verdicts can be

9    ignored or disregarded by this Court.  There is a process in

10   Ecuador.  The process has continued and is now finished.

11           THE COURT:  And you're asking me to recognize the

12   result.

13           MS. LITTLEPAGE:  Well, I'm asking you to recognize

14   that the Ecuadorian Supreme Court ruled and what its ruling is

15   and what's the basis of that ruling and the fact that that

16   court says Cabrera has no causal link.  It is what it is.  It

17   says what it says.  And like all evidence, the Court will

18   consider it the way the Court wants to.

19           Which brings us to the third bucket which we told the

20   Court at the beginning was the one we were going to focus on,

21   and I think that is the only bucket of evidence that has any

22   impact and that is the allegations of bribing the judge.  And

23   we would say, Judge, that there is a giant hole in the evidence

24   on that topic.  It is based on the testimony of a single

25   witness, an admitted liar, and a witness whose story has

DBQLCHE2                        Summation - Ms. Littlepage

1    changed multiple times and whose story has changed multiple

2    times directly linked to money and interactions with Chevron's

3    lawyers.

4           So let's start the story in April of 2012.  In April

5    of 2012, Alberto Guerra was no longer a judge.  He was in tough

6    financial trouble.  His house was under repair and he was

7    living in the house because he couldn't afford to repair it.

8    And the newspapers carried the story of a verdict that was

9    given to a judge on a jump drive.  The newspapers carried a

10   story of a verdict that was given to a judge on a jump drive

11   that the judge then cleaned up and issued as his own.

12          And it won't surprise you to know that within a couple

13   of days, Alberto Guerra went to Chevron and said I have a story

14   to tell you.  I have a story that I think is worth a million

15   dollars.  Here's my story.  My story is that on Friday,

16   January 28, I met Judge Zambrano at the Quito airport and I got

17   a verdict on a flash drive and I went home to my house and I

18   worked on my computer at my home in Quito and I worked on this

19   verdict on the flash drive and I didn't consult with Judge

20   Zambrano the entire weekend, there was no reason for it, and I

21   cleaned up the verdict and then the verdict was issued under

22   Judge Zambrano's name -- a story startling similar to the one

23   that had been in the newspaper the week before.

24          But where's the proof?  Well, first of all, Chevron

25   said bring us proof.  We'll buy your computer from you because

DBQLCHE2                    Summation - Ms. Littlepage

1    if you worked on the verdict at your home computer at your

2    house in Quito, the verdict will be there, right there on that

3    computer.  And they paid him money and they got that computer

4    and what did they find?  No verdict.

5          So then they said give us all your jump drives because

6    if Judge Zambrano handed you this jump drive at the Quito

7    airport with the verdict on it, it will be there.  The flash

8    drive will have the verdict.  And they got all the flash drives

9    and what did they find?  No verdict.

10         But what Alberto Guerra learned is that money rains

11   down on him if he gives Chevron the story they want.  And so he

12   got cash -- $48,000 for documents.  He got a new computer, he

13   got a new cell phone.  But best of all is he got the promise of

14   America.

15         And I can tell you, Judge, as an immigrant that is the

16   pot of gold at the end of the rainbow.  He got promised by

17   Chevron that if he told the story they wanted, they would bring

18   him to America, his wife, his children, they would reunite him

19   with his child that was already living in America illegally.

20   They would get the child who was living in America illegally

21   immigration papers.

22         And so Mr. Guerra got on a plane and went to Chicago

23   and in November he met with the Gibson Dunn lawyers for the

24   first time and this was the meting where he was going to get

25   his deal for America.

DBQLCHE2                    Summation - Ms. Littlepage

1            And after meeting with the Gibson Dunn lawyers and

2     after getting an agreement, his America deal, he had a second

3     story because the first story didn't work.  There was nothing

4     on his home computer.  There was nothing on a flash drive.

5     There was no corroborating proof.  So then we got a second

6     story.  The second story is that on the same weekend, two to

7     three weeks before the verdict, so it's not even like we

8     confused the weekends and I thought I was in Quito this weekend

9     but it was really three weekends later that I went to Lago

10    Agrio on a bus, no.  The exact same weekend he muddled up.

11           He wasn't in Quito meeting Judge Zambrano at the

12    airport.  He was trudging along on a bus all the way to Lago

13    Agrio.  The verdict wasn't on a flash drive.  Now the verdict

14    was on a laptop that Chevron could now walk into this courtroom

15    and say we can't get access to, that's why we can't find the

16    verdict.

17           He wasn't meeting Judge Zambrano at the Quito airport.

18    He was actually in Judge Zambrano's apartment in Lago Agrio.

19    And instead of not speaking to Judge Zambrano the entire

20    weekend because there was no reason for it, he is talking to

21    the judge on the phone and having dinner together every

22    evening.

23           So that's story No. 2.  That story sold better.  That

24    story got him to America.  That story got him moving expenses,

25    $1,000 a month, a car, health insurance for him, and every

DBQLCHE2                   Summation - Ms. Littlepage

1    person in his family, and an immigration lawyer for his entire

2    family to be reunited in America.

3            But you have to step back and look at the whole story

4    that Mr. Guerra came up with and it's a story that we heard

5    here in the courtroom after three months of prep time.  Three

6    months, every Monday, Alberto Guerra flew from Miami to New

7    York.  He met with the Chevron lawyers Monday through Friday

8    and flew back to Miami on Friday evening.  For three months he

9    was prepped for his testimony here.

10           And the story starts in 2009 because in May and June

11   of 2009, Chevron had tried to prove corruption in Ecuador.  It

12   was very important to them that they get to show that the

13   Ecuadorian system was corrupt because by May or June of 2009,

14   the judicial inspections were over.  Everybody knew what the

15   contamination samples showed.  Chevron knew what their own

16   experts reports said.  They knew what their experts'

17   contamination results showed.  So now they had to set in place

18   an answer because if the verdict came out against them, they

19   needed something to take to enforcement courts to say Ecuador

20   is corrupt.

21           So they started the Borja sting and Mr. Borja, the

22   person who had actually done the judicial inspection samples

23   and transported them back and forth for them tapes Judge Nunez.

24   And Chevron issues a press release that says, look, we have

25   proof that judges in Ecuador are taking bribes.  Except when

1    you actually listened to the Borja tapes, Judge Nunez didn't

2    accept a bribe.  There was nothing about Judge Nunez being

3    bribed.

4            But here is Chevron in May or June desperately seeking

5    corruption evidence of judges in Ecuador, and then what

6    happens?  Judge Nunez recuses himself over the allegations.

7    Judge Zambrano is assigned to the case.  And in October of

8    2009, Chevron's savior arrives, Alberto Guerra.  He approaches

9    Chevron and says I can prove corruption in Ecuador because I am

10   willing to accept a bribe to deliver the verdict for you.

11           Well, the first thing you would think Chevron would do

12   would be report this.  This is their proof.  This is the thing

13   they've been looking for.  This is the whole Borja setup.  Yet,

14   none of that happens.  They report Mr. Guerra to no one.

15           So let's look at the timeline of 2009, the

16   interactions.

17           THE COURT:  So basically both sides agree that at

18   different times Guerra approached them and offered to throw the

19   case and neither side reported him.

20           MS. LITTLEPAGE:  Correct.

21           THE COURT:  Not Mr. Donziger and not Chevron's

22   lawyers.

23           MS. LITTLEPAGE:  And with injunctive relief as the

24   only remedy, the person asking for injunctive relief must come

25   with clean hands.  And when we've got the same conduct on both

DBQLCHE2                    Summation - Ms. Littlepage

1  sides, that's the exact scenario where injunctive relief would

2  not be appropriate.

3          But let's look at the timeline of 2009, Judge, because

4  it starts with a phone call between Mr. Guerra and Mr. Racines,

5  the lawyer for Chevron.  Alberto Guerra said he didn't remember

6  the timing of that interaction, but he thought that

7  Mr. Racines's memory was probably more clear than his.

8          So let's look at Mr. Racines's affidavit.  Mr. Racines

9  says that before October 16, he received a cell phone call from

10  Mr. Guerra.  His boss, Mr. Callejas's affidavit, actually tells

11  us that this phone call occurred between October 8 and

12  October 16.  So we have at least the start of a timeline.

13  October 8 to October 16, Mr. Guerra and Mr. Racines talk.

14  Mr. Guerra tells Mr. Racines that he has this offer for him

15  that Chevron can buy the verdict.

16          There is then a second phone call.  Mr. Racines tells

17  us that's a few days later.  And then there's the meeting at

18  the El Chacal restaurant, a meeting which Mr. Racines goes to

19  knowing he is going to discuss a potential bribe with

20  Mr. Guerra, a meeting where he doesn't just have coffee, but a

21  meeting where he goes and has dinner and pays for the bill for

22  Alberto Guerra and the Chevron lawyer to sit and eat and

23  discuss corruption of the judge in Ecuador.

24          Mr. Racines tells us that after one or two months

25  after the second phone call is when he met up with Mr. Guerra

at the El Chacal restaurant, which would put us between

November 10 and December 10.

Then we know Mr. Guerra tells us that he goes back to

Mr. Zambrano and says Chevron says no.  Mr. Zambrano tells him

to go meet with Pablo Fajardo.  And Mr. Guerra tells us some

days later, he meets with Mr. Fajardo, and then shortly

thereafter -- he meets with Mr. Fajardo.  He then meets with

Mr. Donziger a week or two later at the Honey Honey restaurant

in the city of Quito.  This is Mr. Guerra's testimony.

So if you look at some days later and shortly

thereafter and a week or two later, we're between December 1

and December 15 with the meeting with Steven Donziger at the

Honey Honey restaurant in Quito.  And this is where,

apparently, it all starts.  This meeting is where Mr. Guerra

says Mr. Donziger reached an agreement with him, an agreement

of his involvement in the Chevron case.

So let's look at what Mr. Guerra remembers.

Mr. Guerra remembers that he reached a deal with Pablo a month

or a month and a half after Mr. Zambrano's first term.  And we

know from the stipulation that the Court asked the parties to

enter into that that started October 21, 2009.

So a week or two later, he meets with Mr. Donziger at

the Honey Honey restaurant, which means that Mr. Guerra's

testimony and Mr. Racines's affidavit match up fairly

cohesively.  This meeting with Mr. Donziger at the Honey Honey

DBQLCHE2                    Summation - Ms. Littlepage

1   restaurant, which is the foundation, the foundation, the core,

2   the basis of Chevron's claim, occurs between November 28 and

3   December 15.

4           The problem with that, Judge, is we have

5   Mr. Donziger's immigration records.  We know that Mr. Donziger

6   is not in Ecuador any of those days.  In fact, Mr. Donziger is

7   in the U.S. with his mother in hospice who dies the first week

8   of December of 2009.  So the core meeting, the foundation

9   meeting of the Honey Honey with Mr. Guerra did not occur.

10  Mr. Donziger is nowhere near the country of Ecuador at the time

11  this meeting happened.

12          Where's the proof?  Mr. Guerra brought us proof of

13  TAME shipping records, proof we don't disagree with because

14  Mr. Zambrano, Judge Zambrano and Mr. Guerra both agree that

15  they shipped documents back and forth as Mr. Guerra was

16  working, helping draft some of Judge Zambrano's orders.

17          So what's the second piece of proof?  The second piece

18  of proof was a cash deposit slip.  And this one I find

19  interesting, Judge, because one of the things Mr. Callejas told

20  us when he came is that he gets paid $33,000 a month to

21  represent Chevron.  So you have one of the top lawyers in Quito

22  that you pay $33,000 a month to represent you, and yet when it

23  comes time to get the key piece of evidence, the deposit slip

24  from the bank that's going to prove your case, do you send

25  Mr. Callejas to the bank, do you have Mr. Callejas go to the

DBQLCHE2                    Summation - Ms. Littlepage

1    court and get a court order, or do you send Mr. Guerra,

2    himself, by himself, to the bank to bring what he says is a

3    copy of a deposit slip from a secretary at Selva Viva?

4            He admits that the number for everybody in Ecuador is

5    freely available on the internet.  And when Mr. Guerra was on

6    the stand, I asked him to identify his own handwriting on some

7    other bank documents because it seemed stunning to me how

8    similar Mr. Guerra's own handwriting is to the deposit slip of

9    the Selva Viva alleged secretary that they sent Mr. Guerra to

10   the bank to get.

11           So we know that the first meeting in the fall --

12           THE COURT:  Let me interpose a question.  You didn't

13   address the apparent match or similarity between the Ximena

14   signature on the deposit slip and on her national identity

15   card.

16           MS. LITTLEPAGE:  I did not, Judge.

17           THE COURT:  Do you want to address that?

18           MS. LITTLEPAGE:  I can't address it.  I don't know the

19   answer to that.  I know the number is very, very, very similar

20   in handwriting.

21           So we know the first meeting didn't occur.  Can't

22   have.  There's no question.  Honey Honey in November and

23   December of 2009 with Mr. Donziger did not occur.

24           So let's look now at the fall of 2009 and Mr. Guerra's

25   story.

DBQLCHE2                    Summation - Ms. Littlepage

1          THE COURT:  I'm sorry.  Just I'm really trying to

2    understand the thesis.  The "did not occur" assertion rests on

3    not a firm date in December when this allegedly occurred.  It's

4    sort of a reconstruction by you from vaguer testimony by people

5    about it was, well, some period of time after X, whatever X

6    was.

7          Am I right?

8          MS. LITTLEPAGE:  Well, it's actually reconfirmed by

9    both Mr. Guerra's testimony and Mr. Racines' testimony.  I

10   built the timeline on both of them so if the Court had any

11   question, you would see both of them track very similar

12   timelines and you end up at the same frame.

13         THE COURT:  But neither one of them starts from a hard

14   date and says it was one week or two weeks after.  It's

15   fuzzier, isn't it?

