UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                :
:
                            Plaintiff,             :
:
        -against-                                  :
:   Case No.  11 Civ.  0691 (LAK)
:
STEVEN R. DONZIGER, et al.,                        :
:
                            Defendants.            :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# CHEVRON CORPORATION'S POST-TRIAL MEMORANDUM OF LAW


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ xii

TABLE OF DEFINED TERMS AND ABBREVIATIONS ...................................... xxxv

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 13

    A.  TexPet, Remediation, and Release.............................................................. 13

    B.  The *Aguinda* Litigation ............................................................................... 16

    C.  The Chevron-Texaco Transaction ............................................................... 17

    D.  The Lago Agrio Litigation ........................................................................... 17

    E.  Donziger Exploited Corruption in Ecuador to Fuel His Extortion of Chevron in the United States ........................................................................ 18

    F.  Donziger Executed a Pressure Campaign Against Chevron in the United States ........................................................................................................... 19

    G.  The Cabrera Fraud ...................................................................................... 20

    H.  Obstruction and Cover-Up .......................................................................... 22

    I.  Judgment Fraud........................................................................................... 23

    J.  Proceedings in This Action ......................................................................... 24

ARGUMENT .................................................................................................................. 25

I.    Donziger Has Violated RICO ............................................................................. 27

    A.  RICO Provides a Cause of Action for Those Injured by Racketeering ...... 27

    B.  Donziger Operates and Manages an Enterprise That Pursues an Extortionate Scheme Against Chevron ........................................................ 29

        1.  Donziger's Enterprise Is a Multi-Faceted Organization ..................... 30

            a.  U.S. Lawyers................................................................................ 31

            b.  Funders........................................................................................ 32

            c.  Public Relations and Lobbying.................................................... 33

            d.  U.S. Consultants.......................................................................... 34

            e.  Defendants' Ecuadorian Agents .................................................. 35

        2.  Donziger is the Undisputed "Cabeza" of the Enterprise...................... 38

    C.  Donziger Has Committed Dozens of RICO Predicate Crimes ................... 44

        1.  Donziger's Attempt to Obtain Money From Chevron Through Fear of Economic Harm Constitutes Extortion ................................................ 44

i

**TABLE OF CONTENTS** *(continued)*

Page

a.  Extortion Encompasses Attempting and Conspiring to Make Wrongful Use of Fear of Economic Harm to Induce Another to Pay Money ........................................................................................ 45

b.  Donziger Exploited Judicial Weakness and General Corruption in Ecuador to Manufacture "Leverage" Over Chevron ...................................... 46

c.  Donziger's Initial Scheme Was to Corruptly Influence the Court Process Through Party-Nominated and Court-Appointed Experts ................ 48

    i.   Donziger Submitted Forged Reports to the Ecuadorian Court Under the Signature of the LAP-Nominated Expert, Dr. Charles Calmbacher ................................................................................ 48

    ii.  Donziger Set Up a Fraudulent "Monitorship" Program With Fernando Reyes to Influence the Neutral Settling Experts ...................... 51

    iii. These Schemes Failed to Obtain the Results Donziger Desired ............... 52

d.  Unable to Generate Sufficient Leverage Over Chevron in the Judicial Inspection Process, Donziger Implemented a Bolder Scheme to Install and Control Richard Cabrera as the Definitive "Global Expert" ................................................................................. 53

    i.   Donziger Recruited and Placed Cabrera as an "Independent" Expert ............................................................................................. 54

    ii.  Donziger Hired the LAP Team's U.S. Consultants to Ghostwrite the Cabrera Reports ................................................................ 56

    iii. While the U.S. Consultants Wrote Cabrera's Report, Donziger and His Co-Conspirators Also Controlled the Fake Cabrera Inspection Process ........................................................................... 60

    iv.  Despite Drafting the Report and Controlling Cabrera, Defendants—and Cabrera—Repeatedly Denied the LAP Team's Role ................................................................................. 62

    v.   Defendants Can Neither Explain Nor Defend Their Ghostwriting ................................................................................ 64

        (1) Defendants' Assertion That Cabrera "Adopted" the Report They Wrote Is False and No Defense Anyway ................................... 65

        (2) The LAP Team's Relationship with Cabrera Was Illegal Under Ecuadorian Law .................................................................. 67

        (3) Donziger's Attempts to Conceal the Ghostwriting Demonstrate That He Knew it Was Wrongful ................................... 70

        (4) Defendants' Contention That the Cabrera Fraud Is Immaterial Fails ....................................................................... 76

**TABLE OF CONTENTS** *(continued)*

Page

e.  With the Cabrera Report in Hand, Donziger Launched a Full-Scale Pressure Offensive .......................................................................... 79

    i.  In the U.S., Defendants Falsely Promoted the Cabrera Report as Independent .................................................................... 80

    ii.  Donziger Took the Cabrera Report to U.S. Federal and State Officials.................................................................................. 84

f.  Donziger Falsely Presented the Fraudulent Judgment as Legitimate and Enforceable .......................................................................... 86

    i.  Defendants' Fingerprints Are all Over the Judgment, in the Form of Their Own Unfiled, Confidential Work Product ....................... 86

    ii.  Guerra's Eyewitness Testimony Explains These Anomalies and Confirms the LAP Team's Ghostwriting of the Judgment ..................... 92

        (1) Guerra Approached Chevron With Evidence of the LAP Team's Fraud .................................................................. 93

        (2) For Years, Guerra Worked as Zambrano's Illegal Ghostwriter, and Took Bribes for Favorable Orders During That Time From the LAP Team.................................................... 95

        (3) Zambrano's Return to the Case Gave Donziger the Opportunity to Seize the Ultimate Prize:  Ghostwriting the Judgment Itself................................................................ 98

    iii.  Defendants' Gamble to Bring Judge Zambrano to Testify Backfired.................................................................................. 100

        (1) Guerra's Ghostwriting of Orders in Zambrano's Cases in Exchange for Payments from Zambrano ........................... 100

        (2) Zambrano's Claims that he Drafted and Dictated the Lago Agrio Judgment.................................................................. 102

        (3) Documents Left Outside Zambrano's Office Door ........................... 105

        (4) Zambrano's New Employment ........................................................ 106

        (5) Defendants' Failed Attempts to Rehabilitate Zambrano's Testimony ...................................................................... 107

        (6) Zambrano and Moncayo Improperly Coordinated Testimony .................................................................................. 109

        (7) The Tarco Declaration and Report Cannot Be Squared With Zambrano's Claim of Authorship ........................................ 111

g.  Donziger Lied About the Lago Agrio Litigation, Chevron, and TexPet's Ecuador Operations ...................................................... 113

    i.  Donziger's Central and Most-Repeated Lie Was the False "Independence" of Cabrera.................................................... 114

**TABLE OF CONTENTS** *(continued)*

Page

ii. David Russell's "SWAG" $6 Billion Damage Estimate ........................ 114

iii. The Tainted Exxon Valdez Claim............................................................ 118

iv. Misleading Comparison to Chernobyl .................................................... 120

v. False Accusations of Murder ................................................................... 121

vi. Misrepresenting Facts Related to Judge Nuñez's Bribery
Scandal.................................................................................................... 123

vii. Misrepresenting Facts Related to the Cancellation of the
Judicial Inspection at Guanta Military Base ........................................... 124

h. Donziger, Colluding With the Ecuadorian Government, Arranged
for the Criminal Prosecution of Chevron Attorneys in Ecuador and
a Fraud Allegation in U.S. Court ................................................................ 125

i. Donziger Sought to Pressure Chevron to Settle the Case Out of
Fear of Criminal Charges Against Its Attorneys..................................... 125

ii. Donziger Prompted the ROE's U.S. Lawyers to File a Fraud
Allegation Against Chevron in the Southern District of New
York ....................................................................................................... 130

i. Relying on the Cabrera Report and Other Fraudulently Obtained
"Authority," Donziger Sought to Pressure Chevron On Every Front........... 132

i. Donziger Induced Prominent Members of the Media to Repeat
and Amplify His Falsehoods, Causing More Pressure on
Chevron................................................................................................. 132

ii. Donziger and the LAP Team Orchestrated a Protest March
That Threatened Physical Harm Against Chevron Executives
and Attorneys ........................................................................................ 135

iii. The Defendants Abused the Ecuadorian Legal Process by
Securing an Illegal Punitive Damages Award ........................................ 136

iv. Donziger Has Directed His Falsehoods With Particular Focus
on Chevron's Shareholders to Maximize Their Impact.......................... 136

j. Donziger's Campaign Against Chevron Rested on Knowing
Falsehoods and Corruption, Thus Constituting Extortion ........................... 141

i. Donziger's "Pressure" Was Based on Fraud, and Thus
Extortionate........................................................................................... 141

ii. The First Amendment and Related Immunities Under Federal
and New York Law Do Not Shield Donziger's Misconduct ................... 147

(1) The First Amendment Does Not Shield Donziger's
Misconduct....................................................................................... 147

(2) Defendants' Conduct Is Not Protected Petitioning Activity............. 148

iv

**TABLE OF CONTENTS** *(continued)*

2. Donziger's Use of the Mails and Wires in Furtherance of the Scheme
Constitutes Multiple Instances of Fraud ............................................................ 151

   a. Mail and Wire Fraud:  Legal Requirements ................................................. 151

   b. Donziger's Violations of the Mail and Wire Fraud Statutes......................... 154

      i. Donziger Used the Wires to Manage the Team He Assembled
to Pursue His Scheme Against Chevron ................................................. 154

      ii. Donziger Used the Mails to Implement the Forgery of the
Calmbacher Reports................................................................................ 155

      iii. Donziger Used the Wires to Execute the Cabrera Ghostwriting
Fraud ...................................................................................................... 155

      iv. Donziger Managed the Bribery of Judge Zambrano and the
Ghostwriting of the Judgment He Signed Through Use of the
Wires ...................................................................................................... 156

      v. Donziger Spread Lies About Chevron and His Claims Against
the Company Over the Wires.................................................................. 157

      vi. Donziger Furthered His Scheme to Defraud Kohn and Burford
Using the Wires...................................................................................... 157

3. Donziger's Facilitation of Transfers of Millions of Dollars In and Out
of the United States Constitutes Money Laundering ......................................... 158

4. Donziger's Interference with U.S. Judicial Proceedings Constitutes
Obstruction of Justice and Witness Tampering ................................................. 161

   a. Defendants Committed Multiple Acts of Obstruction of Justice
During Proceedings Before U.S. Federal Courts .......................................... 162

      i. To Prevent the Cabrera Fraud from Being Exposed, Donziger
Misrepresented Key Facts to Counsel and Caused Those Same
Misrepresentations to be Repeated to Federal Courts............................ 164

      ii. After It Became Clear to Donziger That He Could Not
Preclude the § 1782 Discovery, Donziger Continued to
Obstruct Proceedings by Adopting an Intentional Delay
Strategy .................................................................................................. 169

      iii. Donziger's Corrupt Intent in Obstructing the 1782 Proceedings
Was Even More Apparent After the Filing of the Crude 1782.............. 170

      iv. Donziger's Campaign to Mislead U.S. Courts Continued Once
Patton Boggs Developed the Strategy to "Cleanse" the Cabrera
Fraud ...................................................................................................... 172

      v. Donziger, In Connection With His Own 1782, Obstructed
Justice in This Court, Repeatedly Flouting Its Orders........................... 176

**TABLE OF CONTENTS** *(continued)*

Page

      b.  During Chevron's Section 1782 Actions, Defendants Committed Multiple Acts of Witness Tampering ............................................................ 178

           i.   Donziger Tampered with the Deposition Testimony of Dr. Charles Calmbacher ............................................................ 178

           ii.  Donziger Tampered with the Sworn Statement of Former Consultant Mark Quarles ........................................................ 179

           iii. Donziger and his Co-conspirators Tampered with the Deposition Testimony of David Chapman ............................................. 180

      c.  Defendants and Their Counsel Obstructed This Action by Selectively Producing Documents and Witnesses from Ecuador and Manufacturing a Collusive Lawsuit in Ecuador to Justify Their Misconduct ............................................................................ 182

      d.  Defendants' Pattern of Obstructive Conduct is Precisely the Type of Egregious Conduct Meriting Criminal Prohibition ................................. 184

    5.  Donziger's Bribery of Foreign Officials Violates the Travel Act .................... 185

      a.  The Bribes Were Made by Covered Persons ........................................ 185

      b.  Donziger and the LAP Team Used Instrumentalities of Interstate Commerce "In Furtherance" of Their Bribes .................................... 186

      c.  The Offers, Promises, and Payments to Cabrera and Zambrano Were Things of Value ............................................................... 187

      d.  Cabrera and Zambrano were "Foreign Officials" ........................................ 189

      e.  Donziger's Payments and Offers Were Made Corruptly ............................. 190

      f.  Donziger and the LAP Team's Bribes Were to Influence Official Acts or Decisions and to Secure an Improper Advantage .......................... 191

      g.  The Bribes Were for a Business Purpose ............................................ 192

D.  These Acts of Racketeering Form a Continuous and Related Pattern ...................... 194

    1.  Relatedness ................................................................................ 195

    2.  Continuity ................................................................................ 196

      a.  Defendants' Pattern Is of Sufficient Longevity to Satisfy Closed-Ended Continuity ............................................................... 196

      b.  Defendants' Pattern Is Open Ended Because it Continues With No Sign of Abatement ..................................................................... 196

E.  This Pattern of Racketeering Activity Has Injured Chevron .................................. 197

F.  Defendants' Conduct Affected Interstate and Foreign Commerce ........................... 198

G.  Donziger's Liability Does Not Require Extraterritorial Application of RICO ......... 199

    1.  Chevron Has Proven a Domestic Pattern of Racketeering Activity .................. 200

TABLE OF CONTENTS *(continued)*

Page

a. The Wholly Domestic Predicate Acts Alone Suffice to Prove Chevron's RICO Claims ................................................................ 202

b. Taken as a Whole, the Pattern of Racketeering Activity Here Is Domestic ................................................................ 204

2. Chevron Has Also Proven a U.S.-Based RICO Enterprise ................................. 207

H. Donziger Has Also Conspired to Violate RICO (18 U.S.C. § 1962(d)) ................. 209

II. Defendants Committed Fraud ................................................................ 210

A. Defendants Have Acceded to the Application of New York Law ........................... 210

B. Fraud Premised on the Reliance of a Third Party Rather Than the Victim Remains Fraud and Demands Redress ................................................. 213

1. New York Recognizes Fraud Claims Premised on Third Party Reliance ................................................................ 213

2. There is No Principled Basis to Limit Fraud Claims to Only Plaintiff Reliance ................................................................ 215

3. Fraud Based on Third-Party Reliance Is Consistent With Traditional Principles Applicable to Claims in Fraud and Equity ............................. 217

C. Defendants Have Committed Multiple Frauds in Their Scheme Against Chevron ................................................................ 218

1. Defendants' Misrepresentations and Material Omissions to Burford Capital Harmed Chevron ................................................. 219

2. Defendants' Misrepresentations and Material Omissions to Joseph Kohn / Kohn Swift Harmed Chevron ..................................... 224

3. Defendants' Misrepresentations and Material Omissions to Courts in the United States in the 1782 Actions Harmed Chevron ..................... 228

4. Defendants' Misrepresentations and Material Omissions to Foreign Enforcement Courts in Ecuador, Argentina, Brazil and Canada Harmed Chevron ................................................................ 231

5. Defendants' Misrepresentations and Material Omissions to David Russell Harmed Chevron ................................................. 235

6. Defendants' Misrepresentations and Material Omissions to Dr. Charles Calmbacher Harmed Chevron ....................................... 238

7. Defendants' Misrepresentations and Material Omissions to the Lago Agrio Court Harmed Chevron ......................................... 240

8. Defendants' Misrepresentations and Material Omissions to Government Agencies and Public Officials in the United States Harmed Chevron ................................................................ 242

**TABLE OF CONTENTS** *(continued)*

9.  Defendants' Other Misrepresentations and Material Omissions Harmed Chevron .................................................................. 245

III.  Camacho and Piaguaje Are Liable for the Actions of Donziger, Fajardo and Other Agents as Vicariously Liable Principals, and as Co-Conspirators ................... 247

A.  The LAPs Have Entered Into, and Ratified, Agreements Authorizing Donziger and Other Agents to Act on Their Behalf .................................. 248

1.  Donziger ......................................................................... 248

2.  Pablo Fajardo and the Other Ecuadorian Attorneys .......................... 251

3.  Luis Yanza ...................................................................... 252

4.  Other U.S. Counsel .............................................................. 252

5.  Stratus and Other Expert Consultants .......................................... 253

B.  The LAPs Have Taken Affirmative Steps to Ratify and Benefit From Their Agents' Frauds Even After Becoming Aware of These Frauds ............................. 254

C.  This Conduct Establishes Camacho and Piaguaje's Vicarious Liability for Their Agents' Frauds ...................................................... 256

D.  This Conduct Establishes That Defendants Are Liable for Civil Conspiracy .......... 257

IV.  Donziger Acted at All Times as the Agent of the Donziger Law Firm Defendants ....... 260

V.  Donziger Has Violated Section 487 .................................................... 261

A.  Donziger Has Repeatedly Attempted to Deceive New York Courts ...................... 261

B.  Donziger Took an Active Role in Inducing Other Counsel to Deceive New York Courts ...................................................................... 264

C.  Donziger Lied to This Court as Counsel of Record ................................. 266

VI.  Defenses Based on Supposed Preclusive Effect of Ecuadorian Judgment Fail ............. 267

A.  Defendants' Collateral Estoppel and Comity Affirmative Defenses Depend Upon the Recognizability of the Lago Agrio Judgment ........................... 268

B.  The Lago Agrio Judgment Is Not Entitled to Recognition Under Federal or New York Law Because It Was Obtained by Fraud ................................. 271

C.  The Lago Agrio Judgment Is Not Subject to Recognition Under Federal or New York Law Because Ecuador Lacks Impartial Tribunals ......................... 274

D.  The Affirmance of the Lago Agrio Judgment by Ecuadorian Appellate Courts Does Not Render the Judgment Enforceable ..................................... 280

1.  The Appellate Courts Expressly Refused to Resolve Chevron's Claims Against the LAPs ............................................................ 281

2.  The Selection Process for the Intermediate Appellate Panel Was Tainted by Influence From Zambrano and the ROE ............................. 282

**TABLE OF CONTENTS** *(continued)*

Page

  3.  The Intermediate Appellate Panel's Purported Analysis of the Fraud
      Evidence is Shallow and Should be Given No Weight...................................... 283

VII. Defendants' Unclean Hands and Related Defenses Fail for Lack of Evidence That
     the Alleged Conduct Even Took Place, Let Alone Harmed Defendants ....................... 284

  A.  The Court Should Ignore Defendants' Allegations Regarding the *Forum Non
      Conveniens* Dismissal, Procedural Conduct in the Lago Agrio Litigation, and
      Conduct in Relation to the Section 1782 Proceedings ............................................. 284

  B.  With Regard to the Remaining Allegations, Defendants Failed to Show Any
      Misconduct by Chevron ...................................................................................... 285

    1.  Guanta Inspection ......................................................................................... 286

    2.  Bribery Solicitation Scandal ......................................................................... 286

    3.  Chevron's *Ex Parte* Meetings ........................................................................ 288

  C.  Defendants Cannot Show That Any Alleged Chevron Conduct Harmed Them ...... 290

  D.  Defendants' "Robin Hood" and "Ends Justify the Means" Arguments Are not
      Relevant to any Defense ..................................................................................... 291

VIII. Defendants' Other Defenses Fail ...................................................................... 294

  A.  Defendants' Equitable Estoppel Arguments Rely on Mischaracterizations ............. 294

  B.  Defendants' Causation Arguments Relating to Cabrera Fail................................... 298

  C.  Defendants Refused to Put Forward Key Witnesses, and the Witnesses that
      Did Testify Did Not Undermine Chevron's Claims .................................................. 298

IX.  This Court Has Jurisdiction to Enter Relief ......................................................... 303

  A.  Subject Matter Jurisdiction ................................................................................ 303

    1.  Federal question ........................................................................................... 303

    2.  Diversity ...................................................................................................... 304

  B.  Personal Jurisdiction ......................................................................................... 305

    1.  Donziger...................................................................................................... 306

    2.  The Appearing LAPs .................................................................................... 306

      a.  The LAPs, Through Their Agents, Have Engaged in a Systematic
          and Continuous Pattern of Activity in New York, Thereby
          Subjecting Themselves to Personal Jurisdiction Pursuant to CPLR
          301.......................................................................................................... 306

      b.  The LAPs Have Transacted Business in New York, Thereby
          Subjecting Themselves to Personal Jurisdiction Pursuant to
          CPLR 302(a)(2) ...................................................................................... 309

**TABLE OF CONTENTS** *(continued)*

Page

       c.  The LAPs Have Committed Torts in New York, Thereby Subjecting Themselves to Personal Jurisdiction Pursuant to 302(a)(2) ................................................... 312

X.     If the Court Considers Any Portion of the Defendants' Designation of the 2010 Depositions of Douglas Beltman and Ann Maest for the Truth of the Matters Asserted There, It Should Also Accept Beltman and Maest's 2013 Deposition Testimony and Witness Statements on the Same Basis ................. 313

REQUESTED RELIEF.................................................................................. 318

I.     The Record Justifies Injunctive and Other Relief ......................................... 318

    A. Any Monetary Award Would Be Uncollectable From the Defendants .................. 320

    B. Chevron Has Suffered Irreparable Harm to Its Goodwill, Reputation, and Ability to Conduct Business .......................................... 322

       1.  Immeasurable Past Harm .......................................................... 323

       2.  Immeasurable Future Harm ...................................................... 324

    C. The Balance of Hardships Between Chevron and Defendants Favors Granting an Injunction ................................................ 326

    D. An Injunction Would Serve the Public Interest ...................................... 327

II.    The Court Should Award Appropriate Injunctive and Other Equitable Relief on Each of Chevron's Claims ................................................. 328

    A. The Court Should Award Injunctive and Other Equitable Relief on Chevron's RICO Claim .......................................................... 329

       1.  Equitable Relief is Available Under RICO.................................... 329

          a.  The Text of 18 U.S.C. § 1964 Permits Private Plaintiffs to Seek Injunctive and Other Equitable Relief in Civil RICO Actions .................... 330

          b.  Where a Statute Creates a Private Right of Action, Federal Courts Can Issue Equitable Remedies Absent Clear Congressional Direction to the Contrary ................................ 333

          c.  The Ninth Circuit's Decision in *Wollersheim* Misinterpreted RICO and Misconstrued Legislative History to Supplant the Statute's Plain Meaning ............................................... 335

          d.  Private Equitable Relief Is Consistent With the Purpose of Civil RICO ......................................................... 338

       2.  Chevron's Proposed Relief Will Protect the Company From Defendants' Ongoing Wrongful Conduct to the Fullest Extent of This Court's Authority .................................................... 339

          a.  Proposed Relief: RICO .............................................. 339

**TABLE OF CONTENTS** *(continued)*

Page

3.  Even if RICO Did Not Provide for Equitable Relief, Chevron Is Entitled to a Statutory Award of Costs, Including Attorneys' Fees .................. 345

B.  The Court Should Award Injunctive and Other Equitable Relief on Chevron's Fraud Claims ........................................................................................ 346

1.  Availability of Equitable Relief ...................................................... 346

2.  Proposed Relief: Fraud ................................................................. 347

C.  The Court Should Award Injunctive and Other Equitable Relief on Chevron's New York Judiciary Law Section 487 Claim ........................................ 351

1.  Availability of Equitable Relief ...................................................... 351

2.  Proposed Relief: Section 487 ......................................................... 352

III.    Defaulted Defendants ................................................................................ 353

CONCLUSION ....................................................................................................... 353

LIST OF APPENDICES .......................................................................................... 354

# TABLE OF AUTHORITIES

Page(s)

## Cases

*"R" Best Produce, Inc. v. DiSapio,*
    540 F.3d 115 (2d Cir. 2008) ..................................................................... 306

*7-Eleven, Inc. v. Upadhyaya,*
    926 F. Supp. 2d 614 (E.D. Pa. 2013) ........................................................ 328

*A.F.A. Tours, Inc. v. Whitchurch,*
    937 F.2d 82 (2d Cir. 1991) ....................................................................... 305

*ABKCO Indus., Inc. v. Lennon,*
    52 A.D.2d 435 (1st Dep't 1976) ........................................................ 307, 308

*Abuhamda v. Abuhamda,*
    236 A.D.2d 290 (1st Dep't 1997) .............................................................. 350

*Ackermann v. Levine,*
    788 F.2d 830 (2d Cir. 1986) ..................................................................... 270

*Acumed LLC v. Stryker Corp.,*
    551 F.3d 1323 (Fed. Cir. 2008) ................................................................ 326

*Adams v. Gillig,*
    199 N.Y. 314 (1910) ................................................................... 11, 318, 346

*Aetna Cas. & Sur. Co. v. Liebowitz,*
    730 F.2d 905 (2d Cir. 1984) ....................................................... 335, 337, 346

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
    483 U.S. 143, 107 S. Ct. 2759 (1987) ...................................................... 200

*Agency Rent A Car Sys. v. Grand Rent A Car Corp.,*
    98 F.3d 25 (2d Cir.1996) .......................................................................... 309

*Aguinda v. Texaco, Inc.,*
    142 F. Supp. 2d 534 (S.D.N.Y. 2001), aff'd, 303 F.3d 470 (2d Cir. 2002).. 16, 88, 294, 295

*Air China, Ltd. v. Kopf,*
    473 F. App'x 45 (2d Cir. 2012) ................................................................ 304

*Alexander & Alexander of N.Y., Inc. v. Fritzen,*
    68 N.Y.2d 968 (1986) ....................................................................... 248, 258

*Allstate Life Ins. Co. v. Linter Group Ltd.,*
    994 F.2d 996 (2d Cir. 1993) ..................................................................... 269

*Amalfitano v. Rosenberg,*
    12 N.Y.3d 8 (2009) .......................................................................... 261, 351

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Amalfitano v. Rosenberg*,
    428 F. Supp. 2d 196 (S.D.N.Y. 2006) ..................................................... 262, 265

*Amalfitano v. Rosenberg*,
    533 F.3d 117 (2d Cir. 2008) ................................................................ 261

*Amusement Indus., Inc. v. Stern*,
    693 F. Supp. 2d 327 (S.D.N.Y. 2010) ................................................... 258

*Aoude v. Mobil Oil Corp.*,
    892 F.2d 1115 (1st Cir. 1989) ............................................................ 272, 273

*Atl. Richfield Co. v. Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO*,
    447 F.2d 945 (7th Cir. 1971) .............................................................. 319

*Baisch v. Gallina*,
    346 F.3d 366 (2d Cir. 2003) ............................................................... 153

*Bank Melli Iran v. Pahlavi*,
    58 F.3d 1406 (9th Cir. 1995) .............................................................. 275

*Bano v. Union Carbide Corp.*,
    361 F.3d 696 (2d Cir.2004) ................................................................ 339, 350

*Banque Franco-Hellenique De Commerce Int'l at Maritime, S.A. v. Christophides*,
    106 F.3d 22 (2d Cir. 1997) ................................................................. 216

*Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*,
    521 F.2d 392 (2d Cir. 1975) ............................................................... 305

*Beauford v. Helmsley*,
    865 F.2d 1386 (2d Cir. 1989) ............................................................. 197

*Beck v. Mfrs. Hanover Trust Co.*,
    820 F.2d 46 (2d Cir. 1987) ................................................................. 153

*Beck v. Prupis*,
    120 S. Ct. 1608 (2000) ....................................................................... 210

*Beck v. Prupis*,
    529 U.S. 494 (2000) ........................................................................... 210

*Bedard v. La Bier*,
    20 Misc.2d 614 (Sup. Ct. Clinton Cnty. 1959) .................................... 258

*Bell v. Hood*,
    327 U.S. 678, 66 S. Ct. 773 (1946) .......................................... 318, 334, 335, 337

*Bencoe Exporting & Importing Co. v. Erie City Iron Works*,
    280 F. 690 (2d Cir. 1922) ................................................................... 218

*Berkshire Capital Grp., LLC v. Palmet Ventures, LLC*,
    307 F. App'x 479 (2d Cir. 2008) ........................................................ 311

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................... 305

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*BMO Nesbitt Burns, et al. v. Loria, et al.*,
    Case No. 1:02-cv-22061 (S.D. Fl. 2002) .......................................................... 27

*Bobker v. Herrick Feinstein LLP*,
    No. 650963/13, 2013 N.Y. Slip Op. 51967(U)
    (Sup. Ct. N.Y. Cnty. Nov. 6, 2013) .............................................................. 261

*Bonnifield v. Chevron Corp.*,
    No. B206255, 2009 WL 1111601 (Cal. Ct. App. Apr. 27, 2009) ...................................... 295

*Borich v. BP, P.L.C.*,
    904 F. Supp. 2d 855 (N.D. Ill. 2012) ........................................................... 200

*Boyle v. United States*,
    556 U.S. 938, 129 S. Ct. 2237 (2009) ........................................................... 30

*Brass v. Am. Film Technologies, Inc.*,
    987 F.2d 142 (2d Cir. 1993) .......................................... 213, 217, 222, 223, 227, 228

*Brenntag Int'l Chems., Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999) ................................................................ 320, 321

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639, 128 S. Ct. 2131 (2008) .................................................. 153, 154, 213

*Bridgeway Corp. v. Citibank*,
    201 F.3d 134 (2d. Cir. 2000) ............................................................... 275, 279

*Browning v. Navarro*,
    826 F.2d 335 (5th Cir. 1987) .................................................................. 272

*Bruff v. Mali*,
    36 N.Y. 200 (1867) ........................................................................... 213

*Buckhannon Bd. & Care Home Inc. v. W.V. Dep't of Health and Human Resources*,
    532 U.S. 598 (2001) .......................................................................... 346

*Buxton Mfg. Co., Inc. v. Valiant Moving & Storage, Inc.*,
    657 N.Y.S.2d 450 (Sup. Ct. N.Y. Cnty. 1997) ................................................... 214

*Calabrese v. CSC Holdings, Inc.*,
    No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 (E.D.N.Y. Jul. 19, 2004) ...................... 148

*Califano v. Yamasaki*,
    442 U.S. 682, 99 S. Ct. 2545 (1979) ...................................................... 10, 334

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508, 92 S. Ct. 609 (1972) ........................................................... 149

*Capitol Records, Inc. v. Thomas-Rasset*,
    692 F.3d 899 (8th Cir. 2012) .............................................................. 328, 329

*Carpenter v. United States*,
    484 U.S. 19, 108 S. Ct. 316 (1987) ........................................................... 152

## TABLE OF AUTHORITIES *(continued)*

*Cedeño v. Castillo*,
  457 F. App'x 35 (2d Cir. 2012)........................................................ 205

*Cedeño v. Intech Grp., Inc.*,
  733 F. Supp. 2d 471 (S.D.N.Y. 2010) ............................................ 203

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*,
  148 F.3d 194 (2d Cir. 1998).......................................................... 214

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
  626 F.3d 695 (2d Cir. 2010).......................................................... 334

*CGC Holding Co., LLC v. Hutchens*,
  824 F. Supp. 2d 1193 (D. Colo. 2011) ................................ 200, 202, 205, 206

*Chase Manhattan Bank, N.A. v Perla*,
  65 A.D.2d 207 (4th Dep't 1978) ................................................... 256

*Chevron Corp. v. Berlinger*,
  629 F.3d 297 (2d Cir 2011)........................................................... 296

*Chevron Corp. v. Berlinger*,
  No. 10-1918 (2d Cir. June 14, 2010).............................................. 264

*Chevron Corp. v. Champ*,
  No. 1:10MC27, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010).................... 211

*Chevron Corp. v. Donziger*,
  768 F. Supp. 2d 581 (S.D.N.Y. 2011) .................................... 311, 326

*Chevron Corp. v. Donziger*,
  783 F. Supp. 2d 713 (S.D.N.Y. 2011) ............................................. 17

*Chevron Corp. v. Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012)..................... 45, 141, 200, 202, 204, 208, 213, 214

*Chevron Corp. v. Donziger*,
  886 F. Supp. 2d 235 (S.D.N.Y. 2012)................... 34, 41, 262, 268, 269, 270, 271

*Chevron Corp. v. Donziger*,
  No. 11-cv-0691 (LAK), 2013 WL 98013 (S.D.N.Y. Jan. 7, 2013)................ 346

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012)..................... 25, 267, 270, 296, 342, 343

*Chevron Corp. v. Salazar*,
  11 Civ. 3718(LAK), 2011 WL 3628843 (S.D.N.Y. 2011)............... 284

*Chevron Corp. v. Salazar, et al.*,
  No. 11 Civ. 3718, Dkt. 101 (S.D.N.Y. July 6, 2011) ................... 251

*Chevron Corp. v. Stratus Consulting, Inc.*,
  No. 10-cv-00047-MSK-MEH (D. Colo. May 25, 2013)............... 175

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) ......................................................... 305

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Chrysler Capital Corp. v. Century Power Corp.,*
 778 F. Supp. 1260 (S.D.N.Y. 1991) ....................................................... 258, 312

*Cintas Corp. v. UNITE HERE,*
 601 F. Supp. 2d 571 (S.D.N.Y. 2009) ............................................................ 148

*City of New York v. Smokes-Spirits.com, Inc.,*
 541 F.3d 425 (2d Cir. 2008) ............................................................................ 214

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.,*
 690 F.2d 1240 (9th Cir. 1982) ................................................................. 148, 149

*Cole v. Cunningham,*
 133 U.S. 107, 10 S. Ct. 269 (1890) ................................................................. 339

*Cooper v. Weissblatt,*
 277 N.Y.S. 709 (App. Div. 2d Dep't 1935) ..................................................... 214

*Cooper, Robertson & Partners, L.L.P. v. Vail,*
 143 F. Supp. 2d 367 (S.D.N.Y. 2001) ............................................................. 309

*Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.,*
 113 F.3d 308 (2d Cir. 1997) ..................................................................... 194, 196

*Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency,*
 318 F.3d 392 (2d Cir. 2003) ............................................................................ 342

*Creative Computing v. Getloaded.com LLC,*
 386 F.3d 930 (9th Cir. 2004) ........................................................................... 328

*Crigger v. Fahnestock & Co., Inc.,*
 443 F.3d 230 (2d Cir. 2006) ............................................................................ 213

*CSX Transp., Inc. v. Peirce,*
 5:05-CV-202, 2013 WL 5375834 (N.D. W.Va. Sept. 25, 2013) ............................ 150, 151

*Cullen v. Margiotta,*
 811 F.2d 698 (2d Cir. 1987) ............................................................................. 29

*Curiale v. Capolino,*
 883 F. Supp. 941 (S.D.N.Y. 1995) ................................................................. 154

*CutCo Indus. Inc. v. Naughton,*
 806 F.2d 361 (2d Cir. 1986) ..................................................................... 309, 310

*Datskow v. Teledyne, Inc., Cont'l Prods. Div.,*
 899 F.2d 1298 (2d Cir. 1990) .......................................................................... 306

*Davis v. Cornue*
 151 N.Y. 172 (1896)................................................................................. 339, 349

*De Falco v. Bernas,*
 244 F.3d 286 (2d Cir. 1981) ............................................................................ 198

*Desser v. Shatz,*
 581 N.Y.S.2d 796 (App. Div. 1st Dep't 1992)....................................... 214, 216

# TABLE OF AUTHORITIES *(continued)*

*Dixon v. Mack*,
    507 F. Supp. 345 (S.D.N.Y. 1980) ................................................................. 313

*Don Lia v. Saporito*,
    909 F. Supp. 2d 149 (E.D.N.Y. 2012) ........................................................... 290

*Dooley v. United Techs. Corp.*,
    No. 91-cv-2499, 1992 WL 167053 (D.D.C. June 16, 1992) ......................... 185

*Drexel Burnham Lambert Group Inc. v. Galadari*,
    777 F.2d 877 (2d Cir. 1985) ......................................................................... 290

*Dupree v. Voorhees*,
    24 Misc.3d 396, 403 (Sup. Ct. Suffolk Cnty. 2009), *rev'd on other grounds*, 68
    A.D.3d 810 (2d Dep't 2009) ......................................................................... 265

*Durland v. United States*,
    161 U.S. 306, 16 S. Ct. 508 (1896) .............................................................. 152

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*
    365 U.S. 127, 81 S. Ct. 523 (1961) .............................................................. 148

*Eaton, Cole & Burnham Co. v. Avery*,
    83 N.Y. 31 (1880) ......................................................................................... 213

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388, 126 S. Ct. 1837 (2006) ........................................... 321, 326, 328

*EEOC v. Wilson Metal Casket Co.*,
    24 F.3d 836 (6th Cir. 1994) ......................................................................... 329

*Ehrenfeld v. Mahfouz*,
    489 F.3d 542 (2d Cir. 2007) ......................................................................... 311

*Eisert v. Town of Homestead*,
    918 F. Supp. 601 (E.D.N.Y. 1996) .............................................................. 153

*European Community v. RJR Nabisco, Inc.*,
    No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ............... 207

*Factors Etc., Inc. v. Pro Arts, Inc.*,
    652 F.2d 278 (2d Cir. 1981) ......................................................................... 215

*Farmer v. Brennan*,
    511 U.S. 825, 114 S. Ct. 1970 (1994) .......................................................... 324

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) ..................................................................................... 311

*Fleet Bus. Credit, L.L.C. v. Global Aerospace Underwriting Mgrs. Ltd.*,
    812 F. Supp. 2d 342 (S.D.N.Y. 2011) ............................................................. 6

*Fountain v. United States*,
    357 F.3d 250 (2d Cir. 2004) ......................................................................... 151

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Franklin v. Gwinnett Cnty. Pub. Sch.,*
    503 U.S. 60, 112 S. Ct. 1028 (1992) ............................................................... 318, 329, 334

*Freeman v. Freeman,*
    43 N.Y. 34 (1870).......................................................................................................... 318

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167, 120 S. Ct. 693 (2000) ................................................................................ 319

*Frummer v. Hilton Hotels Int'l,*
    19 N.Y.2d 533 (1967).................................................................................................... 309

*Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli,*
    575 F.3d 593 (7th Cir. 2009)........................................................................................ 269

*Gelfand v. Tanner Motor Tours, Ltd.,*
    385 F.2d 116 (2d Cir. 1967) ......................................................................................... 308

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323, 94 S. Ct. 2997 (1974) .............................................................................. 147

*GICC Capital Corp. v. Tech. Fin. Grp.,*
    67 F.3d 463 (2d Cir. 1995)........................................................................................... 197

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ........................................................................................... 322

*Gresham v. Peterson,*
    225 F.3d 899 (7th Cir. 2000)........................................................................................ 147

*Griffin v. Griffin,*
    327 U.S. 220, 66 S. Ct. 556 (1946) ............................................................................... 274

*Grove Press, Inc. v. Angleton,*
    649 F.2d 121 (2d Cir. 1981)......................................................................................... 257

*Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.,*
    41 A.D.3d 25 (1st Dep't 2007)..................................................................................... 350

*Guerrero v. Gates,*
    Case No. cv:00-7165 (C.D. Cal. 200) ............................................................................. 27

*H. J. Inc. v. Northwestern Bell Telephone Co.,*
    492 U.S. 229, 109 S. Ct. 2893 (1989) .................................................. 27, 28, 194, 195, 196

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
    322 U.S. 238, 64 S. Ct. 997 (1944) .......................................... 11, 146, 271, 272, 318, 327

*Hilton v. Guyot,*
    159 U.S. 113, 16 S. Ct. 139 (1895) ....................................................... 270, 273, 274, 279

*Hourani v. Mirtchev,*
    943 F. Supp. 2d 159 (D.D.C. 2013) ...................................................................... 200, 205

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432, 119 S. Ct. 755 (1999) .............................................................................. 331

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Huyer v. Wells Fargo & Co.*,
    No. 4:08-CV-00507, 2013 WL 5754885 (S.D. Iowa Oct. 23, 2013) ............................... 335

*Illinois v. Telemarketing Assocs.*,
    538 U.S. 600, 123 S. Ct. 1829 (2003) ........................................................... 147

*In re Barbieri*,
    380 B.R. 284 (E.D.N.Y. 2007) ................................................................... 256

*In re Burke*,
    374 B.R. 781 (Bankr. D. Colo. 2007) ........................................................... 272

*In re Chevron Corp.*,
    709 F. Supp. 2d 283 (S.D.N.Y. 2010) ............................................................. 17

*In re Chevron Corp.*,
    749 F. Supp. 2d 170 (S.D.N.Y. 2010) ........................................................... 176

*In re Chevron Corp.*,
    No. M-19-111-LAK (S.D.N.Y.) ................................................................... 171

*In re Chevron Corp.*,
    633 F.3d 153 (3d Cir. 2011) .................................................................... 230

*In re Chevron Corp.*,
    749 F. Supp. 2d 141 (S.D.N.Y. 2010) ............................................................ 17

*In re Chevron Corp.*,
    No. 10-1146, 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ........................................ 230

*In re Chevron Corp.*,
    No. 10-2675 (D.N.J. June 11, 2010) ............................................................. 230

*In re Chevron Corp.*,
    No. 10-mc-00002 (LAK) (S.D.N.Y. Jan. 11, 2011)................................................ 176, 177

*In re Chevron Corp.*,
    Nos. 10-MC-21, 10-MC-22 (D.N.M. Sept. 2, 2010)...................................................... 230

*In re Chevron Corp.*,
    Nos. 10-MC-27, 10-MC-28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010).................. 230

*In re Parmalat Sec. Litig.*,
    493 F. Supp. 2d 723 (S.D.N.Y. 2007) ........................................................... 269

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    No. MDL 1456, 2007 WL 1051642 (D. Mass. Apr. 2, 2007)......................................... 215

*In re Ski Train Fire in Kaprun, Austria on Nov. 11*,
    230 F. Supp. 2d 376 (S.D.N.Y. 2000).................................................... 307, 308

*In re Sumitomo Copper Litig.*,
    995 F. Supp. 451 (S.D.N.Y. 1998) .............................................................. 152

*In re Union Carbide Corp.*,
    809 F.2d 195 (2d Cir. 1987) .................................................................... 297

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Joseph v. Farnsworth Radio & Television Corp.*,
    198 F.2d 883 (2d Cir. 1952) ............................................................................... 218

*Jota v. Texaco Inc.*,
    Case No. 94-cv-9266 (JSR) (S.D.N.Y.) ......................................................... 294

*Junius Const. Corp. v. Cohen*,
    257 N.Y. 393 (1931)............................................................................................ 217

*Kapps v. Wing*,
    404 F.3d 105 (2d Cir. 2005) ................................................................... 323, 324

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240, 54 S. Ct. 146 (1933) ............................................................... 290

*Kheel v. Port of N.Y. Auth.*,
    457 F.2d 46 (2d Cir. 1972) ................................................................................ 304

*Korenzecher v. Blass*,
    No. 604928/97, 1998 WL 35423611 (N.Y. Sup. Ct. July 15, 1998)................ 214

*Krumme v. WestPoint Stevens Inc.*,
    238 F.3d 133 (2d Cir. 2000) .............................................................................. 211

*LaForest v. Former Clean Air Holding Co., Inc.*,
    376 F.3d 48 (2d Cir. 2004) ................................................................................ 329

*Lama Holding Co. v. Smith Barney Inc.*,
    88 N.Y.2d 413 (1996)................................................................................. 212, 220

*LaMarca v. United States*,
    31 F. Supp. 2d 110 (E.D.N.Y. 1998)................................................................ 316

*Lanvin Parfums, Inc. v. Le Dans, Ltd.*,
    9 N.Y.2d 516 (1961).......................................................................................... 352

*Laufer v. Ostrow*,
    55 N.Y.2d 305 (1982)........................................................................................ 307

*Lawler v. Gilliam*,
    569 F.2d 1283 (4th Cir. 1978) .......................................................................... 290

*Levine v. Michael Ashton, Inc.*,
    No. 110042/09, 2010 WL 128077 (N.Y. Sup. Ct. Jan. 4, 2010) ..................... 214

*Liberty Life Assur. Co. of Boston v. Bahan*,
    No. 09 Civ. 4715 (JRS), 2010 WL 3431147 (S.D.N.Y. Aug. 23, 2010),
    *aff'd*, 441 F. App'x 21 (2d Cir. 2011) ............................................................ 215

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012) .............................................................................. 212

*Litvinov v. Hodson*,
    905 N.Y.S.2d 400 (App. Div. 4th Dep't 2010) ................................................ 215

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Longines-Wittnauer Watch Co. v. Barnes & Reinecke*,
    15 N.Y.2d 443 (1965) ................................................................................. 312

*Lopez v. Miller*,
    915 F. Supp. 2d 373 (E.D.N.Y. 2013) ................................................. 315, 316

*M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*,
    689 F.3d 263 (2d Cir. 2012) .......................................................................... 7

*Madanes v. Madanes*,
    981 F. Supp. 241 (S.D.N.Y. 1997) ............................................................. 312

*Mallis v. Bankers Trust Co.*,
    615 F.2d 68 (2d Cir. 1980) ....................................................... 216, 225, 228, 290

*Mandarin Trading Ltd. v. Wildenstein*,
    16 N.Y.3d 173 (2011) .................................................................................. 212

*Manez Lopez v. Ford Motor Co.*,
    470 F. Supp. 2d 917 (S.D. Ind. 2006) ........................................................ 272

*Marcus v. Jewish Nat'l Fund (Keren Kayemeth Leisrael), Inc.*,
    557 N.Y.S.2d 886 (App. Div. 1st Dep't 1990) ............................................ 347

*Marine Midland Bank v. John E. Russo Produce Co., Inc.*,
    427 N.Y.S.2d 961 (1980) ............................................................................ 256

*Matter of Allstate Ins. Co. (Stolarz)*,
    81 N.Y.2d 219 (1993) .................................................................................. 211

*Maxons Restorations, Inc. v. Newman*,
    292 F. Supp. 2d 477 (S.D.N.Y. 2003) ......................................................... 305

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187, 69 S. Ct. 497 (1949) ............................................................. 328

*McNally v. United States*,
    483 U.S. 350, 107 S. Ct. 2875 (1987) ......................................................... 152

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*,
    788 F. Supp. 2d 71 (E.D.N.Y. 2011) ........................................................... 326

*Mint, Inc. v. Amad*,
    10 Civ. 9395(SAS), 2011 WL 1792570 (S.D.N.Y. May 9, 2011) ................. 327

*Mitchell Bros. Film Group v. Cinema Adult Theater*,
    604 F.2d 852 (5th Cir. 1979) ...................................................................... 290

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*,
    871 F. Supp. 2d 933 (N.D. Cal. 2012) ................................................. 202, 208

*Monex Deposit Co. v. Gilliam*,
    No. 09-287, 2010 WL 2349095 (C.D. Cal. June 1, 2010) ............................ 148

*Morgan v. United States*,
    304 U.S. 1, 58 S.Ct. 773 (1938) ................................................................. 272

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Morrison v. Nat'l Austl. Bank Ltd.*,
    130 S. Ct. 2869 (2010) ................................................................. 200, 201, 204

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*,
    322 F.3d 130 (2d Cir. 2003) .............................. 10, 298, 330, 334, 335, 337, 346

*My First Shades v. Baby Blanket Suncare*,
    914 F. Supp. 2d 339 (E.D.N.Y. 2012) ........................................................ 215

*N.B. Garments (PVT), Ltd. v. Kids Int'l Corp.*,
    No. 03 CIV. 8041(HB), 2004 WL 444555 (S.D.N.Y. Mar. 10, 2004) ........... 214

*Nachbaur v. Weiss*,
    19 F. App'x 24 (2d Cir. 2001) ................................................................. 304

*Nakahata v. New York-Presbyterian Healthcare Sys.*,
    723 F.3d 192 (2d Cir. 2013) ................................................................. 304

*National Organization for Women, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393, 123 S. Ct.
    1057 (2003) ........................................................... 10, 330, 331, 332, 335, 337

*Nat'l Council of Young Isr. v. Wolf*,
    963 F. Supp. 276 (S.D.N.Y. 1997) ................................................... 153, 154, 157

*Neder v. United States*,
    527 U.S. 1, 119 S. Ct. 1827 (1999) ................................................... 151, 152

*Niagara Frontier Transp. Auth. v. Patterson-Stevens, Inc.*,
    237 A.D.2d 965 (4th Dept. 1997) ............................................................. 297

*NML Capital, Ltd. v. Rep. of Argentina*,
    699 F.3d 246 (2d Cir. 2012) ........................................................... 339, 350

*O'Brien v. Argo Partners, Inc.*,
    736 F. Supp. 2d 528 (E.D.N.Y. 2010), *aff'd*, 426 F. App'x 36 (2d Cir. 2011) ............... 215

*O'Malley v. New York City Transit Auth.*,
    896 F.2d 704 (2d Cir. 1990) ................................................................. 153

*Osorio v. Dole Food Co.*,
    665 F. Supp. 2d 1307 (S.D. Fla. 2009) ..................................................... 275

*Owl Const. Co., Inc. v. Ronald Adams Contractor, Inc.*,
    727 F.2d 540 (1984) ........................................................................... 27

*P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*,
    462 F.3d 1015 (8th Cir. 2006) ................................................................. 211

*P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*,
    301 A.D.2d 373 (N.Y. App. Div. 1st Dep't 2003) ........................................ 212

*Parsons v. Lipe*,
    158 Misc. 32 (Sup. Ct. Onondaga Cnty. 1933) .......................................... 297

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Pasley v. Freeman*,
  3 T.R. 51, 100 Eng. Rep. 450 (K.B.) ................................................................. 215, 218

*Pasquantino v. United States*,
  544 U.S. 349, 125 S. Ct. 1766 (2005) ......................................................... 204

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
  317 F.3d 209 (2d Cir. 2003) ......................................................................... 328

*Patsy's Italian Rest., Inc. v. Banas*,
  658 F.3d 254 (2d Cir. 2011) ......................................................................... 328

*Patton Boggs LLP v. Chevron Corp.*,
  No 11-00799 (HHK) (D.D.C. 2011) ............................................................ 31

*Patton Boggs, LLP v. Chevron Corp.*,
  No. 10 Civ. 1975 (HHK) (D.D.C. 2010) ..................................................... 31

*Patton Boggs, LLP v. Chevron Corp.*,
  No. 12 Civ. 9176 (LAK) (S.D.N.Y.) ........................................................... 31

*Pearson Educ., Inc. v. Vergara*,
  09 Civ. 6832(JGK)(KNF), 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010) ..................... 327

*Pennsylvania v. West Virginia*,
  262 U.S. 553, 43 S. Ct. 658 (1923) ............................................................. 324

*People ex rel. Bennett v. Laman*,
  277 N.Y. 368 (1938) ...................................................................................... 351

*People ex rel. Spitzer v. Applied Card Sys., Inc.*,
  11 N.Y.3d 105 (2008) .................................................................................... 350

*People ex rel. Spitzer v. Gen. Elec. Co.*,
  756 N.Y.S.2d 520 (App. Div. 1st Dep't 2003) ............................................ 347

*People v. Dioguardi*,
  8 N.Y.2d 260 (1960) ...................................................................................... 45

*People v. Eichler*,
  26 N.Y.S. 998 (Gen. Term 1894) ................................................................. 143

*People v. Gardner*,
  144 N.Y. 119, 38 N.E. 1003 (1894) ............................................................. 45

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*,
  No. 12 Civ. 9070 (LLS), 2013 WL 3936191 (S.D.N.Y. July 30, 2013) ................... 202

*PI, Inc. v. Ogle*,
  932 F. Supp. 80 (S.D.N.Y. 1996) ................................................................. 211

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*,
  324 U.S. 806 (1945) ...................................................................................... 285

*Premium Mortgage Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009) ......................................................................... 212

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

*Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*,
896 F. Supp. 2d 198 (E.D.N.Y. 2012) ..................................................................... 214, 215

*Primetime 24 Joint Venture v. Nat'l Broad, Co., Inc.*,
219 F.3d 92 (2d Cir. 2000) ..................................................................... 149, 150

*Proctor & Gamble Co. v. Big Apple Industr. Bldg. Inc.*,
879 F.2d 10 (2d Cir. 1989) ..................................................... 194, 195, 197

*Professional Real Estate Investors Inc. v. Columbia Pictures Indust.*,
508 U.S. 49, 113 S. Ct. 1920 (1993) ..................................................................... 150

*Quanta Lines Ins. Co. v. Investors Capital Corp.*,
No. 06 Civ. 4624 (PKL), 2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009) ......................... 211

*R.A.V. v. City of St. Paul*,
505 U.S. 377, 112 S. Ct. 2538 (1992) ..................................................................... 147

*Raila v. United States*,
355 F.3d 118 (2d Cir. 2004) ..................................................................... 330

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ..................................................................... 322, 323

*Religious Tech. Ctr. v. Wollersheim*,
796 F.2d 1076 (9th Cir. 1986) ..................................................... 332, 336, 337

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
68 F.3d 1478 (2d Cir. 1995) ..................................................................... 217

*Republic of Ecuador v. Chevron Corp.*,
638 F.3d 384 (2d Cir. 2011) ..................................................................... 296, 297

*Republic of Ecuador v. Chevron Corp.*,
No. 10-1020-cv(L) (2d Cir. May 18, 2010) ..................................................................... 295

*Republic of Ecuador v. ChevronTexaco Corp.*,
376 F. Supp. 2d 334 (S.D.N.Y. 2005) ..................................................... 13, 14, 131

*Republic of Iraq v. ABB AG*,
920 F. Supp.2d 517 (S.D.N.Y. 2013) ..................................................................... 205

*Reuters Ltd. v. United Press Int'l, Inc.*,
903 F.2d 904 (2d Cir. 1990) ..................................................................... 325

*Reves v. Ernst & Young*,
507 U.S. 170, 113 S. Ct. 1163 (1993) ..................................................... 28, 31, 38, 44

*Rice v. Manley*,
66 N.Y. 82 (1876) ..................................................................... 213, 217, 218

*Rider v. Sandoz Pharms. Corp.*,
295 F.3d 1194 (11th Cir. 2002) ..................................................................... 90

*Robert Stigwood Grp. Ltd. v. O'Reilly*,
530 F.2d 1096 (2d Cir. 1976) ..................................................................... 292

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Rotella v. Wood,*
    528 U.S. 549, 120 S. Ct. 1075 (2000) ..................................................... 330, 339

*Rozier v. Ford Motor Co.,*
    573 F.2d 1332 (5th Cir. 1978) ........................................................................ 271

*Ruffing v. Union Carbide Corp.,*
    764 N.Y.S.2d 462 (App. Div. 2d Dep't 2003) ............................................... 214, 215, 218

*Russello v. United States,*
    464 U.S. 16, 104 S. Ct. 296 (1983) ................................................. 27, 338, 344

*Russian Media Grp., LLC v. Cable Am., Inc.,*
    598 F.3d 302 (7th Cir. 2010) ....................................................................... 328, 329

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
    241 F.3d 232 (2d Cir. 2001) .......................................................................... 329

*S.E.C. v. Constantin,*
    939 F. Supp. 2d 288 (S.D.N.Y. 2013) ......................................................... 319

*S.E.C. v. Fischbach Corp.,*
    133 F.3d 170 (2d Cir. 1997) .......................................................................... 350

*S.E.C. v. Great Am. Indus., Inc.,*
    407 F.2d 453 (2d Cir. 1968) .......................................................................... 347

*S.E.C. v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) .......................................... 9, 318, 319, 349, 352

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ........................................................................... 322, 327

*Schindler v. Issler & Schrage, P.C.,*
    262 A.D.2d 226 (1st Dep't 1999) .................................................................. 262

*Sciambra v. Graham News,*
    892 F.2d 411 (5th Cir. 1990) ........................................................................ 345, 346

*Sec. Pac. Mortg. & Real Estate Serv., Inc. v. Canadian Land Co. of Am., N.V.,*
    690 F. Supp. 1214 (S.D.N.Y. 1988) ............................................................. 291

*Secretary of the Interior v. California,*
    464 U.S. 312, 104 S. Ct. 656 (1984) ............................................................ 339

*Sedima v. Imrex Co.,*
    741 F.2d 482 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479, 105 S. Ct.
    3275 (1985) ..................................................................................... 27, 333, 338

*Sexual Minorities Uganda v. Lively,*
    12 Civ. 30051 (MAP), 2013 WL 4130756 (D. Mass. Aug. 14, 2013) ........... 149

*Sierra Rutile Ltd. v. Katz,*
    No. 90 Civ. 4913 (JFK), 1992 WL 236208 (S.D.N.Y. Sept. 8, 1992) ........... 313

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union,*
    585 F. Supp. 2d 789 (E.D. Va. 2008) ...................................................... 147, 148

*Soc'y of Lloyd's v. Ashenden,*
    233 F.3d 473 (7th Cir. 2000) ................................................................ 275, 279

*Sole Resort, S.A., de C.V. v. Allure Resorts Mgmt., LLC,*
    450 F.3d 100 (2d Cir. 2006) ......................................................................... 309

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
    531 U.S. 159, 121 S. Ct. 675 (2001) ........................................................... 336

*Soltex Polymer Corp. v. Fortex Indus., Inc.,*
    832 F.2d 1325 (2d Cir. 1987) ..................................................................... 328

*Sorota v. Sosa,*
    842 F. Supp. 2d 1345 (S.D. Fla. 2012) ........................................................ 203

*Sosa v. DirectTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) ....................................................................... 149

*Specialty Minerals, Inc. v. Pluess-Staufer AG,*
    395 F. Supp. 2d 109 (S.D.N.Y. 2005) .......................................................... 285

*Spira v. Nick,*
    876 F. Supp. 553 (S.D.N.Y. 1995) ......................................................... 153, 154

*Spool v. World Child Int'l Adoption Agency,*
    520 F.3d 178 (2d Cir. 2008) ......................................................................... 197

*St. Paul Mercury Indemnity Co. v. Red Cab Co.,*
    303 U.S. 283, 58 S. Ct. 586 (1938) ............................................................. 304

*Steele v. Bulova Watch Co.,*
    344 U.S. 280, 73 S. Ct. 252 (1952) ............................................................. 339

*Storm LLC v. Telenor Mobile Comms. AS,*
    No. 06 Civ. 13157(GEL), 2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006) ....................... 339

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) .......................................................................... 310

*Thomas v. Bryant,*
    614 F.3d 1288 (11th Cir. 2010) .................................................................... 324

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) .......................................................................... 322

*Title Ins. & Trust Co. v. Cal. Dev. Co.,*
    152 P. 542 (Cal. 1915) ................................................................................ 339

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ............................................................................ 325

*Town of Nassau v. Nalley,*
    52 A.D.3d 1013 (3d Dep't 2008) .................................................................. 320

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*,
    784 F. Supp. 2d 485 (S.D.N.Y. 2011) ........................................................................ 150

*Trane Co. v. O'Connor Sec.*,
    718 F.2d 26 (2d Cir. 1983) ........................................................................................ 338

*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*,
    623 F. Supp. 2d 518 (D. Del. 2009) .......................................................................... 272

*U.S. v. Console*,
    13 F.3d 641 (3d Cir. 1993) ........................................................................................ 201

*Union Carbide Corp. v. Montell N.V.*,
    9 F. Supp. 2d 405 (S.D.N.Y. 1998) .......................................................................... 216

*United Mine Workers v. Pennington*,
    381 U.S. 657, 85 S. Ct. 1585 (1965) ........................................................................ 148

*United States v. Ariza-Ibarra*,
    651 F.2d 2 (1st Cir. 1981) ......................................................................................... 317

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) .............................................................................. 151, 152

*United States v. Basciano*,
    599 F.3d 184 (2d Cir. 2010) ..................................................................................... 195

*United States v. Biaggi*,
    909 F.2d 662 (2d Cir. 1990) ..................................................................................... 141

*United States v. Boyd*,
    231 F. App'x 314 (5th Cir. 2007) ............................................................................. 147

*United States v. Brecht*,
    540 F.2d 45 (2d Cir. 1976) ......................................................................................... 45

*United States v. Bryce*,
    208 F.3d 346 (2d Cir. 1999) ..................................................................................... 315

*United States v. Carlo*,
    507 F.3d 799 (2d Cir. 2007) ..................................................................................... 154

*United States v. Carson*,
    52 F.3d 1173 (2d Cir. 1995) ......................................... 9, 318, 319, 341, 343, 344, 349, 352

*United States v. Cerilli*,
    603 F.2d 415 (3d Cir. 1979) ..................................................................................... 145

*United States v. Chao Fan Xu*,
    706 F.3d 965 (9th Cir. 2013) ............................................................ 200, 205, 206, 207

*United States v. Clemente*,
    640 F.2d 1069 (2d Cir. 1981) ................................................................................... 142

*United States v. Cohn*,
    452 F.2d 881 (2d Cir. 1971) ..................................................................................... 177

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Coiro*,
    922 F.2d 1008 (2d Cir. 1991) ........................................................... 163

*United States v. Daidone*,
    471 F.3d 371 (2d Cir. 2006) ............................................................. 195

*United States v. Desposito*,
    704 F.3d 221 (2d Cir. 2013) ............................................................. 163

*United States v. Eisen*,
    974 F.2d 246 (2d Cir. 1992) ............................................................. 184

*United States v. Enmons*,
    410 U.S. 396 (1973) ........................................................................ 145

*United States v. Enmons*,
    93 S. Ct. 1007, 35 L.Ed.2d 379 (1973) ........................................... 145

*United States v. French*,
    628 F.2d 1069 (8th Cir. 1980) ......................................................... 145

*United States v. Gambino*,
    566 F.2d 414 (2d Cir. 1977) ............................................................. 45

*United States v. Gonzalez*,
    12-CR-088S, 2013 WL 5973146 (W.D.N.Y. Nov. 8, 2013) ............... 314

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006) ............................................................. 45

*United States v. Gowing*,
    683 F.3d 406 (2d Cir. 2012) ............................................................. 336

*United States v. Hawley*,
    C 06-4087-MWB, 2011 WL 10483390 (N.D. Iowa Oct. 13, 2011) ............... 314

*United States v. Huber*,
    603 F.2d 387 (2d Cir. 1979) ....................................................... 28, 29

*United States v. Hutson*,
    843 F.2d 1232 (9th Cir. 1988) ......................................................... 147

*United States v. Indelicato*,
    865 F.2d 1370 (2d Cir. 1989) ............................................ 153, 194, 195

*United States v. Jackson*,
    180 F.3d 55 (2d Cir. 1999), *on reh'g*, 196 F.3d 383 (2d Cir. 1999) ............... 141, 144

*United States v. Jespersen*,
    65 F.3d 993 (2d Cir. 1995) ....................................................... 164, 171

*United States v. Johnson*,
    507 F.3d 793 (2d Cir. 2007) ............................................................. 314

*United States v. Kaplan*,
    490 F.3d 110 (2d Cir. 2007) ............................................................. 180

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Khan*,
    2008 WL 2323375 (E.D.N.Y. June 2, 2008) ................................................ 315

*United States v. Kumar*,
    617 F.3d 612 (2d Cir. 2010) ........................................ 162, 163, 169, 177

*United States v. LaFontaine*,
    210 F.3d 125 (2d Cir. 2000) ........................................................... 182

*United States v. Larson*,
    807 F. Supp. 2d 142 (W.D.N.Y. 2011) ............................................... 147

*United States v. LeMoure*,
    474 F.3d 37 (1st Cir. 2007) ........................................................... 184

*United States v. Lundwall*,
    1 F. Supp. 2d 249 (S.D.N.Y. 1998) ................................................... 184

*United States v. Manton*,
    107 F.2d 834 (2d Cir. 1938) ..................................................... 146, 273

*United States v. Markle*,
    628 F.3d 58 (2d Cir. 2010) ....................................................... 145, 292

*United States v. Milken*,
    Case No. § 89 Cr. 41 (S.D.N.Y. 1991) ................................................. 27

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994) ........................................................... 152

*United States v. Neapolitan*,
    791 F.2d 489 (7th Cir. 1986) ........................................................... 209

*United States v. Perez-Torres*,
    15 F.3d 403 (5th Cir. 1994) ........................................................... 297

*United States v. Philip Morris USA, Inc.*,
    783 F. Supp. 2d 23 (D.D.C. 2011) ..................................................... 203

*United States v. Price*,
    443 F. App'x 576 (2d Cir. 2011) ....................................................... 180

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
    44 F.3d 1082 (2d Cir. 1995) ............................................................. 29

*United States v. Pugh*,
    717 F. Supp. 2d 271 (E.D.N.Y. 2010) ................................................. 319

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006) ........................................ 162, 178, 179, 181

*United States v. Quinn*,
    514 F.2d 1250 (5th Cir. 1975) ......................................................... 147

*United States v. Rodolitz*,
    786 F.2d 77 (2d Cir. 1986) ............................................................. 179

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*United States v. Rosner*,
    352 F. Supp. 915 (S.D.N.Y. 1972) ................................................................. 169

*United States v. Ruggiero*,
    934 F.2d 440 (2d Cir. 1991) ................................................ 169, 170, 177

*United States v. Salerno*,
    868 F.2d 524 (2d Cir 1989) ...................................................................... 45

*United States v. Sasso*,
    215 F.3d 283 (2d Cir. 2000) ............................................................ 331, 342

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002) ..................................................................... 163

*United States v. Scopo*,
    861 F.2d 339 (2d Cir. 1988) ................................................................... 141

*United States v. Sheiner*,
    273 F. Supp. 977 (S.D.N.Y. 1967), *aff'd*, 410 F.2d 337 (2d Cir. 1969) ......... 153

*United States v. Solow*,
    138 F. Supp. 812 (S.D.N.Y. 1956)) .......................................................... 169

*United States v. Sturm*,
    870 F.2d 769 (1st Cir. 1989) ................................................................... 142

*United States v. Sun Myung Moon*,
    718 F.2d 1210 (2d Cir. 1983) ......................................................... 164, 176

*United States v. Teitler*,
    802 F.2d 606 (2d Cir. 1986) ................................................................... 184

*United States v. Thomas*,
    377 F.3d 232 (2d Cir. 2004) ................................................................... 153

*United States v. Thompson*,
    76 F.3d 442 (2d Cir. 1996) ..................................................................... 180

*United States v. Throckmorton*,
    98 U.S. 61 (1878) ................................................................................... 271

*United States v. Turkette*,
    452 U.S. 576, 101 S. Ct. 2524 (1981) ........................................................ 30

*United States v. Vegas*,
    27 F.3d 773 (2d Cir. 1994) ..................................................................... 315

*United States v. Viola*,
    35 F3d 37 (2d Cir. 1994) ........................................................................ 209

*United States v. Von der Linden*,
    561 F.2d 1340 (9th Cir. 1977) ................................................................. 144

*United States v. Walker*,
    191 F.3d 326 (2d Cir. 1999) ................................................................... 152

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991) ........................................................................ 152, 154

*United States v. Warledo*,
557 F.2d 721 (10th Cir. 1977) ............................................................................ 146

*United States v. Zappola*,
523 F. Supp. 362 (S.D.N.Y. 1981)
*aff'd*, 677 F.2d 264 (2d Cir. 1982) ............................................... 142, 143, 145, 292

*United States v. Zeyra*,
983 F.2d 1080 (9th Cir. 1993) ............................................................................ 315

*V Cars, LLC v. Isr. Corp.*,
902 F. Supp. 2d 349 (S.D.N.Y. 2012) ................................................................. 306

*Vodrey v. Golden*,
864 F.2d 28 (4th Cir. 1988) ................................................................................. 130

*W. Gillette v. Ariz. Corp. Comm'n*,
121 Ariz. 541 (Ariz. Ct. App. 1979) ................................................................... 272

*William Whitman Co. v. Universal Oil Prods. Co.*,
125 F. Supp. 137 (D. Del. 1954) ................................................................. 217, 349

*Windsurfing Int'l Inc. v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986) ............................................................................ 327

*Wiwa v. Royal Dutch Petrol., Co.*,
226 F.3d 88 (2d Cir. 2000) .................................................................................. 307

*Yak v. Bank Brussels Lambert*,
No. 99 Civ. 12090 (JGK), 2002 WL 31132963 (S.D.N.Y. Sept. 26, 2002) ................... 265

*Zino Davidoff SA v. CVS Corp.*,
571 F.3d 238 (2d Cir. 2009) ................................................................................ 336

*Zucker v. Baker*,
35 Misc.2d 841 (Sup. Ct. Queens Cnty. 1962) .................................................... 308

## Statutes

15 U.S.C. § 10(b) ....................................................................................................... 200

15 U.S.C. § 4 .............................................................................................................. 336

15 U.S.C. § 78dd-3 .............................................................................................. 29, 184

15 U.S.C. § 78dd-3(f)(2)(A) ................................................................................... 189

18 U.S.C. § 1341 ......................................................................................................... 29

18 U.S.C. § 1343 ......................................................................................................... 29

18 U.S.C. § 1503 .................................................................................................. 29, 162

18 U.S.C. § 1512 .................................................................................................. 29, 183

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

18 U.S.C. § 1512(b) ........................................................................................................ 177

18 U.S.C. § 1951 ............................................................................................................. 29

18 U.S.C. § 1951(b)(2) .................................................................................................... 45

18 U.S.C. § 1952 ...................................................................................................... 29, 184

18 U.S.C. § 1956(a)(2) .................................................................................................. 158

18 U.S.C. § 1956(a)(2)(A) ............................................................................. 29, 158, 159

18 U.S.C. § 1961 ............................................................................................................ 177

18 U.S.C. § 1961(1) .................................................................................................. 29, 184

18 U.S.C. § 1961(1)(A) ................................................................................................... 29

18 U.S.C. § 1961(1)(B) ................................................................................................... 29

18 U.S.C. § 1961(4) .................................................................................................. 28, 30

18 U.S.C. § 1961(5) ....................................................................................................... 193

18 U.S.C. § 1962 ........................................................................................................... 305

18 U.S.C. § 1962(c) ............................................................... 28, 38, 193, 197, 200

18 U.S.C. § 1962(d) ....................................................................................................... 209

18 U.S.C. § 1964(a) ................................... 10, 328, 330, 332, 336, 340, 341, 342, 344

18 U.S.C. § 1964(b) ....................................................................................................... 331

18 U.S.C. § 1964(c) ............................ 28, 29, 197, 328, 332, 334, 345, 352

18 U.S.C. § 1965(a) ....................................................................................................... 305

18 U.S.C. §§ 1961–1968 ................................................................................................. 44

28 U.S.C. § 1331 ........................................................................................................... 303

28 U.S.C. § 1332 ........................................................................................................... 303

28 U.S.C. § 1651(a) ....................................................................................................... 333

28 U.S.C. § 1782 ............................................................ 22, 161, 162, 163, 228, 229

8 N.Y.2d at 271–72 .......................................................................................................... 45

Ecuadorian Environmental Management Act of 1999 .................................................... 17

N.Y. Jud. Law § 487 (McKinney 2013) ................................................... 260, 261, 265

N.Y. Penal Law § 110.00 ................................................................................................ 29

N.Y. Penal Law § 155.05(2)(e) (McKinney 2013) .................................................. 29, 45

New York Judiciary Law § 487 ...................................................................................... 24

Pub. L. No. 104-67, 109 Stat. 737, § 107 (1995) ......................................................... 337

Pub. L. No. 91-452, § 904(a) (1970) ....................................................... 10, 329, 332

# TABLE OF AUTHORITIES *(continued)*

Page(s)

## Other Authorities

30C Charles Alan Wright, et al., Fed. Prac. & Proc. § 7090 (2d ed.)......................................... 314

67A N.Y. Jur. 2d Injunctions § 140 ...................................................................... 349

*Black's Law Dictionary* (9th ed. 2009).................................................................. 261

Charles Alan Wright et al., *Federal Practice & Procedure* § 2311 (3d ed. 2013).................... 346

G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO:*
    *Reflections on* Religious Technology Center v. Wollersheim:
    *Will Civil RICO Be Effective Only Against White-Collar Crime?,*
    62 Notre Dame L. Rev. 526, 528 (1987).................................. 329, 331, 332, 334, 335, 337

J. Pomeroy, A Treatise on Equity Jurisprudence § 399 .............................................. 289

Jeanneth Valdivieso, *Ecuador Names 1st Female Defense Chief*, Washington Post, Dec.
    27, 2006............................................................................................... 53

Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation,
    Banking and Business Law 55–56 (1985)........................................................ 27

Restatement (Second) of Torts § 682, comment a (1977) ........................................... 130

Restatement (Third) of Foreign Relations Law § 482 cmt. b (1987)............................... 275

Sanders, Alain; Painton, Priscilla (1989-08-21), *Law: Showdown At Gucci*, Time .................... 28

Stephan Küffner, *Ecuador Officials Linked to Colombia Rebels*, Time, Dec. 15, 2009 ............ 53

W. Page Keeton et al., *Prosser and Keeton on Torts* § 105 at 728 (5th ed. 1984).................... 217

Wright & Miller, Federal Practice and Procedure, § 3708 (4th ed. 2013)................................ 303

## Rules

Fed. R. Cir. P. 4(k)(1)(A)..................................................................................... 304

Fed. R. Evid. 401 ............................................................................................... 312

Fed. R. Evid. 402 ............................................................................................... 312

Fed. R. Evid. 403 ............................................................................................... 312

Fed. R. Evid. 804(b)(1) ....................................................................................... 314

Fed. R. Evid. 806 ............................................................................................... 314

Fed. R. Evid. 807 ............................................................................................... 314

N.Y. CPLR § 301 ......................................................................................... 305, 306

N.Y. CPLR § 302(a)(1).......................................................................................... 308

N.Y. CPLR § 302(a)(2).......................................................................................... 308

N.Y. CPLR § 5303 ........................................................................................ 267, 296

N.Y. CPLR § 5304(a) ........................................................................................... 296

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

N.Y. CPLR § 5304(a)(1) ........................................................................................ 269, 273, 279

N.Y. CPLR § 5304(b) ........................................................................................................ 296

N.Y. CPLR § 5304(b)(3) .................................................................................................... 269

N.Y. CPLR § 5430(b)(3) .................................................................................................... 296

## TABLE OF DEFINED TERMS AND ABBREVIATIONS

| | |
|---|---|
| Burford | Burford Capital LLC |
| Beltman | Douglas Beltman, former employee of Stratus |
| Bogart | Christopher Bogart, CEO of Burford |
| Cabrera | Richard Stalin Cabrera Vega |
| Cabrera report | The expert report submitted in the Lago Agrio litigation under the name of the court-appointed expert, Cabrera |
| Chevron | Plaintiff Chevron Corporation |
| Defendants | All Defendants to this action |
| Donziger | Defendants Steven R. Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC |
| Emery Celli | Emery Celli Brinckerhoff & Abady LLP |
| Ex. | Exhibits to the concurrently filed Declaration of Jason B. Stavers in Support of Chevron Corporation's Post-Trial Memorandum of Law |
| FF | Chevron's concurrently filed Proposed Findings of Fact |
| Fajardo | Defaulted Defendant Pablo Estenio Fajardo Mendoza |
| Fajardo declaration | Declaration signed by Pablo Fajardo, dated May 5, 2010, and filed by the LAP team in at least 17 different U.S. courts |
| Guerra | Former Ecuadorian judge Alberto Guerra Bastidas |
| Hinton | LAP team spokesperson Karen Hinton |
| Kohn Swift | Kohn, Swift & Graf P.C. |
| Lago Agrio litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador |
| Lago Agrio judgment | The $18.2 billion judgment entered in the Lago Agrio litigation on February 14, 2011 |
| LAP team | The lawyers and other representatives of the LAPs and their agents and employees, including but not limited to Donziger, Fajardo, Yanza, Stratus, Julio Prieto, Juan Pablo Saenz, Selva Viva, and the Amazon Defense Front |

| | |
|---|---|
| LAPs | The plaintiffs in the Lago Agrio Litigation, including appearing Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje |
| Maest | Ann Maest, former employee of Stratus |
| Motley Rice | Motley Rice LLC |
| Patton Boggs | Patton Boggs LLP |
| ROE | The Republic of Ecuador |
| Stratus | Stratus Consulting, Inc. and, where the context indicates, Beltman and Maest |
| TexPet | Texaco Petroleum Company, a subsidiary of Texaco |
| Tr. | Transcript from the trial in this action |
| Yanza | Defaulted Defendant Luis Francisco Yanza Angamarca |
| Zambrano | Former Ecuadorian judge Nicolas Augusto Zambrano Lozada |

## PRELIMINARY STATEMENT

"If you repeat a lie a thousand times it becomes the truth."  PX 1059.  Over the course of this seven-week trial, Chevron presented testimony, documents, and video that established in extraordinary detail the myriad ways in which Steven Donziger and his cohorts adhered to this credo, lying to Chevron, to the press, to U.S. courts, to U.S. federal and state regulatory agencies, to foreign authorities, and even to each other, all to further their constant goal:  to try to extort and defraud Chevron out of billions of dollars.  But none of these lies, either by dint of repetition or force of wishing, became the truth.  Instead, over time, they ripened into a criminal enterprise, exposing their purveyors and their co-conspirators to sanctions provided by United States and New York law.  This Court, as the finder of fact, should now hold Defendants accountable.

"The nice thing about a trial," as Donziger's counsel put it, "is that it gives both sides at the same time [the opportunity] to present the fact finder with the evidence, all the evidence either side thinks is relevant[.]"  Tr. (Donziger Opening) 24:5–8.  After more than three years of evasion, Defendants promised to respond and provide "context" to the incriminating evidence against them.  But they never did.  In fact, the trial was marked by Defendants' total failure to explain, rebut, or disprove a single piece of evidence or allegation.

Chevron submitted forensic evidence and eyewitness testimony showing that Defendants ghostwrote the $18 billion Ecuadorian judgment they obtained against Chevron.  In response, Defendants proffered former Ecuadorian judge Nicolas Zambrano as the judgment's supposed sole author.  He testified repeatedly that the judgment was typed on his "new" computer, but this contradicts the forensic expert declaration Defendants themselves proffered, which attested that a draft of the judgment was found on the old computer.  It also contradicts the documents showing the date the "new" computer was purchased and shipped to Ecuador.  Zambrano was unable to answer even the most basic questions about the judgment he supposedly wrote, and he had no

1

plausible explanation for the judgment's reliance on foreign law or inclusion of English words whose meaning he did not know.  Neither he nor Defendants could explain how internal memos, emails, and database entries from Defendants' own confidential files appear verbatim in the judgment, even though they are not in the court record.

Chevron submitted voluminous evidence from Defendants' files and adduced testimony from Defendants confirming that Donziger's team ghostwrote the report of court expert Richard Cabrera, objected to it, ghostwrote Cabrera's response, and then touted the report in the United States as the "independent" findings of the Ecuadorian court's "special master."  At trial, Defendants insisted that Cabrera "adopted" the report, but their own correspondence shows that they were revising it until immediately before they printed it for Cabrera to pick up and file, and Defendants offer no evidence that Cabrera had any input into its contents, or that he even read it. They could offer only Donziger's self-serving testimony that *he* considered Cabrera to be "independent" even though Donziger himself oversaw the drafting of the report, arranged for undisclosed payments to Cabrera from Defendants' "secret account," and clandestinely met with Cabrera—all while Defendants and Cabrera denied this in numerous statements in court and in public.  And Defendants did not ever attempt to justify their indefensible actions in objecting to the "Cabrera" report they had just ghostwritten, and then secretly drafting Cabrera's response accepting their objections and jacking the damages up to $27 billion.

Chevron submitted dozens of examples of Defendants' consciousness of wrongdoing, including the use of code names and secret accounts, denials to the Ecuadorian court of the "infamy" that they were working with the "independent" court expert, and admissions that, once the truth came out, it would "destroy" their case and all of them "might go to jail."  PX 1279.

At trial, under oath, Donziger claimed that he was just an "advisor" to the Ecuadorians

and served at Pablo Fajardo's "pleasure."  DX 1750 (Donziger) ¶ 10.  But more than a decade of correspondence, financial records, and contracts shows that Donziger had practical, legal, and economic control over every facet of their campaign against Chevron, and that he dominated every decision, large and small.  Similarly without basis was the testimony of Donziger's public relations advisor, Karen Hinton, who swore under oath that her $10,000-per-month retention was not part of a scheme to force Chevron to settle the lawsuit (*see* DX 1500 (Hinton) ¶ 11), when her own strategy documents and years of correspondence with Donziger prove that was exactly what they sought to do—and what they still seek to do:  "push[] ChevronTexaco to settle the lawsuit in the near future."  PX 1034.

Thus, this trial record proved what Chevron has been saying all along—that Donziger, who professes merely to be a lawyer representing clients, is, in reality, a liar, con man, and criminal who has headed a racketeering enterprise targeting Chevron as its deep-pocketed victim. Indeed, Chevron has now put before this Court an extensive, detailed, and unrebutted evidentiary record that Defendants have been attempting to extort billions of dollars through repeated acts of fraud, bribery, money laundering, obstruction of justice, and other crimes.  Donziger and his co-conspirators, including his clients, defendants Hugo Camacho and Javier Piaguaje, are pursuing a pressure campaign of civil litigation, criminal prosecutions, and media harassment against the company.  Acting with the avowed support of the Ecuadorian government, they are trying to "raise the cost" and "pain" (PX 15; PX 15A at 3, 7) to Chevron of continuing to defend against their pressure tactics and sham lawsuit.  Their intent is to force Chevron to settle on Defendants' terms, rather than absorb the economic losses Defendants can inflict through their illegal acts. All this, to enrich and aggrandize themselves.  Indeed, Donziger himself stands to personally make $600 million or more if this scheme succeeds.  Chevron asks this Court to exercise its equi-

table power to prevent Defendants from profiting from their crimes, and to remedy the harm to Chevron.

**1. RICO and fraud.** Defendants' scheme consists of multiple components, but at its heart, it is an extortionate campaign of public and private pressure based on lies. Defendants even created an internal matrix of U.S. targets for what they called their "Chevron Pressure" campaign, including Congress, the SEC, state attorneys general, and Chevron shareholders. PX 2413. Defendants seek to instill in Chevron a fear of economic harm by disseminating false allegations that supposedly "independent" experts and courts have determined that Chevron is liable for environmental harms caused by oil operations conducted in the Amazon basin by Texaco between 1960 and 1990. (Only Ecuador's state-owned oil company, Petroecuador, has been drilling and spilling in the Amazon in the more than two decades since then. And only later did Texaco become a subsidiary of Chevron, which never did business in Ecuador.) Defendants have made these allegations in the press, trying to damage Chevron's reputation. They have repeated these allegations to U.S. government officials, hoping to induce investigations and public criticism of Chevron. And they have trumpeted their falsehoods to Chevron shareholders, attempting to suppress the value of Chevron's equity and thereby prompt shareholder unrest, and to control the company's management by proxy. To fund their continuing enterprise, they have deceived litigation investors, raising millions of dollars through fraudulent misrepresentations—money they have poured back into their pressure campaign against Chevron. And at all times they have made clear that a multi-billion dollar cash payment will be required to terminate their campaign and the economic burden it imposes on the company.

Defendants have manufactured "evidence" in the United States to support their allegations and for use in both the U.S. and Ecuador, in the process capturing the judiciary and con-

verting it into a tool of their extortionate scheme.  Over the past decade, they have graduated from forgery and intimidation to bribery and ghostwriting of court documents, including the multi-billion-dollar judgment in their own favor.  They colluded with the Ecuadorian court to appoint Richard Cabrera as an "independent" court expert whose report they expected to provide the basis for the final judgment.  Defendants entered into a secret contract with Cabrera, paid him under the table, and ghostwrote the report he would submit under his own name.  They then cited that report in the United States (where they had secretly written it in the first place) and trumpeted it repeatedly as an "independent" report by a "Special Master" supposedly validating their allegations.  PX 314R; PX 4400 (Kim) ¶ 12.  For years, this was the centerpiece of Defendants' scheme, and it was to defend itself against Defendants' ongoing efforts to injure Chevron based on this lie, and others, that Chevron brought this action.

But when Defendants' scheme to influence the events in the Lago Agrio litigation through their captive "special master" began to unravel in the face of Chevron's discovery in this Court and others, Defendants extended their pattern of racketeering and fraud to include an even more audacious scheme—they bribed the presiding judge in the Lago Agrio litigation with the promise of a $500,000 stake in the judgment, and in return he signed the $18 billion judgment they secretly ghostwrote for him.

In Ecuador and around the world, Defendants are bringing enforcement lawsuits based on their fraudulent Ecuadorian judgment, multiplying the proceedings in which Chevron has to defend against Defendants' attacks, and using attachments, seizures, and other tactics to cause Chevron economic harm and to enrich themselves.  Their vexatious enforcement campaign is proceeding as planned by their U.S. counsel, Patton Boggs, endorsed by Donziger, and memorialized in a memorandum entitled "Invictus."  PX 1407 at 7–35.  Defendants are "selecting juris-

dictions that offer the path of least resistance" and allow "prejudgment attachments" (*id.* at 18, 20), to "compound the pressure already placed on Chevron" (*id.* at 20).  To date, Defendants have brought these actions in Argentina, Brazil, and Canada, as well as Ecuador.  They continue to threaten to bring dozens more.  Based on the false premise that the assets of Chevron subsidiaries may be "deemed" assets of Chevron Corporation, Defendants have seized intellectual property assets in Ecuador, causing millions of dollars in harm to Chevron subsidiary Chevron Intellectual Property LLC (PX 6000 (Anson) ¶¶ 48–49), and have forced Chevron and its subsidiaries to incur millions of dollars in legal fees to defend against their enforcement efforts in Canada (PX 3000 (Veiga) ¶ 132).  Defendants have made no attempt to enforce the Ecuadorian judgment in the United States—despite the fact that Chevron itself is located here and has sufficient assets to satisfy the judgment here—because Defendants know that any U.S. court will see their judgment for the fraud that it is.

Chevron has presented at trial overwhelming evidence of Defendants' misconduct.  This Court has, in evidence, thousands of Defendants' own contemporaneous communications, memoranda, and other documents.  At trial, 24 witnesses testified live in Chevron's case-in-chief, and another 23 witnesses testified via deposition.  These witnesses included numerous former participants in Defendants' scheme, including Defendants' former counsel, former environmental consultants, former employees, former funders, and even former Ecuadorian collaborators Alberto Guerra and Fernando Reyes.  Chevron has also supplied this Court with hours of video from the outtakes of *Crude*.  This mountain of evidence proved Chevron's case beyond any reasonable doubt, far exceeding its "fairly light" burden of proof—"preponderance of the evidence."  *Fleet Bus. Credit, L.L.C. v. Global Aerospace Underwriting Mgrs. Ltd.*, 812 F. Supp. 2d 342, 354 (S.D.N.Y. 2011).  Indeed, Chevron here "need only prove that its version of the facts is more

probable than its adversary's."  *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 277–78

(2d Cir. 2012).  And even for Chevron's allegations of fraud, where its burden is "clear and con-

vincing" (*Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)), the evidence of

Defendants' fraud is not merely convincing, but overwhelming.

      In fact, Defendants failed to meaningfully contest Chevron's claims.  Donziger had no

explanation for why, if Defendants' contacts with Cabrera were permissible, Defendants hid

those contacts from the Ecuadorian court and from members of their own team, or why Defend-

ants obstructed justice to prevent the truth from being revealed in the Section 1782 actions.

While Donziger claimed for the first time at trial that he has "a variety of explanations" (Tr.

(Donziger) at 2600:9) for how Defendants' unfiled work product wound up in the judgment, he

and his co-Defendants proffered none because they have none.  And the judgment's signatory,

Zambrano, could not identify even basic facts about the judgment he supposedly wrote.  Indeed,

Zambrano admitted that Guerra ghostwrote orders for him in other cases, that he deposited mon-

ey into Guerra's bank account, and that he had no idea what the English word, "workover,"

meant (Tr. (Zambrano) 1630:22–24, 1642:6–8, 1712:13), even though it appears twice in the Ec-

uadorian judgment.  Moreover, Defendants proposed a witness, Ecuadorian computer analyst

Milton Efrain Jaque Tarco, who contradicted Zambrano's testimony that he wrote the judgment

on his "new computer" (*id.* (Zambrano) at 1658:12–1659:6; PX 7772).  HP shipping records and

Ecuadorian judicial inventories further confirmed that Zambrano was lying.  It came as no sur-

prise, then, after Zambrano's testimony, that Defendants decided not to call Mr. Tarco to testify.

And Donziger's claim that he made "inconsequential errors" (Tr. (Donziger) 2610:1–3) and was

removed from his position as the U.S. coordinator for the Defendants was belied by Defendants'

own exhibit:  minutes from a January 2013 Asamblea meeting.  According to those minutes,

Donziger's "withdrawal" was merely "temporary" even though his transgressions were "serious," but he did not act "alone," and "there would have been a RICO case" in any event due to "Cabrera and the judgment."  PX 7033A at 4.

2.  **Discovery obstruction and adverse inferences.**  Chevron would have been able to provide this Court with even more evidence supporting its claims if not for Defendants' repeated obstruction.  During the § 1782 proceedings, Donziger and his co-conspirators attempted to convince Dr. Charles Calmbacher not to testify, tried to persuade Stratus's counsel to cancel depositions, lied to co-counsel about the propriety of Defendants' contacts with Cabrera, submitted the misleading Fajardo declaration to 17 U.S. courts (including here in the S.D.N.Y.), adopted an intentional delay strategy to prevent their misdeeds from coming out for as long as possible, simultaneously seeking to "cleanse" the Ecuadorian record of the Cabrera fraud through the submission of new expert reports based on Cabrera's, and intentionally withheld responsive documents from production in this case.  Even if belatedly, Chevron eventually obtained much of the information sought through its § 1782 subpoenas, but Defendants successfully obstructed Chevron's attempts to obtain evidence in this action, including any evidence whatsoever from Ecuadorian counsel.  Defendants defied this Court's order to produce Ecuadorian documents, ginned up a ruling issued in the collusive *Cordova* action that they claimed prevented their Ecuadorian counsel from providing "any information" to this Court (Dkt. 1529 at 25–26)—even though their Ecuadorian counsel regularly produced documents at Donziger's request before and since, providing many of Defendants' trial exhibits, including Asamblea meeting minutes.  Defendants' Ecuadorian co-conspirators, including Pablo Fajardo, Luis Yanza, Julio Prieto, and Juan Pablo Saenz, have defaulted in this action, refused to appear for depositions, and declined to testify in this action—even as Fajardo and others submitted declarations to this Court.  Numerous percipi-

ent witnesses, including Aaron Marr Page and Atossa Soltani, attended the trial but resisted discovery and declined to take the witness stand.  And Defendants even provided declarations from supposed computer forensics expert Milton Efrain Jaque Tarco and supposed Zambrano typist Evelyn Calva seeking leave to allow them to testify, but then declined to bring them to the United States once it became clear that their testimony would reveal that Defendants, not Zambrano, were the actual authors of the Ecuadorian judgment.  Although the affirmative evidence Chevron presented at trial—coupled with Defendants' failure to rebut any of it—is more than sufficient to carry Chevron's burden on all of its claims, the Court should draw adverse inferences against the Defendants as a result of this obstruction.  In particular, this Court should infer from Defendants' obstructions that they are aware that their conduct was criminal and improper.  Indeed, the adverse inferences to be drawn here go to virtually every allegation in this case, including the Cabrera ghostwriting/fraud and the Zambrano judgment ghostwriting/fraud.

    **3.  Relief.**  Chevron has demonstrated the need for judicial intervention, as Defendants' conspiracy grinds toward its goal of extorting billions of dollars from Chevron.  This Court's authority to provide relief is beyond reasonable dispute, as it has the "'broad discretion to enjoin possible future violations of law where past violations have been shown.'"  *United States v. Carson*, 52 F.3d 1173, 1183–84 (2d Cir. 1995) (quoting *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)).  Chevron requests that this Court draw upon its fundamental equitable authority to stop Defendants' wrongful conduct in its tracks, before Chevron suffers further injury.  Specifically, as outlined below, Chevron seeks to preclude Defendants from committing further RICO violations and further acts of fraud.  Chevron's proposed RICO and fraud injunctions would prohibit Defendants and their agents from, among other things, seeking to monetize or profit from the fraudulent Lago Agrio judgment, or from filing or prosecuting any

actions to enforce the judgment in the United States, and would order disgorgement of any proceeds flowing from Defendants' misconduct.  Chevron does not, however, seek to prevent Defendants from filing or litigating enforcement actions *outside* the United States—even though such relief would be legally permissible and warranted under the circumstances.

The RICO statute authorizes this Court to find Defendants in violation of the statute and then to enter injunctive relief against these civil Defendants.  *See Califano v. Yamasaki*, 442 U.S. 682, 705, 99 S. Ct. 2545, 2549 (1979).  The RICO statute empowers courts to "prevent and restrain" RICO violations through injunctive relief (18 U.S.C. § 1964(a)), and nowhere limits injunctive relief solely to actions initiated by the government.  Rather, Congress has instructed that RICO is to "be liberally construed to effectuate its remedial purposes."  Organized Crime Control Act, Pub. L. No. 91-452, § 904(a), 84 Stat. 922–947 (1970).  In the absence of "the clearest command to the contrary from Congress"—and no such command has been issued regarding RICO—this Court retains its "equitable power to issue injunctions."  *Califano*, 442 U.S. at 705.  This is why the weight of authority—including the Seventh Circuit in *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393, 123 S. Ct. 1057 (2003), and Judge Rakoff in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003), and the original architect of the RICO statute, Professor Robert Blakey—recognizes that RICO permits private plaintiffs to obtain injunctive and other equitable relief, consistent with the statute's broad remedial purposes.

Equitable relief is also available as a remedy for Chevron's fraud claims under New York state law.  Defendants have repeated their lies to their own funders, to U.S. and foreign courts, and to U.S. and foreign government authorities, and in reliance on those falsehoods, defrauded

10

funders provided Defendants with the millions of dollars Defendants have used to injure Chevron; and courts and other government authorities have slowed Chevron's discovery into Defendants' wrongful conduct, attached assets of Chevron affiliates, and initiated investigations and prosecutions that have further injured Chevron.  This is fraud, through and through.  It meets all the traditional elements of a fraud claim—false statements, reliance, and resulting injury—and New York does not foreclose an action for fraud where the plaintiff's injury was caused by a third party's reliance on false statements.  Moreover, New York law recognizes that equitable relief is available to a prevailing fraud plaintiff.  *See, e.g.*, *Adams v. Gillig*, 199 N.Y. 314, 322 (1910) ("Equity will interfere to grant relief where necessary to prevent the consummation of a fraud.").  In fact, equitable relief from judgments procured by corruption or fraud is well established.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944).  As befits a court sitting in equity, this Court should apply the doctrine of fraud in a flexible manner, so as to prevent injustice.

In addition, and independent of any equitable remedies, RICO also authorizes private plaintiffs to sue for RICO violations and permits the Court to award attorneys' fees upon finding that the plaintiff has been "injured" by a defendant's conduct.  18 U.S.C. § 1964(c).  Thus, regardless of the availability or scope of any equitable relief here, the Court should determine Donziger's RICO liability and then issue Chevron an award of attorney's fees as an independent form of relief.

**4.  Affirmative defenses.**  Defendants have failed to prove any affirmative defense, let alone a defense that would foreclose Chevron's right to equitable relief.  At both the opening of trial and at its closing, Donziger's counsel promised the Court that "the time for name calling is over" (Tr. (Donziger Opening) 24:45), yet when he took the stand to defend himself, "name-

calling" was all Donziger could offer, repeating his admittedly unsubstantiated smears against Chevron.  Accordingly, Defendants' centerpiece affirmative defense—unclean hands—went no-where.  Defendants failed to prove that Chevron acted improperly in any way and have not even attempted to show that they were injured by any purported Chevron conduct.

Defendants' claim of extraterritoriality likewise fails.  This action does not require an ex-traterritorial application of U.S. law, as Chevron has proven both a domestic pattern and (to the extent required) a domestic enterprise.  The majority of the conspirators were American, carrying out their fraudulent scheme largely in and from the United States through evidence manufactured here, for the purposes of extorting an American company.

Defendants' repeated claims of being so impoverished that they cannot possibly defend themselves as a matter of "due process" have also been proven false.  Defendants were forced to admit at trial that they have received more than $25 million in funding from Donziger's friend, Russell DeLeon, in addition to $11 million they secured from the funders they defrauded, Kohn Swift and Burford Capital, another $2.5 million they received earlier this year from Woodsford, the $250,000 also recently raised by Donziger for his defense of this action, and Donziger's re-cent trust fund payouts of $1.9 million (obtained by means of lawsuits against family members or their lawyers).  Finally, Defendants' affirmative defense of collateral estoppel not only fails; it triggers the recognition analysis they tried previously to avoid, which compels the conclusion that the Ecuadorian judgment is the product of fraud and a foreign judicial system that lacks fun-damental fairness and due process.  For these reasons, the Ecuadorian judgment cannot be recog-nized or enforced.

*     *     *

In sum, Chevron has established, by far more than a preponderance of the evidence, that

12

Donziger and his enterprise have engaged in a pattern of racketeering that has included frauds, extortion, and obstruction of justice.  Chevron has likewise established that Defendants' scheme is based entirely upon fraudulent statements that have injured Chevron.  In response, Donziger has offered only partial, vague, and self-serving denials that lack any credibility when stacked up against the avalanche of contemporaneous documents, videotape, and testimony from his former cohorts, proving his malfeasance.  This Court should therefore put a halt to Defendants' ongoing efforts to extort a multi-billion dollar payday out of Chevron.  The Court should find Defendants liable for their racketeering and fraud against Chevron, based on factual findings detailing their RICO and fraud violations, and then enter appropriate equitable relief, including an injunction prohibiting these Defendants and those acting in concert with them from profiting from their misconduct, and separately, award Chevron its costs of suit, including its attorneys' fees.

## FACTUAL BACKGROUND

This section sets forth a summary of the relevant events and case history up to and including trial.  It is followed by a section that contains a more detailed exposition of the witnesses and documentary evidence proving each of Chevron's claims.  Chevron also now separately files its Proposed Findings of Fact, each of which includes a comprehensive list of supporting evidence.  And Chevron now provides detailed timelines, with references to relevant trial exhibits and witness testimony, which are attached here as Appendices A–J.

### A.  TexPet, Remediation, and Release

Beginning in 1964, Texaco Petroleum Company ("TexPet"), a subsidiary of Texaco, Inc., participated in a consortium in the Oriente region of Ecuador, together with Gulf Oil and Ecuador's state-owned oil company, CEPE—later renamed Petroecuador.  *See Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 339–40 (S.D.N.Y. 2005).  From 1967 until 1990, this consortium managed oil operations in the area defined by the agreement.  During the life of

the consortium, from 1964 to 1992, it generated $23 billion for the Republic of Ecuador.  Over

that same period, TexPet realized only $500 million, or about 2.5% of the consortium's revenues.

PX 3000 (Veiga) ¶ 16.  The money generated by the consortium represented more than 50% of

Ecuador's gross national product during the period.

In 1990, Petroecuador took over the consortium's operation, and in 1992, after the gov-

ernment declined TexPet's proposal to continue in the consortium, Petroecuador became the

100% owner of all former consortium operations.  *Republic of Ecuador*, 376 F. Supp. 2d at 339–

41; PX 3000 (Veiga) ¶¶ 17–18.  At that point, TexPet and Ecuador hired two separate independ-

ent consulting firms to audit the environmental impact of the consortium's operations.  These

audits found minimal environmental impact and recommended that certain remedial actions be

taken.[1]

TexPet agreed to participate in a remediation program in exchange for a release from any

liability arising out of the consortium's operations.[2]  Although the Ecuadorian government

acknowledged Petroecuador's share of responsibility as the 62.5% majority owner of the former

consortium,[3] Petroecuador in the end refused to participate in the planned remediation.  In lieu of

a joint remediation effort, the parties agreed that TexPet would perform a specified scope of re-

mediation work reflecting its approximately one-third minority share in the consortium as con-

sideration for a full release, leaving Petroecuador, as majority owner, responsible for any remain-

---

[1]  *See* PX 8035 (Fugro McClelland (West), Inc. Environmental Field Audit for Practices from 1964–1990, Petroecuador-Texaco Consortium Oriente, Ecuador, Oct. 1992) at Part 7; PX 8036–PX 8037 (HBT Agra Ltd. Environmental Audit and Assessment of the Petroecuador-Texaco Consortium Oil Fields Until June 30, 1990, Oct. 1993) at Part 10.

[2]  *See* PX 215 (1/6/1990 Letter from Warren Gillies, General Manager, Texaco Petroleum Co., to Diego Tamariz Serrano, Minister of Energy and Mines); PX 221# (11/9/1994 Report of the Special Permanent Environmental Commission of the Ecuadorian National Congress) at 2.

[3]  PX 217 (1/6/1992 Letter from Nat. Hydrocarbons Dir. to Rafael Almeida Mancheno, Minister of Energy and Mines).

ing remediation as part of its ongoing operation and management of the former concession fields.

This agreement reflected an open and transparent process in which local political leaders, community members, and environmental organizations, including defaulted defendants the Amazon Defense Front and Luis Yanza, participated. It committed TexPet to a scope of work that was "designed to resolve the problems . . . caused by oil operations of the Consortium, . . . taking into consideration the inhabitants of the Oriente region." PX 222 § V. The result was the 1995 settlement agreement. PX 223.

From 1995 to 1998, TexPet performed its share of the remediation at a cost of $40 million. At the time, LAP defendant Hugo Camacho, then the municipal president of Pimampiro, wrote to the CEO of TexPet expressing "a testimony of real gratefulness . . . for the environmental remediation work performed" by TexPet, which he called "fully and satisfactorily completed" and said produced a "positive outcome for the local population." PX 244. Ecuador and Petroecuador supervised the remediation work—and at times demanded additional work— and in 1998 certified TexPet's full performance of its remedial obligations and its funding of the designated socioeconomic programs. PX 246. The certification "release[d], absolve[d] and discharge[d] TexPet" from "any liability and claims" arising out of the consortium's operations. PX 246 § IV; *see also* PX 228 at 5 ("proceed to exempt, release, exonerate and relieve forever Texaco Petroleum Company, . . . and any other affiliate, subsidiary or other related companies, and all their agents, employees, executives, directors, legal representatives, insurers, lawyers, guarantors, heirs, administrators, contractors, subcontractors, successors or predecessors, from any responsibility, claim, request, demand or complaint, be it past, present or future, for any and all reasons related to the actions, works or omissions arising from the activity of the aforementioned companies . . ."); PX 229–32 at 5 (similar).

15

Since Petroecuador took over operational control in 1990, it has drilled more than 414 new wells—almost 30% more than were drilled during TexPet's 25 years as the operator.  PX 8070 at 31.  Even defaulted defendant Pablo Fajardo admitted that "Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself."  PX 8023 at 2.  Petroecuador neglected its remediation obligations until 2005, when it initiated a $67.8 million program to remediate 370 pits within the former concession area.  PX 8065 at 4; PX 8025.

### B.  The *Aguinda* Litigation

In 1993, a lawsuit was filed in the name of a group of Ecuadorian plaintiffs against Texaco in the S.D.N.Y., seeking redress for independent personal injuries allegedly sustained as a result of TexPet's operations in Ecuador and seeking class certification under U.S. law.  *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).  The plaintiffs were represented by Cristobal Bonifaz, a Massachusetts lawyer of Ecuadorian descent; Joseph Kohn, a prominent Philadelphia attorney; and recent Harvard Law School graduate Steven Donziger.  In 1996, in order to obtain the Republic of Ecuador's support and intervention in the case, Kohn and Bonifaz negotiated a waiver of all rights against Petroecuador, the sole owner and operator of oil production operations in the former concession area.  PX 684.  The waiver included a provision requiring the *Aguinda* plaintiffs to "reject" and refuse to collect any amount owed to them should Texaco successfully sue Petroecuador "or any other Ecuadorian public section institution[.]"  *Id*. at 2.  After nearly a decade of litigation, the *Aguinda* action was ultimately dismissed on *forum non conveniens* grounds.  *See Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 550 (S.D.N.Y. 2001), *aff'd*, *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).  As a condition of this dismissal, the court required Texaco to accept certain conditions with respect to any renewal of the action in Ecuador.  Defendants have argued that those conditions bar this action, but as Chevron has already demonstrated in detail, that argument is without merit.  *See* Dkt. 1497 at 3–7.

16

### C.  The Chevron-Texaco Transaction

On October 9, 2001, while the second *forum non conveniens* dismissal in *Aguinda* was on appeal before the Second Circuit, a Chevron subsidiary merged with Texaco, and thus Texaco and TexPet became subsidiaries of Chevron Corporation.  The *Aguinda* action against Texaco, Inc. was unaffected by this transaction because Texaco, Inc. and TexPet continued as separate corporations and no party made any commitments with respect to Chevron.  PX 8000; PX 8001; PX 8002.

### D.  The Lago Agrio Litigation

In 2003, a group of 48 plaintiffs partially overlapping with the *Aguinda* plaintiffs filed a lawsuit against Chevron—but not Texaco, TexPet, or Petroecuador—in Lago Agrio, Ecuador, titled *Maria Aguinda, et al. v. Chevron*, Case No. 2003-002.  *See generally Chevron Corp. v. Donziger*, 783 F. Supp. 2d 713, 716 (S.D.N.Y. 2011); *see also* PX 316.  The litigation has become generally known as the Lago Agrio litigation and the plaintiffs generally known as the Lago Agrio Plaintiffs, or LAPs.  There were no claims premised on independent personal injuries, as in *Aguinda*, but rather the LAPs sued exclusively to vindicate the collective environmental rights of the community, as permitted under the new Ecuadorian Environmental Management Act of 1999 (the "EMA").[4]

The Lago Agrio complaint was signed by an Ecuadorian attorney, Alberto Wray, but the lawyers behind *Aguinda*—Bonifaz, Kohn, and Donziger—continued to lead the new suit.  Over the next few years, Donziger first established himself as the on-the-ground leader of the team in

---

[4]  The EMA granted standing—for the first time in Ecuador (*see* PX 234)—to private parties to seek redress for generalized environmental damage on behalf of affected communities, and afforded the party bringing the lawsuit an award equal to 10% of the damages.  Invoking the EMA, the Lago Agrio complaint identified the Amazon Defense Front as the recipient of the 10% award—although Ecuador soon "announced that it would receive ninety percent of any recovery."  *In re Chevron Corp.*, 749 F. Supp. 2d 141, 149 (S.D.N.Y. 2010) (citing 9/4/2009 press release by Ecuador Prosecutor Washington Pesántez); *see also In re Chevron Corp.*, 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010) (same).  The litigation is not a "class action," however, as Defendants have frequently claimed.

Ecuador and then assumed personal control over the broader effort in the United States to pressure Chevron into a payoff.

### E. Donziger Exploited Corruption in Ecuador to Fuel His Extortion of Chevron in the United States

To Donziger and his co-conspirators, the Lago Agrio lawsuit was just a tool to build their extortionate scheme to get "juicy checks." PX 2474; PX 952. The objective at every phase was to pressure Chevron from every possible angle so that the company would pay to end the harassment. PX 2413. Defendants viewed "personal psychological pressure" on Chevron's "top executives" as just another "way to raise the cost" (PX 15A at 3), and wanted to bring Chevron to "the breaking point" (PX 77A), to "force them to the table for a possible settlement" (PX 172 at 2). Defendants were "always looking for ways to increase the leverage and increase the cost" to Chevron (PX 7537 at 52) because "[t]his case has to be won both in and out of the courtroom. If you had the case without the pressure, you would never get a result" (PX 7421 at 8).

Ecuador proved a fertile ground for the building blocks of Donziger's extortionate scheme. Even Donziger characterized its court system as "weak" and "corrupt." And he could invoke the area's poverty and oilfields—now operated exclusively by Petroecuador—to play on stereotypes of "indigenous people" and "big oil." From the outset of the Lago Agrio litigation, Donziger exploited what he perceived to be a corrupt judiciary and a broader culture of corruption to control the court, intimidate his opponents, and influence the media coverage. In his words: "All the judges here are corrupt . . . . [I]t's their birthright to be corrupt." PX 9A at 2.

Soon after the Lago Agrio lawsuit commenced in 2003, Donziger and his co-conspirators started manufacturing ammunition to use against Chevron in both Ecuador and the United States. They began by deceiving members of their own team, including David Russell and Dr. Charles Calmbacher. Donziger influenced Russell to come up with a grossly inflated remediation esti-

mate of $6 billion, which Donziger touted repeatedly as one of the centerpieces of the LAPs'
public relations campaign, even after Russell disavowed it and ordered Donziger to stop using it.
The LAP team forged Dr. Calmbacher's signature on two bogus judicial inspection reports that
they wrote and then filed with the Lago Agrio court, which made it appear that Dr. Calmbacher
had found contamination in need of further remediation when, in reality, he did not.  And in
2005, Donziger made a secret deal with Fernando Reyes and his colleague, Gustavo Pinto, to
pretend to be "independent" monitors of the court's experts in the Lago Agrio case, when, in re-
ality, they were on the LAPs' payroll and would receive a bonus if the LAPs won the case.

Donziger took advantage of the corruption he found in Ecuador to put additional pressure
on Chevron.  He relied on the LAP team's political connections to spur criminal investigations
and bogus charges against two of Chevron's lawyers, Ricardo Reis Veiga and Rodrigo Pérez Pal-
lares.  And he bribed the presiding judge in the Lago Agrio litigation, Nicolas Zambrano—and
Zambrano's illegal ghostwriter, Alberto Guerra—to favor the LAPs in rulings in the case.

## F.  Donziger Executed a Pressure Campaign Against Chevron in the United States

Donziger's schemes in Ecuador fed his extortionate pressure campaign against Chevron.
He concentrated his publicity efforts in the United States, orchestrating a media blitz to promote
the inflated damages estimates, collusive court rulings, and manufactured criminal prosecutions
coming out of Ecuador.  The goal of this strategy was to inflict maximum "damage to [Chev-
ron's] reputation," put "personal psychological pressure [on] their top executives," disrupt Chev-
ron's relations with shareholders and investors, instill fear of economic harm and, ultimately,
force the company into a payoff.  PX 15A at 3.

Donziger enlisted the help of several public relations professionals and activist organiza-
tions to execute the pressure—including Karen Hinton, Amazon Watch, and Rainforest Action
Network—by, among other things, creating numerous websites and blogs and generating press

releases to parrot Donziger's lies.  He also sought out filmmakers to propagandize the LAPs' efforts in Ecuador and the United States, which resulted in the film *Crude* by documentary filmmaker Joseph Berlinger.  In addition, Donziger recruited public relations and political consultant Chris Lehane, a former lawyer in the Clinton White House Counsel's office, whose initial memo laid the groundwork for the pressure campaign:  "The Ecuadorian Amazon Chevron Texaco project can be reduced, in the end, to a single strategic imperative:  <u>Bringing ChevronTexaco to the negotiation table by inflicting economic pain on the company.</u>"  PX 694 at 2.

Donziger and his proxies pushed false and inflammatory comparisons and claims in order to generate attention from the press, shareholders, and U.S. state and federal government entities.  These included David Russell's $6 billion estimate, the contention that Chevron is responsible for a "Rainforest Chernobyl," and the claim that "Chevron" spilled "more than 18 billion gallons of toxic waste, containing 30 times more crude oil than the Exxon Valdez spill, into Ecuador's rainforest between 1964 and 1992."  *See* PX 1110.  Donziger and his team knew such claims were false, but they continued delivering these and similar messages in a calculated media strategy designed to generate maximum coverage and inflict the most "pain."

### G.  The Cabrera Fraud

Donziger's pressure strategy did not lead to the speedy payoff that he had hoped for, so Donziger decided to tighten his already significant control over the Lago Agrio litigation by forcing out Bonifaz and then installing Pablo Fajardo, a junior lawyer whom Donziger controlled, as "lead counsel" by the end of 2005.  Then, in 2006, Rafael Correa was elected President of Ecuador.  Correa was—and continues to be—an avowed supporter of the LAPs.  He met with Donziger and Fajardo on multiple occasions and became particularly useful in influencing the criminal investigations of Reis Veiga and Pallares.  *See* PX 56A; PX 58A.  The time was ripe for Donziger to take his scheme to the next level.

Donziger and his co-conspirators blackmailed the Ecuadorian judge overseeing the Lago Agrio case—Yanez—to appoint a single "global expert" to conduct an assessment of TexPet's former oil production sites. Although the expert was supposed to be independent, the LAPs' team handpicked a candidate whom they knew in advance would "totally play ball" with them: Richard Stalin Cabrera Vega. On March 3, 2007, shortly before his selection and more than three months before he was sworn in, Cabrera met *ex parte* with the LAPs' lawyers and technical team over several hours to discuss a "work plan" for putting together Cabrera's eventual report that they acknowledged they would write for him and Cabrera would simply sign. PX 35A; PX 36A; PX 39A.

Although the Ecuadorian court ordered Cabrera to conduct his assessment "with complete impartiality and independence vis-à-vis the parties" (PX 342 at 3), in reality, Donziger secretly controlled every aspect of Cabrera's involvement in the Lago Agrio case. Donziger hired Stratus in Colorado to work behind the scenes and ghostwrite Cabrera's report for him. In fact, there is no evidence that Cabrera had *any* role in designing, drafting, or even reading the report before he filed it under his name, never revealing Stratus's involvement at all.

Defendants bought Cabrera's cooperation with tens of thousands of dollars in undisclosed payments, facilitated by a series of international wire transfers and payments from a "secret account," as well as other benefits for work he never performed. All the while, Cabrera and the LAPs maintained a public fiction of "independence." Indeed, throughout his tenure as the court's expert, Cabrera made numerous filings with the Lago Agrio court affirming his supposed independence, even claiming that "the idea that the plaintiffs would be helping me with [the report] is unthinkable." PX 283 at 3. Defendants and their co-conspirators even took active steps to conceal their relationship and coordination with Cabrera. In addition to using code names

21

(1/29/2011 Donziger Dep. 3805:8–12) and secret bank accounts (PX 870), Defendants instructed

the Crude cameramen not to film their secret meetings with Cabrera (*see* PX 39–42) and even

convinced Berlinger to make costly edits to the film in order prevent their secret arrangement

from being exposed (PX 2454 ).  On April 1, 2008, Cabrera filed his report with the Lago Agrio

court, with *Crude* cameras rolling and LAP team members such as Aaron Marr Page in attend-

ance.  That report purported to find "serious and widespread contamination" in the former con-

cession area and assessed damages against Chevron of more than $16 billion.  Simultaneously,

the LAP team sought to perpetuate the false appearance that Cabrera was "neutral" and "inde-

pendent" and that the LAPs' team was not the report's true authors—including by filing a series

of "questions" drafted by Stratus critical of the report it had ghostwritten and recommending the

damages be increased to $27 billion.  Cabrera then filed a response to the LAPs' comments in a

supplemental report that adopted that $27 billion figure, but, as was the case with the first report,

it turned out that the LAP team also ghostwrote Cabrera's supplemental report.

### H.  Obstruction and Cover-Up

Public revelation of the Cabrera fraud would have been devastating to Donziger's pres-

sure campaign in the U.S. and Ecuador.  Yet despite the LAP team's denials, there were signs

that Cabrera was not acting as the "independent" court expert he claimed and was ordered to be.

Chevron initially sought to resolve its concerns through the Lago Agrio court, but was stymied in

every effort to do so—including when Cabrera refused to show up for a deposition or produce

any documents.

Chevron turned to the United States to pursue discovery through proceedings initiated

under 28 U.S.C. § 1782.  In Colorado, for example, Chevron sought discovery from Stratus, sus-

pecting it was the true author of the Cabrera report.  The LAPs' legal team in Ecuador expressed

the dire necessity for a cover-up, telling Donziger that if the truth were revealed via U.S. discov-

ery, "the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)." PX 1279. Accordingly, Donziger hired a team of lawyers in Colorado and elsewhere in the U.S. to defend against the 1782 actions and coordinate strategy. To prevent the truth from coming out, Donziger threatened and pressured witnesses, and he sought to manipulate these lawyers to block discovery, take unsupportable legal positions, and assert falsehoods as facts. Donziger repeatedly misrepresented Cabrera to his own team as completely "independent" and a "court-appointed Special Master." *See, e.g.*, PX 1276; PX 1282. Eventually, however, the LAPs' U.S. counsel learned the truth about Cabrera's involvement in ghostwriting the Cabrera report. One after the other, lawyers withdrew from the case, citing serious ethical concerns.

Donziger then turned to the law firm of Patton Boggs, which developed a strategy to "cleanse" any perceived impropriety surrounding the Cabrera report (PX 1359), while at the same time "fight[ing] hard on all fronts all the time and conced[ing] nothing," even if "we expect to ultimately lose" (PX 1360) in order to "buy as much time as possible" (PX 1348). In particular, the LAP team purported to come clean in U.S. courts with a declaration from Pablo Fajardo that attempted to align the LAPs' public position regarding their relationship to Cabrera with the evidence against them that had been revealed to date. PX 1325. This was a prelude to their ultimate plan, which was to repackage the Cabrera report as the work of new experts, and submit these new reports so that the Ecuadorian court could rely on them, instead of Cabrera's (although this would be a false distinction since they had no time to do any independent research and therefore they were relying on the Cabrera report anyway), thus "cleansing" the anticipated judgment of the "taint" of Defendants' collusion with Cabrera.

## I. Judgment Fraud

Donziger and the LAP team then embarked on their most audacious scheme yet. In the

fall of 2010, the judge presiding over the Lago Agrio case, Nicolas Zambrano, made an offer to the LAP team to fix the case in their favor for a price. Former judge Alberto Guerra met with Donziger, Fajardo, and others on behalf of Zambrano. Guerra proposed that the LAP team pay at least $500,000 to Zambrano, and, in exchange, Zambrano would let the LAP team draft the judgment in their favor in the Lago Agrio litigation, which Zambrano would then sign. The LAP team subsequently promised Judge Zambrano $500,000, payable upon enforcement of the judgment, in exchange for issuing the judgment written by the LAP team.

In late January or early February 2011, Guerra worked on a draft of the Lago Agrio judgment on a computer in Zambrano's home; the draft had been prepared by the LAP team. While he was working to revise the judgment, Guerra called Fajardo "to ask him about some sections of the document that confused [him]," and the next day, Fajardo gave Guerra a "memory aid" that provided information about the case. PX 4800 (Guerra) ¶ 49.

On February 1, 2011, Chevron filed its complaint in this action alleging RICO violations on the part of Defendants. Just two weeks later, on February 14, Zambrano issued the Lago Agrio judgment, imposing an $18.2 billion damages award against Chevron. Every substantive aspect of the Ecuadorian judgment, as well as its overall structure, bears markers of the LAPs' fraud—including text and other elements taken directly from portions of the LAPs' unfiled work product, as well as "factual" assertions and damage calculations found only in the Cabrera report.

### J.  Proceedings in This Action

Chevron's original complaint alleged causes of action for violations of RICO, fraud, tortious interference with contract, trespass to chattels, unjust enrichment, civil conspiracy, violations of New York Judiciary Law section 487, and declaratory judgment. The Donziger Defendants and two of the LAPs appeared in this action; the remaining LAPs and other Ecuadorian Defendants all defaulted. Dkt. 469. On March 7, 2011, the Court issued a preliminary injunction

24

restraining enforcement of the judgment. The injunction was ultimately vacated by the Second Circuit on other grounds, but the Court of Appeals did not reach the Court's factual findings. *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 240 (2d Cir. 2012). During pre-trial proceedings, the Court dismissed Chevron's tortious interference, trespass to chattels, and unjust enrichment claims. Chevron elected not to pursue money damages against these appearing Defendants (Donziger, Camacho, and Piaguaje).

The bench trial of this matter commenced on October 15, 2013, and spanned six weeks—with 24 witnesses testifying live in Chevron's case-in-chief, and another 23 witnesses testifying via deposition. Chevron also supplied this Court with over 2,500 exhibits, including hours of video from the outtakes of *Crude*.[5] The parties gave their closing arguments on November 26, 2013.[6]

## ARGUMENT

The evidence adduced at trial proves a pattern of U.S. conduct consisting of extortion, wire and mail fraud, obstruction of justice, witness tampering, money laundering, and other illegal activity. Defendants took the fruits of their crimes—including the Cabrera fraud, the collusion with the Ecuadorian government, the judicial bribery, and the ghostwritten judgment—and

---

[5] Of note, the parties reached agreement as to all of the footage to be submitted from *Crude* during Chevron's case, thereby eliminating Defendants' counsel's initial (and erroneous) argument that any footage had been taken "out-of-context" or improperly edited. Dkt. 1635.

[6] At the close of trial, the Court directed the parties to address four specific issues in their post-trial briefing. Tr. 2963:21–2967:23. First, the parties are to address the basis, nature, and scope (including geographic scope) of Chevron's request for equitable relief, including on its fraud claim, and the extent to which the injunction would prevent efforts by the judgment creditors to enforce here any foreign judgment that has granted enforcement to the Lago Agrio judgment. Chevron discusses the basis, nature, and scope of its proposed relief in the last section of its brief, "Requested Relief," beginning at page 318. The specific relief sought is described at pages 339 (RICO), 347 (Fraud), and 352 (§ 487). Second, the parties are to address the implications of *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010), on Chevron's RICO claims. As explained in Section I.G., starting at page 199, Chevron is not seeking an extra-territorial application of RICO. Third, the parties are to address any inferences to be drawn from the non-appearance of certain witnesses at trial. Chevron addresses the absence of potentially relevant witnesses in Section VIII.C., starting at page 298. Fourth, the parties are to address any views on the question of whether U.S. courts routinely pass, in a variety of other contexts, on the adequacy of foreign legal systems. Chevron has identified numerous other contexts, beyond recognition and enforcement of foreign judgments, in which U.S. courts consider the adequacy of foreign forums, and Chevron addresses those contexts at page 274.

leveraged them to pursue a racketeering and fraud scheme in the United States.

New York lawyer Steven Donziger hired a U.S.-based spokesperson to spread falsehoods with the U.S. media and U.S. government officials intended to pressure Chevron into a multi-billion dollar payoff. In Colorado, New Jersey, Texas, California, and elsewhere around the country, consultants working with Stratus prepared a report in the first-person voice of the purportedly "independent" court-appointed expert, Richard Cabrera, which Cabrera then signed and submitted to the Lago Agrio court as his own work. In California, activists from Amazon Watch and Rainforest Action Network engaged in a "brutally personal" campaign intended to put "personal psychological pressure" on Chevron's management and board—all premised on lies posted on web sites, sent by letters and email, and promoted on television. In Pennsylvania, Donziger fraudulently induced his co-counsel Joseph Kohn to wire money from U.S. bank accounts to foreign bank accounts that Donziger's co-conspirators then used to bribe the court expert, bribe the judge, and foment their public pressure campaign. In New Jersey and New York, Donziger's "devil's advocate" at the law firm of Patton Boggs implemented a strategy to obstruct and delay revelation of the Cabrera fraud—submitting false statements to federal courts in Colorado, New York, and elsewhere while they retained consultants in Maryland, Massachusetts, Ohio, Vermont, and Virginia to repackage and attempt to "cleanse" the Cabrera report. To keep the scheme going, Patton Boggs and Donziger defrauded New York litigation finance firm, Burford Capital out of $4 million before Defendants' crimes were revealed and Burford terminated the relationship.

Together, these acts constitute a racketeering scheme in violation of U.S. law, as well as fraud and lying to courts in violation of New York law. Defendants' unlawful conduct has injured Chevron in both calculable and incalculable ways, and it has caused Chevron to incur sub-

stantial attorney's fees.  And Defendants continue to inflict harm on Chevron by actively pursu-

ing their wrongful scheme, attacking Chevron with lies, and attempting to monetize the fraudu-

lent Lago Agrio judgment in foreign enforcement actions.  They have made it clear that they will

continue to do so unless and until this Court compels them to stop.

## I.    Donziger Has Violated RICO

### A.  RICO Provides a Cause of Action for Those Injured by Racketeering

The statute widely known as "RICO" is the Racketeer Influenced and Corrupt Organiza-

tions Act, which was enacted by Congress in 1970 as Title IX of the Organized Crime Control

Act.  And while "the RICO statute was intended to provide new weapons of unprecedented scope

for an assault upon organized crime and its economic roots" (*Russello v. U.S.*, 464 U.S. 16 at 26,

104 S. Ct. 296 at 302), "courts and the commentators have persuasively and exhaustively ex-

plained why the RICO statute and its legislative history do not require a RICO plaintiff to prove

the defendant is connected to organized crime" (*Owl Const. Co., Inc. v. Ronald Adams Contrac-*

*tor, Inc.*, 727 F.2d 540, 542 (5th Cir. 1984)).  Indeed, the Supreme Court has rejected attempts to

gloss the statutory text with limitations intended to trim RICO into an organized crime statute.

*See H. J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 243–49, 109 S. Ct. 2893, 2903–

06 (1989); *Sedima v. Imrex Co.*, 473 U.S. 479, 493–500, 105 S. Ct. 3275, 3283–87 (1985).[7]

RICO incorporates both its own unique elements and the elements of dozens of potential

---

[7]  RICO has not been limited to organized crime in practice either.  A 1985 survey by the American Bar Associa-
tion identified 270 private RICO cases, of which only 9% involved "allegations of criminal activity of a type gener-
ally associated with professional criminals."  Report of the Ad Hoc Civil RICO Task Force of the ABA Section of
Corporation, Banking and Business Law 55–56 (1985) (cited in *Sedima*, 473 U.S. at 499 n.16).  High-profile crimi-
nal and civil RICO defendants outside the world of organized crime have included Michael Milken (*United States v.
Milken*, Case No. § 89 Cr. 41 (S.D.N.Y. 1991)), Major League Baseball (*BMO Nesbitt Burns, et al v. Loria, et al*,
Case No. 1:02-cv-22061 (S.D. Fl. 2002)), and the Los Angeles Police Department (*Guerrero v. Gates*, Case No.
cv:00-7165 (C.D. Cal. 200)).  Professor G. Robert Blakey, the statute's lead drafter, once observed in an interview
with *Time*, "We don't want one set of rules for people whose collars are blue or whose names end in vowels, and
another set for those whose collars are white and have Ivy League diplomas."  Sanders, Alain; Painton, Priscilla,
*Law: Showdown At Gucci*, Time, Aug. 21, 1989.

predicate statutes.  It makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Thus, the basic elements that a private plaintiff must establish to prevail on a RICO claim are:  (1) the defendant's operation and management of an enterprise; (2) a pattern of racketeering activity; and (3) resulting injury to the plaintiff.

A RICO **enterprise** consists of any "group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  It can include any combination of individuals and legal persons, such as corporations.  *United States v. Huber*, 603 F.2d 387, 393–94 (2d Cir. 1979).  To be liable under § 1964(c), the defendant must be shown to have **operated and managed** the affairs of the enterprise.  *Reves v. Ernst & Young*, 507 U.S. 170, 183–84, 113 S. Ct. 1163, 1172 (1993).  This does not limit liability to "upper management"; it requires only that the defendant have some role in the conduct of the enterprise.  *Id.*  And that operation and management must incorporate a **pattern** of racketeering activity, which requires a continuous and related series of two or more predicate acts.  *H.J. Inc. v. Northwestern Bell Tel. Co.* 492 U.S. 229, 239, 109 S. Ct. 2893, 2900 (1989).

The component parts of a RICO "pattern"—the **racketeering activity**—are drawn from other state and federal statutes, as defined in § 1961(1).  These include a wide range of crimes, from murder to passport fraud.  18 U.S.C. § 1961(1)(B).  And they incorporate state law felonies, including extortion.  18 U.S.C. § 1961(1)(A).  Thus, RICO's pattern element combines both the elements of distinct criminal statutes with the overarching requirement that violations of those statutes be continuous and related.  *H.J. Inc.*, 492 U.S. at 239, 109 S. Ct. at 2900.

28

RICO provides for both criminal and civil penalties, and provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ."  18 U.S.C. § 1964(c).  In private civil actions, plaintiffs must prove the elements of RICO by a "preponderance of the evidence."  *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1089 (2d Cir. 1995); *Cullen v. Margiotta,* 811 F.2d 698, 731 (2d Cir. 1987).

As previously explained, the evidence adduced at trial proves that an association-in-fact RICO enterprise, led by Donziger, caused injury to Chevron's business and property by committing a pattern of racketeering activity, including (1) extortion and attempted extortion in violation of the Hobbs Act (18 U.S.C. § 1951) and New York's extortion statute (N.Y. Penal Law §§ 110.00, 155.05(2)(e)); (2) mail and wire fraud (18 U.S.C. §§ 1341, 1343); (3) money laundering (18 U.S.C. § 1956(a)(2)(A)); (4) obstruction of justice (18 U.S.C. § 1503); (5) witness tampering (18 U.S.C. § 1512); and (6) interstate and foreign travel or transportation in aid of a racketeering enterprise (18 U.S.C. § 1952 (the "Travel Act")) through violation of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3).[8]

### B. Donziger Operates and Manages an Enterprise That Pursues an Extortionate Scheme Against Chevron

A RICO enterprise may consist of any "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  It can include any combination of individuals and legal persons such as corporations.  *United States v. Huber*, 603 F.2d 387, 393–94 (2d Cir. 1979).  The Supreme Court recently rejected the argument that an enterprise required any formal structure

---

[8]   These and other federal crimes are specifically defined as "racketeering activity" under Section 1961(1).  Extortion and attempted extortion in violation of New York law qualify as racketeering activity because they are chargeable under New York law and punishable by imprisonment for more than one year.  *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to include, *inter alia*, any act or threat involving extortion that is chargeable under State law and punishable by imprisonment for more than one year).

"distinct from the charged predicate acts." *Boyle v. United States*, 556 U.S. 938, 943, 129 S. Ct. 2237, 2242 (2009). Observing that the statutory definition was "obviously broad" and "expansive," *id.* at 944, 129 S. Ct. at 2243, the Court held that an enterprise need not have any hallmarks of organization beyond "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 129 S. Ct. at 2244.[9] The Court also reaffirmed its prior analysis of the enterprise requirement in *United States v. Turkette*, *id.* at 944–45, 129 S. Ct. at 2243, which held that "an association which performs only illegal acts" may still qualify as a RICO enterprise. *United States v. Turkette*, 452 U.S. 576, 580, 101 S. Ct. 2524, 2527 (1981).

### 1. Donziger's Enterprise Is a Multi-Faceted Organization

The enterprise here has existed at least since the mid-2000s for the purpose of obtaining an extortionate multi-billion dollar payoff from Chevron. While its membership has changed over time, the enterprise has at all times included Donziger as its leader and driving force. The enterprise includes U.S. lawyers who have assisted Donziger in furthering the scheme in the U.S. and abroad. It includes U.S. financiers who have provided the necessary capital to keep the scheme going. It includes U.S. public relations specialists and lobbyists. It also includes a number of U.S. consultants, who prepared the fraudulent Cabrera submissions, and then compounded their fraud by promoting their own work as Cabrera's "independent" report. And the enterprise

---

[9] In particular, the Court held that an enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Boyle*, 556 U.S. at 948, 129 S. Ct. at 2245–46.

includes an Ecuadorian branch—used to further Defendants' corrupt relationships with the Lago Agrio court and the Ecuadorian government itself. *See* FF ¶¶ 1–8.

### a. U.S. Lawyers

Donziger's massive scheme required the assistance of a number of other U.S. law firms and attorneys, each of whom played a part in the RICO enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 184, 113 S. Ct. 1163, 1173 (1993) (finding RICO liability for the actions of those "who are under the direction of upper management"). Donziger used these U.S. lawyers and firms to defend against Chevron's Section 1782 discovery actions throughout the United States, and to hold off Chevron's discovery of the Cabrera fraud long enough for him to obtain additional funding and to carry out the judgment ghostwriting scheme.

Patton Boggs has played a particularly prominent role among Donziger's team of U.S. lawyers—it authored the "Invictus" memorandum that served as a blueprint for Donziger's extortionate judgment-enforcement strategy, and also coordinated the obstruction of justice, recommending that the LAPs' counsel take spurious legal positions in order to block Chevron's discovery efforts. Patton Boggs was heavily involved in drafting Pablo Fajardo's fraudulent declaration that the LAPs filed in at least 17 Section 1782 actions across the country, including before this Court, and Patton Boggs has represented the LAPs in at least six of those proceedings. Dkt. 905 at 35 & n.135. Patton Boggs also led the efforts to "cleanse" the Cabrera fraud—including hiring the Weinberg Group to manage and coordinate the cleansing process. And Patton Boggs itself has become an active litigant, suing Chevron three times as the plaintiff. *Patton Boggs, LLP v. Chevron Corp.*, No. 10 Civ. 1975 (HHK) (D.D.C. 2010); *Patton Boggs LLP v. Chevron Corp.*, No 11-00799 (HHK) (D.D.C. 2011); *Patton Boggs, LLP v. Chevron Corp.*, No. 12 Civ. 9176 (LAK) (S.D.N.Y. 2012). Patton Boggs also has been involved in this case behind the scenes, and has taken a leading role in related appeals.

Beyond Patton Boggs, the law firm of Emery Celli also led Defendants' obstruction and cover-up efforts related to Chevron's U.S. discovery, making numerous meritless filings in an express effort to delay proceedings and buy time for Defendants' scheme. And, other law firms and individual lawyers such as Aaron Marr Page and Donziger's former associate, Andrew Woods, have played key roles in the enterprise. *See* FF ¶¶ 8, 132–33, 148–54.

### b. Funders

Several entities and individuals have invested in Defendants' enterprise knowingly and unknowingly in exchange for a share in the proceeds of any eventual recovery. These funders have infused necessary capital at critical junctures in Defendants' extortionate campaign. They include Kohn and his law firm, Kohn Swift, which served as the *Aguinda* plaintiffs' U.S. counsel in connection with the action filed in New York in 1993. From May 2003 until November 2009, Kohn Swift, acting in reliance on Donziger's lies, was the primary funder of the Lago Agrio litigation and related U.S. public pressure activities. It paid more than $6 million in litigation expenses during that six-year span, including $1.1 million to Donziger for legal services and expenses, $1.1 million to U.S. consultants, and $2.2 million transferred by wire from bank accounts in the U.S. to bank accounts in Ecuador. As explained below, Kohn relied on Donziger's lies about, among other things, the relationship between the LAPs' team and Cabrera, and never would have continued funding had he known the truth. *See infra* Argument Section II.C.2.

After Kohn Swift withdrew in November 2009, Defendants began negotiations with Burford Capital LLC in connection with their efforts to attract new funding. Burford agreed in 2010 to provide up to $15 million in financing to Patton Boggs in connection with Patton Boggs' entry into the Lago Agrio litigation as the LAPs' counsel. As explained below, Burford relied on Donziger's and Patton Boggs' lies and omissions about, among other things, the relationship between the LAPs' team and Cabrera, and never would have provided funding had it known the

truth.  *See infra* Argument Section II.C.1.

One of the most consistent sources of funds for Defendants' enterprise has remained largely behind the scenes.  Russell DeLeon, a law school friend of Donziger and Internet gambling entrepreneur, has been a major financial supporter of the Lago Agrio litigation, beginning with his backing of *Crude*.  It came to light for the first time near the end of trial that DeLeon had invested up to $25 million in the case, an amount for which Donziger expressed gratitude, noting that "we have survived thanks to him."  PX 8050 at 3.

Defendants' fundraising efforts continue to this day.  Defendants revealed during trial, for example, that they have secured additional funding from an organization called Woodsford Litigation Funding ("Woodsford").  *See* Tr. (Hinton) 2168:21–2169:3, 2171:8–10.  Donziger testified that Woodsford gave the LAPs $2.5 million in March 2013 and that there are currently discussions with Woodsford and others for additional funding.  Tr. (Donziger) 2528:9–2529:11.  *See* FF ¶¶ 9, 21–27, 98–102.

### c.  Public Relations and Lobbying

Relying on a network of co-conspirators and outside organizations, Defendants have designed a public relations campaign to publicize their falsehoods and extort money from Chevron.  These entities and persons engaged in a wide range of activities, including creating and maintaining a series of blogs and websites (such as *chevrontoxico.com*), and drafting and issuing press releases to broadcast the LAPs' message, over which Donziger exerted tight control.  Their strategy is to "turn up the heat" and bring "economic pain" to Chevron and its management through various means—including shareholder resolutions, major media coverage, organizing demonstrations and protests, and undertaking letter-writing campaigns to spur major investigations by U.S. federal and state government entities such as the Securities and Exchange Commission.  In Donziger's words, the conspirators initiated a "press and internet strategy, using [his proxies] as

the surrogate."  PX 169R at 13.  Donziger described the ideal candidate for the job was someone

who would "raise some hell in Ecuador," noting the "job[] entails f[**]king up every machine

you see that has ChevronTexaco's name on it. . . .  Being able to manufacture reality a plus."  PX

702 at 1.

The enterprise's U.S. public relations and lobbying arms include Karen Hinton, Atossa

Soltani and Amazon Watch, and the Rainforest Action Network.  *See* FF ¶¶ 83–97, 147.

### d.  U.S. Consultants

U.S. environmental consultants played a critical role in the LAPs' fraudulent scheme by

ghostwriting the Cabrera report and Cabrera's subsequent responses to the LAPs' objections.

Chief among these consultants was Douglas Beltman at Stratus, an environmental consulting

firm based in Colorado.  The Court has previously found that "there is no genuine dispute as to

exactly what happened" with respect to the Cabrera fraud.  *Chevron Corp. v. Donziger*, 886 F.

Supp. 2d 235, 259 (S.D.N.Y. 2012).  "As Donziger has admitted, 'Stratus wrote the bulk of the

report adopted by Cabrera and submitted to the court.'"  *Id.* at 260 (citation omitted).  And the

Cabrera report "falsely or, at least, deceptively stated that it had been 'prepared by the Expert

Richard Stalin Cabrera Vega' with the help of '*my* technical team, which consists of *impartial*

professionals.'"  *Id.*  After both Chevron and the LAPs objected to the Cabrera report, Stratus

and other members of the LAP team—at Defendants' direction—drafted Cabrera's responses

and "attempted to word them so that they would read as if Cabrera had written them."  *See id*.

Stratus retained or relied on various other consultants in California (E-Tech), Texas (3TM), New

Jersey (UBR), North Carolina (Charles Champ), and elsewhere (Mark Quarles) to assist in the

effort.

Individuals at Stratus also played a role in Defendants' cover-up of the Cabrera fraud.

Stratus's counsel, for example, originally told the District Court in Colorado that Stratus was

"astonish[ed]" to see "similarit[ies]" between its own work product and the Cabrera report.  PX
678 at 69:12–13.  And Emery Celli, on behalf of the LAPs, praised Stratus employee David
Chapman for doing "an excellent job of not remembering anything" about Stratus's role in De-
fendants' fraud during his deposition.  PX 1303 at 1.  *See* FF ¶¶ 8, 52–62, 144–46.

### e.  Defendants' Ecuadorian Agents

Defendants' agents in Ecuador—their co-counsel, co-conspirators, and representatives—
also participated in both perpetrating Defendants' fraud and attempting to ensure that it remains
hidden.  Of perhaps the most prominence among the Ecuadorian agents is Pablo Fajardo, whom
Donziger installed as the lead local counsel in 2006, even though he had almost no experience
and had just recently graduated from law school.  Fajardo, whose salary and bonus were con-
trolled by Donziger and with whom Donziger remains in constant contact, never appeared to tes-
tify.  Fajardo is counsel of record for the Amazon Defense Front, as well as counsel of record for
the named plaintiffs in the Lago Agrio litigation.  PX 1325.  He was instrumental in securing
Cabrera's appointment.  PX 197; PX 636.  Fajardo also made payments to—and provided other
arrangements for—Cabrera and Guerra.  *See* PX 645; PX 877; PX 4800 (Guerra) ¶¶ 29, 32–34;
Tr. (Guerra) 929:19–930:3, 931:4–22; *see also* PX 1186; PX 1713 at 4–5; PX 1751; PX 583 at
51.  He misled courts in the U.S. and elsewhere regarding Defendants' contacts with Cabrera
(PX 1325), arranged for the bribery of Judge Zambrano, and coordinated the ghostwriting of
numerous orders in the Lago Agrio case, including the judgment itself (*see, e.g.*, PX 4800 (Guer-
ra) ¶¶ 27, 42).  Fajardo also colluded with Defendants to prevent Chevron's discovery of any ev-
idence from Ecuador.  Dkt. 1529 at 81.  And he intimidated Chevron's witnesses.  *See, e.g.*, PX
1758.

Defendants' Ecuadorian co-conspirators also include Fajardo's co-counsel, Juan Pablo
Sáenz and Julio Prieto.  Saenz is a key intermediary between Defendants and the Republic of

Ecuador.  *See, e.g.*, PX 1102; PX 1142; PX 2524.  He has also signed false and misleading decla-rations filed in U.S. courts, including this one (Dkt. 152), and when Defendants sought to resist the Court's discovery orders by purporting to "temporarily" shift control of the Ecuadorian team away from Donziger, Fajardo sent an email stating that the LAPs "have designated Juan Pablo Sáenz as the main attorney to replace Steven . . ." (PX 1502 at 5).  Prieto played a similar role in Defendants' *ex parte* support of Cabrera.  *See, e.g.*, PX 87#.  He also assisted with Defendants' efforts to obstruct discovery.  *See, e.g.*, PX 1279 at 1.  He helped coordinate Defendants' con-tacts with public figures in Ecuador as part of Defendants' pressure campaign.  *See, e.g.*, PX 755; PX 54; PX 54A.  And Prieto admitted in private emails to the LAP legal team that all of them "might go to jail" when the truth came out about their involvement with Cabrera.  PX 1279 at 1.

Through his work with the Amazon Defense Front (the "Front")—which he co-founded—Luis Yanza has served as the public face of Defendants' enterprise in Ecuador.  The Front is a "non-profit" organization purporting to represent the LAPs (*see, e.g.*, PX 2407# at 27; Tr. (Kohn) 1493:10-1494:5) and also maintains an active Internet presence to further Defend-ants' pressure campaign.  The Front is the vehicle by which Defendants hope to divide the spoils of their fraudulent scheme:  The LAPs have ceded all rights to the judgment to the Front (PX 2407R at 27), and the judgment makes the Front the sole trustee of the "commercial trust" into which a portion of the judgment proceeds are to be delivered, along with almost unlimited dis-cretion over how the contents of the trust are to be distributed (*see* PX 399; PX 400 at 186–87).

Yanza has also directed aspects of Defendants' fraud behind the scenes.  As Donziger's closest friend in Ecuador (Dkt. 1529 at 4), Yanza was involved in directing Cabrera's work (*see, e.g.*, PX 35; PX 35A).  He was also in charge of the general accounting duties for the Ecuadorian team (which included the accounts for the Front and Selva Viva), and for facilitating bribery

payments to Cabrera.  PX 912; PX 870; PX 913 at 1.  In fact, in roughly September 2007, at the same time Defendants were secretly making payments to Cabrera, Donziger transferred $12,000 from his personal account to Yanza, claiming during his deposition that this money was to be used to "purchase a house that [Yanza] and his family could live in."  7/19/2011 Donziger Dep. 4916:21–4917:2, 4931:4–10.  Yanza also facilitated the bribery payments to Alberto Guerra.  PX 1746; *see also* PX 1751 (10/27/2009 email from Fajardo to Yanza and Donziger, "The puppeteer won't move his puppet unless the audience pays him something . . . .").

Selva Viva, which counted Donziger as its President and Yanza as its General Manager, has served as the financial arm of Defendants' enterprise in Ecuador.  As Donziger explained, "[t]he [Front] created Selva Viva simply as a pass thru mechanism to administer the funds for the litigation; the Frente [Front] controls Selva Viva."  PX 896 at 2; *see also* Dkt. 1529 at 4.  Accordingly, Selva Viva's accounts were used for bribery payments to Guerra and Cabrera (*see, e.g.*, PX 913), while the Selva Viva office in Ecuador serves as a document repository and hub for meetings between Defendants' Ecuadorian legal team, the Frente, and the LAPs themselves (Dkt. 1529 at 4).  Donald Moncayo, a Selva Viva, employee (Tr. (  Moncayo) 2058:23–24) even appeared at trial to perjure himself in testifying that he saw Zambrano dictating the judgment to Calva.  DX 1600 (Moncayo) ¶ 11.

Other Ecuadorian co-conspirators employed by the LAPs have also played roles in Defendants' enterprise, even those who no longer have a role.  Alejandro Ponce Villacis, for example, who testified for Defendants at trial, worked as the LAPs' attorney on the Lago Agrio litigation from 2005–2008 (DX 1601 (Ponce) ¶ 2), and was involved in efforts to end the judicial inspections (*id.* ¶ 16).  Ponce also participated in aspects of the Cabrera fraud, and lied on the stand about doing so.  *See* PX 6506.

Defendants have relied on a procession of other Ecuadorian co-conspirators to execute their scheme, including Richard Cabrera, Javier Piaguaje, and Maria Eugenia Yepez—the LAPs' Ecuadorian media agent (Tr. (Ponce) 2303:20–24).  And former judges Zambrano and Guerra each played vital roles, for example, using their connections to—and positions within—the Ecuadorian judiciary to legitimize Defendants' actions.  Guerra then served as Zambrano's ghostwriter in the Lago Agrio litigation, drafting orders in favor of Defendants in exchange for payments of $1,000 per month.  *See, e.g.*, PX 4800 (Guerra) ¶¶ 27, 29, 31.  And Guerra brokered an arrangement between Zambrano and Defendants to ghostwrite the judgment itself.  PX 4800 (Guerra) ¶¶ 42, 43.  And Defendants have relied on their collusion with the ROE, through President Correa and his chief legal advisor, Alexis Mera.

Finally, the LAPs themselves—and representative organizations such as the Asamblea de los Afectados de Texaco (the "Assembly of those Affected by Texaco") and its spokesperson, Humberto Piaguaje—have furthered Defendants' scheme, attempting to legitimize Defendants' fraudulent lawsuit and coercive public pressure campaign through misleading public statements and appearances.  *See* FF ¶¶ 16–19, 139–43.

## 2.   Donziger is the Undisputed "Cabeza" of the Enterprise

Donziger's overall authority is unrebutted and more than sufficient to satisfy the "operation or management" requirement of 18 U.S.C. § 1962(c).  *See Reves v. Ernst & Young*, 507 U.S. 170, 183–84, 113 S. Ct. 1163, 1172–73 (1993) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.").  "[T]he word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise . . . ."  *Id.* at 179, 113 S. Ct. at 1170.

Donziger had far more than just "*some* part in directing the enterprise's affairs."  *Id.*  In his own words, Donziger "know[s] more about the details of this story than anybody."  PX 806R at 3.  He has been "at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S. [and has] close ties with almost all of the important characters in the [cases], including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental activists, and many of Chevron's key players."  *Id.* at 5.  Donziger has been "working on the legal case behind these events almost since the day I graduated from Harvard Law School in . . . 1991."  *Id.*  He has long been the self-described "lead lawyer" in the Lago Agrio litigation, as well as the "person primarily responsible for putting [the LAP] team together and supervising it . . . ."  *Id.* at 3.  The retainer agreement between Donziger and the LAPs designated Donziger to act as the LAPs' U.S. representative, "to exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation."  PX 558 at 2.  According to Donziger, his "primary obligation" has been to "run the case on a day to day basis," and he has done "the overwhelming amount of work on this case."  PX 1181 at 2.

Donziger has performed a variety of roles on behalf of the LAPs, including reaching out to financial and political bodies to support and publicize the litigation and to exert pressure on Chevron to settle.  PX 8054.  Donziger also contacted New York's then Attorney General (12/8/2010 Donziger Dep. 719:2–10, 720:5–23), who sent Chevron a letter requesting follow up about the veracity of Chevron's public disclosures respecting liability in Ecuador  (PX 1131).

Donziger controlled the funding.  He took the lead in soliciting funds from investors and was primarily responsible for engaging the investment firms.  PX 2396R at 301–02. Russell DeLeon, a law school friend of Donziger who made billions of dollars in online Internet gam-

bling, was one of *Crude's* major financial backers and also provided broader financial support for the Lago Agrio litigation behind the scenes both in his own name and through Torvia Limited and TC Payment Services (International) Limited.[10]  And following the departure of Wray and Bonifaz, Donziger became the exclusive link between Kohn Swift and the LAPs in Ecuador.  PX 5600 (Kohn) ¶¶ 12–13 (Donziger "became the sole link to the plaintiff-client groups and the sole source of information to me concerning the Ecuadoran litigation . . .").

Once funding was secured, Donziger controlled or had veto power over the manner in which the funds provided to the Lago Agrio team were spent.  PX 552 at 35.  Donziger controlled communications and money flows between the Ecuadorian lawyers and associates and Kohn Swift, which acted as the primary funder for the Ecuadorian litigation for several years.  PX 5600 (Kohn) ¶ 9; PX 4900 (Dahlberg) ¶ 36.  And when the Ecuadorian lawyers and agents needed money, they contacted Donziger, who transferred it to the team's bank accounts in Ecuador.  PX 5600 (Kohn) ¶ 16; PX 4900 (Dahlberg) ¶ 6; PX 3200 (Russell) ¶ 13.  Donziger commingled investment and case funds with his own personal funds, even though he had a "responsibility to safeguard and segregate the investments raised for the Litigation from his personal and other business assets."  PX 4900R ¶¶ 40, 44, 55.  Despite this responsibility, Donziger paid the local counsel out of his personal accounts (7/19/2011 Donziger Dep. 4925:5–14, 4927:2–24, 4916:21–4917:7, 4919:15–20); PX 2396R at 24–26; PX 4900 (Dahlberg) ¶¶ 42, 75, 78), and determined whether and to what extent they would receive bonuses for their work on the Lago

---

[10]  11/29/2010 Donziger Dep. 78:20–24, 79:25–80:7, 80:21–81:6, 101:20–102:14; 12/1/2010 Donziger Dep. 627:20–628:12 (discussing Torvia as an investment vehicle used by DeLeon to transfer funds to Donziger and Selva Viva); 6/28/2013 Donziger Dep. 767:3–769:6 (discussing the use of Magister Law by DeLeon and Torvia to transfer funds to Donziger and Selva Viva).  *See also* PX 7033A at 3 (Donziger expressing gratitude that DeLeon had invested up to $25 million in the case, noting that "we have survived thanks to him"); PX 547 (discussing "Frente and [Donziger] agreements with Torvia"); PX 552 at 1 (naming Torvia as party to Intercreditor Agreement); PX 568 (funding agreement between Torvia Limited and Claimants); PX 1480; PX 2143; PX 2145; PX 2152; PX 4900 (Dahlberg) ¶¶ 39–46, 95–100 (summary of DeLeon's funding of the LAPs and *Crude*).

Agrio team (7/19/2011 Donziger Dep. 4913:10–15; PX 2396R at 24–25, 26–28).

Donziger's "supervis[ion]" of the Lago Agrio litigation and the LAPs' Ecuadorian lawyers has been extensive.  PX 806R at 3.  He has visited "local counsel" in Quito at least monthly.  PX 1509.  He has reviewed their work product, provided them with memoranda and documents to be filed with the Lago Agrio court, coordinated filings both in Ecuador and in the various U.S. litigations (PX 687; PX 1039; PX 1235; PX 3200 (Russell) ¶ 31; PX 4800 (Guerra) ¶ 24), and regularly edited local Ecuadorian counsel's draft filings.  *See, e.g.*, PX 7550; *see also* PX 1038 (Donziger to Prieto:  "Get this done on time and don't fuck up please.").

Donziger also met with several of the Ecuadorian judges presiding over the Lago Agrio case (PX 207; PX 200; PX 192;PX 169R at 40, 42), and managed the LAPs' experts.  Donziger hired, supervised, and worked directly with Stratus to write Cabrera's report.  PX 5200 (Lipton) ¶¶ 7, 12–14, 17; *Donziger*, 886 F. Supp. 2d. at 258–59.  Indeed, he was present at meetings in which members of the LAP team met *ex parte* with Cabrera, including Ann Maest, who later joined Stratus, to discuss the extent to which the LAPs' consultants would be involved in drafting the report.  *Donziger*, 886 F. Supp. 2d at 258–59; 12/13/2010 Donziger Dep. 1120:23–1121:5.  Donziger's retention agreement confirms that he has had "overall responsibility for the strategic direction" of the case not only in Ecuador but elsewhere as well.  PX 558 at 2–3.

Donziger's leadership role is reflected in the fact that he stands to receive more money from the Lago Agrio litigation than any other lawyer—or law firm—working on the case.  The recently produced Asamblea minutes reveal that the LAPs agreed to give their attorneys a contingency fee of 30 percent of any recovery (PX 7033A at 2; PX 8050 at 4) and Donziger's retention agreement entitles him to 31.5 percent of that total contingency fee in turn.  PX 558 at 3.  Donziger is also entitled to a monthly retainer—paid by the LAPs—for his services in the Lago

Agrio team.  *Id.* at 4.  *See* FF Appendix 3 (table showing contractual distribution of any proceeds).

Recently, Donziger has falsely disclaimed his lead role in the enterprise.  At trial, Donziger testified that Pablo Fajardo has been the "lead lawyer" in the Lago Agrio case since 2005, Fajardo is the LAPs' "sole representative," and Donziger "served on the case at the pleasure of the plaintiffs and their representative."  DX 1750 (Donziger) ¶ 10.  Donziger claims that he "work[s] for them; they do not work for [Donziger]."  *Id.*  He made similar statements at the hearing on Chevron's motion for sanctions.  Sanctions Hr'g Tr. Apr. 16, 2013 112:1–2.

As early as November 2005, Donziger described his role in the Lago Agrio litigation as a supervisory one.  PX 169# at 107 ("Supervising the legal work is a fulltime job . . . .").  In contrast, Donziger referred to Fajardo, Sáenz, and Prieto his "local counsel."  1/19/2011 Donziger Dep. 3440:5–10.  Donziger called Fajardo a "young field lawyer in Lago."  PX 7549; Tr. (Donziger) 2473:21–24, 2477:1–4.  In December 2005, within his managerial role, it was Donziger who insisted that "Pablo [Fajardo] become the Joint Counsel of Record" after Donziger became "upset" with then lead local counsel Alberto Wray.  PX 7673 at 1; Tr. (Donziger) 2475:22–2476:6.  Fajardo had almost no experience when Donziger installed him as the "lead" local counsel, and had only graduated from law school the year before.  PX 806 at 26; DX 4 at 1.  The Lago Agrio litigation is his first case.  Tr. (Donziger) 2474:3–7.

Even after Donziger installed Fajardo as the lead local lawyer in late 2005, Donziger continued to refer to himself as the "lead lawyer" for the LAPs and "the person primarily responsible for putting this team together and supervising it," adding that his "role is to be the lawyer and manage the Ecuadorian legal team . . . ."  PX 806R at 3, 21.  Donziger stated, "I play [an] integral role [in] designing the trial strategy and working closely with the local team of lawyers."  *Id.*

at 22.

Fajardo himself believed that Donziger was the "cabeza," or the "head" of the lawsuit. PX 169# at 27 ("[Pablo] . . . [s]till introduces me as the 'cabeza' of the lawsuit."); Tr. (Donziger) 2471:16–17 ("Cabeza means head in Spanish."). Fajardo also calls Donziger "commander-in-chief." PX 7559 at 2; *see also* PX 944 at 1 ("Commander, this is the document submitted by the expert that you requested."). And Fajardo never took the stand to even attempt to explain away these statements, or to assert his control over the enterprise.

Donziger's denials of leadership of the enterprise are also unconvincing in light of the compensation arrangements for Donziger and Fajardo. Donziger admitted that he earns "salary-wise on the case six or seven times more than Mr. Fajardo." Tr. (Donziger) 2479:4–8. And Donziger stands to make "[o]n a contingency fee basis . . . three times or more what Mr. Fajardo stands to make if [Donziger] collect[s] on this judgment . . . ." *Id.* at 2479:17–20. This payment schedule reflects an arrangement in which Donziger is the boss and Fajardo is the employee, an interpretation also supported by Donziger's retainer agreement with the LAPs.[11]

The recently unredacted Asamblea meeting minutes from January 15, 2013, claim that, because of the RICO case going to trial, Donziger was "temporarily" stepping aside as lead counsel. PX 8050 at 4, 5. But this is window dressing, coming long after almost all the relevant conduct at issue. It confirms only that Donziger ran the enterprise until at least January 2013, and probably still does. Indeed, during this meeting, Fajardo described "Steven's role in the U.S. is: to coordinate the legal teams, communications, working with Chevron shareholders, and lob-

---

[11] *See* PX 558 at 2–3 ("[T]he Plaintiffs desire to appoint Steven R. Donziger, Esq. to act as Plaintiffs' U.S. Representative . . . with such responsibilities as . . . coordinating the overall legal strategy of the Plaintiffs . . . assembling and organizing the various United States lawyers and law firms . . . coordinating the efforts to procure funding . . . assembling and organizing the various non-legal advisors, experts, service providers and others . . . and . . . coordinating the media, public affairs and public relations activities on behalf of the Plaintiffs.").

bying, and seeking resources, even though there is no report." *Id.* The "temporary" withdrawal should be given no weight because it is an obvious strategic gambit—Donziger supposedly voluntarily agreed to step aside and reshuffle the roster to avoid discovery and try to insulate himself from RICO liability. Even if credited, the "temporary" demotion—long after almost all the relevant conduct at issue in this case—does not absolve Donziger of operation/management liability, which applies even to lower-level managers. *See Reves*, 507 U.S. at 183–84, 113 S. Ct. at 1172–73 ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."). *See* FF ¶¶ 2–3, 7, 9–15.

### C. Donziger Has Committed Dozens of RICO Predicate Crimes

Donziger's conduct violates the civil RICO statute (18 U.S.C. §§ 1961–1968) through the predicate acts of extortion, mail and wire fraud, money laundering, obstruction of justice, and witness tampering, among others.

#### 1. Donziger's Attempt to Obtain Money From Chevron Through Fear of Economic Harm Constitutes Extortion

By spreading lies intended to cause "damage to [Chevron's] reputation" (PX 15A at 3), put "personal psychological pressure [on] [its] top executives" (*id.*), harm the company's share price (PX 687 at 3), provoke U.S. federal and state governmental investigations (*id.*; PX 754; 1/18/2011 Donziger Dep. 3177:11–24; PX 7441; PX 7442), reduce the value of its brand assets (PX 687 at 3), and otherwise interfere with its business operations (*id.*), Donziger and his co-conspirators seek to instill and profit from Chevron's fear of economic harm. Their threats are predicated on knowing falsehoods and delivered for an unlawful purpose, which constitutes extortion under both federal and New York law. *See* FF ¶ 20, 97.

### a.  Extortion Encompasses Attempting and Conspiring to Make Wrongful Use of Fear of Economic Harm to Induce Another to Pay Money

Donziger's pressure campaign constitutes attempted extortion, which the Hobbs Act defines as attempting to "obtain[] the property of another, with his consent, induced by the wrongful use of actual or threatened force, violence or fear."  18 U.S.C. § 1951(b).  Attempted extortion and conspiracy to commit extortion are RICO predicate crimes under both federal and state law.  18 U.S.C. § 1951(b)(2) (criminalizing obtaining, attempting to obtain, or conspiring to obtain "property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear"); *see Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 248 (S.D.N.Y. 2012); N.Y. Penal Law §§ 155.05(2)(e), 105.17; 110.00 (McKinney 2013).  Fear of economic loss satisfies the "fear" element under both federal and state extortion law.  *United States v. Brecht*, 540 F.2d 45, 52 (2d Cir. 1976); *People v. Dioguardi*, 8 N.Y.2d 260, 268 (1960) ("It is well-settled law in this State that fear of economic loss or harm satisfies the ingredient of fear necessary to the crime [of extortion].") (citations omitted).

To instill fear of economic loss, Defendants need not directly threaten their victim, nor make an explicit quid pro quo demand.  *See, e.g.*, *United States v. Gotti*, 459 F.3d 296, 332–33 (2d Cir. 2006); *Dioguardi*, 8 N.Y.2d at 271–72.  In fact, to prove attempted extortion based upon fear of economic loss, Defendants need not instill actual fear in their victim, but rather only attempt and intend to do so.  *See United States v. Salerno*, 868 F.2d 524, 531 (2d Cir 1989); *People v. Gardner*, 144 N.Y. 119, 124, 38 N.E. 1003 (1894) (extortion "depends upon the mind and intent of the wrongdoer, and not on the effect or result upon the person sought to be coerced").  Whether Defendants actually instilled fear, or whether "the victim may be made of unusually stern stuff[,] is quite irrelevant to a permissible finding that there has been an attempt to instill fear."  *United States v. Gambino*, 566 F.2d 414, 419 (2d Cir. 1977).

45

### b. Donziger Exploited Judicial Weakness and General Corruption in Ecuador to Manufacture "Leverage" Over Chevron

In order to instill a fear of economic harm in Chevron, Donziger needed more than just his bare allegations that the company was liable to his clients. He needed others to say it for him—third parties who could repeat his lies a thousand times and lend credibility and force to his claims. Donziger's *modus operandi* has been to launder his unsupported allegations through third parties, obtaining their cooperation through corruption, bribery, or deceit, and then to hold out their statements as "independent" validation. At first he fed his propaganda to his own people, and relied heavily on U.S.-based consultants to generate the false narrative. But eventually Donziger would use the Ecuadorian court itself as his shill, installing his own agent as a purportedly independent expert and ghostwriting the expert's report, and then by bribing the judge to issue a bogus judgment that Donziger's team had secretly written.

Donziger exploited what he perceived to be a corrupt judiciary and a broader culture of corruption and crime to control the court, intimidate his opponents, and influence media coverage. In Donziger's words: "All the judges here are corrupt . . . . [I]t's their birthright to be corrupt." PX 9A at 2.[12] Thus, Donziger's initial target for intimidation was the Ecuadorian court itself. He explained his approach to some of his consultants in a scene captured by the *Crude* cameras: "[Y]ou know this is Ecuador, okay. . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true." PX 43A at 5–6. And he repeatedly told his Ecuadorian co-conspirators, "the only way the court will respect us is if they fear us—and . . . the only way they will fear us

---

[12] The U.S. government recognizes these problems. In 2007, the Department of State noted that the Ecuadorian judiciary was "susceptible to outside pressure and corruption," which included "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature" and judges basing their decisions on "media influence or political and economic pressures." PX 993 at 4. *See also* PX 1108 at 3; PX 1252 at 4.

is if they think we have [s]ome control over their careers, their jobs, their reputations—that is to say, their ability to earn a livelihood."  PX 184 at 2; *see also* PX 179 at 3 ("[T]he only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us.").  Because "the judicial system [t]here is so utterly weak," Donziger believed that litigants should "go in and confront the judge with media around, and fight and yell and scream and make a scene, and, you know, that would never happen in the United States.  That would never happen in any judicial system that had integrity.  And it's that very weakness that, you know, lets people do that.  That is also—lets people corrupt the process."  PX 8A; *see also* PX 4A.  According to Donziger, the only language a judge would understand would be "one of pressure, intimidation and humiliation."  PX 5A.  In accordance with this approach, Donziger instructed one of his co-conspirators to "prepare a detailed plan with the necessary steps to attack the judge" through legal channels and "any other channel you can think of."  PX 779.  Donziger's goal was that "no judge can rule against us and feel like he can get away with it in terms of his career."  PX 3A.

Donziger assembled what he called a "private army" of supporters that he brought to the court and to field inspections to intimidate and even shut down proceedings (PX 67A; PX 68A; PX 81A), threatened judges with criminal complaints (PX 185), and made sure judges knew he was friends with senior government officials (PX 844).[13]  His Ecuadorian co-conspirators agreed with this strategy.  Fajardo, for example, opined, "I think it's indeed necessary for us to organize pressure demonstrations at the court[.]"[14]  PX 63A.

---

[13]  This campaign was not limited to the courthouse.  As one eyewitness testified: "Whenever Mr. Donziger attended a judicial inspection, it devolved into a media circus.  There would be significant media coverage, a much more combative atmosphere that seemed to be directed more at the media than at the Ecuadorian Court, and a bus of protesters would arrive, sometimes including indigenous people in native dress."  PX 3300 (McMillen) ¶ 17.

[14]  Defendants have continued their strategy of attacking and pressuring judges in the United States and elsewhere.  In the earlier *Aguinda* litigation, they sought recusal of Judge Rakoff for his purported bias after he ruled [Footnote continued on next page]

Donziger's private army accomplished more than just intimidating the court.  It made a show for the media and interfered with Chevron's ability to defend itself in the Lago Agrio law-suit.  At the beginning of trial Defendants organized a "massive protest" at the courthouse against Chevron representatives.[15]  Chevron's lawyers arrived at the courthouse at 6:30 am and found it ringed by "police in riot gear."  PX 3000 (Veiga) ¶ 112.  A crowd formed outside, which Chevron lawyer Ricardo Reis-Veiga recalled as being "large and hostile" and made up of "intox-icated" individuals (PX 3000 (Veiga) ¶¶ 113, 115), and which Chevron lead counsel Adolfo Callejas found "unsettling" (PX 4300X (Callejas) ¶ 27).  Fearing for their personal safety, Reis-Veiga and Callejas sought "refuge inside the courthouse long after the Lago Agrio Plaintiffs' representatives had left and late into the evening."  PX 3000 (Veiga) ¶ 114.  *See* FF ¶¶ 12, 28–34, 39–40.

### c.   Donziger's Initial Scheme Was to Corruptly Influence the Court Process Through Party-Nominated and Court-Appointed Experts

#### i.   Donziger Submitted Forged Reports to the Ecuadorian Court Under the Signature of the LAP-Nominated Expert, Dr. Charles Calmbacher

At the outset of the Lago Agrio litigation, the Court had ordered a "judicial inspection" process, in which experts nominated separately by the LAPs and Chevron were to investigate and report on the environmental conditions at 122 former consortium oil production sites.  PX

---

[Footnote continued from previous page]
against them.  *In re Aguinda*, 241 F.3d 194, 197–98 (2d Cir. 2001) (denying writ).  And this Court is well aware of Defendants' near-daily attacks in court filings and in the media—accusing this Court of being "open . . . for Chev-ron's business," "at Chevron's beck and call," a "Chevron lackey," in a "conspiracy" with Chevron, "corrupt," "bi-ased," "racist," and a "zealot[],," and seeking recusal and reassignment on these bases.  *See, e.g.*, *In re Naranjo*, No. 13-772, Dkt. 182 (2d Cir. Sept. 26, 2013) (Second Circuit's mandate disposing of Defendants' latest writ proceeding and reassignment request); *Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 n.11 (2d Cir. 2012) (denying Defendants' request for reassignment); *Chevron Corp. v. Naranjo*, No. 11-1150-cv(L), 2011 WL 4375022 (2d Cir. Sept. 19, 2011) (denying Defendants' mandamus petition seeking to compel recusal).

[15]  PX 3000 (Veiga) ¶ 114; *see also* PX 67A at 3(Donziger:  "So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003.  Remember all those people on the street?").

48

3300 (McMillen) ¶ 11; PX 4300X (Callejas) ¶ 31. To resolve any differences between the conclusions of the parties' experts, the court appointed a panel of "Settling Experts." PX 3300 (McMillen) ¶ 11.

In 2004, the LAP team selected Dr. Charles Calmbacher to be the expert in charge of their inspections and to act as the LAPs' testifying expert for four of the first sites that were being inspected. 1/18/2011 Donziger Dep. 3190:8–21; 3191:2–3. Notwithstanding the fact that Donziger "wanted the answer to be that there was contamination and people were being injured" (3/29/2010 Calmbacher Dep. 92:4–7), Dr. Calmbacher concluded that the sites he inspected did not require further remediation or pose a risk to human health or the environment (*id*. 115:15–24, 118:15–21). Even after Donziger fired Dr. Calmbacher (PX 2417; PX 2422 at 3), Dr. Calmbacher was adamant that he would still be the one to "write the Perito reports," because he needed "to comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian court." PX 2417 at 1. In an email to Donziger, Dr. Calmbacher made clear that the LAPs' team was not to alter any of the conclusions in his report:

> It also has been stressed to me that it is highly unusual for a perito [expert] to allow others to contribute to the writing of a report. Comments or review is acceptable, but the perito's opinion and findings are final. I therefore have and feel no obligation to allow your team of textile engineers and associated cron[i]es to review or edit my reports. I am assured, as perito of the court, that I am completely within my rights to write and submit my report independent of those who have nominated me for appointment as perito. My sole obligation is to tell the truth, as I see it, to the court, no matter the consequences for either party.

*Id.*

Donziger and the LAP team led Dr. Calmbacher to believe that they would file the reports as he had drafted them, and sent blank pages to him in the United States for his signature or initials. 3/29/2010 Calmbacher Dep. 62:5–63:11. Because the drafts appeared to accurately reflect his opinions, Dr. Calmbacher authorized the reports to be filed. *Id.* 62:11–18. The LAP

team prevailed upon him to send them initialed blank pages and signed signature pages, ostensibly so they could finalize the drafts he had approved and print them for filing in Ecuador.  *Id.* 62:19–63:1.  Dr. Calmbacher sent by overnight delivery service a set of these signed and initialed pages from Georgia to Ecuador and a second set from Georgia directly to Donziger in New York.  *Id.* 63:2–6; PX 722.

The reports that the LAPs filed under Dr. Calmbacher's name, however, are not the same as the reports he authorized to be filed.  3/29/2010 Calmbacher Dep. 111:16–119:1.  The LAP team prepared different, fraudulent reports that misstated the evidence and concluded that the inspected sites presented a danger to the environment and required multi-million dollar remediations.  *Id.*  When Dr. Calmbacher later reviewed the reports filed under his name, he testified that "I did not reach these conclusions and I did not write this report."  *Id.* 116:9–10.

At trial, Defendants failed to rebut Dr. Calmbacher's testimony.  Donziger denied that "he changed or participated in any plan to change the reports after Dr. Calmbacher approved them," and claimed that he is "aware of no such conduct by our team."  DX 1750 (Donziger) ¶ 108.  But none of the emails offered in purported support of this denial (*id.* ¶ 108 n.54 (citing DX 725–DX 735; DX 1381; PX 721; DX 723; PX 3203) shows Dr. Calmbacher reviewing or approving reports containing the findings he denied reaching in his deposition.  And the exchange is consistent with Dr. Calmbacher's testimony that the LAP team showed him a report that reflected his conclusions, but was not the report they filed under his name.  3/29/2010 Calmbacher Dep. 62:5–63:16.  Donziger's testimony that Dr. Calmbacher provided data for Sacha Norte 4 is similarly irrelevant—the reports Dr. Calmbacher testified were falsified were those for Sacha 94 and Shushufindi 48, not for Sacha Norte 4 (3/29/2010 Calmbacher Dep. 112:1–4, 116:11–119:1).  The rest of Defendants' response to Dr. Calmbacher's testimony is unsubstantiated "name-

calling."  *See* DX 1750 (Donziger) ¶¶ 109–110 (describing Calmbacher as "very difficult to work with").  And none of the LAP team members from Ecuador, who were likely responsible for actually fabricating the Calmbacher reports, appeared in this action to testify as to the process by which those reports were submitted.

The LAP team has never withdrawn the forged reports they submitted under Dr. Calmbacher's name, or admitted their conduct to the Lago Agrio court.  *See* FF ¶ 36.

### ii. Donziger Set Up a Fraudulent "Monitorship" Program With Fernando Reyes to Influence the Neutral Settling Experts

Donziger sought to illicitly influence the settling experts who would evaluate the parties' experts' reports.  In 2005, he approached Fernando Reyes about serving as an "independent" monitor of the settling experts.  PX 7502 ¶ 12; 5/13/2013 Reyes Dep. 19:2–9.  Donziger considered Reyes to be "one of the most qualified engineers and academics in the field," and one of only two people on what he called the "'A' List."  PX 2426.

Along with his colleague Gustavo Pinto, Reyes agreed to work for the LAPs, and Donziger instructed them to "keep secret the nature of [their] arrangement . . . ."  PX 7502 ¶ 15; 5/13/2013 Reyes Dep. 24:5–20, 28:17–21; 1/29/2011 Donziger Dep. 3846:6–20 ("[W]hen [Donziger] cut that deal with Mr. Pinto and Mr. Reyes, it was [his] intention that they keep confidential that they were working for the plaintiffs [and] being paid by the plaintiffs.").  In particular, Donziger did not want it known that the LAPs were paying Reyes and Pinto or that they would receive a bonus if the LAPs won the case, because Donziger's "goal was to create the image that the monitorship was 'independent' of the parties, so that it would be received with deference and respect by the Court."  PX 7502 ¶ 15; *see also* 5/13/2013 Reyes Dep. 23:21–24:20, 28:7–16.  Donziger ensured there would be "no written agreement" and took other steps to keep the relationship secret, as reflected by this contemporaneous entry in his private notebook:  "50 k

came today - meet on roof to plan payment [to] GF."  PX 175 at 1; *see also* 1/29/2011 Donziger

Dep. 3845:17–23 (testifying that "GF" refers to Gustavo Pinto and Fernando Reyes).  As

Donziger described the scheme, "I feel like I have gone over to the dark side" (PX 174 at 1) and

made a "bargain with the devil . . ." (PX 177).  *See* FF ¶ 37.

### iii. These Schemes Failed to Obtain the Results Donziger Desired

The Calmbacher and Reyes schemes proved insufficient to get the results Donziger want-

ed.  In the first settling expert report issued in February 2006 regarding the Sacha 53 site, the ex-

perts agreed with Chevron's expert's findings.  *See* PX 1530.  Donziger was "very upset by the

findings of the settling experts' report, and he complained that the report supported Chevron's

position and did not support the plaintiffs' position."  PX 7502 ¶ 19.  Indeed, Donziger recorded

in his personal notes that the report was "disastrous."  PX 169# at 71.  Nonetheless, Donziger

continued to feed the media campaign in the United States, issuing a press release titled "Chev-

ron Slammed in New Court Report for Leaving Toxins in Rainforest."  PX 465#.

Distorting the report in the press was the best Donziger could do.  Donziger instructed

Reyes and Pinto to issue comments on the settling experts' Sacha 53 report stating the settling

experts "were wrong, that they lacked objectivity and were biased towards Chevron . . . ."  PX

7502 ¶ 20.  But Reyes refused to "twist [his] professional assessments to make them fit the plain-

tiffs' interests," and "Donziger expressed disappointment with [his] report and never asked [him]

to submit it to the Court."  *Id.*; *see also* PX 169# at 71 ("G and F [Gustavo Pinto and Fernando

Reyes] have been unable to state a real opinion and they are supposedly on our side!").  The

monitorship scheme was dead—but this was not the last time Donziger would put up a bogus

"independent" expert to parrot his words.  *See* FF ¶ 38.

### d. Unable to Generate Sufficient Leverage Over Chevron in the Judicial Inspection Process, Donziger Implemented a Bolder Scheme to Install and Control Richard Cabrera as the Definitive "Global Expert"

The Ecuadorian court denied Defendants' request to cancel the judicial inspections and appoint a single expert in multiple rulings. *See*, *e.g.*, PX 327 at 2 (denying LAPs' motion and ordering that the "inspections . . . be scheduled at the appropriate time"). Defendants' Ecuadorian counsel attributed this refusal to purported corruption, and proposed to attack the court in an effort to obtain a more favorable ruling. PX 8021 ("it would seem appropriate to publicly attack the judge and the clerk"). Defendants then implemented a two-prong strategy to achieve their goals. First, they solicited twelve Ecuadorian civil law professionals to sign an amicus brief in support of their position, which was filed on July 21, 2006. PX 8018. Listed first among these signatories was Gustavo Larrea, who was at the time campaign manager to presidential candidate Rafael Correa, and who would become Interior Minister in the Correa administration—and who has been linked with the Revolutionary Armed Forces of Colombia ("FARC").[16] But consistent with Donziger's modus operandi, the LAP team (in particular, Aaron Marr Page) drafted the brief and failed to disclose their involvement. *See* PX 8016 at 2 (Donziger: "Aaron helped draft the amicus"); 9/15/2011 Page Dep. 302:12–303:11. Donziger directed that Page take over the project, urged Page to "try to get this out of [Ponce's] hands and work directly with Julio [Prieto]," and managed the drafting of the brief. PX 8017. The LAP team controlled the brief

---

[16] *See* PX 8018 at 5; Jeanneth Valdivieso, *Ecuador Names 1st Female Defense Chief*, Washington Post, Dec. 27, 2006 ("On Wednesday, [Correa] chose his campaign manager, Gustavo Larrea, to be interior minister. Larrea will be tasked with a national referendum on a special assembly to draft a new constitution, a process similar to one underway in Bolivia under leftist President Evo Morales."); Stephan Küffner, *Ecuador Officials Linked to Colombia Rebels*, Time, Dec. 15, 2009 ("Several former officials of the Ecuadorian government had ties with Colombia's Marxist guerrillas, a commission named by President Rafael Correa conceded Tuesday. . . . The 131-page Angostura report provides further evidence that Gustavo Larrea, who has held positions as Interior and Security Minister under Correa, had direct links to the FARC, along with José Ignacio Chauvín, briefly his deputy in the Interior Ministry, and Maria Augusta Calle, a television journalist and currently a legislator for Correa's Alianza PAIS political movement.").

throughout and finalized it for filing.  PX 8020.

Simultaneously, Defendants and their Ecuadorian co-conspirators held a series of private meetings with the judge and blackmailed him into agreeing to their requests.  PX 785 ("Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . ."); PX 185 ("Legal case:  going well with [Judge] Yanez decision to cancel inspections . . . . We wrote up a complaint against [Judge] Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need . . . . So instead of a strong judge who sees the viability of our case, we now might have a weak judge who wants to rule correctly for all the wrong, personal reasons."); *see also* PX 192 ("Met with judge last night in house . . . We saved him, and now we are reaping the benefits."); PX 2478, 2478A (Donziger noting the Court "never would have [acceded to Defendants' requests] had we not really pushed him").  The LAP team's intent and expectation was that the court would substantially adopt the Cabrera report as its judgment.[17]  *See* FF ¶¶ 39–43.

### i.  Donziger Recruited and Placed Cabrera as an "Independent" Expert

A few months after abandoning the monitoring program, Donziger, Fajardo, and Yanza met with Reyes to prepare a new scheme.  They "acknowledged that the judicial inspection pro-

---

[17] PX 35, 35A at 6; *see also* PX 169 at 15–16 ("I asked Pablo if he was 100% sure the judge would [appoint] Richard and not Echeverria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error."); PX 1648 ("The project is at a key point right now.  We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case . . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report."); PX 2377 at 5 (Donziger telling members of the U.S. Congress that "an independent court expert, working with a team of 14 scientists, found that Chevron is liable for up to $27 billion in damages . . . . If the court accepts the damages assessment, then the case could produce the largest judgment ever for an environmental lawsuit."); PX 873 (calling Cabrera's swearing in as Global Expert a "HUGE VICTORY");  PX 499# (ChevronToxico article stating that "Ecuadorian courts generally give wide deference to the findings of court-appointed experts, who are akin to special masters in the United States); PX 5208 (Beltman) ¶ 17 ("It was clear from statements Donziger and others made that the LAPs' team expected the Lago Agrio court to rely upon the Cabrera Report in rendering its judgment.").

cess had not yielded data to support their claims of contamination.  They also said they believed it would be easier to manage one single expert than many."  PX 7502 ¶ 22.  Donziger described the criteria he had in mind for the global expert:  to "totally play ball with us and let us take the lead while projecting the image that he is working for the court."  PX 191 at 30.  Reyes was not comfortable with the plan, however, and he thought the LAPs' $10 billion damages proposal was "completely ludicrous."  PX 7502 ¶ 29.  At Donziger's request, Reyes recommended Richard Cabrera as the "Plan B" expert, even though Cabrera had "technical limitations" and "did not possess the professional skills and experience required to handle" a project of this magnitude. *Id.* ¶ 30.  But Reyes "believed that for Mr. Cabrera, issues such as independence and professional standards were not that important, and therefore he would have no problem doing what the plaintiffs were proposing."  *Id.*

On March 3, 2007, shortly before his official selection and more than three months before his swearing in, Cabrera met *ex parte* with the LAP team and their agents.  The LAP team would "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting."  12/13/2010 Donziger Dep. 1120:23–1121:5; PX 201 ("I spend [sic] the whole day making comments and mostly directing them to Richard [Cabrera].  We laid out our entire case and legal theory – what a benefit!").  During that meeting, Fajardo made a presentation concerning the global assessment in which he discussed what eventually would become the Cabrera report and stated that "what the expert is going to do is state his criteria, alright?  And sign . . . the report and review it. . . .  But all of us, all together, have to contribute to that report."  PX 39; PX 39A at 4–5.  Ann Maest commented, "But . . . not Chevron," and everyone laughed.  PX 39A at 5.

Later in this meeting, the LAP team discussed the "work plan," a document that was prepared by the LAP team and subsequently submitted to the Ecuadorian court by Cabrera as the

independent court expert.  1/8/2011 Donziger Dep. 2406:7–11.  The recording of the March 3 meeting ended with Donziger commenting that they could "jack this thing up to thirty billion . . . in one day."  PX 42, 42A at 5.

On March 19, 2007, the Ecuadorian court appointed Cabrera the global expert.  In the June 2007 order swearing Cabrera in as the expert, the Court stated:  "the Expert [Cabrera] states that he is not under any legal impediment whatsoever and swears to perform his duties faithfully and in accordance with science, technology, and the law, with complete impartiality and inde-pendence vis-à-vis the parties."  PX 342 at 3.  The court would go on to order Cabrera to "work in an impartial manner and independently with respect to the parties" (PX 348 at 6) and explain that "the role of the expert is one of complete impartiality and transparency with respect to the parties and their attorneys."  *Id.* at 10.  Donziger exulted in Cabrera's appointment as a "HUGE VICTORY" and noted that the "visit to the judge last week was a huge help."  PX 873.  *See* FF ¶¶ 44–49.

### ii. Donziger Hired the LAP Team's U.S. Consultants to Ghostwrite the Cabrera Reports

Back in the U.S., preparations were already under way for drafting Cabrera's report. Shortly after the March 2007 meeting, David Chapman, a principal at Stratus, emailed Donziger proposing that "the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report."  PX 847 at 1.  After an April 27, 2007 meeting with Donziger in Colorado, Stratus entered into a contract with Kohn Swift to provide technical assis-tance, including the production of reports.  *See* PX 633.

On June 25, 2007, Cabrera filed his "Work Plan" but did not disclose that it had been

56

drafted by the LAP Team.[18]  *See* PX 277R; PX 843 (LAP team discussing the first draft of Cabrera's work plan and schedule of activities); *see also* 12/29/2010 Donziger Dep.  2166:12–22 (confirming that "[t]he work plan that plaintiffs drafted for Cabrera did not indicate on it anywhere that it had been drafted by the plaintiffs").  With the LAP team's assistance, Cabrera began site inspections on July 4, 2007.  *See* PX 310A at 1; *see also* 12/29/2010 Donziger Dep. 2203:11–13 (testifying that the LAP team "had been involved in Mr. Cabrera's site selection").

Leading up to the April 2008 filing of Cabrera's first report, Stratus and Donziger exchanged hundreds of emails regarding draft outlines of the Cabrera report and proposed annexes, schedules for completion of various annexes, and review, analysis, and translation of the annexes.  *See, e.g.,* PX 985; PX 1521; PX 8026–34.  Donziger pressed for higher and higher damages numbers, explaining at one point that an estimate for unjust enrichment "sound[ed] awfully low" and implored that Stratus not "say or even suggest anything that backs away from the [LAP team's] figures."  PX 936.

Donziger dismissed his U.S. consultants' concerns about the evidentiary basis for their work.  The day after the March 2007 meeting with Cabrera, Maest and other U.S. members of the team warned Donziger that there was no evidence showing groundwater contamination, a major element in the LAPs' theory.  Donziger responded, "[T]his is Ecuador, okay . . . ?  You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want . . . [I]f we take our existing evidence on groundwater contamination which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory . . . [w]e can do it.  And we can get money for it. . . . Be-

---

[18] This would not be an isolated incident.  The LAP team, in fact, drafted everything that Cabrera filed during the Lago Agrio litigation.  *See, e.g.*, PX 288 (draft of Cabrera letter); PX 943 (unstamped Cabrera motion); PX 944 (draft Cabrera motion).

cause at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bull-shit. It really is. We have enough, to get money, to win." PX 43, 43A at 5–7.

Douglas Beltman and others at Stratus wrote the Cabrera report in late February and early March, 2008. On February 22, Beltman exhorted his colleagues that they were "at a critical stage on the Ecuador project" because that their role was to "write, over the next 2 to 3 weeks, probably the single most important technical document for the case." PX 1648. As Donziger admitted, "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera." 12/29/2010 Donziger Dep. 2253:5–11. Beltman, Stratus, and the LAP team drafted the "Summary Report of Expert Examination" and the majority of the annexes that were included in the Cabrera report. PX 5208 ¶ 22. Beltman then arranged to have the Cabrera report translated into Spanish, intending that they would treat "our original English version as if it's a translated version" of Cabrera's work, where possible, and otherwise "change our English version to match the Spanish version that made it into the Cabrera report so that it's an English translation of the Spanish version." PX 1050.

In sworn statements submitted to the Court in this action, the Status consultants who were primarily responsible for this process, Beltman and Maest, were frank in their descriptions of the drafting process. Beltman admitted, "I prepared the first draft of substantial parts of the document that would be filed as the "Summary Report of Expert Examination," which was the main body of the Cabrera Report. At Donziger's direction, I drafted my portions of the report in the first person as though it was written by Richard Cabrera. I supervised the preparation by Dr. Maest and other Stratus personnel or subcontractors of 11 of the 24 sub-reports and appendices, known as 'Annexes,'" to the Cabrera Report." PX 5208 ¶ 22. "I continued to provide comments on and material for the Summary Report and annexes to Donziger and LAPs' team members in

58

Quito up to the night of March 30, 2008 . . . ." *Id*. ¶ 24. "Donziger and Fajardo told me to whom authorship of the various Cabrera Report Annexes should be attributed, and I recorded those names in a table. Donziger told me that the reason for the attribution was to make it more difficult to uncover that Stratus had written the Annexes." *Id*. ¶ 27. Beltman's table detailed each annex, who was really writing it, and to whom its authorship would be falsely attributed. *See* PX 0976 at 6–9. *See also* PX 5210 (Maest) ¶ 30 ("I have reviewed the witness statement of Douglas Beltman regarding drafting of the Cabrera Report and annexes. I am not aware of any facts or data that contradict any of his statements or conclusions. His recollection of the drafting process and related events are consistent with my own.").

The LAP team, and Donziger personally, were working to finalize the Cabrera report until mere hours before it was filed, even though neither Donziger nor any member of the LAP team were scientists qualified to be working on such a report. *See*, *e.g.*, PX 1019 (3/31/2008 Donziger email making edits to damages calculations); 1/8/2011 Donziger Dep. 2507:24–2508:7 (discussing an edited damages table that "was going to be appear in the Cabrera report" and that Donziger was drafting as of March 30, 2008). At most, Cabrera had a few hours to read the report and the 6,000 pages of supporting material. PX 310. But there is no evidence in the record that he did even that.

On April 1, 2008, Donziger received an email from "gringograndote@gmail.com" attaching a Word version of the Cabrera report. PX 1017. The Word version was last saved on March 31, 2008 at 11:09 am and matches word for word the report filed by Cabrera on April 1, 2008. *Compare* PX 310, *with* PX 1017*; see also* PX 4100 (Lynch) ¶¶ 8, 15. Donziger later asserted that Cabrera had "adopted pretty much verbatim what had been provided to him" by Stratus. 1/8/2011 Donziger Dep. 2433:8–14.

As Chevron expert Spencer Lynch testified, the Cabrera report was drafted on LAP attorney Juan Pablo Saenz's computer and edited up until the day before filing.  Tr. (Lynch) 637:14–638:6.  If not for Defendants' obstruction of Chevron's efforts to obtain evidence from Ecuador, Lynch could have obtained additional information about how the final draft of the Cabrera report "came to be in Mr. Saenz' possession."  *See id.* 638:3–13.  And Saenz did not appear at trial to testify in support of this concocted theory.  *See* FF ¶¶ 52–54.

### iii. While the U.S. Consultants Wrote Cabrera's Report, Donziger and His Co-Conspirators Also Controlled the Fake Cabrera Inspection Process

Defendants bribed Cabrera with tens of thousands of dollars in undisclosed payments, facilitated by a series of international wire transfers, as well as other benefits.  Just a few weeks after the March 2007 announcement of Cabrera's forthcoming appointment, Yanza wrote to Donziger:  "We have met with Richard [Cabrera] and everything is under control.  We gave him some money in advance."  PX 850.  The LAP Team also entered into a contract with Cabrera, obtained insurance for him, and arranged for him to have an office and an assistant, who turned out to be one of the LAP Team members' girlfriends.  *See* PX 877; PX 881.

The day before and of Cabrera's swearing in, Donziger and Yanza discussed creating a "secret account," possibly in the name of Donald Moncayo, to be the formal repository of funds for secret, illicit payments to Cabrera outside the court-approved process.  *See* PX 870; PX 871.  Yanza explained the purpose of the secret account:  "you send us money to the secret account to give it to the Wuao [Cabrera]."  PX 913.  Ultimately, the LAP team resolved to repurpose a preexisting account held at Banco Pichincha in the name of the Amazon Defense Front to serve as the secret account.  *See* PX 578 (showing Banco Pichincha account in the name of the Amazon Defense Front ending in 9800 was opened in May 2000); PX 912 (Yanza identifying Banco Pichincha account in the name of the Amazon Defense Front ending in 9800 as the secret ac-

count).  Donziger could not deny that this was the purpose of the account, as he claimed to have no "independent recollection" of the secret account discussions (DX 1750 ¶ 101), and Yanza did not appear to attempt to explain away his contemporaneous emails.

Between August 2007 and February 2008, Donziger directed Kohn Swift to make three separate wire transfers totaling $120,000 to the "secret account."  PX 578 at 6–7; PX 618 at 4–5, 13.  Of this sum, $33,000 has been confirmed as payment to Cabrera through a direct account-to-account transfer at Banco Pichincha.  *See* PX 578 at 6; PX 590; PX 591; PX 593.  And large cash withdrawals were made during or near Donziger's visits to Ecuador where he could facilitate payments in hand.  PX 1509 (showing Donziger's visits to Ecuador on September 17–20 and October 4–6, 2007 and February 18–23, 2008); PX 578 at 6–7 (showing large cash withdrawals on 9/20/07, 10/3/07, 2/21/08, and 2/26/08).  These payments to Cabrera were illicit and outside the court-established process (*see* PX 4900 (Dahlberg) ¶¶ 115–118; PX 2139), despite what Donziger represented to Kohn (*see* PX 1032 (press release forwarded by Donziger to Kohn stating "Cabrera is paid directly by the court . . . as is customary and required in Ecuador").  Yet Cabrera declared in December 2008, "I have not received even one cent from the plaintiffs or from the defendants behind the back of the Court."  PX 301.

The LAPs also bribed Cabrera by paying him through the court process for work the LAPs knew Cabrera did not do.[19]  The origin of much of these funds was a $1 million investment transferred to Kohn Swift through Donziger's law firm account from Gibraltar, per an investment agreement that Donziger secured with DeLeon just days after Cabrera's appointment in March 2007.  *See* PX 586 at 3; PX 641 at 2; PX 846 at 3; PX 1482 at 4 (identifying Donziger's law firm

---

[19]  *See* PX 2139 (Court authorized payments to Cabrera from the Selva Viva account ending in 5004); PX 4900 (Dahlberg) ¶¶ 119–122 (discussing payments to Stratus, Reyes, and Cristobal Villao for their efforts in preparing the expert report submitted under Cabrera's name concurrently with payments to Cabrera through the court process and secret account).

account as Chase bank account ending in 0218).  *See* FF ¶¶ 50–51.

### iv.  Despite Drafting the Report and Controlling Cabrera, Defendants— and Cabrera—Repeatedly Denied the LAP Team's Role

The public perception that Cabrera was "independent" from the LAP team and worked for the court was essential to Donziger's pressure campaign, and he and the LAP team went to great lengths to create this false public image.  But behind the scenes, Donziger and the LAP team controlled everything.  As Donziger wrote, "When I get there, we'll re analyze the work and the budget with Richard [Cabrera].  And we'll adjust with a much smaller team.  My tendency is to stop Richard from working much more in the field . . . or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples.  And we'll change the focus of the data at our offices."  PX 883.

Cabrera affirmed his supposed independence time and again.  In October 2007, he represented that he performed his work "with absolute impartiality, honesty, transparency, and professionalism," and claimed that "the idea that the plaintiffs would be helping me with that is unthinkable."  PX 283 at 1, 3.  Even as late as March 2010, Cabrera dismissed Chevron's accusations as "serious and false," stating, "I prepared my report and submitted my expert opinion, based on technical and scientific results and the documentary information I received from different sectors, to the best of my knowledge and that of my team of professionals that participated in the study."  PX 305 at 2–3.

The LAP team touted Cabrera's independence, impartiality, fairness, and honesty in numerous filings—and denied Chevron's accusations otherwise.  *See* PX 2200.

- "[Chevron] alleges that we, the plaintiffs, have forgotten that the true role of the expert, Cabrera, is that of an auxiliary to the Court, and that our activities in [t]his regard have been similar to those we had with experts we ourselves hired. . . . The plaintiff has respected the authority of Cabrera as your assistant, Mr. Presiding Judge."  PX 351 at 2.

- "To accept [Chevron's] request would be to accept its grounds.  To do so would be to admit that Cabrera maintained a close connection with those of us who are defending the victims of Texaco, a despicable accusation that has NEVER been true and lacks **proof** to support it."  PX 354 at 1.

- "The oil company has tried to influence public opinion to believe that the expert is prejudiced in our favor (which it has never been able to prove), when in reality both parties to this suit are in exactly the same position with regard to a Court-appointed expert.  This illusion the oil company is attempting to create is entirely without any basis in fact. . . . According to the oil company:  if we're not attacking Mr. Cabrera it must be because he works for us.  That's simply ridiculous."  PX 363 at 2–3.

- "The plaintiffs, technicians or leaders, are accused of having a close relationship with Independent Expert Richard Cabrera.  Another infamy, your Honor."  PX 366 at 2.

- Cabrera has "once again demonstrate[d] the seriousness, responsibility, objectivity and impartiality with which the expert has performed his work in this legal proceeding."  PX 374 at 1.

They went so far as to remind the court that "expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies."  PX 365 at 1–2.

Moreover, the LAP team sought to further the false impression that they had not written the Cabrera report themselves.  Defendants' work plan for the Cabrera report instructed the LAP team that when the report was eventually filed, they were not to cheer.  On the contrary, "Everyone [must be] silent."  PX 843 at 4.  And the day after its filing, Fajardo emailed the team and told them, "I think it is good to maintain a uniform line, PLEASE, WE ARE NOT HAPPY."  PX 1028.  He reported that he had told "international agencies" that had contacted him that, "[a]ccording to my cursory reading of the report: I think it is a good report, but it is incomplete."  He then listed the various items he thought were "missing" from the report, and concluded "we

are not happy because of what's missing." *Id.* This picked up on a tactic Defendants discussed at the outset of the global assessment, in which Donziger told his team that they "need[ed] . . . to think of anything Richard could do AGAINST us to prove his independence . . . ." PX 858 at 1.

Donziger and the LAP team continued this tactic by filing with the court questions and comments on the report intended to perpetuate the false appearance that Cabrera was neutral and independent. Their submission purported to urge Cabrera to consider various documents and third-party reports, criticized his legal analysis of liability, and gave suggestions as to how he might support his existing findings and introduce new ones. *See* PX 312. But Defendants and their co-conspirators themselves had decided which documents to review, how to present the legal case, and what findings and support to put forward in Cabrera's report. Defendants and their co-conspirators wrote their "questions" to further the false appearance of independence from Cabrera.[20]

Defendants and their co-conspirators then wrote Cabrera's response to their own "objections." At least some of the "questions to the Perito [Cabrera]" were "assigned to [Stratus]" to draft answers in the U.S. PX 1073 at 1. Beltman expressed his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written" (PX 1668), and another Stratus employee noted that Stratus needed to revise its work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment." PX 1075 at 2. *See* FF ¶¶ 46–48, 57–59.

### v. Defendants Can Neither Explain Nor Defend Their Ghostwriting

Defendants failed to explain or defend their ghostwriting at trial, and Donziger's exten-

---

[20] For instance, they demanded that Cabrera explain why he used a particular valuation for chemical results, claiming that this was "tremendously favorable to the defendant [Chevron]." PX 312 at 54. Defendants also noted "omissions in the expert report" that they claimed were "unjustly favorable to [Chevron] because they make the calculation of the requested sum too conservative." *Id.* at 40.

sive efforts to conceal it demonstrate that he knew it was wrongful.  The post hoc assertion that Cabrera merely "adopted" the report they ghostwrote is no defense; there is no evidence that Cabrera had any role in designing, drafting, or even reading the report he filed—and Defendants have offered nothing to suggest that they provided Cabrera with any drafts, that he gave any comments, or that they took any guidance from him whatsoever.  Further, and in any event, the largely undisputed evidence confirms that the LAP team's relationship with Cabrera was illegal under Ecuadorian law.

### (1) Defendants' Assertion That Cabrera "Adopted" the Report They Wrote Is False and No Defense Anyway

Contrary to Defendants' public denials of working with Cabrera, Donziger now concedes that the Cabrera report was written by Stratus in the United States.  12/29/2010 Donziger Dep. 2377:21–2378:9; 1/14/2011 Donziger Dep. 2758:6–10.  In Donziger's words, "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera" (12/29/2010 Donziger Dep. 2253:5–11), the Cabrera report as filed was "pretty much verbatim" as written by the LAPs' counsel and consultants (1/8/2011 Donziger Dep. 2433:8–14), and the report's opening assertion, "[t]his report was prepared by the Expert Richard Stalin Cabrera Vega," is not an accurate statement (*id.* 2489:21–2490:18; PX 310A at 3).

Nonetheless, Defendants claim that Cabrera merely "adopted" the report they ghostwrote for him word for word in its entirety (Tr. (Donziger) 2566:4–7), but the evidence shows otherwise.  From the beginning, Defendants preferred Cabrera because he was willing to "play ball" with them, not because he was in any way qualified or because he would perform competent analysis.  PX 191#.  Indeed, the LAP team ghostwriter-in-chief, Doug Beltman, and Ann Maest, have since admitted in sworn statements that Cabrera "lacked the skill, qualifications, and expe-

rience to conduct or review a multi-disciplinary environmental damages assessment himself."
PX 5208 (Beltman) ¶ 15; *see also* PX 5210 (Maest) ¶ 27.

Defendants' meetings with Cabrera reflect his lack of involvement in the preparation of
his own report.  At the March 3, 2007 meeting, Defendants insisted that they would all "contribute" to Cabrera's report and discussed its contents, but there is no indication that Cabrera commented on any part of Defendants' plan or offered his thoughts on how the report should take
shape.  PX 39; PX 39A at 4.  Nor is there any evidence that Cabrera offered substantive input or
direction on the process of drafting the report.  *See* PX 956 (Maest's handwritten notes of
1/15/2008 meeting); PX 957 (outlining Stratus's tasks for the "Peritaje Global report," including
writing the "draft outline or structure for [the] report for submittal to FDA legal team"); PX 978
(attaching Beltman's "rough start of the Peritaje Global report").  Beltman and Maest admitted
that they never saw "any indication of an independent Cabrera 'team'" (PX 5208 (Beltman) ¶ 16)
or "have an understanding that Cabrera was preparing his own report" (*id*. ¶ 17; *see also* PX
5210 (Maest) ¶¶ 28–29).  Maest "never discussed the substance of any part of the Cabrera Report
or any annex with Richard Cabrera nor received any inquiry from him regarding that report."
PX 5210 ¶ 30.  Neither did Beltman.  PX 5208 ¶ 29.  And Defendants never brought Richard
Cabrera to testify to this Court as to whether he actually performed any of the work attributed to
him, or even read the report that was submitted in his name.

Instead, the record reflects intense work by the LAP team to prepare Cabrera's report,
without any input from Cabrera himself, throughout early 2008.  Indeed, the LAP team worked
feverishly up until a few hours before the report was printed—at the LAP team's offices—
without a single reference to any communication with Cabrera.[21]  In the early hours of April 1,

---

[21]  Donziger himself made changes to the damages calculations and tables that were copied into the Cabrera report
[Footnote continued on next page]

2008, Donziger received an email from "gringograndote@gmail.com" attaching a Word version of the Cabrera report (PX 1017), which had last been saved on March 31, 2008 at 11:09 am and that matched word for word the report filed by Cabrera on April 1, 2008 (*compare* PX 310, *with* PX 1017; *see also* PX 4100 (Lynch) ¶¶ 8, 15).  There is no evidence Cabrera had any opportunity even to read the 6,000 page report.  PX 310.  Beltman admitted that "the day before I left Quito after working there for a week on the Cabrera Report materials, I saw what I was told was Annex A of the Cabrera Report boxed up in the LAP team's office for transport to and filing in the Lago Agrio court."  PX 5208 (Beltman) ¶ 30.  The next time Cabrera is known to have had any involvement with it was when he carried it into the courthouse on April 1, 2008.  PX 83A.

### (2) The LAP Team's Relationship with Cabrera Was Illegal Under Ecuadorian Law

Defendants argue that the LAP team's relationship with Cabrera was permissible under Ecuadorian law but offer no evidence beyond Donziger's revisionist recollection:  "Although I often have been confused about the issues involved, I now believe the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador [sic] law, custom, and practice as it was occurring in the *Aguinda* case.  Certainly, I never understood that any actions I took or of which I was aware at the time were impermissible in Ecuador."  DX 1750 (Donziger) ¶ 91.  But the undisputed evidence, including Defendants' contemporaneous reactions and testimony from Defendants' own Ecuadorian law experts, establishes that the LAP team's interactions with Cabrera violated Ecuadorian law.

Defendants retained several experts in Ecuadorian law to defend their conduct, but after

---

[Footnote continued from previous page]

right up until the day before its filing.  *See, e.g.*, PX 1019 (3/31/2008 Donziger email making edits to damages calculations); 1/8/2011 Donziger Dep. 2507:24–2508:7 (discussing an edited damages table that "was going to appear in the Cabrera report" and that Donziger was drafting as of March 30, 2008).

those experts each admitted that Defendants' actions violated the law, Defendants declined to draw attention to them at trial.  LAP expert Ricardo Simon Campaña, for example, admitted that a court-appointed expert must be independent of the parties and impartial and that an expert is incompetent if he fails to maintain his independence.  Dkt. 1240-6 (Simon Dep. Tr.) at 86:13–87:5.[22]  Simon testified that because an expert is an "aid to the court" or its "auxiliary," "[i]t is understood" that an expert "must be someone of recognized honesty and propriety" and "always maintain objectivity and a certain distance with respect to the parties."  *Id*. at 92:14–93:3, 101:17–102:2.  According to Simon, "it would obviously be improper" for one party to meet with a court-appointed expert before that expert was appointed to get his commitment in advance to "slam" the other side with a $10 billion judgment.  *Id*. at 117:17–118:8.  It would be improper and illegal under Ecuadorian law for an expert to submit to the court work secretly drafted by one of the parties (*id*. at 144:24–145:7, 166:24–167:7), as would payments to a court-appointed expert outside of the court-mandated process (*id*. at 182:22–183:9).

Similarly, LAPs expert Juan Pablo Albán testified that bribing a court-appointed expert is a crime under Ecuadorian law.  Dkt. 1240-1 (Albán Dep.) 31:25–32:2.  He admitted that ghost-writing a court expert's report and secretly paying him outside of the court-approved process is contrary to Ecuadorian law.  *Id*. 53:23–54:23.  He conceded that "a meeting between a potential expert and one of the parties in order to agree on a future modification of the expert's report would not be appropriate."  *Id*. 96:23–97:2.  Albán also acknowledged that the LAPs' authoring of Cabrera's work plan, without attribution to the LAPs, would be "inappropriate" under Ecuadorian law.  *Id*. 113:10–21.  And he testified that it is a criminal offense to draft a report in

---

[22] Although the parties were permitted to submit materials on Ecuadorian law, they did not call experts in Ecuadorian law to testify live.  *See* 10/9/2013 Tr. (Pre-Trial Hr'g) 16:1–21 (Judge Kaplan noting that "issues of foreign law are issues of law for the Court" and "[u]nder Rule 44.1 [he] may but [he is] not obliged to hear testimony on the subject").

Cabrera's voice and submit it to the court as Cabrera's own work product.  *Id*. 129:3–23.

Simply put, it is illegal under Ecuadorian law for a party to meet with an impartial and independent "global expert" to plan his work before his appointment or to provide assistance and materials in secret, without disclosure and outside the court process.  Dkt. 1411 at 2.  It is also illegal under Ecuadorian law for a party to hire and pay a third party to perform the work of the impartial and independent "global expert," secretly draft the report, and then submit that work as part of the impartial and independent "global expert's" report.  *Id.* at 3.  And it is illegal under Ecuadorian law for an impartial and independent "global expert" and a party to falsely deny before the court any improper relationship, or for that expert to receive secret payments outside of the established court process.  *Id.* at 4–5.

At best, Donziger appears to be unaware of his own experts' testimony, because he asserted:  "Ecuador law experts have confirmed that parties can have *ex parte* contact with court-appointed experts under any circumstances."  DX 1750 (Donziger) ¶ 92.  Donziger failed to explain his reference to "any circumstances" and ignores that Ecuadorian law experts confirmed that the LAP team's relationship with Cabrera violated Ecuadorian law.  Indeed, he does not even name the "experts" who purportedly sanctioned Defendants' conduct.  Whether or not Ecuadorian law permitted generic *ex parte* contacts, as Donziger frames the issue, his own experts confirm the LAPs' actual relationship with Cabrera was illegal under Ecuadorian law.

The only other justification Defendants offered for the Cabrera fraud—that both parties in the Lago Agrio litigation supposedly had *ex parte* contacts with experts—is similarly unavailing.  Donziger attempts to analogize the LAP team's fraudulent ghostwriting scheme to Chevron's benign interactions with a court-appointed expert, Dr. Marcelo Munoz.  DX 1750 (Donziger) ¶ 96.  But Donziger and the LAPs are well aware that there is no "real comparison" to be made and

that any such comparison would not be "legitimate," as Eric Westenberger of Patton Boggs wrote to Donziger and others in July 2010.  PX 1399.  In the case of Munoz, the *ex parte* meeting of which Donziger complains was purely logistical (*see* DX 1750 ¶ 96) and thus permitted under Ecuadorian law, which precludes parties from bribing an expert and ghostwriting his report, but does not categorically bar all *ex parte* contacts (*see* Dkt. 1413-10 (Ex. 91) (Velázquez) at 2–4).

### (3) Donziger's Attempts to Conceal the Ghostwriting Demonstrate That He Knew it Was Wrongful

At trial, Donziger testified extensively about his "state of mind" and "feelings," and claimed that while he was initially "confused," he now "believe[s]" that what the LAPs did with Cabrera was appropriate.  DX 1750 (Donziger) ¶ 91.  But Donziger's testimony is not only inherently incredible, it is also irrelevant, because the only thing that even conceivably could matter is what Donziger knew and believed at the time he was touting "independence" to funders, co-counsel, courts, and government agencies—not some *post hoc* justification.  Donziger's actions speak louder than his words, and show he knew he was committing fraud.

At Donziger's direction, Defendants took measures to ensure that no one outside their team learned of the Cabrera fraud from the very beginning.  At the March 3, 2007 meeting at which the LAP team planned the Cabrera report, for example, Fajardo made clear the need to keep the Cabrera fraud secret:  "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that.  I hope none of you tell them, please."  PX 39A at 3.  The next day, Donziger emphasized the objective of maintaining secrecy:  "Our goal is that they [Chevron] don't know shit . . . [a]nd that's why they're so panicked."  PX 46A at 3.  He made it clear to Beltman and Maest that their role in the report and the subsequent comments had to "remain absolutely secret."  PX 5208

(Beltman) ¶ 10; PX 5210 (Maest) ¶ 25.

Defendants and Cabrera each lied about Stratus's involvement in ghostwriting Cabrera's report.  *See* PX 366 at 2 (LAPs assert in a filing with the Ecuadorian court that the allegation that the Ecuadorian plaintiffs have a "close relationship with Independent Expert Richard Cabrera" is "[a]nother infamy"); PX 281 ("I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."); 12/29/2010 Donziger Dep. 2286:11–2287:2 (testifying that this was not an accurate statement).  Donziger admitted Defendants instructed their team to keep the Cabrera fraud secret because "[w]e did not want Chevron to know what we were doing."  Tr. (Donziger) 2558:19–20. *See also* 1/18/2011 Donziger Dep. 3089:9–18.  Doing so meant using code names like "cook," "waiter," and "menu."  *See* 1/29/2011 Donziger Dep. 3805:8–12 ("Wao"), 3822:12–3824:8; PX 845.  It also meant making secret payments outside the court process without disclosing them to Chevron (PX 850; PX 895; PX 578; PX 1147) and using secret bank accounts (PX 870).  And Donziger proposed that the LAPs' counsel should consider having Cabrera take action "AGAINST us to prove his independence" and "find ways to keep Texaco from finding out much about his plan and his work.")  PX 858.

The importance of Cabrera's false "independence" and "neutrality" is underscored by the care Defendants took to avoid disclosure of their contacts with Cabrera in connection with their propaganda efforts as well.  When *Crude* filmmakers captured a U.S. consultant admitting that "having the perito there" at the LAPs' March 3, 2007 meeting "was totally bizarre," Donziger instructed the filmmaker: "that was off the record."  PX 46A at 3.  *Crude* originally included a scene showing Donziger and others meeting with Carlos Beristain, a member of Cabrera's purportedly independent team.  *See* PX 100.  After viewing this scene, Fajardo emailed the U.S.

filmmakers, imploring that "the images [of Beristain with Donziger] we had discussed be corrected or removed" because "[t]hey are so serious that we can lose everything" and that "the way it is, the entire case will simply fall apart on us."  PX 2454; *see also* 12/22/2010 Donziger Dep. 1567:6–13.  He also wrote, "I'm referring to the scenes where the Spaniards Carlos Beristain [sic] and Adolfo Maldonado appear.  Those two guys must not appear in the documentary at all!  Please, remove them from it."  PX 1091.  Berlinger ultimately had the changes made even though they were "costly."  PX 2454.  And when Fajardo visited the University of Oregon, and was alarmed to discover that students had obtained copies of the version showing Beristain.  Fajardo told Donziger that they had a "serious problem," although he assured Donziger that nobody at Oregon knew that there was a "conflict."  PX 1107.

Donziger concealed the Cabrera fraud from key members of his own team, including Joseph Kohn, Andrew Woods, Karen Hinton, and Laura Garr.  Indeed, "Donziger stressed to [Beltman] and Ann Maest the importance of Stratus ensuring that no one learn of Stratus's involvement in any aspect of the Cabrera Report . . .  Donziger also instructed me not to tell the LAPs' spokesperson, Karen Hinton, or Donziger's legal associate, Andrew Woods, that Stratus participated in drafting the Cabrera Report and certain of its annexes."  PX 5208 (Beltman) ¶ 10.  Kohn's concern regarding the LAP team's activities in Ecuador had been growing since late 2008.  *See* PX 5600 (Kohn) ¶ 20.  After learning about Chevron's allegations regarding the Nunez bribery scheme in 2009, Kohn thought it was important to "investigate Chevron's allegations of misconduct by the Ecuadorian plaintiffs' team."  *Id.* ¶ 22.  Accordingly, Kohn "requested that these contentions be investigated by an American lawyer and investigator retained by KSG and Mr. Donziger."  *Id.*  On September 2, 2009, Kohn Swift drafted a letter in which it proposed to engage former Assistant U.S. Attorney Kenneth Trujillo and his law firm Trujillo Rodriguez &

Richards, LLC "to conduct an investigation into allegations of corruption, bribery and improper interference in the trial in Ecuador of *Aguinda, et al. v. Chevron Corporation*."  PX 1155 at 1.[23]

While he initially pretended to be open to an investigation (PX 5600 (Kohn) ¶ 22), Donziger unequivocally rejected the idea:  "I talked to Pablo and Luis about your idea of hiring the former prosecutor for the purposes you described.  There is a consensus such a move would be adverse to the client's interests and unwise for a host of reasons."  PX 1156.  And Donziger made clear that "[n]either I, nor the legal team in Quito, will cooperate with such an investigation nor continue working with a firm that insists on doing such an investigation.  I can explain de- tails when we talk.  If you go forward with retaining somebody for this purpose, please notify me immediately so I can notify the clients."  *Id.*  This ended Kohn's proposed investigation, which would have been futile:  "I did not go forward with retaining Mr. Trujillo because I believed that without Mr. Donziger's agreement and cooperation it would have been impossible to effectively investigate the various allegations being made by Chevron, including those regarding Richard Cabrera."  PX 5600 (Kohn) ¶ 22.

Donziger also kept other team members in the dark.  In connection with his efforts to re- tain counsel for the § 1782 proceeding against Stratus, Donziger concealed the true extent of the Stratus fraud from Jeffrey Shinder.  Shinder soon resigned, but only after learning of the Cabrera fraud from Beltman.  Tr. (Shinder) 1297:19–1299:8.  Donziger lied to other ostensible allies as well, including Hinton and Woods.  *See* 1/8/2011 Donziger Dep. 2564:5–22; PX 1035; PX 5208 (Beltman) ¶ 10.  In fact, after discovering the truth regarding Cabrera, Andrew Woods drafted a

---

[23] The letter specified:  "[W]e request that your Firm make inquiries into what knowledge members of the legal team prosecuting the *Aguinda* litigation may have of improprieties involving the judge and/or government or ruling party officials, as well as with respect to allegations leveled by Chevron Corporation, the defendant in that litigation, of improper contacts between members of *Aguinda* legal team and various Ecuadorian judges, court-appointed ex- perts, or government officials."  PX 1151 at 1.

memo to file stating:

> Approximately 1 hour ago I spoke with Steven where Steven revealed to me that (1) Jeff Shinder, managing partner of Constantine Cannon, engaged in a day-long interview on March 17 with Doug Beltman . . . , (2) Shinder called Steven this morning to indicate that his firm was unwilling to continue in its representations of the *Aguinda* clients, and (3) Shinder's lack of willingness was due to his discomfort with the level of cooperation that took place between Beltman and the scientific expert in Ecuador, Richard Cabrera . . . .

> I indicated to Steven that this was the first I had heard that any conduct by plaintiffs' experts may have exceeded the contacts that were permitted by court order and crossed over into cooperation with Cabrera or writing of the report.  Steven responded clearly that Beltman was not working with Cabrera directly, but it was understood that the plaintiffs' experts were functionally writing the report.

PX 1259 at 2; *see also* 6/18/2013 Woods Dep. 213:20–214:6.

While he was misleading lawyers in the U.S. about the Cabrera ghostwriting, Donziger dispatched his associate Laura Garr and co-counsel Aaron Page to Ecuador, ostensibly to consult with "local counsel" about the Cabrera relationship.  PX 1256; PX 646; PX 7693.  Their subsequent reports, and correspondence during this period make it clear, however, that true purpose of their mission was to figure out what a detailed review of the record would reveal, so that Donziger could craft a cover story that wouldn't be refuted by that public record.  Page instructed Garr to "get together in an email all four of Cabrera's responses to the attacks (referenced in the email you just sent), and have everybody in the office rack their brains (oh and the record, for what that's worth) to come up with any other instance of Cabrera saying anything on the record. We need as complete a record as possible of everything Cabrera has ever said publicly since February 2007.  That is job one."  PX 7693.  He said, "Probably we will have a strategy call tomorrow afternoon. . . .  Sorry I can't share anything else on email."  *Id.*  Page then asked her for "any documents where we describe our relationship with Cabrera, specifically where we deny any role in the preparation of his report."  PX 1260.

To U.S. counsel, Page maintained the fiction that he and Garr were engaged in a good

faith research exercise.  In a March 9, 2010, memo to the LAPs' counsel at the Brownstein firm, Page reported that "[c]ertain Stratus materials were submitted to the court to be given to Cabrera in early 2008" and that "any Stratus materials turned over by local counsel were done in a way that was consistent with court orders in the *Aguinda* trial—it was done as part of the trial process."  PX 1246 at 2–3; *see also* PX 1254 at 1.  While these representations are impossible to square with the record Page was supposedly researching, Page would later testify that the March 17 discussion between Shinder and Beltman was "certainly [] the first time that I learned that [Stratus] drafted what became known as the Cabrera report, certainly."  8/23/2013 Page Dep. 198:14–18.[24]  Donziger's associate Andrew Woods said the same thing in his own March 18 internal memo.  PX 1259.  Despite the supposed revelatory nature of the March 17 Beltman meeting, however, Garr made similar false representations about Cabrera's false independence to the LAPs new counsel later that month.  PX 1276.

Eventually, it became clear that Defendants would not be able to prevent Chevron from obtaining evidence from Stratus in connection with its § 1782 action, and Defendants knew that the consequences could be disastrous.  In early April 2010, Kohn told Donziger and his Ecuadorian co-conspirators that "Steven should immediately provide us all the facts surrounding Stratus and Cabrerra [sic] and other problems or potential problems he is aware of, contributed to or caused."  PX 1290.  On April 16, 2010, in a "Dear Fellow Counsel" letter that ultimately he never sent, Donziger started to do just that, writing that once Chevron obtained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."  PX 1291 at 1.  On March 19, 2010, Donziger revealed to LAPs' counsel John McDermott that Stratus had, in fact, authored 11 of 17 annexes to the Cabrera report and the

---

[24]  Also unexplained is how Page came to be present at Cabrera's delivery of the report bearing his name to the courthouse, which is captured on film in an outtake from *Crude*.  PX 83.

"executive summary."  PX 1265.  Another LAP attorney, Jonathan Abady of Emery Celli, la-
mented that "[t]here is no credible way of denying that 11 of 17 annexes are from us."  PX1357.
Donziger knew that "[t]he traditional Ecuadorian law perspective (which will be asserted by
Chevron) would hold that the level of collaboration between one party and the expert is prob-
lematic and improper in that all court-appointed experts in Ecuador should be independent.  By
working so closely with our local counsel and Stratus, Cabrera violated his duties to the court."
PX 1291 at 1–2.

   Consistent with their reaction to the *Crude* scene, the LAPs' Ecuadorian counsel also
recognized that the evidence showed they had violated Ecuadorian law and could face criminal
sanctions.  In a March 30, 2010 email to Donziger, Fajardo and others, the LAPs' attorney Julio
Prieto stated that if their relationship with Cabrera were disclosed, it would "destroy[]" their case
in Ecuador and "all of us, your attorneys, might go to jail."  PX 1279; *see also* 1/19/2011
Donziger Dep. 3381:14–20; 1/29/2011 Donziger Dep. 3646:12–19.

   Faced with this reality, Defendants took steps to conceal the true extent of what they had
done.  Defendants filed the "seriously misleading" Fajardo declaration (Dkt. 905 at 35), first in
Colorado and then eventually in 14 other jurisdictions, in order to mislead Chevron and U.S.
courts.  1/19/2011 Donziger Dep. 3363:8–20.  Defendants also misrepresented their fraudulent
conduct to the Lago Agrio court in a June 21, 2010 filing asking for leave to file supplemental
"cleansing" reports.  PX 1370; 1/29/2011 Donziger Dep. 3714:13–18.  *See* FF ¶¶ 62–64.

### (4) Defendants' Contention That the Cabrera Fraud Is Immaterial Fails

   Defendants have attempted to minimize the importance of the Cabrera fraud by pointing
to the Ecuadorian judgment's apparent disclaimer that it does not rely on Cabrera.  Donziger cit-
ed no evidence for this claim besides the judgment the LAP team ghostwrote.  Tr. (Donziger

Closing) 2880:7–13; PX 400 at 51; *see also* PX 429 at 8.  But the judgment's own *ipse dixit* that it did not so rely is not a serious challenge to the judgment's reliance on Cabrera.  In fact, the judgment contains a number of material portions that are based on the fraudulent Cabrera report.

First, the largest single component of the judgment's damages award, the $5.4 billion award for soil remediation, is derived from Cabrera.  To calculate damages for soil remediation, the judgment used a "pit count" of 880 as a multiplier to determine the soil volume that purportedly required remediation.  PX 400 at 125; *see also* PX 429 at 15; PX 2502 at 17.  The judgment itself claims to have derived this figure "through aerial photographs certified by the Geographic Military Institute which appear throughout the record, analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros" (PX 400 at 125), but does not identify the specific documents or explained how they support the 880 pit figure—nor have (or can) Defendants here.  Moreover, in a subsequent "clarification order," Zambrano claimed only that "the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute."  PX 429 at 15.  There is no mention of the unspecified "official documents."

According to the unrebutted testimony of expert Dr. James Ebert, "the 880 pit count in the Ecuadorian judgment must have been based on what is in the Cabrera report" because "it is impossible that the author of the Ecuadorian judgment and the author of the Cabrera report could independently review the hundreds of aerial photographs in the record and reach the exact same conclusion that there are 880 pits requiring remediation."  PX 4000 (Ebert) ¶¶ 3, 18; *see also* Tr. (Ebert) 1345:20–24.  Rather, as Chevron expert Spencer Lynch testified, "the 880 pit count in the judgment was derived from annex H1 to the [Cabrera] report," and he arrived at this conclusion by sorting Annex H-1 to exclude Petroecuador and Petroproduccion pits as well as "no impact"

pits.  Tr. (Lynch) 638:19–639:7; PX 4100 (Lynch) ¶¶ 3.j., 98.

The judgment's $150 million award for potable water damages is also based directly on the Cabrera report.  *See* PX 400 at 182–83.  The judgment concludes that 35 percent of the population lacks access to potable water (*id.* at 182), and reaches its $150 million figure by taking 35 percent of the $428 million potable water assessment in Annex R of the Cabrera report (*see* PX 310A at 44).  The judgment's attempt to source this award to the Barros expert report (*see* PX 400 at 182) only confirms reliance on Cabrera, since the Barros portion cited is a review of Cabrera's potable water recommendation, which Expert Barros finds "[g]rossly [e]xaggerated and [f]raudulent" (PX 3306 at 3).

The judgment also relies on Cabrera through cleansing experts such as Barnthouse and Allen.  To support its $200 million award to restore flora and fauna in the former concession area, the judgment cites only one source: the report of cleansing expert Dr. Lawrence Barnthouse.  PX 400 at 182.  But Barnthouse only reviewed and commented on the Cabrera report's environmental damages assessment and did not perform his own analysis—a fact that the judgment itself explicitly recognizes.  *Id.* at 57 ("Dr. Barnthouse testified that he reviewed expert Cabrera's report, but did not prepare a damage report himself . . . .").  And the judgment relies on cleansing expert Douglas Allen for its awards of $5.4 billion for soil remediation and $600 million for groundwater restoration.  *Id.* at 179, 181.  Allen admitted that he "relied on parts of the Cabrera report" for his soil remediation and groundwater analyses and that he "made no efforts to independently verify" Cabrera's data.  12/16/2010 Allen Dep. 171:18–172:3.

Finally, the judgment awards damages for the same eight categories that were developed by Defendants and ghostwritten into the Cabrera report.[25]  Those damages categories are sup-

---

[25] The judgment's eight damages categories taken from the Cabrera report are:  (1) soil restoration (*compare* PX
[Footnote continued on next page]

ported by nothing else in the record except the LAPs' final alegato, which itself cites throughout to the Cabrera report. And in the judgment as issued,[26] every dollar of compensatory damages was effectively doubled by the judgment's illegal punitive damages award (PX 400 at 185–86), which matched the Cabrera report's "unjust enrichment" award in rationale and effect (PX 310A at 48), and had no other record source.

Moreover, even if it were true, the contention that the Cabrera fraud is irrelevant because the judgment does not rely on the Cabrera report ignores the central role that the Cabrera report has played in Donziger's extortion scheme. That scheme existed long before judgment was rendered in Ecuador and relied heavily on touting false claims of the Cabrera report's independence. *See* FF ¶¶ 76–80.

### e.   With the Cabrera Report in Hand, Donziger Launched a Full-Scale Pressure Offensive

The objective of the Cabrera fraud and the concealment and obstruction of its discovery was to increase the pressure on Chevron to settle. Defendants viewed "personal psychological pressure" on Chevron's "top executives" as just another "way[] to raise the cost" (PX 15A at 3)), and wanted to bring Chevron to "the breaking point" (PX 77A), to "force them to the table for a possible settlement." PX 172 at 2. Defendants were "always looking for ways to increase the leverage and increase the cost" to Chevron (PX 7537 at 52) because "[t]his case has to be won both in and out of the courtroom. . . . If you had the case without the pressure, you would never get a result" (PX 7421 at 8). And this campaign harmed Chevron, causing "irretrievable costs in

---

[Footnote continued from previous page]
400 at 125, 181, *with* PX 313 at 18); (2) restoration of groundwater (*compare* PX 400 at 147, *with* PX 310A at 6); (3) damages to the ecosystem (*compare* PX 400 at 152, *with* PX 310A at 41); (4) loss of indigenous culture (*compare* PX 400 at 173–74, *with* PX 310A at 35); (5) punitive damages (*compare* PX 400 at 185–86, *and* PX 429 at 9, *with* PX 310A at 48); (6) healthcare system (*compare* PX 400 at 183, *with* PX 310A at 42); (7) potable water (*compare* PX 400 at 183, *with* 310A at 42); (8) excess cancer deaths (*compare* PX 400 at 182–83, *with* PX 310A at 40).

[26] On November 12, 2013, the Ecuadorian National Court of Justice vacated the punitive damages portion of the judgment as illegal under Ecuadorian law. DX 8095.

the form of diverted time, attention and focus of Chevron's management team from the Company's paramount business of producing energy for the United States and the world. . . . [T]heir pressure campaign has caused harm to Chevron's most precious asset: its people. Individuals associated with Chevron, including executives and Board members, have been the targets of harassment in the United States." PX 5800 (Zygocki) ¶¶ 20–21. For example, Chevron's lead scientist on the Lago Agrio litigation Sara McMillen testified after the release of the film *Crude*, "I received hate mail from random individuals saying things like 'You are an awful person who deserves every bad thing' and 'I hope Chevron pays you handsomely for the lies you are introducing into this world, How you sleep at night is beyond my comprehension,' and calling me a 'whore.' And the hate mail scared me and made me worry for the safety of my children." PX 3300 ¶ 75.

### i.   In the U.S., Defendants Falsely Promoted the Cabrera Report as Independent

Promotion of the Cabrera report began even before it was submitted. On March 18, 2008, Atossa Soltani of Amazon Watch sent a nine-page letter to the Chairman of the SEC, Christopher Cox, to "follow up on our request in January 2006 that the SEC impose sanctions on [Chevron] for violations of its disclosure obligations . . . ." PX 497# at 1. This letter represented that Cabrera was "an independent special master" and that "[t]he special master report is being prepared by a large team of technical experts under Cabrera's supervision, and it is due within weeks according to court order." *Id.* at 2. Defendants have never explained how Soltani apparently knew the Cabrera report would be filed "within weeks"—and they did not call Soltani to testify about it either, even as she sat in the gallery for trial.

Following the submission of the Cabrera report, Donziger hired Hinton, a public relations specialist, to create and manage the LAP team's campaign of false and misleading public state-

ments.  PX 1034.  Hinton spearheaded the effort to persuade the public that manufactured evidence such as the Cabrera report was legitimate, and to create leverage to force a settlement or other concessions in the Lago Agrio litigation.  As Hinton admitted, Donziger's stated goal when he hired Hinton was to pressure Chevron to settle the lawsuit.  Tr. (Hinton) 2155:5–11, 2159:9–12.  Hinton played a key role in exerting this pressure by issuing press releases and organizing press conferences in which Cabrera was portrayed as an independent expert.

With Hinton's help, the LAP team saturated the U.S. media with their false claims that Cabrera offered an "independent" and scientific perspective which "prove[d]" Chevron's liability.  For instance, there is a lengthy summary of the Cabrera report on chevrontoxico.com, one of Defendants' websites, which never discloses the LAP team's role in writing the report, and concludes with the following:  "[C]ourts in Ecuador generally give wide deference to reports prepared by independent experts."  PX 540# at 2.

Amazon Watch also promoted Cabrera's fake "independence."  When an Amazon Watch representative complained to Donziger that Amazon Watch was "not here to simply rubber-stamp press releases," and dared to tell him that prior experience showed that Amazon Watch "needs to carefully fact-check your press releases in order to safeguard our own credibility," Donziger replied that he and the other lawyers were "the final authority."  PX 906 at 1–2.  "We can be collaborators, but we are not equal partners."  *Id.* at 1.  When Donziger wanted to downplay Cabrera's lack of "qualifications" in press releases, the Amazon Watch representative called this tactic an "unsubtle and unnecessary obfuscation" and "[b]ombast and hoodwink."  *Id.*  But Amazon Watch pressed forward, continuing to act under Donziger's control.  And when Chevron started to challenge Cabrera's independence, Amazon Watch issued an April 3, 2008 press release quoting Pablo Fajardo asserting that "Chevron's claim that Professor Cabrera is cooperat-

ing with the plaintiffs is completely false," and "Chevron is frightened by Cabrera be-cause he is an independent and credible expert."  PX 500 at 3; *see also* PX 501.  The LAP team and their co-conspirators continued to issue multiple press releases referring to Cabrera's "inde-pendence" and stating that he was akin to a U.S. Special Master.  *See* PX 496# at 2; PX 502# at 2; PX 503# at 2; PX 505# at 2; PX 506# at 1; PX 507# at 1–2; PX 508# at 2; PX 509#; PX 510# at 2; PX 511# at 2; PX 512# at 2; PX 513# at 2–3; PX 514# at 2; PX 515# at 2.

The LAP team encountered some close calls that threatened to unmask the false "inde-pendence" narrative.  On May 14, 2008, for example, Beltman wrote Donziger regarding an "[u]rgent issue" that arose when Hinton —who had been kept in the dark regarding the true au-thorship of the Cabrera report—wanted to give Richard Clapp's report, the same report the LAP team submitted as an annex to the Cabrera report, to a reporter.  PX 2438.  But this would have exposed the truth about the LAP team writing the Cabrera report.  Consequently, Beltman told Hinton not to use the Clapp report, giving the false reason that he was "not sure of its pedigree" instead of telling her the real reason it could not be made public:  that it was used as "an Annex" to the Cabrera report.  PX 1035; PX 2438.  Beltman warned Donziger that they "need to be care-ful about this."  PX 2438.

Defendants also misled Kohn about the origins of Cabrera's report.  On May 31, 2008, Kohn appeared on Fox News, touting Cabrera's independence.  PX 1036.  He not only claimed that Cabrera was an "independent expert appointed by the judge," he falsely stated that Cabrera "analyzed all of the evidence from all of the parties from both sides," to come up with the dam-ages estimate of "between eight and sixteen billion."  *Id.* at 2.  Kohn later testified that he made these statements "based on Mr. Donziger's many statements to me and others that Mr. Cabrera was an independent expert acting at the direction of the Ecuadoran court."  PX 5600 (Kohn) ¶

43.

After filing the Cabrera report, the LAP team immediately set out to bolster it by publish-ing Stratus's endorsements of the report—even though Stratus was the report's secret author. Stratus claimed, "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court, and his role is to assist the Court in evaluating the scientific and technical information that was col-lected and compiled for the case.  In the U.S. Court system, Mr. Cabrera would be called a Tech-nical Special Master."  PX 314R at 1.  Even one of the LAP team's own lawyers, Jay Horowitz, would later conclude, "These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings.  There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report."  PX 1347.  Un-derstanding the severity of this misconduct, Horowitz continued that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stra-tus was an active conspirator."  *Id.*  Yet Defendants actively promoted the "comments" as inde-pendent validation—for example issuing a December 2008 press release about the comments ti-tled "*Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists*."  PX 516#; *see also* PX 517#; PX 519#; PX 520#; PX 521#; PX 523#; PX 524#; PX 528#.

Stratus also solicited the endorsement of third-party scientists, falsely representing to them that the report was written by Cabrera.  The conspirators' goal was to obtain fifteen or twenty endorsements from academics, which proved impossible because of what Beltman called the "weaknesses" of the Cabrera report.  As Beltman explained to Donziger:  "Our original con-cerns about this have come to pass . . . .  [Academics] are trained and they function to be critical,

not accepting.  [Additionally], they know that signing their names onto some kind of endorse-
ment of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack
within their academic circles as well). . . .  And finally, some of the underlying work in the
Cabrera report has weaknesses that an academic would probably have a hard time defending."
PX 1052.  Beltman noted, "[w]e're having better success with consultants being willing to sign
endorsements than academics (something I am not proud of)."  *Id.*

The campaign to falsely portray the Cabrera report as that of an independent court expert
was largely successful.  An April 3, 2008 San Francisco Chronicle article, for example, stated:
"A court-appointed expert in Ecuador has recommended that Chevron Corp. pay $7 billion to
$16 billion if it loses a marathon lawsuit over oil-field contamination in the Amazon rain forest."
PX 2484.  *See* FF ¶¶ 61–62, 88, 96–97.

### ii.  Donziger Took the Cabrera Report to U.S. Federal and State Officials

On April 28, 2009, Donziger testified at a hearing before the U.S. House of Representa-
tives' Tom Lantos Human Rights Commission.  Donziger's prepared statement and oral testimo-
ny repeatedly referred to Cabrera as "independent."  PX 2377 at 5, 7, 9; PX 1130# at 63.  And
Donziger failed to disclose to Congress that the LAP team worked directly with Cabrera.  *See*
1/31/2011 Donziger Dep. 3981:17–24.  Donziger also misrepresented the fact that Cabrera's
supposedly independent "team" of disclosed experts, to whom work was falsely attributed, were
either working for the LAPs team or fabricated.  *Id.* 4021:25–4022:4.

Likewise, in his written statement to Congress, Donziger hailed the Cabrera report as
"reviewed" by scientists, without revealing that the reviewers—individuals at Stratus—secretly
authored the report:  "Numerous qualified scientists have reviewed this report and found its con-
clusions reasonable and the damages assessment consistent with the costs of other large envi-
ronmental clean-ups."  PX 2377 at 5.

The LAP team also made fraudulent allegations about Chevron to then New York Attorney General Andrew Cuomo, and provided that office with false information that Cabrera was a neutral "court-appointed technical expert" and that the Defendants had played no part in creating the exorbitant $27 billion figure. PX 7441 at 2. Their intention was to generate an official inquiry or investigation, which would itself bring direct pressure on Chevron, and which the LAP team could use to reinforce their own pressure campaign. *See* 12/8/2010 Donziger Dep. 719:2–10; 720:5–23; PX 1106.

On May 4, 2009, in reliance upon the LAP team's false statements, the New York Attorney General sent Chevron a letter inquiring about Chevron's disclosures related to the Lago Agrio litigation and requesting a "written response" to several questions within a week. PX 1131. The letter stated, "As I understand the allegations, a technical expert has estimated that if the plaintiffs prevail in the litigation, damages assessed against Chevron may be as high as $27 billion." *Id.* at 1. The LAP team seized on their successful prompting of this inquiry. For instance, in a May 25, 2009 letter to Chevron shareholders ostensibly from Atossa Soltani and other members of Amazon Watch (but drafted by Donziger), the co-conspirators claimed that "New York State Attorney General Andrew Cuomo has opened a probe of the company," and "Chevron is now the target of an official fraud investigation by the New York State Attorney General." PX 7542 at 1, 2. Publicly, the LAPs' team denied any responsibility for the Cuomo letter, with Donziger failing to mention that he, in fact, ghostwrote the "draft ltr [sic] for Cuomo" which stated, "[w]e write as shareholders of the Chevron Corporation to seek your assistance to determine if the company is misleading shareholders regarding a potential $27 billion liability." PX 7441 at 2. That draft letter to Cuomo was forwarded by an Amazon Watch representative to Amnesty International, Human Rights Watch, and the Interfaith Center on Corporate Responsi-

bility.  By April 13, those NGOs had placed the ghostwritten Donziger letter onto their respective letterheads and sent it to Cuomo.  *See* PX 7442; PX 7443.  *See* FF ¶ 88.

### f.   Donziger Falsely Presented the Fraudulent Judgment as Legitimate and Enforceable

On the basis of the $18.2 billion Lago Agrio judgment, which issued on February 14, 2011 (PX 400), Donziger and his co-conspirators have extended the pattern of racketeering they had established with their prior illegal conduct, and continued to attempt to instill fear of economic harm in Chevron by portraying the judgment as legitimate and enforceable.  *See, e.g.,* DX 1750 (Donziger) ¶¶ 71–72.  Donziger has threatened to seek to enforce the fraudulent judgment in the United States and other foreign jurisdictions.  PX 1407 at 18–29.  Donziger has also asserted that the conspirators are assembling a legal team to "seize assets, seize boats," wherever Chevron's subsidiaries operate around the world.  Dkt. 30-4 at 7.  Amazon Watch reported that the LAP team will quickly "move to collect the judgment by any means necessary in whatever country the company has assets."  PX 492# at 2 (quotations omitted).  But both Donziger and his Ecuadorian co-conspirators know the judgment is the illegitimate product of fraud.

### i.   Defendants' Fingerprints Are all Over the Judgment, in the Form of Their Own Unfiled, Confidential Work Product

Defendants' judgment is the type of fraudulent judgment that the U.S. State Department has identified as an indication of the problematic practices of the Ecuadorian judiciary, "parcel[ed] out" to be secretly ghostwritten by Defendants, just as they had ghostwritten the Cabrera report.  PX 1108 at 3.  Every substantive aspect of the Ecuadorian judgment, as well as its overall structure, bears markers of the LAPs' fraud—including text and other elements taken directly from the Cabrera report and the LAPs' unfiled work product:

- The judgment's **Introduction** and **Section 4** *falsely* disclaim reliance on the Cabrera report and the cleansing experts, which is a marker of a fraudulent or corrupt tribunal, and dismisses Chevron's fraud allegations with the transparent subterfuge that the misconduct is entirely Donziger's, who is not a party or lawyer of record.  PX 400 at 51, 57.

- **Section 3** rejects Chevron's anterior and dispositive defenses, including the corporate separateness defense, and draws extensively on the LAPs' unfiled "Fusion Memo."  PX 400 at 6–35; PX 2165 at 1–11.

- **Sections 7 and 10** establish and apply the judgment's theory of causation, drawing on the LAPs' unfiled "Moodie Memo," and relying, complete with verbatim errors, on Fajardo's unfiled email regarding the CONALEC case.  PX 400 at 74–90, 154–74; PX 2164 at 29–30.

- **Section 9** contains the major contamination findings, and is run through with markers of fraud, including sections of a report drafted for the LAPs by expert Richard Clapp but never filed, data and conclusions whose only record source is the Cabrera report, numerous instances of reliance on the LAPs' internal record-keeping system (the "Index Summaries"), and over a dozen examples demonstrating that the judgment's true author relied on a 65,000-row database maintained by the LAPs (the "Selva Viva Data Compilation").  PX 400 at 92–154; PX 2164 at 14–28, 30–31.

- **Section 14** imposes punitive damages that are illegal under Ecuadorian law, and follows the Cabrera report's unjust enrichment award in justification and size.  PX 400 at 184–86

- **Section 15** orders that judgment proceeds be placed in a trust, a remedy never requested by any party, and relies on text taken verbatim from an internal Fajardo email.  *Id.* at 186–87.

Chevron has identified markers of fraud on 60 of the 188 pages in the judgment—even without discovery from Defendants' Ecuadorian lawyers and agents and without access to Zambrano's hard drives.  *See, e.g.*, PX 2165; PX 2168; PX 2169.[27]

**"Fusion Memo":  Holding Chevron Liable for TexPet's Alleged Conduct.**  Whether Chevron could be held liable for TexPet's alleged conduct was a threshold issue in the case, and

---

[27]  Chevron identified portions of eight separate internal LAP documents that appear verbatim in the judgment: the Fusion Memo (PX 435); the Draft Alegato (PX 438); two separate Index Summaries (PX 433; PX 865); the Fajardo Trust Email (PX 437); the unfiled Clapp Report (PX 928); and the Moodie Memo (PX 1101).  *See also* PX 3700 (Leonard).  Had Defendants produced their Ecuadorian agents' documents, without doubt Chevron would have been able to demonstrate more overlap.

one that was hotly contested in Lago Agrio (and continues to be contested).  *See, e.g.,* Dkts. 29-17 at 12; *see also* PX 400 at 6.  As Judge Rakoff found, "While plaintiffs continue to allege in conclusory fashion that Texaco directed the Consortium's oil operations from the United States, they have wholly failed, despite years of discovery, to adduce competent evidence to support this assertion."  *Aguinda v. Texaco Inc.*, 142 F. Supp. 2d 534, 548 (S.D.N.Y. 2001).

This was the first defense considered and the judgment devoted 20 pages to it.  PX 400 at 6–26.  But crucial portions of these 20 pages are lifted verbatim in word strings as long as 160 straight words from the LAPs' internal, unfiled Fusion Memo, including the conclusion:  "In this case, it has been proven that in reality TexPet and Texaco Inc. functioned in Ecuador as a single and inseparable operation."  Dkt. 550 at A5 (indicating overlap in page 24 of the judgment); *see also* Dkt. 658-7 at 15; PX 2166; PX 2170.

**The Selva Viva Database and Clapp Report: Contamination.**  Section 9 of the judgment purports to find dangerous, area-wide contamination.  Every award in the judgment, from the $5.39 billion remediation for the "dangerous elements that must be monitored and, eventually eliminated" (PX 400 at 107), to the $8.6 billion punitive damage award for the "suffering of the victims of the defendant's conduct" (*id.* at 185), is predicated on findings of contamination in Section 9.  But this section is permeated with evidence that it was not based on the record, but written using the Defendants' unfiled work product.  *See* PX 3700 (Leonard); PX 928; PX 1051; PX 1080; PX 1082; PX 2175.

Section 9 relies on an unfiled report by LAP expert Richard Clapp, including verbatim, unattributed quotation, for the conclusion that "soil and water samples" indicate an excess of lead in the former concession.  PX 1051; PX 1080; PX 3700 (Leonard) ¶¶ 76–77.  The record does not contain this conclusion, or any basis for it.  To the contrary, only *one* of 253 drinking

water sampling events showed lead at levels above primary drinking water standards, and that was associated with a *recent* oil spill.  *See, e.g.,* PX 8064.  Had the LAPs publicly submitted the Clapp Report, Chevron would have successfully challenged its conclusions.

The judgment also purports to find a threat to health based on samples of "benzene, toluene, PAH's . . . chromium VI, barium or mercury" from the judicial inspections.  PX 400 at 107.  But the judgment's conclusion that these compounds were found in relevant concentrations is erroneous, and flows directly from its improper reliance on the Selva Viva Data Compilation, rather than the sampling results from the judicial inspection reports.  *Id.* at 101–02, 108–09.  In fact, some of the environmental sampling procedures used in Ecuador had a detection limit based on the equipment, the methods used in sampling, or the substance being tested.  Samples under the detection limit were referred to as a "non-detect" and recorded in the filed judicial inspection reports with a less-than sign ("<") followed by a number representing the minimum concentration that can be detected.  PX 4100 (Lynch) ¶ 87.  The minimum concentration that could be detected was listed even where the concentration was actually less than that minimum or zero.  The LAPs' Selva Viva Data Compilation separated the less-than sign from the number, placing each in its row.  *Id.* ¶ 88.  So it is not surprising that the Ecuadorian judgment also dropped the less-than sign and failed to acknowledge that many of the samples actually fell below detectible levels.  *Id.* ¶ 87.

**The Moodie Memorandum and Clapp:  Bungled and Illicit Causation.**  Among the judgment's oddities is that, in a lawsuit brought by Ecuadorians in Ecuador under Ecuadorian law, for harm that oil production allegedly caused in Ecuador, it purports to apply California asbestos causation standards and principles of Australian law.  This incongruity is attributable to the fact that the judgment's author(s) relied on a confidential memorandum written by the LAPs'

Australian legal intern: the "Moodie Memorandum."  PX 5100 (Green); PX 1101.

The judgment and the Moodie Memorandum both purport to analyze causation under the "substantial factor" test, a narrow doctrine from California state law that applies only to a unique challenge in asbestos litigation.  This test is inapplicable to the facts of the Lago Agrio case.  *Id.* The judgment and the Moodie Memo both purport to apply principles of Australian law.  But James Spigelman, the former Chief Justice of the Supreme Court of New South Wales and the *author* of one of the cases cited in the Moodie Memo, concluded that concepts that both the Moodie Memo and the judgment ascribe to Australian law are either unknown to Australian law, or are common phrases that do not carry the specialized meaning ascribed to them in the memorandum and the judgment.  PX 5000 (Spigelman).  Moreover, Spigelman found it "so strange as to constitute an inaccuracy" that both the Moodie Memo the judgment describe a well-established common law principle as particularly Australian, and cite an opinion he authored, *Seltsam v McGuiness*, as the source, even though that opinion, like most references to the principle, cites the very non-Australian *Wigmore on Evidence* as support.  *Id.* ¶¶ 16–18.  An Ecuadorian court would have no reason to cite these principles as Australian, unlike the memo's Australian author.

Professor Michael Green has concluded that these and other commonalities between the Moodie Memorandum and the judgment render it "highly unlikely that the passages in the [judgment regarding causation] were prepared independently of the Moodie memorandum."  PX 5100 (Green) ¶ 3.[28]

---

[28]  There is no question that application of an idiosyncratic causation standard secretly cribbed from one litigant's internal work product is material.  "Toxic tort cases . . . are won or lost on the strength of the scientific evidence presented to prove causation."  *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).  Here, the legal framework by which the judgment analyzed this critical issue was not only wrong, it was clandestinely provided by the LAPs, without any opportunity for Chevron to rebut.  The aforementioned illicit reliance on the Clapp Report is material to the judgment's causation conclusion as well.  The Clapp Report is the only source for the judgment's [Footnote continued on next page]

**The Fajardo Trust Email to Aid Defendants' Control of Judgment Proceeds.**  The judgment orders that any proceeds be placed in a "trust" controlled by defaulted defendant Amazon Defense Front.  In so doing, the judgment relies on language found in the LAPs' unfiled work product (the Fajardo Trust Email) to justify this result—despite the fact that no one, in any *public* filing, requested creation of a trust.  PX 3900 (Hernandez) ¶ 30.  As Hernandez and Juola concluded, the Fajardo Trust Email was "not found in the Lago Agrio trial court record."  *Id.* ¶ 3; PX 3800 (Juola) ¶ 3.

Expert analysis confirms that the language common to the Fajardo Trust Email and the judgment is a marker of fraud.  *Cf.* Dkt. 550 at 29 n.116.  Dr. Robert Leonard concluded "that portions of the [judgment] and the [unfiled Fajardo Trust email] contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the [judgment] are therefore plagiarized from [the LAPs'] unfiled work product."  PX 3700 (Leonard) ¶ 3.  The overlap includes: (i) the same misquoted language from the key case quoted; (ii) the same incorrect citation of the key case cited; (iii) the same short-hand citation to another case, erroneously cited because it has nothing to do with trust law; and (iv) explanatory language and phrases regarding use of judgment trusts.  *Id.*; PX 2513.

**The Ecuadorian Plaintiffs' Lawyers' Unfiled Data Compilation**.  Expert analysis confirms that several data points in the Ecuadorian judgment were copied, cut-and-pasted, or otherwise taken directly from the LAPs' attorneys' unfiled data compilations.  *See* PX 2175.  For example, the Ecuadorian judgment repeats text and errors found in the LAPs' data compilations that were not filed as part of the court record.  PX 4100 (Lynch) ¶ 77a.  Certain irregularities in the Selva Viva Data Compilation, namely the SV and TX suffixes, appear in Ecuadorian judg-

---

[Footnote continued from previous page]
conclusion that "lead poisoning is a real risk" in the area.  PX 1051; PX 1080; PX 3700 (Leonard) ¶¶ 76–77.

ment but are not readily found in the Lago Agrio record. *Id.* ¶ 79. The Ecuadorian judgment al-
so copies the parentheses placement and underscore separators used in the LAPs' unfiled data
compilation, as opposed to the format used in the sampling data in the record. *Id.* ¶¶ 83, 84. In
listing the incorrect expert as having collected certain samples, the judgment even makes the
same mistakes made in the LAPs' unfiled work product. *Id.* ¶ 85. *See* FF ¶¶ 72–80.

This powerful forensic evidence is much more than a preponderance of evidence on the
question of whether or not the LAP team had a hand in writing the judgment. Defendants offer
no evidence, explanation, or theory as to how their own documents—their emails, their legal
memoranda, their databases—appear in the judgment. Nor did the single witness they offered
who purported to have any knowledge of who wrote the judgment—the judge who signed it, Ni-
colas Zambrano. And while Zambrano insisted that he wrote the judgment, his testimony was
not credible. *See infra* Argument Section I.C.1.f.iii. If this were all the evidence adduced at tri-
al, it would be sufficient to prove on any legal standard that Defendants procured the judgment
by fraud in continuance of their long-running pattern of racketeering.

But this is not all the evidence. There was also the eyewitness testimony of a participant
in Defendants' scheme, which was in turn corroborated by additional physical evidence.

### ii. Guerra's Eyewitness Testimony Explains These Anomalies and Confirms the LAP Team's Ghostwriting of the Judgment

Former Ecuadorian judge Alberto Guerra explained how the LAPs' unfiled work product
appears in the judgment: Donziger, Fajardo, and the LAP team put it there when they ghost-
wrote the judgment as a consequence of bribing judge Zambrano. Guerra testified that he secret-
ly ghostwrote Zambrano's orders in the Chevron case (and other cases), and that the LAPs paid
him $1,000 a month to draft favorable rulings for Zambrano to issue. Zambrano then cut a deal
with the LAPs allowing them to draft the judgment, which Guerra then modestly edited, in ex-

change for a bribe of $500,000, to be paid out of the LAPs' judgment proceeds. Guerra's documents corroborate his account: His computer contains drafts of over 100 Zambrano court orders, including orders in the Chevron case; his bank records document LAP payments to him by a member of the LAP team while he was ghostwriting orders for Zambrano; and his shipping records and calendar confirm regular exchanges with Zambrano. All the documentation confirms that the Guerra/Zambrano ghostwriting relationship began before Zambrano became the judge on the Chevron case and continued after the judgment issued. PX 2180. And internal LAP emails confirm Guerra was ghostwriting for the court and discuss the need to pay "the puppeteer" to "move his puppet."

### (1) Guerra Approached Chevron With Evidence of the LAP Team's Fraud

In April 2012, shortly after Zambrano had been dismissed as a judge, Zambrano instructed Guerra to contact Chevron about the possibility that Zambrano could cooperate with Chevron in exposing the judgment fraud. PX 4800 (Guerra) ¶ 58; Tr. (Guerra) 1069:14–1070:8. Guerra had several discussions to this effect with Chevron representatives. PX 4800 (Guerra) ¶¶ 59–60; Tr. (Guerra) 1070:3–1072:21, 1073:15–1074:18.

Andres Rivero, one of Chevron's lawyers, asked to meet with Zambrano. Tr. (Guerra) 1150:6–19. Guerra suggested to Zambrano that he do so and "attempt to negotiate a substantial million-dollar payment from Chevron on his own behalf, even though Chevron never suggested any such thing." *Id.*; PX 4800 (Guerra) ¶ 58. Zambrano responded, however, that he would meet only with Jim Craig, Chevron's spokesperson in Ecuador. Tr. (Guerra) 1150:6–19. But then Zambrano then changed course without explanation and stated that he was no longer willing to cooperate. However, Chevron continued to discuss the matter with Guerra, who revealed that he also had personal knowledge of the judgment writing process, as well as other relevant infor-

mation and corroborating physical evidence.  PX 4800 (Guerra) ¶ 60; Tr. (Guerra) 1069:19–25.[29]

Chevron representatives repeatedly informed Guerra that Chevron could not pay Guerra for his

testimony.  PX 4800 (Guerra) ¶ 59.  Ultimately, Chevron agreed to purchase physical evidence

from Guerra, and compensate him for the time and expense incurred in collecting the physical

evidence.  PX 4800 (Guerra) ¶ 61; PX 1671; PX 1672.

From the beginning, Guerra's conversations with Chevron were shadowed by concerns

about his security.  Following the release of Guerra's declaration on January 28, 2013, the LAP

Team and their allies in the Correa administration "publicly attacked [Guerra] in Ecuador and in

the U.S., branded [him] a traitor, and threatened [him] with criminal prosecution."  PX 4800

(Guerra) ¶ 63.  Indeed, on February 18, 2013, Fajardo filed a criminal complaint against Guerra,

accusing him of various crimes including perjury, defamation, and bribery, among others.  *Id.*;

PX 1758.  Humberto Piaguaje also signed the complaint, although he admitted that he did not

read it before he signed it.  Tr. (H. Piaguaje) 2712:4–6.  As a result, the Prosecutor's Office for

the District of Sucumbios opened an investigation of Guerra for the alleged crime of incitement

of separatism.  *See* PX 4800 ¶ 63.

Due to Guerra's willingness to come forward about the LAP team's corruption, Guerra

has been effectively exiled from his homeland, and he and his family have applied for asylum in

the United States because of security concerns.  PX 4800 ¶¶ 63, 64; Tr. (Guerra) 1233:5–24.[30]

Guerra "is not living nearly as comfortably as [he] was in Ecuador, and [he is] concerned for

---

[29]  Guerra's email communications, bank and shipping records, and other documents corroborated his account.
*See also* PX 433; PX 434; PX 438; PX 439; PX 440; PX 441.

[30]  Before his cooperation in this case, Guerra and his wife lived in a 5,400 square foot home in an affluent gated
community in Quito.  PX 4800 (Guerra) ¶ 64.  Because of the threats to Guerra's safety and that of his family, Chevron has paid for Guerra and his family to relocate to the United States, as well as certain of his and his family's living expenses.  *Id.*  He and other members of his relocated family cannot work in the United States to support their families.  *Id.*  Accordingly, Chevron provides Guerra with a monthly payment of $10,000, as well as a stipend of $2,000 per month for his rent.  Tr. (Guerra) 1053:15–19; PX 1671; PX 1672.

[his] and [his] family's future."  PX 4800 (Guerra) ¶ 64.[31]

### (2) For Years, Guerra Worked as Zambrano's Illegal Ghostwriter, and Took Bribes for Favorable Orders During That Time From the LAP Team

In August 2009, it became clear that Judge Nuñez would have to recuse himself from the Chevron case, and that Judge Nicolas Zambrano would take over.  *See, e.g.*, PX 4800 (Guerra) ¶¶ 21–22; Tr. (Guerra) 914:25–915:2.  Between August and October 2009, Zambrano asked Guerra, who presided over the Lago Agrio case in 2003 and 2004, to reach out to Chevron's representatives and offer to resolve the case in Chevron's favor in exchange for a bribe.  PX 4800 (Guerra) ¶ 22; *see also* PX 4300X (Callejas) ¶ 64; Tr. (Guerra) 914:6–24.  Zambrano reasoned that "Chevron would have much more money than the Plaintiffs . . . ."  PX 4800 (Guerra) ¶ 22; *see also* Tr. (Guerra) 915:3–6, 915:14–18.  On October 16, 2009, Zambrano directed his law clerk and companion, Liliana Suarez, to arrange a meeting with Adolfo Callejas, a fact Callejas memorialized in a contemporaneous declaration.  PX 1167; Tr. (Zambrano) 1752:19–24 (Zambrano denied this fact on the stand).  At Zambrano's direction, Guerra approached Mr. Racines, a lawyer for Chevron, and told him about Zambrano's offer.  PX 4800 (Guerra) ¶ 22.  When Mr. Racines refused Guerra's proposal, Zambrano instructed Guerra to meet with Fajardo, because Zambrano had already reached an agreement with the LAP team, through Fajardo, to expedite the case in the LAP team's favor.  *Id.* ¶ 23; Tr. (Guerra) 917:15–24, 918:2–919:5.

Guerra met with Fajardo in Quito to work out the financial arrangements, and they agreed that the LAP Team would pay Guerra $1,000 per month for Guerra to ghostwrite Zambrano's rulings, expedite the case, and limit Chevron's procedural options by denying their motions on alleged essential errors.  PX 4800 (Guerra) ¶¶ 23–29; Tr. (Guerra) 919:6–920:12.  Fajardo told

---

[31]  The initial agreement with Chevron was entered into in January 21013, after Guerra had retained U.S. counsel and only after Guerra signed his November 2012 declaration.  PX 1671; Tr. (Guerra) 1229:15–25, 1231:16–1232:2

Guerra that they needed to meet with Donziger to go over the arrangement because Donziger "was the boss of the attorneys—of the legal team," and because Donziger was principally responsible for the LAP team's financial affairs, such as locating investors to fund the litigation. Tr. (Guerra) 920:23–921:20, 994:2–11; PX 4800 (Guerra) ¶ 24. Days later, Guerra met with Fajardo, Donziger, and Yanza at the Honey & Honey Restaurant in Quito. PX 4800 (Guerra) ¶ 25; Tr. (Guerra) 921:21–923:6. Donziger confirmed and approved the financial arrangement with Guerra and thanked him for his future work as Zambrano's ghostwriter on the Chevron case. PX 4800 (Guerra) ¶ 27; Tr. (Guerra) 925:3–14, 926:12–927:2.

Following this agreement, Guerra ghostwrote orders for Zambrano that favored the LAPs,[32] and members of the LAP team made periodic $1,000 payments to Guerra. PX 4800 (Guerra) ¶¶ 29, 32–34; Tr. (Guerra) 929:19–930:3, 931:4–22; *see also* PX 1186; PX 1713 at 4–5. To conceal their collusion with Guerra and Zambrano, the LAP team referred to them in e-mails by the code names "puppet" and "puppeteer." *See, e.g.*, PX 1751. Those e-mails immediately preceded separate $1,000 payments made to Guerra by deposit into his bank account, which deposits, in turn, occurred very soon after $1,000 cash withdrawals from the Selva Viva bank account. For example, on October 27, 2009, Fajardo sent Donziger and Yanza an email stating "[t]he puppeteer won't move his puppet unless the audience pays him something." PX 1751. Two days later, on October 29, 2009, $1,000 in cash was withdrawn in cash from a Selva Viva bank account and $1,000 in cash was then deposited into Guerra's bank account. PX 583 at 51; PX 1713 at 4. One month later, on November 27, 2009, Yanza emailed Donziger that "the budget is higher in relation to the previous months, since we are paying the puppeteer." PX 1746 at 2. The same day, $1,000 in cash was deposited into Guerra's account; not coincidentally,

---

[32] On occasion, some rulings favored Chevron with the LAP Team's consent so as not to arouse suspicion. Tr. (Guerra) 930:4–931:2.

$1,000 in cash was withdrawn from the Selva Viva bank account two days prior.  PX 1713 at 4; PX 583 at 51.  Then, on December 23, 2009 and February 5, 2010, Ximena Centeno, a Selva Viva employee, made two cash deposits of $1,000 each into Guerra's bank account.  PX 1713; PX 1718; PX 1719; PX 1741; PX 1739.  Again, not coincidentally, each of those $1,000 cash deposits followed one day after $1,000 cash withdrawals were made from the Selva Viva bank account.  PX 583 at 52–53.[33]

Guerra's computer hard drive, package shipment records, and daily planner also confirmed that Guerra ghostwrote Zambrano's orders.  Forensic analysis of Guerra's computer revealed that it contained drafts of 9 of the 12 court orders Zambrano issued during his first tenure on the Chevron case (PX 1172; PX 1173; PX 1186; PX 1190–93; PX 1197; PX 1209; PX 1220; PX 1243), as well as drafts of 105 rulings issued by Zambrano in other cases (PX 375; PX 1468; PX 1773–1875).  PX 4100 (Lynch) ¶¶ 3(c)–(f), 34–68.  Shipping records confirm Guerra's testimony that Guerra and Zambrano shipped packages containing documents and flash drives to each other, either directly or through intermediaries at the courthouse, and that some of those shipments corresponded in time to the issuance of Zambrano's orders in the Chevron case and other actions.  PX 1682; Tr. (Guerra) 970:1–971:11.  And Guerra's daily planners for 2011 (PX 1733; PX 1733A) and 2012 (PX 1734; PX 1734A) also contain detailed notes as to when Guerra received payments from Zambrano and worked on Zambrano's cases (PX 4800 (Guerra) ¶¶ 19–20, 61; Tr. (Guerra) 1029:8–19, 1029:24–1033:23).  *See* FF ¶¶ 65–69.

---

[33]  The $1,000 cash withdrawals from the Selva Viva account commenced on October 29, 2009, a mere eight days after Zambrano formally commenced his first term presiding over the Chevron case, and the last cash withdrawal of $1,000 from the Selva Viva account occurred on February 22, 2012, exactly one week before Zambrano was officially dismissed as a judge.  PX 583 at 51, 75; *see also* PX 411.

### (3) Zambrano's Return to the Case Gave Donziger the Opportunity to Seize the Ultimate Prize:  Ghostwriting the Judgment Itself

In August 2010, Chevron moved to recuse Judge Ordóñez from the Lago Agrio case, and Zambrano—who was charged with ruling on Chevron's motion—saw it as an opportunity to once again take control of the case and profit from deciding the case.  PX 4300X (Callejas) ¶ 71; Tr. (Guerra) 974:17–975:1, 976:7–977:3, 986:1–5, 986:17–987:13.  So did Guerra.  He reached out to Donziger by email on September 5, 2010, asking for his help with Guerra's daughter's immigration problems and offering to "support the matter of Pablo Fajardo" (PX 1745), which Guerra testified was a reference to the Lago Agrio case (Tr. (Guerra) 1035:9–20).

In the fall of 2010, Guerra, again acting at the direction of Zambrano, who viewed Chevron as a deep pocket, attempted to contact an Ecuadorian lawyer representing Chevron in the Lago Agrio litigation, this time to offer Chevron the opportunity to ghostwrite the judgment to be issued by Zambrano in exchange for a substantial bribe.  PX 4800 (Guerra) ¶ 36; PX 4300X (Callejas) ¶ 69; Tr. (Guerra) 987:1–21.  Guerra attempted this contact through an intermediary, but Chevron's Ecuadorian counsel rejected Guerra's offer.  PX 4800 (Guerra) ¶ 39; PX 4300X (Callejas) ¶ 69; Tr. (Guerra) 990:1–18.

Following this rebuff, Zambrano instructed Guerra to approach and make the same offer to the LAP team.  PX 4800 (Guerra) ¶ 41; Tr. (Guerra) at 990:19–991:19.  And once again, Guerra met with Fajardo to discuss the proposal and then met personally with Donziger, Fajardo, and Yanza at the Honey & Honey Restaurant in Quito.  Guerra proposed that the LAP team pay at least $500,000 to Zambrano and in exchange, Zambrano would let the LAP team draft the judgment in their favor, which Zambrano would then sign.  PX 4800 (Guerra) ¶ 42; Tr. (Guerra) 991:20–993:15, 993:20–22, 994:2–11, 995:5–11, 995:16–996:3, 997:24–25, 998:5–12.  Donziger "showed certain enthusiasm" for the proposal (Tr. (Guerra) 996:7–11), and asked Guerra "sever-

al questions about the proposal" such as "how they would ensure that the arrangement would remain secret" and whether Zambrano could be trusted to uphold his end of the bargain (PX 4800 (Guerra) ¶ 42). Ultimately, Donziger informed Guerra that the LAP team did not have $500,000 to pay the bribe at that time. Tr. (Guerra) 996:12–14; PX 4800 (Guerra) ¶ 42. So the LAP team subsequently promised Judge Zambrano $500,000, payable upon enforcement of the judgment, in exchange for issuing the judgment written by the LAP Team. PX 4800 (Guerra) ¶ 43; Tr. (Guerra) 999:24–1002:1.

Throughout Zambrano's second term presiding over the Chevron case, Guerra continued to ghostwrite Zambrano's rulings in the Chevron case. PX 4800 (Guerra) ¶ 44. Guerra traveled to Lago Agrio to work on the rulings, and worked from Zambrano's apartment on a laptop given to him by Fajardo. *Id.* ¶¶ 44–46; PX 1722; PX 1723; PX 1724; PX 1725; PX 1726; Tr. (Guerra) 1002:8–19, 1003:12–16. *See* FF ¶ 70.

In late January or early February of 2011, Zambrano asked Guerra to travel to Zambrano's apartment in Lago Agrio, where Zambrano and Fajardo greeted him. Tr. (Guerra) 1009:6–16. Fajardo gave Guerra a computer that contained a draft of the judgment. PX 4800 (Guerra) ¶ 47; Tr. (Guerra) 1008:19–22, 1009:11–16; DX 1363 ¶ 24. Zambrano asked Guerra to "work on the document to fine-tune and polish it so it would have a more legal framework." PX 4800 (Guerra) ¶ 47; Tr. (Guerra) 1008:23–1009:4, 1009:25–1010:1, 1010:4–6. Guerra was told that the draft judgment he was reviewing had been drafted by the LAP legal team. Tr. (Guerra) 1009:17–24. While he was working to revise the judgment, Guerra called Fajardo "to ask him about some sections of the document that confused [him]." PX 4800 (Guerra) ¶ 49; Tr. (Guerra) 1011:8–15. The next day, Fajardo gave Guerra a "memory aid" (PX 1703) that provided information about the case (PX 4800 (Guerra) ¶ 49; Tr. (Guerra) 1012:3–12). Over the course of two

days, Guerra reviewed and edited the judgment and made light edits to the judgment due to its highly technical nature and reliance on foreign law, with which Guerra was not familiar.  PX 4800 (Guerra) ¶¶ 48–49; Tr. (Guerra) 1008:7–18, 1010:18–20, 1016:22–1017:22.  The final judgment's structure, wording, and content largely mirrors the draft judgment that Guerra reviewed.  PX 4800 (Guerra) ¶ 51.

Guerra's only subsequent contact with the LAP team occurred in May or June 2011.  PX 4800 (Guerra) ¶ 55.  With Donziger's knowledge, Fajardo arranged to meet with Guerra in his Quito office, along with an American attorney representing the LAPs in the United States.  *Id.*; Tr. (Donziger) 2601:18–2602:3.  They explained to Guerra that the LAPs needed people to testify about the suitability of the Ecuadorian legal system in proceedings in the United States.  *Id.* They also proposed that Guerra travel to the United States to testify to the strength of the Ecuadorian legal system, and offered to pay Guerra's airfare and hotel expenses, plus an additional $5,000 for giving that testimony.  *Id.*  After this meeting, there was no follow up.  *Id.*

### iii. Defendants' Gamble to Bring Judge Zambrano to Testify Backfired

At trial, Defendants put nearly all their eggs in the basket of Judge Zambrano—hoping that his mere claim to have authored the Ecuadorian judgment would be enough to carry the day. But Zambrano, like Donziger, turned out to be a witness who lacked any credibility on the stand.

### (1) Guerra's Ghostwriting of Orders in Zambrano's Cases in Exchange for Payments from Zambrano

Zambrano admitted that Guerra had helped him draft court orders from 2009 through 2012 (Tr. (Zambrano) 1630:22–24, 1647:6–9), though he had never acknowledged any such relationship in his prior sworn statement to this Court or in his statement to prosecutors in Ecuador. Zambrano denied, however, that Guerra had done so in the Chevron case because that would have been improper.  Tr. (Zambrano) 1964:6–9.  It is not a coincidence that Zambrano's admis-

sion occurred for the first time at trial, after LAPs' counsel Julio Gomez had advised Zambrano that draft orders in Zambrano's cases had been found on Guerra's computer.[34]  Tr. (Zambrano) 1639:1–1640:13.

Zambrano had no explanation for the presence of draft orders in the Chevron case that were also found on Guerra's computer.  Tr. (Zambrano) 1718:20–23.  He stated that Guerra assisted him with drafting court orders because, at the time, Guerra "was facing a great financial need."  Tr. (Zambrano) 1630:22–1631:3; *see also* Tr. (Zambrano) 1814:4–11 (Guerra "was facing a very delicate financial situation").  But, despite having permitted Guerra to assist him by drafting orders because of Guerra's financial desperation, Zambrano denied having paid Guerra for ghostwriting his orders—implausibly implying that Guerra's financial need had resulted in his working for nothing.  Tr. (Zambrano) 1630:22–1631:6.  Despite Defendants' attempts to argue that Guerra fabricated bank deposit slips, Zambrano acknowledged making a $300 cash deposit into Guerra's account (Tr. (Zambrano) 1642:6–8), and further acknowledged that the signature on the slip was his signature, but did so only after being advised of this deposit by the LAPs' counsel the week before his trial testimony.  Tr. (Zambrano) 1642–43; PX 1713 at 9.  Zambrano claimed that the $300 deposit was merely a one-time "loan" (Tr. (Zambrano) 1814:4–11), but could not explain why Guerra's contemporaneous day planner entries reflected payments from Zambrano on numerous other occasions—July 15, 2011 ($500), August 11, 2011 ($1,000), October 14, 2011 ($500), and February 24, 2012 ($2,000)—during the time that Guerra served as Zambrano's ghostwriter.  Tr. (Zambrano) 1642:12–18; PX 1733A; PX 1734A at 2.

---

[34] Zambrano at first denied that Mr. Gomez told him prior to Zambrano's deposition that there was evidence submitted to the Court that Guerra had draft orders in cases assigned to Zambrano, later issued under Zambrano's signature, on Guerra's computer, before making the admission after being confronted with his own contrary deposition testimony.  Tr. (Zambrano) 1638:3–1639:18.  Donziger similarly lied initially about his contact with Guerra.  PX 1745; PX 1747; PX 1749.

Zambrano also admitted that Guerra had shipped him draft orders using TAME and that Zambrano shipped to Guerra case materials at Guerra's request.  Tr. (Zambrano) 1643:18–1644:14.

### (2) Zambrano's Claims that he Drafted and Dictated the Lago Agrio Judgment

Zambrano described the 188-page Lago Agrio judgment as "the most important decision [he] ever issued in [his] life as a judge," involving the longest opinion and the largest damages award, and claimed he worked "very hard" on the judgment for "many hours, many days, including several weekends."  Tr. (Zambrano) 1605:14–17, 1606:3–17, 1607:9–22.  Yet Zambrano could not identify what the abbreviation "TPH" (total petroleum hydrocarbons) stood for, although it appears 38 times in the judgment and was the basis for more than $5 billion of the judgment's $8 billion remediation-damages award.  Tr. (Zambrano) 1615:1–10; PX 400 at 181.  He did not know what the judgment described as the "most powerful carcinogenic agent" in the decision—benzene.  Tr. (Zambrano) 1611:15–18; PX 400 at 107.  Nor could he recall what the judgment identified as the "statistical data of highest importance to delivering this ruling"—the San Sebastian health study.  Tr. (Zambrano) 1613:1–21; PX 400 at 134.  He also could not recall the theory of causation upon which the judgment is based—known as "sufficient causation."  Tr. (Zambrano) 1614:7–10; PX 400 at 88.  Zambrano testified that he did not know the meaning of the English word "workover," even though that word appears twice in the LAPs' internal Fusion Memo and, through copying from the Fusion Memo, twice in the judgment.  Tr. (Zambrano) 1614:11–12, 1711:22–1712:13, 1713:8–11; PX 399 at 20–21.

Zambrano testified that he reviewed the entire record (more than 236,000 pages) beginning in October 2010 and that he completed his review "way before" January 2011 (Tr. (Zambrano) 1719:18–1720:2, 1736:21–24)—notwithstanding the fact that unrebutted expert testimony

established that reading this much material in this short amount of time is "impossible" (PX 4200 (Rayner) ¶ 3). He testified that he began drafting the judgment in the middle of November 2010. Tr. (Zambrano) 1663:22–1664:21. When confronted with the interview he gave reporters in which he stated that he had not reviewed more than 50,000 pages of the record as of January 31, 2011 (PX 2348), Zambrano testified that he had lied to reporters in an effort to stop them from "harassing" him. Tr. (Zambrano) 1819:21–1820:13.

Contradicting prior statements in a sworn declaration to Ecuadorian prosecutors that he had drafted the judgment without any assistance at all (PX 6330 ¶ 14; PX 6391 at 1), Zambrano testified for the first time that he had dictated almost the entire Lago Agrio judgment to an 18-year-old recent high school graduate, Evelyn Calva, whom he hired to be his personal assistant (Tr. (Zambrano) 1654:24–1655:3).[35] Zambrano claimed to have paid Calva out of his own pocket and to have dictated approximately 85% of the Lago Agrio judgment to her, including complicated lists of sampling data and legal citations. Tr. (Zambrano) 1818:2–15, 1877:18–1879:25. Zambrano claimed that he drafted the judgment by laying out the cuerpos, his notes, and other materials in his office and then dictating the judgment directly to Calva, but that he never showed any document to Calva to type from. Tr. (Zambrano) 1878:8–1879:7. Zambrano also testified that Calva located legal precedents from the U.S., England, Australia, and France to use in the judgment, although he admitted he does not know whether she speaks English or French. Tr. (Zambrano) 1617:15–1620:6.

Despite his claim of having dictated almost the entire judgment to Calva, Zambrano had no plausible explanation for why the Lago Agrio judgment contained typographic and other er-

---

[35] Zambrano mentioned Evelyn Calva only after Guerra testified at trial that Zambrano had hired a young woman named Calva to retype Guerra's orders from the Lago Agrio case into Zambrano's computer. Tr. (Guerra) 1002:8–1003:3.

rors that are identical to the errors in the Ecuadorian plaintiffs' unfiled work product.  Tr. (Zam-brano) 1711:3–15, 1877:18–1878:7.  At one point, for example, Zambrano explained an error in the order of page numbers in a citation that appears in both the judgment and the Fusion Memo by testifying:  "Well, since the page numbers are being pointed out there, the page numbers where the documents are to be found, surely when I was dictating to Ms. Calva so that she would write the judgment, I noticed that I had skipped one of those pages and then I later included it." Tr. (Zambrano) 1711:11–15.  He had no explanation for how this error would have come to ap-pear in both the Fusion Memo and the judgment.  *See* PX 2164 at 3; PX 435.

Zambrano also could not produce a single scrap of paper establishing that he drafted the judgment.  He claimed that he "discarded" any such materials "approximately" one year after the judgment was issued, even though this RICO case was then pending, as was Chevron's appeal in Ecuador, where Chevron had publicly alleged ghostwriting and was challenging the judgment. Tr. (Zambrano) 1625:18–1626:2, 1818:16–22, 1952:22–1953:2.  And despite being served at his deposition with a subpoena in Spanish to produce documents—a stipulated fact that Zambrano attempted to dispute—Zambrano refused in open court to comply with the subpoena and testified that he would not produce any documents upon his return to Ecuador.  Tr. (Zambrano) 1954:1–1956:21.

Zambrano also testified that there were two computers in his office—an old computer and a new computer—and he testified repeatedly that the judgment was typed entirely and only on the new computer because it "was the more modern computer."  Tr. (Zambrano) 1679:24–1680:6.  As described below, this testimony was fundamentally at odds with the Tarco Declara-tion that Defendants proffered, which alleges that a draft of the judgment was found on the old computer, with the rebuttal testimony of Spencer Lynch, and with the official documents show-

ing the date that the "new" computer was purchased and shipped to Ecuador.  *See infra* Argument Section I.C.1.f.iii.(7).

### (3) Documents Left Outside Zambrano's Office Door

Zambrano's claimed the parties would sometimes leave materials outside his door.  Tr. (Zambrano) 1691:10–14.  But Zambrano could not identify a single document left by the LAP team (or anyone else) outside his door, and, as he testified at his deposition, he could not recall any other case where parties left documents outside his office door.  Tr. (Zambrano) 1691:20–1692:5, 1695:1–4, 1699:12–1700:8.  And in any event, Zambrano testified he would first check to make sure any such materials were included in the record before using them, and that if they were not in the record, he "would discard it because it wasn't useful to me."  Tr. (Zambrano) 1692:25–1693:3, 1694:4–25.  Although Zambrano does not even know what an Excel spreadsheet is (Tr. (Zambrano) 1698:1–2), and testified that there were never any computer disks or electronic files left at his door (Tr. (Zambrano) 1692:3–24), one of the key copied documents—the Selva Viva database—is an Excel spreadsheet.  And Zambrano conceded that it would have been improper under Ecuadorian law for him to have considered a database of test results that was never made part of the official court record.  Tr. (Zambrano) 1699:5–11.  Other LAP work product documents copied in the judgment were not the kind of documents a party would likely leave outside a judge's door—including an email among LAP counsel discussing case law (PX 437, the Fajardo Trust Email) and an early draft of an internal memo (PX 435, the Fusion Memo).

Zambrano also testified that he was not aware of President Correa's support for the Ecuadorian plaintiffs (Tr. (Zambrano) 1740:8–1741:5)—likely making him unique among anyone in Ecuador who pays attention to news or politics.  Yet Chevron's alegato, which Zambrano testified he had read (Tr. (Zambrano) 1960:15–18), referred to Correa's support for the Ecuadorian

plaintiffs more than a dozen times.  Tr. (Zambrano) 1961:8–1963:13; PX 6405 at 17, 18, 107, 152–156, 159–161, 163.

### (4) Zambrano's New Employment

Zambrano acknowledged that he had been removed from his position as a judge in Lago Agrio on February 29, 2012, for inexplicably vacating on appeal the pretrial detention of an accused narcotics trafficker.  Tr. (Zambrano) 1753:25–1755:11; PX 411.  Zambrano was unemployed for over a year following his dismissal.

Zambrano finally found new employment in April 2013 as a legal advisor at the Refinery of the Pacific, an affiliate of Ecuador's state-owned oil company Petroecuador.  Tr. (Zambrano) 1791:2–12, 1802:1–23.  He obtained this new job just days after submitting his March 28, 2013 declaration in this case in support of the Defendants, claiming to have authored the judgment himself and without any assistance.  Tr. (Zambrano) 1791:11–12, 1802:1–23.  Zambrano testified that he never disclosed during the job application process that he was a judge or that he had been removed from judicial office.  Tr. (Zambrano) 1951:1–1952:1.  Zambrano's new job pays $46,000 per year, which is more than twice the salary advertised for the position.  Tr. (Zambrano) 1797:10–23; *see also* PX 6357 (showing Zambrano employed as a legal analyst); PX 6361 (showing Zambrano earning $46,000 per year); PX 6360 at 6 (showing legal analyst salaries of up to $1,800 per month).  Zambrano has never visited the Refinery of the Pacific website and is not even aware that he has a work email address.  Tr. (Zambrano) 1794:17–19, 1796:12–14. And while under Ecuadorian law the government must be the majority shareholder of companies that have multiple owners in a strategic sector, such as the oil sector, Zambrano claimed he did not know Petroecuador was a majority shareholder in the Refinery of the Pacific.  Tr. (Zambrano) 1791:24–1792:3, 1792:13–21, 1792:22–1793:23.

### (5) Defendants' Failed Attempts to Rehabilitate Zambrano's Testimony

Defense counsel's attempts to remedy Zambrano's failure on direct to recall or explain the theory of causation used in the judgment were unsuccessful—in large part because Zambrano attributed the theory to a non-existent principle of U.S. law.  Zambrano began by explaining that the theory was one he had drawn from U.S., English and French law, relating to the differences between "legal causation and scientific causation."  Tr. (Zambrano) 1833:13–21.  According to Zambrano's version of this theory, judges have the discretion to look "into the greater harm or damage."  Tr. (Zambrano) 1833:22–1834:1.  When questioned by the Court on this point, Zambrano explained that a judge would not need to quantify the amount of the damage or determine whether contamination had, in fact, injured anyone; rather, the judge would only need to find the existence of contamination.  Tr. (Zambrano) 1834:2–20.  Zambrano stated that this causation theory was based on a principle developed and applied in the United States, but was unable to provide a source for this assertion.  Tr. (Zambrano) 1834:21–1835:20.  Zambrano's source identification failure is unsurprising because no such principle exists.

Attempts to rehabilitate Zambrano on his use of sources written in languages other than Spanish similarly failed.  On direct, Zambrano had testified that Calva, his 18-year-old assistant, had searched the internet and found French cases to print out for Zambrano to use in the judgment.  Tr. (Zambrano) 1616:10–1620:6.  But Zambrano made no mention then of using Ecuadorian cases that cited to French case law.  On re-direct, defense counsel moved into evidence the *Delfina Torres* case, an Ecuadorian case that cites to French law and is cited in the Ecuadorian judgment.  Tr. (Zambrano) 1888:6–10; DX 1554 at 14.  Even though Zambrano claims to have written the judgment and to recognize the case when presented with a copy by Defendants' counsel (Tr. (Zambrano) 1880:9–14, 1884:15–17), he was unable—even with the case in front of

him—to recall the name of the case,[36] or how he referred to it in the judgment that he acknowl-edged was "the most important decision" he had issued as judge.  Tr. (Zambrano) 1605:14–17, 1885:1–1887:7.[37]

When Defendants' counsel attempted to rehabilitate Zambrano on his admitted lies to re-porters concerning his progress in reading the Lago Agrio record, Zambrano could explain only that he had lied because he wanted reporters to leave him alone.  Tr. (Zambrano) 1819:21–1820:13.  Yet Zambrano later testified that he liked to "behave with probity and always with the truth."  Tr. (Zambrano) 1894:14–16.

Defense counsel also demonstrated that Zambrano possessed documents responsive to the subpoena served on Zambrano at the time of his deposition.  When asked about a selection of documents allegedly presented to Zambrano by Guerra during an airport meeting, Zambrano stated he recognized the English language documents because they contained the name "Andres Rivero."  Tr. (Zambrano) 1918:5–1919:2.  When questioned by the Court, Zambrano admitted that the original documents were in Ecuador and that he had given copies of them to Pablo Fa-jardo, but had not brought the originals to the United States.  Tr. (Zambrano) 1919:11–1921:1.  When later asked by Chevron's counsel whether he would produce responsive documents pursu-ant to the previously served subpoena, and to include the documents Zambrano made available to

---

[36] In addition, the *Delfina Torres* case does not account for the U.S. and Australian causation law that are refer-enced in the judgment, which, as both Mr. Green and Mr. Spiegelman testified, were copied from the Moodie Memo.  *See* PX 5000 (Spigelman) ¶¶ 7–10; PX 5100 (Green) ¶¶ 19–20.

[37] The *Delfina Torres* case is the same case that Fajardo emailed to Donziger and others in June 2010, telling them, "the arguments by the magistrates are very interesting.  I think they serve us well for our alegato and . . . ."  PX 1141.  That incomplete phrase, "alegato and", is similar to phrases in several other emails from Fajardo.  *See* PX 1151 ("will help us with the alegato work and . . ."); PX 2378 ("organizing the office's legal information for the alegato and the other project").  "Alegato" refers to the parties' final briefs; the logical completion of the phrase af-ter the "and" is therefore the judgment itself.  Indeed, just a few weeks before sending the *Delfina Torres* case to Donziger, Fajardo completed the phrase in exactly that manner, but nonetheless indicated that the matter was subject to secrecy, describing a research assignment for a LAPs intern:  "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing . . . ."  PX 1137.  Defendants have offered no alternative ex-planation besides the obvious—that Donziger and Fajardo were scheming to draft a judgment that they would in-duce the court to issue as its own.

Pablo Fajardo, Zambrano responded in the negative.  Tr. (Zambrano) 1956:15–22.

### (6) Zambrano and Moncayo Improperly Coordinated Testimony

The hand-drawn images of Zambrano's office made by Zambrano during his deposition, and later by Moncayo as part of his declaration, are noteworthy for the similarity of the unconventional symbols used to depict certain objects and windows in the room.  As highlighted below in the red outlines, three blocks represent curtains in both images.  PX 6392; DX 1600 (Moncayo) at 21.  Given Zambrano's admission that the LAPs' counsel informed him of the presence of draft orders on Guerra's hard drive prior to his testimony, it seems apparent that Moncayo was provided with Zambrano's drawing prior to the filing of the Moncayo declaration in an effort to coordinate the testimony of both witnesses.  Moreover, Defendants' counsel coordinated Moncayo's testimony regarding Calva and her alleged role in typing the ment.  Moncayo testified that one of Defendants' U.S. counsel called him to coordinate a phone call between himself and Calva.  Tr. (Moncayo) 2099:13–2101:16.  He also implausibly testified to recognizing Calva as the woman he claimed to have seen working in Zambrano's office, despite not seeing her for over three years and admitting that he only glanced through Zambrano's curtains for a few seconds as he was walking by.  Tr. (Moncayo) 2083:17–20.



### (7) The Tarco Declaration and Report Cannot Be Squared With Zambrano's Claim of Authorship

Well after trial had commenced, Defendants sought leave to amend their witness list to permit the testimony of Milton Efrain Jaque Tarco ("Tarco"), a purported computer forensic expert from the Ecuadorian Judicial Council. *See* Dkt. 1681.  Defendants submitted a declaration in which Tarco asserted that he had examined images of the hard drives of two computers assigned to Zambrano and had located a file named "Providencias.docx" on the hard drive of one of the computers, "PC-02."  PX 6371 ¶¶ 2, 10.  Tarco also declared that Providencias.docx contained text "very similar to the judgment," that Providencias.docx had been created on October 11, 2010 and had been edited for 3,571 hours, and that these conclusions were explained in a report that Tarco had coauthored for the Nueva Loja Prosecutor's office in connection with its investigation of Judge Guerra (the "Tarco Report").  *Id.* ¶¶ 2, 10, 14.

The Tarco Declaration, however, contradicted Zambrano's testimony, and the complete Tarco Report showed why:  Providencias.docx was an attempt to manipulate computer metadata to make it appear as though Zambrano had written the judgment beginning in October 2010.  While this Court ultimately did not admit Chevron's rebuttal evidence based on the Tarco Report (due to the refusal of Ecuadorian government officials to permit Chevron's investigators to copy the Report in its entirety), even the brief Tarco Declaration is sufficient to demonstrate that Tarco's conclusions cannot be reconciled with Zambrano's testimony.

First, while Zambrano testified that he drafted the judgment entirely on the "new computer" (Tr. (Zambrano) 1658:14–1659:6, 1679:2–7, 1680:3–6), the Tarco Declaration states that Providencias.docx was found on the old computer, PC-02 (PX 6371 ¶ 10).  A review of the inventory records of the Ecuadorian Judicial Council and the business records of Hewlett Packard (the manufacturer of both computers) demonstrates that PC-02—which Tarco identified by serial

number—was the "old computer" assigned to Zambrano.  PX 4108–10; PX 4119–22.  This ir-
reconcilable conflict demonstrates that Zambrano's judgment drafting testimony was a wholesale
fabrication.

Second, the Tarco Declaration asserts that Providencias.docx was created on October 11,
2010 and was edited for 3,571 hours between that date and the last-edited date of the document,
March 18, 2011.  PX 6371 ¶¶ 10, 11.  But Zambrano testified that he personally turned off his
computers at night and on the weekends, and that he did not take them home with him.  Tr.
(Zambrano) 1679:8–11, 1680:20–25, 1681:15–23, 1683:1–6.  As Spencer Lynch testified, edit
time does not accumulate when a computer is turned off.  Tr. (Lynch) 2816:25–2817:2.  There
are a total of only 3,816 hours (159 days) between October 11, 2010, and the last-edited date of
March 18, 2011 for Providencias.docx.  Accordingly, if the edit time of 3,571 hours were cor-
rect, the file must have been open and edited for an average of 22.46 hours per day, every day
(including weekends and holidays such as Christmas and New Year's)—which is irreconcilable
with Zambrano's testimony regarding his working hours (Tr. (Zambrano) 1661:12–18) and his
turning off the computers every night (Tr. (Zambrano) 1680:24–25, 1681:15–23, 1686:15–19).
In fact, in the Moncayo documents recently produced to Chevron, Fajardo, Saenz, Prieto and
other LAP representatives discuss circulating a press release to roll out the Ecuadorian investiga-
tors' forensic report on Zambrano's computer.  The co-conspirators note that the press release
and report should be made public the same week Guerra was scheduled to testify in this action,
with Fajardo stating "I think that this weapon should be taken advantage of."  PX 8103 at 7.
They then grapple with how to describe the forensic report, essentially admitting that Zambrano
did not draft the judgment:  "Zambrano could not have worked on the judgment 24/7 during

those 5 months." *Id.* at 10–11.[38]  They admit that, as the criminal complainant, they had full access to the Tarco Report, and that the Tarco Report never concludes that the judgment was drafted on a Zambrano computer.  *Id.*  Nonetheless, they proceeded then to issue a press release that claimed the opposite.  PX 7086 ("An expert examination of the desktop computer used by the then substitute judge of the Provincial Court of Sucumbíos, Nicolás Zambrano, which ordered Chevron to pay more than $19 billion, was prepared on said computer and in the office of that judicial department.").  Defendants' Ecuadorian co-conspirators thus continue to manufacture and manipulate "evidence" in order to pressure and extort Chevron.

### g. Donziger Lied About the Lago Agrio Litigation, Chevron, and TexPet's Ecuador Operations

As explained above, the building blocks of Donziger's extortionate campaign were lies.  Some lies, like Cabrera's independence, were rooted in corruptly obtained validation of the LAPs' allegations.  Others were cloaked in evocative language or comparisons, which Donziger would continue to use, and push his proxies to continue using, even after their originators had disavowed them or conclusively explained to Donziger that the statements were without merit.  And with increasing intensity since his own wrongdoing has been revealed, Donziger has spun falsehoods about Chevron's conduct in the Lago Agrio litigation itself, in a doomed attempt to justify his own corruption.  Throughout, Donziger's objective has been to generate public attention and pressure Chevron to pay him off.

---

[38] While this Court ultimately did not permit Mr. Lynch to testify about his conclusions based upon the information contained in the Tarco Report, Chevron would have proven that the Providencias.docx file was almost certainly created on a third computer.  Mr. Lynch analyzed the screenshots of metadata contained in the Tarco Report, which revealed that the "embedded creation date" of Providencias.docx, based on the metadata associated with the Word document itself, was January 21, 2011 (PX 4125 at 9)—even though the "file creation date" metadata indicated that the file was created on PC-02 on October 11, 2010 (PX 4125 at 12).  This is a rare anomaly, which is consistent with the file having been created on a third computer, loaded onto PC-02 while the computer clock was artificially set backwards to October 11, 2010, and that someone then set PC-02's computer clock forward by roughly five months.  Dkt. 1763-1 (Ex. A) ¶ 22(d).  This manipulation is further evidence that Zambrano did not author the judgment and that Defendants have colluded with the ROE to fabricate evidence to bolster their claims.

### i. Donziger's Central and Most-Repeated Lie Was the False "Independence" of Cabrera

The centerpiece of Donziger's strategy was the false independence of the Cabrera report—until he was forced to admit under oath that it was secretly written "verbatim" by the LAPs' paid consultants at Stratus.  The evidence that puts the lie to this claim is overwhelming, and includes not only the drafts and translations prepared by those consultants and the records of the LAP team's efforts to conceal their role (which confirms their consciousness of guilt), but video of the March 3, 2007 meeting between the LAP team and Cabrera, at which Fajardo told Cabrera that the LAP team, not Cabrera, would do the work and write the report.  *See supra* Argument Section I.C.1.d.i.  Yet Donziger and his proxies made public claims that Cabrera was "independent" dozens of times after that March 3, 2007 meeting, knowing those claims were false.  *See* PX 4400 (Kim) ¶ 12–13 (documenting 29 such instances); PX 2205 (timeline showing submission of the Fajardo declaration, which claims Cabrera is an "independent" court expert, to 17 separate U.S. courts).  *See* FF ¶ 88.

### ii. David Russell's "SWAG" $6 Billion Damage Estimate

Donziger's "strategy" to "increase the cost [to] Chevron" including the "cost of [Chevron's sullied reputation . . . in the media" depended on wide publicity of inflated damages estimates.  PX 7537 at 52.  To this end Donziger pressured U.S. expert David Russell to develop the first exaggerated damages estimate.  Donziger and his co-conspirators then repeatedly touted this estimate to U.S. government authorities and media, even after Russell disavowed the estimate and asked that Donziger "cease and desist" from using it.  PX 3200 (Russell) ¶¶ 20, 41; *see also* PX 2221; PX 764; PX 476#–83#; PX 485#–86#; PX 491#; PX 497# at 5 n.9; PX 499# at 2.

In the fall of 2003, during the judicial inspections phase of the Lago Agrio litigation, Donziger hired Russell, an American environmental engineer, to be the chief scientist for the

LAPs.  His first assignment was to prepare an initial damages estimate.  Donziger extracted as-surances from Russell that Russell would "come up with the biggest possible cost estimate [he] could" so that Donziger could use it to put pressure on Chevron "to settle the litigation."  PX 3200 (Russell) ¶ 9; Tr. (Russell) 388:15–18.  Donziger made it clear he wanted a "really big number."  PX 3200 (Russell) ¶¶ 9, 41.

At Donziger's instruction, Russell was told to assume that groundwater and drinking wa-ter was contaminated (PX 3200 (Russell) ¶ 9) and the overwhelming majority of his cost esti-mate concerned water-related cleanup projects (PX 2414 at 3).  Russell saw approximately 45 pits, some only from the van as they drove by—but was told to assume that there were 700 re-quiring remediation.  PX 3200 (Russell) ¶ 5; Tr. (Russell) 301:14–16; 304:9–12.  Donziger also told him that "everything had belonged to Texaco and that Texaco was totally responsible for all contamination regardless of who was operating the pits."  Tr. (Russell) 305:4–7.  On the basis of these instructions and his drive-by assessment of the region, Russell prepared a 3 and ½ page re-port that proposed a 15–18 month study as a "first step in defining the problem," and included the "really big number" Donziger requested—a $6.114 billion remediation estimate that Russell told Donziger was "rough."  PX 2414; Tr. (Russell) 338:19–339:7.  Russell neither took nor ana-lyzed a single air, water, or soil sample, nor did he review any sampling results.  PX 3200 (Rus-sell) ¶ 5.

Donziger ignored Russell's recommendation to do a serious study.  PX 3200 (Russell) ¶¶ 11–14; *see also* PX 710 (memo regarding global inspection).  Instead, Donziger focused his attention on "using [Russell's] estimate as a club and trying to batter Chevron with it in pub-lic[.]"  PX 3200 (Russell) ¶ 12; PX 456#; PX 754.

Within a year of working on the case, Russell "came to learn that [his] cost estimate was

wildly inaccurate and had no scientific data to back it up."  PX 3200 (Russell) ¶ 11.  He would

later testify that it was "SWAG"—a "scientific wild-ass guess."  Tr. (Russell) 338:23–339:11.  In

February 2006, Russell disavowed his $6 billion cost estimate in a letter to Donziger, stating,

"[t]hat 2003 cost estimate is a ticking time bomb which will come back to bite you, and very

badly if anyone attempts to due diligence on it."  PX 763 at 3.  Russell told Donziger that the es-

timate could be off by a factor of ten or more (PX 763 at 2; 1/18/2011 Donziger Dep. 3175:13–

18; PX 2420 (lack of supporting evidence)) and six months later emphasized to Donziger that

"the cost estimate should not be used again, ever!"  PX 788.  Russell told Donziger "on several

occasions from late 2004 through early 2005 that [his] initial cost estimate was wildly inaccurate

and that it should not be used."  PX 3200 (Russell) ¶ 14.

 Donziger feigned indifference, telling Amazon Watch that "this guy is telling me, [it]

would cost . . . [s]ignificantly less than that," but adding, "I don't care what the fuck that guy

says."  PX 18A.  He expressed concern that retreating too far from "Russell's number . . . would

make us look like fools."  PX 169# at 20.

 He and Amazon Watch continued to cite Russell's disavowed estimate, *e.g.,* PX 485# at 2

("The only independent damage assessment, by the U.S. firm Global Environmental Operations,

puts clean-up costs at $6.14 billion . . . "); 1/18/2011 Donziger Dep. 3180:15–20.  After receiv-

ing an email from Russell demanding that it "cease and desist" using his cost estimate, Amazon

Watch decided to take it off the ChevronToxico website (PX 766), but it continued to publicly

cite Russell's cost estimate in press releases through July 2007.  PX 3200 (Russell) ¶ 20.  On

February 23, 2006, Donziger instructed Amazon Watch to send a second "SEC letter in ASAP,

making that slight change that another report will be coming with a multi-billion damage figure,

without disavowing or mentioning Russell's report."  PX 768.  Soltani and Amazon Watch

obeyed, sending the letter to the SEC on February 28, 2006.  *See* PX 497# at 9.  Amazon Watch never corrected its false statements to the SEC regarding the Russell estimate, and, as previously explained, it continued to use the Russell estimate in press releases.  PX 466#; PX 467#; PX 472#; PX 473# at 17; PX 474#; PX 475#; PX 485#; PX 493; PX 2221.[39]

In his trial testimony, Donziger attempted to justify his continued use of Russell's disavowed estimate based on a "more detailed cost assessment from our Ecuadorian technical team" that estimated the remediation cost at over $15 billion, and an analysis by a "junior lawyer" that the "remediation proposal will come in at about $20 billion."  DX 1750 (Donziger) ¶ 118.  However, the estimates were not prepared by a technical expert, but by two junior lawyers, Aaron Marr Page[40] and Daria Fisher (Page's wife)—who expressly stated that "[w]e both feel that our aim right now is to exceed the $6 billion figure, while still passing the laugh test."  DX 731 at 3.  Page and Fisher noted that their approach required a more expensive option for soil remediation (off-site incineration) than the EPA had required in a different clean-up (*id.* at 2), described their plan to "pump-and-treat [] an ecosystem," in blunt terms—"this shit is really unprecedented" (*id.*; PX 3240)—and noted they had developed a $15 billion cost estimate to treat groundwater and soil that "seems fair to us."  *Id*. at 3.  Once more, the plan was to have the legal team prepare an analysis that a credentialed person would then sign.  DX 731 at 1 (Donziger: "when will this report be done and who is going to sign it?"); PX 8014 at 3 ("Daria, a suggestion . . . this needs to be written to protect [F]austo [Penafiel, the purported expert] and this leaves him exposed.").

Even Donziger believed that the estimate of $20 billion was not supportable.  He commented on the draft analysis, "daria: this is a rough edit – let me know if you can get the number

---

[39]  In fact, Donziger and his surrogates publicly cited Russell's estimate at least 22 times after Russell discovered it in writing in February 2006.  PX 4400 (Kim) ¶ 9.

[40]  Page did not major in a scientific field or even take university-level environmental science classes, much less have training in developing environmental remediation estimates (9/15/2011 Page Dep. 11:24–13:8).

down." PX 8014 at 1. He also urged that Fisher "[r]emember that this is not science, this is an active litigation . . . ."). *Id.* at 3. But while Donziger expressed his doubts, Page continued to press Donziger to use the baseless figure: "I really don't understand why you're shying away from going up on the remediation estimate. Like I wrote earlier, while 20b can be attacked it can't be destroyed in a way that will embarrass us. . . . I really think upping it will make media/court/CVX itself start thinking in terms of billions, albeit lower . . . ." PX 3240. Donziger cannot claim that his reliance upon this estimate—prepared by junior lawyers with the goal to reach a high number that passed the "laugh test"—was reasonable. *See* FF ¶¶ 83–87.

### iii. The Tainted Exxon Valdez Claim

Another false comparison Donziger repeatedly invoked was to the Exxon Valdez oil spill. In 1989, the Valdez tanker ran aground in Alaska's Prince William Sound and spilled approximately 11 million gallons of crude oil. Exxon spent $2.1 billion on the cleanup.[41] Donziger and his proxies frequently claimed that "Chevron" spilled "more than 18 billion gallons of toxic waste, containing 30 times more crude oil than the Exxon Valdez spill, into Ecuador's rainforest between 1964 and 1992." PX 477# at 2; PX 536# at 2; PX 533# at 3; PX 2309 at 2.

In May 2007, LAPs scientist Bill Powers investigated the claim, and found that it was false. PX 862. The theory behind the assertion had always been a stretch—it is a comparison of the release of pure crude over several days to the release of water containing less than 0.2% of petroleum hydrocarbons over 30 years. According to his own experience and Ecuadorian government documents, Powers determined that produced water, which is not toxic, contains about 0.1% hydrocarbons, so the 19 billion gallons of water discharged would only have led to a total

---

[41] *Exxon Valdez* Oil Spill Trustee Council, "Questions and Answers," *available at* http://www.evostc.state.ak.us/index.cfm?FA=facts.QA}. Eleven million gallons is not a large oil spill by historical standards—it does not make the top 50 worldwide by volume. The damage and notoriety of the Valdez spill was a function of where it took place. *Id.*

of 19 million gallons of hydrocarbons—or less than two times the volume of pure crude spilled from the Valdez in just few days.  *Id.*

When Soltani first told Donziger about Powers's conclusion, Donziger assured her that "Bill is incorrect.  We have checked this with a number of people."  PX 861 at 1.  Donziger admonished Amazon Watch not to stop using the false statistics because doing so would have "HUGE implications for the legal case."  PX 860.  Indeed, Soltani's primary concern was not to remove or revise these statistics, but on how to "save face moving forward" with the pressure campaign.  PX 861 at 1.  Meanwhile, in an email to another Amazon Watch conspirator, with the subject line "Private," Donziger belittled the idea that Powers had even tried to figure out the true facts:  "i just do not understand for the life of me why powers is going thru this exercise."  PX 860.  In March 2009, Beltman wrote to Donziger, again questioning the use of the Exxon Valdez statistic:  "I have never seen where this 30 times number comes from, and don't recall seeing estimates of the amount of crude spilled that match the 324 million gallons figure.  For my own edification and so I can respond if ever asked, do you know where the 30 times number comes from?"  PX 1110 at 1.  Donziger replied that the statistic was based on his "own calculations.  If that doesn't suffice then kiss my butt."  *Id.*

In January 2011, Donziger asked Beltman "can we defend the 30x Valdez size of the dumping?"  PX 1207.  Beltman told him that the critical 2% figure was "too high – the data we've seen are well below 1%."  *Id.*  And the only actual analysis he could find of produced water actually generated by the consortium operations found that the produced water there contained a miniscule 0.0027% oil (*id.*)—suggesting that Donziger's 2% number was itself inflated by a factor approaching 750, and thus the consortium discharged less than 4% of the oil spilled in the Exxon Valdez disaster—and did so in minute amounts over three decades, not three days.  *Id.*

Yet only months after Beltman explicitly told Donziger that the Exxon Valdez statistic was unreliable (PX 1207 at 1), Donziger, misled Hinton, responding to her inquiry, "[w]hat is our source for the 2% of formation water being crude oil," that the statistic came from "[o]ur own technical team" and that "Beltman can help . . . ." (PX 6842 at 1).

From April 2005 to October 2010, Donziger and his co-conspirators cited to this statistic at least 31 times in press releases and blog posts. PX 4400 (Kim) ¶ 10; *see also* PX 2218 at 3. In a June 2010 press release on chevrontoxico.com, for example, the LAPs claimed that "[e]xperts have concluded that Chevron discharged at least 345 million gallons of pure crude into the Amazon as part of its illegal dumping—far more than both the 11 million gallons spilled in the Exxon Valdez and the enormous amounts of crude spewing out of the BP well in the Gulf." PX 534R at 2. In April 2009, long after Powers had demonstrated that it was false, Donziger even cited the figure in testimony before the United States Congress. PX 1130# at 60.[42] *See* FF ¶ 90.

### iv. Misleading Comparison to Chernobyl

Russell also suggested the phrase "Rainforest Chernobyl"—and Donziger has since made it a central claim in the press campaign. *See, e.g.*, PX 456#; PX 494# at 3; PX 509#; PX 510#. In April 2005, Amazon Watch orchestrated an exhibition of photographs of the Lago Agrio region taken by Lou Dematteis before the Chevron annual meeting, which Donziger insisted be titled "Rainforest Chernobyl." PX 729. Dematteis objected, and Russell agreed that the photographs of "green and growing forest" didn't hold up to the Chernobyl comparison. *Id.* Donziger, however, demanded that the comparison be maintained, stating "the press loves it. texaco hates it. that's the point." *Id.*

---

[42] In fact, Donziger and his surrogates publicly invoked the Exxon Valdez comparison at least 12 times after Powers told him it was indefensible in May 2007. PX 4400 (Kim) ¶ 11. The LAPs "friend" Correa also used this misleading statistic in public speeches. PX 853; PX 7520 at 6; *see also* PX 56; PX 56A.

Donziger and his co-conspirators commonly refer to the contamination in the former concession area as the "Rainforest Chernobyl" or "Amazon Chernobyl." These monikers are, in fact, often included in the title of published articles, press releases, and blog posts. *See, e.g.*, PX 456# at 1; PX 509# at 1; PX 510# at 1; PX 522# at 1. Russell first used the term comparing the size of the former concession area to the size of the area affected by the Chernobyl disaster during an October 30, 2003 interview with *The Wall Street Journal*. DX 1405 at 1. This rudimentary comparison was based on a "desk study" of Chernobyl soils that Russell conducted in 1998 or 1999. Tr. (Russell) 392:3–11. Russell, however, had never visited Chernobyl. *Id.* Donziger and his co-conspirators have relied on Russell's rudimentary comparison to imply that the contamination in the former concession area is comparable to Chernobyl, but Russell intended only to compare the physical size of the area in question, and nothing else. Tr. (Russell) 392:12–18. In any event, Russell publicly disavowed this comparison in 2007—again to the Wall Street Journal—as a "first guess" based on his initial tour, with Donziger, of the region. PX 495R at 2.

Yet despite Russell's disavowal, and despite the fact that the comparison is entirely misleading and has no scientific basis, Donziger and his co-conspirators continue to refer to the contamination in the former concession area as "Chernobyl." *See* PX 486#; PX 505# at 3; PX 509# at 1. *See* FF ¶ 91.

### v.  False Accusations of Murder

Donziger and his co-conspirators have also published lies unrelated to the purported contamination. Early on in their scheme, Donziger and his co-conspirators repeatedly accused Chevron of being involved in the violent August 2004 murder of Pablo Fajardo's brother, Wilson Fajardo. These statements are, however, knowingly false. Just days after the murder, Pablo Fajardo provided to the police a detailed statement identifying the men he asserted had murdered his brother, along with an account of prior threats and an attempt by the suspects to stab his

brother a few days earlier.  *See* PX 2308 at 80–81.  There is no mention in this statement of Chevron or Texaco or any connection to the Lago Agrio litigation.  *Id.*

Nonetheless, to create the impression that Chevron attempted to "assassinate" Pablo Fajardo, Donziger and his co-conspirators implied that the killers mistook Wilson Fajardo for Pablo Fajardo.  In 2009, in a statement before the Tom Lantos Human Rights Commission, Donziger asserted that the "lead lawyer for the rain forest communities, Pablo [Fajardo], has been subjected to death threats" and that "his brother had just been murdered about a year after the trial began under mysterious circumstances that many think was a case of mistaken identity."  PX 1130# at 65.

> When interviewed by Vanity Fair, Fajardo parroted the false accusations:
>
> Killing Fajardo himself would have been risky, given his prominence in the region, but no such protections applied to those close to him.  I said, "I am truly sorry I have to ask you this.  Do you suspect he was killed because of you?  As a threat?  To frighten you off?
>
> Fajardo's Spanish is very clear.  He said, "I would like to think that it was just a regular crime.  Those days were the hardest in my life.  The chief of military intelligence in Shushufindi told one of my brothers that I was being followed, and that the killers had made a mistake.  I don't want to believe that.  And I wouldn't if . . . No, I just don't want to.  But I do know that afterward I was followed.  A lot."

DX 4 at 19–20.

Donziger also spared no opportunity to spread these accusations through his mouthpiece, Amazon Watch.  *See, e.g.*, PX 502# at 2 ("[T]he brother of Fajardo was murdered in 2004 in what observers think may have been a case of mistaken identity.").  And, in order to promote his book proposal, Donziger gave prominence to these provocative lies:  "The book will explore a darker dimension to the litigation – the consequences of taking on a wealthy foreign corporation whose allies and local employees are willing to stop at nothing to win the power game.  The brother of our Ecuadorian lawyer, Pablo Fajardo, was murdered recently with a bullet to the

head.  When Pablo started pressing the local police to investigate, he became a target himself and had to go underground for several weeks."  PX 806# at 32.  Similarly, in a scene in *Crude* set at Wilson Fajardo's grave, Defendant Fajardo linked his brother's "murder[]" to the "first judicial inspection in the Texaco case" and falsely said that the killers "were really looking for me."  PX 7537 at 31 (*Crude* transcript).  *See* FF ¶ 92.

### vi.  Misrepresenting Facts Related to Judge Nuñez's Bribery Scandal

When news broke of the bribery scandal involving Ecuadorian Judge Juan Nuñez in 2009, the LAPs recognized that the scandal could hinder their control over the judiciary and posed a "significant risk to [their] case."  PX 1748 at 1.  Indeed, the videotapes themselves showed Judge Nuñez meeting privately at a Holiday Inn with individuals posing as remediation consultants and assuring them that Chevron would be found liable; Nuñez also met secretly with a member of President Correa's political party and assured both the "presidency" and the LAPs $1 million each.  *See* PX 2531; PX 2531A; PX 2532; PX 2532A; PX 2533; PX 2533A; PX 2534A; *infra* Argument Section VII.B.2.  But because Fajardo knew that Zambrano had asked Judge Nuñez for assistance drafting orders "should the case fall to him," the risk posed by the scandal in Ecuador was "not all bad or worrisome."  *Id.*  Donziger, however, needed a way to spin the scandal in the United States that would keep pressure on Chevron to settle the lawsuit.  Donziger's solution was to concoct false allegations claiming Chevron entrapped Judge Nuñez in a "Nixon-style dirty tricks operation."  PX 2524 at 5.  Donziger continued to use this rhetoric even after the special counsel Donziger retained to examine the bribery tapes concluded that "Chevron is telling the truth" when it claimed not to have "even known about these conversations" at the time they first occurred.  PX 1200 at 1.

### vii. Misrepresenting Facts Related to the Cancellation of the Judicial Inspection at Guanta Military Base

Donziger and his co-conspirators continue to falsely accuse Chevron of misconduct in relation to the rescheduling of the judicial inspection at the Guanta Production Station. The Guanta Station is located in a high-risk region in Ecuador where the Revolutionary Armed Forces of Colombia (the "FARC") regularly engage in violent activities and create unrest among local indigenous Ecuadorians. The only road leading in and out of the production station can be blocked easily, thereby compounding the area's security risks. Notwithstanding the security concerns associated with the region, on October 29, 2003, Chevron moved the Lago Agrio court to order an inspection at Guanta Station. PX 7767 at 3. The inspection was initially scheduled to take place on October 19–20, 2005.

Just days before the inspection was to take place, Chevron received confirmed threats that its team might be detained if the inspection were to proceed as scheduled. In the face of these threats, Chevron moved the Ecuadorian court to suspend the inspection *that Chevron itself had requested*. PX 7748. The Ecuadorian court granted Chevron's motion (PX 7743 at 1), but only after it requested and received reports from "public security agencies" recommending a cessation of activities in the area (*see* PX 7743; DX 384). Despite this fact, the LAPs staged a demonstration at the judge's office and accused Chevron of intimidating the judge into rescheduling the inspection. The Guanta inspection was rescheduled for March 26, 2009, and ultimately took place at Chevron's insistence. According to Donziger, the inspection took place "without incident." See PX 735 at 1. Notwithstanding, Donziger and his co-conspirators continue to allege fraud with regard to the postponement of this inspection. DX 1750 (Donziger) ¶¶ 83–85.

### h.   Donziger, Colluding With the Ecuadorian Government, Arranged for the Criminal Prosecution of Chevron Attorneys in Ecuador and a Fraud Allegation in U.S. Court

### i.   Donziger Sought to Pressure Chevron to Settle the Case Out of Fear of Criminal Charges Against Its Attorneys

Donziger never limited his pressure campaign to the Lago Agrio litigation itself.  On the contrary, as Ricardo Reis Veiga testified:  "Almost immediately after the Lago Agrio complaint was filed in 2003, the representatives of the Lago Agrio Plaintiffs, including Donziger, sought to bring bogus criminal charges against me, my colleague Mr. Pérez Pallares, and former ministers and officials of the Republic of Ecuador, for purported falsification of documents regarding the settlement and release, as well as for purported environmental crimes."  PX 3000 ¶ 62.  *See* Tr. (Veiga) 190:2–15; *see also* Tr. (Veiga) 177:16–23, 178:8–179:1.

Using criminal proceedings to pressure Chevron's lawyers to settle the case was a key weapon in Defendants' arsenal.  As Cristobal Bonifaz described in a 2005 email to Donziger and Kohn, Defendants planned to "destroy [Reis Veiga's] reputation with ChevronTexaco as an incompetent any way we can to see our case settled."  PX 724.  *See also* PX 3000 ¶ 63 ("Just as a matter of logic, if the Lago Agrio Plaintiffs could annul the settlement and release, then (1) they would eliminate one of the biggest legal impediments to holding Chevron liable, and (2) enable the Republic of Ecuador to shirk its clean-up obligations.  And the pendency of criminal charges would put pressure on Chevron to settle the entire civil matter.").

But as prosecutor after prosecutor determined in writing that the criminal charges were unwarranted based on the evidence, colluding with high-ranking Ecuadorian officials took on greater importance.  PX 3000 ¶¶ 69–74; Tr. (Veiga) 183:1–11 ("[F]our different prosecutors wrote written opinions dismissing this charge for total lack of evidence"); PX 3000 ¶ 85 ("Soon after the election of Rafael Correa as President of Ecuador in December 2006, the pressure cam-

paign against me, Mr. Pérez Pallares, and others involved in the remediation intensified—all of which, I later learned, was with the intention of influencing the civil case in Lago Agrio.").

In June 2005, Prosecutor Luis Enriquez Villacrés wrote to the District Prosecutor confirming that "no conduct was found that would be covered by the pertinent articles of the Criminal Code."  PX 253 at 1; PX 3000 ¶ 71.  In September 2006, after additional investigation, the Pichincha Prosecutor issued a report finding no improper conduct and requesting dismissal of the investigation (PX 256 at 18; PX 3000 ¶ 71), and her superior reported to the Third Criminal Court of Napo that there was "not sufficient evidence to pursue the case against . . . Mr. Ricardo Reis Veiga and Dr. Rodrigo Pérez Pallares."  PX 259 at 10; PX 3000 (Veiga) ¶ 72.  The charges still hung by a thread through 2007, however, because of the Ecuador Supreme Court's "unusual" refusal to terminate the investigations despite repeated requests.  PX 258; PX 3000 ¶¶ 76–77.  As Reis Veiga recalled in his recent testimony:  "Such a blatant disregard for the law and the Prosecutor General's strongly worded request [to archive the investigation] worried me.  The unusual actions of the Supreme Court suggested political influence or some other ulterior reason for refusing to archive the investigation."  PX 3000 ¶ 78.

The election of Rafael Correa as president of Ecuador in 2006 was a watershed for the LAPs, however.  As Donziger stated in December 2006, "all these people . . . we already have connections with, they love us and want to help us, okay?  So, we've gone basically from a situation where we couldn't even get in the door to meet many of these people in these positions to one where they're actually asking us to come and asking what they can do."  PX 16; PX 16A (*Crude* clip and transcript).  *See also* PX 3000 ¶ 85.  Donziger, Fajardo, and Yanza met personally with President Correa on more than one occasion.  *See, e.g.*, PX 484R (describing the LAPs' meeting with Correa); PX 74, 74A (*Crude* clip and transcript of June 5, 2007 meeting between

Correa and Defendants); 12/8/2010 Donziger Dep. 854:1–22 (discussing June 5, 2007 meeting). Correa's support would only grow more vocal over the years.  On July 4, 2009, Correa stated in his weekly presidential radio address that he "really loathe[s] the multinationals . . . Chevron-Texaco would never dare do in the United States what it did in Ecuador."  PX 1149.  A few months later, he noted:  "Of course I want our indigenous friends to win."  PX 2494.  By the time of the trial in this action, Correa had made attacking Chevron a centerpiece of his public relations campaign, with weekly television and radio broadcasts and speeches and presentations around the world attacking the company.  *E.g.* PX 853 (referring to Chevron's "'homeland-selling' lawyers . . . who, for a few dollars are capable of selling souls, homeland, family, etc."); PX 490# ("Listen to me, you miserable Mafiosi, the party's over with this Government."); *see also* PX 7511; PX 7516; PX 7518; PX 7519; PX 7520; PX 7526. Correa even labeled Chevron an "enemy of the court" (PX 7511) and called the Ecuadorian lawyers and academics supporting Chevron "[t]he nation's traitors" (PX 7539).

On March 20, 2007, the LAPs met with Correa and he offered "all the endorsement of the National Government to the Assembly of Affected by the oil company Texaco."  PX 484R.  The next day, the LAPs expressed their pleasure with the results of the meeting to Donziger, noting, "THE PREZ WAS VERY UPSET AT TEXACO.  HE ASKED THE [PROSECUTOR] GENERAL TO DO EVERYTHING NECESSARY TO WIN THE TRIAL AND THE ARBITRATION IN THE U.S."  PX 844.  The next week, Fajardo met with ROE officials including Alexis Mera, a Judicial Secretary and chief legal advisor to President Correa, and asked for Mera's assistance in providing Correa with a "basis" for "reopen[ing]" the "investigation for . . . the responsible parties."  Mera, in response, proceeded to outline various ways of nullifying the settlement and release.  PX 54A.

Then in April, President Correa toured the Lago Agrio oil fields with Defendants and their co-conspirators (PX 487R), and issued a press release the same day demanding the criminal prosecution of the Ecuadorian officials who had signed the 1998 Final Release.  PX 489R. When Donziger, who was in Colorado to plan the ghostwriting of the Cabrera report, heard this, he proclaimed that Chevron's lawyers "are shitting in their pants right now."  PX 7537 at 43.  He speculated that it might be the right moment to "ask for the head of Pérez Pallares—given what the President said."  PX 58A.

President Correa also encouraged Pablo Fajardo to pressure the Prosecutor General (who had opined that criminal charges should be dismissed) because the Prosecutor General was "a little nervous . . . [b]ecause the political forces of the National Congress have changed, that is, he is afraid of being removed" and that if Fajardo and the Defendants' allies "put in a little effort at the Public Prosecutor's Office, the [Prosecutor] will yield, and will re-open that investigation into the fraud."  PX 75A.  When the Prosecutor General did not yield to the political pressure of the LAPs and President Correa, he was removed in the first act of Correa's new Constituent Assembly and replaced by Dr. Washington Pesántez—Correa's college roommate and the district prosecutor who had recommended the dismissal of the criminal charges twice before.  PX 358 at 3; PX 259 at 10; PX 261 at 12; PX 3000 (Veiga) ¶ 96.  Within a few months, the new Prosecutor General agreed to meet with Pablo Fajardo, who informed Donziger, "we are insisting that he reopen the criminal investigation against Texaco for the remediation."  PX 992.

When Fajardo suggested investigating the activities of the Prosecutor General's office, Donziger replied, "[b]e careful."  PX 1033.  As part of an ongoing "legal and public pressure" campaign (PX 1507), the LAPs and their allies pressured court staff and the Prosecutor General to bring formal charges.  PX 1067 (Fajardo wondering "if it's possible to put on more pressure at

the Court Monday or Tuesday"); PX 1068.  Donziger, however, was not content.  When Fajardo

complained that they are "screwed" if the case lands with a particular judge, Donziger acknowl-

edged, "[w]e'd never be screwed if we used the real power we have."  PX 1066.

The clinching factor would be the Cabrera report.  On March 11, 2008, with the report

nearly complete, Fajardo wrote to Donziger:  "I have an appointment with the Prosecutor tomor-

row morning, we are insisting that he reopen the criminal investigation against Texaco for the

remediation."  PX 992.  A few weeks later, Donziger wrote to the Ecuadorian plaintiffs' lawyers:

"[W]e received an e-mail from Esperanza [M]artinez, Alberto Acosta's advisor . . . . it says 'on

March 25, 2008, the investigation was reopened, with the objective of gathering new and suffi-

cient information, and, if applicable, filing a criminal action.'  [It is] signed Alfredo Alvear En-

riquez, General Counsel, Deputy Prosecutor.  I will bring you a copy of the letter . . . or I'll send

it with Adolfo, who is coming in the next few days.  This is urgent[.]  [P]lease Julio or Renato,

investigate what is happening at the Prosecutor's Office, and let's get in all possible evidence . . .

If things work out, our buddy Ricardo could go to jail . . ."  PX 1033.

Based in part on the fraudulent Cabrera report, the Prosecutor General's office issued an

opinion ("*dictamen fiscal*") that formally accused Mr. Veiga and Mr. Pérez Pallares of the crime

of *falsedad ideológica*.  PX 272 at 95.  Specifically, Cabrera was asked and agreed to provide a

formal statement that repeatedly referenced his purportedly independent report.  PX 271; PX

2446; PX 3000 (Veiga) ¶ 108.

Aside from the cost to Chevron of defending against criminal allegations (PX 3000

(Veiga) ¶ 125), the investigations and charges inflicted a tremendous "emotional and mental

trauma" on Veiga and his family, including the psychological toll of explaining to close family

why he is being falsely accused of criminal conduct.  *Id*. ¶ 126.  Veiga continued to travel back

and forth to Ecuador on multiple occasions to provide statements to prosecutors at tremendous emotional anguish to his family, who remained in constant worry over his safety.  PX 3000 (Veiga) ¶¶ 75, 126; Tr. (Veiga) 180:8–9.

Donziger sought to capitalize on the criminal prosecutions of Reis Veiga and Pallares in the media campaign.  In Lehane's October 2005 "Roll-Out Plan," he listed "specific steps . . . to fully leverage the criminal investigation of the Chevron executives," including, among other items, exclusive print stories, letters to Chevron's board of directors, letters to the SEC, and communications with analysts and shareholders.  PX 734 at 2–3.  Defendants hoped to leverage the criminal investigations to force Chevron to "settle" the Lago Agrio litigation.  12/1/2010 Donziger Dep. 568:23–569:4, 570:5–6.  Defendants saw the criminal prosecutions as a way to exert "personal psychological pressure [on Chevron's] top executives" (PX 15A at 3), "keep the hammer over [Chevron's] head" (PX 186 at 4), and "force [Chevron] to the table for a possible settlement."  PX 172 at 2.  According to Donziger, "if this penal case is brought, this will be on the wires all over the world and it will really raise the cost to [Chevron]."  PX 2373R at 1.[43]  *See* FF ¶ 34.

### ii. Donziger Prompted the ROE's U.S. Lawyers to File a Fraud Allegation Against Chevron in the Southern District of New York

Even before President Correa's election, the ROE assisted Donziger's extortionate campaign through its U.S. counsel.  Early in the Lago Agrio litigation, Chevron had sought to resolve

---

[43]  Extortion is similar in nature to claims of abuse of process, as both are concerned with preventing the misuse of otherwise legitimate conduct to further an ulterior purpose.  As Justice Powell, sitting by designation, explained in *Vodrey v. Golden*, 864 F.2d 28 (4th Cir. 1988), abuse of process is aimed "at preventing use of legal process for collateral purposes," unlike malicious prosecution, which is specifically focused on "insuring the regularity of legal proceedings."  *Id.* at 31.  Accordingly, in "actions for abuse of process it is 'immaterial that the process used was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings terminated in favor of the person instituting or initiating them.'  *Id.* (quoting Restatement (Second) of Torts § 682, comment a (1977) (footnote omitted)).  The same holds true for Chevron's extortion claim here.  The "truth" or validity of the criminal charges is beside the point.  What matters is whether Defendants "use[d] the legal process for collateral purposes"—i.e., to further their wrongful campaign to pressure Chevron into an unjustified "settlement."

the dispute directly with the ROE through arbitration, and filed and commenced an arbitration proceeding before the American Arbitration Association against Petroecuador to indemnify its costs and expenses in connection with the Lago Agrio litigation.  *Republic of Ecuador v. ChevronTexaco*, 376 F. Supp. 2d 334, 342 (S.D.N.Y. 2005).  Through its U.S. counsel, Winston & Strawn, the ROE filed an action in the Southern District of New York seeking to block the arbitral proceeding.  Chevron filed counterclaims, and Donziger convinced Winston & Strawn to assert a frivolous fraud allegation as an affirmative defense against Chevron as a way to increase pressure.  *See* 1/19/2011 Donziger Dep. 3474:8–11, 3474:15–3475:9 (admitting that the ROE's hiring of Winston & Strawn and the ensuing fraud claim were "important accomplishment[s]"); PX 255 (6/21/2006 Pls' Not. of Mot. to Am. Reply, *Republic of Ecuador v. ChevronTexaco*, 04-cv-8378 (LBS) (S.D.N.Y.)).

In a July 12, 2006 memorandum to his public relations consultant Chris Lehane, Donziger described the fraud filing as a "Significant New Development In Chevron's Ecuador Litigation."  PX 2424.  Donziger stressed to Lehane how Ecuador's allegations of fraud could hurt Chevron financially, noting "Chevron now is fighting two parties rather than one" and that the governments assertion of fraud "hurts Chevron" because "it has the potential to turn Chevron into the new 'Oxy' . . . just at the time Chevron is pursuing significant opportunities in Venezuela, which is now opening up ties to Ecuador in the oil industry."  *Id.*

Winston & Strawn in the end realized that it had no evidence of fraud, and thus could not sustain the claim.  Ecuador's counsel "could not find a witness in Ec[uador] to testify as to [the] reliance [element]" of the fraud claim, and advocated withdrawing the claim in the fear that Judge Sand would "really punish them and even sanction them for leading Chevron down this path knowing they did not have a witness."  PX 187.  *See also* PX 188 ("I told Neil and team to

be ready for a Rule 11 motion from Chevron over the withdrawal of the fraud claim."). But Donziger viewed the fraud claim as a "weapon over Reis Veiga and the company," and thought Ecuador's decision to withdraw it "could play really bad for us." *Id.* at 53. Accordingly, Donziger convinced the ROE to "ameliorate" the potential damage by falsely stating to Judge Sand that the claim was being withdrawn "not because it was not valid, but for reasons of stringent scheduling set by [the Court]." *Id.* at 53. Reflecting upon his achievement, Donziger was "still amazed that we actually sold Winston on the fraud claim" in the first place, and boasted that "[t]his backs up my litigation strategy of filing losing motions to create leverage." *Id*. at 54; PX 190 at 1.

### i. Relying on the Cabrera Report and Other Fraudulently Obtained "Authority," Donziger Sought to Pressure Chevron On Every Front

### i. Donziger Induced Prominent Members of the Media to Repeat and Amplify His Falsehoods, Causing More Pressure on Chevron

From the outset, media coverage was of pivotal importance to Donziger's extortionate scheme, especially in the United States:

> But the work doesn't let up just because I'm in the US, at all. I mean, it's still really intense. You know, so just always looking for ways to increase the leverage and increase the cost of Chevron for not doing anything. So what's the cost? You know, the cost is the, right now . . . . It's the risk of getting a huge multibillion dollar judgment at trial . . . [i]t's the cost of all the hassle they have to put up with from the environmental groups. It's the cost of their sullied reputation, you know, in the media.

PX 7537 at 52. The purpose at all times was to raise that "cost" so high that Donziger would settle the lawsuit—and Donziger believed that the higher he could drive the economic loss his pressure campaign caused, the higher that settlement would be. In 2007, anticipating a mediation with Chevron, Donziger instructed Lehane that they "need to get more press and increase the pressure b/w now and then, to get the price up." PX 931.

In a 2007 media success, Donziger put his figurehead lead counsel to effective use by

having Fajardo featured in a laudatory cover story in the May edition of *Vanity Fair*.  The article, which was filled with over-the-top praise for Fajardo—including the bizarre assertion that he never sweats or gets dirty in the jungle heat (DX 4 at 3)—was in fact another application of Donziger's signature technique.  Far from being an independent journalist, the author, William Langewiesche, was a Donziger mouthpiece.  As one example, when Chevron emailed Langewiesche to schedule a time to discuss its comments on the proposed story, Langewiesche forwarded the email to Donziger, asking for his advice on how to respond.  PX 826 at 2.  In response, Donziger coached Langewiesche on "what I would do."  *Id.* at 1.  A week later, Langewiesche emailed Donziger again, attaching a draft email Langewiesche planned to send to Chevron in response and asking for Donziger's comments.  PX 832.  In the draft email, Langewiesche explained to Chevron's representative that he had "no pre-formed partisan interest here," but in his email to Donziger, Langewiesche revealed, "[y]ou and I are now firmly on the same side – but actually we were about an hour after I met you."  *Id.*  Donziger then forwarded Langewiesche's email to Donziger's wife, Laura Miller—who worked at the time for *Vanity Fair*'s parent corporation—for her comments.  PX 833.

Donziger's most significant media coup was recruiting documentary filmmaker Joseph Berlinger to make *Crude*.  Berlinger was already prominent for *Paradise Lost*, a Peabody award winning film about children wrongfully convicted of murder in Memphis, Tennessee—a 2011 sequel would be nominated for an Academy Award—and for *Metallica: Some Kind of Monster*, documenting two years on tour with the famous heavy metal band.  From the beginning of his involvement, with the Ecuadorian litigation, Berlinger and his team were in close communication with Donziger, including attending the LAP team's strategy meetings.  *See, e.g.*, PX 776.  In exchange for this level of access, *Crude* would serve as a propaganda vehicle for Donziger's cause;

as Berlinger's colleague reassured Donziger in May 2006, "[w]e will live up to our end of the bargain."  *Id.* at 1; *see also* PX 3364A (Donziger telling the *Crude* filmmakers, "I could have been a propagandist").  Defendants promoted *Crude* in—and to raise money for—their pressure campaign.  *See, e.g.*, PX 527# (LAPs press release titled, *Acclaimed Film About Chevron's Eco-Disaster In Ecuador To Open In Nation's Capital*).

Behind the scenes, DeLeon was *Crude*'s primary financial backer.  *See also supra* Argument Section I.B.1.b.  As Donziger wrote, "R[u]ss is funding the case.  Russ is funding the movie.  And Russ wants to fund more cases and more movies."  PX 203.  Through the creation and sole ownership of a production company called Crude Investment, Inc., DeLeon served as the movie's primary funder and producer, contributing approximately 70-75% of total funding.  PX 4900 (Dahlberg) ¶ 97.  Despite the financial links between Donziger, DeLeon, and Berlinger, the LAP team attempted to hide these relationships from the public.  *See, e.g.*, PX 520# at 2 ("Chevron claims the plaintiffs produced . . . Crude, by the Emmy-award winning director Joe Berlinger.  The plaintiffs had no role in producing the film, said Fajardo.").  Although Donziger and his co-conspirators hid the fact that he arranged the funding for *Crude* from the public, Donziger retained control over the film crew and had input into the production of *Crude*.  When, for example, *Crude* filmmakers captured a U.S. consultant admitting that "having the perito there" at the LAPs' March 3, 2007 meeting "was totally bizarre," Donziger instructed the filmmaker: "that was off the record."  PX 46A.  The LAP team also "confidentially" revealed to the *Crude* film crew that Cabrera was going file his report on April 1, 2008, which was not the date it was due.  PX 1021.  The film crew was therefore able to capture footage of Cabrera filing "his" report.  PX 83.  And, as discussed above, Defendants were able to convince Berlinger to make "costly" edits in order to excise certain incriminating scenes from the publicly released version of the

documentary.  PX 2454.

*Crude* became a driver of publicity for the LAP team.  In January 2009, *Crude* premiered at the Sundance Film Festival to critical acclaim.  PX 518#.  Defendants immediately issued a press release commenting on the "significant buzz" the film was generating, claiming that the film presented a "David and Goliath" story about "the infamous 'Amazon Chernobyl.'"  *Id.*

Spurred in part by the apparent (but false) validation of their claims by the "independent" and "neutral" "Special Master" Cabrera report, the LAP team stepped up its successful pressure campaign by parlaying the Cabrera notoriety into further deceptions of the U.S. national and international media.  For example, defaulted-Defendants Fajardo and Yanza—both of whom were deeply involved in manipulating Cabrera and bribing the judge to draft the final Ecuadorian judgment—were awarded the Goldman Environmental Prize, the world's largest prize program for grassroots environmental activists, and Fajardo was awarded the CNN "Heroes" award.  *See* PX 502.  The press release announcing the Goldman Prize echoed the LAP team's misstatements and half-truths, including those regarding Cabrera's independence.  *Id. See* FF ¶¶ 95–97.

### ii. Donziger and the LAP Team Orchestrated a Protest March That Threatened Physical Harm Against Chevron Executives and Attorneys

Defendants' threats against Chevron were not limited to economic harm.  In 2009, Defendants reengaged their "private army" and began issuing direct, violent threats against Veiga and Pallares.  On October 5, 2009, Yanza and others enlisted the help of local citizens in parading effigies of Veiga, Pallares, and Callejas, as well as Chevron executives in front of the courthouse in Ecuador.  PX 91; PX 3000 (Veiga) ¶¶ 123–24; PX 4300X (Callejas) ¶ 98.  The effigies were dressed in striped uniforms to look like prisoners.  *Id.*; Tr. 813:17–21.  At the concluding rally, Yanza and others gave speeches and threatened to "bury [Chevron's lawyers] in the . . . pit."  PX 91.  The protestors announced the "crimes" of each Chevron executive and a man

135

dressed as the Grim Reaper mimed beheading each of the effigies with his scythe before placing the "bodies" face down in a coffin. *Id.*; PX 3000 (Veiga) ¶ 124. The protestors then carried the coffin into the jungle, dug a shallow grave, and buried the Chevron executives in effigy. PX 91. Then their supposed widows threw flowers on the graves. PX 4300X (Callejas) ¶ 98. As Callejas later recalled responding to Defendants' counsel's cross-examination, "I realized for the first time as I watched . . . that these and other threats could become real acts of violence, and I feared and still fear for our safety." *Id.* After describing the demonstration, Callejas explained, "[i]f that's not an incitement to violence, to personal violence and hate, I can't imagine what it would be." Tr. (Callejas) 813:9–814:5.

### iii. The Defendants Abused the Ecuadorian Legal Process by Securing an Illegal Punitive Damages Award

Although the LAPs did not seek such damages in their Ecuadorian complaint, the Ecuadorian judgment awards $8.65 billion in "punitive" damages. PX 400 at 185. Indeed, the judgment states that Chevron could be relieved of this "punitive penalty" if it issued a public "apology" in both the Ecuadorian and United States press, effectively admitting liability, within fifteen days of the judgment. *Id.* at 185–86. As Donziger and the LAPs knew when they drafted the judgment, Ecuadorian law does not allow for punitive damages. *See, e.g.*, PX 2466 at 2. The only apparent purpose of this illegal penalty was to instill a fear of economic harm: Chevron would either be coerced into making an unjustified admission of liability, rendering the possibility of successfully appealing or challenging enforcement extremely difficult, or face an $8 billon fine.

### iv. Donziger Has Directed His Falsehoods With Particular Focus on Chevron's Shareholders to Maximize Their Impact

Donziger and his co-conspirators have consistently sought to intimidate Chevron by conveying lies to Chevron's shareholders, potential investors, and stock analysts. The objective, as

expressed by Donziger, was to instigate fear of, or even cause, a "mass sell-off of billions in [Chevron] stock . . . ."  PX 687 at 3.  In furtherance of their scheme, the co-conspirators have staged protests at Chevron's shareholder meetings (PX 169# at 72) and issued false and misleading propaganda to Chevron's shareholders (PX 7542), institutional investors (PX 687 at 3; PX 7447 at 2) and Chevron analysts (PX 694 at 5).  *See supra* Argument Section I.B.1.c.  Donziger described these pressure tactics on shareholders as one of the "key cards we can play."  PX 169# at 77.

An attack on share price reduces a company's economic value.  Among other negative effects, a lower stock price increases a company's cost of capital, thus reducing its ability to invest in new projects, and impairs the company's recruiting ability, especially for senior executives, where equity is an important component of compensation.  *See* PX 5800 (Zygocki) ¶¶ 20–22 (testimony showing Donziger's conduct has undermined Chevron's ability to recruit the best talent and retain its best people).  Most important for Donziger, however, a lower share price hurts the owners of the company directly, which induces them to demand action.

Donziger implemented several strategies to manufacture concern among Chevron's investors and shareholders.  Lehane proposed "several targeted specific mini-campaigns all designed to create pressure points on Chevron's economics."  PX 734.  These "mini-campaigns" included filing a shareholder lawsuit against Chevron "for failure to disclose information," contacting the New York Attorney General "to see whether we can get Spitzer into the game," and manipulating students at a "major university that is invested in Chevron for a divestment campaign."  *Id.*

Donziger drafted a letter for Amazon Watch to send to the SEC in November 2005, and forwarded it to Lehane for his comment, asking:  "In terms of press coverage, do you think it

would be more effective for Amazon Watch to send the SEC letter quickly (like next week), with [New York State Comptroller Alan] Hevesi hopefully following up in a few weeks referencing it, or wait longer and try to possibly get Hevesi to sign the letter with other shareholders without Amazon Watch so it is a shareholder letter rather than an activist letter?"  PX 736.  Lehane responded:  "Much better to have Hevesi sign the letter, if that is possible. . . . Hevesi signing would apply huge pressure on Chevron . . . . Even if he doesn't sign, [having] him up to say supportive things would make it a stronger story, as well . . . ."  *Id.*

Amazon Watch's letter to Christopher Cox, then SEC Chairman, requested that he "open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations to shareholders in reference to litigation against the company over an oil-related environmental catastrophe in Ecuador."  PX 754.  The Amazon Watch letter cited Russell's disavowed $6 billion damages assessment—attributed vaguely to an "environmental remediation expert"—and alleged that Chevron had "creat[ed] toxic contamination over 30 times larger than the Exxon Valdez," and accused Chevron of failing to inform its shareholders of its "potential liability."  *Id.*

Although Donziger attempted to obscure his role in this campaign by using Amazon Watch as a front, he directed almost every detail of the letter-writing process and drafted many of the letters himself.  1/18/2011 Donziger Dep. 3178:10–13.  He instructed Amazon Watch's staff lawyer to work on the SEC filing (PX 733), complained that the lawyer had not finished the letter (PX 737), provided his final sign-off (PX 748), decided to whom the letter should be sent (PX 752), directed that Amazon Watch add identifying marks "with headers on each page and a TITLE" (PX 753), and finally, dictated plans for follow-up with the SEC (PX 756).  Donziger directed Amazon Watch to seek a meeting with Chairman Cox or one of his deputies in Wash-

ington "to press for them to open a real investigation."  PX 759.  Donziger demanded that Amazon Watch, "[a]t a minimum call the SEC by the end of the week (like Friday) to make sure they received the complaint and it has been filed officially . . . ."  *Id.*  At one point, Donziger grew angry when counsel for Amazon Watch did not immediately approve a letter:  "Lawyers must understand their work is in service of a campaign; the campaign is not in the service of lawyers."  PX 737 at 2.

In July 2006, Donziger reported to Lehane that "[t]he SEC is actively investigating [Chevron's] failure to disclose this liability in its public filings—I know this for a fact, because I was just interviewed by an SEC investigator last week[.]"  PX 2424 at 1.  That same day, Donziger emailed several Amazon Watch employees, stating "I finally talked to the SEC investigator and I can tell you that this investigation of Chevron is active."  He wrote that this was a "huge victory for AW" and instructed his team to "keep feeding them [the SEC] stuff," even though, he wrote, "I sort of feel this is bogus."  PX 781.

Finally, Lehane's 2005 "Roll-Out Plan" suggested that Amazon Watch and the LAP attorneys conduct individual "one-on-one calls with Chevron's analysts walking them through the criminal matter and setting up an individual in-person meeting (which we will do as part of a road show)" and "reach[ing] out to major investors with a call and set up a future meeting."  PX 734 at 3.  Amazon Watch was tasked with crafting the strategic plan for analysts and pension funds.  PX 737.  Amazon Watch admits on the ChevronToxico website that, since at least 2002, its role has involved efforts to "[a]lert[] Chevron's shareholders" about the case in Ecuador "in which a ruling against Chevron would dramatically threaten the value of those shareholders' investments" and "[e]nlist[] major Chevron investors to demand that the company improve its environmental and human rights policies."  PX 455#.

Defendants and their allies have also introduced shareholder resolutions in an effort to pressure Chevron to settle the case.  For example, in April 2005, Donziger and Soltani of Amazon Watch coordinated with Shelley Alpern, Director of Social Research and Advocacy at Trillium Asset Management, to present a shareholder proposal.  PX 727.  In her prepared statement, Alpern criticized Chevron for a purported failure to disclose, noting that "this potential billion-dollar liability is still absent from ChevronTexaco's SEC filings."  *Id.* at 3.  She also cited statements from the Ecuadorian Attorney General regarding the 1998 Release without disclosing Defendants' efforts to undermine that agreement:  "Our confidence is also seriously undermined by statements that the Ecuadorian Attorney General made to a delegation of investors last month.  The Ecuadorian AG questions whether the remediation agreement is valid under that country's law.  The very fact that the AG is stating this to shareholders is disturbing and merits attention."  *Id.* at 2.  Soltani asked Donziger to print copies of Alpern's statement to hand out at the shareholder meeting, thus making material misrepresentations and omissions to Chevron shareholders with the aim of pressuring the company to settle.  *Id.* at 1.

Defendants continued to coordinate with Alpern and other shareholder activists to pressure Chevron even after shareholders rejected the proposed shareholder resolution.  In August 2007, Chevron board member Sam Nunn refused a request to meet with shareholder groups to discuss the Lago Agrio litigation.  PX 2190.  Donziger wrote to Alpern and others requesting they send a letter to Nunn as a means to exert further pressure:  "Just sending such a letter will have a positive effect as he will turn it over to in house counsel and it will be yet another pressure point on the management."  *Id.  See also* Section II.C.6 (discussing DiNapoli's promotion of shareholder resolutions); PX 5801; PX 5802; PX 5803.

### j.   Donziger's Campaign Against Chevron Rested on Knowing Falsehoods and Corruption, Thus Constituting Extortion

Donziger "knowingly and willfully created or instilled fear of economic harm, or used or exploited existing fear of economic harm with the specific purpose of inducing Chevron to part with its property," and thus engaged in the wrongful use of fear. *Donziger*, 871 F. Supp. 2d at 248 (internal alterations and quotation marks omitted).  The building blocks of Donziger's extortion scheme are lies deliberately crafted to cause maximum harm to Chevron—such as bogus comparisons to infamous disasters, fraudulent "independent" expert reports, and now a ghost-written judgment—to "make media/court/CVX itself start thinking in terms of billions" (PX 3240), and to "'put[] pressure' on Chevron to settle the litigation" (PX 3200 (Russell) ¶ 9; Tr. (Hinton) 2159:9–12).  Donziger strategically strove to incite anger and initiate action against Chevron by presenting a false narrative of events in Ecuador and the United States.  As Donziger explains his motto, "[f]acts do not exist.  Facts are created."  PX 47A.  And he packaged this false narrative in press-friendly sound-bites that he and his surrogates repeated again and again, executing Donziger's maxim:  "If you repeat a lie a thousand times it becomes the truth."  PX 1059.  But lies do not become truth by dint of repetition, and when lies are used to obtain property by instilling a fear of economic harm, as Donziger has done for years, they become extortion.[44]

### i.   Donziger's "Pressure" Was Based on Fraud, and Thus Extortionate

Attempted extortion under the Hobbs Act is defined as attempting to "obtain[] the proper-

---

[44]  Even true statements may be the basis for an extortion claim.  Dkt. 1706 at 2 ("[T]ruth is not a defense to extortion."); *United States v. Jackson*, 180 F.3d 55, 66 (2d Cir. 1999); *United States v. Scopo*, 861 F.2d 339, 346 (2d Cir. 1988) (holding that use of statements to prove extortion claims "did not depend on the truth of those statements.  [Defendant] used his statements to control the actions of the firms from which he extorted money and to instill fear of violence in his extortion victims"); *see also United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) ("A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability.").

ty of another, with his consent, induced by the wrongful use of actual or threatened force, violence or fear."  18 U.S.C. § 1951(b).  The Hobbs Act prohibits two categories of "wrongful" conduct.  The first category is the use of "inherently wrongful" means to achieve an otherwise proper objective.  The second is the use of otherwise proper means to achieve a wrongful objective.  *United States v. Zappola*, 523 F. Supp. 362, 366 (S.D.N.Y. 1981) *aff'd*, 677 F.2d 264, 269 (2d Cir. 1982).  In proving attempted extortion as a predicate act, Chevron has demonstrated Defendants used "inherently wrongful" tactics in an attempt to exploit Chevron's fear of economic harm.  While invoking a fear of economic loss is not always, standing alone, "inherently wrongful" (*see United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981);  *United States v. Sturm*, 870 F.2d 769, 772–73 (1st Cir. 1989)), invoking that fear through the use of unlawful means, like bribery, coercion, and fraud, is undisputedly "inherently wrongful."  *Zappola*, 523 F. Supp. at 367 ("It is not every ill conceived and unrealized demand which falls within the first category of Hobbs Act cases, but only those demands which are asserted in an inherently unlawful manner, the use or threat of physical violence being an obvious example.") (internal quotation marks omitted).  Bribing judges and court-appointed experts, and pressuring, threatening, and otherwise coercing them to manipulating a judicial record, extends far beyond a simple threat to sue or strike or otherwise incite fear of economic harm as a bargaining tool.  *See Clemente*, 640 F.2d at 1077.  Indeed, such unlawful conduct is analogous to threatening other unlawful conduct, like physical violence, in order to achieve a desired goal.  *Zappola*, 523 F. Supp. at 367.

Defendants' pressure campaign centered upon the promotion of unlawfully obtained "evidence" manufactured by the LAP team.  *See supra* Argument Section I.C.1.c–d.  This "evidence" was procured through various schemes—for example, Defendants fraudulently submitted judicial inspection reports under the signature of Dr. Charles Calmbacher but Calmbacher had

not reached the exaggerated conclusions the reports contained.  3/29/2010 Calmbacher Dep. 112:23–113:10, 114:7–115:14.  Defendants then coerced the Ecuadorian court to appoint Cabrera as a purportedly "neutral" and "independent" court-appointed expert, and proceeded to bribe Cabrera to secretly draft his entire report.  *See supra* Argument Section I.C.1.d.  Finally, Defendants secretly bribed Zambrano, offering him $500,000.00 in exchange for the ability to draft the Lago Agrio judgment.  *See supra* Argument Section I.C.f.ii.(3).  Defendants pursued these unlawful measures not to receive a judgment that they could legitimately enforce, but to wave in front of key Chevron shareholders, government officials, and the media in an attempt to incite such a fear of economic harm that Chevron would settle rather than fight first the threat and then the reality of the fraudulently obtained judgment.  The fact that Defendants' pressure campaign revolved around the promotion of evidence engineered through unlawful measures renders Defendants' conduct "inherently wrongful" and in violation of the Hobbs Act.

Defendants similarly resorted to inherently wrongful means to extort a settlement from Chevron when they contrived criminal charges against Chevron's employees, which Donziger admitted the LAP team could "facilitate going away at the right time . . . if [Chevron] wanted it to go away."  PX 32; 12/1/2010 Donziger Dep. 558:6–23; 558:25–559:15.  Under New York law, it is a crime to threaten a person with criminal prosecution for the purpose of extorting money.  *See Zappola*, 523 F. Supp. 364 (citing *People v. Eichler*, 26 N.Y.S. 998, 999 (Gen. Term 1894)).  Defendants' contemporaneous writings and testimony revealed that their efforts to instigate criminal charges against Veiga and Pallares were designed to stimulate publicity and force Chevron to settle.  PX 169# at 57; PX 172 at 2 (Donziger admitting the criminal prosecutions were meant "to keep the hammer over [Chevron's] head" and "force [Chevron] to the table for a possible settlement"); 12/1/2010 Donziger Dep. 568:23–569:4; 570:5–6; 578:18–23; 579:8.  De-

fendants pressured the ROE to open criminal investigations of Veiga and Pallares on multiple occasions over the course of several years, even *after* at least four Ecuadorian prosecutors dismissed or closed the criminal investigation because "no conduct was found that would be covered by the pertinent articles of the Criminal Code . . ." (PX 253 at 1).  *See also* PX 252 at 3; PX 3000 (Veiga) ¶ 69; PX 256; PX 259.  According to Donziger:  "[I]f this penal case is brought, this will be on the wires all over the world and it will really raise the cost to [Chevron]."  PX 2373R at 1.  Other LAP team members reiterated this view:  "[W]e have to destroy [Ricardo Reis Veiga's] reputation with ChevronTexaco as an incompetent any way we can to see our case settled."  PX 724.  Defendants knew this conduct was wrongful, and "resort[ed] to very sophisticated means so that [they] wouldn't be tied to the [criminal proceedings]."  PX 1102.

Defendants have argued that ascertaining wrongfulness requires inquiry into the merits of the criminal charges.  In the Second Circuit, however, "when a threat is made to injure the reputation of another, the truth of the damaging allegations underlying the threat is not a defense to a charge of extortion."  *United States v. Jackson*, 180 F.3d 55, *on reh'g*, 196 F.3d 383 (2d Cir. 1999); *see also United States v. Von der Linden*, 561 F.2d 1340, 1341 (9th Cir. 1977) (per curiam).  Further, this Court previously rejected this very argument, noting:

> The problem with defendants' argument is that truth is not a defense to extortion.  That is to say, even if the two lawyers against whom the charges were brought and subsequently dropped in fact had committed the crimes Mr. Donziger alleges they committed, Mr. Donziger's use of the threat of criminal charges to pressure Chevron to settle—if indeed that is what happened here—still may have amounted to extortion or attempted extortion.

Dkt. 1706 at 2; *see also* Tr. (Veiga) 200:7–12 ("We are not trying the question of whether there was a basis for the [criminal] charges.  End of discussion.").  Nor is an inquiry into the validity of the charges necessary to determine whether Donziger's state of mind or "good faith belief" was that the charges were valid.  Donziger's state of mind regarding the validity of the criminal

charges is irrelevant, because the means he pursued to invoke the charges were "inherently wrongful."

Defendants have similarly relied on the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396 (1973), in arguing that "[w]hile economic fear may be actionable under the Hobbs Act, it is only extortion if the party is not entitled to the property sought." Dkt. 1699 at 2. According to Defendants, they are thus allowed to show that "they had a right to recovery for Chevron's contamination in Ecuador" or at least that they had a "*belief* that the claims brought against Chevron were justified." *Id.* The Second Circuit, however, has "declined to extend the *Enmons* defense to non-labor cases." *United States v. Markle*, 628 F.3d 58, 62 (2d Cir. 2010). Indeed, the *Enmons* "claim of right" defense must be limited to the labor context because, otherwise "there is a danger that *Enmons* . . . could effectively repeal the Hobbs Act" by authorizing extortioners to pursue whatever illicit means they desire to collect a debt that is owed to them. *United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir. 1979). Indeed, this Court previously noted both legal authority and sound policy dictate that an actor's belief that he is entitled to property cannot excuse the use of inherently wrongful acts to obtain that property:

> With the sole exception of *United States v. Enmons*, 410 U.S. 396, 93 S. Ct. 1007, 35 L.Ed.2d 379 (1973), whose special circumstances are considered infra, the parties cite no case, and the Court has found none, where the use of inherently wrongful acts to obtain property has been excused by the actor's belief, or even the assumed fact, that he was entitled to it. On the contrary, a consistent line of authority points the other way; and for sound public policy reasons.

*Zappola*, 523 F. Supp. at 363.[45]

---

[45] This Court has made clear time and again, including during trial, the merits of the Lago Agrio litigation have no relevance in assessing the wrongfulness of Defendants' attempted extortion. *See, e.g.*, Dkt. 902 at 2 ("This Court repeatedly has ruled that this case will not retry the claims made in the Lago Agrio case."); Dkt. 901 at 3–4; Dkt. 679 at 11 ("As the LAP Representatives previously have argued, this case is not an occasion to relitigate the merits of the pollution claims that were involved in the Ecuadorian case."); *see also United States v. French*, 628 F.2d 1069, 1075 (8th Cir. 1980) ("[O]ne who takes money extortionately cannot defend on the basis that the money collected thereby was in satisfaction of a legitimate debt.").

Furthermore, Defendants' fraudulent conduct extinguished any possibility of a lawful claim to Chevron's money or property. *See supra* Argument Section I.C.1.f.ii. As numerous courts have held, the corruption of the judicial process, such that it is not a true adversarial proceeding, is fatal to any resulting judgment. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944) (vacating judgment because injecting ghostwritten submission into court proceedings was "tampering with the administration of justice"); *see also Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989) ("Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear."). Corruption on the scale that Defendants engaged in precludes recognition, regardless of subsequent appellate rulings, and regardless of whether the judgment reached the "correct" result. *See United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1938) ("[I]f the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice."). Defendants' pressure campaign aimed at forcing Chevron to capitulate to Defendants' demands is therefore quite different than "the pursuit of higher employment wages and benefits which in itself is a lawful claim to property." *See United States v. Warledo*, 557 F.2d 721, 730 (10th Cir. 1977). Indeed, the circumstances here are somewhat similar to those in *Warledo*, where defendants threatened a railroad in "pursuit of a payment from the railroad for alleged past wrongs." *Id.* In *Warledo*, the Tenth Circuit would not "permit [defendants] to avoid the prohibition of the Hobbs Act because the organization in whose name they act, the Seminole Nation Treaty People, purports to press a lawful claim against the railroad." *Id.* This Court should not permit Defendants to do something similar here.

### ii. The First Amendment and Related Immunities Under Federal and New York Law Do Not Shield Donziger's Misconduct

### (1) The First Amendment Does Not Shield Donziger's Misconduct

As the Supreme Court has held: "[T]here is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S. Ct. 2997, 3007 (1974). Chevron has proven that the pressure campaign against it rests on numerous knowingly false statements of fact. *See supra* Argument Section I.C.1.e. Nor does the First Amendment provide a "refuge for extortion." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 585 F. Supp. 2d 789, 806 (E.D. Va. 2008); *see also Illinois v. Telemarketing Assocs.*, 538 U.S. 600, 612, 123 S. Ct. 1829, 1836 (2003) ("[T]he First Amendment does not shield fraud."); *United States v. Boyd*, 231 F. App'x 314, 316 (5th Cir. 2007) ("The First Amendment does not protect extortion."). The government may proscribe "threats, extortion, blackmail and the like," notwithstanding "'their expressive content.'" *Gresham v. Peterson*, 225 F.3d 899, 909 (7th Cir. 2000) (collecting cases); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 420, 112 S. Ct. 2538, 2563 (1992) (Stevens, J., concurring) ("Although the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'" (internal citation omitted)). Threats of extortion "are not protected under the First Amendment 'simply because they are verbalized or written.'" *United States v. Larson*, 807 F. Supp. 2d 142, 165 (W.D.N.Y. 2011) (citations omitted); *see also United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir. 1988) ("It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which [has] no protection at all.") (quoting *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975)).

This Court has already observed that "truth is not a defense to extortion." Dkt. 1706 at 2.

Otherwise protected speech or petitioning activity loses that protection when part of a larger ex-tortionate scheme. *See Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.*, 690 F.2d 1240, 1265 (9th Cir. 1982) (finding that statements that may otherwise be immune were not protected when they formed part of a larger conspiracy that was not aimed at influencing the government). Case law involving analogous pressure campaigns makes clear that Defendants' conduct here constitutes attempted extortion and is not protected. *See Monex Deposit Co. v. Gilliam*, No. 09-287, 2010 WL 2349095, at *7 (C.D. Cal. June 1, 2010); *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 585 F. Supp. 2d 789, 806 (E.D. Va. 2008).[46]

### (2) Defendants' Conduct Is Not Protected Petitioning Activity

Nor is Defendants' conduct protected petitioning activity. The First Amendment's pro-tection of the right to "petition the Government for a redress of grievances," U.S. Const. amend. I, has been interpreted in the antitrust context, under the *Noerr-Pennington* doctrine. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct. 523 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585 (1965). Under this doctrine, which most courts expand beyond the antitrust context, petitioning conduct may be pro-tected against liability. Here, however, Defendants' conduct does not constitute valid petitioning activity at all, and falls outside this protection under the exception for sham litigation activity.

As an initial matter, *Noerr-Pennington* does not immunize bad-faith litigation activity and violations of the mail and wire fraud, Hobbs Act, and RICO statutes. *See Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 at *2 (E.D.N.Y. July 19, 2004). And as this Court has already held, Defendants' activities in "petitioning" the government of Ec-

---

[46] Those pressure campaign cases in which courts have declined to find liability are distinguishable because, here, Chevron has not received anything of value. *See Cintas Corp. v. UNITE HERE*, 601 F. Supp. 2d 571, 577–78 (S.D.N.Y. 2009).

uador (or governments other than that of the United States) enjoy no protection under the First Amendment or the *Noerr-Pennington* doctrine.  Dkt. 1706 at 3 (citing *Sexual Minorities Uganda v. Lively*, 12 Civ. 30051 (MAP), 2013 WL 4130756, at *21 (D. Mass. Aug. 14, 2013) ("It is well-established . . . that the Petition Clause does not immunize a defendant's interactions with foreign governments.")); *see also Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 99 (2d Cir. 2000).

Turning to Defendants' "petitioning" activity in the United States courts, it is well-settled that conduct such as perjury, fraud, and abuse of process is prohibited in the judicial arena, and will not be immunized by "seeking refuge under the umbrella of 'political expression.'" *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 613 (1972). Fraudulent statements in the adjudicative context likewise threaten the fair and impartial functioning of the courts and do not deserve immunity.  *See Clipper*, 690 F.2d at 1261.

This leaves only Defendants' lobbying of federal and state officials, which is unprotected either because it is founded on misrepresentations and other misconduct, or at the very least falls within the traditional formulation of the sham exception to *Noerr-Pennington*.  This Court has recognized that "[t]here is a third line of cases that says the *Noerr-Pennington* doctrine, at least in some circumstances, does not protect somebody who seeks to invoke governmental action through intentional misrepresentations and maybe other misconduct."  Tr. (Judge Kaplan) 688:24–689:3.  Because Donziger's and his co-conspirators' statements to public officials rest on intentional misrepresentations and other misconduct, the misrepresentation exception to *Noerr-Pennington* eviscerates any protection.[47]

---

[47] *Sosa v. DirectV, Inc.*, 437 F.3d 923 (9th Cir. 2006) is inapposite even if it were the law of the Second Circuit, which it is not.  There, unlike here, the plaintiffs conceded that the sham exception was not met and there were no serious allegations of fraudulent misrepresentations.  *Id.* at 940–42.

While the Second Circuit has not yet adopted the misrepresentation approach, it has noted that the approach taken in *Professional Real Estate Investors Inc. v. Columbia Pictures Indust.*, 508 U.S. 49, 60, 113 S. Ct. 1920, 1928 (1993) ("*PRE*").  *See Primetime 24 Joint Venture v. National Broadcasting Co.*, 219 F.3d 92, 100–01 (2d Cir. 2000) (finding that the PRE standard was not applicable and applying the pattern exception in *California Motor*, finding that the conduct plaintiff alleged may have met that standard and accordingly reversing the lower court's granting of immunity to defendant's conduct).  As Judge Rakoff has noted, the majority of other circuits apply the misrepresentation exception.  *See TPTCC NY, Inc. v. Radiation Therapy Services, Inc.*, 784 F. Supp. 2d 485, 497 (S.D.N.Y. 2011) (Rakoff, J.).  While the circuits have articulated slightly varying formulations of the misrepresentation test, Defendants' conduct meets any standard:  Their false statements were made intentionally with knowledge of falsity and were material—the lies about Cabrera, for example, were featured in Defendants' statements as the defining support for the claims.

Even apart from the misrepresentation approach, the traditional sham standard set forth in *PRE* applies to Defendants' pattern of fraud—including the manufacture of fraudulent evidence, corruption of the purportedly independent expert process, and ghostwriting of the judgment in exchange for an offered bribe.  In a recent analogous case, a railroad company brought RICO, conspiracy, and fraud claims against plaintiffs' lawyers who had fraudulently manufactured evidence to inundate the company with thousands of asbestos cases without regard to their merit.  *CSX Transp., Inc. v. Peirce*, 5:05-CV-202, 2013 WL 5375834 (N.D. W. Va. Sept. 25, 2013).  The court held that there was sufficient evidence to find the lawsuits objectively baseless, concluding that "[o]ne cannot be said to have 'acted with objective reasonableness when the reasonableness depends on a belief in the success of a fraudulent scheme.'"  *Id.* at *10 (citation omit-

ted).  The court held:  "[I]f a party has rigged the process, it may have an objectively reasonable belief that the rigging of the process will lead to a successful outcome.  But the belief stems from the rigging, not the merits of the petition."  *Id*. (quotations and citation omitted).

### 2.  Donziger's Use of the Mails and Wires in Furtherance of the Scheme Constitutes Multiple Instances of Fraud

Donziger's use of the mails and wires was essential to his scheme against Chevron.  Furthering his scheme required the management of a far-reaching enterprise, and Donziger kept in regular contact with co-conspirators in Ecuador and the United States, managing their efforts both from his office in New York and on his extensive travels.  And he carried out the operational aspects of his scheme through the use of, and in many aspects literally over the wires— including the transmittal of false statements to courts, government officials, and the press, and facilitating the ghostwriting, money transfers and other conduct necessary to his scheme.

### a.  Mail and Wire Fraud:  Legal Requirements

The mail and wire fraud statutes penalize persons who, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," use the mail or wires "for the purpose of executing such scheme or artifice."  18 U.S.C. §§ 1341, 1343.  To establish mail or wire fraud, a plaintiff must show "(i) a scheme to defraud, (ii) to get money or property, (iii) furthered by the use of interstate mail or wires."  *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *see also Neder v. United States*, 527 U.S. 1, 20, 119 S. Ct. 1827, 1839 (1999); *Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004).

"The mail and wire fraud statutes do not define 'scheme to defraud,' but it has been described as a plan to deprive a person 'of something of value by trick, deceit, chicane or over-reaching.'"  *Autuori*, 212 F.3d at 115 (quoting *McNally v. United States*, 483 U.S. 350, 358, 107

S. Ct. 2875, 2881 (1987)).  Proving a "scheme to defraud" does not require satisfaction of the

elements of common law fraud.  *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 454–55

(S.D.N.Y. 1998); *Neder*, 527 U.S. at 24–25, 119 S. Ct. at 1841 ("the elements of reliance and

damage would clearly be inconsistent with the statutes Congress enacted"); *Bridge v. Phoenix

Bond & Indemnity Co.*, 553 U.S. 639, 649 (2008) ("No showing of reliance is required to estab-

lish that a person has violated § 1962(c) by conducting affairs of an enterprise through a pattern

of racketeering activity consisting of acts of mail fraud.").  Nor does the statute require that the

"scheme to defraud" be "successful."  *See United States v. Walker*, 191 F.3d 326, 335 (2d Cir.

1999); *United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991) 935 F.2d at 466; *United States

v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("the victims of the scheme need not have been

injured").

> To prove a scheme to defraud, a plaintiff must establish that the defendants used material

false pretenses, representations, or promises in order to obtain something of value.  18 U.S.C.

§§ 1341, 1343; *Carpenter v. United States*, 484 U.S. 19, 27, 108 S. Ct. 316, 321 (1987).  This

"'includ[es] everything designed to defraud by representations as to the past or present, or sug-

gestions and promises as to the future.'"  *Neder*, 527 U.S. at 24, 119 S. Ct. at 1841 (quoting *Dur-

land v. United States*, 161 U.S. 306, 313, 16 S. Ct. 508, 511 (1896)).  The misrepresentations

must be material—"the information withheld either must be of some independent value or must

bear on the ultimate value of the transaction.'"  *Autuori*, 212 F.3d at 118 (quoting *United States

v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)).  "Under the mail fraud statute, it is just as

unlawful to speak half truths or to omit to state facts necessary to make the statements made, in

light of the circumstances under which they were made, not misleading."  *Id.* (quotation marks

omitted).

"[A]ny 'mailing that is incident to an essential part of the scheme satisfies the mailing element.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 2133 (2008); *see also Tocco*, 135 F.3d at 124 (same). The "mailings that are elements of the offense need not themselves contain false or misleading statements . . . . Foreseeable use of the mails in furtherance of the scheme violates the statute." *Spira v. Nick*, 876 F. Supp. 553, 559 (S.D.N.Y. 1995) (Kaplan, J.). "The requisite use of the mails need not be by the defendant and need only be reasonably foreseeable." *Nat'l Council of Young Isr. v. Wolf*, 963 F. Supp. 276, 280 (S.D.N.Y. 1997) (Kaplan, J.); *Tocco*, 135 F.3d at 124 (citation omitted); *Baisch v. Gallina*, 346 F.3d 366, 374 (2d Cir. 2003). The mails or uses of the wires need not be frauds themselves, but can be operational steps taken in preparation to fulfill the scheme. *See United States v. Nixon*, 465 F. App'x 912, 918 (11th Cir. 2012) (upholding conviction for wire fraud based on email communications between defendant and co-conspirator exchanging information and material to be used in their fraudulent scheme)

The plaintiff must show "that the defendant possessed a fraudulent intent." *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir. 2004) (quotation marks omitted). Fraudulent intent may be shown either: (1) by proving "facts showing a motive for committing fraud and a clear opportunity for doing so," or (2), by identifying strong circumstantial evidence of conscious behavior by the defendant. *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989). The requisite intent may also be established by showing reckless indifference to the truth. *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990); *Eisert v. Town of Homestead*, 918 F. Supp. 601, 612 (E.D.N.Y. 1996) (citing *United States v. Sheiner*, 273 F. Supp. 977, 983 (S.D.N.Y. 1967), *aff'd*, 410 F.2d 337 (2d Cir. 1969)).

"Property" under the mail and wire fraud statute has been broadly interpreted. *Wallach*, 935 F.2d at 461 (definition of "property" should not be "too narrowly drawn."). The Second Circuit has held that although the "mail and wire fraud statutes do not generally extend to intangible rights [aside from honest services] they do extend to *all* kinds of property interests, both tangible and intangible." *United States v. Carlo*, 507 F.3d 799, 801–802 (2d Cir. 2007) (citation omitted) (emphasis added).

For purposes of RICO, each individual use of the mails or wires constitutes a separate predicate act. *Bridge*, 553 U.S. at 648 ("In furtherance of this scheme, petitioners used the mail on numerous occasions to send the requisite notices to property owners. Each of these mailings was an 'act which is indictable' as mail fraud."); *Spira*, 876 F. Supp. at 559 ("Inasmuch as each such use of the mails is separately indictable under 18 U.S.C. § 1341, each constitutes an act of racketeering under RICO."); *Curiale v. Capolino*, 883 F. Supp. 941, 948 (S.D.N.Y. 1995) (Kaplan, J.) (same); *Nat'l Council of Young Isr.*, 963 F. Supp. at 280–81.

### b.  Donziger's Violations of the Mail and Wire Fraud Statutes

Here, Donziger's and his agents' use of the wires and mail constitutes numerous acts of wire and mail fraud because such use was incident to essential elements of Defendants' scheme to defraud.

### i.  Donziger Used the Wires to Manage the Team He Assembled to Pursue His Scheme Against Chevron

In furtherance of his long-running scheme to defraud Chevron, Donziger communicated extensively with his co-conspirators by email and phone, directing activities both in the U.S. and in Ecuador. Donziger used the wires to manage Stratus and supervise the ghostwriting of the Cabrera report, reviewing drafts and providing direction. PX 979; PX 936 at 1, 3. Donziger relied on wire communications to exercise control over the enterprise's activities in Ecuador, as he

directed and reviewed Ecuadorian court filings (PX 7550; PX 8057; PX 8058), discussed draft reports with LAPs' experts (PX 719), told Ecuadorian attorneys when to file (PX 708; PX 7465), and berated Fajardo and others not to "fuck up" his instructions (PX 1038).  *United States v. Nixon*, 465 F. App'x 912, 918 (11th Cir. 2012) (upholding conviction for wire fraud based on email communications between defendant and co-conspirator exchanging information and material to be used in their fraudulent scheme).  And his Ecuadorian colleagues kept him apprised of developments in Ecuador (PX 888; PX 1142) and advised him on the implications of events in the United States on their scheme.  PX 1279.  *See* FF ¶ 118.

### ii.  Donziger Used the Mails to Implement the Forgery of the Calmbacher Reports

So that he could submit a forged report under Calmbacher's name, Donziger instructed Calmbacher to send by overnight delivery service one set of signed and initialed pages to Ecuador and the second set directly to Donziger in New York.  PX 722.  Defendants then used the very documents they had obtained through the mail to present their own work as that endorsed by Calmbacher—even though Calmbacher did not agree with the statements they attributed to him, had never offered those opinions, and had in fact reached opposite conclusions.  *See* PX 249 (Sacha 94 Judicial Inspection Report filed in Calmbacher's name opining that the site required more than $15 million of remediation); PX 250 (Shushufindi 48 Judicial Inspection Report filed in Calmbacher's name opining that the site required more than $26 million of remediation); *see also* 3/29/2010 Calmbacher Dep. 113:10 (Calmbacher testifying that he "never made dollar estimates"); *see also* 3/29/2010 Calmbacher Dep. 116:3–10, 116:11–117:20, 113:19–25, 115:15–24 ("I did not reach these conclusions and I did not write this report.").  *See* FF ¶ 119.

### iii.  Donziger Used the Wires to Execute the Cabrera Ghostwriting Fraud

The Cabrera report and its subsequent promotion could not have been accomplished

without widespread use of the wires.  It was written in section by numerous consultants coordinated from Colorado, over the wires, by Beltman and others at Stratus (PX 2433), all acting under Donziger's supervision—which he executed through wire communication (PX 979).  It was translated into Spanish through a series of wire exchanges (PX 976; PX 980), and it was sent to Ecuador via the wires (*see* PX 1019) and then revised by wire communications until just hours before Cabrera falsely represented to the court that it was his work (PX 1018).

Meanwhile, Donziger engaged in extensive email exchanges with Ecuadorians, including Fajardo and Yanza, during the ghostwriting process to conceal Defendants' relationship with Cabrera through the use of code names (PX 874) and to oversee the bribery of Cabrera through both court-authorized payments (for work Cabrera did not perform) (*e.g.*, PX 344; PX 352; PX 620; PX 578), and unauthorized payments from what Defendants termed their "secret account" (PX 912).  Defendants continued their use of the wires to ghostwrite the supplemental Cabrera report and then promoting the $27 billion damages estimate as the work of an independent expert.  *See, e.g.*, PX 1073 (email exchange in which Stratus team members discussed the preparation of the supplemental Cabrera report and the need to "clean up the language" of a portion of the supplemental report "so it sounds more like the Perito [Cabrera] and less like a comment"); PX 516# (12/1/2008 Frente de Defensa de la Amazonia Press Release, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists," falsely asserting that Cabrera was an "independent" "Special Master").  *See* FF ¶ 120.

### iv.  Donziger Managed the Bribery of Judge Zambrano and the Ghost-writing of the Judgment He Signed Through Use of the Wires

During both of Zambrano's tenures as presiding judge, and throughout the last years of the litigation, Donziger and his colleagues schemed and advanced their corruption of the court process over the wires.  When Zambrano initially took over the case, Fajardo kept Donziger up-

to-date on the progress of their arrangement with him through a series of emails using code names "puppet" and "puppeteer" for Zambrano and their go-between, Alberto Guerra.  PX 1751; PX 1753.  Then, as the end of the case approached, they planned the writing of the judgment over the wires, coordinating the assignment of research and writing projects (PX 1137), discussing possible arguments and authority (PX 437), and discussing how they would get their judgment issued as the court's.  PX 1202.  *See* FF ¶ 121.

### v.  Donziger Spread Lies About Chevron and His Claims Against the Company Over the Wires

Use of the wires and mail was also essential to Defendants' widespread, multifaceted pressure campaign.  Donziger and his co-conspirators issued numerous false and misleading press releases, each of which constitutes a predicate act of wire fraud.  *See, e.g.*, PX 2221 (timeline reflecting press releases in which Defendants and their co-conspirators cited David Russell's $6 billion damage estimate even after he disavowed the number and requested that they stop using it).  They also sent emails and letters to government officials, the media, and shareholders in an effort to extort Chevron.  *See, e.g.*, PX 7542; 497#.  And through misrepresentations they induced other parties to use the wires or mails in furtherance of Defendants' scheme.  PX 1131 (letter from New York Attorney General A. Cuomo to Chevron CEO D. O'Reilly); PX 1133 (email from Donziger to Hinton reflecting their involvement in causing Cuomo to send the letter containing false and misleading statements).  *See Nat'l Council of Young Isr. v. Wolf*, 963 F. Supp. 276, 280 (S.D.N.Y. 1997) (Kaplan, J.) ("The requisite use of the mails need not be by the defendant and need only be reasonably foreseeable.").  *See* FF ¶ 122.

### vi.  Donziger Furthered His Scheme to Defraud Kohn and Burford Using the Wires

Donziger made use of the wires to secure funding from both Kohn Swift and Burford. Donziger communicated extensively with Joseph Kohn by email, including multiple emails re-

questing additional funding and specific monetary disbursements.  PX 887; PX 895; PX 896; PX 897; PX 916; PX 2430.  In response, Kohn Swift wired Donziger over $6 million in numerous transactions to fund the litigation.  PX 583; PX 735; PX 901; PX 2427; PX 4900R (Dahlberg) ¶ 35.  Many of these transfers were used to make illicit payments to Cabrera.  *See* PX 583; PX 850; PX 888.  Donziger and Patton Boggs also used the wires to communicate with Burford.  PX 1386; PX 2456; PX 2471.  Based on numerous misrepresentations made to Burford through the wires, including the misrepresentations included in the Invictus memo, Burford agreed to provide $15 million in funding for the litigation.  PX 2382; PX 552.  Burford actually transferred $4 million to the LAPs in October of 2010, which provided the LAPs with a vital cash infusion that allowed them to continue their plan to pressure Chevron into settlement.  PX 2456; PX 3100 (Bogart) ¶ 28.  *See* FF ¶ 123.

### 3.   Donziger's Facilitation of Transfers of Millions of Dollars In and Out of the United States Constitutes Money Laundering

Notwithstanding Donziger's posture as an overmatched "human rights lawyer," the enterprise is a multi-million dollar operation of substantial sophistication.  As Donziger sees it, "[t]his is not a pro bono case."  PX 28A.  Over the years, Donziger has broadened his financial beyond Kohn Swift to include international sources of capital as well as legal and other professional services from international providers.  He and his co-conspirators have put in place a legal and economic framework to keep the money flowing, and to reward the investors—as well as Donziger himself.  Indeed, Donziger has secured unfettered control over the day-to-day budget, notwithstanding the safeguards ostensibly built into the investment agreements, and co-mingles client funds and personal funds in support of his own comfortable lifestyle and generous personal compensation

In violation of 18 U.S.C. § 1956(a)(2)(A), Donziger has caused numerous transfers of

money into and out of the United States in furtherance of his unlawful scheme.

The federal money laundering statute, 18 U.S.C. § 1956(a)(2), prohibits the transfer or attempted transfer of funds from the United States to a foreign country, or vice versa, "with the intent to promote the carrying on of specified unlawful activity," including RICO predicate acts such as extortion, mail fraud, wire fraud, obstruction of justice, and witness tampering. Donziger and his co-conspirators have transferred substantial amounts of money between the United States, Ecuador, and other countries to support their unlawful scheme to obtain and enforce a fraudulent judgment against Chevron. These transfers facilitated by Donziger were the enterprise's only significant source of capital. Because the enterprise was engaged in multiple specific unlawful activities, including mail and wire fraud, extortion, obstruction of justice, and witness tampering, the payments were necessarily made "with the intent to promote the carrying on" of these unlawful activities. 18 U.S.C. § 1956(a)(2)(A). While all of these payments were made to further the unlawful activities in which the enterprise was engaging, and therefore constitute money laundering, certain payments can be traced directly to specific illegal acts.

For more than half of the Lago Agrio litigation, Donziger directed wire transfers from Kohn Swift to the Frente, Selva Viva, and Alejandro Ponce Villacis, among others in Ecuador, in addition to payments to various individuals and entities in the United States. PX 2447; PX 1222; PX 4900 (Dahlberg) ¶¶ 35–38. *See also* PX 897; PX 916; PX 965; PX 968; PX 984. The funds Donziger directed included $1 million in funding from Russell DeLeon in March 2007 originating from an account in Gibraltar before being transferred through one of Donziger's accounts to Kohn Swift for final disbursement to various individuals and entities in the United States, Ecuador, and elsewhere. PX 846 at 1; PX 586 at 3; PX 585. This million-dollar investment was used to pay more than $500,000 to accounts held at Banco Pichincha in Ecuador by Selva Viva and

the Amazon Defense Front; funds which were in turn used to pay Cabrera both through the secret account and the court process using the Selva Viva account.  PX 641 at 2; *see supra* Argument Section I.C.1.d.iii.  The Gibraltar-originating investment was also used to pay U.S.-based Stratus and its subcontractors, Ecuadorian Fernando Reyes, and Cabrera "team" member Cristobal Villao through his employer, U.S.-based Uhl, Baron, Rana, all for their work on the Cabrera report during 2007.  *See* PX 641 at 2; PX 887; PX 2430; PX 596; PX 635; PX 637; PX 639; PX 640; PX 4900 (Dahlberg) ¶ 122 (discussing payments to UBR and Cristobal Villao).

Following Kohn's withdrawal from funding the LAPs in November 2009, Donziger continued making payments to Ecuador from his various U.S. accounts at Chase Bank.  PX 5600 (Kohn) ¶ 23; PX 585.  Donziger also continued to receive funds from Gibraltar through various entities and then pay various U.S. entities including Stratus, the Weinberg Group, and Emery Celli, as they were participating in the cover-up of the Cabrera fraud and the then ongoing "cleansing process."  PX 2145; PX 4900R (Dahlberg) ¶ 44; *see supra* Factual Background Section H; Argument Section I.B.1.a, I.B.2.

On December 23, 2009, and again on February 5, 2010, an employee of Selva Viva deposited $1,000 into Guerra's bank account.  PX 1687; PX 1688; PX 1689; PX 1713; PX 1718.  These payments were in exchange for Guerra ghostwriting orders for Zambrano that would favor the LAPs.  PX 4800 (Guerra) ¶¶ 23, 33.  As the LAP team acknowledged:  "The puppeteer won't move his puppet unless the audience pays him something."  PX 1751; *see also* 6/24/2013 Donziger Dep. 285:08–10 (Donziger "believe[s]" that "puppet" and "puppeteer" were "code names.").  The two primary sources of deposits into the Selva Viva account from 2009 until May 2011 were Kohn Swift and Donziger.  As the payments to Cabrera and Guerra illustrate, the LAP team was using the money that Kohn Swift and other investors transferred to Ecuador to further

the unlawful scheme to obtain a fraudulent judgment.

In 2010, after the LAP team, led primarily by Donziger and attorneys at Patton Boggs, secured a $15 million investment commitment from Burford through its Cayman Islands subsidiary, Treca Financial Solutions (PX 552), Patton Boggs received $4 million from Treca at an account in London (PX 552 at 3, 8).  But even with this funding from Burford, which was ostensibly controlled by Patton Boggs, $400,000 of Burford's initial $4 million investment was transferred directly to Donziger after which Donziger made payments to Selva Viva and Hinton.  PX 4900 (Dahlberg) ¶ 50.

The funding agreements with these third-party investors gave Donziger and the LAP team the opportunity to ensure that the majority of any recovery would remain in the hands of the lawyers and investors, rather than go to the LAPs themselves.  These agreements created a "waterfall" distribution system whereby the claims of funders and the LAP team lawyers and agents would be prioritized above those of the LAPs themselves in the event that the Lago Agrio judgment was enforced.  *See* PX 2151; PX 2152; PX 552 at 56–57; PX 4900 (Dahlberg) ¶¶ 138–83.  The purpose of these agreements was to "keep the proceeds out of Ecuador," and to prioritize the interests of the investors over the interests of the LAPs.  PX 1447 at 1.  Indeed, Donziger himself stood to receive at least $1.2 billion if the judgment were enforced in full.  *See* PX 2152; PX 558 at 3.  It is not surprising, then, that Donziger increasingly established himself as the center of the financial process, negotiating agreements with third-party funders and controlling the monetary distributions to the LAP team.  *See* FF ¶ 25–27.

### 4.  Donziger's Interference with U.S. Judicial Proceedings Constitutes Obstruction of Justice and Witness Tampering

While Donziger was never able to practice the same wholesale corruption in U.S. courts that he pursued in Ecuador, testimony and evidence introduced at trial demonstrate that Donziger

still interfered with Chevron's 28 U.S.C. § 1782 proceedings, as well as this action, through false and corrupt means.

### a.   Defendants Committed Multiple Acts of Obstruction of Justice During Proceedings Before U.S. Federal Courts

The federal obstruction of justice statute provides that "[w]hoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" shall have committed obstruction of justice.  18 U.S.C. § 1503.  Courts in the Second Circuit have given § 1503 "a generally non-restrictive reading."  *United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010).  Chevron demonstrated that while these federal judicial actions were pending, of which Defendants had knowledge or notice, Defendants acted with the wrongful intent or improper purpose to influence the actions, whether or not successful.  *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006).

Defendants have not contested and, indeed, cannot contest that Chevron's § 1782 actions or the present case were pending in U.S. courts, or that Donziger and his co-conspirators were aware that the actions were pending, because their obstructive conduct took place in response to those very proceedings.  *E.g.*, Tr. (Donziger) 2465:2–5 (Donziger testifying that to his recollection, the first § 1782 was initiated in December 2009); Tr. (Shinder) 1250:5–16 (Shinder testifying that he represented Donziger and the LAPs in the Stratus and Calmbacher 1782s).  In fact, acting through Donziger and other U.S. agents, defendants Camacho and Piaguaje intervened in nearly all of the U.S. actions.  Tr. (Donziger) 2568:19–2569:7 (Donziger testifying that his role during the § 1782s was to "organize legal representation for those involved" and "hire[] different counsel at different times . . . for the Lago Agrio communities").  Donziger directed the LAP team's counsel during the § 1782s (*id.*), and was even named in a § 1782 action before this

Court.  *See* PX 2223.  Testimony and evidence introduced at trial also demonstrate that during these proceedings Defendants and their co-conspirators acted "corruptly," or with the specific intent of obstructing justice.  *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002).  By the time Chevron commenced discovery actions in the United States, the Cabrera report was the centerpiece of the litigation in Ecuador.  Public revelation that Stratus authored the report would have exposed the Cabrera fraud, and Donziger's Ecuadorian co-conspirators were blunt about the consequences that would flow from that revelation:

> Today Pablo [Fajardo] and Luis [Yanza] were kind enough to tell us what was going on in Denver, and the fact that certainly ALL will be made public, including correspondence . . . . [T]he problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail) . . . . For us it is NOT acceptable for the correspondence, the e-mails, between Stratus and Juanpa [Saenz] and myself be divulged.

PX 1279.  Defendants' strategy during the 1782 actions revolved around misleading the U.S. courts in order to prevent detection of Defendants' fraudulent actions and extortionate scheme.  Obstruction of justice is a proper RICO predicate act where "the evidence established that . . . [Defendant's] activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."  *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991).  In fact, "a defendant does not need to know with certainty that his conduct would affect judicial proceedings . . . , [i]nstead, the defendant's conduct must only have the natural and probable effect of interfering with the due administration of justice."  *Kumar*, 617 F.3d at 621 (quotations omitted); *United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013).  To prevent the extortionate scheme from being exposed, Donziger sought to block Chevron's efforts by pursuing a strategy of obstruction and delay, submitting fraudulently obtained or misleading declarations to

U.S. courts, flouting court orders, and even manufacturing a collusive lawsuit in Ecuador in an attempt to excuse his discovery misconduct here.  This violated federal law.

> ### i.   To Prevent the Cabrera Fraud from Being Exposed, Donziger Misrepresented Key Facts to Counsel and Caused Those Same Misrepresentations to be Repeated to Federal Courts

When Chevron filed its first § 1782 action—in Colorado—seeking discovery into the relationship between Cabrera and the LAPs, Donziger sought out prominent U.S.-based counsel to represent the LAPs and oppose the discovery.  Donziger lied to these lawyers, and sought to manipulate them into blocking discovery and asserting falsehoods.  Donziger initially retained John McDermott from Brownstein Hyatt Farber Schreck, LLP, to act as local counsel for the LAPs in the Stratus 1782.  PX 2356; 12/29/2010 Donziger Dep. 2381:15–18.  Donziger also retained Jeffrey Shinder of Constantine Cannon, a prominent New York law firm.  PX 1213; PX 1255; 12/29/2010 Donziger Dep. 2353:17–2354:21.  At the outset, Donziger made it clear that "he did not want the depos[itions] to go forward."  5/21/2013 McDermott Dep. 60:3–13.  In order to convince McDermott and Shinder to move to quash the 1782 actions, Donziger repeatedly misrepresented Cabrera as completely "independent" and a "court-appointed Special Master."  Tr. (Shinder) 1262:2–9; PX 7608 at 14; PX 1241 at 2 ("[T]he selection of Cabrera was made independently by the court"); PX 1165; *see also United States v. Sun Myung Moon*, 718 F.2d 1210, 1236 (2d Cir. 1983) (corrupt intent may be inferred from defendant's knowledge of the falsity of records he submitted to a grand jury); *United States v. Jespersen*, 65 F.3d 993, 1000-01 (2d Cir. 1995) (defendant's falsification of contract for purpose of impeding grand jury investigation was corrupt).

But Donziger's plan to launder his lies through respected attorneys faltered when those attorneys investigated his claims.  Shinder sought concrete evidence regarding the LAP team's submissions to Cabrera, and asked Aaron Marr Page to provide "whatever Stratus materials that

were among the 3200 pages that went to Cabrera; and . . . the portions of the Cabrera report that Chevron falsely contends were written by (or lifted from) Stratus work product." PX 1251 at 1. Shinder never received the materials: "I asked for them.  I never got them."  Tr. (Shinder) 1281:21–1282:1.  Shinder then insisted that Donziger arrange meetings with Stratus employees. Tr. (Shinder) 1284:18–22.  On March 17, 2010, Shinder traveled to Colorado and met with several Stratus employees, including Beltman.  PX 1258 at 1; *see also* Tr. (Shinder) 1285:12–22. During that meeting, "Mr. Beltman in a rather forthcoming way essentially and pretty explicitly admitted to having written significant portions of the Cabrera report."  Tr. (Shinder) 1292:2–7. Shinder continued:

> Well, once what I thought—and still think—was the truth came out, you know, there were additional, what I will characterize as lurid details that he admitted to, such as Stratus had essentially had ghostwritten the Cabrera report, then Stratus acting as experts for the plaintiffs wrote comments to their own work, and then wrote the Cabrera report's responses to their own comments, which was just astounding to me the levels to which this descended.

Tr. (Shinder) 1292:11–18.  Beltman also revealed to Shinder, Joe Silver, Martin Beier, and Page that he had attended a dinner at Cabrera's home, after Cabrera was appointed as the global damages expert, with a number of the LAPs' other representatives (Tr. (Shinder) 1287:7–1288:4, 1293:18–1294:5), and discussed how Stratus ghostwrote the report and its annexes (PX 1258). Beltman admitted that he had himself written significant portions of the body of the Cabrera report, and he said that he was directed to do so by Donziger and Fajardo.  *Id.*; PX 5208 ¶ 22. Beltman even discussed how he was in the Quito office of the LAP's lawyers the day before the Cabrera report was filed, and saw the report being printed and boxed up in the office.  Tr. (Shinder) 1294:16–17, 1294:25–1295:9; *see also* PX 1258 at 2.  According to Shinder, Donziger was

in and out of the meeting, but present for the critical admissions from Beltman—and "[Donziger] was nonplussed."  Tr. (Shinder) 1295:16–21.[48]

The day after his meeting with Beltman, Shinder withdrew from the case.  PX 1262. Shinder told Donziger "the primary reason we were withdrawing was ethical reasons, that I had serious issues with the conduct that I learned in Denver, and I did not think that I or my firm could continue to handle this matter consistent with our ethical obligations, and I wanted no part of it."  Tr. (Shinder) 1309:7–18; PX 1262.

Shinder's withdrawal raised concerns with other members of Donziger's team.  After hearing about the withdrawal from Donziger, Andrew Woods drafted a memo to file stating:

> Approximately 1 hour ago I spoke with Steven where Steven revealed to me that (1) Jeff Shinder, managing partner of Constantine Cannon, engaged in a day-long interview on March 17 with Doug Beltman . . . , (2) Shinder called Steven this morning to indicate that his firm was unwilling to continue in its representations of the *Aguinda* clients, and (3) Shinder's lack of willingness was due to his discomfort with the level of cooperation that took place between Beltman and the scientific expert in Ecuador, Richard Cabrera . . . .
>
> I indicated to Steven that this was the first I had heard that any conduct by plaintiffs' experts may have exceeded the contacts that were permitted by court order and crossed over into cooperation with Cabrera or writing of the report.  Steven responded clearly that Beltman was not working with Cabrera directly, but it was understood that the plaintiffs' experts were functionally writing the report.

PX 1259 at 2; *see also* 6/18/2013 Woods Dep. 198:21–199:6.  Woods was especially concerned by this revelation because he signed a sworn declaration to the Colorado court making representations, based on what Donziger told him, regarding the timing of the proceedings in Ecuador.[49]

---

[48] Donziger claims "Shinder is mistaken when he testified I was present in his meeting with Beltman.  I was present in the law office where the meeting took place, and Shinder and I spoke briefly immediately after he exited that meeting."  DX 1750 (Donziger) ¶ 104.  But Shinder's testimony of this point is far more credible than Donziger's self-serving assertion.  Shinder testified the revelation by Beltman was "a shocking event" so he "remember[s] it very clearly."  Tr. (Shinder) 1292:19–1293:9.  Furthermore, unlike Donziger, Shinder has no reason to conceal the truth and his conduct throughout this matter has demonstrated that he is highly ethical and honest.

[49] *Compare* PX 674 (Woods affidavit), *with* PX 1280 ("[Chevron will be] filing a motion alleging fraud connecting to [Woods's March 3, 2010] declaration . . . . This is very alarming to me, since it would appear that that would put me personally squarely in the cross-hairs of any fraud inquiry, and that is not a place I'm comfortable being since I still don't know exactly what happened and was not around while all of the events that Chevron is seeking [Footnote continued on next page]

PX 1280 at 1; *see also* 6/18/2013 Woods Dep. 405:9–406:8.

After learning about Shinder's decision to withdraw, McDermott asked to speak with Donziger and Shinder.  Donziger revealed to McDermott that Stratus had, in fact, authored 11 of 17 annexes to the Cabrera report and the executive summary.  PX 1265.  On March 19, 2010, McDermott also spoke with Shinder.  PX 1267.  Shinder told McDermott that "he was concerned that despite [Donziger's] representations to us that Stratus' work with the Ecuadorian expert complied with Ecuadorian procedure and was proper, he understood the opposite to be true."  PX 1358.  Shinder told Brownstein's attorneys that he was "physically ill" by the revelation of the fraud perpetrated on the Lago Agrio court by the LAP team and that the LAPs were trying to avoid discovery in the § 1782 actions based on procedural objections, like a criminal defense lawyer with a guilty client making procedural objections because the lawyer knows he or she will lose on the facts.  PX 1267.

On March 21, 2010, the Brownstein law firm withdrew as well.  PX 1269.  Citing "the troubling information we gathered in our call with you and Andrew [Woods] and conversations with Jeff Shinder," McDermott informed Donziger that Brownstein was "in an untenable position," that he was "concerned about our ability to satisfy our obligations to Judge Kane and to the court if we continue in our representation," and that "I feel if we proceed I may be compromising this firm's reputation and ethical stature and I cannot do that."  *Id.*  McDermott wrote:

> [W]e did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoenas.  Notably, despite our repeated requests to you, we had not received the pertinent documents and information that were necessary to support the arguments we had discussed as being the main reasons to oppose the subpoenas and that would support the arguments we deemed to be compelling based on our legal

---

[Footnote continued from previous page]

discovery on was happening.  I based that motion entirely on information that I was told was valid by you . . . Can you please review and see if there is anything that is incorrect or misleading?  And if so, I need to file a clarification before the Denver court immediately, like tomorrow or Monday.").

> research.  We were concerned by Jeff Shinder's abrupt decision to no longer be
> involved in the case – which he advised us of the day after he met with numerous
> witnesses in Boulder. . . . Further, Shinder told us that after meeting with the wit-
> nesses, he was concerned that despite your representations to us that Stratus' work
> with the Ecuadorian expert complied with Ecuadorian procedure and was proper,
> he understood the opposite to be true.

PX 1358 at 2.

The next day, Donziger wrote a memo to "file," in an attempt to manufacture a record be-lying his personal and knowing role in ghostwriting the Cabrera report:  "SRD is also contacting local counsel in Ecuador to clarify various issues raised by the role of Stratus as alleged by Chevron in its 1782 action before the Colorado federal court.  As of today, SRD is unsure whether the role of Stratus was consistent with Ecuadorian rules and procedures, per representa-tions by local counsel."  PX 1270.  In the same memo, he stated that he had "set up an appoint-ment" with "an expert in attorney ethics . . . to discuss what if any ethical obligations SRD might have in light of the facts as described by Beltman."  *Id*.

Despite this feigned concern, Donziger admitted that he directed that briefs be filed claiming Cabrera was independent and otherwise "[s]ought to prevent Stratus' role relative to the Cabrera report from coming out" (1/19/2011 Donziger Dep. 3362:7–3363:20), all because "full disclosure of the plaintiffs' team's role in Cabrera's work could destroy the Lago Agrio litiga-tion" (*id.* 3386:24–3387:21).  In fact, after Chevron and TexPet filed a petition for arbitration under the Bilateral Investment Treaty, the LAPs filed an action to stay the arbitration in the Southern District of New York.  The LAPs' petition to stay, which was filed on behalf of Piaguaje and Camacho, among others, discussed at length the global inspection report by the "independent" court-appointed expert.  *See* PX 7608.  *See* FF ¶¶ 103–04, 108.

### ii. After It Became Clear to Donziger That He Could Not Preclude the § 1782 Discovery, Donziger Continued to Obstruct Proceedings by Adopting an Intentional Delay Strategy

Once it was clear that they could not prevent U.S. discovery, the LAP team developed a plan to "cleanse" the Cabrera report in Ecuador. But the LAP team needed to delay the § 1782 discovery proceedings for as long as possible—a strategy they had to strong-arm their Colorado counterparts and Stratus's counsel into accepting. PX 1286 at 1; 4/30/2013 Beier Dep. 148:16–149:11. Understanding that they did not "want these documents to come out" (PX 1286 at 1), the LAP team embarked on a strategy, designed by Jim Tyrrell of Patton Boggs and endorsed by Donziger, to "fight hard on all fronts all the time and concede nothing," in order to "buy as much time as possible." PX 1348 at 1; *see also* PX 1360 ("[W]e gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose."). For the Stratus 1782 proceeding, the lawyers at Patton Boggs proposed a more specific delay strategy: "What about the following? Appeal; move for stay; if we win with [the District Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal." PX 1363.

Section 1503 prohibits "endeavor[ing]" to "influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503. "Due administration of justice" is interpreted broadly, as Section 1503 "'embraces the widest variety of conduct that impedes the judicial process'" and is "'all-embracing.'" *Kumar*, 617 F.3d at 620 (quoting *United States v. Rosner*, 352 F. Supp. 915, 919 (S.D.N.Y. 1972); *United States v. Solow*, 138 F. Supp. 812, 814 (S.D.N.Y. 1956)). Prohibited conduct includes concealing subpoenaed documents, *United States v. Ruggiero*, 934 F.2d 440, 446 (2d Cir. 1991), of which the LAP team is guilty. In a July 2010 email about the Stratus 1782 production, Patton Boggs attorney Eric Daleo warned Westenberger: "Wanted to advise you that

tomorrow's production to Chevron will be the leanest to date at 37 documents, 202 pages . . . . If you think this is unacceptably low, we can produce some documents we were trying to hold off producing that are non-privileged but potentially damaging."  PX 1385.  As in *Ruggiero*, Defendants' improper withholding of non-privileged, responsive documents amounts to obstruction of justice.  *Ruggiero*, 934 F.2d at 446.  *See* FF ¶¶ 103–04, 108, 110.

### iii.  Donziger's Corrupt Intent in Obstructing the 1782 Proceedings Was Even More Apparent After the Filing of the Crude 1782

In March 2010, Chevron discovered that the Netflix version of *Crude* contained scenes—cut from the DVD version at the LAPs' insistence (*see supra*  Argument Section I.C.1.d.v.(3))—including Carlos Beristain, who was listed as part of Cabrera's supposedly "independent" team, at a village meeting coordinating with the LAP team.  PX 3300 (McMillen) ¶ 44.[50]  On April 9, 2010, Chevron filed its discovery application for outtakes from *Crude*.  Well aware of what the Stratus discovery and these outtakes would reveal, Donziger drafted a letter to his "Fellow Counsel," explaining, for the first time, that "Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court."  PX 1291 at 1.  Donziger made clear that this submission was not unsolicited, but that "[t]here was significant back and forth collaboration between local counsel and Cabrera, and separately, via local counsel and Stratus."  *Id*.  And while Donziger, referring to himself as "U.S. counsel," tried to minimize his knowledge of wrongdoing, admitted that discovery would reveal:

> There are also numerous emails between Stratus and local counsel documenting how this work was done, and there are some emails between Stratus and U.S. counsel that show U.S. counsel (relying on guidance of local counsel) approved of this process, encouraged it, and was involved in it from a supervisory perspective.  There was also at least one *ex parte* meeting between Stratus and Cabrera at which U.S. counsel was present.  The emails and testimony likely will show some effort to keep the extent of this *ex parte* col-

---

[50]  *See also* PX 60 (outtake from *Crude* showing Beristain interacting extensively with Donziger and those with him).

laboration between our local counsel and Cabrera from being disclosed.

*Id.*

In the same draft letter, Donziger revealed his consciousness of guilt and knowledge that his actions violated Ecuadorian law.  He acknowledged in the draft letter that:

> The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent . . . [and that] [b]y working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.  Under this perspective, treating Cabrera like a U.S.-style expert as we did will be seen as a violation of local court rules.

PX 1291 at 1–2.

But even as Donziger admitted his knowledge of wrongdoing, he and his co-conspirators continued to corruptly mislead the U.S. courts.  On April 23, 2010, the LAP team filed their opposition to the *Crude* 1782, describing the Beristain meeting as an "innocuous meeting, which is of no relevance to anything . . . ."  *In re Chevron Corp.*, No. M-19-111-LAK (S.D.N.Y.), Dkt. 9 at 8.  This was a bald-faced lie.  Fajardo had emailed the U.S. filmmakers, imploring that "the images [of Beristain with Donziger] we had discussed be corrected or removed" because "[t]hey are so serious that we can lose everything" and that "the way it is, the entire case will simply fall apart on us."  PX 2454 at 2; PX 1091.  Defendants eventually convinced Berlinger to edit this scene out of the version of *Crude* to be publicly released, despite the fact that this change was "costly" (PX 2454) and Defendants may have "paid half the costs of that edit."  Tr. (Donziger) 2568:14–18.  Yet, at a hearing on April 30, 2010, counsel for the LAPs repeated that lie, asserting that Chevron's application for discovery from Berlinger was "frivolous" because the meeting with Beristain was "unimportant," akin to a group of New York lawyers attending parties together, with one later being appointed a court expert.  *In re Chevron Corp.*, No. M-19-111-LAK (S.D.N.Y. Apr. 30, 2010), Hr'g Tr. 39:16–20; 40:20–23; *see also United States v. Jespersen*, 65

F.3d 993, 1000–01 (2d Cir. 1995) (finding corrupt intent where evidence established that defendant falsified contract for purpose of impeding grand jury investigation).  *See* FF ¶¶ 105.

### iv.  Donziger's Campaign to Mislead U.S. Courts Continued Once Patton Boggs Developed the Strategy to "Cleanse" the Cabrera Fraud

Patton Boggs developed a strategy to "cleanse" any perceived impropriety surrounding the Cabrera report.  PX 1310.[51]  The LAP team resolved to file a misleading declaration from Fajardo in U.S. courts that would attempt to characterize the evidence against them that had been revealed to date—but admit no more than that—to mollify U.S. courts while "buy[ing] as much time as possible."  PX 1348 at 1.  They would use that time to file a similarly misleading filing in Ecuador, and then ultimately submit what they termed "cleansing" expert reports, which would repackage the Cabrera report under new names so they would not "end up with a decision based entirely on Cabrera."  PX 1370.

The LAP team determined to draft a declaration for submission in U.S. courts that would purport to describe the LAP team's relationship with Cabrera.  Although it was initially suggested that Donziger sign the declaration, the co-conspirators ultimately decided it should come from Fajardo in order to prevent discovery regarding the declaration in the United States:  "If Steve signs [the declaration], he will most certainly be deposed.  Same for any other counsel in the US. We figured that with Pablo, [Chevron] likely would not slow down the process by deposing him (as we would say the dep needs to go forward in Ecuador)."  PX 1316 at 1.  Donziger, nonetheless, provided the "facts" Patton Boggs relied upon in drafting the Fajardo declaration. 1/14/2011 Donziger Dep. 2783:22–25, 2811:17–2812:12.  The co-conspirators fiercely debated whether it was appropriate to include Donziger's "facts" in the declaration.  In a May 3, 2010

---

[51]  The agenda for an April 30 meeting with Donziger, Patton Boggs, and others lists various action items for the meeting, including "Strategy Consideration – How Do We Characterize Cabrera Going Forward?"  PX 1310 at 2.

email, for example, Maazel wrote:

> I don't quite get the purpose of this [Fajardo] affidavit.  Pablo mentions one document submission but not the other.  If he's submitting an affidavit about what happened, why omit the most important part?  It seems misleading at best.  I just don't see how he can sign an aff[idavit] that documents his submissions to Cabrera without mentioning that he sent documents that originated from Stratus, which is the one thing the judge is going to want to know.  Better for him to say nothing and not submit an affidavit than submit something half way.

PX 1316 at 2.  Maazel went on to note "[t]he more we emphasize [Cabrera's] neutrality the less sense it makes that we were talking to him out of school."  PX 1321 at 2.

Maazel's characterization of the Fajardo declaration as "misleading at best" was, if anything, an understatement.  The declaration included numerous false and misleading statements, including:

- "Throughout the process, by virtue of Cabrera's status as a court-appointed expert, Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation."  PX 1325 ¶ 21.

- "[T]he court concluded that the global damages assessment expert would be selected from the pool of seven independent experts it previously appointed in the case. Of the seven, the court appointed Richard Cabrera . . . ."  *Id*. ¶ 11.

- "Mr. Cabrera proceeded in his work on notice to both parties."  *Id*. ¶ 14.

- "In addition to the information collected from the vast amount of field inspections he performed, Mr. Cabrera was also free to consider materials submitted to him by the parties. Both Plaintiffs and Chevron were asked to supply Mr. Cabrera with documents."  *Id*. ¶ 16.

- "[O]n January 30, 2008, the court issued another order requesting that both parties turn over any information that they thought would be useful to Mr. Cabrera. Plaintiffs delivered materials to Mr. Cabrera. The court did not retain a copy of the materials, opining that the materials would not be considered as evidence in the case, separate and apart from Cabrera's use of them in his report."  *Id*. ¶¶ 17-18.

- "[T]o the extent that Mr. Cabrera put into his report any of the information that I supplied to him, it would be viewable by Chevron or any other member of the public that reviewed Mr. Cabrera's report."  *Id*. ¶ 19.

The "misleading at best" declaration was nonetheless filed with the Colorado district

court in support of a motion for a protective order on May 5, 2010 (PX 1325), and the LAP team

would file the misleading declaration in sixteen other Section 1782 actions in jurisdictions across

the United States.[52]

The LAPs' May 5 motion for a protective order in Colorado was filed in spite of the fact

that their local counsel, Jay Horowitz, expressed concern that the arguments were "*dangerous,*

*ill-advised, and wrong.*"  PX 2452 at 6.  Horowitz criticized the LAP team's argument that Chev-

ron had only circumstantial evidence, noting that it was:

> too much of a stretch considering that Cabrera's report, or substantial annexes to it, are in
> fact the consultant's [i.e., Stratus's] work.  This is far more than "circumstantial evi-
> dence"; this is, indeed, a "'hand-in-glove' showing" and I do not think we should use this
> metaphor as a contrast to what happened here . . . when it is seems, instead, to be a pretty
> good description of what happened here.

*Id*. at 7.

The LAP team also had to resolve false statements made to the Colorado court in an April

27, 2010 hearing by Stratus's counsel—while counsel for the LAPs silently sat by—that Stratus

was "astonish[ed]" to see "similarit[ies]" between its own work product and the Cabrera report

and did not have "any direct communications" with Cabrera.  PX 678 at 58:5–17, 69:13 ; *see al-

so id.* at 40:10–14; 56:25–57:4.  Patton Boggs' Edward Yennock later commented that

"[e]veryone is concerned about Silver's inaccurate representation that Stratus never met with

Cabrera.  Horowitz thinks we have to go to [Judge] Hegarty and tell him.  Steven is worried that

Pablo will face legal repercussions."  PX 1349.

The LAP team controlled the content of the "correction" made by Stratus' counsel.  *See*

PX 1351; PX 1352; PX 2452.  Maazel argued that the LAPs' legal team could not "reveal this

---

[52] *See* PX 1326 (M.D. Tenn.); PX 1327 (S.D. Cal.); PX 1328 (D.N.J.); PX 1329 (D. Md.); PX 1330 (D. Md.); PX 1331 (S.D.N.Y.); PX 1332 (D.N.M.); PX 1333 (W.D.N.C.); PX 1334 (S.D. Ohio); PX 1335 (W.D. Va.); PX 1336 (D. Vt.); PX 1337 (S.D. Tex.); PX 1338 (D. Mass.); PX 1339 (S.D.N.Y.); PX 1340 (S.D. Fla.); PX 2479 (D.D.C.).

bombshell in a footnote, without also making our submission to the Ecuadorian court and execut-ing our [public relations] strategy on this critical point."  PX 1352 at 2.  Abady of Emery Celli agreed, stating, "[h]aven't we resolved that we admit that w/o apology or consciousness of guilt. We are going to do it in Ecuador.  There is no credible way of denying that 11 of 17 annexes are from us."  PX 1357 at 1.  Maazel proposed keeping "these U.S. judges" in the dark until after their Ecuadorian submission.  PX 1356 at 1.  In the end, the brief submission the LAPs' counsel authored disclosed as little as possible.  *See* PX 679.

The Colorado court ultimately denied the LAPs' motion for a protective order and re-quired that the documents be produced—but that was more than five months after Chevron initi-ated the discovery proceeding.  *See Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH, Dkt. 154 (D. Colo. May 25, 2013); PX 1363 at 1.  That decision nonetheless meant that the Cabrera fraud soon would be revealed in Colorado:  "Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the worst possible place, we need to make our submission in Ecuador and fast . . . .  We've bought over a month in CO . . . but time is almost certainly about to run out.  So we need to make a decision whether we can file in Ecuador and control this story, or whether we let events overtake us in CO . . . ."  PX 1363 at 2.

Accordingly, the LAP team made a similar false disclosure in the Lago Agrio court on June 21, which they then would use to tell U.S. courts that their relationship with Cabrera had been "fully disclosed" to the Ecuadorian court.  PX 1320; *see also* PX 382.  While Donziger characterized the petition as an "admittedly less than adequate statement" (PX 1382 at 3), the LAP team subsequently filed it (PX 1381 at 1; *see also* 12/29/2010 Donziger Dep. 2347:6–2348:2), twice in this Court and once in the Second Circuit.  *See* PX 2514; PX 2515; PX 2516.

Filing these false and misleading documents with the intent that they impede Chevron's

requests for discovery demonstrates the requisite corrupt intent for a violation of the obstruction of justice statute. *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1236 (2d Cir. 1983). These lies were necessary to allow Defendants to launder the Cabrera report's fraudulent conclusions by resubmitting them to the Ecuadorian court under the name of new experts. *See* FF ¶¶ 63–64.

### v. Donziger, In Connection With His Own 1782, Obstructed Justice in This Court, Repeatedly Flouting Its Orders

The record of Donziger's obstructive actions in this Court is well-established. On August 6, 2010, Chevron filed its 1782 action against Donziger. *In re Chevron Corp.*, No. 10-mc-00002 (LAK) (S.D.N.Y.). Donziger's and the LAPs' repeated failure to comply with this Court's orders to produce documents and a privilege log resulted in waiver of privilege over nearly all of Donziger's Ecuador-related communications. *See In re Chevron Corp.*, 749 F. Supp. 2d 170 (S.D.N.Y. 2010). On November 30, 2010, the Court ordered Donziger to produce his responsive documents, finding that Donziger's conduct "was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay." *Id.* at 185. After an unsuccessful appeal of this Court's orders, Donziger began producing documents pursuant to Chevron's subpoena. Meanwhile, on November 29, 2010, Chevron began taking Donziger's deposition, where his obstructive conduct prompted the Special Master to write to the Court: "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self-serving answers to questions that should have been answered directly, with no embellishment." *In re Chevron Corp.*, No. 10-mc-00002 (LAK) Dkt. 151 at 1 (S.D.N.Y. Jan. 11, 2011); *see also* PX 2457. The Special Master went on to describe how he had repeatedly cautioned Donziger and his counsel, but that this "seemed to have little effect." *Id.* Even still, Donziger testified that he had yet more responsive documents, such as those in email accounts set up specifically to

hide sensitive communications about, among other topics, the LAP team's authorship of the Cabrera report.  1/18/2011 Donziger Dep. 3012:14–3013:12, 3017:5–21, 3057:17–3059:19, 3086:23–3089:18.

As this Court found, Donziger's productions were incomplete, and there was "reason to believe that Donziger ha[d] not complied full and promptly with the subpoenas served upon him and with this Court's orders that he do so."  *In re Chevron Corp.*, No. 10-mc-00002 (LAK) Dkt. 171 at 1 (S.D.N.Y. Jan. 21, 2011).  On January 21, 2011, Chevron obtained an order requiring Donziger to search his electronic files using search terms.  *Id.*  Following these searches, Donziger produced an additional 87,080 documents, over 85% of which were responsive to the subpoenas.  *Id.* at 1.  This Court also found that there was "evidence that at least suggests that Donziger may have erased or is withholding still other responsive documents."  *Id.* at 2.

Accordingly, on January 21, 2011, the Court ordered Donziger to turn over the computer hard drives in his possession.  *In re Chevron Corp.*, No. 10-mc-00002 (LAK) Dkt. 171 (S.D.N.Y.).  On these hard drives were *thousands* more documents that were relevant and responsive to Chevron's requests but that Donziger had failed to produce.

As previously explained, "endeavor[ing]" to "influence, obstruct, or impede, the due administration of justice" is interpreted broadly.  *Kumar*, 617 F.3d at 620 (18 U.S.C. § 1503(a)).  In addition to upholding convictions under the obstruction statute for concealing subpoenaed documents (*United States v. Ruggiero*, 934 F.2d 440, 446 (2d Cir. 1991)), convictions have been upheld for giving false and evasive answers to questions in sworn testimony (*United States v. Cohn*, 452 F.2d 881 (2d Cir. 1971) (upholding conviction for giving false testimony to grand jury)).  *See* FF ¶¶ 106–07.

### b. During Chevron's Section 1782 Actions, Defendants Committed Multiple Acts of Witness Tampering

Witness tampering is also a RICO predicate act.  18 U.S.C. § 1961(1) (2013).  A defendant commits witness tampering where he knowingly engages in intimidation, threats, misleading conduct, or corrupt persuasion toward another with the intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony from an official proceeding.  18 U.S.C. § 1512(b).  A defendant has the intent to influence testimony when he is aware that the natural and probable consequences of his actions would be to influence the testimony of a witness.  *See Quattrone*, 441 F.3d at 170–71, 176.

### i. Donziger Tampered with the Deposition Testimony of Dr. Charles Calmbacher

Although neither Donziger nor the LAPs intervened in the Calmbacher § 1782 proceeding, despite receiving notice of the proceeding and the deposition (PX 1257; PX 1247; PX 1248), Donziger and his co-conspirators were concerned that discovery would expose the fact that the LAP team fraudulently manipulated reports filed under Calmbacher's name with the Lago Agrio Court (see PX 1277).  Shortly before Calmbacher was to testify at his deposition, Donziger telephoned Calmbacher to try to dissuade him from appearing.  Donziger lied to Calmbacher, telling him that the deposition "poses real problems for [Calmbacher]" and "it "could be a potential law case against" him if he did not "go in with [Donziger] on quashing the subpoena" and threatened that Chevron was "going to go after [him] for unprofessional behavior."  3/29/2010 Calmbacher Dep. 144:17–145:7.  When asked at his deposition whether he thought "Donziger [was] trying to convince [him] not to come and testify," Calmbacher answered:  "Very much so.  Very much so."  *Id.* 145:8–10.  Donziger's attempt to convince a witness not to testify violates the witness tampering statute.  The fact that Donziger was unsuccessful in his attempt to tamper with Dr. Calmbacher's testimony does not absolve his liability under 18 U.S.C. § 1512(b).  *See* FF ¶¶ 36,

111.

### ii. Donziger Tampered with the Sworn Statement of Former Consultant Mark Quarles

In September 2007, Defendants induced one of their consultants, Mark Quarles, to sign a declaration that was submitted in an earlier action pending in the Southern District of New York. The declaration stated that "Mr. Cabrera and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant . . . ." PX 918 at 3 (emphasis omitted). But Quarles obtained this understanding from Donziger. *See* 9/1/2010 Quarles Dep. 118:20–25. By providing his own consultant with a false narrative, understanding that the narrative would be repeated to a U.S. federal court, Donziger engaged in "misleading conduct." Misleading conduct occurs when the defendant makes a false statement with the intent to influence testimony. *See, e.g.*, *United States v. Rodolitz*, 786 F.2d 77, 82 (2d Cir. 1986). Indeed, Donziger's lies amount to "[t]he most obvious example of a section 1512 violation": "the situation where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it . . . ." *Id.* at 81–82.

Donziger was well aware of the natural and probable consequences of his lies to Quarles—namely, that Donziger's lies would be repeated to the court under the imprimatur of a third party witness. *See Quattrone*, 441 F.3d at 176. Donziger even pushed Quarles to make further false representations about Cabrera, asking Quarles to edit his declaration to state that "[a]t no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan." PX 915 at 5. Donziger knew this was false, having been at the March 3 meeting to design Cabrera's work plan. PX 35; PX 36; PX 39. Quarles testified that if he had known that Cabrera was working directly with the LAP Team, he would not have signed the declaration. 9/1/2010 Quarles Dep. 122:1–5. *See* FF ¶ 113.

### iii. Donziger and his Co-conspirators Tampered with the Deposition Testimony of David Chapman

The LAP team also tampered with the deposition testimony of David Chapman, a principal at Stratus, and acted with "corrupt persuasion" in doing so.  Corrupt persuasion describes deterring or attempting to influence testimony through sheer persuasion (no coercion or deception) with "an improper purpose."  *See United States v. Kaplan*, 490 F.3d 110, 125 (2d Cir. 2007); *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *United States v. Price*, 443 F. App'x 576, 581–582 (2d Cir. 2011); *United States v. LaFontaine*, 210 F.3d 125, 133 (2d Cir. 2000).  Persuading or attempting to persuade a witness to withhold information or provide false information may constitute corrupt persuasion.  *See, e.g.*, *Price*, 443 F. App'x at 581–582.

In mid-April 2010, Donziger and the LAP team "receive[d] the astonishing news that Marty [Beier] is serving up someone from [Stratus] Friday for a deposition!!!!" during the Stratus 1782 action.  PX 1292.  Not ready to address the possible revelation of the Cabrera scheme, the conspirators realized it was "[u]rgent that the dep[osition] be cancelled immediately—tonight!"  *Id.*  Donziger and his New York colleagues called Joe Silver to convince him to make Stratus's David Chapman "unavailable" for his April 23 deposition.  PX 1295 at 2.  Silver contemporaneously described this "disturbing conversation" to Beltman and Beier in an email sent on April 22:

> In the last few weeks, the Plaintiffs' team . . . have grown more desperate to a point where, in their disarray, they are challenging everyone around them to take positions which are implausible at best, and very possibly spurious.
>
> [Donziger, Westenberger, and Abady] called me and, within a millisecond, were making clear their anger that the depositions were proceeding over my assurances that they wouldn't and demanding that I make myself and Marty [Beier] or David [Chapman] and [Doug Beltman] unavailable in order to keep the depositions from proceeding.  If I am ever asked whether I participated in a conversation in which a plan to obstruct Chevron's subpoenas was considered, I want to be able to say no.  So while I wasn't so express with them about why I was declining to speak with them, I insisted that we not have this conversation . . . .

*Id.*; *see also* 5/23/2013 Silver Dep. 139:12–17.

When efforts to get Silver to prevent Chapman from testifying failed, the conspirators turned to Donziger's then-local counsel, Rick Kornfeld.  Late in the evening on April 21, 2010, Donziger and his colleagues called Kornfeld and "urg[ed] him to obstruct the depositions as they did [Silver]."  PX 1295 at 2.  Donziger knew that Kornfeld was on vacation, but that his partner Heather Hanneman was available to attend the Chapman deposition scheduled for April 23.  *See* PX 1293; PX 1296 at 1.  Nevertheless, at Donziger's request, Kornfeld sent an email to counsel for Chevron and counsel for Stratus to see if the deposition could be rescheduled.  *See* PX 1296 at 3.  When Chevron refused (*id.* at 2), Donziger and his co-conspirators sought to submit a motion to the court to postpone based on the unavailability of counsel.  PX 1297 at 2.  But in an email dated April 22, 2010, and sent to the LAPs' counsel, including Donziger, Hanneman refused:

> We do not believe that the bases set forth in the motion are proper grounds to quash a subpoena, therefore, we can't file the motion. . . . We are confident that the Court would find the motion to be filed in bad faith and very likely order sanctions.  I am available to attend the deposition tomorrow on behalf of the Lago Agrio plaintiffs.

*Id.* at 1.[53]  Donziger and his co-conspirators were well-aware that the "natural and probable" effect of their actions would prevent Chapman from testifying—indeed, this was their intention. PX 1292; *see also Quattrone*, 441 F.3d at 176; *United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir. 1974).

Although their attempts to prevent the deposition from taking place were unsuccessful, on April 23, 2010, Chapman claimed that he could not remember anything of substance regarding Stratus's role in drafting the Cabrera report.  Immediately after Chapman's deposition, An-

---

[53] Kornfeld withdrew from the Stratus 1782 action on Monday, April 26, 2010 (PX 676), having represented the LAPs for only a month.

drew Wilson of Emery Celli wrote to Donziger:  "Chapman did an excellent job of not remembering anything . . . ."  PX 1302.  In an internal email sent several weeks after the deposition, Wilson noted that he "emphasized [] a lot for Chapman the need to "water down the comments about connections to Cabrera."  PX 1306 at 1.  Efforts to persuade a witness to provide "an account consistent with the defendant's position but inconsistent with the truth" constitute corrupt persuasion.  *United States v. LaFontaine*, 210 F.3d 125, 132–33 (2d Cir. 2000).  *See* FF ¶ 103.

### c. Defendants and Their Counsel Obstructed This Action by Selectively Producing Documents and Witnesses from Ecuador and Manufacturing a Collusive Lawsuit in Ecuador to Justify Their Misconduct

Defendants' witness tampering and obstruction has continued even into this litigation. As this Court previously determined, the LAP team has threatened and intimidated witnesses in Ecuador.  *See* Dkt. 843 at 14 ("Yanza and Fajardo already have threatened two other Chevron witnesses . . . with slander suits and criminal prosecutions . . ."); *id.* at 15 ("Fajardo has made clear that the LAP team closely monitors 'people tied to Chevron' like [witnesses] Guerra and Reyes . . .").  Defendants have also gone to great lengths to obstruct Chevron's efforts to investigate their fraud, including through the initiation of a collusive lawsuit in Ecuador and the submission of misleading accounts of that lawsuit to this Court.

Facing a motion to compel production of their Ecuadorian documents, the LAP team, at the request of the LAPs' then-U.S. counsel, secretly initiated a proceeding in Ecuador to thwart production of the documents.  Dkt. 1529 at 82–84.  Octavio Ismael Córdova Huanca, one of the non-appearing LAPs, purported to sue Fajardo, seeking a declaration barring Fajardo and others from producing documents.  Fajardo did not contest any of Córdova's arguments and in fact argued himself that "it is clear that this represents a serious threat to the rights of the residents of the Ecuadorian Amazon[.]"  Fajardo falsely claimed that this Court had ordered him to produce documents, and asserted for the first time—in direct contradiction to what he had purportedly

told the LAPs' U.S. counsel—that he intended to comply with Chevron's requests for produc-

tion.  PX 426 at 3–4.  On January 15, 2013, the court entered an order instructing the LAPs' legal

team "NOT TO DELIVER to Judge Lewis A. Kaplan of second district of the State of New

York, or to anyone, any information that they have."  PX 427 at 3; PX 1505 at 3.

But the case was not an attempt to resolve the question of Defendants' obligation to pro-

duce documents.  It was simply the latest of Defendants' efforts to prevent Chevron from obtain-

ing legitimate discovery.  As this Court held:

> At a minimum, this time line reflects the fact that the LAP Representatives' U.S. coun-
> sel—while continuously telling this court that they had asked Fajardo for the LAPs' doc-
> uments—at the same time secretly suggested to him that he initiate a lawsuit in Ecuador
> in an effort to foreclose that very possibility.  And it reveals also that the U.S. lawyers
> were aware of the suit long before they made its existence known to the Court.  In fact,
> they did not inform Chevron or the Court about the lawsuit until they were told Fajardo
> had received his desired result and the injunction had been granted.

Dkt. 1529 at 83–84.

The Court also observed that "[t]his evidence suggests that the LAPs anticipated that the

motion to compel would be decided against them.  They appear to have sought to create a de-

fense in depth against that possibility as well as against the risk of sanctions in the event they

failed to comply.  Those defenses certainly included the *Córdova* action . . . ."  *Id.* at 78.

Defendants have produced only those documents they see as helpful while withholding

everything else up to and through trial.  Mere weeks before the start of trial, for example, De-

fendants produced 29 documents—minutes from Asamblea meetings that were partially redact-

ed—that they included on the list of exhibits they planned to introduce at trial.  Dkt. 1529 at 91.

The documents were clearly responsive to Chevron's document requests, and as the property of

the LAPs, "likely would fall within the definition of materials the production of which was

barred by *Córdova*."  *Id.* at 91–92.  As the Court held, "[t]hat these documents were not dis-

closed until the eve of trial underscores the gamesmanship and bad faith of defendants and their

Ecuadorian counsel when it comes to production of key documents from Ecuador and reveals that their strategy has always been to produce materials when it suits their purposes and is most helpful to their case, notwithstanding Court orders for full production or prejudice to the plaintiff." *Id.* at 92.  *See* FF ¶ 110.

### d.  Defendants' Pattern of Obstructive Conduct is Precisely the Type of Egregious Conduct Meriting Criminal Prohibition

Defendants' conduct is not limited to a few simple discovery violations,[54] but a fraudulent scheme to deceive courts that spanned a number of proceedings and took various forms, including false testimony and witness intimidation.  Criminal laws exist to punish such conduct and to "protect the integrity of the court and the due administration of justice."  *United States v. Lundwall*, 1 F. Supp. 2d 249, 256 (S.D.N.Y. 1998).  Application of these criminal statutes here is especially appropriate because this Court has before it evidence of the full scope of Defendants' corruption, whereas each prior court had only the record of the individual acts committed in that court—a far less developed record then that before this Court.

The "numerous prudential reasons [for which] prosecutors might avoid" prosecuting civil discovery abuses do not mean that "§ 1503 precludes their doing so."  *Id.* at 254.  The Second Circuit has repeatedly affirmed RICO convictions based on the corruptness of a lawyer's actions in civil litigation.  *See United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992); *United States v. Teitler*, 802 F.2d 606 (2d Cir. 1986).  Here, Defendants did more than file pleadings in a bad case; they falsified documents before filing them and bullied witnesses into providing false testimony.  These are felonies, and RICO predicate crimes.

---

[54] Donziger's conduct amounts to obstruction and witness tampering even though it took place in discovery proceedings.  Sections 1503 and 1512 provide no defense for obstruction or tampering that occurs in a civil suit or in discovery, and courts have created no such exception. *United States v. Lundwall*, 1 F. Supp. 2d 249, 250, 256 (S.D.N.Y. 1998) (corporate officials who had withheld and destroyed evidence during civil discovery could be prosecuted under § 1503); *United States v. LeMoure*, 474 F.3d 37 (1st Cir. 2007) (affirming conviction for witness tampering under § 1512 based on pressuring a witness to lie in a civil deposition).

### 5.  Donziger's Bribery of Foreign Officials Violates the Travel Act

Chevron proved that Donziger and his co-conspirators bribed at least two foreign officials, Zambrano and Cabrera, and thereby committed multiple violations of the Travel Act (18 U.S.C. § 1952) in furtherance of their fraudulent scheme.  The Travel Act is an enumerated RICO predicate (18 U.S.C. § 1961(1)), and prohibits the use of "any facility of interstate or foreign commerce" in the furtherance of, *inter alia*, a violation of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-3).

A violation of the FCPA's anti-bribery provisions requires proof of the following elements:

(1)    An act by a covered person, which includes a "domestic concern" such as a U.S. resident, or any officers, directors, employees, agents, or shareholders acting on behalf of the covered person;

(2)    use of the mails or any means or instrumentality of interstate commerce;

(3)    in furtherance of an offer, payment, promise to pay, or authorization to pay money or anything of value;

(4)    to any foreign official or other person, knowing that all or a portion of the payment would be offered, given, or promised to a foreign official;

(5)    to corruptly;

(6)    influence any official act or decision, induce an action or an omission to act in violation of a lawful duty, or to secure any improper advantage; and

(7)    the payment or offer was made to assist in obtaining or retaining business for any person or company or directing business to any person or company.

*See* 15 U.S.C. § 78dd-1 to -3; *Dooley v. United Techs. Corp.*, No. 91-cv-2499, 1992 WL 167053, at *9 (D.D.C. June 17, 1992).

### a.  The Bribes Were Made by Covered Persons

Donziger, a U.S. citizen, as well as his law firms, which are organized under the laws of

New York and have their principal place of business in the United States, are "covered persons" under the FCPA.  15 U.S.C. § 78dd-2(h)(1).  Conduct by Fajardo and Yanza, acting as Donziger's agents, is also within the scope of the FCPA.  *Id*; s*ee also United States v. Bodmer*, 342 F. Supp. 2d 176, 181 (S.D.N.Y. 2004).  *See* FF ¶¶ 44–51, 66–70, 137–42.

> ### b.  Donziger and the LAP Team Used Instrumentalities of Interstate Commerce "In Furtherance" of Their Bribes.

Section 78dd-2(a) requires that a domestic concern, or its agent, "make use of the mails or any means or instrumentality of interstate commerce" in furtherance of the bribe.  "The 'in furtherance' component" of crimes analogous to FCPA violations is "to be broadly read and applied.  If the mailing is 'incident to an essential part of the scheme' the statute is satisfied.  That does not mean, however, that the mailing itself must always be an essential part of the scheme, only that it be incident to an essential part."  *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir. 1986) (citations omitted).  Here, Donziger directed, via interstate email, that Kohn Swift transfer funds, via wire, to the "secret account," in order to pay Cabrera (PX 732; PX 895; PX 901; PX 965), Kohn Swift, acting at Donziger's direction, did so by wire transfer (PX 578; PX 618; PX 901; PX 2427), and Donziger discussed over email with Fajardo, Yanza, and others, the payments to Cabrera (PX 850; PX 888; PX 894; PX 912; PX 913).  This satisfies the jurisdictional element, with respect to the Cabrera bribery.  *See, e.g.*, Information at 19, *United States v. Brown*, No. H-06-cr-316 (S.D. Tex. Sept. 11, 2006) (Ex. J) (alleging that transfer of funds to bank account for use as improper payments for Petroecuador officials satisfied interstate commerce element).  Defendants also used email to circulate the internal work product that they would later incorporate into the judgment, including the Fajardo Trust Email (PX 437), the Fusion Memo (PX 435), and the Moodie Memo (PX 1101).  These were, at the very least, "incident to an essential part" of the scheme—and thus satisfied the jurisdictional requirement for the

Zambrano bribery.  *Draiman*, 784 F.2d at 251.

Moreover, it is also unlawful for "any United States person to corruptly do any act outside the United States in furtherance of an offer, payment, promise to pay . . . irrespective of whether such United States person makes use of the mails or any means or instrumentality of interstate commerce in furtherance of such offer, gift, payment, promise, or authorization."  15 U.S.C. § 78dd-2(i)(1).  While in Ecuador, Donziger met regularly with Cabrera and individuals associated with Cabrera, in furtherance of the bribery plot.  *See* PX 35A; 36A; 39A.  Donziger also met with Guerra in Ecuador, in furtherance of the Defendant's plan to bribe Zambrano.  Tr. (Donziger) 2597:10–2598:3.  This falls within the FCPA's prohibited conduct.  *See* FF ¶¶ 120–21.

### c.  The Offers, Promises, and Payments to Cabrera and Zambrano Were Things of Value

The FCPA criminalizes corrupt payments of "money" and corrupt "offers, gifts, promises to give, or authorizations of the giving of anything of value."  15 U.S.C. § 78dd-2(a).  The statutory term "anything of value" has been construed broadly.  *See, e.g.*, *Rotec Indus. Inc. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1279 (D. Or. 2001) (offer of employment to a foreign official was something of value); *United States v. Liebo*, 923 F.2d 1308, 1311 (8th Cir. 1991) (travel expenses); *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) (both tangible and intangible objects can be deemed "something of value").

It is undisputed that Donziger directed both monetary and nonmonetary payments to Cabrera on multiple occasions.  *See* PX 901; PX 916; PX 965; PX 984.  The evidence establishes that Cabrera received $263,000 through the Ecuadorian court process *plus* thousands of dollars more from Defendants' "secret account" unbeknownst to the Ecuadorian court or Chevron, all at

the direction of Donziger.[55]  Defendants made numerous other payments of "things of value" to Cabrera, including the purchase of life insurance, and provision of an assistant, and possibly, an office.  Donziger testified that the LAPs' counsel had entered into a contract with Cabrera (1/29/2011 Donziger Dep. 3801:23–3803:8), and Fajardo wrote to Donziger to say that Cabrera called "about a little mistake in the contract" while also suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Julio Prieto's girlfriend to be his assistant, that it is the LAPs' "duty to help him get insurance."  PX 877 at 1.  Donziger responded, "I'm on it." *Id*.  Donziger later confirmed that the LAP team did provide Cabrera with life insurance. 1/29/2011 Donziger Dep. 3807:19–3808:23; *see also* PX 881.  *See* FF ¶¶ 44–51.

Defendants also made "offers" and "promises to give" Zambrano the sum of $500,000 in exchange for his signature on the $18 billion judgment they secretly wrote.  And they provided him with the ghostwritten judgment itself—or at the very least, they provided him with legal memoranda, database files, and other material for that judgment, all without going through prop-

---

[55]  7/19/2011 Donziger Dep. 4869:6–16 (Donziger describing court procedures for paying Cabrera); PX 869 (Luis Yanza: "At least $2,000 is required to open the account.  Given the urgency, I suggest you send that amount (or more, 5,000 or 10,000) to my personal account and, I can transfer it to the new secret account."); PX 912 at 1; 7/19/2011 Donziger Dep. 4845:7–14 (Donziger confirming that Yanza would ask for money to be put into the secret account); PX 895 at 1; *see also* PX 2427 (email attaching list of total distributions made from Chevron Litigation Fund revealing payments of $50,000 to Frente de Defensa de la Amazonia on August 15, 2007 and September 14, 2007); 1/29/2011 Donziger Dep. 3805:8–12 ("Q. Am I correct, Mr. Donziger, that the plaintiffs' team had a nickname for Mr. Cabrera? He was called Wao, correct? A. Yes."); 3/23/2011 Donziger Dep. 4327:15–20 ("Q. And Wao was the code name that was used to refer to Mr. Cabrera in some e-mail communications that you and other members of the plaintiffs' team had, correct?  A. Yes."); PX 913 ("[S]end us money to the secret account, to give it to the Wuao and if not, the work stops."); PX 871; PX 917; PX 1134 ("The economic subject is chaotic . . . [t]he wao is also very uncomfortable (and this is dangerous) . . ."); PX 344 (6/28/2007 LAP filing attaching check from Selva Viva to Cabrera in the amount of $59,349.00); PX 349 (10/10/2007 LAP filing attaching check from Selva Viva to Cabrera in the amount of $47,000.00); PX 356 (11/28/2007 LAP filing attaching check in the amount of $30,000 for Cabrera, paid by Selva Viva); PX 361 (1/30/2008 LAP filing attaching payment to Cabrera for $25,000, paid by Selva Viva); PX 620 at 16 (4/7//2008 LAP filing submitting check for $9,000 paid for by Selva Viva); PX 367 (5/12/2008 LAP filing submitting $33,000 payment to Cabrera, paid by Selva Viva); PX 369 (9/3/2008 LAP filing submitting payment to Cabrera for $12,000, paid by Selva Viva); PX 370 (12/9/2008 LAP filing submitting payment to Cabrera for $13,550, paid by Selva Viva); PX 376 (7/6/2009 LAP filing submitting payment of $10,000.00 to Cabrera); PX 378 (10/19/2009 LAP filing submitting payment of $25,000.00 to Cabrera); *see, e.g.*, PX 302 (12/15/2008 Cabrera filing requesting payment of $42,915 purportedly for "preparing clarifications to my report, the hiring of experts in various areas of science . . . in addition to some logistical details, such as the letting of offices, service of assistants, and more"); PX 350 (10/15/2007 Cabrera filing requesting $97,000 "to cover the costs required for supplementing the expert examination").

er court channels.  The evidence of the LAPs' illicit influence on the judgment is unrebutted:

The LAP team's fingerprints are all over the judgment (*see supra* Argument Section I.C.1.f.i.),

and Zambrano was unable to explain how that was the case (*see supra* Argument Section

I.C.1.f.iii.).  Alberto Guerra's testimony about Defendants' bribery, which is corroborated in

numerous respects and was not effectively challenged on cross-examination, provides the only

evidence in the record to explain the LAP team's influence over the content of the judgment (*see*

*supra* Argument Section I.C.1.f.ii.).  Moreover, his testimony firmly implicates both Donziger

and Fajardo.  At Zambrano's instruction, Guerra met with Donziger and Fajardo to propose a

$500,00 bribe—which Donziger himself confirmed at trial.  PX 4800 (Guerra) ¶ 42; Tr. (Guerra)

995:6–22; Tr. (Donziger) 2597:10–2598:23.  Guerra testified that while Donziger appeared "in-

terested" in the proposal, he told Guerra that the LAP team did not currently have the requested

$500,000 for the bribe.  PX 4800 (Guerra) ¶ 42; Tr. (Guerra) 996:7–14.  Zambrano and Fajardo

ultimately entered into a direct engagement whereby Fajardo promised Zambrano $500,000 from

any monies recovered through enforcement of the judgment in exchange for the LAP team

ghostwriting the judgment.  PX 4800 (Guerra) ¶ 43; Tr. (Guerra) 1000:15–23, 1001:8–12.  De-

fendants could have brought Pablo Fajardo to testify, but did not, from which the Court should

draw an adverse inference that his truthful testimony would have confirmed Guerra's account.

*See* Dkt. 1529 at 99–102.  *See* FF ¶¶ 66–70.

### d.  Cabrera and Zambrano were "Foreign Officials"

The FCPA defines "foreign official" as

> any officer or employee of a foreign government or any department, agency, or instru-
> mentality thereof, or of a public international organization, or any person acting in an of-
> ficial capacity for or on behalf of any such government or department, agency, or instru-
> mentality, or for or on behalf of any such public international organization.

15 U.S.C. § 78dd-3(f)(2)(A).  Cabrera was a court-appointed expert who acted as an officer of

the Ecuadorian court; in the words of the Lago Agrio court itself, "[t]he Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth."  *See, e.g.*, PX 348.  As an officer of the Ecuadorian court, Cabrera qualifies as a "foreign official" for purposes of the FCPA.[56]  As Zambrano was a sitting judge at all relevant times, he, too, was a "foreign official."

### e.  Donziger's Payments and Offers Were Made Corruptly

The FCPA criminalizes corrupt payments or offers of anything of value to foreign officials or any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to a foreign official.  15 U.S.C. § 78dd-2(a)(1-3).  The courts have defined the FCPA's *mens rea* element, "corruptly," as acting "knowingly and dishonestly, with the specific intent to achieve an unlawful result by influencing a foreign public official's action in one's own favor."  *United States v. Kay*, 513 F.3d 432, 449 (5th Cir. 2007) (internal quotations omitted).

Donziger and the LAP Team were well aware that their payments to Cabrera were dishonest.  They referred to Cabrera using a codename ("Wao"), paid him from a "secret account," instructed Crude cameramen that Cabrera's presence at the planning meeting was "off the rec-

---

[56] Although there do not appear to be any cases addressing whether a judicial officer is a "foreign official" under the FCPA, Cabrera's status as a "foreign official" under the statute's plain language is confirmed by a decision addressing whether a state-owned enterprise is a "foreign instrumentality" within the FCPA's definition of "foreign official."  In *U.S. v. Aguilar*, 783 F. Supp. 2d 1108 (C.D. Cal. 2011), the court listed the three factors:  (1) "The officers and directors of the entity are, or are appointed by, government officials;" (2) "The entity is vested with and exercises exclusive or controlling power to administer its designated functions;" and (3) "The entity is widely perceived and understood to be performing official (i.e., governmental) functions."  *Id.* at 1115.  Cabrera meets all three of these *Aguilar* factors.  He was "appointed by" the court, a government entity.  He was "vested with and exercise[d] exclusive or controlling power" in completing the global damages report.  Indeed, Cabrera declared himself to be the "highest authority" in that assessment.  In that role, Cabrera acted as an "officer," "auxiliary" and "adjunct" of the court, working in an official capacity for the court—as the LAPs' team, the Ecuadorian court, and Cabrera himself acknowledged in writing.  Finally, Cabrera perceived himself—and was perceived by the court and the parties—to have the role of performing official functions on behalf of the court.  PX 496# (ChevronToxico article referring to Cabrera as a "court-appointed special master" and stating that "[a]ttacks against special masters . . . are considered attacks on the court itself").

ord," and fretted that if their collusion with Cabrera was disclosed they might all "go to jail."  PX

1279.  *See supra* Argument Section I.C.1.d.v.

Likewise, there is no question that Donziger and the LAP Team knew their offers and

promises of payment to Zambrano were dishonest—there is no contention in this case or basis to

infer that it was legal to bribe Zambrano to issue a ghostwritten judgment.  *See* FF ¶¶ 44–51, 66–

70.

### f.   Donziger and the LAP Team's Bribes Were to Influence Official Acts or Decisions and to Secure an Improper Advantage

There can be no doubt that the bribes given to Cabrera and offered to Zambrano were to

influence their official acts and decisions, and to secure an improper advantage.  As U.S. regula-

tors have stated, payments made to judicial officials for "favorable action on pending cases" are

payments to "secur[e] an improper advantage."  Plea Agreement at 12, *United States v. Brown*,

No. H-06-cr-316 (S.D. Tex. Sept. 14, 2006) (Ex. J).

Donziger and the LAP Team, as described above, paid Cabrera thousands of dollars "off

the books"—payments that were clearly improper.  But even their payments to Cabrera of

$263,000 through the court process influence his official acts and decisions, because Cabrera did

not actually do any work to justify those payments.  For years, Defendants have argued that

Cabrera, in accordance with Ecuadorian law, independently reviewed the reports the LAP team

wrote for him and, finding them credible, adopted those reports.  Not once, however, have De-

fendants offered any evidence that Cabrera exercised any independent judgment, reviewed "his"

reports in any detail, or even read them.  Offered one last chance to come clean, Donziger, in his

witness statement, admitted improprieties but maintained the lie that Cabrera merely "adopt[ed]"

the reports.  DX 1750 (Donziger) ¶ 94.  But the undisputed evidence establishes that the LAP

team paid Cabrera for work he did not do.  Any payments, whether through the Ecuadorian court

process or not, were therefore improper and made for the purpose of influencing his acts and decisions, and to secure an improper advantage.

The promised payment of $500,000 to Zambrano was also for the purpose of influencing his official acts and decisions, and to secure an improper advantage.  It is difficult to imagine a more "improper advantage" for an attorney than the right to write the judgment in his client's favor.  Yet this was the purpose of the promised payment to Zambrano, and the evidence demonstrates that the LAP Team in fact ghostwrote the judgment in their favor.  *See supra* Argument Section I.C.1.f.i–ii.  That the LAP team offered the bribe in exchange for the opportunity to ghostwrite the judgment establishes that the offer was for the purpose of influencing an act or decision.  And the fact that the issued judgment awarded the LAPs billions and contained the LAP team's unfiled work product confirms that the offer was made to influence the decision.  *See supra* Argument Section I.C.1.f.i. .  *See* FF ¶¶ 44–51, 66–70.

### g.  The Bribes Were for a Business Purpose

The "business purpose test" should be interpreted broadly.  "Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person . . ."  *United States v. Kay*, 359 F.3d 738, 755 (5th Cir. 2004).  The FCPA does not only apply when the payor is seeking a government contract; it also prohibits bribes that would "indirectly assist in obtaining business or maintaining existing business operations in a foreign country."  *Id*. at 756.  The FCPA has been held to prohibit behavior such as bribing tax officials to secure illegally reduced customs and tax liability (*id.* at 755), bribing officials to ensure that the country would privatize its oil company and ensure that defendants could participate in the privatization (*United States v. Kozeny*, 493 F. Supp. 2d 693, 713 (S.D.N.Y. 2007)), and bribing customs officials to wrongfully issue import permits. (*S.E.C. v. Jackson*, 908 F. Supp. 2d 834, 852 (S.D. Tex 2012)).  And the U.S. government has

regularly taken the position that bribes to court officials satisfy the business purpose test.  *See* Information at 6-9, 14, *United States v. Pride Forasol S.A.S.*, No. 4:10-cr-771 (S.D. Tex. Nov. 4, 2010) (Ex. I) at 13–14 (alleging that bribery of an Indian judicial officer qualified as an effort to obtain or retain business); *see also* Plea Agreement at 12, *United States v. Brown*, No. H-06-cr-316 (S.D. Tex. Sept. 14, 2006) (Ex. J) at 12–13 (stating that bribes paid to Nigerian court officials provided a business advantage to Willbros' Nigerian subsidiaries); *SEC v. Montedison, S.p.A.*, Civil Action No. 1:96CV02631, SEC Litigation Release No. 16948 (D.D.C. Mar. 30, 2001) (Ex. K) (settling FCPA accounting-related charges against an Italian company that traded securities on the New York Stock Exchange for bribing Italian government officials in part to overturn an adverse judicial decision); FCPA Opinion Procedure Release No. 07-03 (Dec. 21, 2007) (Ex. L) (government "assumed" that the requestor's payment of foreign court fees to administer her relative's estate (and presumably to receive her portion of assets) would satisfy the business nexus requirement).

Donziger's business is that of a contingency-fee lawyer.  As he described it, he is in "[t]he business of plaintiffs' law.  To make fucking money."  PX 57A at 3.  His actions in structuring offshore trust accounts and "waterfall" payments to litigation funders—whereby he and the funders will be paid before any money would be spent on remediation—demonstrate that his endeavor is a business.  Bribes to government officials to assist a business, even if indirectly, are prohibited by the FCPA.  *Cf. Kozeny*, 493 F. Supp. 2d at 713 (holding that "[i]n light of the broad construction that Congress intended courts to apply to the business nexus element," payments made to a foreign official to induce the official to make available a "lucrative investment opportunity" satisfied the business nexus requirement).

Donziger's pursuit of the judgment was also for the purpose of "indirectly" "obtaining or

retaining business for" others.  He pledged to obtain remediation contracts for his co-conspirators once the judgment was handed down.  He told Fernando Reyes that "if he served as the global court expert and the Lago Agrio plaintiffs won the case, he would work for the rest of his life in the cleanup phase."  12/08/2012 Donziger Dep. 963:17–24; PX 191 at 4.  He and the LAP Team ghostwrote a judgment that awarded over $8.6 billion to the Amazon Defense Front for the purposes of overseeing the remediation.  PX 400 at 179–84; PX 4900R (Dahlberg) ¶ 131.  These are core business purposes that are well within the FCPA's prohibitions.

### D.  These Acts of Racketeering Form a Continuous and Related Pattern

To be liable under RICO, Defendants must conduct the affairs of the enterprise through a "pattern of racketeering activity."  18 U.S.C. § 1962(c).  The statute defines "pattern of racketeering activity" as at least two acts of racketeering activity ("predicate acts") committed within a ten year period.  18 U.S.C. § 1961(5); *see also Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997).  A plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S. Ct. 2893, 2900 (1989).

The "pattern" element of RICO is a "fairly flexible concept," and "the precise methods by which relatedness and continuity or its threat may be proved, cannot be fixed in advance." *H.J. Inc.*, 492 U.S. at 239, 243, 109 S. Ct. at 2900, 2902.  "'[C]ontinuity' means that separate events occur over time and perhaps threaten to recur, while 'relatedness' means—given that different acts of racketeering have occurred—that there is a way in which the acts may be viewed as having a common purpose."  *Proctor & Gamble Co. v. Big Apple Industr. Bldg. Inc.*, 879 F.2d 10, 17 (2d Cir. 1989).  These concepts serve to "ensure that the wrongful activity alleged is neither sporadic nor isolated, and that the acts have similar or common purpose and direction."  *Id.*; *see also United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989).

194

### 1. Relatedness

"[The] predicate acts must be related, both to each other (horizontal relatedness) and to the enterprise (vertical relatedness) . . ." *United States v. Basciano*, 599 F.3d 184, 202 (2d Cir. 2010).  The "relatedness" requirement is satisfied where the predicate acts have "the same or similar purposes, results, participants, victims or methods of commission, or otherwise are inter-related . . ." *H.J. Inc.*, 492 U.S. at 240, 109 S. Ct. at 2901; *see also, e.g.*, *Proctor & Gamble*, 879 F.2d at 16.

Multiple acts of racketeering in furtherance of a single scheme may constitute a "pattern" sufficient for RICO liability.  *United States v. Daidone*, 471 F.3d 371, 374–75 (2d Cir. 2006) (citations omitted) (stating that the Second Circuit has interpreted the term "pattern of racketeering activity" to mean "multiple racketeering predicates —which can be part of a single 'scheme'").[57] "'Relatedness' means . . . given that different acts of racketeering have occurred—that there is a way in which the acts may be viewed as having a common purpose."  *Proctor & Gamble*, 879 F.2d at 17, 19 (finding sufficient relationship where the various predicate acts of the defendants all served the same goal of "fleecing the same victims"); *see also, e.g.*, *Indelicato*, 865 F.2d at 1384 (finding sufficient relationship where three murders were committed with the same goal of changing the leadership of a crime family).

Here, Defendants' predicate acts related both to each other and to the enterprise—they involved the same participants, results, and victim, as each furthered Defendants' broader

---

[57] In his motion to dismiss, Donziger argued that Chevron's RICO claim should be dismissed because it alleged only "a single, even if wide-ranging, effort to extort Chevron[.]" Dkt. 303 at 6.  The Court correctly rejected that argument on two grounds.  *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 246 (S.D.N.Y. 2012) ("There are at least two flaws fatal to this argument.").  First, Chevron alleged—as it has now proven—that Donziger committed numerous other predicate acts besides extortion, including multiple instances of wire fraud, money laundering, and obstruction of justice. *Id*. at 246–47.  Second, the Supreme Court has adopted reasoning from the Second Circuit rejecting the argument that "'a RICO violation cannot be established without proof of more than one scheme, episode, or transaction[.]'"  *Id*. at 247 (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc)).

scheme to obtain a payoff from Chevron.  *See supra* Argument Section I.C.1.e.

## 2.  Continuity

The racketeering predicates must not only be related, but also amount to continued criminal activity.  *H.J. Inc.* 492 U.S. at 240, 109 S. Ct. at 2901.  Continuity can be either closed-ended or open-ended, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *Id.* at 241, 109 S. Ct. at 2902.  Thus, continuity may be satisfied where the predicate acts have extended over a substantial period of time or where the activity threatens to continue into the future.  *Id.* at 242, 109 S. Ct. at 2902.  Here, Chevron has proven both types of continuity.

### a.  Defendants' Pattern Is of Sufficient Longevity to Satisfy Closed-Ended Continuity

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  *H.J. Inc.*, 492 U.S. at 242, 109 S. Ct. at 2902.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."  *Id.*  Sufficient continuity has been found where "numerous" unlawful acts occurred with regularity over at least fifteen months.  *See Cosmos*, 113 F.3d at 310.

In this case, Defendants' scheme extended over a number of years:  Defendants' complaint in Ecuador was filed in 2003, the Cabrera report was filed in 2008, and Defendants continue to attempt enforcement of the fraudulent judgment in jurisdictions across the world to this day.  *See infra* Argument Section II.C.4.  Thus, Defendants' scheme meets the closed-ended continuity criterion.

### b.  Defendants' Pattern Is Open Ended Because it Continues With No Sign of Abatement

"[C]ontinuity may be demonstrated in various ways, such as from the nature of the enter-

prise . . . or from the sheer number of predicate acts over several years, or from the number of schemes." *Proctor & Gamble*, 879 F.2d at 16.  "[A]n inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity."  *GICC Capital Corp. v. Tech. Fin. Grp.*, 67 F.3d 463, 466 (2d Cir. 1995).  "Where the nature of the conduct or the enterprise does not by itself suggest that the racketeering acts will continue, courts must look to other external factors."  *Id.*  Thus, in *Beauford v. Helmsley*, 865 F.2d 1386, 1392–93 (2d Cir. 1989), the court found that "there [could] be no question that the thousands of alleged mail frauds" at issue in the case—fraudulent mailings designed to increase the defendants' profits in a condo conversion project—satisfied the continuity requirement because of the likelihood that the defendants would send similar mailings in the future.  .

Here, Defendants themselves state that the enterprise will continue:  Defendants' Ecuadorian co-conspirators issued numerous statements throughout this trial noting that they will continue to attempt to enforce the Lago Agrio judgment regardless of the actions of this Court.  *See* PX 7033A at 3–4 ("the No. 1 priority is enforcement"); Tr. (H. Piaguaje) 2677:5–11; *see also* Dkt. 1646 at 1 n.1 (10/31/13 Donziger Letter to Court:  "I will not be in court on Thursday of this week due to my attendance at an appellate argument related to the Canadian enforcement proceeding.").

### E.  This Pattern of Racketeering Activity Has Injured Chevron

18 U.S.C. 1964(c) requires proof that a person was "injured in his business or property by reason of a violation of section 1962."  *See also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  Chevron was forced to spend millions of dollars in attorneys' fees it would not otherwise have spent to uncover Defendants' fraudulent scheme.  *See* PX 3000 (Veiga) ¶ 125; Dkt. 1657.  Likewise, Chevron was forced to spend millions of dollars in attor-

neys' fees it would not otherwise have spent as a result of Defendants' efforts to delay and obstruct Chevron from uncovering Defendants' fraudulent scheme. *See infra* Requested Relief Section I.A.; Dkt. 1657. Chevron has been forced to spend at least $1 million in attorneys' fees it would not otherwise have spent as a result of Defendants' efforts to enforce the Lago Agrio Judgment. *See infra* Requested Relief Section I.A.; PX 432 at 2; PX 3000 (Veiga) ¶ 132; *see also* Tr. (J. Piaguaje) 2399:19–25; Dkt. 1646 at 1 n.1. And based on the false premise that the assets of Chevron subsidiaries may be "deemed" assets of Chevron Corporation, Defendants have caused the seizure of a Chevron subsidiary's trademarks in Ecuador, including the Chevron logo itself, causing between $15,703,986 and $23,195,020 in damages. PX 6000 (Anson) ¶ 48. *See* FF ¶¶ 98–102, 124–28.

### F. Defendants' Conduct Affected Interstate and Foreign Commerce

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Only a *de minimis* effect on interstate commerce is required to satisfy the interstate commerce element of RICO. *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 1981).

In their effort to obtain a billion-dollar settlement from Chevron, Defendants' enterprise engaged extensively in both interstate and foreign commerce. Forensic accountant Troy Dahlberg reviewed thousands of bank and wire transfer records and testified that "individual investors, law firms, and litigation investment firms contributed approximately $16 million" to fund the LAP team's efforts related to the Ecuadorian litigation. PX 4900 (Dahlberg) ¶ 5. Donziger even represented to the Asamblea that this amount was much higher, indicating that after Kohn's withdrawal "approximately 25 million has come in." PX 7033A at 2; Tr. (H. Piaguaje) 2693:15–

198

2694:12.  Testimony by Kohn and Bogart confirmed that these funds were primarily raised in the United States (PX 5600 (Kohn) ¶ 9; PX 3100 (Bogart) ¶ 4), and then funneled to the LAPs' attorneys, consultants, publicists, lobbyists, and other supporters domiciled across the United States and in Ecuador (PX 4900 (Dahlberg) ¶ 7).  Defendants have not and indeed cannot dispute that they engaged in interstate and foreign commerce through the generation and distribution of funding for activities related to the Ecuadorian litigation.

Furthermore, Defendants activities "affected" interstate and foreign commerce.  Chevron's "paramount business" is producing energy for the United States and the world" (PX 5800 (Zygocki) ¶ 20), and it remains "commit[ed] to cultivating and maintaining a positive reputation with a wide range of stakeholders around the world."  *Id.*  As Rhonda Zygocki, Chevron's Executive Vice President of Policy and Planning, testified, Defendants' attempts to extort billions of dollars from Chevron "imposed significant, irretrievable costs in the form of diverted time, attention and focus" from Chevron's "paramount business of producing energy" and maintaining its reputation in the United States and around the world, necessarily affecting both interstate and foreign commerce.  Zygocki further testified that Donziger's unfounded attacks affected interstate commerce by "undermin[ing] [Chevron's] ability . . . to compete for new opportunities, and to maintain trust within the communities in which [Chevron] operate[s]."  *Id.* ¶ 22.

### G.  Donziger's Liability Does Not Require Extraterritorial Application of RICO

Courts have taken two general approaches to determining whether a putative application of RICO is impermissibly extraterritorial.  Chevron's RICO claims are proper under both.

This Court has adopted a test focusing on the "pattern of racketeering activity and its consequences," and has already held that Chevron's complaint does not seek extraterritorial application of RICO under that test.  Chevron has now proven the RICO claims that this Court approved at the pleading stage, and its claims are not extraterritorial.  Defendants' domestic predi-

cate acts alone constitute a pattern of racketeering that has proximately caused injury to Chevron, thus satisfying even the most restrictive potential application of a "pattern" test.  Moreover, the inclusion of foreign elements in Defendants' broader pattern does not remove the pattern as a whole from RICO's reach.  Finally, although this Court earlier rejected an "enterprise"-based test for determining the extraterritoriality question, Chevron has also proven that the enterprise Donziger has operated and controlled is located in the United States.

### 1.   Chevron Has Proven a Domestic Pattern of Racketeering Activity

This Court has held that, for purposes of determining whether a putative application of RICO is impermissibly extraterritorial, "the focus properly is on the pattern of racketeering activity and its consequences."  *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012).  Therefore, "[i]f there is a domestic pattern of racketeering activity aimed at or causing injury to a domestic plaintiff, the application of Section 1962(c) to afford a remedy would not [be] an extraterritorial application of the statute."  *Id.*; *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154, 107 S. Ct. 2759, 2766 (1987) ("[T]he heart of any RICO complaint is the allegation of a *pattern* of racketeering.").  At least one Court of Appeals has reached a similar conclusion, holding that "to determine whether [a defendant's acts] are within RICO's ambit, we look at the pattern of [the defendant's] racketeering activity taken as a whole." *United States v. Chao Fan Xu*, 706 F.3d 965, 978 (9th Cir. 2013); *see also Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 165 (D.D.C. 2013) (agreeing with *Chao Fan Xu*); *Borich v. BP, P.L.C.*, 904 F. Supp. 2d 855, 862 (N.D. Ill. 2012); *CGC Holding Co., LLC v. Hutchens*, 824 F. Supp. 2d 1193, 1209–10 (D. Colo. 2011).

That the pattern of racketeering activity should determine the extraterritoriality *vel non* of a particular application of RICO makes the best sense of the Supreme Court's decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010).  *Morrison* makes plain that "to ask what

conduct [a statute] reaches is to ask what conduct [that statute] prohibits." *Id.* at 2877.  Although the Court swept away the old "conduct" and "effects" tests used to resolve the extraterritoriality question in cases under 15 U.S.C. § 10(b) (tests that had also been used in RICO cases), that does not mean that the defendant's conduct has no special relevance.  *Morrison* rejected the "conduct" test because, like the "effects" test, it had no "textual or even extra-textual basis" but was instead based on a court's view of "whether it would be reasonable (and hence what Congress would have wanted) to apply the statute." *Id.* at 2879.

Here, the text of relevant part of RICO sets forth the conduct that violates it: "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Congress presumably was concerned in passing RICO with both enterprises and patterns of racketeering activity, but the "conduct [the statute] prohibits," the action "the statute seeks to regulate," *Morrison*, 130 S. Ct. at 2879, 2884, is the "conduct or participat[ion] . . . in the conduct of [the] enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  The affairs conducted, of course, are those of the enterprise, but the punishable misdeeds consist in a particular form of conducting those affairs—that is, through a pattern of racketeering activity.  And Congress was plainly not seeking to outlaw enterprises—it is conduct, not organization, that brings an enterprise within reach of RICO. *Cf. United States v. Console*, 13 F.3d 641, 653 (3d Cir. 1993) ("[T]he activity of a RICO enterprise need not be entirely illegal.").

As explained below, the pattern Chevron has proven, considered as a whole, is domestic and therefore constitutes a RICO violation.  In denying Donziger's motion to dismiss, this Court raised, but did not need to resolve, the question of whether a pattern-based test "must be limited to patterns that are entirely domestic in nature," or whether it is appropriate to consider the pat-

tern as a singular unit and assess whether, as a whole, it constitutes a domestic course of racketeering activity. *See Donziger*, 871 F. Supp. 2d at 245 n.63 ("The application of the statute to patterns of racketeering activity therefore perhaps must be limited to patterns that are entirely domestic in nature . . . ."). Even if an entirely domestic pattern requirement were the correct approach, and several courts have declined to so limit the pattern-based test, Chevron has proven a domestic pattern of racketeering activity under RICO.[58]

### a. The Wholly Domestic Predicate Acts Alone Suffice to Prove Chevron's RICO Claims

Defendants' predicate acts in the United States make up a domestic pattern of racketeering activity that proximately caused Chevron harm. Thus, even if this Court excludes all foreign activity from consideration, here the domestic predicate acts are more than enough to prove Chevron's RICO claims.

Even though Defendants' broader scheme includes some misconduct and events in Ecuador, it is not the case "that *any* international activity will doom an otherwise domestic [RICO] claim." *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 943 (N.D. Cal. 2012); *see also CGC Holding Co., LLC*, 824 F. Supp. 2d at 1209 (rejecting the contention that "RICO is inapplicable merely because some of the participants in the enterprise reside outside the United States"). Courts have declined to extend RICO to cover U.S. conduct that is incidental to a foreign scheme, such as where the connection between the RICO scheme and the United States is limited to the movement of money in and out of U.S. bank accounts. *Cf. Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, No. 12 Civ. 9070 (LLS), 2013 WL 3936191, at *3 (S.D.N.Y. July 30, 2013) ("The American trustee merely transferred the payments through two

---

[58] Such a limitation would have to account for predicate acts which themselves apply to conduct with a foreign component, such as money laundering (18 U.S.C. § 1956(a)(2)(A)) and the Travel Act (18 U.S.C. § 1952).

banks in New York."); *Sorota v. Sosa*, 842 F. Supp. 2d 1345, 1350 (S.D. Fla. 2012) ("Thus, the enterprise operated entirely in Peru, with its only connection to the United States being that the funds it possessed originated from (and possibly returned to) a Florida bank account."); *United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 29 (D.D.C. 2011) ("[I]solated domestic conduct does not permit RICO to apply to what is essentially foreign activity."); *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 472 (S.D.N.Y. 2010) (domestic allegations "limited to the movement of funds into and out of U.S.-based bank accounts").  But such is not the case here.

As previously explained, Donziger, a New York lawyer working out of his home office, has operated, managed, and led a scheme to extort a payment from Chevron, a U.S. company, by arranging for Chevron to be threatened with a pressure campaign based on misrepresentations and fabricated documents.  *See supra* Argument Section I.B.2., I.C.1.e.  The misrepresentations that constitute the engine of the extortionate pressure campaign were made in the United States to U.S. media, the U.S. Congress, state and federal investigatory bodies, and in meetings of and resolutions presented to Chevron's shareholders.  *See supra* Argument Section I.C.1.e.  And the fabricated documents—the forged Calmbacher reports, the ghostwritten Cabrera report, and the judgment itself—were either fabricated in the United States or adverse inferences are appropriate to that effect.[59]  *See supra* Argument Section I.C.1.c–d.  Donziger and the rest of the enterprise made substantial use of the interstate wires and mails in furtherance of this misconduct.  *See supra* Argument Section I.C.2.b.  Donziger and his allies then attempted to conceal their misconduct by improperly resisting discovery in the Section 1782 actions Chevron brought by filing false evidence like the Fajardo declaration (written by Patton Boggs in this country and signed by Fajardo in Donziger's New York apartment), making misrepresentations in U.S. court filings,

---

[59]  *See* Dkt. 1529 at 99–102.

and otherwise obstructing the federal-court discovery process.  *See supra* Argument Section

I.C.4.a.  Finally, Donziger and others made use of the wires to lie to U.S. funders like Joseph

Kohn and Christopher Bogart—the latter at a critical time, when it looked like the revelations

from the Section 1782 discovery might sink the scheme—in order to obtain funds that were then

wired to Ecuador to perpetuate the fraudulent litigation there.  *See infra* Argument Section

II.C.1–2.  All these predicate acts in the United States proximately caused Chevron numerous

forms of harm.  *See infra* Requested Relief Section I.B.

      In short, even if "[t]he application of [RICO] to patterns of racketeering activity . . . must

be limited to patterns that are entirely domestic in nature," an interpretation this Court raised (but

did not adopt) in denying the Donziger's motion to dismiss Chevron's RICO claims, *Donziger*,

871 F. Supp. 2d at 245 n.63, here Defendants' predicate acts in the United States are inde-

pendently sufficient to establish Chevron's RICO claims.  This case is thus akin to *Pasquantino*

*v. United States*, 544 U.S. 349, 125 S. Ct. 1766 (2005), in which the Supreme Court upheld, over

an extraterritoriality challenge, wire fraud convictions of defendants who ordered liquor by

phone from a store in the United States with the intent to smuggle it into Canada.  "The

*Pasquantino* Court said that the petitioners' 'offense was complete the moment they executed the

scheme inside the United States,' and that it was 'this domestic element of petitioners' conduct

that the Government is punishing.'"  *Morrison,* 130 S. Ct. at 2887 (quoting *Pasquantino*, 544

U.S. at 371, 125 S. Ct. at 1780 (alterations omitted)); *see also id.* (wire fraud statute "prohibits

'any scheme or artifice to defraud,'—fraud *simpliciter*, without any requirement that it be 'in

connection with' any particular transaction or event.").

      **b.   Taken as a Whole, the Pattern of Racketeering Activity Here Is Domestic**

      This Court need not limit its analysis to purely domestic acts.  RICO punishes not predi-

cate acts but, rather, a pattern of racketeering activity.  Thus, this Court should focus on "the pat-

tern of [the defendants'] racketeering activity taken as a whole." *Chao Fan Xu*, 706 F.3d at 978; *see also CGC Holding Co., LLC*, 824 F. Supp. 2d at 1209–10.  For example, in cases holding that a putative application of RICO was extraterritorial, courts have disregarded incidental U.S. acts, even predicate acts, either because they did not proximately cause the plaintiff harm, *see, e.g.*, *Cedeño v. Castillo*, 457 F. App'x 35, 37–38 (2d Cir. 2012); *Hourani*, 943 F. Supp. 2d at 167, or because the "thrust of the pattern of racketeering activity" was not directed at the United States.  *Republic of Iraq v. ABB AG*, 920 F. Supp.2d 517, 546 (S.D.N.Y. 2013).

But where the pattern of racketeering activity in the United States *does* proximately harm the plaintiff, and where the thrust of the pattern *is* directed at the United States, the pattern as a whole should be considered a domestic one.  Applying a "pattern-based" test for extraterritoriality that it derived in part from this Court's opinion in this action, the Ninth Circuit upheld the RICO convictions of Chinese defendants who had engaged in a two-part racketeering scheme. *Chao Fan Xu*, 706 F.3d at 994.  In *Chao Fan Xu*, first the defendants embezzled money from the Bank of China through various frauds, concealing their misconduct by falsifying bank records in China, and then transferred the money to an account in Hong Kong.  Second, the defendants transferred the stolen funds to the United States and, using counterfeit visas and passports based on fake marriages to U.S.-resident spouses, traveled to this country to gamble with the stolen money.  The defendants then fled to the United States when their fraud was discovered in China. *See id.* at 972–73, 978.

The Ninth Circuit held that, although the defrauding of the Bank of China was beyond the reach of RICO independently, the "second part" of the RICO scheme "bound the [d]efendants' enterprise to the territorial United States. . . .  By conspiring to enter and hide out in the United States with the fruit of their ill-gotten gains, [d]efendants engaged in an enterprise that had the

implicit goal to breach United States immigration law in furtherance of the overall goal of the enterprise," which the court described as "to steal large sums of money from the Bank of China and to get away with it in the United States."  *Chao Fan Xu*, 706 F.3d at 978–79.  The latter piece was critical:  "Without the immigration fraud, the bank fraud would have been a dangerous failure."  *Id.* at 979.

Here, as in *Chao Fan Xu* and similar cases, "the conduct of the enterprise within the United States was a key to its success."  *CGC Holding Co.*, 824 F. Supp. 2d at 1210.  The goal and consummation of the scheme was to attempt to extort a payment from Chevron through a pressure campaign of falsehoods and intimidation through media, governmental bodies, and Chevron's own corporate governance structure.  *See* PX 2413.  An extensive course of wire fraud, mail fraud, and extortion in the United States characterizes this aspect of the scheme.  *See supra* Argument Sections I.C.1.e, I.C.2.b.  Much of the basis for the fraudulent statements was evidence fabricated in whole or in part in the United States, principally the Cabrera report.  *See supra* Argument Section I.C.1.d.  The manufactured evidence was later filed in the Ecuadorian lawsuit, which allowed it to have the imprimatur of a court filing, but its genesis and ultimate intended use were in the United States.  The fraud in Ecuador was part of the larger campaign of extorting Chevron, just as the lawsuit in Ecuador was a tool to generate court-stamped "reports" or "findings" for use in that extortionate scheme.  *See, e.g.*, PX 310; PX 399.  To paraphrase *Chao Fan Xu*, the misconduct in Ecuador would not have served Donziger's and his co-conspirators' purposes without an extortionate pressure campaign to convince Chevron to pay.  Moreover, without the fraudulently obtained funding and obstruction of justice by which the entire scheme was supported and concealed, it "would have been a dangerous failure."  706 F.3d at 979.

In this Court's opinion on Donziger's motion to dismiss, it recalled "the so-called 'Pizza Connection' case, [which began with] a decision by members of the Sicilian Mafia to begin shipping narcotics to the United States and their development of a distribution network in this country." 871 F. Supp. 2d at 242. The analogy between that case, in which all but one of the RICO convictions were affirmed, and this case is an apt one. The former involved a scheme in which Sicilian Mafia members produced heroin in Italy and smuggled it into the New York area for distribution (using pizzerias) at the direction of the American Mafia. *See United States v. Casamento*, 887 F. 2d 1141, 1148–49 (2d Cir. 1989). There, as here, the RICO enterprise produced assets abroad—in *Casamento* drugs made in Sicily, here the issuance or filing in Ecuador of fraudulent court documents. But the assets were made use of through racketeering acts in the United States, at the direction of American mob bosses here. The racketeering in the United States in both cases was the purpose and intended use of the foreign activity, and it is the domestic part of the pattern that harmed the victim or victims, making "the pattern . . . taken as a whole" domestic. *Chao Fan Xu*, 706 F.3d at 978.

In short, whether on a strict view of extraterritoriality—analyzing only those predicate acts that occurred in the United States—or in view of the pattern as a whole, the pattern of racketeering activity Chevron has proven is not impermissibly extraterritorial.

### 2. Chevron Has Also Proven a U.S.-Based RICO Enterprise

Instead of determining the extraterritoriality of an application of RICO with reference to the pattern of racketeering activity, some courts have focused on the location of the enterprise. *See Chao Fan Xu*, 706 F.3d at 976–77 (collecting cases); *see also European Community v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957, at *6 (E.D.N.Y. Mar. 8, 2011) (adopting a "nerve center" test, which "focus[es] on the 'brains,' where the [enterprise's] decision[s] are made, as opposed to the 'brawn,' that is, how the [enterprise] acts"). In its opinion

denying Donziger's motion to dismiss, this Court rejected that approach, at least insofar as it purported to make determination of the location of the enterprise the exclusive test. *Donziger*, 871 F. Supp. 2d at 243.  However, this Court noted that "the enterprise alleged in this case, an association in fact including both Americans and Ecuadorians, with the Americans predominant in number and charged with conceiving and supervising the scheme, would cut in favor of application of the RICO statute here." *Id.* at 245–46.  The proven facts confirm that prediction.

Donziger is the "cabeza," the head of the enterprise here alleged, and the locus of its decision-making power.  *See supra* Argument Section I.B.2; Dkt. 1529 at 3 ("Donziger has had practical control over the LAPs' Ecuadorian and U.S. litigation efforts for years.").  The personnel whom Donziger directed as part of the enterprise reflect its location in the U.S.  Although the mere nationality of the members of the enterprise should not be relevant, *see Mitsui*, 871 F. Supp. 2d at 940, that most of the members here are professionally located in the United States supports the notion that "the decision making necessary to effectuate the . . . enterprise's common purpose occurred substantially within the territory of the United States."  *Id.* at 942. Donziger's original funder, Kohn Swift , is located in Philadelphia; Kohn Swift was later replaced by the Burford Group, which worked with Donziger out of its New York offices; the LAP team's media spokeswoman, Karen Hinton, worked out of Washington D.C.; political organizations like Amazon Watch and Rainforest Action Network in California furthered the pressure campaign against Chevron; Donziger used Stratus in Colorado and other U.S.-based scientists to ghostwrite the Cabrera Report, and then, with the assistance of New Jersey-based law firm Patton Boggs, recruited the Weinberg Group in Washington, D.C., to run the "cleansing" operation to launder the fraudulent findings of the Cabrera report into new reports signed by experts in Vermont, Ohio, Maryland, Virginia, and Massachusetts; and Donziger retained law firms, like

Patton Boggs, Emery Celli headquartered in New York, and Motley Rice headquartered in South Carolina, in order to obstruct justice in Section 1782 proceedings around the country.  Although Donziger traveled to Ecuador when necessary to ensure that operations there were yielding the corrupt court documents he could use to fuel the pressure campaign against Chevron in the United States, decision-making and operational authority over anything more than day-to-day court activity remained with Donziger and his allies in the United States.

Under these facts, the RICO enterprise Donziger has managed and operated is domestic. Unlike in *European Community*, in which the U.S. defendants were "nothing more than sellers of fungible goods in a complex series of transactions directed by South American and Russian gangs" (*European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, at *7 (E.D.N.Y. Mar. 8, 2011)), here Donziger has directed all of the enterprise's activities in the United States and in Ecuador out of his New York office.  The enterprise here is therefore even more clearly domestic than that approved in *Mitsui O.S.K. Lines*, where the decision-making occurred "in substantial part within the United States" by U.S. corporations that constituted "an enterprise with one foot in China and one in the United States."  871 F. Supp. 2d at 943.  Here Donziger controls and directs a U.S. enterprise that uses some Ecuadorian team members to procure fraudulent court documents for use against Chevron in this country.  RICO applies to such an enterprise.

### H.  Donziger Has Also Conspired to Violate RICO (18 U.S.C. § 1962(d))

RICO subsection 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]."  "The RICO conspiracy charge is proven if the defendant 'embraced the objective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance thereof."  *United States v. Viola*, 35 F.3d 37, 43 (2d Cir. 1994) (quoting *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir. 1986)).  In actions brought by

private parties, the plaintiff must also show that it was injured by "an act of racketeering." *Beck v. Prupis*, 529 U.S. 494, 507, 120 S. Ct. 1608, 1617 (2000).

There can be no dispute that Donziger "embraced" the scheme against Chevron. He has admitted it—indeed, he has sought to arrange a book deal based on his inside experience. PX 806R at 3 ("I know more about the details of this story than anybody. I am the lead lawyer in the class-action trial that seeks damages for a clean-up. . . . I am the person primarily responsible for putting this team together and supervising it[.]"); *id.* at 4–5 ("I have been at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the US."). He arranged for the filming and production of a movie starring himself as the leading figure in the campaign in which, and in its outtakes, he expounds at length about the LAP team's strategy to intimidate and control the court in Ecuador (*e.g.* PX 184 at 2; PX 5A) and "to increase the leverage and increase the cost of Chevron" in the United States (PX 7537 at 52). And Chevron has extensively proved that Donziger committed numerous overt acts (*see supra* Section I.C.) and that these acts of racketeering acts injured Chevron (*see supra* Section I.E.).

## II.   Defendants Committed Fraud

Chevron also proved that Defendants committed numerous acts of fraud under New York law. As previously explained, Defendants' scheme to extort Chevron involved a series of lies and material omissions to a number of third parties—including former funders, former co-counsel, former experts, foreign courts, U.S. courts, U.S. federal and state government agencies and officials, and others. And these lies and material omissions resulted in harm to Chevron. *See* FF ¶¶ 44–82.

### A.   Defendants Have Acceded to the Application of New York Law

Defendants have waived any argument concerning the application of New York law to Chevron's fraud claims because they never challenged the notion that New York law governs

these claims until the eve of trial, when they for the first time suggested that Ecuadorian law should apply (*see* Dkt. 1468 at 16–18).  Until then, Defendants challenged the viability of Chevron's fraud claim exclusively under New York law, with the LAPs claiming that "[w]hether New York law permits a claim for third-party fraud" was a controlling question of law in this case.  Dkt. 651 at 1; *see also* Dkt. 303 at 17–20; Dkt. 601 at 5–24.  Only after those challenges failed did Defendants switch gears and attempt to raise any choice of law issue.  *See, e.g.*, *PI, Inc. v. Ogle*, 932 F. Supp. 80, 82 (S.D.N.Y. 1996) (finding waiver where defendant raised choice of law issue only after losing motions to dismiss briefed under New York law).  Under these circumstances, Defendants' implied consent to the application of New York law waived any argument that Ecuadorian law must now be applied.  *See, e.g.*, *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (parties give "implied consent" that is "sufficient to establish choice of law" where "briefs assume that New York law controls" ); *see also, e.g.*, *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*, 462 F.3d 1015, 1017 n.3 (8th Cir. 2006) ("[C]hoice of law is waived if not timely raised . . . ."); *Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06 Civ. 4624 (PKL), 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009).

Moreover, even if Defendants had not waived the argument at this late stage, they have failed to establish that New York law should not apply to Chevron's fraud claim.  The essential "first step in any case presenting a potential choice of law issue," is to point to a conflict between Ecuadorian law and New York law with respect to the elements of fraud, but Defendants have made no attempt to do so.  *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).[60]

---

[60] Defendants have not even attempted to explain the nature of a fraud claim under Ecuadorian law, and did not submit any testimony from an Ecuadorian legal expert on this topic, perhaps because doing so would reveal that there is no material conflict with New York law.  *See, e.g.*, *Chevron Corp. v. Champ*, No. 1:10MC27, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010) ("[T]he court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any court.").

This failure is dispositive because "[a] choice-of-law analysis need not be performed unless there is 'an 'actual conflict' between the applicable rules of two relevant jurisdictions.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (citation omitted). Moreover, even if Defendants had demonstrated a conflict, given the substantial amount of New York-based conduct, and the fact that New York resident Donziger largely orchestrated the fraudulent conduct that occurred in Ecuador from New York, New York has a greater interest than Ecuador in having its law applied to Chevron's fraud claims. *See, e.g.*, *id.* at 157–58.

Under New York law, a party is generally entitled to recover for fraud if it proves (1) "a misrepresentation or a material omission of fact which was false and known to be false by defendant," (2) the misrepresentation was "made for the purpose of inducing the other party to rely upon it," (3) "justifiable reliance of the other party on the misrepresentation," and (4) "injury." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996); *accord Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding*).

In addition to claims premised on affirmative misrepresentations, New York recognizes fraud claims based on "material omission[s] of fact." *Lama Holding*, 88 N.Y.2d at 421. To prevail on an omissions-based fraud claim, a plaintiff must prove a fifth element: "'that the defendant had a duty to disclose material information and that it failed to do so.'" *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011) (quoting *P.T. Bank Cent. Asia, N.Y. Branch v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376 (N.Y. App. Div. 1st Dep't 2003)). A party has a duty to disclose in three situations: "first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge,

not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (applying New York law) (quotation marks and citations omitted).

Under New York law, a finding of liability for fraud requires "clear and convincing evidence." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006).

### B. Fraud Premised on the Reliance of a Third Party Rather Than the Victim Remains Fraud and Demands Redress

#### 1. New York Recognizes Fraud Claims Premised on Third Party Reliance

As this Court and many others have noted, a successful fraud plaintiff under New York law need not show personal reliance on a misrepresentation or omission; rather "a claim for common law fraud may rest on third-party reliance." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 256 (S.D.N.Y. 2012). The New York Court of Appeals has long held that "it is not essential that a representation should be addressed directly to the party who seeks a remedy for having been deceived and defrauded by means thereof." *Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33–34 (1880); *see Rice v. Manley*, 66 N.Y. 82, 87 (1876) ("[I]t matters not whether the false representation be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury, or whether it be direct or indirect in its consequences."); *Bruff v. Mali*, 36 N.Y. 200, 205–06 (1867); *see also Bridge v. Phoenix Bond & Idem. Co.*, 553 U.S. 639, 656 & n.7, 128 S. Ct. 2131, 2143 (2008) ("[T]here is no general common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it.") (citing *Rice*).

"[T]he New York Court of Appeals' previous decisions allowing recovery for common law fraud based on third-party reliance remain authoritative." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 257 (S.D.N.Y. 2012); *accord Prestige Builder & Mgmt. LLC v. Safeco Ins. Co.*

*of Am.*, 896 F. Supp. 2d 198, 203–05 (E.D.N.Y. 2012); *N.B. Garments (PVT), Ltd. v. Kids Int'l Corp.*, No. 03 Civ. 8041(HB), 2004 WL 444555, at *3 (S.D.N.Y. Mar. 10, 2004).  Moreover, New York's Supreme Court Appellate Division, as well as its trial courts, have recognized that a fraud claim is viable "where a false representation is made to a third party, resulting in injury to the plaintiff."  *Buxton Mfg. Co., Inc. v. Valiant Moving & Storage, Inc*., 239 A.D.2d 452 (2d Dept. 1997); *accord*, *Ruffing v. Union Carbide Corp.*, 764 N.Y.S.2d 462, 465 (App. Div. 2d Dep't 2003); *Desser v. Schatz*, 581 N.Y.S.2d 796, 797 (App. Div. 1st Dep't 1992); *see also Korenzecher v. Blass*, No. 604928/97, 1998 WL 35423611, at *5 (N.Y. Sup. Ct. July 15, 1998), *vacated in part on other grounds*, 2000 WL 35923331 (N.Y. Sup. Ct. N.Y. Cnty. July 24, 2000); *Levine v. Michael Ashton, Inc.*, No. 110042/09, 2010 WL 128077, at *9 (N.Y. Sup. Ct. Jan. 4, 2010).  These courts have had no trouble finding a fraud claim based on third-party reliance because where both "[r]eliance" by a third party and "clear detriment [to] plaintiff" is "manifest," it is "of no moment . . . that the false representation was not made directly to plaintiff."  *Desser*, 581 N.Y.S.2d at 797.  "It is sufficient if the initial fraud intended to injure the plaintiff caused him damage through intermediate agencies thereby set in motion."  *Cooper v. Weissblatt*, 277 N.Y.S. 709, 714 (App. Div. 2d Dep't 1935).

While the Second Circuit concluded in *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) and *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008), that New York does not recognize fraud claims based on third-party reliance, those decisions cannot be squared with the New York Court of Appeals' rulings in *Eaton*, *Rice*, or *Bruff*—cases that "have not been overruled," and "still today, represent the law of New York."  *Chevron*, 871 F. Supp. 2d at 256.  "The ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes,

or authoritative court decisions of the state," and here New York's appellate courts have spoken. *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981) (explaining that a court of appeals' interpretation of state law need not be deferred to where "clear signals emanating from the state's highest court point[] toward a different rule" or a "clear basis" in state law exists to conclude that the "prediction was incorrect"). Indeed, subsequent to *Smokes-Spirits*, the Appellate Division once again reaffirmed the principle that "fraud may be found 'where a false representation is made to a third party, resulting in injury to the plaintiff.'" *Litvinov v. Hodson*, 905 N.Y.S.2d 400, 401 (App. Div. 4th Dep't 2010) (quoting *Ruffing*, 764 N.Y.S.2d at 465).[61]

## 2. There is No Principled Basis to Limit Fraud Claims to Only Plaintiff Reliance

Defendants have suggested that because they were able to injure Chevron by means of a deceptive scheme without Chevron believing their lies, Chevron has no recourse. That contention is contrary to the very principles of justice that gave rise to the cause of action for fraud more than 200 years ago. "[T]hat a man may assert that which he knows to be false, and thereby do an everlasting injury to his neighbour, and yet not be answerable for it . . . is as repugnant to law as it is to morality." *Pasley and Another v. Freeman*, (1789) 100 Eng. Rep. 450 (K.B.) 455; 3 T.R. 51, 60. These same principles of "common sense" and "common honesty" dictate that Chevron is entitled to relief for its fraud claims here.

---

[61]   Moreover, district courts within the Second Circuit have held on multiple occasions that claims premised on third-party reliance are recognized in New York. *See, e.g.*, *Prestige Builder*, 896 F. Supp. 2d at 205 (holding that "the third-party reliance doctrine is good law in New York" where plaintiff alleged that defendant had made false statements to a government agency to obtain monies owed to plaintiff); *My First Shades v. Baby Blanket Suncare*, 914 F. Supp. 2d 339, 352 (E.D.N.Y. 2012); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, 2007 WL 1051642, at *13 (D. Mass. Apr. 2, 2007) ("Third party reliance on fraud is also cognizable under New York law where there is a sufficient causal connection between a defendant's fraud and a plaintiff's injury."). And even after *Cement & Concrete* and *Smokes-Spirits*, the Second Circuit has affirmed district court decisions finding that fraud claims based on third-party reliance were viable under New York law. *See, e.g.*, *O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 537 (E.D.N.Y. 2010), *aff'd*, 426 F. App'x 36 (2d Cir. 2011); *Liberty Life Assur. Co. of Boston v. Bahan*, No. 09 Civ. 4715 (JRS), 2010 WL 3431147, at *2 (S.D.N.Y. Aug. 23, 2010), *aff'd*, 441 F. App'x 21 (2d Cir. 2011).

Thus, it is "of no moment" that third parties, and not Chevron, relied on Defendants' false statements. *Desser*, 581 N.Y.S.2d at 797.  As New York's highest court stated in *Rice*, "[i]n order to maintain an action for fraud, it is sufficient to show that the defendant knowingly uttered a falsehood with the design to" harm the plaintiff.  66 N.Y. at 84.  And this is not a case of "far-flung liability for inchoate or unintended injuries."  *Union Carbide Corp. v. Montell N.V.*, 9 F. Supp. 2d 405, 412 (S.D.N.Y. 1998).  On the contrary, as outlined below, Defendants intended to harm Chevron through the use of deception, and they may not escape liability because they perpetrated their fraudulent scheme through third parties.

The third parties who received Defendants' affirmative misrepresentations were justified in their reliance on the truth of those statements because Donziger was the "sole source for information" about the Lago Agrio litigation.  PX 5600 (Kohn) ¶ 12.  Thus, because Donziger alone "controlled the distribution of information in the case" (PX 3200 (Russell) ¶ 34), information about the Lago Agrio litigation was "peculiarly within [Donziger's] knowledge" and the recipients of Donziger's misrepresentations had "no independent means of ascertaining the truth."  *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980) (Friendly, J.); *see also Banque Franco-Hellenique De Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 26–27 (2d Cir. 1997) ("[A]nalysis of justifiable reliance in fraud cases under New York law has taken account of the degree to which the truth was accessible to the [recipient].").  Thus, it is no defense for Defendants to claim that litigation funders, experts, courts, and others were not justified in relying on Defendants' misrepresentations.

Nor is it a defense to fraud that *some* of what Defendants told third parties, when viewed in isolation and without context, may have been true.  By making "a partial [and] ambiguous statement," Defendants had a duty to disclose "additional [facts] to avoid misleading" the recipi-

ents of their half-truths.  *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995); *see also Brass*, 987 F.2d at 150 ("[O]nce a party has undertaken to mention a relevant fact . . . [,] it cannot give only half of the truth.").  For example, by referring to Cabrera as a "court-appointed expert" (PX 3100 (Bogart) ¶ 4; PX 5600 (Kohn) ¶ 43), Defendants "could not fairly stop halfway" by omitting, as they did, the "vital" facts that Defendants' arranged Cabrera's selection as the global expert and paid him for his work.  *See, e.g.*, *Junius Const. Corp. v. Cohen*, 257 N.Y. 393, 400 (1931) (finding a duty to disclose facts that go "to the very essence of the bargain").  And by representing to courts in the United States and abroad that the Lago Agrio judgment was valid and legally enforceable (PX 3000 (Veiga) ¶ 138), Defendants defrauded Chevron by withholding the fact that Defendants secured that judgment by ghostwriting Cabrera's report, bribing the presiding Ecuadorian judge, and ghostwriting the judgment itself.  In sum, Defendants' misleading partial representations made their failure to clarify those partial statements fraud.  *See Remington Rand*, 68 F.3d at 1484.  Defendants "knew that [the Lago Agrio judgment] was fraudulent and knew that" neither the 1782 courts nor the foreign enforcement courts enjoyed Defendants' knowledge.  *See William Whitman Co. v. Universal Oil Prods. Co.*, 125 F. Supp. 137, 155 (D. Del. 1954).  Thus, "[t]he use of the fraudulent [Lago Agrio] judgment as *res judicata* was in itself a fraud."  *See id.*

### 3.  Fraud Based on Third-Party Reliance Is Consistent With Traditional Principles Applicable to Claims in Fraud and Equity

That New York courts have recognized fraud claims premised on third-party reliance is consistent with the historical understanding and purposes of the common law prohibition against fraud.  "Fraud and falsehood are *mala in se,* and wrongful in the eye of the law," and the law has historically and justifiably allowed those injured by such intentional misconduct to recover for "damage [that] results therefrom."  *Rice*, 66 N.Y. at 84.  The law of fraud is not just a checklist

of technical elements so rigid as to be capable of evasion by a defendant's resort to intermediaries; rather, it is "founded in common sense or common honesty"—principles that are as applicable "to any case which may arise two centuries hence as it was two centuries ago." *Pasley*, 100 Eng. Rep. at 456, 3 T.R. at 62.[62]

The core principles underlying all fraud claims are intentional deception and damages. *See id.* ("[F]raud without damage or damage without fraud, gives no cause of action; but when these two concur an action lies."). Four and five part tests are necessarily imperfect formulations of these universal principles, as any "definition" is "strictly speaking [] nothing but an abbreviation in which the user of the term defined may please himself." Keeton, *supra*, § 1 at 4 (quotations omitted). Even when applied to "new and singular facts," the foundational legal principle is "that when fraud is committed, and damage is thereby occasioned, a cause of action results to him who is damaged." *Bencoe Exporting & Importing Co. v. Erie City Iron Works*, 280 F. 690, 692 (2d Cir. 1922) (holding that an exporter had a cause of action for fraud based on misrepresentations made by one supplier to another, even though it occurred several links up the supply chain, because the misrepresentation impaired the exportability of his goods); *see also, e.g.*, *Ruffing*, 764 N.Y.S.2d at 463–67 (allowing a child to recover for fraud based on birth defects resulting from misrepresentations told to the child's mother by her employer).

## C.  Defendants Have Committed Multiple Frauds in Their Scheme Against Chevron

As part of their scheme to defraud and extort Chevron, Defendants made false statements to many entities and individuals to induce them to act in reliance on such statements to harm Chevron. Although Chevron was not the direct recipient of Defendants' misrepresentations, it

---

[62]  "*Pasley v. Freeman* . . . is the parent of the modern law of deceit . . . ." W. Page Keeton et al., *Prosser and Keeton on Torts* § 105 at 728 (5th ed. 1984) (Ex. D). *Pasley* is cited with approval in *Rice*, 66 N.Y. at 86, and was described by the Second Circuit as the "first case holding action for deceit would lie where plaintiff had no dealings with the defendant." *Joseph v. Farnsworth Radio & Television Corp.*, 198 F.2d 883, 884 n.2 (2d Cir. 1952).

was unquestionably the single target of Defendants' scheme.  Defendants further withheld material information that would have revealed their deception.  Chevron was directly harmed by the actions of these entities and individuals in reliance on Defendants' false statements and material omissions because it was forced to defend against the falsehoods the action in Ecuador, work to uncover the fraudulent scheme in the United States, and defend against enforcement of the Lago Agrio judgment around the globe.  In sum, Chevron is the victim of Defendants' multiple frauds.

### 1.  Defendants' Misrepresentations and Material Omissions to Burford Capital Harmed Chevron

Christopher Bogart is Chief Executive Officer and co-founder of Burford Capital LLC, which "focuses on litigation finance."  PX 3100 (Bogart) ¶ 1.  Bogart was personally involved in Burford's negotiations, due diligence, and decision to invest in the Lago Agrio litigation, as well as its separation from that investment.  *See, e.g., id.* ¶ 7, 9, 21; PX 2382; PX 1473; PX 2471; PX 1489.  Donziger was introduced to Burford in November 2009 (PX 3100 (Bogart) ¶ 5), the same month that Kohn withdrew funding for the enterprise.  Because the Lago Agrio litigation "was outside [Burford's] usual investment parameters" (*id.*), Burford requested that Patton Boggs, which Burford understood had "a leading role in the Litigation" (*id.*¶ 6), conduct diligence into the case and "provide its analysis" of the issues "as well as its judgment enforcement strategy" before it would consider investing (*Id.* ¶ 8).  Patton Boggs' analysis "was ultimately memorialized in the Invictus memo."  *Id.*  As it made clear at the time, "Burford explicitly undertook this investment because of [Burford's] 'substantial confidence in Jim Tyrrell, the lead partner at Patton Boggs (and a former Latham partner known well to [three of Burford's senior team, all of who are also former Latham partners])' and [Burford's] 'special relationship with and respect for Jim and Patton Boggs.'"  *Id.* ¶ 4 (quoting PX 2382 at 5 (Invictus memorandum presentation email)).  In connection with its decision to invest in the Lago Agrio litigation, Burford's invest-

ment committee was provided with two memoranda.  The first, prepared by Burford's executive team, described the investment opportunity, and Burford's reliance on Patton Boggs, in its opening paragraph:

> We plan to present to the Board an investment opportunity in the Ecuador matter which entails an initial investment of $4 million at closing, with the right, but not obligation, to fund up to an additional $11 million. The attached memorandum from Patton Boggs, whom we would fund as lead counsel, provides an overview of the case. The purpose of this memo is not to duplicate the work of the Patton Boggs memo, but rather to highlight and evaluate what we view as the key issues for your consideration.

PX 2382 at 3.  The second document provided to Burford's investment committee was Patton Boggs's "Invictus" memorandum.  *Id.* at 13.  Burford, through an indirect subsidiary ("Treca"), subsequently entered into an agreement to provide up to $15 million in financing to Patton Boggs.  PX 3100 (Bogart) ¶ 4; *see also* PX 552 (Treca funding agreement).

Defendants and their agents, and specifically Donziger, made false representations to Burford, while omitting material information, "for the purpose of inducing [Burford] to rely upon it" and fund Defendants' extortionate campaign against Chevron.  *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996).  Burford "never would have invested in [the litigation] in the first place had [it] been aware" of the true facts.  PX 3100 (Bogart) ¶ 3.  Chevron was directly harmed by Burford's decision to fund the litigation because Chevron was forced to defend itself against the wrongful conduct Defendants engaged in with Burford's money and, ultimately, against enforcement of the fraudulent Lago Agrio judgment.

***Misrepresentations.***  The Burford funding agreement, to which Donziger and the LAPs' representatives are signatories, "included specific representations, including that none of the plaintiffs *or any of their lawyers* knew anything 'reasonably likely to be material to the Funder's assessment of the Claim that has not been disclosed to the Funder.'"  PX 3100 (Bogart) ¶ 4 (quoting PX 552 at 22).  Not only did Defendants withhold information material to assessing

their claim, Defendants and their agents made a series of specific misrepresentations meant to induce Burford into funding Defendants' pressure campaign against Chevron.

For example, Donziger deceived Burford from the very start of their relationship, falsely representing to Burford that the LAPs had ended the relationship with Kohn Swift because the firm "did not have the resources necessary to implement enforcement strategies."  PX 3100 (Bogart) ¶ 22; *see also* PX 1490.  Moreover, when Burford shared its concerns over Chevron's allegations regarding Defendants' contacts with Cabrera, the Invictus memorandum assured them that Chevron and Gibson Dunn "were 'distort[ing]' reality" and that Chevron's claims regarding the "'procedural improprieties related to the preparation of the Cabrera Report'" were "'especially frivolous.'"  PX 3100 (Bogart) ¶¶ 10–11 (quoting PX 2382 at 18 & n.4 (Invictus memorandum)).  Donziger also "specifically assured [Burford] that the contacts that had occurred between the LAPs and Cabrera were both limited and permissible."  PX 3100 (Bogart) ¶ 12; *see also* PX 1490.  Defendants also falsely represented to Burford that the "'cleansing expert" reports "'substantially weaken[] Chevron's argument' about the Cabrera report's infirmities."  PX 3100 (Bogart) ¶ 16 (quoting PX 2382 at 21 (Invictus memorandum)).

In addition, in response to Chevron's allegations that the *Crude* outtakes depicted Defendants' improper contacts with the Lago Agrio court, Patton Boggs assured Burford that "as with virtually any other claim by Chevron in the [Lago Agrio] litigation, reality [wa]s being distorted" and that the vast majority "of the footage vindicate[d] [the LAPs'] position, and indeed, evidence[d] Chevron's own misconduct."  PX 3100 (Bogart) ¶ 20 (quoting PX 2382 at 18–19 (Invictus memorandum)).  In fact, Patton Boggs, in particular, "was so forceful and unambiguous in its views and conclusions . . . that Burford did not attach much importance to the outtakes at the time."  PX 3100 (Bogart) ¶ 21.

*Material Omissions.*  Each of Donziger's misrepresentations was accompanied by mate-rial omissions that would have exposed his lies if they had been known to Burford.  Donziger gave, at most, "only half of the truth," and possessed "superior knowledge, not readily available" to Burford about Defendants' misconduct.  *Brass*, 987 F.2d at 150.  For example, Donziger with-held the true reason that Kohn was no longer involved in the case—Kohn was terminated after learning that Donziger had deceived him primarily about the extent and nature of Defendants' contacts with Cabrera.  PX 3100 (Bogart) ¶ 23; *see also* PX 1406 at 1.  And not only did De-fendants and their agents falsely represent that they had "limited" contacts with Cabrera, they omitted "the wholesale ghostwriting of the Cabrera report" (PX 3100 (Bogart) ¶ 15), and never revealed the emails in which the LAPs' attorneys in the United States and Ecuador debated the implications of "'cop[ping] to having written portions of the report'" (*id.* (quoting PX 1371 at 1)), including the possibility that "they could all 'go to jail'" (PX 3100 (Bogart)¶ 14 (quoting PX 1279)).  Moreover, because Defendants and their agents withheld from Burford "that the under-lying bases of the Cabrera report were tainted," Burford was unaware "that the reports of these 'cleansing experts' would be relying on those tainted bases as well . . . which would not solve the problem."  PX 3100 (Bogart) ¶ 16.

*Reliance/Causation.*  Donziger misled Burford because he was "trying to raise money" and knew that there would be "negative fallout" if he told the truth.  PX 3100 (Bogart) ¶ 13 (quoting PX 1364).  "Indeed, Burford would have walked away immediately" if it "had been told the complete truth."  PX 3100 (Bogart) ¶ 18.  "Burford relied upon the representations made by Patton Boggs and Donziger" in deciding "to enter into the Funding Agreement."  *Id.*  In fact, Burford had made clear to Donziger that it intended to "rely[] on [the Invictus memorandum]" (*id.* ¶ 18) and that it "could not proceed to its investment committee for consideration for the in-

222

vestment without [it]." *Id.* ¶ 8. Donziger thus knew that Burford was "acting on the basis of mistaken knowledge." *Brass v. Am. Film Technologies, Inc*., 987 F.2d 142, 150 (2d Cir. 1993). Burford also "relied on Donziger's representations regarding the position with Kohn" (PX 3100 (Bogart) ¶ 24), and about the effect of "cleansing expert" reports (*id.* ¶ 16). Burford's reliance on Defendants' misrepresentations and omissions was justifiable because it "was not feasible for Burford to . . . review the massive record amassed in the Ecuadorean proceeding, or to travel to Ecuador to conduct its own on-site diligence." *Id.* ¶ 8. Burford reasonably relied on Donziger's representations because Donziger had "made it clear that he had broad authority" over the Lago Agrio litigation. *Id.* ¶ 7. And given Burford's special relationship with Tyrrell and Patton Boggs, it reasonably expected Patton Boggs to conduct complete and accurate diligence and to fully relay those findings to Burford. *Id.* ¶ 8.

If Burford had "received the full disclosure to which it was entitled under the Funding Agreement, it certainly would not have invested in [the litigation]." PX 3100 (Bogart) ¶ 4. "There is absolutely no question that Burford would not have invested in the Litigation . . . had [it] known the whole truth about Cabrera." *Id.* ¶¶ 13, 39. If "Burford [had] known Donziger's representations regarding Kohn were false, it would not have entered into the Funding Agreement." *Id.* ¶ 24. Similarly, Defendants misrepresentations and omissions about the 'cleansing' experts and *Crude* clips "were material to Burford's decision to fund, [because] Burford would not have entered into the Funding Agreement had Burford known that those representations were false." *Id.* ¶ 21; *see also id.* ¶ 16.

**Injury.** As a result of Defendants' deception, Burford gave them $4 million in November 2010 that kept Defendants' pressure campaign alive, forcing Chevron to defend against Defend-

ants' wrongful conduct in the Lago Agrio litigation and, eventually, against enforcement of the judgment.  *See* PX 552 (Burford funding agreement).  *See* FF ¶¶ 100–102, 123.

### 2. Defendants' Misrepresentations and Material Omissions to Joseph Kohn / Kohn Swift Harmed Chevron

From May 2003 until November 2009, Joseph Kohn, through his law firm, Kohn Swift, was the "primary funder of the [Lago Agrio] litigation and related U.S. public relations and other activities."  PX 5600 (Kohn) ¶ 9; *see also* PX 641 (summary of Kohn Swift's litigation-related expenses).  Donziger would "present[] [Kohn] with proposed budgets," and Kohn would make "[l]ump sum payments . . . to Selva Viva pursuant to the budgets," relying on Donziger's representations that "those payments were then disbursed among the employees, vendors, and others as set forth in the budgets."  PX 5600 (Kohn) ¶ 16.  "Donziger lied to [Kohn] about a number of aspects of the Ecuadoran litigation," including "falsehoods about [Cabrera], the Ecuadoran plaintiffs' team's contacts with him and the role that Stratus and the Ecuadoran plaintiffs' team played in writing [Cabrera]'s report."  PX 5600 (Kohn) ¶ 69.  In addition to these misrepresentations, Donziger "omitted material facts in his communications with [Kohn], and was generally dishonest with [Kohn] about the manner in which [Donziger] was managing the Ecuadoran litigation." *Id.*

Donziger understood that if Kohn knew the true nature of Defendants' scheme to extort Chevron, he would not have continued to fund the litigation, so "Donziger intentionally misled [Kohn] in order to get [Kohn Swift] to continue to fund the Ecuadoran litigation."  PX 5600 (Kohn) ¶ 68; PX 1406 at 4 (letter referring to Defendants' "blatant lies" to Kohn).  And because Donziger was lead counsel and Kohn's only contact with his Ecuadorian clients (PX 5600 (Kohn) ¶¶ 12–13), Kohn justifiably relied on Donziger's representations regarding the case to continue funding it.  Chevron was the intended victim of Defendants' fraudulent scheme and was

directly harmed by Kohn's funding because Chevron was forced to defend itself against the wrongful conduct Defendants engaged in with Kohn's funding, including the Cabrera report, the Lago Agrio action itself, and their contemporaneous pressure campaign.

*Misrepresentations.*  Defendants and their agents, and specifically Donziger, deceived Kohn about many aspects of the Lago Agrio litigation regarding which he had "no independent means of ascertaining the truth." *Mallis*, 615 F.2d at 80.  Among Donziger's early misrepresentations to Kohn was Donziger's false claim that the reason for ending the judicial inspections and proceeding with the global damages report was "to reduce costs and bring the litigation to conclusion more quickly."  PX 5600 (Kohn) ¶ 27.  In light of "Chevron's claim that Professor Cabrera [wa]s cooperating with the [LAPs]" (PX 5600 (Kohn) ¶ 30 (quoting PX 1032 at 2)) and that Defendants had attempted to blackmail the judge to appoint Cabrera, Kohn questioned Donziger and "requested that these contentions be investigated by an American lawyer and investigator" (PX 5600 (Kohn) ¶¶ 20–21).  But Donziger rebuffed Kohn's request for an independent investigation (*id.* ¶ 22) and "consistently denied there was anything improper in connection with [Cabrera], or that there was any basis for Chevron's allegations that [Cabrera] was not independent" (*id.* ¶ 50).  Donziger insisted that Chevron's allegations were "completely false" (*id.* ¶ 30; *see also* PX 1032 at 2 (Donziger email forwarding press release)), "that there were no improper contacts between [Cabrera] and the Ecuadoran plaintiffs' team and that Chevron's allegations were overblown, without merit, and 'b.s.'" (PX 5600 (Kohn) ¶ 52).

Donziger specifically misrepresented Cabrera as an "independent" expert to Kohn (PX 5600 (Kohn) ¶ 30; PX 1023), and "l[ied] to [Kohn] about the Ecuadoran plaintiffs' team's contacts with [Cabrera]" (PX 5600 (Kohn) ¶ 67).  Donziger thus led Kohn to believe "that, at all times, the Ecuadoran plaintiffs' consultants' materials were being submitted publicly to the Ec-

uadoran court through a proper, legal process consistent with Ecuadoran law." *Id.* ¶ 31. Donziger falsely represented that Cabrera was being "paid directly by the court for the current phase of his work, as is customary and required in Ecuador[,]" and "[h]is report . . . reflects the work of no fewer than 14 prominent Ecuadorian scientists and technical experts[.]" *Id.* ¶ 30 (quoting PX 1032 at 2). And, in order to keep up with the false impression they had created, Defendants "requested reimbursement [from Kohn] for translating the [Cabrera] report back into English," which was misleading in light of the fact "that Stratus wrote the Cabrera Report in English and translated it into Spanish." *Id.* ¶ 32.

Donziger eventually admitted to Kohn that "someone on the Ecuadoran team 'may' have provided 'some' documentation to Mr. Cabrera, and if it came out, it could be embarrassing for the Ecuadoran plaintiffs' team" (PX 5600 (Kohn) ¶ 64), but followed this admission with another false representation, through Fajardo, that "they provided [Cabrera] with documents in accordance with a court order and there was nothing to Chevron's charges" (*id.* ¶ 66). Fajardo followed up with an "unsolicited email" in which he further misrepresented "that, '[b]ased on the same order of the judge, by which [Defendants] submitted information to Expert Cabrera, [Defendants] proceeded to submit a packet of information, mainly the input of Stratus, around the middle of March 2008'" and that "'there [wa]s no illegality in the process of delivering information.'" *Id.* ¶ 67 (quoting PX 1312 at 1 (Fajardo email)).

***Material Omissions.*** Although Donziger was aware that Kohn "expected [Donziger] to keep [him] apprised of significant developments in the case" (PX 5600 (Kohn) ¶ 72), Donziger omitted information that was "material to whether KSG would have continued funding the Ecuadoran litigation" (*id.* ¶ 73), including withholding from Kohn "that $33,000 of the $50,000 KSG wire transferred to the [Banco Pichincha] account in Ecuador was being used to pay [Cabrera]

outside the court process," that "he was making payments to [Cabrera] outside the court process [or] that those payments were never disclosed to the Ecuadoran court or to Chevron" (*id.* ¶ 78). Donziger never informed Kohn that Donziger "and his Ecuadoran co-counsel vetted candidates to be the global damage expert prior to the court ordering the end of judicial inspections and the beginning of the court expert phase of trial" (*id.* ¶ 73), nor did Donziger disclose that his "technical team, including U.S.-based consultant Stratus, met with [Cabrera] on March 3[, 2007], prior to [Cabrera's] appointment as global expert" (*id.* ¶ 74). Similarly, Donziger failed to mention that "reports had been submitted to the Ecuadoran court under Dr. Calmbacher's name that did not represent his conclusions and were not his work product." *id.* ¶ 71. Donziger had a duty to disclose this information to Kohn, both because he had made partial statements to Kohn regarding the progress of the litigation while omitting his own misdeeds and because he "possesse[d] superior knowledge, not readily available" to Kohn, and knew that Kohn was "acting on the basis of mistaken knowledge." *Brass*, 987 F.2d at 150.

Indeed, when Kohn attempted to obtain more information about Cabrera, Donziger blocked Kohn's inquiries, and eventually froze him out of the case entirely—clear evidence that Donziger believed the information was not just material to Kohn's decision to continue funding the case, but something that had to be kept from Kohn at all costs. When Kohn suggested the team hire counsel to investigate Chevron's allegation, Donziger informed him, "[n]either I, nor the legal team in Quito, will cooperate with such an investigation nor continue working with a firm that insists on doing such an investigation." PX 1156.

***Reliance/Causation***. Kohn "relied on Donziger to tell [him] the truth about what was going on in the Ecuadoran litigation," but Donziger "deceived" him, and, "as a result, [Kohn] continued to pay millions of dollars to that litigation that [Kohn] never would have paid had [Kohn]

known the truth." PX 5600 (Kohn) ¶ 81.  Kohn's reliance was justified because, particularly on internal matters overseen exclusively by Donziger, he had "no independent means of ascertaining the truth." *Mallis*, 615 F.2d at 80.  Kohn does not speak Spanish (PX 5600 (Kohn) ¶ 10), and Kohn only visited Ecuador once during his time on the case (*id.* ¶ 11).  Thus, as the "principal American lawyer on the case and the sole link to the plaintiff-client groups" (*id.* ¶ 13), Donziger was "the person primarily responsible for making day-to-day decisions in the management of the case" (*id.* ¶ 12).  Ultimately, Donziger was Kohn's "sole source for information" of the Lago Agrio litigation, and he knew that Kohn was acting on the information that he conveyed.  *Id.* ¶ 12.  Accordingly, Donziger had a duty to disclose the information that he withheld from Kohn. *Brass*, 987 F.2d at 150 .

If Kohn "had known that the Ecuadoran plaintiffs' team and Stratus had written [Cabrera's] report and provided it to him the day before he filed it, … [Kohn Swift] never would have approved expenses for the other public relations efforts in connection with the Cabrera Report." PX 5600 (Kohn) ¶ 77.  Nor would Kohn have given an "interview on Fox News in which [he repeated] the misstatements that [Cabrera] was an independent expert appointed by the judge who analyzed all of the evidence from all of the parties from both sides." *Id.*

**Injury.** Kohn's reliance on Donziger's misrepresentations harmed Chevron because Chevron was forced to defend Defendants' fraudulent litigation activities and extortionate pressure campaign, fueled in substantial part by Kohn's funding.  *See* FF ¶¶ 98–99, 123

### 3.   Defendants' Misrepresentations and Material Omissions to Courts in the United States in the 1782 Actions Harmed Chevron

After ghostwriting the Cabrera report and further undermining the legitimacy of the Lago Agrio litigation, Donziger and his allies attempted to conceal their fraudulent activity from Chevron by improperly resisting discovery in the § 1782 actions brought by Chevron in various dis-

trict courts across the United States.  Defendants submitted false evidence to these courts, including a declaration dated May 5, 2010 and signed by Pablo Fajardo, repeating the misrepresentations they had previously made to the litigation funders and others, and otherwise obstructing the federal discovery process.  Defendants and their agents made these false representations to prevent discovery by convincing U.S. courts of their false statements or, at the very least, to delay discovery of Defendants' fraudulent scheme.  Chevron was directly harmed by this delay because it forced to litigate the §1782 proceedings beyond what otherwise would have been necessary to obtain the evidence.  In addition, had Defendants turned over the documents (which they knew to be relevant and discoverable evidence), Chevron would have become aware of, and therefore could have responded to (or even prevented some of), Defendants' fraudulent activities.  Further, had Defendants been forthcoming with the 1782 courts, those courts would have ordered Defendants to produce the evidence more rapidly.

*Misrepresentations.* In connection with the Stratus 1782 proceeding in the District of Colorado, Defendants denied that they, or their agents, were the true authors of the Cabrera report, insisting that Cabrera was "a Court appointed neutral [expert]."  PX 681R at 29.  Moreover, in response to Chevron's allegations that Defendants had corrupted the global assessment process by ghostwriting Cabrera's report, Defendants submitted the declaration of Defendants' Ecuadorian agent, Pablo Fajardo, which touted Cabrera as an "independent expert[]" selected from a "pool of seven" experts "previously appointed" to conduct "the global damages assessment."  PX 1325 at 4.  The declaration further misrepresented that "Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation."  *Id.* at 6.  The Fajardo declaration was submitted to courts throughout the United States.  PX 2205.

*Omissions.*   In addition to presenting Cabrera to the § 1782 courts as "a Court appointed neutral" expert (PX 1325), Defendants omitted the material information that they had bribed Cabrera, had ghostwritten his report, and that Defendants had blackmailed the Lago Agrio court to guarantee Cabrera's appointment.   Defendants had a duty to disclose this information, as they not only had a duty of candor toward the courts but possessed "superior knowledge" than the courts and intended for them to act "on the basis of mistaken knowledge."  *Brass*, 987 F.2d at 150.

*Reliance / Causation.*   Defendants made these misrepresentations and fraudulent omissions with the specific intent to obstruct, or at least delay, discovery in the § 1782 proceedings. Had Defendants been forthcoming about their corruption of the Lago Agrio litigation, the § 1782 courts would not have had to hear or consider evidence of Defendants' fraudulent conduct.   Defendants' misrepresentations necessitated presentation of crime-fraud evidence, and the several crime-fraud rulings issued by the § 1782 courts demonstrates that Defendants needlessly delayed the court proceedings.[63]

*Injury.*   Had the U.S. courts known the true facts, Chevron would have obtained discovery much more quickly, which may have prevented further injury.   Chevron was forced to expend significant resources seeking discovery in the 1782 proceedings (*see, e.g.*, PX 3000 (Veiga) ¶ 125), which would not have occurred but for Defendants' misrepresentations and omissions to these courts.  *See* FF ¶¶ 103–109, 112, 117.

---

[63] *See, e.g.*, *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011); *In re Chevron Corp.*, No. 10-1146, 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, Nos. 10-MC-21, 10-MC-22, Dkt. 77 at 3–4 (D.N.M. Sept. 2, 2010); *In re Chevron Corp.*, Nos. 10-MC-27, 10-MC-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, No. 10-2675, Dkt. 33 at 43–44 (D.N.J. June 11, 2010).

**4. Defendants' Misrepresentations and Material Omissions to Foreign Enforcement Courts in Ecuador, Argentina, Brazil and Canada Harmed Chevron**

Defendants have repeated their false claims about the validity of the Lago Agrio judgment, while omitting the material information that Defendants bribed the judge in the case and ghostwrote the judgment, multiple courts, beginning with the Ecuadorian appellate court and extending to enforcement courts in Ecuador and around the world. Indeed, Patton Boggs' Invictus memorandum set forth how Defendants would "put maximum pressure on Chevron through filing of foreign enforcement actions seeking to collect on the fraudulent Lago Agrio Judgment." PX 3000 (Veiga) ¶ 130; *see also* PX 2382 at 29–40. "[C]onsistent with the Patton Boggs proposal," Defendants have "initiated recognition and enforcement proceedings in Canada, Ecuador, Argentina, and Brazil." PX 3000 (Veiga) ¶¶ 130–31. According to Patton Boggs, the fraudulent judgment can be "enforce[d] in many countries" so long as a "new, unexposed judge" is located. PX 1473. Indeed, Patton Boggs continues to support the enforcement efforts despite the fact that Jim Tyrell admitted "Donziger was a fool" and that he was "not at peace" with Donziger's misrepresentations regarding conduct in Ecuador to Patton Boggs. *Id.*

Defendants' enforcement scheme began in earnest on October 15, 2012, when Defendants "obtained sweeping Ecuadorian court orders that purported to pierce the corporate veil . . . [and] deem[ed] the property of a list of approximately 70 indirect subsidiaries and affiliates of Chevron Corporation from around the world to be the equivalent of Chevron" itself (*id.* ¶ 133), including Chevron's Argentine, Canadian, and Brazilian subsidiaries. *See*, *e.g.*, PX 432. Defendants have since sought to defraud Chevron by falsely representing to courts in these countries that the Lago Agrio judgment and its factual findings are valid and thus enforceable against Chevron and its subsidiaries, while omitting that they ghostwrote the court-appointed expert's

report, bribed the presiding judge, and even ghostwrote the judgment itself.  Their attempts to enforce a judgment they know they procured by fraud is itself a fraud that victimizes Chevron.

*Misrepresentations.*  On May 30, 2012, Defendants filed an enforcement action in Ontario Superior Court against Chevron and two indirect Canadian subsidiaries (Chevron Canada Limited and Chevron Canada Finance Limited).  In this action, Defendants and their co-conspirators represented that "Judge Nicolas Zambrano Lozada of the Sucumbios Provincial Court of Justice rendered a 188-page Decision condemning Chevron to pay [over $18 billion]" (PX 1004 at 5), that "[a]ll the facts, findings and conclusions of law stated in the Judgments and Clarifications in Ecuador are *res judicata* as between [the LAPs and Chevron][,]" and, as a result, Chevron should be "restricted from challenging the Ecuadorian Decisions on the basis of fraud" and "estopped from challenging any fact, finding or determination of law in the Ecuadorian Decisions on the merits" (PX 1004 at 6).  On December 17, 2013, the Court of Appeal for Ontario granted the LAPs' appeal and allowed the action to go forward—in part in reliance on the LAPs' false narrative about Chevron.  *See, e.g.*, Stavers Decl., Ex. C at 26 (stating that "[t]he Ecuador plaintiffs first sued *Chevron* in the United States District Court for the Southern District of New York," that Texaco had promised to recognize "the binding nature of any judgment issued in Ecuador, subject to [the New York Recognition Act]," and that Chevron's RICO suit constitutes "Chevron's cho[ice] not to abide by" Ecuadorian court decisions (emphasis added)).

On September 26, 2012, Defendants requested that a court in Ecuador issue an embargo freezing the assets of Chevron's subsidiary in Ecuador, Argentina, and Colombia in order to satisfy the judgment against it.  PX 415.  In this request, Defendants misrepresented the judgment as valid.  *Id.* at 2–4.  On October 15, 2012, the Ecuadorian court issued the requested embargo to "enforce the ruling of the judgment."  PX 448 at 1.  Defendants subsequently commenced an *ex*

*parte* enforcement action in Argentina on November 5, 2012, "to execute 'preventive' measures . . . mandated by the Ecuadorian Embargo Orders."  PX 3000 (Veiga) ¶ 135; PX 422.  The Argentine pleading stated that "a judgment holding [Chevron] liable has been issued" (PX 422 at 10) and, as a result of that judgment, a court in Ecuador issued a "letter rogatory . . . order[ing] a series of attachments of [Chevron's] assets located in Argentina" (*id.* at 2), which was enforceable by operation of a treaty between Ecuador and Argentina.

On June 27, 2012, Defendants brought "an *exequatur* action for recognition of the fraudulent Lago Agrio Judgment in the Superior Court of Justice in Brasilia, Brazil."  PX 3000 (Veiga) ¶ 137; *see also* PX 2306.  In their Brazilian complaint, Defendants claimed that "the Ecuadorian decision is backed by procedural law because it is "adjudged final and binding."  PX 2306 at 8.  Defendants also attempted to preemptively discredit Chevron's rebuttal to their enforcement attempt by stating that it was "known that CHEVRON will engage in diversionary measures, in procedural contraband, [and] in fallacious arguments, in an attempt to indefinitely extend the duration of the proceeding for recognition."  *Id.* at 9.

In sum, Defendants' representations to the Canadian, Argentine, and Brazilian courts that the Lago Agrio judgment was valid and legally enforceable was false and designed to mislead those court into forcing Chevron to pay on the Lago Agrio judgment.

**Omissions.**  Defendants failed to disclose to the Ecuadorian appellate court that reviewed the Lago Agrio judgment that Defendants had bribed the trial judge in the case and had actually drafted the judgment.  By representing that the Lago Agrio judgment and its factual findings were valid, Defendants created the false and misleading impression that the judgment was legitimately obtained.  In fact, Defendants did not reveal their ghostwriting of Cabrera's report or the judgment itself, or their acts of bribery in the Lago Agrio litigation, in any of the Ecuadorian or

enforcement actions. These omissions were material because they demonstrate that the Lago Agrio judgment was procured by fraud and therefore should not be upheld by the Ecuadorian appellate courts or recognized and enforced by foreign nations. Defendants had a duty to disclose this information, as they had superior knowledge than the enforcement courts and sought for those courts to rely on their representations.

*Reliance / Causation.* Although the Ecuadorian appellate court that reviewed the Lago Agrio judgment refused to address Chevron's allegations of fraud (PX 430; PX 431), no legitimate court would have upheld a ghostwritten judgment it knew to have been the product of bribery. By affirming the Lago Agrio judgment, the Ecuadorian appellate necessarily relied on Defendants' material omissions regarding their corruption of the Lago Agrio court. Moreover, the Argentine court acted in reliance on the fraudulent Lago Agrio Judgment, by issuing "an *ex parte* embargo order, attaching the equivalent of tens of millions of dollars of assets . . . held by the Argentine Subsidiaries." PX 3000 (Veiga) ¶ 135; *see also* PX 2461. In addition, if Defendants had informed or were to inform the enforcement courts in Brazil and Canada that the Lago Agrio judgment was procured by fraud, it would undermine Defendants' enforcement attempts—at the very least, the existence of the enforcement actions themselves, initiated on the premise of a knowingly false assertion as to the validity of the judgment, itself causes an injury.

*Injury.* Chevron has been directly harmed by Defendants' enforcement attempts because it has had to expend significant resources defending itself in these enforcement actions. For example, Chevron "has spent no less than $1 million defending itself in Canada." PX 3000 (Veiga) ¶ 132. Similarly, Chevron has "incurred significant legal costs" defending the recognition action in Brazil, which is still pending. *Id.* ¶ 137. And Chevron Corporation was harmed by more than just the costs of defending the enforcement actions in Ecuador and Argentina because "valuable

trademarks held by [Chevron Intellectual Property, LLC]" were "among the assets embargoed." *Id.* ¶ 134; *see also* PX 418.  In Argentina, as a direct result of the embargos, a court  "[froze] the assets of Chevron's Argentine Subsidiaries and den[ied] them the ability to use receivables for profit-generating activity and even normal business operations" until "the Supreme Court of Argentina vacated the . . . embargo order [after] more than seven months."  PX 3000 (Veiga) ¶¶ 135–36.[64]  *See* FF ¶ 124.

### 5.  Defendants' Misrepresentations and Material Omissions to David Russell Harmed Chevron

David Russell worked "at Donziger's direction" from late 2003 to early 2005 (PX 3200 (Russell) ¶¶ 4, 5) and was "the chief environmental scientist" for the LAPs in the Lago Agrio litigation for the latter half of 2004 (*id.* ¶ 24).  Defendants and their agents, and specifically Donziger, made false representations to Russell, which omitted material information, with the intent to harm Chevron by inducing Russell to produce a damages estimate based on those misrepresentations—a damages estimate so exaggerated that it would coerce Chevron into settling the case for an inflated amount.  *Id.*  ¶¶ 8–22.  Chevron was directly harmed by Donziger's misrepresentations to Russell because it was forced to publicly combat the inflated damages estimate, which Defendants repeatedly showcased in their U.S. public pressure campaign.

*Misrepresentations and Material Omissions.*  As Defendants' chief scientist, Russell recommended "a thorough environmental investigation," but Donziger "didn't want an investigation done so he could continue to make exaggerated claims publicly to pressure Chevron into

---

[64] Chevron Corporation and Chevron Intellectual Property LLC are corporations registered in the United States. These are separate and distinct legal entities, and Chevron Corporation has explained as much in defense of foreign enforcement proceedings.  Nonetheless, Defendants successfully argued to the Ecuadorian court that the assets of Chevron subsidiaries were legally equivalent to the assets of Chevron Corporation.  *See* Dkt. 785-2 at 1-3.  That assertion, which is contrary to the facts and the law—but Defendants are estopped now from contradicting their falsehood and arguing that the embargo orders qualify only as "harm" to Chevron Intellectual Property LLC, and not also "harm" to Chevron Corporation.  *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000).

settlement" (PX 3200 (Russell) ¶ 25 (citing PX 688)).  Rather, Donziger told Russell to "just as-
sume that there was contamination" in the region and "that everything was from Chevron."  PX
3200 (Russell) ¶ 9.  While calculating his damages estimate, "Donziger was [Russell's] guiding
hand," but he did not provide Russell with, and did not allow Russell to collect, "any soil or wa-
ter samples," or "any environmental data."  *Id*. ¶ 5.  Rather than arming Russell with sampling
data necessary to support a valid scientific conclusion of any kind, Donziger withheld actual data
from Russell and "told [him] to assume that Chevron was responsible for environmental harm
caused," including those sites and stations "operated by Petroecuador."  *Id.* ¶ 6.  "Based on the
assumptions Donziger told [him] to use" (*id.* ¶ 6) and Donziger's "descriptions of the environ-
mental damage" (*id.* ¶ 10), Russell "provided Donziger with a $6.114 billion cost estimate" (*id.*)
that was "clearly and significantly exaggerated" (*id.* ¶ 12).  Because his "cost estimate was a
guess based on a short period of looking at sites without actual scientific data," Russell soon in-
formed Donziger and the Ecuadorian legal team that the "estimate was wildly inaccurate and had
no scientific data to back it up."  *Id.* ¶ 11; *see also* PX 2414 (Russell cost estimate).

Donziger also "misus[ed] [Russell's] cost estimate in Donziger's public campaign against
Chevron" (PX 3200 (Russell) ¶ 15), representing to the SEC that the estimate was valid, refer-
ring to it as an estimate for "basic clean-up," and claiming that a "comprehensive ecological re-
mediation could cost twice" as much (PX 754), when, in fact, the estimate "was wildly exagger-
ated based on Donziger's misrepresentations to [Russell]" (PX 3200 (Russell) ¶ 15).  Like
Donziger's representations to Russell, Donziger's statements to the SEC were "completely
false."  PX 3200 (Russell) ¶ 15; *see* PX 754 (SEC letter); PX 539# (press release).  The Ecuado-
rian legal team "acknowledged that the estimate of billions of dollars in costs was for PR purpos-
es."  *Id.* ¶ 11

*Reliance/Causation.*   Russell included the Petroecuador operation sites in his estimate because "Donziger told [him] to," explaining that Chevron was responsible for those sites because "Texaco gave Petroecuador the technology to operate [the sites] before Texaco left Ecuador."  PX 3200 (Russell) ¶ 6.  Russell is an environmental engineer, not a lawyer, so he justifiably "accepted what Donziger said and did not question Donziger's explanation."  *Id.* ¶ 6.  Moreover, Russell "reported to and took direction from only Donziger" (*id.* ¶ 32) and, because Russell "[does] not speak Spanish," he "relied on Donziger and others on the Ecuadorian plaintiffs' team" (*id.* ¶ 7) to provide all of the information about conditions in Ecuador.  In short, Russell "understood that Donziger was in charge" (*id.* ¶ 34) and was the sole "decision-maker" (*id.* ¶ 33) because Donziger alone "controlled the distribution of information in the case" (*id.* ¶ 34).

As Donziger made clear to Russell, "[Donziger] wanted a 'really big number'. . . for purposes of 'putting pressure' on Chevron to settle the litigation."  PX 3200 (Russell) ¶ 9.  But because he realized that Russell's "price tag" (*id.* ¶ 23) would not be big enough on its own, Donziger misled Russell about the extent of the alleged environmental contamination in the Oriente and about the extent of Chevron's responsibility for the alleged harm.  Donziger had led Russell "to believe that the cost estimate . . . was the first step in a serious effort to evaluate the conditions of the oil operations in Ecuador" (*id.* ¶ 13), but it became clear to Russell that his "wildly inaccurate" estimate (*id.* ¶ 11) was to be "the only dollar figure Donziger's team had to use in their strategy to pressure Chevron" (*id.* ¶ 16).  Based on Donziger's "lies and misrepresentations, [Russell] gave him what he wanted"—a preliminary cost estimate that "was grossly exaggerated and wildly inaccurate."  *Id.* ¶ 41.

*Injury.*  Chevron was directly harmed by Russell's inflated estimate because Chevron was forced to publicly refute the exaggerated amount, even after Russell had demanded Defendants cease using the estimate publicly.  *See* FF ¶¶ 83–87, 94.

### 6.   Defendants' Misrepresentations and Material Omissions to Dr. Charles Calmbacher Harmed Chevron

The LAP team selected Dr. Charles Calmbacher in 2004 to act as their testifying expert as part of the "judicial inspections" process in which party-nominated experts were to investigate on environmental conditions surrounding the former consortium oil production sites.  PX3300 (McMillen) ¶ 11.  But Dr. Calmbacher was fired from the LAP team when he concluded that the sites he inspected did not require further remediation or pose a risk to human health or the environment because Donziger "wanted the answer to be that there was contamination."  3/29/2010 Calmbacher Dep. 92:5–7, 115:15–24, 118:15–21; *see also* PX 2422.  Nevertheless, in order to "maintain [his] professional integrity," Dr. Calmbacher decided "to comply with [his] obligation to the . . . Ecuadorian court" by "writ[ing] and submit[ing] [his] report independent[ly]."  PX 2417.

Defendants and their agents, and specifically Donziger, falsely represented to Dr. Calmbacher that they would submit the report that he authorized to be filed, which contained his true conclusions, while omitting their intention to file a forged report that Dr. Calmbacher "did not write," containing conclusions that he "did not reach."  3/29/2010 Calmbacher Dep. 116:9–10.  Because Dr. Calmbacher expressly forbade Defendants from "contribut[ing] to . . . , review[ing] or edit[ing] [his] reports" (PX 2417 at 1), Donziger misrepresented, through David Russell, that initialed blank pages and signed signature pages were necessary to make "minor modifications, such as correcting typographical or formatting errors" (PX 3200 (Russell) ¶ 29), while failing to disclose Donziger's true intent to use those pages to file a report with wholly dif-

ferent conclusions from those of Dr. Calmbacher (PX 3200 (Russell) .

Donziger made these misrepresentations and material omissions with the intent to harm Chevron by providing a false factual basis for Defendants' inflated damages claims.  Dr. Calmbacher relied on Donziger's misrepresentations when he sent the signed and initialed pages as requested.  Chevron was directly harmed by Donziger's misrepresentations to Dr. Calmbacher because it was forced to expend resources uncovering and refuting the fraud.

*Misrepresentations.*  Because Donziger knew that Dr. Calmbacher's conclusions would be damaging to the LAPs' case against Chevron, Donziger devised to submit a fake report in Dr. Calmbacher's name.  First, Donziger let Dr. Calmbacher believe that he would comply with Dr. Calmbacher's expressed desire to submit "[his] report independent of [the LAPs]."  PX 2417 at 1.  Next, Donziger sent Dr. Calmbacher "a very innocuous report," which he knew Dr. Calmbacher would "ha[ve] no problem signing."  3/29/2010 Calmbacher Dep. 62:5–62:18. Donziger then "asked [Dr. Calmbacher] to initial some [blank] papers on the corner so [the report] could be printed" in Ecuador.  *Id.* 62:19–62:23.  At first, Dr. Calmbacher refused.  *Id.*  But based on "what Donziger told [David Russell]," Dr. Calmbacher was led to believe that "the blank signature pages were necessary in case Donziger and his team had to make minor modifications, such as correcting typographical or formatting errors, and then reprint the reports."  PX 3200 (Russell) ¶ 29.

*Omissions.*  Donziger knew that if Dr. Calmbacher knew the truth, he would never have authorized the reports to be filed, so Donziger withheld his true intentions from Dr. Calmbacher. 3/29/2010 Calmbacher Dep. 62:11–18; PX 3200 (Russell) ¶ 29.  Donziger did not tell him that fake reports, containing Dr. Calmbacher's initials and signatures, were filed with the Lago Agrio court, which misstated the evidence and recited conclusions that Dr. Calmbacher "did not reach."

3/29/2010 Calmbacher Dep. 112:1–119:1.  Defendants never disclosed their fraudulent conduct to the Lago Agrio court and have never withdrawn the forged reports.

*Reliance/Causation.*  As a result of Donziger's assurances that sending the requested pages was "honest," and because he understood that his report "had to be initialed," Dr. Calmbacher complied with Donziger's request.  3/29/2010 Calmbacher Dep. 62:19–63:06; PX 3200 (Russell) ¶ 29.  Dr. Calmbacher therefore relied on Donziger's misrepresentations and omissions because, had Donziger disclosed his intent to falsify Dr. Calmbacher's report, Dr. Calmbacher never would have sent signed signature pages and initialed blank pages to Donziger.

*Injury.*  Defendants made these misrepresentations and fraudulent omissions with the specific intent to create a false factual basis for their claims in the Lago Agrio litigation in order to either obtain judgment against Chevron or coerce Chevron into settling the case.  Had Dr. Calmbacher's true report been submitted to the Lago Agrio court, their scheme to corrupt the Ecuadorian judiciary would have been revealed sooner, which may have prevented further injury to Chevron.  Instead, Chevron has been forced to expend resources uncovering and refuting the fraudulent Calmbacher report.  *See* FF ¶¶ 36, 111, 119.

### 7.  Defendants' Misrepresentations and Material Omissions to the Lago Agrio Court Harmed Chevron

To secure their multi-billion dollar judgment against Chevron, Defendants made multiple material misrepresentations to the judges who preceded former judge Zambrano on the Lago Agrio court while omitting material information that allowed their false statements to remain in the Lago Agrio record.  And in defense of their fraudulent judgment on appeal, Defendants failed to disclose to the Ecuadorian appellate courts that the judgment had been obtained by fraud, bribery, and corruption.  Defendants' misrepresentations and material omissions to the Lago

Agrio court and the Ecuadorian appellate courts directly harmed Chevron, which was forced to expend significant resources to uncover the fraud and defend enforcement of the judgment.

*Misrepresentations.*  Before Zambrano's appointment as the judge overseeing the case, the LAP team filed two forged and fraudulent reports with the Lago Agrio court under the signature of Dr. Charles Calmbacher, when in fact Dr. Calmbacher did not write the filed reports nor reach the conclusions they contained.  3/29/2010 Calmbacher Dep. 116:9–10, 60:22–63:11.  Defendants also submitted multiple filings in the Lago Agrio court in which they claimed that Cabrera was working independently and impartially, and denied Chevron's allegations to the contrary.  *See, e.g.*, PX 372 at 2; PX 374; PX 384R at 5–7; PX 2200 (listing evidence of false denials).  When their ghostwriting of the Cabrera report started to come to light, the LAPs' team purportedly came forward to "clarify the truth about Cabrera's work" (PX 384R at 2), but instead made the false and misleading representation that "Chevron enjoyed the same opportunity as [Defendants] to provide information to Cabrera in support of its position in the case" (*id.* at 6).

*Omissions.*  Defendants failed to inform Zambrano's predecessors then presiding over the Lago Agrio litigation that the reports filed under Dr. Calmbacher's signature had been forged.  With respect to Cabrera, although the Lago Agrio court ordered him to perform an impartial and independent environmental assessment (PX 348 at 6) and required him to list all the sources for the information contained in his report (PX 357 at 1), Defendants failed to disclose that they wrote the bulk of Cabrera's report, including the findings and damages assessment (*see, e.g.*, PX 1018; PX 1648; PX 2224).  Defendants also failed to disclose that they bribed Cabrera with non-court-approved payments without disclosure to Chevron.  *See, e.g.*, PX 877.  Defendants maintained the false impression their misrepresentations had created by submitting objections to the Cabrera report in the form of comments without disclosing that they had actually written the re-

port.  *See, e.g.*, PX 1060, PX 2225.  But Defendants concealed from the Lago Agrio court that they had written the bulk of Cabrera's supplemental report submitted in response to the parties' (including Defendants') comments.  *See, e.g.*, PX 952.  Further, by withholding from the Ecuadorian appellate courts the LAP team's forgery of Calmbacher's reports, bribery of Cabrera and ghostwriting of his report, and bribery of Zambrano and ghostwriting of the judgment from on appeal of the Lago Agrio judgment, Defendants sought appellate affirmance of a judgment they knew to be the product of fraud and corruption.

   ***Reliance/Causation.***  Had Defendants informed the judges who preceded Zambrano that they had forged and falsified Dr. Calmbacher's reports, and ghostwritten the Cabrera report after bribing him outside the court process, those judges would have no choice but to strike the evidence.  But because Defendants omitted this material information, the evidence remained in the record, and Defendants were permitted to trumpet Cabrera's $27 billion damages recommendation in the United States.  Similarly, no legitimate appellate court would have affirmed a judgment issued by a corrupt judge and supported by falsified evidence obtained through forgery and bribery.  Thus, in affirming the Lago Agrio judgment, the Ecuadorian appellate court necessarily relied on Defendants' material omissions.  PX 430; PX 431.

   ***Injury.***  Defendants' deception of the Lago Agrio court and corruption of the Ecuadorian judicial system resulted in the judgment against Chevron, which Defendants have sought to enforce in multiple foreign countries and have wielded like a club in the media to pressure Chevron to settle.  *See* FF ¶¶ 11, 39–40.

### 8.  Defendants' Misrepresentations and Material Omissions to Government Agencies and Public Officials in the United States Harmed Chevron

   In order to exert pressure over Chevron to settle the case, Defendants repeated their false mantra that "a basic clean-up would cost at least $6 billion" (PX 754 at 1) and that Cabrera was

"an independent court expert" who had "found that Chevron is liable for up to $27 billion in damages" (PX 2377 at 5) to government agencies including the SEC and DOJ, and U.S. public officials, including the New York State Attorney General and the New York City Comptroller, who is the sole trustee of a New York state retirement fund with significant holdings of Chevron stock.  Because Defendants also omitted the material information that they had bribed Cabrera and ghostwritten his report, these agencies and officials justifiably sought explanations from Chevron in reliance on Defendants' misrepresentations.  Defendants used these false statements in their scheme to defraud Chevron by ratcheting up the pressure on Chevron through the media and its shareholders.  *See, e.g.*, PX 505#; PX 524#.  Chevron was directly harmed by Defendants' misrepresentations to these officials because it was forced to respond to them and face the shareholder pressure to settle the case that was based upon faulty information provided to intentionally mislead them.

 ***Misrepresentations.***  Even though Russell denounced his "grossly exaggerated" cost estimate and repeatedly demanded that Defendants cease from repeating it (PX 3200 (Russell) ¶ 41), Defendants and their agents wrote to the SEC in January 2006 that "a basic clean-up would cost at least $6 billion" and that "[a] comprehensive ecological remediation could cost twice that" (PX 754 at 1) and recited this figure in a letter to the DOJ and SEC later that year, pointing out that it was "exclusive of personal damages" (PX 787 at 4).  Then, in March 2008, Defendants wrote again to the SEC "request[ing] that sanctions be imposed" against Chevron claiming that Chevron's "legal position" had "deteriorated significantly" in light of the Lago Agrio court's "appointment of an independent special master . . ., Richard Cabrera," who was "assess[ing] culpability and ascertain[ing] the monetary value of the damages caused," which "could surpass $10 billion."   PX 497# at 1–2.  Donziger repeated these misrepresentations to

Thomas DiNapoli, the New York City Comptroller, with the intent to harm Chevron by inducing DiNapoli to contact the New York Attorney General Andrew Cuomo, "requesting assistance on the Chevron disclosure matter to enable Cuomo to write a letter to Chevron seeking more information" (PX 1106), and to introduce a shareholder resolution demanding Chevron settle the case. *See* PX 5802; PX 7457; PX 7485.  With DiNapoli's assistance, Defendants could "leverage Cuomo" into putting public pressure on Chevron to settle the case by repeating those same false statements.  PX 1048.

   *Omissions.*  Defendants' false representations to DiNapoli, Cuomo, the SEC, and the DOJ created a false impression about the legitimacy of the Lago Agrio litigation, which Defendants intended to use to pressure Chevron to settle.  To preserve the false impression they had created, Defendants omitted the material information that Russell had disavowed the "wildly inaccurate" $6 billion damages estimate (PX 3200 (Russell) ¶ 41) and that Defendants had bribed Cabrera and ghostwritten his report.  Defendants had a duty to disclose this information due to their superior knowledge and intent that the government officials would act on their misleading statements.

   *Reliance/Causation.*  Both DiNapoli and Cuomo acted in reliance of Defendants' misrepresentations.  Because DiNapoli believed Donziger's representations, he wrote to Chevron, questioning the Company's strategy in the Lago Agrio litigation, citing "the court-appointed expert, Professor Richard Cabrera's" conclusion that Chevron's liability "may be as high as $16 billion." PX 5801 at 1.  DiNapoli wrote again indicating his intent to sponsor a Chevron shareholder resolution citing Cabrera's supplemental assessment "that Chevron be held liable for up to $27.3 billion in damages."   PX 5802 at 2.  DiNapoli introduced the resolution as the custodian of the City's pension funds and, on the date of Chevron's annual meeting, issued a press release de-

manding that Chevron settle the case.  PX 5803; *see also* PX 7490.  The next day, the LAP team issued a press release characterizing DiNapoli's letter as "directly challeng[ing]" Chevron's assertion that "the Ecuador judgment is without merit."  PX 5804.  Similarly, on May 4, 2009, Cuomo wrote to Chevron concerning the Lago Agrio litigation as a result of "complaints" his office had received regarding Chevron's legal risk disclosures in light of the alleged findings of a "technical expert" (Cabrera) that the "damages assessed against Chevron may be as high as $27 billion."  PX 1131 at 1.  Had they known that Defendants bribed Cabrera and wrote his report, DiNapoli would not have attempted to influence Chevron to settle the Lago Agrio litigation and Cuomo would not have been induced to inquire into Chevron's liability disclosure obligations.

*Injury.*  Chevron was directly harmed by Donziger's misrepresentations and material omissions to U.S. agencies and officials because it was forced to respond publicly while also working to uncover Defendants' extortionate scheme.  For example, within two weeks of the Cuomo letter, Defendants issued a press release stating that "New York Attorney General Andrew Cuomo opened a probe of Chevron on allegations the company has misled shareholders about the Ecuador liability."  PX 524# at 2.  Defendants' misrepresentations to these agencies and officials, and the inquiries they prompted, allowed Defendants to increase the public pressure on Chevron to settle the case.  PX 5800 (Zygocki) ¶ 20.  Chevron's public reputation has also suffered, which has hampered its ability to compete for talented employees in the marketplace.  *Id.* ¶ 22.  *See* FF ¶ 11.

### 9.  Defendants' Other Misrepresentations and Material Omissions Harmed Chevron

Defendants and their agents, and in particular Donziger, made material misrepresentations about Cabrera's independence and the Lago Agrio judgment's legitimacy to various other individuals, including his former co-counsel and employees and the so-called "cleansing" ex-

perts, while omitting the material information that Defendants had bribed Cabrera and Zambrano and ghostwritten both the Cabrera report and the Lago Agrio judgment itself.  Donziger knew that without misleading these individuals, they would not assist in the campaign against Chevron.  Chevron was directly harmed by these individuals' reliance on Donziger's misrepresentations because their assistance perpetuated Defendants' scheme against Chevron.

  ***Misrepresentation.***  Donziger misrepresented to his fellow attorneys on the case that Cabrera was an independent and neutral expert, that any contacts between the LAPs' team and Cabrera were permissible under Ecuadorian law, and that Chevron's claims to the contrary were false.[65]  Donziger and the LAPs' team similarly misrepresented to the "cleansing" experts that Cabrera was independent and his data were reliable.[66]

  ***Omissions.***  Donziger omitted material facts that might dispel the false impression he had created, like the extent of Defendants' contacts with the Lago Agrio court and Cabrera, and that Stratus had ghostwritten Cabrera's report.  Donziger made these misrepresentations and material omissions with the specific intent to mislead his fellow attorneys to induce them to work on the case against Chevron.  Similarly, Donziger omitted this information from the "cleansing" experts with the specific intent to harm Chevron by inducing the "cleansing" experts to produce reports that would corroborate the Cabrera report and justify a massive judgment against Chevron.[67]

  ***Reliance/Causation.***  Because they believed Donziger's representations, Shinder, McDermott, Woods, and others all worked, perhaps unwittingly, to obtain the Lago Agrio judg-

---

[65] *See* PX 1259; 6/18/2013 Woods Dep. 206:11–16, 207:7–208:20, 208:25–209:8; Tr. (Shinder) 1261:25–1263:5, 1263:16–23, 1264:5–1266:1, 1268:4–1270:6, 1271:16–1274:6; 5/21/2013 McDermott Dep. 36:19–24, 37:2–10, 55:6–14, 56:21–22, 57:16–20, 82:12–86:7.

[66] 12/16/2010 Picone Dep. 82:22–83:2, 83:5, 83:7–9, 83:12, 83:14–18, 83:20–22, 85:21; 12/16/2010 Shefftz Dep. 68:14–69:4; PX 1410.

[67] 12/16/2010 Allen Dep. 197:23–198:11, 198:13–15, 198:17–20, 198:22–199:6; 199:8–11, 199:13–14, 199:16–22, 199:24, 200:11–22, 200:24; 12/16/2010 Picone Dep. 82:22–83:2, 83:5, 83:7–9, 83:12, 83:14–18, 83:20–22, 85:1.

ment, delay or obstruct discovery in the United States, and/or enforce the Lago Agrio judgment abroad.  Their reliance on Donziger's misrepresentations was justifiable because Donziger was the primary attorney in charge of the case and the sole contact with the LAPs.  And it was these misrepresentations that induced them to assist the LAPs' team.  Had these attorneys known the truth, however, they would have been ethically bound to have refused to assist Donziger in his extortionate scheme or to have ceased immediately, as they did when they each eventually learned the truth.  Likewise, because the "cleansing" experts believed Donziger's misrepresentations, they created reports corroborating the Cabrera report.  Their reliance on Donziger's misrepresentations was justifiable because Donziger was the primary attorney on the case and the sole source of information concerning the Cabrera report and its underlying evidence.

*Injury.*  Chevron was harmed directly by the actions of Donziger's former co-counsel and employees and the "cleansing" experts in reliance on Donziger's misrepresentations because Chevron was forced to defend the action in Ecuador and to respond to the "cleansing" arguments and reports, seek discovery to uncover the fraud in the United States, and, ultimately, defend against enforcement of the Lago Agrio judgment around the world.  *See* FF ¶¶ 63–64.

## III.    Camacho and Piaguaje Are Liable for the Actions of Donziger, Fajardo and Other Agents as Vicariously Liable Principals, and as Co-Conspirators

The LAPs' personal authorization and support of the conduct of their agents, including Donziger, is essential to the fraud and racketeering described in this action.  The LAPs' participation as parties in the Lago Agrio litigation and in the enforcement actions is required for those actions to proceed, and therefore required for Donziger and others to corrupt those actions into tools of their scheme against Chevron.  Donziger and the other conspirators' media profile and access to governments and influential private actors is predicated on their status as the LAPs' lawyer—that client relationship is the calling card they use to obtain financing, promote their

allegations, and induce government investigations.  Yet despite the abundant evidence of fraud, the LAPs have continually renewed their agency relationship with Donziger, Fajardo and others, ratifying and adopting that conduct even through the trial in this action.  And they have tried profit from the misconduct, bringing enforcement actions on two continents.

The LAPs' participation through representation in this conduct subjects them to liability on two distinct grounds.  First, they are vicariously liable to Chevron for the tortious actions of their agents, including for Chevron's common law fraud claim.  Under New York law, "[w]hen . . . agents are acting within the scope of their authority, the principal is liable for any acts of fraud the agents commit."  *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1355 (S.D.N.Y. 1988).  Second, they are liable to Chevron for their furtherance of Donziger and the others' tortious conspiracy, under New York common law civil conspiracy. *See* Dkt. 283 (Amended Complaint) at ¶¶ 414–19 (Claim for Civil Conspiracy); *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986) (civil conspiracy claims "connect the actions of separate defendants with an otherwise actionable tort").  *See* FF ¶¶ 137–54.

### A. The LAPs Have Entered Into, and Ratified, Agreements Authorizing Donziger and Other Agents to Act on Their Behalf

#### 1. Donziger

At the heart of this case is Steven Donziger who, as discussed *supra*, controlled and managed the conspiracy to fraudulently obtain the Ecuadorian judgment.  The LAPs' January 5, 2011 retainer agreement with Donziger designated him as their "United States representative," with responsibility to "further the *interests of the Plaintiffs* in the Litigation (including, without limitation, in developing and executing defensive and offensive litigation strategy, *including actions under 28 USC § 1782* and all related Litigation now occurring or which may arise in the future . . . ."  PX 558 at 2 (emphasis added); *see also* PX 248.  Chevron proved at trial that Donziger has

pursued his mandate from the LAPs through fraud and racketeering, and the LAPs' repeated re-affirmation of their agreements with Donziger demonstrates that they willingly accept and desire their agreement to encompass corrupt acts.

Throughout his many years of involvement in the Lago Agrio litigation, Donziger conducted everything he did on behalf of the LAPs within the very broad scope of authority the LAPs granted him. Donziger himself admits that he was hired to undertake "a high-profile litigation on behalf of" the LAPs and that all of his conduct was, at least in his "own mind," merely "advocacy on our side of the case." *See* DX 1750 (Donziger) ¶¶ 11, 13.

The record contains a number of agreements between Donziger and the LAPs appointing Donziger as the LAPs' agent in the Lago Agrio litigation. In the most recent agreement, dated January 5, 2011, Donziger agrees to represent the LAPs "in connection with the [Lago Agrio] Litigation and . . . zealously prosecute and defend the Litigation." PX 558 at 2. His responsibilities include "coordinating the overall legal strategy of the [LAPs] to pursue and defend all aspects of the [Lago Agrio] Litigation . . . including, without limitation, coordinating the United States legal strategy with the Ecuadorian legal strategy." *Id.* at 2–3. Other responsibilities include coordinating the U.S. lawyers, procuring funding, organizing non-legal consultants, and coordinating the pressure campaign. *Id.* Finally, Donziger is "required to provide his efforts in the United States, Ecuador and elsewhere." *Id.* This agreement clearly grants to Donziger a swath of powers broad enough to encompass his misconduct.

The testimony of his former cohorts and financiers also prove that Donziger acted as an agent to the LAPs. In the words of Christopher Bogart, "Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary inter-face with Burford . . . ." PX 3100 (Bogart) ¶ 7. Kohn echoed those sentiments, testifying that

"Mr. Donziger was the person primarily responsible for making day-to-day decisions in the management of the case, including hiring Ecuadoran personnel for the case, scientists and other consultants, public relations personnel, lobbyists, and Ecuadoran counsel." PX 5600 (Kohn) ¶ 12. David Russell testified, "Donziger identified himself as the lead U.S. attorney in the Ecuadorian litigation." PX 3200 (Russell) ¶ 3. And Jeffrey Shinder, whom Donziger retained to represent the LAPs briefly, before Shinder withdrew upon hearing Beltman's "shocking" disclosures about the ghostwriting of the Cabrera report (Tr. (Shinder) 1292:22–1293:9), testified specifically that Donziger acted on the LAPs' behalf in retaining Shinder's law firm (*id.* 1253:6–18; 1284:25–1285:9) and that he represented to Shinder that he "supervised, coordinated the case, local counsel, the experts, pretty much the entire gamut of the proceeding was under his sort of supervision" (*id.* 1258:21–23).

Donziger's own contemporaneous words and thoughts prove he acted within the scope of the granted authority. For example, Donziger wrote to Yanza that "consistent with years of practice as well as the agreement between the clients and the U.S. attorneys, [] the Kohn firm would be responsible for covering the basic out-of-pocket expenses of the case while my firm would be primarily responsible for the overall management of the case in Ecuador and related advocacy efforts, such as media and outreach to environmental groups and shareholders." PX 1222 at 1. In a book proposal, Donziger described himself as "the lead lawyer in the class-action trial . . . I am the person primarily responsible for putting this team together and supervising it. . . ." PX 806R at 3.

Finally, the LAPs themselves have testified that Donziger acted on their behalf. Camacho, during his deposition, testified that he understood Donziger "represent[ed]" him. 5/14/2013 Camacho Dep. 94:06–94:14. Piaguaje testified in a similar manner at his deposition

(*see* 5/15/2013 Piaguaje Dep. 53:24–54:01; *see also* Tr. (J. Piaguaje) 2395:21–24) and further testified that Donziger's pressuring of judges was done to "support[] us . . . so that there will be compensation for us."  5/15/2013 Piaguaje Dep. 114:11–17.  *See* FF ¶¶ 137, 155–61.

## 2.  Pablo Fajardo and the Other Ecuadorian Attorneys

There is no dispute that the Ecuadorian attorneys, including Fajardo, Ponce, Saenz, and Prieto, are the LAPs' agents.  *See* PX 8087 at 2.  Moreover, the Court has twice found that these Ecuadorian attorneys are agents of the LAPs.  *See Chevron Corp. v. Salazar, et al.*, No. 11 Civ. 3718, Dkt. 101 (S.D.N.Y. July 6, 2011), at 3; Dkt. 1529 at 42.

The LAPs expressly authorized this agency in a November 2010 power of attorney signed by defendants Camacho and Piaguaje, 39 other LAPs, and Fajardo.  PX 392.  This power of attorney invested in Fajardo "the widest of powers and attributes that the law confers" including the authority to "make and/or sign any kind of agreements for setting up the contracting of any kind of consultant, whether this be a legal professional or not."  *Id.* at 4–5.  In addition, Fajardo and the LAPs entered into an agreement on January 5, 2011, whereby Fajardo's engagement as "lead Ecuadorian legal counsel" was continued.  PX 559 at 2.  This agreement authorized Fajardo to "assembl[e] and organiz[e] the various Ecuadoran [sic] lawyers and law firms" that would represent the LAPs and "exercise responsibility for the strategic direction of the [Lago Agrio] Litigation," including "coordinating the Ecuadoran [sic] legal strategy with the United States legal strategy."  *Id.*  Notwithstanding the evidence of fraud and corruption against Fajardo that has been presented to the LAPs in numerous litigations where they are party, they have never repudiated Fajardo's conduct, and indeed they have attempted to defend it every turn. *See* FF ¶¶ 139, 155–60.

### 3.  Luis Yanza

This Court has already found that Luis Yanza, though not an attorney, is an agent of the LAPs.  Dkt. 1529 at 42–44.  Regardless, the trial record clearly establishes that Yanza, as the representative of the Asamblea, is an agent of the LAPs and acted within that authority.

The Asamblea formally granted Yanza a power of attorney by at least March 1, 2010, which allowed him to, on their behalf, "sign contracts, agreements or conventions . . . for the benefit of and in support of the legal case that we are pursuing against Chevron Corporation and the different legal and related extrajudicial activities."  PX 381 at 5.  Exercising this authority, Yanza has signed a number of retention agreements with various co-conspirators on behalf of the LAPs, including Emery Celli (PX 544), Patton Boggs (PX 553), Motley Rice (PX 557), Donziger (PX 558), and Fajardo (PX 559).  Yanza also signed funding agreements with DeLeon (PX 545 at 18) and Burford (PX 552 at 79) on behalf of the LAPs.  Notwithstanding the evidence of fraud and corruption against Yanza that has been presented to the LAPs in numerous litigations where they are party, they have never repudiated Yanza's conduct, and indeed they have attempted to defend it at every turn.  *See* FF ¶¶ 140, 155–60.

### 4.  Other U.S. Counsel

The LAP team consists of a number of U.S.-based attorneys who acted within the scope of authority granted to them by the LAPs in furtherance of their fraudulent scheme.  The LAPs have never repudiated the conduct of any of these lawyers.  To the contrary, they fired Kohn Swift not because the firm had done anything corrupt, but because Joseph Kohn asked too many questions and became insistent about access to documents and information.  PX 5600 (Kohn) ¶¶ 22–25, 54–61, 65–68.

The LAPs retained Patton Boggs in an agreement authorizing Patton Boggs to "serve as legal counsel to the Plaintiffs in connection with the [Lago Agrio] Litigation" with "primary re-

sponsibility for U.S. and non-Ecuadorian aspects of the Litigation," required to "coordinate its efforts as requested by the [LAPs]."  PX 553. at 3.  Donziger also testified that he recommended to Fajardo and Yanza that the LAPs hire Patton Boggs.  1/18/2011 Donziger Dep. 3198:9–15.  Similarly, the LAPs granted Emery Celli and Motley Rice authority to act on their behalf through retainer agreements.  *See* PX 544 at 1; PX 551 at 3; PX 557 at 2.  Aaron Marr Page, Andrew Woods, and Graham Erion, as employees of Donziger, acted as agents of the LAPs through the authority granted to Donziger to hire U.S. counsel to further the Lago Agrio litigation.  *See* PX 558 at 3; *see also* PX 1484 at 1–3 (privilege log identifying LAPs counsel).  Moreover, Page entered into an agreement with Donziger whereby Page would assist Donziger in the Lago Agrio litigation, "pursuant to [Donziger's] authority as representative on behalf of the [LAPs]."  PX 2364 at 7.

Kohn Swift was authorized to act on behalf of the LAPs through several agreements, including the 1993 agreement between Kohn, Bonifaz and the LAPs to litigate the *Aguinda* case in New York (PX 631) and the 2006 agreement between Kohn, Donziger, Bonifaz, and the LAPs to allow their firms to "handle the litigation of this case in Ecuador and/or the United States."  PX 248 at 1; PX 5600 (Kohn) ¶¶ 1, 7 (discussing scope of retention).  *See* FF ¶¶ 148–60.

### 5.  Stratus and Other Expert Consultants

Stratus acted pursuant to an agreement with Kohn Swift, entered into on August 20, 2007, in which Stratus agreed to assess remediation costs, assist in groundwater investigation, and assess the "case science" in the form of a "report."  PX 633 at 7–9.  The work would be headed by Beltman and Maest.  *Id.*  When Kohn Swift withdrew from the case, Donziger confirmed retention of Stratus whereby "all work [Stratus] performed [was] at the request and direction of [Donziger]."  PX 1210.  Although the LAPs did not enter into an agreement directly with Stratus, Stratus's agency flows directly from Donziger's authority to hire consultants.  *See* PX

558 at 3.  The same is true of the other expert consultants, such as Bill Powers, Vincent Uhl, and

the "cleansing" experts who worked on the LAPs' case at Donziger's direction.  *See* FF ¶¶ 144,

155–60.

### B.  The LAPs Have Taken Affirmative Steps to Ratify and Benefit From Their Agents' Frauds Even After Becoming Aware of These Frauds

The record is clear that the LAPs were aware of Chevron's allegations of misconduct by

their agents, and of the evidence in support of those allegation.  Camacho received and read

Chevron's complaint.  PX 2387.  He also testified that he was aware that Chevron alleged the

LAP team had committed fraud.  5/14/2013 Camacho Dep. 195:21–25.  Likewise, Piaguaje testi-

fied that he was aware of Chevron's allegations after Chevron filed its complaint.  DX 1800 (J.

Piaguaje) ¶¶ 18–24; Tr. (J. Piaguaje) 2435:9–15.  And of course, the Camacho and Piaguaje's

counsel in this action have been under an ethical obligation throughout to keep their clients ap-

prised of the charges against them and the basis for those charges.  N.Y. R. Prof. Conduct, 1.4(a)

(2013).  Yet their response has not been to renounce or even question the conduct of their agents.

Instead, they have defended it—including throughout this litigation, where their strategy has

been to defend their agents' conduct, not distance themselves from it.

When confronted with evidence of misconduct, the LAPs have refused to allow for any

hint of repudiation or put any limits on the scope of their authorizations to their agents.  For ex-

ample, the Special Master asked Camacho in his deposition in this action, "if it turns out that it

was obtained by fraud, do you believe that the judgment should still be collected?"  5/14/2013

Camacho Dep. 247:22–248:6.  To which Camacho evasively replied, "I cannot—I cannot answer

that, because here I can never prove and I don't believe there was a fraud."  *Id.* Similarly,

Piaguaje viewed a video clip of Donziger pressuring an Ecuadorian judge, and did not disavow

the conduct.  5/15/2013 Piaguaje Dep. 113:14–17; 113:23–114:3; 114:11–17.  Instead he testi-

fied that "we have always said to those who are supporting us, to say, so that there will be compensation for us. So these are words being said by those supporting us." *Id.* 114:14–17. Furthermore, Piaguaje testified at trial that Fajardo's representation of the LAPs had not been revoked (Tr. (J. Piaguaje) 2387:23–2388:3), as Fajardo was "the person best suited to represent [Piaguaje]" (Tr. (J. Piaguaje) 2391:17–2392:11).

Rather than disavow their agents' misconduct, the LAPs have affirmatively ratified and approved such acts throughout this litigation. In a November 2010 agreement between the LAPs and Fajardo, the LAPs retroactively "ratifie[d] and approve[d]" Fajardo's actions in the Lago Agrio litigation and other litigations, whether "carried out directly or through other persons." *See* PX 390 at 4–5; PX 391 at 6. Fajardo himself relied on this ratification when he submitted his misleading declaration to various Federal courts in the § 1782 actions. *See, e.g.*, PX 1471 at 9. When asked about this agreement, Camacho testified at his deposition that he understood he was ratifying Fajardo's actions in order to allow the Lago Agrio litigation to continue. 5/14/2013 Camacho Dep. 150:2–9. Piaguaje also testified at trial that, in this agreement, he approved of every action taken by Fajardo on behalf of the LAPs in any court as well as every action by Fajardo to raise money. Tr. (J. Piaguaje) 2388:15–2391:2.

The LAPs further ratified Fajardo and Donziger's agency with new retainer agreements on January 5, 2011, giving both of them contingent interests in the judgment. PX 558 at 3; PX 559 at 2. The agreement with Donziger states that Donziger has "acted as the primary United States attorney on behalf of the Plaintiffs to date," and charges him with, *inter alia,* "assembling and organizing the various non-legal advisors, experts and service providers," "coordinating the media, public affairs and public relations," and "retaining lobbyists" on behalf of the LAPs. PX 558 at 1–3.

Finally, documents produced at the close of trial revealed that during a January 2013 meeting of the Asamblea, Donziger and the LAPs discussed Chevron's allegations, including the fact that Donziger's conduct in fraudulently obtaining the Cabrera report was "serious" and "harms the case." PX 7033A at 4. Yet the LAPs resolved to recognize Donziger's "excellent job and work" and allowed Donziger to continue to represent them. *Id.* at 5; *see also* Tr. (H. Piaguaje) 2711:4–5; PX 1502 at 5.

In addition to these acts of ratification, the LAPs have aided their agents and sought to benefit from the fruits of the corrupt scheme by filing enforcement actions in Argentina, Brazil, Canada, and Ecuador. PX 418; PX 1004; PX 2306; PX 2461; PX 448. *See* FF ¶¶ 156–60.

### C. This Conduct Establishes Camacho and Piaguaje's Vicarious Liability for Their Agents' Frauds

Under New York law, "[w]hen . . . agents are acting within the scope of their authority, the principal is liable for any acts of fraud the agents commit." *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.*, 689 F. Supp. 1340, 1355 (S.D.N.Y. 1988); *see also, e.g.*, *Chase Manhattan Bank, N.A. v Perla*, 65 A.D.2d 207, 211 (4th Dep't 1978) (client is liable for the acts of attorney conducted in client's name). And even where an agent's conduct was outside the scope of the agency, the principal has "a duty to repudiate the act within a reasonable time period after receipt of information of the unauthorized acts." *In re Barbieri*, 380 B.R. 284, 295 (E.D.N.Y. 2007). Moreover, "a principal that accepts the benefits of its agent's misdeeds is estopped to deny knowledge of the facts of which the agent was aware." *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 427 N.Y.S.2d 961, 968 (1980).

The evidence demonstrates beyond dispute that Donziger and the other parties identified above are agents of the LAPs. The scope of their agency relationships are defined broadly, and the LAPs have offered no evidence or argument, or even asserted, that the conduct proven at trial

was outside the scope of these relationships.  And if there was any doubt, they have repeatedly

ratified that conduct in written agreements (PX 390 at 4–5; PX 391 at 6; PX 558 at 3; PX 559 at

2) and in their testimony in this action (*e.g.* 5/14/2013 Camacho Dep. 150:2–9; Tr. (J. Piaguaje)

2388:15–2391:2).

Nor have they renounced it, even on a conditional basis.  Indeed, in his closing argument,

the LAPs' counsel referred to Donziger and the other conspirators as his clients' "representa-

tives" and acknowledged that the propriety of the acts of those "representatives" was "central to

deciding" whether Camacho and Piaguaje "did anything wrong."  Tr. 2927:16–19.  At no point

did he suggest that his clients were not liable because their "representatives" had acted outside

the scope of their authority.  *See* Tr. 2924–2931.

To the contrary, the LAPs have implicitly ratified their agents' acts by seeking to benefit

from them through enforcement actions.  PX 418; PX 1004; PX 2306; PX 2461.

### D.  This Conduct Establishes That Defendants Are Liable for Civil Conspiracy

Defendants' liability is not limited to their vicarious liability for the conduct of their

agents—they are also liable as conspirators who have agreed to facilitate, and engaged in overt

acts to facilitate, the known corrupt conduct engaged in by Donziger and the rest of the LAP

team.  Indeed, among their overt acts, the continued retention of Donziger and Fajardo as their

lawyers is a fundamental act that has been and continues to be essential to Defendants' scheme.

And their filing of enforcement actions in Ecuador and other countries is essential to Donziger's

scheme to obtain his largest profit yet from the fraudulent judgment he and his co-conspirators

procured.

"A conspiracy is alleged for the purpose of showing that a wrong was committed jointly

by the conspirators and that, because of their common purpose and interest, the acts of one may

be imputed to the others."  *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981).  Civ-

il conspiracy claims "connect the actions of separate defendants with an otherwise actionable tort." *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).  In addition to proving a valid underlying tort claim—which Chevron has established under both common law fraud and section 487—a civil conspiracy plaintiff must prove the following: "'(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'" *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 355 (S.D.N.Y. 2010) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F. Supp. 1260, 1267 (S.D.N.Y.1991)).

The existence of the agreement between Donziger and the LAPs is not in dispute—to the contrary, it is memorialized in multiple agreements and admitted to by all parties.  And it is a "corrupt agreement" because it authorizes Donziger and others to obtain property from Chevron through unlawful means, including fraud and other illegal acts.  The agreement itself need not specify the illegal acts intended, "[i]t is sufficient if the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts charged, although such agreement be not manifested by any formal words." *Bedard v. La Bier*, 20 Misc. 2d 614, 616 (Sup. Ct. 1959).  The corrupt agreement "may be inferred where the parties are apparently pursuing the same object, whether acting separately or together, by common or different means, all leading to the same unlawful result." *Id*. at 616.  Camacho and Piaguaje's repeated affirmance of the agreement and their efforts to further its object through enforcement actions confirm that they intend for their agreement to encompass Donziger and others' demonstrated illegal acts.

Camacho and Piaguaje have also taken more than one "specific step toward the further-ance of their conspiracy." *Corris v. White*, 29 A.D.2d 470, 473 (4th Dep't 1968). The attorney-client relationship between Donziger and the LAPs is more than just an agreement, but is an essential element of Donziger's racketeering scheme. Without the LAPs' continued authorization to act on their behalf in connection with the Lago Agrio litigation, Donziger would be largely declawed and could never have generated the fraudulent court proceedings and fraudulent pressure campaign he has waged against Chevron. The LAPs' authorizations of Donziger to act on their behalf are the most valuable overt act they could take in furtherance of the conspiracy, and one which they have taken several times over. *See People v. Leisner*, 138 A.D.2d 273, 280 (1st Dep't 1988) *rev'd on other grounds,* 73 N.Y.2d 140 (1989) ("Defendants' registration of Lender as their managing agent was also an act 'in furtherance of the conspiracy', since they thus gave him access to the buildings and clothed him with authority as their legal representative to pursue his tactics. By making Lender the person visibly responsible for conditions at the buildings, moreover, defendants hoped to shield themselves from responsibility for his actions.").

In addition, Camacho and Piaguaje have filed enforcement actions in Argentina, Brazil, Canada, and Ecuador. PX 418; PX 1004; PX 2306; PX 2461. These actions are in direct fur-therance of Defendants' scheme, since they seek to use the judgment fraudulently obtained in Lago Agrio to enrich the conspirators through the seizure of the assets of Chevron's subsidiaries.

Moreover, this continued support and conduct in furtherance of the conspiracy has oc-curred in the face of Chevron's allegations and the extensive evidence in support of those allega-tions. *See supra* Argument Section I.C. This constitutes "intentional participation with a view to the furtherance of the common design." *Ballantine v. Ferretti*, 28 N.Y.S.2d 668, 691 (Sup. Ct. N.Y. Cnty. 1941). The LAPs were not required to know every detail of the conspiracy (*see Bal-*

*lantine*, 28 N.Y.S.2d at 691), and knew more than enough to be part of the conspiracy.  The LAPs' actions speak louder than their evasive deposition testimony, and demonstrate their intent to participate in Donziger's scheme.  *See McGrane*, 195 Misc. at 868.

Finally, Defendants' conspiracy to commit fraud damaged Chevron's reputation and has produced a fraudulent $18 billion judgment (only recently reduced to $9 billion).  *See infra* Requested Relief Section I.B.  Their conspiracy to deceive courts in violation of section 487 caused Chevron to suffer harm in the form of legal fees needlessly spent responding to Donziger's lies.  *See supra infra* Requested Relief Section I.A.  These damages are sufficient to support liability for civil conspiracy.

## IV.   Donziger Acted at All Times as the Agent of the Donziger Law Firm Defendants

The same principles of vicarious liability, as well as authority specific to the liability of law firms, establishes that Donziger's law firms are liable for Donziger's conduct.  *See, e.g.*, *Klenk*, 612 N.Y.S.2d 220, 222 (1994) ("The attorney/drafter's fraudulent scheme occurred while he was a partner acting in the ordinary course of business of each law firm and therefore each law firm is liable for the attorney/drafter's misconduct to the same extent as he is") (citing N.Y. P'ship Law § 24 (McKinney) and *Metflex Corp. v. Klafter*, 507 N.Y.S.2d 460 (2d Dep't 1986)).  Defendants presented no evidence rebutting the inference that Donziger, who signed his letters and emails with a signature block including "The Law Offices of Steven R. Donziger P.C." (*e.g.* PX 542, 695, 1210) and used the email address sdonziger@donzigerandassociates.com for himself (*e.g.* PX 542) and his associates (*e.g.* PX 542, 1307, 2379), was not acting within the scope of the authority he granted himself as the named partner of his law firms.  Indeed, throughout this case, Donziger has made no distinction between himself as a natural person and his law firms, Law Offices of Steven R. Donziger and Donziger & Associates, PLLC.   In fact, the opposite is true—in discovery requests and court filings, Donziger and his firms consolidated their

positions, with no discernment between the three whatsoever.  *E.g.*, PX 8043; 2397R.  Any argument that the law firms are separate from Donziger therefore has no merit.

## V.     Donziger Has Violated Section 487

New York Judiciary Law section 487 is simple:  It prohibits a lawyer from deceiving or trying to deceive courts.  "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . forfeits to the party injured treble damages, to be recovered in a civil action."  N.Y. Jud. Law § 487 (McKinney 2013).[68]  Section 487 provides a broader remedy than that offered by common law fraud and prohibits attempted but unsuccessful deceit, because the "operative language at issue— 'guilty of any deceit'—focuses on the attorney's intent to deceive, not the deceit's success." *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).  To be actionable under section 487, an "act of deceit need not occur during a physical appearance in court; the statute applies to any oral or written statement related to a proceeding and communicated to a court or party with the intent to deceive." *Amalfitano v. Rosenberg*, 533 F.3d 117, 123 (2d Cir. 2008).  Moreover, section 487 does not impose liability only on attorneys who directly engage in deceit, but also on attorneys who have "consent[ed]" to a deceit.  *See* N.Y. Jud. Law § 487 (McKinney 2013).

### A.  Donziger Has Repeatedly Attempted to Deceive New York Courts

On at least four separate occasions, Donziger deceived or attempted to deceive New York courts.  Each of these deceptions is independently sufficient to support Chevron's claim under section 487, which prohibits attorneys from engaging in, or consenting to, "any deceit," including the "act of intentionally giving a false impression." *Bobker v. Herrick Feinstein LLP*, No. 650963/13, 2013 N.Y. Slip Op. 51967(U), at *5 (Sup. Ct. N.Y. Cnty. Nov. 6, 2013) ("'Deceit' is

---

[68]  Beyond damages and criminal penalties, equitable relief is also available on this claim.  *See infra* Requested Relief Section II.C.1.

defined as 'intentionally giving a false impression' or 'a false statement of fact made . . . know-ingly or recklessly . . . with the intent that someone else will act upon it.'") (quoting *Black's Law Dictionary* (9th ed. 2009)); *see also, e.g.*, *Amalfitano v. Rosenberg*, 428 F. Supp. 2d 196, 207–09, 212 (S.D.N.Y. 2006) (finding violation of section 487 based on false statements made in court filings and efforts to admit an invalid agreement into evidence); *Schindler v. Issler & Schrage, P.C.*, 262 A.D.2d 226, 229 (1st Dep't 1999) ("[T]he conduct of defendant law firm clearly falls within the proscription of Judiciary Law § 487 in that it knowingly withheld crucial information from the declaratory judgment court.").

**Quarles Declaration**.  In 2007, Donziger personally edited Mark Quarles' declaration stating to Judge Sands in the Southern District of New York that "Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant.  At no time has Mr. Cabrera en-tertained suggestions or even met with plaintiffs or their representatives regarding his current work plan."  PX 915 at 5.  This was false.  As this Court previously held, "[t]here is no genuine issue [of material fact] with respect to the facts that the LAP team secretly prepared [Cabrera's] work plan, worked closely with him in carrying it out, and drafted most of the report and its an-nexes."  *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 289 (S.D.N.Y. 2012).  Quarles testi-fied that he based his declaration on falsehoods Donziger had told him (9/1/2010 Quarles Dep. 115:20–116:4, 118:3–15, 118:20–25, 121:4–17, 121:21–122:5) and emails between them prove that Donziger not only reviewed a draft of the declaration, but also personally inserted the false language about Cabrera's independence.  PX 915 at 5–6.

**Donziger 1782**.  Donziger participated in drafting the Fajardo declaration that the LAPs filed in the Donziger 1782.  1/14/2011 Donziger Dep. 2773:3–19.  In this declaration, Fajardo falsely claimed that Cabrera was "independent" and that "Chevron enjoyed the same opportunity

as Plaintiffs to provide materials to Cabrera." PX 1331 ¶¶ 11, 21. Donziger was specifically involved in discussions among the LAPs' U.S. lawyers regarding the Cabrera-related language in Fajardo's declaration. PX 1321. Additionally, Donziger orally translated the declaration into Spanish for Fajardo, provided the facts on which the original draft of Fajardo's affidavit was based, and personally obtained Fajardo's signature on the draft declaration. *See* 1/14/2011 Donziger Dep. 2779:15–23; 2783:22–25; 2794: 24–2795:20. The LAP team also filed in the Donziger 1782 a petition that Fajardo filed in Ecuador, in support of their false assertion that the contacts between their lawyers and Cabrera had been "disclosed" to the Lago Agrio court. PX 2516.

*Bilateral Investment Treaty Arbitration Stay Action.* After being recruited and retained by Donziger, the Emery Celli firm initiated an action to stay the BIT arbitration in 2010, with a complaint that incorporated Donziger's falsehoods. The complaint falsely alleged that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the *neutral Special Master* [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages," and that "the final report [was] *produced by the Cabrera team*" consisting of "14 technical officials" that Cabrera had appointed. PX 7608 at 16–17 (emphasis added). The LAPs' complaint also falsely stated that experts from the United States had "reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the world." In reality these "experts" were limited to co-conspirators Beltman and Maest of Stratus—the true authors of the Cabrera report. *See* 7608 at 17–18. These allegations closely tracked Donziger's false testimony before the Lantos Commission, confirming that he was the source for these false representations. PX 2377 at 5, 7, 9; PX 1130# at 63, 65. Donziger filed a formal notice of appearance in this ac-

tion.  PX 7777.  Additionally, on appeal the LAPs submitted to the Second Circuit the petition

that Fajardo filed in Ecuador, which also contained false statements regarding Cabrera's inde-

pendence from the LAPs.  PX 2514 at 5–6.

      ***Berlinger/Crude 1782.***  As in the Donziger 1782, Emery Celli submitted false statements

to this Court during the *Crude* 1782 on behalf of the LAPs regarding Cabrera's independence.  In

their brief to this Court, the LAPs claimed that a meeting between Cabrera team member

Beristain was "innocuous" and "of no relevance to anything."  Dkt. 48-27 at 8.  They also stated

that Chevron's contention that the "outtakes [would] reveal evidence of substantial relevance to

the Lago Agrio Court or the BIT" was "unsupported speculation."  *Id.*  The LAP team repeated

these lies on appeal to the Second Circuit, misrepresenting the import of Donziger's contacts

with Beristain and claiming that Chevron had "cynically fostered" the "misimpression . . . that

[the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups after he was a

court expert."  *Chevron Corp.  v. Berlinger*, No. 10-1918, Dkt. 200 (2d Cir. June 14, 2010), at

23.  Additionally, in the *Crude* 1782, the LAPs filed the false Fajardo petition discussed above.

PX 2515.

## B.  Donziger Took an Active Role in Inducing Other Counsel to Deceive New York Courts

      Donziger was the lead lawyer for the LAPs and cannot escape liability for lies he told

through intermediary lawyers he deceived and induced to lie to courts in New York.  Donziger

recruited the LAP team's U.S. lawyers, including Emery Celli, and directed their legal work on

the LAPs' behalf; in Donziger's own words, he is "the person primarily responsible for putting

this team together and supervising it."  PX 806R at 3.  Donziger testified at trial that he informed

Kohn that his "primary obligation is to run the case on a day-to-day-basis."  Tr. (Donziger)

2469:17–23.  And that is what he did—directing the legal team to do his bidding.

Donziger's role in seeing to it that falsehoods were presented to New York courts was that of an attorney, and was by no means a non-legal role, such as a party or a trustee. *Cf., e.g.*, *Yak v. Bank Brussels Lambert*, No. 99 Civ. 12090 (JGK), 2002 WL 31132963, at *7 (S.D.N.Y. Sept. 26, 2002) (rejecting section 487 claim because attorney "was acting in her capacity as a party" and "not acting as a lawyer"). In addition to his role directing the U.S. litigation, Donziger personally helped create Quarles' declaration and even inserted some of the falsehoods. PX 915 at 5. He also participated in drafting Fajardo's declaration, and, after orally translating it, obtained Fajardo's signature on the declaration even though Donziger knew it was false. *See* PX 1321; PX 1322; 1/14/2011 Donziger Dep. 2773:3–19; 2779:15–23; 2783:22–25; 2794:24–2795:20. These actions are sufficient for this Court to find Donziger liable under section 487. *Amalfitano*, 428 F. Supp. 2d at 207–09, 212 (finding that attorney violated section 487 by preparing false client affidavit).

Donziger admitted that he intended to deceive the courts by concealing the LAPs' true relationship with Cabrera. *See* 1/19/2011 Donziger Dep. 3358:22–3359:8; 3359:15–3360:9; 3362:7–16; 3363:8–20. But even without his admission, the mountain of incriminating evidence is sufficient to support an inference of Donziger's intent to deceive. *See Amalfitano*, 428 F. Supp. 2d at 209 (finding that intent to deceive was "inescapable" where a lawyer presented a client affidavit containing statements that the lawyer knew were false). At a minimum, Donziger's pre-submission review of false documents shows his "consent[] to [a] deceit." N.Y. Jud. Law § 487 (McKinney 2013). Chevron's attorney's fees to oppose Donziger's falsehoods constitute a legally recognizable injury. *Dupree v. Voorhees*, 24 Misc. 3d 396, 403 (Sup. Ct. Suffolk Cnty. 2009), *rev'd on other grounds*, 68 A.D.3d 810 (2d Dep't 2009)), and Chevron is therefore entitled to relief under section 487.

### C.  Donziger Lied to This Court as Counsel of Record

Donziger, as counsel of record in this action, made multiple representations regarding his supposed lack of resources to this New York court.  *See* PX 8043.  When challenged by the Court to provide factual support for his representations, Donziger swore under oath that his "liabilities [were] presently greater than [his] assets making [him] effectively insolvent."  PX 8045 (Donziger) ¶ 2.  Donziger did not, however, submit any documentation to support this assertion.

Donziger's representations regarding the resources available to him were far from accurate.  In fact, the LAP team is contractually obligated to pay Donziger's legal bills in this action.  PX 560 at 6.  And they are well-positioned to do so.  Not only did Donziger represent to the LAP team that DeLeon has provided $25 million since the Kohn Swift withdrawal (PX 7033A), this past spring the Woodsford firm provided another $2.5 million (Tr. (Donziger) 2528:10-22).  Donziger's cries of inadequate resources are also belied by his personal income.  In November 2012, Donziger was named the beneficiary of proceeds from a trust set up by his father, valued at more than $1.3 million.  PX 7764 at 2.  And, in October 2012, a trust set up by Donziger's mother, valued at $600,000, was ordered to be distributed to Donziger.  PX 7781 at 2; PX 7763 ¶ 30.  Donziger concealed documents regarding his financial resources during discovery (*see* Tr. 2513:23-2514:16) and, at trial, refused to answer questions regarding the veracity of his prior representations.  Despite the fact that he consistently used his minimal resources as a shield entitling him to leniency, Donziger stated that the Court's questions on this topic were "inappropriate" and that he would "not answer[] [the Court's] question."  Tr. (Donziger) 552:21-553:2; *see also* 2607:13-2608-15.  This refusal, combined with Donziger's pattern of discovery abuse, merits an adverse inference that Donziger's claims regarding his lack of resources are false and misleading.

## VI.  Defenses Based on Supposed Preclusive Effect of Ecuadorian Judgment Fail

Throughout this case—and throughout trial—Defendants have invoked the supposed preclusive effect of the Lago Agrio judgment as a basis to assert their affirmative defenses to Chevron's claims, initially under the guise of a collateral estoppel defense and more recently as a comity defense.[69]  By raising the judgment as a shield against Chevron's claims in this action, Defendants have voluntarily put its validity under both federal and New York law at issue.  *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 241 (2d Cir. 2012) (recognizing the propriety of "[c]hallenges to the validity of foreign judgments" where the judgment creditor puts the foreign judgment at issue "'in a pending action by . . . affirmative defense'" (quoting N.Y. CPLR § 5303)).  And Chevron has proven that the Lago Agrio judgment is not valid or recognizable because it was procured by fraud and was the product of a judicial system that does not provide impartial tribunals.  Accordingly, all of Defendants' defenses based on the supposed preclusive effect of the Lago Agrio judgment fail because the judgment cannot meet the threshold required for recognizability.[70]

---

[69] *E.g.,* Tr. (Donziger closing) 2883:6–18 ("Judge, that doesn't mean that the underlying issues of comity, which is one of our affirmative defenses, the underlying issues of what's actually in the verdicts can be ignored or disregarded by this Court.  There is a process in Ecuador.  The process has continued and now is finished. . . . I'm asking you to recognize that the Ecuadorian Supreme Court ruled and what its ruling is and what's the basis of that ruling and the fact that the court says Cabrera has no causal link.  It is what it is.  It says what it says.  And like all evidence, the Court will consider it the way the Court wants to."); Tr. (Donziger closing) 2913:2–5 ("They want you to do that, without running afoul of the Second Circuit's opinion in the Count Nine case, not running afoul of comity concerns, and which this Court has recognized in prior opinions, and of course the Second Circuit has well."); PX 8085 (arguing in Court 9:  "This Court should follow the lead of the Third Circuit, which when presented with the evidence of alleged fraud concerning the Cabrera Report and other aspects of Chevron's fraud claims, cautioned: '[T]he circumstances supporting the claim of fraud largely are allegations and allegations are not factual findings. . . .Though it is obvious that the Ecuadorian judicial system is different from that in the United States, those differences provide no basis for disregarding or disparaging that system.'"); *see also* Tr. (Kaplan, J.) 985:2–7 ("The defendants are under the impression that if I were to take judicial notice of [Ecuadorian decisions], they would become, as distinguished from their simply being in evidence, they would be entitled to be treated as prima facie evidence of the facts and opinions contained therein.  In my view that is incorrect.").

[70] Beyond being procured by fraud and the product of a system that does not provide for impartial tribunals, the judgment is also not valid or recognizable because it violates international due process and public policy, it constitutes an unenforceable penalty, and the Ecuadorian courts lacked jurisdiction over Chevron,

### A. Defendants' Collateral Estoppel and Comity Affirmative Defenses Depend Upon the Recognizability of the Lago Agrio Judgment

Although at times in this case Defendants have attempted to disclaim that they are seeking to rely on the preclusive effect of the Lago Agrio judgment as a defense to Chevron's claims, their own words and actions demonstrate otherwise.

As the Court has already found, Defendants first invoked the preclusive effect of the Lago Agrio judgment by pleading collateral estoppel as a defense to Chevron's claims in their answers.  *See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 266–67 (S.D.N.Y. 2012) ("[Defendants'] own words and actions clearly demonstrate that their answers—contrary to what they say now—were intended to plead . . . the Ecuadorian Judgment as *res judicata* and collateral estoppel."); Dkt. 307 at 71; Dkt. 350 at 106.  And although Defendants attempted to withdraw their collateral estoppel defense, the Court rejected these bad faith efforts and the defense remains in this case.  *See Donziger,* 886 F. Supp. 2d at 275–77 (rejecting unilateral attempt to withdraw defenses based on the preclusive effect of the Lago Agrio judgment because "it is abundantly obvious that the effort has been made for the sole purposes of (a) avoiding what the SJ Defendants evidently fear would be an adverse result, and (b) shifting the issue to other fora more to their liking"); Dkt. 637; Dkt. 638; Dkt. 826.[71]

Second, Defendants also pleaded an affirmative defense based on "the doctrine of international comity," and have actively pursued this defense.  Dkt. 307 at 73; Dkt. 350 at 106.  Less than three weeks before trial, Defendants opposed Chevron's motion for summary judgment on

---

[71] Although the Court has indicated that the collateral estoppel defense would be "effectively out of the case . . . if defendants simply elected not to press it at trial" (Dkt. 1407 at 15 n.50), Defendants did "press" this defense at trial by invoking the supposed preclusive effect of the Lago Agrio judgment under the labels of "comity" and "judicial notice."  *See, e.g.,* Tr. (Callejas) 732:3–15; (Judge Kaplan) 984:19–985:16; (Donziger Closing) 2883:6–9; (Donziger Closing) 2913:2–5; Dkt. 1600.  But even if Defendants had decided to not "press" their collateral estoppel defense at trial, Chevron is still entitled to defeat this defense on the merits and establish that the Lago Agrio judgment is not subject to recognition under federal or New York law.

the comity defense, and asserted that "Chevron has had a full and fair opportunity to present its claims of 'fraud' in the Ecuadorian forum it chose and this Court should respect the judgment and process of that forum and abstain from entertaining Chevron's opportunistic forum-shopping." Dkt. 1468 at 11. And Defendants openly embraced this defense at trial, making it a centerpiece of their closing argument. *See* Tr. (Donziger Closing) 2881:13–2883:18 ("[T]he underlying issues of comity, which is one of our affirmative defense, the underlying issue of what's actually in the verdicts [cannot] be ignored or disregarded by this Court."); *see also* Tr. (Donziger Opening) 31:10–24 ("[T]he Court of Appeals of Ecuador provides de novo review . . . . They went back in the record . . . [and] they specifically take up most of the allegations you're going to hear in this courtroom, and one by one they knock them down.").[72]

Defendants have the burden of establishing their collateral estoppel and comity affirmative defenses. *See Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) (party seeking recognition bears burden of proving that comity is appropriate); *In re Parmalat Sec. Litig.*, 493 F. Supp. 2d 723, 733 (S.D.N.Y. 2007) (party asserting collateral estoppel bears the burden of proof). Defendants, however, cannot satisfy this burden because both defenses require, as a threshold matter, proof that the Lago Agrio judgment is subject to recognition under federal or New York law.

As Defendants have conceded and the Court has held, "New York law would require Defendants to show that the Judgment is entitled to recognition under the New York Recognition Act in order to invoke . . . collateral estoppel." Dkt. 450 at 1; *Donziger*, 886 F. Supp. 2d at 278

---

[72] Defendants also unsuccessfully sought to invoke the preclusive effect of the Lago Agrio judgment as a defense to Chevron's claims by requesting that the Court take "judicial notice" of the relevant Ecuadorian judicial opinions for the "truth" of "the matters asserted in the documents." Dkt. 1600 at 1. The Court denied Defendants' request, and noted that the propriety of taking judicial notice of a foreign judicial decision implicates "'the reliability of the foreign proceeding for determining the parties' rights." Dkt. 1683 at 2 (quoting *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 696–67 (7th Cir. 2009)).

("The first step in determining the motion for partial summary judgment dismissing the *res judi-cata*-collateral estoppel defense therefore is to consider whether Chevron is entitled to summary judgment holding that the Ecuadorian Judgment is not recognizable or enforceable under the Recognition Act.").  Yet under New York law, a foreign judgment is not subject to recognition if it was, among other things, "obtained by fraud" or "rendered under a system which does not provide impartial tribunals."  N.Y. CPLR § 5304(a)(1), (b)(3).  The same is true under federal law.  *See Donziger*, 886 F. Supp. 2d at 278 n.267 (applying New York law to assess collateral estoppel defense and noting that because "the standard under federal law is substantially the same as it is under New York law" that "[t]he result would be the same if federal law applied"); *see also Hilton v. Guyot*, 159 U.S. 113, 202–03, 16 S. Ct. 139, 158 (1895); *Ackermann v. Levine*, 788 F.2d 830, 842 n.12 (2d Cir. 1986).

Defendants must satisfy these same criteria in order to establish their "comity" affirmative defense.  As the Supreme Court made clear in *Hilton v. Guyot*—the primary authority Defendants have cited in support of their comity defense (*see* Dkt. 1468 at 11)—whether "comity" should be extended to a foreign judgment depends, among other things, on whether the judgment was the product of "a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting," and whether there was "fraud in procuring the judgment."  *Hilton*, 159 U.S. at 202, 16 S. Ct. at 158; *see also Naranjo*, 667 F.3d at 241 (discussing international comity, and noting that the exceptions to the recognition of foreign judgments are designed "to facilitate trust among nations and their judicial systems by preventing one jurisdiction from using the trappings of sovereignty to engage in a sort of seignorage by which easy judgments are minted and sold to any plaintiff will-

ing to pay for them").

### B. The Lago Agrio Judgment Is Not Entitled to Recognition Under Federal or New York Law Because It Was Obtained by Fraud

Fraud in the procurement of a judgment renders it unrecognizable where the fraud "'prevented the losing party from fully [and] fairly presenting his case or defense' or otherwise significantly tainted the process." *Donziger*, 886 F. Supp. 2d at 286 (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978)).[73]  As discussed above, Chevron has proven at trial that the Lago Agrio litigation was corrupted by Defendants' fraud and bribery, and these acts of corruption denied Chevron from obtaining a fair trial on the merits.  Defendants' control of Cabrera, their clandestine ghostwriting of his report, their bribery of Zambrano, and their ghostwriting of the judgment itself establish beyond any doubt that the Lago Agrio judgment was procured by fraud, and is therefore not recognizable under either federal or New York law.[74]

As numerous courts have held, the corruption of the judicial process, such that it is not a true adversarial proceeding, is fatal to any resulting judgment.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944) (vacating judgment because injecting ghostwritten submission into court proceedings was "tampering with the administration of justice"); *United States v. Throckmorton*, 98 U.S. 61, 65 (1878) (holding that a judgment cannot stand "where, by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case."); *see also* Restatement (Second) of Judg-

---

[73]  The Court has held that "[i]mplicit in this criterion is a requirement of materiality, as judgments will not be set aside or denied recognition where the only impact of the misconduct or other taint is to prevent a litigant from presenting cumulative evidence, to deceive as to a peripheral issue, or the like." *Donziger*, 886 F. Supp. 2d at 286.  But this materiality requirement does not require that the fraud "be of such nature as to alter the result in the case." *Rozier*, 573 F.2d at 1339.  And in any event, Defendants' fraud was plainly material as it went to the core of the Lago Agrio judgment itself, not to any "peripheral issue" in the litigation.

[74]  In addition, the fact that Chevron was even forced to litigate the Lago Agrio case on the merits—*i.e.*, the Lago Agrio court's deeply flawed personal jurisdiction analysis and its refusal to even rule on this issue—is further evidence of judicial corruption and collusion.

ments § 70(1)(a) (1982) (a judgment may be unenforceable if it "[r]esulted from corruption of or duress upon the court").[75]

For example, in *Hazel-Atlas*, attorneys for the prevailing party helped ghostwrite an article that was then published as the work of an ostensibly disinterested expert and presented as such to the lower courts.  322 U.S. at 240–41, 64 S. Ct. at 999.  The Supreme Court vacated the judgment, and explained that this was "not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury," but rather "a deliberately planned and carefully executed scheme to defraud" and thus "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistent with the good order of society."  *Id.* at 245–46, 64 S. Ct. at 1001.  The Supreme Court went on to reject the argument that the ghostwritten article was not "basic" to the judgment, reasoning that those committing the fraud "thought the article material . . . and went to considerable trouble and expense to get it published" and therefore were in "no position now to dispute its effectiveness."  *Id.* at 246–47, 64 S. Ct. at 1002 ("Truth needs no disguise.").

Similarly, in *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir. 1989), where the plaintiff

---

[75] *See also, e.g.*, *Morgan v. United States,* 304 U.S. 1, 19–20, 58 S. Ct. 773 (1938) ("[If] a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred *ex parte* with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing."); *Browning v. Navarro*, 826 F.2d 335, 345–46 (5th Cir. 1987) (setting aside judgment issued after lawyers for one party held substantive, *ex parte* communications with the court); *Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.,* 623 F. Supp. 2d 518, 538 (D. Del. 2009) (denying enforcement on the basis of fraud where, among other things, the court appointed an expert outside of the regular procedure who then solicited a bribe from the judgment debtor); *In re Burke*, 374 B.R. 781, 796–97 (Bankr. D. Colo. 2007) (setting aside judgment obtained through improper procedures and bribery); *Manez Lopez v. Ford Motor Co.*, 470 F. Supp. 2d 917, 923–29 (S.D. Ind. 2006) (where plaintiffs' attorney had family relationship with judicial clerk and funneled materials to the clerk which appeared verbatim in a court order, the court had "no difficulty or hesitancy in concluding, on the basis of the evidence adduced . . . [that the Mexican judgments] are not entitled to recognition in the United States"); *W. Gillette v. Ariz. Corp. Comm'n*, 121 Ariz. 541, 542 (Ariz. Ct. App. 1979) ("The participation in the actual decision making process by only one party to a controversy is inimical to the notions of fairness which underlie the due process of law.").

had relied on forged evidence which was ultimately discovered and replaced with genuine evidence, the First Circuit found that this satisfied the stringent requirements of the "fraud on the court" doctrine because he had "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter[.]" *Id.* at 1118. And like the Supreme Court in *Hazel-Atlas*, the court in *Aoude* expressly rejected a materiality defense, and held that "[t]he failure of a party's corrupt plan does not immunize the defrauder from the consequences of his misconduct." *Id.* at 1120. Of course, here, Defendants' fraud and bribery were *successful*—they directly led to the Lago Agrio judgment, which Defendants are fraudulently seeking to enforce around the world and to use as a defense to Chevron's claims in this case.

Corruption on the scale that Defendants engaged in precludes recognition, regardless of subsequent appellate rulings, and regardless of whether the judgment reached the "correct" result. "Once a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear." *Aoude*, 892 F.2d at 1121; *see also Hilton*, 159 U.S. at 160, 16 S. Ct. at 207 (noting that it is "established" that "foreign judgments may be impeached, if procured by false and fraudulent representations and testimony of the plaintiff, even if the same question of fraud was presented to and decided by the foreign court"). And as the Second Circuit explained in *United States v. Manton*, 107 F.2d 834 (2d Cir. 1938), "if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice." *Id.* at 846. "Judicial action, whether just or unjust, right or wrong, is not for sale." *Id.*

### C. The Lago Agrio Judgment Is Not Subject to Recognition Under Federal or New York Law Because Ecuador Lacks Impartial Tribunals

Both federal and New York law prohibit the recognition of a foreign judgment where it was "rendered under a system which does not provide impartial tribunals."  N.Y. CPLR § 5304(a)(1); *Hilton*, 159 U.S. at 202, 16 S. Ct. at 158; *see also Griffin v. Griffin*, 327 U.S. 220, 229, 66 S. Ct. 556, 560 (1946) ("[D]ue process requires that no other jurisdiction shall give effect, even as a matter of comity, to a judgment elsewhere acquired without due process.").  As the Court noted at the conclusion of the trial, there is nothing unique or objectionable about this inquiry—U.S. courts routinely assess the fairness of foreign judicial systems in a variety of other contexts.  *See, e.g.*, *Shardar v. Attorney Gen. of U.S.*, 503 F.3d 308, 318 (3d Cir. 2007) (reopening petitioner's asylum claim based on evidence that "the court system in Bangladesh is corrupt"); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1137 (9th Cir. 2004) (reversing denial of asylum in part because of evidence of judicial and political corruption in Armenia, including State Department report concluding that Armenia's "judicial system is not independent"); *Rockwell International Systems, Inc. v. Citibank, N.A.*, 719 F.2d 582, 587–88 (2d Cir. 1983) (finding that the Iranian judicial system did not provide an adequate remedy that would preclude issuance of a preliminary injunction); *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985) (refusing to enforce contractual forum selection clause because of the inadequacy of the Iranian judicial system); *Rasoulzadeh v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983) (denying forum non conveniens motion after finding that Iran was an inadequate alternative forum), *aff'd*, 767 F.2d 908 (2d Cir. 1985); *Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico, S.A.*, 528 F. Supp. 1337, 1342 (S.D.N.Y. 1982) (denying forum non conveniens motion after finding that Chile was an inadequate alternative forum), *aff'd*, 727 F.2d 274 (2d Cir. 1984).

Chevron has proven that the Ecuadorian judiciary does not act impartially, and therefore, at least in politicized cases such as this one, in which President Correa has made his interest in the outcome abundantly clear (PX 2503), Ecuadorian judgments do not merit recognition in U.S. courts.  *See, e.g.*, *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141–44 (2d. Cir. 2000) (affirming refusal to recognize Liberian judgment because the Liberian judicial system did not provide impartial tribunals at the time the judgment was issued); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410–13 (9th Cir. 1995) (affirming refusal to recognize Iranian judgment because Iranian courts were politicized and did not provide due process when the judgment was issued).

U.S. courts consider a number of factors to determine whether a foreign system affords fair and impartial tribunals, including the prevalence of corruption, whether the "judicial officers [a]re subject to political and social influence" and whether judges are "highly regarded for impartiality[.]"  *Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 287 (S.D.N.Y. 1999); *Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 476 (7th Cir. 2000).  "'Evidence that the judiciary was dominated by the political branches of government . . . would support a conclusion that the legal system was one whose judgments are not entitled to recognition.'"  *Bridgeway*, 201 F.3d at 142–43 n.3 (2d Cir. 2000) (quoting Restatement (Third) of Foreign Relations Law § 482 cmt. b (1987)); *see, e.g.*, *Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1351 (S.D. Fla. 2009) (refusing to enforce a Nicaraguan judgment for lack of impartial tribunals "[i]n view of the persuasive evidence that direct political interference and judicial corruption in Nicaragua is widespread").  In making these determinations, courts typically rely on expert testimony and independent reports and studies (particularly those of the U.S. State Department).  *See, e.g.*, *Bridgeway*, 201 F.3d at 142–43; *Pahlavi*, 58 F.3d at 1411; *Osorio*, 665 F. Supp. 2d at 1348–49.

Chevron presented at trial overwhelming and undisputed evidence—including the de-

tailed reports and testimony of two different experts, U.S. State Department reports, and independent studies of the Ecuadorian judicial system—that establishes that the Ecuadorian judiciary is not impartial. It is subject to increasing pressure and interference from President Correa's administration, which dictates the result in important cases in which it has an interest, and there is widespread corruption among Ecuadorian judges, who are not regarded by either the Ecuadorian public or neutral international observers as likely to decide cases impartially.

Sandra Elena, an expert on comparative judicial systems, testified that "Ecuador lacks an impartial judicial system." PX 4700 (Elena) ¶ 3. She based her opinion on "three key factors: (1) judicial independence; (2) judicial corruption; and (3) public confidence in the judiciary." *Id.* ¶ 12. The Ecuadorian judiciary has experienced substantial instability in recent years, and "during the course of the Lago Agrio litigation, there have been (a) five different Supreme Courts; (b) four different Judicial Councils; and (c) two different constitutions and a constitutional amendment in 2011 that restructured the judicial system." *Id.* ¶ 18. This lack of a "stable judicial institution[]" encourages "political interference and manipulation of the judiciary," which has in fact occurred in Ecuador. *Id.* ¶ 20. For example, President Correa publicly "threatened several judges with criminal charges if they failed to" convict a man who was accused of attempting to assassinate Correa, and when he was acquitted, "the presiding judge was removed from office." *Id.* ¶ 35.

Elena also looked at numerous independently published indices relating to judicial independence, judicial corruption, and public confidence in the judiciary, all of which confirm that Ecuador lacks impartial tribunals. Elena examined seven judicial independence indices, and all pegged Ecuador as having one of the least independent judiciaries of all Latin American countries. PX 4700 (Elena) ¶¶ 45, 49, 52, 54, 56, 59, 65. Similarly, six indices on judicial corruption

show that Ecuador is "one of the most corrupt countries." *Id.* ¶¶ 73, 76, 78, 80.c, 84, 88. Indeed, only "25.9 percent [of Ecuadorans] in 2004 and 29.9 percent in 2008" thought it was unlikely they could bribe a judge to obtain a favorable sentence. *Id.* ¶ 78. The numbers on public confidence in the judiciary are similar—in 2011, "only 28% of the population in Ecuador had confidence in the Judiciary." *Id.* ¶ 96. Three other measures of confidence in the judiciary also show that Ecuador has one of the least trusted judiciaries in Latin America. *Id.* ¶¶ 93, 97, 99. In light of the history of judicial instability and presidential interference, as well as the findings of the published indices, Elena concluded that "Ecuador is the worst performer in terms of judicial impartiality among all Latin American countries." *Id.* ¶ 106.

Likewise, Ecuadorian judicial expert Vladimiro Álvarez Grau provided evidence of the widespread corruption and undue influence in Ecuador. PX 6200 (Álvarez). Based on his experience as a practicing lawyer and legal scholar in Ecuador, Álvarez concluded that "under the circumstances that have existed and continue to exist, the administration of justice cannot be carried out impartially when the facts or controversies submitted for decision are of political, social, or economic importance." *Id.* ¶ 5. A chief cause of the judiciary's partiality is President Correa, who "has amassed more power than any other president in modern history," and has imposed on Ecuador "what might be called democratic authoritarianism." *Id.* ¶ 33. President Correa is open about his disdain for "capitalism," "foreign companies," and the "Constitution." *Id.* ¶ 32. At his inauguration, he "refused to swear to respect and submit to the Constitution of the Republic," and instead promised "to fulfill the popular mandate of November 26, 2006, the date on which he was elected to office." *Id.* ¶ 32.

Shortly after his election in 2006, President Correa instituted a new constitution, which created a "Constitutional Court" and gave this new court the authority to review decisions of the

277

Supreme Court.  PX 6200 (Álvarez) ¶ 48.  This action "plac[ed] a body that had shown its clear allegiance to President Correa in a position of power over the entire Judicial Branch."  *Id.* ¶ 48. In addition, Correa "has interfered in judicial cases where the Government has an interest" (*id.* ¶ 55), even going so far as to seek to "hold judges personally liable for certain rulings against the Government's position" (*id.* ¶ 54).  Álvarez discussed in great detail a number of specific instances of judicial misconduct before summarizing that "[b]ased on my extensive observation of the political events involving the judicial branch in Ecuador, . . . the Executive Branch has continually violated the Rule of Law by influencing the decisions of the Courts and Tribunals."  *Id.* ¶ 120.  Álvarez further noted with respect to the Lago Agrio litigation that President Correa had "publicly stated his support for plaintiffs, their claims in the proceeding, and the attorneys who represent them" "before there was a final, enforceable judgment."  *Id.* ¶ 121.  He concluded that Correa's "statements likely affected the impartiality of the administration of justice in this case." *Id.* ¶ 121.  Álvarez also found that Ecuador's "direct economic interest" and "political interest" in the outcome of the case, "detract[ed] from the absolute reliability and impartiality that should have existed."  *Id.* ¶ 121.  Indeed, Defense witness Alejandro Ponce himself testified that the independence of the Ecuadorian judiciary had declined since the late 1990s.  Tr. (Ponce) 2307:4–20.

The conclusions of Elena and Álvarez are consistent with the State Department's recent reports on Ecuador, which describe the Ecuadorian judiciary as "corrupt" (PX 1234 at 4), "susceptible to outside pressure" (PX 1108 at 3), and "resource-starved" (PX 1100 at 2).  The 2008 report noted "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases" and "judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature."  PX 1108 at 3.

And the 2009 report found that "[s]ystemic weakness and susceptibility to political or economic pressures in the rule of law constitute the most important problem faced by U.S. companies investing in or trading with Ecuador." PX 1100 at 2. Similarly, the 2010 report acknowledged the presence of "unpredictable judgments in civil and commercial cases" and noted that "[c]oncerns have been raised in the media and by the private sector that Ecuadorian courts may be susceptible to outside pressure and are perceived as corrupt, ineffective, and protective of those in power." PX 1234 at 4. In addition, a report by scholars at the International Assessment and Strategy Center concluded that "the judiciary in Ecuador is almost universally seen as corrupt and, in recent years, increasingly compliant with the wishes of the executive." PX 1496 at 2.

Even Defendants admitted that Ecuador's judicial system was "weak" and "corrupt" and got worse during the 2000s. Donziger opined that judges in Ecuador were "utterly weak" and that "it's their birthright to be corrupt." PX 8A; PX 9A at 2; *see also* PX 43A at 5–6 ("[Y]ou know this is Ecuador, okay. . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want. Sorry, but it's true."). And Ponce testified at trial that the independence of the Ecuadorian judiciary had declined since the late 1990s. Tr. (Ponce) 2307:4–20.

In sum, Chevron's expert witnesses, State Department reports, other independent studies, and even Defendants' own admissions prove that Ecuador does not provide impartial tribunals. The Lago Agrio judgment is therefore not subject to recognition under either New York or federal law. N.Y. CPLR § 5304(a)(1); *Hilton*, 159 U.S. at 202, 16 S. Ct. at 158. Ecuadorian "judicial officers [a]re subject to political . . . influence" (*Bridgeway*, 45 F. Supp. 2d at 287), specifically, the influence of President Correa (PX 6200 (Álvarez) ¶ 55). And far from being "highly regarded for impartiality" (*Soc'y of Lloyd's*, 233 F.3d at 476), Ecuadorian courts are roundly

viewed as corrupt—by Ecuadorian citizens (PX 4700 (Elena) ¶¶ 78, 96), by Ecuadorian politicians (PX 6200 (Álvarez) ¶¶ 67, 69), by the Ecuadorian media (PX 1234 at 4), by the Ecuadorian judges themselves (PX 6200 (Álvarez) ¶ 68), and by impartial outside observers (PX 1100 at 2; PX 1108 at 3; PX 1234 at 4).[76]

### D. The Affirmance of the Lago Agrio Judgment by Ecuadorian Appellate Courts Does Not Render the Judgment Enforceable

Chevron's claims are not affected by Ecuadorian appellate affirmance of the Lago Agrio judgment. To the contrary, the intermediate Ecuadorian appellate court expressly held that it was without jurisdiction to address Chevron's claims in this Court—which it identified with specific reference to the complaint in this action and "the RICO act," and both the intermediate court and the supreme court expressly stated that they did not consider or resolve Chevron's claims against the LAPs or anyone else. Furthermore, the evidence adduced at trial demonstrates that Judge Zambrano himself selected the chief judge of the appellate panel, in apparent violation of Ecuadorian procedural law, which demonstrates the biased nature of that tribunal. And Chevron proved that the Ecuadorian judiciary as a whole is biased and corrupt, particularly in cases of importance to the Ecuadorian government—indeed, it is self-evident that any system which permits a judgment so run through with fraud as this one to stand should be given no deference. Accordingly, the affirmance of the judgment does not cleanse it of impropriety or render it recognizable by this or any court.

---

[76] Defendants have suggested that the testimony of Ms. Elena and Mr. Alvarez, though unrebutted, is deficient because these witnesses did not analyze whether Zambrano was corrupt and whether the Lago Agrio judgment itself was the product of fraud. But these are not relevant inquiries in the "impartial tribunals" context, which focuses on the "system" itself, not any particular judge or judgment. N.Y. CPLR § 5304(a)(1); *see Hilton*, 159 U.S. at 202, 16 S. Ct. at 158. In any event, other evidence confirms that the endemic corruption and other problems that Ms. Elena and Mr. Alvarez described in their testimony were on display in the Lago Agrio case—including private plaintiffs and a local judge colluding to create a fraudulent judgment, the Republic of Ecuador directly supporting a judgment against Chevron, and other pervasive influence over the case by the executive branch.

## 1.  The Appellate Courts Expressly Refused to Resolve Chevron's Claims Against the LAPs

Both the decision of the intermediate Ecuadorian appellate court, as well as that of the

Ecuadorian National Court of Justice, explicitly held that they did not consider or even address

Chevron's fraud claims.  In its order of January 3, 2012, the intermediate appellate court—the

Provincial Court of Justice of Sucumbios—stated:

> Mention is also made of fraud and corruption of plaintiffs, counsel and representatives, a matter to which this Division should not refer at all, except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by the very defendant here, Chevron, under what is known as the RICO act, and this Division has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice, if that were the case.

PX 430 at 10.  And when *the Defendants* here moved for clarification of the order and sought a

ruling that "the Division clarify and state that in fact it has analyzed Chevron's accusations and

that it has not found any fraud in the activities of the plaintiffs or their attorneys," (PX 2551 at

5), the court acquiesced to the extent that is noted that it had not found "fraud"—but in the very

same sentence, insisted that "it stays out of these accusations, preserving the parties' rights . . . to

continue the course of the actions that have been filed in the United States of America."  PX 431

at 4.

Likewise, the National Court of Justice's cassation opinion did not address Chevron's

claims of fraud and misconduct.  In response to Chevron's evidence of fraud in the litigation it-

self, the court stated that, because it was a cassation appeal, "[c]ollateral issues and evidentiary

matters are inapposite."  DX 8095 at 221.  The court also refused to consider Chevron's allega-

tions of judgment fraud on the grounds that a cassation appeal does not challenge a trial judg-

ment, but an appellate decision—which, besides from being a spurious ground to ignore substan-

tial evidence of fraud in the trial court, further confirms that the opinion does not address the is-

sues under dispute in his action.  *Id.* at 100.  Finally, the court held that Chevron's allegations of misconduct on the part of the Defendants were "not admissible in this appeal," directing Chevron to instead "file the respective complaint before the authorities with jurisdiction."  *Id.* at 102.

### 2. The Selection Process for the Intermediate Appellate Panel Was Tainted by Influence From Zambrano and the ROE

Judge Zambrano, as Provincial Director of the Judicial Council, had the responsibility of appointing the appellate panel that would hear the appeal from his own judgment.  PX 403.  And he selected the members of that panel in a manner that did not comport with Ecuadorian law and procedure.  Under Ecuadorian law, the selection of an appellate panel is supposed to occur by public lottery, but in this case, panel selection involved multiple secret lotteries (in several instances conducted before Judge Zambrano himself), direct intervention by Ecuadorian judicial authorities, and numerous changes of personnel.  *See* PX 398; PX 402; PX 403; PX 6344.  Indeed, while Zambrano admitted at trial that the Presiding Judge (Juez Ponente) of the panel is supposed to be selected by lottery, he could not explain why he had announced at a press conference that Judge Toral had been "unanimously *elected*," as opposed to selected at random by lottery.  Tr. (Zambrano) 1746:21-1747:9 (emphasis added).  And while this panel would not be the panel to decide the appeal, due to turnover on the court, once the panel was reconstituted, Toral was once more appointed Presiding Judge with the responsibility to write the opinion.  *See* PX 371.  The attached timeline, Appendix J, details the machinations by which the judges were appointed to the appellate panel.  These events call into serious question the independence of the panel.

The appellate decisions were also rendered at a time when the Correa government was exerting substantial public pressure to affirm "the most important judgment in the history of the country."  PX 6385 at 4.  Chevron proved at trial that the Ecuadorian court system as a whole is

corrupt and biased in favor of the government, as explained *supra* Argument Section I.C.1.b. This is doubly so when the case in question is the topic of weekly television addresses by Correa, and when he has publicly declared his support for Defendants.  *See, e.g.*, PX 853; PX 6385; PX 7511; PX 7516; PX 7520; PX 7526.

But not only are the courts in general (and the National Court of Justice in particular) biased in favor of the government, there are some judges with particular allegiance to Correa.  As Dr. Alvarez testified, Ecuador's International Oversight Committee has questioned the selection of four judges to the National Court of Justice, as they were selected based on "subjective criteria" rather than the objective criteria that should have been applied.  PX (Alvarez) 6200 ¶ 113. One of those judges, Wilson Andino, authored the cassation opinion, as one would expect given that these judges are "in charge of the most controversial lawsuits of the country."  *Id*. ¶ 114.

### 3. The Intermediate Appellate Panel's Purported Analysis of the Fraud Evidence is Shallow and Should be Given No Weight

The intermediate appellate panel purported to analyze then available evidence of the LAPs' role in authoring the judgment, but it offers only a few conclusory assertions and avoids the actual issues raised by that evidence.  In response to the evidence that the judgment shared common errors and idiosyncratic features with the Defendants' internal Selva Viva Data Compilation, the court claimed that it had "been able to confirm first hand that the record includes the information to which the judgment refers."  PX 430 at 11.  But the court provided no citation or other description of where it found that information, and if the court really did find the Data Compilation in the record, it is the only entity ever to do so—neither of the two analyses by Chevron located it, and Defendants, who have had over two years to look for what would have to have been their own filing, have not found it.  And the court did not try to explain the irregular *presentation* of that information in the judgment (unusual naming conventions and other charac-

teristics (*see* PX 401)), which also does not appear in the record.  Similarly, it acknowledged the presence of some of the data errors identified by Chevron as common to the judgment and the Defendants' secret files, but asserted simply that the errors themselves did not affect the judgment.  In each case, the court did not address the larger implication—that these commonalities showed Defendants had a hand in writing the judgment.

The Ecuadorian appellate decisions do not cleanse the Lago Agrio judgment of any impropriety.  To the contrary, their refusal to seriously consider the overwhelming evidence of Defendants' fraud and misconduct is prima facie evidence of their bias—such that their opinions likewise cannot be recognized nor enforced.

## VII.   Defendants' Unclean Hands and Related Defenses Fail for Lack of Evidence That the Alleged Conduct Even Took Place, Let Alone Harmed Defendants

### A.   The Court Should Ignore Defendants' Allegations Regarding the *Forum Non Conveniens* Dismissal, Procedural Conduct in the Lago Agrio Litigation, and Conduct in Relation to the Section 1782 Proceedings

During the Count 9 proceedings, this Court recognized that Defendants' allegations of Chevron's supposed conduct during the *forum non conveniens* dismissal of the *Aguinda* case, procedural conduct that purportedly delayed the Lago Agrio litigation, and conduct during the § 1782 proceedings were not related to the subject matter of this litigation.  *See Chevron Corp. v. Salazar*, 11 Civ. 3718(LAK), 2011 WL 3628843 (S.D.N.Y. 2011).  The Court filed an identical order in this proceeding on August 17, 2011.  Dkt. 348.  Although this order adjudicated Chevron's declaratory judgment claim, a claim that Chevron does not now pursue, the Court's separate and independent analysis of the unclean hands defense is still applicable.  Therefore, this Court should once again dismiss or ignore the allegations regarding the *forum non conveniens* dismissal and the § 1782 proceedings.

Defendants' allegations of conduct during the *Aguinda* litigation and the § 1782 proceed-

ings do not have the requisite "immediate and necessary relation to the equity that plaintiff seeks in respect of the matter in litigation." *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005). Nor do they "transgress equitable standards of conduct." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 185 (1945).

Moreover, such allegations are bereft of evidentiary support. This Court recognized that Defendants' allegations were "contradicted by U.S. court record or otherwise are demonstrably false." Dkt. 348 at 23. Over two years later, after millions of pages of discovery and a complete trial record, Defendants are no closer to proving such allegations. For example, Donziger's only "evidence" of Chevron's collusion with the Ecuadorian government during *Aguinda* was that the LAP team "hear[d] reports" of such, which is inadmissible hearsay. DX 1750 (Donziger) ¶ 62. He further cites a document that acknowledges that the Ecuadorian government had "been tough on the company." *Id.* Moreover, none of Defendants' testimony, including Donziger's, cites a single instance of misconduct by Chevron during the § 1782 proceedings.

### B. With Regard to the Remaining Allegations, Defendants Failed to Show Any Misconduct by Chevron

Defendants' remaining allegations of Chevron conduct similarly remain unproven and therefore do not provide a defense to Chevron's claims. Specifically, Defendants allege that during the Lago Agrio litigation, (1) Chevron used its influence and lied to the Ecuadorian military to block an inspection of the Guanta site, (2) Chevron orchestrated Diego Borja's solicitation of a bribe to Judge Nuñez, and (3) Chevron had substantive *ex parte* meetings with judges presiding over the Lago Agrio litigation. Defendants' evidence of such allegations rests entirely on hearsay and conjecture, and even if true (which they are not) would not constitute a valid defense.

### 1.  Guanta Inspection

Defendants' allegation that Chevron colluded with and lied to the Ecuadorian military to temporarily stop the Guanta inspection is based purely on multiple layers of hearsay and conclusory statements.  Donziger's statement claims that Chevron pressured the military to produce a "fake 'military intelligence report,'" yet provides no evidence other than that he learned of this through a "government investigative report"; a report, if it even exists, that Defendants did not even include in their trial exhibits.  DX 1750 (Donziger) ¶ 83.  Ponce's statement on the Guanta inspection provides even less evidentiary support and is entirely based on information that could not possibly be his personal knowledge.  DX 1601 (Ponce) ¶ 14.  It is not surprising that he is forced to rely on conclusory statements, such as the allegation that Chevron provided a "false report regarding the security of Chevron's attorneys," to which Ponce does not provide a single citation.  *Id.*

### 2.  Bribery Solicitation Scandal

Defendants allege that Chevron was behind a bribery solicitation scandal involving the then-presiding judge in the Lago Agrio litigation in 2009, Judge Juan Nuñez, but offer no evidence of Chevron's involvement, despite extensive discovery into the topic.  The actual evidence in the record, including video tapes of the solicitation meetings and sworn testimony from one of the participants, rebuts Defendants' unsupported allegations.  In fact, far from proving Defendants' "unclean hands" defense, the Borja incident is affirmative evidence in Chevron's favor of the kind of misconduct that occurred in this case—it proves that Chevron got railroaded in a corrupt system in which the judge and government were in cahoots.

In May and June of 2009, an Ecuadorian contractor named Diego Borja videotaped a series of meetings in a private room at a Holiday Inn between Judge Nuñez and individuals posing as remediation contractors looking for future work, and with Patricio Garcia, who was affiliated

with the ruling Ecuadorian political party Alianza Pais.[77]  The videotapes suggest that Judge

Nuñez had prejudged the case in Defendants' favor and had discussed bribes from environmental

contractors in exchange for remediation contracts, and that Judge Nuñez, the LAPs, and "the

presidency" would benefit from this scheme to the tune of "one million" each.  *See* PX 2531; PX

2531A; PX 2532; PX 2532A; PX 2533; PX 2533A;[78] *see also* PX 2534A.[79]  In August 2009,

Chevron turned the tapes over to the Republic of Ecuador and released them publicly.  PX 2315.

Despite the evidence that Judge Nuñez had prejudged the case in the bribery solicitation scandal,

that his recusal reflected apparent acknowledgement of wrongdoing, and that there was no evi-

dence suggesting Chevron had anything to do with the scheme, the LAP team went on the offen-

sive.

Seizing the initiative, Donziger, on September 1, 2009, put out a press release accusing

Chevron of a "Nixon-style Dirty Tricks Operation."  PX 2524 at 2.  The LAP team called on the

U.S. Department of Justice and Ecuador's Attorney General to investigate Chevron for attempt-

ing to bribe a foreign official.  *Id.* at 2–3.  Co-conspirator Juan Pablo Saenz wrote to Donziger on

September 2, 2009, and assured him that the LAP team's "sources at the government tell us

they're actively looking for [Ecuadorians involved in the scandal], to cut their heads off.  We

should focu[s] on [the Americans involved], since they're the Chevron stooges.  Correa and his

cronies will take care of the rest."  PX 2524 at 1; *see also* PX 1162 (Fajardo telling Donziger:

"There is no problem.  For now everything remains more or less under control… we are using all

---

[77]  Though Borja previously had done work for Chevron as a subcontractor, he proceeded to have these meetings and videotape them without ever discussing the plan with any Chevron representative.  3/15/2011 Borja Dep. 161:5–16.  Chevron has publicly acknowledged its relationship with Borja.  PX 2315 at 1.

[78]  Wayne Hansen:  "I know clearly how it is, you say, Chevron is the guilty party."  Judge Nuñez:  "Yes, Sir. . ."  Hansen:  "OK.  Well, sell your shares of Chevron.  [Laughter]."  PX2533A at 35-36.

[79]  Borja:  "What Aurogelio said was that, of the three million, one million is for the judge —."  Garcia:  "Yes."  Borja:  "—one million is for the presidency,"  Garcia:  "Yes."  Borja:  "—and one million for the plaintiffs."  Garcia:  "Yes, that's right."  PX 2534A at 3-4.

our influence.").  This was no idle threat—Borja ultimately received asylum in the United States,
which requires the Department of Homeland Security to have found that Borja had a credible
fear of future persecution in Ecuador.  PX 2527.  The LAP team would later attempt to use se-
cretly recorded conversations between Borja and a former friend, Santiago Escobar, to bolster
their claims that Chevron had been involved in the videos.  But when the LAP team hired a for-
mer prosecutor to investigate the issue, he concluded that Borja's recorded conversations "do *not*
discredit Chevron itself, and in fact corroborate them in a couple important respects."  PX 1200
at 1; PX 2526 at 3.  The former prosecutor explained, "[I]t seems clear from the tapes that Chev-
ron is telling the truth when they claim not to have instructed Borja to make the first 3 tapes and
not to have even known about these conversations until June."  *Id.* at 3–4.  Nevertheless, the
LAP team continued to push the issue, going so far as to the make it a centerpiece of Donziger's
counterclaims against Chevron in this action—which this Court dismissed for failure to state a
claim.  Dkt. 643, ¶¶ 62-114; Dkt. 1321.

Thus, far from being an affirmative defense, the Borja issue shows that the Lago Agrio
trial was corrupt and subject to government influence.  The LAPs were implicated, and they now
make totally unfounded accusations because they believe that the best defense is a good offense.

### 3.  Chevron's *Ex Parte* Meetings

Neither party alleges here that incidental *ex parte* contacts with the Lago Agrio judges
regarding procedural matters were improper.  *See, e.g.*, Tr. (Callejas) 696:16–20 (Callejas's tes-
timony regarding propriety of his meetings with the judge to discuss "logistical and scheduling"
as opposed to "substantive or merit issues").  Yet Chevron had submitted abundant documentary
and testimonial evidence of the LAP team's many *ex parte* meetings where major substantive
issues were discussed in secret, important decisions were made, and the course of the litigation
was changed forever (*e.g.*, the decision to end the joint judicial inspections in favor of a single

global damages court expert, followed by the decision to appoint Cabrera as that court expert, *see supra* Argument Section I.C.1.d).  By contrast, Defendants have provided no evidence (other than speculation) that Chevron's meetings involved substantive issues.

For example, Donziger claims that he personally observed *ex parte* meetings by Chevron attorneys at the judicial inspection.  DX 1750 (Donziger) ¶ 79.  He does not provide any evidence, however, or even allege that such meetings involved discussion of substantive issues.  Donziger's other allegations of *ex parte* meetings are not based on personal knowledge.  Ponce provided even less detail, merely stating—without any foundation establishing that he had personal knowledge—that Chevron "repeatedly" had *ex parte* meetings.  DX 1601 (Ponce) ¶ 17.

And Moncayo's statement details a number of instances where he observed Chevron's lawyers meeting with the presiding Lago Agrio judge.  Yet, despite testifying that he "heard . . . conversations between Chevron's lawyers and the judges" (DX 1600 (Moncayo) ¶ 17), Moncayo testified at deposition and confirmed at trial that he was "really unaware" of the substance of Chevron's meetings with the judges, as the conversations were "just very brief words."  Tr. (Moncayo) 2065:11–2066:1.   On other occasions, he was not able to hear any part of the conversation.  Tr. (Moncayo) 2068:10–12.  Moncayo's only testimony where he alleged to have heard Chevron's attorneys discussing substantive issues was a meeting "in the year 2009 or 2010" where Chevron's attorneys purportedly had a discussion "in regards to the inspections of the Auca wells and other stations."  DX 1600 (Moncayo) ¶ 21.  At trial, however, Moncayo testified that he did not know if they had a discussion about inspections, bringing into question the veracity of his witness statement.  Tr. (Moncayo) 2072:5–7.  In sum, even if Moncayo's testimony were reliable (and it is not), none of it supports Defendants' allegations that Chevron's *ex parte* meetings were improper.  *See also supra* Argument Section VII.B.3.

### C.  Defendants Cannot Show That Any Alleged Chevron Conduct Harmed Them

Regardless of the veracity of Defendants' allegations, they cannot identify evidence meeting their burden to show an injury flowing from Chevron's alleged conduct.  *Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877, 880 (2d Cir. 1985) ("The party asserting an affirmative defense usually has the burden of proving it.").  An unclean hands defense requires injury to the defendant—Defendants' inability to make this showing here is fatal to their defense.

The injury requirement reflects the limitation that the unclean hands doctrine applies "only where the wrongful acts 'in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'"  *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 147 (1933)).  Accordingly, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct."  *Id.* (citing *Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978)); *see also* J. Pomeroy, A Treatise on Equity Jurisprudence § 399 ("The party to a suit, complaining that his opponent is in court with 'unclean hands' because of the latter's conduct in the transaction out of which the litigations arose, or with which it is connected, must show that he himself has been injured by such conduct[.]").

Courts in this Circuit do not apply the unclean hands doctrine where the party raising the defense cannot show that it was injured by the alleged conduct.  *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 75 (2d Cir. 1980) ("Bankers Trust was in no way injured by appellants' allegedly wrongful conduct, and thus may not invoke the unclean hands defense."); *Don Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012) ("Defendants' failure to allege that they relied upon, or were injured in any way, by any unconscionable conduct on the part of the Lia parties relating to the subject matter of this litigation is fatal to their unclean hands defense."); *Sec. Pac. Mortg.*

*& Real Estate Serv., Inc. v. Canadian Land Co. of Am., N.V.*, 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988) ("Without a claim of injury, the defense of unclean hands fails as a matter of law.").

As this Court has already noted, Defendants have not identified any alleged Chevron conduct that has injured them.  Dkt. 348 at 24–25.  The Guanta inspection, which Chevron requested, occurred before the judgment and Defendants cannot show that any delay caused the requisite injury.  The Nuñez bribery solicitation had no effect because Nuñez, who was the fourth judge to preside over the case, did not participate in the judgment and the judgment did not issue until a year and a half after he recused himself and after two more changes of judges. Nor could Chevron's alleged *ex parte* meetings have harmed Defendants, even assuming *arguendo* that such meetings were improper.  Indeed, none of this harmed the LAPs, because the judgment they obtained is a sweeping adoption of the LAPs' position on all issues, regardless of its true source—or author.

### D.  Defendants' "Robin Hood" and "Ends Justify the Means" Arguments Are not Relevant to any Defense

Defendants have long sought to justify their fraudulent behavior by accusing Chevron of wrongdoing, but there is no evidence supporting their claims.  At trial, Defendants offered otherwise inadmissible testimony for the purpose of demonstrating their "state of mind" with regards to their own misconduct.  That they would even make such an argument is a tacit admission of their misdeeds.  But the argument fails as a matter of law, as the Court has noted— Defendants are not free to commit fraud and extortion just because, in their minds, Chevron was a bad actor and Defendants' goals were laudable, a.k.a. the "Robin Hood" or "Ends Justify the Means" defenses.  *See, e.g.*, Tr. (Hinton) 2196:13–17 ("And so in your submission, it would be OK to issue press releases, which hypothetically were false and misleading, to generate economic pressure to induce the payment of money, as long as the party responsible for that had a lauda-

ble motive in his mind?"); *see also, e.g., United States v. Markle*, 628 F.3d 58, 62–63 (2d Cir. 2010) ("[A] reasonable belief that victims owed defendants money is not a defense to Hobbs Act extortion.") (citing *United States v. Zappola*, 677 F.2d 264, 269 (2d Cir. 1982)); Dkt. 1723. Donziger's beliefs about environmental contamination and his opinions about Texaco—whether or not sincere or backed up with objective evidence (they are not)—do not give him license to resort to fraud, bribery, and extortion in order to obtain a payout from Chevron. *Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1097 n.3 (2d Cir. 1976) ("The implied Robin Hood defense as justification for taking from the rich to give to the poor has not been accepted."); Tr. (Hinton) 2195:2–8 (the Court: "So this is a Robin Hood defense.").

In his witness statement, Donziger characterized his fraudulent and illegal conduct as necessary to "safeguard" the litigation process "from corrupt activities on behalf of Chevron," for example, and admitted that Defendants leveraged "out-of-court advocacy efforts," including *ex parte* meetings with government officials and public propaganda. DX 1750 (Donziger) ¶ 13. He asserted that Defendants' efforts were "legitimate and critical to the advocacy on our side of the case" simply because, he alleged, Chevron was doing the same thing. *Id.* As he put it, "[m]y fear that Chevron was trying to corrupt the trial shaped my strategic outlook, and helps explain many of my comments and actions. I have a good faith basis for this belief, as explained below." *Id.* ¶ 17.

But even if these allegations were legally relevant, Defendants failed to offer any evidence to support them. Donziger's "good faith basis for this belief" was nothing of the sort, consisting of vague, unsubstantiated quotes from his own notes, most of which do not even have anything to do with Chevron's supposed corruption. *See* DX 1750 (Donziger) ¶ 18 (struck as inadmissible). Donald Moncayo testified that he had witnessed *ex parte* contacts between Chevron

representatives and judges, but had no knowledge of what was said in any of those exchanges. Tr. (Moncayo) 2065:11–2066:1.  Despite obtaining *millions* of pages of discovery from Chevron, propounding extensive written discovery requests and taking numerous depositions, all directed on this precise topic, Defendants did not—and could not—offer any documentary evidence or point to any other source of support for their claims.  Dkt. 1164 at 4 & nn.13–14 (noting that Defendants have served 600 document requests on Chevron and that Chevron has produced over 6 million pages).  To the contrary, Adolfo Callejas testified that "at no time did I or any member of my team provide documents or evidence to a judge presiding over the Lago Agrio Litigation outside the procedure set forth by law."  PX 4300X (Callejas) ¶ 22.  And he testified that Chevron "absolutely and strictly prohibit[s] bribery of any government official."  *Id.* ¶ 63. These defenses, in fact, serve as a powerful admission of the Defendants' misdeeds.  If the Defendants believed they had acted properly, they would not attempt to rely on an "ends justify the means" defense— and they would not be offering post hoc justifications such as "Chevron's deployment of these tactics reinforced in my own mind that our similar efforts were both legitimate and critical to the advocacy on our side of the case."  DX 1750 (Donziger) ¶ 13; *see also id.* ¶ 59 (explaining that "[t]he existence and deadly consequences of Chevron's contamination of the Ecuadorian rainforest . . . was a key motivating factor as I sought justice for the affected communities in the Aguinda case.").

Defendants have no answer to Chevron's allegations or evidence.  Rather, they contend that because Chevron has pursued what Defendants call "the most well-funded corporate retaliation campaign in history" (*id.* ¶ 11) and supposedly has a "history of corruption in the Ecuador proceedings" (*id.* ¶ 88), and because Defendants are "assisting persons who lack means and power to achieve accountability for wrongs done to them" (*id.* ¶ 3), that any and all means were

justified.  This is at most an explanation of motive for their misconduct, not a justification, and the fact that Defendants even make this argument confirms their wrongful conduct.

## VIII.   Defendants' Other Defenses Fail

### A.   Defendants' Equitable Estoppel Arguments Rely on Mischaracterizations

Chevron's motion for partial summary judgment addresses Defendants' judicial and equitable estoppel defenses (Dkt. 1349 at 27) and remains pending, but Defendants' opposition responds only to equitable estoppel (Dkt. 1468 at 8–11).  The Court should reject their judicial estoppel defense for their failure to support or defend it.[80]

On equitable estoppel, Defendants claim that Chevron cannot sue them for claims arising out of their U.S.-based scheme because Texaco, before any of Defendants' tortious conduct had taken place, supposedly promised not to challenge the jurisdiction of the Lago Agrio court and to satisfy any judgment, subject to its rights under New York law to challenge the judgment based on fraud or the lack of impartial tribunals.  Dkt. 1468 at 8–11.  Defendants are incorrect, and, contrary to their claim, the Second Circuit has not endorsed their view.

The promises in question were representations made by Texaco Inc. in connection with the dismissal of *Aguinda v. Texaco Inc.*, Case No. 93-cv-7527 (JSR) and *Jota v. Texaco Inc.*, Case No. 94-cv-9266 (JSR) (S.D.N.Y.) (JSR) (collectively, "*Aguinda*") and were memorialized in a stipulation and order.  *See* PX 8003.  In particular, Texaco stipulated that it would not challenge the re-filing of the claims in *Aguinda* in Ecuador or Peru based on statute of limitations or personal jurisdiction grounds, and that it would not object to the use of discovery obtained in

---

[80] Further, this defense suffers from many of the same flaws as the equitable estoppel defense—in particular, an alleged promise to submit to litigation in Ecuador does not preclude an action for RICO or fraud.  *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 396–7 (2d Cir. 2011) ("There is also no conflict between Texaco's promise to the district court and Chevron's initiation of a contemporaneous challenge to Ecuador's conduct with respect to the Lago Agrio litigation . . . Chevron has thus reserved its right to challenge any judgment issued in Lago Agrio on the grounds . . . that the judgment itself 'was obtained by fraud' . . . .").

*Aguinda*.  *Id.*  In its original proposal, Texaco had offered another condition, that "Texaco Inc. [would] satisfy judgments that might be entered in plaintiffs' favor, subject to Texaco's rights under New York's Recognition of Foreign Country Money Judgments Act [(the 'NY Act')]." PX 8004 at 4.  But plaintiffs in *Aguinda rejected* that condition, unwilling to agree to Texaco's reservation of rights under the New York Recognition Act.  PX 8005 at 2.[81]  No party or court relied on, or even acknowledged, the proposed judgment-satisfaction condition after the *Aguinda* plaintiffs rejected it.[82]

The LAPs nonetheless sought to revive this phantom promise in *Republic of Ecuador*, where they argued to stay the BIT Arbitration on the same equitable estoppel theory they advance here.  In their briefing to the Second Circuit, they omitted the *Aguinda* plaintiffs' rejection of the proposed judgment-satisfaction condition, and urged the court to find that the purported promise estopped Chevron from challenging the Lago Agrio litigation in the BIT Arbitration. Br. for Pls.-Appellants, *Republic of Ecuador v. Chevron Corp.*, No. 10-1020-cv(L) (2d Cir. May 18, 2010) at 11–14.  To tie this supposed promise to Chevron, the LAPs also asserted without support that Chevron and Texaco are the same company.  *Id.* at 1 n.1.[83]  The Second Circuit re-

---

[81]  The plaintiffs in that case argued that the reservation of rights meant that "Texaco has decided to contest any possible negative ruling of a possible Ecuadorian court, bringing the case back to New York . . . . Texaco's reservation of right to contest the *enforceability* of an Ecuadorian judgment means that the Ecuadorian relief is a mere possibility, and that an Ecuadorian forum is inadequate."  PX 8005 at 2.

[82]  While the jurisdiction, statute of limitations, and discovery conditions appear at every juncture of the case through dismissal, Texaco's proposed judgment satisfaction condition did not appear in the stipulated order (PX 8003), and it was not included in the district court's list of the applicable conditions in its dismissal order (*Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001)).  Texaco did not renew the offered condition before the Second Circuit when it listed the other three conditions (PX 8006 at 3–4)—and the Second Circuit did not list it along with the other three conditions of affirmance (*see Aguinda v. Texaco Inc.*, 303 F.3d 470, 475 (2d Cir. 2002)).

[83]  It is a matter of unchallenged public record that Chevron and Texaco are separate companies.  *See* PX 8000; PX 8001; PX 8002).  The Second Circuit notes that the 2005 name change from ChevronTexaco to Chevron did not alter Chevron's legal obligations (*Republic of Ecuador*, 638 F.3d at 389 n.3), which is true—but that is equally true of the 2001 name change from Chevron to ChevronTexaco. *See also Bonnifield v. Chevron Corp.*, No. B206255, 2009 WL 1111601, at *4–5 (Cal. Ct. App. Apr. 27, 2009) (finding that Chevron and Texaco are separate companies).

jected the LAPs' equitable estoppel argument.  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011) ("[Plaintiffs] have failed to demonstrate any misrepresentation by Chevron that would justify applying equitable estoppel in this case . . . Chevron has thus far honored Texaco's promises to the district court.").  Nonetheless, in a footnote that was unnecessary to the decision but that effectively gave the LAPs—the losing party in the case—the benefit of the doubt, the court concluded that "Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action."  *Id.* at 389 n.3.[84]

The LAPs press essentially the same equitable estoppel theory in this action that was rejected in *Republic of Ecuador*.  It fails here as well, on several independent grounds.

The Second Circuit's discussion notwithstanding, the primary "promise" the LAPs now attempt to invoke was rejected by the *Aguinda* plaintiffs and not relied upon by any court or party.  Equitable estoppel requires reliance, *Republic of Ecuador*, 638 F.3d at 400, and the LAPs cannot claim to have relied on a promise spurned.  The Second Circuit did not hold otherwise. *See id.*  Further, even if there were a promise to satisfy a judgment, it would have been a promise made by Texaco, not the separate entity Chevron, and the LAPs offer no basis to pierce the veil. And even had the LAPs relied on Texaco's promise and were Chevron accountable for it, the promise was that *Texaco* would satisfy a judgment against *Texaco*, not that Chevron would satisfy a judgment against Chevron.  As Donziger has admitted, in suing Chevron the LAPs "su[ed]

---

[84]  The Second Circuit has subsequently retreated from these provisional views on the implications of the 2001 transaction or the purported Texaco promises.  *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 300 (2d Cir 2011) (noting that Texaco "became a wholly-owned subsidiary of Chevron in 2001"); *Naranjo*, 667 F.3d at 235 n.2 ("Chevron purchased Texaco and its subsidiaries in 2001. . . . But the questions of whether U.S. or Ecuadorian law governs whether a successor-in-interest is liable for a predecessor's alleged environmental torts committed in Ecuador, and what that governing law has to say on the subject, are not before us. We therefore express no opinion about them.").

the wrong party in the complaint" in Lago Agrio.  PX 176 at 2.

Moreover, if the proposed-and-rejected judgment-satisfaction promise is revived, so must be Texaco's reservation of its right to challenge under the New York Recognition Act.  PX 8004 at 3–4.  And that statute permits challenges to foreign judgments "obtained by fraud," among other grounds applicable here.  CPLR 5430(b)(3).  *See supra* Argument Section VI.A.[85]

In addition, a promise to satisfy a judgment is not a waiver of tort claims against parties who seek to procure such a judgment by fraud, and who engage in a wide range of other tortious conduct besides.  *See Parsons v. Lipe*, 158 Misc. 32, 79 (Sup. Ct. Onondaga Cnty. 1933) ("To make out a waiver of a legal right, there must be a clear, unequivocal, and decisive act of the party showing such purpose, or acts amounting to an estoppel on his part.").  This applies *a fortiori* with respect to purported waivers of claims that did not yet exist.  *Niagara Frontier Transp. Auth. v. Patterson-Stevens, Inc.*, 237 A.D.2d 965, 965 (4th Dept. 1997) (finding no waiver absent "clear language in the release indicating that [Defendant] agreed to waive future or continuing claims")*; see also United States v. Perez-Torres*, 15 F.3d 403, 407 (5th Cir. 1994) ("[T]he law should not, and does not, regard the willful and knowing commission of a felony as 'reasonable' reliance for [estoppel] purposes.").  Thus, even had Texaco promised to satisfy a judgment and it was *Texaco* and not Chevron currently standing before the Court asserting fraud and racketeering claims against the LAPs, the LAPs would have no equitable estoppel defense.

---

[85]  Nor can Defendants distort Texaco's reservation by claiming, as they have previously, that it applies only "if the plaintiffs sought enforcement in New York."  Dkt. 1468 at 9.  Texaco made no such limitation, and its briefing before the district court described the reservation as the right to contest a judgment "in the limited circumstances permitted by" the New York Act—which it in turn described as the grounds for non-recognition in CPLR § 5304(a) and (b), and not the procedural limitations in CPLR 5303.  PX 8007 at 3.  The Second Circuit rejected Defendants' limitation in *Republic of Ecuador*.  "Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses . . . . Having reserved the rights conferred by CPLR 5304, Chevron remains free to enforce them whenever and wherever it chooses, limited only by the scope of the statute and the availability of a forum prepared to address its claims."  638 F.3d at 397*; see also In re Union Carbide Corp.*, 809 F.2d 195, 204–05 (2d Cir. 1987).

Finally, "the estoppel doctrine invoked by defendants is rooted in equity . . . and is therefore subject to the equitable maxim that 'he who comes into equity must come with clean hands.'" *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 505 (S.D.N.Y. 2003). As the unrebutted record shows, and trial has further proven, Defendants' hands are far from clean here.

## B. Defendants' Causation Arguments Relating to Cabrera Fail

Defendants have argued that their Cabrera fraud cannot have harmed Chevron since the judgment (which the LAPs' team ghostwrote) purports to disclaim reliance on Cabrera. But as previously explained (*supra* Section I.C.1.d.v.(4)), Defendants' argument fails for at least four reasons: (1) the judgment necessarily relies on Cabrera for it "pit count" of 880, which resulted in the largest single component of the judgment's damages award; (2) the judgment relies on Cabrera for the $150 million award for potable water damages; (3) the judgment relies on Cabrera through cleansing experts such as Barnthouse and Allen; and (4) the judgment awards damages for the same eight categories that were developed by Defendants and ghostwritten into the Cabrera report.

## C. Defendants Refused to Put Forward Key Witnesses, and the Witnesses that Did Testify Did Not Undermine Chevron's Claims

Defendants produced only the handful of witnesses they viewed as helpful. Defendants had every opportunity to put in all of the evidence they thought was relevant but instead, after serving an initial witness list with 93 names on it, failed to contest most of the key facts and kept their Ecuadorian co-conspirators sequestered in Ecuador. As the Court noted, this trial was notable for the numerous dogs that did not bark. Tr. 2965:5–17; *see, e.g.*, *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 81–82 (2d Cir. 2000) ("It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse.").

Counsel for the LAPs asserted, in his closing argument, that the Ecuadorian attorneys "have essentially boycotted these proceedings." Tr. (LAP Closing) 2930:9–10. But this is not the case. Pablo Fajardo has been intimately involved in what witnesses would be produced from Ecuador and put before this Court, as was confirmed during this trial. Moncayo testified that Fajardo instructed him to submit a declaration in this matter and to testify in this case. Tr. (Moncayo) 2076:10–12, 2087:6–9. Fajardo dispatched Moncayo to meet with Evelyn Calva and review her witness statement that was to be submitted in this case. Tr. (Moncayo) 2089:10–2090:7. Fajardo told Humberto Piaguaje "that he had to come here to New York and testify." Tr. (H. Piaguaje) 2704:6–8. And recently-produced documents demonstrate that the Ecuadorian attorneys, along with the Asamblea, were discussing whether one of them should come to testify in this trial. As Juan Pablo Saenz stated in an October 21 email sent to, among others, Fajardo, Moncayo, Humberto Piaguaje, Yanza and Prieto, "we still do not know if Julio [Prieto] and the rest of the U.S. attorneys will end up testifying. Nor do we know which one of the [Ecuadorian computer forensic] experts would go. Until we establish that (tomorrow) I suggest we do not send the [press release regarding Zambrano's hard drive]." PX 8103 at 130. Thus, far from a "boycott" of the proceedings, the absence of the Ecuadorian attorneys was a strategic litigation decision.

Having made this litigation decision, Defendants thus determined not to provide this Court with potentially exculpatory evidence. Fajardo never appeared to explain his involvement in the Cabrera fraud, the judgment ghostwriting, or Defendants' bribery and pressure campaigns involving Ecuadorian court officials. Luis Yanza never took the stand to explain what was meant by the "secret account," or why he paid Cabrera off the books out of that account. PX 913. Julio Prieto did not tell this Court why he feared that he and his fellow attorneys might "go

to jail" once Stratus's documents were turned over.  PX 1279.  Juan Pablo Saenz never took the

opportunity to explain his statement that there was "pretty much irrefutable evidence of us col-

laborating with the [government] to get Reis Veiga and Perez convicted."  PX 1103.  Richard

Cabrera did not appear to explain whether he even read the report prepared by Defendants for his

signature.  Ximena Centeno never told this Court why she, as an employee of Selva Viva, depos-

ited money into Judge Guerra's account on two occasions.  PX 1713; PX 1718; PX 1719; PX

1739; 1741.  And despite Defendants' rush to bring Milton Efrain Jaque Tarco to testify that

Judge Zambrano's computer contained a draft of the Lago Agrio judgment (PX 6371 ¶ 2, 10,

14), they changed their minds once it became clear that his testimony conflicted with Zambra-

no's.  *See, e.g.*, Tr. (Lynch) 2814:23–2815:1 ("So am I correct that Mr. Tarco found the provi-

dencias.docx, the judgment-like document on the old computer, whereas Mr. Zambrano testified

he drafted it on the new computer?  A. Yes, that's correct.").

   This Court should draw adverse inferences from Defendants' refusal to bring crucial wit-

nesses to testify.  The Court should infer that: (1) Defendants' refusal to bring their Ecuadorian

co-conspirators to testify at trial indicates a consciousness of guilt; and (2) Defendants' Ecuado-

rian co-conspirators would have testified adversely to Defendants on the issues for which their

testimony would have been relevant, had they testified truthfully.

   But there were still other obvious witnesses—witnesses within this Court's subpoena

power—that Defendants refused to call.  And while it would not be appropriate for this Court to

draw adverse inferences from their failure to testify, this Court may nonetheless conclude that

the witnesses would not have offered exculpatory testimony.  One such witness was Aaron Marr

Page, who was present in court nearly every day of trial.  While Page was present at the Ecuado-

rian court when the Cabrera report was submitted (PX 83), and while Page took the lead in draft-

ing a fake "amicus" brief that Defendants used to pressure the Ecuadorian court into cancelling the judicial inspections (*see* PX 8017 at 1; PX 8020 at 1; PX 8021 at 1; PX 8051 at 1–2), he provided no evidence at trial.  Likewise, Atossa Soltani, the founder and executive director of Amazon Watch, attended the trial but never justified her actions in disseminating Donziger's propaganda.[86]  *See, e.g.*, PX 497#; PX 754; PX 7542; Tr. 1238:4–10.  Jim Tyrrell never explained how the strategy he developed to interfere with Chevron's discovery of the Cabrera fraud (PX 1348) did not constitute obstruction of justice, or how the vexatious enforcement campaign strategy outlined in his Invictus Memorandum does not constitute extortion (PX 2382).  Defendants cannot now claim ambiguity of facts or hypothesize about what might have happened, where they have been the ones who chose not to call the percipient witnesses at trial.

Moreover, the witnesses Defendants did call offered hardly any admissible testimony, and could recall almost nothing of interest about the matters in dispute except for purportedly certain recollections of a few key "facts" of use to Defendants—about which they often could provide no foundation of personal knowledge.  Defendants' star witness, Zambrano, was a disaster, not merely because he lied about writing the judgment, but because even his lies provided even more evidence of Defendants' misconduct.  *See supra* Argument Section I.C.1.f.iii.

While Defendants called two members of their Ecuadorian team to testify, Donald Moncayo and Alejandro Ponce Villacis, neither had any substantive testimony to offer.  Indeed, that may have been the point—Moncayo and Ponce appeared to have been the Ecuadorian LAP team members with the least knowledge about Defendants' improper activities.

But as this Court witnessed, even their limited testimony was incredible, inadmissible, or

---

[86]  Although originally listed on Defendants' witness list, Donziger's counsel told this Court on November 6 that Soltani could not testify because "[s]he has to go to New Zealand or Australia, somewhere far" (Tr. (Zambrano) 1860:2–3), but only days later Soltani appeared in Court, sitting in the gallery.

irrelevant.  Ponce's witness statement contained virtually no testimony about which he had personal knowledge, and instead focused on vague assertions such as accusing Chevron of repeated *ex parte* contacts with Ecuadorian judges without any detail or description of how this was within his personal knowledge.  On cross examination, Ponce was evasive at best, testifying that Cabrera was not required to be independent (Tr. (Ponce) 2226:7–2228:12), but claimed not have seen, and could not explain, Cabrera's filings to the Ecuadorian court asserting his independence (*id.* 2229:10–2229:21).  He stood on unexplained semantic distinctions, arguing that it was not "improper," only "not technical" that Defendant ghostwrote Cabrera's report (*id.* 2228:17–2229:9), and insisted and that emails sent to him were not directed to him (*id.* 2272:2–11).  This Court had the opportunity to observe Ponce's complete lack of credibility, and should disregard his testimony accordingly.

Likewise, Moncayo's testimony that he had witnessed Chevron lawyers engaging in *ex parte* contacts with Ecuadorian judges was not helpful to Defendants, as he could not say whether Chevron's *ex parte* contacts were substantive or procedural.  Tr. (Moncayo) 2065:11–2066:1.  And his testimony that he had witnessed Evelyn Calva typing in Judge Zambrano's office was clearly false and engineered by Fajardo.  He testified that he recalled seeing Calva in Zambrano's office as he walked by, observing her for no more than two or three seconds, nearly three years before, even though he did not know who she was.  *Id.* 2083:1–2086:23.  He only learned her identity a few days before his testimony, when Fajardo dispatched him to meet with her.  *Id.* 2081:11–19; 2088:12–2091:19.  This photographic memory is highly unlikely for someone who could not remember that his job had been to provide logistical support to Cabrera until his recollection was refreshed with a photograph of Cabrera.  *Id.* 2075:24–2080:2.  And regardless of whether Moncayo actually saw Calva in Zambrano's office, this testimony does not help De-

fendants because Moncayo could not testify as to what Calva was doing.  *See*, *e.g.*, Tr. 2083:5–7

("Q. And you don't know what Ms. Calva was doing in Judge Zambrano's office, right?  A.

That's true.").

Defendants called Karen Hinton, who insisted that Donziger did not push for negative

publicity in order to force Chevron to settle because Donziger "did not want to settle the case."

DX 1500 (Hinton) ¶ 11.  But this was proven false not only by Donziger's own contemporaneous

communications (*e.g.* PX 931) but by Hinton's own proposal to him (PX 1034 at 3).

Finally, Donziger himself took the stand in his defense, but only confirmed his dishones-

ty.  On cross examination, he offered evasive answers (such as "I don't know if I did or I didn't"

"It's possible, I don't know if I said it" or "I may have, I don't remember.") over 100 times.[87]

His inability to recall any events or conversations did not affect him at all on re-direct, however,

where he had answers to every question he was asked.  In the face of a decade of correspondence

demonstrating his total control of the litigation (*see supra* Section I.B.2), Donziger spun a story

that was obviously false and obviously designed to evade RICO's "operation or management"

requirement.  Asserting that Fajardo and other Ecuadorian "representatives" controlled the case,

he testified "I work for them; they do not work for me."  DX 1750 (Donziger) ¶ 10.

## IX.    This Court Has Jurisdiction to Enter Relief

### A.  Subject Matter Jurisdiction

#### 1.  Federal question

Chevron's RICO allegations give the Court federal question jurisdiction pursuant to 28

U.S.C. § 1331.  *See*, *e.g.*, *Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192,

---

[87] *See* Tr. (Donziger) 2464:25–2465:1; 2465:3; 2465:5; 2466:14; 2467:14; 2471:15; 2471:20; 2472:9–10; 2473:10; 2474:10; 2475:12; 2477:10; 2478:15–17; 2479:3; 2479:20–21; 2480:21; 2483:9; 2484:21–23; 2487:23; 2488:2; 2488:11; 2489:4; 2489:11; 2489:23; 2490:2–3; 2493:20; 2493:22; 2495:1; 2498:12; 2499:9; 2500:24; 2502:18; 2530:15; 2531:19; 2531:24; 2532:17; 2540:15; 2541:11; 2541:15; 2549:20; 2574:17; 2588:2; 2589:25; 2590:21; 2602:24.

197 (2d Cir. 2013); *Air China, Ltd. v. Kopf*, 473 F. App'x 45, 47–48 (2d Cir. 2012) (noting supplemental jurisdiction over state law claims asserted in connection with federal RICO claim).

## 2. Diversity

This Court may exercise diversity jurisdiction over a case "if there is no plaintiff and no defendant who are citizens of the same State." *Nachbaur v. Weiss,* 19 F. App'x 24, 26 (2d Cir. 2001); *see* 28 U.S.C. § 1332.  The Court may also exercise diversity jurisdiction here because the LAPs, Donziger, and Chevron are citizens of different states.[88]

Diversity jurisdiction exists only if the amount in controversy exceeds $75,000—the amount in controversy is determined by reference to the value to the plaintiff of the property right at issue.  *See Kheel v. Port of N.Y. Auth.*, 457 F.2d 46, 49 (2d Cir. 1972) ("[T]he amount in controversy is calculated from the plaintiff's standpoint; 'the value of the suit's intended benefit' or the value of the right being protected or the injury averted constitutes the amount if controversy when damages are not requested.").  A plaintiff carries its burden by alleging a sufficient amount in controversy, and "the plaintiff's jurisdictional amount allegation . . . will be accepted unless it appears to a legal certainty that the amount cannot be recovered."  Wright & Miller, Federal Practice and Procedure, § 3708 (4th ed. 2013); *see also St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S. Ct. 586, 590 (1938) (insufficient amount in controversy must be shown "to a legal certainty" to justify dismissal).

It is well-settled that, with respect to the jurisdictional minimum for diversity jurisdiction, "[w]here the plaintiff seeks injunctive relief, the value of his claim is generally assessed with reference to the right he seeks to protect and measured by the extent of the impairment to be pre-

---

[88]  It is undisputed that Donziger is a citizen of the state of New York and the LAPs are citizens of Ecuador.  Dkt. 283 ¶¶ 8–10, App. A; Dkt. 307 ¶¶ 8–10; Dkt. 311 ¶ 20.  Chevron is a corporate body incorporated in Delaware (PX 8000) with its principal place of business in California (*see, e.g.*, Chevron Corp. securities filing, available http://www.sec.gov/Archives/edgar/data/93410/000009341013000045/cvx-09302013x10qdoc.htm), and thus is a citizen of both states.  *See* 28 U.S.C. § 1332(c).

vented by the injunction." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir. 1991).

Further, "[i]n calculating that impairment, the court may look not only at past losses but also at

potential harm." *Id.* at 88.  Neither a money damages claim nor a financial recovery is required

to establish the jurisdictional minimum.  *See Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*,

521 F.2d 392, 399 (2d Cir. 1975); *see also Maxons Restorations, Inc. v. Newman*, 292 F. Supp.

2d 477, 481–84 (S.D.N.Y. 2003) (noting courts should "look through to the possible award re-

sulting from the desired arbitration" in determining amount in controversy of petition to compel

arbitration).

Here, Chevron's request for injunctive relief barring future racketeering activity, fraud, or

the monetization of the Ecuadorian judgment satisfies the jurisdictional minimum.  Absent in-

junctive relief, Defendants intend to seize assets of Chevron subsidiaries worth far in excess of

$75,000, and Chevron will continue to incur legal costs in excess of that amount in seeking to

prevent such seizures and prove Defendants' fraud in other forums.  Defendants' continued rack-

eteering activities will injure Chevron's goodwill, and that amount will be far more than

$75,000, considering the absolute value of Chevron's brand and reputation.[89]

### B.  Personal Jurisdiction

Pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, New York's long-

arm statutes determine whether the exercise of jurisdiction is permissible.[90]  Sections 301 and

302 of the New York Civil Practice Laws and Rules govern personal jurisdiction.

---

[89] *See*, *e.g.*, Millward Brown, 2013 BrandZ Top 100, available at:
http://www.millwardbrown.com/brandz/Top_100_Global_Brands.aspx (valuing Chevron brand at $9 billion).

[90] *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244–46 (2d Cir. 2007) (applying New York long-arm statute
to non-domiciliary in a case involving a federal question).  As New York's long-arm statute is more restrictive than
that allowed by the Constitution, contacts sufficient to qualify under the statute will also satisfy the Due Process
Clause.  *See*, *e.g.*, *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010) ("We conclude that
assertion of personal jurisdiction over [defendant] comports with due process for the same reasons that it satisfies
New York's long-arm statute.").

### 1.  Donziger

Steven Donziger has not contested personal jurisdiction and has therefore waived any personal jurisdiction defense.  *See* "*R*" *Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 123 (2d Cir. 2008).[91]

Even if Donziger had not waived the personal jurisdiction defense, which he has, exercise of jurisdiction is proper in this District because Donziger and Donziger & Associates, PLLC are citizens of New York, and because Donziger conducts extensive business activities within the state.[92]  Donziger is the sole proprietor of the Law Offices of Steven R. Donziger, which is located and does business in New York.  *See* FF ¶¶ 129–31.

### 2.  The Appearing LAPs

This Court has stricken the appearing LAPs' (Camacho and Piaguaje) personal jurisdiction defense as a sanction for their continued bad-faith failure to comply with discovery obligations—in particular, the LAPs' deliberate noncompliance with this Court's February 11 Order. Dkt. 1529 at 95.  Nevertheless, even apart from that well-warranted sanction, the record contains more than sufficient evidence to support the exercise of personal jurisdiction over the LAPs.  *See* FF ¶¶ 132–36.

#### a.  The LAPs, Through Their Agents, Have Engaged in a Systematic and Continuous Pattern of Activity in New York, Thereby Subjecting Themselves to Personal Jurisdiction Pursuant to CPLR 301

A defendant is subject to general jurisdiction in New York if it is "doing business" in the

---

[91] *Datskow v. Teledyne, Inc., Cont'l Prods. Div.*, 899 F.2d 1298, 1303 (2d Cir. 1990) (holding that a delay in challenging personal jurisdiction may result in waiver); *V Cars, LLC v. Isr. Corp.*, 902 F. Supp. 2d 349, 359 (S.D.N.Y. 2012) ("Under Fed. R. Civ. P. 12(h)(1)(B)(ii), a party waives a personal jurisdiction defense when it fails to assert this defense in a motion or 'in a responsive pleading.'").

[92] For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. 301.

state, meaning the defendant is "engaged in such a continuous and systematic course" of activity to "warrant a finding of its 'presence' in this jurisdiction." *Laufer v. Ostrow*, 55 N.Y.2d 305, 309–11 (1982) (citing CPLR 301).  Foreign individuals can be subject to general jurisdiction based on the actions of their agents doing business in the State.  *See*, *e.g.*, *ABKCO Indus., Inc. v. Lennon*, 52 A.D.2d 435, 440 (1st Dep't 1976).  Jurisdiction based on an agent's in-state activities can also be found even if the non-domiciliary did not exercise direct control of the agent, but instead ratified or authorized the actions of the agent.  *See Wiwa v. Royal Dutch Petrol., Co.*, 226 F.3d 88, 95 (2d Cir. 2000).

Here, as discussed above, the LAP team has waged a 20-year campaign against Chevron and Texaco from a New York headquarters, through New York lawyers and agents, in the New York media, before New York public officials, and in New York courts.  These activities were done on behalf of and within the scope of authority granted to them by the LAPs.  *See supra* Argument Section III.A.  In addition, the LAPs have ratified and authorized the LAP team's conduct in agreements with Fajardo and Donziger, Asamblea minutes approving of the LAP team's work, and their own deposition and trial testimony.  *See supra* Argument Section III.B.  Further, they have implicitly ratified such conduct by seeking to profit from the fraudulent judgment through enforcement proceedings in Canada, Brazil, and Argentina.  *See id.*

Among the "traditional set of indicia" that New York courts consider when determining whether a party is doing business in New York, is "whether it has individuals permanently located in the state to promote its interests."  *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 381–82 (S.D.N.Y. 2000).  This perfectly describes the role Donziger has played on the LAPs' behalf for nearly 20 years—a role sufficient to establish Section 301 jurisdiction here.  From Donziger's Upper West Side office, the LAPs have mounted a far-

reaching campaign against Chevron that continues to this day, prompting this Court to hold that Donziger's "firm has been the functional equivalent of the LAPs' New York office." Dkt. 181 at 92.

Courts have held that the retention of New York counsel, especially where coupled with the reliance on New York agents for other purposes, satisfies Section 301. *See, e.g., ABCKO Indus. v. Lennon*, 52 A.D.2d 435, 440 (1st Dep't 1976) (finding jurisdiction over Ringo Starr pursuant to Section 301 based on his "composing activities, which he had exploited in the United States through attorneys and accountants whom he has retained in New York on a continuing basis," which "constituted doing business in New York").[93] And the LAPs have not merely *retained* counsel in New York; they have employed litigation in New York to seek meaningful relief—money damages from Texaco in the *Aguinda* case (Case No. 93-cv-7527 (JSR)), an injunction precluding an arbitration between Chevron and the ROE in the *Yaiguaje* case (Case No. 1:10-cv-00316-LBS), and protection of the attorney-client and journalist's privileges in the § 1782 actions (Case Nos. 10-mc-00002(LAK); M-19-111)). Indeed, the LAPs have obtained some measure of relief in New York, delaying Chevron's exposure of their fraud through motions practice, and lifting an injunction, which has allowed them to pursue enforcement actions.

In short, fundamental principles of due process, equity, and estoppel preclude the LAPs from benefiting from Donziger's fraudulent acts (such as obtaining a corrupt judgment in their names), while at the same time disclaiming an agency relationship for purposes of personal jurisdiction. The LAPs have "receive[d] considerable benefits from" their agents' activities in

---

[93] *Accord In re Ski Train Fire*, 230 F. Supp. 2d at 384 (holding that retaining "the services of a New York law firm," and other contacts, demonstrated "substantial and continuous business" in New York conferring general jurisdiction over defendant); *see also Frummer v. Hilton Hotels Int'l*, 19 N.Y.2d 533, 537–38 (1967) (defendant's agent had an office and performed publicity and public-relations work in New York); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967) (same); *Zucker v. Baker*, 35 Misc.2d 841, 844 (Sup. Ct. Queens Cnty. 1962) (fundraising activities in New York by agents constitute doing business in New York).

New York, so they "may not be heard to complain about the burdens." *Frummer*, 19 N.Y.2d at 538.

### b.  The LAPs Have Transacted Business in New York, Thereby Subjecting Themselves to Personal Jurisdiction Pursuant to CPLR 302(a)(2)

In addition to general jurisdiction, a court may exercise personal jurisdiction over "any non-domiciliary . . . who in person or through an agent" (1) "transacts any business within the state" or (2) "commits a tortious act within the state."  CPLR 302(a)(1)–(2); *see Sole Resort, S.A., de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103–04 (2d Cir. 2006).  Chevron's claims arise from the LAPs' transaction of business in New York (including entering legal contracts with lawyers, funders, and advisors) and from their tortious acts committed in New York (including the execution of an extortionate scheme and numerous acts of fraud).  Accordingly, this Court has personal jurisdiction over the LAPs with respect to Chevron's claims based against them.

The Second Circuit considers several factors to determine whether a defendant "transacts business" in New York under CPLR 302(a)(1), including: (i) whether the defendant has an ongoing contractual relationship with a New York entity; (ii) whether the contract was negotiated or executed in New York, and whether after executing a contract, the defendant has visited New York regarding the relationship; and (iii) a choice-of-law clause.  *Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996). "No one factor is dispositive" and "[o]ther factors may also be considered."  *Id.* at 29.  And "[n]o single event or contact connecting defendant to the forum state need be demonstrated."  *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986).  Often, "the place of performance is more critical than the place of the execution of a contract."  *See Cooper, Robertson & Partners, L.L.P. v. Vail*, 143 F. Supp. 2d 367, 371 (S.D.N.Y. 2001).  Here, the totality of evidence and circumstances weighs in favor of

exercising personal jurisdiction over the LAPs.

The LAPs have entered into a number of funding and retention agreements, many of which were negotiated and executed in New York and/or with New York entities. For instance, H5's retention agreement with Donziger and the LAPs was negotiated and performed in New York. *See* PX 566; *see also, e.g.,* PX 1226; PX 1453. Donziger and New York-based consultants from H5 negotiated the funding agreement with Burford from New York. 12/1/2010 Donziger Dep. 621:11–20, 622:02–06; PX 3100 (Bogart) ¶¶ 5–7 (describing Burford's New York operations and meetings with Donziger and other LAPs representatives); *see also, e.g.,* PX 1428. H5 and Donziger also coordinated the RFP process that solicited several New York law firms, including Kilpatrick Stockton, Constantine Canon LLP, Milberg LLP, and Patton Boggs. *See* PX 1208. The LAPs' retention agreement with Emery Celli, a New York firm, was likewise negotiated in New York. PX 544.

Most of the contracts executed by the LAPs have New York choice of law provisions, which "is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004); *see also CutCo.*, 806 F.2d at 366–67.

- The Donziger retention agreement shall be "construed and interpreted in accordance with the laws of New York." PX 558 at 14.

- The Fajardo retention agreement even requires New York law to be applied in arbitration, to the extent U.S. law applies. PX 559 at 6.

- The Patton Boggs and Motley Rice retainers also require the use of New York law in arbitration. PX 553 at 7; PX 557 at 5.

- The Emery Celli retention agreement requires that all disputes be arbitrated in New York City, where the LAPs would "expressly agree to submit to personal jurisdiction in New York." PX 544 at 4.

- The H5 agreement requires that in arbitration, "the substantive law of the State of New York" be applied. PX 566 at 5.

310

- Clause 8.5 of the Burford agreement shall be construed in accordance with New York law.  PX 552 at 32.

Jurisdiction can also be found through the LAPs' projection of themselves into New York through retaining, communicating with, and transacting business through a New York agent, which constitutes "purposeful activity" in New York.  *See* CPLR 302(a).  The New York case *Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007) is demonstrative.  The non-domiciliary defendants in *Fischbarg*, who retained New York counsel, "projected themselves into our state's legal services market," "to engage in a 'sustained and substantial transaction of business'" in New York.  *Id.* at 382.  As *Fischbarg* says: "The quality of defendants' contacts here establishes a transaction of business in New York. Defendants sought out plaintiff in New York and established an ongoing attorney-client relationship with him . . . [and] during the course of the representation, defendants communicated regularly with him in this state."  *Id.* at 380–81; *see also Berkshire Capital Grp., LLC v. Palmet Ventures, LLC*, 307 F. App'x 479, 481 (2d Cir. 2008) (holding that "jurisdiction was proper where a California resident retained via telephone and mail a New York lawyer whose work was performed within the state"); *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 548–49 (2d Cir. 2007) (holding that "non-commercial" activity may qualify as transacting business for purposes of CPLR 302(a)(1), including corresponding with counsel in New York).  *See* FF ¶¶ 137–54.

The LAPs' relationship with New York began 20 years ago with *Aguinda*, and since then, their "contacts with New York, if anything, grew."  *Chevron Corp. v. Donziger*, No. 11-cv-691(LAK), 768 F. Supp. 2d 581, 643 (S.D.N.Y. 2011).  Since filing *Aguinda*, the LAPs have further availed themselves of the protections of New York law through offensive court filings, such as their petition to stay the BIT arbitration, their intervention in the *Crude* 1782 proceeding, their intervention in the *Donziger* 1782 proceeding, and lobbying of New York officials, such as then

311

New York State Attorney General Andrew Cuomo and New York State Comptroller Thomas

DiNapoli, to spread misrepresentations and increase "pressure" on Chevron.  *See* PX 1106; PX

1131; PX 1133.  There is extensive documentation of communications between the LAPs' Ecua-

dorian agents and the LAPs' New York agents, coordinating every aspect of the fraudulent

scheme, including media and political lobbying.  *See, e.g.,* PX 315; PX 529#; PX 695; PX 713;

PX 715; PX 760; DX 1500 (Hinton) ¶¶ 2, 8, 10, 19.[94]

**c.  The LAPs Have Committed Torts in New York, Thereby Subjecting
Themselves to Personal Jurisdiction Pursuant to 302(a)(2)**

Specific personal jurisdiction over the LAPs is also warranted because they directly and

through their agents committed tortious acts within New York.  *See* CPLR 302(a)(2); *Longines-*

*Wittnauer Watch Co. v. Barnes & Reinecke*, 15 N.Y.2d 443, 462 (1965).  "It is well established

under New York law that the acts of a co-conspirator within the state may be attributed to an out-

of-state defendant for the purposes of obtaining personal jurisdiction."  *Madanes v. Madanes*,

981 F. Supp. 241, 261 (S.D.N.Y. 1997) (internal quotation marks omitted).  In such cases, the

plaintiff must make a prima facie case showing the existence of a conspiracy and must show a

sufficient relationship between the defendant and the conspiracy so as to warrant the inference

that the defendant was a member of a conspiracy.  *Chrysler Capital Corp. v. Century Power*

*Corp.*, 778 F. Supp. 1260, 1266–69 (S.D.N.Y. 1991).  To satisfy the latter requirement, courts

apply modified agency concepts, requiring that (1) the non-domiciliary defendant have an

awareness of the effects of their activities in New York; (2) the New York co-conspirators' activ-

ity is for the benefit of the non-domiciliary defendants; and (3) New York co-conspirators act at

the direction of, at the request of, on behalf of, or under the control of the non-domiciliary de-

---

[94]  Although the record is more than sufficient to establish that the LAPs transacted business in New York through
their agents, Chevron likely would have been able to show this even more definitively had the LAPs not improperly
refused to produce Ecuadorian documents.  An adverse inference would be well warranted here.

fendants. *See Dixon v. Mack*, 507 F. Supp. 345, 348–50 (S.D.N.Y. 1980); *Sierra Rutile Ltd. v. Katz*, No. 90 Civ. 4913 (JFK), 1992 WL 236208, at *9 (S.D.N.Y. Sept. 8, 1992) (finding personal jurisdiction over a non-domiciliary co-conspirator where plaintiff alleged that a "scheme devised by the defendants was initiated, directed and consummated in the City and State of New York and that New York was its focal point") (internal quotation marks omitted).

As explained *supra*, the LAPs' scheme to defraud and extort Chevron was headquartered in Donziger's New York office. *See supra* Argument Section I.G.2. The LAPs, through their New York agents, committed numerous tortious acts, including common law fraud, civil conspiracy, mail and wire fraud, money laundering, and obstruction of justice. *See supra* Argument Section III.B. This conduct was undertaken at all times in the LAPs' name, pursuant to their express authority, and with their knowledge. *See supra* Argument Section III.A–B. The LAPs approved and ratified this conduct and seek to benefit from said conduct. *See supra* Argument Section III.B.

## X. If the Court Considers Any Portion of the Defendants' Designation of the 2010 Depositions of Douglas Beltman and Ann Maest for the Truth of the Matters Asserted There, It Should Also Accept Beltman and Maest's 2013 Deposition Testimony and Witness Statements on the Same Basis

Chevron has objected to Defendants' designation of the Beltman and Maest depositions, in whole or substantial part, because they are irrelevant, consistent with the Court's numerous prior rulings concerning the appropriate scope of trial, among other grounds. *See* Fed. R. Evid. 401, 402, & 403. Defendants have essentially admitted that they ghostwrote the Cabrera report, and that their true involvement was not disclosed, either to the Lago Agrio court or to U.S. courts. *See* Tr. (Donziger) 2540–2565; *see also supra* Argument Section I.C.1.d.v. Nonetheless, Defendants sought to designate large portions of deposition testimony of Beltman and Maest taken in 2010, while the two consultants were still under contract with Defendants and

still in active conspiracy with them.  Both Beltman and Maest have since renounced their participation in Defendants' ghostwriting scheme, and their 2010 testimony is inconsistent with contemporaneous documentary evidence and their subsequent written statements and testimony.  *See* PX 5208 (Beltman); Ex. A (Beltman); PX 5210 (Maest); Ex. B (Maest).  Accordingly, the Court should not consider it.

If, however, the Court admits into evidence here any of Defendants' designations from Beltman or Maest's 2010 depositions, then it should also consider their subsequent written declarations (PX 5208 and PX 5210), and their Fall 2003 deposition testimony in the related BIT arbitration proceedings (Ex. A (Beltman); Ex. B (Maest)).  Under Rule 106, "even though a statement may be hearsay, an omitted portion of the statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."  *United States v. Gonzalez*, No. 12-Cr.-88S (WMS), 2013 WL 5973146, at *2 (W.D.N.Y. Nov. 8, 2013) (internal quotation marks omitted) (quoting *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007)).  Thus, to the extent that the Court is inclined to consider Defendants' designated testimony of Beltman and Maest, it should also consider their subsequent written declarations and testimony under Rule 106 and the rule of completeness, to ensure proper context and necessary clarification of their designated statements.

Moreover, the subsequent declarations and testimony of Beltman and Maest are admissible to impeach the designated testimony of Beltman and Maest under Rule 806.  *See United States v. Hawley*, No. C-06-4087 (MWB), 2011 WL 10483390, at *18 (N.D. Iowa Oct. 13, 2011) (prior deposition testimony is "hearsay" for purposes of Rule 806, permitting non-designating party to attack or rehabilitate the credibility of the deponent).  The drafters remarked that Rule

806 is intended to address the precise situation here—where a party designates prior deposition testimony that is later contradicted by subsequent statements of the deponent.  Fed. R. Evid. 806, Adv. Comm. Notes ("With respect to both former testimony and depositions the possibility exists that knowledge of the statement might not be acquired until after the time of the cross-examination.  Moreover, the expanded admissibility of former testimony and depositions under Rule 804(b)(1) calls for a correspondingly expanded approach to impeachment. The rule dispenses with the requirement in all hearsay situations, which is readily administered and best calculated to lead to fair results.").[95]  Indeed, "[n]othing about Rule 806, or any other rule, bars [a party] from supporting a declarant's credibility as to some of his statements and attacking it as to others."  *United States v. Vegas*, 27 F.3d 773, 782 (2d Cir. 1994).

Finally, the declarations and testimony of Beltman and Maest are admissible under the residual hearsay exception.  Fed. R. Evid. 807; *United States v. Bryce*, 208 F.3d 346, 350–51 (2d Cir. 1999) (hearsay is admissible if "(i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party.").  The sworn written declarations and testimony are particularly trustworthy where, as here, they are corroborated by each other and by other testimony.  *See Lopez v. Miller*, 915 F. Supp. 2d 373, 426 (E.D.N.Y. 2013) (admitting affidavits under Rule 807 where "[t]he affidavits—as well as the trustworthiness of the affiants—are corroborated (1) by

---

[95] *See also United States v. Zeyra*, 983 F.2d 1080 (9th Cir. 1993) (unpublished) ("Zeyra was free to use this other evidence to impeach the credibility of the deposition testimony.  *See* Fed. R. Evid. 806."); *United States v. Khan*, No. 6-Cr- 255 (DLI), 2008 WL 2323375, at *3 (E.D.N.Y. June 2, 2008) (Rule 806 permits admission of otherwise hearsay statements, including deposition testimony); 30C Charles Alan Wright, et al., Fed. Prac. & Proc. § 7090 (2d ed.) ("evidence of such prior inconsistent statement or conduct may be introduced to attack the credibility of the declarant without reference to (1) whether the prior inconsistent statement or conduct occurred prior to or after the statement admitted into evidence or (2) whether the prior statement admitted into evidence was made at a prior hearing or deposition.").

each other; (2) by Lopez's testimony, which, as discussed above, was substantially consistent with the affidavits," as well as other corroborating evidence).  The Cabrera fraud is one of the core fraudulent acts by the Defendants—and therefore is material to Chevron's claims.  To the extent Beltman and Maest's testimony is probative to any issue in this case, it is their recent written statement and most recent testimony that are the most reliable evidence—at a minimum, their 2010 depositions should not be considered without reference to these subsequent sworn statements.  Admitting sworn written declarations and testimony is consistent with the Rules of Evidence and the interest of justice.  *Id.* at 424 ("The fourth Rule 807 requirement (interests of justice) generally collapses with the first (trustworthiness)").  Defendants have been on notice that Chevron may rely on these statements since they were filed with the Court on March 22, 2013.  *See* Dkt. 934-1.

**Absent Witness Inference is Not Warranted.**  "Generally, there is no duty on the part of either party to call any particular person as a witness.  However, if a witness could have given material non-cumulative evidence, an unfavorable inference can be drawn."  *LaMarca v. United States*, 31 F. Supp. 2d 110, 128 (E.D.N.Y. 1998) (internal marks and citations omitted).  Throughout this case and during the trial, Chevron adduced mounds of evidence regarding the Cabrera fraud—the only issue to which Beltman and Maest could provide relevant testimony.  Indeed, the Cabrera fraud is one of the most heavily documented issues in the case.  Dkt. 1321 at 14–15 (Chevron's allegation regarding the Cabrera fraud "is not in dispute.  Mr. Donziger has admitted that Stratus, the LAPs' environmental consultant, wrote much of the Cabrera report, which was filed with the Ecuadorian court with the representation that the report had been 'prepared by the Expert Richard Stalin Cabrera Vega' with the help of '[his] technical team, which consists of impartial professionals.'") (footnotes omitted).  As a result, Beltman and Maest's tes-

timony would not have materially added to the other overwhelming evidence regarding the Cabrera fraud.

Further, Defendants conduct with respect to witnesses who did appear indicates that Defendants would have tried to use Beltman and Maest to delve even further into the underlying science of the Lago Agrio litigation.  *See* Dkt. 1742 at 2 (striking most of Mr. Donziger's "proffer of testimony and other evidence which goes to the merits of the Ecuadorian litigation"); Dkt. 1713 (striking Hinton statements); Tr. (Veiga) 58:23–60:1 (Defendants objecting to testimony regarding remediation and release); *see also* Dkts. 720, 721, 901, 902, and 1130.  Moreover, Defendants were permitted to depose Beltman, Maest, and any other Stratus witness during the discovery phase of this trial, yet Defendants never noticed the deposition of any Stratus witness. They should not now be allowed to advance a flawed inference from the absence of testimony from Beltman and Maest that these witnesses somehow would have undermined Chevron's claims or recanted their sworn declaration testimony and/or subsequent deposition testimony in the BIT proceeding.  *See United States v. Ariza-Ibarra*, 651 F.2d 2, 12 (1st Cir. 1981) ("Appellants' complete failure to take any actions consistent with a sincere interest in obtaining the informant's testimony leads us to conclude . . . that their objective throughout the proceedings was not to obtain Larain's testimony but to obtain a tactical advantage at trial and on appeal from his absence").  And Chevron called Josh Lipton to confirm that Beltman and Maest had acted wrongfully at Stratus and have since been separated from Stratus as a result of those actions (PX 5200 ¶¶ 38–39), and Defendants chose not even to cross-examine Mr. Lipton.

Accordingly, a missing-witness inference is particularly unwarranted here, where the testimony of Beltman and Maest would only have marginally added to other, overwhelming evidence of the Cabrera fraud and where Defendants made no effort to procure the testimony of

Beltman and Maest despite ample opportunity to do so.

**REQUESTED RELIEF**

Defendants are intent on completing a decades-long criminal scheme designed to defraud an American energy company out of billions of dollars.  Defendants' misconduct is massive in scope, rivaled by the likes of Bernie Madoff and Enron.  And it affects not only Chevron, its employees, and its many shareholders, but also threatens fundamental notions of justice.  This Court has the power—and the duty—to end this ongoing criminal conspiracy.

Where, as here, it is shown that "'legal rights have been invaded . . . federal courts may use any available remedy to make good the wrong done.'"  *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66, 112 S. Ct. 1028, 1033 (1992) (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S. Ct. 773, 777 (1946)).  And it is well established that "[e]quity will interfere to grant relief where necessary to prevent the consummation of a fraud."  *Adams v. Gillig*, 199 N.Y. 314, 322 (1910) (citing *Freeman v. Freeman*, 43 N.Y. 34, 39 (1870)).  Indeed, the "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944).  Equitable relief is available—and warranted—under all of Chevron's claims.

## I.    The Record Justifies Injunctive and Other Relief

District courts have "'broad discretion to enjoin possible future violations of law where past violations have been shown.'"  *United States v. Carson*, 52 F.3d 1173, 1183–84 (2d Cir. 1995) (quoting *S.E.C. v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)).  The Court should exercise this broad discretion here and prevent Defendants from continuing to advance their on-going illegal scheme to defraud and extort Chevron, and from receiving any profits that may result from their wrongful conduct.

318

"The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." *Manor Nursing*, 485 F.2d at 1100.  Chevron has proven that Defendants time and again violated federal and New York law, and there is no doubt that Defendants intend to continue this unlawful conduct through a vexatious judgment enforcement scheme and an unrelenting pressure campaign.  And it is beyond dispute that this Court has the power to issue equitable relief that will put a stop to Defendants' on-going and future illegal activities.  *See Carson*, 52 F.3d at 1183–84; *Manor Nursing*, 458 F.2d at 1100; *Atl. Richfield Co. v. Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO*, 447 F.2d 945, 947 (7th Cir. 1971) (Stevens, J.) ("If past wrongs have been proved, and the possibility of future misconduct survives, so does the court's power [to issue injunctive relief]."); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185–86, 120 S. Ct. 693, 706 (2000) ("It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

Indeed, both federal and New York courts routinely issue permanent injunctions prohibiting the continuation or resumption of conduct that has been found to be illegal.  *See, e.g.*, *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 310 (S.D.N.Y. 2013) (concluding "that a permanent injunction to prevent future violations [was] obviously warranted" where "all members of [a] corporation were engaged in egregious misconduct and ongoing fraud"); *United States v. Pugh*, 717 F. Supp. 2d 271, 292–93 (E.D.N.Y. 2010) (issuing "permanent injunction barring defendants from acting as tax return preparers and from providing tax advice to others" where "the fraudulent activity has been pervasive and ongoing" and defendants "persisted in preparing fraudulent re-

turns"); *Town of Nassau v. Nalley*, 52 A.D.3d 1013, 1015 (3d Dep't 2008) (affirming issuance of permanent injunction "given the ongoing nature of defendant's violations" of an ordinance).

### A. Any Monetary Award Would Be Uncollectable From the Defendants

Irreparable harm occurs "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). "For this reason, courts have excepted from the general rule regarding monetary injury situations involving obligations owed by insolvents." *Id*. at 250. This principle has special relevance here, where Defendants have claimed poverty for months and in any event there is little question that they lack the funds to satisfy any meaningful award of money damages.

Defendants' fraudulent scheme has already harmed Chevron. Chevron has not only incurred legal fees to detect and defend against Defendants' fraud, it has a multi-billion dollar judgment against it. But a damages award would not be an adequate remedy for Chevron because any such award would be uncollectable against Defendants. Even if the LAPs collected on the Ecuadorian judgment, absent an injunction Defendants likely will take steps to ensure that those assets are placed beyond the reach of this Court. Furthermore, Defendants' vexatious Invictus enforcement scheme has caused, and will continue to cause, various irreparable harms to Chevron in the form of lost good will, lost business opportunities, and diverted internal resources. These harms also cannot be remedied by an award of damages. Considering the balance of hardships between the parties, a remedy in equity is warranted, because Defendants cannot be allowed to profit from their own illegal scheme. Indeed, it would be contrary to the public interest to permit Defendants to pursue enforcement of the fraudulent Ecuadorian judgment. Accordingly, the requirements for permanent injunctive relief are satisfied. *See eBay Inc. v. Mer-*

*cExchange*, *L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839 (2006) (listing four-factor inquiry for seeking permanent injunction).

As a direct result of Defendants' fraud, Chevron has a $9 billion judgment hanging over its head and has been forced to incur "at least $1 million" in legal fees to expose the fraud through the initiation of the § 1782 actions (PX 3000 (Veiga) ¶ 125; Dkt. 1657 (Stipulation re Attorneys' Fees Incurred)) and millions more to fight enforcement actions in Ecuador, Argentina, Brazil, and Canada (PX 3000 (Veiga) ¶¶ 130–138). And Defendants' embargo of Chevron's subsidiary's trademarks—including the Chevron logo itself—in Ecuador has harmed Chevron and its subsidiary substantially. PX 6000 (Anson) ¶ 48; *see* Section II.C.2. These harms are irreparable, due to Chevron and/or its subsidiaries' inability to collect, because no money judgment against Defendants could return Chevron to the position it "previously occupied." *Brenntag*, 175 F.3d at 249.

The Court has recognized the most obvious reason a money judgment is inadequate: "Suppose [Chevron] could have gotten a dollar-for-dollar judgment. 9-1/2 billion, 18-1/2 billion, whatever. Against whom? Who is going to pay it? Mr. Donziger?" Tr. (Donziger Closing) 2921:9–11. In response, Donziger's counsel admitted, "I don't think he has got that kind of money." *Id.* 2921:12–13. And Donziger himself has admitted that he does not have "that kind of money." *See, e.g.*, DX 1750 (Donziger) ¶ 127 (Donziger's claim that he was "operating under constant pressure of lack of resources"); Tr. (Donziger) 2619:6–23 (affirming statements to the Court about "lacking resources to defend in this case"); PX 8044 at 2 (claiming that the litigation was placing "overwhelming demands" on the "limited pool of waking hours [Donziger] ha[s] as a pro se litigant"). Indeed, in an effort to delay this action, Donziger has repeatedly claimed he

has a "lack of resources."  Dkt. 1197 at 6, 9; Dkt. 1211 at 6, 9; Dkt. 1370 at 3; Dkt. 1415 at 3;

Dkt. 1442 at 4.

Moreover, if Defendants were to collect the judgment in foreign jurisdictions and suddenly have billions of dollars, without question they would take steps to ensure that those proceeds were beyond this Court's jurisdiction, absent an injunction.  As Ricardo Reis Veiga noted, in the event that Defendants are able to collect on the Lago Agrio judgment abroad, it is clear that "the money will be kept outside the United States in offshore trusts unreachable by Chevron and outside the jurisdiction of this Court."  PX 3000 (Veiga) ¶ 138.  Corroborating Mr. Veiga's testimony is the funding agreement between the Frente, the LAPs, and Treca Financial Solutions, which created a foreign trust and bound the Frente to "assign all of its . . . Litigation Rights to the Trust" and to use every effort to get the LAPs to assign their rights to the trust.  PX 552 at 15–17; *see also* PX 412.

### B.  Chevron Has Suffered Irreparable Harm to Its Goodwill, Reputation, and Ability to Conduct Business

In addition to Defendants' inability to pay, "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure."  *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).  The Second Circuit has held that "loss of reputation, good will, and business opportunities" constitutes irreparable harm, especially "where it would be 'very difficult to calculate monetary damages that would successfully redress the loss.'"  *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 404 (2d Cir. 2004) (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)).  And "[i]t is well-established that a movant's loss of current or future market share may constitute irreparable harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007).  The Second Circuit has noted that "in deciding whether to award injunctive relief . . . where a history of legal violations is before the district

court, that court has significant discretion to conclude that future violations of the same kind are likely." *Kapps v. Wing*, 404 F.3d 105, 122–23 (2d Cir. 2005).

As the Invictus memo revealed, Defendants plan to collect their fraudulent judgment using a vexatious multiplicity of foreign suits, and seek to sue Chevron "on multiple . . . fronts" and do everything possible to "compound the pressure . . . on Chevron." PX 1527R at 15, 17. This plan has already caused irreparable harm to Chevron, and if Defendants succeed in executing their Invictus scheme, Chevron will suffer additional "loss of reputation, good will, and business opportunities." *Register.com*, 356 F.3d at 404. *See* FF ¶¶ 124–28.

### 1. Immeasurable Past Harm

Rhonda Zygocki, Chevron's Executive Vice President of Policy and Planning, testified that Defendants' actions have already imposed on Chevron "significant, irretrievable costs in the form of diverted time, attention and focus of Chevron's management team from the Company's paramount business of producing energy for the United States and the world." PX 5800 (Zygocki) ¶ 20. Such lost time, attention, and focus are precisely the types of hard-to-measure harm for which injunctions should issue.

Defendants' actions have also harmed Chevron's "reputation, good will, and business opportunities." *Register.com*, 356 F.3d at 404. Because of Defendants' calculated "pressure campaign," Chevron "executives and Board members[] have been the targets of harassment in the United States." PX 5800 (Zygocki) ¶ 21. In Ecuador, Defendants' actions have led to "effigies of Chevron's representatives" being "'killed' and 'buried' in public ceremonies," and Chevron being labeled, "an 'enemy of the state.'" *Id.*; *see also* PX 3000 (Veiga) ¶ 124; PX 4300X (Callejas) ¶¶ 98, 102; Tr. (Callejas) 812:25–814:5. Chevron employees have "feared for their physical safety or have been subjected to criminal charges brought against them by the Ecuadorian government at the instigation of Mr. Donziger." PX 5800 (Zygocki) ¶ 21; *see also* PX 3000

(Veiga) ¶ 126; PX 3300 (McMillen) ¶ 75.  Adolfo Callejas, who represents Chevron in Ecuador, testified that he "feared and still fear[s] for [his] safety."  PX 4300X (Callejas) ¶ 98; *see also* Tr. (Callejas) 814:11–12.  Sara McMillen, Chevron's California-based lead scientist on the Lago Agrio litigation (PX 3300 ¶¶ 2, 7), testified that the hate mail she received after the release of *Crude* has made her fear for the safety of her children (*id.* ¶ 75).  Defendants' intimidation of Chevron employees and counsel "undermines [Chevron's] ability to recruit the best talent, to re-tain our best people, to compete for new opportunities, and to maintain trust with the communi-ties in which we operate."  PX 5800 (Zygocki) ¶ 22.  Such hard-to-measure factors constitute irreparable harm, and are not the type of injury that Defendants could remedy by simply writing a check.  And, as proven at trial, for more than a decade, Defendants and their surrogates have flooded the media with demonstrably false statements about Chevron intended to harm the com-pany's goodwill and public image.  These past injuries to Chevron show that additional irrepara-ble harms are likely in the future.  *Kapps*, 404 F.3d at 122–23.

### 2.  Immeasurable Future Harm

Chevron faces the prospect of further irreparable harm unless this Court enjoins Defend-ants from further advancing their illegal scheme.  "[T]hough the irreparable-injury requirement cannot be met absent a real or immediate threat that the plaintiff will be wronged again, it is also well-established that injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm.'"  *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) (cita-tion omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct. 1970, 1983 (1994)).  The Supreme Court has long recognized that "'one does not have to await the consummation of threatened injury to obtain preventive relief.'"  *Farmer*, 511 U.S. at 845, 114 S. Ct. at 1983 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S. Ct. 658, 663 (1923)).

Ms. Zygocki testified that "[t]he drumbeat of false narratives, including the escalating

damages claims and false assertions of Mr. Cabrera's independence, has caused deep concern among Chevron executives and employees that the Company faces unjust, irreparable harm, through impacts on its relationships and good standing with U.S. federal and state officials, regulators, business partners, communities in which it operates, customers and the general public, disruptions to business operations, [and] other lasting economic consequences."  PX 5800 (Zygocki) ¶ 19.  Even if these harms could somehow be quantified, money could not repair Chevron's disrupted relationships and diminished public standing that would likely occur if Defendants continue seeking to enforce the judgment.  *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) (finding that news service would suffer "irreparable injury . . . incalculable in dollars and cents" if it was "suddenly . . . unable to supply . . . foreign news photographs to its subscribers").

Impairment of intellectual property rights, including that of the Chevron logo, held by Chevron subsidiaries in Ecuador, and in all countries where Defendants seek to enforce the judgment, may also lead to far-reaching, yet hard-to-quantify, injury for which an injunction is appropriate.  As noted by Weston Anson, "[i]f substandard products are sold bearing the Chevron IP Trademarks, the resulting damage is likely to extend beyond the Ecuadorian border.  As a result, Chevron and its subsidiaries will likely have to engage in corrective advertising to inform consumers in the surrounding regions."  PX 6000 (Anson) ¶ 10.

Injunctive relief is particularly appropriate here because Defendants have stated in writing their plan to use vexatious suits against Chevron "largely as a means of attaining a favorable settlement at an early stage."  PX 1527R at 17.  And they have already advanced their plan, filing multiple vexatious suits in Argentina, Brazil, Canada, and Ecuador and threatening many more to

325

come.   PX 418; PX 1004; PX 2306; PX 2461.  Although Chevron does not seek an injunction

prohibiting foreign enforcement actions, as explained below the Court should order relief that

will strip Defendants of any profits they are able to procure as a result of their corrupt judgment.

### C.  The Balance of Hardships Between Chevron and Defendants Favors Granting an Injunction

"[C]onsidering the balance of hardships between" Chevron and Defendants, "a remedy in

equity is warranted."  *eBay Inc.*, 547 U.S. at 391, 126 S. Ct. at 1839.  The balance of hardships

here is clear.  As discussed above, absent an injunction, Defendants will persist in their efforts to

irreparably harm Chevron by pursuing their unlawful scheme.  *See* PX 1527R at 15, 17.  As a

result, Chevron will continue to suffer the hardships of lost goodwill, lost reputation, and lost

business opportunities.  PX 5800 (Zygocki) ¶ 23.  Chevron will have to either pay a "price for

peace," or continue paying counsel to fight enforcement of the $9 billion judgment.  *See Chevron

Corp. v. Donziger*, 768 F. Supp. 2d at 627.

By contrast, Defendants will suffer no legally cognizable hardship if the Court enjoins

their scheme.  *See Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 76

(E.D.N.Y. 2011) ("[M]ost of the hardship that the defendants will face from an injunction will

derive from the defendants' inability to sell infringing machines in the future.  That hardship,

however, is not cognizable.").  Defendants would simply be prevented from profiting from their

fraud.  Defendants' loss of the fraudulent judgment's proceeds and their costs in obtaining the

judgment may not be considered as a hardship in the Court's decision to issue an injunction.  *See

Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) ("We also see no abuse of

discretion in the court's decision not to consider Stryker's expenses in designing and marketing

the T2 PHN, since those expenses related to an infringing product.").  Indeed, it is not an argu-

ment against an injunction to claim that it would destroy Defendants' entire corrupt enterprise.

*Mint, Inc. v. Amad*, No. 10 Civ. 9395(SAS), 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011)

("'[O]ne who elects to build a business on a product found to infringe cannot be heard to com-

plain if an injunction against continuing infringement destroys the business so elected.'") (quot-

ing *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)).

Defendants will suffer no cognizable hardship if the Court issues an injunction.  In light

of the many hardships Chevron will suffer if no injunction issues, "the balance of hardships tips

in [Chevron's] favor."  *Salinger*, 607 F.3d at 68; *see also Pearson Educ., Inc. v. Vergara*, No. 09

Civ. 6832(JGK)(KNF), 2010 WL 3744033, at *5 (S.D.N.Y. Sept. 27, 2010) ("The balance of

hardships weighs in the plaintiffs' favor, as the defaulting defendant has not identified any hard-

ships for the Court to consider.").

### D.  An Injunction Would Serve the Public Interest

Public policy favors the rule of law and disdains judicial proceedings infected by fraud.

The Supreme Court has ruled that even submission of a ghostwritten article as the supposed neu-

tral position of an independent expert—a far less egregious offense than Defendants' writing of

the Cabrera report, comments to that report, and the judgment itself—is "a wrong against the in-

stitutions set up to protect and safeguard the public, institutions in which fraud cannot compla-

cently be tolerated consistently with the good order of society."  *Hazel-Atlas Glass Co. v. Hart-

ford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944) ("[T]ampering with the admin-

istration of justice in the manner indisputably shown here involves far more than an injury to a

single litigant.").  In addition to fraudulently drafting the Cabrera report and the Ecuadorian

judgment, Defendants have repeatedly fabricated evidence, employed threatening tactics against

the Ecuadorian court, tampered with witness testimony, and obstructed legal proceedings in the

United States.

Denying Defendants the ability to further their extortionate scheme would discourage

such schemes in the future.  Therefore, "the public interest would not be disserved by a perma-

nent injunction."  *eBay Inc.*, 547 U.S. at 391, 126 S. Ct. at 1839; *see also 7-Eleven, Inc. v.*

*Upadhyaya*, 926 F. Supp. 2d 614, 631 (E.D. Pa. 2013) ("The public's general interest in the pre-

vention of fraud would be aided by the entry of an injunction here").

## II.     The Court Should Award Appropriate Injunctive and Other Equitable Relief on Each of Chevron's Claims

In crafting the terms of an injunction, "[a] district court has a 'wide range of discretion in

framing an injunction in terms it deems reasonable to prevent wrongful conduct.'"  *Patsy's Ital-*

*ian Rest., Inc. v. Banas*, 658 F.3d 254, 273 (2d Cir. 2011) (quoting *Soltex Polymer Corp. v. For-*

*tex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir. 1987)); *see also Patsy's Brand, Inc. v. I.O.B. Real-*

*ty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003) (holding that "a court can frame an injunction which

will keep a proven infringer safely away from the perimeter of future infringement") (citation

omitted); Dkt. 280 at 4–5 ("Courts granting equitable relief have significant flexibility, including

the discretion to render decrees that go beyond specific misconduct in order to 'fence in' the en-

joined party by keeping it away from the line dividing lawful and unlawful conduct.").  And

"where 'a proclivity for unlawful conduct has been shown,'" as is true here, a "district court has

the discretion to issue a broad injunction."  *Russian Media Grp., LLC v. Cable Am., Inc.*, 598

F.3d 302, 307 (7th Cir. 2010) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192,

69 S. Ct. 497, 500 (1949)); *see also Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 906–

07 (8th Cir. 2012) (directing district court to expand breadth of permanent injunction in light of

defendant's "proclivity for unlawful conduct"); *Creative Computing v. Getloaded.com LLC*, 386

F.3d 930, 937 (9th Cir. 2004) (finding that defendants' "past egregious conduct" justified an "ex-

traordinarily broad prohibition" and an "especially aggressive prophylactic injunction").

"If a party has violated the governing statute, then a court may in appropriate circum-

stances enjoin conduct that allowed the prohibited actions to occur, even if that conduct 'stand-

ing alone, would have been unassailable.'"  *Capitol Records*, 692 F.3d at 906 (quoting *EEOC v.*

*Wilson Metal Casket Co.*, 24 F.3d 836, 842 (6th Cir. 1994)).  In fact, a "district court may even

enjoin certain otherwise lawful conduct when the defendant's conduct has demonstrated that

prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against fu-

ture encroachment."  *Russian Media*, 598 F.3d at 307.  Further, there is no requirement that a dis-

trict court "resolve every possible inquiry or contingency that an injunction might raise,"

*LaForest v. Former Clean Air Holding Co., Inc.*, 376 F.3d 48, 60 (2d Cir. 2004), or "predict ex-

actly what [a defendant] will think of next," *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d

232, 241 (2d Cir. 2001) (quotation marks and citation omitted).

    As discussed further below, Chevron's proposed injunctive and equitable relief on each

of its claims is consistent with these basic principles and is justified by the facts of this case, in-

cluding the scope and breadth of Defendants' ongoing wrongful conduct.

### A.  The Court Should Award Injunctive and Other Equitable Relief on Chevron's RICO Claim

### 1.  Equitable Relief is Available Under RICO

    Where a federal statute gives a private party a right to sue, federal district courts have the

power to issue the full panoply of equitable remedies.  *See Franklin v. Gwinnett Cnty. Pub. Sch.*,

503 U.S. 60, 66, 70–71, 112 S. Ct. 1028, 1032–33, 1035–36 (1992).  The plain text of the RICO

statue does just that, as it grants a private right of action to "[a]ny person injured in his business

or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  The RICO statute

also contains a broad remedial provision, 18 U.S.C. § 1964(a), that authorizes a variety of equi-

table remedies, including injunctions.  And § 1964(a) is not in any respect limited to civil RICO

actions brought by the Government.  Nor is there any reason to believe that Congress intended to leave victims of racketeering powerless to stop ongoing RICO violations.  On the contrary, the "object" of RICO's private right of action is "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557, 120 S. Ct. 1075, 1082 (2000).  Moreover, Congress specified that RICO is to "be liberally construed to effectuate its remedial purposes."  Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970).

In the absence of controlling guidance from the Second Circuit, this Court should join those courts—including the Seventh Circuit in *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393, 123 S. Ct. 1057 (2003), and Judge Rakoff in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003)—that have held that private plaintiffs may seek equitable and injunctive relief under RICO.  Any contrary conclusion, as Professor G. Robert Blakey—the architect and primary drafter of the RICO statute—has observed, would be "inconsistent with the text, legislative history, and purpose of RICO," and cannot be "easily squared with the teaching of the Supreme Court on how to read statutes in general or RICO in particular."  G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO: Reflections on* Religious Technology Center v. Wollersheim: *Will Civil RICO Be Effective Only Against White-Collar Crime?*, 62 Notre Dame L. Rev. 526, 528 (1987); *see also* Dkt. 1831-2.

### a.   The Text of 18 U.S.C. § 1964 Permits Private Plaintiffs to Seek Injunctive and Other Equitable Relief in Civil RICO Actions

"Statutory construction begins with the plain text, and, 'where the statutory language provides a clear answer, it ends there as well.'"  *Raila v. United States*, 355 F.3d 118, 120 (2d Cir. 2004) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S. Ct. 755, 760

(1999)).  Here, the text of the statute provides a clear answer.  As the Seventh Circuit concluded in *Scheidler*, "the text of the RICO statute . . . itself authorizes private parties to seek injunctive relief."  267 F.3d at 695.  The relevant part of the RICO statute, 18 U.S.C. § 1964(a)–(c), demonstrates that both the Government and private plaintiffs can seek equitable and injunctive relief in civil RICO actions:

> (a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
>
> (b) The Attorney General may institute proceedings under this section.  Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.
>
> (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.  The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

18 U.S.C. § 1964(a)–(c).

Section 1964(a) authorizes a broad, nonexclusive list of remedies that courts may issue to "prevent and restrain violations" of RICO.  *See United States v. Sasso*, 215 F.3d 283, 288–90 (2d Cir. 2000) (noting that "[t]he legislative history of § 1964(a) in particular reveals that Congress intended that subsection to constitute broad authorization for entry of remedial orders").  On its face, this provision makes no distinction between actions brought by the Government or by pri-

vate plaintiffs.  Thus, the "straightforward" reading of § 1964(a) is that it "sets out general reme-dies, including injunctive relief, that all plaintiffs authorized to bring suit may seek."  *Scheidler*, 267 F.3d at 696; *see also* Blakey & Cessar, *supra*, at 546 ("Subsection (a) confers jurisdiction on the federal courts to prevent and restrain violations of section 1962 by appropriate orders.  It is not limited on its face or in its legislative history to a particular kind of claim for relief—governmental or private.").

Section 1964(b) authorizes the Government to bring civil RICO suits.  While § 1964(b) specifically provides that the Government can obtain *preliminary* restraining orders, it is silent as to what *final* remedies are available to the Government.  In this respect, the Ninth Circuit in *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1083 (9th Cir. 1986), misread § 1964(b) as authorizing "*the government* to bring actions for equitable relief."  In reality, as the Seventh Circuit recognized in *Sheidler*, "Section 1964(b) does allow the government to seek eq-uitable relief, but it specifically mentions only interim remedies.  Although no one doubts that permanent injunctions are also available to the government, the government's ability to seek permanent, as opposed to interim, equitable remedies comes from the general grant of authority for district courts to enter injunctions found in § 1964(a), not from anything in § 1964(b)."  *Scheidler*, 267 F.3d at 696–97 ).[96]

Section 1964(c) "similarly adds to the scope of § 1964(a), but this time for private plain-tiffs."  *Scheidler*, 267 F.3d at 696.  Specifically, § 1964(c) grants two sets of rights to victims of RICO violations.  First, it creates a general right—distinct and independent from any remedies—

---

[96] The reference to preliminary equitable relief in § 1964(b) was included to make clear that the Government could obtain such relief without having to meet the traditional requirements of irreparable harm and an inadequate legal remedy.  *See* Blakey & Cessar, *supra*, at 546 ("Subsection (b) was drafted . . . to assure that the government could institute proceedings free of the traditional limitations of equity jurisprudence and not as a means of denying private parties their usual equitable remedies.").

for private plaintiffs to sue for RICO violations: "Any person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). Thus, the statute authorizes, in the first instance, a court to make a determination of RICO liability, or non-liability. Second, the statute goes on—after an "*and*"—to provide for additional remedies to RICO victims not available to the Government: the right to "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." *Id.* (emphasis added); *see also* Blakey & Cessar, *supra*, at 545 (noting that "[t]he language does not read 'may sue . . . to recover'" and emphasizing that the use of "the 'and' [preceding] 'shall recover' indicates that the language following it is not to be read restrictively"). Nothing in § 1964(c), however, states that these are the *only* remedies available in a private civil RICO action, or that the general equitable remedies authorized by § 1964(a) are not available to private plaintiffs.

Therefore, because the RICO statute on its face permits private plaintiffs a right to sue "*and*" seek various remedies, including treble damages, attorneys' fees, and equitable relief, that should end the inquiry. But even if there were some ambiguity in the text, the Court must "liberally construe[]" the RICO statute "to effectuate its remedial purposes." Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970). And as the Supreme Court has instructed, "[t]he statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498, 105 S. Ct. 3275, 3286 (1985). Accordingly, the Court should hold that 18 U.S.C. § 1964 authorizes equitable and injunctive relief in private civil RICO suits.

> **b. Where a Statute Creates a Private Right of Action, Federal Courts Can Issue Equitable Remedies Absent Clear Congressional Direction to the Contrary**

Even if the RICO statute did not expressly authorize private plaintiffs to seek equitable

and injunctive relief, nothing in the statute precludes federal courts from exercising their tradi-

tional power to grant equitable remedies.  The Supreme Court has long recognized that "'where

legal rights have been invaded, and a federal statute provides for a general right to sue for such

invasion, federal courts may use any available remedy to make good the wrong done.'"  *Frank-*

*lin*, 503 U.S. at 66, 112 S. Ct. at 1033 (quoting *Bell v. Hood,* 327 U.S. 678, 684, 66 S. Ct. 773,

777 (1946)).  "The general rule . . . is that absent clear direction to the contrary by Congress, the

federal courts have the power to award any appropriate relief in a cognizable cause of action

brought pursuant to a federal statute."  *Franklin*, 503 U.S. at 70–71, 112 S. Ct. at 1035; *see also*

*Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 699 (2d Cir. 2010) ("Where we find that a

statute confers a private right of action, we presume—absent clear congressional direction to the

contrary—that the federal courts have the power to award any appropriate relief." (quotation

marks and citation omitted)).  Indeed, "[a]bsent the clearest command to the contrary from Con-

gress, federal courts retain their equitable power to issue injunctions in suits over which they

have jurisdiction."  *Califano v. Yamasaki*, 442 U.S. 682, 705, 99 S. Ct. 2545, 2559–60 (1979).

No command from Congress—let alone a "clear" command—forbidding the issuance of

traditional equitable remedies in private civil RICO suits is found in the RICO statute.  As Judge

Rakoff explained in *Uzan*, "[T]he right to grant injunctive relief in private civil actions in ac-

cordance with traditional principles of equity jurisdiction is one of the equitable powers given to

federal courts by the Judiciary Act of 1789," and the RICO statute "nowhere expressly denies

courts this power in private civil actions."  *Uzan*, 202 F. Supp. 2d at 243–44; *see also* All Writs

Act, 28 U.S.C. § 1651(a) ("[A]ll courts established by Act of Congress may issue all writs neces-

sary or appropriate in aid of their respective jurisdictions and agreeable to the usages and princi-

ples of law.").  In the absence of any contrary indication in the statute, "the normal presumption

334

favoring a court's retention of all powers granted by the Judiciary Act of 1789 prevails." *Uzan*, 202 F. Supp. 2d at 244; *see also id.* ("It would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' . . . intended, without expressly so stating, to deprive the district courts of this utilizing this classic remedial power in private civil actions brought under the act." (citation omitted)).[97]

### c. The Ninth Circuit's Decision in *Wollersheim* Misinterpreted RICO and Misconstrued Legislative History to Supplant the Statute's Plain Meaning

Only one court of appeal—the Ninth Circuit in *Religious Technology Center v. Wollersheim*—has held that injunctive relief is unavailable in private RICO suits.  But "*Wollersheim*'s reasoning is fatally [f]lawed, since it is inconsistent with the text, legislative history, and purpose of RICO, and it cannot be easily squared with the teaching of the Supreme Court on how to read statutes in general or RICO in particular."  Blakey & Cessar, *supra*, at 528; *see also Huyer v. Wells Fargo & Co.*, No. 4:08-CV-00507, 2013 WL 5754885, at *10 (S.D. Iowa Oct. 23, 2013) (rejecting contention that *Wollersheim* represents "the prevailing view" and following "*Scheidler* over *Wollersheim*" because the Seventh Circuit's analysis was "compelling").

In *Wollersheim*, the Ninth Circuit "relied almost exclusively on the legislative history of RICO to reach its result, as opposed to the actual language of the statute."  *Scheidler*, 267 F.3d at 695.  But "legislative history" cannot "trump the plain meaning of the text."  *United States v.*

---

[97] The Second Circuit employed reasoning similar to that of Judge Rakoff in *Uzan* when it assessed § 1964(c) in *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905, 909 (2d Cir. 1984).  The court in *Liebowitz* explained that "a specific statutory provision authorizing preliminary injunctive relief to maintain the status quo was no longer necessary" when Congress enacted RICO because the Supreme Court had clarified in *Bell v. Hood* that "'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'"  *Liebowitz*, 730 F.2d at 909 (quoting *Bell*, 327 U.S. at 684, 66 S. Ct. at 777); *see also* Blakey & Cessar, *supra*, at 547 (noting "the long-standing and well-settled Supreme Court doctrine that a congressional grant of the right to sue conveys by itself the availability of all necessary and appropriate relief").

*Gowing*, 683 F.3d 406, 409 (2d Cir. 2012).  And as explained above, the text of the RICO statute is clear, and therefore there was no need for the Ninth Circuit to consult RICO's legislative history to determine the meaning of 18 U.S.C. § 1964.  Indeed, as Professor Blakey recognized, "the *Wollersheim* court's concession that subsection (a) on its face provided a 'plausible reading,' which supported granting injunctive relief, was really a concession that its analysis could have and should have stopped without a further consideration of legislative history."  Blakey & Cessar, *supra*, at 548 (footnote omitted).

In any event, the legislative history identified by the Ninth Circuit in *Wollersheim* does not indicate that Congress intended to preclude injunctive relief in private civil RICO suits.  *See* Blakey & Cessar, *supra*, at 548–52.  The Ninth Circuit claimed that the legislative history contained "strong indicia of congressional intent *against* any implied injunctive relief remedy."  *Wollersheim*, 796 F.2d at 1088.  But this history consisted solely of Congress's failure to enact proposed amendments to RICO that would have added an explicit provision allowing private plaintiffs to seek injunctive relief.  *See id.* at 1084–85.  Yet both the Supreme Court and the Second Circuit have since rejected on multiple occasions the significance of this type of legislative history.  *See, e.g.*, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 160, 121 S. Ct. 675, 677 (2001) ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute . . . because a bill can be proposed or rejected for any number of reasons."); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("The fact that proponents of a particular view sought unsuccessfully to have a statute amended to state a proposition with unmistakable clarity tells nothing about whether the preexisting law already covered the point, albeit less clearly.").  As the Seventh Circuit noted in *Scheidler*, while "the *Wollersheim* court may well have made a reasonable decision in 1986 to

rely on Congress's refusal to enact amendments to the statute, recent Supreme Court precedent teaches that this type of legislative history is a particularly thin reed on which to rest the interpretation of a statute." *Scheidler*, 267 F.3d at 699; *see also Uzan*, 202 F. Supp. 2d at 244 ("[T]he Ninth Circuit's reading in *Wollersheim* of RICO's legislative history is far too narrow and wooden.").

*Wollersheim* also relied on a flawed analogy to the substantively different provisions of the Clayton Act, one that ignores the fact that the RICO statute omits language contained in the Clayton Act that specifically charged U.S. Attorney's with seeking injunctive relief. *See Wollersheim*, 796 F.2d at 1087. The Ninth Circuit found it significant that the Supreme Court had held that "section 4 [of the Clayton Act] *precludes* private injunctive relief" and that "[p]rivate antitrust plaintiffs can . . . secure injunctive relief only by virtue of a separate section of the Clayton Act which expressly provides for private equitable actions." *Id.* But the Second Circuit rejected this very analogy to the Clayton Act in *Liebowitz*, reasoning that "once the Supreme Court handed down *Bell v. Hood* . . . , which postdated the enactment of the Clayton Act, a specific statutory provision authorizing preliminary injunctive relief to maintain the status quo was no longer necessary, for in *Bell v. Hood*, the Court stated that 'where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Liebowitz*, 730 F.2d at 909 (quoting *Bell*, 327 U.S. at 684, 66 S. Ct. at 777) (citations omitted). Moreover, § 4 of the Clayton Act ties the ability to obtain equitable relief to actions brought by the Government with specific language that Congress omitted from 18 U.S.C. § 1964(a). *See* 15 U.S.C. § 4 ("The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; *and it shall be the duty of the several United States attorneys, in their respective*

*districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations.*") (emphasis added).[98]

In short, the Ninth Circuit's decision in *Wollersheim* is not persuasive and this Court should not follow it.[99]

### d.   Private Equitable Relief Is Consistent With the Purpose of Civil RICO

Finally, allowing private plaintiffs to seek equitable relief makes sense, as this case demonstrates.  Defendants are conducting an ongoing extortionate scheme that has largely not been successful to date.  There is still time to prevent further harm to Chevron, and the idea that Congress intended to strip courts of the ability to protect RICO victims like Chevron by ending an ongoing racketeering scheme is absurd.

As the Supreme Court has emphasized, "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime."  *Sedima*, 473 U.S. at 498, 105 S. Ct. at 3286.  Congress "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots."  *Russello v. United States*, 464 U.S. 16, 26, 104 S. Ct. 296, 302 (1983).  And one of the key "weapons" that Congress provided was the ability of

---

[98] Further, the Clayton Act—unlike RICO—does not provide for any criminal penalties.  It is thus clear that Congress intended RICO to have broader remedial provisions, and it would be wholly inconsistent with that intent to deny private parties the right to sue to obtain equitable relief to address RICO violations.

[99] Likewise, the Court should not follow the unpersuasive dicta from *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 490 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479, 105 S. Ct. 3275 (1985), or *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28–29 (2d Cir. 1983).  Both cases are examples of an early judicial hostility to the increased usage of civil RICO by private plaintiffs, especially in the securities fraud context, that the Supreme Court subsequently repudiated (and that Congress later addressed with the Private Securities Litigation Reform Act, which eliminated securities law violations from the ambit of RICO).  *See* Blakey & Cessar, *supra*, at 533–34 (noting that courts reacted to private civil RICO suits "with extreme hostility and, with few exceptions, undertook to redraft the statute in a concerted effort to dismiss civil suits in all possible ways"); Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737, § 107.  The decision in *Trane* provides no analysis of the text of the RICO statute at all, and the court limited its "doubts as to the propriety of private party injunctive relief" to RICO actions based on "garden-variety securities law violations."  *Trane*, 718 F.2d at 28–29.  And while *Sedima* contains some analysis of the statutory text, its discussion focused on the same flawed view of RICO's legislative history later adopted in *Wollersheim*.  *See Sedima*, 741 F.2d at 490 n.20.  Moreover, the Supreme Court in *Sedima* strongly criticized the Second Circuit's interpretation of RICO's legislative history and its attempt to limit the scope of RICO by reading in limitations not found in the statutory text.  *See Sedima*, 473 U.S. at 488–500, 105 S. Ct. at 3280–87.

victims of racketeering activity to bring private civil RICO suits, which were designed "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." *Rotella*, 528 U.S. at 557, 120 S. Ct. at 1082. And there is no doubt that allowing private plaintiffs to obtain equitable relief furthers the goal of "eliminating racketeering activity." *See, e.g.*, *Secretary of the Interior v. California*, 464 U.S. 312, 357, 104 S. Ct. 656, 679 (1984) ("Statutes should be construed in a manner consistent with their underlying policies and purposes.").

### 2. Chevron's Proposed Relief Will Protect the Company From Defendants' Ongoing Wrongful Conduct to the Fullest Extent of This Court's Authority

#### a. Proposed Relief: RICO

Chevron proposes the following remedial order with respect to its RICO claims against Donziger. Chevron has modified and refined the language of the form of injunction it proposed in connection with the pretrial order. Among other things, Chevron makes clear that it is not seeking to enjoin the filing or litigation of foreign enforcement actions, even though such relief would be permissible under the circumstances.[100] Chevron has tailored its requested relief here so as to remove any issue of international comity arising from its requested relief, and to deprive

---

[100]Chevron would be within its rights to request, and the Court would be justified in issuing, an injunction prohibiting enforcement of the judgment anywhere in the world following an adjudication that Defendants are liable to Chevron under RICO and/or fraud. *See, e.g.*, *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289, 73 S. Ct. 252, 257 (1952) (affirming injunction prohibiting use of a trademark in Mexico, and holding that a "District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction"); *Cole v. Cunningham*, 133 U.S. 107, 111, 10 S. Ct. 269, 270 (1890) (affirming "a decree of the supreme judicial court of Massachusetts, restraining citizens of that common wealth from the prosecution of attachment suits in New York"); *NML Capital, Ltd. v. Rep. of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012) ("A 'federal court sitting as a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere.'" (quoting *Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir. 2004))); *Storm LLC v. Telenor Mobile Comms. AS*, No. 06 Civ. 13157(GEL), 2006 WL 3735657, at *14 (S.D.N.Y. Dec. 15, 2006) (Lynch, J.) (enjoining initiation of "any legal action in the Ukraine that would disrupt, delay or hinder in any way . . . arbitration proceedings . . . in New York"); *see also Title Ins. & Trust Co. v. Cal. Dev. Co.*, 152 P. 542, 550 (Cal. 1915) (affirming injunction prohibiting "taking or prosecuting any proceeding or action in any Mexican court for the enforcement of" a judgment obtained by fraud); *Davis v. Cornue*, 151 N.Y. 172, 179 (1896) ("[A] court of one state may, where it has jurisdiction of the parties, determine the question whether a judgment between them, rendered in another state, was obtained by fraud, and, if so, may enjoin the enforcement of it.").

the LAPs and their allies of their persistent false U.S. and international public relations claim of

disrespect toward foreign tribunals.  No tribunal with respect for the rule of law will ever enforce

the Lago Agrio judgment.  Chevron's overriding purpose in pursuing the present lawsuit has al-

ways been to expose the truth about Defendants' corrupt scheme and to prevent the wrongdoers

from harming the company and profiting from their crimes.  Even James Tyrrell had to admit to

the Second Circuit, in response to Judge Parker's question whether there was anything wrong

with "enjoining the person who paid the bribe from benefitting from it" (Dkt. 1496-2 at 24-25),

that he "would not have a problem with that."  *Id*. at 25.

Accordingly, the injunction proposed below clarifies that Chevron seeks only to prevent

Defendants from profiting from foreign enforcement efforts or from the fraudulent judgment

generally—so that Defendants cannot misleadingly argue otherwise in this Court or any review-

ing court:

> Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and
> Donziger & Associates, PLLC (collectively, the "Donziger Defendants") and their
> officers, agents, servants, employees, and attorneys, as well as all other persons
> who have actual notice of this Order and are in active concert or participation with
> the Donziger Defendants and/or their officers, agents, servants, employees, and
> attorneys, including the 48 named plaintiffs in the Lago Agrio litigation against
> Chevron, on whose behalf the Donziger Defendants themselves acted as agents,
> are hereby enjoined from:
>
> (1) Committing, aiding, abetting, inducing, directing, or operating an enterprise
> through any acts of racketeering activity, as defined in 18 U.S.C. § 1961, includ-
> ing, but not limited to, any acts of extortion, wire fraud, mail fraud, obstruction,
> and money laundering;
>
> (2) Undertaking any acts to monetize or profit from the judgment rendered on
> February 14, 2011 (the "2011 Judgment") in *Maria Aguinda y Otros v. Chevron
> Corporation*, No. 002-2003, in the Provincial Court of Justice of Sucumbios, Ec-
> uador (the "Lago Agrio Case"), as modified or amended, or any other judgment or
> order that hereafter may be rendered in the Lago Agrio Case by that court or by
> any other court in Ecuador in or by reason of the Lago Agrio Case (collectively, a
> "Judgment"), or any judgment or order issued by any other court that has recog-
> nized or enforced the 2011 Judgment or any subsequent Judgment (collectively,
> an "Enforcement Judgment");

(3) Filing or prosecuting any action for recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or for prejudgment seizure or attachment of assets based upon the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in any court in the United States; and

(4) Seeking or receiving any payment, compensation, or other benefit from the enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or from the sale or encumbrance of any kind on any interest in benefits flowing from the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, other than in constructive trust for plaintiff Chevron Corporation.

The Donziger Defendants and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with the Donziger Defendants and/or their officers, agents, servants, employees, and attorneys, must divest themselves, by means of a constructive trust for the benefit of Chevron, of any interest, direct or indirect, in the enterprise and its proceeds, including any proceeds from the 2011 Judgment or any subsequent Judgment or Enforcement Judgment.

This Order does not enjoin or otherwise prohibit: (a) filing or prosecuting any action for recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or for prejudgment seizure or attachment of assets based upon the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.

This Order shall bind the Donziger Defendants and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with the Donziger Defendants and/or their officers, agents, servants, employees, and attorneys.

Defendant Donziger is required to give actual notice of this Order to all of the defendants who have defaulted in this action, all of the plaintiffs in the Lago Agrio Case and their counsel, and all counsel purporting to seek recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in any jurisdiction.

* * *

Chevron's proposed order on its RICO claims is drawn largely from the remedies expressly listed in 18 U.S.C. § 1964(a), and is consistent with anti-racketeering injunctions that have been affirmed by the Second Circuit. *See Carson*, 52 F.3d at 1184–85 & n.10. Like the injunction affirmed in *Carson*, the proposed injunction enjoins Donziger "from future racketeer-

ing, as that term is used in the RICO statute." *Id.* This type of injunction is specifically author-ized by § 1964(a), as it "prevent[s] and restrain[s] violations of section 1962" and "impos[es] reasonable restrictions on the future activities" of Donziger, including prohibiting him "from en-gaging in the same type of endeavor as the enterprise engaged in." 18 U.S.C. § 1964(a); *see also United States v. Sasso*, 215 F.3d 283, 290 (2d Cir. 2000) ("The legislative history of § 1964(a) in particular reveals that Congress intended that subsection to constitute broad authorization for en-try of remedial orders.").

Likewise, the proposed injunction specifically prohibits Donziger from taking steps to complete his racketeering scheme by monetizing the Lago Agrio judgment. Given the nature of the scheme here—which was designed to defraud and extort Chevron by leveraging a fraudulent-ly obtained foreign judgment—the proposed restriction on the filing and prosecution of enforce-ment actions in the United States is a "reasonable restriction[] on the future activities" of Donziger. 18 U.S.C. § 1964(a); *cf. Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 318 F.3d 392, 398 (2d Cir. 2003) (noting that courts have the "unquestioned authority to terminate and prevent the renewal of a protracted series of vexatious lawsuits" and "[e]ven in the absence of [such] a pattern . . . may have authority to prevent relitigation"). And nothing in the Second Circuit's decision in *Naranjo* prevents this restriction on monetizing the judgment, as the court in *Naranjo* did not evaluate whether an injunction prohibiting enforcement actions would have been permissible had it been issued as a remedy on Chevron's RICO and fraud claims, ra-ther than in connection with a claim for declaratory relief under New York's Recognition Act. *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) ("To resolve the dispute before us, we need only address whether the statutory scheme announced by New York's Recognition Act allows the district court to declare the Ecuadorian judgment non-recognizable, or to enjoin

plaintiffs from seeking to enforce that judgment."); *id.* at 238 n.8 ("We decide only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon."). To the extent this Court enters Chevron's proposed injunction and Defendants then proceed to initiate or further pursue foreign enforcement actions, this Court's injunction would not interfere with any foreign court's jurisdiction or ability to entertain such an action.  Nonetheless, at the appropriate juncture Chevron intends to ask any foreign courts in which Defendants have initiated recognition or enforcement actions to consider this Court's injunction and the findings supporting it.  On that basis Chevron believes it is likely that the foreign court would decline to award Defendants any relief, but any effect accorded to this Court's order would be the decision of the foreign court.[101]

Moreover, prohibiting Donziger and his agents from retaining any interest in the fruits of their scheme, whether it be from enforcement actions or other attempts to monetize the judgment, is consistent with § 1964(a) and Second Circuit authority.  The proposed order's requirement that Donziger and his agents "divest themselves of any interest, direct or indirect, in the enterprise and its proceeds" parallels the language of the statute.  *See* 18 U.S.C. § 1964(a) (authorizing orders that require a "person to divest himself of any interest, direct or indirect, in any enterprise").  Indeed, the Second Circuit has recognized that "[a]s a general rule, disgorgement is among the equitable powers available to the district court by virtue of [18] U.S.C. § 1964." *Carson*, 52 F.3d at 1181–82.  And while the Second Circuit has held that § 1964(a) does not authorize "disgorgement of gains ill-gotten long in the past" (*id*. at 1181–82), Chevron seeks no such

---

[101] An injunction prohibiting Defendants from monetizing the Ecuadorian judgment or retaining any proceeds from a successful foreign enforcement action does not restrict any foreign court in any way, but would be a United States judgment entitled to whatever effect a foreign court applying its own laws would give it.  Those persons subject to the injunction, however, would be in contempt of this Court if they refused to turn over to Chevron any proceeds from monetizing or enforcing the judgment.

disgorgement here.  Rather, Chevron seeks disgorgement that is specifically "designed to 'prevent and restrain' *future* conduct"—namely, the continued use of the Lago Agrio judgment in furtherance of an extortionate scheme—and targets "gains ill-gotten relatively recently," as well as any future gains.  *Id.* at 1182; *see also Russello*, 464 U.S. at 28 ("[Congress's] broader goal was to remove the profit from organized crime by separating the racketeer from his dishonest gains.").

The proposed injunction also addresses the Court's question of whether, if Chevron prevails, and even assuming the injunction were limited to restraining conduct in the United States, it would prevent "efforts, if any, by the judgment creditors to enforce here any foreign judgment that has granted enforcement to the Ecuadorian judgment."  Tr. 2966.  As noted above, the proposed injunction would not only prevent Defendants and their agents from seeking to enforce the judgment here, it also would prevent them "from undertaking any acts to monetize or profit from . . . any judgment or order issued by any other court that has recognized or enforced the 2011 Judgment or any subsequent Judgment (collectively, an '"Enforcement Judgment')."  In other words, Chevron's proposed injunction would be effective to prevent Defendants' strategy as suggested in Invictus, in which they could try to circumvent a U.S.-only injunction by first seeking to enforce the Lago Agrio judgment in a friendly foreign jurisdiction, and then attempt to have a United States court recognize that second, Enforcement Judgment here (assuming that a U.S. state or federal court would consider the Enforcement Judgment without analyzing the underlying judgment).  *See* PX 1407 at 24 (proposing that the LAPs "proceed *initially* in a jurisdiction that promises the most favorable law and practical circumstances," and then attempting through treaties or reciprocity agreements to "obtain conversion of the judgment" in a jurisdiction "housing the highest concentration of Chevron's domestic assets").

### 3. Even if RICO Did Not Provide for Equitable Relief, Chevron Is Entitled to a Statutory Award of Costs, Including Attorneys' Fees

The RICO statute expressly authorizes an award of attorney's fees.  Consequently, even if the Court were to rule as a matter of law that injunctive relief is not an available remedy to a private civil RICO litigant, an award of attorney's fees is available as an independent form of relief.

The relevant portion of the statute provides as follows: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee."  18 U.S.C. § 1964(c).  Unlike other statutes awarding attorney's fees to the "prevailing party" or a party that substantially prevails, § 1964(c) contains no such language.  A plain reading of this section permits—in fact, requires— the award of attorney's fees, so long as the "person is injured in his business or property" by a RICO violation, regardless of whether he or she "prevails" and is entitled to damages or an injunction (for example, if the person was damaged but is unable to quantify that damage).  Both the Second and Fifth Circuits interpret similarly the comparable language in § 4 of the Clayton Act.  *See U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 411 (2d Cir. 1989) ("It is clear from the plain meaning of section 4 that an injury is all that is required for an award of attorney's fees.  An award of attorney's fees to the injured party is mandatory."  *Id*. at 411; *see also id*. at 414 ("because the USFL was successful in proving an antitrust injury, all that is required under section 4 of the Clayton Act, it is entitled to attorney's fees"); *Sciambra v. Graham News*, 892 F.2d 411, 415 (5th Cir. 1990) (holding that a party that could not recover damages because unable to sufficiently prove an "amount of damages" could nevertheless recover attorneys' fees because he had proved the "fact of damage"; "We conclude that if a plaintiff can prove an anti-

345

trust violation and the fact of damage, the plaintiff is entitled to recover attorneys' fees pursuant to section 4.").[102]

In sum, Chevron proved at trial that it was injured as a result of Defendants' RICO violations.  Under the plain text of § 1964(c), "injury is all that is required for an award of attorney's fees."  *U.S. Football League*, 887 F.2d at 411.  The Court should award Chevron reasonable attorney's fees, independent of any other relief to which Chevron is entitled.  The amount of fees should be determined after the Court returns findings on Defendants' liability.

## B.  The Court Should Award Injunctive and Other Equitable Relief on Chevron's Fraud Claims

### 1.  Availability of Equitable Relief

This Court has already explained that Chevron would be entitled to equitable relief if it were to prevail on its fraud claim.  *See Chevron Corp. v. Donziger*, No. 11-cv-0691 (LAK), 2013 WL 98013, at *5 (S.D.N.Y. Jan. 7, 2013) ("[T]he LAP Representatives have advanced no persuasive basis for supposing that there is a substantial basis for difference of opinion with respect to the question whether plaintiff, if it prevails on its claim of fraud in the procurement of the Judgment, would be entitled to at least the relief that would have been available to it in a court of equity . . . .").  This conclusion is consistent with New York law, the views of leading commentators, and decisions from other state and federal courts.  *See, e.g.*, *Adams v. Gillig,* 199 N.Y. 314, 322 (1910) ("Equity will interfere to grant relief where necessary to prevent the consummation of a fraud.");  *Uzan*, 202 F. Supp. 2d at 249 (finding injunctive relief available on common

---

[102] Of note, while, in *Liebowitz* the court declined to award attorneys' fees to a plaintiff who settled a RICO claim after filing suit (730 F.2d 905 (2d Cir. 1984)), that case is inapposite because it arose in the context of a settlement and, therefore, did not involve a plaintiff prevailing after a trial on the merits.  *See Buckhannon Bd. & Care Home Inc. v. W.V. Dep't of Health and Human Resources*, 532 U.S. 598, 603-605 (2001) (distinguishing, in the context of "prevailing party" fee-shifting statutes, between "court-ordered relief" and "private settlements," and allowing recovery only with respect to` the former).  Moreover, post-Liebowitz cases suggest that it was wrongly decided because it misinterpreted comparable language in the Clayton Act.  *See, e.g., U.S. Football League*, 887 F.2d at 411; *Sciambra*, 892 F.2d at 415.

law fraud claim as alternative to RICO-based injunction); Charles Alan Wright et al., *Federal Practice & Procedure* § 2311 (3d ed. 2013) (noting availability of equitable remedies on fraud claims and collecting cases); *see also S.E.C. v. Great Am. Indus., Inc.*, 407 F.2d 453 (2d Cir. 1968) (en banc) (Friendly, J.) ("Since the conduct of [defendants] constituted common law fraud 'in connection with' the purchase of securities . . . the SEC was entitled to an injunction against them . . . ."); *People ex rel. Spitzer v. Gen. Elec. Co.*, 756 N.Y.S.2d 520, 522–24 (App. Div. 1st Dep't 2003) (affirming injunction prohibiting defendant manufacturer from making misleading representations that certain defective dishwashers could not be repaired); *Marcus v. Jewish Nat'l Fund (Keren Kayemeth Leisrael), Inc.*, 557 N.Y.S.2d 886, 889 (App. Div. 1st Dep't 1990) (affirming injunction in false advertising case because "if [defendant charity] were to be allowed to persist in its deceptive practices, there would be a significant risk that people would read defendant's literature and contribute moneys under the mistaken impression that their donations would be allocated to [certain] territories" in Israel).

## 2. Proposed Relief: Fraud

Chevron proposes the following remedial order with respect to its fraud claims, which applies to the LAPs as well as Donziger,[103] and which is co-extensive with Chevron's proposed RICO injunction. Chevron has modified and refined the language of its proposed injunction from what it submitted pretrial in connection with the pretrial order. Among other things, Chevron makes clear that it is not seeking to enjoin the filing or litigation of foreign enforcement actions, even though such relief would be permissible under the circumstances. Accordingly, the proposed injunction below clarifies that Chevron seeks only to prevent Defendants from profit-

---

[103] The LAPs are vicariously liable defendants, conspiratorially liable defendants, and parties with actual notice of the injunction.

ing from foreign enforcement efforts or from the fraudulent judgment generally—so that Defendants cannot misleadingly argue otherwise in this Court or any reviewing court:

> Defendants Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC (collectively, "Defendants") and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with Defendants and/or their officers, agents, servants, employees, and attorneys, are hereby enjoined from:

> (1) Committing, aiding, abetting, inducing, or directing any acts of fraud;

> (2) Undertaking any acts to monetize or profit from the judgment rendered on February 14, 2011 (the "2011 Judgment") in *Maria Aguinda y Otros v. Chevron Corporation*, No. 002-2003, in the Provincial Court of Justice of Sucumbios, Ecuador (the "Lago Agrio Case"), as modified or amended, or any other judgment or order that hereafter may be rendered in the Lago Agrio Case by that court or by any other court in Ecuador in or by reason of the Lago Agrio Case (collectively, a "Judgment"), or any judgment or order issued by any other court that has recognized or enforced the 2011 Judgment or any subsequent Judgment (collectively, an "Enforcement Judgment");

> (3) Filing or prosecuting any action for recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or for prejudgment seizure or attachment of assets based upon the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in any court in the United States; and

> (4) Seeking or receiving any payment, compensation, or other benefit from the enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or from the sale or encumbrance of any kind on any interest in benefits flowing from the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, other than in constructive trust for plaintiff Chevron Corporation.

> Defendants and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with Defendants and/or their officers, agents, servants, employees, and attorneys, must divest themselves, by means of a constructive trust for the benefit of Chevron, of any interest, direct or indirect, in any proceeds from the 2011 Judgment or any subsequent Judgment or Enforcement Judgment.

> This Order does not enjoin or otherwise prohibit: (a) filing or prosecuting any action for recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or for prejudgment seizure or attachment of assets based upon the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.

This Order shall bind Defendants and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with Defendants and/or their officers, agents, servants, employees, and attorneys.

Defendant Donziger is required to give actual notice of this Order to all of the defendants who have defaulted in this action, all of the plaintiffs in the Lago Agrio Case and their counsel, and all counsel purporting to seek recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in any jurisdiction.

* * *

Like the proposed order on the RICO claim, the proposed fraud order enjoins "'possible future violations of law'" in light of the fact that Chevron has proven "'past violations.'" *Carson*, 52 F.3d at 1183–84 (quoting *Manor Nursing*, 458 F.2d at 1100); *cf. Davis v. Cornue,* 151 N.Y. 172, 179 (1896) ("[A] court of one state may, where it has jurisdiction of the parties, determine the question whether a judgment between them, rendered in another state, was obtained by fraud, and, if so, may enjoin the enforcement of it.").

Because of the nature of Defendants' ongoing fraud, any effective injunction against their continued fraudulent activities must prohibit any acts to enforce or otherwise monetize the Lago Agrio judgment.  The judgment was itself necessarily the product of Defendants' fraudulent conduct in violation of New York law, as they were able to obtain critical funding along the way from Kohn Swift and Burford by making misrepresentations and omissions.  And Defendants' false statements and omissions to foreign courts concerning the validity of the Ecuadorian judgment—without disclosing their acts of bribery and ghostwriting—is itself a continuation of their fraud.  *See William Whitman Co. v. Universal Oil Prods. Co.*, 125 F. Supp. 137, 155 (D. Del. 1954) ("The use of the fraudulent Root judgment as res judicata was in itself a fraud.").  Moreover, precluding Defendants from seeking or receiving any ill-gotten gains stemming from their fraud is a recognized equitable remedy under New York law.  *People ex rel. Spitzer v. Applied*

*Card Sys., Inc.*, 11 N.Y.3d 105, 125 (2008) ("'As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits.'" (quoting *S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997))).  Indeed, as noted above, the LAPs' counsel conceded before the Second Circuit the propriety of the relief that Chevron seeks here, when, during oral argument on the LAPs' writ petition, Judge Parker asked whether, "assuming arguendo . . . that the judge who entered a judgment had been bribed, would it be beyond the authority of the court to enjoin the person who paid the bribe from benefitting from the judgment?"  Dkt. 1496-2 at 24. The LAPs' counsel eventually conceded that, "[a]s a legal proposition – as against the person who gave the bribe, I would not have a problem with that."  *Id.* at 25.

It is necessary to prohibit Defendants from engaging in fraud both in the United States and abroad, and this poses no impediment to the issuance of Chevron's proposed order.  An anti-fraud injunction, if anything, is arguably broader in regard to affecting foreign litigation than a federal RICO injunction might be.  "Where it has jurisdiction of the cause and of the parties, the power of a New York court to enjoin a person from beginning or prosecuting an action in another state or country has never been doubted."  67A N.Y. Jur. 2d Injunctions § 140; *see also NML Capital, Ltd. v. Rep. of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012) ("A 'federal court sitting as a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere.'" (quoting *Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir.2004))). And New York appellate courts have approved of injunctions with exterritorial effect on multiple occasions.  *See, e.g.*, *Gryphon Domestic VI, LLC v. APP Int'l Fin. Co., B.V.*, 41 A.D.3d 25, 38 (1st Dep't 2007) ("The [trial] court had the power to issue the injunction, even though it related to extraterritorial conduct, because it had jurisdiction over the defendants."); *Abuhamda v. Abuhamda*, 236 A.D.2d 290 (1st Dep't 1997) (affirming injunction directing a bank subject to ju-

risdiction in New York not to pay out funds from an account in Jordan).

### C.  The Court Should Award Injunctive and Other Equitable Relief on Chevron's New York Judiciary Law Section 487 Claim

#### 1.  Availability of Equitable Relief

This Court has the power to issue an injunction to remedy Donziger's violations of New York Judiciary Law section 487, which provides for both criminal and civil penalties.  Section 487 is intended to protect the public by encouraging enforcement of a professional standard of conduct—"an attorney's special obligation to protect the integrity of the courts and foster their truth-seeking function."  *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009).  And where a defendant violates a statute designed to protect the public welfare through the regulation of professional conduct, courts applying New York law have the power to issue injunctive relief, even where the underlying statute is criminal in origin and does not expressly provide for such a remedy.

For example, in *People ex rel. Bennett v. Laman*, 277 N.Y. 368 (1938), the New York Court of Appeals held that an individual could be enjoined from violating a criminal statute that prohibited the unlicensed practice of medicine.  The court explained that the criminal nature of the underlying statute was no barrier to the issuance of an injunction, which was necessary "not to punish the individual for his past acts, but to afford more complete protection to the complaining party by enjoining unlawful acts in the future."  *Id.* at 381 (rejecting reliance on principle that a "court of equity will not undertake the enforcement of the criminal law, and will not enjoin the commission of a crime").  And even though other statutes expressly authorized injunctive relief, unlike the statute at issue in *Laman*, the court did not read into this silence any intent by the New York Legislature to strip courts of their inherent equitable powers.  *See id.* at 383 (rejecting argument that "injunctions to restrain violation of statute [can] issue only in those cases where spe-

cific provision has been made" because "the policy of the State is to make the remedy more available, not to restrict it").

Nor is the right to seek an injunction prohibiting further violations of a criminal statute limited to actions brought by the government.  For example, in *Lanvin Parfums, Inc. v. Le Dans, Ltd.*, 9 N.Y.2d 516, 523 (1961), the Court of Appeals reversed dismissal of a private plaintiff's action seeking to enjoin violations of a criminal statute prohibiting the repackaging and resale of another's goods.  The court held that because "the alleged criminal acts also threaten plaintiff's property rights, trade-mark, and good will, and an injunction, therefore, is available."  *Id.*  And unlike section 487, the statute in *Lanvin* was purely criminal in nature and did not even expressly provide for a private right of action.  *See id.* at 520.

### 2.  Proposed Relief: Section 487

Chevron proposes the following remedial order with respect to its New York Judiciary Law section 487 claims:

> Defendants Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC (collectively, the "Donziger Defendants") and their officers, agents, servants, employees, and attorneys, as well as all other persons who have actual notice of this Order and are in active concert or participation with the Donziger Defendants and/or their officers, agents, servants, employees, and attorneys, are hereby enjoined from engaging in any deceit or collusion, or consenting to any deceit or collusion, with intent to deceive any court within the state of New York in violation of New York Judiciary Law section 487.
>
> The Donziger Defendants shall attach a copy of this injunction to any initial appearance by any of the Donziger Defendants in any action pending in federal or state courts in New York.

*  *  *

As with the other proposed orders, Chevron seeks to preclude Defendants from engaging in further violations of law in the future.  *See Carson*, 52 F.3d at 1183–84; *Manor Nursing*, 458 F.2d at 1100.  Although New York Judiciary Law section 487 does not require a plaintiff to

prove "'a chronic and extreme pattern' of legal delinquency by the defendant," Chevron has done so here, as it established that Donziger engaged in the deceit (or knowingly consented to deceit) before multiple New York courts, including this Court.  The Court should exercise its equitable powers to ensure that this pattern of deception comes to an end once and for all.

## III.    Defaulted Defendants

Should Chevron prevail on its claims, it will seek a default judgment for equitable relief and may also seek damages against the defaulted defendants in this case, depending on the circumstances existing at that time.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in Chevron's favor finding Donziger liable under RICO and New York Judiciary Law section 487, all Defendants liable for fraud and civil conspiracy, and entering injunctive relief against all Defendants to prevent them from profiting from their crimes and continuing to perpetrate them, and awarding Chevron its costs and attorneys' fees under 18 U.S.C. § 1964(c).

Dated:  December 23, 2013                          Respectfully submitted,
New York, New York

                                                          /s/ Randy M. Mastro
                                                    Randy M. Mastro
                                                    Andrea E.  Neuman
                                                    GIBSON, DUNN & CRUTCHER LLP
                                                    200 Park Avenue
                                                    New York, New York 10166
                                                    Telephone: 212.351.4000
                                                    Facsimile:  212.351.4035

                                                    William E.  Thomson
                                                    333 South Grand Avenue
                                                    Los Angeles, California 90071
                                                    Telephone: 213.229.7000
                                                    Facsimile:  213.229.7520

                                                    *Attorneys for Chevron Corporation*

## LIST OF APPENDICES

Appendix A          Timeline of Litigation Frauds: Russell, Calmbacher, Reyes & Pinto,
                    Cabrera, Cleansing

Appendix B          Timeline of the "Secret Account"

Appendix C          Timeline of the Defrauding of Joseph Kohn and Kohn Swift

Appendix D          Timeline of the Defrauding of Burford

Appendix E          Timeline of Defendants' Obstruction

Appendix F          Timeline of Judgment Fraud

Appendix G          Timeline of ROE Collusion & Pressure

Appendix H          Timeline of Defendants' U.S. Pressure Campaign

Appendix I          Timeline of the Invictus Pressure Campaign

Appendix J          Timeline of Post-Judgment Ecuadorian Court Proceedings

Appendix K          Defendants' Attempts to Rely on Lago Agrio Judgment