UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                :

CHEVRON CORPORATION,          :

             Plaintiff,    :

         :

    -against-         :  Case No.  11 Civ.  0691 (LAK)

         :

STEVEN R. DONZIGER, et al.,    :

         :

            Defendants.  :

         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# CHEVRON CORPORATION'S PROPOSED FINDINGS OF FACT


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

I.  Since at Least 2006, Defendants Have Operated and Managed an Enterprise Whose Primary Purpose Was Unlawfully Obtaining Money and Property From Chevron .................................................................................................................. 1

II.  Donziger Misrepresented Facts to Third Parties to Obtain Funds to Operate the Enterprise and Its Criminal Activities .............................................................. 33

III.  The LAP Team's Complex Financial Transfers, Arrangements, and Distributions ......... 42

IV.  The LAP Team Relied on and Exploited the Weak and Corrupt Ecuadorian Legal System .................................................................................................................. 45

V.  The LAP Team Corrupted the Lago Agrio Litigation ...................................... 55

VI.  The Lap Team Coerced the Court Into Appointing Cabrera as the Global Expert and Then Secretly Ghostwrote His Report ....................................................... 63

VII.  The LAP Team Fraudulently Procured the Lago Agrio Judgment .................................. 89

VIII.  Defendants Seek to Put Chevron in Fear of Economic Harm Through Public Pressure Including Misrepresentations About the Russell Damages Estimate, the Cabrera Report, and the Lago Agrio Judgment. ........................................... 110

IX.  Defendants Have Used Funding Obtained by Fraud to Injure Chevron ....................... 126

X.  Defendants Committed Acts of Obstruction of Justice and Witness Tampering in Attempts to Thwart Chevron's Efforts to Bring Defendants' Fraud to Light in U.S. Courts ............................................................................................................ 134

XI.  Defendants Have Made Extensive Use of Interstate and Foreign Mail and Wires to Further Their Schemes to Defraud ............................................................... 149

XII.  Chevron Has Been Injured by Defendants' Conduct .................................................. 150

XIII.  This Court Has Personal Jurisdiction Over Defendants ................................................ 155

XIV.  In Engaging In Wrongful Conduct, Donziger and the LAP Team Co-Conspirators Were Agents of the LAP Defendants and Corporate Donziger Defendants .................. 163

LIST OF APPENDICES ............................................................................................... 191

I.      **Since at Least 2006, Defendants Have Operated and Managed an Enterprise Whose Primary Purpose Was Unlawfully Obtaining Money and Property From Chevron**

1.      **Since at least 2006, the Lago Agrio Plaintiffs' ("LAP")[1] team has included at various times Steven R. Donziger, The Law Offices of Steven R. Donziger, and Donziger and Associates PLLC (collectively, the "RICO Defendants"), and other lawyers and agents of the LAPs in Ecuador and the United States, including, among others, Pablo Fajardo, Luis Yanza, Julio Prieto, Juan Pablo Sáenz, Alejandro Ponce Villacis, Cristobal Bonifaz, Alberto Wray, Frente de Defensa de la Amazonia A/K/A the Amazon Defense Front, Selva Viva Selviva Cia Ltd., Stratus Consulting, Douglas Beltman, Ann Maest, E-Tech International, Uhl Baron Rana & Associates, Karen Hinton, Joseph Kohn, Kohn Swift & Graf, P.C., Patton Boggs LLP, Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC, Horowitz/Forbes LLP, H5, Atossa Soltani, Amazon Watch, Rainforest Action Network, Russell DeLeon, and the Burford Group.**

- PX 1158 (Fall 2009 chart of tasks assigned to various LAP team members, authored by Donziger).
- PX 2381 (7/8/2010 email from E. Daleo to L. Garr and A. Woods listing 165 individuals involved in the litigation).
- PX 5600 (Kohn) ¶ 3 ("When the Ecuadoran litigation was filed in 2003, I, along with The Law Offices of Cristóbal Bonifaz and Steven Donziger, served as U.S. counsel for the Ecuadoran plaintiffs. Alberto Wray, an Ecuadoran lawyer from the firm of Cabezas and Wray, served as lead Ecuadoran counsel at that time. Luis Yanza, as the representative of the Frente was also involved in the case from the outset."); *id.* ¶ 14 ("In 2006, Mr. Donziger informed me that Pablo Fajardo was taking a prominent role in the Ecuadoran litigation."); *id.* ¶ 15 ("During the time I was involved in the Ecuadoran litigation, Mr. Donziger and the plaintiffs also

---

[1]     The Lago Agrio litigation was ostensibly brought on behalf of forty-eight named individual Ecuadorians, referred to herein as the Lago Agrio Plaintiffs or LAPs. One of these individuals, Esteban Lusitante Yaiguaje, is now deceased and thus is not named as a defendant in this case. The remaining 47 LAPs are: Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Hugo Gerardo Camacho Naranjo, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Javier Piaguaje Payaguaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguaje Lucitante.

retained Alejandro Ponce Villacís and Juan Pablo Sáenz as members of the Ecuadoran legal team.").

- PX 3200 (Russell) ¶ 4 ("I became the lead environmental scientist for Donziger and the Ecuadorian plaintiffs' team in the Ecuadorian litigation.").

- PX 248 (1/2/2006 Agreement To Dispute A Case Against Chevron Texaco, Now Chevron, In Ecuador, providing that the law firm of Kohn, Swift & Graf, the law offices of Steven R. Donziger, and the law offices of Cristóbal Bonifaz will "handle the litigation of this case in Ecuador and/or the United States").

- PX 2188 ("Summary of the Enterprise" demonstrative).

- PX 4900 (Dahlberg) ¶¶ 35-38 (Analysis of KSG contributions); *id.* ¶¶ 39-46 (Analysis of Deleon contributions); *id.* ¶¶ 47-53 (Analysis of Burford contributions); *id.* ¶¶ 59-64 (Analysis of disbursements to Donziger and his law offices); *id.* ¶¶ 65-73 (Analysis of disbursements to U.S. counsel, including Page, Patton Boggs, Emery Celli, and Motley Rice); *id.* ¶¶ 74-76 (Analysis of disbursements to Ecuadorian Counsel, including Fajardo, Sáenz, Prieto, Ponce, and Wray); *id.* ¶¶ 77-78 (Analysis of disbursements to Selva Viva and Yanza); *id.* ¶¶ 80-88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR); *id.* ¶¶ 89-94 (Analysis of disbursements to PR-related individuals and entities, including Hinton); *id.* ¶¶ 95-100 (Analysis of disbursements related to the production of *Crude*); *id.* ¶¶ 101-106 (Analysis of disbursements to NGOs, including the Frente, Amazon Watch, and RAN); *id.* ¶¶ 107-112 (Analysis of disbursements to lobbyists, including Barnes and Lehane); *id.* ¶¶ 114-122 (Analysis of payments to Cabrera, Stratus, Reyes and Villao in relation to the drafting of the Cabrera report); *id.* ¶¶ 123-124 (Analysis of payments to Guerra).

- 1/14/2010 Donziger Dep. 2773:3-2773:19 ("Q. You were involved in the drafting of that declaration?    A. I believe it was drafted by the Patton Boggs firm.  But I did have conversations with them about the contents of it as it was being drafted.").

- 7/19/2011 Donziger Dep. 4731:21-25 ("Q. Were any U.S. lawyers involved in the drafting of the Alegatos?    A. Yes.    Q. Who was involved?    A. Lawyers at Patton Boggs.").

- 6/26/2013 Dunkelberger Dep. 10:9-18 ("Q. Who hired The Weinberg Group?    A. Patton Boggs."), 71:6-8, 71:11-12 ("Who said that the expert that wrote the report was an independent expert?  A. Eric Westenberger, Ilaan, Steven Donziger.").

2.      **Donziger operated and managed the LAP team; including choosing and supervising members of the LAP team and agents of the LAP team, including Stratus, Beltman, Maest, Fajardo, Yanza, Patton Boggs, and Emery Celli.**

- PX 806# (11/3/2006 email from Donziger to David Kuhn with the subject, "Book Proposal attached," attaching Amazon Awakening: "I am the lead lawyer in the class-action trial. . . . I am the person primarily responsible for putting this team together and supervising it[.]").

- PX 5600 (Kohn) ¶ 12 ("[F]rom 2005 onwards, Mr. Donziger was the person primarily responsible for making day-to-day decisions in the management of the case, including hiring Ecuadoran personnel for the case, scientists and other consultants, public relations personnel, lobbyists, and Ecuadoran counsel."); *id.* ¶ 14 ("In 2006, Mr. Donziger informed me that Pablo Fajardo was taking a prominent role in the Ecuadoran litigation."); *id.* ¶ 15 ("Mr. Donziger and the plaintiffs also retained Alejandro Ponce Villacís and Juan Pablo Sáenz as members of the Ecuadoran legal team."); *id.* ¶ 40 ("Mr. Donziger selected and hired public relations and political consultants in the United States, including Karen Hinton" and "supervised Ms. Hinton's work"); *id.* ¶ 60 ("On November 13, 2009, I received a letter from Mr. Fajardo and Mr. Yanza advising me they did not agree we should engage in further settlement negotiations and that they believed all budget and strategy decisions must be made by Mr. Donziger.").

- PX 4800 (Guerra) ¶ 24 ("Mr. Fajardo had previously explained to me that Mr. Donziger was the lead among the Plaintiffs' team and thus he needed to inform Mr. Donziger of everything that was happening in the case.").

- PX 3200 (Russell) ¶ 3 ("Donziger offered to hire me, and I agreed to investigate the contamination in Ecuador.  I negotiated my fees with Donziger."); *id.* ¶ 13 ("Donziger controlled who got paid and how much, and used that power to keep people in line."); *id.* ¶ 31 ("Donziger was always in control of the case, dictating case strategy, overseeing the activities of the legal and technical teams, and was involved in directing the payments to and from the GEO Ecuador Account[.]"); *id.* ¶ 32 ("I reported to and took direction from only Donziger.  I also saw Donziger directing the work of the other members of the plaintiffs' team, including Pablo Fajardo, Luis Yanza, and Edison Camino Castro."); *id.* ¶ 33 ("When Donziger said he wanted something done, the Ecuadorian plaintiffs' team did it.").

- 4/30/2013 Beier Dep. 107:20-108:1 ("Q. At any point in time, did Mr. Beltman tell you who Stratus's principal contacts were on behalf of the LAPs? A. Yes. Q. Did he identify Mr. Donziger as his principal contact? A. Yes.").

- 3/29/2010 Calmbacher Dep. 68:19-24 (Q. Mr. Russell also says that Mr. Donziger approved all management hires and the significant personnel changes for the employees, referring to the Lago Agrio litigation. Is that consistent with what you saw while you were working with the plaintiffs? A. Yes, definitely.").

- 9/1/2010 Quarles Dep. 76:8-11 ("Q. To the extent you've worked for the Lago Agrio plaintiffs, it was correct you were hired to do that work by Mr. Donziger? A. Yes.").

- 5/13/2013 Reyes Dep. 88:4-11 ("THE SPECIAL MASTER: Were you able to -- did you form an opinion as to, based on your observation, whether Mr. Donziger

appeared to be reporting to Mr. Fajardo or Mr. Fajardo appeared to be reporting to Mr. Donziger when they were at meetings and discussing the litigation? THE DEPONENT: Mr. Fajardo would report to Mr. Donziger -- Donziger.”).

- PX 4900 (Dahlberg) ¶ 6 (Donziger “had primary control of financing and related fund disbursements to individuals and entities in connection with the Litigation from approximately 2004 and continuing through at least July of 2012”); *id.* ¶ 36 (‘Donziger was primarily responsible for the oversight of the Litigation[.]”).

- Tr. 921:11-20 (Guerra) (“A.  When I made the agreement with Mr. Fajardo regarding the understanding I just mentioned, Mr. Fajardo insisted that I should meet a few days later, he told me with Mr. Steven Donziger, so that he can find out with my own words regarding my commitment that I had made with Mr. Fajardo. Q.  Did Mr. Fajardo tell you why he wanted you to meet with Mr. Donziger? A. Mr. Fajardo stated that all important matters should be brought to the attention of Mr. Donziger because he said that he was the boss of the attorneys -- of the legal team.”).

- PX 3100 (Bogart) ¶ 5 (“Donziger . . . described himself as the lead U.S. lawyer for the LAPs and also the overall strategist behind the Litigation.”); *id.* ¶ 7 (“Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford[.]”).

- Tr. 1258:17-23 (Shinder) (“A.  He described his role -- this is my term, but it sort of summarizes the gist of it.  What he described was that he was sort of a quarterback of what was going on in Ecuador, that he had a close relationship with the plaintiffs, and that he sort of supervised, coordinated the case, local counsel, the experts, pretty much the entire gamut of the proceeding was under his sort of supervision.”).

- PX 5208 (Beltman) ¶¶ 2-5 (“Donziger exercised near complete control over major decisions of strategy for Stratus’s Ecuador Project.”); *id.* ¶¶ 7-9 (“I understood that Donziger was the Clients’ Project Manager.”); *id.* ¶ 10 (“Donziger insisted at all times that all aspects of Stratus’s work related to the damages assessment . . . remain absolutely secret.”).

- PX 5210 (Maest) ¶¶ 1-4 (“I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services.  In that role, I took direction from Donziger . . . .”).

- PX 943 (12/14/2007 email from Pablo Fajardo to Steven Donziger, in which Fajardo addresses Donziger as “Commander”).

- PX 1038 (6/6/2008 email from Donziger, in which he directs the work of Sáenz, saying “Juampa Get this done on time and don’t fuck up please”).

- PX 1039 (6/9/2008 email from Donziger to J. Sáenz.  Donziger demands from Sáenz “a list of EVERY document you are submitting—every court case, everything, even if it is 50 things”).

- PX 1060 (8/15/2008 email from D. Beltman to Donziger and J. Kohn, in which Beltman updates Donziger on his progress).

- PX 1146 (7/2/2009 memo from Donziger to Kohn: “The legal and political ‘space’ around this case in both Ecuador and the U.S. has been intricately constructed over the last several years by those involved on a fulltime basis.  The process is

managed by myself, Pablo Fajardo, and Luis Yanza. All of us work on this on a full-time basis and we speak among ourselves frequently. We also manage the client relationships and in my case I have raised significant funds for both the case in chief and ancillary activities. All activities from KSG must be coordinated through this process, which in practice means coordinated through me. The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador - including high-level officials in Ecuador's government.  Beneath it all are dozens of indigenous and farmer communities who have a democratic process through which they exercise control over the case, and hire and fire lawyers. These people are our clients, and we answer to them; Pablo, Luis, and I have years-long relationships with each of the leaders from the various indigenous groups and communities. We also see this as not just a legal case, but a political-style campaign driven by a legal case. The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.").

- PX 1181 (11/9/2009 email from Donziger to Kohn stating that Donziger's "primary obligation [is] to run the case on a day to day basis" and that he is "doing the overwhelming amount of work on this case.").
- PX 1210 (1/18/2010 letter from Donziger to D. Beltman.  Donziger writes "It is understood that all work performed will be at the request and direction of my office.").
- PX 6513 (4/17/2006 email from Donziger directing Ecuadorian counsel to complete various tasks for the Lago Agrio litigation).
- PX 7550 (2/27/2006 email from Donziger to Fajardo giving "extensive" comments and instructions to a draft of a motion).
- Tr. 2293:12-23 (Ponce) ("Q.  Now, in this email [PX 6513], sir, is it fair to say that Mr. Donziger is directing you to do something? A.  Yes. Q.  And is it fair to say, for example, in No. 4 he's directing Fausto to do something? A.  Yes. Q.  And is it fair that say in No. 5 he's directing Fausto and Pablo Fajardo and Luis Yanza to do something? A.  Yes. Q.  These are directions from Mr. Donziger to the lawyers on the litigation team in Ecuador, right? A.  Yes.").
- PX 12 (Q: "Have you been making a lot of money on this case yourself? Are you enriching yourself?" Donziger: "[CHUCKLES] Let's talk about that some other time. Seriously.").

**3.      Since at least 2006, the LAP team has had a chain of command.**

- PX 1146 (7/2/2009 memo from Donziger to Kohn Team re "Activity Going Forward": "The process is managed by myself, Pablo Fajardo, and Luis Yanza. . . . All activities from KSG must be coordinated through this process, which in practice means coordinated through me.").
- PX 1158 (Fall 2009 chart of tasks assigned to which LAP team members, authored by Donziger).
- PX 2188 ("Summary of the Enterprise" demonstrative illustrating Defendants' chain of command).
- Tr. 921:11-20 (Guerra) ("A.  When I made the agreement with Mr. Fajardo regarding the understanding I just mentioned, Mr. Fajardo insisted that I should meet a few days later, he told me with Mr. Steven Donziger, so that he can find out with my own words regarding my commitment that I had made with Mr. Fajardo. Q.  Did Mr. Fajardo tell you why he wanted you to meet with Mr. Donziger? A. Mr. Fajardo stated that all important matters should be brought to the attention of Mr. Donziger because he said that he was the boss of the attorneys -- of the legal team.").

**4.     Since at least 2006, the LAP team has divided and coordinated the efforts of its members towards achievement of the common goal to pressure Chevron into settling a fraudulent and extortionate lawsuit.**

- PX 702 (Donziger describing an ideal job candidate as one who would "raise some hell in Ecuador," noting the "job[] entails f[**]king up every machine you see that has ChevronTexaco's name on it. . . .  Being able to manufacture reality a plus.").
- PX 806# (Donziger book proposal outlining the various responsibilities of him and his team).
- PX 1222 (2/4/2010 Donziger email to Yanza: "[C]onsistent with years of practice as well as the agreement between the clients and the U.S. attorneys, [] the Kohn firm would be responsible for covering the basic out-of-pocket expenses of the case while my firm would be primarily responsible for the overall management of the case in Ecuador and related advocacy efforts, such as media and outreach to environmental groups and shareholders.").
- PX 1146 (7/2/2009 memo from Donziger to Kohn team regarding roles of various team members).
- PX 1158 (Fall 2009 chart of tasks assigned to which LAP team members, authored by Donziger).
- PX 2188 (Demonstrative of individuals active in the RICO enterprise from 2003 through 2010).
- PX 4900 (Dahlberg) ¶ 7 (analyzing disbursements to Donziger, U.S. and Ecuadorian counsel, Selva Viva, experts, PR services, Crude funding, and NGOs); *id.* ¶ 36 ("[Donziger and KSG] divided responsibilities. . . . KSG provided financing for the matter and Donziger was primarily responsible for the oversight of the Litigation including the overall promotion of the case, raising capital to fund the case, management of the overall operations of the case, case strategy, advocacy and public relations efforts and case management.").
- PX 5600 (Kohn) ¶ 3 ("I, along with The Law Offices of Cristóbal Bonifaz and Steven Donziger, served as U.S. counsel for the Ecuadoran plaintiffs.  Alberto Wray, an Ecuadoran lawyer from the firm of Cabezas and Wray, served as lead Ecuadoran counsel at that time.  Luis Yanza, as the representative of the Frente was also involved in the case from the outset.  Dr. Wray and Mr. Bonifaz were primarily responsible for the determination and development of the legal theories upon which the action was filed."), *id.* ¶ 7 ("[W]e contributed funding for the litigation expenses, which required the services of lawyers, scientists, and other consultants over many years.  We were involved in discussing strategy in the Ecuadoran litigation and in U.S.-based related cases, meeting with government representatives, settlement strategy, and mediations in 2007 and 2008."); *id.* ¶ 17 ("Luis Yanza, in his capacity as head of the Frente, also served as an accountant for the case."); *id.* ¶ 42 ("Amazon Watch, an independent environmental organization that supported the Ecuadoran plaintiffs' cause, organized a series of protests, marches, activity around the Chevron annual shareholder meeting for the purpose of drawing attention to the Ecuadoran litigation. . . . I do recall that Mr. Donziger worked with them to organize their activities as well as their press releases."); *id.* ¶ 44 ("A lobbyist named Ben Barnes provided some assistance on

behalf of the Ecuadoran plaintiffs with respect to communications with the Office
of the U.S. Trade Representative and others in government, and he also offered
assistance in facilitating a possible settlement of the case.").

- PX 5200 (Lipton) ¶ 7 ("Stratus Consulting's client representative and contact on
the Ecuador Project was . . . Mr. Steven Donziger.").

- PX 3200 (Russell) ¶ 7 ("I also met with members of the Ecuadorian plaintiffs'
legal and public relations team, including Manuel Pallares, Alberto Wray, Monica
Pareja, Cristobal Bonifaz, John Bonifaz, Lou Dematteis, and members of Amazon
Watch. . . . Both Alberto Wray and Monica Pareja, who were lawyers working for
Donziger, prepared me to testify to the Ecuadorian court as an expert during the
trial."); *id.* ¶ 32 ("Although I frequently communicated with other members of the
Ecuadorian plaintiffs' legal and technical teams, I reported to and took direction
from only Donziger.  I also saw Donziger directing the work of the other members
of the plaintiffs' team, including Pablo Fajardo, Luis Yanza, and Edison Camino
Castro.  Donziger ordered them around, yelled at them, and berated them if they
did not comply with his orders quickly enough.  He also said to me on more than
one occasion that he had to manipulate the Ecuadorians in order to get them to do
what he wanted.").

**5.    Since at least 2006, funds and resources have been shared among the LAP team, and used to advance the LAP team's common goals.**

- PX 641 (summary of KSG expenses incurred between 1993 and 2009).
- PX 2137 (Demonstrative of financial disbursements related to Lago Agrio and related litigations).
- PX 2138 (Demonstrative of financial disbursements related to payments for experts and consultants who worked with the LAPs).
- PX 2139 (Demonstrative of financial disbursements related to payments for Cabrera).
- PX 2142 (Demonstrative comparing Cuerpo Summary Cost Filing financial information by year with Selva Viva financial transactions by year).
- PX 2143 (Demonstrative of evidence of investor contributions to the Lago Agrio litigation and related litigations).
- PX 2145 (Demonstrative showing flow of investor funds through Donziger IOLA accounts).
- PX 2146 (Demonstrative showing flow of funds to Selva Viva through Donziger's IOLA and personal accounts).
- PX 2147 (Demonstrative showing categories of financial disbursements by the LAP team).
- PX 7701 (Charts produced by Donziger summarizing case expenditures).
- PX 4900 (Dahlberg) ¶¶ 35-38 (Analysis of KSG contributions); ¶¶ 39-46 (Analysis of Deleon contributions); *id.* ¶¶ 47-53 (Analysis of Burford contributions); *id.* ¶¶ 59-64 (Analysis of disbursements to Donziger and his law offices); *id.* ¶¶ 65-73 (Analysis of disbursements to U.S. counsel, including Page, Patton Boggs, Emery Celli, and Motley Rice); *id.* ¶¶ 74-76 (Analysis of disbursements to Ecuadorian Counsel, including Fajardo, Sáenz, Prieto, Ponce, and Wray); *id.* ¶¶ 77-78 (Analysis of disbursements to Selva Viva and Yanza); *id.* ¶¶ 80-88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR); *id.* ¶¶ 89-94 (Analysis of disbursements to PR-related individuals and entities, including Hinton); *id.* ¶¶ 95-100 (Analysis of disbursements related to the production of *Crude*); *id.* ¶¶ 101-106 (Analysis of disbursements to NGOs, including the Frente, Amazon Watch, and RAN); *id.* ¶¶ 107-112 (Analysis of disbursements to lobbyists, including Barnes and Lehane); *id.* ¶¶ 114-122 (Analysis of payments to Cabrera, Stratus, Reyes and Villao in relation to the drafting of the Cabrera report); *id.* ¶¶ 123-124 (Analysis of payments to Guerra).
- PX 5600 (Kohn) ¶ 9 ("During those nearly seven years, the firm paid over $6 million in litigation expenses.  This included the $1.1 million that we provided to Mr. Donziger for legal services and expenses, $1.1 million that we paid to U.S. consultants, and $2.2 million that we transferred by Wire from bank accounts in the United States to bank accounts in Ecuador."); *id.* ¶ 16 ("Lump sum payments were made to Selva Viva pursuant to the budgets [presented by Donziger] and I understood those payments were then disbursed among the employees, vendors, and others as set forth in the budgets."); *id.* ¶ 31 ("Between 2007 and 2009, KSG paid more than $1 million to Stratus based on Mr. Donziger's approval of their

work."); *id.* ¶ 34 ("Our records reflect that Fernando Reyes was paid $3,000 in connection with the Ecuador litigation."); *id.* ¶¶ 36-37 ("In 2005, Selva Viva opened bank accounts at Banco Pichincha, an Ecuadoran bank with a branch in the United States, through which Mr. Donziger, Mr. Yanza, and others paid bills for a wide range of services needed to pursue the litigation in Ecuador. . . . At Mr. Donziger's direction, between June 2005 and November 2009, KSG made approximately 51 separate wire transfers from our U.S. bank account to a Banco Pichincha account with an account number ending in 5004 in amounts ranging from $10,000 to $100,000."); *id.* ¶ 38 ("In 2007, Mr. Donziger made several references in emails to my assistants at KSG and me regarding a second bank account at Banco Pichincha. (PX 897, 916, 965, 968, 984). PX 897, 916, 965, 968, and 984 are true and correct copies of emails from Mr. Donziger to my assistants and me requesting transfers to this second bank account."); *id.* ¶ 40 ("My firm invested a substantial sum in public relations during the course of the Ecuadoran litigation."); *id.* ¶ 42 ("In 2007, KSG contributed more than $180,000 to Amazon Watch."); *id.* ¶ 43 ("The Ecuadoran plaintiffs' team planned and executed a significant media campaign around the filing of the Cabrera Report. My firm covered the costs of that campaign. That campaign prominently featured the idea that Mr. Cabrera was an 'independent,' court-appointed expert, who found Chevron liable for billions of dollars in damages in Ecuador.").

- PX 3100 (Bogart) ¶ 4 ("After months of due diligence and negotiation, Burford, through an indirect subsidiary, entered into an agreement (the 'Funding Agreement') to provide up to $15 million in financing to Patton Boggs LLP ('Patton Boggs'), a major US law firm, in connection with its entry into the Lago Agrio litigation as plaintiffs' counsel."); *id.* ¶ 25 ("Burford's funding was to be paid only and directly to Patton Boggs and held in a trust account, and Tyrrell's personal approval was required for its disbursement.").

- PX 3200 (Russell) ¶ 36 ("Donziger instructed me how to distribute the money from the GEO Ecuador account. He instructed me to direct payments to Amazon Watch, Luis Yanza of the Frente, and public relations firms assisting the Ecuadorian plaintiffs' team. [PX0696; PX0698; PX0701; PX0704].").

- Tr. (Russell) 374:2-13 ("Q. Were you the only person who controlled payments out of the GEO Ecuador account? A. I was instructed by Mr. Donziger to make certain specific payments which we complied with. Q. And the types of things you were paying for in Ecuador was what, what sort of expenses were you paying for? A. Public relations, technical support for the testing team, salaries, hotel bills, technical supplies, just about everything. Q. Did you also pay for the laboratories to do the sample testing? A. As I recall, there were some payments made.").

6.      Since at least 2006, members of the LAP team have met, communicated, and
        travelled frequently, in and to different locations in the United States,
        Ecuador, and other countries, in the operation of the LAP team.

- PX 1509 (Steven Donziger Migration Records from the Ecuador National
  Migration Office, and an English translation thereof) (reflecting approximately 60
  trips to Ecuador between 2005 and February 2011 when Chevron filed its
  complaint and at least 21 trips to Ecuador since then).
- PX 1311 (5/3/2010 email chain reflecting that Fajardo was staying with Donziger
  in New York in the days leading up to the filing of the Fajardo declaration, and
  that Yanza had just returned to Ecuador following a trip to the U.S.).
- PX 39 (*Crude* outtake reflecting March 3, 2007 meeting in Ecuador where
  Defendants and co-conspirators planned the ghostwriting of the Cabrera Report).
- PX 2196 (Summary chart of amount of telephone, texts, and Skype
  communications between Donziger and individual co-conspirators and Defendants
  during the course of the Lago Agrio litigation and related litigations).
- PX 1406 (8/9/2010 letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E.
  Chavez, H. Payaguaje and E. Criollo re termination of agreement) at 3 (reflecting
  that Sáenz travelled to the U.S. to meet with lawyers at Winston & Strawn and that
  Fajardo, Yanza, and Humberto Piaguaje met with Kohn in Philadelphia and
  traveled to New York to meet with other law firms).
- PX 7620 (Summary of expenses for Fajardo's trip to Miami and Boulder in
  January 2010).
- 12/1/2010 Donziger Dep. 581:19-24, 582:6-7 ("Q. Did Mr. Fajardo ever travel to
  the United States in connection with this case?   A. Yes.   Q. And tell me
  approximately how many times did he do that. . . . A. Numerous times.  I don't
  know the exact number.").
- 12/1/2010 Donziger Dep. 590:10-18 ("Q. Did Luis Yanza ever travel to the United
  States in connection with the case?   A. Yes.   Q. Approximately how many
  times did he do that?   A. Numerous times.   Q. Over ten?   A. About ten, or
  more.").
- 12/29/2010 Donziger Dep. 2244:20-2245:10 ("Q. Do you recall a meeting between
  yourself, Ms. Maest, Mr. Beltman and others that took place in January of '08 in
  Quito?   A. Yes.   Q. Where was that meeting held?    A. I believe it was at the
  private residence of Juan Aulestia.    Q. Who all attended that meeting?    A. To
  the best of my recollection, it was Ms. Maest, Mr. Beltman, Mr. Fajardo, Mr.
  Yanza, Mr. Cabrera, and I believe one or two individuals from our technical team,
  like possibly Mr. Villacreces.").
- 4/16/2013 (Donziger) Sanctions Hr'g Tr. 19:4-7 ("[A.] I go to Ecuador frequently
  and regularly. Q. About once a month you go to Ecuador, correct, sir? A.
  Roughly, yes.").
- 4/16/2013 (Donziger) Sanctions Hr'g Tr. 57:24-58:2 ("Q.  Would it surprise you to
  know that you exchanged e-mails with lawyers in Ecuador on average three to four
  times a day? A.  No, that is not very much given we are all working full time on
  this case, in my opinion.").

- 8/23/2013 Page Dep. 84:17-85:2 ("Q.   According to your Ecuadorian migration records, you were in Ecuador from February 21, 2010 through February 26, 2010. Do you recall that trip?   A.   That's consistent with my general memories of that time period.   Q.   Would you have met with Ecuadorian counsel during your February 2010 trip to Ecuador?   A.   I believe I would have, yes.").
- PX 3100 (Bogart) ¶ 7 (attesting that Burford met in mid-2010 with Fajardo and Yanza in New York at the offices of Patton Boggs).
- PX 3200 (Russell) ¶ 3 ("I went to New York, and Donziger interviewed me to provide technical support for him in Ecuador in the Ecuadorian litigation.").
- PX 3000 (Veiga) ¶ 47 ("Since that time, I have interacted in person with Donziger on a number of occasions, including during Judicial Inspections and meetings in Coral Cables, Florida and Washington, D.C.  For example, I saw Donziger at a number of Judicial Inspections, where he appeared to be coordinating activities for the Lago Agrio Plaintiffs.  He appeared to be instructing Monica Pareja, Pablo Fajardo, Luis Yanza, Julio Prieto, and others.").

7.    **Donziger is, and has been since at least 2003, a legal advisor to and representative of the LAPs, both in Ecuador and in the U.S.**

- PX 248 (1/2/2006 Agreement To Dispute A Case Against Chevron Texaco, Now Chevron, In Ecuador, providing that the law firm of Kohn, Swift & Graf, the law offices of Steven R. Donziger, and the law offices of Cristóbal Bonifaz will "handle the litigation of this case in Ecuador and/or the United States").
- PX 558 (1/5/2011 retainer agreement among the LAPs, represented by P. Fajardo, El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by L. Yanza, and Donziger & Associates, PLLC).
- PX 806# (11/3/2006 email from Donziger to David Kuhn with the subject, "Book Proposal attached," attaching Amazon Awakening: "I am the lead lawyer in the class-action trial. . . . I am the person primarily responsible for putting this team together and supervising it so we can forestall this impending disaster").
- PX 1208 at 3 (1/16/2010 draft request for information from Donziger: "I am a legal advisor to the plaintiffs in the prosecution of Aguinda v. ChevronTexaco, currently being tried in Lago Agrio, Ecuador").
- PX 2377 at 3 (4/28/2009 Donziger statement to the Tom Lantos Human Rights Commission: "I am an attorney based in New York City who serves as legal advisor to about 80 indigenous and farmer communities of the Amazon region of Ecuador.").
- 6/25/2013 Donziger Dep. 480:17-18 ("I was the U.S. representatives of the clients.").
- 4/16/2013 (Donziger) Sanctions Hr'g Tr. 45:2-5 ("Q. And you were one of the other plaintiff's representatives, correct, sir? A. I believe I was. I don't know -- yes, I was U.S. plaintiff's representative.").
- PX 3100 (Bogart) ¶ 5 ("Donziger . . . described himself as the lead U.S. lawyer for the LAPs and the overall strategist behind the Litigation.").
- PX 5600 (Kohn) ¶ 3 ("When the Ecuadoran litigation was filed in 2003, I, along with The Law Offices of Cristóbal Bonifaz and Steven Donziger, served as U.S. counsel for the Ecuadoran plaintiffs."); *id.* ¶ 13 (in 2006, "Mr. Donziger became the principal American lawyer on the case and the sole link to the plaintiff-client groups and the sole source of information to me concerning the Ecuadoran litigation").
- PX 3200 (Russell) ¶ 3 ("Donziger identified himself as the lead U.S. attorney in the Ecuadorian litigation.").
- PX 4800 (Guerra) ¶ 24 ("Mr. Fajardo had previously explained to me that Mr. Donziger was the lead among the Plaintiffs' team and thus he needed to inform Mr. Donziger of everything that was happening in the case.").

8.    **The LAP team has conducted its affairs, in part, through agents, including Stratus Consulting ("Stratus"), and lawyers at U.S.-based law firms, including Patton Boggs LLP ("Patton Boggs") and Emery Celli Brinckerhoff & Abady, LLC ("Emery Celli").**

- PX 5600 (Kohn) ¶ 29 ("On behalf of the Ecuadoran plaintiffs, Mr. Donziger and I retained Stratus in the Spring of 2007 to provide us with materials for submission to the court and also to prepare materials to assist us in efforts to mediate the Ecuadoran litigation.").
- PX 1210 (Confirmation of Stratus's retention by Donziger whereby "all work [Stratus] performed [was at the request and direction of [Donziger.]]").
- PX 5208 (Beltman) at ¶ 8 ("At that meeting, Donziger described Stratus's work as the preparation of a damages assessment on behalf of the LAPs for the Lago Agrio Litigation.").
- PX 5210 (Maest) at ¶ 3 ("I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services.").
- PX 553 (Agreement between Patton Boggs and the LAPs).
- PX 544 (Agreement between Emery Celli and the LAPs).
- PX 630 (Agreement between Weinberg and Emery Celli).
- PX 633 (Agreement between Stratus Consulting and KSG).
- PX 1204# (Invictus memo).
- PX 1284 (Agenda for April 7-8, 2010 Invictus meetings).
- PX 1293 (4/21/2010 emails between Emery Celli, Patton Boggs, Motley Rice and Donziger re Stratus 1782).
- 1/14/2011 Donziger Dep. 2773:3-2773:19 ("Q. You were involved in the drafting of that declaration?     A. I believe it was drafted by the Patton Boggs firm.  But I did have conversations with them about the contents of it as it was being drafted.")
- 7/19/2011 Donziger Dep. 4731:21-25 ("Q. Were any U.S. lawyers involved in the drafting of the Alegatos?   A. Yes.   Q. Who was involved?   A. Lawyers at Patton Boggs.").
- 6/26/2013 Dunkelberger Dep. Tr. 10:9-18 ("Q. Who hired The Weinberg Group? A. Patton Boggs."), 71:6-8, 71:11-12 ("Who said that the expert that wrote the report was an independent expert?  A. Eric Westenberger, Ilaan, Steven Donziger.").
- PX 3100 (Bogart) ¶ 4 ("After months of due diligence and negotiation, Burford, through an indirect subsidiary, entered into an agreement (the 'Funding Agreement') to provide up to $15 million in financing to Patton Boggs LLP ('Patton Boggs'), a major US law firm, in connection with its entry into the Lago Agrio litigation as plaintiffs' counsel.").
- PX 4900 (Dahlberg) ¶¶ 65-73 (Analysis of disbursements to U.S. counsel, including Patton Boggs and Emery Celli); *id.* ¶¶ 80-88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR).

### 9.    Donziger procured and controlled funding for the LAP team.

- PX 552 at 35 (Treca funding agreement giving Donziger control over funds).
- PX 693 (7/29/2004 email string from D. Russell to Donziger, in which Donziger tells Russell not to contact Kohn about funding issues without sending to Donziger first).
- PX 887 (7/25/2007 email from Donziger to Kohn and Karen Wilson in which Donziger asks Kohn for $3000 to pay Reyes).
- PX 1146 (7/2/2009 memo from Donziger to Kohn: "I have raised significant funds for both the case in chief and ancillary activities.").
- PX 2357 (Investment Agreement for Chevron/Ecuador Project between Donziger and J. DeLeon, dated 3/11/2010).
- PX 5208 (Beltman) at ¶ 5 ("Regarding budgeting and funding of Stratus's Ecuador Project, it was apparent that Donziger had a significant degree of input, but that for large expenditures, approval from Joe Kohn was also needed. I communicated with Kohn on several occasions to describe Stratus's upcoming work and to seek approval for major expenditures. Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.").
- PX 5210 (Maest) at ¶ 24 ("Regarding budgeting and funding, it was apparent that Donziger had a significant degree of control, but that for large expenditures, he initially reported to Joe Kohn.  Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.").
- PX 6889 (Copies of checks from Donziger's "Ecuador Work Project" account).
- PX 7033A (1/15/2013 minutes of the *Asamblea* where Donziger discusses the state of the case's financing).
- 11/29/2010 Donziger Dep. 207:5-23 ("Q. So who are the other person or persons who have paid you compensation relating to your work on the case? A. Myself. I pay myself. Q. I see. Out of? A. Out of a case budget that I administered in conjunction with the plaintiffs -- well, the clients' representatives. Q. Are the funds your own personal funds that you own?  A. No. Q. So where do the funds come from? A. They came from a case account kept under the auspices of my law firm. Q. And who pays the money into that account? A. Investors.").
- 12/23/2010 Donziger Dep. 1927:7-12 ("Q. Were you managing these invested funds on behalf of the plaintiffs? A. This particular investment, yes. I should say in collaboration with the plaintiff representatives.").
- 1/18/2011 Donziger Dep. 3212:20-23 ("Q. Russ DeLeon is someone you introduced to the Lago Agrio case as a source of financing, correct? A. Yes.").
- 6/25/2013 Donziger Dep. 568:19-24 ("Q. Were you involved in negotiating that funding agreement with Burford? A. I was. Q. Were you Burford's primary contact in the negotiations? A. I don't know.").
- 7/19/2011 Donziger Dep. 4925:5-14 ("Q. On Exhibit 1819, we have transfers from your personal account to Mr. Sáenz.  The one on April 7th of 2008 for $2,000, what was the purpose of that transfer?    A. Compensation.    Q. Was that in addition to his salary from the Selva Viva account that month or in the place of? A. In addition to.").

- 7/19/2011 Donziger Dep. 4927:2-24 ("Q. The $2,000 that was transferred on September 10th of '08 to Mr. Sáenz, what was the purpose of that payment?   A. As I look at this document, all of these payments were for the same purpose, in my opinion.  They were all compensation, bonuses, per an understanding we had that on occasion, maybe quarterly or three times a year, he would get a $2,000 bonus to supplement his regular salary.").

- 7/19/2011 Donziger Dep. 4916:21-4917:2 ("Q. On September 4th, 2007, again, from your personal checking account, you transferred $12,000 to Luis Yanza. What was the $12,000 payment for?   A. It was to purchase a house that  he and his family could live in.").

- 7/19/2011 Donziger Dep. 4920:18-23 ("Q. In July of '09 you transfer another $2,000 from your personal account to Mr. Yanza.  What was that for?   A. I believe that was either for some medical expenses or the same kind of bonus I just described.  I don't know.").

- PX 3100 (Bogart) ¶ 7 ("Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford.").

- PX 4900 (Dahlberg) ¶ 6 (Donziger "had primary control of financing and related fund disbursements to individuals and entities in connection with the Litigation from approximately 2004 and continuing through at least July of 2012.").

- PX 3200 (Russell) ¶ 13 ("Donziger controlled who got paid and how much, and used that power to keep people in line.").

- PX 5600 (Kohn) ¶ 37 ("At Mr. Donziger's direction, between June 2005 and November 2009, KSG made approximately 51 separate wire transfers from our U.S. bank account to a Banco Pichincha account with an account number ending in 5004 in amounts ranging from $10,000 to $100,000."; *id.* ¶ 38 ("In 2007, Mr. Donziger made several references in emails to my assistants at KSG and me regarding a second bank account at Banco Pichincha.  (PX 897, 916, 965, 968, 984).  PX 897, 916, 965, 968, and 984 are true and correct copies of emails from Mr. Donziger to my assistants and me requesting transfers to this second bank account.").

- Tr. 374:2-5 (Russell) ("Q.  Were you the only person who controlled payments out of the GEO Ecuador account? A.  I was instructed by Mr. Donziger to make certain specific payments which we complied with.").

- Tr. 826:17-22 (Dahlberg) ("Q. What sort of activities was he directing? A. I think, basically, it was more direction about expenditures. So, in other words, money getting expended for, you need $50,000 to Selva Viva or $60,000 for Frente or something like that. Those are the types of things that I saw that Mr. Donziger was directing flows of funds.").

- Tr. 1286:9-14 (Shinder) ("Q. Who paid for the flight to Colorado? A. Mr. Donziger. Q. Who paid for your car service to Boulder? A. Mr. Donziger. Q. Who paid for the lunch and the nice hotel? A. Mr. Donziger.").

- Tr. 2294:18-25 (Ponce) ("Q.  Did Mr. Donziger have any involvement, to your knowledge, in how much you were being paid?  A.  He will canalize the payments to me. The Court:  Does that mean he transmitted the money to  you?  The

Witness:  In some occasions he would transmit the money to me, or on other occasions he will make Joe Kohn to transmit that money to me.").

10.     **Donziger designed and managed the LAP team's strategy in the Lago Agrio litigation.**

- PX 558 at 2 (retainer agreement between Donziger and the LAPs authorizing him "to exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the litigation" and to "coordinat[e] the overall legal strategy . . . to pursue and defend all aspects of the litigation . . . .").

- PX 687 (11/19/2003 memo from Donziger to "Team" re "Strategic Planning Memo/Ecuador Case").

- PX 778 (6/13/2006 email string from A. Page to Donziger. Donziger gives Page instructions about case strategy).

- PX 806# at 3 (Donziger stating he is the "person primarily responsible for putting [the LAP] team together and supervising it . . . ."); *id.* at 5 (Donziger describing himself as being at "the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S. [and having] close ties with almost all of the important characters in the [cases], including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental activists, and many of Chevron's key players.").

- PX 1146 (7/2/2009 memo from Donziger to Kohn: "The legal and political 'space' around this case in both Ecuador and the U. S. has been intricately constructed over the last several years by those involved on a fulltime basis. . . . The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador - including high-level officials in Ecuador's government. . . . We also see this as not just a legal case, but a political-style campaign driven by a legal case. The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.").

- PX 1235 (3/1/2010 memo from Donziger to P. Fajardo, presenting "a strategy to respond to Chevron's effort to open several litigations in the U.S.").

- 3/29/2010 Calmbacher Dep. 25:2-4 (regarding Donziger: "Q. Did he seem to be in charge of the litigation? A. Yes.").

- PX 4900 (Dahlberg) ¶ 35 ("[F]rom the origination of the Litigation, Donziger managed the Litigation and related activities, and KSG financed them."); *id.* ¶ 36 ("KSG provided financing for the matter and Donziger was primarily responsible for the oversight of the Litigation, including the overall promotion of the case, raising capital to fund the case, management of the overall operations of the case, case strategy, advocacy and public relations efforts and case management.").

- PX 5600 (Kohn) ¶ 12 ("And from 2005 onwards, Mr. Donziger was the person primarily responsible for making day-to-day decisions in the management of the case, including hiring Ecuadoran personnel for the case, scientists and other consultants, public relations personnel, lobbyists, and Ecuadoran counsel."); *id.* ¶ 20 ("Through various actions, Mr. Donziger rebuffed these efforts by our firm to take a more active role."); *id.* ¶ 60 ("On November 13, 2009, I received a letter from Mr. Fajardo and Mr. Yanza advising me they did not agree we should engage in further settlement negotiations and that they believed all budget and strategy

decisions must be made by Mr. Donziger."); *id.* at 62 ("On November 24, 2009, Mr. Donziger informed me by email that he was unilaterally retaining Emery Celli to represent the Ecuadoran plaintiffs in connection with litigation in the U.S. District Court for the Southern District of New York related to an arbitration between Chevron and the Republic of Ecuador.").

- PX 3200 (Russell) ¶ 31 ("Donziger was always in control of the case, dictating case strategy[.]").

11.     **Donziger designed and managed the LAP team's efforts to influence the media and the U.S. and Ecuadorian governments against Chevron.**

- PX 57A (Donziger discussing his plan to get "press coverage as part of a legal strategy").
- PX 687 (11/19/2003 memorandum from Donziger to Team re "Strategic Planning Memo/Ecuador Case," detailing plan to pressure Ecuador government).
- PX 694 (8/16/2004 email from C. Lehane to Donziger outlining a plan to "[b]ring[] ChevronTexaco to the negotiation table by inflicting economic pain on the company").
- PX 695 (8/24/2004 email from Donziger to M. Yepez re "Media work plan," outlining media strategy).
- PX 713 (1/3/2005 email from Donziger to L. Yanza re "Various/Press Plan," outlining media strategy).
- PX 1146 (7/2/2009 memo from Donziger to Kohn: "The legal and political 'space' around this case in both Ecuador and the U. S. has been intricately constructed over the last several years by those involved on a fulltime basis.  The process is managed by myself, Pablo Fajardo, and Luis Yanza. All of us work on this on a full-time basis and we speak among ourselves frequently. We also manage the client relationships and in my case I have raised significant funds for both the case in chief and ancillary activities. All activities from KSG must be coordinated through this process, which in practice means coordinated through me. The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador - including high-level officials in Ecuador's government.  Beneath it all are dozens of indigenous and farmer communities who have a democratic process through which they exercise control over the case, and hire and fire lawyers. These people are our clients, and we answer to them; Pablo, Luis, and I have years-long relationships with each of the leaders from the various indigenous groups and communities. We also see this as not just a legal case, but a political-style campaign driven by a legal case. The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.").
- PX 1181 at 2 (11/9/2009 email from Donziger to Kohn stating that Donziger would "handle press and political aspects in both Ecuador and the U.S.").
- PX 7787 (chart showing case expenditures to "Advocacy/PR").
- 8/5/2011 Parker Dep. 43:12-15 ("Q. Did you follow Mr. Donziger's direction to let him proof and approve anything you were going to publish about the case before you published it? A. I did.").
- 6/18/2013 Woods Dep. 336:20-23 (regarding press releases: "Q. Is it fair to say that you didn't on your own decide what to write but rather received instructions from Mr. Donziger? A. Yes.").
- PX 4900 (Dahlberg) ¶ 94 ("Based on the documents provided for my review, it appears that Donziger directed the engagement of the individuals and entities providing the public relation services, as well as coordinated or facilitated the

payment of these service providers or paid them directly from bank accounts under his control.").

- PX 5600 (Kohn) ¶ 40 ("Mr. Donziger, however, supervised public relations and lobbying activities in the United States on behalf of the Ecuadoran plaintiffs. Mr. Donziger selected and hired public relations and political consultants in the United States, including Karen Hinton. Mr. Donziger supervised Ms. Hinton's work and was intimately involved in all press releases issued by Hinton Communications on behalf of the Ecuadoran plaintiffs. In fact, Mr. Donziger authored many of the press releases that were issued by Hinton Communications.").

- Tr. (Kohn) 1518:5-21 (Donziger's "primary obligations include[d] running the case on a day-to-day basis, [and] handling press and political aspects both in Ecuador and the U.S.").

- Tr. (Hinton) 2159:9-12 ("Q. At any time, ma'am, did Mr. Donziger tell you that his goal was to increase press so that he could increase the pressure in order to get the settlement price higher? A. Yes.").

- Tr. (Hinton) 2181:14-18 ("Q. Ms. Hinton, before you posted materials to these Web sites, you cleared that through Mr. Donziger, correct? A. Not always. Q. Most of the time? A. Most of the time.").

12.    **Donziger designed and managed the LAP team's scheme to pressure and
control the Lago Agrio court.**

- PX 184 (July 25, 2006 Donziger diary: "[L]aunched into my familiar lecture about
how the only way the court will respect us is if they fear us - and that the only way
they will fear us is if they think we have come control over their careers, their jobs,
their reputations - that is to say, their ability to earn a livelihood.").
- PX 185 (September 13, 2006 Donziger diary: "Legal case: going well with Yanez
decision to cancel inspections. . . . We wrote up a complaint against Yanez, but
never filed it, while letting him know we might file it if he does not adhere to the
law and what we need.").
- PX 192 (January 19, 2007 Donziger diary: "Guerra will be the judge to decide the
case.  We have to start lobbying him, working with him.").
- PX 199 (March 1, 2007 Donziger diary: "I just don't believe Luis and Pablo get
the public part enough. Clearly the judge is a weak man who lives in fear, and right
now he fears issuing the Providencia more than he fears not issuing it.").
- PX 201 (March 7, 2007 Donziger diary: "But ... he mentioned he met with the
judge, and he said there could be mobilizations if the case is not moved faster.").
- PX 785 (July 26, 2006 email from Donziger to Kohn: "The judge, who is on his
heels from the charges of trading jobs for sex in the court, said he is going to
accept our request to withdraw the rest of the inspections save the four we still
want to do.").
- PX 807 (November 7, 2006 email from Fajardo to Donziger and LAP team asking
for opinions regarding conversation Fajardo had with judge re settling experts and
global assessment).
- PX 811 (November 22, 2006 email where Donziger instructs Yanza what to lobby
to the Judge re global assessment).
- PX 815 (December 21, 2006 email where Donziger instructs Fajardo to talk to the
judge to get the global assessment order before the court recesses).
- PX 909 (September 3, 2007 email where Donziger instructs LAP team to accuse
judge of corruption and otherwise pressure judge to prevent HAVOC inspection).
- PX 1507 (September 12, 2008 email where Fajardo and Yepez update Donziger on
pressuring the court).
- PX 2478A (Crude clip: "You know, five months of delay to do something the
Court could have done last December. And never would have done had we not
really pushed him.").
- Tr. 787:25-788:4 (Callejas) ("Q.  Is it your testimony, sir, that Luis Yanza and
Steven Donziger organized this protest, or were merely present?  A. It's an
assumption that I can make by the way that Luis Yanza and Steven Donziger
addressed and interacted with the persons who were present at that
demonstration.").

13.     **Donziger designed and managed the LAP team's scheme to cause the Lago Agrio court to appoint Richard Stalin Cabrera Vega ("Cabrera") as a global expert secretly under the LAP team's control and have him file as his "independent work" a report secretly drafted by the LAP team.**

- PX 25A (Crude Clip: "Is [Reyes] trustworthy? . . . The problem is once he feels he has his own power…But…but we're paying him, right?").
- PX 195 (February 12, 2007 Donziger Diary: "Key legal issue on Friday: who will be the perito? . . . The question is, do we push for Reyes himself or Richard?").
- PX 197 (February 27, 2007 Donziger Diary: "I asked Pablo if he was 100% sure the judge would appt Richard and not Echeverria, and he said yes, but given that this is the most important decision of the case thus far, there is simply no margin for error.").
- PX 200 (March 4, 2007 Donziger diary: "I was really pissed off at the news they reported - that the judge still did not want to rule . . . . The different pieces of the strategy to get us home have to work in concert, and the one element out of sync at the moment is the fact we don't have the order to begin the PG.").
- PX 201 (March 7, 2007 Donziger diary: "I spend the whole day making comments and mostly directing them to Richard. We laid out our entire case and legal theory - what a benefit! We need to do the same with the judge.").
- PX 204 (April 12, 2007 Donziger diary: "Plan for PG: consult memo Looking for experts in different areas. . . . Need to see Stratus in Denver to get help, but worried about the money.").
- PX 205 (May 2, 2007 Donziger diary: "The challenges are getting a grip on the PG, and integrating the Americans with the Ecuadorians under a common vision of shared work and goals.").
- PX 207 (May 25, 2007 Donziger diary: "I think [the judge] fears Texaco more than he fears us, and the fact we have set up Richard in the perfect way probably scares the hell out of him because he knows what Texaco is planning.").
- PX 633 (March 5, 2010 email from Donziger to McDermott attaching contracts between Stratus, Donziger, and Kohn).
- PX 835 (March 3, 2007 Maest notes re Cabrera report).
- PX 842 (March 21, 2007 Maest notes re call with Donziger re damages).
- PX 845 (March 26, 2007 email between Fajardo and Donziger: "Today the cook met with the waiter to coordinate the menu.").
- PX 847 (April 3, 2007 email between Chapman and Donziger re damages).
- PX 848 (April 10, 2007 email from Donziger to Lipton re damages).
- PX 851 (April 23, 2007 from Donziger to Lipton re damages).
- PX 857 (May 7, 2007 email from Donziger to Yanza re isolated site for writing Cabrera report).
- PX 858 (May 10, 2007 email from Donziger to Fajardo re "proving" Cabrera's independence).
- PX 872 (June 13, 2007 email in which Donziger suggests that Yanza and Fajardo "inform the judge now that we're going to have the big march and maybe ask for his recusal during that march so that he'll get scared now.").

- PX 873 (June 13, 2007 Donziger to LAP team re appointment of Cabrera: "Congratulations .... that visit to the judge last week was a huge help.").
- PX 2396R (Donziger's responses to RFA Nos. 48, 57, 58, 67, 68, 94, and 261 admitting that he supervised the work of those drafting the Cabrera report, the Supplemental Cabrera report, and the cleansing reports).
- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories at 42 (admitting that "Donziger also edited and commented on at least some drafts [of the Cabrera report].").
- PX 2478A (Crude clip: "You know, five months of delay to do something the Court could have done last December. And never would have done had we not really pushed him.").
- PX 5208 (Beltman) ¶¶ 2-5 ("Donziger exercised near complete control over major decisions of strategy for Stratus's Ecuador Project."); *id.* ¶¶ 7-9 ("I understood that Donziger was the Clients' Project Manager."); *id.* ¶ 10 ("Donziger insisted at all times that all aspects of Stratus's work related to the damages assessment . . . remain absolutely secret.").
- PX 5210 (Maest) ¶¶ 1-4 ("I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services. In that role, I took direction from Donziger . . . .").
- PX 8027-8034 (emails from Beltman to Donziger attaching near-final annexes for Donziger's review).
- 12/22/2010 Donziger Dep. 1507-20 ("Isn't it the case that the main body of the expert report ultimately signed by Richard Stalin Cabrera Vega was drafted initially by Stratus Consulting?    A. What turned out to be the main body signed by Mr. Cabrera, a version of that was initially drafted by Stratus, and it turned out, as I understand it, to be substantially the same, that is pretty much adopted by Mr. Cabrera.    Q. And in fact you edited that initial Stratus rough draft; did you not? A. I often looked and commented on and edited material Stratus was drafting.").
- 12/23/2010 Donziger Dep. 1791:15-20 ("Q. Did you advise the plaintiffs to withdraw the request for further inspections after the inspections of the first 27 sites?    A. That was certainly part of my advice.").
- 12/29/2010 Donziger Dep. 2135:15-2136:5 ("Q. Did you have any discussions with the judge in the Lago Agrio case about Cabrera being appointed as the global expert?    A. I have had some discussions with that particular judge, but I don't remember if they were specifically about Mr. Cabrera or just generally about the need to expedite the process.").
- 12/29/2010 Donziger Dep. 2153:16-21 ("Q. Prior to the March 3rd meeting, had anyone on plaintiffs' technical team met with Mr. Cabrera privately?    A. Well, I believe Mr. Reyes met with him when I met with him. Other than that, I don't know.").
- 1/29/2011 Donziger Dep. 3792:5-9 ("Q. In May 2007 it was your view that you needed an isolated site to write the peritaje global, correct?    A. I proposed it as a possibility, yes.").
- PX 4900 (Dahlberg) ¶ 116 (Discussing payments to Cabrera).

- Tr. 1295:22-1296:2 (Shinder) ("Q.  What if anything did Mr. Beltman say regarding Mr. [Donziger] and his involvement with Mr. Beltman in ghostwriting the Cabrera report? A.  Well, he said that everything he did was sort of under the instruction and supervision of Mr. [Donziger] and the lawyers who were handling the case.").

14.     **Donziger authorized and managed the LAP team's scheme to bribe former Judge Alberto Guerra Bastidas and then-Judge Nicolas Zambrano to issue orders favoring the LAPs in the Lago Agrio litigation.**

- PX 4800 (Guerra) ¶ 24 ("Mr. Fajardo told me that we needed to meet with Mr. Donziger to go over this arrangement. Mr. Fajardo had previously explained to me that Mr. Donziger was the lead among the Plaintiffs' team and thus he needed to inform Mr. Donziger of everything that was happening in the case."); *id.* ¶ 27 ("Mr. Fajardo summarized the three parts of our agreement, explaining to Mr. Donziger that I would ghostwrite Judge Zambrano's orders so that the case would not be delayed, in exchange for payment of $1,000 per month from the Ecuadorian Plaintiffs' team. Mr. Donziger then asked me whether Mr. Fajardo's summary was correct, and I told Mr. Donziger directly that those were indeed the terms of the agreement and that Mr. Zambrano authorized me to enter into this agreement."); *id.* ¶ 28 ("Mr. Donziger emphasized that we needed to avoid granting Chevron's essential errors motion at all costs because it was his and Mr. Fajardo's aim to have the judgment issued soon."); *id.* ¶ 37 ("Although Mr. Zambrano and I had decided to approach Chevron first, my relationship remained close with the Ecuadorian Plaintiffs. So much so that I wrote Mr. Donziger an e-mail on September 5, 2010, asking him to advise me on an immigration issue related to my daughter who lived in Chicago. In that email, I offered to 'support the matter of Pablo Fajardo' a code term that I used to refer to the Chevron case-'so it comes out soon and well.'").
- PX 986 (March 5, 2008 email from Guerra to Donziger).
- PX 1753 (September 15, 2009 Fajardo email to Donziger: "The puppeteer is pulling the string and the puppet is returning the package. . . . The puppet will finish off the entire matter tomorrow[.]").
- PX 1751 (October 27, 2009 Fajardo email to Donziger: "The puppeteer won't move his puppet unless the audience pays him something[.]").
- PX 1746 (November 27, 2009 Yanza email to Donziger: "[T]he budget is higher in relation to the previous months, since we are paying the puppeteer. . . .").
- Tr. (Guerra) 921:6-20 ("Q. Please explain who, if anyone else, on the Lago Agrio plaintiffs' team you met with to discuss that subject, the agreement you had reached with Mr. Fajardo to receive a thousand dollars a month to ghostwrite orders in the Chevron case? A. When I made the agreement with Mr. Fajardo regarding the understanding I just mentioned, Mr. Fajardo insisted that I should meet a few days later, he told me with Mr. Steven Donziger, so that he can find out with my own words regarding my commitment that I had made with Mr. Fajardo. Q. Did Mr. Fajardo tell you why he wanted you to meet with Mr. Donziger? A. Mr. Fajardo stated that all important matters should be brought to the attention of Mr. Donziger because he said that he was the boss of the attorneys -- of the legal team.").

15.    **Donziger authorized and managed the LAP team's scheme to bribe Judge Zambrano to issue the $18 billion judgment the LAPs secretly wrote.**

- PX 1138 (Fajardo to Donziger: "I'll say that Friday's meeting is key, and I think that you should be there. In that meeting we'll be talking about all of the outcome of the case and what to do, how much money to put in, how to distribute the items and everything.")

- PX 2396R (Donziger's responses to RFA Nos. 402 and 403 admitting that those drafting some of the LAP team's unfiled work product that appeared in the Lago Agrio judgment worked under his direction).

- PX 4800 (Guerra) ¶ 41 ("The proposal entailed the Ecuadorian Plaintiffs' writing a draft of the judgment and Judge Zambrano signing it and issuing it as his own. I approached Mr. Fajardo and informed him of this offer.  Mr. Fajardo reacted to the proposal enthusiastically.  Mr. Fajardo stated that he needed to inform Mr. Donziger of the details of the proposal."); *id.* ¶ 42 ("Mr. Donziger then asked several questions about the proposal regarding: how the Ecuadorian Plaintiffs' team could be sure that, if a payment were to be made to Mr. Zambrano, he would keep his word; how they could ensure that  the agreement would remain secret; and how they could be sure that Mr. Zambrano would not alter the draft judgment. I informed them, in response, that Mr. Donziger can trust that Mr. Zambrano would not deviate from the agreement and that he would keep it secret.  Although Mr. Donziger appeared to be interested in the proposal, he stated that they did not have that sum of money to pay us at the moment."); *see also* Tr. (Guerra) 996:17-997:2.

- Tr. 993:2-8 (Guerra) ("Q.  What if anything did Mr. Fajardo say to you in response to you conveying Judge Zambrano's proposal at that meeting? A.  Mr. Zambrano felt quite motivated when he learned of the proposal.  He stated that he could not, that he was in no position to make a decision regarding the proposal, that he had to -- that he had to specifically inform Mr. Donziger regarding this issue.").

- Tr. 993:20-22 (Guerra) ("A.  He [Fajardo], he said he was happy.  He looked, he smiled and happy. But he did say that -- but he did say regarding this issue, Mr. Donziger would have to decide.").

- Tr. 994:5-11 (Guerra) ("Mr. Fajardo stated that it was Mr. Donziger who had to make the decision because he, among other, he said that Mr. Donziger, he told me in sort of confidence that it was Mr. Donziger who, because of his involvement, his good involvement was getting the money that allowed the procedures to go forward and that for this purpose, he would frequently travel to Europe seeking investors.").

- Tr. 2597:10-12 (Donziger) (Q. "You admit, sir, that you met with Mr. Guerra a restaurant called the Honey Honey in late 2010, correct, sir? A. I met with him at a restaurant in Quito.").

- Tr. 2597:25-2598:7 (Donziger) ("And by your own admission, Mr. Guerra just floated out there a solicitation of a $500,000 bribe, correct? A. We had a conversation. In the conversation he put it out there, yes. Q. And he told you that that $500,000 bribe would be paid in exchange for the judgment in the Lago Agrio case coming out in your favor, correct? A. That was the idea, yes.").

**16.      Pablo Fajardo acted on behalf of the LAP team under Donziger's direction.**

- PX 169# at 27 ("Pablo . . . [s]till introduces me as the 'cabeza' of the lawsuit. . . .").
- PX 169# at 107 ("Supervising the legal work is a fulltime job . . . .").
- PX 559 (Retainer agreement among El Frente de Defense de la Amazonia, the Asamblea de Afectados por Texaco, and Fajardo, providing "the Plaintiffs hereby appoint [Fajardo] to act as their Ecuadoran representative to exercise responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation"; giving him "primary responsibility" for "assembling and organizing the various Ecuadoran lawyers and law firms who or which from time to time will represent the Plaintiffs in connection with the Litigation").
- PX 390 (Special Power of Attorney and Legal Mandate Authorized by A. Payaguaje and Others in Favor of: Attorney P. Fajardo, and an English translation thereof).
- PX 391 (Lago Agrio Plaintiffs' Filing authorizing Special Power of Attorney and Legal Mandate to P. Fajardo, and an English translation thereof).
- PX 392 (Document entitled, "Special Power of Attorney and Legal Mandate Authorized by Angel Justino Piaguaje Lucitante In Favor Of: Attorney [P. Fajardo]," and an English translation thereof).
- PX 944 (Fajardo referring to Donziger as "Commander").
- PX 7549 (Donziger referring to Fajardo as a "young field lawyer in Lago.").
- PX 7559 (Fajardo referring to Donziger as "commander-in-chief Steven Donziger").
- PX 7673 (Donziger instructing the Ecuadorian lawyers that "Pablo [Fajardo] become the Joint Counsel of Record" after Donziger became dissatisfied with Alberto Wray).
- DX 1601 (Ponce) ¶ 9 ("They mentioned that Pablo Fajardo, a recently admitted lawyer could take that role. We agreed that Pablo Fajardo would lead the case in Lago Agrio and I would provide advice on the strategy as well as draft pleadings etc. We had constant meetings to discuss prosecution of the case. Steven Donziger was present for some of the meetings.").
- Tr. 2474:3-7 (Donziger) ("Q. Is it also the case that Mr. Fajardo only became a lawyer and graduated from school sometime in 2004? A. I have a recollection he became a lawyer in the early 2000s and the Lago case was his first case.").

17.     **Luis Yanza acted on behalf of the LAP team under Donziger's direction.**

- PX 385 (English translation of Special Power of Attorney granted by E. Chavez, Ernesto G. Piaguaje, A. Lucitante, T. Lucitante and P. Bravo on behalf of: L. Yanza) at 4 (granting Yanza a special power of attorney "so that in the name of and as representing ADAT [the Assembly of Parties Affected by Texaco] he can sign contracts, agreements or covenants with different national, foreign or international parties and institutions in our name to the benefit on behalf of the legal process we are conducting against Chevron Corporation and its different judicial and extrajudicial related operations.").
- PX 870; PX 912; PX 896 (Emails between Yanza and Donziger informing Donziger how he will set up the "secret account").
- 12/23/2010 Donziger Dep. 1817:12-1818:4 ("Q. Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right? A. It was created by Mr. Yanza as a mechanism to administer the case funds.   Q. To administer funds for the case?   A. Yes.   Q. And you were the president of Selva Viva; is that correct?   A. I believe so.   Q. Are you still the president? A. I don't know.   Q. Do funds for the case still flow through Selva Viva?   A. Yes.").
- 7/19/2011 Donziger Dep. 4916:21-4917:2 ("Q. On September 4th, 2007, again, from your personal checking account, you transferred $12,000 to Luis Yanza. What was the $12,000 payment for?   A. It was to purchase a house that he and his family could live in.").
- 7/19/2011 Donziger Dep. 4920:18-23 ("Q. In July of '09 you transfer another $2,000 from your personal account to Mr. Yanza. What was that for?   A. I believe that was either for some medical expenses or the same kind of bonus I just described. I don't know.").
- PX 3000 (Veiga) ¶ 51 ("Luis Yanza was a key leader of The Frente, including serving as President for some time. I would see Yanza at nearly every Judicial Inspection. He was almost always involved with protests and other pressure tactics.").
- Tr. 787:25-788:4 (Callejas) ("Q. Is it your testimony, sir, that Luis Yanza and Steven Donziger organized this protest, or were merely present? A. It's an assumption that I can make by the way that Luis Yanza and Steven Donziger addressed and interacted with the persons who were present at that demonstration.").
- Tr. 1493:10-13 (Kohn) ("Q. What was Luis Yanza's role in the litigation in 2009? A. Luis Yanza had been a founding participant in the Frente, in the community organization that was both a beneficiary slash party of the 2003 case.").
- Tr. 2072:14-25 (Moncayo) ("Q. You started working for Selva Viva in 2005, right? A. Yes, without a salary. Q. Luis Yanza hired you? A. Yes. . . . Q. And Mr. Yanza is one of -- is a manager at Selva Viva, right? A. Yes. Q. He's one of your bosses? A. Yes.").

**18.     Selva Viva acted on behalf of the LAP team under Donziger's direction.**

- PX 896 (email from Donziger to Kohn stating that ""[t]he [Front] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [Front] controls Selva Viva.").
- PX 732 (6/14/2005 email from C. Kusner to Donziger re "RE: new bank wire information for Ecuador") (reflecting account information for Selva Viva).
- PX 912 (Email from L. Yanza to Donziger re "Cuenta secreta" ["Secret account"], and an English translation thereof) (reflecting use of Selva Viva to make payments to Cabrera from what Defendants called their "secret account").
- PX 614 (Collection of wire transfer records showing transfers from Amazonia Recovery Limited, Amazon Watch, Torvia Limited, TC Payment Services (International), Rainforest Action Network, and Steven Donziger to accounts held by the Frente de Defensa de la Amazonia and Selva Viva Selviva Cia Ltda).
- PX 608 (Chart titled Payments to Selva Viva Cia Ltd. in re Texaco/Chevron, Years 2007 - 2008 – 2009).
- PX 620 (Collection of checks to R. Cabrera from Selva Viva account ending 5004 showing deposit into R. Cabrera account ending 1700, and an English translation thereof).
- PX 2146 (Demonstrative showing flow of funds to Selva Viva through Donziger's IOLA and personal accounts).
- PX 2396R (Donziger's response to RFA No. 18: "Donziger admits that he had involvement in the formation of SELVA VIVA Selvia Cia, Ltd"; response to RFA No. 21: "Donziger admits that he served as president of SELVA VIVA Selvia Cia, Ltd from 2004 to 2009").
- 12/23/2010 Donziger Dep. 1817:12-1818:4 ("Q. Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right? A. It was created by Mr. Yanza as a mechanism to administer the case funds.    Q. To administer funds for the case?    A. Yes.    Q. And you were the president of Selva Viva; is that correct?    A. I believe so.    Q. Are you still the president? A. I don't know.    Q. Do funds for the case still flow through Selva Viva?    A. Yes.").
- PX 4900 (Dahlberg) ¶¶ 77-78 (Analysis of disbursements to Selva Viva and Yanza).
- PX 5600 (Kohn) ¶ 16 ("Lump sum payments were made to Selva Viva pursuant to the budgets [presented by Donziger] and I understood those payments were then disbursed among the employees, vendors, and others as set forth in the budgets.").
- Tr. 2078:3-4 (Moncayo) ("A. I worked for Selva Viva and Selva Viva gave the logistics part to Mr. Cabrera.").
- Tr. 2635:5-9 (Donziger) ("Selva Viva is really an entity created under, I guess, the corporate law of Ecuador that served as a funding vehicle for the Aguinda case, when it was in Ecuador, to pay people in Ecuador who worked on the case. I think that came in existence in approximately 2004.").
- Tr. 2687:16-18 (H. Piaguaje) ("Q. The minutes for the asamblea are kept in the Selva Viva offices, correct? A. Yes.").

19.   **The Amazon Defense Front acted on behalf of the LAP team under Donziger's direction.**

- PX 399; PX 400 at 186 (Lago Agrio judgment designates the Front as the sole trustee of the "commercial trust" into which a portion of the judgment proceeds are to be delivered).
- PX 558 (1/5/2011 retainer agreement among the Lago Agrio Plaintiffs, represented by P. Fajardo, El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by L. Yanza, and Donziger & Associates, PLLC).
- PX 559 (Retainer agreement among El Frente de Defense de la Amazonia, the Asamblea de Afectados por Texaco, and P. Fajardo).
- PX 575 (Transaction record for account ending 0404 in the name of Frente De Defensa de La Amazonia, and an English translation thereof ).
- PX 577 (Transaction record for account ending 7604 in the name of Frente De Defensa de La Amazonia, and an English translation thereof).
- PX 578 (Banco Pichincha Statement for Frente de Defensa MDE la Amazonia [Amazon Defense Front] account ending 9800, and an English translation thereof).
- PX 590 ("Receipt for Account to Account Transfer" for $33,000 from Amazon Defense Front account ending 9800 to R. Cabrera account ending 1700 and a $4 bank fee, and an English translation thereof).
- PX 614 (Collection of wire transfer records showing transfers from Amazonia Recovery Limited, Amazon Watch, Torvia Limited, TC Payment Services (International), Rainforest Action Network, and Steven Donziger to accounts held by the Frente de Defensa de la Amazonia and Selva Viva Selviva Cia Ltda).
- PX 896 (email from Donziger to Kohn stating that "[t]he [Front] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [Front] controls Selva Viva" and "[t]his separate account will be used for same purpose under the same control of the Frente and Yanza").
- PX 2407# at 27 ("Respondent understands that the AMAZON DEFENSE FRONT is working for the LAGO AGRIO PLAINTIFFS. . . . [T]he LAGO AGRIO PLAINTIFFS designated the AMAZON DEFENSE FRONT as the entity with authority to create a trust and distribute any award ultimately obtained in the lawsuit.").
- PX 4900 (Dahlberg) ¶¶ 101-106 (Analysis of disbursements to NGOs, including the Amazon Defense Front).
- PX 3200 (Russell) ¶ 36 ("Donziger instructed me how to distribute the money from the GEO Ecuador account.  He instructed me to direct payments to Amazon Watch, Luis Yanza of the Frente, and public relations firms assisting the Ecuadorian plaintiffs' team.  [PX0696; PX0698; PX0701; PX0704].").

20.     **The LAP team continues to pursue its fraudulent scheme to obtain money and property from Chevron through fear of economic harm, fraud, and other wrongful means.**

- PX 12A ("Have you been making a lot of money on this case yourself? Are you enriching yourself?" Donziger: "[Chuckles] Let's talk about that some other time. Seriously.").
- PX 15A (Donziger's goal was to inflict "damage to [Chevron's] reputation" and put "personal psychological pressure [on] their top executives. . . .").
- PX 28A (Donziger: "I'd like to establish through this case is the idea that lawyers can make significant money by bringing what is essentially a novel human rights case.").
- PX 57A (Donziger: "The business of plaintiffs' law.  To make fucking money.").
- PX 203 (Donziger: "I sit back and dream . . . Billions of dollars on the table. A movie, a possible book. I cannot keep up with it all.").
- PX 1527# ("Invictus: Path Forward: Securing and Enforcing Judgment and Reaching Settlement") (detailing a strategy to pressure Chevron into settlement by instituting multiple foreign enforcement proceedings).
- PX 2306 (Filing in the Superior Court of Justice of Brazil seeking to enforce the judgment in Brazil).
- PX 2461 (Order issued by the National Civil Trial Court No. 61 of Argentina in Aguinda Salazar Maria vs. Chevron Corporation on Preventive Measures freezing the assets of Chevron's Argentina subsidiaries, reflecting the effects of LAPs' efforts to enforce the judgment in Argentina).
- PX 1522 (Document titled "Tasas del Banco de la Nacion Argentina" ["Interest Rates - Bank of the Argentine Nation"] indicating the injury caused by the embargo order which froze the assets of Chevron subsidiaries for several months before the order was vacated by the Argentina Supreme Court).
- PX 4300X (Callejas) ¶ 109 ("The public smear campaign against Chevron continues to this day and shows no signs of stopping, fueling a growing atmosphere of fear and intimidation. I even have been advised by other Ecuadorians not to make public remarks regarding the Lago Agrio Litigation. I remain concerned not just for the safety of myself, but also for that of my family and my coworkers. I have had to live with that fear every day.").
- PX 3000 (Veiga) ¶ 130 ("I have reviewed the Invictus memo. . . . I have also monitored the Lago Agrio Plaintiffs' efforts to enforce the fraudulent Lago Agrio Judgment in foreign jurisdictions, which is consistent with the Patton Boggs proposal set forth in the Invictus memo on how to put maximum pressure on Chevron through the filing of foreign enforcement actions seeking to collect on the fraudulent Lago Agrio Judgment."), *id.* ¶¶ 134-138 (attesting that the LAPs have obtained an Ecuadorian embargo order that affects valuable Chevron trademarks in that country and that the Argentinian embargo order (since vacated) had significant effects: "The order was damaging and disruptive to operations, freezing the assets of Chevron's Argentine Subsidiaries and denying them the ability to use receivables for profit-generating activity and even normal business operations. The harm suffered in Argentina is irreparable.").

## II. Donziger Misrepresented Facts to Third Parties to Obtain Funds to Operate the Enterprise and Its Criminal Activities

### 21. Donziger has obtained financing from third parties to pay for the activities of the LAP team.

- PX 543 (funding agreement dated June 30, 2009 between Donziger, Kohn, Swift & Graf, and DeLeon).
- PX 546 (draft funding agreement between Torvia and the LAPs).
- PX 552 at 35 (Treca funding agreement).
- PX 2143 (Demonstrative of evidence of investor contributions to the Lago Agrio litigation and related litigations).
- PX 2145 (Demonstrative showing flow of investor funds through Donziger IOLA accounts).
- PX 2357 (Investment Agreement for Chevron/Ecuador Project between Donziger and J. DeLeon, dated March 11, 2010).
- PX 2367 (Convertible Promissory Note by and between D. Sherman and Donziger).
- PX 2368 (Convertible Promissory Note by and between G. Krevlin and Donziger).
- PX 2370 (Convertible Promissory Note by and between M. Donziger and Donziger).
- PX 5208 (Beltman) ¶ 5 ("Regarding budgeting and funding of Stratus's Ecuador Project, it was apparent that Donziger had a significant degree of input, but that for large expenditures, approval from Joe Kohn was also needed. I communicated with Kohn on several occasions to describe Stratus's upcoming work and to seek approval for major expenditures. Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.").
- PX 5210 (Maest) ¶ 24 ("Regarding budgeting and funding, it was apparent that Donziger had a significant degree of control, but that for large expenditures, he initially reported to Joe Kohn.  Nonetheless, we at Stratus understood Donziger to have control of strategy decisions.").
- 11/29/2010 Donziger Dep. 207:5-23 ("Q. So who are the other person or persons who have paid you compensation relating to your work on the case? A. Myself. I pay myself. Q. I see. Out of? A. Out of a case budget that I administered in conjunction with the plaintiffs -- well, the clients' representatives. Q. Are the funds your own personal funds that you own?  A. No. Q. So where do the funds come from? A. They came from a case account kept under the auspices of my law firm. Q. And who pays the money into that account? A. Investors.").
- 11/29/2010 Donziger Dep. 207:25-208:2, 208:11-13 ("Q. [W]ho are the investors that you are talking about? . . . A. Mr. DeLeon Q. Anybody else? A. Orin Kramer").
- 6/25/2013 Donziger Dep. 568:19-24 ("Q. Were you involved in negotiating that funding agreement with Burford? A. I was. Q. Were you Burford's primary contact in the negotiations? A. I don't know.").
- 1/18/2011 Donziger Dep. 3212:20-23 ("Q. Russ DeLeon is someone you introduced to the Lago Agrio case as a source of financing, correct? A. Yes.").

- PX 3100 (Bogart) ¶ 4 ("After months of due diligence and negotiation, Burford, through an indirect subsidiary, entered into an agreement . . . to provide up to $15 million in financing to Patton Boggs LLP . . . in connection with its entry into the Lago Agrio litigation as plaintiffs' counsel."); *id.* ¶ 7 ("Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford . . . .").

- PX 4900 (Dahlberg) ¶ 6 (Donziger "had primary control of financing and related fund disbursements to individuals and entities in connection with the Litigation from approximately 2004 and continuing through at least July of 2012.") ; *id.* ¶ 34 ("I have reviewed financial and accounting documents that show that the activities and operations surrounding the Litigation were funded by a number of investors during varying distinct periods of time throughout the course of the Litigation."); *id.* ¶¶ 35-38 (Analysis of KSG contributions); ¶¶ 39-46 (Analysis of Deleon contributions); *id.* ¶¶ 47-53 (Analysis of Burford contributions).

- PX 5600 (Kohn) ¶ 37 ("At Mr. Donziger's direction, between June 2005 and November 2009, KSG made approximately 51 separate wire transfers from our U.S. bank account to a Banco Pichincha account with an account number ending in 5004 in amounts ranging from $10,000 to $100,000."; *id.* ¶ 38 ("In 2007, Mr. Donziger made several references in emails to my assistants at KSG and me regarding a second bank account at Banco Pichincha. (PX 897, 916, 965, 968, 984). PX 897, 916, 965, 968, and 984 are true and correct copies of emails from Mr. Donziger to my assistants and me requesting transfers to this second bank account.").

- Tr. 259:20-260:1 (Bogart) ("Burford was relying unquestionably on the representations from both Mr. Donziger and Patton Boggs about a set of facts that turned out not to be true.").

- Tr. 826:17-22 (Dahlberg) ("Q. What sort of activities was he directing? A. I think, basically, it was more direction about expenditures. So, in other words, money getting expended for, you need $50,000 to Selva Viva or $60,000 for Frente or something like that. Those are the types of things that I saw that Mr. Donziger was directing flows of funds.").

- Tr. 2295:8-12 (Ponce) ("Q. Did you understand how the litigation was being funded? A. Yes. Q. How was the litigation being funded? A. At the time I was in the case, it was funded by the law firm of Joseph Kohn.").

- Tr. 2528:10-22 (Donziger) ("What is the name of the funding firm that agreed to fund the Lago Agrio plaintiffs' litigation this past spring? A. Woodsford. Q. And can you tell the Court how much money Woodsford has agreed to provide to fund the Lago Agrio plaintiffs' litigation? . . . A. $2.5 million.").

- Tr. 2606:11-13 (Donziger) ("Q. And, sir, am I correct that you personally met with Woodsford prior to the execution of that funding agreement? A. I met with individuals in Woodsford, yes.").

22.     **Donziger and other members of the LAP team made misrepresentations and material omissions to third-party investors regarding the LAP team's relationship with Cabrera and the ghostwriting of the Cabrera report with the intent that the investors would rely on those misrepresentations and material omissions in their decision to provide funding.**

- PX 1032 at 2 (4/4/2008 email from Donziger to J. Kohn forwarding press release stating "Cabrera is paid directly by the court . . . as is customary and required in Ecuador.").
- PX 1043 (6/29/2008 email from D. Beltman to J. Kohn regarding "approval for upcoming work," containing misrepresentations about Stratus work and seeking funding).
- PX 1201 at 2, 4 (12/26/2009 email from Donziger to S. Seidel attaching a memo asserting Cabrera's independence).
- PX 1290 at 2 (4/13/2010 letter from J. Kohn to P. Fajardo, J. Saenz, and L. Yanza: "We have no knowledge of what he is talking about except what Steven has now reluctantly told us: that it involves communications with Cabrerra [sic], something that surprised us and that we find quite disturbing if true.").
- PX 1312 at 1-2 (5/3/2010 email string forwarded by J. Kohn to C. Hillwig and N. Glazer, in which Fajardo tells Kohn that the LAPs did, in fact, submit material to Cabrera).
- PX 1406 at 1 (8/9/2010 letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje and E. Criollo: "I am also shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera . . . Not only did we not know of any of this conduct, it is contrary to assurances that Donziger and you made to us on numerous occasions.").
- PX 1424# at 1 (8/25/2010 email from A. Will to P. Benzian attaching the Invictus memo).
- PX 1476 at 3 (2/21/2011 email from D. Willis to C. Bogart and M. Woodall copying W. Del Mul, attaching letter from Treca to Donziger, Fajardo Yanza and the Frente: "[W]e also note that very serious allegations of fraud and other misconduct have been made that appear to contravene directly the representations made to the Funder . . . .").
- PX 1488 at 2-3 (9/23/2011 email from C. Bogart to Donziger, J. Tyrrell, and W. Carmody, attaching letter: "[W]e believe that you and particularly your US representatives engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding from Treca . . . .").
- PX 2559 (1/3/2010 email from John Wotowicz to N. Economou: "[A]gree with you [N. Economou] to keep Selvyn [Seidel] at some distance from the 'realities' of this situation. I would not want it to get out that the case is in 'trouble'.").
- PX 3100 (Bogart) ¶ 13 ("There is absolutely no question that Burford would not have invested in the Litigation . . . had we known the whole truth about Cabrera."); *id.* ¶ 38 ("[T]he LAPs' representatives, including their counsel, Steven Donziger and Patton Boggs, misled Burford by making at least the following specific misrepresentations: '(1) that [their] ex parte communications with Cabrera were

limited, (2) that they were lawful under Ecuadorian law, and (3) that Chevron's suggestions to the contrary were false.'").

- PX 5600 (Kohn) ¶ 69 ("In addition to falsehoods about Mr. Cabrera, the Ecuadoran plaintiffs' team's contacts with him and the role that Stratus and the Ecuadoran plaintiffs' team played in writing Mr. Cabrera's report, Mr. Donziger misrepresented facts to me, omitted material facts in his communications with me, and was generally dishonest with me about the manner in which he was managing the Ecuadoran litigation."); *id.* ¶ 70 ("I believe that Mr. Donziger made these material false statements and material omissions to me to defraud me and KSG because he knew that if he were to tell me the truth about Mr. Cabrera and other misconduct, I would have sought to remove him from the case, or, failing that, KSG would have stopped funding the litigation."); *id.* ¶ 80 ("Had I been told the truth about Mr. Cabrera, KSG would not have participated in or funded the Ecuadoran plaintiffs' efforts in preparing the Cabrera Report and bribing Mr. Cabrera.").

- Tr. 225:17-22 (Bogart) ("[A.] There is no question that this Court's lengthy opinion in connection with the grant of the preliminary injunction certainly informed Burford's thinking, yes. Q. Is it your testimony that as of March 7, 2011, Burford entertained the belief that it had been misled as of that date? A. Yes.").

- Tr. 257:3-8 (Bogart) ("Q. Mr. Bogart, do you believe that Donziger and Patton Boggs misled you by suggesting that ex parte meetings and communications are lawful in Ecuador? A. I certainly believe that we were misled about the quantity and nature of the ex parte communications that appear to have occurred here.").

- Tr. 259:19-260:6 (Bogart) ("Q. Which particular facts are you referring to? A. Well, I think we've just been discussing, for example, the Cabrera report. And it is, you know, I think it has been made clear through both my testimony and the documents in the case it was unquestionably Burford -- Burford was relying unquestionably on the representations from both Mr. Donziger and Patton Boggs about a set of facts that turned out not to be true. Q. What particular representation was Mr. Donziger saying that Mr. Burford -- that Burford was relying upon with respect to the Cabrera report, can you be more specific? A. As I've already said that whatever contacts had occurred with Cabrera, they were both permissible and limited.").

23.     **Third-party investors provided funds to the LAP team on the basis of the misrepresentations and material omissions made to them regarding Cabrera by the LAP team and agents of the LAP team.**

- PX 1043 (6/29/2008 email from D. Beltman to J. Kohn, containing misrepresentations about Stratus work and seeking funding).
- PX 1201 at 2, 4 (12/26/2009 email from Donziger to S. Seidel attaching a memo asserting Cabrera's independence).
- PX 1290 at 2 (4/13/2010 letter from J. Kohn to P. Fajardo, J. Saenz, and L. Yanza: "We have no knowledge of what he is talking about except what Steven has now reluctantly told us: that it involves communications with Cabrerra [sic], something that surprised us and that we find quite disturbing if true.").
- PX 1405R at 1 (7/19/2010 email from E. Westenberger to F. Schwitter and S. Seidel of Burford, copying J. Tyrrell, attaching Cabrera materials, holding out Cabrera as appointed independently).
- PX 1406 at 1 (8/9/2010 letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje and E. Criollo: "I am also shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera . . . Not only did we not know of any of this conduct, it is contrary to assurances that Donziger and you made to us on numerous occasions.").
- PX 1407 at 1 (8/10/2010 email from A. Small to Burford, copying Donziger and Patton Boggs attorneys, attaching Invictus memo, which contains many misrepresentations and omissions regarding Cabrera).
- PX 1476 at 3 (2/21/2011 email from D. Willis to C. Bogart and M. Woodall copying W. Del Mul attaching letter from Treca to the LAPs: "[W]e also note that very serious allegations of fraud and other misconduct have been made that appear to contravene directly the representations made to the Funder . . . .").
- PX 1488 at 2-3 (9/23/2011 email from C. Bogart to Donziger, J. Tyrrell, W. Carmody attaching letter: "[W]e believe that you and particularly your US representatives engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding from Treca . . . .").
- PX 1156 (9/4/2009 email from Donziger rejecting Kohn's request for an internal investigation: "Neither I, nor the legal team in Quito, will cooperate with such an investigation nor continue working with a firm that insists on doing such an investigation.").
- PX 2133 (timeline of Burford's investment and the LAP team's fraudulent misrepresentations to Burford).
- Donziger Dep. 3235:23-3239:9 (Donziger testifying that he did not recall or know whether Burford was informed of Stratus's role, Calmbacher and Russell).
- Donziger Dep. 3896:6-10 ("Q. Have you had communications with anyone from the Burford Group about the role that Stratus played in connection with the Cabrera report?   A. No.").
- Donziger Dep. 3902:20-22 (Donziger testifying that "[t]here is an Invictus memo that I think was the primary thing [Burford] used to make their decision.").

- PX 3100 (Bogart) ¶ 18 ("Burford relied upon the representations made by Patton Boggs and Donziger that the contacts between the LAPs' representatives and Cabrera were limited and permissible under Ecuadorian law, and that Chevron's fraud allegations were exaggerated and unfounded. These representations by Patton Boggs and Donziger were material to Burford's decision to enter into the Funding Agreement."); *id.* ¶ 21 ("Those representations were material to Burford's decision to fund, and Burford would not have entered into the Funding Agreement had Burford known that those representations were false.").

- PX 4900 (Dahlberg) ¶ 40 (discussing DeLeon's investment: "The agreement explicitly stated that . . . the LAPs will ensure that 'the Litigators at all times maintain accurate and complete accounting and other financial records in respect to the Case Fund.' . . . It does not appear that Donziger established a separate "Case Fund" account, and, instead, commingled DeLeon's investment funds with funds from other sources into the Law Firm Account.").

- PX 5600 (Kohn) ¶ 32 ("[K]nowing that Stratus wrote the Cabrera Report in English and translated it into Spanish, I find it misleading that Mr. Beltman requested reimbursement for translating the same report back into English."); *id.* ¶43 ("I gave one interview, which appeared on television news, in which I repeated that Mr. Cabrera was 'the judge's independent expert.' . . . I did so based on Mr. Donziger's many statements to me and others that Mr. Cabrera was an independent expert acting at the direction of the Ecuadoran court."); *id.* ¶ 69 ("I have come to learn from various public filings, emails, declarations, depositions, videos, and reports that Mr. Donziger lied to me about a number of aspects of the Ecuadoran litigation."); *id.* ¶ 70 ("I believe that Mr. Donziger made these material false statements and material omissions to me to defraud me and KSG because he knew that if he were to tell me the truth about Mr. Cabrera and other misconduct, I would have sought to remove him from the case, or, failing that, KSG would have stopped funding the litigation."); *id.* ¶ 79 ("Indeed, I was repeatedly assured that nothing untoward was going on. These are all omissions by Mr. Donziger that I consider material, and had I been aware of them, KSG would not have continued to be involved in or fund these efforts.").

- Tr. 225:17-22 (Bogart) ("[A.] There is no question that this Court's lengthy opinion in connection with the grant of the preliminary injunction certainly informed Burford's thinking, yes. Q. Is it your testimony that as of March 7, 2011, Burford entertained the belief that it had been misled as of that date? A. Yes.").

- Tr. 257:3-8 (Bogart) ("Q. Mr. Bogart, do you believe that Donziger and Patton Boggs misled you by suggesting that ex parte meetings and communications were lawful in Ecuador? A. I certainly believe that we were misled about the quantity and nature of the ex parte communications that appear to have occurred here.").

- Tr. 259:23-260:1 (Bogart) ("Burford was relying unquestionably on the representations from both Mr. Donziger and Patton Boggs about a set of facts that turned out not to be true.").

- Tr. 261:3-18 (Bogart) ("[Q.] What particular Crude outtakes, sir, are inconsistent with representations in the Invictus memo? A. I'm not sure how I identify outtakes to you. I suppose I have two sets of knowledge about the outtakes. One was a small number of outtakes that were available on the American Lawyers website;

and then there were yet more, to my recollection, outtakes that were exhibits to or described in this Court's decision in March of 2011, if I'm not mistaken about the date. And the Invictus memo was perfectly clear about the outtakes.  And it was a topic discussed at some length in that memo in which we were told that the outtakes that were the subject of what was at that point Chevron's allegations represented a mere less than .1 percent of the total volume of outtakes and, indeed, that the overall view of the outtakes was that they supported the plaintiff's position and contradicted Chevron's.").

- Tr. 1439:17-24 (Kohn) ("I did not spend time on the detail of the litigation, the motion practice. I relied upon your [Donziger's] information and reports. I relied on the progress that was being made in the case. The inspections were going forward. The inspections were ultimately completed. And I did not get involved in reviewing particular pleadings or motions up until sort of the beginning of 2009 when our firm did make some requests repeatedly to be more involved in those issues.").

- Tr. 1454:3-12 (Kohn) ("[Q.] And other than what you could glean from what others would tell you, you had no personal knowledge of how day-to-day decisions were being made in Ecuador with regard to the Aguinda litigation, correct? A. That is correct. You know, we reposed tremendous confidence -- I did personally -- in your [Donziger's] abilities and your integrity and your supervision of the matter. We would receive reports, and the case was progressing as reported. And there was litigation in the U.S. that had been spawned by that, which we reviewed those materials as well.").

24.     The LAP team used money obtained from third-party investors to fund activities that were intended to, and did, injure Chevron, including (a) obtaining, by corrupt means, a judgment in the Lago Agrio litigation to use to extort a payment from Chevron in the United States, (b) litigation in the United States to prevent discovery and disclosure of fraudulent activity performed in the United States and elsewhere in obtaining the Lago Agrio judgment, and (c) the campaign to use pressure to coerce Chevron to settle.

- PX 4900 (Dahlberg) ¶¶ 35-38 (analysis of KSG contributions); ¶¶ 39-46 (analysis of DeLeon contributions); *id.* ¶¶ 47-53 (analysis of Burford contributions); *id.* ¶¶ 59-64 (analysis of disbursements to Donziger and his law offices); *id.* ¶¶ 65-73 (analysis of disbursements to U.S. counsel, including Page, Patton Boggs, Emery Celli, and Motley Rice); *id.* ¶¶ 74-76 (analysis of disbursements to Ecuadorian Counsel, including Fajardo, Saenz, Prieto, Ponce, and Wray); *id.* ¶¶ 77-78 (analysis of disbursements to Selva Viva); *id.* ¶¶ 80-88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR); *id.* ¶¶ 89-94 (analysis of disbursements to PR-related individuals and entities, including Hinton); *id.* ¶¶ 95-100 (analysis of disbursements related to the production of *Crude*); *id.* ¶¶ 101-106 (analysis of disbursements to NGOs, including the Frente, Amazon Watch, and RAN); *id.* ¶¶ 107-112 (analysis of disbursements to lobbyists, including Barnes and Lehane); *id.* ¶¶ 114-122 (analysis of payments to Cabrera, Stratus, Reyes and Villao in relation to the drafting of the Cabrera report); *id.* ¶¶ 123-124 (analysis of payments to Guerra).

- PX 5600 (Kohn) ¶ 34 ("KSG paid for various other consultants in connection with the Ecuadoran litigation.  Our records reflect that Fernando Reyes was paid $3,000 in connection with the Ecuador litigation."); *id.* ¶ 39 ("In response to an email from my assistant asking why the transfer should be made to this second account, Mr. Donziger stated that the reason for making these payments into a different account was because these payments involved 'separate case-related piece[s] of work that [are] being run by the Frente.  The Frente created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente controls Selva Viva.  This separate account will be used for [the] same purpose under the same control of the Frente and Yanza, and will be accounted for the same way with receipts.'" (quoting PX 897); *id.* ¶ 43 ("The Ecuadoran plaintiffs' team planned and executed a significant media campaign around the filing of the Cabrera Report.  My firm covered the costs of that campaign.  That campaign prominently featured the idea that Mr. Cabrera was an 'independent,' court-appointed expert, who found Chevron liable for billions of dollars in damages in Ecuador.").

- PX 581, 584, 586, 641 (exhibits showing KSG's contributions to the litigation and Donziger's control of the funds).

- PX 552 at 3 (11/3/2010 email from Bogart confirming funding of Patton Boggs' London account).

- PX 586 at 185 (online transfer of $1.25 million from Donziger's Law Firm Account to the Ecuador Case Account).

- PX 586 at 187 (transfer of money from Ecuador Case Account to various LAP team members).
- PX 586 at 223, 235 (Patton Boggs transfer to Donziger's Law Firm Account; transfer from Law Firm Account to Selva Viva and Hinton).
- PX 2145 (demonstrative showing flow of investor funds through Donziger IOLA accounts).
- PX 2146 (demonstrative showing flow of funds to Selva Viva through Donziger's IOLA and personal accounts).
- PX 2147 (demonstrative showing categories of financial disbursements by the LAP team).

III.    **The LAP Team's Complex Financial Transfers, Arrangements, and Distributions**

25.    **Donziger has caused transfers of money into and out of the United States in furtherance of the LAP team's unlawful activities.**

- Appendix 2 (Table identifying transfers into and out of the United States caused by Donziger and made in furtherance of the LAP team's unlawful activities).
- PX 586 (Donziger bank statements).
- PX 641 (summary of KSG expenses incurred between 2003 and 2009).
- PX 2145 (demonstrative showing flow of investor funds through Donziger IOLA accounts).
- PX 2146 (demonstrative showing flow of funds to Selva Viva through Donziger's IOLA and personal accounts).
- PX 7701 (charts produced by Donziger summarizing case expenditures).
- PX 4900 (Dahlberg) ¶¶ 35-38 (analysis of KSG contributions); ¶¶ 39-46 (analysis of DeLeon contributions); *id.* ¶¶ 47-53 (analysis of Burford contributions); *id.* ¶¶ 59-64 (analysis of disbursements to Donziger and his law offices); *id.* ¶¶ 65-73 (analysis of disbursements to U.S. counsel, including Page, Patton Boggs, Emery Celli, and Motley Rice); *id.* ¶¶ 74-76 (analysis of disbursements to Ecuadorian Counsel, including Fajardo, Saenz, Prieto, Ponce, and Wray); *id.* ¶¶ 77-78 (analysis of disbursements to Selva Viva); *id.* ¶¶ 80-88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR); *id.* ¶¶ 89-94 (analysis of disbursements to PR-related individuals and entities, including Hinton); *id.* ¶¶ 95-100 (analysis of disbursements related to the production of Crude); *id.* ¶¶ 101-106 (analysis of disbursements to NGOs, including the Frente, Amazon Watch, and RAN); *id.* ¶¶ 107-112 (analysis of disbursements to lobbyists, including Barnes and Lehane); *id.* ¶¶ 114-122 (analysis of payments to Cabrera, Stratus, Reyes and Villao in relation to the drafting of the Cabrera report); *id.* ¶¶ 123-124 (analysis of payments to Guerra).
- PX 5600 (Kohn) ¶ 9 ("During those nearly seven years, the firm paid over $6 million in litigation expenses.  This included the $1.1 million that we provided to Mr. Donziger for legal services and expenses, $1.1 million that we paid to U.S. consultants, and $2.2 million that we transferred by wire from bank accounts in the United States to bank accounts in Ecuador."); *id.* ¶ 31 ("Between 2007 and 2009, KSG paid more than $1 million to Stratus based on Mr. Donziger's approval of their work.").
- PX 3200 (Russell) ¶ 36 ("Donziger instructed me how to distribute the money from the GEO Ecuador account.  He instructed me to direct payments to Amazon Watch, Luis Yanza of the Frente, and public relations firms assisting the Ecuadorian plaintiffs' team.  [PX0696; PX0698; PX0701; PX0704].").

26.     **The LAP team created a "waterfall" distribution system that prioritizes the claims of funders and the LAP team lawyers and agents, above those of the LAPs themselves or the people of the Oriente, in the event that the Lago Agrio judgment is enforced.**

- Appendix 3 (Lago Agrio Judgment Distribution Tables).
- PX 400 at 186-187 (ordering creation of a trust for the judgment proceeds to be administered by the LAP team).
- PX 412 (filing by Fajardo in Lago Agrio litigation notifying Ecuadorian court of creation of trust for judgment proceeds and requesting that proceeds be directed to that trust).
- PX 552 at 56-58 (intercreditor agreement subjecting any funding and service agreements to the distribution waterfall).
- PX 2151 (demonstrative of potential recovery of the LAP team, showing no recovery for any individual LAPs).
- PX 2152 (summary chart of the potential distributions to funders, attorneys, and advisors under the judgment distribution waterfall described in the intercreditor agreement (PX 552)).
- PX 1063 at 1 (the LAP team requested that the Frente receive an additional amount equal to 10% of the judgment (a fact that Donziger thought "best if Chevron did not know" out of concern that it "could harm the image" of the litigation)).
- PX 4900 (Dahlberg) ¶¶ 138-83 (analysis of the "waterfall" distribution showing the LAP team's priority of claims).

27.     **The LAP team has structured its financial arrangements so that any funds obtained from Chevron outside of Ecuador will not be transferred into Ecuador at least until the claims of LAP team's investors, lawyers, and other agents have been satisfied, and possibly not at all.**

- PX 400 at 186-187 (ordering creation of a trust for the judgment proceeds to be administered by Defendants).
- PX 412 at 1 (filing by Fajardo in Lago Agrio litigation notifying Ecuadorian court of creation of trust for judgment proceeds and requesting that proceeds be directed to that trust).
- PX 552 at 48-73 (intercreditor agreement reflecting that the trust would be under the exclusive control of a trustee the LAP team approved).
- PX 1447 (10/12/2010 email laying out plans to "keep the proceeds out of Ecuador").
- PX 1527R at 30-31 (Invictus memo: "[A]rranging for receipt of any funds recovered against the judgment through payment agents in the United States and thereafter dividing those funds outside the Republic of Ecuador" would "have the practical effect of keeping the funds outside the immediate reach of Ecuadorian law upon recovery and would permit any adjudication of fee splitting to take place in a carefully considered forum.").
- PX 4900 (Dahlberg) ¶ 184 ("The creation of Amazonia Recovery Limited in Gibraltar appears to be consistent with the statements in the Invictus memorandum regarding collecting and distributing proceeds from the Judgment outside of Ecuador.").
- Tr. 2427:20-2428:13 (J. Piaguaje) ("Q.  Did you participate in any discussion with Mr. Fajardo or others at the asamblea that any money received from the Lago Agrio Chevron judgment would be managed in a trust outside of Ecuador? A.  No, in Ecuador itself. . . . Q.  Who told you that any money received from the Lago Agrio Chevron judgment would be managed in a trust in Ecuador itself? A.  Well, we have the coordinators.  You have Luis Yanza and you have Humberto Piaguaje as coordinators, and they inform us of what is going on, because for my part I don't know anything about this so they inform us.").

IV.   **The LAP Team Relied on and Exploited the Weak and Corrupt Ecuadorian Legal System**

28.   **Since his election in 2006, Ecuadorian President Rafael Correa, through intimidation tactics and extensive restructuring of the entire Ecuadorian government, has effectively assumed control of the Ecuadorian judiciary, and that judiciary does not act impartially or with integrity.**

- PX 394 at 1 (Official Circular by A. Mera, Legal Counsel to the Office of the President of the Republic of Ecuador, announcing that suits for damages will be filed against a judge "who cause[s] suspension or delay" by interfering with public works).
- PX 993 at 1, 4-5, 7 (U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices – Ecuador for 2007).
- PX 1093 at 2 (World Bank Institute, Worldwide Governance Indicators, 2010).
- PX 1449 (Sanctions or jail for those criticized by Correa in broadcast, EL UNIVERSO, Oct. 27, 2010).
- PX 1499 ('Meddling with the judiciary' has given the Administration an advantage, EL COMERCIO, Dec. 4, 2012).
- PX 4300X (Callejas) ¶ 105 ("During the past ten years, the increasing political power of the Executive Branch has impeded the impartiality and independence of the Ecuadorian judiciary and threatened the Rule of Law.").
- PX 4700 (Elena) ¶ 25 ("In 2008, after President Correa was elected president of Ecuador, a new constitution was enacted. Article 182 of the new Constitution established nine-year tenure at the renamed 'National Court' (formerly the Supreme Court). The number of justices was reduced from 31 to 21 members, and a system was put in place whereby one third of the members would change every three years."); *id.* ¶ 27 ("In 2011, President Correa sought to reform the Judicial Council and reduce its size from nine members to three members. Each of the three members was appointed by a government body that is under President Correa's control: the Executive Branch, the Legislative Branch (where President Correa's party holds a majority), and the Transparency and Social Control Branch."); *id.* ¶ 32 ("The existence during the period that I have studied of five entirely different Supreme Courts, four different Judicial Councils, and two different Constitutions, along with political interference, destabilized the judiciary in Ecuador. These facts alone allow me to conclude that the Ecuadorian judicial system is not independent or impartial."); *id.* ¶ 37 ("In my opinion, Ecuadorian judges are not free from undue influence, particularly from the executive branch of government, and particularly over the past ten years.").

29.     **Since 2006, United States government authorities, quasi-governmental entities, and private organizations that evaluate government performance have identified the Ecuadorian judicial system as corrupt and lacking independence.**

- PX 993 at 1, 4-5, 7 (U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices – Ecuador for 2007).
- PX 1093 at 2 (World Bank Institute, Worldwide Governance Indicators, 2010).
- PX 1108 at 1, 3-5 (U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices – Ecuador, for 2008).
- PX 1252 at 1, 4-5 (U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices – Ecuador for 2009).
- PX 1486 at 3 (excerpt from the U.S. Department of State County Reports on Terrorism 2010: Western Hemisphere Overview, Aug. 18, 2011).
- PX 1500 (Final Report of the International Oversight Committee of Judiciary Reform in Ecuador, Dec. 13, 2012).
- PX 4700 (Elena) ¶ 42 ("The lack of judicial independence in Ecuador can be seen in all of the most internationally recognized indices that address this issue."); *id.* ¶ 67 ("According to internationally recognized indices, evidence of corruption within the legal and judicial system of Ecuador is overwhelming."); *id.* ¶ 89 ("The lack of transparency and barriers to access to judicial information in Ecuador create an opaque environment, which is a fertile ground for corruption. My conclusion is supported by the most relevant international indices related to judicial corruption, and my analysis of relevant judicial practices."); *id.* ¶ 105 ("Every relevant indicator and index demonstrates the lack of independence and the existence of corruption in the Ecuadorian judicial system, often in extreme degrees. Indeed, in all 17 indices and indicators on which I relied, Ecuador's scores were at the bottom of the rankings.").

30.    **Defendants, their co-conspirators, and their expert witnesses in this case have identified the Ecuadorian judicial system as corrupt and lacking independence.**

- PX 3A (Crude Clip: "And really mobilizing the country politically, so that no judge can rule against us and feel like he can get away with it in terms of his career.").

- PX 4A (Crude Clip: "[W]e're gonna confront [the judge] . . . and let him know what time it is. … I mean, this is just out of bounds.  Both in terms of judicial behavior and what -- what lawyers would do.  But Ecuador, you know, there's almost no rules here.  And this is how the game is played. It's dirty.").

- PX 5A (Crude Clip: "And, the only language that I believe, this judge is gonna understand is one of pressure, intimidation and humiliation. … It's, it's dirty. I hate it. Hate it, but it's necessary.").

- PX 7A (Crude Clip: "I mean, I've never seen such utter weakness. It's the same kind of weakness that leads to corruption.").

- PX 8A (Crude Clip: "[I]t represents the fact that the judicial system here is so utterly weak…like the only way you can secure a fair trial is if you do things like that, like go in and confront the judge with media around, and fight and yell and scream and make a scene …. And it's that very weakness that … lets people corrupt the process.").

- PX 9A (Crude Clip: "All the judges here are corrupt. … They're all corrupt. It's…it's their birthright to be corrupt.").

- PX 20A (Crude Clip: "So, we are in a significantly improved position, uhm, because of that election result. . . .").

- PX 33A at 5 (Crude Clip: "You talk to influential people who talk to the judge. You know?  It is the most ridiculous legal culture. … You're still dealing with hundreds of years of encrusted judicial weakness and corruption.").

- PX 43A (Crude Clip: "[A]t the end of the day, there's a thousand people around the courthouse, you're gonna get what you want.").

- PX 63A at 2 ("I think it's indeed necessary for us to organize pressure demonstrations at the court and vigilance.").

- PX 67A at 3 ("[I]t's a problem of institutional weakness in the judiciary, generally, and of this court, in particular. We have concluded that we need to do more, politically, to control the court, to pressure the court. We believe they make decisions based on who they fear the most, not based on what the law should dictate.").

- PX 68A at 2 ("Big march that we make our own army.  Private [army].").

- PX 76A at 2 ("So, you know, if we're gonna choose to do things, we need to do the things the judge is gonna really feel. Like the President of the country calling him out, you know.").

- PX 77A (Crude clip: "[A]ll this bullshit about the law and facts . . . . But in the end of the day it is about brute force; who can apply the pressure and who can withstand the pressure.  And can you get them to the breaking point.").

- PX 81A (Crude Clip: "Donziger: He'll be killed. … He might not be, but he'll think – he thinks he will be. …. Which is just as good.").

- PX 179 at 3 (3/11/2006 entry in Donziger personal notes: "But I keep thinking of what Mateo told me - the only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us. Given the morality or immorality of Ecuador's justice system, that type of comment did not even shock me. It is part of the rules of the game here.").

- PX 181 (5/31/2006 entry in Donziger personal notes: "On the other hand, we can [have] mediocre proof and a good political plan and stand a good chance of winning.").

- PX 184 at 2 (7/25/2006 entry in Donziger personal notes: "At which pt I launched into my familiar lecture about how the only way the court will respect us is if they fear us - and that the only way they will fear us is if they think we have come [sic] control over their careers, their jobs, their reputations - that is to say, their ability to earn a livelihood.").

- PX 803 at 1 (10/19/2006 email from Donziger to E. Moe: "Of course, it be [sic] great to be able to say the judiciary is independent and it won't matter who gets elected. Ecuador unfortunately has no such luxury.").

- PX 841 at 1 (3/20/2007 email from Donziger: "The press release portrays Correa and his government as meddling in the case in our favor. … The idea that he's 'helping us' with evidence is terrible for the case's image. It looks like the case is more of a circus than justice.").

- PX 844 (3/21/2007 email from Yepez: "[CORREA] ASKED THE ATTORNEY GENERAL TO DO EVERYTHING NECESSARY TO WIN THE TRIAL … HE EVEN SAID THAT HE WOULD CALL THE JUDGE.").

- PX 872 at 1 (6/13/2007 email in which Donziger instructs Yanza and Fajardo to "inform the judge now that we're going to have the big march and maybe ask for his recusal during that march so that he'll get scared now.").

31.     **The Ecuadorian judicial system is corrupt and it is not independent from the other branches of the Ecuadorian government.**

- *See supra* supporting evidence for Proposed Findings of Fact 32-34.
- PX 1234 at 4 (2010 U.S. State Department Investment Climate Statement noting that "[c]oncerns have been raised in the media and by the private sector that Ecuadorian courts may be susceptible to outside pressure and are perceived as corrupt, ineffective, and protective of those in power.").
- PX 1100 at 2 (2009 U.S. State Department Investment Climate Statement noting that "[s]ystemic weakness and susceptibility to political or economic pressures in the rule of law constitute the most important problem faced by U.S. companies investing in or trading with Ecuador.").
- PX 4700 (Elena) ¶ 67 ("According to internationally recognized indices, evidence of corruption within the legal and judicial system of Ecuador is overwhelming."); *id.* ¶ 89 ("The lack of transparency and barriers to access to judicial information in Ecuador create an opaque environment, which is a fertile ground for corruption. My conclusion is supported by the most relevant international indices related to judicial corruption, and my analysis of relevant judicial practices."); *id.* ¶ 105 ("Every relevant indicator and index demonstrates the lack of independence and the existence of corruption in the Ecuadorian judicial system, often in extreme degrees.  Indeed, in all 17 indices and indicators on which I relied, Ecuador's scores were at the bottom of the rankings.").
- PX 6200 (Alvarez) ¶ 4 ("In my opinion, the Ecuadorian judicial system does not provide impartial, independent tribunals . . . .").
- PX 1496 at 2 (International Assessment and Strategy Center report concluding that "the judiciary in Ecuador is almost universally seen as corrupt and, in recent years, increasingly compliant with the wishes of the executive.").

32.     **Judge Zambrano engaged in corruption as a prosecutor and as a judge, both
          before and after he issued the Lago Agrio judgment.**

- PX 251 (Filing by R. Vera with the Prosecutor General's Office, and an English
  translation thereof) (criminal complaint against Zambrano).
- PX 263 (Filing by L. Valladolid with the Prosecutor General's Office and an
  English translation thereof) (criminal complaint against Zambrano).
- PX 411 (2/29/2012 dismissal order removing Zambrano from the court for
  releasing drug trafficker without explanation).
- PX 2495 (article regarding the case noting that the drug trafficker that Zambrano
  released was associated with the Colombian guerilla organization FARC and was
  trafficking 8.3 tons of cocaine).

33.     Since the election of Rafael Correa in 2006, the government of Ecuador has
        actively supported the LAP team, with Correa personally declaring that he
        wants the LAPs to win, offering to do everything necessary for the LAPs to
        win the trial, including calling the judge, and attacking Chevron as an
        "enemy of the country" and those who represent it "traitors."

- PX 841 (3/20/2007 email from Donziger: "The press release portrays Correa and
  his government as meddling in the case in our favor. . . . The idea that he's
  'helping us' with evidence is terrible for the case's image. It looks like the case is
  more of a circus than justice.").
- PX 844 (3/21/2007 email from Yépez: "[CORREA] ASKED THE ATTORNEY
  GENERAL TO DO EVERYTHING NECESSARY TO WIN THE TRIAL. . . . HE
  EVEN SAID THAT HE WOULD CALL THE JUDGE.").
- PX 1149 (On 7/4/2009, Correa stated in his weekly presidential radio address that
  he "really loathe[s] the multinationals . . . Chevron-Texaco would never dare do in
  the United States what it did in Ecuador.").
- PX 2494 at 2 (Correa: "Of course I want our indigenous friends to win[.]").
- PX 7511 (Correa has called Chevron an "enemy of the country.").
- PX 7539 (Correa: Ecuadorian lawyers and academics supporting Chevron are
  "[t]he nation's traitors").
- PX 484# (On March 20, 2007, members of the LAP team met with Correa and he
  offered "all the endorsement of the National Government to [the] Assembly of
  Affected by the oil company Texaco.").
- PX 2524 (9/2/2009 email chain between Sáenz and Donziger re "Chevron Charged
  With Dirty Tricks in Ecuador") at 1 (following the Nunez bribery solicitation
  scandal, Sáenz wrote to Donziger and assured him that the Front's "sources at the
  government tell us they're actively looking for [Ecuadorians involved in the
  scandal], to cut their heads off. We should focu[s] on [the Americans involved],
  since they're the Chevron stooges. Correa and his cronies will take care of the
  rest.").
- PX 490# (4/28/2007 article, "Correa se declara 'indignado' por daños en la
  Amazonía causados por Texaco" ["Correa Says He is 'Furious' About the Damage
  Texaco caused in the Amazonian Region"], EFE) at 1 (in a national radio address,
  President Correa echoed the RICO Defendants' rhetoric, calling Chevron's
  Ecuadorian lawyers traitors and demanding that they, along with the Petroecuador
  officials who signed the 1998 Final Release, be criminally prosecuted).
- PX 1103 (certified translation of 2/4/2009 email exchange between Donziger and
  Sáenz re "RE: New Press Release/important") at 1 (Sáenz writes Donziger that
  there is "pretty much irrefutable evidence of us collaborating with the
  [government] to get Reis Veiga and Perez convicted.").
- PX 8018 at 5 (amicus brief in support of the LAPs' request to cancel the judicial
  inspections signed by a member of Correa's staff, Gustavo Larrea).
- Jeanneth Valdivieso, *Ecuador Names 1st Female Defense Chief*, Washington Post,
  Dec. 27, 2006 ("On Wednesday, [Correa] chose his campaign manager, Gustavo
  Larrea, to be interior minister. Larrea will be tasked with a national referendum on

a special assembly to draft a new constitution, a process similar to one underway in Bolivia under leftist President Evo Morales.").

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 26-31 (admitting that Donziger and other members of the LAP team had numerous meetings with Republic of Ecuador officials regarding the Lago Agrio litigation and the criminal prosecutions, including President Correa, Correa's legal advisor Alexis Mera, multiple Attorneys General, staff members in the office of the Attorney General, and the ROE's attorneys at Winston & Strawn).

- Donziger Dep. 742-860; 1484-1486; 1635-1641; 2029-2044; 4355-4356; 4444-4453; 4648-4650 (testifying that Donziger and other members of the LAP team had numerous contacts with Republic of Ecuador officials regarding the Lago Agrio litigation and the criminal prosecutions).

34.     **The LAP team exploited the corruption in the Ecuadorian legal system to pressure the Ecuadorian court and the Prosecutor General to bring bogus criminal charges against Chevron attorneys Ricardo Reis Veiga and Rodrigo Pérez Pallares.**

- PX 3000 (Veiga) ¶¶ 62, 79.
- PX 489# (after touring the former concession area with members of the LAP team, Correa issued a press release the same day demanding the criminal prosecution of the Ecuadorian officials who had signed the 1998 Final Release).
- PX 75A (Crude clip: President Correa also encouraged Pablo Fajardo to pressure the Prosecutor General (who had opined that criminal charges should be dismissed) because the Prosecutor General was "a little nervous . . . [b]ecause . . . the political forces of the National Congress have changed, that is, he is afraid of being removed" and that if Fajardo and the Defendants' allies "put in a little effort at the Public Prosecutor's Office, the [Prosecutor] will yield, and will re-open that investigation into the fraud . . . .").
- PX 358 at 3; PX 259 at 10; PX 261 at 12; PX 3000 (Veiga) ¶ 96 (When the Prosecutor General did not yield to the political pressure of the LAPs and President Correa, he was removed in the first act of Correa's new Constituent Assembly and replaced by Dr. Washington Pesántez—Correa's college roommate and the district prosecutor who had recommended the dismissal of the criminal charges twice before).
- PX 992 (Within a few months, the new Prosecutor General agreed to meet with Pablo Fajardo, who informed Donziger, "we are insisting that he reopen the criminal investigation against Texaco for the remediation.").
- PX 1067 (the LAP team and their allies pressured court staff and the Prosecutor General to bring formal charges, with Fajardo wondering "if it's possible to put on more pressure at [the] Court Monday or Tuesday").
- 12/1/2010 Donziger Dep. 408:5-14 ("I personally, and I think this was shared by other members of our team, our current team, I don't know if this would include Mr. Bonifaz, felt it appropriate to call to the attention of government officials the elements of what we believed were the fraud involving Texaco's earlier remediation."), 454:19-455:4 ("Q. From your perspective, during that period of time, 2005 to 2008, did you think that that publicity regarding the criminal investigation of Mr. Veiga and/or Mr. Pallares would help you or hurt you in your effort to get a bigger settlement from Chevron in the civil case?     A. I think as a general matter we were trying to put pressure on Chevron through various means.").
- 12/8/2010 Donziger Dep. 724:14-18 ("Q. And did you consult with Mr. Avila for the specific purpose of trying to pursue the criminal case against Mr. Veiga and Mr. Pallares?     A. I believe I did, yes.").
- 12.23.2010 Donziger Dep. 2017:5-9 ("Did you ever disclose that finding of Mr. Beltman with any member of the Attorney General's office of Ecuador? A.   It was not my obligation.  The answer is no.").
- PX 58A (Crude clip: "perhaps it's time to call for the head of Pérez Pallares").

- PX 187 at 2 (10/2/2006 entry in Donziger personal notes: "On the other hand, this was their main weapon over Reis Veiga and the company, and it had been reported widely in the trade publications and in Ecuador. But Neil is a very traditional lawyer and does not consider things like press and negative publicity.").
- PX 265 (3/31/2008 reopening of investigation).
- PX 268 (indictment).
- PX 271 (Cabrera testimony in criminal investigation).
- PX 272 (Prosecutor's opinion citing Cabrera's testimony).
- PX 812 (11/26/2006 Ponce email re putting pressure on new AG).
- PX 831 (2/28/2007 draft of letter to prosecutor).
- PX 1069 (9/19/2008 email re prosecution and use of Cabrera report).
- PX 1103 (2/4/2009 email re use of Beltman's report as amicus in criminal case).

V.      **The LAP Team Corrupted the Lago Agrio Litigation**

    **35.    Early in the Lago Agrio litigation, the court ordered a series of 122 judicial
            inspections of various oil drilling and production sites, where experts for the
            parties would each examine the sites and submit their findings to a panel of
            settling experts to reconcile the reports and issue final determinations
            regarding the presence or absence of harmful contamination.**

- PX 3300 (McMillen) ¶ 11 ("At the outset of the Ecuador litigation, the parties
  agreed and the Court ordered the inspection of 122 oil production sites located in
  the former Concession area. For most of the judicial inspections, experts were
  nominated by each side. At each judicial inspection site, these nominated experts
  took samples under the supervision of the judge at that site, sent their samples to a
  laboratory for testing and analysis, and then each submitted a written report of his
  or her findings and conclusions to the Ecuadorian Court. The Ecuadorian Court
  also appointed a third set of experts, known as the Settling Experts, who were to
  resolve any disputes between each side's experts' reports and findings. The
  Settling Experts attended the judicial inspections.").
- PX 4300X (Callejas) ¶¶ 29, 31, 33 (same).
- PX 3200 (Russell) ¶ 24 (same).
- PX 317 (judicial inspection order).

36.     **The LAP team forged and filed two judicial inspection reports with the Lago Agrio court in the name of Dr. Charles Calmbacher which did not reflect Dr. Calmbacher's views after obtaining his signature on those reports under false pretenses.**

- 3/29/2010 Calmbacher Dep. 116:9-10 (Shown copies of the reports filed by Defendants in the Lago Agrio court under his name, Dr. Calmbacher testified, "I did not reach these conclusions and I did not write this report."); *id.* 62:5-63:11 (Dr. Calmbacher explaining that the conspirators sent him a version of his expert report that correctly stated his views and blank pages for him to initial so that they could obtain his signature for the falsified reports filed with the Lago Agrio court).
- PX 249 (Judicial Inspection Report for Sacha Well 94, submitted in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, bearing the foja number 46,239 - 46,279, and an English translation thereof).
- PX 250 (Judicial Inspection Report of the Shushufindi 48 Well, submitted in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, bearing the foja numbers 52,205 - 52,270, and an English translation thereof).
- PX 722 (Email string from C. Calmbacher to Donziger re "papers").
- PX 723 (Email string from D. Russell to Donziger re "papers").

37.    **The LAP team hired Fernando Reyes and Gustavo Pinto to act as "independent" "monitors" of the judicial inspections, but concealed the fact that they were paying Reyes and Pinto and that they would direct the contents of Reyes and Pinto's monitoring reports.**

- PX 7502 (Reyes Declaration) ¶¶ 12, 15 (describing monitorship arrangement); ¶ 20 (Donziger instructed Reyes and Pinto to issue comments on the settling experts' Sacha 53 report stating the settling experts "were wrong, that they lacked objectivity and were biased towards Chevron . . . ."); *id.* (Reyes refused to "twist [his] professional assessments to make them fit the plaintiffs' interests," and "Donziger expressed disappointment with [his] report and never asked [him] to submit it to the Court.").
- PX 169# at 102 (1/12/2006 entry in Donziger personal notes: "50 k came today - meet on roof to plan payment [to] GF.").
- 1/29/2011 Donziger Dep. 3845:17–21 (Donziger testifying that "GF" refers to Gustavo Pinto and Fernando Reyes), 3846:6-20 (Donziger testifying that "when [he] cut that deal with Mr. Pinto and Mr. Reyes, it was [his] intention that they keep confidential that they were working for the plaintiffs [and] being paid by the plaintiffs").
- PX 169# at 71 (Donziger: "G and F [Gustavo Pinto and Fernando Reyes] have been unable to state a real opinion and they are supposedly on our side!").

38.     **On February 1, 2006, the settling experts released their first report, on the Sacha 53 site, and their report substantially favored Chevron's position.**

- PX 324 (Order issued in Maria Aguinda y Otros v. Chevron Corp., Case No. 002-2003, bearing the foja numbers 92,686 - 92,688, and an English translation thereof) at 5-6 ("Add to the record the 190-page report submitted on February 1, 2006, at 5:00 p.m. by court-appointed settling experts Johnny Zambrano, Gerardo Barros, Galo Albán, Luis Albuja, and Jorge Jurado, which details the judicial inspection carried out at Sacha Well 53, and provide it to the parties, who shall have 60 days to respond.").
- PX 1530 (In the first settling expert report issued in February 2006 regarding the Sacha 53 site, the experts agreed with Chevron's expert's findings).
- Dkt. 586-23 (Ex. 2822) at 26 (Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well explaining: "[T]he concentration levels of the elements analyzed are lower than the allowable limits[.]").
- Dkt. 31-12 at 76 (Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well: "[T]he risk to human health is low, with a probability of impact equally low, unless there are drastic changes in the site's current conditions[.]"); *id.* ("In the case of Mr. Baños's well, no concentrations of hydrocarbons were detected.").
- PX 7502 (Reyes Declaration) ¶ 19 (Reyes states that "Donziger was very upset by the findings of the settling experts' report, and he complained that the report supported Chevron's position and did not support the plaintiffs' position."); *id.* ¶ 20 (Donziger directed Reyes and Pinto that their monitorship report on the Sacha 53 settling experts' report should establish that the findings of the settling experts were wrong, that they lacked objectivity, and that they were biased in favor of Chevron.).
- PX 169# at 71 (Donziger recorded in his personal notes that the settling experts' report was "disastrous" for the LAPs' case).

39.     **The LAP team put pressure on the Lago Agrio court to rule in the LAPs'
        favor by making clear to the presiding judges that the Ecuadorian
        government supported the LAPs and by exerting pressure on the presiding
        judges to rule in the LAPs' favor.**

- PX 3A (Crude clip: "[I]n a year from now . . . [a]ll we're doin' is . . . really
  mobilizing the country, politically, so that no judge can rule against us and feel
  like he can get away with it in terms of his career.").
- PX 76A (Crude clip: "Our biggest problem right now is we have to pressure the
  judge and the court.").
- PX 184 (Donziger personal notes entry: "[T]he only way they [the court] will fear
  us is if they think we have come control over their careers, their jobs, their
  reputations – that is to say, their ability to earn a livelihood.").
- PX 779 (email from Donziger to Ponce: Donziger instructed one of his
  coconspirators to "[p]repare a detailed plan with the necessary steps to attack the
  judge through legal, institutional channels and through any other channel you can
  think of.").
- PX 1055 (email from Yanza to Donziger, discussing plan to pressure the court).
- PX 1096 (email from Prieto to Garces, Yanza, Fajardo, Donziger, Sáenz, etc.: "It
  seems to me that our goal isn't to increase the pressure [on the court] just because;
  rather, what we want is to increase it to get a judgment, so I would think that this is
  a strategy.").

40.     **The LAP team put pressure on the Lago Agrio court to rule in the LAPs'**
        **favor by holding demonstrations at the court and at inspections featuring**
        **demonstrators who were referred to by the LAP team as their "private**
        **army."**

- PX 4300X (Callejas) ¶ 41 ("I recall that they also organized several
  demonstrations outside the courthouse and subjected the presiding judge at the
  time, Judge Germán Yánez, to a press campaign that questioned his handling of the
  case and accused him of bias in favor of Chevron.").

- PX 4800 (Guerra) ¶ 4 ("[A] massive protest was assembled outside the courthouse
  and I feared that, were I to issue a court order against the Ecuadorian Plaintiffs, the
  protesters would take over the courthouse and endanger my well-being as well as
  the safety of others.").

- PX 4A (Crude clip: "Um, what we're doing now is we're going down and we're
  going to confront the judge who we believe is paid by Texaco.  We believe he is
  corrupt and we're gonna confront him, ah, with - - with our suspicious about his
  corruption and let him know what time it is.").

- PX 5A (Crude clip: "And, the only language that I believe, this judge is gonna
  understand is one of pressure, intimidation and humiliation.").

- PX 8A (Crude clip: "[T]he only way you can secure a fair trial is if you do things
  like that, like go in and confront the judge with media around, and fight and yell
  and scream and make a scene . . . .").

- PX 43A (Crude clip: "You can say whatever you want and at the end of the day,
  there's a thousand people around the courthouse, you're going to get what you
  want.").

- PX 67A (Crude clip: "We have concluded that we need to do more, politically, to
  control the court, to pressure the court.").

- PX 81A (Crude clip: "There won't be any judge who would dare rule against [us]."
  "No, forget it! They'd kill him.").

- PX 182 (Donziger personal notes entry: "[W]e need a massive protest at the court,
  and only after that should we talk to the judge about what he needs to do.").

- PX 779 (email from Donziger to Ponce: Donziger instructed one of his
  coconspirators to "[p]repare a detailed plan with the necessary steps to attack the
  judge through legal, institutional channels and through any other channel you can
  think of.").

41.      **The LAP team put pressure on Judge Yanez to cancel the judicial inspection process and to appoint a global expert by exploiting a sex scandal involving Judge Yanez, and by threatening to file a complaint against Judge Yanez.**

- PX 785 (email from Donziger to Kohn: "Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").

- PX 185 at 2 (Donziger personal notes entry: "Legal case: going well with Yanez decision to cancel inspections . . . We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need.").

- PX 807 (email in which Fajardo reports a meeting with the Judge noting an effort to convince the Judge to adopt the Global Assessment, the Judge's resistance because the request lacked a legal basis, and Fajardo's request for feedback from the team to help strengthen their position).

- PX 815 (email in which Fajardo writes that he "met with the Judge today, and I can say that he will definitely not issue the order [authorizing global inspections] before the recess; he will issue it immediately afterward").

- PX 199 (Donziger personal notes entry stating: "Pablo returned to Lago and met with the judge. . . . The bottom line is that the judge asked us for help to protect him, like we did last August.").

42.     **The LAP team in other instances met with the court on an *ex parte* basis to discuss substantive issues in violation of Ecuadorian law.**

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 21-24 (admitting that Donziger and other members of the LAP team had numerous *ex parte* meetings with judges in the Lago Agrio litigation at which they discussed substantive issues, including efforts to prevent inspection of the HAVOC laboratory, the LAPs' request to cancel the judicial inspections, the appointment of a single global expert in place of the judicial inspections, and the appointment of Cabrera as the global expert, and detailing the dates, participants, and locations of those meetings).
- Donziger Dep. 2135-2136, 3737-3739, 4749-4753, 4939-4945 (testifying that members of the LAP team, including Donziger, met *ex parte* with judges in the Lago Agrio litigation on several occasions to discuss substantive issues).
- PX 5A (Donziger preparing to meet *ex parte* with the judge to block inspection of the HAVOC laboratory).
- PX 6A (Donziger meeting ex parte with the judge to block inspection of the HAVOC laboratory).
- PX 909 (Donziger emails Fajardo stating that inspection of the HAVOC laboratory "WOULD BE A DISASTER FOR THE LAGO AGRIO CASE" and suggesting "[w]e accuse all of them, including the judge of CORRUPTION for still even thinking of ordering an illegal inspection with no basis in the law in order to favor a corrupt transnational that is killing innocent Ecuadorians.").
- PX 3300 (McMillen) ¶¶ 21-22 (describing Chevron's efforts to inspect the HAVOC laboratory and the LAP team's successful efforts to block the inspection, including Donziger's *ex parte* meeting with the judge to reverse an order permitting inspection).

**VI.     The Lap Team Coerced the Court Into Appointing Cabrera as the Global Expert and Then Secretly Ghostwrote His Report**

    **43.     In 2006, the LAP team pressured the Lago Agrio court to cancel the remaining judicial inspections and institute a global inspection process led by a single global expert under their control.**

- PX 785 (email from Donziger to Kohn: "Pablo met with the judge today.  The judge, who is on his heels from the charges of trading jobs for sex in the court, said he is going to accept our request to withdraw the rest of the inspections . . . . The judge also I believe wants to forestall the filing of a complaint against him by us, which we have prepared but not yet filed.").

- PX 185 at 2 (Donziger personal notes entry: "Legal case: going well with Yanez decision to cancel inspections . . . We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need.").

- PX 328 (filing by P. Fajardo in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, requesting that the remaining judicial inspections be cancelled).

- PX 330 (filing by P. Fajardo in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, requesting that the court appoint a single expert to conduct the judicial examinations).

- PX 697 (email from Donziger to D. Russell: "when we finish all of texaco's inspections, and a few of ours, we will cut the inspections short after about 30").

- PX 767 at 1-2 (document entitled "Strategic Plan": "Settling experts . . . Request for just 1, new ones who will accept payments" and "Inspections . . . We propose a Global Assessment").

- PX 2396R (Donziger's response to RFA No. 35: "Donziger admits that . . . he met with Judge Yanez in November 2006, outside the presence of any attorney or representative of CHEVRON, to discuss the possibility of a global assessment.").

- PX 4300X (Callejas) ¶ 41 (discussing the LAPs' pressure on the court to cancel the judicial inspections).

**44.**    **The LAP team chose Cabrera as the Global Expert and pressured the court to appoint him.**

- PX 17A (Crude clip: "The judge is going to appoint a guy in Ecuador, um, to be the expert but really, you know, we'll be supporting him with the work -- our people, E-Tech, whoever we choose to use.").
- PX 201 (Donziger personal notes entry: "I spend the whole day making comments and mostly directing them to Richard.  We laid out our entire case and legal theory – what a benefit!").
- PX 835 at 2 (A. Maest handwritten notes: "Only Plaintiffs are doing Peritaje Global, not Chevron").
- PX 858 (email string from Donziger to E. Fajardo Mendoza:  "[W]e need . . . to think of anything Richard could do AGAINST us to prove his independence").
- PX 873 (email from Donziger to A. Soltani, S. Tegel, K. Koenig, and J. DeLury Ciplet: "The perito got sworn into after all those visits to the court . . . WE ARE GOING TO END THE TRIAL!!!!!!!").
- PX 2396R (Donziger's response to RFA No. 33: "Donziger admits that . . . he had contact with Judge Yanez outside the presence of any attorney or representative of CHEVRON to request Cabrera's appointment . . . .").
- 1/18/2011 Donziger Dep. 3052:3-11 ("Q. Because you knew that the appointment of the global damages expert, your candidate, Richard Cabrera, would finish the case in your favor, correct, sir? A. Not necessarily, no. Q. That's what you hoped and expected, correct, sir? A. Yes.").
- PX 4300X (Callejas) ¶ 44 ("Not only was Mr. Cabrera not qualified, but his appointment was replete with procedural irregularities.").

45.     **Through secret bribes and other unlawful means, the LAP team controlled Cabrera and the findings he would submit to the Lago Agrio court.**

- PX 850 (On April 17, 2007, just weeks after Cabrera's appointment and prior to his swearing in as the global expert, Yanza wrote Donziger: "We have met with Richard [Cabrera] and everything is under control. We gave him some money in advance.").

- PX 913 (In an email to Donziger, Yanza explained the purpose of the secret account: "for you to send us money to the secret account, to give it to the Wuao [Cabrera] and if not, the work stops.").

- PX 4900 (Dahlberg) ¶ 116 ("Based on my analysis of documents such as emails, memoranda, and bank statements, I identified additional Evidence of Payments totaling $120,000 that appear to be payments made to Cabrera from Selva Viva . . . ."); *id.* ¶ 118 ("The payments made to Cabrera through the Secret Account appear to be inconsistent with my understanding of how Cabrera was to be compensated for court authorized work, and appear to be for work performed solely on behalf of the LAPs.").

- PX 883 (Donziger: "My tendency is to stop <u>Richard</u> from working much more in the field . . . or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices.") (emphasis in original).

- 1/29/2011 Donziger Dep. 3833:16-3834:6 (Donziger testifying that the LAPs' counsel and consultants wrote Cabrera's work plan, were involved in Cabrera's site selection, and suggested Cabrera's sampling protocols).

- 1/29/2011 Donziger Dep. 3801:23-3803:9 (Donziger testified that the LAPs' counsel had entered into a contract with Cabrera.

- PX 877 (Fajardo wrote Donziger that Cabrera called "about a little mistake in the contract" while also suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Julio Prieto's girlfriend to be Cabrera's assistant, and that it is the LAPs' "duty to help him get insurance."  Donziger responded, "I'm on it.").

- 1/29/2011 Donziger Dep. 3807:19–3808:17 (Donziger testifying that the LAP team provided Cabrera with life insurance).

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 35-36 (asserting that "Cabrera was advanced funds to cover expenses incurred for work performed so that his work would not stop" but failing to state the amount of money advanced and offering no indication that Cabrera ever paid back this "advance").

46.     **Cabrera took an oath of appointment that required him to "act with complete impartiality and independence vis-à-vis the parties" in his role as the Lago Agrio court's appointed global expert, which position rendered him an auxiliary and officer of the Ecuadorian court.**

- PX 342 at 3 (certificate of swearing-in of Cabrera: "[T]he Expert states that he is not under any legal impediment whatsoever and swears to perform his duties faithfully and in accordance with science, technology, and the law, with complete impartiality and independence vis-à-vis the parties.").
- PX 4900 (Dahlberg) ¶ 114 ("I reviewed documents evidencing that Cabrera was sworn in as the court-appointed expert on June 13, 2007 and according to the Ecuadorian court filing on this date, Cabrera took an oath . . . .").

47.     **The Lago Agrio court ordered Cabrera to conduct the global inspection impartially and independently.**

- 12/29/2010 Donziger Dep. 2166:12-17 ("Q. At the time that plaintiffs provided Cabrera with a draft work plan, it is true, isn't it, that Cabrera was under an order from the Ecuadorian court to act independent from the parties? A. I believe so, yes.").
- PX 4900 (Dahlberg) ¶ 114 ("I reviewed documents evidencing that Cabrera was sworn in as the court-appointed expert on June 13, 2007 and according to the Ecuadorian court filing on this date, Cabrera took an oath . . . .").
- PX 4300X (Callejas) ¶ 52 ("I recall multiple occasions where the Court issued orders reminding Mr. Cabrera of his duties and obligations.").
- PX 342 at 3 (certificate of swearing-in of Cabrera: "[T]he Expert states that he is not under any legal impediment whatsoever and swears to perform his duties faithfully and in accordance with science, technology, and the law, with complete impartiality and independence vis-à-vis the parties.").
- PX 348 at 6 (order issued in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003: Cabrera "must perform his work in an impartial manner and independently with respect to the parties.").
- PX 352 at 1 (order issued in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003: "In addition, the expert must support his work with the most appropriate scientific methodologies and procedures and guarantees disclosure of the evidence and transparency.").

48.     **The Lago Agrio court ordered Cabrera to disclose to the parties all material upon which he relied in preparing the global expert report.**

- PX 348 at 6 (order issued in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003: Cabrera "must perform his work in an impartial manner and independently with respect to the parties.").
- PX 357 at 1 (order issued in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003: "[A]ll the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. At that time all those documents will be provided to the parties. For the foregoing reasons, in his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work.").
- PX 4300X (Callejas) ¶ 52 ("I recall multiple occasions where the Court issued orders reminding Mr. Cabrera of his duties and obligations.").

**49.     Cabrera did not act independently and impartially as the Lago Agrio court's appointed global expert.  To the contrary, he met with the LAP team without disclosure to Chevron, permitted the LAP team to draft his work plan, control his global inspection, and write his report and supplemental report.**

- PX 35A at 2 (transcript of CRS-187-01-02, in which Cabrera introduces himself at the LAPs' March 3, 2007 meeting).
- PX 39A at 4 (transcript of March 3, 2007 meeting in Ecuador attended by the LAPs' attorneys, the LAPs' technical experts, and Cabrera in which Fajardo stated, "[T]he work isn't going to be the expert's. All of us bear the burden. . . .But all of us, all together, have to contribute to that report.").
- PX 843 (LAP-drafted document, circulated by Fajardo, entitled "Final Plan from the Global Expert Examination" containing an outline of tasks to be performed for Cabrera's global examination).
- PX 1648 at 1 (email from Beltman to Stratus employees telling his team that they will draft the Cabrera Report: "The project is at a key point right now. We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. . . . We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report. The people in the Quito office are working on some parts, and we're working on others.").
- PX 2437 (email from Beltman to translators attaching a draft of the Cabrera Summary Report in English and requesting that it be translated into Spanish in advance of the upcoming submission to the Ecuadorian court).
- 12/13/2010 Donziger Dep. 1120:23-1121:5 (Donziger testifying that "the primary purpose of the [March 3, 2007,] meeting" with Cabrera was to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting").
- 12/29/2010 Donziger Dep. 2253:5-11 (Donziger agreed that "the general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera").
- 12/29/2010 Donziger Dep. 2163:17-22 (Donziger testifying that the LAPs' representatives were involved in "developing Cabrera's work plan").
- PX 4900 (Dahlberg) ¶ 119 ("Based on information I have reviewed, it appears that employees of Stratus played a major role as the support team in the drafting of the expert report, as they outlined and drafted substantial portions of the Cabrera report and many of its annexes and supervised its translation to Spanish.").
- PX 4100 (Lynch) ¶ 8 ("Based upon my analysis of electronic evidence, I conclude, to a reasonable degree of scientific certainty, that Defendant Steven Donziger's hard drive contained a draft of the Cabrera Report (PX 1017) which was most likely modified and saved by Ecuadorian Plaintiffs' lawyer Juan Pablo Saenz the day before it was filed with the Ecuadorian court by Richard Cabrera. Excepting the court markings and handwriting, that draft is identical to the report filed with the Ecuadorian court by Richard Cabrera on April 1, 2008.").

50.    **The LAP team bribed Cabrera with payments that were not approved by the Lago Agrio court and that were made without disclosure to Chevron.**

- PX 877 (email string between Donziger and Fajardo, copying Yanza with the subject: "WORRIED," discussing the LAPs' contract with Cabrera and suggesting that the LAPs' representatives "help [Cabrera] get an office," arrange for Julio Prieto's girlfriend to be Cabrera's assistant, and that it is the LAPs' "duty to help him get insurance."  Donziger responded, "I'm on it.").
- PX 881 (email string from J. Prieto to P. Fajardo and Donziger re "insurance for the wao," discussing procuring life insurance for Cabrera).
- PX 913 (email from L. Yanza to Donziger re "Let's not give Texaco the pleasure of stopping the PG": asking Donziger "to send us money to the secret account to give it to the Wuao [Cabrera] and if not, the work stops").
- 1/29/2011 Donziger Dep. 3808:3-8 ("Q. And here you are having a very detailed exchange about the insurance to be purchased for Cabrera, the dollar values, and how much it is going to cost, correct, sir? A. Yes.").
- 7/19/2011 Donziger Dep. 4875:20-25 ("Q. Does this refresh your recollection that the $50,000 paid in September was to satisfy an advance that Mr. Yanza had promised to Cabrera? A. It refreshes my recollection that it involves some payment to Cabrera.").
- PX 4900 (Dahlberg) ¶ 116 ("Based on my analysis of documents such as emails, memoranda, and bank statements, I identified additional Evidence of Payments totaling $120,000 that appear to be payments made to Cabrera from Selva Viva."); *id.* ¶ 118 ("The payments made to Cabrera through the Secret Account appear to be inconsistent with my understanding of how Cabrera was to be compensated for court authorized work, and appear to be for work performed solely on behalf of the LAPs.").

51.    **The LAP team bribed Cabrera with payments that were approved by the Lago Agrio court for work they knew he did not perform.**

- PX 277# (letter from Cabrera to Dr. Germán Yanez, in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, requesting payment from the court).
- PX 344 (6.28.2007 LAP filing attaching check from Selva Viva to Cabrera in the amount of $59,349.00).
- PX 349 (2007.10.10 LAP filing attaching check from Selva Viva to Cabrera in the amount of $47,000.00).
- PX 353 (Cabrera filing accepting receipt of $47,000 payment from the LAPs).
- PX 888 (email string from L. Yanza to Donziger "pissed off": "Tonight I have to coordinate the new request for money with the huao in order to continue the work").
- PX 1147 (email from L. Yanza to Donziger re "very urgent": "Friend, we are paying Cabrera 10 today to calm him down . . . .").
- 1/29/2011 Donziger Dep. 3816:5-12 ("A. It refreshes my recollection about the $10,000.  Q. That Cabrera was paid $10,000 on that date, correct? A. Yes. Q. By the plaintiffs' team, correct? A. Yes.").
- PX 367 (filing by Fajardo in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, discussing the LAPs' payment of $33,000 to Cabrera, and thereby completing payment of $97,000 requested by Cabrera).
- PX 4300X (Callejas) ¶ 50 ("Mr. Cabrera filed a letter with the Court asking that Chevron be ordered to pay the fees due to him for his prior role as a settling expert and noting that he had made an arrangement with the Lago Agrio Plaintiffs, who already had paid him their share directly."); *id.* ¶ 51 ("This payment to Mr. Cabrera by the Lago Agrio Plaintiffs' representatives, purportedly for his settling expert work, was particularly suspicious for several reasons . . . .").

52.     **Donziger, Stratus, and other members of the LAP team wrote the bulk of the report Cabrera submitted to the Lago Agrio court on April 1, 2008, including the "Summary Report" that set forth the findings and damages assessment and at least 11 of the 17 annexes to the Cabrera report.**

- PX 1265 (Handwritten notes of "Call w/ Steven Donziger" on March 19, 2010, revealing that Stratus authored 11 of 17 annexes to the Cabrera report and the "executive summary.").

- 12/22/2010 Donziger Dep. 1509:7-20 ("Isn't it the case that the main body of the expert report ultimately signed by Richard Stalin Cabrera Vega was drafted initially by Stratus Consulting?     A. What turned out to be the main body signed by Mr. Cabrera, a version of that was initially drafted by Stratus, and it turned out, as I understand it, to be substantially the same, that is pretty much adopted by Mr. Cabrera.").

- 1/8/2011 Donziger Dep. 2423:4-8 ("Q. So the annex categories and damage categories that you provided to Stratus were developed exclusively by the plaintiffs' team; is that right?     A. I believe so."); *id.* 2432:24-2433:21 ("Q. Is the reason that you didn't need to do a comparison because Cabrera signed the report that plaintiffs provided to him?     A. Well, I knew that he adopted pretty much verbatim what had been provided to him.").

- PX 1291 at 1 (Donziger: if Chevron obtained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.").

- PX 1357 at 1 (LAPs' U.S. counsel Jonathan Abady: "There is no credible way of denying that 11 of 17 annexes are from us.").

- PX 5208 (Beltman Witness Statement) ¶ 22 ("I prepared the first draft of substantial parts of the document that would be filed as the 'Summary Report of Expert Examination,' which was the main body of the Cabrera Report.  At Donziger's direction, I drafted my portions of the report in the first person as though it was written by Richard Cabrera.  I supervised the preparation by Dr. Maest and other Stratus personnel or subcontractors of 11 of the 24 sub-reports and appendices, known as 'Annexes,' to the Cabrera Report.").

- PX 5210 (Maest Witness Statement) ¶ 30 ("I have reviewed the witness statement of Douglas Beltman regarding drafting of the Cabrera Report and annexes.  I am not aware of any facts or data that contradict any of his statements or conclusions.  His recollection of the drafting process and related events are consistent with my own.").

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 42 (admitting that "Donziger also edited and commented on at least some drafts [of the Cabrera report].").

- PX 4100 (Lynch) ¶ 8 ("Based upon my analysis of electronic evidence, I conclude, to a reasonable degree of scientific certainty, that Defendant Steven Donziger's hard drive contained a draft of the Cabrera Report (PX 1017) which was most likely modified and saved by Ecuadorian Plaintiffs' lawyer Juan Pablo Saenz the day before it was filed with the Ecuadorian court by Richard Cabrera. Excepting the court markings and handwriting, that draft is identical to the report filed with

the Ecuadorian court by Richard Cabrera on April 1, 2008. I therefore conclude that PX 1017 was the final draft of the Cabrera Report."); *id.* ¶¶ 10, 11, 15-19 (explaining analysis).

- Tr. (Lynch) 637:14-638:6 (testifying that a copy of the Cabrera report that was attached to an email dated April 1, 2008 sent from gringograndote@gmail.com to Donziger was saved by LAP attorney Juan Pablo Saenz's computer and edited up until the day before filing of the Cabrera report).

- 4/30/2013 Beier Dep. 99:1-100:6 ("Q    And by that you understood that Mr. Beltman was telling you that Stratus created a database for Cabrera to use?    A    Again, I don't recall his exact words, but that was my paraphrasing of what he said, yes."); *id.* 102:20-104:14 ("Q    And is it fair to say that Beltman was telling you that he wrote drafts of significant parts of the body of Cabrera's report?    A    That's what he said.  That paraphrase, yes.    Q    And that Mr. Donziger and Mr. Fajardo instructed him to do it that way?    A    I believe that's what he said.").

- PX 962 (Stratus outline for Cabrera report).

- PX 1013 (March 25, 2008 Beltman revisions to Cabrera summary report).

- PX 1017 (On April 1, 2008, Donziger received an email from "gringograndote@gmail.com" attaching a Word version of the Cabrera report.).

- PX 1019 (On March 31, 2008 Donziger emailed Cris Cadena a damages table; the damage categories and amounts match nearly exactly the damages assessed in the Cabrera report).

- PX 1024 (April 1, 2008 emails between Donziger and Maest re translation of the summary of the Cabrera report).

- PX 1050 (July 28, 2008 Beltman email regarding translation of Cabrera report into English).

- PX 1648 (February 22, 2008 Beltman email of overview of drafting of Cabrera report).

- PX 1650 (chart of status of translation of annexes).

- PX 2155 (demonstrative comparing produced documents from Donziger, Stratus, and UBR 1782 actions to filed annexes of the Cabrera report).

- PX 2224 (comparison of draft of Cabrera report in Defendants' possession and filed report).

- PX 2225 (timeline of Stratus's role in drafting the Cabrera report).

53.      **Donziger personally controlled the amounts and categories of damages in the "Summary Report" that was submitted to the Lago Agrio court on April 1, 2008, and signed by Cabrera.**

- 1/8/2011 Donziger Dep. 2507:24-2508:7 ("Q. That was the damage table that was going to be appear in the Cabrera  report, correct?     A. I believe so.     Q. And that is something that you are working on drafting as of March 30th of 2008, correct? A. I believe so, yes.").

- PX 1018 (Email dated March 30, 2008 from D. Beltman to Donziger re "what do u think of this?", and an English translation thereof, in which, just two days before filing of the Cabrera Report, Donziger sent Beltman a table of damages; the total damages were within one-tenth of one percent of those that appeared in the filed Cabrera report).

- PX 1019 (Email dated March 31, 2008 from Donziger to criscadena@hotmail.com re "tabla" ["table"] and an English translation thereof) (table of calculated damages).

- PX 1020 (Email from Donziger to criscadena@hotmail.com re "tabla" ["chart"] and an English translation thereof).

- PX 5208 (Beltman Witness Statement) ¶ 24 ("I continued to provide comments on and material for the Summary Report and annexes to Donziger and LAPs' team members in Quito up to the night of March 30, 2008, when I provided comments to Donziger on a draft damages table for the Summary Report that I had received from him.  On the morning of April 1, 2008, Donziger emailed a Microsoft Word version of the Summary Report named "Informe Sumario Version Final (Steve).doc" to me and Dr. Maest 'for translation' to English.  It was my understanding that this was an electronic version of the Summary Report that Richard Cabrera was filing that same morning in the Lago Agrio court.").

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 42 (admitting that "Donziger also edited and commented on at least some drafts [of the Cabrera report].").

54.     **Donziger manipulated the evidence and methodology of the Cabrera report to ensure that the damages assessment in the Cabrera report was for billions of dollars.**

- PX 5208 (Beltman Witness Statement) ¶ 32 ("Stratus used a series of overarching assumptions at the direction of Donziger in developing the opinions and conclusions set forth in the Cabrera Report. These assumptions, combined with specific instructions from Donziger as to each damage category, are determinative of the dollar values calculated in the Cabrera Report's damages assessment."); *id.* ¶ 33 (Donziger directed Stratus to assume that it was not necessary to allocate any responsibility to Petroecuador); *id.* ¶¶ 34-35 (Donziger directed Stratus to ignore Petroecuador's remediation of the former concession area, including the costs of that remediation, in calculating damages for the Cabrera report); *id.* ¶ 36 (Donziger directed Stratus to use the soil cleanup levels identified by Donziger and the LAPs' lawyers); *id.* ¶ 37 (Donziger directed Stratus to assume 916 or 917 pits required remediation, a number taken from an inventory prepared by the LAPs' representatives, and never requested verification as to whether the pits on the inventory actually existed).

- PX 5210 (Maest Witness Statement) ¶ 38 ("The damages assessment in the Cabrera Report and Cabrera Response are based on many assumptions provided by Donziger and the LAPs' representatives that neither I nor Stratus know to be true or accurate.").

- PX 936 at 1, 3 (2007.11.17 Email from Donziger to Beltman re "Unjust Enrichment") (Donziger explaining that an estimate for unjust enrichment "sound[ed] awfully low" and imploring that the Stratus consultants not "say or even suggest anything that backs away from the [Lago Agrio plaintiffs'] figures.").

- PX 42A at 3-4 (2007.03.03 Crude clip of meeting between Donziger, Maest, and unidentified male) (The recording of the March 3rd meeting with Cabrera ended with Donziger commenting, they could "jack this thing up to thirty billion . . . in one day." Donziger went on to say that he was exaggerating—it would really take 90 days).

- PX 43A at 5–7 (2007.03.04 Crude clip of meeting between Donziger, Maest, and others) (Donziger: "[I]f we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory . . . [w]e can do it. And we can get money for it. . . . ... Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit. It really is. We have enough, to get money, to win.").

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 42 (admitting that "Donziger also edited and commented on at least some drafts [of the Cabrera report].").

55.     **Donziger, Stratus, and other members of the LAP team wrote "Comments" on the Cabrera report which they filed in the Lago Agrio court as objections to the Cabrera report without disclosing that they had in fact written the Cabrera report.**

- 1/14/2011 Donziger Dep. 2953:4-13 ("Q. Stratus was involved in the drafting of plaintiffs' comments on the Cabrera report, correct?   A. I believe so.   Q. And did they work at your direction in doing that?   A. Well, generally they worked under my direction.   I don't remember specifically if I had discussions with them about comments."); *id.* 2958:13-2959:12 ("Q. In plaintiffs' comments on the Cabrera report, they never reveal that they are commenting on the work that they themselves provided to Cabrera, correct?   A. I think that's correct, yes.").

- PX 5208 (Beltman Witness Statement) ¶ 38 ("Despite the fact that the LAPs' lawyers and consultants drafted the Cabrera Report, after the Cabrera Report was submitted to the Ecuador court on April 1, 2008, Donziger instructed me to conduct additional damages assessment work for comments on the Cabrera Report that would seek to increase the damages assessed by billions of dollars.  I began the process of preparing comments in June 2008."); *id.* ¶ 39 ("We began planning comments on the Cabrera Report shortly after it was filed.  We (Steven Donziger, Pablo Fajardo, Luis Yanza, Jen Peers, Ann Maest and I) met in Boulder June 4-5, 2008 to discuss, among other things, the planned comments. . . . I understood these comments to be a 'formal response to the Court about the Expert's Report.'  Stratus created an extensive to-do list for the comments project.  Ann Maest, David Mills, Jen Peers, and I all worked on portions of the text for the comments.  We completed our work on the comments in the U.S. and send it to the LAPs' team."); *id.* ¶ 40 ("The comments, including the portions prepared by Stratus, do not disclose the drafting of the Cabrera Report by Stratus or the LAPs' representatives, i.e., that the LAPs' representatives were commenting on their own report."); *id.* ¶ 41 ("I understand that on September 16, 2008, the LAPs submitted their comments to 'the Expert Report filed by Expert, Richard Cabrera Vega', containing Stratus's work.").

- PX 5210 (Maest Witness Statement) ¶ 39 ("The comments, including the portions prepared by Stratus, do not disclose that the Cabrera Report was drafted by Stratus or the LAPs' representatives.  With the comments the LAPs were literally commenting on their own work."); *id.* (explaining that the comments asserted the remediation standard Donziger previously directed Stratus to use in the Cabrera report (TPH of 1,000 parts per million) was too lenient and proposed a more stringent standard (100 ppm), increasing the damage assessment); *see also id.* ¶¶ 39-42 (confirming Beltman's testimony detailed above).

- PX 312 (LAPs' comments to the Cabrera report) at 1 ("In spite of being conclusive, the report submitted by the Expert Cabrera has certain fallacies that enormously favor the interests of the defendant company"); *id.* at 2 ("The omissions we have been able to detect in the Expert Opinion of the Expert, Richard Cabrera, broadly favor the interest of the defendant because they diminish and/or avoid certain environmental damage and environmental legislation that must be

taken into account in his evaluation."); *id.* at 40 (criticizing the Cabrera report as "unjustly favorable to [Chevron]").

- PX 1030 (April 2, 2008 Stratus task list which includes preparation of LAPs' comments to the Cabrera report).
- PX 1042 (June 25, 2008 Maest notes outlining comments to the Cabrera report).
- PX 1060 (August 15, 2008 Beltman email to Donziger re status of comments to the Cabrera report).
- PX 1664 (August 11, 2008 email with status of comments to the Cabrera report).
- PX 2225 (timeline of Stratus's role in drafting comments to the Cabrera report).

56.     **Donziger, Stratus, and other members of the LAP team wrote the bulk of the Supplemental Cabrera report that Cabrera submitted to the Lago Agrio court on November 17, 2008 in response to the parties' comments.**

- 1/14/2011 Donziger Dep. 2959:16-2960:13 ("Q. And are you aware that plaintiffs' drafted Mr. Cabrera's response to their comments that was then filed under his name as Exhibit 44?    A. My understanding is materials were drafted and given to him the same way some of the annexes were prepared.    Q. When you say 'materials,' the actual text of his pleading was drafted for him by Stratus and other members of the plaintiffs' team, correct?    A. The text was drafted in I think the hope that he would adopt it verbatim, yes.").

- PX 5208 (Beltman Witness Statement) ¶ 43 ("In October 2008, shortly after the LAPs filed their comments, I received a list of questions the LAPs had directed to Cabrera that the Quito team assigned to Stratus for response. The responses were divided among Ann Maest, Bill Powers, Jen Peers[,] myself and others at Stratus. Continuing to follow Donziger's instructions as to the confidentiality of Stratus's role, Stratus instructed Brian Lazar to edit the language of the portions we had already drafted to sound 'more like the Perito.' Stratus drafted 'Cabrera's' responses to the LAPs' comments throughout October and November 2008."); *id.* ¶ 44 ("I understood that portions of the Cabrera Response that Stratus was drafting would be filed with the Lago Agrio court as if written by Cabrera. My discussions about this work with Donziger and the LAPs' representatives confirmed that Donziger and the LAPs' team wanted the Cabrera's Responses to increase the damages assessed by billions of dollars."); *id.* ¶ 45 ("I understood that Cabrera filed the 'Cabrera Response' based at least in part on text written by the LAPs' representatives and consultants, including Stratus, on November 17, 2008. The Cabrera Response incorporated work, calculations, and text written by Stratus, among others, and increased the damages assessed in the Cabrera Report from $16 billion to $27 billion."); *id.* ¶ 47 ("Stratus also prepared or revised support for damage calculations in the Cabrera Response finding an additional $7.8 billion in damages."); *id.* ¶ 48 (disavowing the $2.7 billion soil remediation damage assessment Stratus prepared for the Cabrera response); *id.* ¶ 49 (disavowing the $3.2 billion groundwater damage assessment Stratus prepared for the Cabrera response).

- PX 5210 (Maest Witness Statement) ¶ 50 ("For all of my reports and testimony, I based my opinions and conclusions on a series of assumptions and data provided to me by Donziger and the LAPs' representatives that I do not know to be true. In addition, I now believe that the damages assessment in the Cabrera Report and Cabrera Response is tainted. Therefore, I disavow any and all findings and conclusions in all of my reports and testimony on the Ecuador Project.").

- PX 952 (Fajardo task list, including drafting of answer to the expert report).

- PX 1072 (Maest notes including Cabrera response in task list).

- PX 1073 (October 27, 2008 Beltman email to Stratus members re answering questions to Cabrera).

- PX 1078 (October 31, 2008 Beltman email to Powers re answering certain questions to Cabrera).

- PX 1516 (October 31, 2008 Stratus email containing draft of Cabrera response).
- PX 1517 (November 4, 2008 Stratus email containing Powers' draft of Cabrera response).
- PX 2225 (timeline of Stratus's role in drafting the Supplemental Cabrera report).

57.     **The Lago Agrio court did not authorize members of the LAP team to write the Cabrera report or the Supplemental Cabrera report.**

- PX 339 at 2 (May 17, 2007 order appointing Cabrera).
- PX 340 at 1 (May 23, 2007 order: "the parties may present suggestions about the essential items to be considered in the expert analysis and the report of the Expert's Assessment that has been ordered to be carried out.").
- PX 348 at 2, 3 (October 3, 2007 order: "The transparency of the expert's work will be ensured, and the parties shall have access to that work. … The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report. … The expert's assistants must ensure that the evidentiary requirements of the plaintiff are met, stipulating in their report the sources of the information and the methodologies used.").
- PX 352 at 1, 6-7 (October 22, 2007 order: "In addition, the expert must support his work with the most appropriate scientific methodologies and procedures and guarantees disclosure of the evidence and transparency. … The Expert, Richard Cabrera, is informed that he must personally prepare and work on the expert report, taking into account the scientific, technical, and legal standards of both a universal nature and those in effect here.- Regarding section 3), the Expert has already been admonished to receive the parties' opinions so that his report will be objective ….").
- PX 357 at 1 (November 29, 2007 order: "all the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. At that time all those documents will be provided to the parties. For the foregoing reasons, in his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work.").
- PX 364 at 1 (April 14, 2008 order: "With regard to the request, the Expert must conduct his own investigations which he shall use as the primary basis for his report, but he shall not be prohibited from using any information contained in other expert reports.").
- PX 368 at 1 (May 30, 2008 order: "he cannot be obligated to disclose said expert report in advance and against his will and to an authority other than the Judge in the case.").

58.     **The LAP team submitted numerous filings to the Lago Agrio court denying that Cabrera was working with or for the LAP team, that Cabrera was appointed "at the suggestion of the Plaintiffs," that there was a "close relationship" between the LAP team and Cabrera, or that Cabrera was anything but independent, impartial, and fair.**

- PX 2200 (demonstrative timeline of the LAP team's filings in the Lago Agrio court in which they denied having a relationship with Cabrera).
- 12/29/2010 Donziger Dep. 2284:7-14 ("The Special Master:  And Mr. Fajardo did not tell the Court in his pleading of January 18 that it was going to supply or the plaintiffs' team was going to supply other materials to Mr. Cabrera outside of the processes of the court; is that correct?          Donziger:  That's correct.").
- PX 312 at 40 (LAP comments on Cabrera report criticizing the Cabrera report as "unjustly favorable to [Chevron]").
- PX 351 at 2 (October 17, 2007 LAP filing: "There is no need for an impartial overseer or anything of this kind within an independent judicial investigation. The engineer, Richard Cabrera has demonstrated his moral integrity and his technical aptitude for carrying out this important judicial procedure.").
- PX 354 at 1 (October 29, 2007 LAP filing: "To do so would be to admit that Cabrera maintained a close connection with those of us who are defending the victims of Texaco, a despicable accusation that has NEVER been true and lacks proof to support it.").
- PX 363 at 2-3 (April 4, 2008 LAP filing: "[N]ow the oil company is attempting to imply an alleged friendship' or common-interest relationship between the expert Mr. Cabrera and the plaintiffs.... THE AMERICAN OIL COMPANY'SREASONING RESEMBLES THAT OF PRESIDENT BUSH: 'YOU'RE EITHER WITH US, OR AGAINST US.'  According to the oil company: if we're not attacking Mr. Cabrera it must be because he works for us. That's simply ridiculous.").
- PX 365 at 1-2 (April 18, 2008 LAP filing: "I remind you, Mr. President, that expert Cabrera was given the task because of his professional and personal suitability, and as such, his work should be free of external pressures from the parties, especially when these pressures can compromise the systematic integrity of his work in an attempt to turn this professional designated by the court into a mere executor of their plans and strategies.").
- PX 366 at 2 (April 25, 2008 LAP filing: "a "close relationship with Independent Expert Richard Cabrera" is "[a]nother infamy.").
- PX 372 at 2 (March 20, 2009 LAP filing: "I reiterate on the record my objection to the opposing party's constant accusations seeking to associate the plaintiffs with Expert Cabrera's work and the Cabrera Report.").
- PX 374 at 1 (April 22, 2009 LAP filing: "which once again demonstrates the seriousness, responsibility, objectivity and impartiality with which the expert has performed the work in this legal proceeding.").
- PX 384# (June 21, 2010 Fajardo petition to permit the LAPs to file cleansing expert reports, failing to disclose the LAP team's true relationship with Cabrera).

59.     **Cabrera submitted numerous filings to the Lago Agrio court denying that he had "relation or agreements" with the LAP team, denials that he was "in close contact with" members of the LAP team, denials that he had received "technical information and support staff to assist" his work, and assertions that his work was done with "absolute impartiality, honesty and transparency."**

- PX 2200 (demonstrative timeline of Cabrera's statements to Lago Agrio court in which he denied having a relationship with the LAP team).
- 12/29/2010 Donziger Dep. 2285:17-2286:5 ("Q. Mr. Donziger, isn't it true that both Mr. Cabrera and plaintiffs had filed pleadings with the Lago Agrio court denying that they were linked?     A. I remember there were pleadings where Mr. Cabrera made representations about independence and transparency, which I reviewed.").
- PX 279 at 1 (July 12, 2007 Cabrera letter: "the complete and absolute impartiality with which I must act in carrying out the expert evaluation.").
- PX 281 at 1 (July 23, 2007 Cabrera letter: "I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs.").
- PX 283 at 3 (October 11, 2007 Cabrera letter: "The defendant's attorneys allege that the plaintiff is in 'close contact' with me, and that the plaintiff has provided me with technical information and support staff to assist with the expert examination. This is untrue. If I need any technical information in connection with this case, all I have to do is request it from this Court; the idea that the plaintiffs would be helping me with that is unthinkable.").
- PX 287 at 1 (October 31, 2007 Cabrera letter: "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency.").
- PX 289 at 1 (November 6, 2007 Cabrera letter: "The Work Plan was implemented as designed and intended, with complete transparency and impartiality.").
- PX 292 at 1 (December 10, 2007 Cabrera letter: "I hope and I am certain that my report, which is completely impartial, will help bring to light the truth of the matters in dispute.").
- PX 299 at 7 (October 7, 2008 Cabrera letter: "I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality.").
- PX 301 at 1-2 (December 8, 2008 Cabrera letter: "I clarify, Your Honor, that I have not received even one cent from the plaintiffs or from the defendants behind the back of the Court. …. I am one of those people who are convinced that the dignity of a person cannot be bought or sold, and therefore, I reject this false accusation, because all they do with it is to try to impair my reputation as an honorable man.").
- PX 304 at 1, 7 (March 4, 2009 Cabrera letter: "To ensure that there is no doubt as to the impartiality, integrity, and transparency of my work … All the tasks were performed under my strict direction and control.").

- PX 305 at 2, 3 (March 22, 2010 Cabrera letter: "Chevron accuses me of having a conflict of interest. ... Your Honor, this is another serious and false accusation. ... I prepared my report and submitted my expert opinion, based on technical and scientific results and the documentary information I received from different sectors, to the best of my knowledge and that of my team of professionals that participated in the study.").
- PX 310 (Cabrera report).
- PX 313 (Cabrera supplemental report).

60.     **The LAP team ghostwrote a Lago Agrio court filing in which Cabrera "confirm[ed] [his] commitment to continue performing my work in the expert examination in a clear, objective, professional, impartial and transparent manner" and alleged that Chevron had threatened him and members of his team, requesting that Chevron "be urged to abandon their actions of intimidation, insults, persecution and other measures that do nothing other than affect the image of justice and my person."**

- PX 944 at 1 (2007.12.17 email from Fajardo to Donziger attaching draft of the Cabrera letter in which Cabrera claimed to be threatened by Chevron ("Cabrera threat letter")).
- PX 944 at 2-4 (draft of Cabrera threat letter sent by Fajardo to Donziger with the metadata showing the author as "Pablo" and that the document was last modified on October 31, 2007, six days before the threat letter was filed in Cabrera's name).
- PX 288 at 1 (2007.11.05 filed version of the Cabrera threat letter in which Fajardo, writing as Cabrera, claims "my life, as well as the lives of my family and collaborators, are in serious danger" because of Chevron).

61.     **Stratus wrote and publicly released in December 2008 a "review" of the Cabrera report that falsely described Cabrera as a "neutral expert" who personally "prepared" the Cabrera report and the Supplemental Cabrera report, without disclosing that Stratus had written or controlled the authorship of the bulk of the Cabrera report and Supplemental report.**

- PX 314R ("Comments on the Report of the Court-Appointed Expert Richard Cabrera Vega in the Case of *Maria Aguinda y Otros v. Chevron Corp.*").
- PX 1347 at 1 (Email chain from Horowitz to Wilson cc'ing Abady, Donziger, Maazel, Westenberger, Yennock, Daleo, Rockwell re "Rule 60(b) and Stratus Materials") (LAPs' U.S. counsel Horowitz: "These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report. . . . it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator.").
- PX 5208 (Beltman Witness Statement) ¶ 59 ("Because the effort to secure third party endorsements failed, Donziger directed me to provide him with the December 1, 2008, 'Stratus Comments' endorsing the Cabrera Report. I drafted the Stratus Comments, and they were signed by myself and four other Stratus scientists."); *id.* ¶ 60 ("The December 1,2008 Stratus Comments do not disclose that Stratus drafted substantial portions of the Cabrera Report, but instead state that the report was prepared by Cabrera.").
- PX 1291 at 1 (Donziger: if Chevron obtained discovery from Stratus, "they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.").
- 1/19/2011 Donziger Dep. 3400:7-9 (Donziger: "Stratus had drafted a substantial number of annexes that were adopted by [Cabrera] verbatim that were included in his report.").

62.     **The LAP team knew that ghostwriting the Cabrera report was illegal and that public disclosure of their authorship could subject them to criminal and civil liability.**

- PX 1279 at 1 (Email from Prieto to Donziger, Saenz, Yanza and Fajardo re "Protection Action" and an English translation thereof) (Prieto: "[T]he effects [of disclosure of Defendants' relationship with Cabrera in the Stratus 1782 action] are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]").

- PX 2454 at 2 (Email chain from Donziger to Berlinger re "GRACIAS," and an English translation thereof) (Fajardo imploring Berlinger to edit *Crude* to remove scene showing members of the LAP team meeting with Cabrera team member Carlos Beristain, because disclosure of Defendants' relationship with Cabrera and his team was "so serious that we could lose everything").

- PX 1291 at 1 (Letter from Donziger to Fellow Counsel) (Donziger: relationship with Cabrera was "a violation of local court rules," and "improper" under a "traditional Ecuadorian law perspective. . . . By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court.").

- PX 1347 (Email chain from Horowitz to Wilson cc'ing Abady, Donziger, Maazel, Westenberger, Yennock, Daleo, Rockwell re "Rule 60(b) and Stratus Materials") (LAPs' U.S. counsel: "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator.").

- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's interrogatories) at 46 (listing code names Donziger and other members of the LAP team used to refer to Cabrera, the judge, and the Lago Agrio court).

- 1/29/2011 Donziger Dep. 3805:8–12 (testifying regarding the code names the LAP team used to conceal their relationship with Cabrera).

- PX 870 (the LAP team used a "secret" bank account to conceal their payments to Cabrera).

- PX 39–42 (the LAP team instructed the *Crude* cameramen not to film certain discussions that would reveal the Cabrera fraud).

- Tr. (Donziger) 2558:19–20 (Donziger admitted Defendants instructed their team to keep the Cabrera fraud secret because "[w]e did not want Chevron to know what we were doing.").

- PX 46A at 3 (When Crude filmmakers captured a U.S. consultant admitting that "having the perito there" at the LAPs' March 3, 2007 meeting "was totally bizarre," Donziger instructed the filmmaker: "that was off the record.").

- PX 5208 (Beltman) ¶ 10 ("Donziger stressed to [Beltman] and Ann Maest the importance of Stratus ensuring that no one learn of Stratus's involvement in any aspect of the Cabrera Report . . .  Donziger also instructed me not to tell the LAPs' spokesperson, Karen Hinton, or Donziger's legal associate, Andrew Woods, that Stratus participated in drafting the Cabrera Report and certain of its annexes.").

63.     **When the LAP team's ghostwriting of the Cabrera report became public, the LAP team sought to "cleanse" the fraud by making false and incomplete disclosures to the Lago Agrio court about the LAP team's role in ghostwriting the report.**

- PX 384R (Filing by P. Fajardo in *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003, bearing the foja numbers 185,160 - 185,167, and an English translation thereof") at 2, 5, 6 (In a filing seeking the opportunity to submit additional expert reports, Fajardo failed to disclose that Defendants made secret payments to Cabrera and ghostwrote his reports, instead making false and incomplete disclosures: "I appear before you to clarify the truth about Cabrera's work."; "Cabrera performed approximately forty-eight (48) separate inspections of the site subject to litigation on his own account"; "Chevron enjoyed the same opportunity as the Plaintiffs to provide information to Cabrera in support of its position in the case.").

- PX 1359 (2010.05.20 Email chain among Donziger, E. Westenberger, J. Abady and others re "Draft Outline of Possible Ecuadorian Court Filing") at 1 ("Patton Boggs attorney Eric Westenberger explained this was "an effort to 'cleanse' any perceived impropriety related to the Cabrera Report").

- PX 1370 (2010.06.14 Email from Donziger to J. Tyrrell, E. Westenberger, and E. Daleo re "important update/Ecuador") (Donziger: "The Ecuador team is getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera. Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem.").

- PX 1375 at 35 (the LAPs' counsel ultimately removed any specific assertions as to their involvement in the Cabrera fraud from the filing, apparently to "balance[] the desire for a 'cleansing'" with the concern that only a partial disclosure of their involvement could "come back to haunt us in a big way").

64.     When the LAP team's ghostwriting of the Cabrera report became public, the
        LAP team sought to "cleanse" the fraud by submitting additional expert
        reports that re-asserted the Cabrera report's conclusions, but with even
        higher damages findings, written by paid experts who relied on the Cabrera
        report without being informed of the true facts that the LAP team had
        ghostwritten the Cabrera report.

- PX 1410 at 1 (LAP counsel explained how the cleansing experts should "address
  Cabrera's findings in such a subtle way that someone reading the new expert report
  . . . might feel comfortable concluding that certain parts of Cabrera are a valid
  basis for damages").
- PX 1414 at 1 (the LAPs hired consulting firm the Weinberg Group to "conduct a
  comprehensive review of selected sections of an expert report prepared by
  Engineer Richard Stalin Cabrera Vega as an independent expert for the court").
- 12/16/2010 Allen Dep. 205:13-206: 9 (cleansing expert Douglas Allen was asked,
  "Does it not bother you or impact your opinions to the reasonable degree of
  scientific certainty with which they are made that the report upon which you relied,
  that by Mr. Cabrera, was not only purported to be written by Mr. Cabrera but in
  fact has been shown not to be written by Mr. Cabrera but to be written by plaintiffs
  and plaintiffs' paid consultants?" and Allen responded, "yeah, it might bother
  me.").
- PX 2411R (Donziger Defendants' second supplemental responses to Chevron's
  interrogatories) at 44 ("Donziger provided oral comments on at least some of the
  [cleansing expert] reports.").

**VII.   The LAP Team Fraudulently Procured the Lago Agrio Judgment**

    **65.   Following Zambrano's appointment as a judge in Lago Agrio in 2008, and until Zambrano's dismissal as a judge in February 2012, Guerra ghostwrote orders and rulings for Zambrano in exchange for payments from Zambrano.**

- Tr. (Zambrano) 1630:22-24, 1647:6-9 (Zambrano admitted that Guerra had helped him draft court orders from 2009 through 2012); *id.* 1642:6-8 (Zambrano acknowledged making a $300 cash deposit into Guerra's account).

- PX 4800 (Guerra) ¶¶ 8, 11-20 (attesting that from 2008 to 2012, Zambrano paid Guerra approximately $1,000 per month to ghostwrite orders and judgments in Zambrano's civil cases).

- PX 1733A; PX 1734A at 2 (Guerra's contemporaneous day planner entries reflects payments from Zambrano on numerous occasions—July 15, 2011 ($500), August 11, 2011 ($1,000), October 14, 2011 ($500), and February 24, 2012 ($2,000)—during the time that Guerra served as Zambrano's ghostwriter).

- PX 4100 (Lynch) ¶ 3(e) ("Mr. Guerra's computer hard drive and thumb drives also contained drafts of 105 rulings issued by the Ecuadorian court in cases unrelated to the Chevron case ('Other Draft Guerra Rulings'). At least 101 of the 105 rulings were issued by then-judge Zambrano. True and correct copies of the 105 Other Draft Guerra Rulings are marked as PX 375, PX 1468, PX 1773 – PX 1875").

- PX 4105 (Full Lynch Report).

- PX 2180 (Timeline depicting the dates of draft orders extracted from Guerra's hard drive and the dates the corresponding orders were issued by the Lago Agrio court).

66.     **In 2009 and 2010, while then-Judge Zambrano presided over the Lago Agrio litigation, Guerra ghostwrote orders in the Lago Agrio litigation.**

- PX 4800 (Guerra) ¶¶ 8, 11-20 (attesting that from 2008 to 2012, Zambrano paid Guerra approximately $1,000 per month to ghostwrite orders and judgments in Zambrano's civil cases).
- PX 4100 (Lynch) ¶ 3(c)-(d) (concluding Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases).
- PX 4105 (Full Lynch Report).
- PX 2180 (Timeline depicting the dates of draft orders extracted from Guerra's hard drive and the dates the corresponding orders were issued by the Lago Agrio court).
- PX 1687 (Attachment K to the declaration of Alberto Guerra Bastidas - Banco Pichincha Account Statement, and an English translation thereof) (reflecting deposit from Selva Viva employee Ximena Centeno).
- PX 1688 (Attachment L to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof) (same).
- PX 1689 (Attachment M to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof, and an unredacted version thereof) (same).

67.     **In 2009, Zambrano, through Guerra and Liliana Suarez, proposed to Chevron's counsel in Ecuador the opportunity to meet to discuss a resolution of the Lago Agrio litigation in Chevron's favor.  Chevron refused these overtures.**

- PX 4800 (Guerra) ¶¶ 21-22 (In August 2009, it became clear that Judge Nuñez would have to recuse himself from the Chevron case, and that Judge Nicolas Zambrano would take over); *id.* ¶ 22 (Between August and October 2009, Zambrano asked Guerra to reach out to Chevron's representatives and offer to resolve the case in Chevron's favor in exchange for a bribe); *id.* (Zambrano reasoned that "Chevron would have much more money than the Plaintiffs . . .[.]"); *id.* (At Zambrano's direction, Guerra approached Mr. Racines, a lawyer for Chevron, and told him about Zambrano's offer); *id.* ¶ 23 (Racines refused Guerra's proposal).

- Tr. (Guerra) 914:6–24, 914:25–915:2, 915:3–6, 915:14–18, 917:15–24, 918:2–919:5 (same).

- PX 1167 (contemporaneous Callejas declaration memorializing that, on October 16, 2009, Zambrano directed his law clerk and companion, Liliana Suarez, to arrange a meeting with Callejas).

- PX 4300X (Callejas) ¶¶ 64-69 (describing overtures Guerra made to Racines and Campuzano, another lawyer on the Chevron team, and Suarez's effort to have Callejas meet privately with Zambrano, and attesting that he and members of Chevron legal team rejected these overtures).

68.     **In 2009, Zambrano reached an illicit agreement with members of the LAP team, which agreement was further negotiated and agreed to by Guerra, Fajardo, Donziger, and Yanza, by which Guerra and Zambrano would expedite the case and issue orders in the Lago Agrio litigation favoring the LAPs.**

- PX 4800 (Guerra), ¶¶ 23-35 ("Mr. Zambrano subsequently told me that I should meet with Mr. Pablo Fajardo, that he had reached an agreement with the Plaintiffs' representatives to quickly move the case along in their favor (although he did not tell me the details of that agreement) and that I should work out a financial arrangement directly with Mr. Fajardo for payment of my ghostwriting services. Mr. Fajardo and I subsequently met in Quito, at the corner of Rio Coca and 6 de Diciembre avenues, and we discussed my role as ghostwriter for Mr. Zambrano. We agreed on 3 things: (1) I would make the case move quickly; (2) Chevron's procedural options would be limited by not granting their motions on alleged essential errors in rulings I was to write, so the case would not be delayed; and (3) the Plaintiffs' representatives would pay me USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write.").
- PX 1753 (2009.09.15 email from P. Fajardo to Donziger, L. Yanza, J. Prieto, and J. Saenz re "PUPPETEER") (referring to Zambrano and Guerra as the "puppeteer" and "puppet": "I think that everything is quiet... The puppeteer is pulling the string and the puppet is returning the package... By now it's pretty safe that there won't be anything to worry about...The puppet will finish off the entire matter tomorrow... I hope they don't fail me...").
- PX 1751 (2009.10.27 email from P. Fajardo to Donziger and L. Yanza re "NEWS") ("The puppeteer won't move his puppet until the audience doesn't pay him something...").
- PX 1746 (2009.11.27 email from L. Yanza to Donziger re "Important to discuss this weekend") ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer").
- PX 4100 (Lynch) ¶ 3(c)-(d)(concluding Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases).
- PX 4105 (Full Lynch Report).
- PX 2180 (Timeline depicting the dates of draft orders extracted from Guerra's hard drive and the dates the corresponding orders were issued by the Lago Agrio court).
- PX 1687 (Attachment K to the declaration of Alberto Guerra Bastidas - Banco Pichincha Account Statement, and an English translation thereof) (reflecting deposit from Selva Viva employee Ximena Centeno during this period).
- PX 1688 (Attachment L to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof) (same).
- PX 1689 (Attachment M to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof, and an unredacted version thereof) (same).

69.     **As part of this illicit agreement, the LAP team agreed to, and regularly did, pay Guerra approximately $1,000 a month.**

- PX 4800 (Alberto Guerra Bastidas Witness Statement), ¶¶ 23-35 ("Mr. Zambrano subsequently told me that I should meet with Mr. Pablo Fajardo, that he had reached an agreement with the Plaintiffs' representatives to quickly move the case along in their favor (although he did not tell me the details of that agreement) and that I should work out a financial arrangement directly with Mr. Fajardo for payment of my ghostwriting services.  Mr. Fajardo and I subsequently met in Quito, at the corner of Rio Coca and 6 de Diciembre avenues, and we discussed my role as ghostwriter for Mr. Zambrano.  We agreed on 3 things: (1) I would make the case move quickly; (2) Chevron's procedural options would be limited by not granting their motions on alleged essential errors in rulings I was to write, so the case would not be delayed; and (3) the Plaintiffs' representatives would pay me USD $1,000 per month for writing the court rulings Mr. Zambrano was supposed to write.").
- PX 1753 (2009.09.15 email from P. Fajardo to Donziger, L. Yanza, J. Prieto, and J. Saenz re "PUPPETEER") (referring to Zambrano and Guerra as the "puppeteer" and "puppet": "I think that everything is quiet… The puppeteer is pulling the string and the puppet is returning the package… By now it's pretty safe that there won't be anything to worry about…The puppet will finish off the entire matter tomorrow… I hope they don't fail me…").
- PX 1751 (2009.10.27 email from P. Fajardo to Donziger and L. Yanza re "NEWS") ("The puppeteer won't move his puppet until the audience doesn't pay him something…").
- PX 1746 (2009.11.27 email from L. Yanza to Donziger re "Important to discuss this weekend") ("[T]he budget is higher in relation to the previous months, since we are paying the puppeteer").
- PX 4100 (Lynch) ¶ 3(c)-(d) (concluding Guerra's hard drive contained drafts of nine of the 12 court orders Zambrano issued during his first tenure on the Chevron case (from October 2009 through March 2010), and drafts of two appellate judgments issued by Zambrano in other cases).
- PX 4105 (Full Lynch Report).
- PX 2180 (Timeline depicting the dates of draft orders extracted from Guerra's hard drive and the dates the corresponding orders were issued by the Lago Agrio court).
- PX 1687 (Attachment K to the declaration of Alberto Guerra Bastidas - Banco Pichincha Account Statement, and an English translation thereof) (reflecting deposit from Selva Viva employee Ximena Centeno during this period).
- PX 1688 (Attachment L to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof) (same).
- PX 1689 (Attachment M to the declaration of Alberto Guerra Bastidas - Banco Pichincha deposit records, and an English translation thereof, and an unredacted version thereof) (same).

70.     **In late 2010 or early 2011, the LAP team reached an illicit agreement with Zambrano, by which they agreed to pay him a $500,000 bribe from the judgment enforcement proceeds for the LAP team to ghostwrite the judgment Zambrano would issue in the Lago Agrio case.**

- PX 4800 (Guerra) ¶ 41 (Zambrano "suggested and authorized me to seek an agreement with the Ecuadorian Plaintiffs' representatives so that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano"); *id.* ¶ 42 ("Fajardo, Yanza and Donziger were present at the meeting, in which I summarized the proposal in detail, explaining that, in exchange for a payment of at least $500,000, Mr. Zambrano would let the Ecuadorian Plaintiffs' team draft the judgment in their own favor, and that Mr. Zambrano would then sign this draft judgment."); *id.* ¶ 43 ("Mr. Zambrano later told me that he was in direct contact with Mr. Fajardo and that the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever money they were to collect from the judgment, in exchange for allowing them to write the judgment in the Plaintiffs' favor."); *id.* ¶ 51 ("Based on what Mr. Zambrano told me, it is my understanding that the Ecuadorian Plaintiffs' attorneys made changes to the judgment up to the very last minute before it was signed and issued by Mr. Zambrano.").

71.     **Zambrano did not write the Lago Agrio judgment.**

- Tr. (Zambrano) 1605:14–17, 1606:3–17, 1607:9–22 (Zambrano described the 188-page Lago Agrio judgment as "the most important decision [he] ever issued in [his] life as a judge," involving the longest opinion and the largest damages award, and claimed he worked "very hard" on the judgment for "many hours, many days, including several weekends."); 1615:1–10 (Zambrano could not identify what the abbreviation "TPH" (total petroleum hydrocarbons) stood for); 1611:15–18 (Zambrano did not know what the judgment described as the "most powerful carcinogenic agent" in the decision—benzene); 1613:1–21 (Zambrano could not recall what the judgment identified as the "statistical data of highest importance to delivering this ruling"—the San Sebastian health study); 1614:7–10 (Zambrano could not recall the theory of causation upon which the judgment is based—known as "sufficient causation."); 1614:11–12, 1711:22–1712:13, 1713:8–11 (Zambrano testified that he did not know the meaning of the English word "workover," even though that word appears twice in the judgment); 1719:18–1720:2, 1736:21–24 (Zambrano testified that he reviewed the entire record (more than 236,000 pages) beginning in October 2010 and that he completed his review "way before" January 2011); 1691:20–16921:5, 1695:1–4, 1699:12–1700:8 (Zambrano could not identify a single document left by the LAPs' team (or anyone else) outside his door, and could not recall any other case where parties left documents outside his office door); 1698:1–2 (Zambrano testified that he did not know what an Excel spreadsheet was, even though material from the unfiled Selva Viva data compilation, an Excel spreadsheet appears in the judgment).
- PX 400 (Lago Agrio judgment) ("TPH" appears 38 times in the judgment, though Zambrano did not know what it stands for); *id.* at 181 (awarding nearly $5.4 billion (more than half of the judgment's remediation award for purported soil contamination based on TPH levels); *id.* at 107 (the judgment called benzene the "most powerful carcinogenic agent", something Zambrano could not recall); *id.* at 134 (identifying the San Sebastian health study as the "statistical data of highest importance to delivering this ruling" – Zambrano was unable to identify this); *id.* at 88 (the theory of causation upon which the judgment is based is known as "sufficient causation" – something Zambrano did not know).
- PX 399 at 20–21 (English word "workover" appears twice in Spanish version of judgment).
- PX 435 (English word "workover" appears twice in the Fusion memo).
- PX 4200 (Rayner) ¶ 3 (concluding that it would have been "impossible" for Zambrano to have read the entire record (more than 236,000 pages) between October 2010 and January 2011, as Zambrano testified he did).
- PX 6371 (Tarco declaration) ¶ 10 (attesting that a document very similar to the judgment, Providencias.docx, was written on the old computer).
- Tr. (Zambrano) 1658:14 –1659:6, 1679:2–7, 1680:3–6 (testifying that he drafted the judgment entirely on the "new computer").
- PX 4108–10; PX 4119–22 (review of the inventory records of the Ecuadorian Judicial Council and the business records of Hewlett Packard (the manufacturer of

both computers) demonstrates that PC-02—which Tarco identified by serial number—was the "old computer" assigned to Zambrano).

- PX 6371 ¶¶ 10, 11 (the Tarco Declaration asserts that Providencias.docx was created on October 11, 2010 and was edited for 3,571 hours between that date and the last-edited date of the document, March 18, 2011).

- Tr. (Zambrano) 1679:8–11, 1680:20–25, 1681:15–23, 1683:1–6 (Zambrano testified that he personally turned off his computers at night and on the weekends, and that he did not take them home with him).

- Tr. (Lynch) 2816:25–2817:2 (testifying that edit time does not accumulate when a computer is turned off).

- PX 8103 at 10-11 (LAP team discussing press release regarding the forensic report: "Zambrano could not have worked on the judgment 24/7 during those 5 months.").

72.    **The Lago Agrio judgment was ghostwritten by the LAP team.**

- PX 1057 (email from P. Fajardo to Donziger: Donziger writes that part of his plan is "[D]oing everything to prepare the court to issue a quick judgment and in such a way that it can be enforced in the U.S. before appeals in Ecuador . . . Working out the plan for court and the judges, to speed things up.").
- PX 1088 (email from P. Fajardo to Donziger copying L. Yanza, calling a meeting "with all the teams" to develop a plan to "obtain a trial judgment in 2009" that would be "favorable and significant" because "[w]e have Correa, the Court and U.S. politics . . . It's now or never").
- PX 1137 (Fajardo explaining that he will give Selva Viva intern Brian Parker "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing").
- PX 1138 ("Comrade, I don't know if you are coming tomorrow or not. In any case, I'll say that Friday's meeting is key, and I think you should be there. In that meeting we'll be talking about all the outcome of the case and what to do, how much money to put in, how to distribute the items and everything.").
- PX 2378 (Fajardo emails Donziger and Yanza regarding hiring a new attorney to assist with "organizing the office's legal information for the alegato and the other project" and noting that the potential hires are "willing to work at our offices and do what we ask them to . . . .").
- PX 5100 (Green) ¶ 11 ("[M]y assessment is that it is highly unlikely that the passages in the Ecuadorian judgment identified below were prepared independently of the Moodie memorandum.").
- PX 4800 (Guerra) ¶ 47 ("Mr. Zambrano gave me a draft of the judgment so that I could revise it. It was through him that I found out that the attorneys for the Plaintiffs had written that judgment and had delivered it to him."); *id.* ¶ 49 ("Overall, I made very few changes to the draft judgment—mostly word changes due to personal preference—and my version of the draft judgment was not too different from the one that the Plaintiffs' lawyers had given to Mr. Zambrano.").
- PX 3900 (Hernandez) ¶ 3 ("Based on my expert review and analysis, I have concluded that, to a reasonable degree of certainty, the documents known as the Fusion Memo (PX 435), the Record Index Excerpts (attached hereto as Attachments A and B), the Fajardo Trust Email (PX 437), the Moodie Memo (PX 1101), and the draft *alegato* (PX 438), are not found in the Lago Agrio trial court record.").
- PX 3700 (Leonard) ¶ 3 ("I conclude, to a reasonable degree of scientific certainty, that portions of the Ecuadorian court's February 14, 2011 judgment . . . and the Ecuadorian Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the judgment are therefore plagiarized from the Ecuadorian Plaintiffs' unfiled work product.").
- PX 4100 (Lynch) ¶ 3(i) ("The Ecuadorian Judgment repeats over 100 specific naming and data irregularities, as well as other errors, from the Ecuadorian Plaintiffs' Lawyers' Unfiled Data Compilation, PX 439 – PX 441.  These data

points in the Ecuadorian Judgment were copied, cut-and-pasted, or otherwise taken directly from the Ecuadorian Plaintiffs' Lawyers' Unfiled Data Compilation.").

73.     **The Lago Agrio judgment contains internal work product prepared by the LAP team but never filed in the Lago Agrio litigation, including the Fusion memo, the Fajardo trust email, the Moodie memo, the Clapp report, the Selva Viva data compilation, and the LAPs' index summaries.**

- 7/19/2011 Donziger Dep. 4687:10-13 ("Q. Are you aware of an occasion on which Exhibit 1806A, the Fusion memo, was provided to the court in Lago Agrio? A. No."); 4689:7-11 ("Q. Are you aware of anywhere in the Lago Agrio record that the Fusion memo appears? A. No. You mean the hand-marked record? No."); 4704:21-4605:4 ("Q. Is it accurate that since the overlap between the judgment and the Fusion memo was disclosed in the Younger declaration, plaintiffs' counsel have not identified any instance in the record where the text from the Fusion memo appears, other than the judgment, correct? A. That's correct.").

- 6/24/2013 Donziger Dep. 223:21-224:9 ("Q. This memo that Mr. Moodie wrote, this is the plaintiffs' internal work product? A. I believe it is. Q. Are you aware of any occasion on which this memo was provided to Judge Zambrano? A. No. Q. Are you aware of any occasion on which this memo was filed with the Ecuadorian court? A. No, I don't -- I don't know whether it was or was not.").

- PX 2156 (demonstrative comparing overlap between the Moodie memo and the Lago Agrio judgment).

- PX 2164 (summary charts comparing text from the Lago Agrio judgment to the Lago Agrio Plaintiffs' unfiled work product).

- PX 2166 (Fusion memo highlighted and annotated to show textual overlap with the Lago Agrio judgment).

- PX 2167 (Lago Agrio Plaintiffs' draft alegato highlighted and annotated to show textual overlap with the Lago Agrio judgment).

- PX 2168 (email sent from Fajardo on June 18, 2009, highlighted and annotated to show textual overlap with the Lago Agrio judgment).

- PX 2169 (November 2006 report sent by Prieto to Donziger on October 24, 2007, highlighted and annotated to show textual overlap with the Lago Agrio judgment).

- PX 2175 (summary chart of overlap and common errors found in the Lago Agrio judgment, Selva Viva data compilation, and Stratus compilation).

- PX 3800 (Juola) ¶ 3 ("I have concluded, to a reasonable degree of certainty, that the Fusion Memo, the Clapp Report, the Index Summaries, the Fajardo Trust email, the Draft Alegato, and the Selva Viva Data Compilation are not in the trial court record.").

- PX 3700 (Leonard) ¶ 3 ("I conclude, to a reasonable degree of scientific certainty, that portions of the Ecuadorian court's February 14, 2011 judgment . . . and the Ecuadorian Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the judgment are therefore plagiarized from the Ecuadorian Plaintiffs' unfiled work product.").

- PX 5100 (Green) ¶ 11 ("[M]y assessment is that it is highly unlikely that the passages in the Ecuadorian judgment identified below were prepared independently of the Moodie memorandum.").

- PX 3900 (Hernandez) ¶ 3 ("Based on my expert review and analysis, I have concluded that, to a reasonable degree of certainty, the documents known as the Fusion Memo (PX 435), the Record Index Excerpts (attached hereto as Attachments A and B), the Fajardo Trust Email (PX 437), the Moodie Memo (PX 1101), and the draft *alegato* (PX 438), are not found in the Lago Agrio trial court record.").

- PX 4100 (Lynch) ¶ 3(i) ("The Ecuadorian Judgment repeats over 100 specific naming and data irregularities, as well as other errors, from the Ecuadorian Plaintiffs' Lawyers' Unfiled Data Compilation, PX 439 – PX 441.  These data points in the Ecuadorian Judgment were copied, cut-and-pasted, or otherwise taken directly from the Ecuadorian Plaintiffs' Lawyers' Unfiled Data Compilation.").

74.     **The LAP team's internal work product (as identified in Paragraph 73 above) does not appear in the official record of the Lago Agrio litigation.**

- PX 3800 (Juola) ¶ 3 ("I have concluded, to a reasonable degree of certainty, that the Fusion Memo, the Clapp Report, the Index Summaries, the Fajardo Trust email, the Draft Alegato, and the Selva Viva Data Compilation are not in the trial court record.").

- PX 3900 (Hernandez) ¶ 3 ("Based on my expert review and analysis, I have concluded that, to a reasonable degree of certainty, the documents known as the Fusion Memo (PX 435), the Record Index Excerpts (attached hereto as Attachments A and B), the Fajardo Trust Email (PX 437), the Moodie Memo (PX 1101), and the draft alegato (PX 438), are not found in the Lago Agrio trial court record.").

75.     **The Lago Agrio judgment contains quotations from and references to books, articles, and other secondary sources unavailable or not widely available in Ecuador, many of which appear in work product prepared by the LAP team but never filed in the Lago Agrio litigation and which does not appear in the record of the case.**

- PX 937 (Library records).
- PX 2491 (July 15, 2008 Erion email asking for McGraw-Hill Spanish-English dictionary).

76.   **The judgment awards approximately $5.4 billion based on a "pit count" of 880 pits, but the author of the judgment derived this pit count from the Cabrera report.**

- PX 400 (Lago Agrio judgment) at 125 (calculating damages for soil remediation by using a "pit count" of 880 as a multiplier to determine the soil volume that purportedly required remediation); *id.* (asserting that Zambrano reached the 880 pit count "through aerial photographs certified by the Geographic Military Institute which appear throughout the record, analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros"); *id.* at 180-181 (awarding nearly $5.4 billion for soil remediation).
- PX 2502 at 17 (2011.02.17 Motion for Clarification requesting that the Ecuadorian court clarify its basis "for concluding that there are 880 pits, as is indicated on page 125 of the Judgment").
- PX 429 at 15 (2011.03.04 clarification order) (making no mention of reliance on the unspecified "official documents" referred to in the judgment, but rather claiming only that "the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute.").
- PX 4000 (Ebert) ¶¶ 3, 15, 18, 20-23 ("the 880 pit count in the Ecuadorian judgment must have been based on what is in the Cabrera report" because "it is impossible that the author of the Ecuadorian judgment and the author of the Cabrera report could independently review the hundreds of aerial photographs in the record and reach the exact same conclusion that there are 880 pits requiring remediation.").
- Tr. (Ebert) 1345:20–24 (same).
- PX 4100 (Lynch) ¶¶ 3(j), 98 (concluding that "the 880 pit count in the judgment was derived from annex H1 to the [Cabrera] report," and reaching this conclusion by sorting Annex H-1 to exclude Petroecuador and Petroproduccion pits as well as "no impact" pits).
- Tr. (Lynch) 638:19–639:7 (same).

77.     While the March 4, 2011 "Clarification Order" issued over Zambrano's
name states that the number of pits identified in the Lago Agrio judgment as
requiring remediation for which Chevron is liable was based on aerial
photographs in the court record, such a count could not be made from the
aerial photographs in the Lago Agrio record.

- PX 400 at 125 (Judgment stating that "we have 880 pits (proven through aerial
photographs certified by the Geographic Military Institute which appear
throughout the record analyzed together with the official documents of
Petroecuador submitted by the parties and especially by the expert Gerardo Barros
. . . .").

- PX 2502 (2011.02.17 Motion for Clarification requesting that the Ecuadorian court
clarify its basis "for concluding that there are 880 pits, as is indicated on page 125
of the Judgment").

- PX 429 at 15 (2011.03.04 Clarification Order stating "it is emphasized that, as
explained in the judgment, the Court analyzed the various aerial photographs that
form a part of the record and that were certified by the military Geographic
Institute").

- PX 310 at 25 (Cabrera Report claiming that the pit count found in Annex H-1 of
the Cabrera Report was derived, in part, from an "in-depth" analysis of "various
aerial photographs on file at the Military Geographical Institute").

- PX 4000 (Ebert) ¶ 3 (concluding that "it is impossible that the authors of the
Ecuadorian judgment and the Cabrera report independently reached the same 880
pit count by use of aerial photography. Rather, I conclude, to a reasonable degree
of certainty, that the 880 pit count in the Ecuadorian judgment must have been
based on what is in the Cabrera report, rather than any independent attempt to
assess aerial photographs in the record.").

- PX 4009 at 1-2 (Di Paolo Report concluding that "it is impossible for the
Ecuadorian court to accurately identify the number of pits or the number of pits
requiring remediation using aerial photo interpretation" because, among other
reasons, "no aerial photos were found in the record for approximately 35% of the
sites").

78.   **The judgment's $150 million award for potable water damages is based directly on the Cabrera report.**

- PX 400 (Lago Agrio judgment) at 182-183 (concluding that 35 percent of the population lacks access to potable water and reaching the $150 million figure by taking 35 percent of the $428 million potable water assessment in Annex R of the Cabrera report); *id.* at 182 (attempting to source this award to the Barros expert report).
- PX 310A (Cabrera report) at 44 (assessing $428 million for potable water).
- PX 3306 at 3 (Barros expert report reviewing Cabrera's potable water recommendation, which Expert Barros finds "[g]rossly [e]xaggerated and [f]raudulent").

79.     **The judgment's $200 million award to restore flora and fauna in the former concession area is based on cleansing expert reports that relied directly on the Cabrera report.**

- PX 400 (Lago Agrio judgment) at 182 (To support its $200 million award to restore flora and fauna in the former concession area, the judgment cites only one source: the report of cleansing expert Dr. Lawrence Barnthouse); *id.* at 57 (Barnthouse only reviewed and commented on the Cabrera report's environmental damages assessment and did not perform his own analysis—a fact that the judgment itself explicitly recognizes: "Dr. Barnthouse testified that he reviewed expert Cabrera's report, but did not prepare a damage report himself . . . .").

80.     **The judgment's eight categories of damages are based directly on the Cabrera report.**

- The judgment's eight damages categories taken from the Cabrera report are:
- (1) soil restoration (*compare* PX 400 at 125, 181, *with* PX 313 at 18);
- (2) restoration of groundwater (*compare* PX 400 at 147, *with* PX 310A at 6);
- (3) damages to the ecosystem (*compare* PX 400 at 152, *with* PX 310A at 41);
- (4) loss of indigenous culture (*compare* PX 400 at 173–74, *with* PX 310A at 35); (5) punitive damages (*compare* PX 400 at 185–86, *and* PX 429 at 9, *with* PX 310A at 48);
- (6) healthcare system (*compare* PX 400 at 183, *with* PX 310A at 42);
- (7) potable water (*compare* PX 400 at 183, *with* 310A at 42);
- (8) excess cancer deaths (*compare* PX 400 at 182–83, *with* PX 310A at 40).

81.     **The composition of the appellate panel that heard the first instance appeal of the Lago Agrio judgment was the product of a secret, improper process.**

- PX 371 (Document appointing Judge Toral to the Sucumbios court, and an English translation thereof).
- PX 393 (Affidavit of Assets re N. Zambrano Lozada, and an English translation thereof).
- PX 398 (Notice of Appointment, issued by the National Personnel Department of the Judicial Branch of Ecuador, appointing A. Orellana as Associate Judge in the Provincial Court of Sucumbios, and an English translation thereof).
- PX 402 (Request by Judge B. Cevallos to replace Judge M. Yaguache with Judge L. Zambrano on the Provincial Court of Justice of Sucumbios, and an English translation thereof) (weeks before the panel was officially constituted, Judge Yaguache was removed from the panel by Cevallos and replaced by Judge Luis Legña with no justification, except to state that Judge Yaguache's removal was "for the benefit of institutional interests.").
- PX 403 (Certificate of Lottery Drawing to Form the Sole Division of the Provincial Court of Justice of Sucumbios, No. 106-2011, and an English translation thereof).
- PX 406 (Fajardo court filing noting the procedural irregularities in the constitution of the appellate panel and requesting that the panel make clear that appropriate procedures were followed "to avoid defects nullifying the proceedings.").

**82.      The first instance appellate judgment does not provide a substantive explanation for the evidence of fraud in the judgment itself or for the evidence of fraud in the proceedings Chevron submitted to the court.**

- PX 430 (Appellate judgment) at 10 (In its January 3, 2012 order, the second instance review panel stated that it had no "competence" to address the allegations of fraud against the LAP team).
- PX 431 (Appellate Clarification Order) at 5 (In its January 13, 2012 "Clarification Order," the second instance review panel stated in reference to the allegations of fraud against the LAP team, that "it stays out of these accusations," but that it did not find the evidence of fraud persuasive).

VIII.   **Defendants Seek to Put Chevron in Fear of Economic Harm Through Public Pressure Including Misrepresentations About the Russell Damages Estimate, the Cabrera Report, and the Lago Agrio Judgment.**

83.   **In 2003, the LAP team retained David Russell as a science expert in connection with the Lago Agrio litigation, and prevailed upon him to provide the highest possible preliminary damages estimate before he undertook any serious investigation in order to "scare Chevron" and its investors into settlement.**

- PX 3200 (Russell) ¶ 4 ("I ultimately worked for Donziger from the Fall of 2003 to early 2005.  At first, my role was to do an initial cost estimate for remediation based on a brief trip to Ecuador.  Later, I became the lead environmental scientist for Donziger and the Ecuadorian plaintiffs' team in the Ecuadorian litigation.").
- PX 3200 (Russell) ¶ 9 ("Donziger told me that he wanted a 'really big number,' and he needed a 'really big number' for purposes of 'putting pressure' on Chevron to settle the litigation.  In response, I told him that I would try to come up with the biggest possible cost estimate I could. . . .  Donziger told me that everything was from Chevron and that I should just assume that there was contamination.").
- PX 3200 (Russell) ¶ 11 ("Mr. Bonifaz acknowledged that the estimate of billions of dollars in costs was for PR purposes because no one had an accurate estimate of the total costs. Mr. Bonifaz's statement that, in effect, my six-billion-dollar cost estimate was just for PR purposes is consistent with what Donziger told me.").
- PX 3200 (Russell) ¶ 12 ("Donziger was using the estimate as a club and trying
- to batter Chevron with it in public").
- Donziger Dep. 3168:4-9 ("Q. Do you know who David Russell is?    A. Yes.    Q. He was your top expert on remediation valuation, wasn't he?    A. At a certain time, yes.").
- Donziger Dep. 3170:3-12 ("Q. And didn't [Russell] also tell you that you had insisted at the time he put that 2003 remediation estimate of $6 billion together that he deliberately chose the most expensive remedial options available? A.   Yes").
- PX 688 (April 13, 2004 email from Russell to Bonifaz about lack of data).
- PX 697 (September 14, 2004 email from Donziger to Russell pushing him to finish the report despite Russell's concerns about lack of data).
- PX 817 (December 22, 2006 email from Leila Salazar to Donziger describing Russell's report as "PRELIMINARY" but useful to "scare Chevron and investors.").

84. **As a result of instructions provided by the LAP team and Donziger, in particular, Russell provided a "SWAG" – a "scientific wild-ass guess"— remediation estimate of $6 billion dollars.**

- PX 2414 (Russell's 3-page report, recommending "a substantial sampling and identification campaign" as a "necessary first step in defining the problem" but nonetheless providing a "very rough" cost estimate of $6.114 billion).
- Tr. (Russell) 338:23–339:11 (testifying that the $6 billion estimate was a SWAG, which stands for "Scientific Wild Ass Guess.").
- PX 3200 (Russell) ¶ 10 ("I provided Donziger with a $6.114 billion cost estimate based largely on the assumptions Donziger told me to use, the descriptions of the environmental damage in the area given to me by Donziger and members of the Ecuadorian plaintiffs' team, and my observations during my trip.").

85.     **In 2006, Russell sent Donziger and Amazon Watch cease-and-desist letters ordering them to stop citing Russell's preliminary estimate of $6 billion, on the grounds that it was unreliable and overstated the likely cost of remediation in the region by a factor of ten or more.**

- PX 763 (February 14, 2006, Russell cease and desist letter to Donziger).
- PX 766 (February 13, 2006, Russell cease and desist email to Amazon Watch).
- PX 788 (August 15, 2006, Russell cease and desist email to Donziger).
- PX 3200 (Russell) ¶ 11 ("Within a year of working for Donziger, I came to learn that my cost estimate was wildly inaccurate and had no scientific data to back it up.").
- PX 3200 (Russell) ¶ 16 ("I wrote Donziger and Amazon Watch to tell them to 'cease and desist' using the estimate.'").
- PX 18 ("The reality is, based on what this guy is telling me, [it] would cost less than that. Significantly less than that.").

86.     **The LAP team encouraged and participated in publishing false statements about the Russell damages estimate to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders, with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 4400 (Kim) ¶¶ 8–9 (Identifying 32 instances of public citations to Russell's estimate by Donziger or other LAP team members, including 22 instances made after February 14, 2006).
- PX 18A (Crude Clip: "It is a valid number. I don't care what the fuck that guy says").
- 1/18/2010 Donziger Dep. 3179:15-20 ("Q. Didn't you in fact continue repeatedly to use that $6 billion remediation estimation in public press releases and in the litigation efforts in Lago Agrio?  A. Yes.").
- 1/18/2010 Donziger Dep. 3190:15-3191:3 ("Q. And you continued to use that same damage estimate, you and Amazon Watch, in your submissions to the SEC, even though the only independent damage assessment you could cite was David Russell's that you had known for more than a year he had renounced? … A. Yes").
- PX 754 (Letter from Amazon Watch to the SEC requesting an investigation of Chevron and claiming, "One environmental remediation expert estimated that a basic clean-up would cost at least $6 billion.").
- PX 3200 (Russell) ¶ 22 ("[D]espite my demand that Donziger and his team stop using my wildly inaccurate cost estimate, and despite Donziger's promise to do so, Donziger and his team ignored me.  They continued to issue press releases relying on that estimate.").
- 1/18/2010 Donziger Dep. 3187:9-3188:9 ("More than a year earlier Russell had told you that even his $6 billion remediation estimation that he prepared at your insistence was off by a factor of ten or more, correct?   A. Yes.   Q. You thought it would make you look like fools to use any number that would be less than 3.5 to $4 billion for remediation because you've worked with Russell's number all these years, correct? . . . . A. That was one reason, yes, that I believe I wrote that.  Q. And by 'worked with Russell's number all these years,' you mean that you had continued to use Russell's $6 billion remediation number even after more than a year earlier than you wrote this note he had renounced it as off by a factor of ten or more, correct?  A. Yes.").

87.     **In 2004, Russell told Donziger to stop comparing the former concession area to Chernobyl, and in 2007, Russell publicly disavowed the comparison, but Donziger and other members of the LAP team continued thereafter to make this false and misleading comparison.**

- PX 495# (Wall Street Journal article reporting that Russell had disavowed the comparison).
- Tr. (Russell) 393:2–13 (Russell testifying that in late 2004 he told Donziger "to drop it" because Chernobyl was "not a good comparison").
- Tr. (Russell) 392:3–18 (Chernobyl comparison based on the physical size of the geographic region—Russell had never visited Chernobyl).
- PX 486# (4/24/2007 LAPs press release asserting "Chevron Management Must Inform Investors, Prepare for Possible 'Rainforest Chernobyl' Judgment").
- PX 505# at 3 (8/1/2008 LAPs press release asserting, "Because of the extent of the contamination, locals call the concession where Texaco operated the 'Rainforest Chernobyl'").
- PX 509# (9/16/2008 LAPs press release titled, "Amazon Defense Coalition: Ecuador Court Report Underestimates Damages for Chevron's 'Amazon Chernobyl' in Ecuador").

88.     **The LAP team encouraged and participated in publishing false statements about the Cabrera report and Cabrera's independence to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders, with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 4400 (Kim) ¶¶ 12–13 (Identifying 29 instances of public claims by Donziger and other LAP team members that Cabrera was "independent," all of which are after March 3, 2007).
- PX 497# (3/18/2008 letter from Amazon Watch to the SEC referring to Cabrera as "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision.").
- PX 500# (4/3/2008 LAPs press release quoting Fajardo: "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert.").
- PX 503# at 2 (Amazon Watch press release stating: "A recent court-ordered report, written by an independent expert, has proposed that Chevron pay a minimum of $7 billion and up to $16 billion to compensate for environmental contamination.").
- PX 2377 at 7 (Donziger statement to the Tom Lantos Human Rights Commission, dated April 28, 2009, calling the Cabrera report "[t]he best and most recent independent estimate available of the human health impact of this contamination.").
- 1/14/2011 Donziger Dep. 2878:9-16 (admitting that he drafted a press release referring to Cabrera as independent); *id.* at 2972:7-2973:21 (admitting that he told a reporter "Our side had nothing to do with the Cabrera report" and acknowledging that this statement was "not accurate").
- 6/18/2013 Woods Dep. 192:24-193:2 ("Q. So do you recall referring to Mr. Cabrera in press releases, blogs and articles as a independent, court-appointed expert? A. Yes.").
- PX 5600 (Kohn) ¶ 30 ("At the time the Cabrera Report was filed in April 2008, Mr. Donziger sent me multiple press releases, some in draft form, all referring to Mr. Cabrera as an 'independent' expert."); *id.* ¶ 43 (the LAPs' media campaign "prominently featured the idea that Mr. Cabrera was an 'independent,' court-appointed expert, who found Chevron liable for billions of dollars in damages in Ecuador.").
- PX 2205 (summary chart reflecting the proceedings where the 5/5/2010 Declaration of Fajardo was filed).
- 1/8/2011 Donziger Dep. 2564:13-22 ("Q. Did you ever affirmatively tell Congressman McGovern about Stratus' and plaintiffs' involvement in drafting the Cabrera report?  A. I don't know.  Q. Weren't you affirmatively keeping it a secret from him?  A. Well, as I testified, we felt like it was important to keep it confidential.").

89. **The LAP team encouraged and participated in publishing false statements about the Lago Agrio judgment against Chevron to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders, with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 1527# (Invictus memorandum, outlining LAP team plan to file enforcement actions in foreign courts).
- PX 7086 (10/22/2013 LAPs press release asserting that Ecuadorian investigation has confirmed that Zambrano wrote the judgment).
- DX 1750 (Donziger) ¶ 71 (Donziger testifying in this case: "I have no knowledge that anybody on the legal team of the plaintiffs wrote the judgment in this case, or wrote any part of the judgment.").

90.   **The LAP team encouraged and participated in publishing false and misleading statements to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders comparing environmental conditions in the former TexPet oil concession area to the Exxon Valdez spill, with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 4400 (Kim) ¶¶ 10–11 (Identifying 31 instances of public claims that oil discharged during consortium operations in Ecuador was 30 times greater than the 1989 Exxon Valdez oil spill, including 12 instances after May 24, 2007.).
- PX 860 (5/24/2007 email from Donziger to Amazon Watch's S. Tegel instructing Amazon Watch to continue making 30x Valdez comparison because not doing so would have "HUGE implications for the legal case").
- PX 862 (5/24/2007 email from Bill Powers to Donziger explaining that 30x Valdez comparison is inaccurate).
- PX 1110 (3/1/2009 email from Donziger to Beltman telling Beltman that source for 30x Valdez claim is "My own calculations.  If that doesn't suffice then kiss my butt.").
- PX 1130# at 60 (4/28/2009, Donziger testifying before the United States Congress: "We estimate that at least 30 times the amount of oil spilled in the Exxon Valdez disaster has been dumped.").
- PX 1207 (1/11/2010 email from Beltman to Donziger telling him that documentation he has does not support Valdez 30x claim: "we can't back it up").

91. **The LAP team encouraged and participated in publishing false and misleading statements to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders comparing environmental conditions in the former TexPet oil concession area to Chernobyl , with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 486# (4/24/2007 LAPs press release asserting "Chevron Management Must Inform Investors, Prepare for Possible 'Rainforest Chernobyl' Judgment").
- PX 505# at 3 (8/1/2008 LAPs press release asserting, "Because of the extent of the contamination, locals call the concession where Texaco operated the 'Rainforest Chernobyl'").
- PX 509# (9/16/2008 LAPs press release titled, "Amazon Defense Coalition: Ecuador Court Report Underestimates Damages for Chevron's 'Amazon Chernobyl' in Ecuador").

92.     **The LAP team encouraged and participated in publishing false and misleading statements to the public, the press, the Lago Agrio court, this Court, other U.S. courts, courts in other countries, the BIT arbitration tribunal, the U.S. and foreign governments, and Chevron's shareholders about the murder of Wilson Fajardo, with the intent that these statements instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 2308 at 80–81 (342 page police report of investigation into the 8/9/2004 Wilson Fajardo murder, including a 2-page signed statement from Pablo Fajardo, in which he states that on the night he was killed, "my brother was taken by Paul and Jhonny Zambrano . . . my brother was tortured . . . and then shot, and then after my brother was taken away by the brothers Zambrano Paul and Jonny. [T]hese people met up with Pedro Bautista, and, between them three, they took my brother to the place where they murdered him. . . . [T]hey are the main perpetrators of this murder. [M]y brother did not have problems with other people except with Pedro Bautista . . ." and further describing an altercation between Wilson Fajardo and Bautista several nights earlier.).

- PX 1130# at 65 (4/28/2009, Donziger testifying before the United States Congress that Fajardo had been "subjected to death threats" and that in 2004 "his brother had just been murdered about a year after the trial began under mysterious circumstances that many think was a case of mistaken identity.").

- DX 4 at 20 (Fajardo quoted in Vanity Fair: "I would like to think that it was just a regular crime. Those days were the hardest in my life. The chief of military intelligence in Shushufindi told one of my brothers that I was being followed, and that the killers had made a mistake. I don't want to believe that. And I wouldn't if . . . No, I just don't want to. But I do know that afterward I was followed. A lot.").

- PX 502# at 2 (LAPs press release stating: "[T]he brother of Fajardo was murdered in 2004 in what observers think may have been a case of mistaken identity.").

- PX 806# at 31–32 (Donziger book proposal stating: The brother of our Ecuadorian lawyer, Pablo Fajardo, was murdered recently with a bullet to the head. When Pablo started pressing local police to investigate, he became a target himself and had to go underground for several weeks. . . . It drives me crazy that I cannot know if Pablo's brother, or the woman living near the well site, were killed because of this case.").

- PX 7537 at 31 (Theatrical release of *Crude*, featuring scene of Fajardo at his brother's gravesite, saying that "[m]y brother died 8 days before the first judicial inspection in the Texaco case" and that the killers "were really looking for . . . me.").

- PX 5600 (Kohn) ¶ 14 (Describing Donziger telling him that Fajardo "was taking a prominent role in the Ecuadoran litigation" in 2006—two years after the Wilson Fajardo murder).

93.     **The LAP team made false and misleading statements to Ecuadorian criminal prosecutors, including asserting that the Cabrera report was independent, in order to obtain criminal indictments of Chevron attorneys Reis Veiga and Pérez Pallares, with the intent that these indictments instill in Chevron a fear of economic harm and cause Chevron economic harm.**

- PX 3000 (Veiga) ¶ 62 ("Almost immediately after the Lago Agrio complaint was filed in 2003, the representatives of the Lago Agrio Plaintiffs, including Donziger, sought to bring bogus criminal charges against me [and] my colleague Mr. Pérez Pallares . . . Between 2003 and 2011, I experienced an unimaginable nightmare, ranging from stress, anger, pain, and frustration from having to face such accusations"); *id.* ¶ 79 (stating that attorneys uncovered "proof that these were bogus criminal charges brought as part of a scheme by Donziger and his allies, in collusion with the Republic of Ecuador, to extort a settlement from Chevron by threatening me and Mr. Pérez Pallares with jail time and distracting us from defending Chevron in the Ecuadorian litigation").
- 12/1/2010 Donziger Dep. 408:6–14 ("I personally, and I think this was shared by other members of our team, our current team, I don't know if this would include Mr. Bonifaz, felt it appropriate to call to the attention of government officials the elements of what we believed were the fraud involving Texaco's earlier remediation."); 454:19–455:4 ("Q. From your perspective, during that period of time, 2005 to 2008, did you think that that publicity regarding the criminal investigation of Mr. Veiga and/or Mr. Pallares would help you or hurt you in your effort to get a bigger settlement from Chevron in the civil case?  A. I think as a general matter we were trying to put pressure on Chevron through various means.").
- 12/8/2010 Donziger Dep. 724:14–18 ("Q. And did you consult with Mr. Avila for the specific purpose of trying to pursue the criminal case against Mr. Veiga and Mr. Pallares?  A. I believe I did, yes.").
- 12/23/2010 Donziger Dep. 2017:5–9 ("Did you ever disclose that finding of Mr. Beltman with any member of the Attorney General's office of Ecuador? A.   It was not my obligation.  The answer is no.").
- PX 58A (Crude clip: "perhaps it is time to ask for the head of Pérez Pallares,").
- PX 75A (Crude clip: "the President thinks that if we put in a little effort at the Public Prosecutor's Office, the Attorney General will yield, and will re-open that investigation into the fraud.").
- PX 187 (October 2, 2006 entry in Donziger personal notes: "On the other hand, this was their main weapon over Reis Veiga and the company, and it had been reported widely in the trade publications and in Ecuador. But Neil is a very traditional lawyer and does not consider things like press and negative publicity.").
- PX 265 (March 31, 2008 reopening of investigation).
- PX 268 (indictment).
- PX 271 (Cabrera testimony in criminal investigation).
- PX 272 (Prosecutor's opinion citing Cabrera's testimony).
- PX 812 (November 26, 2006 email from Ponce to Donziger and Fajardo regarding putting pressure on new Attorney General).

- PX 831 (February 28, 2007 draft of letter to prosecutor).
- PX 1069 (September 19, 2008 emails between Donziger and Fajardo regarding prosecution and use of Cabrera report).
- PX 1103 at 1 (February 4, 2009 email from Saenz to Donziger regarding use of Beltman's report as amicus in criminal case).

94.     **The LAP team published false statements about the Russell damages estimate, the Cabrera report, Cabrera's independence, the Exxon Valdez comparison, the Chernobyl comparison, the murder of Wilson Fajardo, and the Lago Agrio judgment through Amazon Watch, RAN, Karen Hinton and websites under their control, including www.chevrontoxico.com.**

- PX 2221 (Demonstrative of use of Russell's $6 billion damages estimate).
- PX 1034 (Email from Hinton to Donziger re "Proposal from Hinton Communications," with attachment).
- PX 500# (4/3/2008 Amazon Defense Coalition Press Release, "Chevron Accused of Lying To Shareholders Over $16 Billion Damages Claim In Ecuador Rainforest Case By Amazon Defense Coalition"); *id.* at 3 (Fajardo: "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert.").
- PX 499# at 2 (ChevronToxico article stating that "Ecuadorian courts generally give wide deference to the findings of court-appointed experts, who are akin to special masters in the United States").
- PX 516# at 1, 2 (12/1/2008 Amazon Defense Coalition Press Release, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists", stating that "[t]he independent expert report was prepared by Richard Cabrera, an Ecuadorian environmental scientist appointed by the court as a Special Master who has worked mostly for oil companies in preparing environmental damage assessments," and quoting an endorsement from "Douglas Beltman, a scientist at Stratus Consulting who, along with a team of scientists, reviewed the expert's report on behalf of the [Lago Agrio] plaintiffs.").
- PX 3200 (Russell) ¶ 22 ("[D]espite my demand that Donziger and his team stop using my wildly inaccurate cost estimate, and despite Donziger's promise to do so, Donziger and his team ignored me.  They continued to issue press releases relying on that estimate.").
- PX 502# at 2 (Amazon Watch press release: "[T]he brother of Fajardo was murdered in 2004 in what observers think may have been a case of mistaken identity.").
- PX 518# (press release claiming that the film *Crude* presented a "David and Goliath" story about "the infamous 'Amazon Chernobyl.'").
- PX 456# at 1; PX 509# at 1; PX 510# at 1; PX 522R at 1 (press releases referring to "Amazon Chernobyl" or "Rainforest Chernobyl").
- PX 754 (Amazon Watch letter to SEC chairman Christopher Cox alleging that Chevron had "creat[ed] toxic contamination over 30 times larger than the Exxon Valdez").

95.     **The LAP team controlled the substance of messages about the Lago Agrio litigation, Chevron, and conditions in the former concession area delivered by Amazon Watch, RAN, Karen Hinton and websites/blogs under the LAP team's control, including www.chevrontoxico.com.**

- PX 906 (8/24/2007 email chain among Fajardo, Donziger, and Tegel regarding "follow up on press releases"); *id.* at 1–2 (When an Amazon Watch representative complained to Donziger that Amazon Watch was "not here to simply rubber-stamp press releases," and dared to tell him that prior experience showed that Amazon Watch "needs to carefully fact-check your press releases in order to safeguard our own credibility," Donziger replied sharply. He stated that he and the other lawyers were "the final authority," and that, "We can be collaborators, but we are not equal partners.").
- PX 733 (10/1/2005 email from Donziger to Ciplet and Soltani, Donziger proposes themes for an Amazon Watch fundraising proposal and urges them to put forth a "vision" based on Donziger's work: "Explain it from the perspective of the law review article I wrote two years back, which explains the significance of the campaign/case . . .").
- PX 737 (11/2/2005 email string from Donziger to Ciplet expressing "irritati[on]" that Amazon Watch had not yet offered what he expected to be minimal feedback on a letter to the SEC he prepared, calling the delay "ridiculous": "the letter is good to go as we edited it extensively in Quito and it shouldn't take more than 15 minutes to review it and offer comments").
- PX 748 (1/24/2006 email from Tegel at Amazon Watch asking Donziger for his "sign-off" on the SEC letter and his edits to the accompanying press release, indicating that neither could go out without Donziger's approval).

96.     **The LAP team, directly and through agents including Amazon Watch, RAN, and Karen Hinton, targeted Chevron employees and Board members for public and private criticism based on false and misleading statements with the intent that these statements would cause Chevron to have a fear of economic harm and would cause Chevron economic harm.**

- PX 5800 (Zygocki) ¶¶ 20–21 (the LAP team has caused "irretrievable costs in the form of diverted time, attention and focus of Chevron's management team from the Company's paramount business of producing energy for the United States and the world. . . . . [T]heir pressure campaign has caused harm to Chevron's most precious asset: its people. Individuals associated with Chevron, including executives and Board members, have been the targets of harassment in the United States.").

- PX 734 at 2–3 (In Lehane's October 2005 "Roll-Out Plan," he listed "specific steps . . . to fully leverage the criminal investigation of the Chevron executives," including, among other items, exclusive print stories, letters to Chevron's board of directors, letters to the SEC, and communications with analysts and shareholders).

- PX 15A at 3 (the LAP team saw the criminal prosecutions as a way to exert "personal psychological pressure [on Chevron's] top executives").

- PX 2425 at 2, 8 (Latin American Center for International Higher Education Studies, Press Conference – FDA and the Coalition: photograph from LAPs' press conference showing posters depicting Chevron employees Ricardo Reis Veiga and Rodrigo Perez Pallares, which Donziger referenced in alleging remediation fraud).

- PX 1163 (9/25/2009 Memorandum from Donziger to Rainforest Action Network outlining pressure campaign tactics including targeting Chevron Board members).

97.     **The LAP team's conduct described in these findings of fact, including the ghostwriting and promotion of the Cabrera report and the Lago Agrio judgment, have caused Chevron to have a fear of economic harm if Chevron does not pay the LAP team the money the LAP team has demanded.**

- PX 3000 (Veiga) ¶ 130 ("I have reviewed the Invictus memo . . . I have also monitored the Lago Agrio Plaintiffs' efforts to enforce the fraudulent Lago Agrio Judgment in foreign jurisdictions, which is consistent with the Patton Boggs proposal set forth in the Invictus memo on how to put maximum pressure on Chevron through the filing of foreign enforcement actions seeking to collect on the fraudulent Lago Agrio Judgment."); *id.* ¶¶ 134–38 (noting the Ecuadorian embargo order affects valuable trademarks and that the Argentinian embargo order (since vacated) had significant effects: "The order was damaging and disruptive to operations, freezing the assets of Chevron's Argentine Subsidiaries and denying them the ability to use receivables for profit-generating activity and even normal business operations. The harm suffered in Argentina is irreparable.").
- PX 5800 (Zygocki) ¶¶ 19, 22–23 ("I and other executives at Chevron fear that Chevron has suffered and will continue to suffer the types of irreparable harm I describe above, including reputational and economic harm, as long as Mr. Donziger and others working with him continue their public pressure campaign and continue their efforts to coerce Chevron by seeking to enforce their fraudulent $19 billion judgment.").

IX.     **Defendants Have Used Funding Obtained by Fraud to Injure Chevron**

98.     **Donziger and his co-conspirators induced Kohn Swift & Graf PC ("Kohn Swift") to invest approximately $10 million in the Lago Agrio litigation based on false representations and material omissions about the propriety (or impropriety) of the LAP team's conduct in that proceeding, including but not limited to statements and material omissions about their ghostwriting of the Cabrera report.**

- PX 641 (chart of Kohn, Swift & Graf's expenses and funding of Lago Agrio litigation).
- PX 693 (email string from D. Russell to Donziger. Donziger tells Russell not to contact Kohn about funding issues without sending to Donziger first).
- PX 1032 (email from Donziger to Kohn forwarding press release disclaiming the LAPs cooperation with Cabrera and stating that "Cabrera is paid directly by the court . . . as is customary and required in Ecuador.").
- PX 1043 (email from D. Beltman to J. Kohn, containing misrepresentations about Stratus work and seeking funding).
- PX 1155 (Draft Letter from Kohn Swift Graf, LLC to K. Trujillo of Trujillo Rodriguez & Richards, LLC proposing that Trujillo's firm investigate the alleged improprieties in the Lago Agrio litigation).
- PX 1156 (email from Donziger to J. Kohn, denying Kohn's request to investigate improprieties in the Lago Agrio litigation).
- PX 1157 (email string between N. Glazer and C. Hillwig. Glazer writes "And I think there may be a reason he [Donziger] doesn't want us to examine things. It used to be just a gut feeling, now I'm convinced there may really be something to it.").
- PX 1290 (letter from J. Kohn to P. Fajardo, J. Saenz, and L. Yanza: "We have no knowledge of what he [Donziger] is talking about except what Steven has now reluctantly told us: that it involves communications with Cabrerra [sic], something that surprised us and that we find quite disturbing if true.").
- PX 1312 (Fajardo emails Kohn and tells him that the LAPs submitted material to Cabrera in accordance with a court order that there was "no illegality in the process of delivering information.").
- PX 1406 at 1 (letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje and E. Criollo: "I am also shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera . . . Not only did we not know of any of this conduct, it is contrary to assurances that Donziger and you made to us on numerous occasions.").
- PX 5600 (Kohn) ¶ 16 ("Lump sum payments were made to Selva Viva pursuant to the budgets and I understood those payments were then disbursed among the employees, vendors, and others as set forth in the budgets."); *id.* ¶ 31 ("I was not involved in any discussions about Stratus's work being attributed to Mr. Cabrera or otherwise being used in a non-transparent manner. It was my understanding that, at all times, the Ecuadoran plaintiffs' consultants' materials were being submitted

publicly to the Ecuadoran court through a proper, legal process consistent with Ecuadoran law."); *id.* ¶ 32 ("[K]nowing that Stratus wrote the Cabrera Report in English and translated it into Spanish, I find it misleading that Mr. Beltman requested reimbursement for translating the same report back into English."); *id.* ¶ 33 ("I now know Mr. Donziger lied to me about the nature of Stratus's work on the Cabrera Report."); *id.* ¶ 43 (discussing "Mr. Donziger's many statements to me and others that Mr. Cabrera was an independent expert acting at the direction of the Ecuadoran court."); *id.* ¶ 52 ("After the meeting, I again asked Mr. Donziger in Mr. Barnes's presence whether there was any truth to Chevron's claims. Mr. Donziger again assured me that there were no improper contacts between Mr. Cabrera and the Ecuadoran plaintiffs' team and that Chevron's allegations were overblown, without merit, and 'b.s.'"); *id.* ¶ 66 ("Mr. Fajardo said that they provided Mr. Cabrera with documents in accordance with a court order and there was nothing to Chevron's charges."); *id.* ¶ 68 ("I notified them that Mr. Donziger had misled us about contacts with Mr. Cabrera, lied to us about the status of the case and the Ecuadoran plaintiffs' team's actions, and withheld material information from us."); *id.* ¶ 69 ("In addition to falsehoods about Mr. Cabrera, the Ecuadoran plaintiffs' team's contacts with him and the role that Stratus and the Ecuadoran plaintiffs' team played in writing Mr. Cabrera's report, Mr. Donziger misrepresented facts to me, omitted material facts in his communications with me, and was generally dishonest with me about the manner in which he was managing the Ecuadoran litigation."); *id.* ¶ 73 ("Mr. Donziger never informed me that he and his Ecuadoran co-counsel vetted candidates to be the global damage expert prior to the court ordering the end of judicial inspections and the beginning of the court expert phase of trial."); *id.* ¶ 75 ("I had no knowledge that Stratus was writing the Cabrera Report, which Mr. Cabrera filed under Mr. Cabrera's name. I was not consulted when Mr. Donziger and his consultants and co-counsel drafted Mr. Cabrera's work plan and I was not consulted when Mr. Donziger and his consultants and co-counsel assigned sections and subject matters that would become the Cabrera Report."); *id.* ¶ 78 ("Mr. Donziger never informed me that $33,000 of the $50,000 KSG wire transferred to the second account in Ecuador was being used to pay Mr. Cabrera outside the court process. Mr. Donziger never informed me that he was making payments to Mr. Cabrera outside the court process and that those payments were never disclosed to the Ecuadoran court or to Chevron."); *id.* ¶ 79 ("Indeed, I was repeatedly assured that nothing untoward was going on.  These are all omissions by Mr. Donziger that I consider material, and had I been aware of them, KSG would not have continued to be involved in or fund these efforts.").

99.     **Kohn Swift justifiably relied on misrepresentations and material omissions of Donziger and his co-conspirators, which caused Kohn Swift to continue funding the Lago Agrio litigation.**

- PX 1406 at 1 (letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje and E. Criollo: "I am also shocked by recent disclosures concerning potentially improper and unethical, if not illegal, contacts with the court-appointed expert, Mr. Cabrera . . . Not only did we not know of any of this conduct, it is contrary to assurances that Donziger and you made to us on numerous occasions.").

- PX 5600 (Kohn) ¶ 12 ("Donziger was the person primarily responsible for making day-to-day decisions in the management of the case" and Kohn's "sole source for information."); *id.* ¶ 70 ("I believe that Mr. Donziger made these material false statements and material omissions to me to defraud me and KSG because he knew that if he were to tell me the truth about Mr. Cabrera and other misconduct, I would have sought to remove him from the case, or, failing that, KSG would have stopped funding the litigation."); *id.* ¶ 77 ("If I had known that the Ecuadoran plaintiffs' team and Stratus had written [Cabrera's] report and provided it to him the day before he filed it, . . . . [KSG] never would have approved expenses for the other public relations efforts in connection with the Cabrera Report."); *id.* ¶ 79 ("Indeed, I was repeatedly assured that nothing untoward was going on.  These are all omissions by Mr. Donziger that I consider material, and had I been aware of them, KSG would not have continued to be involved in or fund these efforts."); *id.* ¶ 80 ("Had I been told the truth about Mr. Cabrera, KSG would not have participated in or funded the Ecuadoran plaintiffs' efforts in preparing the Cabrera Report and bribing Mr. Cabrera.").

- Tr. (Kohn) 1439:17–24 ("I relied upon your [Donziger's] information and reports.").

100.    **Donziger and his co-conspirators induced Burford Capital directly and through statements made by the LAP team's agents, including Jim Tyrrell of Patton Boggs, to invest approximately $4 million in the Lago Agrio litigation based on false representations and material omissions about the propriety (or impropriety) of the LAP team's conduct in that proceeding, including but not limited to statements and material omissions about their ghostwriting of the Cabrera report.**

- PX 1201 (December 26, 2009 email from Donziger to Burford attaching case materials, describing Cabrera as "independent").
- PX 1405# (July 19, 2010 email between Westenberger and Burford attaching Cabrera materials, holding out Cabrera as appointed independently).
- PX 1473, 1474 (Bogart notes regarding Donziger's lack of disclosure).
- PX 1476 at (email from D. Willis to C. Bogart and M. Woodall copying W. Del Mul, attaching letter from Treca to the LAPs, which states: "[W]e also note that very serious allegations of fraud and other misconduct have been made that appear to contravene directly the representations made to the Funder . . . .").
- PX 1488 at 2–3 (email from C. Bogart to Donziger, J. Tyrrell, W. Carmody, attaching letter: "[W]e believe that you and particularly your US representatives engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding from Treca . . . .").
- PX 2133 (timeline of Burford's investment and the LAP team's fraudulent misrepresentations to Burford).
- PX 2382 (9/5/2010 "Presentation Regarding Potential Burford Investment in Ecuador Matter": "We plan to present to the Board an investment opportunity in the Ecuador matter which entails an initial investment of $4 million at closing, with the right, but not obligation, to fund up to an additional $11 million. The attached [Invictus] memorandum from Patton Boggs, whom we would fund as lead counsel, provides an overview of the case.").
- PX 2559 (1/3/2010 John Wotowicz email to Nicolas Economou: "[A]gree with you to keep Selvyn at some distance from the 'realities' of this situation. I would not want it to get out that the case is in 'trouble'").
- PX 2456 (November 2, 2010 Burford confirmation of Patton Boggs funding).
- 1/18/2011 Donziger Dep. 3235:23–3239:9 (Donziger not remembering whether Burford was informed of Stratus's role, Calmbacher and Russell); 3239:22–3240:3 (Tyrrell played "the primary role" in convincing Burford).
- 1/29/2011 Donziger Dep. 3896:6–3897:17 ("Q. Have you had communications with anyone from the Burford Group about the role that Stratus played in connection with the Cabrera report?  A. No."); 3902:20–22 ("There is an Invictus memo that I think was the primary thing they used to make their decision.").
- PX 3100 (Bogart) ¶ 38 ("[T]he LAPs' representatives, including their counsel, Steven Donziger and Patton Boggs, misled Burford by making at least the following specific representations: '(1) that your ex parte communications with Cabrera were limited, (2) that they were lawful under Ecuadorian law, and (3) that Chevron's suggestions to the contrary were false.'"); *see generally id.* ¶¶ 4, 9–24

(detailing misrepresentations and omissions about Kohn's withdrawal, the LAP team's contacts with Cabrera, the *Crude* outtakes, and the cleansing reports).

- Tr. (Bogart) 225:17–22 ('[A.] There is no question that this Court's lengthy opinion in connection with the grant of the preliminary injunction certainly informed Burford's thinking, yes. Q.  Is it your testimony that as of March 7, 2011, Burford entertained the belief that it had been misled as of that date?  A.  Yes.").

- Tr. (Bogart) 257:3–8 ("Q.  Mr. Bogart, do you believe that Donziger and Patton Boggs misled you by suggesting that ex parte meetings and communications are lawful in Ecuador? A.  I certainly believe that we were misled about the quantity and nature of the ex parte communications that appear to have occurred here.").

- Tr. (Bogart) 259:19–260:9 ("Q.  Which particular facts are you referring to? A.  Well, I think we've just been discussing, for example, the Cabrera report.  And it is, you know, I think it has been made clear through both my testimony and the documents in the case it was unquestionably Burford -- Burford was relying unquestionably on the representations from both Mr. Donziger and Patton Boggs about a set of facts that turned out not to be true. Q.  What particular representation was Mr. Donziger saying that Mr. Burford -- that Burford was relying upon with respect to the Cabrera report, can you be more specific? A.  As I've already said that whatever contacts had occurred with Cabrera, they were both permissible and limited.").

**101.** **Burford Capital justifiably relied on misrepresentations and material omissions of Donziger and his co-conspirators, which caused Burford Capital to fund the Lago Agrio litigation.**

- PX 1490 at 1–2 (Letter from Burford Group to Donziger, Fajardo, Yanza, and others: "[W]e believe that you and particularly your US representatives engaged in a multi-month scheme to deceive and defraud in order to secure desperately needed funding from Treca, all the while concealing material information and misrepresenting critical facts in the fear that we would have walked away had we known the true state of affairs.").

- PX 1364 (Donziger email to U.S. counsel in June 2010 during a period of active negotiations with Burford: "need to probe" what admitting the truth about the Cabrera fraud would mean "at a time we are trying to raise money" because there would be "negative fallout" and it "[m]ight be better to be general").

- PX 3100 (Bogart) ¶ 8 ("[I]t was not feasible for Burford to, for example, review the massive record amassed in the Ecuadorean proceeding, or to travel to Ecuador to conduct its own on-site diligence.  Because Patton Boggs needed to do that work in connection with its own entry into the case in any event, it was agreed that Patton Boggs would provide its analysis on those issues as well as its judgment enforcement strategy to Burford . . . .  That work was ultimately memorialized in the Invictus memo."); *id.* ¶ 13 ("There is absolutely no question that Burford would not have invested in the Litigation . . . had we known the whole truth about Cabrera."); *id.* ¶ 18 ("Indeed, Burford would have walked away immediately. . . . These misrepresentations by Patton Boggs and Donziger were material to Burford's decision to enter into the Funding Agreement."); *id.* ¶ 24 ("Burford relied on Donziger's representations regarding the position with Kohn.").

102.    **The LAP team, including Donziger, used the funds invested by Kohn and Burford to put Chevron in fear of economic harm and to injure Chevron by causing it to defend against Defendants' fraudulent and extortionate conduct.**

- PX 4900 (Dahlberg) ¶¶ 35–38 (analysis of KSG contributions); *id.* ¶¶ 47–53 (analysis of Burford contributions); *id.* ¶¶ 59–64 (analysis of disbursements to Donziger and his law offices); *id.* ¶¶ 65-73 (Analysis of disbursements to U.S. counsel, including Page, Patton Boggs, Emery Celli, and Motley Rice); *id.* ¶¶ 74–76 (analysis of disbursements to Ecuadorian Counsel, including Fajardo, Saenz, Prieto, Ponce, and Wray); *id.* ¶¶ 77–78 (analysis of disbursements to Selva Viva and Yanza); *id.* ¶¶ 80–88 (analysis of disbursements to experts and consultants, including Maest, Beltman, Stratus, E-Tech, Reyes, Russell, and UBR); *id.* ¶¶ 89–94 (analysis of disbursements to PR-related individuals and entities, including Hinton); *id.* ¶¶ 95–100 (analysis of disbursements related to the production of *Crude*); *id.* ¶¶ 101–106 (analysis of disbursements to NGOs, including the Frente, Amazon Watch, and RAN); *id.* ¶¶ 107–12 (Analysis of disbursements to lobbyists, including Barnes and Lehane); *id.* ¶¶ 114–22 (analysis of payments to Cabrera, Stratus, Reyes and Villao in relation to the drafting of the Cabrera report); *id.* ¶¶ 123–24 (analysis of payments to Guerra).
- PX 5600 (Kohn) ¶ 34 ("KSG paid for various other consultants in connection with the Ecuadoran litigation.  Our records reflect that Fernando Reyes was paid $3,000 in connection with the Ecuador litigation."); *id.* ¶ 39 ("In response to an email from my assistant asking why the transfer should be made to this second account, Mr. Donziger stated that the reason for making these payments into a different account was because these payments involved 'separate case-related piece[s] of work that [are] being run by the Frente.  The Frente created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente controls Selva Viva.  This separate account will be used for [the] same purpose under the same control of the Frente and Yanza, and will be accounted for the same way with receipts.'  (PX 897)."); *id.* ¶ 43 ("The Ecuadoran plaintiffs' team planned and executed a significant media campaign around the filing of the Cabrera Report. My firm covered the costs of that campaign.  That campaign prominently featured the idea that Mr. Cabrera was an 'independent,' court-appointed expert, who found Chevron liable for billions of dollars in damages in Ecuador.").
- PX 552 (Email from Bogart confirming funding of Patton Boggs' London account).
- PX 1187 (11/19/2010 letter from J. Kohn to L. Yanza and P. Fajardo re "Ecuador-Texaco Case" reflecting Kohn's investment in the case).
- PX 1290 (4/13/2010 letter from J. Kohn to P. Fajardo, J. Saenz, and L. Yanza regarding Chevron).
- PX 1406 (8/9/2010 letter from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje and E. Criollo regarding termination of agreement).
- PX 2145 (Demonstrative showing flow of investor funds through Donziger IOLA accounts).

- PX 2146 (Demonstrative showing flow of funds to Selva Viva through Donziger's IOLA and personal accounts).
- PX 2456 (November 2, 2010 Burford confirmation of Patton Boggs funding).

X.  **Defendants Committed Acts of Obstruction of Justice and Witness Tampering in Attempts to Thwart Chevron's Efforts to Bring Defendants' Fraud to Light in U.S. Courts**

103.  **The LAP team attempted to and did obstruct and delay the Stratus 1782 proceeding in Colorado by making or causing lawyers and witnesses to make to the court false statements regarding the relationship between and among the LAP team, Stratus, and Richard Cabrera.**

- PX 678 (4/27/2010 Hr'g. Transcript in *Chevron Corp. v. Stratus Consulting, Inc.*, 10-cv-00047-MSK-MEH (D. Colo.)).
- PX 1325 (Declaration of Pablo Fajardo Mendoza, filed in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH (D. Colo.), arguing that the Ecuadorian court sanctioned the LAPs' giving of documents to Cabrera).
- PX 681R (7/9/2010 LAP filing in Stratus 1782: "Cabrera is not even an expert for one party, but a Court-appointed neutral.").
- PX 1297 (email from H. Hanneman to Wilson refusing to delay deposition: "A vacation is simply not a proper basis upon which to quash.  We are confident that the Court would find the motion to be filed in bad faith and very likely order sanctions.").
- PX 1298 (email from Maazel to Wilson, Abady, Westenberger, and Donziger, forming plan to obstruct deposition: "Another thought is that we might all walk out at some point in the dep if they keep trying to invade the privilege.").
- PX 1302 (email from Wilson to Maazel, Westenberger, Abady, and Donziger discussing the Chapman deposition: "Chapman did an excellent job of not remembering anything – but Chevron will be able to do side-by-side comparisons of Stratus work product and his report to a judge that will smell bad.").
- 5/21/2013 McDermott Dep. 60:3–13 ("Q. Okay.  Did you understand through your conversations with Mr. Donziger about the strategy in opposing Chevron's 1782 petition that Mr. Donziger was seeking to delay that action? . . . A. Actually, my recollection is that he wanted them to prevent them from taking place.  Maybe it was just delayed, but my recollection is he did not want the depos to go forward.").

104.    **The LAP team attempted to and did obstruct and delay the Stratus 1782 proceeding in Colorado by pursuing motions and appeals they knew to be frivolous, and by improperly withholding documents they had been ordered to produce by the court.**

- 4/30/2013 Beier Dep. 121:25–122:4 ("Q. Let me ask you, is it correct that had Donziger, Donziger and the LAPs U.S. counsel not intervened, Stratus would have turned over to Chevron all its documents as set forth by the court? A. Yes."); 148:16-24 ("Q. You had testified that attorneys from Patton Boggs had exerted pressure on you not to enter into a stipulation with Chevron that would expedite the production of documents from Stratus; is that correct? A. I don't remember the exact pressure that was asserted, but it was related to the stipulation and I specifically remember that they wanted us not to say there was a stipulation in a filing.").

- PX 1385 (July 2010 email about the Stratus 1782 production, Patton Boggs attorney Eric Daleo warned Westenberger: "Wanted to advise you that tomorrow's production to Chevron will be the leanest to date at 37 documents, 202 pages . . . . If you think this is unacceptably low, we can produce some documents we were trying to hold off producing that are non-privileged but potentially damaging.").

- PX 1348 (May 17, 2010 email, Donziger described the LAP team's effort to obstruct and delay discovery in the Stratus 1782: "Seems we have a tension b/w the strategy as outlined by Jim [Tyrrell] (fight hard on all fronts all the time and concede nothing, buy as much time as possible) and [Judge] Hegerty's expectation as outlined by Jay [Horowitz] in his email of last night that something should be turned over.").

105.    **The LAP team attempted to and did obstruct and delay the Berlinger 1782 proceeding in the Southern District of New York by making or causing lawyers and witnesses to make to the court false statements regarding the relationship between and among the LAP team, Chevron, and Richard Cabrera.**

- *In re Chevron Corp.*, No. M-19-111-LAK (S.D.N.Y. Apr. 30, 2010), Hr'g Tr. 39:16–20; 40:20–23 (at a hearing on April 30, 2010, counsel for the LAPs falsely asserted that Chevron's application for discovery from Berlinger was "frivolous" because the meeting with Beristain was "unimportant," akin to a group of New York lawyers attending parties together, with one later being appointed a court expert).
- Dkt. 48-27 (4/23/2010 Lago Agrio Plaintiffs' Memorandum in Opposition to Application, *In re Application of Chevron Corp.*, No. M-19-111 (S.D.N.Y.)) at 8 (telling the court that the meeting between the RICO Defendants and Cabrera team member Carlos Beristain was "innocuous" and "of no relevance to anything.").
- Dkt. 48-28 (6/14/2010 Brief and Special Appendix for Respondent-Appellant Lago Agrio Plaintiffs, *Chevron Corp. v. Berlinger*, No. 10-1918-cv(L) (2d Cir.)) at 23 (claiming, in *Crude* appeal before the Second Circuit, that Defendants had requested Berlinger to delete the scene from the DVD version of the film only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups *after* he was a court expert" (emphasis in original)).
- PX 2515 at 6 (the LAP team also filed in the Donziger 1782 a petition that Fajardo filed in Ecuador, in support of their false assertion that the contacts between their lawyers and Cabrera had been "disclosed" to the Lago Agrio court).

106.    **The LAP team attempted to and did obstruct and delay the Donziger 1782
proceeding in the Southern District of New York by making or causing
lawyers and witnesses to make to the court false statements regarding the
relationship between and among the LAP team, Chevron, and Richard
Cabrera.**

- PX 1331 ¶¶ 11, 21 (the LAP team filed in the Donziger 1782 the Fajardo
declaration which falsely claimed that Cabrera was "independent" and that
"Chevron enjoyed the same opportunity as Plaintiffs to provide materials to
Cabrera.").

- PX 2516 at 6 (the LAP team also filed in the Donziger 1782 a petition that
Fajardo filed in Ecuador, in support of their false assertion that the contacts
between their lawyers and Cabrera had been "disclosed" to the Lago Agrio court).

107.   **The LAP team attempted to and did obstruct and delay the Donziger 1782 proceedings in the Southern District of New York by failing to serve a privilege log as required by the Local Rules, improperly withholding documents, hard drives, and data storage devices they had been ordered to produce by the court, and obstructing deposition sessions through improper refusal to answer questions and by providing nonresponsive answers.**

- *In re Application of Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010) (denying LAP team's motions to quash Donziger subpoena).
- *In re Application of Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y. 2010) ("This Court finds that the failure to submit a privilege log, at least from September 1, 2010, when the Individual Petitioners made an issue of it in their papers in opposition to the motions to quash and possibly earlier, was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay.").
- Dkt. 1679-6 (Ex. 6) (4/26/2011 letter in Donziger 1782); Dkt. 356-11 (Ex. BA) ¶23 (Donziger failed to disclose at least 8 email addresses and to produce more than 65 external storage devices that were connected to his computers, the content of which could not be found).
- *In re Application of Chevron Corp.*, No. 10-mc-00002-LAK, Dkt. 151 (S.D.N.Y. Jan. 11, 2011) (Order quoting letter to the Court from the Special Master charged with supervising the Donziger deposition: "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self serving answers to questions that should have been answered directly, with no embellishment").

108.    **The LAP team attempted to and did obstruct and delay other 1782 proceedings by making or causing lawyers and witnesses to make to the courts false statements regarding the relationship between and among the LAP team, Chevron, and Richard Cabrera.**

- 1/14/2011 Donziger Dep. 2781:15–23 ("Q. Was it the intention to represent to the courts in Colorado and New York that [the Fajardo Declaration] would accurately set forth the facts pertaining to Cabrera's gathering of information germane to his report and the confidentiality of that information? A. Yes.").
- 1/19/2011 Donziger Dep. 3363:8–20 (in various 1782 proceedings, Donziger "[s]ought to prevent Stratus' role relative to the Cabrera report from coming out").
- PX 1310 (email from Eric Daleo discussing "strategy" for "Cabrera going forward" in various 1782 actions).
- PX 1326 (Fajardo Declaration executed on May 5, 2010, filed in D. Colo. arguing that the Ecuadorian court sanctioned the LAPs' giving of documents to Cabrera); *see also* PX 1327–1340 (filing of Fajardo Declaration in other 1782 actions).

109. **Donziger and his co-conspirators attempted to and did obstruct and delay numerous court proceedings in the United States through the filing of the materially false and misleading Fajardo declaration, which was first filed in the Stratus 1782 proceeding in Colorado, and then subsequently filed in 16 separate actions, including in the Donziger 1782 proceeding in this Court.**

- PX 1326 (Fajardo Declaration executed on May 5, 2010, filed in D. Colo. arguing that the Ecuadorian court "sanctioned" the LAPs' giving of documents to Cabrera).
- PX 1327-1340 (filing of Fajardo Declaration in other 1782 actions).

110.    **The LAP team, including the LAPs' U.S. counsel, attempted to and did obstruct and delay this RICO action by improperly withholding documents they had been ordered to produce by the court, and by secretly orchestrating a collusive court proceeding in Ecuador (the Cordova action) to undermine this Court's discovery orders and prevent Chevron from obtaining legitimate discovery in the possession of the Defendants' Ecuadorian agents.**

- PX 416 (Petition for Action for Protection and Precautionary Measures filed by Octavio Ismael Cordova Huanca in the Provincial Court of Justice of Sucumbíos, Lago Agrio, Ecuador, and an English translation thereof) (initiating collusive action seeking injunction barring Fajardo and other Ecuadorian attorneys and agents from providing documents to the LAPs so as to prevent their production in this action).
- PX 427 (judgment of the First Labor Court of Sucumbios, Lago Agrio, Ecuador, in the matter of C. Ismael, N. Agila v. P. Fajardo et al, Case No. 21351-2012-0307, and an English translation thereof) (1/15/2013 Ecuadorian court order purporting to bar Fajardo and other Ecuadorian attorneys and agents from providing documents to the appearing LAPs in response to Chevron's discovery requests in this action).
- PX 1505 (letter from P. Fajardo to C. Smyser re "Chevron v. Donziger, Case No. 11-CIV-691-LAK. Chevron Corporation v. Steven Donziger" and an English translation thereof) (refusing to provide documents in response to this Court's order granting Chevron's motion to compel production of documents from Defendants' Ecuadorian attorneys and agents, Dkt. 787).
- PX 1506 (letter from P. Fajardo to J. Keker re "Chevron v. Donziger, Case No. 11-CV-00091-LAK" and an English translation thereof) (same).
- PX 1512 (Declaration of Craig Smyser in Support of the Defendant's Opposition to Chevron's Motion for Sanctions, filed in *Chevron Corp. v. Donziger*, No. 11-cv-0691-LAK (SDNY), Dkt. 952) (U.S. counsel for the LAPs attesting that he suggested to Fajardo the idea of bringing the *Cordova* action).

**111.    Donziger corruptly attempted to persuade Calmbacher not to testify in a federal court proceeding based on false representations.**

- 3/29/2010 Calmbacher Dep. 144:24-145:7 (Under the guise of seeking to move to quash the subpoena, Donziger contacted Dr. Calmbacher and attempted to convince him not to testify at his deposition, telling him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior."); 145:8-10 (When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified: "Very much so. Very much so.").
- PX 1238 (after the court granted Chevron's motion to obtain discovery from Calmbacher but before his deposition, Donziger wrote Woods: "we need to find [Calmbacher]. . . . run a search and try to track him down."); *id.* (Donziger instructed Woods: "can u call Russell and ask if he has chuck's contact info; it's important. also, don't tell him details of anything.").
- PX 1247 (3/9/2010 Memorandum from A. Woods to File re "Memo regarding phone conversation between Steven Donziger and David Russell") (Woods: Donziger told Russell it was in "our mutual interest" to "try to defeat the discovery attempts" and asked Russell to tell Calmbacher that Donziger wanted to speak with him regarding Chevron's petition).

112.    **Donziger corruptly induced Andrew Woods to sign a false affidavit for submission in a federal court proceeding based on false representations.**

- PX 674 (March 3, 2010 Woods affidavit filed in Stratus 1782 action in support of a motion for leave to file a brief in opposition to Chevron's petition).
- PX 1280 at 1 (Woods email to Donziger: "[Chevron will be] filing a motion alleging fraud connecting to [Woods's March 3, 2010] declaration . . . . This is very alarming to me, since it would appear that that would put me personally squarely in the cross-hairs of any fraud inquiry, and that is not a place I'm comfortable being since I still don't know exactly what happened and was not around while all of the events that Chevron is seeking discovery on was happening.  I based that motion entirely on information that I was told was valid by you . . . Can you please review and see if there is anything that is incorrect or misleading?  And if so, I need to file a clarification before the Denver court immediately, like tomorrow or Monday.").
- PX 1259 at 2 (Woods memo to file following Shinder's withdrawal: "I indicated to Steven [Donziger] that this was the first I had heard that any conduct by plaintiffs' experts may have exceeded the contacts that were permitted by court order and crossed over into cooperation with Cabrera or writing of the report. Steven responded clearly that Beltman was not working with Cabrera directly, but it was understood that the plaintiffs' experts were functionally writing the report.").
- 6/18/2013 Woods Dep. 198:21–199:6, 405:9-406:8.

**113.    In or about September 2007, Donziger made false statements to a New York court by inducing Mark Quarles to sign a declaration that falsely asserted that "Mr. Cabrera and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant . . . ."**

- PX 918 (Declaration of Mark Anthony Quarles, P.G., dated September 17, 2007, filed in *Republic of Ecuador v. ChevronTexaco Corp.*, 04 Civ. 8378 (LBS) (S.D.N.Y.)).
- PX 915 (Email from Donziger to M. Quarles re "your affidavit edited", with attachment) (Donziger email to Quarles attaching draft Quarles affidavit, in which Donziger proposed Quarles add statements Donziger knew to be false, including that "Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant. At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan." Donziger also told Quarles to delete language suggesting that if any such contacts had taken place, "a degree of biasness would have been introduced into the sampling plan.").
- 9/1/2010 Quarles Dep. 96:12-97:1; 115:20-116:4, 118:20-25, 121:23-122:5 (testifying that the statement concerning Cabrera's independence in his declaration was based on several days of observation of the global assessment process in 2007, and also on specific false representations by Donziger that Cabrera had written the work plan upon which the Cabrera Report was based; that Donziger paid him to conduct his observations and sign the declaration; and that had he known that Cabrera was working directly with the lawyers for the Lago Agrio Plaintiffs, he would not have signed the declaration).

**114.    In or about August 2010 and February 2011, Donziger caused false statements to be made to a New York court by causing the false and misleading Fajardo declaration to be filed (twice) in proceedings pending before this Court.**

- PX 1331 (Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed on August 28, 2010 in *In Re Application of Chevron Corp.*, No. 1:10-mc-00002-LAK (S.D.N.Y.), Dkt. 31-6) (falsely stating that Cabrera was "independent" and that Cabrera had responded to Chevron's and the LAPs' comments about his report, failing to disclose Defendants' secret payments to Cabrera or ghostwriting of his report and responses to the parties' comments).
- PX 1339 (Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed on February 25, 2011 in *Chevron Corp. v. Steven Donziger*, No. 11-cv-0691-LAK (S.D.N.Y.), Dkt. 138-13) (same).

**115.   In or about January 2010, Donziger caused false statements to be made to a New York court by causing a complaint to stay arbitration to be filed that falsely claimed that Cabrera's report was "independent," that Cabrera was a "neutral Special Master," and that his final report was "produced by the Cabrera team" comprised of 14 technical officials.**

- PX 7608 (1/14/2010 Lago Agrio Plaintiffs' Complaint to Stay Arbitration, *Yaiguaje v. Chevron Corp.*, No. 10-CV-0316 (LBS) (S.D.N.Y.)) ¶ 29 (alleging that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the *neutral Special Master* [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages" and that "Dr. Cabrera appointed a team of 14 technical officials") (emphasis added); ¶ 30 (stating that "the final report [was] *produced by the Cabrera team* . . . .") (emphasis added); ¶ 31 (alleging that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the world.").

116.  **In or about May 2013 through November 2013, Donziger caused false statements to be made to a New York court about his financial situation and ability to pay for counsel and the Special Masters.**

- PX 8043 (Donziger, as counsel of record in this action, made multiple representations regarding his "lack of resources" to this New York court).
- PX 8045 (Donziger) ¶ 2 (When challenged by the Court to provide factual support for his representations, Donziger swore under oath that his "liabilities [were] presently greater than [his] assets making [him] effectively insolvent.").
- PX 560 (the LAP team is contractually obligated to pay Donziger's legal bills in this action).
- PX 7033A (Donziger represented to the LAP team that DeLeon has provided $25 million since the Kohn withdrawal).
- Tr. (Donziger) 2528:10-22 (this past spring the Woodsford firm provided another $2.5 million).
- PX 7764 at 2 (In November 2012, Donziger was named the beneficiary of proceeds from a trust set up by his father, valued at more than $1.3 million).
- PX 7781 at 2; PX 7763 ¶ 30 (In October 2012, a trust set up by Donziger's mother, valued at $600,000, was ordered to be distributed to Donziger).
- Tr. (Donziger) 2513:23-2514:16 (Donziger concealed documents regarding his financial resources during discovery).
- Tr. (Donziger) 552:21-553:3; *see also* 2607:13-2608:15 (Despite the fact that he consistently used his minimal resources as shield entitling him to leniency, Donziger stated the Court's questions on this topic were "inappropriate" and that he would "not answer[] [the Court's] question.").

**117.    Donziger's false representations to New York courts were intended to, and did, injure Chevron by causing Chevron to spend substantial amounts of money to investigate the true facts surrounding the Cabrera fraud and other aspects of the Defendants' fraudulent scheme and defend itself in litigation.**

- Dkt. 1657 (Stipulation re Attorneys' Fees Incurred) ¶ 2 (stipulating that Chevron "incurred millions of dollars in legal fees" in connection with various 1782 actions); ¶ 3 (stipulating that these legal fees were incurred to obtain discovery of, among other things, the LAP team's relationship with Cabrera, including their financial relationship with Cabrera and their involvement in drafting the Cabrera report).
- PX 3000 (Veiga) ¶ 125 ("Chevron paid U.S. counsel at least $1 million, among other things, to uncover evidence through § 1782 discovery proceedings in the United States").

XI.    **Defendants Have Made Extensive Use of Interstate and Foreign Mail and Wires to Further Their Schemes to Defraud**

118.    **Donziger made use of the interstate wires (including telephone, Internet or email) for the purpose of managing the team he assembled to pursue his scheme against Chevron.**

- *See* Appendix 1 Mail and Wire Fraud.

119.    **Donziger made use of the mail and the interstate wires (including telephone, Internet or email) for the purpose of implementing the forgery of the Calmbacher reports.**

- *See* Appendix 1 Mail and Wire Fraud.

120.    **Donziger made use of the interstate wires (including telephone, Internet or email) for the purpose of executing the Cabrera ghostwriting fraud.**

- *See* Appendix 1 Mail and Wire Fraud.

121.    **Donziger made use of the interstate wires (including telephone, Internet or email) for the purpose of managing the bribery of Judge Zambrano and the ghostwriting of the judgment Zambrano signed.**

- *See* Appendix 1 Mail and Wire Fraud.

122.    **Donziger made use of the interstate wires (including telephone, Internet or email) for the purpose of publishing false and misleading statements about Chevron and his claims against the company.**

- *See* Appendix 1 Mail and Wire Fraud.

123.    **Donziger made use of the interstate wires (including telephone, Internet or email) for the purpose of furthering his schemes to defraud Kohn and Burford.**

- *See* Appendix 1 Mail and Wire Fraud.

XII.    **Chevron Has Been Injured by Defendants' Conduct**

124.    **Chevron spent and, unless Defendants are enjoined, will be forced to continue to spend, substantial amounts of money and executive time and effort on defending itself and its executives in the criminal proceedings in Ecuador and enforcement proceedings initiated as part of Defendants' fraudulent scheme.**

- PX 2445 (letter from C. James, Executive Vice President of Chevron Corp, to Honorable A. Cuomo describing the LAPs' pressure campaign).
- PX 3000 (Veiga) ¶ 125 ("Chevron paid U.S. counsel at least $1 million, among other things, to uncover evidence through § 1782 discovery proceedings in the United States to be used in our defense of the criminal allegations in Ecuador. Given the LAPs and Donziger's professed limited financial resources, I do not expect Chevron Corporation ever to be made whole for these legal fees.  Thus, Chevron has been irreparably harmed."); *id.* ¶ 132 ("Chevron Corporation has spent no less than $1 million defending itself in Canada.  Chevron Corporation does not expect that it will ever be made whole by Donziger or the Lago Agrio Plaintiffs.  Thus, Chevron Corporation has been irreparably harmed in this regard."); *id.* ¶ 135 ("The harm suffered in Argentina is irreparable."); *id.* ¶ 137 ("Chevron, which I understand has already incurred significant legal costs in the case, is now waiting for the Lago Agrio Plaintiffs to respond to Chevron Corporation's answer and legal aid opposition, and for further court orders to move the case along.").
- PX 5800 (Zygocki) ¶ 21 ("Finally, their pressure campaign has caused harm to Chevron's most precious asset:  its people.  Individuals associated with Chevron, including executives and Board members, have been the targets of harassment in the United States."); *id.* ¶ 23 ("I and other executives at Chevron fear that Chevron has suffered and will continue to suffer the types of irreparable harm I describe above, including reputational and economic harm, as long as Mr. Donziger and others working with him continue their public pressure campaign and continue their efforts to coerce Chevron by seeking to enforce their fraudulent $19 billion judgment.").

**125.**   **Chevron spent and, unless Defendants are enjoined, will be forced to continue to spend, substantial amounts of money and executive time and effort in pursuit of discovery through § 1782 actions in order to investigate the true facts surrounding the Cabrera fraud and other aspects of the Defendants' fraudulent scheme.**

- Dkt. 1657 (Stipulation re Attorneys' Fees Incurred) ¶ 2 (stipulating that Chevron "incurred millions of dollars in legal fees" in connection with various 1782 actions); ¶ 3 (stipulating that these legal fees were incurred to obtain discovery of, among other things, the LAP team's relationship with Cabrera, including their financial relationship with Cabrera and their involvement in drafting the Cabrera report).

- PX 3000 (Veiga) ¶ 125 ("Chevron paid U.S. counsel at least $1 million, among other things, to uncover evidence through § 1782 discovery proceedings in the United States").

- PX 2223 (Demonstrative timeline reflecting the filing of the 1782 actions and key events in the Lago Agrio litigation).

**126.** **Funds of Chevron's Argentine subsidiaries were embargoed from November 2012 through June 2013, resulting in opportunity costs to the subsidiaries and depreciation of the embargoed funds, which were held in non-interest-bearing bank accounts in pesos.**

- PX 273 (order issued by the Supreme Court of Justice of Argentina in Aguinda Salazar, Maria v. Chevron Corporation re: Preventive Measures).
- PX 415 (filing by P. Fajardo in Maria Aguinda y Otros v. Chevron Corp., Case No. 002-2003, requesting "preventive measures on the defendant's property located in Colombia and Argentina").
- PX 422 (Request that the Court Order Preventive Measures, Aguinda Salazar, Maria v. Chevron Corporation re: Preventive Measures).
- PX 1522 (document titled "Interest Rates - Bank of the Argentine Nation").
- PX 2461 (Order issued by the National Civil Trial Court No. 61 of Argentina in Aguinda Salazar Maria vs. Chevron Corporation on Preventive Measures).
- PX 4300X (Callejas) ¶ 84 ("In October 2012, Judge Erazo issued orders that purported to embargo the assets of Chevron Corporation and many of its direct and indirect subsidiaries around the world.").

127.    **Fifty of Chevron Intellectual Property's trademarks are subject to an Ecuadorian embargo order, issued pursuant to the Lago Agrio judgment, that will ultimately transfer the rights to use those marks in Ecuador away from Chevron.**

- PX 415 (Filing by P. Fajardo in Maria Aguinda y Otros v. Chevron Corp., Case No. 002-2003, bearing the foja numbers 220,699 - 220,758, and an English translation thereof) (motion for an embargo order requesting "the Court to order the attachment of" 54 trademarks "registered in the name of Texaco, Chevron, or their subsidiaries," which it then lists by name, registration number and type).

- PX 418 (Order of the Provincial Court of Sucumbios, in Case No. 2003-0002, and an English translation thereof) at 1 (On October 25, 2012, in response to the Ecuadorian trademark office's request for clarification of the Ecuadorian Embargo Order, the Ecuadorian court issued the Ecuadorian Expansion Order in which it held that "the order attaching intellectual property registered by Chevron and its subsidiaries at IEPI is expanded to include the following trademarks," and then listed more than 50 by description and registration number, including two marks described as follows: "Chevron design in blue, white and red, registration No.421, type PM" and "Chevron design in blue, white and red, surrounded by a white strip in the shape of a pentagon, registration No.419, type PM.").

- PX 432 (Order issued in Summary Proceeding No. 21100-2003-0002, brought by M. Aguinda  and Others against A. Callejas, and an  English translation thereof) (2012.10.15 embargo order attaching all of the trademarks identified by the LAPs—whether held by Chevron Corporation, a subsidiary, or affiliate—and ordering that "attachment is decreed over all the income, royalties and in general, any monetary benefit linked to these brands, whether present or future, that Chevron Corp. may come to have, directly or through its subsidiaries, including those received by Chevron Intellectual Property LLC, as a result of the Distinctive Logo Use License Contract between Chevron Intellectual Property LLC (licensor) and Swissoil del Ecuador S.A. (licensee).").

- PX 4300X (Callejas) ¶¶ 85, 86 (describing a further embargo order issued on September 9, 2013 and concluding that as a result of that order "Chevron IP no longer controls these trademarks and that they are now under [the Ecuadorian trademark office's] custody for the benefit of the Lago Agrio Plaintiffs.").

128.    **The $96 million commercial cases arbitration award owed to Chevron by the Republic of Ecuador is subject to an Ecuadorian embargo order, issued pursuant to the Lago Agrio judgment, preventing payment of this award to Chevron.**

- PX 432 (Order issued in Summary Proceeding No. 21100-2003-0002, brought by M. Aguinda and Others against A. Callejas, and an English translation thereof).
- PX 448 (Order issued in the Provincial Court of Justice of Sucumbios on October 15, 2012 at 16h53, bearing the foja numbers 221,491 - 221,494. and an English translation thereof).
- PX 449 (Filing by M. Valenzuela on October 22, 2012 in Maria Aguinda et al. v. Chevron Corporation, No. 0002-2003-P-CPJS, and an English translation thereof).
- PX 451 (Order issued on June 6, 2013 in *Chevron Corporation v. Republic of Ecuador*, No. 1:12-cv-01247-JEB (D.D.C.), Dkt. 29) (upholding arbitration award).
- PX 452 (Memorandum Opinion issued on June 7, 2013 in *Chevron Corporation v. Republic of Ecuador*, No. 1:12-cv-01247-JEB (D.D.C.), Dkt. 30) (same).
- PX 453 (Judgment in a Civil Action issued on June 7, 2013 in *Chevron Corporation v. Republic of Ecuador*, No. 1:12-cv-01247-JEB (D.D.C.), Dkt. 31) (same).
- PX 454 (Order issued in the Summary Verbal Proceeding No. 21100-2003-0002 filed by M. Aguinda et al, v. Dr. A. Callejas Rivadeneira, and an English translation thereof).

XIII. **This Court Has Personal Jurisdiction Over Defendants**

129. **Donziger is a resident of New York City, is licensed to practice law by the state of New York, and is admitted in the United States District Court for the Southern District of New York.**

- DX 1750 (Donziger) ¶ 1 ("I am a member of the bars of the State of New York, the District of Columbia, the Southern District of New York, and the Second Circuit Court of Appeals.").
- PX 542 (email containing Donziger's signature block, giving a New York City address for Law Offices of Steven R. Donziger, P.C.).

**130.    The Law Offices of Steven R. Donziger is a New York business with its headquarters and operations in New York City.**

- PX 542 (email containing Donziger's signature block, giving a New York City address for Law Offices of Steven R. Donziger, P.C.).
- DX 1750 (Donziger) ¶ 1 ("I am a member of the bars of the State of New York, the District of Columbia, the Southern District of New York, and the Second Circuit Court of Appeals.").

**131.   Donziger & Associates, PLLC is a New York business with its headquarters and operations in New York City.**

- PX 552 at 48 (Intercreditor agreement listing as a party "Donziger & Associates, PLLC a New York professional limited liability company"); *id*. at 74.
- PX 7700; PX 7788 at 7–8 (Invoices showing New York City Address for "Steven Donziger and Associates").
- DX 1750 (Donziger) ¶ 1 ("I am a member of the bars of the State of New York, the District of Columbia, the Southern District of New York, and the Second Circuit Court of Appeals.").

132. **Defendants Hugo Gerardo Camacho Naranjo ("Camacho") and Javier Piaguaje Payaguaje ("Piaguaje") authorized and ratified the retention of Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC on their behalf in connection with the Lago Agrio litigation and related 1782 actions.**

- PX 558 (Retainer agreement dated January 5, 2011 (after Chevron exposed the Cabrera ghostwriting through discovery in the 1782 actions) between the individual Lago Agrio Plaintiffs and Donziger & Associates, signed by Fajardo on behalf of Camacho and Piaguaje).
- 5/14/2013 Camacho Dep. 94:06-94:14 ("Q.  Did you ever authorize Mr. Fajardo to hire Mr. Donziger to represent you?  A.  Yes.").
- 5/15/2013 Piaguaje Dep. 53:24-54:01 ("Q.  Mr. Fajardo hired Mr. Donziger to work on your behalf?  A.  Yes.").
- 5/15/2013 Piaguaje Dep. 113:19-114:17 (When shown a Crude outtake clip depicting Donziger pressuring an Ecuadorian judge, Piaguaje did not disavow the conduct, instead testifying that "we have always said to those who are supporting us, to say, so that there will be compensation for us. So these are words being said by those supporting us.").
- Tr. (J. Piaguaje) 2395:21-24 ("Q. And Mr. Fajardo told you that he hired Mr. Donziger to work on your behalf, right? A. Well, he didn't tell me on my behalf for myself as a plaintiff, but for the group, for the group of plaintiffs.").

**133.  Camacho and Piaguaje authorized and ratified the retention of numerous New York law firms, including Patton Boggs, Emery Celli, and Constantine Cannon LLP, on their behalf in connection with the Lago Agrio litigation and/or related 1782 actions, and those retention agreements were negotiated and performed in New York.**

- PX 553 (draft of retainer agreement between the individual LAPs, including Camacho and Piaguaje, and Patton Boggs "having offices at . . . New York.").
- PX 551 (retainer agreement between the individual LAPs, including Camacho and Piaguaje, and Emery Celli, located in New York).
- PX 544 (letter from Emery Celli in New York to Donziger, Fajardo and Yanza confirming retention).
- PX 666 (billing statement from Constantine Cannon indicating work done in New York on behalf of the LAPs).
- PX 1208 (email from H5 attaching RFIs to Kilpatrick Stockton, Constantine Canon LLP, Millberg LLP, and Patton Boggs, and discussing meeting with Donziger in New York to send the RFIs).
- Tr. 1249:10-11 (Shinder) ("I am the managing partner of Constantine Cannon's New York City office.").
- Tr. 1250:3-4 (Shinder) ("Q. Did you come to represent the Lago Agrio plaintiffs? A. Yes.").

**134.    Camacho and Piaguaje authorized and ratified the retention of H5 on their behalf, and that retention agreement was negotiated in New York.**

- PX 566 (Retention agreement between the individual LAPs, including Camacho and Piaguaje, and H5).
- PX 1226 (emails between Donziger & Associates associate Andrew Woods and Julia Brickell of H5's New York office negotiating retention agreement).
- PX 1453 (emails between Donziger and Economou of H5's New York office negotiating retention agreement).
- PX 1208 (email from H5 attaching RFIs to Kilpatrick Stockton, Constantine Canon LLP, Millberg LLP, and Patton Boggs, and discussing meeting with Donziger in New York to send the RFIs).
- PX 3100 (Bogart) ¶ 5 ("Nicholas Economou of the New York litigation services firm H5 contacted Burford to solicit investment capital . . . .  Economou introduced Burford to Steven Donziger . . . .").

135.    **A number of the retention agreements entered into with the LAPs, including Camacho and Piaguaje, include New York choice of law provisions.**

- PX 558 at 9 (Donziger retention agreement shall be "construed and interpreted in accordance with the laws of New York.").
- PX 559 at 6 (Fajardo retention agreement requires arbitration and "[t]o the extent state law is applicable, the arbitrators shall apply the substantive law of the State of New York.").
- PX 553 at 8 (Patton Boggs retention agreement "shall be governed by and construed and interpreted in accordance with the laws of New York.").
- PX 557 at 6 (Motley Rice retention agreement "shall be governed by and construed and interpreted in accordance with the laws of New York.").
- PX 551 at 10 (Emery Celli retention agreement "shall be governed by and construed and interpreted in accordance with the laws of New York.").
- PX 544 at 4 (Emery Celli retention letter for work beyond representation in SDNY requires that all disputes be arbitrated in New York City, where the LAPs would "expressly agree to submit to personal jurisdiction in New York.").
- PX 566 at 5 (H5 agreement requires that in arbitration, "the substantive law of the State of New York" be applied.).
- PX 552 at 32 ("Clause 8.5 of the [Burford] Agreement . . . shall be construed in accordance with the laws of the State of New York.").

136.   **In or about 1993, Camacho, Piaguaje, and other Ecuadorian plaintiffs filed a lawsuit in New York federal court seeking money damages from Texaco in the *Aguinda* case (Case No. 93-cv-7527 (JSR)).**

- DX 1800 (J. Piaguaje) ¶ 15 ("I became a plaintiff in *Aguinda et al. v. Texaco, Inc.*, Case No. 1:93-cv-07257-JSR, filed in the United States District Court for the Southern District of New York").

XIV.   **In Engaging In Wrongful Conduct, Donziger and the LAP Team Co-Conspirators Were Agents of the LAP Defendants and Corporate Donziger Defendants**

137.   **In all of the conduct established by Chevron in this action, Donziger was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 248 (1/2/2006 Agreement To Dispute A Case Against Chevron Texaco, Now Chevron, In Ecuador, providing that the law firm of Kohn, Swift & Graf, the law offices of Steven R. Donziger, and the law offices of Cristóbal Bonifaz will "handle the litigation of this case in Ecuador and/or the United States").

- PX 558 (retainer agreement dated January 5, 2011 among the LAPs, represented by P. Fajardo, El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by L. Yanza, and Donziger & Associates, PLLC).

- PX 806# (11/3/2006 email from Donziger to David Kuhn with the subject, "Book Proposal attached," attaching Amazon Awakening: "I am the lead lawyer in the class-action trial . . . I am the person primarily responsible for putting this team together and supervising it so we can forestall this impending disaster").

- PX 1392 (letter from J. Tyrrell to Donziger re "Engagement of Patton Boggs").

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).

- Piaguaje Dep. 53:24-54:3 ("Q Mr. Fajardo hired Mr. Donziger to work on your behalf? A Yes. Q When did he do that? A I think it was last year.").

- Camacho Dep. 94:06-94:14 ("Q   Did you ever authorize Mr. Fajardo to hire Mr. Donziger to represent you?     A   Yes.").

- PX 3100 (Bogart) ¶ 7 ("Donziger made it clear that he had broad authority from the LAPs to negotiate financing arrangements and to be the primary interface with Burford.").

- PX 4900 (Dahlberg) ¶ 36 ("Donziger was primarily responsible for the oversight of the Litigation, including the overall promotion of the case, raising capital to fund the case, management of the overall operations of the case, case strategy, advocacy and public relations efforts and case management.").

- PX 4800 (Guerra) ¶ 24 ("Mr. Fajardo had previously explained to me that Mr. Donziger was the lead among the Plaintiffs' team and thus he needed to inform Mr. Donziger of everything that was happening in the case.").

- PX 5600 (Kohn) ¶ 12 ("Mr. Donziger was the person primarily responsible for making day-to-day decisions in the management of the case, including hiring Ecuadoran personnel for the case, scientists and other consultants, public relations personnel, lobbyists, and Ecuadoran counsel.").

- PX 3200 (Russell) ¶ 3 ("Donziger identified himself as the lead U.S. attorney in the Ecuadorian litigation."); id. ¶ 31 ("Donziger was always in control of the case, dictating case strategy, overseeing the activities of the legal and technical teams, and was involved in directing the payments to and from the GEO Ecuador Account").

- Tr. 2395:21-24 (J. Piaguaje) ("Q. And Mr. Fajardo told you that he hired Mr. Donziger to work on your behalf, right? A. Well, he didn't tell me on my behalf for myself as a plaintiff, but for the group, for the group of plaintiffs.").

138.   **In all of the conduct established by Chevron in this action, Donziger was acting as the agent of the Law Offices of Steven R. Donziger and Donziger & Associates, PLLC.**

- PX 542 (email containing Donziger's signature block listing Law Offices of Steven R. Donziger, P.C.).
- PX 552 at 48 (Intercreditor agreement listing as a party "Donziger & Associates, PLLC a New York professional limited liability company"); *id*. at 74 (listing same address as in PX 542).
- PX 558 at 2 (retainer agreement between the LAPs and Donziger & Associates designating Steven Donziger as "the Firm's lead partner on the engagement.").
- PX 607 (billing invoices from the Law Offices of Steven Donziger sent by Steven Donziger).
- PX 7700; PX 7788 at 7–8 (Invoices showing same New York City Address for "Steven Donziger and Associates" as in PX 542).
- PX 8043 ("Donziger Defendants' Combined Reply in Support of Motions for Stay and Procedural Safeguards," signed by Steven Donziger).

139.   **In all of the conduct established by Chevron in this action, Fajardo was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 323 (Special and Judicial Power of Attorney on behalf of Fajardo).
- PX 325 (Order issued in Maria Aguinda y Otros v. Chevron Corp., Case No. 002-2003, designating Fajardo to replace Wray as "common counsel").
- PX 390 (Special Power of Attorney and Agency for Judicial Matters in favor of Fajardo).
- PX 391 (Special Power of Attorney and Agency for Judicial Matters in favor of Fajardo).
- PX 392 (Special Power of Attorney and Agency for Judicial Matters in favor of Fajardo).
- PX 558 (retainer agreement dated January 5, 2011 among the LAPs, represented by Fajardo, El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by Yanza, and Donziger & Associates, PLLC).
- PX 559 (retainer agreement dated January 5, 2011 between El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by Yanza, the LAPs and Fajardo).
- PX 761 (resolution issued by The Executive Committee of the Assembly of the Victims of Texaco: "The current legal team [is] headed by attorney Pablo Fajardo").
- PX 1392 (letter from J. Tyrrell to Donziger, dated July 12, 2010, and regarding "Engagement of Patton Boggs LLP").
- PX 5609 (November 13, 2009 letter to Kohn from Fajardo and Yanza "[o]n behalf of the communities affected by Texaco").
- PX 5600 (Kohn) ¶ 14 ("In 2006, Mr. Donziger informed me that Pablo Fajardo was taking a prominent role in the Ecuadoran litigation.").
- PX 3000 (Veiga) ¶ 050 ("I first met Pablo Fajardo at one of the Judicial Inspections. At the time he was not serving as the lead lawyer but assisting others. Over time, Fajardo assumed a more substantive role litigating the case.").
- 5/15/2013 Piaguaje Dep. 53:24-54:3 ("Q Mr. Fajardo hired Mr. Donziger to work on your behalf? A Yes. Q When did he do that? A I think it was last year.").
- 5/14/2013 Camacho Dep. 93:14-18 ("Q. You understood you were giving Mr. Fajardo a power of attorney to represent you in the case against Chevron when you signed Exhibit 3603 (indicating)? A. Yes.").
- Tr. 2380:18-20 (J. Piaguaje) ("Q. [Fajardo] is your attorney in the case of Maria Aguinda v. Chevron Corporation in the Lago Agrio courthouse? A. Yes."); 2381:22-24 ("Q. This is something you signed authorizing Pablo Fajardo to represent you in the Lago Agrio Chevron case, correct? A. Yes.").

**140.    In all of the conduct established by Chevron in this action, Yanza was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 381 at 3 (Special Power of Attorney granted on behalf of Yanza, allowing him to "sign contracts, agreements or conventions . . . for the benefit of and in support of the legal case that we are pursuing against Chevron Corporation and the different legal and related extrajudicial activities.").
- PX 385 (Special Power of Attorney granted on behalf of Yanza).
- PX 544 (Co-counseling Agreement between Emery Celli, Donziger, Yanza, and Fajardo).
- PX 558 (retainer agreement dated January 5, 2011 among the LAPs, represented by Fajardo, El Frente de Defensa de la Amazonia, represented by E. Chavez, the Asamblea de Afectados por Texaco, represented by L. Yanza, and Donziger & Associates, PLLC).
- PX 4900R (Dahlberg) ¶ 103 ("Along with Donziger, Yanza helped to facilitate the majority of the payments that came into the Frente, the majority of which was paid by KSG.").
- PX 5600 (Kohn) ¶ 3 ("Luis Yanza, as the representative of the Frente was also involved in the case from the outset."); *id.* ¶ 17 ("Luis Yanza, in his capacity as head of the Frente, also served as an accountant for the case.").
- PX 3000 (Veiga) ¶ 51 ("Luis Yanza was a key leader of The Frente, including serving as President for some time.  I would see Yanza at nearly every Judicial Inspection.  He was almost always involved with protests and other pressure tactics.").
- Tr. (J. Piaguaje) 2422:18-24 ("Q. Is it fair to say, Mr. Piaguaje, that Mr. Yanza and Mr. Fajardo set the agenda for the asamblea meetings? A. Yes. Well, at the first meeting, we decide what we are going to address, and then Luis Yanza, he is our coordinator, he does that. My lawyer, Pablo Fajardo, deals with the legal aspects, and as far as the legal aspects, I don't know much about that. That's up to the attorneys.").

**141.    In all of the conduct established by Chevron in this action, Ponce was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 8087 at 2 ("Chevron lists Pablo Fajardo, Juan Pablo Saenz, Julio Prieto, Alberto Wray . . . . Defendants [Camacho and Piaguaje] do not dispute that Pablo Fajardo . . . is their agent, along with other legal counsel").
- PX 5600 (Kohn) ¶ 15 ("During the time I was involved in the Ecuadoran litigation, Mr. Donziger and the plaintiffs also retained Alejandro Ponce Villacís and Juan Pablo Sáenz as members of the Ecuadoran legal team.").
- PX 3000 (Veiga) ¶ 53 ("Alejandro Ponce Villacis:  Alejandro Ponce Villacis was a lawyer who represented the Lago Agrio Plaintiffs.").
- PX 4900R (Dahlberg) ¶ 74 ("The documents I analyzed included transactions with the following individuals or entities that provided legal services in connection with the Litigation: Alberto Wray, Alejandro Ponce Villacis, Juan Pablo Saenz, Julio Prieto Mendez, Monica Pareja, Neidl & Associates, Pablo Fajardo Mendoza, and Paola Delgado.").
- 12/13/2010 Donziger Dep. 1284:11-18 ("Q. Well, let me ask first, the local counsel that you are referring to, does that group include Mr. Ponce, Mr. Saenz, Mr. Prieto and Mr. Fajardo? A. And Dr. Wray. Q. That would be the group you would be referring to? A. Yes.").
- Tr. (Ponce) 2222:5-7 ("Q.  You were part of the Lago Agrio plaintiffs' legal team from June 2005 through November of 2008? A.  That's correct.").

142.  **In all of the conduct established by Chevron in this action, Saenz was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 2499 (filing in Maria Aguinda y Otros v. Chevron Corp., Case No. 002-2003, by J. Saenz).
- PX 8087 at 2 ("Chevron lists 'Pablo Fajardo, Juan Pablo Saenz, Julio Prieto, Alberto Wray' . . . . Defendants [Camacho and Piaguaje] do not dispute that Pablo Fajardo . . . is their agent, along with other legal counsel").
- 12/13/2010 Donziger Dep. 1284:11-18 ("Q. Well, let me ask first, the local counsel that you are referring to, does that group include Mr. Ponce, Mr. Saenz, Mr. Prieto and Mr. Fajardo? A. And Dr. Wray. Q. That would be the group you would be referring to? A. Yes.").
- PX 4900 (Dahlberg) ¶ 74 ("The documents I analyzed included transactions with the following individuals or entities that provided legal services in connection with the Litigation: Alberto Wray, Alejandro Ponce Villacis, Juan Pablo Saenz, Julio Prieto Mendez, Monica Pareja, Neidl & Associates, Pablo Fajardo Mendoza, and Paola Delgado.").
- PX 5600 (Kohn) ¶ 15 ("During the time I was involved in the Ecuadoran litigation, Mr. Donziger and the plaintiffs also retained Alejandro Ponce Villacís and Juan Pablo Sáenz as members of the Ecuadoran legal team.").
- Tr. (Donziger) 2633:2-3 ("And there were two younger lawyers, Juan Pablo Saenz and Julio Prieto, who worked with him.").

143.    **In all of the conduct established by Chevron in this action, Prieto was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 8087 at 2 ("Chevron lists Pablo Fajardo, Juan Pablo Saenz, Julio Prieto, Alberto Wray . . . . Defendants [Camacho and Piaguaje] do not dispute that Pablo Fajardo . . . is their agent, along with other legal counsel").
- PX 3000 (Veiga) ¶ 52 ("Julio Prieto:  Julio Prieto was a lawyer who represented the Lago Agrio Plaintiffs.  I met Prieto at a number of Judicial Inspections.").
- PX 4900 (Dahlberg) ¶ 74 ("The documents I analyzed included transactions with the following individuals or entities that provided legal services in connection with the Litigation: Alberto Wray, Alejandro Ponce Villacis, Juan Pablo Saenz, Julio Prieto Mendez, Monica Pareja, Neidl & Associates, Pablo Fajardo Mendoza, and Paola Delgado.").
- 12/13/2010 Donziger Dep. 1284:11-18 ("Q. Well, let me ask first, the local counsel that you are referring to, does that group include Mr. Ponce, Mr. Saenz, Mr. Prieto and Mr. Fajardo? A. And Dr. Wray. Q. That would be the group you would be referring to? A. Yes.").
- Tr. 2633:2-3 (Donziger) ("And there were two younger lawyers, Juan Pablo Saenz and Julio Prieto, who worked with him.").

144.    **In all of the conduct established by Chevron in this action, Stratus was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 633 (email from Donziger to Englert and Hoke, copying McDermott attaching the contracts between Kohn and Stratus, Stratus and Jones, Belanger and E-Tech, and Donziger and Stratus).
- PX 1210 (letter from Donziger to "confirm the retention of Stratus Consulting, Inc. to provide on-going professional services in connection with Aguinda et al. v. Chevron Texaco").
- PX 5208 (Beltman) at ¶ 8 ("At that meeting, Donziger described Stratus's work as the preparation of a damages assessment on behalf of the LAPs for the Lago Agrio Litigation.").
- PX 5210 (Maest) at ¶ 3 ("I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services.").
- PX 5600 (Kohn) ¶ 29 ("On behalf of the Ecuadoran plaintiffs, Mr. Donziger and I retained Stratus in the Spring of 2007 to provide us with materials for submission to the court and also to prepare materials to assist us in efforts to mediate the Ecuadoran litigation.").

145.   **In all of the conduct established by Chevron in this action, Beltman was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs, including Beltman).
- PX 5208 (Beltman) at ¶ 8 ("At that meeting, Donziger described Stratus's work as the preparation of a damages assessment on behalf of the LAPs for the Lago Agrio Litigation.").
- PX 4900 (Dahlberg) ¶ 80 ("I have reviewed documents that evidence requests for payments, wire transfers, and checks indicating the LAPs' Attorneys and Representatives transferred funds to various consultants and experts in connection with the Litigation [including] . . . Doug Beltman").
- PX 5600 (Kohn) ¶ 29 ("On behalf of the Ecuadoran plaintiffs, Mr. Donziger and I retained Stratus in the Spring of 2007 to provide us with materials for submission to the court and also to prepare materials to assist us in efforts to mediate the Ecuadoran litigation.").

**146.    In all of the conduct established by Chevron in this action, Maest was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 5210 (Maest) ¶ 3 ("I formally began working for Donziger on behalf of the Lago Agrio Plaintiffs (LAPs) in the Lago Agrio Litigation in or around January 2006, providing environmental consulting services.").
- PX 4900 (Dahlberg) ¶ 80 ("I have reviewed documents that evidence requests for payments, wire transfers, and checks indicating the LAPs' Attorneys and Representatives transferred funds to various consultants and experts in connection with the Litigation [including] . . . Ann Maest").
- PX 5600 (Kohn) ¶ 29 ("On behalf of the Ecuadoran plaintiffs, Mr. Donziger and I retained Stratus in the Spring of 2007 to provide us with materials for submission to the court and also to prepare materials to assist us in efforts to mediate the Ecuadoran litigation.").

147.   **In all of the conduct established by Chevron in this action, Karen Hinton was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- DX 1500 (Hinton) ¶ 2 ("Steven Donziger and Pablo Fajardo hired me in May 2008 to be the United States press coordinator for the *Aguinda* lawsuit. Before I accepted the job, I met with Mr. Donziger in Washington, DC, and then Mr. Fajardo and other individuals associated with the case in Quito and Lago Agrio, Ecuador. I worked for the Amazon Defense Coalition, representing the Lago Agrio plaintiffs, and /or Steven Donziger until August 2013.").

**148.    In all of the conduct established by Chevron in this action, Aaron Marr Page was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 at 3 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs including Page).
- PX 2364 at 7 (email from Page to Donziger attaching invoice and updated engagement letter whereby Page would assist Donziger in the Lago Agrio Litigation, "pursuant to [Donziger's] authority as representative on behalf of the [LAPs].").
- PX 4900 (Dahlberg) ¶ 65 ("The documents I analyzed include transactions with individuals or entities that provided legal services in connection with the Litigation in the United States and/or operated primarily or exclusively in the United States, including Aaron Marr Page and Forum Nobis . . .").

149.   **In all of the conduct established by Chevron in this action, Andrew Woods was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1484 at 1 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 4900 (Dahlberg) ¶ 44 ("[T]here are numerous wire transfers and check payments made by Donziger from the Ecuador Case Account to various entities including, but not limited to, . . . Andrew Woods . . .").

150.   **In all of the conduct established by Chevron in this action before July 17, 2011, Kohn Swift was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 248 at 1 (1/2/2006 Agreement To Dispute A Case Against Chevron Texaco, Now Chevron, In Ecuador, providing that the law firm of Kohn, Swift & Graf, the law offices of Steven R. Donziger, and the law offices of Cristóbal Bonifaz will "handle the litigation of this case in Ecuador and/or the United States").
- PX 631 at 1 (retainer agreement between C. Bonifaz, J. Kohn, and the plaintiffs in the Texaco Litigation in New York).
- PX 684 at 1 (Waiver of Rights between C. Bonifaz and J. Kohn in *Aguinda v. Texaco*, No. 93-CV-7527 (S.D.N.Y.)).
- PX 1054 at 1 (letter from Kohn to Donziger, dated August 7, 2008, memorializing the "agreement concerning the allocation and distribution of any attorney's fees and costs reimbursements obtained in the Ecuador litigation").
- PX 1484 at 2 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs, including KSG).
- PX 4900 (Dahlberg) ¶ 35 (discussing a "January 2006 agreement between Donziger, KSG and Law Offices of Cristobal Bonifaz ('Bonifaz') and the Frente, indicating that the Frente retained the above attorneys to 'handle' the Litigation case in Ecuador and/or the United States and finance the costs of Ecuadorian attorneys' fees and litigation expenses.").
- PX 5600 (Kohn) ¶ 1 ("The law firm, Kohn, Swift and Graf PC ("KSG"), with which I have been a member since 1982, was retained by the Frente de Defensa de la Amazonia ('Frente') to act as one of the U.S. counsel for the plaintiffs in the case Maria Aguinda y otros v. Chevron (the 'Ecuadoran litigation')."); *id.* ¶ 7 (in addition to financing, KSG was "involved in discussing strategy in the Ecuadoran litigation and in U.S.-based related cases, meeting with government representatives, settlement strategy, and mediations in 2007 and 2008.").

**151.  In all of the conduct established by Chevron in this action, Patton Boggs was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 553 (11/4/2010 email attaching draft Patton Boggs retainer agreement).
- PX 1391# (7/12/2010 retainer letter from Tyrrell to Donziger).
- PX 1392 (7/12/2010 retainer letter from Tyrrell to Donziger re "Engagement of Patton Boggs LLP").
- PX 1484 at 1 (Supplemental Appendix to Privilege Logs by Non-Parties Andrew Woods and Laura Garr, listing counsel for Lago Agrio Plaintiffs).
- PX 1527# (Invictus Memo on "Securing and Enforcing Judgment and Reaching Settlement").
- 12/16/2010 Allen Dep. 70:23-71:3 (naming Patton Boggs as "plaintiffs' counsel").
- 4/30/2013 Beier Dep. 206:2-11 (acknowledging that Patton Boggs represented the LAPs but that "Patton Boggs asked that their participation . . . not be disclosed because they weren't going to make an appearance").
- 1/18/2011 Donziger Dep. 3198:9-15 ("Q. So you recommended to Mr. Fajardo and Mr. Yanza that the plaintiffs hire Patton Boggs, correct?  A. Yes.  Q. When did you make that recommendation?  A. I would say in early 2010.").
- 5/23/2013 Silver Dep. 71:19-23 ("Q. And what interest did Eric Westenberger and Patton Boggs have in the Colorado 1782 action that you were involved in?  A. My understanding was that they were assisting the plaintiffs' counsel.").
- PX 3100 (Bogart) ¶ 4 (Burford "entered into an agreement . . . to provide up to $15 million in financing to Patton Boggs LLP . . . , a major US law firm, in connection with its entry into the Lago Agrio litigation as plaintiffs' counsel."); *id.* ¶ 6 ("By early 2010, Patton Boggs had secured a leading role in the Litigation, with Jim Tyrrell as the lead partner.").
- PX 4900 (Dahlberg) ¶ 68 ("Patton Boggs had a draft agreement to be jointly engaged by Fajardo, acting on behalf of the LAPs; Ermel Chavez Parra, acting on behalf of the Frente; and Yanza, acting on behalf of the Asamblea De Afectados Por Texaco to provide assistance in connection with the Litigation in relation to the Section 1782 proceedings filed by Chevron throughout the United States. . . . In exchange for these services, it appears that Patton Boggs was to receive 12% of the Total Contingency Fee Payment from a Final Judgment as well as an 'Hourly Fee Payment . . . [of] 75% of the standard hourly rates normally charged by' Patton Boggs.").

**152.    In all of the conduct established by Chevron in this action, Emery Celli was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 551 at 1 (retainer agreement between the individual LAPs, including Camacho and Piaguaje, and Emery Celli, located in New York).
- PX 544 at 1 (letter dated December 2, 2009 from Emery Celli in New York to Donziger, Fajardo and Yanza confirming retention).
- PX 1314 (Emery Celli attorneys discussing Fajardo Declaration with other counsel for the LAPs).
- PX 1320 (email from I. Maazel to I. Moll, E. Westenberger, J. Brickell, J. Abady, A. Woods, Donziger, L. Garr, B. Narwold, J. Tyrrell, A. Wilson, E. Daleo, E. Yennock re Global strategy).
- PX 1321 (email string from Donziger to J. Abady re Fajardo Declaration) (J. Abady of Emery Celli, acting as counsel for the LAPs in 1782 actions, discussing Fajardo Declaration).
- PX 4900 (Dahlberg) ¶¶ 65, 71 (analysis of disbursements to U.S. counsel, including Emery Celli).

153.    **In all of the conduct established by Chevron in this action, Motley Rice LLC was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 556 at 1 (draft Master Agreement among El Frente de Defense de la Amazonia, the Asamblea de Afectados por Texaco, Donziger & Associates PLLC, Motley Rice LLC, Patton Boggs LLP, and Emery, Celli, Brinckerhoff & Abady LLP, Fajardo, and each person thereafter that executes an accession agreement).
- PX 557 at 1 (retainer agreement between Aguinda v. Chevron "individual plaintiffs," Frente de Defensa de la Amazonia, Asamblea de Afectados por Texaco, and Motley Rice LLC).
- PX 2365 at 1 (First Amendment to Retainer Agreement between individual plaintiff's, Frente de Defensa de la Amazonia, Asemblea de Afectados por Texaco, and Motley Rice).
- PX 4900 (Dahlberg) ¶¶ 65, 72 (analysis of disbursements to U.S. counsel, including Motley Rice).

154. **In all of the conduct established by Chevron in this action, Horowitz/Forbes, LLP was acting as an agent for the LAPs, including Camacho and Piaguaje.**

- PX 1379 at 1-2 (email from J. Horowitz to L. Treece copying J. McDermott and T. Beyer re Aguinda) (discussing representation of LAPs in Stratus 1782 action).
- PX 1347 at 1 (Horowitz, representing the LAPs, discussing the Stratus comments on the Cabrera Report, which failed to disclose that Stratus wrote the report, and concluding "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator").

**155.**   **Camacho and Piaguaje are aware of the misconduct of their agents as established in this action by Chevron, and have not disavowed their agents' misconduct or the fruits of their agents' misconduct, including the Lago Agrio judgment.**

- PX 1502 at 5 (email from Fajardo stating that the Board of the Union of People Affected by Texaco met on January 14-15, 2013 and made certain decisions regarding the litigation, including that "Steven Donziger will continue to be a part of the team working in the United States").
- PX 2387 (image of Hugo Gerardo Camacho Naranjo reading Chevron's complaint in this action).
- 5/14/2013 Camacho Dep. 28:16-28:20 ("Q: Do you understand that a case was brought against Mr. Donziger, Mr. Fajardo, Mr. Yanza, and all the plaintiffs from the case in Ecuador against Chevron in New York? A: I have heard.").
- 5/14/2013 Camacho Dep. 195:21-25 ("Q: In its complaint, Chevron alleges that your lawyers in Ecuador have committed fraud in representing you in Ecuador. Were you aware of that? A: I saw it on television.").
- 5/14/2013 Camacho Dep. 247:22-248:6 (when asked whether the judgment should be collected if it were obtained by fraud, Camacho refused to answer, testifying "I cannot answer that, because here I can never prove and I don't believe there was a fraud.").
- 5/15/2013 Piaguaje Dep. 113:19-114:17 (after being shown a Crude outtake clip depicting Donziger pressuring an Ecuadorian judge and asked if he authorized such conduct, Piaguaje did not disavow the conduct, instead testifying that "we have always said to those who are supporting us, to say, so that there will be compensation for us. So these are words being said by those supporting us.").
- Tr. (J. Piaguaje) 2436:8-12 ("Q.  Paragraph 20, do you see that, Mr. Piaguaje, did you learn that Chevron was complaining that your attorneys put pressure over the judge presiding over the Lago Agrio case when Chevron filed allegations against you and others? A.  Yes.").

**156.    Since becoming aware of the misconduct of their agents as established in this action by Chevron, Camacho and Piaguaje have agreed to further the LAP team's fraud and other misconduct.**

- PX 1502 at 5 (email from Fajardo stating that the Board of the Union of People Affected by Texaco met on January 14-15, 2013 and made certain decisions regarding the litigation, including that "Steven Donziger will continue to be a part of the team working in the United States").

- PX 7066 at 2 (email from Yanza to Assembly delegates coordinating the "messages to our bases and public opinion" that the Republic of Ecuador's statements on the case were "forced" by Chevron and are only "related to the media, not judicial. . . . [The government's statements] do[] not mean that [the government] is getting involved in our case.").

- 1/19/2011 Donziger Dep. 3421:11-3422:6 ("Q. Am I correct that after it arose as an issue in this litigation in September 2010 that the plaintiffs' counsel in the U.S. may not have been properly authorized to represent the Lago Agrio plaintiffs' counsel, and Mr. Kaplan had submitted this earlier power of attorney from Mr. Fajardo to Judge Kaplan, the plaintiffs' team went out and got a new power of attorney executed for Mr. Fajardo?    A. I would describe it as a broadened, more explicit power.    Q. In response to the issue that arose before Judge Kaplan in September  about whether there had been proper authorization of any of the plaintiffs' counsel in the U.S. to represent the Lago Agrio plaintiffs, correct?    A. Partly.").

- 5/14/2013 Camacho Dep. 127:22-128:2 ("Q: When you say 'that we have to continue with the case,' are you referring to continuing with the lawsuit where you're a plaintiff against Chevron in Ecuador, or this lawsuit where you're a defendant in New York? A: Both.").

- 5/14/2013 Camacho Dep. 247:22-248:6 (when asked whether the judgment should be collected if it were obtained by fraud, Camacho refused to answer, testifying "I cannot answer that, because here I can never prove and I don't believe there was a fraud.").

- Tr. (J. Piaguaje) 2390:19-2391:2 ("Q.  And you know Mr. Fajardo is working with other people to raise money to pay for lawyers? A.  Yes, so that they will move forward with this process, with this case, the trial. Q.  And you approve of Mr. Fajardo's actions to raise money, correct? A.  Yes, because we want to accomplish our goal.").

**157.    Since becoming aware of the misconduct of their agents as established in this action by Chevron, Camacho and Piaguaje have taken overt acts in furtherance of their agents' misconduct and sought to benefit from that misconduct by authorizing legal actions seeking to enforce the Lago Agrio judgment.**

- PX 660 (Canadian enforcement action filed in the name of the LAPs after Chevron filed its complaint).
- PX 1004 (Amended complaint in Canadian enforcement action filed in the name of the LAPs after Chevron filed its complaint).
- PX 1445 at 1 (in October 2010, following revelation of Defendants' fraud through 1782 actions, Donziger writes Yanza: "It is high priority for us to cooperate as soon as possible with Andrew Niedl in order to determine the documents that explain the authority to obligate the plaintiffs in the contracts with the law firms.").
- PX 2306 at 1-2 (Filing in the Superior Court of Justice of Brazil, and an English translation thereof) (filing in the name of the LAPs seeking to enforce the judgment after Chevron filed its complaint).
- PX 2461 at 1 (Order from Argentina enforcement action undertaken in the name of the LAPs after Chevron filed the complaint in this action).
- PX 7066 at 1 (October 2, 2013 email from Yanza to the Assembly delegates informing them of updates on the enforcement of the judgment, including that the Ecuadorian trademarks embargo "does not represent much to us financially" and that in Canada "there will be a hearing to which at least one person must travel in representation of the affected people.").
- Tr. (J. Piaguaje) 2398:15-2399:8 ("Mr. Fajardo told you and others at this meeting that a document was filed in Brazil seeking recognition of the judgment? A.  Yes. . . . Q.  And Mr. Fajardo has the power that you've conferred on him and others in the Lago Agrio case have conferred on him to file these lawsuits around the world to seek recognition of the judgment? A.  Yes.").

158.   **Since becoming aware of the misconduct of their agents as established in this action by Chevron, Camacho and Piaguaje have vigorously defended their agents' conduct in this action.**

- PX 1502 at 5 (email from Fajardo stating that the Board of the Union of People Affected by Texaco met on January 14-15, 2013 and made certain decisions regarding the litigation, including that "Steven Donziger will continue to be a part of the team working in the United States").

- PX 6703 at 3 (Minutes from October 2010 meeting of the Assembly, stating "[W]e, the plaintiffs . . . express our support for and confidence in the team of Ecuadorian and U.S. attorneys and our leaders who represent us in this struggle. . . . We especially express our unconditional and total support for our attorney and colleague, Steven Donziger, who is experiencing fierce attacks by Chevron in the United States of America. It is really intolerable that one would unjustly attack Mr. Donziger for the sole crime of having represented us, valiantly denouncing the crime committed by Chevron (Texaco) in the Ecuadorian Amazon region. Across the miles we join in solidarity with him, his family, and his work team.").

- PX 7019 at 3 (Minutes from October 30, 2010 meeting of the Assembly accepting a proposal "regarding the agreement of support for our colleague Steven Donziger, attorneys, and other leaders who are being attacked by the Chevron company.").

- PX 7591 at 5 (October 15, 2013 radio interview where Humberto Piaguaje states: "Steven Donziger is our attorney . . . [F]rom the outset . . . , Steven Donziger is, [ ] our attorney so far, but really he also does have his faults. We can't, I can't accuse him because we worked with him from the beginning.").

- 5/14/2013 Camacho Dep. 247:22-248:6 (when asked whether the judgment should be collected if it were obtained by fraud, Camacho refused to answer, testifying "I cannot answer that, because here I can never prove and I don't believe there was a fraud.").

- 5/15/2013 Piaguaje Dep. 113:19-114:17 (after being shown a *Crude* outtake clip depicting Donziger pressuring an Ecuadorian judge, Piaguaje did not disavow the conduct, instead testifying that "we have always said to those who are supporting us, to say, so that there will be compensation for us. So these are words being said by those supporting us.").

159.  **Since becoming aware of the misconduct of their agents as established in this action by Chevron, Camacho and Piaguaje have affirmatively ratified that this misconduct was engaged in on their behalf, for their benefit, and within the scope of the authorization Camacho and Piaguaje granted their agents.**

- PX 391 at 6 (November 8, 2010 Special Power of Attorney between Camacho and Fajardo wherein Camacho and other LAPs "ratify and approve each and every one of the actions undertaken by [Fajardo.]").
- PX 1502 at 5 (email from Fajardo stating that the Board of the Union of People Affected by Texaco met on January 14-15, 2013 and made certain decisions regarding the litigation, including that "Steven Donziger will continue to be a part of the team working in the United States").
- PX 6703 at 3 (Minutes from October 2010 meeting of the Assembly, stating "[W]e, the plaintiffs . . . express our support for and confidence in the team of Ecuadorian and U.S. attorneys and our leaders who represent us in this struggle. . . . We especially express our unconditional and total support for our attorney and colleague, Steven Donziger, who is experiencing fierce attacks by Chevron in the United States of America. It is really intolerable that one would unjustly attack Mr. Donziger for the sole crime of having represented us, valiantly denouncing the crime committed by Chevron (Texaco) in the Ecuadorian Amazon region. Across the miles we join in solidarity with him, his family, and his work team.").
- PX 558 at 1 (Retainer agreement dated January 5, 2011 (after Chevron exposed the Cabrera ghostwriting through discovery in the 1782 actions) authorizing Donziger to continue in role of U.S. Representative).
- PX 559 at 1 (Retainer agreement dated January 5, 2011 (after Chevron exposed the Cabrera ghostwriting through discovery in the 1782 actions) authorizing Fajardo to continue in role of lead Ecuadorian counsel).
- PX 7067 at 1 (November 4, 2013 email from Yanza to the LAPs, with the subject "Enjoy yourselves a little," summarizing Callejas's testimony that he felt threatened by the LAP team's burial demonstration outside his office).
- PX 7591# (October 15, 2013 radio interview where H. Piaguaje states: "Steven Donziger is our attorney . . . [F]rom the outset, Steven Donziger is our attorney so far, but really he also does have his faults. We can't, I can't accuse him. He was our attorney because we've worked him from the beginning.").
- 5/14/2013 Camacho Dep. 247:22-248:6 (when asked whether the judgment should be collected if it were obtained by fraud, Camacho refused to answer, testifying "I cannot answer that, because here I can never prove and I don't believe there was a fraud.").
- 5/15/2013 Piaguaje Dep. 113:19-114:17 (after being shown a Crude outtake clip depicting Donziger pressuring an Ecuadorian judge, Piaguaje did not disavow the conduct, instead testifying that "we have always said to those who are supporting us, to say, so that there will be compensation for us. So these are words being said by those supporting us.").
- Tr. (J. Piaguaje) 2388:15-2390:6 ("Q.  Mr. Piaguaje, in this document that you signed, you approved of each and every one of the actions undertaken by attorney Pablo Fajardo Mendoza in the Lago Agrio Chevron case, right? A..  Yes. Q.  You

approved of each and every one of the actions undertaken by Mr. Fajardo in all the courts in which he represented you, correct? A.  Yes.  Q.  Mr. Piaguaje, you approved of all the financial and administrative acts which Mr. Fajardo carried out for your defense in the Lago Agrio Chevron case? A.  Yes. Q.  And you approved of all the financial acts Mr. Fajardo carried out through other people that he legally authorized on your behalf? A.  Yes.").

160.    **At trial, and in depositions taken in this action, Camacho and Piaguaje have
ratified that the misconduct of their agents, as established in this action by
Chevron, was engaged in on their behalf, for their benefit, and within the
scope of the authorization Camacho and Piaguaje gave their agents.**

- 5/14/2013 Camacho Dep. 150:2-9 ("Q: Do you see in Exhibit 3608 where it says:
'Principals ratify and approve each and every one of the acts performed by Lawyer
Pablo Fajardo Mendoza'? When you signed this, what acts of Mr. Fajardo did you
understand you were ratifying and approving? A: That the trial should continue.").

- 5/15/2013 Piaguaje Dep. 113:19-114:17 (after being shown a Crude outtake clip
depicting Donziger pressuring an Ecuadorian judge, Piaguaje did not disavow the
conduct, instead testifying that "we have always said to those who are supporting
us, to say, so that there will be compensation for us. So these are words being said
by those supporting us.").

- Tr. (J. Piaguaje) 2388:15-2390:6 ("Q.  Mr. Piaguaje, in this document that you
signed, you approved of each and every one of the actions undertaken by attorney
Pablo Fajardo Mendoza in the Lago Agrio Chevron case, right? A..  Yes. Q.  You
approved of each and every one of the actions undertaken by Mr. Fajardo in all the
courts in which he represented you, correct? A.  Yes. Q.  Mr. Piaguaje, you
approved of all the financial and administrative acts which Mr. Fajardo carried out
for your defense in the Lago Agrio Chevron case? A.  Yes. Q.  And you approved
of all the financial acts Mr. Fajardo carried out through other people that he legally
authorized on your behalf? A.  Yes.").

161.   **At trial, and in depositions taken in this action, Camacho and Piaguaje testified that Steven Donziger is their agent, that they support him notwithstanding his misconduct, as established in this action by Chevron, that he acted within the scope of the authorization Camacho and Piaguaje granted, and that they continue to seek to benefit from his misconduct, including by authorizing legal actions seeking to enforce the Lago Agrio judgment.**

- 5/14/2013 Camacho Dep. 247:22-248:6 (when asked whether the judgment should be collected if it were obtained by fraud, Camacho refused to answer, testifying "I cannot answer that, because here I can never prove and I don't believe there was a fraud.").
- Tr. (J. Piaguaje) 2390:19-2391:2 ("Q.  And you know Mr. Fajardo is working with other people to raise money to pay for lawyers? A.  Yes, so that they will move forward with this process, with this case, the trial. Q.  And you approve of Mr. Fajardo's actions to raise money, correct? A.  Yes, because we want to accomplish our goal.").
- Tr. (J. Piaguaje) 2398:15-2399:8 ("Mr. Fajardo told you and others at this meeting that a document was filed in Brazil seeking recognition of the judgment? A.  Yes. . . . Q.  And Mr. Fajardo has the power that you've conferred on him and others in the Lago Agrio case have conferred on him to file these lawsuits around the world to seek recognition of the judgment? A.  Yes.").

Dated:  December 23, 2013
New York, New York

Respectfully submitted,


_____/s/ Randy M. Mastro_____
Randy M. Mastro
Andrea E.  Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile:  212.351.4035


William E.  Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*

## LIST OF APPENDICES

Appendix 1          Donziger Mail and Wire Fraud Violations

Appendix 2          Donziger Money Laundering Violations

Appendix 3          Lago Agrio Judgment Distribution Tables