# EXHIBIT J

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

**Un-Sealed**
Public and unofficial staff access to this instrument are prohibited by court order.

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. **H-06-316**

JIM BOB BROWN

## PLEA AGREEMENT

The United States of America, by and through Donald J. DeGabrielle, Jr., United States Attorney for the Southern District of Texas and James R. Buchanan, Assistant United States Attorney, Mark F. Mendelsohn, Deputy Chief, and Thomas E. Stevens, Trial Attorney, Criminal Division, Fraud Section of the Department of Justice (together, the "DOJ"), on the one hand, and the defendant, Jim Bob Brown ("Defendant"), on the other hand, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, have entered into an agreement, the terms and conditions of which are as follows:

### The Defendant's Agreement

1. Defendant agrees to plead guilty to Count 1 of the Information. Count 1 charges Defendant with conspiring to violate the Foreign Corrupt Practices Act ("FCPA"), in violation of Title 18, United States Code, Section 371 and Title 15, United States Code, Section 78dd-2(a) and (i).

### Punishment Range

2. The **statutory maximum** penalty for each violation of Title 18, United States Code, Section 371, is not more than five (5) years' imprisonment and a fine of not more than the greater of (a) two hundred fifty thousand dollars ($250,000), or (b) if any


15

person derived a pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, not more than twice the gross gain or twice the gross loss. (18 U.S.C. § 3571). Additionally, Defendant may receive a term of supervised release after imprisonment of up to three (3) years. (18 U.S.C. §§ 3559(a)(4), 3583(b)(2)). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. (18 U.S.C. §§ 3559(a)(4), 3583(e)(3)). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

### Mandatory Special Assessment

3.      Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a mandatory special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Fine and Reimbursement

4.      Defendant understands that under the United States Sentencing Commission, Guidelines Manual (the "Sentencing Guidelines" or "U.S.S.G."), Section 5E1.2(d)(7) (Nov. 2004), the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any is ordered.

5. Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment.

6. Defendant agrees to make complete financial disclosure to the DOJ and to the Probation Office by, among other things, truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of Defendant's sentence, Defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing.

### Settlement With Internal Revenue Service

7. It is further understood that prior to the date of sentencing Defendant shall file accurate amended tax returns for all tax years in which additional taxes are due and owing, including but not limited to the years 2000 and 2001, and will pay, or will enter into an agreement to pay, past taxes due and owing by him to the Internal Revenue Service, including applicable penalties, if any, on such terms and conditions as will be agreed upon between him and the Internal Revenue Service. The DOJ cannot, and does not, agree not to prosecute Defendant for criminal tax violations. However, if Defendant fully complies with the understandings specified in this Agreement, no testimony or other information given by him to DOJ starting on April 22, 2005 (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution.

### Cooperation

8. The parties understand that this agreement carries the potential for a motion for departure under Section 5K1.1 of the Sentencing Guidelines. Defendant

understands and agrees that whether such a motion is filed will be determined solely by the United States through the DOJ. Should Defendant's cooperation, in the sole judgment and discretion of the DOJ, amount to "substantial assistance", the DOJ reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the <u>Sentencing Guidelines</u> and <u>Policy Statement</u>. Defendant further agrees to persist in his plea through sentencing and fully cooperate with the DOJ. Defendant understands and agrees that the DOJ will request that the Court defer sentencing until that cooperation is complete.

9. Defendant understands and agrees that "fully cooperate" as used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to the conduct of current and former officers, directors, employees and agents of Willbros Group, Inc., Willbros International Inc. and their subsidiaries and affiliates. Defendant understands that such information includes both state and federal offenses arising therefrom. In that regard:

   (a) Defendant agrees that this plea agreement binds only the DOJ; it does not bind any other federal, state or local prosecuting authority other than the DOJ;

   (b) Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the DOJ, including in a proceeding in a foreign jurisdiction. Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

   (c) Defendant agrees voluntarily and at his own expense to attend any interviews and conferences as the DOJ may request, including meetings with any foreign authority or regulator;

   (d) Defendant agrees to provide truthful, complete and accurate information and testimony and understands that any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney can and will be prosecuted under the appropriate perjury, false statement or obstruction statutes;

(e) Defendant agrees to provide to the DOJ all documents in his possession or under his control relating to all areas of inquiry and investigation;

(f) Should the recommended departure under Section 5K1.1 of the Sentencing Guidelines, if any, not meet Defendant's expectations, Defendant understands that he remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his plea.

