# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| CHEVRON CORPORATION, |
| Plaintiff, |
| v. |
| STEVEN DONZIGER *et al.*, |
| Defendants. |

11-CV-0691

The Honorable Lewis A. Kaplan, U.S.D.J.
The Honorable James C. Francis, U.S.M.J.

**INITIAL POST-TRIAL BRIEF OF DEFENDANTS HUGO GERARDO CAMACHO
NARANJO AND JAVIER PIAGUAJE PAYAGUAJE**

## I.    INTRODUCTION

The United States courts have failed the Ecuadorian Amazon communities.  Twenty years ago, these vulnerable and historically-discounted farmers and indigenous tribes called upon our courts—this very Court, in fact—to do something bold and historic: render a U.S. oil major accountable for the environmental and human consequences of its reckless behavior in a developing country.  But Texaco, Inc. protested that, although its headquarters were located in New York, the question of its liability to these Amazonians was one better answered by the courts of Ecuador, which, according to Texaco, were very much up to that task.  The oil company so advocated despite (or, as the evidence now shows us in hindsight, *because of*) the fact that, in 1998, Ecuador received a raw score of 2.3 in Transparency International's bellwether Corruption Perceptions Index, coming in at 77 out of 85 nations analyzed—good for the bottom 10%.[1]  The Lago Agrio Plaintiffs—now alleged by Chevron to have embraced and reveled in Ecuador's alleged corruption—resisted the move ferociously, and at great cost, cognizant that Chevron's claimed justifications for a change of venue were pretext for its desire to squelch the case through back-channeling.  The Amazon communities' efforts were to no avail; this Court was unwilling to insert itself into an affair that it deemed distinctly Ecuadorian—even though a company that called New York home was alleged to have wantonly injured thousands of people.  This Court dismissed the case on *forum non conveniens* grounds, and cast the Amazon

---

[1] In 2011, apparently the last year that the original raw-score scale was used (and well after Chevron first declared Ecuador to be a cesspool of corruption from which no internationally respectable judicial decree could issue), Ecuador was awarded a slightly higher raw score of 2.7, coming in at 120 out of 182 nations analyzed—good for the 34th percentile.  In 2013, Ecuador has climbed to 102 out of 175 nations analyzed, reaching the 41st percentile.  In sum, since the late 1990s, Ecuador and its courts have not become, as Chevron avers, more corrupt or less reliable—the opposite is true.  The national ethos in Ecuador *has*, however, surely moved further left during that time.  And that is Chevron's real gripe with Ecuador.  Ecuador's national intuitions have not deteriorated; rather, they ceased being susceptible to the undue influence that companies like Chevron enjoyed in this region for the past several decades.

communities off to Ecuador. In so acting, this Court declined the opportunity to bring lasting closure to this dispute a decade ago.

When the Amazon communities came here many years ago seeking justice, this Court was eager to expel them from New York—it tried to do so once and was reversed by the Second Circuit Court of Appeals, then managed to dispense with them more permanently the second time around. With no regard for this history, this Court now appears determined to maintain a death-grip on these Ecuadorian citizens, and to make itself the global, authoritative voice in this dispute. This Court has locked the Lago Agrio Plaintiffs into this case to this point by giving Chevron every benefit of every doubt even when there has been no good reason to do so, and, at times, by finding uncertainty in the law where none really exists. In so doing, the Court has forced the Lago Agrio Plaintiffs to expend massive resources here that likely otherwise would have been allocated to attempting to enforce the judgment that it took them eighteen years to win—one of Chevron's obvious main objectives in filing this blunt instrument of a lawsuit. And, apparently, the Court perceives that having the Lago Agrio Plaintiffs in the case when it issues findings about the bona fides of the Ecuadorian litigation and Judgment will imbue those findings with greater weight when Chevron places them before enforcement courts in Canada, Argentina, and elsewhere.

But this is where the rubber meets the road. The time for Chevron to use this case as a tool to win public-relations victories, or to deliver the Lago Agrio Plaintiffs a litigation death by a thousand cuts, an endless stream of largely one-sided discovery and motion practice, is now expired. The trial is complete. Chevron's lawyers demonstrated what an awesome spectacle can be achieved when a client writes a blank check, and when one's opponent happens to be a group of vulnerable citizens who struggle to fund their case and find representation because Chevron is

2

executing the sweeping retaliation campaign warned of by its contractor, Diego Borja, several years ago in a recorded conversation: "[T]hese guys, once the trial is over, they'll go after everyone who was saying things about it. . . . [T]he lawsuits will start against everyone who said things, you get it?"  Chevron's counsel got its chance to batter an Ecuadorian judge who traveled thousands of miles to a hostile environment to defend his Judgment, causing Chevron's counsel to boast in closing argument that "we gave a warm New York welcome to" Judge Nicolas Zambrano.  At least from the undersigned's perspective, the facilitation of a losing litigant's efforts to humiliate a foreign judge is not a proud moment for the U.S. judicial system.  That holds true whether the judge is from England or Ecuador.

But, regardless of one's opinion of it, the one-sided show is over.  We have reached the point at which Chevron finally needs to show that its allegations actually amount to a legal claim.  Undoubtedly, Chevron is not especially concerned with the law.  Anyone who has paid a modicum of attention to this case understands that Chevron is unlikely to obtain any lawful or lasting equitable relief from this Court.  Indeed, for Chevron, the real end-game is eliciting from this Court a one-sided recitation of the alleged facts surrounding the underlying environmental and human rights litigation—whether or not these facts ultimately give rise to a cognizable claim or plausible relief.  That is undoubtedly why Chevron relentlessly filed motions for *partial* summary judgment with the aim of coaxing this Court into endorsing its accusations as fact.  An improver advisory opinion is the best Chevron can hope for.  This Court lacks jurisdiction over the Lago Agrio Plaintiffs.  The fraud claim against them is not cognizable.  There is no authority to grant Chevron the equitable relief sought against them.  The reasons that each of these statements is unassailably true are numerous; many have been stated before; and others are stated herein.

## II.   THE COURT LACKS PERSONAL JURISDICTION OVER THE LAGO AGRIO PLAINTIFFS

In advance of trial, this Court held that dispositive issues on the question of whether personal jurisdiction exists over defendants Camacho and Piaguaje should be decided after the completion of discovery.  (DI 572 at 3.)  Following discovery, and now trial, those issues and the underlying facts have not changed (with the exception of this Court's Opinion on Chevron's motion to compel and for sanctions, DI 1529, which shall be addressed here last).

Mere retention of New York counsel and participation in litigation in New York are insufficient to satisfy N.Y. CPLR §§ 301 and 302 for purposes of asserting personal jurisdiction against defendants.  Similarly, Camacho and Piaguaje possess insufficient minimum contacts with New York to satisfy constitutional due process.  To the extent that personal jurisdiction is based on the conduct of Donziger's actions on behalf of the LAPs there was no evidence presented at trial that the LAPs would have performed the activities conducted by Donziger and his firm in New York if he had been unavailable; there was no evidence presented at trial that any other attorneys that the LAPs would have hired to perform similar activities as Donziger would necessarily have been in New York; and there was no evidence presented at trial that New York posed some advantage or benefit for the LAPs as the locus from which Donziger conducted his activities.  Furthermore, to the extent that Chevron's allegations concerning Donziger's alleged conduct are found true, there was no evidence presented at trial that Camacho or Piaguaje authorized or ratified any of the alleged misconduct (*i.e.*, the pressure campaign, extortion, misrepresentations, ghostwriting, or bribery), and to the extent that Donziger is found to have actually engaged in any such misconduct, he would have been acting adversely to his client's interests and therefore his conduct cannot serve as a basis for a finding of personal jurisdiction

against Camacho and Piaguaje.  For all of these reasons, this Court lacks personal jurisdiction against Camacho and Piaguaje.

> **A.    There is no general personal jurisdiction over Camacho and Piaguaje under CPLR § 301 or 302.**

The standards governing personal jurisdiction under CPLR §§ 301 and 302 have not changed since Camacho and Piaguaje first presented their arguments on personal jurisdiction to this Court.  (*See* DI 518, DI 519 and DI 568.)  Those arguments are incorporated herein by reference, to wit:

Under N.Y. CPLR § 301, a defendant may be subject to general jurisdiction when it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction."  *McGowan v. Smith,* 52 N.Y.2d 268, 272 (N.Y. 1981); *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 63, 567 (S.D.N.Y. 2005).    The traditional indicia that courts rely upon in deciding whether a defendant is "doing business" in New York include: (1) the existence of an office in New York; (2) the solicitation of business in New York; (3) the existence of bank accounts or other property in New York; and (4) the presence of employees in New York.  *See e.g., Insight Data Corp. v. First Bank Sys.¸* No. 97-cv-4896, 1998 U.S. Dist. LEXIS 3604, *11 (S.D.N.Y. Mar. 24, 1998).    Neither Camacho nor Piaguaje meet any of these criteria.  Moreover, as previously argued, New York law provides that hiring counsel and participating in litigation are irrelevant under N.Y. CPLR § 301 and are not a "continuous and systematic" course of "doing business" that make Camacho and Piaguaje constructively "present" in New York for all purposes.  (*See* DI 518 at 4-10.)

