UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

CHEVRON CORPORATION,                 :

               Plaintiff,           :

        -against-               :   Case No.  11 Civ.  0691 (LAK)

                                              :

STEVEN R. DONZIGER, et al.,       :

           Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# CHEVRON CORPORATION'S POST-TRIAL
# REPLY MEMORANDUM OF LAW

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... v

TABLE OF DEFINED TERMS AND ABBREVIATIONS ...................................... xvii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 6

I.    Defendants Fail to Address the Substantial Evidence Proving Their Wrongdoing ........... 6

    A.    Defendants Have No Explanation for the Appearance of Their Own Unfiled Work Product in the Judgment ................................................................. 6

    B.    Zambrano's Testimony Confirmed That He Did Not Write the Judgment, as Defendants' Silence Tacitly Concedes ......................................... 7

    C.    Defendants' Experts, the Lago Agrio Court Orders, and Their Own Conduct Disprove Defendants' Claim That They Did Nothing Wrong with Cabrera ............. 10

    D.    Defendants Cannot Rebut Guerra's Testimony and the Corroborating Evidence ................................................................................................. 12

        1.    Guerra's Testimony Has Remained Consistent in All Material Respects ......................................................................................... 13

        2.    Defendants Fail to Rebut the Forensic and Documentary Evidence ................. 16

            a.    Centeno Deposit Slips ..................................................................... 17

            b.    Zambrano's Deposit of $300 into Guerra's Account ......................... 17

            c.    Draft Chevron Orders on Guerra's Computer ................................... 18

        3.    Defendants Fail to Discredit Guerra's Testimony Regarding His 2009 "Honey & Honey" Meeting with Donziger ......................................... 20

        4.    Defendants' Post Hoc Reliance on a Few Vague Fajardo Emails Is Misplaced, as They Are Inadmissible Hearsay, No Answer to Chevron's Ghostwriting Evidence, and Consistent With Guerra's Testimony ....................................................................................... 23

        5.    Chevron's Payments to Guerra Were Reasonable for Witness Protection and Compensation for Losses ............................................ 25

    E.    The *Crude* Clips of Donziger Explaining His Corruption Are Not Taken "Out of Context" ....................................................................................... 27

    F.    Defendants' False Assertions That Chevron's Claims Have Shifted or Were Insufficiently Alleged Three Years Ago Cannot Justify Defendants' Failure to Address the Evidence .................................................................................. 28

II.   Defendants' Jurisdictional Defenses Fail, as Do Their Merits Arguments Dressed Up as "Jurisdictional" Issues ....................................................... 31

**TABLE OF CONTENTS** *(continued)*

Page

A. This Court Has Personal Jurisdiction Over the LAPs ................................................ 31

   1. There Is No Good Cause to Reconsider the Court's Order Striking the LAPs' Personal Jurisdiction Defense ................................................ 31

   2. The LAPs Ignore the Various Bases for Personal Jurisdiction Over Them ................................................ 33

      a. The LAPs Have Had Direct Contacts With New York for 20 Years, Including the Filing and Intervention in Four Lawsuits in Their Names ................................................ 33

      b. The LAPs Have Had Ongoing Contact With New York Through Their New York Agents, Thus Satisfying CPLR 301 ................................................ 34

      c. The LAPs Have Transacted Business in New York, Thus Satisfying CPLR 302(a)(1) ................................................ 35

      d. The LAPs Have Committed Torts in New York, Thus Satisfying CPLR 302(a)(2) ................................................ 36

   3. The Exercise of Jurisdiction Over the LAPs Satisfies Due Process ................................................ 36

B. Chevron Established Article III Standing and RICO Injury ................................................ 37

   1. There Is No Such Thing as "RICO Standing" ................................................ 37

   2. There Is No Dispute About the Facts and Legal Sufficiency of Chevron's Injuries—Indeed, Defendants Stipulated to Many of Them ................................................ 38

   3. Chevron Incurred These Injuries as a Result of Defendants' Conduct ................................................ 40

   4. Chevron Will Continue to Be Injured Absent an Injunction ................................................ 42

   5. Chevron's Injuries Are Redressible Through the Relief It Seeks ................................................ 43

C. Notions of "Comity" Do Not Deprive the Court of the Ability to Enforce U.S. Law or End Defendants' Ongoing Scheme ................................................ 44

   1. Defendants' "Comity" Arguments Are Premised on a Fundamental Error Regarding the Scope of Relief that Chevron Is Actually Seeking ................................................ 44

   2. *Naranjo* Does Not Bar Chevron's RICO and Fraud Claims or Preclude This Court From Granting Effective Relief ................................................ 45

   3. Defendants' Other "Policy" Concerns Are Misplaced, and, in Any Event, Cannot Overcome the Mountain of Evidence Proving Their Misconduct Here ................................................ 47

III. Donziger Does Not Challenge the Elements of RICO, and His Attacks Misstate Governing Law and Ignore the Bulk of the Evidence Adduced at Trial ................................................ 50

A. Donziger Does Not Contest the Core Elements of RICO, the Majority of the Predicate Acts Proven by the Evidence, or Chevron's RICO Conspiracy Claim ................................................ 50

B. Chevron Is Not Seeking an Extraterritorial Application of RICO ................................................ 52

**TABLE OF CONTENTS** *(continued)*

Page

C. Defendants' Use of Their Fake Independent Expert and Other Lies Constituted Extortion, and Donziger's Attempt to Recast Chevron's Claims as Normal Litigation Fails ........................................................................................ 56

   1. Defendants' Wrongful Conduct Goes Far Beyond Mere "Litigation Activity" .................................................................................................... 56

   2. The First Amendment Does Not Protect False Statements, Extortion, or Fraud ........................................................................................................ 57

      a. The First Amendment and *Noerr-Pennington* Doctrine Do Not Immunize the Petitioning of Foreign Governments ........................ 57

      b. The "Sham" Exception Is Largely Irrelevant Because *Noerr-Pennington* Does Not Immunize Foreign Conduct and, in Any Event, Defendants' Misconduct Satisfies the Exception ................... 59

   3. As Defendants' Cases Recognize, There Is No Bar to Seeking Relief Against an Attorney Who Is a Principal in a Fraudulent Scheme ....................... 60

D. Donziger Unduly Limits Mail and Wire Fraud, But the Evidence More Than Satisfies the Statute Regardless ........................................................................... 62

   1. Donziger Misstates the Substantive Basis for Chevron's Claims ........................ 62

   2. False Statements Regarding Cabrera's Independence Are Actionable ............... 63

   3. Chevron Has Proven the Elements of Mail and Wire Fraud, Including With Respect to Defendants' False Statements About Cabrera ............................ 65

IV. Defendants' Limited Response to Chevron's Fraud Claim Does Not Rebut the Evidence Against Them ...................................................................................... 66

A. New York Recognizes Fraud Claims Premised on Third-Party Reliance ................. 66

B. *Naranjo* Is Irrelevant to Chevron's Fraud Claim Because New York Common Law Provides a Cause of Action for Fraud ............................................................ 70

C. Defendants' Lies About Cabrera's "Independence" Are Actionable Fraud and Were Intended to Deceive ................................................................................. 71

V. Defendants Offer No Response to Chevron's Civil Conspiracy Claim ............................ 73

VI. Donziger Offers No Response to Chevron's Section 487 Claim ..................................... 73

VII. Defendants Fail to Rebut Chevron's Entitlement to Equitable Relief ............................ 74

A. Chevron Has No Adequate Remedy at Law and Has Established Irreparable Harm ................................................................................................................. 74

B. Theoretical Remedies in Other Jurisdictions Are Not a Bar to Equitable Relief ....... 75

C. Donziger Is Wrong About Chevron's Ability to Seek Injunctive and Other Equitable Relief Under RICO ............................................................................... 77

VIII. Defendants' Affirmative Defenses and Irrelevant Attacks on Chevron Are Without Merit .................................................................................................. 81

**TABLE OF CONTENTS** *(continued)*

Page

A. Defendants Have Failed to Establish the Elements of Unclean Hands or Related Defenses................................................................................................... 81

    1. Chevron's Legitimate Lobbying Efforts Do Not Constitute Unclean Hands ........................................................................................................ 82

    2. Preinspections and the Postponement of the Guanta Inspection Do Not Constitute Unclean Hands................................................................... 85

    3. Chevron's Purported Litigation Tactics Do Not Constitute Unclean Hands ........................................................................................................ 87

    4. The Judge Nuñez Bribery Scandal Cannot Constitute Unclean Hands ............... 88

    5. Defendants' Allegations of Environmental Harm Are Irrelevant, Unsupported, and False, and Cannot Constitute Unclean Hands ......................... 89

        a. Defendants Continue to Assert False and Irrelevant Environmental Allegations ........................................................................................... 89

        b. This Court Should Strike Donziger's Unsupported Allegations.................... 95

B. Chevron Is Not Judicially or Equitably Estopped by Texaco's Representations in *Aguinda* ........................................................................................................... 97

C. Defendants' Collateral Estoppel Defense Fails ....................................................... 104

D. Defendants' Attacks on This Court Are Unwarranted, Unfair, False, and Irrelevant.................................................................................................................. 106

CONCLUSION........................................................................................................................ 108

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aaacon Auto Transp., Inc. v. Barnes*,
603 F. Supp. 1347 (S.D.N.Y. 1985) .......................................................................... 33

*ABKCO Indus., Inc. v. Lennon*,
52 A.D.2d 435 (1st Dep't 1976) ............................................................................... 34

*Aguinda v. Texaco, Inc.*,
142 F. Supp. 2d 534 (S.D.N.Y. 2001) .................................................................... 104

*Aguinda v. Texaco, Inc.*,
303 F.3d 470 (2d Cir. 2002) ................................................................................... 101

*Amins v. Life Support Med. Equip. Corp.*,
373 F. Supp. 654 (E.D.N.Y. 1974) ........................................................................... 33

*Andros Compania Maritima S.A. v. Intertanker Ltd.*,
714 F. Supp. 669 (S.D.N.Y. 1989) ........................................................................... 33

*Aoude v. Mobil Oil Corp.*,
892 F.2d 1115 (1st Cir. 1989) ............................................................................... 105

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
792 F. Supp. 969 (S.D.N.Y. 1992) ........................................................................... 98

*Associated Container Transp. (Austl.) Ltd. v. United States*,
705 F.2d 53 (2d Cir. 1983) ................................................................................ 58, 59

*Banker v. Esperanza Health Sys., Ltd.*, No. 05-cv-4115,
2006 WL 47669 (S.D.N.Y. Jan. 9, 2006) ................................................................. 33

*Bankers Trust Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ................................................................................... 40

*Bencoe Exporting & Importing Co. v. Erie City Iron Works*,
280 F. 690 (2d Cir. 1922) ........................................................................... 67, 69, 70

*Benjamin Ctr. v. Hampton Affiliates, Inc.*,
66 N.Y.2d 782 (1985) .............................................................................................. 35

*Bernhan Chemical & Metal Corp. v. Ship-A-Hoy*,
200 A.D. 399 (1st Dep't 1922) ................................................................................. 73

*Bisogno v. Borsa*,
101 A.D.3d 780 (2d Dep't 2012) .............................................................................. 62

*Blake v. Dierdorff*,
856 F.2d 1365 (9th Cir. 1988) ................................................................................. 62

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Bono v. United States*,
 113 F.2d 724 (2d Cir. 1940) .................................................................. 96

*Bowman v. City of Indianapolis*,
 133 F.3d 513 (7th Cir. 1998) ................................................................. 73

*Brenntag Int'l Chems., Inc. v. Bank of India*,
 175 F.3d 245 (2d Cir. 1999) .................................................................. 74

*Bridge v. Phoenix Bond & Indem. Co.*,
 553 U.S. 639, 128 S. Ct. 2131 (2008) ............................................. 42, 65

*Bridgeway Corp. v. Citibank*,
 201 F.3d 134 (2d Cir. 2000) ............................................................ 99, 102

*Bruff v. Mali*,
 36 N.Y. 200 (1867) .......................................................................... 69, 70

*Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*,
 239 A.D.2d 452, 657 N.Y.S.2d 450 (2d Dep't 1997) ......................... 69

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
 404 U.S. 508, 92 S. Ct. 609 (1972) ...................................................... 59

*Calabrese v. CSC Holdings, Inc.*,
 283 F. Supp. 2d 797 (E.D.N.Y. 2003) .................................................. 57

*Calabrese v. CSC Holdings, Inc.*,
 No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 (E.D.N.Y. July 19, 2004) ...... 84

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
 208 F.3d 885 (10th Cir. 2000) .............................................................. 58

*Catskill Dev. v. Park Place Entm't Corp.*,
 547 F.3d 115 (2d Cir. 2008) .............................................................. 72, 73

*Cedeño v. Castillo*,
 457 F. App'x 35 (2d Cir. 2012) ............................................................. 54

*Cedeño v. Intech Grp, Inc.*,
 733 F. Supp. 2d 471 (S.D.N.Y. 2010) ................................................... 53

*Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*,
 148 F.3d 194 (2d Cir. 1998) .................................................................. 67

*Chesley v. Union Carbide Corp.*,
 927 F.2d 60 (2d Cir. 1991) ................................................................... 50

*Chevron Corp. v. Donziger*,
 871 F. Supp. 2d 229 (S.D.N.Y. 2012) ............................... 29, 54, 66, 68

*Chevron Corp. v. Donziger*,
 886 F. Supp. 2d 235 (S.D.N.Y. 2012) ................................................ 105

*Chevron Corp. v. Naranjo*,
 667 F.3d 232 (2d Cir. 2012) .......................... 44, 46, 47, 48, 70, 71

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Chevron Corp. v. Naranjo,*
    No. 11-1150-cv(L), Dkt. 600 (2d Cir. Sept. 19, 2011).................................... 106

*Chevron Corp. v. Naranjo,*
    No. 13-332, Dkt. 62 (2d Cir. Apr. 10, 2013)................................................ 106

*Chevron Corp. v. Salazar,*
    No. 11 Civ. 3718-LAK (S.D.N.Y.) ................................................................. 60

*Church v. Wickwire,*
    231 A.D. 249 (1st Dep't 1931)...................................................................... 63

*Citigroup Inc. v. City Holding Co.,*
    97 F. Supp. 2d 549 (S.D.N.Y. 2000) ............................................................. 36

*City of Los Angeles v. Lyons,*
    461 U.S. 95, 103 S. Ct. 1660 (1983) .............................................................. 44

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) .................................................................................. 38

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.,*
    690 F.2d 1240 (9th Cir. 1982) ....................................................................... 57

*Coastal States Mktg., Inc. v. Hunt,*
    694 F.2d 1358 (5th Cir. 1983) ....................................................................... 58

*Comm'r v. Banks,*
    543 U.S. 426, 125 S. Ct. 826 (2005) ............................................................. 35

*Cooper v. Weissblatt,*
    154 Misc. 522, 277 N.Y.S. 709 (2d Dep't 1935) ........................................... 67

*Corporacion Tim, S.A. v. Schumacher,*
    418 F. Supp. 2d 529 (S.D.N.Y. 2006) ........................................................... 50

*Cresswell v. Sullian & Cromwell,*
    922 F.2d 60 (2d Cir. 1990) ............................................................................ 76

*Crowe v. Smith,*
    848 F. Supp. 1258 (W.D. La. 1994) .............................................................. 62

*CSX Transp., Inc. v. Peirce,*
    No. 5:05-CV-202, 2013 WL 5375834 (N.D. W. Va. Sept. 25, 2013)............. 60

*Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,*
    773 F.2d 452 (2d Cir. 1985) .......................................................................... 49

*Daimler AG v. Bauman,*
    No. 11-965, 2014 WL 113486 (U.S. Jan. 14, 2014) ...................................... 35

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
    352 F.3d 775 (2d Cir. 2003).......................................................................... 69

*De Mañez v. Bridgestone Firestone N. Am., Tire, LLC,*
    533 F.3d 578 (7th Cir. 2008) ......................................................................... 50

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Delehanty v. Walzer*, 59 N.Y.S.2d 777 (Sup. Ct. Kings Cnty. 1945) ......................................... 40

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) .......................................................................... 38

*Desser v. Schatz*,
    182 A.D.2d 478, 581 N.Y.S.2d 796 (1st Dep't 1992) ......................................... 69

*Dornberger v. Metro. Life Ins. Co.*,
    961 F. Supp. 506 (S.D.N.Y. 1997) ............................................................... 43

*Dow Jones & Co. v. Harrods, Ltd.*,
    237 F. Supp. 2d 394 (S.D.N.Y. 2002) ........................................................... 76

*Drexel Burnham Lambert Grp. Inc. v. Galadari*,
    777 F.2d 877 (2d Cir. 1985) ...................................................................... 82

*Eastman Kodak Co. v. Kavlin*,
    978 F. Supp. 1078 (S.D. Fla. 1997) .............................................................. 50

*Eaton, Cole & Burnham Co. v. Avery*,
    83 N.Y. 31 (1880) ................................................................................. 69

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388, 126 S. Ct. 1837 (2006) ........................................................... 78

*Ehrenfeld v. Bin Mahfouz*,
    9 N.Y.3d 501 (2007) ............................................................................... 34

*Ehrenfeld v. Mahfouz*,
    489 F.3d 542 (2d Cir. 2007) .................................................................. 34, 36

*European Cmty. v. RJR Nabisco, Inc.*,
    No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ........... 55, 56

*Exclaim Assocs. Ltd. v. Nygate*,
    No. 600510/05, 2005 WL 3501559 (Sup. Ct. N.Y. Cnty. Sept. 15, 2005) ...................... 62

*Factors Etc., Inc. v. Pro Arts, Inc.*,
    652 F.2d 278 (2d Cir. 1981) ...................................................................... 66

*Farmer v. Brennan*,
    511 U.S. 825, 114 S. Ct. 1970 (1994) ....................................................... 43, 75

*Feinberg v. Feinberg*,
    40 N.Y.2d 124 (1976) .............................................................................. 71

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    219 F. Supp. 2d 576 (S.D.N.Y. 2002) ........................................................... 40

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) ...................................................................... 40

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ........................................................................ 43

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Fischbarg v. Doucet,*
9 N.Y.3d 375 (2007).................................................................................. 36

*Franklin v. Gwinnett Cnty. Pub. Sch.,*
503 U.S. 60, 112 S. Ct. 1028 (1992) .......................................................... 81

*Frummer v. Hilton Hotels Int'l,*
19 N.Y.2d 533 (1967)................................................................................. 34

*Gaia House Mezz LLC v. State St. Bank & Trust Co.,*
720 F.3d 84 (2d Cir. 2013) ......................................................................... 98

*Gelfand v. Tanner Motor Tours, Ltd.,*
385 F.2d 116 (2d Cir. 1967) ....................................................................... 34

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323, 94 S. Ct. 2997 (1974) ..................................................... 50, 57

*Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
No. 97 CIV. 8779 (RPP), 1998 WL 321446 (S.D.N.Y. June 18, 1998) ..................... 20, 61

*Haagen-Dazs, Inc. v. Frusen Gladje Ltd.,*
493 F. Supp. 73 (S.D.N.Y. 1980) ............................................................... 88

*Hadcock v. Osmer,*
153 N.Y. 604 (1897).................................................................................... 63

*Hallak v. L3 Commc'ns Corp.,*
490 F. App'x 2 (9th Cir. 2012) .................................................................... 63

*Hamilton v. Atlas Turner, Inc.,*
197 F.3d 58 (2d Cir. 1999) ......................................................................... 31

*Hatch v. Ooms,*
69 F. Supp. 788 (D.D.C. 1947) ................................................................... 12

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.,*
322 U.S. 238, 64 S. Ct. 997 (1944) ............................................................. 12

*Hilton v. Guyot,*
159 U.S. 113, 16 S. Ct. 139 (1895) ....................................................... 49, 105

*Hittle v. Scripto–Tokai Corp.,*
166 F. Supp. 2d 159 (M.D. Pa. 2001) ......................................................... 67

*ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.,*
775 F. Supp. 650 (S.D.N.Y. 1991) ............................................................. 33

*Illinois ex rel. Madigan v. Telemarketing Assocs.,*
538 U.S. 600, 123 S. Ct. 1829 (2003) ......................................................... 57

*In re Application of Chevron Corp.,*
749 F. Supp. 2d 135 (S.D.N.Y. 2010)........................................................... 9

*In re Chevron Corp.,*
709 F. Supp. 2d 283, 286 (S.D.N.Y. 2010) ................................................. 93

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*In re Fredeman Litig.*,
    843 F.2d 821 (5th Cir. 1988) .......................................................... 81

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009) ........................................... 64

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009) ........................................... 34

*In re Petition of Treco*,
    205 B.R. 358 (S.D.N.Y. 1997) .................................................... 102

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
    230 F. Supp. 2d 376 (S.D.N.Y. 2002) ........................................... 34

*In re Tronox, Inc. Sec. Litig.*,
    No. 09 Civ. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. Jun. 28, 2010) ......... 103

*In re Union Carbide Co.*,
    809 F.2d 195 (2d Cir. 1987) ........................................................ 100

*Indem. Ins. Co. of N. Am. v. K-Line Am., Inc.*,
    2007 WL 1732435 (S.D.N.Y. June 14, 2007) ................................. 33

*Jackson Constr. Co. v. United States*,
    62 Fed. Cl. 84 (Fed. Cl. 2004) ..................................................... 97

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979) ........................................................... 74

*Jacobson v. Fireman's Fund Ins. Co.*,
    111 F.3d 261 (2d Cir. 1997) ......................................................... 68

*Jaffe v. Accredited Sur. & Cas. Co.*,
    294 F.3d 584,  (4th Cir. 2002) ...................................................... 98

*Johnson v. Collins Entm't. Co.*,
    199 F.3d 710 (4th Cir. 1999) ........................................................ 81

*Jones v. Buttarazzi*,
    204 A.D.2d 1018 (4th Dep't 1994) ............................................... 71

*Kapps v. Wing*,
    404 F.3d 105 (2d Cir. 2005) ......................................................... 75

*Kingsland v. Dorsey*,
    338 U.S. 318, 70 S. Ct. 123 (1949) ............................................... 12

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001) ....................................................... 100

*Laufer v. Ostrow*,
    55 N.Y.2d 305 (1982) .................................................................. 34

*Lefferts v. Lefferts*,
    243 A.D. 278, 276 N.Y.S. 809 (1935) .......................................... 73

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Lerner v. Fleet Bank, N.A.,*
318 F.3d 113 (2d Cir. 2003) ................................................................ 37, 38

*Litvinov v. Hodson,*
74 A.D.3d 1884 (4th Dep't 2010) ............................................... 67, 68

*Lueck v. Sundstrand Corp.,*
236 F.3d 1137 (9th Cir. 2001) ...................................................... 101

*Magnaleasing, Inc. v. Staten Island Mall,*
563 F.2d 567 (2d Cir.1977) ......................................................... 72, 73

*Maharaj v. Bankamerica Corp.,*
128 F.3d 94 (2d Cir.1997) ............................................................. 99

*Mallis v. Bankers Trust Co.,*
615 F.2d 68 (2d Cir. 1980) ........................................................... 82

*McLaughlin v. Anderson,*
962 F.2d 187 (2d Cir. 1992) ........................................................ 107

*Miller v. Yokohama Tire Corp.,*
358 F.3d 616 (9th Cir. 2004) .................................................. 63, 108

*Mintz & Gold LLP v. Zimmerman,*
17 Misc. 3d 972 (Sup. Ct. N.Y. Cnty. 2007) ................................. 62

*Mitchell v. Washingtonville Cent. Sch. Dist.,*
190 F.3d 1 (2d Cir.1999) ............................................................... 99

*Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.,*
871 F. Supp. 2d 933 (N.D. Cal. 2012) .......................................... 55

*Monex Deposit Co. v. Gilliam,*
No. SACV 09-287-JVS (RNBx), 2010 WL 2349095 (C.D. Cal. June 1, 2010) ............... 57

*Morrison v. Nat'l Austl. Bank Ltd.,*
561 U.S. 247 S. Ct. 2869 (2010) .................................................. 38

*Mosesson v. Jacob D. Fuchsberg Law Firm,*
257 A.D.2d 381 (1st Dep't 1999) .................................................. 62

*Motorola Credit Corp. v. Uzan,*
202 F. Supp. 2d 239 (S.D.N.Y. 2002) .................................. 57, 78, 98

*Naranjo v. Chevron Corp.,*
No. 13-772-cv, Dkt. 182 (2d Cir. Sept. 26, 2013) ...................... 106

*Nat'l Org. for Women, Inc. v. Scheidler,* 267 F.3d 687 (7th Cir. 2001) .............. 78, 79, 80

*New Hampshire v. Maine,*
532 U.S. 742, 121 S. Ct. 1808 (2001) ........................................... 98

*Newin Corp. v. Hartford Acc. & Indem. Co.,*
37 N.Y.2d 211 (1975) .................................................................... 62

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Norex Petrol. Ltd. v. Access Indus., Inc.,*
   540 F. Supp. 2d 438 (S.D.N.Y. 2007) ................................................................. 54

*Norex Petrol. Ltd. v. Access Indus., Inc.,*
   631 F.3d 29 (2d Cir. 2010) ................................................................................. 54

*Nowak v. Ironworkers Local 6 Pension Fund,*
   81 F.3d 1182 (2d Cir. 1996) ............................................................................... 38

*Odesser v. Cont'l Bank,*
   676 F. Supp. 1305 (E.D. Pa. 1987) .................................................................... 62

*Osorio v. Dole Food Co.,*
   665 F. Supp. 2d 1307 (S.D. Fla. 2009) ............................................................. 102

*Pac. Mortg. & Real Estate Servs., Inc. v. Canadian Land Co. of Am., N.V.,*
   690 F. Supp. 1214 (S.D.N.Y. 1988) ................................................................... 82

*PenneCom B.V. v. Merrill Lynch & Co.,*
   372 F.3d 488 (2d Cir. 2004) ............................................................................... 98

*Pennsylvania v. West Virginia,*
   262 U.S. 553, 43 S. Ct. 658 (1923) .................................................................... 43

*People v. Peckens,*
   153 N.Y. 576 (1897) ............................................................................................ 72

*Pravin Banker Assocs., Ltd. v. Banco Popular del Peru,*
   109 F.3d 850 (2d Cir. 1997) ............................................................................... 49

*Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.,*
   896 F. Supp. 2d 198 (E.D.N.Y. 2012) ................................................................ 68

*PrimeTime 24 Joint Venture v. Nat'l Broad. Co.,*
   219 F.3d 92 (2d Cir. 2000) ................................................................................. 58

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
   508 U.S. 49, 113 S. Ct. 1920 (1993) .................................................................. 60

*Religious Technology Center v. Wollersheim,*
   796 F.2d 1076 (9th Cir. 1986) ............................................................................ 81

*Republic of Ecuador v. Chevron Corp.,*
   638 F.3d 384 (2d Cir. 2011) .............................................................. 97, 104, 105

*Republic of Ecuador v. ChevronTexaco Corp.,*
   376 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................................ 93

*Reves v. Ernst & Young,*
   507 U.S. 170, 113 S. Ct. 1163 (1993) ................................................................ 51

*Rice v. Manley,*
   66 N.Y. 82 (1876) ............................................................................................... 67

*Ruffing v. Union Carbide Corp.,*
   308 A.D.2d 526, 764 N.Y.S.2d 462 (2d Dep't 2003) ................................... 67, 68

## TABLE OF AUTHORITIES *(continued)*

*Salinas v. United States*,
    522 U.S. 52, 118 S. Ct. 469 (1997) ............................................................... 52

*Santalucia v. Sebright Transp., Inc.*,
    232 F.3d 293 (2d Cir. 2000) ......................................................................... 67

*Schley v. Pullman's Palace Car Co.*,
    120 U.S. 575, 7 S. Ct. 730 (1887) ................................................................ 96

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479, 105 S. Ct. 3275 (1985) ........................................................... 80

*Sedima, S.P.R.L. v. Imrex Co.*,
    741 F.2d 482 (2d Cir. 1984) ......................................................................... 81

*Sexual Minorities Uganda v. Lively*,
    No. 12 Civ. 30051 (MAP), 2013 WL 4130756 (D. Mass. Aug. 14, 2013) ...................... 58

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004) ......................................................................... 44

*Shindler v. Lamb*,
    25 Misc. 2d 810 (Sup. Ct. N.Y. Cnty. 1959) .................................................. 40

*Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*,
    585 F. Supp. 2d 789 (E.D. Va. 2008) ........................................................... 57

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159, 121 S. Ct. 675 (2001) ............................................................. 80

*Somportex Ltd. v. Phila. Chewing Gum Corp.*,
    453 F.2d 435 (3d Cir. 1971) ......................................................................... 49

*Sosa v. DirectTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ........................................................................ 59

*Specialty Minerals, Inc. v. Pluess-Staufer AG*,
    395 F. Supp. 2d 109 (S.D.N.Y. 2005) ........................................................... 87

*Spiegel v. Cont'l Ill. Nat'l Bank*,
    609 F. Supp. 1083 (N.D. Ill. 1985) ............................................................... 61

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir. 1993) ........................................................................ 40

*Tamimi v. Tamimi*,
    38 A.D.2d 197 (2d Dep't 1972) .................................................................... 71

*Thomas v. Bryant*,
    614 F.3d 1288 (11th Cir. 2010) .................................................................... 75

*TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*,
    784 F. Supp. 2d 485 (S.D.N.Y. 2011 ............................................................ 59

*Trane Co. v. O'Connor Sec.*,
    718 F.2d 26 (2d Cir. 1983) ........................................................................... 81

TABLE OF AUTHORITIES *(continued)*

Page(s)

*Travelers Ins. Co. v. 633 Third Assocs.*,
  14 F.3d 114 (2d Cir. 1994) ............................................................... 67

*Tribune Co. v. Purcigliotti*,
  869 F. Supp. 1076 (S.D.N.Y. 1994) .................................................. 62

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010) .............................................................. 41

*United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
  151 F.3d 1139 (9th Cir. 1998) .......................................................... 102

*United States v. Carson*,
  52 F.3d 1173 (2d Cir. 1995) .............................................................. 81

*United States v. Manton*,
  107 F.2d 834 (2d Cir. 1938) ............................................................ 105

*United States v. Mittelstaedt*,
  31 F.3d 1208 (2d Cir. 1994) .............................................................. 66

*United States v. Neapolitan*,
  791 F.2d 489 (7th Cir. 1986) ............................................................ 52

*United States v. Perez-Torres*,
  15 F.3d 403 (5th Cir. 1994) ............................................................. 100

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) ........................................................ 61

*United States v. Philip Morris USA, Inc.*,
  396 F.3d 1190 (D.C. Cir. 2005) ........................................................ 81

*United States v. Tolub*,
  187 F. Supp. 705 (S.D.N.Y. 1960) .................................................... 29

*United States v. Viola*,
  35 F.3d 37 (2d Cir. 1994) .................................................................. 52

*United States v. Walker*,
  191 F.3d 326 (2d Cir. 1999) .............................................................. 66

*Vinokur v. Penny Lane Owners Corp.*,
  269 A.D.2d 226 (1st Dep't 2000) ...................................................... 71

*Weiss v. Mayflower Doughnut Corp.*,
  135 N.E.2d 208 (N.Y. 1956) ............................................................. 98

*West v. A T & T*,
  311 U.S. 223, 61 S. Ct. 179 (1940) ................................................... 67

*Wheeling-Pittsburgh Steel Corp. v. Mitsui & Co.*,
  221 F.3d 924 (6th Cir. 2000) ............................................................ 81

*Youmans v. Smith*,
  153 N.Y. 214 (1897) .......................................................................... 62

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Zanani v. Savad*,
    217 A.D.2d 696 (2d Dep't 1995) ............................................................... 64, 65

*Zino Davidoff SA v. CVS Corp.*,
    571 F.3d 238 (2d Cir. 2009) ...................................................................... 80

*Zucker v. Baker*,
    35 Misc. 2d 841 (Sup. Ct. Queens Cnty. 1962) ....................................... 34

*Zuyder Zee Land Corp. v. Broadmain Bldg. Co.*,
    86 N.Y.S.2d 827 (Sup. Ct. N.Y. Cnty. 1949) ........................................... 73

**Statutes**

18 U.S.C. § 1001 ................................................................................................. 107

18 U.S.C. § 1341 ................................................................................................. 107

18 U.S.C. § 1343 ................................................................................................. 107

18 U.S.C. § 1346 ................................................................................................. 107

18 U.S.C. § 1503 ................................................................................................. 107

18 U.S.C. § 1505 ................................................................................................. 107

18 U.S.C. § 1512(b) ............................................................................................ 107

18 U.S.C. § 1623 ................................................................................................. 107

18 U.S.C. § 1951 ................................................................................................. 107

18 U.S.C. § 1961(4) ............................................................................................ 51

18 U.S.C. § 1962(c) ............................................................................................ 50, 51

18 U.S.C. § 1962(d) ............................................................................................ 50

18 U.S.C. § 1964 ................................................................................................. 78

18 U.S.C. § 1964(c) ............................................................... 37, 38, 39, 40, 50, 79, 108

18 U.S.C. §§ 1961–1964 ..................................................................................... 107

**Rules**

CPLR 5304(a) ...................................................................................................... 49

CPLR 5304(a)(1) ................................................................................................. 105

CPLR 5304(b)(3) ................................................................................................. 105

Fed. R. Civ. P. 11(b)(3) ...................................................................................... 96

Fed. R. Civ. P. 52(a) ........................................................................................... 96

Fed. R. Evid. 402 ................................................................................................ 96

Fed. R. Evid. 403 ................................................................................................ 96

N.Y. CPLR § 5303 .............................................................................................. 49

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

**Other Authorities**

17A JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 124.22[4] (3d ed. 2013) ........ 68

9C ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2578 (3d ed. 2013) .................... 108

Charles Alan Wright et al.,
      *Federal Practice & Procedure* § 1296 (3d ed. 2013) ....................................................... 29

Cortelyou Kenney, Comment, *Disaster in the Amazon:*
      *Dodging "Boomerang Suits" in Transnational Human Rights Litigation,*
      97 Cal. L. Rev. 857 (2009) ............................................................................................. 47, 48

G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO: Reflections on*
      Religious Technology Center v. Wollersheim: *Will Civil RICO Be Effective Only*
      *Against White-Collar Crime?*, 62 Notre Dame L. Rev. 526 (1987) ................................. 79

Restatement (Third) of Foreign Relations Law § 482(1)(a) (1987) ............................................. 49

Roger Parloff, *Defendants in Chevron Case Cite Their*
      *Own Press Release as Authority*, Fortune, Sept. 13, 2013, *available at*
      http://finance.fortune.cnn.com/2013/09/13/chevron-rico-amazon/ ................................... 48

Ronald Brand, *Recognition and Enforcement of Foreign Judgments,*
      Fed. Jud. Ctr. Int'l Litig. Guide 13 (April 2012) ............................................................. 49

**TABLE OF DEFINED TERMS AND ABBREVIATIONS**

| | |
|---|---|
| Burford | Burford Capital LLC |
| Beltman | Douglas Beltman, former employee of Stratus |
| Bogart | Christopher Bogart, CEO of Burford |
| Cabrera | Richard Stalin Cabrera Vega |
| Cabrera report | The report submitted in the Lago Agrio litigation under the name of the court-appointed expert, Cabrera |
| Chevron | Plaintiff Chevron Corporation |
| Chevron Br. | Chevron's Post-Trial Memorandum of Law (Dkt. 1847) |
| Defendants | All defendants to this action |
| Donziger | Defendants Steven R. Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates PLLC |
| Donziger Br. | Donziger's Post-Trial Memorandum of Law (Dkt. 1850) |
| Emery Celli | Emery Celli Brinckerhoff & Abady LLP |
| Ex. | Exhibits to the concurrently filed Declaration of Randy M. Mastro in Support of Chevron Corporation's Post-Trial Reply Memorandum of Law |
| FF | Chevron's concurrently filed Proposed Findings of Fact |
| Fajardo | Defaulted Defendant Pablo Estenio Fajardo Mendoza |
| Fajardo declaration | Declaration signed by Pablo Fajardo, dated May 5, 2010, and filed by the LAP team in at least 17 different U.S. courts |
| Guerra | Former Ecuadorian judge Alberto Guerra Bastidas |
| Hinton | LAP team spokesperson Karen Hinton |
| Kohn Swift | Kohn, Swift & Graf P.C. |
| Lago Agrio litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador |
| Lago Agrio judgment | The $18.2 billion judgment entered in the Lago Agrio litigation on February 14, 2011 |

| | |
|---|---|
| LAP team | The lawyers and other representatives of the LAPs and their agents and employees, including but not limited to Donziger, Fajardo, Yanza, Stratus, Julio Prieto, Juan Pablo Saenz, Selva Viva, and the Amazon Defense Front |
| LAPs | The plaintiffs in the Lago Agrio litigation, including appearing Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje |
| LAPs Br. | The LAPs' Post-Trial Memorandum of Law (Dkt. 1851) |
| Maest | Ann Maest, former employee of Stratus |
| Motley Rice | Motley Rice LLC |
| Patton Boggs | Patton Boggs LLP |
| ROE | The Republic of Ecuador |
| Stratus | Stratus Consulting, Inc. and, where the context indicates, Beltman and Maest |
| TexPet | Texaco Petroleum Company, a subsidiary of Texaco |
| Tr. | Transcript from the trial in this action |
| Yanza | Defaulted Defendant Luis Francisco Yanza Angamarca |
| Zambrano | Former Ecuadorian judge Nicolas Augusto Zambrano Lozada |

## PRELIMINARY STATEMENT

Defendants' post-trial submissions are most significant for what they fail to address. With no response to the mountain of evidence of their own wrongdoing, Defendants virtually ignore the seven-week trial.  Instead, they pretend that the evidence does not exist.  Defendants attempt to show that their purported ends somehow justify their corrupt means, and they claim they cannot respond to Chevron's allegations or its requested relief because they do not understand them.  But that claim is false: Defendants have contested the case against them through heavy motion practice and they have long known Chevron's proposed equitable relief, since it was filed with the Court months ago.  Just as repeating a lie a thousand times does not make it true, ignoring the evidence does not make it go away.

