**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHEVRON CORPORATION,

           *Plaintiff,*

    v.

STEVEN DONZIGER, *et al.*,

           *Defendants.*

No. 11-CIV-0691 (LAK)

**POST-TRIAL REPLY MEMORANDUM OF STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC**

RICHARD H. FRIEDMAN
FRIEDMAN | RUBIN
1126 Highland Avenue
Bremerton, WA  98337
Tel: (360) 782-4300
Fax: (360) 782-4358

ZOE LITTLEPAGE
LITTLEPAGE BOOTH
2043A West Main
Houston, TX  77098
Tel: (713) 529-8000
Fax: (713) 529-8044

*Of Counsel:*

DEEPAK GUPTA
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 888-1741
Fax: (202) 328-7030

January 21, 2013

STEVEN R. DONZIGER
245 W. 104th Street, #7D
New York, NY 10025
Tel: (212) 570-4499
Fax: (212) 409-8628

*Attorneys for Steven R. Donziger, Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ..............................................................................................................1

ARGUMENT ....................................................................................................................8

    I.       Because Chevron lacks standing, this Court lacks jurisdiction and must
            immediately dismiss this case. ...................................................................8

    II.      Chevron's proposed injunction exacerbates the very international-comity
            problems it seeks to avoid. ........................................................................11

    III.     Chevron is judicially estopped from obtaining any of the relief sought. ...............15

    IV.    Chevron has no cause of action under RICO, and RICO does not
            authorize any of the relief Chevron seeks. ................................................19

    V.      Chevron has no cause of action under New York law, and New York law
            does not authorize any of the relief Chevron seeks. ....................................22

    VI.    Chevron's requested injunction is impermissibly vague and would burden
            protected First Amendment activity. ..........................................................27

    VII.   All of Chevron's claims are meritless. ......................................................30

    VIII.  The defendants do not assert a collateral-estoppel defense in this case and
            are not asking this Court to enforce the Ecuadorian judgment. ..........................34

CONCLUSION ..............................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Adebiyi v. Yankee Fiber Control, Inc.*,
   705 F. Supp. 2d 287 (S.D.N.Y. 2010) ..............................................................................23, 24

*Aetna Casualty & Surety Co. v. Liebowitz*,
   730 F.2d 905 (2d Cir. 1984) ..........................................................................................21, 22

*Aguinda v. Texaco, Inc.*,
   142 F. Supp. 2d 534 (S.D.N.Y. 2001) ................................................................15, 16, 17, 18

*Amalfitano v. Rosenberg*,
   12 N.Y.3d 8 (2009) ...............................................................................................................26

*Barrows v. Alexander*,
   78 A.D.3d 1693 (App. Div. 4th Dep't 2010) ........................................................................27

*Batts v. Tow-Motor Forklift Co.*,
   66 F.3d 743 (5th Cir. 1995) ..................................................................................................24

*Brackett v. Griswold*,
   112 N.Y. 454 (1889) ..............................................................................................................23

*Bridge v. Phoenix Bond & Indemnity Co.*,
   553 U.S. 639 (2008) ...............................................................................................................31

*Brown v. Entertainment Merchants Ass'n*,
   131 S. Ct. 2729 (2011) ...........................................................................................................29

*Bruff v. Mali*,
   36 N.Y. 200 (1867) .................................................................................................................23

*Cedeño v. Castillo*,
   457 F. App'x 35 (2d Cir. 2012) .............................................................................................30

*Cement & Concrete Workers District Council Welfare Fund v. Lollo*,
   148 F.3d 194 (2d Cir. 1998) ..................................................................................................22

*Chatin v. Coombe*,
   186 F.3d 82 (2d Cir. 1999) ....................................................................................................27

*Chevron Corp. v. Donziger*,
   871 F. Supp. 2d 229 (S.D.N.Y. 2012) ..................................................................................26

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2011) ............................................................................................*passim*

*City of New York v. Smokes-Spirits.com, Inc.*,
   541 F.3d 425 (2d Cir. 2008), *rev'd on other grounds*, *Hemi Group, LLC v. City of New York*,
   559 U.S. 1 (2010) ..................................................................................................................22

*Clapper v. Amnesty International USA*,
   133 S. Ct. 1138 (2013) ...........................................................................................................10

*Commodity Futures Trading Commission v. Vartuli*,
  228 F.3d 94 (2d Cir. 2000) ........................................................................................29

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ....................................................................................................2

*Deck v. Engineered Laminates*,
  349 F.3d 1253 (10th Cir. 2003) ................................................................................32

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ......................................................................................30

*Dress Shirt Sales, Inc. v. Hotel Martinique Associates*,
  12 N.Y.2d 339 (1963) ................................................................................................25

*Eaton, Cole & Burnham Co. v. Avery*,
  83 N.Y. 31 (1880) ......................................................................................................23

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
  12 N.Y.3d 553 (2009) ..........................................................................................23, 25

*Factors Etc., Inc. v. Pro Arts, Inc.*,
  652 F.2d 278 (2d Cir. 1981) ......................................................................................25

*Federal Treasury Enterprise Sojuzplodoimport v. Spirits International N.V.*,
  400 F. App'x 611 (2d Cir. 2010) ...............................................................................22

*Haber v. Kisner*,
  255 A.D.2d 223 (App. Div. 1st Dep't 1998) .............................................................27

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010) ......................................................................................................30

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992) ..................................................................................................30

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ................................................................................................25

*Litvinov v. Hodson*,
  905 N.Y.S.2d 400 (App. Div. 4th Dep't 2010) .........................................................24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................................9, 10

*Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Restaurant Employees*,
  239 F.3d 172 (2d Cir. 2001) ......................................................................................29

*Mitchell v. Washingtonville Central School District*,
  190 F.3d 1 (2d Cir. 1999) .....................................................................................15, 17

*Motorola Credit Corp. v. Uzan*,
  202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003) ........20

*National Organization for Women, Inc. v. Scheidler*,
  267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003) ...........................20, 21

*Norex Petroleum Ltd. v. Access Industries, Inc.*,
   631 F.3d 29 (2d Cir. 2010) ................................................................30

*Oakes v. Muka*,
   56 A.D.3d 1057 (App. Div. 3d Dep't 2008) ......................................27

*Palmer & Cay, Inc. v. Marsh & McLennan Cos.*,
   404 F.3d 1297 (11th Cir. 2005) .........................................................24

*People v. Canale*,
   240 A.D.2d 839 (App. Div. 3d Dep't 1997) ......................................27

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir. 1996) .................................................................29

*Reiser v. Residential Funding Corp.*,
   380 F.3d 1027 (7th Cir. 2004) ..........................................................24

*Reno v. Bull*,
   226 N.Y. 546 (1919) .........................................................................25

*Republic of Ecuador v. Chevron Corp.*,
   638 F.3d 384 (2d Cir. 2011) .......................................................17, 18

*Rice v. Manley*,
   66 N.Y. 82 (1876) .............................................................................23

*Rudow v. City of New York*,
   822 F.2d 324 (2d Cir. 1987) .............................................................26

*Schweizer v. Mulvehill*,
   93 F. Supp. 2d 376 (S.D.N.Y. 2000) ...............................................26

*Solin v. Domino*,
   501 F. App'x 19 (2d. Cir. 2012) .......................................................25

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ............................................................29

*Starr Foundation v. American International Group, Inc.*,
   76 A.D.3d 25 (App. Div. 1st Dep't 2010) ........................................25

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) .....................................................................10, 21

*Ultramares Corp. v. Touche*,
   255 N.Y. 170 (1931) .........................................................................23

*United States Football League v. National Football League*,
   887 F.2d 408 (2d Cir. 1988) .............................................................22

*Wankier v. Crown Equipment Corp.*,
   353 F.3d 862 (10th Cir. 2003) ..........................................................24

*Warren v. Forest Lawn Cemetery & Mausoleum*,
   635 N.Y.S.2d 874 (App. Div. 4th Dep't 1995) .................................23

iv

*Woodling v. Garrett Corp.*,
    813 F.2d 543 (2d Cir. 1987) ...................................................................................24

## Statutes

18 U.S.C. § 1964(a) .................................................................................................21

18 U.S.C. § 1964(c) .................................................................................................21

N.Y. Jud. Law § 487 ...........................................................................................26, 27

New York Recognition of Foreign Country Money Judgments Act,
    N.Y.C.P.L.R. § 5301 *et seq.* ............................................................................16, 19

## Rules

ABA Model Rules of Professional Conduct, Preamble ¶ 9, Rule 1.4 ...........................29

Federal Rule of Civil Procedure 12(h)(3) ............................................................*passim*

Federal Rule of Civil Procedure 41 .........................................................................35

## Other Sources

60A N.Y. Jur. 2d Fraud & Deceit (West 2013) ........................................................23

Gregory P. Joseph, *Civil RICO: A Definitive Guide* (3d ed. 2010) ...........................8, 19

Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* (2014) ...................4, 8, 19, 20

David B. Smith & Terrance G. Reed, *Civil RICO* (Matthew Bender 2013)...............8, 19, 21

**INTRODUCTION**

Well before this case went to trial, renowned trial attorney John Keker observed that the case had "degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit."[1]

Chevron's latest display of might over merit comes in the form of approximately one thousand pages of post-trial briefing, proposed findings, and exhibits. But the only thing this show of force manages to prove is that brevity is indeed the soul of wit. In fact, the sheer heft of Chevron's papers only makes the legal and factual holes in its case more apparent.

