**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CHEVRON CORPORATION,

              *Plaintiff*,

     v.

STEVEN DONZIGER, *et al.*,

              *Defendants*.

No. 11-CIV-0691 (LAK)

---

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF**
**SUBJECT-MATTER JURISDICTION OF STEVEN R. DONZIGER, THE LAW**
**OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC**


RICHARD H. FRIEDMAN
FRIEDMAN | RUBIN
1126 Highland Avenue
Bremerton, WA 98337
Tel: (360) 782-4300
Fax: (360) 782-4358

ZOE LITTLEPAGE
LITTLEPAGE BOOTH
2043A West Main
Houston, TX 77098
Tel: (713) 529-8000
Fax: (713) 529-8044

*Of Counsel:*

DEEPAK GUPTA
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 888-1741
Fax: (202) 328-7030

STEVEN R. DONZIGER
245 W. 104th Street, #7D
New York, NY 10025
Tel: (212) 570-4499
Fax: (212) 409-8628

January 22, 2013

*Attorneys for Steven R. Donziger, Law*
*Offices of Steven R. Donziger, and*
*Donziger & Associates, PLLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................................................ii

INTRODUCTION.........................................................................................................1

RULE 12(h)(3) STANDARD ........................................................................................2

ARGUMENT..............................................................................................................4

Because Chevron lacks standing, this Court lacks jurisdiction and "must dismiss the action." ......4

     1.    Chevron's litigation costs in Ecuador and enforcement actions.................................4

     2.    The costs of Chevron's unprecedented discovery campaign.....................................11

     3.    The costs of the temporary embargo lifted in June 2013 .........................................12

     4.    Chevron's trademarks.........................................................................................13

     5.    The arbitration award owed to Chevron by Ecuador..............................................13

     6.    The reputational harm to Chevron .......................................................................14

     7.    The Ecuadorian judgment itself ..........................................................................14

     8.    The defendants' litigation financing ....................................................................17

     9.    Chevron's attorney's fees in this case...................................................................18

CONCLUSION ...........................................................................................................18

i

# TABLE OF AUTHORITIES

## Cases

*Arbaugh v. Y & H Corp.*,
 546 U.S. 500 (2006) ........................................................................................2

*Cacchillo v. Insmed, Inc.*,
 638 F.3d 401 (2d Cir. 2011) ...........................................................................4

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
 727 F.2d 274 (2d Cir. 1984) ...........................................................................3

*Chevron Corp. v. Donziger*,
 871 F. Supp. 2d 229 (S.D.N.Y. 2012) ..........................................................15

*Chevron Corp. v. Naranjo*,
 667 F.3d 232 (2d Cir. 2011) ...................................................................6, 9, 10

*Clapper v. Amnesty International USA*,
 133 S. Ct. 1138 (2013) ...............................................................6, 12, 13, 15, 16

*Clinton v. City of New York*,
 524 U.S. 417 (1998) ......................................................................................15

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ........................................................................................4

*Denney v. Deutsche Bank AG*,
 443 F.3d 253 (2d Cir. 2006) .........................................................................11

*Ex parte McCardle*,
 7 Wall. 506 (1868) ...........................................................................................3

*First Nationwide Bank v. Gelt Funding Corp.*,
 27 F.3d 763 (2d Cir. 1994) ...........................................................................12

*Heldman on behalf of T.H. v. Sobol*,
 962 F.2d 148 (2d Cir. 1992) .........................................................................17

*Hemi Group, LLC v. City of New York*,
 559 U.S. 1 (2010) .....................................................................................11, 16

*Holmes v. Securities Investor Protection Corp.*,
 503 U.S. 258 (1992) ......................................................................................11

*John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*,
 588 F.2d 24 (2d Cir. 1978) .............................................................................3

*Lincoln House, Inc. v. Dupre,*
   903 F.2d 845 (1st Cir. 1990) ........................................................................15

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .......................................................................3, 4, 7, 17

*Mansfield, C. & L.M.R. Co. v. Swan,*
   111 U.S. 379 (1884) ........................................................................................3

*Marcavage v. City of New York,*
   689 F.3d 98 (2d Cir. 2012) .............................................................................5

*McLaughlin v. American Tobacco Co.,*
   522 F.3d 215 (2d Cir. 2008) ......................................................................5, 14

*Steel Co. v. Citizens for a Better Environment,*
   523 U.S. 83 (1998) .............................................................................3, 17, 18

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009) ......................................................................................15

*UCFW Local 1776 v. Eli Lilly & Co.,*
   620 F.3d 121 (2d Cir. 2010) .........................................................................16

*United States v. Phillip Morris USA, Inc.,*
   396 F.3d 1190 (D.C. Cir. 2005), *cert. denied.* 546 U.S. 960 (2005) .........................15

*United States National Bank v. Independent Insurance Agents of America, Inc.,*
   508 U.S. 439 (1993) ........................................................................................2

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ......................................................................................15

**Treatises**

Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 6(2) (3d ed. 2010) ...........................16

Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* (2014) .....................................16

David B. Smith & Terrance G. Reed, *Civil RICO* (Matthew Bender 2013) ...........................11

5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* .............................3

**Rules**

Federal Rule of Civil Procedure 12(h)(3) ...............................................................*passim*

**INTRODUCTION**

In its approximately one thousand pages of post-trial briefing and supporting documents, Chevron devotes just a single conclusory paragraph (Reply at 43-44) to the central threshold legal issue in this case: Has Chevron proven that the relief it seeks is *likely to redress* a legally cognizable injury caused by the defendants' alleged wrongdoing—in other words, that it has standing to sue?

