UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

        *Plaintiff*,

v.

STEVEN DONZIGER, *et al.*,

        *Defendants*.

No. 11-CIV-0691 (LAK)

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION OF STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC**

*Of Counsel:*

DEEPAK GUPTA
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
Tel. (202) 888-1741
Fax: (202) 328-7030

February 6, 2014

RICHARD H. FRIEDMAN
FRIEDMAN | RUBIN
1126 Highland Avenue
Bremerton, WA 98337
Tel: (360) 782-4300
Fax: (360) 782-4358

ZOE LITTLEPAGE
LITTLEPAGE BOOTH
2043A West Main
Houston, TX 77098
Tel: (713) 529-8000
Fax: (713) 529-8044

STEVEN R. DONZIGER
245 W. 104th Street, #7D
New York, NY 10025
Tel: (212) 570-4499
Fax: (212) 409-8628

*Attorneys for Steven R. Donziger, Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC*

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................................ii

Introduction ....................................................................................................................................1

Argument ........................................................................................................................................4

I.   Chevron Cannot Water Down the Basic Requirements of Standing. .......................................4

II.  Chevron Still Has Not Shown How Any Asserted Injury Gives It Standing. ...........................6

        1.    Chevron's litigation costs in Ecuador and enforcement actions .................................8

        2.    The costs of Chevron's unprecedented discovery campaign ....................................10

        3.    The costs of the temporary embargo lifted in June 2013 ..........................................10

        4.    Chevron's trademarks ................................................................................................11

        5.    The arbitration award owed to Chevron by Ecuador ................................................12

        6.    The reputational harm to Chevron .............................................................................12

        7.    The Ecuadorian judgment itself .................................................................................14

        8.    The defendants' litigation financing ..........................................................................15

        9.    Chevron's attorney's fees in this case ........................................................................16

Conclusion ....................................................................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*American Malting Co. v. Keitel*,
   209 F. 351 (2d Cir. 1913) .................................................................................................. 13

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2011) ................................................................................................ 6

*Clapper v. Amnesty International USA*,
   133 S. Ct. 1138 (2013) ................................................................................................ *passim*

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ............................................................................................................ 9

*Cover v. Schwartz*,
   133 F.2d 541 (2d Cir. 1942) ................................................................................................ 4

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .......................................................................................................... 16

*Heldman on behalf of T.H. v. Sobol*,
   962 F.2d 148 (2d Cir. 1992) ................................................................................................ 3

*Kendall v. Employees Retirement Plan of Avod Products*,
   524 U.S. 417 (1998) ............................................................................................................ 4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................. *passim*

*Marcavage v. City of New York*,
   689 F.3d 98 (2d Cir. 2012) .................................................................................................. 9

*Massachusetts v. E.P.A.*,
   549 U.S. 497 (2007) ....................................................................................................... 5, 14

*Nebraska Press Association v. Stuart*,
   427 U.S. 539 (1976) .......................................................................................................... 13

*Steel Co. v. Citizens for a Better Environment*,
   523 U.S. 83 (1998) ............................................................................................................ 16

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ............................................................................................................ 5

**Rules**

Federal Rule of Civil Procedure 12(h)(3) ................................................................................ 4, 17

**INTRODUCTION**

Before turning to the many reasons why Chevron lacks standing to bring this case, one lingering issue deserves mention. In a lengthy footnote, Chevron's opposition to our jurisdictional motion smuggles in a sur-reply addressing the availability of injunctive relief under RICO. On that issue, we can hardly improve on what Chevron's own law firm has told the Second Circuit in a case that, as it happens, will be argued tomorrow: "[T]he RICO statute does not afford injunctive relief to private parties. Indeed, the text and history of the RICO statute shows that Congress affirmatively decided not to authorize private injunctive claims."[1] That brief (attached here) persuasively urges the Second Circuit to "now confirm that private RICO claims for injunctive relief fail as a matter of law." If the Second Circuit agrees, as it should, then Chevron cannot get the relief it seeks here. We will not attempt to resolve this intramural dispute among Chevron and its lawyers. And this Court shouldn't have to either: This case should come to an end long before.

Two weeks ago, we moved to dismiss this case for lack of subject-matter jurisdiction because recent events made it abundantly clear that Chevron lacks standing to proceed. "For all of its gargantuan briefing," we explained, "Chevron has not even *identified* (much less proven) a single injury that would give it standing." Motion 1.

