UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

          -against-                                    11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

Randy M. Mastro
Andrea E. Neuman
Reed M. Brodsky
William E. Thompson
Anne Champion
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

G. Robert Blakey
William J. and Dorothy K. O'Neill
Professor Emeritus
Notre Dame Law School
*Amicus Curiae*

Richard H. Friedman
FRIEDMAN | RUBIN

Zoe Littlepage
Rainey C. Booth
LITTLEPAGE BOOTH

Steven Donziger

*Attorneys for Defendant Steven Donziger and
Steven R. Donziger & Associates LLP*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo
Camacho Naranjo and Javier Piaguaje
Payaguaje*

*Table of Contents*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   I.    The Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       A.    Texaco's Operations in Ecuador . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       B.    Aguinda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            1.    The Principal Plaintiffs' Lawyers in Aguinda . . . . . . . . . . 8
               a.    Cristobal Bonifaz . . . . . . . . . . . . . . . . . . . . . . . 8
               b.    Steven Donziger . . . . . . . . . . . . . . . . . . . . . . . . 9
               c.    Joseph Kohn . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.    Key Events During Aguinda . . . . . . . . . . . . . . . . . . . . 11
               a.    Forum Non Conveniens – The Aguinda Plaintiffs Attack Ecuadorian Courts as Corrupt While Texaco Defends Them . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
               b.    The Start of the LAPs' Alliance With the ROE – The LAPs Agree Not to Sue PetroEcuador or the ROE . . . . . . . . . 13
               c.    The Aguinda Plaintiffs Seek to Recuse, and Attack, Judge Rakoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               d.    The Environmental Management Act is Passed in Ecuador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
               e.    Texaco Merges with a Chevron Subsidiary and Survives the Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   II.   The Lago Agrio Litigation Begins . . . . . . . . . . . . . . . . . . . . . . . . . 16
       A.    Donziger's Attitudes and Beliefs About the Ecuadorian Courts and the Conduct of Lawyers in Ecuador . . . . . . . . . . . . . . . . . . . . . . . 17
       B.    The Ecuadorian Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
       C.    The LAPs' Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
            1.    The American Lawyers . . . . . . . . . . . . . . . . . . . . . . . 23
            2.    The ADF, Selva Viva, and Luis Yanza . . . . . . . . . . . . . . 28
            3.    The Ecuadorian Lawyers . . . . . . . . . . . . . . . . . . . . . . 30
            4.    The Assembly . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
   III.   The Beginnings of Donziger's Pressure Campaign . . . . . . . . . . . . . . 34
       A.    Donziger's Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
       B.    Donziger's Public Relations Team and NGO Allies . . . . . . . . . . . . . 37
            1.    The Public Relations and Lobbying Team . . . . . . . . . . . . 37
            2.    Amazon Watch . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
       C.    The Pressure Begins – The LAPs' First Scientist and the $6 Billion "Drive By" Damages Estimate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
       D.    Donziger Touts Russell's "SWAG" and Other Misleading Descriptions of Conditions in the Orienté to Put Pressure on Chevron . . . . . . . . . . . . 43
       E.    False and Misleading Representations to Incite Governmental Action Against Chevron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
       F.    Donziger's Attempt to Justify His Continued Use of Russell's Disavowed

           Estimate is Unpersuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

IV.   The First Phase of the Lago Agrio Case – The Judicial Inspections . . . . . . . . 50

     A.    The Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     B.    The LAPs' Judicial Inspection Experts . . . . . . . . . . . . . . . . . . . . . . . . . 53

     C.    The Calmbacher Episode . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

     D.    The LAP Lawyers Halt Testing for BTEX and GRO Because it Is Yielding Unhelpful Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     E.    Sacha-53 and the "Independent" Monitors – Donziger, in His Words, Goes Over to the "Dark Side" and Makes a "Bargain With the Devil" . . . . . . 60

     F.    The Termination of the LAPs' Remaining Judicial Inspections and the Genesis of the Global Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

         1.    The LAPs Coerce the Judge to Cancel the LAPs' Remaining Judicial Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

         2.    Donziger Chooses Cabrera to be the Global Expert . . . . . . . . . . 72

V.    The Second Phase of the Lago Agrio Case – The Cabrera "Global Expert" Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

     A.    The LAPs Secretly Plan the Cabrera Report – The March 3 and 4, 2007 Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

     B.    Donziger, Fajardo, and Yanza Put Together an "Army," Cabrera is Sworn in, and the LAP Team Prepares His Work Plan . . . . . . . . . . . . . . . . . . . . . . 83

     C.    The Field Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

         1.    The LAP Team Pays Cabrera to Ensure that He Would "Totally Play Ball" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

         2.    The LAP Team Provides Cabrera with Administrative "Support" and Controls his Field Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

     D.    Donziger Attempts to Deceive Judge Sand About Cabrera's Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

     E.    Stratus Secretly Writes Most of the Report . . . . . . . . . . . . . . . . . . . . . 103

     F.    Stratus Criticizes its Own Report to Enhance the False Image of Cabrera's Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

     G.    Donziger's Explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

VI.   The Pressure Campaign Continues – The LAP Team Turns Up the Heat By Pressing for Indictment of Former Texaco Lawyers. . . . . . . . . . . . . . . . . . . . . . . . . . . 119

VII.  The Third Phase of the Lago Agrio Case – 2009-2010: Evidence of the Cabrera Fraud Begins to Come Out, Kohn Leaves the Case, New Financing Is Found, and the Case Proceeds in Lago Agrio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

     A.    Donziger's Assumption that What Happens in Ecuador, Stays in Ecuador . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

     B.    The Release of Crude . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

     C.    The Section 1782 Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

         1.    The Section 1782 Action Against Stratus – Denver Counsel Withdraw and Donziger and Fajardo Seek to Obstruct Justice Before the Federal Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

            a.    Donziger Retains U.S. Counsel to Represent the LAPs in Denver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

         b.    Beltman Discloses the Truth to Shinder – Denver Counsel Withdraw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

         c.    Fajardo Submits a Misleading Affidavit in Denver and Elsewhere . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

    2.    The New York 1782 Proceedings – Berlinger and Donziger . . 146

    3.    The LAP Team Sought to Deceive This Court in the Berlinger 1782 Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

D.    Donziger Deceives Kohn, Refuses His Demand for an Investigation of the Facts With Respect to Cabrera, and Precipitates a Final Break . . . . . . 149

    1.    Donziger Misrepresented to and Concealed From Kohn Important Information Regarding Cabrera and Stratus . . . . . . . . . . . . . . 150

    2.    Donziger Deceives Kohn About the "Secret" Account . . . . . . 152

    3.    Donziger Refuses to Cooperate With Kohn's Demand for an Investigation Independent of Donziger . . . . . . . . . . . . . . . . . . 154

            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

    4.    Kohn Cuts Off Funding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

    5.    Defendants' Response to Kohn's Testimony . . . . . . . . . . . . . . 164

E.    The Search for New Funding – Patton Boggs, the Invictus Strategy, and Burford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

    1.    Patton Boggs Is Retained, Develops the Enforcement Strategy, and Obtains Funding from Burford . . . . . . . . . . . . . . . . . . . . . . . . 166

    2.    The Invictus Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

F.    Fajardo Obtains a Broader Power of Attorney, and Donziger and Fajardo Enter Into Their First Written Retention Agreements with the LAPs . . 172

G.    Burford Terminates the Funding Agreement . . . . . . . . . . . . . . . . . . . . . 174

H.    Donziger and Patton Boggs Try to Fix the Cabrera Problem – the Cleansing Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

VIII.    The Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

A.    Its Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

B.    Chevron's Ghostwriting and Bribery Claims . . . . . . . . . . . . . . . . . . . . 182

IX.    The LAPs Wrote the Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

A.    Zambrano Was Not the Author . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

    1.    Zambrano Was Unfamiliar With Key Aspects of the Judgment He Signed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

    2.    Zambrano's Account of the Preparation of the Judgment Was Self Contradictory and Implausible . . . . . . . . . . . . . . . . . . . . . . . . . 187

    3.    Zambrano's Testimony as to the Computer on Which He Claimed the Judgment Was Entered Was Inconsistent With the Evidence . . 193

    4.    Zambrano's Self Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

B.    Evidence that the LAPs Wrote the Judgment . . . . . . . . . . . . . . . . . . . . 200

    1.    The LAPs' "Fingerprints" Are All Over the Judgment . . . . . . . 200

         a.    The Fusion Memo, the Draft Alegato, the Index Summaries, the Clapp Report and the Fajardo Trust Email . . . . . . 201

         b.    The Moodie Memo . . . . . . . . . . . . . . . . . . . . . . . . . . 203

         c.    Selva Viva Database . . . . . . . . . . . . . . . . . . . . . . . . . . 207

2.      Defendants' Failure to Provide any Explanation for the Overlap . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

3.      Evidence that the LAPs Began Preparing the Judgment as Early as 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

C.      Ultimate Findings on this Point – The LAPs Wrote the Judgment  . . . 218

X.    How it All Began: Guerra Ghostwrote Orders for Zambrano and the LAPs Paid Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

A.      The Guerra-Zambrano-Donziger Conflict . . . . . . . . . . . . . . . . . . . . . 220

B.      Preliminary Observations on Credibility . . . . . . . . . . . . . . . . . . . . . . 222

C.      Guerra's Ghostwriting for Zambrano  . . . . . . . . . . . . . . . . . . . . . . . . 224

1.      The Guerra-Zambrano Ghostwriting Deal – Unrelated Civil Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

2.      Zambrano's First Tenure Presiding Over the Lago Agrio Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

a.      Guerra Reaches out to Chevron  . . . . . . . . . . . . . 229

b.      Following Chevron's Rejection, Guerra Makes a Deal With the LAPs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

c.      Guerra Drafted Zambrano's Orders in the Chevron Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

d.      The LAP Team Paid Guerra for His Ghostwriting Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

D.      Ultimate Findings on This Point – Guerra Was Zambrano's Paid Ghostwriter in Civil Cases and Was Paid By Donziger and the LAPs To Write Some of Zambrano's Orders in the Chevron Case . . . . . . . . . . . . . . . . . . . . . 237

XI.   The Story Ends:  The LAPs Bribed Zambrano to Allow Them to Write the Judgment and Issue It Under His Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

A.      Zambrano's Second Tenure Presiding Over the Lago Agrio Chevron Case: The Accounts of the Three Witnesses at Trial . . . . . . . . . . . . . . . . . . 241

1.      Guerra  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

a.      Guerra's Account . . . . . . . . . . . . . . . . . . . . . . . . . 241

b.      Assessing Guerra's Account  . . . . . . . . . . . . . . . . . 250

2.      Zambrano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 256

3.      Donziger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257

a.      Donziger's Account . . . . . . . . . . . . . . . . . . . . . . . . 257

b.      Donziger's Credibility . . . . . . . . . . . . . . . . . . . . . . 259

B.      Chevron's Circumstantial Evidence Pertinent to the Alleged Bribery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

C.      Other Circumstantial Evidence – The Fajardo December 2010-January 2011 Emails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

D.      The Defendants' Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

1.      Donziger's Testimony, Even If True, Would Not Negate the Alleged Bribe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

2.      Donziger's Approval Was Necessary for the Alleged Deal With Zambrano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

a.      Donziger Controlled the LAP Team  . . . . . . . . . . . 275

iv

           b.     Donziger's Approval Was Necessary, and Given, for the 2009 Ghostwriting Deal with Guerra ................... 278

    E.     Ultimate Findings on this Point – Fajardo, with Donziger's Approval, Promised Zambrano $500,000 of the Judgment Proceeds to Decide the Case for the LAPs and Sign a Judgment They Prepared ............... 279

XII.   The Appeals ...................................................... 281

    A.     The First Level Appeal ..................................... 282

        1.     The LAPs Contend that Chevron Set Up its Ghostwriting Claim ................................................... 283

        2.     The Appellate Panel Affirms the Judgment ............... 285

        3.     The Appellate Clarification Order ...................... 288

    B.     The National Court of Justice Affirms the Judgment in All But One Respect ................................................... 290

XIII   The Pressure Campaign Continues ............................... 292

    A.     The Invictus Strategy Deployed – Attempts to Enforce the Lago Agrio Judgment ................................................ 292

    B.     The Purpose of All of These Efforts ........................ 295

Prior Proceedings in this Litigation .................................. 298

The Pleadings ...................................................... 298

    The Amended Complaint ........................................ 298

    The Answers ................................................... 299

Discovery and Motion Practice ...................................... 301

    Discovery and Discovery Sanctions ............................. 301

    The Partial Summary Judgment Motions .......................... 301

    Attempts to Recuse the Judge or Require Reassignment of the Case ....... 302

The Trial ......................................................... 303

Post-Trial Briefing ................................................ 304

Discussion and Additional Findings .................................. 306

I.     This Court Has Subject Matter Jurisdiction ..................... 307

    A.     This Case Is Not Moot .................................... 308

    B.     This Court Had Subject Matter Jurisdiction When the Action Was Brought ................................................... 311

    C     The Court Would Have Subject Matter Jurisdiction Even on Defendants' Erroneous Premise ......................................... 313

II.    The Non-Statutory Claims for Equitable Relief With Respect to the Judgment ................................................... 318

    A.     Equitable Relief With Respect to Fraudulent Judgments Generally ... 318

    B.     Fraud on the Court – Corruption and Coercion of Judges and Judicial Official ................................................. 322

        1.     The Bribery of Zambrano ............................... 323

        2.     The Coercion of Judge Yánez ........................... 324

        3.     The Corruption of Cabrera ............................. 325

    C.     Fraud – Ghostwriting and Deception ........................ 327

        1.     The LAPs' Ghostwriting of All or Part of the Judgment and Zambrano's Adoption of Their Product Was Fraud Warranting

         Equitable Relief Even Absent Bribery . . . . . . . . . . . . . . . . . . . . 327

      2.    The Deception of the Lago Agrio Court By The Misrepresentations that Cabrera Was Independent and Impartial and By the Passing Off of the Ghostwritten Report as His Work Was Fraud Warranting Equitable Relief Even Absent Bribery . . . . . . . . . . . . . . . . . . . . 330

  D.    The Other Requirements for Relief Have Been Satisfied . . . . . . . . . . 334

  E.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

III.    The RICO Statute Applies Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339

  A.    RICO Applies to Prohibited Conduct Regardless of Whether a Defendant Is a Member of Organized Crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

  B.    Equitable Relief Is Available in Private RICO Actions . . . . . . . . . . . . 341

IV.    The Section 1962(c) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

  A.    The Elements of a Section 1962(c) Violation . . . . . . . . . . . . . . . . . . . 354

  B.    The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354

  C.    Donziger Conducted and Participated in the Conduct of the Affairs of the Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

  D.    The Predicate Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

      1.    Extortion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

          a.    The Elements of Extortion and Their Application Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

          b.    Much of Donziger's Conduct Was Not Protected . . . . . 360

              i.    Donziger's Entitlement Argument Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361

              ii.    Donziger's Conduct is Not Protected Petitioning Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 364

          c.    Donziger's Extortionate Conduct . . . . . . . . . . . . . . . . . 366

              i.    Donziger's Misconduct in the Litigation . . . . . . 366

              ii.    Donziger Made Representations He Knew Were Materially False in Order to Exert Pressure on Chevron . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 367

                 (A)    Donziger Repeatedly Used Damages Estimates He Knew Were False or the Truth of Which He Doubted . . . . . . . . . . . . . 368

                 (B)    Donziger Sought to Pressure Chevron by Causing Third Parties to Act on His Misrepresentations . . . . . . . . . . . . . . . . . . 372

                 (C)    Donziger Pressed the Republic of Ecuador to File Criminal Charges Against Chevron Attorneys in Order to Pressure Chevron into Settlement . . . . . . . . . . . . . . . . . . . . . . . 374

          d.    Application of the Hobbs Act to This Conduct Is Consistent With Morrison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 377

      2.    Wire Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 379

          a.    The Elements of Wire Fraud . . . . . . . . . . . . . . . . . . . . . 379

          b.    The Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 381

           3.      Money Laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

           4.      Obstruction of Justice and Witness Tampering . . . . . . . . . . . . 387

                  a.     Obstruction of Justice  . . . . . . . . . . . . . . . . . . . . . . 387

                        i.     The Elements of Obstruction of Justice . . . . . . . 387

                        ii.    Donziger Obstructed Justice  . . . . . . . . . . . . . . 388

                  b.     Witness Tampering  . . . . . . . . . . . . . . . . . . . . . . . . 390

                        i.     The Elements of Witness Tampering . . . . . . . . . 390

                        ii.    Donziger Tampered with the Testimony of Mark Quarles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

           5.      Violation of the Travel Act Through Furtherance of Violation of the Foreign Corrupt Practices Act . . . . . . . . . . . . . . . . . . . . . . . . . 391

                  a.     The Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

                  b.     The Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 393

                        i.     Donziger Was a "Domestic Concern" . . . . . . . . 393

                        ii.    Donziger Used Instrumentalities of Interstate Commerce in Furtherance of the Payments . . . . 394

                        iii.   Donziger's Use of the Wires Was Corrupt and Intended to Influence Official Action  . . . . . . . . 395

                        iv.   The Offers, Promises, and Payments to Cabrera Were of Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 395

                        v.    Donziger Facilitated the Payments Knowing They Would Be Given to Cabrera, a Foreign Official

                               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 396

                        vi.   The Payments Were for a Business Purpose . . . 398

     E.     There Is A Related, Continuous and Domestic Pattern . . . . . . . . . . . . 399

     F.     Chevron Was Injured by the Pattern of Racketeering Activity and, Absent Equitable Relief, Will Continue to be Injured . . . . . . . . . . . . . . . . . 401

V.     Donziger Conspired to Conduct the Affairs of the Enterprise Through a Pattern of Racketeering Activity in Violation of Section 1962(d) . . . . . . . . . . . . . . . . . . . 406

VI.    Chevron's Other State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 408

VII.   Neither the Judgment Nor the Appellate Decisions in Ecuador Foreclose Liability

      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409

     A.     The Ecuadorian Decisions and Rulings Are Not Admissible for the Truth of the Matters Asserted Therein . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 410

     B.     The Appellate Decisions in Ecuador Do Not Break the Chain of Causation

         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 413

         1.      The Intermediate Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . 413

         2.      National Court of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

     C.     In Any Case, the Ecuadorian Decisions May Not Be Afforded Comity or Other Recognition Because They Were Rendered In a Judicial System That Does Not Provide Impartial Tribunals or Procedures Compatible with Due Process in Cases of this Nature  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

         1.      The 2004 and 2005 Judicial Purges . . . . . . . . . . . . . . . . . . . . . 420

         2.      The Election of President Correa . . . . . . . . . . . . . . . . . . . . . . . 421

         3.      The 2011 Judicial "Reorganization" . . . . . . . . . . . . . . . . . . . . . 425

4.      U.S. Department of State Reports . . . . . . . . . . . . . . . . . . . . . . . 428
5.      Donziger and His Colleagues Admitted the Weakness, Politicization,
        and Corrupt Nature of the Ecuadorian Judiciary . . . . . . . . . . . 430
6.      President Correa's Influence in the Lago Agrio Litigation . . . . 431

VIII.   This Court Has Personal Jurisdiction Over the LAP Representatives . . . . . . . 434
A.      The Personal Jurisdiction Defense Has Been Stricken . . . . . . . . . . . . . 434
B.      In Any Case, This Court Would Have Personal Jurisdiction At Least Under
        N.Y. CPLR  302(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434
        1.      Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 435
        2.      Section 302 – Specific Jurisdiction . . . . . . . . . . . . . . . . . . . . . 443
                a.      Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 443
                        i.      Transacting Business . . . . . . . . . . . . . . . . . . . . 443
                        ii.     "Arising Out of" . . . . . . . . . . . . . . . . . . . . . . . . 446
                b.      Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 448
                        i.      The LAP Representatives Transacted Business in
                                New York . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 448
                        ii.     The Claims in This Suit Arise Out of the Transaction
                                of Business in New York . . . . . . . . . . . . . . . . . 451
        3.      Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 452
IX.     The Other Affirmative Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 455
A.      The Judicial Estoppel Defense is Without Merit . . . . . . . . . . . . . . . . . . 455
B.      Defendants Have Abandoned All Other Pleaded Affirmative Defenses,
        Which in Any Case Lacked Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 461
        1.      Rule 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 462
        2.      Unclean Hands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 464
X.      Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 469
A.      Chevron Has No Adequate Remedy at Law and is Threatened With
        Irreparable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 469
        1.      Further Proceedings in Ecuador, If Any Even Theoretically Were
                Available, Would Offer No Adequate Remedy . . . . . . . . . . . . . 469
        2.      Defense of Multiple Enforcement Actions Would Not Provide An
                Adequate Remedy at Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471
        3.      Money Damages Are Not, and Could Not Have Been, an Adequate
                Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473
B.      Chevron Is Entitled to Equitable Relief Preventing These Three Defendants
        From Benefitting From the Fraud on the Court and Donziger From Profiting
        From the RICO Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475
        1.      Constructive Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 475
        2.      Other Equitable Relief to Prevent These Defendants From Benefitting
                from the Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478
C.      Injunction Against Enforcement in the United States . . . . . . . . . . . . . . 478
D.      This Relief Is Consistent with Naranjo . . . . . . . . . . . . . . . . . . . . . . . . . 479
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 484

Appendices (in separately bound volume) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .App. 1

x

Lewis A. Kaplan, *District Judge.*

*Introduction*

Steven Donziger, a New York City lawyer, led a group of American and Ecuadorian lawyers who brought an action in Ecuador (the "Lago Agrio" case) in the names of 47 plaintiffs (the "Lago Agrio Plaintiffs" or "LAPs"), on behalf of thousands of indigenous peoples of the Orienté region of Ecuador, against Chevron Corporation ("Chevron"). They claimed that Chevron was responsible for extensive environmental damage caused by oil activities of Texaco, Inc. ("Texaco"), that ended more than twenty years ago and long before Chevron acquired Texaco's stock.

After years of pressuring Chevron to settle by a variety of both legitimate and illegitimate means, Donziger and his clients obtained a multibillion dollar judgment (the "Judgment") in the Ecuadorian courts and now seek to enforce it around the world. Chevron then brought this action, contending among other things that the Judgment was procured by fraud. Following a full trial, it now seeks equitable relief against Donziger and the two of his Ecuadorian clients who defended this case in order to prevent any of them from profiting from the alleged fraud or from seeking to enforce the Judgment in the United States.

This case is extraordinary. The facts are many and sometimes complex. They include things that normally come only out of Hollywood – coded emails among Donziger and his colleagues describing their private interactions with and machinations directed at judges and a court appointed expert, their payments to a supposedly neutral expert out of a secret account, a lawyer who invited a film crew to innumerable private strategy meetings and even to *ex parte* meetings with judges, an Ecuadorian judge who claims to have written the multibillion dollar decision but who was so inexperienced and uncomfortable with civil cases that he had someone else (a former judge who had been removed from the bench) draft some civil decisions for him, an 18-year old typist who

supposedly did Internet research in American, English, and French law for the same judge, who knew only Spanish, and much more.  The evidence is voluminous.  The transnational elements of the case make it sensitive and challenging.  Nevertheless, the Court has had the benefit of a lengthy trial.  It has heard 31 witnesses in person and considered deposition and/or other sworn or, in one instance, stipulated testimony of 37 others.  It has considered thousands of exhibits.  It has made its findings, which of necessity are lengthy and detailed.

Upon consideration of all of the evidence, including the credibility of the witnesses – though several of the most important declined to testify – the Court finds that Donziger began his involvement in this controversy with a desire to improve conditions in the area in which his Ecuadorian clients live.  To be sure, he sought also to do well for himself while doing good for others, but there was nothing wrong with that.  In the end, however, he and the Ecuadorian lawyers he led corrupted the Lago Agrio case.  They submitted fraudulent evidence.  They coerced one judge, first to use a court-appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the LAPs.  They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment.  If ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it.

The defendants seek to avoid responsibility for their actions by emphasizing that the Lago Agrio case took place in Ecuador and by invoking the principle of comity.  But that warrants

3

no different conclusion.

Comity and respect for other nations are important.  But comity does not command blind acquiescence in injustice, least of all acquiescence within the bounds of our own nation.  Courts of equity long have granted relief against fraudulent judgments entered in other states and, though less frequently, other countries.  Moreover, the United States has important interests here.  The misconduct at issue was planned, supervised, financed and executed in important (but not all) respects by Americans in the United States in order to extract money from a U.S. victim.

That said, considerations of comity and the avoidance of any misunderstanding have shaped the relief sought here.  Chevron no longer seeks, and this Court does not grant, an injunction barring enforcement of the Lago Agrio Judgment anywhere in the world.  What this Court does do is to prevent Donziger and the two LAP Representatives, who are subject to this Court's personal jurisdiction, from profiting in any way from the egregious fraud that occurred here.  That is quite a different matter. Indeed, the LAP Representatives' lawyer recently conceded before the Second Circuit that the defendants "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming that the judge was bribed.[1]  Defendants thus have acknowledged the propriety of equitable relief to prevent individuals subject to the Court's jurisdiction from benefitting from misdeeds for which they are responsible.  And while the Court does enjoin enforcement of the Judgment by these defendants in the United States, that limited injunction raises no issues of comity or international relations.  It is the prerogative of American courts to determine whether foreign judgments may be

---

[1] Tr., Sept. 26, 2013, at 25:3-15, *Naranjo v. Chevron Corp.*, No. 13-772-cv (2d Cir.) [DI 1496-2].

4

enforced in this country.

Donziger is intelligent, resourceful, and a master of public and media relations.  An extensive public relations and media campaign has been part of his strategy from early days, and it continues.  Among its objectives has been to shift the focus from the fraud on Chevron and the Lago Agrio court to the environmental harm that Donziger and the LAPs claim was done in the Orienté.  Indeed, that was a principal focus of defendants' case at trial and of their post-trial briefing.  But one should not be distracted from the issues actually presented in *this* case.

The Court assumes that there is pollution in the Orienté.  On that assumption, Texaco and perhaps even Chevron – though it never drilled for oil in Ecuador – might bear some responsibility.  In any case, improvement of conditions for the residents of the Orienté appears to be both desirable and overdue.  But the defendants' effort to change the subject to the Orienté, understandable as it is as a tactic, misses the point of this case.

The issue here is not what happened in the Orienté more than twenty years ago and who, if anyone, now is responsible for any wrongs then done.  It instead is whether a court decision was procured by corrupt means, regardless of whether the cause was just.  An innocent defendant is no more entitled to submit false evidence, to coopt and pay off a court-appointed expert, or to coerce or bribe a judge or jury than a guilty one.  So even if Donziger and his clients had a just cause – and the Court expresses no opinion on that – they were not entitled to corrupt the process to achieve their goal.

Justice is not served by inflicting injustice.  The ends do not justify the means.  There is no "Robin Hood" defense to illegal and wrongful conduct.  And the defendants' "this-is-the-way-it-is-done-in-Ecuador" excuses – actually a remarkable insult to the people of Ecuador – do not help them.  The wrongful actions of Donziger and his Ecuadorian legal team would be offensive to the

5

laws of any nation that aspires to the rule of law, including Ecuador – and they knew it.  Indeed, one Ecuadorian legal team member, in a moment of panicky candor, admitted that if documents exposing just part of what they had done were to come to light, "apart from destroying the proceeding, all of us, your attorneys, might go to jail."[2]  It is time to face the facts.

*Facts*

I.      *The Background*

The events at issue in this case took place in law offices in New York, Philadelphia, and elsewhere in the United States, a consulting firm in Colorado, a public relations firm in Washington, the Orienté, courthouses in Ecuador and all over the United States, the offices of a New York documentary film maker, news media throughout the world, and government offices in Ecuador and the United States, and other places.  They involved an array of lawyers, financial backers, scientists, judges, celebrities, media consultants, non-governmental organizations, politicians, and law school interns.  But despite the case's complex history, reach and its large cast of players, the events ultimately center on one man – Steven Donziger – and his team of Ecuadorian lawyers and U.S. and European backers.

We begin with the backdrop against which these events took place.

A.      *Texaco's Operations in Ecuador*

In 1964, the Republic of Ecuador ("ROE") granted to a Gulf Oil subsidiary and to

---

[2]

PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza, and J. Sáenz).

6

TexPet, an indirect subsidiary of Texaco, a concession to explore for and produce oil in the Orienté.[3] The Gulf-TexPet joint venture, of which TexPet was the sole operator, became known as the Consortium.[4]  In 1973, however, Ecuador's state-owned oil company, now known as PetroEcuador, acquired a 25 percent interest in the Consortium, 12.5 percent from each of TexPet and Gulf.[5] Shortly thereafter, PetroEcuador acquired Gulf's remaining equity and thus became the majority owner of the Consortium.  TexPet continued to hold a 37.5 percent interest.[6]

TexPet operated for the Consortium until June 1992, when the Concession expired. TexPet's 37.5 percent interest reverted to PetroEcuador, and TexPet began the process of winding down its operations.[7]  In connection with the termination of TexPet's Ecuadorian operations, TexPet and Texaco in 1993 entered into a Memorandum of Understanding with the ROE that provided that TexPet would be released from any potential claim for environmental harm once TexPet performed an agreed-upon remediation in the area in which it had operated.[8]  In the Spring of 1995, the parties

---

[3]

PX 210 (Napo Joint Operating Agreement); PX 3000 (Reis Veiga Direct) ¶ 14.

[4]

*Id.*

[5]

PX 211 (Agreement among the ROE, TexPet, and Gulf Oil); PX 3000 (Reis Veiga Direct) ¶ 14.

[6]

PX 212 (Agreement among the ROE, Ecuadorian Government Petroleum Corporation, and Gulf Oil); PX 3000 (Reis Veiga Direct) ¶ 14.

[7]

PX 3000 (Reis Veiga Direct) ¶ 19.

[8]

PX 222 (Dec. 14, 1994 MOU among the ROE, PetroEcuador, and TexPet), at 3; PX 3000 (Reis Veiga Direct) ¶ 29.

7

executed a Settlement Agreement and Scope of Work agreement[9] (the "Settlement Agreement") that laid out specific tasks TexPet was required to complete before its remediation and wind down were complete, whereupon it would be entitled to a release.[10]  From 1995 through 1998, ROE inspectors issued 52 *actas* in which they confirmed TexPet's completion of each task.[11]  The final *acta* – the 52nd Certificate – was issued in September 1998 and stated that TexPet had complied with its obligations under the Settlement Agreement.  The final release was signed on September 30, 1998.[12] It stated that TexPet had fully performed its obligations under the MOU and Settlement Agreement and that TexPet was released from all potential claims by the ROE and PetroEcuador.[13]

B.    *Aguinda*

While TexPet was winding down its operations in Ecuador, a group of Ecuadorian plaintiffs brought a class action against Texaco in the Southern District of New York (*"Aguinda"*)[14]

---

[9]

PX 3000 (Reis Veiga Direct) ¶ 26; PX 247 (Certificate # 052-RAT-98).

[10]

PX 223 (March 1995 Contract among TexPet, ROE, and PetroEcuador); PX 3000 (Reis Veiga Direct) ¶ 30.

[11]

PX 3000 (Reis Veiga Direct) ¶ 33; *see also e.g.*, PX 224, PX 225, PX 226, PX 237, PX 238, PX 240, PX 242, PX 243, and PX 245 (*actas*).

[12]

PX 246 (*Acta* Final by and between the Government of the ROE, PetroEcuador, Petroproduccion, and Texaco Petroleum Company).

[13]

*Id.*

[14]

*Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (filed Nov. 3, 1993) (hereinafter *"Aguinda"); see also Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 341 (S.D.N.Y. 2005).

The Court takes judicial notice of its own records.  FED. R. EVID. 201(b); *I. & I. Holding*

8

seeking billions of dollars of damages for alleged injury to the environment and health of the plaintiffs as well as certain equitable relief within Ecuador.[15]  The principal lawyers for the plaintiffs were Cristobal Bonifaz, Joseph Kohn, and Steven Donziger.[16]  As all three figured in the story that is at the heart of this case, we pause to identify them.

### 1. The Principal Plaintiffs' Lawyers in Aguinda

#### a. Cristobal Bonifaz

Cristobal Bonifaz, grandson of a former Ecuadorian president, practiced law in Amherst, Massachusetts in the early 1990s.  His son attended law school with Steven Donziger.

In 1993, Bonifaz accepted an invitation to travel to Ecuador to meet with residents of the Orienté concerning complaints about pollution in the region and the possibility of a lawsuit.[17]

---

[15] *Corp. v. Greenberg*, 151 F.2d 570, 572 (2d Cir. 1945).

[16] *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625, 626 (S.D.N.Y. 1996) *vacated sub nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998).

The defendants include not only Steven Donziger, but his law firm, variously referred to as the Law Offices of Steven Donziger and Steven R. Donziger & Associates, PLLC.   The sole proprietorship is not a legal entity and is indistinguishable from Donziger personally for all legal purposes.  *E.g.*, *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 500 (S.D.N.Y. 2002); *Anti-Hydro Co. v. Castiglia*, 461 N.Y.S. 2d 87 (App. Div. 1983).  It is undisputed that Donziger's professional company, Steven R. Donziger & Associates, PLLC, is liable to the same extent as Donziger because Donziger was its agent and acted within the scope of his employment by it.  *See In re Klenk*, 612 N.Y.S. 2d 220, 220 (App. Div. 1994) ("The attorney['s] fraudulent scheme occurred while he was a partner acting in the ordinary course of business of each law firm and therefore each law firm is liable for the attorney['s] misconduct to the same extent as he is.").  Accordingly, references to Donziger (unless otherwise stated) include the sole proprietorship and the professional company for ease of expression except if otherwise specifically stated.

[17] Bonifaz Dec. 30, 2010 Dep. Tr. at 37:19-22.

9

He took a small group of lawyers, including Donziger, and others with him.[18]  In June of that year,

Bonifaz entered into a retention agreement with various individuals who soon became plaintiffs in

*Aguinda*.[19]

b.      *Steven Donziger*

Donziger's interest in Latin America began when he worked as a journalist for the

United Press International in Nicaragua from 1984 to 1987[20] during which he covered events in

several Latin American countries.[21]  He also became fluent in Spanish.[22]

After his return from Nicaragua, Donziger[23] graduated from Harvard Law School in

1991.[24]  He then worked as a public defender[25] for two years before he accompanied Bonifaz on his

---

[18]

DX 1750 (Donziger Direct) ¶ 20.

[19]

PX 631 (June 27, 1993 Retention Agreement Between Bonifaz, Kohn, and plaintiffs in the *Aguinda* Litigation).

[20]

DX 1750 (Donziger Direct) ¶ 2.

[21]

*Id.* ¶¶ 2-5.

[22]

*Id.* ¶ 2.

[23]

Unless otherwise stated, "Donziger" hereafter refers collectively not only to Donziger himself, but also to defendants The Law Offices of Steven R. Donziger and Donziger & Associates PLLC.  As noted, the first is a sole proprietorship indistinguishable as a legal matter from Donziger.  The second is responsible for Donziger's personal actions because everything he did was done as  its agent and within the scope of his authority.

[24]

*Id.* ¶ 1.

[25]

*Id.* ¶ 3.

10

trip to Ecuador.[26]  While on that trip, Donziger traveled widely in the Napo Concession area and met

Maria Aguinda, who later became the first-named plaintiff in *Aguinda.*[27]

Although Donziger's name appears on the *Aguinda* complaint, he was not a lead

lawyer when it began.  Nevertheless, he did much of the groundwork in Ecuador, took a "handful

of trips" to the area from 1993 to 2002 "to meet with clients in the Amazon rainforest, to attend

meetings of local community groups . . . , and to take care of lawsuit-related issues."[28]  During those

trips and through case-related discovery from Texaco, Donziger made "significant headway on the

factual development of the case."[29]


      *c.*     *Joseph Kohn*

Bonifaz knew that he needed an experienced trial lawyer to assist him.  He needed

money as well.  He therefore got in touch with Joseph Kohn, a Philadelphia attorney and partner at

Kohn, Swift & Graf, P.C. (the "Kohn firm" or "Kohn").[30]  Kohn too was retained by the *Aguinda*

plaintiffs.[31]  Kohn and Bonifaz were co-lead counsel in *Aguinda* at its outset,[32] and Kohn provided

---

[26]

    *Id.* ¶ 21.

[27]

    *Id.* ¶¶ 22, 25.

[28]

    *Id.* ¶ 28.

[29]

    *Id.* ¶ 29.

[30]

    PX 2442 (Dec. 30, 2008 Email from K. Hinton to S. Cohen and H. Glaser attaching Dec. 30, 2008 *Bloomberg* article), at 10.

[31]

    PX 5600 (Kohn Direct) ¶ 1; *see also* PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco*; PX 631 (June 27, 1993

11

much of the funding.[33]


2.      *Key Events During Aguinda*

The details of *Aguinda* are largely unimportant at this stage but several points are

significant.


a.      *Forum Non Conveniens – The Aguinda Plaintiffs Attack Ecuadorian*
        *Courts as Corrupt While Texaco Defends Them*

Texaco sought dismissal of *Aguinda* on the grounds *inter alia* of *forum non*

*conveniens* and the failure to join the ROE and PetroEcuador, which it argued were indispensable

because (1) the requested equitable relief within Ecuador could not otherwise be ordered, and (2)

PetroEcuador's own actions would be at issue in the case.[34]  The *Aguinda* plaintiffs argued that New

York was the appropriate forum because Texaco was headquartered here.  They contended also that

the case could not be brought in Ecuador because Ecuador did not permit class actions or pretrial

discovery.[35]

---

Retention Agreement Between Bonifaz, Kohn, and plaintiffs in the *Aguinda* Litigation).

[32]

PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco*), at 1.

[33]

PX 2350 (Dec. 21, 1994 Ltr. from Bonifaz to Kohn reflecting fee sharing agreement in *Aguinda* and *Ashanga v. Texaco,* another case brought on behalf of residents of Peru), at 2-3.

[34]

Mot. to Dismiss, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Dec. 28, 1993) [DI 10], at 3.

[35]

Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Mar. 10, 1994) [DI 23], at 3 n.2.

12

On November 12, 1996, Judge Rakoff – to whom that case was assigned – dismissed the complaint on the grounds of *forum non conveniens* and international comity and because PetroEcuador and the ROE had not been joined as plaintiffs.[36] The plaintiffs appealed the ruling and persuaded the ROE to move to intervene in the case, a motion that Judge Rakoff denied.[37]

In 1998, the Court of Appeals reversed the dismissal of *Aguinda* on the ground that the district court had failed to obtain a commitment by Texaco to submit to the jurisdiction of the Ecuadorian courts.[38] It remanded with instructions to require "Texaco's consent to Ecuadoran jurisdiction . . . [and to] independently reweigh the factors relevant to a *forum non conveniens* dismissal."[39]

Following remand, Texaco provided the missing commitment and then renewed its motion to dismiss on *forum non conveniens* grounds. As part of its argument that the case belonged in Ecuador and not the United States – and, as will be seen, a great irony – Texaco argued that Ecuador would be an adequate alternative forum because it had an independent judiciary that provided fair trials.[40] With equal irony, the plaintiffs contended that Ecuador would not be an

---

[36]

*Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated sub nom. Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998).

[37]

*Aquinda v. Texaco, Inc.*, 175 F.R.D. 50, 51 (S.D.N.Y. 1997).

[38]

*Jota*, 157 F.3d at 159.

[39]

*Id.*

[40]

*E.g.*, Texaco Inc.'s Supp. Mem. of Law *passim*, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Mar. 10, 2000) [DI 147].

As will appear, there is no necessary inconsistency between seeking a *forum non conveniens* dismissal in order to proceed in a foreign country and later attacking a judgment rendered

adequate forum because the Ecuadorian judiciary was weak and corrupt and did not provide impartial tribunals.[41]

> Judge Rakoff granted the motion and was affirmed on appeal.[42]

> ### b.   The Start of the LAPs' Alliance With the ROE – The LAPs Agree Not to Sue PetroEcuador or the ROE

> A second point to be made about *Aguinda* is that it provided the impetus for an arrangement whereby the LAPs in substance granted PetroEcuador and the ROE immunity from suit in exchange for assistance in *Aguinda*, an alliance that has strengthened over time.

> The *Aguinda* plaintiffs were concerned by Texaco's argument that the ROE was an indispensable party in view of the complaint's prayer for an equitable decree requiring environmental remediation in Ecuadorian territory.  They obtained the ROE's agreement to seek to intervene in the case and to advise this Court that it consented to the "execution in its territory of any environmental cleanup measures that the [Southern District] Court may order [Texaco] to perform."[43]  But there was a *quid pro quo*.  The *Aguinda* plaintiffs gave the ROE and PetroEcuador a judgment reduction agreement to protect them against any award of contribution that Texaco might

---

41   in that foreign country as fraudulent or on other permissible grounds.  The standards governing the availability of an alternate forum for *forum non conveniens* analysis and for a collateral attack on a foreign judgment are quite different.  *See infra Discussion* § IX.A.

42   *E.g.*, Pls.' Reply Mem. of law *passim*, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) [DI 151].

43   *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 537 (S.D.N.Y. 2001) *aff'd as modified*, 303 F.3d 470 (2d Cir. 2002).

    PX 684 (Waiver of Rights Between C. Bonifaz and J. Kohn in *Aguinda v. Texaco*, No. 93 Civ. 7527 (S.D.N.Y.)), at 1-2.

14

obtain against them.[44]

          *c.*     *The Aguinda Plaintiffs Seek to Recuse, and Attack, Judge Rakoff*

      *Aguinda* was marked also by a challenge to Judge Rakoff's impartiality and an attack on his integrity.

      After the reversal of Judge Rakoff's initial *forum non conveniens* dismissal, the plaintiffs moved to recuse him, claiming that his attendance at a seminar on environmental issues created an appearance of partiality because Texaco had contributed general funding to the organization that sponsored the seminar.[45]  Judge Rakoff denied the motion.  The Second Circuit then denied the *Aquinda* plaintiffs' mandamus petition, holding that no reasonable person knowledgeable of the facts would doubt Judge Rakoff's impartiality.[46]  Some time later, Donziger – in a video recorded for possible use in a documentary film – attacked Judge Rakoff.  He stated that

---

[44]

        Bonifaz later testified that "this idea of an agreement not to sue arose following statements by Judge Rakoff . . . that if the Government of Ecuador intervened in the *Aguinda* litigation, that Texaco might bring counterclaims against it."  Bonifaz Mar. 1, 2011 Dep. Tr. at 14:16-22.  Bonifaz said that, at his suggestion, the ROE had agreed to intervene in the *Aguinda* case, but that it wanted an assurance from Bonifaz that it would not be sued if it did so.  According to Bonifaz, "the Procurador [Attorney General]. . . said that he will be happy to do whatever we wanted with respect to the case.  Then, following that conversation, whatever it was, I talked to a woman at his office . . . in which she said 'Well, the Procurador wants this document signed by you guys that you're not going to sue Ecuador,' because Judge Rakoff raised the issue in court that 'If you guys do that, you're going to get sued.' So they freaked out, and so then they wanted this document signed."  Bonifaz Mar. 1, 2011 Dep. Tr. at 16:8-21.  (Defendants' objection to this testimony is overruled.  The evidence is relevant to the development of the relationship among the ROE and the defendants, which goes among other things to the likelihood that influence improperly was brought to bear on the Lago Agrio court.  The statements attributed to the ROE officials are not hearsay because they are not received for the truth of the statements but to explain why the *Aguinda* plaintiffs, most of whom are LAPs, waived claims against the ROE and PetroEcuador.)

[45]

        *In re Aguinda*, 241 F.3d 194, 198 (2d Cir. 2001).

[46]

        *Id.* at 198, 206.

15

Judge Rakoff "was corrupt too, brother.  He was – totally biased against us."[47]

As will appear, these events foreshadowed what became a pattern by the LAP team of seeking to intimidate and threaten judges by pressure tactics including *ad hominem* attacks.[48]

### d.    The Environmental Management Act is Passed in Ecuador

The pendency of Texaco's dismissal motion and then the risk that the Court of Appeals would affirm Judge Rakoff's initial *forum non conveniens* dismissal prompted other actions by the *Aguinda* plaintiffs' lawyers.  As Bonifaz later suggested, "his team" had "worked with Ecuadorian legislators to draft a law similar to U.S. superfund law," in preparation "for a possible move from U.S. courts."[49]   The legislation in question became Ecuador's Environmental Management Act of 1999 (the "EMA"),[50] which among other things created a private right of action for damages for the cost of remediation of environmental harms generally, as distinct from personal injuries or property damages to specific plaintiffs.[51]

---

[47]

PX 10A (Mar. 30, 2006 *Crude* Clip).

[48]

*See infra* § Facts II.A, IV.F.1.

[49]

DI 29-10 (Hendricks Decl. 1), Ex. 83, at 2.

[50]

Act 99–37, Registro Oficial No. 245, July 30, 1999.

[51]

*Id.*; PX 2382 (Invictus Memo), at 29 ("Art. 43.  Natural or legal persons or human groups, linked by a common interest and directly affected by the harmful action or omission, may file with the judge of competent jurisdiction actions for monetary damages and for deterioration caused to health or the environment, including biodiversity and its constituent elements.")  (citing EMA).

As noted, the issue whether Ecuador permitted class actions was hotly disputed in *Aguinda*.

      *e.*      *Texaco Merges with a Chevron Subsidiary and Survives the Merger*

      The final event of note that occurred during *Aguinda* was the merger of a wholly owned subsidiary of Chevron with and into Texaco, with Texaco emerging as the surviving entity. Chevron thereby became the indirect owner of all of Texaco's common stock.  Chevron, however, did not acquire any of Texaco's assets or assume any of its liabilities by operation of the merger.[52]

*II.*      *The Lago Agrio Litigation Begins*

      In May 2003, about one year after the Second Circuit affirmed the dismissal of *Aguinda*, the LAPs sued Chevron (but not Texaco) for damages and for remediation of environmental harm said to have been caused by Texaco.[53]  The case was brought for the benefit of some 30,000 indigenous residents of the Concession area.  Significantly, however,  the complaint asked that any funds awarded to perform the requested remediation, plus an additional ten percent, be delivered to the Frente de la Defensa de la Amazonia (the "ADF") for use in performing any remediation ordered by the court.[54]  Thus, the LAPs sought to have the ADF placed in complete control of any and all sums recovered.  As will appear, this is significant because Donziger and some of his Ecuadorian associates controlled and still control the ADF.

---

[52]

      *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 243 & nn. 23-25 (S.D.N.Y. 2012).

[53]

      *Id.*  The EMA is cited in the complaint as creating a right on the part of natural persons and others to sue "for damage and loss and for health and environmental deterioration, including biodiversity." *Id.* at 29, 32.

[54]

      *Id.* at 29-31; PX 5600 (Kohn Direct) ¶ 4.

The case initially was assigned to Judge Alberto Guerra Bastidas ("Guerra"), who then was the president of the Lago Agrio court[55] and who became an important witness at trial. Before turning to the events of the Lago Agrio proceedings, however, three subjects are important to an understanding of what transpired later: (1) Donziger's attitudes and beliefs concerning the Ecuadorian courts, (2) the many Ecuadorian judges who were assigned to the case for varying periods during the years of its existence, and (3) a brief description of the plaintiffs, their lawyers, and the structure of the LAPs' team.  As someone once said, "you can't tell the players without a scorecard."

A.   *Donziger's Attitudes and Beliefs About the Ecuadorian Courts and the Conduct of Lawyers in Ecuador*

Donziger's attitudes and beliefs about the capability, fairness, and integrity of the Ecuadorian legal system are no secret.  During *Aguinda*, he argued strenuously that Ecuador was not an adequate forum because the Ecuadorian judiciary was weak and corrupt and did not provide impartial tribunals.[56] After the Lago Agrio case began, he made repeated statements – many on camera[57] – in which he amplified this view.  For example:

---

55

   PX 4300X (Callejas Direct) ¶ 24.

56

   *E.g.*, Plaintiffs' Reply Mem. of Law, *passim, Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (JSR) (S.D.N.Y. filed Apr. 24, 2000) [DI 151].

57

   As will appear, these statements made on camera were recorded by a documentary film maker whom Donziger recruited to make a film about the Lago Agrio case and for which he procured millions in financing from a friend.  The film was released with the title *Crude*.

   In these film clips, Donziger frequently sought to justify improper or questionable actions with respect to the Ecuadorian litigation by contending that such behavior was necessary in under the circumstances.  But there is no credible evidence to support Donziger's claims of

18

- "They're all [*i.e.*, the Ecuadorian judges] corrupt! It's—it's their birthright to be corrupt."[58]

- "These judges are really not very bright – it is like a vocational job to them, they deal with resolving disputes at a very basic level[;] there is little or no intellectual component to the law."[59]

- "Uh, in a year from now, we're not comin' down here anymore. The case is over. All we're doin' is writing reports and preparing for final submissions of papers. And, really mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career."[60]

- "[T]his is not a legal case, this is a political battle that's being played out through a legal case and all the evidence is in. *  *  * So, what we need to do is get the politics in order in a country that doesn't favor people from the rainforest."[61]

- "It's incredible that a judge can – you can just walk in his office, with all the media, and it's obvious what we're doing, and he doesn't have the power to say, 'get the fuck out of my office,' like at least to the press. I mean, I've never seen such utter weakness. It's the same kind of weakness that leads to corruption. *  *  * These people [*i.e.*, the judges] have no power. *  *  * They don't think they can do anything."[62]

- "You know, what . . . just happened with this judge, um, is sort of sad to me

---

necessity or justification, which often hinged on unsubstantiated suppositions of misconduct by Chevron. The Court finds that Donziger's attempts of self justification best are understood as attempts to make himself look good notwithstanding his conduct. Those attempts are not credible given the entire record of this case and the Court's assessment of Donziger.

[58]

PX 9A (Mar. 30, 2006 *Crude* Clip).

[59]

PX 179 (Donziger Notebook).

[60]

PX 3A (Mar. 9, 2006 *Crude* Clip), at CRS-032-00-CLIP-01.

[61]

PX 11A (Apr. 3, 2006 *Crude* Clip), at CRS060-00-CLIP-04.

[62]

PX 7A (Mar. 30, 2006 *Crude* Clip), at CRS-053-02-CLIP-04.

19

because it represents the fact that the judicial system here is so utterly weak – like the only way you can secure a fair trial is if you do things like that, like go in and confront the judge with media around, and fight and yell and scream and make a scene, and, you know, that would never happen in the United States. That would never happen in any judicial system that had integrity. And it's that very weakness that, you know, let people do that. That is also– lets people corrupt the process."[63]

- [To a colleague]: "Please prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of. Send it to me today."[64]

- "[I]t's a problem of institutional weakness in the judiciary, generally, and of this court, in particular. We have concluded that we need to do more, politically, to control the court, to pressure the court. We believe they make decisions based on who they fear the most, not based on what the laws should dictate. * * * [I]t's a critically important moment, because we want to send a message to the court that, 'don't fuck with us anymore – not now, and not – not later, and never.'"[65]

- "You can solve anything with politics as long as the judges are intelligent enough to understand the politics. [T]hey don't have to be intelligent enough to understand the law, just as long as they understand the politics."[66]

Though Donziger's statements are remarkably disrespectful to the judicial system he now so vehemently defends, it will be seen that they are not unlike President Correa's views of the Ecuadorian judiciary. The *Crude* outtakes depicted also Donziger's beliefs on the role of lawyers and evidence in litigation:

- "I once worked for a lawyer who said something I've never forgotten. He said, 'Facts do not exist. Facts are created.' And ever since that day, I

---

[63]

PX 8A (Mar. 30, 2006 *Crude* Clip).

[64]

PX 779 (June 14, 2006 Email from S. Donziger to A. Ponce re: "Need plan").

[65]

PX 67A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-01.

[66]

PX 81A (Undated *Crude* Clip), at CRS-129-00-CLIP-02.

realized how the law works."[67]

- "Science has to serve the law practice; the law practice doesn't serve science."[68]

- "[A]ll this bullshit about the law and facts but in the end of the day it is about brute force . . ."[69]

- "[A]t the end of the day, this [*i.e.*, the lack of evidence on a key point] is all for the Court just a bunch of smoke and mirrors and bullshit.  It really is."[70]

In considering these and other statements, not to mention Donziger's conduct, it is relevant to note that Donziger is a member of the New York Bar.  His conduct, whether in the United States or in Ecuador, was subject in every respect to the New York rules governing the conduct of lawyers.[71]

Finally, it is relevant to note that Donziger and his Ecuadorian associates assumed that it would be impossible to obtain evidence of their actions.  This 2007 exchange with Atossa Soltani, the head of Amazon Watch, a non-governmental organization ("NGO") supporter of Donziger and the LAPs, during a videotaped conversation about arguably questionable planned activities in Ecuador, is revealing:

"SOLTANI:      Do you guys know if anybody can, uh, subpoena these videos?  That is a – how do you [unintelligible]

---

[67]

PX 47A (Mar. 4, 2007 *Crude* Clip), at CRS 198-00-CLIP-07.

[68]

PX 24A (Jan. 16, 2007 *Crude* Clip), at CRS 158-02-CLIP 9.

[69]

PX 77A (June 13, 2007 *Crude* Clip), at CRS 361-11.

[70]

PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-05-CLIP-01.

[71]

N.Y. RULES OF PROF'L CONDUCT, Rule 8.5(a) (effective Apr. 1, 2009); N.Y. CODE OF PROF'L RESP., DR 1-105 (repealed effective Apr. 1, 2009).

21

"DONZIGER:        We don't have the power of subpoena in Ecuador."[72]

B.    *The Ecuadorian Judges*

A total of six judges presided over the Lago Agrio Chevron case from the time it was filed in 2003 until the Judgment was issued in February 2011.[73]  In general, the president of the Provincial Court of Nueva Loja – an election for which, it appears, was held every two years – was to preside over the case.  When a new president was selected, the case would be transferred either to the newly-elected president, who would keep the case for two years or to another judge in the court, who would keep it for four months.[74]  But the fact that six judges – two of whom presided over the case more than once – presided over the Lago Agrio case in the eight years it was pending reveals that the assignment system did not always work exactly as expected.

When the Lago Agrio case was filed in May 2003, Alberto Guerra was the president of the court and so the case was assigned to him.[75]  Guerra's term as president ended in January 2004, and the case was reassigned to the newly-elected president, Judge Efraín Novillo.[76]  Judge Novillo presided over the case for two years.  When his term was up in January 2006, the case was

---

[72]

PX 68A (June 6, 2007 *Crude* Clip), at CRS-35-04-CLIP-02.

[73]

PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[74]

Tr. (Zambrano) 1715:21-23; *see also* PX 4300X (Callejas Direct) ¶ 20.

[75]

PX 4800 (Guerra Direct) ¶ 4.

[76]

*Id.*; PX 2522 (List of Judges on the Lago Agrio Chevron Case).

22

transferred to Judge Germán Yánez.[77]  Judge Yánez's term on the case lasted until October 2007,

when Judge Novillo took over again.[78]

In August 2008, Judge Juan Nuñez became president and the Lago Agrio case was

transferred to him.[79]  Nuñez's term was cut short in September 2009, however, when he recused

himself.[80]  The case then fell to Nicolás Zambrano,[81] who first had joined the Lago Agrio court on

July 30, 2008 directly from a career as a prosecutor[82] and whose term was four months because he

was not the president of the court.  The case then went to Judge Leonardo Ordóñez, who had just

been elected president, in February 2010.[83]  Although, as president, Judge Ordóñez was to have

presided over the case for two years,[84] he was removed from the case when Chevron successfully

moved to recuse him in 2010.[85]

---

[77]

PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[78]

*Id.*; PX 348 (Oct. 3, 2007 Lago Agrio Court Order).

[79]

PX 2522 (List of Judges on the Lago Agrio Chevron Case).

[80]

PX 4800 (Guerra Direct) ¶ 21; PX 4300X (Callejas Direct) ¶ 20.

[81]

Tr. (Zambrano) 1715:1-5; PX 2522 (List of Judges on the Lago Agrio Case).

[82]

PX 4124 (July 30, 2008 Personnel Action Appointing N. Zambrano as Second Judge of the Superior Court of Nueva Loja); Tr. (Zambrano) 1629:19-1630:7.

[83]

Tr. (Zambrano) 1716:13-16.

[84]

*Id.* 1716:22-25.

[85]

*Id.* 1904:22-1905:2; DX 1561 (Oct. 1, 2010 Order).

23

Judge Zambrano took over again in October 2010[86] and issued the Judgment four months later.

### C.  The LAPs' Team

#### 1.  The American Lawyers

The lawyers for the *Aguinda* plaintiffs had laid groundwork for suing in Ecuador if the New York case were dismissed by working toward the enactment in Ecuador of the EMA.  At the outset of the Ecuadorian case, the same three American lawyers – Bonifaz, Kohn, and Donziger – played the key roles, using Ecuadorian counsel, the first of whom was Dr. Alberto Wray, to appear of record.  By the time the Lago Agrio case began, however, the respective roles of the American lawyers had changed.

Kohn, who had a lead role in the United States in *Aguinda*, had no ties to Ecuador and did not speak Spanish.[87]  While he provided most of the funding for the Lago Agrio case and related public relations activities from its inception until 2009,[88] he had little direct role in the

---

86

PX 2522 (List of Judges on the Lago Agrio Case).

87

PX 5600 (Kohn Direct) ¶ 10.

88

Between May 2003 and November 2009, the Kohn firm "was the primary funder of the litigation and related U.S. public relations and other activities.  During those nearly seven years, the firm paid over $6 million in litigation expenses.  This included . . . $1.1 million that [the Kohn firm] provided to Mr. Donziger for legal services and expenses, $1.1 million that [the Kohn firm] paid to U.S. consultants, and $2.2 million that [the firm] transferred by wire from bank accounts in the United States to bank accounts in Ecuador."  PX 5600 (Kohn Direct) ¶ 9; *see also* Donziger Nov. 29, 2010 Dep. Tr. at 205:10-206:4.  These payments included a monthly stipend that the Kohn firm paid to Donziger.  *See* Donziger Jan. 19, 2011 Dep. Tr. at 3547:23-3548:22.

24

litigation.   He mainly stayed abreast of some developments through Bonifaz and Donziger,[89] although, as discussed below, he sought unsuccessfully to become more involved when the case began to run into difficulty in 2009.

Bonifaz's role also changed.  While he was involved in selecting and briefing the lead Ecuadorian counsel,[90] tensions subsequently arose between Bonifaz and Donziger.  Bonifaz's role quickly faded, and he left the case in 2005 for reasons that are neither clear nor material.[91]

Although Bonifaz still was involved when the Ecuadorian lawsuit began, he no longer was in charge.  Donziger had taken over.  In 2006, Donziger wrote that he had been the "lead counsel on the [Lago Agrio] lawsuit for the last three years"[92] – i.e., since it began.   He explained further that he was and had been:

> "at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S.  I have close ties with almost all of the important characters in the story, including Amazon indigenous leaders, high-ranking Ecuadorian government officials, the world's leading scientists who deal with oil remediation, environmental activists, and many of Chevron's key players."[93]

He stated that he was the individual who had put together and supervised the team that was pursing

---

[89]
      PX 5600 (Kohn Direct) ¶ 10.

[90]
      Bonifaz Dec. 30, 2010 Dep. Tr. at 32:16-33:4.

[91]
      Id. at 20:21-22; see also PX 761 (Feb. 10, 2006 Assembly Resolution Terminating C. Bonifaz).

[92]
      PX 806R (Donziger Book Proposal), at 5.

[93]
      Id.

25

the case and related activities[94] and that his role was "to be the lawyer and manage the Ecuadorian legal team, while Kohn provide[d] overall guidance and money."[95] He described himself as the "lead lawyer in the class-action trial."[96]

      There is no substantial doubt that Donziger was in charge of the important aspects of the Ecuadorian case.   He referred to the Ecuadorian lawyers as his "local counsel."[97] They often referred to him as the "cabeza," or head, of the team.[98] From the time the case was filed in Lago

---

[94]

      *Id.* at 3 ("I am the person primarily responsible for putting this team together and supervising it.").

[95]

      *Id.* at 21.

[96]

      *Id.* at 3.

[97]

      Donziger July 19, 2011 Dep. Tr. at 4764:19-23 ("Q.  When you say 'local counsel,' do you mean Pablo Fajardo, Saenz, and Prieto?  A.  Yes."); Tr. (Donziger) 2477:1-6; PX 7682 (Jan. 28, 2010 Draft Ltr. from S. Donziger to J. Tyrrell) ("It likely will involve regular travel to Ecuador as well to work with local counsel."); Tr. (Donziger) 2470:4-10 ("Q.  Isn't it a fact, Mr. Donziger, that you would give directions to local counsel in Ecuador on what to do with the litigation?  A.  On occasion I would express my opinion as to what they should do, and I would do it in forceful terms.").

[98]

      DX 1306 (Donziger Notebook), at 23 ("Pablo . . . [s]till introduces me as the 'cabeza' of the lawsuit which I don't like but that is fixable.").

      Chevron offered selected portions of Donziger's personal notebook as a series of individual exhibits but the defendants offered all of it as DX 1306.  The portions offered by Chevron all were admissible, even over any hearsay objection, because Donziger's statements in the notebook are nonhearsay when offered by his opposing party, Chevron. FED. R. EVID. 801(d)(1).  The situation is quite different when the entire notebook was offered by the defendants.  To the extent it was offered for the truth of the statements, it was hearsay.  No hearsay exception was established.  Nor did defendants establish that the entire notebook was admissible under the rule of completeness, FED. R. EVID. 106, which in any case would not have overcome any hearsay objection, *infra Discussion* § VII.C, or that any specific part was admissible for a nonhearsay purpose.  Accordingly, DX 1306, except for those portions specifically relied upon in this opinion, which are admissible for the truth of the matters asserted under FED. R. EVID. 801(d)(1), is inadmissible and stricken.

Agrio until at least quite recently, and perhaps even until today, Donziger has supervised the

Ecuadorian legal team, set deadlines, was involved in setting the lawyers' salaries,[99] reviewed their

court filings, directed the legal strategy, and coordinated the work between the lawyers in Ecuador

and the scientists, experts, lawyers, litigation funders, politicians, and media consultants throughout

the world.[100] In addition, he communicates extensively with the press, and he has made tactical and

---

[99]

Donziger Dep. July 19, 2011 Dep. Tr., at 4912:19-22 ("I think [Yanza's] salary was set by mutual consent between Mr. Kohn and myself on the one hand, and Mr. Yanza on the other, when Mr. Kohn was involved in the case), *id.* at 4913:10-15 ("Q. Who determined whether or not Mr. Yanza received a bonus?  A.  I think, again, it was done by mutual consent between Mr. Yanza and myself after Mr. Kohn withdrew from the case."); PX 2396R (Donziger's Responses and Objections to Chevron Corps.' First Set of Requests for Admission), at 21 ("REQUEST FOR ADMISSION NO. 3: Admit that YOU were involved in setting Pablo Fajardo Mendoza's bonuses for his work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 3: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Pablo Fajardo Mendoza's compensation."); *id.* at 22 ("REQUEST FOR ADMISSION NO. 5:  Admit that YOU were involved in setting Pablo Fajardo Mendoza's bonuses for his work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 5: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Pablo Fajardo Mendoza's compensation."); *id.* at 23 ("REQUEST FOR ADMISSION NO. 7: Admit that YOU were involved in setting Luis Yanza's monthly salary for his work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 7: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); *id.* at 24-25 (same for Juan Pablo Sáenz); *id.* at 26 (same for Julio Prieto); *id.* at 23-24 ("REQUEST FOR ADMISSION NO. 9: Admit that YOU were involved in setting Luis Yanza's bonuses for work concerning the LAGO AGRIO LITIGATION.  RESPONSE TO REQUEST FOR ADMISSION NO. 9: . . . Donziger admits that he was aware of, and at times participated in, discussion concerning Luis Yanza's compensation."); *id.* at 25-27 (same for Juan Pablo Sáenz.); *id.* at 26 (same for Julio Prieto).

[100]

*E.g.*, PX 8057 (Mar. 7, 2010 Email from S. Donziger to L. Yanza, J. Sáenz, J. Prieto, L. Garr, and A. Page), at 5 ("Friends, Today is Sunday but it's urgent that we resolve the following by Monday: 1) The local motion with the court – we need a draft right away with the translation so we can review it here before submitting it in Lago Agrio.  The sooner it can be submitted the better; rush if possible friends . . . .  Please friends, we are in a difficult situation; I am asking you to work today."); PX 1065 (Sept. 11, 2008 Email from S. Donziger to J. Sáenz) ("'No' is not a sufficient answer.  If you have too much work, find somebody else to do it and pay them.  I need this tonite – no bullshit, and trust me, it will help our clients more than what you are currently doing, as important as what you are doing is."); PX 1038 (June 6, 2008 Email from S. Donziger to J. Sáenz, P. Fajardo, J. Prieto, L.

27

strategic decisions.[101]   He largely has controlled the money.[102]   Hence, the Court finds that it has

been Donziger who, from the very beginning of the Lago Agrio case, has called the important

Yanza, R. Garcia) ("Juampa Get this done and don't fuck up please."); PX 2376 (Apr. 19. 2007 Email from S. Donziger to M. Regalado and M. Garcés) ("Friends: I am very, very disappointed that you had already left when I called at 5:20.  I'm applying new rules for office communication. . . . We're paying too much to put up with this type of thing.  I send a corrected press release and instead of answering me, you left."); PX 687 (Nov. 19, 2003 Memorandum from Donziger to Team Entitled "Strategic Planning Memo/Ecuador Case"); PX 7670 (Jan. 21, 2008 Email from S. Donziger to J. Prieto, J. Sáenz, L. De Heredia, P. Fajardo, A. Ponce) ("Julio, Juampa, and Pablo, and Alejandro: Please ask Lupita to give you the legal document that I gave her on Friday.  It is urgent that you take care of it."); PX 7582 (July 22, 2010 Email from S. Donziger to P. Fajardo) ("Can you send me the summary that I recently asked for? thanks."); PX 7465 (Sept. 20, 2010 Email from S. Donziger to J. Sanez, P. Fajardo, J. Prieto, L Yanza, V. Barham) ("Friends, Let's talk tonight.  Let's not do anything rash please.  Let's analyze it first as a group."); PX 3040 (Apr. 3, 2008 Email from S. Donziger to P. Fajardo, L. Yanza, M. Garces. M. Guadalupe de Heredia, J. Sáenz, J. Prieto) ("PERSONALIZE THE REIS [VEIGA] MATTER BECAUSE USING HIM IS A WEAKNESS OF CHEVRON.  PLEASE TAKE ADVANTAGE").

[101]

This of course is not to say that Donziger never consulted his Ecuadorian colleagues, both lawyers and others, and that he did not take account of their views.  But It was Donziger who made the important final decisions, giving such weight to any views expressed by others as he thought appropriate.

[102]

Although Mr. Kohn provided the money through 2009, Donziger largely controlled how and when it was spent.  Many of the payments Kohn made to the plaintiffs' team in Ecuador, scientists, consultants, PR strategists, and experts first flowed through Donziger and were subject to his approval.  Indeed, Donziger sometimes paid the Ecuadorian legal team from his personal account, for which he later was reimbursed by Kohn.  *See, e.g.*, Donziger July 19, 2011 Dep. Tr. at 4925:5-14, 4927:2-4928:2. And while Kohn ultimately bore the cost of the salaries and bonuses of Ecuadorian lawyers and agents during his time on the case, Donziger was involved in setting the amount of each.  *E.g.*, *id.* at 4912:18-22 (Q: Who set Mr. Yanza's salary?  A:  I think it was set by mutual consent between Mr. Kohn and myself on the one hand and Mr. Yanza on the other, while Mr. Kohn was involved in the case.); *id.* at 4913:15-23 ("Q. Did Mr. Yanza receive any bonuses while Mr. Kohn was funding the litigation?  A.  I believe he did, yes.  Q.  Did Kohn agree to those bonuses?  A.  He paid them, so yeah, he agreed to them.").  Donziger testified also that he even purchased a home for Yanza.  *Id.* at 4917:3-10.  While Donziger paid for the home from his personal checking account, he was reimbursed for the payment by Kohn.  *Id.* at 4918:12-18; *see also* PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson) ("Please send your deposit of 20,000 to the following account").

shots.[103]  The main exception to this general conclusion for the period 2003-09, during which Kohn

was the principal financial backer, was that Donziger on occasion sought Kohn's acquiescence with

respect to activities that required additional funds.[104]  As will appear, however, Donziger did not

always tell Kohn the whole truth about what he was doing.

### 2.    The ADF, Selva Viva, and Luis Yanza

Luis Yanza is Donziger's closest friend in Ecuador.[105]  Although he is not a lawyer,

he has been and remains a central figure in the LAP team.  He has long served as "the coordinator

of the case for the affected communities."[106]  He has been paid throughout from funds raised to

finance the case.  Donziger even purchased a residence for him out of personal funds, though this

expense ultimately was reimbursed to Donziger by the Kohn firm.[107]

Yanza has been involved in some of the legal team's biggest strategic decisions,

---

[103]

Donziger and the other defendants disputed this, at least for the period early 2012 to date, both on a sanctions motion and at trial.  The Court previously rejected their argument on the sanctions motion and now rejects it again after trial.

[104]

*Infra Facts* § VII.D.

In 2010, a new source of funding, Burford Capital, invested millions of dollars in the case, at which point the law firm of Patton Boggs was given some authority, along with Donziger, over the expenditure of the money.  *Infra Facts* § VII.E.1.

[105]

PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 7 ("[m]y closest friend in Ecuador and the coordinator of the case for the affected communities [is] Luis Yanza").

[106]

*Id.*

[107]

Donziger July 19, 2011 Dep. Tr. at 4912:11-21, 4914:4-24, 4917:3-10, 4918:12-18; *see also* PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson) ("Please send your deposit of 20,000 to the following account.").

29

including, according to Donziger, the decision to replace the first Ecuadorian lead lawyer, Alberto Wray.[108]  He was copied on nearly every important email sent among the Ecuadorian lawyers and Donziger, and has been the liaison between the lawyers and their clients.  He serves also as a major point of contact between the LAP team and various Ecuadorian government officials including President Correa.[109]

Donziger and Yanza formed two entities that figure in the events that followed.

The first was the ADF, which was formed in 1993, shortly after the *Aguinda* complaint was filed, to support the case.[110]  Yanza functions as its executive director and representative with respect to the Lago Agrio case.[111]

The second was Selva Viva CIA, Ltda. ("Selva Viva"), "an entity created under . . . the corporate law of Ecuador that served as a funding vehicle [in the Lago Agrio] case . . . to pay people in Ecuador who worked on the case."[112]  It was founded in 2004, also by Yanza and at the

---

[108]

Donziger Dec. 23, 2010 Dep. Tr. at 1763:18-23.

[109]

*See infra Facts* § VI.

[110]

DX 1900 (H. Piaguaje Direct) ¶ 22; Tr. (Kohn) 1493:10-19.

[111]

*Id.*; PX 5600 (Kohn Direct) ¶ 3 (Yanza was the representative of the ADF with respect to the Lago Agrio case from the outset); *id.* ¶ 17 (Yanza was the head of the ADF).

[112]

Tr. (Donziger) 2635:5-9; Donziger Dec. 23, 2010 Dep. Tr. at 1817:12-17 ("Q.  Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right?  A.  It was created by Yanza as a mechanism to administer the case funds."); PX 6906 (record of incorporation of Selva Viva, its entry into the Register of Companies, and the designation of Donziger as president); PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "critical money transfer") ("The Frente [ADF] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [ADF] controls Selva Viva.").

30

direction of Donziger, who was and still may be its president.  Yanza controls the Selva Viva bank accounts,[113] which have been  used primarily as a "pass thr[ough] mechanism to administer the case funds. . . ."[114]  For many years, when the Ecuadorian team needed money, Yanza contacted Donziger and Donziger in turn requested the funds from Kohn.  The Kohn firm then wired the money either directly to Selva Viva or to Donziger, who then passed it on to Selva Viva.  It is undisputed that the ADF, which is controlled by Yanza and Donziger, controls Selva Viva.

The ADF, Yanza, and Selva Viva all are defaulted defendants in this case.[115]

3.      *The Ecuadorian Lawyers*

When the Lago Agrio litigation commenced, the American lawyers – who were not licensed to practice law in Ecuador – hired Ecuadorian attorneys to represent the LAPs in court.  The composition and leadership of the Ecuadorian legal team changed through the years – although, as will become evident, it always has been managed and overseen by Donziger.

Pablo Estenio Fajardo Mendoza ("Fajardo") graduated from law school in 2000 and, for a time, worked for the ADF helping residents of the Orienté bring claims against oil

---

[113]

*E.g.*, Donziger July 19, 2011 Dep. Tr. at 4844:22-4845:14; PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "Critical money transfer") ("Luis Yanza . . . runs the Selva Viva account.").

[114]

PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson, J. Kohn, and K. Kenny re: "critical money transfer") ("The Frente [ADF] created Selva Viva simply as a pass thru mechanism to administer funds for the litigation; the Frente [ADF] controls Selva Viva."); *see also* Donziger Dec. 23, 2010 Dep. Tr. at 1817:12-18 ("Q.  Selva Viva was an Ecuadorian corporation created and run by the representative of the plaintiffs; is that right? A.  It was created by Yanza as a mechanism to administer the case funds.").

[115]

DI 1469.

companies.[116] After the Lago Agrio complaint was filed in 2003, he became one of the junior lawyers on the Ecuadorian team.  His role was relatively minor until Donziger recommended that he replace Dr. Wray,[117]  which occurred in 2005.[118]

From then on, Fajardo has been the *procurador común* – lead counsel before the courts in Ecuador – for the LAPs.[119]  And, as will be seen, Fajardo has represented the plaintiffs in court, filed briefs on their behalf, signed retention agreements with investment firms, and given interviews with the international press as their representative.[120] He has traveled to the United States a number of times in connection with the Lago Agrio case.[121]

Fajardo is a defendant in this case and, as is discussed below, appeared *pro se* in its

---

116

PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 7.

117

Tr. (Donziger) 2474:16-20, 2475:17-2476:6; PX 6872 (May 23, 2006 Ltr. from S. Donziger to D. Kuhn), at 9 ("As we surveyed our options, we decided that Fajardo was the best bet to replace Pareja even though he had never run a trial in his life and (as the graduate of an extension school) was not considered a 'real' lawyer by Chevron's legal team.").

118

PX 323 (Special and Judicial Power of Attorney on Behalf of Pablo Estenio Fajardo Mendoza).

119

*Id.*

120

*E.g.*, DX 1500 (Hinton Direct) ¶ 34 ("Pablo Fajardo won the CNN Hero Award. . . .").

121

*E.g.*, PX 1107 (Feb. 24, 2009 Email from P. Fajardo to S. Donziger and L. Yanza) ("I'm in Oregon [and] . . . . I'm supposed to give the opening address at a super important conference in the environmental world. . . ."); PX 5600 (Kohn Direct) ¶ 18 ("In 2006, Mr. Donziger, Mr. Fajardo, Mr. Yanza, and Mr. Ponce met me in my offices to discuss the case."); Donziger Jan. 14, 2011 Dep. Tr. at 2795:11-20 ("Q.  Where were you and Mr. Fajardo meeting?  A.  It was in my apartment.  Q.  In New York?  A.  Yes.  Q.  What was the purpose of Mr. Fajardo's visit to New York in May of 2010?  A.  To deal with various issues relating to the Lago case.").

early days.[122]  He never answered the complaint, and a certificate of default has been entered against him.[123]

A number of other Ecuadorian lawyers has been involved in the Lago Agrio case on behalf of the LAPs.  The most significant have been Alejandro Ponce Villacis ("Ponce"), Juan Pablo Sáenz, and Julio Prieto.

Yanza recruited Ponce, a lawyer based in Quito, shortly after the Lago Agrio case was filed to "provide advice on the strategy as well as draft pleadings" and consult on matters of Ecuadorian law.[124]  Although Ponce was involved in "design[ing] the strategy of the case,"[125] he left the team in 2008 when he became a partner in his firm.[126]

Juan Pablo Sáenz and Julio Prieto report to Donziger and Fajardo, who often have called upon them to research and answer questions of Ecuadorian law,[127] translate documents (Sáenz

---

[122]

DI 128 (Feb. 23, 2011 Ltr. from P. Fajardo to Court).

[123]

DI 469 (Certificate of Default as to Fajardo, Yanza, the ADF, Selva Viva, and the 45 defaulting Lago Agrio Plaintiffs).

[124]

DX 1601 (Ponce Direct) ¶ 9.

[125]

*Id.* ¶ 12.

[126]

*Id.* ¶ 9.

[127]

*E.g.*, PX 7735 (Apr. 10, 2007 Email From S. Donziger to J. Sáenz and A. Ponce) ("Need some manner to make theory of unjust enrichment part of damages claim.  Any ideas of how under Ecuadorian law?"); PX 2493 (Aug. 26 2008 Memorandum from G. Erion and J. Sáenz) ("Re: Chevron's Liability for Texaco in Fact and Law.").

33

is fluent in English),[128] write briefs,[129] and handle daily litigation tasks.

    4.    *The Assembly*

In 2001, a grass roots organization called the Asamblea was formed in the Orienté.[130]

Humberto Piaguaje, the current leader, explained that associations were formed in each oil field.

Each association designated delegates to participate in a larger council, and leaders of each

indigenous group and one representative of settlers in each province formed an executive

committee.[131] The executive committee has met approximately once a month, often with members

of the Ecuadorian plaintiffs' legal team.[132] Minutes of these meetings have been taken and kept

---

128

    PX 8057 (Mar. 7 2010 Email from P. Fajardo to S. Donziger copying others) ("Juampa [Sáenz] is translating the Callejas statement.")

129

    PX 8057 (Mar. 7 2010 Email from J. Prieto) ("I can start on the motion [to be submitted in Denver]"); PX 7580 (Nov. 7, 2006 Email from S. Donziger to J. Sáenz, L. Schrero, and J. Prieto); PX 7468 (Nov. 11, 2010 Email from J. Sáenz to P. Fajardo and S. Donziger) ("Friends, here's the most recent draft of the Alegato. It still needs some work."); PX 435 (Nov. 15, 2007 Email from J. Sáenz to P. Fajardo, J. Prieto, S. Donziger, and A. Anchundia) ("Colleagues, here's the first version of the famous merger memo, for your review and comments. At the last minute I thought it would be a good idea to add something about piercing the corporate veil, which is still missing.").

130

    DX 1900 (H. Piaguaje Direct) ¶ 26; Tr. (Donziger) 2635:11-22 ("The asamblea, I would describe it as a grassroots organization that was created by the affected communities that exist in the Napo concession area, that is where Texaco used to operate. There is about 80 different communities, some indigenous, some farmer communities, that consider themselves to be the class of people that would benefit from any cleanup of the environmental damage. And they organized an assembly in recent years to meet on a regular basis and to monitor the lawsuit and to work with the lawyers to make their views known about how they thought the lawsuit should be litigated, or whatever issues that they wanted to express themselves about they would.").

131

    DX 1900 (H. Piaguaje Direct) ¶ 36.

132

    *Id.* ¶ 37.

34

since 2001.[133]

Although the Asamblea "existed informally as a de-facto organization" since 2001, it changed its name in 2012 to the Union of the Assembly of those Affected by Texaco ("UDAPT" or the "Assembly").[134]  In each of its incarnations, it has worked closely with the ADF[135] in connection with the Lago Agrio case.

III.    *The Beginnings of Donziger's Pressure Campaign*

A.    *Donziger's Strategy*

Donziger's assumption of control over the litigation resulted in a fundamental change in approach.  The new approach is a lens through which virtually everything that happened after the Lago Agrio case began in 2003 must be viewed.

Donziger believed that the court of public opinion was as important as any other.[136]  Once he took control of the case, the effort became "a campaign with various fronts active

---

[133]

   *Id.* ¶ 38.

[134]

   *Id.* ¶ 26.

[135]

   The ADF is referred to also as the "Amazon Defense Coalition."  *See, e.g.*, DX 1600 (Moncayo Direct) ¶ 6.

[136]

   Charles Calmbacher, one of the first experts Donziger hired to assist in the Lago Agrio litigation, testified that "a big concern of Donziger's was our public appearance.  He was convinced that he could win the case in the court of public opinion. . . . He felt, you know, if we showed any contamination, he could basically bring that out as, you know, something horrible to the people and to the Amazon and get public opinion on his side."  Calmbacher Dep. Tr. at 26:1-14.

simultaneously," including the media and the U.S. and Ecuadorian political spheres.[137]  He adopted an aggressive media strategy.

The importance of Donziger's media and public relations strategy is evident from the manner in which Donziger spent the millions of dollars that were obtained from investors.[138]  He outlined the campaign in a memorandum he wrote to his team in late 2003.  He explained that the team would initiate and/or utilize celebrities; non-governmental organization "pressure;" the "Ecuador government – executive, and Congress;" national, international, and Ecuadorian press; a "divestment campaign" in which the team would seek to convince institutional investors to sell Chevron stock, and even a criminal case in Ecuador in its effort to obtain money from Chevron.[139]

---

[137]  PX 687 (Nov. 19, 2003 Memorandum from Donziger to Team re: "Strategic Planning Memo/Ecuador Case"), at 1.

[138]  While the financial records are incomplete and do not permit a full and accurate accounting, PX 4900R (Dahlberg Direct) ¶¶ 8, 31-32, Donziger spent, or had primary control over spending by others from whom he raised money, at least several million dollars to make the documentary film *Crude*, to hire public relations personnel and lobbyists, to pay a former presidential speech writer to ghostwrite op-ed pieces for signature by others, and to fund ostensibly independent NGOs that publicly supported the LAPs in various ways.  *Id.* ¶¶ 7, 89-112; *see also* PX 607 (Invoices from S. Donziger to Kohn, Swift & Graf), at 58 (June 10, 2010 Invoice reflecting $7,500 fee for Paul Orzulak, West Wing Writers).  The public relations personnel and lobbying firms he hired included Karen Hinton, Ken Sunshine, Paul Orzulak, Kerry Kennedy, Lou Dematteis, Mark Fabiani, Christopher Lehane, Ben Barnes Group, and Downey McGrath Group.  PX 4900R (Dahlberg Direct) ¶¶ 89, 107.  Among the NGOs with which he worked closely, and for which he raised substantial funds, were Amazon Watch, the ADF, the Rainforest Action Network, and Selva Viva.  *Id.* ¶¶ 101-06.

[139]  *E.g.*, PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 1 ("The space is occupied by players in the worlds of law, science, environmental activism, politics, the press, lobbying, diplomacy, celebrity, shareholders, financial analysts, regulatory agencies, and many others in Ecuador – including high-level officials in Ecuador's government . . . . We . . . see this as not just a legal case, but a political-style campaign driven by a legal case.  The battle takes place on a daily basis, 24/7 per day, with no breaks for the normal rhythms of the typical legal practice.").

In fact, many of Donziger's former co-counsel on the case expressed grave concerns over

Just as important as the pressure campaign directed at Chevron was an analogous campaign directed at the Ecuadorian courts.  As we have seen already, Donziger viewed the Ecuadorian courts as corrupt, weak and responsive to pressure – as institutions that, at best, "make decisions based on who they fear the most, not based on what the laws should dictate."[140]  In a particularly revealing comment, made in his personal notebook, he wrote that "*the only way the court will respect us is if they fear us – and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations – that is to say, their ability to earn a livelihood.*"[141]  "[I]n the end of the day," he said, "it is about brute force" rather than "all this bullshit about the law and facts."[142]  As we shall see, he and his associates directly coerced at least one judge and mobilized demonstrations to intimidate others.  And the object always included ratcheting the pressure up on Chevron in order to extract money from it.

This focus on the media had at least one unintended effect.  Hoping to promote the LAPs' cause in the court of public opinion, Donziger in 2005 recruited a film maker to follow him and his team around in Ecuador and the United States, filming scenes for use in documentary.  That film eventually become the documentary *Crude*, which prompted extensive U.S. discovery efforts

---

his "obsession with public relations."  PX 1406 (Aug. 9, 2010 Ltr. from J. Kohn to P. Fajardo, L. Yanza, H. Piaguaje, E. Chavez, H. Payaguaje, E. Criollo), at 4; *see also* PX 1157 (Sept. 5, 2009 Email from N. Glazer to S. Donziger) ("We have a team of experienced attorneys who want to be fully integrated into and engaged with the matter . . . . And we . . . learn of case developments not from co-counsel but from press releases . . . . I feel . . . that it is extremely unprofessional, and that too much emphasis is placed on PR and not enough on other aspects.").

[140]

*Supra Facts* § II.A.

[141]

PX 184 (Donziger Notebook), at 2 of 5 (emphasis added).

[142]

PX 77A (Undated *Crude* Clip).

by Chevron that led to the disclosure of outtakes from the film.  Many of Donziger's statements on camera made to the *Crude* film makers, some of which are quite revealing, are in evidence in this case.

> B.    *Donziger's Public Relations Team and NGO Allies*
>
> 1.    *The Public Relations and Lobbying Team*

As Donziger viewed (and views) his efforts to force Chevron into settlement as "a political-style campaign driven by a legal case,"[143] it is not surprising that he spent a significant part of the resources he raised for the Lago Agrio case on these efforts, and hired several public relations professionals and lobbyists with extensive political experience to work on the LAPs' behalf.  He involved also, and at times financially contributed to, NGOs to support his efforts.  These individuals and organizations often were mere mouthpieces, however.  Donziger at all times controlled the content and timing of the LAPs' public relations.

Until quite recently, Karen Hinton was the public face of the litigation's public relations efforts.  She was the "United States press coordinator" and handled media relations efforts from May 2008 to March 2013.[144]  During that period, Hinton issued press releases and blog posts to generate media interest in the case, selected materials to submit to public officials, responded to

---

[143]    PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re "Activity Going Forward"), at 1.

[144]    DX 1500 (Hinton Direct) ¶¶ 2, 4.  In 2009, Donziger described Hinton to one of the case's investors as follows: "Former aid[e] to Andrew Cuomo (Clinton cabinet member and currently [Attorney General] of New York).  Responsible for 60 Minutes, Wash Post, Bloomberg, AP, Wall Street Journal, and interest by Andrew Cuomo in investigating Chevron for misleading shareholders."  PX 1123 (Apr. 14, 2009 Memorandum from S. Donziger to R. DeLeon re "Estimated 15-month budget, Ecuador case"), at 1-2.

media inquiries,[145] and, eventually, handled media requests related to the discovery proceedings Chevron launched in the United States.[146]  As Hinton understood it at the time of her retention, the objective of her communications efforts was to "facilitate the stated goal of pushing ChevronTexaco to settle the lawsuit in the near future."[147]  Hinton did not have ultimate control over the content of her work, however.  The substance of her press releases always was subject to Donziger's approval.[148]

Chris Lehane likewise worked to develop the LAPs' media and public relations strategy as an "advisor" to Donziger[149] using "strategies and tactics . . . employed in political campaigns . . . ."[150]  After first discussing Donziger's objectives with him, Lehane proposed to

---

[145]

DX 1500 (Hinton Direct) ¶ 4; Tr. (Hinton) 2180:22-2181:2.

[146]

Tr. (Hinton) 2169:14-15.

[147]

PX 1034 (Apr. 28, 2008 Email from K. Hinton to S. Donziger re "Proposal from Hinton Communications"), at 3.

[148]

*E.g.*, PX 6817 (Mar. 11, 2009 Email Chain Between K. Hinton and S. Donziger) (Donziger tells Hinton: "do not change headlines ever without telling me. . . . in the future blind copy me on those emails to quito. . . I need to know what is going on for purposes of managing my own staff there and knowing what journalists there have been sent . . . I think I asked you that before"); PX 1133 (May 5, 2009 Email from K. Hinton to S. Donziger) ("There are people in this world – other than yourself – who know how to get things done.  I know that's hard for you to believe, given your own incredible fascination with yourself."); PX 6814 (Dec. 3, 2009 Email chain Between K. Hinton and S. Donziger) (Donziger: "when I send a final copy of a press release for posting, the issue of the headline is settled. never change it at that point. tks."  Hinton: "I said I misunderstood.  Why do u always feel the need to rub a mistake in extra hard. . . To make sure your authority is respected and acknowledged?  It is.  Ok!").

[149]

Donziger June 28, 2013 Dep. Tr. at 845:21-23.

[150]

PX 728 (Apr. 27, 2005 Email from C. Lehane to S. Donziger and J. Kohn attaching Ecuadorian Issues Outline), at 4.

Donziger a strategy to target shareholders, Congress, and "high level media" in order to "inflict[] real economic pain on the company" and "bring[] Chevron Texaco to the negotiation table."[151]  The plan was to "fully leverage" events in Ecuador, with a view to "apply[ing] shareholder pressure on Chevron."[152]  Donziger hired him, and, in exchange for his work on the case, arranged for Lehane to be given a percentage of any eventual monetary recovery.[153]

### 2.   *Amazon Watch*

Another central player in Donziger's publicity campaign was Amazon Watch, an NGO that declares a dedication to protecting the rainforest and the indigenous groups that inhabit it.[154]  Amazon Watch and various of its staff – including Atossa Soltani, its founder and executive director, and Mitchell Anderson, a "field consultant" – worked with Donziger and others on the LAP team to support and publicize the lawsuit and to pressure Chevron. To that end, the organization collaborated with the LAPs to lobby regulatory agencies and elected officials,[155] sought support

---

[151]

        *Id.* at 1 (emphasis omitted).

[152]

        PX 734 (Oct. 1, 2005 Email from S. Donziger to J. Kohn re "Lehane's first press plan"), at 2; *see also* PX 694 (Aug. 16, 2004 Email from C. Lehane to S. Donziger re: "Issues Outline Document"), at 2 ("We must create an ongoing storyline that ChevronTexaco faces hidden purposely concealed economic exposure because of its unresolved role in the Ecuador . . . project.  Ultimate success will depend on our ability to organize and focus our efforts on impacting the company's bottom line.").

[153]

        June 28, 2013 Donziger Dep. Tr. at 845:24-846:4; *see also* PX 560 (Feb. 2011 Advisory Agreement between LAPs, CSL Strategies, and Mark Fabiani LLC).

[154]

        *See* PX 571 (2005 Amazon Watch Annual Report), at 5.

[155]

        PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson, P. Paz y Mino, and K. Koenig re: "For Pat Doherty"); PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani

40

among Chevron shareholders for a settlement,[156] and sought media attention through press releases.[157]

Although Amazon Watch's public materials did not bear Donziger's name, Donziger himself drafted many Amazon Watch materials related to the Lago Agrio litigation.[158] Donziger not only controlled the content of Amazon Watch press releases pertaining to the litigation,[159] he drafted also complaints that Amazon Watch submitted to the SEC[160] and memoranda to be sent to elected

---

and S. Aird to C. Cox).

[156]

PX 7542 (May 25, 2009 Amazon Watch Letter to Shareholders), at 2.

[157]

*See, e.g.*, PX 483R (Mar. 6, 2007 Amazon Watch press release) at 2 ("[An] independent damage assessment, by the U.S. firm Global Environmental Operations, estimates clean-up to cost at least $6.14 billion."); PX 472R (Apr. 26, 2006 Amazon Watch press release), at 1 ("Two rainforest leaders sparked a dramatic showdown with Chevron CEO David O'Reilly today over the oil major's devastating $6 billion toxic contamination of their ancestral lands . . . .").

[158]

*See, e.g.*, June 28, 2013 Donziger Dep. Tr. at 834:2-5 (acknowledging that "[o]n occasions [Donziger] wrote press releases that [Amazon Watch] put out"); Jan. 18, 2011 Donziger Dep. Tr. at 3177:10-13; 3178:10-20 (Q: "You drafted the [SEC] complaint letters for Amazon Watch to send; did you not?" A: "I believe at times I did.").

[159]

*See, e.g.*, PX 1214 (Jan. 27, 2010 Email from S. Donziger to S. Tegel, A. Soltani, K. Koenig, and M. Anderson re: "another thought"), at 1 ("Suggestions are welcome for any press release we do; final editing authority is something we would never grant to any outsider – especially somebody not in a position to understand the art and feel of this campaign and its daily developments."); PX 808 (Nov. 9, 2006 Email from S. Donziger to J. Ciplet and A. Soltani re: "suggestion"), at 1 ("I also know the press releases on the Ecuador campaign are not a terrible work burden to AW because I am writing most of them."); PX 906 (Aug. 24, 2007 Email from S. Donziger to S. Tegel, M. Anderson, A. Soltani, and K. Koenig re: "follow up on press releases"), at 1 ("[W]e are never going to outsource our editing responsibility to anybody else or any NGO . . . .").

[160]

*See, e.g.*, PX 996 (Mar. 17, 2008 Email from S. Donziger, M. Anderson, S. Tegel, P. Paz y Mino, and A. Soltani re: "Edited SEC letter/final"), at 1 ("The final SEC letter is attached with all of AW's edits sent to me on Friday plus some additional edits of my own . . . . I think this letter will really put some heat on them. To submit this, this is what you need to do . . . .").

41

officials regarding Chevron.[161]   Despite Donziger's authorship, the materials bore no outward indication of his involvement – documents drafted in whole or in substantial part by Donziger were sent on Amazon Watch letterhead and signed by Amazon Watch personnel.

In addition, in April 2005 Amazon Watch used funding from the LAPs[162] to launch a website that was a key conduit for Donziger's campaign.[163]  Dubbed "ChevronToxico," the website posted information about the litigation as well as materials written by Donziger, Hinton, and others, some of which included deliberately misleading statements.

Hinton, Lehane, Soltani, and others at Amazon Watch became important figures in Donziger's pressure campaign against Chevron, and their names appear throughout this case. Among the campaign's first real tasks, however, was the use of a flawed $6 billion figure to attempt to convince Chevron that it was facing multibillion dollar exposure in Ecuador and that the time had come to settle.

C.    *The Pressure Begins – The LAPs' First Scientist and the $6 Billion "Drive By" Damages Estimate*

Soon after the complaint was filed in Lago Agrio in 2003, Donziger hired David Russell, an environmental engineer,[164] to generate an initial cost estimate for remediation of the

---

[161]

See, e.g., PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson re: "For Pat Doherty"), at 1 ("Mitch, Attached is the memo you requested.  I put it in your name.").

[162]

Donziger June 28, 2013 Dep. Tr. at 841:19-22.

[163]

PX 571 (2005 Amazon Watch Annual Report), at 8; Tr. (Hinton) 2180:1-24.

[164]

PX 3200 (Russell Direct) ¶ 1.  Prior to his involvement with the Lago Agrio case, Russell worked on projects involving remediation and strategic planning related to oil operations in

42

Concession area.[165]  Among the purposes of the estimate was to subject Chevron to the threat of a

very large recovery.[166]

In the fall of 2003, at Donziger's direction, Russell went to the Orienté to work on

his damages estimate.[167]  There are three notable points about this estimate.

*First*, Russell visited only about 45 of the hundreds of oil pits in the region, and based

his calculations on an extrapolation of what he observed at those sites.[168]  But he did not analyze

any soil or water samples at any of the sites he visited.[169]  And his visits to some of those sites, he

acknowledged at trial, were no more searching than driving past them at 40 or 50 miles per hour.[170]

*Second*, Russell testified, and the Court finds, that Donziger instructed him to make

certain assumptions in calculating costs.[171]  Among them was the assumption that Texaco was fully

---

the United States and Latin America.  *Id.* ¶ 2.

[165]

*Id.*

[166]

*E.g.*, Tr. (Russell) 388:14-18 ("I believe . . . that Mr. Donziger was intending to use this cost estimate to get Chevron's attention and to attempt to get them to settle the case.").

[167]

PX 3200 (Russell Direct) ¶ 5; *see also* DX 1750 (Donziger Direct) ¶ 111; Tr. (Russell) 300:8-10 .

[168]

Tr. (Russell) 304:9-12.

[169]

PX 3200 (Russell Direct) ¶ 5.  Donziger testified, however, that Russell was "provided with and reviewed a considerable amount of data, including historical records and maps."  DX 1750 (Donziger Direct) ¶ 111.

[170]

Tr. (Russell) 309:4-8; PX 3200 (Russell Direct) ¶ 5.

[171]

DX 1750 (Donziger Direct) ¶ 111; PX 3200 (Russell Direct) ¶ 9.

liable for all of the contamination in the region, even that caused by PetroEcuador[172] after it took over operation of the Consortium properties when TexPet left in 1992.

*Third*, as the report itself made clear, Russell's "cost projections [w]ere very rough."[173]  He testified that this was due to "the amount of unknowns and the lack of information [he] had with regard to not only levels of contamination but the extent of those levels of contamination."[174]  And he informed Donziger and other members of the LAP team as early as December 2004 that his estimates were "best guesses based upon a week of looking at the sites, without any scientific data," and encouraged the team not to "rush to judgment" based on a "guesstimate."[175]  He was entirely candid at trial on the consequences of this lack of data – the quantities he used in generating the $6 billion figure were, he said, were "SWAG," an acronym for a "scientific wild ass guess."[176]

D.   *Donziger Touts Russell's "SWAG" and Other Misleading Descriptions of Conditions in the Orienté to Put Pressure on Chevron*

Russell's $6 billion SWAG figure quickly became a key weapon in Donziger's effort to exert pressure on Chevron and convince the company – and the world – that the damages in the

---

[172]

PX 3200 (Russell Direct) ¶ 6; *see also* DX 1750 (Donziger Direct) ¶ 111.

[173]

PX 2414 (Russell Damages Estimate), at 2.

[174]

Tr. (Russell) 339:4-7.

[175]

PX 3201 (Dec. 12, 2004 Email chain including D. Russell, C. Bonifaz, A. Wray, S. Donziger, and M. Pareja).

[176]

Tr. (Russell) 339:10-11.

44

Orienté were substantial and the threat of an enormous judgment against it was real.  As we shall see, Donziger and his public relations operation avidly used Russell's $6 billion figure in the media to generate leverage despite the fact that they knew that it could not withstand serious analysis.

David Russell left the LAP team in early 2005 because, among other reasons, the LAP team owed him money and refused to pay it.[177]  By that time he had made explicit to Donziger that his cost estimate had been "wildly inaccurate and that it should not be used."[178]  But that did not stop Donziger and his public relations team from using the number, over Russell's protests, to pressure Chevron through the media.[179]

---

[177]

PX 3200 (Russell Direct) ¶ 38.

[178]

*Id.* ¶ 14.

[179]

*Id.* ¶¶ 12-13, 20; *see generally* PX 766 (Feb. 13, 2006 Email chain including D. Russell, L. Salazar-Lopez, and S. Donziger re: "Cease and Desist!");  PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1-2; PX 766 (Feb. 16, 2006 Email from L. Salazar-Lopez to D. Russell re: "Cease and Desist!") (stating that Amazon Watch "respect[s] your request and have decided to take [the] report off of [the Amazon Watch] website"); PX 466R (Mar. 17, 2006 ChevronToxico press release), at 2; PX 467R (Mar. 22, 2006 Amazon Defense Coalition press release), at 1 ("Chevron is resorting to increasingly desperate measures to cover its tracks in the landmark environmental trial in Ecuador in which the oil giant faces a $6 billion clean-up tab."); PX 472R (Apr. 26, 2006 Amazon Watch press release), at 1 ("Two rainforest leaders sparked a dramatic showdown with Chevron CEO David O'Reilly today over the oil major's devastating $6 billion toxic contamination of their ancestral lands . . . ."); PX 480R (Oct. 30, 2006 Amazon Watch press release), at 1-3 (referring to "landmark $6 billion pollution trial" and remediation cost estimates of "at least $6 billion"); PX 18A (Undated *Crude* Clip), at CRS-138-02-CLIP-02; PX 788 (Aug. 15, 2006 Email from S. Donziger to D. Russell re "I asked you once . . .") ("No problem, I will contact the Frente to have that removed . . . ."); PX 476R (Aug. 25, 2006 Amazon Watch press release), at 1 ("Clean-up is estimated at $6.1 billion."); PX 494R (Aug. 30, 2007 Amazon Defense Coalition press release), at 3 ("Global Environmental Services, an Atlanta-based company that assessed the damage, called the area the 'Rainforest Chernobyl' and estimated clean-up would cost at least $6 billion.").

45

E.   *False and Misleading Representations to Incite Governmental Action Against Chevron*

The press was not the only intended audience for Russell's disavowed $6 billion figure and other false and misleading comparisons.  Donziger and his public relations team employed both in efforts to instigate action and put pressure on Chevron from federal and state officials and agencies.  One aim was to create the perception that the litigation threatened serious harm to the company, was material to Chevron's bottom line, and would result in a lower share price and lower profits for Chevron shareholders.  In Lehane's words, "the Ecuadorian Amazon ChevronTexaco project can be reduced, in the end, to a single strategic imperative: 'Bringing ChevronTexaco to the negotiation table by inflicting real economic pain on the company.'"[180]

To that end, Donziger in late 2005 drafted a letter[181] that ultimately was sent by Amazon Watch to the Securities and Exchange Commission ("SEC").  The letter "request[ed] that [it] open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations. . . ."[182]  The letter promoted Russell's SWAG remediation estimate, stating that "[o]ne environmental remediation expert estimated that a basic clean-up would cost at least $6 billion"[183] despite the fact that Donziger knew when he wrote it that Russell had told

---

[180]

PX 728 (Apr. 27, 2005 Email from C. Lehane to S. Donziger and J. Kohn attaching Ecuadorian Issues Outline) (emphasis omitted).

[181]

PX 736 (Nov. 1, 2005 Email from S. Donziger to C. Lehane and J. Kohn re: "SEC ltr/other").

[182]

PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

[183]

*Id.*

46

him that it was wildly inaccurate.[184]   The letter asserted also that Chevron had "creat[ed] toxic

contamination over 30 times larger than the Exxon Valdez"[185] and decried Chevron's alleged failure

to disclose its "potential liability" to its shareholders.[186] He used the same figure, despite subsequent

confirmation that it was exaggerated, in later testimony before a Congressional commission on

human rights, and in press releases.[187]

---

184

    PX 3200 (Russell Direct) ¶ 14 ("I told Donziger on several occasions from late 2004 through early 2005 that my initial cost estimate was wildly inaccurate and that it should not be used.").

185

    PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

    In 2007, Bill Powers, a member of the LAPs' technical team, investigated the claim that the contamination in the Orienté was 30 times larger than the contamination caused by the Exxon Valdez.  He concluded that it was vastly exaggerated and so informed Donziger and Soltani of Amazon Watch.  PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re: "exxon valdez 30x"); PX 862 (May 24, 2007 Email from B. Powers to S. Donziger, A. Soltani, S. Tegel, K. Koenig and J. Ciplet re: "FOE is on our team RE: exxon valdez 30x"). Soltani responded that Amazon Watch – which had featured the Exxon Valdez comparison in press releases – needed to "save face" and remove the references to the spill.  PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re "exxon valdez 30x").  But Donziger insisted that they stick to the claim.  He warned that there would be "HUGE implications for the legal case" if they disavowed the comparison to Exxon Valdez, and told Amazon Watch that it "[w]ould terribly prejudice the people it is trying to help if it makes this change." PX 860 (May 24, 2007 Email from S. Donziger to S. Tegel re: "private").  Despite Soltani's reservations, ChevronToxico continued to tout the claim. *See, e.g.*, PX 492R (July 4, 2007 Amazon Watch press release), at 2; PX 2309R (Aug. 28, 2009 Amazon Defense Coalition Press Release), at 2; PX 503 (May 21, 2008 Amazon Defense Coalition press release), at 2 ("30 times more pure crude than in the Exxon Valdez disaster"); PX 510 (Sept. 16, 2008 Amazon Defense Coalition press release), at 2 ("The Ecuadorians have accused Texaco . . . of committing the worst oil-related disaster on the planet on their ancestral lands – one at least 30 times worse than the Exxon Valdez spill."); PX 513R (Oct. 15, 2008 ChevronToxico press release), at 2 ("All told, the amount of oil dumped in Ecuador by Texaco is at least thirty times greater than the amount spilled during the Exxon Valdez disaster, according to the plaintiffs in the civil suit.").

186

    PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox).

187

    PX 1130R (Apr. 28, 2009 S. Donziger Testimony before Tom Lantos Human Rights Comm'n, Hr'g on Ecuador, Nigeria, West Papua: Indigenous Communities, Environmental

The day after the SEC letter was sent, Donziger wrote to Soltani of Amazon Watch: "[n]ow that the SEC ltr is filed, it is key we come up with a coherent strategy to build pressure for the April shareholder's [sic] meeting."[188]  Donziger called on Amazon Watch and others – including Chevron shareholders (whom Amazon Watch was to address at an upcoming shareholder meeting) – to send letters to the SEC calling for investigation into Chevron's conduct in Ecuador.[189]  Donziger suggested that Amazon Watch "seek a meeting with [SEC chairman Christopher] Cox or one of his deputies" in order "to press for them to open a real investigation."[190]  He insisted that Amazon Watch could  "get a lot of legs out of this if it is exploited with a little follow-up" and emphasized that the "key . . . to [the] strategy . . . is to keep this alive and active so it is hanging over their heads

---

Degradation, and International Human Rights Standards), at 60.

Douglas Beltman, another scientist then working for the LAPs, also challenged the accuracy of the Exxon Valdez claim.  He asked Donziger: "do you know where the 30 times number comes from?" PX 1110 (Mar. 1, 2009 Email from D. Beltman to S. Donziger re "Pls answer questions"), at 1.  Donziger replied: "*My own calculations.  If that doesn't suffice then kiss my butt.*" *Id.* (emphasis added).

Shortly thereafter, Donziger recited the Exxon Valdez comparison in his testimony and continued to use the statistic in press releases and blog posts throughout 2009 and 2010. PX 522R (Apr. 27, 2009 Amazon Defense Coalition press release), at 2; PX 527R (Oct. 22, 2009 Amazon Defense Coalition press release), at 2 ("Experts for the plaintiffs have concluded the disaster is at least 30 times larger than the Exxon Valdez spill . . . ."); PX 529R (Dec. 30, 2009 Amazon Defense Coalition press release), at 2 ("Experts consider the disaster at least 30 times worse than the damage caused by the Exxon Valdez."); PX 533R (*The Chevron Pit* Blog Entry), at 3 ("Experts have concluded that the Chevron [sic] discharged at least 345 million gallons of pure crude oil directly into the rainforest ecosystem . . . and approximately 11 million gallons of pure crude was spilled during the Exxon Valdez disaster.").

[188]

PX 756 (Jan. 31, 2006 Email from S. Donziger to A. Soltani and J. Ciplet re: "Plan for SEC follow up").

[189]

*Id.*

[190]

PX 759 (Feb. 1, 2006 Email to A. Soltani, S. Aird, J. Ciplet, L. Salazar Lopez, and S. Tegel re: "imp follow up with SEC").

as long as possible, and so it can be used to get other shareholders to write their own letters."[191]

By the end of February 2006, Russell had sent his first cease and desist emails to Donziger and Amazon Watch.[192]  Donziger emailed Soltani to suggest that they send "the SEC letter in ASAP, making [the] slight change that another report will be coming with a multi-billion damage figure, without disavowing or mentioning Russell's report."[193]

Donziger's efforts to incite an SEC investigation did not amount to much.  After meeting with an SEC investigator, he wrote to his team that the investigator thought that "the probability of a negative judgment [in the Lago Agrio litigation] was so attenuated that they [SEC staff] did not think it [*i.e.*, the possible $6 billion exposure] was material yet."[194]  But while Donziger admitted that he "sort of fe[lt] [that the investigation he sought was] bogus," he insisted that he would " keep feeding them [the SEC] stuff" as long as the SEC was willing to continue talking with them.[195]  This was not the only time Donziger and his public relations team would reach out to the SEC in an effort to gain leverage over Chevron.[196]

---

191

  *Id.*

192

  PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1.

193

  PX 768 (Feb. 23, 2006 Email from S. Donziger to A. Soltani, L. Salazar-Lopez, S. Tegel, J. Ciplet re: "important – SEC ltr").

194

  PX 781 (July 12, 2006 Email from S. Donziger to A. Page and D. Fisher re: "SEC investigation/Chevron").

195

  *Id*.

196

  Amazon Watch wrote to SEC Chairman Cox again in March 2008 to request "that the SEC impose sanctions on Chevron . . . for violations of its disclosure obligations" with respect to its liability in the Lago Agrio litigation.  In that letter, Amazon Watch stated that the case

F.   *Donziger's Attempt to Justify His Continued Use of Russell's Disavowed Estimate is Unpersuasive*

Donziger attempted at trial to justify his continued use of Russell's disavowed estimate by explaining that he believed in its validity and, indeed, thought at the time that the actual remediation figure was much higher than $6 billion.   He testified that he had a "more detailed cost assessment from [the] Ecuadorian technical team" that had calculated the remediation cost to be over $15 billion as well as estimates by a "junior lawyer" that the "remediation proposal [would] come in at about $20 billion."[197]   That these estimates were so much higher than $6 billion, Donziger claimed, satisfied him that it was acceptable to continue using Russell's cost estimate notwithstanding the fact that Russell demanded repeatedly that he stop doing so.   But Donziger's claim is far fetched and the Court finds that Donziger in fact never believed it.   The only estimates of which there was any evidence were prepared under Donziger's direction by junior lawyers who worked for him.[198]   As Donziger acknowledged, their purpose was to "make media/court/CVX

_____

was "[c]oming to a [c]lose" and touted "the appointment of an independent special master to assess culpability and ascertain the monetary value of the damages caused."   *See* PX 497R (Mar. 18, 2008 Ltr. from A. Soltani to C. Cox), at 2.   The letter stated also that Chevron's liability "appears to have increased substantially" such that the "materiality threshold as understood by SEC guidance is reached."   *Id.* at 5.   Donziger largely drafted this letter for Amazon Watch as well.   *See* PX 996 (Mar. 17, 2008 Email from S. Donziger, M. Anderson, S. Tegel, P. Paz y Mino, and A. Soltani re: "Edited SEC letter/final"), at 1 ("The final SEC letter is attached . . . .").

[197]

DX 1750 (Donziger Direct) ¶ 118.

[198]

They were prepared by Donziger's associate, Aaron Marr Page, and his wife, Daria Fisher, and were to be submitted under the name of Fausto Peñafiel.   DX 731 (Apr. 14, 2006 Email from A. Maest), at 4 ("Fausto can be the author of this if you'd like to submit it?"); DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page and D. Fisher re: "excellent work on remediation/questions"); PX 8014 (Edits by S. Donziger, "The Cost of Remediating the Former Texaco Concession: An Order of Magnitude Estimate," signed by Fausto Miguel Peñafiel Villareal).   Mr. Peñafiel, one of the LAPs' party-nominated experts, introduced Donziger to Fernando Reyes, whose involvement in the case will be explained below.   *See*

50

[Chevron] itself start thinking in terms of billions"[199] and potentially to use the figure to pique the SEC's interest in the litigation.[200]  There is no evidence of any competent study during this time period by any qualified person that supports Donziger's claim.

\* \* \*

We have touched here only on part of Donziger's earliest efforts beyond the litigation itself, which have continued unabated for years since.  We shall touch on other examples later.  But we turn now to the Lago Agrio case itself, which already had begun.

IV.    *The First Phase of the Lago Agrio Case  – The Judicial Inspections*

A.    *The Process*

Judge Guerra opened the evidentiary phase of the Lago Agrio litigation on October 21, 2003.[201]  It began with the parties submitting requests for the types and scope of evidence that

---

Reyes Dep. Tr. at 17:2-17.  Page and Fisher are lawyers, not scientists.  They worked on the estimates under Donziger's direction.  PX 8014 (Edits by S. Donziger, "The Cost of Remediating the Former Texaco Concession: An Order of Magnitude Estimate," signed by Fausto Miguel Peñafiel Villareal), at 3 ("Daria, a suggesti[o]n: [I] would put this at end in a footnote or leave out altogether; texaco will see this and slam you . . . Remember that this is not science, this is an active litigation and this needs to be written to protect fausto and this part leaves him exposed.  Always think how they will come back at us.").  Their sole objective – in Page's words – was "to exceed the \$6 billion figure, while still passing the laugh test."  DX 731 (Apr. 15, 2006 Email from D. Fisher to S. Donziger and A. Page, re: "excellent work on remediation/questions"), at 3.

[199]

PX 3240 (Apr. 20, 2006 Email from A. Page to S. Donziger re: "DOJ ltr").

[200]

DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page and D. Fisher re: "excellent work on remediation/questions"), at 1 ("[W]ill releasing this now help with the SEC . . . ?").

[201]

PX 4300X (Callejas Direct) ¶¶ 25, 26.

51

the Lago Agrio judge should consider.  Adolfo Callejas – Chevron's local counsel in Ecuador –

explained that:

> "Under Ecuadorian civil procedure, the parties must submit all of their evidentiary
> requests in a defined period; in the case of summary verbal proceedings, that period
> is six days.  While all of the evidence does not have to be provided within that time
> frame, all requests for then-existent documents, witness testimony, expert
> assessments, judicial inspections of a place or thing, and other proof must be
> requested by both parties by the statutory deadline. . . . My legal team and I
> submitted a number of evidentiary requests on Chevron's behalf during the initial
> six-day evidentiary period, as did the lawyers for the Lago Agrio Plaintiffs.
> Although there were numerous requests for documents and for witness testimony
> from both sides, the bulk of the requests were for judicial inspections of a total of
> 122 sites, including well sites and production stations, in the former Concession area
> and nearby oilfields."[202]

Guerra granted both sides' evidentiary requests.[203]

Each side identified a technical expert to negotiate the procedures that would govern

the judicial inspection process.  Sara McMillen, Chevron's lead scientist on the Lago Agrio case,[204]

assumed this role for Chevron, while David Russell, who then still was working for Donziger,  took

the lead on behalf of the LAPs.[205]  The parties ultimately agreed upon and submitted to the court a

sampling and analysis plan.[206]

> "For most of the judicial inspections, experts were nominated by each side.  At each
> judicial inspection site, these nominated experts took samples under the supervision

---

[202]

   *Id.* ¶¶ 28-29.

[203]

   PX 317 (Oct. 29, 2003 Lago Agrio Court Order).

[204]

   PX 3300 (McMillen Direct) ¶ 2.

[205]

   PX 4300X (Callejas Direct) ¶ 31; PX 3300 (McMillen Direct) ¶ 14.

[206]

   PX 4300X (Callejas Direct) ¶ 31.

of the judge at that site, sent their samples to a laboratory for testing and analysis, and then each submitted a written report of his or her findings and conclusions to the Ecuadorian Court. The Ecuadorian court also appointed a third set of experts, known as the Settling Experts, who were to resolve any disputes between each sides' experts reports and findings. The Settling Experts attended the judicial inspections."[207]

It is relevant to note that the Lago Agrio court formally appointed the party-nominated experts, but each nominating party paid or provided the funds to pay the experts it nominated. The parties were to share any compensation and expenses of settling experts, each side to submit its half to the court, which then would pay it to the settling expert.[208]

At each judicial inspection, the party that requested the inspection was to present any arguments it had concerning the site. The opposing party would rebut.[209] Each side was to have the right also to request that the court include relevant documentation or other evidence in the record. Following each side's oral presentation, the court itself inspected the site, "registering comments and observations and allowing the parties and the experts to identify the areas where they intended to take samples."[210] The court's secretary was to transcribe the proceedings at the inspection sites, and the transcript of the proceedings – including a list of all the documents presented at the inspection – was to be finalized and signed by the parties.[211] The finalized document was called an *acta*, and was to be made part of the official court record. The documents within the record, which

---

[207]

PX 3300 (McMillen Direct) ¶ 11.

[208]

PX 4300X (Callejas Direct) ¶ 33.

[209]

*Id.*

[210]

*Id.*

[211]

*Id.*

53

of course included many papers in addition to the *actas,* were grouped into *cuerpos,* or books, each of which contained about 100 pages of material.[212]

Following the inspections, each party's experts were to submit their reports, to which the opposing party's expert would have an opportunity to respond.[213] If the settling experts had been called upon to resolve conflicting reports produced by the party-nominated experts, the settling experts' results would be included as well.[214] The parties' nominated experts' reports, rebuttal reports, and any reports by settling experts were to be submitted to the court and made part of the record.

The first judicial inspection took place on August 18, 2004.[215] As will appear, the process of inspecting 122 sites moved very slowly and never ultimately was completed.

B.      *The LAPs' Judicial Inspection Experts*

Russell was in charge of choosing the plaintiffs' experts.[216] He "created budgets for the scientific investigation, purchased equipment, hired, trained, managed, and paid members of the Ecuadorian plaintiffs' field team, and hired and interfaced with the plaintiffs' outside

---

212

   Tr. (Zambrano) 1720:3-5.

213

   PX 4300X (Callejas Direct) ¶ 34.

214

   *Id.* ¶ 33.

215

   *Id.* ¶ 31.

216

   Russell himself could not serve as an expert because he did not speak Spanish.  PX 3200 (Russell Direct) ¶ 7.

54

laboratories."[217]


C.    *The Calmbacher Episode*

The first judicial inspection expert that Russell and Donziger hired, in the summer of 2004, was Dr. Charles Calmbacher, an industrial hygienist who previously had worked with Russell on other projects.[218]  Calmbacher was instructed to inspect and write the reports for the LAPs with respect to the first four judicial inspection sites.[219]  He traveled to Ecuador four times to meet with the plaintiffs' team and participate in those inspections.[220]

Calmbacher became ill on his last trip and returned to the United States before he completed his reports.[221]  Before he left, he gave the plaintiffs' team his unfinished drafts, but continued working on them from the United States.[222]  When Calmbacher was unable to finish the drafts within the deadlines Donziger set, Donziger fired him.[223]  Even after he was fired, however, Calmbacher insisted to Donziger that he would still be the one to "write the Perito [expert] reports"

---

[217]

Id. ¶ 24.

[218]

PX 3200 (Russell Direct) ¶ 26; Calmbacher Dep. Tr. at 13:23-14:1,18:10-14.

[219]

PX 3200 (Russell Direct) ¶ 26. These sites were Sacha-6, Sacha-21, Sacha-94, and Shushufindi-48.

[220]

Calmbacher Dep. Tr. at 49:17-20

[221]

Id. at 61:9-16.

[222]

Id. at 61:19-23.

[223]

DX 1750 (Donziger Direct) ¶ 110; PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S. Donziger and D. Russell).

because he needed to "comply with [his] obligation to the court and to maintain [his] professional

integrity with the Ecuadorian court."[224]  He wrote to Donziger and Russell:

> "It also has been stressed to me that it is highly unusual for a perito [expert] to allow others to contribute to the writing of a report.  Comments or review is acceptable, but the perito's opinion and findings are final.  I therefore have and feel no obligation to allow your team of textile engineers and associated cron[i]es to review or edit my reports.  I am assured, as perito of the court, that I am completely within my rights to write and submit my report independent of whose who have nominated me for appointment as perito.  My sole obligation is to tell the truth, as I see it, to the court, no matter the consequences for either party."[225]

Calmbacher finished two of the reports and sent them to the LAP lawyers in

Ecuador.[226]  The reports were edited and reformatted by them and sent back to Calmbacher for his

signature.[227]  Calmbacher agreed with the conclusions reached by the reformatted and edited reports

and told the plaintiffs' team that he "had no problem signing [them] because that's what [he] felt."[228]

But those reports were not the reports that the LAP team eventually filed.

Calmbacher testified that:

> "[w]hat happened after that . . . was they asked me to initial some [blank] papers on the corner so [the report] could be printed on that because it had to be initialed.  I said, no, I don't think so.  David [Russell] implored . . . me to do that, that it was honest, it was fair, it was okay.  So I did it.  I think it was about 30 pages.  And I FedEx'd it down . . . I overnighted it.  That was the last I've heard on the project.

---

[224]

PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S. Donziger and D. Russell).

[225]

*Id.*

[226]

Calmbacher Dep. Tr. at 62:5-10; PX 2417 (Oct. 24, 2004 Email from C. Calmbacher to S. Donziger and D. Russell).

[227]

Calmbacher Dep. Tr. at 62:5-10.

[228]

*Id.* at 62:5-18.

I have not been contacted or anything else."[229]

On February 14 and March 8, 2005, respectively, the LAP team submitted to the Lago Agrio court what purported to be the reports of their nominated expert for the judicial inspections of the Shushufindi 48 and Sacha 94 sites.[230] They bore the signatures and initials of, and purported to have been written by, Dr. Calmbacher.[231] The reports found that "highly toxic chemicals" contaminated the area and that TexPet's remediation was "inadequate or insufficient."[232] When shown these reports at a deposition several years later, however, Dr. Calmbacher testified: "I did not reach these conclusions and I did not write this report."[233] He never concluded that TexPet had failed to remediate any site[234] or that any site posed a health or environmental risk.[235] Thus, someone on the LAP team used the blank pages Calmbacher had initialed and his signature pages

---

[229]

> Id. at 62:18-63:8. Evidence presented at trial suggests that it was more than Russell's imploring that convinced Calmbacher to initial the documents. Donziger was threatening not to pay Calmbacher for the work he performed if he did not sign. Russell sent an email to Donziger on March 1, 2005 that he had "communicated [Donziger's] threat to Calmbacher," and that Russell had "also advised him that it was in his interest to comply by signing the documents and sending them to [Donziger]." PX 721 (Mar. 1, 2005 Email from D. Russell to S. Donziger).

[230]

> PX 249 (Judicial Inspection Report for Sacha Well 93); PX 250 (Judicial Inspection Report of the Shushufindi 48 Well).

[231]

> Id.

[232]

> PX 249 (Judicial Inspection Report for Sacha Well 93), at 32.

[233]

> Calmbacher Dep. Tr. at 113:1-25, 114:22-116:18, 117:2-20.

[234]

> Id. at 115:15-19.

[235]

> Id. at 115:20-24.

57

to submit over his name two reports that contained conclusions he did not reach.

There clearly have been tensions between Calmbacher and Donziger. The reasons for those tensions, and for the ultimate split between the two, are not clear, and their accounts differ. Donziger contends that he fired Calmbacher because he missed deadlines for his two reports and displayed "other [unspecified] unprofessional conduct."[236] Calmbacher admits that Donziger was frustrated that his reports were late, but contends also that he at times disagreed with members of the LAPs' team on the format of the reports and that he voiced his concerns to the LAP team and "probably ruffled feathers."[237] Nevertheless, the Court sees no sufficient basis to conclude that any ill feeling that Calmbacher may have harbored colored his testimony with respect to reports filed in his name on the Shushufindi 48 and Sacha 94 sites. It credits Dr. Calmbacher's testimony that those reports were not the reports he wrote and did not reflect his views. This means that someone on the LAP Ecuadorian legal team revised his draft reports, printed them on the blank pages that Dr. Calmbacher initialed, and filed them with knowledge of the falsity.

The judicial inspections continued despite Dr. Calmbacher's departure, and the LAP team hired other experts to take his place. But their troubles in this sphere did not end.

D.    *The LAP Lawyers Halt Testing for BTEX and GRO Because it Is Yielding Unhelpful Results*

As noted previously, among the problems that faced the LAP team in the Lago Agrio case is that PetroEcuador had operated in the Concession area from 1992, when TexPet left Ecuador,

---

[236]    DX 1750 (Donziger Direct) ¶ 110.

[237]    Calmbacher Dep. Tr. at 85:19-25.

58

forward and, in addition, had been a member of the Consortium earlier.  The LAPs already had entered into an agreement with the ROE and PetroEcuador pursuant to which they were obliged to reduce the amount of any judgment they might obtain against Texaco by the amount of any contribution judgment that Texaco might obtain against the ROE and PetroEcuador.  Moreover, the prospect of proof that PetroEcuador, an ROE owned entity, was responsible for substantial pollution in the Orienté would not have been viewed favorably by the ROE.  The LAPs therefore had an interest in obtaining a judgment that Chevron was entirely responsible for any and all pollution liability and remediation responsibility.

In late 2004, Russell met in New York with Donziger, Bonifaz, Wray, and perhaps others to discuss the LAPs' strategy for the remaining judicial inspections.[238]  Russell reported that "the fact that [they were] finding BTEX, which is benzene, toluene, ethylbenzene, and xylene; and GRO, which is gasoline range organics," in the samples they were testing from the Concession area was "much more indicative of contamination from PetroEcuador rather than Texaco because these compounds are volatile and degrade quickly in hot, wet, warm environment such as in the jungle."[239]  As Texaco had not operated in the Concession area since 1992, it was highly unlikely that any BTEX and GRO that ever had been attributable to Texaco's operations still would have been present.[240]  PetroEcuador's continuing operations probably were the cause.

---

238

      DX 1750 (Donziger Direct) ¶ 113; Tr. (Russell) 394:6-19.

239

      Tr. (Russell) 394:22-395:2.

240

      Tr. (Russell) 407:17-19 ("We found BTEX and GRO, and that was indicative of recent contamination rather than contamination which would have been ten or perhaps 20 years old from Texaco.").

59

According to Russell, whom the Court found to be a credible witness, the "senior lawyers" – Donziger, Bonifaz and Wray – requested that the LAP team stop testing for BTEX and GRO because testing for these compounds "would be counterproductive to the case because it argues for more recent contamination and that implies PetroEcuador rather than Texaco."[241] Accordingly, Russell and his team "stopped analyzing for those compounds [and] started instead substituting a less reliable measure which was total petroleum hydrocarbons," or TPH.[242]  The methods the team used to test for TPH, however, were unable to distinguish between TPH attributable to recent activity and activity that occurred a considerable period earlier.[243]  Moreover, they were subject to a further problem, namely that "TPH methods currently in use can show up naturally occurring compounds as an indication of petroleum, so give you a false positive."[244]

---

[241]

PX 705 (Nov. 4, 2004 Email from D. Russell to E. Camino, S. Donziger, M. Pareja, and A. Wray); *see also* Tr. (Russell) 407:21-408:9.

[242]

Tr. (Russell) 408:7-9.  Donziger testified that "the conclusion of the conversation [in Manhattan] was that if we were looking for a sample analysis that would more precisely evidence the scope of Texaco's contamination, testing for total TPH was the more appropriate test to use. . . . Accordingly, we adopted a focus on sampling for TPH rather than BTEX or GRO, although we kept a balanced portfolio of chemical analyses."  DX 1750 (Donziger Direct) ¶ 114.

The Court does not credit this testimony.  It is contrary to Russell's testimony on this technical point, a point on which his testimony was not challenged.  Donziger, for reasons discussed below, is not a credible witness.  Wray and Bonifaz both were deposed, but the deposition testimony of these two witnesses that was submitted at trial is silent about this meeting.

[243]

Tr. (Russell) 408:22-409:2.

[244]

*Id.* 408:10-14.

60

E.    *Sacha-53 and the "Independent" Monitors – Donziger, in His Words, Goes Over to the "Dark Side" and Makes a "Bargain With the Devil"*

As mentioned, the court appointed several "settling experts" at the beginning of the judicial inspection process, whose job it was to resolve any conflicts between the parties' nominated inspection experts' reports. "The decision to request a settling report was solely in the Court's discretion," and it ordered only one such report before the LAPs' judicial inspections were terminated – that of the Sacha-53 well site.[245]

The Sacha-53 site was important for the LAPs because, as Donziger explained to his colleagues in a contemporaneous email, it was a "Texaco 'remediated site'" – *i.e.*, a site that Texaco had remediated pursuant to its agreement with the ROE as a prerequisite to obtaining the release discussed previously – "so[, in Donziger's words, it would provide] the first definitive scientific proof in the case to put the lie to their claim they remediated."[246]  But Donziger soon learned that the settling experts' conclusions with respect to Sacha-53 would not be favorable to the LAPs.  So Donziger sought to provide an outwardly credible criticism of the anticipated settling expert report in order to undermine its conclusions.

In late 2005, Donziger met Ramiro Fernando Reyes Cisneros ("Reyes"), a petroleum and environmental engineer in Ecuador,[247] at a cocktail party for the launch of a book Reyes had

---

245

    PX 4300X (Callejas Direct) ¶ 39.

246

    PX 708 (Nov. 11, 2004 Email from S. Donziger to C. Bonifaz, J. Kohn, J. Bonifaz, A Wray, and M. Pallares).

247

    DI 658-18 (Reyes Decl.) ¶ 3.  The Reyes declaration is an exhibit to Reyes' deposition, where he attested to its accuracy.  The declaration was designated by the plaintiff and received in evidence.  Defendants had the opportunity to cross-examine him concerning the declaration at the deposition.  It therefore is properly before the Court.

61

published on oil in the Amazon.[248]  Also present was Gustavo Pinto, the president of the Association of Geological, Mining, Petroleum and Environmental Engineers ("CIGMYP") of Ecuador.[249]  At Donziger's request, Reyes and Pinto met with Donziger and Fausto Peñafiel – then a consultant for the LAP team – on the following day to discuss the Lago Agrio case.[250]

Donziger and Peñafiel outlined the judicial inspection and settling expert process for Reyes and Pinto and told them that "[t]he settling experts were going to issue a report on the judicial inspection of Sacha 53."[251]  "Donziger proposed the idea of bringing in an 'independent institution' to monitor the work of the settling experts."[252]  He wanted the independent monitors to make "recommendations" concerning the inspections to the judge presiding over the Lago Agrio case.[253]  He inquired whether CIGMYP would perform that function.[254]  He informed Pinto and Reyes that the LAP team would pay them for that work.  His "initial wish was . . . to have the association's monitorship be oriented to show that the results that were being obtained were favorable . . . to the

---

[248]

    *Id.* ¶ 10.

[249]

    *Id.*

[250]

    *Id.*  The fact of the meeting is corroborated by Reyes' notes from the meeting, PX 739 (Reyes annotations regarding Nov. 17, 2005 meeting), and Donziger's own notebook, PX 174 (Donziger Notebook), at 1; *see also* Reyes Dep. Tr. at 18:15-22.

[251]

    DI 658-18 (Reyes Decl.) ¶ 11.

[252]

    *Id.*

[253]

    Reyes Dep. Tr. at 21:10-16.

[254]

    *Id.* at 19:2-9.

62

plaintiffs."[255]

On November 18, 2006, Donziger reached a secret understanding with Pinto and Reyes pursuant to which he would pay them to "monitor" the settling expert report on Sacha-53. Donziger wrote about the meeting in his notebook:

> "Deal with Gustavo Pinto – *feel like I have gone over to the dark side*.  First meeting like that I was not eaten alive.  Made modest offer, plus bonus.  *Agreed to keep it between us, no written agreement.*  Independent monitoring."[256]

Lest there be any doubt, Donziger admitted at a deposition that the "modest offer" he made was of money[257] and that the reference to an agreement "to keep it between us" meant that the fact that Pinto and Reyes would be working for the LAPs was to be kept confidential,[258] including from the judge.[259]  He conceded also that it was "possible" that the "modest offer" agreed upon was $50,000, although he professed not to recall the amount.[260]

A week later, the same four men met again and finalized the deal.  They agreed that Pinto and Reyes would lead the "independent monitorship" and would be paid a fee plus a potential

---

[255]
       *Id.* at 55:6-10, 20-22.

[256]
       PX 174 (Donziger Notebook), at 1(emphasis added).

[257]
       Donziger Dec. 29, 2010 Dep. Tr. at 2105:19-2106:17.

[258]
       *Id.* at 2108:18-2019:9; Donziger Jan. 29, 2011 Dep. Tr. at 3846:6-17.

[259]
       Donziger Jan. 29, 2011 Dep. Tr. at 3847:19-25.

[260]
       Donziger Dec. 29, 2010 Dep. Tr. at 2109:24-2110:4, 2110:11-14, 2110:20-2111:13.

63

bonus if the plaintiffs won the case.[261]  "There never existed a formal contract between CIGMYP,

Pinto, [Reyes], Donziger, or Peñafiel, and all the participants in the meeting agreed that payment

by plaintiffs to CIGMYP, to Pinto and to [Reyes] for this monitorship would remain secret."[262]

Secrecy was essential because Donziger and the LAP team knew that an appearance of

independence and neutrality was essential in order for the expected efforts of Pinto and Reyes to be

taken seriously by Chevron and the court.[263]

In fact, the agreement was for Reyes and Pinto to work covertly for the LAP team

and to keep their relationship with the LAPs secret from the judge.[264]  And Donziger well understood

that the arrangement was improper.  He wrote in his notebook on February 6:

> "Talked to Gustavo this morning about the [settling expert] report.  I keep thinking
> we pay them so little, and they know the court's peritos [experts] make so much,
> why will they want to keep doing this for us?  *This was my one bargain with the
> devil*, but we can't win with the devil b/c they can always pay more.  Really
> frustrating, feel really boxed in."[265]

Nonetheless, the deal and, as Donziger recorded, the secret payment were made.  He

wrote in his notebook: "50 k came today – meet on roof to plan payment [to] [Pinto].  Luis [Yanza]

---

261

     *Id.*; Reyes Dep. Tr. at 28:7-16.  Reyes's journal entry from that day states "Letter stating Thursday 17 CIGMYP Board resolved to set up a scientific-technical monitorship (of) remediation process of Texaco case.  Invite them to a work meeting.  Acknowledging his appointment as settling expert, we express support of developments within bounds of professional ethics and technical results."  DI 658-18 (Reyes Decl.) ¶ 12.

262

     DI 658-18 (Reyes Decl.) ¶ 12.

263

     *Id.* ¶ 15.

264

     *Supra* notes 260-61.

265

     PX 177 (Donziger Notebook) (emphasis added).

64

has his doubts; I explained we are not paying for time, but for value.  Juan came later to collect the [money]."[266]  Juan was a member of the LAP team (likely Juan Pablo Sáenz) and was used to deliver the money to Pinto because Pinto "didn't want to be paid directly."[267]

Pinto and Reyes met with the settling experts a week after they made the deal with Donziger.[268]  They "discussed the expert report on the inspection of Sacha 53, which the [settling experts] had been working on, and . . . asked when the[] [settling experts] could provide the monitors a draft of the report.  They never did, at least not to [Reyes].  The meeting . . . was basically to review the technical aspects of the report the settling experts were preparing on Sacha 53."[269]  Although Reyes and Pinto never received an advance draft of the report, they knew from these discussions what the report would conclude.  And they conveyed that information to Donziger and the LAP team.

In order for their "monitorship" to have the desired effect, Reyes and Pinto had to be appointed by the court.  They therefore wrote a letter to Judge Germán Yánez, then the judge presiding over the Chevron case, detailing their credentials and their proposed role.[270]  They did not, however, disclose that they were being paid by the LAPs' team.[271]

---

[266]

PX 175 (Donziger Notebook).

[267]

Donziger Dec. 29, 2010 Dep. Tr. at 2120:2-11, 2120:25-2111:12.

[268]

DI 658-18 (Reyes Decl.) ¶ 13.

[269]

Id.; see also PX 741 (Reyes annotation regarding the Nov. 29, 2005 meeting).

[270]

DI 658-18 (Reyes Decl.) ¶ 14; PX 746 (Jan. 20, 2006 Ltr. from G. Pinto to Judge Yánez).

[271]

See PX 746 (Jan. 20, 2006 Ltr. from G. Pinto to Judge Yánez).

Judge Yánez did not respond to the letter, so Pinto and Reyes went to meet with him in his office.[272]  Before doing so, they showed Donziger an advance copy of the comments on the settling experts' work that they intended to make to the judge.[273]  When they met with the judge, they explained the need for the monitorship and expressed their desire to become involved in the case.  But the judge "did not express any interest in what [they] were telling him about the case."[274]

To jump slightly ahead for a moment, the settling experts' report was published in February 2006.[275]  It concluded – consistent with the fears that led Donziger to the "independent monitorship" scheme – that Texaco had fully remediated the Sacha-53 site.  Donziger characterized the report as "disastrous" for the LAPs' team.[276]  He instructed Reyes and Pinto to prepare a report that "established that the findings of the settling experts' report on Sacha 53 were wrong, that they lacked objectivity and were biased toward Chevron, and therefore the report should be discounted."[277]  The report that Pinto and Reyes drafted, however, did not reach those conclusions.  Instead, they concluded that, while the settling experts had "failed to strictly follow their judicial

---

[272]

DI 658-18 (Reyes Decl.) ¶ 17.

[273]

Donziger Jan. 29, 2011 Dep. Tr. at 3849:25-3850:8.

[274]

DI 658-18 (Reyes Decl.) ¶ 17.

[275]

PX 1530 (Jan. 17, 2006 Ltr. from G. Pinto and F. Reyes to Lago Agrio court) (referring to "[t]he Report [which] was prepared by the Settling Experts Mr. Galo Albán, Eng., Dr. Luis Albuja, Mr. Gerardo Barros, Eng., Mr. Jorge Jurado, Eng., Mr. Johnny Zambrano, Eng., and is dated Feb. 1, 2006.").

[276]

DX 1306 (Donziger Notebook), at 71 of 87.

[277]

DI 658-18 (Reyes Decl.) ¶ 20; Reyes Dep. Tr. at 51:2-11.

66

mandate" and that some of the data submitted by both parties had deficiencies, "the report contained enough information for the Court to make its own ruling."[278]  Donziger was extremely disappointed in what he called Reyes' and Pinto's "tepid" response and instructed them not to file it with the court.[279]

The Reyes–Pinto arrangement suggests that Donziger and his team were worried that the evidence would not support their claim, at least to the extent they had hoped.  The one settling expert report that was in the process of completion concerned a site they expected would expose what Donziger characterized as Texaco's "lie," but he learned it would reach the opposite conclusion.  When the likelihood that the report would reach that opposite conclusion became known, Donziger – in his own words – went over "to the dark side"[280] by recruiting and paying new experts to pose as "independent monitors" and to criticize the settling experts' conclusions to the court without disclosing that the LAPs were paying them.  Moreover, it must be noted that Donziger did not address – much less offer any innocent explanation of – these events, either in his written direct testimony or on the witness stand.

In the end, Donziger's arrangement with Reyes and Pinto – his first "bargain with the devil"[281] – ultimately did not work out for him.  The judge was not interested and the report Reyes and Pinto wrote did not meet Donziger's expectations.  But it was not his last such bargain.

---

[278]        DI 658-18 (Reyes Decl.) ¶ 20; PX 1530 (Feb. 1, 2006 Draft of Reyes and Pinto Report).

[279]        DI 658-18 (Reyes Decl.) ¶ 20; Reyes Dep. Tr. at 53:19-54-7; PX 191 (Donziger Notebook).

[280]        PX 174 (Donziger Notebook), at 1.

[281]        PX 177 (Donziger Notebook).

67

By this time the LAPs were up to something new, which, if it succeeded, would reduce the risk of unwanted results from the many uncompleted judicial inspections.

    *F.*    *The Termination of the LAPs' Remaining Judicial Inspections and the Genesis of the Global Assessment*

        Extensive evidence demonstrates that Donziger and the rest of his team concluded that Dr. Wray had made a terrible mistake in committing to judicial inspections of so many sites.[282] They were costly and took a great deal of time.[283]  Moreover, as the unfolding Sacha-53 crisis demonstrated, they were risky – the party-nominated experts could disagree, and the settling experts might agree with Chevron.  For these reasons, the LAPs on January 27, 2006 – shortly before the publication of the Sacha-53 settling expert report – moved to eliminate 26 of the remaining judicial inspections that the LAPs had requested, ostensibly because they were unnecessary.[284]  The judge then presiding swiftly denied the motion.[285]

---

[282]

    *E.g.*, PX 176 (Donziger Notebook), at 2 ("This goes back to Alberto's errors: . . . asking for too many inspections rather than controlling the process"); PX 195 (Donziger Notebook), at 2 ("The problem is that Wray made some dumb-fuck agreement with Callejas at the first inspection where they agreed the perito for the [global expert] would come from somebody who had actuado en [acted in] the trial.").

[283]

    *E.g.*, Tr. (Ponce) 2317:15-2318:8 (recommending LAPs seek to terminate inspections because they were costly and the evidence was very favorable without the remaining inspections) (The Court credits Ponce's testimony as to cost.  As the accuracy of his opinion concerning the results of the inspections conducted thus far is not material here, the Court makes no finding on that point either way); DX 1601 (Ponce Direct) ¶ 16 (same); PX 184 (Donziger Notebook), at 3 of 5.

[284]

    PX 4300X (Callejas Direct) ¶ 40; PX 328 (July 21, 2006 Motion, quoting plaintiffs' Jan. 27, 2006 motion), at 3-4.

[285]

    PX 4300X (Callejas Direct) ¶ 41.

68

The LAPs responded by filing several motions challenging the court's decision, initiated a press campaign that questioned the judge's handling of the case and accusing him of bias in favor of Chevron, and began to organize several demonstrations outside the courthouse to protest his rulings.[286]   The point of all of this, as Donziger wrote in his journal, was that the LAPs:

> "need a massive protest on the court, and only after that should we talk to the judge about what he needs to do.  The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions."[287]

So the issue of reducing the LAPs' judicial inspections continued to percolate through the spring of 2006.  Moreover, a new ingredient entered the LAPs' internal discussions of the issue – the idea not only of dropping all of the remaining LAP judicial inspections, but of substituting a single, supposedly impartial, global expert.

The idea of a global expert did not immediately persuade Donziger.  On May 31, 2006, he wrote in his notebook:

> "Yesterday we had a 5-hour [meeting] and it was extremely intense and frustrating.  Went through options on Global [Expert] – had Plans A through E, and I realized how difficult this aspect of the case is going to be.  *Bottom line problem is we will have no control over the [expert], who will be appointed by the judge.  Pablo and our legal team keep insisting that the solution is for the judge to appoint someone who is favorable to us, but I don't trust this approach so far.*"[288]

In other words, he was concerned that he perhaps could not control a single global expert.  He worried that such an expert would not be "willing to do work that holds oil companies accountable.

---

[286]
       *Id.*

[287]
       PX 182 (Donziger Notebook), at 2 of 3.

[288]
       PX 181 (Donziger Notebook), at 1 (emphasis added).

. . . Which gets back to my point that we need a foreigner as the expert for the global.  No Ec[uadorian] is going to come through and hold them accountable for billions – it is just not going to happen. . . . *Without that insurance, I just don't see how we can go forward with the global [expert]*."[289]

1.      *The LAPs Coerce the Judge to Cancel the LAPs' Remaining Judicial Inspections*

The LAP team, in Donziger's words, often "talk[ed] to the judge about what he needs to do" in private.[290]

In July 2006, the LAPs filed another motion, this time seeking to relinquish all of their remaining inspections, not just the 26 they in January had sought to eliminate.[291]  Donziger wrote in his notebook that:

> "Our issues first and foremost are whether the judge will accept the renuncia of the inspections.  If this happens – and Pablo thinks it will, but I and Aaron [Marr Page] think he is overoptimistic – then we have to face the prospect of more of the wasteful, time-consuming, and expensive inspections. [sic]  If it doesn't happen, then we are in all-out war with the judge to get him removed."[292]

But the "all-out war" to remove the judge proved unnecessary.

Donziger and the LAP team knew that Judge Yánez was in a weakened state.  He

---

[289]

PX 182 (Donziger Notebook), at 2 of 3 (emphasis added).

[290]

PX 169R (Donziger Notebook), at 28.

[291]

PX 328 (July 21, 2006 Motion).  The motion, filed by Fajardo, explained *inter alia* that further judicial inspections were unnecessary because, it claimed, the evidence of contamination was clear and abundant.

[292]

PX 184 (Donziger Notebook), at 3.

70

recently had been accused of "trading jobs for sex in the court"[293] and was worried about his reputation and perhaps career.   They were determined to use that to their advantage.  As Donziger wrote in his notebook at the time, Fajardo informed Donziger that

> "there is the feeling in the court that we are behind the [sexual harassment] complaint[] against Yánez . . . , which we are not, even though we have much to complain about, which is sort of ironic.  I [*i.e.*, Donziger] asked if this theory in the court hurt or helped us, and both Pablo and Luis said it helped us.  *At which pt I launched into my familiar lecture about how the only way the court will respect us is if they fear us – and that the only way they will fear us is if they think we have . . . control over their careers, their jobs, their reputations – that is to say, their ability to earn a livelihood.*"[294]

So the LAP team "wrote up a complaint against Yánez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need."[295]  Donziger explained in an email to Kohn that Fajardo then met with the judge, who "said he is going to accept our request to withdraw the rest of the inspections save the four we still want to do. . . . The judge also . . . wants

---

[293]

PX 785 (July 26, 2006 Email from S. Donziger to J. Kohn).

[294]

PX 184 (Donziger Notebook), at 2 (emphasis added).

[295]

PX 185 (Donziger Notebook), at 2.  Donziger testified that he "never threatened Judge Yánez or any other judge that we would file a complaint against that judge if he did not rule in our favor." DX 1750 (Donziger Direct) ¶ 122.

This testimony is inconsistent with Donziger's contemporaneous writings in his notebook and his July 26, 2006 email to Kohn.  Moreover, while Donziger testified that *he* never threatened the judge, he did not say that no one else on his team did or that he did not authorize or approve such threats.  The Court finds that Donziger knowingly was complicit both in the preparation of a misconduct complaint against Judge Yánez and in threatening the judge with the filing of the complaint unless the judge did what the LAPs' wished him to do.  It was part of Donziger's strategy to instill fear in that judge by convincing him that "we [the LAPs] ha[d] . . . control over [his] career[], [his] job[], [his] reputation[] – that is to say, [his] ability to earn a livelihood."  PX 184 (Donziger Notebook), at 2.

71

to forestall the filing of a complaint against him by us, which we have prepared but not yet filed."[296]

Faced with this coercion,[297] Judge Yánez granted the request to cancel the LAPs' remaining judicial inspections.  Donziger and Fajardo succeeded also in convincing the judge that he should "fear" the LAP team.[298]  After Judge Yánez issued the order, Donziger on September 13, 2006, wrote that the judge "told Luis [Yanza] that we needed to back him now as he fights for survival on the court.  So instead of a strong judge who sees the validity of the case, we now might have a weak judge who wants to rule correctly [*i.e.*, for the LAPs] for all the wrong, personal reasons.  Need to get going on the inspections (looking for [expert]) and [global expert]."[299]

This last statement – that Donziger recognized his "[n]eed to get going on the inspections (looking for [expert]) and [global expert]" – demonstrates that his earlier misgivings about a global expert had been overcome and that Donziger was looking for an expert to appoint to that pivotal role.  The explanation for this change of heart is plain.  Donziger's "[b]ottom line problem [about pursuing a global expert idea had been that] we will have no control over the [expert], who will be appointed by the judge."[300]  But the coercion of Judge Yánez eliminated that "bottom line problem."  Donziger had found himself with "a weak judge who wants to rule correctly

---

[296]

PX 785 (July 26, 2006 Email from S. Donziger to J. Kohn).

[297]

A defense expert on Ecuadorian law testified, and the Court holds, that threatening a judge to get him to appoint Cabrera or another court officer would be a crime under Ecuadorian law.  DI 1400-4 (Albán Dep.), Ex. D at 48:1-12.

[298]

PX 184 (Donziger Notebook), at 2.

[299]

PX 185 (Donziger Notebook).

[300]

PX 181 (Donziger Notebook).

for all the wrong, personal reasons,"[301] among them the fear that the LAPs would file their judicial misconduct complaint against him at a time when he least could withstand it. Donziger therefore expected to be able to select and to control the global expert. That is exactly what then took place.

## 2.    *Donziger Chooses Cabrera to be the Global Expert*

With these pieces in place, Donziger and the LAP team moved on to finding a compliant global expert. The idea was that the global expert – just like the "monitoring" experts, Reyes and Pinto, who ultimately had not been appointed – in fact would work for the LAPs but would appear to be independent and neutral. This required Donziger to find someone who, in Donziger's own words, would "totally play ball with" him.[302]

Donziger began quietly vetting candidates to fill the post.[303] Initially, the lead candidate for the job was Reyes,[304] with whom Donziger already was acquainted from the Sacha-53 episode.

> "[] Donziger, [] Fajardo, and [] Yanza together . . . explained to [Reyes] that having a single expert to carry out a global assessment was important to the plaintiffs because they acknowledged that the judicial inspection process had not yielded data to support their claims of contamination. They also said they believed it would be

---

301

       PX 185 (Donziger Notebook), at 2.

302

       PX 191 (Donziger Notebook), at 4.

303

       *E.g.*, PX 2426 (Sept. 19, 2006 Email from S. Donziger to C. MacNeil Mitchell, R. Herrera, and E. Bloom) ("Here is the info on the possible experts from Ecuador.").

304

       *Id.*; *see* Donziger Dec. 29, 2010 Dep. Tr. at 2130:18-23.

easier to manage a single expert than many."[305]

   Donziger met with Reyes in December 2006 "to do a hard vet."[306]  Before settling on Reyes as the global expert, Donziger was determined to ensure that Reyes would "*totally play ball with us and let us take the lead while projecting the image that he is working for the court.*"[307] He needed also to persuade Reyes to take the assignment.  So Donziger told Reyes "that if he did this he likely would never work in the oil industry again in Ecuador, at least for an American company, but that he could be a national hero and *have a job the rest of his life being involved in the clean-up.*"[308]  And he reminded Reyes that, as the global expert, he would "need . . . to state that Chevron was the only party responsible for environmental damages and the harm to the local community."[309]

   Donziger's statement to Reyes that he would "have a job the rest of his life being involved in the clean-up" warrants emphasis.  The Lago Agrio complaint identified the ADF, which is controlled by Donziger and Yanza, as the entity to which the LAPs wanted any recovery money

---

[305]
    DI 658-18 (Reyes Decl.) ¶ 22.

[306]
    PX 191 (Donziger Notebook).

[307]
    *Id.* (emphasis added).

[308]
    *Id.* (emphasis added).

[309]
    DI 658-18 (Reyes Decl.) ¶ 25.  Reyes responded that in his book he had "advocated for joint responsibility between the Ecuadoran government and Texaco environmental impacts, which could be used against" him, but Donziger "dismissed these concerns and said none of them would prevent [Reyes] from serving as an expert."  *Id.* ¶ 26.

74

paid.[310]  Thus, in promising Reyes that he would "have a job the rest of his life being involved in the clean-up" if he took the assignment and gave the LAPs what they wanted, Donziger promised something that he expected to be able to deliver – long-term, remunerative employment paid for by the ADF.

  While Donziger was vetting Reyes, Fajardo and Yanza met with Judge Yánez to get him to appoint Reyes as the global expert.  But Judge Yánez was troubled because he felt "bound by an agreement Wray made with Callejas [Chevron's local counsel] in the first inspection to use [experts] already appointed by the court."[311]  This would have excluded Reyes.  In consequence, the LAP team believed that the choice would be between José Echeverria and Richard Cabrera Stalin Vega ("Cabrera"), both of whom previously had been designated as settling experts.[312]  Of the two, Donziger's choice was Cabrera.  Donziger wrote:

> "Richard [Cabrera] served in the last inspection, and he was found by Fernando Reyes, who has turned out to be a good friend of the case.  Richard showed some surprising independence, telling the judge quietly that Texaco's sampling was bullshit.  The question is, do we push for Reyes himself or Richard?  At first, I thought the idea Reyes would not be the [expert] was a case killer.  I simply am loathe to spend much more money on the case not knowing if we can get a damage claim before the court, which essentially would prevent us from winning the case before a decision can even be made.  I trust Reyes; I don't know Richard even though he looks promising.  So I met Richard with Reyes on Sat afternoon in the Hotel Quito, one of my endless series of meetings.  He is a humble man, not very sophisticated, but he seemed smart and under-stated – maybe the perfect foil for

---

[310]

  PX 316 (Lago Agrio Complaint), at 31.

[311]

  PX 194 (Donziger Notebook), at 1; PX 195 (Donziger Notebook) ("The problem is that Wray made some dumb-fuck agreement with Callejas at the first inspection where they agreed the [expert] for the [global inspection] would come from somebody who had actuado en the trial.").

[312]

  PX 195 (Donziger Notebook).

Chevron, but there is no way to know for sure so there is risk.  Reyes thin[k]s we should go with Richard, and we can help him."[313]

Accordingly, Donziger, Cabrera, Reyes, and other LAP lawyers met to discuss the possibility of Cabrera being appointed global expert.[314]

On February 27, 2007, Donziger, Yanza, and Fajardo met with Cabrera and Reyes to do another "hard vet" of Cabrera and to give him the "hard sell."  Just as he had done with Reyes, Donziger, again in his own words,  "did the build up about the importance of the case, what it means for history, how we can do something that we will always be remembered for, what it would mean for the country and world, etc."[315]  This sort of encouragement, Donziger noted "always works at the opportune moment."[316]  But that, the Court finds, is not all he said.  The quoted entry from his notebook summarized "the build up" he gave Cabrera in terms almost identical to the summary he wrote of his "build up" to Reyes.  It is logical to infer, and the Court finds, that Donziger made the same implicit promise of lifetime work on the remediation to Cabrera that he had made previously to Reyes.  In any case, Cabrera agreed to the plan.

Meanwhile, the LAP team continued to meet *ex parte* with Judge Yánez[317] to have

---

[313]
  *Id.*; *see also* DI 658-18 (Reyes Decl.) ¶ 31 ("Donziger asked me to introduce him to Cabrera, and I arranged a meeting which took place on Feb. 9 or 10, 2007, at Hotel Quito . . . .").

[314]
  DI 658-18 (Reyes Decl.) ¶¶ 33-34.

[315]
  PX 197 (Donziger Notebook), at 2.

[316]
  *Id.*

[317]
  *E.g.*, PX 200 (Donziger Notebook) ("On Friday night, Pablo and Luis met with the judge near the airport in his barrio in a restaurant. I was supposed to be there, but I couldn't find it[.]  I was really pissed off at the news they reported – that the judge still did not want to

him appoint their new choice, Cabrera, as the global expert.  By February, the LAPs were "100%

sure the judge would app[oin]t Richard [Cabrera] and not Echeverria."[318]  On March 19, 2007, the

judge announced the appointment.[319]  But Donziger and the LAP team were so sure of Cabrera's

appointment that they proceeded on the basis that Cabrera would be appointed even before the

appointment was announced and Cabrera sworn in.

V.      *The Second Phase of the Lago Agrio Case – The Cabrera "Global Expert" Report*

    A.      *The LAPs Secretly Plan the Cabrera Report – The March 3 and 4, 2007 Meetings*

        Donziger, Fajardo, and Yanza called the entire LAP team together for a meeting on

March 3, 2007.[320]  This included several American technical experts with whom Donziger had been

---

rule, he needed protection, that a magistrate from the Supreme Ct was coming on Thursday to check him out given the denuncias, etc.  The different pieces of the strategy to get us home have to work in concert, and the one element out of sync at the moment is the fact we don't have the order to begin the [global inspection].  This is the one thing left; if we can get thru this, we should be home free.").

[318]

PX 197 (Donziger Notebook).  And they were certain well before that Judge Yánez would grant their request to appoint a single global expert.  In an email on January 9, 2007 to the LAPs' legal team, Fajardo described a meeting he had had with the judge, to whom he referred as "the Big Boss."  "I had a short meeting today with the Big Boss (you know who I'm talking about); we discussed the start of the Global Assessment.  The idea is to perform a symbolic act at a well or station in Lago Agrio for the start of the Global Assessment.  The Expert will be sworn in at that act, and the judge will set the deadline for the Expert to deliver his report to the Court."  PX 821 (Jan. 9, 2007 Email from P. Fajardo to S. Donziger and others).

[319]

PX 335 (Mar. 19, 2007 Lago Agrio Court Order), at 2.

[320]

DI 658-18 (Reyes Decl.) ¶ 34.  Ann Maest testified that she met Cabrera for the first time in March 2006.  Maest Dep. Tr. at 68:12-17; *see also* PX 636 (Screenshot from *Crude* Clip of Mar. 3, 2007 Meeting including Cabrera, Yanza, and Fajardo).  She clearly was mistaken as to the year.

77

consulting – Charlie Champ, Dick Kamp, and Ann Maest,[321] a scientist at E-Tech, an organization that was working with the LAPs[322] and who worked also for the Boulder, Colorado-based environmental consulting firm, Stratus Consulting ("Stratus").[323]  The purpose of the meeting, as will appear in more detail, was to plan the global expert report.  So sure were Donziger and Fajardo of Cabrera's appointment that the supposedly independent and impartial Cabrera, as well as Fernando Reyes, were present.

Donziger explained the importance of the meeting to the *Crude* camera even before the meeting began:

> "Today is . . . a very important day 'cause we're meeting with . . . *our* team of Ecuadorian technical people and *our* American consultants . . . to figure out how to . . . pull all that information together for the final report *we're gonna submit to the court*, that is gonna ask for damages that'll very likely be in the multiple billions of dollars."[324]

Thus, Donziger in an unguarded moment,[325] acknowledged that the report ultimately submitted would be the product of the LAPs and their "team of Ecuadorian technical people and . . . American

---

[321]

PX 201 (Donziger Notebook) ("March 7, 2007 . . . Sat had all-day Tech meeting in the office . . . Richard and Fernando there, as was Ann, Dick, and Champ.").

[322]

Maest Dep. Tr. at 42:17-34; *see also* PX 633 (Mar. 5, 2010 Email from S. Donziger to E. Englert, M. Hoke, and J. McDermott) ("E-tech is a scientific consulting entity we worked with before we hired Stratus.  When Stratus came in the summer of 2007, we stopped working with E-tech.").

[323]

Maest Dep. Tr. at 50:5-7.

[324]

PX 33A[S] (Mar. 3, 2007 *Crude* Clip), at CRS-187-01-01 (emphasis added).

[325]

As will appear, Mr. Donziger had obtained the financing for the film maker and had influence over the content of the film.  *Infra Facts* § VII.B.  It thus is not too surprising that he spoke as candidly as he often did when the camera was rolling.

78

consultants."

Parts of the meeting were recorded by the film makers.  Yanza began by introducing the participants and setting out the general agenda.[326]  He introduced Cabrera to the full team for the first time.[327]  Fajardo set forth the plan for the final phase of the evidentiary period, explaining that, while Cabrera was likely to be appointed the global expert, "the work isn't going to be the expert[']s.  All of us bear the burden."[328]  Maest then asked whether "the final report [was] going to be prepared only by the expert?"[329]  Fajardo responded, "what the expert is going to do is state his criteria, alright?  And sign the report and review it.  But all of us, all together, have to contribute to the report."[330]  Maest commented, "But . . not Chevron," which provoked laughter.[331]  The video clips of the meeting ended with Donziger commenting, they could "jack this thing up to $30 billion in one day."[332]

Reyes – who had been Mr. Donziger's first choice for appointment as global expert – testified that:

"At the meeting, Mr. Fajardo, Mr. Yanza and Mr. Donziger dropped any pretense

---

[326]

PX 35A (Mar. 3, 2007 *Crude* Clip), at CRS-187-01-02.

[327]

*Id.*

[328]

PX 39A (Mar. 3, 2007 *Crude* Clip), at CRS-191-00-CLIP-03.

[329]

*Id.*

[330]

*Id.*

[331]

*Id.*

[332]

PX 42A (Mar. 3, 2007 *Crude* Clip), at CRS-193-00-CLIP-01.

that Mr. Cabrera would act independently in writing an expert report that would be technically sound and executed according to professional standards. On the contrary, it was obvious that the plaintiffs had already predetermined the findings of the global assessment, that they themselves would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it. The purpose of the meeting was to establish all the conditions for controlling and managing the expert's work, in secret, in accordance to the plaintiffs' interests."[333]

The next day, Donziger met over lunch with some of his American experts to discuss the work plan.[334] The meeting, parts of which also were taped, confirmed that Donziger and the LAPs would go far to control the process and conceal their involvement from Chevron and the court. At one point, one of the experts commented, "I know we have to be totally transparent with Chevron, and show them what we're doing," to which Donziger responded "[n]o, no. . . . they will find out . . . [but] not in the moment. . . ."[335] Maest replied, "Yeah, we don't have to give them our plan . . . . I don't think, do we?" and Donziger answered "[w]ell, it's a little unclear. . . . No one's ever done this before . . . . This is so crazy . . . . *Our goal is that [Chevron] do[es]n't know shit . . . and that's why they're so panicked by this.*"[336] Another expert commented that "having [Cabrera] there yesterday, in retrospect, was totally bizarre."[337] Donziger quickly told him not to talk about

---

[333]

       DI 658-18 (Reyes Decl.) ¶ 35.

[334]

       PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-05-CLIP-01; PX 201 (Donziger Notebook), at 1 of 2 ("On Sunday lunch, went to Mosaico (the four gringos, including me), and spent four hours there talking things through.").

[335]

       PX 46A (Mar. 4, 2007 *Crude* Clip), at CRS197-00-CLIP 3.

[336]

       *Id.* (emphasis added).

[337]

       *Id.*

80

that and told the film crew "that was off the record. . . ."[338]  Thus, right from the start, Donziger

evidenced his intent that the intimate relationship he had forged with Cabrera would not be allowed

to see the light of day.

The group discussed also the existing data.  When Maest noted that "right now all

the reports are saying it's just at the pits and the stations and nothing has spread anywhere at all,"

Donziger replied, "That's not true.  The reports are saying the ground water is contaminated because

we've taken samples from ground water."[339]  Maest responded, "[t]hat's just right under the pits,"

to which Donziger responded:

> "Yeah, but, that is evidence. . . . *Hold on a second, you know, this is Ecuador, okay
> . . . You can say whatever you want and at the end of the day, there's a thousand
> people around the courthouse, you're going to get what you want.  Sorry, but it's
> true*. . . .  Okay.  Therefore, if we take our existing evidence on groundwater
> contamination which admittedly is right below the source . . . .  And wanted to
> extrapolate based on nothing other than, our, um, theory that it is, they all, we
> average out to going 300 meters in a radius, depending on the . . . gradient.  We can
> do it.  We can do it.  And we can get money for it. . . . And if we had no more money
> to do more work, we would do that.  You know what I'm saying? . . . *And it wouldn't
> really matter that much. . . . Because at the end of the day, this is all for the Court
> just a bunch of smoke and mirrors and bullshit.  It really is.  We have enough, to get
> money, to win*."[340]

Following the March 3-4 meetings, the LAPs wrote the work plan that supposedly

was to be done by Cabrera.  On March 21, 2007,  Fajardo sent the initial draft to Donziger for his

---

[338]

    *Id.*

[339]

    PX 43A (Mar. 4, 2007 *Crude* Clip), at CRS-195-95-CLIP-01.

[340]

    *Id.* (emphasis added).  The Court makes no finding as to whether the groundwater
contamination was widespread or existed "just right under the pits."  As noted, the existence
or absence of contamination in the Orienté was not at issue in this trial.

81

approval.[341]  It laid out all of the required tasks including such things as the selection of sites to be

studied, field work, drafting of the report, and its submission to the court.  It assigned responsibility

for each item, in most cases to members of the LAP team or their hired consultants.  Cabrera was

allotted responsibility for relatively little.  The drafting of the report was assigned to "[t]he Expert

with the support team," the latter being a reference to the LAP personnel.  Review of the initial draft

of the report was to be done by the "Legal team," meaning the LAP lawyers.  And following the

final item on the list, submission to the court, the LAPs wrote, "Everyone silent," the point of course

being that no one was to disclose the control over and overwhelming participation in the process by

the LAP team.   Indeed, Donziger admitted on cross-examination that he instructed all those

associated with the preparation of the Cabrera Report to keep their work highly confidential.[342]

Before Cabrera officially was sworn in, however, the LAP team faced another

possible hitch in its plan.  Fajardo learned that Judge Yánez was considering appointing two global

experts – one for Chevron and one for the LAPs.  The LAP team was very concerned – they had

worked hard to have the judge appoint the expert they had vetted and chosen and who would "totally

play ball" with them.  Fajardo reported Judge Yánez's plan to Donziger and others in an email titled

"Code Orange."  He wrote: "What is new is that in view of the other restaurant's challenge, the cook

has the idea of putting in another waiter, to be on the other side. This is troublesome. I suggest we

---

341

       PX 843 (Mar. 21, 2007 Email from P. Fajardo to S. Donziger and L. Yanza) (attaching draft
of work plan).

342

       Tr. (Donziger) 2558:16-20.

       Donziger at trial denied any knowledge of the fact that the March 21, 2007 work plan said
"everyone silent" following the entry for submission of the report to the court.  *Id.* 2558:21-
2559:1.  That denial is patently incredible, however, as the work plan was submitted to
Donziger, who led the entire effort.

82

activate alarms, contacts, strategies, pressures in order to avoid this happening. It is necessary to do it urgently."[343]  Fajardo wrote that the "Lago Agrio messenger is waiting until this afternoon to meet with the cook, to hear his position."[344]  Donziger testified in a deposition that the LAP team used code names "to prevent any reader of those documents from knowing exactly who it was [he] w[as] talking about. . . ."[345]  He admitted at trial that the "cook" referred to the judge; the waiter referred to Cabrera; and the "other restaurant" referred to Chevron.[346]

Not surprisingly in light of the position in which Donziger, Fajardo, and others had put Judge Yánez, the "messenger" – most likely  Fajardo – caused Judge Yánez to drop the idea of appointing two experts.  And they took additional steps to control his activities.

On April 17, 2007, Luis Yanza wrote to Donziger: "We have met with Richard [Cabrera] and everything is under control.  We gave him some money in advance."[347]

Shortly thereafter, the LAP team set up a new, "secret" bank account through which they surreptitiously could pay the supposedly independent expert.[348]  As Yanza once explained to Donziger, the purpose of the secret account was for Donziger and Kohn to "send . . . money to the

-----

[343]

PX 845 (Mar. 26, 2007 Email from P. Fajardo to S. Donziger and others).

[344]

*Id.*

[345]

Donziger Jan. 29, 2011 Dep. Tr. at 3817:13-23.

[346]

Tr. (Donziger) 2549:10-2550:12.

[347]

PX 850 (Apr. 17, 2007 Email from L. Yanza to S. Donziger).

[348]

PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger).

secret account to give it to the Wuao."[349]  The "wuao" or "wao" was another code name the LAP team created to refer to Cabrera.[350]  As we shall see, Donziger and Yanza later put that secret account to considerable use.

Having secured Cabrera's selection and his agreement to cooperate with them, the LAP lawyers likely believed that they had paved their path to victory.  But their problems were not over.

B.    *Donziger, Fajardo, and Yanza Put Together an "Army," Cabrera is Sworn in, and the LAP Team Prepares His Work Plan*

Cabrera was selected in April 2007, but he had not been sworn in by June.  The field work had not yet begun.  Donziger and his colleagues feared their plan was in danger.

Donziger and Fajardo visited Judge Yánez on June 4, 2007, to inquire why the swearing in was taking so long and to encourage him to allow the expert to get to work in the field.  Remarkably, the audio of this *ex parte* meeting with the judge was recorded by the *Crude* camera crew.[351]

Very early in the meeting, Donziger said to the judge: "Let's speak frankly.  What do we do to start" the process with Cabrera?[352]  The judge replied that it "is already about to start,"

---

349

   PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo).

350

   Tr. (Donziger) 2550:13-19.  As will be seen, the LAP team also used the term "huao" in correspondence to refer to Cabrera.

351

   The images indicate that the recording was done from the hallway outside the judge's chambers. PX 61 (June 4, 2007 *Crude* Clip).

352

   PX 61A (June 4, 2007 *Crude* Clip), at CRS354-02-CLIP-05.

84

but that Chevron had filed "two books" of "suggestions" and issues regarding the process by which Cabrera's field work was to be carried out, and the judge needed to rule on them.[353]   One such "suggestion" was that Chevron lawyers be permitted to attend Cabrera's inspections.   Donziger replied that "we are fine with that."[354]   Judge Yánez responded: "Yes, but the only thing that must be made clear is . . . the expert is appointed by the court."[355]   There must be "parameters so that he can – this is going to be done right, isn't it?   And the situation can't be made too creative.   Yes, because, I know that tomorrow you'll leave but I'll still be here, right?"[356]   Donziger assured Judge Yánez that he, Donziger, would not "desert" the judge, and stressed that the judge could not let Chevron's complaints about the expert or threats to appeal Judge Yánez's ruling delay the swearing in any further.[357]

Donziger and Fajardo left the meeting frustrated with the delay and worried that Judge Yánez was slipping away from their control.   They discussed the need to pressure the judge to swear in Cabrera and get the process going.   Donziger said: "To me, this is already a matter of combat . . . I think we actually have to put an army together . . . ."[358]   Fajardo agreed: "We have to

---

[353]         *Id.*

[354]         *Id.*

[355]         *Id.*

[356]         *Id.*

[357]         *Id.*

[358]         PX 63A (June 4, 2007 *Crude* Clip), at CRS346-00-CLIP-02.

85

have demonstrations, have protests.  I think that has to be done right now. . . ."[359]  He continued: "*the idea is to teach a lesson to this judge and to the next one.  I mean, teach the court a lesson.  A message to the court.*"[360]

The next day, Donziger met with Yanza and Atossa Soltani of Amazon Watch and explained the situation:

> "I think that, analyzing the outlook of this case, we are losing strength with the court. Uhm, this case has pretty much been asleep for five months. It's weird. I mean, *we got – we were getting, like, everything, for a while, that we wanted. You know, we got the cancellation of the inspections. You know, we we're getting the peritaje global, the final phase*. But then, like, suddenly everything was in place and he won't swear in the *perito*, which is needed to start the hundred and-twenty day period. It's been, like, weeks and weeks and weeks of delays. You know, after sort of analyzing the situation, we believe that the judge is trying to stall the case until the end of the year, until the new guy comes in . . . So, you know – but it goes way beyond the problem of any individual judge, 'cause it's possible the next person could come in and . . . and not want to deal with it and do the same.  You know, it's a problem of institutional weakness in the judiciary, generally, and of this court, in particular.  *We have concluded that we need to do more, politically, to control the court, to pressure the court.  We believe they make decisions based on who they fear the most, not based on what the laws should dictate*.  So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003."[361]

He added that the protest would occur during the last week in June and emphasized that "it's a critically important moment, because *we want to send a message to the court that, 'don't fuck with us anymore – not now, and not – not later, and never. . . . [N]o one fears us right now.  And, until*

---

[359]

    *Id.*

[360]

    *Id.* (emphasis added).

[361]

    PX 67A (June 6, 2007 *Crude* clip), at CRS-350-04-CLIP-01 (emphasis added).

86

*they fear us, we're not gonna win this case.*   I'm convinced."[362]   Indeed, on June 13, 2007, he

suggested that Fajardo and Yanza "inform the judge now that we're going to have the big march and

maybe *ask for his recusal during that march so that he'll get scared now.*"[363]

     As it turned out, the June 4 visit to Judge Yánez by Donziger and Fajardo quickly had

its desired effect, and Donziger's fears as to whether Cabrera would be sworn in and thus authorized

to begin his work as global expert proved short-lived.  Cabrera was sworn in on June 13, 2007.[364]

At his swearing-in, Cabrera promised to execute his duties "faithfully and in accordance with

science, technology and the law and with complete impartiality and independence vis-a-vis the

parties."[365]

     Roughly two weeks later, Cabrera submitted what purported to be his work plan to

the court.[366]  While this was more abbreviated than the detailed March 21 plan initially prepared by

the LAP team, it too in fact had been written by the LAP team.[367]  It listed categories of experts who

---

[362]

          *Id.* (emphasis added).

[363]

          PX 872 (June 13, 2007 Email from S. Donziger to P. Fajardo and L. Yanza) (emphasis
          added).

[364]

          PX 342 (Cabrera Certificate of Swearing In).

          Donziger obviously was unaware when he wrote his own June 13 email (PX 872) that
          Cabrera had been or would be sworn in on that day.  It is unclear whether the threat he had
          suggested to Fajardo and Yanza was made before the swearing in took place.

[365]

          PX 342 (Cabrera Certificate of Swearing In), at 3.

[366]

          PX 277R (Cabrera Work Plan).

[367]

          Donziger Jan. 31, 2011 Dep. Tr. at 4132:11-18 ("Q.  Now, in the spring of 2007 it was the
          plaintiffs' team that drafted Mr. Cabrera's work plan, correct?  A.  We drafted a work plan
          that we gave to him.  Q.  That he then adopted, correct, sir?  A.  I believe he used most of

87

would assist in collecting samples in the field and analyzing data[368] – all of whom secretly would be named by the LAP team.[369]

C.      *The Field Work*

Shortly before Cabrera was sworn in, Donziger and Fajardo had discussed the need to "scale up" the "battle" once that occurred by "organiz[ing] pressure demonstrations at the court and [providing] vigilance" to "protect" the expert.[370]  They proceeded with the plan once Cabrera was sworn in.  They decided that a "pressure demonstration" would take place the day Cabrera was set to begin "his" work in the field.

On June 26, 2007, Donziger emailed the producer and cameraman of the *Crude* documentary to fill them in on the plan.  He wrote that "Richard [Cabrera] the new expert [would be] tak[ing] sampling [during the following week] for the first time in Lago, and a ton of people will be there to protect him from the Chevron lawyers. . . ."[371]  He suggested that the crew "film us getting ready for the big march.  The march will be the biggest in the history of the [ADF] . . . [yo]u can capture the main characters (me, Pablo, Luis) early in the morning Tuesday greeting the

---

it, if not all of it.").

[368]
        PX 277R (Cabrera Work Plan), at 11.

[369]
        Donziger Jan. 31, 2011 Dep. Tr. at 4132:20-22.

[370]
        PX 67A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-01 (emphasis added).

[371]
        PX 875 (June 26, 2007 Email chain between S. Donziger, M. Bonfiglio, and J. Berlinger).

88

communities as they travel to lago from the hinterlands. . . ."[372]   And he noted that "[t]he other thing that would be good to capture is our private 'army' which has been very effective.  Yesterday they followed a Texaco lawyer into the judge's chambers and had a confrontation.  This is a critical part of our strategy that is allowing the case to go forward . . ."[373]

The demonstration occurred on July 3, 2007, and culminated with a speech by Yanza.[374]  Cabrera began his site inspections the following day, surrounded by Donziger's "army."[375]  Over the next three months, Cabrera visited sites and collected samples.[376]

Chevron was skeptical of Cabrera from the day he was named.  It thought him unqualified and that he lacked relevant experience, and it voiced its concerns to the court.[377]  Chevron's lawyers became even more suspicious when Cabrera took samples at various sites because they observed what seemed to them to be collaboration and familiarity between Cabrera – the supposedly independent global expert – and the LAP team.[378]  In addition, "unlike the Lago Agrio Plaintiffs' representatives, Chevron lawyers and . . . technical team members were often

---

[372]       *Id.*

[373]       *Id.*

[374]       PX 78 (July 3, 2007 *Crude* Clip), at CRS405; PX 79A (July 3, 2007 *Crude* clip).

[375]       PX 3300 (McMillen Direct) ¶ 27.

[376]       *Id.*

[377]       PX 4300X (Callejas Direct) ¶ 48.

[378]       PX 3300 (McMillen Direct) ¶¶ 27-28.

89

blocked from observing up close Cabrera's inspections."[379]  Thus, "[t]hroughout Mr. Cabrera's proposed appointment, swearing in, field work and the ultimate submission of his reports, Chevron repeatedly petitioned the Court to address its concerns over Cabrera's lack of impartiality and independence and his suspected collusion with the Lago Agrio Plaintiffs' representatives."[380]  The Lago Agrio court never intervened.[381]  It merely reminded Cabrera "that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth" and asserted that "[t]he transparency of the expert's work will be ensured."[382]

Chevron had reason to be suspicious of Cabrera's field work, which was anything but transparent.   Among other things, Donziger later admitted that the LAP team "had [also] been involved in Mr. Cabrera's site selection" and his "sampling protocols."[383]  Indeed, he conceded that he could not recall a single site Cabrera sampled that the LAPs had not "recommended" to him.[384] Nor was that all.

1.      *The LAP Team Pays Cabrera to Ensure that He Would "Totally Play Ball"*

The LAP team paid Cabrera.  Some of the payments they made to him were official,

---

[379]

PX 4300X (Callejas Direct) ¶ 49.

[380]

*Id.* ¶ 52.

[381]

*Id.*

[382]

PX 348 (Oct. 3, 2007 Lago Agrio Court Order).

[383]

Donziger Dec. 29, 2010 Dep. Tr. at 2203:4-6; 2203:11-17; Tr. (Donziger) 2457:22-2548:4.

[384]

Tr. (Donziger) 2548:9-17; Donziger Jan. 29, 2011 Dep. Tr. at 3726:23-3727:4.

90

court-approved payments made through the court process, which worked like this: on several occasions, Cabrera filed a letter with the court, requesting payment for work he performed or was about to perform.[385]  The court approved the amount, and ordered the LAPs, who had requested the global expert, to pay it.  The LAP team then wrote Cabrera a check for that amount, which was filed with the court and then given to Cabrera.[386]

       But the court-approved payments were not the only ones the LAPs made to Cabrera. They paid him also outside the court process.  And they began paying him even before he had begun to perform his duties.

       After Cabrera was named as the global expert but before he was officially sworn in, the LAPs agreed to set up a new, "secret" bank account through which they surreptitiously would pay Cabrera.[387]  Yanza and Donziger began the process of opening the secret account in June 2007.

---

[385]

       PX 4300X (Callejas Direct) ¶¶ 50-57.  This process was consistent with Articles 9 and 14 of Ecuador's Rules Governing the Activities and Fee Schedule of Experts in the Civil, Criminal and Similar Areas of the Judiciary.  *See* DI 1413-9, at 21.

[386]

       For example, on June 25, 2007, Cabrera filed a request with the court for $59,349 "[t]o complete the work I am to perform within the deadline Your honor has set . . . ."  PX 277 (June 25, 2007 Ltr. from R. Cabrera to Lago Agrio court).  The following day, the Lago Agrio court approved the payment.  PX 344 (June 28, 2007 Court Approved Payment of $59,349 from LAPs to Cabrera), at 2 of 5.  Two days later, the LAPs paid Cabrera $59,349.  *Id.* at 1.

       On October 15, 2007, Cabrera wrote to the court asking it to order the LAPs to pay him $97,000.  PX 350 (Oct. 15, 2007 Ltr. from R. Cabrera to Lago Agrio court). The court ordered the LAPs to pay Cabrera $97,000 a week later.  PX 354 (Oct. 22, 2007 Lago Agrio Court Order).  The LAPs paid Cabrera the $97,000 in at least three installments.  PX 356 (Nov. 22, 2007 Court Approved Payment of $30,000 from LAPs to Cabrera); PX 361 (Jan. 24, 2009 Court Approved Payment of $25,000 from LAPs to Cabrera); PX 367 (May 10, 2008 Court Approved Payment of $33,000 from LAPs to Cabrera).

[387]

       PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger); PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo).

Yanza informed Donziger that "[t]o open the account we need at least 2 thousand dollars.  Due to the urgency, I suggest that amount (or more, 5 or 10 thousand) be sent to my personal account and I will transfer it to the new secret account."[388]  Donziger responded "I'm not sure it should be your account. [A]re you sure?"[389]  Yanza assured Donziger that "the first transfer is just to open the other account.  Once we have the other account I'll immediately transfer all the money to that account and we start operating with that account."[390]  He later made clear that he would open the secret account in someone else's name.[391]

The LAP team ultimately decided to repurpose a preexisting account the ADF held at Banco Pichincha to serve as the secret account.[392]  Between August 2007 and February 2009, Donziger had Kohn make three separate payments totaling $120,000 via wire transfer to the secret account.[393]  A large portion of this money was paid to Cabrera via direct account-to-account transfers

---

[388]

PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger).

[389]

*Id.*

[390]

*Id.*

[391]

*Id.*  He considered opening the account in the name of either "Lupe" or "Donald," referring to Lupeta de Heraldaia and Donald Moncayo, both of whom work for the LAPs through Selva Viva.  Woods Sept. 14, 2011 Dep. Tr. at 439:10-440:23; Tr. (Moncayo) 2058:23-24.

[392]

PX 578 (Banco Pichincha Account Statement for ADF) (account number 3921429800); PX 912 (Sept. 12 2007 Email from L. Yanza to P. Fajardo re: "Secret account") (identifying secret account as account number 3921429800).

[393]

PX 578 (Banco Pichincha Account Statement for ADF), at 6-7; PX 618 (Wire Transfers), at 4-5; PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson and J. Kohn re "Critical money transfer") ("Pls transfer 50,000 to the following account in Ecuador.").

at Banco Pichincha.[394]  For example, on August 9, 2007, Yanza sent Donziger an email in which he included the account information for the secret account and wrote that "[Kohn] ha[s] to deposit 50k [into the secret account] so we can pay the advances to the consultants so they will start their work as soon as possible.  I hope it is deposited by Wednesday at the latest.  I'll be in touch that day to arrange all of this with Huao."[395]  Six days later, Kohn transferred $50,000 into the secret account.[396]  Two days after that, $33,000 was transferred to Cabrera from the secret account.[397]  And on September 12, 2007, Yanza emailed Donziger stating that he "need[ed] 50,000 more by Monday at the latest."[398]  He followed up on that request five days later, telling Donziger: "I hope you make that deposit right away because I offered to give the Wao another advance tomorrow and I don't want to look bad."[399]  That same day, Kohn transferred $49,998 into the secret account.[400]  And on February 8, 2008, Yanza emailed Donziger and asked for a transfer to the secret account, stating

---

[394]

       PX 578 (Banco Pichincha Account Statement for ADF), at 6; PX 590 (Aug. 17, 2007 Transfer Receipt) (showing transfer of $33,000 to Cabrera); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the ADF).

[395]

       PX 894 (Aug. 9, 2007 Email from L. Yanza to S. Donziger re: "bank information urgent").

[396]

       PX 2427 (Oct. 26, 2007 Email from K. Wilson to S. Donziger) (reflecting payment of $50,000 to Frente de la Amazonia Aug. 15, 2007).

[397]

       PX 578 (ADF Account Statement), at 6; PX 590 (Aug. 17, 2007 Transfer Receipt); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the ADF).

[398]

       PX 912 (Sept. 12, 2007 Email from L. Yanza to S. Donziger).

[399]

       PX 917 (Sept. 17, 2007 Email from L. Yanza to S. Donziger).

[400]

       PX 578 (ADF Account Statement), at 6.

"[h]opefully, [Kohn] transfers 25."[401]  Later that day, Donziger emailed Kohn, asking him to deposit

$20,000 into the Frente's secret account.[402]  Kohn transferred the money to the secret account four

days later.[403]

        Defendants have contended that the secret payments they made to Cabrera were

"advanced funds to cover expenses incurred for work performed so that his work would not stop."[404]

And Donziger testified at trial that the secret account was "to pay [Cabrera] for work performed

outside of the court process due to the paralysis that existed in the court. . . ."[405]  He maintained also

that such payments were "appropriate" under Ecuadorian law.[406]

        In fact, experts are prohibited under Ecuadorian law from "requir[ing] or receiv[ing]

anything of value, whether directly or indirectly, from the parties in the case . . . since their fees

must be established in advance by the competent judge."[407]  The attempt to justify their payments

to Cabrera outside the court process – that is, without an application by Cabrera to the court

---

[401]

       PX 967 (Feb. 8, 2008 Email from L. Yanza to S. Donziger).

[402]

       PX 968 (Feb. 8, 2008 Email from S. Donziger to J. Kohn and K. Wilson).

[403]

       PX 578 (ADF Account Statement), at 7; PX 618 (Banco Pichincha Account Statement for ADF).

[404]

       PX 2411 (Donziger Defs.' Second Supplemental Responses to Chevron's Interrogatories), at 34.

[405]

       Tr. (Donziger) 2550:20-25.

[406]

       Tr. (Donziger) 2551:16-20.

[407]

       DI 1413-9 (Art. 15 of Rules Governing the Activities and Fee Schedule of Experts in Civil, Criminal and Similar Areas of the Judiciary), at 21.

94

followed by court approval followed by payment – as necessary "to keep the process going" is not

persuasive. While such advances might have been both understandable, if irregular, had they been

made openly and in response to proven delays by the court in acting on payment requests, there is

no persuasive evidence of either. Defendants' expert, moreover, testified that secret payments to

Cabrera without the knowledge of the court to alter the result of the expert's report would have been

crimes under Ecuadorian law.[408] Indeed, the Ecuadorian Criminal Code provides that "[a]nyone who

bribes a[n] . . . expert . . . or who knowingly uses false . . . experts in a court proceeding . . . will be

punished as guilty of false testimony or perjury."[409]

All of the circumstances – including the fact that a court-approved payment process

existed but that the LAP team secretly paid Cabrera outside of that process, used a secret account

to do so, worried in emails about whether any of the money should go through Yanza's personal

account even temporarily, and used code names as they did it – indicate that the secret payments

were illegal or at least improper,[410] that the LAP team knew that, and that they attempted to conceal

---

[408]     DI 1413-12 (Albán Dep. Tr.), at 31:25-32:2, 54:7-23.

[409]     DI 1413-4 (ECUADOR CRIM. CODE Art. 359), at 48-49.

[410]     The fact that at least some of the money the LAPs paid Cabrera changed hands before
Cabrera took the oath of office in June 2007 is not significant. They knew that he was to
act in an official capacity before any of the payments were made. The money was intended
to influence his official actions once he was sworn in. In those circumstances, the payments
were wrongful. *See, e.g.*, 18 U.S.C. § 201 (the prohibition against bribing a public official
extends to a "person who has been selected to be a public official," defined as "any person
who has been nominated or appointed to be a public official, or has been officially informed
that such person will be so nominated or appointed"); 18 U.S.C. § 201 (the prohibition
against government officials receiving compensation for representational services extends
to agreements to receive or acceptance of compensation before the term of employment
begins); *Crandon v. United States*, 494 U.S. 152, 163 (1990) (discussing the inclusion in
Sections 201 and 203 of pre-employment compensation or bribes); N.Y. PENAL LAW §§
10.00(15), 200.10, 200.11, 200.12, 200.15 (proscribing the receipt of bribes by public

95

their payments.  Whatever else these payments may have included, if anything, at least part of them were made as part of even more extensive efforts to ensure that Cabrera "would totally play ball with" the LAPs and with other U.S. consultants whom the LAPs had hired to draft the report Cabrera would file under his name.

        2.     *The LAP Team Provides Cabrera with Administrative "Support" and Controls his Field Work*

        The LAPs provided Cabrera more than payments from the secret account.  Three days before Cabrera began his field work, Fajardo sent an email to Donziger and Yanza, informing them that Cabrera that morning had called him "about a little mistake in the contract, [and] he seemed a bit upset. . . ."[411]  Fajardo suggested that Donziger get in touch with Cabrera

        "to offer some Support, which . . . should be the following:

        1.  That we help him get an office, if he hasn't yet, we shouldn't let him go through that hassle, it is our obligation to help him.  Leaving him alone would be irresponsible of us, we could give him someone to help him, he'll feel better.

        2.  I recommend that Julio [Prieto]'s girlfriend be his assistant, I think she's a really bright girl, *and since she's Julio's girlfriend, there would be no problems*, she knows something about law and could help him in many

---

servants, defined to include those who have "been elected or designated to become a public servant"); *see also United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008) ("Although defendants' Sixth Amendment rights attached only upon indictment, the district court properly considered pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment."); *United States v. Solow*, 138 F. Supp. 812,  813-16 (S.D.N.Y. 1956) (Weinfeld, J.) (destruction prior to service of subpoena of evidence material to known investigation constitutes obstruction of justice).

[411]

        PX 877 (July 1, 2007 Email from P. Fajardo to L. Yanza and S. Donziger re: "WORRIED").

aspects, *plus we'd have this situation more or less controlled. . . .*

3.  Even though it's not our obligation, but I think it's our duty to help him get insurance.  We must understand that he has no structure and we do.  I think that he now needs to get to the heart of his work. . . ."[412]

Donziger replied that he was "on it."[413]

Donziger and Fajardo believed that supporting Cabrera in every way was necessary to maintaining the "control" over him upon which Donziger insisted.  So they entered into a contract with Cabrera, provided him with a secretary (Prieto's girlfriend), obtained life insurance for him,[414] and provided other support.  To ensure that Cabrera continued to cooperate with them, they needed to make clear that they supported him.  And their "support" was not limited only to administrative matters.  They also supported and controlled his work in the field.

Shortly after Cabrera began his inspections, he filed a letter with the Lago Agrio court in which he complained that Chevron's representatives had interfered with his first inspection at the sampling site and were "insulting [Cabrera], trying to affect [his] reputation, dignity, and impartiality."[415]  He wrote that, in the future, "[i]f upon arriving at a site or well that [he] need[ed] to sample [he] f[ou]nd alterations . . . [he] reserve[d] the right to replace that and all tampered sites with other sites that have not been altered, without the new sites having to be on the list that was

---

[412]

  *Id.* (emphasis added).

[413]

  *Id.*

[414]

  *Id.*; PX 881 (July 11, 2007 Email from J. Prieto to P. Fajardo and S. Donziger re: "insurance for the wao").

[415]

  PX 279 (July 12, 2007 Ltr. from R. Cabrera to Lago Agrio court), at 2.  This exhibit was not offered or received for the truth of Cabrera's statements.

97

provided in the work plan."[416]

Read in concert with the LAP team's internal correspondence, Cabrera's letter to the court – in which he "reserve[d] the right" to visit new sites and collect new data – was meant to lay the groundwork for the LAP team's maintenance of control over Cabrera's field work.  Indeed,  on July 17, 2007, Donziger sent an email to Yanza and Fajardo, the subject of which was "Ideas for meeting with Richard [Cabrera]."[417]  He wrote:

"These are the [l]atest ideas:

1) That we think that Richard should suspend his work in the field and we should not pay the team until after the recess.  *We just need to tell the team and Texaco that he's going to start all over after the recess so there is nothing strange, everything appears normal.*

2) When I get there, we'll re analyze the work and budget with Richard.  And we'll adjust with a much smaller team.  My tendency is to stop Richard from working much more in the field. . . or, if he continues doing it, *he should continue under the most strict control with an extremely limited number of samples . . . And we'll change the focus of the data at our offices.*

3) It is key to have deadlines to receive drafts from all the consultants, such as the biologists, the water man, and so on.  Personally, I don't want to wait for the 'final' product to determine if the work is useful or not, or we will be screwed because they will ask for even more money to make the changes if we are not properly informed of everything during the process."[418]

Donziger's email underscores the fact that the LAP team had chosen the sites which Cabrera was to visit and, when the team's funds began to run low, sought to limit the number of sites even further.  All the while, the LAPs knew that – for the samples he did collect – they could simply

---

*Id.*

PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

*Id.* (emphasis added).

98

"change the focus of the data at [their] offices."

The "team" to which Donziger referred included Stratus and other consultants and scientists who were hired to perform technical work supposedly to have been done by Cabrera.[419] One of those consultants was Uhl, Baron, Rana & Associates, Inc. ("UBR"), an environmental consulting firm Kohn and Donziger had hired and paid to develop a potable water report.[420]  As will be seen, the report UBR prepared ultimately became an appendix to the Cabrera Report.[421]  It was attributed to Juan Villao Yepez, an employee of UBR, who was identified as a supposedly independent expert on Cabrera's supposedly independent technical team.[422]  The fact that the LAP team had hired and was paying UBR was not disclosed to the Lago Agrio court.

The authorship of the Cabrera Report and its appendices will be discussed more fully below.  The importance of Donziger's July 17, 2007 email for present purposes is that it shows that the LAP team worried about how they could continue to pay the team of U.S. environmental consultants they had assembled and hired to perform Cabrera's work for him.  And the team worried also about maintaining control over the sites Cabrera inspected, the samples he took, and the data

---

[419]

   *See, e.g.*, PX 2481 (July 19, 2007 Email from S. Donziger to L. Yanza and P. Fajardo re: "Very important") ("If we use the American consultants here, it is [sic] necessary for Huales to pay directly or can Kohn pay them?  It might be a problem.  Another option is for the locals to adopt the work they do and are paid here, and the locals there.").

[420]

   *See, e.g.*, PX 632 (July 18, 2007 Retention Agreement between J. Kohn and UBR); PX 2430 (July 24, 2007 Statement Reflecting $5,000 payment from J. Kohn to UBR).

[421]

   PX 310 (Cabrera Report), at 4347 of 6124; Donziger Jan. 8, 2011 Dep. Tr. at 2537:12-17 ("Q. Now, the work that Uhl Baron did for yourself and Mr. Kohn ultimately became Annex O-R of the Cabrera Report, correct?  A.  I believe so, either verbatim or something very similar.").

[422]

   PX 310A (Cabrera Report), at 6085 of 6124.

99

the samples produced.  So five days after Cabrera sent the letter to the court stating that he reserved

the right to visit new sites and collect new data,[423] Donziger informed Fajardo that Cabrera should

collect an extremely limited number of samples and that (1) the focus of the data could be

"change[d] . . . at [the LAPs'] offices" and (2) the data ultimately would be analyzed and

summarized by the consultants the LAPs were paying to prepare Cabrera's report.[424]  This two-

pronged attack enabled the LAP team to get what it wanted – fewer testing sites, lower costs, and

control over the samples and results they elicited – while allowing Cabrera to blame the need for

changes to his work plan on Chevron.

Donziger noted also in his July 17, 2007 email to Fajardo that the LAPs' hired

consultants needed to be required to submit their drafts to the LAP team early on.  Donziger wanted

control over the consultants' reports from their inception.  He did not want to risk waiting until their

work was "final" and ready to be included in the report to discover that it ultimately was not

"useful" to the LAPs.

---

[423]

PX 279 (July 12, 2007 Ltr. from R. Cabrera to Lago Agrio Court), at 2.

[424]

PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

100

D.    *Donziger Attempts to Deceive Judge Sand About Cabrera's Independence*

During this period, a case entitled *Republic of Ecuador v. ChevronTexaco Corp.*[425] was pending in this Court before Honorable Leonard B. Sand.  The details of that case are not particularly germane here.  One, however, is significant because it provides further evidence of Donziger's (1) awareness that the LAPs' control over Cabrera and their extensive participation in the activities with which he was charged, as a supposedly independent expert, were wrongful, and (2) determination to maintain the false appearance that Cabrera was independent when he most certainly was not.

In mid-September 2007, the ROE and PetroEcuador were due to submit supplemental papers in support of a motion to dismiss Chevron's counterclaims and to renew their own motion for summary judgment.  Donziger had been given by the ROE's lawyers a draft of a declaration proposed for signature by Mark Quarles and submission to Judge Sand.  Quarles was one of the outside consultants hired by the LAPs to, among other things, work on the global expert report supposedly done by Cabrera.  Paragraph 5 subpart 3 of the draft read as follows:

---

[425]

No. 04 Civ. 8378 (LBS).

Chevron Corporation briefly changed its name to Chevron Texaco before rechanging it to Chevron.  *See* Chevron Corp. Annual Report 2000 (Form 10–K) (Mar. 28, 2001), *available at* http://www.sec.gov/Archives/ edgar/data/93410/0000093410010000015/0000093410-01-000015.txt; ChevronTexaco Corp. Annual Report 2001 (Form 10–K) (Mar. 27, 2002), *available at* http://www.sec.gov/ Archives/edgar/data/93410/000095014902000568/ f80065e10-k405.htm; Chevron Corp., Annual Report 2005 (Form 10–K) (Mar. 1, 2006), *available at* http://www.sec.gov/Archives/edgar/data/93410/000095014906000076/ f16935e10vk.htm. the Court takes judicial notice of the fact that Chevron, following the acquisition of the shares of Texaco, was renamed Chevron-Texaco Corporation and then later changed its name back to Chevron Corporation.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining that courts may take judicial notice of "documents filed with the SEC . . . 'to determine what the documents stated'").

101

> "3.     In the event Chevron or the Plaintiffs had been allowed to participate in developing Cabrera's sampling strategy and selection of sites/methods, a degree of biasness [sic] would have been introduced into the sampling plan. Given that Chevron and the Plaintiff were not involved in the workplan preparation, Cabrera's plan should represent no bias."[426]

On the evening of September 16, 2007, Donziger emailed the draft declaration to Quarles with Donziger's comments and requested Quarles to revise the declaration accordingly.[427] Donziger's proposal with respect to paragraph 5, subpart 3, was as follows (with the original draft in normal type and Donziger's comments and requested changes in boldface):

> "3.     **[I would delete para in favor of the following language, if true: Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant.  At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan.**
> [In the event Chevron or the Plaintiffs had been allowed to participate in developing Cabrera's sampling strategy and selection of sites/methods, a degree of biasness would have been introduced into the sampling plan. Given that Chevron and the Plaintiff were not involved in the workplan preparation, Cabrera's plan should represent no bias.  **–would delete para]**"[428]

The foregoing demonstrates that Donziger did not want Quarles to say that participation by either side in Cabrera's sampling strategy or site or method selection would have introduced bias into the process.  So he suggested to Quarles that he assert, "if true," that Cabrera neither had entertained suggestions from nor even met with the LAPs regarding his work plan.  But Donziger by this time knew that the statements he proposed that Quarles make in his declaration

---

[426]     PX 915 (Sept. 16, 2007 Email from S. Donziger to M. Quarles re: Quarles Affidavit), at 6 of 9.

[427]     *Id.*

[428]     *Id.* at 5-6 of 9 (emphasis in original).

102

would have been false.  Among other things, Donziger had been at the March 3, 2007 meeting with Cabrera and others at which the LAPs laid out the plan they had prepared.  Donziger knew also that the LAPs controlled Cabrera's site selections and that Cabrera in all other respects was "totally playing ball" with the LAPs.  His inclusion of the words "if true" were nothing more than a misguided attempt to cover himself, should the blatant inaccuracy of the declaration itself ever be discovered, by permitting him to assert that he had relied on Quarles and that the falsity of the declaration had not been Donziger's fault.

The subparagraph that Donziger wanted changed was altered before the Quarles declaration was filed on the following day, September 17, 2007.  The final version (which, with renumbering of certain paragraphs, appeared as subparagraph 1 of paragraph 7) was this:

> "1.     Mr. Cabrera and his team have acted independently from <u>both</u> the plaintiffs and the defendant at the three (3) Phase II inspections that were witnessed on September 6 - 7, 2007.  In fact, armed guards were present to accompany Cabrera and his team and to prevent plaintiff and defendant personnel from interfering with the execution of the sampling plan."[429]

Thus, Quarles was not prepared to go as far as Donziger wished, either because he knew that Donziger's assertions were false or because he knew that he lacked personal knowledge sufficient to justify him in saying what Donziger proposed.

In any case, the Quarles declaration as filed was intended by Donziger to convey the idea that Cabrera was working independently of the plaintiffs.  It did so to some extent, though not to the degree Donziger wished.  Even its limited message was inaccurate, and Donziger knew it.  In fact, Quarles testified that if he had known that the LAPs had drafted Cabrera's work plan and

---

[429]     PX 918, at 3-4 (emphasis in original); *Republic of Ecuador v. ChevronTexaco Corp.*, No. 04 Civ. 8378 (LBS) (S.D.N.Y. filed Sept. 17, 2007) [DI 225], at 3-4 of 6.

103

that Cabrera had worked directly with the plaintiffs, he would not have signed even the modified

declaration.[430]


E.      *Stratus Secretly Writes Most of the Report*

Ann Maest was a significant figure in the ensuing events.  She first met Donziger and

the LAP team in 2006, and eventually suggested that Donziger speak to Stratus' leadership to

discuss retaining the firm in connection with the Cabrera Report.[431]  Donziger then met with Stratus'

president, Josh Lipton, Maest, Stratus' executive vice president and chief financial officer Douglas

Beltman, and other Stratus personnel in Boulder, Colorado in April 2007.[432]  Donziger explained the

history of the Lago Agrio litigation and the status of the evidentiary phase of the case.[433]  He

---

[430]

    Quarles Sept. 1, 2010 Dep. Tr. at 115:20-116:04, 118:20-25, 121:21-122:05.

[431]

    PX 848 (Apr. 10, 2007 Email from S. Donziger to J. Lipton and A. Maest) ("Josh – Ann
    Maest suggested I write to reconnect about the Ecuador case against Chevron . . . . The case
    is winding down fast, and we need to prepare a damages assessment . . . . I am interested
    in a 'global' discussion of how Stratus might be able to take on some or all of this.").
    Donziger wrote in his notebook on April 12, 2007 "Need to see Stratus in Denver to get
    help, but worried about the money. . . .  Maest was down.  Unclear if we can pull it all
    together in the time frame allotted."  PX 204 (Donziger Notebook); *see also* PX 5200
    (Lipton Direct) ¶ 13 ("On April 10, 2007 Donziger contacted me via email at Dr. Maest's
    suggestion and described his need for technical assistance on a damages assessment.").

[432]

    PX 5200 (Lipton Direct) ¶ 15 ("I met with Donziger on April 26, 2007 at Stratus's office in
    Boulder, Colorado."); PX 851 (Apr. 23, 2007 Email from S. Donziger to J. Lipton and A.
    Maest re: Meeting Thursday); PX 2466 (Apr. 22, 2007 Memorandum from S. Donziger to
    J. Lipton re: Overall Ecuador Work Plan); PX 59A (Apr. 26, 2007 *Crude* Clip), at CRS-269-
    01-04 (April 2007 meeting with Stratus).

[433]

    PX 5200 (Lipton Direct) ¶ 15.

104

explained also what he envisioned Stratus' role would be.[434]  He said that he needed Stratus' help preparing the damages claim and explained that, while the LAP team had already done some testing in the field and had produced a tentative remediation plan, it was "spotty" and needed "to be significantly beefed up."[435]

Stratus entered into a retention agreement with Kohn on August 20, 2007.[436]  The agreement specified that Stratus would "provide regular updates on the progress of our work with Mr. Steven Donziger via phone or email."[437]  Doug Beltman was identified as the Stratus project manager and officer-in-charge of the firm's "Ecuador Project."[438]

Throughout the rest of 2007 and early 2008, Beltman, Maest, and others at Stratus consulted with Donziger and worked on preparing the damages assessment.[439]  Donziger and Stratus personnel exchanged hundreds of emails regarding draft outlines of the Cabrera Report as well as

---

[434] PX 59A (Apr. 26, 2007 *Crude* Clip), at CRS-269-01-04 (April 2007 meeting with Stratus).

[435] *Id.*

[436] PX 633 (Mar. 5, 2010 Email from S. Donziger to E. Englert and M. Hoke), at 2-10.

[437] *Id.* at 8.

[438] PX 5200 (Lipton Direct) ¶ 19.

[439] *See, e.g.*, PX 942 (Dec. 10, 2007 A. Maest handwritten notes re: "Call with Steven and Doug re Damages Assessment"); PX 945 (Dec. 20, 2007 A. Maest handwritten notes re "Ecuador GW Sampling"); PX 951 (Dec. 27, 2008 A. Maest handwritten notes re "Call with Steven and Doug - Ecuador"); PX 954 (Jan. 9, 2008 A. Maest handwritten notes re "Needed for Trip"); PX 956 (Jan. 15, 2008 A. Maest handwritten notes re "Meeting in Quito"); *see also* PX 957 (Jan. 16, 2008 Memorandum "Potential tasks for Stratus Consulting").

105

schedules for the drafting, review, analysis, translation, and completion of the annexes.[440]  But it is

clear that Donziger had the final word on every annex and every piece of the report[441] – even in

arriving at the actual damages figures.[442]

Based on data given to them by Donziger and the LAP team, their visits to Ecuador,

and their own analyses, Beltman, Maest and their team at Stratus wrote the bulk of the Cabrera

Report.  As Donziger later admitted, much later, after Stratus had come clean about its involvement,

it was "the general idea" "that Stratus would draft the report in a form that it could be submitted

directly to the Ecuadorian court by Mr. Cabrera."[443]  In January 2008, Beltman sent a first draft of

---

[440]

       *E.g.*, PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Annex tracking table") (attaching table tracking author, language, and status of review of each annex); PX 1521 (chart tracking translation of annexes); PX 8026 (Feb. 20, 2008 Email from D. Beltman to A. Maest, J. Peers, and S. Donziger re: "annex on TexPet cleanup"); PX 8027 Mar. 10, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "Another annex: ecological risks"); PX 8028 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Draft annex on historical data") ("For your review.  English and Spanish versions."); PX 8029 (Mar. 4, 2008 Email from D. Beltman to S. Donziger re: "extrapolation annex without maps"); PX 8030 (Mar. 13, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "Lost ecosystem value") ("Steven: Attached is the Spanish version of our annex on the value of the rainforest lost at wells and stations.").

[441]

       *See id.*; PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: Annex tracking table) (attaching table tracking author, language, and status of review of each annex, including column for "SD review").

[442]

       *E.g.*, PX 936 (Nov. 17, 2007 Email from S. Donziger to D. Beltman re: "Unjust Enrichment") ("pls read our submission carefully and make sure you don't say or even suggest anything that backs away from the figures.  Remember, we said in the submission that the unjust enrichment would be on the order of billions of dollars (for everything, not just dumping).").

[443]

       Donziger Dec. 29, 2010 Dep. Tr. at 2253:5-11.

106

an outline of the Cabrera Report to Donziger and Maest for their comments.[444]  In February 2008 – six weeks before Cabrera's report was to be filed – Maest and Beltman traveled to Ecuador to meet with Cabrera, Donziger, and other members of the LAPs' team.[445]  Beltman wrote to the Stratus team in Boulder that

> "The project is at a key point right now.  We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case.  The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment.  We (the case attorneys, the case team in Quito, and Stratus) have put together a very ambitious outline for this report.  The people in the Quito office are working on some parts, and we're working on others."[446]

The report to which he referred, of course, was the one that Cabrera would submit to the Lago Agrio court.  At Donziger's direction, Stratus wrote its portions in the first person as though they were written by Cabrera.[447]  Beltman emailed that draft to Donziger on February 27, 2008,[448] and continued to work on it through March.[449]  Other members of the Stratus team worked

---

[444]   PX 962 (Jan. 24, 2008 Email from D. Beltman to S. Donziger and A. Maest) (attaching draft outline, named "Outline.v1.doc," for the report); *see also* PX 2433 (Feb. 8, 2008 Email from D. Beltman to S. Donziger, A. Maest, and others) (attaching updated draft outline "based on what we talked about last Friday).

[445]   PX 1648 (Feb. 22, 2008 Email from D. Beltman to Stratus employees re: "CONFIDENTIAL – Ecuador Project Update") ("Greetings from Ecuador").

[446]   *Id.*

[447]   Donziger Dec. 29, 2010 Dep. Tr. at 2253:5-11.

[448]   PX 978 (Feb. 27, 2008 Email from D. Beltman to S. Donziger re: "Start on report text; human tox annex").

[449]   *E.g.*, PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: "Annex tracking table").

107

at Beltman's direction and drafted portions of the annexes that would accompany Cabrera's report,[450]

often collaborating with members of the LAPs' Ecuadorian team in doing so.[451]  All of the portions

of the report that Stratus prepared were in English, were written in Cabrera's voice, and later were

translated into Spanish for submission to the court.[452]

      Beltman, Maest, and others at Stratus continued to provide comments on and material

for the Summary Report and the annexes to Donziger and the LAP team up to March 30, 2008, two

days before it was to be filed.[453]  On that day, Beltman provided comments to Donziger on a draft

---

[450]

    *E.g.*, PX 1649 (Mar. 1, 2008 Email from D. Beltman to M. Carney re: "eco risk annex") ("Hey Mike: Great job on the ecorisk annex.  The link below has some edits and comments.  We are well on our way, but it's going to take a bit more work."); PX 981 (Mar. 4, 2008 Email from A. Maest to J. Peers re: "Yet another updated perito db").

[451]

    *E.g.*, PX 2468 (Mar. 4, 2008 Email from J. Sáenz to D. Beltman); PX 1014 (Mar. 27, 2008 Email from J. Peers to L. Villacreces, P. Fajardo, and J. Prieto re: "corrected figures – Exhibit Ecological Impact").

[452]

    PX 1050 (July 28, 2008 Email from D. Beltman to B. Lazar re: "english translations"); PX 2436 (Mar. 10 2008 Email From D. Beltman to A. Maest and J. Peers re: "Report help") ("Unfortunately, I've been too busy on annex stuff to work much on [the report], and it has to go to the court in 2 weeks and get translated. . . . My goal is to have the entire report drafted by COB Tuesday.  Based on how things are going, our current translators will take more than a week to turn it around, which puts us at next week Tuesday, if we're lucky."); PX 980 (Feb. 29, 2008 Email from D. Beltman to info@translatingspanish.com and A. Maest re: "Ecuador project") (attaching two annexes for translation); PX 994 (Mar. 12, 2008 Email from info@translatingspanish.com to D. Beltman and A. Maest); PX 2437 (Mar. 12, 2008 Email from D. Beltman to info@translatingspanish.com re: "Big Report").

[453]

    *See* PX 1003 (Mar. 19, 2008 Email from B. Lazar to D. Beltman re: "eco loss"); PX 1005 (Mar. 20, 2008 Email from L. Gamboa to D. Beltman re: "Infomacion"); PX 1007 (Mar. 20, 2008 mail from L. Gamboa to D. Beltman re: "A modest change"); PX 1008 (Mar. 21, 2008 Email from A. Maest to J. Peers and D. Beltman re: "Most recent versions of report and three annexes"); PX 1011 (Mar 22, 2008 Email from B. Powers to D. Beltman, S. Donziger, and A. Maest re: "Status?"); PX 1653 (Mar. 22, 2008 Email from D. Beltman to J. Peers, M. Carney, and A. Maest re: "TPH figures in pits, out of pits"); PX 1013 (Mar. 25, 2008 Email from D. Beltman to J. Sáenz and S. Donziger re: "new pieces").

108

damages table to be used in the Summary Report.[454]  The table set the total estimated damages at $16.3 billion.[455]

The last draft of the Cabrera Report was saved on the morning of March 30, 2008.[456] Beltman, who was in Ecuador at the time, later recalled seeing the Report and annexes "boxed and packed up in the offices of the plaintiffs' lawyers in Ecuador . . . the day before the report was filed."[457]  On April 1, 2008, Donziger downloaded the final version of the report from a secret email account Fajardo had created for him.[458]

Later that day, Cabrera – accompanied by the LAPs, their supporters, and members of the press[459] – walked into the Lago Agrio court and filed the report he claimed to have written.[460] It consisted of an executive summary and 21 annexes and set the amount of damages at $16.3

---

[454]
PX 1018 (Mar. 30, 2008 Email from S. Donziger to D. Beltman re "what do u think of this?").  The next day, Donziger emailed the chart to criscadena@hotmail.com.  PX 1020 (Mar. 31, 2008 Email from S. Donziger to ciscadena@hotmail.com re: "chart").

[455]
PX 1018 (Mar. 30, 2008 Email from S. Donziger to D. Beltman re: "what do u think of this?").

[456]
PX 1017 (Apr. 1, 2008 Email from gringograndote@gmail.com to S. Donziger re: "Informe Final"); PX 4100 (Lynch Direct) ¶¶ 8, 15.

[457]
Tr. (Shinder) 1294:25-1295:9.

[458]
Tr. (Donziger) 2554:16-22; PX 1017 (Apr. 1, 2008 Email from gringograndote@gmail.com to S. Donziger re: "Informe Final").

[459]
PX 4300X (Callejas Direct) ¶ 56.

[460]
PX 310A (Cabrera Report).

109

billion.[461]  It stated that "[t]his report was prepared by the Expert Richard Stalin Cabrera Vega for

purposes of providing professional technical assistance to the Nueva Loja Superior Court of Justice

. . . ."[462]

        We now know, and Donziger eventually admitted,[463] that the Cabrera Report was not

written by Cabrera.  It was written almost entirely by Stratus and others working at the direction of

Stratus and Donziger.  Indeed, all of the damage amounts in the Cabrera Report came verbatim from

Stratus' drafts.[464]  And the annexes drafted by Stratus or its subcontractors were falsely attributed

to experts on Cabrera's purportedly independent team, who had been selected by Donziger and the

LAP team.[465]  But, while Donziger reviewed and commented on every aspect of the Cabrera Report

and its annexes before they were filed, there is no evidence that Cabrera himself ever did.

---

461

        *Id.* at 7.

462

        *Id.* at 1.

463

        Donziger Jan. 8, 2011 Dep. Tr. at 2433:8-14 (Cabrera "adopted pretty much verbatim what
        had been provided to him" by Stratus).

464

        PX 1019 (Mar. 31, 2008 Email from S. Donziger to criscadena@hotmail.com) ("Table of
        Calculated Damages/Main Report"); Donziger Jan. 8, 2011 Dep. Tr. at 2507:24-2508:7 ("Q.
        That was the damage table that was going to . . . appear in the Cabrera report, correct? A.
        I believe so.  Q.  And that is something that you are working on drafting as of March 30th
        of 2008, correct?  Q. I believe so, yes."); *see also* PX 976 (Feb. 26, 2008 Email from D.
        Beltman to M. Carney, T. Hodgson, J. Peers, A. Maest, P. Sowell, E. English, D. Mills, C.
        Rodgers and copying L. Cross re: "Ecuador annex schedule") (discussing work plan to
        complete Report and attaching chart listing who was responsible for each annex and to
        whom each should be attributed).

465

        PX 976 (Feb. 26, 2008 Email from D. Beltman to M. Carney, T. Jodgson, J. Peers, A.
        Maest, P. Sowell, E. English, D. Mills, C. Rodgers and copying L. Cross re: "Ecuador annex
        schedule") (attaching chart listing who was responsible for each annex and to whom each
        should be attributed).

Immediately after the Cabrera Report was filed, Donziger, Fajardo, and their team began trumpeting it to the press as the work of an independent, court-appointed expert who had conducted his work with the assistance of an independent team of scientists.  The ADF issued a press release on April 2 – which Donziger had prepared before the Cabrera Report was filed – titled "Court Expert Smacks Chevron with Up To $16 billion in Damages for Polluting Indigenous Lands in Amazon."[466]   Another release stated that "an *independent* expert has proposed that Chevron pay a minimum of $7 billion and up to $16 billion . . . . Cabrera, the court appointee who is a respected geologist and environmental consultant, was assisted by a team of technical specialists."[467]   And another stated that the "expert report [] was prepared with the help of 15 scientists under the supervision of [an] Ecuadorian environmental consultant."[468]

Two weeks after the report was filed, Fajardo gave a press conference, with Donziger at his side, in which he stated that "what scares Chevron the most, is that this *independent, court-appointed expert, who doesn't . . . respond to either side of the case* has determined that to repair this damage it will be between seven billion and sixteen billion dollars."[469]  Donziger and the plaintiffs' team falsely stressed Cabrera's "independen[ce]"[470] to maximize the leverage on Chevron, although they well knew that the claim of independence was a lie.

---

[466]      *Compare* PX 1023 (Apr. 1, 2008 Email from S. Donziger to J. Kohn re: "DRAFT ONLY – DO NOT SHOW TO ANYBODY"), *with* PX 498R, 499R (Apr. 2, 2008 Press Release).

[467]      PX 498R (Apr. 2, 2008 Press Release) (emphasis added).

[468]      PX 501 (Apr. 14, 2008 Press Release).

[469]      PX 2237A (*Crude* Clip), at CRS 481 (emphasis added).

[470]      PX 502 (Apr. 16, 2008 Press Release).

F.    *Stratus Criticizes its Own Report to Enhance the False Image of Cabrera's Independence*

Stratus' work was not complete the day the Cabrera Report was filed.  Donziger and his team knew that Chevron would respond to the Report and that they would need to defend it.  So the day after it was filed, Beltman emailed Donziger with a list of items that Stratus would be working on moving forward.  Among the items he listed was to "lin[e] up some experts to review and defend the report," to "prepare [the plaintiffs'] comments on Cabrera report to submit to the court," and to "write report on Cabrera's report as response to Chevron's anticipated report on Cabrera's report."[471]  Thus, having written the bulk of the Cabrera Report, Stratus began preparing to (1) respond to it on behalf of the LAPs as if the Cabrera Report actually had been written by Cabrera,[472] and (2) write a response for Cabrera to issue to anticipated Chevron criticisms of the report that Stratus secretly had written.  The plan was to maximize the deception.

The goal for the LAP team's response was to create the impression that it was dissatisfied with the Report and that Cabrera had not gone far enough in assessing damages – notwithstanding the fact that the LAP team, including Stratus, itself had written it.  Fajardo wrote to the team the day after the Report was filed:

"Several international agencies have called me.  I have told them the following, among other things:

a. According to my cursory reading of the report:  I think it is a good report, but it is incomplete.  For example, the cost of groundwater clean up is not

---

[471]

PX 1030 (Apr. 2, 2008 Email from D. Beltman to S. Donziger and A. Maest re: "List of items for moving forward").

[472]

*See, e.g.*, PX 1040 (June 10, 2008 A. Maest Handwritten notes re: "Ecuador Meeting"); PX 1664 (Aug. 10, 2008 Email from D. Beltman to J. Peers, A. Maest, D. Mills, D. Chapman, and J. Lipton re: "Status of Cabrera comment work").

112

> economically quantified. It does not determine what Texaco should pay for the [e]ffect on the culture of the indigenous peoples, it includes an item for recovery, but there is no item for sanctions. It does not include an estimate of the financial damage caused to the economy of rural residents, and it does not say what should be done so rural residents can recover a decent life.
>
> b. For these reasons, the plaintiffs are waiting for the judge to give us the report, we will analyze it in depth, and we will ask the Expert to complete this report, which does not meet our expectations…
>
> c. The report is a step toward justice, but we are not happy because of what's missing.
>
> *. . . . I think it is good to maintain a uniform line, PLEASE, WE ARE NOT HAPPY…*"[473]

On September 15, 2008, Chevron responded to the Cabrera Report.  It challenged its findings, asked that the court strike the Report in its entirety and sought a hearing on errors the Report allegedly contained.[474]  It questioned also Cabrera's independence and accused Cabrera of working improperly with the LAP team.

The LAPs filed their comments – which had been written by Stratus and other members of the LAP team – on September 16, 2008, the day after Chevron's response was filed.[475]  Although the comments largely endorsed Cabrera, they noted that he "did not consider more documentary information in his report"[476] and claimed that his "omissions" "broadly favor[ed] the

---

[473]

PX 1028 (Apr. 2, 2008 Email from P. Fajardo to LAP team re: "GOSSIP AND SUGGESTIONS").

[474]

PX 311 (Chevron Sept. 15, 2008 Motion); PX 4300X (Callejas Direct) ¶ 57.

[475]

PX 311 (Chevron Sept. 15, 2008 Motion).

[476]

PX 312 (LAPs' Comments on Cabrera Report), at 17.

113

interest of [Chevron]."[477]

This appearance of dissatisfaction with the Cabrera Report was important because it supported the false pretense that Cabrera had acted independently. It also provided a basis upon which Cabrera later could admit errors in his initial report and increase his damages assessment. Indeed, the LAP team already was preparing Cabrera's supplemental filings.

On October 7, 2008, Cabrera wrote to the Court:

"President, I am an honest man with nothing to hide, and my conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from my expert report. The fact that neither of the two parties is fully satisfied with my report is clear evidence of my impartiality. I am therefore perfectly willing to appear before the Superior Court of Justice and answer questions or provide whatever is necessary to remove any doubts on the work carried out with a multi-disciplinary and honest team. . . . I was appointed as expert by the President of the Superior Court of Justice of Nueva Loja; I do not take orders from either of the parties to the lawsuit. . . . This means, President, that I am not, nor will I be, subject to the views or whims of either of the parties; I act in accordance with rulings by the judge, with the law and with my principles."[478]

This of course was blatantly false and misleading. Moreover, the assertion that "neither of the two parties is fully satisfied with" the Report corroborates the conclusion that the response to the report that Stratus wrote on the LAPs' behalf – that is, Stratus' criticism of its own work product that had been submitted over Cabrera's name – was intended to feed the false impression that Cabrera had been independent. That was a key part of Donziger's strategy.

In November 2008, Cabrera submitted a supplemental report, in which he purportedly responded to the comments and questions submitted by the LAPs. The supplemental report acknowledged certain omissions and added another $11 billion to the initial damages assessment

---

[477]

       *Id.* at 2.

[478]

       PX 299 (Oct. 8, 2008 Ltr. from R. Cabrera to Lago Agrio court), at 7-8.

in the Cabrera Report.[479]  This report, just like the one it was supplementing, had been written by Stratus and the LAP team.[480]

Cabrera in February 2009 issued also a response to Chevron's petition. He wrote:

"Your Honor, I don't know how long I will have to keep responding to the same requests from the parties. . . . [M]y opinion and my clarifications are clear; they are based on field and bibliographic research, statistical analyses, laboratory analyses, and scientific commentaries which are serious, objective, and deeply impartial. . . . *The entire expert investigation procedure was completed by me personally.*"[481]

Again, Cabrera did not disclose Stratus' and the LAP team's role in drafting the Cabrera Report and its supplement.[482]

---

[479]

PX 4300X (Callejas Direct) ¶ 59.

[480]

PX 1075 (Oct. 27, 2008 Email chain between D. Beltman, A. Maest, and J. Peers re: "Ecuador, Doug- you should read this") ("We received a request from Tania for an update on where we are in responding to a set of the questions to the [Expert] assigned to us"); PX 1668 (Oct. 29, 2008 Email from D. Beltman to J. Peers and A. Maest re: "Plan for rough estimate of groundwater damages"); PX 1078 (Oct. 31, 2008 Email from A. Maest to D. Beltman and J. Peers re: "Reinjection and gas capture questions"); PX 1080 (Nov. 6, 2008 Email from D. Beltman to S. Donziger re: "Clapp").

[481]

PX 303 (Feb. 5, 2009 Ltr. from R. Cabrera to Lago Agrio court), at 1-2 (emphasis added).

[482]

There is another sidelight to the tale of the Cabrera Report.

In the course of preparing the Cabrera Report and ensuing documents, Stratus, Donziger, and the LAP team dealt not only with new material prepared by Stratus, but with material that the LAPs already had in hand from other experts they had employed.  They divided some of the available material among the Cabrera Report itself, the response that Stratus prepared for Cabrera to make to the comments on the Cabrera Report submitted on behalf of the LAPs, and perhaps other documents.  With so many cooks in the kitchen, there was bound to be confusion, and at least one now obvious mistake was made.

Donziger and Stratus hired Richard Clapp to prepare two reports.  PX 1080 (Nov. 6, 2008 Email from D. Beltman to S. Donziger re: "Clapp") ("[Clapp] has done two reports that I know of.  A long while back, he wrote up a summary of the toxic effects of the chemicals in crude oil and drilling fluids, and it was incorporated into the expert report as an annex pretty much as is.").  One of Clapp's reports was submitted "pretty much as is" as an annex to the Cabrera Report, although it was attributed to someone else.  *Id.*  Beltman explained

115

        In the last analysis, the facts concerning the Cabrera Report are crystal clear.   The remaining LAP judicial inspections were cancelled, the global expert proposal adopted, and Cabrera appointed in consequence of the coercion of and pressure placed upon Judge Yánez.   As Donziger admitted in a *Crude* outtake, Judge Yánez "never would have done [that] had we not really pushed him."[483]

        Cabrera was not even remotely independent.  He was recruited by Donziger.  He was paid under the table out of a secret account above and beyond the legitimate court-approved payments.  He was promised work on the remediation for life if the LAPs won.  The LAPs gave him an office and life insurance, as well as a secretary who was a girlfriend of one of the LAP team members.   Stratus and, to some extent others, wrote the overwhelming bulk of his report and his responses to Chevron's objections, as well as to the deceitful comments Stratus had written on its own report.   And, in accordance with Donziger's plan to ratchet up the pressure on Chevron with a supposedly independent recommendation that Chevron be hit with a multibillion dollar judgment, he repeatedly lied to the court concerning his independence and his supposed authorship of the report.

---

to Donziger that Clapp had written also another piece, which Stratus had sent to the LAP team in Ecuador, "but it did not appear in the [LAPs'] comments on the Cabrera report, which means it will probably appear in the expert's response to the comments." *Id.* Beltman and Donziger were adamant, however, that Clapp's authorship of both reports remain secret. *Id.* ("I don't think we should hand out either one as Clapp's thereby distributing proof."). Clapp informed Beltman and Donziger at one point that he was planning to use his initial report in a piece Donziger asked him to write. PX 1082 (Nov. 18, 2008 Email from R. Clapp to D. Beltman re: "Ecuador trip report and health summary"). Beltman immediately wrote to Donziger: "We have to talk to Clapp about that [report] and how we have to limit its distribution. It CANNOT go into the Congressional Record as being authored by him. You want to talk to him, or me?" *Id.* The fact that Clapp had written the annex was not revealed until years later, in discovery actions filed in the United States.

483      PX 2478A (June 13, 2007 *Crude* Clip).

116

G.      *Donziger's Explanation*

The foregoing facts were not seriously disputed at trial.  None of Fajardo, Yanza, nor Cabrera – all of whom were centrally involved – submitted to a deposition or testified at trial. Donziger, however, over time has attempted to avoid responsibility in a variety of ways including denial followed by various explanations, justifications and evasions in efforts to portray these events in a benign light.  None has merit.

As will be seen, Donziger initially attempted to keep his and his confederates' role in the Cabrera episode and Report secret – even from some of his co-counsel – and vehemently denied any accusation that the LAPs had been involved in drafting the Cabrera Report.  By late 2010, however, the truth of the Report's authorship had been revealed to such a degree that Donziger no longer could deny it.  So he began to offer a new explanation: Stratus wrote the bulk of the report, he acknowledged, but that was acceptable under Ecuadorian law.  He testified at trial: "Although I often have been confused about the issues involved,[484] I now believe the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador law, custom and practice as it was occurring in the *Aguinda* case.  Certainly, I never understood that any actions I took or of which I was aware at the time were impermissible in Ecuador."[485]

Donziger's belated admission and explanation is incomplete and unpersuasive.  It does not square with the facts.  He does not explain why, for example, he went to such great lengths to keep the firm's involvement secret if he believed Stratus' drafting of the Cabrera Report was

---

[484]

        The Court does not credit this claim of confusion.  Donziger was the architect of all that occurred with respect to the Cabrera Report and is intimately familiar with all the details.

[485]

        DX 1750 (Donziger Direct) ¶ 91.

117

permissible.  Nor does he (nor can he) square his statement that the "process used to create" the report was consistent with Ecuadorian law, custom and practice with the fact that the Lago Agrio court on multiple occasions instructed Cabrera to conduct his work impartially and independently of the parties.[486]

Nor is Donziger's explanation consistent with the fact that Cabrera himself – most likely at the direction of the LAP team – wrote to the court several times to deny any coordination with the LAPs.  On July 23, 2007, in response to objections by Chevron, Cabrera wrote to the court: "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."[487]  In October of that year, he wrote again: "I have performed my work with absolute impartiality, honesty, transparency and professionalism.  I reject the descriptions or attacks that have been leveled against me alleging that I am biased toward one of the parties, and I also reject the unfounded accusations that I am performing my work surreptitiously.  That is completely untrue."[488]  Later that month, he

---

[486]

On October 3, 2007, for example the court issued an order which stated that Cabrera "is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth. . . . The Expert is responsible for the opinions, for the conclusions made by the professionals making up his team and assisting with the preparation of the report."  PX 348 (Oct. 3, 2007 Lago Agrio Court Order), at 2.  And on October 22, 2007, the court issued an order stating that "Richard Cabrera[] is informed that he must personally prepare and work on the expert report, taking into account the scientific, technical, and legal standards of both a universal nature and those in effect here."  PX 352 (Oct. 22, 2007 Lago Agrio court Order), at 6-7.

[487]

PX 281 (July 23, 2007 Ltr. from R. Cabrera to Lago Agrio court).

[488]

PX 283 (Oct. 11, 2007 Ltr. from R. Cabrera to Lago Agrio court); *see also* PX 286 (Oct. 30, 2007 Ltr. from R. Cabrera to Lago Agrio court) ("I have fully and faithfully complied with the instructions you gave in each order and at the meetings that were held during the sample collection process.").

118

wrote again: "I can only confirm my commitment to continue my work with absolute impartiality, honesty and transparency."[489]

Indeed, the LAPs' lawyers themselves, in responding to Chevron's objections in Ecuador concerning Cabrera's independence, wrote that the objections were "based completely on the baseless concept of a 'conspiracy' of which there is no evidence, for this reason the [objection] is completely unfounded and must be rejected as well as sanctioned given that it was lodged for the sole purpose of damaging the Lago Agrio Plaintiffs' case and tarnishing the good name of the distinguished Superior Court of Nueva Loja."[490]   Donziger does not explain why his legal team dissembled to the court about their arrangement with Cabrera if there was nothing wrong with it.[491]

The Court rejects Donziger's excuses entirely.  He knew at all times that his actions were wrongful and illegal.

---

[489]

PX 287 (Oct. 31, 2007 Ltr. from R. Cabrera to Lago Agrio court).

[490]

PX 354 (Oct. 29, 2007 Motion).

[491]

One of defendants' Ecuadorian law experts testified as follows: "Q.  So if I understood you, if Cabrera received information from a U.S. firm called Stratus and the plaintiffs submitted it and he adopted it, his obligation was to say in his report 'This information came from Stratus'? [colloquy omitted] A. . . . I'm being asked for an opinion that were not the subject of my [written] opinion.  But nonetheless, I reaffirm if the Court-appointed expert were to incorporate information that is not his and did not expressly acknowledge that, the – the expert would be lying.  And if that is proved, he would be subject to a criminal – criminal proceedings for providing false testimony."  DI 1413-12 (Albán Dep. Tr.), at 66:14-67:3.  Further: "Q.  For example, when the expert passes off someone else's work as his own without attributing it to the person who submitted it? [objection omitted].  A.  I answered previously that the expert's silence on the true source or origin of that information would constitute false testimony."  *Id.* at 107:9-16.

The same expert testified that the passing off of Cabrera's ghostwritten work plan was inappropriate, DI 1400-4 (Albán Dep. Tr.), at 112:8-17, and that Cabrera's attendance at the March 3, 2007 meeting and the discussion about ghostwriting his report and keeping that information from Chevron was "irregular, arbitrary and illegal."  *Id.* at 126:1-16.

119

*VI.     The Pressure Campaign Continues  – The LAP Team Turns Up the Heat By Pressing for Indictment of Former Texaco Lawyers.*

While all this was going on, political events in Ecuador took place that came to have major implications for the Lago Agrio case.  The background begins with the fact that the LAPs had been concerned from the very outset of the Lago Agrio case with the possibility that the release signed by the ROE in its final agreement with Texaco would wipe out or prejudice the LAPs' claim. So in 2003, the LAPs began pressing for a criminal prosecution of Texaco lawyers based on alleged fraud in connection with the release and the conclusion of the Texaco-ROE relationship.  Their purpose was plain – to force Chevron to settle the lawsuit.  As Donziger wrote in his personal notebook on October 4, 2005:

"Idea to pressure the company, get major press in U.S. . . . and compel the Ec govt to act against the company legally to nullify the remediation contract."[492]

He emphasized two days later that:

"[t]he key issue is criminal case. Can we get that going? What does it mean? I really want to consolidate control with contract before going down a road that I think *could force them to the table for a possible settlement.*"[493]

The LAPs initially did not have much success.  The Prosecutor General in 2006 issued a report requesting the dismissal of the charges of falsification of documents, stating that he had found no evidence to support them.[494]  Around the same time, the prosecutor issued a report finding no improper conduct on the part of Pallares and Reis Veiga, the Texaco lawyers, and

---

[492]     PX 170 (Donziger Notebook).

[493]     PX 172 (Donziger Notebook) (emphasis added).

[494]     PX 252 (Order by Dr. Cecilia Armas Erazo de Tobar in Preliminary Criminal Investigation).

requested dismissal of the investigation.[495]  Despite the prosecutors' requests, however, Ecuador's

highest court did not terminate the investigations.[496]

       The court's action coincided with a political development in Ecuador – the 2006

election of Rafael Correa as president.  President Correa's influence over the judiciary is described

elsewhere.   For present purposes, however, Donziger explained the fundamental change that the

election had worked.  The LAPs had "gone basically from a situation where we couldn't get in the

door to meet many of these people in these positions [in the government] to one where they're

actually asking us to come and asking what they can do. . . ."[497]  The LAPs "ha[d] connections" with

the new administration, Donziger said. "[T]hey love us and they want to help us . . . ."[498]

       In March 2007, President Correa met with Yanza, Ponce, and others and offered "all

the endorsement of the National Government to the Assembly of Affected by the oil company

Texaco."[499]  The following day, the media agent for the LAP team who was present for the meeting

reported to Donziger that:

---

[495]

       PX 256 (Submission by Dr. M. Vega Carrera in Preliminary Criminal Investigation No. 25-2004); PX 259 (Filing by W. Pesantez in Cause No. 25- 2004); PX 261(Prosecutor General's Ratification of Dismissal of Criminal Action).

[496]

       PX 3000 (Reis Veiga Direct) ¶ 77; PX 258 (Filing by J. German in Preliminary Criminal Investigation No. 146-2003).

[497]

       PX 16A (Dec. 6, 2006 *Crude* Clip), at CRS138-01.

[498]

       *Id.*; *see also* PX 192 (Donziger Notebook) ("Met interim [Attorney General] with Luis [Yanza], APV [Ponce], Raul. 'The door is always open' he said to Luis – a far cry from the days of the protests, fighting our way into the halls of power.  Think of what has happened in ten years – how we have gone from fighting on the outside of power, to being on the inside.").

[499]

       PX 484R (Mar. 20, 2007 ROE Press Release), at 1 of 3.

> "THE PREZ WAS VERY UPSET AT TEXACO.  HE ASKED THE ATTORNEY GENERAL TO DO EVERYTHING NECESSARY TO WIN THE TRIAL AND THE ARBITRATION IN THE U.S. . . . THIS SATURDAY HE WILL REPORT ON THE MATTER ON NATIONAL TELEVISION, OFFICIALLY NOW.  AT THAT TIME HE WILL CLARIFY SEVERAL POINTS IN ORDER NOT TO HURT US IN THE TRIAL."[500]

In a further note, the LAPs' media agent wrote that President Correa "GAVE US  FABULOUS SUPPORT.  *HE EVEN SAID THAT HE WOULD CALL THE JUDGE.*"[501]  Fajardo and Prieto met with ROE officials the following week and asked for assistance in providing President Correa with a basis for reopening the "investigation for . . . the responsible parties."[502]

A month later, President Correa boarded a helicopter with Yanza, Fajardo, and others and toured the Lago Agrio oil fields.[503]  He issued a press release that same day calling upon the "District Attorney of Ecuador to allow a criminal case to be heard against the Petroecuador officers who approved the" Final Release.[504]  Donziger, who was in Colorado meeting with Stratus, noticed that President Correa had not mentioned the Texaco lawyers in his statement and reflected that it might be the right moment "to ask for the head of Pérez-Pallares [a Texaco lawyer who had been involved in Texaco's agreements with the ROE] – given what the President said."[505]  He explained

---

[500]

PX 844 (Mar. 21, 2007 Email from M. Eugenia Yepez Relegado to S. Donziger re: "report") (emphasis in original); *see* Tr. (Ponce) 2303:20-2304:2.

[501]

*Id.*  (capitals in original, other emphasis added).

[502]

PX 54A (Mar. 29, 2007 *Crude* Clip), at CRS-221-02-CLIP-01.

[503]

PX 487R (Apr. 25, 2007 ROE Press Release).

[504]

PX 489R (Apr. 26, 2007 ROE Press Release).

[505]

PX 58A (Apr. 26, 2007 *Crude* Clip), at CRS-268-000-CLIP-01.

that the President was "basically calling for the heads of government officials that signed off on the remediation, and he's totally with us."[506]

President Correa took to the radio on April 28, 2007, denouncing the "homeland-selling" lawyers defending Chevron-Texaco, "who for a few dollars are capable of selling souls, homeland, family, etc," and calling for criminal prosecution of anyone who had signed the "shameless" Final Release.[507]

Fajardo met with President Correa again in June 2007. He reported that the president had informed him that "the current . . . Prosecutor General . . . is . . . a little nervous. Because, since the political forces of the National Congress have changed . . . he is afraid of being removed. . . . So, the President thinks that if we put in a little effort at the Public Prosecutors' office, the Attorney General will yield, and will re-open that investigation into the fraud of . . . the contract between Texaco and the Ecuadorian Government."[508]

Notwithstanding the pressure from the LAPs and President Correa, the Prosecutor General refused to re-open the case. But his refusal cost him dearly. He immediately was removed from office and replaced by Dr. Washington Pesántez – President Correa's college roommate and the district prosecutor who previously had recommended the dismissal of the criminal charges twice before.[509] Several months later, however, and following a meeting with Fajardo, Pesántez agreed

---

[506]
     *Id.*

[507]
     PX 853 (Apr. 28, 2007 Transcript of Correa Radio Address).

[508]
     PX 75A (June 8, 2007 *Crude* Clip), at CRS376-03-CLIP-01.

[509]
     PX 358 (Nov. 29, 2007 Official Register of the Government of Ecuador: Mandate No. 1 of the Constituent Assembly), at 3; PX 259 (Mar. 13, 2007 Filing by W. Pesantez in Cause No.

123

to reopen the criminal case.[510]   Fajardo reported to Donziger on March 11, 2008: "I have an appointment with the Prosecutor tomorrow morning, we are insisting that he reopen the criminal investigation against Texaco for the remediation."[511]   And a few weeks after that, Fajardo wrote to Donziger and members the Ecuadorian LAP team:   "We received an email from Esperanza [M]artinez, Alberto Acosta's advisor . . . . [i]t says 'on March 25, 2008, the investigation was reopened, with the objective of gathering new and sufficient information, if applicable, filing a criminal action.' . . . . This is urgent . . . let's get in all possible evidence . . . . If things work out, our buddy Ricardo could go to jail . . . ."[512]

While the LAPs were the driving force behind the criminal case, Donziger instructed his team to deny any involvement in it – and to tell the ROE officials to do the same.  He wrote to the LAP team in August 2008: "We [must] explain to all the ministers and to Correa that they shouldn't say ANYTHING publicly about the case except that the government has nothing to do with it.  That is key."[513]   And a month later he instructed Fajardo that:

> "The party line when the media or anyone else asks about the Prosecutor's case should be: 'The criminal case against Chevron's lawyers and against public officials is not our battle. We are totally focused on winning the civil case, which has nothing

---

25-2004), at 10; PX 261 (Prosecutor General's Ratification of Dismissal of Criminal Action), at 12; PX 300 (Reis Veiga Direct) ¶ 96.

[510]

PX 992 (Mar. 11, 2008 Email from P. Fajardo to S. Donziger).

[511]

*Id.*

[512]

PX 1033 (Apr. 23, 2008 Email string between S. Donziger, P. Fajardo, A. Ponce, J. Sáenz, J. Prieto, and L. Yanza re: "URGENTE").

[513]

PX 1058 (Aug. 11, 2008 Email from S. Donziger to LAP team re: "Problem") (emphasis in original).

to do with what the <u>Prosecutor</u> does. . . .' DON'T GET IN THE BATTLE – THIS IS VERY IMPORTANT IF WE SAY THAT WE AGREE WITH THE PROSECUTOR'S OFFICE, IT COULD BE USED TO UNDERMINE THE INTERESTS OF OUR CLIENTS IN THE US."[514]

Donziger perhaps sought to keep the team's involvement secret for an additional reason as well – he realized it could harm him personally.  He later wrote to his team in a different context that "[i]n the US, threatening to file a criminal case to get an advantage in a civil case is considered a violation of ethical rules of the profession."[515]

Over the ensuing years, President Correa's support for the LAP team grew more vocal.  And while we jump ahead of developments in the lawsuit itself, it is useful to complete the tale of the attempted criminal prosecution of Texaco lawyers before returning to the civil litigation.

On July 4, 2009, President Correa stated in his weekly presidential radio address that he "really loathe[d] the multinationals . . . . Chevron-Texaco would never dare do in the United States what it did in Ecuador."[516]  A few months later he stated in a radio broadcast: "Of course I want our indigenous friends to win."[517]

On April 29, 2010, the Prosecutor General's office issued an opinion formally accusing Reis Veiga and Pérez-Pallares of the crime of *falsedad ideologica*.[518]  The opinion cited,

---

[514]

   PX 1069 (Sept. 19, 2008 Email from S. Donziger to P. Fajardo and others re: "important suggestions about the media") (emphasis in original).

[515]

   PX 8058 (Jul. 18, 2010 Email from S. Donziger to J. Sáenz, J. Prieto, and P. Fajardo).

[516]

   PX 1149 (July 4, 2009 Transcript of President Correa's Weekly Radio Program).

[517]

   PX 2494 (Sept. 12, 2009 Reuters Article).

[518]

   PX 272 (Prosecutor's Office Opinion in connection with Instruccion Fiscal No. 09-2008-

125

among other things, the Cabrera Report as evidence of Texaco's contamination.[519]  Nevertheless, on June 1, 2011, the First Criminal Division of the National Court of Justice in Ecuador formally dismissed the charges.[520]

President Correa's alliance with the LAPs and animosity toward Chevron did not go away with the dismissal of the criminal charges.  He since has publicly attacked Chevron in multiple press releases, television and radio broadcasts, speeches, and presentations throughout the world.[521] He has referred to Chevron's attorneys as "homeland-selling lawyers."[522]  He has labeled Chevron an "enemy of the court."[523]  After the Judgment was issued, he praised it has an "historic" ruling[524] And, as will be seen, President Correa's support for the LAP team has been used to benefit defendants in this case as well.

---

[519]  DRR).

*Id.* at 95.

[520]  PX 407 (June 1, 2011 Opinion of National Court of Justice, First Criminal Division).

It is more likely than not that this occurred because the pendency of the criminal charges had become disadvantageous to Donziger and the LAPs in U.S. litigation because it was a factor in the success of Chevron and the former Texaco lawyers in obtaining discovery here that the LAPs wished to prevent.  *See, e.g.*, *Chevron Corp. v. Donziger*, 11 Civ. 0691 (LAK), 2013 WL 646399, at *9-10 (S.D.N.Y. Feb. 21, 2013) (describing circumstances).

[521]  *E.g.*, PX 7511 (Aug. 17, 2013 *Agence France-Presse* Article); PX 7516 (Sept. 14, 2013 Tr. of Pres. Correa Statement); PX 7518 (Sept. 16, 2013 El Telegrafo Article); PX 7519 (Sept. 17, 2013 *El Telégrafo* Article); PX 7520 (Sept. 21, 2013 Tr. of Pres. Correa Statement); PX 7526 (Sept. 28, 2013 Tr. of Pres. Correa Statement).

[522]  PX 853 (Apr. 28, 2007 Tr. of Pres. Correa's Weekly Radio Program).

[523]  PX 7511 (Aug. 17, 2013 *Agence France-Presse* Article).

[524]  PX 2503 (Feb. 19, 2011 *Ultimahora* Article).

VII.    *The Third Phase of the Lago Agrio Case – 2009-2010: Evidence of the Cabrera Fraud Begins to Come Out, Kohn Leaves the Case, New Financing Is Found, and the Case Proceeds in Lago Agrio*

Up to this point, this opinion has proceeded more or less chronologically.  In 2009, however, important sequences of events, each with its own relevant chronology, began taking place.  In order better to explain the facts, this section addresses the important sequences, each in its own chronological order.  But it is important to bear in mind that everything that went on during this period – in Ecuador, the United States, and elsewhere – was interrelated.

A.    *Donziger's Assumption that What Happens in Ecuador, Stays in Ecuador*

Relatively early in the Lago Agrio case, Donziger made a critical assumption.  He assumed that Chevron never would be able to obtain evidence of what transpired in Ecuador.  Evidence that he thought so appears in a June 2006 exchange he had with Atossa Soltani, head of Amazon Watch, that was recorded by the *Crude* film makers.

On that occasion, Donziger and Yanza – with the cameras recording every word – related to Soltani their plans for creating what they called a private army, ostensibly to protect the court against corruption, a euphemism for surrounding the court with LAP supporters to pressure it to do what they wished.  For present purposes, however the important part of the conversation was this exchange between Soltani and Donziger:

"SOLTANI:    Do you guys know if anybody can, uh, subpoena these videos?   That is a – how do you [unintelligible]

DONZIGER:    We don't have the power of subpoena in Ecuador.

SOLTANI:    What about U.S.?   These guys . . . [referring to the film makers]

127

> DONZIGER:      An army – it's not an armed army– it's a group of people to
>                watch over the court . . .
>
> SOLTANI:       I just want you to know – I just want you to know that it's –
>                it's illegal to conspire to break the law."

Following a round of laughter, Donziger responded that "[n]o law's been conspired to be broken."[525]

Donziger's belief that Chevron would not be able to obtain discovery from Ecuador has proved true to a large extent. Indeed, defendants repeatedly have refused to produce documents from Ecuador, claiming that Ecuadorian law prevents them from doing so. And this in serious respects has impeded Chevron's efforts to litigate its case. But the assumption that what happens in Ecuador, stays in Ecuador fails to the extent that one hires an American film crew to capture many of his litigation-related moves over the course of three years in Ecuador and the United States. And it did not account for the fact that certain of the important players in this case – most notably the *Crude* film makers, Stratus, and Donziger himself – were U.S. residents and therefore subject to U.S. rules of discovery.

Beginning in 2009, Chevron began obtaining subpoenas under 28 U.S.C. § 1782 to require production of documents and testimony from persons in the United States who had relevant evidence. Thus, while defendants did not produce meaningful discovery from Ecuador, Chevron obtained some evidence of what transpired there.

### B.      The Release of Crude

The documentary film called *Crude* was made because Donziger in 2005 recruited

---

[525]    PX 68A (June 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-02.

128

film maker Joe Berlinger to portray the LAPs' case against Chevron.[526] The film featured Donziger quite prominently.   Donziger provided Berlinger, cameraman Mike Bonfiglio, and other crew members expansive access to himself, his team and some of its activities for nearly the next three years.[527]  The ultimate product, *Crude,* first was released in January 2009.[528]

The *Crude* team's independence from Donziger and the LAPs' lawyers – to the extent there was any at all – was limited.[529]  For one thing, Donziger recruited the film's main source of funding: his former classmate Russell DeLeon.[530] As Donziger wrote: "R[u]ss is funding the case. Russ is funding the movie.  And Russ wants to fund more cases and more movies."[531]  Through his

---

[526]

Berlinger testified in a related proceeding that "During the summer of 2005, a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door.  He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker to tell his clients' story." *Chevron Corp. v. Berlinger*, 629 F.3d 297, 302-03 (2d Cir. 2011) (quoting *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010)) (emphasis omitted).

[527]

The video was shot in Ecuador and in the United States during the period approximately January 2006 through September 2008.  PX 1 (*Crude* Annotated Tape Log).

[528]

Tr. (Donziger) 2567:22-25.

[529]

Donziger often instructed Bonfiglio and Berlinger to stop filming when he did not like what was being said.  *E.g.*, PX 46A (Mar. 4, 2007 *Crude* Clip), at CRS197-00-CLIP 3.  In the months leading up to *Crude*'s release in January 2009, Donziger and Fajardo were in close contact with Berlinger and Bonfiglio – to discuss budgeting, to coordinate press strategy, and to ensure that the film makers and the LAP team were putting forth the same message. Donziger wrote to Bonfiglio that "there will be certain questions asked of us that you might want to advise us on how to position – such as funding sources, questions of bias, etc.  [W]e need to show independence from each other but we should be on the same page as to how that will play out."  PX 1090 (Dec. 23, 2008 Email from S. Donziger to M. Bonfiglio).

[530]

PX 203 (Donziger Notebook).

[531]

*Id.*

129

creation and sole ownership of a production company called Crude Investment, Inc., DeLeon contributed approximately 60 percent of the film's total funding.[532]

Nonetheless, just as they had done with Cabrera, Donziger and his team attempted to create the appearance that the film was independent, while they controlled or influenced its content from behind the scenes. Ironically, this ultimately contributed to the "outing" of their true role with respect to Cabrera.

In December 2008 – one month before *Crude* first was exhibited – Donziger received a director's cut of the film.[533] One scene showed Dr. Carlos Beristain – a member of Cabrera's supposedly neutral staff – working directly with the LAPs and their lawyers, including Donziger. Donziger requested that Berlinger delete the Beristain images and other material.[534] Fajardo made the same request to Bonfiglio, emphasizing that if the scene with Beristain were left in the film, "the entire case will simply fall apart on us. . . . Those two guys [Beristain and Adolfo Maldonado, another supposed neutral] must not appear in the documentary at all! Please, remove them from it. It really isn't much, but it can complicate the entire case for us."[535]

Berlinger and Bonfiglio initially did not comply, and the film – with the Beristain

---

[532]

PX 4900 (Dahlberg Direct) ¶ 97.

[533]

Donziger Dec. 22, 2010 Dep. Tr. at 1569:16-19; PX 2465 (Dec. 13, 2008 Email from S. Donziger to A. Woods re: "tell me what u think of this"). Donziger testified that he sent this list also to Berlinger. Donziger Dec. 22, 2010 Dep. Tr. at 1570:21-1571:5.

[534]

Donziger Dec. 22, 2010 Dep. Tr. at 1571:6-1572:2. The list included also a note that the film's "scene of me [Donziger] telling Trudie [Styler] to only use Texaco is gratuitous and not necessary." PX 2465 (Dec. 13, 2008 Email from S. Donziger to A. Woods re: "tell me what u think of this").

[535]

PX 1091 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio).

130

scene – was shown at a film festival.[536]   But Fajardo persisted, again imploring Berlinger and Bonfiglio to "remove the images" of Beristain "before the film is shown more widely, and before it is sold to a distribution company."[537]  He explained that the images were "*so serious that we could lose everything . . . .* "[538]  Berlinger ultimately removed the Beristain images from the scene, and they were not included in the version released on DVD.[539]  They were left, however, in the version of the film that streamed over Netflix.  Someone at Chevron noticed.

The deleted images seemed to Chevron to confirm its suspicion that Cabrera had been neither neutral nor independent.  Parenthetically, the attempt to have them removed evidenced the Donziger and Fajardo's awareness that their relationship with Cabrera and his staff had been improper and, indeed, could prove fatal to the Lago Agrio case.  As Fajardo wrote, "we could lose everything."

---

[536]

PX 1097 (Jan. 22, 2009 Email from P. Fajardo to M. Bonfiglio).

[537]

*Id.*

[538]

*Id.*

[539]

PX 1097 (Jan. 22, 2009 Email from J. Berlinger to M. Bonfiglio and A. Spiegel).

C.      *The Section 1782 Proceedings*

      *1.*      *The Section 1782 Action Against Stratus – Denver Counsel Withdraw and Donziger and Fajardo Seek to Obstruct Justice Before the Federal Court*

In December 2009, Chevron brought a Section 1782 proceeding against Stratus and related individuals in the District of Colorado.[540]  It argued that discovery was appropriate because similarities between the Cabrera Report and documents published by people working with Stratus, as well as documents produced by Stratus in a mediation proceeding, suggested that Stratus had written all or at least part of the Cabrera Report.[541]  It contended that it was entitled to discovery to determine the degree to which that in fact was so as well as the LAPs' involvement in the process.[542]

Realizing that disclosure of Stratus' documents would reveal the LAP team's relationship with Cabrera, the LAPs' lawyers immediately sought to (1) prevent Chevron from obtaining discovery from Stratus, and (2) minimize the effects of any discovery that it might obtain.

      *a.*      *Donziger Retains U.S. Counsel to Represent the LAPs in Denver*

Shortly after Chevron filed the Colorado Section 1782 action against Stratus, Donziger retained attorneys John McDermott of Denver firm Brownstein Hyatt Faber Schreck, LLP, and Jeffrey Shinder of the New York City-based Constantine Cannon firm as counsel for the LAPs

---

[540]

      *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.).

[541]

      *Id.*, DI 2 (Chevron Corp. Mem. in Support of § 1782 Application), at 8 & n.7.

[542]

      *Id.*

to oppose the Section 1782 petition.[543]   Donziger assured them that Cabrera had been an "independent" "court-appointed Special Master."[544]  And Shinder, whom Donziger sought to interest also in the much larger engagement of seeking to enforce the Ecuadorian judgment that the LAPs already expected, testified that:

> "the purported independence of the expert [Cabrera] was important in our [*i.e.*, his and Donziger's] conversations. It was of obvious significance. It was of significance to me in evaluating the possibility of being enforcement counsel that the process had integrity and it was the kind of process that would withstand scrutiny should we take that judgment and try to enforce it in an American court, and that the expert was supposedly independent and had done a review of the evidence that had procedural integrity was consequential and something we discussed."[545]

So, before agreeing to represent the LAPs, Shinder wanted to know if anything Chevron had alleged in its Section 1782 application was true.  He met with Donziger in New York City in January 2010 to discuss the proceeding and his potential retention.

Shinder observed that Donziger was "worried, borderline sort of panicked over" the 1782 proceeding.[546]  Shinder asked him:

> "['']Steven, what am I going to find?[']  I need access to the facts. [Donziger] denied [Chevron's] allegations.   And the facts as he portrayed them to me were that Chevron was trumping up this allegation that Stratus had essentially ghostwritten the

---

543

PX 1213 (Jan. 23, 2010 Email from S. Donziger to J. Shinder); PX 2356 (Feb. 26, 2010 Email from E. Engelhart to S. Donziger re: "Chevron petition") (attaching draft engagement letter); Donziger Dec. 29, 2010 Dep. Tr. at 2353:17-2354:21, 2381:15-18.

544

Tr. (Shinder) 1262:2-9; PX 7608 (Jan. 19, 2010 Email from S. Donziger to J. McDermott), at 14; PX 1241 (Mar. 5, 2010 Email from S. Donziger to J. Shinder), at 2 of 4 ("selection of Cabrera was made independently by the court," "Cabrera conducted dozens of independent site inspections and lab analyses").

545

Tr. (Shinder) 1262:14-23.

546

*Id.* 1272:21-22.

Cabrera report by sort of drawing improper inferences from materials that had been properly submitted to Mr. Cabrera through the process in Ecuador, that Cabrera had independently taken in those materials, and independently chose to incorporate them into his report. . . . I had been told that there was no, quote unquote, relationship between Stratus and Mr. Cabrera.  That to the extent there were any similarities between the Cabrera report and work that Stratus had done, that that was the result of Mr. Cabrera's independent judgment . . . . "[547]

A few weeks after their New York meeting, Donziger sent Shinder a list of "responses to allegations that Chevron was making against the Lago Agrio plaintiffs and in, particular, Cabrera and his report."[548]   The list contained several purported responses to what Donziger called Chevron's "misrepresentations" about the Cabrera Report:[549]

"Fact:  The Amazon Defense Coalition (ADC) [*i.e.*, the ADF] has never made *any* payments to Dr. Cabrera, or any other court official, beyond what has been required by court under Ecuadorian procedural rules to satisfy the costs of the trial. . . .

Fact:   The Cabrera report is an independent review and assessment of the voluminous evidence in the case. Some small analyses provided by the parties through regular court procedures were adopted by Cabrera after his own independent assessment determined they were technically sound and consistent with the evidence. This process is entirely proper, routine, and consistent with the practice of judges and experts in the United States and other countries. . . .

Fact:  Representatives of the ADC never conducted Dr. Cabrera's field work or prepared samples for him. During the course of Dr. Cabrera's site assessments both sides were allowed to observe his work and suggest places for his team to sample for evidence of contamination. . . ."[550]

---

547

    *Id.* 1268:17-1269:21.

548

    *Id.* 1275:5-7; PX 1224 (Feb. 9, 2010 Email from S. Donziger to J. Shinder re: "interested in your thoughts").

549

    PX 1224 (Feb. 9, 2010 Email from S. Donziger to J. Shinder re: "interested in your thoughts").

550

    *Id.*

These assertions were false or misleading.  The LAPs did pay Cabrera outside the

court process via the ADF secret account.[551]  Cabrera was not independent.  And the LAP team,

through Stratus,  performed all or much of "his" work.  But Shinder did not know any of that at the

time.  He relied on Donziger's representations that Cabrera had been independent and neutral.  He

did, however, ask Donziger about the "small analyses" that apparently had been provided to Cabrera

by the parties.[552]  Donziger told him that the LAPs had provided to Cabrera "approximately 3,000-

plus pages of documents . . . [c]onsistent with the process that had been set up, that the court had

approved, both parties had an opportunity to submit materials to Cabrera, and the plaintiffs had

properly availed themselves of that opportunity and sent 3,000-plus pages to Cabrera."[553]  Shinder

requested that Donziger provide those materials to him.  He never did.[554]

       *b.*     *Beltman Discloses the Truth to Shinder – Denver Counsel Withdraw*

Nonetheless, relying on Donziger's representations about Cabrera's independence

---

[551]

    Amazon Defense Coalition seems to have been used interchangeably with Amazon Defense Front in references to the Frente de la Defensa de la Amazonia.  *E.g.*, PX 2389R (Hugo Camacho Naranjo's Objections and Responses to Chevron Corps' First Set of Requests for Prod. of Documents) ¶ 31; PX 700 Defin. 5; PX 1504 (included papers).

[552]

    Tr. (Shinder) 1276:2-11.

[553]

    Tr. (Shinder) 1276:4-10; *see also* PX 1244 (Mar. 8, 2010 Email from S. Donziger to J. Shinder and L. Minnetto) ("With respect to the Stratus documents . . . we have determined that a package of material (approx. 3,000 pages) was submitted by local counsel to the court in early 2008 in response to a court order asking both parties to turn over any materials they thought might assist Cabrera in carrying out his mandate.  While we do not know (yet) precisely what documents may have been submitted, all documents would only have been submitted directly to Cabrera to assist him in preparation of his report . . . .").

[554]

    Tr. (Shinder) 1276:12-15.

135

and the propriety of the Report, Shinder entered into a retention agreement with Donziger and the LAPs and set to work.[555]   He soon set up a day of meetings in Colorado with individual Stratus personnel, the last of which was with Doug Beltman.[556]   Shinder testified that the interview with Beltman was scheduled to last two hours, and he

> "need[ed] every minute of the two hours to interview him. I had sort of accumulated some sense during the day, although it was incomplete, and certainly paled in comparison with what I heard from Mr. Beltman, that Stratus's involvement in the Cabrera report was much deeper and much more problematic than had been characterized to me.  I approached the interview in a way, I wanted to maintain a kind of collegial, conversational tone so Mr. Beltman and I could develop a good rapport, which I think was achieved. I asked him a lot of detailed follow-ups, contextual follow-ups on things, a lot of questions about his time in Ecuador, how he met Mr. Cabrera, Stratus's work in terms of what they were doing on the case. And over time and the climax, if you will, it was about an hour and 45 minutes in, it became a very forthcoming interview, and about an hour and 45 minutes in *he essentially, quite explicitly . . . admitted to having written significant portions of the Cabrera report.*"[557]

And once "the truth came out . . . there were additional . . . lurid details that [Beltman] admitted to, such as Stratus had essentially . . . ghostwritten the Cabrera report, then Stratus acting as experts for the plaintiffs wrote comments to their own work, and then wrote the Cabrera report's responses to their own comments."[558]   Beltman told Shinder that "everything he did was sort of under the

---

[555]

PX 1255 (Mar. 15, 2010 Email from A. Woods to L. Minnetto, J. Shinder, and S. Donziger) (attaching retention agreement).

[556]

Tr. (Shinder) 1285:12-22.

[557]

*Id.* 1288:6-1292:7 (emphasis added).

[558]

*Id.* 1292:11-17.

instruction and supervision of Mr. Donziger and the lawyers who were handling the case."[559]

The following day, Shinder spoke with his firm's ethics counsel and one of the managing partners. They "agreed that the firm could not continue to represent Mr. Donziger and the Lago Agrio plaintiffs."[560]  Shinder immediately called Donziger and informed him that the firm had decided to withdraw.[561]  He told Donziger that he "thought that to the extent there was an underlying case to be made regarding the environmental damage in Ecuador, that the conduct that I learned had irretrievably wounded it, that it could not rely on the Cabrera report since it was not independent, and I was not his lawyer anymore, so I wasn't going to counsel him on what, if anything, to do to try to fix the situation, but it bothered me, and it still bothers me, that we'll never know whether or not there was a case to be made against Chevron."[562]

---

[559]

Id. 1295:25-1296:2.

The testimony of Shinder, Donziger, Stratus attorney Martin Beier, and Beltman conflicted as to whether Donziger was present during this meeting.  See DX 1750 (Donziger Direct) ¶ 104 (not present); Donziger Jan. 29, 2011 Dep. Tr. at 3639:4-8 (same); Beier Dep. Tr. at 83:1-4 (meeting included Beltman, Beier, Shinder, Page); id. at 90:7-11 (meeting included "Jeff Shinder, Doug Beltman, Aaron Marr Page, Joe Silver.  At the very beginning, possibly before the meeting formally convened, Steven Donziger was there.  But he left and was not present during the interview"); Beltman Oct. 6, 2010 Dep. Tr. at 383:20-21 (Donziger present).

The Court finds that he was not.

[560]

Tr. (Shinder) 1298:1-4.

[561]

Id. 1298:5-8.

[562]

Id. 1298:21-1299:4; PX 1262 (Mar. 19, 2010 Email from J. Shinder to S. Donziger re: "Constantine Cannon Withdrawal").

The Brownstein firm withdrew as well.  After Shinder's withdrawal, John McDermott of the Brownstein firm asked to speak with him.  Donziger gave Shinder permission to speak to McDermott and told Shinder he could be fully forthcoming about reasons for his withdrawal.

Donziger fully understood the significance of Beltman's revelations given the falsehoods Donziger and his LAP team repeatedly had told about Cabrera and his report. The very next day he wrote a second of his infrequent memos to "file" that purported to describe the recent withdrawals of counsel.[563] Indeed, a few weeks later, Donziger drafted a letter to "fellow counsel," which he apparently never sent, in which he acknowledged that:

> "The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus, Cabrera violated his duties to the court. Under this perspective, treating Cabrera like a U.S.-

---

PX 1264 (Mar. 19, 2010 Email chain Between J. Shinder and S. Donziger); Tr. (Shinder) 1301:15-25.   Shinder spoke with McDermott two or three days later, and informed him of what Shinder had learned during his interview with Beltman. *Id.* at 1302:10-1303:1. On March 21, 2010, the Brownstein law firm withdrew as well. PX 1269 (Mar. 21, 2010 Email from J. McDermott to S. Donziger re: "Chevron v. Stratus"). McDermott wrote to Donziger: "Based upon what we have learned regarding Stratus and Cabrera, including the troubling information we gathered in our call with you and Andrew [Woods] and conversations with Jeff Shinder, and our as yet unresolved questions regarding Ecuadorian laws of privilege or confidentiality of materials submitted to the court, we are in an untenable position." *Id.*

[563]

PX 1270 (Mar. 22, 2010 S. Donziger memo to file re: "Denver action/ethical issues").

He wrote that "[w]hile Shinder noted that it was not unusual for court experts to adopt factual findings of the parties, he thought Beltman described a much broader role where Stratus was preparing materials in conjunction with local Ecuadorian counsel to be used and/or adopted by Cabrera in his report." The memo went on to state that Shinder had "made these conclusions without being aware of various court orders in Ecuador asking for the parties to turn over materials to Cabrera to assist him in the preparation of his report, or being aware generally that the parties in the Ecuador litigation . . . generally work very closely with the parties." *Id.* It claimed also that Donziger was "unclear whether the facts a[s] described by Beltman would be considered acceptable or improper by an Ecuadorian court. . . . [and] whether the role of Stratus was consistent with Ecuadorian rules and procedures, per representations by local counsel." *Id.* In fact, however, there were no such uncertainties in Donziger's mind. He had chosen Cabrera for the global expert position because Cabrera would cooperate with the LAPs. He and Fajardo procured his appointment by coercing Judge Yánez. They had caused Stratus to write all or most of his report and then falsely passed that report off – both to the court and to the world press – as the independent work of a neutral, court-selected expert. The Court finds that he had no illusions about the impropriety of what he and his colleagues had done.

138

> style expert as we did [and even that is questionable] will be seen as a violation of local court rules.  Whether the court will see these facts as no big deal, improper, some sort of procedural defect that can be corrected, or (as the [Chevron] lawyers will surely assert) a fraud is uncertain. Our side believes we can weather the storm with good advocacy in both the court and the media, in Ecuador and in the U.S. However, it was not lost on us that our local counsel seemed concerned about how the information would land in Ecuador and what impact it would have on the case, and to them personally. They fully expect that Chevron would refer the information to the national prosecutor for action."[564]

But he once again tried to justify his actions by referring to another perspective that allegedly had been offered by unidentified "local counsel," viz.:

> "that given the customs and practices of the *Aguinda* case, nothing improper happened. The information in the Cabrera report is sound, and is consistent with the high quality of work that Stratus has done as a world class environmental consultancy. As you know, all of the court appointed experts in the judicial inspections have been working closely with the parties in one form or another for several years with full knowledge of the court, and Cabrera was no different. Chevron's experts, including U.S. citizens appointed by the judge at Chevron's request were working with Chevron's counsel. Even though Cabrera was not an expert put forth by the parties, given that the plaintiffs unilaterally sought the global expert report and are paying him, that Chevron boycotted the process, and that the court ordered the parties to turn over materials to Cabrera and otherwise assist him then the role of local counsel and Stratus was well within our rights and custom under the rules and practices of the *Aguinda* case as they had evolved since its inception almost seven years ago."[565]

And this indeed was essentially the position that Donziger took at trial, where he argued that his belief in the second "perspective" justified the LAP team's actions with respect to Cabrera.  He contended also that, while he was unsure at the time,  he now believes "the process used to create the executive summary of the Cabrera report was fundamentally consistent with Ecuador law. . . ."[566]

---

[564]     PX 1291 (Donziger Memo to "Fellow Counsel").

[565]     *Id.*

[566]     DX 1750 (Donziger Direct) ¶ 91.

Donziger's attempt to cover himself in his memo by reference to "another perspective," and his comparable position at this trial, are fabrications and unpersuasive even in their own terms. They are fabrications because he received no alternative perspective from local counsel, identified or otherwise.[567] They are fabrications because no "customs and practices of the *Aguinda* case," even if there had been any comparable practices, could have justified what was done with Cabrera. If similar things were done with comparable experts, they all were wrongful; their acceptability did not improve with the volume of misconduct. They are fabrications because there were no comparable practices. Yes, lawyers work with their own experts, both here and probably in Ecuador. That is accepted because everyone knows that party-nominated experts are selected and paid by their clients. That built-in bias is above board and considered in evaluating the testimony of party-paid experts.[568] But Cabrera was a court-appointed expert, sworn to be independent and impartial. And Donziger fully understood that Cabrera was neither independent nor impartial –

---

[567]

Fajardo understood that the collusion between the LAP team and Stratus on the one hand and Cabrera on the other, not to mention the manner in which Cabrera was appointed and paid, was improper. As we have seen, he implored Bonfiglio and Berlinger to remove the images of Beristain and Maldonado from *Crude* precisely because the presence of those images could lead to discovery of what really had happened. And he was under no illusion that there was any benign explanation for that. He told Bonfiglio that if the images of Beristain and Maldonado were left in the film, "the entire case will simply fall apart on us . . . . Those two guys [Beristain and Adolfo Maldonado, another supposed neutral] must not appear in the documentary at all!" PX 1091 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio). He explained that the images were "so serious that we could lose everything. . . . " PX 1097 (Jan. 22, 2009 Email from P. Fajardo to M. Bonfiglio).

As we will see momentarily, Prieto and other lawyers in the LAPs' Ecuador office were even more aware of the improprieties that had been committed.

[568]

There is only one respect in which Cabrera was even arguably comparable to a party-nominated expert in either country. Although he was court-appointed, the LAPs were responsible for providing the Court with funds to pay him through an open process described above. The secret payments, however, were improper.

140

Donziger was personally responsible for making sure that he was neither and for having him paid under the table, above and beyond the open, court-approved payments.  Moreover, it was Donziger who decided to ghostwrite the Cabrera Report using his own paid consultants and to hide and misrepresent the facts concerning the Cabrera-Stratus-LAP relationship.

In sum, Donziger knew at every step that what he and the LAP team did with Cabrera was wrong, deceptive, and illegal.


c.    *Fajardo Submits a Misleading Affidavit in Denver and Elsewhere*

The District of Colorado granted Chevron's Section 1782 application for the issuance of a subpoena on March 4, 2010.[569]   The LAP team, realizing that production by Stratus was extremely likely in view of that ruling, was  anxious to "minimize the effects" of the court-ordered production of Stratus' documents.[570]   In one of those blinding rays of candor that can occur even in clouds of lies, Prieto, one of the LAPs' lawyers in Ecuador, wrote to Donziger, Fajardo, and others on March 30, 2010 as follows:

> "Today Pablo [Fajardo] and Luis [Yanza] were kind enough to tell us what was going on in Denver, and the fact that certainly ALL will be made public, including correspondence . . . .   Apparently this is normal in the U.S. and there is no risk there, but *the problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail), and we are not willing to minimize our concern and to sit to wait for whatever happens. For us it is NOT acceptable for the correspondence, the e-mails, between*

---

[569]

    *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.), DI 22.

[570]

    PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, P. Fajardo, L. Yanza, and J. Sáenz).

> *Stratus and Juanpa [Sáenz] and myself to be divulged.*"[571]

Thus, Prieto recognized that the disclosure of Stratus' documents would reveal what actually had gone on between Cabrera and the LAPs, that this disclosure would "destroy[] the [Lago Agrio] proceeding," and that "all of us, your attorneys, might go to jail." Nor was he alone in this view – Brian Parker, then an intern at the Selva Viva office, was told by other lawyers working on the case that the Cabrera Report "would be worth zilch" and that Donziger "might get in trouble or lose his license."[572] So Prieto implored Donziger and Fajardo to prevent the disclosure of the emails between Stratus, Sáenz and himself.[573]

Prieto had reason to worry. Less than a month after the District of Colorado granted Chevron's Section 1782 application against Stratus, Chevron filed a 1782 application against Berlinger (the "*Crude* 1782"), seeking the issuance of subpoenas for the outtakes from the *Crude* film.[574] More will be said on the *Crude* 1782 below. For present purposes it is important to note only that, even with production from Stratus imminent, this filing created the added possibility that Chevron would obtain footage of Cabrera and members of his team working directly with members of the LAP team.

The LAP team quickly developed a plan to "cleanse" the Cabrera Report in Ecuador – that is, to provide an alternative evidentiary basis for the Lago Agrio case against the possibility

---

[571]

    *Id.* (emphasis added).

[572]

    Parker Dep. Tr. at 136:1-5.

[573]

    Donziger much later tried to put a very different spin on Prieto's "go-to-jail" email. We conclude below that his attempt was untruthful. *Infra Facts* § XI.A.3.b.iii.

[574]

    *In re Chevron Corp.*, 10 MC 1 (LAK) (S.D.N.Y.), DI 1 (filed Apr. 9, 2010).

142

that the Cabrera Report would be stricken or discredited or be relied upon as evidence of fraud in

a foreign court where the LAPs would seek enforcement of any favorable judgment.  The idea was

to have a new expert or experts repackage, or cleanse, the Cabrera Report.  But the LAPs  needed

to delay the Section 1782 proceeding in Denver as long as possible in order to do that.  So, a month

after the District of Colorado granted Chevron's Section 1782 petition, the LAPs filed a motion for

a protective order with respect to the subpoena.  They claimed that the subpoenaed documents and

testimony were protected from disclosure by the attorney-client privilege and work product

protection.[575]  The motion later was supported by a declaration of Pablo Fajardo (the "Fajardo

Declaration").[576]

        The Fajardo Declaration purported to explain to the Denver court what had happened

with the Cabrera Report and that it was acceptable under Ecuadorian law.  The LAPs' American

lawyers debated what the affidavit should reveal and whether Fajardo should be the one to sign it.

When a lawyer from Patton Boggs – a firm that had been brought on by the LAPs in early 2010 and

the involvement of which will be discussed more fully below –  circulated a draft of the affidavit

to Donziger and other lawyers on May 3, 2010, one lawyer from Emery Celli Brinckerhoff &

Abady, LLC, which also represented the LAPs, responded:

> "I don't quite get the purpose of this affidavit. Pablo mentions one document submission [to Cabrera] but not the other. *If he's submitting an affidavit about what happened, why omit the most important part?* It seems misleading at best. *I just don't see how he can sign an aff. that documents his submissions to Cabrera without mentioning that he sent documents that originated from Stratus which is the one thing the judge is going to want to know . . . . [And] I wouldn't emphasize too much that Cabrera was independent and court-appointed. Once [Fajardo] says that in an*

---

[575]    *Chevron v. Stratus Consulting, Inc.*, No. 10 Civ. 00047 (D. Colo.), DI 68.

[576]    *Id.* DI 99 (filed May 5, 2010).

*American court, we'll never be able to back off from it.*"[577]

Another LAP American lawyer expressed his concern that Fajardo might "be subject to deposition[.] This is why we struggled with who would sign the declaration. If Steve [Donziger] signs, he will most certainly be deposed. Same for any other counsel in the US. We figured that with [Fajardo], they likely would not slow down the process by deposing him."[578]

The Fajardo Declaration that ultimately was filed gave an anodyne description of the process by which the judicial inspections had been terminated, the global expert proposal adopted, and Cabrera in particular selected.  It stated that "[i]n addition to the information collected from the vast amount of field inspections he performed, Mr. Cabrera was also free to consider materials submitted to him by the parties.  Both plaintiffs and Chevron were asked to supply Mr. Cabrera with documents."[579]  It stated also that "to the extent that Mr. Cabrera put into his report any of the information that [Fajardo] supplied to him, it would be viewable by Chevron or any other member of the public that reviewed Mr. Cabrera's Report."[580]

The Fajardo Declaration was highly misleading.  It failed to mention that Fajardo, with Donziger's approval, had threatened the judge with a misconduct complaint unless the judge agreed to their demands to cancel the LAPs' remaining judicial inspections.   And while it

---

[577]     PX 1319 (May 3, 2010 Email from I. Maazel to others) (emphasis added).

[578]     PX 1316 (May 3, 2010 Email from E. Westenberger to others).

[579]     PX 1326 (Fajardo Decl.) ¶ 16.

[580]     *Id.* ¶ 19.

144

acknowledged that the LAPs had "delivered materials to Mr. Cabrera,"[581] it did not mention the March 3, 2007 meeting at which the LAPs laid out the plan for Cabrera's Report and indicated, in Cabrera's presence, that the work would be done by them.  Nor did it reveal that Stratus and the LAPs' counsel in fact had written most of the Cabrera Report.  In other words, it omitted what the Emery Celli lawyer said was "the most important part"—that Fajardo "sent documents that originated from Stratus."[582]   The declaration similarly neglected to report that the LAPS "chang[ed] the focus of [Cabrera's] data at [their] offices."[583] And it, of course, failed to disclose that the LAPs had made secret payments to Cabrera outside the court process.

Notwithstanding the Fajardo Declaration, the District of Colorado denied the LAPs' motion for a protective order and ordered Stratus to turn over its documents.[584] Following the ruling, however, the LAP team – including Donziger – brainstormed ways to delay further the production of Stratus' documents and, realizing that production was inevitable, to mitigate its effects.  One of the LAPs' American lawyers sent an email to the LAP team emphasizing that "Stratus will be under a court order to produce all materials it gave Cabrera. Stratus will not risk a contempt motion, it will comply.  Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the

---

581

       *Id.* ¶ 18.

582

       PX 1319 (May 3, 2010 Email from I. Maazel to S. Donziger, E. Westenberger, A. Wilson, E. Yennock, J. Abady, E. Daleo, and J. Rockwell re: "Draft Affidavit").

583

       PX 883 (July 17, 2007 Email from S. Donziger to L. Yanza and P. Fajardo).

584

       *See Chevron Corp. v. Stratus Consulting, Inc.*, No. 10 Civ. 0047, DI 154 (filed May 25, 2010).

worst possible place, we need to make our submission in Ecuador and fast."[585] Another lawyer

responded, "[w]hat about the following? Appeal; move for stay; if we win with [the District of

Colorado] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains

and then we move for clarification. If we lose again, we think about another appeal."[586]  In other

words, delay.

          The "submission in Ecuador" to which the lawyer referred was a petition the

American legal team had been drafting and planned to file –in Fajardo's name –in the Lago Agrio

court (the "Fajardo Petition").[587]  The Fajardo Petition, which Donziger characterized as a "very

general and admittedly less than adequate statement,"[588] was filed with the Lago Agrio court on June

21, 2010.[589]  It informed the court that the LAPs had made submissions to Cabrera but did not

"confess to having authored specific portions of the report."[590]  It conceded, however, that the LAPs

had given Cabrera "proposed factual findings and economic valuations of the environmental and

---

[585]
          PX 1363 (May 27, 2010 Email chain Between S. Donziger and Patton Boggs Attorneys re:
          "Mini-revelation").

[586]
          *Id.*

[587]
          PX 384 (Fajardo Petition).

[588]
          PX 1382 (June 20, 2010 Email from S. Donziger to U.S. lawyers re: "important update on
          Ecuador submission"), at 2-3.

[589]
          PX 384 (Fajardo Petition).

[590]
          PX 1371 (June 14, 2010 Email from J. Abady to U.S. lawyers re: "Current Thinking on
          Ecuadorian Submission").

other damages Texpet's practices and contamination caused."[591]

It thus went farther than the Fajardo Declaration filed in Denver.  But that too was deceptive. There was no disclosure of the fact that Cabrera was handpicked by Donziger because he would cooperate with the LAPs, that the report was planned and written by the LAPs and Stratus, and that Cabrera "play[ed] ball" by simply affixing his name to it, acting all the while under the false pretense – fostered by the LAPs – that the report was Cabrera's independent work.

Nonetheless, the LAPs later told U.S. courts that, in filing the Fajardo Petition, they had "fully disclosed" their relationship with Cabrera.  The LAPs filed the Petition twice in this Court and once in the Second Circuit.[592]

2.     *The New York 1782 Proceedings – Berlinger and Donziger*

Following the start of the Stratus 1782 proceeding, Chevron brought two more Section 1782 actions in New York.

The first was against Berlinger.  It sought, among other things, production of the out takes – the video shot in connection with the making of *Crude* that was not included in the film.[593] That discovery was ordered and the decision affirmed by the Court of Appeals.[594] The record here

---

[591]

PX 384 (Fajardo Petition), at 6-7.

[592]

PX 2514 (filing in Second Circuit); PX 2515 (filing in 10-MC-00001); PX 2516 (filing in 10-MC-00002).

[593]

*See In re Application of Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y. 2010), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011).

[594]

*Id.*

147

contains important evidence from those out takes, which were contemporary recordings of the words and deeds of Donziger and his allies both in Ecuador and in the United States.

The other Section 1782 proceeding brought in New York was against Donziger.  It sought to compel production of documentary evidence and testimony.  Although Donziger and the LAPs resisted fiercely, this Court ordered the requested discovery, and the Court of Appeals affirmed.[595]  Donziger was obliged to produce a trove of documents and emails relating to the Lago Agrio case and to give a deposition.  Much of the evidence in this case was obtained in that proceeding.

### 3.      *The LAP Team Sought to Deceive This Court in the Berlinger 1782 Proceeding*

The LAPs filed the misleading Fajardo Declaration in fifteen Section 1782 proceedings in courts across the United States, including this one.[596]  But perhaps their first act of deception in this Court occurred in April 2010, when Chevron sought discovery from Berlinger.

As noted, Chevron filed the *Crude* 1782 petition on April 9, 2010.  Five days later, Donziger prepared his draft letter to "fellow counsel," in which he admitted that the LAP team's contacts with Cabrera violated the "traditional Ecuadorian law perspective."[597]  Despite this admission by Donziger, his co-counsel offered a completely different explanation to this Court.

---

[595]

   *In re Chevron Corp.*, 749 F. Supp. 2d 141, 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

[596]

   *See* PX 1326-1340, 2479 (Fajardo Decls.).

[597]

   PX 1291 (Donziger Draft Letter to "Fellow Counsel").

On April 23, 2010, the LAP team filed its opposition to the *Crude* 1782, describing the Beristain meeting with Donziger as an "innocuous meeting, which is of no relevance to anything. . . ."[598]  This, of course, was untrue.  As discussed, Fajardo had emailed Berlinger and Bonfiglio shortly after the film first was exhibited, explaining that the presence of the images of Beristain and Maldonado were "so serious that we can lose everything"[599] and that Beristain "must not appear in the documentary at all" or "the entire case will simply fall apart on us."[600]  But at a hearing on April 30, 2010, counsel for the LAPs repeated this falsehood.  He told the Court that Chevron's application for production of the out takes was "frivolous" because the meeting with Beristain was "unimportant," akin to a group of New York lawyers attending a party together.[601]

Notwithstanding the LAPs' misrepresentations, the Court granted Chevron's application for discovery from Berlinger on May 6, 2010 and was affirmed on appeal.  Berlinger produced 600 hours of raw footage to Chevron.  The out takes included footage of the LAP team's March 3 meeting with Cabrera, scenes of the LAPs' representatives – including Donziger – meeting *ex parte* with Ecuadorian judges[602] and lengthy statements by Donziger in which he expressed his highly critical view of the Ecuadorian judicial system.  Some of these scenes have been discussed

---

[598]  *In re Chevron Corp.*, 10 MC 00001 (LAK), DI 24 (filed May 13, 2010), at 8.

[599]  PX 2454 (Aug. 3, 2010 Email between S. Donziger and J. Berlinger re: "GRACIAS").

[600]  PX 1090 (Dec. 25, 2008 Email from P. Fajardo to M. Bonfiglio).

[601]  *In re Chevron Corp.*, 10 MC 00001 (LAK) (S.D.N.Y. Apr. 30, 2010), Hr'g Tr. 39:16-20; 40:20-23.

[602]  *See* PX 1 (*Crude* Annotated Tape Log).

already and some will be mentioned below. It is important to note here, however, that the revelation of these scenes came at around the same time Stratus began producing documents to Chevron. Donziger and his co-counsel knew by then that they could no longer deny what had happened with Cabrera, and they knew they had to figure out a way to salvage their case.

But before we get to that, there is another story that must be told. The full extent of the LAPs' contacts with Cabrera threatened to surface even before the Section 1782 applications were filed. And Chevron's allegations were causing serious strife within the LAP team between those who always were aware of the truth underlying the Cabrera Report (Donziger, Fajardo, Yanza, and others) and those who intentionally were kept in the dark, most significantly, Joseph Kohn.

### D.     *Donziger Deceives Kohn, Refuses His Demand for an Investigation of the Facts With Respect to Cabrera, and Precipitates a Final Break*

As far as Donziger was concerned, Kohn's role in the Lago Agrio case was to pay for it. Kohn largely acquiesced for years; he was not involved in the day-to-day decisions and actions and relied on Donziger to keep him apprised of important events. Donziger, however, was selective with what he told Kohn and when he told him, and he actively misled him in important respects. This led to a break in relations and is important for several reasons.

*First*, Donziger misled Kohn, his financial backer and supposed co-counsel, concerning the Cabrera Report and related matters. This demonstrates his full awareness that what transpired between and among Donziger, the LAP Ecuadorian lawyers, Cabrera and Stratus had been highly improper. It is further evidence that Donziger's claim that he believed otherwise is untrue.

*Second*, the manner in which Donziger dealt with Kohn further confirms that Donziger was in entire control of the Lago Agrio case and all related activities.

*Third*, the break in relations between Donziger and Kohn resulted in the loss of Donziger's principal financial backer and led to the search for another. That search in turn quite possibly resulted in still further deception of a financing source and led to the appearance on the scene of Patton Boggs LLP.

1.  *Donziger Misrepresented to and Concealed From Kohn Important Information Regarding Cabrera and Stratus*

As discussed previously, Donziger and Kohn formally retained Stratus in the spring of 2007.[603] Kohn, in accordance with the Stratus contract, understood "that materials prepared by Stratus on behalf of the Ecuadoran plaintiffs would be 'for submittal to the court,' on the record, and that the global damages expert would then review and consider whether to accept, or reject, or rely upon in some way any or all of Stratus's findings in his own report."[604] But he was kept in the dark about most of what was important regarding Cabrera – the LAPs' role in selecting him, securing his appointment, and ensuring that he would cooperate with them – and about Stratus' true role.

Kohn and Donziger did agree in the spring of 2006 that "it would be best to limit or end the judicial inspections and move onto the second evidence-gathering phase of the litigation: the global damages expert report and final submissions."[605] But Donziger did not tell Kohn that Donziger and "his Ecuadoran co-counsel vetted candidates to be the global damages expert prior to the court ordering the end of judicial inspections and the beginning of the court expert phase of trial.

---

[603]    PX 5600 (Kohn Direct) ¶ 29; PX 633 (Aug. 20, 2007 Stratus Contract), at 1-9.

[604]    PX 5600 (Kohn Direct) ¶ 29 (quoting PX 633 (Aug. 20, 2007 Stratus Contract)).

[605]    *Id.* ¶ 27.

[Kohn] was not aware that Fernando Reyes was one of the candidates Mr. Donziger and his Ecuadoran co-counsel vetted. [He] was not aware that Fernando Reyes suggested to Mr. Donziger that he choose Mr. Cabrera to be the court expert."[606]

Nor did Donziger inform Kohn that Donziger, the Ecuadorian LAP lawyers, and their U.S. technical consultants met with Cabrera on March 3, 2007 to plan out Cabrera's "work."[607] He was not told that Stratus actually was writing the report to be submitted under Cabrera's name.[608] Indeed, Kohn believed – based on statements by Donziger – that "at all times, the Ecuadoran plaintiffs' consultants' materials were being submitted publicly to the Ecuadoran court through a proper, legal process consistent with Ecuadoran law."[609]

Kohn did learn that, "[e]ven before the Cabrera Report was filed in 2008, Chevron representatives began suggesting that Mr. Cabrera was not an independent expert. [Kohn] raised these allegations with Mr. Donziger on several occasions. [But] Mr. Donziger consistently denied [that] there was anything improper in connection with Mr. Cabrera, or that there was any basis for Chevron's allegations that Mr. Cabrera was not independent."[610]

After the Cabrera Report was filed, Donziger continued to deceive Kohn regarding

---

[606]

    *Id.* ¶ 73.

[607]

    *Id.* ¶ 74.

[608]

    *Id.* ¶ 31 (Kohn "did not review drafts of Stratus' work being submitted in Ecuador. [He did] not recall reviewing any draft documents beginning with 'I, Richard Cabrera.' [He] was not involved in any discussions about Stratus's work being attributed to Mr. Cabrera or otherwise being used in a non-transparent manner.").

[609]

    *Id.*

[610]

    *Id.* ¶ 50.

152

Stratus' role and the propriety of the LAP team's collaboration with Cabrera.  In the days following

the issuance of the Report, Donziger sent to Kohn several press releases, some in draft form, all of

which referred to Cabrera as an "independent" expert."[611]  And while Kohn was aware that Cabrera

filed a second, supplemental report that increased his damages estimate by $11 billion, Donziger did

not disclose to Kohn that Stratus had written the supplemental report.[612]


2.      *Donziger Deceives Kohn About the "Secret" Account*

While he was misleading Kohn about the Cabrera operation, Donziger and other

members of the LAP team continued to pump him for money.  "[B]etween June 2005 and November

2009, KSG [the Kohn firm] made approximately 51 separate wire transfers from [its] U.S. bank

account to [Selva Viva's primary account at] Banco Pichincha . . . in amounts ranging from $10,000

to $100,000."[613]  In 2007, however, Donziger began referring in emails to Kohn to a second account

at Banco Pichincha.[614]  He asked Kohn to transfer money into this second account on three occasions

in 2007 and 2008.[615]  When Kohn's assistant asked Donziger why he wanted the money transferred

to a new account, Donziger explained that it was because the payments involved "separate case-

---

611

PX 1023 (Apr. 1, 2008 Email from S. Donziger to J. Kohn); PX 1032 (Apr. 4, 2008 Email from S. Donziger to J. Kohn).

612

PX 5600 (Kohn Direct) ¶ 33.

613

*Id.* ¶ 37.

614

*Id.* ¶ 38; PX 897, 917, 965, 968, 984 (Emails to Kohn Referring to Second Selva Viva Account).

615

PX 5600 (Kohn Direct) ¶ 38.

153

related piece[s] of work that [are] being run by the Frente [*i.e.*, the ADF] . . . . This separate account will be used for [the] same purpose under the same control of the Frente and Yanza, and will be accounted for the same way with receipts."[616]

We now know that this second account had a special purpose. It was the "secret" account the LAPs set up in order surreptitiously to pay Cabrera outside the court process.[617]   But Donziger did not tell Kohn that – in fact, he led Kohn to believe that Cabrera was being "paid directly by the court . . . as is customary and required in Ecuador."[618]  Thus, "[i]n accordance with . . . instructions from Mr. Donziger, [Kohn] wire transferred $120,000 total from its U.S. bank account to this second account in Ecuador on August 15, 2007 ($50,000), September 17, 2007 ($50,000), and February 12, 2008 ($20,000)."[619]  As noted, $33,000 of that money was transferred directly from the secret account into Cabrera's account without Kohn's knowledge just before Cabrera formally was named.[620]

---

616

PX 897 (Aug. 14, 2007 Email from S. Donziger to J. Kohn, K. Wilson, K. Kenny re: "Critical money transfer").

Kohn testified that he understood that the "second account was simply an administrative or ministerial matter, no different from any business or firm having more than one bank account." PX 5600 (Kohn Direct) ¶ 39.

617

The record is silent as to what other covert purposes, if any, it served.

618

PX 5600 (Kohn Direct) ¶ 30.

619

*Id.* ¶ 38.

620

*See supra Facts* § V.C.1.

154

3.     *Donziger Refuses to Cooperate With Kohn's Demand for an Investigation Independent of Donziger*

By late 2008, Kohn was worried about the likelihood of obtaining a judgment in the plaintiffs' favor and of enforcing such a judgment if it were obtained.   Chevron's allegations concerning the Cabrera Report were surfacing.[621]   As will be detailed below, Chevron had begun to allege that the judge presiding over the Lago Agrio case had been caught on video accepting a bribe.[622]   And, despite prior assurances from Donziger that a judgment would issue in Ecuador by 2006 or 2007,[623] the case seemed to "be dragging on indefinitely."[624]   Kohn attempted to take a more active role.[625]

Donziger "rebuffed these efforts."[626]   He "refused to provide [Kohn] with copies of his files, including all the court filings [Kohn] had requested; he cancelled or postponed meetings at the last minute; and generally he refused to substantively engage with [the Kohn firm]."[627]   He repeatedly attempted to "prevent [Kohn lawyers] from meeting with members of the Ecuadoran legal team by first delaying or rescheduling meetings, and then ultimately stating [that Kohn

---

[621]

PX 5600 (Kohn Direct) ¶¶ 20, 50.

[622]

*Infra Discussion* § IX.B.2.

[623]

PX 5600 (Kohn Direct) ¶ 20.

[624]

*Id.*

[625]

*Id.*

[626]

*Id.*

[627]

*Id.* ¶ 54.

lawyers] were not allowed to speak directly with the Ecuadoran legal team."[628]  When Kohn in early 2009 suggested a meeting with the Ecuadorian legal team to discuss the final brief the LAPs would submit to the Lago Agrio court, Donziger "kept putting it off and even became irate when a lawyer in [the Kohn] firm . . . communicated with Mr. Sáenz directly."[629]  Sáenz "appeared to acquiesce to this control, telling" the Kohn firm "Steven is our point of contact, so please coordinate with him about the best way to proceed." [630]  And in a memorandum to Kohn and others at his firm, Donziger made clear that he was the boss and that the Kohn firm would not be allowed to step on his toes:

> "It is critical that you understand the larger context of how this effort is being managed and thereby understand how [the Kohn firm] can best add value.  The legal and political 'space' around this case in both Ecuador and the U.S. has been intricately constructed over the last several years by those involved on a fulltime basis. The process is managed by myself, Pablo Fajardo, and Luis Yanza. All of us work on this on a full-time basis and we speak among ourselves frequently. We also manage [t]he client relationships and in my case I have raised significant funds for both the case in chief and ancillary activities.  *All activities from [the Kohn firm] must be coordinated through this process, which in practice means coordinated through me.*
>
> *            *            *
>
> Given this context, the 'value added' of the [Kohn] team needs to be focused on discrete tasks within the existing structure, not overall management of this complex, delicate, intricate and multi-cultural process. The learning curve at this point is way too great to even start down that road. . . .That said, your input and thoughts are valued and I have no doubt your contributions can be immense if you are willing to work within this structure and complete tasks (such as legal research, draft reports) by specific deadlines and be real about what you can and cannot do. *But be clear: I am not going to consult with each of you on each and every aspect of this effort, unless you want to come work out of my office on a fulltime basis, which I am sure*

---

[628]
    *Id.*

[629]
    *Id.* ¶ 55.

[630]
    PX 1185 (Nov. 13, 2009 Email from J. Sáenz to L. Yanza, P. Fajardo, and J. Kohn).

*you would rather not do. . . .*"[631]

Kohn and other lawyers at his firm repeatedly expressed their frustration among themselves and to Donziger at his refusal to provide them with information about what was going on in Ecuador, or to allow them to be meaningful participants in the decision-making process.  This frustration eventually led to Kohn's withdrawal from the case.  But there was another event in particular that precipitated the withdrawal.

Kohn was becoming aware of Chevron's allegations concerning the LAPs' contacts with Cabrera.[632]  Fearing that their case was in jeopardy, Kohn proposed to Donziger that they retain an American lawyer to conduct an investigation, on behalf of the LAPs but independent of Donziger and the LAPs' Ecuadorian team, into "Chevron's allegations of misconduct by the Ecuadoran plaintiffs' team," including the Cabrera Report.[633]  He suggested Kenneth Trujillo – a Spanish-speaking former Assistant United States Attorney and former City Solicitor of Philadelphia,[634] to "make inquiries into what knowledge members of the [LAP] legal team . . . may have of improprieties involving the judge and/or government or ruling party officials, as well as with respect to allegations leveled by Chevron Corporation, the defendant in that litigation, of improper contacts

---

[631]

PX 1146 (July 2, 2009 Memo from S. Donziger to Kohn team re: "Activity Going Forward") (emphasis added).

[632]

PX 5600 (Kohn Direct) ¶¶ 50-52.  Kohn testified that he participated in two mediation sessions with Donziger and attorneys for Chevron in late 2007 and early 2009.  At both of those sessions, Chevron's attorneys "asserted that the Ecuadoran plaintiffs' team had improper contacts with Mr. Cabrera."  *Id.* ¶ 52.

[633]

*Id.* ¶ 22.

[634]

*Id.*; PX 1155 (draft retention agreement with K. Trujillo).

between members of *Aguinda* legal team and various Ecuadorian judges, court-appointed experts, or government officials."[635]

Kohn testified that Donziger initially appeared receptive to the idea of hiring an independent investigator and that he, Donziger, and Trujillo participated in at least one conference call to discuss Trujillo's possible engagement.[636]  A few days later, however, Donziger emailed Kohn to say that he did not think going forward with an investigation was a good idea.[637]  Donziger wrote:

> "I talked to Pablo and Luis about your idea of hiring the former prosecutor for the purposes you described. There is a consensus such a move would be adverse to the client's interests and unwise for a host of reasons. *Neither I, nor the legal team in Quito, will cooperate with such an investigation nor continue working with a firm that insists on doing such an investigation.*  I can explain details when we talk.  If you go forward with retaining somebody for this purpose, please notify me immediately so I can notify the clients."[638]

Kohn did not go forward with retaining Trujillo because he knew that an investigation would be ineffective without Donziger and the Ecuadorian legal team's cooperation.[639]

Squabbles occur among co-counsel for all sorts of reasons and that they rarely are subjects of interest or concern to courts.  This one, however, was different.  Donziger blocked

---

[635]  PX 1155 (draft retention agreement with K. Trujillo).

[636]  PX 5600 (Kohn Direct) ¶ 22.

[637]  *Id.*; PX 1156 (Sept. 4, 2009 Email from S. Donziger to J. Kohn re: "idea to retain a lawyer").

[638]  PX 1156 (Sept. 4, 2009 Email from S. Donziger to J. Kohn re: "idea to retain a lawyer") (emphasis added).

[639]  PX 5600 (Kohn Direct) ¶ 22.

Kohn's efforts to become more involved, and especially blocked the suggestion that a lawyer independent of Donziger and the LAP Ecuadorian lawyers look into what really had happened with Cabrera and other alleged improprieties, in order to conceal to the extent possible the truth about what had taken place.  The Court finds these events probative of Donziger's consciousness of guilt.

### 4.    *Kohn Cuts Off Funding*

Two months after Donziger rejected Kohn's proposal for the Trujillo investigation, Kohn informed Donziger that he no longer would pay Donziger's monthly expenses for his work on the Lago Agrio case.[640]  Donziger responded that Kohn had no role on the case other than to pay for it.[641]  Kohn replied that, although he previously had

> "requested you to adjust your requested monthly figure several times since the work in Ecuador was reduced and more time was spent here . . . you did not.  Since then you have continued to send us expenses for all travel, meals, staff and anything else without any thought.  In terms of the legal work on the case, you have consistently tried to exclude us from discussions, meetings etc, including preventing meetings

---

[640]

PX 1181 (Nov. 9, 2009 Email Chain Between J. Kohn and S. Donziger).

Donziger and Kohn had a fee sharing arrangement, and Kohn was under no obligation to pay Donziger's expenses.  *Id.*

[641]

*Id.*

Donziger wrote:  "As a general matter, your firm's primary obligation is to finance the case; my firm's primary obligation is to run the case on a day to day basis, maintain relations with the clients, handle press and political aspects in both Ecuador and the U.S., and make sure we are set up for an enforcement action and financing going forward. In other words, I am doing a substantial portion of the actual work. If you break it down by time and value, I think I am doing the overwhelming amount of work on this case. I am not going to keep doing a substantial portion of the work AND take over your responsibility for financing while maintaining our same equity arrangement."  *Id.*

with the lawyers in Ecuador we have been requesting for many months."[642]

Kohn stated also that he had "consistently said [he was] willing to discuss proposals for other funding."[643]  He had even identified and spoken with firms that were willing to come in and help on a "lawyerly and businesslike basis."[644]  But Donziger repeatedly declined to respond to Kohn's offer. Kohn wrote: "I conclude you are not interested in doing so because you perceive them as our friends who you could not control, or would not simply take orders from you."[645]

On November 10, 2009, Kohn wrote to Fajardo and Yanza regarding the possibility of further settlement negotiations with Chevron.[646]  He argued that settlement discussions were advisable and that a settlement of $700 million would "provide for virtually 100% clean-up" of the Orienté, as well as funds for other projects.[647]  Fajardo and Yanza replied that they did not wish to engage in settlement discussions at that time. They stated that "all budget and strategy decisions must be made by Mr. Donziger."[648]  They also "raised certain issues about slowness in [Kohn's] payment of certain bills over time, or that [Kohn] had not funded certain things or met certain

---

642

       *Id.*

643

       *Id.*

644

       *Id.*

645

       *Id.*

646

       PX 1184 (Nov. 10, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo).

647

       *Id.*

648

       PX 5600 (Kohn Direct) ¶ 60 (citing PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo)).

160

commitments."[649]

Kohn responded on November 19, 2009, that "[t]he working relationship between [him] and . . . Steven ha[d] steadily deteriorated over the past years" and that Kohn had "paid all necessary litigation expenses, as well as many wasteful and unnecessary expenses incurred due to Steven's extravagance and decisions."[650]  He explained that:

> "[B]y far, the largest single component of the 'budget' is Steven's demand for fees and expenses, and there, in my opinion, lies the root of the current problem, and the reason why this current crisis arises . . . . At the same time as we have spent enormous sums of money on the case, Steven has denied us access to documents, information and the legal team, despite our repeated requests.  He has made it impossible for us to effectively discharge our duty as attorneys and has interfered with the attorney-client relationship."[651]

Kohn concluded by stating that "unless or until such agreements are reached, [Kohn] considers that due to Steven's influence and interference, there is no longer an attorney-client relationship with our firm and we will withdraw from any further representation related to the case and notify the vendors and other appropriate entities of that fact."[652]

Several months later, Kohn spoke with Jeffrey Shinder by telephone.  Shinder explained to Kohn that he had withdrawn from representing the LAPs in the Denver Section 1782 proceeding against Stratus and his reasons for doing so.[653]  Shortly thereafter, Kohn met with

---

[649]    Tr. (Kohn) 1463:18-1464:18.

[650]    PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to L. Yanza and P. Fajardo).

[651]    *Id.*

[652]    *Id.*

[653]    PX 5600 (Kohn Direct) ¶ 63.

161

Donziger – at Donziger's request – in New York.[654]  Donziger asked Kohn if he was "interested in joining a [new] committee of lawyers representing the Ecuadoran plaintiffs."[655]  Kohn replied that he had spoken with Shinder about the LAPs' contacts with Cabrera and that he "would not discuss anything with [Donziger] unless he – and anyone of the Ecuadoran team that had contact with Mr. Cabrera – 'came clean' about what happened with Mr. Cabrera."[656]  Donziger admitted to Kohn that "someone on the Ecuadoran team 'may' have provided 'some' documentation to Mr. Cabrera, and if it came out, it could be embarrassing for the Ecuadoran plaintiffs' team."[657]

On April 13, 2010, Kohn wrote to Fajardo and Sáenz, informing them that he had become aware of "very disturbing recent events related to the case taking place in the U.S."[658]  Because "Steven stopped providing [Kohn] with information, consulting with [Kohn], or following any of [Kohn's] advice," he was reaching out to the Ecuadorian lawyers directly.[659]  Kohn noted, among other things, that:

> "Steven . . . hired other firms to deal with the depositions of Stratus.  He informed me last week, without providing any details or facts, that the information Stratus may provide will be damaging to the case and highly embarrassing.  We have no knowledge of what he is talking about except what Steven has now reluctantly told us: that it involves communications with Cabrer[]a, something that surprised us and

---

[654]

  *Id.* ¶ 64.

[655]

  *Id.*

[656]

  *Id.*

[657]

  *Id.*

[658]

  PX 1290 (Apr. 13, 2010 Ltr. from J. Kohn to P. Fajardo, J. Sáenz, and L. Yanza).

[659]

  *Id.*

that we find quite disturbing if true. This conduct - the contacts with Cabrer[]a (if they took place), and the failure to properly oppose or prepare for these depositions, has and will cause severe damage to the case."[660]

Accordingly, Kohn informed the lawyers that Donziger and possibly others needed to withdraw in order to salvage the case.[661]  Moreover, the LAPs' Ecuadorian legal team, he asserted, needed to open their files to the Kohn firm and allow themselves to be interviewed by an independent attorney.[662]

Later in April 2010 – and after the Colorado district court had granted Chevron's Section 1782 application with respect to the Stratus documents, but before any documents had been produced – Kohn met in Philadelphia with Fajardo, Yanza, and Humberto Piaguaje at the Ecuadorians' request.[663]  Kohn asked them about their interactions with Cabrera.  Fajardo responded that they had provided documents to Cabrera in accordance with a court order and that Chevron's allegations were false.[664]  A few days later, on May 3, 2010, Kohn received an unsolicited email from Fajardo, in which he clarified that he "did not mention [one] detail" regarding "the information [the LAPs] shared regarding the process in Ecuador."[665]  Fajardo wrote that "[b]ased on the same order of the judge, by which we submitted information to Expert Cabrera, we proceeded to submit

---

[660]

    *Id.* at 2.

[661]

    *Id.*

[662]

    *Id.*

[663]

    PX 5600 (Kohn Direct) ¶ 66.

[664]

    *Id.*

[665]

    PX 1312 (May 3, 2010 Email from P. Fajardo to J. Kohn).

a packet of information, mainly the input of Stratus, around the middle of March 2008."[666]  Fajardo

assured Kohn that "there is no illegality in the process of delivering information."[667]  This email,

quite interestingly, preceded the filing of Fajardo's misleading declaration in the Stratus litigation

in Denver by only two days.[668]

On July 29, 2010, Kohn received a letter from representatives of the LAPs purporting

to terminate their attorney-client relationship with the Kohn firm.[669]

After evidence of the Cabrera fraud and other events began to emerge from Section

1782 proceedings, Kohn "disavowed any financial interest in the Ecuadoran judgment."[670]  Kohn

testified at trial: "I relied on Mr. Donziger to tell me the truth about what was going on in the

Ecuadoran litigation . . . and I now know that Mr. Donziger did not tell me the truth.  It is now clear

to me that Mr. Donziger deceived and defrauded me, and that, as a result, we continued to pay

millions of dollars to that litigation that we never would have paid had we known the truth."[671]

---

[666]

    *Id.*

[667]

    *Id.*

[668]

    *Chevron Corp. v. Stratus Consulting, Inc.*, 10 Civ. 0047, DI 99 (D. Colo. filed May 5, 2010).

[669]

    PX 5600 (Kohn Direct) ¶ 68.

[670]

    *Id.* ¶ 25.

[671]

    *Id.* ¶ 81.

### 5.   Defendants' Response to Kohn's Testimony

Donziger for the most part failed to respond to Kohn's testimony.  He did not offer any explanation for why he had not provided Kohn with accurate information concerning Cabrera, Stratus, himself, and the Ecuadorian LAP lawyers.  His questions to Kohn at trial suggested that Kohn could and should have taken steps to obtain information concerning Ecuadorian law from sources other than Donziger, such as hiring an Ecuadorian law expert to investigate the Cabrera Report.[672]  Thus, Donziger appeared to argue that Kohn's failure to learn the truth of what happened in Ecuador and whether it was proper under Ecuadorian law was his own fault.

That of course is understandable in view of the fact that litigation by Kohn to recover the money he advanced to Donziger is quite possible.[673]  And it is not this Court's function to decide the merits of any such claim here.  But it is its duty to find the facts to the extent they are material to *this* case.   And it finds that Donziger's arguments, to the extent they are material here, are not persuasive.

Kohn *had* proposed hiring such an expert in 2009, Kenneth Trujillo, but Donziger and the Ecuadorian lawyers were unwilling to allow him to conduct a meaningful investigation.[674]  Moreover, whether or not Kohn sought independently to verify the limited information he received from Donziger does not change the fact that Donziger misrepresented to him vital facts about the

---

[672]

Tr. (Kohn) 1448:19-21.

[673]

Kohn testified that he has "preserved through tolling agreements [his] firm's right to pursue litigation to recover amounts paid [to Donziger and Stratus] in connection with the Ecuadoran litigation."  PX 5600 (Kohn Direct) ¶ 25.

[674]

Tr. (Kohn) 1449:10-19.

165

case in Ecuador.  And when Kohn did try to find out what had gone on, Donziger prevented him from doing so because, the Court finds, Donziger understood full well that what he and his associates had done was wrong.

The LAPs called one witness whose testimony differed slightly from Kohn's on certain points.  Humberto Piaguaje, the "executive coordinator of the asamblea,"[675] testified that Fajardo, Yanza, and Piaguaje, during their April 2010 Philadelphia meeting with Kohn, asserted that there were "decisions that [Kohn] made that were above the interests of the members of the assembly for the struggle that they were involved in."[676]  According to Piaguaje, the Assembly subsequently decided to terminate Kohn "[b]ecause he did not abide by some of the things that had been suggested at the meeting."[677]

Thus, through Piaguaje's testimony, defendants appear to suggest that Kohn was fired because he was taking actions that the LAPs had not ratified and because he would not abide by his clients' wishes.  But they fail to mention a single action Kohn took of which they did not approve (besides his decision to stop funding the case).  And they fail to explain how what they describe as their decision to fire him changes the fact that Kohn repeatedly was lied to about Cabrera and other important events.  Accordingly, the Court does not credit Piaguaje's claim.

---

[675]        Tr. (H. Piaguaje) 2678:10-13.

[676]        *Id.* 2698:11-16.

[677]        *Id.* 2699:20-24.

E.      *The Search for New Funding – Patton Boggs, the Invictus Strategy, and Burford*

By the end of 2009, Kohn no longer was supporting the lawsuit and the LAPs were in financial difficulty.  Although Donziger had secured a $500,000 investment from Russell DeLeon in June 2009,[678] he knew that much more would be needed to keep the case going.  Moreover, the LAP team's internal emails make clear that they expected to obtain a large judgment soon – a timetable that proved inaccurate – and Donziger knew he would need substantial U.S. legal help to mount a credible enforcement threat.  The story of how he found it is important.  It led to the refinement of the enforcement strategy that the LAP team planned to follow to collect the Judgment.

1.      *Patton Boggs Is Retained, Develops the Enforcement Strategy, and Obtains Funding from Burford*

As of late 2009, Donziger's plan for enforcement of the judgment he expected shortly to obtain was simple – to seek enforcement in the United States.  That is what he then told Jeffrey Shinder, whom he considered hiring to run the enforcement effort.[679]  But around the same time, he began working with H5, a litigation services firm in New York, to secure financing.[680]  In November

---

[678]

PX 543 (Jun. 30, 2009 Investment Agreement between R. DeLeon, S. Donziger, and J. Kohn) § 7.2.

[679]

Shinder testified as follows with respect to a late 2009 conversation with Donziger: "Q. Did you come to speak to Mr. Donziger in the fall of 2009?  A.  Yes, I did.  Q.  Generally, do you recall what legal services Mr. Donziger was looking for?  A.  I do.  He was looking for enforcement counsel, lawyers in the United States who were going to take a judgment that he anticipated getting from the court in Ecuador and getting it enforced in the United States against Chevron, and that was the role we were auditioning for.   Q.  Did you say enforcing in the United States?  A.  Yes.  Q.  Did Mr. Donziger say that to you?  A.  Yes."  Tr. (Shinder) 1253:6-18.

[680]

PX 3100 (Bogart Direct) ¶ 5; PX 541 (Nov. 1, 2009 Ltr. from N. Economou to S. Donziger and L. Yanza).

2009 – the same month in which Kohn officially informed Donziger he no longer would finance the Lago Agrio case – Nicolas Economou of H5[681] reached out to Burford Capital LLC ("Burford") "to solicit investment capital for international judgment enforcement activities in connection with the Lago Agrio litigation."[682] Economou introduced Burford to Donziger, who "described himself [to Burford] as the lead U.S. lawyer for the LAPs and also the overall strategist behind the Litigation."[683]  Burford "rapidly made it clear that [the Lago Agrio case]  was outside its usual investment parameters and that Burford could only even consider the matter if highly regarded US litigation counsel were involved."[684]

So Donziger – with the assistance of Economou and Burford – expanded the search for "highly regarded US litigation counsel."  In January 2010, Economou and Burford chief executive Christopher Bogart had a meeting with Donziger, James Tyrrell, a senior partner of Patton Boggs, and Eric Westenberger, another partner at the firm.[685]  In early February, Patton Boggs proposed to Donziger a "multi-jurisdictional strategy" for "expeditiously delivering the Aguinda Plaintiffs [LAPs] their due recovery."[686]  The proposal called for attacking Chevron "on multiple fronts – in the United States and abroad."  And the point of the multi-front strategy was explicit:

---

[681]     PX 541 (Nov. 1, 2009 Ltr. from N. Economou to S. Donziger and L. Yanza).

[682]     PX 3100 (Bogart Direct) ¶ 5.

[683]     *Id.*

[684]     *Id.*

[685]     Tyrrell Dep. Tr. at 81:13-23.

[686]     PX 1389 (Response to Request for Information), at 7 of 88.

> "[S]wift recovery is of paramount importance . . . A thoughtfully crafted, multi-front approach, not only increases the odds of obtaining expedient and significant recovery, it also serves the related purpose of keeping Chevron on its heels."[687]

The point of the multi-front strategy thus was to leverage the expense, risks, and burden to Chevron of defending itself in multiple jurisdictions to achieve a swift recovery, most likely by precipitating a settlement.

Before the month of February was out, Patton Boggs "had secured a leading role in the [l]itigation, with Jim Tyrrell as the lead partner."[688] "Burford thus began more significant diligence and commenced commercial negotiations over investment terms."[689]

Patton Boggs quickly became heavily involved in the Lago Agrio litigation, both in the United States and in Ecuador. By July 2010, it had "assist[ed] Ecuadorian counsel in sustaining and prosecuting plaintiffs' claims against [Chevron] in Ecuador, and defend[ed] multiple ancillary 28 U.S.C. § 1782 actions across six U.S. jurisdictions."[690] It also had "drafted . . . briefs filed in both U.S. Courts and the Lago Agrio Court, performed a sizeable document review in connection with the Colorado § 1782 proceedings [against Stratus]" (although PB did not appear formally in that action), and led efforts to retain Ecuadorian law experts.[691]

In conducting its due diligence, Burford largely relied on Patton Boggs to keep it

---

[687]
    *Id.*

[688]
    PX 3100 (Bogart Direct) ¶ 6; PX 1391R (July 12, 2010 Ltr. from J. Tyrrell to S. Donziger) ("PB's work on behalf of the plaintiffs . . . first commenced in February 2010").

[689]
    PX 3100 (Bogart Direct) ¶ 7.

[690]
    PX 1391R (July 12, 2010 Ltr. from J. Tyrrell to S. Donziger).

[691]
    *Id.*

169

apprised of events in the litigation, to assess the merits of the LAPs' case, and to come up with a coherent enforcement strategy that would be undertaken once the LAPs received a judgment in their favor. Moreover, "it was agreed [with Burford during its due diligence] that Patton Boggs would provide its analysis on . . . [a] judgment enforcement strategy to Burford, and that Burford would not try independently to perform that work, although Burford remained in close and active contact with Tyrrell and . . . Westenberger about their work."[692]

The enforcement strategy was key to inducing Burford to invest in the case. So Patton Boggs prepared a document setting forth the LAPs' plan, a document that was entitled "Invictus" and that has become known as the "Invictus Memo."[693] The Invictus Memo found favor with Burford, which was not surprising in light of the fact that Burford had "a special relationship with and respect for Jim [Tyrrell] and Patton Boggs. . . ."[694] In September 2010, Burford's investment committee approved the investment and a funding agreement was signed,[695] pursuant to which Burford was to invest a total of $15 million in three separate tranches – $4 million on November 1, 2010,[696] and two subsequent tranches each of $5.5 million. In return, Burford was

---

[692]
PX 3100 (Bogart Direct) ¶ 4.

[693]
PX 2382 (Invictus Memo).

[694]
PX 2382 (Sept. 5, 2010 Memo from C. Bogart to Burford Investment Comm.), at 3.

[695]
PX 3100 (Bogart Direct) ¶ 8.

[696]
*Id.* ¶ 25; PX 2456 (Nov. 2, 2010 Email from C. Bogart to S. Donziger, N. Economou, and W. Carmody) ("I confirm that we have funded Patton Boggs' London account.").

170

given a 5.545 percent interest the Judgment, less certain costs and expenses.[697]

2.      *The Invictus Strategy*

The Invictus strategy is significant not only because Burford relied on it in approving the investment, but because the LAP team has been carrying it out since the Judgment was rendered in 2011.

Invictus built on the LAPs' previous intention to seek to enforce the anticipated favorable judgment in the United States and the Patton Boggs proposal to Donziger. It set out a plan to enforce it "quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad."[698]  It noted that "[o]btaining recognition of an Ecuadorian judgment in the United States is undoubtedly the most desirable outcome."[699]  But Invictus recognized also that enforcement in the United States could prove difficult. It emphasized that "Patton Boggs' current and former representation of numerous, geographically diverse foreign governments means that barriers to judgment recognition in a given country may not necessarily preclude enforcement there."[700]  It further elaborated that "Patton Boggs [would] use its political connections and strategic alliances to ascertain which nations' governments are not beholden to Chevron, so as to minimize the prospect

---

[697]     PX 552 (Burford Funding Agreement).

[698]     PX 2382 (Invictus Memo), at 15.

[699]     *Id.* at 22.

[700]     *Id.*

of adverse governmental interference in the enforcement process."[701]   And it touted the benefits of

what it called a "keystone" strategy.  It explained that:

> "proceeding as an initial matter in a jurisdiction housing the highest concentration
> of Chevron's domestic assets would offer certain obvious advantages, including
> efficiency. Nonetheless, it is more important for Plaintiffs to proceed *initially* in a
> jurisdiction that promises the most favorable law and practical circumstances. To
> that end, Plaintiffs' Team will identify and potentially target certain 'keystone'
> nations - that is, nations that enjoy reciprocity, or, better yet, are part of a judgment
> recognition treaty - with nations that serve as the locus for greater Chevron assets.
> For instance, while enforcing western judgments in the Middle East is notoriously
> challenging, certain countries in that region have entered into relevant treaties with
> European nations. If the Aguinda Plaintiffs are able to obtain conversion of the
> judgment in one of those European nations, this *may* open the door to enforcement
> in the Middle Eastern target nation."[702]

Invictus noted also that the LAPs would identify Chevron-related entities – such as subsidiaries and

joint ventures – and "target" them with enforcement actions also.[703]

The Invictus Memo made clear that the LAPs' enforcement strategy contemplated

an initial multi-pronged attack on Chevron, its assets, and subsidiaries in multiple jurisdictions

outside the United States followed by proceedings here.  Although Burford was enticed by the

Invictus strategy, however, it did not stick around long enough to see it implemented.

---

[701]

     *Id.*

[702]

     *Id.* at 21 (emphasis in original).

[703]

     *Id.* at 26.

     F.     *Fajardo Obtains a Broader Power of Attorney, and Donziger and Fajardo Enter Into Their First Written Retention Agreements with the LAPs*

There is a final point to be made about the Burford story: it led to a broadening of Fajardo's power of attorney from the LAPs and the execution of a formal retention agreement between Donziger and the LAPs.  Both are relevant.

On November 5, 2010, four days after he signed the Burford Funding Agreement on the LAPs' behalf, Fajardo obtained a new power of attorney ("POA") from the LAPs.[704]  The reason, among others, for the broadened POA was that Donziger had secured funding by promising investors a share in the LAPs' recovery from a judgment.  The Funding Agreement with Burford made clear that Burford's return on its investment would be paid from the LAPs' share of any recovery on a judgment net of the portion allocated to the attorneys' fees.[705]  Moreover, Donziger recently had agreed to amend his March 2010 funding agreement with Russell DeLeon by "deleting the[]reference [of DeLeon's recovery] to percentage of Attorney Fees" and changing it to "1.75% of Net Plaintiff recovery."[706]  It was unclear, however, whether Fajardo had had the authority under his previous POA to sign such agreements on the LAPs' behalf.  Indeed, DeLeon had raised that

---

[704]

     PX 392 (Fajardo Nov. 2010 Power of Attorney), at 1-2.

     The new POA was "a broadening or extension of the power of attorney that was previously granted to [Fajardo], for which reason the [LAPs] ratif[y] and approve[] each and every one of the actions performed by the attorney Pablo Fajardo Mendoza . . . in . . . legal actions in . . . court of law, national or foreign, financial or administrative actions and that have been performed directly or through other persons legally authorized by him for the defense of his/her interests."  *Id.*

[705]

     Donziger Jan. 31, 2011 Dep. Tr. at 4075:10-16.

[706]

     PX 1402 (July 27, 2010 Email from R. DeLeon to S. Donziger re: "Amendment to Agreement").

173

question with Donziger.[707]   Nor was that the only such problem.[708]   In order to address these concerns and to ensure that the funding agreements with Burford and DeLeon would be enforceable, the LAP team drafted a broader POA for Fajardo.  It drew up also a retention agreement between Donziger and the LAPs, which was signed in January 2011.[709]  The retention agreement explicitly vested in Donziger the responsibility of "coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the Litigation."[710]

More will be said on this agreement below in connection with other matters.  But for now it suffices to note only this.  Although Fajardo, as a matter of form and convenience, signed Donziger's agreement in his capacity as attorney-in-fact for the LAPs, the Court finds that no change in the substance of the relationship was intended or occurred, at least in any time period relevant to this case.  Donziger remained firmly in charge.  The paperwork done in early 2011 was undertaken principally to ensure that the new investors, who were to receive portions of any recovery net of attorney fees, had a written paper trail that led back to the LAPs individually.   While those concerned with the documentation were at it, Donziger and Fajardo, who both had contingent fee arrangements, obtained written agreements of their own.

---

[707]

   *Id.* ("Does Pablo have authority to sign for [the LAPs]?  If so, how can this be clarified?").

[708]

   Donziger and Fajardo had signed also retention agreements with various U.S. law firms on the LAPs' behalf.  Donziger Jan. 18, 2011 Dep. Tr. at 3207:1-22.

[709]

   PX 558 (Donziger Jan. 2011 Retention Agreement).

[710]

   *Id.* at 2.

G. *Burford Terminates the Funding Agreement*

Burford funded the $4 million first tranche under the Funding Agreement in November 2010.  It never funded the others.  On September 23, 2011, Burford informed the LAPs that it was terminating the Funding Agreement.[711]  It claimed it had been misled, by Patton Boggs and Donziger, principally regarding Cabrera.[712]  There is evidence that Patton Boggs in turn pointed the finger at Donziger.[713]

During its due diligence, Burford specifically had asked Donziger and Patton Boggs whether Chevron's allegations about the LAPs' relationship with Cabrera were a cause for concern.[714]  Donziger and Patton Boggs assured Burford that they were not.  They told Bogart that the LAPs' contacts with Cabrera had been "limited" and were "lawful under Ecuadorian law."[715]  But subsequent events – including testimony given by Donziger in the Section 1782 proceeding in this Court – "flatly contradict[ed]" those representations.[716]  Had Burford known the truth about the

---

[711]

PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

[712]

*Id.*

[713]

Tyrrell of Patton Boggs informed Bogart shortly after Donziger's depositions in January 2011 that Donziger had not "told the truth" to Patton Boggs about the LAPs "voluminous" contacts with Cabrera when he retained the firm.  PX 1473 (Bogart Notes of Jan. 27, 2011 Call with J. Tyrrell).  (The notes are received as evidence of Tyrrell's state of mind but not for the truth of the matters stated.)

[714]

PX 3100 (Bogart Direct) ¶ 18.

[715]

*Id.* ¶ 38; PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

[716]

PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza).

175

Cabrera Report, it asserted, it would not have invested in the Lago Agrio case.  Indeed, as Bogart

testified at trial, it "would have walked away immediately."[717] The failure to disclose the truth about

Cabrera, Burford stated, "[i]n addition to breaching the Funding Agreement . . . amount[ed] to

fraud."[718]

   The question whether Patton Boggs misled Burford concerning the Cabrera episode

one day may be important to a Chevron claim against Patton Boggs in a related action or in any

litigation that may arise between Burford and Patton Boggs.  But those cases are not now before the

Court, and the answer to that question is not material to the resolution of this one.  Two things are

plain here, however.  *First*, the romancing of Burford led to the development of the Invictus strategy

of proceeding on multiple fronts, especially in foreign courts, rather than bringing a single

enforcement against Chevron in the United States.  *Second*, there is not much doubt that Donziger

misled Burford – either by misstating or failing to disclose material facts – in his determination to

raise money to pay for the litigation.


  *H.*  *Donziger and Patton Boggs Try to Fix the Cabrera Problem – the Cleansing Experts*

   As noted, after the Denver court granted the Section 1782 application against Stratus,

the LAP lawyers knew they no longer could ignore the LAP team's involvement in drafting the

Cabrera Report, as the truth soon was to be exposed.  So they planned to hire a new expert to address

Cabrera's findings in the hope of providing alternative grounds for the damages evaluation.  One

---

[717]

  PX 3100 (Bogart Direct) ¶ 18.

[718]

  *Id.* ¶ 36 (quoting PX 1490 (Sept. 29, 2011 Ltr. from Burford to P. Fajardo, El Frente de
Defensa de la Amazonia, S. Donziger, Purrington Moody Weil LLP, and L. Yanza)).

of the LAPs' lawyers explained that:

> "The path for an Ecuadorian decision will be simple. We would hope the judge
> would say/rule: There has been much controversy surrounding the Cabrera report,
> and objections to it. [Perhaps: The court did not anticipate that there was the degree
> of collaboration between plaintiffs' counsel and Cabrera, that there may have been.
> Given these issues, the court is not relying on Cabrera for its ruling.] However, the
> Court now has additional submissions from the parties . . . The court finds the new
> report (demonstrating damages of $—billion) to be persuasive, reliable and accurate
> and therefore rules . . . ."[719]

He stated also:

> "Simply put, our local team is convinced that a court ruling – relying solely on
> Cabrera – is potentially imminent if we don't get something on file immediately. .
> . . If we cop to having written portions of the report, the details of exactly how that
> might have been accomplished will be for another day, when and if the relevant
> people are deposed as part of the 1782s, but hopefully by that time, the process of
> having both sides cure this with new submissions will be under way and render the
> details of the Cabrera report a thing of the past.  We will have already admitted that
> we authored portions of the report; the details of how that was accomplished might
> be inter[]esting for Chevron, but u[lt]imately irrelevant because of our admission and
> alternative grounds for a damage evaluation."[720]

But the LAP team knew that it had to move quickly. It needed to submit the Fajardo

Petition[721] – and convince the court to grant it – before the Lago Agrio court issued a ruling relying

solely on the Cabrera Report.  On June 14, 2010, Donziger emailed Tyrrell and Westenberger of

Patton Boggs:

> "The Ecuador team is getting nervous that there is an increasing risk that our
> 'cleansing' process is going to be outrun by the judge and we will end up with a

---

[719]    PX 1371 (June 14, 2010 Email from J. Abady to E. Yennock, E. Westenberger, E. Daleo,
J. Tyrrell, I. Moll, S. Donziger, B. Narwold, I. Maazel, A. Wilson, A. Celli, N. Economou,
J. Brickell re: "Current Thinking on Ecuadorian Submission") (brackets in original).

[720]    *Id.*

[721]    PX 384R (Fajardo Petition).

decision based entirely on Cabrera.  Absent our intervention ASAP, they believe the judge could issue *autos para sentencia* in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem."[722]

The Fajardo Petition was filed one week later.[723]  It asked the Lago Agrio court to allow the parties to submit "supplementary information to aid th[e] Court in the process of assessing the global damages."[724]  The court granted the LAPs' request on August 2, 2010.[725]  Shortly thereafter, the American LAP team began "brainstorming" whom they would retain to draft the supplemental submissions.[726]  As one Patton Boggs lawyer explained in an email to Donziger and others, "our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera). . . ."[727]

Patton Boggs ultimately hired the Weinberg Group to manage the cleansing process.[728]  Donziger and Patton Boggs lawyers told the Weinberg Group that "the defendants in the case had made allegations of veracity of the [Cabrera] report and involvement by another consulting firm in connection with the independent expert, and that because of these questions of veracity that

---

[722]

    PX 1370 (Jun. 14, 2010 Email from S. Donziger to J. Tyrrell, E. Westenberger, and E. Daleo).

[723]

    PX 384R (Fajardo Petition).

[724]

    *Id.* at 2.

[725]

    PX 387 (Aug. 2, 2010 Lago Agrio Court Order).

[726]

    PX 1410 (Aug. 18, 2010 Email from A. Small to S. Donziger, E. Westenberger and J. Abady re: "Brainstorming on Expert Issues").

[727]

    *Id.*

[728]

    Dunkelberger Dep. Tr. at 10:9-15.

they wanted to supplement or have an outside third party look at some of the same data and prepare a report."[729]  Westenberger of Patton Boggs and Donziger told employees of the Weinberg Group that Cabrera "wrote the report and was an independent expert. . . ."[730]  The Weinberg Group was not told that Cabrera had met with the LAPs' representatives without the Lago Agrio court's knowledge.[731]  And it was not told that Stratus had worked with the LAPs' lawyers to write the Report under Cabrera's name.[732]

The Weinberg Group recruited a team of experts to work on drafting the cleansing reports.[733]  It coordinated the preparation of seven reports, all of which were submitted to the Lago Agrio court on September 16, 2010,[734] and at least some of which were reviewed and commented upon by Donziger.[735]  Although the reports purported to "supplement" the Cabrera Report, some of them relied upon it directly.[736]  One of the cleansing experts later testified that he was given the Cabrera Report, which he "accepted . . . at face value and used  as a starting point to do [his] own

---

[729]

    *Id.* at 51:6-14.

[730]

    *Id.* at 60:19-61:11.

[731]

    *Id.* at 250:2-24.

[732]

    *Id.* at 81:24-82:7.

[733]

    *Id.* at 91:16-22.

[734]

    Donziger Jan. 30, 2011 Dep. Tr. at 4065:16-22.

[735]

    Donziger Jan. 31, 2011 Dep. Tr. at 4067:11-21.

[736]

    Tr. (Donziger) 2577:4-11.

179

evaluation."[737]   Another testified that, based on statements by employees at the Weinberg Group, it "was [his] baseline understanding" that the Cabrera Report had been prepared by a "neutral" expert,[738] that he relied on the cost and data information provided in the Report, and that his "results depend, in part, on the accuracy of [the Cabrera Report's] data series and his cost figures.[739] Indeed, as one Patton Boggs attorney wrote to Donziger, the cleansing should "address Cabrera's findings in such a subtle way that someone reading the new expert report (the Court in Lago or an enforcement court elsewhere) might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages."[740]

## VIII.   The Judgment

### A.    Its Contents

With the cleansing reports in the Lago Agrio record, the 188-page single spaced Judgment was issued on February 14, 2011 by then-Judge Zambrano.[741]  It found Chevron liable for at least seven categories of harm to the environment and human health.  It awarded $8.646 billion plus another $8.646 billion to be paid unless Chevron issued a public apology within 15 days.

---

[737]

Allen Dep. Tr. at 90:4-10.

[738]

Shefftz Dep. Tr. at 68:14-24.

[739]

*Id.* at 63:18-64:9.

[740]

PX 1410 (Aug. 18, 2010 Email from A. Small to S. Donziger, E. Westenberger, and J. Abady re: "Brainstorming on Expert Issues").

[741]

PX 400 (Lago Agrio Judgment).

The Judgment professed to disclaim reliance on the Cabrera Report.[742]  It stated also that the author or authors had "not considered the conclusions presented by the experts in their reports, because they contradict each other despite the fact that they refer to the same reality. . . ."[743]

The Judgment mentioned some of Chevron's charges of misconduct by Donziger, many of which were based on his statements recorded in *Crude* out takes.[744]  It characterized his statements regarding the Ecuadorian judiciary as "disrespectful." It went on, however, to state that there was "no record in the case file of any power of attorney granted to him by the plaintiffs . . . . Therefore, insofar as concerns the merits of his statements, they [a reference to Chevron's arguments] are rejected . . . and the Court does not recognize anything that Mr. Donziger might say or do when he is in front of the cameras or in any other act."[745]  Thus, it purported to disregard as irrelevant all of Donziger's alleged misconduct, without considering what actually occurred, because he did not hold a formal power of attorney from his clients.

Finally, the Judgment ordered that the LAPs establish a trust for the benefit of the ADF "or the person or persons that it designates" and that Chevron pay the damages awarded to that trust.[746]  It directed that the trust's board of directors be made up of the "representatives of the Defense Front," *i.e.*, the ADF, and provided that the board would choose the contractors who would

---

[742]

　　　　*Id.* at 49-51.

[743]

　　　　*Id.* at 94.

[744]

　　　　*Id.* at 50-52.

[745]

　　　　*Id.* at 51.

[746]

　　　　*Id.* at 186.

perform the remediation.[747]  Thus, the Judgment did exactly what the complaint had asked – it put the ADF in complete control of any proceeds of the Judgment.

Chevron issued no apology.  Instead, it filed a motion for clarification and expansion of the Judgment three days after it was issued.[748]  It requested further explanation of several of the Judgment's conclusions, including the conclusion that Chevron and Texaco had merged and that Chevron was liable as Texaco's successor.[749]  It questioned also the Judgment's award of punitive damages, "which are not defined in the Ecuadorian legal system," and were "completely identical to the items indicated in the Cabrera Report," which the Judgment purported to exclude from its consideration.[750]

The Lago Agrio court issued a clarification order on March 4, 2011.[751]  It held *inter alia* that "the occurrence of the merger has been proved beyond any reasonable doubt by the public statements and actions of the representatives of the merged companies"[752] and reiterated that "the Court decided to refrain entirely from relying on Expert Cabrera's report when rendering judgment . . . . [T]he report had NO bearing on the decision.  So even if there was fraud, it could not cause any

---

[747]

     *Id.* at 187.

[748]

     PX 2502 (Chevron Motion for Clarification and Expansion of the Lago Agrio Judgment).

[749]

     *Id.* at 2-3.

[750]

     *Id.* at 23.

[751]

     PX 429 (Mar. 4, 2011 Judgment Clarification Order).

[752]

     *Id.* at 3.

182

harm to" Chevron.[753]  The clarification order stated that the punitive damage award was based on Chevron "misconduct during these proceedings" and that it was "in accordance with Article 18 of the Civil Code" and the "universal principles of law to sanction someone who well deserved it, to set an example."[754]

        B.      *Chevron's Ghostwriting and Bribery Claims*

Chevron contends that Zambrano did not write the Judgment, that the LAPs prepared it, and that the LAPs bribed Zambrano to decide the case in their favor and to sign the judgment they had prepared.  The evidence concerning those contentions and its analysis are extensive.  The Court here summarizes its findings before proceeding to the detailed discussion of how it reached them.

The first major point is that the Court finds that Zambrano did not write the Judgment, at least in any material part.  The LAP team wrote it, and Zambrano signed it.  The following sections explain the Court's bases for that conclusion.

In Part IX.A, the Court examines Zambrano's trial testimony and finds that it was not credible.  Zambrano neither could recall nor explain key aspects of the 188 page opinion despite his claim that he alone wrote it.  He was a new judge with very little civil experience, so much so that he admittedly had another former judge ghostwrite orders for him in civil cases.  He was unfamiliar with – and on occasion bewildered by – certain of the most important concepts and evidence with which the opinion dealt.  His testimony was internally inconsistent and at odds with other evidence in the record.  He was an evasive witness.  Finally, Zambrano had economic and other motives to

---

[753]      *Id.* at 8-9.

[754]      *Id.* at 9.

testify as he did.  His livelihood, what remains of his reputation after having been removed from the bench, and perhaps even his personal safety hinged on his protecting the legitimacy of the $18 billion Judgment by claiming authorship.

Having concluded that Zambrano did not write the Judgment, the Court turns in Part IX.B to the question who did.  It examines the overwhelming and unrefuted evidence establishing that portions of at least eight of the LAP team's internal work product documents appear verbatim or in substance in the Judgment.  These documents never were filed with the Lago Agrio court or made part of the official case record.  Defendants utterly failed to explain how or why their internal work product – their "fingerprints" – show up in the Judgment.  As will be seen, the most logical conclusion is that members of the LAP team wrote at least material portions of the Judgment, and probably substantially all of it, and that they copied from their own internal files in doing so.  And direct evidence from the LAPs' internal emails – dealt with in Part XI.B.3 – suggests that the LAP team had been preparing since at least 2009 to write a draft judgment to pass to the judge, this despite the fact that one of their own Ecuadorian law experts testified that the submission of proposed judgments to an Ecuadorian judge is improper.

The next question is how it came to pass that Zambrano decided the case for the LAPs and signed a judgment they prepared for him.  The Court in Parts X and XI examines Chevron's contention that the Judgment was the result of a corrupt scheme in which the LAPs promised to pay Zambrano $500,000 from the proceeds of the Judgment in exchange for his deciding the case their way and permitting them to write the Judgment.  In doing so, it details each of the witnesses' accounts of what happened in Lago Agrio in the years and months leading to the Judgment, considers the evidence corroborating or conflicting with each account, and assesses the

184

credibility of each witness.  Having concluded based entirely on direct and uncontroverted evidence that the LAPs wrote the Judgment, the Court credits Guerra's explanation that they got Zambrano to sign it by bribing him.  Although Guerra's credibility is not impeccable, that portion of his account was corroborated extensively by independent evidence.  Donziger and Zambrano provided *no* credible evidence to support their versions of what transpired.

IX.     *The LAPs Wrote the Judgment*

    A.     *Zambrano Was Not the Author*

Zambrano testified at trial.  He claimed that he "was the one who exclusively drafted" the Lago Agrio Judgment, that "no one . . . helped [him] to write the judgment," and that he did all the research for the Judgment.[755]  He flatly denied that he considered anything that was not in the official court record.

The Court rejects Zambrano's claim of authorship, let alone sole authorship, as unpersuasive for a host of reasons.

    1.     *Zambrano Was Unfamiliar With Key Aspects of the Judgment He Signed*

Even at the most general level – that is, without considering the inconsistencies between Zambrano's deposition (taken days before his trial testimony) and his trial testimony, the internal inconsistencies in his trial testimony, and the inconsistencies between his testimony and other evidence – Zambrano was a remarkably unpersuasive witness.

As an initial matter, Zambrano was unable to answer basic questions about the

---

[755]     Tr. (Zambrano) 1608:12-16.

Judgment that he ostensibly wrote and that he came to New York to defend.

The Judgment states that "benzene . . . is the most powerful carcinogenic agent considered in this decision."[756]  But when Zambrano was asked "what substance the judgment says is, quote, the most powerful carcinogenic agent considered," he could not recall.[757]  Instead, he said that "[t]he hexavalente is one of the chemicals that if it is exceeded in its limits, it becomes cancer causing, carcinogenic."[758]

Zambrano was asked also which report the Judgment stated is "statistical data of highest importance to delivering this ruling."[759]  He responded "[t]he report by the expert Barros."[760]  But the Judgment stated that the "Relative Risk established in" the study entitled *Cáncer en la Amazonía Ecuadoriana* "is statistical data of highest importance to delivering this ruling . . . ."[761]

Zambrano was unable also to recall the theory of causation on which the Judgment

---

[756]

   PX 400 (Lago Agrio Judgment), at 107.

[757]

   Tr. (Zambrano) 1611:15-18 .

[758]

   He perhaps meant to refer, incorrectly in response to this question, to hexavalant chromium, which is a different known carcinogen.  *See id.* 1610:21-23.

[759]

   *Id.* 1613:1-16 (quoting PX 400 (Lago Agrio Judgment), at 134).

[760]

   *Id.*

[761]

   PX 400 (Lago Agrio Judgment), at 134.

   The Judgment does not identify by name the author of the study *Cáncer en la Amazonía Ecuadoriana*.  Defendants nowhere suggest that Barros was the author this study.

relied.[762]  And, although the English word "workover" appears twice in the Judgment,[763] Zambrano testified that he does not speak English,[764] did not know what "workover" means,[765] and could not explain why the word was in the Judgment.[766]

TPH – which stands for total petroleum hydrocarbons – appears over 35 times in the Judgment.[767]  Indeed, the Judgment awards plaintiffs over $5 billion for TPH cleanup.[768]  But when Zambrano was asked at his deposition what TPH stands for, he testified that "it pertains to hydrocarbons, but I don't recall exactly."[769]

Zambrano's inability to recall every detail of a 188-page decision of course would not itself prove that he had not written it.  But the aspects of the Judgment he was unable to recall were not insignificant details – they included the identification of a substance for the presence of which the Judgment awarded $5 billion, the identity of a substance that the Judgment described as the most powerful carcinogenic agent it considered, and the source of the most important statistical

---

762

       Tr. (Zambrano) 1614:7-10; PX 400 (Lago Agrio Judgment), at 88.

763

       PX 399 (Lago Agrio Judgment (Spanish)), at 20-21.

764

       Tr. (Zambrano) 1614:11-12.

765

       *Id.* 1712:12-13.

766

       *Id.* 1713:8-11.

767

       *See, e.g.*, PX 400 (Lago Agrio Judgment), at 100, 101, 102, 104.

768

       *Id.* at 181.

769

       Tr. (Zambrano) 1615:1-10.

187

data.  It is extremely unlikely that a judge who claims to have spent many months reviewing the

record[770] and to have written this lengthy and detailed decision would not recall such important

aspects – especially when, as will be seen, that Judgment was hailed by the president of Ecuador as

the most important decision in the country's history.  When this is taken together with the evidence

discussed below, it is significant.

2.     *Zambrano's Account of the Preparation of the Judgment Was Self
       Contradictory and Implausible*

In a declaration submitted to this Court in March 2013, Zambrano stated:  "I confirm

that I am the only author of the judgment that I issued on February 14, 2011 . . . . *I did not receive*

*support or assistance from Dr. Alberto Guerra or from any other person . . . .*"[771]  He made the same

statement in a declaration to Ecuadorian prosecutors.[772]   At trial, however, he testified that he

actually had received assistance from someone else – a Ms. Calva who, he claimed, typed almost

every word of the Judgment as he dictated to her.[773]  He paid her $15 per day for her transcription

---

770

        Zambrano testified that he set to work on the Judgment right after he began his second tenure
on the case with the benefit of the notes he had made during his brief prior tenure.  He
claimed that he read the entire court record in order to render his decision and  that he
finished doing so "[w]ay before January 2011 . . . [and] [b]y that time . . . [he] w[as] already
polishing the draft of the judgment." *Id.* 1736:21-1737:2

771

        PX 6330 (Zambrano Mar. 28, 2013 Decl.) ¶ 14 (emphasis added).

772

        PX 6391 (Zambrano Sept. 2013 Decl. to Ecuadorian Prosecutors), at 1 ("I am the only
author of the decision issued on February 14, 2011, that I have not had any help from any
person. . . .").

773

        Zambrano testified:  "I would begin dictating by taking a document from here, another one
from over there.  So you have an idea as to what the office was set up . . . the cuerpos of the
trial were laid out.  On some of them I had the corresponding annotations.  On some
occasions I would sit on the piece of furniture that was next to her desk.  I would dictate.

188

services.[774]   Moreover, as his testimony proceeded, he claimed that Ms. Calva did even more.

In fact, Calva's existence first was disclosed by Guerra.  Other aspects of Guerra's testimony will be explored more fully below.  For present purposes, it suffices to note that Guerra testified that the daughter of an attorney friend of Zambrano, Arturo Calva, retyped drafts of orders in the Chevron case into Zambrano's computer at Zambrano's office.[775]   Several days after Mr. Guerra testified, defendants moved for leave to add Ms. Calva as a witness.[776]

At that point, Zambrano changed his story.  He mentioned Ms. Calva during the following week, both at his deposition and at trial, claiming for the first time that he had dictated the entire Judgment to Calva.

In addition to Zambrano's failure to mention Calva in his declaration and statement, Zambrano's testimony at trial regarding her role was internally inconsistent.   For example, Zambrano first testified that "nobody helped [him] do the research [he] needed to do to write and

---

Other times I would stand up because I would reach for a document or refer to a cuerpo or some other writing.  I wold refer to notes that I had made and in my mind I was developing the idea I wanted to state so she would type it accurately."  Tr. (Zambrano) 1661:16-1662:10.

[774]

Calva was not a court employee.  Her father was a lawyer in Lago Agrio who often appeared before then-Judge Zambrano.  Tr.(Zambrano) 1659:23-1660:13.  Zambrano hired her at his personal expense in mid-November 2010, *id.* 1664:12-15, to help him with the Judgment in the Chevron case because, he said, "it was a very voluminous trial. [Calva] was an excellent typist; she was very good at typing.  She also know very much about the computing system.  She had just graduated . . . and her mother asked me if she could help me in some kind of situation, and precisely I needed help.  That's why I made the proposal to her that I could give her $15 per day, and the mother accepted willingly."  *Id.* 1818:8-15.

[775]

PX 4800 (Guerra Direct) ¶ 46.

[776]

DI 1642 (Oct. 30, 2013 LAPs Mot. to Amend Witness List).

189

author the judgment."[777]  But when he later was asked how he had found French, British, Australian, and American authorities that were cited in the Judgment, Zambrano explained that Ms. Calva, an 18-year old whom he paid $15 per day, was "the one who would go onto the internet.  She would look for a specific subject . . . she would print them out so that I would read them later."[778]   In any case, however, there was no credible explanation of how Calva, as Zambrano claimed, found French, British, Australian, and American legal authorities on the Internet given that there is no evidence that she had any legal training or spoke French or English.   Nor was there any reasonable explanation of how Zambrano could "read . . .  later," much less deal intelligently with, any such French or English language authorities in light of the fact that he reads neither French nor English, has no legal training in the common law, and even had very little experience with civil matters in Ecuador.[779]

Finally, Zambrano was adamant that Calva typed only what he dictated orally to her.

---

[777]

Tr. (Zambrano) 1608:14-16.

[778]

Id. 1616:23-1617:4; see also id. 1619:4-6, 1620:1-4.

Zambrano later testified that he never performed internet searches himself.  Id. 1684:7-10

[779]

Defendants contend that Zambrano did not have to read the French sources cited in the Judgment because he "copied [them] from [an] Ecuadorian Supreme Court case which went through and discussed Colombian, Argentinean, and French law."  Tr. (summation) 2902:7-11.  But Zambrano's testimony at trial suggested that he never actually had read that case.  He was unable to recall its name, the names of the parties, or what it was about – even after being shown a copy of the decision by defense counsel.  Tr. (Zambrano) 1885:1-20, 1887:10-23.  And even if the supreme court case could have explained the French language authorities that are cited in the Judgment, it does not explain the American, English, or Australian ones. PX 1141 (June 18, 2009 Email from P. Fajardo to J. Prieto, J. Sáenz, and S. Donziger attaching Torres de Concha v. Petroecuador).  It nowhere cites or discusses cases or law from those countries.  Id.

190

He "never show[ed] Ms. Calva any document for her to type from."[780]  But the 188-page Judgment contains many complicated words, citations, and numerical sequences.  The sampling data cited in the Judgment consists of strings of alphanumeric sequences with dashes, periods, underscores, odd spacing, and parentheses in them.  For example:

> "con resultados como  3142 y 466 en Auca 1 en AU01-PIT1-SD2-SU2-R(220-240 cm)_sv y AU01-A1-SD1-SU1-R(60-100cm)_sv; 2450 y 876 en Cononaco 6 en CON6-A2-SE1_sv  y  CON6-PIT1-SD1-DU1-R(160-260cm)_sv; 154.152,73.6325,70.4021 en Shushufindi 18, en SSF18-A1-SU2- R(O.Om)_sv, SSF18-PIT2-SD1-SU1-R(1.5-2.0m)_sv; y SSF18-A1- SU1-R (0.0 m)_sv)."[781]

It is not credible that Zambrano dictated these sequences to Calva orally and that Calva then typed them exactly into the draft without looking at any underlying document.  Moreover, as will appear, the Judgment contains portions of eight documents from the LAPs' internal files, many of them *in haec verba*.  Even assuming that Zambrano actually prepared the Judgment, as he claims, he certainly would not have dictated these pre-existing documents to Ms. Calva rather than giving them to her with markings indicating exactly what he wanted her to copy.

Of course, Ms. Calva readily could have confirmed or denied Zambrano's account.  When her name surfaced, the Court granted defendants' motion to add her as a witness.[782]  Defendants advised the Court that she had obtained a visa to come to the United States for that purpose.[783] But defendants failed to call her or to explain her absence.  While the Court does not

---

[780]

Tr. (Zambrano) 1879:23-25.

[781]

PX 399 (Lago Agrio Judgment (Spanish)), at 109.

[782]

DI 1681 (Nov. 5, 2013 Lago Agrio Court Order).

[783]

Tr. 2333:16-2335:10.

draw any inference as to the substance of the testimony she would have given, her absence is worthy of note.

There is still another consideration. Judge Ordóñez began presiding over the Lago Agrio case on March 12, 2010 and was expected to continue for two years. Chevron moved to recuse him on August 2010. He opposed the motion, and he was not recused until October 1, 2010.[784] Zambrano did not assume jurisdiction of the case as the presiding judge until October 11, 2010.[785] Moreover, he did not issue *autos para sentencia* – the order closing the evidentiary phase of the case, inviting final argument, and declaring the case ready for decision[786] – until December 17, 2010.[787] Thus, the intervals between the issuance of the Judgment on February 14, 2011 and (1) *autos para sentencia*, (2) Zambrano's assumption of jurisdiction as the presiding judge, and (3) the initial recusal were (1) less than two months, (2) about four months, and (3) about six months, respectively.

The Lago Agrio court record at the point at which the case was decided contained over 200,000 pages. While the 200,000 page figure no doubt overstates in some measure the part of the record that remained relevant to a decision on the merits,[788] the reasonable conclusion is that

---

[784] PX 6374 (Oct. 1, 2010 Lago Agrio Court Order).

[785] PX 2546 (Oct. 11, 2010 Lago Agrio Court Order).

[786] Tr. (Zambrano) 1911:2-5.

[787] PX 397 (Dec. 17, 2010 Lago Agrio Court Order).

[788] Zambrano testified that he read every page of the Lago Agrio record to render the decision and that this was required by Ecuadorian law. Tr. (Zambrano) 1719:24-1720:16. Even assuming that reading every page would have been required as a formal matter of Ecuadorian law, the Court does not find it credible that Zambrano, or many other judges,

the relevant part was quite large.[789]  Moreover, the Judgment is a 188 page, single spaced document

of considerable complexity that purports to rely on innumerable pieces of evidence, many of them

lengthy documents themselves.   The preparation of the Judgment in the time available, even

assuming that the author or authors began as soon as Chevron moved to recuse Judge Ordóñez,

would have been a Herculean task for anyone.  To have done so without any assistance save an 18-

year old typist, as Zambrano claimed, would have rendered its accomplishment in the relevant time

period even less likely.  And to have done so by dictating orally virtually every word, without the

typist copying anything at all from other documents, as Zambrano claimed, would have made it still

less probable.[790]  The likelihood that Zambrano would have been capable of doing what he said he

did, much less capable of doing it in the way he said he did it, is quite small.

---

[789]      would have read portions of the record that were not relevant to the decision of the case in the course of preparing a decision.  It implies no criticism of any such omission, which is a different matter from Zambrano's apparent lack of candor in claiming that he actually had done that.  Accordingly, the Court finds Chevron's argument that Zambrano could not even have read every page of the record during the total time over which he was assigned to the case (*see* PX 4200 (Rayner Direct) *passim*), though quite probably correct, immaterial on the authorship issue.

One of Donziger's former associates wrote to Sáenz that the Lago Agrio record in January 2010 – more than a year before the case was decided – contained "more than 200,000 pages of trial evidence, 62,000 scientific analyses produced by independent laboratories contracted by both parties, testimony from dozens of witnesses, and 101 judicial field inspections . . . ."  PX 1211 (Jan. 7, 2010 Email From L. Garr to J. Sáenz).

[790]      Zambrano's contention that he was aided by notes and materials he had collected during his first tenure on the case, *i.e.*, in the roughly four month period starting in September 2009, is undermined by the fact he claimed to have destroyed those notes and materials.  While that was understandable in light of Zambrano's removal from the bench, as he could not have any further use for them, there remains a lack of anything to corroborate that part of his story.

3.      *Zambrano's Testimony as to the Computer on Which He Claimed the Judgment Was Entered Was Inconsistent With the Evidence*

Zambrano's testimony as to his alleged authorship of the Judgment was contradicted persuasively on yet another point by other evidence.

Zambrano testified that the only computer on which he and Calva wrote the Judgment was the new computer in his office at the Lago Agrio court.[791]  But this is contradicted by objective evidence.

On October 24, 2013, a week into trial, defendants moved for leave to call Milton Efrain Jaque Tarco, a witness not previously identified.[792]  They explained that Tarco is a police expert in computer forensics[793] and then submitted a declaration signed by Tarco in support of their motion (the "Tarco Declaration").[794]  Tarco there stated that he had been asked to examine and

---

[791]

Tr. (Zambrano) 1679:5-7, 1680:3-6; PX 6371 (Tarco Decl.).

[792]

DI 1601 (Oct. 24, 2013 LAPs Mot. for Leave to Amend the Witness List).

[793]

PX 6371 (Tarco Decl.) ¶ 1.

[794]

*Id.*  This statement was admissible against defendants as an adoptive admission by virtue of their submission of his declaration in support of their motion for leave to call him as a witness.  *See* FED. R. EVID. 801(d)(2)(B); *see also* 2 Kenneth S. Broun, MCCORMICK ON EVIDENCE § 261 (7th ed.) ("When a party offers in evidence a deposition or an affidavit to prove the matters stated therein, the party knows or should know the contents of the writing so offered and presumably desires that all of the contents be considered on its behalf since only the portion desired could be offered. Accordingly, it is reasonable to conclude that the writing so introduced may be used against the party as an adoptive admission in another suit."); *see, e.g., Attorney Gen. of U.S. v. Irish N. Aid Comm.*, 530 F. Supp. 241, 252 (S.D.N.Y. 1981) *aff'd*, 668 F.2d 159 (2d Cir. 1982) (finding letters written to defendant that defendant had specifically adopted or incorporated by reference in its reply to the summary judgment motion admissible under F.R.E. 801(d)(2)(B)); *Diaz v. Silver*, 978 F. Supp. 96, 120 (E.D.N.Y. 1997) *aff'd*, 522 U.S. 801 (1997) and *aff'd sub nom. Acosta v. Diaz*, 522 U.S. 801 (1997) and *aff'd sub nom. Lau v. Diaz*, 522 U.S. 801 (1997) (referee's report admissible under 801(d)(2)(B) where state legislature submitted it to the Department of Justice in seeking preclearance under the Voting Rights Act).

194

analyze the "computer equipment . . . that Dr. Nicolas Augusto Zambrano Lozada allegedly used" to write the Lago Agrio Judgment.[795]

Tarco explained in his declaration – which, to jump ahead, ultimately was received in evidence only as to two narrow points[796] – that he had been provided with both computers that had been in Zambrano's office during the time in which Zambrano claimed he had written the Lago Agrio Judgment, which Tarco called PC-01 and PC-02.[797] He created forensic copies of each of the computers and analyzed their contents.[798] Because "relevant information for [the Judgment] was found [only] in computer PC-02," Tarco limited his discussion to that computer.[799]

Although the Court granted defendants' motion for leave to add Tarco to their witness list, defendants ultimately did not call him at trial. There appears to be at least one reason why they did not.

Tarco's declaration was received to establish the serial numbers of each of the computers that had been in Zambrano's office – PC-01 and PC-02.[800] Chevron expert Spencer

---

[795]

    PX 6371 (Tarco Decl.) ¶ 2.

[796]

    Tr. 2781:20-2789:1.

[797]

    PX 6371 (Tarco Decl.) ¶ 5.

[798]

    *Id.* A "forensic copy" is "the exact image that is created of all of the data and information from the hard drives in a computer at a certain moment." *Id.*

[799]

    *Id.* ¶ 6.

[800]

    *Id.* ¶ 5.

Lynch testified, using records obtained from the Lago Agrio court[801] and from Hewlett-Packard,[802] testified that the computer that the Tarco Declaration identified as the one that contained data relevant for the Judgment (PC-02) – a file called PROVIDENCIAS – was the *older* of the two computers.[803] PC-01 – which Tarco stated did not contain any documents relating to the Lago Agrio case – was the new computer.[804] Thus, the Tarco Declaration, insofar as it was received in evidence, contradicted Zambrano's testimony that "[i]t was on this new computer that the whole writing of the judgment was done."[805]

---

[801]

See PX 4108 (Lago Agrio Court Delivery Record of Furniture and/or Office Equipment); PX 4110 (same); PX 4109 (Lago Agrio Court Department of Fixed Assets Control of Fixed Assets for N. Zambrano); PX 4110 (Lago Agrio Court Record of Delivery of Furniture and/or Office of Equipment).

[802]

See PX 4122 (HP Shipment Detail).

[803]

Tr. (Lynch) 2808:9-11, 2813:4-13.

[804]

Lynch determined that the "old" computer was manufactured by HP in October 2006 (PX 4119 (Serial Number & Subassembly Tracking)), and given to Zambrano two years later. PX 4110 (Lago Agrio Court Record of Delivery of Furniture and/or Office of Equipment); Tr. (Lynch) 2812:22-2813:3. The new computer – on which Zambrano testified the Judgment was typed in full – was manufactured by HP in September 2010. PX 4121 (Serial Number and Subassembly Tracking). The Judicial Council of the Lago Agrio court purchased the new computer on November 26, 2011. PX 7772 (Ltr. No. AF-001-2013 from A. Jimenez).

Moreover, the new computer had not even been shipped by HP by October 10, 2010 – the date on which the Tarco declaration stated that the PROVIDENCIAS file was created. Tr. (Lynch) 2819:25-2820:5. It was not received by the Ecuadorian Judicial Council until November 26, 2010, PX 7772 (Ltr. No. AF-001-2013 from A. Jimenez), almost two months after Zambrano was reassigned to the Chevron case.

[805]

Tr. (Zambrano) 1679:5-7; *see also id.* 1658:14-1659:6.

4. *Zambrano's Self Interest*

It is relevant to understand also the nature and extent of Zambrano's personal motives to support the LAPs and to deny Chevron's accusations.  They are economic and political, and the two are interrelated.

One personal motive is quite simple – employment.  Zambrano had been in government service almost his entire adult life, first in the Air Force, then as a prosecutor from 1994 until he was appointed a judge in 2008.[806]  In February 2012, he was removed from the bench for misconduct.[807]  In May 2012, the Judiciary Council again found Zambrano guilty of judicial misconduct in another incident and imposed the further sanction of removal from office to be "recorded in his personnel file since he [then wa]s no longer part of the judicial branch."[808] Following his removal, he was unemployed.[809]  Moreover, we infer that Zambrano's employment prospects in the legal field were quite limited and that the likelihood that he would be hired by the government after the Judiciary Council removed him from office as a judge for two incidents of misconduct was nil.

On January 28, 2013, Chevron filed a motion in this case to which it attached a declaration by Guerra that set forth his contention that Zambrano had been bribed.  On March 13,

---

[806]

*Id.* 1894:25-1902:4; PX 4124 (July 30, 2008 Zambrano Judicial Appointment).

[807]

PX 411 (Feb. 29, 2012 Order).  The Plenary Judicial Council found that Zambrano and Judge Ordóñez, previously mentioned, overturned a detention order and released from custody a defendant who had been apprehended in a truck containing 557 kilograms of cocaine. *Id.*

[808]

PX 6321 (May 22, 2012 Order), at 8.

[809]

Tr. (Zambrano) 1801:23-25.

2013, Zambrano provided the defendants with a declaration contesting Guerra's allegations.[810]  In April, Zambrano started a new job as a legal adviser at the Refinery of the Pacific, a venture that is majority owned by PetroEcuador, the Ecuadorian national oil company.[811]

This sequence of events gives rise to a strong inference that Zambrano's employment was – and remains – directly related to his testimony.  Zambrano's attempt to deny any such connection only made the connection more likely because of the clumsy way in which he dissembled about it.**[812]**

The likelihood of such a connection is enhanced by the importance of the Lago Agrio case to the president and government of the ROE.  It has been open and notorious in Ecuador for years that President Correa and the government support the LAPs in the case against Chevron.  The government itself is litigating closely related issues against Chevron in an arbitration.[813]  On the very day that Zambrano issued the Judgment, he appeared at a press conference with then-president of

---

[810]

PX 6330 (Zambrano Decl.) ¶¶ 1, 14.

[811]

Tr. (Zambrano) 1792:4-21, 1802:9-1803:7.

[812]

Zambrano testified that he had never visited the website of the Refinery of the Pacific, despite that he had been working there for six months.  Tr. (Zambrano) 1794:15-19.  He was unaware that he had an email address with the company.  *Id.* 1795:15-17.  And he claimed not to know whether Petroecuador was a majority shareholder of RFP, even though he admitted that Ecuadorian law requires that Petroecuador must own more than a majority share.  *Id.* 1793:13-21, 1793:3-8.

[813]

*See, e.g.*, *Chevron Corp. v. Republic of Ecuador*, __ F. Supp. 2d ___, 12 Civ. 1247 (JEB), 2013 WL 5797334 (D.D.C. Oct. 29, 2103); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D. D.C. 2013); *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 248 (S.D.N.Y. 2012).

198

the Judiciary Council, Benjamin Cevallos.[814]  Cevallos praised Zambrano, calling him "a brave judge, a determined judge, a judge who knows how to fulfill his obligations . . . ."[815]  And he congratulated Zambrano for a decision that he described as "a touch of happiness . . . that has been shared with all of you.  This is happiness for all citizens, especially for the indigenous communities of the Ecuadorian Amazon."[816]  A week later, President Correa told reporters that Zambrano's ruling was "historic."[817]  Yet Zambrano claimed not to recall what had been said at the press conference[818] and to have been entirely unaware, even at trial,  "that President Correa supported the Lago Agrio plaintiffs' case before [Zambrano] issued the Lago Agrio Chevron judgment."[819]  But that testimony is not at all credible.

   For one thing, Zambrano was at the press conference, which was a media event at which a high official of the judiciary lauded him publicly.  People understandably forget minor details of such events, but Zambrano's claims to lack recollection of an event that likely was a high point of his career are implausible.

   The claim of unawareness of the president's and the government's position on the

---

[814]

  Tr. (Zambrano) 1800:6-10; PX 2500 (Tr. of Feb. 14, 2011 Press Conference).

[815]

  PX 2500 (Tr. of Feb. 14, 2011 Press Conference), at 3.

[816]

  *Id.* at 4.

[817]

  PX 2503 (*Correa says the judgment against Chevron in Ecuador must be respected*, *Ultimahora*, Feb. 19, 2011).

[818]

  Tr. (Zambrano) 1800:3-1801:4.

[819]

  *Id.* 1959:18-21.

199

lawsuit is even worse. Chevron's *alegato* – its final written argument before Zambrano rendered the Judgment – argued extensively that the case had been prejudicially influenced by the government. It made abundantly clear that the government generally and President Correa in particular supported the LAPs' case.[820] Zambrano swore that he had read this document before he issued the Judgment.[821] Zambrano, contrary to his testimony, was well aware that the Judgment he issued was just what the president of Ecuador wanted.

The Court finds that Zambrano's disavowals of memory and of knowledge were false. The motive for this lack of candor was to attempt to defeat any inference that there was, or that Zambrano thought there was, a connection between his testimony and his job. But the attempts fail. The Court finds that Zambrano at least thought that his job would be in jeopardy if he did not testify favorably to the plaintiffs, and his desire to keep his job strongly motivated his testimony.[822]

In sum, the Court finds that Zambrano did not write the Judgment issued under his name. He was astonishingly unfamiliar with important aspects of its contents. His testimony at trial was evasive and internally inconsistent. He repeatedly contradicted himself when attempting to explain how he wrote the Judgment, whether he received any assistance, and what materials he relied upon in doing so. The testimony he gave at trial was markedly different from that which he

---

[820]

PX 6405 (Chevron *alegato*), § 3.8, at 150-163 of 604.

[821]

Tr. (Zambrano) 1961:4-6.

[822]

Given this finding, it is unnecessary to determine whether the job actually was given to him to buy his testimony or, in the vernacular, to "keep him sweet." The Court does not, however, credit Zambrano's claim that he got the job over the Internet. Tr. (Zambrano) 1935: 13-25. He made quite clear at trial that he had limited if any computer skills. If he is to be believed, he had an 18-year old typist do legal research for him on the computer. Tr. (Zambrano) 1684:3-11. He did not even know the email address assigned to him at Refinery of the Pacific. Tr. (Zambrano) 1796:12-14.

200

gave at his deposition just days before.  And his responses and explanations at trial varied from one minute to the next.  Not only was his version of events internally inconsistent, it was, as we shall see, in large respects thoroughly contradicted by evidence that was unrebutted and unexplained by the defendants.  So we turn to the question of who did write it.

        B.      *Evidence that the LAPs Wrote the Judgment*

        1.      *The LAPs' "Fingerprints" Are All Over the Judgment*

We explain in Appendix I, § I, that the record in the Lago Agrio case consists of the documents duly filed with the clerk and added to the *cuerpos,* booklets each containing about 100 pages.  Consideration of any other materials, including any materials provided to a judge or court official informally or *ex parte*, would have been improper under Ecuadorian law.[823]

Zambrano stated that he decided the Lago Agrio case[824] "[a]ccording to the evidence that is part of the record. . . ."[825]  He added that, while documents related to the case that were not incorporated into the court record occasionally were left at the door of his office in the court,[826] he "always matched [those documents] up with what already existed in the [record of the] case."[827]  If

---

[823]

      *Infra* App'x I Pages 1-5.

[824]

      That of course is a hotly contested issue and the Court does not credit Zambrano's claim of authorship.  But Zambrano's testimony as to what materials properly could have been considered in deciding the case nonetheless has value, particularly as the thrust of his testimony was that everything was done with utter propriety.

[825]

      Tr. (Zambrano) 1608:21-22.

[826]

      *Id.* 1691:3-14.

[827]

      *Id.* 1692:25-1693:3.

the documents were different from those in the record, he discarded them because they were not "useful" to him.[828]  Thus, according to Zambrano, he considered only documents that were in the court record – that is, officially filed by the parties and added by the clerk to the *cuerpos*.

Chevron exhaustively compared documents produced by defendants in discovery in this case and in the Section 1782 proceedings, on the one hand, with, on the other hand, the Lago Agrio court record – the record that Zambrano claimed was the sole source of evidence used in writing the Judgment.  That comparison establishes that portions of eight documents produced by defendants in discovery – internal work product – appear *in haec verba* or in substance in the Judgment that Zambrano claims to have written himself.[829]  These documents appear nowhere in the Lago Agrio court record.[830]

> a.   *The Fusion Memo, the Draft Alegato, the Index Summaries, the Clapp Report and the Fajardo Trust Email*

The first six of the eight documents – known as the Fusion Memo,[831] the Draft Alegato,[832] the January and June Index Summaries,[833] the Clapp Report,[834] and the Fajardo Trust

---

[828]
   *Id.* 1694:15-22.

[829]
   *Infra* App'x I.

[830]
   *Id.*

[831]
   PX 435 (Fusion Memo).

[832]
   PX 438 (Draft *Alegato*).

[833]
   PX 433-34 (Index Summaries).

[834]
   PX 928 (Clapp Report).

Email[835] – were considered by Chevron Expert Dr. Robert Leonard, who concluded that parts of them appear verbatim or in substance on 30 pages of the Judgment.[836]  Some of these inclusions and commonalities were on important issues, including the question whether Chevron could be held liable for alleged pre-acquisition torts of Texaco.  Even more important, however, they are, as Chevron's counsel aptly called them, like "fingerprints."  There is no plausible explanation for their presence in the Judgment except that whoever wrote the Judgment copied parts of them.   This becomes even clearer when one examines the commonalities between these six LAP internal work product documents and the Judgment.  Examples of these are summarized in exhibits to Dr. Leonard's testimony,[837] PX 2164 through 2169[838] and PX 2170, which "contain[] side-by-side comparisons highlighting text from the Ecuadorian Plaintiffs' unfiled work product in the above five exhibits that appears verbatim or nearly verbatim in the Ecuadorian Judgment."  PX 2164, which gives "39 examples of plagiarized text from the[se six pieces of the] Ecuadorian plaintiffs' unfiled work product that appear[] in the Ecuadorian Judgment,"[839] is attached as Appendix II.  It and the video accompanying it are especially helpful in understanding the expert testimony, which the Court fully credits.

---

[835]

     PX 437 (Fajardo Trust Email).

[836]

     PX 3700 (Leonard Direct) ¶ 80.

[837]

     *Id.* ¶¶ 39-79.

[838]

     *Id.* ¶ 39.

[839]

     *Id.*

Two other internal LAP documents that are not in the record[840] but that show up in the Judgment are referred to as the Moodie Memo and the Selva Viva Database and warrant brief separate treatment.

b.      *The Moodie Memo*

On February 2, 2009, a former intern for the LAP team, Nick Moodie, prepared a memorandum for Prieto and Sáenz regarding "[t]he standard of proof in US common-law toxic tort negligence claims" (the "Moodie Memo").[841]  The purpose of the Moodie Memo was to "provide[] examples of the plaintiff's [*sic*] burden of proof taken from common-law jurisdictions."[842]  Both the Moodie Memo and the corresponding part of the Judgment cite, among other things, American and Australian tort law in their causation analyses.

There are three striking similarities in both documents' discussion of and citation to U.S. law on causation:

- *First,* the Moodie Memo discusses the "substantial factor" test, which it explains was taken from "Californian case law" and requires a plaintiff to prove that there is a "[r]easonable medical probability that D's conduct was a substantial factor in contributing to the aggregate dose of toxic substance and hence the risk of developing the disease."[843]  The Judgment states also

---

840

The fact that neither is in the Lago Agrio record is established by the testimony of Dr. Juola, PX 3800 ¶¶ 3, 27 (Selva Viva Database), and Mr. Hernandez (PX 3900) ¶¶ 3, 17-19, 35-36, 39) (Moodie Memo).  The Court credits that testimony.

841

PX 1101 (Moodie Memo).

842

*Id.*

843

*Id.* at 2.

that "substantial factor" is an appropriate test for legal causation.[844]

- *Second,* the Moodie Memo cites the California case, *Rutherford v. Owens-Illinois, Inc.,*[845] as reflective of U.S. law on causation in toxic substance cases and as requiring proof that "D's conduct was a substantial factor in contributing to the aggregate dose of toxic substance and hence the risk of developing the disease."[846]  The Judgment, citing *Rutherford*, also states that substantial factor requires "that the conduct of the defendant was a factor that contributed substantially to increasing the dose of harmful substances and ultimately the risk of developing illnesses."[847]

- *Third,* the Moodie Memo states that the substantial factor test does not require that "it was toxic chemical's [*sic*] from D's conduct that *actually* produced the malignant growth (due to the 'irreducible uncertainty of which particular fibre or fibres actually cause the cancer to begin forming')."[848]  The Judgment states that the substantial factor test means that agents "must be considered without the need to investigate which of them was precisely the cause of harm, due to the irrefutable lack of scientific uncertainty about which of the elements used by the defendant caused the harm."[849]

Chevron expert Michael Green, a law professor from Wake Forest University School of Law "with substantial expertise in the area of causation in toxic tort lawsuits,"[850] analyzed the

---

[844]

PX 400 (Lago Agrio Judgment), at 89-90 ("Finally, we refer to two theories that have been developed by Anglo-Saxon case law which refer to causation in harm to human health: the theory of the substantial factor and that of the most probable cause, which are legal theories of causation developed in the USA, Australia and England. . . .").

[845]

941 P.2d 1203 (Cal. 1997).

[846]

PX 1101 (Moodie Memo), at 2.

[847]

PX 400 (Lago Agrio Judgment), at 89.

[848]

PX 1101 (Moodie Memo), at 2 (emphasis in original).

[849]

PX 400 (Lago Agrio Judgment), at 89-90.

[850]

PX 5100 (Green Direct) ¶ 1.

Judgment and the Moodie Memo.  He expressed the view that it was odd that a court in Ecuador –
a civil law country – would cite to and rely upon U.S. (and other common law countries') law on
causation without any explanation for doing so.[851]  He found it difficult to understand also why the
Judgment relied on the "substantial factor" theory set forth in *Rutherford*, as the theory is outdated
and generally applied only in asbestos cases.[852]  The reason, he concluded, is that this section of the
Judgment was largely copied from the Moodie Memo.  This Court agrees.

The documents' citation to and discussion of Australian law also indicate that the
Moodie Memo and the Judgment were written by the same author.  Both documents cite to
Australian law regarding its "process of inference" rule for causation.  Both documents contain
identical strings of words:

> **The Moodie Memo:** "Australia: *causation can be established by a process of*
> *inference which combines* primary *facts even if* each piece of evidence alone does not
> rise above the level of possibility. . . ."[853]

> **The Judgment:** "Australian case law tells us that *causation can be established by*
> *a process of inference which combines* concrete *facts even if* the actual causation
> cannot be attributed to anyone of them by itself. . . ."[854]

This part of the Judgment, at least, was copied from the Moodie Memo.  There is

---

[851]     *Id.* ¶¶ 16-18.

[852]     *Id.* ¶ 20A-C.

[853]     PX 1101 (Moodie Memo), at 3 (emphasis added).

[854]     PX 400 (Lago Agrio Judgment), at 90 (emphasis added).

evidence also of additional copying from the Moodie Memo into the Judgment. Both documents refer to the Australian case law for the "process of inference" discussion.[855] The Moodie Memo cites specifically to *Seltsam v. McGuiness*.[856] But Honorable James Spigelman, the former Chief Justice of the Supreme Court of New South Wales[857] and author of the *Seltsam* opinion, testified at trial that the citation to his opinion, or to Australian law, for this proposition is anomalous. "Besides the similarity of the language," he said, "it is striking that both the Ecuadorian Judgment and the Moodie Memo attribute this approach to Australian law, whereas it is a well-established proposition throughout the common law world. It is usually attributed, as [former Chief Justice Spigelman] did in *Seltsam v. McGuinness*, to the American text, *Wigmore on Evidence* 3rd Edition, paragraph 2497. To describe it as an Australian legal approach is inaccurate."[858]

Both Professor Green and former Chief Justice Spigelman identified other mistakes of U.S. and Australian law that are common to both the Moodie Memo and the Judgment.[859] It is unnecessary to list them all here. The fundamental point, however, is not that the Judgment came

---

[855]
    *Id.* at 89-90; PX 1101 (Moodie Memo), at 3.

[856]
    (2000) 49 NSWLR 262, PP 91, 98.

[857]
    PX 5000 (Spigelman Direct) ¶ 1.

[858]
    *Id.* ¶ 18. Counsel for the Donziger defendants pointed at trial to what appears to be an Australian journal article, which cites the *Seltsam* case for this proposition and does not mention *Wigmore on Evidence* or any other American source. Tr. (Spigelman) 902:11-903:13; DX 1203 (K. Mengersen, S.A. Moynihan, and R.L. Tweedie, *Causality and Association: The Statistical and Legal Approaches*, STATISTICAL SCIENCE, 2007), at 240. But the fact that Australian authors in an Australian publication cite exclusively to an Australian case in no way establishes that that case – or Australian law in general – is commonly cited in jurisdictions *outside* Australia, such as Ecuador.

[859]
    *See* PX 5100 (Green Direct) ¶¶ 21B-E; PX 5000 (Spigelman Direct) ¶ 17.

207

to mistaken or odd conclusions about the law of the United States or Australia. It instead is that *both* the Moodie Memo and the Judgment made the *same mistakes* in characterizing them. Nothing in the Moodie Memo appears anywhere in the Lago Agrio Record.[860] Thus, the likelihood that the Judgment independently would contain exactly the same errors in characterizations as appear in the Moodie Memo is almost zero. The Court finds that parts of the Moodie Memo were copied into and paraphrased in the Judgment.

> c.   *Selva Viva Database*

Spencer Lynch of Stroz Friedberg, LLC, compared the environmental sample names and testing results contained in the Judgment with those contained in the lab results filed with the judicial inspection reports in the Lago Agrio case (the "Filed Lab Results"). He compared them also with those contained in a series of spreadsheets that were produced to Chevron in discovery, but not filed with the Lago Agrio court (the "Selva Viva Database").[861] While the Filed Lab Results "were similar in many ways to the" Selva Viva Database, Lynch found that there were "several notable differences [which] revealed that the [Selva Viva Database] was more likely the source of the information cited within the Ecuadorian Judgment" than the Filed Lab Results.[862] He found also that "reliance on the [Selva Viva Database] introduced several numerical errors into the Ecuadorian

---

[860]    PX 3900 (Hernandez Direct) ¶ 35 ("The Moodie Memo was not located in the Reviewed Record . . . . No complete excerpt from the Moodie Memo was located in the Reviewed Record . . . .").

[861]    PX 439-441 (Selva Viva Database).

[862]    PX 4100 (Lynch Direct) ¶ 81.

Judgment, indicating that the data was copied from this source."[863]

     *First.*  Many of the Judgment's citations to sample results, each of which consisted of a series of letters and numbers, ended with the suffix "_sv" or "_tx."[864]  Not one of the Filed Lab Results contained an "_sv" or "_tx" suffix but the Selva Viva Database did.[865]  In addition, both the Selva Viva Database and the Judgment used a naming convention "ending with numeric ranges and an 'm' or 'cm' enclosed *within* parentheses . . . [but] the Filed Lab Results used a naming convention that ended with numeric ranges in parentheses, followed by an 'm' or 'cm' *outside* of the parentheses."[866]  Further, in discussing the results of benzene testing, the Judgment referred to the sample result "SA_13-JI_AM1_0.1M,"[867] which matches the format used in the Selva Viva Database.[868]  However, the sample names in the Filed Lab Results contained no underscores, but used dashes instead.[869]

     *Second.*  There are two striking discrepancies between numerical values in the Filed Lab Results and the Judgment that must have resulted from copying from the Selva Viva Database.

---

[863]

     *Id.*; *see also* PX 2175 (Portion of Judgment Showing Errors Common to Selva Viva Database).

[864]

     PX 4100 (Lynch Direct) ¶ 82.

[865]

     *Id.*; PX 349-441 (Selva Viva Database).

[866]

     PX 4100 (Lynch Direct) ¶ 83.

[867]

     PX 399, 400 (Lago Agrio Judgment), at 108.

[868]

     PX 4100 (Lynch Direct) ¶ 84.

[869]

     *Id.*; *see* PX 2175 (Summary of Overlap and Common Errors in Judgment, Selva Viva Database, and Stratus Compilation).

The first relates to reporting of concentrations of mercury.  The sensitivity of testing to determine the presence or absence and, in the former case, concentration of a substance in a sample varies depending upon the capabilities of the equipment or testing method used.  Where a test does not reveal the presence of the subject substance, the result often is reported as a less-than sign ("<") followed by a number that indicates the minimum concentration of the subject substance that can be detected by the particular equipment and testing method used.[870]

The Judgment contained the following passage (which, though it is extraneous to the present point, was relevant to liability and damages in Ecuador):

> "Mercury has been considered as a possible human carcinogenic agent by the EPA and there are multiple studies showing the effects of mercury exposure, the most serious being permanent brain and kidney damage, which alerts this Court that *alarming levels of mercury have been found in the Sacha, Shushufindi and Lago Agrio fields, where we found several samples <u>reaching 7 mg /kg.</u> taken by the experts* José Robalino in the judicial inspection at Sacha Central (see samples -ESTSl_sv and SAC-PITl-Sl-l_sv); and SAC-PIT-l-Sl-2 sv) and Xavier Grades at Shushufindi 8 and Lago Agrio Norte (see samples SSF08-PIT1-Sl_sv, SSF08-PIT1-S2_sv, SSF08-PIT1-S3 _sv, SSF08-PIT2-Sll_ sv, SSF08-PIT2-S3_SV, SSF08-PIT2-S4-l_sv, SSF08-PIT2-S5_sv, SSF08-Pl T2-S6_sv, and also LAN-ESTA-B_sv, LAN-ESTA-Bl_sv, LAN-ESTA-B2_sv, LAN-ESTA-C_sv, LAN- ESTBASUEl_sv, LAN-ESTB-ASUE2_sv, LAN-ESTB-Dl_sv, LAN- ESTB-D2_sv, LAN-ESTB-El_sv).  In light of these results, showing evidence of the presence of mercury in elevated levels in soil samples collected during the judicial inspections, there is evidence of a worrying presence of this element in the soil of the ecosystem of the concession."[871]

In fact, however, the Filed Lab Results did not report that mercury levels reached 7 mg/kg in these

---

[870]

PX 4100 (Lynch Direct) ¶ 87; *see also, e.g.*, 40 C.F.R. § 439.1(j) ("Non-detect (ND) means a concentration value below the minimum level that can be reliably measured by the analytical method"); DENNIS R. HELSEL, NONDETECTS AND DATA ANALYSIS 9 ("[m]easurements whose values are known only to be above or below a threshold . . . [are c]alled 'less thans' or 'nondetects'"); *id.* at 6 (illustrating tabular presentation of nondetects using less than ("<") symbol).

[871]

PX 400 (Lago Agrio Judgment), at 109 (all emphasis added).

210

samples.  They reported levels of "<7" – *i.e.*, no detectable mercury – for every one of them.[872]

The source of this anomaly is apparent.  The Selva Viva Database separated the "<" sign from the following value by placing each in its own column.  The column containing the "<" sign was labeled "flag."  The author or authors of the Judgment thus used the Selva Viva Database rather than the Filed Lab Results, ignored or did not understand the "flag" column, and wrongly reported each of these test results as showing a concentration of mercury of 7 mg/kg.[873]

The next "tell" is quite similar.  The Judgment reported the concentration of a substance allegedly found at some specific sites in *milligrams* per kilogram.[874] – *i.e.*, one one-thousandth of a gram per 1,000 grams (2.2 pounds) of sample.  Page 109 of the Judgment contains the following passage:

> "and 3142 *mg/kg.*, in the samples taken by the plaintiffs' experts, since the defendant's experts did not analyze this compound. On the other hand, the expert Luis Villacreces, in samples taken during the inspections of the Auca 1 well, Cononaco 6, the Sacha 51 well and wells 18, 4 and 7 at Shushufindi has provided results that exceed any standard of reasonable tolerance, with results such as 3,142 and 466 at Auca 1 in AU01-PIT1-SD2-SU2-R(220-240 cm)_sv and AU01-Al-SD1-SU1-R(60-100cm)_sv; 2450 and 876 at Cononaco 6 in CON6-A2-SEl_sv and"[875]

In fact, the Filed Lab Results for these samples reported their findings in *micrograms*

---

[872]
PX 4100 (Lynch Direct) ¶ 87.

[873]
This is illustrated by Figure 26 in PX 4100 (Lynch Direct) ¶ 89; *see also id.* ¶¶ 87-88.

[874]
A milligram is one-thousandth of a gram.  A concentration of one milligram is one one-thousandth of a gram per 1,000 grams of sample.

[875]
PX 400 (Lago Agrio Judgment), at 109 (emphasis added).

Of course, the original Judgment (PX 399) was in Spanish; this is the stipulated English translation.  But the phrase "3142 mg/kg" is identical in both.

per kilogram (µg/kg) – that is, in millionths of a gram per kilogram.[876]  Thus, the Judgment could not have obtained the results it reported from the Filed Lab Results.  It had to have copied them from the Selva Viva Database which, unlike the Filed Lab Results, reported at least some of its test results in milligrams per kilograms.[877]

*Finally.*  Both the Judgment and the Selva Viva Database incorrectly identified one of Chevron's experts, John Connor, as the submitter of a specific sample result.[878]  But the judicial inspection report filed with the Lago Agrio court shows that Fernando Morales was Chevron's expert for that inspection, not John Connor.[879]

The foregoing analysis, it should be understood, does not reflect any review by this Court of the substantive merits of the Judgment.  The point is that these particular characteristics of the Judgment are inconsistent with the evidence in the Lago Agrio record upon which the Judgment purportedly relied, but appear in the Selva Viva Database, which is not in that record.  This goes directly to the question of the authorship of the Judgment.  At least in these respects, the Judgment was copied from LAP material outside the record, and Zambrano's testimony was untrue.

---

[876]

PX 4100 (Lynch Direct) ¶ 90 & Fig. 27.

[877]

*Id.* & Fig. 28

It perhaps bears mention, though the point is extraneous for the present purpose of identifying copying in the Judgment from non-Record sources, that the use of milligrams per kilogram exaggerated the concentration of the subject substances in these samples by a factor of 1,000, assuming that the Filed Lab Results were accurate to begin with.

[878]

*Id.* ¶ 85.

[879]

*Id.* ¶ 85 & Fig. 21.

212

2.      *Defendants' Failure to Provide any Explanation for the Overlap*

Defendants had remarkably little to say regarding the evidence of the extensive overlap between the Judgment and their internal work product.  They did not explain how the LAPs' internal work product ended up verbatim or in substance in the Judgment, despite that it appears nowhere in the record.  Donziger testified that he had "a variety of explanations" for how it had occurred, but failed to provide a single one.[880]  Ponce testified that documents were provided to the judge at some judicial inspections and that certain *actas* from those judicial inspections (which were incorporated into the record) did not reflect all of the documents submitted by the parties.[881]  But he failed to identify a single occasion when that actually had happened, much less any given document that was submitted on such an occasion.  Moreover, Ponce had left the LAP team before most of the LAP internal work product documents that appear in the Judgment even were created,[882] so his testimony explained nothing.

Zambrano testified that documents related to the case that were not parts of the court record occasionally were left at the door of his office in the court.[883]  Defendants thus appear to suggest that the overlap between the Judgment and the LAPs' internal documents is explained by the possibility that the documents were left at Zambrano's doorstep and that Zambrano copied from

---

[880]
      Tr. (Donziger) 2600:6-9.

[881]
      DX 1601 (Ponce Direct) ¶ 11.

[882]
      Tr. (Ponce) 2272:22-2273:1, 2273:4-8.

[883]
      Tr. (Zambrano) 1691:10-14.

them.  But Zambrano could not recall any of the specific documents that were left at his door.[884]

Moreover, he was clear that he did not use any material that was left at his door.  When documents

were left for him, he explained, he "always matched it up with what already existed in the [*cuerpos*

of the] case."[885]  If a document differed from what was in the *cuerpos*, he discarded it "because it

wasn't useful" to him.[886]

      More fundamentally, any contention that the eight internal LAP documents that

appear verbatim or in substance in the Judgment were provided to the judge during the judicial

inspections or were left at Zambrano's doorstep cannot be taken seriously.  Not only would any such

*ex parte* submission have contravened Ecuadorian law, but defendants utterly failed to prove that

any such thing actually occurred.  Had a member of the LAP team provided a document *ex parte*

to Zambrano or any other judge, that person could and should have been brought to court or deposed

to explain what the document was and when it was provided to the judge.  But no such witness was

produced.  Defendants' failure to provide any evidence corroborating their explanation makes clear

that it is nothing more than a post-hoc attempt to explain away the inexplicable.

---

[884]

    *Id.* 1691:20-23.

[885]

    *Id.* 1692:24-1693:3.

[886]

    Tr. (Zambrano) 1694:15-21.  When asked at trial whether he discarded documents that did not match those that were already in the cuerpos, Zambrano answered in the negative.  *Id.* 1694:7-12.  However, at his deposition two days earlier, Zambrano had testified that when documents were different from those in the cuerpos, he discarded them.  Zambrano Dep. Tr. at 282:11-20.  He testified at trial that his deposition testimony on this point was true. Tr. (Zambrano) 1694:23-25.

    Again, the point is not that Zambrano wrote the Judgment.  The Court finds that he did not. Rather, it is that this testimony confirms that he felt constrained to say that he relied only on material in the record.

Finally, it bears mention that Chevron has adduced evidence of *only* eight LAP documents that were copied into the Judgment.  One may wonder why even more of the Judgment was not traced to the LAPs' internal work product.  It is entirely conceivable, however, that Chevron would have done just that if it had been given complete access to the LAPs' documents.  But documents from Ecuador were not produced in response to discovery requests and orders by this Court.  Only through discovery from Donziger and others in the United States was Chevron able to obtain even the eight documents discussed above.  Those eight documents firmly establish that the LAPs wrote at least material portions of the Judgment.  In all the circumstances, the Court infers that the LAPs wrote all or most of it, particularly in light of evidence that they had been preparing for some time to write the whole Judgment.

### 3.    *Evidence that the LAPs Began Preparing the Judgment as Early as 2009*

As one of the defendants' Ecuadorian law experts testified,[887] it is unlawful under Ecuadorian law for parties to submit proposed judgments to a court.[888]  Nevertheless, despite the lack of any meaningful discovery from the LAP team in Ecuador or testimony by any of its members, there is more than a hint in emails that Donziger produced under court order that the LAPs

---

[887]

The testimony, which in this respect was uncontroverted, was given in a deposition and submitted under FED. R. CIV. P. 44.1 to facilitate the Court's decision on certain matters of Ecuadorian law.

[888]

DI 1751-5 (Rosero Dep. Tr.), at 124:12-125:19.

This is not unique to Ecuador.  The same is true in Mexico.  *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 470 F. Supp. 2d 917, 926 (S.D. Ind. 2006) ("Under Mexican judicial procedures, it is improper to submit any proposed order to a Mexican state court.")  The parties have made no submissions on the point as to the law of other countries.

215

did prepare a form of judgment and, indeed, had begun that task in mid-2009, if not before.

In late May or early June 2009, an intern named Brian Parker began working at the Selva Viva office.  On June 5, 2009, Fajardo asked Donziger for "suggestions as to what he could do during these first few days."[889]  Donziger offered no printable ideas.  But Fajardo responded to Donziger that he would give Parker "a research assignment for our legal alegato *and the judgment, but without him knowing what he is doing . . .*"[890]  Then, on June 18, 2009, Fajardo sent Donziger a copy of a new court decision.  He added that "[t]he arguments by the magistrates are very interesting, I think they serve us well for our alegato and . . ."[891]

These emails are suggestive.  The distinction drawn between the alegato – *i.e.*, the written closing argument in an Ecuadorian litigation[892] – and the judgment in the email about Parker indicates that Fajardo's reference to "the judgment" meant exactly what it said. Parker was to do research for preparation of a judgment, but was not to be told the purpose of the assignment. Moreover, defendants have advanced no reason why it was important to keep Parker in the dark, save for the logical inference that he really was working on a judgment that could not properly have been submitted to the Lago Agrio court.  Likewise, the strategically placed ellipsis at the end of the quoted sentence from the June 18 email implies that Fajardo knew that Donziger would know from

---

[889]

PX 1137 (June 5, 2009 Email from P. Fajardo to S. Donziger re: "BRYAN" [sic]).

[890]

*Id.* (emphasis added); *see also* Donziger July 19, 2011 Dep. Tr. at 4763:24-4764:23, 4765:20-4766-17.

[891]

PX 1141 (June 18, 2009 Email from P. Fajardo to S. Donziger, J. Prieto, and J. Sáenz re: "THIS IS THE MOST COMPLETE ONE") (ellipsis in original).

[892]

Tr. (Zambrano) 1960:12-14 ("[The *alegato*] is a statement of position by one of the parties regarding a specific point that is in dispute in that litigation.").

216

the June 5 email that the ellipsis referred to the judgment.

These emails, in and of themselves, of course do not prove that the LAP team began work in 2009 on a proposed judgment. But there is more as well that suggests that they did so, at least by some time in 2010.

Donziger's distrust of the competence and integrity of the Ecuadorian judiciary is clear. Moreover, Donziger and the LAPs had strong reasons to want to control the contents of, and therefore to write, the Judgment, assuming that they could obtain the judge's signature on it. They were deeply concerned by early to mid-2010 that the Lago Agrio court, even assuming it ruled in their favor, might rely on the Cabrera Report if left to its own devices.[893]  Prieto's "go to jail" email was written in late March 2010, and this June 2010 email was written in the face of the imminent disclosure of "the Stratus materials" in the Colorado 1782 proceeding.  Thus, there was an immediate threat that the Cabrera Report would be discredited as the work of the LAPs' consultants, Stratus.  Reliance on it by the Ecuadorian court would have threatened to discredit even a judgment favorable to the LAPs – unless such a judgment were written in a particular way, as it ultimately was, with the disclaimer of reliance already noted.  In fact, on the day that Donziger wrote the email just quoted, one of the LAPs' other U.S. lawyers spelled out the hope that the cleansing expert would provide an alternate basis for a decision and that the judge would decline to rely on the

---

[893]  PX 1370 (June 14, 2010 Email from S. Donziger to J. Tyrrell, E. Westenberger, and E. Daleo re: "important update/Ecuador") ("'The Ecuador team is getting nervous that there is an increasing risk that our 'cleansing' process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera. Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem.  Abady's firm is re-editing the submission in light of the recent complications with the Stratus materials . . .'").

Cabrera Report and rely instead on the cleansing expert.[894]  There could have been no better way to

ensure that the Lago Agrio court would not rely on the Cabrera Report than for the LAPs to draft

the decision themselves.

The probability that the LAPs drafted the judgment draws strength also from the

following deposition testimony by Donziger:

> "Q.    Did the Lago Agrio plaintiff team at any time develop a proposed judgment
> for the Lago Agrio case?    A.    I don't believe so.  I don't know.  It is possible."[895]

Donziger, almost in the same breath, testified that he (1) believed that the LAPs had not prepared

a proposed judgment, (2) did not know whether they had prepared a proposed judgment, and (3)

thought it possible that they had prepared a proposed judgment.  But this deposition took place only

five months after the Judgment was issued.  Chevron already had suggested that the Judgment, like

the Cabrera Report, had been ghostwritten by the LAPs, or at least that the judge received "secret

assistance" from the plaintiffs' team in writing it.[896]  So Chevron's suggestion that the LAPs had

ghostwritten the Judgment, the Court finds, was in Donziger's mind when this deposition was taken.

Given his lead role in the litigation and the emails discussed above, it is most unlikely that he did

not know whether the LAPs had prepared a proposed judgment.  If they had not, the easy and

truthful answer would have been that they had not done so.  Period.  Indeed, the fact that Donziger

obfuscated – that he quickly changed his answer to this very simple question from "I don't believe

so" to "I don't know" to "[i]t is possible" – suggests that Donziger knew quite a bit more than he

---

[894]    PX 1371 (June 14, 2010 Email from J. Abady to S. Donziger and others).

[895]    Donziger July 19, 2011 Dep. Tr. at 4814:22-4815:2.

[896]    *Infra Facts* § XII.A.1.

218

was willing to say and that he did not say what he knew because it would have been damaging.

C.      *Ultimate Findings on this Point – The LAPs Wrote the Judgment*

As we have noted, there is direct evidence that the LAPs began preparing a draft judgment as early as 2009.  Donziger evaded the question whether they prepared a proposed judgment, notwithstanding that the submission of proposed judgments would have been improper in Ecuador. The Judgment copied extensively from eight LAP internal work product documents – documents which were not in the record, which Zambrano denied having used, and the presence of which in the Judgment defendants could not explain.  There is extensive evidence of substantive *ex parte* contact by LAP lawyers,[897] including Donziger, with various Ecuadorian judges throughout the Lago Agrio case.   There is the LAPs' previous ghostwriting of the Cabrera Report and their submission of a report supposedly written by Calmbacher but in fact written by the LAPs.

In addition, we have referred to the LAPs' strong motive to control the specific content of the Judgment insofar as it related to the Cabrera Report.  Moreover, the LAPs' Cabrera Report problem had grown even more acute by later in 2010, when the Judgment must have been in preparation.  By then, the Denver lawyers had withdrawn as counsel upon their discovery of what had transpired among Donziger, Stratus, and the LAPs.  The LAPs' last-ditch effort to stop the production of the Stratus documents had failed.[898]  The Second Circuit had directed Berlinger to produce substantially all of the *Crude* out takes, so that material either had been or was about to be

---

[897]

  *E.g.*, Donziger Jan. 29, 2011 Dep. Tr. at 3711:9-12 (LAP Ecuadorian lawyers "up to a certain point" "spoke regularly to the judge ex parte"); *Infra Discussion* § II.B.2, *supra Facts* § IV.F.1.

[898]

  *Supra Facts* § VII.C.1

219

produced.[899]  This Court had directed Donziger to produce extensive material and to submit to a

deposition in a Section 1782 proceeding.[900]  Other Section 1782 proceedings had been or were being

filed around the country.  Hopes of suppressing the facts that Cabrera had been neither impartial nor

independent and that Stratus had written all or much of his report had been dashed.

    In the circumstances, the Court finds that the LAPs wrote the Judgment in its entirety

or in major part and that Zambrano made little or no contribution apart from his signature and

perhaps some light editing designed to make it read more like other decisions he had signed in this

and other cases.  The Court would have made these findings without regard to the facts that Fajardo

and the other Ecuadorian lawyers – those who naturally would have drafted or been involved

intimately with the drafting of the judgment by the LAPs – (1) did not testify, and (2) did not

produce documents pursuant to Chevron's request and the Court's order.  But the inference from the

absence of these witnesses strongly confirms these findings.


X.  *How it All Began: Guerra Ghostwrote Orders for Zambrano and the LAPs Paid Him*

    The LAPs wrote the Judgment.  Zambrano did not.  And yet the Judgment was issued

by the Lago Agrio court under Zambrano's signature.  How was this accomplished?

    Chevron contends that the LAPs bribed Zambrano to allow them to write the

Judgment and that this bribe was facilitated by Alberto Guerra.  As will be seen, the Court finds that

Chevron has so proved.  To understand how this deal ultimately came to pass, however, we must

---

[899]

    *Chevron Corp. v. Berlinger*, 629 F.3d 297, 305-06 (2d Cir. 2011) (noting July 15, 2010 order to produce).

[900]

    *In re Chevron Corp.*, 749 F. Supp. 2d 141, 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Donziger*, 409 F. App'x 310 (2d Cir. 2010) (summary order).

turn back to mid-2009, when Zambrano first presided over the Lago Agrio case and the Judgment still was two years away.

> A.   *The Guerra-Zambrano-Donziger Conflict*

Alberto Guerra was the judge who presided over the Lago Agrio case from its filing until it was reassigned to another judge in 2004.  But his involvement did not end then.  Nor did it end when he was removed from the bench in May 2008.[901]

Chevron – in reliance on Guerra's testimony – claims that Guerra was a party to three distinct corrupt bargains with Zambrano before Zambrano too was removed from the bench:

- The first corrupt bargain, solely between Guerra and Zambrano, allegedly began after Guerra was removed from the bench.  Zambrano, whose previous experience had been almost entirely as a prosecutor, was new to the bench and inexperienced in civil cases.  He made an arrangement with Guerra pursuant to which Guerra drafted court decisions in civil cases over which Zambrano presided.  Zambrano paid him for his ghostwriting services.  There is no suggestion that Donziger or the LAPs were involved in this arrangement at its outset.

- The second was an outgrowth of the first.  It came into existence when Zambrano was assigned in mid-2009 to preside over the Chevron case for the first of two occasions.   Zambrano allegedly reached an unspecified arrangement with the LAPs to move the case along quickly and generally in the LAPs' favor.  At Zambrano's suggestion, Guerra then made a deal with Donziger, Fajardo, and Yanza.  The substance was that the LAPs paid Guerra roughly $1,000 per month to ghostwrite orders for Zambrano in the Chevron case that would give effect to the Zambrano-LAP deal, expediting the case in a way favorable to the LAPs.

- The third corrupt arrangement is said to have taken place in connection with Zambrano's second and decisive period of presiding over the Lago Agrio case, which began in mid- to late 2010.  At Zambrano's request, Guerra allegedly facilitated a deal among Zambrano, Donziger, and Fajardo pursuant

---

[901]   PX 4800 (Guerra Direct) ¶ 7.

to which the LAPs promised to pay Zambrano $500,000 in exchange for Zambrano permitting the LAPs to write the decision. Fajardo then is said to have provided Zambrano and Guerra with a draft of the judgment to which Guerra made minor editorial changes. Zambrano allegedly signed and filed it.

Zambrano admitted at trial that he had Guerra draft decisions for him in civil cases but he denied that he paid Guerra to do so and denied that he had Guerra draft anything for him in the Lago Agrio Chevron case. He denied also the second and third alleged corrupt bargains and claimed that he dictated every word of the 188-page Judgment without any help from anyone except the typist.

Donziger admitted that Guerra proposed to him and Fajardo that Zambrano would throw the case and let the LAPs write the decision in exchange for a $500,000 bribe. He claimed, however, that he rejected the deal. Fajardo and Yanza declined to testify.

There are substantial credibility issues with respect to the testimony of Guerra, Zambrano, and Donziger. The resolution of these issues draws on the history of relationships among the five key actors, all of which span close to ten and in some cases more years. Moreover, it requires careful consideration of an enormous amount of testimony and documentary evidence, some important portions of which were ignored by both sides. Determinations of credibility depend also upon assessments of intangible factors such as the courtroom demeanor, tone, and manner of witnesses as well as other considerations and evidence.[902] Before turning to what happened among

---

[902] "Findings of fact, whether based on oral or documentary evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." FED. R. CIV. P. 52(a)(6). "[W]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Metzen v. United States*, 19 F.3d 795, 797-98 (2d Cir. 1994) (citation omitted).

222

Zambrano, Donziger, and Guerra in the years leading up to the Judgment, the Court makes some preliminary observations on the credibility of each witness.

       B.     *Preliminary Observations on Credibility*

      Each of Guerra, Zambrano, and Donziger was a deeply flawed witness.  The parties' opposing arguments naturally reflect that.

      This is a civil case.  Nevertheless, the defendants – in the classic manner of defendants attacking accomplice witnesses who "turn state's evidence" by testifying for the prosecution in exchange for what they trust will be reduced sentences for their own crimes – understandably train their guns on Guerra.  They point out that Guerra admitted that he had been a corrupt judge, a crook just like many government accomplice witnesses in criminal cases.  He later sought to profit from his proximity to these events, and he has succeeded in doing so.  He is the beneficiary of what amounts to a private witness protection program created for him by Chevron, which facilitated his relocation from Ecuador to the United States and has been supporting and assisting him since his arrival here.  The defendants therefore are quite right in the sense that a key witness against them, Guerra, is self interested.  The Court recognizes that his testimony, in the words of the standard instruction given to juries with respect to such witnesses, "should be scrutinized with great care and viewed with particular caution. . . ."[903]

---

[903]

      1 LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS Instr. 7-5 (Matthew Bender & Co. 2013).

      We bear in mind also another relevant portion of this standard instruction:

      "The government argues, as it is permitted to do, that it must take the witnesses as it finds them.  It argues that only people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others.

Chevron, in the classic response, argues that conspiracies of the sort alleged here usually are proved only by the testimony of accomplices who often are scurrilous characters, that Guerra's testimony like that of many accomplice witnesses is corroborated by other evidence, and that the defendants' witnesses – Donziger and Zambrano – are at least equally flawed. We will deal below with the allegedly corroborating evidence, which requires extensive analysis. But it is well to recognize at the outset that Chevron too is quite right as to the matter of self interest.

Donziger of course stands to recover a contingent fee of more than $600 million if the Judgment is collected, a vast multiple of Guerra's economic interest. Nor, as already mentioned and as will be further detailed below, is his self interest purely economic.

Zambrano too is self interested. If indeed he was promised $500,000 from the proceeds of the Judgment, his chances of ever seeing a penny would be reduced by a finding that he was bribed to throw the case. $500,000 is a considerable fortune to someone in his position. His economic self interest in denying that corrupt bargain is obvious. And, as detailed previously, his self interest goes beyond that.

In sum, as the Court begins its analysis of what really happened in the final phase of the Lago Agrio case, it keeps in mind that all three of the these witnesses testified in ways that, if believed, would advance their own interests, economic and personal. Guerra's admitted corrupt behavior and the consequent attack on his character, which is entirely appropriate, should not obscure the fact that there are no saints here. Donziger and Zambrano are quite open to comparable

---

For those very reasons, the law allows the use of accomplice testimony. Indeed, it is the law in federal courts that the testimony of accomplices may be enough in itself for conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt."

*A fortiori* the same is true in civil cases, in which the standard of proof is less than beyond a reasonable doubt.

224

attacks.  The Court will return below to the credibility of the witnesses as it pertains to specific

testimony and findings of fact.  It turns first, however, to its discussion of the events that led up to

the ultimate bribe deal.


     *C.*    *Guerra's Ghostwriting for Zambrano*

        *1.*    *The Guerra-Zambrano Ghostwriting Deal – Unrelated Civil Cases*

        Guerra first met Zambrano when Guerra was a judge on the Provincial Court in Lago

Agrio, where Zambrano was a prosecutor.[904]  Guerra was elected presiding judge in January 2002[905]

and presided over the Lago Agrio case from May 2003 through January 2004.[906]  He was dismissed

from the bench in May 2008.[907]  Following his dismissal, however, he maintained contact with

Zambrano who, as noted, joined the court in July 2008.[908]

        Guerra testified that "[a]s a former prosecutor,[] Zambrano had ample knowledge of

---

[904]

     PX 4800 (Guerra Direct) ¶ 8; Tr. (Zambrano) 1629:19-1630:4.

[905]

     PX 4800 (Guerra Direct) ¶ 4.

[906]

     *Id.*

[907]

     *Id.* ¶ 7.

     Guerra said that "[a]ccording to the Judiciary Council, the reason for my dismissal was that I made statements that the Chevron case should be declared null, at a time when I no longer presided over the Chevron case.  In reality, I believe I was dismissed because I confronted Judges Novillo and Yánez, who succeeded me as judges in this case, regarding several dubious and illegal rulings they had issued in the proceedings, and regarding their practice of asking the experts for 25 percent of their fees in consideration for having appointed them as such." *Id.*

[908]

     *See* Tr. (Zambrano) 1811:6-1812:2.

225

criminal law and procedure, but very limited knowledge of civil law rules, substantively and especially procedurally."[909]   So when Zambrano became a judge, he was much more comfortable handling his criminal cases than his civil ones.   He and Guerra entered into an agreement by which Zambrano paid Guerra $1,000 per month to assist Zambrano in drafting his "writs and rulings" in civil cases.[910]   Guerra explained that he was facing financial hardships at that time as a result of his removal from the bench and came to rely on his arrangement with Zambrano as a main source of income.

       According to Guerra, he worked on the rulings in Zambrano's civil cases mainly on weekends at Guerra's home in Quito.[911]   Zambrano lived in Manta and worked in Lago Agrio, and he sometimes met Guerra in the Quito airport on his flights home from Lago Agrio.[912]   On such occasions, Zambrano sometimes gave Guerra court files and Guerra spent the weekend working on the orders.[913]   Zambrano then met Guerra at the Quito airport on his return trip to Lago Agrio to collect from Guerra flash drives containing the draft rulings Guerra had written.[914]   On other occasions, Guerra and Zambrano shipped the materials to each other in freight packages via the

---

[909]
     PX 4800 (Guerra Direct) ¶ 11.

[910]
     *Id.* ¶ 11.

[911]
     *Id.* ¶ 13.

[912]
     *Id.*

[913]
     *Id.*

[914]
     *Id.*

Ecuadorian TAME airline.[915]

Guerra testified that Zambrano generally paid Guerra for his ghostwriting services in cash when they met in the Quito airport.[916]  On various occasions, however, Zambrano deposited the money directly into Guerra's account at Banco Pichincha in Quito.[917]

That Guerra ghostwrote orders for Zambrano in cases other than Chevron is corroborated by independent evidence Chevron produced at trial.

*First,* as will be seen, Guerra in 2012 provided Chevron with full access to the hard drive of his personal computer.[918]  That hard drive contained drafts of 105 rulings issued by the Lago Agrio court in cases unrelated to the Chevron case from December 22, 2010 through November 28, 2011.[919]  At least 101 of the 105 draft rulings were issued by then-judge Zambrano or in cases assigned to him.[920]

---

[915]

*Id.* ¶¶ 13-15.

Guerra testified that he generally shipped the documents to Zambrano directly.  At times, however, he shipped them to other individuals in Lago Agrio, who would then deliver them to Zambrano.  *Id.* ¶ 16.

[916]

*Id.* ¶ 17.

[917]

*Id.*

[918]

*Infra Facts* § XI.A.1.a.iii.

[919]

PX 375, PX 1468, PX 1773-PX 1875; PX 4100 (Lynch Direct) ¶ 3e; PX 2177 (Summary Chart of non-Chevron draft rulings on Guerra's computer).

[920]

PX 4100 (Lynch Direct) ¶¶ 54-68.  Chevron expert Spencer Lynch, the Director of Digital Forensics at Stroz Friedberg, LLC (*id.* ¶ 1) compared the drafts orders found on Guerra's computer to court rulings published on the Ecuadorian court website, http://www.funcionjudicial-sucubios.gob.ec/index.php/consulta-de-causas, in cases assigned to Zambrano.  *Id.*  His analysis revealed that text "appear[ed] verbatim, or nearly verbatim

227

*Second*, the fact that Guerra and Zambrano at times shipped documents between them is corroborated by TAME's certified shipping records.[921]   The records reveal that, between November 18, 2009, and February 28, 2012, Guerra and Zambrano shipped 16 packages between them.[922]   The description of these packages generally was either "documents" or "package with documents.'"[923]

Zambrano admitted that he and Guerra had a close relationship[924] that continued after Guerra was removed from the court and after Zambrano became a judge.[925]   He admitted also that "Guerra helped [him] with the drafting of orders in [Zambrano's] cases," though he said that the arrangement did not include the Chevron case.[926]   Thus, there is no doubt that Guerra ghostwrote orders for Zambrano for some time.

Zambrano at one point did deny that he paid Guerra for doing so although his

---

in 105 rulings issued by the Ecuadorian court [and] . . . [a]t least 101 of the 105 rulings were issued by then-judge Zambrano or in cases assigned to then-judge Zambrano." *Id* ¶ 68b-c.

[921]

PX 1682 (TAME Shipment Records For Alberto Guerra Between Nov. 19, 2009 and Feb. 28, 2012).

[922]

*Id.*

[923]

*Id.*

[924]

Tr. (Zambrano) 1629:25-1630:4.

[925]

*Id.* 1811:6-1812:2.

[926]

*Id.* 1630:22-24.

228

testimony on the point was inconsistent.[927]  But Guerra produced his day planners covering the period July 14, 2011 through July 12, 2012,[928] which corroborate his testimony, at least for the period they cover.[929]

The Court sees no persuasive reason why Guerra would have done this work for Zambrano without compensation, especially given that Guerra had been removed from the bench even before Zambrano became a judge and was in financial difficulty.  Indeed, while Zambrano at one point denied such payments, his testimony on this point actually was internally contradictory and his claim that Guerra worked for nothing was not credible.   And while it is true, as defendants argue, that the available day planners do not begin until 2011, the logic of the situation also supports Guerra's version.

The Court finds that Zambrano compensated Guerra for drafting orders on his civil cases and that the arrangement began in late 2008 or early 2009 and in any case before there was any immediate prospect of Zambrano being assigned the Chevron case.  Zambrano's testimony that he did not pay Guerra and that the arrangement began in 2010 is not credible.

---

[927]

As Chevron pointed out, Zambrano "stated that Guerra assisted him with drafting court orders because, at the time, Guerra 'was facing a great financial need.' Tr. (Zambrano) 1630:22-1631:3; *see also id.* 1814:4-11 (Guerra 'was facing a very delicate financial situation').  But, despite having permitted Guerra to assist him by drafting orders because of Guerra's financial desperation, Zambrano denied having paid Guerra for ghostwriting his orders – implausibly implying that Guerra's financial need had resulted in his working for nothing. Tr. (Zambrano) 1630:22-1631:6." DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 101.

[928]

PX 1733 (Guerra Daily Planner); PX 1734 (Guerra Daily Planner).

He testified that he had lost the prior day planners.  Tr. (Guerra) 1025:1-17.

[929]

PX 1735 (Guerra Daily Planner), at 1, 180; PX 1685 (Guerra Daily Planner Entry for Feb. 24, 2012).

2.      *Zambrano's First Tenure Presiding Over the Lago Agrio Case*

a.      *Guerra Reaches out to Chevron*

In August 2009, Judge Nuñez was presiding over the Lago Agrio case.  A scandal allegedly involving his conduct and the Chevron case broke in consequence of which he left the case and Zambrano became the presiding judge.  According to Guerra, Zambrano instructed Guerra to reach out to the attorneys for Chevron "in order to negotiate an agreement by which the company would pay Zambrano and [Guerra] for issuing the final judgment in Chevron's favor."[930]  Zambrano, Guerra said, believed that "Chevron would have much more money than the Plaintiffs for this agreement, and therefore [he] could get a better deal and greater benefits" from the company.[931]

Pursuant to Zambrano's instruction, Guerra called Alberto Racines, an attorney at the law firm of Adolfo Callejas, Chevron's Ecuadorian counsel, some time in the August to October 2009 period.[932]  The two met, and Guerra informed Racines that he "could establish a direct connection with Judge Zambrano so they could discuss and negotiate important and decisive issues in the case, including the judgment."[933]  After the meeting, Guerra continued to contact Racines and pressed him to "do the deal," but Racines ultimately rejected Guerra's proposal.[934]

---

[930]        PX 4800 (Guerra Direct) ¶ 22.

[931]        *Id.*

[932]        *Id.* ¶ 22; Tr. (Guerra) 916:3-3.

[933]        PX 4800 (Guerra Direct) ¶ 22; Tr. (Guerra) 916:3:917-4.

            Guerra did not tell Racines that he was ghostwriting orders for Zambrano.  Tr. (Guerra) 917:5-7.

[934]        Tr. (Guerra) 917:8-20.

230

Guerra claims that he reported Racines' rejection to Zambrano, who then decided to explore the possibility of a deal with the plaintiffs.[935]   Zambrano explained that he already had reached an agreement with the LAPs' representatives to "move the case along in their favor" and told Guerra that he should "work out a financial agreement directly with Fajardo for payment of [Guerra's] ghostwriting services."[936]

> b.     *Following Chevron's Rejection, Guerra Makes a Deal With the LAPs*

Guerra said that he first met with Fajardo in Quito to discuss the matter.[937]   They agreed that: (1) Guerra would "move the case quickly," (2) "Chevron's procedural options would be limited by not granting [its] motions on alleged essential errors in rulings [Guerra] was to write," and (3) the LAPs' "representatives would pay [Guerra] approximately USD $1,000 per month for writing the court rulings [] Zambrano was supposed to write."[938]   But Fajardo told Guerra that Guerra should meet with Donziger promptly so that Donziger could hear the deal from Guerra's mouth.  This was necessary, Fajardo said, because Donziger "was the boss of the attorneys – of the legal team" and "all important matters should be brought to [his] attention."[939]

At Fajardo's request, according to Guerra, Guerra several days later allegedly met

---

[935]

   PX 4800 (Guerra Direct) ¶ 23.

[936]

   *Id.*

[937]

   *Id.*; Tr. (Guerra) 919:6-14.

[938]

   PX 4800 (Guerra Direct) ¶ 23; Tr. (Guerra) 920:2-7.

[939]

   PX 4800 (Guerra Direct) ¶ 23; Tr. (Guerra) 921:6-20.

with Donziger, Fajardo, and Yanza at the Honey & Honey Restaurant in Quito.[940]   Fajardo

summarized for Donziger the three aspects of the agreement he had reached with Guerra.[941]

Donziger, said Guerra, "thanked [Guerra] for [his] work as Zambrano's ghostwriter in th[e] case and

for helping steer the case in favor of the Plaintiffs."[942]

 

       *c.*       *Guerra Drafted Zambrano's Orders in the Chevron Case*

       During Zambrano's first tenure on the Chevron case Guerra wrote many of

Zambrano's rulings in that case as well as others.[943]   He drafted most – but not all – in the LAPs'

favor.[944]   He continued to deliver the rulings to Zambrano by hand at the Quito airport or shipped

them via TAME.[945]   He testified that he occasionally met or spoke on the phone with Fajardo "to

discuss matters that were to be included in the court orders in the case. . . ."[946]

---

[940]

     PX 4800 (Guerra Direct) ¶ 25; Tr. (Guerra) 921:5-25.

[941]

     PX 4800 (Guerra Direct) ¶ 27.

[942]

     *Id.*; Tr. (Guerra) 925:6-14.

[943]

     PX 4800 (Guerra Direct) ¶ 31; Tr. (Guerra) 930:7.

[944]

     Tr. (Guerra) 930:14-16.

     He occasionally drafted orders, or portions of orders, to favor Chevron because, he explained, "it could seem too obvious if every single portion of every single court order that [Guerra] drafted[.] [I]t could seem as though all of the orders were being issued for the benefit of the plaintiffs.  That would have looked suspicious and the idea was to not have it look suspicious."  *Id.* 930:20-24.

[945]

     PX 4800 (Guerra) ¶ 31.

[946]

     Tr. (Guerra) 931:8-11.

In addition to 105 drafts of orders in Zambrano's other cases,[947] Guerra's computer contained nine drafts of orders that Zambrano issued in the Lago Agrio Chevron case between October 21, 2009 and February 17, 2010.[948]  Forensic analysis demonstrated that eight of those nine draft orders last were saved to Guerra's computer prior to the date on which Zambrano issued the corresponding order,[949] generally by only a few days.[950]  The Court finds that the Zambrano orders were prepared from the Guerra drafts.  The Guerra draft orders corroborate his testimony that he was ghostwriting orders for the Chevron case, although not the claim of an arrangement between Zambrano and the LAPs.

---

[947]

   *Supra* note 920.

[948]

   PX 1172, 1173, 1186, 1190-1193, 1197, 1209, 1220, 1243 (Guerra Draft Chevron Orders); PX 4100 (Lynch Direct) ¶ 34.

[949]

   PX 4100 (Lynch Direct) ¶ 48.

[950]

   *Id.* ¶ 45 & Table 10.

   Although the last-saved date for the ninth order postdated Zambrano's issuance of it, it is much more likely it actually was created by Guerra before Zambrano issued its counterpart.  Chevron's forensic expert testified that the metadata of the order – which is 72 pages long – reflects that the order was edited for a total of only two minutes before it was last saved.  Because it is impossible to draft a 72-page document in two minutes, and because the order is nearly identical to the order that was issued by Zambrano, it is much more likely, and the Court finds, that the ninth draft order was written by Guerra, issued by Zambrano, and for some reason later last-saved on Guerra's computer.  *Id.*

   The Court notes also that the fact that these draft Chevron orders all had a file system create date of July 23, 2010 does not suggest that all were created then or that they were not prepared by Guerra when he said he prepared them.  Forensic analysis of his computer showed that he installed Windows XP on July 23, 2010 and then transferred these draft orders, as part of a larger transfer of data on the same date, from an external hard drive.  The obvious inference is that Guerra backed up his computer to the external hard drive before installing Windows XP and then restored his files from the external hard drive to the computer.  PX 4100 (Lynch Direct) ¶¶ 34-37; *see* Tr. (Lynch) 557:1-558:10.

*d.*      *The LAP Team Paid Guerra for His Ghostwriting Services*

According to Guerra, the LAP team paid Guerra for his ghostwriting work directly, either in cash or by deposit into his bank account.[951]   Fajardo sometimes paid him in cash on the street in Quito.[952]   On other occasions, members of the LAP team deposited money into Guerra's account at Banco Pichincha.[953]

Records of Guerra's bank account at Banco Pichincha[954] establish also that Guerra was paid by the LAPs' lawyers.

Guerra's account statements and deposit slips confirm that in each of October, November, and December 2009, and February 2010, $1,000 was deposited into Guerra's account at Banco Pichincha.[955]   The deposits for December 2009 and February 2010 both were made by Ximena Centeno, who Donziger confirmed was an employee of Selva Viva at the time each deposit

---

[951]

PX 4800 (Guerra Direct) ¶ 31; Tr. (Guerra) 931:21-22.

[952]

PX 4800 (Guerra Direct) ¶ 32; Tr. (Guerra) 932:10-11 ("[Fajardo] would hand me a blank white envelope and inside the envelope were [$]20 and $50 bills.").

[953]

PX 4800 (Guerra Direct) ¶ 33.

[954]

The Court has concluded, for reasons set out in Appendix III, that the records are admissible and it finds them persuasive.

[955]

PX 1713 (Guerra Banco Pichincha Deposit Slips); PX 1689, 1706-1708 (Guerra Banco Pichincha Account Statements).

234

was made.[956]  Those two deposit slips[957] bear signatures and a national identity number that match

Centeno's signature and national identity number as shown on her national identity card.[958]  The

authenticity of both of those deposit slips, moreover, was confirmed entirely independently of

Guerra.[959]  And all four deposits tie in to defendants' own emails, which remove any doubt as to

whether the LAPs in fact made these deposits to Guerra's account.

Beginning in mid-2009, Fajardo began an email chain that involved Donziger and

others and that referred to the PUPPET and the PUPPETEER.  The text and context of the emails

demonstrate these terms were code names, and that PUPPETEER referred to Guerra and PUPPET

referred to Zambrano.[960]  These emails confirm Guerra's testimony about the ghostwriting deal he

made with the LAPs during Zambrano's first term on the case.

---

[956]

PX 1719 (Dec. 23, 2009 Deposit Slip); PX 1718 (Feb. 5, 2010 Deposit Slip); Tr. (Donziger) 2596:1-4 ("Q.  Ximena Centeno [wa]s an employee of Selva Viva [in December 2009], correct, sir?  A.  My understanding was that she worked for Selva Viva at that time, yes.").

[957]

PX 1718 (Feb. 2010 Guerra Banco Pichincha Deposit Slip); PX 1713 (same), at 8; PX 1719 (Dec. 2009 Guerra Banco Pichincha Deposit Slip); PX 1713 (same), at 1.

[958]

PX 1741 (X. Centeno national identity card).  The admissibility of this exhibit is dealt with in Appendix V.I.

[959]

DI 1671 (Owen Decl.) *passim.*  The declaration was filed in opposition to defendants' motion (DI 1660) to strike, among other things, bank records offered through Guerra.  Defendants neither objected to consideration of the declaration nor, for that matter, replied to Chevron's opposition to their motion.  In any case, the Court is not bound by the rules of evidence in deciding preliminary questions of admissibility.  FED. R. EVID. 104(a).

[960]

Donziger and Fajardo often used code names in internal emails.  As Donziger admitted in a deposition, he did so "to prevent any reader of those documents from knowing exactly who it was [he] w[as] talking about. . . ."  Donziger Jan. 29, 2011 Dep. Tr. at 3817:13-18.  One admitted example is Fajardo's 2007 cook-waiter-restaurant email, discussed above, in which Donziger admitted that "cook"  meant Judge Yánez, "waiter" meant Cabrera, and "restaurant" meant Chevron.

The chain began on September 15, 2009 – shortly after Judge Nuñez had recused himself and at about the same time at which (1) Zambrano had begun acting on the Chevron case, and (2) Guerra said he struck the ghostwriting deal with Fajardo and Donziger – with an email from Fajardo to Donziger, Sáenz, Prieto, and Yanza.  The subject was "PUPPETEER."  Fajardo wrote:

> "I think that everything is quiet … The puppeteer is pulling the string and the puppet is returning the package… By now it's pretty safe that there won't be anything to worry about… The puppet will finish off the entire matter tomorrow…  I hope they don't fail me …"[961]

As we have seen, Zambrano formally took over and issued his first two orders in the Lago Agrio case on October 21, 2009.[962]  On the same day, Fajardo emailed his colleagues to assure them that "things here are under control."[963]  Then, on October 27, 2009, Fajardo emailed Donziger and Yanza that "[t]he puppeteer won't move his puppet unless the audience pays him something."[964]  Two days later, $1,000 was withdrawn from Selva Viva's account at Banco Pichincha.[965]  That same day, $1,000 in cash was deposited into Guerra's account.[966]

On November 26, 2009, another $1,000 in cash was withdrawn from the Selva Viva

---

[961]  PX 1753 (Sept. 15, 2009 Email from P. Fajardo to S. Donziger, J. Prieto, J. Sáenz, L. Yanza, and renatog85@hotmail.com re: "PUPPETEER") (ellipses in original).

[962]  He had issued some orders in it earlier.  *E.g.*, PX 348 (Oct. 3, 2009 Lago Agrio Court Order).

[963]  PX 1176 (Oct. 21, 2009 Email from P. Fajardo to S. Donziger, J. Sáenz, J. Prieto, L. Yanza, and R. Garcia re: "ONWARD").

[964]  PX 1751 (Oct. 27, 2009 Email from P. Fajardo to S. Donziger and L. Yanza re: "NEWS").

[965]  PX 583 (Banco Pichincha Account Summary for Selva Viva), at 51.

[966]  PX 1713 (Guerra Deposit Slips), at 10.

236

account.[967]  On November 27,$1,000 in cash was deposited into Guerra's bank account.[968] On the same day, Yanza emailed Donziger and explained that "the budget is higher in relation to the previous months, since we are paying the puppeteer. . . ."[969]

On December 22, 2009, $1,000 was withdrawn from the Selva Viva bank account.[970] The next day, Selva Viva employee Ximena Centeno deposited $1,000 into Guerra's account.[971]

On February 4, 2010, $1,000 was withdrawn from the Selva Viva bank account.[972] The next day, Ximena Centeno deposited $1,000 into Guerra's account.[973]

The alleged arrangement among the LAPs, Guerra, and Zambrano continued until Zambrano was replaced on the Lago Agrio case by Judge Leonardo Ordóñez in February 2010.[974] Although he no longer was working for the LAPs, Guerra subsequently continued to ghostwrite orders in Zambrano's civil cases.[975]

---

[967]
    PX 583 (Banco Pichincha Account Summary for Selva Viva), at 51.

[968]
    PX 1713 (Guerra Deposit Slips), at 5, 11.

[969]
    PX 1746 (Nov. 27, 2009 Email from L. Yanza to S. Donziger).

[970]
    PX 583  (Banco Pichincha Account Summary for Selva Viva), at 52.

[971]
    PX 1713 (Guerra Deposit Slips), at 7; PX 1719 (same), at 1.

[972]
    PX 583 (Banco Pichincha Account Summary for Selva Viva), at 53.

[973]
    PX 1713 (Guerra Deposit Slips), at 8; PX 1718 (same), at 1.

[974]
    PX 4800 (Guerra Direct) ¶ 35; PX 2522 (Timeline of Judges in the Lago Agrio Litigation).

[975]
    PX 4800 (Guerra Direct) ¶ 35.

> D.    *Ultimate Findings on This Point – Guerra Was Zambrano's Paid Ghostwriter in Civil Cases and Was Paid By Donziger and the LAPs To Write Some of Zambrano's Orders in the Chevron Case*

The Court finds that during Zambrano's first term on the Chevron case, Guerra was ghostwriting orders for him in civil cases generally and, to some extent, on the Chevron case in particular. He was paid for those services, at least as to the cases other than Chevron, by Zambrano. The bank records prove that he was paid for his services on the Lago Agrio Chevron case by the LAPs as well, which they did with Donziger's authorization and agreement.[976] This is confirmed by the PUPPETEER emails, in which PUPPETEER referred to Guerra and PUPPET to Zambrano. Indeed, the events of October 26-29, 2009, and of November 26-27, 2009, make that conclusion virtually inescapable.

Defendants offered no evidence or testimony that rebuts or explains these emails or the payments. Fajardo and Yanza, the authors of the emails, declined to testify. Donziger at his deposition denied knowledge of the identities of the PUPPETEER and the PUPPET and claimed neither to have known to what Fajardo had been referring nor to have discussed the matter with him.[977]

Donziger attempted at trial to pass off the code names as jokes or nicknames.[978] But that attempt is unpersuasive, particularly in light of the fact that he admitted in a deposition that the LAP team used code names in emails "to prevent any reader of those documents from knowing

---

[976]    *Infra Facts* § XI.D.2.

[977]    Donziger June 24, 2013 Dep. Tr. at 285:14-286:22; Donziger June 25, 2013 Dep. Tr. at 389:23-390:2.

[978]    Tr. (Donziger) 2592:12-15, 2592:24-2593:4.

238

exactly who it was [he] w[as] talking about."[979]  So too is his contention that he does not know who

the PUPPET and the PUPPETEER were but that they were not Zambrano and Guerra.[980]

But there remains an important qualification.  Guerra asserted at trial that Zambrano,

during his first tenure on the case (late 2009 into early 2010), told him that he, Zambrano, had made

an agreement with the LAPs to move the case along in their favor and told Guerra to work out a deal

with Fajardo to obtain payment from the LAPs for Guerra's ghostwriting services.  Guerra claimed

that he then met – first with Fajardo and later with Fajardo, Donziger, and Yanza – and worked out

a deal to move the case in the LAPs' favor, limit Chevron's procedural options by denying its

motions claiming essential errors, and to receive $1,000 per month from the LAPs for doing those

orders for Zambrano.

Guerra first began telling his story to Chevron representatives in June 2012.  He had

a series of discussions with Chevron's lawyers in Ecuador, at least some of which were recorded and

transcribed.   In the June 25, 2012 interview, Guerra told a slightly different story about his

ghostwriting role with respect to the Chevron Lago Agrio case during Zambrano's first tenure.

Although he said that he was ghostwriting for Zambrano on the Chevron case and others, he never

mentioned that Zambrano had reached any arrangement with the LAPs to issue orders in their favor.

To the contrary, he suggested that Zambrano's motives for wanting to move the case were vanity

and the hope that, if the case proceeded quickly, Zambrano later might be in a position to decide it

---

[979]    Donziger Jan. 29, 2011 Dep. Tr. at 3817:13-18.

[980]    *Id.* 2593:5-23.

239

and then to extract a lucrative payment from someone.[981]  Indeed, Guerra told an anecdote, that he attributed to Fajardo, in which Fajardo claimed that he had approached Zambrano during this period (*i.e.*, Zambrano's first tenure on the case) to try to have the case expedited, but that Zambrano had thrown him out of his office.[982]

This inconsistency was not explored at trial by either side.  Nevertheless, it is not easily reconciled with the truth of Guerra's later testimony that Zambrano had told him that Zambrano already had reached an unspecified arrangement with the LAPs to move the case quickly as opposed to wishing to do so for his own reasons.  There is no other evidence that this arrangement took place.  The Court therefore declines to find that the alleged arrangement between Zambrano and the LAPs during Zambrano's first tenure on the Lago Agrio case existed or to credit Guerra's testimony with respect to the alleged 2009 Honey & Honey restaurant meeting.[983]

We proceed now to Zambrano's second tenure in the Lago Agrio Chevron case, the

---

[981]

DX 1360 (June 25, 2012 Interview Transcript), at 42-45 (during period in which Guerra wrote orders for Zambrano, Zambrano told him not to "give Chevron room for anything" out of vanity and avoidance of delay because he wanted to issue the judgment), 65 ("[d]on't give Chevron any room" "to reach such a point as to say: 'Well, right now . . . , now we're in a situation to talk, see.  Cut the bull.  Do you want to talk to me?'").

[982]

*Id.* at 69-70.

[983]

Donziger argued that Guerra must have lied concerning the alleged fall 2009 meeting at the Honey & Honey restaurant because Donziger was not then in Ecuador.  While the Court does not credit Guerra's testimony with respect to that meeting, it finds Donziger's argument that he was not in Ecuador when it allegedly took place unpersuasive.  Ecuadorian records establish that Donziger was in Ecuador from October 6 until some time on October 9, 2009.  PX 1509 (Donziger Immigration Records).  Donziger's contention that the alleged meeting must have taken place at a different time rests on assumptions that the Court regards as unfounded.  Nevertheless, the point is academic in view of the Court's finding on this point, which to reiterate is that the LAPs, with Donziger's authorization, paid Guerra during this period to ghostwrite Zambrano's orders on the Chevron case and to do so to their advantage.

240

bribe, and the Judgment.

XI.     *The Story Ends:  The LAPs Bribed Zambrano to Allow Them to Write the Judgment and Issue It Under His Name*

As noted, Zambrano returned to preside over the Lago Agrio Chevron case in late 2010 when the case had progressed to the point at which a judgment was near.  Chevron contends that the LAPs reached a deal with Zambrano by which they agreed to pay him $500,000 to allow them to write the Judgment in their favor, which he would sign and issue as his own.  Guerra was instrumental in facilitating this plan.  The Court in this section assesses Chevron's allegations.  It first details each witness' account of what transpired among Guerra, Zambrano, and the LAPs during Zambrano's second tenure on the Lago Agrio Chevron case.  It then discusses the pertinent credibility problems of each witness and examines the evidence corroborating or conflicting with each account.  Finally, it explains why – given the history of the litigation, the weight of the evidence, and the credibility of the witnesses – the bribery claim is the explanation that makes sense and is persuasive.

A.   *Zambrano's Second Tenure Presiding Over the Lago Agrio Chevron Case: The Accounts of the Three Witnesses at Trial*

1.   *Guerra*

a.   *Guerra's Account*

i.   *More Ghostwriting, The Bribe, and The Judgment*

In August 2010, Chevron moved to recuse Judge Ordóñez.[984]  According to Guerra, Zambrano "saw this as an opportunity to once again take control of the Chevron case, and asked [Guerra] to help him write the court ruling sustaining Judge Ordóñez's disqualification from the case."[985]  Zambrano saw this also as a chance to reach out to Chevron's attorneys once again in the hopes of striking a deal.  Zambrano instructed Guerra to make another overture to the Callejas firm.[986]

At more or less the same time, Guerra, who had maintained contact with the LAP team, on September 5, 2010, emailed Donziger to ask for legal advice on an immigration issue relating to Guerra's daughter.[987]  But he closed with the statement that he would "support the matter of Pablo Fajardo so it will come out soon and well."[988]  Guerra testified that the only business Guerra then had with Fajardo was the Lago Agrio case and that he and Zambrano knew by this date that

---

[984]

PX 4800 (Guerra Direct) ¶ 36.

[985]

*Id.*; Tr. (Guerra) 975:15-977:3.

[986]

PX 4800 (Guerra Direct) ¶ 36; Tr. (Guerra) 987:1-21.

[987]

PX 4800 (Guerra Direct) ¶ 37; Tr. (Guerra) 1033:24-1034:20.  Guerra testified also that he discussed with Donziger an immigration issue concerning his son at the Honey & Honey Restaurant.  Tr. (Guerra) 925:17-926:1.

[988]

PX 1745 (Sept. 5, 2010 Email from A. Guerra to S. Donziger re: "Greetings from Quito").

Zambrano would return to the case.[989]  Thus, his message was an assurance to Donziger that he would continue to assist the LAPs with respect to the case so that it would "come out soon and well."[990]  Donziger did not reply to Guerra directly, but Fajardo later told Guerra that Donziger had received the email and was looking into the matter.[991]

Guerra pursued the prospect of a deal with Chevron.  He testified that "[g]iven that [his] previous attempts to approach Chevron through Mr. Racines had been unsuccessful, on this occasion [Guerra] asked an intermediary to propose to Chevron's attorneys that Chevron write the final judgment in the case in exchange for a payment to Mr. Zambrano and" to Guerra.[992]  The intermediary informed Guerra that he or she had reached out to attorneys at the Callejas firm and that the attorneys had rejected the overture.[993]

Guerra allegedly reported this to Zambrano, who then suggested that Guerra approach the LAPs' representative with essentially the same proposition – "that they could obtain a verdict in their favor, in exchange for a payment of at least USD $500,000 to Mr. Zambrano; and for

---

[989] Tr. (Guerra) 1035:13-20.

[990] *Id.* ("By this date, Judge Zambrano and I knew that later on Judge Zambrano would rehear the case.  In these circumstances and through this message, specifically regarding the issue that I will support the matter of Pablo Fajardo so it will come out soon and well, this subject was related only with the Chevron case.").

[991] PX 4800 (Guerra Direct) ¶ 37.

[992] *Id.* ¶ 39; Tr. (Guerra) 987:5-21.

[993] PX 4800 (Guerra Direct) ¶ 40; Tr. (Guerra) 990:9-18.

whatever amount [Guerra] could negotiate or agree to for [him]self."[994]  Guerra then took the offer

to Fajardo, who allegedly was enthusiastic but said that he had to discuss it with Donziger.[995]  Days

later, Guerra said, he received a call from Fajardo, who asked him to a meeting with himself,

Donziger, and Yanza.[996]

        The meeting took place at the Honey & Honey restaurant in Quito.  Guerra

summarized the proposal.  Donziger had several questions for Guerra, including how he could be

sure that Zambrano actually would  rule in the LAPs' favor if the payment were made.[997]  Guerra

assured Donziger that he could trust Zambrano.  Although he appeared interested in the deal,

Donziger ultimately replied that they, the LAPs, did not then have that sum of money.[998]

        Some time later, Zambrano informed Guerra that he had been in direct contact with

Fajardo and that "the Plaintiffs' representatives had agreed to pay him USD $500,000 from whatever

money they were to collect from the judgment, in exchange for allowing them to write the judgment

in the Plaintiffs' favor."[999]  Zambrano told Guerra that he would share some of the money with

---

[994]      PX 4800 (Guerra Direct) ¶ 41; Tr. (Guerra) 990:9-23.

[995]      PX 4800 (Guerra Direct) ¶ 41; Tr. (Guerra) 991:20-993:22.

[996]      PX 4800 (Guerra Direct) ¶ 42; Tr. (Guerra) 995:5-22.

[997]      PX 4800 (Guerra Direct) ¶ 42; Tr. (Guerra) 995:23-997:9.

[998]      PX 4800 (Guerra Direct) ¶ 42; Tr. (Guerra) 996:12-16.

[999]      PX 4800 (Guerra Direct) ¶ 43; Tr. (Guerra) 999:24-1001:12.

244

Guerra once it was paid to him.[1000]

Guerra then resumed his role as Judge Zambrano's ghostwriter, albeit in a manner different from before.[1001]  Zambrano "advised [Guerra] that [they] had to be more careful because the attorneys for Chevron would be very attentive to any irregularities.  Because of that, there were times when [Guerra] traveled to Lago Agrio to work on the court rulings for the Chevron case" and he shipped documents via TAME less frequently.[1002]

When Guerra was in Lago Agrio, he said, he worked on the Chevron rulings in Zambrano's apartment.[1003]  He drafted them on a laptop Fajardo had given him during Zambrano's first tenure on the Chevron case.[1004]  When he completed a ruling, he left the laptop for Zambrano, who did not have a printer, and Zambrano took it elsewhere to print the document.[1005]  Zambrano then had the orders re-typed on his personal work computer in his office at the courthouse by Calva.[1006]  Zambrano apparently did this because "he did not want to upload the draft order onto his

---

[1000]

PX 4800 (Guerra Direct) ¶ 43; Tr. (Guerra) 1002:2-7.

There were objections to this testimony, which the Court ultimately received for the reasons set forth in Appendix V.II.

[1001]

PX 4800 (Guerra Direct)  ¶ 44; Tr. (Guerra) 1002:8-19.

[1002]

PX 4800 (Guerra Direct) ¶ 44; Tr. (Guerra) 1000:24-1001:2, 1002:8-1003:11.

[1003]

PX 4800 (Guerra Direct) ¶ 46; Tr. (Guerra) 1003:17-1004:7.

[1004]

PX 4800 (Guerra Direct) ¶ 46; Tr. (Guerra) 1003:7-16.

[1005]

PX 4800 (Guerra Direct) ¶ 46; Tr. (Guerra) 1002:15-19.

[1006]

PX 4800 (Guerra Direct) ¶ 46; Tr. (Guerra) 1002:15-1003:3.

245

work computer from a flash drive, as he understood that computer technicians could detect when that happens and he did not want it to become known that the orders had not been drafted on his work computer."[1007]

About two weeks before the Judgment was issued in February 2011, Guerra went to Zambrano's apartment where he said he met with Fajardo and Zambrano. "Zambrano gave [Guerra] a draft of the judgment so that [Guerra] could revise it."[1008] He told Guerra that the LAPs' attorneys had written the judgment and delivered it to him, and it was then Guerra's job to "work on the document to fine-tune and polish it so it would have a more legal framework."[1009] Fajardo told Guerra to call him if Guerra needed any further assistance.[1010]

Guerra worked on the draft judgment in Zambrano's apartment for several hours over the course of two days.[1011] At some point, he called Fajardo to ask him about two sections of the draft that confused him, and Fajardo told him he would provide him with a "memory aid" to clarify Guerra's concerns.[1012] Fajardo brought it over to Zambrano's apartment later that day.[1013]

---

[1007]

PX 4800 (Guerra Direct) ¶ 46.

[1008]

*Id.* ¶ 47; Tr. (Guerra) 1009:6-1010:6.

[1009]

PX 4800 (Guerra Direct) ¶ 47; Tr. (Guerra) 1009:6-1010:6.

[1010]

PX 4800 (Guerra Direct) ¶ 47; Tr. (Guerra) 1010:21-1011:7.

[1011]

PX 4800 (Guerra Direct) ¶ 48; Tr. (Guerra) 1010:18-20.

[1012]

PX 4800 (Guerra Direct) ¶ 49; Tr. (Guerra) 1011:8-23.

[1013]

PX 4800 (Guerra Direct) ¶ 49; Tr. (Guerra) 1011:24-1012:12.

Guerra's edits were minor, involving mainly spelling and punctuation.[1014]  When he was through, he returned the document to Zambrano on the laptop.[1015]  The document was "not too different from the one that the Plaintiffs lawyers had given to Mr. Zambrano."[1016]  Zambrano later told Guerra that "the Ecuadorian Plaintiffs' attorneys made changes to the judgment up to the very last minute before it was signed and issued by Judge Zambrano" on February 14, 2011.[1017]

Three days after it was issued, Chevron filed a request for expansion and clarification of the Judgment.[1018]  Guerra testified that he assisted Zambrano over the phone as he prepared the supplemental and clarification order,[1019] which was issued on March 4, 2011.[1020]

ii.     *Guerra's Last Meeting with the LAP Team*

Guerra continued assisting Zambrano with orders in his civil cases until Zambrano was dismissed from the court.[1021]  He had no further contact with the LAP team save a meeting in

---

[1014]

PX 4800 (Guerra Direct) ¶ 49.

[1015]

*Id.*; Tr. (Guerra) 1017:23-1018:7.

[1016]

PX 4800 (Guerra Direct) ¶ 49; Tr. (Guerra) 1020:3-5.

[1017]

PX 4800 (Guerra Direct) ¶ 51; Tr. (Guerra) 1018:18-25.

[1018]

PX 2502 (Chevron Request for Clarification of Judgment).

[1019]

PX 4800 (Guerra Direct) ¶ 52; Tr. (Guerra) 1020:6-9.

[1020]

PX 429 (Mar. 4, 2011 Judgment Clarification Order).

[1021]

PX 4800 (Guerra Direct) ¶ 54; Tr. (Guerra) 1020:19-22.

247

May or June 2011 with Fajardo and one of the LAP Representatives' U.S. lawyers at which Fajardo and the U.S. lawyer asked Guerra to "testify [in this case] about the suitability of the Ecuadorian legal system."[1022]

### iii.   Guerra Contacts Chevron

Guerra testified that in April 2012, Zambrano, who by then recently had been dismissed from the court, authorized Guerra to "begin talks with Chevron's representatives to reveal the truth regarding the drafting of the judgment in the Chevron case."[1023]  Guerra explained that "[i]n [his] initial discussions with Chevron's representatives . . . [he] attempted to negotiate a large payment for [himself], as [he] believed that, with the substantial $18 billion judgment issued by Mr. Zambrano, Chevron would be willing to pay [Guerra] a substantial amount for evidence and testimony that the judgment was illegal and obtained by fraud."[1024]

Zambrano "ultimately had a change of heart" and told Guerra "that he was not willing to provide information to Chevron or to reveal the truth."[1025]  Guerra continued cooperating with Chevron's representatives nonetheless.   He informed them that he had ghostwritten for

---

[1022]

       PX 4800 (Guerra Direct) ¶ 55.

       Fajardo offered to pay for Guerra $5,000 for his testimony and to cover his airfare and expenses.  Guerra did not disclose to the U.S. lawyer that he had served as Zambrano's ghostwriter or that Zambrano had agreed to $500,000 from the LAP team.  *Id.*  After the meeting, Fajardo never followed up with Guerra and the subject was dropped.

[1023]

       *Id.* ¶ 58.

[1024]

       *Id.*

[1025]

       *Id.* ¶ 60.

Zambrano.[1026] He disclosed that the LAP team agreed to pay Zambrano $500,000 from any proceeds collected on the Judgment in order to be able to ghostwrite it.[1027] And he told them he had physical evidence to back up his story. Guerra agreed also to make himself available to testify in this case,[1028] although Chevron's attorneys "told [him] repeatedly that Chevron absolutely would not pay [him] for testimony."[1029]

     In July 2012, Guerra began to turn over physical evidence to Chevron's representatives. He gave them his personal computer, on which he had typed many of the orders in Zambrano's cases,[1030] two cellular telephones,[1031] his daily planners,[1032] TAME shipping records,[1033] his cellular telephone records,[1034] bank records, and credit card statements.[1035] And he

---

[1026]

    PX 4800 (Guerra Direct) ¶ 61; PX 1671 (Guerra Jan. 27, 2013 Signed Agreement with Chevron) ¶ 2; Tr. (Guerra) 1152:12-22.

[1027]

    PX 1671 (Guerra Jan. 27, 2013 Signed Agreement with Chevron) ¶ 3.

[1028]

    *Id.* ¶ 7.

[1029]

    PX 4800 (Guerra Direct) ¶ 59.

[1030]

    PX 4800 (Guerra Direct) ¶ 61; PX 1736#; Tr. (Guerra) 1118:13-16.

[1031]

    PX 4800 (Guerra Direct) ¶ 61; PX 1738 #.

[1032]

    PX 1733, 1734 (Guerra Daily Planners); Tr. (Guerra) 1125:7-9.

[1033]

    PX 1682 (TAME Shipping Records).

[1034]

    PX 1727, 1728 (Guerra telephone records).

[1035]

    PX 4800 (Guerra Direct) ¶ 61; *see* Tr. (Guerra) 1160:22-1161:3.

249

provided Chevron's investigators access to two of his email accounts.[1036]  Chevron paid Guerra a total of $48,000 for the physical evidence.[1037]

After two meetings with Chevron attorneys in Ecuador, and after he had turned over the bulk of his physical evidence,[1038] Chevron in November 2012 flew Guerra to Chicago to meet with Chevron representatives and attorneys.[1039]  Guerra there signed a declaration that was filed in this case in January 2013 in which he described his relationship with Zambrano and the drafting of the Lago Agrio Judgment.[1040]

Fearing retaliation from the ROE, Guerra and his family (including his wife, his son, and his son's family) relocated to the United States.[1041]  Chevron representatives paid for the move[1042] and, as his visa status does not allow him to work while he is in this country, Chevron pays him $10,000 per month for his living expenses, pays for health insurance coverage for Guerra and his family, leases a car for him, and pays for an attorney to represent him in any dealings with federal or state government investigative authorities or any civil litigation, and for an immigration

---

[1036]

PX 4800 (Guerra Direct) ¶ 61.

[1037]

*Id.*; PX 1671, 1672 (Guerra Agreements with Chevron); Tr. (Guerra) 1043:6-15.

[1038]

Tr. (Guerra) 1070:1-1075:4.

[1039]

*Id.* 1075:6-19.

[1040]

DX 1363 (Guerra Nov. 17, 2013 Decl.); Tr. (Guerra) 1084:13-1085:1.

[1041]

PX 4800 (Guerra Direct) ¶ 64.

[1042]

PX 1671 (Guerra Jan. 27, 2013 Signed Agreement with Chevron).

250

attorney to deal with his resident status.[1043]

Shortly after Guerra left Ecuador, the LAP team filed a criminal complaint against him there.[1044]

b.      *Assessing Guerra's Account*

i.      *Guerra's Credibility*

From the standpoint of demeanor, Guerra was an impressive witness.  He testified clearly, directly, and responsively, regardless of which side questioned him.  He rarely hesitated. On the other hand, it is appropriate to recognize that he was very extensively prepared for his testimony by Chevron.[1045]  While there is nothing wrong with extensive preparation of a witness, it may bear on the weight of the testimony.  But there is more to assessing Guerra's credibility than the fact that he came across well on the stand.

The first consideration is Guerra's self interest – including the fact that Chevron, to summarize briefly, is supporting him and has assisted his relocation from Ecuador to the United States.

Second, Guerra admitted that he often has been dishonest.[1046]  His professional history includes multiple instances in which he has accepted bribes, lied, and facilitated illegal

---

[1043]

Id.; Tr. (Guerra) 1052:24-1064:9.

[1044]

PX 4800 (Guerra Direct) ¶ 64.

[1045]

Tr. (Guerra) 1049:9-1052:7.

[1046]

PX 4800 (Guerra Direct) ¶ 55.

relationships between parties and judges. For example, Guerra testified that he:

- Issued rulings in Zambrano's favor when Guerra was a judge and Zambrano a prosecutor in Lago Agrio.  Although Guerra was "careful to issue these rulings with some legal grounds," he claimed to have known "that the party benefitting from [his] decision was paying Mr. Zambrano bribes for arranging to have the case ruled in that party's favor, and Mr. Zambrano, from time to time, shared with [Guerra] a portion of those bribes."[1047]

- As a practicing attorney, Guerra "on occasion bribed judges, including judges on the nation's highest courts, to rule in [his] clients' favor or assist [Guerra] in obtaining favorable ruling."[1048]

- As a judge, Guerra "occasionally accepted bribes from litigants in exchange for issuing favorable rulings."[1049]

- Ghostwrote orders for Zambrano in return for payments from both Zambrano and the LAP team.

- Attempted to solicit bribes from both the LAP team and, on at least two occasions, from Chevron.

- Solicited a $500,000 bribe to be paid by the LAP team to Zambrano in exchange for a ruling in the LAPs' favor.

- Was removed from the court apparently for making statements that the "Chevron case should be declared null, at a time when [he] no longer presided over the . . . case."[1050]

- Admittedly lied to the Chevron investigators in claiming that the LAPs had offered him $300,000, a lie that he explained at trial by saying that he had

---

[1047]

     *Id.* ¶ 8.

[1048]

     *Id.* ¶ 9.

[1049]

     *Id.*

[1050]

     *Id.* ¶ 7.

been trying to exaggerate his own importance.[1051]

The details of some of these admissions are important to this story and indeed form the basis for much of Chevron's theory of how the Judgment came about. They will be dealt with more fully below. For present purposes, the Court notes only that Guerra's willingness to accept and solicit bribes, and his lie to Chevron about the supposed offer by the LAPs of $300,000, and other considerations, put his credibility in serious doubt, particularly in light of the benefits he has obtained from Chevron. Indeed, Guerra admitted that he came forward because he believed he would be "rewarded handsomely."[1052] In addition, there are some inconsistencies in his story.

### ii.    Inconsistencies in Guerra's Account

As discussed, it appears that Guerra first began to tell his story to Chevron representatives in June 2012.[1053] There were three interviews in June and July 2012, two entirely and one partly recorded.[1054] He told his story again when he met with Chevron lawyers in Chicago and signed the declaration that later was filed in this case. And he told it again at trial. Each recounting yielded variations in some of the details. The Court begins with the following concerning Guerra's participation in the drafting of the Judgment as they were matters upon which

---

[1051]      Tr. 1197:3-16; DX 1360 (June 25, 2012 Interview Tr.), at 10, 29, 48, 83, 87.

[1052]      PX 4800 (Guerra Direct) ¶ 58.

[1053]      Rivero Apr. 24, 2013 Dep. Tr. at 90:12-91:4.

[1054]      *Id.* at 91:13-92:5; *see* DX 1360 (Transcript of July 13, 2012 Conversation between A. Guerra, Yohir Akerman, and A. Rivero); DX 1361 (Transcript of July 13, 2012 Conversation between A. Guerra and A. Rivero); DX 1362 (Transcript of July 31, 2012 Conversation between A. Guerra, Investigator 5, and A. Rivero).

the defendants have focused.

*First*, Guerra's testimony regarding how he allegedly received the draft of the Judgment to begin his work on it changed.

As noted, Guerra testified at trial that Zambrano gave him a draft on Fajardo's laptop approximately two weeks before the Judgment was issued so that Guerra could revise it.[1055]  Guerra then spent two days working on the document in Zambrano's apartment in Lago Agrio using Fajardo's computer.[1056]  But when he spoke with Chevron's representatives earlier, he said that Zambrano had given him a draft of the Judgment on a flash drive at the Quito airport.[1057]

*Second*, Guerra's testimony regarding his receipt of the "memory aid" from Fajardo while he was working on the Judgment changed as well.

At trial, he said that he called Fajardo to ask him about two sections of the draft that confused him at some point while he was working in Zambrano's apartment.[1058]  Fajardo then brought him the memory aid to clarify Guerra's concerns.[1059]  When Guerra met with the investigators in July 2012, however, he said that Fajardo had emailed the memory aid to him,[1060] and

---

[1055]

PX 4800 (Guerra Direct) ¶ 47.

[1056]

*Id.* ¶¶ 47-48.

[1057]

*Id.* ¶ 47.

[1058]

*Id.* ¶ 49.

[1059]

*Id.*

[1060]

DX 1361 (Tr., July 13, 2012 Conversation between A. Guerra and A. Rivero), at 48.

254

he repeated that in his November 2012 declaration.[1061]

Guerra explained at trial that "[a]t the beginning, [he] was certain that [he] had received that memory aid via e-mail, but then [he] later recalled that [Fajardo] personally handed [Guerra] the document in the nighttime hours of the first day of [his] review of" the Judgment.[1062] He said further that "[w]hen [he] first summarized these events in a sworn declaration in November 2012, [he] stated that [he] recalled receiving this 'memory aid' from Fajardo . . . but [he] could not locate the document itself."[1063]    However, while later searching for documents responsive to defendants' requests in this action, Guerra located the memory aid and provided it to Chevron.[1064]

Defendants contend that Guerra initially told Chevron that he had received the Judgment and the memory aid on a flash drive and by email because Guerra wanted to convince Chevron that he had hard evidence to back up his story.  He then gave Chevron representatives his computer, access to his email accounts, and a number of flash drives in exchange for payment, promising them that they would find the memory aid and a draft of the Judgment on his media.  But when Chevron's experts searched his email and flash drives, they found no memory aid and no Judgment.  So, defendants argue, Guerra changed his story to explain his alleged receipt of the memory aid and the draft judgment in ways consistent with the absence of those documents on Guerra's computer.  But there is at least one problem with defendants' theory that these changes

---

[1061]

 DX 1363 (Guerra Nov. 2012 Decl.) ¶ 26.

[1062]

 Tr. (Guerra) 1012:9-12.

[1063]

 PX 4800 (Guerra Direct) ¶ 50.

[1064]

 *Id.*; Tr. (Guerra) 1016:3-9.

255

reflected a careful conforming by Guerra of the details of the story to new evidence as it emerged.

Guerra explicitly told Chevron's representatives in his July 2012 meetings that he had *not* found the memory aid or the draft of the Judgment on his computer or the flash drives.[1065] What he said were on his computer hard drive were copies of drafts of orders he had written for Zambrano,[1066] and that was accurate. It is entirely possible that Guerra told Chevron that he received the draft of the Judgment from Zambrano on a flash drive because that is how he normally received drafts of orders from Zambrano, that he so believed at the time, and that his memory subsequently was refreshed.

*Third*, there is another possibly troublesome question concerning the memory aid testimony. The memory aid itself, though it purports to contain a chronology of the Lago Agrio case, does not refer to anything that occurred after 2009 although it allegedly was provided to Guerra in late 2010 or early 2011.[1067] Thus, one might expect that any chronology given to Guerra in late 2010 or early 2011 would have included events after 2009. Nevertheless, there is no necessary inconsistency in this, as Guerra stated that the memory aid responded to specific questions he had asked,[1068] which may explain the date cutoff. Likewise, it is entirely possible that Fajardo responded to Guerra's request with a preexisting document that, though old, was adequate to the purpose.

---

[1065]
      DX 1361 (Tr., July 13, 2012 Conversation between A. Guerra and A. Rivero), at 61.

[1066]
      *Id.*

[1067]
      PX 1703 (memory aid); Tr. (Guerra) 1012:13-23.

[1068]
      *Id.* (Guerra) 1013:5-12.

256

### 2.   *Zambrano*

We have discussed Zambrano's account of how he claimed to have prepared the Judgment. He claimed that he was the sole author of the Judgment. He never asked Guerra to make revisions to it before it was issued on February 14.[1069] He never asked Guerra to travel to Lago Agrio to work on the Judgment.[1070] Indeed, according to Zambrano, Guerra never worked on the Lago Agrio Judgment at any time before it was issued.[1071] But for reasons previously explained, Zambrano was not a credible witness.[1072] No more need be said on that point. We turn now to Donziger.

---

[1069]

   Tr. (Zambrano) 1810:1-4.

[1070]

   *Id.* 1810:11-18.

[1071]

   *Id.* 1811:3-5.

[1072]

   It is worth noting that Chevron unsuccessfully sought a favorable statement from Zambrano in this action. Zambrano testified that Guerra, in approximately August 2012, informed him that he had been speaking to Chevron representatives, and "that Chevron was willing to give [Zambrano] a minimum of $1 million or whatever he wanted" in exchange for his cooperation. *Id.* 1914:24-1915:2. Guerra met him at the Quito airport and gave Zambrano documents, including the business card of a Chevron attorney who wished to speak with him. *Id.* 1915:7-13; DX 92 (Zambrano Decl.; Rivero Business Card), at 138 of 250.

   Guerra called Zambrano several times after their airport meeting to reiterate the proposal. Tr. (Zambrano) 1929:22-1930:9. In January 2013, Zambrano received a phone call from Rivero himself requesting that Zambrano meet with him in person. *Id.* 1930:10-25; DX 84 (Transcript of Recorded Call Between Zambrano and Rivero). Zambrano told Rivero that he would not speak with him until he confirmed that Rivero worked for Chevron and found out exactly what Guerra had told him. Zambrano secretly recorded the conversation. Tr. (Zambrano) 1931:5-15; DX 84 (Transcript of Recorded Call Between Zambrano and Rivero).

   Zambrano did not follow up with Rivero. In March 2013, he signed a declaration that defendants filed in this action. PX 6330 (Zambrano Mar. 28, 2013 Decl.).

3.     *Donziger*

a.     *Donziger's Account*

Donziger's direct testimony on these subjects was brief.  He stated:

"I did not write the judgment in the [Lago Agrio] case in Ecuador.  I have no knowledge that anybody on the legal team of the plaintiffs wrote the judgment in this case, or wrote any part of the judgment.

I have never met Judge Nicolás Zambrano, nor have I communicated with him. Other than his live testimony during this trial, I have never seen Judge Nicolás Zambrano.

I did not bribe Judge Zambrano.  The allegations by former Judge Alberto Guerra that I was involved in a meeting where I 'approved' a plan arranged by Pablo Fajardo to pay Zambrano $500,000 is false."[1073]

With respect to Guerra, Donziger testified that he "did not agree or express any support for a plan to pay any amount of money so that the plaintiffs would be able to draft the final judgment."[1074] Donziger did admit that he had had a relationship with Guerra, although he described it in minimal terms.

Donziger stated that he "occasionally chatted about non-substantive matters" with Guerra when Guerra was the presiding judge on the Lago Agrio Chevron case, *i.e.*, from May 2003 until January 2004.[1075]  He acknowledged that Guerra had Donziger's phone number in 2008.[1076] They each had the other's email address, and Donziger admitted having received emails from

---

[1073]     DX 1750 (Donziger Direct) ¶¶ 71-73.

[1074]     *Id.* ¶ 75.

[1075]     *Id.* ¶ 77.

[1076]     Tr. (Donziger) 2588:20-25.

Guerra, which he claimed he thought were spam and ignored.[1077]  But he conceded also that he had received a March 1, 2008 email from Guerra in which Guerra sought a favor for a friend, and that he forwarded it to Fajardo for advice.[1078]

Donziger said that "[t]he one meeting with Guerra that stands apart vividly in [his] memory was the one in Quito" with Guerra and Fajardo[1079] at which, he acknowledged, the topic of a bribe was discussed.[1080]  But he said that he agreed to attend only "with the idea that [he] would pick up useful tidbits of 'courthouse gossip.'"[1081]

The meeting took place in late 2010 at "a restaurant in Quito" and lasted approximately 45 minutes.[1082]  Toward the end of the meeting, Donziger acknowledged, Guerra said that he could ensure that the judgment would come out in the LAPs' favor for $500,000 – that "he could get it done for a payment."[1083]  But Donziger, in contrast to Guerra, testified that he

---

[1077] *Id.* 2589:1-13.

[1078] PX 2469 (Mar. 1, 2008 Email from A. Guerra to S. Donziger re: "Request for Investivation" [*sic*]); PX 1749 (Mar. 2, 2008 Email from S. Donziger to P. Fajardo re: "What should I do?"); Tr. (Donziger) 2589:14-20.

[1079] He did not deny that he had other meetings with Guerra, with or without Fajardo.

[1080] DX 1750 (Donziger Direct) ¶ 78.

[1081] *Id.*

[1082] Tr. (Donziger) 2597:8-24.

[1083] *Id.* 2598:2-16.

259

"immediately and unequivocally refused" Guerra's request.[1084]  He added that "I would never do that . . . . Whatever money we had we would not – it would not be used to bribe a judge . . . ."[1085]

Donziger admitted that neither he nor anyone else on the LAP team reported Guerra's bribe solicitation.[1086]  He said there were "various reasons"[1087] for that, but the only one he gave was that he "felt like [Guerra's] offer didn't have a lot of credibility.  And [Donziger] was very concerned that doing anything at that point to turn [Guerra] in would give Chevron an excuse to further use it against the court or against the process such that the trial could be derailed."[1088]

### b.   Donziger's Credibility

#### i.   Self Interest

That Donziger is deeply self interested – both on the ghostwriting questions and, in addition, with respect to the outcome of this case generally – is obvious.  We have noted already that Donziger personally stands to gain a contingent fee in excess of $600 million[1089] and, it appears, control of or influence over the billions that would go to the ADF were the Judgment collected.[1090]

---

[1084]

DX 1750 (Donziger Direct) ¶ 78.

[1085]

Tr. (Donziger) 2598:24-2599:7.

[1086]

*Id*. 2600:24-2601:4.

[1087]

*Id*.

[1088]

*Id*. 2650:17-2651:2.

[1089]

PX 558 (Donziger Jan. 2011 Retention Agreement), at 3.

[1090]

*Supra Facts* § II.

260

The money is important to him.  Just one indicator, of many, came from his own lips in an exchange

with the *Crude* camera crew:

> "DONZIGER:   You can never underestimate the power of personal relationships in this business. You  know?
>
> CAMERAMAN: What business is that?
>
> DONZIGER: The business of getting press coverage as part of a legal strategy.
>
> CAMERAMAN: Hey, uh. Can we, Can we all fit in your – ?
>
> DONZIGER: The business of plaintiffs' law. To make fucking money."[1091]

And Donziger's self interest extends beyond money.  As he confided to his personal

notebook on April 4, 2007:

> "I had an incredible email with Russ this morning. He read the VF [Vanity Fair] story.
>
> R[u]ss is funding the case. Russ is funding the movie. And Russ wants to fund more cases and more movies.
>
> *I sit back and dream.* I cannot believe what we have accomplished.  *Important people interested in us. A new paradigm of not only a case, but how to do a case. Chevron wanting to settle. Billions of dollars on the table. A movie, a possible book. I cannot keep up with it all.*"[1092]

Thus, Donziger wants money, but he wants more as well.  These desires have been important

motivating factors.

---

[1091]      PX 57A[9] (Apr. 24, 2007 *Crude* Clip), at CRS-258-00-CLIP-01.

[1092]      PX 203 (Donziger Notebook) (emphasis added).

261

ii.     *Deceit*

Donziger has deceived when deception served his interests.[1093]  Many such incidents have been discussed already, including these:

- Donziger recruited Reyes and Pinto, ostensibly to act as independent monitors but in reality to work for the LAPs, to undermine an anticipated negative report from the court's settling experts.  He made an under the table payment to induce them to do so.  Contrary to the facts, he arranged with them to conceal their relationship with the LAPs to the court and to pose as independents.  Donziger admitted in the privacy of his notebook that this was a "bargain with the devil"in which he had gone "over to the dark side."

- Donziger recruited Cabrera and then ensured that Cabrera "would totally play ball" with the LAPs.  He and his Ecuadorian colleagues secretly prepared the work plan, a version of which Cabrera, in accordance with the scheme, passed off on the court as his own.  Donziger then hired and worked extensively with Stratus to have Stratus write most of the Cabrera Report that was supposed to be Cabrera's independent, impartial product.  In order to conceal the roles of Stratus and the LAPs vis-a-vis Cabrera, he instructed Stratus' Beltman and Maest to keep their involvement secret.  Once the report was filed, complete with Cabrera's repeated false protestations to the court of his independence, Donziger knowingly promoted the fiction of Cabrera's impartiality and independence, drafting or assisting in the drafting of numerous press releases touting the work of the "independent expert."

- Donziger long hid the truth about Cabrera from Karen Hinton and others on the public relations team, whom he repeatedly had issue press releases emphasizing Cabrera's independence and lambasting Chevron's allegations to the contrary.[1094]

- Donziger concealed Stratus' real role from Kohn despite that Kohn at the time was funding the LAPs.  Donziger hid from Kohn the fact that some of the funds Kohn provided were shuttled covertly to Cabrera through a "secret account."    And Donziger prevented Kohn from commissioning an independent investigation of the Cabrera episode when allegations of

---

[1093]    The Court considers the evidence of Donziger's prior deceit on the issue of his credibility and not to prove character for the purpose of showing that he acted in accordance with that character on other specific occasions.

[1094]    Tr. (Hinton) 2189:5-2190:3.

262

misconduct began to surface.

• Donziger concealed the truth about the Cabrera Report from certain, though not all, members of the LAP team.  He did not inform the Weinberg Group or the cleansing experts that Cabrera had not been independent.  Nor did he reveal that fact to his co-counsel in the United States, many of whom were working directly on the Cabrera fallout.

• Donziger convinced Shinder and McDermott to represent the LAPs in the Stratus Section 1782 proceeding by assuring them that Chevron's allegations concerning the LAPs' collusion with Cabrera were untrue.  It was not until they learned the truth directly from Beltman that Donziger confessed that the LAPs' involvement in the preparation of the report were more extensive than he initially had indicated.

• Once the details of the Cabrera episode began to leak out, Donziger encouraged the American lawyers not to reveal in their court filings any more than they absolutely had to.  He specifically warned them of the "negative fallout" that could occur if the Fajardo Declaration and Petition disclosed too much.  As we know, the misleading Fajardo Declaration was filed in the Denver court and at least sixteen others in the United States, including this one.

### iii.    Misrepresentation to this Court

As noted, Prieto on March 30, 2010, sent an email to Donziger, Fajardo, and others expressing Prieto's concern that "the proceeding," *i.e.*, the Lago Agrio case, would be destroyed and "all of us, your attorneys, might go to jail" if Stratus' documents were produced in the Colorado Section 1782 proceeding.[1095]  Donziger has testified twice about that email.  His two accounts were very different.

In a January 2011 deposition, Donziger admitted that Prieto's email expressed "concern[] that all of the local Ecuadorian lawyers for the Lago Agrio plaintiffs might end up in jail

---

[1095]    PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, J. Sáenz, L. Yanza, and P. Fajardo re: "Protection Action").

263

*because of. . . [t]he role they played related to Stratus, Mr. Cabrera. . . .*"[1096]  But when he was questioned about the same email at a sanctions hearing before this Court in April 2013, Donziger said that Prieto had not been concerned with the *substance* of the Stratus documents that would be disclosed – that is, with the fact that the truth about the relationship among the LAP lawyers, Stratus and Cabrera would come out.  He was concerned instead, Donziger claimed, with "his fear that by turning over documents in the United States via the Stratus 1782, that it would violate their Ecuadoran law obligations in Ecuador among local counsel"[1097] – in other words, a professional obligation of confidentiality.

The hearing at which Donziger offered this new explanation for the email dealt with Chevron's motion to sanction Donziger and the LAPs for their failure to produce documents from Ecuador.  Defendants had refused to produce the documents because, among other reasons, they claimed it would have been illegal under Ecuadorian law.  Donziger's testimony at the sanctions hearing thus offered a convenient explanation for the very damaging email – with the added benefit that the new explanation was in line with defendants' newly-minted argument that Ecuadorian law prevented disclosure of Stratus' documents.  But it was contradicted directly by his prior sworn testimony on the matter.  The Court finds that this testimony by Donziger at the sanctions hearing deliberately was false.[1098]

---

[1096]

Donziger Jan. 19, 2011 Dep. Tr. at 3381:14-20 (emphasis added).

[1097]

Sanctions Hr'g (Donziger), at 113:9-18.

[1098]

Donziger sought to mislead this Court in another way, albeit perhaps not so blatantly.

On May 3, 2013, former counsel for Donziger sought and later obtained leave to withdraw as counsel on the ground of non-payment of fees.  DI 1104 (LAPs Mem.); DI 1105 (Donziger Mem.).  Following the withdrawal, Donziger repeatedly moved to adjourn

*iv.      Evasiveness and Demeanor*

In November 2011, Donziger prepared a memorandum for himself in advance of his

deposition in the Section 1782 case in this Court.[1099]  The memorandum began as follows:

> "Read: RICO, Borja, Cabrera report, Tropical Rainforest EP, Cancer-San Seb,
> Guanta, Genocide, Wray testimony (3rd day), Chevron's own test results; define SRD
> role; 2nd circuit brief; basis for belief people were dying.
>
> Comments: *'It's possible but I don't think so'; 'I guess it's possible, but to best of
> my recollection I didn't.'* "[1100]

He testified, "I wrote it [the italicized language] in response to specific questions that might come

---

deadlines or stay this case, always claiming that he had "limited resources" with which to
secure new counsel and defend himself.  DI 1212 (Donziger Aff.) ¶ 14; *see also* DI 1211
(Mot. to Stay) ("A stay is absolutely necessary if I am to have a realistic chance to obtain the
funds for, and to retain, substitute counsel"); DI 1214 (May 23, 2013 Tr.), at 3:25-4:4; DI
1318 (July 18, 2013 Tr), at 11:13-18 ("my prior counsel already spent thousands of hours
dealing with their previous motions . . . which essentially drove my counsel off of this case
. . . because I couldn't afford to pay their fees anymore because they were all wasted on these
previous motions for summary judgment"); DI 1369 (Mot. for Order to Show Cause); DI
1435 (Mot. for Extension of Time); DI 1459 (LAPs Mem.).

Although the Court largely granted Donziger's requested relief, it made clear time and again
that it would be willing to consider further extensions or delays if Donziger provided
competent evidence or sworn testimony substantiating his claim that he was constrained by
a lack of resources.  *E.g.*, DI 1214 (May 23, 2013 Tr.), at 13:25-14:6; DI 1185 (Order), at
3 ("The Court . . . is willing to consider [Mr. Donziger's] issues in the event a well supported
motion is filed."); DI 1302 (Order Denying Mot. for Stay); DI 1407 (Order Denying Stay).
Donziger never did so.  At trial, however, Donziger admitted that, notwithstanding his claims
of lack of resources, he actually  had secured additional funding of $2.5 million in March
2013 – two months before his counsel withdrew – from a British investor.  *See* Tr.
(Donziger) 2528:9-2529:11. He admitted also that he personally had received $600,000 in
liquid assets and over one million in real estate over the preceding year and a half from
probate actions he initiated against family members in Florida. *Id.* 2537:6-2539:2.

[1099]

PX 2457 (Donziger Deposition Memo).

[1100]

*Id.* (emphasis added).

265

up that that would be an appropriate response to."[1101]

Donziger graduated from Harvard Law School. He tried cases as a public defender in Washington before getting involved with *Aguinda.* He did not need a written reminder to respond to a question by saying, if such an answer would be true, that he did not remember or even that his best recollection was that something had or had not happened.

Donziger was evasive repeatedly at his deposition in the Section 1782 action against him, his deposition in this case, and again at trial. In his June 2013 deposition in this case, Donziger replied "I don't know" or "I don't recall" to more than 180 questions, nearly every substantive question posed to him.[1102] And during his cross-examination at trial, Donziger so responded over one hundred times.

The likelihood that Donziger's memory was as bad as these answers suggested is very small.

* * *

In sum, the Court declines to credit Zambrano's and Donziger's testimony with respect to the bribe scheme. As to Guerra, the Court has examined his credibility carefully, considered his past dishonesty, and examined the inconsistencies in his testimony. Guerra on many occasions has acted deceitfully and broken the law. Some details of his story of what transpired in the Lago Agrio case have changed. But that does not necessarily mean that it should be disregarded wholesale.

The Court next considers the circumstantial evidence relevant to the bribe scheme,

---

[1101]

      Tr. (Donziger) 2464:4-10.

[1102]

      Donziger June 24, 25, 28 2013 Dep. Tr., *passim.*

266

and the defendants' evidence at trial.  It concludes that this evidence leads to one conclusion: Guerra told the truth regarding the bribe and the essential fact as to who wrote the Judgment.  The Court is convinced that the LAPs bribed Zambrano and wrote the Judgment in their favor.

> **B.** *Chevron's Circumstantial Evidence Pertinent to the Alleged Bribery*

Certain facts probative of the validity of Chevron's contention that the LAPs bribed Zambrano are undisputed or already have been determined.

*First*, Guerra and Zambrano had a long standing and close relationship.  No one disputes that Guerra drafted orders for Zambrano, at least in some civil cases other than Chevron. The Court has concluded that the arrangement between them was improper under Ecuadorian law and found, in addition, that Zambrano paid Guerra for his drafting services.

*Second*, Guerra drafted orders for Zambrano on the Chevron case, as well as others, during Zambrano's first tenure.  The LAPs paid him $1,000 a month for his services with respect to Chevron.

*Third*, Guerra and Donziger both testified that Fajardo arranged a meeting in late 2010 at the restaurant in Quito at which Guerra proposed to fix the case with the judge (then Zambrano) for a $500,000 bribe.  Donziger did not deny that Guerra proposed that the *quid pro quo* would include not only a decision in favor of the LAPs, but allowing the LAPs to write the Judgment.  Nor did he deny Guerra's testimony that Fajardo was at the meeting.

*Fourth*, the Court has found that Zambrano did not write much, if any, of the Judgment.

*Fifth*, the Judgment includes substantial passages and references that do not appear

anywhere in the Lago Agrio Record, but that do appear verbatim or in substance in a number of documents from the LAPs' files. Whoever wrote the Judgment copied those materials from the LAPs' unfiled work product. Moreover, a complete review of the LAPs' files never took place because the files located in Ecuador were not produced.

*Sixth*, neither Donziger nor the LAP team reported Guerra's bribe solicitation to authorities.[1103] Indeed, the LAPs considered hiring Guerra as an expert witness on the fairness of the Ecuadorian judicial system for use in the United States long after Guerra had solicited a bribe from them to fix the Lago Agrio case.

*Seventh*, Fajardo – who is the LAPs' counsel of record in Ecuador and the holder of a power of attorney on behalf of all of the LAPs – and their other Ecuadorian lawyers declined to testify.

In addition to the foregoing, there is additional circumstantial evidence independent of Guerra's testimony.

---

[1103]   While Donziger tried to explain this away, the fact that he did not report the bribe solicitation is undisputed. Moreover, the explanation is not persuasive. Donziger claimed that there were "various reasons" why no report was made, but the only reasons he mentioned were that he claimed that he did not regard Guerra as having had much credibility and that he was "very concerned that doing anything at that point to turn [Guerra] in would give Chevron an excuse to further use it against the court or against the process such that the trial could be derailed." Tr. (Donziger) 2650:17-2651:2. Given the facts that (a) Donziger frequently claimed that he was afraid that Chevron would corrupt the process and buy a favorable outcome; (b) Donziger had made complaints against other judges, *id.* 2601:5-17; and (c) the Ecuadorian government, up to and including the president, was openly and fully supportive of Donziger and the LAPs, those explanations are of limited value. The failure of Donziger and the LAPs to report Guerra's bribe solicitation, moreover, certainly was not comparable to Chevron's failures in light of the hostility of the Ecuadorian government to Chevron. *Supra Facts* § IX.A.4, *infra Discussion* § VII.C.6.

268

*First*, Zambrano needed the money.[1104]

*Second*, Donziger and the LAPs had huge financial and other incentives to want to win.

*Third*, Donziger and the LAPs had at least *two* important reasons for wishing to control precise aspects of the decision, quite apart from winning in general.

The first already has been discussed – Donziger and the LAPs had strong incentives to ensure that the decision not rely on the Cabrera Report.[1105]  But he was unwilling to abandon reliance publicly on the Cabrera Report because doing so would have discredited the case and impugned the LAPs' integrity in vital respects.[1106]  So the LAPs continued to rely on the Cabrera Report in their final *alegato*[1107] but they needed to ensure that the decision did not do so.

---

[1104]

    Zambrano's personal financial statement, filed in November 2010 although dated in July 2008, PX 393 (ROE Judiciary Council personnel action dated Nov. 16, 2010 attaching Zambrano's sworn assets statement dated July 31, 2008), showed that he had cash on hand of under $2,500, not even enough to pay his outstanding Diners Club balance.  He owed banks nearly $8,000.  Apart from two used vehicles, one of which was pledged, the only other material asset shown was $27,500 of real estate owned by his wife.  Zambrano made no effort to explain these data, to show that his financial circumstances had improved, or to deny any economic motive to participate in the bribe arrangement.  Nor is it likely that there was any improvement in Zambrano's financial situation between July 2008 and the issuance of the Judgment.

[1105]

    *See supra Facts* §§ 5.E.-G.

[1106]

    That Donziger's mind ran in this direction is shown by his reaction much earlier to Soltani's suggestion that Amazon Watch stop comparing the pollution in the Orienté to the Exxon Valdez spill.  Rather than retreat, Donziger insisted that they stick to the claim.  He warned that there would be "HUGE implications for the legal case" if they disavowed the comparison to Exxon Valdez, and told Amazon Watch that it "could terribly prejudice the people it is trying to help if it makes this change." PX 860 (May 24, 2007 Email from S. Donziger to S. Tegel re: "private").

[1107]

    DX 1482 (LAPs' Final *Alegato*), *passim*.

The Court has not yet discussed the second, and it is this.  The LAPs were concerned about an ambiguity in the EMA in connection with their attempts to raise new financing in 2010 after Kohn withdrew his support.  As Patton Boggs spelled out in 2010 in the Invictus Memo, which was prepared in the effort to obtain a new investment from Burford, Article 43 of the EMA provides that the judge in an action such as the Lago Agrio case is to order payment of damages "to the community directly affected and to repair the harm and damage . . . [and] also order the responsible party to pay to the moving party ten percent (10%) of the value of damages."[1108]  Thus, "Art. 43 present[ed] some measure of risk that a substantial portion of the judgment could be awarded to a presently uninvolved-and therefore unforeseen-agency or public authority" with only ten percent going to the LAPs.[1109]  Although Patton Boggs said it thought the possibility of such an outcome was low, it recognized that such an outcome would dramatically reduce the money available for investors and the fees payable to the attorneys, both of which depended on the LAPs winning.  This was of sufficient concern that the Invictus Memo contemplated that "the Plaintiff group  [might] . . . arrang[e] for receipt of any funds recovered against the judgment through payment agents in the United States and thereafter dividing those funds outside the Republic of Ecuador."[1110]

---

[1108]

PX 1407 (Invictus Memo), at 27 (quoting EMA) (internal quotation marks omitted).

[1109]

*Id.*

[1110]

*Id.* at 27-28.

The defendants in May 2012 did create a Gibralter company, Amazonia Recovery Limited ("Amazonia") for receipt and distribution of any funds in consequence of the Judgment. *See* PX 657 (Amazonia Memorandum of Association); Donziger June 25, 2013 Dep. Tr. at 626:18-20, 627:12-24, 629:12-17, 631:3-6, 632:4-9, 633:22-634:2, 634:13-635:15; PX 1520 (diagram of Newco (*i.e.*, Amazonia) structure and fund flows).  Amazonia, however, was not created until more than a year after the Judgment was rendered.

270

Writing the decision precisely as they wished and securing Zambrano's signature on it would have solved or, at least gone far toward solving, both the Cabrera Report and Article 43 problems. The disclaimer of reliance on the Cabrera Report offered the best hope for the first. Obtaining a judgment providing that *all* of the damages would be payable to the ADF, as the Judgment ultimately did, would have eliminated the EMA Article 43 concern.

*Finally,* there was no lack of opportunity. The LAPs previously had availed themselves of Guerra's ghostwriting efforts when Zambrano was on the case for the first time.

These facts circumstantially support Chevron's contention.


C.      *Other Circumstantial Evidence – The Fajardo December 2010-January 2011 Emails*

That said, and despite the fact that the defendants have not argued the point, there are two exhibits that at first blush would be in some tension with Chevron's claim that the defendants bribed Zambrano with respect to the outcome and the Judgment, *if* they were admissible and fully candid. They are emails by Fajardo dated December 31, 2010 and January 8, 2011.[1111]

The December 31, 2010 email was addressed to Eric Westenberger of Patton Boggs, Donziger, and Sáenz. The subject was "ABOUT THE ALEGATO," *i.e.*, the final written argument to be submitted to the Lago Agrio court. Fajardo pointed out that the LAPs' final submission would

---

[1111]         DX 899 (Dec. 31, 2010 Email from P. Fajardo to E. Westenberger, S. Donziger and J. Sáenz re: "ABOUT THE ALEGATO"); DX 900 (Jan. 8, 2011 Emails from P. Fajardo to J. Sáenz, J. Prieto, S. Donziger, A. Carrasco, E. Westenberger, L. Yanza, and V. Barham; second email to J. Prieto, J. Sáenz, S. Donziger, toxico, A. Carrasco, E Westenberger, and V. Barham re: "CHEVRON'S ALEGATO").

have to be filed in the next week, that its preparation was being coordinated by Westenberger[1112] and Sáenz, that Fajardo already had hoped to have received it for translation into Spanish, but that "it ha[d] not arrived, at least not yet."  He went on to say that "[n]obody knows when the Judge may issue the judgment . . . but if the judge issues the judgment soon, we will end up with the document [*i.e.*, the *alegato*] in hand and it will be useless to us."  The email closed by stating that "we are behind schedule with this memorandum of law, which could have serious consequences for the case."[1113]

The January 8, 2011 emails[1114] went to a broader audience, including also Prieto, Yanza,[1115] Anne Carrasco, and Vanessa Barham, the former of whom worked at Patton Boggs and the latter of whom was among the LAPs' lawyers working in Ecuador.[1116]  The first of Fajardo's two emails of that date reported that Chevron had filed its *alegato* on January 6.  Prieto responded that

---

[1112]

Patton Boggs in general and Westenberger in particular did a great deal of work in preparing the LAPs' *alegato*. *E.g.*, Tyrrell Dep. Tr. at 315:4-13, 319:6-320:5; *see also* PX 7468 (Nov. 11, 2010 Email from S. Donziger to E. Westenberger and A. Small re: "this is latest draft of alegato"); PX 1470 (Jan. 12, 2011 Email Chain Between Patton Boggs lawyers re: review of final *Alegato*).

[1113]

DX 899 (Dec. 31, 2010 Email from P. Fajardo to E. Westenberger, S. Donziger and J. Sáenz re: "ABOUT THE ALEGATO").

[1114]

DX 900 (Jan. 8, 2011 Emails from P. Fajardo to J. Sáenz, J. Prieto, S. Donziger, A. Carrasco, E. Westenberger, L. Yanza, and V. Barham; second email to J. Prieto, J. Sáenz, S. Donziger, toxico, A. Carrasco, E Westerberger, and V. Barham re: "CHEVRON'S ALEGATO").

[1115]

One of the addressees of the second Fajardo email of that date (that of 16:23:47) was <toxico@ecuanex.net.ec> which, as the 15:49:22 email of that date reveals, is (or is among) Yanza's email addresses.

[1116]

Tyrrell Dep. Tr. at 260:12-17; *Chevron Corp. v. Donziger,* No. 11-1264, DI 92-3, at 87-88 (2d Cir. filed July 5, 2011).

272

he could not "believe they beat us!" to which Fajardo in turn replied that "[t]he one who strikes first has greater success or causes greater impact. . . They want to influence the judge with their theory. It is a mistake on our part to have fallen asleep for so long on the alegato."[1117]

   These emails, if admissible and taken literally, would be consistent with a belief on Fajardo's part in late December and early January 2011 that the result of the Lago Agrio case then was in doubt. If Fajardo in fact so believed, that fact would undercut Chevron's argument that the case had been fixed by then with the promise of $500,000 out of the judgment proceeds in exchange for Zambrano's promise to decide the case for the LAPs and to sign a judgment they prepared.[1118] But the Court would not construe these emails in such a manner even if they were admissible, which they are not.

   The key consideration is that the only individuals on the LAP side who *necessarily* would have known if a bribery deal had been struck would have been Fajardo and Donziger. That is so of Fajardo because he is said to have agreed to it. It is true of Donziger because his approval would have been essential for reasons discussed in the following section. Given the relationships on the LAP side of the case, it is not unreasonable to think that Yanza also perhaps would have known. But all of these emails went to other people as well, including Patton Boggs' Westenberger

---

[1117]
   DX 900 (Jan. 8, 2011 Emails from P. Fajardo to J. Sáenz, J. Prieto, S. Donziger, A. Carrasco, E. Westenberger, L. Yanza, and V. Barham; second email to J. Prieto, J. Sáenz, S. Donziger, toxico, A. Carrasco, E Westenberger, and V. Barham re: "CHEVRON'S ALEGATO").

[1118]
   The emails, even if taken literally, would not utterly defeat the idea that Zambrano had been bribed. Even if the corrupt bargain had been struck, Fajardo may have been concerned that Zambrano would double cross the LAPs. Given the LAP team's views of Chevron, the risk of being outbid, whether real or the product of fevered speculation, may have been in his mind.

273

in the case of the December 31 email and Patton Boggs' Carrasco and Westenberger, as well as junior lawyers in Ecuador, in the case of the January 8 communications.

There is no reason to believe that any of the core three on the LAP side of the case – Fajardo, Donziger, and Yanza, if Yanza was knowledgeable about this – would have confided the fact that they had bribed Zambrano to any of the other recipients of the emails. Their goal was to urge the email recipients to finish the work on the *alegato*, which already was late, even if only to keep up the pretense that the Lago Agrio litigation was in real dispute and the end result in doubt. They could not successfully have done that if they had told those working on the *alegato* that "the fix was in" and that the *alegato* would be no more than window dressing. Equally important, this trio had a long record of keeping knowledge of questionable behavior as close to their personal vests as possible. That was the case with concealment from Kohn and Donziger's principal public relations person, Karen Hinton, of the true facts with respect to the Cabrera Report and the LAPs' relation to it. It is reflected in the edict in the Cabrera work plan, addressed to those who were in on the LAPs' role in the Cabrera Report, that everyone was to be "silent." And there are other examples. The bottom line here is that there is no reasonable likelihood that Donziger, Fajardo, or Yanza would have disclosed a bribery arrangement, assuming it existed, to the other recipients of these two emails. The risks were too great.[1119]

Accordingly, these emails would not bear the weight that might have been placed

---

[1119]
     That is especially true with respect to Eric Westenberger and Anne Carrasco of Patton Boggs, who were recipients. As Donziger, Fajardo, and Yanza must have known, they had no reason to suppose that these lawyers, who were subject to compulsory process in the United States, would have allowed themselves to be swept into a conspiracy to bribe a judge. Indeed, earlier in 2010, Donziger, Fajardo, and Yanza had seen the LAPs' Denver lawyers withdraw in the Stratus 1782 proceeding as soon as they learned the truth about the Cabrera Report.

274

upon them even if they were admissible in evidence.[1120]  Moreover, in the only important respects
they are not admissible.[1121]

    D.    *The Defendants' Evidence Regarding Zambrano's Alleged Agreement to Fix the Case*

    The defendants offered no evidence with respect to Guerra's contention that the LAPs
bribed Zambrano save for Zambrano's denial and Donziger's testimony.

    As noted, Zambrano was not credible.  We are left then with Donziger's testimony.

    1.    *Donziger's Testimony, Even If True, Would Not Negate the Alleged Bribe*

    It should be recalled at the outset that Donziger's testimony on this point was narrow.
He essentially said no more than that Donziger himself "did not bribe Judge Zambrano," that
"allegations by former Judge Alberto Guerra that I [Donziger] was involved in a meeting where I
'approved' a plan arranged by Pablo Fajardo to pay Zambrano $500,000 is false," and that he "did
not agree or express any support for a plan to pay any amount of money so that the plaintiffs would

---

[1120]

    Chevron objected to the emails on, *inter alia*, hearsay grounds.

[1121]

    As the text shows, the critical point for which the emails might be used would be to support
assertions by Fajardo, explicit and implicit, that the outcome of the case was in doubt and
that the submissions of which he was urging prompt completion could matter.  This in turn
could imply that the case had not been fixed.  But the emails are inadmissible hearsay for any
such purpose.

    FED. R. EVID. 802 renders "hearsay" inadmissible.  Rule 801(c) defines "hearsay" as an out
of court "statement" offered "to prove the truth of the matter asserted in the statement."  Rule
801(a) defines "statement" as "a person's oral assertion, written assertion, or nonverbal
conduct, if the person intended it as an assertion."  Fajardo's statements in these emails, to
the extent they are offered for the purpose of proving that the outcome of the Lago Agrio case
was in doubt and thus that the case had not been fixed, were assertions and therefore
classic hearsay.  Nor would they be admissible under the state of mind exception to the
extent they contain statements of belief.  FED. R. EVID. 803(3).

be able to draft the final judgment."[1122]

This testimony, assuming its truth, would be of only limited value.  Among other things, Guerra never said he was present when Donziger agreed to the alleged bribe or that anyone told him that had occurred.  He attributed the corrupt promise to Fajardo.  Fajardo, on behalf of the LAPs, is alleged to have promised a bribe to Zambrano *after* the 2010 meeting at the Honey & Honey Restaurant and outside Donziger's presence.  So Donziger's testimony would not necessarily have been inconsistent with a finding that Fajardo did precisely that.  But this raises an additional issue that warrants serious consideration – whether Donziger authorized or approved any such deal, assuming it was made.

### 2.   *Donziger's Approval Was Necessary for the Alleged Deal With Zambrano*

#### a.   *Donziger Controlled the LAP Team*

Donziger once wrote that he was "at the epicenter of the legal, political, and media activity surrounding the case both in Ecuador and in the U.S."[1123]  He has described himself as the "lead lawyer" in the Lago Agrio litigation and the "person primarily responsible for putting [the LAP] team together and supervising it."[1124]  In a November 2009 email, Donziger wrote that his "primary obligation" was to "run the case on a day to day basis."[1125]  His January 2011 retention

---

[1122]

See supra Discussion § XI.A.3.a.

[1123]

PX 806R (Donziger Book Proposal), at 5.

[1124]

Id. at 3.

[1125]

PX 1181 (Nov. 9, 2009 Email from S. Donziger to J. Kohn re: Trip to Ecuador), at 2.

276

agreement with the LAPs – signed just a few months after the alleged bribery of Zambrano – bears this out, describing him as the LAPs' U.S. Representative and his duties as being "to exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation."[1126]

As the "cabeza" – or head – of the LAP team, Donziger supervised the Ecuadorian legal team, set deadlines, paid the lawyers' salaries, including Fajardo's,[1127] reviewed at least their important court filings in Ecuador, and coordinated the work among the lawyers in Ecuador and the scientists, experts, lawyers, litigation funders, politicians, and media consultants in the United States and elsewhere.[1128]  He visited his local counsel monthly since the case began.[1129]  He controlled the LAP team's media strategy, communicated with the press, and recruited Berlinger to film *Crude*.

In addition, Donziger largely has controlled the money used for purposes of the Lago Agrio case, public relations, and related litigation.  He was the intermediary between the Ecuadorian lawyers and Kohn when Kohn was funding the case.  He recruited Russell DeLeon, his law school classmate, to fund *Crude* and other aspects of the LAPs' efforts.  He secured funding from Burford, and, together with H5, brought on Patton Boggs.  He occasionally paid even some of the LAP team's expenses and lawyers' salaries out of his personal funds.

Donziger has been intimately involved with the LAP team's legal strategy in the U.S.

---

[1126]
      PX 558 (Donziger Jan. 2011 Retention Agreement), at 2.

[1127]
      *See* PX 4900R (Dahlberg Direct) ¶ 75.

[1128]
      *See supra Facts* § II.C.1.

[1129]
      PX 1509 (Donziger Ecuador Migration Record).

and in Ecuador.  He hired David Russell to come up with the first damages estimate.  With Russell, he hired the LAPs' first nominated expert, Calmbacher, and then rode herd over the completion of his reports.  He repeatedly met with Ecuadorian judges presiding over the Lago Agrio case.[1130]  He recruited Reyes and Pinto, supposedly to serve as independent monitors but in reality to challenge the settling experts' conclusions concerning two site inspections, and agreed to make the under the table payments in the "bargain with the devil" referred to above.  He (at Reyes' suggestion) selected and vetted Cabrera to be the global expert and made sure Cabrera was under the LAP team's control. He met with Cabrera and the LAP team on March 3, 2007 to plan Cabrera's work, and then he met with the American experts the following day to discuss their involvement in it.  He recruited, hired, and worked directly with Stratus in drafting much of the Cabrera Report.  And when the truth about Cabrera began to leak out, Donziger controlled the LAPs' efforts to minimize, contain, and spin it. He recruited and hired lawyers to assist the LAPs in the Stratus 1782 proceeding.  And he personally was involved in determining what information the Fajardo Declaration and Petition would – and would not – reveal.

Donziger's role is reflected in the fact that he stands to receive more money from the Lago Agrio case than any other lawyer – or law firm – who has worked on the case. His January 2011 retention agreement with the LAPs – signed just shortly after the LAP team allegedly struck the deal with Zambrano and shortly before the Judgment was issued – entitles him to 31.5 percent of all attorneys fees (which will be 20 percent of anything collected on the Judgment, net of certain preferred payments).[1131]

---

[1130]    PX 207, 200, 192, 169R (Donziger Notebook), at 20.

[1131]    PX 558 (Donziger Jan. 2011 Retention Agreement), at 3.

278

> b.    *Donziger's Approval Was Necessary, and Given, for the 2009
> Ghostwriting Deal with Guerra*

Guerra's testimony that the LAPs paid him for ghostwriting Zambrano's orders during Zambrano's first term as the Lago Agrio Chevron judge was extensively corroborated by independent evidence: the Guerra bank deposit slips (including those bearing the signature and *cedula* number of the LAPs' Ximena Centeno) and Guerra bank statements, the Selva Viva bank statements, and the PUPPETEER emails.[1132]   The PUPPETEER emails corroborate Donziger's approval of these payments to Guerra.[1133]   And Donziger has admitted the significance of that finding with respect to the question whether Donziger was complicit in a later scheme to bribe Zambrano:

> "The importance of this story to Chevron's case is simple: If the plaintiffs' lawyers in fact entered into a deal with Guerra in 2009 to influence the case, then that shows their willingness to act corruptly, making it far more likely that they bribed Judge Zambrano a year later."[1134]

\*   \*   \*

In sum, Donziger was the boss of the LAP team; Fajardo was his "local counsel." If Fajardo promised consideration to Zambrano to fix the case, he would have done so only with Donziger's authorization.

---

[1132]

*Supra Facts* § X.C.2.d.

[1133]

*Id.*

[1134]

DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 38.

279

E.      *Ultimate Findings on this Point – Fajardo, with Donziger's Approval, Promised Zambrano $500,000 of the Judgment Proceeds to Decide the Case for the LAPs and Sign a Judgment They Prepared*

As we have seen, (1) Zambrano, a new judge inexperienced in civil matters, had his close friend and associate, Guerra, who had been removed from the bench for misconduct, drafting orders for him in civil cases which Zambrano signed and filed as his own; (2) Zambrano had motives to solicit a bribe in the Chevron case; (3) his friend and ghostwriter, Guerra, was a ready means of doing so; (4) Guerra concededly solicited the bribe from Donziger, Fajardo, and Yanza; (5) Donziger, Fajardo, and Yanza had motives and the opportunity to promise the bribe and, at least as long as the money was paid out of judgment proceeds and probably otherwise, the means to pay it; and (6) the Judgment that Zambrano ultimately signed copied from LAP internal work product that was not in the court record.  In short, there is a classic circumstantial case – independent of Guerra's testimony – that the LAPs bribed Zambrano to rule in their favor and sign a judgment they wrote for him.  To this must be added (1) the Court's finding that Zambrano could not and did not write the Judgment himself, least of all in the manner in which he claimed he did so, and (2) neither the files of the LAPs' Ecuadorian counsel nor their testimony was made available.

The defendants, to the extent they produced evidence, sought to deny the charge.  But neither Zambrano nor Donziger was a credible witness, at least on this point.  And the other witnesses associated with the defendants – Fajardo and Yanza – declined to testify.  That said, this Court recognizes that "disbelief of a . . . denial of a fact which the [adverse party] has the burden of proving is not sufficient to sustain [the adverse party's] burden."[1135]  So the question comes down

---

[1135]      *Wantanabe Realty Corp. v. City of New York*, 315 F. Supp. 2d 375, 393 n.110 (S.D.N.Y. 2003); *accord Venzie Corp. v. U.S. Mineral Prods. Co.*, 521 F.2d 1309, 1313 (3d Cir. 1975) ("While the jury was free to disregard the defendants' testimony that no agreement of any

280

to whether the circumstantial evidence, either alone or in conjunction with Guerra's testimony, carries Chevron's burden.

This Court already has made clear its skepticism concerning Guerra's testimony, character, and motives.  Among other things, it has concluded that Guerra's testimony to the effect that Zambrano had cut a deal with the LAPs during his first tenure on the Lago Agrio case was not sufficiently persuasive in view of prior statements he made to Chevron investigators.  But, in language specifically approved by our Circuit:

> "There never has been any positive rule of law which excluded evidence from careful consideration entirely, on account of the wilful falsehood of a witness as to some portions of his testimony.  Such disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements.  But when the testimony is once before the jury, the weight and credibility of every portion of it is for them . . . ."[1136]

In other words, a jury is entitled to believe part or even most of the testimony even of one who, it concludes, deliberately has lied under oath as to other particulars.  Substantially the same is true of a judge sitting, as in this case, as the trier of the facts.

In this particular instance, Guerra told the Chevron investigators very early on that (1) Zambrano told Guerra to go to the LAPs and "have them give me [Zambrano] around 500 and see how much they give you, . . . have them bring the judgment, we dress it up here and we issue it," (2) Guerra's attempt to do so was unsuccessful, (3) Zambrano later told Guerra that he "[made]

---

kind was formulated during the course of these contacts, mere disbelief could not rise to the level of positive proof of agreement to sustain plaintiffs' burden of proving conspiracy."); *Ortho Diag. Systs., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 477 (S.D.N.Y. 1996) (same).

[1136]

*United States v. Weinstein*, 452 F.2d 704, 713-14 (2d Cir. 1971) (Friendly, C.J.) (quoting *Knowles v. People*, 15 Mich. 408, 412 (1867)).

contact with the other side . . . [and] ultimately, he sets it up . . . with Fajardo," and (4) and "they offered him . . . half a million dollars . . . [b]ut to be paid later."[1137]  He never wavered from that account.[1138]

In view of the entire record – including but not limited to the circumstantial evidence that predominantly supports Chevron's contention and the Court's evaluation of all of the pertinent testimony – this Court finds that (a) Zambrano agreed with Fajardo to fix the case for a payment of $500,000 paid out of any judgment proceeds, (b) Fajardo did so with Donziger's express authorization, (c) the LAPs drafted all or most of the Judgment, and (d) Zambrano signed their draft without consequential modification as part of the *quid pro quo* for the promise of $500,000.

## XII.    The Appeals

A next logical point in the story of the Lago Agrio case is the appeals.  In order to appreciate one aspect of that story, however, it is necessary first to describe briefly an event that occurred in this action only days after this case began.

Chevron filed its complaint in this case on February 1, 2011.[1139]  It sought *inter alia* a preliminary injunction barring the enforcement of the then imminently expected Judgment.[1140]  The Judgment was rendered thirteen days later, on February 14.  On February 15, Chevron filed its reply

---

[1137]    DX 1360 (June 25, 2012 Tr.), at 49, 51, 81.

[1138]    DX 1363 (Guerra Nov. 17, 2013 Decl.) ¶ 23; PX 4800 (Guerra Direct) ¶¶ 41-43.

[1139]    DI 1 (Complaint).

[1140]    *Id.* at 147.

282

memorandum in support of the preliminary injunction motion in this Court.[1141]   In a footnote, it wrote that it "suspected" that Judge Zambrano had "received secret 'assistance' drafting the judgment. . . ."[1142]   It based this allegation primarily on the fact that Zambrano had stated to the press only weeks before the Judgment was issued that he had reviewed only three quarters of the approximately 200,000-page record.[1143]   Chevron pointed out that it would have been impossible for the judge to have reviewed 50,000 pages and write a 188-page judgment in that period of time, and noted that it anticipated "requesting discovery on this issue shortly."[1144]

   With that fact in mind, we turn to the appeals.


A.     *The First Level Appeal*

   Both Chevron and the LAPs appealed the Judgment.[1145]   The LAPs argued that the lower court had failed to account for three types of harm in its damage award and sought an increase in damages.[1146]   Chevron argued that the Judgment should be reversed on multiple grounds,

---

[1141]

     DI 91 (Chevron Reply Mem.).

[1142]

     *Id.* at 6, n.1.

[1143]

     *Id.* at 6.

     Zambrano testified at trial that he lied to the reporter on this point.  Tr. (Zambrano) 1738:9-12.

[1144]

     *Id.* at 6, n.1.

[1145]

     PX 430 (Appellate Judgment), at 1.

[1146]

     *Id.*

including ghostwriting.[1147]  It attached to its appellate brief among other things an affidavit of an expert in which the expert identified overlap between the LAPs' internal Selva Viva database and the Judgment.[1148]  Chevron contended that the overlap indicated that the LAPs secretly had assisted Judge Zambrano in writing the Judgment.

### 1. The LAPs Contend that Chevron Set Up its Ghostwriting Claim

Shortly after the parties filed their appellate briefs, the Judicial Council of the Sucumbíos Court selected three judges from the trial court to hear the appeal.[1149]  Several months after the panel was chosen, the LAPs filed a motion requesting that the panel "take into account and analyze Chevron's [judgment fraud] allegations when deciding this appeal to prevent Chevron from taking advantage of this Division's possible silence and so continue its worldwide smear campaign against the Ecuadorian judicial system."[1150]

Although the LAPs admitted in the motion that they "ha[d] been unable to determine with certainty how it was that overlapping of information identified by Chevron occurred," they suggested that "maybe it was the company [Chevron] itself that established the conditions for Judge

---

[1147]

Id.

[1148]

PX 2548 (LAPs' July 8, 2011 Filing with Appellate Court), at 4, 8-10.

[1149]

PX 403 (Certificate of Lottery Drawing to Form the Sole Division of the Provincial Court of Justice of Sucumbios, No. 106-2011).  Chevron contends that Judge Zambrano improperly and secretly influenced the selection of the panel, which, it claims, should have been done publicly by random lottery.  It has failed, however, to provide evidence or foreign law materials explaining the procedure for selection of appellate judges under Ecuadorian law.

[1150]

PX 2548 (LAPs' July 8, 2011 Filing with Appellate Court), at 12.

284

Zambrano to be able to use the contested material[s] as a basis."[1151]  The LAPs noted that Chevron

first alleged that Zambrano had received secret assistance in its reply brief to this Court on February

15.  They contended that "[t]he fact that Chevron has identified similarities and differences between

the judgment of February 14, 2011, and some documents obtained from plaintiffs through collateral

procedures initiated in the U.S., all in **only one day**, [wa]s categorical evidence that Chevron was

ready to make these accusations before the judgment was rendered."[1152]  Thus, the LAPs continued,

"Chevron might know perfectly well how these materials were taken into account by Judge

Zambrano. . . . Logic compels us to conclude that Chevron knew where to look for it because

Chevron itself put it there from the beginning."[1153]

    Chevron responded two weeks later.  It denied the allegation that it had provided the

LAPs' unfiled work product to Zambrano.[1154]  It noted that its February 15, 2011 filing with this

Court said that it suspected fraud in the authorship based on "Judge Zambrano's admission only

weeks before February 14, 2011, that he still had a quarter of the approximately 200,000-page record

left to review."[1155]  It was not until Chevron obtained further discovery from the LAPs' U.S. counsel

---

1151

  *Id.* at 5.

1152

  *Id.* at 8-9 (emphasis in original).

1153

  *Id.* at 5, 10.

1154

  PX 2549 (Chevron Response to LAPs' July 8, 2011 Appellate Filing), at 1.

1155

  *Id.* at 5.

  In fact, the footnote in Chevron's February 15, 2011 reply memorandum in this Court
referred also to unspecified "indications in the Judgment itself." DI 91, at 6 n.1.  But it did
not explain what "indications" it had in mind.  The Court notes, however, that at least one
such indication was obvious on the face of the Judgment – the presence of the _sv and _tx

285

and then compared the documents it received in discovery to the Judgment that it presented evidence of the overlap to the Ecuadorian appellate court in May 2011.[1156]  Thus, the LAPs' assertion that Chevron had located the portions of the Judgment that matched the LAPs' internal files in "only one day" was false.  Moreover, Chevron noted that, despite the LAPs' accusations and bluster, "*[n]owhere* do Plaintiffs deny that they secretly provided Judge Zambrano with the content of their internal documents so that it could be incorporated into the text of the lower court judgment."[1157]

Chevron appended to its response additional evidence of overlap, based in part on discovery it had obtained from Section 1782 proceedings in the U.S.  Nonetheless, Chevron requested – based on the overlap evidence and the LAPs' failure to explain it or deny their involvement in writing the Judgment – that the Judgment be declared null and void.[1158]

### 2.  The Appellate Panel Affirms the Judgment

The three-judge appellate panel affirmed the Judgment on January 3, 2012, rejecting the arguments made by both parties.[1159]  Although it claimed to have resolved the appeal "on the

---

suffixes in the Judgment's designations of samples.  As previously discussed, those suffixes were not used in the Filed Lab Results in the Record, the ostensible source of the Judgment's references. *Supra Facts* § IX.B.1.C.  "SV," moreover, were the initials of Selva Viva, the LAPs' administrative entity.

[1156]   PX 2549 (Chevron Response to LAPs' July 8, 2011 Appellate Filing), at 5.

[1157]   *Id.* at 2 (emphasis in original).

[1158]   *Id.*

[1159]   PX 430 (Appellate Judgment).

As discussed below, the appellate judgment was not received for the truth of the matters stated therein and has no legal effect here.

286

merits,"[1160] the panel stated that it would not "refer at all" to Chevron's specific allegations "of fraud and corruption of plaintiffs, counsel and representatives . . . except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by . . . Chevron, under what is known as the RICO act, and this [court] has no competence to rule on the conduct of counsel, experts or other officials . . . . ." [1161]

Indeed, the appellate court declined almost entirely to address Chevron's allegations concerning overlap between the Judgment and the LAPs' unfiled work product. While Chevron had not yet obtained Guerra's evidence by the time the appeal was decided, it did present to the appellate court some other evidence that it presented at trial in this case – for example, that portions of the unfiled Selva Viva Database, the Fajardo Trust Email, and the Fusion Memo – were copied either verbatim or in substance into the Judgment. But the appellate court by and large disregarded it. The court failed entirely to address the overlap between the Judgment and the Fusion Memo, the Index Summaries, and the Fajardo Trust Email.[1162] And, while the appellate court stated that it "ha[d] been able to confirm first hand that the record include[d]" certain "information" in the Judgment that appeared also in the unfiled Selva Viva Database,[1163] it did not identify the specific "information" to which it referred, where it had found it within the record, or why it differed from the LAPs' filed

---

[1160]      *Id.* at 1.

[1161]      *Id.* at 10.

[1162]      PX 430 (Appellate Judgment).

[1163]      *Id.* at 11.

sampling data.[1164]   The appellate court thus declined to address the fundamental implication of the overlap between the Judgment and the LAPs' unfiled work product – that the LAPs had written, or assisted Zambrano in writing, the Judgment.

Moreover, to the extent the appellate court acknowledged that the Judgment incorrectly had reported some of the data samples – for example, its incorrect reporting of mercury and PAH levels as much higher than the Filed Lab Results reported them to be – it concluded that the errors were immaterial to the Judgment's damages award.[1165]   The panel did not attempt to re-calculate the damages based on the correct figures.   It concluded simply that the judge had considered *all* of the evidence – not each piece individually – to arrive at the total damages award.[1166]   But that of course missed at least one major point – Chevron pointed to the overlap in

---

[1164]

> Moreover, for reasons previously stated, the appellate court decision may not be considered for the truth of the matters asserted, as it is hearsay if and to the extent it is offered for that purpose. *Infra* note 1563.  The Court concludes below that it does not have issue preclusive effect on this or any other factual point.  *Infra Discussion* § IX.A

[1165]

> For example, the appellate court noted that, in listing some of the sample results, the Judgment omitted decimals – notwithstanding that the sampling results reported the decimals – and instead reported the next whole number.  PX 430 (Appellate Judgment), at 11.  This was particularly true for at least one sample of benzene.  But the court concluded that "[t]his gaffe, no doubt involuntary, does not affect the merits of the judgment being examined, since, regardless, it refers to an alarming quantity of benzene in the environment."  *Id.*  The appellate panel addressed also the fact that the Judgment reported certain results for PAHs in milligrams rather than micrograms but concluded only that "the assessment of the quantity of contamination based on these samples should be reduced considerably."  *Id.*  And the panel noted that the Judgment omitted the "less than" symbol in reporting the results for mercury, and "[f]or this reason, emphasi[z]ed . . . that the reference to the presence of 'high levels' of mercury . . . does not match the facts. . . ."  *Id.* at 12.  Nonetheless, the court "consider[ed] that this error in the assessment of the laboratory results regarding a contaminating element d[id] not invalidate the remaining findings or reasoning regarding others which are in fact characterized as contaminating elements."  *Id.*

[1166]

> "[T]he . . . errors would not be capable of slanting [the Judgment's] reasoning, or inducing it to error . . . because the judge in his judgment has not assessed each sample and its results separately, as if they described isolated facts, but instead it is the collection of information

288

general and to the errors and other idiosyncracies common to the Judgment and the unfiled LAP documents as evidence that the LAPs had written or secretly had a hand in writing the Judgment, which raised an entirely different issue from whether there simply had been factual errors.

Consistent with its statement that it would not "refer at all" to Chevron's specific allegations "of fraud and corruption of plaintiffs, counsel and representatives," the intermediate appellate court failed largely to address the question whether these commonalities supported Chevron's claim of misconduct.

### 3.   The Appellate Clarification Order

The LAPs sought clarification of the appellate court's decision.[1167]  They referred to the appellate court's statement that it "ha[d] no competence to rule on" Chevron's fraud allegations that were "pending resolution before" this Court[1168] and asked that "the [appellate] Division clarify and state that in fact it *ha[d]* analyzed Chevron's accusations, and that it *ha[d] not* found any fraud in the activities of the plaintiffs or their attorneys."[1169]

The appellate court issued its clarification order on January 13, 2012.[1170]  It stated

---

coming from various sources that undoubtedly has created in the trial judge the conviction of the existence of damage."  *Id.*

[1167]  PX 2551 (LAPs' Appellate Clarification Request); PX 2552 (Chevron Response to LAPs' Appellate Clarification Request); PX 431 (Appellate Clarification Order).

[1168]  PX 2551 (LAPs' Appellate Clarification Request), at 4; PX 2552 (Chevron Response to LAPs' Appellate Clarification Request), at 9 (citing PX 430 (Appellate Judgment), at 10).

[1169]  PX 2551 (LAPs' Appellate Clarification Request), at 5 (emphasis added).

[1170]  PX 431 (Appellate Clarification Order).

that, while it did "not find evidence of 'fraud,'" it was "stay[ing] out of these [fraud] accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America."[1171]  It noted that "[t]his was a determining factor for the [Appellate] Division's considerations in the judgment that is being clarified, since it is obvious that it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction. . . ."[1172]

Nonetheless, the court stated conclusorily that "all of the samples, documents, reports, testimonies, interviews, transcripts and minutes, referred to in the judgment, are found in the record without the defendant identifying any that is not – the defendant's motions simply show disagreement with the reasoning, the interpretation and the value given to the evidence, but they do not identify correctly legal evidence that is in the record."[1173]  But the clarification order – like the underlying appellate order – did not address any of Chevron's specific ghostwriting claims.  Nor did it identify where in the record it had located the documents it claimed were there and – as noted previously –  its statements concerning what it allegedly found in the record may not be considered for their truth.  It posited instead that "[i]f there had been any 'secret assistance,' the presumed concordance between the plaintiffs' internal documentation, and the text of the judgment would not be limited to a fairly simple interpretation of evidence that is contained in the record."[1174]

---

[1171]   *Id.* at 4.

[1172]   *Id.*

[1173]   *Id.* at 3.

[1174]   *Id.* at 4.

B.　　　*The National Court of Justice Affirms the Judgment in All But One Respect*

Chevron sought review in the Ecuadorian National Court of Justice on January 20, 2012.[1175]  The National Court of Justice is a court of cassation.  It reviews only the legal arguments and does not re-examine the facts.

Despite its limited scope of review, Chevron made a plethora of arguments – both legal and factual – to the National Court.  Most relevant, however, were its contentions that the trial court proceedings should have been "nullified" because, *inter alia*, the LAPs had submitted fraudulent reports by Dr. Calmbacher, Cabrera had been appointed illegally and had illegally carried out his duties, and the LAPs had ghostwritten the Judgment.[1176]

The National Court issued its opinion affirming in large part the appellate court's decision on November 12, 2013, while trial in this case was underway.[1177]  It noted that "the cassation appeal is an extraordinary appeal granted to the losing party so that the Cassation Court may annul not every unfair judgment, but only those in which their own specific unfairness has been proved to have been founded on a wrongful interpretation of the law."[1178]

With respect to Chevron's allegations concerning Calmbacher and Cabrera, the National Court noted that Chevron had not "mentioned which legal rule ha[d] been supposedly infringed" or "which procedural rules have rendered the proceeding absolutely null" and stated that

---

[1175]

　　　DX 1022 (Chevron Cassation Appeal).

[1176]

　　　*Id.*

[1177]

　　　PX 8095 (Opinion of Ecuadorian National Court of Justice).

[1178]

　　　*Id.* at 96.

291

it had concluded that the cassation court therefore was unable to pass on them.[1179]  It accepted the trial court's statement that it had not relied on the Cabrera Report.[1180]  The National Court "concluded that . . . [t]he court of appeals ha[d] adequately addressed the requests of the defendant with respect to the report of Mr. Cabrera and has properly weighed the evidence in accordance with the rules of the sound judgment, within which it has considered that the aforementioned report was not taken in consideration by the trial judge. . . ."[1181]  The National Court therefore "discard[ed] the [Cabrera] allegation inasmuch as it is shown that there has been a correct weighing of the evidence in accordance with legal standards . . . ."[1182] It pointed out, however, that it had not reviewed the record before the trial court as "one cannot attempt to re-evaluate the evidence through a cassation appeal. . . ."[1183]

The National Court stated also that Chevron's ghostwriting allegations were inappropriate for cassation review.[1184]  The court wrote:

> "appellant has alleged that the judgment rendered by the trial judge was drafted by the plaintiffs, and making reference even to the commission of a procedural violation, which would result in the nullity of the trial court's judgment. The nullity of any judgment, according to the Code of Civil Procedure, arises for reasons

---

[1179]  *Id.*; *see also id.* at 97-98.

[1180]  *Id.* at 156-57 (citing PX 400 (Lago Agrio Judgment), at 50-51).

[1181]  *Id.* at 157.

[1182]  *Id.*

[1183]  *Id.*

[1184]  The National Court did not consider Chevron's allegations concerning Guerra or the bribe scheme.  Chevron did not raise them in its cassation petition, as Guerra had not yet approached Chevron by the time the petition was filed.

292

expressly provided for in the law itself, which is something different from the grounds for nullity of a proceeding, as we discussed herein, therefore allegations such as those involving the perpetration of a crime are not sufficient legal foundation to lodge a cassation appeal and allege the nullity of a judicial proceeding, since the record also does not show any judicial determination on the commission of a crime."[1185]

The National Court affirmed the appellate court in all but one respect. It "quashed" the punitive damages award "since punitive damages are not contemplated under Ecuadorian law and public apologies are not admissible nor, therefore, is any award for that concept."[1186] It therefore cut the LAPs' damages award to $8.646 billion.

XIII    *The Pressure Campaign Continues*

    A.    *The Invictus Strategy Deployed – Attempts to Enforce the Lago Agrio Judgment*

As noted, the Invictus Memo set out a plan to enforce the Judgment "quickly, if not immediately, on multiple enforcement fronts – in the United States and abroad."[1187] It laid out also a so-called "keystone nation" strategy:

> "As with the domestic enforcement analysis, proceeding as an initial matter in a jurisdiction housing the highest concentration of Chevron's domestic assets would offer certain obvious advantages, including efficiency. Nonetheless, it is more important for Plaintiffs to proceed *initially* in a jurisdiction that promises the most favorable law and practical circumstances. To that end, Plaintiffs' Team will identify and potentially target certain 'keystone' nations - that is, nations that enjoy reciprocity, or, better yet, are part of a judgment recognition treaty - with nations that

---

[1185]

    *Id.* at 99 (footnotes omitted).

[1186]

    *Id.* at 222.

[1187]

    PX 2382 (Invictus Memo), at 29.

serve as the locus for greater Chevron assets."[1188]

In pursuit of this strategy, the LAPs currently are seeking enforcement of the Judgment against subsidiaries of Chevron in Argentina,[1189] Brazil,[1190] and Canada.[1191]  The Court finds that they intend to do so in the United States when they conclude that it is tactically advantageous to do so.[1192]

---

[1188]

       *Id.* at 35 (emphasis in original).

[1189]

       PX 2461 (Order Issued by the National Civil Trial Court No. 61 of Argentina in *Aguinda Salazar Maria v. Chevron Corp.*).

       In the Argentine case, the LAPs successfully convinced a trial court to embargo Chevron's Argentine subsidiary's assets, dividends, and future bank deposits.  *Id.* at 2-4.  The decision ultimately was reversed by the Argentine Supreme Court, which held that Chevron Argentina – the defendant in the Argentine case – was separate from Chevron Corporation – the defendant in the Lago Agrio case – and that the LAPs had failed to pierce the corporate veil.  PX 273 (Order Issued by the Supreme Court of Justice of Argentina in *Aguinda Salazar Maria v. Chevron Corp*).

[1190]

       PX 2306 (Filing in the Superior Court of Justice of Brazil).

       The Brazilian action, *see* Tr. (J. Piaguaje) 2398:7-2399:3, so far as the record discloses still is in its initial stages.

[1191]

       PX 1004 (Amended Statement of Claim, filed in *Yaiguaje v. Chevron Corp.*, Court File No. CV-12-454778, Ontario Superior Court of Justice).

       An Ontario court stayed the LAPs' enforcement action against Chevron's Canadian subsidiary, holding that the LAPs had failed to pierce the corporate veil. The court held that the case could not proceed unless and until the LAPs located assets of Chevron Corporation in Canada.  PX 660 (Order, *Yaiguaje v. Chevron Corp.*, File No. CV-12-9808-00CL, Ontario, Canada).  The stay of proceedings later was vacated by the Ontario Court of Appeal, http://cdn5.lettersblogatory.com/wp-content/uploads/2013/12/C57019.rere_.pdf, which then stayed its decision pending Chevron's motion for leave to the Supreme Court of Canada, http://cdn5.lettersblogatory.com/wp-content/uploads/2014/01/2014ONCA0040.pdf.

[1192]

       As noted, attempts to enforce the Judgment in the United States always have been part of the plan.  Indeed, even when the defendants sought to defeat the preliminary injunction in this case by disclaiming any then present intention to seek enforcement in New York, they conspicuously did not disclaim any such intention elsewhere in the United States.

294

The LAPs are enforcing the Judgment in Ecuador despite that Chevron never has operated in the country and has no subsidiaries there.  As noted, Invictus foreshadowed the LAPs' plan of seeking "attachment of Chevron's assets prior to successful recognition of the Ecuadorian judgment."[1193]  It noted that "attachment would undoubtedly compound the pressure already placed on Chevron vis a vis an international enforcement campaign, and force Chevron to focus its resources on the proceedings initiated by the Plaintiffs, rather than its sideshows."[1194]  The LAPs recently have attempted to employ this strategy in Ecuador.

A few months after the intermediate appellate court affirmed the Judgment, the Provincial Court of Sucumbíos issued orders attaching Chevron's assets and the assets of its

---

Moreover, the reasons for their failure to seek enforcement to date in the United States are fairly obvious.

As an initial matter, the defendants' repeated efforts to have this case assigned to a different judge make clear their preference for almost any other forum. Any attempt, however, to enforce the Judgment in the United States while this action remains pending would carry a substantial risk that the enforcement proceeding would be litigated here for two reasons.

*First*, as long as this action remains pending, any suit in a federal court by any of the LAPs (other than the two LAP Representatives who defended this case at trial) to enforce the judgment likely would be a compulsory counterclaim in this case, as the defaulting LAPs are defendants here and have not answered the complaint in this case.  FED. R. CIV. P. 13(a)(1).

*Second*, there in any event would be a substantial chance that any enforcement action brought in a federal court other than this one would be transferred to this Court under 28 U.S.C. § 1404(a) or 1407, as occurred with Patton Boggs' related lawsuit in the District of New Jersey.  *Patton Boggs LLP v. Chevron Corp.*, No. 12 Civ. 9176 (LAK), DI 42 (filed Dec. 14, 2012).  Moreover, as the LAPs all are aliens, any enforcement action brought in a state court, other than those of the two states of which Chevron is a citizen (California and Delaware), could and quite likely would be removed by Chevron to federal court and then likely transferred to this Court.

[1193]

PX 2382 (Invictus Memo), at 31.

[1194]

*Id.*

295

subsidiaries worldwide.   In furtherance of enforcement of the Judgment, it attached Chevron's

intellectual property rights in Ecuador, funds going into or leaving Ecuador to Chevron's bank

accounts abroad, and a $96 million arbitration award issued against the Republic of Ecuador

("Embargo Order").[1195]   More will be said on this below, but it suffices now to note only that it is

another important aspect of  the LAPs' multi-pronged enforcement plan.


> **B.     *The Purpose of All of These Efforts***

Donziger's and the LAPs' purposes in pursuing the expansive media campaign

previously discussed, in their attempts to instigate the criminal prosecution of Chevron lawyers, in

their efforts to precipitate disinvestments in Chevron stock, and in their overtures to government

officials and agencies to investigate Chevron and in related activities, always have included driving

Chevron to the settlement table.

On October 6, 2007, Donziger confided to his personal notebook the following:

> "The key issue is criminal case. Can we get that going? What does it mean? I really
> want to consolidate control with contract before going down a road that I think could
> force them to the table for a possible settlement."[1196]

Later that month, Donziger, on the eve of a mediation with settlement, wrote confidentially to

another of his hired PR people that "[w]e need to get more press and increase the pressure b/w now

---

[1195]

PX 432 (Oct. 15, 2012 Order issued in Summary Proceeding No. 21100-2003-0002), at 4
(attaching intellectual property, cash, and other assets in Ecuador, along with a $96,355,369
arbitration award issued against the ROE); PX 418 (Oct. 25, 2012 Order issued in Summary
Proceeding No. 21100-2003-0002) (expanding attachment order); PX 7087 at 4 *et seq.*
(Oct. 3, 2013 Official Letter of Ecuadorian Intellectual Property Inst. informed Lago Agrio
court of notations of attachment of Chevron trademark registrations pursuant to attachment).

[1196]

PX 169R (Donziger Notebook), at 6.

296

and then, to get the price up."[1197]

In August 2009, Donziger sent a new prospective PR firm a memorandum outlining his ideas for their efforts.  It began by stating that the "primary objective is to pressure Chevron such that they will have to settle the case at a level that would allow for a comprehensive environmental clean-up" and then discussed generating pressure from shareholders, disinvestment, pressure from governmental investigators, diplomatic pressure, celebrity endorsements, and pressure from Congress and NGOs.[1198]

To be sure, Donziger's long-time head PR person, Karen Hinton, testified at trial that Donziger's interest was only in taking the case to verdict and not in settling it:

> "I had numerous conversations with Mr. Donziger about resolving the case. Mr. Donziger repeatedly told me that in the settlement talks Chevron refused to agree to pay for a full and complete remediation of the concession area. As a result, Mr. Donziger made it clear during this time that his clients did not want to settle the case. As Mr. Donziger repeatedly told me, settlement meant, by definition, compromise and his clients deserve a full recovery, not a compromised recovery. Since the sample data overwhelmingly proved contamination, Mr. Donziger and his clients wanted a full trial and verdict so the Amazon would get completely cleaned up (and not just partially). He also wanted Chevron to provide medical facilities and clean drinking water. Throughout the time I worked on the case, the team prepared the case for trial, not settlement."[1199]

---

[1197]

PX 931 (Oct. 29, 2007 Memo from S. Donziger to C. Lehane); *see also* PX 728 (Apr. 27, 2005 email from C. Lehane to S. Donziger and J. Kohn), at 2 ("As we have discussed, the Ecuadorian Amazon ChevronTexaco project can be reduced, in the end, to a single strategic imperative: **Bringing ChevronTexaco to the negotiation table by inflicting real economic pain on the company.**") (bold in original).

[1198]

PX 7450 (Aug. 2009 Memo from S. Donziger to New Partners re "Idea for Campaign").

[1199]

DX 1500 (Hinton Direct) ¶ 11.

The Court does not credit her assertions that Donziger told her that the sample data overwhelmingly proved contamination or that he would not compromise the case in any way meaningful to Chevron for that reason.  Nor does it credit her testimony that

297

But she quickly admitted on cross-examination that Donziger wanted to get more press attention to get the settlement price higher.[1200]   The Court finds disingenuous Hinton's efforts to deny or to equivocate about Donziger's objective to use media and other outside attention of various sorts to force Chevron to the settlement table and to induce it to offer more in settlement than it otherwise would have done.   Moreover, trying the case to judgment (and even through appeals) and achieving a favorable settlement are not mutually exclusive goals.   There are indications that Donziger and the LAPs concluded long ago that trying the case to a decision could provide the best chance for a significant settlement.[1201]

This Court finds that Donziger and the LAPs were very much interested from the outset in settling the Lago Agrio case.   Logic dictates the finding also that they are, and will remain, at least as interested in doing so now and in the future. The objects of all of Donziger's media and

---

"[t]hroughout the time [she] worked on the case, the team prepared the case for trial, not settlement."   *Id.*

[1200]

She testified on cross examination as follows:

"Q.  And at any time did Mr. Donziger tell you that his goal was to get more press, increase the pressure in order to get that settlement price higher?  A.  Are you speaking about a particular time frame?

Q.  At any time, Ms. Hinton.  A.  Repeat it again.

Q.  At any time, ma'am, *did Mr. Donziger tell you that his goal was to increase press so that he could increase the pressure in order to get the settlement price higher?  A.  Yes.*

Q.  At any point in time, Ms. Hinton, did Mr. Donziger tell you that he wanted to force Chevron to the table for possible settlement? [Objection and ruling omitted]  A.  Not in those words."  Tr. (Hinton) 2159:3-18 (emphasis added).

[1201]

*See* PX 1184 (Nov. 10, 2009 Ltr. from J. Kohn to P. Fajardo and L. Yanza re: "Ecuador-Texaco Case"), at 2; PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to P. Fajardo and L. Yanza re: "Ecuador-Texaco Case"), at 2 (noting reported "decision to not raise settlement before [they] 'win' the trial").

298

outside pressure efforts, including his attempt to have Chevron lawyers prosecuted criminally in Ecuador, prominently included increasing the pressure on Chevron to make it more willing to compromise, and at a higher amount, than otherwise would have been the case.  The questions whether and to what extent those efforts were actionable, which is not quite as simple as the defendants would have them, are dealt with below.

<em>Prior Proceedings in this Litigation</em>

*The Pleadings*

This action was filed on February 1, 2011 against the LAPs, Donziger, Fajardo, Yanza, the ADF, Selva Viva, and a number of other individuals and entities.[1202]  All defendants were duly served.  Fajardo, on behalf of himself, the LAPs, and all of the other Ecuadorian defendants, sought and obtained an extension of time within which to move or answer.[1203]  Two of the LAPs – Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the "LAP Representatives") answered and have defended the action.  None of the other Ecuadorian defendants answered or moved with respect to the complaint.  A certificate of default has been entered against them.[1204]

*The Amended Complaint*

The amended complaint contained nine causes of action. As the Court has granted

---

[1202]     Among these were the Stratus Defendants – Stratus Consulting, Inc., the consulting firm that allegedly ghost-wrote all or most of the Cabrera Report, and two of its personnel, Douglas Beltman and Ann Maest.  The Stratus Defendants ultimately settled with Chevron.

[1203]     DI 128 (Letter from P. Fajardo to Court, Feb. 23, 2011); DI 127 (Order extending time).

[1204]     DI 205.

299

defendants' dismissal motions as to some,[1205] only five remain – (1) counts 1 and 2, which assert substantive and conspiracy claims against Donziger under RICO, (2) Counts 3 and 7, which assert, respectively, fraud and civil conspiracy claims against all defendants, and (3) Count 8, which asserts that Donziger violated Section 487 of the New York Judiciary Law.[1206]

Count 9 sought a declaration that the Judgment was unenforceable and unrecognizable "on, among others, grounds of fraud, failure [by Ecuador] to afford procedures compatible with due process, lack of impartial [Ecuadorian] tribunals, lack of personal jurisdiction, [and] contravention of public policy."[1207] As discussed below, Count 9 has been disposed of as well.

*The Answers*

Two aspects of the defendants' answers[1208] are relevant here.

*First*, Donziger's seventh affirmative defense asserts that "Chevron's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata."[1209] Likewise, the LAP Representatives' thirty-third affirmative defense asserts that "[t]he claims asserted in the Complaint and any relief sought thereunder are barred, in whole or in part, under the doctrines of

---

1205

      *Chevron Corp. v. Donziger,* No. 11 Civ. 0691 (LAK), 871 F. Supp. 2d 229 (S.D.N.Y. 2012) (Donziger); DI 634 (LAP Representatives).

1206

      *Id.* ¶¶ 420-26.

1207

      *Id.* ¶ 430.

1208

      DI 307 (Donziger answer); DI 350 (LAP Representatives' answer).

1209

      DI 307 (Donziger answer), at 71.

300

res judicata and/or collateral estoppel."[1210]

      *Second*, both assert unclean hands and *in pari delicto* affirmative defenses.[1211] Moreover, the LAP Representatives' pleading explicitly and significantly relies, in this respect, on findings by the Lago Agrio court of misconduct by Chevron in the defense of the Lago Agrio case.[1212]

---

[1210]    DI 350 (LAP Representatives' answer), at 106.

[1211]    *Id*. at 91-105; DI 307 (Donziger answer), at 71.

[1212]    Indeed, they allege that:

    "*As observed by the Ecuadorian Court in its final judgment*, Chevron also engaged in the following procedural misconduct: raising at the eleventh hour 'unresolved issues' previously abandoned by Chevron in an effort to delay resolution of the case; obstructing the evidence gathering process by launching frivolous attacks upon each and every expert report not submitted by a Chevron-affiliate, which the Court found to be designed to 'impede the normal advance of the evidence gathering process, or even prolong it indefinitely;' and frontally attacking the court in a display of shocking disrespect for the judicial process. Further, In [*sic*] summation of Chevron's behavior throughout the course of the litigation, *the Court observed that* 'the following constitutes a display of procedural bad faith on the defendant's part: failure to . . . [produce] . . . documents ordered coupled with a failure to submit an excuse on the date indicated; attempting to abuse the merger between Chevron Corp. and Texaco Inc. as a mechanism to evade liability; abuse of the rights granted under procedural law, such as the right to submit the motions that the law allows for [. . .]; repeated motions on issues already ruled upon, and motions that by operation of law are inadmissible within summary verbal proceedings, and that have all warranted admonishments and fines against defense counsel defendant from the various Judges who have presided over this Court; [and] delays provoked through conduct that in principle is legitimate, but . . . [which have] . . . unfair consequences for the proceedings . . . such as refusing and creating obstacles for payment of the experts who took office, thus preventing them from being able to commence their work . . . .'" *Id*. at 103-04 (emphasis added).  *See also* DI 350 (LAP Representatives' answer), at 101-04.

*Discovery and Motion Practice*

    *Discovery and Discovery Sanctions*

        During discovery, the defendants refused to comply with Chevron's request for production of documents insofar as it sought documents located in Ecuador that were not in the personal physical possession of Donziger or the LAP Representatives – in principal part documents physically in the hands of Fajardo and the Ecuadorian LAP lawyers as well as Yanza, the ADF, and Selva Viva.

        The Court granted Chevron's motion to compel production and, when the defendants did not comply, its motion for sanctions.[1213] As will be discussed below, the only sanction ultimately imposed was the striking of the LAP Representatives' personal jurisdiction defense.[1214]

    *The Partial Summary Judgment Motions*

        Chevron made four motions for partial summary judgment on various aspects of the

---

[1213]

    *Chevron Corp. v. Donziger*, --- F.R.D. ---, 2013 WL 5575833 (S.D.N.Y. Oct. 10, 2013).

[1214]

    *Id.* at *40 (striking defense unless documents relevant to personal jurisdiction were produced by Oct. 24, 2013, which they were not).

    The Court concluded also that defendants' failure to comply with the order compelling production warrants (a) the inference that the documents requested but not produced would have been unfavorable to defendants, and (b) exclusion at trial of documents ordered but not produced. But it reserved for trial the questions whether to draw that inference and to exclude such documents. *Id.* at *40-43. In any event, the Court drew no such inference from the defendants' failure to comply and excluded no documents on that ground. In some instances, it drew inferences from the failure of the Ecuadorian lawyers to testify. As noted however, it would have made the same findings in the absence of such inferences.

302

case.  Three motions were denied in their entirety and the fourth in all but one small respect.[1215]

### Attempts to Recuse the Judge or Require Reassignment of the Case

From the very outset of this case, the defendants made repeated efforts to get rid of the judge, who previously had ruled against them and been affirmed in both the Berlinger and Donziger Section 1782 proceedings.[1216]  The several early efforts, which began within a week of the filing of this action, are recounted in the Court's ruling denying the first formal recusal motion.[1217] Defendants then unsuccessfully sought a writ of mandamus or an order reassigning the case to a different judge.  The Court of Appeals summarily denied both requests.  In denying mandamus, it stated that "[B]ias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it in for the party for reasons unrelated to the officer's view of the

---

[1215]

   *Chevron Corp. v. Donziger*, No. 11 Civ. 0691 (LAK), 2013 WL 4482691 (S.D.N.Y. Aug. 22, 2013) (denying motion in the exercise of discretion without consideration of the merits); DI 1063 (Order, Apr. 24, 2013) (denying motion for partial summary judgment dismissing collateral estoppel affirmative defense); DI 878 (Order, Mar. 4, 2013) (denying motion for partial summary judgment on Count 8); *Chevron Corp. v. Donziger*, 886 F. Supp.2d 235 (S.D.N.Y. 2012) (substantially denying motion for partial summary judgment dismissing former adjudication affirmative defenses).  (The first of the cited decisions mistakenly spoke of three rather than four motions for partial summary judgment.)

[1216]

   *Chevron Corp. v. Berlinger*, 629 F.3d 297, 305-06 (2d Cir. 2011) (noting July 15, 2010 order to produce); *In re Chevron Corp.*, 749 F. Supp. 141, 170 (S.D.N.Y. 2010), *aff'd sub nom. Lago Agrio Plaintiffs v. Donziger*, 409 F. App'x 310 (2d Cir. 2010) (summary order).

[1217]

   *Chevron Corp. v. Donziger*, 783 F. Supp. 2d 713, 718 (S.D.N.Y. 2011).

303

law[.]"[1218] It rejected the reassignment request without comment.[1219]

Undaunted, Donziger within days of the Court of Appeals' decision, made another motion for recusal,[1220] which this Court denied summarily.[1221] Still undaunted, defendants later filed yet another mandamus petition, that one ostensibly to challenge a number of interlocutory rulings by this Court, but in which they again asked the Court of Appeals to reassign the case to another judge.[1222] Those applications too were denied summarily.[1223]

*The Trial*

Chevron waived all claims for damages and sought only equitable relief. The case was tried without a jury[1224] from October 15 through November 26, 2013. In conformity with common practice in this district in non-jury cases, the direct testimony of most witnesses was taken in the form of written statements, the truth of which was affirmed on the witness stand. The

---

[1218]

    *Chevron Corp. v. Donziger*, No. 11-2259-op, 2011 WL 4375022 (2d Cir. Sept. 19, 2011) (quoting *McLaughlin v. Union Oil Co. of Calif.*, 869 F.2d 1039, 1047 (7th Cir. 1989)).

[1219]

    *Chevron Corp. v. Naranjo*, 667 F.3d 232, 239 n.11 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 423 (2012).

[1220]

    DI 391 (Feb. 17, 2012 Mot. for Recusal).

[1221]

    DI 392 (Feb. 24, 2012 Memo. Endorsement).

[1222]

    Petition for writ of mandamus, *Naranjo v. Chevron Corp.*, No. 13-772 (2d Cir. filed Mar. 5, 2013), at 31-40.

[1223]

    *Naranjo v. Chevron Corp.*, No. 13-772, DI 182 (2d Cir. filed Sept. 26, 2013).

[1224]

    *See Chevron Corp. v. Donziger*, No. 11 Civ. 691 (LAK), 2013 WL 5526287 (S.D.N.Y. Oct. 7, 2013) (no right to jury trial in this case).

304

witnesses so testifying then were tendered for cross-examination, redirect, and any subsequent questioning as usual. Some exhibits were offered through witnesses in the usual way. Many were offered and received in bulk, subject to the filing and, where appropriate, rulings on objections to exhibits so offered.

Chevron called 25 witnesses live and offered deposition testimony of 22 additional witnesses. The defendants called only six witnesses live – Donziger, Hinton, Ponce, Javier Piaguaje, Selva Viva employee Donald Moncayo, and Assembly leader Humberto Piaguaje. They did not call Fajardo, Yanza, Sáenz, Prieto, or Cabrera, none of whom was deposed. The record thus lacks any testimony from them.

The trial was conspicuous for the fact that the defendants sought to offer extensive evidence of environmental conditions in the Orienté and of Texaco's alleged responsibility for them notwithstanding the Court's numerous pretrial rulings that those questions were not at issue in this case.

*Post-Trial Briefing*

The post-trial briefing in this matter was notable for the fact that the defendants made little effort to address the evidence presented at trial or to argue the facts. They confined themselves, for the most part, to rearguing the contentions they made in Ecuador with respect to alleged environmental pollution in the Orienté and to legal arguments that, they contend, require dismissal even if the facts are as Chevron contends.[1225]

---

[1225] *See* DI 1850 (Donziger Defs.' Post-trial Mem. of Law); DI 1857 (Donziger Defs.' Post-trial Reply); DI 1851 (LAPs Reps.' Post-trial Mem. of Law); DI 1858 (LAPs Reps.' Post-trial Reply).

One consequence of this approach is that the defendants – who offered only a handful of their proposed exhibits through witnesses in open court[1226] – made little effort to show the relevance or significance of most of the more than 1,000 exhibits they tendered in a mass submission on the last day of the trial.  The Court therefore does not have the benefit of much reasoned discussion by defendants as to what defendants think they proved or disproved even assuming their exhibits are admissible, which many quite obviously are not.  Nevertheless, the Court has considered the evidence on both sides and, to the extent it is admissible, given it such weight as it deserves.[1227]

---

[1226]

That is true also, albeit not to the same extent, of Chevron.  Chevron, however, has explained its case extensively both in summation and in extensive post-trial submissions.

[1227]

As frequently occurs in bench trials, most of the exhibits on both sides were received subject to subsequent rulings on (1) motions to strike, where such motions were made, and (2) objections, which in the case of Chevron's objections are set forth in an extensive spreadsheet listing each exhibit, Chevron's objections, and defendants' responses.  A similar practice was employed with respect to the parties' designations of deposition testimony.

Some of these motions and objections were ruled upon during or after the trial.  Others are dealt with in this opinion, including in Appendix III.  Beyond that, little purpose would be served by the making of specific rulings as to the admissibility of hundreds or possibly thousands of exhibits and many pages of deposition testimony that do not figure in the outcome.  Suffice it to say that the Court has received in evidence any exhibit or testimony upon which it relies in this opinion.

*Discussion and Additional Findings*

Chevron's principal remaining claims seek equitable relief with respect to the Judgment both on non-statutory grounds and under RICO.   These two claims are entirely independent of each other[1228] although, of course, they rely to a great but not complete extent on the

---

[1228]    There is a basis of subject matter jurisdiction over these and other non-federal claims completely independent of the RICO claims, namely 28 U.S.C. § 1332.  *See generally* DI 283 (Am. Compl.), ¶¶ 8-17, 20, 23.

At the outset of the action, there was one uncertainty as to the existence of complete diversity, viz. the allegation that defendant Selva Viva Selviva CIA, LTDA (actually Selva Viva CIA, LTDA, subsequently referred to as "Selva Viva") is an Ecuadorian limited liability company.  *Id*. ¶ 14.  Had that been true, it would have been a citizen of every state or nation of which any of its members was a citizen.  *E.g.*, *Handlesman v. Bedford Vill. Green Assocs. L.P.*, 213 F.3d 48, 52 (2d Cir. 2000).  There is no allegation as to the identity or citizenship of its members.  Accordingly, if paragraph 13 of the complaint (paragraph 14 of the amended complaint) had been accurate, plaintiff's failure to have alleged that none of Selva Viva's members was a citizen of Delaware or California, the states in which Chevron is organized and in which it has its principal place of business, respectively, would have been fatal to diversity or alienage jurisdiction.  But that pleading flaw has been rendered immaterial by the proof at trial.

The Court finds that Selva Viva is, and from its inception always has been, an Ecuadorian corporation with its principal place of business in Ecuador.  Tr. (Donziger) 2635:4-6 (Selva Viva is an entity created under corporate law of Ecuador); Donziger June 24, 2013 Dep. Tr. at 103:6-16 (acknowledging incorporation of Selva Viva and Donziger's designation as president); Tr. (H. Piaguaje) 2677:12-2678:3 (stating that witness is a 40 percent shareholder of Selva Viva); PX 6906 (record of incorporation of Selva Viva, its entry into the Register of Companies, and the designation of Donziger as president); PX 426 (Ecuadorian court record reflecting Fajardo's description of Selva Viva as a corporation); Tr. (Kohn) 1420:11-20 (Selva Viva headquartered in Quito, Ecuador); Tr. (Donziger) 10:6-17 (Selva Viva's office is in office of LAPs' Ecuadorian counsel); Donziger June 26, 2013 Dep. Tr. at 737:7-14 (Selva Viva office is in Ecuador); DX 226T-227T (same).  It therefore is a citizen of Ecuador.  Thus, plaintiff Chevron is a citizen of California and Delaware, and defendants all are citizens of Ecuador or of states other than California and Delaware.  The matter in controversy, exclusive of interest and costs, obviously exceeds the sum of $75,000.  Subject matter jurisdiction exists under 28 U.S.C. § 1332(a) and (c).  For the sake of good order, the complaint and the amended complaint are deemed amended to conform to the proof that Selva Viva is an Ecuadorian corporation with its principal place of business in Ecuador.  *See* FED. R. CIV. P. 15(b)(2); 28 U.S.C. § 1653.   Accordingly, even a pretrial dismissal of the RICO claims would not have permitted dismissal of the non-RICO claims for want of subject matter jurisdiction.

307

same facts.  Chevron asserts in addition certain other claims.

       The Court begins by disposing of Donziger's claim, raised only after trial, that the Court lacks subject matter jurisdiction because Chevron lacks Article III standing.  It then turns to the merits of Chevron's claims, the affirmative defenses, and then to relief.  The appendices to this opinion, filed separately for convenience, are an integral part of it and contain additional findings of fact and conclusions of law.

## I.    *This Court Has Subject Matter Jurisdiction*

       Following the completion of the trial and all post-trial briefing, defendants moved to dismiss the case for lack of subject matter jurisdiction.  They argue that Chevron lacks Article III standing by virtue of its recent withdrawal of its damage claim and its decision to limit the geographic scope of injunction against enforcement of the Judgment to the United States.  Defendants claim that these recent changes in the relief sought eliminated any "case or controversy" between them and Chevron.  Parenthetically, that is a proposition that defies common sense given the bitter adversity of the parties on the central issue between them, whether the Lago Agrio Judgment was procured by fraud.  But putting that aside, their argument is completely baseless.

       *First*, subject matter jurisdiction – including standing[1229] – is determined as of the time the action is brought.[1230]  But defendants do not suggest that Chevron lacked standing when the

---

[1229]     15 MOORE'S FEDERAL PRACTICE § 101.32 (3d ed. 2013) ("Standing is determined as of the time suit is filed.").

[1230]     *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (rejecting challenge to plaintiffs' standing because "unlawful conduct . . . was occurring at the time the complaint was filed"); *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570-71 (2004) (footnote omitted) ("It has long been the case that 'the jurisdiction of the court

308

action was brought.  The basis for their present motion – Chevron's limitation of the relief it seeks – occurred only recently.  So they have posed the wrong question.  The right question is whether these recent changes have mooted the case.[1231]  The answer to that question quite plainly is "no."

      *Second*, even were the Court to engage defendants' standing argument – thereby ignoring the horn book law that subject matter jurisdiction and its standing component are determined as of the time the action is brought – it would reject it.  Defendants' arguments ignore the factual record in this case.  Given the record and this Court's findings, there would be standing here even if the matter were determined as of this moment.

      In sum, this Court has subject matter jurisdiction.

### A.    This Case Is Not Moot

      Article III of the Constitution limits the judicial power of the United States – and thus the jurisdiction of federal courts – in relevant part to "Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States" and "to Controversies between . . . Citizens of

---

depends upon the state of things at the time of the action brought.' *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824). This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure."). *Accord, e.g., Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006); *Focus on the Family v. Pinellas Suncoast Trans. Auth.*, 244 F.3d 1263, 1275 (11th Cir. 2003).

[1231]

      *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("One commentator has defined mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 YALE L.J. 1363, 1384 (1973)).

different States"[1232] – or, as it often is stated more broadly, to "cases and controversies."[1233] Assuming the existence of a case or controversy at the time an action is brought – and defendants' motion, not to mention their behavior in litigating this case over the past three years so assumes – the federal court continues to have subject matter jurisdiction unless and until "a suit becomes moot," *i.e.*, until "'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'"[1234]  But, as the Supreme Court held just months ago, "a case 'becomes moot only when it is impossible for a court to grant *any effectual relief whatever* to the prevailing party.'"[1235]  "As long as the parties have a concrete interest, *however small*, in the outcome of the litigation, the case is not moot."[1236]

     *First*, the litigants here plainly retain a "concrete interest" in the resolution of this case. Chevron insists that it has been a victim of defendants' fraud and racketeering activity.  It alleges that it is threatened with additional injury.  It seeks equitable relief both to rectify past injuries and prevent further injury.  Donziger and the LAP Representatives argue in response that Chevron's claims are spurious, that this Court lacks jurisdiction to provide Chevron with any effective relief, and that comity in any event demands respect for the Lago Agrio Judgment and the various enforcement

---

[1232]

     U.S. CONST., art. III, § 2.

[1233]

     *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal quotation marks omitted).

[1234]

     *Chafin v. Chafin,* 133 S.Ct. 1017, 1023 (2013) (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 621, 726 (2013)).

[1235]

     *Id.* (quoting *Knox v. Serv. Empls*, 132 S. Ct. 2277, 2287 (2012) (emphasis added)).

[1236]

     *Knox*, 132 S. Ct. at 2287 (quoting *Ellis v. Ry. Clerks*, 466 U.S. 435, 442 (1984)) (emphasis added).

courts.  Nevertheless, "there is not the slightest doubt that there continues to exist between the parties 'that concrete adverseness which sharpens the presentation of issues.'"[1237]

*Second*, Chevron's withdrawal of its damage claim and its limitation of the geographic scope of the anti-enforcement injunction it seeks did not make it "impossible for [this] court to grant any effectual relief whatever."[1238]  This Court can and, as will appear below, does impose a constructive trust on the proceeds of the Judgment to these defendants, including the proceeds of intellectual property and royalties already seized from Chevron in Ecuador in Judgment enforcement proceedings and a $96 million arbitration award in favor of Chevron against the ROE, in order to prevent these defendants from profiting unjustly at Chevron's expense.  It can and, as will be appear below, does enjoin these defendants from pursuing any proceedings in the United States to enforce the Judgment, once again to prevent them from profiting from the fraud.  Regardless of whether those and any other remedies granted would afford Chevron all the relief it could hope for with respect to the fraud and racketeering of which it complains, Chevron certainly has "a concrete interest, [even if others might characterize it as] small," in obtaining them.  The fact that the Court can afford Chevron such relief means this case is not moot.[1239]

---

[1237]

    *Id.* at 1024; *see also Cabala v. Crowley*, 736 F.3d 226, 229 (2d Cir. 2013) ("Because the parties continued to dispute the form and extent of the relief to which [plaintiff] was entitled, the case never became moot.").

[1238]

    *Chafin*, 133 S. Ct. at 1023.

[1239]

    *Chafin*, 133 S. Ct. at 1026 ("[T]he availability of a partial remedy is sufficient to prevent [a] case from being moot.") (quoting *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (*per curiam*)); *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy for [plaintiff's injury], . . . the availability of [any] possible remedy is sufficient to prevent this case from being moot.").

311

B.      *This Court Had Subject Matter Jurisdiction When the Action Was Brought*

Defendants have not questioned the existence of subject matter jurisdiction generally, or Chevron's standing in particular, as of the time this action was brought. But subject matter jurisdiction goes to the Court's power to hear a case, and the Court therefore is obliged to raise the issue of its own motion whenever a question appears. Accordingly, the Court does so now.

One element of a "case" or "controversy," the existence of which is essential to the jurisdiction of a federal court, is that the plaintiff have standing to sue. The determination, as the Court has shown, is made "on the basis of what was known at the time a suit was initially filed."[1240]

"[T]he irreducible constitutional minimum of standing contains three elements:" (1) "the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical," that is (2) "'fairly traceable to the challenged action of the defendant,'" and (3) "likely" to "be redressed by a favorable decision."[1241] Although an "injury-in-fact" exists when a defendant has inflicted a "present harm" on a plaintiff, the "Supreme Court has recognized that a plaintiff in some circumstances may have standing to sue even when the plaintiff shows only an imminent threat of future harm or a present harm incurred in consequence of such a threat."[1242]

---

[1240]

> *Hargrave v. Vermont*, 340 F.3d 27, 34 n.7 (2d Cir. 2003); *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (although the "proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*" (emphasis added) (internal citation omitted)).

[1241]

> *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[1242]

> *Hedges v. Obama*, 724 F.3d 170, 188-89 (2d Cir. 2013).

The complaint in this case alleged that the defendants (1) corrupted the judicial process in Ecuador, (2) colluded with the Ecuadorian government, (3) improperly procured the appointment of Cabrera and secretly ghostwrote his report, (4) improperly induced the Ecuadorian government to prosecute two former Texaco lawyers, and (5) mounted a public relations blitz, aimed at Chevron and based in part on knowing misrepresentations, all to extort a payment from Chevron, and that they also had obstructed justice and tampered with witnesses in U.S. discovery proceedings to prevent proof of their misconduct.[1243]   Chevron asserted that it already had suffered substantial damages, that the entry of a large judgment against it was imminent as a result of the alleged corruption, that the defendants would move promptly to seek to enforce that judgment, and that it was threatened with irreparable injury absent equitable intervention.[1244]   Chevron sought damages as well as an injunction barring the defendants from seeking to enforce the imminent judgment anywhere in the world.[1245]

Those allegations satisfied Article III's standing requirements.  And while a plaintiff ultimately bears the burden of proving, not merely alleging, facts sufficient to satisfy the standing requirements as of the date an action is begun, Chevron did so.   The findings in this opinion demonstrate that Chevron proved the substantial truth of the facts alleged in the complaint.  Finally, the remedy it initially sought – *damages and a global injunction* prohibiting the LAPs and both their

---

[1243]
    *See* DI 1 (Feb. 1, 2011 Compl.).

[1244]
    The Judgment was entered thirteen days following the filing of the original complaint in this case, thus demonstrating that Chevron's claim that this event was imminent was well founded.  *See Hargrave*, 340 F.3d at 34. In any case, Chevron alleged other, already consummated, injuries.

[1245]
    *See, e.g.*, DI 1 (Feb. 1, 2011 Compl.) Prayer for Relief.

313

Ecuadorian and U.S. counsel from enforcing or profiting in any way from the Judgment – would obviously redress Chevron's injuries by compensating it for injuries already incurred and by preventing future injuries stemming from both the Judgment and attempts to enforce it.[1246]

Chevron had standing, and the Court had subject matter jurisdiction, as of the commencement of this action.

C.    *The Court Would Have Subject Matter Jurisdiction Even on Defendants'
       Erroneous Premise*

Even were this Court to accept defendants' erroneous premise that the standing requirements that apply at the commencement of a lawsuit persist through the twists and turns that litigation can take – in other words, their invitation to ignore (1) the foundational principle that standing is determined at the time the complaint is filed, (2) the fact that Chevron both pleaded and proved that it had standing at the outset, and (3) the fact that this action is far from moot – the Court still would conclude that Chevron has standing here.

*First*, defendants' enforcement of the Judgment in Ecuador already has resulted in the loss by Chevron of Ecuadorian trademarks and related revenue streams, which are being applied to

---

[1246]

      Defendants argue that even a global anti-enforcement injunction could not have redressed Chevron's injuries "because foreign courts would first have to decide to give it effect." *See* DI 1861 (Defs.' Mem. of Law in Supp. Mot. to Dismiss for Lack of Jurisdiction), at 6 n.4. That argument ignores the fact that even the possibility that foreign enforcement  might enforce the Judgment is a threat directly caused by the fraudulent procurement of the judgment in the first place.  It ignores also the facts that "[c]ourts often adjudicate disputes where the practical impact of any decision is not assured" and that "[c]ourts also decide cases against foreign nations, whose choices to respect final rulings are not guaranteed." *Chafin*, 133 S. Ct. at 1025-26.  Such potentialities have no bearing on jurisdiction.

314

the satisfaction of the Judgment.[1247]  The value of those trademarks is between $15,703,986 and $23,195,020, and the value of lost future royalties amounts to $5,138,596.[1248]  And it has lost its $96 million arbitration award against the ROE to the extent that the award otherwise would have been enforceable in Ecuador.[1249]  As the attachment orders say, all of that property is applicable to the satisfaction of the Judgment under Article 2367 of the Ecuadorian Civil Code.[1250]  The application of that property to the satisfaction of the Judgment – that is, to the benefit of the Judgment creditors and, through his contingent fee arrangement, Donziger – is a concrete, particular, and direct consequence of the fraudulent Judgment, not merely "fairly traceable" to it.[1251]

---

[1247]

See DI 1847 (Chevron Corp.'s Post-trial Mem. of Law), at 197-98; DI 1848 (Chevron Corp.'s Proposed Findings of Fact) ¶ 127.

[1248]

PX 6000 (Anson Direct) ¶¶ 48-49.

[1249]

PX 432 (Oct. 15, 2012 Order issued in Summary Proceeding No. 21100-2003-0002), at 4 (attaching $96,355,369 arbitration award issued against the ROE).

[1250]

See, e.g., PX 432 ("Therefore, in strict compliance with Article 2367 of the Civil Code, which states that, 'every personal obligation gives the creditor the right to satisfy it with all real property or personal property of the debtor, whether present or future, only excepting those that cannot be attached . . .', since none of the assets for which attachment is being requested is covered under this exception, and since it is necessary to comply with that ordered in the judgment being executed, against the defendant in this proceeding, Chevron Corp., it is ordered that the execution of this judgment be applicable to the entirety of the assets of Chevron Corporation, until such time as the entire obligation has been satisfied.").

[1251]

Defendants' argument that subsequent appellate proceedings constitute an intervening cause ignores the fact that "the 'fairly traceable' standard is lower than that of proximate cause." Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013).  Defendants' actions need not be "the very last step in the chain of causation" in order to establish causation for the purposes of Article III.  Bennett v. Spear, 520 U.S. 154, 168-69 (1997).  It ignores also this Court's conclusion, infra, that the subsequent appellate rulings are not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system.

Those injuries are redressable by the constructive trust the Court today imposes on, and the related relief it grants with respect to, Donziger's right to share in those proceeds and any benefits accruing to the other defendants and the LAP Representatives.  The constructive trust with respect to the any royalties and other income generated by the trademarks will deprive Donziger and these other defendants of any benefit from the Judgment and restore that value to its rightful owner, Chevron.[1252]

*Second*, Chevron has established that it is threatened with additional, imminent injury as a direct result of defendants' continued efforts to enforce the Judgment.  It currently is incurring substantial legal fees and other expenses to defend enforcement proceedings,[1253] all concrete and direct consequences of the fraud perpetrated by these defendants.  In addition, it is threatened with the risk of further disruptive pre-judgment attachment in foreign countries, as occurred in Argentina,[1254] and with the risk that some foreign country will enforce the Judgment.  All of these threatened injuries are direct consequences of the Judgment.

Defendants nevertheless argue that the risk of further attachments and of foreign enforcement are not certain to be realized and, even were they certain, would be products of the

---

[1252]

*Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) ("A constructive trust is properly imposed in this situation in order to make [a plaintiff] whole for its loss of the value of the Property . . . .").

[1253]

*See, e.g.*, PX 3000 (Veiga Direct), ¶ 132.

[1254]

PX 2461 (Order, National Civil Trial Court No. 61, Argentina, in Aguinda Salazar Maria v. Chevron Corporation).

The Argentine attachment ultimately was vacated by Argentina's highest court. *See* PX 273 (Order, Supreme Court of Justice of Argentina, in Aguinda Salazar, Maria v. Chevron Corporation).

316

actions of other courts and thus not "fairly traceable" to defendants.  But these arguments are not persuasive.

The suggestion that the risks of attachments or a foreign decision enforcing the Ecuadorian Judgment are merely speculative is disingenuous.  Defendants' own written enforcement strategy lays out the plan to use prejudgment attachment wherever possible,[1255] and they have pursued that course in Argentina already.  If the possibility of a foreign judgment enforcing the Judgment entered in Ecuador were as speculative as defendants argue, they would not be pursuing such judgments in Argentina, Brazil, and Canada, spending large sums doing so, and obtaining investors willing to fund those (and doubtless other) efforts in exchange for percentages of the result.[1256] Finally, the attempt to lay any outcome adverse to Chevron at the doorstep of whatever foreign court might render a decision adverse to it, and thus to disconnect defendants' fraud from the threatened harm, does not withstand analysis.  Defendants' fraud produced the Judgment.  Their enforcement efforts present the foreign tribunals with the opportunities to enforce that Judgment.  If any does so, it would be in consequence of defendants' actions and arguments.  Thus, there is a substantial risk that the harm Chevron apprehends will come to pass and, should that occur, it would have come to pass

---

[1255]

PX 2382 (Invictus Memo), at 17 ("Consistent with its aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment basis, largely as a means of attaining a favorable settlement at an early stage.").

[1256]

See Friends of the Earth, 528 U.S. at 184 (plaintiffs' evidence of direct effects of defendants' conduct could not "be equated with the speculative 'some day' intentions" upon which plaintiffs relied in Lujan) (quoting Lujan, 504 U.S. at 564).

317

as a direct result of defendants' actions. That would suffice to give Chevron standing to seek relief even if the existence of standing now matter, which for reasons already discussed it does not.[1257]

Finally, the fact that the relief sought in this case would not remedy all of the past harms nor prevent all of the threatened harms of which Chevron is at substantial risk would not deprive it of standing even if standing were viewed as of the present rather than as of the commencement of the action. The requirement of redressability is satisfied if the relief would "relieve *a* discrete injury."[1258]  A plaintiff "need not show that a favorable decision will relieve his *every*

---

[1257]

Defendants' reliance on *Clapper* for the proposition that the harm must be certain and that plaintiffs may not rely on "speculation about the unfettered choices made by independent actors not before the court," 133 S.Ct. 1150 n.5 (quotation marks and citation omitted), is misplaced. *Clapper* acknowledged that the "substantial risk" and "clearly impending" standards may be coextensive and, even if they are not, did not abandon the former. *See id.* There is no proper comparison to be made between the chain of speculation that the *Clapper* Court condemned as too attenuated and the far more direct relationship between defendants' fraud in this case and any foreign judgment enforcing the Ecuadorian Judgment.

Even more basic, *Clapper* must be read in the context in which it was written – an attempt to use the courts to cabin the actions of the executive branch. The Court made clear that its "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 1146-47 (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)) (internal quotation marks omitted).

This purely private dispute implicates none of the separation of powers concerns that inform the standing doctrine, particularly in cases like *Clapper*. It therefore would be entirely wrong to apply literally some of the language used in *Clapper*, assuming that the language was meant to impose standards higher than usual in the first place, to purely private litigation. Such application could alter dramatically, to cite but one example, the law governing preliminary injunctions in trade secret cases by transforming the requirement of impending dissemination into a jurisdictional question, rather than a question on the merits. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009) (finding that plaintiff had standing, but vacating preliminary injunction for lack of irreparable harm where plaintiff failed to show imminent disclosure of trade secrets).

[1258]

*Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) (emphasis added).

318

injury."[1259]  Because Chevron "would benefit in a tangible way from the [C]ourt's intervention,"[1260] it has standing here.

II.      *The Non-Statutory Claims for Equitable Relief With Respect to the Judgment*

Chevron asserts that the Judgment was procured by bribery and coercion of Ecuadorian judges and, even if that were not so, that it nevertheless was procured by fraud in other respects.   It nevertheless does not seek to set aside the Judgment in the Ecuadorian court – an institution of a sovereign nation – or even to enjoin its enforcement outside the United States. Rather, it seeks equitable relief "that will strip Defendants of any profits they are able to procure as a result of their corrupt judgment"[1261] and to enjoin enforcement of the Judgment in the United States.[1262]

A.      *Equitable Relief With Respect to Fraudulent Judgments Generally*

Three basic principles underlie Chevron's non-statutory claim for relief from the Judgment.

*First*, independent equitable actions long have afforded relief from judgments obtained by fraud, whether by enjoining their enforcement, preventing those responsible from

---

[1259]

   *Id.*

[1260]

   *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 n.5 (1998).

[1261]

   DI 1847 (Chevron Post-trial Mem. of Law), at 326.

[1262]

   *Id.* at 347-49.

benefitting from their fraudulent actions, or otherwise.[1263]   The willingness of equity to "enjoin a judgment obtained by fraud" has existed at least since the seventeenth century. [1264] While the merger of law and equity altered the procedural context in which such actions are pursued and other changes in the legal environment have reduced the frequency with they are brought, all relief traditionally granted in equity remains available.[1265]

---

[1263]

    *E.g.*, 4 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 1364, at 984 (Symons 5th ed. 1941) ("POMEROY") ("where the legal judgment was obtained or entered through fraud, . . . then a court of equity will interfere . . . and restrain proceedings on the judgment which cannot be conscientiously enforced"); Note, *Injunctions – Foreign Judgment – Enforcement Abroad Restrained*, 38 YALE L.J. 261 (1928).  FED. R. CIV. P. 60(b) indeed provides that "the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules *or by an independent action.*"  *See id.* Comm. Note 2007 Amdt. (emphasis added).

[1264]

    *See, e.g.*, HENRY L. MCCLINTOCK, MCCLINTOCK ON EQUITY ("MCCLINTOCK") § 4, at 11, 459 (1948); *see also id.* § 171, at 459 ("Since [the seventeenth century] . . . there has been no serious question as to the power [of equity] to enjoin the enforcement of a judgment obtained by fraud . . . .").

[1265]

    *Stainback v. Mo Hock Ke Lok Po*, 336 U.S. 368, 382 n.26 (1949) ("Notwithstanding the fusion of law and equity by the Rules of Civil Procedure, the substantive principles of Courts of Chancery remain unaffected."); *Union Mut. Life Ins. Co. v. Friedman*, 139 F.2d 542, 544 (2d Cir. 1944) ("Under the present practice there is no longer a law side and an equity side of the court, but only a civil action in which all relief must be obtained that could formerly be secured either at law or in equity."); 4 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1043, at 177 (3d ed. 2002) ("[T]he merger of law and equity and . . . abolition of . . . forms of action furnish a single uniform procedure by which a litigant may present his claim in an orderly manner to a court empowered to award whatever relief is appropriate and just; the substantive and remedial principles that applied prior to the advent of the federal rules are not changed."); *see also, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) ("[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction.") (quoting 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: FEDERAL RULES OF CIVIL PROCEDURE § 2941, at 31 (2d ed. 1995) (internal quotation marks omitted) (alteration in original)).

320

*Second*, equity acts *in personam* – it acts on the person subject to its jurisdiction and, in this context, not on the challenged judgment, whether foreign or domestic.[1266]  It therefore "may command persons properly before it to cease or perform acts outside its territorial jurisdiction."[1267]  Since the time of Lord Coke, this principle has resulted, in proper cases, in equitable decrees "enjoin[ing] parties from enforcing judgments obtained by them at law when it was unconscionable for them to do so" even "leav[ing] the judgment in peace."[1268]  Moreover, the principle that equity

---

[1266]

E.g., 2 POMEROY § 428; MCCLINTOCK § 34, at 85; *see also, e.g., Hart v. Sansom*, 110 U.S. 151, 155 (1884) ("[A] court of equity acts in personam, by compelling a deed to be executed or canceled by or on behalf of the party. It has no inherent power, by the mere force of its decree, to annul a deed or to establish a title."); *Massie v. Watts*, 10 U.S. (6 Cranch) 148, 158 (1810) (Marshall, C.J.) ("[T]he principles of equity give a court jurisdiction wherever the person may be found, and the circumstance, that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction.").

[1267]

*Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) (affirming injunction prohibiting use of trademark in Mexico); *accord, e.g., Cole v. Cunningham*, 133 U.S. 107, 111 (1890) (affirming Massachusetts decree restraining Massachusetts citizens from prosecuting attachment actions in New York); *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 263 (2d Cir. 2012) (federal court sitting in equity having personal jurisdiction over party may "enjoin him from committing acts elsewhere" (quoting *Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir. 2004) (internal quotation marks omitted))); *City of Jamestown v. Pennsylvania Gas Co.*, 1 F.2d 871, 878 (2d Cir. 1924) ("Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitae, which he could do voluntarily, to give full effect to the decree against him.") (internal quotation marks and citation omitted); *Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 Civ. 13157 (GEL), 2006 WL 3735657, at *14 (S.D.N.Y. Dec. 15, 2006) (Lynch, J.) (enjoining initiation of lawsuits in Ukraine that would disrupt or delay New York arbitration proceedings); *Penn v. Lord Baltimore*, 1 Ves. Sen. 444, 447-48, 27 Eng. Rep. 1132, 1134-35 (Ch.) (1750) (Lord Chancellor entertained in England bill seeking specific performance of contract to determine boundary between provinces of Maryland and Pennsylvania).

[1268]

MCCLINTOCK § 34, at 85; *accord*, 73 N.Y. JUR. 2D, *Judgments* § 226 (2011) ("The equitable remedy against a judgment is not a proceeding in rem but is a proceeding in personam against a party to the judgment seeking to deprive him or her of the benefit of the judgment by enjoining the enforcement of it.  The remedy in equity does not assail the court in which the judgment was rendered . . . but may be employed to secure relief against the judgment

acts *in personam* means that a court of equity having jurisdiction over individual parties may enjoin those parties from enforcing, or afford other equitable relief with respect to, a judgment of another state or another nation.[1269]  Thus, the fact that equity acts *in personam* affords ample scope for equitable relief short of voiding or setting aside a fraudulent judgment.

---

on the ground that the rights acquired cannot be retained in good conscience.");  73 N.Y JUR. 2D, *Judgments* § 234 ("By a decree operating in personam or upon parties personally subject to its jurisdiction, a court of equity may grant relief from a judgment rendered in a foreign state even though the court that rendered the judgment had jurisdiction.") (footnote omitted).

This principle underlies also the rule that "[w]hen . . . both parties to a suit in a foreign country[] are resident within the territorial limits of another country [or subject to its *in personam* jurisdiction], the courts of equity in the latter may act *in personam* upon those parties, and direct them, by injunction, to proceed no further in such suit." JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 899 (1st Eng. ed. Grigsby ed. 1884).

[1269]  *Gray v. Richmond Bicycle Co.*, 167 N.Y. 348, 358-59 (1901) ("a court of one state may, where it has jurisdiction of the parties, determine the question whether a judgment between them, rendered in another state, was obtained by fraud, and, if so, may enjoin the enforcement of it, although its subject-matter is situated in such other state") (quoting *Davis v. Cornue*, 151 N.Y. 172, 179 (1896) (internal quotation marks omitted)); *Venizelos v. Venizelos*, 293 N.Y.S.2d 20 (App. Div. 1968) (affirming injunction barring, *inter alia*, enforcement of a Greek court decree); *Browning v. Navarro*, 826 F.2d 335 (5th Cir. 1987) (instructing district court to consider whether state court judgment was procured by fraud and may be set aside); *Ellerman Lines, Ltd. v. Read*, [1928] 2 K.B. 144 (C.A. 1928) (English plaintiff entitled to injunction barring enforcement of Turkish judgment that was procured by fraud); *Title Ins. & Trust Co. v. Cal. Dev. Co.*, 152 P. 542, 550-51, 553, 557-58 (Cal. 1915) (affirming injunction barring enforcement in Mexico of Mexican judgment obtained by fraud); *Ochsenbein v. Papelier*, (1873) L.R. 8 Ch. (Eng.) 695 (English equity court had jurisdiction to enjoin enforcement of French judgment procured by fraud but declined to grant relief in light of adequacy of legal remedy); *Bowles v. Orr*, (1835) 1 Younge & Collyer, 464, 160 Eng. Rep. 189 (1835) (enjoining action to enforce in England a French judgment allegedly obtained by fraud); *Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State*, 64 A.L.R. 1136 (1930); *see also Tamimi v. Tamimi*, 328 N.Y.S.2d 477 (App. Div. 1972) (declaring void a Thai divorce decree on the ground that the decree had been procured by fraud).

322

   *Third*, fraud in its procurement is an ancient basis for enjoining enforcement of or granting other equitable relief with respect to a judgment where other requisites of the exercise of equitable power are present.[1270]

   With this background, the Court proceeds to the claim that the Judgment was procured by fraud.

   B. *Fraud on the Court – Corruption and Coercion of Judges and Judicial Official*

   There is a good deal of learning concerning the kinds of fraud that support an independent action for relief from a judgment.[1271]   But there is uniform agreement on the proposition that "a judgment may be avoided . . . if the judgment . . . [r]esulted from corruption of or duress upon the court . . . ."[1272]   "Where . . . the situation is clear cut, as where a judge accepts a

---

[1270]

   *E.g.*, *supra* note 1263; 12 MOORE'S FEDERAL PRACTICE § 60.81.

[1271]

   Fraud in the context of independent actions or other applications for relief from a judgment generally falls into two or three categories. "Relief is always possible for 'extrinsic' fraud" and for "fraud on the court," which often is confused with or treated as a subset of extrinsic fraud. 12 MOORE'S FEDERAL PRACTICE § 60.81[1][b]. Relief for so-called "intrinsic fraud" often has been available less frequently. *Id.* § 60.81[1][b][ii].   There is more recent discussion as to whether the supposed distinction between extrinsic and intrinsic fraud is or should be meaningful. *Id.* § 60.81[1][b][iv]; *see Gleason v. Jandrucko*, 860 F.2d 556, 560 (2d Cir. 1988) ("Relief from a judgment by way of an independent action need not be premised on a showing of extrinsic as opposed to intrinsic fraud.") (citations and emphasis omitted).

[1272]

   RESTATEMENT (SECOND) OF JUDGMENTS § 70(1)(a) & cmt b (1982); *see* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2870 ("Fraud on the court" most commonly has been invoked in cases involving "'the most egregious conduct involving a corruption of the judicial process itself.' The concept clearly includes bribery of a judge . . . ."); *accord*, RESTATEMENT OF JUDGMENTS § 124 (1942); *United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002) (bribery of judge or juror is fraud on court and ground for relief from judgment) (internal quotations omitted); *Wilkin v. Sunbeam Corp.*, 466 F.2d 714, 717 (10th Cir. 1972) (corruption of judicial officers is fraud on the court); *Root Ref. Co. v. Universal Oil Prods. Co.*, 169 F.2d 514, 517, 541 (3d Cir. 1948) (vacating

323

bribe . . . , the person injured thereby is entitled to equitable relief."[1273]  The position is equally clear with respect to the coercion of judicial officers.  "[E]quitable relief will be given from a valid judgment to a party . . . injured thereby because of . . . duress upon the court . . . by the other party or a third person" if the judge "submits to duress."[1274]  Indeed, defendants do not contend otherwise.

This record establishes both of these types of fraud on the Lago Agrio court.

### 1.    The Bribery of Zambrano

This Court has found by clear and convincing evidence that Zambrano was corrupted by Donziger and the LAPs.  Fajardo – with Donziger's approval – agreed to pay Zambrano $500,000 out of proceeds of the Judgment in exchange for Zambrano deciding the Lago Agrio case in the LAPs' favor and signing a decision provided by the LAPs. The principle that such a bribe warrants

---

judgments obtained by bribery of Third Circuit judge), *cert. denied sub nom. Universal Oil Products Co. v. William Whitman Co.*, 335 U.S. 912 (1949); *In re Ibanez,* 834 N.W.2d 306, 312 (S.D. 2013) (same); *Pizzuto v. Ramirez*, No. 1:92–cv–00241–BLW, 2013 WL 1222560, at *8 (D. Ida. Mar. 22, 2013) (bribery of judge or juror is fraud on court and ground for equitable relief against judgment); *Ellett v. Ellett*, 35 Va. App. 97, 101, 542 S.E.2d 816, 818 (2001) ("[e]xtrinsic fraud includes such circumstances as bribery of a judge or juror"); *In re Miller*, 902 P.2d 1019, 1022 (Mont. 1995) ("[e]xtrinsic fraud includes such circumstances as bribery of a judge or juror").

For the sake of completeness, the defendants have not asserted that the question whether the bribery of Zambrano and the coercion of Judge Yánez were lawful under Ecuadorian law should be decided under Ecuadorian law.  In the absence of a party's demonstration of a conflict of laws, the law of the forum, here New York, applies. 19A N.Y. JUR. 2D, *Conflict of Laws* § 2 (2014). Citations are unnecessary to establish the proposition that bribing a judge is unlawful here.  Moreover, an Ecuadorian law expert for defendants testified, and this Court holds, that the law in Ecuador is the same.  DI 1413-12 (Albán Dep. Tr.), at 31:21-32:2; DI 1400-4 (Ex. D), at 48:1-12.24.

[1273]

RESTATEMENT OF JUDGMENTS § 124 cmt. a.

[1274]

*Id.*

324

equitable relief is so well established that counsel for the LAP Representatives recently conceded before the Second Circuit that they "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming that the judge was bribed.[1275]  Thus, the bribery of Zambrano establishes a clear basis for relief provided that other equitable considerations are satisfied.

### 2.        The Coercion of Judge Yánez

The Court has found, also by clear and convincing evidence, that Fajardo and Donziger coerced Judge Yánez to allow the LAPs to terminate their remaining judicial inspections, to appoint a global expert, and to designate their hand-picked choice, Richard Cabrera, for that position.   They did so by threatening him with the filing of a misconduct complaint at a time when he was especially vulnerable, and by other pressure as well.

Defendants do not dispute that the coercion of Judge Yánez would be fraud on the court and afford a basis for equitable relief if it were material to the outcome.  Rather, they argue that the coercion of Judge Yánez was immaterial because the Cabrera Report played no role in the ultimate decision.  But they are mistaken.

The only basis for the contention that the Cabrera Report played no role in the ultimate decision is the statement in the Judgment that the Lago Agrio court did not rely on it.[1276] But that disclaimer does  not carry the day for the defendants on this point for at least two reasons.

---

[1275]

DI 1496-2 (Tr., Sept. 26, 2013), at 25:3:15, *Naranjo v. Chevron Corp.*, No. 13-772-cv (2d Cir.).

[1276]

The National Court of Justice accepted that statement and therefore disregarded the allegations regarding Cabrera. *Supra Facts* § XII.B.

325

*First*, the disclaimer is inadmissible hearsay – it is nothing more than an out-of-court statement by the author or authors of the Judgment, and it is offered for its truth.  It therefore is inadmissible hearsay, and it would be so even if Zambrano were the author.[1277]

*Second*, even if the disclaimer were admissible for its truth, it would be only some evidence on the question.  But this Court has found, on the basis of other evidence, that the Cabrera Report in fact was relied upon by the author or authors of the Judgment and that it played an important role in holding Chevron liable to the extent of more than $8 billion.  The most material respect in which that was true was the reliance on the Cabrera Report for the count of 880 pits, which was an essential predicate to more than $5 billion of the damage award.[1278]

Accordingly, the coercion of Judge Yánez, coupled with the important reliance on the Cabrera Report by the author or authors of the Judgment, is a second material fraud on the Lago Agrio court, and it is entirely independent of the bribery of Zambrano.

### 3. *The Corruption of Cabrera*

In late February and early March 2007, Donziger and Fajardo, having concluded that Cabrera would cooperate them, were giving him the "hard sell" to accept the global expert appointment.  They promised him a lifetime of work on the remediation if the LAPs won the case. Even before he was sworn in as the global expert on June 13, 2007, Donziger and the LAPs began

---

[1277]

*Infra Discussion* VII.A.

[1278]

*Infra* App'x III.I.

326

covertly paying him through the secret account in addition to paying him via the public and established court process.  They provided him also with a secretary and life insurance.

The Court finds, by clear and convincing evidence, that at least some of these payments and benefits, actual and promised, were bribes given to influence Cabrera's actions as the court-appointed global expert.  The *quid pro quo* were Cabrera's repeated representations to the Lago Agrio court and others that he was impartial and independent, his putting of his name to the Report largely prepared by Stratus and it subcontractors and claiming that Report as his own product, and his filing as his own purported response (actually written mostly by Stratus and the LAPs) to the LAPs' and Chevron's comments on the Cabrera Report.

Cabrera took an oath administered by and was an officer of the court.  When Donziger and the LAPs covertly paid him and provided him with other benefits under the table to make sure he "totally play[ed] ball" with them, they bribed or corrupted a judicial official.[1279]  The same principles that apply to the bribery of Zambrano apply to this behavior.[1280]  In light of the reliance by the author(s) of the Judgment on the Cabrera Report, this corruption of Cabrera is highly material.

---

[1279]

As discussed, experts are prohibited under Ecuadorian law from accepting "anything of value" from parties, as the fees are established by the judge, and it is illegal to bribe a court-appointed expert. *Supra Facts* § V.C.1; *see also* DI 1413-4 (ECUADOR CRIM. CODE Arts. 355, 359), at 48, 49; DI 1413-7 (ECUADOR CODE OF CIV. P. Arts. 251, 252, 839), at 56; DI 1413-9 (Rules Governing the Activities and Fee Schedule of Experts in the Civil Criminal and Similar Areas of the Judiciary, Arts. 9, 14, 15), at 21; DI 1413-12 (Albán Dep. Tr.), at 31:25-32:2, 54:7-23.

[1280]

*See Morgan v. United States*, 304 U.S. 1, 19-20 (1938) (addressed below).

C.      *Fraud – Ghostwriting and Deception*

Donziger and the LAPs committed fraud on the court and/or extrinsic fraud by means independent of the bribery of Zambrano, the corruption of Cabrera, and the coercion of Judge Yánez.

1.      *The LAPs' Ghostwriting of All or Part of the Judgment and Zambrano's Adoption of Their Product Was Fraud Warranting Equitable Relief Even Absent Bribery*

This Court has found that the LAPs wrote the Judgment, in whole or in major part, that they gave the draft to Zambrano, and that Zambrano (whether with or without Guerra's participation) made little or no contribution apart from his signature and perhaps some light editing. Even if Zambrano had not been bribed to take these actions, his actions and those of the LAPs would have been fraud on the court and/or extrinsic fraud, the choice being only a matter of one's verbal preference.

In *Morgan v. United States*, [1281] upon which Chevron relies, the plaintiffs challenged rates fixed by the Secretary of Agriculture on the ground that the Secretary signed findings submitted to him *ex parte* by department staff without notice to the unsuccessful litigant and without hearing or considering the evidence submitted by the plaintiffs. In holding the order invalid, the Supreme Court reasoned that the Secretary's action would have been improper in a court of law and that no lesser standard applied to the rate making proceeding before it:

> "If in an equity cause, a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred ex parte with the plaintiff's attorney regarding them, and then adopted his proposals without affording

---

[1281]

304 U.S. 1.

an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing. The requirements of fairness are not exhausted in the taking or consideration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps."[1282]

Even more pointed, in present circumstances, is *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*,[1283] the misconduct in which shares some elements with that in this case.  In *Bridgestone/Firestone*, the Mexican plaintiffs in a U.S. wrongful death action sought to avoid a *forum non conveniens* dismissal of their U.S. case on the ground that Mexican courts were not an adequate and available alternative forum.  They pointed to the fact that they had sued in Mexico but that the Mexican court had dismissed their action.  Upon inquiry into the circumstances of that dismissal, however, it turned out that (1) the plaintiffs' had sought the dismissal of their own Mexican case in order to bolster their opposition to the *forum non conveniens* motion in the United States, (2) the plaintiffs' Mexican lawyers had been given $20,000 "for expenses" plus 10 percent of plaintiffs' gross recovery (in the U.S.) if they obtained the dismissal of the Mexican action, (3) the Mexican lawyers manipulated the proceedings in Mexico to have the case assigned to a particular judge and to a *secretaria de acuerdos* – essentially a permanent law clerk whose job was "to draft all orders issued in a case prior to the final judgment and present those orders to the judge for final approval" – who was a sister of one of the plaintiffs' Mexican lawyers, (4) the plaintiffs' Mexican lawyers improperly submitted to the judge a proposed order dismissing the Mexican case, and (5) the judge signed the order thus provided.  Moreover, as has been the case here with Fajardo,

---

[1282]

   *Id.* at 20.

[1283]

   470 F. Supp. 2d 917 (S.D. Ind. 2006).

Yanza, Prieto, and Sáenz, the Mexican lawyers in *Bridgestone/Firestone* refused to testify in the U.S. proceeding.  The U.S. court held that the Mexican dismissal had been obtained by fraud.

Neither *Morgan* nor *Bridgestone/Firestone* was an independent action for relief from an allegedly fraudulent judgment.  They nevertheless illustrate the fact that the Judgment here was obtained by fraud regardless of whether Zambrano was bribed and even without regard to whether Yánez was coerced or Cabrera corrupted.  Judges and a judicial officer, at the behest of the LAPs, abandoned their sworn responsibilities of fairness and impartiality.  Even without that misconduct, the actions of the LAPs and Zambrano – the secret submission of a form of judgment desired and written by the LAPs and Zambrano's adoption of that form of judgment in whole or in part, respectively – would have deprived Chevron of a fair determination of the Lago Agrio case.  Those actions constituted fraud on the court because they involved misconduct by both court officials and a litigant that went directly to the integrity of the process.  In any case, they satisfied the classic definition of extrinsic fraud – "by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case . . . .  [T]he unsuccessful party [Chevron w]as . . . prevented from exhibiting fully [its] case, by fraud or deception practised on [it] by [its] opponent."[1284]

---

[1284]   *United States v. Throckmorton*, 98 U.S. 61, 65 (1878).

2.     *The Deception of the Lago Agrio Court By The Misrepresentations that Cabrera Was Independent and Impartial and By the Passing Off of the Ghostwritten Report as His Work Was Fraud Warranting Equitable Relief Even Absent Bribery*

The facts concerning the Cabrera Report and Cabrera's response to the LAPs' Stratus-authored critique, as well as Chevron's critique, of the Cabrera Report, are not disputed, at least seriously.  These two documents were presented to the Lago Agrio court on the basis that the documents had been prepared by Cabrera and that Cabrera himself was impartial and independent. The representations and pretenses that Cabrera was impartial, that he wrote the documents and, in this Court's view, that he was independent all were inaccurate.[1285]  These false pretenses and representations to the Lago Agrio court – engaged in by Cabrera as a court official at the instance of Donziger and the LAPs – constituted fraud warranting equitable relief.

Particularly relevant here is the Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,[1286] also heavily relied upon by Chevron, in which the Court reversed a ruling that had denied equitable relief against a previous judgment and, indeed, in which the Court

---

[1285]

The Court recognizes that the parties referred to their respective nominated judicial inspection experts and others they hired as "independent" in certain public statements notwithstanding that those individuals had been selected and paid by those who selected them and sometimes interacted with the lawyers who engaged them.  *See, e.g.*, Tr. (Reis Veiga) 107:4-109:8, Tr. (McMillen) 428:1-429:6; DX 1416 (Filing of A. Callejas).  Those situations, however, were quite different from that of Cabrera, who was (1) court-appointed to be a single global expert rather than someone openly nominated by and working with one side or the other, (2) sworn to be independent and impartial, (3) to be paid only through an open court process.  The representations and pretenses that Cabrera was "independent" therefore are not properly comparable to the manner in which the parties treated experts whom they openly had hired and who would have been regarded by any reasonable observer as partisan or, at least, beholden to the hiring party.

[1286]

322 U.S. 238 (1944).

331

directed that the prior judgment be vacated.  Attention to the facts is useful, as they parallel those of this case in important respects.

The first suit had been for patent infringement.  Hartford, the eventual patentee, had met with resistance from the Patent Office during prosecution of its patent application.  In order to overcome that resistance, it ghostwrote and procured publication of an article, signed by a supposedly disinterested expert whom Hartford procured, that described the alleged invention as "a remarkable advance in the art."  It brought the article to the attention of the Patent Office, and the patent issued.

Hartford then sued Hazel-Atlas for infringement.  The ghostwritten article played no role in the trial, and the district court dismissed the case on the ground that the accused device did not infringe.  Hartford appealed and drew the appellate court's attention to the ghostwritten article.  The court of appeals reversed and reinstated the infringement suit, which then was settled on terms favorable to Hartford.

Over time, the facts concerning the article, some small part of which had been known to Hazel-Atlas at the time of trial, came out, many after the court of appeals' ruling in favor of the patentee.  Hazel-Atlas then commenced a new action in the court of appeals seeking relief from the prior judgment.[1287]  The court of appeals ruled against it, but the Supreme Court reversed and directed that the prior judgment be vacated.

The basis for the Supreme Court's ruling was that Hartford's actions constituted fraud on the court.  As the Court put it:

---

[1287]

The procedure, now unfamiliar, involved the filing in the court of appeals of a petition for leave to file a bill of review in the district court to set aside the decree that had been entered in the district court following the issuance of the court of appeals' mandate in the first case. 322 U.S. at 239.

332

> "Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments.  This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury.  Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals.  *Cf. Marshall v. Holmes*, *supra*.  Proof of the scheme, and of its complete success up to date, is conclusive.  *Cf. United States v. Throckmorton*, *supra*.

> \*    \*    \*

> We have, then, a case in which undisputed evidence filed with the Circuit Court of Appeals in a bill of review proceeding reveals such fraud on that Court as demands, under settled equitable principles, the interposition of equity to devitalize the 1932 judgment despite the expiration of the term at which that judgment was finally entered.[1288]

> \*    \*    \*

> Hartford's fraud, hidden for years but now admitted, had its genesis in the plan to publish an article for the deliberate purpose of deceiving the Patent Office.  The plan was executed, and the article was put to fraudulent use in the Patent Office, contrary to law. [citations omitted] From there the trail of fraud continued without break through the District Court and up to the Circuit Court of Appeals.  Had the District Court learned of the fraud on the Patent Office at the original infringement trial, it would have been warranted in dismissing Hartford's case. \*   \*   \* So, also, could the Circuit Court of Appeals have dismissed the appeal had it been aware of Hartford's corrupt activities in suppressing the truth concerning the authorship of the article.  The total effect of all this fraud, practiced both on the Patent Office and the courts, calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced.[1289]

The Court went on to direct that the earlier judgment of the court of appeals be set aside, that the

mandate be recalled, that Hartford's original appeal be dismissed, and that the district court be

---

[1288]

       *Id.* at 245-47.

[1289]

       *Id.* at 250.

333

directed to dismiss the infringement suit in addition to "tak[ing] such additional action as may be necessary and appropriate."[1290]

The situation here, even without regard to the fact that Cabrera was paid covertly by Donziger and the LAPs, is at least as egregious.  That is so notwithstanding that, in retrospect,  the Lago Agrio court was aware of what might appear to have been a few drops in what in fact was a heavy downpour:

- The Lago Agrio court knew that Cabrera was the LAPs' ultimate choice because Fajardo and Donziger had lobbied and coerced it *ex parte* for his appointment.  Moreover, Cabrera in February 2007 had written the court to ask that Chevron be ordered to pay him certain fees he claimed with respect to alleged prior services as a settling expert and, in the course of doing so, said he had made an arrangement with the LAPs, who already had paid him their share of the fees allegedly due for settling expert work.[1291]

- The Lago Agrio court knew also that Chevron had suspicions about Cabrera's neutrality and independence, as Chevron brought them to its attention more than once.[1292]

But those inklings were a far cry from a full and fair disclosure.  Neither the Lago Agrio court nor Chevron knew anything approaching the whole story of the overall Cabrera fraud – the thorough-going deception that Cabrera was impartial and independent, that he did his own work with his own independent helpers, that he wrote the Report and other documents that he purported to have written, and that he was compensated only through the court process.  Indeed, the first important evidence did not leak out until March 2010, after the Netflix release of *Crude*, and the production of the

---

[1290]

    *Id.* at 251.

[1291]

    PX 4300X (Callejas Direct) ¶ 50.

[1292]

    *Id.* ¶¶ 47-60.

334

Stratus documents later that year in the Denver Section 1782 proceeding.  Confirmation came still later.[1293]

      Nor may *Hazel-Atlas* be distinguished successfully on the basis of the statement in the Lago Agrio Judgment that the Lago Agrio court did not rely on the Cabrera Report.  As we hold below, that statement is not even admissible in evidence for its truth.  In any event, the evidence persuasively establishes that the Judgment rests in material respects on the Cabrera Report.

### D.    *The Other Requirements for Relief Have Been Satisfied*

      In considering whether a litigant is entitled to relief from a prior judgment on the ground of fraud, courts frequently consider whether (1) the fraud (whether intrinsic or extrinsic) prevented a full and fair presentation or determination of the litigant's claim or defense in the prior action or otherwise would render it unconscionable to give effect to the prior judgment, (2) the party seeking relief was diligent in discovering the fraud and attacking the judgment, and (3) evidence of

---

[1293]  *See* PX 3300 (McMillan Direct) ¶¶ 5-6, 33-60.

335

the fraud is clear and convincing.[1294]  For present purposes, only the first of these considerations

warrants discussion.[1295]

When courts are asked to grant relief from or to decline to recognize a prior judgment

on the ground of fraud, a central question is whether such an outcome is appropriate to "protect the

fairness and integrity of litigation."[1296]  In cases in which the tribunal has been corrupted, "no

worthwhile interest is served in protecting the judgment."[1297]  The point is analogous to that made

by the Second Circuit in the infamous *Manton* case, a criminal prosecution of a Court of Appeals

judge where the Circuit rejected a contention that there had been no obstruction of justice by a judge

---

[1294]

     *See* RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. d (1982); *see also Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421 (1923) ("[I]t must appear that the fraud charged really prevented the party complaining from making a full and fair defense"); *Marshall*, 141 U.S. at 596; *Lundborg v. Phoenix Leasing, Inc.*, 91 F.3d 265, 271 (1st Cir. 1996) (due diligence; clear and convincing evidence); *Diaz v. Methodist Hosp.*, 46 F.3d 492, 497 (5th Cir. 1995) (full and fair opportunity to present case); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 71 (2d Cir. 1990) (due diligence and lack of fault on part of party attacking judgment); *Green v. Foley*, 856 F.2d 660, 665 (4th Cir. 1988) (fully and fairly presenting case), *cert. denied*, 490 U.S. 1031 (1989).

     The same considerations are pertinent in determining whether a judgment should be recognized or enforced, either offensively or by means of an affirmative defense, under the Uniform Act, which in New York is CPLR Article 53.

[1295]

     The Court finds both the fraud and that Chevron has been diligent in discovering the fraud and attacking the Judgment by clear and convincing evidence.  Indeed, the defendants do not suggest any lack of diligence by Chevron.

[1296]

     12 MOORE'S FEDERAL PRACTICE § 60.43[1][d] (3d ed. 2012) (quoting *Lonsdorf v. Seefeldt*, 47 F.3d 893, 898 (7th Cir. 1995)).

[1297]

     RESTATEMENT (SECOND) OF JUDGMENTS § 70, cmt. b (1982).

336

because the cases would have been decided the same way in any case.[1298]  The Circuit's view in that

case has equal bearing here.

Even in cases of extrinsic fraud short of judicial corruption, a plaintiff need not prove

that the outcome of the prior case would have been different absent the fraud.[1299]  It ordinarily must

show only that the fraud "prevented the losing party from fully and fairly presenting his case or

defense" or otherwise significantly tainted the process.[1300]  Implicit in this latter criterion is a

---

[1298]

The Circuit wrote:

"We cannot doubt that the other judges who sat in the various cases acted honestly and with pure motives in joining in the decisions. No breath of suspicion has been directed against any of them and justly none could be. And for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided. But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. *Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago; that the judge must be 'perfectly and completely independent with nothing to influence or control him but God and his conscience.'" United States v. Manton*, 107 F.2d 834, 846 (2d Cir. 1939) (emphasis added).

[1299]

*E.g., Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536-37 (7th Cir. 2003); *Schultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 924 n.10 (1st Cir. 1988); RESTATEMENT (SECOND) OF JUDGMENTS § 70, cmt c, d (1983) (party seeking relief must show either corruption of court or that fraud goes to a material matter and that party seeking relief had "a substantial case to present"); RESTATEMENT (FIRST) OF JUDGMENTS § 124, cmt. d (1942) ("It is of the essence of a fair trial that a judicial tribunal should have an uncorrupted mind and if it does not the trial is not fair even though it may be shown that the tribunal would have reached the same result had there been no corruption or duress. Thus where a party, although believing that he can prove his case, nevertheless out of excess of caution bribes a tribunal, equitable relief will be given against him even though, on the facts presented, the tribunal would have reached the same decision.").

[1300]

*Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978); *see Ty Inc.*, 353 F.3d at 536-37.

337

requirement of materiality, as judgments will not be set aside or denied recognition where the only impact of the misconduct or other taint is to prevent a litigant from presenting cumulative evidence, to deceive as to a peripheral issue, or the like.[1301]

Zambrano's exchange of a favorable decision and his signature on the LAPs' proposed judgment for a promise of $500,000 of the judgment proceeds was corruption that went to the integrity of the judicial process and requires relief from that judgment. Its materiality is beyond question.

The same would be true of Zambrano's signature on a judgment ghostwritten by the LAPs and submitted to him *ex parte*, even absent the promise of the $500,000. That alone would have been a classic case of fraud on the court. As the Supreme Court recognized in *Morgan*, "there would be no hesitation in setting aside" such a decision "as having been made without a fair hearing."[1302] The actions of Zambrano and the LAPs would have deprived Chevron of a full opportunity to makes its defense.[1303]

---

[1301]

See RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. d (1982); *see Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (denying relief on ground of fraud consisting of alleged withholding of report that would have been cumulative); *see also Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1274 n.5 (10th Cir. 1995) ("[C]oncealment of *material* information by a party may justify a refusal to give preclusive effect to a judgment.") (emphasis added); *Standard Chlorine of Del., Inc. v. Sinibaldi*, 821 F. Supp. 232, 253 (D. Del. 1992).

[1302]

*Morgan*, 304 U.S. at 20.

[1303]

This is especially obvious with respect to one of Chevron's most significant defenses, viz. that it was not liable because it never had operated in Ecuador and that there was no basis for holding it liable for any actions of Texaco – not a defendant in the Lago Agrio case – because Chevron did not succeed to Texaco liabilities by virtue of its indirect acquisition of its shares years after the events in question. Much of the portion of the Judgment rejecting Chevron's position was copied directly out of the Fusion Memo, part of the LAPs' unfiled work product. *Supra Facts* § IX.B. But it would have been true in any case because

338

The coercion of Judge Yánez, the corruption of Cabrera, the ghostwriting of the Cabrera Report and associated documents, and the misrepresentations to the Lago Agrio court of Cabrera's impartiality and independence stand somewhat differently, as the significance of these events, assuming they stood alone, would depend upon whether the Cabrera Report ultimately mattered in any significant way. The Court, however, already has found that the Ecuadorian court relied significantly on the Cabrera Report despite the disclaimer of reliance. These fraudulent elements therefore were material to the outcome.[1304]

---

Chevron never was afforded any opportunity to respond directly to anything that was given to Zambrano *ex parte.*

[1304]

Camacho and Piaguaje, the LAP Representatives, are liable for the actions of Donziger, Fajardo, and the other Ecuadorian and U.S. lawyers for the LAPs, and Stratus and the other LAP experts, consultants, and advisers. Under New York law, a principal is liable for the acts of its agents, committed within the scope of their employment or actual or apparent authority. *E.g., American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982); *Standard Sur. & Cas. Co. v. Plantsville Nat'l Bank*, 158 F.2d 422 (2d Cir.1946), *cert. denied*, 331 U.S. 812 (1947); *Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.*, 542 F. Supp. 684, 687 (S.D.N.Y. 1982), *aff'd* 718 F.2d 1085 (2d Cir. 1983).

These defendants dispute their liability for the acts of their agents only under New York law and only on the theory that their awareness of Chevron's complaint and other claims of misconduct was insufficient to constitute ratification. DI 1858 (LAP Reps.' Post-trial Mem. of Law), at 15-17. There are two fundamental problems with the argument.

*First*, a principal is liable for the torts of an agent under New York law as long as the agent acted within the scope of the agent's actual or apparent authority. Ratification is immaterial except in the absence of actual or apparent authority. *E.g., Dover, Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 318-19 (S.D.N.Y. 2006) (mag. op.); RESTATEMENT (THIRD) OF AGENCY §§ 7.03(1)(a), 7.04 (principal liable for torts of agent committed with actual authority *or* ratified by principal), 7.03(2)(b), 7.08 (principal liable for torts of agent committed with apparent authority). Moreover, an Ecuadorian law expert for Chevron explained, and this Court holds, that the law in Ecuador is the same. DI 1413-11 (Apr. 5, 2013 Velazquez Decl.), Ex. 92, Ann. B. ("According to rules of contractual and tort liability, the client is held liable for the actions of his agent, even when the client does not become aware of the agent's conduct until after it has occurred, if he takes no action to reject it or, failing that, to withdraw the agency authorization and, even more so, if he benefits from such conduct.").

*Second*, the Court finds that these defendants knowingly ratified the misconduct,

E.      *Conclusion*

All of the elements required for equitable relief from the Judgment as against all defendants have been satisfied in this case subject only to the resolution of two remaining questions – whether (1) the Ecuadorian appellate decisions alter this conclusion, and (2) the *sine qua non* for the exercise of equitable jurisdiction, the inadequacy of legal remedies, is present here. The first of these issues implicates the import of and the effect, if any, of the appellate decisions, which is dealt with in Point VII below. The second is common to the non-statutory claim for equitable relief and to Chevron's RICO and other claims. The Court defers discussion of it to the section of this opinion dealing with relief.

III.    *The RICO Statute Applies Here*

Chevron asserts that Donziger, though not the LAP Representatives, has violated two sections of the RICO statute.[1305]  The first, 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The second, Section 1962(d), prohibits "any person" from "conspir[ing] to violate" the preceding section. The Court begins by disposing of certain arguments common to both claims.

---

substantially for the reasons set forth by Chevron. DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 254-56.

[1305]

The amended complaint states RICO claims also against Fajardo, Yanza, the ADF, Selva Viva, Stratus Consulting, Inc., Ann Maest, and Doug Beltman. *See* DI 283 (Am. Compl.) ¶ 1. Each of these other defendants either has settled or defaulted. Accordingly, this opinion deals with the RICO liability only of Donziger.

340

A.    *RICO Applies to Prohibited Conduct Regardless of Whether a Defendant Is a Member of Organized Crime*

RICO was drafted as a weapon in the fight against organized crime.  Some therefore argue that the statute is limited to mobsters of the sort portrayed in *The Godfather*, *Goodfellas*, or *The Sopranos*.  That argument is misconceived.

"Congress drafted RICO broadly to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways."[1306]  Thus, while the statute's legislative history focused on "the predations of mobsters," it "shows [also] that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime."[1307]  Hence, the Supreme Court has made it clear that RICO applies "not just [to] mobsters" but to "*any person*" who violates its provisions.[1308]  The statute, moreover, is intended "to be read broadly," in accordance with "Congress' self-consciously expansive language and overall approach," as "an aggressive initiative to supplement old remedies and develop new methods for fighting crime," regardless of whether the defendant is associated with organized crime or a "respected business."[1309]

---

[1306]

H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 248-49 (1989).

[1307]

*Id.* at 245-46.

[1308]

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) ("Section 1962 . . . makes it unlawful for 'any person' – *not just mobsters* – to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity.") (emphasis added); *see also H.J. Inc.*, 492 U.S. at 247 (quoting 116 CONG. REC. 35204 (1970)).

[1309]

*Sedima*, 473 U.S. at 497-99 ("The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.").

Against this clear background, the RICO claims against Donziger are entirely appropriate despite the fact that he is a Harvard-educated lawyer.  The RICO question in this and all other such cases is whether all of the statutory requirements are satisfied with respect to each defendant, not whether the defendant fits a particular popular stereotype.  Nevertheless, it bears mention also that this is a *civil* RICO case in which the plaintiff's burden is to prove its case by a preponderance of the evidence – that is, that "its version of the facts is more probable than its adversary's"[1310] – rather than beyond a reasonable doubt, as would be the case in a criminal prosecution.[1311]

### B.    *Equitable Relief Is Available in Private RICO Actions*

Two circuits have ruled definitively on whether equitable relief is available to private plaintiffs under RICO.  They are divided.[1312]  The question is open in our own.[1313]  Unsurprisingly,

---

[1310]

*M.O.C.H.A. Soc'y Inc. v. City of Buffalo,* 689 F.3d 263, 277-78 (2d Cir. 2012).

[1311]

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985); *Cullen v. Margiotta*, 811 F.2d 6989, 731 (2d Cir. 1987), *abrogated on other grounds*, *Agency Holding Co. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987).

The Court has found certain facts that are common to the RICO and non-statutory claims by clear and convincing evidence.  Nevertheless, the Court wishes to be clear that it makes no findings based on the "beyond a reasonable doubt" standard.

[1312]

*Compare Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1980-89 (9th Cir. 1986) (reading legislative history of RICO statute as foreclosing injunctions for private plaintiffs), *with Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695-98 (7th Cir. 2001) (hereinafter "*NOW*") (ruling that RICO statute's text expressly provides for private injunctive relief), *overruled on other grounds sub nom. Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003).

Circuits to have addressed the question in *dicta* likewise are divided.  *Compare Johnson v. Collins Entm't. Co.*, 199 F.3d 710, 726 (4th Cir.1999), *In re Fredeman Litig.*, 843 F.2d 821, 828–30 (5th Cir. 1988) (suggesting injunctive relief unavailable), *with Bennett v. Berg*, 710

Chevron asserts that the statute affords such relief to private litigants where otherwise appropriate while defendants argue for the opposite conclusion.  This Court thus far has not passed on the issue though pressed by both sides to do so.  The case now has been tried and the facts determined.  The time for a decision on this point is at hand.

       Judge Diane Wood's opinion for the Seventh Circuit in *National Organization for Women v. Scheidler*,[1314] which held that equitable relief is available under the statute to prevailing civil RICO plaintiffs, is the most persuasive analysis of the issue thus far.  In this Court's view, the conclusion reached by the Seventh Circuit is demanded by the plain language of the statute[1315] and draws added support from the context in which the statute was enacted.

       RICO's civil remedies provision contains three parts.  The first, Section 1964(a), grants district courts jurisdiction to "prevent and restrain" RICO violations.[1316]  It does not limit the breadth of that jurisdictional grant.

---

F.2d 1361, 1366 (8th Cir. 1983) (McMillan, J., concurring) (suggesting injunctive relief is available); *see also Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 848 (1st Cir. 1990); *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 267 n.4 (4th Cir. 1989) (noting controversy but expressing no opinion).

[1313]

  *See, e.g., Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28–29 (2d Cir.1983) (expressing doubt in *dicta* about availability of injunctive relief for private plaintiffs).

[1314]

267 F.3d 687 (7th Cir. 2001).

[1315]

*See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

[1316]

18 U.S.C. § 1964(a).

The second part of the remedies provision is Section 1964(b),[1317] which states that the Attorney General may institute proceedings under Section 1964(d) and authorizes the court to enter restraining orders, prohibitions, or take such other actions as it deems proper.

The third and final part, Section 1964(c),[1318] provides that any person injured in his business or property by a violation of the statute may sue in a district court and shall recover, *inter alia*, treble damages and attorneys' fees.[1319]

Read together, as they must be, Sections 1964(b) and (c) plainly provide remedies in addition to, and not in place of, the remedies provided for in Section 1964(a). Section 1964(a) empowers district courts to "prevent and restrain" RICO violations, thus authorizing injunctive relief. It does so generally rather than limiting the jurisdiction conferred only to cases brought by the Attorney General or some other public actor. Section 1964(b) specifically authorizes suits by the Attorney General and confers additional powers on the district courts in such actions – the issuance of restraining orders, prohibitions, or other relief they deem appropriate. Finally, Section 1964(c) creates a private right of action for treble damages.

"[T]his reading of the statute gives the words their natural meaning and gives effect to every provision in the statute."[1320] It is consistent also with Congress's intent "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to

---

[1317]

   *Id.* § 1964(b).

[1318]

   *Id.* § 1964(c).

[1319]

   *See id.* § 1964(a), (b), (c).

[1320]

   *NOW*, 267 F.3d at 696.

344

eliminating racketeering activity."[1321]  The Supreme Court repeatedly has rejected efforts to curtail the scope of civil RICO actions where courts ignore Congress's insistence that the statute be "liberally construed to effectuate its remedial purposes."[1322]  "Indeed, if Congress' liberal-construction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident."[1323]

This reading is supported also by the context in which RICO was enacted, a context of which Congress is deemed to have been aware.[1324]  Article III of the Constitution provides that the judicial power of the United States extends "to all Cases, in Law *and Equity.*"[1325]  Congress implemented Article III in 1789 by conferring "jurisdiction over 'all suits . . . in equity.'"[1326]  The Supreme Court has rejected efforts to curtail the equitable powers of district courts in cases in which

---

[1321]

*Rotella v. Wood*, 528 U.S. 549, 557 (2000) (Congressional intent was to "encourag[e] civil litigation to supplement Government efforts to deter and penalize the . . . prohibited practices"); *see also NOW*, 267 F.3d at 698 (quoting *Rotella* and noting that "this role for civil RICO litigation" is "fully consistent" with the view that "the statute gives private citizens the ability to seek injunctive relief as well as damages").

[1322]

Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970).

[1323]

*Sedima*, 473 U.S. at 491 n.10.

[1324]

*S. New England Tel. Co. v. Global NAPs*, 624 F.3d 123, 135 (2d Cir. 2010) ("Because we presume that 'Congress legislates against the backdrop of existing jurisdictional rules that apply unless Congress specifies otherwise, a clear statement from Congress is required before we conclude that a statute withdraws the original jurisdiction of the district courts . . . .'" (citations and internal quotation marks omitted)).

[1325]

U.S. CONST. art. III, § 2 (emphasis added).

[1326]

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (quoting Judiciary Act of 1789, § 11, 1 Stat. 78).

345

they otherwise have subject matter jurisdiction unless "a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity."[1327]

RICO does not "in so many words, or by a necessary and inescapable inference," foreclose equitable relief in actions brought by private plaintiffs. Accordingly, this Court agrees with *Motorola Credit Corp. v. Uzan* that "[i]t would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of utilizing this classic remedial power in private civil actions brought under the act."[1328] Absent just such an express Congressional deprivation, the Court declines to divest itself of equitable powers that the Framers intended district courts to have and that they have possessed since 1789.

This Court holds that RICO empowers a district court to grant such equitable relief as may be warranted in cases in which the court finds a violation of the statute and that the principles of equity support relief sought. It respectfully shares Judge Rakoff's view that the contrary reading of the statute in *Religious Technology Center v. Wollersheim*[1329] is unpersuasive.

---

[1327]

> *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (stating that the "comprehensiveness" of a court's "equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command"); *see also Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960) (holding that, where the statute provided that "the [d]istrict [c]ourts are given jurisdiction . . . 'for cause shown, to restrain violations'" of a statute, district courts have full equitable powers).

[1328]

> 202 F. Supp. 2d 239, 244 (S.D.N.Y. 2002).

[1329]

> 796 F.2d 1076.

346

C.      *Morrison v. National Australia Bank Does Not Require Dismissal*

Donziger argues that *Morrison v. National Australia Bank, Ltd.*,[1330] requires dismissal of Chevron's RICO claims on the ground that application of the statute here would be extraterritorial and therefore improper.

As the Court noted in denying in part defendants' motion to dismiss,[1331] the Supreme Court in *Morrison* reiterated the longstanding principle "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."[1332] "This principle," the Supreme Court said, "represents . . . a presumption about a statute's meaning."[1333] "When a statute gives no clear indication of an extraterritorial application, it has none."[1334] Accordingly, the analysis of statute-based claims that involve foreign aspects involves two steps. The first is to determine whether Congress has given sufficient indication of an intention that the statute apply outside the United States. If it has not, the second step is to determine whether the proposed application of the statute in fact would be extraterritorial. This, the Court said, turns on "the 'focus' of congressional concern" or the activity "that the statute seeks to 'regulate.'"[1335] The

---

[1330]

     561 U.S. 247, 130 S. Ct. 2869 (2010).

[1331]

     *See Chevron v. Donziger*, 871 F. Supp. 2d at 239.

[1332]

     *Morrison*, 130 S. Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).

[1333]

     *Id.*

[1334]

     *Id.* at 2878.

[1335]

     *Morrison*, 130 S. Ct. at 2884.

determination is informed by the "objects of the statute's solicitude" and "th[e] transactions that the statute seeks to regulate."[1336]

      The first step in the analysis is not open to significant discussion.  Our court of appeals has ruled that RICO does not apply extraterritorially.[1337]  The second step, however, is another matter entirely, as it requires determination of the focus of congressional concern, a matter not yet addressed by the Second Circuit.

      The decisions to have considered the matter have taken essentially one of two approaches to determining whether application of RICO to situations involving conduct both in the United States and abroad would be extraterritorial.  Some have taken the view that RICO's focus is on the enterprise, an approach that would make the domestic or foreign character of the enterprise,

---

[1336]

      *Id.* (citation omitted).

[1337]

      *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010).

      Although the Court adheres to *Norex*, it respectfully questions whether RICO's "silence" as to extraterritorial application, the basis for the *Norex* holding, correctly resolves the question whether Congress intended that RICO apply outside the territorial limits of the United States.  As the Supreme Court observed in *Morrison*, its reliance on the presumption against extraterritorial application was not intended to impose a "clear statement" requirement, "if by that is meant a requirement that a statute say 'this law applies abroad,'" before it could be so applied.  *See* 130 S. Ct. at 2883.  "Assuredly, context can be consulted as well" in pursuit of statutory meaning and Congressional intent.  *Id.*

      Given RICO's heritage as a weapon of choice in prosecuting the Sicilian Mafia, *see, e.g.*, *United States v. Casamento*, 887 F.2d 1141 (2d Cir. 1989), and the more recent application of racketeering statutes to transnational drug and terrorism networks, *e.g.*, *United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010) (reversing dismissal of indictment charging murder of Mexican citizen under 18 U.S.C. § 1959 in Mexico where defendant paid for and arranged murder in United States); *United States v. Guzman Loera*, No. 3:12-cr-006849-FM-1, Indictment [DI 1] ¶¶ 10-11 (W.D. Tex. filed Apr. 11, 2012), it seems likely that Congress intended it to have extraterritorial application.  *See* Gideon Mark, *RICO's Extraterritoriality*, 50 AM. BUS. L.J. 543, 573-85 (2013) (hereinafter "*RICO's Extraterritoriality*").

348

however that is to be determined, dispositive of whether the alleged conduct falls within RICO.[1338] Others, including this Court, have rejected that analysis.  They have concluded that the focus of RICO is on the alleged pattern of racketeering activity.[1339]  Chevron maintains that application of RICO to the conduct in question here would not be extraterritorial under either approach.

This Court adheres to its determination that the focus of RICO for *Morrison* purposes cannot properly rest on the domestic or foreign character of the enterprise for the reasons this Court previously has expressed, which have been amplified by the Ninth Circuit in *Chao Fan Xu*.[1340] "RICO's focus is on the pattern of racketeering activity for purposes of analyzing the extraterritorial

---

[1338]

> *See United States v. Chao Fan Xu*, 706 F.3d 965, 975-79 (9th Cir. 2013) (discussing the different approaches and holding that the proper focus is on the pattern of activity); *see also Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 938-40 (N.D. Cal. 2012) (focusing on the enterprise); *Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010), *aff'd*, 457 F. App'x 35 (2d Cir. 2012).

[1339]

> *Chao Fan Xu*, 706 F.3d at 975-79; *Chevron Corp. v. Donziger*, 871 F. Supp. 2d at 245; *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 165-66 (D.D.C. 2013); *Borich v. BP, P.L.C.*, 904 F. Supp. 2d 855, 862 (N.D. Ill. 2012); *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1209 (D. Colo. 2011).

[1340]

> *Chao Fan Xu*, 706 F.3d at 977-78; *Chevron Corp. v. Donziger*, 871 F. Supp. 2d at 245-46; *see also RICO's Extraterritoriality*, 50 AM. BUS. L.J. at 595-603.

application of the statute."[1341]   The next question, then, is how a court should look at the alleged pattern of racketeering activity.

This much is clear.  RICO defines "racketeering activity" as an act "chargeable" or "indictable" under enumerated state and federal statutes.[1342]  Thus, we first must direct our attention to acts "chargeable" or "indictable" under state or federal law, giving due regard in each case to *Morrison*, as only such acts are eligible for inclusion in a pattern of racketeering activity.  If no pattern of racketeering activity, as that term is defined in the statute,  has occurred, no substantive violation of RICO has taken place.  But what more is required, if anything, is not evident.

Donziger contends that the answer is found in *Norex Petroleum Ltd. v. Access Industries, Inc.*,[1343] which, he contends, requires dismissal of the RICO claims as improper extraterritorial applications of the statute.  As this Court concluded in denying his motion to dismiss

---

[1341]

> *Chao Fan Xu*, 706 F.3d at 977-78; *accord Chevron Corp. v. Donziger*, 871 F. Supp. 2d at 245-46.
>
> Recognizing that a reviewing court might disagree and focus instead on the character of the enterprise, this Court finds that the character of the enterprise here at issue was predominantly domestic by any reasonable standard.  The enterprise, as will appear, was essentially the LAP team, including Donziger and the LAPs' other lawyers (both U.S. and Ecuadorian), and its host of consultants, PR people, financiers, and advisors including Stratus, Beltman, Maest, Hinton, Lehane, Russell, Calmbacher, H5, and many others.  With the exception of the handful of Ecuadorian lawyers, Yanza, and the two entities that he and Donziger controlled, virtually every member of the enterprise – and there were a great many – were American.  The nerve center of the entire operation, *see Chao Fan Xu*, 706 F.3d at 976-77, was in New York City, where Donziger was based and, despite roughly monthly visits to Ecuador, spent most of his time.  In any case, it was in the United States.  This is where almost all of the important decisions were made, the location from which the Ecuadorian lawyers were supervised (except when Donziger actually was in Ecuador), and the place from which the pressure campaign with all of its many different aspects was organized, supervised, and run.

[1342]

> 18 U.S.C. § 1961(1).

[1343]

> 631 F.3d 29 (2d Cir. 2010); *see also Cedeño v. Castillo*, 457 F. App'x 35 (2d Cir. 2012).

350

the amended complaint, however, he is mistaken.[1344]  It suffices for present purposes to quote the

discussion from that opinion:

> "In *Norex*, a Canadian plaintiff alleged that the defendants had engaged in a
> racketeering scheme, using Russian companies, to take over control of another
> Russian company in which the plaintiff was a minority shareholder, leaving the
> Canadian plaintiff as 'a powerless minority shareholder.' {631 F.3d at 31.} The
> district court dismissed the complaint under the pre- *Morrison* conduct-and-effects
> test.  The Second Circuit affirmed. Insofar as the brief opinion addressed the
> question now before this Court, it said only that 'simply alleging that some domestic
> conduct occurred cannot support a claim of domestic application. "[I]t is a rare case
> of prohibited extraterritorial application that lacks all contact with the territory of the
> United States." [*Morrison*, 130 S.Ct.] at 2884 (emphasis in original). The slim
> contacts with the United States alleged by *Norex* are insufficient to support
> extraterritorial application of the RICO statute.' {*Id.* at 33.}
>
> The allegations of the amended complaint here are entirely different. Unlike
> the *Norex* complaint, the scheme alleged here was conceived and orchestrated in the
> United States to injure a U.S. plaintiff, involved a predominately U.S. enterprise, and
> was carried out in material respects, though by no means entirely, here. *Norex*
> therefore does not control. Indeed, as the Circuit in *Norex* found it unnecessary to
> articulate an approach to deciding whether application of RICO in a given situation
> is extraterritorial, beyond drawing a conclusion with respect to the particular
> complaint before it, that case sheds no light on the pivotal question before this Court.
> {*See* Note, *Life After Morrison: Extraterritoriality and RICO*, 44 VAND. J.
> TRANSNAT'L L. 1385, 1402 (2011) (*Norex* did not 'offer [ ] much guidance as to
> what might constitute domestic application.').}"[1345]

So *Norex* does not answer the question before the Court.  Nor is this the only Court to reach that

conclusion on analogous facts.[1346]

---

[1344]

   *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 240-42 (S.D.N.Y. 2012).

[1345]

   *Id.* at 240-41 (footnotes included in curly brackets).

[1346]

   *Id.* at 244 (quoting *CGC Holding Co. v. Hutchens*, 824 F. Supp. 2d 1193, 1209-10 (D. Colo.
2011) (distinguishing *Norex* on the basis of pattern of racketeering activity in that case that
occurred largely in the United States and was directed at U.S. victim)); *Aluminum Bahrain
B.S.C. v. Alcoa Inc.*, Civ. Action No. 8–299, 2012 WL 2093997, at *2-4 (W.D. Pa. June 11,
2012) (distinguishing *Norex* on similar grounds).

351

     *Chao Fan Xu*[1347] is relevant also.  The RICO conspiracy indictment in that case charged "a scheme to steal funds from the Bank of China" in China and to escape prosecution and retain the proceeds by transferring proceeds to the United States and fleeing here by, among other things, passport and visa fraud.[1348]  The only predicate acts charged, however, were violations of U.S. criminal statutes.[1349]

     On appeal from convictions, the Ninth Circuit first held that RICO's focus is on the pattern of racketeering activity.[1350]  It then stated that it would "look at the pattern of Defendants' racketeering activity taken as a whole" in order "to determine whether Defendants' count one [*i.e.*, RICO] convictions are within RICO's ambit."[1351]  It next observed that the first part of the alleged scheme "center[ed] on the Bank of China fraud and, to that extent it was predicated on extraterritorial activity [and therefore] beyond the reach of RICO."[1352]  But it went on to note that

---

[1347]

706 F.3d 965.

[1348]

706 F.3d at 972-74; *United States v. Xu Chaofan*, No. 2:02-cr-00674-PMP-LRL, Second Superseding Indictment [DI 151] ¶¶ 1-13 (D. Nev. filed Jan. 31, 2006).

[1349]

*Xu Chaofan*, No. 2:02-cr-00674-PMP-LRL [DI 151] ¶ 11.

[1350]

*Chao Fan Xu*, 706 F.3d at 975-78.

[1351]

*Id.* at 978.

This formulation conflates "pattern of racketeering activity," which is defined by statute as a pattern of acts indictable or chargeable under U.S. or state law, *see* 18 U.S.C. § 1961(1), and thus domestic in nature, with all of the defendants' alleged misconduct, whether domestic or foreign.  Referring to the latter as "Defendants' pattern racketeering activity taken as a whole," while perfectly normal in ordinary conversation, can be confusing in this context.

[1352]

*Id.*

352

the "second part [of the scheme] involved racketeering activities conducted within the United States," that those racketeering activities were within RICO's focus, and affirmed the RICO conspiracy conviction on the ground that they fell "within the ambit of the statute."[1353]  It reached that conclusion, despite its view that the pattern of racketeering activity "may have been conceived and  planned overseas," because "it was executed and perpetuated in the United States."[1354]

Chao Fan Xu thus seems to cut in two directions.  At one point it suggested that the presence of a domestic pattern of activity is sufficient even where it is bound up with extensive foreign conduct.  At another it indicated that it looked at the defendants' actions as a whole.  In either case, however, it concluded that the conception and planning of the scheme overseas and the embezzlement in China as an integral part of the overall scheme did not foreclose application of RICO to the domestic pattern of racketeering activity.

In the last analysis, these cases yield no clear, authoritative principle for determining whether a given application of RICO is or is not extraterritorial.  Quite understandably given the difficulty of the issue, they bring to mind Justice Stewart's famous observation with respect to hard-core pornography – "I know it when I see it."[1355]

In this case, the evidence at trial established that Donziger, a New York lawyer and resident, here formulated and conducted a scheme to victimize a U.S. company through a pattern of racketeering.  That pattern included substantial conduct in the United States – e.g., the bulk of Donziger's overall supervision of the entire operation; much of Donziger's fund raising activity; the

---

[1353]      Id. at 978-79.

[1354]      Id. at 979.

[1355]      Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (concurring opinion).

353

ghostwriting of the Cabrera Report, which occurred mainly in Boulder, Colorado, and was supervised by Donziger from New York; much of the pressure and lobbying campaign designed to injure Chevron's reputation and impact its bottom line and its stock price, a campaign micromanaged by Donziger that employed many U.S. public relations advisors and lobbyists; the making of *Crude* by a New York-based and recruited film maker; and the improper efforts to ward off discovery through U.S. courts of what really had taken place with Cabrera, Stratus, and the LAPs. Much of the funding came principally from Kohn in Philadelphia and Burford, which operated at least partly in the United States. Absent the U.S. activity, there would have been no scheme. Even had there been one, it would have been doomed to failure, without that activity. Unlike *Norex,* this is not a case "simply [involving] some domestic conduct."[1356]

As we demonstrate below, all of the elements of the RICO claims, including the existence of a domestic pattern of racketeering activity, have been proved. It therefore suffices for purposes of this case to hold that the application of RICO to that domestic pattern of racketeering activity would not be extraterritorial.

IV.     *The Section 1962(c) Claim*

The first RICO claim is that Donziger and others who did not appear at trial conducted, and continue to conduct, the affairs of an enterprise – essentially, the LAP team – through a pattern of racketeering activity that includes extortion, wire fraud, money laundering, obstruction of justice, witness tampering, and violation of the Travel Act through violation of the Foreign Corrupt Practices Act ("FCPA").

---

[1356]     *Norex*, 631 F.3d at 33.

The Court begins the analysis by setting out the elements of a Section 1962(c) violation, knowledge of which is indispensable to all that follows. It then conducts a detailed analysis of whether there has been a Section 1962(c) violation and whether further violations are likely.

A.      *The Elements of a Section 1962(c) Violation*

"A violation of § 1962(c) . . . requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."[1357] Here, the alleged enterprise in substance is the LAP team and its associated persons – an enterprise over which Donziger long has presided. The alleged pattern of racketeering activity by which Donziger and others conducted the affairs of that enterprise includes many of the wrongful, improper, and illegal actions discussed above.

B.      *The Enterprise*

Section 1961(4) defines "enterprise" to "include[] . . . any union or group of individuals associated in fact although not a legal entity." An enterprise may consist of "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by

---

[1357]

*Sedima*, 473 U.S. at 496.

In a suit for damages for such a violation, the plaintiff would be obliged to prove "injury to [its] business or property . . . caused by the violation of Section 1962." *Chevron v. Donziger*, 871 F. Supp. 2d 229, 239 (S.D.N.Y. 2012) (quoting *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008)). Chevron at this point, however, seeks only equitable relief. The Court deals below with the proof required to entitle it to such relief, assuming proof of a violation of the statute.

355

evidence that the various associates function as a continuing unit."[1358]  It "need not have a hierarchical structure or a 'chain of command,'" and "decisions may be made on an ad hoc basis and by any number of methods."[1359]

A RICO enterprise "is an entity separate and apart from the pattern of activity in which it engages" and must be proved separately.[1360]  Importantly, an enterprise need not be illegitimate or illegal, and the enterprise itself (or the members of an associated-in-fact enterprise) need not commit any of the racketeering acts at all.[1361] Indeed, the enterprise frequently is itself a victim of the racketeering activity perpetrated by its participants.

In this case, the LAP team and its affiliates were a group of persons associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay.  The group included (1) Donziger, (2) the U.S. and Ecuadorian lawyers, including Kohn, Patton Boggs, and others, (3) Yanza, the ADF, and Selva Viva, (4) the investors who gave money to finance the operation, usually in exchange for shares of any recovery, (5) the LAPs' public relations, media, and lobbying arms, (6) the LAPs' technical people, including Stratus,

---

[1358]

*United States v. Turkette*, 452 U.S. 576, 583 (1981).

[1359]

*Boyle v. United States*, 556 U.S. 938, 948 (2009).

[1360]

*Turkette*, 452 U.S. at 583.

[1361]

*Id.* ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.  The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute.  The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.  The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.") (citation omitted).

356

Beltman, Maest, Russell, Calmbacher, Champ, Quarles, E-Tech, UBR, and 3TM, and (7) others. In accordance with the authorities just cited, the Court emphasizes that it does not imply that each and every member of the enterprise committed acts of racketeering activity or, for that matter, acted improperly in any respect, although some did. The findings are that all of these persons and entities were associated in fact for the purposes stated and that they constituted an enterprise within the meaning of the RICO statute.

C. *Donziger Conducted and Participated in the Conduct of the Affairs of the Enterprise*

Liability under Section 1962(c) does not attach unless an individual "employed by or associated with any enterprise . . . conduct[s] or participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs." In sum, a defendant must have "participated in the operation or management of the enterprise" in order to be liable under Section 1962(c).[1362] Section 1962(c) liability, however, is not confined "to those with *primary* responsibility for the enterprise's affairs," or to "those with a *formal position* in the enterprise."[1363] In the Second Circuit, "discretionary authority in carrying out the instructions of the [enterprise's] principals" is sufficient to satisfy the "operation or management" requirement.[1364]

---

[1362] *Reves v. Ernst & Young*, 507 U.S. 170, 179, 183-84 (1993) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.").

[1363] *Id.* at 179 (emphasis added).

[1364] *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) (quoting *United States v. Diaz*, 176 F.3d 52, 93 (2d Cir. 1999)).

357

For reasons amply detailed above, the Court finds that Donziger was in ultimate command and, in any case, certainly conducted, and participated in the conduct of, the affairs of the enterprise at all relevant times.

### D. The Predicate Acts

#### 1. Extortion

Hobbs Act extortion, which is a RICO predicate act, requires "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right" and attempts to do so.[1365]   As Chevron has not paid the Judgment and nor settled the case, we are concerned here with attempted extortion.

One of Donziger's principal objectives from the early days of the Lago Agrio case was to subject Chevron to pressure sufficient to produce a generous settlement prior to judgment. Failing that, his aim was  to obtain the largest possible judgment in the hope that the threat of

---

[1365]   18 U.S.C. § 1951(b)(2).  The New York Penal Law, upon which Chevron relies also for predicate act purposes, is to the same effect.  N.Y. PENAL L. §§ 155.05(2)(e), 105.17, 110.00 (McKinney 2013).

The Hobbs Act makes it unlawful to attempt "in any way or degree," to "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by . . . extortion." 18 U.S.C. § 1951(a) "[I]t is well established that the burden of proving . . . a nexus [with interstate or foreign commerce] is 'de minimis.'" United States v. Arena, 180 F.3d 380, 389 (2d Cir. 1999) (quoting United States v. Farrish, 122 F.3d 146, 148 (2d Cir. 1997)).  "[A]ny interference with or effect upon interstate [or foreign] commerce, whether slight, subtle or even potential . . . is sufficient to uphold a prosecution under the Hobbs Act," Jund v. Town of Hempstead, 941 F.2d 1271, 1285 (2d Cir. 1991), and proof of the defendants' intent to affect commerce is unnecessary where the interference is a natural consequence of the offense, see United State v. Daley, 564 F.2d 645, 649 (2d Cir. 1977). The nexus with interstate and foreign commerce in this case is plain: the potential of a payment by Chevron to the LAPs.  The commerce requirement is satisfied here, and the defendants do not claim otherwise.

358

enforcement would bring Chevron to the table or, if that did not occur, that the judgment actually could be collected.

These objectives, of course, are shared by every plaintiff in every lawsuit.  As long as a lawsuit is pursued by lawful and proper means, it is not extortion, in the criminal sense, because the means are not wrongful.[1366]  Indeed, some courts have held that even the filing of a meritless lawsuit is not extortionate lest every unsuccessful lawsuit lead to an extortion claim and thus chill resort to the courts.[1367]   As we will see, however, this case is far more complicated than this simple proposition because it was not pursued by lawful methods alone.

### a.      The Elements of Extortion and Their Application Here

The Hobbs Act's principal elements are two:   "wrongful means and wrongful objective."[1368]  The "means" – in other words, the threat – "can be wrongful because it causes the victim to fear a harm that is itself wrongful, such as physical injury, or because the means is wrongful, such as violence."[1369]  Moreover, there is no need for a threat of violence.  "[T]he Hobbs Act may . . . be violated by a threat that causes the victim to fear only an economic loss."[1370]

---

[1366]

> *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003); *see also Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract . . . does not constitute extortion.").

[1367]

> *Deck*, 349 F.3d at 1258.

[1368]

> *Viacom Int'l, Inc. v. Icahn*, 747 F. Supp. 205, 210 (S.D.N.Y. 2010).

[1369]

> *United States v. Jackson*, 180 F.3d 55, 70, *on reh'g,* 196 F.3d 383 (2d Cir. 1999).

[1370]

> *Id.*, 180 F.3d at 69-70.

359

In this case, the allegedly extortionate behavior included Donziger's efforts to pressure Chevron to settle without exhausting the legal process – in other words, to pay before the marshal literally came to its door and took away its property to satisfy a final, enforceable judgment. Donziger wrote, for example, that the LAPs' "key leverage point . . . is our ability to threaten Chevron's cash position - *i.e., to get their money without going through a lengthy appeals process that drags this out for years.*"[1371]  On another such occasion, he said that, at "the end of the day[,] it is about brute force; who can apply the pressure and who can withstand the pressure.  And can you get them to the breaking point."[1372]  And he engaged in two categories of conduct to apply that pressure. Both were wrongful.

The first category was the corrupt and fraudulent behavior in and relating to the Lago Agrio litigation itself.  It included the coercion of Judge Yánez to appoint a global expert and to select Cabrera, the secret payments to Cabrera and other means used to ensure that he would cooperate with the LAPs, the covert use of Stratus and others to write most of the Cabrera Report, the passing off of the Stratus-LAP product as that of a supposedly impartial and independent neutral expert, the payments to Guerra to influence the content of Zambrano's decisions during Zambrano's first tenure on the case, the ghostwriting of the Judgment, and the bribery of Zambrano.

---

[1371]  PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 2 (emphasis added).

[1372]  PX 77A (June 13, 2007 *Crude* Clip).  Donziger's comments in full:

"We have to keep pushing on all fronts at all times.  That simple.  All fronts at all times; push, push, push.  It's just a matter of force.  It's pure force.  Who can put the most pressure and who can resist.  It's just like . . . You know, all this bullshit about the law and facts, . . . . yeah, that factors into it, 'cause that affects the level of force.  But in the end of the day it is about brute force; who can apply the pressure and who can withstand the pressure.  And can you get them to the breaking point."

The connection between Donziger's wrongdoing in the Lago Agrio case itself and his objective "to get [Chevron's] money without going through a lengthy appeals process that drags out for years" was straightforward. The bribery of Cabrera and Stratus's secret preparation of the report were intended to ensure that the court-appointed, supposedly impartial and independent expert – whose appointment Donziger and the LAP team engineered – would recommend damages "in the multiple billions of dollars."[1373]   Inflating Chevron's potential exposure by means of that ostensibly neutral expert was a means to "threaten Chevron's cash position."  So too with the ghostwriting of the Judgment, the corruption of Zambrano, and the LAPs' efforts to enforce that Judgment.   The object all along was to maximize Chevron's possible exposure and to increase *both* the risk that the Ecuadorian court in fact would rule for the LAPs and the additional risk that any such judgment would be enforceable outside Ecuador, all in order to bring Chevron to its knees.

The other category of activities designed to pressure Chevron to pay was the use of the media, NGOs, the disinvestment campaign, celebrity advocacy, lobbying, incitement of official investigations and inquiries, and the attempt to incite criminal prosecution of former Texaco lawyers in order to pressure Chevron to settle.  As will appear, by no means all of this activity was wrongful, but some certainly was.

b.      *Much of Donziger's Conduct Was Not Protected*

Chevron contends that every act in furtherance of this plan was an act of racketeering activity because it was indictable under the Hobbs Act.  Donziger makes essentially two rejoinders. The net of this clash is that both sides overreach, but that some of Donziger's means were wrongful.

---

[1373]      PX 33A[S] (Mar. 3, 2007 *Crude* Clip), CRS-187-01-01.

*First*, Donziger contends that the LAPs were entitled to the recovery that was obtained in Ecuador, that Donziger so believed, and that a threat of economic harm is not extortionate, *i.e.*, wrongful, "unless (1) the defendant is not legally entitled to the property that he or she seeks *and* (2) does not hold a good-faith belief in that entitlement."[1374]

*Second*, he asserts that he did nothing more than conduct a lawsuit. Lawsuits, he correctly notes, all inherently instill fear of adverse results, and most settle for that reason. But the bringing of a lawsuit, he argues, is not extortion, at least not in the criminal sense, notwithstanding that it always exerts some pressure on the defendant to part with something of value in exchange for peace. Indeed, he understandably invokes the First Amendment in his defense.

Ultimately, the parties' respective arguments are not completely persuasive as to either categorical position.

### i.     *Donziger's Entitlement Argument Is Without Merit*

The first of Donziger's arguments rests on the uncontroversial proposition, derived from *United States v. Jackson*[1375] and its predecessors, that some perfectly lawful activities instill fear of economic harm and thus are not wrongful. The distinction between legitimate and wrongful (*i.e.*, extortionate) threats of economic harm turns, he argues, upon whether the threatener in good faith believes it is entitled, and in fact has a plausible claim, to the property it seeks. But that is where Donziger's argument goes off the tracks.

---

[1374]   DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 71 (emphasis added).

[1375]   180 F.3d 55 (2d Cir. 1999).

The *Jackson* panel did not hold that no threat of economic harm to obtain property is extortionate as long as the threatener, with the benefit of hindsight, could be said to have been entitled to the property demanded. Rather, it said that "Congress meant to adopt the traditional concept of extortion, which includes an element of wrongfulness."[1376] The element of wrongfulness may be supplied by (1) the lack of a plausible claim of entitlement to the property demanded, *or* (2) the lack of a good faith belief of entitlement, *or* (3) the lack of a nexus between the threat and the claim of right. It may be supplied also, in this Court's view, by inherently wrongful conduct. The existence of this element of wrongfulness is a question of fact for the fact finder.[1377] Finally, neither the plausibility of a claim of right nor the threatener's good faith belief is established merely by proof that the threatener in fact thought that the threatener, in some cosmic, moralistic or personal ethical sense, was entitled to the property.

One may assume, without deciding, that there was a plausible basis for bringing the Lago Agrio case in the first place and that Donziger at its inception had a good faith belief that his clients were entitled to recover something. One may assume further that the mere bringing of the lawsuit, though it of course carried with it some threat of economic harm to Chevron, was not wrongful. This does not get Donziger where he wishes to go.

It would be fundamentally wrong to view the threat of economic harm in this case in static terms. It was Donziger's purpose to magnify the pressure on Chevron by increasing both the perceived magnitude of its potential exposure and the perceived likelihood that the exposure in the end would culminate in huge liability. He repeatedly did so by manifestly wrongful means,

---

[1376]

     *Id.* at 70.

[1377]

     *Id.* at 70-71.

363

which included corruption of the litigation and a pressure campaign premised on misrepresentations. Within the litigation, he coerced Judge Yánez to allow the LAPs to drop their remaining judicial inspections and to appoint their hand-picked global expert, coordinated the ghostwriting of the Cabrera Report to threaten Chevron for the first time with more than $16 billion of exposure; coopted Cabrera to put his name to it; supervised the ghostwriting for Cabrera's signature on the response to the LAP and Chevron comments on the Cabrera Report, which raised the ante to more than $22 billion; and bribed Zambrano to allow the LAP team to ghostwrite the multibillion Judgment. His pressure campaign relied upon his repeated dissemination of estimates of Chevron's damages exposure and the magnitude of the harm allegedly created by Texaco that he knew to be false.

Each of these tactics increased the perceived threat of harm to Chevron, either by increasing the dollar exposure, by increasing the probability of a judgment that could be enforced outside Ecuador, or by both. They were inherently wrongful by any definition. Chevron "had a preexisting right to be free from the threats invoked" by the illegitimate means employed.[1378] Viewing them in terms of the *Jackson* formulation, they destroyed the nexus between the original plausible claim and the fear of a catastrophic adverse result on that claim because the fear of such a result was a product not solely of the original plausible claim, but of the illegitimate means used to increase the exposure on that claim, the likelihood that Chevron would be found liable, and the likelihood that any such finding ultimately would prove enforceable. In other words, the illegitimate means that Donziger and his confederates used provided them with "leverage to force the payment of money" that arose uniquely from the illegitimate means. Moreover, the "actual disclosure" of

---

[1378]

     *United States v. Tobin,* 155 F.3d 636, 640 (3d Cir. 1988) (Alito, J.).

those illegitimate means would have been, and even today would be, "counterproductive."[1379]  Put still another way, one engaged in litigation either accepts the risk of an adverse result reached by fair and honest methods or settles, and that is fine.  But a litigant who magnifies the risks to its adversary by corrupting the litigation in order to "get the price up" creates leverage purely attributable to the corruption, which is inherently wrongful, which bears no proper nexus to any plausible claim that may have been asserted in the first place, and from which the victim has a right to be free.

ii.    Donziger's Conduct is Not Protected Petitioning Activity

Implicit in what has been said already, this Court accepts that litigation is a constitutionally protected right in the United States and assumes it should be afforded ample scope even when conducted abroad.  It serves the important purpose of permitting resolution of disputes by means more desirable than otherwise might be employed.  Accordingly, while the authorities already referred to do not compel a conclusion so broad, it assumes without deciding that even "meritless litigation is not extortion" under the Hobbs Act.[1380]  But we are dealing here with something else entirely.

Chevron's claim with respect to the Lago Agrio case itself, insofar as it pertains to the predicate acts of attempted extortion, is not that the case was entirely baseless.  Rather, it is that Donziger and others corrupted the case by bribing the judge and by other corrupt and fraudulent

---

[1379]

     *Jackson*, 180 F.3d at 70-71.

[1380]

     *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (collecting cases and holding that "meritless litigation is not extortion" under Hobbs Act); *United States v. Pendergraft*, 297 F.3d 1198, 1205 (11th Cir. 2002).

365

means and that they did so, among other reasons, to instill fear in Chevron of a catastrophic result sufficient "to get [Chevron's] money without" litigating the case to judgment, without "going through a lengthy appeals process that drags this out for years," and without the need for time consuming and expensive judgment enforcement proceedings.[1381]   It is clear from cases in the *Noerr-Pennington* area[1382] that corruption of an adjudicative process removes any shield that the First Amendment otherwise would provide.[1383]   That is so because "bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right

---

[1381]

      *See* PX 1146 (July 2, 2009 Memo), at 2; PX 33A[S] (Mar. 3, 2007 *Crude* Clip), CRS-187-01-01.

[1382]

      That doctrine sharply restricted, on the basis of First Amendment considerations, antitrust liability based on litigation, lobby and petitioning of public agencies for allegedly anticompetitive purposes.  *See generally* ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (SIXTH) 292-94 (2007).  Nevertheless, antitrust liability may be imposed for (1) "filing of baseless lawsuits or administrative actions not in order to prevail . . . but to impede a competitor's ability to compete," (2) litigation "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival," and (3) "intentional misrepresentations made to a judicial or administrative body" for anticompetitive purposes.  *Id.* at 293-94.  Accordingly, "activities of this sort have been held beyond the protection of *Noerr*." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981) (collecting cases); *see also Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("In the adjudicatory sphere, . . . information supplied by the parties is relied on as accurate for decision making and dispute resolving.  The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity" from liability).

[1383]

      *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) (there are "many . . . forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations" because "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process"); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) (while "the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.'"(quoting Schauer, *Categories and the First Amendment: A Play in Three Acts*, 34 VAND. L. REV. 265, 270 (1981)) (brackets in original)).

366

to petition."[1384]  Accordingly, the actions in the Lago Agrio case itself, which are said to have been corrupt, to the extent proved, were wrongful means for Hobbs Act and RICO purposes.

c.      *Donziger's Extortionate Conduct*

i.      *Donziger's Misconduct in the Litigation*

As amply detailed above,  Donziger's actions in increasing the pressure on Chevron by dishonest and corrupt steps in the litigation – coercion, bribery, ghostwriting, and so on – were intended to communicate threats to Chevron.  Their purpose was to instill fear of a catastrophic outcome in order to increase the amount Chevron would pay to avoid the worst.

The Hobbs Act requires only obtaining, or attempting to obtain, "property from another, with his consent, induced by wrongful use of . . . fear."[1385]  No verbal or explicit threat is required.[1386]  Thus, subject to the constraints of *Morrison*, which are discussed below, Donziger's misconduct in the litigation that was undertaken for the purpose of instilling fear of economic harm in order to induce payment by Chevron were indictable under the Hobbs Act, chargeable under the New York extortion statute, and therefore acts of racketeering activity.

---

[1384]

     *Fed. Prescription Serv.*, 663 F.2d at 263.

[1385]

     18 U.S.C. § 1951(b)(2).

[1386]

     *See, e.g.*, *United States v. Coppola*, 671 F.3d 220, 241 (2d Cir. 2012) ("[T]he Hobbs Act 'leaves open the cause of the fear' inducing a party to consent to part with property and does not require that such fear be 'created by implicit or explicit threats.'") (quoting *United States v. Gotti*, 459 F.3d 296, 333 (2d Cir. 2006)).

ii.     *Donziger Made Representations He Knew Were Materially False in Order to Exert Pressure on Chevron*

Donziger's misconduct outside the courthouse went hand in hand with his misconduct within it. Both were parts of an offensive to produce a multi-billion dollar payout. Donziger's "brute force" campaign depended largely on his ability to threaten Chevron by portraying the litigation as a likely source of huge liability for the company.[1387]

As an initial matter, although the existing case law perhaps does not go so far, the Court assumes for purposes of this decision that advocacy through public statements and lobbying activities for the purpose of inflicting economic harm, except to the extent it rests on knowingly false statements or statements as to the truth of which the speaker in fact entertains serious doubt, is not extortionate. But Donziger in some instances relied upon estimates and comparisons that he knew were false or the truth of which he seriously doubted. These included Russell's $6 billion SWAG, claims that contamination in the Orienté exceeded that of the Exxon Valdez by a factor of thirty, and assertions of Cabrera's impartiality and independence. Accordingly, these are proper subjects of the extortion predicate act claim.

As we have seen, Donziger exercised virtually total control over the specific content and timing of the press campaign.[1388] He rebuffed repeatedly Hinton's and Amazon Watch's efforts to exercise discretion over the substance or wording of particular materials.[1389] Donziger

---

[1387]     PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 2.

[1388]     *See supra Facts* § III.B.1-2.

[1389]     *See, e.g.*, PX 6817 (Mar. 11, 2009 Email from S. Donziger to K. Hinton) ("do not change headlines ever without telling me"); PX 6814 (Dec. 3, 2009 Email from S. Donziger to K. Hinton) ("[w]hen I send a final copy of a press release for posting, the issue of the headline

368

accordingly made or caused these assertions to be made in press releases and sought to have them repeated by prominent figures to create "pressure . . . to get the price up"[1390] and induce Chevron to settle.

>           (A)     *Donziger Repeatedly Used Damages Estimates He*
>                   *Knew Were False or the Truth of Which He Doubted*

The LAPs' former chief scientist, David Russell, disavowed his initial damages assessment and repeatedly requested that the LAPs and Amazon Watch cease using his $6 billion figure.[1391]  Russell warned that the estimate "was prepared in a very short time, with only a week of review . . ., and [was] heavily influenced by [Donziger] in the writing."[1392]  He said the number "[was] too high by a substantial margin, perhaps by a factor of ten, or more."[1393]  As a result, he warned,  the "2003 cost estimate is a ticking time bomb which will come back to bite you, and very badly if anyone attempts due diligence on it."[1394]

---

is settled. never change it at that point. tks."); PX 1214 (Jan. 27, 2010 Email from S. Donziger to S. Tegel, A. Soltani, K. Koenig, M. Anderson re: "another thought"), at 1 ("Suggestions are welcome for any press release we do; final editing authority is something we would never grant to any outsider – especially somebody not in a position to understand the art and feel of this campaign and its daily developments.").

[1390]   PX 931 (Oct. 29, 2007 Email from S. Donziger to C. Lehane re: "let's talk") ("Totally confidential, but Chevron is hurting and they have asked to go to mediation at end of November. We need to get more press and increase the pressure b/w now and then, to get the price up.").

[1391]   *See supra Facts* § III.C-D.

[1392]   PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1.

[1393]   *Id.*

[1394]   *Id.* at 2.

Donziger and Amazon Watch both promised to stop citing Russell's estimate in their press releases and statements to the public. But these promises were broken. The ADF[1395] and Amazon Watch – at Donziger's direction – continued to tout the $6 billion figure[1396] and continued to attribute it to Russell's firm.[1397] Donziger knew that Russell had disavowed his cost estimate and had revealed that it was wildly inaccurate. His continued reliance on the figure thus was deliberately deceitful or, at best, highly misleading.

Donziger now claims that his team had prepared a new, higher estimate, which satisfied him that it was acceptable to continue using Russell's cost estimate despite Russell's repeated demands that he stop doing so.[1398] But the Court does not credit that claim. The "replacement" estimates were prepared under Donziger's direction by junior lawyers who worked

---

[1395]

As noted above, the ADF uses the name the Amazon Defense Coalition. Although its press releases are issued under the latter name, we continue to use ADF to prevent confusion.

[1396]

See, e.g., PX 477R (Sept. 13, 2006 Amazon Watch press release), at 1, 2, 3 ("[a]n independent expert has estimated a clean-up would cost $6.1 billion"); PX 480R (Oct. 30, 2006 Amazon Watch press release) at 2 (alleged contamination "would cost at least $6 billion to remediate"); PX 481R (Nov. 8, 2006 Amazon Watch press release) at 2 (Chevron's "Ecuador liability" was "estimated at $6 billion"); PX 482R (Nov. 15, 2006 Amazon Defense Coalition press release) at 1-2 ("Clean-up is estimated at $6 billion.").

[1397]

See, e.g., PX 494R (Aug. 30, 2007 Amazon Defense Coalition press release) at 3 ("Global Environmental Services, an Atlanta-based company that assessed the damage, called the area the 'Rainforest Chernobyl' and estimated clean-up would cost at least $6 billion."); PX 483R (Mar. 6, 2007 Amazon Watch press release), at 2 (referencing an "independent damage assessment, by the U.S. firm Global Environmental Operations" that "estimates clean-up to cost at least $6.14 billion"); PX 485R (Mar. 20, 2007 Amazon Watch press release) at 2 (stating that an "independent damage assessment, by the U.S. firm Global Environmental Operations puts clean-up costs at $6.14 billion").

[1398]

See supra Facts § III.C-E.

for him.[1399]  They were intended to "make media/court/CVX [Chevron] itself start thinking in terms

of billions,"[1400] and potentially to be used to pique the SEC's interest in the litigation.[1401]  To the

extent they ever were publicly quoted or relied upon, they too were weapons in Donziger's scheme

to ratchet up the pressure on Chevron to settle.

   Evocation of the Exxon Valdez disaster was another such weapon.  Donziger's

allegiance to the hyperbolic and highly misleading comparison between the contamination in the

Orienté and the oil spilled by the Exxon Valdez further demonstrates Donziger's willingness to

disregard the truth in order to inflate Chevron's perceived exposure.  Despite repeated warnings

from the LAPs' own scientific experts about the inaccuracy of the comparison,[1402] ADF press

releases and other materials continued to maintain that "[e]xperts for the plaintiffs have concluded

the disaster is at least 30 times larger than the Exxon Valdez spill."[1403]  And they did so at

---

[1399]

  They were prepared by Donziger's associate, Aaron Marr Page, and his wife, Daria Fisher. *See* DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page, D. Fisher re: "excellent work on remediation/questions"); *see also supra Facts* § III.F.

[1400]

  PX 3240 (Apr. 20, 2006 Email from A. Page to S. Donziger re: "DOJ ltr").

[1401]

  DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page, D. Fisher re: "excellent work on remediation/questions"), at 1 ("[W]ill releasing this now help with the SEC . . . ?").

[1402]

  *See supra Facts* § III.E.

[1403]

  PX 527R (Oct. 22, 2009 Amazon Defense Coalition press release), at 2; *see* PX 533R (June 2, 2010 post, "The Chevron Pit"), at 3 ("Experts have concluded that the Chevron [sic] discharged at least 345 million gallons of pure crude oil directly into the rainforest ecosystem . . . . and approximately 11 million gallons of pure crude was spilled during the Exxon Valdez disaster."); PX 513R (Oct. 15, 2008 ChevronToxico post), at 2 ("All told, the amount of oil dumped in Ecuador by Texaco is at least thirty times greater than the amount spilled during the Exxon Valdez disaster, according to the plaintiffs in the civil suit."); *see also* PX 4400 (Kim Direct), at Attachments C & D (chart and timeline of "Donziger and/or Co-Conspirators' Use of '30 times Exxon Valdez' Claim").

Donziger's direction.  Indeed, when the director of Amazon Watch suggested removing references to the spill from its website,[1404] Donziger insisted that it stick to the claim.  He warned that there would be "HUGE implications for the legal case" if they disavowed the comparison to Exxon Valdez, and told Amazon Watch that it "[w]ould terribly prejudice the people it is trying to help if it makes this change."[1405]

It is no accident that the substance of the misrepresentation pertained to the scale of the disaster and, consequently, the supposed scope of Chevron's exposure.  In dogged pursuit of headlines and, ultimately, support for a number likely to "get the price up,"[1406] Donziger ignored warnings that those claims were "off by [a] factor of ten" or more.[1407]

---

[1404]
PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re: "exxon valdez 30x").

[1405]
PX 860 (May 24, 2007 Email from S. Donziger to S. Tegel re: "private").

[1406]
PX 931 (Oct. 29, 2007 Email from S. Donziger to C. Lehane re: "let's talk") ("Totally confidential, but Chevron is hurting and they have asked to go to mediation at end of November. We need to get more press and increase the pressure b/w now and then, to get the price up.").

[1407]
PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re: "exxon valdez 30x"); PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re: "Cease and Desist"), at 1 (stating that the estimate was "too high by a substantial margin, perhaps by a factor of ten, or more").

> (B)     *Donziger Sought to Pressure Chevron by Causing*
> *Third Parties to Act on His Misrepresentations*

Donziger devoted particular attention to promulgating the misrepresentations related to Cabrera, the Russell SWAG, and the Exxon Valdez to elected officials, the SEC,[1408] and Chevron investors in the hope of inducing them to pressure Chevron themselves.

Donziger targeted then-New York Attorney General Andrew Cuomo and New York State Comptroller Thomas DiNapoli, the latter of whom is "the sole Trustee of the Common Retirement Fund . . . whose portfolio includes more than 7.5 million shares of Chevron Corporation . . . valued at approximately $556 million."[1409]  In response to lobbying efforts by Donziger's team,[1410] Cuomo and DiNapoli wrote to Chevron chief executive officer, David O'Reilly, repeating

---

[1408]

> *See* PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox); PX 497R (Mar. 18, 2008 Amazon Watch Ltr. from A. Soltani to C. Cox).

[1409]

> PX 5801 (Nov. 17, 2008 Letter from T. DiNapoli to D. O'Reilly), at 1 ("It appears that Chevron's strategy remains that of denying responsibility for the contamination and, instead, protracting the legal proceedings.  I question whether that strategy best serves the company and its shareholders.").

[1410]

> This team included Hinton, Amazon Watch staffer Mitch Anderson, and LAP lobbyist Ben Barnes.  PX 1048 (July 11, 2008 Email from K. Hinton to S. Donziger re: "Cuomo") ("I spoke with Andrew Cuomo this morning and told him about the lawsuit and the comptroller's office, etc. He said he would be helpful, if we gave him a good idea about how to do that.  You should discuss with Patrick Doherty about how we might leverage Cuomo."); PX 7441 (Apr. 2, 2009 Email chain from S. Donziger to S. Martin, S. Moorhead, K. Caperton, M. Anderson, K. Koenig, and A. Soltani re: "draft ltr for Cuomo"); PX 1106 (Feb. 13, 2009 Email from S. Donziger to B. Barnes, S. Moorhead, P. Thomasson, and K. Hinton re: "DeNapoli info/instructions for Ben") ("Instructions: (1) That DiNapoli call Andrew Cuomo's office, or write a letter, requesting assistance on the Chevron disclosure matter to enable Cuomo to write a letter to Chevron seeking more information.  The person to call is Steve Cohen, Cuomo's chief of staff."); PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson, P. Paz y Mino, and K. Koenig re: "For Pat Doherty"), at 2 (touting $6 billion damages estimate and claiming that "[t]he amount of pure crude dumped is more than 30 times greater than that spilled during the Exxon Valdez disaster"); PX 7422 (Mar. 23, 2007 Email from K. Koenig to S. Alpern, J. Gresham, A. O'Meara, M. Rosenthal, P. Doherty, I. Lowe, T. Symonds, G. Wong, and S. Donziger re: "Ecuador Court Speeds Up

373

what they were told and doubtless believed – that an independent, court-appointed expert (Cabrera) had recommended billions in damages against Chevron.[1411]  Comptroller DiNapoli repeatedly urged the company to settle.[1412]  He even wrote a Huffington Post piece recounting his request that "Chevron's board of directors settle this marathon litigation and spare the company's battered reputation any further damage."[1413]  Both Amazon Watch and the ADF (*i.e.*, Donziger) then publicized Cuomo and DiNapoli's positions.[1414]

---

Chevron's $6 Billion Amazon Trial Over Rainforest Contamination") (including press release referring to "only independent damage assessment" of $6 billion and discussing coordination for Chevron annual meeting).

[1411]

PX 5801 (Nov. 17, 2008 Letter from T. DiNapoli to D. O'Reilly), at 1; PX 1131 (May 4, 2009 letter from A. Cuomo to D. O'Reilly) (referring to Cabrera as "a technical expert [who] has estimated that . . . damages assessed against Chevron may be as high as $27 billion").

[1412]

*E.g.*, PX 7480 (May 2011 Investor Statement on Chevron and *Aguinda v. Texaco*), at 1 ("We also call upon the Company to reevaluate whether endless litigation in the *Aguinda* case is the best strategy for the Company and its shareholders, or whether a more productive approach, such as reaching an equitable negotiated settlement, could be employed to protect shareholder investments and prevent any further reputational harm due to protracted litigation."); PX 5803 (May 25, 2011 press release, "DiNapoli to Chevron: Resolve Amazon Lawsuit, Standoff on Poor Ecological Record Bad for Business"); PX 7498 (May 25, 2012 press release, "NYS Pension Fund Renews Call for Chevron to Resolve Ecuador Lawsuit").

[1413]

PX 7490 (Sept. 26, 2011 Email from E. Sumberg, S. Thompson, P. Grannis, C. Calhoun, N. Groenwegen, B. Anastassiou, E. Evans re: "Huffington Post: What Chevron Owes the People of Lago Agrio").

[1414]

PX 7542 (May 25, 2009 Amazon Watch Ltr. to Shareholders), at 2; PX 5804 (May 26, 2011 Amazon Defense Coalition press release), at 1 ("New York State Comptroller Thomas DiNapoli, who manages $780 million in Chevron stock called on the company 'to face reality' and resolve the lawsuit, which is currently under appeal by both parties in Ecuador. 'The entire case is looming like a hammer over shareholders' heads.  Investors don't derive any benefit from this never-ending courtroom drama.'").

374

Donziger fed DiNapoli and Cuomo the same misrepresentations he was feeding the press.[1415]  And he sought to use their influence, both as public officials and in the case of the Comptroller as a major Chevron stockholder, to "increase the leverage and increase the cost [to] Chevron," including "the cost of all the hassle [it has] to put up with from the environmental groups" and "the cost of their sullied reputation . . . ."[1416]  That leverage was intended to convince Chevron to settle with Donziger and the LAPs.

> (C)    *Donziger Pressed the Republic of Ecuador to File Criminal Charges Against Chevron Attorneys in Order to Pressure Chevron into Settlement*

We have discussed already Donziger's efforts to incite the ROE to prosecute two Chevron lawyers – Reis Veiga and Pérez-Pallares – criminally.  Donziger viewed a "criminal case" against the two lawyers, premised on alleged fraud in connection with the release signed with the ROE, as "a road that . . . could force [Chevron] to the table for a possible settlement."[1417] Donziger was convinced that such a  prosecution would be a potential source of "major press in [the] U.S." and a way to "really raise the cost to CVX."[1418]

---

[1415]

Tobin, 155 F.3d 636 (finding extortionate campaign of harassment consisting, among other things, of threats to report the victim to Internal Revenue Service and threats to interfere with business by maligning reputation).

[1416]

PX 7537 (*Crude* Transcript, Theatrical Version), at 52.

[1417]

PX 172 (Donziger Notebook).

[1418]

PX 2373R (May 11, 2005 Email from S. Donziger to A. Wray, C. Bonifaz, J. Kohn, J. Bonifaz re: "sked conference call Monday at 10 a.m."), at 1-2; PX 170 (Donziger Notebook).

To that end, he asked Chris Lehane to prepare a plan to "fully leverage the criminal investigation of . . . Chevron executives."[1419] The priority of the plan was "to apply shareholder pressure on Chevron, including" letters to Chevron board members, "elected officials who head major pension funds," and "major investors" such as "public and university funds . . . ."[1420] The plan called also for "Meetings with State Pension Fund Elected Officials" (to persuade them "to publicly demand a meeting with Chevron to discuss the matter"), an "Analyst Road Show," a "Google ad that [would] put[] out some provocative information for anyone who types in a search for Chevron," and "SEC letters calling for an investigation of Chevron" in the "days and weeks" following the release of a story about the criminal investigation in order "to keep imposing tremendous pressure on Chevron."[1421]

Although the LAPs' efforts to stimulate such a prosecution initially met resistance, the tide turned following President Correa's election in 2007.  After a series of meetings with Donziger and the LAP team, the president announced his support for the prosecution.[1422]  On April

---

[1419]  PX 734 (Oct. 3, 2005 Email from S. Donziger to J. Kohn re: "Lehane's first press plan"), at 2.

[1420]  *Id.* at 2-3.

[1421]  *Id.* at 3-4.

[1422]  *See discussion supra Facts* § VI; *see also* PX 7537 (*Crude* Transcript, Theatrical Version), at 43 (Donziger: "Correa just said that anyone in the Ecuadorian government who approved the so-called remediation is now going to be subject to litigation in Ecuador.  Those guys are shitting in their pants right now.").

Fajardo and Donziger lobbied the Prosecutor General's office as intently as they did the Office of the President.  *See, e.g.,* PX 75A (June 8, 2007 *Crude* clip), at CRS376-03-CLIP-01 (noting Correa's suggestion that "if we put in a little effort at the Public Prosecutors' office, the Attorney General will yield, and will re-open that investigation into the fraud of . . . the contract between Texaco and the Ecuadorian Government"); PX 992 (Mar. 11, 2008

376

29, 2010, the Prosecutor General's office issued an opinion citing the Cabrera Report and formally accusing Reis Veiga and Pérez-Pallares of the crime of *falsedad ideologica*.

Donziger knew that, "[i]n the US, threatening to file a criminal case to get an advantage in a civil case is considered a violation of ethical rules of the profession."[1423] He nevertheless used the criminal prosecutions in an attempt to "keep the hammer over [Chevron's] head"[1424] and to "force [Chevron] to the table."[1425] His action in doing so, moreover, was wrongful irrespective of whether there was a plausible claim of wrongdoing by the lawyers and of any belief by Donziger in the merit of the claim of such wrongdoing. In terms of *Jackson*'s formulation, there was no nexus between the property Donziger sought to obtain by threatening the Chevron lawyers with criminal prosecution and any plausible claim that the lawyers had violated Ecuadorian law in connection with the release of Texaco years earlier. Moreover, Donziger and the LAP lawyers were well aware of the wrongful nature of their actions. They "resort[ed] to very sophisticated means"

---

Email from P. Fajardo to S. Donziger re: "urgent that we speak about next week"), at 1 ("I have an appointment with the Prosecutor tomorrow morning, we are insisting that he reopen the criminal investigation against Texaco for the remediation."); PX 1067 (Sept. 18, 2008 Email from P. Fajardo to J. Saenz, J. Prieto, S. Donziger, and others re: "Prosecutor's Case") ("the bread is almost ready to be taken out of the oven, but that's a good time to get burned . . . Let's all do our best to make sure this action moves forward. I wonder if it's possible to put on more pressure at Court Monday or Tuesday").

[1423]

PX 8058 (July 18, 2010 Email from S. Donziger to J. Saenz, J. Prieto, and P. Fajardo).

[1424]

PX 169R (Donziger Notebook), at 41.

[1425]

PX 172 (Donziger Notebook), at 2.

377

to prevent being "tied to the matter."[1426]  Their efforts to distance themselves is probative of their awareness of the wrongful nature of their attempts to procure these prosecutions.

> ### d.   Application of the Hobbs Act to This Conduct Is Consistent With Morrison

Donziger's media, lobbying, and public relations campaign, as well as the Cabrera scheme, took place largely in the United States.  Much of it was directed by Donziger in major part from his New York City apartment.  As a result, *Morrison* has no bearing on the bulk of Donziger's conduct.  Among Chevron's allegations of extortion, however, are various actions that took place, in whole or in part, in Ecuador or abroad, including the bribery of Zambrano, efforts to persuade the ROE to criminally charge Chevron attorneys, efforts to enforce the judgment abroad, and quite possibly the ghostwriting of the Judgment.  The Court therefore must determine whether the presumption against extraterritoriality applies to the Hobbs Act.

The Hobbs Act has two basic components – (1) the wrongful use of fear, in this case, of economic or reputational harm (2) in order to obtain the property of another – neither of which evinces a Congressional intent that the statute be applied to extraterritorial conduct. To determine which of defendants' conduct properly is considered part of the domestic pattern, the Court therefore must discern the focus of the statute or the "object[] of the statute's solicitude."[1427]

---

1426

PX 1103 (Feb. 4, 2009 Email from J. Saenz to S. Donziger, M. Garces, P. Fajardo, and others re: "Nuevo Boletin/importante"), at 3 ("The problem is that in Ecuador, our discourse has been that we haven't had ANYTHING to do with the process at the prosecutor general's office . . . . So, to publically [*sic*] say that the discovery comes from one of our collaborators ties us in some way to the prosecutorial investigation.  And we all agree that we don't want that to happen.").

1427

*Morrison*, 130 S. Ct. at 2884.

The defining element of extortion is the pursuit of "something of value from the victim that can be exercised, transferred, or sold."[1428]  By the statute's very terms, the conduct prohibited is to, "in any way or degree," "obstruct[], delay[], or affect[]commerce or the movement of any article or commodity in commerce, by . . . extortion. . . ."[1429]  In *Scheidler v. National Organization for Women, Inc.*,[1430] the Supreme Court explained that, "[a]t common law, extortion was a property offense"[1431] and demonstrated the significance of the defendant's objective to the definition of extortion by examining the claim alongside the crime of coercion.  Coercion, the Court explained, targeted those who "employed threats and acts of force and violence to dictate and restrict the actions and decisions of businesses," but stopped short of seeking and acquiring property, which the crime of extortion requires.[1432]  Thus, it is the defendants' desire "ultimately to enrich themselves" at the target's expense that transforms merely *coercive* tactics into *extortion*.[1433]

As a result, the fact that certain of Donziger's wrongful efforts to force Chevron to pay took place in Ecuador is of no moment.  While Donziger's activities in Ecuador were important, they in many respects were merely tools. Regardless of where the conduct creating the threat took

---

[1428]

    *Sekhar v. United States*, 133 S. Ct. 2720, 2726 (2013).

[1429]

    18 U.S.C. 1951(a).

[1430]

    537 U.S. 393 (2003).

[1431]

    537 U.S. at 402.

[1432]

    *Id.* at 405-06; *see also United States v. Gotti*, 459 F.3d 296, 323 (2d Cir. 2006) ("We . . . read *Scheidler II* as . . . simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question.").

[1433]

    *Gotti*, 459 F.3d at 324.

379

place, the plan was hatched and run from the United States and its object was a multi-billion dollar payment from Chevron, a U.S. based company.  The application of the Hobbs Act to the extortionate behavior therefore would not be extraterritorial.

> 2. *Wire Fraud*

Donziger engaged in multiple acts that are indictable under the wire fraud statute and that therefore are acts of racketeering activity.

> a. *The Elements of Wire Fraud*

The wire fraud statute prohibits the use of the wires "for the purpose of executing" a "scheme or artifice to defraud."[1434]  A "scheme or artifice to defraud" is a plan to deprive a person of something of value by trick, deceit, chicane or overreaching.  "[A]ny 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself contain[s] no false information."[1435]  Nor need the defendant personally communicate by wire – he or she need only cause the wires to be or initiate a series of events which foreseeably would result in their use.[1436]  The scheme need not even be successful in order for liability to obtain under the statute.[1437]

---

[1434]

18 U.S.C. §§ 1341, 1343.

[1435]

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 715 (1989) (alteration in original)); *United States v. Maze*, 414 U.S. 395, 400 (1974) (mails need only be "for the purpose of executing" the scheme) (quoting *Kann v. United States*, 323 U.S. 88, 94 (1944)).

[1436]

*See, e.g., United States v. Bortnovsky*, 879 F.2d 30, 39 (2d Cir. 1989) (noting that "defendant need not actually intend, agree to or even know of a specific mailing to 'cause' mail to be sent as long as he or she 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen'"

380

Fraudulent intent is established by proof of intentional fraud or by demonstrating "reckless indifference to the truth."[1438]  Intentional fraud is established by "a 'conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim.'"[1439]

The statute requires also that the plaintiff prove the defendants used materially false or fraudulent pretenses, representations, or promises in the scheme.[1440] The materiality element is satisfied if the false pretense or representation has "some independent value" or "bear[s] on the ultimate value of the transaction."[1441]

Finally, although many of the wires at issue were interstate, a number of them were sent to or from the United States.  In any event, "the wire fraud statute punishes frauds executed 'in

---

(internal citations omitted)).

[1437]

United States v. Walker, 191 F.3d 326, 335 (2d Cir. 1999); see also United States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000) ("The wire fraud statute punishes the scheme, not its success.") (quotation marks and brackets omitted).

[1438]

O'Malley v. New York City Transit Auth., 896 F.2d 704, 706 (2d Cir. 1990) (citations omitted).

[1439]

Autuori, 212 F.3d at 116 (quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999)).

[1440]

Neder v. United States, 527 U.S. 1, 25 (1999) (holding materiality is an element of a "scheme or artifice to defraud" under the mail and wire fraud statutes).

[1441]

Autuori, 212 F.3d at 118 (quoting United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994)); id. ("[U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." (internal quotation marks omitted)).

interstate or foreign commerce,' so this is surely not a statute in which Congress had only 'domestic concerns in mind.'"[1442]

###### b.   The Conduct

Donziger's overriding goal was to extract a large payment from Chevron in exchange for peace.  In pursuit of that objective, however, he engaged, as we have seen, in a number of deceitful schemes, each of which was intended to play its part in achieving that end and each of which was furthered by use of the wires.  These included, but were not limited to: (1) the ghostwriting of the Cabrera Report by Stratus and the LAPs and the passing off of the report as the work of Cabrera, together with the misrepresentations of his supposed impartiality and independence; (2) the false portrayal of Cabrera as neutral and impartial, (3) the concealment of the true relationship among Cabrera, Stratus and the LAPs, including concealment of the secret payments to Cabrera; (4) the ghostwriting by Stratus of the response to Chevron's objections to the Cabrera Report, which too were passed off as Cabrera's work; (5) the attempts to deceive Chevron and courts in the Section 1782 proceedings concerning what actually had transpired among Cabrera, Stratus, and the LAPs; (6) the ghostwriting of all or much of the Judgment and Zambrano's false claim of authorship; and (7) the false statements to the media and to public officials that were made to increase the pressure on Chevron.

In each of these schemes, Donziger specifically intended to mislead Chevron by falsely portraying the extent of its potential exposure and the likelihood of an adverse result, both material matters designed to induce it to settle the case and to do so at a higher figure than otherwise

---

[1442]   *Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005) (citations omitted).

might have been available.  He sought also to portray those same matters falsely to others in a position to exert pressure on Chevron toward the same end.  Thus, he acted with *scienter*, and the schemes involved deception as to material matters.  The jurisdictional means requirement was satisfied by the extensive use of the wires by Donziger, Fajardo, and Yanza, among others, to transmit messages – chiefly emails – both within the United States and between the United States and Ecuador in furtherance of the schemes.[1443]

       3.     *Money Laundering*

---

[1443]

Numerous emails were sent in furtherance of these schemes.

For example, the ghostwriting of the Cabrera Report by Stratus was coordinated through wire communications.  *See, e.g.,* PX 2433 (Feb. 8, 2008 Email from D. Beltman to S. Donziger, A. Maest, P. Fajardo, J. Peers, B. Lazar), supervised by Donziger, PX 979 (Feb. 27, 2008 Email from S. Donziger to D. Beltman re: "Start on report text; human tox annex"), translated into Spanish, PX 980 (Feb. 29, 2008 Email from D. Beltman to info@translatingspanish.com, and A. Maest re: "Ecuador Project"), sent to Ecuador, PX 1019 (Mar. 31, 2008 Email from S. Donziger to criscadena@hotmail.com re: "table"), and revised by Donziger, PX 1018 (Mar. 30, 2008 Email from D. Beltman to S. Donziger re: "what do u think of this?").  So too were the attempts to conceal it.  *See, e.g.*, PX 1315 (May 3, 2010 Email from S. Donziger to E. Westenberger, and others re: "Fajardo edits"); PX 1321 (May 4, 2010 Email from A. Wilson to S. Donziger, and others re: "Fajardo Declaration"); PX 2452 (May 5, 2010 Email from S. Donziger, and others re "aguinda litigation").

Other examples are the communications regarding the ghostwriting by Guerra of Zambrano orders and the early preparation by the LAP team for preparing the judgment. Fajardo kept Donziger apprised of the team's arrangements during Zambrano's first tenure on the case, PX 1751 (Oct. 27, 2009 Email from P. Fajardo to L. Yanza, S. Donziger re "News"), Donziger and Fajardo coordinated research assignments for the judgment, PX 1137 (June 5, 2009 Email from P. Fajardo to S. Donziger re: "BRYAN"), and the two discussed case law and proposed arguments, PX 1141 (June 18, 2009 Email from P. Fajardo to S. Donziger and others re: "THIS IS THE MOST COMPLETE ONE").

"Each of these [wires] was an 'act which is indictable' as [wire] fraud. . . ." *Bridge*, 553 U.S. at 648. They are not, moreover, a complete list of the wire communications in furtherance of these schemes.  The record in this case is replete with other emails in furtherance of the schemes, including many cited elsewhere in this opinion.  Still others are included in Appendix 1 to Chevron's Proposed Findings of Fact, although the exhibit is somewhat overinclusive.  *See* DI 1848 (Chevron Corp. Proposed Findings of Fact), App'x 1.

383

Money laundering, a violation of Section 1956 of the Criminal Code,[1444] is a RICO predicate act.[1445]  Section 1956 in pertinent part states that:

> "Whoever transports, transmits, or transfers . . . funds [1] from a place in the United States to or through a place outside the United States or [2] to a place in the United States from or through a place outside the United States –
>
>> "(A) with the intent to promote the carrying on of specified unlawful activity . . ."

thereby commits a felony.[1446]  "[S]pecified unlawful activity" includes, with an exception irrelevant to this case, "any act or activity constituting an offense listed in section 1961(1) of this title . . . ."[1447]  "[S]pecified unlawful activity" thus includes any act of racketeering activity, including Hobbs Act and state law extortion, wire fraud, obstruction of justice, witness tampering, and violation of the Travel Act.  Section 2(b) of the Criminal Code, moreover, provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal."[1448]  Thus, whoever transfers, or willfully causes another to transfer, funds into the United States from abroad, or from the United States to another country, "with the intent to promote the carrying on of" a RICO predicate offense violates the money laundering statute.

---

[1444]   18 U.S.C. § 1956.

[1445]   *Id.* § 1961(1).

[1446]   *Id.* § 1956(a)(2).

[1447]   *Id.* § 1956(b)(7)(A).

[1448]   *Id.* § 2(b).

384

As the "cabeza" of the Lago Agrio litigation for the LAPs, Donziger's responsibilities included: (1) obtaining money to fund the litigation and related activities, including public relations and media, and (2) disbursing, or causing the disbursement of, the funds thus raised to vendors and to recipients in Ecuador, most notably Selva Viva, which managed most of the money sent there. To whatever extent he (1) obtained money from outside the United States or (2) sent or caused money to be sent from the United States to another country, in each case with the requisite intent and to promote the carrying on of a RICO predicate offense, he committed money laundering.

The record in this case contains persuasive evidence of a number of such offenses by Donziger.[1449]  The following are illustrative.

Donziger on March 23, 2007 received in his Chase attorney account in New York $1.75 million from a Gibraltar account controlled by Russell DeLeon, a law school friend Donziger recruited to help fund the case.[1450]  He promptly transferred $1 million of that money to the Kohn firm in Philadelphia, where it was controlled by Donziger and Kohn pending its use for case-related

---

[1449]

In Appendix 2 of its Proposed Findings of Fact, Chevron lists a number of wire transfers it asserts were money laundering. *See* DI 1848 (Chevron Corp. Proposed Findings of Fact), App'x 2.  The Court need not find that each of these transfers constituted money laundering.

[1450]

PX 586 (Collection of Chase Bank statements for accounts referred to as "Law Firm Account" and "Ecuador Case Account"), at 3 (reflecting deposit of $1.75 million on March 23, 2007 from Gibraltar-based account); Donziger Jan. 18, 2011 Dep. Tr. at 3212:20-23 (acknowledging that "Russ DeLeon is someone [he] introduced to the Lago Agrio case as a source of financing").

385

expenditures.[1451]  Donziger then caused that money to be transmitted to entities in the United States and Ecuador.[1452]

In the United States, that money paid in part for the production of the Cabrera Report: both Stratus and Cristobal Villao, an author of one of the Report's annexes, through his American employer, Uhl, Baron, Rana and Associates, received payments from Kohn, the money for which came from DeLeon's contribution to the case.[1453]

Some of the funds were used in Ecuador to pay Cabrera through both the Lago Agrio court and the secret account the LAPs established to pay Cabrera outside the court process.  For example, on August 14, 2007, after receiving a request from Yanza,[1454] Donziger asked Kohn to send

---

[1451]

PX 846 (Mar. 29, 2007 Email from S. Donziger to R. DeLeon re: "Update memo"), at 1 (discussing deposit of DeLeon's funds); PX 586 (Collection of Chase Bank statements for accounts referred to as "Law Firm Account" and "Ecuador Case Account"), at 3 (reflecting deposit of $1.75 million on March 23, 2007 from Gibraltar-based account and subsequent transfer to Kohn Swift & Graf).

[1452]

PX 585 (Summary of 2005-2013 Transfers to Selva Viva Acct. Ending 5004 from S. Donziger, Kohn Swift & Graf, and Foreign Entities), at 1, 2 (listing wire transfers from Kohn Swift & Graf to Selva Viva); PX 641 (June 12, 2009 Texaco-Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2.

Kohn Swift & Graf identified the expenses for which DeLeon's funds were used in its record keeping.  *See* PX 641 (June 12, 2009 Texaco-Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2 (identifying "Investor's Expenses").  There is no evidence of any other investor during that period of the case.

[1453]

*See* PX 641 (June 12, 2009 Texaco-Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2 (reflecting payments to Stratus and UBR between March 30, 2007 and November 30, 2007); PX 2430 (July 24, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 596 (Sept. 6, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 635 (Oct. 18, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 4900R (Dahlberg Direct) ¶ 122 (regarding payments to UBR and Villao).

[1454]

PX 894 (Aug. 9, 2007 Email from L. Yanza to S. Donziger re: "bank information urgent") ("[Kohn] ha[s] to deposit 50k so we can pay the advances to the consultants so they will

$50,000 to the secret account in Ecuador.[1455]  The Kohn firm did so on the following day.[1456]  On August 17, 2007, $33,000 was transferred from that account to Cabrera.[1457]  That process was repeated in the following month:  Yanza emailed Donziger to request disbursement of an additional $50,000 for Cabrera,[1458] Donziger directed that Kohn deposit the money into the secret account,[1459] and the transfer was subsequently made to the secret account.[1460]

---

start their work as soon as possible.  I hope it is deposited by Wednesday at the latest.  I'll be in touch that day to arrange all of this with Huao.")

[1455]   PX 897 (Aug. 14, 2007 Email from S. Donziger to K. Wilson and J. Kohn re: "Critical money transfer"), at 3.

[1456]   PX 578 (Banco Pichincha Statement), at 6 (reflecting Aug. 15, 2007 transfer of $49,998 from Kohn Swift & Graf); PX 2427 (Oct. 26, 2007 Email from K. Wilson to S. Donziger and J. Kohn), at 3 (reflecting payment of $50,000 to ADF on Aug. 15, 2007).

[1457]   PX 578 (ADF Account Statement), at 6 (reflecting transfer to "Cabrera Vega, Richard-Stalin" on Aug. 17, 2007); PX 590 (Aug. 17, 2007 Account-to-Account Transfer Receipt between ADF and Cabrera Vega); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the Frente).

[1458]   PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger re: "Let's not give Texaco the pleasure of stopping the PG") ("I think we should think ahead and not give those Texaco sons of bitches the pleasure, using the same mechanism as weeks ago, meaning, for you to send us money to the secret account to give it to the Wuao . . . ."); PX 967 (Feb. 8, 2008 Email from L. Yanza to S. Donziger); PX 917 (Sept. 17, 2007 Email from L. Yanza to S. Donziger) ("I hope you make a deposit right away because I offered to give the Wao another advance tomorrow and I don't want to look bad.").

[1459]   PX 916 (Sept. 16, 2007 Email from S. Donziger to K. Wilson re: "quito account") ("The 50,000 to the Frente goes to the second account . . . not the primary account to which we usually transfer funds.").

[1460]   PX 578 (ADF Account Statement), at 6 (reflecting Sept. 17, 2007 transfer from Kohn Swift & Graf).

In sum, Donziger received money from overseas and caused it to be used in this instance in at least these two ways: (1) to fund in part the ghostwriting of the Cabrera Report, which was used in an attempt to extort Chevron; and (2) to pay Cabrera in violation of the Travel Act.  In so doing, Donziger committed acts indictable for money laundering.

### 4.        Obstruction of Justice and Witness Tampering

#### a.        Obstruction of Justice

##### i.        The Elements of Obstruction of Justice

Criminal Code Section 1503[1461] provides that "[w]hoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice" is guilty of an obstruction of justice.   "[T]he [plaintiff] must establish (1) that there is a pending judicial . . . proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial . . . proceeding, whether or not the defendant is successful in doing so."[1462] "[A] defendant does not need to know with certainty that his conduct would affect judicial proceedings . . . [i]nstead, the defendant's conduct must only have the natural and probable effect of interfering with the due administration of justice."[1463]  Section 1503 requires also proof of "a

---

[1461]    18 U.S.C. § 1503.

[1462]    *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006).

[1463]    *United States v. Kumar*, 617 F.3d 612, 620-21 (2d Cir. 2010) (noting that courts afford Section 1503 "a generally non-restrictive reading") (internal quotations omitted); *see also United States v. Aguilar*, 515 U.S. 593, 598 (1995) (noting that "the 'Omnibus Clause'

388

connection between the defendant's intentional acts and the likelihood of potentially affecting the administration of justice."[1464]  That is, "'the act must have a relationship in time, causation, or logic with the judicial proceedings.'"[1465]  Obstruction of justice is a predicate act under RICO in cases where, as here, a defendant's efforts were "designed to prevent detection and prosecution of the organization's illegal activities [and] were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."[1466]

### ii.      *Donziger Obstructed Justice*

As thoroughly recounted above, Donziger and the LAPs' U.S. counsel submitted the deliberately misleading Fajardo Declaration first to the court in Denver and then to many other courts throughout the country, including this one.[1467]  The LAPs' American lawyers – including Donziger – were involved in drafting the declaration.[1468]  They debated extensively the extent to which it would reveal the truth about the LAPs' "contacts" with Cabrera.[1469]  And they decided that

---

serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice").

[1464]

*Quattrone*, 441 F.3d at 170.

[1465]

*Id.* (quoting *Aguilar*, 515 U.S. at 599).

[1466]

*United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991).

[1467]

*See supra Facts* § VII.C.1.c.

[1468]

*E.g.*, PX 1319 (May 3, 2010 Email from E. Yennock to LAPs' U.S. Counsel, including Donziger).

[1469]

*See id.* Ed Yennock of Patton Boggs instructed Donziger to "confirm[] that [the declaration] [wa]s accurate."

389

Fajardo rather than Donziger should sign it for fear that Donziger, a U.S. resident and thus subject to compulsory process, would be deposed.[1470]   Finally, the declaration, as discussed earlier,[1471] was misleading at best.

       Donziger's conduct with respect to the Fajardo Declaration was obstruction of justice, plain and simple.[1472]  The declaration was drafted while the Stratus Section 1782 proceeding was pending, as Donziger was acutely aware.[1473]  Its purpose – in Donziger's words – was to "prevent Stratus' role relative to the Cabrera report from coming out."[1474]  Donziger was involved in the communications as to what it would and would not say.  He knew that it was false or misleading. His conduct was intended to "impede . . . the due administration of justice," and it fell squarely within the federal obstruction of justice statute.[1475]

---

[1470]

    PX 1316 (May 3, 2010 Email from E. Westenberger to others) ("This is why we struggled with who would sign the declaration. If Steve [Donziger] signs, he will most certainly be deposed. Same for any other counsel in the US. We figured that with [Fajardo], they likely would not slow down the process by deposing him.") .

[1471]

    *See supra Facts* § VII.C.1.c.

[1472]

    The Court makes no finding as to whether Patton Boggs, Emery Celli, or any of their attorneys committed obstruction of justice.  It suffices to find, as the Court does, that Donziger knowingly caused the Fajardo Declaration to be false and misleading and to be filed.  He is liable as a principal in those circumstances.  18 U.S.C. § 2(b).

[1473]

    *Quattrone*, 441 F.3d at 170; *see, e.g.*, Tr. (Donziger) 2569:1-7 ("My role at the time was to try to organize legal representation for those involved [in the Stratus Section 1782 proceeding], and I hired different counsel at different times at that time for the Lago Agrio communities.").

[1474]

    Donziger Jan. 19, 2011 Dep. Tr. at 3363:18-20.

[1475]

    18 U.S.C. § 1503; *see also United States v. Ruggiero*, 934 F.2d 440, 445 (2d Cir. 1991).

390

        b.     *Witness Tampering*

        i.     *The Elements of Witness Tampering*

The federal witness tampering statute[1476] prohibits knowing attempts to *inter alia* "hinder, delay, or prevent the communication to a . . . judge of the United States information relating to the commission or possible commission of a Federal offense."[1477] "The section was written broadly to encompass non-coercive efforts to tamper with a witness."[1478] Thus, one violates Section 1512 if one is "motivated by an improper purpose."[1479] Improper purposes include causing a witness to withhold relevant facts about a defendant's wrongful acts[1480] or to provide false testimony to the court.[1481]

        ii.     *Donziger Tampered with the Testimony of Mark Quarles*

---

[1476]

18 U.S.C. § 1512.

[1477]

*Id.* § 1512(b)(3).

[1478]

*United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (finding evidence sufficient to support conviction for witness tampering where defendant, "[c]oncerned [witness] would testify against him . . . directed intermediaries . . . to reach out to [witness] and deliver a message" despite absence of evidence of intent behind or effect of message).

[1479]

*United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996).

[1480]

*United States v. Price*, 443 F. App'x 576, 582 (2d Cir. 2011).

[1481]

*Thompson*, 76 F.3d at 453.

Donziger attempted to have Mark Quarles alter materially the declaration he submitted to Judge Sand in an earlier proceeding in this district between Chevron and the ROE.[1482] As discussed previously, Donziger urged Quarles to assert that Cabrera neither had entertained suggestions from nor even met with the LAPs regarding his work plan, both of which Donziger knew were false.

Although Donziger knew that the statements he sought to have Quarles make were false, he urged Quarles to adopt them to prevent exposure of the truth regarding Cabrera and to mislead the court. Donziger's effort to influence Quarles's testimony constitutes witness tampering.[1483]

5.    *Violation of the Travel Act Through Furtherance of Violation of the Foreign Corrupt Practices Act*

The Travel Act,[1484] an enumerated RICO predicate,[1485] prohibits the use of "any facility of interstate or foreign commerce" in furtherance of, or with the intent to promote unlawful activity.[1486]  "Unlawful activity" is defined in Criminal Code Section 1952(b)(2)[1487] as, *inter alia,*

---

[1482]

*See supra Facts* § V.D.

[1483]

*United States v. Rodolitz*, 786 F.2d 77, 81-82 (2d Cir. 1986) ("The most obvious example of a section 1512 violation" is "the situation where a defendant tells a potential witness a false story as if the story were true, intending that the witness believe the story and testify to it . . . .").

[1484]

18 U.S.C. § 1952.

[1485]

18 U.S.C. § 1961(1)(C).

[1486]

18 U.S.C. § 1952(a)(3) (elements of Travel Act violation include: (1) use of the "mail or any facility in interstate or foreign commerce," (2) with the intent to "promote, manage,

392

"bribery . . . in violation of the laws . . . of the United States."  Chevron asserts that Donziger

violated the Travel Act through the use of facilities of interstate or foreign commerce with the intent

to facilitate violations of the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA").

He did so by using email and by causing money to be wired to Ecuador to further the payment of

money to Cabrera, a court appointee.[1488]

a.    The Elements

The FCPA's anti-bribery provisions apply where: (1) a "domestic concern," such as

a U.S. resident or a resident's agent, (2) uses the "mails or any means or instrumentality of interstate

commerce" (3) "corruptly" (4) "in furtherance of an offer, payment, promise to pay, or

authorization" to pay money or "anything of value" to any person, (5) "knowing that all or a portion

of" the payment would be "offered, given, or promised" to a "foreign official" (6) in order to

influence any official act or decision, induce an action or an omission to act in violation of a lawful

---

establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," followed by (3) performance of or an attempt to perform an act of promotion, management, establishment, carrying on, or facilitation of the enumerated unlawful activity).

[1487]

Id.

[1488]

See United States v. Kozeny, 664 F. Supp. 2d 369 (S.D.N.Y. 2009) (declining defendant's motion for entry of judgment of acquittal or new trial following conviction for conspiring to violate the FCPA and Travel Act in furtherance of FCPA violation); Dooley v. United Techs. Corp., No. 91 Civ. 2499, 1992 WL 167053, at *9 (D. D.C. June 16, 1992) (holding that violations of the Travel Act based on conduct allegedly violating the FCPA sufficiently stated a RICO predicate act); United States v. Young & Rubicam, 741 F. Supp. 334 (D. Conn. 1990) (denying motion to dismiss RICO count premised on violation of Travel Act through bribery prohibited by FCPA); see also Envtl. Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052 (3d Cir. 1988) (finding allegations that company bribed foreign government officials over period of time to procure military contract sufficient to allege pattern of racketeering activity premised on FCPA violations).

393

duty, or to secure any improper advantage, and (7) the making of the payment or offer to assist in obtaining or retaining business for any person or company or directing business to any person or company.[1489]  Because all of the conduct material to elements of the Travel Act occurred within the United States,[1490] the presumption against extraterritoriality does not apply.

### b.    The Conduct

#### i.    Donziger Was a "Domestic Concern"

"The term 'domestic concern' means . . . any individual who is a citizen, national, or resident of the United States" and "any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship which has its principal place of business in the United States . . . ."[1491]  Donziger is a U.S. citizen, a member of the New York Bar, and maintains his office here.[1492]

---

[1489]

See 15 U.S.C. § 78dd-2(a)(3); see also Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. S.E. Schreiber, 327 F.3d 173, 179-80 (2d Cir. 2003) (listing factors).

The FCPA includes an "[e]xception for routine governmental action" where the payment is intended "to expedite or to secure the performance of a routine governmental action by a foreign official . . . ."  See 15 U.S.C. § 78dd-2(b).  That exception plainly does not apply here, where the payments were intended to permit Stratus to write the Cabrera Report.

[1490]

Cf. United States v. Carson, No. SACR 09-00077-JVS, 2011, WL 7416975, at *4 (C.D. Cal. 2011) (holding that presumption against extraterritoriality does not apply because "[a]ll the elements under the Travel Act were allegedly satisfied in California, even if the target of Defendants' commercial bribery scheme was overseas").

[1491]

15 U.S.C. § 78dd-2(h)(1)(A)-(B).

[1492]

See PX 1750 (Donziger Direct) ¶ II.1.

394

>           ii.     *Donziger Used Instrumentalities of Interstate Commerce in*
>                   *Furtherance of the Payments*

Under both the Travel Act and the FCPA, a domestic concern must "make use of the mails or any means or instrumentality of interstate commerce" in furtherance of the payments.

Donziger's "use of the Internet to send emails in furtherance of [the Cabrera] bribery scheme [was] sufficient to satisfy the interstate commerce requirement of the FCPA"[1493] and Travel Act, as was his transfer of funds to a bank account.[1494]  Specifically, Donziger used email to cause Kohn to transfer funds to the secret account in order to pay Cabrera from that account.[1495]  Kohn complied with Donziger's requests and wired the money.[1496]  Donziger, Fajardo, Yanza, and others discussed the details of the scheme via email.[1497]

---

[1493]

*S.E.C. v. Straub*, No. 11 Civ. 9645 (RJS), 2013 WL 4399042, at *1 (S.D.N.Y. Aug. 5, 2013).

[1494]

*See* Information at 18-19, *United States v. Brown*, No. H-060cr0316 (S.D. Tex. Sept. 11, 2006) (alleging that transfer of funds to bank account for use as improper payments for PetroEcuador officials satisfied interstate commerce element).

[1495]

*See, e.g.*, PX 895 (Aug. 14, 2007 Email from S. Donziger to K. Wilson and J. Kohn re: "Critical money transfer") ("Pls transfer 50,000 to the following account in Ecuador.").

[1496]

*See* PX 578 (Account Statement, ADF) at 6 (reflecting $50,000 wire from Kohn Swift & Graf); PX 901 (Aug. 15, 2007 Email from K. Wilson to S. Donziger, J. Kohn, K. Kenney re: "Frente Wire") ("The wire transaction for Frente has been completed.").

[1497]

*See, e.g.*, PX 850 (Apr. 17, 2007 Email from L. Yanza to S. Donziger re: "A couple of things") ("We have met with Richard and everything is under control.  We gave him some money in advance."); PX 888 (July 26, 2007 Email from L. Yanza to S. Donziger re: "pissed off") ("Tonight I have to coordinate the new request for money with the huao . . . . [T]he huo is asking for other technical field implements."); PX 894 (Aug. 9, 2007 Email from L. Yanza to S. Donziger re: "bank information urgent").

395

        *iii.*    *Donziger's Use of the Wires Was Corrupt and Intended to Influence Official Action*

"Corruptly" means to act "knowingly and dishonestly, with the specific intent to achieve an unlawful result by influencing a foreign public official's action in one's own favor."[1498]

As this Court has found,[1499] Cabrera often was referred to by a code name. Donziger was instrumental in arranging for him to be paid, over and above the payments that went through the normal court process, from a secret account. The Court has found that Donziger intended that at least part of the payments via the secret account would ensure that Cabrera did what Donziger and his confederates wanted him to do as is confirmed by the multi-year effort to conceal the truth concerning the relationship among Cabrera, Stratus and the LAPs.[1500] Indeed, Donziger would not go along with the suggestion to pursue the possibility of using a global expert until he was satisfied that he and the LAPs would control the expert. The report Cabrera signed was written for him by Stratus and the LAPs. Donziger's actions were corrupt and intended to influence official action.

        *iv.*    *The Offers, Promises, and Payments to Cabrera Were of Value*

The FCPA prohibits corrupt payments of "money" and corrupt "offer[s], gift[s], promise[s] to give, or authorization[s] of the giving of anything of value."[1501] The term "anything

---

[1498]

    *United States v. Kay*, 513 F.3d 432, 449 (5th Cir. 2007).

[1499]

    *See supra Facts* § V.A.

[1500]

    *E.g.*, PX 1279 (Mar. 30, 2010 Email from J. Prieto to S. Donziger, L. Yanza, and P. Fajardo re: "Protection Action").

[1501]

    15 U.S.C. § 78dd-2(a).

of value" is construed broadly to include such benefits as employment offers,[1502] travel expenses,[1503] and charitable contributions.[1504]   Cabrera received tens of thousands of dollars directly from the secret account.[1505]

<blockquote>

v.      *Donziger Facilitated the Payments Knowing They Would Be Given to Cabrera, a Foreign Official*

</blockquote>

The FCPA prohibits domestic concerns from using email or wire transfers "in furtherance of . . . [a] payment . . . or authorization of the payment of any money . . . to" "any person, while knowing that all or a portion of such money . . . will be offered, given, or promised, directly or indirectly, to any foreign official . . . ."[1506]   For the purposes of the FCPA, a "foreign official" is defined as:

---

[1502]

*See Rotec Indus. Inc. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1278-79 (D. Or. 2001).

[1503]

*United States v. Liebo*, 923 F.2d 1308, 1310-11 (8th Cir. 1991); *see also* Complaint, *SEC v. UTStarcom, Inc.*, No. 09-cv-6094 (N.D. Cal. Dec. 31, 2009).

[1504]

Complaint, *SEC v. Schering-Plough Corp.*, No. 04-cv-945, (D.D.C. June 9, 2004).

[1505]

*See, e.g.*, PX 901 (Aug. 15, 2007 Email from K. Wilson to S. Donziger, J. Kohn, K. Kenney re: "Frente Wire") ("The wire transaction for Frente has been completed."); PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo re: "Let's not give Texaco the pleasure of stopping the PG") ("send . . . money to the secret account to give it to the Wuao").

Donziger likewise provided Cabrera with an office, an assistant, and life insurance.  PX 877 (July 1, 2007 Email from Fajardo to S. Donziger and L. Yanza re: "Worried") (advocating that the team provide Cabrera with an office and an assistant, to which Donziger replied that he was "on it."); *see also* Jan. 29, 2011 Donziger Dep. Tr. 3808:14-3808:16 (reviewing email and stating "it looks to me like insurance for Cabrera was purchased").

[1506]

15 U.S.C. § 78dd-2(a)(3).

397

> "any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or . . . any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international organization."[1507]

The statute provides further that "[a] person's state of mind is 'knowing' with respect to conduct, a circumstance, or a result" where the "person is aware that . . . such circumstance exists, or that such result is substantially certain to occur."[1508]

The Court's findings make clear that Donziger caused the use of the secret account for the purpose of paying Cabrera,[1509] that he asked Kohn to wire money to that account,[1510] and that he knew the money was intended to pay Cabrera.[1511]  It has found further that the money in fact was used to pay Cabrera.[1512]  The Court therefore finds that Donziger was "aware" that it was "substantially certain" that Cabrera would be paid from the funds he wired to the secret account.

---

[1507]

15 U.S.C. § 78dd-3(f)(2)(A).

[1508]

15 U.S.C. § 78dd-2(h)(3)(A).

[1509]

See supra Facts § V.A; see also PX 871 (June 12, 2007 Email string between L. Yanza and S. Donziger); PX 913 (Sept. 12, 2007 Email from L. Yanza to S. Donziger and P. Fajardo).

[1510]

PX 895 (Aug. 14, 2007 Email from S. Donziger to K. Wilson and J. Kohn re: "Critical money transfer") ("Pls transfer 50,000 to the following account in Ecuador.").

[1511]

PX 894 (Aug. 9, 2007 Email from L. Yanza to S. Donziger re: "bank information urgent") ("[Kohn] ha[s] to deposit 50k so we can pay the advances to the consultants so they will start their work as soon as possible.  I hope it is deposited by Wednesday at the latest.  I'll be in touch that day to arrange all of this with Huao.").

[1512]

PX 578 (ADF Account Statement), at 6 (reflecting transfer to "Cabrera Vega, Richard Stalin" on Aug. 17, 2007); PX 590 (Aug. 17, 2007 Account-to-Account Transfer Receipt between ADF and Cabrera Vega); PX 591 (Aug. 17, 2007 Ltr. from J. Fajardo to Banco Pichincha Manager); PX 593 (Banco Pichincha Record of Cash Transactions for the ADF).

Furthermore, as an expert appointed by the Lago Agrio court, Cabrera was an officer or official of the Ecuadorian court.[1513]

### vi. The Payments Were for a Business Purpose

"Congress intended for the FCPA to apply broadly to payments intended to assist the payor, either directly or indirectly, in obtaining or retaining business for some person . . . ."[1514]  The SEC and the Department of Justice interpret the FCPA to prohibit payments to court officials and regularly find that such payments satisfy the business purpose test.[1515]  This Court agrees.

Here, the payments increased the likelihood that Donziger's business – that of contingency litigation – would benefit from a favorable judgment.  Roughly 30 percent of the 20 percent contingency fee owed to the litigation team accrues to Donziger.  He stood to benefit directly from any judgment and, accordingly, from any act that improved the likelihood that such a judgment would issue and its amount.  The improper payments to Cabrera were intended to do, and did, exactly that.

---

[1513]

PX 348 ("The Expert [Cabrera] is hereby reminded that he is an auxiliary to the Court for purposes of providing to the process and to the Court scientific elements for determining the truth.").

[1514]

*United States v. Kay*, 359 F.3d 738, 755 (5th Cir. 2004).

[1515]

*See*, *e.g.*, DI 1849, Ex. I (Information at 6-9, 14, *United States v. Pride Forasol S.A.S.*, No. 4:10-cr-771 (S.D. Tex. Nov. 4, 2010)) (alleging that bribery of Indian court official in order to obtain favorable judgment constituted effort to obtain or retain business); Ex. J (Plea Agreement at 12, *United States v. Brown*, No. H-06-cr-316 (S.D. Tex. Sept. 14, 2006)) (noting bribes to court officials provided business advantage to subsidiaries).

399

E.        *There Is A Related, Continuous and Domestic Pattern*

The pattern requirement is well defined.  The racketeering activity must include "at least two [predicate] acts" within a ten-year period.[1516]   The predicate acts must be "related," and they must "amount to or pose a threat of continued criminal activity."[1517]  The predicate acts cannot be "isolated events" – instead, they must "have the same or similar purposes, results, participants, victims, or methods of commission."[1518]   In addition, "'a plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (*i.e.*, past criminal conduct extending over a substantial period of time).'"[1519]  Open-ended continuity requires the "threat of continuing criminal activity beyond the period during which the predicate acts were performed."[1520]   Closed-ended continuity requires "predicate acts extend[ed] over a substantial period of time," with two years generally considered the minimum duration necessary.[1521]

The pattern at issue in this case comprises, at the very least, a five-year effort to extort and defraud Chevron through the series of predicate acts described above.  These acts of racketeering satisfy the pattern requirement whether viewed as an open- or closed-end pattern.  The

---

[1516]

18 U.S.C. § 1961(5).

[1517]

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

[1518]

*Id.* at 240.

[1519]

*First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004) (quoting *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir.1995)).

[1520]

*Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999).

[1521]

*First Capital Asset Mgmt.*, 385 F.3d at 181.

400

number and variety of predicate acts, the duration of the period over which they have been committed, the fact that they all targeted Chevron and its money, and the fact that the overall scheme continues all demonstrate criminal activity over a substantial period of time and a threat that it will continue into the future.  That threat is particularly acute in view of the defendants' failure thus far to achieve their goal.

This pattern of racketeering is domestic and satisfies the analysis required under *Morrison*.  Each of the predicate acts described above is indictable and/or chargeable under statutes enumerated in Section 1961(1).[1522]  In some instances, conduct that occurred abroad was indictable, notwithstanding the general presumption against extraterritorial application, because the presumption was overcome by the underlying statute (for example, money laundering, which by its terms applies to money sent to and from the United States).  In others, the presumption against extraterritorial application applies to the underlying statute, but the focus or "the object of the statute's solicitude" is in the United States (for example, the attempts to extort money from Chevron, a U.S. company, by fears generated as part of a scheme conceived, run, and financed principally from the United States).

Although certain of defendants' actions took place abroad, this is a case in which "the conduct of the [affairs of the] enterprise within the United States was key to its success."[1523]  Further, many of the enterprise's participants, whose actions were quite material to the execution of the

---

[1522]   18 U.S.C. § 1961(1).

[1523]   *CGC Holding, Co. LLC v. Hutchens*, 824 F. Supp. 2d 1193, 1210 (D. Colo. 2011); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 978-79 (9th Cir. 2013) (finding a domestic pattern where, in the absence of the domestic conduct, the conduct abroad and the scheme itself "would have been a dangerous failure").

401

pattern of racketeering, live and work in the United States.  Donziger, the head of the enterprise and the center of its decision-making power, resides and mostly operates within the United States (with the exception of a few trips each month to Ecuador).  Its principal funders – Kohn and then Burford – operated entirely or in relevant part in the United States.  Hinton, Lehane, and Amazon Watch – important actors in the pressure campaign – operated from Washington, D.C., and California. Donziger employed Colorado-based Stratus and other U.S.-based scientists to produce the fraudulent Cabrera Report and then used American law firms to attempt to prevent the disclosure of the truth regarding the Cabrera episode.  Unlike the situation in *Norex*, these were not incidental, sporadic, or immaterial contacts with the United States.[1524]  They have been sustained and significant.  As a result, the Court finds that *Morrison* is satisfied.

F.      *Chevron Was Injured by the Pattern of Racketeering Activity and, Absent Equitable Relief, Will Continue to be Injured*

Chevron now seeks, as against these three defendants, only equitable relief designed to prevent them from benefitting in any way from the Judgment.  It seeks that relief both on non-statutory state law grounds and under RICO.  In order to obtain that relief on its RICO claims, it must establish that the RICO violations it has proved, actual and threatened, bear an appropriate causal connection to the relief sought.  And though Chevron no longer seeks damages against these defendants, RICO's explicit provision for civil damages actions is a useful starting point in seeking to address the nature of the required causal connection.

---

[1524]   *Cf. Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010).

402

RICO explicitly provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of" the RICO statute.[1525]  Damages therefore are available only "to those persons injured by reason of the defendant's predicate acts."[1526]  The predicate acts must be both the factual and the proximate cause of the injury.[1527]  Equitable relief under RICO is constrained by the same causation requirements.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the . . . violation led directly to the plaintiff's injuries."[1528]  A "plaintiff must prove only . . . an injury directly resulting from some or all of the activities comprising the violation," however, and need not prove that every predicate act constituting the pattern injured the plaintiff in some way.[1529]

Among the predicate acts that Chevron has proved are (1) multiple extortionate acts including, among others, (a) the ghostwriting of the Judgment and the promise of $500,000 to Zambrano for signing it, and (b) the ghostwriting of the Cabrera Report upon which the author(s) of the Judgment relied for the pit count that underlies more than $5 billion of the damages award, as well as the false portrayal of Cabrera as a neutral, impartial and independent expert, and the

---

[1525]

    18 U.S.C. 1964(c).

[1526]

    *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994) (internal quotation marks omitted).

[1527]

    *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003).

[1528]

    *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

[1529]

    *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994) (noting that *Marshall* "appears to be a correct reading of § 1964(c)" but not so holding).

403

payments and other inducements to Cabrera to ensure that he "played ball," (2) multiple acts of wire fraud in furtherance of fraudulent schemes with respect to all of the foregoing, (3) money laundering to promote racketeering acts, including with respect to the ghostwriting of the Cabrera Report by Stratus and payments to Cabrera, and (4) violations of the Travel Act to facilitate violations of the anti-bribery provision of the FCPA by payments to Cabrera.

Defendants contend that Chevron has not demonstrated that its injuries "flow" from the Judgment and that the Judgment's enforcement breaks the chain of causation because it is the result of an independent actor's discretion.[1530] Defendants' efforts to attenuate the chain of causation leading to Chevron's harm fail.

"The mere recitation of the chain of causation alleged by [Chevron] is perhaps the best explanation" of why that injury satisfies RICO's direct causation mandate.[1531] The attachment of Chevron's property, including the arbitration award, in Ecuador,[1532] was a product of the predicate acts just described.   The threat of enforcement of the Judgment elsewhere is as well. Notwithstanding defendants' assertions to the contrary, the appellate decisions and the orders attaching Chevron's assets were not truly the "independent actions of third . . . parties,"[1533] for the

---

[1530]

DI 1861 (Defs.' Mem. of Law in Supp. Mot. to Dismiss for Lack of Jurisdiction), at 16.

[1531]

Cf. *Lerner*, 318 F.3d at 123 ("The mere recitation of the chain of causation alleged by the plaintiffs is perhaps the best explanation of why they do not have standing in this case.") (quoting *Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000)).

[1532]

*See supra* Facts § XIII.A, *Discussion* § I.A.

[1533]

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 15 (2010).

404

reasons discussed below.[1534] Significantly, Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery and other misconduct.[1535]  As the most "directly injured victim[]," there is no party better situated "to vindicate the law as private attorney[] general."[1536]  Finally, Chevron's injuries are not indirect, incidental, or unintended – they were the very result Donziger sought by his predicate acts.

Not only are Chevron's injuries proximate consequences of the racketeering acts, but Donziger has realized gains from them at Chevron's expense and threatens to realize more. Donziger's retainer agreement[1537] with the LAPs and the ADF, which is governed by New York law,[1538] provides that Donziger is entitled to be paid (a) 6.3 percent of all amounts collected in respect of the Lago Agrio litigation,[1539] plus (b) any arrearages in his monthly retainer, [1540] plus (c)

---

[1534]

See infra Discussion § VII.B.

[1535]

Cf. Anza, 547 U.S. at 459; see also Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 272-73 (1992).

[1536]

Holmes, 503 U.S. at 269-70.

[1537]

PX 558 (Jan. 5, 2011 retainer agreement).

[1538]

The retainer agreement contains New York governing law clauses, PX 558 ¶¶ (10)(a), 11, which control under N.Y. GEN. OBLIG. L. § 5-1401(1).

[1539]

PX 558 (Jan. 5, 2011 retainer agreement) ¶ (3)(a) (the 6.3 percent is the product of 31.5 percent of the Total Contingency Fee Payment, which is 20 percent of all funds collected).

It is conceivable that the percentage of any Judgment proceeds to which Donziger is entitled has been slightly diluted subsequently in order to accommodate giving equity to new investors, but this neither matters nor is persuasively shown on the record.

[1540]

See id. ¶ (3)(b).

405

reimbursement for expenses.[1541]   Donziger's contingent fee is payable only out of "Plaintiff Collection Monies," which the retainer agreement defines as "amounts paid . . . whether from Chevron Corporation. . . , any other party listed as a defendant in respect of the Litigation . . . or any other party added or joined to the Litigation as a defendant. . . ."[1542]   Thus, the Judgment directly resulting from Donziger's fraud is the indispensable predicate of his right to collect a contingent fee with respect to the Lago Agrio case. This is true also with respect to other property already seized from Chevron.  Its intellectual property rights in Ecuador, which are worth between $15 and $30 million, are being held pending sale preparatory to the distribution of the cash proceeds to the Judgment creditors and their investors, subject to Donziger's right to his share of the recovery.[1543]

All of the property that Donziger now has and which he hereafter may receive as a result of the Judgment are and will be the products of the Judgment obtained in consequence of his predicate acts of racketeering.   To the extent he has been enriched by property taken from Chevron, Chevron has lost that property as a proximate consequence of those predicate acts.  Moreover, to the extent the Judgment is enforced in the future, Donziger will be enriched further at Chevron's expense to the extent of 6.3 percent of the property thus obtained.

---

[1541] *Id.* ¶ (3)(d).

[1542] *Id.* ¶ (3)(a).

[1543] *See supra Facts* § XIII.A.

406

V.      *Donziger Conspired to Conduct the Affairs of the Enterprise Through a Pattern of Racketeering Activity in Violation of Section 1962(d)*

RICO Section 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]." Chevron asserts that Donziger conspired to violate Section 1962(c).

1.      *The Elements*

The elements of a Section 1962(d) violation are plain:

> "The 'straightforward language of § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."' *Id.* (quoting 18 U.S.C. § 1962(d)).  A RICO conspiracy charge 'is proven if the defendant "embraced the objective of the alleged conspiracy," and agreed to commit . . . predicate acts in furtherance thereof." *Id.* (quoting *United States v. Neapolitan*, 791 F.2d 489, 495 (7th Cir.1986)).  Assuming that a RICO enterprise exists, the government must prove only "'that the defendant[s] . . . know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual role[s].' *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir.1989).  In applying this analysis, we need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.' *Viola*, 35 F.3d at 44–45; *see also Salinas*, 118 S. Ct. at 478 (upholding conviction under Section 1962(d) where defendant 'knew about and agreed to facilitate the scheme')."[1544]

Thus, "[t]he RICO conspiracy provision . . . is even more comprehensive than the general conspiracy offense" in that it does not require an overt act "to effect the object of the conspiracy."[1545] Indeed, one may be convicted of conspiracy to violate RICO without agreeing "to commit the two

---

[1544]      *United States v. Zichittello*, 202 F.3d 72, 99 (2d Cir. 2000).

[1545]      *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also* 18 U.S.C. § 371.

or more predicate acts requisite to the underlying offense."[1546]


      *2.   The Conduct*

Chevron's amended complaint names ten "RICO Defendants" and twenty-one non-parties as participants in the alleged RICO conspiracy. The RICO Defendants include Donziger, Fajardo, Yanza, Selva Viva, and the ADF.[1547] The non-parties include Stratus, Beltman, Maest and others. With the Stratus defendants having settled and all of the RICO Defendants other than Donziger having defaulted, the only alleged RICO conspirator who went to trial was Donziger.

The Court finds that at least Donziger, Fajardo, and Yanza conspired to violate RICO by conducting the affairs of the enterprise through a pattern of racketeering. Donziger was aware of far more than the "general contours" of the conspiracy – he was its primary architect and key to its viability.[1548]

---

[1546]

    *Salinas*, 522 U.S. at 66.

[1547]

    DI 283 (Am. Compl.) ¶¶ 8-18.

[1548]

    *See supra Facts* § II.C.1.

*VI.     Chevron's Other State Law Claims*

Chevron makes two other state law claims, viz. that defendants defrauded persons other than Chevron with consequent injuries to Chevron and that Donziger violated Section 487 of the New York Judiciary Law.[1549]

As the foregoing discussion makes clear, Donziger's pressure campaign included a plethora of false and misleading representations to persons and entities – including among others members of the media, the New York Attorney General, the SEC, the New York State Comptroller, and Chevron shareholders – often in efforts to pressure Chevron into settlement. Likewise, Donziger, a member of the New York Bar, attempted to deceive the judges of this Court.  Among other things, he suggested that Mark Quarles include statements that Donziger knew to be false in a declaration before the Honorable Leonard Sand to deceive the court into believing that Cabrera was an independent expert.[1550]   In attempting to explain away the Prieto email, he offered a deliberately false explanation to this Court that contradicted his prior sworn testimony in an obvious attempt to avoid sanctions for failing to produce documents from Ecuador.[1551]  But these claims have been transformed radically by events.

Chevron has waived its claim for damages and seeks only injunctive relief.  With respect to its claims premised on reliance by third parties (other than the Ecuadorian courts) on false or misleading statements, it seeks only an injunction against "[c]ommitting, aiding, abetting,

---

[1549]   N.Y. JUD. L. § 487.  The statute provides for treble damages and criminal sanctions against "[a]n attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."

[1550]   *Supra Facts* § V.D.

[1551]   *Supra Facts* § XI.A.3.b.iii.

inducing, or directing any acts of fraud."[1552]  With respect to Section 487, it seeks only an injunction barring Donziger "from engaging in any deceit or collusion, or consenting to any deceit or collusion, with intent to deceive any court within the state of New York" and requiring him to attach a copy of the order to any initial appearance in any state or federal action in this state.[1553]

It is debatable whether the injunctive relief sought by Chevron with respect to these claims would be sufficiently specific to satisfy Rule 65(d)(1).[1554]  It is debatable also whether it makes practical sense to subject every future public statement by these defendants, or every future action by Donziger in connection with litigation in courts in New York, to the possibility of contempt proceedings for violating an injunction barring "acts of fraud" and any "deceit or collusion."  Moreover, the professional consequences of Donziger's behavior, past and future, may be addressed quite adequately by other bodies.  Accordingly, the Court, in the exercise of discretion, declines to grant equitable relief on Chevron's claims of third party fraud and violation of Judiciary Law Section 487.

VII.    *Neither the Judgment Nor the Appellate Decisions in Ecuador Foreclose Liability*

At the outset of the case, defendants pleaded the Ecuadorian Judgment as collateral estoppel.  They subsequently conceded that the recognizability and enforceability of the Judgment under the Uniform Recognition of Foreign Country Money Judgments Act, codified in New York

---

[1552]    DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 347-48.

[1553]    *Id.* at 352.

[1554]    *See, e.g., City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 142-45 (2d Cir. 2011); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 50-52 (2d Cir. 1996).

410

as Article 53 of the CPLR, is an essential element of their collateral estoppel defense.[1555]  So, in an effort to avoid a determination of that issue, they now purport to disavow reliance on the collateral estoppel defense.[1556]

This disavowal is disingenuous.  Defendants now argue that (1) the Court effectively is bound by statements or assertions contained in the Judgment and in the appellate decisions in Ecuador or, at least, that these statements and assertions have evidentiary significance; (2) the appellate decisions break the chain of causation between the bribery, ghostwriting, and other fraud in the Lago Agrio court and the injuries suffered by and threatened to Chevron; and (3) the Court should extend comity to the Ecuadorian decisions.[1557]  Thus, defendants seek to breathe conclusive or, at least, substantial legal effect into these Ecuadorian court decisions without calling their arguments what in substance they are: a collateral estoppel defense or an effort to gain legal recognition of these decisions.  Their arguments all are entirely without merit.

A.    *The Ecuadorian Decisions and Rulings Are Not Admissible for the Truth of the Matters Asserted Therein*

To start at the most basic level, the statements and conclusions set forth in the Ecuadorian decisions lack evidentiary significance in this case.  The Judgments, the decisions of the Ecuadorian appellate courts, and a few other rulings were received in evidence but only for the fact

---

[1555]

*Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 264-67 (S.D.N.Y. 2012).

[1556]

DI 1857 (Donziger Defs.' Post-trial Reply Mem. of Law), at 34-35.

[1557]

*E.g.*, DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 23-28, 48-51, 52-53; Tr. (Donziger closing) 2883:6-18; Tr. (Donziger opening) 31:10-24; DI 1600 (Defs.' Trial Brief Requesting Judicial Notice of Four Ecuadorian Court Decisions).

411

that they were rendered and contain the statements that they contain.  In no case was any received for the truth of the matters stated.  Thus, none properly may be relied upon for the truth of its statements.  The defendants nevertheless relied in their post-trial submissions upon one or more of these documents as evidence of facts or conclusions they stated.[1558]  It therefore is important to be clear as to their evidentiary status and the basis for the Court's rulings.

The principal decisions and rulings that are in evidence are the (1) Judgment (PX 399 (Spanish), PX 400 (English)), (2) trial level clarification order (PX 429), (3) intermediate appellate court decision (PX 430), (4) intermediate appellate court clarification order (PX 431), and (5) National Court of Justice decision (DX 8095).  In each case, however, the exhibit was received only for purposes other than the truth of the matters they asserted.[1559]  Although defendants made a few allusions to an intention to offer one or more of these documents at a subsequent time for the truth of the matters asserted, no such offer ever was made.

In these circumstances, any contention that these decisions and rulings should have been received for the truth of the matters asserted has been waived.  But even if it had not been waived, the documents would not have been admissible for their truth.

The statements and conclusions contained in these decisions and rulings were out of court statements.  Thus, if offered to prove their truth, they would have been inadmissible absent the existence of an applicable exception.[1560]  Defendants never identified any allegedly applicable

---

[1558]   See, e.g., DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 23-28.

[1559]   Tr. 195:16-198:25 (PX 399, PX 400), 456:14-456:24 (PX 429), 457:17-459:8 (PX 430), 459:16-25 (PX 431), 2958:12-2959:11 (DX 8095).

[1560]   FED. R. EVID. 801(c).

412

hearsay exception.   The only one that seems even remotely relevant is the public records exception.[1561]  But that exception does not apply to judicial findings.[1562]

---

[1561]
Statements and conclusions in court rulings and documents are inadmissible hearsay absent a relevant exception.  *E.g.*, *United States v. Sine*, 493 F.3d 1021, 1036 (9th Cir 2007); *Herrick v. Garvey*, 298 F.3d 1184, 1191-92 (10th Cir. 2002); *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994).  Were they not, FED. R. EVID. 803(22), which creates a hearsay exception for evidence of a judgment of final conviction, would have been superfluous.  *See Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 447 (E.D.N.Y. 2013) (judgment of conviction admissible pursuant to exception to hearsay rule).

FED. R. EVID. 803(8).

[1562]
*Herrick*, 298 F.3d at 1192; *Jones*, 29 F.3d at 1554; *Nipper v. Snipes*, 7 F.3d 415, 417 (4th Cir. 1993); *United States v. Nelson*, 365 F. Supp. 2d 381, 388 (S.D.N.Y. 2005); *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, 02 Civ. 9144 (PAC), 2006 WL 988143, at *3 (S.D.N.Y. Apr. 13, 2006); 5 WEINSTEIN'S FEDERAL EVIDENCE § 803.10[1], at 5-803 (2d ed. 2002).

For the sake of completeness, we note that defendants at one point requested that the Court take judicial notice of the Ecuadorian decisions enumerated above (other than the National Court of Justice decision), arguing that the decisions if so noticed would become "*prima facie* evidence of the facts and opinions stated therein."  DI 1600 (Defs.' Trial Brief Requesting Judicial Notice of Four Ecuadorian Court Decisions). The Court declined to do so in a memorandum decision filed November 5, 2013.  DI 1683 (Nov. 5, 2013 Order).

B.       *The Appellate Decisions in Ecuador Do Not Break the Chain of Causation*

Defendants assert that the Judgment was affirmed by two appellate courts and that there is no evidence "that every one of these [appellate] judges . . . are [*sic*] corrupt or unqualified."[1563]  This, they say, cleansed the case of the fraud perpetrated in Lago Agrio – in their words, they say it broke "the chain of causation" between the bribery, ghostwriting, and other fraud in the Lago Agrio court and Chevron's injuries.[1564]  They are mistaken.

1.       *The Intermediate Decision*

The *sine qua non* of defendants' argument that the intermediate appellate court's decision broke "the chain of causation" is that it undertook a *de novo* review of the Judgment, affording no deference to the findings and conclusions below.  Defendants, however, offered no evidence to support that proposition.  Moreover, it is abundantly clear that the Ecuadorian appellate court did not conduct a review of that nature.  The intermediate appellate decision and clarification order thus did not cleanse the Lago Agrio Judgment of its impropriety for at least two reasons.

*First*, the appellate court expressly declined to examine Chevron's allegations of fraud and corruption.  The appellate panel stated that it "should not refer at all" to these allegations "except to let it be emphasized that the same accusations are pending resolution before authorities of the United States of America . . . and this [court] has no competence to rule on the conduct of

---

[1563]     DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 3.

[1564]     *See id*. at 48-51.

414

counsel, experts or other officials . . . if that were the case."[1565]   In its clarification order, the appellate court stated again that it was "stay[ing] out of these [fraud] accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America."[1566]   Moreover, the appellate court could not have evaluated Chevron's bribery claim or any of its allegations related to or supported by Guerra, as Guerra had not yet disclosed what he knew to Chevron before the appellate decision was rendered.

*Second*, contrary to defendants' assertion, the appellate court did not review the record *de novo*.  Under Ecuadorian law, the appellate court was required to "rule on the merit of the record."[1567]   Defendants contend that this required (and resulted in) a *de novo* review of the Judgment.[1568]   But a review of the intermediate appellate decision makes clear that is not what transpired.  Apart from the fact that the appellate court explicitly stated that it would not pass on Chevron's fraud allegations, it declined also to analyze the evidence of overlap between the

---

[1565]

PX 430 (Appellate Judgment), at 10.  The Court notes also that, although not discussed by the parties, the National Court of Justice stated that "it is not within its scope of [the appellate] court to have jurisdiction to hear collusive action cases . . . or procedural fraud." DX 8095 (Opinion of Ecuadorian National Court of Justice), at 95.

[1566]

PX 431 (Appellate Clarification Order), at 4.

[1567]

ECUADOR CODE OF CIV. P. Art. 838; DI 1413-8, at 52.

[1568]

DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 26.  Although the Court, relying on the declarations submitted on the preliminary injunction motion, indicated its then understanding that the intermediate appellate court would review the facts and law *de novo*, the additional evidence presented at trial reveals that this conclusion was premature. Moreover, as the appeal in this case later proceeded, that understanding proved incorrect. *See Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 621 (S.D.N.Y. 2011).  Further, the Patton Boggs Invictus Memo stated its understanding that "the standard of review is not *de novo*."  PX 2382 (Invictus memo), at 24.

415

Judgment and the LAPs' internal files.  The court failed entirely to address the overlap between the Judgment and the Fusion Memo, the Index Summaries,  and the Fajardo Trust Email.[1569] And while the appellate court stated that it had "been able to confirm first hand that the record include[d]" certain "information" in the Judgment that appeared also in the unfiled Selva Viva Database,[1570] it did not identify the specific "information" to which it referred, where it had found it within the record, or why the Judgment differed from the Filed Lab Results but matched the Selva Viva Database.  Further, the appellate court failed to address the fact that the errors it identified in the Judgment – inaccurate reporting of mercury and PAH levels – were present also in the LAPs' unfiled internal work product but nowhere in the Lago Agrio record.[1571]  The appellate court thus declined to address the fundamental implication of the overlap between the Judgment and the LAPs' unfiled work product –  that the LAPs had written, or at least assisted Zambrano in writing, the Judgment.

It bears mention also that it would have been impossible for any court to have conducted a *de novo* review of the 188-page Judgment and the trial record in the time the appellate court rendered its decision.  The record included more than 200,000 pages of trial evidence, 62,000 scientific laboratory analyses, testimony from dozens of witnesses, and more than 100 judicial fields inspections.[1572]  Nevertheless, on January 3, 2012 – only five weeks after the three member appellate

---

[1569]  PX 430 (Appellate Judgment).

[1570]  *Id.* at 11.

[1571]  *Supra Facts* § XII.A.2.

[1572]  PX 1211 (Jan. 7, 2010 Email from L. Garr to J. Sáenz), at 1.

416

panel was selected[1573] – the appellate court affirmed the Judgment.[1574] Even assuming that the judges began working on the decision as soon as they were selected, they could not have conducted a *de novo* review of this case– at least not in any meaningful sense of the term – in such a short time.[1575] This Court finds that it did not do so.

2.      *National Court of Justice*

Nor did the opinion of the National Court of Justice "break[] the chain of causation."

The National Court of Justice is a cassation court, *i.e.*, it reviews legal arguments only.[1576]  It dismissed Chevron's claim that the proceedings should have been nullified due to the underlying fraud because "it is not possible to seek the cassation of a judgment by making these kinds of allegations" where the "appeal does not indicate which law has been violated" or "which

---

The appellate court itself noted "that at this stage alone there were almost two hundred record binders (about twenty thousand pages), not counting the more than two hundred thousand papers in the first instance case."  PX 430 (Appellate Judgment), at 2.  The parties did not indicate whether the appellate court's review "on the merit of the record" consisted of: (1) the record binders only (preventing it from reviewing and evaluating the 200,000 pages of trial evidence), or (2) the 20,000 pages in record binders and the 200,000 pages of trial evidence (which it could not have reviewed in five weeks).  The appellate court's review was not *de novo* in either case.

1573

PX 410 (Nov. 29, 2011 Certificate of Lottery Assignment on Appellate Panel).

1574

PX 430 (Appellate Judgment).

1575

*Cf.* PX 4200 (Rayner Direct) ¶ 3(b) (stating that it would have been impossible for Judge Zambrano to have read the approximately 236,000 pages of Lago Agrio case record in eight weeks).

1576

*Supra Facts* § XII.B.

417

legal rules have been infringed."[1577]  It refused to "re-evaluate the evidence through a cassation appeal, because to do so would be to diminish the independence of trial judges,"[1578] even though a vital part of Chevron's appeal was the destruction of Judge Zambrano's independence by permitting the LAPs to draft his judgment.[1579]

C.   *In Any Case, the Ecuadorian Decisions May Not Be Afforded Comity or Other Recognition Because They Were Rendered In a Judicial System That Does Not Provide Impartial Tribunals or Procedures Compatible with Due Process in Cases of this Nature*

United States courts may not give comity to or recognize the judgment of a foreign state if "the judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with due process of law."[1580] As the Ninth Circuit succinctly stated: "We are aware of no deviation from that principle."[1581] In determining whether a foreign legal system

---

[1577]   DX 8095 (Opinion of Ecuadorian National Court of Justice), at 95, 97-98.

[1578]   *Id.* at 157.

[1579]   As with Chevron's appeal to the intermediate appellate court, the National Court of Justice could not have evaluated Chevron's bribery claim or any of its allegations concerning Guerra, as Guerra had not yet come forward when Chevron filed its appeal.

[1580]   RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 482(1)(a); *see also* N.Y. CPLR § 5304(a)(1) ("A foreign country judgment is not conclusive if the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law."); *cf. Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895) (holding that if the foreign court provided a full and fair trial, "under a system of jurisprudence likely to secure an impartial administration of justice . . . and there is nothing to show either prejudice . . . or fraud in procuring the judgment," it should not be "tried afresh").

[1581]   *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1410 (9th Cir.) (declining to recognize or enforce Iranian judgment), *cert. denied*, 516 U.S. 989 (1995).

418

"provide[s] impartial tribunals [and] procedures compatible with due process of law," a court considers not only the structure and design of the judicial system at issue, but also "its practice during the period in question."[1582]   Courts essentially are tasked with one question: whether the foreign procedures are "fundamentally fair" and "do not offend against basic fairness."[1583] Moreover, they are not confined by the rules of evidence in answering that question.[1584]

The Court is far from eager to pass judgment as to the fairness of the judicial system of another country, but it of course is obliged to do so.[1585]   Vladimiro Álvarez Grau[1586] testified

---

[1582]

*Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000) (affirming district court's refusal to recognize a 1993 Liberian judgment because the Liberian judicial system then did not provide impartial tribunals or procedures compatible with the requirements of due process).

[1583]

*Soc'y of Lloyd's v. Ashenden*, 233 F.3d 473, 477 (7th Cir. 2000) (internal quotation marks and citations omitted).

[1584]

*Id.* at 477 (in evaluating the law of a foreign nation, courts are "not limited to the consideration of evidence that would be admissible under the Federal Rules of Evidence; any relevant material or source may be consulted").

[1585]

Courts are obliged to do so in other circumstances as well including the determination whether the enforce a foreign judgment that is presented for enforcement and the determination of the availability of a foreign forum for purposes of a *forum non conveniens* motion.  (The latter is determined under a different standard that is far more forgiving of problems with foreign legal systems.)

[1586]

Álvarez is an impressively credentialed expert who has practiced law in Ecuador for 43 years and has held numerous elected and appointed public offices and legal academic positions in that country.  PX 6200 (Álvarez Direct) ¶¶ 8-23.  In addition, he has been a weekly columnist for 19 years, covering legal and political issues for two major newspapers in Ecuador.

In *Naranjo*, the Second Circuit characterized Álvarez as "an avowed political opponent of the country's current President, Rafael Correa."  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 238 (2d. Cir. 2012).  The evidence presented at trial demonstrates that he and Correa never were political opponents.  Álvarez ran for president of Ecuador in 1992 for the Christian Democratic Party at a time when President Correa was not publicly known and his political party did not exist.  Tr. (Álvarez) 2032:14-25. Further, when asked about his position

credibly at trial regarding Ecuador's political, governmental, and legal situation in recent years, the undue influence of the executive branch over the judiciary, and his conclusion that the Ecuadorian judiciary "does not operate impartially, with integrity and fairness in the application of the law and the administration of justice."[1587]  Defendants offered no evidence to rebut Álvarez's testimony. Donziger and Ponce themselves stated in a *Crude* out take that all Ecuadorian judges are corrupt, doubtless an exaggeration but nonetheless probative.  According to Donziger, the judicial system is "utterly weak" and lacks integrity.  The State Department's Human Rights Reports indicate also that Ecuadorian judges sometimes decide cases based on substantial outside pressures, especially in cases of interest to the government.  There is abundant evidence that, at the time the Ecuadorian courts' decisions in the Lago Agrio case were rendered, the judicial system was not fair or impartial and did not comport with the requirements of due process.  The Ecuadorian decisions therefore are not entitled to recognition here.

---

regarding President Correa, Álvarez "acknowledge[d] the positive actions or undertakings that [President Correa] has carried out on behalf of Ecuador," but explained that, "as an Ecuadorian citizen, as an attorney, and as a university professor, as a father and grandfather in my family, I cannot hold back from analyzing and criticizing President Correa's actions, which constitute violations of the rule of law that lead to a lack of independence in the branches or powers of the state and interference in the functioning of the Ecuadorian judiciary."  *Id*. at 2033:1-14.

It was mentioned also that the Court drew "significant support" from Álvarez in granting the preliminary injunction.  *Naranjo*, 667 F.3d at 238 n.9.  Defendants had ample opportunity at trial to submit evidence on this point, but elected not to do so.  The Court now has evaluated Álvarez's demeanor among other things and finds that he is a credible witness.  And although the Court continues to draw support from Álvarez's testimony, it draws significant support also from the U.S. Department of State's Country Reports and the statements of Donziger and his colleagues.  *See generally Bridgeway*, 201 F.3d 143 (upholding district court's reliance on such reports in concluding that Liberian judicial system was not fair and impartial and did not comport with the requirements of due process).

[1587]

PX 6200 (Álvarez Direct) ¶ 122.

420

The Ecuadorian judiciary has been in a state of severe institutional crisis for some time.  Matters have deteriorated in recent years.  From 1979 to 1998, judges of the Supreme Court of Justice, the highest court in Ecuador at that time, were appointed by the National Congress for six-year terms and therefore were susceptible to political influence.[1588]  Ecuador's Nineteenth Constitution, in effect from 1998 until October 2008, overhauled the appointment system, providing that Supreme Court justices would serve life terms and that the Supreme Court *en banc* would appoint new justices.[1589] A brief period of stability and judicial independence followed these reforms.[1590]

### 1.     The 2004 and 2005 Judicial Purges

This changed dramatically when the Ecuadorian Congress in 2004, just after the Lago Agrio litigation was filed, purged the three highest judicial tribunals in Ecuador.[1591]  In December 2004, the Congress, at the instigation of then-President Gutierrez, unconstitutionally replaced 27 of the 31 justices of the Supreme Court with new justices elected by Congress.[1592]  Just five months later, President Gutierrez declared a state of emergency and removed all of the Supreme Court

---

[1588]
       *Id.* ¶ 25.

[1589]
       *Id.* ¶ 26.

[1590]
       *Id.* ¶ 27.

[1591]
       *Id.*

[1592]
       *Id.* ¶ 28.

421

justices, including those then recently elected.[1593]  As a result, Ecuador was left without a Supreme Court for most of a year during which the Lago Agrio case was pending.[1594]

Ecuador's judiciary never has recovered from these events.  In November 2005, following President Gutierrez's downfall, new justices selected by a new qualification committee established by Congress were appointed.[1595]  In May 2006, that new Supreme Court purported to limit lower-court judges to four-year terms and arrogated to itself the power to appoint and re-appoint lower court judges.[1596]  In consequence, Supreme Court justices serve at the will of Congress, and lower court judges' futures depend on whether their rulings coincide with the positions of the higher-court judges.

2.    *The Election of President Correa*

Rafael Correa was elected president of Ecuador in 2006.  At his inauguration, he refused to swear to respect and submit to the Constitution of the Republic.[1597] President Correa's stated view was that "the Judicial Branch depends on the Executive Branch.  If I don't give it money it has no means to act . . . ."[1598]

---

[1593]    *Id.* ¶ 29.

[1594]    *Id.*

[1595]    *Id.* ¶¶ 30-31.

[1596]    *Id.* ¶ 31.

[1597]    *Id.* ¶ 32.

[1598]    *Id.* ¶ 33.

422

Shortly after assuming office, President Correa commanded the Supreme Electoral Tribunal, with threats of violence, to set a date for a referendum to create a Constituent Assembly to draft a new Constitution.[1599]   When the Tribunal obeyed, 57 of the 100 congressional representatives challenged the constitutionality of the Tribunal's proceedings and voted to remove the president of the Tribunal.[1600]   The Tribunal, by then subservient to the President, dismissed these 57 representatives – all of whom had been elected – and called on 57 alternate representatives loyal to the president to fill their seats.[1601]   The representatives who had been dismissed brought suit in the Constitutional Tribunal, which ruled in their favor and ordered that they be reinstated.  President Correa immediately condemned that decision and sent the National Police to block the representatives from returning to the Congress building.[1602]   That very day, the newly appointed congressional majority unconstitutionally removed all of the judges of the Constitutional Tribunal and appointed new judges.[1603]   The new Constitutional Tribunal reversed its previous decision with respect to the 57 original representatives and from that day forward consistently has backed the administration's decisions.[1604]

---

[1599]

      *Id.* ¶ 35.

[1600]

      *Id.* ¶ 36.

[1601]

      *Id.* ¶¶ 36-37.

[1602]

      *Id.* ¶ 38.

[1603]

      *Id.* ¶ 39 ("In addition, threats of criminal prosecution were made against both the members of the Constitutional Tribunal and the original 57 representatives.").

[1604]

      *Id.*

423

In April 2007, Ecuador voted to draft a new constitution, and a Constituent Assembly was formed. It issued "Mandate No. 1," which among other things proclaimed that it enjoyed full powers, threatened removal and criminal sanctions to any judge who ruled contrary to its decisions, and eliminated Congress.[1605] When this was challenged before the Constitutional Tribunal, that body ruled that no judge could contravene the Constituent Assembly.[1606]

The new October 2008 constitution further concentrated power in the hands of President Correa. It extended the term of the president and, though it provided for a Congress, it granted him the authority to dissolve it and hold new elections.[1607] It subjects certain decisions of the Supreme Court (renamed the National Court of Justice) to review by the Constitutional Tribunal (renamed the Constitutional Court).[1608] In addition, it terminated the appointments of 31 Supreme Court justices and subjected them to a lottery from which 21 randomly would be selected to serve on the National Court of Justice. Most of the 31 justices refused to submit to the lottery and resigned in protest, causing a gap of several months before the government was able to appoint interim justices.[1609] Moreover, the Constitutional Court is subject to the *de facto* control of the political branches,[1610] most notably the LAPs' stalwart supporter, President Correa.

---

[1605]

   *Id.* ¶ 43.

[1606]

   *Id.* ¶ 44

[1607]

   *Id.* ¶ 46.

[1608]

   *Id.* ¶ 48.

[1609]

   *Id.* ¶ 50.

[1610]

   *Id.* ¶¶ 39-51, 119.

424

Since his initial re-election in November 2008, President Correa has continued to interfere in judicial matters of interest to the Ecuadorian government.[1611]  In a number of recent cases, judges have been threatened with violence, removed, and/or prosecuted when they ruled against the government's interests.[1612]  The Correa administration has targeted large foreign companies in particular.[1613]  In 2009, Ecuador withdrew from the International Centre for Settlement of Investment Disputes, and President Correa soon thereafter requested that Congress terminate 13 bilateral investment treaties that prescribed fair treatment toward foreign companies.[1614]

The president of the Civil and Criminal Commission of the National Assembly stated in 2009 that "[w]e have a justice administration system that has entirely collapsed."[1615]  And in June 2010, the Judicial Council publicly declared that "the Judicial Branch is not independent," and noted "serious risks" "that affect the ability to dispense justice."[1616]  Among those risks, the Judicial Council raised "the threat of impeachment,", the lack of "economic and financial autonomy," and outside "influence in matters that are the exclusive domain of the purveyors of justice."[1617]

---

[1611]

*Id.* ¶¶ 52-61.

[1612]

*Id.* ¶¶ 52-56, 66, 74.

[1613]

*Id.* ¶¶ 58-61; *see also id.* ¶ 60 ("President Correa has stated that 'I really, really hate the big multi-national companies . . . .'").

[1614]

*Id.* ¶ 60.

[1615]

*Id.* ¶ 66.

[1616]

*Id.* ¶ 67 (quoting *From the Judiciary Council to the Nation*, Resolution No. 043-2010, June 22, 2010).

[1617]

*Id.*

3.        *The 2011 Judicial "Reorganization"*

In January 2011, President Correa asserted the need to hold a referendum "to get my hands on the justice system."[1618]   The referendum, which passed by a majority vote, resulted in, among other things, the dissolution of the nine-member Judicial Council, creation of a three-member Transitional Judicial Council to be appointed by government branches under President Correa's influence, and the restructuring of the entire judiciary by the Transitional Judicial Council.[1619] Shortly after its creation, the Transitional Judicial Council began evaluating judges and subjecting each to a psychological examination, which provided an opportunity to exclude judicial officers who did not support the interests of the government.[1620]   Hundreds of judges were fired and many resigned.[1621]  On September 5, 2011, President Correa declared a state of emergency and permitted the Transitional Judicial Council not only to remove judges and justices, but also to designate their replacements.[1622]   Many of the Council removals were of judges who had criticized the reorganization process, including judges who were involved in cases in which the administration or President Correa had an interest.[1623]  An International Oversight Committee – appointed in 2011 by President Correa and the Transitional Judicial Council – acknowledged that "suspension[s] of

---

[1618]
     *Id.* ¶ 77.

[1619]
     *Id.* ¶¶ 78, 80.

[1620]
     *Id.* ¶¶ 83-85.

[1621]
     *Id.* ¶¶ 83, 85, 107.

[1622]
     *Id.* ¶ 86.

[1623]
     *Id.* ¶ 92.

426

judges . . . sometimes[] become strictly discretional, especially when they originate from the administrative review of a jurisdictional decision.'"[1624]

On January 18, 2012, the Transitional Judicial Council appointed the 21 judges of the National Court of Justice.[1625]  Legal scholars reported that the candidates who were awarded the highest scores in their final evaluation interviews were those closest to the Correa administration.[1626]  Members of the National Judicial Council were appointed on January 9, 2013, for a term of six years.[1627]  The Council, headed by President Correa's former secretary, appoints and evaluates judges and substitute judges of the National Court of Justice and the provincial courts.[1628]

While there are many examples of President Correa's influence over the Ecuadorian judiciary, Álvarez's description of the lawsuit against the Ecuadorian newspaper, *El Universo*, bears mention in greater detail.  President Correa filed impairment and defamation charges in 2011 against *El Universo*, its columnist, and certain of its directors regarding an editorial piece on the president's alleged lies.[1629]  Five different judges temporarily presided in that proceeding.[1630]  Within two days

---

[1624]

PX 1500 (Report of International Oversight Committee), at 43; *see also* PX 6200 (Álvarez Direct) ¶ 115.

[1625]

PX 6200 (Álvarez Direct) ¶ 109.

[1626]

*Id.* ¶¶ 110-111.

[1627]

*Id.* ¶ 117.

[1628]

*Id.* ¶ 118.

[1629]

*Id.* ¶¶ 93-94.

[1630]

*Id.* ¶ 95.

427

of Judge Paredes' appointment, he entered a 156-page judgment against the defendants.[1631]  Each defendant was ordered to serve a three-year prison sentence and they collectively were to pay $30 million to President Correa as compensation, plus attorneys' fees.[1632]  President Correa appealed the judgment on the grounds that he had not been awarded the full $80 million he had requested.[1633]  Computer experts repeatedly confirmed the accusation that Judge Paredes had not written the judgment.[1634]   Notwithstanding that information, the intermediate appellate court rejected defendants' appeals.[1635]  The day prior to defendants' hearing before the National Court of Justice, Judge Encalada – who had served temporarily on the trial court – came forward with the following information: (1) Judge Paredes told her that President Correa's lawyer had written the judgment, and (2) Judge Paredes offered Judge Encalada 25 percent of the attorneys' fees awarded to President Correa if she presided over the trial and signed the judgment.[1636]  Nonetheless, the newly-appointed National Court of Justice unanimously affirmed the judgment.[1637]  It was only after national and

---

[1631]

    *Id.*

[1632]

    *Id.* ¶ 96.

[1633]

    *Id.* ¶ 97.

[1634]

    *Id.* ¶ 98; *see also id.* ("The judicial officers who arranged for and allowed this analysis were sanctioned by the Transitional Judicial Council, while Judge Paredes was not.").

[1635]

    *Id.* ¶ 99.

[1636]

    *Id.* ¶ 101.  It is worth noting that Judge Encalada left Ecuador and sought asylum in Colombia shortly after making her statement.  *Id.*

[1637]

    *Id.* ¶ 102.

428

international criticism that President Correa publicly pardoned *El Universo*, its directors, and the columnist.[1638]

All this has led numerous independent commentators, identified by Álvarez, to conclude that the rule of law is not respected in Ecuador in cases that have become politicized.[1639] Álvarez himself concludes that "the Judiciary can no longer act impartially and with integrity where the matter or dispute to be decided involves important political, social, or economic issues, and is instead subjected to constant pressure and threats that influence its decisions.

4.    *U.S. Department of State Reports*

Álvarez's portrayal of the Ecuadorian judiciary is consistent also with the U.S. Department of State's Country Reports in recent years.  According to the 2010 and 2011 Investment Climate Statements, "[c]orruption is a serious problem in Ecuador," and there were concerns that

---

[1638]

    *Id.* ¶ 104.

[1639]

    *See, e.g., id.* ¶ 70 (a former President of the Supreme Court said in January 2010 that "judges are obeying certain government influences. . . . There are judges who have been instructed, who because of their position or for other reasons, do improper things, and that is the way justice is administered in general, and that's why the country is not progressing, nor will it make much progress as long as it has no independent judiciary system"); *id.* (another former Supreme Court justice wrote that "[s]ince 2008, the administration of justice has entered an institutional crisis. . . . [T]here is a marked trend whereby the Executive Branch is taking over all sorts of duties, and the Judiciary has not been able to escape this trend"); *id.* (the Chairman of the special committee that selected the justices of the Supreme Court in 2005 declared recently that "[t]he great disgrace of the court system is that political interests can't resign themselves to not interfere with the courts. . . . The current constitution has minimized the power of the Court; that is evident in its rulings.  Political influences have turned out to be ruinous"); *id.* ¶ 57 (an attorney and academic wrote in June 2009 that "what we are experiencing on a daily basis, those of us who are involved in judicial activity, cannot be worse.  With few exceptions, we find corruption at every step, delays all around; alarming incompetence, undue pressure and interference, and on and on, to the point that at this time justice in Ecuador is just one more item up for sale").

the Ecuadorian courts were "susceptible to outside pressure" and were "corrupt, ineffective, and protective of those in power."[1640]  Those same reports indicated that neither legislative oversight "nor internal judicial branch mechanisms have shown a consistent capacity to investigate effectively and discipline allegedly corrupt judges."[1641]

      Likewise, the Human Rights Reports for Ecuador recognized that the judiciary was "susceptible to outside pressure and corruption," particularly in cases of interest to the government.[1642]  In fact, the 2008 Human Rights Report described "the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature."[1643]

---

[1640]

      PX 1234 (2010 Investment Climate Statement), at 4, 8; PX 1478 (2011 Investment Climate Statement), at 4, 7.

[1641]

      PX 1234 (2010 Investment Climate Statement), at 4; PX 1478 (2011 Investment Climate Statement), at 4.

[1642]

      PX 1108 (2008 Human Rights Report), at 3; PX 1252 (2009 Human Rights Report), at 4; ("While the constitution provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption.  The media reported on the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases . . . . Judges occasionally reached decisions based on media influence or political and economic pressures.").

[1643]

      PX 1108 (2008 Human Rights Report), at 3; PX 1252 (2009 Human Rights Report), at 4.

     5.    *Donziger and His Colleagues Admitted the Weakness, Politicization, and Corrupt Nature of the Ecuadorian Judiciary*

The outspoken opinions of Donziger and his colleagues are in line with those held by Álvarez.  Ponce, one of the Ecuadorian lawyers for the LAPs, had the following conversation with Donziger in a *Crude* outtake:

> "DONZIGER:     Where's the judge? They're all weak.
>
> "PONCE:     All the judges here are corrupt.  Even . . .
>
> "DONZIGER:     They're all corrupt!  It's – it's their birthright to be corrupt."[1644]

According to Donziger, the only way to secure a fair trial in Ecuador is by causing disruption because the judicial system is plagued by "utter weakness" and lacks "integrity."[1645]  Donziger's understanding of the Ecuadorian judiciary was that judges "make decisions based on who they fear the most, not based on what the laws should dictate."[1646]  He viewed the Lago Agrio litigation "not [as] a legal case," but rather "a political battle that's being played out through a legal case."[1647]  In discussing the Lago Agrio case with Ponce and others, Donziger said: "You can solve anything with politics as long as the judges are intelligent enough to understand the politics. . . . [T]hey don't have to be intelligent enough to understand the law, just as long as they understand the politics."[1648]

---

[1644]

PX 9A (Mar. 30, 2006 *Crude* Clip).

[1645]

PX 7A (Mar. 30, 2006 *Crude* Clip), at CRS-053-02-CLIP-04; PX 8A (Mar. 30, 2006 *Crude* Clip).

[1646]

PX 67A (Jun. 6, 2007 *Crude* Clip), at CRS-350-04-CLIP-01.

[1647]

PX 11A (Apr. 3, 2006 *Crude* Clip), at CRS-060-00-CLIP-04.

[1648]

PX 81A (Undated *Crude* Clip), at CRS-129-00-CLIP-02.

431

Accordingly, Donziger and his colleagues repeatedly have pressured the Ecuadorian judges "to let [them] know what time it is," to send a message that they cannot "fuck with us anymore – not now, and not – not later, and never."[1649]  When one individual suggested to Donziger and Ponce that the judge would be "killed" for ruling against the LAPs, Donziger responded that the judge "might not be [killed], but he'll think – he thinks he will be . . . [w]hich is just as good."[1650] Donziger and his colleagues's statements – all of which were captured on video – evidence their acknowledgment that the Ecuadorian judiciary does not provide impartial tribunals.

6.    *President Correa's Influence in the Lago Agrio Litigation*

The "political battle" in Ecuador was made possible by President Correa who consistently has expressed strong feelings about, and demonstrated great interest in, the LAPs' suit against Chevron.  President Correa pledged his full support to the LAPs in a 2007 meeting with Yanza, Ponce, and others.[1651]  The LAPs' media agent reported to Donziger the following day that President Correa "GAVE US FABULOUS SUPPORT.  *HE EVEN SAID THAT HE WOULD CALL THE JUDGE.*"[1652]

---

[1649]

PX 5A (Mar. 30, 2006 *Crude* Clip), at CRS-052-00-CLIP-6; PX 67A (Undated *Crude* Clip), at CRS-350-04-CLIP-01.

[1650]

PX 81A (Undated *Crude* Clip), at CRS-129-00-CLIP-02.

[1651]

PX 853 (Apr. 28, 2007 ROE Press Release), at 1.

[1652]

PX 844 (Mar. 21, 2007 Email from M. Eugenia Yepez Relegado to S. Donziger re: "report") (capitals in original, italics added); *see* Tr. (Ponce) 2303:20-2304:2.

message

A month later, after meeting again with members of the LAP team, President Correa broadcast a call for the criminal prosecution of the "Chevron-Texaco . . . homeland-selling lawyers" in addition to the prosecution of PetroEcuador officials.[1653]  In a *Crude* outtake, Donziger states: "This is incredible. . . . Correa, the President of Ecuador, just said that anyone in the Ecuadorian government who approved the so-called remediation is now going to be subject to litigation in Ecuador.  Those guys are shittin' in their pants right now."[1654]  When the Prosecutor General found no basis to support criminal charges, he was removed from office and replaced by President Correa's former college roommate who – unsurprisingly – agreed several months later that the criminal case should be reopened.

President Correa's public support for the LAP team in the Lago Agrio litigation grew even stronger over the next few years.  In separate radio broadcasts in 2009, President Correa announced that he "really loathed the multinationals," and "he want[ed]  our indigenous friends to win."[1655]  When the Judgment issued in 2011, President Correa praised it as an "historic" ruling.[1656] In press releases, speeches, and other public forums, President Correa has continued to attack Chevron.[1657] And a month after Zambrano provided the defendants with a declaration contesting the

---

[1653]

PX 487R (Apr. 27, 2007 ROE Press Release); PX 853 (Transcript of Correa Radio Address).

[1654]

PX 2477A (Apr. 26, 2007 *Crude* Clip).

[1655]

*Supra Facts* § VI.

[1656]

PX 2503 (*Correa says the judgment against Chevron in Ecuador must be respected*, ULTIMAHORA, Feb. 19, 2011).

[1657]

*See, e.g.*, PX 7511 (*Ecuador's president denounces Chevron as 'enemy of our country,'* THE RAW STORY, Aug. 17, 2008); PX 7516 (Tr., Excerpt from *Cadena Presidencial*, Pres.

433

bribery and ghostwriting allegations, he started a new job as a legal adviser that is majority owned by PetroEcuador, the Ecuadorian national oil company.[1658]

\*    \*    \*

In sum, this Court finds that Ecuador, at no time relevant to this case, provided impartial tribunals or procedures compatible with due process of law.[1659]  The decisions of its courts in the Lago Agrio case are not entitled to recognition in courts in the United States.  The defendants' reliance on them, as well as their collateral estoppel defense, therefore fail.[1660]

---

Correa, Sept. 14, 2013); PX 7518 (*Chevron tried to approach Correa, negotiating with the White House*, EL TELÉGRAFO, Sept. 16, 2013); PX 7519 *(Chevron managed nine teams of experts in order to 'suffocate' Ecuador*, EL TELÉGRAFO, Sept. 17, 2013); PX 7520 (Tr., *Enlace Presidencial*, Pres. Correa, Sept. 21, 2013); PX 7526 (Tr. *Cadena Presidencial*, Pres. Correa, Sept. 28, 2013).

[1658]

*Supra Facts* § IX.A.4.

It bears mention that unlike Zambrano, Álvarez stated that he has been labeled a traitor and someone who "sold out his country" as a result of the opinions he presented to the Court. Tr. (Álvarez) 2008:9-2011:21.

[1659]

"Evidence that the judiciary was dominated by the political branches of government . . . support[s] a conclusion that the legal system was one whose judgments are not entitled to recognition."  RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 482 cmt. b; *see also Bridgeway*, 201 F.3d at 142 n.3.

[1660]

It fails also because Chevron has proved that it did not have a full and fair opportunity to defend itself.  *See Republic of Ecuador*, 638 F.3d at 400 ("Collateral estoppel bars relitigation of an issue that has already been fully and fairly litigated in a prior proceeding.") (internal quotation marks and citation omitted).

434

VIII.   *This Court Has Personal Jurisdiction Over the LAP Representatives*

     A.    *The Personal Jurisdiction Defense Has Been Stricken*

         Lack of personal jurisdiction is an affirmative defense.  Camacho and Piaguaje – the LAP Representatives – pled that the Court lacks personal jurisdiction over them.  The Court struck this defense as a sanction for their failure to produce documents relevant to their personal jurisdiction defense.  Accordingly, there is no need to address the merits of the stricken defense.  Nevertheless, against the possibility that a reviewing court might disagree with the sanctions ruling, the Court concludes that it would have had personal jurisdiction over these defendants in any case.

     B.    *In Any Case, This Court Would Have Personal Jurisdiction At Least Under N.Y. CPLR  302(a)(1)*

         In determining whether a court has personal jurisdiction over an out-of-state defendant, it "must determine whether the plaintiff has shown that the defendant[s] [are] amenable to service of process under the forum state's laws; and [] it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process."[1661]

---

[1661]

    *Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007), *certified question accepted sub nom. Ehrenfeld v. Bin Mahfouz*, 872 N.E.2d 866 (N.Y. 2007), and *certified question answered sub nom. Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830 (N.Y. 2007).

### 1.   Relevant Facts

Donziger lives and works on Manhattan's Upper West Side.  His family and law practice are here.  It is here that he long has spent the majority of his time.[1662]

The LAP Representatives have engaged in activities in New York through Donziger – their attorney and agent – and otherwise since as far back as 1993 and extending up to and beyond February 2011, when this action was filed.

Donziger has pursued his quest to hold Texaco and later Chevron accountable for the alleged pollution in Ecuador, first through *Aguinda* in this Court and then in the Lago Agrio case, for over twenty years.  He has done little else in that time.  The only other client he has represented has been Russell DeLeon, an investor in the Ecuador litigation.[1663]

That he has had time for little else is not surprising considering the scope of the campaign in which Donziger and others acting at his direction have carried out against Chevron. He has run a three-pronged strategy that included litigation, lobbying, and a media campaign.

All of this is spelled out in Donziger's January 2011 retainer agreement,[1664] which simply codified in black and white what had been going on for years.  Its terms are instructive, as it makes clear the scope of the activity, including extensive activity in New York, that the LAPs hired Donziger to perform.  Among the key points are these:

---

[1662]

Donziger's Ecuadorian travel records show that he spent approximately 187 out of 1,460 days in Ecuador between 2007 and 2011.  PX 1509 (Donziger's Ecuador Travel Records). While he of course has not spent every moment of his life in New York that was not spent in Ecuador, the Court infers that a majority of that time was spent here.

[1663]

*See* Tr. (Dahlberg) 871:9-25; PX 4900 (Dahlberg Direct), at 16.

[1664]

PX 558 (Donziger Jan. 2011 Retainer Agreement).

436

- The recitals define the "Litigation" to include the Lago Agrio case; the Section 1782 actions; enforcement proceedings in Ecuador, the United States and elsewhere.[1665]

- They acknowledge that "the Plaintiffs previously engaged [Donziger] to provide legal services to pursue and defend, as the case may be, the Litigation to its conclusion" and reflect the desire "to document and define the economic compensation to which [Donziger] is entitled to receive [*sic*] for [his] representation of the Plaintiffs in connection with the Litigation."[1666]

- The agreement fixed Donziger's compensation as a monthly retainer plus expenses plus a contingent fee equal to a percentage of the amount collected in the Litigation.[1667]

- It stated that Donziger had "acted as the primary United States attorney on behalf of the Plaintiffs to date,"[1668] continued the engagement,[1669] and designated Donziger as the "Plaintiffs' U.S. Representative."[1670]

- It designated Donziger "to exercise overall responsibility for the strategic direction . . . and the day-to-day management of the Litigation" including

  - "coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the Litigation,"

  - "*coordinating the efforts to procure funding* . . . . for the Litigation . . . (including, without limitation . . . obtaining and evaluating bids from third parties in respect of such funding . . . , making recommendations to the Plaintiffs in respect of such bids and

---

[1665] *Id.* at 1.

[1666] *Id.*

[1667] *Id.* ¶ 3.

[1668] *Id.* at 1-2.

[1669] *Id.* ¶ 1.

[1670] *Id.* ¶ 2(b).

437

> preparing and negotiating on behalf of the Plaintiffs the definitive transactional documents and agreements with each funder . . . )."

- "*assembling and organizing the various non-legal advisors, experts, service providers and others* who or which from time to time will assist the Plaintiffs in pursuing and/or defending various aspects of the Litigation, and coordinating the efforts and undertakings of such advisors, experts, service providers and others."

- "*coordinating the media, public affairs and public relations activities on behalf of the Plaintiffs (including, without limitation, retaining lobbyists, public affairs advisors and public relations advisors on behalf of the Plaintiffs).*"[1671]

- It designated New York law as governing the entire relationship.[1672]

Many of Donziger's and his associates' actions in support of that strategy took place in New York. His office – run out of his apartment in Manhattan – has been the functional equivalent of the LAPs' New York office.[1673] He had numerous New York bank accounts, including an "Ecuador Case Account," a law firm account, and a Chase account in his name.[1674] These bank

---

[1671]

    *Id.* (emphasis added).

[1672]

    *Id.* ¶¶ 10(a), 11.

[1673]

    PX 3200 (Russell Direct) ¶ 32 ("At times, Donziger worked on this case in Ecuador, but he also directed the team's activities from Manhattan by phone and email.").

    The LAP representatives appear to concede that Donziger ran the case out of his apartment. Tr. (Gomez Opening) 40:3-4; *see also* Woods June 18, 2013 Dep. Tr. at 159:24-160:16.

[1674]

    PX 0616 (Ecuador Case Project Account -2758; Law Firm Account -0218); PX 617 (S. Donziger Personal Checking Account -5365). The Court takes judicial notice of the fact that the routing number at the bottom of a check corresponds to the state in which the account was opened.

accounts were used to support the litigation and related efforts by, among other means, receiving deposits from investors and paying lawyers and expenses in Ecuador.[1675]

Donziger has managed the fundraising efforts for the LAPs – which have been integral to keeping the LAP team afloat – largely from New York. Acting from his New York base, he reached out to and entered into agreements with numerous investors. Most of the agreements among the LAPs, the investors, and others contain New York governing law clauses,[1676] and some provide for the giving of notice to the LAPs by giving notice to Donziger at his New York Office.[1677] Some of the investors too have been from New York. In one instance, for example, Donziger informed Yanza of "two possible investors in New York who can help us quite a bit with money now through the upcoming years" with a potential investment of $10 million.[1678] He solicited the help of and was in frequent communication with the New York based firm H5 in so doing,[1679] and he secured a substantial financing commitment from Burford Capital, which had New York

---

[1675]

*E.g.*, PX 4900 (Dahlberg Direct) ¶¶ 44, 50, 58, 71, 75, 78.

[1676]

*E.g.*, PX 559 (Fajardo Retention Agreement), at 6; PX 553 (Patton Boggs Retention Agreement), at 7; PX 544 (Emery Celli Retention Agreement), at 4 (signed by Donziger and Fajardo); PX 566 (H5 Retention Agreement), at 5; PX 552 (Burford Agreement), at 32 (listing Piaguaje but not Camacho as a claimant).

[1677]

*E.g.*, PX 566 (H5 Retention Agreement), at 6-7; PX 552 (Burford Agreement), at 37.

[1678]

PX 1063 (Sept. 9, 2008 Email from S. Donziger to L. Yanza), at 1.

[1679]

PX 3100 (Bogart Direct) ¶ 5; PX 566 (H5 Retention Agreement). PX 2196 shows that Donziger exchanged 583 text messages with individuals from H5 between September 14, 2009 and May 13, 2011. The exhibit is not entirely clear as to whether Donziger and H5 called one another 1,287 times or spoke for 1,287 minutes but, in either case, it is clear that they communicated extensively. PX 2196 (Donziger's Call Volume), at 2.

employees and an office here.[1680]  To ensure Burford's financial commitment, which was absolutely

crucial to the LAP team, Donziger, Burford, and Patton Boggs crafted the Invictus Memo, which

was discussed and circulated in New York.[1681]  Fajardo and Yanza attended a meeting in New York

to discuss the Invictus Memo in mid-2010.[1682]

   Donziger micromanaged the Stratus operation in major part from New York.[1683]  As

we know, that operation led to the Cabrera Report, which was an integral weapon in Donziger's

pressure campaign.  Donziger regularly emailed with the Stratus consultants to oversee the drafting

of the report and ultimately edited the report and annexes.[1684]  Among other things, he discussed with

---

[1680]

   PX 3100  (Bogart Direct) ¶ 6.  Patton Boggs, Donziger, and Burford spent "a number of months" negotiating the funding deal.  *Id.* ¶ 7.

[1681]

   *E.g.*, PX 1310 (Apr. 30, 2010 Email from E. Daleo to J. Brickell, I. Maazel, S. Donziger, L. Garr, J. Abady, A. Wilson, N. Economou, I. Moll, A. Woods, and W. Narwold re: 1:00 Invictus Meeting in New York); PX 1386 (July 4, 2010 Email from S. Donziger to S. Seidel, N. Economou, C. Bogart, J. Molot, and J. Tyrrell re: Next Steps, Invictus Draft Budget); PX 1394 (July 13, 2010 Email from NYScanner@PattonBoggs.com to S. Sepulveda re: Ecuador – Invictus Chart).

[1682]

   PX 3100 (Bogart Direct) ¶ 7.

[1683]

   The Court recognizes that Donziger did not spend all of the 1,273 days that he was not in Ecuador between 2007 and 2011 in New York.  That the center of his operations, home, and family are were located in New York, however, permits an inference that he spent much of that time in New York.  Absent evidence to the contrary, the Court thus infers that at least some if not most of the documented communications at issue were received in or made from New York.

[1684]

   PX 962 (Jan. 24, 2008 Email from D. Beltman to S. Donziger and A. Maest re: Draft Outline of the Cabrera Report); PX 2433 (Feb. 8, 2008 Email from D. Beltman to S. Donziger, A. Maest, J. Peers, B. Lazar, and P. Fajardo re: Draft Outline of the Cabrera Report) ("These revisions are based on what we talked about last Friday."); PX 978 (Feb. 27, 2008 Email from D. Beltman to S. Donziger re: Start on Report Text) (attaching a draft of the Cabrera Report asking for guidance and edits);  PX 985 (Mar. 5, 2008 Email from D. Beltman to S. Donziger re: Annex Tracking Table);  PX 987 (Mar. 6, 2008 Email Chain Between D. Beltman and S. Donziger re: Translation of Uhl Report); PX 1018 (Mar. 30,

Beltman the results of water contamination tests and the claim that the contamination in Ecuador was substantially worse than the Exxon Valdez oil spill,[1685] conspired to limit Clapp's public statements about the Cabrera Report,[1686] and coordinated a press release concerning the LAPs' comments on the Cabrera Report.[1687]

        Donziger orchestrated the LAP team's efforts first to conceal and later to minimize the Cabrera fraud after the truth about it started coming to light.  Fajardo traveled to Donziger's Manhattan apartment in order to "deal with various issues relating to the Lago Agrio case," including drafting Fajardo's Declaration used in the Section 1782 proceedings.[1688]  Donziger was extensively involved in the drafting and editing of that declaration, which was used in attempts in sixteen federal courts including this one to obfuscate the fraud.[1689]  And he hired New York counsel

---

2008 Email Chain Between D. Beltman and S. Donziger re: Table of Calculated Damages); PX 1030 (Apr. 2, 2008 Email from D. Beltman to S. Donziger and A. Maest re: List of Items Moving Forward); PX 1060 (Aug. 15, 2008 Email from D. Beltman to S. Donziger and J. Kohn re: Work Status) (updating Donziger on each aspect of Stratus' work, per Donziger's request).

[1685]

PX 1207 (Jan. 11, 2010 Email from S. Donziger to D. Beltman and Response re: "30x Valdez"); PX 1110 (Mar. 1, 2009 Email from S. Donziger to D. Beltman re: "30x Valdez"); PX 1669 (Jan. 10-12, 2009 Email Chain Between C. Mitchell, S. Donziger, E. Bloom, S. Saucedo, and D. Beltman re: Cabrera Report).

[1686]

PX 1079 (Nov. 5, 2008 Email chain Between D. Beltman and S. Donziger re: Clapp); PX 2438 (May 14, 2008 Email chain Between D. Beltman and S. Donziger re: "Urgent Issue") (discussing need to keep the Clapp report away from the press).

[1687]

PX 1667 (Sept. 24, 2008 Email from D. Beltman to S. Donziger, A. Maest, and J. Peers re: "Draft Press Release").

[1688]

Donziger Jan. 14, 2011 Dep. Tr. at 2794:10-20.

[1689]

PX 2205 (Proceedings in Which Fajardo Declaration Was Filed); PX 1304 (Apr. 24, 2010 Email chain Between S. Donziger, A. Wilson, J. Abady, I. Maazel, E. Westenberger re: "Fajardo Letter"); PX 1313 (May 3, 2010 Email from E. Yennock to S. Donziger and others

to represent the LAPs in the Section 1782 proceedings related to Cabrera.[1690]  Donziger met with Shinder in Manhattan in 2009 to discuss Shinder's potential representation of the LAPs in those Section 1782 proceedings also.[1691]

      Donziger has directed many aspects of the Lago Agrio case itself from his New York office.  For example, the first meeting between Donziger and David Russell, who was the LAPs' first scientist and whose cost estimate the defendants misused, took place in New York.[1692]  In late 2004, Donziger and Russell participated in a strategy meeting in New York in which they discussed test results indicating that PetroEcuador, not Chevron, may have been responsible for some of the contamination.[1693]

      Beyond securing investors, coordinating strategy, and working with experts, Donziger controlled, largely from New York, the extraordinary media campaign waged against Chevron[1694] and reached out to financial and political bodies in New York to support and further

---

re: "Fajardo Declaration"); PX 1315 (May 3, 2010 Email from S. Donziger to E. Westenberger and others re: "Fajardo Declaration Edits").

[1690]

PX 551 (Oct. 18, 2010 Retainer Agreement with Emery Celli Brinckerhoff & Abady, LLC); PX 1319 (May 3, 2010 Email from I. Maazel to others).

[1691]

Tr. (Shinder) 1268:4-1273:19.

[1692]

Tr. (Russell) 298:5.

Russell testified that in summer 2004, he "did [his] work from both the United States and Ecuador, and communicated the activities of the scientific team primarily by email with Donziger when he was in New York City and also when he was in Ecuador. . . . All of [his] work was performed at Donziger's direction."  PX 3200 (Russell Direct) ¶ 24.

[1693]

DX 1750 (Donziger Direct) ¶ 113; Tr. (Russell) 394:6-19.

[1694]

PX 1094 (Jan. 4, 2009 Email from K. Hinton to S. Donziger re: "Planning"); PX 2444 (Feb. 3, 2009 Email from S. Donziger to K. Hinton re: "DiNapoli"); PX 1106 (Feb. 13, 2009

442

publicize the litigation and to exert pressure on Chevron to settle.  He arranged for New York's then

Attorney General, who sent Chevron a letter requesting follow up about the veracity of Chevron's

public disclosures respecting liability in Ecuador.[1695]   Donziger arranged also for the New York

State Comptroller to make a similar inquiry to Chevron.[1696]  He persuaded Berlinger, another New

York resident, to film and produce *Crude*.[1697]

Finally, the LAP Representatives themselves participated repeatedly in litigation in

New York courts either as parties or as volunteers.  Piaguaje was a plaintiff in *Aguinda*.[1698]  Both

he and Camacho were plaintiffs in an action before Judge Sand to enjoin Chevron's BIT arbitration

---

Email from S. Donziger to B. Barnes, S. Moorhead, P. Thomasson, and K. Hinton re: "D[i]Napoli info/instructions for Ben"); PX 1133 (May 5, 2009 Email Chain Between S. Donziger and K. Hinton re: "Cuomo Letter"); PX 1132 (May 5, 2009 Email chain among S. Donziger, A. Woods, and K. Hinton re: "Bob McCarty"); PX 1228 (Feb. 17, 2010 Email chain between S. Donziger, A. Woods, K. Hinton, L. Garr, and H. Shan re: "Blog Advice"); PX 1456 (Nov. 5, 2010 Email from S. Donziger to H. Shan, M. Ramos, M. Anderson, B. Tarbatton, K. Koenig, A. Woods, K. Hinton re: "Blogging and Such") (chastising the recipients for failing to blog about the "case and the struggle of the Amazonian communities" more frequently).

[1695]      PX 1048 (July 11, 2008 Email from K. Hinton to S. Donziger); PX 1131 (May 4, 2011 Ltr. from A. Cuomo to D. O'Reilly [Chevron]); PX 2445 (May 11, 2009 Ltr. from C. James [Chevron] to A. Cuomo).

[1696]      PX 1106 (Feb. 13, 2009 Email from S. Donziger to B. Barnes, S. Moorhead, P. Thomasson, and K. Hinton); PX 7489 (Nov. 17, 2008 Ltr from T. DiNapoli to Chevron); PX 5802 (Dec. 6, 2010 Ltr. from P. Doherty at the Office of T. DiNapoli to Chevron); PX 7457 (Apr. 18, 2010 Email from M. Anderson to S. Donziger and A. Woods re: "DiNapoli Investor Statement").

[1697]      This occurred in summer 2005 when, according to Berlinger, "a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door. He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker to tell his clients' story."  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 302-03 (2d Cir. 2011) (quoting *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 287 (S.D.N.Y. 2010)) (emphasis omitted).

[1698]      *See Aguinda v. Texaco, Inc.*, 93 Civ. 7527 (JSR).

443

against the ROE.[1699]  They have appeared voluntarily by counsel in both of the Section 1782

proceedings[1700] – although they were not named as parties – to oppose the discovery that Chevron

there sought, first from Berlinger and then from Donziger.

2.       *Section 302 – Specific Jurisdiction*

a.       *Legal Standard*

i.       *Transacting Business*

This Court has jurisdiction over the LAP Representatives under New York CPLR

Section 302(a)(1), which provides "[a]s to a cause of action arising from any of the acts enumerated

in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor

or administrator, who in person or through an agent: . . . transacts any business within the state . .

. ."  This is because the LAP Representatives, principally through their agent Donziger, "avail[ed]

[themselves] of the privilege of conducting activities within New York."[1701]

In determining whether a defendant transacts business in New York, courts typically

consider the totality of the circumstances.[1702]  An out-of-state defendant need not enter the forum

---

1699
        *See Yaiguaje et al. v. Chevron Corp.*, 10 Civ. 316 (LBS).

1700
        *In re Application of Chevron Corp.*, 10 MC 1 (LAK) [DI 6]; *In re Application of Chevron Corp.*, 10 MC 2 (LAK) [DI 17].

1701
        *Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998), *overruled on other grounds Rotella v. Wood*, 528 U.S. 549, 555 (2000).

1702
        *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004).

444

state, and a single contact in some circumstances may be sufficient to support jurisdiction.[1703] Moreover, a defendant's agent's contacts with New York also may provide the basis for finding that personal jurisdiction exists. "Among the factors considered" in evaluating agency based jurisdiction "are whether the nondomiciliary consented to the actor's conduct, whether the nondomiciliary benefitted from that conduct, and whether the nondomiciliary exercised 'some control' over the agent."[1704]

Both commercial and non-commercial activities may support jurisdiction under Section 302(a)(1).[1705] Courts have enumerated several relevant commercial activities in a non-exhaustive list, including "(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract . . . ."[1706] The existence of a New York choice of law clause in a contract is significant because "the parties, by so choosing, invoke the benefits and protections of New York law."[1707]

---

[1703]

> *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997).

[1704]

> *Pennie & Edmonds v. Austad Co.*, 681 F. Supp. 1074, 1078 (S.D.N.Y. 1988); *see also Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981).

[1705]

> *Girl Scouts of U.S. v. Steir*, 102 F. App'x 217, 219 (2d Cir. 2004) (citation omitted).

[1706]

> *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996).

[1707]

> *Sunward*, 362 F.3d at 23 (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 367 (2d Cir. 1986)).

Other actions by defendants, such as having their New York-based agent make multiple contacts with a plaintiff,[1708] sending a single shipment to New York while employed by an out-of-state business that regularly sells products to buyers in the forum state,[1709] or purposeful and repeated use of a New York correspondent bank account by a foreign bank[1710] satisfy the "transacting business" requirement as well.  New York courts typically find, in the context of fee dispute cases, that an out of state entity's retention and use of the services of a New York lawyer constitutes transaction of business.[1711]  This is so regardless of where the litigation, for which the New York lawyer was retained, took place.[1712]  In addition, the act of litigating a case as a plaintiff in New York has been held sufficient to confer jurisdiction over a subsequent action to enforce a judgment rendered in the initial case.[1713]

This is not to say that limited activities in New York to further the aims of foreign litigation necessarily are sufficient to find personal jurisdiction.  Merely sending a cease and desist

---

[1708]

*PDK Labs*, 103 F.3d at 1109.

[1709]

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170-71 (2d Cir. 2010).

[1710]

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).

[1711]

*Fischbarg v. Doucet*, 38 A.D.3d 270, 273, 832 N.Y.S.2d 164, 167 (1st Dep't), *aff'd* 9 N.Y.3d 375, 880 N.E.2d 22 (2007).

[1712]

*Id.* at 274-75; *see also Pennie*, 681 F. Supp. at 1078.

[1713]

*See SEC v. Softpoint, Inc.*, 95 Civ. 2951 (JSR), 2012 WL 1681167, at *3 (S.D.N.Y. May 9, 2012) (personal jurisdiction existed where the defendant "transacted business in New York when he litigated the case that resulted in the judgment the SEC now seeks to enforce.  This enforcement action arises directly from the litigation in which Cosby participated.  Moreover, Cosby's appeal to courts located in New York constituted purposeful availment of the state's privileges, and he could reasonably foresee that, if he did not prevail, the SEC might enforce the judgment against him in the very courts to which he had turned.").

446

letter or serving documents upon a New York entity, for example, have been held insufficient because such actions do not "invoke the privileges or protections of our State's laws."[1714]

### ii.     "Arising Out of"

In order to establish personal jurisdiction under CPLR 302(a)(1), a plaintiff must prove also that its cause of action arises out of the defendant's transaction of business in New York.[1715]  This requires "'an articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York."[1716]  It "does not[, however,] require a causal link between the defendant's New York business activity and a plaintiff's injury."[1717]  It is enough that "at least one element [of the cause of action] arises from the New York contacts."[1718]

---

[1714]

  *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 509, 881 N.E.2d 830 (2007).

[1715]

  *Chloe*, 616 F.3d at 170-71.

[1716]

  *Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998) (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 466-67, 522 N.E.2d 40, 43 (1988)).

[1717]

  *Licci*, 732 F.3d at 168-69 (there was personal jurisdiction over the Lebanese Canadian Bank in New York where the bank engaged in transactions with correspondent New York accounts to funnel money to terrorist organizations that injured or killed plaintiffs or their family members); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 104 (2d Cir. 2006) ("In cases where claims have been dismissed on jurisdictional grounds for lack of a sufficient nexus between the parties' New York contacts and the claim asserted, the event giving rise to the plaintiff's injury had, at best, a tangential relationship to any contacts the defendant had with New York.  In fact, in those cases, the injuries sustained and the resulting disputes bore such an attenuated connection to the New York activity upon which the plaintiffs attempted to premise jurisdiction that the disputes could not be characterized as having 'arisen from' the New York activity."); *Sunward*, 362 F.3d at 23-24; *Kronisch*, 150 F.3d at 130-31.

[1718]

  *Licci*, 732 F.3d at 169.

447

For example, in *PDK Labs*,[1719] the defendant's attorney – acting as his agent – "initiated from New York persistent, vexing communications" with the plaintiff for approximately three months.[1720]  These communications apparently included threats of a lawsuit alleging patent violations and false advertising and attempts to compel the plaintiff into investing in defendant's product.[1721]  The plaintiff then filed a declaratory judgment action against the defendant seeking a declaration that the defendant lacked standing to sue for patent violations or false advertising, and the defendant asserted personal jurisdiction as a defense.[1722]  Relying on the New York communications, the Second Circuit there held that the plaintiff's declaratory judgment action was adequately related to activities in New York to confer personal jurisdiction even though the central issue in the case was whether the defendant – a Georgia resident – would have had standing to sue for harms he allegedly suffered in Georgia.[1723]

---

[1719]

   103 F.3d 1105 (2d Cir. 1997).

[1720]

   *Id.* at 1109.

[1721]

   *Id.* at 1109-10.

[1722]

   *Id.* at 1107.

[1723]

   *Id.* at 1110-11.

b.      *Discussion*

i.      *The LAP Representatives Transacted Business in New York*

As an initial matter, Donziger was the LAP Representatives' agent both under general principles of agency law[1724] and the analysis used in determining agency for the purposes of personal jurisdiction.

Finding that an agency relationship exists in these circumstances comports with *Elman v. Benson*,[1725] in which the Appellate Division held that an attorney was the defendant-client's agent even though the client denied having knowledge of or control over the attorney's actions.[1726] It held that a lawyer's activities in attempting to secure a judgment favorable for its client naturally are conducted for the client's benefit.  Where a client effectively delegates certain tasks to an attorney, the "attorney has the implied authority to take all steps necessary in an action which he has been hired to bring."[1727]  Indeed, "[a] company [or individual] cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise to a legal dispute."[1728]

That Donziger acted for the LAP Representatives' benefit is without question.  All of the actions he took in New York relating to the Ecuador litigation and pressure campaign were

---

[1724]   *See supra note* 1304.

[1725]   32 A.D.2d 422, 302 N.Y.S.2d 961 (2d Dep't 1969).

[1726]   *Id.* at 425.

[1727]   *Id.* at 426.

[1728]   *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004).

449

designed to secure a substantial judgment in their favor.  Although the LAP Representatives did not

consent to or control case management and strategy minutiae, their views were considered through

the Assembly, which "me[]t on a regular basis and [] monitor[ed] the lawsuit and [] work[ed] with

the lawyers to make [the affected communities'] views known about how they thought the lawsuit

should be litigated, or whatever issues that they wanted to express . . . ."[1729]  Moreover, the LAP

Representatives repeatedly testified that they "trusted their attorneys" and delegated tasks, including

fundraising and hiring, to those attorneys.[1730]  They cannot now disclaim responsibility for the

actions that those attorneys took on their behalf and in their interest.[1731]

       The LAP Representatives' very retention of Donziger constituted transacting business

in New York.[1732]  That their retainer agreement and numerous other agreements to which they are

parties contain New York governing law clauses further demonstrates that the LAP Representatives

transacted business in the state and availed themselves of the benefits and protections offered by

---

[1729]
       Tr. (Donziger) 2635:11-22.

[1730]
       Camacho Dep. Tr. at 94:12-14, 105:20-22, 108:23-24, 133:20-21, 196:8-11, 219:18-20; J. Piaguaje Dep. Tr. at 53:24-54:3.

[1731]
       The LAP Representatives argue that any fraudulent actions that Donziger took were not and could not have been in their interest.  First, not all of the relevant actions that Donziger took in New York in and of themselves were illegal.  More importantly, the LAPs effectively gave Donziger, Fajardo, and their other lawyers carte blanche to do as they saw fit.  Tr. (J. Piaguaje) 2388:23-2389:1 ("Q. You approved of each and every one of the actions undertaken by Mr. Fajardo in all the courts in which he represented you, correct? A. Yes.").  Those attorneys endeavored unwaiveringly to obtain the money damages and remediation that their clients sought.  To the extent that those clients buried their heads in the sand and did not ask questions of their attorneys, they cannot now use their past indifference to means to escape accountability for their part in the fraud.

[1732]
       *Cf. Fischbarg*, 38 A.D.3d at 273.

450

New York's laws.[1733]  Additionally, they took repeated advantage of New York law and New York courts.  Filing suit in New York in the *Aguinda* case, suing to enjoin the BIT arbitration, and appearing in the New York 1782 actions qualify also as transacting business in the state under the reasoning of *SEC v. Softpoint*.[1734]

Moreover, the LAP Representatives conducted business in New York and enjoyed the advantages offered by its position as the largest city in the United States and the center of the country's financial system.  Donziger's work principally was done here.  His associates worked out of his kitchen.  He had multiple bank accounts in New York in which funds to support the litigation were deposited and from which payments to lawyers and for expenses were made.  He spent a considerable amount of his time in New York, conducting the Stratus operation and pressure campaign, among activities, at least in part from New York.  And it is no coincidence that Donziger conducted many of his litigation, fundraising, and public relations activities from and in New York.  That he recruited investors, lawyers, and experts in and from New York shows not only that New York was central to the case because Donziger was located here, but also because many of those investors and lawyers themselves were located in New York.  Understanding the unique role that New York state and local officials could play in influencing the company, he arranged for the state's attorney general and the city comptroller to exert pressure on Chevron.

There can be no serious doubt that the LAP Representatives transacted business in New York.  Donziger was not merely a lawyer hired by an out-of-state resident to prosecute or defend litigation in a New York court or, for that matter, to do so elsewhere.  These defendants

---

[1733]  *Cf. Sunward*, 362 F.3d at 23.

[1734]  2012 WL 1681167, at *3.

engaged Donziger to run litigation in Ecuador, New York, and elsewhere.  They explicitly designated him as their U.S. Representative.  They put him in charge of raising  money to finance the operation over a period of years; to plan and execute complex public relations and lobbying strategies in New York, elsewhere in the United States, and abroad; and to select and hire all manner of non-legal advisors, experts and service providers.

> ii.     *The Claims in This Suit Arise Out of the Transaction of Business in New York*

Having found that the LAP Representatives transacted business in New York, the Court turns now to whether that transaction of business arises out of the claims asserted in this action.  Unquestionably, it does.

The nexus here is greater than that in *PDK* and at least equivalent to that in *Licci.* Chevron's fraud claims arise out of many of Donziger's activities in New York, including orchestrating the Cabrera Report, retaining Russell and later misusing his work, recruiting Berlinger, coordinating and supervising Stratus, supervising the Ecuadorian lawyers, meeting with Shinder concerning his Section 1782 representation, drafting and editing Fajardo's misleading declaration in the Section 1782 proceedings, work on the Invictus Memo, and engaging in a public relations pressure campaign against Chevron.  And much like in *Licci*, Donziger's maintenance and use of New York bank accounts was essential to support the very operation that proximately caused Chevron's injury.  The alleged fraud does not, as the LAP Representatives suggest, arise solely out of the bribe, ghostwriting, or other actions that took place exclusively in Ecuador.

This action arises as well out of the *Aguinda* action, action to enjoin the BIT arbitration, and Section 1782 proceedings in which the LAP Representatives appeared as well.  The

452

facts here loosely are analogous to those in *Softpoint*, where this court held that personal jurisdiction was proper in an action to enforce a judgment against the party who brought the original action. Past litigation in this forum forms a part of Donziger and the LAPs' overall strategy to secure the judgment against Texaco/Chevron which Chevron now challenges.  The *Aguinda* litigation raised the same principal factual allegations as the Ecuador litigation that ultimately gave rise to the fraudulently obtained judgment.  In the action to enjoin the BIT arbitration, the LAPs sought to have the Court enjoin Chevron from collaterally attacking the Ecuador litigation through arbitration. Chevron's claims here form part of the same protracted legal battle to obtain relief from the fraudulent judgment in Ecuador.  Finally, the Section 1782 proceedings represent Chevron's attempt and the LAPs' strenuous efforts to avoid producing inculpatory documents from Berlinger and Donziger.  The facts ultimately uncovered in the documents that Berlinger and Donziger did produce are central to the issues in this case.

> For all these reasons, the LAP Representatives' claims in this action arise out of their extensive transaction of business in New York since 1993 and extending up to and beyond commencement of this lawsuit.  Jurisdiction is proper under Section 302(a)(1).[1735]

### 3.    Due Process

The Court still must determine that exercising jurisdiction over the LAP representatives comports with the constitutional requirements of fair play and substantial justice.[1736]

---

[1735]

Chevron argues also that the Court has general personal jurisdiction over the LAP Representatives under CPLR Section 301.  In view both of the sanctions ruling and the strength of showing of personal jurisdiction under Section 302(a)(2), the Court declines to address that argument.

[1736]

The Second Circuit in *Licci* observed that it would be anomalous if the court were to find that the due process requirements were not met in a case in which personal jurisdiction

453

Such a determination rests on whether the defendants have had adequate minimum contacts with the forum state and whether exercising jurisdiction over them would be reasonable.

The Court first must consider the nature and quality of the defendants' contacts with the forum state based on the totality of the circumstances. It is said that "[w]here the claim arises out of, or relates to, the defendants' contacts with the forum – i.e., specific jurisdiction [is asserted] – minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."[1737] The Court has found already that Chevron's claims arise out of the LAP Representatives' contacts with New York. It has found that the LAP Representatives purposefully have availed themselves of the benefits of New York and its laws and could foresee being haled into court here. Having brought or joined in multiple lawsuits in this jurisdiction spanning many years and having secured legal representation plus public relations and fundraising services from an agent dedicated solely to their cause demonstrates their purposeful availment of the forum state and this action's foreseeability.

Next, the Court considers whether exercising jurisdiction would comport with fair play and substantial justice.[1738] Relevant considerations here include "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the

---

[1737]    existed under N.Y. CPLR 302(a)(1). *See Licci*, 732 F.3d at 170.

*Id.* (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)) (alterations in original).

[1738]    *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

454

interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."[1739] As to the first prong, the Second Circuit has recognized that "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."[1740]

      The LAP Representatives' primary due process argument against the exercise of jurisdiction is that they have been disadvantaged in this litigation because they were unable to obtain testimony or documents from Fajardo, Yanza, Sáenz and Prieto.[1741]  Fajardo, Sáenz, and Prieto are the LAP Representatives' lawyers.  In fact, Fajardo sought an extension of time on their behalf in this case[1742] and is their attorney-in-fact under broad powers of attorney.  Yanza is their case coordinator.  Yet, through three years of litigation, the LAP Representatives have evidenced not the slightest interest in procuring the testimony of these individuals or the relevant documents they possess in Ecuador.  They did not seek their depositions or the evidence they possess, either through this Court or through letters rogatory.  They did not revoke Fajardo's power of attorney.[1743]  There is no evidence that they threatened to fire them if they would not cooperate.  They simply did

---

[1739]

      *Chloe*, 616 F.3d at 164 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113–14 (1987)).

[1740]

      *Bank Brussels*, 305 F.3d at 129-30 (internal quotation marks omitted).

[1741]

      DI 1851 (LAP Reps.' Post-trial Mem. of Law), at 17-18.

[1742]

      DI 127, DI 128.

[1743]

      Tr. (J. Piaguaje) 2387:23-2388:3.

nothing.  They did nothing because their lawyers and advisers concluded that participation in this case by Fajardo, Sáenz, Prieto and Yanza would hurt far more than it could help, if indeed it would help at all.  The idea that the LAP Representatives were disadvantaged by litigating in New York because their own lawyers would not cooperate with them is absurd.

Finally, the fact that New York is a long way from Ecuador avails the LAP Representatives not at all.  Piaguaje appeared regularly in court during the trial.  Moncayo and Humberto Piaguaje, witnesses whom the defendants thought would be helpful, had no trouble coming here, just as Donziger has had no trouble going to Ecuador on a monthly basis for years. Fajardo has come to the United States in general and New York in particular on several occasions.

The exercise of personal jurisdiction over the LAP Representatives would be entirely consistent with the Due Process Clause even if the LAP Representatives had not forfeited their personal jurisdiction defenses.

IX.     *The Other Affirmative Defenses*

A.     *The Judicial Estoppel Defense is Without Merit*

Donziger argues in substance that Chevron is judicially estopped to proceed with this case because it allegedly agreed in *Aguinda* to being sued in Ecuador, offered to satisfy any judgment rendered there except in limited circumstances, and extolled the supposed virtues of the Ecuadorian legal system in order to procure the *forum non conveniens* dismissal.[1744]  He simply ignores the fact that Chevron was not a party to *Aguinda*, proceeding instead on the basis of the obvious inaccuracy.  The LAP Representatives make essentially the same argument, although they

---

[1744]     DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 55-57.

456

in some but not all places in their brief recognize that Texaco – not Chevron – was the defendant in *Aguinda* and argue that Chevron is bound by Texaco's alleged promises.[1745]

The judicial estoppel argument is both shopworn and unsupported by sufficient facts. It was made and rejected in the Count 9 Action in an extensive opinion.[1746]  Defendants have made no effort whatever to address that decision.  There is no need to cover again the ground covered there.  But there are three points that warrant mention.

*First*, for reasons previously set forth, the statements concerning the characteristics of the Ecuadorian courts, even if binding on Chevron, pertained to an entirely different time period and entirely different circumstances and thus could not be controlling here.

*Second,* the principal basis of the attempts to bind Chevron to statements allegedly made by Texaco was the proposition that Chevron "merged" with Texaco and therefore succeeded to its obligations.  Alternatively, it depends heavily on piercing the corporate veil or otherwise disregarding the separate corporate existence of Texaco, which now is an indirect subsidiary of Chevron.

The record in this case establishes, and the Court finds, that Chevron did not merge with Texaco.  To the contrary, "[o]n October 9, 2001, Texaco Inc. merged with a wholly-owned subsidiary of Chevron Corporation, Keepep Inc., and emerged from that transaction as the surviving corporation and a direct subsidiary of Chevron.[1747]   After 2001, however, Texaco continued

---

[1745]   DI 1851 (LAP Reps.' Post-trial Mem. of Law), at 33-38.

[1746]   *Chevron v. Salazar*, 807 F. Supp. 2d 189 (S.D.N.Y. 2011).

[1747]   The LAP Representatives persist, in the face of the evidence, falsely to assert that Chevron merged with Texaco.  DI 1851 (LAP Reps.' Post-trial Mem. of Law), at 34 ("Texaco merged with Chevron").

operating independently of Chevron; and it has been maintained as a separately-constituted corporation ever since."[1748]   Moreover, despite the Court's observations in the prior decision that defendants had not alleged any basis for disregarding Texaco's separate corporate existence and that the key facts relating to such an argument were disputed,[1749] defendants neither alleged nor proved any such basis at trial.   Indeed, defendants failed even to cross-examine the Chevron witness, Reis Veiga, who testified about Chevron's acquisition of the shares of Texaco through a reverse triangular merger, which left Texaco as the surviving company, concerning any of these matters.   Accordingly, the Court holds that (1) Chevron is not bound by any of the statements made in *Aguinda* by Texaco and relied upon by defendants by virtue of any merger, and (2) defendants failed to establish any basis for disregarding the separate corporate existence of Texaco and attributing the statements relied upon to Chevron.[1750]

---

Donziger's post-trial memorandum is slightly less inaccurate but misleading nonetheless. It states that "Texaco became a wholly owned subsidiary of Chevron in 2001 and, between 2001-2005 the combined company was known as ChevronTexaco."   DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 7 n.12.   The first part of the sentence is consistent with the facts but also is inconsistent with any merger of Texaco and Chevron – merged companies do not become parent and subsidiary.   The second part of the sentence seeks to imply that a parent company and a wholly owned subsidiary are a "combined company" and that the parent is liable for the debts and obligations of the subsidiary.   That of course is not so unless the corporate veil is pierced or the separate corporate existence of the subsidiary is disregarded on another basis.   Moreover, there is no evidence that any "combined company" ever was known as ChevronTexaco.   *Supra note* 426.

[1748]

PX 3000 (Reis Vega Direct) ¶ 8.

[1749]

*Chevron v. Salazar*, 807 F. Supp. 2d at 193, 196, 198.

[1750]

This Court referred also to the fact that the panel in *Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384 (2d Cir. 2011), which had been misinformed that Texaco had merged into Chevron and that Chevron was the surviving company, stated that "lawyers from Chevron-Texaco" had reaffirmed Texaco's statements.   *Chevron v. Salazar*, 807 F. Supp. 2d at 197 n.23.   As this Court pointed out, the lawyers in question were Messrs. Veiga and Timms, whose names appeared on Texaco's brief in *Aguinda*.   As the Court further noted, they had

458

*Third*, the Texaco statements upon which defendants rely were made in briefs and declarations in *Aguinda* and were to the effect (1) that the Ecuadorian courts were neither corrupt nor unfair and, allegedly, (2) that Texaco would satisfy any judgment for plaintiffs, reserving its right to contest its validity in the circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act.[1751]

The allegation that Texaco promised that it would satisfy any judgment for the plaintiff as indicated above mischaracterizes the record and what actually transpired.

We start with the most recent.  Donziger's post-trial memorandum leads into this subject with the following statements:

> "To obtain dismissal, Chevron then 'unambiguously agreed in writing to being sued on [the plaintiffs'] claims (or their Eucadorian equivalent) in Ecuador.  *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001) . . . .  Sure that it would prevail in Ecuador, Chevron 'also offered to satisfy any judgments in Plaintiffs' favor, reserving its right to contest their validity *only in the limited circumstances* permitted by New York's Recognition of Foreign Country Money Judgments Act.' *Id.* (emphasis added)."[1752]

In fact, the language he quoted about a promise to satisfy any judgments does not appear in Judge Rakoff's cited decision.  It comes from somewhere else.  Here is what actually happened.

---

been with Texaco for years before the Chevron transaction.  Even assuming that they were Chevron employees at the time of the *Aguinda* appeal, they acted as attorneys for Texaco and their statements as Texaco's attorneys did not bind Chevron.  *Id.*  In any case, the evidence at this trial showed, and the Court finds, that Reis Veiga, at least, was an employee of Texaco, not Chevron, in 2001 when the *Aguinda* appeal was decided.  PX 3000 (Reis Veiga Direct) ¶ 7.

[1751]  *See* DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 55-56; DI 1851 (LAP Reps.' Post-trial Mem. of Law), at 33-35.

[1752]  DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 55-56 (emphasis in original).

459

Texaco did initially offer to make satisfaction of any judgment.  One of a package of proposed conditions of the *forum non conveniens* dismissal it sought, subject to its rights to contest in some circumstances such a judgment.[1753]  Defendants have offered no evidence that they accepted that offer or that any court relied upon any such proposal or promise.  Certainly neither Judge Rakoff in granting the *forum non conveniens* dismissal, nor the Second Circuit in substantially affirming it, did so.[1754]  Indeed, the stipulation that the *Aguinda* parties signed to evidence

[1753]

Texaco Mem. in Support of Renewed Motion to Dismiss at 12-13, *Aguinda v. Texaco Inc.*, 93 Civ. 7527 (JSR) (S.D.N.Y. filed Jan. 11, 1999).  A copy of a portion of this filing, which appears to be missing from the court file (which antedated electronic filing), is PX 8004.

It should be noted also that the memorandum described the offer in general terms and referred for the precise language to certain appendices.  *Id.* at 13 n.7.  The appendices do not appear to be in the record of this case, and the Court has not located them in the record of *Aguinda*.  Texaco's *Aguinda* reply memorandum, however, stated the offer as having been "to satisfy any judgment in plaintiffs' favor, reserving its right to contest their validity only in the limited circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act."  PX 8007 (Excerpt of Texaco Reply Mem. in Support of Renewed Motion to Dismiss, *Aguinda v. Texaco Inc.*, 93 Civ. 7527 (JSR), DI 142 (S.D.N.Y. filed Jan. 25, 1999)), at 3.

[1754]

*Aguinda v. Texaco Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001) (relying only on agreements to being sued on the claims asserted, to accept service of process, and to limited waiver of statute of limitations); *Aguinda v. Texaco Inc.*, 303 F.3d 470 (2d Cir. 2002) (the one respect in which the Circuit modified the order was to expand the duration of the limited limitations waiver from 60 days to one year).  *Id.* at 478-79.  It did not even mention the conditions relied upon by Judge Rakoff.

As noted in *Chevron Corp. v. Salazar*, 807 F. Supp.2d 189 (S.D.N.Y. 2011), the Court is aware that a footnote in *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011), while recognizing that Judge Rakoff had not expressly adopted Texaco's offer, stated that he implicitly did so by granting the *forum non conveniens* dismissal.  638 F.3d at 389 n.4.  For reasons stated there, that observation was *dictum* with which this Court respectfully disagrees.  *See* 807 F. Supp. 2d at 196-98.  Nothing turns on this difference of view, however, for reasons discussed in the ensuing text.

460

satisfaction of the conditions, a prerequisite to the *forum non conveniens* dismissal, contained no promise to satisfy any Ecuadorian judgment.[1755]  Hence, there could be no judicial estoppel.

But let us assume *arguendo* that Texaco's offer had been accepted, or that the court had relied upon it in granting the dismissal, and that Chevron stands in Texaco's shoes to that extent. Even on those generous assumptions, the judicial estoppel argument would fail.  A promise to satisfy any Ecuadorian judgment, subject to the right to contest it in the circumstances permitted by New York's Recognition of Foreign Country Money Judgments Act, would have preserved the right to contest the validity of any such judgment on any *ground* permitted by the New York Recognition Act in any forum, not merely to contest validity in an enforcement action brought in New York. Any other view would have rendered the reservation nonsensical, as it would have stripped Texaco of any defense to enforcement of a judgment on any ground anywhere in the world save in New York.[1756]  Indeed, that is precisely the view previously taken by the Circuit.[1757]

---

[1755] PX 8003 (Stipulation and order, *Aguinda v. Texaco Inc.*, 93 Civ. 7527 (JSR), DI 159 (S.D.N.Y. filed June 27, 2001)).

[1756] Moreover, if there were any ambiguity on that point, that ambiguity would raise a question of fact.  The Court finds that the reservation of rights to contest an Ecuadorian judgment limited only the grounds on which such a judgment could be contested and limited those only to grounds permitted by the New York Recognition Act.  It did not limit the venues in which or procedural vehicles by which any such judgment could be attacked.

[1757] *Republic of Ecuador*, 638 F.3d at 397 ("Chevron has thus reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the Ecuadorian judicial system 'does not provide impartial tribunals or procedures compatible with the requirements of due process of law,' that the judgment itself 'was obtained by fraud,' or that 'the proceeding in [Lago Agrio] was contrary to an agreement between the parties.' [citation omitted] Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses.").

461

As Chevron's arguments here all would be defenses to enforcement of the Judgment under the New York Recognition Act, there could be no estoppel even if Texaco had made the promise inaccurately attributed to it, and even if Chevron were bound by it.[1758]

### B.   Defendants Have Abandoned All Other Pleaded Affirmative Defenses, Which in Any Case Lacked Merit

The defendants' answers contained long lists of purported affirmative defenses, most of them pleaded in conspicuously conclusory terms.[1759]  Apart from those dealt with above, defendants' closing arguments and post-trial briefs mentioned none of them, with the exception that the LAP Representatives' post-trial memorandum argues that Chevron's amended complaint failed to allege fraud with the particularity required by Fed. R. Civ. P. 9(b).[1760]  Nor, with the exception of a supposed unclean hands defense, was any evidence introduced to prove them.  Accordingly, the pleaded affirmative defenses not dealt with above are rejected on the grounds that they have been abandoned and in any case would be unsupported by sufficient credible evidence.[1761]  We pause here only to address, briefly, the Rule 9(b) argument and the lack of merit of the unclean hands defense.

---

[1758]  The LAP Representatives' equitable estoppel argument is entirely without merit.

[1759]  DI 307 (Donziger Defs.' Answer); DI 311 (LAP Reps.' Answer).

[1760]  DI 1851 (Lap Reps.' Post-trial Mem. of Law), at 25.

[1761]  E.g., Harbison v. Little, 723 F. Supp. 2d 1032, 1038 (M.D. Tenn. 2010) (collecting cases); United States v. Livecchi, 605 F. Supp. 2d 437, 451 (W.D.N.Y. 2009) aff'd, 711 F.3d 345 (2d Cir. 2013); U.S. Surgical Corp. v. Hosp. Products Int'l Pty. Ltd., 701 F. Supp. 314 (D. Conn. 1988) ("Insofar as any claim or defense urged by the defendant is founded upon a particular prior art reference to which sufficient reference is not made in the  post-trial brief, such claim or defense is deemed abandoned."); see also K & N Eng'g, Inc. v. Spectre Performance, EDCV 09-01900-VAP, 2011 WL 6133258, at *10 (C.D. Cal. Dec. 8, 2011).

### 1.    Rule 9(b)

Donziger made no Rule 9(b) argument before trial and makes none now.  The LAP Representatives, however, moved before trial for judgment on the pleadings dismissing the amended complaint[1762] and made a brief Rule 9(b) argument as part of that motion,[1763] which the Court denied in relevant part long ago.[1764]  They now contend that Chevron waived at least part of its fraud claims because the amended complaint did not comply with the particularity requirement of Rule 9(b).[1765]

At no point during the trial did any of the defendants object to the receipt of any evidence on the ground that any lack of specificity in the amended complaint surprised or prejudiced them.  Nor did they seek a continuance during trial to meet any allegedly unexpected evidence. Indeed, no such application would have been persuasive, as the LAP Representatives knew Chevron's contentions inside and out from extensive discovery, the pretrial orders, and four voluminous motions for partial summary judgment.

---

[1762]

DI 600 (LAP Reps. Mot. for Judgment on the Pleadings).

[1763]

DI 601 (LAP Reps. Mem. of Law), at 19-24.

The principal point of the Rule 9(b) argument was that the complaint did not sufficiently allege any misstatements by Camacho and Piaguaje.  It argued also that it did not sufficiently allege proximate cause, but allegations of causation are not covered by Rule 9(b) because they are not "circumstances constituting fraud."  *See, e.g.*, *Wilamowsky v. Take–Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 753 n.7 (S.D.N.Y. 2011) (collecting cases).

[1764]

DI 634 (Nov. 27 2012 Memo. Endorsement).

[1765]

DI 1851 (LAP Reps.' Post-trial Mem. of Law), at 25-29.

In these circumstances, the LAP Representatives' Rule 9(b) argument is baseless. The notice and other functions of the rule were more than served here.[1766]  Moreover, Rule 15(b)(2) provides in relevant part that "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  Given the lack of any objection to proof at trial based on any Rule 9(b) deficiency and the lack of any claim of consequent surprise or prejudice, all of the issues were tried by consent even if all were not specifically raised in the pleadings.  Indeed, the complaint in these circumstances became irrelevant as to any such issues.[1767]  In any case, the amended complaint is deemed amended to conform its allegations to the proof.[1768]

---

[1766]

To the extent the LAP Representatives suggest otherwise, the suggestion is frivolous. "Whether a complaint complies with the Rule, . . . depends 'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.' *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004) (internal quotation marks omitted). In particular, 'where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.' *Id.*; *see United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 509–10 (6th Cir. 2007); *State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 237 (E.D.N.Y. 2008); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 (S.D.N.Y. 2004); *Cardiac Devices*, 221 F.R.D. at 333 (collecting cases); *United States ex rel. Franklin v. Parke–Davis*, 147 F. Supp. 2d 39, 47 (D. Mass. 2001)." *United States v. Wells Fargo Bank, N.A.*, ___ F. Supp.2d ___, No. 12 Civ. 7527 (JMF), 2013 WL 5312564, at *16 (S.D.N.Y. Sept. 24, 2013).  In the circumstances of this case, the amended complaint complied with Rule 9(b).

[1767]

*See Torry v. Northrup Grumman Corp.*, 399 F.3d 876, 878 (7th Cir. 2005); 3 MOORE'S FEDERAL PRACTICE ¶ 15.18[1] (3d ed. 2013); *see also Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 636 (9th Cir. 2002) (parenthetical).

[1768]

"Even when a party does not move for leave to amend, a court may constructively amend pleadings on unpleaded issues in order to render a decision consistent with the trial." 3 MOORE'S FEDERAL PRACTICE ¶ 15.18[3], at 15-95.

2. *Unclean Hands*

The defendants all pleaded, albeit Donziger only in conclusory terms, that Chevron's claims were barred by alleged unclean hands.[1769]  The LAP Representatives opened on it at trial.[1770]  All defendants relied upon it, at one time or another, in urging the relevancy of evidence.[1771]  But the pleaded defense disappeared from the case when the defendants barely even mentioned it in their post-trial submissions.[1772]  Accordingly, they abandoned it.  In any case, it is well established that unclean hands is not a defense to fraud on the court.[1773]  Nevertheless, it is appropriate to find also

---

[1769]

DI 307 (Donziger Defs.' Answer), at 71; DI 311 (LAP Reps.' Answer), at 91.

That defense was dismissed in part in the Count 9 Action, *Chevron Corp. v. Salazar*, No. 11 Civ. 3718 (LAK), 2011 WL 3628843, at *6-10 (S.D.N.Y. Aug. 17, 2011).  To the extent the dismissal was on the sufficiency of the defense generally (as opposed to its alleged applicability to legal and declaratory claims), the ruling is entirely applicable here, as the pleadings in the Count 9 Action and this case are the very same documents.

[1770]

Tr. (Opening) 40:20-41:1.

[1771]

Tr. (Reis Veiga) 91:25-94:10, 143:8-149:12, 150:8-152:15; Tr. (Callejas) 807:9-809:19; Tr. 1944:22-1945:20.

[1772]

The only explicit mention of the defense is in a footnote in the LAP Representatives' initial trial brief in which they state: "Similarly, the Lago Agrio Plaintiffs reserve the rights to brief the unclean hands defense if and when Chevron makes plain the specific nature of the equitable relief it seeks."  DI 1851 (LAP Reps. Post-trial Mem. of Law), at 30 n.8.  Defendants in their reply brief make factual assertions that could be intended to support this defense, but nowhere do they state specifically any such intent.

[1773]

12 MOORE'S FEDERAL PRACTICE § 60.21(4)(i); *see Martina Theatre Corp. v. Schine Chain Theatres, Inc.*, 278 F.2d 798, 801 (2d Cir. 1960) (dictum).

465

that there was no credible evidence to support any such defense even if it had been pressed and even if proof of unclean hands would have been a defense in this case.[1774]

The one point upon which the Court thinks it appropriate to elaborate in this final regard is the defendants' claim with respect to the so-called Nuñez bribe scandal.  The gist of the assertion is Chevron, through Diego Borja, an employee of one of its contractors, schemed to have Judge Nuñez removed from the case.[1775]  The allegation, however, has not been proved.

It is undisputed that in May and June of 2009, Borja had a series of secret videotaped meetings with Judge Nuñez and Patricio Garcia, who was affiliated with the Republic of Ecuador's ruling party,[1776] in which they discussed the Ecuador litigation.[1777]  Borja later provided the tapes to

---

[1774]

Defendants' other factual allegations of Chevron misconduct that could be construed to support an unclean hands defense relate to (1) the *Aguinda forum non conveniens* dismissal, (2) the Section 1782 proceedings, (3) the inspection of the Guanta site, (4) *ex parte* meetings with Ecuadorian judges, (5) lobbying efforts in the United States and Ecuador, and (6) Chevron's litigation tactics.  The record does not support a finding of unclean hands as to any of these allegations.

[1775]

DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 15.

Borja in 2009 worked for a company called InterIntelg, which "was a contractor for . . . Texaco."  Borja Mar. 15, 2011 Dep. Tr. at 59:7-15.

[1776]

DX 31 (Aug. 31, 2009 Ltr. from T. Cullen to W. Pesantez), at 1 ("Patricio Garcia Ortega [was] a political coordinator for Alianza País.").

[1777]

*See* PX 2531 (Excerpts of video of May 11, 2009 Meeting between Carlos Patricio Ortega, Aulo Gelio Servio Tulio Ávila Cartagena, Pablo Almeida, Rubén Darío Miranda Martínez, and Diego Borja); PX 2531A (Transcript of Same); PX 2532 (Excerpts of video of May 15, 2009 Meeting between Judge Juan Evangelista Nuñez Sanabria, Aulo Gelio Servio Tulio Ávila Cartagena, Pablo Almeida, Wayne Douglas Hansen, and Diego Fernando Borja Sanchez); PX 2532A (Transcript of Same); PX 2533 (Excerpts of video of June 5, 2009 Meeting between Judge Juan Evangelista Nuñez Sanabria, Juan Pablo Novoa Velasco, Diego Fernando Borja, and Wayne Hansen); PX 2533A (transcript of same).

466

Chevron, which turned them over to the Republic of Ecuador[1778] and released them publicly in August 2009.[1779]

   Chevron claimed that the recordings showed that Judge Nuñez was implicated in a $3 million bribery scheme and would rule against the company.[1780]  Donziger and the LAPs, in turn, accused Chevron of attempting to entrap Judge Nuñez in a bribery scandal and "undermine the trial process so the company c[ould] avoid paying a judgment."[1781]

   The effect of these public pronouncements were many.  Borja and his wife relocated to the United States, seeking asylum out of fear that they would be persecuted by the ROE for Borja's involvement.[1782]  Once in the United States, Chevron paid for Borja's and his wife's living expenses for at least two years.[1783]  In addition, Judge Nuñez recused himself from the case.[1784]

   Defendants now hold fast in their claim that Chevron created the scandal in an attempt to disqualify Judge Nuñez.

---

[1778]

   DX 31 (Aug. 31, 2009 Ltr. from T. Cullen to W. Pesantez).

[1779]

   DX 30 (Chevron Aug. 31, 2009 Press Release).

[1780]

   *Id.*

[1781]

   PX 2524 (Sept. 1, 2009 Email from S. Donziger to S. Donziger), at 3.

[1782]

   Borja Mar. 15, 2011 Dep. Tr. at 21:12-16; PX 2527 (U.S. Dep't of Homeland Security Asylum Record for D. Borja).

[1783]

   Borja Mar. 15, 2011 Dep. Tr. at 24:14-25:1.

[1784]

   PX 2525 (Nuñez Recusal Motion).

467

As an initial matter, defendants point to Borja's one-time position as a contractor for the company and Chevron's later financial support of Borja in contending that Chevron put Borja up to the scheme that resulted in the recorded conversations.  But the fact that Borja once worked for a contractor used by Chevron is not persuasive evidence that he acted at the company's behest when he recorded the meetings in question.  Likewise, Chevron's payments to Borja upon his arrival in the United States suggest that the company had some interest in him as a witness.  But they do not prove that Chevron was involved in or even knew of his efforts with respect to  Judge Nuñez until after the fact.

Defendants next rely on recorded statements Borja made to his friend, Santiago Escobar, in which Borja purportedly admitted that the bribe scheme was illusory.  But the recordings of Borja speaking to Escobar are inadmissible hearsay.[1785]  And while defendants initially claimed that they intended to call Escobar at trial, they never did so.

Finally, defendants are correct that the recordings of the meetings with Judge Nuñez and others do not conclusively demonstrate that Judge Nuñez was offered or accepted a bribe, although they do show that a bribe was discussed outside of his presence and that Judge Nuñez made several statements that at least arguably indicated his intention to rule for the LAPs.[1786]  But Chevron's misunderstanding or even misrepresentation of the content of the conversations would

---

[1785]
Even if the recordings were not hearsay, they would not get defendants where they wish to go.  Although Borja claimed that the bribe scheme was a set up, he did not say that Chevron knew about it or was involved in it in any way.  PX 1200 (Email from A. Goelman to S. Donziger, J. Kohn, W. Taylor, J. Hall re: "The Escobar-Borja tapes"), at 1-2; *see* DX 39-57 (Borja-Escobar Recording Transcripts).

[1786]
*E.g.*, PX 2534A (June 22, 2009 Borja Recording), at 2-3, 5-9; PX 2533A (June 5, 2009 Borja Recording), at 16 ("In the ruling I say that so many millions have to be issued for remediation every month.").

468

not show unclean hands, which requires "a transgress[ion of] equitable standards of conduct"[1787] that has an "immediate and necessary relation to the equity that the [plaintiff] seeks in respect of the matter in litigation."[1788]   Even a deliberate misrepresentation of the content of the tapes, and the defendants have failed to prove that, would not remotely have approached in gravity the misconduct by the defendants proved in this case.   This is particularly so in light of the fact that Chevron released the tapes to the ROE and the public, which were in a position to reach their own conclusions about what the tapes did and did not prove.

In the last analysis, the defendants have adduced no admissible evidence that Chevron committed a "willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct."   Indeed, the LAPs' own investigator concluded that "it seems clear from the tapes that Chevron is telling the truth when they claim not to have instructed Borja to make the first 3 tapes and not to have even known about these conversations until June" 2009, after the events occurred.[1789]

---

[1787]    *Holm v. First Unum Life Ins. Co.*, 7 F. App'x 40, 41 (2d Cir. 2001) (alteration in original).

[1788]    *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (alteration in original).

[1789]    PX 1200 (Email from A. Goelman to S. Donziger, J. Kohn, W. Taylor, J. Hall re: "The Escobar-Borja tapes"), at 1.

469

X.      Relief

     A.      *Chevron Has No Adequate Remedy at Law and is Threatened With Irreparable Injury*

        Chevron has suffered injury – and is threatened with additional and irreparable injury – in consequence of defendants' fraud and their efforts to enforce the Judgment that they fraudulently obtained.  It has no adequate remedy at law.

        Defendants resist this conclusion.  Donziger argues that there Chevron has other remedies that could result in modification or vacatur of the Judgment.  Donziger and the LAP Representatives all contend that Chevron may raise its claim that the Judgment was procured by fraud wherever and whenever they seek to enforce the Judgment.[1790]  These contentions are baseless.

     1.      *Further Proceedings in Ecuador, If Any Even Theoretically Were Available, Would Offer No Adequate Remedy*

        Donziger claims that  "Chevron has had, and continues to have, available remedies in Ecuador by which the judgment could be modified or vacated, including appeal to the Constitutional Tribunal."[1791]  The claim is unpersuasive.

        The Court understands and assumes that there is a theoretical possibility of review – limited to "fundamental constitutional rights violations" – by the Constitutional Court of Ecuador.[1792]  But the possibility of such review is not adequate for at least two reasons.

---

[1790]    DI 1851 (LAP Reps.' Post-trial Mem. of Law ), at 40; DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 59-61.

[1791]    DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 60.

[1792]    DI 134 (Coronel Aff.) ¶ 2.

470

*First*, Ecuador does not provide impartial tribunals or procedures compatible with due process in cases of this nature.  The evidence of political control of the Constitutional Court is highly persuasive and that of the partiality of the political branches to the LAPs irrefutable. Moreover, Donziger for years has described Ecuadorian judges as "corrupt,"[1793] "not very bright,"[1794] and "utter[ly] weak[]."[1795]  He has made clear that the entire judiciary is beholden to the executive, that "this [case] is a political battle that's being played out through a legal case," and that one cannot win the legal case without politics on its side.[1796]  When President Correa took office, Donziger bragged that the LAP team had gotten politics firmly on its side.[1797]  Donziger's contention that Chevron may not obtain relief from this Court because there are remedies available to it in Ecuador is ironic and without merit.[1798]

*Second*, the Judgment has been enforceable in Ecuador, and elsewhere, at least since the intermediate appellate court ruled.  Assets already have been seized in Ecuador.  Given the size of the Judgment and the comparative impecuniousness of the defendants, there is no assurance that Chevron could recoup property applied to the Judgment between now and any decision by the

---

[1793]

     PX 9A (Mar. 30, 2006 *Crude* Clip).

[1794]

     PX 179 (Donziger Notebook), at 3.

[1795]

     PX 7A (Mar. 30, 2006 *Crude* Clip), at CRS-053-02-CLIP-04.

[1796]

     PX 11A (Apr. 3, 2006 *Crude* Clip), at CRS060-00-CLIP-04.

[1797]

     PX 16A (Dec. 6, 2006 *Crude* Clip), at CRS138-01-CLIP-01x  (the LAPs have "gone basically from a situation where we couldn't get in the door to meet many of these people in these positions [in the government] to one where they're actually asking us to come and asking what they can do. . . .").

[1798]

     *Supra Discussion* § VII.C.

Constitutional Court even if it prevailed.  Defendants, moreover, have taken extensive steps to ensure that any funds recovered are held offshore and beyond the reach either of U.S. or Ecuadorian courts.[1799]

No other potential Ecuadorian remedy has been identified.  Any that may exist on paper would be inadequate for the same reasons.

### 2. *Defense of Multiple Enforcement Actions Would Not Provide An Adequate Remedy at Law*

Neither would defense of multiple enforcement actions provide Chevron an adequate legal remedy.

*First*, the LAP team's enforcement strategy contemplates attacks on Chevron, its assets, and subsidiaries in multiple jurisdictions outside the United States followed by proceedings here.[1800]  It already has sued in Ecuador, Argentina, Brazil, and Canada.  The Invictus Memo and other evidence makes clear that the enforcement battle will not be limited to these four actions.  The LAPs intend to pursue additional actions both abroad and in the United States.  Moreover, the purpose of this multi-jurisdictional attack is to "increase[] the odds of obtaining expedient and significant recovery, [and to] . . . keep[] Chevron on its heels."[1801]  Thus, the legal remedy the defendants tout is the defense of a multitude of lawsuits.  The multiplicity of suits, moreover, is entirely unnecessary and thus vexatious.  It is attributable in significant measure to the defendants'

---

[1799]

*See supra* note 1110.

[1800]

*See supra Facts* § VII.E.2**.**

[1801]

PX 1389 (July 10, 2010 Email Chain Between J. Tyrrell, S. Seidel, C. Bogart, and J. Molot), at 7.

472

desire to profit by the coercive effect of the added burden and risks thus imposed.  They certainly could have brought one enforcement action either in California or in Delaware, where Chevron is headquartered and incorporated, respectively, and been sure of collecting the entire Judgment if they prevailed without subjecting Chevron to the added burdens and risks of their strategy.

"The fact that there is [some] remedy at law, . . . does not preclude equitable relief."[1802]  Equitable relief is appropriate where a legal remedy is "incomplete and inadequate to accomplish substantial justice."[1803]  The defense of a multiplicity of suits – in circumstances like these – does not afford an adequate remedy.[1804]

*Second*, defense of multiple enforcement actions would not avert interim harm to Chevron even if it ultimately prevailed in every proceeding.  The LAPs seek to grab as many of Chevron's and its subsidiaries' assets as they can until the Judgment has been paid.  And even if Chevron were to win every enforcement action outside Ecuador, it would not be afforded complete relief.  Chevron's injuries go well beyond the Judgment itself – indeed, they include among other things the payment of legal fees to defend against the enforcement actions and harm to reputation and goodwill.  Success in the enforcement actions would not remedy these harms.

---

[1802]

*Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir. 1972).

[1803]

*Id.*

[1804]

*Lee v. Bickell*, 292 U.S. 415, 421 (1934); *Donovan v. Pennsylvania Co.*, 199 U.S. 279, 304 (1905); *see, e.g.*, *Bruce v. Martin*, 680 F. Supp. 616, 622 (S.D.N.Y. 1988).

473

3.       *Money Damages Are Not, and Could Not Have Been, an Adequate Remedy*

Finally, defendants contend that "any 'injury' Chevron *might* suffer could be remedied by money damages. . . . If the injury is that Chevron may have to pay on the judgment, that payment would be a monetary award that can be repaired in kind."[1805]

This argument does not withstand analysis. The LAP Representatives are indigenous people living in the Ecuadorian rainforest. Both they and Donziger repeatedly have cited their "lack of resources" as reasons to delay this action.[1806] Donziger's claim, in particular, is strikingly at odds with innumerable representations to this Court concerning his claimed lack of resources.[1807] In such circumstances, the theoretical availability of an action for damages is and always was entirely immaterial. As Justice Scalia has written, while economic injury usually "is not considered irreparable, . . . that is because money can usually be recovered from the person to whom it is paid. If the expenditures cannot be recouped, the resulting loss may be irreparable."[1808] That is this case.

---

[1805]

DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 60.

[1806]

DI 1197, at 6, 9; DI 1211, at 6, 9; DI 1370, at 3; DI 1415, at 3; DI 1442, at 4.

[1807]

*See e.g.*, Tr. (Donziger Closing) 2921:7-13 ("THE COURT: Suppose [Chevron] could have gotten a dollar-for-dollar judgment . . . . Against whom? Who is going to pay it? Mr. Donziger?" Donziger's counsel responded, "I don't think he has got that kind of money."); DX 1750 ¶ 127 (Donziger's claim that he was "operating under constant pressure of lack of resources"); Tr. (Donziger) 2619:6-23 (affirming statements to the Court about "lacking resources to defend in this case"); DI 1197, at 6, 9; DI 1211, at 6, 9; DI 1370, at 3; DI 1415, at 3; DI 1442, at 4.

[1808]

*Philip Morris USA Inc. v. Scott*, 131 S. Ct. 1, 4 (2010); Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 HARV. L. REV. 687, 716. (1990) ("Damages are no remedy at all if they cannot be collected, and most courts sensibly conclude that a damage judgment against an insolvent defendant is an inadequate remedy.").

474

\* \* \*

A final point.  The equitable relief the Court now grants would not provide a complete remedy for Chevron's injuries, existing and threatened.  It does not set aside the Judgment.  It does not enjoin foreign enforcement proceedings.  But that does not preclude the Court from granting equitable relief that would solve the problem in part.  Defendants have cited no authority standing for the proposition that equitable relief is unavailable if it does not provide a complete remedy to an injury that is not redressable at law.[1809]  That would make no sense at all.  It essentially would close the courts entirely to litigants who are threatened with injuries that are not compensable by money damages nor *wholly* preventable or redressable in equity.  The relief granted here – relief that would prevent Donziger and the LAP Representatives from profiting from the Judgment or seeking to enforce it in this country – would partially remedy and partially prevent the injuries, existing and threatened, that cry out for relief.  Certainly it is far better than pursuing fruitless claims for money damages against these three defendants.[1810]

---

[1809]

By contrast, the Supreme Court has instructed lower courts to take a flexible approach when determining whether to grant equitable relief. *Hecht Co. v. Bowles, supra*, 321 U.S. 321, 329 (1944) ("[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mo[]ld each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.")  When considering whether to grant equitable relief, courts should "balance[] the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v. U. S.*, 321 U.S. 414, 440 (1944).

[1810]

*See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) ("an injunction . . . is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief.").

B.    *Chevron Is Entitled to Equitable Relief Preventing These Three Defendants From Benefitting From the Fraud on the Court and Donziger From Profiting From the RICO Violations*

1.    *Constructive Trust*

Chief Judge (later Justice) Cardozo stated the governing principle years ago in words cited many times since:

> "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee (*Moore v. Crawford*, 130 U. S. 122, 128; Pomeroy Eq. Jur. sec. 1053)."[1811]

Among the circumstances in which a constructive trust may be imposed are those in which the defendant stands to receive a benefit by virtue of fraud.[1812]  In this context, moreover, fraud "may mean misrepresentation giving rise to a cause of action for deceit or it may imply the acquisition of property by some other type of wrongdoing or by any type of inequitable conduct."[1813]  The

---

[1811]

   *Beatty v. Guggenheim Exp. Co.*, 225 N.Y. 380, 386 (1919).

[1812]

   "[A]ssets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party." *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002) (citing RESTATEMENT (FIRST) OF RESTITUTION § 166 (1936)); *see also* 4 POMEROY § 1053.  While New York law often speaks of claims to impose constructive trusts having four elements – (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment –  the key is unjust enrichment, "since the purpose of the constructive trust is [its] prevention." *In re First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (citations omitted) (affirming constructive trust for *pro rata* distribution to defrauded investors).  To put it simply, "a constructive trust is a flexible device and must not be bound by an 'unyielding formula.'" *Golden Budha Corp. v. Canadian Land Co. of America, N.V.*, 931 F.2d 196, 202 (2d Cir. 1991) (party adequately pleaded the elements of a constructive trust where the district court determined that all elements other than unjust enrichment were lacking).

[1813]

   GEORGE TAYLOR BOGERT ET AL., THE LAW OF TRUSTS AND TRUSTEES § 471, at 41-42 (3d ed. 2009) ("BOGERT") (footnotes omitted).

476

imposition of a constructive trust on Donziger's right to a contingent fee, among other property traceable to the Judgment, and the other defendants' rights to recovery fits this mold to a tee.

Donziger's retainer agreement[1814] with the LAPs and the ADF, which is governed by New York law,[1815] provides that Donziger is entitled to be paid (a) 6.3 percent of all amounts paid in respect of the litigation,[1816] plus (b) any arrearages in his monthly retainer,[1817] plus reimbursement for expenses.[1818]  His contingent fee is payable only out of "Plaintiff Collection Monies," which the retainer agreement defines as "amounts paid . . . whether from Chevron Corporation. . . , any other party listed as a defendant in respect of the Litigation . . . or any other party added or joined to the Litigation as a defendant."[1819]  Thus, the Judgment is the indispensable predicate of his right to collect a contingent fee with respect to the Lago Agrio case. That Judgment is the direct result of

---

[1814]

PX 558 (Jan. 5, 2011 retainer agreement).

[1815]

The retainer agreement contains New York governing law clauses, PX 558, ¶¶ 10(a), 11, which control under N.Y. GEN. OBLIG. L. § 5-1401(a).

[1816]

*Id.* ¶ 3(a) (the 6.3 percent is the product of 31.5 percent of the Total Contingency Fee Payment, which is 20 percent of all funds collected).

It is conceivable that the percentage of any Judgment proceeds to which Donziger is entitled has been slightly diluted subsequently in order to accommodate giving equity to new investors, but this neither matters nor is persuasively shown on the record.

[1817]

*See id.* ¶ 3(b).

[1818]

*Id.* ¶ 3(d).

[1819]

PX 558 ¶ 3(a).

477

fraud by Donziger.  Moreover, his right to a contingent fee and the fee itself are property subject to execution and attachment[1820] and certainly to the imposition of a constructive trust.

This is true also with respect to other property already seized from Chevron.  Its intellectual property rights in Ecuador, which are worth between $15 and $30 million, are being held pending sale preparatory to the distribution of the cash proceeds to the Judgment creditors and their investors, subject to Donziger's right to his share of the recovery.  Moreover, Donziger owns, directly or through a nominee, shares of a Gibraltar company, Amazonia, through which the property collected on the Judgment is to be funneled.[1821]  Those shares too are subject to a constructive trust, as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger.

---

[1820]

Prior to the entry of the Judgment, Donziger's retainer agreement was "an executory contract" for the payment of his retainer and reimbursement of his expenses plus a "transfer of a future fund [*i.e.*, his share of the collections on the Judgment] upon which specific performance [would] be granted when the fund [came] into existence." *Brandes v. North Shore University Hosp.*, 18 M.3d 1112(A), 856 N.Y.S.2d 496, 2008 WL 80629, at *3 (Sup. Ct. Queens Co. Jan. 8, 2008) (citing *Williams v. Ingersoll,* 89 N.Y. 508 (1882)). The fund came into existence "when there [wa]s a judgment," *i.e.*, on February 14, 2011.  *Aponte v. Maritime Overseas Corp.,* 300 F. Supp. 1975, 1077 (S.D.N.Y. 1968).  His rights to payments when the fund came into existence, *i.e.*, when judgment was entered, as well as his rights against that fund once it came into being, were and are, respectively, assignable. *Id.* at 1077; N.Y. GEN. OBLIG. L. § 13-101; David D. Siegel, *Practice Commentaries*, 7B MCKINNEY'S CONSOL. LAWS OF N.Y. – CPLR 5501 TO 5500 C5201:9, at 66-67 (McKinney 1997). Accordingly, his claims to the contingent fee, to his monthly retainer, and to expense reimbursements at all relevant times were and remain property subject to execution and attachment under New York law.  N.Y. CPLR § 5201(b) ("A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment.); § 6202 ("Any . . . property against which a money judgment may be enforced as provided in section 5201 is subject to attachment.").

[1821]

Donziger testified that he has been given shares in Amazonia based on his proportionate equity interest in the LAPs' claim.  Donziger June 25, 2013 Dep. Tr. at 632:4-9, 633:15-634:2.  *See also supra* note 1110.

478

Accordingly, the Court will impose a constructive trust for Chevron's benefit on Donziger's contractual and other rights to fees and other payments and upon his Amazonia shares. In addition, it will issue injunctive relief to ensure that Donziger, regardless of the ultimate efficacy of the constructive trust and disgorgement order discussed below, never benefits in any material way from the Judgment in the Lago Agrio case.

> 2.    *Other Equitable Relief to Prevent These Defendants From Benefitting from the Fraud*

Equity is confined by no rigid formula in framing relief.  "A court of equity in decreeing a constructive trust is bound by no unyielding formula.  The equity of the transaction must shape the measure of relief."[1822]   Moreover, "[a] court may grant more than one type of relief to a wronged" party.

In the circumstances, an order will be entered requiring Donziger and the other defendants to pay over and assign to Chevron all fees and other payments, property, and other benefits that they have received or hereafter receive , directly or indirectly, in consequence of the Judgment.

> C.    *Injunction Against Enforcement in the United States*

As demonstrated above, courts of equity enjoin the enforcement of judgments procured by fraud where there is no full, complete and adequate remedy at law and where the plaintiff would be injured irreparably in the absence of such relief.

---

[1822]

*Beatty*, 225 N.Y. at 389.

Here, the Court has found that defendants always have intended to seek to enforce the Judgment in the United States. They have delayed doing so temporarily for tactical reasons: (1) the desire to avoid even the slightest risk that any U.S. enforcement action would be transferred to the undersigned, and (2) pursuit of their "keystone strategy" which rests in part on the belief that obtaining a foreign judgment recognizing the Ecuadorian Judgment might smooth their path to its recognition in this country. Their intent ultimately to pursue enforcement in the United States, where Chevron is incorporated and based (and where problems about reaching assets of Chevron subsidiaries in efforts to enforce the Judgment against Chevron could be avoided entirely by proceeding directly against Chevron), is clear.

Given the Court's findings that Chevron has no adequate remedy at law and that the expansion of the multiplicity of enforcement actions already pending (four are pending in other countries already) would cause it additional irreparable injury, these defendants will be enjoined from instituting any enforcement proceedings in the United States.

### D. *This Relief Is Consistent with* Naranjo

In March 2011, this Court issued a preliminary injunction temporarily barring enforcement of the Judgment anywhere outside Ecuador. In April 2011, the Court bifurcated, and later severed, Chevron's declaratory judgment claim (the "Count 9 Action") and stayed most proceedings in the first eight counts pending its resolution.[1823]

---

[1823] *Donziger II*, 800 F. Supp. 2d at 484; DI 328 (May 31, 2011 order severing Count 9).

480

In September 2011, the Second Circuit vacated the preliminary injunction. Its subsequent opinion – *Chevron Corp. v. Naranjo*[1824] – did not pass, one way or the other, on this Court's findings with respect to the nature of the Ecuadorian tribunals or the evidence of fraud in the procurement of the Judgment. Rather, it explained that the panel had vacated the preliminary injunction on the ground that:

> "the procedural device [Chevron] has chosen to present those claims [in Count 9] is simply unavailable: The [New York Recognition of Foreign Country Money Judgments Act ("Recognition Act")] nowhere authorizes a court to declare a foreign judgment unenforceable on the preemptive suit of a putative judgment-debtor."[1825]

In its view, a declaration with respect to the alleged unenforceability or non-recognizability of the Judgment could not be had because the Recognition Act (1) "does not authorize a court to declare a foreign judgment null and void for all purposes in all countries,"[1826] and (2) could not justify a declaration with respect to recognizability and enforcement in New York alone because there was no indication that the LAPs ever would seek to enforce the Judgment here.[1827] The panel noted also that "[c]onsiderations of international comity provide additional reasons to conclude that the Recognition Act cannot support the broad injunctive remedy granted by the district court."[1828] The

---

[1824]   667 F.3d 232 (2d Cir. 2012).

[1825]   *Naranjo*, 667 F.3d at 240.

[1826]   *Id.* at 245.

[1827]   *Id.* at 246.

[1828]   *Id.* at 242.

481

Circuit remanded Count 9 to this Court with instructions to dismiss it in its entirety,[1829] a direction that was carried out at once.

Defendants contend that *Naranjo* forecloses the relief Chevron here seeks. Donziger argues that "this Court cannot give Chevron what it wants without transgressing basic principles of international comity, as articulated by the Second Circuit in . . . *Naranjo*. . . ."[1830]  In so arguing, he misrepresents the relief Chevron seeks, misconstrues the holding in *Naranjo*, and attempts to broaden the panel's international comity discussion well beyond the confines of the statute it was interpreting.

*First*, the holding in *Naranjo* was limited to the panel's interpretation of New York's Recognition Act and its determination that that statute could not be used preemptively to attack a judgment.  The Court of Appeals declined explicitly to pass on the "separate proceedings between these parties on other causes of action before" this Court.[1831]  Those "other causes of action" were the ones Chevron pressed at trial.  None of them invokes the Recognition Act, and *Naranjo* simply does not apply to them.[1832]

Chevron here seeks a determination that the defendants procured the Judgment by fraud and through violation of the RICO statute.  It asks this Court for, among other things, a

---

[1829]

Id. at 234.

[1830]

DI 1857 (Donziger Defs.' Post-trial Reply Mem. of Law), at 11.

[1831]

*Naranjo*, 667 F.3d at 239 n.11.

[1832]

The only reason the Recognition Act has *any* application to this case is because defendants pled collateral estoppel in their answers and attempted to rely on the Ecuadorian Judgment as a basis for that defense.  In so doing, they recognized that the recognizability and enforceability of the Judgment under the Recognition Act was an essential element of their collateral estoppel defense.  *See supra Discussion* § VII.

482

constructive trust over the proceeds to these defendants of that Judgment and an injunction barring these defendants from profiting from their fraud, including by seeking to enforce the Judgment in the United States. While the Count Nine Action under the New York Recognition Act implicated some of the same *questions* as those at issue here – most significantly, whether the Judgment was procured by fraud – the claims in this case involve an entirely different statute, RICO, and non-statutory state law causes of action about which the *Naranjo* panel said nothing substantive. Indeed, as Judge Parker noted at oral argument on defendants' most recent petition for a writ of mandamus (the basis of which was that this Court supposedly had violated the "spirit" of *Naranjo*): "Judge Kaplan is [here] adjudicating a different case" from that at issue in *Naranjo*.[1833] "He is . . . not adjudicating the Recognition Act . . . . He may be looking at the same problem, but he's looking at it from a decidedly different vantage point."[1834]

*Second*, the international comity concerns expressed in *Naranjo* were tied to the panel's discussion of the Recognition Act.[1835] Defendants' attempt to apply *Naranjo*'s language more broadly is misguided. The *Naranjo* panel determined that "[n]othing in the language, history, or purposes of the [Recognition] Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a New York court to restrain efforts to enforce those foreign judgments against them, or to preempt the courts of other countries from making their own decisions

---

[1833]     Tr., Sept. 26, 2013 (Hr'g on LAPs' Pet. for Writ of Mandamus), at 0:11:21-11:29.

[1834]     *Id.* at 00:01:58-2:15.

[1835]     *See Naranjo*, 667 F.3d at 243.

about the enforceability of such judgments."[1836]  But it recognized, however, that "[t]o resolve the dispute before [it], [it] need only address whether the statutory scheme announced by New York's Recognition Act allows the district court to declare the Ecuadorian judgment non-recognizable, or to enjoin plaintiffs from seeking to enforce the judgment."[1837]  Defendants now ask the Court to apply the Second Circuit's analysis of the precise language and legislative intent behind a New York statute to (1) an utterly different statute adopted by Congress, and (2) centuries-old non-statutory causes of action.  They have offered no persuasive reason why it should do so.

*Third*, even if the international comity concerns voiced in *Naranjo were* more broadly applicable, they would not be implicated here.  This Court does not here "set aside the Ecuadorian Judgment."  It does not grant worldwide injunction barring any efforts to enforce the Judgment in other countries. And it does not, as Donziger claims, issue "a worldwide anti-*collection* injunction."[1838]  It prevents the three defendants who appeared at trial – over whom it has personal jurisdiction – from profiting from their fraud.  This does not "disrespect the legal system . . . of the country in which the judgment was issued" or those of "other countries" in which the LAPs now, or later may, seek to enforce the Judgment.

It should be noted also that, although it does not pursue one here, Chevron's amended complaint sought a worldwide injunction as relief for Chevron's RICO and common law fraud claims.  The *Naranjo* panel was keenly aware of that fact.  And counsel for Chevron confirmed at oral argument that, if the Second Circuit were to lift the preliminary injunction (as it ultimately did),

---

[1836] *Id.*

[1837] *Id.* at 244.

[1838] DI 1857 (Donziger Defs.' Post-trial Reply Mem. of Law), at 12.

484

it would ask this Court "to reactivate the RICO claims and seek the same injunction under those claims[.]"[1839]  Although one member of the panel explicitly contemplated providing this Court with "instructions . . . with respect to what [kind of relief] might be appropriate under RICO,"[1840] the opinion in *Naranjo* provided no such instruction.  Instead, the Court of Appeals pointedly "express[ed] no views on the merits of the parties' various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation[, nor the relief Chevron sought,] which may be addressed as relevant in other litigation before the district court or elsewhere."[1841]  Thus, even if Chevron still were seeking an injunction preventing Donziger and the LAP Representatives from enforcing the Judgment anywhere in the world – which it is not – nothing in *Naranjo* would prevent it from doing so.

## *Conclusion*

The saga of the Lago Agrio case is sad.  It is distressing that the course of justice was perverted.  The LAPs received the zealous representation they wanted, but it is sad that it was not always characterized by honor and honesty as well.  It is troubling that, in the words of Jeffrey Shinder, what happened here probably means that "we'll never know whether or not there was a case to be made against Chevron."[1842]

---

[1839]

   DI 445-14 (*Naranjo* Oral Arg. Tr.), at 76:19-77:1, 77:16-78:14.

[1840]

   *Id.* 78:15-21.

[1841]

   *Naranjo*, 667 F.3d at 246 n.17.

[1842]

   Tr. (Shinder) 1298:21-1299:4.

But we have come full circle.  As the Court wrote at the outset, "[t]he issue in this case is not what happened in the Oriente more than twenty years ago and who, if anyone, now is responsible for any wrongs then done.  The issue here, instead, is whether a court decision was procured by corrupt means, regardless of whether the cause was just."

The decision in the Lago Agrio case was obtained by corrupt means.  The defendants here may not be allowed to benefit from that in any way.  The order entered today will prevent them from doing so.

The foregoing, together with the appendices to this opinion, constitute the Court's findings of fact and conclusions of law. Defendants' motions to dismiss [DI 1860, DI 1862] are denied.

SO ORDERED.

Dated:      March 4, 2014


                                    /s/  Lewis A. Kaplan
                         _____
                                        Lewis A. Kaplan
                                  United States District Judge