UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                  Plaintiff,

        -against-                          11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# APPENDICES TO OPINION


Appearances:


Randy M. Mastro
Andrea E. Neuman
Reed M. Brodsky
William E. Thompson
Anne Champion
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

G. Robert Blakey
William J. and Dorothy K. O'Neill
Professor Emeritus
Notre Dame Law School
*Amicus Curiae*

Richard H. Friedman
FRIEDMAN | RUBIN

Zoe Littlepage
Rainey C. Booth
LITTLEPAGE BOOTH

Steven Donziger

*Attorneys for Defendant Steven Donziger and Steven R. Donziger & Associates LLP*


Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*

*Table of Contents*

Appendix I – The LAP Internal Work Product
    Found in the Judgment Was Not in the Court Record . . . . . . . . . . . . . . . . . . . . . . . App. 1
    I.    The Record in the Lago Agrio Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1
        A.    The Official Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 1
        B.    The Lago Agrio Court Was Obliged to Decide Based Solely on Materials
              In the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 2
        C.    This Court's Conclusions and Findings . . . . . . . . . . . . . . . . . . . App. 5
    II.    Chevron's Experts' Examination of the Record and the LAP Internal Work
        Product to Identify Commonalities . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 5

Appendix II – Portions of Fusion Memo, Draft Alegato, Index
    Summaries, Clapp Report, and Fajardo Trust Email in Judgment (PX 2164) . . . App. 11

Appendix III – The Cabrera Report Was Material to the Judgment . . . . . . . . . . . . . . . . App. 42
    I.    The Pit Count . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 43
    II.    Potable Water Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 48
    III.    The Cleansing Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 50
    IV.    Eight Categories of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 51

Appendix IV – Aerial Photograph Example (PX 4021) . . . . . . . . . . . . . . . . . . . . . . . . App. 55

Appendix V – Evidentiary Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 56
    I.    Admissibility of the Bank Records and Identity Cards . . . . . . . . . . . . . . App. 56
        A.    The Bank Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 57
        B.    The Identity Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 60
        C.    The Deposit Slips and Centeno's Signatures . . . . . . . . . . . . . . . App. 61
            1.    The Deposit Slips . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 61
            2.    Centeno's Signatures and Cedula . . . . . . . . . . . . . . . . . App. 64
    II.    The Hearsay Objections to Certain Guerra-Zambrano Conversations Are
        Overruled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 65
    III.    Beltman and Maest Witness Statements . . . . . . . . . . . . . . . . . . . . . . . App. 70
        A.    Rule 106 – The Rule of Completeness . . . . . . . . . . . . . . . . . . App. 71
        B.    Credibility – Rule 806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 73
        C.    Residual Hearsay – Rule 807 . . . . . . . . . . . . . . . . . . . . . . . App. 73
    IV.    Missing Witness Inferences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 75
        A.    The Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 75
        B.    Defendants' Absentees . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 77
        C.    Plaintiff's Absentees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 79

Appendix VI – The Trial Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 81

i

Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 81

Direct Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 81

Deposition Designations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . App. 82

Donziger's Improperly Amended Exhibit List . . . . . . . . . . . . . . . . . . . . . . App. 84

Appendix I – The LAP Internal Work Product
Found in the Judgment Was Not in the Court Record

In order to determine whether LAP internal work product was contained in the Lago Agrio case record, we must begin by defining the record, which involves consideration both of Ecuadorian law and of evidence.

I.      *The Record in the Lago Agrio Case*

        A.      *The Official Record*

Chevron and the defendants provided expert submissions under Federal Rule of Civil Procedure 44.1 on what constitutes the official record of a case under Ecuadorian law.  Both parties' experts agreed that Ecuadorian law clearly defines what makes up the record, but they differed on whether and when a judge may consider anything outside of it.

Chevron's expert, Dr. Santiago Efraín Velázquez Coello explained that parties in Ecuador may submit materials to the court only by presenting them for filing in the official record. He cited two provisions of Ecuadorian law to support his conclusion:

> "in Ecuador, any documents must be added to the record according to the law; otherwise, the judge cannot consider them at the time of his decision. So states Article 117 of the Code of Civil Procedure, which indicates, '[o]nly evidence that has been properly taken i.e., that has been requested, presented and obtained in accordance with the law will be valid in court.' Article 2 of the Regulation on the Arrangement of the Process and Judicial Proceedings states: 'Chronology of the record.- Submissions and documents that the parties file will be added to the record chronologically. [Nonparty] case documents will be added the same way. Each page must be numbered with digits and longhand, and the clerk shall validate this with his initials.' Only by proceeding as indicated is it legally possible to introduce documents and materials into a case in Ecuador and, therefore, the documents that are presented to the judge in violation of these rules have no legal value and the

App. 1

judge cannot consider them in his judgment."[1]

Defendants' expert, Juan Pablo Albán Alencastro, acknowledged that "[u]nder Ecuadorian law if a document has not been formally incorporated into the case in accordance with the provisions of Regulation on the Settlement Process and Judicial Proceedings of June 19, 1981 . . . [it] is not part of the record."[2]

Thus, the record in the Lago Agrio case consists of the submissions and documents that the parties filed, the pages of which were numbered, initialed by the clerk, and added chronologically to the *cuerpos* – booklets or files of about 100 pages.[3]

B.   *The Lago Agrio Court Was Obliged to Decide Based Solely on Materials In the Record*

The parties made submissions also on whether an Ecuadorian trial judge properly may consider documents and evidence that is not part of the record.

Dr. Velázquez stated that the court may consider only materials that are included in the formal record and facts that are "public and well-known" – a concept akin to facts that would be subject to judicial notice in the United States.[4]   In addition, judges research case law and legal scholarship, but "[w]hat is not permitted to the judge is to consider information or evidence that does

---

[1]

DI 1751-1 (Velázquez Decl.), Ex. A at 2.

[2]

DI 1702-1 (Albán Decl.) ¶ 31.

[3]

Tr. (Zambrano) 1720:3-5.

[4]

DI 1751-1 (Velázquez Decl.), Ex. A at 1-2.

not appear in the record and to use that as a basis for his judgment, erroneously claiming their public and well known nature."[5]

Dr. Albán took a slightly different position. He said that "[i]t is not unusual . . . that in high-profile cases, the parties and even third parties not directly involved in the dispute, try to emphasize their positions and views on the trial in various ways, the media exposure of the details of the case is the most common form, but the anonymous sending of documents also occurs in an attempt to convince the authority responsible for the processing and decision of the case on the legitimacy or importance of a given argument."[6] He stated that "Article 335 of the Organic Code of the Judiciary . . . which establishes prohibitions for lawyers in the representation of cases, says nothing about these informal remissions of documentation."[7] He did not say, however, that consideration of such documents would be appropriate.

Dr. Velázquez responded that the alleged practice adverted to by Dr. Albán "has never been a normal practice" in Ecuador[8] and that it would "be contrary to express provisions of Ecuadorian law. . . . [I]f this were a common practice in Ecuador it would have no relevance whatsoever to the present analysis, as a custom is not law unless statute expressly says so."[9]

---

[5]     *Id.* at 2.

[6]     DI 1702-1 (Albán Decl.) ¶ 32.

[7]     *Id.* ¶ 33.

[8]     DI 1751-1 (Velázquez Decl.), at 2.

[9]     *Id.*

App. 3

Dr. Velázquez's view found support in the testimony of Zambrano, who said that "the official record of the case is that which is contained in the cuerpos."[10]  Moreover, Zambrano stated that he decided the Lago Agrio case[11] "[a]ccording to the evidence that is part of the record. . . ."[12]  Finally, he testified that, while documents related to the case that were not incorporated into the court record occasionally were left at the door of his office in the court,[13] he "always matched [those documents] up with what already existed in the [record of the] case."[14]  If the documents were different from what was in the record, he discarded them because they were not "useful" to him.[15]  Thus, according to Zambrano, he considered only documents that were contained within the formal court record – that is, officially filed by the parties and added by the clerk to the *cuerpos* – in writing the Judgment.

---

[10]

Tr. (Zambrano) 1693:18-23.

[11]

That of course is a hotly contested issue, but Zambrano's testimony as to what materials properly could have been considered in deciding the case nonetheless has value, particularly as the thrust of his testimony was that everything was done with utter propriety.

[12]

*Id.* 1608:21-22.

[13]

*Id.* 1691:10-14.

[14]

*Id.* 1692:25-1693:3.

[15]

*Id.* 1694:13-25.

App. 4

C.     *This Court's Conclusions and Findings*

The Court concludes and finds that the record in the Lago Agrio case consists of the documents duly filed with the clerk and added to the *cuerpos.*  Consideration of any other materials, including any materials provided to a judge or court official informally or *ex parte*, would have been improper under Ecuadorian law.[16]

II.    *Chevron's Experts' Examination of the Record and the LAP Internal Work Product to Identify Commonalities*

Dr. Robert Leonard – a professor of forensic linguistics – compared the Lago Agrio Judgment[17] to documents Chevron received from the defendants in discovery (the "LAPs' internal work product") to determine whether the "[]Ecuadorian Judgment[] and the Ecuadorian Plaintiffs' unfiled work product contain[ed] matching or similar word strings and strings of symbols whose presence [was] not explainable either as set phrases or by chance. . . ."[18]  In other words, Dr. Leonard was retained to determine whether the LAPs' internal work product had appeared in the Judgment.

Dr. Leonard analyzed the Ecuadorian Judgment "to determine whether it was 'plagiarized' in whole or in part from the Ecuadorian Plaintiffs' unfiled work product"[19] – that is, whether it contains material taken from LAPs' work product that was not part of the record in the

---

[16]

To the extent the Court has made a determination of Ecuadorian law, its conclusion is one of law.  FED. R. CIV. P. 44.1.

[17]

PX 399 (Lago Agrio Judgment (Spanish)).

[18]

PX 3700 (Leonard Direct) ¶ 3.

[19]

*Id.* ¶ 34.

App. 5

Lago Agrio case. Three computational experts, working under his direction, "perform[ed] searches . . . comparing the Ecuadorian Judgment to documents which [Dr. Leonard understood] were produced by the Ecuadorian Plaintiffs' consultants, lawyers, or affiliates."[20] Using results from those searches, Dr. Leonard identified a number of documents obtained in discovery "as having potential plagiaristic overlap to the Ecuadorian court record so as to evaluate whether or not the overlap was attributable to a filed [*i.e.*, record] document."[21] He concluded:

> "that portions of the Ecuadorian Judgment and the Ecuadorian Plaintiffs' unfiled work product contain matching or similar word strings and strings of symbols whose presence is not explainable either as set phrases or by chance, and that those portions of the Ecuadorian Judgment [were] therefore plagiarized from Plaintiffs' unfiled work product."[22]

Specifically, he found at least 32 matches between the Judgment and six of the LAPs' unfiled, internal work product documents and concluded that the parts of the Judgment containing these matches likely "had their origin in the Ecuadorian Plaintiffs' unfiled work product."[23] The six documents, parts of which appear in the Judgment, are the Fusion Memo,[24] the January and June

---

[20]      *Id.* ¶ 35.

[21]      *Id.* ¶ 36.

[22]      *Id.* ¶ 37.

[23]      *Id.* ¶ 38.

[24]      PX 435 (Fusion Memo).

Index Summaries,[25] the Fajardo Trust Email,[26] the Draft Alegato,[27] and the Clapp Report.[28]

Dr. Patrick Juola, who worked in conjunction with Dr. Leonard, then compared each of these six documents as well as the Selva Viva Database, a group of spreadsheets,[29] to the entire Lago Agrio record to determine whether each document's text appeared anywhere within the record.[30] Dr. Juola converted each of the 236,000 pages of the Lago Agrio record to OCR,[31] text-searchable documents.[32] He then broke the entire record into groups of five consecutive words and did the same with each of the LAPs' unfiled internal work product documents.[33] Dr. Juola was

---

[25] PX 433 (January 2007 Index Summary); PX 865 (June 2007 Index Summary).

[26] PX 437 (Fajardo Trust Email).

[27] PX 438 (Draft Alegato).

[28] PX 928 (Clapp Report).

[29] PX 439-441 (Selva Viva Database).

[30] PX 3800 (Juola Direct) ¶ 27.

[31] *Id.* ¶ 29. OCR "is a process by which hard copies are scanned and processed to create electronic files that can be viewed on the computer." Dr. Juola explained that "OCR stands for optical character recognition. It's the process of taking an image which is – if you think about how a newspaper photo is constructed it's essentially a collection of black dots or white dots, and from that black or white dots, extracting the text, the characters that would actually comprise the language inside that document." Tr. (Juola) 1544:17-22. Dr. Juola concluded that the overall scanning quality of the Lago Agrio record was high, and that no more than 1-1.5% of the documents in the court record were unsearchable. PX 3800 (Juola Direct) ¶ 32. His team analyzed each of the unsearchable documents by hand. *Id.* ¶ 33.

[32] PX 3800 (Juola Direct) ¶ 17.

[33] *Id.* ¶¶ 18-21.

provided also with every specific linguistic overlap Dr. Leonard found between the LAPs' internal work product and the Judgment (the "overlap examples").[34] He broke the overlap examples into five word groups as well.  Dr. Juola then used computer software to identify any five word group in the overlap examples that matched any five word group in the Lago Agrio court record.[35]  He ran the same analyses for overlaps between the LAPs' internal work product documents and the Judgment.[36] "Based on [those] comparisons, [Dr. Juola was] able to find any documents in the court record that contained an exact match . . . of at least five words with one of the [overlap e]xamples."[37]

For each match the computer identified, Juola "first verified the match by visually comparing the matching phrase and the corresponding part of the court record. [H]e then checked whether the match was a direct quotation.  Finally, [h]e analyzed the match to determine whether it was a common or stereotyped phrase, judging partially on the phrase's frequency and distribution across documents and partially on [his] understanding of the phrase's meaning."[38]  He excluded from his results common five-word phrases, such as "en el Ecuador como una."[39]  He concluded that "the Fusion Memo, the Clapp Report, the Index Summaries, the Fajardo Trust email, the Draft

---

[34]
       *Id.* ¶ 21.

[35]
       *Id.* ¶ 22.

[36]
       *Id.* ¶ 27.

[37]
       *Id.* ¶ 23.

[38]
       *Id.* ¶ 24.

[39]
       *Id.* ¶ 25.

App. 8

Alegato, and the Selva Viva Data Compilation [we]re not in the trial court record."[40]

Dr. Juola and his team used computers to compare the Lago Agrio record to the LAPs' internal work product.  The next Chevron expert, Samuel Hernandez, the director of Morningside Translations, did so by hand.[41]

Hernandez and his team of bilingual reviewers were given the Fusion Memo, excerpted portions of the January and June Index Summaries, the Fajardo Trust email, the Moodie Memo,[42] and the LAPs' Draft *Alegato*,[43] as well as excerpts from each document.[44]  They compared each document to every document in the Lago Agrio record that had been filed by the LAPs or a third party, as well as every document in the Lago Agrio record that had been filed by Chevron after the date on which Chevron first received documents from the LAPs in discovery proceedings in the United States.[45]  Hernandez's team reviewed the documents in three stages – any overlap identified

---

[40]

    *Id.* ¶¶ 3, 27, 37.

[41]

    PX 3900 (Hernandez Direct) ¶¶ 23-27.

[42]

    PX 1101 (Moodie Memo).

[43]

    PX 2167 (LAPs' Draft *Alegato*).

[44]

    The excerpts contained the word strings or phrases that overlapped with the Judgment.

[45]

    PX 3900 (Hernandez Direct) ¶¶ 12-22.  For the Moodie Memo and draft *alegato*, Hernandez and his team compared the documents and excerpts of them to (1) all documents in the Lago Agrio record filed by the LAPs or any third party after the date upon which the Moodie Memo and draft *alegato* was created, and (2) all documents in the Lago Agrio record filed by Chevron after the date on which Chevron first received documents from the LAPs in U.S. discovery proceedings.  *Id.* ¶¶ 16-22.

App. 9

in the first stage then was reviewed again in the second, and again in the third.[46]  At the second stage, reviewers were informed that "the name of a person, the name of a place, and one word or two unconnected words were not, by themselves, enough for a document to be considered potentially responsive."[47]  At the third stage of review, any documents that "contained only general topical similarities, without any close relationship between the actual text of the document in the . . . Record and the actual text of" the LAPs' internal work product were excluded.[48]

       The Court finds that the methodologies used by the Chevron experts were reliable and admissible, credits their testimony, and adopts their findings.

---

[46]

    *Id.* ¶¶ 23-24.

[47]

    *Id.* ¶ 25.

[48]

    *Id.* ¶ 26.

Appendix II – Portions of Fusion Memo, Draft Alegato, Index
Summaries, Clapp Report, and Fajardo Trust Email in Judgment (PX 2164)

## IDENTIFIED OVERLAP BETWEEN THE ECUADORIAN PLAINTIFFS' UNFILED WORK PRODUCT AND THE ECUADORIAN JUDGMENT

### UNFILED FUSION MEMO (PX 435)

**Figure 1. Identical or nearly identical word strings in the unfiled Fusion Memo and the Ecuadorian Judgment (more than 90 words)**

| Fusion Memo: page 8 | Ecuadorian Judgment: page 24 |
|---|---|
| Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta.  Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante.  En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable.  Las decisiones importante pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc., | Es cierto que por norma general una empresa puede tener subsidiarias con personalidad jurídica completamente distinta. Sin embargo, cuando las subsidiarias comparten el mismo nombre informal, el mismo personal, y están directamente vinculadas con la empresa madre en una cadena ininterrumpida de toma de decisiones operativas, la separación entre personas y patrimonios se difumina bastante, o incluso llega desaparecer. En este caso, se ha probado que en la realidad Texpet y Texaco Inc. funcionaron en el Ecuador como una operación única e inseparable. Tanto las decisiones importantes como las triviales pasaban por diversos niveles de ejecutivos y órganos de decisión de Texaco Inc., |

Note: Bolding and color in Figure 1 are added and indicate identical or nearly identical matches between the documents.

