UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

               Plaintiff,

      -against-

STEVEN R. DONZIGER, et al.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:    Case No.  11 Civ.  0691 (LAK)
:
:
:
:

# CHEVRON CORPORATION'S
# APPLICATION FOR ATTORNEYS' FEES

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................ 3

I.  A Prevailing Plaintiff in a RICO Action is Entitled to an Attorneys' Fee Award Equal to a Reasonable Number of Hours Multiplied by a Reasonable Hourly Rate ......... 3

II.  Chevron is Entitled to an Attorneys' Fees Award Based on the Court's March 4, 2014 Judgment on the RICO Claim Against Donziger ................................................ 7

III.  The Attorneys' Fees Requested by Chevron are Reasonable .......................................... 10

   A. The Hourly Rates Claimed by Chevron's Counsel Are Reasonable Within the Relevant Market and Considering the Nature of the Litigation ................................ 11

      1. The Requested Rates are Reasonable in the Southern District of New York ................................................................................................................... 12

      2. The Requested Rates Reflect the High Caliber of Lawyering, the Difficulty of the Matter and the Results Achieved ............................................. 13

   B. The Hours Expended Litigating This Complex Case Were Reasonably Necessary to Obtain a Successful Outcome for Chevron ......................................... 14

      1. Initial and Amended Complaints ............................................................. 16

      2. Discovery ................................................................................................ 17

      3. Ecuadorian Law ...................................................................................... 19

      4. Enterprise Financials ............................................................................... 19

      5. Motions and Hearings ............................................................................. 20

      6. Writ Petition ........................................................................................... 23

      7. Trial and Related Submissions ................................................................ 24

CONCLUSION ....................................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amerisource Corp. v. Rx USA Int'l, Inc.*,
  02-CV-2514 (JMA), 2010 WL 2160017 (E.D.N.Y. May 26, 2010) ................................... 5

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008) .................................................................. 3, 4, 5, 11

*Barfield v. New York City Health and Hospitals Corp.*,
  537 F.3d 132 (2d Cir. 2008) .................................................................. 5, 9

*Bergerson v. New York State Office of Mental Health*,
  652 F.3d 277 (2d Cir. 2011) .................................................................. 3

*Bingham v. Zolt*,
  823 F. Supp. 1126 (S.D.N.Y. 1993) .................................................................. 15

*Chevron Corp. v. Naranjo*,
  No. 13-772 (2nd Cir. 2013) .................................................................. 23

*Christiansburg Garment Co. v. EEOC*,
  434 U.S. 412 (1978) .................................................................. 8

*Ebbert v. Nassau County*,
  No. CV 05-5445 (AKT), 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ......................... 13

*Farrar v. Hobby*,
  506 U.S. 103 (1992) .................................................................. 5, 9

*Gucci Am., Inc. v. Rebecca Gold Enterprises, Inc.*,
  89 CIV. 4736 (BN), 1993 WL 88270 (S.D.N.Y. Mar. 23, 1993) ................................... 6

*Gusman v. Unisys Corp.*,
  986 F.2d 1146 (7th Cir. 1993) .................................................................. 4

*Hensley v. Eckerhart*,
  461 U.S. 424, 103 S. Ct. 1933 (1983) .................................................................. 6, 7

*In re "Agent Orange" Prod. Liab. Litig.*,
  818 F.2d 226 (2d Cir. 1987) .................................................................. 12

*In re Application of Chevron Corp.*,
  749 F. Supp. 2d 170 (S.D.N.Y. 2010) .................................................................. 15

*Johnson v. Ga. Highway Express, Inc.*,
  488 F.2d 714 (5th Cir.1974) .................................................................. 5

*Johnson v. New York City Transit Auth.*,
  823 F.2d 31 (2d Cir. 1987) .................................................................. 8

*Khalil v. Original Old Homestead Rest., Inc.*,
    657 F. Supp. 2d 470 (S.D.N.Y. 2009) ............................................................... 7

*Khanna v. Am. Exp. Co.*,
    No. 11 CIV. 6245 JSR, 2011 WL 6382603 (S.D.N.Y. Dec. 14, 2011) ........................... 7, 8

*Lenihan v. City of New York*,
    640 F. Supp. 822 (S.D.N.Y. 1986) .................................................................. 6

*Lilly v. County of Orange*,
    910 F. Supp. 945 (S.D.N.Y. 1996) ................................................................ 13

*Lochren v. Cnty. of Suffolk*,
    344 F. App'x 706 (2d Cir. 2009) ................................................................... 5

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012) ........................................................................ 2

*Louis Vuitton Malletier, S.A. v. LY USA*,
    2008 WL 5637161 (S.D.N.Y. Oct. 3, 2008) ...................................................... 2

*Luciano v. Olsten Corp.*,
    109 F.3d 111 (2d Cir. 1997) ....................................................................... 5

*Lunday v. City of Albany*,
    42 F.3d 131 (2d Cir. 1994) .................................................................. 1, 6, 7

*MDO Dev. v. Kelly*,
    726 F. Supp. 79 (S.D.N.Y. 1989) .................................................................. 3

*Millea v. Metro-North R. Co.*,
    658 F.3d 154 (2d Cir. 2011) ....................................................................... 9

*Millea v. Metro-North R.R. Co.*,
    658 F.3d 154 (2d Cir. 2011) ....................................................................... 7

*Miroglio S.P.A. v. Conway Stores, Inc.*,
    629 F. Supp. 2d 307 (S.D.N.Y. 2009) ............................................................ 6

*Mostly Memories, Inc. v. For Your Ease Only, Inc.*,
    594 F. Supp. 2d 931 (N.D. Ill. 2009) ............................................................. 4

*New York State Assoc. for Retarded Children, Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983) ..................................................................... 6

Niles v. Palmer,
    No. 97 Civ. 7573, 1999 WL 1419042 (S.D.N.Y. Oct. 22, 1999) .............................. 12

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004) ....................................................................... 9

*Rodriguez v. McLoughlin*,
    84 F. Supp. 2d 417 (S.D.N.Y. 1999) ......................................................... 12, 13

*Sciambra v. Graham News*,
    892 F.2d 411 (5th Cir. 1990) ...................................................................... 8

*Simmons v. New York City Transit Auth.*,
   575 F.3d 170 (2d Cir. 2009) ............................................................. 4

*Stochastic Decisions, Inc. v. DiDomenico*,
   995 F.2d 1158 (2d Cir. 1993) ...................................................... 1, 3

*Terminate Control Corp. v. Horowitz*,
   28 F.3d 1335 (2d Cir. 1994) ........................................................... 15

Tran v. Tran,
   166 F. Supp. 2d 793 (S.D.N.Y. 2001) ........................................... 12

*U.S. Football League v. Nat'l Football League*,
   887 F.2d 408 (2d Cir. 1989) ............................................................. 8

## Statutes

15 U.S.C. § 15(a) ................................................................................. 8

18 U.S.C. § 1964(c) ......................................................................... 1, 3

## Other Authorities

Clifford Krauss, "Big victory for Chevron over claims in Ecuador," New York Times,
   March 4, 2014 ................................................................................. 10

