UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                :
:
Plaintiff,                          :
:
-against-                                   :        Case No.  11 Civ.  0691 (LAK)
:
:
STEVEN R. DONZIGER, et al.,                         :
:
Defendants.                         :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CHEVRON CORPORATION'S OPPOSITION TO DEFENDANTS'
EMERGENCY MOTION FOR STAY PENDING APPEAL OR, IN THE
ALTERNATIVE, FOR A TEMPORARY ADMINISTRATIVE STAY
[DKT. 1888]**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD............................................................................................... 4

ARGUMENT ........................................................................................................... 4

I.    Defendants Fail to Show That They Will Suffer Irreparable Harm Absent a Stay ........... 4

    A.   Defendants Contend That This Court's Equitable Relief Is Ineffectual and Does Not Even Bind the LAPs .......................................................................... 5

    B.   Defendants Cannot Show "Irreparable" Harm from the Inability to Continue or Profit from Their Illegal Conduct ................................................................ 6

    C.   Defendants Offer No Evidence of Irreparable Loss of Goodwill or Reputational Harm Stemming from the Injunction .................................................. 10

    D.   Defendants Offer No Evidence That They Lack Sufficient Funds or That the Order Will Impede Their Ability to Retain Counsel .................................................. 11

    E.   Defendants Fail to Identify Any Real Property at Risk from the Injunction ............. 12

    F.   Any Value of Donziger's Share in Amazonia Derives from His Fraud and Is Properly Subject to a Constructive Trust .................................................. 12

II.    Defendants Have Not—and Cannot—Make a Strong Showing That They Are Likely to Succeed on Appeal ...................................................................................... 15

    A.   Defendants Rely on an Incorrect Legal Standard Regarding the Requisite Likelihood of Success on Appeal .................................................................. 15

    B.   Defendants Are Unlikely to Prevail on Their Argument That Chevron Lacked Standing to Bring This Suit.................................................................. 16

        1.   The Court Properly Considered and Rejected Defendants' Challenge as One of "Mootness," Not "Standing" .................................................. 16

        2.   Chevron Proved "Standing" Even Under Defendants' Flawed Premise That a Party Can Lose Standing Based on Post-Filing Events ............................ 18

    C.   Defendants Are Not Likely to Prevail on Their Argument Regarding the Availability of Injunctive Relief to a Private Civil RICO Plaintiff ........................... 22

    D.   Defendants Are Not Likely to Prevail on Their Argument That This Court's Decision Contravenes *Naranjo* .................................................................. 24

    E.   Defendants Are Not Likely to Prevail on Their Argument That Chevron Is Judicially Estopped from Obtaining Relief.................................................. 26

    F.   Defendants Are Not Likely to Prevail on Their Argument That the Court Lacks Personal Jurisdiction over Camacho and Piaguaje........................................... 29

III.    Chevron Faces Irreparable Harm If the Court Enters a Stay ........................................... 30

# TABLE OF CONTENTS
(continued)

**Page(s)**

IV.    A Stay Would Reward Defendants' Longstanding Delay and Obstruction
Strategy, and Harm the Public Interest ........................................................................ 31

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008) .................................................................. 9

*AHI Metnall, L.P. by AHI Kan., Inc. v. J.C. Nichols Co.*,
   891 F. Supp. 1352 (W.D. Mo. 1995) ........................................................ 13

*Arreola v. Godinez*,
   546 F.3d 788 (7th Cir. 2008) ..................................................................... 18

*Asarco Inc. v. Court*,
   611 F. Supp. 4680 (D.N.J. 1985) ............................................................... 13

*Bank of New York Co. v. Irving Bank Corp.*,
   139 Misc. 2d 665 (N.Y. Sup. Ct. 1988) ................................................... 14

*BayOil, S.A. v. Polembros Shipping Ltd.*,
   196 F.R.D. 479 (S.D. Tex. 2000) .............................................................. 29

*Blanciak v. Allegheny Ludlum Corp.*,
   77 F.3d 690 (3d Cir. 1996) ........................................................................ 17

*Boron v. W. Tex. Exports, Inc.*,
   680 F. Supp. 1532 (S.D. Ind. 1988) ......................................................... 29

*Bridgeway Corp. v. Citibank*,
   201 F.3d 134 (2d Cir. 2000) ...................................................................... 25

*Carpenter Tech. Corp. v. City of Bridgeport*,
   180 F.3d 93 (2d Cir. 1999) ........................................................................ 12

*Carr v. Alta Verde Indus., Inc.*,
   931 F.2d 1055 (5th Cir. 1991) ................................................................... 18

*Chafin v. Chafin*,
   133 S. Ct. 1017 (2013) ............................................................................... 17

*Chevron Corp. v. Berlinger*,
   629 F.3d 297 (2d Cir. 2011) ...................................................................... 27

*Chevron Corp. v. Champ*,
   Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ................. 7

*Chevron Corp. v. Donziger*,
   768 F. Supp. 2d 581 (S.D.N.Y. Mar. 7, 2011) ........................................... 7, 32

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2012) ............................................................... passim

*Chevron Corp. v. Page*,
   No. RWT-11-1942, Hr'g Tr. at 73:14–28, 74:17–21, (D. Md. Aug. 31, 2011) .................. 7

*Chevron v. Banco Pichincha*,
   No. 11-cv-24599 (S.D. Fla. Feb. 27, 2013) Dkts. 128, 129 .............................. 14

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 161 (2d Cir. 2010) .................................................................. 30

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ................................................................. 21, 22

*Clark v. Pattern Analysis & Recognition Corp.*,
    87 Misc. 2d 385 (N.Y. Sup. Ct. 1976) .................................................. 13

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724, 128 S. Ct. 2759 (2008) .................................................. 22

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ............................................................................... 9

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ......................................................... 9, 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167, 120 S. Ct. 693 (2000) .................................................... 20

*Grupo Dataflux v. Atlas Global Grp., L.P.*,
    541 U.S. 567, 124 S. Ct. 1920 (2004) .................................................. 16

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
    484 U.S. 49, 108 S. Ct. 376 (1987) ...................................................... 18

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
    322 U.S. 238, 64 S. Ct. 997 (1944) ................................................. 3, 33

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) .................................................................. 22

*Hilton v. Guyot*,
    159 U.S. 113, 16 S. Ct. 139 (1895) ...................................................... 25

*Huyer v. Wells Fargo & Co.*,
    295 F.R.D. 332 (S.D. Iowa 2013) ........................................................ 23

*In re Adelphia Recovery Trust*,
    634 F.3d 678 (2d Cir. 2011) .................................................................. 27

*In re Chevron Corp.*,
    633 F.3d 153 (3d Cir. 2011) ............................................................. 7, 32

*In re Ski Train Fire in Kaprun, Austria*
    *on Nov. 11, 2000*, 230 F. Supp. 2d 376 (S.D.N.Y. 2002) ................... 30

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007) .................................................................. 15

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694, 102 S. Ct. 2099 (1982) .................................................. 29

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Interphoto Corp. v. Minolta Corp.*,
   417 F.2d 621 (2d Cir. 1969) ................................................................................ 10

*Jiffy Lube Int'l v. Weiss Bros.*,
   834 F. Supp. 683 (D.N.J. 1993) ............................................................................... 9

*Larson v. Valente*,
   456 U.S. 228, 102 S. Ct. 1673 (1982) ................................................................... 19

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 112 S. Ct. 2130 (1992) .................................................................... 16

*Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*,
   788 F. Supp. 2d 71 (E.D.N.Y. 2011) ................................................................... 1, 8

*Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*,
   708 F.3d 921 (7th Cir. 2013) ................................................................................ 17

*Mint, Inc. v. Amad*,
   No. 10 Civ. 9395(SAS), 2011 WL 1792570 (S.D.N.Y. May 9, 2011) ................. 9

*Motorola Credit Corp. v. Uzan*,
   202 F. Supp. 2d 239 (S.D.N.Y. 2002) ............................................................. 22, 23

*National Organization for Women, Inc. v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001) .......................................................................... 22, 23

*NaturalLawn of Am., Inc. v. West Group, LLC*,
   484 F. Supp. 2d 392 (D. Md. 2007) ........................................................................ 9

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
   992 F.2d 430 (2d Cir. 1993) ................................................................................. 10

*Nken v. Holder*,
   556 U.S. 418, 129 S. Ct. 1749 (2009) ........................................................... passim

*Packer v. Yampol*,
   12 Del. J. Corp. L. 332 (Del. Ch. 1986) ............................................................... 14

*Religious Technology Center v. Wollersheim*,
   796 F.2d 1076 (9th Cir. 1986) .............................................................................. 23

*Republic of Ecuador v. Chevron Corp.*,
   638 F.3d 384 (2d Cir. 2011) ........................................................................... 27, 28

*SEC v. Parklane Hosiery Co.*,
   558 F.2d 1083 (2d Cir. 1977) ................................................................................. 9

*SEC v. Softpoint, Inc.*,
   No. 95 Civ. 2951 (JSR), 2012 WL 1681167 (S.D.N.Y. May 9, 2012) ................ 30

*Street v. Vitti*,
   685 F. Supp. 379 (S.D.N.Y. 1988) ....................................................................... 13

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,
  No. 03 Civ. 4148(WHP), 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) ........................ 13

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ......................................................................................... 10

*Torres v. N.Y. State Bd. of Elections*,
  462 F.3d 161 (2d Cir. 2006) ..................................................................................... 15

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388, 100 S. Ct. 1202 (1980) ....................................................................... 17

*Varsames v. Palazzolo*,
  96 F. Supp. 2d 361 (S.D.N.Y. 2000) .......................................................................... 12

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) .................................................................................... 9

## Statutes

18 U.S.C. § 1964 ............................................................................................................ 23

28 U.S.C. § 1782 .................................................................................................... 14, 30

N.Y. CPLR § 302(a)(1) ........................................................................................... 29, 30

## Other Authorities

Charles Alan Wright et al., *Federal Practice & Procedure* § 3531 (3d ed. 2013) ..................... 22

## Rules

Fed. R. Civ. P. 65(d)(2) ................................................................................................. 6

## PRELIMINARY STATEMENT

Defendants do not challenge this Court's detailed factual findings that they engaged in acts of racketeering and fraud under United States law, by, among other things, bribing an Ecuadorian judge to issue their ghostwritten judgment against Chevron and using it as a tool of extortion. Instead, Defendants seek a stay of the Court's injunction on the ground that they will be "irreparably harmed" if they are not permitted to continue their racketeering activities unfettered or to profit from them. *See* Mot. at 16–20. But, as a matter of law, an inability to pursue a tortious, let alone criminal, course of conduct cannot be the "irreparable harm" necessary to prevent enjoining that conduct (*see*, *e.g.*, *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 76 (E.D.N.Y. 2011)), and thus Defendants cannot satisfy one of the two "most critical" factors required of any litigant seeking a stay. *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761 (2009).

