UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

        -against-                                 11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR A STAY PENDING APPEAL**

Appearances:

Randy M. Mastro
Andrea E. Neuman
Reed M. Brodsky
William E. Thompson
Anne Champion
GIBSON, DUNN & CRUTCHER, LLP
*Attorneys for Plaintiff*

Richard H. Friedman
FRIEDMAN | RUBIN

Zoe Littlepage
Rainey C. Booth
LITTLEPAGE BOOTH

Steven Donziger

*Attorneys for Defendant Steven Donziger
and Steven R. Donziger & Associates LLP*

Julio C. Gomez
JULIO C. GOMEZ, ATTORNEY AT LAW LLC
*Attorney for Defendants Hugo Gerardo
Camacho Naranjo and Javier Piaguaje
Payaguaje*

LEWIS A. KAPLAN, *District Judge.*

An Ecuadorian court in 2011 entered an $18.2 billion judgment (the "Lago Agrio Judgment")[1] against Chevron Corporation ("Chevron") in an action brought by 47 individuals referred to as the Lago Agrio plaintiffs (the "LAPs"). Chevron brought this action against the LAPs, their lead U.S. attorney, Steven Donziger,[2] and others involved in the Lago Agrio litigation and related events, claiming that the Lago Agrio Judgment was obtained by fraud as part of a scheme to extort money from the company. Following a lengthy trial with an enormous factual record, this Court made extensive findings, including that Donziger and the LAPs: (i) submitted fraudulent evidence; (ii) coerced a judge to use a global expert to issue a damages assessment and then to appoint to that role a man Donziger selected, paid through a secret account, and controlled; (iii) paid a Colorado consulting firm secretly to write all (or most) of the global expert's report, which was presented falsely as the expert's own work; (iv) misrepresented the facts and substance of their relationship with the global expert to U.S. courts; and, ultimately, (v) wrote secretly the Lago Agrio Judgment and promised $500,000 to the Ecuadorian judge in exchange for deciding the case in their favor and signing the judgment they prepared.[3]

This Court found Donziger liable on two independently sufficient legal theories: (1) fraud in the procurement of the Lago Agrio Judgment, and (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). It found also that Hugo Gerardo Camacho Naranjo and

---

[1]

> The amount of the Lago Agrio Judgment was reduced later to approximately $8.646 billion. PX 8095 (Opinion of Ecuadorian National Court of Justice) at 222.

[2]

> Chevron sued also Donziger's law office, The Law Offices of Steven R. Donziger and Donziger Associates PLLC. As there is no material distinction among them, references to Donziger refer also to his law office.

[3]

> *See generally* Opinion [DI 1874].

2

Javier Piaguaje Payaguaje (the "LAP Representatives"), the only other defendants who defended this action, were liable for the fraud because it was committed by their agents, including Donziger, within the scope of their employment.[4]

Chevron sought and, mindful of the Circuit's ruling in *Chevron Corporation v. Naranjo*,[5] this Court granted only narrow relief intended to preclude Donziger and the two LAP Representatives from profiting from the misdeeds for which they were responsible.  To that end, the judgment in this case (the "NY Judgment") (i) imposed a constructive trust for Chevron's benefit upon any proceeds "traceable to the [Lago Agrio] Judgment" or its enforcement that Donziger or the LAP Representatives have received or might receive,[6] (ii) required that Donziger "execute in favor of Chevron a stock power transferring" to the company "all of his right, title and interest in his shares of Amazonia," a company organized to collect and distribute any proceeds of the Lago Agrio Judgment,[7] (iii) enjoined Donziger and the LAP Representatives from "[f]iling or prosecuting any action for recognition or enforcement of the [Lago Agrio] Judgment" (or any new judgment

---

[4]      Chevron did not sue the LAP Representatives under RICO.  For the purposes of this motion, the Court refers to Donziger and the LAP Representatives collectively as "movants."

[5]      667 F.3d 232 (2d Cir. 2012).

[6]      NY Judgment [DI 1875] ¶¶ 1, 2.

[7]      *Id.* ¶ 3.

Amazonia Recovery Limited ("Amazonia") is a Gibraltar company established in May 2012 for the receipt and distribution of any funds resulting from the Lago Agrio Judgment.  *See* PX 657 (Amazonia Memorandum of Association); Donziger June 25, 2013 Dep. Tr. at 629:12-17, 632:4-9, 633:15-634:2; PX 1520 (Diagram of Newco [i.e. Amazonia] structure and fund flows).  Donziger's equity interest is identical to the share of any proceeds from the Lago Agrio Judgment to which he otherwise would be entitled as a contingent fee. *See infra* n.43.

3

based upon the Lago Agrio Judgment) "in any court in the United States,"[8] and (iv) prohibited Donziger and the LAP Representatives from attempting to "monetize or profit from the [Lago Agrio] Judgment, . . . including . . . by selling, assigning, pledging, transferring or encumbering any interest therein."[9]  Significantly, the NY Judgment did not restrict the other LAPs, who remain free to sell, assign, or transfer their interests, if any, in the Lago Agrio Judgment and to seek to enforce it anywhere in the world.  Nor did it restrict any of the other named defendants who did not participate in this trial from doing so.

The relief this Court granted is substantially the relief the LAPs' attorney, in an appearance joined in by Donziger, conceded late last year before the Second Circuit "would not [pose] a problem" if Chevron prevailed on its bribery claims.[10]  It merely prevents these three individuals – who are among those responsible for the bribery of the presiding judge in Lago Agrio and otherwise procuring the Lago Agrio Judgment by fraud – from profiting from that misconduct. Nevertheless, Donziger and the LAP Representatives now seek a stay in order to suspend pending appeal the very relief they stated would pose no problem.

Movants' position is without merit.  A principal focus of this motion necessarily is on the question whether movants will be harmed irreparably if the NY Judgment remains in effect until this appeal is decided.  But movants identify no credible threat of irreparable injury should that

---

[8]     NY Judgment ¶ 4.

[9]     *Id.* ¶ 5.

[10]     Tr. Sept. 26, 2013, at 25:3-15, *Naranjo v. Chevron Corp.*, No. 13-7772-cv (2d Cir.) [DI 1496-2] (stating that defendants "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming the judge was bribed).

