**STEVEN R. DONZIGER, ESQ.**

245 WEST 104TH STREET, SUITE 7D
NEW YORK, NEW YORK 10025

212-570-4499 (O)
917-566-2526 (CELL)

August 1, 2017

<u>VIA ECF</u>

Ms. Ruby J. Krajick
Clerk of the Court
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

    RE:    *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Ms. Krajick:

I write to object to the notice of application for costs (Dkt. 1924) in the above-captioned matter and respectfully request that any taxation be held in abeyance pending resolution of a number of critical and related legal and factual issues that are now pending or will soon be presented to the district court.[1] Although I am not at this point presenting a full opposition to the taxation request, I want to call your attention to four important aspects of this situation which I believe merit the attention of your office prior to any exercise of its authority in this matter.

*Serious Unresolved Equitable Problems*

The costs application before your office occurs in the context of a simultaneous and interrelated request by Chevron for the recovery of roughly $32 million in attorney fees under the RICO statute. That request is contrary to law for a number of reasons particular to the RICO statute and the fact that Chevron "unequivocally [] surrendered any claim to money damages as well as to any other relief that is not equitable in nature" in order to avoid a jury, Dkt. 1500. Thus, under *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905 (2d Cir. 1984), Chevron also lost any entitlement to fees in this matter. Beyond the unavailability of fees under the RICO statute, Chevron's attorney fee request is objectionable for equitable reasons that have only come into clear focus in the time since the trial record in the case closed and that equally bear, in my view, on the availability of costs. Some of these facts are being presented to the court as part of a

---

[1] I certainly understand that the Clerk of the Court has no responsibility or authority to decide any of the broader issues referenced in this letter. Nonetheless I believe they are important context for your office as you proceed to exercise the procedural authority you do have with respect to the taxation of costs, including your inherent authority as an officer of the judiciary to guard against misuse of your office and abuse of your powers.

Ms. Ruby J. Krajick
August 1, 2017
Page 2 of 7

briefing schedule that extends to September 11, 2017. Others will be presented in later submissions and developed in the discovery period that I intend to request in the coming days.

In brief, and as noted above, the problem for Chevron is that evidence has emerged strongly suggesting that the company and its counsel knowingly suborned perjury, obstructed justice, violated numerous federal laws, and committed a fraud on this court with respect to the testimony of Alberto Guerra—Chevron's "star witness" at the RICO trial and the source of the *only* direct evidence Chevron offered in support of the core finding of the district court that there was a "bribe" agreement in the Ecuador case. Following the issuance of the RICO judgment, Guerra admitted under cross-examination in a related international arbitration between Chevron and the Republic of Ecuador that he intentionally and repeatedly lied on the stand and in his sworn statement during the RICO trial. Further, and more devastating for Chevron, the process of digital forensic examination of the hard drives of the computers of Ecuador trial judge Nicolas Zambrano has been completed. This examination revealed unquestionably that the Ecuador judgment was drafted on those computers and that it was done slowly over the course of many months, with hundreds of interim file saves. These new facts also completely contradict Guerra's claim (credited by Judge Kaplan) that the trial judgment was written by our team and given to the judge on a flash drive. Although Chevron has tried to spin these fatally damaging revelations in various ways, it cannot deny the fact that they are utterly incompatible with the story told by Guerra and accepted by the district court that the judgment was drafted by lawyers for the plaintiffs and delivered to Judge Zambrano only days before the judgment issued. I testified under oath that the Guerra story about bribery and ghostwriting was false and was the product of Chevron's own bribery of Guerra, given that witness has received at least $2 million in cash and benefits from the company. That Guerra story—again, the basis of the district court's core RICO findings—has effectively been proven false.

I obviously am not asking your office to opine on Judge Kaplan's findings. The new evidence will be considered by a variety of appropriate judicial bodies, both in this jurisdiction and others that are considering enforcement of the Ecuador judgment. But as a judicial officer, these critical developments bear heavily on the responsibilities of the Clerk of the Court. It is my view that for purposes of any Chevron request for monetary remuneration—be it a taxation for costs, or the motion for attorney fees that will be taken up by the district court—one key question is whether equity allows a party to recover said fees and costs for a judgment obtained by fraud. Obviously, there are strong arguments that this should not be allowed. The emerging evidence suggests knowledge of the above-referenced facts on the part of Chevron and its counsel at Gibson Dunn & Crutcher, including members of the litigation team headed by Randy Mastro (the lawyer who signed the application for costs) who had advertised themselves to Chevron as a "rescue squad" for companies in legal trouble. It is highly unlikely this is a case where a witness "duped" the party and the lawyers he was assisting with his testimony. Guerra was infamously "prepared" by Gibson Dunn attorneys for 53 consecutive business days for his RICO testimony. The firm's elite investigators and digital forensic analysts at Kroll, Stroz Friedberg, and other consultancies had unfettered access to all of Guerra's files and digital media. Guerra's corrupt history and

