**STEVEN R. DONZIGER, ESQ.**

245 WEST 104TH STREET, SUITE 7D
NEW YORK, NEW YORK 10025

212-570-4499 (O)
917-566-2526 (CELL)

September 11, 2017

**VIA ECF**

Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

   RE:   *Chevron v. Donziger*, Case No. 11 Civ. 691 (LAK)

Dear Judge Kaplan:

Chevron's response in opposition (Dkt. 1934) to my August 7, 2017 letter motion (Dkt. 1927) serves largely to reinforce the validity of argument that a grant of fees in this matter is barred by clear judicial precedent and equity.[1] Chevron puts forth no credible argument that overcomes the established holding and bedrock principle of *Aetna Casualty & Surety Co. v. Liebowitz*, 730 F.2d 905 (2d Cir. 1984), that legal fees cannot be awarded without a claim for money damages. The company utterly ignores the profound Constitutional implications—First Amendment SLAPP issues, Fifth Amendment due process problems, the Seventh Amendment jury trial right issues—that bar this brazen attempt by the nation's second-largest fossil fuel company, with total revenues during the six-year period of the RICO litigation of over $1 trillion, to bankrupt a solo practitioner and human rights lawyer.

Even putting aside the outrageousness of this attack by a powerful corporation on adversary counsel, Chevron is attempting to wipe out my assets based on false evidence. Despite various attempts at spin that, as described below, end up only in a bewildering series of dead ends, Chevron falls completely flat in its now desperate attempts to salvage the false Guerra testimony that forms the core of this court's RICO findings and makes the RICO judgment utterly unreliable as any basis to impose legal fees or costs or to defend enforcement actions in other jurisdictions. Incontrovertible facts adduced after the close of the RICO trial record clearly demonstrate the company and its counsel at Gibson Dunn bribed a witness to put forth fraudulent and untruthful testimony that, again, formed the basis for the core findings in this case. Chevron now seeks to

---

[1] The undersigned, acting *pro se*, is currently traveling overseas and for logistical reasons was unable to file this Reply by the deadline of September 11, 2017 even though it was completed. Leave is requested to ensure this Reply receives full consideration despite its filing shortly after the deadline.

parlay that fraud into a SLAPP-style erasure of my assets to try to thwart ongoing litigation against the company to collect the Ecuadorian judgment in other jurisdictions.

Chevron's opposition reveals many problems. First, it does not dispute voluminous scientific and testimonial evidence that it created a humanitarian catastrophe in Ecuador that continues to kill people and decimate indigenous groups, rendering any claim for fees on the back of this underlying human rights violation unethical, inappropriate, and barred under the equitable doctrine of unclean hands. Second, the company distorts facts about the false Guerra testimony to further cover-up its Guerra fraud; in the process, it makes the preposterous claim that Guerra's admission before the arbitration panel of lying to this court somehow "supports" the very prior testimony he now acknowledges was untrue.[2] Third, Chevron's lawyers evince fear at the prospect of being held to account for their gross misconduct via a renewed discovery process that would be absolutely essential to protecting the due process rights of the undersigned. Given that the Chevron lawyers at the Gibson Dunn firm who signed the opposition are themselves potential witnesses or co-conspirators to a fraud involving the discredited and avowedly corrupt witness Guerra, it is little wonder that they resist a process that could well produce even more evidence on their unethical and illegal behavior in this matter -- even apart from the baseline ethical issues involved in Gibson Dunn essentially promising Chevron it would find or produce "fraud" so as to "rescue" its deep-pocketed client from the consequences of a horrendous humanitarian catastrophe and multi-billion dollar liability of its own making.

My specific responses to Chevron's opposition follows.

**<u>Clear Judicial Precedent Bars Chevron's Fee Award</u>**

As explained in my August 7 letter motion and earlier pleadings, *Aetna* clearly forecloses the possibility of attorneys fees under § 1964(c) for "a plaintiff [like Chevron] who only obtained injunctive relief," or where "there has been less than a final recovery of damages." *Aetna* at 907. Chevron's defense that the case doesn't apply because it claims to have proven an "injury" ***is precisely the argument made by Aetna*** in *Aetna*, and rejected by the district court and the Second

