UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CHEVRON CORPORATION,

                Plaintiff,

           -against-                         11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
-------------------------------------------------------------------X

## SPECIAL MASTERS' FINAL REPORT AND RECOMMENDATION ON ALLOCATION OF THEIR FEES AND COSTS

Pursuant to Your Honor's Order of November 9, 2017 (ECF No. 1939) (the "Allocation Order"), the Order of Appointment (ECF No. 942) (the "Order of Appointment"), and Rule 53 of the Federal Rules of Civil Procedure, we respectfully submit this report and recommendation on the allocation of our fees and costs. For Your Honor's consideration, we have also included a summary of our work performed in connection with our appointment, which is intended to serve as our final report on discovery under paragraph 2(e) of the Order of Appointment.

## BACKGROUND

The long and tortured history of this dispute, started in this Court in 1993, has spanned decades and continents. For a full recounting, we refer the reader to Your Honor's opinion following the trial of this matter and to the opinion of the United States Court of Appeals for the Second Circuit affirming Your Honor's judgment in favor of plaintiff Chevron Corporation ("Chevron"). *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ("*Chevron I*"), *aff'd*, 833 F.3d 74 (2d Cir. 2016) ("*Chevron II*"), *cert. denied*, 137 S. Ct. 2268 (2017). This

report and recommendation assumes familiarity with those exhaustive opinions. We now consider our role in pre-trial discovery, and how the fees and costs associated with our work, which have to date been advanced by Chevron, should be allocated, "in the event the Court does not elect to tax all of the costs against the defendants." Allocation Order ¶ 3.

A.  **Our Appointment and the Work Performed**

On February 13, 2013, Chevron moved for the appointment of a special master to oversee party and non-party depositions in this matter. At that time the discovery deadline was May 31, 2013, and the parties contemplated some 42 depositions. *See* Chevron Corporation Motion to Appoint Special Master (ECF No. 797 at 1). The trial was scheduled for October 15, 2013, *see* Trial Order (ECF No. 606). Chevron based its request primarily on its expectation that the depositions in this matter would be contentious and would require resolution of "among other things, privilege and work product objections in connection with dozens of depositions . . . ." *Id.* at 1, 4. Defendants objected to Chevron's request. *See* Joint Memorandum of Law in Opposition to Motion to Appoint Special Master (ECF No. 822).

On March 1, 2013, Your Honor granted Chevron's request. *See* Memorandum Endorsement (ECF No. 865) ("Appointment Memorandum"). Your Honor observed that this case was "exceptionally contentious" and plagued by exceedingly difficult relations between counsel; the Court wrote that "[t]here [was] no reason to expect that depositions of many or all of the important witnesses in this case [would] proceed properly without supervision." *Id.* ¶ 1. Your Honor pointed to the following prior history:

- In the Section 1782 proceeding Chevron brought to obtain discovery from Donziger in connection with litigation and arbitration abroad,[1] Your Honor

---

[1] References in this report and recommendation to "the Section 1782 proceeding" are to the action captioned *In re Application of Chevron Corporation*, 10-MC-00002 (LAK) (S.D.N.Y. filed Aug. 4, 2010).

2

> "concluded that it was necessary to order Donziger to respond to questions without evasion, self-serving statements, or criticism of the questions . . . ." *Id.* ¶ 2 (citation and quotations omitted).

- In the severed litigation of Count 9 of the amended complaint in this case, Defendants directed witnesses "not to answer questions on ground of alleged privilege despite prior rulings by magistrate judges in both the District of Maryland and this Court that the claimed privileges and had been waived, vitiated by the crime-fraud exception or both." *Id.* (citation omitted).

- During prior document discovery in this case, Defendants and their allies had been "remarkably obstructive" and that "[t]he likelihood of further attempts to preclude or disrupt discovery [was] palpable." *Id.* ¶ 3.

- Your Honor further found that the problems identified above would "likely be compounded by the possibility that some important depositions will take place outside the United States and others in this country but in districts remote from this one, making effective and timely supervision by [Your Honor] or a magistrate judge, both having substantial other responsibilities, virtually impossible." *Id.* ¶ 4.

