UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                  Plaintiff,

          -against-                                11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

        Appearances:

                Randy M. Mastro
                Andrea Neuman
                William E. Thompson
                GIBSON DUNN & CRUTCHER LLP
                *Attorneys for Plaintiff*

                Steven Donziger
                THE LAW OFFICES OF STEVEN DONZIGER
                *Attorney for Defendant Steven Donziger*

LEWIS A. KAPLAN, *District Judge.*

        This Court found after a lengthy trial that Steven Donziger and his co-conspirators

attempted to extort billions of dollars from Chevron Corporation.  They did so by, among other

2

things, violating the Racketeering Influenced and Corrupt Organizations Act ("RICO"),[1] foisting fraudulent evidence on an Ecuadorian court, coercing Ecuadorian judges, illegally writing all or much of the Ecuadorian court's purported decision, and then procuring the signature of an Ecuadorian judge on a $19 billion judgment against Chevron that the co-conspirators had written, in part by the promise of a $500,000 bribe. This Court found also, and independently of RICO, that Donziger's actions were wrongful under the common law.

The details of this extraordinary behavior are contained in extensive findings. The judgment specifically provided, in words relevant here, that "Chevron shall recover of Donziger and the LAP Representatives,[2] and each of them, jointly and severally, the costs of this action pursuant to Fed. R. Civ. P. 54(d)(1) and 28 U.S.C. § 1920."[3]

While Donziger appealed from the judgment, he challenged neither the factual findings nor the costs provision of the judgment. The entire judgment was affirmed by the Court of Appeals, which commented that "[t]he record in the present case reveals a parade of corrupt actions by the LAPs' legal team [*i.e.,* Donziger and his co-conspirators], including coercion, fraud, and bribery, culminating in the promise to [the Ecuadorian judge,] Judge Zambrano[,] of $500,000 from

---

[1]
     18 U.S.C. § 1961 *et seq.*

[2]
     "LAPs" refers to the Lago Agrio plaintiffs, *i.e.,* the plaintiffs in the Ecuadorian case., all of whom were defendants here. "LAP Representatives" refers to the two LAPs who appeared in and defended this case. The remaining LAPs and some other defendants defaulted in this case.

[3]
     DI 1875, ¶ 9.

a judgment in favor of the LAPs."[4]  Insofar as Donziger is concerned, the case is over save for the

matters of costs and attorney fees.

Having prevailed in the litigation, Chevron gave notice of taxation of costs against

Donziger and the LAP Representatives.[5]  The Clerk taxed costs in the total amount of $944,463.85,

which consisted of fees and expenses of special masters in the amount of $872,387.63, fees for

service of papers of $1,550, interpreters' costs of $23,400, and court reporter fees of $47,126.22.[6]

Donziger[7] (though not the LAP Representatives) now seeks review of the Clerk's

taxation by a letter filed electronically on August 16, 2017.[8]  He contends that no costs should be

awarded against him for various reasons and, in any case, that the special master fees and expenses

should not be taxed because Chevron forfeited any right to recover them by its alleged failure to

comply with an earlier procedural order of the Court.

---

[4]

    *Chevron Corp. v. Donziger,* 833 F.3d 74, 126 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 2268 (2017).

[5]

    LOCAL CIV. R. 54.1(a) prohibits taxation of costs during the pendency of an appeal.

[6]

    DI 1928.

[7]

    Two Donziger-related entities also are defendants against which costs were taxed, the Law Offices of Steven Donziger ("SRD Office") and Steven R. Donziger & Associates, PLLC ("PLLC").  None of Donziger's submissions with respect to costs has mentioned either. Nevertheless, Donziger in May 2013 filed a notice of appearance on behalf of himself, SRD Office and PLLC that never has been withdrawn.  Accordingly, the Court treats his submissions with respect to costs as having been made on behalf of those entities as well as on his own  behalf.  For the sake of clarity, however, the LAP Representatives throughout this litigation have been and remain represented by separate counsel.  They have raised no objections with respect to the taxation of costs against them.

[8]

    DI 1931.

4

*The Proceedings Thus Far and Donziger's Contentions*

    *Proceedings as to Costs – The Clerk's Office*

        Chevron filed its notice of taxation of costs on December 5, 2016, not long after the docketing of the mandate affirming the judgment.[9]  Following that filing, Donziger moved to hold taxation of costs in abeyance pending the outcome of a petition for a writ of certiorari.[10]  The Court obliged.  But the Supreme Court denied certiorari on June 19, 2017.  Chevron on the same day moved to reactivate both its attorneys' fee motion and proceedings to tax costs.[11]  Donziger did not object to that motion.  On July 17, 2017, the Court directed the Clerk to tax costs.[12]

        Although Dongizer had not objected to the reactivation of proceedings to tax costs, his position changed after that motion was granted.  On August 1, 2017, he wrote to the Clerk, arguing that taxation of costs should "be held in abeyance pending resolution of a number of critical and related legal and factual issues that are now pending or will soon be presented to the district court."[13]  These were (1) Donziger's contention that any award of attorneys' fees under RICO is

---

[9]

    DI 1918.

[10]

    DI 1919, DI 1921.

    Chevron's motion for attorneys' fees against Donziger likewise was held in abeyance.

[11]

    DI 1922.

[12]

    DI 1923, ¶¶ 1-2.

[13]

    DI 1925, at 1 (footnote omitted).

foreclosed by Circuit precedent,[14] (2) his vaguely described and unsupported assertion that "a variety of appropriate judicial bodies, both in this jurisdiction and others" may consider whether Chevron "and its counsel knowingly suborned perjury, obstructed justice, violated numerous federal laws, and committed a fraud on this court with respect to the testimony of [trial witness] Alberto Guerra,"[15] (3) Donziger's assertion that Chevron forfeited its right to seek recovery of the special masters' fees and compensation by failing to make a timely motion under the Court's July 9, 2013 order,[16] (4) a contention that the recovery of attorneys' fees and costs "to attack and to try to disable adversary counsel [would be] in violation of the First Amendment,"[17] and (5) an assertion that all further post-judgment proceedings against him should be moved to another court because the then-chair of the Grievance Committee of this Court allegedly had referred his conduct to the Departmental Disciplinary Committee of the First Department of the New York Supreme Court in an alleged letter that Donziger has not produced.[18]  None of Donziger's contentions was supported by any affidavit, declaration or exhibits.

The Clerk declined to hold the taxation of costs in abeyance, which was entirely

---

[14]    *Id.*

[15]    *Id.* at 2.

[16]    *Id.* at 3-5.

[17]    *Id*. at 5-6.

[18]    *Id.* at 7-8.

6

appropriate given the Court's prior direction to "proceed to tax costs."[19]  Accordingly, costs were

taxed on August 8, 2017.[20]

*Proceedings as to Costs – The Present Position*

The procedure for objecting to costs taxed by a district court clerk is specified in Rule

54(d)(1) of the Federal Rules of Civil Procedure – "On motion served within the next 7 days, the

court may review the clerk's action."  As costs were taxed on August 8, Donziger had until August

15 to file a motion seeking review of the Clerk's action.  In fact, as discussed above, he never did

file a motion.  Rather, on August 16, 2017, the day after such a motion would have been due, he

electronically filed a letter objecting to the Clerk's actions.[21]  The letter was largely a reprise of

Donziger's August 1 letter to the Clerk.  But he added to it by (1) "insist[ing]" that the undersigned

recuse himself,[22] (2) asserting that Chevron should bear its own costs because it despoiled the

---

[19]

DI 1923, ¶ 2.

[20]

DI 1928.

The Clerk taxed $1,550 for service fees, $47,126.22 for court reporter fees, $23,400 for translation services, and $872,387.63 for compensation and expenses of special masters.

[21]

DI 1931.

Donziger's multiple prior recusal/reassignment requests all were denied.  *E.g., Chevron Corp. v. Donziger,* 974 F. Supp.2d at 566; *Id.* 783 F. Supp.2d 713, 718 (S.D.N.Y. 2011) (both citing record).

[22]

DI 1931, at 1-2.

7

Ecuadorian rain forest,[23] and (3) contending that Donziger has limited means and therefore ought not to bear any costs in this matter.[24]

Taken together, Donziger's letters purport to articulate reasons that no costs should be taxed against him and, in any case, that Chevron forfeited any right to recover the special master fees and expenses.  He has not challenged specifically any of the other items of costs taxed.  With respect to the special masters, however, one point warrants particular note in order to understand the proceedings.

Chevron's bill of costs contained copies of the bills it had paid for the compensation and expenses of the special masters and their assistant.  In the case of one of the two special masters, former Magistrate Judge Katz, the material included detailed, contemporaneous time records.  In the case of the other, Max Gitter, Esq., it included invoices showing the hours worked and the billing rates but not time detail.[25]  Accordingly, by order dated November 9, 2017, the Court (1) required that Mr. Gitter and Cleary, Gottlieb provide Donziger and the Court with "time records (including any description of services the existing records contain) sufficient to show the services rendered that were . . . included in the bill of costs taxed by the Clerk," and (2) requested that the special masters make a recommendation with respect to the allocation of the special master costs as between the

---

[23]

*Id.* at 3-4.

[24]

*Id.* at 4-5.

[25]

The same was true of a Cleary Gottlieb associate, Mr. Ormond, whom the Court authorized to assist the special masters.

