# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| CHEVRON CORPORATION, | : |
| Plaintiff, | : |
| v. | :    11 Civ. 0691 (LAK) |
| STEVEN DONZIGER, *et al.*, | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS EX PARTE APPLICATION BY ORDER TO SHOW CAUSE FOR DISCOVERY AND A PRESERVATION ORDER IN FURTHERANCE OF THIS COURT'S MARCH 4, 2014 JUDGMENT AND TO SET A HEARING DATE SUBSEQUENT TO THAT DISCOVERY ON CHEVRON'S APPLICATION TO HAVE STEVEN DONZIGER HELD IN CONTEMPT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................. 1

I.      FACTUAL BACKGROUND ..................................................................................... 5

    A.      Donziger's Ongoing Attempts to Monetize and Profit From the Ecuadorian Judgment ........................................................................................................ 5

    B.      Donziger's Monetization of His Involvement in the Ecuador Litigation, His Diversion of Litigation Funds for His Personal Benefit, and the Formation of Amazonia to Keep any Judgment Proceeds "Out of Ecuador" ............................. 7

II.     ARGUMENT .......................................................................................................... 10

    A.      Legal Standard ................................................................................................ 10

    B.      Chevron Has Established That Donziger Is in Contempt. ...................................... 11

        1.      Donziger Has Violated the Judgment's Command That He Transfer His Amazonia Shares to Chevron ................................................................ 12

        2.      Donziger and His Co-Conspirators Have Violated, and Likely Continue to Violate, the Judgment's Prohibition of Acts to "Monetize or Profit From" the Corrupt Ecuadorian Judgment ................... 14

    C.      A Preservation Order and Post-Judgment Discovery Are Necessary to Determine the Full Extent of Donziger's Violations of the Judgment and Ensure Compliance .......................................................................................... 16

    D.      Coercive Sanctions Are Appropriate to Ensure Compliance With the Judgment ....................................................................................................... 18

III.    CONCLUSION ...................................................................................................... 19

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Application of Chevron Corp.*,
    736 F. Supp. 2d 773 (S.D.N.Y. 2010)........................................................................17

*In re Application of Chevron Corp.*,
    No. 1:10-mc-00002, ECF No. 147 (Jan. 10, 2011)..................................................16

*In re Application of Chevron Corp.*,
    No. 1:10-mc-00002, ECF No. 171 (Jan. 21, 2011)....................................................1

*In re Application of Hornbeam Corp.*,
    No. 14 Misc. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) ...........................17

*Avant Capital Partners, LLC v. Strathmore Dev. Co. Michigan, LLC*,
    703 F. App'x 362 (6th Cir. 2017) ...........................................................................11

*Ayyash v. Bank Al-Madina*,
    233 F.R.D. 325 (S.D.N.Y. 2005) .......................................................................10, 17

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
    814 F.3d 91 (2d Cir. 2016)......................................................................................10

*Chevron Corp. v. Donziger*,
    296 F.R.D. 168 (S.D.N.Y. 2013) ............................................................................10

*Chevron Corp. v. Donziger*,
    833 F.3d 74 (2d Cir. 2016), *cert. denied*, No. 16-1178, 2017 WL 1198372
    (U.S. June 19, 2017) .............................................................................................7, 11

*Chevron Corp. v. Donziger*,
    No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017)...........................................11

*Energy Capital Co. v. Caribbean Trading and Fidelity Corp.*,
    No. 93 Civ. 8100, 1994 WL 698210 (S.D.N.Y. Dec. 13, 1994)..............................16

*Exports v. Lee*,
    No. 95 Civ. 8082, 1996 WL 631718 (S.D.N.Y. Oct. 31, 1996) ..............................17

*Fujitsu Ltd. v. Federal Exp. Corp.*,
    247 F.3d 423 (2d Cir. 2001).....................................................................................16

*Handwerker v. AT&T Corp.*,
    211 F.R.D. 203 (S.D.N.Y. 2002) .............................................................................13

Gibson, Dunn &
Crutcher LLP

## TABLE OF AUTHORITIES

Page(s)

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2d Cir. 1995)................................................................................................12, 14

*Motorola Credit Corp. v. Uzan*,
    73 F. Supp. 3d 397 (S.D.N.Y. 2014)........................................................................................11

*N.A. Sales Co. v. Chapman Indus. Corp.*,
    736 F.2d 854 (2d Cir. 1984)................................................................................................10, 18

*N.Y. State Nat'l Org. for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)....................................................................................................10

*Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.*,
    369 F.3d 645 (2d Cir. 2004)......................................................................................................11

*S.E.C. v. Oxford Capital Sec., Inc.*,
    794 F. Supp. 104 (S.D.N.Y. 1992)......................................................................................10, 18

*State of N.Y. v. Shore Realty Corp.*,
    763 F.2d 49 (2d Cir. 1985)........................................................................................................4, 15

*Utica Coll. v. Gordon*,
    389 F. App'x 71 (2d Cir. 2010) ................................................................................................13

**Rules**

Fed. R. Civ. P. 70(e) ....................................................................................................................10

Local Civil Rule 6.1(d) ................................................................................................................10

