**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION, :
:
Plaintiff, :
:
v. :   11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, *et al.*, :
:
Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF CHEVRON CORPORATION'S
MOTION FOR ENTRY OF DEFAULT JUDGMENT**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 2

A.    The Defaulted Defendants Were Properly Served but Failed to Respond to
      Chevron's Complaint ................................................................................................... 2

B.    Chevron's Claims Against the Defaulted Defendants ....................................................... 5

C.    The Evidence at Trial Proved the Truth of Chevron's Allegations ................................... 9

      1.    The Evidence Confirmed Chevron's Allegations About the Defaulted
            Defendants' Fraud on the Court ........................................................................... 10

      2.    The Evidence Confirmed Chevron's Allegations That the Defaulted
            RICO Defendants Played a Key Role in Carrying Out and Attempting to
            Cover Up the Fraudulent Scheme, and Were Part of a Criminal Enterprise ........ 13

ARGUMENT ...................................................................................................................... 14

A.    The Defaulted Defendants Have Admitted Their Liability by Failing to Respond .......... 14

B.    This Court Has Personal Jurisdiction Over the Defaulted Defendants ........................... 15

      1.    The Defaulted RICO Defendants ........................................................................ 16

      2.    The Defaulted LAPs ........................................................................................... 17

C.    Chevron Is Entitled to Equitable Relief Against All of the Defaulted Defendants
      Equivalent to the Relief Granted Against the Appearing Defendants ............................ 19

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Au Bon Pain Corp. v. Artect, Inc.*,
  653 F.2d 61 (2d Cir. 1981)..............................................................15

*Brenntag Intern. Chemicals, Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999)............................................................19

*Chevron Corp. v. Donziger*,
  833 F.3d 74 (2d Cir. 2016), *reh'g denied* (Oct. 27, 2016), *cert. denied*, 137
  S.Ct. 2268 (2017)...........................................................1, 8, 10, 11, 12, 20

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010)............................................................16

*City of New York v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011)........................................................14, 15

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*,
  183 F.3d 151 (2d Cir. 1999)............................................................15

*Donziger v. Chevron Corp.*,
  137 S.Ct. 2268 (2017).......................................................................9

*E. Coast Novelty Co., Inc. v. City of New York*,
  842 F. Supp. 117 (S.D.N.Y. 1994)..................................................19

*Frow v. De La Vega*,
  82 U.S. 552 (1872)..........................................................................19

*Fustok v. ContiCommodity Services, Inc.*,
  873 F.2d 38 (2d Cir. 1989)..............................................................20

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
  322 U.S. 238 (1944).........................................................................20

*Kreutter v. McFadden Oil Corp.*,
  71 N.Y.2d 460 (1988).......................................................................16

*Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*,
  788 F. Supp. 2d 71 (E.D.N.Y. 2011) ..............................................20

*Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*,
  619 F.3d 207 (2d Cir. 2010)............................................................15

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*,
   373 F.3d 241 (2d Cir. 2004)..................................................................................................14

**Rules**

Fed. R. Civ. P. 5(a)(2)..............................................................................................................4

L. Civ. R. 54.1..........................................................................................................................2

N.Y. CPLR 302(a)(1)..............................................................................................................16

## PRELIMINARY STATEMENT

On March 4, 2014, following a seven-week trial, this Court issued an opinion and judgment finding Steven Donziger and his law firm liable for racketeering and fraud as a result of his scheme to extort billions of dollars from Chevron Corporation ("Chevron"), which included the corrupt procurement of a multi-billion-dollar Ecuadorian judgment.  To remedy this misconduct, the Court issued equitable relief against Donziger and the appearing Lago Agrio Plaintiffs, Hugo Gerardo Camacho Naranjo, and Javier Piaguaje Payaguaje (collectively with Donziger, the "Appearing Defendants").  Dkts. 1874, 1875.  The Second Circuit has since unanimously affirmed this Court's judgment in all respects, and the Supreme Court has denied certiorari.  *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016), *reh'g denied* (Oct. 27, 2016), *cert. denied*, 137 S.Ct. 2268 (2017).  This Court should now grant Chevron default judgments against the remaining Defendants who have defaulted in this case (the "Defaulted Defendants").[1]

---

[1] The Defaulted Defendants are:  Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia (the "Frente"), Selva Viva Selviva Cia, Ltda. ("Selva Viva"), and the 45 non-appearing Lago Agrio Plaintiffs ("LAPs"):  Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Liore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje, Alfredo Donaldo Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.  *See* Dkt. 205 at 1.

The Defaulted Defendants—in particular Fajardo, Yanza, the Frente, and Selva Viva (the "Defaulted RICO Defendants")—have played and continue to play an integral role in Defendants' scheme.  And the remaining individual LAP Defendants continue to permit their names to be used in efforts to injure Chevron and wrongfully capitalize on the corrupt Ecuadorian judgment.  Basic notions of fairness and justice demand that they cannot escape liability by strategically choosing to ignore these proceedings.  The Defaulted Defendants failed to respond to either Chevron's Complaint or the Amended Complaint.  Therefore, as a matter of law, they have admitted all of the allegations against them.  Moreover, the extensive evidence that Chevron presented at trial confirmed the truth of Chevron's allegations against the Defaulted Defendants.

