**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHEVRON CORPORATION,

                Plaintiff,

     v.

STEVEN DONZIGER *et al.*,

                Defendants.

11 Civ. 0691 (LAK)

**OPPOSITION TO CHEVRON'S APPLICATION FOR CONTEMPT AND**
**RELATED DISCOVERY (DKT. 1966)**

Chevron's contempt application is baseless. ***First,*** with respect to the "Amazonia shares," it is the understanding of undersigned that the "Amazonia" entity in Gibraltar either no longer exists or is entirely owned by Chevron after Chevron forced it into receivership as part of its blitzkrieg of global collateral litigation in and around 2014. To the best of the undersigned's knowledge, the entity—a public interest vehicle, as explained below—never effectively received sufficient funds due to Chevron's litigation assault and thus has been considered irrelevant and ignored by the plaintiffs for years. Undersigned is uncertain whether Amazonia still exists and if so, in what status or form.[1] In 2014, undersigned

---

[1] Assuming the entity or any part of it has been taken over by Chevron, it is now, in undersigned's view, null and void. The whole purpose of the entity was to aid in the enforcement of the affirmed environmental judgment against Chevron, structure the subsequent remediation of Chevron's massive contamination, and offer relief to the tens of thousands of affected indigenous peoples and farmers suffering the impacts of Chevron's contamination. It would utterly contrary to the entity's fundamental

contacted Chevron seeking a common sense resolution to the relevant part of the Court's 2014 judgment. *See* Ex. 1. In an obvious sign of bad faith, ***Chevron never responded to this letter*** and ***failed to include it in among its multitude of exhibits offered in support of its contempt application***. Indeed, before filing its contempt application, Chevron never even contacted the undersigned to clearly state what it needed in regards to these imagined "shares."[2]

While undersigned cannot be compelled to act in a manner that would materially prejudice his clients (as a transfer of shares, were the entity functioning and/or before Chevron took it over, might have entailed), at this point in time there appears to be any number of possible approaches that could satisfy any concerns the Court might have concerning Amazonia. To better understand the situation, the Court should first require Chevron to fully disclose the status of Amazonia, the result of the Gibraltar litigation, what "shares" it thinks undersigned has given that Chevron appears to control the entirety of Amazonia, and what concerns Chevron

---

purpose for it be used ***by*** Chevron as some sort of litigious device to frustrate that enforcement, delay that remediation, and deny Chevron's victims timely relief. While it is unclear where such voidature would need to be established, undersigned and those impacted have little concern that Chevron's apparent strategy to abuse the captured entity will be embraced by any legitimate court where judgment enforcement is being effectuated, such as those in Canada.

[2]   Chevron asserts as relevant that it "requested that the Court order Donziger to 'comply forthwith'" with the share transfer request and that "Donziger did not respond to that request." Dkt. 1966 at 13. But of course Chevron's letter was to the Court, not to undersigned, and Chevron puts a lot of nonsense in its various letters and motions. Chevron fails to note that the Court did not respond or otherwise appear to take any note of the mention of the share request. To the extent undersigned was aware of the issue, undersigned presumed that the Court, like undersigned, considered the whole issue obsolete and pointless given that Chevron now seems to hold all shares in Amazonia.

2

has that could be addressed at this point by further action by the Court.

Before moving on, it is worth noting the palpable bad faith behind Chevron's continued effort to demonize the intentions behind the Amazonia entity and the good faith of the many financial supporters of the Ecuadorian litigation. Most of these persons are public interest oriented individuals seeking to assist impoverished indigenous peoples and farmer communities access justice and vindicate a meritorious environmental claim that they otherwise would not have the resources to prosecute. It always has been important to these individuals that justice be achieved for the affected indigenous peoples and farmer communities and that Chevron's horrific contamination properly remediated. More specifically, the Amazonia entity, as undersigned understands it, was an effort to organize investor interests in a fair and transparent (across investors) manner, and to ensure an orderly and responsible use of funds once the Ecuadorian judgment results in a recovery. To that end, efforts to shield and ensure sufficient funds for a full remediation as ordered by the Ecuadorian court were literally written into the governing bylaws (Memorandum and Articles of Association, trial exhibit PX 657) of the entity. The Court cited this governing document at footnote 1110 of its RICO Judgment, but never observed that the entity is actually structured to fully protect monies dedicated to environmental remediation. The Articles provide, in the definition section, that "Remediation Proceeds" are as follows:

> All proceeds of the Award attributable to amounts paid or collected pursuant to, or in respect of amounts described in, Section Thirteen of the Judgment. For the avoidance of doubt, the Company has no right, title or interest in or to any Remediation Proceeds. In the event that any such Remediation Proceeds are paid to the Company, the Company shall hold such Remediation Proceeds on trust for the Remediation Trust, and immediately remit the same to the Remediation Trust.