16         MS. LITTLEPAGE:  No, sir.  Mr. Racines's timeline

17   starts with an affidavit he signs in October 16, 2009.  In that

18   affidavit, he says a few days ago Mr. Guerra called.

19   Mr. Callejas's affidavit actually gives us better evidence and

20   he frames that time frame between October 8 and October 16.  So

21   we do have a firm date to start with between October 8 and

22   October 16 is the first phone call.

23         THE COURT:  What comes next?

24         MS. LITTLEPAGE:  There's a second phone call.  There's

25   a meeting at the El Chacal restaurant.  Judge Zambrano is

DBQLCHE2                     Summation – Ms. Littlepage

1    officially on the case.  And then there's the meeting at the

2    Honey Honey restaurant.

3           THE COURT:  I know, but is there hard evidence of what

4    the time intervals are after October 16?

5           MS. LITTLEPAGE:  Well, there's two different time

6    intervals, Judge.  There's Mr. Racines's time interval of the

7    El Chacal restaurant and him telling, Chevron telling

8    Mr. Guerra no, and then meeting at the Honey Honey.  And then

9    there's a separate timeline of Mr. Guerra saying it was one or

10   two months after Mr. Zambrano was assigned to the case that I

11   met with Pablo Fajardo.  And those times match up.

12          THE COURT:  So one or two months after what?

13          MS. LITTLEPAGE:  Mr. Zambrano is assigned to the case.

14          THE COURT:  Okay.  So you hang everything on, for that

15   piece of your argument that the meeting didn't take place, on

16   the proposition that when someone four years after the events

17   is asked how much later did X happen than Y and says a month or

18   two, that can't possibly mean a month or three or two or three

19   months; is that right?

20          MS. LITTLEPAGE:  Even if it was a month or two or

21   three, Mr. Donziger is still not in Ecuador.

22          THE COURT:  He's in Ecuador in January.

23          MS. LITTLEPAGE:  He is, sir.

24          THE COURT:  So if it's three months, then it's not

25   impossible.

DBQLCHE2                    Summation - Ms. Littlepage

1           MS. LITTLEPAGE:  But it wouldn't match up with

2  Mr. Racines's timeline, which is why I did both of them because

3  they match up --

4           THE COURT:  So come back.

5           MS. LITTLEPAGE:  -- with very similar dates.

6           THE COURT:  Come back to Mr. Racines.  You start --

7  let's just assume for the sake of argument you're right about

8  October 10 to 16 being the starting point.

9           MS. LITTLEPAGE:  8th through the 16th.

10          THE COURT:  Pardon?

11          MS. LITTLEPAGE:  The 8th to the 16th.

12          THE COURT:  Okay.

13          MS. LITTLEPAGE:  Yes, sir.

14          THE COURT:  Then the two intervals according to

15  Racines are what and what?

16          MS. LITTLEPAGE:  He says a few days later he got a

17  phone call from Mr. Guerra, Mr. Callejas supports that on his

18  affidavit, and then he says one to two months later he meets at

19  the El Chacal restaurant.

20          THE COURT:  So they both say one to two months.  And

21  in each case -- this is a question, not a statement -- and in

22  each case you have somebody years later talking about how long

23  the interval was and they both say one to two months, and

24  whatever the frailties of human memory or whatever, they may be

25  right, they may be wrong.

1          Is that about it?

2          MS. LITTLEPAGE:  Well, they may be right, they may be

3    wrong, but Mr. Donziger says they're wrong and his immigration

4    papers say they're wrong.

5          THE COURT:  No, his immigration papers say only that

6    he didn't get there until January 5.  He doesn't know what

7    these intervals were, according to him, because he knows

8    nothing about it.  Correct?

9          MS. LITTLEPAGE:  Correct.

10         THE COURT:  Just so I understand.  Thank you.

11         MS. LITTLEPAGE:  Thank you.

12         If we look to the fall of 2010, Chevron moves to

13   recuse Judge Ordonez knowing that Judge Zambrano will be

14   assigned to the case, and that also raises a question, Judge.

15   Within a very short period of time, Alberto Guerra is back

16   offering them again to buy the verdict.  So they've moved to

17   recuse Ordonez.

18         THE COURT:  I think he was a seller.  I thought he was

19   a seller.  It's a joke.

20         MS. LITTLEPAGE:  Sell the verdict to Chevron to buy

21   the verdict.

22         When Chevron moves to recuse Judge Ordonez, they know

23   the evidence is closed.  They know the verdict is close.  They

24   know the next person on the case is going to write the verdict.

25   They know it's going to be Judge Zambrano.  And the question

DBQLCHE2                    Summation - Ms. Littlepage

1    has to be is did they just -- is this an action they took

2    because they knew they would get a do-over card.  Remember,

3    Mr. Racines and Mr. Callejas have signed affidavits from the

4    fall before, kept privately, not released, but kept privately

5    confirming Guerra trying to sell them the verdict the year

6    before.  When they put Zambrano back on the case, is that just

7    a step knowing that whatever Zambrano does, they can pull out

8    these old affidavits and get a do-over card claiming fraud and

9    bribery?

10          So let's look forward at the fall of 2010 where

11   Mr. Guerra says there was a second meeting at the Honey Honey.

12   Mr. Donziger says this is the first meeting he had with

13   Mr. Guerra at the Honey Honey.  But what they both agree on is

14   no deal is struck.  Mr. Guerra in his witness statement says

15   that Mr. Donziger did not agree to pay any money.  Mr. Donziger

16   says he did not agree to pay any money.  So no deal is struck

17   in the fall of 2010.

18          So where's the proof?  Again, we get back to the

19   testimony of Alberto Guerra, a triple hearsay statement where

20   he says Zambrano told him that Pablo Fajardo told him that

21   there would be a deal.  That's it.  And it comes right down to

22   it, the entire case rests on Zambrano told Guerra that Pablo

23   Fajardo told Zambrano that there was a deal.

24          And we know that every, virtually everything that

25   Steven Donziger has written in the last ten years is now in

DBQLCHE2                    Summation - Ms. Littlepage

1    Chevron's possession:  his emails, his diary, his memos.  Not a

2    single thing --

3           THE COURT:  Excuse me, doesn't that cut off sometime

4    certainly earlier than 2013, maybe earlier than 2012, maybe

5    even earlier than that?  I'm not sure offhand.

6           MS. LITTLEPAGE:  What it doesn't cut off is any emails

7    about a verdict, any drafts of a verdict, any writing of a

8    verdict and sending it to Ecuador to be entered by Judge

9    Zambrano.  And we know that for the month of January of 2011,

10   Mr. Donziger spends one, two, three, four, five, six full days

11   in depositions with Chevron.

12          So, again, where's the proof?  Then Chevron brought us

13   the memory aid that they said was proof of Mr. Guerra's story,

14   a memory aid, a document that ends in 2009, clearly unfinished

15   because it has a title, Cabrera, and nothing below it.  And a

16   document that there's not just one story about or two stories,

17   but for this piece of evidence Mr. Guerra has three stories.

18          The first story is that Pablo emailed it to him on

19   Saturday or Sunday at his home in Quito.  The second story is

20   that he received it late afternoon or the night of the first

21   day, Friday, via email at an internet cafe in Lago where he had

22   to leave Judge Zambrano's apartment and go to the internet cafe

23   and get the email and print it out.

24          But we know from his hotmail account that he has no

25   emails from Pablo Fajardo.  He doesn't even have Pablo

DBQLCHE2                   Summation - Ms. Littlepage

1   Fajardo's contact information in his hotmail.  So for trial we

2   got a brand new story.  For trial he said for the first time in

3   two years, year and a half, that Pablo brought the memory aid

4   over in person to Zambrano's apartment.

5         And we have a document, we have an email that Chevron

6   says is proof of an interaction between Mr. Donziger and

7   Mr. Guerra because it talks about from Mr. Guerra, I will

8   support the matter of Pablo Fajardo so it will come out soon

9   and well.

10        But when Mr. Guerra was asked about this exact

11  document by Chevron whether that was referring to the Chevron

12  case, he said the truth is no.

13        And so let's move past bribing the judge to authorship

14  because that's the second part of Chevron's claim is that the

15  proof they have of RICO violations and fraud is authorship, is

16  that the verdict was written by the plaintiffs, which brings us

17  to the No. 1 question of the case:  Who wrote the verdict?

18  This is the question.  Who wrote the verdict?

19        There are actually people who do authorship, who

20  decide and look at prior writings, prior documents, and come up

21  with conclusions about who wrote a document.  Interestingly,

22  after all the money Chevron spent and all the effort Chevron

23  went to in this case, the one thing they didn't bring in this

24  courtroom is an expert to talk about who wrote the verdict.

25        We know that Mr. Guerra told us that Chevron

DBQLCHE2                    Summation - Ms. Littlepage

1    immediately asked him for his prior orders to look to see if

2    his prior orders were similar to the verdict.  So we knew

3    Chevron was looking at this issue because they immediately

4    asked Mr. Guerra for his prior orders.  We know they had access

5    to Judge Zambrano's writings because Mr. Guerra told you he

6    never wrote any of Judge Zambrano's criminal orders.  We know

7    that they had Mr. Donziger's writings.  They had Pablo

8    Fajardo's pleadings.

9         And we know that they hired people who do authorship.

10   They hired Mr. Lynch and Stroz Friedberg who admitted that

11   Stroz Friedberg has an entire division that performs authorship

12   analysis and he was not asked to do an authorship analysis in

13   this case.

14        They hired Mr. Leonard, the man who told you that he

15   helped police solve murders based on a single sentence written

16   by a husband before the wife's murder that he could prove also

17   matched up to the ransom note that he said was involved in the

18   murder.  Mr. Leonard was not asked to do any authorship

19   analysis.

20        They brought you Patrick Juola.  Mr. Juola actually

21   created this incredible computer system, this system that looks

22   at authorship, costs $2 million.  It's his pride and joy.  It's

23   not impacted by language.  It can search for authorship through

24   various languages.  And what did they have Mr. Juola do?  OCR

25   the record.  What they never asked him to do is look at

DBQLCHE2                    Summation - Ms. Littlepage

1    authorship.

2            So we know that they went to the leading experts in

3    the country on authorship, people who pride themselves on their

4    expertise on authorship, pride themselves on being able to

5    compare the writings of one person, person A and the writings,

6    the suspected writings, and be able to prove that person A

7    wrote the suspected writing.  And what's the one thing they did

8    not ask any of these people to do is answer the question in the

9    case:  Who wrote the verdict?

10           So let's talk about Judge Nicolas Zambrano because

11   yesterday afternoon was a critical piece of evidence.

12   Mr. Lynch, one of the last questions asked in the entire trial,

13   Chevron's expert, agreed that the verdict was started in

14   October of 2010 on a desktop computer in Judge Zambrano's

15   office.  The fight was whether it was the new computer or the

16   old computer, but there was no dispute that the verdict was

17   started in October of 2010 on a desktop computer in Judge

18   Zambrano's office.

19           Neither, none of that evidence matches up with Judge

20   Guerra's various stories.  It's not on a jump drive.  It's not

21   on Pablo Fajardo's laptop.  The verdict was started in October

22   of 2010 on a desktop computer in Judge Zambrano's office.

23           And it was Mr. Guerra who told us that Judge Zambrano

24   hired Ms. Calva.  It was Judge Guerra who told us that

25   Ms. Calva came day by day to type for Judge Zambrano.

DBQLCHE2                    Summation - Ms. Littlepage

1          Mr. Lynch told us that 30 percent of Judge Zambrano's

2     verdict is in quotation marks, but we know that he actually

3     quoted a lot more than 30 percent because, for example, Judge,

4     in the Esmeralda Communities case, the one against

5     Petroecuador, pages of that Ecuadorian Supreme Court decision

6     is copied almost verbatim into the verdict.

7          And when the big issue was raised about how Judge

8     Zambrano could have talked about Colombian and Argentinian and

9     French law, the answer is easy -- he copied it from the

10    Ecuadorian Supreme Court case which went through and discussed

11    Colombian, Argentinian, and French law.

12         We know that Judge Zambrano doesn't a hundred percent

13    understand American law because it was the Court itself that

14    asked Judge Zambrano to explain his -- what the verdict said

15    about American law.  He got it somewhat wrong in this courtroom

16    and, interestingly, he got it wrong here the exact same way he

17    got it wrong in the verdict.  He doesn't understand strict

18    products liability law in America.  He didn't get the theory

19    and the principles of strict products liability a hundred

20    percent right here, and he got it exactly the same way

21    incorrect in the verdict.

22         The fusion memo.  Chevron makes a lot of hay about the

23    fusion memo, but Judge Zambrano told the Court that he recalled

24    seeing the fusion memo before.  And we know that the fusion

25    memo exhibits are in the Ecuadorian Lago Agrio record and we

DBQLCHE2                      Summation - Ms. Littlepage

1    know that he dictated from the fusion memo and from those

2    exhibits straight into the verdict.

3              So then suddenly in the middle of the trial in light

4    of all this evidence, we took a different direction and Chevron

5    started talking about President Rafael Correa.  And suddenly we

6    had experts talking about the lack of confidence in the

7    judiciary overall in Ecuador, who on cross-examination was

8    shown that in fact the Ecuador judiciary system is the same now

9    as it was when Chevron was begging to go back to Ecuador saying

10   it was a completely fair forum.

11             And what we know is that there is not a scrap of

12   evidence other than inference and inference and innuendo that

13   Rafael Correa had anything to do with the Zambrano verdict,

14   nothing to do with the appellate court decision, and it would

15   be hard pressed to even argue that he had any influence over

16   the Ecuadorian Supreme Court decision which removed $9 billion

17   of the damages last week.

18             (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DBQ8CHE3                    Summation - Ms. Littlepage

1              MS. LITTLEPAGE:  A very wise judge in the *Pavlov v.*

2    *Bank of New York Company* case in 2001 wrote, "It is not the

3    business of our courts to assume the responsibility for

4    supervising the integrity of the judicial system of another

5    sovereign nation."