## Waiver of Appeal

10. Defendant gives up the right to appeal any discretionary determination made by the Court in sentencing, including without limitation any determination of offense level or sentencing range made under the United States Sentencing Guidelines. Defendant reserves the right to appeal any error of law made by the Court in sentencing, including without limitation a sentence in excess of the statutory maximum. Additionally, Defendant is aware that Title 28, United States Code, Section 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. Defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, **including but not limited to Title 28, United States Code, Sections 1651, 2241 and 2255**.

11. Defendant further waives any rights under Title 28, United States Code, Section 2241 to challenge the manner in which the sentence is executed or the legality of Defendant's detention. In exchange for this Agreement with the United States, Defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time barred on the date that this Agreement is signed, in the event that (a) Defendant's conviction is later vacated for any reason, (b) Defendant violates any provision of this Agreement, or (c) a court later permits Defendant to withdraw his plea.

12. In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the Sentencing Guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, **did not induce his guilty plea**, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Defendant further understands and agrees that the Sentencing Guidelines are "effectively advisory" to the Court. <u>United States v. Booker</u>, 125 S. Ct. 738 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

13. Defendant understands and agrees that he makes each and all waivers contained in this Agreement in exchange for the concessions made by the United States in this Agreement.

**The Agreements of the United States**

14. The United States agrees to each of the following:

(a) At the time of sentencing, the United States agrees not to oppose Defendant's anticipated request to the Court and the United States Probation Office that he receive a two (2) level downward adjustment pursuant to U.S.S.G. Section 3E1.1(a) should Defendant accept responsibility as contemplated by the Sentencing Guidelines;

(b) If Defendant qualifies for an adjustment under U.S.S.G. Section 3E1.1(a), the United States agrees to move for an additional one-point reduction pursuant to U.S.S.G. Section 3E1.1(b) based on the timeliness of the plea or the expeditious manner in which Defendant provided complete information regarding his role in the offense;

6

(c) If Defendant fully complies with the understandings specified in this Agreement, he will not be further prosecuted criminally by the DOJ for any conduct described in the Information (filed concurrently with this Agreement), to the extent that Defendant has disclosed such conduct to the DOJ as of the date of this Agreement. This Agreement does not provide any protection against prosecution for any crimes except as set forth in the immediately preceding sentence

## United States' Non-Waiver of Appeal

15. The United States reserves the right to carry out its responsibilities under Guidelines sentencing. Specifically, the United States reserves the right:

(a) to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b) to set forth or dispute sentencing factors or facts material to sentencing;

(c) to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d) to file a pleading relating to these issues, in accordance with U.S.S.G. Section 6A1.2 and Title 18, United States Code, Section 3553(a); and

(e) to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

16. Defendant is aware that the sentence may be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that (a) the Court has justification and authority to impose any sentence up to and including the statutory maximum set for the offense to which Defendant pleads guilty, (b) the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines, and (c) any sentence within the Sentencing Guidelines range

determined by the Court is reasonable. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentencing imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

17. Defendant represents to the Court that he is satisfied that his attorneys have rendered effective assistance. Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

    (a)    If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the DOJ, and the court all agree;

    (b)    At a trial, the DOJ would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court;

    (c)    At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

### Stipulated Factual Basis for Guilty Plea

18. Defendant is pleading guilty because he is in fact guilty of the charges contained in Count 1 of the Information. In pleading guilty to Count 1 of the

8

Information, Defendant acknowledges that the facts as stated in the stipulation contained below are true, and if the case proceeded to trial, the DOJ would be able to prove those facts beyond a reasonable doubt. This factual basis is not a complete recitation of all facts relevant to the underlying criminal conduct or known to Defendant to relate to that conduct, nor does this factual basis include all the relevant conduct that may be considered by the Court for sentencing purposes. Defined terms below (e.g., "DOE 1") have the same meaning ascribed to them in the Information, which is hereby expressly incorporated by reference into this Agreement.