Similarly, under N.Y. CPLR § 302, specific personal jurisdiction is restricted to cases that involve specific, enumerated contacts with New York and claims that arise from those specific contacts.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007); *Agency*

*Rent A Car Sys. v. Grand Rent a Car Corp,*, 98 F.3d 25, 29 (2d Cir. 1996); N.Y. CPLR § 302(a)(1) (personal jurisdiction is appropriate over any non-domiciliary who "transacts any business within the state or contracts anywhere to supply goods or services in the state.")

There were no facts presented at trial that alter the legal conclusion that Camacho and Piaguaje are simply not "present" in New York, or, that Chevron's claims do not arise from any "specific, enumerated contacts with New York for purposes of asserting jurisdiction over Camacho and Piaguaje under §§ 301 or 302, respectively. To begin with, Chevron presented no evidence at trial to reach the conclusion that Camacho and Piaguaje are "present" here. There was no evidence presented at trial that Camacho and Piaguaje have any connection to New York; no evidence that Camacho or Piaguaje:

- ever traveled to New York (unless in connection with the defense of this case);

- ever had offices, bank accounts, or employees in New York;

- ever transacted, conducted, solicited, or engaged in any business in New York;

- ever earned income or revenue from New York;

- ever owed or paid any taxes to New York;

- ever had any regular contact or communication with any resident of New York, including Steven Donziger or the associates at his firm;

- ever made a telephone call or sent a facsimile, letter, package, or transmission via regular or electronic mail to anyone in New York (unless in connection with the defense of this case);

- ever received a telephone call, facsimile, letter, package, or transmission via regular or electronic mail from anyone in New York (unless in connection with the defense of this case);

- ever personally negotiated, executed, or entered into any written or verbal contacts in New York; or

- ever formed, established, maintained or currently have any type of direct relationship with a person or business residing in New York.

6

None of the factors that courts look into in the context of general personal jurisdiction were proven by the evidence presented at trial. *See Norfolk S. Ry. Co. v. Transcontainer Transp., Inc.*, 01-cv-1304 (LAK), 2001 WL 726942, at *2 (S.D.N.Y. June 28, 2001) (Kaplan, J.). By the conclusion of trial, the key facts remain unchanged. Camacho and Piaguaje are life-long residents of Ecuador. Neither man has been a resident of, or maintained a place of business, in the United States. Neither Camacho nor Piaguaje has ever been physically present in the State of New York (except in Mr. Piaguaje's case, for purposes of defending this action). And Camacho has only left the Republic of Ecuador to give a deposition in this case in Peru.

The authorities amply cited in defendants' briefs, DI 518 and 568, for the proposition that retaining a lawyer or involvement in litigation does not subject a party to personal jurisdiction remain good law and are incorporated herein by reference. *See e.g. Kargo, Inc. v. Pegaso PCS, S.A. de C.V.,* No. 5-cv-10528, 2008 WL 2930546, at *5 (S.D.N.Y. July 29, 2008) (holding that retention of "attorneys, accountants, and business advisors in New York" failed to establish a "continuous and systematic course" of "doing business" in New York); *In re Ski Train Fire in Kaprun, Austria*, No. 1428 (SAS), 01-cv-7342, 2003 WL 1807148, at *5 (S.D.N.Y. Apr. 4, 2003) ("Nor will the retention of advisors or counsel in New York to assist with these transactions suffice to subject AHP to general jurisdiction in New York."); *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 218 (W.D.N.Y. 1997) (same); *Bush v. Stern Bros. & Co.*, 524 F. Supp. 12, 14 (S.D.N.Y. 1981) (holding that "[t]he location in New York of firms, such as law firms and investment services, which perform services for [defendant] for a fee[,] does not represent activity by [defendant] in New York for jurisdictional purposes."); *Ginsberg v. Gov't Props. Trust, Inc.*, No. 07-cv-365, 2007 WL 2981683, at *5 n. 2 (S.D.N.Y. Oct. 11, 2007) (rejecting argument that defendant was subject to jurisdiction because he previously initiated a

lawsuit in New York and holding that "involvement in litigation" is not relevant to § 301's general jurisdiction analysis "even [in] situations where a defendant consents to jurisdiction for the purpose of another case or cases"); *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F. Supp. 669, 675-76 (S.D.N.Y. 1989) (rejecting argument, under both specific and general jurisdiction, that defendant's involvement in a "mere handful of arbitrations and litigations in New York" arose to the level of "conducting" or "transacting" business); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n. 5 (2d Cir. 1991) ("A party's consent to jurisdiction in one case, however, extends to that case alone.")  No facts were presented at trial that alter the analysis, or, the conclusion that Chevron's jurisdictional allegations fail as a matter of law.[2]

Nor were any facts presented at trial that demonstrate purposeful availment.[3]  *See* further discussion *infra.*  And, no facts were presented at trial to demonstrate that Camacho and Piaguaje had contacts with New York at the time this lawsuit was filed.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) ("personal jurisdiction depends on defendant's contacts with the forum state at the time the lawsuit was filed.").  As argued previously, any contacts attributable to the *Aguinda* complaint filed in 1993 are stale and irrelevant to whether Camacho and Piaguaje were "doing business" in New York with a "fair amount of permanence and

---

[2] Additionally, while New York Appellate Division courts are split as to whether an individual may be susceptible to general jurisdiction under § 301, defendants' research so far has revealed no case where an individual was subjected to general jurisdiction for non-commercial activities.  *See e.g. Nilsa B.B. v. Clyde Blackwell H.*, 445 N.Y.S.2d 579, 584 (2d Dep't 1981) (declining to find that the individual defendant – who did not perform any commercial activity here – was "doing business" in New York); *FCNB Spiegel v. Dimmick*, 619 N.Y.S.2d 935, 937 n. 3 (N.Y. Civ. Ct. 1994) (holding that § 301 applied to individual engaged in commercial activity – regularly commuting into New York for employment).

[3] No evidence was presented at trial to alter the fact that Camacho and Piaguaje intervened in the Section 1782 proceedings and filed an action to stay Chevron's BIT arbitration to assert their rights under Ecuadorian law, and thus did not choose New York as the forum.  *See Ehrenfeld v. Mahfouz*, 489 F.3d 542, 545 (2d Cir. 2007) (acts "intended to further [a party's] assertion of rights under [a foreign country's laws]" do rise to the level of transacting business in New York).  Defending a lawsuit is the "antithesis of purposeful activity in New York."  *See Pan Atl. Grp., Inc. v. Quantum Chem. Co.,* 90 CIV 5155 (JSM), 1990 WL 180160, *3 (S.D.N.Y. Nov. 8, 1990).

continuity" in February 2011, nearly eighteen years later, and no evidence was presented at trial to suggest otherwise. *See Indem. Ins. Co. of N. Am. v. K-Line Am, Inc.*, 06-cv-0615 (BSJ), 2007 WL 1732435, *7 (S.D.N.Y. June 14, 2007) ("That [the defendant] once brought suit in New York fifteen years ago does not establish that it is presently doing business in New York"); *ICC Primez Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.p.A.*, 775 F. Supp. 650, 652 n. 2 (S.D.N.Y. 1991) (holding that a business relationship that ended three months prior to the filing of the complaint could not give rise to § 301 personal jurisdiction); *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F. Supp. 669, 675 (S.D.N.Y. 1989) (holding that when contacts and thus presence ceases, a corporation is no longer "doing business" under § 301); *Aacon Auto Transport, Inc. v. Barnes*, 603 F. Supp. 1347, 1351 (S.D.N.Y. 1985) (same).

There was also no evidence presented at trial that Camacho and Piaguaje's contacts with Donziger were significant or that they were actively engaged in the *Aguinda* litigation. *See Banker v. Esperanza Health Sys., Ltd.,* No. 05-cv-4115, 206 WL 47669, at *1, 4 (S.D.N.Y. Jan. 9, 2006) (retention of counsel is not "transacting business" under N.Y. CPLR § 302(a)(1) unless client was "actively" and "continually immersed" in that litigation; granting motion to dismiss where Texas defendants did not direct much communication to New York lawyer, nor did they attend any meetings in New York); *Amins v. Life Support Med. Equip. Corp.,* 373 F. Supp. 654, 658 (E.D.N.Y. 1974) (explaining "New York courts have not hesitated to reject jurisdiction under § 302(a)" where individuals have not purposely resorted to New York laws and dismissing limited meetings in New York and phone calls between clients and attorney in New York as "isolated and fleeting").  No evidence was presented at trial that Camacho and Piaguaje reached into New York to obtain legal counsel; no evidence was presented that they did anything more than sign onto the original case with other indigenous residents and farmers through Cristobal

Bonifaz.  No evidence was presented at trial that Camacho and Piaguaje projected themselves into New York's legal services market; that there are communications between Donziger in New York and Camacho and Piaguaje in Ecuador, or that they established an on-going relationship with Donziger.  *But see Fischbarg v. Doucet*, 880 N.E.2d 22, 24-25, 9 N.Y.3d 375, 378 (2007) (finding personal jurisdiction only because defendants contacted New York attorney over 30 times, regularly sent materials to him and communicated with him, and thus used his services thereby projecting themselves into New York's legal services market and availing themselves of the benefits and protections of the attorney-client relationship).  *Fischbarg*, however, involved a New York attorney's claims for unpaid legal fees, thus the claim "arose from" the retention of counsel, the attorney-client relationship in New York was directly at issue.  In this case, no such privity exists between Chevron's fraud claims and Camacho and Piaguaje's hiring of New York lawyers or litigating previously in New York.