This unrebutted evidence is devastating and dispositive.  For example, Defendants do not even mention, much less dispute, that:

- There is a substantial overlap between their confidential internal files and the Ecuadorian judgment and other forensic evidence showing Defendants ghostwrote the judgment;

- The only witness at trial who explained the overlap's origin was Alberto Guerra;

- Defendants submitted to the Ecuadorian court forged expert reports under Dr. Charles Calmbacher's name and kept citing publicly a $6 billion remediation estimate from their expert, David Russell, long after he told them to "cease and desist" because it was not "valid";

- Defendants repeatedly touted to the Ecuadorian court, to Chevron, and to parties in the U.S. the report of the "independent" court expert, Richard Cabrera, attributing $16 billion in damages to Chevron, and called charges they were working with that expert and writing his report false and an "infamy";

- Defendants "objected" to Cabrera's original report that they had ghostwritten, and then ghostwrote Cabrera's supplemental report, adopting the LAPs' objections, ignoring Chevron's, and increasing the damages attributed to Chevron by more than $10 billion;

- Defendants secretly paid "independent" court expert Cabrera bribes outside of the court process, through their "secret account";

- Defendants used code words like "cook," "waiter," "restaurant," and "Wao" to hide their illicit dealings with Cabrera and the Ecuadorian court;

- One of Defendants' Ecuadorian lawyers warned Donziger and other members of Defendants' legal team that they would "go to jail" if their dealings with Cabrera were revealed;

- Donziger lied to the U.S. lawyers he retained to obstruct Chevron's discovery of his fraud with Cabrera, causing one after another to resign in disgust;

- Defendants falsely told the United States Congress that the Cabrera report was an "independent estimate" prepared by Cabrera and his "team of 14 technical officials";

- Defendants falsely told United States officials that Cabrera was an "independent special master" who was "one of Ecuador's most highly regarded geologists and environmental consultants" and that "Chevron's lawyers and technical advisors were found to have harassed Cabrera";

- Defendants attempted to obstruct U.S. court proceedings to prevent or delay the revelation of their lies about Cabrera;

- The experts whom Defendants hired to attempt to "cleanse" the Cabrera fraud relied on Cabrera as the basis for their reports and did not do their own analysis;

- The judgment that Defendants ghostwrote relies on the Cabrera report in several material respects;

- A Selva Viva employee working for Defendants deposited money directly into Alberto Guerra's bank account during the time that he testified he was ghostwriting orders for Judge Zambrano in the Chevron case;

- Zambrano, who issued the Ecuadorian judgment, could not answer basic questions about its content, including the meaning of frequently used terminology and the judgment's core legal theory;

- Nor could Zambrano—or Defendants—explain how the LAP team's unfiled work product repeatedly appeared in the judgment; and

- Defendants routinely made factual assertions to United States officials, Chevron shareholders, and others about Chevron's alleged conduct, that their own consultants and lawyers had told them were without foundation or entirely false—all in an effort to pressure Chevron into a payoff.

Defendants even ignore their own evidence at trial—including their own witnesses:

- Defendants barely mention the testimony of their supposed "star" witness, Zambrano, citing him only on peripheral issues;

- Defendants never cite at all the testimony of several of their other witnesses, including Donald Moncayo, Karen Hinton, and Alejandro Ponce Villacis; and

- Defendants cite testimony of their few other witnesses only for marginal issues and are unable to address or rebut the overwhelming evidence of wrongdoing against them.

Even if Defendants somehow could not figure out Chevron's claims and supporting evidence from its annotated Amended Complaint, the mail and wire fraud appendix attached to it, the four motions for summary judgment, or the other extensive briefing in this case, Chevron's trial presentation must have informed them. For example, Chevron's 253-slide closing argument detailed Chevron's claims, including hundreds of citations to the trial evidence. Nonetheless, Defendants' post-trial submissions ignore entire claims and predicate acts, such as:

- Money laundering;

- Obstruction of justice;

- Witness tampering;

- Travel Act/FCPA; and

- New York Judiciary Law section 487.

On each of these subjects, Defendants have nothing at all to say.

In view of this unrebutted evidence and the ample documentation supporting all of Chevron's claims against them, Defendants' feigned ignorance of Chevron's case is an effective admission that they lack any viable defenses on the merits. Defendants all but concede that the evidence they adduced at trial does not bolster their position and, in fact, supports Chevron's. Defendants never even attempted to supply the "context" that they have claimed for years would supposedly cast a different light on the incriminating evidence against them. On the contrary, Defendants were so invested in the corrupt Ecuadorian "context" that, as Donziger admitted at

trial, even though Guerra solicited a bribe from Donziger and the LAP team, Defendants never-theless later approached Guerra about serving as an expert witness in the Count 9 proceedings. PX 4800 (Guerra) ¶ 55; Tr. (Donziger) 2601–02; PX 2406R at 18; PX 2407R at 18.  And the few pieces of evidence that Defendants did choose to address further prove how little they have to say on any of the relevant issues.  For instance, their lead argument is the unsupportable assertion that Chevron's decision to pursue equitable relief somehow deprives the Court of "jurisdiction" or Chevron of "RICO standing."  Presumably, this is intended to set up a later argument to different courts that any judgment in this Court is "void," but this is nonsense, as the Court's prior rulings have made clear.  Defendants' briefs evade the substance of Chevron's claims and focus instead on irrelevant technicalities and legal arguments that this Court has already rejected.

Trying to change the subject from what Chevron pleaded and proved, Donziger spins a lengthy narrative about Chevron's supposed misconduct in Ecuador.  But his purported "facts" consist almost entirely of unsupported assertions, inadmissible proffers, and mischaracterizations of the record.  Donziger's brief is so bereft of evidentiary support that the Court should strike nearly the entirety of its first 21 pages.  Likewise, the LAPs again assert that "Chevron presented no evidence at trial to reach the conclusion that Camacho and Piaguaje are 'present'" in New York.  LAPs Br. at 6.  As this Court observed when that same claim was made during closing argument:  "I think perhaps we were at different trials, counselor" (Tr. 2926:13–14).

As for relief, Defendants argue against the straw man of a worldwide anti-suit injunction that Chevron is not seeking.  And the principles of comity to foreign courts do not preclude the victim of a racketeering scheme that violates U.S. laws from obtaining relief preventing the rack-eteers from profiting from their crimes.  *Naranjo* has nothing to say about this, and even Defend-ants' counsel James Tyrrell admitted to the Second Circuit that he would "not have a problem"

4

with "enjoining the person who paid the bribe from benefitting from it." Dkt. 1496-2 at 24–25.

As Chevron made plain in its proposed pre-trial order (Dkt. 1492-1 at 18–19; Dkt. 1492-7), this

is the equitable relief that Chevron seeks—an injunction that would foreclose Defendants, and

those acting in concert with them, from profiting from their misdeeds. This relief is permissible

under any of the standards that Defendants invoke.

Moreover, Defendants' post-trial briefs confirm the game they have been playing with

the Second Circuit, in their serial attempts to have that court intervene in the proceedings in this

Court. After decrying, month after month, the purported affront to international comity suppos-

edly posed by this Court's rulings on Defendants' belated, bad-faith attempts to withdraw their

collateral estoppel defenses, Defendants have now made a complete about-face, invoking the Ec-

uadorian judgment's supposedly dispositive effect at every turn. Having previously told the Se-

cond Circuit that they *never* invoked the preclusive effect of the Ecuadorian judgment and that

this was a figment of this Court's imagination (*see Naranjo v. Chevron Corp.*, No. 13-772-cv,

Dkt. 3-1 at 1–3, 13–16 (2d Cir. Mar. 6, 2013)), Defendants now put the validity of the Ecuadori-

an judgment squarely at issue. Donziger, in particular, spends many pages describing the various

decisions by Ecuadorian courts (Donziger Br. at 23–28), ignoring the evidence that he and his

cohorts wrote the judgment themselves and concealed that fact (*id*. at 48–51). He relies on the

judgment as supposed proof of Chevron's liability for environmental contamination and as a re-

pudiation of Chevron's fraud claims, which he mischaracterizes as having been considered and

rejected by the Ecuadorian courts (*id*. at 23–26), when, in fact, those courts disclaimed "compe-

tence" to address Chevron's proof of fraud, which they acknowledged was before this Court.

PX 430 at 10.

Both sets of Defendants appear to operate under the assumption that they are entitled to

lie, cheat, and steal because they claim to be working for human rights and environmental justice. On that basis, Defendants claim the right to corrupt an Ecuadorian "court" into issuing a document that they secretly ghostwrote themselves, saying they are entitled to billions of dollars. But Defendants are wrong. Their purported ends cannot justify their corrupt means. And they cannot hide behind and purport to rely on an increasingly corrupt and authoritarian Ecuadorian regime and its dependent, biased courts.

In sum, Defendants' post-trial briefs are largely beside the point and barren of substance, exposing the paucity of their defenses.[1] The Court should therefore enter judgment for Chevron and against Defendants.

## ARGUMENT

## I.    Defendants Fail to Address the Substantial Evidence Proving Their Wrongdoing

For years, Defendants have insisted that "context" will show the true meaning of the evidence against them, but they never identify that supposedly exculpatory context, because it does not exist. Defendants' scheme has taken place over a decade on two continents, and the scale of their scheme is matched by the mountain of evidence that their correspondence, financial transfers, and filmmaking has produced.[2] Defendants ignore almost all of this evidence.

### A.  Defendants Have No Explanation for the Appearance of Their Own Unfiled Work Product in the Judgment

Defendants ignore the overwhelming evidence that the author or authors of the Ecuadorian judgment had access to, and used, Defendants' internal and unfiled work product. They do not attempt to explain why portions of internal LAP documents appear verbatim throughout the

---

[1]   To the extent that Defendants attempt to use their January 21 reply brief to try to "cure" their numerous failures to address evidence, issues, and even entire causes of action, Chevron may seek leave to address any such new arguments in a surreply.

[2]   Chevron now provides a comprehensive timeline, which captures all of the significant events and evidence in the full chronological "context," as an aid to the Court as it navigates the sizable evidentiary record here. *See* Ex. E.

Ecuadorian judgment, including:  the Fusion Memo, the LAPs' Draft Alegato, two of the LAPs'

Index Summaries, the Fajardo Trust email, the unfiled Clapp Report, the Selva Viva Data Com-

pilation, and the Moodie Memo.  *See* Chevron Br. at 86–92.  While Defendants have, in the past,

offered "explanations" for how some of these documents might have ended up in the Ecuadorian

judgment,[3] Defendants abandoned those explanations at trial and in their post-trial briefs because

they are neither credible nor supported by evidence.

### B.  Zambrano's Testimony Confirmed That He Did Not Write the Judgment, as Defendants' Silence Tacitly Concedes

Before trial, Defendants claimed that "the importance of the testimony of Judge Zambra-

no has no equal."  Dkt. 1385 at 4.  In petitioning the court to allow Zambrano to appear as a wit-

ness, Defendants asserted that Zambrano was "the only person on defendants' witness list who

can testify regarding the authorship of the judgment; the only person capable of explaining its

formulation, its content and his understanding of his authority under Ecuadorian law to issue it as

---

[3]  For example, in March 2013, Defendants announced that they had "recently found that exhibits to the Fusion Memo . . . became part of the record after being presented at a judicial inspection."  Dkt. 917 at 2.  They vaguely asserted that "[t]he presence of the exhibits but not the memo raises fact questions about . . . what constitutes the 'record.'"  *Id.*  But the presence of the exhibits in the record was no surprise; the exhibits to the Fusion Memo are identified in the judgment itself, alongside the verbatim text from the Fusion Memo, for which the Defendants still have no explanation.  *See* Dkt. 1006 at 4; PX 400 at 8–9.  And there are no "questions" about "what constitutes the 'record'"—it is a physical thing, a set of bound and numbered books maintained at the Lago Agrio court, as Defend-ants' star witness, former judge Zambrano, testified.  Tr. (Zambrano) 1692:25–1694:25.  Nor is any "question" about "what constitutes the record" even relevant unless Defendants can point to something besides the judgment itself containing their unfiled work product, and colorably argue that this source is incorporated in "the record"—but they have never identified even such a disputed portion of the record.  In any case, Defendants' contemporaneous emails reveal that they deliberately submitted the Fusion Memo exhibits to the Ecuadorian court at the judicial in-spection, without the Fusion Memo itself.  *See* PX 1039 (Donziger email to Sáenz stating "please send me a list of EVERY document you are submitting [to the Ecuadorian court]—every court case, everything, even if it is 50 things"); PX 2486 (Sáenz response to Donziger, which does not list the Fusion memo).

Even less credible was Defendants' accusation that Chevron set up the ghost writing issue "by slipping [the unfiled work product] to the judge."  Dkt. 754-1 (Ex. 3101) at 4.  And Zambrano testified that he only used material that was already included in the record, and if he found that evidence he intended to rely on was not in the record, he would "discard" it.  Tr. (Zambrano) 1692:25–1694:25.  Therefore, even if Chevron had tried to "slip[]" unfiled work product to the judge, Zambrano would have caught it and "discard[ed]" it if he had been the author of the judgment.

Finally, Defendants resorted to unsupported conjecture in arguing that the quality of the scans of the record precluded Defendants or Chevron from properly identifying the relevant portions of the record.  *See* Dkt. 917 at 26.  Defendants have never countered Chevron's claims with citations to portions of the record that could be poor digital images of what Chevron has proven is unfiled work product.

he did." *Id.* But Zambrano's testimony at trial lacked all credibility, and so Defendants have virtually abandoned him in their post-trial briefs.[4]

Zambrano's testimony left Defendants no choice but to cast him aside. He could not answer basic questions about what he agreed was "the most important decision" he ever issued as a judge. *See* Chevron Br. at 100–04. On the witness stand, Zambrano came across as someone who had not even read the judgment, let alone written it. *See id.* at 102–05.[5]

Donziger claims that the evidence that the LAP team bribed Zambrano is "flimsy" and "not substantiated anywhere in the reams of documents the company has obtained through discovery proceedings." Donziger Br. at 30. But this is not true. Donziger ignores substantial corroborating evidence (*e.g.*, the LAP team's documented history of bribing Guerra for favorable ghostwritten orders in the case, the overlapping material proving that the LAP team had an illicit hand in the judgment, and the LAP team's use of code names for Guerra and Zambrano). And his attacks on a select few pieces of evidence are unpersuasive. For instance, Donziger's only response to the bank records showing $1,000 cash withdrawals from a Selva Viva bank account (PX 583 at 51) which were in turn followed by $1,000 cash deposits in Guerra's account, at least two of which were made by a Selva Viva employee (PX 1713; PX 1718; PX 1719; PX 1739; PX 1741) is to speculate—without support—that they were forged. *See* Donziger Br. at 40–41.

The most significant corroboration—the presence of the LAPs' unfiled work product in

---

[4]  Donziger refers to Zambrano's testimony only twice: He concedes that Zambrano "admitted giving Guerra access to his office and letting him prepare draft orders in other cases" (Donziger Br. at 36) and he cites Zambrano's testimony in support of the dubious proposition that Zambrano's $300 payment to Guerra was merely a loan (*id.* at 41). The LAPs do not refer to Zambrano's testimony at all, except to complain that Chevron's cross-examination "batter[ed]" him. LAPs Br. at 3.

[5]  Indeed, Zambrano testified that he had not reviewed the judgment since its issuance, not even to prepare for his deposition or trial testimony. Tr. (Zambrano) 1821:25–1822:12. While Defendants' counsel apparently reviewed other relevant evidence with Zambrano in the week prior to his deposition and trial testimony (*see, e.g.*, Tr. (Zambrano) 1932:2–5 (recording of telephone call from Andres Rivero); Tr. (Zambrano) 1642:19–1643:7 (Zambrano deposit into Guerra's account); Tr. (Zambrano) 1639:1–1640:13 (draft Zambrano orders on Guerra's computer)), the decision that Zambrano not review the judgment is a transparent attempt to manufacture an explanation for his inability to recall any details about the judgment he claimed to have authored.

the judgment—is independent of and predates Guerra's disclosures to Chevron.  Defendants of-

fer only a misguided attempt to compare the volume and precision of this evidence to that detail-

ing the Cabrera fraud.  It is true that the Cabrera evidence is unusually prolific, but this is be-

cause of Defendants' choice to, among other things, hire a film crew to follow them around and

record their actions *in flagrante delicto*.  Such evidence is far more voluminous than is necessary

to prove liability for the Cabrera fraud.  The evidence of Defendants' involvement in ghostwrit-

ing the judgment is necessarily less extensive because the bribery scheme took place *after*

Donziger and other co-conspirators had been compelled to turn over their documents, and De-

fendants refused later requests and orders to produce Ecuadorian documents.[6]  And Defendants'

refusal to produce documents from Ecuador deprived Chevron and the Court of a fuller record of

Defendants' conduct during the critical judgment ghostwriting period.  *See* Dkt. 1529 at 94.  By

seeking to capitalize on their refusal to produce evidence from Ecuador, Defendants' argument

here only reinforces why the sanctions and adverse inferences are appropriate and necessary.

Defendants try to bolster Zambrano by speculating about the contents of the Tarco report,

claiming that it "may have been dispositive of defendants' position that Judge Zambrano is the

sole author of the Judgment" but that it "could not be secured by either side."  LAPs Br. at 17–

18.  But it was Defendants who successfully moved to exclude the only portions of the report

that had been authorized for copying, and, in any event, Defendants' assertion is baseless.  Their

Ecuadorian cohorts reviewed the Tarco report and admitted among themselves that the report did

*not* conclude that the judgment was drafted on one of Zambrano's computers.  PX 8103 at 1.  On

the contrary, they grappled with how to describe the report's description of the edit time for

---

6    Chevron served subpoenas on Donziger on August 9, 2010, after several months of intense litigation over doc-
uments from Stratus, Berlinger, and others, and this Court ordered Donziger to produce documents in response on
October 20, 2010.  *In re Application of Chevron Corp.*, 749 F. Supp. 2d 135 (S.D.N.Y. 2010).  By the time Zambra-
no had resumed his role as presiding judge on October 11, 2010, Donziger and his co-conspirators were on notice
that their emails and other documents were likely to be subject to discovery in the United States.

Providencias.docx (the document containing a text similar to the judgment) as 3,571 hours
(PX 6371 ¶¶ 10, 11, 14), because "Zambrano could not have worked 24 hours a day in the judg-
ment during those 5 months" (PX 8103 at 1).  Indeed, this would not square with Zambrano's
testimony that he turned the computers off at night and on the weekends and that they remained
at his office when he went home.  Chevron Br. at 111–12.  Thus, as Defendants' Ecuadorian
counsel recognized, Zambrano could not have edited the document for 3,571 hours between Oc-
tober 2010 and March 2011, and the information in the Tarco report refutes Defendants' asser-
tions that Zambrano drafted the judgment.

### C. Defendants' Experts, the Lago Agrio Court Orders, and Their Own Conduct Disprove Defendants' Claim That They Did Nothing Wrong with Cabrera

Defendants try to excuse the Cabrera fraud based on the claim that, supposedly, "the
preparation of the Cabrera report *was* proper under Ecuadorian law" (Donziger Br. at 69) and
"Chevron has never been able to show that the report's preparation violates a single Ecuadorian
law or procedural rule" (*id*. at 42).  But the LAPs' own experts conceded that the preparation of
the Cabrera report *was* illegal under Ecuadorian law (Chevron Br. at 67–69), and it violated the
Lago Agrio court's specific orders (*id*. at 56).  After all, that is why Defendants and Cabrera lied
about the ghostwriting in Lago Agrio (*id*. at 62–64), and why Defendants used code words in
their correspondence about Cabrera  (*id*. at 71, 188 n.55) and obstructed justice in United States
courts to prevent that correspondence from being disclosed (*id*. at 70–76).

Defendants now argue without support that Cabrera was nonetheless "independent" be-
cause he was "appointed by the court, which is what that word signifies in Ecuadorian law and
practice" (Donziger Br. at 42) and the term independent "was merely meant to signify that the
experts were free to draw their own conclusions."  LAPs Br. at 29 n.6.  But these new theories
are inconsistent with the Lago Agrio court's orders, with the opinions of Defendants' own Ecua-

10

dorian legal experts, and with Defendants' contemporaneous writings and conduct.[7]  For example, when Chevron alleged in the Lago Agrio litigation that Defendants were working with Cabrera—something Defendants now claim was proper—they responded with outrage, characterizing the allegation as an "infamy."  PX 366 at 2.  These denials confirm that Defendants knew that Cabrera's "independence" meant that they were precluded from secretly working with him as they did.  *See* Chevron Br. at 62–64.  And Cabrera himself denied any relationship with the LAPs in court filings.  *See* PX 2200; PX 281; PX 283; PX 287; PX 292; PX 299 at 7; PX 301; *see also* Chevron Br. at 62.[8]  Cabrera lied to the Lago Agrio court, just as Defendants did, because he, and they, knew that his relationship with the LAPs was illegal and violated court orders.  Indeed, two years after Cabrera filed the report the LAP team had ghostwritten, Prieto warned Donziger that if that fact were disclosed, it would "destroy[]" the LAPs case and their Ecuadorian attorneys "might go to jail."  PX 1279.[9]  Defendants' *post hoc* rationalizations of their claims of Cabrera's "independence" and the "neutrality" of this "Special Master" are unper-

---

[7]  The LAPs cite nothing in support of this assertion.  Donziger cites various materials, including a LAP team press release and his own testimony (most of which was not admitted for the truth of the matters asserted), which do not support this assertion.  The only Ecuadorian lawyer the LAPs offered as a fact witness, Alejandro Ponce, asserted that he knew nothing about the LAP team's contacts with Cabrera, but testified that he believed Cabrera did not even need to be independent and could be completely partial to one party.  Tr. (Ponce) 2226:20–2229:9.  It is telling that Ponce believed he needed to take such an extreme position in order to defend his colleagues.  And when presented with the incriminating evidence of Defendants' ghostwriting of the Cabrera report, even Ponce had to admit that such conduct was "not technical considering that an expert, according to Ecuadorian law, shall give its opinion based on *his* knowledge of the technique, the science, or the act as it is provided on the civil procedure code of Ecuador."  *Id.* at 2229:6–9 (emphasis added).

[8]  And at least some of these filings were authored by Fajardo.  *Compare* PX 944 at 4 (draft Cabrera filing showing "PABLO" as the author), *with* PX 288 (final Cabrera filing submitted six days after Fajardo email); *see also* PX 2183.

[9]  Defendants have previously attempted to explain Prieto's email as expressing concern regarding the illegality of disclosing their Ecuadorian clients' privileged communications, although they do not appear to have renewed that argument at trial.  Nor could they have done so under oath—Donziger admitted during his deposition that Prieto meant that "they all might end up in jail if it came out what Stratus had done for Cabrera."  1/29/2011 Donziger Dep. 3646:12–19; *see also* 1/19/2011 Donziger Dep. 3381:14–20; Dkt. 1151 at 13–14 (finding that the Prieto email "plainly seems to betray consciousness of wrongdoing in Ecuador and a motive to obstruct justice in Colorado [in] order to cover it up" and that Defendants' alternative explanation "is entirely inconsistent with Donziger's prior sworn testimony"); PX 1291.  Furthermore, Stratus was not a client to the Ecuadorian lawyers and their files were located in the United States, so Ecuadorian disclosure laws would not be applicable.  In any event, Defendants did not produce Prieto to offer any alternative explanation.

suasive.

In disbarment proceedings following the seminal case of *Hazel-Atlas Glass Co. v. Hart-ford-Empire Co.*, 322 U.S. 238, 64 S. Ct. 997 (1944), which also involved ghostwriting for an expert, the attorneys made the same arguments as Defendants here:  that they had done nothing wrong because the nominal author "did adopt, 'with slight alteration,' sign and authorize" the article.  *Hatch v. Ooms*, 69 F. Supp. 788, 801–03 (D.D.C. 1947).  The court rejected that *post hoc* rationalization, stating that "[t]he critical point is that it was material in the consideration of such article to know that it had been substantially prepared and published by those interested" in assisting the ghostwriting party.  *Id.* at 801.  The Supreme Court affirmed the lawyers' disbarment.  *Kingsland v. Dorsey*, 338 U.S. 318, 320, 70 S. Ct. 123, 124 (1949).

### D.  Defendants Cannot Rebut Guerra's Testimony and the Corroborating Evidence

At trial, Chevron presented overwhelming evidence that Defendants procured the Lago Agrio judgment against Chevron through corruption, including bribery and fraud.  *See* Chevron Br. at 46–113.  Defendants pretend that Guerra is the only evidence of their judgment ghostwriting, but that is far from true.  Guerra is himself a corroborator of, and is corroborated by, other evidence, which Defendants do not even address.

Defendants' various critiques of Guerra ignore the key fact that it was not Chevron that chose Guerra—it was Defendants themselves who chose to make him a part of their corrupt scheme.  Guerra's account was well corroborated, not just by proof that the LAPs' legal team's unfiled and confidential work product appears in the judgment, but also by:

- Forensic analysis of Guerra's computer, which contained numerous draft orders in Zambrano's cases, including the Chevron case (PX 4100 (Lynch) ¶¶ 34–36);

- Internal LAP team emails referring to Guerra and Zambrano as the "puppet" and "puppeteer" that were all sent after Zambrano began issuing orders in the Chevron case in September 2009 (PX 1746; PX 1751; PX 1753; PX 2545);

- The fact that in May or June 2011—months after Guerra admittedly solicited a bribe from Donziger and the LAP team—Defendants approached Guerra to serve as an expert witness in the Count 9 proceedings.  PX 4800 (Guerra) ¶ 55; Tr. (Donziger) 2601–02; PX 2406R at 18; PX 2407R at 18;

- An email from Guerra to Donziger in which Guerra refers to supporting the LAPs' case against Chevron (PX 1745 ("I will support the matter of Pablo Fajardo so it will come out soon and well."));

- Bank records showing $1,000 deposits into Guerra's account at about the same time withdrawals were made from the Selva Viva account in identical amounts (PX 583 at 51–53; PX 1713; PX 1718; PX 1719);

- Deposit slips showing that two of those $1,000 deposits were made by a Selva Viva employee (PX 1713 at 67–8; PX 1718; PX 1719; PX 1739; PX 1741);

- TAME shipping records reflecting shipments between Guerra and Zambrano (PX 1682);

- Guerra's day planner entries detailing payments and meetings between Guerra and Zambrano (PX 1733; PX 1733A; PX 1734; PX 1734A); and

- A "Memory Aid" document written by the LAPs' legal team that Fajardo gave Guerra to assist him in reviewing the draft ghostwritten judgment (PX 1703).

Even Zambrano ultimately admitted that Guerra drafted orders for him—but only after Defendants' counsel reviewed the corroborating evidence with him—undercutting any modicum of credibility left to his denials that Guerra and the LAPs' legal team were involved in drafting the Lago Agrio judgment.  *See* Chevron Br. at 100–02.

    With no meaningful response to Chevron's evidence of judgment fraud, Donziger distorts the record, makes up evidence that does not exist, engages in speculation, and focuses on irrelevant or minor inconsistencies that in no way discredit Guerra's testimony.

### 1.  Guerra's Testimony Has Remained Consistent in All Material Respects

    Donziger attempts to impeach Guerra's testimony based on alleged inconsistencies between Guerra's early unsworn statements to Chevron representatives and his trial testimony.  But Guerra's testimony has remained consistent in all material respects.  He has always stated that:

13

- He worked as Zambrano's ghostwriter in civil cases (Tr. (Guerra) 910:24–911:20; DX 1363 ¶ 7)—which even Zambrano finally admitted at trial (Tr. (Zambrano) 1630:22–24, 1647:6–9).

- He was Zambrano's ghostwriter of orders in the Chevron case as well, and that he received $1,000 per month from the LAP team to favor them in these orders.  Tr. (Guerra) 910:24–911:8, 931:4–18; DX 1363 ¶¶ 13, 15.

- He worked with Zambrano to attempt to solicit bribes from Chevron, without any success, as Chevron witnesses confirmed, and thus sought bribes from the LAP team, as Donziger has confirmed.  Tr. (Guerra) 914:6–18, 915:19–919:5; DX 1363 ¶¶ 12–13; DX 1750 (Donziger) ¶ 78 ("Mr. Guerra openly asked for a bribe.").

- He normally met with Zambrano, as part of their criminal scheme, either at the Quito airport where they would exchange flash drives, documents, and cash, or else they would ship documents to each other via TAME.  Tr. (Guerra) 967:6–969:4, 969:17–970:8; DX 1363 ¶¶ 8–9, 18.

- The LAP team ghostwrote the judgment, that he reviewed the judgment approximately two weeks before its issuance, at Zambrano's request, and that he made only minor changes to the draft.  Tr. (Guerra) 1008:19–1009:4, 1009:17–24, 1016:22–1017:13; DX 1363 ¶¶ 25–28.

- Fajardo gave him a "Memory Aid" document during his review—indeed he swore to it even before locating the document.  Tr. (Guerra) 1011:8–17, 1011:24–1012:2; DX 1363 ¶ 26.