When it filed this RICO action in February 2011, Chevron made grand promises. It promised to show that a two-decade quest by indigenous Ecuadorians to seek justice for Chevron's pollution of their rainforest homeland was nothing but "sham litigation." But along the way, Chevron dropped *any* attempt to contest the overwhelming evidence that it willfully polluted the water, land, and air of the Amazon for decades. Then, on the eve of trial, Chevron dropped *all* of its damages claims—a transparent maneuver designed to deprive Steven Donziger of his constitutional right to a trial by jury. Now, in its post-trial briefing, Chevron has ditched its request for an injunction that would enjoin foreign enforcement proceedings—an attempt, at least on its face, to avoid the serious international-comity concerns that led the Second Circuit to reverse this Court's previous worldwide anti-enforcement injunction.

These three strategic decisions, taken together, leave Chevron on the horns of an intractable legal dilemma. On the one hand, as every first-year law student learns, nobody may

---

[1] As Chevron has acknowledged, it has deployed more than 2,000 legal professionals from more than 60 law firms, including at least 114 lawyers from Gibson Dunn, to fight this epic battle. One can only estimate how many hundreds of millions of dollars Chevron has spent on legal fees to avoid its responsibility to clean up its pollution in the Amazon.

bring a case in federal court without demonstrating (1) a legally cognizable injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Lawyers refer to these requirements—injury, causation, and redressability—as "standing." Without standing, there is no jurisdiction over the case and the Court has "no business deciding it." *Id.* at 341. Because there has been no attempt to enforce the Ecuadorian judgment in the U.S., Chevron must attempt to demonstrate standing by giving its proposed injunction real teeth—by proving that it binds foreign courts in a way that makes it likely to redress Chevron's claimed injury.

On the other hand, Chevron must satisfy the international-comity concerns raised by the Second Circuit. This means that it must strip its proposed injunction of any binding effect—by showing that it preserves the ability of foreign courts to make their own decisions about how to apply their own laws on enforceability. The dilemma facing Chevron is that it must somehow do both—a logical impossibility.

**Chevron Lacks Standing:** For all of its gargantuan briefing, Chevron has not even *identified* (much less proven) a single injury that would give it standing. As explained in detail in our concurrently filed motion to dismiss this case under Federal Rule of Civil Procedure 12(h)(3), that's because no such injury exists. Chevron says that it has been injured by having to defend itself in foreign proceedings seeking to hold the company accountable for its pollution of the Amazon rainforest. But how would that alleged injury be redressed by an injunction that, Chevron insists, would *not* prohibit those proceedings? Chevron asks this Court to divest the defendants of their interests in the Ecuadorian judgment. But how would that relief remedy a present injury—or prevent a certainly impending future injury—when no court has yet enforced the judgment and Chevron itself confidently asserts (at page 340) that "[n]o tribunal with respect for the rule of law will *ever* enforce the Lago Agrio judgment"? Chevron spends hundreds of pages

complaining of the Ecuadorian court's decision finding the company liable for decades of unprecedented, willful pollution, as well as the preparation of a single expert report submitted in those proceedings. But how can either of those things be said to have caused Chevron's purported injury when the company has chosen not to contest its liability here and an Ecuadorian appellate court undertook a *de novo* review of the decision, expressly refused to rely on the expert report, and then affirmed the judgment (which has since been affirmed as well by the nation's Supreme Court)?

The point is this: Although Chevron has *never* had standing to bring this lawsuit, whatever argument it *might* have had for standing (before dropping its damages claim and before articulating its requested equitable relief) is now gone—and, with it, so too is this Court's authority over the dispute. And because that is true regardless of whatever factual findings or conclusions of law the Court might eventually issue, this Court has no choice: Federal Rule of Civil Procedure 12(h)(3) requires that "the court *must* dismiss the action," immediately, for lack of jurisdiction.

**Chevron Fails to Overcome Basic Principles of International Comity:** Even if this Court could somehow manufacture jurisdiction, it still could not grant Chevron the relief it requests without violating basic principles of international comity, as already articulated by the Second Circuit in this very case. Chevron bends over backwards to assure this Court that it is not seeking to enjoin the filing or prosecution of foreign enforcement actions. But that concession paradoxically manages to exacerbate the very comity problems Chevron tries to avoid: Its proposed relief (now an anti-*collection* injunction as opposed to an anti-*enforcement* injunction) would permit foreign courts to hold enforcement proceedings, yet purport to deprive them of any effect—an outcome even *more disrespectful* to foreign courts than the injunction reversed by the Second Circuit.

**This Action Is Barred By Chevron's Own Promises:** As the Second Circuit has expressly recognized, Chevron obtained a *forum non conveniens* dismissal by promising both the district court and the court of appeals that if this case were sent to Ecuador, Chevron would satisfy any judgment against it, subject only to its rights under New York's Recognition Act—a statute no longer at issue in this case. After two long decades of litigation, with the effects of the company's pollution continuing to cause devastation, Chevron cannot now yank back its promise simply because it doesn't like how the litigation in Ecuador turned out. Nor can Chevron use a statute *other than* the Recognition Act as an end-run around its promise. Chevron's only response—that we have somehow waived this defense—is spurious; we have asserted it vigorously, at every stage of this case.

**Chevron Has No Cause of Action Under RICO:** The courts disagree about whether RICO ever permits equitable relief; most say it doesn't. Chevron spends many pages, and its amicus spends more, discussing that issue. But the question now presented by this case is different, and more fundamental: Can a private party ever obtain equitable relief or attorney's fees under RICO without making a claim for money damages? On that question, the text of the statute is clear and the authorities agree: RICO provides a private right of action only to plaintiffs seeking damages. Even Judge Rakoff, one of the few judges who has said equitable relief may be available to private parties, has explained that RICO does not authorize injunctive relief without a claim for damages: "Civil RICO claims are *only* available where monetary relief is sought . . . . Thus, if the suit is in essence a claim . . . for injunctive relief, RICO will not be a suitable vehicle." Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* § 7.02[2] (2014) (emphasis added). No case or authority holds otherwise, and Chevron cites none. Nor does it cite any authority for its claim (at 11) that this Court may "issue Chevron an award of attorney's fees as an independent form of relief" "regardless of the availability or scope of any equitable relief."

4

That is hardly surprising. Chevron cannot deprive Donziger of his constitutional right to a jury by dropping its claim for damages and yet force him to pick up the tab for its enormous and unprecedented campaign to trash *his* reputation.

**Chevron Has No Cause of Action Under New York Law:** Chevron's state-law claims also face insurmountable threshold problems. The Second Circuit has repeatedly held that allegations of third-party reliance—with no allegation of reliance on the part of the *plaintiff*—are insufficient to make out a common-law fraud claim under New York law. Chevron asks this Court to disregard those precedents because Chevron thinks they are inconsistent with three state-court decisions from the 1800s. Chevron is doubly wrong. First, the 19th-century cases did not involve claims of reliance by a third party. Second, even if they did, this Court is bound by Second Circuit precedent, which squarely forecloses Chevron's argument.

**The Relief Chevron Seeks Is Barred by the First Amendment:** Chevron seeks to impose liability on Mr. Donziger and his co-defendants for engaging in classic First Amendment activity: filing and supporting litigation, speaking to the press, engaging in protests, and seeking to persuade public officials. As explained in our opening brief, the First Amendment and the *Noerr-Pennington* doctrine preclude such liability. In addition, the breadth and vagueness of Chevron's proposed injunction would create serious First Amendment problems of their own.

**All of Chevron's Claims Fail on the Merits:** Chevron's RICO and state-law claims also fail on the merits, for both legal and factual reasons. On the law: RICO does not apply extraterritorially, and Chevron has not proven that any domestic predicate acts have proximately caused it harm. Nor has Chevron proven fraud. The defendants did not intend to defraud anyone by calling Richard Cabrera an "independent" expert, and no one relied on those purportedly incorrect statements to proximately cause harm to Chevron. Moreover, litigation is not extortion—especially when its merit is not contested.

5

On the facts: Chevron cannot explain how Alberto Guerra's testimony could possibly be true when it is internally inconsistent and unsupported by credible evidence, Guerra admits that he lied to Chevron to drive up the price of his testimony, and the key meeting that he alleges took place between him and Mr. Donziger could not have occurred because Donziger was in another country at the time. And Chevron's fabricated "ghostwriting" claim—that the defendants wrote the Ecuadorian judgment themselves—rests on two false assumptions: (1) that the so-called "overlap" between parts of the judgment and parts of the Ecuadorian plaintiffs' submissions proves fraud, and (2) that the judgment must have been ghostwritten because some of those submissions were not part of the official court record. At best, the overlap proves that the Ecuadorian trial court borrowed liberally from the parties' filings. But that was *the court*'s decision—not some smoking gun of fraud. And the submissions that were not formally entered into the record were provided to the court at judicial site inspections (as was common); they were not used to ghostwrite the judgment.

\*     \*     \*

When accusing someone else of misleading a court, one should take special care to avoid doing that very thing. But throughout its hundreds of pages of post-trial briefing, Chevron willfully distorts quotations, plucks language out of context, and misstates the evidence in an effort to cast Mr. Donziger in the worst possible light. It would not be humanly possible, in the time available, to catalogue all of these distortions. Nor would that be necessary given the insuperable jurisdictional and legal flaws described above. So a few examples will have to suffice.