Before this Court may consider anything else in this case, it must first answer that question. And because it is now abundantly clear that Chevron has not demonstrated that it has standing, Federal Rule of Civil Procedure 12(h)(3) requires that "the court must dismiss the action" for lack of subject-matter jurisdiction under Article III of the U.S. Constitution. This unseemly spectacle of a case must come to an end.

For all of its gargantuan briefing, Chevron has not even *identified* (much less proven) a single injury that would give it standing. That's because none exists. Chevron says that it has been injured by having to defend itself in foreign proceedings seeking to hold the company accountable for its pollution of the Amazon rainforest. But how, exactly, would that injury be redressed by an injunction that, Chevron insists, would *not* prohibit those proceedings? Chevron also asks this Court to divest the defendants of their interests in the Ecuadorian judgment—relief that Chevron calls (at page 344) "disgorgement" of "any future gains." But how would that relief remedy a *present* injury of Chevron's—or prevent a *certainly impending* future injury—when no court has yet enforced the judgment, and Chevron itself confidently asserts (at 340) that "[n]o tribunal with respect for the rule of law will *ever* enforce the Lago Agrio judgment"? Chevron spends hundreds of pages complaining about the Ecuadorian trial court's decision finding the company liable for decades of unprecedented, willful pollution, as well as the preparation of a single expert report submitted in that case. But how can either of those things be said to have caused Chevron's purported injury when the company has chosen not to contest its liability here

and an Ecuadorian appellate court undertook a *de novo* review of the decision, expressly refused to rely on the expert report, and then affirmed the judgment (which has since been affirmed as well by the nation's Supreme Court)?

In the end, Chevron all but admits that it is not asking this Court to resolve any concrete case or controversy. What it really wants out of this proceeding—its "overriding purpose"—is not a remedy for an actual injury caused by real wrongdoing, but just some injunction (any will do) "and the findings supporting it," which Chevron hopes will "expose the truth" and which it "intends" to take to "foreign courts" for them "to consider" in deciding whether to enforce the judgment. Chevron Br. 340, 343. This Court's opinion, Chevron "believes," would "likely" persuade those other courts and thereby increase Chevron's chances of success—although the final decision would lie in the hands "of the foreign court," not this one. *Id.* But just as our Constitution does not empower federal courts "to render advisory opinions," so too does it bar them from authoring amicus briefs to be filed for consideration abroad. *U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993).

Although Chevron has *never* had standing to bring this lawsuit, whatever argument it *might* have had for standing (before dropping its damages claim and before articulating its requested equitable relief) is now gone—and, with it, so too is this Court's authority over the dispute. And because that is true regardless of whatever factual findings or conclusions of law the Court could eventually issue, this action must be dismissed before the Court ever gets that far.

## RULE 12(h)(3) STANDARD

Federal Rule of Civil Procedure 12(h)(3) instructs: "If the court determines at any time that it lacks subject-matter jurisdiction, the court *must* dismiss the action." As this language makes clear, "[t]he objection that a federal court lacks subject-matter jurisdiction may be raised . . . at any stage in the litigation, even after trial." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); *see*

also *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984); 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 ("[I]t has long been well-established that the court's lack of subject matter jurisdiction may be asserted at any time," including after trial and "prior to final judgment," because "Rule 12(h)(3) . . . preserv[es] the defense throughout the action.").

The reason for this "'springs from the nature and limits of the judicial power of the United States,'" which are "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)); *see also John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 27 (2d Cir. 1978) ("[J]urisdiction over the subject matter provides the basis for the court's power to act, and an action must be dismissed whenever it appears that the court lacks such jurisdiction.") (citing Rule 12(h)(3)).

Thus, a court may not "resolve contested questions of law when its jurisdiction is in doubt," but must instead decide jurisdiction first. *Steel Co.*, 523 U.S. at 101. To do otherwise, the Supreme Court has held, is "to act ultra vires." *Id.* at 101-02. Because "standing to sue" is a "threshold jurisdictional question," *id.* at 102—and one that the plaintiff "bears the burden" of proving "at the trial stage," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)—this Court must address that question before it can proceed any further in this case. There is no such thing as "hypothetical jurisdiction." *Steel Co.*, 523 U.S. at 101. A court without jurisdiction may not consider the merits of the plaintiff's claims—even if only to reject them.