Chevron still hasn't. Chevron begins its opposition with a three-page introduction that perfectly captures its overall approach: long on bluster, short on reasoning. Chevron scoffs at the notion that its three key strategic decisions—(1) refusing to contest liability for its pollution in Ecuador, (2) abandoning damages to avoid a jury, and (3) asking for an injunction purporting to

---

[1] Br. for Appellants Leucadia Nat'l Corp., *et al.*, at 16, *Sykes v. Mel Harris & Assocs.*, No. 13-2742 (2d Cir.); *see also id.* at 44-50 (arguing that "the text of the RICO statute does not authorize private injunctive relief," that "the history of the RICO statute demonstrates that private parties cannot pursue injunctive relief," and that "the weight of authority confirms that RICO does not authorize injunctive relief in private lawsuits") (capitalization omitted).

1

block only future collection of the judgment—have combined to deprive this Court of jurisdiction. Chevron calls our argument "technical" "nonsense" that is "without support in the case law," while assuring the Court that "the basis for Article III standing is simple." Opp. 1, 3, 11. Yet when it comes to actually articulating that "basis," Chevron has only this to say: "Chevron's proof that Defendants are actively trying to take assets and inflict reputational and other injuries to extort a multi-billion dollar payoff justifies the invocation of judicial power to issue an order prohibiting their further misconduct." *Id.* at 3. That is indeed a "simple" proposition—and a vague and a conclusory one too.

The reason Chevron falls back on these "simple" assertions—like its refrain that an "ongoing scheme" is causing "ongoing injuries" that its injunction will "prevent," *id.* at 1, 4—is that this is the best it can do. As our motion details, Chevron's case for standing is beset by two insurmountable problems: an inability to link the alleged Article III injury to the relief sought, and no theory of causation. These shortcomings are as much failures of logic as they are of proof; they do not "depend[] on an evaluation of the evidence." *Id.* at 15. And, surprisingly, they manage to be even more glaring now than they were before.

With respect to Chevron's first fatal problem (the mismatch between injury and relief), Chevron says that "the injury [its] proposed injunction seeks to prevent" is not "the legal fees associated with foreign enforcement" but rather "the underlying purpose of the enforcement attempts—namely, to obtain Chevron's assets." *Id.* at 12. But that "injury" is utterly speculative: It will come to pass only if a foreign court *enforces the judgment*, and "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in [a] case." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013).

Nor does Chevron spell out how any injury it alleges would "likely" be redressed by its injunction. The Supreme Court has made clear that a plaintiff "cannot rely on speculation about

2

'the unfettered choices made by independent actors not before the court.'" *Id.* at 1150 n.5. And that is especially true where those "independent actors" are foreign courts, not bound by this Court's decrees. For this reason, redressability is Chevron's "most obvious problem." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992). The relief sought "would not remedy [Chevron's] alleged injury unless the [foreign courts] were bound by [this Court's decree]," which they are not. *Id.* at 568-69.

With respect to Chevron's second fatal problem (causation), Chevron devotes just three paragraphs to this requirement. *See* Opp. 8-9. The first asserts: "To the extent Chevron faces" injuries, they "are 'fairly traceable' to Defendants' ongoing misconduct." *Id.* at 8. The second declares that "Chevron has proved causation." *Id.* And the third consists of still more conclusory statements, before ending with a citation to Chevron's post-trial briefing, where one can find even more. *Id.* at 9. That is a stunning failure to establish causation.

At bottom, the difficulty for Chevron is that it must prove that "the unfettered choices made by independent actors" with "broad and legitimate discretion"—whether the appellate courts of Ecuador or future enforcement courts in nations such as Canada—"have been or will be made in such manner as to produce causation and permit redressability of injury." *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 157 (2d Cir. 1992). This Chevron cannot do.

What Chevron lacks in serious legal arguments, however, it seeks to make up for in *chutzpah*. Three times, Chevron calls our motion "frivolous," claiming that there is "no room for debate" on standing. *Id.* at 1, 2 n.1, 14, 15. Chevron goes so far as to say that the motion "warrants rebuke," and twice raises the possibility of "sanctions." *Id.* at 2 n.1, 16.