PLAINTIFF'S
EXHIBIT
**2164**
11 Civ. 0691 (LAK)

**Figure 2. Identical or nearly identical word strings in the unfiled Fusion Memo and the Ecuadorian Judgment (more than 150 words)**

| Fusion Memo: page 6 | Ecuadorian Judgment: page 21 |
|---|---|
| Cartas de funcionarios menores dirigidas a Shields{footnote 13}.- En este apartado se hace referencia a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización.  William Saville era un ejecutivo de Texpet que operaba en Quito. Él envio muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones.  Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de trasporte de combustibles en el oriente (PET031387).  J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito, solicita la autorización de Shields para licitar varios servicios (PET020758) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio.  Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos.  Aquí se reproducen dos solicitudes para aprobar el inicio de dos licitaciones (PET035974 y doc s/r).<br><br>{footnote 13} Pedidos de oficiales inferiores dirigidas a Shileds [PSV-018/I]  Cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885. | Del mismo modo, cartas de funcionarios menores dirigidas a Shields, en el cuerpo 65, fojas 6855, 6856, 6860, 6861, 6875, 6882, 6885, donde se hace referencia a cartas dirigidas a Shields que se originaron en Quito, en manos de funcionarios menores que solicitaban su autorización, como William Saville, que era un ejecutivo de Texpet que operaba en Quito, y envió muchas y cotidianas comunicaciones a Shields (en Nueva York) solicitando autorizaciones. Por ejemplo, le envía a Shields los costos estimados de la perforación de los pozos Sacha 36 al 41 (doc s/n), y solicita su aprobación para iniciar la licitación de transporte de combustibles en el Oriente (PET{space added}031387 en foja 6856). J.E.F. Caston, otro ejecutivo de la petrolera ubicado en Quito solicita la autorización de Shields para licitar varios servicios (PET{space added}020758 en foja 6860) y para aprobar los costos estimados de instalar bombas sumergibles en cinco pozos en el campo Lago Agrio. Finalmente tenemos a Max Crawford, otro funcionario radicado en Quito, quien también solicitaba periódicamente la aprobación de Shields para diversos objetivos (PET{space added}035974 en foja 6882, y doc s/r en foja 6885). |

Note: Bolding, color, and underlining in Figure 2 are added.  Bolded red text indicates identical or nearly identical matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified.  Curly brackets are used to interject text or comments not in the original documents.

2

**Figure 3. Identical idiosyncratic numerical ordering and identical or nearly identical word strings in the unfiled Fusion Memo and the Ecuadorian Judgment (22 words)**

| Fusion Memo: page 5 | Ecuadorian Judgment: page 21 |
|---|---|
| d) **Cartas y memorandos de Shields y Palmer a John McKinley (Archivos Texaco Inc. y Texpet)**{footnote12}.- Como se mencionó antes, McKinley era otro alto ejecutivo de Texaco Inc. de quien dependían importantes aprobaciones y decisiones. **Tanto Shields como Palmer mantenían un flujo constante de cartas y memos con McKinley, solicitando su autorización e informándole acerca de acontecimientos** importantes.<br><br>{footnote12}Comunicaciones Palmer-McKinkey y Shields-MkKinley [PSV-018/F] **Cuerpo 66, fojas 6957, 6958, <u>6964</u>, 6959, 6960, 6974<u>.</u>** | Existen además en el expediente **cartas y memorandos de Shields y Palmer a John McKinley**, provenientes de los **archivos Texaco Inc, y Texpet**. En el **cuerpo 66, fojas 6957, 6958, <u>6964</u>, 6959, 6960, 6974<u>.</u>** Que demuestran que **tanto Shields como Palmer mantenían un flujo constante de cartas y memos con McKinley, solicitando su autorización e informándole acerca de acontecimientos** relacionados con la Concesión Napo. |

Note: Bolding, color, and underlining in Figure 3 are added.  Bolded red text indicates identical or nearly identical matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.


**Figure 4. Identical or nearly identical word strings (more than 80 words) in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 10 | Ecuadorian Judgment: pages 24-25 |
|---|---|
| **Es completamente normal que el directorio de una empresa subsidiaria** de otra **esté conformado por algunos oficiales de** ésta. **También es normal que** los directores de la subsidiaria **reciban informes periódicos sobre su estado, y tomen ciertas decisiones que por su importancia están por sobre la administración regular.  Sin embargo, en el caso de Texaco Inc. y su subsidiaria Texaco Petroleum Company, el rol de los directores trasciende los roles normales, pues estos recibían información y tomaban decisiones acerca de la gran mayoría de hechos y actos de Texpet sobre** su **operación de la concesión** **p**etrolera Napo. | En este sentido este sentido **es completamente normal que el** Directorio de **una empresa subsidiaria esté conformado por algunos oficiales de** su matriz, y que **también es normal que** la matriz **reciba informes periódicos sobre su estado, y tomen ciertas decisiones que por su importancia están por sobre la administración regular. Sin embargo, en el caso de Texaco Inc. y su subsidiaria Texaco Petroleum Company** (Texpet)**, el rol de los** Directores **trascienden los roles** que pueden considerarse **normales, pues éstos recibían información y tomaban decisiones acerca de la gran mayoría de hechos y actos de Texpet sobre** asuntos cotidianos de la **operación de la concesión Petrolera Napo,** |

Note: Bolding and color in Figure 4 are added.  Bolded red text indicates exact matches between the documents.

3

**Figure 5. Similar text and source citations in unfiled Fusion Memo and Ecuadorian Judgment, but not in filed Final Alegato**

| Fusion Memo: pages 3-4 | Ecuadorian Judgment: page 24 | Final Alegato: Enero 17, 2011 - 16H55, page 99 |
|---|---|---|
| Al igual que Shields, Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogados de Texaco Inc{footnote 8}. En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a que ésta sea propietaria de las acciones de aquella. Ambas trabajaban íntimamente vinculadas, tomando Texaco Inc. todas las decisiones y Texpet limitándose a ejecutarlas. {footnote 7} Declaración Juramentada de Robert M. Bischoff [PSV-018/C] Cuerpo 63, foja 6621. {footnote 8} Ibíd.. | Al igual que Shields, ha quedado claro en el expediente que Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogado de Texaco Inc. En este caso, vemos como la relación entre Texpet y Texaco Inc. no estaba limitada a que ésta sea propietaria de las acciones de aquella, sino que ambas trabajaban íntimamente vinculadas, tomando Texaco Inc. todas las decisiones mientras que Texpet se limita a ejecutarlas. | De hecho, las instancias en las que Bischoff tomó la medida de marcar la distinción demuestran la inseparbilidad de las comañías, en lugar de desacreditarla.  Por ejemplo, en una declaración bajo juramento Bischoff describió cómo debía asegurarse de que los contratos de Texpet que superaban ciertos valores recibieran la aprobación necesaria de los ejecutivos y de los asesores letrados de Texaco{footnote 362}. Se trata de otro ejemplo de cómo las estructuras de Texpet/Texaco eran, en efecto, indiferenciables.<br><br>La tradición de ejecutivos que se desempeñan al mismo tiempo en ambas compañías o que pasan de una a otra, una y otra vez, continúa con Chevron y Texpet en la actualidad.<br><br>{footnote 362: Foja 6639: Transcripción de la declaración de Robert M. Bischoff (17 de agosto de 1995). |

Note: Bolding and color in Figure 5 are added and indicate identical or nearly identical matches in two or more documents. Curly brackets are used to interject text or comments not in the original documents.

4

**Figure 6. Identical or nearly identical word strings (more than 65 words) in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 11 | Ecuadorian Judgment: pages 21-22 |
|---|---|
| Nuevamente, lo anterior es solo un ejemplo de las docenas de **actas** que **demuestran el constante escrutinio que** el Directorio de **Texaco Inc. mantenia sobre toda operación y noticia relativa a Texpet. Si analizamos este hecho independientemente, quizás se pueda** justificar **como el normal control que ejerce un directorio sobre sus subsidiarias. Sin embargo debemos analizar este control dentro de su contexto, tomando en cuenta** además **que el Directorio de Texaco Inc. además entregaba las "asignaciones" de dinero con las cuales Texpet operaba**. | En mi criterio estas **actas demuestran el constante escrutinio que** la matriz **Texaco Inc. mantenia sobre toda operación y noticias relativas a Texpet** en Ecuador. **Si analizamos este hecho independientemente, quizás se pueda** confundir **como el normal control que ejerce un directorio sobre sus subsidiarias. Sin embargo debemos analizar este control** de la matriz sobre su subsidiaria **dentro de su contexto, tomando en cuenta** también **que el Directorio de Texaco Inc. además entregaba las "asignaciones" de dinero con las cuales Texpet operaba**, |

Note: Bolding and color in Figure 6 are added.  Bolded red text indicates exact matches between the documents.

**Figure 7. Identical or nearly identical word strings (more than 65 words) in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 3 | Ecuadorian Judgment: page 24 |
|---|---|
| **El señor Robert M. Bischoff durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina.  Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual él mismo llama Texaco Petroleum Company (Texpet)**{footnote 7}. **Esto demuestra cómo inclusive los mismos ejecutivos de Texaco Inc. pensaban en Texpet como** parte **de Texaco Inc., y no como una empresa separada.**<br><br>{footnote 7}Declaración Juramentada de Robert M. Bischoff [PSV-018/C] **Cuerpo 63, foja 6621**. | **el señor Robert M. Bischoff durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina. Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual él mismo llama Texaco Petroleum Company (Texpet)**, según consta en su declaración juramentada, en **cuerpo 63, foja 6621**. **Esto demuestra cómo inclusive los mismos ejecutivos de Texaco Inc. pensaban en Texpet como** una división **de Texaco Inc., y no como una empresa separada.** |

Note: Bolding and color in Figure 7 are added.  Bolded red text indicates exact matches between the documents.
Curly brackets are used to interject text or comments not in the original documents.

5

Plaintiff's Exhibit 2164   p. 5 of 31

App. 15

**Figure 8. Identical or nearly identical word strings (more than 55 words) in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 10 | Ecuadorian Judgment: page 21 |
|---|---|
| Las **decisiones del "Comité Ejecutivo" de Texpet debían ser aprobadas por el directorio de Texaco Inc**. Así, **vemos que en el Acta de Directorio No. 478**{footnote 22} **éste aprobó la decisión de Texpet de entrar en negociaciones con el Ecuador para oponerse a una elevación en el impuesto a la renta para la petrolera, y pagos adicionales.**<br><br>{footnote 22}Doc. ADT 4. **Cuerpo 25, foja 2427.** | Por otro lado, debe ser considerado el hecho probado de que **las decisiones del "Comité Ejecutivo" de Texpet debían ser aprobadas por el directorio de Texaco Inc**, como **vemos que en el Acta de Directorio No. 478 (Cuerpo 25, foja 2427)**, donde **éste aprobó la decisión de Texpet de entrar en negociaciones con el Ecuador para oponerse a una elevación en el impuesto a la renta para la petrolera, y pagos adicionales**, |

Note: Bolding and color in Figure 8 are added. Bolded red text indicates exact matches between the documents. Curly brackets are used to interject text or comments not in the original documents.

**Figure 9. Identical or nearly identical word strings (more than 30 words) in the unfiled Fusion Memo and the Ecuadorian Judgment, but not in the filed Record**

| Fusion Memo: page 3 | Ecuadorian Judgment: page 24 | Record: foja 6615 |
|---|---|---|
| a) El **señor Robert C. Shields, desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet**{footnote 5}.<br><br>{footnote 5}**Declaración juramentada** de Robert C. Shields. [PSV-018/B] **Cuerpo 63, foja 6595**. | el **señor Robert C. Shields, desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet**, según consta en su **declaración juramentada** (**cuerpo 63, foja 6595**). | P. ¿Cuánto tiempo estuvo como **vicepresidente de Texaco, Inc.** a cargo de la producción de Latinoamérica?<br>R. Desde el otoño de **1971** hasta el verano de **1977**.<br>P. Durante ese tiempo ¿tuvo usted also que ver en las actividades ecuatorianas?<br>R. Fui Presidente del Directorio **de la Junta de directores de** Texaco Petroleum Company, que era una subsidiaria de completa propiedad de Texaco, Inc., |

Note: Bolding and color in Figure 9 are added. Bolded red text indicates exact matches between the documents. Curly brackets are used to interject text or comments not in the original documents.

6

Plaintiff's Exhibit 2164  p. 6 of 31

App. 16

**Figure 10. Identical or nearly identical word strings (more than 115 words) and misordered foja numbers (i.e., "6831, 6826, 6833") in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 4 | Ecuadorian Judgment: page 20 |
|---|---|
| Pedidos de autorización de Shields a Palmer (Archivos Texpet){footnote 9}.- El Sr. Shields, estrechamente vinculado con la labor de Texpet como operadora del consorcio, enviaba decenas de misivas a sus superiores de Texaco Inc., solicitando su aprobación para diversos asuntos propios de las operaciones en el Oriente ecuatoriano. Cabe mencionar que Shields se hace los pedidos a nombre de "la división ecuatoriana" de Texaco Inc. La autorización era necesaria para asuntos tan cotidianos como la licitación de servicios de catering y limpieza para los sitios de operaciones del consorcio en Quito y el Oriente (PET029369 y PET028910), hasta la contratación de equipos y personal para el mantenimiento de oleoductos (PET 01921X) y construcción de puentes en Aguarico y Coca (PET016879). También se solicita autorización para la contratación de servicios de entretenimiento cinematográfico en las instalaciones del Oriente (PET029086). Finalmente, Shields solicita la autorización de Palmer para iniciar la exploración del pozo Sacha-84, en octubre de 1976 (PET012134).<br><br>{footnote 9} Comunicaciones Shields-Palmer [PSV-018/E1] Cuerpo 65, fojas 6827,6828, 6830, 6831, 6826, 6833. | En el expediente, en el cuerpo 65, fojas 6827, 6828,6830, 6831, 6826, 6833, constan las traducciones de varios pedidos de autorización de Shields a Palmar, en los que el señor Shields hace pedidos a nombre de la "División Ecuatoriana" de Texaco Inc. a sus superiores de Texaco Inc., solicitando su aprobación para diversos asuntos propios de las operaciones en el Oriente ecuatoriano. Constan en el expediente autorizaciones para asuntos cotidianos, de administración regular, como la licitación de servicios de catering y limpieza para los sitios de operaciones del consorcio en Quito y el Oriente (traducción de documento PET 029369 en foja 6827 y PET 028910 en foja 6830), o la contratación de servicios de entretenimiento cinematográfico en las instalaciones del Oriente (PET 029086 en foja 6831). Del mismo modo encontramos una autorización para la contratación de equipos y personal para el mantenimiento de oleoductos (PET 019212 en foja 6828) y construcción de puentes en Aguarico y Coca (PET 016879 en foja 6833). Finalmente, Shields solicita la autorización de Palmer para iniciar la exploración del pozo Sacha-84, en octubre de 1976 (PET 012134). |

Note: Bolding, color, and underlining in Figure 10 are added. Bolded red text indicates exact matches between the documents. Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

7

Plaintiff's Exhibit 2164   p. 7 of 31

App. 17

**Figure 11. Identical or nearly identical word strings (more than 30 words) and unique formatting in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 9 | Ecuadorian Judgment: page 22 |
|---|---|
| a) El acta de Reunión de Directorio No. 380{footnote 19}, de fecha 22 de enero de 1965, estableció asignaciones a favor de la Cia. Texaco Petróleos del Ecuador por un monto de USD 30.312,oo. {footnote 19}Doc. ADT 1. Cuerpo 22, foja 2166. | Entre las pruebas que nos llevan a este convencimiento citamos adicionalmente el acta de reunión de directorio de Texaco Inc. No. 380, de fecha 22 de enero de 1965 (Cuerpo 22, foja 2166), que estableció asignaciones a favor de la Cia. Texaco Petróleos del Ecuador por un monto de USD 30.312,oo. |

Note: Bolding, color, and underlining in Figure 11 are added. Bolded red text indicates exact matches between the documents. Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

**Figure 12. Identical or nearly identical word strings (more than 30 words) and unique formatting in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 10 | Ecuadorian Judgment: page 22 |
|---|---|
| b) El acta de Reunión de Directorio No. 387{footnote 20}, de fecha 17 de septiembre de 1965, estableció asignaciones a favor de Texaco Petróleum Company (Textpet), por un monto de USD 27.625,oo. {footnote 20}Doc. ADT 2. Cuerpo 22, foja 2176 | El acta de reunión de directorio de Texaco Inc. No. 387, de fecha 17 de septiembre de 1965 (Cuerpo 22, foja 2176) estableció asignaciones a favor de Texaco Petróleum Company (Texpet), por un monto de USD 27.625,oo. |

Note: Bolding, color, and underlining in Figure 12 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

8

**Figure 13. Identical or nearly identical word strings (more than 50 words) in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 6-7 | Ecuadorian Judgment: page 24 |
|---|---|
| **Shields suscribe** la **Carta a nombre de Texpet, cuando según su mismo testimonio entre 1971 y 1977 ostentaba el cargo de vicepresidente de Texaco Inc.  Este hecho guarda coherencia con lo declarado por Bischoff, acerca de que Texpet era la división de Texaco Inc. que operaba en Latinoamérica, y no una mera subsidiaria.** | Al revisar el expediente consta que **Shields suscribe** sus ca**rtas a nombre de Texpet, cuando según su mismo testimonio entre 1971 y 1977 ostentaba el cargo de Vicepresidente de Texaco Inc. Este hecho guarda coherencia con lo declarado por Bischoff, acerca de que Texpet era la división de Texaco Inc. que operaba en Latinoamérica, y no una mera subsidiaria**, como sostiene la defensa de la parte demandada. |

Note: Bolding and color in Figure 13 are added.  Bolded red text indicates exact matches between the documents.