Michael Goldhaber, "Chevron v. Donziger: The meaning of Judge Kaplan's opinion,"
   The Litigation Daily, March 4, 2014 .............................................. 10

Pub. L. 91-452, 84 Stat. 947, § 904(a) ............................................... 8

Steven Mufson, "U.S. Judge rules for Chevron in Ecuador pollution case," Washington
   Post, March 4, 2014 ....................................................................... 10

The Hon. Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and
   Strategy § 7.08 (Law Journal Press, 2005) ..................................... 12

## PRELIMINARY STATEMENT

On March 4, 2014, the Court found Steven Donziger and his law firms liable to Chevron under the Racketeer Influenced and Corrupt Organizations Act for injuring Chevron through a pattern of racketeering that included multiple frauds, extortion, and obstruction of justice. Dkt. 1874. The verdict was supported by a 485-page opinion with 85 pages of appendices, and followed extensive motions practice, numerous court conferences and hearings, nearly two years of discovery, and a seven-week trial. It represents a major victory for Chevron, and a landmark event in the company's defense against a multi-billion dollar extortion campaign. Chevron now seeks an award of a "reasonable attorney's fee" for the legal costs it incurred in prosecuting this successful RICO suit—an award mandated by the RICO statute. 18 U.S.C. § 1964(c); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1168 (2d Cir. 1993).

Litigating a RICO case is an inherently costly endeavor. RICO is a complex statute, which requires a prevailing plaintiff to prove that defendants violated multiple federal criminal laws over time and in connection with the operation of an enterprise. Chevron did so, amassing and presenting an extensive evidentiary record through documents, videos, fact witnesses, and experts. As the Court found in its opinion, "The facts are many and sometimes complex. . . . The evidence is voluminous." Dkt. 1874 at 1–2. Chevron is entitled to an award compensating it for the cost of attorney time that was "usefully and reasonably expended." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).

Moreover, Donziger's tactics in the litigation compounded Chevron's legal costs. The Court found that "[t]he LAP Representative[s], the Donziger Defendants, and their Ecuadorian allies have been remarkably obstructive in this case." Dkt. 865; Dkt. 809 at 1. Because of Donziger's intransigence and the obstructive tactics of those under his direction, Chevron had to, among other things, bring numerous motions to compel, cross-examine or otherwise respond to

1

surprise witnesses before and during trial, and respond to groundless requests for extraordinary relief from the Court of Appeals—all of which were denied.  And because Donziger chose from the outset to attack Chevron rather than attempt to defend his indefensible conduct, propounding hundreds of overbroad document requests and interrogatories, Chevron was obligated to review millions of pages of irrelevant or privileged documents and incur thousands of hours of attorney time preparing written discovery responses of little or no relevance to the issues in the case. Donziger presented little of what he obtained in these "discovery" efforts at trial, and never explained to the Court what if anything this material had to do with his defense.  *See* Dkt. 1874 at 304–05.  Nonetheless, these tactics imposed substantial costs on Chevron, including attorneys' fees that are compensable here, where "Defendants acted willfully and used discovery tactics that undoubtedly increased the costs of prosecuting this litigation."  *Louis Vuitton Malletier, S.A. v. LY USA*, 2008 WL 5637161, at *3 (S.D.N.Y. Oct. 3, 2008) *aff'd Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012).

In the interest of streamlining the Court's consideration of this application, Chevron does not seek attorneys' fees for all of the work it performed to successfully try its RICO claim.  As described in this memorandum and in the accompanying papers, Chevron requests fees for only a limited set of activities at the core of its case, such as preparing the complaint, attending court hearings, participating in trial, and preparing post-trial submissions; and for activities imposed upon it by Donziger and his co-defendants, including the review of documents sought by Donziger, successfully opposing Donziger's motion to dismiss Chevron's RICO claim, and responding to other motions from Donziger—including those the Court deemed "baseless" and "frivolous."  Chevron seeks an award of $32,334,584 for attorneys' fees incurred in these aspects of the case, reflecting 36,837 hours billed by Chevron's outside counsel at Gibson, Dunn &

Crutcher LLP, and 139,747 hours billed to Chevron by attorneys at Huron Consulting Group and Merrill Communications LLC.  This amount is based on reasonable hourly rates—commensurate with the rates charged by comparable firms in the Southern District of New York, and appropriate for the complexity and importance of this litigation.[1]

## ARGUMENT

**I.      A Prevailing Plaintiff in a RICO Action is Entitled to an Attorneys' Fee Award Equal to a Reasonable Number of Hours Multiplied by a Reasonable Hourly Rate**

When a plaintiff prevails in a civil RICO action, the award of reasonable attorneys' fees is mandatory.  18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter . . . shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . ."); *see also Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1168 (2d Cir. 1993); *MDO Dev. v. Kelly*, 726 F. Supp. 79, 86 (S.D.N.Y. 1989).

Second Circuit case law on the proper means of determining an attorneys' fee award is extensive, but the essential rule is that "Attorneys' fees are awarded by determining a *presumptively reasonable fee*, reached by multiplying a reasonable hourly rate by the number of reasonably expended hours."  *Bergerson v. New York State Office of Mental Health*, 652 F.3d 277, 289 (2d Cir. 2011) (emphasis added).  The Second Circuit adopted this "presumptively reasonable fee" approach in *Arbor Hill*, after undertaking a detailed analysis of the history of attorneys' fee jurisprudence.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 186–93 (2d Cir. 2008); *see also* 10-54 Moore's Federal Practice – Civil § 54.190 "Lodestar Method of Fee Calculation."

Focusing on the "reasonable hourly rate" half of the fee equation, the court in *Arbor Hill*

---

[1]   Chevron will separately seek non-attorneys' fee costs under Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920, pursuant to the Court's order awarding it costs under those provisions.  *See* Dkt. 1875, ¶ 9.

instructed a district court evaluating a fee request, "in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." 522 F.3d. at 190. Because *Arbor Hill* arose in the context of a pro bono representation under the Voting Rights Act, the court's analysis expressly addressed factors a district court must consider where market factors may not have "disciplin[ed]" the rate structure agreed to by the plaintiff.[2] *Id.* at 184. But at the outset of the analysis, the court explained that its fee-setting jurisprudence is meant to "approximate" the "free market." *Id.* at 184.[3] As the court subsequently held, "[t]he presumptively reasonable fee boils down to 'what a reasonable, paying client would be willing to pay,' given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.'" *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill*, 493 F.3d at 185, 190). Indeed, it has long been the rule in the Seventh Circuit that where the party seeking an attorneys' fee award actually paid the requested fees based on an hourly rate, *that* rate is "presumptively appropriate," and departure from that rate by the district court without basis is an abuse of discretion. *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150–51 (7th Cir. 1993) (Easterbrook, J.) (holding that "lawyers who fetch above-average rates are presumptively entitled to them, rather than to some rate devised by the court"); *see also Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 594 F. Supp. 2d 931, 934 (N.D. Ill. 2009) ("the attorney's actual billing rate paid by his client is 'presumptively appropriate' to use as the market rate) (quoting *People*

---

[2] The fees in question in *Arbor Hill* were those of Chevron's counsel in this action, Gibson, Dunn & Crutcher, LLP, and the court affirmed an award of attorneys' fees. The particular question on appeal, which prompted the court to undertake a broader analysis of fee determination doctrine, was how to determine a reasonable hourly rate where counsel resident in one district (the Southern District of New York) appeared in an action in another (the Northern District of New York) where prevailing rates for legal services were substantially lower than in the counsel's resident district—the so-called "forum rule." *See* 493 F.3d at That particular issue is not implicated here, because Chevron relies on the prevailing rates for legal services in the Southern District of New York, where this action proceeded.