In addition, and as a matter of fact, Defendants offer no evidence that the injunction will have the "immediate and profound" impact that they now assert. Defendants present no evidence of lack of funds, and in fact have added additional lawyers to their motion papers. Their claim of "emergency" contradicts their characterizations of the Court's order as a mere "advisory opinion" that does not "redress" any of Chevron's injuries. It conflicts with Defendants' frequent public statements that "[n]othing in Judge Kaplan's ruling will prevent my clients from pursuing the judgment's enforcement in other countries." Ex. A at 2 (Donziger); *see also* Ex. B at 10 (Fajardo).[1] And Donziger's "law practice" continues to proceed as it always has, with current media reports placing him in Ecuador, presiding over press conferences at which this Court

---

[1] "Ex." refers to the exhibits to the concurrently filed Declaration of Jason B. Stavers in Support of Chevron Corporation's Opposition to Defendants' Emergency Motion for a Stay Pending Appeal or, in the Alternative, for a Temporary Administrative Stay.

is denounced as "racist."  Ex. B at 9–10.  Where there is no evidence of irreparable injury, there is no basis for a stay.

Defendants fare no better on the second of the two "most critical" factors, their likelihood of success on appeal.  Defendants do not claim a likelihood of success in challenging the evidentiary basis for the Court's nearly 500 pages of factual findings of misconduct, including acts of wire and mail fraud, obstruction of justice, money laundering, and fraudulent procurement of a judgment they wrote themselves.  Instead, Defendants recycle the same flawed legal arguments that this Court has considered and rejected:  Chevron's Article III "standing" to bring this action; whether RICO allows private parties to obtain injunctive relief; whether the Court's decision violates *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); whether Chevron is judicially estopped from obtaining the injunction; and whether the Court lacks personal jurisdiction over the LAPs.  Defendants offer no reason to think that a reviewing court will decide these issues any differently, and several of Defendants' arguments border on frivolous, as this Court has noted.  In fact, it is easy to see why Defendants, in filing their motion, asked the Court to deny it "without opinion" and without giving Chevron an opportunity to respond.  Mot. at 1–2.

The other factors governing Defendants' stay application—the likelihood of substantial injury to Chevron and considerations of the public interest—also weigh decisively in favor of maintaining the injunction during Defendants' appeal.  As this Court has already found, Chevron has suffered, and continues to face, the risk of irreparable harm from Defendants' racketeering scheme.  And there is a strong public interest in enforcing this nation's laws and preventing defendants from extorting a U.S. defendant through fraud—particularly when the scheme was hatched and financed largely from the United States.  Just as there is no public benefit in permitting a convicted criminal to go on committing crimes while he challenges his conviction or sen-

tence, there is no justification for allowing Donziger or the LAPs to profit from their misconduct during the appeal. As the Supreme Court has explained, the sort of fraud that Defendants have been adjudged to have committed here "involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944).

Contrary to Defendants' claims, there is no "public interest" to be served by staying the injunction to allow Defendants to obtain "compensation" for alleged environmental harm in Ecuador. Mot. at 21. Hoping to change the subject, Defendants repeat their false assertion that "Chevron chose not to contest its liability for the environmental contamination" in Ecuador (*id*. at 5), when they well know that Chevron vigorously disputes Texaco's (let alone Chevron's) liability for any pollution that Petroecuador—which has operated alone for some 24 years now—has failed to address. The Republic of Ecuador ("ROE") made 97% of the profits—over $20 *billion*—from the long-ended consortium with TexPet (which made less than $500 *million*) (PX 3000 (Veiga) ¶ 16), and fully released TexPet and its affiliates from all environmental claims in exchange for ROE-approved remediation that was completed decades ago. And the nature of Defendants' misconduct made the environmental "merits" irrelevant in this action. As this Court has found, there is no "Robin Hood" defense to extortion and fraud, and Defendants' contrary claim insults the people of Ecuador, and undermines, rather than promotes, respect for the rule of law.

In sum, Defendants cannot establish irreparable harm absent a stay or make a strong showing of success on the merits, there is a substantial risk of irreparable harm to Chevron ab-

sent the injunction, and the public interest favors allowing the injunction to remain in place.  The

Court should, therefore, deny Defendants' "emergency" motion for stay pending appeal.

## LEGAL STANDARD

"A stay is an intrusion into the ordinary processes of administration and judicial review,

and accordingly is not a matter of right, even if irreparable injury might otherwise result to the

appellant." *Nken*, 556 U.S. at 427, 129 S. Ct. at 1757 (quotation marks and citation omitted).  In

determining whether to grant a stay pending appeal, the Court must consider four factors:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance

of the stay will substantially injure the other parties interested in the proceeding; and (4) where

the public interest lies." *Id.* at 434, 129 S. Ct. at 1761.  "The first two factors [namely, strong

showing of success on appeal and irreparable harm] are the most critical."  *Id.*

## ARGUMENT

## I.     Defendants Fail to Show That They Will Suffer Irreparable Harm Absent a Stay

Defendants claim that absent a stay of the injunction, they will suffer "profound irrepara-

ble harm" because the injunction (1) "threatens to destroy Mr. Donziger's law practice";

(2) could chill third parties from funding or associating with Donziger; (3) could leave the LAPs

without sufficient funds to finance an appeal of this action; (4) could result in the loss of real

property; and (5) requires Donziger to transfer his Amazonia shares to Chevron.  Mot. at 16–19.[2]

As an initial matter, the injunction expressly excludes the litigation of this action, at-

---

[2]  Defendants purport to make a "reduced" showing of irreparable injury because they believe they demonstrated a "very substantial likelihood of success on appeal."  Mot. at 16.  As explained in previous briefing and below, how-ever, Defendants are unlikely to prevail on any aspect of their appeal, and as a result they must make a heightened showing of irreparable injury.  Regardless, they have failed to establish any irreparable injury here under any stand-ard.

tendant appeals, and foreign enforcement actions—thus mooting several of Defendants' concerns. Dkt. 1875 ¶ 6. The injunction does not bar Defendants from appealing this Court's decision while pursuing their pending enforcement actions in Canada, Argentina, and Brazil, or even initiating additional foreign enforcement actions if they choose. Moreover, any "harm" that Defendants might suffer would not be irreparable because they could recapture any proceeds turned over to Chevron in the event the injunction were overturned on appeal. Defendants also fail to put forth a shred of evidence to support their claims of "harm." Finally, any harm that Defendants might suffer from their inability to profit from their misconduct is not cognizable because Defendants have no right to such profits. *See* Dkt. 1847 at 326–27.

### A. Defendants Contend That This Court's Equitable Relief Is Ineffectual and Does Not Even Bind the LAPs

Defendants' current assertions of "emergency" and "irreparable harm" cannot be squared with their lead argument that the equitable relief this Court has issued is of such insignificance that it cannot redress any of Chevron's injuries. *See* Dkt. 1888 at 6–7; *see also* Dkt. 1861 at 5–6. Defendants cannot obtain a stay based on the inherently contradictory argument that the relief this Court has issued is both ineffectual *and* the cause of irreparable harm.

Indeed, it is only before this Court, and only when it suits their purposes, that Defendants suggest the Court's injunction will have any effect. Beyond the courtroom walls, Defendants' public statements manifest their intent to flout this Court's orders. *See* Ex. C (reporting that Fajardo "pointed out that Kaplan's decision is not binding on the Ecuadorians 'and has no effect outside the U.S., where the judgment was issued'"); Ex. D (Juan Pablo Saenz, Ecuadorian counsel for the LAPs, asserting that this Court's injunction "will not serve to reduce the risk the oil company faces in the imminent collection of the sentence dictated against it by the Ecuadorean justice system"); Ex. E at 7 ("Judge Kaplan's decision will have little if any impact on foreign

courts . . . ."); Ex. F at 4 (arguing that "the grave danger here is not to the Ecuadorians seeking justice.  In fact, they're not dissuaded in the least by a U.S. judge acting in an overtly racist manner . . . .") Ex. N. at 2 (Donziger:  "What is important [to know] about Kaplan's ruling is that it won't have the slightest impact on the judges in the other countries where the affected communities are enforcing the judgment . . . .").[3]

### B.  Defendants Cannot Show "Irreparable" Harm from the Inability to Continue or Profit from Their Illegal Conduct

Defendants do not deny any of their own wrongdoing, and they take no issue with this Court's extensive factual findings describing their fraud and numerous RICO violations—which included submitting false evidence, ghostwriting the supposedly "independent" Cabrera report, money laundering, obstruction of justice, seeking to extort Chevron with a public pressure campaign founded on demonstrable falsehoods, wire fraud, and promising Judge Zambrano $500,000 to let them write the $19 billion judgment in their own favor.  *See* Dkt. 1874 at 34–279.