4

occur.  Indeed, their claims of irreparable injury rest on a pastiche of unsupported assertions, contradictions of undisputed evidence, and fertile imagination.  Nor have they shown any likelihood of appellate success on any legal issue that would alter the relief granted here.  As a result, their motion is denied in almost all respects.  It is granted only to the limited extent that the Court will modify pending appeal the requirement that Donziger transfer immediately to Chevron his right, title and interest in his Amazonia shares to ensure that Chevron does not succeed to ownership of those shares before the appeal is decided.  In the interim, the Court orders that those shares – which represent Donziger's right, vis-à-vis his clients, to a 6.3 percent share of any money collected on the fraudulently procured judgment – and any proceeds of those shares will be held pending appeal by the Clerk of the Court for the benefit of Chevron and Donziger, as their interests ultimately may appear, and be voted, after ten days prior notice and absent a contrary order of this Court, as Donziger may direct.

*Discussion*

Four factors are relevant to a determination whether to issue a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[11]  "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay.  Simply stated, more of one

---

[11] *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002).

5

excuses less of the other."[12]  The sliding scale notwithstanding, however, an applicant for a stay

pending appeal must establish more than a "mere possibility" *both* of irreparable injury absent a stay

and of success on the merits of the appeal.[13]  Thus, a showing of likely irreparable harm absent a

stay pending appeal is indispensable,[14] although the required strength of that essential showing may

vary depending upon the strength of any likelihood of prevailing on the merits.

I.      *Movants Have Not Shown Any Threat of Irreparable Injury Absent a Stay Pending Appeal of the Limited Relief Granted Here*

Donziger claims that (1) the prohibition on his selling, assigning, pledging,

transferring or encumbering any interest in the Lago Agrio Judgment and the requirement that he

transfer his interest in that Judgment to Chevron would destroy his law practice and leave him no

means of earning a living,[15] (2) the required transfer of his Amazonia shares to Chevron would

deprive him of their value and of his right to participate in Amazonia's affairs and, worse yet,

introduce Chevron into the internal workings of an entity formed to collect the Lago Agrio Judgment

---

12

    *Mohammed*, 309 F.3d at 101 (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)).

13

    *See Nken v. Holder*, 556 U.S. 418, 434-35 (2009).

    There is no need here to discuss precisely how much more than a "mere possibility" is required.

14

    *See, e.g.*, *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) ("The movant must show that it will suffer irreparable injury unless a stay is granted.").

15

    Def. Mem. [DI 1888] at 16.

6

from Chevron,[16] and (3) Donziger would suffer a loss of good will and reputational damage absent a stay.[17]   The LAP Representatives contend that the prohibition of the monetization of any interest they may have in the Lago Agrio Judgment would render them unable to finance their appeal unless the judgment of this Court were stayed.[18]   Both the LAP Representatives and Donziger claim that they will be deprived, absent a stay, of "real property" by the NY Judgment, which would render that supposed injury irreparable.[19]

These arguments cannot be squared with the record in this case, the terms of the NY Judgment, common sense, or all three.   There simply is no material threat of *any* irreparable injury if the NY Judgment remains in effect until the Circuit has full briefing, an opportunity to study the extensive findings and record, heard oral argument, and decided the case.

A.     *The Judgment Does Not Threaten Irreparable Harm to Donziger's Law Practice*

Donziger claims that the NY Judgment "threatens to destroy . . . Donziger's law practice" by precluding him from "work[ing] on[] a case to which he has devoted the better part of the last two decades."[20] This argument is empty rhetoric.

Nothing in the NY Judgment prevents Donziger from continuing to work on the Lago

---

[16]     *Id.* at 19-20.

[17]     *Id.* at 18.

[18]     *Id.*

[19]     *Id.*

[20]     *Id.* at 16.

Agrio case.  Period.  The pertinent question is whether and to what extent it affects his compensation during the pendency of the appeal and, if so, whether any such effect would cause irreparable injury before the appeal is decided.

*1.      Donziger's Compensation Arrangements*

Paragraph 1 of the NY Judgment imposes a constructive trust on any property that Donziger has received, or hereafter may receive, that is "traceable to the [Lago Agrio] Judgment" or its enforcement.  But it is quite unlikely to have any effect on Donziger's law practice or compensation during the pendency of the appeal.

Donziger's compensation is governed by a written retainer agreement.[21]  It provides that he is entitled to a Monthly Retainer and, in the event money ever is recovered on the Lago Agrio Judgment, a Contingent Fee that works out to 6.3 percent of the recovery.[22]  While any payments of a Contingent Fee would be "traceable to the [Lago Agrio] Judgment," and thus subject to the constructive trust imposed by paragraph 1, the same would not be true of Monthly Retainer payments unless those payments were traceable to the Lago Agrio Judgment.  Thus, at least as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, just as he has

---

[21]
 PX 558 (Jan. 5, 2011 retainer agreement).

 Similar arrangements were in effect prior to the execution of that agreement.

[22]
 *Id.* ¶¶ 3(a), 3(b), 3(i).

 The percentage of any Lago Agrio Judgment proceeds to which Donziger is entitled may have been slightly diluted subsequent to the execution of his retainer agreement in order to give equity to new investors, but this neither matters nor is shown persuasively on the record.

8

been paid at least $958,000 and likely considerably more over the past nine or ten years.[23]

To be sure, the NY Judgment would change things in respect of the payment of any Contingent Fee to Donziger, as any such payment would be traceable to the Judgment and thus subject to paragraph 1.  But there are two problems with any suggestion that preventing Donziger from collecting a Contingent Fee during the pendency of the appeal would inflict irreparable injury by depriving him of the ability to work on the case or to earn a living, much less destroying his law practice.

*First*, Donziger has been litigating the case, making a living, and conducting his professional and business activities for years without receiving any contingent fees.  The fact that the payment of any Contingent Fee, should any ever be due, would have to await (and would depend upon) the outcome of this appeal is not an immediate threat of irreparable injury.

*Second*, there is no evidence that the Lago Agrio Judgment is likely to be collected in any material part, if at all, during the pendency of the appeal in this case.  Although the LAPs are seeking enforcement of the Lago Agrio Judgment in Argentina, Brazil, and Canada, enforcement has not been granted in any of them.  Nor is there any evidence that anything likely would be collected in any of those countries during the pendency of this appeal even if any of them permitted enforcement of the Judgment before the appeal is decided.[24]  And while the Lago Agrio Judgment

---

[23]

A forensic accountant reviewed Donziger's financial records to the extent he produced them. Donziger's deficient record keeping precluded the accountant from completely verifying "where, when, and on what" money was spent in the litigation, including Donziger's own compensation.  *See, e.g.*, PX 4900R (Dahlberg Witness Statement) ¶¶ 29-32, 55.  The documents available, however, indicated that Donziger received roughly $958,000 in monthly payments ranging from $10,000 to $17,500 from 2004 to 2009.  *Id.* ¶ 60.