willingness to lie to advance his financial and other interests were documented for years prior to the RICO trial. Chevron's extraordinary payments and provision of benefits to Guerra are vastly in excess of the small measure of compensation allowed under federal law and the ethical rules regarding fact witnesses. All of these factors and more suggest that Chevron and its attorneys at Gibson Dunn knew full well that Guerra's story was invented for high-priced sale. Again, the question of whether a court may make an award of either costs or fees in connection with such patently corrupt conduct will need to be fully addressed in this case. I would ask that your office refrain from acting on Chevron's application until these issues are fully resolved.[2]

### *Special Master Fees Waived Under Judge Kaplan's July 9, 2013 Order*

Chevron's application for costs is also flawed for more specific reasons that also militate in favor of the Clerk's office waiting until after the determination of the availability *vel non* of the costs procedure in light of the conduct described above. I will be presenting this timing question to the district court shortly. For present purposes, I will explain just one of the more obvious flaws with the Chevron application – namely, that the company already has forfeited any claim to Special Master fees by failing to move for such compensation within a specific time period specified by the district court during the RICO proceedings.

As background, it is important to note that I always vehemently rejected the appointment and excessive use of special masters in the case, in particular on the grounds that I was and am an individual litigant without the resources necessary to pay the top-dollar fees charged by the particular special masters Judge Kaplan favors and with whom he had an obvious personal relationship. I objected to the appointment of the masters (Dkt. 943), especially on the grounds that I was unable to afford them (Dkt. 999). My counsel at that time, John Keker, also directly advised Special Masters Katz and Gitter directly of my inability to pay. (*See* Dkt. 1111 at 4, Ex. C, D.) My financial circumstances during the pre-trial phase of this action were such that Mr. Keker was forced to withdraw, citing unpaid bills and the fact the district court showed "implacable hostility" toward me and had allowed the proceeding to degenerate into a "Dickensian farce". (Dkt. 1110 at 1.) I then acted *pro se* in the matter, including on all critical

---

[2] To be clear, every relevant aspect of Judge Kaplan's findings and conclusions of law—not just the core "bribery" and "ghostwriting" findings—are being challenged in enforcement actions against Chevron in other jurisdictions on a far fuller evidentiary record than was before the district court or the Second Circuit. In Canada, both the Ontario Court of Appeal and the country's Supreme Court already unanimously rejected a Chevron request to block the enforcement action based on the RICO decision and other issues. Further, most of Judge Kaplan's predicate RICO findings against me (*i.e.,* money laundering, wire fraud) are derivative of the fraudulent testimony presented by Guerra in reference to the supposed bribery and ghostwriting, which render them legally irrelevant for purposes of judgment enforcement other than as evidence of the lengths to which Chevron will go to avoid paying compensation for the extensive harm it caused in Ecuador – harm Chevron never contested in the context of the RICO litigation. The other findings of the district court not related to fraud or ghostwriting (such as "extortion") are also being contested by me on legal and factual grounds in other courts that will review *all of the evidence* both as it exists and as it continues to emerge -- not just the limited and distorted evidence Chevron wishes to be considered, as was the case before the district court.

pre-trial matters, until just days prior to trial when I was able to retain counsel at no cost. While pro se, I litigated against at least 114 lawyers deployed by Chevron at the Gibson Dunn firm.

Without counsel to represent me and in the middle of this rather challenging situation, Judge Kaplan was required to address my objections to the fees of the special masters based on my lack of financial resources. He did so by first proposing a way forward in an Order To Show Cause dated June 19, 2013. In that Order, Judge Kaplan proposed that the Special Masters bill me and Chevron separately. He ruled that if I was unable to pay, then Chevron could "advance" 100% of the funds to the Special Masters with the option of later seeking judgment against me for any funds so advanced and supposedly owed by me. (Dkt. 1253.) I objected to the procedure on numerous grounds. (Dkt. 1267.) In particular, I argued:

> The Court's proposal in Dkt. 1253 would effectively accelerate and prioritize Chevron's and the Special Masters' claim on any available funds to shortly after the Special Masters submit their final invoices, presumably sometime this summer and in any event well before trial. In other words, the Court's proposal gives Chevron on a silver platter a means to easily drain off any funds I might secure between now and trial. (*Id.* at 4.)