---

[2]  For a more comprehensive account of the numerous respects in which Guerra acknowledged or was confronted with falsehoods in his RICO testimony, I reference my Motion for Judicial Notice dated Nov. 5, 2014, 2d Cir. No. 14-826, Dkt. 461-1, at 6-8 (noting, as just one example, how Guerra acknowledged that a key part of his testimony regarding his alleged involvement in the alleged bribery scheme—indeed, the part relating to his promised compensation, which also supplies the basic motive for his involvement—"wasn't true"). The Second Circuit chose to ignore this evidence on technical grounds, without review or comment, leaving its own decision essentially incomplete and obsolete on issuance. This is another reason why foreign courts now reviewing the merits of the Ecuadorians' judgment enforcement application, and Chevron's defenses thereto including its trumped-up claims of fraud and bribery, will necessarily conduct their own plenary reviews and come to their own conclusions, rather than obsequiously apply the false findings and conclusions of U.S. courts, as Chevron hopes. This forthcoming additional scrutiny, which in light of the new evidence will likely arrive at vastly different conclusions that those reached by this Court, presents an additional prudential reason for this court to decline to further advance this matter in any respect, as it would only exacerbate the impending difficulties

Circuit in that case. Chevron's real claim is once again that the established law of this Circuit should be rewritten to suit its own objectives.

Chevron claims *Aetna* is distinguishable because it involved a settlement, or alternatively that the broader holding of *Aetna* applicable here was dicta because the case turned on the fact of settlement. This ignores the fact that the fee-seeker in that case (Aetna) specifically claimed, like Chevron here, that it had established "injury" as part of earning its injunction, that it did so after an evidentiary hearing resulting in full factual findings subject to only abuse-of-discretion review, and indeed that it was legally "successful on its RICO claims" by way of the court's adoption of the terms of the consent judgment part of the settlement (which, notably, did provide for substantial six-figure damages). *Aetna Casualty & Surety Co. v. Liebowitz*, 570 F. Supp. 908, 910 (E.D.N.Y. 1983) (trial court decision). Neither the trial court nor the Second Circuit disagreed with these points by Aetna. *See, e.g.*, 570 F. Supp. at 911 ("Aetna is without doubt the prevailing party in this litigation"). But they nonetheless found against it. Both courts recognized both the easier issue of the non-availability of attorneys fees for a settlement with no adjudication of liability, and also the somewhat harder issue where the fee-seeker was a "prevailing party" with a proven injury, sufficient for recovery under any number of fee-shifting statutes—including the Clayton Act, after the 1976 amendments.

The Second Circuit, seeing no embrace of the "prevailing party" approach anywhere in the RICO statute, categorically rejected the notion that anything short of a full recovery of damages would allow for fees, and expressly rejected the notion that proven injury alone would suffice:

> [§ 1964(c)] appears on its face to require a civil RICO plaintiff, in order to qualify for an attorney's fee, first to prove that he has suffered injury to his business or property as a result of the RICO violation ***and to recover the damages sustained and the cost of the suit***, of which the attorney's fee would be deemed part. . . .
>
> Turning to the legislative history of § 1964(c), we find nothing indicating a Congressional intent to authorize an award of attorney's fees when there has been less than a final recovery of damages and costs.

730 F.2d at 907 (emphasis added). Chevron's "injury"-only theory is foreclosed by the clear holding in *Aetna* that not just ("first") injury but also ("and") "recover[y] [of] damages sustained" is a necessary predicate to an award of fees. *Id.* This holding was not dicta because it was necessary to meet Aetna's unchallenged claim that it had proven injury. *U.S. Football League v. National Football League*, 887 F.2d 408 (2d Cir. 1989), does not detract from this holding, not only because it is a Clayton Act case rather than a RICO case, but more fundamentally because damages there ***were*** established, trebled, and awarded in that case, in accord with the stricter requirements of *Aetna*. *U.S. Football League* simply declined to make an exception in a case of nominal damages. Even *Sciambra v. Graham News*, 892 F.2d 411 (5th Cir. 1990), which in any event could not relieve this Court of the obligation to follow Second Circuit precedent, is not in tension, not only because it, too, is a Clayton Act case, but because the relevance of proof of injury (or "fact of

damage") in *Sciambra* was only to establish that the fee-seeker was indeed a "prevailing party"—at which point the different analysis in the Clayton Act context took over.