Given the imminent discovery cut-off date and the large number of depositions contemplated, Your Honor concluded that at least two special masters would be necessary to handle the depositions in this matter. On March 26, 2013 you appointed us to serve as Special Masters in this case. *See* Order of Appointment.

Between the date of our appointment and the formal end of discovery (which was later extended from May 31, 2013 to June 30, 2013, see below) Special Master Gitter and Mr. Ormand worked essentially full time on this assignment.[2] Special Master Katz's schedule in that period was, from time to time, subject to pre-existing, binding commitments as special master in

---

[2] At the time of the work described herein, Mr. Ormand was an associate with Cleary Gottlieb Steen & Hamilton LLP. Citing Mr. Ormand's exceptional abilities and his work in the Section 1782 discovery, the Special Masters jointly requested his assistance, which was so-ordered by the Court. *See* Order of Appointment ¶ 9 (ECF No. 942); Endorsed Letter (ECF No. 1062). Given his familiarity with this matter and our role as Special Masters in it, Mr. Ormand has in effect served as "of counsel" to us in connection with the preparation of this report and recommendation.

3

a case before another judge of this Court (a case involving supervision of a deposition in Hong Kong) and as an arbitrator or mediator for JAMS. After June 30, 2013, and through the end of the trial in late November 2013, the work on this assignment became far more sporadic for both us and for Mr. Ormand (although it did entail supervision of a very few depositions that Your Honor afforded to the parties during the trial).

In addition to the preparation of this report, the work we performed, with the invaluable assistance of Mr. Ormand, included the following, among other tasks:

- Supervision of depositions of 25 witnesses (supervision of seventeen in person and four by video conference, to avoid travel costs, and supervision by phone availability of four additional depositions – most of the "availability" events ultimately turned into a supervisory event, in part).[3] The parties had been allowed by the Court 21 depositions per side (Rule 16 Order, ECF No. 910, ¶ 1) during the short period between March 15, 2013 and the original discovery cut-off date, May 31, 2013, but that number became substantially reduced in part through our mediation efforts.

- Responding to numerous and varied applications by the parties, and mediating the number, scheduling, and venues of the depositions, all of which necessitated hundreds of emails, conference calls, and phone calls, as well as an occasional in-person conference with all counsel.

- Daily, including weekends, close attention to (by initial screening reviews and often later detailed readings of) nearly 400 court filings made by the parties and Your Honor in the 95 days between March 26 and June 30, 2013, including: motions (some involving voluminous exhibits), Your Honor's orders and opinions (many of which were lengthy), court hearing or conference transcripts, stipulations, letters, and other filings.[4]

---

[3] We endeavored, successfully, to split roughly evenly the time each of us spent on deposition supervision, taking into account the fact that several depositions consumed only a half day while others consumed far more than a full working day, going even well past 8:00 p.m., or two days. (Mr. Ormand attended each deposition supervised by us.) As a consequence of Special Master Katz's pre-existing commitments mentioned above, and for other reasons, including several reflected below and because of Mr. Gitter's ready access to secretarial, copying, filing, and other office services, some other tasks, or the lead role in other tasks (such as the initial drafting of most of our formal written orders), fell disproportionately to Special Master Gitter.

[4] As in many other large law firms, monitoring of court filings and their retrieval (both hard copy and electronic) are made at Cleary Gottlieb by non-legal staff in Cleary Gottlieb's managing

- Issuance of hundreds of oral rulings at the depositions, some of which required factual or legal research at a break in the deposition prior to ruling, and 20 numbered, formal written orders, several of which were lengthy. (Only three rulings or orders were appealed to Your Honor by one or more parties; all three were affirmed.)

- Review of often voluminous document productions in connection with the depositions, at times on very short notice.[5]

- Review of portions of correspondence and transcripts in the Section 1782 proceeding, when required to deal with issues of subject matter waiver of privilege that arose in several of those supervised depositions. *See, e.g.*, Special Masters Order No. 6 at 5 & n.3 (ECF No. 1093); Tyrrell Tr. at 58:5-74:14 (June 13, 2013).[6]

- Extensive review of the court filings and email correspondence relating to various related section 1782 proceedings brought in other jurisdictions (particularly the proceeding in the United States District Court for the District of Colorado), which became highly relevant to the privilege issues in the depositions of the witnesses whose testimony concerned those proceedings.[7]

- Review of a great many other documents, transcripts, court filings, opinions and correspondence from a variety of prior proceedings and depositions, which was necessary to prepare for the supervised depositions.