8

defendants and Chevron.[26]   Donziger then was given until December 4, 2017 to object to the reasonableness of the hours devoted to the services performed by any or all of the special masters or their assistant and until December 23, 2017 to object to the special masters recommendation.[27]

The special masters furnished the necessary time records to Donziger on November 21, 2017,[28] and filed their report and recommendation on the recommended allocation of their fees and costs on December 8, 2017.[29]   Donziger filed no timely objection to either.   Accordingly, the Court (1) found that the hours for and the hourly rates at which the special masters and their assistant billed were reasonable and appropriate,[30] and adopted the findings set forth in the special masters' report while reserving to itself the decision whether to tax all costs against the defendants or, if not, the manner in which the costs would be apportioned.[31]   In each case, Donziger – despite his failure to object prior to the Court's ruling – thereafter submitted an intemperate, unsupported and hyperbolic letter complaining of the Court's determination.[32]

---

[26]
    DI 1939.

[27]
    *Id.*

[28]
    DI 1949.

[29]
    DI 1942; *see* DI 1939.

    The special masters recommended that 85 percent of the special master costs be apportioned to the defendants, jointly and severally.  DI 1942.

[30]
    DI 1940.

[31]
    DI 1946.

[32]
    DI 1941, DI 1947.

On January 12, 2018, the special masters submitted an invoice for the work they performed in preparing the report of December 8.[33]  That invoice is not at issue here, as it was not, and could not have been, included in the bill of costs now under review.

*Discussion*

I.      *Donziger's Objections to the Taxation of Costs Fail to Comply With Court Rules*

Donziger's application to review the Clerk's taxation of costs fails in material respects to comply with the Federal Rules of Civil Procedure and the rules of this Court.

The application was made by means of a letter filed electronically.  Rule 54(d)(1) provides that review of a clerk's taxation of costs is to be by motion.  Local Civil Rule 7.1(a), with exceptions not here relevant, requires that motions be brought on by notice of motion or order to show cause and that they be accompanied by memoranda of law and "[s]upporting affidavits and exhibits thereto containing any factual information and portions of the record necessary for the decision of the motion."  Section 13.1 of the Court's ECF Rules and Instructions make clear that the Court's letter motion practice, which applies to other sorts of mostly routine procedural applications, does not permit letter motions to review taxation of costs.[34]

These rules serve important purposes.  The requirement of affidavits, exhibits, and memoranda of law – rather than unsworn letters and other informal submissions – serves to place before the Court evidence, legal authority and argument "necessary for the decision of the motion."

---

[33]      DI 1950.

[34]      *Id.*

Accomplishment of that purpose is especially important here, as Donziger relies on (a) factual assertions that go well beyond the record in this case which, in any event, is enormous, and (b) legal contentions, the basis for which, if there is any, is far from self evident. Yet Donziger has not supported his contentions with the materials the rules require.

These deficiencies cannot be overlooked on the theory that Donziger is representing himself. Donziger is a graduate of the Harvard Law School and, according to the attorney search function of the website maintained by the New York Unified Court System, a member of the New York Bar for twenty years.[35] He is not entitled to any special indulgence as a *pro se* litigant.[36]

Accordingly, the application to review the taxation of costs – except as it relates to the taxation of the special master fees and expenses which, as discussed below, raises at least some issues that may be decided on the existing record and without briefing – is, to the extent it is denied, based on Donziger's failure to comply with the Federal Rules of Civil Procedure and the local rules of this Court. The Court nevertheless considers all of Donziger's arguments, based on such materials as are readily at hand, to determine whether they would have been meritorious had they been presented properly. Even on that basis, however, he would fail in substantially all respects. Hence, the ruling on this motion rests on alternative grounds.

---

[35] N E W   Y O R K   S T A T E   U N I F I E D   C O U R T   S Y S T E M, http://iapps.courts.state.ny.us/attorney/AttorneySearch#search_result (last visited Feb. 5, 2018).

[36] Although "a court is ordinarily obligated to afford a special solicitude to pro se litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy v. Freshwater,* 623 F.3d 90, 101–02 (2d Cir. 2010).

II.     *Donziger's Arguments to Hold Costs in Abeyance*

Donziger's letter to the Clerk requested that she hold the taxation of costs in abeyance.  While the letter thus ostensibly went to the timing rather than the substance of the taxation process, in fact only three of the several arguments he made there actually addressed the question of timing.  Everything else went to the merits.  We deal first with the timing arguments.

A.     *The Claim that Attorneys' Fees Are Foreclosed by Circuit Precedent*

Among the bases for Donziger's attempt to have the Clerk hold costs in abeyance was the argument that Circuit precedent forecloses attorneys' fees in this case.[37]  The argument is a *non sequitur.*  Even if, as Donziger claims, Circuit precedent concerning attorneys' fee awards in civil RICO cases forecloses such an award in this case, it has nothing to do with the taxation of costs under Rule 54(d)(1).

B.     *The Assertion that "A Variety of Appropriate Judicial Bodies, Both in this Jurisdiction and Others" May Consider Whether Chevron "and Its Counsel Knowingly Suborned perjury, Obstructed Justice, Violated Numerous Federal Laws, and Committed a Fraud on this Court With Respect to the Testimony of Alberto Guerra"*

Donziger's argument for delay on this basis is frivolous.[38]

---

[37]

DI 1925, at 1.

[38]

Moreover, to whatever extent it properly may be understood as arguing that this Court's findings, based on the trial record before it, were erroneous, unsupported by the evidence, or otherwise inappropriate, the argument is barred.  Donziger was entitled to contend on direct appeal that those findings were clearly erroneous but failed to do so.  The argument therefore is foreclosed here for the reasons discussed in Point III.A.

*First.* The reference to "a variety of appropriate judicial bodies" is unexplained, not to mention unsupported by any evidence or legal authority.[39]  What judicial bodies?  In what proceedings?  Held in abeyance until when?  And what possible relevance might these speculative possibilities, if any there are, have to the taxation of costs in this case?  All of that is unexplained.

The judgment of this Court is final and enforceable.  It stands, regardless of whether courts or other "bodies" outside the United States recognize or enforce the Ecuadorian judgment or comment on testimony of Guerra either before this Court or before any other body.

*Second.* Although the foregoing is more than sufficient to dispose of Donziger's argument, it bears mention that Donziger overlooks the fact that the testimony of Guerra was far from indispensable to the judgment rendered in this case.  As the Court's opinion makes clear, this Court would have reached precisely the same result in this case even without the testimony of Alberto Guerra.

The Court found  that Donziger and his co-conspirators, among other misdeeds, (1)

---

[39]
 Presumably it refers entirely or in part to Donziger's efforts to enforce the fraudulent Ecuadorian judgment in Argentina, Canada, and Brazil.  Brazil's Supreme Judicial Tribunal, reportedly its highest appellate court in non-constitutional courts, is said recently to have denied recognition to the Ecuadorian judgment. *E.g.,*  Ted Folkman, LETTERS BLOGATORY, *Lago Agrio Court: STJ Rejects Ecuadoran Judgment* (available at https://lettersblogatory.com/2017/12/01/lago-agrio-court-stj-rejects-ecuadoran-judgment/#more-25727 (last visited Dec. 5, 2017); *see also id. Lago Agrio: LAPs Abandon Recognition and Enforcement Action in Brazil,* (available at https://lettersblogatory.com/2017/09/25/lago-agrio-laps-abandon-recognition-and-enforcement-effort-in-brazil/) (last visited Oct. 8, 2017).  Argentina's court of first instance also reportedly has rejected his suit. *Id. Lago Agrio: Argentine Court Refuses to Enforce Ecuadoran Judgment,* (available at https://lettersblogatory.com/2017/11/02/lago-agrio-argentine-court-refuses-to-enforce-ecuadoran-judgment/#more-25606 (last visited Dec. 5, 2017); *see also id. Lago Agrio: The Argentine and Brazilian Developments, In English* (available at https://lettersblogatory.com/2017/11/08/lago-agrio-the-argentine-and-brazilian-developments-in-english/ (last visited Dec. 5, 2017).

13

blackmailed Judge Yanez to abandon the judicial inspections and to appoint Cabrera as the global expert, (2) corrupted Cabrera, (3) wrote Cabrera's report, (4) falsely passed off Cabrera's report as the work of an independent and impartial expert, and (5) ghost-wrote former Judge Zambrano's purported decision which demonstrably relied on the fraudulent Cabrera report notwithstanding its disclaimer.[40] The first four of those findings were made entirely without regard to Guerra's testimony. And Guerra's testimony was not essential to the fifth. Moreover, the Court held that this fraudulent behavior warranted equitable relief with respect to the Ecuadorian judgment. It did so without necessary regard to whether Donziger and the LAPs bribed former Judge Zambrano, the only point on which Guerra's testimony was critical.[41]

There is no valid reason to delay the taxation of costs on the theory that someday, somewhere, some other body may comment on Guerra's credibility in a manner more to Donziger's liking.

C.    *Change of Venue*

Donziger argued that the Clerk should defer taxation of costs based on an assertion that the chair of this Court's Grievance Committee has made a complaint against him to state disciplinary authorities.[42] This, he asserted, would justify transfer of this case to another court.

---

[40]

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 482-502, 558-64.

[41]

*Id.* at 564-66.

[42]

The basis for the argument apparently is a claim by Donziger that he has received a copy of such a letter. He has not submitted an affidavit to that effect nor a copy of any such letter. As there is nothing in the record to support Donziger's assertion, we refer to it as "alleged."