## PRELIMINARY STATEMENT

Steven Donziger is in knowing, serial contempt of this Court's March 4, 2014 judgment ("Judgment").  The evidence currently in Chevron's possession demonstrates this beyond question, and at the same time it indicates a high likelihood that Donziger has engaged in other acts of contempt that are presently unknown.  Accordingly, Chevron here seeks leave to conduct post-judgment discovery of Donziger and those acting in concert with him, as well as issuance of a document preservation order, in order to uncover the full extent of Donziger's violations.  Donziger's long record of obstruction and concealment is recounted in this Court's March 1 corrected memorandum opinion.  *See, e.g.*, Dkt. 1963 at 33.  Donziger's "outrageous" behavior required this Court to order him to produce his computer hard drives (s*ee In re Application of Chevron Corp.*, No. 1:10-mc-00002, ECF No. 171 (Jan. 21, 2011)), and to sanction him for refusing to produce documents he controlled overseas (*see, e.g.*, *Chevron Corp. v. Donziger*, 296 F.R.D. 168 (S.D.N.Y. 2013)).  Chevron here proceeds *ex parte* to ensure that Donziger and those acting in concert with him do not destroy or divert evidence confirming their contempt.  Any other relief sought in conjunction with contempt proceedings would, of course, be on the public record after Donziger has an opportunity to be heard.

Even on the present record, however, Donziger's contempt is clear, and a hearing date should be set now, to occur after discovery is completed, on Chevron's application to have Donziger held in contempt for violating this Court's Judgment in multiple respects.  The Judgment enjoins Donziger from "undertaking any act[] to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging or encumbering any interest therein."  Dkt. 1875 ¶ 5.  The Judgment also requires Donziger to "execute in favor of Chevron a stock power transferring to Chevron all of his right,

title and interest in his shares of Amazonia," a Gibraltar entity organized to collect and disburse—and keep out of Ecuador—the proceeds from the corrupt Ecuadorian judgment. *Id.* ¶ 3; PX 4900 (Dahlberg Direct) ¶ 14.[1]  Despite the Judgment's express provisions, Donziger refuses to transfer his Amazonia shares to Chevron, and he is actively conspiring to monetize and profit from the fraudulent Ecuadorian judgment by offering to sell, assign, pledge or encumber interests in New York City, among other places.

Donziger's contemptuous actions are deliberate and intentional.  He expressly acknowledged that he understood that "this Court's order . . . require[s] [him] to transfer *forthwith* 'all of his right, title, and interest' in Amazonia Recovery Limited," when he sought "emergency" relief from that provision in March, 2014.  Dkt. 1888 at 19 (quoting Dkt. 1875 ¶ 3) (emphasis added). Yet, nearly four years later, Donziger continues to flout the Court's directive.

At the same time that he refuses to transfer his shares in Amazonia to Chevron as ordered, Donziger is actively trying to monetize and profit from the fraudulent Ecuadorian judgment.  Chevron has obtained evidence that he has been soliciting funding by offering interests in the judgment to litigation funders in New York as recently as January 2018.  Marketing himself as "the architect of successfully winning" the Ecuador judgment, on November 6, 2017, Donziger met in person with a funder in New York requesting money to continue the extortionate litigation against Chevron in exchange for an interest in any proceeds realized from the foreign enforcement of the judgment.  Declaration of Randy M. Mastro ("Mastro Decl.")), Exhibit 2 (Declaration of Lee Grinberg ("Grinberg Decl.")) ¶¶ 4-5.  In the words of the potential funder with whom he met, Donziger "inquired whether Elliott would provide him with funds . . . in ex-

---

[1]  The Court's April 25, 2014 order amended the Judgment "solely pending the determination of the appeal in this case" to require Donziger to transfer his Amazonia shares to the Clerk of the Court.  Dkt. 1901 at 32.  Donziger did not transfer his shares to the Clerk of the Court as ordered and this amendment has become moot as there is no further right of appeal in this matter.

change for an interest in proceeds that may result from enforcement of the Ecuadorian judgment." *Id.* ¶ 6.

Underscoring his consciousness of the illicit nature of his actions, Donziger asks potential funders to sign a non-disclosure agreement so that he can "speak freely" (Grinberg Decl., Ex. 1) with them in attempting to monetize and profit from the fraudulent Ecuadorian judgment. And while Donziger's attempt to profit from and monetize the judgment in this most recent instance was unsuccessful, his solicitation by itself violates this Court's injunction. Moreover, in an email to the potential funder, Donziger referred to a "packet of materials" that he "generally send[s]" when soliciting investment in the fraudulent judgment, indicating that the acts of contempt shown here are likely just the tip of the iceberg. *Id.*, Ex. 4. In order to expose the extent of his contemptuous activity and to determine whether he has succeeded in profiting from the Judgment contrary to the injunction, Chevron requires immediate discovery from Donziger and the newly revealed third-parties involved.

Separate and apart from the profit that Donziger would reap as the owner of the largest single contingency interest in the corrupt judgment, the recently discovered funding solicitation documents also disclose other mechanisms by which Donziger is likely profiting from the Ecuador litigation in violation of the Judgment, which also justify further discovery. In his 2013 review of Donziger and the LAPs' fundraising scheme, Chevron's expert, while not able to conduct a full audit (Dkt. 1963 at 19 n.66), was able to trace only about $16 million out of the approximately $33 million raised. *Id.* at 23 n.74. And of that amount, Chevron proved that Donziger paid himself "salary" in excess of $1.3 million, and that he repeatedly deposited litigation funds into his personal accounts. Discovery is thus necessary to account for how Donziger has deployed infusions of new litigation funds and to uncover whether he has continued a pattern

and practice of using such funds for personal benefit and enrichment.  *See id*. at 19 n.66 ("[T]here was nothing resembling an accurate picture of Donziger's financial situation at the time of trial nor even reliable assessment of how much of the millions of dollars he raised went into and remained in his own pocket.").