The trial evidence that this Court received and evaluated proves with more than a reasonable certainty Chevron's entitlement to the same equitable relief as issued with respect to the Appearing Defendants.  The Court should therefore issue a default judgment against all of the Defaulted Defendants that includes the same equitable relief as in the judgment against the Appearing Defendants.  Upon entry of default judgments, Chevron intends to seek an award of attorney's fees and costs against the Defaulted RICO Defendants, as appropriate.[2]

## STATEMENT OF FACTS

### A.    The Defaulted Defendants Were Properly Served but Failed to Respond to Chevron's Complaint

Chevron filed its Complaint on February 1, 2011.  It alleged an extensive conspiracy to corrupt judicial proceedings in Ecuador and to extort a multi-billion-dollar payment from Chevron through a fraudulent scheme.  Dkt. 1; Dkt. 206 ¶ 3.

---

[2]  Upon the entry of the default judgment, Chevron intends to file an application seeking costs against the Defaulted RICO Defendants and a motion seeking an award of attorneys' fees, pursuant to 18 U.S.C. § 1964(c).  *See* L. Civ. R. 54.1 (applications for costs should be filed "[w]ithin thirty (30) days after the entry of final judgment").

This Court authorized service of the Summons and Complaint "by hand, facsimile, email or overnight mail . . . ."  Dkt. 4 at 4. Chevron served the Defaulted Defendants with the Summons, Complaint, and other supporting papers by overnight mail on February 3, 2011, and by email on February 4, 2011.  Dkt. 205 at 4-5; Dkt. 75 ¶ 4.  Chevron also personally served the Frente on February 14, 2011, and it personally served Yanza and Fajardo individually and on behalf of the LAPs on February 15, 2011.  Dkt. 205 at 6; Dkt. 206 ¶ 9.

On February 24, 2011, Fajardo sent this Court a letter in which he claimed he was the "lawyer for the Ecuadorian nationals and organizations," and requested on behalf of himself and the "Ecuadorian defendants" an "extension of time to respond to the complaint . . . ."  Dkt. 128. The Court rejected Fajardo's attempt to appear on behalf of the Ecuadorian defendants other than himself because he was not licensed to practice in New York, noting that "[t]hese other Ecuadorian defendants have been represented by various licensed attorneys in related proceedings in this Court over the years."  Dkt. 127 at 1 & n.2.  The Court, however, did extend the time for Defendants to respond to the Complaint until March 1, 2011.  *Id.* at 2.

In addition to Fajardo's letter, Yanza and a number of the defaulting LAPs acknowledged this lawsuit at a press conference (Dkt. 110-12), and several of the defaulting LAPs were filmed by their agents acknowledging receipt of Chevron's Complaint.  Dkt. 205 at 5-6.  The Defaulted Defendants failed, however, to answer or otherwise respond to the Complaint.  *Id.* at 6-7.  The fact that a number of the Defaulted Defendants publicly acknowledged receipt of the Complaint shows that their default was willful and knowing, and not the result of a mistake or failed communication.

On March 7, 2011, this Court issued a decision on Chevron's request for a preliminary injunction, noting that "[t]he Ecuadorian defendants were served with the summons and com-

plaint, pursuant to the order to show cause, on February 4, 2011.  They therefore had until February 25, extended by the Court until March 1, to answer or move with respect to the complaint.  None but the LAP Representatives did either."  Dkt. 181 at 99-100 (citations omitted); *see also* Dkt. 1874 at 298 ("All defendants were duly served.").

On March 11, 2011, the Clerk of the Court certified that the Defaulted Defendants "are in default for failing to timely answer or otherwise respond to the complaint."  Dkt. 206-18 at 2. That same day, Chevron requested entry of default against the Defaulted Defendants.  Dkt. 205. The Clerk entered a Certificate of Default, effective March 11, 2011.  Dkt. 469.

On April 20, 2011, Chevron filed its Amended Complaint.  Dkt. 283.  The Amended Complaint did not include any "new claim for relief," but merely added additional specificity and detail to some of the allegations.  Thus, Chevron was not required to serve the Amended Complaint on the Defaulted Defendants.  *See* Fed. R. Civ. P. 5(a)(2) ("No service is required on a party who is in default for failing to appear.  But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.").[3]

Although they refused to appear in this Court, several of the Defaulted Defendants publicly acknowledged that they were aware of the proceedings and even assisted the Appearing Defendants, underscoring the willful nature of their default.  *See, e.*g., Dkt. 1529 at 4 ("Fajardo, the ADF, Yanza, and Selva Viva . . . continue to assist in the defense.").[4]  For instance, minutes from

---

[3] Although default was already entered as to the Defaulted Defendants before the filing of the Amended Complaint, out of an abundance of caution Chevron is concurrently filing a request for the clerk to enter default as to the Defaulted Defendants with respect to the Amended Complaint.

[4] *See also* Dkt. 841-2 at 4 (Feb. 18, 2013 Fajardo letter) ("It is surprising to know that Kaplan has been capable of making known his opinion that the court order issued on January 15, 2013 at 1:57 p.m. by the Labor Court Judge of Sucumbios constitutes part of the alleged fraud."); Dkt. 952 ¶ 2 (LAPs' attorney, Craig Smyser, acknowledging that he "participated in

a January 15, 2013 meeting of the "Union of People Affected by the Petroleum Operations of Texaco" show that Donziger updated the meeting participants, which included Fajardo and Yanza, on the proceedings of the "RICO case."  Declaration of Randy M. Mastro ("Mastro Decl."), Exhibit 4 (PX 7033A) at 2-3 ("Chevron has accused Luis [Yanza], Pablo [Fajardo], myself and the consultants of committing fraud.").  And in October 2013, Fajardo issued a press release touting the report of supposed Ecuadorian computer expert Milton Efrain Jacque Tarco, in an effort to rebut Chevron's allegations that Defendants ghostwrote the judgment:  "'This report destroys the arguments by the oil company that are accusations that the judgment was drafted by third parties and ratifies that the truth always prevails[.]'"  *Id.*, Ex. 5 (PX 7086).