RICO Trial PX 657 at 11. [3] "Available Proceeds," out of which investors could be legally paid by ARL, was in turn defined as "[t]he total proceeds of the Award, *reduced by . . . any portion of the Award consisting of or attributable to Remediation Proceeds*." *Id.* at 5 (emphasis added).  Amazonia was a private entity that obviously was organized with a public interest purpose linked to the environmental, human rights, and access to justice objectives of the underlying litigation. Chevron and its lawyers (who are closely linked to a broader effort to undermine third-party litigation finance and taint "plaintiffs lawyers," in particular through Chevron's highest-tier funding of related projects through the U.S. Chamber of Commerce) breezily demonized it as some nefarious effort to steal away monies. It appears that this Court unfortunately bought the Chevron story without reading the fine print.

> > ***Second,*** with respect to the claim that the undersigned is attempting to

---

[3]   Section Thirteen of the Ecuador judgment sets out all the actual damages figures and found and calculated by the Ecuadorian court. It does not set out the punitive damages figure nor the separate 10% incentive award under Ecuador's Environmental Management Act to the community organization that led prosecution of the lawsuit, the *Frente de Defensa de la Amazonía.*

monetize or profit from the Ecuadorian judgment in violation of this Court's RICO judgment, the bad faith of this claim is clear. Most critically, Chevron *completely fails to cite* on this point the applicable order of the Court, namely its order dated April 25, 2014 (Dkt. 1901). Because undersigned moved for relief from the "monetize or profit from" portions of the original RICO judgment, and the Court granted relief, or at least very distinct clarification, in regard to the same, it is Dkt. 1901 that is effectively the applicable order of the Court on which Chevron thinks the undersigned should be held in contempt. Yet, Chevron fails to even cite it. Thinking what—that it will somehow go unnoticed?

Chevron fails to cite the relevant RICO order because it is fatal to its pretense of contempt. That order makes clear that funds "traceable to the judgment" would *not* include the sorts of funds that undersigned raised and used to pay case expenses, including for his own fees, in the years prior to the RICO litigation.[4] The only funds subject to the order are those obtained by way of "*collections* [that] are made in respect of the Lago Agrio Judgment." Dkt. 1901 at 8 (emphasis added). The Court outright chastised the undersigned for seeing any concern regarding his ability to raise funds (and compensate himself and others) implied in the language of paragraph 5 of the RICO Judgment:

---

[4]    Dkt. 1901 at 7-8 ("[A]s long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, just as he has been paid at least $958,000 and likely considerably more over the past nine or ten years.").

> The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment [and that the Court had just made clear did not include funds raised to cover litigation expenses and fees] by selling, assigning, or borrowing on *their* interests in the Lago Agrio Judgment and thus at least confusing the issue of traceability. Indeed, Donziger's memorandum so recognized when he described paragraph 5 by saying that it would "[d]epriv[e] Mr. Donziger of *his* interest in . . . a case to which he has devoted the better part of the last two decades."

*Id.* at 10 (emphasis original). To the extent that case litigation fund-raising could even be brought within the ambit of the paragraph 5 (and undersigned believes it is not), the Court emphasized, literally, that the paragraph would only apply to "selling, assigning, or borrowing on *their* interests"—the specific interests of the undersigned or the two individual plaintiffs (who do not hold any personal interests in the judgment).

In case the forgoing wasn't clear enough, the Court also established that "The NY Judgment Does Not Threaten to Prevent the LAP Representatives From Financing Their Appeal," *id.* at 11 (section heading), specifically making clear that "[n]othing in the NY Judgment prevents the LAPs (other than the two LAP Representatives who are named in the NY Judgment) and their allies from *continuing to raise money in the same fashion*" as prior fund-raising efforts noted by the Court, *i.e.* accepting funds for litigation expenses from investors in return for

a contingency interest in any recovery. *Id.* at 12 (emphasis added).