6              Judge, you were right then, and you are right now.

7              What Chevron's burden is is to prove their case, not

8    with assertions, not with allegations, but to prove their case,

9    every element of that case, and one of the crucial elements is

10   causation, that conduct caused them injury.

11             Thank you, Judge.

12             THE COURT:  Mr. Friedman.

13             MR. FRIEDMAN:  Thank you, your Honor.

14             THE COURT:  I trust you are going to supply me with

15   your PowerPoint or whatever it is, the graphics?

16             MS. LITTLEPAGE:  Yes.

17             THE COURT:  Thank you.

18             MR. FRIEDMAN:  Your Honor, this is an unusual closing

19   argument for me to make.  Ordinarily, I study the facts, spend

20   more time with the facts and the fact finder.  Ordinarily, I

21   have studied the law more than most of the judges I appear

22   before.  And that gives me a certain standing, I feel, to argue

23   to the court, argue to the jury, about what the law or the

24   facts should be or what they should find.  And here it has not

25   escaped me that this fact finder, this judge, has spent more

DBQ8CHE3                    Summation - Mr. Friedman

1    time with the facts, more time with the law than I probably

2    ever will, the law and the facts of this case.  And I don't

3    learn the facts as fast as Ms. Littlepage.  She has been sort

4    of a wonder to me in the way that she has been able to learn

5    the facts as quickly as she had.

6              So it seems a little presumptuous of me to stand here

7    and argue to the Court about what you ought to do with this

8    case.  It occurred to me to not even make a closing argument.

9    I seriously thought about that.  And I thought, well, in a

10   sense, my weakness may be something of a strength.  It occurred

11   to me that I might have a few things to offer to the Court as

12   it thinks it's way through this case.  Maybe a sense of

13   detachment that comes from a clean slate and being new to the

14   scene.  Maybe a fresh set of eyes, a new perspective.

15             My first observation in getting involved with this

16   case that can't escape anybody is how contentious it's been.

17   Big things, small things, important things, unimportant things,

18   everybody was fighting about everybody, disagreeing about

19   everything.  But what struck me right from the beginning is

20   that both sides agreed what your verdict would be.  They both

21   were expecting the exact same thing from you.  And that seemed

22   curious to me for several reasons, reasons that you don't need

23   to know much about this case to understand.

24             Chevron is asking this Court to do some extraordinary

25   things and take some extraordinary positions.  First among

DBQ8CHE3                    Summation - Mr. Friedman

1    them, of course, is that Chevron wants you to say, needs you to

2    say, that Mr. Guerra is a credible witness.

3           Now, good lawyers, good judges can construct an

4    argument on either side of the issues, on any issue, and

5    certainly someone could construct an argument for Mr. Guerra's

6    credibility in the face of all the facts Ms. Littlepage just

7    walked you through, the ones you saw yourself.  But why would

8    you want to strain to come to the conclusion that Mr. Guerra is

9    a truthful witness, that he testified truthfully in this court?

10   Maybe because you believed people on our side of the case have

11   not been as forthcoming with the Court as they should have

12   been.  Maybe because you think people associated with our side

13   of the case have been disrespectful to the Court.  Maybe the

14   Court finds Mr. Donziger's personality style of lawyering

15   offensive.  There are plenty of reasons, from what I have seen,

16   for the Court to have strong feelings about this case and

17   towards our side of the case.

18          THE COURT:  Mr. Friedman, I think you have gotten into

19   a vein that is really not appropriate.

20          MR. FRIEDMAN:  I will move on then, your Honor.

21          Let me say this.  I think all of us involved in this

22   case have had to navigate through heightened feelings,

23   acrimony, less than ideal conduct, using the law as a compass.

24   And that's what I wanted to talk to the Court about.  I would

25   like to share with the Court how this case looks to a lawyer

DBQ8CHE3                    Summation - Mr. Friedman

with fresh eyes, to a lawyer with fresh eyes who is trying to
look to the law as a compass for how this case ought to come
out.

         One of the things that struck me, and struck me again
as Mr. Mastro made his argument, is the wealth of factual
material in this case, the literally thousands of documents,
the hundreds of hours -- I guess they haven't all been
admitted, but originally the hundreds of hours of Crude
outtakes, the enormous volume of factual material.  And the
Court is probably aware, in the movie-making business, we saw
it exemplified by Crude, and most commercial films take
hundreds, if not thousands of hours of footage, and then you
can edit and you can make any kind of film you want.  You can
take those thousands of hours and make a comedy, a tragedy,
anything in between.

         To an extent, that same thing is true here.  Many of
the things that Mr. Mastro talked to you about are out of
context.  Some of them you may have recognized as out of
context.  Some of them you may not have recognized as out of
context.  I will just use one example where he quoted Mr.
Donziger as saying, if you tell a lie often enough, it becomes
the truth.  And if you go to the place where he says that in
the Crude outtakes, what you will see is he is complaining
about Chevron and his fear that Chevron is going to succeed, in
his view, in passing lies off as the truth.

1          THE COURT:  What is the exhibit number, please?

2          MR. FRIEDMAN:  It's in the Crude outtakes.

3          THE COURT:  What is the exhibit number?

4          MR. FRIEDMAN:  I don't know offhand.

5          THE COURT:  Mr. Mastro, do you know the exhibit

6     number?

7          MR. MASTRO:  Yes, I do, your Honor.  Because it's not

8     in the Crude outtakes.  It's an e-mail that he signs Steven

9     Donziger, and the e-mail is 1059.  It's an August 13, 2008

10    e-mail.

11         THE COURT:  It may also be in the outtakes.

12         MR. FRIEDMAN:  I think it is, your Honor.  I am pretty

13    sure it's in the outtakes.  I have recently looked at that DX

14    exhibit.

15         Your Honor, there are others.  They were in the Crude

16    outtakes.  If you look at, I think it's PX 4, which is the

17    fourth Crude outtake, that's the one we had the little dispute

18    about where the sentence was taken out of the middle of other

19    two other sentences that Mr. Donziger has said.

20         My point is simply this, your Honor.  The wealth of

21    factual information is both a boon to the Court and a potential

22    trap.  And the potential trap is that you take things said by

23    either side at face value without seeing the full factual

24    underpinnings or context.

25         THE COURT:  Well, just so that we are all clear,

1    Plaintiff's Exhibit, and I am not saying it's not an outtake

2    also, but Plaintiff's Exhibit 1059 is an e-mail string.

3            It begins with an e-mail on August 13, 2008, from Mr.

4    Donziger and Mr. Fajardo.  And the e-mail in its entirety

5    reads:  "If you repeat a lie a thousand times, it becomes the

6    truth."

7            On the following day, Mr. Fajardo responded, and the

8    e-mail in its entirety reads:  "Things rise.  It used to be if

9    you repeated things three things, it becomes the truth."

10           MR. FRIEDMAN:  I don't know what was on the e-mail

11   string before that.

12           THE COURT:  There is nothing else on the exhibit, but

13   certainly there is nothing on the exhibit that says a word

14   about Chevron.

15           Now, as I say, some other piece of evidence, but at

16   least in that case there is nothing out of context, at least

17   not out of the context of the given exhibit.

18           MR. FRIEDMAN:  Right.  I guess that's kind of my

19   point, your Honor.  I think if you go to the diaries -- I don't

20   want to belabor the point.  The point is simply this.  A lot of

21   what you have been presented with requires contextual

22   understanding.  That's my point.  And whether it's the diary

23   entries, the e-mails, what other e-mails were being exchanged

24   between Mr. Donziger and Mr. Fajardo at the time 1059 was being

25   exchanged, those are all things that are frankly hidden traps

DBQ8CHE3                    Summation - Mr. Friedman

1    for the Court factually.

2              One thing that's apparent is that the Court has given

3    Chevron every opportunity to prove its legal entitlement to

4    relief, that is, entitlement to equitable relief under

5    applicable legal standards.  And despite all the sensationalist

6    talk about the evidence in this case, that's the bottom line

7    for the Court.  Has Chevron proven entitlement to some sort of

8    equitable relief under its two causes of action?

9              Not surprisingly, Mr. Mastro did not mention the law

10   once in his argument to the Court.

11             Viewed with fresh eyes, what Chevron is asking the

12   Court to do is truly extraordinary.  It's asking the Court to

13   make factual findings about events that in large part took

14   place 3,000 miles away, in another language, in another

15   culture, in another legal system.  And to do that, they are

16   essentially asking the Court to become expert in Ecuador

17   procedural and substantive law, at least expert enough to

18   answer questions such as:  What ex parte contacts with judges

19   in Ecuador are appropriate?  What ex parte contacts with

20   experts are appropriate?  How is a lawyer's involvement with

21   preparing expert reports, how is that to be discussed and

22   presented in Ecuador?  What proposed documents must be filed in

23   the record?  How is a judge expected to act when he prepares

24   his final verdict?  May a judge begin drafting a final judgment

25   before issuing an autos para sentencia?

DBQ8CHE3                     Summation - Mr. Friedman

1          The list goes on and on, and I am not going to belabor

2     this point either, but what Chevron is asking the Court to do

3     is to become expert in those issues, and then look at the

4     facts, again, across these cultural language barriers, and make

5     factual decisions about what did and did not happen.

6          The fact is Mr. Mastro quoted Mr. Donziger -- again,

7     this was from a Crude outtake -- about we are doing things that

8     we would never do in the United States.  And I think that's DX

9     4.  That is the one where a sentence was taken out from the

10    middle of two other sentences.  The truth is things are done

11    differently down there.

12         Chevron wants you to look at all those issues and more

13    of Ecuador procedural and substantive law, and then in essence

14    say, the Ecuador judicial system got it wrong.  This is what

15    Ms. Littlepage was referencing as well from another

16    perspective.  Essentially, what Chevron wants you to say is

17    that all of these issues that were raised before the Ecuadorian

18    courts were wrongly decided by the Ecuadorian courts.

19         THE COURT:  I don't understand that to be the case at

20    all.  So I am obviously missing something huge.

21         MR. FRIEDMAN:  Let me give an example, your Honor.

22         Chevron is saying that the preparation of the Cabrera

23    report was improper under Ecuadorian law, and that it was

24    fraudulent, and various other things they have said in that

25    regard.  Those issues about the Cabrera report were brought

DBQ8CHE3                    Summation - Mr. Friedman

1    both to the trial and the appellate courts.  The trial court,

2    of course, threw out the Cabrera report.  And the appellate

3    courts, none of the courts said, this is fraud, it's deserving

4    of reference to a prosecutor, anything of the kind.

5            THE COURT:  But didn't the appellate court explicitly

6    say, we leave all of that to the court in New York, that's not

7    anything we are going to pass on?

8            MR. FRIEDMAN:  I think what they said is, it's going

9    on in that context, and the parties are free to pursue -- I

10   don't know the exact language, but the parties are free to

11   pursue it there.  But you would think, if this was so offensive

12   to Ecuadorian law, that there would have been a referral to the

13   prosecutor's office, if this was such a crime in Ecuador.

14           The same would be true of other sorts of issues.

15   There was a lot of talk in the Ecuadorian pleadings -- many of

16   them have been made exhibits now -- about allegations of

17   ghostwriting the judgment, of improprieties by Judge Zambrano.

18   Again, the appellate courts were not receptive to those

19   arguments.  And if this Court is going to be receptive to those

20   arguments, it's going to put itself in conflict with the

21   Ecuador appellate courts.  That's the point that I wanted to

22   make.  That to get Chevron where -- there may be other ways to

23   get where it wants to go, but a big part of Chevron's argument

24   is what took place in Ecuador was improper, and the Ecuador

25   courts didn't catch it but you should.  That's essentially what

1   they are saying.

2           They want you to do that, without running afoul of the

3   Second Circuit's opinion in the Count Nine case, not running

4   afoul of comity concerns, which this Court has recognized in

5   prior opinions, and of course the Second Circuit has as well.

6           There are three main categories of wrongful conduct as

7   I see it.  How the Cabrera report was prepared.  How it was

8   talked about after it was prepared.  And then, of course, the

9   allegation of bribing the judge.

10          The Cabrera report largely, primarily written by

11  Stratus.  Chevron presented that evidence to the trial and

12  appellate courts.  We have talked about that.  But what I want

13  to point out to the Court, what harm was caused to Chevron by

14  that conduct?  Because under our law, it's not enough to have

15  negligence or evil state of mind in the air, as Judge Cardozo

16  said.  You need to actually tie it to causation.

17          There may have been a causation claim here when there

18  was a monetary claim, maybe.  But now, with no claim for

19  monetary damages, the question is:  What harm was caused to

20  Chevron by the way the Cabrera report was prepared?  What harm

21  was caused that meets the standards for granting equitable

22  relief, that is, irreparable injury and inadequate remedies at

23  law?

24          And there is the talking about the Cabrera report.

25  The one point maybe I agreed with Mr. Mastro on is the

1    significance of PX 1291.  I remember in the trial when the

2    Court noted that exhibit as well.  That's the to council memo.

3    Mr. Mastro has been quoting the first section of that memo that

4    talks about the traditional view under Ecuadorian law as Mr.

5    Donziger saw it.  They have not quoted to the Court the next

6    section of the memo, in which he says, "The other perspective

7    is this."  And essentially what he says is, given the way this

8    case has been litigated and the way things have evolved and the

9    way the Ecuadorian system works, there is a good argument to be

10   made that everything we did was proper.

11           I would commend the Court to that memo, because I

12   suggest to the Court that what it reflects is an American

13   lawyer trying to figure out what is proper, what isn't proper,

14   where the lines were, and what to do about it now.

15           Is Mr. Donziger at that point in time required to

16   say -- if that memo represents his state of mind at the time,

17   is he required to say, we did something wrong if there is a

18   good faith basis in the law and the facts to believe otherwise?