Nigeria—Corrupt Payments to NNPC, NAPIMS and SPDC Officials

      a.     In or around 2004, DOE 1 and others known and unknown, including certain employees of WII and GCCB and Consultant 1, agreed to make a series of corrupt payments totaling in excess of $6 million to, among others, officials of NNPC, NAPIMS and SPDC in order to obtain or retain business in Nigeria for WGI, WII, the Willbros Nigerian Subsidiaries, GCCB, and any of them, with respect to the EGGS project and other projects. Consultant 1, with DOE 1's knowledge and authorization, obtained, and intended to obtain in the future, millions of dollars in funds from WGI by invoicing WGI for performing purported consulting services in Nigeria and used, and intended to use, at least part of those funds to make corrupt payments to Nigerian officials and others. CN 1 and others known and unknown, with DOE 1's knowledge and authorization, processed and approved those invoices and caused them to be transmitted from Nigeria to WGI's administrative headquarters in the United States. DOE 1 and others known and unknown referred to these promised corrupt payments to Nigerian

9

officials as "commitments." By late 2004, DOE 1 and his co-conspirators had paid some, but not all, of the commitments to the Nigerian officials.

  b. In January 2005, WGI announced DOE 1's resignation from WGI and the commencement of an internal investigation into allegations of tax improprieties relating to a WII Bolivian subsidiary operating under DOE 1's management. WGI also ceased paying Consultant 1 and another purported consultant operating primarily in Bolivia. In Nigeria, BROWN and other WII employees learned of demands for continued payment of the outstanding commitments. BROWN, DOE 2 and other WII employees became concerned that failure to continue paying the commitments would result in interference with WII's business operations and potential loss of the EGGS Phase 2 contract, valued at approximately $141,000,000.

  c. In or around January and February 2005, BROWN, DOE 2, NN 1 and GCCB Employees 1, 2, 3, 4 and 5 agreed that BROWN and DOE 2 would raise approximately $1.5 million in cash in Nigeria in order to pay some of the outstanding commitments that DOE 1 and others known and unknown had previously made on behalf of WGI, WII, the Willbros Nigerian Subsidiaries and GCCB respecting the EGGS project and other projects. BROWN, DOE 2 and others known and unknown determined that $1.5 million cash was unavailable to them through WGI or the Willbros Nigerian Subsidiaries, in part because of the increased scrutiny caused by WGI's ongoing internal investigation, and thus resorted to outside sources for the funds.

  d. On or about February 19, 2005, GCCB Employee 2 arrived at BROWN's office in Lagos, Nigeria, with a written loan agreement for $1 million and a suitcase containing $1 million cash, the latter to pay part of the outstanding

10

commitments. BROWN, on behalf of WWA and WNL, and GCCB Employee 2, on behalf of GCCB, executed the loan agreement and GCCB Employee 2 released the suitcase full of cash to BROWN.

      e.    On or about February 21, 2005, BROWN, on behalf of WWA, then purported to "loan" to NN 1, pursuant to another written agreement, the $1 million cash, with the intent that NN 1 would deliver the funds to Nigerian officials.

      f.    In or around late February and early March, 2005, DOE 2, on behalf of WNL, borrowed the Nigerian Naira equivalent of approximately $550,000 cash from another Nigerian national ("NN 2"), through an entity controlled by him, with the intent of using those funds to make the remainder of the payments towards the outstanding commitments to Nigerian officials described above.

      g.    In or around February and March 2005, BROWN and a WII Nigeria-based employee whose title was "General Manager—Offshore" attempted to cause WWA to enter into an agreement with a new purported consultant (to replace Consultant 1) for the purpose of continuing the making of corrupt payments to Nigerian officials for the EGGS project and potentially other projects. Although BROWN and the new consultant executed a contract in late February, the heightened scrutiny applied to such contracts in the wake of WGI's internal investigation caused WGI ultimately to prevent any payments to the new consultant.