### B.    The Court cannot base specific jurisdiction over Camacho and Piaguaje on the conduct of Steven Donziger.

As previously argued, "[t]o be considered an agent for jurisdictional purposes, the putative agent must have acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal." *Ross v. UKI Ltd.,* No. 02 Civ. 9297, 2004 WL 384885, at * 4 (S.D.N.Y. Mar. 1, 2004) (quoting *Grove Press, Inc. v. Aneleton,* 649 F.2d 121, 122 (2d Cir. 1981)).  "In addition, the plaintiff must demonstrate that the principal exercised some control over the activities of the purported agent."  *Chong v. Healthtronics, Inc.*, CV-06-1287 SJF MLO, 2007 WL 1836831 (E.D.N.Y. June 20, 2007) (citing *CutCo Industries. Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir. 1986)).  The "allegations must sufficiently detail the defendant's conduct so as to persuade a court that the defendant was a 'primary actor' in the specific matter in question." *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000).

Chevron attempted to prove at trial that Donziger made fraudulent statements to third parties to Chevron's detriment. However, Chevron presented no evidence at trial that Camacho and Piaguaje had knowledge of, consented to, or controlled any allegedly fraudulent statements by Donziger. Nor did Chevron present any evidence at trial that Camacho or Piaguaje were "primary actors" in the alleged fraud to third parties.

After trial, it is clear that neither Camacho nor Piaguaje made any alleged fraudulent statements to any third parties with respect to any of the matters set forth in Chevron's complaint. Moreover, Chevron did not present evidence at trial to conclude that Camacho or Piaguaje had any authority, control, discretion, or power over Donziger's allegedly fraudulent representations made to third parties to Chevron's detriment. As a result, there is no basis in the trial record to find that Donziger was the agent of Camacho and/or Piaguaje with respect to any alleged fraud. *See Ross*, 2004 WL 384885, at * 4 (finding that personal jurisdiction did not exist over the head of a real estate conglomerate based on the New York actions of a co-owner because the head did not have knowledge of, or authority or control over, the co-owner's actions); *cf. Stadt v. Univ. of Rochester,* 921 F. Supp. 1023, 1026 (W.D.N.Y. 1996) (finding sufficient control where putative agents performed acts forming the basis of the action at the direction of the defendant); *Holmes v. First Meridian Planning Corp.,* 547 N.Y.S.2d 928, 929 (3d Dep't 1989) (finding sufficient control where putative agent was commissioned by defendant to procure customers in New York). In the absence of control or authorization of Donziger's allegedly fraudulent statements to third parties, Donziger's contacts cannot be attributed to Camacho and Piaguaje under N.Y. CPLR § 302(a)(1).

Furthermore, Chevron's claims of fraud (based on third-party reliance) and conspiracy also do not "arise from" Camacho's and Piaguaje's alleged contacts with New York.

Jurisdiction under N.Y. CPLR § 302(a)(1) requires the New York business supposedly "transacted" by Camacho and Piaguaje to have been the very "business" that gave rise to Chevron's claims. *Faherty v. Spice Entm't, Inc.*, No. 04-cv-2826, 2005 WL 2036018, at *6 (S.D.N.Y. Aug. 23, 2005). "The relationship between the business conducted in New York and the claims alleged by the Plaintiff must be direct." *Id.*; *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (requiring "substantial relationship between the transaction and the claim asserted"). A "merely coincidental" or tenuous connection is insufficient. *Johnson v. Ward*, 4 N.Y.3d 516, 520 (2005); *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1333-34 (Fed. Cir. 2001). Only Chevron's claims for fraud and civil conspiracy against Camacho and Piaguaje remain. At trial, the evidence demonstrated that these claims primarily concern conduct occurring in, and directed towards, Ecuador (*e.g.,* meetings with Cabrera, ghostwriting the Cabrera report, intimidation and bribery of Ecuadorian judges, ghostwriting the Judgment). When the primary alleged wrongdoing or injury took place outside of New York, there is no nexus between the act or injury and the jurisdiction. *See, e.g.*, *Fontanetta v. Am. Bd. of Internal Med.*, 421 F.2d 355, 358-59 (2d Cir. 1970) (plaintiff's claim arose from his failure to pass oral medical boards administered by defendant in Pennsylvania and Missouri, not administration of written exam in New York); *Johnson v. Ward*, 4 N.Y.3d 516, 520 (N.Y. 2005) ("Plaintiffs' cause of action arose out of defendant's allegedly negligent driving in New Jersey, not from the issuance of a New York driver's license or vehicle registration."); *Holness v. Mar. Overseas Corp.*, 251 A.D.2d 220, 223-24, 676 N.Y.S.2d 540, 543-44 (1st Dep't. 1998) (no personal jurisdiction where contract to repair ships was executed in New York because injury sustained by worker repairing ships in Virginia did not arise from the contract); *Brandt v. Toraby*, 273 A.D.2d 429, 430, 710 N.Y.S.2d 115, 116 (2d Dep't 2000) (no personal jurisdiction

where contract to make repairs was negotiated in New York, but  injury occurred at Connecticut job site).

Furthermore, personal jurisdiction through agency, requires that the principal selected New York as the locus of the agent's conduct purposefully.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (relying on principal's "selection and repeated use of New York's banking system" as basis for subjecting principal to specific jurisdiction in the Southern District of New York because ); *see also, Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000) (relying on principal's establishment of an investor relations office in New York to cultivate relationships with New York capital markets to establish defendant's purposeful availment of the privilege of conducting activities within the forum state) (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("describing as essential element in jurisdictional inquiry the question whether there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws")) (internal quotation marks omitted).

At trial, there was no evidence presented that the location of Donziger's office in New York was anything but coincidental to the activities that he performed on behalf of the LAPs (*e.g.*, fundraising, public relations, media activities).  None of the evidence presented at trial demonstrated that the LAPs through their Ecuadorian attorney Pablo Fajardo, retained Donziger to conduct any activities that invoked the benefits and privileges of New York or that they gained any benefit from Donziger's office being located in a New York apartment.  S*ee, e.g., Far W. Capital v. Towne*, 46 F.3d 1071, 1076 (10th Cir. 1995) ("FWC next argues that defendants are subject to personal jurisdiction in Utah because they hired an "agent" in Utah to assist in negotiations . . . .  By hiring Mr. Wright, FWC argues, defendants availed themselves of the

privilege of conducting business in Utah and are therefore subject to personal jurisdiction in Utah. We disagree. Nothing in the record suggests that defendants hired Mr. Wright because of his Utah residence . . . .") In fact, much of Donziger's activity of which Chevron complains occurred outside of New York.

This Court cited *Wiwa* and *Licci* in support of its deferral of jurisdictional questions, specifically as a result of the referral of certified questions in *Licci* to the New York Court of Appeals. (DI 582 at 2-3, n. 8.)   In resolving one of those certified questions, the New York Court of Appeals explained that the jurisdictional inquiry under N.Y. CPLR § 302 requires "an examination of the particular facts," and that "although determining what facts constitute 'purposeful availment' is an objective inquiry, it always requires a court to closely examine the defendant's contacts for their quality." *Licci*, 20 N.Y.3d 327, 338 (2012). In *Licci* the Court focused upon a foreign banks repeated use of a correspondence account in New York on behalf of a client for purposeful availment of New York;'s dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States. *Licci*, 20 N.Y.3d at 339. *Licci* supports the view that the quality of Camacho and Piaguaje's contacts with New York through Donziger are not sufficient to establishment purposeful availment of the forum state. No evidence was presented at trial that the retention of Donziger as an attorney, or his ongoing activities had any involvement with or purposeful availment with New York practices, mechanism or laws. Similarly, in *Wiwa*, the Second Circuit focused upon the defendant's purposeful availment of New York capital markets and the site of an office in New York for "cultivating" relationships with New York capital markets to assert jurisdiction. There is no evidence that Donziger was

retained to conduct any activity that was advantaged or enhanced by being conducted from New York.

Finally, if an agent acts contrary to the principal's interests, then that agent's conduct should not be imputed to the principal and jurisdiction should not attach as a result. *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 87 (2d Cir. 2000) ("Under New York law, the adverse interest exception rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal.") (citations omitted). The adverse interest exception to principal liability applies "where an agent, though ostensibly acting in the business of the principal, is really committing fraud for his own benefit, he is acting outside of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Id.* For example, courts have found that using company funds to "pay for sports cars and construction work on personal property demonstrated that the agent intended to totally abandon his principles interest." *Cobalt Multifamily Investors I, LLC v. Shapiro,* 2009 U.S. Dist. LEXIS 60481 (S.D.N.Y. July 15, 2009). Looting from a company will almost always satisfy the adverse interest exception. *Bondi v. Bank of America Corp (In re Parmalat),* 383 F.Supp. 2d 587, 599 (S.D.N.Y.2005) (reasoning that pilfering of company funds is not "in any sense in the interest of the company."); *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.),* 278 B.R. 28 (Bankr. E.D.N.Y. 2002) (Principal sufficiently alleged adverse interest between principal corporation and its agent where the agent "clearly acted entirely in their own interests and to the detriment of [principal] by diverting more than $43 million of [principal] funds to a variety of companies that provided no goods or services to [principal].")