All of these statements are corroborated by contemporaneous documents.

Donziger seizes on minor inconsistences between Guerra's unsworn statements to Chevron's representatives made more than 18 months ago and his trial testimony.  But Guerra's initial recollections were made prior to refreshing his recollection through review of his calendar entries and other records, and do not undermine the consistency in his subsequent sworn testimony once he had had sufficient opportunity to reflect on the events that had transpired.

Stripped of Donziger's rhetoric, any inconsistent details between Guerra's initial statements and his testimony are inconsequential.  In his initial conversations with Chevron's representatives, Guerra stated that he had received the draft Chevron judgment from Zambrano on a flash drive at the Quito airport—which was their regular practice (PX 4800 (Guerra) ¶¶ 13, 15;

14

Tr. (Guerra) 967:6–969:4)—but he subsequently recalled and testified, repeatedly and consistent-ly, that he and Zambrano had deviated from this method for the Chevron judgment, and that he had reviewed the draft on a computer provided by Fajardo in Zambrano's apartment. *Compare* DX 1360 at 88–89, *with* DX 1363 ¶ 25, PX 4800 (Guerra) ¶¶ 46–47, Tr. (Guerra) 1009:11–16.[10]

Donziger also focuses on the immaterial detail of whether Fajardo emailed or hand-delivered the Memory Aid to Guerra (*see* Donziger Br. at 36–38), but Defendants conceded at trial that Fajardo *did* provide the Memory Aid to Guerra, telling the Court "[w]e have come to learn or we've received information that the reason why the witness actually received the memory aid from Mr. Fajardo is to assist him in preparing" a speech. Tr. (Guerra) 1212:6–12. Guerra denied the connection (*id.* 1144:21–24) and when the Court pressed counsel to identify "any link between the memory aid and any content in [the speech]" (*id.* 1212:21–22), Defendants could not. Indeed, after "a lengthy period going by while counsel for the defendants are search-ing through things and consulting at counsel table" (*id.* 1213:24–1214:2), Donziger's counsel effectively abandoned the argument, telling the Court: "If we can find a connection, we'll show them to you" (*id.* 1214:7–8). Counsel never did.[11]

Donziger also manufactures inconsistencies where none exist. Guerra testified at trial that he maintained phone contact with Zambrano and had meals with him over the weekend that

[10]  Donziger speculates that the infamous *El Universo* bribery case (*Rafael Correa v. El Universo et al.*) is the reason why Guerra initially claimed that he had received the draft Chevron judgment on a flash drive. Donziger Br. at 32. But there is no need to look beyond Guerra's own dealings with Zambrano to identify the source of Guerra's initial misrecollection. Guerra had received on a flash drive a draft appellate judgment for delivery to Zambrano in another major environmental damages case against a different oil company (the OCP case). PX 4800 (Guerra) ¶ 56. With respect to the *El Universo* case—in which a draft of the judgment in favor of President Correa was copied onto the issuing judge's computer via flash drive the day before it issued—that case confirms the political retaliation and judicial corruption in Ecuador and that judicial bribery and ghostwriting schemes similar to those described by Guerra are employed even by political leaders in Ecuador.

[11]  Unlike Defendants' position, Guerra's testimony about the Memory Aid has been consistent in all material respects. He has always stated that Fajardo provided him with the Memory Aid; that Fajardo provided him with it while Guerra was editing the LAP team's draft judgment; and that Guerra did not find the document helpful in edit-ing the draft judgment. DX 1363 ¶ 26; PX 4800 (Guerra) ¶ 49; Tr. (Guerra) 1011:8–1012:18. Moreover, this was Guerra's testimony even when he believed the Memory Aid to have been lost—when he located it, it was consistent with his recollection. DX 1368; PX 1703.

he reviewed the draft judgment in Zambrano's apartment.  Tr. (Guerra) 1137:23–1138:3.

Donziger claims that Guerra changed his story on this point, because, according to Donziger,

Guerra told Chevron's representatives "that he had no contact with Zambrano over the whole

weekend."  Donziger Br. at 32.  But what Guerra had actually said initially was that he did not

"have to consult" with Zambrano to edit the judgment.  (DX 1360 at 95; *see also* Tr. (Guerra)

1139:9–1141:16).  The Court has pointed out that "there is no inconsistency between the two

statements" (Tr. (Guerra) 1141:10–11), yet Donziger continues to misrepresent the record.[12]

Similarly, Donziger also claims, contrary to the evidence, that Guerra "created a new sto-

ry at trial" that Zambrano would share with Guerra a portion of the $500,000 bribe from the LAP

team.  Donziger Br. at 35–36.  But there is nothing "new" about that testimony, which Guerra

made in his November 17, 2012 declaration, his deposition on May 2, 2013, his witness state-

ment dated October 9, 2013, and at trial on October 23, 24, and 25.  DX 1363 ¶ 23; DX 1367 at

99:3–14; PX 4800 (Guerra) ¶¶ 41, 43; Tr. (Guerra) 1001:8–14, 1002:2–7.[13]

## 2.  Defendants Fail to Rebut the Forensic and Documentary Evidence

Donziger ignores significant evidence corroborating Guerra's testimony.  He has no re-

sponse to the evidence of the LAP legal team's unfiled work product that ended up in the judg-

ment, the drafts of 105 Zambrano orders and rulings in non-Chevron cases found on Guerra's

computer, the internal LAP emails, the emails from Guerra to Donziger, the TAME shipping

---

[12] Donziger notes that Fajardo's contact information did not appear in Guerra's email contacts for certain of his email accounts (Donziger Br. at 37), but he ignores that both Donziger's and Zambrano's email addresses are in-cluded in Guerra's email contacts (PX 4100 (Lynch) ¶ 76; PX 1732) and that Guerra's cell phone contained contacts for Fajardo and Zambrano (PX 4100 (Lynch) ¶ 73; PX 1731).  In any event, Defendants do not dispute that they met and communicated with Guerra.  DX 1750 (Donziger) ¶¶ 76–77.

[13] While Guerra did state at the June 25, 2012 meeting with Chevron's representatives that the LAP team had offered to pay him $300,000, he did not include that statement in his November 17, 2012 sworn declaration.  Guerra further explained in his testimony that he came up with such exaggerations to try to enhance his negotiating position. Tr. (Guerra) 1124:24–1125:6; *see also* DX 1367 at 168:11–14 ("I told Chevron several things.  Some of them were true, others were exaggerations.  Sometimes some things were said firmly, others were said lightly . . . .").

records, and Guerra's day planners.  Donziger attempts to explain only three pieces of evidence: $1,000 deposits into Guerra's account by Ximena Centeno, a $300 deposit by Zambrano into Guerra's account, and the drafts of nine Chevron case orders found on Guerra's computer. Donziger Br. at 36, 40–41.  Donziger's arguments lack evidentiary basis and are unpersuasive.

### a.  Centeno Deposit Slips

Unable to rebut hard evidence of not one (as Donziger erroneously claims) but two $1,000 deposits into Guerra's account by Selva Viva employee Ximena Centeno, Donziger suggests that Guerra forged the documents.  Donziger Br. at 40–41.  But this claim is baseless and is contradicted by other evidence.  Guerra is not the only source for the deposit slips.  Chevron's investigators obtained authentic copies of the deposit slips directly from the bank, without Guerra ever touching the documents.  *See* PX 1718; PX 1719; Dkt. 1671 (declaration from Chevron investigator K. Owen).  Since the images of the Centeno deposit slips independently provided to Chevron investigators had been regenerated by the Ecuadorian bank on February 26, 2013 (Dkt. 1671 ¶ 4), many weeks after Guerra had already left Ecuador, Guerra could not have forged the bank deposit slips.

Even if Chevron had obtained the deposit slips only from Guerra, Defendants do not explain how Guerra could have known who Centeno was and what her signature looked like, how Guerra timed the Centeno deposits to coincide with matching withdrawals from the Selva Viva bank account, or how Guerra could have known four years ago he would want to have evidence corroborating payments from Selva Viva, such that he gathered $1,000 in cash and made deposits in his own account under an assumed identity.

### b.  Zambrano's Deposit of $300 into Guerra's Account

Donziger attempts to minimize Zambrano's deposit of $300 into Guerra's account by characterizing it as a "loan" made in June 2011, after the issuance of the Lago Agrio judgment.

Donziger Br. at 41.  But Donziger ignores Guerra's contemporaneous day planner entries reflecting payments from Zambrano on numerous other occasions in 2011 and 2012, while Guerra served as Zambrano's ghostwriter.  *See* Chevron Br. at 101.  And even without this evidence, Zambrano's testimony that the $300 payment was a "loan" for which he never sought repayment and that this was the *only* payment Zambrano ever gave Guerra is not credible.  Zambrano admits that Guerra was ghostwriting orders and rulings for Zambrano during this period, and Zambrano testified that Guerra was "facing a very delicate financial situation" and "great financial need" at the time.  Tr. (Zambrano) 1630:22–1631:3, 1814:8–11.  The suggestion that Guerra acted as Zambrano's ghostwriter for several years for free is not credible.[14]

### c.   Draft Chevron Orders on Guerra's Computer

Zambrano's claim that Guerra drafted orders for him in other civil cases, but not in the Chevron case, his most important civil case, is implausible and belied by the physical evidence recovered from Guerra's computer, including nine draft orders in the Chevron case.

Chevron's expert Spencer Lynch testified that the draft orders were uploaded from an external drive to Guerra's computer on July 23, 2010.  Tr. (Lynch) 580:2–5, 580:21–581:3.  Lynch testified that he "do[es]n't have any information as to where [the draft orders on Guerra's computer] were before the external hard drive" (*id*. 581:2–3), but he was able to determine that the draft orders were uploaded from a hard drive that also contained Guerra's family photos and curriculum vitae (*id*. at 616:13–20).  This suggests, as Lynch testified, that the draft orders and other documents were downloaded from Guerra's computer onto a hard drive before a Windows rein-

---

[14]  The fact that a payment from Zambrano was for only $300, not the $1,000 a month Zambrano agreed to pay Guerra to serve as his ghostwriter, does not undermine Guerra's testimony.  Guerra testified that Zambrano did not pay Guerra $1,000 regularly (as the LAPs did), but instead Zambrano paid "sometimes . . . more or sometimes . . . less."  Tr. (Guerra) 1029:16–19.  This is further corroborated by Guerra's day planner entries, reflecting payments from Zambrano of varying amounts in intervals and varying duration.  PX 1733 at 24, 40, 72; PX 1733A; PX 1734 at 48; PX 1734A.

stallation on Guerra's computer, and those same documents were then uploaded back onto the computer on July 23, 2010, after the reinstallation. *Id*. at 616:21–617:2; PX 4100 (Lynch) ¶ 35.

Donziger ignores this reasonable explanation, however, and offers a dubious, unsupported theory that Guerra copied the files from Zambrano's computer, and then onto his own. Donziger Br. at 36. But neither Zambrano nor Guerra testified about using flash drives to copy files from Zambrano's computer, Zambrano could not recall whether in 2010 he allowed Guerra access to his office while he was not there (Tr. (Zambrano) 1813:22–24), and the ROE's forensic expert, Milton Efrain Jaque Tarco, asserted in his declaration—offered and then withdrawn by the LAPs—that "no external USB units were connected to [Zambrano's old] computer before [2012]." PX 6371 ¶ 15.[15]  Nonetheless, Donziger falsely ascribes this theory to Lynch, misstating his testimony to say "that the metadata from this is consistent with the order being drafted on another computer and then uploaded, all at once, onto Guerra's hard-drive." Donziger Br. at 36. And Donziger makes no sense in claiming that because the orders are not 100% duplicates of the orders as issued by Zambrano, this shows that Guerra copied them from Zambrano's computer. *Id.*  In fact, it shows the opposite: that Zambrano modified the versions he received from Guerra. In Donziger's scenario, Guerra copied the orders from Zambrano's computer, and then edited them for no apparent reason. And, as with the $1,000 deposit slips, Guerra supposedly did all this in 2010, before the judgment issued, before he had reason to think that Zambrano would again preside over the Chevron case, and before he had any contact with Chevron about testifying in this action (which had not yet been filed). Donziger's made up "theory" has no evidentiary support and makes no sense. If anything in this case recalls Rube Goldberg, this is it.

---

[15]  Given that Zambrano's new computer was not manufactured until September 27, 2010 (PX 7097 ¶ 5; PX 4121), any download of draft Chevron orders by Guerra—of which there is absolutely no evidence—would have had to have been from Zambrano's old computer, since the upload to Guerra's computer occurred on July 23, 2010.

**3.  Defendants Fail to Discredit Guerra's Testimony Regarding His 2009
"Honey & Honey" Meeting with Donziger**

Donziger's attack on Guerra's testimony that he met with Donziger in 2009 to discuss the
LAP team's bribery scheme does not withstand scrutiny.  Guerra testified that he initially agreed
with Fajardo to ghostwrite orders in the Chevron case in the LAPs' favor, in exchange for $1,000
per month.  PX 4800 (Guerra) ¶ 23; Tr. (Guerra) 919:23–921:5, 929:19–932:25.  Then Donziger
affirmed the agreement at a meeting at the Honey & Honey restaurant.  PX 4800 (Guerra) ¶ 28;
Tr. (Guerra) 921:6–927:2.  Defendants admit that this testimony, if credited, shows the LAPs'
counsel's "willingness to act corruptly, making it far more likely that they bribed Judge Zambra-
no a year later."  Donziger Br. at 38.  In an effort to impeach this testimony, Donziger posits a
timeline that he asserts shows that any such meeting could have occurred only after November
28, 2009, because Donziger was not in Ecuador between November 14, 2009 and January 5,
2010.  *Id.* at 39.  But Donziger's timeline distorts Guerra's testimony, and that of the Chevron
lawyers with whom Guerra also sought meetings.  It is also inconsistent with the timing of events
in the Lago Agrio case and with Selva Viva and Guerra bank records.



Donziger bases his timeline on the notion that Guerra testified that "he reached a deal
with Fajardo 'a month, a month and a half' after Judge Zambrano was assigned to the Chevron
case on October 21, 2009."  Donziger Br. at 39.  In fact, Guerra testified that he reached his deal

with Fajardo "a month, month and a half" "after Judge Zambrano was *back on the case*."  Tr. (Guerra) 1185:7–11 (emphasis added).  While Zambrano's term did not formally begin until October 21, he began issuing orders in the case on September 4.  PX 2545.  Guerra never refers to October 21 or to Zambrano's formal designation as presiding judge.  And Defendants do not appear to dispute that Guerra was in touch with Chevron attorneys, asserting that he could arrange for a bribe with Zambrano, before October 21.  *See* Donziger Br. at 38–39.

Moreover, Guerra also testified that his meeting with Fajardo occurred "between September, October, or November of 2009" (Tr. (Guerra) 919:9–11), testimony that Donziger ignores.  Thus, the initial agreement with Fajardo likely occurred in October (the middle of Guerra's range and four to six weeks after September 4), not after November 28, as Donziger claims.  *See* Donziger Br. at 39.  Guerra further testified that his subsequent meeting with Donziger at the Honey & Honey restaurant took place "a week or two" after he reached the deal with Fajardo (Tr. (Guerra) 921:25–922:2), which is consistent with either Donziger's October 6–9 or his November 10–14 trip to Ecuador.  PX 1509 at 3.

Similarly, Donziger's timeline relies on distortions of Ecuadorian attorneys Alberto Racines's and Adolfo Callejas's declarations.  Racines stated that by mid-October 2009 he had definitively rejected Guerra's overtures, which began in July or August 2009, when he told Guerra not to contact him further on the matter.  DX 1355 ¶¶ 2–6.[16]  Callejas also described the same events occurring "in early October 2009," and further described a rejected approach from Judge Zambrano, through his former clerk and current companion Liliana Suarez, on October 8, 2009.  DX 99 ¶¶ 3–4.  The timing of these rejections from Chevron is consistent with the evidence that the meeting between Guerra and Fajardo occurred in October 2009.  The fact that Racines and

---

[16] Racines's timeline is substantially consistent with Guerra's, who testified that he approached Chevron sometime in or shortly after August 2009 (PX 4800 (Guerra) ¶¶ 21–22).

Callejas recall that "one or two months" after the October rejection by Chevron, Guerra and Racines had a chance encounter at an Argentinian restaurant—during which Guerra stated that he could "fix" the judgment in Chevron's favor—does not mean that Guerra and Zambrano had not already negotiated their deals with Fajardo prior to the chance encounter at the restaurant. DX 99 ¶ 6; DX 1355 ¶ 6.[17]  It would not have been unusual for Guerra and Zambrano to continue to seek a bribe from Chevron even after negotiating their deal with the LAP team.  Indeed, that is precisely what happened at the beginning of Zambrano's second term, when Zambrano and Guerra again approached Chevron, despite their prior deal with the LAP team.  PX 4800 (Guerra) ¶ 36.[18]

In addition, an October 2009 agreement between Guerra and Fajardo is consistent with contemporaneous bank records showing $1,000 deposits in Guerra's account on October 29, 2009, and November 27, 2009, at around the same time of $1,000 withdrawals from the Selva Viva account.  PX 1713 at 10–11; PX 583 at 51.  These Selva Viva withdrawals occurred within a day or two of internal LAP emails referencing payments to the "puppet" and "puppeteer." PX 1751; PX 1746.  Donziger offers no alternative explanation for these transactions.[19]

---

[17]  Guerra's recollection as to the exact timing of seeing Racines at the Argentinian restaurant is less precise than the recollection of Chevron's Ecuadorian counsel.  Guerra testified that his first meeting with Racines occurred at an Argentinian restaurant (Tr. (Guerra) 916:14–19, 1178:3–1179:16).  That testimony is inconsistent with Racines's and Callejas's declarations, which describe earlier meetings with Guerra followed by a chance encounter at the Argentinian restaurant.  DX 99 ¶ 6; DX 1355 ¶ 6.  Chevron did not educate Guerra about the evidence and testimony of other witnesses, and never showed Guerra the prior declarations of Chevron's Ecuadorian counsel.  Tr. (Guerra) 1177:10–12.  In any event, whether Guerra's meeting at the restaurant was the first meeting with Racines or a subsequent chance encounter is inconsequential.

[18]  In touting the accuracy of the declarations filed by Callejas and Racines, Donziger necessarily concedes that Liliana Suarez contacted Chevron at Zambrano's request to seek a bribe from Chevron—a fact about which Zambrano lied (Tr. (Zambrano) 1751:20–24)—and that Guerra was soliciting bribes in the Chevron case at the same time Zambrano was presiding over the Chevron case and when Guerra was serving as Zambrano's ghostwriter.

[19]  Also frivolous is Donziger's claim that the 2009 Honey & Honey restaurant meeting must not have occurred since "there were no entries [in Guerra's day planners] showing any meeting between Guerra and Donziger, Fajardo, or anyone on the plaintiffs' team."  Donziger Br. at 40.  Donziger forgets that Guerra testified that he could not locate day planners for 2009 and 2010 so he only was able to produce them for parts of 2011 and 2012.  Tr. (Guerra) 1025:1–17.

**4.   Defendants' Post Hoc Reliance on a Few Vague Fajardo Emails Is Misplaced, as They Are Inadmissible Hearsay, No Answer to Chevron's Ghostwriting Evidence, and Consistent With Guerra's Testimony**

In a recent submission to the international BIT tribunal hearing Chevron's petition against the Republic of Ecuador, the ROE argued that a few Fajardo emails from late December 2010 and early January 2011 suggested Defendants did not conspire with the Ecuadorian court to fix the judgment against Chevron.  Defendants made no such argument at trial or in their initial post-trial brief here.  Nor could they have done so, because these vague emails are inadmissible hearsay to which Chevron objected at trial.  *See* Chevron's Objections to Defendants' Exhibits (provided to Court per Dkt. 1771); DX 897, DX 899, DX 900.  Indeed, Defendants elicited no testimony on this topic at trial.  Thus, the Court should not consider these emails at all.  Even if considered, however, these emails in no way undermine the wall of ghostwriting evidence, most of which Defendants have just ignored.  They show only that the LAP team was in a hurry to submit their final trial briefs, which they had to do before a judgment could properly issue, and that they were most likely keeping some on their own team in the dark about their scheme to ghostwrite the judgment—just as they had lied to them about their ghostwriting of the Cabrera report.

The first email, sent by Fajardo on December 16, 2010 to lawyers at Patton Boggs and Emery Celli, to Donziger, and to others, conveyed Fajardo's concern that they had not completed their alegato (their final written closing argument) because "we can presume that at any moment, any day, the Judge may request the case filed in order to render judgment . . . ."  DX 897.  Indeed, Fajardo was prescient—Zambrano issued that order, the "autos para sentencia," the next day.  PX 2557.  The second email, sent by Fajardo on December 31, 2010, to Eric Westenberger of Patton Boggs, Donziger, and Sáenz, suggests a schedule for filing remaining parts of the alegato and urges filing them quickly because "[n]obody knows when the Judge may issue the

judgment; he may do it in two weeks, several months, or even years." DX 899. The third email, which Fajardo sent on January 8, 2011 to Patton Boggs attorneys, Donziger, and a wider group than usual in Ecuador, informs them that Chevron has filed its alegato and summarizes Chevron's arguments. In this email chain, Fajardo urges the LAP team to "speed up our work" because "Chevron has gotten ahead of us by filing their alegato" and "[t]he one who strikes first has greater success . . . . It is a mistake on our part to have fallen asleep for so long on the alegato." DX 900.

These vague emails are not inconsistent in any way with Chevron's bribery and ghost-writing evidence, including Guerra's corroborating testimony. In the first place, Fajardo would still have wanted to cover all of his bases, make sure the court record included Defendants' final written closing arguments before issuance of the judgment, and then press the judge to stay on track to issue the judgment in the LAPs' favor. Moreover, even with a bribery scheme in place, it is likely that the bribery/ghostwriting deal was closely held among Fajardo and a few others in the "know," such as Donziger.[20]

Even if these emails could somehow be construed as reflecting any uncertainty on Fajardo's part at the time the emails were written in late December 2010 and early January 2011, their timing would nevertheless be consistent with Guerra's account of when Zambrano consummated his ghostwriting/bribe deal with the LAPs: "In *late January or early February of 2011*, approximately two weeks before the trial court in the Chevron case issued the judgment, Mr. Zambrano gave me a draft of the judgment so that I could revise it. It was through him that I found out that the attorneys for the Plaintiffs had written that judgment and had delivered it to him." PX 4800

---

[20] This was not the first time that Donziger and Fajardo compartmentalized information in order to mislead members of their own team. *See* Chevron Br. at 72–75; PX 2438 (Beltman asking Donziger how he should tell Hinton that she could not give the Clapp report to a reporter, since she was unaware it was an annex to the Cabrera report); PX 1137 (Fajardo telling Donziger he would assign an intern "a research assignment for our legal alegato and the judgment, but without him knowing what he is doing. . . .") (alteration in original).

24

(Guerra) ¶ 47 (emphasis added).  Hence, any *post hoc* relevance Defendants might attempt to put

on these few vague Fajardo emails would be misplaced.

### 5.  Chevron's Payments to Guerra Were Reasonable for Witness Protection and Compensation for Losses

Defendants rely on fabrications and distortions of fact to attack Guerra's credibility based

on Chevron's security payments to him.  Donziger Br. at 6.

Defendants claim that, by April 2012, when Guerra first approached Chevron, he was liv-

ing on only $500 per month and had no savings.  Donziger Br. at 31.  In fact, in or around July

2012, Guerra had been working for a municipality that was paying him on average $1,000 per

month (Tr. (Guerra) 1224:19–22), and it was only after he left that job that he made $500 per

month (Tr. (Guerra) 1225:5–7).  At that time, he also "had some moneys" for investment.  Tr.

(Guerra) 1225:16–18.  In addition, until February 2012, Zambrano paid Guerra approximately

$1,000 per month to be his ghostwriter.  Tr. (Guerra) 1029:14–19; PX 4800 (Guerra) ¶ 11.[21]  In-

deed, Guerra reported income in Ecuador of $42,000 for 2012 (DX 1367 at 53:17–22).  He was

not in the "dire straits" Donziger suggests.  *See* PX 4800 (Guerra) ¶ 64.

Defendants also mischaracterize the nature of Chevron's payments and Guerra's compar-

ative quality of life in the United States.  *See* Donziger Br. at 34.  No payments were ever made

to Guerra "[i]n return for his story," as Donziger claims.  *Id*.  Chevron's representatives made it

abundantly clear to Guerra throughout that Chevron "would not at any time pay [Guerra] in ex-

change for [his] testimony."  PX 4800 (Guerra) ¶ 62; *see also* DX 1360 at 30–32 ("[L]et's be

clear . . . the money we're talking about is for, the money has to be for information . . . [i]t can-

not be for testimony."); DX 1361 at 40 ("[W]e say it again, we don't have . . . the ability to make

any payment for testimony nor for a statement . . . ."); *id*. at 46.  And, in fact, Chevron never paid

---

[21]  While income of $1,000 a month may seem low by U.S. standards, when he was first employed as a judge, Guerra received a salary of $1,500 a month.  DX 1367 at 50:16–20.

Guerra for his testimony or sworn declarations.  Guerra submitted his November 17, 2012 declaration before negotiating his agreement with Chevron, and no "firm discussions with Chevron concerning financial commitments or steps Chevron would take to protect [him] and [his] family" had occurred prior to the signing of Guerra's declaration.  PX 4800 (Guerra) ¶ 62.  Indeed, Guerra decided to move to the United States with his wife, son, daughter-in-law, and grandchild only in January 2013, well after he signed his declaration, due to his "well-founded fears of persecution, torture, and/or assassination" as a result of his testimony becoming public.  *Id.* ¶ 64.

Moreover, contrary to Donziger's suggestion, Guerra does not have a higher standard of living in the United States.  In Ecuador, Guerra lived "very comfortably," in a large, "nearly 5,400 square foot" home with a guest house in an affluent community in Quito, surrounded by his family and friends.  PX 4800 (Guerra) ¶ 64.  But in the United States, Guerra lives in a small two-bedroom apartment where he does not speak the language and cannot practice his profession.  *Id.*  Guerra has been publicly attacked and branded a traitor in Ecuador, and the LAPs' team has filed a fabricated criminal complaint against him.  *Id.* ¶¶ 63–64.  Guerra and his family have applied for political asylum due to "[t]he risk that [he] and [his] family would run in Ecuador, would face in Ecuador in case [they] were to return."  Tr. (Guerra) 1233:5–19, 1233:22–24.

Donziger attempts to use Chevron's security payments to Guerra—necessitated in part by the conduct of Donziger's own co-conspirators—to smear Guerra and Chevron, calling them "bribes," and citing an inadmissible hearsay declaration of a law professor whom they never called to testify at trial, and who they appear not to have informed of the facts of this case.  The generalized proposition that any payments to witnesses are an ethical violation is incorrect, and it does not support Donziger's assertions.  *See* Donziger Br. at 6 n.10.  Before entering into its agreements with Guerra, Chevron consulted separate ethics counsel (*see* Dkt. 1650; Dkt. 1474 at

28–30), and the terms of its contract with Guerra expressly state that payments are *not* contingent on testimony.  PX 1671 ¶ 4.  Chevron disclosed all of this in full (in contrast to Defendants' refusals to produce their own records of dealings with Zambrano[22]), and it has been extensively briefed before this Court, which found Defendants' allegations "frivolous."  Dkt. 1650.

In short, there is nothing unusual or improper about providing witnesses with protection from intimidation and threats, or compensating witnesses for cooperating.  This Court as the trier of fact is entitled to assess Guerra's credibility in light of all the evidence—which includes the substantial hard evidence corroborating Guerra's account in all material respects.

### E.  The *Crude* Clips of Donziger Explaining His Corruption Are Not Taken "Out of Context"

Defendants try to minimize Donziger's admissions of corruption captured on film by claiming the clips have been "taken out of context to suggest that when Mr. Donziger complained about his *fears* of corruption he was actually hatching a plot to *engage* in corruption." Donziger Br. at 5.  But in the seven-week trial, Defendants did not submit *any Crude* clips into evidence and have not identified even a single clip whose meaning is altered by "context."[23]

With nothing to say on the merits, Donziger falls back on generalized rhetoric that tries to duck the *fact* of the evidence contained in the clips, and its actual content, by trying to spin the outlandishness of his conduct and his foolishness in having arranged to capture it on film as some sort of denial that it could have happened:  "Even on its own terms, this theory was implausible:  A human-rights lawyer lets a documentary film crew follow him around for three

---

[22] Evidence indicates that Defendants' former counsel at Smyser Kaplan met with Fajardo and Zambrano in Ecuador (PX 2508; PX 2509), Fajardo obtained Zambrano's visa for him (PX 6407), and some combination of Defendants' counsel and Donziger's co-conspirators at Patton Boggs paid for Zambrano's trip to the United States (Tr. 1728:10–1729:1).

[23] The parties reached agreement as to all of the footage that Chevron submitted into evidence from *Crude* during its case. Dkt. 1635.  At trial, Defendants' only example of a statement they claimed could be salvaged by "context" was Donziger's statement that "If you repeat a lie a thousand times, it becomes the truth."  Tr. (Donziger Closing) 2907:16–2909:17.  But that was not even a *Crude* clip at all; it was an email that literally had no context.  PX 1059. As the Court noted at trial, there is nothing misleading about Chevron's use of the email quotation.  Tr. 2909:15–17.

years, camera rolling constantly, to document his scheme to bribe judges?"  Donziger Br. at 5.
Whether Donziger's decision to permit the *Crude* team access to his conduct and his private
musings was a wise one is not the issue—he did do so, regardless of the rhetorical questions
posed by his lawyers now.[24]

### F. Defendants' False Assertions That Chevron's Claims Have Shifted or Were Insufficiently Alleged Three Years Ago Cannot Justify Defendants' Failure to Address the Evidence

Since Chevron filed its complaint in February 2011, its case against Defendants has remained consistent.  As Defendants continued to pursue their fraudulent scheme, Chevron amassed evidence, and witnesses such as Guerra, Reyes, Bogart, Kohn, Russell, and representatives of Stratus came forward.  Some new facts emerged, and some facts were filled in.  But contrary to Defendants' contentions, Chevron's core claims of RICO, RICO conspiracy, fraud, civil conspiracy, and New York Judiciary Law section 487 have not changed.

Defendants' claim that they cannot respond to Chevron's proof because Chevron's allegations have "shifted" over time is an obvious attempt to sandbag Chevron by avoiding addressing the evidence until after initial post-trial briefs have been filed, and to prevent Chevron from responding to Defendants' arguments.  Through the regular process of litigation, Defendants have been provided with ample notice of Chevron's claims.  *See, e.g.*, Dkt. 1830 at 2 ("[T]he suggestion that the defendants will not know what the case against them is—and, more particularly, what portions of the Ecuadorian record they wish to rely upon—cannot reasonably be credited.").  Chevron was not required "to make full disclosure [before trial] of the evidence which it

---

[24] Donziger permitted a camera crew to film him because he had control over what the crew filmed and the editing of the final version.  *See, e.g.*, PX 43A at 10 (Donziger instructing filmmakers to stop filming because "I got to make a point to these guys, but I can't get this on camera"); PX 46A at 3 (Donziger instructing filmmakers that a clip was "off the record"); PX 2454 at 2 (Fajardo working with Berlinger to remove a clip showing the LAPs' working relationship with Cabrera's team);  PX 2A (Donziger prepping an interviewee to cry in front of the cameras, calling it "the old Cinema fake-ete");  PX 68 at 2 (*Crude* outtake with Donziger telling Soltani not to worry about appearing to conspire to break the law because "[w]e don't have the power of subpoena in Ecuador").

hope[d] to adduce at trial, or of the legal theories upon which it intend[ed] to rely" (*United States v. Tolub*, 187 F. Supp. 705, 710 (S.D.N.Y. 1960) (citations omitted)), but it did timely disclose its evidence and theories, and Defendants have long had ample notice as to the substance of Chevron's claims.

Defendants also complain about Chevron's clarification, more than a year ago, that it did not intend to relitigate the Lago Agrio litigation in this Court, even though it alleged that Defendants had made a "sham" of that litigation. *See, e.g.*, LAPs Br. at 26. But whatever the contours of Chevron's complaint before January 8, 2013, when the Court entered the relevant order—and Defendants grossly exaggerate the prominence of the allegation of "sham litigation" in Chevron's complaint—that was nine months before trial, and if it had any effect, it reduced the scope of this case, it did not enlarge it.

Regarding the fraud claim, Chevron's 166-page Amended Complaint discussed the LAPs' fraud in detail, and more than sufficed under Rule 9(b)'s pleading standard. Despite a seven-week trial, the LAPs devote five pages of their post-trial brief to attacking Chevron's complaint, rather than attacking the evidence of their fraud. LAPs Br. at 25–29. This argument is waived, and as the Court has observed, would have been "futile" had it been timely made. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 255 n.140 (S.D.N.Y. 2012).[25]

With specific respect to fraud, Chevron identified years ago the underlying facts of its fraud claims, including Defendants' lies to U.S. courts (Dkt. 283 ¶ 360), Russell (*id*. ¶ 102), Calmbacher (*id*. ¶¶ 118–20), and U.S. government officials (*id*. ¶¶ 238–245). While the details of Defendants' fraud upon funders such as Burford were not known when Chevron filed its com-

---

[25]   Moreover, a primary reason that Rule 9(b) requires fraud to be pleaded with particularity is to prevent a party from filing suits "for their nuisance or settlement value and with little hope that they will be successful on the merits" Charles Alan Wright et al., *Federal Practice & Procedure* § 1296 (3d ed. 2013) (footnote omitted). Chevron has supported its claims at trial and has by no means sought a quick "nuisance" value settlement, so there is no reason to reconsider the adequacy of Chevron's pleadings at this late stage.

plaint nearly three years ago, the substance of Chevron's allegations on that front has long been known to Defendants.  Indeed, the LAPs and Patton Boggs filed a 35-page brief moving to strike the declaration of Christopher Bogart in June 2013, and included substantial discussion and interpretation of the underlying facts, and acknowledged that Chevron's fraud theory on that score had been discussed at a court hearing in 2012.  Dkt. 1256.