The misrepresentations begin with the very first words of Chevron's brief, which purport to quote Mr. Donziger: "If you repeat a lie a thousand times it becomes the truth." We are led to believe that Donziger is speaking about his own beliefs, professing a personal "motto." But he was talking *about Chevron*—not himself. What he actually wrote was "*Si repitan una mentira mil veces se*

*hace la verdad*," accurately translated as: "if *they* repeat a lie a thousand times it becomes the truth."

PX 1059. The "they" was Chevron/Texaco.

The pattern of distorting quotations to make Donziger appear to say the opposite of what he really said is repeated throughout Chevron's papers:

| Chevron's Papers | Reality |
|---|---|
| "As Donziger explains his motto, '[f]acts do not exist. Facts are created.'" Chevron Br. 141. | He goes on to say: "***And you talk to Texaco, because they create facts. Texaco creates facts. They create standards. . . . That's what I am saying. They create fiction***."[2] |
| "[W]e're gonna confront [the judge] . . . and let him know what time it is. . . . I mean, this is just out of bounds. Both in terms of judicial behavior and what—what lawyers would do. But Ecuador, you know, there's almost no rules here. And this is how the game is played. It's dirty." Chevron Proposed FF ¶ 30. | "[W]e're gonna confront the judge, ***who we believe is paid by Texaco; we believe he is corrupt, and we're gonna confront him, uh… with—with our… suspicions about his corruption***, and let him know what time it is. ***And, uh… you know… This is something that you would never do in the United States. I mean, this is something you would***—I mean, this is just out of bounds, both in terms of judicial behavior, and what—what lawyers would do. But Ecuador, you know, there's almost no rules here. And this is how the game is played, it's dirty. ***And, you know, they're playing dirty; we're honest, they're dirty. They play dirty, we have to occasionally use … um, pressure tactics to neutralize their corruption. And today is one of those examples***."[3] |

Unfortunately, Chevron takes the same liberties with the law as it does with the facts. To

highlight just two examples:

---

[2] PX 47A–full; CVX-RICO-9140478.

[3] PX 4A–full; CVX-RICO-9138394. Chevron also fails to mention that, in this clip, Mr. Donziger is *not* referring to the judge presiding over the Lago Agrio litigation. To the contrary, he is referring to *another judge* in *another city* to whom Chevron had appealed via collateral attack to request a forced inspection of the Ecuadorian plaintiffs' laboratory in order to "harass the lab out of business." *Id.* Donziger's statements make clear that he was "confronting" the judge about Chevron's dirty tactics, not his own.

| Chevron's Papers | Reality |
|---|---|
| The "weight of authority" holds that "RICO permits private plaintiffs to obtain injunctive and other equitable relief." Chevron Br. 10. | All the leading RICO treatises say otherwise. *See* Rakoff, *RICO* § 7.04[3] ("[M]ost courts hold that RICO does not authorize injunctions in a private civil action."); Joseph, *Civil RICO* § 20(A) (The "trend of decisions" is "distinctly negative" on "whether injunctive relief is available to private litigants under RICO."); Smith & Reed, *Civil RICO* §10.03[1] ("Most district courts that have addressed the question have held that injunctive relief is not available to private parties in a civil RICO suit."). |
| "[E]ven if Defendants had decided to not 'press' their collateral estoppel defense at trial, Chevron is still entitled to defeat this defense on the merits and establish that the Lago Agrio judgment is not subject to recognition under federal or New York law." Chevron Br. 268 n.71. | Chevron's counsel to the Second Circuit: The defendants would "still have the right to [assert the collateral-estoppel defense] or not. . . . If they didn't press it [at trial], it won't be in the case. It will not be in the case." Oral Argument 9/26/13 (2:01:26-34). |

Fortunately, however, this Court need not wade through all the many misrepresentations that Chevron stuffs into its brief. What this Court must do instead—first and foremost—is answer a more fundamental question: Is there jurisdiction to proceed? Because the answer to that question is a resounding no, this Court must dismiss the action.

## ARGUMENT[4]

### I.   Because Chevron Lacks Standing, This Court Lacks Jurisdiction and Must Immediately Dismiss This Case.

Our opening brief (at 43-52) explains at length why Chevron does not have standing in this case. Now that Chevron has filed hundreds of pages of post-trial briefing itemizing its alleged injuries, its lack of standing is even more apparent. Chevron asserts five injuries in its proposed findings of fact, plus four others in its brief:

---

[4] We hereby incorporate by reference all arguments made in the post-trial briefing of co-defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, as well as those made in our motion to dismiss for lack of subject-matter jurisdiction under Rule 12(h)(3), which we are filing concurrently with this brief.

(1) Chevron's litigation costs in Ecuador and enforcement actions, *see* Proposed FF ¶ 124;

(2) the costs of Chevron's unprecedented discovery campaign, *see id.* ¶ 125;

(3) the costs of the temporary Argentine embargo lifted in June 2013, *see id.* ¶ 126;

(4) Chevron's embargoed trademarks, *see id.* ¶ 127;

(5) the embargo on the arbitration award owed to Chevron, *see id.* ¶ 128;

(6) the reputational harm to Chevron, *see* Chevron Br. 320;

(7) the Ecuadorian judgment itself, *see id.*;

(8) the defendants' litigation financing, *see id.* at 219-47; and

(9) Chevron's attorney's fees in this case, *see id.* at 11.

As our Rule 12(h)(3) motion to dismiss lays out in detail, not one of these injuries satisfies all three elements of Article III standing: that it is (1) "actual" or "*certainly* impending," (2) "fairly traceable" to the defendants' allegedly unlawful conduct (rather than "the independent action of some third party"), and (3) "likely" to be redressed by the relief it requests. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 565 n.2 (1992).

We do not aim to retread every point made in our Rule 12(h)(3) motion here. But one useful way to think about Chevron's standing problem is to work backwards, and ask whether Chevron has proven that the relief it seeks is likely to redress its asserted injury. Because Chevron is not seeking damages, its requested relief would not remedy any of its past asserted injuries (like the costs of prior litigation or a since-lifted embargo). And because Chevron's proposed injunction would not (Chevron assures us) "prevent Defendants from filing or litigating enforcement actions outside the United States," it also would not prevent Chevron from incurring costs in those actions. Chevron Br. 10. And, it should go without saying, the injunction would do nothing to stop Chevron from pursuing its *own* discovery campaign, or to nullify the effect of an Ecuadorian embargo.

So the only injuries that Chevron asserts that could possibly be said to "likely" be redressed by the relief it seeks are (1) the liability imposed by the Ecuadorian judgment and

(2) the attorney's fees Chevron has incurred in this case.[5] But neither of these asserted injuries is legally cognizable under Article III. As for satisfying the judgment, that is a "*possible* future injury" that would occur only if *two courts* (the Constitutional Tribunal of Ecuador and a foreign enforcement court) rule against Chevron. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). An injury that "rest[s] on speculation about the decisions of independent actors" is not "*certainly impending*." *Id.* at 1150. And the speculation Chevron offers runs the other way: "No tribunal with respect for the rule of law will *ever* enforce the Lago Agrio judgment." Chevron Br. 340 (emphasis added). As for attorney's fees, that asserted injury "is insufficient to create an Article III case or controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

Then there is causation. Even setting aside redressability, Chevron must prove that its purported Article III injury (whatever it may be) was caused by the defendants' allegedly unlawful actions, and not "the independent action of some third party." *Lujan*, 504 U.S. at 560. But Chevron has chosen not to contest its liability for the environmental contamination it created, so it has not even attempted to establish that it would not have a judgment against it were it not for the defendants' alleged wrongdoing. Moreover, Chevron has not proven that the preparation of the Cabrera Report (or even Alberto Guerra's false "bribery" claims) caused its alleged Article III injury because (1) the Ecuadorian trial-court excluded the report and did not base its decision on the report's conclusions; (2) an Ecuadorian appellate court undertook a *de novo* review of the decision, expressly refused to rely on the report, and affirmed the judgment; and (3) the Ecuadorian Supreme Court also affirmed (while eliminating punitive damages, thereby halving Chevron's liability).

---

[5] As explained in our motion to dismiss, not even Chevron's liability under the judgment would be redressed by its proposed injunction because, as Chevron admits (at 343), "any effect accorded to this Court's order would be the decision of the foreign [enforcement] court."

These two fundamental problems—an inability to link the alleged Article III injury to the relief sought, and no theory of causation—leave Chevron without standing in this case. Under Rule 12(h)(3) of the Federal Rules of Civil Procedure, this Court "must dismiss the action" for lack of jurisdiction immediately, before proceeding to consider Chevron's requested findings of fact and conclusions of law.

## II.  Chevron's Proposed Injunction Exacerbates the Very International-Comity Problems It Seeks To Avoid.

Even assuming jurisdiction, this Court cannot give Chevron what it wants without transgressing basic principles of international comity, as articulated by the Second Circuit in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2011). That decision emphasized at length the "grave[]" comity concerns raised by a "preemptive, global anti-enforcement" injunction: "[W]hen a court in one country attempts to preclude the courts of every other nation from ever considering the effect of [a] foreign judgment, . . . the court risks disrespecting the legal system not only of the country in which the judgment was issued, but also those of other countries who are inherently assumed insufficiently trustworthy to recognize what is asserted to be the extreme incapacity of the legal system from which the judgment emanates." 667 F.3d at 244.