**ARGUMENT**

**BECAUSE CHEVRON LACKS STANDING, THIS COURT LACKS
JURISDICTION AND "MUST DISMISS THE ACTION."**

Standing is an "essential and unchanging" requirement of every federal case. *Lujan*, 504 at 560. It demands that the plaintiff—"for each claim and form of relief sought"—establish a legally cognizable injury that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). These three elements—injury, causation, and redressability—make up the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. If the plaintiff fails to prove them at trial, then the "dispute is not a proper case or controversy" and the court has "no business deciding it." *DaimlerChrysler*, 547 U.S. at 341.

Chevron has failed to establish an injury that would satisfy all three elements. It asserts five injuries in its proposed findings of fact, plus four other injuries at various times in its post-trial brief—not one of which is (1) "actual" or "*certainly* impending," (2) "fairly traceable" to the defendants' allegedly unlawful conduct (rather than "the independent action of some third party"), and (3) "likely" to be redressed by the relief it requests. *Lujan*, 504 U.S. at 560-61, 565 n.2.

**1.      Chevron's Litigation Costs in Ecuador and Enforcement Actions**

Chevron's first asserted injury is that it has "spent and, unless Defendants are enjoined, will be forced to continue to spend, substantial amounts of money and executive time and effort on defending itself and its executives in the criminal proceedings in Ecuador and enforcement proceedings initiated as part of Defendants' fraudulent scheme." Chevron Proposed FF ¶ 124.[1]

---

[1] *See also* Chevron Br. 6 ("[Defendants] have forced Chevron and its subsidiaries to incur millions of dollars in legal fees to defend against their enforcement efforts in Canada."); *id.* at 197 ("Chevron has been forced to spend at least $1 million in attorneys' fees it would not otherwise

4

Even assuming that this is a legally cognizable injury—and an "actual, quantifiable injury" under RICO, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008)—it cannot serve as the basis for standing because Chevron has not shown that the asserted injury (1) "would be prevented by the equitable relief sought" and (2) is fairly traceable to the defendants' allegedly unlawful conduct. *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012).

      Take redressability first. Neither the litigation costs already incurred nor those Chevron expects to incur in the future would be redressed by the relief it seeks. As for costs incurred, Chevron cannot recover them because it is not seeking damages. As for costs expected, Chevron has asked this Court for an order that—by its own terms—does not "enjoin or otherwise prohibit" the defendants from "filing or prosecuting any action for recognition or enforcement of the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, or for prejudgment seizure or attachment of assets based upon the 2011 Judgment or any subsequent Judgment or Enforcement Judgment, in courts outside the United States." Chevron Br. 341; *see also id.* at 348 (same). Because Chevron repeatedly "makes clear that it is not seeking to enjoin the filing or litigation of foreign enforcement actions"—and because no domestic enforcement action has yet been brought—the costs Chevron incurs in enforcement proceedings will not be redressed by its requested relief.[2] Put differently, although Chevron bemoans the "substantial costs" it "will be

---

have spent as a result of Defendants' efforts to enforce the Lago Agrio Judgment."); *id.* at 321 ("As a direct result of Defendants' fraud, Chevron . . . has been forced to incur . . . millions [of dollars in legal fees] to fight enforcement actions in Ecuador, Argentina, Brazil, and Canada.").

    [2] Chevron Br. 339; *see id.* at 347 (same); *id.* at 10 ("Chevron does not, however, seek to prevent Defendants from filing or litigating enforcement actions outside the United States."); *id.* at 326 ("Chevron does not seek an injunction prohibiting foreign enforcement actions."); *id.* at 340 ("Chevron seeks only to prevent Defendants from profiting from foreign enforcement efforts or from the fraudulent judgment generally."); *id.* at 343 ("To the extent this Court enters Chevron's proposed injunction and Defendants then proceed to initiate or further pursue foreign enforcement actions, this Court's injunction would not interfere with any foreign court's jurisdiction or ability to entertain such an action.").

forced" to spend in those proceedings "unless Defendants are enjoined," that money will be spent *regardless* of whether this Court grants the requested injunction.

True, there may be good reason to be skeptical of Chevron's claim that it "does not . . . seek to prevent Defendants from filing or litigating enforcement actions outside the United States." *Id.* at 10. Its requested injunction prohibits the defendants from "[u]ndertaking any acts to monetize or profit from the judgment," which would seem to include "filing or prosecuting" an enforcement action. *Id.* at 340-41. And elsewhere in its brief Chevron contends that the injunction is warranted because "it would be contrary to the public interest to permit Defendants to pursue enforcement of the fraudulent Ecuadorian judgment"—a statement impossible to square with Chevron's purported limitation on the injunction. *Id.* at 320.[3] But that limitation—which is written into the text of the injunction itself—either means something or it doesn't. If it means something, then the relief Chevron seeks does nothing to redress its asserted injury; if it doesn't, then Chevron is once again asking this Court for a preemptive global anti-enforcement injunction—the very thing the Second Circuit invalidated in *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2011) (as discussed in Part II of our reply brief).[4]

---

[3] *See also id.* at 325 ("Even if these harms could somehow be quantified, money could not repair Chevron's disrupted relationships and diminished public standing that would likely occur *if Defendants continue seeking to enforce the judgment*." (emphasis added)); Chevron Proposed FF ¶ 97 (quoting a Chevron executive expressing "fear that Chevron has suffered and will continue to suffer . . . reputational and economic harm, as long as Mr. Donziger and others working with him . . . continue their efforts to coerce Chevron *by seeking to enforce* their fraudulent $19 billion judgment" (emphasis added)).