Perhaps Chevron believes this Court will overlook or not comprehend the insuperable jurisdictional defects in its case if they are labeled "frivolous" or "technical." *Id.* at 11. But, as the Second Circuit has explained, "[t]here is nothing 'technical'" in Article III's jurisdictional

3

requirement—"unless all decisions in conformity with constitutional restraints on the powers of the federal judiciary are 'technical.'" *Cover v. Schwartz*, 133 F.2d 541, 551 (2d Cir. 1942). Nor is there anything "technical" in Chevron's strategic decision to rob Steven Donziger of his constitutional right to a jury. And there certainly is nothing "technical" in ensuring that a federal court will not be transformed into a worldwide fact-finding commission, or a source of amicus briefs aspiring to influence the outcomes of foreign proceedings. Because Chevron does not deny that this is what it asks from this Court, "the court must dismiss the action" for lack of jurisdiction. Fed. R. Civ. P. 12(h)(3).

## ARGUMENT

### I.  Chevron Cannot Water Down the Basic Requirements of Standing.

Betraying some awareness of the predicament in which it finds itself, Chevron seeks to move the goalposts. It suggests that "successful standing challenges" only involve "litigation asserting the illegality of governmental action," and faults us for not citing a "case in which an injured private party was denied standing to bring a private claim against another private party." Opp. 2. But Article III does not go by the wayside in private disputes, nor create a special set of rules for them. *See, e.g.*, *Kendall v. Employees Ret. Plan of Avod Prods.*, 561 F.3d 112 (2d Cir. 2009) (holding plaintiff lacked standing in case between private parties). Quite the contrary, standing is an "essential and unchanging" requirement for every federal case, and it demands that any plaintiff show three things: injury in fact, causation, and redressability. *Id.* at 118 (quoting *Lujan*, 504 U.S. at 560).

Chevron then tries to water down each of these elements. As for injury in fact, Chevron claims that we "misstate[] the law" and that it need not "show that its future injuries are 'certainly impending.'" Opp. 5. But the Supreme Court made clear just last year, in *Clapper*—no less than a *dozen times*—that this is *exactly* what Chevron must show. *See* 133 S. Ct. at 1143

4

("[Plaintiffs'] theory of future injury is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'"); *id.* at 1147 ("[T]he Second Circuit's 'objectively reasonable likelihood' standard is inconsistent with our requirement that 'threatened injury must be certainly impending to constitute injury in fact.'"); *see also id.* at 1143, 1147, 1148, 1150, 1151, 1152 & 1155. And the Court's holding applied that standard: "We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is *certainly impending.*" *Id.* at 1155 (emphasis added). Even before *Clapper*, the Court "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in *Clapper*). So too here.[2]

As for causation and redressability, Chevron attempts to dilute them too—the former, from "fairly traceable" to "meaningful contribution"; the latter, from "likely" redressability to something else entirely: an assertion that a "risk would be reduced to some extent" if Chevron were to prevail. Opp. 9, 12. Chevron's sole support for those watered-down standards is the global-warming case, *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007). But the Court *relaxed* the standing requirements in that case because it determined that the plaintiff—the Commonwealth of Massachusetts—was not a "normal litigant[] for the purposes of invoking federal jurisdiction," and was "entitled to special solicitude in [the] standing analysis" due to "its quasi-sovereign interests." *Id.* at 518, 520. The only sovereign entities affected by this case, by contrast, are the

---

[2] Chevron seeks to evade this standard based on Justice Breyer's dissent and a footnote in the majority opinion. *See* Opp. 3, 5-6. The footnote describes "some instances" where the Court did not "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about," and instead "found standing based on a 'substantial risk' that the harm will occur." 133 S. Ct. at 1150 n.5. But that footnote also leaves no doubt that—"to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement"—"even that standard" prohibits a plaintiff from "rely[ing] on speculation about 'the unfettered choices made by independent actors not before the court.'" *Id.* That includes speculating about foreign enforcement courts. And Justice Breyer's dissent is just that—a *dissent*.

5

Republic of Ecuador and the countries Chevron deems "insufficiently trustworthy to recognize what is asserted to be the extreme incapacity of the [Ecuadorian] legal system." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2011).

Ultimately, however, Chevron's case for standing is so weak that it cannot clear even the lowered bar it sets for itself. And Chevron certainly cannot satisfy what the law actually requires.