**Figure 14. Identical or nearly identical word strings (more than 45 words) and unique formatting in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 10 | Ecuadorian Judgment: page 22 |
|---|---|
| c) **El acta de Reunión de Directorio No. 393**{footnote 21}, **de fecha 19 de abril de 1966, estableció asignaciones a favor de Texaco Petróleum Company (Textpet), por un monto de** <u>USD 331.272,oo</u>**., y a favor de la Cía. Texaco Petróleos del Ecuador por** <u>USD 13.631</u><br><br>{footnote 21}Doc. ADT 3. **Cuerpo 22, foja 2182**. | **El acta de reunión de Directorio** de Texaco Inc. **No. 393, de fecha 19 de abril de 1966** (**Cuerpo 22, foja 2182**) **estableció asignaciones a favor de Texaco Petróleum Company (Textpet), por un monto de** <u>USD 331.272,oo</u>**, y a favor de la Cía. Texaco Petróleos del Ecuador por** <u>USD 13.631</u> |

Note: Bolding, color, and underlining in Figure 14 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

9

Plaintiff's Exhibit 2164   p. 9 of 31

**Figure 15. Identical or nearly identical word strings (more than 95 words) and unique word choice (i.e., "workover") in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 4 | Ecuadorian Judgment: page 20 |
|---|---|
| b) Pedidos de autorización de Bischoff a Palmer (Archivos Texpet){footnote 10}.- Al igual que Shields, Palmer se refiere a las operaciones de Texpet en el Oriente como "la división ecuatoriana".  Entre sus pedidos de autorización, consta el urgente pedido para aprobar la licitación de dos torres de "workover" (soporte y mantenimiento) para la explotación en el Oriente (PET030919), y la licitación de un camino entre los pozos Yuca y Culebra (PET016947).  También se solicita autorización para extender un contrato de servicios de ferry en la zona (PET032775), y con mayor importancia, se solicita aprobación de los documentos de aprobación del Pozo Vista-1.<br><br>{footnote 10} Comunicaciones Bischoff-Palmer [PSV-018/E2] Cuerpo 65, fojas 6839, 6840, 6843, 6844, 6848. | También constan del expediente varios documentos de los archivos Texpet, con pedidos de autorización de Bischoff a Palmer, en el cuerpo 65, fojas 6839, 6840, 6843, 6844, 6848, donde consta que del mismo modo que Shields, Palmer se refiere a las operaciones de Texpet en el Oriente como "la División Ecuatoriana". Entre sus pedidos de autorización, consta el urgente pedido para aprobar la licitación de dos torres de "workover" (soporte y mantenimiento) para la explotación en el Oriente (PET 030919 en foja 6839), y la licitación de un camino entre los pozos Yuca y Culebra (PET 016947 en foja 6843), aspectos claves para el desarrollo de las operaciones de Texpet. También se solicita autorización para extender un contrato de servicios de ferri en la zona (PET 032775 en foja 6844), y con mayor importancia, se solicita aprobación de los documentos de aprobación del Pozo Vista-1. |

Note: Bolding, color, and underlining in Figure 15 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

10

Plaintiff's Exhibit 2164   p. 10 of 31

App. 20

**Figure 16. Identical or nearly identical word strings (more than 70 words) and unique word choice (i.e., "workover") in the unfiled Fusion Memo and the Ecuadorian Judgment**

| Fusion Memo: page 5 | Ecuadorian Judgment: pages 20-21 |
|---|---|
| c) **Pedidos de autorización de Palmer a Granville** (Archivos Texpet){footnote 11}.- Como se explicó anteriormente, **la cadena de autorizaciones** va bastante **más arriba de Palmer**.  Uno de los ejecutivos de Texaco Inc. superiores a Palmer era Maurice Granville; en el archivo del proceso constan decenas de pedidos de autorización, dentro de los cuales sobresalen los que se describen a continuación. **Haciendo eco de un pedido de Shields (ver PET01921**X del literal a)**, Palmer le solicita a Granville la autorización para contratar equipos y personal para el mantenimiento** oleoductos **(PET029976) y según el requerimiento de Bischoff (ver PET030919** del literal b) **aprueba una de las ofertas para la construcción de las** <u>torres de "workover"</u>**, sometiendo dicha aprobación al visto bueno de Granville (PET029991).**<br><br>{footnote 11} Comunicaciones Palmer-Granville [PSV-018/E3] **Cuerpo 66, fojas 6930, 6938, 6943**. | Adicionalmente, constan en el expediente sendos **pedidos de autorización de Palmer a Granville**, en el **cuerpo 66, fojas 6930, 6938, 6943**, que demuestran que **la cadena de autorizaciones** se extiende **más arriba de Palmer**, ya que **haciendo eco de un pedido de Shields (ver PET019212, en foja 6828)**, **Palmer le solicita a Granville la autorización para contratar equipos y personal para el mantenimiento** de oleoductos **(PET 029976**, en foja 69309) **y según el requerimiento de Bischoff (ver PET 030919**, en foja 6839) **aprueba una de las ofertas para la construcción de las** <u>torres de "workover"</u>**, sometiendo dicha aprobación al visto bueno de Granville (PET 029991**, en foja 6943**).** |

Note: Bolding, color, and underlining in Figure 16 are added.  Red bolded text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

11

Plaintiff's Exhibit 2164   p. 11 of 31

**UNFILED DRAFT ALEGATO (PX 438)**

**Figure 17. Similar text in the unfiled Draft Alegato and Ecuadorian Judgment, but not in filed Final Alegato**

| Draft Alegato: page 61 | Ecuadorian Judgment: page 24 | Final Alegato: Enero 17, 2011 - 16H55, page 99 |
|---|---|---|
| Al igual que Shields, Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet.  En su declaración juramentada Bischoff explica cómo los contratos de Texpet que excedían ciertos valores debían ser aprobados por el jefe de los abogados de Texaco Inc., lo cual ayuda a probar la forma en que Texpet dependía de Texaco Inc. | Al igual que Shields, ha quedado claro en el expediente que Bischoff participaba activamente en las complejas cadenas y procesos de toma de decisiones que involucraban a Texaco Inc. y Texpet. En su declaración juramentada Bischoff explica cómo los contratos del cuartel general de Texpet, ubicados en Florida, que se excedieran de USD 500.000,oo debían ser aprobados por un abogado de apellido Wissel, jefe de los abogado de Texaco Inc. | De hecho, las instancias en las que Bischoff tomó la medida de marcar la distinction demuestran la inseparbilidad de las comañias, en lugar de desacreditarla.  Por ejemplo, en una declaración bajo juramento Bischoff describió cómo debía asegurarse de que los contratos de Texpet que superaban ciertos valores recibieran la aprobación necesaria de los ejecutivos y de los asesores letrados de Texaco{footnote 362}. Se trata de otro ejemplo de cómo las estructuras de Texpet/Texaco eran, en efecto, indiferenciables. |

Note: Bolding and color in Figure 17 are added and indicate identical or nearly identical matches in two or more documents. Curly brackets are used to interject text or comments not in the original documents.

**Figure 18. Identical or nearly identical word strings (more than 25 words) in the unfiled Draft Alegato and the Ecuadorian Judgment**

| Draft Alegato: page 61 | Ecuadorian Judgment: pages 23-24 |
|---|---|
| Así, por ejemplo se ha verificado que el ejecutivo Robert C. Shields desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet. | Por ejemplo, el señor Robert C. Shields, desempeñó el cargo de Vicepresidente de Texaco Inc. entre 1971 y 1977, siendo a la vez Jefe de la Junta de Directores de Texpet, |

Note: Bolding and color in Figure 18 are added.  Bolded red text indicates exact matches between the documents.

12

App. 22

**Figure 19. Identical or nearly identical word strings (more than 40 words) in the unfiled Draft Alegato and the Ecuadorian Judgment**

| Draft Alegato: page 61 | Ecuadorian Judgment: page 24 |
|---|---|
| Otro "ejecutivo compartido" que jugó un papel importante en la estrecha relación entre Texpet y Texaco Inc. es **Robert M. Bischoff**, quien **durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina. Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual él mismo llama Texaco Petroleum Company (Texpet),** lo cual reafirma la idea de que las mismas personas vinculadas con Texaco Inc. pensaban en Texpet como parte de su compañía. | Del mismo modo, el señor **Robert M. Bischoff durante su carrera ostentó cargos de Texaco Inc. tanto en EEUU como en América Latina. Entre 1962 y 1968 trabajó como Vicepresidente en la división de producción para América Latina, a la cual él mismo llama Texaco Petroleum Company (Texpet),** según consta en su declaración juramentada, en cuerpo 63, foja 6621., |

Note: Bolding and color in Figure 19 are added.  Bolded red text indicates exact matches between the documents.

13

Plaintiff's Exhibit 2164   p. 13 of 31

App. 23

UNFILED JANUARY INDEX SUMMARY (PX 0433)

**Figure 20. Identical orthographic errors and identical or nearly identical word strings in Lago Agrio Plaintiffs' unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Pruebas pedidas por CVX, Row 46, Column B | Ecuadorian Judgment: pages 127-128 | Record: foja 159.199 |
|---|---|---|
| **Que se agregue a los autos como prueba,** el **documento Informe sobre Desarrollo Humano Ecuador 1999 publicado por UNICEF en el que se consignan datos sobre políticas ambientales y sostenibilidad en el Ecuador en 1990, págs. 61-74.** Si **bien estos datos registran los problemas ambientales del Ecuador, las técnicas de explotación petrolera no constan como uno de los problemas ambientales.** En **las páginas 63 y 64 de dicho informe se señala la carencia de políticas ambiéntales en el país en 1980** en la que **recién se da inicio a una insipiente política de protección ambiental.** | Se considera **como prueba las páginas. 61-74 del documento "Informe sobre Desarrollo humano, Ecuador 1999", publicado por UNICEF en el que se consignan datos sobre políticas ambientales y sostenibilidad en el Ecuador** en la década de los noventa. Se considera que la parte demandada alegó que si **bien estos datos registran los problemas ambientales del Ecuador, las técnicas de explotación petrolera no constan como uno de los problemas ambientales,** sin embargo, al revisar el documento el juzgador ha encontrado bajo el título: {quotation omitted} La parte demandada también ha alegado que en **las páginas 63 y 64 de dicho informe se señala la carencia de políticas ambiéntales en el país** en el decenio de **1980,** cuando **recién se da inicio a una insipiente política de protección ambiental.** | **Que se agregue a los autos** y se tenga **como prueba** de mi parte las copias certificadas de **las páginas 61 a 74,** que en catorce fojas útiles acompaño, **del documento** denominado **"INFORME SOBRE DESARROLLO HUMANO ECUADOR 1999", publicado por la UNICEF, en el que se consignan los datos sobre "políticas ambientales y sostenibilidad en el Ecuador 1990".**<br><br>En estos datos y cifras se puede observar principalmente los **problemas ambientales** de tratamiento prioritario en el País (recuadro 4.4, página 64), en el que **las técnicas de explotación petrolera no constan como uno de los problemas ambientales.**<br><br>{…}<br><br>Cabe anotar que **las páginas 63 y 64 se señala la carencia de políticas ambientales en el** País durante el siglo pasado hasta el año **1980** en que **recién se da inicio a una incipiente política de protección ambiental,** |

Note: Bolding, color, and underlining in Figure 20 are added.  Bolded red text indicates identical or nearly identical matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified.  Curly brackets are used to interject text or comments not in the original documents.

14

**Figure 21. Identical or nearly identical language in the unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Pruebas pedidas por SV, Rows 6-9, Column D | Ecuadorian Judgment: page 7 | Record: foja 2132 |
|---|---|---|
| Copia íntegra y certificada del "Agreement and Plan of Merger", que dice relación con "Certificate of Merger of Keepep Inc and into Texaco Inc.", documetno cuya fecha de emisión es el 9 de octubre de 2001. | 1) Copia íntegra y certificada del "Acuerdo y Plan de Fusión", que dice relación con el "Certificado de Fusión entre Keepep Inc y Texaco Inc.", documento cuya fecha de emisión es el 9 de octubre de 2001; | 1.- Copia íntegra y certificada del "Agreement and Plan of Merger", que dice relación con el "Certificate Of Merger Of Keepep Inc. With And Into Texaco Inc.", {no "documento"} cuya fecha de emisión fue el nueve de octubre del año dos mil uno. |
| Copia íntegra y certificada del documento en el que conste la autorización de Chevron Corporation, para que su subsidiaria {no comma} Keepep Inc {no comma} intervenga en el Merger. | 2) Copia íntegra y certificada del documento en el que conste la autorización de Chevron Corporation, para que su subsidiaria {no comma} Keepep Inc. {no comma} intervenga en la Fusión; | 2.- Copia íntegra y certificada del documento en el cual conste la autorización de Chevron Corporation, para que su subsidiaria, Keepep Inc, intervenga en el acto a que se refiere el numeral anterior. |
| Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} para que se proceda al cambio de denominación de Chevron Corporation a Chevron Texaco Corporation. | 3) Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} para que se proceda al cambio de denominación de Chevron Corporation a Chevron Texaco Corporation; | 3.- Copia íntegra y certificada de la autorización del órgano corporativo competente, para que se proceda al cambio de denominación de Chevron Corporation a ChevronTexaco Corporation. |
| Copia íntegra y certificada la autorización del órgano corporativo competente {no comma} emitida para que Texaco pueda incorporar {no comma} a su nueva denominación {no comma} la palabra Texaco. | 4) Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} emitida para que Chevron pueda incorporar {no comma} a su nueva denominación {no comma} la palabra Texaco. | 4.- Copia íntegra y certificada de la autorización del órgano corporativo competente, para que Chevron Corporation pueda incorporar, a su nueva denominación, la palabra Texaco. |

Note: Bolding, color, and underlining in Figure 21 are added. Purple underlining emphasizes the particular language feature being exemplified and bolding demonstrates identical or nearly identical language matches of those exemplified features. (For clarity of presentation, not all identical or nearly identical language matches are bolded in this example.) Curly brackets are used to interject text or comments not in the original documents.

15

**Figure 22. Identical or nearly identical word strings in the unfiled January Index Summary and Ecuadorian Judgment, but not the filed Record.**

| January Index Summary: Pruebas pedidas por SV, Row 5, Columns H {"testimonio en fojas 2150. P75.C22"} and I | Ecuadorian Judgment: page 138 | Record: fojas 2150 vuelta and 2151 |
|---|---|---|
| Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Pet{no "r"}o y el Frente, y por eso seguramente se imprimió en hojas de Petro. Las muestras {no "s"}e tomaron al azar. | "Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petroecuador y el Frente, y por eso seguramente se imprimió en hojas de Petro". Este testigo asegura que las muestras se tomaron al azar | 2) La metodología fue la recopilación de las muestras de suelo y agua de los diferentes campos, estas muestras las tomaron al azar y los resultados de lapsus fueron comparados con las tablas ambientales que existen en vigencia. 4) No soy asesor del Frente de Defensa de la Amazonía a mi me contrató el Frente de Defensa de la Amazonía para un trabajo técnico a realizarse en el listado de pozos que me presentaron. 11)...de la Amazonía me imagino que las hojas en las cuales se imprimió es por el convenio interinstitucional que hay entre Petr{no "o"}ecuador y el Frente de Defensa de la Amazonía. |

Note: Bolding and color in Figure 22 is added.  Bolded red text indicates exact matches between the documents. Curly brackets are used to interject text or comments not in the original documents.

16

**Figure 23. Incorrectly cited foja number (i.e., 4103 instead of correctly citing 4105), identical or nearly identical representation of time (i.e., "11h18"), and identical or nearly identical word strings (more than 15 words) in the unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Pruebas pedidas por SV, Row 6-9, Column H | Ecuadorian Judgment: pages 6-7 | Record: foja 4105 |
|---|---|---|
| en **fojas 4103 se encuentra un Razón de 29 de octubre 11h18** de **que la parte demandada no se presentó a la exhibición** {same text listed 4 times} | a **fojas 4103 se encuentra**n **una** razón **de 29 de octubre** del 2003, a las **11h18**, sentada por la Secretaría de la Presidencia, en la que consta **que la parte demandada no se presentó a la exhibición** de varios documentos relativos precisamente a este tema, | RAZON: Siento como tal que el dia **de** hoy miércoles **29 de octubre** del año dos mil tres, siendo ya las once horas, dieciocho minutos, **no se** ha **presenta**do **la parte demandada** con el objeto de dar cumplimiento a la exhibitión de documentos despuesta en providencia de las 15H30 de octubre 23 del 2003. |

Note: Bolding, color, and underlining in Figure 23 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

17

**Figure 24. Identical or nearly identical description of tables—mistaken period usage, identical or nearly identical recording of dates, identical or nearly identical word strings (more than 50 words), and omitted "cuadro 5"—in both the unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Pruebas pedidas por CVX, Row 50, Columns B {quoted text below} and D {"Fojas 3301"} | Ecuadorian Judgment: page 129 | Record: foja 3308 |
|---|---|---|
| Que se reproduzca y tenga como prueba el contenido de los cuadros:<br><br>a. Cuadro 1: Tasas Generales del estado de salud. Región Amazónica Ecuatoriana. Correspondiente a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989. | Con respecto a los cuadros 1, Tasas Generales del estado de salud Región Amazónica Ecuatoriana. Correspondiente a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989; | Que se reproduzca y se tenga como prueba de mi parte, el contenido de los Cuadros:<br><br>Cuadro 1 "TASAS GENERALES DEL ESTADO DE SALUD – REGION AMAZONICA ECUATORIANA", correspondientes a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989, |
| b. Cuadro 2:  Expectativa de vida al nacer en la Región Amazónica. Correspondientes a los años 1962, 1977, 1980, 1985. 1980-1985; 1985-1990. | 2, expectativa de vida al nacer en la Región Amazónica. Correspondiente a los años 1962,{no space}1977,{no space}1980, 1985. 1980-1985; 1-85-1990; | Cuadro 2 "EXPECTATIVA DE VIDA AL NACER REGION AMAZONICA ECUATORIANA", años 1962, 1977, 1980-85, 1985-90; |
| c. Cuadro 3: "Mortalidad Neonatal e Infantil" 1989. | 3, "Mortalidad Neonatal e Infantil" 1989; | Cuadro 3 "MORTALIDAD NEONATAL E INFANTIL – 1989" (TASA POR 1000 NACIDOS VIVOS); |
| d. Cuadro 4: Tasa de Mortalidad Infantil, 1980-1989.<br><br>El demandante reitera que con estos documentos se contradice lo afirmado por los demandantes. | 4, Tasa de Mortalidad Infantil 1980-1989, se los tiene en cuenta para emitir este fallo con las consideraciones anotadas. | Cuadro 4 "TASA DE MORTALIDAD INFANTIL (POR 1000 NACIDOS VIVOS), años 1980 a 1989; |

18

Plaintiff's Exhibit 2164   p. 18 of 31

App. 28

| {No mention of Cuadro 5} | {No mention of Cuadro 5} | Cuadro 5 "TASA DE MORTALIDAD MATERNAL" (POR 1000 NACIDOS VIVOS), años 1980 a 1989; fuente: Ministerio de Salud Pública-UNICEF, los mismos que constan como anexo de mi contestación a la demanda. |
|---|---|---|

Note: Bolding, color, and underlining in Figure 24 are added. Bolded red text indicates exact matches between the documents. Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

**Figure 25. Identical or nearly identical word strings (more than 35 words) in the unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Prueba pedidas por SV, Row 23, Columns H ("Yanacuri en foja 3339 a 3393. Cuerpo 34") and I | Ecuadorian Judgment: page 133 | Record: foja 3378 |
|---|---|---|
| **Entre las conclusiones afirma el autor del informe que es difícil establecer una relación entre la contaminación por petróleo y su impacto porque sus efectos son variados y por la poca información que había de la contaminación en el pasado**. | **Entre las conclusiones afirma el autor del informe que es difícil establecer una relación entre la contaminación por petróleo y su impacto porque sus efectos son variados y por la poca información que había de la contaminación en el pasado**, | ESTABLECER UNA RELACIÓN **entre la contaminación por petróleo y su impacto** en la salud **es** extremadamente **difícil**, en parte **porque** sus **efectos** producidos por el petróleo y sus diversos componentes **son variados y** escasamente conocidos pero también **por la** falta de **información** sobre **la contaminación en el pasado** y de registro médicos. Por estas razones, se examinaron diferentes impactos en la salud en vez de centrarse tan sólo en uno de ellos, por ejemplo el cáncer. |

Note: Bolding and color in Figure 25 is added; bolded red text indicates exact matches between the documents.