[3] *Arbor Hill*, at 184 ("Our fee-setting jurisprudence has become needlessly confused—it has come untethered from the free market it is meant to approximate.").

*Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1311 (7th Cir. 1996)).

Although the Second Circuit has not squarely addressed the question, the Seventh Circuit's presumption that rates actually paid in a lawsuit are reasonable is consistent with the reasoning of *Arbor Hill*.

Beyond evidence of what the party seeking fees actually paid to counsel, a district court is to consider all relevant factors, including those identified in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *Arbor Hill*, 522 F.3d at 190.[4]  The district court is afforded considerable discretion, and "*Arbor Hill* did not hold that district courts must recite and make separate findings as to all twelve *Johnson* factors." *Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009).  In general, "district courts look to the facts and complexity of the case and take into account their own experience with the case." *Amerisource Corp. v. Rx USA Int'l, Inc.*, 02-CV-2514 (JMA), 2010 WL 2160017, at *11 (E.D.N.Y. May 26, 2010).  "The most critical factor" in determining the presumptively reasonable fee "is 'the degree of success obtained' by the plaintiff." *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).

*Arbor Hill* does not address the appropriate number of hours—the other half of the "presumptively reasonable fee" calculation—, but before and since *Arbor Hill*, the Second Circuit has held that "[i]n reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997).  Hours which are

---

[4]  "The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10); the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."  522 F.3d at 186 n.3 (citing *Johnson*, 488 F.2d at 717–19).

"excessive, redundant, or otherwise unnecessary" are not compensable—"'Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.'" *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939–40 (1983) (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (1980) (en banc)). The district court's inquiry should not hinge on what appears necessary in hindsight, and should not "second guess experienced counsel in deciding whether the hours devoted to research [and] drafting . . . were necessary [or] substitute[e] [its] after-the-fact judgment for that of counsel who engaged in whatever research and other activities they felt necessary." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994). "The critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) (quoting *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992)).

    In support of a request for attorneys' fees, the party seeking fees "must document the application with contemporaneous time records . . . specifying, for each attorney, the date, the hours extended, and the nature of the work done." *New York State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). "[W]here the record is substantial, it is permissible to file an application in the form of an affidavit, appending in computer printout form a copy of the relevant portions of the contemporaneous time records."). *Gucci Am., Inc. v. Rebecca Gold Enterprises, Inc.*, 89 CIV. 4736 (BN), 1993 WL 88270, at *3 (S.D.N.Y. Mar. 23, 1993). A party seeking fees may transfer information from "contemporaneous records [to] a form convenient for the Court"—submission of the actual physical records is not required. *Lenihan v. City of New York*, 640 F. Supp. 822, 824 (S.D.N.Y. 1986). The ultimate purpose of any submission is to permit the district court to evaluate whether the hours were "usefully and reasonably

expended." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cit. 1994).

## II.   Chevron is Entitled to an Attorneys' Fees Award Based on the Court's March 4, 2014 Judgment on the RICO Claim Against Donziger

Attorneys' fees are available to any party "injured in its business or property" by a RICO violation, and this Court expressly held that Chevron was so injured by Donziger. Dkt. 1874 at 404. The RICO statute does not require that a plaintiff seek or obtain monetary damages for an award of attorneys' fees (18 U.S.C. § 1964(c)) and attorneys' fee awards generally are not required to be proportionate or tied to monetary damages awards. Courts do consider the degree of success obtained when weighing the amount of an attorney fee award, but success is not measured exclusively in terms of monetary damages awards. Here, Chevron's success was substantial, and more than justifies a substantial award of attorneys' fees.

In general, "a plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." *Hensley v. Eckerhart*, 461 U.S. 424, 435 n.11, 103 S. Ct. 1933, 1940 n.11 (1993). Disproportion between a plaintiff's recovery and the fee applied for is not "a proper basis for a reduction in an otherwise reasonable fee." *Khalil v. Original Old Homestead Rest., Inc.*, 657 F. Supp. 2d 470, 478 (S.D.N.Y. 2009). Indeed, a degree of disproportion is to be expected when attorneys' fees are awarded pursuant to a fee-shifting statute. *See Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 169 (2d Cir. 2011) ("The whole purpose of fee-shifting statutes is to generate attorneys' fees that are *disproportionate* to the plaintiff's recovery.") (emphasis in original). That is because fee-shifting provisions, like the one in RICO, are designed "precisely to encourage individual plaintiffs to bring such suits." *Khanna v. Am. Exp. Co.*, No. 11 CIV. 6245 JSR, 2011 WL 6382603, at *4 (S.D.N.Y. Dec. 14, 2011).

Furthermore, the provision of costs, attorneys' fees, and other enhanced penalties under

RICO should be construed liberally to "effectuate [the statute's] remedial purposes."  Pub. L. 91-452, 84 Stat. 947, § 904(a); *see also Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 415–17 (1978) (noting fee-shifting provisions in general should be construed liberally); *Khanna v. Am. Exp. Co.*, No. 11 CIV. 6245 JSR, 2011 WL 6382603, at *4 (S.D.N.Y. Dec. 14, 2011) ("RICO awards victorious parties mandatory treble damages and attorneys' fees . . . precisely to encourage individual plaintiffs to bring such suits.").

Interpreting the similar fee provision in the Clayton Act,[5] the Second Circuit has expressly held that proving injury is all that is required to obtain attorneys' fees.  In *U.S. Football League v. Nat'l Football League*, a jury had found that the National Football League had injured the upstart USFL through its monopoly power, but awarded the USFL only a nominal $1.00 in damages, and the district court subsequently denied the USFL's request for injunctive relief.  887 F.2d 408, 410 (2d Cir. 1989).  Nonetheless, the Second Circuit held that the USFL was entitled to attorneys' fees, "because the USFL was successful in proving an antitrust injury, all that is required under section 4 of the Clayton Act[.]"  *Id*. at 414; *see also Sciambra v. Graham News*, 892 F.2d 411, 415 (5th Cir. 1990).