And, in fact, while this case is the first in which Defendants' misconduct has been adjudicated following a full trial, this Court is not alone in its assessment of Defendants' scheme.  In addition to the numerous other U.S. federal courts that have found at least probable cause of a crime or fraud with respect to Defendants' activities, Judge Butler of the Supreme Court of Gibraltar recently found that there is a *prima facie* case to support Chevron's allegations of conspiracy and extortion against Russell Deleon and Torvia Limited.  Ex. G (*Chevron Corp. v. Deleon*, Claim No. 2012-C232 (Sup. Ct. Gib. Mar. 14, 2014)).  Judge Butler presided over a four-day hearing and reviewed thousands of pages of documents.  *Id.* ¶¶ 5, 48(iv).  In his 72-page

---

[3]  Defendants appear to suggest that this Court's Judgment does not on its face apply to "the dozens of other Lago Agrio plaintiffs" beyond the two who appeared in this action.  Mot. at 6.  Yet the Judgment states that "[i]n accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment is binding upon the parties; their officers, servants, employees, and attorneys; and *other persons who are in active concert and participation with any of the foregoing*."  Dkt. 1875 ¶ 8 (emphasis added).

opinion, Judge Butler refused to dismiss Chevron's action, declining to accept Donziger's and the LAPs' claim of res judicata and rejecting Deleon's and Torvia's claim that Chevron was launching an "impermissible collateral attack upon the decisions of courts of competent jurisdiction in Ecuador." *Id.* ¶ 44. Judge Butler stated that he was "not impressed with [Deleon's and Torvia's] submissions that the [Lago Agrio Court] at first instance disregarded the Calmbacher and Cabrera reports" and was "not convinced" that the Ecuadorian courts considered Chevron's allegations either at trial or on appeal. *Id.* ¶ 48(i), (xvi). In fact, Judge Butler noted that "[i]f the Appeal court in Ecuador had before it anything like the evidence which has been put before me, it is indeed surprising on the face of it that at the least a rehearing [on Chevron's fraud allegations in the Lago Agrio litigation] was not ordered" and that "it is difficult to envisage how [Chevron] could have properly and fairly contested the [Lago Agrio] proceedings if its allegations of wholesale corruption of the judiciary and Government [of Ecuador] are true." *Id.* ¶ 48(vi), (ix). Judge Butler signaled his awareness of the RICO proceedings but noted that the record here "support[s] the conclusions which I have reached and which I would have reached even without the report of the RICO application." *Id.* ¶ 118.[4]

Defendants, therefore, cannot show the requisite irreparable harm because the conduct they have been barred from pursuing has been exposed and adjudicated as racketeering and extortion. Defendants contend that the Court's remedial order "threatens to destroy Mr. Donziger's law practice and thereby deprive him of his means of earning a livelihood and providing for his

---

[4]   *See also Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (JH/LFG), Dkt. 77 at 3–4 (D.N.M. Sept. 2, 2010); *In re Chevron Corp.*, No. 10-cv-1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011); *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. Mar. 7, 2011); *In re Chevron Corp.*, No. 10-2675 (SRC), Dkt. 33 at 43–44 (D.N.J. June 11, 2010); *Chevron Corp. v. Page*, No. RWT-11-1942, Hr'g Tr. at 73:14–28, 74:17–21 (D. Md. Aug. 31, 2011); *In re Chevron Corp.*, No. 11-24599-CV, Dkt. 82 at 4, 26 (S.D. Fla. June 12, 2012); *Chevron Corp. v. Page*, No. 11-cv-00395-RWT-CBD, Hr'g Tr. at 58:2–12 (D. Md. Jan. 25, 2013).

family." Mot. at 16. But Donziger admits he has "no other cases or clients" beyond his work on

the Chevron case (*id.*), and that work has now been adjudged to be a racketeering scheme (which

Donziger does not claim he will seek to challenge on appeal). Thus, any comparison between

Donziger's "law practice" and the harm from disrupting an ordinary business fails.[5]

In short, there can be no "irreparable harm" when a party is enjoined from continuing to

break the law or from profiting from past misconduct, and that Donziger might suffer some pe-

cuniary harm from being unable to continue engaging in illegal conduct or profiting from the

fraud cannot justify issuance of a stay.[6] To the contrary, courts have held that where, as here, an

injunction precludes a party from engaging in further misconduct, any resulting losses to that

party do not outweigh the irreparable harm faced by the plaintiff in the absence of the injunction.

*See Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 76 (E.D.N.Y.

2011) ("[M]ost of the hardship that the defendants will face from an injunction will derive from

the defendants' inability to sell infringing machines in the future. That hardship, however, is not

---

[5]   And there can no longer be any dispute that Donziger's law practice is an extortion racket. Indeed, this Court found that Donziger, through his representation of the LAPs, committed numerous criminal acts, including extortion, wire fraud, money laundering, and bribery of foreign officials in violation of the Foreign Corrupt Practices Act: "Among the predicate acts that Chevron has proved are (1) multiple extortionate acts including, among others, (a) the ghostwriting of the Judgment and the promise of $500,000 to Zambrano for signing it, and (b) the ghostwriting of the Cabrera Report upon which the author(s) of the Judgment relied for the pit count that underlies more than $5 billion of the damages award, as well as the false portrayal of Cabrera as a neutral, impartial, and independent expert, and the payments and other inducements to Cabrera to ensure that he "played ball," (2) multiple acts of wire fraud in furtherance of fraudulent schemes with respect to all of the foregoing, (3) money laundering to promote racketeering acts, including with respect to ghostwriting the Cabrera Report by Stratus and payments to Cabrera, and (4) violations of the Travel Act to facilitate violations of the anti-bribery provision of the FCPA by payments to Cabrera." Dkt. 1874 at 402–03; *see also id.* at 379, 387. Likewise, the Court further found that Donziger and the LAPs procured the Lago Agrio judgment through fraud and bribery. *Id.* at 338–39 & n.1304. Defendants do not contest any of these findings or conclusions.

[6]   Donziger's counsel previously argued that Donziger was a "pariah" to the "people in Ecuador" and was "severed" and "separated" from the legal team there. Dkt. 895-1, Ex. 3501 at 30:6–25. And the minutes of the January 15, 2013 Assembly meeting described the strategic decision to have Donziger "step aside" and effect a "temporary withdrawal from the case." PX 7033A at 4. In reality, as this Court explained, Donziger was in control of the LAPs' legal team "until at least quite recently, and perhaps even until today." Dkt. 1874 at 25–26. But the fact that Donziger previously took the position that he was no longer working on the case (when that position suited him), illustrates that it is highly disingenuous for Defendants now to complain that the injunction will deprive Donziger of his "ability to work on" the case against Chevron. Mot. at 16.

cognizable."); *see also Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008)

("We also see no abuse of discretion in the court's decision not to consider Stryker's expenses in

designing and marketing the [product], since those expenses related to an infringing product.");

*Mint, Inc. v. Amad*, No. 10 Civ. 9395(SAS), 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011)

("'[O]ne who elects to build a business on a product found to infringe cannot be heard to com-

plain if an injunction against continuing infringement destroys the business so elected.'") (quot-

ing *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)); *NaturaLawn*

*of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 402 & n.8 (D. Md. 2007) (disregarding

enjoined party's assertions of irreparable harm where "defendants' hardships have been created

by their own willful acts"); *Jiffy Lube Int'l v. Weiss Bros.*, 834 F. Supp. 683, 693 (D.N.J. 1993)

("To the extent that the defendants suffer significant, and in a sense irreparable, damage from the

granting of the preliminary injunction, this harm is a predictable consequence of their willful

breach of contract and their misconduct.  As such, it is not the type of harm from which we seek

to protect a defendant.").[7]

      Defendants' cited case law is inapposite.  For example, in *Enyart v. Nat'l Conf. of Bar*

*Examiners, Inc.*, 630 F.3d 1153 (9th Cir. 2011), a national testing association refused to provide

a legally blind law school graduate with accommodations to take the Multistate Professional Re-

sponsibility Exam and Multistate Bar Exam, effectively precluding her from practicing as a law-

---

[7]    While Defendants continue to assert that they will present exculpatory evidence, *see* Ex. H at 1, the time for
submitting such evidence has now come and gone.  Defendants had every opportunity during the seven-week trial—
indeed, during the entire course of this case—to offer any evidence on their behalf.  Defendants never presented
credible responses to Chevron's evidence, either on summary judgment or at trial.  Now, the "burden" is on the
"party attacking the findings of fact[] to show that the findings are clearly erroneous."  *SEC v. Parklane Hosiery
Co.*, 558 F.2d 1083, 1086 (2d Cir. 1977); *see also Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (clear error re-
quires a "definite and firm conviction that a mistake has been committed" (quotation marks and citation omitted)).
Defendants have not even attempted to meet this standard in their motion to stay; nor do they suggest they will be
able to do so on appeal.  Accordingly, Defendants cannot claim "irreparable harm" from an injunction that precludes
them from profiting from, or furthering, a racketeering scheme and a fraudulently procured judgment.

yer. *Id*. at 1165. Here, the injunction does not prevent Donziger from practicing law—it pre-cludes him from continuing and profiting from illegal conduct. Donziger remains free, for now, to take on other cases. *See* Dkt. 1874 at 409.[8]

### C. Defendants Offer No Evidence of Irreparable Loss of Goodwill or Reputational Harm Stemming from the Injunction

Defendants also argue that Donziger will suffer an "irreparable loss of goodwill and harm to his reputation" because the injunction will likely "chill third parties from funding or associat-ing with Mr. Donziger and his law practice." Mot. at 18. But Defendants offer no evidence to support their assertion, even though it is their burden to do so. *See Nken*, 556 U.S. at 433–34, 129 S. Ct. at 1761 ("The party requesting a stay bears the burden of showing that the circum-stances justify an exercise of that discretion."). For example, Defendants do not attach bank ac-count records showing a lack of funds resulting from the injunction's alleged "chilling effect." And even if they had offered such evidence, it is implausible that any "chilling" or "reputational" harm could be attributed to the injunction—as opposed to the extensive evidence establishing that Donziger masterminded a fraudulent scheme to extort Chevron.[9]

---

[8]   In the contempt context at least, such broader occupational prohibitions are permissible where the connection "between [a lawyer's] profession and his contemptuous behavior—committed while acting in his professional ca-pacity—is readily apparent." *United States v. Cutler*, 58 F.3d 825, 838-39 (2d Cir. 1995) (upholding contempt order suspending John Gotti's defense lawyer from practicing in the Eastern District of New York after the lawyer contin-ued pressing his client's case in the media in violation of court orders).