[24]

The Argentine courts rejected the LAPs' efforts to enforce the Lago Agrio Judgment against Chevron subsidiaries in that country absent a showing that the corporate veil should be pierced, and the Brazilian case appears still to be in its early stages.  *See* PX 273 (Order

is enforceable in Ecuador, and certain limited Chevron assets have been attached there for the benefit of the judgment creditors, Donziger and the LAP Representatives have characterized the possibility that they actually will receive anything as a result of that attachment as "speculation."[25] Thus, there has been no showing that Donziger has received, or is likely during the pendency of this appeal to receive, any Contingent Fee. The risk even of a delay of his receipt of any Contingent Fee by virtue of the effectiveness of the NY Judgment pending appeal is purely speculative.

In all the circumstances, there simply is no cognizable possibility that the effectiveness of paragraph 1 of the NY Judgment during the pendency of the appeal would have any irreparable effect on Donziger, his activities, his representation of his clients, or his law practice.

## 2.    *The Monetization Provision*

No doubt recognizing this, Donziger seeks to attribute such effects to paragraph 5 of the NY Judgment, which prohibits him from "monetiz[ing] or profit[ing] from the Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest

---

Issued by the Supreme Court of Justice of Argentina in *Aguinda Salazar Maria v. Chevron Corp.*); PX 2306 (Filing in the Superior Court of Justice of Brazil). A court in Ontario, Canada rejected the LAPs' efforts to enforce the Judgment in Canada without considering the merits. *See* PX 660 (Order, Yaiguaje v. Chevron Corp., File No. CV-12-9808-00CL). That decision was reversed and the case remanded with instructions to proceed to the merits. But the appellate decision now is before the Supreme Court of Canada. *See Press Releases, Supreme Court of Canada: Judgments in Leave Applications*, JUDGMENTS OF THE SUPREME COURT OF CANADA, http://scc-csc.lexum.com/scc-csc/news/en/item/4564/index.do (last visited Apr. 24, 2014) (granting Chevron's application to appeal from a decision by the Ontario Court of Appeal overturning the lower court's decision).

[25]    DI 1888 at 6.

While the Court does not adopt that characterization, Donziger certainly is bound by his own assertion.

therein."[26]  But he is wrong.

The point of paragraph 5 – which is narrower than language that was proposed by Chevron in its post-trial memorandum[27] and not specifically objected to by movants in their reply memoranda[28] – was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on *their interests* in the Lago Agrio Judgment and thus at least confusing the issue of traceability.[29]  Indeed, Donziger's memorandum so recognized when he described paragraph 5 by saying that it would "[d]epriv[e] Mr. Donziger of *his* interest in . . . a case to which he has devoted the better part of the last two decades."[30]

The NY Judgment, including paragraph 5, in fact would deprive Donziger of the ability to profit from the Lago Agrio Judgment that he obtained by fraud.  The practical effect of

---

[26]

NY Judgment ¶ 5.

[27]

Chevron Post-Trial Mem. [DI 1847] at 340-41.

[28]

*See* Donziger Reply Mem. [DI 1857]; LAP Reps. Reply Mem. [DI 1858].

Movants of course contended that they should prevail in the action.  But they did not comment on this proposed form of relief and thus arguably have waived any objection to it. Donziger surely did not claim that this provision, if granted, would prevent him from making a living or destroy his law practice.

[29]

*See, e.g.*, DI 1847 at 340-44.

Courts generally will impose a constructive trust not only on property that is stolen or misappropriated, but also on property that is "traceable" to property that is stolen or misappropriated.  *See, e.g., United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 416 (2d Cir. 2001).  "Thus, the victim may recover against the thief regardless of the form into which the thief has converted the stolen property."  *Sec. & Exch. Comm'n v. Universal Express, Inc.*, No. 04 Civ. 2322 (GEL), 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008).

[30]

DI 1888 at 16 (emphasis added).

that, however, as we have seen, is not to prevent him from working on the case nor to prevent him from being paid his monthly retainer for his labors.  It is to prevent him from benefitting personally, at Chevron's expense, from property traceable to that fraudulent Judgment.  But leaving those provisions of the NY Judgment in place pending disposition of this appeal would threaten no irreparable injury.  There is no reason to suppose that the Lago Agrio Judgment will be collected in any material part during the pendency of the appeal. Even if there were, Donziger could realize the contingent fee benefits of such collections once the appeal is decided – if he prevails.

B.     *The NY Judgment Does Not Threaten to Prevent the LAP Representatives From Financing Their Appeal*

The LAP Representatives claim that the Judgment's prohibition on monetizing the Lago Agrio Judgment would prevent them from "financ[ing] any appeal of this action."[31]  That claim borders on the irresponsible.

*First.*   There is not a shred of evidence that the LAP Representatives or any of the other LAPs ever paid or contributed anything toward the legal fees or legal expenses incurred in this case, the Lago Agrio case, or any of the other litigation involving Chevron, or that there is or ever was any intention that they would do so in the future.  The litigation against Chevron has been funded by investors in exchange for shares of any eventual recovery.  In fact, the LAPs have raised at least $15.99 million and perhaps $21 million or more from such sources.[32]  At least $7.5 million

---

[31]

   *Id.* at 18.

[32]

   PX 2143 (Funding for the Enterprise).

of that amount has been paid to U.S. counsel,[33] much of it to firms representing the LAPs.[34]  Nothing in the NY Judgment prevents the LAPs (other than the two LAP Representatives who are named in the NY Judgment) and their allies from continuing to raise money in the same fashion.

*Second.*  There is no reason to suppose that the Amazon Defense Front ("ADF") and the LAPs lack funds, even at this moment, to pay for the appeal by the LAP Representatives, whom they obviously decided to have defend this case in the interests of all in order to give them a voice in the courtroom.  The LAPs are litigating actively against Chevron in Argentina, Brazil, Canada, Ecuador and even elsewhere in the United States[35] and are represented in those cases by prominent counsel.  According to their lead Ecuadorian counsel, Pablo Fajardo, in a statement made on or about March 19, 2014, "[w]e're preparing more court actions in other countries.  We're also putting together proactive cases all over the world."[36]  Although the LAP Representatives repeatedly have

---

[33]

    PX 4900R (Dahlberg Witness Statement) ¶ 65 & Ex. D.

[34]

    This has included at least $4.8 million to Patton Boggs and $395,973 to Emery, Celli, Brinckerhoff & Abady LLP.  *Id.* Ex. D.