The court responded to this concern by modifying its proposed approach in a July 9, 2013 order that required Chevron to pay *all* of the Special Master fees in the first instance. Critically, the court established a mid-summer 2013 deadline by which Chevron would need to submit any demands for reimbursement of those fees from me, at which point I could challenge any allocation of them to me in light of my particular circumstances and the other litigation expenses I was incurring. The deadline imposed by Judge Kaplan on Chevron was unequivocal:

> Within 14 days after the later of (a) the submission of the special masters' final billings and (b) the determination of any objections thereto by Chevron, Chevron may move, pursuant to Fed. R. Civ. P. 53(g)(3), for an allocation of part of the fees and costs advanced by it to one or more of the defendants. The motion shall include all bills and substantiation provided to Chevron by the special masters. Defendants shall file any objections to Chevron's motions within 14 days of its service. (Dkt. 1287 at 2.)

It obviously would have been highly embarrassing and counterproductive for Chevron to seek reimbursement of these substantial fees at a time when I could not afford counsel. Thus, to serve its immediate tactical needs, the company chose to let the 14-day deadline pass and waive any allocation. In fact, I never even saw a bill for the special master fees at the time despite demanding one from both the court-appointed Masters and Chevron—all of whom refused to disclose to me the extent of the fees being charged, which were surely exorbitant. The company chose to simply pay the full amount submitted by the special masters and hide that amount from

me and the public, rather than give me and my co-defendants an opportunity to exercise the right the court had conferred on us (a right obviously necessary for any semblance of due process) to know and challenge the amount we might be responsible for paying. Because I never even knew how much the special masters had billed for their costs until Chevron submitted those bills as part of its costs application years after the end of the trial, I also was deprived of the ability to fully argue the circumstances around this critical issue before the Court of Appeals when it granted two extraordinary hearings on our motions to recuse Judge Kaplan for his animus toward me and the Ecuadorian plaintiffs.[3]

Indeed, later in the July 9 order referenced above, the court observed that that "defendants complain that they are entitled to know the amount of the costs that may be imposed on them. And so they shall—at such point as Chevron seeks an order requiring them to pay all or part of the costs it will advance pursuant to this order." (*Id.* at 3.) The order that the court references at this point is clearly the order sought under the *explicit procedures it was then laying down*—not an end-of-litigation taxation of costs. My co-defendants and I successfully pressed for and obtained a mid-litigation resolution of this issue in that Chevron was given an opportunity to seek costs in 2013 and decided not to do so. Having tactically forfeited the right to recover special master fees under the express terms of the court's order in Docket 1287, Chevron cannot now attempt a do-over now by submitting a standard taxation application to your office. Especially troubling, and a surefire indicator of Chevron's bad faith, is that the company lawyers chose not to inform your office of this very case-specific and dispositive history with regard to payment of special master fees.

### *Constitutional and Other Policy Implications*

There are other important constitutional issues involved that militate in favor of the exercise of caution by your office at this time and that bear on Chevron's applications to recover fees and costs. It is my position (and that of my Ecuadorian indigenous clients) that Chevron's use of the RICO statute to attack and to try to disable adversary counsel is at core a SLAPP-style lawsuit in violation of the First Amendment. The fact Chevron presented what appears to be fraudulent evidence to the district court is a further demonstration of this point, as is its motion to have me (a solo practitioner) reimburse one of the largest companies in the world a total of $32,334,584 in legal fees and almost $1 million in costs following the company's own corrupt conduct both in Ecuador and in the United States as outlined partially in this correspondence.

Chevron admitted in 2009, when it was on the cusp of losing the case in its preferred forum of Ecuador, that its long-term strategy to evade paying the judgment was "to demonize Donziger" rather than to litigate on the merits. The company repeatedly has threatened the Ecuadorian indigenous groups and their counsel with a "lifetime of litigation" and financial ruin if they persist. In fact, within days of the RICO judgment being issued in March 2013, Chevron sought

---

[3]   *See Chevron Corp. v. Camacho Naranjo* et al., Case No. 11-2259, Dkt. 31 (2d Cir. Jul 8, 2011); *Camacho Naranjo* et al. *v. Chevron Corp.*, Case No. 13-772, Dkts. 72, 90, 97, 152 (2d Cir. 2013).

from the district court *prior to any appeal* an order for me to pay its legal fees, underscoring the company's plan to try to eliminate counsel from the case as early as possible. In my view, the entire Chevron RICO litigation is at core a novel attempt at a privatized, ersatz "criminal" prosecution financed by a powerful corporation using a civil standard of proof (sans jury) to vilify counsel who played a key role in helping hold the company accountable for its outrageous misconduct in Ecuador, misconduct for which it was held liable in the forum of its choosing.[4] I respectfully request that your office not to let itself be used by Chevron as another instrument in a novel corporate-financed counterattack strategy that is being challenged in courts around the world on a far fuller evidentiary record than that reviewed by either Judge Kaplan or the Second Circuit panel that affirmed his decision.