While Clayton Act cases are generally useful in interpreting comparable RICO statutory language given that "the antitrust laws provided a major influence on the statutory scheme embodied in RICO," *Aetna*, 570 F. Supp. at 911, where the Clayton Act has specifically followed a different path or reflects a different legislative intent, any reliance on Clayton Act cases must be limited as appropriate to reflect that difference. Such is the case on the question of whether a standard lesser than "final recovery of damages," such as a "prevailing party" or injury-only standard, should be read into RICO's allowance of attorneys fees. The fact that Congress amended the Clayton Act to expressly include a "prevailing party" standard reflects a different path and different legislative intent, even though the language was added to the tandem section on injunctive relief at 15 U.S.C. § 26 rather than the core civil recovery section at 15 U.S.C. § 15. Borrowing intent from one inter-linked section of a statute for another is quite different than borrowing from a whole different statute addressing an entirely different subject area of the law. *Aetna* was attuned to this. 730 F.2d at 909 (noting the "non-existence in RICO of a provision comparable to § 16 of the Clayton Act"); 570 F. Supp. at 912 ("It follows that if Congress had intended for fees to be awarded to a prevailing party or a substantially prevailing party in a suit brought under § 1964, it would have used language similar to that found in these statutes."). In response, Chevron does not offer an alternative interpretation of the significance of the fact that the Clayton Act has an articulate prevailing party provision; it simply announces: "There is no reason to adopt a different reading of 28 U.S.C. § 1964(c) [from 15 U.S.C. §15], given the language of the two statutes remains the same." Ipse dixit and arrogance, not law.

Civil RICO has conspicuously **not** been amended to move it in the direction of other fee-shifting statutes. *Aetna* has gone unchallenged for over 30 years and its holding is clear. "Final recovery of damages" remains the standard. As set out in my August 7 letter motion, Chevron knowingly, and for strategic advantage, forfeited its right to pursue, much less achieve, such a recovery in order to deny me my right to a jury trial in this case. It is precisely that right that is wisely protected by the *Aetna* rule requiring actual recovery of damages before authorizing a monetary award of fees that in most cases will be far above the mere $20 USD required to trigger the civil jury right (even if no party has ever had the audacity to demand the outrageous amount Chevron demands with its fee application). Allowing a party to strategically drop damages to eliminate the jury trial right but pursue a massive, jury-less monetary claim against its adversary by way of the attorneys fees provision would open up a huge loophole in the protections of the Seventh Amendment that is clearly not constitutionally permissible.

**Chevron's Argument Against Discovery Is Unavailing**

Chevron claims that the issue of its Guerra-related fraud should be off-limits because a motion for fees "is not the right place" to litigate issues "unrelated" to the "reasonableness" of the claimed fees. Opp. at 18 (quoting *Samms v. Abrams*, 198 F. Supp. 3d 311, 320 (S.D.N.Y. 2016)). Chevron obviously wants to act like its request for $32 million in fees is a "routine" matter—as if the

undersigned was simply another commercial litigant and the RICO findings were not infected by fraud. Neither is true. The fee issue implicates core Constitutional concerns regarding my ability to speak out about a public matter of grave importance to our society, namely, a U.S. corporation devastating the lives of thousands of people and in the process accelerating climate change and the destruction of the planet. It also implicates my continued right to earn a livelihood in support of myself and those that depend on me, including a minor child. And, as elaborated on below, the RICO findings were infected by fraud and Chevron as the moving party is demonstrably responsible for that fraud, thereby nullifying (under the doctrine of unclean hands) any possibility of a fee recovery in this matter even if the Court does not deny the motion based on the holding in *Aetna* that already has been extensively briefed.

To the contrary, nothing could be *more related* to the reasonableness of a fee motion and to due process requirements than the fact that the fee sought is the result of attorney efforts to present false testimony to a federal court to frame various individuals with quasi-criminal findings in a civil trial absent a jury. Made worse is that the false testimony was part of a SLAPP-style attempt to thwart the role of adversary counsel in an ongoing litigation as that litigation continues in other jurisdictions, backed by unanimous Supreme Court decisions of two sovereign nations (Ecuador, Canada) that disagree with Your Honor's findings. The Gibson Dunn lawyers who signed Chevron's opposition (among them Randy Mastro, Andrea Neumann, and William Thomson) protest that allowing depositions to ascertain facts surrounding their own roles (and those of colleagues Brodsky, Weitzman, and others) in creating the Guerra fraud would be an attempt to "harass" opposing counsel. Let's put aside for a moment that the undersigned was forced by these same lawyers (with the active encouragement of this Court) to sit for an unheard-of 19 days of depositions in the RICO and related matters, for which the company now tries to impose almost $1 million in "costs" for the "services" of two Special Masters to oversee the bloated proceedings.[3] To the contrary, discovery in this matter would be critically necessary to further establish the facts and circumstances needed for any neutral arbiter (of which this court is decidedly not, hence the need for transfer to another court) to determine the equitable issues involved that are essential to conducting any fair analysis on the merits should the court decide to proceed past the *Aetna* barrier.