- Substantial legal research on many issues relating to attorney-client and work product privilege that were raised by the parties immediately before or during nearly every supervised deposition, including: waiver (express, implied, by conduct, by client, by failure to object timely, by prior voluntary testimony), joint defense, common interest, crime-fraud exception, proper holders of the privileges, and others.

---

attorney's office. Given their physical proximity and ready electronic access via Cleary Gottlieb's managing attorney's office, Special Master Gitter and Mr. Ormand conducted the screening reviews to determine relevance to our work (which proved to be the case for the majority of filings, or parts thereof) and the screener determined whether further dissemination and closer reading of a court filing, or a portion of it, was warranted.

[5] For example, late in the evening before the deposition of witness Martin Beier, his counsel delivered to Special Master Gitter, who was scheduled to supervise that deposition, an especially large number of documents, necessitating nearly all night review of the documents.

[6] Given his familiarity with that Section 1782 correspondence and the transcripts, Special Master Gitter conducted those reviews.

[7] As Special Master Gitter was supervising the depositions of the first two of those witnesses in the Colorado proceedings, those reviews fell to him.

These tasks required hundreds of hours of work by both of us and Mr. Ormand, as our time records show. This included time before and after business hours, *see, e.g.*, Special Masters Order No. 6 at 5 n.3 (ECF No. 1093) (describing late night *in camera* review conducted in advance of a deposition scheduled for the next morning), over weekends, *see, e.g.*, Joint Order No. 2 (ECF No. 972) (issued on a Saturday), and -- for Special Master Katz and Mr. Ormand -- travel to supervise depositions of Ecuadorian citizens at the U.S. Embassy in Lima, Peru. The logistics of scheduling the depositions in Peru alone required a substantial amount of our and Mr. Ormand's time, *see, e.g.*, Special Masters' Interim Report No. 1 (ECF No. 1146), as our time records reflect.

While the sheer bulk of the material with which the Special Masters were required to become familiar can be gleaned by the massive factual record set out in this Court's, and the Court of Appeals', opinions *Chevron I* and *Chevron* II, much of the work we were required to do was actually occasioned by the parties' -- and in particular Defendants' -- conduct during discovery. We now turn to that subject.

**B.     The Parties' Conduct During the Depositions**

Regrettably, Your Honor's stated concerns about the parties' contentiousness and Defendants' obstructive behavior were reflective of our experiences as Special Masters in this matter. Even routine requests were met with pitched battle by Defendants. Defendants frequently treated our orders not as directives but as statements to be litigated or ignored. Defendants also repeatedly interposed frivolous privilege objections -- even after those same or similar objections had been overruled (and no appeal had been taken) -- in an effort to block the people who witnessed or participated in the underlying events at issue from testifying about what happened. We provide the following non-exhaustive examples by way of illustration:

6

*Obstructive Behavior in Connection with Scheduling*

Three days after our appointment, we attempted to convene a conference call with the counsel for all the parties to address elementary, preliminary matters such as the identities of witnesses to be deposed, which depositions would require supervision, and the parties' views on scheduling. Defendants responded to this most simple and basic of requests by obstructing our efforts to schedule the call and attempting to relitigate whether our presence in this matter was necessary. We had to issue two separate written orders just to have a lawyer for Mr. Donziger -- any lawyer, however junior -- on the phone. *See* Joint Order No. 1 (ECF No. 971), Joint Order No. 2 (ECF No. 972).