Deferral of the costs issue was warranted, he said, because he would "be taking up this issue with the district court and if necessary with an appellate court with the ultimate aim of having all post-trial issues moved to a different and non-conflicted venue for resolution."[43]

Donziger has provided no evidence, whether by affidavit or by filing a copy of the supposed letter, that any such complaint was made.  Assuming, however, that such a complaint was made, it would be immaterial here.  There is no basis for the assertion that the law requires or even permits a change of venue on such a basis.  The substance of Donziger's suggestion is frivolous.

Judges have a duty to refer reliable evidence of professional misconduct by lawyers to relevant disciplinary authority.[44]  Indeed, a judge is not disqualified from hearing a case by reason of having made a disciplinary referral regarding a lawyer in the case.[45]  In any case, Donziger does not suggest that the chair or any member of the Grievance Committee is presiding over this case.

III.    *The Merits*

Having disposed of the timing arguments, we come to the merits of Donziger's arguments, assuming *arguendo* that they had not been forfeited for failure to comply with court rules.

---

[43]    DI 1925, at 7.

[44]    CODE OF CONDUCT FOR UNITED STATES JUDGES, Canon 3B(5).

[45]    U.S. Jud. Conf., Comm. on Codes of Conduct, *Adv. Opinion No. 66*; U.S. Jud. Conf., Comm. on Codes of Conduct, *Compendium of Selected Opinions* § 3.6-7(b).  Nor do "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, . . . constitute a basis for a bias or partiality motion."  *Liteky v. United States,* 510 U.S. 540, 555 (1994).

A.      *Some of Donziger's Claims Would Be Precluded Because They Could Have Been, But Were Not, Raised on Direct Appeal*

Donziger advances three arguments that are inconsistent with the judgment and therefore no longer available to him.  First, he contends that the imposition of costs on him would violate the First Amendment.[46]  Second, he again demands that the undersigned recuse himself.[47]  Third, he asserts that costs should be denied because Chevron was guilty of fraud on the Court and other misconduct by virtue of its payments to or for the benefit of Alberto Guerra.[48]

The First Amendment argument, to the extent it is comprehensible at all, is a reprise of an argument in his post-trial brief.[49]  The recusal argument, as his letter makes clear, is based entirely on arguments he made prior to the entry of judgment, arguments that were rejected repeatedly by this Court and, on mandamus and other interlocutory applications, by the Court of Appeals.  So too the argument with respect to Guerra.  Chevron's payments to and other arrangements with Guerra were the subject of extensive briefing, direct testimony, and cross examination prior to, during, and after the trial.[50]  Donziger's appellate briefs rehearsed the facts at

---

[46]    DI 1931, at 1.

[47]    *Id.* at 1-2.

[48]    *Id.* at 2-3.

[49]    DI 1850, at 64-66.

[50]    Briefing: *E.g.*, DI 916, DI 976.  Direct testimony: *E.g.*, Tr. (Guerra) 1032-64; PX 1671; PX 4800, at pp. 23-64.  Cross examination: Tr. (Guerra). 1096-97; 1116-19; 1221-34.

length.[51]

Donziger made neither the First Amendment nor the recusal argument on appeal[52] although both contentions could have been raised there.[53]  Likewise, although he referred to Chevron's payments to Guerra in his appellate briefs, he never made in the Court of Appeals the argument that he now makes here – viz. that costs should be denied to Chevron because its actions with respect to Guerra were improper – although that argument too was available to him on direct appeal.[54]  Nor, for that matter, did he argue on appeal that this Court's findings that relied on Guerra's testimony were clearly erroneous.

As our Court of Appeals has held, "a [district court] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived

---

[51]

Corrected Brief for Defendants-Appellants Steven Donziger et al., *Chevron Corp. v. Donziger,* No. 14-826(L), 2d Cir. DI 150, at 52-57; Reply Brief for Defendants-Appellants Steven Donziger et al., *id.,* 2d Cir. DI 314, at 23-24.

[52]

Corrected Brief on behalf of Steven R. Donziger, et al., *Chevron Corp. v. Donziger,* 833 F.3d 74, *passim*.

[53]

*E.g., Stevens v. Rite Aid Corp.,* 851 F.3d 224, 228 n.4 (2d Cir. 2017) ("[An] appeal brings up for review all prior orders of the District Court that produced the judgment."); *SongByrd, Inc. v. Estate of Grossman,* 206 F.3d 172, 178 (2d Cir. 2000) ("[An] appeal from a final judgment brings up for review all reviewable rulings which produced the judgment." (citations and internal quotation marks omitted)); *Shannon v. Gen. Elec. Co.,* 186 F.3d 186, 191 (2d Cir. 1999) (quoting *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.,* 393 F.2d 441, 444 (2d Cir.1968) ("interlocutory orders and decrees are merged into the final order of the district court [and] may be reviewed on the appeal") (citation omitted)); 15A Charles Allan Wright, et al., Federal Practice and Procedure: Jurisdiction and Related Matters § 3905.1, at 250 (2d ed. 2017) ("[A]ppeal from final judgment opens the record and permits review of all rulings that led up to the judgment.").

[54]

*Supra* note 53.

the right to challenge that decision at a later time."[55]  Defendants thus are bound by the judgment

provision awarding costs.  Indeed, this Court could not properly reconsider that portion of the

judgment – as opposed to determining which particular categories of costs would be awarded and

the amounts of each, which remain open because neither question was determined previously.[56]  And

even if the Court had discretion to do so, it would decline to exercise it in Donziger's favor in view

of his egregious misconduct described previously and his misconduct in this litigation.  That has

included, among other things, outright defiance of court orders requiring him to (1) produce

---

[55]

    *North River Ins. Co. v. Philadelphia Reins. Corp.,* 63 F.3d 160, 164 (2d Cir. 1995) (quoting *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C. Cir. 1987) (internal quotation marks omitted)).  *Accord, e.g., United States v. Philip Morris USA Inc.,* 801 F.3d 250, 257-58 (D.C. Cir. 2015) (litigant waives issue that could have been, but was not, raised on prior appeal); *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 239-40 (5th Cir. 2012) (litigant waives issue that could have been, but was not, raised on prior appeal); *Med. Ctr. Pharmacy v. Holder,* 634 F.3d 830, 834-36 (5th Cir. 2011) (issue that could have been but was not raised on appeal is forfeited and may not be revisited by the district court on remand); *Empagran S.A. v. Hoffman-LaRoche, Ltd.,* 388 F.3d 337, 344 (D.C. Cir. 2004) (argument made in second appeal waived by failure to raise it in district court or on prior appeal); 18 MOORE'S FEDERAL PRACTICE § 134.20[3], at 134-54.1 (3d ed. 2017); *see Phil-Insul Corp. v. Airlite Plastics Co.,* 854 F.3d 1344, 1357 (Fed. Cir. 2017) (issue within scope of the judgment appealed from and not raised by the appellant in its opening brief on appeal is necessarily waived); *Myers v. Central Fla. Invests., Inc.,* 592 F.3d 1201, 1227 (11th Cir. 2010) (appellate court declined to consider issue that should have been raised on prior appeal); *Ward v. Santa Fe Ind. Sch. Dist.,* 393 F.3d 599, 607 (5th Cir. 2004) ("A party cannot raise an issue on appeal that could have been raised in an earlier appeal in the same case."); *Nat'l Home Equity Mtg. Assn. v. Face,* 283 F.3d 220, 225 (4th Cir. 2002), *vacated on other grounds*, 123 S. Ct. 69 (inappropriate on second appeal to consider argument that could have been raised on prior appeal in same case); 18B CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 4478.6 (2d ed. 2017).

[56]

    *North River Ins. Co.* reversed a district court ruling that departed from its prior appealable but unappealed final decision.  63 F.3d at 165-166.  *See also Parmalat Capital Finance Ltd. v. Bank of America Corp.,* 671 F.3d 261, 270-71 (2d Cir. 2012) (abuse of discretion for district court to consider on remand from first appeal an alternative ground for prior decision that was advanced neither in prior district court proceedings nor on first appeal).

responsive documents located in Ecuador but subject to his control[57] and (2) contribute as required to the interim payment of the expenses of the special masters.[58]  Moreover, Donziger arguably is in contempt of the final judgment of permanent injunction in this case.[59]

        B.     *Donziger's Allegedly Limited Means*

Donziger contends that costs should not be imposed on him because he is a person of limited means, whether considered in and of itself or in relation to the fact that Chevron is among the world's largest enterprises.  These arguments too would fail even if the Court were to disregard Donziger's failure to comply with court rules governing motions to review taxation of costs.

        1.     *Donziger's Finances*

Rule 54(d) "creates a presumption that the district court will award the prevailing party costs."[60]  "The burden is on the non-prevailing party to overcome this presumption[, and w]hen a district court exercises its discretion and denies costs to a prevailing party, it must provide a valid

---

[57]

    *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 218-24 (S.D.N.Y. 2013).

[58]

    DI 865; DI 1204.

[59]

    The judgment directed him to "execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest of his shares in Amazonia[,]" a Gibraltar company set up to receive any proceeds of the enforcement of the Ecuadorian judgment.  DI 1875, ¶ 3.  According to Chevron's uncontradicted assertion, he has not done so.  DI 1922.