Donziger is subject to this Court's jurisdiction and had a lawful judgment entered against him after a full trial on the merits.  It is well established that this Court has the power to enforce compliance with its Judgment through contempt and to enter related discovery and preservation orders.  *See, e.g.*, *State of N.Y. v. Shore Realty Corp.*, 763 F.2d 49, 53 (2d Cir. 1985) ("The District Court had ample authority to issue [discovery orders] necessary for the enforcement of its [injunction] order.").  Based on Donziger's latest acts of contempt, evidence suggesting other contemptuous acts by Donziger that require further inquiry through discovery, and his long history of obstruction, disregard of lawful Court orders, and witness and document tampering—all of which indicate a high risk of document destruction and further witness tampering—Chevron moves for limited *ex parte* relief by order to show cause to authorize this targeted discovery and to require preservation of evidence in the interim.  Chevron therefore respectfully requests that the Court (1) grant *ex parte* an order requiring Donziger, as well as any other person or entity acting at his direction or in concert with him, to preserve and maintain within the U.S. any and all documents or evidence relating to the Judgment or compliance therewith; (2) authorize Chevron *ex parte* to serve post-judgment discovery on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the Judgment, following an appropriate period of time for Chevron to conduct the requested discovery.

## I.   FACTUAL BACKGROUND

**A.    Donziger's Ongoing Attempts to Monetize and Profit From the Ecuadorian Judgment**

Donziger has boasted on camera that he is in "[t]he business of getting press coverage as part of a legal strategy … [t]o make f—ing money."  Dkt. 1874 at 260.  He has obtained tens of millions of dollars for this "business" from a wide variety of investors, and he continues to seek billions more through settlement or enforcement of the corrupt Ecuadorian judgment.  Despite this Court's entry of the RICO Judgment against him, Donziger's efforts to profit from and monetize the Ecuadorian judgment continue unabated.  Chevron has learned that, in November 2017, Donziger and an associate met with representatives of the hedge fund Elliott Management Corporation in Elliott's New York office to offer an interest in proceeds from the fraudulent Ecuadorian judgment as the basis for a "strategic capital partnership."  The documents that Chevron has discovered to date indicate the following:

On November 3, 2017, Jonathan Bush, who is CEO, president, and a director of athenahealth, Inc., a NASDAQ listed healthcare technology company headquartered in Watertown, Massachusetts, sent an email from his athenahealth business email account to Elliott entitled, "Chevron Deal," introducing Katie Sullivan and stating that he was "[l]ooking forward to hearing what you think."  Mastro Decl., Ex. 3.  Ms. Sullivan is the founder and president of Streamline Family Office, Inc., a private financial advisory firm based in Dover, Massachusetts.  Grinberg Decl., ¶ 2.  She followed up with Elliott to arrange a meeting regarding a potential investment by Elliott "'to help the successful plaintiffs in the Chevron Ecuador deal.'"  *Id*.  A meeting was set for November 6, 2017 at 4 PM.  *Id*., ¶ 3.

A few hours before the meeting, Ms. Sullivan informed Elliott that Donziger, "'the architect of successfully winning the judgement (sic),'" would be attending the meeting.  Grinberg

Decl. ¶ 4.   Ms. Sullivan also requested that Elliott execute a non-disclosure agreement so that Donziger could "'speak freely'" during the meeting.  *Id*; *see also* Grinberg Decl., Ex. 2.   The proposed non-disclosure agreement is offered by one of the defaulting defendants in the RICO action, the "Frente de Defensa de la Amazonia ('FDA'), as represented by Steven R. Donziger, Esq., with address at 245 West 104th Street, #7D, New York, New York," and is explicit in its purpose—to facilitate "discussions concerning a possible financing of a judgment collection action in the *Aguinda v. ChevronTexaco* case where the FDA is the beneficiary[.]"  *Id*. at 1.   The agreement provides that "counterparty agrees to accept the FDA's Confidential Information for the sole purpose of evaluation in connection with counterparty's *business discussions* with the FDA," *id*. (emphasis added); represents that "the Confidential Information is proprietary to and commercially and competitively valuable to the FDA," *id*. at 2; specifies that it is governed by the laws of New York, *id*.; and identifies Donziger as the "U.S. Legal Representative" of the FDA.  *Id*. at 3.   Elliott did not execute the agreement.  Grinberg Decl. ¶ 5.

Handwritten notes taken at the November 6, 2017 meeting confirm that Donziger represented to Elliott that he and his co-conspirators had raised $33 million from third-party funders and individuals.  Grinberg Decl., Ex. 3.   The notes further confirm that Donziger stated that between 15%-20% of the Ecuadorian judgment has been committed to "15" people or entities, and that he personally holds an interest of 6.3% in the Ecuadorian judgment proceeds.[2]  *Id*.   The notes also show that Elliott and Donziger discussed the ongoing Canadian enforcement proceedings and whether the proceeds of the fraudulent Ecuadorian judgment could "come in to [the] U.S."  *Id*.

---

[2]  This admission by Donziger is consistent with Chevron's analysis of the Intercreditor Agreement, which sets forth nine priorities for the distribution of the fraudulent Ecuadorian judgment. The amounts to be paid to various litigation funders and law firms equals roughly 20%.  *See* PX 552.