**B.    Chevron's Claims Against the Defaulted Defendants**

Chevron's Complaint alleged nine claims for relief, including violations of 18 U.S.C. § 1964(c) (civil RICO) and 18 U.S.C. § 1962(d) (conspiracy to violate RICO); fraud; civil conspiracy; and violations of New York Judiciary Law section 487.  Dkt. 1.  The Amended Complaint alleged the same claims for relief.  Dkt. 283.

Chevron brought its RICO claims against the four Defaulted RICO Defendants:  Fajardo, Yanza, the Frente, and Selva Viva.  Chevron alleged that the Defaulted RICO Defendants, along with Donziger and others, "conspired to engage in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to defraud and extort Chevron, and have each participated in the operation or management of the criminal enterprise."  Dkt. 1 ¶ 7; Dkt. 283 ¶ 7; *see also* Dkt. 1 ¶¶ 10-13; Dkt. 283 ¶¶ 11-14.

---

a phone call with Pablo Fajardo" in which he "suggested that . . . the best way to resolve the issue [of Chevron's motion to compel] would be to ask an Ecuadorian court for a ruling on the rights and obligations of the lawyers and the clients in this relationship governed by Ecuadorian law."); Dkt. 905 at 48-49 (finding that the Ecuadorian order behind which the LAPs attempted to shield their refusal to produce Ecuadorian documents was "obviously . . . collusive" and "troublesome").

For instance, the Complaint and the Amended Complaint both alleged that Fajardo "has served as one of the heads of the criminal enterprise in the U.S. and Ecuadorian media" (Dkt. 1 ¶ 306(b); Dkt. 283 ¶ 342(b)), has participated in "a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation" (Dkt. 1 ¶ 332; Dkt. 283 ¶ 368), and has "planned and coordinated the ghostwriting of the Cabrera Report" (Dkt. 1 ¶ 306(b); Dkt. 283 ¶ 342(b)).  Chevron further alleged that Fajardo submitted false and misleading declarations in the United States and Ecuador, which "perpetuated [Defendants'] false version of events, hiding their relationship with Cabrera and claiming that he was 'independent.'" Dkt. 1 ¶ 252; Dkt. 283 ¶ 273.

Chevron also alleged that Yanza and the Frente have been responsible for "exerting influence over and colluding with the Ecuadorian government and court officials," and "have made false statements to Chevron stockholders, financial analysts, investors, and/or state and federal agencies."  Dkt. 1 ¶ 306(c); Dkt. 283 ¶ 342(c); *see also* Dkt. 1 ¶¶ 333-34; Dkt. 283 ¶¶ 369-70. "Defendant Selva Viva has served as a conduit for funding and otherwise furthering Defendants' criminal enterprise" (Dkt. 1 ¶ 306(d); Dkt. 283 ¶ 342(d)) and "distribut[ed] those funds to finance the RICO Defendants' illegal scheme."  Dkt. 1 ¶ 335; Dkt. 283 ¶ 371.

Chevron further alleged that, because of the RICO Defendants' fraud before the Lago Agrio court, Chevron was entitled to a "permanent injunction that enjoins Defendants" from seeking to enforce the Lago Agrio judgment.  Dkt. 1 ¶ 359; Dkt. 283 ¶ 395.  And Chevron expressly requested "equitable relief as appropriate pursuant to applicable law," including "a permanent injunction" preventing any of the Defendants, including the LAPs, from enforcing the corrupt Ecuadorian judgment.  Dkt. 1 at Prayer for Relief, ¶ 5; Dkt. 283 at Prayer for Relief, ¶ 5.

As alleged in the Complaint and Amended Complaint, the purpose of the RICO Defendants' lies was to "force Chevron into a payoff" (Dkt. 1 ¶ 67; Dkt. 283 ¶ 69) by fraudulently "'getting a huge multi-billion-dollar judgment at trial[.]'"  Dkt. 1 ¶ 68; Dkt. 283 ¶ 70.  The RICO Defendants exploited the "systemic weakness and corruption" in Ecuador's judiciary by "threatening violence, bullying judges, and using political connections to obtain rulings in their favor based on the judges' fear of repercussions rather than the facts or law."  Dkt. 1 ¶ 70; Dkt. 283 ¶ 72.  The RICO Defendants also improperly influenced the judge presiding over their case through improper "*ex parte* meetings" and blackmail.  Dkt. 1 ¶ 75; Dkt. 283 ¶ 78.