Chevron apparently thinks that this interpretation by the Court of its own judgment does not merit citation, much less discussion, in its 24-page contempt application which is the sixth such application filed against the undersigned since the commencement of the action. More importantly, Chevron's application is entirely devoid of any allegation that the fund-raising at issue is an attempt to "avoid[] the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment," *i.e.* on funds from a "collections . . . made in respect of the Lago Agrio Judgment." *Supra.* It is further devoid of any allegation that the interests supposedly being "monetized" were specifically Donziger's or Mssrs. Camacho or Piaguaje's ("their") interests, as opposed to the majority outstanding interest in the case that the Court recognized would legitimately allow the Ecuadorian plaintiffs to "continu[e] to raise money in the same fashion" as they had been doing.

Now comes Chevron's game. It is hardly subtle. Chevron filed its contempt application with ***zero*** allegations that would satisfy the Court's own interpretation of the contours of its second RICO order. Why? Because Chevron's next move almost certainly will be to exclaim that it should not be required to trust undersigned's word that the interests being pledged for investment purposes are not specifically his own or those of Mssrs Camacho/Piaguaje, but rather should be entitled to extensive and

invasive discovery into confidential and privileged internal matters of the team litigating against it in Canada and elsewhere in order to prove the same—and in the process, intimidate and scare off the financial supporters of the case as the company has done regarding, among others, Burford, Woodsford, Mr. DeLeon, H5, and now Elliott Capital Management. This Court should not countenance such a fishing expedition intended to cut off financing for enforcement efforts, the legitimacy of which was recognized by the Second Circuit when it affirmed this Court's RICO Judgment expressly on the grounds that "[t]he relief tailored by [this Court] . . . does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment anywhere outside of the United States."[5]

Chevron's desperation to access this confidential information is evident from its application and the blizzard of subpoenas it served in recent weeks on the undersigned and others. Undersigned will need to move to quash those subpoenas separately (requiring more time stolen from broader efforts to hold Chevron accountable for its environmental crimes—another express strategic purpose of Chevron's discovery tactics), but for present purposes it is noted that Chevron has not met even the weakest threshold showing that discovery is warranted. Again, Chevron has not presented *any* specific claim that the interest offered for investment is specific to the undersigned or Mssrs. Camacho/Piaguaje; certainly there is nothing

---

[5]   *Chevron Corporation v. Donziger*, 833 F.3d 74, 151 (2016).

in the Lee Grinwald affidavit to back up this contention.

Absent such specificity, the notion that the undersigned's fund-raising efforts are in violation of the Court's RICO Judgment are baseless. Chevron could have offered such speculation up bare, at any time, for no reason, but it knows it would be rejected. So instead Chevron tried to dress up the speculation in association with the declaration it managed to obtain from Mr. Grinburg, hoping that the lack of any specific reference to undersigned's interest of Piaguaje/Camacho's interest will go unnoticed. That hope is as weak as the hope that the Court's order at Dkt. 1901 would go unnoticed.

In sum, Chevron's sixth application to hold the undersigned in contempt (the previous five being unsuccessful) is manifestly in bad faith given the absence of any specific evidence of a violation of the Court's RICO Judgment and the extent to which the application instead serves Chevron's larger "demonization" strategy against counsel for the plaintiffs. To the extent Chevron has a specific claim with regards to the Amazonia shares, it should first inform the Court—and undersigned— of the current status and existence (or not) of the Amazonia entity, and its own interest in the same. Chevron's claim regarding fund-raising should be expressly rejected. The application for contempt should be dismissed and all discovery predicated on the application should be immediately withdrawn.

DATED:      April 24, 2018            Respectfully submitted,

                                      *s/ Steven R. Donziger*
                                      Steven R. Donziger
                                      245 W. 104th Street, #7D
                                      New York, NY 10025
                                      Tel: (917) 678-3943
                                      Fax: (212) 409-8628
                                      Email:
                                       sdonziger@donzigerandassociates.com

                                      *Pro se*
                                      *Counsel to Donziger & Associates,*
                                      *PLLC, and the Law Offices of Steven R.*
                                      *Donziger*