19           And the testimony has been uncontradicted.  He sent

20   associates down to Ecuador to look into this.  He had meetings

21   about this.  He got information and reactions from everyone.

22   And of course you heard one reaction, if this comes out we are

23   all going to jail.  There are other reactions in the record as

24   well.  There is back and forth.  There's lots of discussions.

25   And the question is, was he required in April, in light of that

DBQ8CHE3                    Summation – Mr. Friedman

state of mind, to just come out and say, OK, we screwed up, we

were wrong, there is no good faith basis for our position?

          Now, maybe the Court will say yes.  If that 1291

represents his state of mind, he is still required to come

forward at that time and say, yes, you have to not make those

arguments in the second half of the memo and only make the

arguments in the first half of the memo.  But if that's true,

that simply leads to another question for this Court.  What

specific statement after that time did he make that was

improper?  Who relied on that statement?  And what harm did

that reliance cause Chevron?

          For a RICO case, as the Court is aware, the plaintiff

has to prove that someone relied on the misrepresentations and

that plaintiff was harmed as a result.  And in a RICO case,

relying upon mail fraud or wire fraud violations, the plaintiff

also has to prove that its the pattern of mail or wire fraud

violations, not some other act, that caused the plaintiff's

injury to business or property.  And I would suggest to the

Court, despite the wealth of evidence, there hasn't been any

evidence on those points that would support a mail or wire

fraud RICO violation.

          That gets us to the allegation of bribing the judge,

your Honor.  I think what I would like to remind the Court

about, which I think kind of epitomizes a lot of this case, and

particularly Mr. Guerra, is the moment that Mr. Guerra was on

 1    the stand, and after getting him to tell his story, Mr. Mastro
 2    said, "And do you see the person in the courtroom?  Do you see
 3    Mr. Donziger here in the courtroom?"  And this is on October
 4    23, transcript page 923.  And Mr. Guerra said, "Yes."  And Mr.
 5    Mastro says, "Can you point him out to us?"  And the Court
 6    said, "The usual way of doing that, Mr. Mastro, is to not point
 7    at the witness."  And Mr. Guerra said, "Yes, I see him.  He
 8    just smiled.  He is behind the lady in the red."  And on that
 9    day, Ms. Littlepage was dressed in red sitting at that seat,
10    and Mr. Booth is sitting right where he was, and Mr. Donziger
11    was sitting next to her.  And the Court said, "I'm sorry.  Is
12    that translation accurate, that he is behind the lady in the
13    red?"  And the translator confirmed that's where he sat.

14         That demonstrated two things at once I would suggest
15    to the Court.  One, that Mr. Guerra didn't know or remember Mr.
16    Donziger very well.  More importantly, he was willing to say
17    whatever he believed Mr. Mastro wanted him to say.

18         THE COURT:  I remember the incident vividly, and the
19    problem is that Mr. Mastro certainly didn't point to Mr. Booth.
20    You can make out of that whatever you want to make.  They
21    concededly had the meeting.  They both agreed they had the
22    meeting.  So the question is what was said at that meeting.  So
23    the fact that he pointed or indicated Mr. Booth.

24         MR. MASTRO:  Mr. Donziger was seated back from the
25    table.

1          THE COURT:  The bottom line of that is we were all

2     here, and it doesn't prove much of anything, except that he

3     didn't recognize Mr. Donziger.

4          MR. FRIEDMAN:  I guess it gets down to whether anybody

5     who heard Mr. Guerra would base any important decision in their

6     life, or stake anything important in their own lives, on him

7     being correct about his "bribing the judge" story.  That's the

8     bottom line.  We can all dance around that issue.  Arguments

9     can be made.  Arguments have been made for his credibility.  I

10    will just leave it at that.

11         But to get where Chevron wants you to go, you not only

12    have to publicly state that Mr. Guerra is a credible witness,

13    you also have to find certain things about mail and wire fraud

14    and the legal elements of this case.

15         I didn't want you to think I came without a PowerPoint

16    like everybody else.

17         Chevron has to prove that someone relied on

18    misrepresentations and that the plaintiff Chevron was harmed as

19    a result.

20         They have to prove that the pattern of mail or wire

21    fraud violations, not some other act, caused their injury.

22         We had a lot of discussion about the extortion issue,

23    your Honor.  Our position -- I think it's borne out by the case

24    law -- is to find extortion, there has to be proof that the

25    defendant had no claim of right to the property and no

1   reasonable belief in the right to the property.  Of course, in

2   this case, that would be the affected people, the plaintiffs in

3   Ecuador, had no claim of right to the property and no

4   reasonable belief in the right to the property.

5           Chevron has presented zero evidence on that point.

6   None.

7           You have to find extraterritorial application for

8   RICO.  And, of course, you have got the guidance of *Morrison v.*

9   *National Australia Bank*.  When a statute gives no clear

10  indication of an extraterritorial application, it has none.

11  And *Morrison* was a securities case.  But the statutory language

12  of *Morrison*, I would commend to the Court if you haven't

13  studied it already, RICO has no clear indication of

14  extraterritorial application.

15          You have to find that the New York State common law

16  fraud law applies to allegations of bribing a judge in Ecuador.

17          And you have to find RICO provides a right to

18  equitable relief to private parties, even though the Second

19  Circuit has aligned itself in dicta with courts that say no.

20          THE COURT:  And made abundantly clear that the

21  question is open in this circuit.

22          MR. FRIEDMAN:  It is open in this circuit, there is no

23  question.

24          THE COURT:  You know, a moment ago you cited the

25  *Bridge* case in the Supreme Court for the proposition that, in

1    order to prove mail fraud, you have to prove reliance.  In

2    fact, it holds exactly the opposite.  I just opened it up on

3    Westlaw because I was so surprised to hear you say it.

4              MR. FRIEDMAN:  No, your Honor.  I think what *Bridge*

5    says, and I don't have a copy of it with me, is that someone

6    relied on misrepresentations.  I got that out of my handy RICO

7    for dummies book so maybe they got it wrong.

8              Is that not true, must prove someone relied on the

9    misrepresentations?

10             THE COURT:  My understanding of the case.

11             MR. FRIEDMAN:  I apologize if I got that wrong, and I

12   will address it in our post-trial brief.

13             THE COURT:  I would urge you to do so.  Maybe I got it

14   wrong.

15             MR. FRIEDMAN:  I took that out of the RICO book

16   published by the ABA that was citing *Bridge v. Phoenix* for that

17   proposition.

18             THE COURT:  I think one of us is mistaken.  We will

19   find out.

20             I will quote you from the opinion at page 649.  "It

21   thus seems plain, and indeed petitioners do not dispute, that

22   no showing of reliance is required to establish that a person

23   has violated Section 1962(c) by conducting the affairs of an

24   enterprise through a pattern of racketeering activity

25   consisting of acts of mail fraud."

DBQ8CHE3                     Summation - Mr. Friedman

1              MR. FRIEDMAN:  I apologize for not going to the

2    source, your Honor.  Actually, I apologize if I got that wrong.

3              THE COURT:  Whatever.  Let's just go on.  It will be

4    briefed.

5              MR. FRIEDMAN:  We talked about providing equitable

6    relief for a private party.

7              Then you have to find the likelihood of irreparable

8    harm and if the remedies available at law are inadequate.

9              Here, there are adequate remedies at law.  And I would

10   point out that it's Chevron's burden to prove the likelihood of

11   irreparable harm and that the remedies available at law are

12   inadequate to address that, including monetary relief.

13             There are procedures in Ecuador to investigate,

14   evaluate, and remedy fraud.  Some of those are going on right

15   now.  We heard about the Guerra investigation that's going on

16   right now, the criminal investigation that involves statements

17   by Mr. Zambrano, etc., the forensic investigation.  That's all

18   going on even as we speak.

19             If anyone tries to enforce this judgment in a foreign

20   country, each country where that judgment might be enforced has

21   its own legal process to prevent irreparable harm.  And Chevron

22   had an adequate remedy in money damages that it elected to drop

23   before this case got to trial.

24             THE COURT:  What was that exactly?

25             MR. FRIEDMAN:  They had their monetary claims against

1    the plaintiffs for RICO.  I think it was the amount of the

2    judgment times three.  No?

3              THE COURT:  No.  It was a sub one billion dollar

4    number.

5              MR. FRIEDMAN:  They backed off and then they had a

6    different number which was for the costs.

7              THE COURT:  Let's suppose for the sake of argument you

8    were right, and I think you are not, but let's suppose you

9    were.  Suppose they could have gotten a dollar-for-dollar

10   judgment.  9-1/2 billion, 18-1/2 billion, whatever.  Against

11   whom?  Who is going to pay it?  Mr. Donziger?

12             MR. FRIEDMAN:  I don't think he has got that kind of

13   money.

14             THE COURT:  This is a reasonable point, isn't it?

15             Mr. Piaguaje?

16             MR. FRIEDMAN:  I guess it depends on what we are

17   talking about.  If we are talking about the costs of

18   discovering the Cabrera fraud, as they have put it, and that

19   they put in their pretrial, they would have an offset, I

20   suppose, against any amounts recovered by the judgment.

21             The bottom line, your Honor, is that there are plenty

22   of other -- well, to find for Chevron's favor on this point,

23   what you have to do is pass judgment on the Ecuadorian court

24   system and say it cannot provide an adequate remedy no matter

25   what, based on the evidence before you, that the other

DBQ8CHE3                    Summation – Mr. Friedman

1    countries where enforcement actions might be initiated are

2    inadequate to handle these matters, and that only courts in

3    this country are competent to judge those sort of matters.

4           THE COURT:  The argument would be a whole lot stronger

5    from your point of view if all of the relevant parties were

6    prepared to agree that there will be one judgment enforcement

7    proceeding and winner take all.  But that's not the evidence.

8           MR. FRIEDMAN:  It's hard to imagine they would ever

9    agree on that, your Honor.  Right, that would be a sensible way

10   to resolve the issue.

11          I would say, your Honor, and I am sure the Court

12   appreciates this, the case is bigger than just Mr. Donziger or

13   even the 30,000 people in Ecuador who may be affected by the

14   Court's ruling.  The Court does not have the luxury of ruling

15   on this matter without regard to the consequences to future

16   cases and future parties since we are in a common law

17   jurisdiction.

18          Ultimately, as a practical matter, what Chevron is

19   asking you to do is to extend the reach of common law tort law,

20   at least as to fraud and RICO, to the far reaches of the globe.

21   To borrow a phrase from the Supreme Court in *Morrison*, in

22   essence, what they are asking you to do is to create a climate

23   where this would become a Shangri-La for plaintiffs' lawyers,

24   where people like Ms. Littlepage and myself could sue large

25   corporations in the Southern District of New York for RICO

1    violations.  If we get false statements sent through the mails

2    and bribing of a foreign official, suddenly we have got an

3    argument to be in the Southern District and argue for RICO and

4    common law fraud violations.

5         Let me conclude in this way, your Honor.  It is a

6    complicated case, obviously, legally and factually.  And that

7    complexity --

8         THE COURT:  I had noticed that.

9         MR. FRIEDMAN:  I figured you had.

10        The legal compass that the Court has, the principles

11   that it has to guide itself through these facts are important

12   beyond this case.  Your decision will be read by people around

13   the world, and they will be looking for something more than

14   whether somebody ghostwrote an expert report, or even whether

15   somebody bribed a judge in Ecuador.  They will also be looking

16   to see if American courts will follow their own rules of law.

17   They will also be looking to see whether there is going to be

18   special exceptions, special rules for large American

19   corporations.

20        How would those rules that are in play here in this

21   case be applied if Chevron had won the trial in Ecuador -- I am

22   sure the Court has thought about that -- and the Ecuadorians

23   were here with evidence they said showed that Chevron had

24   falsified an expert report and bribed a judge?  Would a U.S.

25   district court judge apply New York common law to that

DBQ8CHE3                    Summation - Mr. Friedman

1   situation?  Would a U.S. district court judge find that RICO

2   should apply to that situation?  That, I think, is the ultimate

3   question in this case.

4           Thank you for giving me the time to talk, your Honor.

5   I appreciate that.  It's been said that all great truths are

6   paradoxes, and one of the paradoxes for me in this case,

7   because I don't think I have ever been as unprepared and

8   disorganized in a courtroom as I have over the last six

9   weeks --

10          THE COURT:  Well, you have concealed it very well.

11          MR. FRIEDMAN:  Well, thank you.

12          I don't think I have ever performed as poorly as a

13  lawyer, and I don't think I have ever been as proud of a case I

14  have done as this case.  It's been a privilege to be in this

15  courtroom representing Mr. Donziger.  What he has accomplished

16  by legitimate, if noisy, boisterous, rude, unconventional ways

17  has caused people around the world to look with fresh eyes at

18  the way our corporations treat the third world, that's an

19  important thing.  It's an accomplishment that I am proud to be

20  a part of.

21          Thank you for your time.

22          THE COURT:  Mr. Gomez.

23          I trust that a half hour will be adequate, if that?

24          MR. GOMEZ:  Oh, yes, your Honor.  After what everyone

25  has said, I am not sure there is really much more to say.

DBQ8CHE3                    Summation - Mr. Gomez

1              *La sabiduria nos llega cuando ya no sirve para nada.*

2              Perhaps not a lot of people in this Court understood

3   what I just said.  And perhaps those who didn't understand what

4   I have just said now have, for one brief moment, a sense of

5   what my clients felt like to participate in this.

6              Translated into English, what I have just said means,

7   wisdom comes to us when it is no longer useful.  Those are the

8   words of Gabriel Garcia Marquez, not mine.  And he means to

9   say, I think, wisdom often comes too late.

10             All the parties in this case could reflect seriously

11  on whether wisdom has come too late for them.