Nigeria—Corrupt Payments to Revenue and Court Officials

      h.    Beginning in at least 1996 and continuing through at least 2004, officers, employees and agents of WGI, WII and the Willbros Nigerian Subsidiaries negotiated for, caused to be negotiated and approved of the negotiation of lower federal

11

and state tax obligations in exchange for corrupt, "under the table" payments to Nigerian revenue officials, including officials responsible for auditing and enforcing the VAT, ITF and PAYE taxes. The tax amounts ultimately assessed by the Nigerian revenue officials were, because of the corrupt payments, lower than the amounts that would otherwise have been assessed, thereby assisting the Willbros Nigerian Subsidiaries, WII and WGI, and any of them, in obtaining or retaining business and securing an improper advantage.

      i.      Beginning in at least 1996 and continuing through at least 2004, officers, employees and agents of WGI, WII and the Willbros Nigerian Subsidiaries made, caused to be made and approved the making of corrupt payments to officials of the Nigerian judicial system in exchange for favorable action on pending cases, including in some instances dismissal of a case affecting the business of the Willbros Nigerian Subsidiaries, thereby assisting the Willbros Nigerian Subsidiaries in obtaining or retaining business and securing an improper advantage.

Method of Corrupt Payments

      j.      Beginning at least in 1996, when DOE 1 was Managing Director for WGI's Nigerian operations and BROWN held positions entitled Choba Administrator and later Division Manager, and continuing through at least early 2005, DOE 3, with the knowledge, agreement and approval of DOE 1, DOE 2, BROWN, CN 1 and others known and unknown, purchased from NN 3 fictitious invoices from non-existent Nigerian vendors for supplies and services purportedly provided to one or more of the Willbros Nigerian Subsidiaries.

      k.      DOE 3, DOE 1, DOE 2, BROWN, CN 1 and others known and unknown understood and agreed that CN 1 and others acting with his knowledge and

12

approval would send, cause to be sent and approve the sending of, by facsimile, email and other means and instrumentalities of interstate and foreign commerce, funding requests from Nigeria to WGI's administrative headquarters in Tulsa, Oklahoma and Houston, Texas. These documents purported to reflect cash disbursements incurred or to be incurred for Nigerian operations, and requested the wiring of funds from a United States bank to a bank in Nigeria to fund these purported expenditures. DOE 3, DOE 1, DOE 2, BROWN, CN 1 and others known and unknown understood and agreed that the total amount of disbursements reflected in these documents was based at least in part upon the false premise, representation and pretense that the Nigerian operations had incurred and would incur expenditures in amounts represented by the fictitious invoices. In response to these periodic funding requests, WGI's administrative headquarters made wire transfers of funds from a bank account in the United States to a bank account in Nigeria controlled by one or more of the Willbros Nigerian Subsidiaries.

l. DOE 3, DOE 1, DOE 2, BROWN, CN 1 and others known and unknown understood and agreed that WII personnel working in Nigeria, including BROWN, would use, and approve the use of, the funds obtained from the false representations (and fictitious invoices upon which they were based) at least in part to make and cause to be made corrupt payments to Nigerian revenue and court officials (including officials responsible for auditing and enforcement of the VAT, ITF and PAYE taxes, and officials of the Federal High Court and Bayelsa state court) in order to obtain or retain business, and secure an improper advantage, in Nigeria for WGI, WII and the Willbros Nigerian Subsidiaries, and any of them. From 2001 through 2004 alone, these types of payments totaled in excess of $300,000.