At trial, throughout this case, and in its communications with the public, Chevron has spun a narrative whereby "[t]he Ecuadorian rainforest and its residents served as props" in

Donziger's alleged scheme to make himself personally rich.  (DI 1389.)  At trial, Chevron attempted to demonstrate that Donziger was misusing client funds, and has suggested that the Amazon communities will not benefit from any recovery of monies from Chevron—that it will all be gobbled up by Donziger and his supposed cohorts.  The Lago Agrio Plaintiffs do not endorse or accept this perspective on Donziger, but, nevertheless, that is Chevron's narrative.  Chevron cannot have its cake and eat it too.  It cannot seek to condemn Donziger for allegedly scamming his clients, yet, at the same time, pin Donziger's alleged activities on those clients for purposes of jurisdiction or substantive liability.  Moreover, if Donziger engaged in numerous acts of fraud in procurement of the Judgment as Chevron claims, he would certainly have been acting against the best interests of his clients, who hold meritorious claims that would have prevailed absent the type of chicanery that Chevron describes.  In sum, if Chevron's narrative is to be accepted, this Court simply cannot exercise personal jurisdiction over the Lago Agrio Plaintiffs under an agency theory vis à vis Donziger.

## C.   Camacho and Piaguaje have insufficient minimum contacts with New York to satisfy constitutional due process.

"Due process considerations require that the defendant have certain minimum contacts [with the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169 (2d Cir. 2013) (internal quotation marks omitted) (citing *Int'l Shoe*, 326 U.S. at 316).[4] Where specific jurisdiction is sought over a defendant, "the jurisdictional inquiry focuses on the affiliation between the forum and the underlying controversy." *Id.* at 169-170 (citing *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846 (2011)).  That inquiry requires a two-

---

[4] In its August 24, 2012 Order, this Court specifically cited reference to *Licci* as a basis for deferral of certain personal jurisdiction issues because of certain legal questions certified to the New York Court of Appeals in that case.  DI 572 at 3, n. 8.

pronged analysis of: (1) "the quality and nature of the defendant's contacts with the forum state under a totality of circumstances test" and (2) "whether the assertion of personal jurisdiction would comport with fair play and substantial justice."  *Id.* at 170 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  For the second part of this analysis, the following are relevant factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff;s interest in obtaining convenient and effective relief…

*Id.* at 170.

In this case, as previously argued, under the totality of the circumstances, the quality and nature of defendants' contacts with the forum state are not sufficient: defendants engaged in no commercial activity in New York; participated in litigation that was dismissed years ago; and retained an attorney through which they did not avail themselves of any New York markets or mechanisms.

Furthermore, the exercise of personal jurisdiction over Camacho and Piaguaje does not comport with fair play and substantial justice because documents and witnesses critical to the issues at trial could not be compelled by either side.  Numerous times both sides sought to secure the appearance of witnesses (for discovery or trial) or sought the introduction of documents to no avail simply because parties residing outside the jurisdiction of this Court could not be compelled to appear or could withhold relevant documents and information on the basis of foreign law.  Case in point: the forensic report of the Zambrano computers issued by Ecuadorian authorities; the forensic report could not be secured by either side; the forensic report was material and relevant to a critical issue in this case, the ghostwriting of the Judgment.  The forensic report may have been dispositive of defendants' position that Judge Zambrano is the

17

sole author of the Judgment, yet it could not be obtained by the litigating parties and was not available to be used as evidence because Ecuadorian authorities would not permit its release. Fair play and substantial justice cannot exist where personal jurisdiction is exercised over a foreign party that is incapable of compelling the production of evidence.  By way of further example, the depositions of Messrs. Fajardo, Yanza, Saenz, and Prieto could not be taken and their testimony at trial could not be compelled.  Their documents, which were the subject of numerous motions and a sanction hearing could not be obtained fully.  Such limitations impeded both sides from presenting their case, and Chevron will likely argue that the should Court impose adverse inferences against the defendants as a result, however, the prejudice is greatest against Camacho and Piaguaje who were unable to compel the appearance of witnesses who were in the best position to explain away the circumstantial evidence that Chevron presented at trial.

The exercise of adverse inferences for the non-appearance and more recently this Court's sanction of Camacho and Piaguaje for the failure of their Ecuadorian attorneys to produce documents speaks volumes about the lack of fair play or substantial justice in requiring Camacho and Piaguaje to litigate in a forum where they cannot compel others to comply with discovery obligations on them or to travel to present testimony in their defense and then must risk adverse inferences or suffer sanctions for failing to do so.

**D.      The Court cannot base personal jurisdiction over Camacho and Piaguaje as a sanction.**

On October 10, 2013, only five days before the start of the trial, this Court struck Camacho and Piaguaje's personal jurisdiction defense as a sanction for failure to comply with the February 11 Order.[5]  (DI 1529.)

---

[5] Despite its ruling, the Court agreed to take evidence at trial on the question of whether it has personal jurisdiction over Camacho and Piaguaje independent of its sanctions order.  DI 1529 at 98.  Chevron presented no evidence to alter the landscape that existed before trial.

On October 24, 2013, Camacho and Piaguaje moved for reconsideration of this Court's October 13, 2013 Opinion.  (DI 1631.)  The Court has yet to rule on defendants' reconsideration motion and those arguments are incorporated herein by reference.  No evidence presented at trial alters the facts underlying defendants' motion for reconsideration.  There was no evidence presented at trial that Camacho and Piaguaje waived their personal jurisdiction objection to discovery.  There was also no evidence presented at trial that they have greater control over documents in Ecuador than previously demonstrated, or that they can be faulted for being unsuccessful in forcing other Ecuadorian citizens to violate the law and court orders of their country, or that they should be sanctioned for the independent decisions and actions of other individuals.  No evidence was presented at trial of any prejudice to Chevron warranting sanctions; the company has obtained millions of pages of discovery in dozens of proceedings which it used amply at trial.  No evidence was presented at trial that defendants have done anything but produced all records that come into their actual possession or control, whether those documents are favorable or unfavorable, such as the minutes of Asamblea meetings or the Donald Moncayo documents – in every instance where defendants have been able to assert control over documents they have produced them (though reasonably asserting privilege as it is their right to do).  No evidence was presented at trial to alter the reality that defendants produced all documents in their possession; that Mr. Fajardo and his Ecuadorian colleagues were asked to provide responsive documents; and that Mr. Fajardo and his colleagues declined to produce the entirety of their files, citing Ecuadorian law and an Ecuadorian court order.  No evidence was presented at trial evidencing bad faith by Camacho and Piaguaje in any way to warrant sanctions. A court cannot and should not impose a sanction of asserting jurisdiction over a party over which it has no jurisdiction to begin with.  For these reasons, and those specifically referenced in

defendants' motion for reconsideration, Camacho and Piaguaje respectfully request the Court reconsider its findings, withdraw its Opinion, and dismiss Chevron's claims against Camacho and Piaguaje for lack of personal jurisdiction.

## III. CHEVRON'S COMMON-LAW FRAUD CLAIM AND ITS CONCOMITANT REQUEST FOR EQUITABLE RELIEF FAIL FOR A LITANY OF REASONS

### A. Under New York law, a Judgment Debtor May Not Sue a Judgment Creditor for Relief With Respect to the Judgment Based on Fraud in its Procurement

In an opinion issued earlier this year, the Court scolded the Lago Agrio Plaintiffs because they purportedly framed incorrectly the pertinent question concerning the theoretical viability of Chevron's common-law fraud claim—at least to the extent that the claim is premised on an assertion that the Ecuadorian judgment was obtained by fraud.  (DI 707 at 14-15.)  The Court stated:  "The right question instead is whether, under New York law, a judgment debtor may sue a judgment creditor for relief with respect to the judgment based on fraud in its procurement and, in an appropriate case, even obtain damages.  There is no serious doubt that it may do so."  (*Id.* at 15.)  But there is, in fact, more than "serious doubt" about this.  New York's courts have spoken on this issue, and they have unambiguously held that no such cause of action exists under New York law:

> A litigant's remedy for alleged fraud in the course of a legal proceeding "lies *exclusively* in that lawsuit itself, i.e., by moving pursuant to CPLR 5015 to vacate the civil judgment due to its fraudulent procurement, *not a second plenary action collaterally attacking the judgment in the original action*."

*Vinokur v. Penny Lane Owners Corp.*, 269 A.D.2d 226 (N.Y. App. Div. 1st Dep't 2000) (emphasis added) (quoting *Yalkowsky v. Century Apartments Assocs.*, 215 A.D.2d 214 (N.Y. App. Div. 1st Dep't 1995).)