At trial, Chevron called 24 witnesses live, offered deposition testimony from 21 others, and put more than 3,000 exhibits into evidence.  And Chevron's closing argument PowerPoint presentation detailed Chevron's claims with citations to trial record evidence.  Pages 189–90 of the presentation are titled "The Frauds That Chevron Has Proven Include" and list six different frauds: (1) Burford, (2) Kohn, (3) U.S. courts, (4) Congress, federal and state regulators and shareholders, (5) foreign enforcement courts, and (6) Ecuadorian courts and Ecuadorian authorities.  Ex. A.  In addition, beginning at page 183, Chevron included slides laying out its fraud theory as to the LAPs, with one slide titled "The LAPs Are Liable for Their Agents' Fraud"—which was also a topic raised in Chevron's January 28, 2013 motion for summary judgment.  Dkt. 745 at 33.  Defendants' false assertion that they are unaware of Chevron's fraud theories and supporting evidence is thus inexcusable.

This Court should treat the LAPs' statement that they purport to "reserve the right to challenge Chevron's fraud theories on a more particularized basis on reply should it become more apparent which theories Chevron is actually pursuing" (LAP Br. at 30 n.8) for what it is—impermissible gamesmanship intended to obscure their lack of a viable defense and preclude Chevron from responding from what arguments they are able to cobble together.

II.   **Defendants' Jurisdictional Defenses Fail, as Do Their Merits Arguments Dressed Up as "Jurisdictional" Issues**

    **A.  This Court Has Personal Jurisdiction Over the LAPs**

The LAPs devote nearly half of their post-trial brief to contesting this Court's exercise of personal jurisdiction over them.  *See* LAPs Br. at 4–20.  But the LAPs' arguments ignore both the undisputed evidence and the prior rulings of this Court.  *See* Chevron Br. at 306–12.[26]

        **1.  There Is No Good Cause to Reconsider the Court's Order Striking the LAPs' Personal Jurisdiction Defense**

The LAPs offer no basis for this Court to reconsider its order striking the LAPs' personal jurisdiction defense as a sanction for their continued discovery misconduct.  Dkt. 1529 at 97–98.  Striking the LAPs' personal jurisdiction defense was a fitting sanction, because the documents improperly withheld "go directly to the nature and extent of the activities of Donziger and others in New York on behalf of the LAPs, which would be highly pertinent to the existence of personal jurisdiction over the LAP Representatives."  *Id.* at 61.[27]

Since the imposition of sanctions, the LAPs have sought to employ selected Ecuadorian documents as a sword while withholding the rest under the purported shield of Ecuadorian law, confirming this Court's finding "that their strategy has always been to produce materials when it suits their purposes and is most helpful to their case, notwithstanding Court orders for full production or prejudice to [Chevron]."  Dkt. 1529 at 92.  For example, the LAPs were able to obtain

---

[26]  The LAPs forfeited their personal jurisdiction defense by delaying their Rule 12(b)(1) motion for 17 months, during which they aggressively litigated this case (including filing two Rule 12 motions that did not challenge personal jurisdiction) and imposed substantial burdens on this Court and Chevron.  *See* Dkt. 559 at 18–21; Dkt. 572 at 3 n.12; *see also Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 60 (2d Cir. 1999) ("[A] delay in challenging personal jurisdiction by motion to dismiss may result in waiver, 'even where . . . the defense was asserted in a timely answer.") (internal quotation marks and citations omitted) (alteration in original).  Of note, this Court held that Chevron's activities in the Lago Agrio litigation went far beyond contesting personal jurisdiction, and that Chevron had "failed to show that it is entitled to judgment as a matter of law foreclosing recognition or enforcement of the Judgment on the ground that the Ecuadorian court lacked jurisdiction over its person."  Dkt. 550 at 75.  The LAPs should be held to the same standard here.

[27]  Humberto Piaguaje could not even estimate the amount of paper documents that are kept at Selva Viva, testifying that "[t]here is a roomful . . . .  I don't know because there are so many."  Tr. (H. Piaguaje) 2689:5–8.

the Tarco affidavit (Dkt. 1602-2), had direct contact with him (*see* Dkt. 1602), and moved for permission to call him as a witness (Dkt. 1601), which was granted. They reversed course and chose not to call him, not because they could not "compel" him, but because it became clear that his testimony was irreconcilable with Zambrano's.[28] And, as a general matter, both the LAPs and Donziger have attempted to capitalize on their refusal to produce Ecuadorian documents by claiming that if Chevron's charges were true, then Chevron would have more evidence.[29]

Notwithstanding their continued flouting of the Court's production orders, the LAPs now repeat the same arguments that they made in their motion for reconsideration of that decision (*see* Dkt. 1631), to which Chevron has already responded (*see* Dkt. 1678).[30] The LAPs' newly minted claim that Chevron should have adduced more evidence *at trial* of the LAPs' control over Ecuadorian documents and their refusal to produce them (LAPs Br. at 18–20) fails because

---

[28] *See* Tr. (Lynch) 2814:5–2815:1 ("Q. So am I correct that Mr. Tarco found the providencias.docx, the judg-ment-like document on the old computer, whereas Mr. Zambrano testified he drafted it on the new computer? A. Yes, that's correct."); *see also* Dkt. 973 (motion for leave to submit Zambrano declaration); Dkt. 1385 (motion for leave to offer Zambrano testimony); Dkt. 1642 (motion for leave to offer Calva testimony); PX 7033A; DX 82, 87, 109, 218–46, 1391 (Ecuadorian documents offered at trial by Defendants); DX 1600 (Moncayo); DX 1601 (Ponce); DX 1800 (J. Piaguaje); DX 1900 (H. Piaguaje).

[29] Donziger's counsel made Chevron's purported lack of evidence a theme of her closing argument, asserting that there was "no evidence and no proof and not even any allegations that Mr. Donziger had anything to do with the appellate court's decision, or the appellate court's clarification" (Tr. (Donziger Closing) 2880:18–23), that "there is a giant hole in the evidence" regarding the ghostwriting of the judgment (*id.* 2883:21–2884:2) and attacking Guerra's testimony that the judgment was prepared on a laptop provided by Fajardo because "the verdict was on a laptop that Chevron could now walk into this courtroom and say we can't get access to, that's why we can't find the verdict" (*id.* 2886:3–16). In his brief, Donziger argued that "Chevron elicited no evidence showing that, at the time the statements were made, Mr. Donziger or the other RICO defendants did not have a good-faith belief that Cabrera was independent" (Donziger Br. at 69) and criticized Chevron for supposedly failing to provide "'smoking gun' evidence of bribery" (*id.* at 72). For their part, the LAPs argued that they should not be subject to the jurisdiction of this Court because, "there was no evidence presented at trial that the LAPs would have performed the activities conduct-ed by Donziger and his firm in New York if he had been unavailable" (LAPs Br. at 4), "there was no evidence pre-sented at trial that Camacho or Piaguaje authorized or ratified any of the alleged misconduct" (*id.*), "[n]or were any facts presented at trial that demonstrate purposeful availment" (*id.* at 8), "[t]here was no evidence presented at trial that Camacho and Piaguaje's contacts with Donziger were significant or that they were actively engaged in the *Agu-inda* litigation" (*id.* at 9), "[n]o evidence was presented at trial . . . that there are communications between Donziger in New York and Camacho and Piaguaje in Ecuador, or that they established an ongoing relationship with Donziger" (*id.* at 10), and that there was "no evidence at trial that Camacho and Piaguaje, had knowledge of, con-sented to, or controlled any allegedly fraudulent statements by Donziger" (*id.* at 11). In truth, of course, there was evidence at trial on most of these points, but even if there were not, Defendants cannot use their own discovery ob-struction as a defense.

[30] Chevron incorporates its opposition by reference here.

Chevron did prove (i) the LAPs' control of the documents (*see, e.g.*, PX 559); (ii) the LAPs' refusal to produce the documents (*see, e.g.*, PX 1505; PX 8086); and (iii) the resulting prejudice to Chevron.[31]  Regardless, it was not Chevron's burden to prove these matters again at trial, months after already proving them at an evidentiary hearing and weeks after a detailed sanctions order.

## 2.   The LAPs Ignore the Various Bases for Personal Jurisdiction Over Them

### a.   The LAPs Have Had Direct Contacts With New York for 20 Years, Including the Filing and Intervention in Four Lawsuits in Their Names

Contrary to the LAPs' unsupported assertion (LAPs Br. at 6), Chevron proved that the LAPs are legally "present" in New York for personal jurisdiction purposes on account of their repeated availment of the protections of New York law and courts through litigation against Chevron (*Aguinda*,[32] *Yaiguaje*, and the Donziger and Berlinger § 1782s), the retention of New York counsel (including Donziger, Constantine Cannon, Emery Celli, Motley Rice, and Patton Boggs), and their work with consultants and other contacts here (including H5, Berlinger, and Hinton).  *See* Chevron Br. at 306–09.  These contacts satisfy CPLR Section 301's test for general

---

[31]  For example, Lynch testified that Sáenz's computer and the documents on it would have informed his opinions about the ghostwriting of the Cabrera report and the judgment. Tr. (Lynch) 638:7–9, 638:12–18. And Leonard testified that having access to the Ecuadorian documents would have assisted him in analyzing whether the judgment contained further copying of Defendants' internal work product. Tr. (Leonard) at 667:6–16.

[32]  The LAPs claim that their *Aguinda* contacts are "stale and irrelevant," while at the same time arguing that *Aguinda* is still intricately linked to the Lago Agrio litigation. *See* LAPs Br. at 8, 33–38. *Aguinda* and the Lago Agrio litigation are indeed distinct legal matters, but they concern related issues, making the LAPs' authorities distinguishable. *See Indem. Ins. Co. of N. Am. v. K-Line Am., Inc.*, Nos. 06-cv-0615 (BSJ), 06-cv-2557, 06-cv-2956, 06-cv-2962, 06-cv-3038, 06-cv-3040, 06-cv-3042, 2007 WL 1732435, at *7 (S.D.N.Y. June 14, 2007) (no jurisdiction over an out-of-state party in a negligence action stemming from a train derailment based on an unrelated patent infringement suit the party filed in 1991). The LAPs' other cases are similarly inapposite. *See Banker v. Esperanza Health Sys., Ltd.*, No. 05-cv-4115, 2006 WL 47669, at *3–4 (S.D.N.Y. Jan. 9, 2006) (communications were sporadic and limited to the time of the pending litigation); *Andros Compania Maritima S.A. v. Intertanker Ltd.*, 714 F. Supp. 669, 675–76 (S.D.N.Y. 1989) (involving one defendant, an inactive oil company with no employees, that was merely *involved* in a "mere handful of arbitrations and litigations in New York" stemming from when it had been active); *ICC Primez Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*, 775 F. Supp. 650, 655–56 (S.D.N.Y. 1991) (out-of-state party ceased doing its business via physical presence in the state); *Aaacon Auto Transp., Inc. v. Barnes*, 603 F. Supp. 1347, 1351 (S.D.N.Y. 1985) (same); *Amins v. Life Support Med. Equip. Corp.*, 373 F. Supp. 654, 658 (E.D.N.Y. 1974) (lawyer's services did not have to be rendered in New York as he was a patent attorney).

jurisdiction.  *See ABKCO Indus., Inc. v. Lennon*, 52 A.D.2d 435, 440 (1st Dep't 1976).[33]

The LAPs incorrectly claim that legal activities undertaken here on their behalf are "irrel-evant" under CPLR Section 301.  But multiple courts have found personal jurisdiction where a defendant's contacts with New York consist solely of New York litigation and retention of New York counsel, and the LAPs cite no contrary authority.[34]

### b. The LAPs Have Had Ongoing Contact With New York Through Their New York Agents, Thus Satisfying CPLR 301

The LAPs have not merely retained New York agents; they have been acting in New York through those and other agents for decades, which subjects the LAPs to New York jurisdic-tion.  *See* Chevron Br. at 247–54, 306–13; *Laufer v. Ostrow*, 55 N.Y.2d 305, 308–11 (1982).

The LAPs discuss only one of their agents—Donziger—and claim that there was no evi-dence of either authority or ratification over his misconduct.  *See* LAPs Br. at 4.  But the LAPs gave Donziger broad authority to manage the Lago Agrio litigation and Donziger committed fraud and other misdeeds under the aegis of that authorization.  *See* PX 558.  And the LAPs rati-fied his actions (*see* Chevron Br. at 254–56), which they fail to address, and thus are liable under the "centuries old" rule that "a principal is liable for the acts of its agent within the scope of the agent's authority."  *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 450 (S.D.N.Y. 2009).[35]

---

[33] The LAPs rely on *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 545 (2d Cir. 2007), where the Second Circuit certified a question to the New York Court of Appeals, which concluded in *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501 (2007), that personal jurisdiction was lacking because the foreign defendant's only contacts with New York were incidental to the prosecution of that foreign defendant's claim against the plaintiff in England.  *Id.* at 509.  But that foreign defendant sought to enforce the laws of England, not those of New York itself, as the LAPs have done time and again.  *Id.*  The court in *Ehrenfeld* acknowledged that where an attempt to enforce the laws of a foreign jurisdiction was coupled with more, such contacts could be sufficient.  *Id.* at 510.

[34] *See, e.g.*, *ABKCO Indus., Inc.*, 52 A.D.2d at 440; *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 384 (S.D.N.Y. 2002); *Frummer v. Hilton Hotels Int'l*, 19 N.Y.2d 533, 537–38 (1967); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967); *Zucker v. Baker*, 35 Misc. 2d 841, 845 (Sup. Ct. Queens Cnty. 1962).

[35] Further, the LAPs' claim that they had no "control" over Donziger's actions contradicts their longstanding claims of attorney-client privilege over communications involving Donziger, which necessarily imply that, as Donziger's clients, they retained authority over him.  The LAPs' role as client in the attorney-client relationship

There is also no merit to the LAPs' argument that Donziger was acting contrary to their interests.  *See* LAPs Br. at 10–16.  Donziger's extortionate scheme has always been aligned with, and had the goal of furthering, the LAPs' ultimate fundamental interest of obtaining a payout from Chevron.  *See Benjamin Ctr. v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784–85 (1985) ("To come within the [adverse interest] exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes.").

Moreover, the LAPs ignore their extensive contacts with New York media, investors, state officials, courts, financiers, and other entities through agents besides Donziger, including Fajardo, Yanza, Patton Boggs, H5, and Karen Hinton.  *See* Chevron Br. at 30–38, 307.[36]

### c. The LAPs Have Transacted Business in New York, Thus Satisfying CPLR 302(a)(1)

The LAPs' numerous contractual relationships also subject them to personal jurisdiction in New York pursuant to CPLR 302(a)(1).  *See* Chevron Br. at 309–12.  Contrary to the LAPs' arguments, these agreements facilitated, among other things, Defendants' fraud with respect to New York-based Burford Capital and their obstruction of justice during the Donziger and Berlinger § 1782 actions in New York.  Chevron's claims arise directly from these New York con-

---

gave them the power to control Donziger and their other lawyers.  *See, e.g.*, *Comm'r v. Banks*, 543 U.S. 426, 436, 125 S. Ct. 826, 832 (2005) ("The relationship between client and attorney . . . is a quintessential principal-agent relationship" and "the client retains ultimate dominion and control over the underlying claim").

[36]  The Supreme Court's recent decision in *Daimler AG v. Bauman*, No. 11-965, 2014 WL 113486 (U.S. Jan. 14, 2014)—a case that "concern[ed] the authority of a court in the United States to entertain a claim brought by foreign plaintiffs against a foreign defendant based on events occurring entirely outside the United States"—does not preclude a finding of personal jurisdiction over the LAPs.  *Id.* at *1.  First, the Court did "not pass judgment on invocation of an agency theory in the context of general jurisdiction," and thus did not reach the fundamental basis of Chevron's general jurisdiction argument.  *Id.* at *10.  Second, the Court's holding was premised on the insufficiency of "Daimler's slim contacts with the State" and a concern over endorsing a rule that would allow for general jurisdiction anywhere a corporation's "sales are sizable."  *Id.* at *11–12.  Here, by contrast, the LAPs' contacts with New York through Donziger and their other agents were anything but "slim," and these extensive contacts rendered them, like Donziger, to be "at home in the forum State."  *Id.* at *11.  Third, the Court's discussion of international comity was related squarely to the exercise of general jurisdiction over a corporation with only limited contacts to a state, and has no application here, where general jurisdiction is premised on the LAPs' extensive and long-term contacts with New York through their agents.  *Id.* at *12.  Fourth, and finally, *Bauman* was expressly limited to an analysis of general jurisdiction, and thus cannot have any impact on Chevron's specific jurisdiction arguments.  *Id.* at *10 ("Plaintiffs have never attempted to fit this case into the *specific* jurisdiction category." (emphasis in original)).

tacts.  *See Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000).

Furthermore, the LAPs purposefully availed themselves of the opportunity to do business in New York by hiring a New York attorney.[37]  Like the non-domiciliary defendant in *Fischbarg v. Doucet*, 9 N.Y.3d 375, 377 (2007), who entered into a retention agreement with New York counsel, the LAPs' agreements with Donziger and other New York counsel show that they, through their "'own initiative,'" "projected themselves into our state's legal services market," "to engage in a 'sustained and substantial transaction of business'" in New York.  *Id.* at 382.[38]

### d.   The LAPs Have Committed Torts in New York, Thus Satisfying CPLR 302(a)(2)

In addition, the LAPs have both directly and through the conduct of their agents committed torts in New York in furtherance of the fraudulent and extortionate enterprise.  *See* Chevron Br. at 312–13; Dkt. 559 at 33–34.  While their tortious scheme had international implications, it was headquartered in Donziger's New York office, and it consisted in substantial part of conduct undertaken by him and others in New York.  *See* Chevron Br. at 38–44, 199–209.

### 3.   The Exercise of Jurisdiction Over the LAPs Satisfies Due Process

The LAPs' claim that the Court cannot constitutionally exercise jurisdiction over them because they are "incapable of compelling the production of evidence" from Ecuador (LAPs Br. at 18) is devoid of merit.  The LAPs cite no legal authority for this argument, nor do they offer any evidence that they made any attempts to "compel" evidence or testimony from Ecuador.

---

[37] *See Ehrenfeld*, 489 F.3d at 548–49 (holding that "non-commercial" activity may qualify as transacting business for purposes of CPLR 302(a)(1), including corresponding with counsel in New York).

[38] The LAPs attempt to distinguish *Fischbarg*, 9 N.Y.3d at 380, which affirmed the trial court's exercise of personal jurisdiction over out-of-state defendants, by arguing that Chevron's claim must arise directly from the LAPs' retention of New York counsel.  *See* LAPs Br. at 10.  While *Fischbarg* involved New York attorneys suing a non-domiciliary in fee disputes, the legal principles relating to purposeful activity addressed in those cases are applicable here.  Specifically, *Fischbarg* found that as long as the non-domiciliary's contacts with New York are not "'merely coincidental' occurrences that have a tangential relationship to the present case," the claims "arise[] out of" the contacts.  9 N.Y.3d at 384–85.

This Court has already rejected this factual predicate, finding that the LAPs do have the ability to obtain such evidence.  Dkt. 1529 at 104.  This finding was affirmed at trial when Defendants' witness Moncayo testified that Fajardo *wanted* "to come and testify in New York" (Tr. (Moncayo) 2093:8–10) putting the lie to the LAPs' assertion that Fajardo's deposition "could not be taken" and his "testimony at trial could not be compelled."  LAPs Br. at 18.  And the LAPs' continued insistence that they could not compel evidence is absurd in light of their parade of documents, witnesses, and declarations from Ecuador throughout trial.  *See supra* Section II.A.1.

### B.  Chevron Established Article III Standing and RICO Injury

Notwithstanding their signed stipulation that, among other things, Chevron "incurred millions of dollars in legal fees . . . to obtain discovery regarding activities in the United States relating . . . to the Lago Agrio Plaintiffs' representatives' relationship with Cabrera . . ." (Dkt. 1657 ¶¶ 2–3), Defendants assert that "Chevron has not alleged any actual damages or identified specific monetary losses" (Donziger Br. at 47) and question "what is Chevron's claimed injury[]?" (LAPs Br. at 27).  Donziger's arguments confuse the distinct legal concepts of standing, injury, damages, and relief.  *See* Donziger Br. at 43–52.  They are unavailing in any event, because Chevron has proven it has suffered injury as a result of Defendants' conduct and seeks relief that will limit future harm.  This satisfies the constitutional and statutory requirements for relief.

### 1.  There Is No Such Thing as "RICO Standing"

RICO, like most private causes of action, incorporates an injury requirement.  *See* 18 U.S.C. § 1964(c).  "Because the requirements set forth in § 1964(c), including that a plaintiff's injury be proximately caused by defendants' conduct, are often termed 'RICO standing,' courts sometimes discuss them as jurisdictional requirements, akin to constitutional standing." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 126 (2d Cir. 2003).  But "RICO standing is not jurisdictional, and therefore . . . a court has original jurisdiction over a RICO claim even if plaintiffs lack stand-

ing under the RICO statute." *Id*. at 129[39]; *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006) (addressing "RICO standing" in the context of the RICO injury requirement and citing to *Lerner*, 318 F.3d at 129); *cf. Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 2877 (2010) ("But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question."). Defendants' attempt to elevate the requirements of § 1964(c) to a constitutional question of subject-matter jurisdiction is without any basis.

Donziger's conflation of injury and standing perhaps explains his unpersuasive citation to *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1147 (2013). *See* Donziger Br. at 46. In *Clapper*, the court rejected standing based on plaintiffs' "highly speculative fear" that their communications would be intercepted in the future in violation of the First and Fourth Amendments. 133 S. Ct. at 1148. Deconstructing the "highly attenuated chain of possibilities," the Court identified four independent acts (including a number of decisions and actions by Defendants) before injury would occur. *Id.* Unlike the plaintiff in *Clapper*, there are no decisions or actions that Chevron can take to avoid or prevent the LAPs from pursing enforcement of the fraudulent judgment, and it has already been established that Chevron has suffered injury resulting from Defendants' conduct—in fact, Defendants stipulated to it. *See* Dkt. 1657 ¶¶ 2–3.

## 2. There Is No Dispute About the Facts and Legal Sufficiency of Chevron's Injuries—Indeed, Defendants Stipulated to Many of Them

Chevron has presented uncontroverted evidence that it has and will continue to incur concrete injuries as a result of Defendants' fraudulent scheme. Chevron has spent, and will continue to spend, millions of dollars to fight Defendants' lies and other extortionate acts, including

---

[39] The issue was potentially dispositive in *Lerner* because that case involved supplemental jurisdiction over state law claims. 318 F.3d at 128–30. As in *Lerner*, Defendants cannot defeat this Court's supplemental jurisdiction over Chevron's New York law claims by attacking the merits of Chevron's RICO claim after trial. *See* Donziger Br. at 44 (arguing "this *case* must be dismissed for lack of subject-matter jurisdiction"); *see also Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) (affirming exercise of supplemental jurisdiction because federal claim was dismissed for failure to state a claim, and not for lack of subject matter jurisdiction).

enforcement actions in Ecuador, Argentina, Brazil, and Canada (*see* Chevron Br. at 198, 231–35, 321), and Defendants' embargo of the Chevron logo and other subsidiary trademarks will injure the Chevron brand and result in the loss of millions of dollars of otherwise anticipated license payments (*id.*).  Defendants' conduct "has imposed significant, irretrievable costs in the form of diverted time, attention and focus of Chevron's management team" (PX 5800 (Zygocki) ¶ 20) and "caused harm to Chevron's most precious asset:  its people" (*id.* ¶ 21).  But even if that were not the case, Defendants *stipulated* that Chevron "incurred millions of dollars in legal fees . . . in connection with" the § 1782 proceedings, "to obtain discovery regarding activities in the United States relating, among other things, to the Lago Agrio Plaintiffs' representatives' relationship with Cabrera, including their financial relationship with Cabrera, and their involvement in drafting the Cabrera Report."  Dkt. 1657 ¶¶ 2–3.[40]

Notwithstanding his own stipulation, Donziger asserts that "Chevron has not alleged any actual damages or identified specific monetary losses."  Donziger Br. at 47.  He explains this implausible assertion with a reference to Chevron's dismissed unjust enrichment claim, which he suggests, incorrectly, this Court dismissed because Chevron's claimed loss was premature.  *Id.* at 47–48.  In fact, the Court dismissed that claim because Chevron had not yet shown the LAPs have been enriched, not because Chevron failed to demonstrate injury.  *See* Tr. (Anson) 1997:19–2000:6, 2002:22–2003:16.  From there, Donziger erroneously asserts that "[n]ow that damages are off the table, the same goes for Chevron's RICO claims."  Donziger Br. at 48.  The argument misses the distinction between an injury suffered by a plaintiff—which Chevron has proven (and which Donziger stipulated to)—and damages to compensate for that injury, which Chevron is not seeking.  Title 18 U.S.C. § 1964(c) requires that Chevron show that it has been

---

[40] Donziger even adopts the point in his own post-trial brief, asserting, "Chevron sought to expose what it claimed was fraud in the relationship between the Ecuadorian plaintiffs' legal team, Steven Donziger, and an environmental expert named Richard Cabrera[.]"  Donziger Br. at 22.

"injured in [its] business or property by reason of a violation of section 1962 of this chapter[.]" It has done so.  Neither § 1964(c) nor any other principle of law requires Chevron to seek damages in order to satisfy the statutory requirement of injury.[41]

It is well settled, and Defendants do not dispute, that legal fees incurred as a result of racketeering acts constitute injury under RICO and New York common law fraud.  *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) (holding that "we explicitly ruled in *Bankers Trust* that legal fees may constitute RICO damages when they are proximately caused by a RICO violation"); *Delehanty v. Walzer*, 59 N.Y.S.2d 777, 792 (Sup. Ct. Kings Cnty. 1945) (internal citations omitted) (collecting cases establishing that where a defendant's fraud requires the plaintiff to institute litigation to disprove the fraud or minimize its effects, "the reasonable cost of conducting [the litigation] is part of the damages; any legal work done to protect one's rights against another fraudulent attack is part of the damage suffered therefrom"), *rev'd on other grounds*, 271 A.D. 886 (2d Dep't 1946); *see also Shindler v. Lamb*, 25 Misc. 2d 810, 812 (Sup. Ct. N.Y. Cnty. 1959).  And the Second Circuit has held that attorneys' fees incurred in "overcoming bribe-induced decisions" of another court are recoverable RICO damages.  *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988).[42]

### 3.  Chevron Incurred These Injuries as a Result of Defendants' Conduct

Chevron's expenditure of over $10 million in legal fees in order to obtain evidence in

---

[41]  Donziger's reliance on *First Capital* is misplaced.  *See* Donziger Br. at 47 (citing *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 578 (S.D.N.Y. 2002), *aff'd, First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004)).  That case involved "alleged lost debt," a theory unrelated to Chevron's claim of injury here and one that by its very nature involves no cognizable injury until such time as the debt is proven uncollectable.  *First Capital*, 219 F. Supp. 2d at 579.  The court concluded that it had correctly denied standing in its earlier decision because "plaintiffs' alleged lost debt injury does not provide them with RICO standing because their ongoing collection efforts render the extent of the loss uncertain"; that is, there was no injury until such time as collection efforts failed and the loss from the failed collection could be calculated.  *Id.* at 579–80.  That is inapplicable here, where Chevron has actually incurred the injuries to which Defendants stipulated.

[42]  Donziger specifically challenges Chevron's allegation, but not the actual evidence, that it has suffered reputational harm.  Donziger Br. at 50–51.  But his challenge rests on an inapposite case concerning lost sales, not reputational or other intangible harms.  In any event, Chevron's legal fees more than satisfy 18 U.S.C. § 1964(c).

§ 1782 proceedings and further expenditure of millions of dollars more to fight enforcement actions in Ecuador, Argentina, Brazil, and Canada were the proximate consequence of Defendants' fraudulent scheme, and the additional costs to Chevron in lost management time, damaged goodwill, and other injuries were the direct result—and, indeed, the very objective—of Defendants' misconduct. *See* Chevron Br. at 197–98, 222–24, 227–28, 230, 234–35, 237–38, 240, 242, 244–47. Testimony from Chevron witnesses Zygocki and Reis Veiga also demonstrated this causal link. *See* PX 5800 (Zygocki) ¶¶ 19–23; PX 3000 (Reis Veiga) ¶¶ 38, 132, 135.[43]

Addressing "but for" causation, this Court previously recognized the adequacy of the causal link between Chevron's RICO claims and its alleged damages. Dkt. 468 at 35–36. As demonstrated in Chevron's post-trial brief, those allegations have now been proven.

Donziger's argument that a hypothetical Ecuadorian judgment would have been entered against Chevron, regardless of Defendants' fraud (Donziger Br. at 49), ignores the injuries he stipulated to—expenses incurred to expose fraud, including the ongoing Cabrera fraud even before the judgment issued—and is wholly speculative. Even as to injuries that flowed from the judgment, however, Donziger's reliance on *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010), is misplaced. Eli Lilly's alleged misstatements were found not to have caused injury because "Lilly was not . . . the *only* source of information on which doctors based prescribing decisions"—and the Second Circuit detailed the various other factors that were potential intervening causes of the prescription of the Eli Lilly drug. *Id.* at 135 (emphasis in original).[44]

Here, Defendants' multiple frauds, intimidation of judges, forgery of Calmbacher's re-

---

[43] Chevron need not prove that "all of the money it spent to defend the case in Ecuador and to obtain evidence in the United States for that purpose was spent as a proximate consequence of the alleged RICO violations." Dkt. 471 at 5–6 (citing Dkt. 468 at 19–21 & nn.63–66).

[44] The court specifically found that "[a]n individual patient's diagnosis, past and current medications being taken by the patient, the physician's own experience with prescribing Zyprexa, and the physician's knowledge regarding the side effects of Zyprexa are all considerations that would have been taken into account in addition to the alleged misrepresentations distributed by Lilly." *UFCW Local 1776*, 620 F.3d at 135.

41

ports, bribery of Cabrera and ghostwriting of his reports, bribery of Guerra and Zambrano, and

ghostwriting of the judgment, all undermine Donziger's assertion that a judgment would have

been entered against Chevron regardless of the fraud.  Certainly, Zambrano's testimony does not

support any claim by Donziger that the purported author of the judgment understood or evaluated

any of the evidence developed in the Lago Agrio litigation.  Zambrano was unable to answer

even basic questions about the judgment—corroborating the forensic evidence that he merely

signed his name to a document drafted by plaintiffs, just as did their fake "independent" expert,

Cabrera.  *See supra* Section I.C.  Moreover, Defendants' enforcement scheme is itself expressly

intended to be an extortionate campaign, as described in the Invictus memorandum.  *See* Chev-

ron Br. at 231–35 & n.64.  The costs incurred by Chevron to fight Defendants' abusive multi-

jurisdiction enforcement campaign are not merely a "foreseeable and natural consequence of

[Defendants'] scheme"—they are, in certain respects, the point.  *See Bridge v. Phoenix Bond &

Indem. Co.*, 553 U.S. 639, 658, 128 S. Ct. 2131, 2144 (2008); *see also* Chevron Br. at 169–77.

### 4.   Chevron Will Continue to Be Injured Absent an Injunction

In addition to denying the existence of injuries to which he stipulated, Donziger appears

to be arguing that Chevron cannot obtain an injunction to prevent future injury unless it has al-

ready sustained that injury or can account for it precisely.  Donziger Br. at 45 ("To the extent it

complains of possible future injuries—like the possible future enforcement of the judgment in

another country—Chevron cannot show that those injuries are 'concrete and particularized' and

'actual or imminent' rather than 'conjectural or hypothetical.'").  The law is otherwise.  The Su-

preme Court has long recognized that "'one does not have to await the consummation of threat-

ened injury to obtain preventive relief.'"  *Farmer v. Brennan*, 511 U.S. 825, 845, 114 S. Ct.

1970, 1983 (1994) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S. Ct. 658, 663

(1923)).  Chevron established in detail how the evidence satisfies all the elements required for

injunctive relief.  *See* Chevron Br. at 318–28.

Donziger's authorities do not support his position.  While recovery of "out-of-pocket losses" (*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994)) requires certainty regarding the extent of the loss claimed, this requirement in the damages context does not foreclose the availability of injunctive relief for continued injury from defendants' racketeering and fraudulent acts.  *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) (explaining that *recovery* under RICO "requires a showing of some actual, out-of-pocket financial loss").  Here, continued enforcement efforts will likewise result in continued injury in the form of fees and executive employee time and attention defending these actions, as well as losses in the event of successful enforcement.  *See* Chevron Br. at 234–35.  And if Donziger is permitted to continue his efforts to extort Chevron by the knowing publication of falsehoods, Chevron will be required to expend future legal fees and time and attention to expose and prevent those wrongful acts, while continuing to experience "impacts on its relationships and good standing with U.S. federal and state officials, regulators, business partners, communities in which it operates, customers and the general public, disruptions to business operations, [and] other lasting economic consequences."  PX 5800 (Zygocki) ¶ 19, 23.  Finally, Chevron has established that Defendants should not be permitted to continue to intentionally injure Chevron's reputation and business relationships, and impose other injuries though their ongoing pressure campaign.  *See* Chevron Br. at 324–26.