Attempting to satisfy those concerns, Chevron repeatedly assures this Court "that it is not seeking to enjoin the filing or litigation of foreign enforcement actions," and that "this Court's injunction would not interfere with any foreign court's jurisdiction or ability to entertain such an action." Chevron Br. 339, 343. As already discussed, and as discussed in greater detail in our Rule 12(h)(3) motion, that concession (if true) poses insurmountable redressability problems for

11

Chevron.[6] But it also manages to make worse the very comity concerns the company "tailored its requested relief . . . to remove." *Id.* at 339.

For let's be clear about what Chevron means by "tailored." Instead of a worldwide anti-*enforcement* injunction, Chevron now asks this Court for a worldwide anti-*collection* injunction. It seeks to block all people with "actual notice" of the injunction who "paricipat[e] with" someone involved in this case—defined in a way that means (in practical effect) anyone, anywhere—from "[u]ndertaking any acts to monetize or profit from the [Ecuadorian] judgment," "any other judgment or order" issued by "any" Ecuadorian court "in the Lago Agrio Case," "or any judgment or order issued by any other court that has recognized or enforced the [Ecuadorian] Judgment or any subsequent Judgment." Chevron Br. 340-41.[7] And the injunction would have those same people "divest themselves, by means of a constructive trust for the benefit of Chevron, of any interest, direct or indirect, in . . . any proceeds from the [Ecuadorian] Judgment or any subsequent Judgment or Enforcement Judgment." *Id.* at 341.

That is a breathtakingly broad injunction. If given effect in other countries, it is hard to imagine who would *ever* be able to obtain relief for injuries caused by Chevron's flagrant

---

[6] If not true, of course, then the injunction would be functionally identical to the one nullified in *Naranjo*, and this case would run foursquare into that one. Even so, as discussed in our Rule 12(h)(3) motion, the redressability problem would remain.

[7] The proposed injunction would apply to all "persons who have actual notice of this Order and are in active concert or participation with the Donziger Defendants and/or their officers, agents, servants, employees, and attorneys, including the 48 named plaintiffs in the Lago Agrio litigation against Chevron." Chevron Br. 340. And it would require Mr. Donziger "to give actual notice of this Order to all of the defendants who have defaulted in this action, all of the plaintiffs in the Lago Agrio Case and their counsel, and all counsel purporting to seek recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in *any jurisdiction.*" *Id.* at 341 (emphasis added). In addition, as mentioned in our Rule 12(h)(3) motion, the injunction's prohibition on "[u]ndertaking any acts to monetize or profit from the [Ecuadorian] judgment" would seem to include bringing an enforcement action—but for Chevron's repeated assertions to the contrary and the exception written into the text of the injunction itself. *Id.* at 340.

environmental contamination in Ecuador, which spanned two decades and devastated an area of the rainforest the size of Rhode Island, and which Chevron did not even try to contest at trial. Even if someone were eventually able to do so, the recovery would go back *to Chevron* through the constructive trust.

Two examples demonstrate the injunction's purported scope. Suppose that the Constitutional Tribunal of Ecuador, after considering Chevron's due-process objections, set the judgment aside and ordered a new trial (with a new judge). Suppose further that the parties then submitted numerous different expert reports—but no Cabrera Report—and the judge ruled against Chevron on the merits. Could anyone ever collect on that judgment under Chevron's proposed injunction? No. That's a judgment "rendered in the Lago Agrio Case by [a] court in Ecuador." Chevron Br. 340.

Or consider Canada, where the Court of Appeal for Ontario recently determined: "After all these years, the Ecuadorian plaintiffs deserve to have the recognition and enforcement of the Ecuadorian judgment heard on the merits in an appropriate jurisdiction. At this juncture, Ontario is that jurisdiction." Opening Br. Ex. 1, at 28-29 (*Yaiguaje v. Chevron*, 2013 ONCA 758 (Court of Appeal of Ontario, Dec. 17, 2013)). What would happen, then, if the Ontario court, applying its own law, were to hold that the judgment is enforceable—rejecting "Chevron['s] conten[tions] that the trial judgment was obtained through fraud, bribery and other illegal means," *id.* at 4—and the Canadian Supreme Court affirmed? Could anyone collect then? No again. That's an "order issued by [a] court that has recognized or enforced" the judgment. Chevron Br. 340.

The point should be clear: Chevron's global anti-collection injunction—if it is to have any hope of likely redressing an injury—is even *more* disrespectful to foreign courts than the one already invalidated by the Second Circuit. It says to them: "Go ahead. Have your enforcement

actions. They just won't mean anything." Yet Chevron gives no reason why foreign courts cannot be trusted to apply their own laws on the enforceability of judgments and come to their own conclusions about "the truth" of the allegedly "corrupt scheme." *Id.* at 340. It gives no reason why those courts cannot consider all the same arguments (and all the same evidence) that Chevron has put forth in this Court. And it certainly gives no reason why a U.S. trial judge is somehow uniquely capable of deciding the judgment's enforceability so that he must take it upon himself—in the absence of any enforcement attempt at this time, in this country—to answer the question for all time, and all countries.

In fact, Chevron does just the opposite. In the very next sentence after declaring that it has "remove[d] any issue of international comity" from the case by "tailor[ing] its requested relief," Chevron asserts: "No tribunal with respect for the rule of law will *ever* enforce the Lago Agrio judgment." *Id.* at 339-40 (emphasis added). But if that is so, then Chevron should be willing to defend itself in foreign enforcement courts—like Canada, where it could "us[e] the full panoply of Ontario substantive and procedural law available to [it]"—rather than spend hundreds of millions of dollars on a RICO case in the hope of obtaining an "injunction and the findings supporting it" for those foreign courts "to consider" in reaching what Chevron claims to be an inevitable and obvious conclusion. Opening Br. Ex. 1, at 21-22; Chevron Br. 343. That Chevron has not done so speaks volumes. One might fairly assume that Chevron thinks that only American courts have "respect for the rule of law"—that only they, to use the Second Circuit's words, are "[s]ufficiently trustworthy to recognize . . . the extreme incapacity of the [Ecuadorian] legal system"—a sentiment so plainly offensive to international comity that it needs no elaboration. *Naranjo*, 667 F.3d at 244.

One more thing: It is no answer to say, as Chevron does, that "any effect accorded to this Court's order would be the decision of the foreign court." Chevron Br. 343. Of course it would

14

be. No court in *any* country—not even a U.S. trial court—has the authority to hand down edicts for all the world to obey. Even Chevron's erstwhile global anti-enforcement injunction would not have had an effect in foreign courts unless those courts had chosen to give it one. Yet that didn't stop the Second Circuit from highlighting the grave threat that the injunction posed to international comity. The reason for this, no doubt, is to avoid putting foreign courts in the uncomfortable position of having to choose between two competing foreign decisions, both of which purport to govern the dispute. Because Chevron's new injunction does not prevent that result, it is every bit as offensive to comity as the old one, if not more so. Whether one views that as an independent reason to deny Chevron the relief it requests or as an overlay that informs the application of other doctrines bearing on the case, the upshot is the same: This Court cannot grant Chevron the relief it requests.

## III.   Chevron Is Judicially Estopped From Obtaining Any of the Relief Sought.

That brings us to judicial estoppel—yet another threshold barrier Chevron cannot overcome. That doctrine bars relief here because the defendants have shown that (1) Chevron "took an inconsistent position in a prior proceeding" and (2) the court "adopted" that position "by rendering a favorable judgment" to Chevron. *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). Nothing more is needed.

With respect to prong one: Chevron promised the *Aguinda* court that if this case were sent to Ecuador, it would satisfy any judgment against it subject to one narrow exception. Chevron (then Texaco) did not mince words: "If this Court dismisses these cases on *forum non conveniens* or comity grounds, Texaco will agree" to "satisfy judgments that might be entered in plaintiffs'

favor, subject to [its] rights under New York's Recognition of Foreign Country Money Judgments Act, N.Y.C.P.L.R. § 5301 *et seq.*" PX 8004, at 3-4.[8]

With respect to prong two: The *Aguinda* court then granted Chevron's request and dismissed the case. *See Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470. That should be the end of the inquiry (and therefore, of this case). Because the Second Circuit has already held that Chevron cannot assert any "rights under New York's [Recognition] Act" in this proceeding—the one condition Chevron put on its promise, PX 8004, at 4—it should not be permitted to use a *different* statute (RICO) as an end-run around that promise. *Naranjo*, 667 F.3d at 239-42. And that is what would happen should Chevron prevail: The only thing it seeks is equitable relief purporting to permanently extinguish its obligation to satisfy the judgment anywhere on the globe.

Chevron's front-line response to this straightforward argument is that it is waived. *See* Chevron Br. 294 ("The Court should reject [the defendants'] judicial estoppel defense for their failure to support or defend it."). But the defendants have pressed this argument at virtually every stage of the litigation—from the very beginning (in answering the complaint and opposing Chevron's preliminary injunction) to the very end (in post-trial briefing). *See* Dkt. 137, at 17-20; Opening Br. 55-57. Chevron's sole support for its claim that the defendants have "fail[ed] to support or defend" the argument is a brief that actually shows otherwise: It makes all the same points that would "support" the defense, only under the rubric of equitable estoppel (rather than both forms of estoppel). *See* Dkt. 1468, at 8-11. And it does so in response to a three-sentence paragraph at the back of Chevron's motion for partial summary judgment that itself fails to

---

[8] This was no one-time promise. Chevron made it no less than *five times* in a successful effort to induce the court to dismiss the case and force the plaintiffs to litigate in Ecuador. *See* DI 1197-1, Ex. A, at 57 nn. 235-236.

differentiate between the two forms of estoppel. *See* Dkt. 1349, at 27. Chevron's wavier argument thus boils down to a quibble about the label used in a single section of a single brief in a case with thousands of filings—a frivolous argument made all the more astonishing in light of Chevron's treatment of an estoppel defense the defendants *have actually withdrawn* in this case (collateral estoppel, discussed in Part VIII, below).