[4] Even if Chevron's proposed injunction were a global anti-enforcement injunction, it still wouldn't likely redress Chevron's asserted injury because foreign courts would first have to decide to give it effect in order to prevent the future costs of enforcement proceedings, and Chevron cannot "prove in advance that the judicial system"—a foreign one, no less—"will lead to any particular result in [that] case." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013). In fact, if foreign courts declined to give effect to the injunction, that would *exacerbate* Chevron's alleged injury, not remedy it, by increasing the litigation costs.

This is to say nothing of causation. One of Chevron's (many) fatal problems is that—for whatever asserted harm it relies on as its Article III injury—it must prove that this harm was caused by the defendants' allegedly unlawful actions and not "the independent action of some third party." *Lujan*, 504 U.S. at 560. And here, Chevron has not established that the judgment against it (and thus any enforcement of that judgment) was caused by how the Cabrera Report was prepared or by the alleged "bribery" of Judge Zambrano.[5]

With respect to the Cabrera Report, the Ecuadorian trial court expressly refused to rely on the report's conclusions, as did the two appellate courts that affirmed the judgment.[6] Chevron tries to fill this causal gap by contending that "the judgment necessarily relies on [the] Cabrera" Report (1) in reaching "it[s] 'pit count' of 880"; (2) "for the $150 million award for potable water damages"; (3) "through cleansing experts"; and (4) because it "awards damages for the same eight categories" indentified in the Cabrera Report. Chevron Br. 298; *see also id.* at 76-79. But none of these contentions amounts to proof that the judgment against Chevron is fairly attributable to how the report was prepared.

The judgment's "pit count" was based on a review of "aerial photographs," plus documents "submitted by the parties" and "the expert Gerardo Barros." PX 400, at 125. It wasn't based on the Cabrera Report, where "[t]he number 880 does not appear." Trial Tr. 1337:1-5. The National Court of Justice, addressing this very issue, independently held that "the judge did not weigh the challenged report" or "contradict[] any principles of logical evaluation"

---

[5] Chevron says nothing in its brief that addresses the causal shortcomings we discussed in our opening brief (at 48-51).

[6] See PX 400 (Trial Court), at 51 ("[T]he Court accepts [Chevron's] petition that [the] report not be taken into account to issue this verdict."); DX 8095 (National Court of Justice), at 157 (affirming intermediate appellate court's conclusion "that the [Cabrera] report was not taken [into] consideration by the trial judge").

in calculating the total number of pits. *See* DX 8095, at 159.[7] And Chevron did not give the Ecuadorian trial court its own pit count—of its *own pits*—nor did it do so in this Court. *See* PX 400, at 125 (noting that Chevron refused to submit documents "record[ing] the number of pits"). More fundamentally, even if the judgment did in fact use the Cabrera Report's pit count in calculating one of its many damages awards, the only injury that could possibly have caused Chevron is based on the difference between the true pit count (which Chevron does not provide) and the count used in the judgment. Chevron does not attempt to allege that the costs of defending against enforcement proceedings would be different had the judgment used a pit count of, say, 780, rather than 880, in determining one of its damages awards.

As for Chevron's other contentions, they too fail Article III causation. The $150 million award for potable water damages was based on a *different* report that found the Cabrera Report's $430 million figure "enormously exaggerated." PX 400, at 182-83. And Chevron does not spell out how the judgment's reliance on this and other reports—or the judgment's eight damages categories—caused its asserted injury (the costs of enforcement proceedings). As the National Court of Justice repeatedly emphasized in its cassation opinion, Chevron has not said "which rule for weighing evidence the court violated" in calculating its damages awards, and "it is necessary to allege, show, [and] explain to the judge in what manner each rule and each precept has been violated," and how those violations have "affect[ed] the validity of the proceeding" and caused

---

[7] Chevron attempts to prove otherwise by pointing to the testimony of an expert who reviewed the aerial photographs and determined that "the 880 pit count in the Ecuadorian judgment must have been based on what is in the Cabrera report, rather than any independent attempt to assess aerial photographs in the record." PX 4000 ¶ 3. But that expert did not review the other documents used by the trial court to calculate the total number of pits, and so his testimony cannot by itself establish that the judgment's pit count was necessarily derived from the Cabrera Report. Trial Tr. 1340-41.