## II.     Chevron Still Has Not Shown How Any Asserted Injury Gives It Standing.

As detailed in our motion to dismiss, Chevron has asserted nine different injuries. Its opposition identifies no new ones. Nor does it explain how *any* of these injuries could meet the three requirements of standing. The holes in Chevron's case are summarized in this chart:

| INJURY | CAUSATION | REDRESSABILITY |
|---|---|---|
| **1.) Litigation costs in Ecuador and enforcement actions.**<br><br>*Chevron says*: "Chevron is incurring costs on a daily basis defending against enforcement in four countries," and "it is a virtual certainty that Defendants will continue … litigating their extant enforcement actions and bringing new ones elsewhere (including in the United States)." Opp. 6. | • Chevron articulates no theory of causation for this or any other alleged injury. Opp. 8-9.<br><br>• Instead, Chevron offers only this conclusory assertion: "To the extent Chevron faces the loss of attorneys' fees and related costs in defending against enforcement actions," that injury is "'fairly traceable' to Defendants' ongoing misconduct." Opp. 8. | • Chevron says nothing about costs incurred.<br>• Chevron contends that its injunction would "prevent Defendants from continuing" to "force [Chevron] to incur costs" in "fending off Defendants' scheme." Opp. 10. But Chevron has repeatedly "made clear that it [i]s seeking to preclude *only* those enforcement actions brought 'in any court in the United States'"—of which there are none. Post-Trial Reply 45 n.46 (emphasis added).<br>• Chevron does not explain how future costs would be redressed. It says only that the LAPs "contend" that the injunction would "serve as a disincentive to pursuing foreign enforcement actions," which "[i]f true," Chevron predicts, would "likely reduce the injury to Chevron by reducing the costs it would incur in defense." Opp. 14. |
| **2.) The costs of Chevron's unprecedented discovery campaign**<br><br>*Chevron says*: "Chevron has suffered injury in fact in the form of legal fees and further expenditures in connection with the § 1782 proceedings." Opp. 5. | • Chevron has no argument. | • Chevron asserts that its proposed injunction would "prevent Defendants from continuing" to "force [Chevron] to incur costs uncovering" their "scheme." Opp. 10. It does not say how. |

6

| | | |
|---|---|---|
| **3.) The costs of the temporary embargo lifted in June 2013**<br><br>*Chevron says*: "[A]n Argentine court, before it was reversed by a higher court, froze the assets of Chevron subsidiaries, causing harm … to Chevron." Opp. 14. | • Chevron has no argument. | • Chevron has no argument. |
| **4.) Chevron's trademarks**<br>*Chevron says*: "The Ecuadorian court" has embargoed Chevron's "intellectual property assets" and the LAPs "are slated to receive the funds generated in [an] auction of [Chevron's] trademarks." Opp. 13. | • Chevron has no argument. | • Chevron speculates that its injunction would "prevent Defendants from taking possession of any Chevron assets" and "would bar Defendants from receiving [auction] funds and place them in constructive trust for Chevron." Opp. 13-14. |
| **5.) Arbitration award owed to Chevron by Ecuador**<br>*Chevron says*: "[The LAPs] have secured a right (from the biased and corrupt Ecuadorian courts) to collect Chevron's arbitration award against the Republic of Ecuador." Opp. 6-7. | • Chevron has no argument. | • Chevron has no argument. It does not say how the embargo would be nullified by the relief it seeks, such that it would "likely" receive payment from Ecuador should it prevail. |
| **6.) Reputational harm to Chevron**<br>*Chevron says*: "Chevron has suffered … [lost] goodwill" and faces "the threat of further reputational harms." Opp. 5. | • Chevron makes only a conclusory assertion that any "loss of goodwill and reputational harm via Defendants' public pressure campaign" is "'fairly traceable' to Defendants' ongoing misconduct." Opp. 8. | • Chevron states that its injunction would "prevent Defendants from continuing" to "injure its reputation." Opp. 10. Chevron does not specify how, but presumably it might do so by banning the defendants from creating "press releases, letters to government officials and shareholders, web videos, and cartoons." *Id.* at 7. |
| **7.) The Ecuadorian judgment itself**<br>*Chevron says*: "Chevron faces … the loss of up to $9 billion if Defendants were to succeed." Opp. 8. | • Chevron makes only a conclusory assertion that any "loss of up to $9 billion if Defendants were to succeed" is "'fairly traceable' to Defendants' ongoing misconduct." Opp. 8. | • Chevron says that its injunction would "bar Defendants from profiting from [the] judgment," which Chevron hypothesizes would redress an Article III injury because the "risk" of the defendants "ever collecting" on the judgment would "be reduced to some extent." Opp. 12. |