19

**Figure 26. Identical or nearly identical word strings (more than 35 words), miscited foja numbers (i.e., the study cited on foja 614 in January Index Summary and twice in Ecuadorian Judgment begins in the Record at foja 612, not 614), and textual changes (e.g., the addition of "gravemente" and "es decir") in the unfiled January Index Summary and Ecuadorian Judgment, but not in the filed Record**

| January Index Summary: Pruebas pedidas por SV, Row 4, Columns H and I | Ecuadorian Judgment: pages 137 and 146 | Record: fojas 612, 618, 621 |
|---|---|---|
| A partir del **cuerpo 7**P13. Foja 614. 1500 páginas {Column H} | y constante en el expediente desde el **cuerpo 7,foja 614**, {page 137}<br><br>y constante en el expediente desde el **cuerpo 7**, Foja 614, {page 146} | {Study actually begins at foja 612.} |
| 1. S**e entrevistaron 1017 familias, de las cuales 957 se consideran gravemente afectadas;** {Column I} | en el que s**e entrevistaron 1017 familias, de las cuales 957 se consideran gravemente afectadas** {page 137} | Como resultado del análisis de las encuestas realizadas a un total de **1017 familias, 957 se** encuentran {no "gravemente"} **afectadas**, {Foja 618} |
| **- De las familias afectadas, el 42, 42%, es decir, 406, iniciaron acciones para remediar su situación y solamente el 17, 24%, es decir, 70 obtuvo algún resultado.** {Column I Cont.} | **-De las familias afectadas, el 42, 42%, es decir, 4006, iniciaron acciones para remediar su situación y solamente el 17, 24%, es decir, 70 obtuvo algún resultado.** {page 137} | Del 94.10 % de **las familias afectadas,** apenas un 42.{no space}42{space} **%** (n = 406) hizo algo por tartar de **remediar** los problemas y/o efectos de contaminación **y** de estos solo un 17.{no space}24{space} **%** (n = **70) tuvo algún** tipo de **resultado.** {Foja 621} |

Note: Bolding, color, and underlining in Figure 26 are added. Bolded red text indicates exact matches between the documents. Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

20

**UNFILED JUNE INDEX SUMMARY (PX 434)**

**Figure 27. Identical or nearly identical word strings in the unfiled June Index Summary and Ecuadorian Judgment, but not the filed Record.**

| June Index Summary: Pruebas pedidas por SV, Row 5, Columns H {"testimonio en fojas 2150. P75.C22"} and I | Ecuadorian Judgment: page 138 | Record: fojas 2150 vuelta and 2151 |
|---|---|---|
| Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petro y el Frente, y por eso seguramente se imprimió en hojas de Petro. Las muestras se tomaron al azar. | "Me contrató el Frente. Me imagino que hay un convenio interinstitucional entre Petroecuador y el Frente, y por eso seguramente se imprimió en hojas de Petro". Este testigo asegura que las muestras se tomaron al azar | 2) La metodología fue la recopilación de las muestras de suelo y agua de los diferentes campos, estas muestras las tomaron al azar y los resultados de lapsus fueron comparados con las tablas ambientales que existen en vigencia. 4) No soy asesor del Frente de Defensa de la Amazonía a mi me contrató el Frente de Defensa de la Amazonía para un trabajo técnico a realizarse en el listado de pozos que me presentaron. 11)...de la Amazonía me imagino que las hojas en las cuales se imprimió es por el convenio interinstitucional que hay entre Petr{no "o"}ecuador y el Frente de Defensa de la Amazonía. |

Note: Bolding and color in Figure 27 is added.  Bolded red text indicates exact matches between the documents.  Curly brackets are used to interject text or comments not in the original documents.

21

Plaintiff's Exhibit 2164   p. 21 of 31

**Figure 28.  Lago Agrio Record citation errors from the unfiled June Index Summary found in the Ecuadorian Judgment.**

| June Summary Index: Indice, Row 930, Columns B and D | Ecuadorian Judgment: page 142 | Ecuadorian Judgment: page 150 | Record: fojas 74973 - 75003 |
|---|---|---|---|
| **Acta** de **inspección judicial** de pozo **Shushifindi 13**<br><br>**74973-750**13 | Concordantemente, en la **inspección judicial de Shushufindi 13** (ver **acta** en fojas **74973-750**13), | En la **inspección judicial de Shushufindi 13** (foja **74973-750**13), | **ACTA DE INSPECCION JUDICIAL POZO SHUSHUFINDI –13 74973-750**03 |

Note: Bolding, color and underlining in Figure 28 are added.  Bolded red text indicates identical or nearly identical matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

**Figure 29. Incorrectly cited foja number (i.e., 4103 instead of correctly citing 4105), identical or nearly identical representation of time (i.e., "11h18"), and identical or nearly identical  word strings (more than 15 words) in the unfiled June Index Summary and Ecuadorian Judgment, but not in the filed Record**

| June Index Summary: Pruebas pedidas por SV, Row 6-9, Column H | Ecuadorian Judgment: pages 6-7 | Record: foja 4105 |
|---|---|---|
| en **fojas** 4103 **se encuentra un Razón de 29 de octubre** 11h18 de **que la parte demandada no se presentó a la exhibición** {same text listed 4 times} | a **fojas** 4103 **se encuentra**n **una razón de 29 de octubre** del 2003, a las 11h18, sentada por la Secretaría de la Presidencia, en la que consta **que la parte demandada no se presentó a la exhibición** de varios documentos relativos precisamente a este tema, | **RAZON:** Siento como tal que el día **de** hoy miércoles **29 de octubre** del año dos mil tres, siendo ya las once horas, dieciocho minutos, **no se** ha **presentó la parte demandada** con el 15H30 de octubre 23 del 2003. |

Note: Bolding, color, and underlining in Figure 29 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

22

**Figure 30. Identical or nearly identical description of tables—mistaken period usage, identical or nearly identical recording of dates, identical or nearly identical word strings (more than 50 words), and omitted "cuadro 5"—in both the unfiled June Index Summary and Ecuadorian Judgment, but not in the filed Record**

| June Index Summary: PCV-03, Row 50, Columns B {"Fojas 3301"} and D {quoted text below} | Ecuadorian Judgment: page 129 | Record: foja 3308 |
|---|---|---|
| **Que se reproduzca y tenga como prueba el contenido de los cuadros:**<br><br>a. **Cuadro 1: Tasas Generales del estado de salud. Región Amazónica Ecuatoriana. Correspondientes a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989.** | Con respecto a los **cuadros 1, Tasas Generales del estado de salud Región Amazónica Ecuatoriana. Correspondiente a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989;** | **Que se reproduzca y** se **tenga como prueba** de mi parte, **el conteniedo de los Cuadros:**<br><br>**Cuadro 1** "TASAS GENERALES DEL ESTADO DE SALUD – REGION AMAZONICA ECUATORIANA", **correspondientes a los años 1967, 1970, 1974, 1978, 1982, 1986, 1989,** |
| b. **Cuadro 2:  Expectativa de vida al nacer en la Región Amazónica. Correspondientes a los años 1962, 1977, 1980, 1985. 1980-1985; 1985-1990.** | **2, expectativa de vida al nacer en la Región Amazónica. Correspondiente a los años 1962,**{no space}**1977,**{no space}**1980, 1985. 1980-1985; 1-85-1990;** | **Cuadro 2** "EXPECTATIVA DE VIDA AL NACER REGION AMAZONICA ECUATORIANA", **años 1962, 1977, 1980-85. 1985-**90**;** |
| c. **Cuadro 3: "Mortalidad Neonatal e Infantil" 1989.** | **3, "Mortalidad Neonatal e Infantil" 1989;** | **Cuadro 3** "MORTALIDAD NEONATAL E INFANTIL – 1989" (TASA POR 1000 NACIDOS VIVOS); |
| d. **Cuadro 4: Tasa de Mortalidad Infantil, 1980-1989.**<br><br>El demandante reitera que con estos documentos se contradice lo afirmado por los demandantes. | **4, Tasa de Mortalidad Infantil 1980-1989,** se los tiene en cuenta para emitir este fallo con las consideraciones anotadas. | **Cuadro 4** "TASA DE MORTALIDAD INFANTIL (POR 1000 NACIDOS VIVOS), años 1980** a **1989;** |

23

Plaintiff's Exhibit 2164   p. 23 of 31

App. 33

| | | |
|---|---|---|
| {No mention of Cuadro 5} | {No mention of Cuadro 5} | Cuadro 5 "TASA DE MORTALIDAD MATERNAL" (POR 1000 NACIDOS VIVOS), años 1980 a 1989; fuente: Ministerio de Salud Pública-UNICEF, los mismos que constan como anexo de mi contestación a la demanda. |

Note: Bolding, color, and underlining in Figure 30 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified.  Curly brackets are used to interject text or comments not in the original documents.


**Figure 31. Identical or nearly identical word strings (more than 35 words) in the unfiled June Index Summary and Ecuadorian Judgment, but not in the filed Record**

| June Index Summary: Prueba pedidas por SV, Row 23, Columns H ("Yanacuri en foja 3339 a 3393. Cuerpo 34") and I | Ecuadorian Judgment: page 133 | Record: foja 3378 |
|---|---|---|
| **Entre las conclusiones afirma el autor del informe que es dificil establecer una relación entre la contaminación por petróleo y su impacto porque sus efectos son variados y por la poca información que había de la contaminación en el pasado.** | **Entre las conclusiones afirma el autor del informe que es dificil establecer una relación entre la contaminación por petróleo y su impacto porque sus efectos son variados y por la poca información que había de la contaminación en el pasado,** | ESTABLECER UNA RELACIÓN **entre la contaminación por petróleo y su impacto** en la salud es extremadamente **dificil**, en parte **porque** los **efectos** producidos por el petróleo y sus diversos componentes **son variados y** escasamente conocidos pero también **por la** falta de **información** sobre **la contaminación en el pasado** y de registro médicos. Por estas razones, se examinaron diferentes impactos en la salud en vez de centrarse tan sólo en uno de ellos, por ejemplo el cáncer. |

Note: Bolding and color in Figure 31 are added.  Bolded red text indicates exact matches between the documents.

24

**Figure 32. Identical or nearly identical word strings (more than 35 words), miscited foja numbers (i.e., the study cited on foja 614 in June Index Summary and twice in Ecuadorian Judgment begins in the Record at foja 612, not 614), and textual changes (e.g., the addition of "gravemente" and "es decir") in the unfiled June Index Summary and Ecuadorian Judgment, but not in the filed Record**

| June Index Summary: Pruebas pedidas por SV, Row 4, Columns H and I | Ecuadorian Judgment: pages 137 and 146 | Record: fojas 612, 618, 621 |
|---|---|---|
| A partir del **cuerpo 7**P13. Foja 614. 1500 páginas {Column H} | y constante en el expediente desde el **cuerpo 7**,foja 614, {page 137} <br><br> y constante en el expediente desde el **cuerpo 7**, Foja 614. {page 146} | {Study actually begins at foja 612.} |
| 1. Se **entrevistaron 1017 familias, de las cuales 957 se consideran** gravemente **afectadas;** {Column I} | en el que se **entrevistaron 1017 familias, de las cuales 957 se consideran** gravemente **afectadas;** {page 137} | Como resultado del análisis de las encuestas realizadas a un total de **1017 familias, 957** se encuentran {no "gravemente"} **afectadas,** {Foja 618} |
| - **De las familias afectadas, el 42, 42%, es decir, 406, iniciaron acciones para remediar su situación y solamente el 17, 24%, es decir, 70 obtuvo algún resultado.** {Column I Cont.} | -**De las familias afectadas, el 42, 42%, es decir, 4006, iniciaron acciones para remediar su situación y solamente el 17, 24%, es decir, 70 obtuvo algún resultado.** {page 137} | Del 94.10 % de **las familias afectadas,** apenas un 42.{no space}42{space} **%** (n = **406**) hizo algo por tartar de **remediar** los problemas y/o efectos de contaminación **y** de estos solo un 17.{no space}24{space} **%** (n = **70) tuvo algún** tipo de **resultado.** {Foja 621} |

Note: Bolding, color, and underlining in Figure 32 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

25

Plaintiff's Exhibit 2164   p. 25 of 31

**Figure 33. Identical orthographic errors and identical or nearly identical word strings in Lago Agrio Plaintiffs' unfiled June Index Summary and Ecuadorian Judgment**

| June Index Summary: PCV-03, Row 46, Column D | Ecuadorian Judgment: pages 127-128 |
|---|---|
| Que se agregue a los autos **como prueba, el documento Informe sobre Desarrollo Humano Ecuador 1999 publicado por UNICEF en el que se consignan datos sobre políticas** <u>ambientales</u> **y sostenibilidad en el Ecuador** en 1990, <u>**págs. 61-74**</u>. **Si bien estos datos registran los problemas** <u>ambientales</u> **del Ecuador, las técnicas de explotación petrolera no constan como uno de los problemas** <u>ambientales</u>. **En las** <u>**páginas 63 y 64**</u> **de dicho informe se señala la carencia de políticas** <u>ambiéntales</u> **en el país en 1980** en la que **recién se da inicio a una insipiente política de protección** <u>ambiental</u>. En la página 66 se determina el enorme impacto ambiental de los colonos. | Se considera **como prueba** las <u>páginas. 61-74</u> **del documento** "**Informe sobre Desarrollo humano, Ecuador 1999**", **publicado por UNICEF en el que se consignan datos sobre políticas** <u>ambientales</u> **y sostenibilidad en el Ecuador en** la  década de los noventa. Se considera que la parte demandada alegó que s**i bien estos datos registran los problemas** <u>ambientales</u> **del Ecuador, las técnicas de explotación petrolera no constan como uno de los problemas** <u>ambientales</u>, sin embargo, al revisar el documento el juzgador ha encontrado bajo el título: [quotation omitted] La parte demandada también ha alegado que e**n las** <u>**páginas 63 y 64 de dicho informe se**</u> **señala la carencia de políticas** <u>ambiéntales</u> **en el país en** el decenio de **1980,** cuando **recién se da inicio a una insipiente política de protección** <u>ambiental</u>, |

Note: Bolding and underlining in Figure 33 are added; bolding indicates identical or nearly identical matches between the documents and underlining emphasizes the particular language feature being exemplified.

Plaintiff's Exhibit 2164   p. 26 of 31

**Figure 34. Identical or nearly identical language in the unfiled June Index Summary and Ecuadorian Judgment, but not in the filed Record**

| June Index Summary: Pruebas pedidas por SV, Rows 6-9, Column D | Ecuadorian Judgment: page 7 | Record: foja 2132 |
|---|---|---|
| Copia íntegra y certificada del "Agreement and Plan of Merger", que dice relación con "Certificate of Merger of Keepep Inc and into Texaco Inc.", documetno cuya fecha de emisión es el 9 de octubre de 2001. | 1) Copia íntegra y certificada del "Acuerdo y Plan de Fusión", que dice relación con el "Certificado de Fusión entre Keepep Inc y Texaco Inc.", documento cuya fecha de emisión es el 9 de octubre de 2001; | 1.- Copia íntegra y certificada del "Agreement and Plan of Merger", que dice relación con el "Certificate Of Merger Of Keepep Inc. With And Into Texaco Inc.", {no "documento"} cuya fecha de emisión fue el nueve de octubre del año dos mil uno. |
| Copia íntegra y certificada del documento en el que conste la autorización de Chevron Corporation, para que su subsidiaria {no comma} Keepep Inc. {no comma} intervenga en el Merger. | 2) Copia íntegra y certificada del documento en el que conste la autorización de Chevron Corporation, para que su subsidiaria {no comma} Keepep Inc. {no comma} intervenga en la Fusión; | 2.- Copia íntegra y certificada del documento en el cual conste la autorización de Chevron Corporation, para que su subsidiaria, Keepep Inc, intervenga en el acto a que se refiere el numeral anterior. |
| Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} para que se proceda al cambio de denominación de Chevron Corporation a Chevron Texaco Corporation. | 3) Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} para que se proceda al cambio de denominación de Chevron Corporation a Chevron Texaco Corporation; | 3.- Copia íntegra y certificada de la autorización del órgano corporativo competente, para que se proceda al cambio de denominación de Chevron Corporation a ChevronTexaco Corporation. |
| Copia íntegra y certificada la autorización del órgano corporativo competente {no comma} emitida para que Texaco pueda incorporar {no comma} a su nueva denominación {no comma} la palabra Texaco. | 4) Copia íntegra y certificada de la autorización del órgano corporativo competente {no comma} emitida para que Chevron pueda incorporar {no comma} a su nueva denominación {no comma} la palabra Texaco. | 4.- Copia íntegra y certificada de la autorización del órgano corporativo competente, para que Chevron pueda incorporar, a su nueva denominación, la palabra Texaco. |

Note: Bolding, color, and underlining in Figure 34 are added. Purple underlining emphasizes the particular language feature being exemplified and bolding demonstrates identical or nearly identical language matches of those

27

Plaintiff's Exhibit 2164   p. 27 of 31

exemplified features. (For clarity of presentation, not all identical or nearly identical language matches are bolded in this example.) Curly brackets are used to interject text or comments not in the original document.