Attorneys' fee awards are equitable in nature, and thus, district courts have discretion to modify them on equitable grounds, including the defendants' ability to pay. *Johnson v. New York City Transit Auth.*, 823 F.2d 31, 33 (2d Cir. 1987).  No such adjustment is merited here, as Donziger has "sought to mislead this Court" on this very point, and cannot now raise his purported economic limitations in defense against this fee request.  Dkt. 1874 at 263 n.1098.  As the Court has found, Donziger's repeated assertions to this Court that he did not have the means to defend himself in this action were "unsubstantiated" (Dkt. 1501 at 2) despite the Court's repeat-

---

[5]   Section 4 of the Clayton Act states, in relevant part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).

ed offers to extend further relief "in the event a well supported motion is filed" (Dkt. 1185 at 3). *See* Dkt. 1874 at 263 n.1098.  Then at trial, after initially telling the Court "I'm not getting into this, I think we should move on," (Tr. (Donziger) 2536 21–22) and giving evasive answers to questions by Chevron's counsel (*id*. at 2537:6–2538:12), Donziger admitted that he had received nearly $2 million from family sources in the past two years (*id*. 2538:14–18).  Donziger also admitted that the LAP team had received another $2.5 million in funding in 2013 and was in "ongoing discussions" with that investor and others (Tr. (Donziger) 2528:9–2529:11) and belatedly produced Ecuadorian documents revealed $25 million in financing from Russell DeLeon (PX 8050) that had not previously been disclosed.  Moreover, as documented herein, a substantial portion of the fees Chevron seeks here were incurred as a direct result of Donziger's overbroad discovery requests, his frivolous motions, and his obstruction of Chevron's discovery.  He is in no position to call on the equitable protections of the Court.  "One who comes to equity must come with clean hands."  *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (quotation omitted).

"The most critical factor in determining the presumptively reasonable fee is 'the degree of success obtained' by the plaintiff."  *Barfield*, 537 F.3d at 152 (quoting *Farrar*, 506 U.S. at 114).  Success does not require a large monetary award.  *Millea v. Metro-North R. Co.*, 658 F.3d 154, 168 (2d Cir. 2011) (holding it to be an abuse of discretion where "[t]he district court conflated a small damages award with a de minimis victory").  "Nominal relief does not necessarily a nominal victory make."  *Farrar,* 506 U.S. at 120–21, 113 S.Ct. 566 (O'Connor, J., concurring).  And here, the relief was far more than nominal.  The Court's factual findings alone are of extraordinary value, vindicating Chevron's contention that it was the victim of fraud and a corrupt smear campaign, and they can be expected to provide a bulwark against Donziger's and the

LAPs' future attempts to convince governmental officials, shareholders, and the media that the Ecuadorian judgment is worthy of respect and that Chevron should pay them off.  And the injunctive relief protects Chevron's assets or those of its subsidiaries from attempts to enforce the fraudulent Ecuadorian judgment by imposing a constructive trust on any assets Donziger or his allies manage to obtain on that basis.  Dkt. 1875.  Indeed, the media was quick to recognize the importance of this verdict.  The New York Times described it as a "major victory," and the Washington Post called it "resounding."[6]  One journalist who has covered the dispute for years, and who attended much of the trial, summarized the scope of Chevron's victory:

> After 20 years and hundreds of millions of dollars in litigation costs, we have a winner in the Chevron Ecuador dispute. And of all the countless legal battlegrounds, it's now clearer than ever that U.S. litigation was the main event. . . .  Oh, the death spasms of the litigation—from the underlying environmental case in the Ecuadorean Amazon to Chevron's counterattack in New York—will last for years. . . .  Judge Kaplan's findings will surely be persuasive to a judge in Canada or any other rule of law nation where the plaintiffs may hope to enforce their judgment. . . .  Judge Kaplan's impressive and impeccable marshaling of the evidence is a vindication for the rule of law.[7]

### III.   The Attorneys' Fees Requested by Chevron are Reasonable

This action represented a major component of Chevron's defense against a multi-billion dollar extortionate scheme perpetrated by U.S. lawyers, with the backing of the government of Ecuador, financial support from numerous patrons including an Internet gambling billionaire, legal support from at least one global law firm, and the unwitting support of U.S. government officials, shareholders, and members of the media.  The stakes were high, as was the complexity of the case.  Moreover, the central defendant resides in the Southern District of New York, where the prevailing rate for legal services is higher than in many other jurisdictions.  Accordingly, it was reasonable, indeed necessary, for Chevron to retain experienced, capable counsel, and for

---

[6]   Clifford Krauss, "Big victory for Chevron over claims in Ecuador," New York Times, March 4, 2014; Steven Mufson, "U.S. Judge rules for Chevron in Ecuador pollution case," Washington Post, March 4, 2014.
[7]   Michael Goldhaber, "Chevron v. Donziger: The meaning of Judge Kaplan's opinion," The Litigation Daily, March 4, 2014.

that counsel to devote many hours to the prosecution of Chevron's case.  The result, which consists of both a sweeping opinion that reveals Donziger's misconduct and the fundamental taint infecting the Ecuadorian judgment he obtained, and an injunction barring him and others from profiting from that judgment or seeking to enforce it in the United States, is the most significant victory yet in Chevron's defense against Donziger's attempt to extort billions of dollars.

Moreover, the fees sought here are not based on a hypothetical calculation, but are actual fees incurred and paid by Chevron.  Chevron is a sophisticated buyer of legal services.  The company's general counsel is a former partner at a leading large law firm, and it routinely retains outside counsel to handle litigation and other matters.  Decl.¶ 13.[8]  It requires detailed invoices in support of bills for legal fees, and monitors the work done by its outside counsel to ensure that it legal work is being carried out in an efficient manner.  *Id*.  Where work can be performed by less expensive attorneys, Chevron allocates that work accordingly, as it did in this case.  Decl.¶ 23.  Consequently, this Court need not "bear[] the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively."  *Arbor Hill*, 522 F.3d at 184.  Those shoes are already filled, and the fees paid by Chevron in this case define what "a reasonable, paying client would be willing to pay[.]"  *Id.*

Chevron's requested fees of $32,334,584, which represents the fees incurred for only a portion of the legal work required to prevail in this action, is more than reasonable.

**A.  The Hourly Rates Claimed by Chevron's Counsel Are Reasonable Within the Relevant Market and Considering the Nature of the Litigation**

"When fixing a reasonable rate for attorneys' fees, it is appropriate for a court to consider and to apply the prevailing market rates in the relevant community for similar legal work of law-

---

[8]  "Decl.¶ __" refers the Declaration of Christopher M. Joralemon, filed concurrently herewith.  "Ex. __" refers to the exhibits to Mr. Joralemon's declaration.

yers of reasonably comparable skill, experience and reputation." *Niles v. Palmer,* No. 97 Civ. 7573, 1999 WL 1419042, at *17 (S.D.N.Y. Oct. 22, 1999); *see also Tran v. Tran* 166 F. Supp. 2d 793, 803 (S.D.N.Y. 2001).  The Court should also take into account, among other things, the time expended, the caliber of lawyering, the difficulty of the matter and the results achieved. The Hon. Jed S. Rakoff & Howard W. Goldstein, RICO Civil and Criminal Law and Strategy § 7.08 (Law Journal Press, 2005) (citing *Perkins v. Standard Oil Co.,* 399 U.S. 222, 223 (1970)).  The rates and expenditures claimed by Chevron are reasonable.