[9]   Defendants' cited cases stand for the unremarkable proposition that loss of goodwill and reputational harm may constitute irreparable harm, but these cases are inapposite because they involved legitimate businesses with no allegations of misconduct, let alone misconduct proven after a trial. *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (publisher of children's books had made a "clear showing" that it was denied a "unique opportunity" to publish a book featuring immensely popular children's cartoon characters); *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (auto manufacturer granted additional dealerships in the same market area, impacting sales and continued vitality of plaintiff dealership); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (manufacturer of photographic equipment terminated distributorship for distribu-tor's failure to follow manufacturer's directions).

### D.  Defendants Offer No Evidence That They Lack Sufficient Funds or That the Order Will Impede Their Ability to Retain Counsel

Relatedly, Defendants claim that the injunction precludes them from raising the funds necessary to litigate this action, any appeal of this action, and foreign enforcement actions.  Mot. at 18.  But, consistent with their past unsubstantiated assertions of a lack of resources, *see* Dkt. 1874 at 263–64 n.1098, Defendants fail to offer any evidence regarding their financial status. Indeed, they equivocate in the motion itself—claiming only that the LAPs "will likely be" unable to finance an appeal.  Mot. at 18.

Nor do the circumstances indicate that Defendants are lacking for counsel.  Four lawyers signed onto the present motion, and it lists three others as "Of Counsel" (not including Patton Boggs, which has long served as appellate counsel for the LAPs and operated behind the scenes in this action).  *Id.* at 22–23.[10]  None of these individuals submitted an affidavit asserting that he or she is unwilling to continue representing Defendants on appeal as a result of the injunction.  In fact, one is an appellate specialist who appeared only after trial, and two more appeared on Defendants' brief only *after* the injunction issued.  And in the pending foreign enforcement actions, the LAPs continue to be represented by prominent local counsel in Canada, Brazil, and Argentina[11]—none of whom has indicated that he or she is even *considering* withdrawing, much less that he or she will do so imminently due to the injunction.  To the contrary, Donziger proclaimed in the most recent press conference that "the communities and their attorneys trust that they will ultimately collect every last penny of the judgment" because regardless of this Court's opinion,

---

[10]  James Tyrrell of Patton Boggs also currently represents the LAPs in their appeal to the Fourth Circuit from Chevron's subpoenas seeking discovery from Aaron Marr Page.  *Chevron Corp. v. Aaron Marr Page*, Case No. 13-1382 (4th Cir.).  The subpoenas were issued both in this action and in a separate action brough under § 1782.  Tyrrell argued the LAPs' appeal on March 18, 2014.

[11]  Graham Erion, one of the LAPs' lawyers, has stated that the LAPs are represented by "a number of the world's top litigation law firms in the U.S., Canada, Brazil, Ecuador and Argentina," which he termed "one of the most powerful teams of litigators ever assembled."  Dkt. 1141-1, Ex. 3703, at 2–3.

"the communities and their attorneys will continue the enforcement actions in several countries."

Ex. B at 4.

### E.  Defendants Fail to Identify Any Real Property at Risk from the Injunction

Defendants further claim that they face "the loss of real property."  Mot. at 18.  Again,

however, they present no evidence that they have lost any real property as a result of the Court's

injunction, or that they even face such a loss.  Defendants do not identify which real property is

allegedly at risk.  This Court already recognized as much in rejecting Defendants' argument as

"downright frivolous":

> There is no evidence that any of the defendants save Donziger himself owns any real
> property, let alone real property "that is traceable to the Judgment" or its enforcement.
> Nor is there any evidence that Donziger owns any real property other than real estate ob-
> tained by him in consequence of probate litigation he instituted in Florida against family
> members, which of course is not traceable to the Judgment or its enforcement.  So the
> claim that defendants face the loss of real property in consequence of the Judgment is
> spun entirely out of whole cloth.

Dkt. 1892 at 3 n.1 (citation omitted).

Defendants' cited cases are inapposite because they involve the potential loss of a specif-

ic piece of property.[12]  Here, by contrast, Defendants fail to identify any particular piece of real

property at risk of loss, let alone identify any steps Chevron has taken to seize such property un-

der the Court's injunction.

### F.  Any Value of Donziger's Share in Amazonia Derives from His Fraud and Is Properly Subject to a Constructive Trust

According to Defendants, the forced transfer of Donziger's shares in Amazonia Recovery

---

[12]  In *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93 (2d Cir. 1999), the plaintiff sought a preliminary
injunction to prevent a government taking a specific piece of real property through the use of eminent domain.  The
Second Circuit vacated the denial of that motion because "[t]he Connecticut Supreme Court has recognized that a
party seeking judicial review of a government agency's decision to condemn property has no adequate remedy at
law and is therefore entitled to obtain equitable relief."  *Id.* at 97.  Likewise, in *Varsames v. Palazzolo*, 96 F. Supp.
2d 361 (S.D.N.Y. 2000), the court found irreparable injury where a defendant failed to transfer shares of a company
having ownership of a specific piece of real property to plaintiffs, as required under an agreement.  *Id.* at 367–68.

would result in irreparable harm that would be exacerbated by Chevron's inclusion in the inner functioning of that entity.  Mot. at 19–20.[13]  But Amazonia is an entity created solely in furtherance of Defendants' fraudulent scheme.  Dkt. 1874 at 269 n.1110 (finding that Defendants created Amazonia in May 2012 "for receipt and distribution of any funds in consequence of the Judgment." (citations omitted)).  Thus, Donziger has no right to be free from interference in his ownership or operation of an entity devoted to an unlawful pattern of racketeering activity.

Moreover, Defendants' attempt to analogize this case to actions involving shareholder disputes fails.  See Mot. at 19 n.11.  In each of the cited cases, the shares at issue reflected ownership in a legitimate entity.[14]  Here, however, the Court has already found that the value of Donziger's Amazonia shares derived from his fraud:  "Donziger owns, directly or through a nominee, shares of a Gibraltar company, Amazonia, through which the property collected on the Judgment is to be funneled.  Those shares too are subject to a constructive trust, as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger." Dkt. 1874 at 477 (citation omitted).

---

[13] In making this argument, Defendants rely on materials outside the record, fail to attach those materials, and provide only the vaguest descriptions, hindering efforts to locate and respond to the references.  See, e.g., Mot. at 20 (citing "Shareholders Agreement, at 3").

[14] The cases also concerned *preliminary* injunctions where there had not been a final evaluation of the underlining facts or law.  See Suchodolski Assocs., Inc. v. Cardell Fin. Corp., No. 03 Civ. 4148 (WHP), 2003 WL 22909149 (S.D.N.Y. Dec. 10, 2003) (issuing preliminary injunction where loan repayment terms could lead plaintiffs to lose shares at any time unless there was court intervention); Street v. Vitti, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (issuing preliminary injunction where plaintiffs showed majority shareholder likely breached fiduciary duty and plaintiffs would likely lose their employment as company officers without injunction); Asarco Inc. v. Court, 611 F. Supp. 468, 480 (D.N.J. 1985) (issuing preliminary injunction where issuance of preferred stock with different voting rights within the same series was likely unlawful under New Jersey law); Clark v. Pattern Analysis & Recognition Corp., 87 Misc. 2d 385, 386 (N.Y. Sup. Ct. 1976) (issuing preliminary injunction where proposed recapitalization lacked legitimate business purpose and would force minority shareholders to sell their share).  Additionally the cited cases largely involved disputes between shareholders regarding preferred stock, shareholder representation on the board of directors, or actions specifically designed to "alter[] the entire voting landscape of" the business. AHI Metnall, L.P. by AHI Kan., Inc. v. J.C. Nichols Co., 891 F. Supp. 1352, 1359 (W.D. Mo. 1995).

Defendants also misrepresent the record with respect to Amazonia, stating that Chevron has "fought for years to destroy" the organization. Mot. at 20. In fact, Amazonia was created in 2012 in Gibraltar in secret, unbeknownst to Chevron. PX 655 (2012.05.23 Memorandum of Association for Amazonia). Although documents regarding Amazonia were responsive to numerous discovery requests in this action,[15] Defendants produced no such documents and Chevron did not discover the entity until the fifth in a series of document productions from non-party Banco Pichincha in May 2013. Ex. I; PX 583 at 89 (showing transfer of $149,000 from Amazonia to Selva Viva).[16] When asked about Amazonia at his June 2013 deposition, Donziger was evasive and attempted to avoid answering any questions, claiming privilege—a claim Defendants repeat here. *See* Mot. at 20; Ex. J at 626:18–629:11.

Defendants offer only speculation about the possible effects of the transfer of Donziger's Amazonia shares. They offer no evidence to support claims that the loss of Donziger's shares will result in irreparable harm to "fellow shareholders." Mot. at 19. Nor do they submit evidence detailing the number, class, or rights of Donziger's shares in Amazonia, rendering any claims about the effect of the transfer to Chevron and Chevron's "ability to inflict damage on the corporation" completely theoretical and unsubstantiated. *Id.* at 20.[17] Defendants also suggest

---

[15] *See* Dkt. 721 at xlvii, xlix, lvii–lviii (document requests implicating Amazonia documents, including 1, 26, and 115–118 to Donziger and corresponding requests to the LAPs including 1 and 118–121).