    Doubtless due to the discovery cut-off date, the record does not reveal how much was paid to Smyser Kaplan & Veselka LLP, a firm that represented the LAP Representatives earlier in this action.  Likewise, the identity of the payer(s) is unknown, as a lawyer with the firm reportedly told another lawyer that "he did not know who was paying the bills" in this case. *See* Supp. Decl. of Judith Kimerling in Support of Consolidated Reply to Mot. to Intervene [DI 710] ¶ 32 ("When I asked who would be paying me if I agreed to be an expert, [Ty Doyle of Smyser Kaplan] explained that his firm had become involved in the case through a 'series of referrals;' that they had been interviewed by Pablo Fajardo and a 'community representative' from Ecuador; and that the firm was getting paid and was not working on a contingency fee basis, but that he did not know who was paying the bills.").

[35]

    Patton Boggs argued an appeal on their behalf in the Fourth Circuit only last month.  *See Chevron Corp. v. Page*, No. 13-1382 (4th Cir.).

[36]

    Stavers Decl. [DI 1894], Ex. B (Mar. 19, 2014 Press Conference) at 10 ("[W]e're going to continue with the enforcement actions in the three countries we've already mentioned: Brazil, Argentina and Canada.  We're litigating in each jurisdiction.  No judge in those

pleaded poverty *in this case*, and their lawyers *here* have claimed non-payment of fees, they never have produced any evidence of the financial condition of those who are bankrolling the case despite repeated invitations to do so.  Thus, the claim of inability to pay is entirely unsubstantiated and appears to have been deployed in an effort to gain tactical advantage.

*Third.*  This conclusion is supported not only by the LAPs' apparently well funded litigation efforts in other jurisdictions, but by another statement of Fajardo.  In May 2013, he stated that the LAPs  would "scal[e] back in New York to focus on the main issue: enforcing the $19 billion judgment around the world. . . . The New York case is a distraction, a sideshow aimed at exhausting our resources."[37]  Self-created "poverty" in one of many spheres of activity that is attributable to a party's own resource allocation decisions does not justify a stay pending appeal.

*Finally.*  Even if one were to ignore all of the above, the suggestion that the LAP Representatives need the freedom to monetize their interests in the Lago Agrio Judgment in order to finance their appeal ignores the fact that they have retained little if any economic interest in that Judgment, assuming they ever had such an interest in the first place.  As noted previously, the Lago Agrio Judgment provides for the payment of the entire award to the ADF.  This appears to include the 10 percent that Ecuador's Environmental Management Act contemplates be awarded to individual plaintiffs, essentially as a bounty for bringing such a suit.[38]  Thus, it is doubtful that the

---

jurisdictions is under any obligation to abide by Judge Kaplan's ruling.  We're preparing more court actions in other countries.  We're also putting together proactive cases all over the world.").

[37]  Stavers Decl. [DI 1140], Ex. 3728.

[38]  *See* DI 1874 at 269-70; PX 400 (Lago Agrio Judgment) at 187-88.

LAP Representatives themselves are or ever were entitled to receive anything at all, personally, under the Lago Agrio Judgment.[39]  They appear to have nothing to monetize.

In sum, the LAP Representatives have not shown that the provision of the NY Judgment preventing them from monetizing any interest they may have in the Lago Agrio Judgment threatens them with irreparable injury, either by preventing them from appealing here or in any other way.  This case always has been financed on the movants' side by outside investors, not the individual defendants.  There has been no showing that the money to pay for the appeal is not on hand already or, in any case, could not be raised just as millions have been raised before.  And the LAP Representatives have failed to demonstrate that they have retained whatever economic interest they ever had in the Lago Agrio Judgment, if they ever had any, that they could sell or borrow upon to pay any appellate fees but for the intervention of the NY Judgment.

---

[39]  For the sake of completeness, we note that the LAP Representatives and the rest of the LAPs in 2012 entered into a deed of trust (in which they were referred to as SETTLOR ONE) containing this provision:

"The SETTLORS hereby contribute, assign and transfer to the separate fund of the trust, each and every one of the assets listed in section Ten point One and Ten point Two of Clause Three, subsection Ten, ('Recitals') of this AGREEMENT, in other words: **One**.- SETTLOR ONE transfers as their initial contribution, the amount of one thousand United States Dollars (USD 1,000.00). In addition SETTLOR ONE agrees to contribute to the TRUST all of the monies they will receive in the future as a result of the parts of the ENFORCEABLE JUDGMENT corresponding to damages for COMPENSATION ARISING FROM THE LITIGATION." PX 2459 (Creation of a Commercial Trust for the Administration of Monies) at 9 (emphasis in original).

"COMPENSATION ARISING FROM THE LITIGATION" is defined to include all remediation awards, which are the vast bulk of the Lago Agrio Judgment, but to exclude the 10 percent referred to in the text. *Id.* at 5.  Thus, it appears that the conveyance to the trust included any right that the LAPs had to any part of the damages awarded by the Lago Agrio Judgment save the 10 percent referred to, but that the right to the 10 percent resided in the ADF by virtue of the Lago Agrio Judgment itself, not in the individual plaintiffs.

C.     *The Transfer of Amazonia Shares Would Not Threaten Donziger With Irreparable
       Harm Pending Appeal*

The NY Judgment requires that Donziger "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia."[40]   Donziger contends that such a transfer would threaten irreparable harm by depriving him of his "ability to exercise or sell his shares, or to participate in the entity's affairs, during the pendency of the appeal,"[41] and by granting Chevron control of his shares, which "would threaten the entity's purpose and existence."[42]   These arguments lack merit.

*First.*   For reasons explained in this Court's opinion, allowing Donziger to benefit from the Lago Agrio Judgment would be to hand him, at Chevron's expense, proceeds of the fraud he committed.   The Amazonia shares are the proxy through which Donziger and others with equity interests in any collections on the Lago Agrio Judgment will receive any benefits it may yield.   Thus, Donziger's Amazonia shares in equity belong to Chevron.   Any other conclusion would allow Donziger to be enriched unjustly if any of the Lago Agrio Judgment were collected.   Allowing the shares to remain in Donziger's hands pending appeal would enable him to benefit from his fraud prior to any collections by selling the shares and by hiding or dissipating the sale proceeds.   Taking the shares out of his hands now would prevent such a result and cause no injury to Donziger that could not be undone.   If Donziger prevailed on appeal, the shares and whatever economic benefit they may have yielded in the interim would be restored to him.   If he did not prevail, that fact would

---

[40]      NY Judgment ¶ 3.

[41]      DI 1888 at 19.

[42]      *Id.* at 20.

reflect the Second Circuit's determination that Chevron, not Donziger, is entitled to the shares and any proceeds of the shares. Putting the shares in Chevron's hands in the interim – the relief awarded by this Court – would cause no irreparable injury to Donziger.