*Conflict of Interest*

A final but critical issue is the conflict of interest that unfortunately in my view has been created through the efforts of certain SDNY judges to engineer disciplinary action against me by way of an advocacy-oriented and in my view powerfully misleading referral letter to the Attorney Grievance Committee of the First Judicial Department. After omitting critical facts bearing on the reliability of the RICO judgment, the letter entreats the First Department to impose a penalty against me based on theory of collateral estoppel without closely examining the truth of a protean matter that continues to engage the courts of countries around the world. The letter also fails to mention the raft of open and problematic issues surrounding the district court's RICO decision—such as the use of paid "fact" testimony and the new evidence cited above—that obviously would give disciplinary counsel pause prior to initiating action.[5] Signed by Judge Castel (and endorsed by the five other judges on the SDNY Grievance Committee), this referral letter puts me in an extremely complicated if not untenable situation: the court to which I must now seek a hearing on the numerous outstanding issues related to a potentially backbreaking

---

[4] Interestingly, Chevron argues in courts around the world that an American attorney via the Ecuador litigation engaged in serious criminal misconduct to "extort" money from the oil company. One might think such explosive allegations in a high-profile case that has received global media coverage might attract the attention of U.S. prosecutorial authorities who (unlike Chevron) are required by law to exercise discretion in the public interest. The fact no such public authorities have initiated action against that attorney speaks volumes about the utter lack of credibility of Chevron's so-called "bribery" and "ghostwriting" evidence. At a minimum, if Chevron truly had confidence in the integrity of Guerra's story it would not have dropped money damages claims on the eve of trial, thereby depriving me and the other defendants of a jury of impartial fact finders.

[5] As indicated, the new evidence never was heard by the district court, the Second Circuit panel, or the U.S. Supreme Court. However, the new evidence will be presented to courts in other jurisdictions that are moving to enforce the Ecuador judgment against Chevron's assets. The new evidence consists primarily of a) admissions under oath by Chevron witness Guerra that he repeatedly lied on the stand on critical issues that formed the core basis of the RICO ruling; and b) a forensic examination of the computers of the Ecuador trial judge that definitively proves the district court was wrong to conclude I was involved in bribing the judge in Ecuador and ghostwriting the judgment. Other critical evidence that the district court refused to consider, such as the 105 technical evidentiary reports and 64,000 chemical sampling results presented during the Ecuador trial documenting Chevron's responsibility for creating illegal and life-threatening amounts of pollution, also will be presented in the enforcement proceedings.

Ms. Ruby J. Krajick
August 1, 2017
Page 7 of 7

amount of fees and costs already has seven judges who have made a determination against me without apparently even understanding, much less reviewing, the full evidence.

More to the point with regard to Chevron's application for costs, all of the judges on the SDNY Grievance committee who voted to seek disciplinary action against me are connected to the supervision of your office.[6] I will be taking up this issue with the district court and if necessary with an appellate court with the ultimate aim of having all post-trial issues moved to a different and non-conflicted venue for resolution. In my view, it would be patently unfair if any judge or judicial authority in the same court where at least six judges have taken the extraordinary step of seeking my disbarment—in a recommendation that if accepted would help vindicate a colleague and friend who issued the controversial pro-Chevron decision--would now make *any determination* regarding the numerous remaining legal and factual issues involved, including those related to costs and fees. This is particularly true when those determinations could result in backbreaking burdens being imposed on a solo practitioner who continues to fight for highly vulnerable clients who suffer grievous impacts from extensive oil contamination that not even the moving party in this matter disputes it caused.

***Conclusion***

In light of the above, I want to reiterate my request that the Clerk of the Court hold in abeyance any action regarding taxation of costs until the various issues raised are fully resolved. I also urge your office to take utmost care to avoid putting its taxation authority in the service of what appears to be a SLAPP-style litigation strategy of a private party where key factual, statutory, and constitutional issues that bear heavily on the process are still being litigated.

                        Sincerely,

                        / s /

                        Steven R. Donziger

---

[6] To be clear, I have high regard for the integrity of the Office of the Clerk for the SDNY. The presentation of this conflict obviously has nothing to do with anything that office has done. This is an extraordinary, and perhaps unprecedented, situation. I know of no other situation where a practicing attorney must object to an application for costs and a motion for fees before a court with a now vested interest in the disbarment of that attorney based on contested evidence, as explained herein and further in my response to the referral letter. If the Clerk of the Court would like to review the Castel letter and my submission to the Attorney Grievance Committee, I would be happy to provide the materials on a confidential basis. To be clear, neither that Committee nor the Office of Disciplinary Counsel for the District of Columbia Bar (which forwarded me a letter of inquiry based on the RICO decision) has taken action against me after being informed of the many problems with the Guerra testimony, the details of Chevron's SLAPP-style litigation strategy, and the fact there are many open factual issues that contradict Judge Kaplan's findings that are still being litigated.