The deciding court must have a record of all the relevant facts and circumstances so that it does not run the risk that Chevron will illegally earn a financial reward for attorney misconduct or outright illegality. Chevron's attorneys may not like it, but they and/or their colleagues are deeply implicated in the fraud and their opposition to further discovery on these issues should be given no weight. If these attorneys did nothing wrong, they would not be so adamant about opposing discovery into their own roles in the creation of the now-recanted Guerra testimony. By initiating

---

[3]  It is undisputed that this court during the underlying proceedings allowed Chevron and two of its executives to depose the undersigned for a historic record length of time; the Court also denied my effort to bring counterclaims. Certainly the same Court at a minimum should now try to correct a discovery playing field radically tilted in favor of Chevron by allowing me and my Ecuadorian clients a small fraction of that same time to depose each of the Gibson Dunn lawyers and others involved in the 53-day coaching of Guerra before he lied repeatedly to this court in exchange for exorbitant payments.

a motion to recoup fees on a record with clear evidence of fraud for which they are responsible, Chevron's lawyers at Gibson Dunn have only themselves to blame for the peril in which they and their client now find themselves by greedily pursuing a recoupment of fees and costs that has a clearly punitive and unconstitutional purpose.

**The Core "Bribery" Evidence in the RICO Trial Has Been Eviscerated**

Chevron's claim that the Guerra testimony in the arbitration proceeding "corroborates" his trial testimony (Dkt. 1934 at 10) in this matter is false. Unassailable evidence has emerged in the international arbitration proceeding that absolutely eviscerate the Guerra testimony relied on by this court for its core RICO findings, as follows:

- Guerra testified under oath before this court that the plaintiffs "delivered" to Ecuador trial judge Nicolas Zambrano the "ghostwritten" decision against Chevron after eight years of proceedings in late January or early February 2011, just days before the Ecuador trial judgment issued. PX 4800 (Guerra Direct) at 18-19, 21. Your Honor relied heavily on this exact testimony and placed it at the center of his finding that the undersigned and others had been involved in a "bribe" of Zambrano in exchange for an agreement to "ghostwrite" the judgment. Dkt. 1874 at 245 ("About two weeks before the Judgment was issued in February 2011, Guerra went to Zambrano's apartment where he said he met with Fajardo and Zambrano. 'Zambrano gave [Guerra] a draft of the judgment so that [Guerra] could revise it.' He told Guerra that the LAPs' attorneys had written the judgment and delivered it to him."). I testified under oath that this assertion by Guerra is categorically false. There is no direct evidence in support other than Guerra's testimony.

- The results of a forensic examination—conducted under the auspices of the BIT arbitration that Chevron initiated against the Republic of Ecuador (ROE)—of the hard drives from Judge Zambrano's courthouse computers categorically and forensically prove that this core of Guerra's testimony is false. It is now undisputed that a file containing substantial parts of the Ecuador judgment in draft form was on Zambrano's courthouse computers at least by October 11, 2010. The results also show that on those same computers, the Word file that became the judgment gradually developed as text was added incrementally and the file was saved hundreds of times. Despite having years to respond to this devastating evidence, Chevron has come up with nothing to contradict it.

- Guerra's story was always suspect given his admitted history of corruption and dishonesty, Chevron's exorbitant and illegal payments to him, and the fact that the details of his story shifted repeatedly to match evolving facts. *See* Dkt. 1640 (motion to strike Guerra's testimony). Indeed, the false story which Guerra told at trial and which the Court relied on in its final decision appeared only after an earlier and strikingly different version of the story was disproven by new facts. Guerra tries to gloss over this in his witness statement, stating that "[i]n trying to recall these events initially, I assumed I had received the

> document on a flash drive given to me by Mr. Zambrano in the Quito airport, as Mr. Zambrano often provided me flash drives along with the court files. But later on, I specifically recalled that I worked on that document in Mr. Zambrano's residence in Lago Agrio using Mr. Fajardo's computer." PX 4800 at 18-19. In fact, the earlier story was not merely an assumption, but a detailed explanation by Guerra of being given the draft judgment on a flash drive and then working on it for several days over the course of a specific weekend at his house in Quito. That is what Guerra initially told Chevron's investigators. Chevron "disappeared" this version after its forensic team could not find a trace of the judgment on Guerra's computer. To maintain the flow of payments from Chevron, Guerra then had to shift to a story that left no digital trace, and the story of being given the judgment on Pablo Fajardo's laptop was it. Now that story, too, has been proven false by the forensic examination.