We spent many hours mediating disputes over the deposition schedule, disputes generated mostly by Defendants. One scheduling dispute that bears particular mention in analyzing allocation arose out of Mr. Donziger's request for an extension of the discovery cut-off date then set for May 31, 2013 -- a deposition scheduling dispute that occasioned more than five orders, a court hearing, and a Special Masters Interim Report.[8] The dispute came about after the motions to withdraw filed by Keker & Van Nest LLP and Smyser & Veselka, LLP (ECF No. 1164) were granted. In light of this development, we understood that the deposition schedule that had been in effect at that time would no longer be practicable. A more complete account of the circumstances is provided in our Interim Report No. 2 (ECF No. 1183), and in Your Honor's May 24, 2013 Order (ECF No.1185), but in brief, after initial positive developments toward

---

[8] This dispute was the subject of, among others, Special Masters Order No. 10 (ECF No. 1171), Your Honor's Order of May 21, 2013 (ECF No. 1176) ("May 21 Order"), Special Masters Interim Report No. 2 (ECF No. 1183), Your Honor's Order of May 24, 2013 (ECF No. 1185) ("May 24 Order"), Special Masters Order No. 11 (ECF No. 1188) ("Order No. 11"), and Special Masters Order No. 12 (ECF No. 1189) ("Order No. 12").

agreement on a new deposition schedule, Defendants' positions underwent a radical change, over the course of one night.

In connection with this negotiation, on May 20, 2013, Mr. Donziger made a motion for Your Honor to implement "procedural safeguards" that would provide a "workable transition" to his *pro se* representation, including a two week delay of all depositions and other deadlines. May 21, 2013 Order (ECF No. 1176). At Your Honor's request, we submitted our Interim Report No. 2 on May 23, 2013, which (for reasons set forth therein) recommended that Your Honor reject Mr. Donziger's motion. That same day (three days after his initial request), Mr. Donziger sought an even longer, three-month delay in the completion of the depositions. *See* May 23, 2013 Minute Entry. Your Honor rejected this modified request, but granted Mr. Donziger's initial request for a two-week extension. *Id.*

The day after the Court granted Mr. Donziger's request, we received correspondence from Defendants, including Mr. Donziger, which suggested that the depositions should proceed immediately -- notwithstanding that their request for a two-week total hiatus had just been granted by Your Honor. As described by Special Master Katz in Special Masters Order No. 11: "In my 21 years as a magistrate judge, I never encountered a shifting of positions as stark and inexplicable as those which have occurred here in just the last five days." The following day, Defendants reversed their position yet again. *See* Special Masters Order No. 12.

As a result of this dispute, we were required to convene several conference calls, participate in a court hearing, submit an interim report, and issue four written orders. Attending to basic matters like scheduling should never require Herculean effort, but in this case, due to Defendants' obstructive behavior, we were forced to devote many hours to that most basic task.

*Frivolous and Repetitious Assertions of Privilege*

As Your Honor predicted in the Appointment Memorandum: "[I]t is virtually certain that many claims of privilege will be made in certain depositions. It is important to the proper progress of this action that they be ruled upon promptly. Any other course will cause unnecessary delay and expense." Appointment Memorandum ¶ 5. Your Honor's prediction came true. While an occasional difficult privilege issue required our attention, there were, more frequently, frivolous assertions of privilege (and other frivolous objections by Defendants), which generated substantial unnecessary work and used up a great deal of the deposition day.[9]

One notable example is the subject of Special Masters Order No. 6 (ECF No. 1093) ("Order No. 6"). Special Master Gitter issued Order No. 6 shortly after the deposition of Martin Beier of Silver & DeBoskey, P.C., former counsel for Stratus Consulting, Inc. ("Stratus"). The order addressed two points that had previously been decided orally during Mr. Beier's deposition. *See* Beier Tr. at 140:25-146:22 (April 30, 2013). First, Special Master Gitter rejected a bare, blanket, conclusory assertion of "work product and common interest privileges" made via email from defense counsel prior to the deposition. *See* Order No. 6, at 3-4. Second, Special Master Gitter rejected additional "alleged common interest" privilege objections raised during Mr. Beier's deposition by defense counsel in response to a line of questioning about the desire of Patton Boggs LLP, counsel for the Lago Agrio Plaintiffs, to delay Stratus's document production in section 1782 proceedings filed against it. *See* Order No. 6, at 5-7. As the Order

---

[9] As is customary, we required that arguments about objections take place outside the presence of the witness. Defendants used this mechanism frequently, for inappropriate questioning or frivolous objections, creating undue interruptions of testimony and expanding our time expenditures. For example, Defendants' behavior turned the Guerra deposition from seven hours of testimony into a 10 ½- hour day for us.