[60]

    *Rodriguez v. Whiting Farms, Inc.,* 360 F.3d 1180, 1190 (10th Cir. 2004); *accord Carter v. Inc. Vill. of Ocean Beach*, 759 F.3d 159, 163 (2d Cir. 2014); *Whitfield v. Scully*, 241 F.3d 264, 270 (2d Cir. 2001).

reason for the denial."[61]  Thus, the burden is on Donziger to establish that costs should be denied in order to avoid financial hardship.[62]

Donziger has not carried, or even attempted to carry, that burden, even as to the full amount taxed by the Clerk.  Moreover, even if he had demonstrated that he would be able personally to pay the full amount of the costs taxed against him, that would not be dispositive.  Although a district court "may deny costs based on financial hardship, indigency *per se* does not preclude an award of costs against an unsuccessful litigant."[63]

Donziger and his clients have complained of a purported lack of resources through much of this litigation to support various arguments or to justify their behavior.  Indeed, they flatly refused to comply with the Court's order that they bear part of the special master costs on an interim basis.[64]  Yet, despite repeated invitations by the Court to submit financial information supporting

---

[61]

*Id.* (citation omitted).

[62]

*E.g., Chapman v. AI Transport,* 229 F.3d 1012, 1039 (11th Cir. 2000) ("If a district court in determining the amount of costs to award chooses to consider the non-prevailing party's financial status, it should require substantial documentation of a true inability to pay."); *McGill v. Foster,* 18 F.3d 456, 459 (7th Cir. 1994) (costs award affirmed where non-prevailing prisoner plaintiff "failed to establish . . . that he was incapable of paying the court-imposed costs at this time or in the future").

[63]

*Whitfield v. Scully,* 241 F.3d 264, 273 (2d Cir. 2001), *abrogated in another respect, Bruce v. Samuels,* 136 S. Ct. 627 (2016).

[64]

DI 865, at 2; DI 1204.

their claims of inability to pay,[65] they never did so.[66]   Indeed, Donziger has not submitted any affidavits, declarations or other evidence of his own financial circumstances or those of his clients in support of his motion to review the taxation of costs. To be sure, some evidence concerning the financing of this litigation came into the trial record.[67] But that evidence does not sustain Donziger's burden of demonstrating that costs should be mitigated or denied on the basis of his financial circumstances.

---

[65]

E.g., Chevron Corp. v. Donziger, 974 F. Supp. 2d 362, 388-89, 432-33, 453-54, 465-79, 525 n.1098 (S.D.N.Y. 2014), aff'd, 833 F.3d 74 (2d Cir. 2016), cert. denied, 137 S.Ct. 2268 (2017). DI 865, at 3; DI 1287; DI 1293.

[66]

Donziger recently asserted that "KPMG . . . fully audit[ed] his finances as part of the . . . trial." DI 1947, at 3.  That representation is entirely false.

While a KPMG forensic accountant did review some financial records and was a witness at trial, there was no audit.  The accountant's unchallenged testimony was precisely to the contrary. Tr. (Dahlberg) 863:24-864:11 ("THE COURT:  Is anything in here a certification or an opinion by you as a certified public accountant that the books and records here fairly present the financial condition of any company, entity, or person?     THE WITNESS: No, it does not, your Honor.     THE COURT: Okay.  Are you claiming you did any audit of anything in accordance with generally accepted auditing standards?  THE WITNESS:  I am not, your Honor.").  See also PX 4900R (Dahlberg witness statement) ¶¶ 24-27.

Not only was there no audit, there was no evidence at trial as to Donziger's financial situation beyond (1) his admission that he had obtained between $1.8 and $1.9 million in cash and property as the result of from "family estate related matters" in the two years prior to trial, Tr. (Donziger) 2537:20-2538:18, and (2) what little appeared in the incomplete and disorganized document production that the KPMG accountant reviewed, infra, at pp. 22-23; PX 4900R (Dahlberg witness statement); Tr. 815:18-887:3 (Dahlberg live testimony).  Among other things, the accountant noted that he was not given records of payments to lawyers although they were requested by Chevron in this and related litigation. PX 4900R (Dahlberg witness statement) ¶ 27.  So there was nothing resembling an accurate picture of Donziger's financial situation at the time of trial nor even reliable assessment of how much of the millions of dollars he raised went into and remained in his own pocket.  Moreover, even if there had been adequate evidence of Donziger's financial situation as of the time of trial (fall 2013), it now would be long out of date.

[67]

See supra n.66.

As an initial matter, Donziger repeatedly has refused to provide much information concerning his personal financial situation. Presumably to compensate for his failure to provide such information, he claims that his original trial counsel, the Keker firm, withdrew in the first half of 2013 claiming non-payment and invited an inference that it did so because Donziger lacked the ability to pay its bills. But even assuming that Donziger stopped paying the Keker firm's bills, the fact that he ceased payments would not necessarily say anything about the financial resources available to him.[68] Indeed, it came out at trial that Donziger received cash and real estate worth $1.8 to $1.9 million from "family estate related matters" during the two years prior to trial, i.e., in the period from October 2011 until October 2013,[69] during which payments to the Keker firm appear to have stopped or fallen well behind. Other evidence showed that Donziger personally received somewhere between $958,000 and $1.3 million from litigation funders before trial, and the figure could well have been higher because the records from which that information was gleaned were incomplete.[70] There simply is no factual basis from which the Court responsibly could conclude that Donziger is unable to pay costs in the full amount taxed by the Clerk or that the amount of any such judgment should be reduced to avoid undue financial hardship.

Perhaps more fundamentally, Donziger's focus on his supposed personal circumstances should not blind one to the fact that the litigation with Chevron, including this case,

---

[68]    DI 1164, at 5 & n.16 ("[T]here is no competent evidence that the non-payment [wa]s a result of inability to pay as distinguished from a decision not to pay by whomever controls resources on the defendants' side." (footnote omitted)).

[69]    Tr. (Donziger) 2537:20-2538:18.

[70]    PX 4900, ¶¶ 8, 27, attach. C. (Dahlberg).

has been financed by third-party funders.[71]  And it is Donziger who, with limited and apparently now long past exceptions, essentially has controlled the money.[72]  Moreover, his clients at least arguably are obliged to pay the reasonable costs of defending Donziger, which may include costs imposed upon him by the Court, to the extent of monies available to them to fund the Chevron litigations.[73]  Thus, no consideration of Donziger's means would be complete without full knowledge of the funding arrangements for this case.

---

[71]

See, e.g., Cherry v. Champion Int'l Corp., 186 F.3d 442, 447 (4th Cir. 1999) (no reduction in cost award despite proof that plaintiff had "no independent income and owned no property in her own name" because she had "sufficient access to marital property" and a 401(k) plan).

[72]

Chevron v. Donziger, 974 F. Supp. 2d at 397-98 & n. 102.

In the period through 2009, most of the money came from the Kohn firm, but "Donziger largely controlled how and when it was spent."  Id.  After Kohn stopped its support, Donziger and Patton Boggs lined up financing from Burford Capital LLC ("Burford"), which provided $4 million but then refused to provide further funding upon its conclusion that Donziger and Patton Boggs had misled it.  Id. at 474-75, 478-79.  The funds provided by Burford were to be spent only with the agreement of both Donziger (referred to in the Funding Agreement as Claimants' U.S. Representative) and Patton Boggs (referred to as "Nominated Lawyers").  DI 356-2 (Funding Agreement), ¶¶ 3(b) and Sched. 3.  Those funds, which perhaps by now have been exhausted, would have been available to pay Donziger's defense costs in this case as well as any costs imposed upon him.  Id. ¶¶ 3(e), 3(f).

[73]

PX 558 (retainer agreement) § 9.

The retainer agreement provides also that Donziger's clients would have the right to seek to recoup from Donziger whatever they have paid to defend him in the event of a final judgment determining that Donziger "has committed actual fraud, professional malpractice or willful misconduct."  Id.  The judgment in this case determined that Donziger has committed actual fraud and willful misconduct, albeit not actual fraud on or misconduct with respect to his clients.  In all the circumstances, it is questionable whether (a) the findings here would excuse Donziger's clients from their indemnity obligation given the lack of findings of fraud or misconduct directed at those clients, and (b) Donziger's clients would adopt this Court's findings of fraud and misconduct to avoid their obligation to pay for Donziger's defense in light of the possible implications of adopting those findings for their efforts to enforce the Ecuadorian judgment in other countries.

Neither Donziger nor his clients have come forward with complete and current evidence concerning the monies available to them.  The most that can be said is that the KPMG forensic accountant called by Chevron at trial, based on his examination of incomplete records all of which now are more than four years old, testified that:

- "[T]he activites and operations surrounding the Litigation were funded by a number of investors during varying distinct periods of time throughout the course of the Litigation.  Based on the documents I analyzed, it appears that the various individual investors, law firms, and litigation investment firms agreed to provide approximately $32 million in funds to finance the activities and operations surrounding the Litigation."[74]

- "The available documents show that the individual investors, law firms, and litigation investment firms contributed approximately $16 million to finance the activities and operations surrounding the Litigation."[75]

In addition, the accountant concluded that:

"The extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain would not have allowed him to provide accountability to either his investors or to the Lago Agrio Plaintiffs (the 'LAPs')."[76]

Donziger himself admitted at trial that he spent over $21.4 million on the litigation

---

[74]  DX 4900R (Dahlberg).  ¶ 34.

The available records showed receipt of only $16 million.  *Id.*

[75]  *Id.* ¶ 5.

[76]  *Id.* ¶ 8 (emphasis added).

from 2007 to 2013,[77] and the figure may well have been substantially higher.  Moreover, there is no

evidence as to what additional monies have been raised in the several subsequent years.  By the time

of trial four years ago, these included at least an additional $2.5 million from a British investor.[78]

And Donziger has been engaged in extensive litigation in Canada and elsewhere for some time now,

which at least suggests that he has raised much more.  Donziger thus has raised at least $21.4 million

over the years, and probably a good deal more, a large part of which never has been accounted for.