Shortly after the meeting, Ms. Sullivan emailed Elliott again to state that "[i]t was a pleasure to meet with you to introduce you to the Chevron case and share the opportunity for you to be a key partner in enforcing and collecting the historical $9.5B/now $12B environmental judgement (sic)."  Grinberg Decl., Ex. 4 at 2.  Donziger followed up on that email the next day, stating that "[i]t was nice to meet and talk with someone who obviously gets the situation with the Chevron matter," and that he was willing to transmit "a packet of materials that I generally send out to those doing due diligence on the opportunity."  *Id*.  On January 19, 2018, Ms. Sullivan and Donziger again contacted Elliott and stated that they wished "to bring [Elliott] up to date on recent developments with the Ecuador case and discuss our vision for a strategic capital partnership."  *Id*. at 1.  Elliott responded by declining involvement with Donziger and the Ecuador case.  *Id*.

**B.**  **Donziger's Monetization of His Involvement in the Ecuador Litigation, His Diversion of Litigation Funds for His Personal Benefit, and the Formation of Amazonia to Keep any Judgment Proceeds "Out of Ecuador"**

The Elliott notes confirm that Donziger has likely diverted or hidden millions of dollars raised in the name of the Ecuador litigation—funds that he may still possess and about which Chevron is entitled to discovery to uncover the full extent of Donziger's contempt.

During the course of the Ecuador litigation, Donziger took the lead in soliciting funds from investors and was primarily responsible for engaging investment firms.  *See, e.g.*, PX 2396 at 301-02.  Donziger also largely controlled or had veto power over the manner in which the funds provided to the Ecuadorian team were spent.  *See* Dkt. 1874 at 27 & n.102; *see also* Dkt. 1963 at 21 ("And it is Donziger who, with limited and apparently now long past exceptions, essentially has controlled the money.").  And while the Ecuador litigation and its funding was under Donziger's control, individual investors, law firms, and litigation investment firms agreed to provide over $32 million in funds to Donziger and his co-conspirators.  PX 4900 ¶ 34.   Con-

sistent with the documents showing that this level of funding was ***agreed to***, Donziger related in the recent Elliott meeting that the LAPs had in fact ***actually received*** the $33 million in funding. Grinberg Decl., Ex. 3. As recounted in the November 6, 2017 notes from his "Donziger conversation," the potential funder was told *by Donziger himself* that he and his co-conspirators had already raised "$33mm" from "3rd party funders / individuals." *Id.* Yet over half of these monies—*i.e.*, over $16 million—have never been accounted for by Donziger. Dkt. 1963 at 23 n.74. When this Court repeatedly invited him to present evidence of his finances or funding efforts, Donziger refused. Dkt. 1874 at 263 n.1098; *see also* Dkts. 1253, 1287, 1963 at 20-21. Similarly, when the Ecuadorian groups he claims as clients demanded an accounting for the funds raised to finance the litigation, Donziger refused to provide one. Dkt. 1945-1 (Aug, 20, 2016 UDAPT resolution). Indeed, the UDAPT has publicly denounced Donziger, stating that he is "driven by [his] greed," is characterized by a "lack of transparency in managing the resources of the people affected," and has "taken advantage" of the Ecuadorian plaintiffs' lawsuit for his own benefit.[3] Dkt. 1945-2 (Sept. 12, 2017 UDAPT letter).

As Chevron's forensic accounting expert, Troy Dahlberg, testified at the RICO trial, the "extremely poor organization and incomplete nature of the financial and accounting records that Donziger produced and appeared to maintain" did not account for "the totality of the funds that were raised or the expenses incurred in relation to the [Ecuadorian] Litigation." PX 4900 ¶ 55. Even after an in-depth analysis of documents of all types produced during the RICO case, Mr.

---

[3] According to the minutes from a January 2013 UDAPT meeting, Donziger confirmed that, between 2010 and 2013, the Ecuadorian plaintiffs had raised "approximately 25 million" from outside funders. PX 7033A at 2. During this same meeting Donziger pledged to give back 1.3% of his interest in the fraudulent Ecuadorian judgment. *Id.* at 5. Despite making this pledge, Donziger's recent solicitation efforts reveal that he still claims entitlement to the full 6.3% contingency stake. *See* Grinberg Decl., Ex. 3; *see also* Trial Tr. at 2492 at 1-4 (Donziger testifying that his contingency interest is 31.5% of the 20% owed to the lawyers, *i.e.*, 6.3% of the total Ecuadorian judgment).

Dahlberg was able to trace the in-flow of only $16 million.  Dkt. 1963 at 23 n.74 (citing PX 4900 ¶ 34).  Hence, of the $33 million in funding Donziger obtained and controlled, there is no record of what happened to over $16 million.  *Id*. at 23 (noting that a "large part" of Donziger's fund-raising for the Ecuadorean litigation "never has been accounted for").

Of the $16 million in funds Mr. Dahlberg was able to trace to some extent, there was confirmation that Donziger took as a "salary" approximately $1.3 million  (Dkt. 4900 ¶ 64), in addition to providing himself with the single largest contingency interest in the fraudulent Ecuadorian judgment.  *See* Dkt. 1874 at 398 ("Roughly 30 percent of the 20 percent contingency fee owed to the [Ecuadorian plaintiffs'] litigation team accrues to Donziger."); *id.* at 404-05 ("Donziger's retainer agreement with the LAPs and the ADF . . . provides that Donziger is entitled to be paid (a) 6.3 percent of all amounts collected in respect of the Lago Agrio litigation, plus (b) any arrearages in his monthly retainer, plus (c) reimbursement for expenses."); *id.* at 404 n.1539 (citing PX 558 (Donziger's Jan. 5, 2011 retainer agreement) ¶ (3)(a) (the 6.3% is the product of 31.5% of the Total Contingency Fee Payment, which is 20% of all funds collected)). There was also confirmation that on multiple occasions, Donziger deposited litigation funds into his personal accounts.  *See, e.g.*, PX 586 at p. 185-87.