The RICO Defendants' scheme involved obtaining false and misleading expert testimony as a key part of ultimately obtaining a fraudulent judgment against Chevron.  The RICO Defendants pressured David Russell into developing an "exaggerated damages estimate and continued to 'use it to put out a figure that will scare Chevron and investors,' long after Russell sent Donziger a cease and desist letter demanding that he stop using the estimate."  Dkt. 1 ¶ 92; Dkt. 283 ¶ 101 (quoting PX 817).  They also "submitted [to the Lago Agrio court] falsified expert reports under the name of . . . Dr. Charles Calmbacher, that contradicted his conclusions that he had found no evidence of harm."  Dkt. 1 ¶ 100; Dkt. 283 ¶ 109.  To do so, "[t]he conspirators printed their fraudulent reports on the pages that Dr. Calmbacher had initialed, used the signature pages that he had provided, and filed the forged reports with the court in Lago Agrio."  Dkt. 1 ¶ 111; Dkt. 283 ¶ 120.  Even though Chevron "informed the Lago Agrio court about the falsified Calmbacher reports, [the court] refused to remove his reports from the record or take any corrective measures."  Dkt. 1 ¶ 112; Dkt. 283 ¶ 121.  The Complaint also alleged that "the RICO Defendants and their co-conspirators conspired with officials from the Republic of Ecuador to advance baseless criminal prosecutions against Ricardo Reis Veiga and Rodrigo Perez Pallares,

lawyers responsible for executing the 1998 Final Release that precludes Defendants' claims against Chevron in the Lago Agrio Litigation."  Dkt. 1 ¶ 185; Dkt. 283 ¶ 199.

When these frauds proved insufficient, the RICO Defendants moved on to Cabrera. Dkt. 1 ¶ 113; Dkt. 283 ¶ 122.  As Chevron alleged (and later proved at trial), the RICO Defendants first "arranged for the Lago Agrio court to create a new 'global assessment' process and secured the appointment of a coconspirator [Cabrera] to the position of the purportedly neutral 'global assessment expert' with whom they would work in secret to ghostwrite his report." Dkt. 1 ¶ 113; Dkt. 283 ¶ 122.  "When Chevron raised questions with the Lago Agrio court as to the authorship of the Cabrera Report and Cabrera's relationship with the Lago Agrio Plaintiffs, Cabrera [r]epresented in multiple filings with the Lago Agrio court that he had worked independently and transparently despite evidence to the contrary."  Dkt. 1 ¶ 173; Dkt. 283 ¶ 187. They then repackaged Cabrera's report in the form of "seven new 'expert' reports [presented to] the Lago Agrio court . . . ."  Dkt. 1 ¶ 176; Dkt. 283 ¶ 190.  As a key part of their "fraudulent scheme" to exert pressure on Chevron, the RICO Defendants "continuously touted the findings in the so-called 'independent' Cabrera Report . . . ."  Dkt. 1 ¶ 221; Dkt. 283 ¶ 238.

The Complaint alleged that "a judgment that finds Chevron liable and awards damages appears to be imminent," and that such a judgment would "disregard the evidence of fraud and corruption . . . ."  Dkt. 1 ¶ 295.  Reviewing the allegations, the Second Circuit observed that Chevron's original Complaint "plausibly alleged facts from which it could be inferred that a judgment imposing liability on Chevron would be traceable to the corrupt and fraudulent conduct of those defendants; it plausibly alleged facts from which it could be inferred that such a judgment was imminent."  *Donziger*, 833 F.3d at 123.

The corrupt, fraudulent judgment indeed was imminent.  It issued on February 14, 2011, just two weeks after Chevron filed its original Complaint.  Chevron's Amended Complaint, filed on April 20, 2011, added supplemental factual allegations concerning the RICO Defendants' ghostwriting of the then-recently issued Ecuadorian judgment.

Specifically, Chevron's Amended Complaint alleged that "[t]he RICO Defendants and/or their co-conspirators were also closely involved in either the actual drafting of portions of the 188-page judgment or providing to Judge Zambrano—or whoever actually wrote the judgment—on an ex parte basis material that is not part of the public record in the Lago Agrio Litigation." Dkt. 283 ¶ 326.  In support of this allegation, Chevron alleged that "portions of the judgment rely on information that was obtained from and exclusive to the 'Selva Viva Database'—the same database controlled by the RICO Defendants and their co-conspirators and the source of at least two annexes of the Cabrera Report.  The Selva Viva Database, however, is not part of the Lago Agrio Litigation public record."  *Id.*

## C.  The Evidence at Trial Proved the Truth of Chevron's Allegations

More than three years after Chevron filed its Amended Complaint, this Court conducted a lengthy trial—hearing the testimony of 31 witnesses in person and the stipulated testimony of 37 others, and admitting and considering thousands of exhibits for both sides.  On March 4, 2014, the Court issued an opinion and judgment in favor of Chevron, and against the Appearing Defendants.  Dkt. 1874 at 2; Dkt. 1875.  The Second Circuit affirmed that judgment in all respects on August 8, 2016, and the mandate issued on November 3, 2016.  Dkt. 1914.  The Supreme Court denied certiorari on June 19, 2017.  *See Donziger v. Chevron Corp.*, 137 S.Ct. 2268 (2017).

Each of the Defaulted Defendants—whether directly, vicariously through the acts of an agent, or as a coconspirator—is liable for the entire fraudulent scheme proved at trial and dis-

cussed at length in Chevron's post-trial briefing (Dkts. 1847, 1855) and in this Court's Opinion (Dkt. 1874). Chevron incorporates those documents by reference here. *See, e.g.*, Dkt. 1874 at 338 n.1304 (discussing vicarious liability).

Though the Defaulted RICO Defendants did not appear at trial, they played a key role in the conspiracy and scheme to extort Chevron, and some, including Pablo Fajardo, played an active (albeit behind-the-scenes) role in litigating the case in this Court. Without rehashing the entire factual basis of Chevron's claims, this section highlights the Court's findings, based on overwhelming evidence, that confirm the truth of Chevron's allegations with respect to the Defaulted Defendants.