12             All the parties in this case could benefit from

13  questioning the wisdom of their choices.  The wisdom of the

14  merger with Texaco for example.  The wisdom of the retention of

15  Stratus Consulting.  The wisdom of the Lago Agrio plaintiffs

16  not suing every member of the consortium.

17             Whether these decisions were wise or not are open

18  questions.  And, like the parties, this Court may also engage

19  in such reflection as it decides this case.  How wise or just

20  is it to exercise jurisdiction over the Ecuadorian defendants?

21  How wise or just is it to judge the impartiality of the

22  Ecuadorian court system?  How wise or just is it to rule on

23  questions of Ecuadorian law?

24             On the issue of personal jurisdiction, specific facts

25  regarding the Ecuadorian defendants' contacts with New York

DBQ8CHE3                    Summation - Mr. Gomez

1    were not disputed by the evidence adduced at trial.  There was

2    no evidence presented at trial that Camacho or Piaguaje are

3    doing business continuously or systematically in New York.

4    Camacho and Piaguaje maintain that before this case, they have

5    never travelled to New York, have never had offices, bank

6    accounts, employees in New York.  They have never transacted or

7    engaged in any business in New York.  They never earned any

8    income, revenue from New York, or paid taxes in the state.

9    They never had any regular contact or communication with

10   residents of New York.

11            Chevron did not present any evidence at trial that

12   seriously disputes these facts.

13            THE COURT:  I think perhaps we were at different

14   trials, counselor.

15            MR. GOMEZ:  There was no evidence presented at trial

16   that demonstrates sufficient contacts with the state of New

17   York, and certainly no evidence that the state of New York has

18   any material interest, any dispute between Chevron, Camacho or

19   Piaguaje.

20            On the issue of judging the independence and

21   impartiality of the Ecuadorian legal system, Chevron has

22   presented experts that opined on the independence and

23   impartiality of Ecuadorian courts and its judges.  But there

24   was no direct evidence at trial to prove that any of the

25   frailties that might exist in Ecuador's judicial system

1    actually affected the Lago Agrio litigation.  Vladimiro Alvarez

2    Grau, one of Chevron's experts, conceded on the stand that not

3    all of Ecuador's judges are corrupt, and that not all of

4    Ecuador's judges are subject to manipulation or influence by

5    political forces.

6         There is no reliable evidence of any kind that former

7    Judge Nicolas Zambrano was influenced in any way by the

8    Republic of Ecuador or unable to issue an impartial decision as

9    a result of political influence.

10        On this record, defendants Camacho and Piaguaje would

11   ask, what is the legal basis and wisdom of judging the

12   independence and impartiality of the Ecuadorian legal system in

13   this case?

14        On the issue of deciding questions of Ecuadorian law,

15   there are numerous questions posed by the parties.  12 by

16   Chevron.  16 by the defendants.  Among them are questions that

17   go to the heart of the misconduct alleged by Chevron in Ecuador

18   and that are central to deciding whether defendants or their

19   representatives did anything wrong.  What kinds of contacts

20   with experts are permitted under Ecuadorian law?  What kinds of

21   contacts with judges are permitted under Ecuadorian law?  What

22   information may an Ecuadorian judge rely upon to issue his

23   ruling?  May a judge in Ecuador consider arguments or other

24   information received outside the record?

25        These are just a few of the critical questions of

DBQ8CHE3                    Summation - Mr. Gomez

 1    Ecuadorian law that this Court may be required to answer.  And

 2    they are not questions of substantive Ecuadorian law.

 3    Primarily, they are mostly questions of Ecuadorian procedural

 4    law.  And if this Court chooses to answer them, it will do so

 5    without the benefit of authorized translations of Ecuadorian

 6    legal codes, without the benefit of testimony by the proffered

 7    Ecuadorian law experts, and probably without the aid of an

 8    interpreter or translator to assist the Court with any legal

 9    research the Court may need to undertake during its

10    deliberations.

11            THE COURT:  Weren't many of the Ecuadorian law experts

12    deposed and isn't that testimony all before me, or much of it?

13            MR. GOMEZ:  Yes, it is, your Honor.

14            THE COURT:  You may go on.

15            MR. GOMEZ:  And if this Court in New York is going to

16    exercise jurisdiction over Camacho and Piaguaje and decide

17    whether the Ecuadorian court acted independently and

18    impartially and applied Ecuadorian procedural law correctly in

19    the Lago Agrio case, what is the difference there between doing

20    that and acting as the appellate court of the Sucumbios court?

21    But this court must engage in that kind of deliberation to

22    decide whether Chevron had a full and fair opportunity to try

23    its case in Ecuador.  And that really creates a very

24    complicated situation, with issues of international comity

25    squarely before this court.

DBQ8CHE3                    Summation – Mr. Gomez

 1            In light of all of these circumstances, defendants

 2      Camacho and Piaguaje submit to this Court that the assertion of

 3      jurisdiction over them does not comport with constitutional due

 4      process or traditional notions of fair play and substantial

 5      justice.  Defendants Camacho and Piaguaje, having to defend in

 6      this court, were not able to present as full and fair a defense

 7      in this case as they could have in Ecuador.  Defendants were

 8      hampered in the presentation of their defense by the need to

 9      translate documents for these proceedings.  They were hampered

10      by the need to have interpreters present for the preparation of

11      witnesses.  They were hampered by the need to secure visas for

12      witnesses to appear at these proceedings.  They were hampered

13      by their need for witnesses to travel a great distance to be

14      here.

15            These hurdles are the result of the exercise of

16      jurisdiction over foreign parties and such matters should be

17      factored into a court's decision to exercise jurisdiction,

18      because it is so much more difficult for Camacho and Piaguaje

19      to litigate here what could have been litigated in Ecuador.

20            THE COURT:  This actually was their chosen forum in

21      the first place, wasn't it?

22            MR. GOMEZ:  Yes, it was, your Honor.

23            And it is incredibly hard to explain to my clients how

24      the court that they initially chose said they were in the wrong

25      court and how they can now be required to come back to New York

DBQ8CHE3                    Summation - Mr. Gomez

1    to litigate the case.

2            Defendants were also hampered by the inability to

3    compel the attendance of witnesses from Ecuador.  This Court

4    has never heard from key witnesses whose participation is

5    central to this case.  Witnesses who, for whatever reason, did

6    not make themselves available, did not volunteer to come here,

7    and could not be compelled to appear to give testimony on

8    behalf of my clients, Hugo and Javier.

9            Even defendants' attorneys in Ecuador, who have

10   essentially boycotted these proceedings, their attendance could

11   not be compelled to offer evidence that I believe would have

12   aided my clients.

13           I know it is difficult, in view of the mountain of

14   evidence that Chevron has presented to this Court, to not

15   assume that every witness in Ecuador who did not testify would

16   only have presented evidence unfavorable to the defendants.

17   And it is difficult to not assume that every document in

18   Ecuador that was not produced would only have presented

19   evidence unfavorable to my clients.

20           My clients, Hugo Camacho, Colonos in Ecuador, and

21   Javier Piaguaje, an indigenous Ecuadorian of the Siekopai, have

22   appeared in this case under protest, and the record is clear

23   that they maintain this Court does not have jurisdiction over

24   them now.

25           The record is also clear they believe that the

1   exercise of jurisdiction over them is a sign of injustice.

2   Whether they are right or wrong under U.S. law ultimately

3   remains to be seen.  Whether it is wise or just for U.S. courts

4   to exercise jurisdiction over them is a question that will be

5   answered by this case.  And in deciding this question, my

6   clients, the Ecuadorian defendants, hope that wisdom will not

7   come too late for the courts that will be asked to answer this

8   question yes or no.

9            Thank you, your Honor, for the opportunity to be

10   before you and your patience.

11            THE COURT:  Thank you, Mr. Gomez.

12            All right.  Mr. Mastro, I can give you ten minutes now

13   or we can go over till after lunch.

14            MR. MASTRO:  I wish I could say I could finish in ten

15   minutes, but perhaps what makes the most sense is for me to

16   consolidate the many points I would otherwise make and try and

17   be as brief as possible after lunch.

18            THE COURT:  We will resume at 10 past 2.  I hope you

19   will in the interim get the exhibit issues, if they are not

20   already resolved, resolved, because we will close this record

21   today.

22            MR. MASTRO:  Thank you very much, your Honor.

23            (Luncheon recess)

24

25

1                      AFTERNOON SESSION

2                         2:15 p.m.

3           THE COURT:  Good afternoon, folks.

4           Mr. Mastro.

5           MR. MASTRO:  Thank you, your Honor.

6           Your Honor, I want to talk a little bit more about the

7    evidence because it seems we heard scant little about that in

8    defendants' closing.  Ms. Littlepage said the time for

9    inference and innuendo is over.  Where's the proof?

10          I think she got her answer from Mr. Gomez who

11   complained that there's "a mountain of evidence" in this case

12   and he had it right.  And we heard from Mr. Friedman and he

13   complained about the Crude outtakes.  The Crude outtakes, which

14   by the way, your Honor, now have been agreed upon by all

15   parties, there's no cuts in any sequence, all in without

16   objection, all of them absolutely accurate.  And I can tell you

17   to a certainty there is no Crude outtake that says what Steven

18   Donziger wrote is his philosophy, if you repeat a lie a

19   thousand times it becomes the truth.

20          Now, your Honor, I have to address some of the

21   misstatements that were made during defendants' closings.  And

22   it's understandable the pressure of a trial, a big record, why

23   some misstatements would be made, but let's clarify some of

24   them because Ms. Littlepage tried mightily to push out a

25   timeline based on speculation and, yes, inference and innuendo

DBQLCHE4                    Rebuttal - Mr. Mastro

1   that just doesn't hold up, a timeline going back four plus

2   years and witnesses' faded memories that is anything but

3   certain and, in fact, based on express misstatements by

4   Ms. Littlepage in doing that timeline.

5           Let me explain, your Honor.  In fact, in

6   September 2009, September 4, 2009, in fact, Judge Zambrano was

7   already issuing orders on the Lago Agrio Chevron case as Judge

8   Nunez was seeking to recuse himself, didn't officially take

9   over until October, but as you can see, your Honor,

10  September 4, Zambrano is issuing orders in the Chevron case.

11          What was the actual testimony by both the Chevron

12  witnesses and Mr. Guerra about the potential earliest point in

13  the timeline?  Mr. Callejas in his declaration, DX99,

14  paragraph 2, he says -- go to the next slide please, Randall --

15  he said that in the summer of 2009, Mr. Racines, Dr. Racines

16  from his office, first had an encounter with Guerra in this

17  regard.

18          And what did Guerra say?  Let's go to Guerra's

19  testimony.  What Guerra said was that when he was planning that

20  first connected with Mr. Fajardo about cutting the deal to

21  steer the case in the direction of the LAPs for a thousand

22  dollars a month and Judge Zambrano's instruction that that

23  occurred -- and I'll give your Honor the pages, page 919 of the

24  transcript, lines 6 through 11 -- he said that that encounter

25  occurred with Fajardo when they cut the deal, September,

DBQLCHE4                    Rebuttal - Mr. Mastro

1  October, or November of 2009.  So it could have been as early

2  as September and that would make perfect sense.  And then

3  Mr. Fajardo said he cut the deal and then later met with

4  Mr. Donziger.

5           Now, Ms. Littlepage -- and that, your Honor, is

6  page 921 of the transcript, lines 6 through 20.  He says he met

7  later with Mr. Donziger.  Deal is done, but he's meeting with

8  Donziger so Donziger can see him face to face.

9           And, your Honor, what in fact happens here is that

10  this could have been as early as October or November.  And

11  Ms. Littlepage put up a slide saying to you Donziger wasn't in

12  Ecuador in November or December.  In fact, this is

13  Exhibit 1509, Donziger, page 3, Donziger was there from

14  October 6 through 9, 2009.  Donziger was there from November 10

15  through November 14.  With faded memories, the time sequence is

16  perfectly logical.

17           Now, your Honor, I have to come to something else that

18  was said by Ms. Littlepage, and this one couldn't have just

19  been a mistake.  She put before you the September 5, 2010 email

20  from Alberto Guerra to Steven Donziger, the one where

21  Mr. Guerra says, "I will support the matter of Pablo Fajardo so

22  it will come out soon and well."  Let's put that on the screen,

23  please, Randall.  Plaintiff's Exhibit 1745.

24           Now, your Honor asked me is this a little early in the

25  time sequence for the later judgment.  It's not early in the

DBQLCHE4                    Rebuttal - Mr. Mastro

 1    time sequence, your Honor, to resume the Guerra relationship to

 2    steer the case in the plaintiffs' favor because everybody knew

 3    by this point in time, September 5, 2010, that Judge Zambrano

 4    was going to be resuming on the case.  Chevron had made a

 5    recusal motion of Judge Ordonez in August.  Guess who decided

 6    that motion?  Judge Zambrano.  So everyone knew the case was

 7    headed back to Zambrano.  And this is Guerra saying that he'll

 8    support the matter of Pablo Fajardo, as he had done during

 9    Zambrano's first tenure.

10          Now, your Honor, Ms. Littlepage again did something

11    she did at the trial, so this one couldn't have been a mistake.

12    She cited one of Guerra's conversations that had been

13    previously recorded going back to mid-2012.  It's DX1362.  And

14    she brought up, your Honor, same quote she did at the trial,

15    she says, oh, he didn't mean, Guerra didn't mean the trial.

16    She cited your Honor to something that says the truth is no but

17    it's no unintelligible.

18          Now, your Honor will recall that you read the rest of

19    the transcripts starting at the bottom of the page and then

20    onto the next page, page 31 of the transcripts, page 32 of the

21    exhibit, starting with, quote, Nicolas knew, we knew that we

22    will allow the procedure and the recusal will be accepted at

23    the end.