ECUADOR

m.  In or around December 2003, DOE 1, BROWN and Willbros Ecuador Employee 1 agreed to make corrupt payments of at least $300,000 to Ecuadorian officials of PetroEcuador and PetroComercial in order to obtain or retain business (including the Proyecto Santo Domingo business), for WGI, WII and WSOS, and any of them. As BROWN understood the arrangement, PetroEcuador and PetroComercial would award Proyecto Santo Domingo to WSOS upon the payment by a WSOS representative to Ecuadorian officials of $150,000 up front and $150,000 at the project's conclusion.

n.  In or around January through June 2004, DOE 1, BROWN, Consultant 1 and Willbros Ecuador Employee 1 communicated by email and telephone to arrange for the transfer of $150,000 from DOE 1 to Willbros Ecuador Employee 1 and Willbros Ecuador Employee 2, for the purpose of making part of the corrupt payments promised to PetroEcuador and PetroComercial officials.

o.  In or around June 2004, Consultant 1, at the direction of DOE 1, transferred by wire $150,000 to a bank account controlled by Willbros Ecuador Employee 2, for the purpose of making a corrupt payment or payments to PetroEcuador and PetroComercial officials. Willbros Ecuador Employee 1 informed BROWN that Willbros Ecuador Employee 2 had received the fund transfer.

p.  In furtherance of the conduct described Paragraph 18(a) – (o) above, the following acts, among others, occurred in the Southern District of Texas and elsewhere:

14

1.     On or about June 10, 2004, BROWN, the defendant, sent or otherwise transmitted from Venezuela to DOE 1, through WGI's server located at WGI's administrative headquarters in Houston, Texas, an email requesting wire transfer of $150,000 for corrupt payments to Ecuadorian officials;

2.     In and around January and February 2005, BROWN, the defendant, communicated by telephone and email between Nigeria and Houston, Texas to discuss with a WGI senior executive, among other things, strategies by which WGI, WII, the Willbros Nigerian Subsidiaries, and any of them, could obtain and retain the EGGS business.

**Breach of Plea Agreement**

19.    If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

20.    Whether Defendant has breached any provision of this plea agreement shall be determined solely by the United States through the DOJ, whose judgment in that regard is final.

## Complete Agreement

21. This written plea agreement, consisting of seventeen (17) pages (including the signature pages), together with the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant and his counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

22. Any modification of this plea agreement must be in writing and signed by all parties.

Filed at __Houston__, Texas, on __September 14__, 2006

_____
JIM BOB BROWN
Defendant

Subscribed and sworn to before me on __September 14__, 2006.

MICHAEL N. MILBY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

DONALD J. DeGABRIELLE, JR.
United States Attorney

By: _____
James R. Buchanan
Assistant United States Attorney
Southern District of Texas

16

PAUL E. PELLETIER
Acting Chief, Fraud Section

By: _____
Mark F. Mendelsohn, Deputy Chief
Thomas E. Stevens, Trial Attorney

By: _____
Mark E. Weinhardt
Attorney for Defendant Jim Bob Brown

17

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION
# PLEA AGREEMENT - ADDENDUM

I have fully explained to Defendant his rights with respect to the pending Information. I have reviewed the provisions of the United States Sentencing Commission's <u>Guidelines Manual</u> and <u>Policy Statements</u> and I have fully and carefully explained to Defendant the provisions of those Guidelines that may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and that the Court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

Dated: September 8, 2006

/s/ Mark E. Weinhardt
Mark E. Weinhardt
Attorney for Defendant

I have consulted with my attorney and fully understand all my rights with respect to the Information pending against me. My attorney has fully explained and I understand all of my rights with respect to the provisions of the United States Sentencing Commission's <u>Guidelines Manual</u> that may apply in my case. I have read and carefully

reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

Dated: September 01, 2006

Jim Bob Brown
Defendant