When it has helped this Court to achieve its apparent, desired end (i.e., forcing the Lago Agrio Plaintiffs to remain in this case so that the Court can attempt to bind them, at least until

post-appeal, with gratuitous findings about the bona fides of the Lago Agrio case), the Court has assigned great weight to the holdings of New York's intermediate appellate courts concerning issues of New York law—even when the Second Circuit's perception of New York law is seemingly at odds with these state-court decisions.  To wit, even though the Second Circuit has in the past several years held *three times* that a colorable New York state-law fraud claim requires that the plaintiff, and not a third party, relied on the misrepresentation(s) alleged, this Court has perceived itself as empowered to ignore that precedent because it reads certain New York Appellate Division opinions as authorizing a "third-party" fraud claim. (*See, e.g.*, DI 707 at 9 ("[I]t is debatable whether there is 'substantial ground for difference of opinion' on the point, *especially in view of the fact that the Circuit has not addressed the New York appellate decisions that reached conclusions at variance with its own.*") (emphasis added).)  Having staked out this position, the Court cannot now ignore clear and uncontradicted pronouncements from New York's appellate courts on a different issue simply because, this time, the state-court opinions do not favor Chevron.  Chevron's New York common-law fraud claim must be dismissed on this basis alone.

### B. Chevron's Common-law Fraud Claim Must Be Rejected For the Same Reasons That the Second Circuit Rejected Chevron's Declaratory Judgment Claim

New York law does not countenance a common-law fraud action attacking a prior judgment on the basis of "alleged fraud in the course of a legal proceeding"—period. (*See supra* at 20 (quoting *Vinokur*, 269 A.D.2d at 226).)  The reasons that such a claim does not exist are multiplied when the judgment under attack was issued from a foreign court.

In a January 26, 2012 Opinion, the Second Circuit ordered this Court to dismiss Chevron's claim seeking a declaration that the Ecuadorian Judgment was obtained by fraud and thus unenforceable under New York law.  *Chevron Corp. v. Naranjo, et al.*, 667 F.3d 232 (2d

Cir. 2012).  The Second Circuit observed that New York's Recognition of Foreign Country Money Judgments Act (N.Y. C.P.L.R. 5301, *et seq.*; the "Recognition Act") "and the common-law principles it encapsulates are motivated by an interest to *provide for* the enforcement of foreign judgments, not to prevent them." *Id.* at 241 (emphasis in original). "New York undertook to act as a responsible participant in an international system of justice—not to set up its courts as a transnational arbiter to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Id.* at 242.  The Second Circuit further held that even the "limited . . . claim that Chevron can petition a New York court to declare in advance" the non-enforceability of "the Ecuadorian judgment *in New York*, must fail." *Id.* at 245 (emphasis in original).  The Court opined that "an advisory opinion" as to "the effect in New York of a foreign judgment that may never be presented in New York . . . . would unquestionably provoke extensive friction between legal systems" and encourage parties to use New York "to seek a res judicata advantage . . . in connection with potential enforcement efforts in other countries."  *Id.* at 246.  Thus, the Second Circuit concluded that this Court "abused its discretion in undertaking to issue a declaratory judgment" and that "Chevron can present its defense to the recognition and enforcement of the Ecuadorian judgment in New York if, as and when the LAPs seek to enforce their judgment in New York."  *Id.*

In sum, the Second Circuit found that Chevron's declaratory judgment claim (and its concomitant injunction) was antithetical to the public-policy underpinnings of the Recognition Act "and the common-law principles it encapsulates."  It is inconceivable that New York law— or the Second Circuit—would allow all of these policies and common-law principles to be easily circumvented and rendered meaningless simply by packaging a C.P.L.R. 5304(b)(3) defense to enforcement as a common-law fraud claim attacking a foreign judgment on the grounds that it

was obtained by fraud (or, as it were, a RICO claim premised on the same "litigation fraud" allegations and with the same goal of attacking a foreign judgment). Chevron has never cited any precedent for a common-law fraud claim charging that a foreign-country judgment is the product of fraud. There is none, and with good reason. No "responsible participant in an international system of justice" could entertain such a claim by a debtor. Rather, a jurisdiction that would recognize such a claim places itself outside of and above the international system, and sets itself up essentially as a foreign-judgment clearinghouse.

Nevertheless, the Court has raised, and specifically asked the parties to comment on, the proposition that courts "routinely" pass on the bona fides of foreign judgments and the judicial systems from which they emanate. This Court need look no further than the Second Circuit's *Naranjo* opinion to see that U.S. courts certainly do not and should not "routinely" embark on such an undertaking—far from it. The Second Circuit observed that it is a "particularly weighty matter" for a U.S. court in one country to condemn another country's legal system, an undertaking that may nevertheless be unavoidable "when a party seeks to invoke the authority of our courts *to enforce a foreign judgment*." *Naranjo*, 667 F.3d at 244 (emphasis added). The Second Circuit concluded that a declaratory judgment action seeking to denounce a foreign judgment on the basis of alleged fraud offers insufficient justification for the denigration of a foreign judiciary at the hands of a disgruntled litigant. There is no reason for the policy analysis to change when the vehicle for judicial denigration is a common-law fraud action, a RICO action, or any other vehicle that a creative foreign-judgment debtor might concoct to attack prior proceedings. It is an entirely different story, however, when the foreign-judgment creditor asks our courts to give that foreign judgment the same force and effect as one issued by a domestic court.

And while our courts also must sometimes address the viability of a foreign judiciary in the context of a *forum non conveniens* motion like the one Texaco (and later, Chevron) brought successfully in the *Aguinda* litigation, even then, they have done so reluctantly.  *See, e.g., Corporacion Tim, S.A. v. Schumacher*, 418 F. Supp. 2d 529, 532-33 (S.D.N.Y. 2006) *aff'd*, 233 F. App'x 37 (2d Cir. 2007) ("American courts should be wary of branding other nations' judicial forums as deficient in the substance or procedures that their laws contain. Such denunciations not only run counter to principles of international comity and could retard efforts to reform foreign tribunals, but also risk imposing on our judicial system the burden of serving as courtroom to the world . . . .") (internal citation omitted).  Outside of the context of judgment recognition proceedings and, to a lesser extent, *forum non conveniens* motions, our courts appear universally loathe to intervene and "protect" a litigant from an adverse foreign judgment and/or what is claimed to be a lacking foreign judiciary.  *See, e.g., De Manez v. Bridgestone Firestone N.A., Tire, LLC*, 533 F.3d 578, 588 (7th Cir. 2008) (concluding that the district court had no "authority to evaluate [a party's lawyer's] actions before the Mexican courts" because "[w]hether the proceedings in [Mexico] were conducted in an honest and upright manner is a matter for the Mexican judicial and bar authorities, not for us. We are not in a position to draw any conclusion, positive or negative, even though we are aware that the problem of corruption within the judicial sector is one that plagues scores of countries around the globe . . . ."); *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1088-89 & n.9 (S.D. Fla. 1997) (where plaintiff sought a "declaratory judgment regarding the parties' rights under [a] distributorship agreement" from federal district court "in order to preempt the effect of a possible adverse judgment in Bolivia," court opined, "[w]hether or not Bolivia's courts can adequately adjudicate the distributorship dispute, they had

jurisdiction over the matter before this Court did, and this Court wields no prerogative to disturb that jurisdiction").

This Court should not help Chevron invent a brand new pathway for foreign litigants to assail foreign courts and their judgments in the United States.  The axiom by which the Court must abide in this case is clear:  "It is hard to imagine any more direct affront to comity than the relief sought herein . . . . '*It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation*. Such an assumption would directly conflict with the principle of comity . . . .'" *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) (quoting *Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir.), *cert. denied*, 429 U.S. 833 (1976)) (emphasis added).

### C.  Chevron Waived its Common-Law Fraud Claim, At Least in Substantial Part

Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P.  9(b).  Under Rule 9(b), "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989).  Chevron's Amended Complaint did not meet that standard.  The Lago Agrio Plaintiffs long ago moved to dismiss on these grounds, among others.  The Court denied that motion with no mention of the Rule 9(b) argument.

The sprawling, blunderbuss quality of Chevron's Amended Complaint allowed it to make this case a moving target.  Until not long ago, Chevron seemed to be claiming that the underlying environmental and human-rights litigation was, in the broadest sense, a fraud from its inception insofar as it was a "sham" and "objectively baseless," as averred throughout its Amended

Complaint.  But, as the Court is aware, Chevron backpedaled when it became clear that maintaining its claim that the Lago Agrio Litigation was "objectively baseless," *i.e.*, lacking merit, might expose Chevron to discovery concerning, among other areas of inquiry, its efforts to hide contamination from the Ecuadorian court during the judicial site inspection process.  The Court invited Chevron to "clarify" that it never intended to say that the Lago Agrio Plaintiffs' claims had no merit:

> THE COURT:  Maybe an editor's blue pencil might solve the problem, Mr. Mastro. . . . It may be that Chevron really means to assert by using the term "sham litigation" that it was a lawsuit that transparently had no merit at the inception . . . . And it may mean, it may be that they're really asserting something else.  And if they're really asserting something else, that may change the scope of the discovery that may be appropriate here . . . .
>
> * * *
>
> Look, it is my working hypothesis that this sham litigation argument is going to go away because you are going to resolve it by virtue of *Chevron stating more specifically what their allegation is and what it isn't*.

(Tr. at 135:16-17, 137:20-138:1, 189:11-14 (emphases added).)    Chevron accepted the invitation, and *de facto* amended its Complaint to withdraw any charge that the Lago Agrio Plaintiffs' claims were without merit and objectively baseless.  The substance of Chevron's claims was materially altered; the target was moved. And it has continued to move throughout this case.