### 5.  Chevron's Injuries Are Redressible Through the Relief It Seeks

Ignoring the pending enforcement actions against which Chevron continues to defend itself and Defendants' promise to bring "dozens" more such actions around the world (Chevron Br. at 5–6), Donziger now claims that equitable relief would not redress Chevron's future injury (Donziger Br. at 51–52).  In support of this argument, Donziger cites cases where defendants

failed to demonstrate a likelihood of future harm.  Donziger Br. at 51 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S. Ct. 1660, 1667 (1983)).  But the plaintiff in *Lyons*, who had been placed in a chokehold by a Los Angeles police officer during a minor traffic stop, was found to lack standing to seek prospective injunctive relief because the fact that such practices had been used in the past did not translate into a real and immediate threat of future injury to Lyons.  *Id.*; *see also Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).[45]  Chevron, unlike Mr. Lyons, faces the real and immediate threat of continued injury resulting from Defendants' enforcement of the fraudulent judgment, as well as their continued efforts to extort Chevron through, among other things, media and shareholder campaigns built on lies.

### C.  Notions of "Comity" Do Not Deprive the Court of the Ability to Enforce U.S. Law or End Defendants' Ongoing Scheme

Defendants argue that "[p]rinciples of international comity" as discussed in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), preclude this Court from granting relief on Chevron's RICO and fraud claims.  Donziger Br. at 52–55; LAPs Br. at 21–25.  But "comity" does not mean foreign judgment creditors have immunity from violations of U.S. law, and this Court is not powerless to stop Defendants' U.S.-based racketeering and fraud scheme because it happens to involve, in part, corrupt conduct in a foreign court.

### 1.  Defendants' "Comity" Arguments Are Premised on a Fundamental Error Regarding the Scope of Relief that Chevron Is Actually Seeking

Much of Defendants' discussion of *Naranjo* and international comity is misplaced because it posits that Chevron is seeking "a broad worldwide injunction that would stop anyone

---

[45] *Shain*, 356 F.3d at 215, also cited by Defendants, is similarly inapplicable to Chevron's circumstances.  As in *Lyons*, the plaintiff in *Shain* sought injunctive relief for a future unconstitutional strip search and failed to establish "the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search."  *Id.*  Chevron's future encounters with Defendants in foreign courts around the world are to be expected based on Defendants' current activity in Canada, Ecuador, and Brazil, and threats of enforcement actions elsewhere.  Such future encounters will necessarily involve Chevron's efforts to resist enforcement of the fraudulent judgment.

from attempting to enforce the Ecuadorian judgment—in any court, anywhere."  Donziger Br. at 52; *see also id.* at 43, 54; LAPs Br. at 2, 39–40.  But this is a straw man, because, consistent with Chevron's proposed pre-trial order (Dkt. 1492-7), Chevron expressly does not seek any such "worldwide anti-enforcement injunction."  *See* Chevron Br. at 340–41 ("This [Proposed] Order does not enjoin or otherwise prohibit:  (a) filing or prosecuting any action for recognition or enforcement of the 2011 Judgment . . . in courts outside the United States . . . ."), 348–49 (same).

Thus, even if it were accurate to say that a worldwide anti-enforcement injunction "would raise concerns about international comity"—and it is not, given the facts Chevron proved at trial—that is beside the point given that the actual relief Chevron seeks in this action expressly would *not* "force other nations to follow U.S. law on enforceability" or preclude foreign courts from deciding "whether the judgment should be enforced."  Donziger Br. at 52, 54.[46]

## 2. *Naranjo* Does Not Bar Chevron's RICO and Fraud Claims or Preclude This Court From Granting Effective Relief

Reprising their arguments made to the Second Circuit in the 2013 writ proceedings, Defendants rely heavily on the Second Circuit's decision in *Naranjo* to argue that this Court is powerless to end Defendants' scheme.  But *Naranjo* did not create a broad legal rule barring all claims related in any way to the validity of a foreign judgment, and it did not preclude U.S. courts from issuing relief that would restrain a judgment creditor from monetizing a foreign judgment if such relief is appropriate to redress a proven claim.  And it expressly did not address in any way Chevron's RICO and fraud claims.  On the contrary, *Naranjo*'s analysis was limited to "those issues that relate to the severed declaratory judgment claim and the district court's rul-

---

[46] Defendants' claims of uncertainty regarding Chevron's relief are disingenuous.  *See, e.g.,* Donziger Br. at 43 ("The defendants thus had to defend themselves in a six-week bench trial without even knowing what exactly it is that Chevron is seeking."); LAPs Br. at 40 n.10 ("If and when Chevron identifies precisely what it is asking for, the Lago Agrio Plaintiffs will respond.").  The relief Chevron now seeks largely tracks the proposed orders it submitted on August 30, 2013—more than a month before trial.  *Compare* Chevron Br. at 340–41, 348–49, *with* Dkt. 1492-7 at 2–3.  In those pre-trial filings, Chevron made clear that it was seeking to preclude only those enforcement actions brought "in any court in the United States."  Dkt. 1492-7 at 2–3.

ings thereon" (667 F.3d at 238 n.8) and expressly acknowledged that its comity discussion was unnecessary to its holding (*id.* at 244 ("[T]he injunction collapses before we reach issues of international comity.")).

Furthermore, *Naranjo* tied its discussion of international comity directly to policy concerns specific to New York's Recognition Act.  *See Naranjo*, 667 F.3d at 243 ("Nothing in the language, history, or purposes of the Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them . . . ."); *id.* at 244 ("Nothing in the New York statute, or in any precedent interpreting it, authorizes a court to enjoin parties holding a judgment issued in one foreign country from attempting to enforce that judgment in yet another foreign country.").  Defendants assert that "[t]here is no reason for the policy analysis" to be any different with respect to "a common-law fraud action, a RICO action, or any other vehicle that a creative foreign-judgment debtor might concoct to attack prior proceedings."  LAPs Br. at 23; *accord* Donziger Br. at 56 (asserting "that this action is nothing more than an attempt to have RICO supply the remedy Chevron cannot obtain under the Recognition Act").  But *Naranjo*'s "policy analysis" was in fact an analysis of the New York Legislature's intent in adopting the Recognition Act.  Applying the New York Legislature's intent in adopting one statute to an entirely different statute enacted by the United States Congress makes no sense.  Defendants identify no "policy analysis" that should override Congress's intent in passing RICO to put an end to racketeering, or abrogate New York's longstanding common law prohibition on fraudulent conduct.

If Defendants' expansive reading of *Naranjo* were accurate, it would shut the courthouse doors to victims of domestic extortion and fraud where a foreign judgment is used as a weapon used to carry out the scheme.  Under Defendants' view, the United States' substantial interest in

enforcing its own laws must take a backseat to the purported interests of foreign nations in allowing their courts to serve as vehicles through which defendants can profit from their criminal schemes. *Naranjo* did not endorse this view, and that decision does not limit this Court's ability to issue equitable remedies to prevent Defendants from continuing to violate U.S. law or otherwise profit from their violations of U.S. law. *Cf. Naranjo*, 667 F.3d at 241 (acknowledging that by refusing to recognize foreign judgments procured without due process, New York's Recognition Act "prevent[s] one jurisdiction from using the trappings of sovereignty to engage in a sort of seignorage by which easy judgments are minted and sold to any plaintiff willing to pay for them"). Indeed, even the LAPs' counsel admitted to the Second Circuit that he "would not have a problem" with an order "enjoining the person who paid the bribe from benefitting" from a foreign judgment. Dkt. 1496-2 at 24–25. That is precisely the relief Chevron seeks here.

### 3. Defendants' Other "Policy" Concerns Are Misplaced, and, in Any Event, Cannot Overcome the Mountain of Evidence Proving Their Misconduct Here

Defendants contend that, by providing Chevron with equitable relief on its RICO and fraud claims, the Court would be "invent[ing] a new pathway for foreign litigants to assail foreign courts and their judgments in the United States" (LAPs Br. at 25), and "invit[ing] 'boomerang' lawsuits like this one" that are supposedly "exacerbating an 'ominous trend for corporate accountability and international civil procedure.'" Donziger Br. at 57 (quoting Cortelyou Kenney, Comment, *Disaster in the Amazon: Dodging "Boomerang Suits" in Transnational Human Rights Litigation*, 97 Cal. L. Rev. 857, 861 (2009)).[47] That is nonsense. The Court would not be

---

[47] Defendants' only support for the supposed "trend" of "boomerang" lawsuits is a student comment written by one of their own former legal interns, Cortelyou Kenney. *See* PX 1484 at 3; Kenney, *supra*, at 857 (stating that she is "indebted to . . . Steven Donziger" and "Pablo Fajardo Mendoza" and has "engaged in advocacy work in conjunction with some of the groups discussed herein"). Kenney's comment relies on Defendants' own work product for support, including the Cabrera report (*e.g.*, *id.* at 869 n.57), and Amazon Defense Coalition press releases (*e.g.*, *id.* at 857 n.2). This is not the first time Defendants have attempted to give the false impression that "independent" evidence supports their contentions. *See* Roger Parloff, *Defendants in Chevron Case Cite Their Own Press Release as Authority*, Fortune, Sept. 13, 2013, *available at* http://finance.fortune.cnn.com/2013/09/13/chevron-rico-amazon/;

inventing any "new pathway" or endorsing "boomerang" lawsuits; it would merely be enforcing well-established federal and New York law in light of the mountains of evidence proving that Defendants are conducting an ongoing criminal scheme. Defendants' slippery slope arguments depend on the notion that those pursuing foreign environmental and human rights litigation are— as a general rule—engaged in U.S.-based racketeering and fraud schemes. But whatever their numbers, rigorous enforcement of U.S. law against crime-committing, bogus human rights lawyers like Donziger is sound policy, not an "ominous trend."

Defendants' assertion that comity precludes any inquiry into the validity of the Lago Agrio judgment, or Ecuador's judicial system (Donziger Br. at 3, 52–53; LAPs Br. at 23–25), ignores Defendants' repeated reliance on the supposed preclusive effect of the Lago Agrio judgment on the claims in this action (*see* Chevron Br. at 268–71) and their continued invocation of the judgment in their post-trial briefs (*e.g.*, Donziger Br. at 52–53 (arguing that the Court must "defer to the proceedings in Ecuador"), *id*. at 15, 24 (relying on judgment and appellate orders for the truth of the matters asserted)). As Defendants acknowledge, comity does not preclude a court from assessing the validity of a foreign judgment after a "foreign-judgment creditor asks our courts to give that foreign judgment the same force and effect as one issued by a domestic court." LAPs Br. at 23; *see also Naranjo*, 667 F.3d at 241 (recognizing the propriety of "[c]hallenges to the validity of foreign judgments" where the judgment creditor puts the judgment at issue "'by . . . affirmative defense'" (quoting CPLR 5303)).

In fact, "comity," properly understood, demands an assessment of foreign tribunals. As the Supreme Court explained in *Hilton v. Guyot*, inherent in the comity analysis is determining whether the judgment was the product of "a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and

---

*see also* Chevron Br. at 218–47.

there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting," and whether there was "fraud in procuring the judgment." 159 U.S. 113, 202, 16 S. Ct. 139, 158 (1895); *see also* Donziger Br. at 52 (citing *Hilton*). The other comity cases Defendants cite are consistent with *Hilton*, making clear that "comity" is not a presumption favoring foreign judgments or precluding skepticism thereof—it is an assessment of a foreign judgment's validity and the legitimacy of the judicial system from which it emanates. *See id.* at 52–53.[48]

Finally, Defendants' contention that "our courts appear universally loathe to intervene and 'protect' a litigant from an adverse foreign judgment and/or what is claimed to be a lacking foreign judiciary" (LAPs Br. at 24) is wrong. As previously explained, U.S. courts routinely assess the state of a foreign judiciary whenever a foreign judgment creditor seeks to enforce a foreign judgment or raise it as an affirmative defense. In fact, it is required by the 1962 Uniform Foreign Money-Judgments Recognition Act. *See, e.g.*, CPLR 5304(a).[49] This type of analysis is common in the American legal system in general, as Chevron explained in its post-trial memorandum. *See* Chevron Br. at 274 (collecting cases finding foreign judicial systems inadequate). None of the cases Defendants cite suggests otherwise. *See* LAPs Br. at 53–54.[50]

---

[48] For instance, in *Pravin Banker Associates, Ltd. v. Banco Popular del Peru*, 109 F.3d 850 (2d Cir. 1997) (cited in Donziger Br. at 52–53), the court explained that "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States." *Id.* at 854. Likewise, *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir. 1985) (cited in Donziger Br. at 53), emphasized that "'comity does not achieve the force of an imperative or obligation.'" *Id.* at 457 (quoting *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971)).

[49] The Federal Judicial Center International Litigation Guide specifically advises courts to inquire whether the "judicial system from which the judgment originates does not provide impartial tribunals and due process of law." Ronald Brand, *Recognition and Enforcement of Foreign Judgments*, Fed. Jud. Ctr. Int'l Litig. Guide 13 (April 2012) (citing Restatement (Third) of Foreign Relations Law § 482(1)(a) (1987) (allowing for nonrecognition if "the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law")); *see also* Restatement (Third) of Foreign Relations Law § 482 cmt. b (1987).

[50] In *De Mañez v. Bridgestone Firestone N. Am., Tire, LLC*, 533 F.3d 578 (7th Cir. 2008), the Seventh Circuit rejected the use of a federal court's "inherent power" to sanction a Mexican lawyer for his actions "before the Mexican courts," but the case did not involve any substantive claims or an attempt to obtain recognition of a foreign judgment. *Id.* at 585–88. And *Chesley v. Union Carbide Corp.*, 927 F.2d 60 (2d Cir. 1991), involved a unique attempt to obtain attorneys' fees from a settlement fund "controlled by the Supreme Court of India." *Id.* at 65–68. While *Corporacion Tim, S.A. v. Schumacher*, 418 F. Supp. 2d 529 (S.D.N.Y. 2006), states that "American courts

III.    **Donziger Does Not Challenge the Elements of RICO, and His Attacks Misstate Governing Law and Ignore the Bulk of the Evidence Adduced at Trial**

Donziger does not challenge a single element of 18 U.S.C. § 1962(c), the RICO statute that is the centerpiece of this case.  In the words of the statute, he does not deny that he "conduct[ed] or participate[d], directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).  He challenges only the injury requirement associated with a private cause of action (18 U.S.C. § 1964(c)), and two of the predicate crimes of which he is accused, extortion and mail fraud, but not the pattern element or the numerous other predicate crimes, including obstruction of justice and money laundering.  Nor does Donziger offer any response to Chevron's RICO conspiracy claim.  18 U.S.C. § 1962(d).

The limited arguments Donziger does make are unavailing.  His extraterritoriality argument is predicated on a misreading of the evidence, and posits a purely Ecuadorian scheme, when, in fact, the gravamen of Chevron's case is that Donziger and others, including numerous other U.S. citizens, engaged in a pattern of crimes in the United States as part of a scheme to extort billions of dollars from a U.S. company.  His attempt to shield his conduct behind the First Amendment fails as well, because "there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S. Ct. 2997, 3007 (1974).  Donziger addresses only one other predicate crime, mail fraud, and his attempted rebuttal misstates the law and understates the evidence against him.

A.  **Donziger Does Not Contest the Core Elements of RICO, the Majority of the Predicate Acts Proven by the Evidence, or Chevron's RICO Conspiracy Claim**

Beyond the bare pronouncement that "Chevron has not come close to establishing a case

---

should be wary of branding other nations' judicial forums as deficient in the substance or procedures," the court also recognizes that the assessment of a foreign judicial system is a "requirement" under the "adequate alternative venue" prong of the *forum non conveniens* analysis.  *Id.* at 532.  In fact, the court in another of Defendants' cited cases, *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997), *denied* a *forum non conveniens* motion on the basis of evidence of "widespread corruption in the Bolivian courts."  *Id.* at 1084–87.

under RICO" (Donziger Br. at 68), Donziger does not discuss the actual elements of RICO, or contest the evidence proving that he violated them.  Indeed, he does not cite or discuss 18 U.S.C. § 1962(c) anywhere in his brief.

 **Enterprise.**  The evidence at trial established that Donziger has been the head of a multi-faceted enterprise since at least the mid-2000s, with the purpose of extorting a multi-billion dollar payoff from Chevron.  *See* Chevron Br. at 29–38.  Donziger does not contest this evidence or the existence of an enterprise.  He argues only that if there is an enterprise, it "was in Ecuador and consisted of Ecuadorians."  Donziger Br. at 63.  In fact, the enterprise included U.S. lawyers (Chevron Br. at 31–32), U.S. funders (*id*. at 32–33), and U.S. consultants (*id*. at 34–35), and it targeted a U.S. victim.

 **Operation or Management.**  The evidence at trial established that Donziger was, and remains, the "cabeza" of the enterprise.  *See* Chevron Br. at 38–44; 18 U.S.C. § 1961(4); *Reves v. Ernst & Young*, 507 U.S. 170, 183–84, 113 S. Ct. 1163, 1172 (1993).  Donziger does not address this element at all, and has abandoned his earlier protestations that he was merely a "consultant" to the Ecuadorian lawyers in the Lago Agrio litigation (*see, e.g.*, DX 1750 (Donziger) ¶ 10; Sanctions Hr'g Tr. Apr. 16, 2013 112:1–2), which was an obvious falsehood (*see* Chevron Br. at 42–43), in favor of a new assertion that a voluntary and temporary removal from his formal role as lead U.S. counsel in 2013 somehow immunizes him from liability for ten years of prior racketeering.  Even if either assertion were true and had any material effect, neither addresses the evidence that Donziger operated and managed the broader RICO enterprise, headquartered in New York, that pursued extortion, obstruction, and other crimes in its scheme against Chevron.

 **Pattern.**  The evidence at trial established that Defendants engaged in multiple predicate acts that Donziger does not contest in his brief, including money laundering (Chevron Br. at

158–61; Dkt. 1848-2), obstruction of justice (Chevron Br. at 162–77, 182–84), witness tamper-ing (*id*. at 178–82), and violations of the Travel Act (*id*. at 185–94). And Chevron proved how these crimes constitute a "pattern" under the RICO statute, and how they affected interstate and foreign commerce. *See id*. at 194–199. Donziger challenges only the extortion and mail fraud predicate acts (Donziger Br. at 68–71), and does not otherwise address the pattern element at all.

**RICO Conspiracy.** The evidence at trial established that Donziger "'embraced the ob-jective of the alleged conspiracy,' and agreed to commit two predicate acts in furtherance there-of." *United States v. Viola*, 35 F.3d 37, 43 (2d Cir. 1994), *abrogated on other grounds by Salin-as v. United States*, 522 U.S. 52, 118 S. Ct. 469 (1997) (quoting *United States v. Neapolitan*, 791 F.2d 489, 499 (7th Cir. 1986)); *see* Chevron Br. at 209–10. Donziger offers no response to Chevron's RICO Conspiracy claim.

### B.  Chevron Is Not Seeking an Extraterritorial Application of RICO

As Chevron explained in its post-trial brief, the RICO scheme, "at its heart, . . . is an ex-tortionate campaign of public and private pressure based on lies." Chevron Br. at 4. Donziger and his cohorts lied "to Chevron, to the press, to U.S. courts, to U.S. federal and state regulatory agencies, to foreign authorities, and even to each other, all to further their constant goal:  to try to extort and defraud Chevron out of billions of dollars." *Id.* at 1. Donziger's contention that ap-plying RICO to this scheme would be impermissibly extraterritorial depends on tendentious mis-characterizations of the record amassed at trial and his determination to ignore the domestic heart of the RICO scheme at issue here.

Defendants' domestic conduct by itself makes out the elements of Chevron's RICO claims, constituting a pattern of far more than two predicate acts that proximately caused Chev-

ron harm.[51]  And even if the Court considers events in Ecuador by which Donziger and others used the corrupt Ecuadorian judiciary to obtain court-stamped documents in order to ratchet up the pressure on Chevron in the United States, the pattern of racketeering conduct in which Defendants have engaged as a whole remains domestic.  *See* Chevron Br. at 204–07.  For example, entirely in the United States, Donziger and others lied to Congress, the SEC, and New York's Attorney General and Comptroller about the provenance and probity of the Cabrera report, harming Chevron and forcing it to spend money to defend itself.  *See id.* at 242–45.  Such extortionate conduct premised on mail and wire fraud alone constitutes a RICO violation for which Donziger is liable.

Donziger's response to the record of domestic misconduct is to ignore it.  *See* Donziger Br. at 63–64.  His post-trial brief speaks as if Chevron's RICO claims consist solely of the filing of the Cabrera report and the LAPs' bribing of Judge Zambrano and ghostwriting of the judgment.  *See id.*  Donziger does not address the use to which fraudulent documents like the Cabrera report have been put in the United States as tools of the pressure campaign; he dismisses the fabrication of the Cabrera report by Stratus in Colorado at Donziger's direction as the work of "supporting actors"; he ignores his own supervisory role in both the Cabrera fraud and the corrupt agreement the LAP team reached with Zambrano through Guerra; and he ignores his own lies to U.S. funders to keep the scheme going and the obstruction of justice and misrepresentations in U.S. court proceedings that he orchestrated in order to conceal that scheme.  *See id.*

The situation here is thus far afield from cases like *Cedeño v. Intech Group, Inc.*, 733 F. Supp. 2d 471 (S.D.N.Y. 2010), *aff'd sub nom. Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012), and *Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29 (2d Cir. 2010), on which

---

[51]  Moreover, although not necessary to establish a RICO violation here, the Court should consider Defendants' predicate acts of money laundering and violations of the Travel Act, the governing statutes of which contemplate extraterritorial conduct as part of the violation.

Donziger purports to rely.  In those cases, the plaintiffs had "fail[ed] to allege that the domestic predicate acts proximately caused [their] injuries."  *Cedeño*, 457 F. App'x at 38; *see also Norex Petrol. Ltd. v. Access Indus., Inc.*, 540 F. Supp. 2d 438, 443–44 (S.D.N.Y. 2007).

Donziger's continued emphasis on *Norex*, in particular, shows the emptiness of his extraterritoriality objection.  *Norex* involved an alleged scheme whereby defendants stole the plaintiff's interest in a Russian oil company through corrupt Russian officials and corrupt Russian bankruptcy proceedings.  *See Norex*, 631 F.3d at 31.  The conduct in the United States involved wire transfers, some travel between the United States and Russia, and a single stray extortion attempt, none of which caused the plaintiff's injuries.  *See Norex*, 540 F. Supp. 2d at 444.  These few domestic threads contrast sharply with the domestic pattern of racketeering in the United States in which Donziger and his allies have engaged, which includes:

- efforts to extort Chevron in the U.S. through lies to U.S. audiences and evidence fabricated in the U.S.,

- procurement of funds by defrauding investors in the U.S.,

- concealment of the ongoing scheme through obstruction and witness tampering in U.S. court proceedings, and

- ongoing management from the United States.

*See* Chevron Br. at 202–07.  Indeed, in denying Donziger's motion to dismiss on extraterritoriality grounds, this Court recognized that "[t]he allegations of [Chevron's] amended complaint . . . are entirely different" from *Norex* and that *Norex* "sheds no light on the pivotal question before this Court."  *Donziger*, 871 F. Supp. 2d at 241.

Donziger's attempt to declare his enterprise "foreign" similarly distorts reality.  He describes the enterprise here as "the *Afectados*' search for justice," and argues that "[t]he RICO predicate act of extortion is supposed to have occurred because the *Ecuadorian* plaintiffs in an *Ecuadorian* lawsuit over harms in *Ecuador* offered to settle with Chevron under *Ecuadorian*

law." Donziger Br. at 62.  Again, not so.  Chevron has laid out the purpose, duration, and (large-ly American) membership of the RICO enterprise.  *See* Chevron Br. at 30–44; *Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 940 (N.D. Cal. 2012) (rejecting na-tionality of members and location of racketeering activity and effects in favor of a territoriality test that "examin[es] the alleged 'decisions effectuating the relationships and common interest of [the enterprise's] members, and how those decisions are made'") (quoting *European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957, at *6 (E.D.N.Y. Mar. 8, 2011)).  The enterprise is not an Ecuadorian lawsuit, as Donziger now misleadingly asserts; it is a campaign Donziger has led to extort a multi-billion dollar payoff from Chevron, an American company, by pressuring it in the United States.

Moreover, the evidence at trial demonstrated that Donziger made the critical decisions of the enterprise, such as the selection of Cabrera and the ghostwriting of his report and the pressure campaign based upon it, how he controlled funding of and payments to other members of the en-terprise, and how Donziger stands to profit more than any other enterprise member from any money obtained from Chevron.  *See* Chevron Br. at 38–44.  Donziger's reliance on Humberto Piaguaje's assertion that the Lago Agrio litigation was controlled from Ecuador cannot overcome this evidence.  *See* Donziger Br. at 62 (citing DX 1900 (H. Piaguaje)).  In fact, on cross-examination, Piaguaje admitted that he did not know what role Donziger played in determining the course of the Ecuadorian litigation, did not know that Donziger had traveled to Ecuador at least once a month while the case was pending, and did not know that Donziger paid bonuses to Fajardo and Yanza.  Tr. (H. Piaguaje) 2683:16–24, 2684:10–13, 2706:19–2707:1, 2709:3–8.  In any event, nothing Piaguaje said changes Donziger's New York-based control over the larger extortionate enterprise, and the Ecuadorian lawsuit is but a part of that enterprise's scheme.  *See,*

*e.g.*, *European Cmty.*, 2011 WL 843957, at *6 (focusing on "where the [enterprise's] decision[s] are made").

### C.  Defendants' Use of Their Fake Independent Expert and Other Lies Constituted Extortion, and Donziger's Attempt to Recast Chevron's Claims as Normal Litigation Fails

Defendants' attempts to invoke the protections afforded by the First Amendment and by the common-law litigation privilege (*see* Donziger Br. at 64–66; LAPs Br. at 28) are premised on a distortion of Chevron's claims and the evidence that supports them.  Chevron has already substantially addressed Defendants' arguments in this respect (*see* Chevron Br. at 147–51), and here responds only to the few specific points raised in Defendants' post-trial briefing.

#### 1.  Defendants' Wrongful Conduct Goes Far Beyond Mere "Litigation Activity"

At the pleading stage of this litigation, this Court rejected Donziger's motion to dismiss, explaining:

> Chevron does not allege a scheme that consisted of the allegedly baseless Lago Agrio litigation, either in and of itself or in combination with allegedly false and defamatory statements.  Rather, it alleges that the RICO Defendants are executing a multi-faceted, extortionate scheme that has included not only bringing the Lago Agrio litigation, but also intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron "into paying to stop the campaign against it."

Dkt. 468 at 26–27 (citations omitted).  Donziger now seeks to reprise these same arguments and to characterize his misconduct as mere "litigation" activity.  But the trial confirmed that the Lago Agrio litigation was just a means to generate threats in the form of escalating baseless damage assessments that served as ransom notes for Defendants' extortionate scheme:  from a $6 billion demand (Russell's disavowed "SWAG"); then, $16 billion (the fraudulent Cabrera report); then, $27 billion (the fraudulent Cabrera Supplemental report); then, $113 billion (the fraudulent cleansing expert reports based on Cabrera); and finally, $18 billion (the judgment the LAP team

ghostwrote in exchange for a proffered bribe).  *See* Chevron Br. at 78–79, 188–89, 244.  Accord-ingly, Defendants' arguments that Chevron cannot prove extortion because this was garden-variety "litigation" (Donziger Br. at 70–71) are a mischaracterization of the claims that Chevron has made and proved at trial.  *See, e.g.*, *Calabrese v. CSC Holdings, Inc.*, 283 F. Supp. 2d 797, 809–10 (E.D.N.Y. 2003); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 247 n.3 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.2d 130 (2d Cir. 2003).[52]

## 2. The First Amendment Does Not Protect False Statements, Extortion, or Fraud

Donziger once again attempts to invoke the First Amendment (Donziger Br. at 64–66), but he fails to address the numerous U.S. Supreme Court and lower court decisions explaining that there is no First Amendment protection for fraudulent statements or extortionate conduct. Chevron Br. at 147–51; *see also Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612, 123 S. Ct. 1829, 1836 (2003); *Gertz*, 418 U.S. at 340, 94 S. Ct. at 3007; *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 585 F. Supp. 2d 789, 806 (E.D. Va. 2008); Dkt. 1706 at 2.  Donziger also ignores the case law holding that otherwise protected speech or petitioning activity loses that protection when part of a larger extortionate scheme.  *See Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1265 (9th Cir. 1982); *Monex Deposit Co. v. Gilliam*, No. SACV 09-287-JVS (RNBx), 2010 WL 2349095, at *7 (C.D. Cal. June 1, 2010); *Smithfield Foods*, 585 F. Supp. 2d at 806.

### a. The First Amendment and *Noerr-Pennington* Doctrine Do Not Immunize the Petitioning of Foreign Governments

Despite this clear precedent, Defendants seek to shield their conduct with the *Noerr-*

---

[52] Contrary to Defendants' suggestion (Donziger Br. at 71), in order to establish attempted extortion under the Hobbs Act, Chevron need not show that Defendants lacked a good faith belief in their right to Chevron's property and, in any event, Defendants' fraudulent conduct extinguished any possibility of a lawful claim to such property. *See* Chevron Br. at 145–46.

*Pennington* doctrine and the right to petition the Government.  *See* Donziger Br. at 65.[53]  As this Court has already held, the *Noerr-Pennington* doctrine does not immunize Defendants' activities in "petitioning" the government of Ecuador or other foreign countries.  Dkt. 1706 at 3 (citing *Sexual Minorities Uganda v. Lively*, No. 12 Civ. 30051 (MAP), 2013 WL 4130756, at *21 (D. Mass. Aug. 14, 2013)); *see also PrimeTime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 99 (2d Cir. 2000).

As the District of Massachusetts recognized in *Lively*, a handful of decisions have applied *Noerr-Pennington* to the petitioning of foreign governments, but "those cases rest their conclusions on the scope of the Sherman Act itself and not on the First Amendment petition clause." *Lively*, 2013 WL 4130756, at *21 n.11.  For example, Defendants cite *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358 (5th Cir. 1983), where the Fifth Circuit emphasized that its application of *Noerr-Pennington* doctrine to the petitioning of a foreign government was—unlike here—not premised on "first amendment concerns" but rather on "a limitation on the scope of the Sherman Act."  *Id.* at 1364–65; *see also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 891 (10th Cir. 2000) ("*Coastal States*' grant of immunity to prelitigation threats was not based on the right to petition and, therefore, does not inform our decision in the present non-antitrust case.").

Donziger also cites *Associated Container Transportation (Australia) Ltd. v. United States*, 705 F.2d 53, 61 (2d Cir. 1983), for the proposition that the Second Circuit has declined to decide the question of whether the *Noerr-Pennington* doctrine immunizes the petitioning of foreign governments.  Donziger Br. at 65.  But that case, like *Coastal States*, arose in the antitrust context—not the First Amendment context.  As this Court has held, the application to foreign

---

[53] Chevron already refuted, and this Court rejected, Defendants' attempt to invoke the *Noerr-Pennington* doctrine as to the Ecuadorian criminal prosecutions of Chevron attorneys.  *See* Dkt. 1598; Dkt. 1706 at 3.  Chevron incorporates by reference those arguments and authorities, equally applicable here.

petitioning activity is straightforward when divorced from antitrust considerations: "To whatever extent [the *Noerr-Pennington* doctrine] applies outside the antitrust context, it does not apply where, as here, a party petitions a *foreign* government." Dkt. 1706 at 3 (emphasis in original).

      **b.** **The "Sham" Exception Is Largely Irrelevant Because *Noerr-Pennington* Does Not Immunize Foreign Conduct and, in Any Event, Defendants' Misconduct Satisfies the Exception**

Next, Defendants argue that Chevron cannot satisfy the "sham" exception to *Noerr-Pennington* because the Lago Agrio litigation was not "objectively baseless" and Chevron purportedly disclaimed any attempt to prove the litigation was a "sham." Donziger Br. at 65–66; LAPs Br. at 28.[54] But as just explained and as this Court has held, *Noerr-Pennington* does not protect the petitioning of foreign governments. Dkt. 1706 at 3. *Noerr-Pennington* thus has no application to the Lago Agrio litigation, the LAP team's efforts to procure criminal prosecution of Chevron employees in Ecuador, or other foreign misconduct.

To the extent *Noerr-Pennington* does apply to any of Chevron's allegations, the "sham" exception is not limited to the "objectively baseless" formulation but encompasses misrepresentations made in an adjudicative context, as the Second Circuit has recognized: "*Noerr-Pennington* does not protect abuses of the governmental process. Misrepresentations, for example, may not be condoned in an adjudicatory process." *Associated Container Transp. (Austl.) Ltd.*, 705 F.2d at 59 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 613 (1972)); *see also TPTCC NY, Inc. v. Radiation Therapy Servs., Inc.*, 784 F. Supp. 2d 485, 497 (S.D.N.Y. 2011) (Rakoff, J.). Donziger does not mention—let alone address—this formulation of the "sham" exception.