Chevron next attempts to escape its binding promise—which it calls a "phantom promise"—by contending that it "was rejected by the *Aguinda* plaintiffs and not relied upon by any court or party." Chevron Br. 295-96. But judicial estoppel doesn't require reliance; it requires an "inconsistent position" and a "favorable judgment." *Mitchell*, 190 F.3d at 6; *see also Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011) ("[A]n express adoption of the prior inconsistent position is not required. The court need only adopt the position 'in some manner, such as by rendering a favorable judgment.'"). As the Second Circuit has already held, that exists here:

> We therefore conclude that the district court adopted Texaco's promise to satisfy any judgment issued by the Ecuadorian courts, subject to its rights under New York's Recognition of Foreign Country Money Judgments Act, in awarding Texaco the relief it sought in its motion to dismiss. As a result, that promise, along with Texaco's more general promises to submit to Ecuadorian jurisdiction, is enforceable against Chevron in this action and any future proceedings between the parties, including enforcement actions, contempt proceedings, and attempts to confirm arbitral awards.

*Republic of Ecuador*, 638 F.3d at 389 n.4.

In any event, the *Aguinda* plaintiffs did not "reject" Chevron's condition. They argued to the court why that condition was insufficient to permit dismissal *and lost*, after which they spent almost a decade litigating the case in Ecuador (even as Chevron initially refused to submit to jurisdiction). And the *Aguinda* court, too, relied on Chevron's promise in holding that the company had met the requirement for dismissal: The court cited several submissions in which

17

Chevron agreed to satisfy any judgment subject only to its rights under the Recognition Act. *See Aguinda*, 142 F. Supp. 2d at 539.[9] (As a separate matter, Chevron is equitably estopped from reneging on their promises because the defendants relied on them—an issue discussed in the post-trial briefing of co-defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje, which we are incorporating by reference.)

Chevron's last two arguments on judicial estoppel are equally meritless. The first is that the doctrine does not apply here because "the promise was that *Texaco* would satisfy a judgment against *Texaco*, not that Chevron would satisfy a judgment against Chevron." Chevron Br. 296. But that argument—once again made "without citation to relevant case law"—has already been rejected by the Second Circuit. *Republic of Ecuador*, 638 F.3d at 389 n.3. As that Court put it: "Texaco's promise to satisfy any judgment by the Ecuadorian courts . . . is enforceable against Chevron in this action." *Id.* at 389 n.4.

Chevron's final argument is based on the Recognition Act. It goes like this: "[I]f the proposed-and-rejected judgment-satisfaction promise is revived, so must be Texaco's reservation of its right to challenge under the New York Recognition Act. And that statute permits challenges to foreign judgments 'obtained by fraud,'" so Chevron is not breaking its promise by bringing this case. Chevron Br. 297 (citation omitted). Second Circuit precedent forecloses this argument as well: "The Recognition Act nowhere authorizes a court to declare a foreign

---

[9] *See also Republic of Ecuador*, 638 F.3d at 389 n.4 ("Texaco had been trying to convince the district court that Ecuador would serve as an adequate alternative forum for resolution of its dispute with Plaintiffs. As part of those efforts, Texaco assured the district court that it would recognize the binding nature of any judgment issued in Ecuador. Doing so displayed Texaco's well-founded belief that such a promise would make the district court more likely to grant its motion to dismiss. Had Texaco taken a different approach and agreed to participate in the Ecuadorian litigation, but announced an intention to disregard any judgment the Ecuadorian courts might issue, dismissal would have been (to say the least) less likely.").

judgment unenforceable on the preemptive suit of a putative judgment-debtor." *Naranjo*, 667 F.3d at 240.

In a footnote (at 297 n.85), Chevron contends that it is not bound by "the procedural limitations in CPLR 5303" of the Recognition Act, but only "the grounds for non-recognition in CPLR § 5304(a) and (b)." Chevron's promise, however, was clear: It agreed to satisfy any judgments "subject to [its] rights under New York's Recognition of Foreign Country Money Judgments Act, N.Y.C.P.L.R. § 5301 *et seq.*" PX 8004, at 4. That includes the whole statute.

## IV. Chevron Has No Cause of Action Under RICO, and RICO Does Not Authorize Any of the Relief Chevron Seeks.

We explained in our opening brief (at 57-59) why RICO does not authorize equitable relief in private civil actions. Nothing Chevron says changes that. Chevron contends, for example, that the "weight of authority" is on its side. Chevron Br. 10. But it seems to be alone in that assessment. *See, e.g.*, Rakoff, *RICO* § 7.04[3] ("[M]ost courts hold that RICO does not authorize injunctions in a private civil action"); *id.* § 4.02[3] ("Courts have generally indicated that injunctive and other equitable relief is not available under RICO."); Joseph, *Civil RICO* § 20(A) (noting that the "trend of decisions" is "distinctly negative" on "whether injunctive relief is available to private litigants under RICO"); David B. Smith & Terrance G. Reed, *Civil RICO* §10.03[1] (Matthews Bender 2013) ("Most district courts that have addressed the question have held that injunctive relief is not available to private parties in a civil RICO suit," meaning that "the proponents of private equitable relief face a difficult challenge.").[10]

---

[10] *See also* Rakoff, *RICO* § 7.02[2] (noting split between Ninth and Seventh Circuits, and adding: "The other circuit courts adverting to the issue are split, with the Second, Fourth, Fifth, and Sixth Circuits suggesting that injunctive relief is not available to private plaintiffs and the Eighth suggesting that it is.").

Still, Chevron at least has *some* support for the proposition that, in *some* circumstances, "private plaintiffs may seek equitable and injunctive relief under RICO," Chevron Br. 330, which is more than can be said for many of its assertions. This Court is familiar with those cases, however, and with the arguments on the other side. No more on that question need be added here.

But the question now presented by this case is different: Can a private party obtain equitable relief under RICO without a claim for money damages? On that question, by contrast, Chevron cites no case law. Nor does its amicus, Professor Blakey. The two cases Chevron relies on—one from the Seventh Circuit and one from Judge Rakoff, both of which were vacated by higher courts—involved claims for money damages. *See Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 696 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003); *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003). This case does not. And that makes all the difference, for even Judge Rakoff concedes that RICO does not authorize injunctive relief without a claim for damages. As he has put it: "Civil RICO claims are *only* available where monetary relief is sought . . . . Thus, if the suit is in essence a claim . . . for injunctive relief, RICO will not be a suitable vehicle." Rakoff, *RICO* § 7.02[2] (emphasis added).

The reason for that is simple: Section 1964(c) provides "a private right of action *for damages*." *Uzan*, 202 F. Supp. 2d at 244 (emphasis added); *see also Scheidler*, 267 F.3d at 696 ("Those private plaintiffs who have been injured in their business or property by reason of a RICO violation are given a right to sue *for treble damages*." (emphasis added)). It says that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains."

18 U.S.C. § 1964(c). That is the cause of action the statute provides private parties—to sue for damages. A private plaintiff not seeking such damages, therefore, does not have a RICO claim.

Consequently, if equitable relief is ever appropriate (which it is not, for reasons described in our opening brief), it can be awarded only *in addition to* money damages, not *in place of* them. So even if it were true that § 1964(a) "sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek," a plaintiff not seeking damages is not "authorized to bring suit." *Scheidler*, 267 F.3d at 696. Indeed, we have found no case that holds to the contrary, nor any case where a court granted a private party injunctive relief under RICO when that party was not seeking money damages. This Court should not become the first.[11]

Finally, Chevron contends that, "regardless of the availability or scope of any equitable relief here, the Court should determine Donziger's RICO liability and then issue Chevron an award of attorney's fees as an independent form of relief." Chevron Br. 11; *see id.* at 345-46. "Obviously, however," this Court would lack jurisdiction to do so: "The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." *Steel Co.*, 523 U.S. at 107. Moreover, even assuming standing—and even assuming the availability of equitable relief under RICO as a general matter—the statute's "plain language" simply does not "authorize an attorney's fee award for obtaining injunctive relief, as distinguished from damages." *Aetna Cas. & Sur. Co. v. Liebowitz*, 730 F.2d 905, 907 (2d Cir. 1984); *see also* Smith & Reed, *Civil RICO* §10.08 ("[C]ourts are not authorized to award attorneys fees unless the plaintiff has successfully obtained a judgment for damages.").

Section 1964(c) provides a cause of action for treble damages "and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). The Second Circuit has held that this

---

[11] In any event, our opening brief lays out (at 59-61) the reasons why equitable relief would not be appropriate here even if it were permitted by RICO. Those reasons still hold true.

language "require[s] a civil RICO plaintiff, in order to qualify for an attorney's fee, first to prove that he has suffered injury to his business or property as a result of the RICO violation and to recover the damages sustained and the cost of the suit, of which the attorney's fee would be deemed part." *Liebowitz*, 730 F.2d at 907. Chevron attempts to distinguish *Liebowitz* by saying that it is "inapposite because it arose in the context of a settlement" and that "post-*Liebowitz* cases suggest that it was wrongly decided." Chevron Br. 346 n.102. But, settlement or not, the Court's interpretation of the relevant statutory language could not have been clearer: It does not "authorize an attorney's fee award for obtaining injunctive relief." *Liebowitz*, 730 F.2d at 907.[12]

## V.   Chevron Has No Cause of Action Under New York Law, and New York Law Does Not Authorize Any of the Relief Chevron Seeks.