Chevron "harm." DX 8095, at 98, 169 & 171; *see id.* at 169 (flora and fauna); *id.* at 170 (potable water); *id.* at 171 (cancer).[8] So too for Article III.

The short of the matter is that Chevron has not proven that there would be no enforceable judgment against it had the Cabrera Report (which addressed *damages*, not *liability*) been prepared differently. It hasn't even tried. And so it has not proven that the cost of opposing enforcement proceedings—its primary asserted injury—is the result of the way the Cabrera Report was prepared.

The same goes for Chevron's bogus bribery allegations. Setting aside the fact that those allegations (as our opening brief details) are based entirely on the uncorroborated, contradictory, and paid-for testimony of an admitted con man, the Ecuadoran judgment was affirmed on appeal under a "standard of review . . . similar to the American standard of *de novo* review," which in Ecuador is "applicable to questions both of fact and of law." *Naranjo*, 667 F.3d at 237. The appellate courts in this case discharged their obligations with considerable care: The intermediate court, for example, thoroughly addressed Chevron's argument (made in support of its "ghostwriting" theory) that certain evidence "supposedly . . . included in the filings" but "not in the case record was considered" by the trial court in reaching its conclusion. PX 430, at 11. After painstakingly reviewing the record for itself, the appellate court was "able to confirm first hand that the record include[d] the information to which the judgment refers." *Id.* Moreover, the appellate court's independent review of the record revealed that the trial court made several small "mistake[s]" and "error[s] in the assessment of the evidence," but that these were too

_____

[8] *See also id.* at 98 ("[A]llegations [are] unproductive when they do not state which legal rules have been infringed, or how the nullity of the proceeding has arisen.").

minor to affect the judgment in any way. *Id.* at 11-12.[9] The court explained that even Chevron's experts—some of whom committed "gaffe[s]" in assessing the scientific evidence taken from the oil sites—found "alarming quantit[ies]" of contaminants. *Id.*[10] Chevron has not contested those alarming quantities here.

That means that Chevron would likely have a judgment against it irrespective of any of the defendants' alleged wrongdoing (which Chevron would surely resist with all the scorched-earth vigor it does now). In addition, "[a]ccording to Chevron's [own] expert on Ecuadorian law, the Ecuadorian judgment remained unenforceable until the intermediate court issued its decision." *Naranjo*, 667 F.3d at 237. So it is *that* decision—not the trial court's—that triggered the judgment's enforceability and led to the enforcement proceedings that Chevron now says have caused it harm.

Chevron protests, of course, that the Ecuadorian appellate courts did not consider the claims it now presses in this Court, and that "no legitimate appellate court would have affirmed a judgment issued by a corrupt judge and supported by falsified evidence obtained through forgery and bribery." Chevron Br. 242; *see also id.* at 280. But protests are not proof. What Chevron must *prove*—what it has not proven—is that the appellate court failed to undertake a *de novo* review (or that the appellate court was bribed or biased). And again, lest one forget, Chevron has not contested its liability in this case or otherwise shown that its massive environmental

---

[9] *See, e.g.*, *id.* at 12 ("[T]his error in the assessment of the laboratory results regarding a contaminating element does not invalidate the remaining findings or reasoning regarding other[] . . . contaminating elements.").

[10] For further examples of the care with which the intermediate appellate court exercised its review, *see* PX 430, at 11 ("[S]ince the unit of measurement are not milligrams but micrograms, therefore the assessment of the quantity of contamination based on these samples should be reduced considerably"), and *id.* at 11-12 ("Regarding mercury, another error in the assessment of the evidence is found since the lower court has overlooked the symbol 'less than' and instead it has assumed the results are 'precise,' when they are not.").

contamination complied with Ecuadorian law. These failures of proof doom its case for constitutional causation.[11]

One last point on Chevron's first asserted injury: As discussed in our opening brief (at 47-48), this injury cannot serve as the basis of jurisdiction for the additional reason that it is unripe. Because "the Second Circuit [has held] that ripeness does not occur until a RICO claim has accrued, which does not happen 'until the amount of damages becomes clear and definite,'" a RICO claim will not be considered ripe if "other proceedings or contingencies will affect the likelihood or amount of damages." David B. Smith & Terrance G. Reed, *Civil RICO* ¶ 6.04[5][viii] (Matthew Bender 2013).

## 2.    The Costs of Chevron's Unprecedented Discovery Campaign

Chevron's second asserted injury is that it has "spent and, unless Defendants are enjoined, will be forced to continue to spend, substantial amounts of money and executive time and effort in pursuit of discovery through § 1782 actions in order to investigate the true facts surrounding the Cabrera fraud and other aspects of the Defendants' fraudulent scheme." Chevron Proposed FF ¶ 125.[12] Chevron, in other words, wants the costs of uncovering a

---

[11] And then there is RICO causation, which—although admittedly non-jurisdictional—is "a more rigorous matter" demanding that the RICO violation was both the but-for cause and proximate cause of the plaintiff's injury. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *see Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 8-15 (2010) (reaffirming that RICO requires direct causation with no independent steps by third parties "separat[ing] the alleged fraud from the asserted injury"). The best Chevron can muster on this score is a handful of bare assertions—200 pages into its brief— that the defendants have engaged in "a pattern of racketeering that has proximately caused injury to Chevron," and a total avoidance of any mention of but-for causation. Chevron Br. 199-200; *see also id.* at 202 ("Defendants' predicate acts in the United States make up a domestic pattern of racketeering activity that proximately caused Chevron harm."); *id.* at 204 ("All these predicate acts in the United States proximately caused Chevron numerous forms of harm."). That is not nearly enough.