7

| | | |
|---|---|---|
| **8.) The defendants' litigation financing** *Chevron says*: "[I]t is a virtual certainty that Defendants will" continue "attempting to obtain additional financing." Opp. 6. | • Chevron has no argument. | • Chevron has no argument. |
| **9.) Chevron's attorney's fees here** *Chevron says*: Nothing. | • Chevron has no argument. | • Chevron has no argument. |

### 1. Chevron's Litigation Costs in Ecuador and Enforcement Actions

Chevron continues to claim that it has standing because it "has suffered injury in fact in the form of legal fees and further expenditures in connection with [foreign] enforcement actions," and it "faces the real threat of responding to ongoing and contemplated enforcement actions in the United States and elsewhere." Opp. 5.[3] Chevron further asserts that "it is a virtual certainty that Defendants will continue their efforts to extort Chevron by . . . litigating the extant enforcement actions and bringing new ones elsewhere (including in the United States)." *Id.* at 6.

For starters, it is not a "certainty" (virtual or otherwise) that the defendants will bring a "new" enforcement action "in the United States." *Id.* It is not even likely. The "[d]efendants have made no attempt to enforce the Ecuadorian judgment in the United States," and they have no plans to do so in the future. Chevron Post-Trial Opening Br. 6. Attempting to show otherwise, Chevron offers nothing but its own speculation. It hypothesizes that the defendants "could try" to pursue a "strategy" that was "suggested" to them, "first seeking to enforce the Lago Agrio judgment in a friendly foreign jurisdiction, and then"—if the foreign court applied its law to enforce the judgment—"attempt to have a United States court recognize that [possible decision]

---

[3] *See also* Opp. 7 ("[The defendants] have already filed three foreign enforcement actions and have promised dozens more."); *id.* at 14 ("Chevron is incurring costs on a daily basis defending against enforcement in four countries, including Ecuador.").

8

here." *Id.* at 344. Even assuming that Chevron's "proposed injunction would be effective to prevent" this chain of potential future events, *id.*, "hypothetical injuries do not suffice for Article III standing." *Clinton v. City of New York*, 524 U.S. 417, 459 (1998). A plaintiff cannot achieve standing by "rely[ing] on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 133 S. Ct. at 1150 n. 5 (quoting *Lujan*, 504 U.S. at 562).

As for the costs of enforcement actions the defendants have actually brought, Chevron's main hurdle isn't "injury in fact"—it's the relief Chevron has chosen to request from this Court. That relief would redress neither the litigation costs Chevron has already incurred (because it is not seeking damages) nor those costs that Chevron expects to incur in the future (because it "is not seeking to enjoin the filing or litigation of foreign enforcement actions"). Chevron Post-Trial Opening Br. 339; *see also* Motion 5-6 & n.2. Chevron's only response to this logic is that the Lago Agrio plaintiffs "contend" that the injunction would "serve as a disincentive to pursuing foreign enforcement actions," which "[i]f true," Chevron predicts, would "likely reduce the injury to Chevron by reducing the costs it would incur in defense." Opp. 14. That is pure conjecture—not "likely" redressability. *See Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (plaintiff must show that its injury "would be prevented by the equitable relief sought").

Nor does Chevron meaningfully respond to our discussion (at Motion 7-11) of the second insurmountable hurdle it faces: an inability to show that its asserted injury is "fairly traceable" to the defendants' allegedly unlawful actions and not "the independent action of some third party." *Lujan*, 504 U.S. at 560. Indeed, Chevron's three-paragraph causation section is completely devoid of any theory of causation, or any reasoning at all. *See* Opp. 8-9. It is little more than a string of conclusory assertions, with citations to still more of them. That is far from enough. Because Chevron cannot show that the injury it alleges (here, the costs of defending enforcement actions) is fairly traceable to the conduct it complains of—rather than the independent action of

9

the Ecuadorian appellate courts and Chevron's own uncontested liability—it has no case for constitutional causation. That alone is fatal to its bid for standing.