**Figure 35. Incorrectly cited foja number in Unfiled June Index Summary and Ecuadorian Judgment, but not in Record (i.e., June Index Summary and Ecuadorian Judgment incorrectly begin on foja 102251, but the Record begins on foja 102254)**

| June Index Summary: INDICE, Row 1452, Columns B and D | Ecuadorian Judgment: page 114 | Record: fojas 102254-102308 |
|---|---|---|
| {Column B} Acta de Inspección Judicial en Estación Lago Agrio Central<br><br>{Column D} 102251-102308 | (ver acta en fojas 102251 a 102308). | {102254} ACTA DE INSPECCIÓN JUDICIAL A LA ESTACION "LAGO AGRIO CENTRAL" |

Note: Bolding, color, and underlining in Figure 35 are added.  Bolded red text indicates exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

**Figure 36. Lago Agrio Record citation error from the unfiled June Index Summary found in the Ecuadorian Judgment (i.e., June Index Summary and Ecuadorian Judgment incorrectly begin on foja 52474, but the Record begins on foja 52476)**

| June Index Summary: INDICE, Row 756, Columns B and D | Ecuadorian Judgment: pages 100-101 | Record: fojas 52476-52780 |
|---|---|---|
| {Column B} Informe Pericial de pozo Sacha 10, Ing Camino (frente)<br><br>{Column D} 52474-52780 | Así también, el perito insinuado por los demandantes, Edison Camino, ha dicho en su informe de Sacha 10 que "Algunos de los compuestos de los TPHs pueden afectar el sistema nervioso", y en que "un compuesto TPH (benceno) es carcinogénico en seres humanos" (ver informe en fojas 52474 a 52780). | {52476} Yo, Ing. Edison CAMINO CASTRO, en virtud de su disposición en la Inspección Judicial del sitio denominado Pozo Sacha 10. |

Note: Bolding, color, and underlining in Figure 36 are added.  Bolded red text exact matches between the documents.  Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text or comments not in the original documents.

28

**UNFILED FAJARDO TRUST EMAIL (PX 437)**

**Figure 37. Identical or nearly identical word strings (more than 40 words) in the unfiled Fajardo Trust Email and the Ecuadorian Judgment, but not in the filed Registro Oficial**

| Fajardo Trust Email | Ecuadorian Judgment: page 186 | Registro Oficial: page 29 |
|---|---|---|
| La **procedencia del fideicomiso como modo de cumplir las obligaciones** tiene como fundamento el artículo 24, numeral 17 de la Constitución anterior (debe haber una norma similar en la actual) y **ha sido reconocida** (la procedencia del modo) **en las resoluciones de Corte Suprema números 168-2007 de abril 11 de 2007, juicio No. 62-2005, propuesto por Andrade c. CONELEC; y, 229-2002, R.**{space} **O. 43 de marzo 19 de 2003;** | **la procedencia del fideicomiso como modo de cumplir las obligaciones ha sido reconocida en las resoluciones de Corte Suprema números 168-2007 de abril 11 de 2007, juicio No. 62-2005, propuesto por Andrade c. CONELEC; y, 229-2002, R.O. 43 de marzo 19 de 2003,** | {other than "artículo 24, numeral 17, de la Constitución", no overlap with the Fajardo Trust Email is found.} |

Note: Bolding and color in Figure 37 are added.  Bolded red text indicates exact matches between the unfiled Fajardo Trust Email and the Ecuadorian Judgment. Curly brackets are used to interject text, spaces, or comments not in the original documents.

29

**Figure 38. Identical or nearly identical word strings in the unfiled Fajardo Trust Email and the Ecuadorian Judgment, but not in the filed Registro Oficial**

| Fajardo Trust Email | Ecuadorian Judgment: page 186 | Registro Oficial: page 29 |
|---|---|---|
| Finalmente, es necesario establecer un mecanismo adecuado de ejecución de la condena, que permita asegurar que el criterio de Justicia empleado en la presente sentencia se haga realidad, asegurando la tutela judicial efectiva | Finalmente, considerando que es necesario establecer un mecanismo adecuado de ejecución de la condena, que permita asegurar que el criterio de Justicia empleado en la presente sentencia se haga realidad, asegurando así la tutela Judicial efectiva, | Finalmente, es necesario establecer un mecanismo adecuado de ejecución de la sentencia, que permita asegurar que el criterio de Justicia empleado en el presente caso se haga realidad, asegurando la tutela Judicial efectiva |
| y procurando precautelar los intereses de Juan Pablo Andrade Bailón a través de la aplicación del mismo criterio que ha servido para fijar las indemnizaciones por daños materiales | y procurando precautelar los derechos de los demandantes y de los afectados, a través de la aplicación del mismo criterio que ha servido para fijar las indemnizaciones, | y procurando precautelar los intereses de Juan Pablo Andrade Bailón con la aplicación del mismo criterio que ha servido para fijar las indemnizaciones por daños materiales. |

Note: Bolding, color, and underlining in Figure 38 are added. Bolded red text indicates exact matches among the three documents or between the unfiled Fajardo Trust Email and the Ecuadorian Judgment. Purple underlining emphasizes the particular language feature being exemplified. Curly brackets are used to interject text, spaces, or comments not in the original documents.

**UNFILED CLAPP REPORT (PX 928)**

30

Plaintiff's Exhibit 2164   p. 30 of 31

App. 40

**Figure 39. Identical word strings in the unfiled Clapp Report and the Ecuadorian Judgment, but not in the filed Record**

| Clapp Report: page 7 | Ecuadorian Judgment: page 109-110 | Anexo K of Cabrera Report |
|---|---|---|
| **Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud para las poblaciones locales.  Los niveles de plomo en el suelo** más que duplican el límite legal y prueban **que el envenenamiento con plomo es un riesgo real** que fue creado por operaciones de producción de PETRÓLEO en la concesión de Texaco en la amazona ecuatoriana. | **Las muestras de suelo y agua tomadas durante las inspecciones judiciales han indicado niveles excesivos de plomo que puede plantear riesgos de salud para las poblaciones locales. Los niveles de plomo en el suelo** son mucho más elevados de lo normal, lo que contribuye a corroborar **que el envenenamiento con plomo es un riesgo real.** | {While the filed Anexo K of the Cabrera report appears to be based on the unfiled Clapp Report, it does not include this string.} |

Note: Bolding and color in Example 39 are added.  Bolded red text indicates exact matches. Curly brackets are used to interject text, spaces, or comments not in the original documents.  The translation of this word string in the Ecuadorian Judgment is: "Soil and water samples taken during the judicial inspections have indicated excessive lead levels that could pose health risks for local populations. Lead levels in the ground are much higher than normal, which tends to corroborate that lead poisoning is a real risk."

31

Plaintiff's Exhibit 2164   p. 31 of 31

App. 41

Appendix III – The Cabrera Report Was Material to the Judgment

Donziger contended at trial that the Cabrera events – the coercion of Judge Yánez, the inducement of Cabrera to work for the LAPs, the ghostwriting of the Cabrera Report, and the misrepresentation to the Lago Agrio court and others of Cabrera's relationship with the LAPs and his purported independence – were not material to the Judgment[49] because the Judgment said that it did not consider the Cabrera Report in reaching the decision.[50]   This argument fails.   The Judgment itself establishes that its professed disclaimer was not accurate.

To be sure, the Judgment states that it did not take the Cabrera Report "into account to issue [the] verdict."[51]   The Court has concluded elsewhere that this disclaimer statement, including its repetition by the appellate courts, is inadmissible hearsay.[52]  Even if it were admissible, however, it would be no more than some evidence on that point.

Chevron has pointed to evidence suggesting that the Judgment in fact relied upon the Cabrera Report – either directly or indirectly – in four distinct ways: (1) to determine the number of waste pits, which was an essential input on which more than half of the $8.646 billion damage award rests; (2) to calculate potable water damages; (3) by relying on reports of the cleansing experts, which in turn relied upon the Cabrera Report (hence the defendants' use of the term "cleansing experts"); and (4) to determine the eight categories of damages for which Cabrera

---

[49]
      Tr. (summation) 2880:7-13.

[50]
      *Id.*

[51]
      PX 400 (Lago Agrio Judgment), at 51.

[52]
      *See supra Facts* § VII.A.

App. 42

recommended monetary awards against Chevron.

Having considered the evidence, the Court finds that Chevron proved the most important, but not all, of these contentions.

I.      *The Pit Count*

The largest single component of the $8.646 billion award against Chevron was  the $5.4 billion award for remediation of soil at waste pits.  The Judgment purported to explain that figure by (a) finding that there were 880 waste pits in the Concession area, then (b) multiplying 880 by an assumed amount of soil per pit requiring remediation, and (c) multiplying the product of those figures by a cost per unit of soil to be remediated.[53]  Thus, the $5.4 billion figure is a linear function of the pit count as well as assumptions as to pit size and depth.  To put it in the clearest terms, an overstatement of the pit count by 10 percent would have increased the amount of the judgment by about $540 million.  Chevron contends that the critical count of 880 pits comes only from the Cabrera Report.[54]

---

[53]

The Judgment stated:

"The contamination in the area of the concession extends to 7,392,000 cubic meters (m3), a figure that is arrived at considering that we have 880 pits (proven through aerial photographs certified by the Geographic Military Institute which appear throughout the record, analyzed together with the official documents of Petroecuador submitted by the parties and especially by the expert Gerardo Barros, and aggravated by the fact that the defendant has not submitted the historical archives that record the number of pits, the criteria for their construction, use or abandonment) of an area of 60 x 40 meters, and because of the possibility of leaks and spills, it should be remediated in an area of at least 5 meters around the pits, and the pits have a depth of 2.40 meters (which is a reasonable estimate, considering that the pits have different dimensions, and as we noted above, the defendant has not presented an archive or historical record that details the number or the dimensions specified for the construction of the pits)."  PX 400 (Lago Agrio Judgment), at 125.

[54]

DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 77.

Before addressing Chevron's argument, it is important to understand what that argument is and what it is not. Some might characterize the discussion that follows as an effort by this Court to review the merits of the Ecuadorian Judgment. But any such characterization would be wrong. The point here is not whether the Judgment was right or wrong on this point. It instead is whether the Judgment, right or wrong, took the 880 pit count – the importance of which cannot be overstated – from the Cabrera Report, notwithstanding the Judgment's disclaimer of reliance on that document.

We begin with the Judgment's explanation for its 880 pit finding. It initially claimed to have derived the 880 figure from "[1] aerial photographs [of the Concession] certified by the Geographic Military Institute which appear throughout the record, analyzed together with [2] the official documents of Petroecuador submitted by the parties and [3] especially by the expert Gerardo Barros,"[55] which are in the Lago Agrio record. But neither the Judgment nor the defendants have identified any such "official documents of Petroecuador," whether in the record or otherwise, that support the pit count of 880.

Following the entry of the Judgment, Chevron moved for expansion and clarification, *inter alia,* of the basis for the conclusion that there were 880 pits:

> "What is the basis for concluding that there are 880 pits, as is indicated on page 125 of the Judgment: '*considering that we have 880 pits*'? *   *   *   In that regard, I hereby request that you expand your judgment, mentioning the page numbers from which all this information was obtained."[56]

In the Lago Agrio court's subsequent clarification order, the court dropped its former references to

---

[55]

PX 400 (Lago Agrio Judgment), at 125.

[56]

PX 2502 (Chevron motion for expansion and clarification, filed Feb. 17, 2011), twenty-seventh request for expansion of the judgment, at 17 (emphasis in original).

App. 44

unspecified PetroEcuador documents and to the Barros report.  It stated only that "the Court analyzed the various aerial photographs that form a part of the record and that were certified by the military Geographic Institute."[57]  Thus, the 880 pit count figure purportedly rests exclusively on analysis of aerial photographs in the record that were obtained from the Military Geographic Institute.

Against this background, Chevron called two witnesses whose testimony, the Court finds, collectively established that the count of 880 pits could not have come from the aerial photographs and must have been drawn from the Cabrera Report and nothing else.

The first was Spencer Lynch, who addressed the fact that the Judgment used a figure of 880 pits whereas the figure in Cabrera Report Anexo H-1 was 916.[58]  The difference, he pointed out, was that the 916 pit figure in the Cabrera Report included a total of 36 pits that either had been operated by PetroEcuador or at which there had been "no impact" and for which, therefore, no remediation was necessary.[59]  With those pits excluded, the net pit count in the Cabrera Report was 880.[60]

The second witness was Dr. James Ebert, an expert in "scientific methods and techniques of photogrammetry, photo analysis, digital imaging and image processing, and digital

---

[57]

    PX 429 (Lago Agrio Judgment Clarification Order), at 15.

[58]

    The same 916 pit figure appeared also in a spreadsheet produced by Stratus, upon which Anexo H-1 likely was based.  PX 4100 (Lynch Direct) ¶ 98 & Figure 34.

[59]

    *Id.*

[60]

    *Id.*

mapping technologies."[61]  Dr. Ebert examined the photographs and the "various documents that contained aerial photographs in the" Lago Agrio record, including the Cabrera Report and anexos, the "Hidden Pits Report," the "Judicial Inspection Reports' aerial photographs, and other various expert reports."[62]  For a variety of reasons, he concluded that it would have been impossible for Zambrano accurately to have interpreted the aerial photographs in the record.[63]  He explained that Anexo E to the Cabrera Report was the primary source in the Lago Agrio record that used aerial photographs to map pit locations and count specific pits.  But these aerial photo scans – all of which were in black and white – were of such low resolution that it would have been "difficult for even an experienced photogrammetrist to identify and map pits,"[64] much less someone with no special training or equipment.  Even more important, he concluded that "it is impossible that the authors of the Ecuadorian judgment and the Cabrera report independently reached the same 880 pit count by use of aerial photography."[65]

---

[61]     PX 4000 (Ebert Direct) ¶ 4.

[62]     *Id.* ¶ 13.

[63]     *Id.* ¶ 15.

[64]     *Id.*

[65]     *Id.* ¶ 3; *see also id.* ¶ 18.

Dr. Ebert then went on to illustrate "why it [wa]s not possible that the author of the Ecuadorian judgment and the author of the Cabrera report reached the same result by interpreting the photos independently."  *Id.* ¶ 19.  He provided two examples of aerial photographs from the Military Geographic Institute that appeared in annexes to the Cabrera Report and that were interpreted by its author as identifying pits.  Higher quality scans of the same photographs revealed that some of these pits actually were trees, above-ground tanks, and other objects.  *Id.* ¶¶ 21, 22 & Figures 1, 2.  For example, Appendix IV compares an aerial photograph of the Sacha Sur Station well site from Anexo E of the Cabrera Report

In sum, Lynch and Ebert collectively testified that (1) the 916 pit count in the Cabrera Report, once adjusted in a very common sense way to eliminate the 36 "pits" that either were those of PetroEcuador or required no remediation, was 880, (2) the pit count in the Judgment was 880, and (3) neither the pit count in the Judgment nor that in the Cabrera Report could have been determined accurately from the aerial photographs upon which each purported to rely.  They further concluded that, as a practical matter, it is impossible that these two documents could have reached the net count of 880 pits independently on the basis of examination of the aerial photographs, which was the sole stated foundation of each.

Although the defendants never made the point, there is one potential weakness in Chevron's argument and the experts' conclusions on this score.  Chevron has not provided conclusive evidence that the 880 pit count is nowhere in the Lago Agrio record.  In contrast to its analysis with respect to the identity of language in and other characteristics of the Judgment and the LAPs' internal work product, Chevron did not offer a witness who testified that the witness had reviewed the entire record and found no reference to 880 pits except in or simply derived from the Cabrera Report.

On the other hand, defendants have not identified any possible source in the Lago Agrio record for the Judgment's 880 pit count, other than the Cabrera Report, save for the claim that Zambrano reached that figure independently by counting what appeared to him to be waste pits on low resolution aerial photographs.  The Court finds that hypothesis to be incredible given both the quality of the photographs and Zambrano's lack of credibility.

---

(top), to a higher quality image taken from the same source at the same site (bottom).  It reveals that a portion of the image characterized by the Cabrera Report as a waste pit actually is a man made structure.

App. 47

Nor did the LAPs' submissions to the Lago Agrio court, its *alegatos*, point to any record support for the pit count that wound up in the Judgment, although it referred extensively to the Cabrera Report.  In fact, their December 17, 2011 *alegato* claimed that there were 916 pits – the same figure as the Cabrera Report – and cited only the Cabrera Report as support for that proposition.[66]

This failure to cite any other record support for this or any other pit count is telling. The LAPs were worried that their relationship with Cabrera would impugn the credibility of any judgment that relied on it.  Indeed, they successfully had petitioned the court to allow them to submit the cleansing reports to provide alternative bases upon which the ultimate decision could claim reliance.  If there were a source in the record other than the Cabrera Report that supported the pit count figure – which was the basis for the largest component of damages – the LAPs would have cited it.  But they did not.  And that logically suggests that there was nothing in the Lago Agrio record to support the pit count except the Cabrera Report, adjusted to eliminate the PetroEcuador and the "no impact" pits.