### 1.   The Requested Rates are Reasonable in the Southern District of New York

This case was litigated in the federal district court for the Southern District of New York. New York City market rates therefore should apply to this Court's determination of the reasonableness of the hourly rates underlying Chevron's requested fees.  *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir. 1987) (the relevant community for determining rates is the "district in which the reviewing court sits").

The rates paid by Chevron accord with the prevailing market rates in the Southern District of New York.  *See Rodriguez v. McLoughlin,* 84 F. Supp. 2d 417, 423 (S.D.N.Y. 1999).  A 2013 National Law Journal survey determined that the market for partner hourly rates in New York City ranges from $435 to and $1,800.  The average 2013 partner hourly rate paid by Chevron for Gibson Dunn partners included in this fee application was $950—below the average partner rate at many of Gibson Dunn's peer firms.  *See* Ex. G (Latham Watkins average $990; Frank average $1,000; Skadden average $1035; Paul Weiss average $1040; Debevoise average $1,055).  The rates claimed in Chevron fee application are well within the range of reasonableness established by the New York City market.  The highest-billing of these attorneys, former Solicitor General Ted Olson, is one of the nation's premier appellate advocates, and represented Chevron before the Second Circuit in opposition to Defendants' petition to remove the presiding

judge in this action—which the Second Circuit denied just hours after Olson finished his argument.  Moreover, the rates paid by Chevron are similar to those regularly charged to and paid by Gibson Dunn's clients—including Chevron.  Del.¶ 14.  *Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate.").[9]

### 2. The Requested Rates Reflect the High Caliber of Lawyering, the Difficulty of the Matter and the Results Achieved

Chevron's RICO claims were complex and required demonstrating that Defendants operated a multinational criminal enterprise over several years in order to fraud and extort Chevron. This lawsuit involved exposing Defendants' fraud in Ecuador and demonstrating that their baseless U.S. pressure campaign was part of a concerted and organized effort to extort one of the best-known companies in the world.  The requested rates are appropriate given the experience and special expertise Chevron's counsel at Gibson Dunn brought to the litigation.  *See Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *18 (E.D.N.Y. Dec. 22, 2011) (approving rates based in part on the attorneys' "special expertise" they brought to the case).

Gibson Dunn was eminently qualified to represent Chevron in this litigation.  Gibson Dunn is a leading international law firm with more than 1100 attorneys in 18 offices worldwide. Its largest office is in New York, where it has more than 300 attorneys.  It was awarded "Litigation Department of the Year" for back-to-back two-year periods in 2010 and 2012 by The American Lawyer magazine, in significant part because of its representation of U.S. companies engaged in high-stakes, transnational litigation, including the Chevron matter.  Decl.¶ 16.  The firm

---

[9]  In *Rodriguez*, the court stated "part of the reason attorneys at prominent New York law firms are entitled to charge higher rates is that higher overhead and higher costs are associated with such practice."  84 F. Supp. 2d at 426.  The court further found that were it to ignore the higher costs and overhead associated with major law firms, counsel at such firms, "for whom [civil rights litigants] are not typical clients, would be dissuaded in engaging in civil rights litigation on behalf of clients of modest means."  *Id.* at 422.

has a Transnational Litigation practice group that focuses on these types of cases, and two of the group's co-chairs, Andrea Neuman and William Thomson, represented Chevron in this action. Lead counsel Randy Mastro, trial counsel Reed Brodsky, and other Gibson Dunn attorneys representing Chevron have served as Assistant United States Attorneys in the Southern District of New York, with extensive and specialized experience prosecuting criminal enterprises and organized crime. Ex. H. This case's complexity and importance require the services of top-flight legal counsel, which Gibson Dunn provided—at rates similar to those charged by its peer firms in this District.

Nonetheless, where legal services could be performed by less expensive resources, Chevron employed them. In order to respond to Donziger's extensive document requests, Chevron had to review millions of pages of material. This work was overseen by Chevron's lead counsel, Gibson Dunn, but a substantial portion of the review itself was conducted by attorneys contracted directly by Gibson Dunn (at a rate of $280 per hour) and through Merrill and Huron, vendors who provide contract attorneys for document review and other tasks (at rates between $60 and $120 per hour). Decl. ¶ 10–12, 23.

### B. The Hours Expended Litigating This Complex Case Were Reasonably Necessary to Obtain a Successful Outcome for Chevron

Prosecuting this lawsuit required a substantial amount of attorney time, reflecting both the inherent complexity of this action, and Donziger's determined efforts to delay, complicate, and obstruct it at every turn.[10] But Donziger's enterprise, a sophisticated organization operating

---

[10] Donziger's conduct in this action was consistent with his efforts to obstruct justice in other actions as well, including two prior proceedings in this Court. *See* Dkt. 1874 at 131–49. At Donziger's direction, LAP lawyers filed the "highly misleading" Fajardo declaration (*id.* at 143) in fifteen proceedings in federal courts around the country (*id.* at 147) in an effort to obstruct discovery into their dealings with Ecuadorian court-expert Richard Cabrera, including twice in this Court. In its opinion, this Court found, "Donziger's conduct with respect to the Fajardo Declaration was obstruction of justice, plain and simple." Dkt. 1874 at 389. And Donziger's co-counsel falsely characterized the content of the outtakes from *Crude* to this Court in an attempt to obstruct disclosure of that evidence. *Id.* at 148. When Chevron sought discovery from Donziger himself under 28 U.S.C. § 1782, Donziger "resisted fiercely"

on two continents with tens of millions of dollars in funding and supported by at least one international lobbying and law firm, sought to extort billions of dollars from Chevron and its subsidiaries around the world.  Beating back this attack was imperative, and justified sustained economic investment in this litigation.