[16] *Chevron v. Banco Pichincha*, No. 11-cv-24599 (S.D. Fla. Feb. 27, 2013) Dkts. 128, 129 (adopting Magistrate's report and recommendation and authorizing Chevron to issue a subpoena under 28 U.S.C. § 1782 to Banco Pichincha, C.A. for documents related to bank accounts controlled by the LAPs held by Selva Viva Selviva, Ltda. and the Amazon Defense Front including the "secret account.").

[17] Defendants rely on *Bank of New York Co. v. Irving Bank Corp.*, 139 Misc. 2d 665 (N.Y. Sup. Ct. 1988). But there, the "presence of [an] amendment" to a rights plan that would limit the right of the board of directors unless elected by supermajority vote that was likely contrary to New York law was "likely to taint the electoral process." *Id.* at 669. Defendants also cite *Packer v. Yampol*, 12 Del. J. Corp. L. 332, 348 (Del. Ch. 1986), where the perceived "chilling effect" stemmed from the issuance of "supervoting Preferred Stock" that would "virtually assur[e] the outcome of the election of directors." *Id.* at 348. There is no support for Defendants' proposition that the identity of a shareholder would "threaten [Amazonia's] purpose and existence." Defendants also offer no evidence that transfer of Donziger's shares would create "Chevron[] control of Amazonia." Mot. at 19 n.12. At trial, Donziger himself [Footnote continued on next page]

14

that if the Amazonia shares are transferred to Chevron, the shares might be "automatically nulli-fied." Mot. at 19.  But again, there is no evidence that this would happen.  And as for the pur-ported irreparable harm from Donziger's loss of the ability to sell his shares, he testified that he had previously been unsuccessful in his attempts to do so.  Ex. K at 837:24–838:9.

## II.    Defendants Have Not—and Cannot—Make a Strong Showing That They Are Likely to Succeed on Appeal

Defendants also fail to make a strong showing that they are likely to prevail on any of the issues they intend to raise on appeal.  Rather, they continue to press a number of legal theories that they raised in the post-trial briefing, each of which this Court considered and properly re-jected in its 485-page opinion.  Defendants have failed to show that the Second Circuit would likely disagree with this Court's resolution of any of those issues.

### A.  Defendants Rely on an Incorrect Legal Standard Regarding the Requisite Like-lihood of Success on Appeal

Defendants contend that they need not show a "likelihood" of success on appeal.  Rather, they claim they need only demonstrate a "difficult legal question" and a "substantial possibility" of persuading the appellate court to adopt their position.  Mot. at 3 (quotations marks and cita-tions omitted).  But this misstates the law.  The Supreme Court has made clear that "the 'possi-bility' standard is too lenient."  *Nken*, 556 U.S. at 435, 129 S. Ct. at 1761.  Rather, a litigant seeking a stay pending appeal must make "a *strong* showing that he is likely to succeed on the merits."  *Id.* at 434, 129 S. Ct. at 1761 (emphasis added).[18]

---

[Footnote continued from previous page]
did not know the number of shares he owns in Amazonia.  Tr. 2491:19-23.

[18]  Defendants rely on two pre-*Nken* decisions for their erroneous legal standard.  Mot. at 2 (citing *Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 207 (2d Cir. 2006); *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170–71 (2d Cir. 2007)).

### B. Defendants Are Unlikely to Prevail on Their Argument That Chevron Lacked Standing to Bring This Suit

As this Court observed, given the history of this litigation, it defies common sense to contend that there is no "case or controversy" between Chevron and Defendants.  Dkt. 1874 at 307.  Yet in seeking a stay, Defendants continue to advance their "completely baseless" standing argument—the same argument, premised on the same authorities, that this Court considered and properly rejected after thorough briefing from both sides.  *Id*.  There is little chance that the Court of Appeals will come to a different conclusion.

### 1.  The Court Properly Considered and Rejected Defendants' Challenge as One of "Mootness," Not "Standing"

Defendants continue to press their novel theory that while Chevron may have had standing when the case began, it lost that standing by dropping its claim for money damages and declining to seek a global anti-enforcement injunction.  Mot. at 4.  While it is true that each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation," this means only that the facts pleaded in the complaint with respect to standing "must be supported adequately by the evidence adduced at trial."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992) (quotation marks omitted).  Accordingly, the Court properly labeled Defendants' theory as one of "mootness," not "standing" (Dkt. 1874 at 307–08), in accordance with the settled rule that a party's standing is determined by examining the state of things at the time the action is brought.  *See, e.g.*, *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570–71, 124 S. Ct. 1920, 1924 (2004) ("It has long been the case that the jurisdiction of the court depends upon the state of things at the time of the action brought.  This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure." (quotation marks, citation, and footnote

16

omitted)).

Defendants do not dispute that Chevron alleged in its Complaint sufficient facts to establish standing. Nor do Defendants claim that Chevron's decision to waive money damages and pursue more limited equitable relief somehow *mooted* the case. *See* Dkt. 1874 at 310 (finding that there was still a live dispute); *see also Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("[A] case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." (quotation marks and citation omitted)). Rather, Defendants cling to the notion that their challenge is "not a mootness question" at all. Mot. at 4.

Defendants argue that Chevron *lost* standing before trial by waiving money damages and seeking more limited injunctive relief—the result of which, according to Defendants, is that Chevron's "new" requested relief is not likely to remedy the harm caused by Defendants' wrongdoing. *Id*. But Defendants fail to cite a single authority to support their interpretation of the standing doctrine, which conflicts with both logic and settled precedent: "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S. Ct. 1202, 1209 (1980) (quotation marks and citation omitted). Thus, "[w]hen a party with standing at the inception of the litigation loses it due to intervening events, the inquiry is really one of mootness." *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) (quotation marks and citation omitted); *see Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698–99 (3d Cir. 1996) ("If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot.").

In sum, as this Court correctly found, Defendants have conflated the concepts of standing and mootness—only the latter is based on events subsequent to filing the complaint. *See Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction *except mootness*, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction." (emphasis added)); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69, 108 S. Ct. 376, 387–88 (1987) ("Subject-matter jurisdiction 'depends on the state of things at the time of the action brought'; if it existed when the suit was brought, 'subsequent events' cannot 'ous[t]' the court of jurisdiction.") (Scalia, J., concurring); *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008) ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to filing suit, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is entitled to relief.").

### 2. Chevron Proved "Standing" Even Under Defendants' Flawed Premise That a Party Can Lose Standing Based on Post-Filing Events

In any event, as the Court found, Chevron has suffered a number of injuries as "a concrete, particular, and direct consequence" of Defendants' ongoing racketeering and extortion scheme against the company—including injuries to Ecuadorian trademarks and related revenue streams and its interest in a $96 million arbitration award. Dkt. 1874 at 314. Chevron is also threatened with "additional, imminent injury as a direct result of defendants' continued efforts to enforce the Judgment"—including legal fees and other expenses, the risk of further pre-judgment attachment in foreign countries, and the risk of additional enforcement proceedings in the United

States.  Dkt. 1874 at 315; Dkt. 1883.[19]  The constructive trust and related equitable relief that this Court granted likely will remedy these injuries by ensuring that any funds derived from Defendants' improper enforcement efforts will be restored to Chevron.  Dkt. 1874 at 315; *see also id.* at 310 (explaining how the equitable relief will "prevent these defendants from profiting unjustly at Chevron's expense").  As a result, Chevron has readily satisfied Article III's "standing" hurdle, even if the relief awarded does not address every injury that Chevron has suffered as a result of Defendants' pervasive misconduct.  *See Larson v. Valente*, 456 U.S. 228, 243 n.15, 102 S. Ct. 1673, 1682 n.15 (1982) (for purposes of establishing standing, a plaintiff "need not show that a favorable decision will relieve his every injury").

Defendants assert that Chevron's injuries are not "fairly traceable" to their scheme because, they claim, "Chevron chose not to contest its liability for the environmental contamination" in Ecuador.  Mot. at 5.  In other words, according to Defendants, Chevron would have been subject to a $19 billion judgment against it anyway, so it does not matter that they corrupted the litigation by ghostwriting the Cabrera report or bribing Judge Zambrano to let them write the $19 billion judgment in their own favor.  As this Court is well aware, Chevron vigorously disputes the notion that Texaco (let alone Chevron) is responsible for environmental harms in Ecuador.  *See, e.g.*, Dkt. 1855 at 89–95 (rebutting some of Defendants' environmental allegations); *infra* at Section IV.  But that is beside the point:

> The issue here is not what happened in Orienté more than twenty years ago and who, if anyone, now is responsible for any wrongs then done.  It instead is whether a court decision was procured by corrupt means, regardless of whether the cause was just.  An innocent defendant is no more entitled to submit false evi-

---

[19]  Defendants point out that there have not yet been any United States enforcement proceedings (Mot. at 5 n.2), but they do not disclaim any intent to seek to enforce the judgment here—the only country in which Chevron has assets.  Indeed, the LAPs' counsel at Patton Boggs recommended that "[o]btaining recognition of an Ecuadorian judgment in the United States is undoubtedly the most desirable outcome."  PX 1407 at 18.  And it is telling that Defendants also seek to stay that part of the injunction that precludes U.S. enforcement actions.  *See* Mot. at 21–22.

> dence, to coopt and pay off a court-appointed expert, or to coerce or bribe a judge
> or jury than a guilty one.  So even if Donziger and his clients had a just cause –
> and the Court expresses no opinion on that – they were not entitled to corrupt the
> process to achieve their goal.  Justice is not served by inflicting injustice.  The
> ends do not justify the means.  There is no "Robin Hood" defense to illegal and
> wrongful conduct.