*Second.* Donziger's interest in Amazonia corresponds to his equity interest in any proceeds of the Lago Agrio Judgment, which is only 6.3 percent.[43] Corporate records show that he was not a director of the company on the date as of which they spoke,[44] and there is no suggestion that he is now. There has been no showing that any corporate action requiring or permitting shareholder approval is likely to occur before the appeal in this case is decided. Hence, Donziger has not shown that he would be injured irreparably by being deprived of the ability "to exercise . . . his shares . . . [, whatever exactly that means,] during the pendency of the appeal."

*Third.* Donziger's suggestion that the transfer of his shares to Chevron would give Chevron "control" of its adversary, Amazonia,[45] is nonsense. Six percent shareholders without board representation do not control companies.

*Fourth.* Donziger's suggestion that a transfer of his shares to Chevron, to speak colloquially, would put the fox in the hen house – in the sense that Chevron thereby would gain

---

[43]

See DI 1874 at 476-77 & n.1821; *see also* Donziger June 25, 2013 Dep. Tr. at 632:4-9, 633:15-634:2 (testifying that Donziger's shares in Amazonia are based on his proportionate equity interest in the LAPs' claim); PX 558 (Jan 5, 2011 retainer agreement) ¶¶ 3(a), 3(i).

6.3 percent represents 31.5 percent of the Total Contingency Fee Payment, which is 20 percent of all funds collected. Donziger testified at trial that he did not know the number of Amazonia shares he owns, but confirmed that it is "the equivalent of what the contingency fee interest was before it was created." Trial Tr. 2491:19-24.

[44]

See PX 656 (Jan. 29, 2013 List of the Directors and Secretaries of Amazonia Recovery Limited) at 7 of 19 (naming Pablo Fajardo, Ermel Gabriel Chavez Parra, Luis Yanza, and Julian Jarvis as Directors, and GT Fiduciary Services Limited as Secretary).

[45]

See, e.g., DI 1888 at 19 n.12 (referring to "Chevron's control of Amazonia . . . .").

access to confidential information in the hands of the company charged with trying to collect the Lago Agrio Judgment from Chevron – is overwrought.  As noted, Donziger is but a six percent shareholder without board representation in a company in which there is no evidence of any planned action requiring or permitting shareholder approval during the pendency of the appeal.  There is no reason to suppose that the holder of such a limited number of shares would have access to any sensitive corporate information except to the extent, if any, that the directors opted to share it.  Even if Chevron became a 6.3 percent shareholder, there is no likelihood that the company would share confidential information with it, as at least a majority of the directors – Fajardo, Chavez, and Yanza – are Donziger allies and Chevron adversaries.

Accordingly, an immediate transfer of Donziger's Amazonia shares to Chevron would threaten Donziger with no irreparable injury.  On the other hand, the overriding concern in ordering the transfer was immediately to prevent Donziger from benefitting from the fraud he committed through the vehicle of his Amazonia shares.  That objective may be achieved during the pendency of the appeal by taking the shares out of Donziger's hands without now placing them into Chevron's.  Accordingly, the Court will grant Donziger's motion to the extent of modifying paragraph 3 of the NY Judgment, solely pending the determination of this appeal, to require that the shares be conveyed to the Clerk of this Court, who shall hold them for the benefit of Donziger and Chevron, as their respective interests appear upon disposition of this appeal.

D.      *The Constructive Trust Provision Does Not Threaten to Deprive Donziger or the LAP Representatives of Real Property*

Donziger and the LAP Representatives protest as well the NY Judgment's requirement that they transfer and assign to Chevron "all property whether personal *or real*, tangible or intangible, vested or contingent . . . traceable to the Judgment or the enforcement of the Judgment anywhere in the world."[46]  They assert that they "face the loss of real property," which they say inherently would be irreparable harm.[47]

The LAP Representatives have not shown that they own any real property at all. There is no evidence of real property ownership by Donziger except for some property that he acquired by virtue of family probate litigation.  Thus, movants have failed to show that any of them owns real property that is traceable to the Lago Agrio Judgment.  Property that is not traceable to the Lago Agrio Judgment is unaffected.

E.      *The NY Judgment's Application to Those "Acting in Concert" With Donziger and the LAP Representatives Does Not Threaten to Irreparably Harm Donziger and the LAP Representatives*

Paragraph 8 of the NY Judgment provides:

"In accordance with Federal Rule of Civil Procedure 65(d)(2), this Judgment is binding upon the parties; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participating with any of the foregoing."

---

[46]     NY Judgment ¶¶ 1, 2 (emphasis added); *see also* DI 1888 at 18.

[47]     DI 1888 at 18.

In addition, Federal Rule of Civil Procedure ("FRCP") 65(d)(2) explicitly provides that the NY Judgment is binding only upon those persons with actual notice thereof.[48]

Donziger contends that this provision will "chill third parties from funding or associating with" him to the extent that he will be harmed irreparably during the pendency of the appeal.[49] The argument is without merit.

As paragraph 8 states, it is a function of FRCP 65(d)(2). It is intended to "give[] force to injunctions" by "prevent[ing] parties from violating them by proxy."[50] The idea that anyone would decline to associate with Donziger by reason of paragraph 8 of the NY Judgment is fanciful, as there is nothing in the NY Judgment that prevents Donziger from associating with anyone. If he has suffered a loss of good will or esteem, that loss is attributable to the fact that the evidence at trial established serious misconduct on his part and cannot be remedied by a stay pending appeal.

His complaint about the impact of paragraph 8 on funding is nearly as far fetched. As discussed, Donziger's side of the Lago Agrio litigation has been funded by investments in exchange for shares of any collections that may be obtained. The NY Judgment does not limit efforts to enforce the Lago Agrio Judgment outside the United States, even by Donziger and the LAP Representatives.[51] It limits efforts to do so in the United States only by Donziger and the LAP

---

[48]

Fed. R. Civ. P. 65(d)(2) ("The order binds only the following who receive actual notice of it by personal service or otherwise . . . .").

[49]

DI 1888 at 18.

[50]

*Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

[51]

It does, of course, limit the personal ability of Donziger or the LAP Representatives to profit from such efforts by, *inter alia*, imposing a constructive trust on anything that they receive that is traceable to the Lago Agrio Judgment.

Representatives.  The ability of the other LAPs, the ADF, Amazonia and anyone else claiming the right to seek enforcement to attempt to do so even in the United States is unaffected as long as they do not knowingly act in concert with Donziger or the LAP Representatives.[52]  Thus, the LAPs (other than the two LAP Representatives) and most of their entourage are virtually unconstrained by the NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay. Paragraph 8 threatens the movants with no irreparable injury.

*          *          *

In sum, Donziger and the LAP Representatives have failed to demonstrate that they face a cognizable threat of irreparable harm, or even the possibility of such a threat, absent a stay pending appeal.