This new evidence directly and frontally destroys the core findings of the RICO judgment and nothing in Chevron's opposition—despite its varied attempts at misdirection and spin—changes that fundamental fact. The RICO judgment is unreliable and under equitable principles must be given no weight as a basis for any award of fees, even if the Court mistakenly extends its analysis past the clear holding of the *Aetna* decision barring an award of fees under RICO absent a final recovery of damages.

**Chevron's Denials of the Significance of the New Evidence Are Outrageous**

While Chevron's experts have strained mightily to find inconsistencies between the results of the forensic examination and various minor and largely irrelevant details of Judge Zambrano's RICO testimony, the basic and indisputable fact that the draft judgment was found on Zambrano's courthouse computers as early as October 2010 utterly destroys the possibility that Guerra's story is true.[4] Chevron literally has had years to provide a cogent explanation as to how Guerra's

---

[4] Guerra clearly testified under oath in this court that he was closely involved with Judge Zambrano and the alleged corrupt arrangement to "ghostwrite" the judgment throughout the Fall of 2010:

> From [the time Zambrano allegedly struck a corrupt deal with the plaintiffs] forward, our modus operandi regarding my role as ghostwriter in the Chevron case changed. Mr. Zambrano advised me that we had to be more careful because the attorneys for Chevron would be very attentive to any irregularities. Because of that, there were times when I traveled to Lago Agrio to work on the court rulings for the Chevron case. I would regularly travel to Lago Agrio by bus, and less frequently by plane on TAME. True and accurate copies, certified by TAME, of TAME's records reflecting my travel between Quito and Lago Agrio from 2009 through 2010 are marked as PX 1722 through PX 1726. Those records reflect, for example, that I traveled via TAME from Quito to Lago Agrio on August 4, 2010, returning to Quito on August 6, 2010; and that I again traveled from Quito to Lago Agrio on August 11, 2010, returning to Quito on August 12, 2010.

*Id.* at 17. The Court relied heavily on this exact testimony and placed it at the center of its central finding that the undersigned and others had been involved in a corrupt arrangement or "bribe" with the Ecuador trial judge. Pushing past Guerra's massive credibility issues and all his changing story details, the Court found that Guerra "never wavered" from certain core aspects of his account, including that the corrupt arrangement was for the

testimony can be reconciled with this fact. Its response has been to bury its head in the sand, offering no explanation in the hundreds of pages of briefing and dozens of hours of trial time in the BIT arbitration. It certainly offered no explanation in its opposition to my August 7 letter motion.

*Chevron's theory of unfiled work product*

The miscellaneous distractions offered in Chevron's opposition are stale or meaningless. Chevron tries to argue that materials not found in the record but in the possession of the plaintiffs were used verbatim in the 188-page judgment, as if this proves "ghostwriting" despite the collapse of the Guerra testimony. In the BIT arbitration, the U.S. legal team for the ROE categorically demonstrated that both parties (Chevron and the Fajardo legal team) occasionally provided the court with materials that were never logged in the official record, either because of logistical problems or other challenges. The ROE went as far as to cite to videotape of both parties handing materials to the judge that were never logged to prove the point that this was an occasional practice engaged with full knowledge of the parties and the court, and was not in the least bit nefarious.[5] Perhaps Chevron one day may make the less bombastic and more grounded allegation that such informal practices in Ecuador amount to a cognizable due process claim; regardless, the proof that *both parties* engaged in such practices and that they were common in Ecuador destroys the argument that the judgment's reliance on allegedly "unfiled" documents proves the bogus "ghostwriting" allegation.[6]

---

plaintiffs' team to "bring the judgment" so that Zambrano and Guerra could "dress it up" and "issue it." Dkt. 1874 at 280. Again, we now know this not to be true.

[5] When the defense dedicated some of its limited resources to bringing a distinguished lawyer familiar with the Ecuador judicial inspection process (Mr. Alejandro Ponce) to New York to testify about how it was typical to provide materials to the judge that were not necessarily placed in the record, the Court disregarded his testimony in two sentences in its final decision on the rationale that Mr. Ponce, in his written direct testimony, "failed to identify a single occasion when that actually had happened" (even though he testified clearly that it ***did*** happen, *see* Dkt. 1700-4 at 4, and Chevron did not raise any challenge to the lack of specificity on cross) and "had left the [plaintiffs'] team before most of the LAP internal work product documents that appear in the Judgment even were created" (simply ignoring the fact that Mr. Ponce was testifying to a practice). Significant parts of the evidence assembled by the ROE on this point was also available, *see* DX 902 at 88-93, and, along with countless other persuasive rebuttals to various Chevron "fraud" theories, was simply ignored by this Court in its final decision.