9

notes, much of the asserted privilege of a "common interest" dealt not with communications between defendant and the witness but solely between the witness and his own law partners.

Further, to address fully Defendants' privilege claims (and avoid undue delay), Special Master Gitter and Mr. Ormand were required to invest substantial time researching privilege issues and thoroughly reviewing the factual record in the Colorado Section 1782 proceeding against Stratus. This research revealed that (a) the privilege assertions were legally lacking in specificity; (b) the privilege assertions, when probed, were substantively spurious; (c) the privilege assertions had previously been found to have been waived in the New York Section 1782 proceeding (defense counsel had not objected to voluntary testimony by Mr. Donziger about purportedly privileged subject matter); and (d) the documentary evidence was inconsistent with the purported common interest relationship and instead demonstrated "divergent and at times even antagonistic interests." *See generally* Order No. 6. Nevertheless, and without having taken an appeal, Defendants re-argued this frivolous privilege position on the record at a number of subsequent depositions. *See, e.g.*, McDermott Tr. 38:7-50:7 (May 21, 2013); Garr Tr. 64:19-66:23 (June 5, 2013); Kohn Tr. 219:19-221:11 (June 6, 2013); Tyrell Tr. 58:5-74:14 (June 13, 2013). *See also* Dunkelberger Tr. at 37:11-48:5 (June 26, 2013) (in a telephone availability deposition supervised by Special Master Gitter, overruling privilege objection on waiver grounds and, observing that "we have been through this before several times, at least in five depositions that I can recall . . . [t]he basis for my ruling [now] is the same one I made at the time in the McDermott deposition and the Beier deposition and in the Garr deposition and in the Kohn deposition and in the Tyrrell deposition"). Many of these repetitious objections caused delay at the depositions.

Our experience with Defendants' frivolous assertions of privilege was consistent with Your Honor's experience in the severed Count 9 litigation. *See* Appointment Memorandum ¶ 2 ("counsel for . . . these defendants repeatedly directed witnesses . . . not to answer questions on ground of alleged privilege despite prior rulings by magistrate judges in both the District of Maryland and this Court that the claimed privileges had been waived, vitiated by the crime-fraud exception or both"). Dealing with these objections, which should never have been made, required substantial effort by both us and Mr. Ormand.

*Unwillingness to Accept Prior Rulings*

Defendants also repeatedly demonstrated an unwillingness to accept and/or follow both Your Honor's and our prior orders – often by relitigating them after they became final.[10] To cite just a few examples:

- Defendants repeatedly disobeyed our prohibition on speaking objections, *see* Special Masters Order No. 3 (ECF No. 1058), which unnecessarily lengthened many of the depositions days.

- As noted above, Defendants repeatedly re-argued frivolous privilege positions.

- Mr. Donziger (having shown up late for his deposition both days) spent the better part of two hours at the beginning of the first day of his deposition complaining about his status as a Rule 30(b)(6) witness, Donziger Tr. at 4:22-41:24, even though all concerned, including the Special Masters, had been operating on the assumption from the outset of our appointment, as the parties well knew, that he would testify in that capacity on behalf of his law firm.

- Mr. Donziger opened the morning of the second day of his deposition by complaining about Your Honor's orders in relation to our fees and about the length of his deposition, Donziger Tr. at 319:2-333:6, all of which had already

---

[10] In two instances Chevron also was an offender on this score: (a) Chevron had sought to limit the subjects for permissible examination of its so-called "apex" witnesses, notwithstanding Your Honor's prior orders on the scope of permissible discovery. *See* Special Masters Order No. 10 (ECF No. 1171). We denied that request. *Id.* Undeterred, Chevron again sought similar relief with respect to its Rule 30(b)(6) witnesses, and we again denied the request. *See* Special Masters Order No. 17 (ECF no. 1242). (b) Both sides sought to relitigate our order concerning the length of the deposition of Judge Nicolas Zambrano. *See* Special Masters Order No. 7 (ECF No. 1122). We denied those requests. *Id.*

11

>been the subject of prior orders from either Your Honor, or us, rejecting his complaint. Order (ECF No. 12531, Special Masters Order No. 13 (ECF No. 1190).