He has submitted no evidence in connection with the taxation of costs that could justify any

conclusion, one way or the other, as to whether third party funding is available to pay costs in this

case.

In sum, there is no substantial basis to credit Donziger's unsubstantiated claim of

inability to pay.  Given that the burden of proof to establish at least that payment would cause serious

financial hardship is on the party seeking to avoid imposition of costs, and given that Donziger has

provided no such evidence, the Court would decline to temper the award of costs even if it were to

overlook his failure to comply with court rules.

2.      *Disparity of Litigants' Resources*

The other branch of Donziger's means-related argument is straightforward.

Chevron is a huge enterprise.  According to its 2016 annual report, the consolidated

---

[77]      Tr. (Donziger) 2502:4-9.

[78]      *See* Tr. (Donziger) 2528:9–2529:11.

balance sheet for Chevron reflected net equity of $146.7 billion.[79]  Whatever Donziger's personal

net worth may be, the Court proceeds on the assumption that it is very small compared to that of

Chevron. But virtually every circuit to consider the question has held that disparity of wealth does

not justify denial or reduction of costs, at least in the absence of persuasive evidence of inability to

pay.[80]  Indeed, at least one circuit has reversed a reduction of costs that was made in light of the

disparity of resources between an individual plaintiff and a giant corporation.[81]


C.    *Chevron's Alleged Pollution of the Ecuadorian Rain Forest*

As noted previously by both this Court and the Court of Appeals:

"The issue here [wa]s not what happened in the Orienté, more than twenty years ago
and who, if anyone, now is responsible for any wrongs then done. [The issue] instead
[wa]s whether a court decision was procured by corrupt means, regardless of whether

---

[79]

C H E V R O N   2 0 1 6   A N N U A L   R E P O R T,   a t   3 5,   *a v a i l a b l e   a t*
https://www.chevron.com/-/media/chevron/annual-report/2016/2016-Annual-Report.pdf
?l=2#page=3.

[80]

*Compare Moore v. CITGO Ref. & Chems. Co.,* 735 F.3d 309, 319-20 (5th Cir. 2013) ("The
court erred as a matter of law in relying on CITGO's "enormous wealth"—or the
comparative wealth of the parties—as a basis for reducing the cost award."), *Chapman v.
AI Transport,* 229 F.3d 1012, 1038-39 (11th Cir. 2000) (en banc) ("[W]hen awarding costs
a district court should not consider the relative wealth of the parties."), *In re Paoli R.R.
Yard PCB Litig.,* 221 F.3d 449, 468 (3d Cir. 2000) (same), *Cherry v. Champion Int'l Corp.,*
186 F.3d 442, 447-48 (4th Cir. 1999) (same), *Smith v. Southeastern Penn. Transp. Auth.,*
47 F.3d 97, 99-100 (3d Cir. 1995) ("We reject the general proposition that it is
"inequitable" to tax costs in favor of a prevailing party with substantially greater wealth
than the losing party."), *and Reed v. Int'l Union of Auto., Aerospace, & Agric. Implement
Workers Local Union No. 663,* 945 F.2d 198, 204 (7th Cir. 1991) (same), *with Ass'n of
Mexican-Am. Educators v. California,* 231 F.3d 572, 592-93 (9th Cir. 2000) (en banc).

[81]

*Moore,* 735 F.3d at 319-20.

the cause was just."[82]

Moreover, as one witness pointed out at trial, a singular irony of Donziger's misconduct is that its occurrence "probably means that we'll never know whether or not there was a case to be made against Chevron."[83] An application to review the Clerk's taxation of costs is not a proper vehicle for attempting to find out, which would entail retrying on the merits a pollution case that was corruptly litigated in Ecuador.[84] That is especially so where the application fails to comply with either the Federal Rules of Civil Procedure or this Court's rules and is unsupported by competent evidence or legal analysis. Moreover, assuming that the Court's discretion extends so far as to permit denial of taxable costs on the basis of alleged behavior extrinsic to the conduct of the litigation, the fact of the matter is that Donziger simply has not proved what he alleges only in the most conclusory of terms. And certainly the fraudulent Ecuadorian judgment cannot be taken as having established anything.

D.    *Donziger's Claim of Fraud by Chevron*

Donziger next argues that all costs should be denied to Chevron because it allegedly committed fraud, suborned perjury, and perhaps was guilty of other misconduct in connection with the testimony of Alberto Guerra. In essence, he claims that Guerra's testimony was false, at least

---

[82]

*Chevron Corp. v. Donziger,* 833 F.3d at 85 (quoting *id.* 974 F. Supp. 2d at 385-86).

[83]

974 F. Supp. 2d at 644 (internal quotation marks and footnote omitted).

[84]

"[D]isapproval of a prevailing [party's] *extrajudicial conduct* on which [other party's] claim was based is not a sufficient basis for denying costs to the prevailing" party. 10 MOORE'S FEDERAL PRACTICE § 54.101[1][b], at 54-157 (3d ed. 2017) (emphasis in original).

in material respects, and that Chevron bought and paid for the alleged perjury.  And it is true that costs may be denied to a prevailing party if the prevailing party is guilty of sufficiently serious misconduct in the course of the action.[85]  But all of the evidence concerning these charges was developed before and during the trial.  It was considered carefully and extensively in the Court's extensive findings and conclusions.[86]  And Donziger's argument fails now for several reasons.

First, as already noted, Donziger could have challenged the judgment's award of costs against him on the appeal from the final judgment but failed to do so. That failure forecloses the issue now.[87]

Second, Donziger's argument would be unpersuasive even if it were not precluded. Donziger failed to prove any misconduct, let alone any of sufficient gravity to warrant denial of costs to the prevailing party.

The crux of Donziger's argument is twofold.  *First,* he argues once again, as he did at trial, that Guerra perjured himself and now contends that Chevron suborned that false testimony.[88] *Second*, he argues that Chevron at least acted improperly in providing financial support and other economic lures to Guerra to induce him to come to the United States and to testify at trial.  But neither argument is well founded.

To begin with, this Court heard Guerra's testimony.  It heard as well the testimony

---

[85]

     *E.g., id.*

[86]

     *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 502-35.

[87]

     *See supra* Point III.A.

[88]

     *E.g.* Tr. (Opening) 35:20-36:12.

of the other key witnesses on the relevant point, Donziger and former Ecuadorian judge Zambrano. It recognized that all three were highly flawed witnesses and laid out the economic and other inducements to Guerra to come to the United States and testify.[89]  It carefully and skeptically assessed Guerra's account as well as the extensive evidence that corroborated it in many though not all respects.[90]  It declined to credit certain aspects of his testimony,[91] although it credited a good deal of it.

To the extent that the Court already has found that Guerra's testimony was credible,[92] findings by which Donziger is bound, there was no perjury and therefore no subornation.  And the fact that the Court did not credit Guerra in some particulars is of no help to Donziger.  Even if Guerra had perjured himself, as opposed to having been mistaken, in those particulars – and the Court declines to find so – the question here would be whether Chevron suborned perjury.  In order to establish subornation of perjury, Donziger was required to prove that Chevron knew or believed that Guerra's testimony would be perjurious and nevertheless induced him to commit that perjury.[93]

---

[89]

> *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 504-05, 517-18.

[90]

> *E.g., id.* at 517-20, 526-28, 534.

[91]

> *Id.* at 512-13 (declining to credit Guerra's testimony "that the alleged [corrupt] arrangement between Zambrano and the LAPs during Zambrano's first tenure on the Lago Agrio case [2009-10] existed or . . . with respect to the alleged 2009 Honey & Honey restaurant meeting" relating thereto).

[92]

> And it bears mention that Donziger did not challenge that finding on appeal as having been clearly erroneous, the relevant standard for upsetting the finding.

[93]

> *E.g., Petite v. United States*, 262 F.2d 788, 794 (4th Cir. 1959) ("[E]ssential to subornation of perjury that the suborner should have known or believed or have had good reason to believe that the testimony given would be false.") (internal quotation marks and citation

Donziger has not done so.[94]

Donziger's other argument fares no better.

To be sure, as the Court wrote previously, Guerra at the time of trial was "the beneficiary of what amount[ed] to a private witness protection program created for him by Chevron, which facilitated his relocation from Ecuador to the United States and ha[d] been supporting and assisting him since his arrival here."[95]  Chevron had paid him $48,000 for physical evidence and information it contained.[96]  In addition,

> "Fearing retaliation from the ROE, Guerra and his family (including his wife, his son, and his son's family) relocated to the United States. Chevron representatives paid for the move and, as his visa status does not allow him to work while he is in this country, Chevron pays him $10,000 per month for his living expenses, pays for health insurance coverage for Guerra and his family, leases a car for him, and pays for an attorney to represent him in any dealings with federal or state government investigative authorities or any civil litigation, and for an immigration attorney to deal with his resident status."[97]

---

omitted), *rev'd on other grounds*, 361 U.S. 529 (1960); *Ryan v. United States*, 58 F.2d 708, 710 (7th Cir. 1932) ("[T]he suborner must know or believe that the testimony of the witness about to be given will be false, and he must know or intend that the witness is to give the testimony corruptly or with the knowledge or belief of its falsity.") (quoting *Boren v. United States*, 144 F. 801, 802 (9th Cir. 1906)); 2 LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL, Instr. 48-15 (2006).

[94]

Indeed, the record establishes that Chevron went to great lengths to seek corroboration for everything that Guerra said to it and succeeded to a considerable degree. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 506-07, 509-11, 526-28, 533.  Moreover, his testimony was corroborated in important respects by admissions of both Donziger and Zambrano.  *Id.* 506, 521-22.