In addition, Donziger participated in the creation of Amazonia to appease potential funders and keep the Ecuadorian judgment proceeds "'outside the Republic of Ecuador.'"  PX 4900 ¶ 184 (quoting PX 1527R at 30–31, "Invictus: Path Forward: Securing and Enforcing Judgment and Reaching Settlement"); *see also* Dkt. 1874 at 172-73.  As this Court found, "Donziger owns, directly or through a nominee, shares of a Gibraltar company, Amazonia, through which the property collected on the Judgment is to be funneled."  Dkt. 1874 at 477.  Donziger, in fact, "testified that he has been given shares in Amazonia based on his proportionate equity interest in the

LAPs' claim." Dkt. 1874 at 477 n.1821. To prevent Donziger from "receiv[ing] a benefit by virtue of [his] fraud," this Court imposed a constructive trust on Donziger's right to a contingent fee, among other property traceable to the Ecuadorian judgment. Dkt. 1874 at 475-76. Donziger's Amazonia shares are subject to the constructive trust, "as whatever value they now or hereafter may have is a direct function of the fraud perpetrated by Donziger." *Id.* at 477. And the Court entered an order requiring Donziger "to pay over and assign to Chevron all fees and other payments, property, and other benefits that [he had] received or hereafter receive[s], directly or indirectly, in consequence of the Judgment." *Id.* at 478; *see also* Dkt. 1875 ¶¶ 1, 3. Yet he has refused to comply with this order in failing to assign the Amazonia shares and in failing to assign the other monies received in consequence of the corrupt Ecuadorian judgment. *See* Dkt. 1963 at 17 n.59. The evidence of Donziger's solicitation, receipt, and diversion—through off-shore devices and otherwise—of millions of dollars in "profit" from the fraudulent Ecuadorian judgment more than substantiates Chevron's request for post-judgment discovery into the profits from the judgment that Donziger continues to retain beyond the Amazonia shares themselves.

## II.   ARGUMENT

### A.   Legal Standard

Federal Rule of Civil Procedure 70 outlines the procedure for "[e]nforcing a [j]udgment for a [s]pecific [a]ct."[4] Subpart (e) allows a court to "hold the disobedient party in contempt" until the disobedient party complies with the Court's judgment. Fed. R. Civ. P. 70(e).

District courts also have "inherent power to enforce compliance with [their] lawful orders through civil contempt." *S.E.C. v. Oxford Capital Sec., Inc.*, 794 F. Supp. 104, 106 (S.D.N.Y. 1992); *see also CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98-100 (2d Cir. 2016) (affirming finding of civil contempt for violation of an injunction). If a party is held in contempt,

---

[4]  Local Civil Rule 83.6 outlines the local procedure for contempt proceedings in civil cases.

contempt sanctions may be imposed to "coerce the contemnor into future compliance with the court's order. . . . " *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (citations omitted).  "A district court has broad discretion to fashion an appropriate coercive remedy in a case of civil contempt, based on the nature of the harm and the probable effect of alternative sanctions." *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984) (citations omitted).

At this time, Chevron requests that the Court grant *ex parte* a preservation order and authorization to conduct post-judgment discovery of Donziger and other persons or entities reasonably calculated to possess information relevant to enforcement of the Judgment, in order to prevent destruction or diversion of evidence in the interim.  This Court may grant an order *ex parte* "upon a clear and specific showing by affidavit of good and sufficient reasons."  S.D.N.Y. Local Civil Rule 6.1(d); *see also Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (holding that *ex parte* orders for expedited discovery prior to a Rule 26(f) conference are permissible "under the flexible standard of reasonableness and good cause, applying particularly careful scrutiny since plaintiff not only seeks expedition, but also moves on an ex parte basis").  Courts have found cause to grant *ex parte* motions to compel discovery in support of judgment enforcement.  *See Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 398-99 (S.D.N.Y. 2014) (Rakoff, J.) (noting grant of *ex parte* discovery to assist plaintiff in collecting a judgment); *Avant Capital Partners, LLC v. Strathmore Dev. Co. Michigan, LLC*, 703 F. App'x 362, 364 (6th Cir. 2017) (same).

## B.    Chevron Has Established That Donziger Is in Contempt.

To support a finding of contempt, Chevron must show that (1) the Judgment is lawful, clear, and unambiguous, (2) Donziger's noncompliance with the Judgment is clear and convincing, and (3) Donziger has not "diligently attempted to comply" with the Judgment "in a reasona-

11

ble manner." *Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs, Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks omitted).

To begin, the relief granted in the Judgment is lawful. Donziger challenged this Court's Judgment on appeal, and the Second Circuit rejected that challenge. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016), *cert. denied*, No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017). The Second Circuit held that "[t]he relief tailored by the district court . . . prohibit[s] Donziger and the LAP Representatives from profiting from [their] corrupt conduct" and that the district court did not abuse its discretion in granting that relief. *Id.* Donziger sought a panel rehearing and a rehearing *en banc* of the Second Circuit's opinion, but both requests were summarily denied. Donziger then petitioned the United States Supreme Court to review the Second Circuit's opinion. That petition was also denied. *Chevron Corp. v. Donziger*, No. 16-1178, 2017 WL 1198372 (U.S. June 19, 2017). Donziger has exhausted all avenues for appeal and cannot now dispute that the Judgment is lawful and final.