### 1. The Evidence Confirmed Chevron's Allegations About the Defaulted Defendants' Fraud on the Court

The Court found, with respect to Russell, that "the quantities he used in generating the $6 billion figure were, he said, . . . 'SWAG,' an acronym for a 'scientific wild ass guess.'" Dkt. 1874 at 43 (quoting Russell trial testimony); *see also Donziger*, 833 F.3d at 86 ("Donziger Attempts To Intimidate Chevron Into Settling by Trumpeting a Huge Remediation Cost Estimate Based Only On 'SWAG'"). The Court further found that "Russell's $6 billion SWAG figure quickly became a key weapon in Donziger's effort to exert pressure on Chevron . . . ." Dkt. 1874 at 43. As for Dr. Calmbacher, the Court found that the "reports [that Calmbacher approved] were not the reports that the LAP team eventually filed." *Id.* at 55. Rather, "someone on the LAP team used the blank pages Calmbacher had initialed and his signature pages to submit over his name two reports that contained conclusions he did not reach." *Id.* at 56-57.

This Court further found that "Fajardo and Donziger coerced Judge Yánez to allow the LAPs to terminate their remaining judicial inspections, to appoint a global expert, and to designate their hand-picked choice, Richard Cabrera, for that position. They did so by threatening

him with the filing of a misconduct complaint at a time when he was especially vulnerable, and by other pressure as well." Dkt. 1874 at 324; *see also Donziger*, 833 F.3d at 92 ("Donziger Coerces Judge Yánez To Appoint a 'Global' Expert—Cabrera—Who '[W]ould [T]otally [P]lay [B]all With' the LAPs") (alterations in original). The Court concluded that Fajardo and Yanza, along with Donziger, planned and coordinated the ghostwriting of the Cabrera report. Dkt. 1874 at 76-108, 325-26, 333. The Court also found that Yanza participated in bribing Cabrera, whom the LAPs paid improperly and outside the court process via the Frente's secret account (*id*. at 89-95, 385-86), and that Donziger, Fajardo, Yanza, and others discussed the details of the bribery scheme via email (*id*. at 395). Further, the Court found that Fajardo and the Frente "trumpet[ed] [the Cabrera Report] to the press as the work of an independent, court-appointed expert . . . falsely stress[ing] Cabrera's 'independen[ce]' to maximize the leverage on Chevron, although they well knew that the claim of independence was a lie." *Id*. at 110 (citations omitted) (fifth alteration in original); *see also Donziger*, 833 F.3d at 98 ("In order to enhance the false image of Cabrera's independence, Stratus proceeded, as instructed by Donziger, to prepare objections to the Cabrera Report for submission to the court by the LAPs.").

The Court found that the fraudulent "Cabrera Report Was Material to the Judgment." Dkt. 1874-1 at 42; *see also* Dkt. 1874 at 325 ("[T]he Cabrera Report in fact was relied upon by the author or authors of the Judgment . . . ."); *Donziger*, 833 F.3d at 103 ("The Lago Agrio Judgment Drew Heavily on the Cabrera Report"). Even though the Lago Agrio opinion "states that it did not take the Cabrera Report 'into account to issue [the] verdict,'" this Court found that the disclaimer was implausible and inadmissible hearsay. Dkt. 1874-1 at 42 (citation omitted) (alteration in original)*.* Most important to this finding was that the Judgment's Pit Count, the "largest single component of the $8.646 billion award against Chevron" (*id.* at 43), "came direct-

ly out of the Cabrera report . . . ."  *Id.* at 48.  The Court similarly concluded that the Lago Agrio judgment's "potable water damages" and "reliance on the Barnthouse report" proved that the "Cabrera Report was material to the Judgment . . . ."  *Id.* at 54.

The Court also found that "[t]he LAPs wrote the Judgment.  Zambrano did not."  Dkt. 1874 at 219; *see also Donziger*, 833 F.3d at 104 ("Judge Zambrano Did Not Write the Lago Agrio Judgment"); *id.* at 106 ("The Lago Agrio Judgment Was Written by the LAPs").  After devoting nearly 100 pages of the Opinion to Chevron's overwhelming proof of the ghostwriting, the Court summarized its findings: "(a) Zambrano agreed with Fajardo to fix the case for a payment of $500,000 paid out of any judgment proceeds, (b) Fajardo did so with Donziger's express authorization, (c) the LAPs drafted all or most of the Judgment, and (d) Zambrano signed their draft without consequential modification as part of the *quid pro quo* for the promise of $500,000."  Dkt. 1874 at 281.

The Court further found that throughout their fraudulent scheme, "Donziger, Fajardo, and the other Ecuadorian and U.S. lawyers for the LAPs" acted in their capacity as agents of the LAPs.  *Id*. at 338 n.1304.  The LAPs are therefore liable for their agents' fraud, which was committed "within the scope of their actual or apparent authority."  *Id.* (citations omitted); *see also Donziger*, 833 F.3d at 150 ("Given the collaborative actions of Donziger and Fajardo . . . to secure the Lago Agrio Judgment for the LAP Representatives and the other LAPs, there was no error in the district court's ruling that the LAP Representatives are responsible for injury to Chevron perpetrated by Donziger in his capacity as their attorney.").  And even assuming Donziger had no actual or apparent authority to commit misconduct on the LAPs' behalf, the Court found that the LAPs "knowingly ratified the misconduct . . . ."  Dkt. 1874 at 338 n.1304; *see also Donziger*, 833 F.3d at 150 ("[T]he LAPs in November 2010 granted Fajardo a new power of at-

torney that expressly ratified all of his prior acts, direct or indirect, in pursuit of their litigation interests.").