24          So then -- please go down the page, Randall, go to the

25    top of the page.  Thank you.  Good -- so then I mean beforehand

1    we knew that obviously that Nicolas will return to be there,

2    right?  I mean he will return to and to and to speed up the

3    procedure.  Well, it must have been that because, because I

4    have not had any other business with Pablo Fajardo.  The issue

5    of Pablo Fajardo turns out quickly and well was the trial.

6            Now, your Honor, I have to come to something that

7    Mr. Friedman said.  We can take that off the screen, Randall.

8    Please put up Exhibit 1291, pages 2 and 3.  Mr. Friedman

9    pointed out at pages 1 and 2 -- Randall, sorry -- Mr. Friedman

10   pointed out that Mr. Donziger's April 2010 letter to fellow

11   counsel, the one that he never ended up actually apparently

12   sending to any of them, but in which he's trying to explain

13   away the burgeoning Stratus ghostwriting scandal.  He writes

14   that under the traditional Ecuadorian law perspective, this

15   would be problematic and improper.  But he also writes, as

16   Mr. Friedman points out, that the other perspective is that

17   given the customs and practices of the Aguinda case, nothing

18   improper happened.

19           Now, your Honor, in that same exchange, he notes that

20   it was not lost on us that our local counsel seemed concerned

21   about how the information would land in Ecuador and what impact

22   it would have on the case and to them personally.

23           And when he speaks, your Honor, of the other

24   perspective is that given the customs and practices of the

25   Aguinda case, nothing improper happened.  Is he saying there's

DBQLCHE4                    Rebuttal - Mr. Mastro

a special rule for this case, there's a special rule for a case

where we bribe and blackmail and threaten and intimidate

judges?  Your Honor, there is nothing, nothing in the record in

this case or in the Aguinda case that suggests there was ever

any deviation from traditional Ecuadorian law as it applied to

this case.

        And how do we know?  How do we know what local

counsel, on who Mr. Donziger says he relied, felt at the time?

We know from Mr. Prieto's email just a couple weeks before this

that they may all go to jail.  And your Honor asked me about

this -- didn't Mr. Donziger previously explain what that meant,

Mr. Prieto's email about all the Ecuadorian lawyers going to

jail.  And, your Honor, it's at page 3381 of Mr. Donziger's

deposition, lines 14 through 20, which have been designated in

this case.

        So Mr. Prieto was concerned that all of the local

Ecuadorian lawyers for the Lago Agrio plaintiffs might end up

in jail because of the role they played in drafting the Cabrera

report, correct?

        Mr. Donziger, in a more candid moment than he gave on

this stand, the role they played related to Stratus,

Mr. Cabrera, yes.

        Now, your Honor, Ms. Littlepage tried to poke holes in

the ample evidence of judgment ghostwriting fraud here, unable

to have any substantive response, she started with our six

DBQLCHE4                    Rebuttal - Mr. Mastro

1    experts who showed meticulously how pieces of the internal work

2    product of the plaintiffs, LAPs, show up word for word in the

3    judgment and that those same documents are nowhere to be found

4    in the Lago Agrio record itself.

5         She has no response on the merits.  They have no

6    expert of their own.  Their own people don't explain how that

7    could have happened, the ones who presumably should know, here

8    or in Ecuador.  She says should have had another expert to give

9    another opinion.  Your Honor, it's ludicrous.

10        She then tries to poke holes in individual pieces of

11   evidence.  She says of the fusion memo, well, exhibits to the

12   fusion memo are in the record.  We never said otherwise.  It's

13   the memo itself showing a draft memo from their internal work

14   product that shows up word for word in 150 word strings.

15        And, your Honor, she then goes on to say, well, what

16   they say are ghostwriting mistakes, Mr. Zambrano himself made

17   mistakes as to causation in the judgment and then he made those

18   mistakes on the stand.  So he must be telling the truth because

19   it's the same mistake in the judgment itself.  Mr. Zambrano

20   made the mistake because he had no idea what the standard of

21   causation was or what his own judgment said on causation.

22        The reason that mistake is in the judgment is because

23   the Lago Agrio plaintiffs' team ghostwrote it themselves.  It's

24   called the Moodie's memo.  It deals with California and

25   Australian law.  That's Exhibit 1101.  It misstates, as

DBQLCHE4                    Rebuttal - Mr. Mastro

1      Professors Green and Spigelman explained, the law of causation

2      and the exact same mistakes, exact same language shows up in

3      the judgment itself because it was ghostwritten by the

4      plaintiffs out of their own Moodie's memo written by an intern

5      who didn't understand the true legal standards.

6              And, your Honor, Ms. Littlepage says where are the

7      documents from Mr. Donziger around the time of the judgment

8      showing he was working on the ghostwriting of the judgment?

9      Well, your Honor will recall exactly what we were all doing

10     back in 2010.  Mr. Donziger was the subject of a 1782.  He

11     wasn't complying with the Court's orders.  He waived privilege.

12     He still didn't produce his documents.  And then by

13     October 2010, there were orders about his hard drive having to

14     be searched.

15             And, in fact, off of that hard drive we were able to

16     get internal documents from the LAPs team that showed the

17     judgment had been ghostwritten, eight separate documents that

18     showed the judgment had been ghostwritten.  And, of course,

19     after that point in time Mr. Donziger is no longer using his

20     direct email.  He's using those dummy email accounts and those

21     password protected email accounts that he used over and over

22     again -- lagarto3 and gringograndote and those kind of

23     accounts -- to avoid being caught.  But even up to

24     October 2010, we were able to find eight separate documents

25     that show up in substantial parts, word-for-word in the

DBQLCHE4                    Rebuttal - Mr. Mastro

1    judgment itself.

2                And, finally, Ms. Littlepage said to your Honor we can

3    explain a lot about what went on in the judgment from a case

4    Mayudo(phonetic) v. Petroecuador that they showed to Judge

5    Zambrano and they said that's where he got the French law and

6    the Colombian law and the Argentinian law, out of that case, no

7    great mystery there.  Of course, Judge Zambrano couldn't even

8    say who the parties to the case were when it was presented to

9    him.  He couldn't even explain what the case was about when he

10   was sitting there trying to read it.

11               But, your Honor, guess where the case really comes

12   from.  Please go to Plaintiff's Exhibit 1141.  The case comes

13   from Pablo Fajardo who in June 2009 sends it to his internal

14   team, including Steven Donziger.  He sends this case and he

15   says that the arguments are very interesting.  I think they

16   serve us well for our alagato and ...  The "..." your Honor, is

17   the judgment and they were already planning then to do the

18   ghostwriting.

19               And you know how we know the "..." is that?  Because

20   in a less circumspect moment days before, Pablo Fajardo writes

21   to Steven Donziger -- this is Exhibit 1137 -- about an intern

22   now working in their office, Brian Parker, and he's been given

23   a research assignment for our legal memorandum and the judgment

24   but without him knowing what he is doing.  They were working,

25   already planning.  And this case they came up with, they used

DBQLCHE4                    Rebuttal – Mr. Mastro

1    it to ghostwrite the judgment.

2            And by the way, your Honor, that doesn't explain how

3    U.S. law, British law, Australian law, other French law show up

4    in the judgment.  This case is about a discrete causation

5    issue.  It doesn't explain the ghostwriting at all.  In fact,

6    the contemporaneous documentation shows it proves the

7    ghostwriting because it was Fajardo who came up with it.

8            THE COURT:  And who is the judge in Ecuador on June 5,

9    2009?

10           MR. MASTRO:  It was Judge Nunez, your Honor.

11           THE COURT:  And is this before or after the recusal is

12   made against him, the motion?

13           MR. MASTRO:  This is before.  And, your Honor, we will

14   come to this and explain it more in our posttrial briefs, but

15   the LAP team already had a well-established relationship with

16   Judge Nunez.  And when the bribe scandal occurs and Patricio

17   Garcia is the political coordinator for the Correa

18   administration, he makes the specific bribe solicitation and

19   Nunez has private meetings with these folks posing as

20   contractors, Chevron knowing nothing about it, Garcia makes

21   clear that the bribe solicitation is 1 million for the judge,

22   Nunez, 1 million for the presidency, Correa's office, and

23   1 million for the Lago Agrio plaintiffs.  That's what's on

24   those tapes.

25           And Donziger's own special counsel that he hired

DBQLCHE4                        Rebuttal - Mr. Mastro

1   concluded that Chevron knew nothing about that, Aton Goldman,

2   who your Honor may remember was a former AUSA here in the

3   Southern District.  That's all in the record, your Honor, and

4   that is in fact in the book that we presented to your Honor.

5        But coming back to this, your Honor, Ms. Littlepage

6   also made an extraordinary statement.  She made an

7   extraordinary statement, something we were all here yesterday

8   to witness, Mr. Lynch's ultimately very limited testimony.  And

9   she I think said in her closing that Mr. Lynch had said that

10  the judgment, the draft judgment, was found on the old computer

11  in Zambrano's office.  We all know no such thing was said.

12        In fact, Mr. Lynch didn't have access to any of those

13  hard drives.  Mr. Lynch simply was repeating what the Tarco

14  declaration said which is that there was a file name in which a

15  document similar but not identical to the judgment called

16  providencias.docx was purportedly put on the old computer on a

17  date of October 2010.  Of course, what Lynch went on to say

18  was --

19        THE COURT:  Is that something that came into evidence

20  or not?

21        MR. MASTRO:  Your Honor, only that the following

22  question and answer:

23        "Can you tell when the providencias.docx was created

24  based on the Tarco declaration?"

25        He didn't say he could.  He said only that a file of

DBQLCHE4                    Rebuttal - Mr. Mastro

1    that name was purportedly put on the computer on October 2010.

2            Yet she made that representation to the Court so I

3    have to clean it up because Mr. Lynch actually testified what

4    the Tarco declaration says is completely inconsistent with

5    Zambrano's testimony, Zambrano having said he is sure he only

6    worked on the new computer.  That's 1679, line 5, to 1680, line

7    19.  And then in fact his old computer was taken out for

8    maintenance while he was working on the judgment.

9            Your Honor, I just didn't want to leave the record at

10   all unclear on this point.  Tarco declaration, Zambrano

11   testimony, collusion between the ROE and the plaintiffs' team

12   imploded on them.  And Zambrano lied, can't put any credence on

13   the Tarco declaration.  They wouldn't even bring him here it

14   imploded so badly on them and they tried so hard to keep it out

15   of evidence.

16           THE COURT:  Well, and indeed, for the most part

17   succeeded at that.  Am I right?

18           MR. MASTRO:  And that's absolutely right, your Honor,

19   while we were prepared to show they were both liars.  But in

20   any event, we certainly proved that Zambrano was a liar.

21   Mr. Tarco never showed up here.

22           Now, your Honor, the next point that I wanted to cover

23   briefly was that Ms. Littlepage said nothing about unclean

24   hands except one reference and I have to correct it.  So with

25   all the talk about clean hands at the beginning of this trial,

DBQLCHE4                        Rebuttal - Mr. Mastro

1    not a mention of it in closings by any of the defendants'

2    counsel except in one respect.  She said the fact that

3    Mr. Callejas and his team did not report overtures that they

4    received was unclean hands compared to Mr. Donziger and

5    Mr. Fajardo not reporting the late 2010 bribery solicitation of

6    Mr. Guerra, concrete as it was.

7            And as your Honor often tells us in this case, that's

8    like comparing a cartful of apples to a truckload of oranges

9    because your Honor will recall --

10           THE COURT:  I hope I haven't told you that often.

11   Once at least I know.

12           MR. MASTRO:  Fortunately not that often to me, your

13   Honor.

14           THE COURT:  I should do a better simile, you know.

15           MR. MASTRO:  But your Honor will recall why there's no

16   basis for comparing Chevron's situation to the Lago Agrio

17   plaintiffs' team for the following reasons.

18           Mr. Callejas testified, back in 2009, these were vague

19   overtures, that there were often miracle cures that people

20   would come to them about.  He didn't feel that they had enough

21   of a basis to go to authorities back in 2009, but they were

22   concerned about it enough, the legal team, to contemporaneously

23   document that there had been such contact so they can never be

24   accused of having submitted to them.

25           2010, different time, clear, concrete overture by

DBQLCHE4                     Rebuttal - Mr. Mastro

1    Guerra.  And keep in mind, Guerra is making overtures to both

2    sides in 2009 and 2010.  He's on their payroll in 2009, a

3    thousand dollars a month to steer the case in their direction,

4    the LAPs.

5          We're in 2010.  What did Mr. Callejas tell this Court?

6    What distinguishes Chevron's situation from theirs?

7    Mr. Callejas explained there were no authorities to go to.  The

8    authorities were in bed with the Lago Agrio plaintiffs' team

9    and prosecuting two Chevron attorneys at the time on bogus

10   criminal charges ginned up by Mr. Donziger and his team to put

11   political pressure on Chevron.  Who were they supposed to go to

12   and not face criminal prosecution themselves?

13         Mr. Donziger and Mr. Fajardo, they didn't need to go

14   to the authorities because they cut their deal.  They knew they

15   had the judge in their pocket, and they were ghostwriting the

16   judgment.  Cartful of apples, truckload of oranges.

17         THE COURT:  Well, there's certainly some evidence in

18   the record as I remember it that in the period -- and maybe

19   because Zambrano was on this case twice, I may misremember

20   which period it is, but I think it was in the second period

21   that the defendants in this case viewed the prospect of

22   Zambrano becoming the judge in the case at least initially with

23   great alarm and they compared it to having Zambrano decide a

24   case in which Chevron was a party to putting Hitler and Bush

25   together -- not my comparison, something from one of their

DBQLCHE4                        Rebuttal - Mr. Mastro

1    documents.

2              MR. MASTRO:  And, your Honor, there is email traffic

3    about using words like alarms when it looks like Zambrano is

4    taking over for Nunez in late, in the fall of 2009 and there

5    are exchanges about that.