More than two years have passed since Chevron filed this action, and the Lago Agrio Plaintiffs *still* do not have an appropriate sense of the factual bases for Chevron's common-law fraud claim, as distinct from the many allegations in this case that, as the Court has observed a number of times, are purely a matter of public relations.  We understand Chevron's non-specific allegation that *someone* affiliated with the Lago Agrio Plaintiffs "knowingly misrepresented, omitted, and/or concealed material facts . . . in their representations to . . . U.S. courts, the Lago

26

Agrio court, federal and state agencies and officials in the United States, Chevron's stockholders, investors, analysts, and the media, to obtain favorable rulings from U.S. and the Lago Agrio courts, pressure U.S. officials to investigate Chevron, and propagate false information to harm Chevron." (DI 707 at 11-12.) But the trial in this action did not elucidate the factual bases for these generalized averments. There was no attempt to prove that any U.S. judge relied on any misrepresentation. There was no testimony from any U.S. government official or employee. There was no effort to prove that Chevron was injured by any action taken by these people, whatever that action might be. Who told these officials what, and when? And what did those officials do with that information? Rule 9(b) requires that such facts be pled at the very outset— no less by the end of the case. Further, the only "injury" Chevron appears to claim is that it incurred litigation expenses in the course of rebutting what is alleged to be the Lago Agrio Plaintiffs' false public narrative. But that damages theory appears novel in terms of a fraud claim, and is in any event convoluted. Such "injuries" do not flow from any action taken by a third party in "reliance" on a misrepresentation.

The only fraud theory that Chevron *seemed* to be trying to prove at trial was its so-called "funder-fraud" theory; Chevron called both Joseph Kohn and Christopher Bogart of Burford Capital to testify that they were misled into providing financing to the Lago Agrio Plaintiffs. Chevron appears to have first articulated this "funder-fraud" theory at or after the close of written discovery in this case, and the new claim never became part of Chevron's pleading. Aside from that issue, what is Chevron's claimed injury under this theory? Although the answer remains unclear, Chevron seems to suggest that Kohn's and Burford's capital infusions injured Chevron in that this money enabled its adversaries to continue litigating, whereas, without that capital, the Lago Agrio Plaintiffs would have been forced to give up, or would have at least been

more readily dispatched.  This theory, however, requires a finding that the act of litigating—both offensively and defensively, apparently—itself is culpable conduct.  That, however, would be impermissible under the *Noerr-Pennington* doctrine, which cloaks with immunity "efforts to influence governmental action through litigation, lobbying, and the like. . . . . provided the activities are more than a mere 'sham.'  *Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud . . . ." *Bath Petroleum Storage, Inc. v. Market Hub Partners et al.,* 229 F.3d 1135, 2000 U.S. App. LEXIS 25440 *3 (2d.Cir. Oct. 11, 2000).

Of course, Chevron's Amended Complaint originally accounted for this roadblock.  The document alleges multiple times that that Lago Agrio Plaintiffs' case against Chevron is a "sham" and "objectively baseless"—the magic words that claimants use to plead themselves into the "sham litigation" exception to *Noerr-Pennington.*  But Chevron bargained away its right to argue that the Lago Agrio Plaintiffs' claims against are baseless in exchange for avoiding merits-related discovery.  Chevron can no longer pursue any aspect of its "fraud" claim—particularly, "funder fraud"—that requires this court to find that Chevron is damaged simply by virtue of having to litigate against the Lago Agrio Plaintiffs at all.  And even if Chevron *could* pursue this funder-fraud theory, it would still fall flat for other reasons, most of which would seemingly be applicable to Chevron's other fraud theories, to the extent that Chevron is pursuing them.  For example, the supposedly fraudulent statements that Chevron cites—*e.g.*, any representation that Richard Cabrera was an "independent" expert; that the relationship between Cabrera and the Lago Agrio Plaintiffs' team was appropriate and customary as a matter of Ecuadorian law and practice; that Chevron's emphasis on the relationship between Cabrera and the Lago Agrio Plaintiffs' team was overblown and misleading—are statements of opinion, and are thus not actionable misrepresentations.  *See, e.g., Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547

F.3d 115, 134 (2d Cir. 2008) (discussing "the general principle that statements of opinion generally cannot constitute fraud"); *Zuyder Zee Land Corp. v. Broadmain Bldg. Co.*, 86 N.Y.S.2d 827, 828 (Sup. Ct. 1949) *aff'd* 276 A.D. 751, 92 N.Y.S.2d 607 (N.Y. App. Div. 1949) ("the representation, involving as it did the interpretation of a written documents, falls in the category of an opinion or statement of law which, even when inaccurate, cannot afford a basis for recovery in fraud"). This Court might ultimately opine that Cabrera was not, in its view, an "independent" expert, whatever that word means in this context. But that does not make the statement an actionable fraud.[6]

In sum, Chevron's third-party fraud claim has been, by design, amorphous and obscured from the outset. Chevron has now dumped thousands of exhibits into the record in the apparent hope that the Court will be sufficiently motivated to ferret out a cognizable fraud claim somewhere in that record. That is an intolerable approach to a fraud claim. The Lago Agrio Plaintiffs were entitled to know "who, what, when, where, and how" from day one. Instead, the trial is over and we still await answers. Under these circumstances, the Lago Agrio Plaintiffs have been denied a realistic opportunity to defend this claim.[7] The claim should therefore be denied.[8]

---

[6] That is particularly true where Chevron represented to the Lago Agrio court that the company's hired-gun experts—certainly, *less* "independent" than Cabrera by any measure—were, in fact, "independent." (Plainly, the term was not used in connection with the Ecuadorian litigation in the colloquial sense that Chevron urges this Court to adopt—*i.e.*, that the expert was utterly disconnected from any party. It was merely meant to signify that the experts were free to draw their own conclusions; the evidence does not show that Cabrera was prevented from doing so.

[7] In addition to the issues already discussed, Chevron's failure to zero in on a factual basis for its fraud claim leads to two noteworthy problems. *First*, because Chevron's theories are general, blunderbuss, and blended together, it is unclear what substantive law applies to them. Chevron and this Court seem to assume, based on nothing more than Steven Donziger's place of residence and an assumption that all alleged "frauds" were plotted there, that New York law governs. But that is not necessarily a sound analysis. Choice of law, as this Court is aware, is a fact-dependent issue. *See, e.g., Amusement Indus. v. Stern*, 693 F. Supp. 2d 327 (S.D.N.Y. 2010) (Kaplan, J.). Each of the alleged frauds that Chevron has identified to some extent throughout this case presumably has a unique factual underpinning—particularly

### D. As Observed Repeatedly by the Second Circuit, "Third-Party Fraud" Claims Such as Chevron's  Are Not Cognizable

The Court has previously acknowledged that Chevron's "amended complaint does not sufficiently allege any claim of fraud based on detrimental reliance *by Chevron*."   (DI 707 at 6.) Rather, Chevron's fraud claim rests entirely on allegations that various third parties relied on misrepresentations and acted to Chevron's detriment as a result.

In the past fifteen years, the Second Circuit has held on at least three occasions that, under New York law, it is "*clear* that fraud claims may not be premised on false statements on which a third party relied." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Intern. N.V*., 400 Fed. Appx. 611, 613 (2d Cir. 2010) (emphasis added); *City of New York v. Smokes-Spirits.Com, Inc*., 541 F.3d 425, 545 (2d Cir. 2008), *overruled on other grounds sub nom, Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) (holding that "allegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law"); *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) ("[A] plaintiff does not establish the reliance element of fraud . . . by showing only that a third party relied on defendant's false statements . . . ."); *see also Dallas Aerospace, Inc. v. CIS Air Corp.*,

---

when each "fraud" involves a different third party.  Without knowing precisely where the relevant events allegedly occurred or where their impact was felt, any presumption about choice of law is unwarranted. *Second*, Chevron's refusal to fully commit to a factual basis for its fraud claims frustrates a period of limitation analysis.  For example, Chevron may or may not be pursuing a claim that the Lago Agrio case was fraudulent, "sham litigation because [the Lago Agrio Plaintiffs] sue[d] Chevron which never even did business in Ecuador instead of Texaco . . . ." (Tr. at 136:8-13.)  If Chevron is indeed pursuing that claim, the statute of limitations prevents Chevron from grounding its fraud claim on such an assertion.  *See* N.Y.C.P.R. 213(8) ("action based upon fraud" must be brought within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it.").  The statute began to run on this claim the moment that Chevron was sued in Ecuador, eight years prior to this lawsuit.

[8]  The Lago Agrio Plaintiffs reserve the right to challenge Chevron's fraud theories on a more particularized basis on reply should it become more apparent which theories Chevron is actually pursuing. Similarly, the Lago Agrio Plaintiffs reserve the rights to brief the unclean hands defense if and when Chevron makes the plain the specific nature of the equitable relief it seeks.

351 F.3d 775, 784 (2d Cir. 2003) ("To succeed on a theory of fraudulent misrepresentation under New York law, a plaintiff must show that the defendant made a false representation of a material fact *to the plaintiff* and that the plaintiff suffered injury as a result of justifiable reliance upon that fact.") (emphasis added).