In any event, Chevron has proven that Defendants' misconduct satisfies the traditional

---

[54] Defendants also rely on *Sosa v. DirectTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), which is inapposite even if it were the law of the Second Circuit, which it is not. There, unlike here, the plaintiffs conceded that the "sham" exception was not met and there were no serious allegations of fraudulent misrepresentations. *See id.* at 940–42.

"sham" exception, because they manufactured false evidence, corrupted the independent expert assessment, and bribed a judge to allow them to ghostwrite a judgment in their own favor, in support of the U.S. enforcement scheme. *See* Chevron Br. at 150–51; *see also CSX Transp., Inc. v. Peirce*, No. 5:05-CV-202, 2013 WL 5375834, at *10 & n.2 (N.D. W. Va. Sept. 25, 2013).

Defendants now claim that Chevron somehow waived the ability to argue that the Lago Agrio case was a "sham." Donziger Br. at 66; LAPs Br. at 28. But Chevron did no such thing. Rather, in clarifying its references to "sham litigation" in the Amended Complaint, Chevron merely stated that it was not seeking to relitigate the environmental conditions in Ecuador (Dkt. 705 at 3–4)—something Defendants previously argued Chevron was not entitled to do. *See Chevron Corp. v. Salazar*, No. 11 Civ. 3718-LAK (S.D.N.Y. July 21, 2011), Dkt. 130. In accepting this clarification, the Court did not preclude Chevron from invoking the "sham" exception to *Noerr-Pennington*. Dkt. 720. Rather, Chevron has proven that the Lago Agrio litigation was a "sham" in that the LAPs' team corrupted the judicial process and, eventually, procured a judgment by fraud. Dkt. 705 at 3–4. No reasonable litigant who realistically expected to prevail "on the merits" of the case would bribe the presiding judge and secretly ghostwrite the report of the court-appointed expert. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S. Ct. 1920, 1928 (1993).

### 3. As Defendants' Cases Recognize, There Is No Bar to Seeking Relief Against an Attorney Who Is a Principal in a Fraudulent Scheme

Donziger argues that "RICO itself does not provide a vehicle for collateral attacks on core litigation activity." Donziger Br. at 66. But Donziger's reference to "core litigation activity" appears to be made from whole cloth; the cases he cites do not discuss "core litigation activity" at all, and it is unclear what he means by that phrase. Nor does the New York litigation privilege shield Defendants' misconduct.

60

Donziger asserts that "Congress could not have intended" to "sweep up" core litigation activity under RICO because doing so "would chill an attorney's efforts and duty to represent his or her client in the course of a pending litigation." Donziger Br. at 66. But the real quotation from the case he cites is: "Congress could not have intended that the mail fraud statute sweep up correspondence between attorneys, *dealing at arm's length on behalf of their parties*, concerning an issue in pending litigation. . . . Subjecting the letters in issue to the mail fraud statute would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation." *Spiegel v. Cont'l Ill. Nat'l Bank*, 609 F. Supp. 1083, 1089 (N.D. Ill. 1985), *aff'd*, 790 F.2d 638 (7th Cir. 1986) (emphasis added). Donziger was not just an attorney dealing at arms' length with the other side on behalf of his clients. And while the court in *Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., No. 97 CIV. 8779 (RPP), 1998 WL 321446, at *5 (S.D.N.Y. June 18, 1998), cited this statement from *Spiegel* in concluding that the ordinary litigation and pre-litigation conduct alleged there did not constitute mail or wire fraud, it did not suggest that misconduct such as bribing judges and rely on fabricated evidence was immunized merely because it is connected to litigation.

In fact, courts to consider the issue have rejected Donziger's argument that an attorney cannot be liable under RICO for conduct related to litigation. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1129–30 (D.C. Cir. 2009) (rejecting as "without merit" the defendant's argument "that mailings sent in furtherance of a separately-proven scheme to defraud somehow fall outside the mail fraud statute's coverage because they are drafted and physically sent by lawyers who themselves have no fraudulent intent" and distinguishing *Spiegel* as standing only for the unremarkable proposition that "ordinary litigation mailings . . . do not themselves constitute a scheme or artifice to defraud" ); *see also Crowe v. Smith*, 848 F. Supp. 1258, 1263–64

61

(W.D. La. 1994) (movants "urge us to find (or forge) a broad shield from RICO for attorney advocacy. We find no such shield in the language of RICO or the case law, and we decline to form one of our own making."); *Blake v. Dierdorff*, 856 F.2d 1365, 1371–72 (9th Cir. 1988); *Odesser v. Cont'l Bank*, 676 F. Supp. 1305, 1311–12 (E.D. Pa. 1987).

Finally, Defendants argue that the New York litigation privilege shields their misconduct. Donziger Br. at 66. New York's litigation privilege protects "statements made in the course of judicial proceedings," but only as to "claims of defamation." *Exclaim Assocs. Ltd. v. Nygate*, No. 600510/05, 2005 WL 3501559, at *6 (Sup. Ct. N.Y. Cnty. Sept. 15, 2005). The litigation privilege applies only to defamation claims. *Mosesson v. Jacob D. Fuchsberg Law Firm*, 257 A.D.2d 381, 382 (1st Dep't 1999) (quoting *Youmans v. Smith*, 153 N.Y. 214, 223 (1897)).[55] The litigation privilege is therefore irrelevant here.

Moreover, the privilege does not apply "where a party has manipulated the legal process[.]" *Mintz & Gold LLP v. Zimmerman*, 17 Misc. 3d 972, 977–78 (Sup. Ct. N.Y. Cnty. 2007). And, as Donziger has argued in this action, "New York's litigation privilege does not immunize misrepresentations made in connection with litigation that is 'a means to the accomplishment of a larger fraudulent scheme.'" Dkt. 581 at 9 (quoting *Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211, 217 (1975) and citing *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1094–95 (S.D.N.Y. 1994)). That is the case here. *See* Dkt. 283.

### D. Donziger Unduly Limits Mail and Wire Fraud, But the Evidence More Than Satisfies the Statute Regardless

#### 1. Donziger Misstates the Substantive Basis for Chevron's Claims

Donziger falsely asserts that "Chevron rests its claims, almost entirely, on the purportedly misleading statements that the defendants made with respect to the preparation of the Cabrera

---

[55] The only case Defendants cite involved a defamation claim. *See* Donziger Br. at 66 (quoting *Bisogno v. Borsa*, 101 A.D.3d 780, 781 (2d Dep't 2012)).

Report and the 'independence' of Cabrera."  Donziger Br. at 68.  Donziger's mail and wire fraud

violations go far beyond the Cabrera scheme.  *See* Chevron Br. at 154–58.

### 2. False Statements Regarding Cabrera's Independence Are Actionable

Proceeding from this erroneous limitation of the evidence against him, Donziger asserts

that Chevron's mail and wire fraud claims fail because "fraud cannot be predicated upon misrep-

resentations of law."  Donziger Br. at 68 (quoting *Hallak v. L3 Commc'ns Corp.*, 490 F. App'x 2,

5–6 (9th Cir. 2012)).[56]  Even as to Cabrera's independence, however, Donziger's statements

about Cabrera's independence were factual, not legal, assertions.

Whether Cabrera was "neutral" and "independent" is a question of fact that is "suscepti-

ble of actual knowledge":  either he reached his opinions through disinterested analysis, or as

Chevron has proved, his opinions were in fact the opinions of the Defendants.  *Hadcock v. Os-

mer*, 153 N.Y. 604, 610 (1897); *see also Church v. Wickwire*, 231 A.D. 249, 255 (1st Dep't

1931).  Cabrera's role in the Lago Agrio litigation was not "independent" or "neutral" by any

definition of those words.  Under similar circumstances, in *In re Moody's Corp. Sec. Litig.*,

plaintiffs alleged that "Moody's falsely claimed that it was an independent body."  599 F. Supp.

2d 493, 507 (S.D.N.Y. 2009).  Defendants countered that the statements at issue were "'declara-

tions of intention' or 'vague pronouncements' constituting 'puffery.'"  *Id.* at 508.  The court re-

jected Defendants' characterization because "Moody's steadfastly maintained independence as a

cornerstone of its business" and listed "specific steps that Moody's was taking to ensure its inde-

---

[56]  The authority Donziger cites, an unpublished Ninth Circuit memorandum disposition, does not support his proposition of law.  Rather, it materially qualifies the language Donziger quotes:  "Misrepresentations of law can result in actionable fraud in only 'four special situations': when 'the party making the misrepresentation (1) purports to have special knowledge; (2) stands in a fiduciary or similar relation of trust and confidence to the recipient; (3) has successfully endeavored to secure the confidence of the recipient; (4) or has some other special reason to expect that the recipient will rely on his opinion.'  *Hallak*, 490 F. App'x at 6 (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004)).  And it is similarly well-established that misrepresentations about foreign law provide the basis for a fraud claim where the individuals and entities to whom the statements were made cannot be deemed to have knowledge of foreign law.  *See infra* Section IV.C.

pendence." *Id.* at 509; *see also Zanani v. Savad*, 217 A.D.2d 696, 696–97 (2d Dep't 1995) (holding that Defendants' statement that "there was no standard approach used by the City of New York to reassess real property after substantial renovations of a building were completed" was not an opinion and could support a claim for fraud).  Similarly, here, Defendants' claims of Cabrera's "independence" were the "cornerstone" of their efforts to obtain funding, evade discovery in the United States, and extort Chevron.  And Defendants backed up their claims with specific (false) details aimed at demonstrating Cabrera's "independence."

For example, Defendants made declarations in the § 1782 proceedings not only that Cabrera was "a Court-appointed neutral," (PX 681# at 29), but also that "Chevron enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera supportive of its position in the litigation" (PX 1325 ¶ 21; *see also* PX 681# at 15–16 ("Chevron . . . enjoyed the same opportunity as Plaintiffs to provide materials to Cabrera")).  The latter false statement of fact could never be confused with a mere opinion.  This was not merely a general statement that Cabrera was "neutral"; it was coupled with specifics to reinforce the false impression that Cabrera was a disinterested third party whose opinions were uninfluenced by his affiliation with either party.[57]

Defendants also imply, without explanation or citation to the record, that their statements were not false in the "context" in which they were made.  *See* LAPs Br. at 29 & n.6.  But Defendants' lies were never presented in context as "representation[s] of opinion."  *Zanani*, 217 A.D.2d at 697.  Defendants never once expressed or implied a disclaimer that "independent" and "neutral" were terms of art that actually meant "appointed by the court," much less that they meant "appointed by the court but actually working hand-in-glove with one party's team behind

---

[57] Chevron has also proven a number of other factual misrepresentations that do not turn on Defendants' specific gloss on "independent."  *See, e.g.*, PX 3100 (Bogart) ¶ 12 (Donziger "specifically assured [Burford] that the contacts that had occurred between the LAPs and Cabrera were both limited and permissible.");  PX 3200 (Russell) ¶ 29 (Donziger led Russell to believe that "the blank signature pages were necessary in case Donziger and his team had to make minor modifications, such as correcting typographical or formatting errors, and then reprint the reports.").

the scenes." To the contrary, the context of the falsehoods only further proves that they were presented as statements of fact.

### 3. Chevron Has Proven the Elements of Mail and Wire Fraud, Including With Respect to Defendants' False Statements About Cabrera

Even if Chevron's mail and wire fraud claims were based only on Defendants' false statements about Cabrera's independence (and they are not), Chevron has presented more than enough evidence to prove that Defendants have engaged in mail and wire fraud and that this conduct has injured Chevron. *See* Chevron Br. at 155–56.

Donziger asserts that Chevron has failed to prove that Defendants' misrepresentations about Cabrera were made "with the requisite scienter," claiming that there was no evidence that Donziger "did not have a good-faith belief that Cabrera was independent within the meaning of Ecuadorian law." Donziger Br. at 69. But Chevron detailed the abundant contemporaneous evidence proving Donziger's consciousness of guilt in its opening brief. *See* Chevron Br. at 70–76.

Donziger next argues that Chevron has not shown that anyone relied on Defendants' misrepresentations about Cabrera's independence (Donziger Br. at 69), but the Supreme Court has held that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge*, 553 U.S. at 661, 128 S. Ct. at 2145. Moreover, even if Chevron were required to show reliance upon Defendants' misrepresentations, Chevron has demonstrated, at the very least, that Kohn and Burford relied on Donziger's representations about Cabrera when funding the litigation, which injured Chevron. *See* Chevron Br. at 219–28.

Donziger claims that the Cabrera fraud is immaterial because the Lago Agrio court did not rely on the Cabrera report (Donziger Br. at 5–6)—for which he cites the ghostwritten judgment itself as evidence (*id*. at 23)—and that Chevron has not demonstrated that it has been

harmed by Defendants' misrepresentations about Cabrera's independence (*id*. at 69). But "[t]he scheme to defraud need not have been successful or complete. Therefore, the victims of the scheme need not have been injured." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994); *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1216 (2d Cir. 1994) (same); *United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999) (same). And Chevron *has* shown that it has been injured by Defendants' misrepresentations regarding Cabrera, for example through Kohn and Burford, who relied on those misrepresentations in providing money for the litigation. *See* Chevron Br. at 219–28. Moreover, the judgment itself clearly relied on Cabrera in multiple respects. Chevron Br. at 76–79; *see also* FF ¶¶ 76–80.

## IV. Defendants' Limited Response to Chevron's Fraud Claim Does Not Rebut the Evidence Against Them

### A. New York Recognizes Fraud Claims Premised on Third-Party Reliance

Defendants offer no new arguments and no new authorities that would warrant reconsideration of this Court's conclusion that New York law recognizes a cause of action for fraud premised on third-party reliance. *See Donziger*, 871 F. Supp. 2d at 256–57. Instead, Defendants once again urge this Court to follow Second Circuit cases on a matter of New York law, despite the subsequent reaffirmance of a line of New York appellate cases recognizing fraud claims based on a third party's reliance. LAPs Br. at 30–33. Defendants ignore the fact that "[t]he ultimate source for state law adjudication in diversity cases is the law as established by the constitution, statutes, or authoritative court decisions of the state." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981); *see also Hittle v. Scripto–Tokai Corp.*, 166 F. Supp. 2d 159, 161–62 (M.D. Pa. 2001). "In making this prediction [as to how the New York Court of Appeals would rule], [the court must] give the 'fullest weight' to pronouncements of the state's highest court, while giving 'proper regard' to relevant rulings of the state's lower courts." *Santalucia v.*

*Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000) (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)).

Defendants fail to cite a single New York Court of Appeals decision rejecting fraud claims based on third-party reliance. *See* Donziger Br. at 67–68; LAPs Br. at 30–33. Instead, they rely on Second Circuit decisions such as *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194 (2d Cir. 1998), which provide no explanation for their conclusions, and are at odds with the New York Court of Appeals' binding pronouncement in *Rice v. Manley*, 66 N.Y. 82 (1876), allowing fraud claims premised on third-party reliance.[58]

Moreover, the Second Circuit's decisions on this topic do not consider *Litvinov v. Hodson*, where New York's Appellate Division recently affirmed the vitality of such claims in New York. 74 A.D.3d 1884, 905 N.Y.S.2d 400 (4th Dep't 2010); *accord Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 764 N.Y.S.2d 462 (2d Dep't 2003); *see also* Dkt. 707 at 9; *West v. A T & T*, 311 U.S. 223, 237, 61 S. Ct. 179, 183 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").[59]  As this

---

[58] Defendants have no better response to *Rice v. Manley* than to label it "ancient" and cite an ambiguous observation from a law review article that the facts of *Rice* "do not fit comfortably into the elements of fraud." LAPs Br. at 32 n.9; *see also* Donziger Br. at 67 (referring to *Rice* as a "late-nineteenth-century" case, but offering no rebuttal to its holding). But far from having been overruled or forgotten, the view of fraud established in *Rice* has been cited and applied extensively by both state and federal courts. *See, e.g., Bencoe Exporting & Importing Co. v. Erie City Iron Works*, 280 F. 690, 692 (2d Cir. 1922) ("when fraud is committed, and damage is thereby occasioned, a cause of action results to him who is damaged"); *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528, 764 N.Y.S.2d 462, 465 (2d Dep't 2003) ("fraud may exist where a false representation is made to a third party, resulting in injury to the plaintiff"); *Cooper v. Weissblatt*, 154 Misc. 522, 524–26, 277 N.Y.S. 709, 713–14 (2d Dep't 1935) ("a false statement as to a material fact, made to induce a person to act and followed by actual damage, will support a cause of action. . . . [I]t is not necessary that the deceit should have been practiced directly upon the plaintiff.").

[59] In *Jacobson v. Fireman's Fund Ins. Co.*, the Second Circuit overruled a prior Second Circuit opinion on an issue of New York state law even though the prior panel's opinion was issued only eight years earlier. 111 F.3d 261, 267 (2d Cir. 1997). The Second Circuit identified several intervening Appellate Division cases that were contrary to the prior panel's opinion and concluded that "New York law has continued to shift away from the view expressed in [the prior opinion.]" *Id.*

Court recognized, *Litvinov* constitutes "intervening" authority that justifies departing from the Second Circuit's prior decisions.  17A JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 124.22[4] (3d ed. 2013) (noting that a district court need not defer to a higher court's interpretation of state law when there is "an intervening authoritative state decision"); *see also* Dkt. 707 at 9; *Donziger*, 871 F. Supp. 2d at 257.  In light of this intervening authority, several other district courts have recognized common law fraud claims based on third-party reliance.  *See, e.g.*, *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, 896 F. Supp. 2d 198, 205 (E.D.N.Y. 2012); Chevron Br. at 215 n.61 (collecting cases).

Defendants attempt to distinguish *Litvinov* as an "indirect reliance" case (LAPs Br. at 31).  Yet the *Litvinov* court did not base its decision on the fact that the misrepresentation was communicated through an "intermediary" to the plaintiff, but rather on the longstanding principle that "fraud may be found 'where a false representation is made to a third party, resulting in injury to the plaintiff.'"  *Litvinov*, 74 A.D.3d at 1885 (quoting *Ruffing v. Union Carbide Corp.*, 308 A.D.2d 526, 528 (2d Dep't 2003)).  The court in *Litvinov* also relied upon *Ruffing*, which upheld a fraud claim by a plaintiff who was a fetus in utero when the defendant made misrepresentations to his mother, and, therefore, obviously did not involve "indirect reliance" by the unborn fetus. *See Ruffing*, 308 A.D.2d at 531.

Defendants' similar attempt to distinguish *Eaton, Cole & Burnham Co. v. Avery* as a case resting on "indirect reliance" also fails.  *See* LAPs Br. at 31.  There, too, the New York Court of Appeals relied on the broad "principle of adjudications . . . that it is not essential that a representation should be addressed directly to the party who seeks a remedy for having been deceived and defrauded by means thereof."  *Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33–34 (1880).  And New York courts have cited *Eaton* for the proposition that fraud claims based on

68

third-party reliance are valid. *Buxton Mfg. Co. v. Valiant Moving & Storage, Inc.*, 239 A.D.2d 452, 454, 657 N.Y.S.2d 450, 451 (2d Dep't 1997) (citing *Eaton* for the proposition that "[f]raud . . . may also exist where a false representation is made to a third party, resulting in injury to the plaintiff."); *Desser v. Schatz*, 182 A.D.2d 478, 479–80, 581 N.Y.S.2d 796, 797 (1st Dep't 1992). There is no basis for this Court or any other federal court to narrow *Eaton* when New York courts have not done so.

Defendants' concession that the New York cases Chevron cites permit a fraud claim in the case of "indirect reliance" undercuts Defendants' assertion that to establish fraud a "plaintiff must show that the defendant made a false representation of a material fact *to the plaintiff*" (LAPs Br. at 31 (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784 (2d Cir. 2003)). The viability of "indirect reliance" cases shows that such generic statements of law cannot be read literally, since they would preclude fraud claims altogether where the statements are made to an intermediary. *See, e.g.*, *Bruff v. Mali*, 36 N.Y. 200 (1867). Indeed, New York's recognition of "indirect reliance" fraud claims demonstrates the broader principle that common law fraud is meant to be a flexible cause of action, not something that can be evaded by designing a fraud to evade black letter requirements of the tort. *See Bencoe Exporting & Importing Co. v. Erie City Iron Works*, 280 F. 690, 692 (2d Cir. 1922) (holding that even when confronting "new and singular facts," "when fraud is committed, and damage is thereby occasioned, a cause of action results to him who is damaged").

For example, in *Bruff*, the defendants issued false and fraudulent stock certificates, but argued that no claim for fraud could lie because plaintiffs were not the original purchasers. 36 N.Y. at 204. The New York Court of Appeals rejected their argument and refused to allow the defendants to escape liability by laundering the fraudulent shares on the open market. *Id.* at 205

("[H]aving authenticated and issued these certificates for the purpose of defrauding, the defendants should be held liable to any one sustaining damage by purchasing on the faith of their genuineness."). This Court should hold Defendants liable for their lies, despite the "new and singular facts" involved. *Bencoe*, 280 F. at 692.

### B. *Naranjo* Is Irrelevant to Chevron's Fraud Claim Because New York Common Law Provides a Cause of Action for Fraud

Defendants argue that, because their fraud has a connection with a foreign judgment, *Naranjo* somehow immunizes them from liability. *See* LAPs Br. at 23. But *Naranjo* contains no such principle. To the contrary, the *Naranjo* court was aware of Chevron's other claims and expressly recognized that they would go forward. *Naranjo*, 667 F.3d at 247. In fact, the *Naranjo* holding was far narrower than the *dicta* the LAPs quote in their post-trial brief, and not even that *dicta* would foreclose this action.

*Naranjo*'s actual holding was that "the procedural device [Chevron] has chosen to present [its] claims is simply unavailable: The Recognition Act nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor." *Naranjo*, 667 F.3d at 240. The court noted that the Recognition Act "do[es] not create an affirmative cause of action to declare foreign judgments void and enjoin their enforcement." *Id.* Far from creating blanket immunity for those who corrupt foreign litigation, the *Naranjo* court merely held that the Recognition Act did not create a cause of action for their victims. Because New York common law clearly recognizes a cause of action for fraud, *Naranjo* is irrelevant to Chevron's fraud claim.

Even looking to the broader dicta in *Naranjo*, Chevron's fraud claims implicate none of the comity concerns the court raised because Chevron's claims are not brought against the Lago Agrio court or any other court, nor do they usurp any other court's authority to adjudicate claims

before it.  Passing judgment on *Defendants'* culpable conduct—which consists substantially of activity in the United States that is only indirectly related to the Lago Agrio litigation—does not "dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs."  *Naranjo*, 667 F.3d at 242.  Nor does *Naranjo* foreclose the relief Chevron seeks.  *See supra* Section II.C.

Defendants' assertion that Chevron's fraud claim "must be dismissed" because New York does not provide for a cause of action for a judgment debtor to sue a judgment creditor is also incorrect.  LAPs Br. at 20–21.  Their reliance on *Vinokur v. Penny Lane Owners Corp.* is misguided.  *Vinokur* concerned a New York judgment where the court found that the plaintiff had remedies available in the original action.  269 A.D.2d 226 (1st Dep't 2000).  At a minimum, given the evidence, that is not the case here.  And the Court has already noted that New York law does provide relief in such circumstances.  *See* Dkt. 707 at 15 n.43 ("At a minimum, New York courts allow plaintiffs to seek equitable relief in independent actions from judgments obtained through fraud extrinsic to the issues decided in the underlying action.") (citing *Jones v. Buttarazzi*, 204 A.D.2d 1018, 1018 (4th Dep't 1994); *Tamimi v. Tamimi*, 38 A.D.2d 197, 199–204 (2d Dep't 1972)); *see also, e.g.*, *Feinberg v. Feinberg*, 40 N.Y.2d 124, 127 (1976) (reversing lower court's decision that a "divorce decree [issued in the Dominican Republic] could not be collaterally attacked in New York" on the basis of fraud).  In any event, this argument is predicated on Defendants' distortions of Chevron's claims as purely an attack on the Lago Agrio judgment, which of course they are not.  *See* Chevron Br. at 218–47.

### C.  Defendants' Lies About Cabrera's "Independence" Are Actionable Fraud and Were Intended to Deceive

Defendants seek to shield themselves from liability by labeling their lies about Cabrera as non-actionable opinions.  However, all of the misrepresentations Chevron has alleged relate to

statements of fact that may properly support an action for fraud.  *See supra* Section III.D.2.  And

even if Defendants' lies could be considered "opinions," they were made with present intent to

deceive and therefore support fraud liability under New York law.  Even assuming statements

about Cabrera's "independence" could be considered opinions, they are nevertheless actionable

because they were made with an intent to deceive.  Under New York law, "opinions 'may consti-

tute actionable fraud where a present intent to deceive exists.'"  *Catskill Dev. v. Park Place

Entm't Corp.*, 547 F.3d 115, 134 (2d Cir. 2008) (quoting *Magnaleasing, Inc. v. Staten Island

Mall*, 563 F.2d 567, 569 (2d Cir.1977)); *see also People v. Peckens*, 153 N.Y. 576, 591–92

(1897) ("The rule that no one is liable for an expression of an opinion is applicable only when

the opinion stands by itself as a distinct thing.  If it is given in bad faith, with knowledge of its

untruthfulness, to defraud others, the person making it is liable.").  In a case involving what

would otherwise have been a non-actionable estimate of the tax owed on leased property, the Se-

cond Circuit held that liability was proper because the defendant "told his employees to quote the

very modest figures for additional rent charges, [even though] he knew, from the many internal

memoranda circulated, that those were not his firm's true figures."  *Magnaleasing, Inc.*, 563 F.2d

at 569.  Defendants' internal communications prove that they did not believe Cabrera was "inde-

pendent" or "neutral."  *See* Chevron Br. at 70–76, 218–248.  Thus, in spreading these falsehoods,

Defendants had a clear "intent to deceive."

Furthermore, even if the issue of Cabrera's independence were a legal question, a fraud

claim can be based on misrepresentations about *foreign* law, where made to parties not reasona-

bly expected to have knowledge of that law.  *See Bowman v. City of Indianapolis*, 133 F.3d 513,

519 (7th Cir. 1998) (recognizing that a "misstatement of law" can form "the basis for a fraud ac-

tion" where "the misrepresentation relates to the law of a foreign jurisdiction"); *see also Lefferts*

*v. Lefferts*, 243 A.D. 278, 279, 276 N.Y.S. 809, 811 (1935) (holding that "as a general proposition an action for fraud cannot be based, nor relief granted, upon a misrepresentation of the law," but that statements of foreign law are questions of fact); *Bernhan Chemical & Metal Corp. v. Ship-A-Hoy*, 200 A.D. 399, 410 (1st Dep't 1922) ("Foreign law is a matter of fact and, therefore, the representations of the plaintiff with reference to such foreign law were representations as to a fact."). Donziger made his misstatements about Cabrera's legal status to U.S. courts, U.S. lawyers, U.S. consultants, U.S. funders, and the U.S. media—none of whom can be deemed to have knowledge of Ecuadorian law. Chevron Br. at 67–69; *see also* PX 1279; PX 1291.[60]

Having secretly written Cabrera's report, Defendants knew that Cabrera was not "independent" or "neutral." And Defendants had been warned by co-counsel that their statements were "misleading at best" but made those statements anyway. PX 1319 at 3. The only logical conclusion based on this evidence is that Defendants acted with a "present intent to deceive" the recipients of these statements as to the true facts. *Catskill Dev.*, 547 F.3d at 134. Defendants are therefore liable for fraud in any event. *Magnaleasing, Inc.*, 563 F.2d at 569.

## V.    Defendants Offer No Response to Chevron's Civil Conspiracy Claim

The evidence shows that Defendants engaged in a conspiracy to injure Chevron in violation of New York law. *See* Chevron Br. at 257–60. But Defendants offer no rebuttal to this evidence and barely mention Chevron's conspiracy claim in their post-trial briefs.

## VI.   Donziger Offers No Response to Chevron's Section 487 Claim

The evidence shows that Donziger violated New York Judiciary Law section 487 on numerous occasions, each of which independently establishes that Donziger violated New York

---

[60] The LAPs reliance on *Zuyder Zee Land Corp. v. Broadmain Bldg. Co.* is misplaced. *Zuyder* is distinguishable: the alleged misrepresentations there were merely one party to a contract's interpretation of the contract's terms. 86 N.Y.S.2d 827, 828 (Sup. Ct. N.Y. Cnty. 1949). The definitive statement of the contract's contents was the contract itself, to which all parties had access. Here, far from having equal access to information, the deceived individuals had no independent access to the truth about the Lago Agrio litigation and were forced to rely on Defendants' misrepresentations, which they presented as facts.

law.  *See* Chevron Br. at 261–66.  But Donziger offers no rebuttal to this evidence, and, indeed, does not even mention Chevron's section 487 claim in his post-trial brief.

## VII.    Defendants Fail to Rebut Chevron's Entitlement to Equitable Relief

### A.  Chevron Has No Adequate Remedy at Law and Has Established Irreparable Harm

Defendants claim that Chevron cannot obtain equitable relief because it has adequate remedies at law that prevent it from suffering irreparable injury.  *See* Donziger Br. at 59–60; LAP Br. at 38–40.  This argument is flawed as a matter of both law and logic.

Defendants have repeatedly asserted their "lack of resources" even to present a defense in this action, let alone sufficient funds to satisfy a money judgment in Chevron's favor.  *See, e.g.*, Chevron Br. at 321–322.  Thus, in September 2013, Chevron waived claims for money damages against the LAPs, and then Donziger.  Dkts. 1404, 1469.  Now, Donziger asserts that "any 'injury' Chevron *might* suffer could be remedied by money damages."  Donziger Br. at 60 (emphasis in original).  But Defendants' financial condition makes monetary damages an inadequate remedy at law because "there is a substantial chance that upon final resolution of the action [Chevron] cannot be returned to the position [it] previously occupied."  *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999); *see also* Chevron Br. at 320–22.[61]

Moreover, Defendants ignore the irreparable harm to Chevron's goodwill, reputation, and ability to conduct business, which cannot be adequately remedied with money damages.  *See* PX 5800 (Zygocki) ¶¶ 20–22; Chevron Br. at 320–326.  These damages are by definition irreparable.  Chevron Br. at 322–23.

Because Defendants' "No. 1 priority is enforcement" (PX 7033A at 3), Chevron also fac-

---

[61] The one case cited by the Donziger Defendants in support of money damages as an adequate remedy at law involves a defendant corporation with "more than $4 million of business," facing liability in the low thousands. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 71 & 72 n.8 (2d Cir. 1979); *see also* Donziger Br. at 60. The financial circumstances of the *Jackson Dairy* defendant differ substantially from that of Donziger and the LAPs, who have repeatedly claimed to lack resources.

es future irreparable harms in the form of additional attorneys' fees expended by Chevron in defending itself in enforcement actions, in enforcement proceeds obtained by Defendants, if any, and in the business disruptions that are the expressed intent of Defendants' "Invictus" enforcement strategy—all warranting injunctive relief. *Thomas v. Bryant*, 614 F.3d 1288, 1318 (11th Cir. 2010) ("it is [] well-established that injunctive relief is appropriate 'to prevent a substantial risk of serious injury from ripening into actual harm'" (quoting *Farmer*, 511 U.S. at 845, 114 S. Ct. at 1983)); *Kapps v. Wing*, 404 F.3d 105, 122–123 (2d Cir. 2005) ("[I]n deciding whether to award injunctive relief . . . where a history of legal violations is before the district court, that court has significant discretion to conclude that future violations of the same kind are likely."). And if Defendants were to obtain any enforcement proceeds, they have admitted they would take steps to try to place those proceeds in foreign trusts to attempt to render them beyond this Court's jurisdiction, absent an injunction. Chevron Br. at 322; PX 3000 (Reis Veiga) ¶ 138; PX 552 at 15–17 (funding agreement between the Frente, the LAPs, and Treca Financial Solutions creating a foreign trust to which litigation rights are assigned); *see also* PX 412.

### B. Theoretical Remedies in Other Jurisdictions Are Not a Bar to Equitable Relief

Donziger claims that "Chevron has had, and continues to have, available remedies in Ecuador by which the judgment could be modified or vacated, including appeal to the Constitutional Tribunal." Donziger Br. at 60. But Chevron has proven multiple RICO violations and acts of fraud in this trial against these Defendants, and Chevron is therefore entitled to equitable relief in this action, separate and apart from any redress that it theoretically might be able to seek in Ecuador or other foreign courts.[62]

---

[62] Even the authority cited by Donziger recognizes that comity does not preclude a U.S. court from making findings that a foreign judgment was obtained through fraudulent and corrupt means offensive to public policy and notions of justice, and thus should not be enforced. *See Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 446 (S.D.N.Y. 2002) ("No sovereign state is under unyielding compulsion to enforce the judgments of another nation

Donziger quotes *Cresswell v. Sullian & Cromwell*—a case in which the investor plaintiffs sought to have a summary judgment ruling set aside due to alleged withholding of information by defendants during discovery—for the proposition that equitable relief will not be granted to a party that "has, or by exercising proper diligence would have had," a remedy "by proceeding[] in the original action . . . to open, vacate, modify, or otherwise obtain relief against the judgment." 922 F.2d 60, 71–72 (2d Cir. 1990) (internal quotation marks and citation omitted) (remanding to district court for consideration of whether "the situation in which plaintiffs find themselves is not due to their own attorney's neglect" in not seeking the information elsewhere).  But Donziger fails to quote the entire passage, leaving out the purpose of this maxim:  "*It must also appear that the situation in which the party seeking [equitable] relief finds himself is not due to his own fault, neglect or carelessness." Id.*  The proceedings in Ecuador have been tainted by Defendants' repeated wrongful and illegal actions, including collaboration with Cabrera and various judges at numerous points in time throughout the Lago Agrio litigation, ghostwriting of court documents, and blackmail and bribery of court officers.  Despite the overwhelming evidence presented that Defendants ghostwrote the Cabrera report and the Ecuadorian judgment, the Ecuadorian courts have yet to find any wrongdoing, and then Judge Zambrano lied on the witness stand before this Court claiming to have written the judgment himself.  *See, e.g.*, Tr. (Zambrano) 1630:22–24, 1642:6–8, 1658:12–1659:6, 1712:12–13.  It is not through "fault, neglect or carelessness" by Chevron that it has been denied justice in Ecuador.