**A.** Chevron's common-law fraud claim also faces insurmountable hurdles. As Chevron acknowledges, the Second Circuit has repeatedly held that "allegations of third-party reliance"—rather than "reliance *on the part of the plaintiff*"—"are insufficient to make out a common law fraud claim under New York law." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008), *rev'd on other grounds*, *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010); *accord Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) ("We hold that a plaintiff does not establish the reliance element of fraud [under] New York law by showing only that a third party relied on a defendant's false statements."); *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) ("*Lollo* and *Smokes-Spirits* make clear that fraud claims may not be premised on false statements on which a third party relied."). Yet

---

[12] The two "post-*Liebowitz* cases" that Chevron cites (one from the Second Circuit and one from the Fifth) interpret the *Clayton Act*—not RICO—and neither mentions *Liebowitz*. The Second Circuit case is particularly off point: It involved a jury verdict that awarded damages to the plaintiff. *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 411-12 (2d Cir. 1988). The Court held that the "recovery of their reasonable attorney's fees must be sustained regardless of the *amount* of damages awarded." *Id.* at 412 (emphasis added). Here, of course, there is no claim for damages and no jury.

Chevron contends that this Court should brush aside those holdings because, Chevron believes, they "cannot be squared" with three state-court decisions from the 1800s. Chevron Br. 213-14 (citing *Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33-34 (1880); *Rice v. Manley*, 66 N.Y. 82, 87 (1876); *Bruff v. Mali*, 36 N.Y. 200, 205-06 (1867)).

Chevron is wrong and wrong again. For starters, those state-court decisions concerned claims that the *plaintiff* relied (albeit indirectly) on the alleged fraud, whereas the Second Circuit cases involved claims of reliance by a *third party*. Chevron does not cite a single New York case holding that a plaintiff may bring a fraud claim without having relied on the fraud in some way. And little wonder: New York courts have long held that a fraud claim is not actionable unless the fraud was "calculated and intended to influence the *plaintiff*," who was then injured "in reliance upon" it. *Brackett v. Griswold*, 112 N.Y. 454, 467 (1889); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009) ("[A] cause of action for fraud require[s] . . . justifiable reliance by the plaintiff."); *Ultramares Corp. v. Touche*, 255 N.Y. 170, 187 (1931) ("A representation, even though knowingly false, does not constitute ground for an action of deceit unless made with the intent to be communicated to the persons or class of persons who act upon it to their prejudice."); *Warren v. Forest Lawn Cemetery & Mausoleum*, 635 N.Y.S.2d 874, 874 (App. Div. 4th Dep't 1995) ("Plaintiff is not a proper party to allege fraud because no misrepresentation was made to him, nor did he allege that he relied on any misrepresentation."); 60A N.Y. Jur. 2d Fraud & Deceit § 193 (West 2013) ("It is the prevailing rule that a person making a representation is only accountable for its truth or honesty to the very person or persons whom he or she seeks to influence."); *id.* at § 166 (distinguishing between indirect and third-party reliance).

But even if Chevron were somehow right about New York law, this Court remains "bound by Second Circuit precedent, even on issues of state law." *Adebiyi v. Yankee Fiber Control, Inc.*, 705 F. Supp. 2d 287, 291 n.4 (S.D.N.Y. 2010) (internal quotations omitted). "In a

hierarchical system, decisions of a superior court are authoritative on inferior courts," *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004), making a circuit court's interpretation of state law "binding on district courts" in that circuit "unless an intervening decision of the state's highest court has resolved the issue," *Wankier v. Crown Equipt. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003); *see also Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995) ("[The district court] was bound by our interpretation of state law absent a subsequent state court decision or statutory amendment that rendered this court's prior decision clearly wrong."); *Adebiyi*, 705 F. Supp. 2d at 291, n.4 ("[Only] a more recent decision regarding New York law from the New York Court of Appeals would trump an earlier decision from the Second Circuit."). Indeed, as the Second Circuit has explained, even an *appellate panel* is bound by a prior panel's holding "on an issue of state law . . . absent a subsequent decision" by the state's highest court that "cast[s] doubt on that ruling." *Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987); *see also Palmer & Cay, Inc. v. Marsh & McLennan Cos.*, 404 F.3d 1297, 1307 n.15 (11th Cir. 2005) (panel bound by prior panel decision on state-law issue—notwithstanding an intervening decision from state intermediate appellate court to the contrary—"unless and until [the prior panel's decision] is overruled by intervening, on-point case law from our circuit sitting *en banc*, the Supreme Court, or, on matters of Georgia state law, the Georgia Supreme Court").

Chevron can point to no intervening New York Court of Appeals decision that abrogates the Second Circuit's holdings, nor any case standing for the principle that district courts are free to disregard binding circuit precedent on state law simply because they disagree.[13] Instead,

---

[13] Chevron cites a 2010 intermediate-appellate-court decision (at 215), but that case (like the nineteenth-century cases Chevron puts so much weight on) involved *indirect* reliance: The plaintiff was "deceived and defrauded" by misrepresentations made to someone else, on which *the plaintiff* then relied. *Litvinov v. Hodson*, 905 N.Y.S.2d 400, 401 (App. Div. 4th Dep't 2010). Even if this decision came from the New York Court of Appeals, it would hardly cast doubt on the Second Circuit's previous rulings.

Chevron relies on a case that considered whether a *circuit* court should defer to "the state law holding" of a *different circuit* (the one in which the state is located). *See* Chevron Br. 214-15 (quoting *Factors Etc., Inc. v. Pro Arts*, Inc., 652 F.2d 278, 283 (2d Cir. 1981)). The Second Circuit held that it should. That case in no way supports Chevron's position here.

   **B.**  Chevron's common-law fraud claim fails for a second, independent reason: The company is not seeking damages—an essential element of any fraud claim. *See Eurycleia Partners*, 12 N.Y.3d at 559 ("[A] cause of action for fraud require[s] . . . damages."). The reason damages are an essential element is that the "purpose" of an action for fraud is "to indemnify the party injured," and a claim seeking only equitable relief does not serve that purpose. *Reno v. Bull*, 226 N.Y. 546, 552 (1919); *see also Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (holding that plaintiffs in fraud case were "limited to recovering their losses"). This case illustrates the point. Although Chevron claims that it suffered damages from the alleged fraud, it no longer seeks them. So any relief granted by this Court would not serve to indemnify Chevron for its losses, whatever they may be.

   Admittedly, New York courts have never had an opportunity to address this anomalous situation; plaintiffs generally do not abandon their damages claims solely to avoid a jury. But New York courts have repeatedly rejected attempts by plaintiffs to seek relief other than damages for out-of-pocket losses. *See Lama*, 88 N.Y.2d at 421 (finding "no actionable fraud" where plaintiff did not claim out-of-pocket losses); *Dress Shirt Sales, Inc. v. Hotel Martinique Assocs.*, 12 N.Y.2d 339, 344 (1963) (affirming dismissal of fraud case where only damages sought were "completely undeterminable and speculative"); *Starr Found. v. Am. Int'l Group, Inc.*, 76 A.D.3d 25, 29 (App. Div. 1st Dep't 2010) (dismissing fraud claim due to "the impermissibly speculative nature of the recovery sought"). The Second Circuit has too. *See Solin v. Domino*, 501 F. App'x 19, 22 (2d. Cir.

2012) (holding that "no recovery may be had" where plaintiff did not seek damages for "out-of-pocket loss"). This Court, if it reaches the question, should do so as well.

**C.** Chevron's decision to drop damages also dooms its other state-law claim. Chevron argues that Mr. Donziger violated New York Judiciary Law § 487 by allegedly deceiving or attempting to deceive New York courts. *See* Chevron Br. 261-66. Chevron is wrong about that; but, more fundamentally, it doesn't even have a cause of action because the only remedy contemplated by that section is treble damages. The section states that an attorney guilty of a violation shall "forfeit[] to the party injured treble damages, to be recovered in a civil action." N.Y. Jud. Law § 487. Nowhere does it provide a cause of action for relief other than treble damages.

That's because "section 487 is not a codification of a common-law cause of action for fraud," but is essentially a criminal statute (indeed, for many years it was a part of the New York penal code). *Amalfitano v. Rosenberg*, 12 N.Y.3d 8, 14 (2009). Accordingly, the damages provision of § 487 operates as a "civil forfeiture remedy," *id.* at 13—not a broad cause of action for injunctive relief. So it is not surprising that Chevron can point to no case where a plaintiff was able to sue under § 487 for something other than damages. To the contrary, courts consistently describe that section as permitting only a claim for damages.  *See Rudow v. City of New York*, 822 F.2d 324, 330 (2d Cir. 1987) (holding in due-process case that § 487 provides only a right to treble damages and not "a right to be free of attorney deceit"); *Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 408 (S.D.N.Y. 2000) ("[Section 487] provides for a private civil cause of action for treble damages."). And this Court, in this case, has done the same. *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 260 (S.D.N.Y. 2012) (stating that § 487 "provides for civil treble damages and criminal

sanctions," without discussing other types of relief). The Court should not depart from this longstanding interpretation to invent a new state-law cause of action out of thin air.[14]

## VI.    Chevron's Requested Injunction Is Impermissibly Vague and Would Burden Protected First Amendment Activity.

Even assuming that this Court had any legal authority to grant an injunction under federal or state law, Chevron's proposed injunction here would run roughshod over the First Amendment and, in particular, would trammel Mr. Donziger's free speech rights and impinge on his legal and ethical duties. The proposed injunction would enjoin Mr. Donziger and the other defendants from:

> Committing, aiding, abetting, inducing, directing, or operating an enterprise through any acts of racketeering activity, as defined in 18 U.S.C. § 1961, including, but not limited to, any acts of extortion, wire fraud, mail fraud, obstruction, and money laundering.