[12] *See also* Chevron Br. 197 ("Chevron was forced to spend millions of dollars in attorneys' fees it would not otherwise have spent to uncover Defendants' fraudulent scheme."); *id.* at 321.

"fraudulent scheme" to serve as the legally cognizable injury inflicted by that scheme. But a plaintiff cannot "manufacture standing" through "self-inflicted injuries"—and surely not by spending money to build its case. *Clapper*, 133 S. Ct. at 1151-52.

Bootstrapping aside, however, Chevron's second bid for standing fails for at least three additional reasons. *First*, the requested relief does not redress this alleged injury. The costs Chevron has already incurred cannot be recovered because it has dropped its claim for damages. And the costs it might incur in the future would not be prevented by the injunction it requests, which says nothing about Chevron's § 1782 proceedings. Nor has Chevron ever claimed, let alone proved, that it would be spared the costs of bringing those proceedings should it prevail here.

*Second*, there is no causation. The § 1782 actions were brought, en masse, *by Chevron*—to overwhelm the defendants, stretch their resources, and help cook up a "fraud" narrative (and later a RICO case) through a fishing expedition unlike anything in American legal history. That cannot be laid at the feet of the defendants. *Third*, the alleged injury is not ripe because "the amount of damages" has not yet "become[] clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).

### 3.    The Costs of the Temporary Embargo Lifted in June 2013

Chevron's third asserted injury is even further afield: "Funds of Chevron's Argentine subsidiaries were embargoed from November 2012 through June 2013, resulting in opportunity costs to the subsidiaries and depreciation of the embargoed funds." Chevron's Proposed FF ¶ 126. This is obviously not an injury that would give Chevron standing because the embargo is no longer in effect and Chevron seeks only prospective relief. That relief would in no way remedy the "opportunity costs" and "depreciation" of the embargo—even assuming those undefined and

unsubstantiated costs were cognizable under Article III (and RICO). And, just for good measure, the same causation problems that plagued Chevron's first asserted injury do this one as well.

### 4.    Chevron's Trademarks

Chevron's fourth asserted injury is that "[f]ifty of [Chevron's] trademarks are subject to an Ecuadorian embargo order, issued pursuant to the Lago Agrio judgment, that will ultimately transfer the rights to use those marks in Ecuador away from Chevron." Chevron Proposed FF ¶ 127; *see also* Chevron Br. 321. Here, too, Chevron comes up short. What does Chevron mean when it says that the embargo "will ultimately" cause Chevron harm? Is it predicting that the Constitutional Tribunal of Ecuador will reject its due-process objections to the judgment—or that something else will happen? An alleged injury that "rest[s] on speculation about the decisions of independent actors" is not cognizable under Article III. *Clapper*, 133 S. Ct. at 1150.

But even if it were, Chevron's alleged trademark injury would flunk both the causation and redressability parts of the test—causation, for the reasons already discussed; redressability, because the relief sought would not prevent the injury in the slightest. "Chevron seeks only to prevent Defendants from profiting from foreign enforcement efforts or from the fraudulent judgment generally"; it does not ask this Court to nullify the embargo (nor could it). Chevron Br. 340; *see also id.* at 326. And it has not established that the order will be nullified should it prevail.

### 5.    The Arbitration Award Owed to Chevron by Ecuador

Chevron's fifth asserted injury (and the last identified in its proposed findings of fact) is that "[t]he $96 million commercial cases arbitration award owed to Chevron by the Republic of Ecuador is subject to an Ecuadorian embargo order, issued pursuant to the Lago Agrio judgment, preventing payment of this award to Chevron." Chevron Proposed FF ¶ 128. Again, Chevron has not proven that this alleged injury is certainly impending or was caused by the defendants' alleged fraud. And the relief it seeks wouldn't redress the injury anyway.

13

Apart from the injuries listed in its proposed findings of fact, Chevron's brief asserts several other types of injuries: reputational harm, liability from the judgment itself, the defendants' litigation financing, and Chevron's attorney's fees in this case. None can serve as the basis for standing.