### 2. The Costs of Chevron's Unprecedented Discovery Campaign

Chevron also persists in pressing its second asserted injury: that it "suffered injury in fact in the form of legal fees and further expenditures in connection with the § 1782 proceedings." *Id.* at 5. But that is all that Chevron says on the matter, apart from a lone assertion that its injunction would "prevent Defendants from continuing" to "force [Chevron] to incur costs uncovering" the defendants' "scheme." *Id.* 10. Chevron does not say how it would do so. And for good reason: neither does its injunction, which does not even mention Chevron's § 1782 proceedings or purport to halt those voluntary actions.

As we explained in our motion, the problems with this "injury" are not limited to redressability. *See* Motion 11-12. Indeed, Chevron manages to go zero for three: It does not even attempt to argue causation. *See* Opp. 8-9. And it offers no response to our basic point that "a plaintiff cannot 'manufacture standing' through 'self-inflicted injuries'—and surely not by spending money to build its case." Motion 12 (quoting *Clapper*, 133 S. Ct. at 1151-52).

### 3. The Costs of the Temporary Embargo Lifted in June 2013

Not wanting to give up *any* injury that could potentially give it standing, Chevron clings even to its assertion that "an Argentine court, before it was reversed by a higher court, froze the assets of Chevron subsidiaries, causing harm to the operations of those subsidiaries, and ultimately to Chevron." Opp. 14. But Chevron makes no attempt to ground the rest of the standing analysis in this asserted injury. That's because the prospective relief it seeks could not possibly redress this past "harm," and because Chevron has no theory of causation anyway.

10

### 4.     Chevron's Trademarks

This brings us to Chevron's fourth asserted injury: The Ecuadorian court's embargo of "the intellectual property assets of a Chevron subsidiary." *Id.* According to Chevron, the Ecuadorian co-defendants "have nearly consummated the seizure and sale of [Chevron's] trademarks" and "are slated to receive the funds generated in [an] auction of those trademarks," which poses a "real threat" to the company. *Id.* at 5, 13, 14.

To begin with, Chevron cannot rely on this alleged injury to obtain standing for its claims against Steven Donziger; he has not received any "funds" from any "auction," nor is he "slated to." Chevron makes no effort whatsoever to tie him to this so-called "injury" or to otherwise establish how claims against him could be rooted in it.

Nor can Chevron rely on this alleged injury for its claims against Mr. Donziger's Ecuadorian co-defendants. One reason for this is its failure to establish causation, which infects its entire case. Another is the lack of redressability. Chevron does not contend that a favorable decision from this Court would nullify the embargo in Ecuador. Rather, Chevron says that it has satisfied redressability because its "proposed relief would bar [the Ecuadorian co-defendants] from receiving [the auction] funds, and place them in constructive trust for Chevron." *Id.* at 13.[4] That relief, according to Chevron, is "more than adequate" to establish standing. *Id.* at 14.

Hardly. Here is what would have to happen for Chevron's proposed relief to redress this injury:

(1) there would have to be an auction;
(2) someone would have to buy the trademarks;
(3) the Ecuadorian co-defendants would then have to receive the funds from the auction;

---

[4] *See also id.* at 14 ("Chevron's requested relief will prevent [the Ecuadorian co-defendants] from taking possession of any Chevron assets or those of its subsidiaries."); *id.* at 10 (same).

11

(4) the Ecuadorian courts (which Chevron claims do "not follow the rule of law," *id.*) would have to agree to enforce this Court's judgment deeming them corrupt; and

(5) the Ecuadorian courts would then have to give the money back to Chevron.

That is not only well short of "likely"—it is completely far-fetched. A plaintiff "cannot rely on speculation about 'the unfettered choices made by independent actors not before the court,'" and no foreign court is bound by this Court's decision. *Clapper*, 133 S. Ct. at 1150 n.5. That makes redressability Chevron's "most obvious problem." *Lujan*, 504 U.S. at 568; *see id.* at 568-69 ("Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question.").