The Court finds that the 880 pit count in the Judgment came directly out of the Cabrera Report, adjusted only for the PetroEcuador and "no impact" pits.  It further finds that the circumstances discussed by Ebert and Lynch, whom the Court credits, make it impossible that the pit count in the Judgment came from anything but the Cabrera Report.

II.     *Potable Water Damages*

Chevron next contends that the Judgment's $150 million award for potable water

---

[66]

DX 1482 (LAPs' Dec. 17, 2011 Alegato), at 60 & n.252.

App. 48

damages is based on the Cabrera Report.[67]

The Cabrera Report recommended the award of $428 million in damages for potable water.[68]  A report filed by Chevron expert Gerardo Barros, which is cited in the Judgment,[69] stated that the Cabrera Report had awarded $430 million for potable water, and that this figure was "[g]rossly [e]xaggerated and [f]raudulent."[70]  The Judgment, citing Barros, agreed that the "430 million is too high," and therefore reduced it.[71]  It found that 35 percent of the relevant population lacked access to potable water and awarded $150 million to remedy that problem.[72]  The $150 million figure is 35 percent of the $430 million, rounded down by $500,000 to an even million, recommended in the Cabrera Report.  Moreover, the Judgment cited no evidentiary basis for the $150 million figure.[73]

Once again, the point here is not whether the Judgment was correct in awarding damages in respect of potable water or, if so, whether the figure it selected was well founded.  Those questions are not before this Court.  Rather, the point is that the figure awarded was derived directly

---

[67]

PX 400 (Lago Agrio Judgment), at 182-83.

[68]

PX 310A (Cabrera Report), at 6.

[69]

PX 400 (Lago Agrio Judgment), at 182.

[70]

PX 3306 (Barros Report Excerpt), at 3. The full Barros Report was not offered.  Thus, the only evidence of what Barros said on this subject was his repetition and rounding off of what Cabrera said.

[71]

PX 400 (Lago Agrio Judgment), at 182-83.

[72]

*Id.* at 182-83.

[73]

*See id.*

from the $428 million recommendation contained in the Cabrera Report, as this Court finds.

III.    *The Cleansing Experts*

As noted, the LAPs successfully petitioned the Lago Agrio court to permit them to submit additional expert reports that were intended to "cleanse" the Cabrera Report.  The Judgment cited several of them.  Chevron contends, however, that the Judgment relied on the Cabrera Report by virtue of its reliance on the cleansing experts.  For example, the Judgment cites only one source to support its $200 million award to restore flora and fauna in the Concession area: the report prepared by Dr. Lawrence Barnthouse.[74]  This is so despite the fact that the Judgment recognized that "Dr. Barnthouse testified that he reviewed expert Cabrera's report, but did not prepare a damage report himself" and concluded that "the plaintiff committed fraud by using work of Dr. Barnthouse."[75]  Moreover, the Judgment cited the report of Douglas Allen as a basis for its awards of $5.4 billion for soil remediation and $600 million for groundwater restoration.[76]  But Allen admitted in a deposition that he "relied on parts of the Cabrera Report" and that he did not attempt independently to verify Cabrera's data.[77]

Chevron's argument with respect to the cleansing experts falters at least with respect to Allen.  As a preliminary matter, it is not clear that the Judgment actually purported to rely on the

---

[74]    *Id.* at 182.

[75]    *Id.* at 57.

[76]    *Id.* at 179, 181.

[77]    Allen Dep. Tr. at 171:18-172:3.

Allen report for the groundwater restoration figure.  In awarding $600 million for groundwater restoration, the Judgment noted that the figure is "lower than the average according to economic criterion estimated by Douglas C. Allen, expert contracted by the plaintiffs . . . which is not in any way obligatory or binding for this Court, but rather a simple reference that is not accepted. . . ."[78] Thus, although the Judgment used Allen as a reference point, it is not clear that it purported to rely on his report – and only his report – to come up with the $600 million figure.  Moreover, although Allen testified in his deposition that his report relied on parts of the Cabrera Report, he did not say that he relied on it in his damages assessments for soil remediation and groundwater restoration – the two areas for which he is cited in the Judgment.

With respect to the cleansing experts, then, we are left only with the Judgment's reliance on Barnthouse, who in turn relied on the Cabrera Report, for its $200 million award for restoration to flora and fauna.  This alone would be insufficient to deem the Judgment invalid for its reliance on a fraudulent report, particularly in this case, where such a figure is a tiny drop in a very large bucket.  Combined with the pit count and the potable water damages, however, it supports the conclusion that the Judgment relied on the Cabrera Report notwithstanding its purported disclaimer of such reliance.

IV.    *Eight Categories of Damages*

Finally, Chevron argues that the Judgment "awards damages for the same eight categories that were developed by Defendants and ghostwritten into the Cabrera Report."[79]  These

---

[78]     PX 400 (Lago Agrio Judgment), at 179.

[79]     DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 78.

App. 51

categories are: soil restoration,[80] restoration of groundwater,[81] damages to the ecosystem,[82] loss of indigenous culture,[83] punitive damages,[84] healthcare system,[85] potable water,[86] and excess cancer deaths.[87]   These damage categories, Chevron contends, "are supported by nothing else in the record except the LAPs' final alegato, which itself cites throughout to the Cabrera Report."[88]   Chevron posits also that the Judgment's punitive damages award "matched the Cabrera Report's 'unjust enrichment' award in rationale and effect . . . and had no other record source."[89]   There are several problems with Chevron's arguments on this point.

     *First.*   The Cabrera Report identified *seven* categories of damages, not eight like the Judgment.   It did not recommend an award of damages for soil restoration.   Chevron effectively admits this fact, as it cites without explanation a November 2007 filing by Cabrera as support for

---

[80]

     PX 400 (Lago Agrio Judgment)*,* at 125, 181.

[81]

     *Id.* at 147.

[82]

     *Id.* at 152.

[83]

     *Id.* at 173-74.

[84]

     *Id.* at 185-86.

[85]

     *Id.* at 183.

[86]

     *Id.*

[87]

     *Id.* at 184.

[88]

     DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 78-79.

[89]

     *Id.* at 79.

the fact that Cabrera awarded damages for soil restoration.  But (1) the filing is in Spanish and an English language version was not provided, and (2) the filing – whatever it may be – is not part of the Cabrera Report.

   *Second*.  Although the LAPs did identify soil restoration as the eighth damages category in their *alegato*, Chevron has failed to prove that it did so in reliance only on Cabrera.  In fact, Chevron did not even offer the *alegato* in evidence.  Moreover, the fact that the *alegato* identified eight categories of damages makes it just as likely that the Judgment relied on the LAPs' final brief.

   *Third*.  Chevron is incorrect in its assertion that the Judgment's punitive damages award is the same "in rationale and effect" as Cabrera's recommended unjust enrichment award.  The Cabrera Report recommended an award of $8.31 billion for "unjust enrichment."  It stated that "in other countries, unjust enrichment is used to determine the amount of punitive damages.  Although the Court can decide to use the calculation of unjust enrichment in that way," the Cabrera Report instead calculated it by comparing the "'savings' gained by Texpet by not using adequate environmental controls; and . . . the current value of those savings based on the defendant's profits from capital investments."[90]  By contrast, the Judgment imposed a "punitive penalty equivalent to additional 100% of the aggregate values of the reparation measures."[91]  In effect, it simply doubled the damages figure.

---

[90]   PX 310A (Cabrera Report), at 51.  The Cabrera Report stated that "Annex T provides details on the calculation of unjust enrichment."  *Id.*  However, Chevron did not offer an English  translation of Annex T into evidence and therefore the Court declines to consider the Spanish.

[91]   PX 400 (Lago Agrio Judgment), at 185.

\*   \*   \*

In sum, the Court finds that the Judgment purported to rely on the Cabrera Report at least (1) for the pit count – which drove its largest damages award, (2) for the potable water damages award, and (3) by virtue of its reliance on the Barnthouse report.  The Court thus finds that the Cabrera Report was material to the Judgment at least in those respects, which collectively were very important indeed.

Appendix IV – Aerial Photograph Example (PX 4021)



Figure 2
Sacha Sur

App. 55

Appendix V – Evidentiary Issues

I.    *Admissibility of the Bank Records and Identity Cards*

Guerra testified that in the fall of 2009 he entered into an agreement with Donziger, Fajardo, and Yanza to draft orders favorable to the defendants under Zambrano's name in exchange for $1,000 per month, to be paid by Fajardo and the LAPs.[92]  Chevron offered documentary evidence to corroborate Guerra's story.  It included bank statements[93] and deposit slips purporting to show a series of $1,000 deposits into Guerra's account including two allegedly made by a Selva Viva employee named Ximena Centeno on December 23, 2009 and February 5, 2010.[94]  It includes also additional deposit slips dated October 24, 2009,[95] November 27, 2009,[96] and January 6, 2011[97] each showing a $1,000 deposit into Guerra's bank account,[98] although none of these three bears Centeno's signature.  Finally, Chevron offered copies of two of Centeno's national identity cards,[99] both of

---

[92]

   Tr. (Guerra) 914:10-931:13; *see supra Facts* § X.C.

[93]

   PX 1689, 1704, 1705, 1708, 1710 (Guerra Bank Statements).

[94]

   Several copies of the deposit slips for those two dates appear in the record.  PX 1713 (Guerra Deposit Slips), at 1, 7, 8; PX 1719 (Dec. 23, 2009 Guerra deposit slip obtained by Chevron investigator from the bank); PX 1718 (Feb. 5, 2009 Guerra deposit slip obtained by Chevron investigator from the bank).

[95]

   PX 1713 (Guerra Deposit Slips), at 10.

[96]

   *Id.* at 5, 11.

[97]

   *Id.* at 15.

[98]

   *Id.* at 5, 10, 11, 15.

[99]

   PX 1740, 1741 (Centeno Nat'l Identity Cards).

App. 56

which bear her signature and *cedula* (or identification number).[100]  These were provided as means

of authenticating the purported Cedeno signatures that appear on the December 23, 2009 and

February 5, 2010 deposit slips and to prove that the *cedula* on one of these belonged to Centeno.

### A.    The Bank Statements

Defendants objected to the admissibility of the bank statements,[101] citing principally

hearsay.[102]  Those exhibits are admissible under either the business records exception[103] or the

------

[100]

A *cedula* number is an identification number that in Ecuador is assigned "to each individual, specifically, of Ecuadorian nationality, and which is used to identify the person throughout his or her life."  Tr. (Guerra) 958:6-9.

The parties stipulated that the *cedula* number that appears on the two deposit slips belongs to Ximena Centeno.  Tr. (Guerra) 953:1-4 ("MS. LITTLEPAGE: Yes. There is a woman who worked for Selva Viva, whose name is Ximena Centeno, whose number this is. We believe this is hearsay because we do not believe there is any evidence that that woman deposited this money at this bank.").

[101]

PX 1689, 1704, 1705, 1708, 1710 (Guerra Bank Statements).

[102]

Defendants' other objections merit only brief attention.

Defendants' relevance objection clearly is baseless. The bank statements Chevron offered show that money was deposited into Guerra's bank account (a) two days after Fajardo sent an email to Donziger and Yanza stating "[t]he puppeteer won't move his puppet unless the audience pays him something," PX 1751 (Oct. 27, 2009 Email from P. Fajardo to S. Donziger and L. Yanza re: "NEWS"), and (b) in amounts that corresponded to near-simultaneous withdrawals from the Selva Viva account, PX 583 (Banco Pichincha Account Summary for Selva Viva), at 52-53.  All of this is highly relevant to Chevron's claim that Donziger and the LAPs paid Guerra as Guerra claimed.  *See supra* Facts § X.C.

Defendants object to the admission of the redacted copy of Guerra's bank statement for February 2010, PX 1689, under the rule of completeness.  The exhibit includes an unredacted Spanish-language version of the bank statement.  Even if it did not, defendants have not shown that the redacted portions of this bank statement, which contain personal information and transactions unrelated to this case, must be admitted under Rule 106.

Finally, defendants raised what became a common litany of objections, including authenticity and best evidence.  Substantially for the reasons discussed below in relation to

residual hearsay exception.[104]

   The business records exception provides that a record of a "regularly conducted activity" is admissible for the truth of the matter where the record was made contemporaneously by someone with knowledge, the record was kept in the regular course of business and as a regular practice, a qualified witness testifies to those facts, and the records are trustworthy.[105]  Courts have recognized, however, that neither a qualified witness nor a certification is necessary to provide the foundation in all instances.  Instead, "the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and circumstantial evidence."[106]  Courts have acknowledged also that "[a] foundation for admissibility may at times be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements."[107]

   The Court takes judicial notice that banks routinely produce periodic statements for their customers and that those periodic statements reflect any and all deposits, withdrawals, debits and credits during stated periods of time.  This is done in the regular course of business by bank

---

    the deposit slips, these objections have no merit and do not warrant further discussion.

[103]    Fed. R. Evid. 803(6).

[104]    *Id.* 807.

[105]    *Id.* 803(6).

[106]    *United States v. Pelullo*, 964 F.2d 193, 201 (3d Cir. 1992) (quotations omitted).

[107]    *Fed. Deposit Ins. Corp. v. Staudinger*, 797 F.2d 908, 910 (10th Cir. 1986) (quotations omitted); *see also* 5-803 Weinstein's Evidence § 803.08 (2d ed. 1997-present).

employees with knowledge of the computer systems used to track customers' account activity. Having taken judicial notice of these facts, and having considered also Guerra's testimony regarding the source of the bank statements,[108] the Court finds that the bank statements are admissible under Rule 803(6).  There is no reason to believe those records untrustworthy.

Even if the technical requirements of Rule 803(6) were not satisfied, the Court would receive the bank statements under the residual hearsay exception.  In *Karme v. C.I.R.*,[109] the Ninth Circuit held that a bank statement was admissible under the residual hearsay exception due to its "circumstantial guarantees of trustworthiness," the fact that it was more probative of a material fact than other obtainable evidence, and that "admitting it will best serve the purposes of these rules and the interests of justice."[110]  This Court agrees.

As discussed above, the bank statements are probative of whether defendants paid Guerra as he claimed.  Coupled with the "puppeteer" emails and the deposit slips, *infra*, the bank statements are more probative of that fact than any other evidence that Chevron has or reasonably could have obtained.  There is no reason to doubt their trustworthiness.  They appear in the exact manner that one would expect, and Guerra testified as to how he obtained them directly from the

---

[108]

Tr. (Guerra) 1040:3-16 ("Q. Mr. Guerra, I want to refer you to your what's been marked as Plaintiff's Exhibit 1689, 1704, 1705, and 1708. If you could please look at each of those. Mr. Guerra, are each of those documents a monthly bank statement that you received from your bank, Banco Pichincha, concerning your bank account? A. Yes, sir, they are. Q. Do you recognize them to be true and correct copies of your bank statements that you received directly from your bank, your monthly statements? A. Yes. Q. Are these documents that you turned over to Chevron in connection with this litigation? A. Yes.").

[109]

673 F.2d 1062 (9th Cir. 1982).

[110]

*Id.* at 1064-65; FED. R. EVID. 807.

bank, testimony that the Court credits.[111]   Thus, "[g]iven the circumstantial guarantees of trustworthiness which were present here, the distant location of the bank, and the lack of any evidence in the record to suggest that the bank records are anything other than what they purport to be," the bank statements are admissible under the residual hearsay exception as an alternative to the business records exception.[112]   Moreover, Rule 807(b)'s notice requirement is satisfied because Chevron produced Guerra's bank statements for December 2009, February 2010, and June 2011 in January 2013 – months before trial began,[113] and Chevron disclosed all of its trial exhibits to defendants approximately six weeks before trial began, on August 30, 2013.[114]

### B.   The Identity Cards

Chevron offered two of Centeno's national identity cards, which purport to bear her signature and her *cedula* number.   They were offered as signature exemplars to authenticate the signature that appears on two of the deposit slips.   Defendants objected to the admission of the identification cards on the bases of relevance and best evidence.

The cards are relevant to the question of whether Centeno made the deposits to

---

[111]   Tr. (Guerra) 1040:3-16.

[112]   *Karme*, 673 F.2d at 1065.

[113]   DI 746 (Guerra Decl.), Ex. C, Att. K, G, M.

[114]   DI 1492 (Chevron proposed pretrial order) (filed August 30, 2013; docketed October 4, 2013); *see, e.g.*, *Robinson v. Shapiro*, 646 F.2d 734, 741-42 (2d Cir. 1981) (notice served six weeks before trial was conceded to be sufficient); *United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at \*22 n.7 (S.D.N.Y. Jan. 2, 2001) (requiring that the government give defendant 30-days notice if it intended to avail itself of Rule 807).

Guerra's bank account, as the signatures on the identity cards permit a determination as to whether the signatures on the deposit slips were affixed by Centeno.

Defendants' best evidence argument likewise is without merit. There is no genuine question about the authenticity of the original identity cards. Nor is there anything about the circumstances that makes it unfair to admit the copies. Indeed, Centeno was an employee of Selva Viva, which must have had ready access either to copies of her cards or other information permitting defendants to verify the authenticity of the signatures on the copies of the identity cards offered at trial.[115]

Accordingly, the identity cards[116] were received properly. Centeno's signatures on them are exemplars against which to compare the signatures found on the deposit slips dated December 23, 2009 and February 5, 2010.

C.      *The Deposit Slips and Centeno's Signatures*

1.      *The Deposit Slips*

The defendants initially objected to the deposit slips on hearsay, authenticity, best evidence and relevancy grounds. They then explicitly waived any hearsay objection to the deposit slips save for their hearsay objection to the purported Centeno signatures and the *cedula* number of the person who allegedly made the December 23, 2009 and February 5, 2010 deposits.[117] What

---

[115]      FED. R. EVID. 1003.

[116]      PX 1740, 1741 (Centeno Nat'l Identity Cards).

[117]      Tr. 942:14-943:5.

remains, therefore, are the authenticity, best evidence, and relevancy arguments and the hearsay objection with respect to the signatures and *cedula* number on the December 23, 2009 and February 5, 2010 deposit slips.