Chevron's request reflects only a portion of the tasks that were necessary to prevail in this lawsuit, and only a portion of the fees actually incurred even to complete those tasks.  Specifically, Chevron seeks fees incurred in preparing its complaint, handling discovery, analyzing matters of Ecuadorian law, analyzing the racketeering enterprise's complex financial issues, preparing and litigating motions—including participation in court hearings—responding to Defendants' ill-taken writ petition and, finally, trial and related court submissions.[11]

Chevron's $32,334,584 fee request does not reflect the full "cost of the suit," or even its

---

(*id*. at 147) engaging in what this Court found at the time to be "a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay" (*In re Application of Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y. 2010)) and then offering only an "inadequate, grudging and delayed" production in response to multiple court orders.  *In re Chevron Corp.*, No. 10-mc-00002 (LAK) ("*Donziger 1782*") Dkt. 171 (Jan. 21, 2011).  When the Court ultimately ordered Donziger to turn over images of his hard drives to Chevron (*id.*) those images contained innumerable highly relevant, highly damaging documents, and it was later revealed that even this production was likely incomplete, as Donziger had used numerous other hard drives that he has never produced to this day. *Donziger 1782* Dkt. 176; *see generally* Dkt. 356 Ex. A (Annotated version of Chevron's amended complaint describing Donziger obstruction) ¶¶ 317–23; Dkt. 1847 (Chevron Post-Trial Brief) at 176–77.  Donziger also failed to disclose the existence of multiple web-based email accounts he had created specifically to conceal documents from Chevron during the pendency of the Cabrera fraud, and he did not search those accounts for responsive documents.  Instead, just as LAPs counsel had falsely asserted regarding the *Crude* outtakes, Donziger insisted that these "irrelevant accounts" "contained nothing of importance."  (4/11/2011 Letter from B. Kaplan).  *Compare id.* *with* (Dkt. 1874 at 148) (describing meeting with Carlos Beristain removed from *Crude* as "of no relevance to anything" and "unimportant").  In fact, one of these purportedly "irrelevant" accounts was "gringograndote@gmail.com," from which Donziger received the final draft of the Cabrera Report—in Microsoft Word format—the morning it was filed.  Trial Tr. (Lynch) at 637:14-638:2.  Chevron never obtained discovery from most of these accounts.  Meanwhile, the Special Master overseeing Donziger's deposition in that action informed the Court, "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self- serving answers to questions that should have been answered directly, with no embellishment." *Donziger 1782*, Dkt. 151 at 1 (S.D.N.Y. Jan. 11, 2011).  Chevron's motion seeking to hold Donziger in contempt for this conduct in the Donziger 1782 proceeding remains pending in that action.

[11] Where a plaintiff pursues RICO and non-RICO claims in the same action, tasks that furthered both the RICO and non-RICO claims are an appropriate basis for attorneys' fees, and no apportionment or deduction is required.  *Bingham v. Zolt*, 823 F. Supp. 1126, 1137 n.9 (S.D.N.Y. 1993) (holding separating tasks between RICO and non-RICO claims unnecessary because "all of the plaintiff's claims involved a common nucleus of facts and were based on related legal theories"); *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994) (holding no apportionment between claims was necessary where time spent on other issues was "thoroughly intermingled" with successful RICO claim and where fee had already been reduced).

full attorneys' fees. *See* 18 U.S.C. § 1964(c). Chevron has not included any fees for significant components of the litigation, such as the extensive litigation over non-party subpoenas including those issued to Patton Boggs and Amazon Watch (*see*, *e.g.*, Dkt. 905, 1427), time spent working with experts whom Chevron did not call at trial, but whose reports Chevron submitted to the Court in support of briefs on various issues, *see*, *e.g.*, (Dkt. 1474 at 34 (quoting Professor Nancy Moore's opinion that Donziger "violated [his] professional responsibilities under the rules of conduct applicable to [] lawyers"), and time spent identifying and working with fact witnesses who were ultimately unwilling to testify at trial due to risks of reprisals by Defendants' allies in Ecuador (*see*, *e.g.*, Dkt. 760, 1227, 1408). Chevron also has not included time billed by junior associates at its primary outside counsel, or any time at all from its in-house attorneys or from law firms that it consulted in connection with specific aspects of the litigation. Chevron has not included these fees in order to narrowly tailor the hours claimed and thus streamline the Court's consideration of the application.

### 1. Initial and Amended Complaints

On February 2, 2011, Chevron filed its original complaint in this action. Dkt. 1. The 230-page complaint centered on Defendants' RICO violations and included a 52-page chart detailing 172 instances of mail and wire fraud—predicate acts under RICO. *See id.* at 179–206, App. B. It also set forth detailed factual allegations establishing that Donziger had engaged in extortion, obstruction of justice, and other RICO predicate acts. Chevron's detailed pleading was reasonable in order to protect the complaint from anticipated attack on numerous grounds, as in fact did come to pass. In April 2011, Chevron filed an amended complaint consisting of 432 numbered paragraphs and an appendix listing 184 specific instances of mail and wire fraud. *See* Dkts. 283, 283-1, 283-2.

Because many of the defendants to Chevron's claims resided in Ecuador, and in anticipa-

tion that some or all of the Ecuadorians would default (as most did), Chevron was required to incur additional legal fees analyzing and executing a plan for service of the complaint and amended complaint.  *See* Dkts. 69–71, 75, 92, 93, 95.

Chevron seeks $395,138 in attorneys' fees related to the complaint and amended complaint in this action.  *See* Ex. A-1.

### 2. Discovery

While Chevron did not initiate this action until it had obtained substantial evidence of Defendants' wrongful conduct through earlier proceedings, it nonetheless required discovery in this action to prepare the evidence submitted during the seven-week trial and relied upon by the Court in its 485-page opinion.  It sought and obtained documents, testimony, and written discovery from Defendants, from their former counsel, and from various vendors and other related entities.  But just as they had done in earlier actions, Defendants were "remarkably obstructive" and "resisted discovery to an astonishing degree."  Dkt. 797, 809.  This behavior resulted in numerous meeting and conferences between counsel, careful review of Donziger's voluminous (and largely baseless) objections to Chevron's requests, and ultimately extensive motions practice.  Meanwhile, Chevron was obligated to respond to Defendants' discovery requests—which were sweeping, burdensome, and contentious.

Donziger propounded hundreds requests for production, covering topics ranging from historical oil operations in Ecuador to the acquisition of Texaco to Chevron's communications with government officials.  Donziger also sought numerous categories of documents that were subject to privilege.  In order to identify responsive documents and review them for privilege, Chevron had to review approximately one million documents, some decades old, held both by

the company in the United States and by its outside counsel in Ecuador.[12]  Many of these documents were in Spanish.  This review requiring the time of dozens of attorneys.  *See* Decl. ¶¶ 9–12.  Similarly, Donziger demanded depositions of senior Chevron executives, including the Chief Executive Officer, John Watson.  Chevron objected to this and other depositions as irrelevant (Dkt. 1067), and the matter was fiercely contested—indeed, Donziger even sought relief from the Special Masters regarding the *location* of Mr. Watson's deposition.  *See* Dkt. 1183 at 2–5 (Special Masters Interim Report No. 2).  In the end, Donziger was permitted to take Mr. Watson's deposition, along with that of senior Chevron counsel Ed Scott, and Executive Vice President Rhonda Zygocki.  But, as Chevron suspected, the depositions were nothing more than harassment opportunities.  Notwithstanding Defendants' barrage of press releases and blog posts about these depositions, Donziger did not call these witnesses to testify at trial or cite a single line of testimony from any of these witnesses in his post-trial brief. Nonetheless, Chevron was required to incur substantial attorneys' fees in responding to Defendants' discovery demands.