Dkt. 1874 at 4.  Thus, because Defendants resorted to corruption and bribery to procure a fraudulent judgment, Chevron's injuries from their efforts to enforce that judgment are at the very least "fairly traceable" to their misconduct.  *See id.* at 316 ("Defendants' fraud procured the Judgment. Their enforcement efforts present the foreign tribunals with the opportunities to enforce that Judgment.  If any does so, it would be in consequence of defendants' actions and arguments.").

Defendants also claim that the Court's equitable remedy will not likely redress Chevron's injuries.  Mot. at 6.  But "[i]t can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185–86, 120 S. Ct. 693, 706 (2000).  It makes no sense for Defendants to argue that they need "emergency" relief from the injunction's "immediate and profound effects," when four pages later they contend that the injunction can have an effect on them, if at all, only if some "hypothetical chain of events" come to pass.  Mot. at 2, 6.

Regardless, this Court properly rejected Defendants' attempt to "disconnect" their fraud from the threatened harm from enforcement.  Dkt. 1874 at 316.  Without relief from this Court, it is a virtual certainty that Defendants will continue their efforts to extort Chevron by, among other things, litigating the extant enforcement actions and bringing new ones elsewhere (including

in the United States[20]), and attempting to obtain additional financing for their public pressure scheme by selling off pieces of the fraudulent judgment and creating new investment vehicles from which it likely would be harder for Chevron to recover any funds distributed.[21]  This is not a "hypothetical injury" based on a "highly attenuated chain of possibilities."[22]  On the contrary, Defendants and their agents intend to make it difficult for Chevron to recover any funds, and issue near-daily press statements boasting about the imminence of Chevron's injuries.  *See, e.g.*, PX 8100 at 2 ("Pablo Fajardo:  let the world know that our fight continues.  That one decision, issued by judge Kaplan does not stop us or the payment collection actions we have begun against the oil company."); Ex. D (Juan Pablo Saenz, Ecuadorian counsel for the LAPs, asserting that this Court's injunction "will not serve to reduce the risk the oil company faces in the *imminent* collection of the sentence dictated against it by the Ecuadorean justice system" (emphasis added)).  And in any event, contrary to Defendants' contention (Mot. at 7), the case law does not require that this threatened harm be literally "certain" to come about before a plaintiff can have standing.  *See Clapper*, 133 S. Ct. at 1150 n.5 (explaining that the Court's cases "do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.  In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that

---

[20]  This Court has "found that defendants always have intended to seek to enforce the Judgment in the United States," but have thus far delayed doing so "temporarily for tactical reasons . . . ."  Dkt. 1874 at 479.

[21]  In fact, were it not for the RICO action, there is no question that Defendants would long ago have filed in the United States—the only country where Chevron has assets.

[22]  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148–50 (2013).  In *Clapper*, the plaintiffs—who challenged a statute authorizing the Government's interception of foreign communications—lacked standing because any future injury was based on a speculation whether the Government would choose to target the challengers' foreign communications, whether the Government would rely on the challenged statute to do so, whether the Government would seek and obtain judicial approval, and whether the Government would then succeed in acquiring the foreign communications.  *Id.*  Defendants, by contrast, have already begun enforcement actions and have promised dozens more, and they have already managed to secure the right to assets belonging to Chevron or its subsidiaries.

harm." (citations omitted)).[23]  Rather, it is enough that "there is a substantial risk that the harm Chevron apprehends will come to pass and, should that occur, it would have come to pass as a direct result of defendants' actions."  Dkt. 1874 at 316–17; *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769 (2008) ("A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." (citations omitted)).

The Court properly found that Chevron has standing to bring this action, even under the flawed conception of the "standing" doctrine that Defendants advance, and the Second Circuit is unlikely to reach a different conclusion.

### C.  Defendants Are Not Likely to Prevail on Their Argument Regarding the Availability of Injunctive Relief to a Private Civil RICO Plaintiff

The Court's conclusion that injunctive and other equitable relief is available to prevailing private civil RICO plaintiffs is "demanded by the plain language of the statute," "support[ed] from the context in which the statute was enacted," and consistent with the well-reasoned decisions of the Seventh Circuit in *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), and Judge Rakoff in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002).  Dkt. 1874 at 342–45.

---

[23] Defendants accuse this Court of "disregard[ing]" *Clapper*'s "holding."  Mot. at 7 n.3.  In fact, this Court addressed *Clapper* and explained that "[t]here is no proper comparison to be made between the chain of speculation that the *Clapper* Court condemned as too attenuated and the far more direct relationship between defendants' fraud in this case and any foreign judgment enforcing the Ecuadorian Judgment."  Dkt. 1874 at 317 n.1257.  Moreover, this Court's application of *Clapper* is consistent with Second Circuit precedent.  *See Hedges v. Obama*, 724 F.3d 170, 195–96 (2d Cir. 2013) (explaining that "*Clapper* recognized that the Court has not uniformly required that it be 'literally certain that the harms [plaintiffs] identified will come about'" (quoting *Clapper*, 133 S. Ct. at 1150 n.5)).  Further, this Court did not create an "exception" to *Clapper*, as Defendants claim.  Mot. at 7 n.3.  Instead, the Court properly refused to expand the holding of *Clapper*, especially to cover a purely private dispute such as this one.  *See, e.g.*, Charles Alan Wright et al., *Federal Practice & Procedure* § 3531 (3d ed. 2013) (noting that successful standing challenges have "been very much tied to litigation asserting the illegality of governmental action. . . . Claims of private wrongdoing ordinarily are asserted by persons obviously having the enforceable interest, if anyone has; such problems as arise commonly are handled in terms of defining private causes of action or of identifying the real party in interest."); *see also Clapper*, 133 S. Ct. at 1147 ("[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." (quotation marks and citation omitted)).

In asserting that they are likely to persuade the Second Circuit to take a different approach, Defendants address neither the plain language of 18 U.S.C. § 1964, nor the persuasive reasoning of *Scheidler* and *Uzan*. Instead, they rely primarily on dicta from two Second Circuit decisions that reflected an initial judicial hostility to the increased use of civil RICO by private plaintiffs in the early 1980s. There is little reason to believe the Second Circuit will adhere to its initial, tentative views on this topic, particularly after the "Supreme Court repeatedly has rejected efforts to curtail the scope of civil RICO actions." Dkt. 1874 at 344. And while Defendants claim that "the weight of authority" supports their position (Mot. at 8), the reality is that in the nearly three decades since the Ninth Circuit's decision in *Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986), the clear trend of authority is toward holding that equitable relief is available to private civil RICO plaintiffs. *See, e.g.*, *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332, 344 (S.D. Iowa 2013) (noting that it is no longer the "prevailing view" that "injunctive relief is unavailable" to private civil RICO plaintiffs and rejecting the Ninth Circuit's approach in *Wollersheim* after finding the "*Scheidler* analysis compelling").

Defendants also provide no support for their erroneous contention that injunctive relief is available under RICO only if it is paired with "a claim for damages." Mot. at 9. The idea that Congress would require private civil RICO plaintiffs seeking equitable remedies to also seek damages as a remedy makes no sense, as equitable relief is traditionally available only where legal remedies such as damages are inadequate (as is the case here, *see* Dkt. 1874 at 473). And nothing in the statutory text or case law supports such an irrational limitation on equitable relief under RICO. Donziger's *only* citation is to an out-of-date section of Judge Rakoff's RICO treatise that neither cites nor discusses *Scheidler* or *Uzan* (and thus does not reflect the current state

of the law or Judge Rakoff's current views), and nowhere says that equitable relief under RICO is available only if accompanied by a claim for damages.  *See* Dkt. 1863 n.9.

### D. Defendants Are Not Likely to Prevail on Their Argument That This Court's Decision Contravenes *Naranjo*

Defendants ignore this Court's thorough explanation of why the relief awarded here is consistent with the Second Circuit's prior decision in *Naranjo*.  *See* Dkt. 1874 at 479–84.  In particular, they contend that the Court's injunction "exacerbates the very comity concerns raised in *Naranjo*" because even if Defendants are able to enforce their fraudulent judgment in another country, this Court's injunction would preclude them from profiting from their efforts—the proceeds would instead go "back to Chevron."  Mot. at 10.  According to Defendants, this outcome is "disrespectful" to foreign enforcement courts, and thus in violation of *Naranjo*.  *Id.*

But as this Court explained, Defendants proceed from an incorrect premise because "the international comity concerns expressed in *Naranjo* were tied to the panel's discussion of the Recognition Act."  Dkt. 1874 at 482; *see Naranjo*, 667 F.3d at 242 ("Considerations of international comity provide additional reasons to conclude that the Recognition Act cannot support the broad injunctive remedy granted by the district court.").  Moreover, even if *Naranjo*'s comity concerns applied more broadly beyond the construction of the Recognition Act, and to the claims or relief at issue in this proceeding, the injunction would still not run afoul of those concerns because it does not "preclude the courts of every other nation from ever considering the effect of [a] foreign judgment."  *Id.* at 244.  To the contrary, the injunction expressly carved out the ability of Donziger and the LAPs to pursue foreign actions for recognition and enforcement of the Lago Agrio judgment.  Dkt. 1875 ¶ 6.

While the injunction does require that Defendants turn over to Chevron the proceeds from any successful foreign enforcement efforts, Defendants have not explained why that result

would be "disrespectful" to the foreign enforcement courts themselves.  In particular, Defendants fail to identify any plausible interest that those hypothetical courts would have in ensuring that Defendants retain the proceeds of their fraudulent judgment.  Nor have Defendants articulated how such interest (assuming it exists) would outweigh the United States' substantial interest in enforcing its own laws and ensuring that U.S. courts can provide an effective remedy when defendants over whom its courts have personal jurisdiction seek to extort a U.S. defendant in violation of U.S. law.  In short, as this Court explained, the injunction is not an affront to comity because it merely "prevents the three defendants who appeared at trial – over whom [the Court] has personal jurisdiction – from profiting from their fraud."  Dkt. 1874 at 483.