II.     *Donziger and the LAP Representatives Do Not Have a Substantial Probability of Material Success on Appeal*

The movants' failure to demonstrate any real prospect of irreparable injury is fatal to their motion.  In any case, however, their prospects of a reversal of any material part of the judgment would be insufficient to warrant a stay pending appeal.[53]

---

[52]

NY Judgment ¶ 4.

[53]

*Nken*, 556 U.S. at 434 ("It is not enough that the chance of success on the merits be 'better than negligible.'") (citation omitted).

Movants advocate that this Court require only a "substantial possibility" of success on appeal.  *See Mohammed*, 309 F.3d at 101 (noting that the Circuit has "also used 'possibility' rather than 'probability'").  The Court need not determine which articulation of the standard applies here because it finds that movants do not meet the standard under either formulation.

A.      *Donziger and the LAP Representatives' Standing Argument is Unlikely to Succeed*

Movants place heaviest reliance on their argument, first conceived well after the trial, that Chevron's decision prior to trial to withdraw its damages claim and request for a worldwide injunction deprived the company of standing. That argument is unlikely to fare better on appeal than it did in this Court.

As Supreme Court and Second Circuit precedent makes absolutely plain, "standing is to be determined as of the *commencement of suit*"[54] and is properly understood as an "evaluat[ion] of [a plaintiff's] personal stake as of the *outset of the litigation.*"[55] Where circumstances change subsequent to the filing of the complaint – even where those changes stem from the plaintiff's own choices or intentions – the plaintiff's "standing" is not altered.[56] Instead, those changes may – or may not – render a case moot.[57]

Two Second Circuit cases not previously cited underscore this principle. In *Comer v. Cisneros*,[58] one of the named plaintiffs, Felicia Stokes, claimed she intentionally had been deprived on the basis of race of the opportunity to use her Section 8 housing benefit in the Buffalo suburbs, where she wished to live. She sought injunctive relief against the alleged racial

---

[54]

    *Azim v. Vance*, 530 F. App'x 44, 45 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife,* 555, 570 n.5 (1992) (internal quotation marks omitted)) (emphasis added).

[55]

    *Altman v. Bedford Cent. School Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) (quoting *Cook v. Colgate*, 992 F.2d 17, 19 (2d Cir. 1993)) (brackets in original) (emphasis added).

[56]

    *See Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994).

[57]

    *Azim*, 530 F. App'x at 46.

[58]

    37 F.3d 775.

discrimination with respect to the availability of housing subsidies in the suburbs. After Stokes determined that she no longer wanted to leave Buffalo, the district court dismissed her claim for lack of standing.[59]   The Second Circuit reversed, holding that, "the question whether Stokes has a current desire to live outside the City . . . is irrelevant because standing is measured as of the time the suit is brought."[60]

In *Azim v. Vance*,[61] the Circuit made the point even more plainly. The plaintiffs, licensed taxi cab drivers, challenged the City's use of GPS devices in their cars and the administrative and/or criminal charges brought against them. This Court dismissed the complaint for lack of standing because one plaintiff had settled with the City and another determined he no longer wanted the job from which he claimed to have been unfairly dismissed.[62]   The Second Circuit disagreed, but affirmed on a different ground. Emphasizing the principle that "standing is to be determined as of the commencement of suit," the Circuit held that, "to the extent that the plaintiffs had standing at the time of the filing, given the subsequent actions discussed above, once the named parties lost tangible interest, their claims were rendered moot."[63]

The proper analysis here thus is mootness, not standing. Chevron's determination,

---

[59]

   *Id.* at 791.

[60]

   *Id.*  Nor did the plaintiff's determination that she no longer wished to live in the suburbs mean that her claims were not redressable. The Circuit observed that equitable relief could be "shape[d]" by the court. *Id.*

[61]

   530 F. App'x 44.

[62]

   *Azim v. N.Y.C. Taxi & Limousine Comm'n*, No 11 Civ. 2921, 2012 WL 399934 (S.D.N.Y. Feb. 6, 2012).

[63]

   530 F. App'x at 45-46.

subsequent to the filing of its complaint, to seek relief narrower than it demanded in its complaint did not impact its standing. Instead, that decision bears on the question whether the company retains a "tangible interest" in the litigation's outcome. As the Court explained in its Opinion,[64] Chevron plainly still has such an interest. This case is not moot, and the Court granted meaningful relief to the company.[65] Significantly, movants do not argue otherwise. Indeed, their claims of irreparable injury evidence their tacit acknowledgment that the relief granted to Chevron is effective and significant.

Movants' new challenge to Chevron's standing as of the time the complaint was filed – not raised before this motion – is not likely to fare any better on appeal. As the Court set forth in its opinion, Chevron pleaded at the case's outset, and then proved at trial, facts sufficient to satisfy the requirements of Article III standing: that it had been injured by movants' conduct, that movants threatened further injury through the then imminent entry of a large judgment (which issued not two weeks later as a result of their fraud), and that damages and global injunctive relief would redress those injuries.[66] Movants reach further than their grasp by arguing that the absence of the Lago Agrio Judgment at the time of the initial complaint foreclosed Chevron's standing.[67] Chevron plainly had been injured by movants' fraud even before the Lago Agrio Judgment was issued. The

---

[64]

See DI 1874 at 308-10.

[65]

See *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'") (quoting *Knox v. Serv. Emps. Int'l Union*, 132 S. Ct. 2277, 2287 (2012)).

[66]

See DI 1874 at 311-13.

[67]

See Def. Reply [DI 1896] at 3 ("Chevron did not have standing to seek *any* injunctive relief at the outset because there was no Ecuadorian judgment against it at that time, let alone an enforceable one, nor were there any enforcement proceedings.")

threat of the entry of that judgment – the product, as this Court now has found, of a bribe and other fraud – was imminent.[68]   No more was required.