[6] Chevron recites a number of other unconvincing or already rebutted claims regarding the judgment. For example, it references the citations to French law, a "language[] neither Zambrano nor his typist speaks, reads, or writes," ignoring the established fact that those citations were taken from a large portion of an Ecuadorian Supreme Court judgment that Zambrano appropriately incorporated wholesale. Dkt. 1874 at 189 n.779. The Court dismissed this fact by pretending it was relevant that Zambrano, three years later, "was unable to recall its name, the names of the parties, or what it was about." *Id.* The record portion cited by the Court not only utterly disproves this claim, but shows how the Court itself went out of its way to assist Chevron's gamesmanship to hide the truth throughout the RICO trial.

> Q. Do you know the name, can you tell us the name of this case or will tell us the name of this case, I should say?
> ZAMBRANO. Well, this was a complaint brought by the communities of Esmeraldas Province against Petroecuador.

*The issue of the "old" versus the "new" computer*

Chevron also attempts to salvage the collapsed Guerra testimony by raising the same bogus arguments related to his two computers. Chevron in its opposition puts huge emphasis on the fact that while Judge Zambrano said he typed the judgment into what he called the "new" computer, it initially appeared it had been typed into the so-called "old" computer in his office. This apparent inconsistency, which could easily be explained by inexact memory by an individual who clearly had little technological savvy, was also a key part of the findings by this Court. Dkt. 1874 at 194-95. In its opposition, Chevron slyly persists on this point, noting that "only Zambrano's 'old' computer contained versions of the document in question," but failing to mention that the forensic results in the BIT arbitration revealed that ***the old and new computers were networked together*** such that Zambrano was able to edit a document that was "on" the old computer while sitting at his new computer. Again, the evidence shows that Zambrano opened and saved the Word document that became the judgment hundreds of times.

*The weakness of Chevron's rebuttal by Spencer Lynch*

The fact that the draft judgment was *found* on the courthouse computers by itself fatally undermines Guerra's claim that the judgment was "ghostwritten" by the plaintiffs. But, as indicated, the forensic evidence is even stronger than that. It shows a clear picture of the judgment being developed over time on those computers starting in October 2010, or months before Guerra claims it was delivered to the trial judge. The only rebuttal Chevron's expert, Spencer Lynch, is able to offer to these facts is the observation that various USB drives were attached to the courthouse computers from time to time. Lynch then posits that it would be impossible to "rule out" that the judgment was not copied—piece by piece—from files on USB drives during late 2010 and early 2011. There is no way this far-fetched speculation is sufficient to support the claim that the judgment was ghostwritten. It will indeed never be possible to "rule out" every new and far-fetched conspiracy theory Chevron can conjure up, especially when the theory simply changes like a chameleon every time new evidence appears. Lynch's new USB conspiracy theory also happens to contradict Guerra's story of the judgment being "delivered" by the plaintiffs in late January 2011—a discrepancy Chevron doesn't even try to address, because it cannot do so credibly.

---

MR. BOOTH: Your Honor.
MR. MASTRO: Objection, move to strike. Nonresponsive.
THE COURT: The answer is stricken. It is nonresponsive.
MR. BOOTH: Let me ask it a different way. Dr. Zambrano, will you tell the Court how this case is referred to in Ecuador?
THE COURT: If indeed it is a case.
A. This case is so unique because it was one of the first ones dealing with environmental pollution and this is definitely where one observes that the burden of proof is inverted.
MR. MASTRO: Objection, your Honor. Move to strike.
THE COURT: Granted.

Tr. at 1885.

**Conclusion**

Once again, I respectfully request that Your Honor recuse himself for the reasons stated in the letter motion. Absent that, I request that the Court reserve any litigation on the reasonableness of Chevron's claimed fees until it has decided on the availability of *any* fees absent a recovery of damages. If the court decides to reject the *Aetna* holding, I request that it certify its disagreement directly to the Second Circuit. If litigation regarding reasonableness is required, I request a substantial period of discovery to inquire into the nature of Chevron's and Gibson Dunn's conduct regarding Guerra's false testimony and its billing practices generally.

                Sincerely,

                / s /

                Steven R. Donziger