Dealing with the parties' -- and in particular Defendants' -- unwillingness to accept or follow prior orders also required substantial effort by both us and Mr. Ormand.

## DISCUSSION

Rule 53(g)(3) of the Federal Rules of Civil Procedure provides that "[t]he court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master. An interim allocation may be amended to reflect a decision on the merits." Courts enjoy "broad discretion" in determining cost allocations for special master fees. *See, e.g., Roy v. Cnty. of Lexington*, 141 F.3d 533, 549 (4th Cir. 1998); *Aird v. Ford Motor Co.*, 86 F.3d 216, 221 (D.C. Cir. 1996); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1220 (6th Cir. 1987).

In making our recommendation on allocation, we have considered the factors set forth in Rule 53 and Your Honor's Order. At Your Honor's instruction, we have <u>not</u> considered "the parties' means" in preparing this report. *See* Allocation Order ¶ 3.

### A.   The Nature and Amount of the Controversy

As Your Honor has observed, "[t]his case is extraordinary. The facts are many and sometimes complex." *Chevron I*, 974 F. Supp. 2d at 384. The conflict between the parties in this case, as the Second Circuit observed, "must be among the most extensively chronicled in the history of the American federal judiciary." *Chevron II*, 833 F.3d at 83 (citations, quotations and alteration omitted). The substance of this matter has proceeded since 1993 in the court systems of the United States and Ecuador, among other fora. This particular action was commenced by Chevron in 2011, and sought, successfully, to enjoin Defendants from enforcing in this country

12

an $8.646 billion Ecuadorian judgment against Chevron that was "procured through, *inter alia*, defendants' bribery, coercion, and fraud . . . ." *Chevron II*, 833 F.3d at 80.

While this case is unique and the amount in controversy is obviously huge, we have found little guidance in the case law concerning whether, and if so how, those facts should inform our recommendation on allocation in this case. The Advisory Committee notes to Rule 53 suggest that the amount in controversy might be considered relative to the parties' means (which we have been instructed not to consider). Those notes also state that "[t]he nature of the dispute also may be important -- parties pursuing matters of public interest, for example, may deserve special protection." Fed. R. Civ. P. 53(h) advisory committee's note to 2003 amendment. Neither the example in the Advisory Committee Notes nor case law with similar examples[11] has anything to do with the "nature of the controversy" in this case.

As this Court has stated repeatedly this case is about allegations (now proven and found) of bribery and fraud; more precisely, about a series of frauds that include frauds designed to obstruct the revelations of the underlying bribery and frauds. Put another way, "the nature of the controversy" in this case is inextricably bound up with the other factors -- "responsibility for the reference"; the parties' conduct in discovery after the reference; and the "decision on the merits."

### B.   Responsibility for the Reference

#### i).   *Responsibility for Initial Reference*

The Advisory Committee Notes on the 2003 Amendment states, in pertinent part, that "[a] party whose unreasonable conduct has occasioned the need to appoint a master . . . may

---

[11] *See, e.g., Morgan Hill Concerned Parents Assoc. v. Cal. Dep't of Educ.*, No. 2:11-cv-03471-KJM-AC, 2015 WL 10939711, at *2 (E.D. Cal. July 2, 2015) (plaintiffs were nonprofit associations pursuing "a free appropriate public education on behalf of their members' children with disabilities").

13

properly be charged with all or a major portion of the masters' fees."

As discussed more fully above, Your Honor's Appointment Memorandum makes clear that Defendants' obstructive conduct, both in this case and in related proceedings, gave rise to the need for our involvement at the deposition phase of this case. That prior conduct included Mr. Donziger's refusal to behave properly as a witness in the Section 1782 proceeding (which continued at his deposition in this case); it also included the practice of interposing frivolous privilege objections to block important testimony.