[95]

*Id.* at 504.

[96]

*Id.* at 517.

[97]

*Id.* at 517 (footnotes omitted).

But these arrangements would provide no basis for denying costs to Chevron even if Donziger had not forfeited the argument.

There was extensive motion practice concerning these issues prior to trial. The motions produced an extensive record, including expert affidavits concerning the ethical propriety of the participation by Chevron's lawyers in the Guerra arrangements.[98] And the bottom line of all of that motion practice was the Court's denial of all efforts to strike or preclude Guerra's testimony on the straightforward, common sense, and well established basis that:

> "'[i]t is the province of the [trier of fact] and not of the court to determine [as a matter of law] whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony.'. . . . [A]ny claims of professional or other misconduct are appropriately considered in other contexts, particularly in view of the fact that Chevron acted on the basis of substantial outside expert advice."[99]

Of course, we now consider the matter in a context distinct from whether Guerra's testimony should have been excluded. The concern, if the issue still were open to Donziger, would be whether Chevron engaged in misconduct and, if so, whether it was sufficient to warrant denial of costs. The evidence does not justify a finding of misconduct, let alone misconduct sufficient to

---

[98]
    The first round was occasioned by defendants' motions to strike Guerra's affidavit, submitted on a summary judgment motion. The relevant parts of the record with respect to that motion include DI 916, DI 930, DI 976, DI 977, DI 1029, DI 1034 and DI 1071.

    The second round came on defendants' motion dismiss the action on the ground that the Guerra arrangements alone justified such action. The relevant papers with respect to that motion include DI 1422, DI 1423, DI 1472, DI 1474, DI 1475, DI 1481 and DI 1650.

    The third was a motion to strike Guerra's trial testimony. The papers with respect to the third are DI 1640 and DI 1650. Of particular note are the expert affidavits, DI 977-4, DI 977-5, DI 977-6, and DI 1423-2, and a portion of Chevron's memorandum of law in opposition to the second motion,  DI 1474, at 1-22.

[99]
    DI 1650 (citations omitted).

warrant such a denial.

The principles that govern the propriety of Chevron's payment for the relocation of Guerra and his family from Ecuador, living expenses in the United States prior to and during trial, the many hours he spent being debriefed by Chevron counsel and preparing to testify, and legal expenses occasioned by the relocation such as the cost of immigration counsel are not in much dispute.  Donziger and the other defendants conceded before trial that a party may pay a fact witness's expenses and reimburse the witness for time lost in connection with the litigation, provided the payments are reasonable.[100]  Moreover, defendants' proffered professional responsibility expert conceded that "it is permissible for attorneys to pay expenses reasonably necessary to keep [a] witness in a safe location" "if [the] witness faces a bona fide personal safety or security risk."[101]

In this case, there was abundant evidence, which the Court credits, that Guerra's decision to cooperate with Chevron and, ultimately, to testify in this case would have exposed him and his family to serious risks to personal safety and security had they remained in Ecuador.[102]  His

---

[100]

> DI 1422, at 18-19.
>
> Indeed, while the New York Rules of Professional Conduct prohibit offering witnesses inducement or compensation, "contingent upon the content of the witness's testimony or the outcome of the matter," that same rule allows a lawyer to "advance, guarantee or acquiesce in the payment of . . . reasonable compensation to a witness for the loss of time in attending, testifying, preparing to testify or otherwise assisting counsel, and reasonable related expenses." N.Y. R. PROF'L CONDUCT 3.4(b); *see also* N.Y. Comm. of Prof'l Ethics, Op. 668 (1994) (concluding the same under prior law); N.Y. Comm. of Prof'l Ethics, Op. 962 (2013) (reimbursement of travel expenses is reasonable).

[101]

> DI 1423-2 ¶ 7; *accord,* DI 1422, at 27.

[102]

> The facts are marshaled, among other places, in Chevron's memorandum in opposition to defendants' motion to impose termination sanctions.  DI 1474, at 8-10, 13-18 (citing evidence in the record).

decision to testify effectively forced him to become an exile from his native country.  The Court finds that Chevron's payments for relocating the Guerras to this country, for legal counsel to deal with immigration issues, and for living expenses (particularly in light of the fact that his immigration status barred employment) were reasonable in object and in amount.  It was permissible also to compensate him within reason for time he spent being interviewed repeatedly by Chevron counsel and preparing to testify, and no more was done.[103]  There is no evidence that any of these payments was conditioned upon the substance of Guerra's testimony or contingent on the outcome of this case.  The evidence of record establishes no misconduct in these respects.

So far as the payments for physical evidence are concerned, defendants' proffered professional responsibility expert conceded that "[l]awyers may pay reasonable costs to gather documents and other physical evidence from various sources" and for physical evidence itself.[104]  He went on to contend, however, that payments for physical evidence that exceed the replacement cost of the physical articles themselves – and thus reflect the value of the information they contain

---

[103]

American Bar Association, Standing Comm. on Ethics and Prof. Responsibility, Formal Opinion 96-402 (August 2, 1996) ("[A] lawyer, acting on her client's behalf, may compensate a non-expert witness for time spent in attending a deposition or trial or in meeting with the lawyer preparatory to such testimony, provided that the payment is not conditioned on the content of the testimony . . . .").  No distinction is drawn between compensation for "time spent in actually attending a deposition or trial," "time spent in pretrial interviews," and "time spent in reviewing and researching records that are germane to his or her testimony."  *Id.*  The Committee goes on to explain that the amount of compensation must be "reasonable," and that for a witness who is retired or unemployed, "reasonable" compensation is determined by the "value of the witness's time based on all relevant circumstances."  *Id.*

[104]

DX 1423-2, ¶¶ 8-9.

or reflect – are improper *per se.*[105]

To be sure, the Court understands the concern that motivated the defendants' witness's qualification – payments for information in a given case could edge along the spectrum in the direction of payments for testimony. But the assertion that any payment beyond the replacement cost of a piece of physical evidence inherently is unethical was entirely unsupported by any citation of authority. Chevron's expert, on the other hand, provided an extensive, well reasoned, and well supported opinion in which he said that Chevron's counsel appropriately could pay Guerra "solely for the information in his possession, so long as that payment [was] a fixed sum not in any way contingent on his testimony or the outcome of the litigation; the witness makes no promise to testify in return for the payment; and no future payment [would] be made to the witness for his testimony other than legally and ethically permitted payment for expenses incurred in connection with testifying."[106]

In the last analysis, the Court need not resolve this abstract disagreement between experts. The relevance of misconduct by a prevailing party with respect to taxation of costs is that misconduct may be an equitable factor that, in a proper case, could warrant departure from the presumption that the prevailing party is entitled to recover costs. In this case, any undue aggressiveness with respect to the payment for physical evidence, and the Court makes no finding of any impropriety, would not warrant such a departure for a host of reasons:

- Donziger's behavior in this litigation was outrageous and, in many respects,

---

[105]

    *Id.* ¶ 10.

[106]

    DI 977-4, ¶ 6.

far beyond the bounds of propriety.  Among other things, he wilfully, deliberately disregarded a court order to produce relevant documents located in Ecuador but nonetheless under his practical control.[107]  He deliberately testified falsely at an evidentiary hearing on Chevron's motion for sanctions.[108]  And he falsely testified that he lacked recollection in response to nearly 300 questions at his deposition in this case and on cross-examination at trial.[109] He has no claim to a favorable exercise of discretion based on what was no more than a perhaps arguable departure long before the trial that ultimately had no effect on the case.

- Chevron fully disclosed all of its payments and other arrangements with Guerra.  There most assuredly was no concealment or fraud.[110]

- Chevron relied on extensive expert advice with respect to its dealing with Guerra and acted in the good faith belief that its actions were proper.[111]

---

[107]

*Chevron Corp. v. Donziger,* 296 F.R.D. 168, 187, 190-96, 210-12, 216-19 (S.D.N.Y. 2013).

[108]

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 524-25.

[109]

*Id.* at 525-26.

The Court does not take into account his false protestations of lack of memory in his deposition in the 1782 proceeding or his obstruction of justice, witness tampering, and other misconduct in related cases, as it considers only misconduct in this action for purposes of striking an equitable balance with respect to costs. *See Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 722 (10th Cir. 2000).

[110]

DI 755-14.

[111]

DI 977-4.

- Chevron even disclosed the facts concerning its interactions with Guerra to the U.S. Department of Justice long before calling Guerra at trial.[112]

No more need be said.

### E.    The Forfeiture Argument

Finally, Donziger argues that Chevron has forfeited the right to recover, whether by taxation of costs or otherwise, the fees and expenses of the special masters because it failed to make a timely motion as supposedly required by the Court's July 9, 2013 order.[113]  In order to place his argument in context, it is necessary to set out the procedural history.

---

[112]

DI 977-6, ¶ 6.

[113]

Donziger does not here challenge the appointment of the special masters or the hourly rates fixed for their compensation.  While he objected to the appointments before trial, he could have pressed that point, as well as objecting to the hourly rates which also were fixed well before trial, on appeal from the final judgment.  *See generally* 15A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS 2D § 3905.1 (2d ed. 2017). That was so because  (1) the final judgment, as we have seen, awarded costs against the defendants, and (2) the fees and expenses of the special masters, as we shall see in more detail, are taxable as costs.  *E.g., Chemical Bank & Trust co. v. Prudence-Bonds Corp. (New Corp.),* 207 F.2d 67, 78, 82 (2d Cir. 1953); *Aird v. Ford Motor Co.,* 86 F.3d 216, 220-22 (D.C. Cir. 1996); *Studiengellschaft Kohle mbH v. Eastman Kodak Co.,* 713 F.2d 128, 134 (5th Cir. 1983); LOCAL CIV. R. 54.1(c)(8) ("Fees of masters . . . are taxable as costs, unless otherwise ordered by the Court.") Accordingly, any challenge to the appointments and the  hourly rates would be precluded by Donziger's failure to raise any such issues on the appeal from the final judgment.  *Supra* Point III.A.