The facts here clearly and convincingly establish the remaining requirements for contempt, namely two brazen, ongoing violations of the Judgment by Donziger and his co-conspirators.

### 1. Donziger Has Violated the Judgment's Command That He Transfer His Amazonia Shares to Chevron

"A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal citations and quotation marks omitted). Here, the Judgment is clear and unambiguous in its decree that "Donziger shall execute in favor of Chevron a stock power transferring to Chevron all

of his right, title and interest in his shares of Amazonia. . . ." Dkt. 1875 ¶ 3.[5] Donziger demonstrated his full understanding of this requirement in his "emergency motion to stay," filed in this Court on March 18, 2014, which acknowledged that "this Court's order would require [him] to transfer *forthwith* 'all of his right, title, and interest' in Amazonia Recovery Limited." Dkt. 1888 at 19 (quoting Dkt. 1875 ¶ 3) (emphasis added).

It is beyond dispute that Donziger has not complied with this aspect of the Judgment. Donziger has not executed a stock transfer certificate transferring his shares to Chevron. Mastro Decl. ¶ 8. Nor has he transferred any shares of Amazonia to the Clerk of Court. *Id.* ¶ 10; s*ee also* Mastro Decl., Ex. 1 (showing docket entries in this matter since the entry of the Court's March 4, 2014 Judgment, reflecting no transfer of Amazonia shares to the Clerk). Rather than "diligently attempt[ing] to comply" with the Judgment in a reasonable manner, the evidence shows that Donziger has done the opposite. More than four years have elapsed since the entry of the Judgment, and Donziger has not complied—or even attempted to communicate with Chevron about complying—with it. Mastro Decl. ¶ 9.

In a letter sent to the Court on June 19, 2017, Chevron noted Donziger's failure to comply with the Judgment and requested that the Court order Donziger to "comply forthwith." Dkt. 1922. Donziger did not respond to that request. The Court ruled that Chevron's request could not be made by way of a letter, so it was "denied without prejudice to proceeding by formal motion." Dkt. 1923 at 2. At that point, Donziger could have avoided unnecessary motion practice by transferring the Amazonia shares to Chevron, but instead he chose to continue to flout the Judgment by doing nothing. In its March 1 corrected memorandum opinion, the Court

---

[5] On April 24, 2014, the Court amended this Judgment "solely pending the determination of the appeal in this case" to require Donziger to transfer his Amazonia shares to the Clerk of the Court. Dkt. 1901 at 32. As Donziger's appeal is no longer pending, Donziger must transfer all of his rights, title and interest in his shares of Amazonia directly to Chevron.

expressly recognized that, notwithstanding the Judgment's directive to transfer the Amazonia shares, Donziger had failed to challenge Chevron's assertion that he had not turned over his Amazonia shares and that he was "arguably . . . in contempt of the final judgment of permanent injunction in this case."  Dkt. 1963 at 17 & n.59.  Donziger's willful, persistent inaction is more than sufficient to justify contempt.  *See, e.g.*, *Handwerker v. AT&T Corp.*, 211 F.R.D. 203, 209 (S.D.N.Y. 2002) (holding that "[n]on-compliance may be deemed willful when the court's orders have been clear, when the party has understood them, and when the party's non-compliance is not due to factors beyond the party's control" and that "a party's persistent refusal to comply with a[n] . . . order presents sufficient evidence of willfulness, bad faith or fault") (internal quotation marks and citations omitted).[6]

### 2. Donziger and His Co-Conspirators Have Violated, and Likely Continue to Violate, the Judgment's Prohibition of Acts to "Monetize or Profit From" the Corrupt Ecuadorian Judgment

The Judgment is also "clear and unambiguous" (*King*, 65 F.3d at 1058) that Donziger is "enjoined and restrained from undertaking any acts to monetize or profit from" the fraudulent Ecuadorian judgment, "including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."  Dkt. 1875 ¶ 5.  Here, too, Donziger's prior filings show that he fully understands that the Judgment prevents him from, among other things, offering shares of the fraudulent Ecuadorian judgment or other consideration to solicit funds from third parties in support of enforcing that judgment.  *See* Dkt. 1888 at 16-17 (arguing that the Judgment's restrictions would "[d]epriv[e] Mr. Donziger of his interest in, and ability to work on," enforcement of the Ecuadorian judgment, and that, "by broadly enjoining him from 'undertaking any acts to monetize or profit from the Judgment,' the Court's order threatens to "obliterate" his

---

[6]  A showing of "willful[]" or "bad faith" conduct is not required for a finding of contempt.  *See Utica Coll. v. Gordon*, 389 F. App'x 71, 73 (2d Cir. 2010).

practice[.]") (quoting Dkt. 1875 ¶ 5); *see also id.* at 18 ("[The Judgment is] likely to (and intended to) chill third parties from funding or associating with Mr. Donziger and his law practice . . . .").