### 2. The Evidence Confirmed Chevron's Allegations That the Defaulted RICO Defendants Played a Key Role in Carrying Out and Attempting to Cover Up the Fraudulent Scheme, and Were Part of a Criminal Enterprise

The Court found that Fajardo, Yanza, and the LAPs' team played an important role in pressuring Ecuador's Prosecutor General to bring criminal charges against former Texaco lawyers. Dkt. 1874 at 119-23. Specifically, the Court noted Yanza's role in getting "the endorsement of the National Government to the Assembly of the Affected . . . ." *Id.* at 120 (citation and quotations omitted). The Court also noted that Yanza and Fajardo "toured the Lago Agrio oil fields" in a helicopter with President Correa, and that Correa "issued a press release that same day calling upon the 'District Attorney of Ecuador to allow a criminal case to be heard against the Petroecuador officers who approved the' Final Release." *Id.* at 121 (quoting PX 489R). The Court further found that "the LAPs['] [attorneys and agents] were the driving force behind the criminal case . . . ." *Id.* at 123.

Fajardo also played a role in the scheme by filing his deliberately misleading declaration in "fifteen Section 1782 proceedings in courts across the United States, including this one." Dkt. 1874 at 147 (citation omitted). The Court found that "[t]he Fajardo Declaration was highly misleading. It failed to mention that Fajardo, with Donziger's approval, had threatened the judge with a misconduct complaint unless the judge agreed to their demands to cancel the LAPs' remaining judicial inspections." *Id.* at 143. Fajardo's declaration also "failed to disclose that the LAPs had made secret payments to Cabrera outside the court process." *Id.* at 144. But the Court noted that "[n]onetheless, the LAPs later told U.S. courts that, in filing the Fajardo Petition, they had 'fully disclosed' their relationship with Cabrera." *Id.* at 146. The Court further found that Fajardo traveled to Donziger's Manhattan apartment in order to "'deal with various issues relat-

13

ing to the Lago Agrio case,'" including drafting Fajardo's declaration used in the Section 1782 proceedings. *Id.* at 440 (citation omitted).

The Court also found that "the LAP team and its affiliates were a group of persons associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay." Dkt. 1874 at 355. As relevant here, the Court found that the enterprise included the Defaulted RICO Defendants. *Id.* The Court further found that "at least Donziger, Fajardo, and Yanza conspired to violate RICO by conducting the affairs of the enterprise through a pattern of racketeering." *Id.* at 407.

## ARGUMENT

By defaulting, the Defaulted Defendants have admitted their liability. Because the Defaulted Defendants are liable and the Court has personal jurisdiction over them, the Court should award Chevron equitable relief against all the Defaulted Defendants equivalent to the equitable relief awarded against the Appearing Defendants. *See* Dkt. 1875 at 1-3.

**A.     The Defaulted Defendants Have Admitted Their Liability by Failing to Respond**

By failing to timely respond, the Defaulted Defendants have admitted all of the factual allegations in Chevron's original Complaint (Dkt. 1) and Amended Complaint (Dkt. 283), which establishes their liability on Chevron's claims as a matter of law.

"It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004)). "[E]ntry of a default[] formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.* at 128.

14

The Court can issue a default judgment as to liability based solely on these admissions. Alternatively, the Court could exercise its discretion to "require proof of necessary facts" before granting a default judgment. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). Although Chevron has already presented the Court with that proof at trial, Chevron remains amenable to submitting whatever additional proof the Court may require.

Having established the Defaulted Defendants' liability by virtue of their default, as well as through the facts proven at trial, Chevron is now entitled to "entry of a default judgment," which "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled . . . ." *Mickalis Pawn Shop*, 645 F.3d at 128 (footnote omitted). Here, as explained below, Chevron is entitled to equitable relief against all of the defaulters equivalent to the relief awarded against the Appearing Defendants.

## B.    This Court Has Personal Jurisdiction Over the Defaulted Defendants

It is an open question in the Second Circuit "'whether a district court must investigate its personal jurisdiction over [a] defendant before entering a default judgment.'" *Id.* at 133 (citation omitted) (alteration in original); *see also Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010) ("[W]e agree with our sister circuits that before a court grants a motion for default judgment, it *may* first assure itself that it has personal jurisdiction over the defendant[.]") (citations omitted) (emphasis added).  To the extent the Court elects to do so here, Chevron has already proven by at least a preponderance of the evidence at trial that this Court has personal jurisdiction over the Defaulted Defendants.  *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999) (holding that before entering default judgment, "[t]he plaintiff still must prove the jurisdictional facts by a preponderance of the evidence, either at an evidentiary hearing or at trial") (citation omitted).

15

### 1.    The Defaulted RICO Defendants

The Court found sufficient facts, based on the evidence presented at trial, to establish per-
sonal jurisdiction over Fajardo and Yanza.  In particular, Fajardo submitted false declarations to
various U.S. courts, including the Southern District of New York, in furtherance of Defendants'
scheme to harm Chevron while simultaneously trying to conceal their misconduct.  Dkt. 1874 at
388-89, 142-47.  As a necessary part of this plan, Fajardo traveled to Donziger's Manhattan
apartment to draft his declaration and to "'deal with various issues relating to the Lago Agrio
case[.]'"  *Id.* at 440 (quoting Donziger Jan. 14, 2011 Dep. Tr. at 2794:10-20).