6              And there's email traffic where Mr. Fajardo then comes

7    to say that he thinks things are under control and he explains

8    to Mr. Donziger in email traffic that is in the book that we've

9    handed up that will Nunez have more influence over Zambrano or

10   will Liliana -- that turned out to be Zambrano's mistress --

11   and Guerra have more influence.

12             And of course, your Honor, we know what happens later

13   in the fall.  They've cut their deal with Guerra.  They know

14   he's steering the case in their direction at Zambrano's

15   insistence.  So they eventually reach a point with Zambrano

16   where they're extremely comfortable with Zambrano.  And by

17   December of 2009, again, an email that is in the book,

18   Mr. Fajardo is assuring his team that the plan for the

19   judgment, this is in the middle of Zambrano's first tenure, the

20   plan for the judgment is assured 99.99 percent.

21             Now, your Honor, I want to come briefly to a couple of

22   the things that were said by the defendant's counsel,

23   Mr. Friedman and Ms. Littlepage, about causation and the

24   Cabrera report.  And I want to, if I may, just spend a minute

25   explaining how Cabrera never came out of this case, never came

DBQLCHE4                    Rebuttal - Mr. Mastro

1    out of this judgment no matter what language they ghostwrote in

2    the judgment for Zambrano.

3            Your Honor, the judgment and clarification order

4    purport to say that Cabrera is not going to be taken into

5    account, but the reality is in four fundamental respects, this

6    judgment relied on Cabrera, always did.

7            Your Honor will recall the pit count.  This is

8    critically important because the number of pits is then

9    multiplied by a multiplier and that's how they come up with the

10   $5.4 billion for remediation.

11           And going a little too fast on the charts, but I will

12   try to speak faster.

13           THE COURT:  I don't know that that's going to help

14   understanding, Mr. Mastro.

15           MR. MASTRO:  So the judgment refers to 880 pits.  And

16   the judgment, the author of the judgment claims that that's

17   proven through aerial photographs and there's even a

18   clarification there.

19           THE COURT:  Well, it said more than that.

20           MR. MASTRO:  It does say more than that, your Honor,

21   but the clarification order then specifically says that the 880

22   pits, the source of that is "the court analyzed the various

23   aerial photographs that form a part of the record and that were

24   certified by the military geographic institute."  So challenged

25   on this point, the clarification order makes crystal clear that

DBQLCHE4                        Rebuttal - Mr. Mastro

1    it's the photos of the pits that supposedly are the basis on

2    which Judge Zambrano came to the conclusion that there were 880

3    pits.

4            Now, we had expect testimony from both Mr. Lynch, who

5    factored out those pits that should be removed because they're

6    attributed to Petroecuador or as to which there were findings

7    of no impact, the actual number after you do that in the

8    Cabrera report is 880 pits, exactly the same number that shows

9    up in the judgment.

10           And then we had an expert on aerial photography and

11   how to review aerial photographs who said it's impossible that

12   the Cabrera report could independently review, the author of

13   the Cabrera report could independently review and then that the

14   Ecuadorian judgment could come to exactly the same pit count.

15   It's practically impossible for Judge Zambrano, with no

16   training in reviewing aerial photographs, to have accurately

17   interpreted those photographs.  And we saw a demonstration in

18   this courtroom.

19           And the same thing was done with cleansing expert

20   Allen of pits that weren't pits because we looked at the aerial

21   photograph, they turned out to be trees.  And, of course, this

22   is critically important, your Honor, because the 880 pits times

23   6 million per pit is how they came up with 5.4 billion in

24   remediation, 6 million per pit coming from Doug Allen.

25           THE COURT:  Now, Allen is one of the so-called

1    cleansing experts?

2              MR. MASTRO:  Correct, your Honor.  We're going to come

3    back to him in a minute.

4              Potable water damages.  The judgment relies on Cabrera

5    for its potable water damages.  Cabrera said 430 million to

6    replace the entire potable water system.  The judgment purports

7    to rely on Barros, but all Barros says here, Cabrera says

8    430 million, it's enormously exaggerated because you don't have

9    to replace the whole water system, so there should be some

10   factoring off the 430 million that's Cabrera's estimate.

11             What does the judgment do?  It uses the same

12   430 million, Cabrera is the source, and it does a factoring off

13   the 430 million.  The 430 million is Cabrera and any factoring

14   that's done is off of Cabrera.

15             Now, your Honor, it's also the case that through the

16   cleansing experts, we know that the judgment relies on Cabrera

17   because after all, your Honor, it's undisputed, the Weinberg

18   group confirms this, Ted Dunkelberger and the cleansing experts

19   confirm it.  They were given Cabrera's report on which to rely,

20   and many of them admitted that they did rely on Cabrera's

21   report.  And then they didn't have time to do their own

22   reports.  They had less than a month.  They didn't do any

23   independent research.  They didn't go to Ecuador, they didn't

24   do any testing, they didn't do any independent sampling.  They

25   had to rely on what was given to them.  In fact, in some cases,

DBQLCHE4                    Rebuttal - Mr. Mastro

1   like deja vu all over again, Stratus-wise, their reports were

2   even ghostwritten in whole or in part by a coordinating expert

3   from the Weinberg group.

4           But let's talk about two examples where the cleansing

5   experts relying on Cabrera pass through to the judgment.

6   Dr. Barnhouse, one of the cleansing experts, he testified he

7   reviewed Cabrera's report but did not prepare a damages report

8   himself.  The judgment then purports to be based on

9   Dr. Barnhouse, but he himself did not do any damage report.  It

10  goes back to Cabrera for this particular damage, to say there

11  are damages for loss of habitat and services.  It's Cabrera

12  that concluded there should be damages for that category and

13  Cabrera alone.

14          And, your Honor, back to Doug Allen.  Doug Allen,

15  whose per pit count is part of how you figure out how to do the

16  5.4 in remediation damages, he admits he relied on parts of the

17  Cabrera report and the judgment says that specifically it cites

18  Allen in this regard.

19          Now, your Honor, finally, the structure, the damage

20  categories by structure come right out of Cabrera and they're

21  mirrored in the judgment itself.  While the numbers may not be

22  identical in each category, in fact they differ, it's

23  remarkable how consistent the damage categories are and how at

24  the end of the day there's such similarity in the numbers.

25  And, your Honor, we have listed them all for you comparing the

DBQLCHE4                        Rebuttal - Mr. Mastro

1   pages of the judgment with the pages of the Cabrera report.

2              Cabrera tainted this judgment throughout, through the

3   cleansing experts, through the ghostwriting.  It's a tainted

4   judgment.

5              Now, your Honor, finally, I have to say a word about

6   collateral estoppel because it's the elephant in the room.

7   They can talk about comity.  They can talk about you should

8   give judicial notice.  If it walks like a duck and it talks

9   like a duck and it squawks like a duck, it's a duck.  They want

10  you to give effect to appellate decisions in Ecuador on factual

11  findings in this case.  It's called collateral estoppel.  They

12  may have raised it as an affirmative defense.  They don't have

13  a recognizable or enforceable judgment and they've now put it

14  at issue, no matter what words they use, comity, judicial

15  notice, whatever, they're synonyms for collateral estoppel.

16             Your Honor has every right to now reach the

17  determination that it's their affirmative defense of collateral

18  estoppel is no good and should be rejected because the judgment

19  and the appellate decisions that flow from it come out of a

20  corrupt Ecuadorian system and it's a judgment procured by

21  fraud.

22             Now, your Honor, the fact of the matter is that the

23  Ecuadorian courts, both at the trial level and the appellate

24  level, recognized that the fraud allegations, the RICO case, is

25  where fraud issues would be determined.  They actually refuse

DBQLCHE4                    Rebuttal - Mr. Mastro

1    to reach those questions.  Their latest cassation appeal says

2    procedural fraud they're not even going to consider.  And, of

3    course, going back to Zambrano at the appellate level, they

4    said that was to be determined here.

5            If your Honor determines this was a judgment procured

6    by fraud in a fundamentally corrupt system that denies

7    litigants, not just Chevron, but litigants in cases like this

8    where the government has such a profound interest, due process

9    and fairness, that judgment, whether affirmed on appeal or

10   otherwise, should not be given force and effect and their

11   affirmative defense fails.

12           And I have to say, your Honor, it's unrebutted

13   evidence in this record, unrebutted evidence first from

14   academic Sandra Elena who did a comparative analysis of

15   judicial systems and concluded that Ecuador is the worst

16   performer in terms of judicial impartiality among all Latin

17   American countries and that given the huge turnover year after

18   year in the top judges in Ecuador, especially since Correa has

19   been in, the Ecuadorian judicial system is neither independent

20   nor impartial.  Your Honor has the right to consider that.

21           And your Honor has the right to consider Dr. Grau,

22   Dr. Alvarez Grau's moving testimony in this courtroom, moving

23   testimony about a country that he loves, a court system and

24   legal practice that he's been involved in for decades, that the

25   administration of justice cannot be carried out impartially

DBQLCHE4                    Rebuttal - Mr. Mastro

1    when the facts or controversy submitted for decision are

2    political, social, or economic importance, and his own

3    testimony about the changes that have occurred over the last

4    decade and particularly during the Correa administration,

5    moving, powerful testimony on the ground in Ecuador.

6            And, your Honor, I have to say that what happened with

7    Dr. Alvarez Grau since, with Mr. President Correa directly

8    attacking him as a Chevron witness on national radio, a man so

9    proud of his country, so patriotic, who broke down on the stand

10   here telling about painful experience but still had the courage

11   to testify, it tells you volumes about the state of the

12   judiciary in Ecuador.

13           And, your Honor, it also tells you volumes about the

14   state of the world in Ecuador that on the day this trial began,

15   the national assembly controlled by the same political party as

16   President Correa -- this is in the record, your Honor,

17   PX2558 -- issued a resolution condemning Chevron, national

18   assembly condemning Chevron.  President Correa going on

19   national radio condemning Chevron and calling those who testify

20   honestly in court that they are traitors to the state.  We know

21   what the state of justice is in Ecuador and it's a sorry,

22   sorry, sad state.

23           Your Honor, in concluding, I have to come back to what

24   Mr. Friedman said at the end of his closing because, your

25   Honor, he expressed a very personal view and I have to say it

DBQLCHE4                    Rebuttal - Mr. Mastro

1     saddened me, it saddened me because, your Honor, Steven

2     Donziger has shamed our profession.  Other lawyers who were

3     working with him, who were misled by him, felt they had to

4     ethically withdraw instead of continuing to represent him, and

5     this is not someone who has served the interest of his clients

6     well.  This is someone who has committed crimes to win a case

7     and to aggrandize himself.

8          And, your Honor, it's why Jeff Shinder when he told

9     Mr. Donziger he had to withdraw for ethical reasons said --

10    this is page 1298, lines 21 to 24 -- I communicated to him that

11    I thought that to the extent there was an underlying case to be

12    made regarding the environmental damage in Ecuador that the

13    conduct that I learned had irretrievably wounded it.

14         And, your Honor, everything that Mr. Donziger touched,

15    every person he touched in this case on his team, how many of

16    them came into this courtroom since to turn on him, from

17    Stratus, that they renounced their work on the Cabrera report,

18    from David Russell, who said that his work for Mr. Donziger was

19    swag, a scientific wild assed guess.

20         THE COURT:  This is rebuttal, not repetition.

21         MR. MASTRO:  I understand, your Honor -- and

22    Mr. Calmbacher, whose report was forged and submitted to the

23    Court even though he found no environmental contamination.

24         Your Honor, the evidence in this case is overwhelming.

25    It's overwhelming evidence of fraud and extortion and bribery

DBQLCHE4                    Rebuttal - Mr. Mastro

1   and blackmail.  And maybe Mr. Donziger thought he could get

2   away with it in Ecuador, but he can't get away with it here.

3            Your Honor, we ask you to enter a judgment finding

4   Mr. Donziger and his coconspirators to have violated the RICO

5   statute, impose equitable relief that protects parties from

6   this kind of criminal activity and protect Chevron from

7   Mr. Donziger and his coconspirators profiting from this crime

8   and finds that Mr. Donziger and the Ecuadorian defendants have

9   engaged in fraud.

10            Your Honor, we appreciate everything and all the time

11  you have given to this case in the several weeks of this trial.

12  We're here for one thing and one thing alone -- justice.

13            Thank you, your Honor.

14            THE COURT:  Thank you.  Okay.

15            Where do we stand on the question of the exhibits and

16  the deposition designations?

17            MR. FRIEDMAN:  Your Honor, we would move into evidence

18  all of our exhibits.  We've given the Court, to the clerk our

19  three hard drives with all of those exhibits on them.  Why are

20  you looking at me like that?

21            THE COURT:  Well, I don't even know what they are.

22            MR. FRIEDMAN:  They're all the exhibits on our exhibit

23  list.  I don't think you want me to read them all.

24            THE COURT:  Perhaps not, but.

25            MR. FRIEDMAN:  I don't know what the -- I'm just

DBQLCHE4

1      trying to do what Mr. Mastro did a couple weeks ago.  We have

2      an exhibit list with all our exhibits on it.  We've withdrawn a

3      bunch.  So the clerk has a copy of the ones we're moving in.

4                 THE COURT:  Can I see that?  He's out of the room

5      right now.  Andy.

6                 THE DEPUTY CLERK:  Yes, Judge.

7                 THE COURT:  Do you have a list of the defendant's

8      exhibits that they're moving in?

9                 THE DEPUTY CLERK:  No.

10                THE COURT:  No.

11                MR. FRIEDMAN:  I apologize, your Honor.  I thought

12     it's on the hard drive.

13                THE DEPUTY CLERK:  The hard drive is being loaded up.

14     It's being scanned right now.

15                THE COURT:  I thought I was abundantly clear on day

16     one.  There's to be a set of paper exhibits initialed by

17     counsel both counsel, so that there's no controversies about

18     what the record is.  And do we have a list?