Nevertheless, this Court has thus far refused to follow binding precedent and to dismiss Chevron's fraud claim. The Court has said, essentially, that the Second Circuit has it wrong because three New York Court of Appeals cases from the late 1800s, as well as a recent intermediate Appellate Division opinion, demonstrate that New York law does, in fact, recognize a "third-party" fraud claim. But two of those ancient cases, as well as the Appellate Division case on which this Court has placed the greatest emphasis, are plainly not "third-party fraud" cases, whereby the plaintiff did not rely on any alleged misrepresentation, but was instead harmed by way of another's reliance on it. Rather, they are "indirect reliance" cases, whereby the plaintiff alleges that he or she did indeed rely on an alleged misrepresentation (unlike Chevron), albeit one communicated through an intermediary. *See Litvinov v. Hudson*, 74 A.D.3d 1884 (N.Y. App. Div. 4th Dep't 2010) (permitting fraud claim where court found that third party was "acting as an intermediary" between plaintiff and defendant, and defendant knew that plaintiff would ultimately rely on false statement)*; Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31 (1880) (court held that fraud claim could be based on statements defendant made to third parties with the intent that they would ultimately be "communicated to the plaintiff and relied upon by it"); *Bruff v. Mali,* 36 N.Y. 200, 205 (1867) (fact that false stock certificate was purchased through intermediary was not material to plaintiff's fraud claim, and opining that "having authenticated and issued these certificates for the purpose of defrauding, the defendants

should be held liable to any one sustaining damage *by purchasing on the faith of their genuineness*.") (emphasis added).[9]

This Court presumably is aware of the distinction between "indirect reliance" claims and "third-party fraud" claims; it has previously adjudicated a case involving the former. *See Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348 (S.D.N.Y. 2010) (Kaplan, J.) ("The indirect reliance doctrine states that 'a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff].'") (internal citations omitted).

Assuming that the Court, for whatever reason, continues to think that the Second Circuit is wrong, it is nonetheless bound to adopt the Second Circuit's perception of New York law—even if New York state courts have at times ruled to the contrary. *See Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 309-10 (S.D.N.Y. 2009) ("In the Second Circuit, a federal district court will conclusively defer to a federal court of appeals interpretation of the law of a state that is within its circuit.") (internal quotations omitted); *Luna v. U.S.*, 454 F.3d 631, 636 (7th Cir. 2006) ("If a district court concludes that the intermediate state appellate courts have correctly answered a question [that a circuit] court botched, it should report its conclusions while applying the existing law of the circuit.").)  This Court has justified deviating from clear and binding precedent by suggesting that *Litvinov* (which is not even a third-party fraud case)

---

[9] As for the third ancient case to which this Court has looked, *Rice v. Manley*, 66 N.Y. 82 (1876), observers have noted that this ruling was simply a precursor to the tort of tortious interference, which did not exist at the time.  *See* Harvey S. Perlman, "Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine," 49 U. Chi. L. Rev. 61, 75-6 (1982) ("These facts [of *Rice*] *do not fit comfortably into the elements of fraud*: no statement was made to the plaintiff, nor did he rely on any statement to his detriment. . . . .  Faced with this state of the world, it is not surprising that courts intent on bringing some cases of *contractually based loss* within the scope of liability for tortious acts might devise a cause of action separate from traditional torts that at once would create and limit liability. The interference tort is such a cause of action.") (emphasis added); *see also* DI 601 at 18-19.

was decided after "the Second Circuit's only *substantive discussion* of the issue."  (DI 707 at 9 n.24 (emphasis added).)  But *stare decisis* would be a hollow doctrine indeed if lower courts could disregard appellate precedent simply because the higher court did not take care to list all of the opinions that it reviewed in reaching its plain legal conclusion.  The Court should do now what could have been done many months ago, and reject Chevron's untenable "third-party fraud" claim.

### E. Chevron is Judicially and Equitably Estopped From Collaterally Attacking the Ecuadorian Proceedings and From Seeking to Frustrate Enforcement of or Collection Upon the Ecuadorian Judgment in the Manner That It Has in This Action

As the Court is aware, in 1993, the Amazon communities filed claims against Texaco in this Court, seeking redress for the devastation caused by Texaco's deliberate contamination of their water and land between 1964 and 1990.  *Aguinda, et al. v. Texaco, Inc.*, No. 93-cv-7527 ("*Aguinda*").  The *Aguinda* plaintiffs "sought money damages under theories of negligence, public and private nuisance, strict liability, medical monitoring, trespass, civil conspiracy, and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).  In 1996, this Court granted Texaco's motion to dismiss the *Aguinda* case on *forum non conveniens* grounds. *Aguinda v. Texaco, Inc*., 945 F. Supp. 625 (S.D.N.Y. 1996) ("*Aguinda I*"), *vacated sub nomine, Jota v. Texaco, Inc*., 157 F.3d 153 (2d Cir. 1998).  In 1998, however, the Second Circuit vacated this Court's dismissal and remanded the for further consideration.  The Second Circuit held "that dismissal on the ground of *forum non conveniens* was erroneous in the absence of a condition requiring Texaco to submit to jurisdiction in Ecuador."  *Jota,* 157 F.3d at 155.

On remand, Texaco made a series of promises intended to secure its *forum non conveniens* dismissal.  Texaco promised, *inter alia*, to satisfy any Ecuadorian judgment subject only to a reservation of the right to invoke the defenses to enforcement identified in N.Y.C.P.L.R. 5304:

> If this Court dismisses these cases on forum non conveniens or comity grounds, Texaco will agree as follows: (i) first, it will accept service of process in Ecuador and not object to the civil jurisdiction of a court of competent jurisdiction in Ecuador . . . ; (ii) second, Texaco will waive statute of limitations-based defenses that may have matured between the dates when the Aguinda and Jota plaintiffs filed their Complaints in this Court . . . ; (iii) third, plaintiffs and Texaco may utilize the extensive discovery obtained to date in lawsuits to be filed in Ecuador . . . ;  and (iv) fourth, Texaco will satisfy judgments that might be entered in plaintiffs' favor, subject to Texaco's rights under New York's Recognition of Foreign Country Money Judgments Act, N.Y.C.P.L.R. § 5301 et seq. (McKinney 1998).

Moreover, in response to the Amazon communities' concern that Chevron would refuse to honor any Ecuadorian judgment, Chevron cited its written "Agreements Regarding Conditions of Dismissal" in which it "agree[d] to satisfy a final judgment . . . in favor of a named plaintiff in *Aguinda*, subject to Texaco Inc.'s reservation of its right to contest any such judgment under New York's Recognition of Foreign Country Money Judgments Act."  Relying on Texaco's representations, this Court again dismissed the case on *forum non conveniens* grounds in 2001.  In its opinion, this Court cited the agreements by which Chevron promised to satisfy any Ecuadorian judgment subject only to limited defenses to enforcement.

In October 2001, as its second *forum-non-conveniens* dismissal remained under consideration by the Second Circuit, Texaco merged with Chevron, and the resulting entity began referring to itself as "ChevronTexaco."  In a brief filed with the Second Circuit on December 20, 2001, the company, which previously identified itself only as "Texaco, Inc.," voluntarily identified itself as "ChevronTexaco," and signed its brief accordingly.  In fact, Chevron attorney Ricardo Reis Veiga, who was Chevron's first witness called in this trial and

who watched from the gallery virtually every other day, put his name on that brief.  And in that brief, "ChevronTexaco" attempted to use the merger against the Amazon communities.  The company asserted that New York was now an improper venue because Texaco had become "ChevronTexaco," with its headquarters in California rather than New York:

> In their brief, plaintiffs argue that these lawsuits should proceed in New York because it is 'the home of Texaco Inc.' That is no longer true. As generally known (and thus this Court may take judicial notice), Texaco merged with Chevron Inc. on October 9, 2001, five months after the District Court's decision. The resulting corporation, ChevronTexaco, Inc., is headquartered in San Francisco. ChevronTexaco is in the process of closing down what remains of Texaco's former offices in White Plains, New York.

The Second Circuit affirmed the *forum-non-conveniens* dismissal on August 16, 2002, on the condition that ChevronTexaco adhere to its promises.  *Aguinda v. Texaco*, 303 F.3d 470.  In an August 19, 2002 press release lauding the Second Circuit's affirmance, "ChevronTexaco" reiterated its belief that Ecuador was the appropriate venue for the trial:

> ChevronTexaco is pleased with the ruling of the U.S. Court of Appeals affirming the lower court's dismissal of these claims and ruling that the cases brought by these plaintiffs do not belong in the U.S. judicial system.   This ruling vindicates *ChevronTexaco's long-standing position and the arguments we have made to the court*: The appropriate forum for this litigation is Ecuador. . . .

The Second Circuit has, in a related case, rejected Chevron's contention that, despite the foregoing record, it is not bound by the promises made to secure the dismissal of *Aguinda*. *Republic of Ecuador v. Chevron Corporation*, 638 F.3d 384, 389, n.3 (2d Cir. 2011). The Court held:

> "[I]n seeking affirmance of the district court's *forum non conveniens* dismissal, lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. . . .*Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action.*"

35

*Id*. at n.3 (emphasis added).  The Court added:

> "Texaco's promise to satisfy any judgment by the Ecuadorian courts . . . along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action *and any future proceedings between the parties*, including enforcement actions, contempt proceedings, and attempts to confirm arbitral awards."