Defendants also argue that Chevron should be denied equitable relief in this action because it "may raise the same fraud defenses it seeks to litigate here any time the judgment's enforcement is sought."  Donziger Br. at 59–60; LAPs Br. at 40.  But Defendants mischaracterize

---

that are predicated on laws inherently repugnant to fundamental public policies or notion of justice of the forum state, or that do violence to its important domestic interests.").

Chevron's claim in this action as one based solely on enforcement. Chevron seeks to prevent Defendants from continuing their racketeering and fraud against Chevron, and Defendants' enforcement actions are only a part of Defendants' schemes. As the victim of Defendants' actions, Chevron is entitled to relief in its chosen forum and need not wait for Defendants to initiate an enforcement action in order to seek partial relief from Defendants' wrongdoing.[63]

Finally, Defendants have demonstrated that they can irreparably injure Chevron in earlier procedural stages of enforcement actions, regardless of whether proceeds are ultimately awarded. Contrary to the LAPs' assertion that in Argentina, "without any indication that it suffered irreparable injury, Chevron succeeded in lifting the freeze order on appeal to Argentina's highest court" (LAP Br. at 40), the Argentine embargo order "was damaging and disruptive to operations, freezing the assets of Chevron's Argentine Subsidiaries and denying them the ability to use receivables for profit-generating activity and even normal business operations." PX 3000 (Reis Veiga) ¶¶ 135–136. And in Ecuador, the Defendants showed that they can capture courts and nullify Chevron's defenses with false claims about the Lago Agrio judgment when they recently succeeded in embargoing "valuable trademarks held by [Chevron Intellectual Property, LLC]," among other assets. *Id.* ¶ 134; *see also* PX 4300X (Callejas) ¶¶ 85–86.

## C. Donziger Is Wrong About Chevron's Ability to Seek Injunctive and Other Equitable Relief Under RICO

As Chevron explained in its post-trial memorandum, private parties may seek injunctive and other equitable relief under RICO because the text of the statute, 18 U.S.C. § 1964, expressly authorizes such relief, and even if it did not, there is no "clear" command in the statute to pre-

---

[63] The availability of such a defense to enforcement is far from certain in any event. The Invictus memorandum reveals that Defendants intend to pursue enforcement in jurisdictions where they have political connections and influence to "leverage . . . with governments of foreign nations in which Chevron does business" (PX 1204R at 24), by which Defendants will seek to inhibit Chevron from effectively and fairly putting forth evidence of fraud even where a fraud defense is available.

clude this Court from exercising its general power to issue equitable remedies.  Chevron Br. at

329–39; *see also Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 696 (7th Cir. 2001),

*rev'd on other grounds*, 537 U.S. 393, 123 S. Ct. 1057 (2003); *Motorola Credit Corp.*, 202 F.

Supp. 2d at 243.[64]

     Donziger admits that § 1964(a) "grants district courts 'jurisdiction to prevent and restrain

violations' of RICO by issuing the full range of 'appropriate orders' available to courts of equi-

ty."  Donziger Br. at 57.  Nonetheless, Donziger claims that "RICO's text and structure makes

clear" that "the statute does not authorize equitable relief in private civil actions."  *Id*.  In making

this argument, however, Donziger relies on the same "less intuitive interpretation" of the RICO

statute that, for good reason, the Seventh Circuit rejected in *Scheidler*.  267 F.3d at 696.  While

§ 1964(a) is silent as to who may seek the remedies it authorizes, Donziger contends that its

scope is somehow limited by § 1964(b)'s provision of a civil right of action for the Government.

Yet § 1964(b) does not provide that *only* the "Attorney General may institute proceedings under

this section," and its reference to temporary "restraining orders or prohibitions" does not imply

any limitation on the availability of *permanent* equitable remedies to private plaintiffs.  In fact, it

shows the opposite, as the Seventh Circuit explained.  *See Scheidler*, 267 F.3d at 696–97 ("Sec-

tion 1964(b) does allow the government to seek equitable relief, but it specifically mentions only

interim remedies.  . . . [T]he government's ability to seek permanent, as opposed to interim, equi-

table remedies comes from the general grant of authority for district courts to enter injunctions

found in § 1964(a), not from anything in § 1964(b). . . . [W]e see no reason not to conclude, by

---

[64] Donziger offers no substantive response to the persuasive reasoning of the Seventh Circuit in *Scheidler* and Judge Rakoff in *Uzan*.  He instead asserts that those decisions are "not good law" merely because they were re-versed "by higher courts" on *other* grounds.  Donziger Br. at 58.  But courts routinely rely on decisions that have been reversed as to other issues, and nothing in the subsequent decisions in *Scheidler* and *Uzan* casts any doubt on the soundness of those courts' reasoning with respect to the availability of equitable relief in private RICO suits. And there is no dispute about the soundness of the general principle that equity is a flexible doctrine, and that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394, 126 S. Ct. 1837, 1841 (2006).

parity of reasoning, that private parties can also seek injunctions under the combination of grants in §§ 1964(a) and (c).").[65]

Donziger also suggests that because § 1964(c) specifies that private plaintiffs can seek treble damages and the cost of suit, including attorney's fees, this implies that no other remedies are available.  Donziger Br. at 57.  But this ignores the first clause of § 1964(c), which creates a general right for injured private plaintiffs to sue for RICO violations, and which is separated from the second clause (providing for additional remedies not available to the Government) by an "and" rather than a "to."  *See* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court *and* shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." (emphasis added)).  As Professor Blakey has explained, the use of "the 'and' preceding 'shall recover' indicates that the language following it is not to be read restrictively," as might be the case if § 1964(c) "read 'may sue . . . to recover.'"  G. Robert Blakey & Scott D. Cessar, *Equitable Relief Under Civil RICO: Reflections on* Religious Technology Center v. Wollersheim: *Will Civil RICO Be Effective Only Against White-Collar Crime?*, 62 Notre Dame L. Rev. 526, 545 (1987); *see also* Dkt. 1831-2 at 8–23.  Like the Seventh Circuit in *Scheidler*, the Court should reject Donziger's flawed reading of "the two clauses of § 1964(c) . . . as tightly linked provisions, under which private plaintiffs may sue *only* for monetary damages."  267 F.3d at 696 ("We cannot agree that this is a reasonable reading of the statute.").

Donziger mischaracterizes the Supreme Court's discussion of RICO's legislative history

---

[65] The statute's express reference in § 1964(b) to a "restraining order" being available to the Attorney General when the government brings a civil RICO case makes perfect sense because the U.S. government would not be an injured party bringing a money damages claim, but rather would seek equitable relief to prevent ongoing racketeering from irreparably harming others.

in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S. Ct. 3275 (1985).  He claims that "[t]he Supreme Court has explained that RICO's civil-remedies provision was 'limited to injunctive actions by the United States.'"  Donziger Br. at 57 (quoting *Sedima*, 473 U.S. at 486).  But the quoted language refers only to the initial "civil remedies in the bill passed by the Senate" *before* a private right of action was added to the bill by the House.  *Sedima*, 473 U.S. at 486–87.

Donziger further selectively quotes from *Sedima*, stating "that a proposed 'amendment that would have allowed private injunctive actions' was *withdrawn* because it was 'greeted with some hostility.'"  Donziger Br. at 57 (quoting *Sedima*, 473 U.S. at 487).  Donziger omits that this "hostility" was attributed to the fact that the withdrawn proposed amendment "had not been reviewed in Committee."  *Sedima*, 473 U.S. at 487–88 ("Representative Steiger also offered an amendment that would have allowed private injunctive actions, fixed a statute of limitations, and clarified venue and process requirements. . . .  The proposal was greeted with some hostility *because it had not been reviewed in Committee*, and Steiger withdrew it without a vote being taken." (emphasis added)).  In any event, the Supreme Court has since made clear that "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute . . . because a bill can be proposed or rejected for any number of reasons."  *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 160, 121 S. Ct. 675, 677 (2001); *see also Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("The fact that proponents of a particular view sought unsuccessfully to have a statute amended to state a proposition with unmistakable clarity tells nothing about whether the preexisting law already covered the point, albeit less clearly.").[66]

---

[66]  Donziger's reliance on *Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986), and dicta in *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479, 105 S. Ct. 3275 (1985), and *Trane Co. v. O'Connor Sec.*, 718 F.2d 26 (2d Cir. 1983), is unpersuasive for the reasons Chevron explained in its post-trial memorandum.  Chevron Br. at 335–38 & n.99.  Donziger also cites three cases from other

Finally, Donziger asserts that RICO does "not permit [Chevron] to seek disgorgement," relying on the D.C. Circuit's decision in *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005). Donziger Br. at 59. But regardless of the D.C. Circuit's views on this question, the Second Circuit in *United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995), expressly held that, "[a]s a general rule, disgorgement is among the equitable powers available to the district court by virtue of [18] U.S.C. § 1964." *Id.* at 1181. And while RICO does not authorize "disgorgement of gains ill-gotten *long in the past*" (*id.*) (emphasis added), that is not what Chevron seeks in this case. Rather, Chevron seeks only disgorgement of the kind *Carson* expressly authorized—namely, disgorgement focused on "gains ill-gotten relatively recently" (or in the future), and "designed to 'prevent and restrain' *future* conduct." *Id.* at 1182; *see also* Chevron Br. at 343–44. Such relief is consistent with the "divestment" remedy the D.C. Circuit endorsed in *Philip Morris*, because it is "aimed at separating the RICO criminal from the enterprise." 396 F.3d at 1198. In any event, to the extent *Philip Morris* could be read to preclude disgorgement that is designed to prevent and restrain future conduct, which is precisely what Chevron has requested here, this Court is bound to follow *Carson*, which remains the law in the Second Circuit.

## VIII.  Defendants' Affirmative Defenses and Irrelevant Attacks on Chevron Are Without Merit

### A.  Defendants Have Failed to Establish the Elements of Unclean Hands or Related Defenses

Defendants do not actually attempt to show how the evidence adduced at trial meets the

---

circuits that have, in dicta, suggested that equitable relief is unavailable in private RICO suits. *See* Donziger Br. at 58 (citing *Wheeling-Pittsburgh Steel Corp. v. Mitsui Co.*, 221 F.3d 924, 927 n.2 (6th Cir. 2000); *Johnson v. Collins Entm't. Co.*, 199 F.3d 710, 726 (4th Cir. 1999); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988)). These cases, however, merely followed the flawed reasoning of *Wollersheim*, and are therefore unpersuasive for the same reasons *Wollersheim* itself is unpersuasive. Moreover, each case was decided before the Seventh Circuit's persuasive critique of *Wollersheim* in *Scheidler*. In addition, Donziger's reference to the Solicitor General's brief in *Scheidler* is similarly unavailing, as the Solicitor General at that time advanced the same counterintuitive reading of the RICO statute's text discussed above, relied on *Wollersheim*'s flawed assessment of RICO's legislative history and misplaced analogy to the Clayton Act (*see* Chevron Br. at 335–38), and ignored the settled power of federal courts to issue all available remedies, including equitable remedies, "absent clear direction to the contrary by Congress" (*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 70–71, 112 S. Ct. 1028, 1035 (1992)).

elements of the unclean hands defense to equitable relief.  Donziger does not mention the de-
fense at all in his brief, while the LAPs refer to it only in a footnote, claiming without explana-
tion or authority that they "reserve the rights to brief the unclean hands defense if and when
Chevron makes [] plain the specific nature of the equitable relief it seeks."  LAPs Br. at 30 n.8.
Nonetheless, their briefs are replete with unsubstantiated allegations of Chevron wrongdoing that
are either irrelevant to their defense of this case, insufficient to constitute unclean hands, or have
been proven false at this trial.  For the reasons explained in Chevron's opening brief and here,
even had Defendants attempted to meet the elements of unclean hands, they could not do so.

Defendants, having asserted this affirmative defense, bear the burden of establishing the
elements of unclean hands.  *See Drexel Burnham Lambert Grp. Inc. v. Galadari*, 777 F.2d 877,
880 (2d Cir. 1985) ("The party asserting an affirmative defense usually has the burden of proving
it.").  But Defendants cannot even meet their burden of establishing the facts they allege, much
less that any injury flowed from this alleged misconduct, as is required.  *Mallis v. Bankers Trust
Co.*, 615 F.2d 68, 75 (2d Cir. 1980) ("Bankers Trust was in no way injured by appellants' alleg-
edly wrongful conduct, and thus may not invoke the unclean hands defense.").  Therefore, this
defense fails as a matter of law.  *Sec. Pac. Mortg. & Real Estate Servs., Inc. v. Canadian Land
Co. of Am., N.V.*, 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988) ("Without a claim of injury, the de-
fense of unclean hands fails as a matter of law.").

Taking each of Defendants' unclean hands allegations in turn, they have failed to meet
their burden as to any of them.

### 1.   Chevron's Legitimate Lobbying Efforts Do Not Constitute Unclean Hands

Defendants attack Chevron's lobbying activities in both the U.S. and Ecuador as some-
how improper, quoting inadmissible (and inaccurate) statements from politicians that are not part
of the trial record.  Donziger Br. at 20–21.  Donziger also alleges that "on the first day of trial,

Chevron lawyer Ricardo Reis Veiga tried to torpedo the litigation by persuading the country's Attorney General to call the trial judge and urge him to throw out the lawsuit."  Donziger Br. at 11.  In support of this assertion, Donziger cites a completely unrelated brief filed by Chevron in the Ecuadorian litigation years after its inception (DX 1416), and a deposition excerpt in which Veiga testified, consistent with his trial testimony, that "at the end of 2003 or beginning of 2004" he met with Ecuador's Attorney General to express concern "that the Aguinda plaintiffs in Lago Agrio were actually claiming public general environmental remediation claims which fall exactly within the scope of the release that we had negotiated and obtained from the Republic of Ecuador and Petroecuador" and to urge the Republic of Ecuador to fulfill its obligations under these agreements.  DX 378 at 2–3.  This does not support Donziger's assertion that Veiga "tried to tor-pedo the litigation" by getting the Ecuadorian Attorney General to "call the trial judge" (Donziger Br. at 11), which Veiga specifically denied on cross-examination.  Tr. (Veiga) 128:7–10.  Indeed, Defendants repeatedly attempted to elicit testimony in support of this theory from Veiga at trial and failed to do so:

> Q. Did you have other contacts with high government officials, besides the two we have just talked about, during the 2003–2004 time period?
>
> A. I had some other meetings with government officials of Ecuador.
>
> Q. About the Lago Agrio case?
>
> A. About the settlement agreements that we signed.  When you say the Lago Agrio litigation, the release is exactly for the same claims.  So, obviously, there is a relationship to the claims that were made.  But our primary objective was to get assurance that they would honor the agreements that they signed.  It's a very rea-sonable expectation that any company might have after complying with their por-tion of the bargain.
>
> Q. What did you want these government officials to do to honor their part of the bargain? What were you asking them to do?
>
> [. . .]

A. First of all, we wanted them to give assurance to us that they would honor their obligations.  Part of those obligations had to do with Petroecuador assuming liabilities for any remaining remediation of the sites, not including the scope of work that we were responsible for.  And the other one was for the Republic of Ecuador to assume any liabilities based on the release that they got.

Tr. (Veiga) 126:3–127:19.

Q. And it was your hope that if the president of Ecuador would honor those agreements in some way, it would end the Lago Agrio litigation?

[ . . .]

A. The hope was simple.  We sign[ed] an agreement.  We complied with our portion of the bargain.  We have been released of any further environmental liabilities.  The state oil company, Petroecuador, continue[s] to operate those fields.  We have been sued for claims that fall exactly within the scope of the release, and we just want them to assure they will comply with that bargain. I don't know in which way to comply.  Hopefully, they would do the remediation that they had and assume the liabilities, if they exist, in whatever way they thought would be appropriate.  We never asked the Republic of Ecuador to intervene in the case, but we comply with our portion of the bargains, and we thought that they should comply with theirs.

Tr. (Veiga) 124:19–125:14.

Further, Chevron has never argued that legitimate lobbying constitutes wrongdoing, but that any protection afforded to such activity does not protect fraud and extortion.  *See Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787, at *2 (E.D.N.Y. July 19, 2004).  Defendants' lobbying and public pressure campaign was predicated on false statements and engaged in for the improper purpose of coercing Chevron into paying them off.  *See* Chevron Br. at 79–86.  Defendants make no allegation that Chevron's lobbying efforts were based on falsehoods, and even if they did, they cannot demonstrate injury because, as they concede, Chevron has been unsuccessful to date in persuading the Ecuadorian government to honor its obligations under the settlement and release agreements it entered into with TexPet, or to the U.S. government to end trade preferences for Ecuador.  Donziger Br. at 20.

## 2. Preinspections and the Postponement of the Guanta Inspection Do Not Constitute Unclean Hands

Donziger's claim that Chevron "went to great lengths to sabotage" the judicial inspections including by "conduct[ing] secret pre-inspection testing," and uncovering purportedly "worrisome" results leading to the postponement of the Guanta inspection, are unsupported inventions and, in any event, would not suffice to establish unclean hands. Donziger Br. at 12.

First, preinspections of judicial inspection sites were a legitimate and necessary part of the judicial inspection process that *both parties* openly conducted with the knowledge of the Ecuadorian court. *See, e.g.*, Tr. (McMillen) 487:20–488:3; PX 8015 at 2 (detailing Defendants' preinspection schedule and related responsibilities). Thus, there is no "wrongdoing" to speak of that could be cognizable as unclean hands. The document on which Donziger relies to establish the purportedly nefarious purpose of preinspections, the judicial inspection playbook for Sacha Norte 1, does not support his claims. *See* DX 591.[67] Rather, this document shows that perimeter sampling is just one of the sampling techniques used, and is a necessary part of environmental site testing to establish the extent of contamination and remediation that would be needed in the event contamination is found. *Id.* at 10 (listing "Demonstrate clean soil boundaries surrounding on-site pits and station boundaries" as a "Sampling Objective"); DX 592 at 2 (referencing collection of clean soil samples from multiple locations "surrounding the site"); *id.* at 5 (recommending perimeter sampling "to access potential constituent migration"). As this Court observed during trial, this is analogous to a surgeon needing to define the extent of malignancy of a tumor when operating: "And so the surgeon causes the pathologist to test not only the heart of the tumor, which is of course essential to identify the pathology, but what appeared to be clean areas

---

[67] Defendants also cite DX 676, but that document was authored by Defendants purporting to summarize Chevron's responses to various human rights allegations. Not only is it a document from Defendants' case files in support of their extortionate campaign against Chevron, but it does not even mention Chevron's preinspection process.

around it to ensure that when the surgeon cuts—the analogy here being remediates—you get the whole cancer." Tr. 498:11–16.

Nor did Chevron instruct its experts to search only for "clean" samples from the perimeter of the site; rather, it called for collecting a range of samples from the inspection site, including samples "from within the pit, spill area, or other potential area of concern."  DX 592 at 5.[68] Defendants themselves admitted that their formulation of Chevron's preinspections "might be a stretch." Tr. 495:22 (argument of Donziger's counsel).  And Donziger's continued reliance on improperly obtained work product—videos of some of Chevron's preinspection activity—does not change the analysis.  This Court and the Special Masters have held that these videos are protected work product and are therefore inadmissible.  *See* Dkt. 1397-1; Tr. 497:6–12.

Even assuming *arguendo* the existence of any admissible evidence that preinspections were somehow improperly conducted, Donziger cannot prove injury.  He claims that Chevron got the judicial inspection of Guanta Station cancelled because pre-inspection sampling there "worried" Chevron because it purportedly would have shown "high levels of contamination, including high levels of arsenic, chromium, and polycyclic aromatic hydrocarbons."  Donziger Br. at 12.  But this is false.  It was Chevron that requested the inspection of the Guanta Station in the first place, and it was not cancelled; it was merely rescheduled and, at Chevron's request, performed a few months later (PX 7743).  And while Donziger claims without evidence that the military intelligence report regarding the safety threat was "fake" (DX 1750 (Donziger) ¶ 83), the National Police issued its own report confirming the safety threat (PX 3320).  Finally, Defendants could not have been injured because they ultimately obtained a judgment in their favor.

---

[68]  The only party guilty of "manipulating" the judicial inspections is Defendants, who instructed their experts to "find whatever contamination" they could (3/29/2010 Calmbacher Dep. 126:13–17), falsified an expert's reports when he did not find contamination (*id.* 116:9–10), and ultimately coerced the judge to cancel the judicial inspections and appoint Richard Cabrera as the sole damages expert.

### 3.   Chevron's Purported Litigation Tactics Do Not Constitute Unclean Hands

Defendants also allege that Chevron engaged in abusive litigation tactics before the Ec-

uadorian court by "clogging the courts with frivolous and repetitive filings" and using a "docu-

ment dump" strategy.  Donziger Br. at 12.  This Court has already ruled that it "does not regard

the allegation of the filing of too many motions, of allegedly baseless motions, of discovery de-

lay, and the like in the Ecuadorian case as remotely approaching a sufficient claim of unclean

hands."  Dkt. 348 at 24 n.69.  The examples of Chevron's "excessive" filings Donziger provides

do nothing to advance his claim even from a factual perspective.

In addition, Defendants' allegations amount to an improper and untimely assertion of Ec-

uadorian law:  Donziger claims that the number of motions Chevron filed was excessive, its ap-

peals "improper," and its tactics done "to create a record of purported due process violations by

the court."  Donziger Br. at 14 & n.45.  The only "authorities" Donziger cites in alleged support

for these bare legal conclusions are the suspect Ecuadorian trial and appellate court decisions in

the Lago Agrio case.  Donziger Br. at 14–15.  He otherwise offers no support for these proposi-

tions of Ecuadorian law, and he never timely asserted such reliance on foreign law in this regard.

Furthermore, while Donziger alleges that Chevron's conduct, such as its successful mo-

tion to recuse Judge Ordóñez, caused delay (Donziger Br. at 14), the alleged conduct does not

have the requisite "immediate and necessary relation to the equity that plaintiff seeks in respect

of the matter in litigation."  *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109,

112 (S.D.N.Y. 2005).  The doctrine of unclean hands is not applicable to Chevron's filing of mo-

tions in the Ecuadorian suit because the right it seeks to vindicate here is the right to be free of a

criminal scheme.  *Cf. Haagen-Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F. Supp. 73, 74–76

(S.D.N.Y. 1980) (finding that unclean hands could apply to defendants' allegedly deceptive

packaging of its product to create the impression of Scandinavian origin because the plaintiff was

87

suing for damages related to defendant's unfairly "package[ing] [ice-cream] in a manner calculated to trade upon 'plaintiff's unique Scandinavian marketing theme'"; the unclean hands doctrine applied because the plaintiff's misconduct related to its exercise of the right in suit, the alleged right to "exclusive" use of a particular "unique Scandinavian marketing theme").

### 4.  The Judge Nuñez Bribery Scandal Cannot Constitute Unclean Hands

Donziger also alleges that Chevron "concocted" the bribery scandal involving Judge Nuñez "[i]n an effort to cause [his] removal from the case." Donziger Br. at 15.  Donziger offers no evidence that Chevron "concocted" the scandal, except the same shopworn allegation that Borja was a "long-time Chevron contractor" who Donziger speculates therefore acted at Chevron's behest in taping Judge Nuñez and others soliciting bribes.  *Id*.  Unable to come up with a shred of evidence that Chevron had any involvement in (or even foreknowledge of) Borja's actions, Defendants rely heavily on Chevron's financial support of Borja and his family *after* the tapes were made and brought to Chevron's attention.  Donziger Br. at 17–18.  Chevron provided that support because Borja and his family faced serious safety risks in Ecuador after the scandal broke, forcing them to emigrate to the U.S. and apply for asylum—which was granted based on a well-founded fear of future persecution.  PX 2527.  Defendants also inaccurately characterize the support as ongoing (Donziger Br. at 18 (claiming Chevron "pays" Borja's rent and "gives" him a monthly stipend)), when it ended years ago.  9/12/2011 Mittelstaedt Dep. 102:21–23.

Moreover, the record shows that Defendants actively sought the very persecution that necessitated Borja's emigration—"Our sources at the government tell us they're actively looking for them, to cut their heads off"—and most of the "benefits" Chevron provided to Borja were for attorney's fees for his asylum application and defense in the § 1782 discovery action brought against him by Defendants and the Republic of Ecuador.  PX 2524 at 1.

Chevron detailed the facts regarding the Nuñez bribery scandal in its opening brief.

Chevron Br. at 286–88.  Only in Defendants' "through-the-looking-glass" world of "spin" is the evidence somehow favorable to them.  *See* PX 2524.  In reality, it proves what Chevron has said all along:  it was getting railroaded in a corrupt Ecuadorian proceeding in which Defendants knowingly participated and benefited from that corruption.

Donziger's continued reliance on inadmissible hearsay statements made by Borja to Santiago Escobar about Chevron's purported "cook[ing]" of evidence and use of purportedly biased laboratories during the Ecuadorian litigation only underscores the lack of any evidence to substantiate these false allegations.  Donziger Br. at 17.  Defendants' own special counsel, former S.D.N.Y. Assistant United States Attorney and Zuckerman Spaeder partner Aitan Goelman, whom Donziger hired to investigate the matter, concluded that "Chevron is telling the truth," and dismissed Borja's statements to Escobar as "bombast from a trash-talker being prodded into making increasingly grandiose claims."  PX 2526 at 2–3.  And Donziger cannot allege any injury in this regard, given the $18 billion judgment ultimately issued in the LAPs' favor.

### 5.   Defendants' Allegations of Environmental Harm Are Irrelevant, Unsupported, and False, and Cannot Constitute Unclean Hands

Chevron has maintained throughout the case—and it continues to maintain—that this case is not a retrial of the environmental aspects of the Lago Agrio litigation.  But in order to avoid having Donziger's false allegations go unrebutted, Chevron provides the following responses, recognizing that these issues are irrelevant to any claim or defense in this action.

### a.   Defendants Continue to Assert False and Irrelevant Environmental Allegations

As this Court has repeatedly held, this case is about Defendants' fraud and extortion scheme, not the environmental merits—or lack thereof—of the underlying Lago Agrio litigation.  *See, e.g.*, Dkt. 902 at 2 ("This Court repeatedly has ruled that this case will not retry the claims made in the Lago Agrio case."); Dkt. 901 at 2–3; Dkt. 679 at 11.  Donziger nonetheless ignores

89

the Court's rulings, choosing instead to spend much of his brief repeating his own fabricated claims that Chevron polluted the Ecuadorian rainforest and "does not contest any of these facts." Donziger Br. at 8.  This, like so many of Donziger's other statements, is a lie.

Donziger claims, for example, that prevailing industry practice from 1972 to 1990 was to pump "waste back into well cavities deep underground, where it can't harm the environment," but Texaco instead dug "unlined waste pits" where "toxic chemicals Chevron dumped into them leached into the surrounding ground."  Donziger Br. at 7.  Donziger cites nothing but one of the LAPs' own briefs for these contentions.  *Id.* at 7–8.  In fact, Donziger is wrong—pumping drilling muds underground for disposal was not the prevailing oil industry practice during this time (PX 8070 at 28–29, ¶¶ 18–20 (the U.S. EPA reported in 1984 approximately 125,000 earthen waste pits in U.S. oilfields—97.5% of which were unlined)).  Moreover, *current* Ecuadorian regulations permit permanent disposal of drilling wastes in the exact same types of unlined pits that Donziger claims were "outdated," "dangerous," and "below industry standards" (Donziger Br. at 8) when Texaco operated in Ecuador more than two decades ago.  PX 8070 at 30, ¶¶ 23–24 (citing Ec. regulations Acuerdo 621 (1992), Decreto 2982 (1995), Decreto 1215 (2001)).[69]

As importantly, the evidence collected in Ecuador demonstrated that any residual oil from consortium operations was not "leach[ing] into the surrounding ground" (Donziger Br. at 7), as Donziger contends (PX 8067 at 51–52 ("Approximately 97% of the [soil] samples analyzed (1257 of 1297) contained no hydrocarbons or metals at concentrations above conservative health-based screening criteria, indicating no risk to local residents regardless of the potential for exposure at these locations . . . . This comprehensive evaluation clearly indicates that conditions resulting in exposure of local residents to unsafe concentrations of hydrocarbons or metals do not

---

[69] Since TexPet ceased operating in Ecuador in 1990, Petroecuador has dug hundreds of earthen pits for management of drilling muds, cuttings, and wastes.  *See* PX 8070 at 30–31, ¶ 24.  Similar pits are still in use in the United States.  *Id.* at 29, ¶ 20.

exist within the Concession area."); PX 8064 at 9–10 ("[T]he analytical test results of 221 drink-ing water sampling points in the former Petroecuador-Texaco Concession area show that 99% of these points, including 100% of the public drinking water supplies, meet the most stringent drinking water criteria among those established by Ecuador, the U.S. Environmental Protection Agency (USEPA), and the World Health Organization (WHO) . . . .")).

Donziger is also wrong in claiming that TexPet's discharge of produced water, which he inaccurately labels "toxic waste," was illegal or sub-standard. Donziger Br. at 7. In 1963, for example, approximately 1.4 billion barrels [almost 58 billion gallons] of produced water were discharged into surface water in the United States, and this volume remained similar through 1985. *See* PX 8070 at 33–34, ¶ 34, Figure 9A. Indeed, more than 930 million barrels per year of produced water are *currently* discharged to the surface in onshore oilfield operations worldwide. *Id.* at 33–34, ¶ 34. The first regulations in Ecuador establishing numerical limits on produced water were not put in place until 1992, after TexPet left Ecuador (*id.* at 35, ¶ 40 (citing Acuerdo 621 (1992))), and Petroecuador continued to discharge millions of gallons of produced water into surface waters as late as 2005. *Id.* at 35, ¶ 41. Moreover, sampling of surface waters in the con-cession area showed no impact from historical produced water discharges. *Id.* at 36, ¶ 42 ("The-se sampling locations included points directly downstream of the former points of produced wa-ter discharge at all 11 production stations in the former Concession, and found there to be no cur-rent impact on surface water quality from the historical discharges of produced water in the for-mer Concession area.").

Donziger similarly misrepresents the language of internal Texaco memoranda in claiming that Texaco attempted to conceal spills and refused to upgrade pits or eliminate "pipes [built] into the sides of many of its pits so the toxic contents could easily flow into nearby streams" due

91

to cost.  Donziger Br. at 7–8.  These documents say no such thing.  *See*, *e.g.*, DX 1064 (Texaco memorandum noting that "the possibility of pollution by our current waste disposal into pits is very minimal . . . .  The design of the current syphon system in our pits is such that the oil is retained in the pit and only water is drained from the pit.  The water that is discharged from the pit is of such low salinity that it has little or no detrimental effect on the environment.").  Donziger further claims that "Chevron's own hand-picked evidence" confirmed the company's culpability and "showed unlawful amounts of contamination" (Donziger Br. at 19, 20), but again, he misrepresents the actual evidence.  *See*, *e.g.*, PX 8064 at 7 ("the results of sampling and testing of hundreds of domestic and public water supplies throughout the former Concession [ ] prove that there are *no impacts* to water quality in this area due to the past operations of Texpet"); PX 8070 at 91 ("Inspection of 108 of the 172 RAP sites (63%) during the period of 2003 to 2009 has confirmed that Texpet completed the remediation of pits, soils, and spill sites, and other required tasks, in accordance with applicable specifications.").

Donziger likewise perverts the findings of oil field audits conducted in connection with the transfer of full ownership of the oil fields to Petroecuador in 1992.  Donziger claims the audits found "numerous violations of Ecuadorian law" (Donziger Br. at 9), but in reality the audit by Fugro-McClelland concluded that "TEXPET's operation[s] from 1964 through 1990 were *in compliance with Ecuadorian laws and regulations and industry practices* for seismic, exploratory drilling and many areas of development drilling/production operations."  DX 1703 at 7 (emphasis added); *see also id.* at 62 ("TEXPET's practices for waste handling, spill prevention and control and abandonment and restoration were in conducted [sic] according to Ecuadorian law and regulation and industry practices.").  Donziger also claims the audits identified spills at 97% of the sites assessed, but the Fugro-McClelland audit actually concluded that "approximately 70

percent of the hydrocarbon contamination at the production facilities and 50 percent of the drill pads and pits contamination was attributed to PETROAMAZONAS' operations from 1990 through 1992," and not the consortium's prior operations.  PX 8035 at 8.  And Donziger ignores entirely the remediation program subsequently conducted by Texaco, which was overseen and certified by the Republic of Ecuador and by third-party auditors.  *See In re Chevron Corp.*, 709 F. Supp. 2d 283, 286 (S.D.N.Y. 2010) (citing *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2005)).