Chevron Br. 340. But the injunction doesn't say what this means beyond what it separately prohibits: "[u]ndertaking any acts to monetize or profit from the judgment"; "[f]iling or prosecuting any action for recognition or enforcement" of the judgment "in any court in the United States"; and "[s]eeking or receiving any payment, compensation, or other benefit from the enforcement" of the judgment. *Id.* at 340-41. Because the injunction does not give the defendants "a reasonable opportunity to know what is prohibited" nor "provide[] explicit standards for those who apply it," it is impermissibly vague. *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999).

---

[14] Even if this Court were to mint a new state-law cause of action for equitable relief, Chevron still wouldn't have a § 487 claim. New York courts have consistently held that § 487 applies only "to an attorney acting in his or her capacity *as an attorney*"; it does not apply "to a party who is represented by counsel and who, incidentally, is an attorney." *Barrows v. Alexander*, 78 A.D.3d 1693, 1693 (App. Div. 4th Dep't 2010) (emphasis added); *see Oakes v. Muka*, 56 A.D.3d 1057, 1058 (App. Div. 3d Dep't 2008); *People v. Canale*, 240 A.D.2d 839, 841 (App. Div. 3d Dep't 1997); *Haber v. Kisner*, 255 A.D.2d 223, 223 (App. Div. 1st Dep't 1998).

The injunction's vagueness is made all the more intolerable by the fact that this case, at bottom, is an attempt to retaliate against a group of Ecuadorian villagers and their lawyers for having asserted their case against Chevron in courts, the halls of government, through political protests, and in the press. To show why, we could scarcely improve upon Chevron's own description of the conduct it seeks to outlaw:

> Defendants have designed a public relations campaign to publicize their falsehoods and extort money from Chevron. These entities and persons engaged in a wide range of activities, including creating and maintaining a series of blogs and websites (such as *chevrontoxico.com*), and drafting and issuing press releases to broadcast the [Ecuadorian plaintiffs'] message, over which Donziger exerted tight control. Their strategy is to "turn up the heat" and bring "economic pain" to Chevron and its management through various means—including shareholder resolutions, major media coverage, organizing demonstrations and protests, and undertaking letter-writing campaigns to spur major investigations by U.S. federal and state government entities such as the Securities and Exchange Commission.

Chevron Br. 33.[15]

If Chevron believes that the RICO conspiracy consists of these activities—blogging, publicly broadcasting one's message, protesting, and petitioning the government—then that creates serious questions, to say the least, about the scope of its proposed injunction. For example, would the injunction bar Mr. Donziger and his "co-conspirators" from speaking with members of the press, non-profit organizations, or members of Congress about the case? Would it prevent them from blogging, organizing protests, or engaging in other core expressive activity? It is entirely unclear. As a result, Mr. Donziger would be forced to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," which would have a chilling effect on the exercise of his First Amendment rights. *Brown v. Entm't Merchs. Ass'n*,

---

[15] At other times in its brief, Chevron complains that Mr. Donziger "reach[ed] out to financial and political bodies to support and publicize the litigation and to exert pressure on Chevron to settle," *id.* at 39; "contacted New York's then Attorney General" regarding the case, *id.*; engaged in "media harassment against the company," *id.* at 3; and "organize[d] pressure demonstrations at the court" in Lago Agrio, including "a 'massive protest' at the courthouse against Chevron representatives," *id.* at 47-48.

131 S. Ct. 2729, 2743 (2011) (ellipsis and internal quotation marks omitted); *see also Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (striking part of injunction barring threats of spurious lawsuits as not narrowly tailored, overbroad, and violative of the First Amendment); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps.*, 239 F.3d 172, 176-78 (2d Cir. 2001) (reversing injunction for vagueness and stating that "the First Amendment strongly disfavors injunctions that impose a prior restraint on speech" and "[w]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases"); *Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 110 (2d Cir. 2000) ("Whereas past fraud may ordinarily be punished without provoking First Amendment concerns, . . . the same is not true of measures . . . that restrict speech in an attempt to guard against future misrepresentation or abuse.").[16]

Whatever the injunction's precise contours, it is sweeping, as illustrated by what Chevron exempts: The proposed injunction would "not enjoin or otherwise prohibit . . . litigating this action or any appeal of any order or judgment issued in this action." Chevron Br. 341. It says something about the injunction's intended scope that Chevron feels the need to carve out an exception for appealing the injunction itself.

Finally, the First Amendment concerns raised by the injunction also show why the defendants cannot be held liable in this case, as explained in our opening brief (at 64-66). The actions Chevron complains about constitute activity that is protected either by the First Amendment or by immunity doctrines that serve the same interests, wherever they occur. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 932 (9th Cir. 2006) (applying *Noerr-Pennington* immunity to RICO

---

[16] The injunction also conflicts with Mr. Donziger's duties to zealously advocate for, communicate with, and loyally represent his clients. *See* ABA Model Rules of Professional Conduct, Preamble ¶ 9, Rule 1.4.

claim concerning pre-litigation demand letters). And Chevron has abandoned its main defense to these doctrines—*Noerr-Pennington*'s "sham" exception—by declining to contest its liability in the underlying environmental case.

## VII.  All of Chevron's Claims Are Meritless.

Threshold problems aside, Chevron's RICO and state-law claims would fail anyway because they are meritless, for the reasons set forth in our opening brief (at 61-71).

*First*, RICO does not apply extraterritorially, and Chevron has not proven a domestic enterprise or a domestic pattern of racketeering activity. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010). Nor has Chevron established a "connection between (1) the pattern of racketeering that [it] alleges occurred in the United States"—the preparation of the Cabrera Report and representations made regarding it—and (2) "the injuries [it claims to have] sustained." *Cedeño v. Castillo*, 457 F. App'x 35, 37-38 (2d Cir. 2012); *see also id.* at 38 (plaintiff must prove that the "domestic predicate acts proximately caused his injuries"). Although Chevron asserts (three times) that the "predicate acts in the United States proximately caused Chevron numerous forms of harm," it does not back up those assertions with proof. Chevron Br. 204.[17] *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8-15 (2010) (reaffirming that RICO requires direct causation with no independent steps by third parties "separat[ing] the alleged fraud from the asserted injury").

*Second*, as discussed above, RICO liability cannot be premised on litigation or First Amendment activity. Chevron has not shown why *Noerr-Pennington* immunity or New York's

---

[17] *See id.* 199-200 ("Defendants' domestic predicate acts alones constitute a pattern of racketeering that has proximately caused injury to Chevron."); *id.* at 202 ("Defendants' predicate acts in the United States make up a domestic pattern of racketeering activity that proximately caused Chevron harm.").

common-law litigation privilege do not apply here. Chevron contends (at 148-49) that the "Defendants' activities in 'petitioning' the government of Ecuador (or governments other than that of the United States) enjoy no protection under the First Amendment or the *Noerr-Pennington* doctrine." As our opening brief explains (at 65), *Noerr-Pennington* immunizes foreign litigation. And if foreign litigation is what Chevron's RICO claim is based on, then that only reinforces the first point: Chevron is impermissibly seeking to apply RICO extraterritorially. And if not, then *Noerr-Pennington* immunizes the actions anyway.

*Third*, Chevron has failed to prove fraud. Its claims are based primarily on the purportedly misleading statements made about the preparation of the Cabrera Report and the "independence" of Cabrera. But Chevron has not shown that these statements were (a) fraudulent, (b) relied upon, and (c) caused Chevron an injury. The statements regarding Cabrera's "independence" are legal opinions, and Mr. Donziger and the other defendants believed in good faith that Cabrera was independent within the meaning of Ecuadorian law (because he was court-appointed) and that the expert report was prepared in compliance with Ecuadorian law. DX 1750, at 45-53. Chevron has not proven otherwise. Moreover, Chevron has not demonstrated that "someone relied on the defendant's [alleged] misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008). Nor has Chevron proven that someone's reliance on those alleged misrepresentations proximately caused it harm.

More broadly, Chevron has not demonstrated that Steven Donziger ever had the intent to defraud anyone in any way. There is no question that he believed firmly in his clients' cause, the strength of the evidence on their side, and the rightness of their position. His own personal diary—obtained by Chevron in discovery—makes this clear. He emphasizes "lawyering as part

of a larger campaign to win justice."[18] He worries throughout that "[w]e are winning on the proof, but we are losing the larger war because of time" and Chevron's greater resources.[19] He repeatedly discusses the personal "sacrifice" of committing to the cause he believes in—"the intense hours, the travel, being away from home, the giving up of other income."[20] He remarks on how important it is for Chevron to understand that the case was directed by "the locals who are most affected"—that is, "people who operate on principle, who do not adhere to the Texaco vision that everything can be bought or sold for the right price."[21] These diary entries back up Mr. Donziger's testimony that "[a]t no time did [he] act with fraudulent or criminal intent." DX 1750, at 45-46.