### 6.    The Reputational Harm to Chevron

Chevron claims that the defendants' "enforcement scheme has caused, and will continue to cause, various irreparable harms to Chevron in the form of lost good will, lost business opportunities, and diverted internal resources." Chevron Br. 320. Chevron is right about one thing: Given the relief it now seeks, those asserted "harms" are indeed irreparable; as explained above, Chevron says that its requested relief would *not* prevent the defendants' enforcement actions. In addition, Chevron still has the same causation problems as before, plus one more: The "harassment" that some people affiliated with Chevron have apparently been subjected to by strangers to this litigation—like "the hate mail [one scientist] received after the release of *Crude*"—is very likely due to Chevron's pollution of Ecuador and the inner workings of someone else's mind rather than the defendants' allegedly illegal activity. And, moreover, Chevron's vague assertions of reputational harm are not nearly concrete enough to constitute an injury in fact (or an "actual, quantifiable injury" under RICO, *McLaughlin*, 522 F.3d at 227).[13]

### 7.    The Ecuadorian Judgment Itself

Chevron's briefing also suggests that the judgment itself is its Article III injury because the company might one day have to make good on it. *See* Chevron Br. 320 ("Defendants' fraudulent

---

[13] The following sentence is illustrative of the vague and conclusory nature of Chevron's allegations of reputational harm: "Defendants' intimidation of Chevron employees and counsel 'undermines [Chevron's] ability to recruit the best talent, to retain our best people, to compete for new opportunities, and to maintain trust with the communities in which we operate.'" Chevron Br. 324 (quoting PX 5800 ¶ 22); *see also id.* at 323-24.

scheme has already harmed Chevron. Chevron has not only incurred legal fees to detect and defend against Defendants' fraud, it has a multi-billion dollar judgment against it."); *id.* at 321 ("Chevron has a $9 billion judgment hanging over its head."). This "*possible* future injury," presumably, is what Chevron's requested constructive trust seeks to redress. *Clapper*, 133 S. Ct. at 1147; *See* Chevron Br. 341 & 348; *see also id.* at 326 (saying that, should Chevron prevail, "Defendants would simply be prevented from profiting from their fraud").[14]

But this hypothetical injury will occur only if (1) the Constitutional Tribunal of Ecuador rejects Chevron's due-process arguments and (2) an enforcement court in a different country, such as Canada or Brazil, does the same and enforces the judgment. Such "guesswork as to how independent decisionmakers will exercise their judgment" does not rise to the level of a "*certainly impending*" injury, as required by the Constitution. *Clapper*, 133 S. Ct. at 1147 & 1150.[15] And while Chevron "can only speculate" as to what a foreign enforcement court will do in the future, *Clapper*, 133 S. Ct. at 1150, the speculation it offers actually cuts *against* standing: "No tribunal with respect for the rule of law will ever enforce the Lago Agrio judgment." *Id.* at 340.[16]

---

[14] Chevron refers to this remedy as "disgorgement." *See, e.g., id.* at 344 ("Chevron seeks disgorgement that is specifically designed to prevent and restrain . . . any future gains."); *id.* at 10 (asking Court to "order disgorgement of any proceeds flowing from Defendants' misconduct"). But, as our opening brief points out, disgorgement "is a quintessentially backward-looking remedy focused on remedying the effects of past conduct to restore the status quo." *United States v. Phillip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005), *cert. denied.* 546 U.S. 960 (2005).

[15] *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 499-500 (2009) (refusing to dilute strict imminence requirement to demand only a "*realistic* threat"); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art[icle] III. A threatened injury must be certainly impending to constitute injury in fact."); *Clinton v. City of New York*, 524 U.S. 417, 459 (1998) ("[H]ypothetical injuries do not suffice for Article III standing.").

[16] Another way to think of it is this: If Chevron's "unjust enrichment claim is premature at best" because the "Defendants have not recovered on the Judgment to date," then how can it be any different for Chevron's preemptive "disgorgement" claim? *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 259 (S.D.N.Y. 2012); *see Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir. 1990) (RICO action not ripe because it was "contingent upon future [proceedings] in the state court," and "so long as [the] underlying liability claim remains pending and unresolved in the

Nor has Chevron proven that this possible future injury would be caused by the defendants' alleged wrongdoing or would likely be redressed by the constructive trust it requests. As for causation, the chain would be "interrupted by the independent actions" of the foreign enforcement court (as well as the Ecuadorian appellate courts). *UCFW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 135-36 (2d Cir. 2010).[17]

As for redressability, here is what Chevron says will happen should it prevail: "[A]t the appropriate juncture Chevron intends to ask any foreign courts in which Defendants have initiated recognition or enforcement actions to consider this Court's injunction and the findings supporting it. On that basis Chevron *believes it is likely* that the foreign court would decline to award Defendants any relief, but any effect accorded to this Court's order *would be the decision of the foreign court*." Chevron Br. 343 (emphasis added).