### 5.    The Arbitration Award Owed to Chevron by Ecuador

In a similar vein, Chevron continues to assert another "injury" that does not concern Steven Donziger and cannot be "likely" redressed by this Court: that the Ecuadorian co-defendants "have secured a right (from the biased and corrupt Ecuadorian courts) to collect Chevron's arbitration award against the Republic of Ecuador." Opp. 6-7; *see also id.* at 14 (same). This Court can do nothing to remedy that alleged injury except issue an injunction and hope that the "biased and corrupt Ecuadorian courts" decide to enforce it. That is not likely redressability, and Chevron does not even try to carry its "burden of establishing" that it is. *Lujan*, 504 U.S. at 561. And again, Chevron sets forth no theory that would allow it to establish causation.

### 6.    The Reputational Harm to Chevron

Next up is reputational harm. Chevron maintains that it "has suffered injury in fact in the form of [lost] goodwill" and because it faces "the threat of further reputational harms." Opp. 5.

Chevron does not specify what these "harms" are, or how they were (or will be) caused by the defendants' alleged wrongdoing as opposed to "the independent action of some third party." *Lujan*, 504 U.S. at 560. All it says on that score is this: "To the extent Chevron faces . . . the loss of goodwill and reputational harm via Defendants' public pressure campaign," that injury is "'fairly traceable' to Defendants' ongoing misconduct." Opp. 8. Again, that is not enough to carry its burden of establishing standing. What reputational harm has Chevron suffered exactly? And how do we know that this harm was caused by the defendants, as opposed to the public's dislike of Chevron's willful pollution in the Ecuadorian Amazon or Chevron's retaliatory tactics for avoiding responsibility for that pollution?

Chevron is equally conclusory on the subject of redressability. It claims that the proposed injunction would "prevent Defendants from continuing the pattern of racketeering and fraud that has and continues to . . . injure its reputation." *Id.* at 10. Although Chevron does not elaborate on its thinking, perhaps it has in mind that the injunction would ban the defendants from creating "press releases, letters to government officials and shareholders, web videos, and cartoons." *Id.* at 7. Such an injunction, of course, could not hope to remedy any past reputational harm to Chevron, as in a defamation case for damages. And even if this were a defamation case, it is well settled that an injunction would be off-limits. *See Am. Malting Co. v. Keitel*, 209 F. 351, 354 (2d Cir. 1913) ("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States."). Indeed, the broad injunction that Chevron appears to contemplate—forbidding "cartoons" or "videos" satirizing or condemning its pollution and retaliatory tactics—would be an obvious prior restraint on speech—"the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976).

13

### 7. The Ecuadorian Judgment Itself

Then there's Chevron's potential liability under the Ecuadorian judgment—its last real attempt to articulate an injury to satisfy standing. But Chevron does not show how this asserted injury meets *any* of standing's requirements, much less all three.

As to the first requirement: Chevron posits that its future liability can serve as its Article III injury because the defendants "continue in the present to threaten Chevron" with "the loss of up to $9 billion if [they] were to succeed in their extortionate scheme." Opp. 5, 8. "[I]t is a virtual certainty," Chevron adds, "that Defendants will continue . . . litigating the extant enforcement actions." *Id.* at 6. But "litigating" and "succeed[ing]" are two different things. Although Chevron claims that it is a "virtual certainty" that the defendants will keep *litigating*, it does not say the same about their *success*. It makes no effort to show how "the loss of up to $9 billion" could be "certainly impending" rather than based on "speculation about the decisions of independent actors." *Clapper*, 133 S. Ct. at 1150. In fact, Chevron does not even argue that the injury is *likely*. Just the opposite: Chevron predicted in its post-trial briefing that "[n]o tribunal with respect for the rule of law will ever enforce the Lago Agrio judgment." Chevron Post-Trial Opening Br. 340. Chevron does not explain how it can establish an injury in fact by relying on something that the company itself contends will never come to pass.[5]

As to the second requirement: Chevron once again comes up short, offering only a single conclusory assertion that the judgment is "fairly traceable to Defendants' ongoing misconduct." Opp. 8. If Chevron even articulate a theory of causation, then it has not met its "burden of establishing" standing. *Lujan*, 504 U.S. at 561.

---

[5] As Chevron concedes, plaintiffs who can "only 'speculate' about whether they would be [harmed] in the future"—as Chevron does here—that speculation "'substantially undermines their standing theory.'" Opp. 7 (quoting *Clapper*, 133 S. Ct. at 1148).