The authenticity, best evidence, and relevancy objections are speedily dispatched. Authenticity of the deposit slips, putting to one side the authenticity of the Centeno signatures on the December 23, 2009 and February 5, 2010 slips, was proved by multiple means, including without limitation the distinctive characteristics of bank deposit slips,[118] the corroboration of the information on the deposit slips by the bank statements, the testimony of Guerra, and, with respect to the December 23, 2009 and February 5, 2010 deposit slips, a Chevron investigator's affidavit stating that he obtained copies of each of them directly from the bank.[119]   The best evidence objection is baseless because there was no genuine question as to the identity of the copies offered to the originals from which they were copied and there was no unfairness in admitting the copies.[120] The relevance of the deposit slips is obvious – they were offered to prove that the LAPs paid Guerra for ghostwriting at least some of Zambrano's Chevron orders.   The existence of deposit slips corresponding in timing and amount to the alleged payments makes it more likely that such payments were made than in the absence of such evidence.[121]   This is especially true of the

---

118

       FED. R. EVID. 901(b)(4).

119

       *E.g., Jian Rong Xiao v. Bd. of Immigration Appeals*, 213 F. App'x 38, 41-42 (2d Cir. 2007) (party's testimony as to "issuance and chain of custody with respect to" personal documents can be sufficient to show authenticity); 5-901 WEINSTEIN'S FEDERAL EVIDENCE § 901.03 (2d ed. 1997-present).

120

       FED. R. EVID. 1003.

121

       *See id.* 401.

December 23, 2009 and February 5, 2010 deposit slips, provided that they bear Centeno's signatures as they purport to do.[122]

   Finally, even if the technical requirements of Rule 803(6) were not satisfied, the deposit slips, putting to one side the purported signatures of Centeno and the *cedula* number, are admissible under the residual hearsay exception for the same reasons discussed in relation to the bank statements' admissibility under the same rule.[123]

---

[122]

The deposit slips – at least to the extent of the dates, amounts, and identity of the account to which the deposits were made – would have been admissible over hearsay objection under the business records exception even if that objection had not been waived and even assuming that the deposit slips were offered to prove the truth of those data.

There is adequate documentary evidence to provide a foundation for the deposit slips' admissibility under Rule 803(6) by virtue of *United States v. Pelullo*, 964 F.2d 193, 201 (3d Cir. 1992) ("[T]he testimony of the custodian or other qualified witness is not a sine qua non of admissibility in the occasional case where the requirements for qualification as a business record can be met by documentary evidence, affidavits, or admissions of the parties, i.e., by circumstantial evidence, or by a combination of direct and circumstantial evidence." (citation and quotations omitted)). Guerra's bank statements are circumstantial evidence of the deposit slips' reliability as to those points, and that is as true of the two bearing the purported signature of Centeno as it is of the others. The statements corroborate the dates, amounts, and account numbers listed on the deposit slips. In addition, Guerra testified that he retrieved the entire group of deposit slips (PX 1713) directly from Banco Pichincha. Tr. (Guerra) 934:2-7. The Chevron investigator independently obtained directly from the bank copies of the two deposit slips purportedly signed by Cenento and that bore her *cedula* number, PX 1718 and PX 1719. The testimony of Guerra and the investigator, in addition to establishing authenticity through the chains of custody, support an inference that the bank maintained those records in the normal course of its business and that it was its regular course of business to do so.

[123]

There is an additional basis for admitting the two deposit slips that purport to contain Centeno's signature, assuming that those slips in fact do bear her signature. By signing, Centeno verified the accuracy of the date, time, amount, account, and recipient contained on the deposit slip. Her signature thus was an adoptive admission of all of the other statements contained on each slip under Rule 801(d)(2). Rule 801(d)(2) and Centeno's conceded role as defendants' agent or employee are discussed in greater detail below.

2.      *Centeno's Signatures and Cedula*

Defendants object on authenticity and hearsay grounds to the admission of the purported Centeno signatures and *cedula* number on the bottom of the December 23, 2009 and February 5, 2010 deposit slips.  The Court begins with the authenticity issue.

Defendants argue that there is no evidence that Centeno, as opposed to the bank teller or some other person, actually signed the deposit slips and wrote Centeno's *cedula* number on them, and that the admissibility of the statements hinges on the author's identity.  The argument is not persuasive.

The Court has before it two Centeno national identity cards, each of which bears her signature.  It has compared these exemplars with the signatures on the two deposit slips in question, as it of course may do for this purpose.[124]  The signatures are extremely similar and share obvious common characteristics.  Each contains loops around each the first and last names and all are consistent in size, style, and lettering.  In all the circumstances, the Court finds that Centeno signed the deposit slips for the December 23 2009 and February 5, 2010 deposits and in fact made those deposits to Guerra's account.  As she did so as an employee of Selva Viva,[125] which is controlled

---

[124]

*See United States v. Kalymon*, 541 F.3d 624, 632 (6th Cir. 2008) ("Rule 901(b)(3) in turn provides that the trier of fact can authenticate a signature by identifying and comparing it with a signature already authenticated." (citation omitted)); *United States v. Spano*, 421 F.3d 599, 605 (7th Cir. 2005) ("no rule of evidence makes a [factfinder] incompetent to determine the genuineness of a signature by comparing it to a signature known to be genuine").

[125]

Tr. (Donziger) 2596:1-4 ("Q. Ximena Centeno is an employee of Selva Viva [in December 2009], correct, sir?  A. My understanding was that she worked for Selva Viva at that time, yes."); PX 1739 (public record showing Ximena Centeno's employment at Selva Viva from September 2009 to May 2010).

by the defendants,[126] the information on those two deposit slips, to the extent if any that it might be characterized as one or more statements offered to prove the truth of the matters asserted, are admissible against the defendants as non-hearsay pursuant to Rule 801(d)(2).[127]

II.     *The Hearsay Objections to Certain Guerra-Zambrano Conversations Are Overruled*

Donziger – but not the LAP Representatives – objected to Guerra's in-court direct testimony, although not his written direct testimony, with respect to (a) Guerra's conversation with Zambrano in which Zambrano allegedly instructed Guerra to propose to the LAPs that he would allow them to draft the judgment and would sign and issue it as his own in exchange for at least $500,000, and (b) Guerra's conversation with Zambrano following the ensuing meeting at which Guerra allegedly repeated the proposal to Fajardo, Yanza, and Donziger.  The latter was the conversation in which Zambrano allegedly told Guerra that he had been in touch with Fajardo, that the LAPs had agreed to pay Zambrano $500,000 from the proceeds of the judgment, and that Zambrano would share that money with Guerra once it was received.[128]

The Court overruled Donziger's hearsay objection as to Zambrano's alleged statement in conversation (a) on the ground that the statements were admissible at least for nonhearsay purposes, viz. "to explain the sequence of events regardless of whether it was true" and

---

126

      *See supra Facts* § II.C.2.

127

      *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).

128

      The written direct is at PX 4800 (Guerra Direct) ¶¶ 41-44.  The testimony and objections are included in the passage at Tr. (Guerra) 990:9-1002:1.

promised a later ruling as to the full scope of admissibility.[129]  It overruled also their hearsay objections as to the alleged statements by Fajardo and Zambrano in conversation (b).[130]  The Court has reviewed these rulings and adheres to them.

Zambrano's statement in conversation (a) clearly was admissible, regardless of its truth, "to explain the [ensuing] sequence of events" and, in addition, to demonstrate the relationship between Zambrano and Guerra.

The Zambrano statements to Guerra in the post-meeting conversation, conversation (b),  require analysis at two levels because they include statements as to what Fajardo allegedly told Zambrano. For the reasons that follow, everything said in conversation (b) also was admissible against Donziger (and would have been admissible against the LAP Representatives had they objected to it).

The Fajardo statement to Zambrano – *i.e.*, Fajardo's statement that the LAPs had agreed to pay Zambrano $500,000 from the proceeds of the judgment was not hearsay because it was offered to prove that Fajardo made the statement, which was relevant to show why Zambrano thereafter did what he did.  The same is true of part of Zambrano's subsequent statement to Guerra – *i.e.*, that Zambrano would share with Guerra part of any money he received from the LAPs – as it explains why Guerra assisted in the preparation of the judgment.  Thus, the only hearsay in either conversation was Zambrano's relation to Guerra of what Fajardo allegedly had said to Zambrano, which was offered to prove the truth of Zambrano's account of what Fajardo had said. But this was

---

[129]

Tr. (Guerra) 991:1-5.

[130]

Tr. (Guerra) 999:14-16, 999:24-1001:24.

an admissible co-conspirator declaration.[131]   Indeed, the same would be true of the entirety of the conversation even if every statement were offered for the truth of the matters asserted.

The guiding principles are these:

"To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.  *   *   *   The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment. [citation omitted]   In addition, while the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.' *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir.1996)."[132]

As the Federal Rules of Evidence apply both to criminal and civil cases[133] and do not differentiate as to the standards governing admissibility of co-conspirator declarations, these principles apply here.[134]

---

[131]

Fed. R. Evid. 801(d)(2)(E).

[132]

*United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Although not expressly required, there is abundant independent evidence of the existence of the conspiracy.

[133]

Fed. R. Evid. 1101(b).

[134]

*United States v. Stanchich*, 550 F.2d 1294, 1299 n.4 (2d Cir. 1977).

The Court notes that there can be no conspiracy to bribe because the crime of bribery is one which necessarily requires the concerted action of the briber and the bribee.  *United States v. Sager*, 49 F.2d 725, 727-28 (2d Cir. 1931) ("[w]here concert is necessary to an offense, conspiracy does not lie").   Defendants therefore conceivably might have argued that Donziger and Fajardo could not have been co-conspirators, and the statements in conversations (a) and (b) therefore are inadmissible hearsay, because Donziger and Fajardo could not have been convicted of conspiring with Zambrano to commit bribery.  But that argument would be of no avail for three reasons.

App. 67

In this case, the Court finds, as is explained in the text, that there was a conspiracy among Zambrano, Guerra, Fajardo, and Donziger for Zambrano to decide the case in the LAPs' favor and to sign a judgment prepared by their lawyers and pass that judgment off as his own in exchange for $500,000.  There is ample evidence, independent of the alleged hearsay statements, both of the existence of that conspiracy and of the participation of Donziger and Fajardo in it.  In addition to the circumstantial evidence described in the text, this includes (1) Guerra's changing his "*modus operandi* regarding [his] role as ghostwriter in the Chevron case,"[135] (2) the "brief meeting"

*First*, defendants did not make the argument.  It therefore was waived.  Even if they had made the argument, however, it would have failed for each of two independent reasons.

*Second*, admission of a statement under Rule 801(d)(2)(E) does not require that the technical elements necessary to obtain a conspiracy conviction all have been satisfied – only that the statements were made "in furtherance of some joint purpose." *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976) ("The absence of a conspiracy count . . . is without legal significance in determining whether [one's] statements were admissible against [another]. The Government need only prove a conspiracy in fact between [the two] to make the words of one, spoken in furtherance of some joint purpose, the words of the other as well."); *United States v. El-Mezain*, 664 F.3d 467, 502 (5th Cir. 2011).  Rule 801(d)(2)(E), if otherwise satisfied, therefore would have warranted receipt of the statements even if the participants in the two conversations could not have been convicted of conspiracy to commit bribery in addition to bribery.

*Third*, all of the participants in the conversations would have been subject to conviction for conspiracy notwithstanding the rule noted in the *Sager* case.  The Court of Appeals has limited the rule set forth in *Sager* – that there can be no criminal conviction of the payer and taker of a bribe for the crime of conspiracy to bribe – to apply only to situations in which the conspiracy "involved [no] more participants than were necessary for the commission of the" crime of bribery. *United States v. Benter*, 457 F.2d 1174, 1178 (2d Cir. 1972).  A conspiracy may be charged where the bribe payer and bribe recipient use a "go between" – a person whose participation is not necessary to the offense of bribery, which requires only offer and acceptance in exchange for (usually) official conduct – to facilitate the bribe.  *See id.*  That is exactly the situation here.  The bribe givers (Fajardo, Donziger, and perhaps Yanza) and the bribe taker (Zambrano) used Guerra as their go between.  Although he facilitated the bribe, Guerra's participation was not essential to the crime of bribery, which required Fajardo and/or Donziger on one side and Zambrano on the other.  All of the participants in the bribe scheme therefore could have been convicted of conspiracy. *Cf. United States v. Wong*, No. 99 CR. 842 (RPP), 2000 WL 297163, at *3 (S.D.N.Y. Mar. 22, 2000).

[135] PX 4800 (Guerra Direct) ¶ 44.

App. 68

in Zambrano's apartment among Guerra, Fajardo and Zambrano during which the latter two handed over Fajardo's laptop, containing a draft of the judgment, for Guerra "to fine tune and polish" it,[136] (3) Guerra's call to Fajardo for clarification during the "fine tuning" of the judgment,[137] (4) Fajardo's provision to Guerra of the "memory aid" to assist him in revising the draft,[138] (5) Guerra's assistance to Zambrano in preparing the supplemental and clarification order,[139]  (6) Donziger's responses to Guerra at the meeting at which the bribe was proposed, including particularly his inquiry as to how he could be sure that Zambrano would "not deviate from the agreement and . . . keep it secret" and his statement that the LAPs "did not have that sum of money [*i.e.*, $500,000] . . . at [that time],"[140] which were attempts to negotiate the terms of the proposal by delaying payment (the LAPs then were short of cash) and by seeking to ensure that Zambrano would have to deliver the promised *quid pro quo* before any money changed hands, and (7) the enormous amount of independent evidence, including Donziger's own statements, that Donziger was in overall charge of the entire LAP effort, and Fajardo's statements.

Finally, the Court finds that Zambrano's relation to Guerra of what Fajardo told Zambrano was in furtherance of the conspiracy.  Zambrano thereby induced Guerra to contribute his efforts to the joint project – the preparation of a judgment prepared principally by the LAPs in

---

[136]        *Id.* ¶ 47

[137]        *Id.* ¶ 49

[138]        *Id.*

[139]        *Id.* ¶ 52.

[140]        *Id.* ¶ 42.

exchange for a future payment.  Making clear to him that Fajardo had conveyed the LAPs'
agreement to pay the money, out of which Guerra would receive his cut, furthered the overall plan.
The "in furtherance" requirement, moreover, is satisfied as to every statement made by Zambrano
in his conversation with Guerra and every statement made by Fajardo in his conversation with
Zambrano.

### III.      *Beltman and Maest Witness Statements*

Douglas Beltman and Ann Maest were employed by Stratus.  Beltman was in charge
of the Lago Agrio engagement for the firm.  Both were principal authors of the Cabrera Report and
other materials.  Prior to the commencement of this action, and thus at a time when their interests
were aligned with those of the defendants, Beltman and Maest were deposed in Chevron's Section
1782 proceeding.  They and Stratus originally were defendants in this action, but they and Stratus
settled with Chevron.  In connection with the settlement, each signed and provided to Chevron a
declaration that is at odds with that given in their depositions.[141]  Neither side, it appears, sought to
take their depositions in this case.

During the trial, Chevron and the defendants stipulated that the Beltman and Maest
declarations would be received in evidence, but not for the truth of the matters asserted, and that the
defendants would waive cross-examination of Stratus' president, Joshua Lipton.  Subsequently,
defendants designated testimony of Beltman and Maest given in the Section 1782 depositions.[142]

---

[141]

   PX 5208 (Beltman Decl.); PX 5210 (Maest Decl.).

[142]

   The Court previously had ruled that "all defendants were 'present or represented' at the 1782
   Depositions, thus satisfying Rule 32(a)(1)(A) and (a)(8) and making them usable 'to the
   same extent as if taken in [this] action.'" DI 939 (Mar. 26, 2013 Order).

App. 70

Chevron responded by offering their declarations.   Defendants objected to receipt of those declarations to the extent they were offered for the truth of the matters asserted.   Chevron argues that these declarations are admissible for their truth under FED. R. EVID. 106, 806 and 807.

A.      Rule 106 – The Rule of Completeness

The rule of completeness states that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time."[143]

Only evidence that is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion" is admissible under the rule.[144]   Thus, portions of the declarations that are necessary in fairness or to explain the admitted depositions would be admissible under Rule 106.

The purpose for which the admitted portions of the declarations may be used is less clear.   The Second Circuit in *United States v. Pierre*[145] noted that "Rule 106 is silent as to the permissible uses of the document offered for completeness."[146]   It acknowledged that "if the original

---

143

FED. R. EVID. 106.

144

*United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (citation omitted).

145

781 F.2d 329 (2d Cir. 1986).

146

*Id.* at 332 n.2.

evidence was admitted only for a limited purpose, then the additional material should be similarly limited."[147]  Thus, "[w]here the first document is introduced not as substantive evidence but only to impeach credibility, the document offered for completeness would seem to be appropriately introduced also not as substantive evidence but only to rehabilitate credibility."[148]  Logically it may well follow that where the original evidence was admitted for the truth, as is the case here, the Rule 106 evidence similarly would be admitted for the truth.  Indeed, the Second Circuit in *Johnson* stated that "even though a statement may be hearsay," an omitted portion may be put in evidence where necessary.[149]

Phoenix Assocs. III v. Stone,[150] and *United States Football League v. National Football League*,[151] however, suggest a different conclusion.  They hold that "Rule 106 'does not compel admission of otherwise inadmissible hearsay evidence. . . .'"[152]  Accordingly, Rule 106 does not support Chevron's contention that the Beltman and Maest declarations are admissible for their truth.

---

[147]
    *Id.*

[148]
    *Id.*

[149]
    *Johnson*, 507 F.3d at 796.

[150]
    60 F.3d 95 (2d Cir. 1995).

[151]
    842 F.2d 1335 (2d Cir. 1988).

[152]
    *Phoenix Assocs.*, 60 F.3d at 103 (quoting *United States Football League*, 842 F.2d at 1375-76).