Chevron seeks $18,930,757 in attorneys' fees related to its handling of discovery matters in this case.  This is comprised of $1,622,984 in fees related to offensive discovery, $7,334,942 in fees charged by Gibson Dunn related to defensive discovery, and $9,972,831 in fees charged by Merrill and Huron related to defensive discovery.  *See* Ex. A-2 (Offensive Discovery), A-3 (Gibson Dunn Defensive Discovery), Ex. E (Merrill Defensive Discovery), Ex. F (Huron Defensive Discovery).

---

[12]  Donziger served his first set of discovery requests on Chevron in the RICO action in July 2012.  Chevron anticipated, based on previous Donziger filings and public statements, the nature of documents he would seek, and had already begun collection and review at that time.  The LAP Representatives served discovery requests in October 2012, which were largely duplicative of Donziger's requests.  Donziger also served interrogatories on Chevron, along with additional document requests, in November 2012, as did the LAP Representatives.  Chevron has not included time spent responding solely to the LAPs documents requests, interrogatories, and requests for admission in this fee application.  *See* Ex. D (chronology of discovery events).

### 3.  Ecuadorian Law

At various points during the litigation, Defendants asserted that Ecuadorian law applied to various issues in the case.  For example, Donziger insisted that the LAP team's bribery and ghostwriting for court-expert Richard Cabrera complied with Ecuadorian law, and that his inability to find a record source for LAP team materials that appeared in the Ecuadorian judgment was due to a lack of clarity in Ecuadorian law as to the nature of the record.  *See*, *e.g.*, Dkt. 1850 at 22.  To rebut these and other assertions, Chevron retained Ecuadorian legal experts, analyzed Ecuadorian and U.S. sources, and deposed Defendants' Ecuadorian legal experts.  In addition, the Court ordered the parties to address certain questions of Ecuadorian law.  Dkt. 1356.  These efforts bore substantial fruit—in the Court's opinion, it made findings favoring Chevron and based on testimony elicited from *Defendants* Ecuadorian legal experts by Chevron's counsel in deposition (*e.g.* Dkt. 1874 at 71 n.297, 94 n.408, 118 n.491, 183, 214).

Chevron seeks $706,298 in attorneys' fees related to analyzing and proving matters of Ecuadorian law.  *See* Ex. A-4.

### 4.  Enterprise Financials

Defendants' acquisition and uses of funds were relevant to multiple aspects of Chevron's RICO claims.  Chevron proved that Donziger had engaged in several RICO-predicate financial crime—money laundering, Travel Act/FCPA, and wire fraud.  *See* Dkt. 1874 at 379–82, 391–98. Defendants' connections with Cabrera, Alberto Guerra, and Nicholas Zambrano were shown in part through financial relationships.  And Donziger rested multiple requests for relief in the litigation on assertions that he was without resources to continue—assertions which were inconsistent with the financial records obtained and analyzed by Chevron.  "Follow the money" is a time-honored approach to investigating criminal activity for good reason, and it was an important component of Chevron's prosecution of this lawsuit.  It was a costly project, however, requiring

19

the services of not just attorneys, but financial and accounting professionals.  Chevron seeks only the attorneys' fees associated with this aspect of the litigation.

Chevron seeks $115,433 for attorneys' fees related to its analysis and presentation of Defendants' financial operations.  *See* Ex. A-5.

### 5.  Motions and Hearings

Motion practice and hearings are integral to pre-trial litigation, and this case, with a docket running nearly 2,000 entries, was no exception.  Chevron does not seek attorneys' fees for all time related to motions and hearings, but only for those that directly bear on its RICO claim or were made necessary by Donziger's litigation tactics. Chief among these are the following.

On May 4, 2011, Donziger filed the first motion to dismiss the amended compliant claiming the complaint failed to state any claim on which relief could be granted.  Dkt. 303 at 2–17; *see also* Dkt. 323 (LAPs joinder).  Chevron defended its complaint in a 35-page opposition.  Dkt. 324.  In a May 14, 2012 order, the Court upheld Chevron's complaint, finding Defendants' arguments "without merit."  Dkt. 468 at 7–37.

Since 2011, Defendants asserted in this Court and elsewhere that the Lago Agrio judgment precluded litigation of Chevron's RICO claims against Defendants.  Dkt. 1847–11.   In response, on March 1, 2012, Chevron sought summary judgment on Defendants' affirmative defenses of res judicata and collateral estoppel.  Dkt. 396 at 1.  On July 31, 2012, the Court granted summary judgment and dismissed the Defendants' res judicata defense, but did not grant summary judgment as to the collateral estoppel defense.  The Court also made a series of factual findings regarding central contested issue in the case, and clarified the law and the state of the evidence with regard to other issues.  *See* Dkt. 550 at 38–39 (finding "no genuine dispute" that Defendants wrote the report of a purportedly independent court expert); *id*. at 89 (finding "barely" evidence to support a genuine dispute of fact regarding the credibility of a witness).

In order to obtain the evidence it needed to prosecute this action, Chevron filed over 10 separate motions to compel discovery from Defendants.[13]  Chevron moved to compel materials which plainly should have been produced, including materials within the custody and control of the Defendants' Ecuadorian attorneys and coconspirators (*see* Dkt. 1529), and Donziger's financial records (*see* Dkt. 1380).  This Court repeatedly intervened to grant Chevron the relief to which it was entitled.  *See, e.g.*, Dkt. 787 (granting Dkt. 562, Chevron's motion to compel production of documents from Ecuador); Dkt. 1012 (granting Dkt. 475, Chevron's motion to compel documents from Kohn and Garr over Defendants' objections); Dkt. 1316 (reinstating and granting Dkt. 854, Chevron's motion to compel the Defendants to produce recordings of a conversation between a Chevron attorney and Judge Zambrano); Dkt. 1380 (granting all of Dkt. 1374, Chevron's motion to compel accounting documents and other materials from Donziger, except as to Donziger's passports).

On February 13, 2013, the Court granted Chevron's motion seeking documents "in the possession, custody or control of their Ecuadorian attorneys and agents."  Dkt. 787 at 1-2.  The Court requested that Defendants advise by February 20, 2013, whether or not they would comply with the order.  *Id.* at 2.  In response, Defendants produced a letter from their Ecuadorian counsel, defaulted defendants Pablo Fajardo, claiming that Ecuadorian law, including a recent Ecuadorian court order, precluded him from providing the documents.  Dkts. 836, 841.  On Chevron's

---

[13]  *See* Dkts. 1374 (seeking to compel Donziger and the LAPs to produce withheld materials); 1194 (seeking to compel production from Donziger); 1195 (seeking to compel production from the LAPs); 562 (seeking production of documents in the possession of the Defendants' Ecuadorian coconspirators); 608 (seeking production of withheld material from Donziger and the LAPs); 850 (seeking to compel production from Constantine Cannon and Brownstein firms after the Defendants instructed them to withhold documents); 854 (seeking to compel the Defendants to produce alleged recordings of an interaction between Judge Zambrano and a Chevron attorney);1259 (seeking to compel Patton Boggs to produce materials from its privilege logs); 475 (seeking to compel document production from Joseph Kohn and Laura Garr); 1776 (seeking an order compelling production of documents on Donald Moncayo's privilege log); 1031 (seeking to compel production of documents for use at the sanctions hearing in April 2013); 1023 (seeking to compel the LAPs to produce an email exchange referenced in the declaration of Jarod Stewart).

motion for sanctions, the Court held a three-day evidentiary hearing in April 2013.  *See* Dkt. 997.  Shortly before trial, the Court granted Chevron's motion, finding Defendants intentionally failed to comply with a court order and had pursued the collusive lawsuit to obstruct discovery.  Dkt. 1529.