Defendants also suggest that "comity" somehow bars this Court from concluding that Ecuador lacks impartial tribunals in cases of this nature.  Mot. at 11.[24]  Defendants cite no authority on this point.  In fact, it is well settled that U.S. courts must consider whether foreign legal systems lack impartial tribunals in circumstances such as these, when the validity of a foreign judgment is put at issue by a judgment creditor.  *See* Dkt. 1874 at 418 ("The Court is far from eager to pass judgment as to the fairness of the judicial system of another country, but it of course is obliged to do so."); *see, e.g.*, *Hilton v. Guyot*, 159 U.S. 113, 202, 16 S. Ct. 139, 158 (1895); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000).

Nor do Defendants offer any evidence that this Court's order would cause friction in relations between the United States and Ecuador.  Mot. at 22.  Indeed, the Ecuadorian appellate court stated that "it stay[ed] out of [Chevron's] accusations, preserving [Chevron's] rights to . . . con-

---

[24] Defendants incorrectly assert that this Court relied on "the testimony of a single person, Vladmiro Álvarez Grau—'an avowed political opponent of the country's current President.'"  Mot. at 11.  But this Court found that "[t]he evidence presented at trial demonstrates that [Álvarez] and Correa never were political opponents."  Dkt. 1874 at 418 n.1586.  Moreover, beyond Álvarez's testimony—which went unrebutted, as this Court noted (*id.* at 419)—the Court also relied on various U.S. State Department reports' conclusions about Ecuador and its judiciary.  *See id.* at 428–29.

tinue . . . the actions that have been filed in the [United States]." Dkt. 417-2 (Ecuadorian appellate clarification order) at 5. And the Ecuadorian Ambassador to the United States recently stated that the country takes no position on the outcome of this action or the propriety of this Court's relief. Ex. L (Ambassador Cely: "The Republic has no interest in passing judgment on Chevron's claims against the Lago Agrio Plaintiffs' (the LAPs') lawyers or on Judge Kaplan's findings regarding such claims.").

Further, as the Court noted, Defendants have admitted that the relief here is consistent with principles of international comity and the Second Circuit's prior decision in *Naranjo*: "[T]he LAP Representatives' lawyer recently conceded before the Second Circuit that the defendants 'would not have a problem' with 'the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it,' assuming that the judge was bribed." Dkt. 1874 at 3 (quoting Tr., Sept. 26, 2013, at 25:3–15, *Naranjo v. Chevron Corp.*, No. 13-772-cv (2d Cir.) [DI 1496-2]). Accordingly, Defendants cannot be heard now to complain that the relief granted offends international comity or *Naranjo*.

### E. Defendants Are Not Likely to Prevail on Their Argument That Chevron Is Judicially Estopped from Obtaining Relief

Defendants are unlikely to persuade the Second Circuit that this Court abused its discretion in rejecting their judicial estoppel argument. As a preliminary matter, Defendants do not dispute the Court's conclusion that they failed to oppose Chevron's motion for summary judgment on the issue of judicial estoppel, which means that "[t]his Court should reject their judicial estoppel defense for their failure to support or defend it." Dkt. 1847 at 294.

On the merits, Defendants continue to argue that "Texaco's promises are . . . binding on Chevron" (Mot. at 13), which this Court rejected as an "obvious inaccuracy" because "Chevron was not a party to *Aguinda*." Dkt. 1874 at 455. Defendants rely on the Second Circuit's deci-

sion in *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011), in which that court—in a footnote that was unnecessary to its decision—gave the losing party there (the LAPs) the benefit of the doubt regarding whether Chevron was accountable for Texaco's promises in *Aguinda*. *Id.* at 389 n.3. The Second Circuit subsequently retreated from its provisional views on the implications of the 2001 transaction or the purported Texaco promises. *See Naranjo*, 667 F.3d at 235 n.2 ("Chevron purchased Texaco and its subsidiaries in 2001. . . . But the questions of whether U.S. or Ecuadorian law governs whether a successor-in-interest is liable for a predecessor's alleged environmental torts committed in Ecuador, and what that governing law has to say on the subject, are not before us. We therefore express no opinion about them."); *see also Chevron Corp. v. Berlinger*, 629 F.3d 297, 300 (2d Cir. 2011) (noting that Texaco "became a wholly-owned subsidiary of Chevron in 2001").

Further, even if "Chevron" were bound by Texaco's promises in *Aguinda*, this Court exercised its discretion to reject Defendants' estoppel arguments because (1) Texaco's statements concerning the characteristics of the Ecuadorian courts "pertained to an entirely different time period and entirely different circumstances and thus could not be controlling here"; (2) the Court analyzed the evidence and found that, as a matter of fact, "Chevron did not merge with Texaco" and that Defendants "neither alleged nor proved" any basis for disregarding Texaco's separate corporate existence; and (3) Defendants "mischaracterize[] the record" in alleging that Texaco promised in the *Aguinda* case to satisfy any judgment, which it did not. Dkt. 1874 at 455–61.[25]

Moreover, as this Court explained, even assuming *arguendo* that Texaco's offer had been

---

[25] Judicial estoppel also requires Defendants to show that Chevron would "derive an unfair advantage" against them without application of the doctrine. *In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011). Defendants have not and cannot plausibly identify any such "unfair advantage" here that would close the courthouse doors to the victim of an adjudicated racketeering and fraud scheme. At a minimum, this Court was entitled to conclude from its review of the evidence that Defendants' showing was inadequate on this fact-bound issue.

accepted and that Judge Rakoff had adopted it in some manner in dismissing *Aguinda* (which are "generous assumptions" on this record), Defendants' judicial estoppel argument still fails because Texaco reserved the right to contest the validity of any judgment "on any *ground* permitted by New York's Recognition Act in any forum, not merely to contest validity in an enforcement action brought in New York." Dkt. 1874 at 460. This Court made factual findings to the effect that Texaco's reservation of rights "did not limit the venues in which or procedural vehicles by which any such judgment could be attacked." *Id*. at 460 n.1756. Defendants do not take issue with these findings except to suggest they are somehow "forcelose[d]" by *Naranjo* and its views about the scope of the Recognition Act. Mot. at 13–14. But even under Defendants' erroneous premise, Texaco did not agree to waive all defenses to enforcement anywhere in the world unless Defendants sought to enforce their judgment in New York. *See* Dkt. 1874 at 460 (noting that Defendants' view "would have rendered the reservation nonsensical, as it would have stripped Texaco of any defense to enforcement of a judgment on any ground anywhere in the world save in New York."). And Texaco did not waive any future, then-unripe or nonexistent, claims under U.S. law, such as RICO, against any person or entity, much less do so against Donziger, Fajardo, or other non-*Aguinda* parties.

Thus, because "Chevron's arguments here all would be defenses to enforcement of the Judgment under the New York Recognition Act, there could be no estoppel even if Texaco had made the promise inaccurately attributed to it, and even if Chevron were bound by it." Dkt. 1874 at 461. And as this Court noted, this is precisely the view previously taken by the Second Circuit. *See Republic of Ecuador*, 638 F.3d at 397 ("Chevron has thus reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the Ecuadorian judicial system 'does not provide impartial tribunals or procedures compatible with the requirements of due process of

law,' that the judgment itself 'was obtained by fraud,' or that 'the proceeding in [Lago Agrio] was contrary to an agreement between the parties.'  Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses." (citation omitted)).

### F. Defendants Are Not Likely to Prevail on Their Argument That the Court Lacks Personal Jurisdiction over Camacho and Piaguaje

The LAPs have not made a strong (or even plausible) showing that this Court lacks personal jurisdiction over them.  They fail to acknowledge their repeated flouting of their discovery obligations, for which this Court was well within its discretion to strike their personal jurisdiction defense as a sanction.  Dkt. 1529 at 97–98; *see also id.* at 48–49 (explaining that a court has jurisdiction to determine its own jurisdiction, and if a defendant agrees to submit to jurisdictional discovery for purposes of challenging jurisdiction, the defendant agrees to abide by the court's determination of that issue) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S. Ct. 2099, 2106 (1982)).  Defendants do not argue that this Court abused its discretion in issuing that sanction, nor do they cite any authorities indicating that it was somehow improper.[26]

Apart from the soundness of the Court's discovery sanction, Defendants cannot show that this Court clearly erred in making the findings that support the exercise of specific personal jurisdiction over the LAPs pursuant to N.Y. CPLR § 302(a)(1).  Dkt. 1874 at 434–55.  First, this

---

[26] Defendants do argue that the Court relied on case law applicable only when the Court "already has" personal jurisdiction over the parties, and that relying on such case law here amounts to "circular reasoning."  Mot. at 14.  But there are a number of cases in which courts have struck a personal jurisdiction defense as a sanction, as the Court did here, and if the courts in those cases already had personal jurisdiction over the sanctioned party, the sanction would have been nugatory.  *See, e.g.*, *BayOil, S.A. v. Polembros Shipping Ltd*., 196 F.R.D. 479, 482–83 (S.D. Tex. 2000) (striking personal jurisdiction defense as a sanction for defendant's "shredd[ing]" of documents relevant to the personal jurisdiction inquiry); *Boron v. W. Tex. Exports, Inc*., 680 F. Supp. 1532, 1536 (S.D. Ind. 1988) (noting that a sanction of "deciding the personal jurisdiction issue" against the defendant was "particularly just" when that defendant "misrepresents the truth in an effort to avoid jurisdiction").