Movants would not have a greater chance of success even if one were to accept their invalid premise that standing is determined by events subsequent to the suit's commencement.  As the Court's Opinion and prevailing case law make plain (and movants once more ignore), movants' conduct and the fraudulent Lago Agrio Judgment need not constitute the 'but for' or proximate causes of Chevron's injuries in order to satisfy Article III.[69]  Instead, Chevron was required only to demonstrate, as this Court found that it did,  that the harms it has suffered and with which it remains threatened are "fairly traceable" to movants' misconduct;[70] in other words, that the threat of enforcement that Chevron confronts is "fairly traceable" to movants' bribery, the Lago Agrio Judgment they ghostwrote, and their other fraudulent acts.  Movants' suggestions to the contrary

---

[68]

Lest there ever was any doubt, movants have continued to articulate both their desire to enforce the Lago Agrio Judgment and their confidence that other courts will recognize it. *See* DI 1894, Ex. B (Mar. 19, 2014 Press Conference) at 4 (Donziger: "[T]he communities and their attorneys will continue the enforcement actions in several countries" pending the appeal. "And in my opinion, the judges in those countries will ultimately not be biased toward Chevron . . . ."), 5 (Donziger: "[W]e have the utmost confidence that Chevron will ultimately have to pay . . . ."), 10 (Fajardo: "[W]e're going to continue with the enforcement actions in the three countries we've already mentioned: Brazil, Argentina and Canada. We're litigating in each jurisdiction.  No judge in those jurisdictions is under any obligation to abide by Judge Kaplan's ruling.  We're preparing more court actions in other countries. We're also putting together proactive cases all over the world."), 16 (Donziger: "What the communities are doing now is collecting on the judgment they won. . . . We're just going to collect what Chevron owes the communities."); Ex. D (*NY Judge Rules for Chevron in Ecuador Case*, THE WALL STREET JOURNAL (Mar. 4, 2014)) at 1 (Juan Pablo Saenz: this Court's ruling "will not serve to reduce the risk the oil company faces in the imminent collection of the sentence dictated against it by the Ecuadorian justice system").

[69]

*See* DI 1874 at 314 n.1251.

[70]

*Rothstein v. UBS A.G.*, 708 F.3d 82, 91-92 (2d Cir. 2013) (noting that "the 'fairly traceable' standard is lower than that of proximate cause").

defy logic.[71]   Finally, Chevron plainly will "benefit in a tangible way from the [C]ourt's intervention,"[72] thus defeating movants' arguments that the injuries they have caused and still threaten to cause defy redress in this Court.

B.   *Even If Donziger Were to Prevail on the Question of the Availability of Injunctive Relief Under RICO, Chevron Still Would Be Entitled to All the Relief this Court Granted*

The Court recognizes that the question whether injunctive relief is available to private plaintiffs is open in this Circuit.  Courts that have addressed the issue are divided.[73] It is conceivable that movants will prevail on that issue notwithstanding this Court's view. Nevertheless, that fact carries no water for the movants.

The relief granted here against Donziger rests not only on RICO, but on the independent and sufficient state law ground that the Lago Agrio Judgment was procured by fraud. Thus, even were equitable relief unavailable under RICO, the Court would have granted the same relief on the basis that Donziger procured the Lago Agrio Judgment through fraud. Any uncertainty concerning the availability of private injunctive relief under RICO provides no basis for staying Chevron's relief against Donziger.

---

[71]
>Movants' arguments are no more successful under the more rigorous RICO causation standard, which applies to claims against Donziger only.  The threat of the Lago Agrio Judgment's enforcement in the United States is the direct byproduct of movants' attempts to enforce the Lago Agrio Judgment. *See* DI 1874 at 403-04.

[72]
>*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

[73]
>*See* DI 1874 at 341-45.

Moreover, the LAP Representatives were not even sued under RICO.  The relief granted against them does not depend upon that statute.  Donziger's RICO argument thus has no bearing on them at all.

C.      *The Relief Granted is Consistent with* Naranjo

Movants assert that the NY Judgment "exacerbates the very comity concerns raised in [*Chevron Corporation v.*] *Naranjo*."[74]  But they do little to explain why *Naranjo* – which was decided on the ground that declaratory relief is not available under New York's Recognition Act – precludes this Court from granting the coercive – not declaratory – relief it did grant, which was granted on entirely different theories of liability.

As the Court explained in its Opinion,[75] the constructive trust and injunction do not, as movants falsely assert, "preemptively nullify a foreign judgment or thwart its possible enforcement in other countries."[76]  As is plain on the face of the NY Judgment, its application is confined to the three movants who defended this case at trial – over whom the Court has personal jurisdiction – and prohibits enforcement of the Lago Agrio Judgment by them only within the United States.

This Court's Judgment  does not interfere with any foreign court's enforcement of the Lago Agrio Judgment, places no restrictions upon the LAPs' attempt to enforce the Lago Agrio Judgment in foreign courts, and does not preclude parties not before the Court from profiting from

---

[74]     DI 1888 at 10.

[75]     *See* DI 1874 at 479-84.

[76]     DI 1888 at 9.

any such enforcement.  Movants make no attempt to explain their claims to the contrary.  This Court's carefully cabined relief tailored to prevent these three individuals – all subject to its personal jurisdiction – from profiting from the egregious fraud for which they are responsible is entirely consistent with *Naranjo*.

> D.     *Movants are Not Likely To Succeed on Their Argument That Chevron is Judicially Estopped from Obtaining Relief*

For the reasons already set forth in the Opinion, Donziger and the LAP Representatives' reassertion of their argument that Chevron is judicially estopped from obtaining relief is unlikely to prevail on appeal at least because (a) Texaco's assertions many years ago as to the adequacy of Ecuador's courts concerned a different time period, wholly different circumstances, and thus do not obtain here, (b) Chevron did not "merge" with Texaco in any relevant sense, and (c) it mischaracterizes the record to suggest, as movants have, that Texaco promised it would satisfy any judgment for plaintiffs subject to certain conditions.[77]

As the Court already has explained, even accepting – contrary to the facts and the law – movants' erroneous arguments that (a) Chevron stands in Texaco's shoes, and (b) movants accepted and Judge Rakoff relied upon Texaco's very conditional offer to satisfy any judgment entered in plaintiffs' favor, their judicial estoppel argument still would fail.  A promise to satisfy a judgment subject to the defenses available under New York's Recognition of Foreign Country Money Judgments Act would not affect Chevron here.  As the Second Circuit explained, "Chevron has . . . reserved its right to challenge any judgment issued in Lago Agrio on the grounds that the

---

[77]     DI 1874 at 455-61.  This Court addressed these arguments also in *Chevron Corp. v. Salazar*, 807 F. Supp. 2d 189 (S.D.N.Y. 2011).

Ecuadorian judicial system 'does not provide impartial tribunals or procedures compatible with the requirements of due process of law,' that the judgment itself 'was obtained by fraud,' or that 'the proceeding in [Lago Agrio] was contrary to an agreement between the parties.' *Nothing in that reservation of rights purports to restrict the kind of forum or type of proceeding in which Chevron can raise those defenses*."[78]  As a result, even had Chevron made or adopted that promise as movants claim – and this Court found that it did not[79] – the promise would not preclude Chevron from asserting the arguments it asserted here, all of which are defenses under the New York Recognition Act.  Accordingly, movants have failed to demonstrate a likelihood of success on appeal on these grounds also.