While we recognize and have taken into account that the reference to us was made on Chevron's motion, Defendants were far more responsible than Chevron for both the reference to us and the need for our intervention at the depositions. This latter factor weighs heavily in favor of substantially increasing the portion of our fees and costs allocated to Defendants.

    ii). *Parties' Conduct before the Special Masters*

The cases dealing with "responsibility for the reference" also indicate that the parties conduct before the master can be an important factor in an allocation. *See e.g., Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 339 n.7 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 2388 (2016) (allocation may take into account "frivolous or bad faith positions that have unnecessarily increased the costs associated with the proceeding <u>before the Special Master</u>") (emphasis added); *see also Evolution, Inc. v. Suntrust Bank*, No. 01-2409-CM DJW, 2004 WL 2278559 at *5 (D. Kan. Sept. 28, 2004) (a party's "lack of cooperation" with special master a major factor in apportioning 70% of masters' fees to that party). Further, the sentence in Rule 53 that provides for amendment of an interim allocation after a decision on the merits may be read to indicate an intention that the allocating court take account of the parties behavior during special master supervision.

Here, the very conduct that created the need for a reference to us continued unabated during the discovery we supervised, and it unnecessarily increased the costs of the proceedings before us, as exemplified by the incidents described above and countless others. Defendants were staggeringly uncooperative, including with respect to basic matters such as scheduling. Defendants also continued their practice of interposing frivolous privilege assertions in an attempt to block testimony, but that practice proved unsuccessful given our physical presence and ability to compel testimony at the depositions.[12] Our experience with Defendants in this matter indicated to us that their obstructive behavior during the deposition phase of discovery was in substantial part aimed at keeping the facts under wraps.

C.     **The Decision on the Merits**

This is, without doubt, one of the most extraordinary cases ever to have been litigated in this or any other federal court. Due to the nature of this controversy, many lawyers who represented or were affiliated with Defendants had to sit for deposition, which gave rise to privilege issues that added to the complexity of our assignment. Our assignment required hundreds of hours of work over approximately three months, including the extensive study of the record in this case and related proceedings, the issuance of 20 written orders and countless oral orders, and oversight of about two dozen depositions (sometimes over multiple days).

At the time of our appointment, this case was in the middle of discovery, and Your Honor issued an interim allocation providing that 50 percent of our fees would be advanced by Chevron

---

[12] To be sure, counsel for Chevron were on occasion overzealous, and both Chevron and Defendants tried to take advantage of our presence to relitigate issues that had already been decided. But there is a world of difference between (for example) Chevron trying to protect irrelevant or peripheral witnesses from being burdened by lengthy depositions and testifying about ancillary subject matter, on the one hand, and Defendants trying to prevent the basic facts coming to light, on the other.

and 50 percent would be advanced by Defendants (jointly and severally). Appointment Memorandum at 2.[13] We now have a decision on the merits, and Rule 53 explicitly permits reconsideration of Your Honor's interim allocation to be amended to reflect that decision. Although not a fee-shifting provision, the final sentence of Rule 53(g)(3) may be read, in addition to the reading mentioned above at p. 15, *supra*, to suggest that the prevailing party should not bear the brunt of special master costs and fees. On that reading of the final sentence, the fact that there is a final judgment in this case concluding that Defendants obtained a multi-billion dollar judgment against Chevron through bribery and fraud would also weigh in favor of increasing the portion of our fees and costs allocated to Defendants in order to "reflect [Your Honor's] decision on the merits." Fed. R. Civ. P. 53(g)(3).

## CONCLUSION AND RECOMMENDED ALLOCATION

Having weighed the relevant factors, and in light of all of the foregoing, in the event Your Honor elects not to tax all costs against Defendants, we recommend that our fees and costs be allocated as follows: 85 percent to Defendants (jointly and severally) and 15 percent to Chevron.

Respectfully submitted,

_____        _____
Theodore H. Katz, Special Master      Max Gitter, Special Master

Dated: December 8, 2017
       New York, New York

---

[13] Your Honor later directed Chevron to advance all of our fees, after Defendants repeatedly stated that they would not advance their share. Order (ECF No. 1253).