    *1.      The July 9, 2013 Order and the Special Master Bills*

For reasons well documented in the extensive record,[115] the Court appointed two special masters to coordinate discovery, to preside at or otherwise supervise depositions, to rule on objections, and to direct, supervise, monitor, and report upon implementation of the Court's discovery orders.[116] It directed that the cost of the special masters be advanced on a 50-50 basis, with plaintiffs paying one half and Donziger and the LAP Representatives paying the other, subject to later reallocation in accordance with Rule 53(g) of the Federal Rules of Civil Procedure (the "First Orders").[117]

        Donziger and the other defendants refused to comply with the Court's orders to advance their half of the costs.[118]  Accordingly, the Court, by a July 9, 2013 order (the "Second Order"), directed Chevron to "advance" 100 percent of the special masters' compensation on an interim basis, but afforded it the right to seek an allocation of any part of the funds thus advanced by it to one or more defendants and to recover any portion so allocated.  Any such application, the

---

[115]

        *See, e.g.*, DI 865 (referring to parties' proposal to take at least 42 depositions in a relatively short period, the extreme contentiousness of counsel, deposition misconduct by Donziger and counsel for him and the LAP Representatives in a related prior litigation, defendants' obstructive and disruptive actions in this case, the possibility that important depositions in this case would occur outside the United States and require effective and timely supervision, and the high likelihood that many claims of privilege would be asserted, including during depositions outside New York and the United States, making prompt rulings essential to proper progress of this case).

[116]

        *Id.*; DI 942.

[117]

        DI 942.

[118]

        DI 1204.

        They asserted inability to pay but never documented any such thing.  *E.g.*, DI 1293, at 2-3.

Court directed, was to be made no later than 14 days after the submission of the special masters'

"final billings."[119]  In response to defendants' contention that they were entitled to know the amount

of the costs that could be imposed upon them, the Court stated that they would have that opportunity

"at such point as Chevron seeks an order requiring them to pay all or part of the costs that it

[Chevron] will advance pursuant to this order."[120]

      The special master bills that were submitted in support of the bill of costs were

rendered in July, August and September 2013 and covered varying periods ending no later than

August 31, 2013 and in some cases earlier.[121]  In accordance with the Order, the funds to pay them

were advanced by Chevron.  All of the bills are attached to Chevron's bill of costs.[122]

      Chevron did not move for an allocation of any part of the funds it had advanced

within 14 days after receipt of the last of the invoices included in the bill of costs it filed in late 2016.

Donziger argues that Chevron thus forfeited any right to recover any part of the money it advanced,

even via taxation of costs at the conclusion of the case.  This argument is unpersuasive for several

---

[119]

    DI 1287.

[120]

    *Id.* at 3.

[121]

    DI 1928-3, Exh. 7. Special Master Katz's bill covered the period March 26 through July 25, 2013.  Special Master Gitter's bill covered his services for the period March 26 through June 30, 2013.  Two Cleary Gottlieb bills, which covered disbursements and the services of the associate who assisted both special masters, covered the period March 26 through August 31, 2013.

[122]

    The bill of costs contained copies of the bills rendered by the special masters, Mr. Gitter and former magistrate Judge Katz, and the Cleary Gottlieb firm, which provided them with the services of one assistant and various other items billed as disbursements.  Mr. Katz's bills contained detailed time records for all of his services.  Those rendered by Mr. Gitter, a retired Cleary partner, and Cleary showed the hours worked and the rates charge but not detailed time records.  *Id.*

reasons.

      2.    *Analysis*

      The starting point for this discussion is three straightforward propositions.  The first is that Rule 53, which governs special masters, empowers a court to provide interim compensation for special masters, subject to reallocation of those expenses at the end of the case.[123] The second is that Local Civil Rule 54.1(c)(8) and Federal Rule 54(d)(1) contemplate taxation of the compensation and expenses of special masters as costs at the conclusion of a case.[124]  Moreover, the local rules of this Court, consistent with Federal Rules 53(g)(3) and 54(d)(1), provide that costs will not be taxed prior to the entry of final judgment and, if an appeal is taken, prior to the conclusion of the appellate process.[125]  The 14 day time limit in the Second Order must be considered against this background.

      As the foregoing suggests, and as the First and Second Orders made clear by referring to reallocation in accordance with Rule 53(g)(3), those orders provided only for the payment of the special masters during the interim between their appointment and the conclusion of the appellate process.

      It was in that context that the Second Order, which required Chevron to "advance" 100 percent of these expenses rather than to pay the 50 percent set out in the First Orders, gave

---

[123]

      Fed. R. Civ. P. 53(g)(3) ("An interim allocation may be amended to reflect a decision on the merits.").

[124]

      Local Civ. R. 54.1(c)(8) provides that "[f]ees of Masters . . . are taxable as costs."  Fed. R. Civ. P. 54(d)(1) provides for taxing costs in favor of the "prevailing party."

[125]

      Local Civ. R. 54.1(a).

Chevron on option with respect to those interim advances – half the amount of which was necessitated by Donziger and the LAP Representatives' disregard of the Court's orders and refusal to pay.  The Second Order gave Chevron the option, but not the obligation, to move to recover on an interim basis any or all of the funds it advanced to cover Donziger and the LAP Representatives' share without waiting either for the ultimate reallocation of those expenses under Rule 53(g) or the taxation of costs at the conclusion of the case and any appeals.

Donziger nevertheless argues in substance that Chevron lost the right to seek to impose *any part* of the *ultimate liability* for the special masters on him by failing to move to change the *interim responsibility* to advance costs pending a determination of the ultimate liability.

Donziger's argument makes little sense.  Nothing in the Second Order impaired Chevron's rights under the Order of Appointment of the Special Masters,[126] Rule 53(g)(3), Rule 54(d), and Local Civil Rule 54.1 to seek to impose all or part of the fees and expenses of the special masters on the defendants at the conclusion of the litigation.  In fact, Rule 53(g)(3) expressly states that "[a]n interim allocation may be amended to reflect a decision on the merits."[127]  The fact that Chevron did not avail itself of the option afforded by the Second Order with respect to interim payment did not foreclose its effort to recover all or part of what it had paid at the conclusion of the litigation.

\*   \*   \*

In sum, none of Donziger's arguments for review of the Clerk's taxation of costs has

---

[126]

DI 942.

[127]

*Accord,* 9 MOORE'S FEDERAL PRACTICE § 53.52[2], at 53-123 (3d ed. 2017) (collecting cases).

merit.  The contention that the Clerk was obliged to hold the matter of costs in abeyance is frivolous.
All or substantially all of his arguments could be rejected on the ground that he disregarded court
rules in seeking review of the Clerk's actions.   Even if the Court were to reach the merits
notwithstanding that procedural default, the arguments would fail:

- Several are foreclosed because Donziger failed to raise them on direct appeal although they were available to him there.

- Donziger's claim of limited means is unproven and in any case would be insufficient.

- The disparity in resources between Donziger and Chevron is not an appropriate consideration and, in any case, would be rejected by the Court on the facts of this case.

- Chevron's alleged pollution of the Ecuadorian rain forest is extraneous to this litigation, therefore has no bearing on taxation of costs, and in any case is unproven.

- While misconduct by a prevailing party in some circumstances may warrant denial of costs, no such thing has been proved here.  In any case, Donziger has no equitable claim on a favorable exercise of the Court's discretion on this basis given his own, far more serious misconduct in this litigation.

- Donziger's forfeiture argument is without merit.

IV.      *The Ultimate Apportionment and Taxation of Costs*

So what remains to be determined?

The foregoing rulings require denial of Donziger's motion insofar as it seeks review of the Clerk's taxation of costs for service fees, court reporter fees and translation costs, a total of $72,076.22.  The rulings of December 6 and 27, 2017[128] require rejection also of any claims with respect to the reasonableness of the amounts taxed for special master expenses.  What remains, then, is whether some adjustment of the costs taxed for the special master expenses is warranted, whether under Rule 53(g)(3) or otherwise, notwithstanding Donziger's procedural default in bringing the motion.

### A.    General Principles

Rules 53(g)(3)and 54(d) afford district courts a modicum of discretion with respect to the imposition of expenses of special masters in particular and taxable costs generally, respectively.[129]

The pertinent factors mentioned in Rule 53(g)(3) are "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to the master."[130]  But "whether a party prevails in a case is probably the most important factor that the courts have historically considered in allocating the responsibility of

---

128

       DI 1940, DI 1946.

129

       As noted above, LOCAL CIV. R. 54.1(c)(8) provides that special master compensation is a taxable cost, which is consistent with established practice.  9 MOORE'S FEDERAL PRACTICE § 53.52[4] (3d ed. 2017).

130

       FED. R. CIV. P. 53(g)(3).

paying a master's compensation."[131]

Rule 54(d) differs somewhat.  As previously noted, it "creates a presumption that the district court will award the prevailing party costs."[132]  Any departure from that presumption must be explained, and the explanation must be sufficient to justify the result.[133]  Moreover, as discussed in Point III, none of the arguments advanced by Donziger warrants such a departure.  Nevertheless, we pause to consider whether the factors enumerated in Rule 53(g)(3) suggest some variance here.