Chevron has uncovered direct evidence that, as recently as January 2018, Donziger has done precisely that: attempted to monetize the fraudulent Ecuadorian judgment by offering an interest in proceeds from the judgment to at least one New York City hedge fund. The documents evidencing the Elliott meeting establish that (i) Donziger arranged and attended an in-person meeting on November 6, 2017 with Elliott for the purpose of obtaining financing to enforce the fraudulent Ecuadorian judgment; (ii) Donziger solicited an investment from Elliott in exchange "for an interest in proceeds that may result from enforcement" of the judgment (Grinberg Decl. ¶ 6); (iii) Donziger stated at the meeting that he had raised $33 million from third-party funders and individuals in support of judgment enforcement efforts against Chevron; (iv) Donziger also stated that between 15-20% of the fraudulent Ecuadorian judgment had been committed to 15 people, and; (v) Donziger himself continues to possess a 6.3% share. Grinberg Decl., Exs. 1-4. When Elliott did not respond to Donziger's offer, he and his associate, Katie Sullivan, contacted Elliott again on January 19, 2018, seeking to provide additional information and discuss their "vision for a strategic capital partnership" with Elliott. *Id.*, Ex. 4 at 1.

This evidence clearly and convincingly shows that Donziger has not "diligently attempted to comply" with the Judgment's restrictions on monetizing the corrupt Ecuadorian judgment. Instead, Donziger and his co-conspirators have been acting—and are likely continuing to act— behind the scenes to shop the fraudulent judgment around. This is, as the Court recently recognized, evidenced by Donziger's engagement in "extensive litigation in Canada and elsewhere for some time now, which at least suggests that he has raised much more" money than has been un-

15

covered to date.  Dkt. 1963 at 23.  Donziger's use of a carefully drafted non-disclosure agreement so that he can "speak freely" (Grinberg Decl., Ex. 1) to potential third-party funders, as well as his offering of a pre-prepared packet of materials that he "generally send[s] out to those doing due diligence on the opportunity" (*id.*, Ex. 4 at 2) are irrefutable evidence of his past and likely ongoing violations of the Judgment's clear commands.

**C.     A Preservation Order and Post-Judgment Discovery Are Necessary to Determine the Full Extent of Donziger's Violations of the Judgment and Ensure Compliance**

In light of the already-established violations of the Judgment and indications that other violations likely exist, post-judgment discovery is necessary to uncover the full extent of Donziger and his co-conspirators' ongoing violations of this Court's orders.  *See* Mastro Decl., Exs. 4-7 (proposed post-judgment discovery requests and subpoenas to Donziger, Sullivan, Bush, and athenahealth, Inc.).  The Court has authority to grant such discovery requests as part of contempt proceedings or under 28 U.S.C. § 1651.  *See Shore Realty Corp.*, 763 F.2d at 53 ("The District Court had ample authority to issue [discovery orders] necessary for the enforcement of its October [injunction] order."); *see also Energy Capital Co. v. Caribbean Trading and Fidelity Corp.*, No. 93 Civ. 8100, 1994 WL 698210, at *5-6 (S.D.N.Y. Dec. 13, 1994) (entering finding of civil contempt and ordering discovery as a sanction "warranted in order to both coerce compliance and to compensate plaintiffs for the losses they have suffered on account of defendants' noncompliance").

Donziger and his co-conspirators, well aware of the Judgment and its injunctive commands, are already under an obligation to preserve evidence relevant to enforcement of the Judgment.  *See, e.g., Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litiga-

16

tion.") (citation omitted).  Nonetheless, in light of Donziger's serial violations of the Judgment,

and his "outright defiance" (Dkt. 1964 at 17) of the Court's orders,[7] the Court should assert its

inherent authority to order preservation of evidence relevant to enforcement of the Judgment.

*See In re Application of Chevron Corp.*, 736 F. Supp. 2d 773, 787 (S.D.N.Y. 2010) ("[C]ourts

almost certainly have inherent authority to order those before them to preserve potentially rele-

vant evidence . . . ."); *see also In re Application of Hornbeam Corp.*, No. 14 Misc. 424, 2014 WL

8775453, at *7 (S.D.N.Y. Dec. 24, 2014) (granting § 1782 application and ordering preservation

of all "documents and evidence" that may contain "potentially relevant" information); *Exports v.*

*Lee*, No. 95 Civ. 8082, 1996 WL 631718, at *1 (S.D.N.Y. Oct. 31, 1996) (denying post-

judgment discovery until entry of judgment but ordering "both defendants (and all persons or en-

---

[7] This Court's March 1 corrected memorandum opinion explains in detail Donziger's "outra-
geous" behavior and "egregious misconduct," which was, "in many respects, far beyond the
bounds of propriety." Dkt. 1963 at 17, 33.  This behavior includes, "[a]mong other things," a
willful and deliberate "disregard[] [of] a court order to produce relevant documents located in
Ecuador [that were] under his practical control," deliberately false testimony "at an evidentiary
hearing on Chevron's motion for sanctions," and repeated false testimony during depositions and
at the trial "in response to nearly 300 questions[.]" *Id*. at 33.  Donziger also flouted the Court's
order to contribute to interim payment of the expenses of the special masters. *Id*. at 17.  In re-
sponse to some of this misconduct, the Court granted sanctions against Donziger and the LAPs,
finding that they acted "willfully and in bad faith" and with "gamesmanship" to "frustrate Chev-
ron's efforts to obtain discovery in this Court to which it was entitled."  Dkt. 1529 at 80-87.
Donziger and the LAPs' strategy, the Court found, had "always been to produce materials when
it suits their purposes and is most helpful to their case, notwithstanding Court orders for full pro-
duction or prejudice to" Chevron.  *Id*. at 92; *see also* Dkt. 1963 at 46 ("Donziger's refusal to
produce documents that were in his practical control accords with the Special Masters' assess-
ment of his behavior: he was 'trying to prevent the basic facts coming to light.'").