This Court found that "Donziger informed Yanza of 'two possible investors in New York
who can help us quite a bit with money now through the upcoming years' with a potential in-
vestment of $10 million."  *Id.* at 438 (quoting PX 1063 (Sept. 9, 2008 Email from S. Donziger to
L. Yanza), at 1).  And both "Fajardo and Yanza attended a meeting in New York to discuss the
Invictus Memo in mid-2010."  *Id.* at 439 (citation omitted).  Fajardo and Yanza also signed the
January 2011 retainer agreement with Donziger (Mastro Decl., Ex. 6 (PX 558) at 12), making
them subject to personal jurisdiction through their agent's actions for the reasons discussed more
fully below with respect to the defaulted LAPs, and for the reasons stated in the Opinion (Dkt.
1874 at 434-55).

Fajardo and Yanza thus "transact[ed] . . . business within the state [of New York]" and
are subject to jurisdiction here.  N.Y. CPLR 302(a)(1).  Fajardo's submission of false declara-
tions, and the LAP team's obtaining financing were key parts of the conspiracy that Chevron al-
leged and proved.  Chevron's cause of action therefore arises out of Fajardo's and Yanza's con-
tacts with the state, and jurisdiction is proper.  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616
F.3d 158, 170 (2d Cir. 2010) ("[S]ection 302 'is a 'single act statute' and proof of one transaction
in New York is sufficient to invoke jurisdiction, even though the defendant never enters New

16

York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'") (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Fajardo and Yanza were also agents of Selva Viva and the Frente, acting on their behalf, and those organizations, too, are subject to jurisdiction in New York. *See* Dkt. 1 ¶¶ 334-35; Dkt. 283 ¶¶ 370-71 (alleging that Fajardo and Yanza are agents of the Frente and Selva Viva); *see also* Mastro Decl., Ex. 6 (PX 558) at 12 (retainer agreement with Donziger signed by the Frente).

### 2.   The Defaulted LAPs

The Court already found that it has jurisdiction over the LAP Representatives, independent of the Court's striking their personal jurisdiction defense, and the Court's analysis applies equally to the defaulted LAPs.  Dkt. 1874 at 434-55.

The Court found that "[t]he LAP Representatives have engaged in activities in New York through Donziger—their attorney and agent—and otherwise since as far back as 1993 and extending up to and beyond February 2011 . . . ."  *Id.* at 435.  The defaulted LAPs also retained Donziger at various times, including in the "January 2011 retainer agreement," and he acted on their behalf as well.  *Id.*; Mastro Decl., Ex. 6 (PX 558) at 13 (listing each of the defaulted LAP Defendants as a party to the agreement).  The Court found that the retainer agreement "makes clear the . . . extensive activity in New York, that the LAPs hired Donziger to perform."  Dkt. 1874 at 435.  Among the key provisions were terms giving Donziger responsibility for "*coordinating the efforts to procure funding*," "*assembling and organizing the various non-legal advisors, experts service providers and others*," "*coordinating the media* [and] *public affairs*," and a term stating that "New York law [governs] the entire relationship."  *Id.* at 436-37 (quoting PX 558) (emphases in original).

The Court noted that Donziger's office "has been the functional equivalent of the LAPs' New York office." *Id*. at 437 (citation omitted).  Donziger performed many of his key duties under the retainer agreement from New York, including "fundraising efforts for the LAPs" (*id.* at 438); "micromanag[ing] the Stratus operation" (*id.* at 439); "orchestrat[ing] the LAP team's efforts first to conceal and later to minimize the Cabrera fraud" (*id.* at 440); and "control[ling] . . . the extraordinary media campaign waged against Chevron" (*id.* at 441) (citations omitted).

Because Donziger's actions in conducting business in New York are equally attributable to the 45 defaulted LAPs as they are to Camacho and Piaguaje, the Court's analysis and conclusions under New York CPLR Section 302(a)(1) apply to the defaulted LAPs too.  Dkt. 1874 at 443.  The defaulted LAPs' "very retention of Donziger constituted transacting business in New York." *Id.* at 449 (citation omitted).  And the "New York governing law clauses further demonstrate[] that the [defaulted LAPs] transacted business in the state and availed themselves of the benefits and protections offered by New York's laws." *Id.* at 449-50 (citation omitted).  Chevron's claim against the defaulted LAPs "arise[s] out of many of Donziger's activities in New York, including orchestrating the Cabrera Report, retaining Russell and later misusing his work, recruiting Berlinger, coordinating and supervising Stratus, supervising the Ecuadorian lawyers, meeting with Shinder concerning his Section 1782 representation, drafting and editing Fajardo's misleading declaration in the Section 1782 proceedings, work on the Invictus Memo, and engaging in a public relations pressure campaign against Chevron." *Id.* at 451.

Therefore, personal "[j]urisdiction [over the defaulted LAPs] is proper under Section 302(a)(1)." *Id.* at 452.

**C.   Chevron Is Entitled to Equitable Relief Against All of the Defaulted Defendants Equivalent to the Relief Granted Against the Appearing Defendants**

Having established the Defaulted Defendants' liability and the Court's personal jurisdiction, Chevron is entitled to equitable relief against all the Defaulted Defendants.