19                THE DEPUTY CLERK:  There's two bodies.  There's the

20     ones that were moved in on a daily basis, which we have.  And

21     then I was told there are others that are agreed upon with

22     Gibson Dunn, which we have on this hard drive which we don't

23     have a list of.

24                THE COURT:  No list.

25                MR. FRIEDMAN:  No list.  Could I have a minute to talk

DBQLCHE4

1    to Mr. Seley, your Honor?

2              THE COURT:  Sounds like a good idea.

3              MR. MASTRO:  Your Honor, we actually have prepared a

4    list of their exhibits with our objections to it.  So if I hand

5    that up, you will have a list of their exhibits.

6              MR. FRIEDMAN:  And I was told, your Honor, this was on

7    the hard drive, but I haven't personally looked.

8              THE COURT:  That may be, but I'm an old-fashioned guy.

9    I use hard drives, but I don't view them as the Court's record.

10   Certainly not here.

11             All right.  So I'm handed a document of 212 pages

12   titled plaintiff's objections to defendant's trial exhibits.

13   And we'll mark this, Andy, Court Exhibit C and I'll do that

14   myself.

15             Now, does everybody agree that except to the extent

16   the defendant's exhibits that are listed here have already been

17   received, either unconditionally or otherwise, this list

18   comprehends each and every exhibit the defendants are offering

19   in this case?

20             MR. FRIEDMAN:  With one exception, your Honor, which I

21   think is the Ecuadorian Supreme Court opinion that we've agreed

22   can go into evidence and I'm not sure what the number is.

23             THE COURT:  Let's deal with that separate.  With that

24   exception.

25             MR. FRIEDMAN:  With that exception, yes.

DBQLCHE4

1       THE COURT:  Okay.  And I guess then there's just no

2  reason why I shouldn't take the copies of the exhibits and I'll

3  just rule on these in due course.

4       MR. FRIEDMAN:  Yes.

5       MR. MASTRO:  Yes, your Honor.  It should be

6  denominated I'm told Exhibit D because there's already an

7  Exhibit C.

8       THE COURT:  Exhibit D.  We've just magically

9  transformed it into Exhibit D with a fountain pen, not an

10  electronic device.

11       Okay.  Now, next item.

12       MR. FRIEDMAN:  We marked, we agreed that the Supreme

13  Court of Ecuador opinion could be an exhibit, but I did not

14  catch the number that we agreed on.

15       MR. MASTRO:  Not for the truth obviously, your Honor.

16       MR. FRIEDMAN:  PX8095.

17       THE COURT:  PX8095.

18       MR. FRIEDMAN:  Yes.

19       THE COURT:  And who's offering it?

20       MR. FRIEDMAN:  We would offer it.

21       MR. MASTRO:  I don't know why it has a PX, your Honor.

22  It's okay, but we're not offering it.  We're just not

23  objecting.

24       THE COURT:  If you're not offering it, give it a

25  Defendant's Exhibit number.

DBQLCHE4

1          MR. MASTRO:  Go ahead, Mr. Friedman.  Give it a

2     Defendant's Exhibit number.

3          THE COURT:  It can be DX8095.

4          MR. FRIEDMAN:  Let's call it DX8095.

5          THE COURT:  All right.  And it's being offered by the

6     defense.  And is there any objection?

7          MR. MASTRO:  No, your Honor, as long as not for the

8     truth.

9          THE COURT:  Well, then it's received not for the

10    truth.

11          (Defendant's Exhibit 8095 received in evidence)

12          THE COURT:  Okay.  So that's it on the exhibits all

13    around.

14          MR. FRIEDMAN:  One last.

15          THE COURT:  The second last item.

16          MR. FRIEDMAN:  We have a stipulation about the

17    confidentiality of certain exhibits if I could just hand up to

18    the Court.

19          THE COURT:  Well, I don't quite understand this.  Are

20    these materials that are the subject of this proposed order in

21    evidence for what purpose given that the Court has ruled,

22    either myself or Judge Katz, that they're all protected work

23    product, what's the point?

24          MR. FRIEDMAN:  We're offering them to make them part

25    of the record.  I expect you're going to rule that they're not

DBQLCHE4

1    going to be -- not admitted, but we had to show that we offered

2    them.

3              You're talking about the videotapes?

4              (Continued on next page)

DBQ8CHE5

1              THE COURT:  I am talking about what you just handed

2      me.

3              MR. FRIEDMAN:  Part of it deals with videotapes.

4      There are other parts of those documents that have other

5      exhibits that are not work product.

6              THE COURT:  Look, I will figure it out, and I will

7      sign it or not as appropriate.  Thank you.

8              So we are done with exhibits on both sides.

9              MR. MASTRO:  We have our plaintiff's rebuttal exhibit

10     list.  Andy was already given a thumb drive.  We have a

11     document.

12             THE COURT:  I recognize some familiar items here.

13     Some of these have been received, is that right?

14             MR. MASTRO:  Yes, your Honor.

15             THE COURT:  To the extent they are not received,

16     you're offering the rest of them?

17             MR. MASTRO:  Yes, your Honor.

18             THE COURT:  And there are defense objections, right?

19             MR. FRIEDMAN:  There are.  And I think we filed those

20     electronically.

21             THE COURT:  So this will be Court Exhibit E.  To the

22     extent it becomes appropriate to do so, I will rule on the

23     objections.  To the extent the exhibits have already been

24     received, I don't have to do anything, unless there is a motion

25     to strike pending, and I don't actually know.

DBQ8CHE5

1          This is Court Exhibit E, Andy.

2          Now, we are all done with exhibits, correct?

3          MR. MASTRO:  Yes, your Honor.  Other than on the

4     subject of Mr. Moncayo's documents, which we still do not have.

5     Mr. Brodsky can address that.

6          MR. BRODSKY:  We have reached a Rule 502(d) agreement

7     with Mr. Gomez.  And so he is going to be producing today from

8     the hard drive of Mr. Moncayo the responsive documents, which

9     in short order and expeditiously we will review.  If we

10    identify anything, we would ask your Honor to allow us to

11    submit from those documents, given the fact that we are

12    reviewing them for the first time now.

13         THE COURT:  Any objection to that from the defendants?

14         MR. FRIEDMAN:  No.

15         MR. GOMEZ:  No.

16         THE COURT:  That's obviously not a blank check that

17    anything that is there is admissible.  I understand that.  So I

18    will certainly accept that.

19         Deposition designations?

20         MR. FRIEDMAN:  Those were also submitted on the hard

21    drives to the Court.  They are all submitted on the hard

22    drives.  I take it you would like a paper pleading that

23    indicates each one of them.

24         THE COURT:  You bet.

25         MR. FRIEDMAN:  I can't say for sure that's been filed.

DBQ8CHE5

1    I know it was supposed to have been filed, but I can't say for
2    sure it was.  If I could have 48 hours to do that?
3            THE COURT:  Absolutely.
4            And that should be a joint list.  I want to know
5    definitively on a piece of paper.  And you don't want 48 hours.
6    You want more than 48 hours, right, because the turkey is not
7    going to help you on this.
8            MR. FRIEDMAN:  I am not in a good position to bargain
9    right now.
10           THE COURT:  I am trying to accommodate you.
11           MR. FRIEDMAN:  I appreciate it.
12           All right.  The record is now at this moment, subject
13   to getting that list, closed.  If there is an application with
14   respect to the Moncayo documents, there will be an application
15   with respect to that.  And it's not to go beyond next week.
16   But Friday of next week that ship has sailed irrevocably
17   whether anybody is on it or not.
18           Everybody understand that?
19           MR. MASTRO:  Understood, your Honor.
20           THE COURT:  Now, next item.
21           You are all going to contemplate before your post
22   Thanksgiving naps the briefing from here on, and there are a
23   number of items that I have made notes of that I would simply
24   suggest to you both you take into account in that briefing.  I
25   am dealing with a lot of skilled lawyers so I know you will

DBQ8CHE5

1    take account of almost everything, and probably more than

2    everything, but these should not go awry.

3         There should be addressed the question of whether, if

4    the plaintiff prevails, the plaintiff is seeking equitable

5    relief on state law claims, independent of the RICO claims, and

6    what the basis of that is and what the scope and nature of it

7    is.  And it's a subject that to some degree was addressed in my

8    opinion some time ago denying an application for a Section

9    1292(b) certificate, and then you all had lots of fun with it

10   in the Court of Appeals, but that should not be omitted.

11        A second question that is obviously not lost on you,

12   any of you, is the implications of *Morrison* for the RICO

13   claims.  I may be doing an injustice to both of you, but I

14   understand it to be more or less the plaintiff's position that

15   this was activity largely directed by an American from the

16   United States, aimed at an American, and it may be an

17   oversimplification, but that's pretty much the end of the

18   discussion from the plaintiff's point of view.  And the view on

19   the other side is at least a significant part of the conduct

20   took place beyond the boundaries of the United States, and that

21   from their point of view, again, at the risk of

22   oversimplification, is the end of it.

23        I suggest you look at this question, both of you, from

24   a much more nuanced point of view.  Quite possibly as an

25   alternative to each of your respective positions, but it may

DBQ8CHE5

1    not be as simple as either one of you think it.  So I just want

2    you to know that I am thinking about it, and I want to give you

3    a fair opportunity, both of you, to think about it and help me

4    think about it.

5            Thirdly, the closing arguments made clear everybody's

6    awareness that there were quite a few apologies to Arthur Conan

7    Doyle, the dogs that did not bark in this case.  A humorous

8    reference to the absence of a whole cast of characters.  Again,

9    not a derogatory comment, just an effort at being a little bit

10   light.  There are a whole bunch of people who presumably had

11   quite a lot to say had they been here, including, but not

12   limited to, Ann Maest, Douglas Beltman, Luis Yanza,

13   Mr. Prieto -- forgive me, I forget his first name -- Juan Pablo

14   Saenz, Pablo Fajardo.  And I think both sides have questions to

15   address on what, if anything, I am to make of the missing

16   nature of those, and possibly other witnesses.  What, if any,

17   inferences can or should be drawn and the like.

18           In the event the plaintiff were to prevail, what is

19   the appropriate scope of any equitable relief, if any is

20   appropriate at all, in terms of geography?  Does it stop at the

21   Atlantic and the Pacific, the Canadian and Mexican borders, or

22   does it go beyond?  I know that's a subject near and dear to

23   everybody's heart.

24           I suggest also that consideration be given to the

25   question of whether, if equitable relief is appropriate and if

DBQ8CHE5

1    it were limited to the United States, it should incorporate or

2    could incorporate or might incorporate or apply to efforts, if

3    any, by the judgment creditors to enforce here any foreign

4    judgment that has granted enforcement to the Ecuadorian

5    judgment.  This is a subject prompted by the Invictus

6    memorandum, which everybody is familiar with, and given that,

7    it's squarely raised by the issues in the case, and I suggest

8    it is an appropriate subject for consideration.

9           Finally, there has been a lot of argument about comity

10   and those sorts of arguments.  I suggest that the parties might

11   consider sharing any views they might have with me on the

12   question of whether in fact U.S. courts, including state courts

13   and courts of other nations don't routinely pass, in a variety

14   of other contexts, on the adequacy of legal systems of

15   countries other than their own, and on the question of whether

16   particular judgments of countries other than their own were or

17   were not viewed as fraudulent.

18          Two contexts that are obvious are these.  I mentioned

19   the ironies of this case yesterday, and they are remarkable in

20   many ways.  Everybody has changed sides on key issues, and

21   sometimes lawyers need to do that in the interest of their

22   clients, lawyers on both sides.  It is certainly the case that

23   Chevron is here arguing that the courts of Ecuador are

24   systemically inadequate and that the particular judgment

25   involved was fraudulent, in the face of having argued in this

DBQ8CHE5

very court years ago, for purposes of the forum non conveniens

motion, that the courts of Ecuador were adequate and that the

case should go there.

        Mr. Donziger as counsel and his clients argued back

then, for purposes of forum non conveniens, that the courts of

Ecuador were systematically inadequate.  Well, both sides in

that case asked Judge Rakoff and the Court of Appeals to pass

judgment on the adequacy of the Ecuadorian legal system, and

American courts do it all the time.  Ms. Littlepage, in a

moment of good advocacy, and I don't mean to suggest there was

only one moment, Ms. Littlepage, this morning cited back to me

my decision in *Pavlov*, where I considered the adequacy for

another purpose of a foreign judicial system.

        It does happen all the time in the forum non

conveniens circumstance.  And, of course, it does happen all

the time in this country under the Uniform Foreign-Country

Money Judgments Act and the common law of every state of the

union when a foreign judgment is brought here and enforcement

or recognition is sought.  I understand that's not exactly what

the complaint seeks here.  It may or may not be what the

defense is seeking when they rely now on the Ecuadorian

appellate decisions.  That's for another day.  But I suggest

you all think about and address these issues.

        And that's the end of my list.  Obviously, much more

will occur to you, but these are things that I want you to be

DBQ8CHE5

1    sure to cover, because they are all important, and it's in

2    everybody's interest to have as informed a judge as you can

3    have.

4            OK.  On a final note from me, I think it was Mr.

5    Friedman who commented this morning that one of the things that

6    amazed him about this case was how amazingly contentious it

7    was.  I have something to say only now from the moment the

8    trial started to today.  I have nothing but respect for the

9    professionalism of all of the lawyers who presented this case

10   on both sides.  Everybody acted zealously on behalf of their

11   clients, did their best.  They were, as far as I can see,

12   entirely professional, and I am very appreciative of that,

13   particularly given the past history in this case, on which I

14   have commented enough already.

15           So I think we are done.  I hope everybody gets their

16   planes, if that's where you're going, and Happy Thanksgiving.

17           (Adjourned)

18

19

20

21

22

23

24

25

DBQ8CHE5

1                          DEFENDANT EXHIBITS

2    Exhibit No.                              Received

3     8095    . . . . . . . . . . . . . . 2959

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25