*Id*. at n.4 (emphasis added).

Chevron gave up its request for damages in this action in order to secure a bench trial before this Court instead of a jury trial. It did so because, as Chevron readily admits, it only wants one thing from this Court: equitable relief that will block or frustrate enforcement and collection upon the Ecuadorian judgment.  But Chevron, in side-stepping a jury, has outsmarted itself.  To wit, even if we assume assume *arguendo* that Chevron's fraud (and RICO) claims fall within the limited grounds reserved in *Aguinda* for attacking an Ecuadorian judgment—i.e., the grounds identified in New York's Recognition Act—to the extent that they assert litigation fraud resulting in the Ecuadorian judgment, other of Chevron's purported "fraud" theories plainly fall outside the scope of New York's Recognition Act.  As this Court has noted:

> The LAP Representatives presuppose that the state law fraud claim is based entirely on the contention that they and/or their agents procured the Judgment by fraud. As we have seen, however, that is incorrect. . . . [T]he fraud claim is based at least in material part on contentions that the Donziger Defendants and others – acting as agents of the LAPs – (a) fraudulently made false statements to U.S. courts, federal and state agencies and officials, Chevron's stockholders, persons in the investment arena, and journalists, (b) at least some relied upon those fraudulent statements, and (c) Chevron was injured in consequence of that reliance. To that extent, the fact[] that the Judgment allegedly was obtained by fraud . . . [is] not the only conduct for which relief is sought.  *This aspect of the fraud claim . . . is independent of whether the Judgment was obtained by fraud . . . .*"

(DI 707 at 11-12 (emphasis added).)  When Chevron waived the right to attack any Ecuadorian judgment on grounds other than those enumerated in N.Y.C.P.L.R. 5304, it waived the right to

try and block or frustrate enforcement on the basis that the Lago Agrio Plaintiffs allegedly "made false statements to U.S. courts, federal and state agencies and officials, Chevron's stockholders, persons in the investment arena, and journalists," and, for that matter, funders and whomever was supposedly "defrauded" by Donziger.  Chevron also waived the right to any claim that the Lago Agrio proceedings were fraudulent, "sham litigation because [the Lago Agrio Plaintiffs] sue[d] Chevron which never even did business in Ecuador instead of Texaco . . . ."  (Tr. at 136:8-13.)  These assertions of fraud, and perhaps others, are all "independent of whether the Judgment was obtained by fraud," and do not fall within the ambit of the Recognition Act—"which is the sole reserved route for Chevron to challenge any final judgment resulting from the Lago Agrio litigation . . . ."  *Republic of Ecuador*, 638 F.3d at 399.  The doctrines of judicial and collateral estoppel bar Chevron from using these various "fraud" assertions as justification for equitable relief aimed at preventing enforcement of the Judgment.

Judicial estoppel precludes a party from asserting a "factual position . . . clearly inconsistent" with one previously advanced by that party and "adopted by . . . the court in some manner." *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 98 (2d Cir. 1997).  The doctrine's purpose is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citations and quotation marks omitted).  Chevron obtained its *forum non conveniens* dismissal in part by giving up certain lines of attack on any subsequent adverse Ecuadorian judgment.  To allow Chevron to disregard these limitations with impunity would more than undermine the integrity of this Court and the Second Circuit; it would allow a blatant swindle.

Equitable estoppel lies where "the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001). The Lago Agrio Plaintiffs filed their case in Ecuador, and expended huge sums of money litigating there for upwards of eight years, in reliance on Chevron's *Aguinda* promises. As the Second Circuit has noted, '[t]o the extent [Chevron] seeks to use any . . . award obtained on grounds other than those reserved in its pledge to the district court to block enforcement of any final judgment Plaintiffs may obtain in the Ecuadorian courts, Plaintiffs' claims of equitable estoppel, like their claims of judicial estoppel, can be raised and resolved at that time." *Republic of Ecuador*, 638 F.3d at 400. Insofar as Chevron continues to press fraud theories independent of whether the Judgment was obtained by fraud, but now *exclusively* seeks equitable relief aimed at frustrating the Judgment, Chevron impermissibly attacks the Judgment "on grounds other than those reserved in its pledge to the district court" in *Aguinda*.

We have identified the many reasons why Chevron's claims must fail to the extent that they are premised on the notion that the Judgment was procured by fraud. Chevron's *other* "fraud" theories went by the wayside when the company decided, for strategic reasons, to limit itself to equitable relief attacking the Judgment. There is no viable basis for any claim here.

### F. Chevron Has Failed to Show That It Will Suffer will Suffer Irreparable Injury Absent Injunctive Relief, and That It Has No Adequate remedy at Law

In order to obtain a permanent injunction, Chevron must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

38

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013 (quoting *Monsanto Co.*

*v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756, 177 L. Ed. 2d 461 (2010)).  Chevron has not and

cannot satisfy any of these requirements.  Here, we focus specifically on requirements No. 1 and

No. 2.

 In entering the now-vacated preliminary injunction barring worldwide enforcement of the

Ecuadorian Judgment, this Court framed the purported, threatened "irreparable" injury facing

Chevron as follows:

> The evidence establishes that the LAPs and their allies intend
> quickly to pursue multiple enforcement actions and asset seizures,
> including *ex parte* remedies where possible, around the globe.
> Absent a preliminary injunction, Chevron would be forced to
> defend itself and litigate the enforceability of the Ecuadorian
> judgment in multiple proceedings. There is a significant risk that
> assets would be seized or attached, thus disrupting Chevron's
> supply chain, causing it to miss critical deliveries to business
> partners, damaging "Chevron's business reputation as a reliable
> supplier and harm the valuable customer goodwill Chevron has
> developed over the past 130 years," and causing injury to
> Chevron's "business reputation and business relationships."

*Chevron Corp. v. Donziger, et al.*, 768 F. Supp. 2d. 581, 626-27 (S.D.N.Y. 2011) ("*Donziger*"),

*vacated sub nom*, *Chevron Corp. v. Naranjo, et al.,* 667 F.3d 232 (2d Cir. 2012)  (internal

citations omitted).

 In vacating the preliminary injunction, the Second Circuit rejected the notion that being

forced to defend enforcement actions, even with the prospect of asset seizures, is not "injury" at

all—let alone "irreparable" injury. *See, e.g., Naranjo*, 667 F.3d at 246 ("The LAPs hold a

judgment from an Ecuadorian court.  They may seek to enforce that judgment in any country in

the world where Chevron has assets."); *see also* Sept. 16, 2011 Tr. at 49:19-50:5 (1:11-cv-1150

2d Cir. 2011) (THE COURT: "Wouldn't any plaintiff who had a big judgment against a

company with worldwide operations undertake planning as to where it would be advantageous

for them to go and enforce the judgment and wouldn't it be a part of that thinking for anybody as to whether a settlement would be more likely if they found the best place among money places?").

There is no evidence in this record to suggest that Chevron would suffer irreparable injury absent an injunction that in some way interferes with the Lago Agrio Plaintiffs' ability to enforce or collect upon their Judgment. Indeed, now that enforcement proceedings have played out to some extent, Chevron's Chicken-Little routine should fool no one this time around. Indeed, as this Court is aware, the Lago Agrio Plaintiffs obtained a partial freeze on Chevron's Argentinian assets for a period of several months. Ultimately, without any indication that it suffered irreparable injury, Chevron succeeded in lifting the freeze order on appeal to Argentina's highest court—*i.e.*, Chevron resorted to legal processes available in the enforcement forum. And that brings us to our second and final point. Chevron has available to it the ultimate "remedy at law," which defeats any claim for injunctive relief: Chevron can defend itself against foreign enforcement actions. The fact that there may be more than one of those to contest at a given moment does not change the analysis, particularly not for a litigant that has launched, blitzkrieg-style, upwards of twenty 28 U.S.C. § 1782 actions in courts from California to Vermont.[10]

---

[10] Before the commencement of the trial, Chevron indicated that it "might" seek forms of equitable relief other than an injunction blocking enforcement of and collection upon the Judgment. If and when Chevron identifies precisely what it is asking for, the Lago Agrio Plaintiffs will respond. Similarly, we will address at that time the geographical scope of the relief sought as well as the effect of the U.S. Supreme Court's decision in *Morrison v. Nat'l Austl. Bank*, 130 S. Ct. 2869 (2010), as the Court has requested.

**IV.     CONCLUSION**

For the foregoing reasons, the Court should enter judgment in favor of Defendants Hugo

Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje.


December 23, 2013                              Respectfully submitted,

                                              GOMEZ LLC
                                              Attorney at Law

                              By:      *s/ Julio C. Gomez*
                                       Julio C. Gomez

                                       The Sturcke Building
                                       111 Quimby Street, Suite 8
                                       Westfield, NJ
                                       T: 908-789-1080
                                       F: 908-789-1081
                                       E-mail: jgomez@gomezllc.com

                                       *Attorney for Defendants*
                                       *Hugo Gerardo Camacho Naranjo and*
                                       *Javier Piaguaje Payaguaje*