Also false is Donziger's claim that TexPet's operations "left behind massive amounts of poison and pollution" and that "[t]oxic—and in many cases carcinogenic—chemicals continue to infect the waters that tens of thousands of indigenous people depend on."  Donziger Br. at 9.  In fact, David Russell told Donziger as early as 2004 that "Texaco may be right when they indicate that the remediation is performing as designed, and degrading the petroleum."  PX 710 at 1.  And Russell further explained: "From the data I have seen so far, we are not finding any of the highly carcinogenic compounds one would hope to see when investigating the oil pits."  PX 2420; *see also* PX 3201 at 6 (Russell:  "[W]e don't know the extent of soil contamination or the magnitude or extent of groundwater contamination");Tr. (Russell) 385:12–386:7 (Russell told Donziger on "more than one occasion" that they "weren't finding analytical results consistent with high levels of contamination which may have been in need of remediation").  Defendants' experts Ann Maest and Charles Champ told Donziger in March 2007 that there was no support for their claims of groundwater contamination.  PX 43A at 5 (Maest:  "all the reports are saying [groundwater contamination is] just at the pits and the stations and nothing has spread anywhere at all"); *id.* at 8 (Champ:  "the one hole in the remediation is the water"); PX 3316 at 1 (Maest noting that "most of the [groundwater] samples are clean"); *see also* PX 8064 at 7.  And even after ghost-

writing the Cabrera report himself using manipulated and cherry-picked data to support the LAPs' claims, Beltman told Donziger in 2008 that he had difficulty garnering any other peer support for it because its underlying data had "weaknesses that an academic would probably have a hard time defending."  PX 1052 at 1; *see generally* PX 8064–8074.

Donziger's twenty-page attack on Chevron and the supposed environmental damage stemming from TexPet's conduct in Ecuador is unsupported by admissible evidence—indeed, in many cases, he cites nothing at all.  *See* Ex. B.  As Donziger has done throughout his extortionate campaign against Chevron, his favorite tactic is to cite the LAP team's own propaganda, either by citing their own previous allegations, or by citing third parties they have used to launder their lies—with Cabrera chief among them.  For instance, to support the claim that "oil and water samples from inspections revealed unlawful amounts of at least fifteen different potentially toxic substances" (Donziger Br. at 19), Donziger cites only the LAPs' own briefs in the Lago Agrio litigation.  Apart from the fact that these *alegatos* are mere attorney argument, they also rely heavily on the Cabrera report.  *See*, *e.g.*, DX 1482 at 131 ("[B]ased on an analysis of several comparable past groundwater remediation projects, the Cabrera Report postulated a cost ranging from $3.5 million to $13.4 million per site over 20 years for an approximate total of $3.240 billion.  The plaintiffs recommend that a similar amount be kept on reserve . . . .").  *See also supra* n. 47.

Moreover, as Donziger knows, the cost numbers he asserts, and his arguments for pinning them on Chevron, are fabrications.  First, as discussed above, the alleged historical wrongful practices and injuries he ascribes to TexPet never happened.  Second, he ignores, and has instructed his consultants to ignore (*e.g.* PX 3200 (Russell) ¶ 6; PX 5208 (Beltman) ¶ 33), that the current environmental situation is the result of the practices and failures of Petroecuador, which

94

has been the sole operator in the former consortium area for 23 years, spilling and drilling throughout that entire period.  When TexPet's contract expired in 1992, it offered to participate in a joint remediation effort, but the ROE declined, and instead, agreed to split remediation responsibility between TexPet and Petroecuador.  TexPet remediated its portion, but Petroecuador did nothing for fifteen years—except to drill over 400 new wells and, Fajardo's words, "inflict[] more damage and many more disasters than Texaco itself."  PX 8023 at 2; *see* Chevron Br. 14–16.  But Donziger would charge Chevron with undoing Petroecuador's "damage" and "disasters."  Third, Donziger's billion dollar allegations are baseless fictions.  No independent entity has ever substantively endorsed the sorts of dollar figures that Donziger throws around.  Nor have Donziger's own consultants stood behind them:  Russell abandoned his initial $6 billion estimate within a year (PX 3200 (Russell) ¶ 11), and Beltman, who could get no peer support for the ghostwritten Cabrera report (PX 1052), has now disavowed it (PX 5208 (Beltman) ¶¶ 47, 73, 76).  In fact, the ROE has since 2005 been engaged in actual remediation projects in the region—over Donziger's attempts to stop them (PX 1142)—at an estimated cost of $67.8 million to remediate 370 pits.  PX 8065 at 4; PX 8025.

In sum, environmental conditions in the former concession area, while not at issue in this case, are also not any fault of Texaco's or Chevron's in any event, and Defendants' characterizations of those conditions are knowing falsehoods.  Defendants' continuing attempts to re-inject them as a defense to or justification for their corrupt actions therefore fail.

### b.  This Court Should Strike Donziger's Unsupported Allegations

It is axiomatic that only admissible evidence in the trial record may be considered by the Court in making factual determinations.  *See, e.g.*, *Schley v. Pullman's Palace Car Co.*, 120 U.S. 575, 578, 7 S. Ct. 730, 731 (1887) ("It is only necessary to say that the facts *dehors* the record, which have been improperly introduced into the brief of the counsel for the defendant in error,

have not in any degree influenced our determination of the case."); *Bono v. United States*, 113

F.2d 724, 725 (2d Cir. 1940) ("Though the appellant has briefed this appeal as though facts stat-

ed in the brief, but not shown by the record, may be given effect it is, of course, the record alone

which controls as to the facts.").  Yet in addition to asserting as "facts" allegations that are com-

pletely unsupported, Donziger's post-trial brief—especially the first 21 pages—repeatedly cites

to inadmissible evidence that is outside of the trial record and completely unrelated to his alleged

"facts."  *See* Ex. B (listing bases for striking unsupported assertions of fact); Ex. C (annotated

copy of Donziger's post-trial brief with specified unsupported assertions of fact crossed out).[70]

This Court should foreclose Donziger from laundering his unsupported attacks on Chev-

ron through this proceeding.  Donziger's brief was written for audiences other than this Court,

but that does not mean he can disregard the rules of procedure and evidence.  Fed. R. Civ. P.

11(b)(3) ("By presenting to the court a pleading, written motion, or other paper, . . . an attorney .

. . certifies that . . . the factual contentions have evidentiary support."); *see also* Fed. R. Civ. P.

52(a); Fed. R. Evid. 402; Fed. R. Evid. 403.  Striking *sua sponte* the unsupported factual allega-

tions in Donziger's brief would make a reviewing court aware that Donziger's smears, which he

will no doubt repeat in other fora, are not supported by any evidence adduced in this action.  *See*

*Jackson Constr. Co. v. United States*, 62 Fed. Cl. 84, 87 n.2 (Fed. Cl. 2004) ("After the post-trial

briefing was completed, the defendant filed a Motion to Strike References to Deposition Testi-

mony Not in the Trial Record.  The Court agrees with the defendant's position and hereby grants

the defendant's motion to strike.  In reaching its decision on the merits, the Court did not consid-

er any of the disputed deposition testimony referenced in the plaintiff's post-trial briefs.").

---

[70] Both Defendants' briefs are rife with falsehoods and unsupported allegations.  By identifying the specifically objectionable and unsupported assertions in a portion of Donziger's brief, Chevron does not imply that anything else in either brief is accurate or supported by evidence.  Indeed, the strike-throughs reflected in Exhibit C are conservative.

**B. Chevron Is Not Judicially or Equitably Estopped by Texaco's Representations in *Aguinda***

Contrary to Defendants' arguments, Texaco's representations in the *Aguinda* action do not estop Chevron "from collaterally attacking the Ecuadorian proceedings and from seeking to frustrate enforcement of or collection upon the Ecuadorian judgment."  LAPs Br. at 33; *see* Donziger Br. at 10–11.  As a preliminary matter, this action is not a "collateral attack" on the Ecuadorian proceedings, making Defendants' argument on this point irrelevant.  In any event, as Chevron explained in its opening brief (Chevron Br. at 294–98) and previously (*e.g.*, Dkt. 1497 at 3–7), Texaco (much less Chevron) did not make a binding promise to satisfy any Ecuadorian judgment (the LAPs rejected the only similar proposal) (Chevron Br. at 295; Dkt. 1497 at 4), and the Second Circuit opinion Defendants cite rejects the LAPs' estoppel claim, holding there is no restriction on "the kind of forum or type of proceeding in which Chevron can raise [] defenses [to the Ecuadorian judgment]."  *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011).

Moreover, Defendants' unclean hands—their pervasive fraud in the procurement of that judgment—bars them from invoking any equitable defenses here.  Both judicial estoppel and equitable estoppel are subject to the doctrine of "unclean hands," which requires that "he who comes into equity must come with clean hands."  Chevron Br. at 298 (quoting *Motorola Credit Corp.*, 274 F. Supp. 2d at 505).  The unclean hands doctrine bars parties from relying on equitable defenses where, as here, "the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is 'directly related to the subject matter in litigation' and has injured the party attempting to invoke the doctrine."  *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (quoting *Weiss v. Mayflower Doughnut Corp.*, 1 N.Y.2d

310, 316 (1956)).[71]

Both these elements are satisfied here.  First, Defendants' unconscionable conduct could not be more closely related to the "subject matter in litigation"—their fraudulent pursuit of the litigation in Ecuador as part of their racketeering and fraud in the United States.  Second, Chevron has proven at trial that Defendants' inequitable, corrupt conduct injured Chevron.  In fact, Defendants' conduct provides a paradigmatic case of unclean hands.  In *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969 (S.D.N.Y. 1992), when the court found that defendants had fabricated evidence in support of their laches defense, it barred them from relying on the defense, regardless of its merits.  *Id.* at 970–72 ("Because of Berkshire's unclean hands, we find that it is immaterial that Dweck's revised testimony may support a finding of laches.").  Likewise, here, Defendants cannot shield their misconduct behind the fraudulent Ecuadorian judgment they fabricated.  And the injury to Chevron is equally clear.  *See supra* Section II.B.

Even if Defendants could raise these equitable defenses, given their other misconduct, they would fail on the merits in any event.  Defendants assert, first, that Chevron is precluded from challenging Defendants' conduct, except in the defense of an enforcement action brought by the LAPs, because Texaco supposedly promised that it would "satisfy any judgment" in order to obtain a *forum non conveniens* dismissal of the *Aguinda* action (LAPs Br. at 34–38; Donziger Br. at 10–11, 55–56); and second, that Chevron cannot challenge Defendants' fraudulent conduct in Ecuadorian courts because Texaco previously represented in the 1990s in securing *forum non*

---

[71]  Judicial estoppel requires Defendants to show that Chevron "would derive an *unfair* advantage or impose an *unfair* detriment on the opposing party if not estopped."  *New Hampshire v. Maine*, 532 U.S. 742, 751, 121 S. Ct. 1808, 1815 (2001) (emphasis added).  Moreover, "Judicial estoppel does not apply when a party's assertedly inconsistent positions stem from reliance on statements made to the court by an opponent, which later prove untrue."  *Jaffe v. Accredited Sur. & Cas. Co.*, 294 F.3d 584, 595 n. 7 (4th Cir. 2002).  Implicit in any representation regarding the foreign forum in a *forum non conveniens* dismissal is the understanding that the opposing party will litigate the underlying action without engaging in fraud.  Likewise, equitable estoppel requires Defendants to show that they are the "innocent" party.  *Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 90 (2d Cir. 2013).  Given Defendants' misconduct, there is nothing unfair about allowing Chevron to pursue its claims against them.

*conveniens* dismissal here that the Ecuadorian judiciary was capable of handling the claims made

in the *Aguinda* action (Donziger Br. at 55).  Defendants' estoppel theories are not responsive to

the claims and remedies Chevron seeks here; they fail to take into account the dramatic change

of circumstances in Ecuador since the *Aguinda* dismissal; and they misstate the nature of the

purported representations made or relied upon in the *Aguinda* dismissal.

    Neither of Defendants' asserted equitable defenses satisfies the elements of judicial or

equitable estoppel.  A party "'invoking judicial estoppel must show that (1) the party against

whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that po-

sition was adopted by the first tribunal in some manner.'"  *Bridgeway Corp. v. Citibank*, 201

F.3d 134, 141 (2d Cir. 2000) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6

(2d Cir.1999)).  The Second Circuit requires "clear inconsistency between [the party's] present

and former positions."  *Id.* (quoting *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d

Cir.1997) (alteration in *Bridgeway*).  As explained below, there is no inconsistency between the

position taken by Texaco in *Aguinda* and Chevron's challenge to Defendants' wrongful conduct.

Nor did any court adopt the core "promise" Defendants erroneously claim was made.

    Equitable estoppel may apply where:  "1) the party to be estopped makes a misrepresen-

tation of fact to the other party with reason to believe that the other party will rely upon it; 2) and

the other party reasonably relies upon it; 3) to her detriment."  *Kosakow v. New Rochelle Radiol-

ogy Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).  Defendants have identified no "misrepre-

sentation of fact," and cannot argue that their fraud in Ecuador, let alone their racketeering and

fraud in the United States, was done "in reliance" on any statement made by Chevron or Texaco.

*See United States v. Perez-Torres*, 15 F.3d 403, 407 (5th Cir. 1994) ("[T]he law should not, and

does not, regard the willful and knowing commission of a felony as 'reasonable' reliance.").

Regardless, Defendants' asserted equitable defenses fail because they are not responsive to the bulk of Chevron's claims or the record in this action.  Rather, they are predicated on Defendants' misconstruction of this case as being purely a challenge to the Ecuadorian judgment.  No statement by Texaco in *Aguinda* can be read to have waived Texaco's right (let alone Chevron's right) to defend itself against racketeering and fraud, and no estoppel argument provides any defense for Defendants' extortionate scheme in the United States, their obstruction of justice in the United States, or even of the bulk of their conduct in Ecuador, including the Calmbacher, Russell, Reyes, and Cabrera frauds.  Nor could *any* statements by *anyone* in 1999 about a hypothetical Ecuadorian judgment have had this effect.  Whatever representations Texaco made about the Ecuadorian judiciary or its future rulings, they did not purport to waive torts against Texaco (much less Chevron) that had not yet occurred.  *See* Chevron Br. at 297 (collecting cases); *see also In re Union Carbide Co.*, 809 F.2d 195, 205 (2d Cir. 1987) (holding that, after a *forum non conveniens* dismissal, "[a]ny denial by the Indian courts of due process can be raised by [the defendant] as a defense to the plaintiffs' later attempt to enforce a resulting judgment against [the defendant] in this country").

Defendants also mischaracterize the supposed representations at issue here.  Defendants' primary argument—that "Chevron" supposedly agreed to "satisfy any judgment"—was never agreed to by the *Aguinda* plaintiffs nor relied on by the court.  Texaco initially offered to make satisfaction of the judgment a condition of dismissal in its package of proposed conditions (PX 8004 at 4), but the *Aguinda* plaintiffs *rejected* Texaco's offer because it included the reservation of Texaco's right to challenge the anticipated judgment under New York law (PX 8005 at 2–3; *see* Dkt. 1497 at 3–4).  After the *Aguinda* plaintiffs rejected Texaco's proposed condition, it vanished from the proceedings entirely.  Over the next three years, the specifics of Texaco's condi-

tions were memorialized in further briefing, in a stipulation signed by the *Aguinda* plaintiffs' lead counsel, Joseph Kohn (PX 8003), and in published opinions from both the Second Circuit and this Court.[72]  The conditions proposed by Texaco and accepted by the *Aguinda* plaintiffs (consent to personal jurisdiction, consent to the use of discovery, and partial waiver of statute of limitations) appear at each juncture—but no party or court ever refers to the judgment satisfaction as a condition of dismissal.  *See* Dkt. 1497 at 4 n.7.

Moreover, Texaco's position before the *Aguinda* court was merely that Ecuador would be an "adequate" forum for the *LAPs* to bring their claims.  *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002).  And any adequacy arguments actually adopted by the court necessarily were with respect to the *plaintiffs*, not Texaco.  *See Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1144 (9th Cir. 2001) (discussing adequacy of "remedy for the plaintiff's complained of wrong").  Moreover, there is no inconsistency in contending at one point in time that Ecuador generally provided an "adequate" forum at the time, and then, later, bringing affirmative claims against those who corruptly obtained a fraudulent judgment—or even challenging the judgment that resulted from acts of fraud in this case.  In *Bridgeway Corp.*, the Second Circuit held that there was no fundamental inconsistency between actually litigating a case in a foreign country, even as a plaintiff, and later challenging the proceeding as unfair.  201 F.3d at 141.  The defenses to judgment enforcement under the New York Recognition Act, which Texaco expressly reserved, ap-

---

[72] See *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 475 (2d Cir. 2002) ("Texaco consented to personal jurisdiction in Ecuador as to the *Aguinda* plaintiffs and in Peru or Ecuador as to the *Jota* plaintiffs.  Texaco stipulated it would waive its statute of limitations defenses that matured during the period of time between the filing of the complaint and the 60th day after the dismissal of the action by the district court.  It preserved such defenses, however, with respect to the passage of time prior to the initial filing of the complaints.  It also offered to stipulate that plaintiffs could utilize the discovery obtained thus far in resumed proceedings in Ecuador or Peru.  Texaco then renewed its motion to dismiss by reason of forum non conveniens."); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001) ("Here, Texaco has now unambiguously agreed in writing to being sued on these claims (or their Ecuadorian equivalents) in Ecuador, to accept service of process in Ecuador, and to waive for 60 days after the date of this dismissal any statute of limitations-based defenses that may have matured since the filing of the instant Complaints.").

ply here to this judgment procured by fraud.  No inconsistency exists.

Defendants' asserted equitable defenses also fail because of the dramatic decline in the Ecuadorian judiciary since the *Aguinda forum non conveniens* dismissal.  Judicial estoppel "does not bar a party from protecting its interests in the face of changed circumstances."  *In re Petition of Treco*, 205 B.R. 358, 364 (S.D.N.Y. 1997) (Sotomayor, J.); *see Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1344 (S.D. Fla. 2009) (parties not "estopped from contesting the fairness of Nicaragua's procedures" because intervening changes "fundamentally altered the legal landscape in Nicaragua"), *aff'd*, 635 F.3d 1277 (11th Cir. 2011); *see also United States ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1147 (9th Cir. 1998).  The LAPs argue that Chevron cannot reconcile its current position about the Ecuadorian judicial system being corrupt with the position Texaco took in the *Aguinda* action because Ecuador's courts have been corrupt all along.  LAPs Br. at 1.[73]  In fact, the unrebutted evidence presented at trial was that

---

[73] The LAPs cite Ecuador's 1998 "raw score of 2.3 in Transparency International's bellwether Corruption Perceptions Index, coming in at 77 out of 85 nations analyzed—good for the bottom 10%." LAPs Br. at 1.  But the metric cited by the LAPs is of no relevance to this question—it is a measure of overall corruption, specifically "perceptions of the degree of which corruption is seen by business people."  The Corruptions Perceptions Index 1998, *available at*: http://archive.transparency.org/policy_research/surveys_indices/cpi/previous_cpi/ 1998#sthash.2GxXlnnm.dpuf (last visited Jan. 20, 2014).  It is *not* a measure of the impartiality of the judiciary.

Donziger asserts that the striking of the $8.646 billion punitive award from the Lago Agrio judgment by the Ecuadorian National Court of Justice and "the two recent legal victories Chevron has achieved over Ecuador's state-owned oil company . . . severely undercuts Chevron's argument that the Ecuadorian courts are systematically biased against it."  Donziger Br. at 28.  This argument rests on falsehoods and is illogical.  First, while Donziger does not identify "the two recent legal victories," the only "legal victories" Chevron has achieved related to Ecuadorian oil production are those obtained in U.S. courts in discovery actions related to this case and in international arbitration—not in Ecuadorian courts.  These orders validate Chevron's concerns about the Ecuadorian judiciary, and do no "undercut" them.  Second, the National Court of Justice's striking of the punitive award reflects the complete lack of any dispute that punitive damages are illegal under Ecuadorian law (Dkt. 1411 ¶ 11); *see also* PX 2466 at 2 (Donziger wrote:  "Punitive:  no basis in Ecuadorian law, but we could push it and seek it anyway.").  Indeed, arranging for apparently adverse results to create the illusion of fairness is part of Donziger's approach to fraud.  *See* PX 858 at 1 (Donziger told his team that they "need[ed] . . . to think of anything Richard [Cabrera] could do AGAINST us to prove his independence . . . .").  Third, Donziger misstates Chevron's position, which is that Ecuadorian courts are weak and dominated by corruption and the overt control of President Correa—who is an avowed opponent of Chevron.  *See* Chevron Br. at 274–83; *see, e.g.*, PX 7511 (labeling Chevron an "enemy"); PX 7539 (calling the Ecuadorian lawyers supporting Chevron, "The nation's traitors").  This is not only Chevron's position (supported by unrebutted expert testimony, *see* PX 4700 (Elena) ¶¶ 33–37; PX 6200 (Alvarez) ¶ 4)), but is the U.S. Department of State's as well (PX 1100 at 2) (2009 U.S. State Department report concluding that "[s]ystemic weakness and susceptibility to political or economic pressures in the rule of law constitute the most important problem faced by U.S. companies investing in or trading with Ecuador.").

corruption of Ecuador's courts accelerated starting in the early 2000s and that the Ecuadorian judiciary has "consistently deteriorated over time" (PX 4700 (Elena) ¶ 49), due primarily to the judicial purges of 2004 and 2005 and increasing political interference with the judiciary under the Correa administration.  For example, "[s]ince 2004, the judiciary has been subject to great political interference."  *Id.* ¶ 34.  And, "[s]ince 2006-2007, Ecuador is consistently ranked as one of the worst countries for Judicial Independence."  *Id.* ¶ 54; *see also* Dkt. 1148 at 4.  Furthermore, whatever promises were made and whatever representations Texaco made with respect to the fitness of the Ecuadorian judiciary, they were made by and with respect to Texaco and the included personal injury claims asserted in the U.S. *Aguinda* action, not the very different Lago Agrio action brought against Chevron.  Dkt. 1497 at 5–6; *see also* Chevron Br. at 296–97.  It is undisputed that Texaco and Chevron are two distinct corporate entities.  PX 8000; PX 8001; PX 8002.  This Court has previously rejected "[t]he blithe assumption that Chevron is bound or estopped by anything that Texaco said or did . . . that Chevron became its successor-in-interest . . . [and] that the LAPs are entitled to pierce Texaco's corporate veil or otherwise impute its previous positions to Chevron. . . . [T]here is no evidence in this record that, if accepted, could justify disregarding Texaco's separate corporate existence."  Dkt. 181 at 106; *see also In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *15–16 (S.D.N.Y. Jun. 28, 2010) (discussing limitations on successor liability); *Aguinda*, 142 F. Supp. 2d at 548 (finding that Texaco did not substantially direct TexPet's participation in the consortium from the United States).[74]  And there is no question that the community-harm claim the LAPs ultimately asserted

---

[74] This corporate-form distinction is an important legal matter.  Defendants are seeking to capitalize on their admittedly incorrect decision to sue Chevron, rather than Texaco or TexPet (*see* PX 176), and the subsequent finding of Chevron's liability in the judgment they ghostwrote.  They are bringing enforcement actions against subsidiaries of Chevron Corp., instead of the then-Texaco, Inc. subsidiary that operated in Ecuador, in order to access a wider range of assets.  Yet they have never offered any evidence that the multiple corporate veils they seek to pierce are invalid—with the dubious exception of the Fusion Memo, which is also the most glaring example of their improper role in the drafting of the Lago Agrio judgment.

against Chevron in Ecuador under that country's new Environmental Management Act was fundamentally different than the individual damage claims asserted on behalf of a few dozen individuals in the U.S. *Aguinda* action.

Defendants attempt to buttress their argument with passing comments from the Second Circuit's opinion in *Republic of Ecuador*, 638 F.3d 384 (LAPs Br. at 35), but those passing comments, in a footnote not necessary to the decision, are mistakes of fact, and do not overcome the evidentiary record here showing that the LAPs rejected the supposed "promise," that was offered by Texaco to apply to Texaco only, and not by or for Chevron, and that Chevron and Texaco were and remain separate companies.  Indeed, in more recent opinions, the Second Circuit has since corrected itself.  *See* Chevron Br. at 296 n.84 (citing *Naranjo*, 667 F.3d at 235 n.2). Moreover, even in *Republic of Ecuador*, the Second Circuit ultimately rejected the LAPs' attempt to rely on the supposed "promise" by Texaco to block the BIT arbitration (638 F.3d at 400), and expressly noted that, even assuming the "promise" was binding on Texaco, and assuming that it applies to Chevron, "Chevron has . . . reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the Ecuadorian judicial system 'does not provide impartial tribunals or procedures compatible with . . . due process of law'. . . . Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses."  *Id.* at 397.

### C.  Defendants' Collateral Estoppel Defense Fails

Although Defendants call it by different names, such as "deference" and "international comity," they continue to argue for the purportedly preclusive effect of the Lago Agrio judgment and appellate decisions.  Donziger Br. at 1, 3, 5, 52–55.  Collateral estoppel by any other name is still collateral estoppel.  As detailed in Chevron's initial brief, Defendants cannot satisfy the burden of establishing their collateral estoppel/comity affirmative defenses because the Lago Agrio

104

judgment was "obtained by fraud," "rendered under a system which does not provide impartial tribunals," and procured in contravention of due process, such that it therefore cannot be recognized or accorded comity or deference under federal or New York law. *See* Chevron Br. at 267–84; Dkt. 450 at 1–2; *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 278–79 (S.D.N.Y. 2012); CPLR 5304(a)(1), (b)(3). Moreover, Chevron does not need to prove that "every one" of the Ecuadorian appellate judges was "corrupt or unqualified." Donziger Br. at 3. Rather, Defendants' control of Cabrera and ghostwriting of his report, their bribery of Zambrano, and their ghostwriting of the judgment itself establish that the Lago Agrio judgment was procured by fraud, and "[o]nce a litigant chooses to practice fraud, that misconduct infects his cause of action, in whatever guises it may subsequently appear." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989); *see also Hilton*, 159 U.S. at 160, 16 S. Ct. at 207; *United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939). Even so, as Chevron explained in its post-trial memorandum, the selection process associated with the intermediate appellate panel was improper. *See* Chevron Br. at 282–83.

The Ecuadorian appellate decisions do not cleanse the fraudulent Lago Agrio judgment of its taint. Defendants erroneously contend that the intermediate Ecuadorian appellate court "rejected" Chevron's fraud claims. Donziger Br. at 26–27. In reality, the intermediate Ecuadorian appellate court declined to address them. *See* PX 430 at 10; PX 431 at 4. Similarly, the Ecuadorian National Court of Justice also declined to address Chevron's claims of fraud and misconduct. *See* DX 8095 at 102, 221. The limited response to the ghostwriting evidence offered by the intermediate appellate court—which amounted to no response at all, since it cited record pages that did not match up with the LAPs' internal work product that showed up word-for-word in the ghostwritten judgment—did not come close to resolving that issue, as Chevron explained

in its post-trial memorandum.  *See* Chevron Br. at 283–84.  Nor did any of these Ecuadorian ap-

pellate courts have before them the full evidentiary record developed here, such as the damning

trial testimony of Alberto Guerra and former judge Zambrano.  *See id.* at 92–113.

### D.  Defendants' Attacks on This Court Are Unwarranted, Unfair, False, and Irrelevant

In a preview of further attacks to come on any judgment unfavorable to them, Defendants

attack this Court's impartiality and the fairness of these trial proceedings.  These attacks are un-

warranted and based on falsehoods.[75]  But they are consistent with Defendants' longstanding

strategy of seeking to intimidate tribunals that rule against them.  *See* Chevron Br. at 47 n.14.

Beyond their general smears, all unsupported by the record and false, Defendants make

two specific false factual claims.  First, this Court did not invite Chevron to file its RICO action.

*See* Donziger Br. at 28 n.109.  It was Chevron that "first publically mentioned" RICO, arguing in

a September 1, 2010 brief in opposition to Donziger's motion to quash the Donziger § 1782 pro-

ceeding that Donziger's violations of the Hobbs Act, RICO, and other statutes merited imposi-

tion of the crime-fraud exception to vitiate Donziger and the LAPs' privilege claims.  *See* Dkt.

298-13 at 23–25.[76]  Donziger misleadingly quotes the Court—at the subsequent hearing—

---

[75] The Second Circuit has rejected all of Defendants' repeated attempts to change the judge presiding over this case, just as it rejected Defendants' attempt to recuse Judge Rakoff from *Aguinda* when he ruled against them.  *Naranjo v. Chevron Corp.*, No. 13-772-cv, Dkt. 182 (2d Cir. Sept. 26, 2013); *Chevron Corp. v. Naranjo*, No. 11-1150-cv(L), Dkt. 600 (2d Cir. Sept. 19, 2011); *Chevron Corp. v. Naranjo*, No. 13-332, Dkt. 62 (2d Cir. Apr. 10, 2013); *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001) .

[76] Besides explaining this Court's question about the Hobbs Act and RICO, Chevron's September 1, 2010 brief shows just how absurd Defendants' assertions are that Chevron's claims have "shifted," and that they do not understand the charges against them.  In September 2010, six months before Chevron filed its complaint in this action, it laid out the framework of its RICO claim in the Donziger § 1782:

> The evidentiary record Chevron has put before this Court amply supports a finding of at least "probable cause" that numerous U.S. criminal statutes have been violated.  For example, under the Hobbs Act, 18 U.S.C. § 1951, a conspiracy to commit extortion—*i.e.*, the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"—is a felony punishable by twenty years' imprisonment.  The broad scheme to threaten or obtain a false judgment based on faked evidence and corrupted court experts positing wildly excessive damages "assessments," from a tribunal subjected to intense political and physical pressure, topped off with a campaign of public vilification against Chevron and

inviting *Donziger's* counsel to respond to Chevron's crime-fraud argument.  *See* Dkt. 287-3

(Donziger § 1782 Hr'g Tr. Sept. 23, 2010) at 23:21–24:22.  Second, the motion practice in this

litigation has been far from "one-sided."  LAPs Br. at 2.  As of May 17, 2013, the Court counted

85 substantive motions filed in this case—46 motions by Chevron and 39 motions by Defend-

ants.  Dkt. 1164 at 2 n.6.  Since then, the bulk of the motion practice has come from the Defend-

ants.  Indeed, Defendants filed a flurry of at least 20 motions immediately before and during the

trial.  *See* Dkts. 1489, 1490, 1521, 1523, 1525, 1590, 1593, 1600, 1601, 1603, 1631, 1640, 1642,

1645, 1646, 1660, 1665, 1699, 1755, 1761.  On the other hand, discovery in this litigation has

been decidedly "one-sided."  Chevron produced approximately a million documents to Defend-

ants and made available five senior employees, including its CEO, for deposition—a time- and

resource-consuming process that yielded virtually no evidence that Defendants chose to cite in

their post-trial briefs.  In contrast, Defendants produced little material, their co-conspirators re-

fused to appear for deposition, and they refused to produce any of their Ecuadorian agents' doc-

uments.  *See* Dkt. 1529 at 92–93, 100.

Finally, Donziger's suggestion, made through his spokesperson Christopher Gowen, that

Chevron's publicly filed proposed findings of fact (Dkt. 1848) is "a highly questionable practice

that amounts to an attempt at ghostwriting the court's decision" is absurd.  *See* Ex. D.  Proposed

findings of fact are a customary practice in federal court.  *See* 9C ARTHUR R. MILLER, *Federal*

---

its employees based on knowing falsehoods, represents a literal extortion racket.  *See McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992).  This scheme also involves multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346.  And Donziger's attempts to in-timidate or mislead Calmbacher in connection with his deposition is probable cause for obstruc-tion of justice in violation of 18 U.S.C. § 1503 or witness tampering in violation of 18 U.S.C. § 1512(b).  *See* Hendricks I, Ex. DD, 144:20–146:23.

All of these acts and the conspiracy to commit them, if committed in furtherance of a racketeering enterprise, constitute predicate acts under RICO, 18 U.S.C. §§ 1961–1964.  The perjury and mis-representations to Congress and federal regulatory agencies constitute additional predicate acts of obstruction of justice and false statements.  *See* 18 U.S.C. §§ 1001, 1623, 1505.

Dkt. 298-13 (Chevron brief in Donziger § 1782, originally filed September 1, 2010) at 23–24.

*Practice & Procedure* § 2578 (3d ed. 2013) ("The trial court may invite opposing counsel to submit proposed findings of fact and conclusions of law.  Indeed this practice is well established as a valuable aid to decision making.") (internal quotation omitted); *see also* SDNY ECF option for "Proposed Findings of Fact" under "Trial Documents."  There is no comparison between the public submission of proposed findings of fact and Defendants' *ex parte—and publicly denied—* ghostwriting of the Cabrera report and the Lago Agrio judgment itself.

## CONCLUSION

The Court should enter judgment in Chevron's favor finding Donziger liable under RICO and New York Judiciary Law section 487, finding all Defendants liable for fraud and civil conspiracy, entering equitable relief against all Defendants to prevent them from profiting from their crimes and continuing to perpetrate them, and awarding Chevron its costs and attorneys' fees under 18 U.S.C. § 1964(c).

Dated:  January 21, 2014           Respectfully submitted,
New York, New York

                              /s/ Randy M. Mastro
                        Randy M. Mastro
                        Andrea E. Neuman
                        GIBSON, DUNN & CRUTCHER LLP
                        200 Park Avenue
                        New York, New York 10166
                        Telephone: 212.351.4000
                        Facsimile:  212.351.4035

                        William E. Thomson
                        333 South Grand Avenue
                        Los Angeles, California 90071
                        Telephone: 213.229.7000
                        Facsimile:  213.229.7520

                        *Attorneys for Chevron Corporation*