*Fourth*, litigation is not extortion, even when it is baseless. *See Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003). And it certainly isn't extortion when it *succeeds*—and the losing party doesn't even contest the litigation's merit.

In addition to these legal defects, Chevron has also failed to establish its case on the facts. We have already detailed the reasons why Alberto Guerra's "bribery" story cannot be true. Suffice it to say here, the story is internally inconsistent, uncorroborated by credible evidence, and comes from a man who admits to giving and taking bribes—and to lying "to improve [his] position" with Chevron so he could extract even more money in exchange for his testimony. *See* Opening Br. 31-41. Chevron has no response to this. It cannot explain, for example, how the key meeting that Guerra claims took place between him and Mr. Donziger could have happened when immigration records prove that Donziger was not in Ecuador at the time that Guerra says that the meeting occurred.

---

[18] DONZ00036276.
[19] DONZ00036277.
[20] DONZ00036250.
[21] DONZ00036249.

As for the other evidence Chevron relies on, we cannot possibly respond to it all in this reply brief. And given the obvious shortcomings of Chevron's legal arguments, we see no need. But we think it is important to respond to one of Chevron's most egregious and baseless allegations: that the defendants "ghostwrote" the Ecuadorian trial-court judgment.

As an initial matter, Chevron offered no expert testimony on who authored the judgment, despite having "access to experts on the moon," as this Court has put it, including two of the world's leading experts in authorship attribution (Dr. Robert Leonard and Dr. Patrick Juola).[22] That omission is telling. Absent that testimony, the only appropriate inference—and the most logical explanation—is that the judge wrote his own decision. Moreover, although Chevron claims (at 87) that it has "identified markers of fraud on 60 of the 188 pages in the judgment," that assessment (even if true) does not prove that the judgment was ghostwritten. Quite the contrary, as Chevron's own expert acknowledged, it is common for judges to copy verbatim a party's submissions or other materials from the trial record without attributing the text to the original author.[23] Potential judicial plagiarism does not establish bribery or fraud.

Nor does the fact that the Ecuadorian court relied on some documents that were not formally entered into the record. Throughout the litigation, both sides regularly submitted briefs and other summary documents to the court that were never included in the official record. *See* DX 906 ¶¶ 18-19; Dkt. 1702-1 ¶¶ 32-33. At a judicial site inspection on June 12, 2008, for instance, the exhibits to the "Fusion Memo" were submitted and added to the court record. DX 906 ¶¶ 13-16; DX 605H-Y. But the memo itself was not added. Presumably, that is because it was submitted to the judge (along with the exhibits) but not docketed—like so many other

---

[22] Trial Tr. 1848:11; DX 1332; Trial Tr. at 655:19-656:7; *Id.* at 663:3-66:13; *Id.* at 1542:8-1543:17.

[23] Trial Tr. 1357:12-18 (Dr. Green testifying that U.S. judges rely on legal memos without attribution).

documents throughout the trial. *See* DX 906 ¶ 19 (noting that documents were handed to Chevron and the court at judicial inspections but not docketed in the record). That is hardly proof of ghostwriting.

## VIII. The Defendants Do Not Assert a Collateral-Estoppel Defense in This Case and Are Not Asking This Court to Enforce The Ecuadorian Judgment.

Intent on having this Court decide the enforceability of the Ecuadorian judgment—the very thing the Second Circuit forbade in *Naranjo*—Chevron insists (at 12) that the defendants are asserting the "affirmative defense of collateral estoppel," which "triggers the recognition analysis" under New York's Recognition Act. *See* Chevron Br. 267-70. Because of this defense, Chevron argues, the Court can proceed to conduct that analysis—and even nullify the judgment—notwithstanding the fact that "[t]he Recognition Act nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor." *Naranjo*, 667 F.3d at 240. This argument is in keeping with Chevron's overall strategy of extracting from this Court an advisory opinion on the judgment's enforceability to file in "foreign courts" for them "to consider" in their enforcement proceedings. Chevron Br. 343.

But there's a problem: The defendants have *abandoned* that defense. Yes, this Court has "rejected" their "attempt[s] to withdraw their collateral estoppel defense," but that does mean that "the defense remains in this case." Chevron Br. 268. Just as the plaintiff is the master of the complaint, the defendants "of course" have "the option" of selecting their own defenses, as this Court has noted. Dkt. 1407, at 15 n.50. And the defendants here could not be any clearer: They

are not asserting a collateral-estoppel defense. They did not "press it at trial," nor do they do so now. *Id.* So let there be no doubt—that defense is out of the case.[24]

Even so, Chevron claims (at 268 n.71) that "it is still entitled to defeat this defense on the merits and establish that the Lago Agrio judgment is not subject to recognition under federal or New York law." Chevron does not cite any authority for this proposition. And at oral argument before the Second Circuit just a few months ago, Chevron's counsel said just the opposite: The defendants, he represented to that Court, "still have the right to [assert the defense] or not. . . . If they didn't press it [at trial], it won't be in the case. It will not be in the case." Chevron's counsel was right the first time. The defendants' collateral-estoppel defense is not in this case.

---

[24] This Court previously rejected the defendants' request to formally withdraw their collateral-estoppel defense, reasoning that it would be "a blatant exercise in forum shopping" to allow the defendants to withdraw the defense out of "fear" of "an adverse result," and that the defendants should have withdrawn it earlier to "save[] themselves, their adversary, and the courts the enormous resources expended litigating precisely the issue they now seek to take to other fora." Dkt. 550, at 69. The Court drew an analogy to Rule 41 (on voluntary dismissal)—an analogy the Court deemed "especially persuasive" because the "policies that animate [the rule] likewise support denial of what amounts to the withdrawal of a defense without prejudice in an effort to avoid the possibility of an adverse result while preserving that defense for use in a forum more to the defendants' liking." *Id.* at 69-70.

But, with respect, the defendants did not engage in "forum shopping." They are the defendants. Nor did their withdrawal prejudice anyone; the collateral-estoppel defense is now *out of the case*—which is what would have happened had Chevron defeated it. As for the Rule 41 analogy, there is no such thing as "withdrawing a defense without prejudice in an effort to avoid the possibility of an adverse result." When a defense is withdrawn, it no longer exists in the case—which, again, is what would have happened had the Court *rejected* the defense.

With respect to "forum shopping," the irony is almost too much to bear. After all, it was Chevron that spent a decade insisting that the litigation be moved from New York to Ecuador, spent the next decade fighting jurisdiction in Ecuador after it got its wish, and then returned to New York—this time, its forum of choice—in an unprecedented attempt to preemptively thwart enforcement of an unfavorable judgment anywhere in the world.

## CONCLUSION

In Chevron's world, might makes right. It has made a conscious choice never to clean up its mess in the Amazon or compensate the thousands of people whose health, livelihood, and cultures have been permanently affected by the company's wrongdoing. Instead, Chevron has chosen to use its limitless resources to go after the victims and their advocates—to make them pay for having the temerity to assert their rights, to stop anyone from trying the same thing again. As a Chevron spokesperson explained: "We can't let little countries screw around with big companies like this." Another put spokesperson was even more succinct, promising the Ecuadorians a "lifetime of litigation."

So far, Chevron has made good on that promise. Chevron spent a decade fighting to move the case to Ecuador. Then, after it got its wish, it spent a second decade fighting the Ecuadorian courts' jurisdiction and using dirty tactics to thwart justice. Now that a court of law has issued its judgment, Chevron has gone to truly unprecedented lengths to prevent the judgment from being enforced.

Not content to use the ordinary legal tools, Chevron has invented its own. Invoking RICO, a statute designed to pursue mobsters, it has dreamt up a vast global "conspiracy" orchestrated by Steven Donziger, a solo lawyer working from the kitchen table of his two-bedroom Manhattan apartment. It has branded everyone involved in the Ecuadorians' pursuit of justice—prominent law firms, spokespeople, consultants, funders—as "co-conspirators." It has spied on advocates, sued journalists and environmental groups, intimidated critics.

But, at the end of the day, the only thing that Chevron's massive retaliation campaign will have produced is astronomical legal bills. Indeed, once the layers are peeled back, it becomes apparent that Chevron does not even have standing—the building block of jurisdiction in any

36

federal case. As Federal Rule of Civil Procedure 12(h)(3) requires, this Court—before issuing any findings of fact or conclusions of law—"must dismiss the action" forthwith.

Respectfully submitted,

*/s/ Richard H. Friedman*
Richard H. Friedman
Friedman | Rubin
1126 Highland Avenue
Bremerton, WA  98337
Tel: (360) 782-4300
Fax: (360) 782-4358

*/s/ Zoe Littlepage*
Zoe Littlepage
Littlepage Booth
2043A West Main
Houston, TX  77098
Tel: (713) 529-8000
Fax: (713) 529-8044

*/s/ Steven R. Donziger*
STEVEN R. DONZIGER
245 W. 104th Street, #7D
New York, NY 10025
Tel: (212) 570-4499
Fax: (212) 409-8628

DEEPAK GUPTA
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 888-1741
Fax: (202) 328-7030

January 21, 2013

*Attorneys for Steven R. Donziger, Law Offices of Steven R. Donziger and Donziger & Associates, PLLC*