Chevron's "beliefs," however, have no bearing on "likely" redressability. What matters is whether Chevron has "demonstrate[d] the likelihood" by "adduc[ing] facts showing that," in this case, "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . . have been or will be made in such manner as to produce causation and permit

---

state court, it [would be] inappropriate to [permit] the present federal RICO action"); Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* § 4.03[5] (2014) ("It is not enough that a plaintiff might suffer recoverable injuries in the future. In order to be able to maintain a RICO action, the plaintiff must show that his damages are not contingent upon the happening of uncertain events in the future."); Gregory P. Joseph, *Civil RICO: A Definitive Guide* § 6(2) (3d ed. 2010) ("The RICO injury must be ripe and not contingent on future events that may or may not occur.").

[17] Or viewed through the prism of RICO: Because the injury would depend on the decisions of "third and even fourth parties," the alleged violations could not lead "directly to [Chevron's] injuries." *Hemi Group*, 559 U.S. at 14-15.

redressability of injury." *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992); *Lujan*, 504 U.S. at 562. This Chevron has not done.[18]

Chevron's case for redressability is weaker still, we might add, because this Court lacks personal jurisdiction over the Ecuadorian defendants. *See* Naranjo & Payaguaje Opening Br. 4-20. As a result, any constructive trust—and any other relief this Court could issue—would apply only to Steven Donziger (notwithstanding Chevron's attempts to bind others in what is akin to a defendant class action). So long as the Ecuadorians can continue seeking enforcement of the judgment and ultimately collect on it, it is hard to see how Chevron is helped by—or has an interest in—ensuring that the recovery goes to anyone but Mr. Donziger.[19]

### 8.     The Defendants' Litigation Financing

Chevron also asserts injuries stemming from its New York fraud claim, alleging that it "was directly harmed by the actions" that third parties took "in reliance on Defendants' false statements and material omissions because it was forced to defend against the falsehoods the action in Ecuador [sic], work to uncover the fraudulent scheme in the United States, and defend against enforcement of the Lago Agrio judgment around the globe." Chevron Br. 219; *see id.* at 219-47. These injuries suffer from many of the same defects as Chevron's RICO injuries—the

---

[18] If foreign courts were bound by this Court's order, of course, then perhaps the injury would be "redressable even though the nexus between the judicial relief and the injury is mediated by a third party." *Sobol*, 926 F.2d at 157. But they are not, as Chevron itself admits (at 343), creating an "obvious problem" for redressability. *Lujan*, 504 U.S. at 568; *see id.* at 568-69 ("Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question.").

[19] This is not to say that Chevron would not "derive great comfort and joy" in having this Court issue an injunction applying only to Mr. Donziger. *Steel Co.*, 523 U.S. at 107. But "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.*

most glaring of which is redressability. For example, Chevron says that it was injured because Burford Capital LLC "gave [the defendants] $4 million in November 2010," which "forc[ed] Chevron to defend against Defendants' wrongful conduct in the Lago Agrio litigation and, eventually, against enforcement of the judgment." *Id.* at 223-24. This past "injury," however, cannot be remedied by the prospective relief Chevron requests. And Chevron has not proven that the injury of having to defend against litigation was caused by the alleged fraud.

### 9.    Chevron's Attorney's Fees In This Case

Finally, Chevron suggests that the attorney's fees it has incurred in this case could serve as its Article III injury. It asserts that, "regardless of the availability or scope of any equitable relief here, the Court should determine Donziger's RICO liability and then issue Chevron an award of attorney's fees as an independent form of relief." *Id.* at 11.[20]

That is a truly remarkable argument. "Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself." *Steel Co.*, 523 U.S. at 107; *see also id.* ("An interest in attorney's fees is insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." (brackets and internal quotation marks omitted)).

### CONCLUSION

Because it is now apparent that Chevron lacks standing, Rule 12(h)(3) of the Federal Rules of Civil Procedure requires that the Court "must dismiss the action," before proceeding to issue any findings of fact or conclusions of law on any other issue.

---

[20] *See also id.* at 345 ("The RICO statute expressly authorizes an award of attorney's fees. Consequently, even if the Court were to rule as a matter of law that injunctive relief is not an available remedy to a private civil RICO litigant, an award of attorney's fees is available as an independent form of relief.").

Respectfully submitted,

*/s/ Richard H. Friedman*
Richard H. Friedman
Friedman | Rubin
1126 Highland Avenue
Bremerton, WA  98337
Tel: (360) 782-4300
Fax: (360) 782-4358

*/s/ Zoe Littlepage*
Zoe Littlepage
LITTLEPAGE BOOTH
2043A West Main
Houston, TX  77098
Tel: (713) 529-8000
Fax: (713) 529-8044

*Of Counsel:*

DEEPAK GUPTA                              */s/ Steven R. Donziger*
GUPTA BECK PLLC                           STEVEN R. DONZIGER
1625 Massachusetts Avenue, NW             245 W. 104th Street, #7D
Washington, DC 20036                      New York, NY 10025
Tel. (202) 888-1741                       Tel: (212) 570-4499
Fax: (202) 328-7030                       Fax: (212) 409-8628

January 22, 2013                          *Attorneys for Steven R. Donziger, Law*
                                          *Offices of Steven R. Donziger, and*
                                          *Donziger & Associates, PLLC*