14

As to the third requirement: Chevron relies on *Massachusetts* (the case giving a State "special solicitude in [the] standing analysis" because of "its quasi-sovereign interests," 549 U.S. at 520) and claims that it "has proved redressability" because the "risk" of the defendants prevailing "would be reduced to some extent if Chevron received the relief it seeks." Opp. 12 (brackets omitted). But, again, Chevron puts this risk at *zero*. And the standard that Chevron must meet is "likely" redressability. The only way this Court's injunctive relief could possibly redress Chevron's speculative injury is if the foreign enforcement court—after applying its law to *enforce* the judgment—then honored this Court's decision purporting to *nullify* it. That is doubly speculative, and anything but likely.[6]

### 8. The Defendants' Litigation Financing

Chevron appears to have given up its argument for standing based on the alleged "litigation finance" injuries that form the basis of its New York fraud claim. Chevron says only that "it is a virtual certainty that Defendants will" continue "attempting to obtain additional financing for their scheme by selling off pieces of the fraudulent judgment." *Id.* at 6. But Chevron offers no theory for why that injury—"attempting to obtain additional financing"—is cognizable under Article III. And Chevron does not even attempt to show causation or redressability, as it must to carry its burden of establishing standing.

---

[6] Chevron also contends that its injunction would "prevent Defendants from selling the judgment to third parties who believe themselves to be outside the reach of this Court and who themselves could try to pursue enforcement actions against Chevron." Opp. 10-11. But, again, Chevron has not established that the "judgment" gives rise to an Article III injury (or satisfies the other two elements of standing). Nor has Chevron proven that "enforcement actions" will be prevented if it prevails here.

### 9. Chevron's Attorney's Fees In This Case

Chevron says even less about its last asserted injury: the attorney's fees it has incurred in this case. Chevron's silence on this injury is a concession that it cannot be used as a bootstrap for standing.

## CONCLUSION

Chevron ends its opposition with an odd argument: that we should not be allowed to "sidestep" the merits by raising the issue of Article III standing. Opp. 15-17. That has things backwards. As the Supreme Court has repeatedly made clear, federal courts must address jurisdiction first. And because there is no such thing as "hypothetical jurisdiction," to skip forward to the merits without addressing standing is "to act ultra vires." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

Thus, before this Court does anything else in this case, it must *first* evaluate whether Chevron has—for any of the nine injuries it has identified—satisfied all three elements of standing: injury, causation, redressability. Despite Chevron's attempt to take a confident, blunderbuss approach to standing, the law requires more precision: It requires that Chevron's case be assessed on an injury-by-injury basis. The Supreme Court's "standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press" and must do so "separately for each form of relief sought," and that standing "requires careful judicial examination" of each alleged injury. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) (citations omitted).

In this case, the "careful judicial examination" required does not, as Chevron contends, "depend[] on an evaluation of the evidence." Opp. 15. Rather, because Chevron has utterly failed to even *articulate* a coherent theory of standing, let alone prove it, Chevron has failed to meet its burden to establish this Court's jurisdiction. Chevron's failure to connect the dots leaves

16

this Court no other option: It "must dismiss the action" for lack of jurisdiction, as required by Federal Rule of Civil Procedure 12(h)(3).

                Respectfully submitted,

                */s/ Richard H. Friedman*
                Richard H. Friedman
                Friedman | Rubin
                1126 Highland Avenue
                Bremerton, WA  98337
                Tel: (360) 782-4300
                Fax: (360) 782-4358

                */s/ Zoe Littlepage*
                Zoe Littlepage
                LITTLEPAGE BOOTH
                2043A West Main
                Houston, TX  77098
                Tel: (713) 529-8000
*Of Counsel:*             Fax: (713) 529-8044

DEEPAK GUPTA          */s/ Steven R. Donziger*
GUPTA BECK PLLC       STEVEN R. DONZIGER
1625 Massachusetts Avenue, NW  245 W. 104th Street, #7D
Washington, DC 20036      New York, NY 10025
Tel. (202) 888-1741        Tel: (212) 570-4499
Fax: (202) 328-7030       Fax: (212) 409-8628

Feburary 6, 2014          *Attorneys for Steven R. Donziger, Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC*

17