B.      *Credibility – Rule 806*

Chevron relies also on Rule 806 as an alternative basis for admissibility.  The rule provides:

> "When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness.  The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it."[153]

A deposition is a hearsay statement.[154] The declarations therefore are admissible for the purpose of impeaching Beltman and Maest's credibility to the extent they are inconsistent with their deposition testimony to the same extent it would be admissible "if the declarant had testified as a witness."[155]  "To be inconsistent, statements 'need not be diametrically opposed.'  The inconsistency requirement is satisfied 'if there is any variance between the statement and the testimony that has a reasonable bearing on credibility.'"[156]


C.      *Residual Hearsay – Rule 807*

Chevron contends also that the Beltman and Maest declarations should be received for the truth of the matters asserted under the residual hearsay exception.  The rule does not provide

---

[153]

FED. R. EVID. 806.

[154]

*See D'Cunha v. Genovese/Eckerd Corp.*, 415 F. App'x 275, 278 (2d Cir. 2011); *Vaughn v. Willis*, 853 F.2d 1372, 1379 (7th Cir. 1988).

[155]

FED. R. EVID. 806.

[156]

*United States v. Preldakaj*, 456 F. App'x 56, 58 (2d Cir. 2012) (citation omitted).

App. 73

a sound basis for admitting the declarations.

Some of the Rule 807 criteria are satisfied here.  In the last analysis, however, it declines to receive them under the residual exception.  Given the divergence between what these witnesses said under oath at their depositions and what they said under oath in the declarations, one is hard pressed to say that either is trustworthy.  Even more to the point, Chevron knowingly agreed to the receipt of the declarations for non-hearsay purposes only in exchange for defendants' agreement not to cross-examine Dr. Lipton.  While the Court recognizes that Chevron may have regarded defendants' subsequent designation of the Beltman and Maest deposition testimony as a breach of the spirit of the agreement, a view upon which it expresses no opinion, it is questionable whether Chevron thus was free to offer the declarations for their truth.  Moreover, Beltman and Maest were obliged by their settlement agreements to testify at trial at Chevron's request, so Chevron could have called them live in any case.  In all the circumstances, the right course is to leave the parties where their mid-trial stipulation put them – the defendants had the deposition testimony in evidence for what it was worth given the impeachment provided by the declarations.

\* \* \*

Accordingly, PX 5208 and PX 5210 are in evidence for impeachment purposes to the extent inconsistent with these witnesses' deposition testimony.  In all the circumstances, the Court has disregarded as untrustworthy and unreliable all of the deposition testimony of Beltman and Maest, except to whatever extent it is relied upon specifically in this opinion.  The Court has considered and rejected Chevron's other contentions on this point.

App. 74

IV.     *Missing Witness Inferences*

Each side contends that the Court should draw inferences unfavorable to its adversary or adversaries from the latter's failure to call certain witnesses.  Defendants argue that such inferences are appropriate with respect to Chevron's failure to call Beltman, Maest, and Calmbacher.  Chevron argues that such inferences are appropriate with respect to defendants' failure to call Fajardo, Yanza, Sáenz, and Prieto.[157]

A.      *The Legal Standard*

"A missing witness charge permitting the jury to infer that the testimony of an unproduced witness would have favored one party is appropriate if production of the witness is 'peculiarly within [the] power' of the other party."[158]  Such an inference is equally permissible in bench trials.[159]  Hence, where one party alone could produce a material witness but fails to do so, an inference that the testimony would favor the opposing party may be appropriate.  Such inference is warranted also where a party to the action is, in effect, a missing witness.[160]  By parity

---

[157]

It so argues also with respect to the failure to call Centeno, Tarco and Calva.  While much ink could be spilled concerning whether such inferences would be appropriate, the Court in the exercise of discretion declines to draw them.  Accordingly, these absentees need not be discussed further.

[158]

*United States v. Rabbani*, 382 F. App'x 39, 41 (2d Cir. 2010).

[159]

*See Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011).

[160]

*Gray v. Great Am. Recreation Ass'n, Inc.*, 970 F.2d 1081, 1082 (2d Cir. 1992) ("The non-appearance of a litigant at the trial or his failure to testify as to facts material to his case and as to which he has especially full knowledge creates an inference that he refrained from appearing or testifying because the truth, if made to appear, would not aid his contention." (quoting *United States v. Fields*, 102 F.2d 535, 537-38 (8th Cir. 1939))).

of reasoning, an adverse inference may be appropriate based on the failure to testify of someone closely allied with or related to a party, such as an employee.[161]   In the event that a witness is available equally to both sides, "the failure to produce is open to an inference against both parties"[162] or neither party.[163]   Where the missing witness's testimony would be cumulative, however, the inference is not available.[164]

   In determining whether a witness is uniquely available to an adverse party, courts in this circuit consider whether that witness is available to the party seeking the adverse inference,[165] as the availability of the witness to an opposing party makes an adverse inference against the party with the closer relationship to the witness less appropriate.   An adverse inference is not warranted, for example, where the controlling or related party makes the missing witness available to its opponent, the party seeking the adverse inference equally could obtain the missing witness's testimony, or the party seeking the adverse inference made no attempt to obtain the witness's

---

[161]

   Although the prototypical missing witness case involves government informants or employer/employee relationships, *Deler v. Commodore Cruise Line*, 92 CIV. 4473 (SHS), 1995 WL 733655, at *5 (S.D.N.Y. Dec. 12, 1995) (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1215-16 (2d Cir. 1994)); *see also United States v. Carter*, 07-5756-CR, 2009 WL 765004, at *3 (2d Cir. Mar. 25, 2009), other types of close relationships also afford a basis for determining that a witness is peculiarly within one party's power. *E.g.*, *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1053 (7th Cir. 1974) (failure to call party's son); *Gaw v. C.I.R.*, 70 T.C.M. (CCH) 1196 (T.C. 1995), *aff'd*, 111 F.3d 962 (D.C. Cir. 1997) (failure to call mother-in-law).

[162]

   *United States v. Nichols*, 912 F.2d 598, 601 (2d Cir. 1990) (citations and emphasis omitted).

[163]

   *E.g.*, *Deler*, 1995 WL 733655, at *5.

[164]

   *See United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988).

[165]

   *See Nichols*, 912 F.2d at 602.

App. 76

testimony.[166]  Such a rule prevents a party from manipulating the system by choosing not to call a witness while claiming that the witness's testimony would be favorable.  The availability determination rests on "all the facts and circumstances bearing upon the witness's relation to the parties."[167]

### B.    Defendants' Absentees

Fajardo, Yanza, Sáenz, and Prieto all are Ecuadorian "local counsel" who work under Donziger's supervision and whose compensation often has come through and been influenced or determined by Donziger.[168]  Donziger has close personal relationships at least with Fajardo and Yanza.  Fajardo holds a power of attorney from all of the LAPs, is their counsel of record in the Ecuadorian courts, and was instrumental in arranging for the testimony or, in some cases, anticipated testimony of other Ecuadorian witnesses on the LAPs' behalf.[169]  Yanza is the case "coordinator"

---

[166]

> See id.

[167]

> Id. (citation omitted).

[168]

> See PX 4900R (Dahlberg Direct) ¶ 75; see supra Facts § II.C.1; PX 2396R (Donziger RFA Responses), at 21-28.

[169]

> See, e.g., Tr. (H. Piaguaje) 2704:6-8 ("Q.  Did Mr. Fajardo tell you that you had to come to New York to testify?  A.  Yes."), 2685:11-14 ("Q.  Did Mr. Fajardo assist you in selecting which of the asamblea minutes to produce?  A.  The most important ones which we believed that we had to produce, yes."); Tr. (Moncayo) 2075:22-23 ("Q.  And Mr. Fajardo helped you draft [your witness statement], correct?  A.  To write it, yes."), 2081:13-22 (testifying that Fajardo contacted Calva's father to discuss her testifying in New York), 2099:11-13 ("Q.  Did Pablo Fajardo ask you to speak to or send you to speak to any other people who were coming up to New York to testify?  A.  Just with Ms. Calva."); Tr. (J. Piaguaje) 2404:2-10 (testifying that he discussed with Fajardo his coming to New York to testify).

for them.  Sáenz submitted a declaration on the LAPs' behalf earlier in this case.[170]  Fajardo, Yanza, and Sáenz all traveled to the United States in connection with the Lago Agrio case when they thought it expedient.[171]  Fajardo has a large contingent fee interest in the Judgment.

Given the relationships between each of the defendants and these four individuals[172] and their obvious possession of material, non-cumulative information going to the heart of the case, the defendants' failure to produce them warrants, and the Court draws, an inference that the testimony of each of Fajardo, Yanza, Sáenz, and Prieto would have been adverse to defendants had they testified.  The Court emphasizes, however, that it would have made the same findings in the absence of those inferences.

---

[170]

DI 152-155 (Sáenz Decls.).

[171]

*See* PX 5600 (Kohn Direct) ¶¶ 18, 51, 66; PX 1406 (Aug. 9, 2010 Ltr. from J. Kohn to P. Fajardo and others), at 3.

[172]

"[W]here an employee who could give important testimony relative to issues in litigation is not present and his absence is unaccounted for by his employer, who is a party to the action, the presumption arises that the testimony of such employee would be unfavorable to his employer."  *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983) (citation omitted).  Other types of close relationships render a witness "peculiarly within one party's power" also.  For example, the Tax Court in *Gaw v. C.I.R.*, 70 T.C.M. (CCH) 1196 (T.C. 1995), *aff'd*, 111 F.3d 962 (D.C. Cir. 1997), drew an adverse inference against defendant for his failure to offer the testimony of his mother-in-law, who possessed material information and was beyond the court's subpoena power because the defendant and the mother-in-law shared "close and amicable business and family relationships prior to and during the years at issue." *Id.* at *24 & n.45.  The Seventh Circuit similarly held that an adverse inference instruction was appropriate where the defendant "testified in effect that her son [who possessed material information] was available to her as a witness; yet he was beyond the subpoena power of the defendants." *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1053 (7th Cir. 1974).

App. 78

C.    *Plaintiff's Absentees*

Defendants seek to have the Court draw adverse inferences from Chevron's failure to call Beltman, Maest, and Calmbacher.

Chevron's settlement agreement with Stratus, Beltman, and Maest required Beltman and Maest to testify at trial if so requested by Chevron. Chevron included them on its witness list but ultimately did not call them either on its direct case or, once it stipulated with the defendants that their witness statements would be received for non-hearsay purposes in exchange for a waiver of cross-examination by defendants of Stratus' Dr. Lipton, on its rebuttal case.

There is no question that Beltman and Maest were available to Chevron by reason of the settlement agreements. Nor is there any question that both were beyond the geographical bounds of the Court's subpoena power. Nevertheless, the Court declines to draw an adverse inference from their absence for several reasons.

Beltman and Maest settled with Chevron in March 2013.[173] Their declarations were filed in April 2013,[174] long before the close of the discovery period. Defendants thus were well aware of Beltman's and Maest's quite revised accounts and could have deposed them. But defendants elected not to do so. That alone is sufficient to preclude or, in the exercise of discretion, to decline to draw any adverse inference. A witness is not unavailable to a party that fails to make any effort to seek his or her testimony.[175] Moreover, defendants agreed at trial to the receipt of the Beltman and Maest declarations for non-hearsay purposes. Only afterward did they offer their 2010

---

[173]

*See, e.g.*, DI 934-1 (Settlement and Mutual Release).

[174]

DI 1007-1 (Stavers Decl. Apr. 12, 2013), at Exs. 3652-3653.

[175]

*See Mittelstaedt*, 31 F.3d at 1215-16.

Section 1782 depositions for the truth of the statements they then had made, this despite the fact that Beltman and Maest subsequently had recanted much of what they had said in 2010.  An adverse inference against Chevron in these circumstances would be neither logical nor just and would risk rewarding gamesmanship.[176]

Although Calmbacher is not Chevron's agent or employee and was not contractually bound to testify, Chevron included his name on its witness list and by all appearances intended to have him testify, which implies that it could have produced him as a witness.  However, as was the case with Beltman and Maest, defendants elected not to take Calmbacher's deposition.  They made that election notwithstanding that they were quite aware of the nature of his deposition testimony that Chevron offered at trial.  Thus, for the reasons discussed above, defendants cannot now claim a benefit from Calmbacher's failure to testify.

---

[176]

See *United States v. Carter*, No. 07-5756-CR, 2009 WL 765004, at *3 (2d Cir. Mar. 25, 2009).

Appendix VI – The Trial Record

*Exhibits*

A complete list of plaintiff's exhibits was marked as Court Exhibit F.[177]  A complete list of defendants' exhibits was marked as Court Exhibit D, modified by the Court's February 25, 2014 order.[178]  Except to the extent specific exhibits were received or objections sustained during trial or by other orders, all of the exhibits were received subject to the adversary's objections.[179] Some of those objections are ruled upon in this opinion and appendices, many specifically and some by category.  Nevertheless, given the volume of exhibits that were provisionally received subject to objections, the Court has not ruled specifically on every objection.

To the extent the Court has relied in this opinion or appendices on exhibits that were objected to, it has overruled the objections.  To the extent the Court has not so relied, it should be understood either as having sustained or not ruled on the remaining objections in view of the apparent lack of materiality of the exhibits.

A number of other matters concerning the record warrant explanation.


*Direct Testimony*

Each party submitted the direct testimony of its witnesses – with the exception of Nicolás Zambrano, Jeffrey Shinder, and to some extent Alberto Guerra – in the form of written declarations ("Witness Statements").  Portions of every Witness Statement were objected to.

---

[177]    DI 1871 (Feb. 20, 2014 Order), Ex. 1.

[178]    DI 1872 (Feb. 24, 2014 Order); DI 1873 (Feb 25, 2014 Order).

[179]    DI 1872 (Feb. 24, 2014 Order), Ex. 2.

The Court ruled from the bench on some of these objections.  It issued comprehensive orders ruling on the objections to the Witness Statements of Steven Donziger and Karen Hinton.[180]  It received other Witness Statements subject to objection.  To the extent the Court has relied in the opinion or appendices on portions of those Witness Statements that were objected to, it has overruled the objections.  To the extent it has not so relied, it either has sustained or not ruled on the objections in view of the apparent immateriality of the evidence in question.

*Deposition Designations*

Each party designated portions of depositions taken in this action and certain related Section 1782 proceedings.  Many of these designations were the subject of objections.  To the extent the Court has relied in the opinion or appendices on deposition testimony to which objections were made, it has overruled the objections.  To the extent it has not so relied, it either has sustained the objections or not otherwise ruled on them.

*Spanish Language Documents*

Many of defendants' trial exhibits are in Spanish, in whole or in part, and were placed in the record *en masse*, without English translations, and received, along with many other exhibits, subject to objections.  Chevron objected to a great many on the ground, among others, that defendants provided translations of none or only parts of the documents.

On December 2, 2013, the Court directed (1) Chevron to provide a list of defendants' exhibits to which the aforementioned objection was made, and (2) defendants to show cause why

---

[180]     DI 1742 (Nov. 18, 2013 Order), DI 1713 (Nov. 12, 2013 Order).

App. 82

the Spanish language exhibits (including any exhibits that are partly in Spanish) submitted without complete English translations should not be excluded.[181]

In response to the Court's order, defendants "ask[ed] that [the Court] exercise its discretion and not strike the Spanish language exhibits [defendants] have offered, and give defendants the opportunity to submit translations of these exhibits if future briefing . . . make[s] them relevant and material."[182]  The Court on December 13, 2013 struck all exhibits that are entirely or partly in Spanish "except to the extent that defendants, no later than the date on which their reply to Chevron's post-trial brief is due, identif[y] each such document on which [they] rel[y] and provide[] Chevron and the Court with complete, certified English translations of the Spanish language content of each."[183]  Defendants filed their reply briefs on January 21, 2014.  They neither identified any Spanish language documents upon which they relied nor provided the required translations.

Chevron and Donziger then filed a stipulation agreeing to a list of defendants' exhibits that "are entirely or partly in Spanish [for which] the Defendants have not provided Chevron or the Court with complete, certified English translations of the Spanish language content . . . ."[184]  The LAP Representatives "d[id] not dispute that the exhibits listed in the Stipulation . . . are entirely or partly in Spanish," but asked that the Court require Chevron to submit any translations it had of such documents "prior to ordering any remaining exhibits stricken from the

---

[181]       DI 1771 (Dec. 2, 2013 Order).

[182]       DI 1828 (Defs. Br.), at 2.

[183]       DI 1830 (Dec. 13, 2013 Order), at 3.

[184]       DI 1864 (Stipulation), at 2.

App. 83

record of these proceedings."[185]

The Court declines to shift to Chevron the burden of submitting English language translation of defendants' exhibits, particularly in light of the defendants' failure to identify specific Spanish language documents upon which they relied. Defendants filed their proposed pretrial order on August 31, 2013, which included most if not all of the Spanish language documents now in question.[186] They had five months after the filing of their proposed pretrial order in which to provide translations for those documents and one month after the Court ordered them to do so. They have declined. The exhibits identified at pages 2-3 of DI 1864, Exhibit 1 were, and remain, stricken pursuant to the Court's December 13, 2013 order.

*Donziger's Improperly Amended Exhibit List*

Donziger moved on September 13, 2013 to amend his trial exhibit list.[187] He sought to add 27 exhibits to the list identified on his proposed pretrial order, fifteen of which (DX 1094-1108) were described as entire websites. The Court denied the motion with respect to those exhibits.[188] In contravention of that order, Donziger included certain of these exhibits in the mass offer of exhibits, subject to objection.[189]

---

[185]    DI 1865 (Notice re: Defs. Exhibits).

[186]    *See* DI 1377 (Defs. Proposed Pretrial Order), Exs. 1 & 2.

[187]    DI 1431 (Donziger Defs. Mot.).

[188]    DI 1539 (Oct. 11, 2013 Order).

[189]    *See* DI 1872 (Court Exhibit D), Ex. 2 at 171-172, 181.

App. 84

Two of those exhibits appear to be pages from a Chevron web site, which the Court will allow to remain in the record in view of their apparent authenticity.[190]  The remainder all appear to be press releases or other materials prepared by the defendants which, to the extent offered for the truth of the matters asserted, are hearsay.  They all are stricken.[191]

---

The exhibits in question are DX 1094, DX 1096, DX 1099-1101, DX 1102A through DX 1102-T and DX 1106.

[190]   DX 1094; DX 1096.

[191]   DX 1099-1101; DX 1102A through DX 1102-T and DX 1106.

App. 85