On May 6, 2013, counsel for Donziger and the LAPs moved to withdraw from the case for non-payment of fees.  Dkts. 1109, 1112.  In their withdrawal motion, Donziger's counsel told the Court that "Donziger is prepared to represent himself and his law firms in this matter" (Dkt. 1110 at 10), and that "[w]ithdrawing at this stage of the litigation would not unduly disrupt the existing case schedule" (*id.* at 9).  The Court permitted the withdrawal on May 17, 2013.  Dkt. 1164.  On June 5, 2013, however, notwithstanding his former counsel's representations, Donziger sought a three-month stay of all proceedings, asserting that without that delay, he could not prepare for trial, and accusing the Court of "fundamentally mismanaging this case."  Dkt. 1249 at 1; Dkt. 1211.  This was the first of over a dozen requests for stays, extensions and other delays that the Defendants would make up prior to and even once the trial commenced, largely premised on Donziger's unsubstantiated claims of economic hardship.[14]

Defendants' obstruction and frivolous motion practice continued up until the eve of, and through, trial.  Chevron was forced to move to compel yet again on August 28, 2013, for documents including accountings of expenditures associated with Selva Viva.  Dkt. 1374.  The Court granted this motion on September 3 (Dkt. 1380), yet Donziger refused to comply.  Chevron

---

[14]  *See e.g.,* 5/23/2013 Hr'g Tr. 3:25–4:4; *Id.* at 19:25–20:11 (LAPs' request to extend deposition deadline); Dkt. 1205 (Defendants' June 3, 2013 Motion for Extension of Time to File Response to Chevron's Motion to Compel Donziger to Produce Documents Withheld), Dkt. 1266 (Defendants' June 24, 2013 Motion for Extension of Time to Respond to Order to Show Cause), Dkt. 1343 (Defendants' August 18, 2013 Motion for Order to Show Cause Why Defendants' Motion for an Adjournment of all Dates for 30 Days Should Not be Granted), Dkt. 1369 (Defendants' August 27, 2013 Joint Motion for Order to Show Cause Why Proceeding Should Not be Stayed Pending Disposition of Petition for a Writ of Mandamus),  Dkt. 1435 (Donziger's September 16, 2013 Letter Motion for Extension of Time to File Response to Order on Issues of Ecuadorian Law), Dkt. 1438 (LAPs' September 18, 2013 Motion for Extension of Time for Submission of documents pertaining to Ecuadorian law), Dkt. 1459 (Defendants' September 27, 2013 Letter Motion for Extension of Time).

moved for sanctions (Dkt. 1466), and at the October 9, 2013 pretrial hearing, the Court again or-
dered production (10/9/2013 Hr'g Tr. at 53), and the documents were belatedly produced during
trial.  Tr. 2514–17.  Just prior to trial, Donziger and the LAPs moved for terminating sanctions
and to strike testimony provided by Alberto Guerra because of Chevron's alleged "improper in-
fluence."  Dkt. 1422.  After Chevron responded to this motion (Dkt. 1474), the Court denied it
finding it was "frivolous."  Dkt. 1650.  And after post-trial briefing was complete, Donziger filed
a motion to dismiss.  *See* Dkts. 1861, 1862.  Chevron responded to this motion (Dkt. 1863),
which was denied by the Court in its opinion.  Dkt. 1874 at 485.

Chevron seeks $2,011,926 for attorneys' fees related to motions and hearings in this ac-
tion.  *See* Ex. A-6.

### 6.  Writ Petition

Despite their repeated inability to establish that this Court was biased against them, De-
fendants continued to launch baseless attacks on the Court's integrity.  *See* Dkt. 1874 at 302–03
(reviewing recusal efforts).  After several failed attempts to remove the presiding judge in 2011,
including a failed petition for a writ of mandamus from the Second Circuit, Defendants filed an-
other recusal motion with the Court in February 2012.  Dkt. 391.  This Court once again denied
the Defendants' recusal motion, finding it both untimely and meritless.  Dkt. 392.  Then in 2013,
Defendants filed another petition for a writ of mandamus in Second Circuit seeking, among other
relief, reassignment of the case.  *Chevron Corp. v. Naranjo*, No. 13-772 (2nd Cir. 2013), Dkt. 1
(petition); Dkt. 90 (order granting Donziger joinder).   After briefing and oral argument, the Se-
cond Circuit denied the petition in a *per curiam* opinion issued only hours after oral argument.

Chevron seeks $586,711 for attorneys' fees related to Defendants' 2013 writ petition,
which they brought only after the same request, on essentially the same baseless assertions, had
already been rejected by both this Court and the Second Circuit.  *See* Ex. A-7.

### 7. Trial and Related Submissions

Trial on the merits of Chevron's RICO claims commenced on October 15, 2013, and spanned seven weeks—with 24 witnesses testifying live in Chevron's case-in-chief, and another 23 witnesses testifying via deposition. Chevron also supplied this Court with over 2,500 exhibits, including hours of video from the outtakes of *Crude*. Donziger's obstructive conduct continued in the immediate pre-trial proceedings and through trial. Defendants defied the Court's pre-trial procedures (Dkt. 1308), made inadequate pretrial disclosures (Dkt. 1367), refused to provide a final witness list to Chevron and continued to add witnesses after trial began (Dkts. 1431, 1601, 164), submitted an error-riddled and incomplete exhibit list, which they amended throughout trial (C*ompare* Dkts. 1377-1 to 1377-2, *with* Dkt. 1432-3–1432-13, *with* Court Exhibit D (Chevron's objections to Defendant's trial exhibits), and sprung previously withheld Ecuadorian documents on Chevron just before trial.

The parties gave their closing arguments on November 26, 2013—Chevron presenting to the Court and providing to Defendants a 253-slide PowerPoint presentation laying out its claims and the evidence that supports them. At the close of trial, each party was given an opportunity to make post-trial submission to the Court. To present the complex facts, legal arguments, and vast evidence in an organized and efficient manner, Chevron devoted considerable time and resources to drafting its extensive post-trial brief. *See* Dkts. 1847–1849, 1855.

Chevron seeks $9,588,321 for attorneys' fees related to trial and related submissions. *See* Ex. A-8.

### CONCLUSION

For the foregoing reasons, Chevron respectfully requests that this Court order Defendants to pay, within fourteen days of this Court's order, Chevron's attorneys' fees in the total amount of $32,334,584.

Dated:  March 18, 2014
New York, New York

Respectfully submitted,


<u>        s/ Randy M. Mastro        </u>
Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*