Court found that Donziger acted as the LAPs' agent and transacted business in New York, thus they "avail[ed] [themselves] of the privilege of conducting activities within" New York. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 161, 169 (2d Cir. 2010). The Court noted, among other things, that Donziger was retained by the LAPs under an agreement governed by New York law and conducted litigation, fundraising, lobbying, and public relations activities on the LAPs' behalf in New York. Dkt. 1874 at 449–51. Defendants dispute none of this.

Second, the Court also found that Chevron's claims arose out of many of Donziger's activities in New York, including the orchestration of the fraudulent Cabrera Report, coordinating and supervising Stratus's ghostwriting of the Cabrera report, supervising the Ecuadorian lawyers, drafting Fajardo's misleading declaration in the 28 U.S.C. § 1782 proceedings, and coordinating the public pressure campaign. *Id.* at 451. The LAPs' "extensive transaction of business in New York since 1993," including the initiation of the *Aguinda* case and other related litigation in New York, supports the exercise of specific personal jurisdiction under N.Y. CPLR § 302(a)(1). Dkt. 1874 at 452.[27]

### III.   Chevron Faces Irreparable Harm If the Court Enters a Stay

Chevron has suffered immeasurable harm as a result of Defendants' fraudulent scheme and it will continue to suffer further harm in the absence of an injunction. *See* Dkt. 1874 at 323–26, 469–74. Should this Court or a reviewing court stay the injunction pending appeal, Chevron

---

[27] While the LAPs attempt to characterize their relationship with Donziger as "mere retention of a lawyer or involvement in litigation in New York," Mot. at 14, in fact multiple courts have found personal jurisdiction where a defendant's contacts with New York consisted solely of New York litigation and retention of New York counsel. *See, e.g.*, *SEC v. Softpoint, Inc.*, No. 95 Civ. 2951 (JSR), 2012 WL 1681167, at *3 (S.D.N.Y. May 9, 2012); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 376, 384 (S.D.N.Y. 2002). Defendants also claim that they retained no "control" over Donziger and his activities, but this self-serving claim belies the extensive authority granted to Donziger in his retention agreement and the ongoing attorney-client relationship between the LAPs and Donziger. *See* Dkt. 1874 at 448–49.

would again be exposed to imminent harm from the ongoing efforts to extort Chevron and to monetize the fraudulent Lago Agrio judgment.  *See id.*

Defendants contend that even with a stay, if Chevron prevails on appeal, "it would be able to receive all the property subject to this Court's constructive trust at that time."  Mot. at 20.  But this is a fantasy.  This Court previously explained that if Defendants were permitted to seize Chevron's assets, "there is no assurance that Chevron could recoup [that] property" because, among other reasons, Defendants "have taken extensive steps to ensure that any funds recovered are held offshore and beyond the reach either of U.S. or Ecuadorian courts."  Dkt. 1874 at 470–71 (citation omitted).  As a result, Defendants' machinations designed to defeat any forced transfer of property renders the assurance of the status quo illusory.  This is all the more so because Defendants and their co-conspirators, including Fajardo, assert that the LAPs are not bound by this Court's order.  Ex. M (Fajardo stating in an interview that "Judge Kaplan's ruling has no effect in connection with enforcing the judgment.  Legally speaking, it has no effect since he is a judge in New York.").  Under the circumstances, Chevron would have no effective remedy should the Court stay the constructive trust and allow Defendants to monetize the judgment during the appeal.[28]

## IV.    A Stay Would Reward Defendants' Longstanding Delay and Obstruction Strategy, and Harm the Public Interest

Defendants' stay request is their latest attempt to obstruct and delay adjudication of their corrupt scheme, with the goal of buying time to press forward with foreign enforcement actions and profit from their misconduct.  The Court recognized Defendants' delay strategy more than

---

[28] Defendants also argue that "Chevron will face enforcement actions outside the United States regardless of whether a stay pending appeal is granted."  Mot. at 21.  This is true, but the Court's injunction ensures that Chevron will not be irreparably injured by an adverse ruling in such actions.  Removing the constructive trust pending Defendants' appeal would risk irreparable harm to Chevron.

three years ago in connection with denying a motion to quash, describing Defendants' "deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay." *In re Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y. 2010). A few months later, the Court found that "counsel for the LAPs and Donziger made Herculean and perhaps questionable efforts in the Section 1782 proceedings to prevent or delay the disclosure of material proving the roles of Stratus and other U.S. consultants in the Cabrera report." *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 610 & n.115 (S.D.N.Y. 2011), *rev'd on other grounds, Naranjo*, 667 F.3d at 232.[29] And Defendants have persisted in their obstruction and delay strategy throughout the course of this action, as this Court has found on several occasions. *See, e.g.*, Dkt. 1529 (imposing sanctions for Defendants' "extraordinary efforts" to resist discovery).

Now that Defendants' misconduct has been finally adjudicated by a neutral fact finder following a full trial, Defendants once again seek to delay the effect of the Court's ruling by staying the injunction so that Defendants may profit from their scheme during the appeal. Yet this would frustrate the strong public interest in preventing fraud and enforcing this nation's laws. For instance, in *Nken v. Holder*, the Supreme Court addressed a request for a stay of the removal of an alien from this country, finding that there "is no basis for the blithe assertion of an absence of any injury to the public interest" because a stay of removal "permits and prolongs a continuing violation of United States law." 556 U.S. at 436, 129 S. Ct. at 1762 (quotations, citations, and alterations omitted).

---

[29] Donziger candidly explained the strategy to the LAPs' U.S. counsel: "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road. I could be convinced otherwise but I think it important we adhere to that fundamental principle of our strategy as outlined by Jim [Tyrrell] at the meeting a few weeks ago." Dkt. 48-21 at 1; *see also* Dkt. 496-5 (Donziger: "Seems we have a tension [between] the strategy as outlined by Jim (fight hard on all fronts all the time and concede nothing, buy as much time as possible)" and the idea that "something should be turned over" regarding the Cabrera fraud); Dkt. 549-4 (Ex. 2422) (Westenberger strategy: "This certainly will cause delay").

Here, the Court has adjudicated Donziger a racketeer, finding that he committed several criminal acts, including extortion, wire fraud, money laundering, and violation of the Foreign Corrupt Practices Act through bribery of foreign officials.  Dkt. 1874 at 402–03.  Whatever the merits of Donziger's other challenges on appeal, he does not challenge this Court's core findings about his misconduct or the predicate crimes that serve as the basis for his RICO liability.  Likewise, the public has an interest in preventing Defendants from profiting from a judgment obtained through corruption and fraud—wrongs that "involve[] far more than an injury to a single litigant."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 1001 (1944).  Defendants do not seek to contest this Court's finding that Donziger and the LAPs committed fraud in procuring the $19 billion judgment against Chevron.  Dkt. 1874 at 338–39 & n.1304.

Defendants contend that a stay is in the public interest because this Court's injunction hinders compensation for, and remediation of, environmental harm in Ecuador.  Mot. at 21–22.  But this Court already rejected Donziger's "Robin Hood" defense and explained why Chevron is entitled to injunctive relief regardless of the environmental conditions in Ecuador.  *See* Dkt. 1874 at 4 ("Justice is not served by inflicting injustice.  The ends do not justify the means.  There is no 'Robin Hood' defense to illegal and wrongful conduct.").  Moreover, as reflected in this Court's factual findings, Defendants resorted to fraud and bribery in Ecuador because they were unable to establish Chevron's liability on the merits—so it is false for them now to claim that the injunction somehow hinders environmental cleanup for which Chevron (as opposed to Petroecuador) is responsible.

Evidence uncovered during the RICO proceeding showed that the LAPs' own experts had discovered that the pollution they encountered was caused by Petroecuador's oil operations in

the decades since TexPet left, not TexPet's prior operations, and the LAPs sought to conceal this evidence.  "Russell reported [to Donziger] that 'the fact that they were finding [contaminants]' in the samples they were testing from the Concession area was 'much more indicative of contamination from PetroEcuador rather than Texaco because these compounds are volatile and degrade quickly in hot, wet, warm environment such as in the jungle.'"  Dkt. 1874 at 58.  The Court found that "[a]s Texaco had not operated in the Concession area since 1992, it was highly unlikely that any BTEX and GRO that ever had been attributable to Texaco's operations still would have been present.  PetroEcuador's continuing operations probably were the cause."  *Id*. at 58.

In addition, "[i]n the Spring of 1995, [the ROE, Petroecuador, and Texaco] executed a Settlement Agreement and Scope of Work agreement (the 'Settlement Agreement') that laid out specific tasks TexPet was required to complete before its remediation and wind down were complete, whereupon it would be entitled to a release."  Dkt. 1874 at 6–7.  Texaco "complet[ed] each task" it agreed to, and "[t]he final release was signed on September 30, 1998.  It stated that TexPet had fully performed its obligations under the MOU and Settlement Agreement and that TexPet was released from all potential claims by the ROE and PetroEcuador."  *Id.* at 7.  And Defendant Hugo Camacho personally signed a letter to TexPet expressing "a testimony of real gratefulness [to TexPet] for the environmental remediation work performed" by TexPet, which he called "fully and satisfactorily completed" and said produced a "positive outcome for the local population."  PX 244.[30]

Accordingly, the public interest strongly favors ensuring that Defendants are precluded from profiting from their scheme.  There is no countervailing public interest in allowing Defendants to continue extorting Chevron with a fraudulent judgment.

---

[30] Nor does "international comity" (Mot. at 21) justify issuance of a stay.  *See supra* at Section II.D.

## CONCLUSION

For these reasons, Chevron respectfully requests that the Court deny Defendants' motion for a stay pending appeal.

Dated:  March 31, 2014
New York, New York

Respectfully submitted,

s/ Randy M. Mastro
_____

Randy M. Mastro
Andrea E.  Neuman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile:  212.351.4035

William E.  Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile:  213.229.7520

*Attorneys for Chevron Corporation*