      E.      *The LAP Representatives Are Not Likely To Prevail on Their Contention that the Court Lacks Personal Jurisdiction Over Them*

      The LAP Representatives contend that they are likely to prevail on their argument that this Court lacks personal jurisdiction over them.  They are wrong.

      First, as the Court already has explained, it struck the LAP Representatives' personal jurisdiction defense as a sanction for their failure to produce documents relevant to that defense.[80]  In so doing, it applied the well-settled principle that a party's refusal to produce such documents

---

[78]

      *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 397 (2d Cir. 2011) (citation omitted) (emphasis added).

[79]

      DI 1874 at 458-60.

[80]

      *See id.* at 434; *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 220-22 (S.D.N.Y. 2013).

justifies the imposition of such a sanction.[81]  The likelihood of reversal of that sanction does not rise above the level of a "mere possibility."[82]

Second, Chevron proved personal jurisdiction independent of the sanction ruling. Donziger and the LAP Representatives do not here dispute this Court's findings of fact, which independently supported the exercise of jurisdiction over the LAP Representatives under New York's long-arm statute.[83]  Donziger not only acted as the LAPs' agent (and transacted business on their behalf) in New York for nearly twenty years, he was retained to do as much.[84]  His activity on the LAPs' behalf is imputed to them under the "usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal."[85]  Donziger's actions in New York on the LAP Representatives' behalf therefore satisfied the requirements of New York CPLR § 302(a)(1).[86]

---

[81]

> See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée, 456 U.S. 694, 708 (1982) (affirming sanction striking personal jurisdiction defense and finding that "the District Court simply placed the burden of proof upon petitioners on the issue of personal jurisdiction. Petitioners failed to comply with the discovery order; they also failed to make any attempt to meet this burden of proof.  This course of behavior, coupled with the ample warnings, demonstrates the 'justice' of the trial court's order") (citation omitted); accord Bayoil, S.A. v. Polembros Shipping Ltd., 196 F.R.D. 479, 482-83 (S.D. Tex. 2000) (striking personal jurisdiction defense as sanction for destroying documents relevant to personal jurisdiction).

[82]

> Nken, 556 U.S. at 434 (internal quotation marks and citation omitted).

[83]

> DI 1874 at 434-55.

[84]

> See id. at 435.

[85]

> Wight v. BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000) (citing In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997)); see also DI 1874 at 448-49.

[86]

> See DI 1874 at 434-55.

Movants' invocation of the adverse inference exception to the principles of agency does not change the analysis, as the exception plainly does not apply to this case.  It is a "narrow" one, "and applies only when the agent has totally abandoned the principal's interests."[87]  Unless an agent is found to have "acted entirely in his own interests and adversely to the interests" of the principal, the exception does not apply.  As movants do not – and could not – suggest that Donziger's efforts to secure a favorable judgment (albeit by illicit means) were not intended to benefit the LAP Representatives, the exception is not likely to carry the day for him.

III.     *A Stay Would Threaten Chevron With Irreparable Harm and Not Be in the Public Interest*

Among the four factors a court must consider in weighing whether to grant a stay pending appeal, "the first two factors" – the movant's likelihood of success on appeal and prospect of suffering irreparable harm – "are the most critical."[88]  As movants have failed to make the required showing on these two prongs, little more need be said as to the second two, which ask whether a stay is likely irreparably to harm Chevron and whether a stay is in the public interest.  The Court finds, however, that these two factors also cut against the stay movants seek.

Movants' claims that a stay will not harm Chevron are unpersuasive.  First, as this Court already has recognized, in the event movants were permitted to benefit from the Lago Agrio Judgment pending appeal, "there is no assurance that Chevron could recoup [that] property," which

---

[87]

       *Wight*, 219 F.3d at 87 (internal quotation marks and citation omitted); *see also Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) ("To come within the exception, the agent must have *totally abandoned* his principal's interests. . . . A fraud that by its nature will benefit the [principal] is not 'adverse' to [his] interests, even if it was actually motivated by the agent's desire for personal gain.") (internal citations omitted) (emphasis in original).

[88]

       *Nken*, 556 U.S. at 434.

– if it prevails on appeal – rightly belongs to it.[89]  As this Court has found, "[d]efendants . . . have taken extensive steps to ensure that any funds recovered are held offshore and beyond the reach of either U.S. or Ecuadorian courts."[90]  As a result, any benefit movants obtain in the interim between the entry of this Court's Judgment and the resolution of the appeal is likely to be lost forever. Moreover, movants' claim that "no . . . [domestic] enforcement actions exist" and that Chevron "has not" and "cannot show" that any such enforcement actions are "imminent absent the injunction" misses the point – movants' attempts to minimize the likelihood that any domestic enforcement actions will be filed is not the same thing as disclaiming any right to file them.[91]  This Court has found that the LAPs intend to seek enforcement in U.S. jurisdictions when they conclude that it would be tactically advantageous to do so.[92]  As a result, Chevron has established that it is likely to suffer irreparable harm in the event the relief it received is stayed.[93]

Nor is the stay movants seek in the public interest.  The concept that Donziger and the LAP Representatives should be permitted to profit pending appeal from the fraud for which they are responsible – with Chevron having no real prospect of recouping the loss if this Court's decision is affirmed – is not in the interests of anyone but the wrongdoers.

---

[89]

DI 1874 at 470.

[90]

*Id.* at 471.

[91]

DI 1888 at 20-21.

[92]

*See* DI 1874 at 479.

[93]

This point is underscored by the fact that the Court found in its Opinion that, absent the relief granted, Chevron was likely to suffer irreparable harm.  *See id*. at 469-75.

*Conclusion*

The motion for a stay pending appeal [DI 1888] is granted to the extent that paragraph 3 of the Judgment, solely pending the determination of the appeal in this case, is modified to read as follows:

> "Donziger shall execute in favor of the Clerk of this Court a stock power transferring to the Clerk all of his right, title and interest in his shares of Amazonia. The Clerk shall hold the Amazonia shares thus transferred, and all proceeds thereof, pending the determination of the appeal in this case, for the benefit of Donziger and Chevron, as their interests then may appear.  Upon request by Donziger, given on notice to Chevron at least ten days in advance of the date for the proposed vote, the Clerk shall vote, or direct the owner of record thereof such to vote, such shares as directed by Donziger unless otherwise ordered by the Court.  Donziger and the LAP Representatives, and each of them, shall execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment."

It is denied in all other respects.  This opinion includes the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:          April 25, 2014

/s/  Lewis A. Kaplan

_____
Lewis A. Kaplan
United States District Judge