B.     *The Need for and Demands Upon the Special Masters and Their Proposed Allocation*

The record in this case reflects the reasons for the appointment of the special masters, which included anticipated difficulties with Donziger and the other defendants based on experience in prior related litigation.[134]  It reflects also a great deal of very important work they did – work far beyond what could have been demanded of a magistrate judge who would have been subject to the competing demands of many other assigned cases.[135]  Nevertheless, the Court did not feel itself to be fully informed with respect to the extent to which the demands upon the special masters were occasioned disproportionately and unreasonably by one side or the other.  Accordingly, it requested

---

[131]
    9 MOORE'S FEDERAL PRACTICE § 53.52[3] (3d ed. 2017).

[132]
    *Supra* n.60.

[133]
    *Whitfield*, 241 F.3d at 270 (citing *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 459 (10th Cir. 1995)).

[134]
    DI 865.

[135]
    *See, e.g.*, DI 1942, at 3-6.

a recommendation from the special masters concerning the appropriate apportionment of the costs of their services, taking into account the nature and amount of the controversy and the extent to which any party was more responsible than others for the reference and for the need for their services.[136]

The masters recommended ultimately that defendants, jointly and severally, be taxed 85 percent of the masters' costs and fees and that the remaining 15 percent be taxed to Chevron.[137] This recommendation was based on their experience supervising the parties, and the masters' report chronicles the "Herculean effort" that the supervision required.[138]  Such an effort was necessitated by the parties' – most often, defendants' – obstructive behavior in connection with scheduling, frivolous and repetitious assertions of privilege, and unwillingness to accept prior rulings.[139]

The masters highlighted, as an example, one occasion in which Donziger changed his position regarding a scheduling issue twice in the course of five days.[140]  He moved first for a two-week delay of all depositions and other discovery deadlines, occasioned by the withdrawal of Keker

---

[136]

DI 1939.

The Court did not ask the special masters to address the parties' means, as the Court, although not the special masters, had extensive knowledge of the prior proceedings bearing on that issue

[137]

DI 1942.

[138]

*Id.* at 8.

[139]

*Id.* at 9-12.

[140]

*Id.* at 8.

& Van Nest LLP and Smyser & Veselka, LLP.[141]  He then moved for a three-month delay instead of the initial request for two weeks.[142]  But after the Court granted his request for a two-week extension (though not for three months), Donziger the next day proposed to the Special Masters that depositions proceed immediately.[143]  This issue alone called for the masters to convene multiple conference calls, participate in a court hearing, prepare an interim report, and issue four written orders.[144]  And this is but one example of Donziger's behavior turning "basic matters like scheduling" into tasks requiring many hours of work.[145]

The report includes also examples of Donziger's frivolous assertions of privilege during depositions (objections that "turned the Guerra deposition from seven hours of testimony into a 10 ½-hour day"[146]) and stubborn insistence on relitigating prior final rulings ("Mr. Donziger opened the morning of the second day of his deposition by complaining about [the Court's] orders in relation to [the Special Masters'] fees and about the length of his deposition, all of which had already been the subject of prior orders."[147]).

---

[141]

DI 1168.

[142]

*See* DI 1185, at 2.

[143]

*See* DI 1189, at 1.

[144]

DI 1942, at 8.

[145]

*Id.*

[146]

*Id.* at n.9.

[147]

*Id.* at 11-12 (citation omitted).

But blame does not fall on Donziger alone. Chevron too occasionally was recalcitrant, "tr[ying] to take advantage of [the Special Masters'] presence to relitigate issues that had already been decided."[148]   Nevertheless, the Special Masters saw a difference between Donziger's "staggeringly uncooperative" behavior that, they believe, was an attempt to prevent the truth from coming to light, and Chevron's more legitimate – if still "overzealous" – attempts to shield witnesses from the burdens of lengthy depositions.[149]  In sum, the Special Masters concluded that defendants' behavior was responsible for most, but not all, of the many hours spent supervising this litigation.

The report sheds significant light on the issue of the question of the allocation of fees. And, as noted above, the Court adopted the special masters' findings in the absence of timely objection from Donziger.

C.      *Analysis*

I begin with the presumption created by Rule 54(d)(1), that costs are awarded to the "prevailing party."[150]  Knowing nothing about this litigation except that Chevron prevailed, it would be appropriate to tax 100 percent of the costs against defendants as a matter of course.  But doing so is not mandatory – the decision whether to tax costs "rests within the sound discretion of the

---

148    *Id.* at n.10, n.12.

149    *Id.* at 15 and n.12.

150    *See Whitfield*, 241 F.3d at 270 ("[B]ecause Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule obtaining in civil litigation, not an exception.").

district court."[151]

      There are, of course, reasons that a court may decline to award costs in favor of the prevailing party: for example, "misconduct by the prevailing party, the public importance of the case, the difficulty of the issues, or the losing party's limited financial resources."[152]  But Donziger has done little to warrant a favorable exercise of equitable discretion, whether based on these reasons or otherwise.

      The issue of Donziger's financial resources is discussed in Point III.B.  The Court's conclusions there apply here as well: Donziger has not demonstrated a lack of resources that would warrant relief here.  Public importance and the difficulty of the issues provide little guidance here. The Advisory Committee's notes say that "parties pursuing matters of public interest . . . may deserve special protection."[153]  This litigation was about allegations that a court decision was procured by corrupt means, *not* about what happened to the Ecuadorian rainforest.[154]  Hence, this was not a case brought in the public interest in any sense that would warrant relieving Donziger from taxation of costs.  And difficulty of issues provides no reason to disturb the presumption that costs should be taxed in favor of the prevailing party.  Finally, as to misconduct, all or virtually all of it is attributable to Donziger and the other defendants.

---

[151]

    *E.g.*, *Broadspring, Inc. v. Nashed*, 693 F. App'x 13, 15 (2d Cir. 2017) (quoting *Dattner v. Congraga Foods, Inc.*, 458 F.3d 98, 100 (2d Cir. 2006)).

[152]

    *Whitfield*, 241 F.3d at 270.

[153]

    FED. R. CIV. P. ADVISORY COMMITTEE NOTES, 2003 Amendments, Subdivision (h).

[154]

    *Supra* Point III.C.

In addition to the behavior detailed by the special masters in their report and summarized in Point IV.B above, Donziger engaged in repeated misconduct throughout this litigation.  One major category of misconduct was his refusal to produce to Chevron documents that were physically located in Ecuador.[155]  Donziger argued in response to Chevron's motion to compel production of the documents that he was unable to obtain those documents from the Ecuadorian legal team.[156]  He did so despite "overwhelming evidence" that he controlled the Lago Agrio litigation and after having made no "serious attempt" to get the documents from the Ecuadorian lawyers.[157]  Donziger's refusal to produce documents that were in his practical control  accords with the Special Masters' assessment of his behavior: he was "trying to prevent the basic facts coming to light."[158]

Donziger's history of misconduct in this litigation means that he has no substantial claim on the Court's exercise of its equitable discretion in his favor.  But there is more to consider here.  Rule 53(g)(3) instructs that special masters' fees must be allocated with consideration given to "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."  These factors – especially the third – considered in combination with other equitable principles lead to the conclusion that the masters' proposed 85/15 split of their fees is appropriate.

The nature and amount of the controversy and the parties' means have been discussed

---

155

*Chevron Corp. v. Donziger, et al.*, 296 F.R.D. 168, 176-77 (S.D.N.Y. 2013).

156

*Id.* at 195.

157

*Id.* at 195, 218.

158

DI 1942, at 15 n.12.

already, and the conclusion that these factors do nothing in defendants' favor stands.  This leaves the parties' respective responsibility for the reference to the special master.  The reference, of course, was requested by Chevron.[159]  It was granted in light of Donziger's history of difficult behavior in other, prior litigation and in this case.[160]  So, although it was Chevron that initially requested the masters over Donziger's protests, it is fair to say that Donziger was significantly responsible for the reference.

Broadening the scope of the question to consider whose behavior was more responsible for the substantial amounts of time and work devoted to this litigation by the special masters confirms Donziger's responsibility for a large bulk of the many hours the masters spent overseeing discovery.  The masters' report, which is summarized in Point IV.B and which the court adopted,[161] describes the basis for the masters' conclusion on this point: that Donziger's obstructive conduct "continued unabated during discovery" and "unnecessarily increased the costs of the proceedings."[162]  Their conclusion is supported by an independent review of the record, which contains numerous instances of the masters spending time dealing with Donziger's behavior, such as addressing last minute, frivolous or repetitive requests.[163]

Given the Court's discretion to decline strict application of the Rule 54 presumption

---

[159]

DI 865.

[160]

*Id.* at 1.

[161]

DI 1946.

[162]

DI 1942, at 15.

[163]

*E.g.*, DI 1272.

49

when considering special masters, it is appropriate in this case to tax 85 percent of the special master

costs against Donziger and other the other defendants, jointly and severally, with the remaining 15

percent taxed to the plaintiffs.


*Conclusion*

For the foregoing reasons, Donziger's motion to review the taxation of costs is

granted to the extent that the amount taxed for special master expenses is reduced to $741,526.49

and denied in all other respects. A supplemental judgment in the amount of $813,602.71 shall be

entered.

SO ORDERED.

Dated:          February 28, 2018

_____
Lewis A. Kaplan
United States District Judge