Separately, Chevron detailed Donziger's discovery misconduct in its memorandum of law in
support of contempt in the Donziger § 1782 proceedings.  *See In re Application of Chevron*
*Corp.*, No. 1:10-mc-00002, ECF No. 147 (Jan. 10, 2011).  There, Chevron showed that
Donziger, in defiance of numerous Court orders, acted in bad faith by withholding thousands of
responsive documents, refused to search relevant databases, and engaged in repeated attempts to
delay and frustrate production of responsive materials.

tities under the direction or control of either defendant) to *preserve* all documents that are responsive" to proposed discovery requests) (emphasis in original).

Donziger's contempt of the lawful Judgment provides "good and sufficient reason" to grant this motion *ex parte*—especially since the threat of sanction gives Donziger "an incentive to conceal" his fraudulent and contumacious conduct.  *See Ayyash*, 233 F.R.D. at 327 (finding "good cause" to grant an *ex parte* motion for expedited discovery where defendants had "both incentive and capacity to hide their assets" in order to circumvent a court award of damages). Moreover, if the requested discovery reveals evidence that Donziger has successfully monetized his interests in Amazonia or the Ecuadorian judgment, Chevron will request that this Court enter an order disgorging Donziger and any of his agents of any money or property obtained.

**D.     Coercive Sanctions Are Appropriate to Ensure Compliance With the Judgment**

Donziger has made no effort to comply with one aspect of the Judgment and has intentionally violated another.  And even after unsuccessfully exhausting his appeals, Donziger continues his baseless attacks on the Judgment's "legitimacy" and "viability."  *See, e.g.*, Dkt. 1927 at 6 Donziger letter, stating that there are supposedly "glaringly critical facts that undermine the legitimacy of the RICO judgment," such that "the continued viability of the court's ruling will be a very open question"); Dkt. 1925 at 6 (Donziger letter questioning "the reliability of the RICO judgment").  Under these circumstances, and after Chevron has conducted discovery of Donziger and his cohorts, the Court should hold a hearing and hold Donziger in contempt.

As Chevron will further demonstrate at the appropriate time, Donziger's past behavior shows that the only way to obtain his compliance is through a coercive sanction.  *See N.A. Sales Co.*, 736 F.2d at 857-58 ("In light of Chapman's continuous and obviously willful violation of Judge Mishler's orders, he had ample reason to conclude that only a stiff remedy would suffice to coerce compliance.").  While a district court has broad discretion to fashion a sanction to co-

erce compliance, it should consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction[.]" *Oxford Capital Sec., Inc.*, 794 F. Supp. at 109 n.4 (citations and internal quotation marks omitted).

The magnitude of the harm threatened by Donziger's contumacy is significant.  He time and again has shown that he is absolutely unwilling to abide by this Court's orders voluntarily, and he will continue to enlarge and profit from his vast fraud until he is restrained from doing so. Donziger's misconduct not only further victimizes Chevron, it threatens to infect other U.S. companies, such as those solicited or involved in solicitations, and it ultimately threatens the integrity of the U.S. courts.  Donziger's solicitations to Elliott are clear admissions that he continues to seek U.S. investors in the fraudulent Ecuadorian judgment.  *See* Grinberg Decl., Ex. 4 at 2 (Donziger Nov. 2017 email: "I have a packet of materials that I generally send out to those doing due diligence on the opportunity."); *id.* at 1 ("We would like to bring you up to date on recent developments with the Ecuador case and discuss our vision for a strategic capital partnership."). Donziger's ongoing refusal to comply with the Judgment, four years after it was entered, warrants imposing coercive sanctions.  Chevron will pursue these sanctions, as well as any other relief deemed just and proper, in the briefing and hearing to determine the extent of Donziger's contempt.

### III.    CONCLUSION

For the foregoing reasons, Chevron requests that the Court (1) grant *ex parte* an order requiring Donziger, as well as any other person or entity acting at his direction or in concert with him, to preserve and maintain within the U.S. any and all documents or evidence relating to the

Judgment or compliance therewith; (2) authorize Chevron *ex parte* to serve post-judgment discovery requests on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment, and; (3) set a prompt briefing schedule and hearing date to adjudicate Donziger's contempt and determine the appropriate remedy to compel Donziger's compliance with the Judgment, following an appropriate period of time for Chevron to conduct the requested discovery.  In addition, Chevron requests any other relief the Court deems just and proper.

Dated: March 19, 2018                                     Respectfully submitted,

New York, New York                                       GIBSON, DUNN & CRUTCHER LLP

                                                         /s/ Randy M. Mastro

                                                         Randy M. Mastro
                                                         Andrea E. Neuman
                                                         200 Park Avenue
                                                         New York, New York 10166
                                                         Telephone: 212.351.4000
                                                         Facsimile: 212.351.4035
                                                         Email: RMastro@gibsondunn.com

                                                         William E. Thomson
                                                         333 South Grand Avenue
                                                         Los Angeles, California 90071
                                                         Telephone: 213.229.7000
                                                         Facsimile: 213.229.7520

                                                         STERN, KILCULLEN & RUFOLO LLC
                                                         Herbert J. Stern
                                                         Joel M. Silverstein
                                                         325 Columbia Tpke, Ste 110
                                                         P.O. Box 992
                                                         Florham Park, New Jersey 07932-0992
                                                         Telephone:  973.535.1900
                                                         Facsimile:  973.535.9664

                                                         *Attorneys for Chevron Corporation*