Chevron alleged and proved a conspiracy—and an enterprise—whose purpose was to extort a payment from Chevron through improper means.  Dkt. 1874 at 355.  The idea that "there might be one decree of the court sustaining the charge of joint fraud committed by the defendants[,] and another decree disaffirming the said charge, and declaring it to be entirely unfounded[,] is unseemly and absurd, as well as unauthorized by law."  *Frow v. De La Vega*, 82 U.S. 552, 554 (1872).  As a matter of law, if one co-defendant is liable for this scheme, they all are. *See E. Coast Novelty Co., Inc. v. City of New York*, 842 F. Supp. 117, 122 (S.D.N.Y. 1994) ("[U]nder New York law, allegations of conspiracy are properly made for the purpose of establishing joint liability by coparticipants of independent tortious conduct.") (citations omitted).

Chevron proved at trial with reasonable certainty (and at least a preponderance of evidence) that it "has suffered injury—and is threatened with additional and irreparable injury—in consequence of defendants' fraud and their efforts to enforce the Judgment that they fraudulently obtained.  It has no adequate remedy at law."  Dkt. 1874 at 469.

As the parties stipulated during trial, Chevron has incurred millions of dollars in legal fees to expose and defend against Defendants' fraud and misconduct.  Dkt. 1657 (Stipulation re Attorneys' Fees Incurred).  Even if these harms are susceptible to monetary calculation, they are irreparable here because the Defendants purport to be insolvent.  *Brenntag Intern. Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999).  Defendants also have shown an intention to evade payment, with the funding agreement among the Frente, the LAPs, and Treca Fi-

19

nancial Solutions creating a foreign trust to keep any collected judgment proceeds beyond this Court's reach.  Mastro Decl., Ex. 7 (PX 552) at 15-17; *id.*, Ex. 8 (PX 3000) (Veiga) ¶ 138.

Chevron, moreover, has suffered irreparable harm, as Defendants' actions have imposed on Chevron "significant, irretrievable costs in the form of diverted time, attention and focus of Chevron's management team from the Company's paramount business of producing energy for the United States and the world."  *Id.*, Ex. 9 (PX 5800) (Zygocki) ¶ 20.

The balance of hardships favors Chevron as the Defaulted Defendants will suffer no legally cognizable hardship if the Court enjoins their fraudulent scheme.  *See Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 788 F. Supp. 2d 71, 76 (E.D.N.Y. 2011) (inability to continue infringement not cognizable hardship).

And the public interest favors the grant of equitable relief because the Defaulted Defendants' fraud is "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944) ("[T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant.").

The Second Circuit affirmed this Court's conclusion that Chevron, lacking an adequate remedy at law and faced with irreparable harm, is entitled to equitable relief.  The Second Circuit specifically held that "Chevron's right to defend against enforcement actions [does not] provide a basis for finding that it has an adequate remedy at law, given that the Donziger and Invictus strategy is to inundate Chevron with such actions, forcing it to incur sizeable legal fees."  *Donziger*, 833 F.3d at 143.  That ruling applies with equal force to Chevron's request for equita-

ble relief against the Defaulted Defendants.  *See Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

Therefore, the Court should grant Chevron the equitable relief detailed in its Proposed Order of Default Judgment, filed concurrently herewith.  The equitable relief should be equivalent to that awarded against the Appearing Defendants, including, but not limited to: (1) imposing "a constructive trust for the benefit of Chevron on all property . . .  that [the Defaulted Defendants have] received, or hereafter may receive . . . that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world"; (2) enjoining and restraining the Defaulted Defendants from "[f]iling or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment" or "[s]eeking prejudgment seizure or attachment of assets based upon the Judgment or any New Judgment . . . in any court in the United States"; and (3) enjoining and restraining the Defaulted Defendants "from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment[.]"  Dkt. 1875 at 1-3.

## CONCLUSION

Because the Defaulted Defendants have admitted Chevron's allegations against them, and because Chevron prevailed at trial against the Appearing Defendants, Chevron is now entitled to a default judgment against the Defaulted Defendants.  The Court should grant Chevron the following relief, as set forth in Chevron's Proposed Order of Default Judgment:

> 1) Equitable relief against all the Defaulted Defendants equivalent to the equitable relief awarded in the Opinion and Judgment (Dkt. 1874, 1875), including, but not limited to: (1) imposing "a constructive trust for the benefit of Chevron on all property . . .  that [the Defaulted Defendants have] received, or hereafter may receive . . . that is traceable to the Judgment or the enforcement of the Judgment an-

21

ywhere in the world"; (2) enjoining and restraining the Defaulted Defendants from "[f]iling or prosecuting any action for recognition or enforcement of the Judgment or any New Judgment" or "[s]eeking prejudgment seizure or attachment of assets based upon the Judgment or any New Judgment . . . in any court in the United States"; and (3) enjoining and restraining the Defaulted Defendants "from undertaking any acts to monetize or profit from the Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."  Dkt. 1875 at 1-3;

2)  All such other and further equitable or legal relief as this Court deems just.

Dated:  April 6, 2018                            Respectfully submitted,

New York, New York                           GIBSON, DUNN & CRUTCHER LLP

                                                                 *s/ Randy M. Mastro*
                                                         _____
                                                         Randy M. Mastro
                                                         Andrea E. Neuman

                                                         200 Park Avenue
                                                         New York, New York 10166
                                                         Telephone: 212.351.4000
                                                         Facsimile: 212.351.4035
                                                         rmastro@gibsondunn.com

22

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520


STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*