i582che1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    CHEVRON CORPORATION,

4                    Plaintiff,              New York, N.Y.

5               v.                           11 Civ. 691(LAK)

6    STEVEN DONZIGER, *et al.*,

7                    Defendants.

8    ------------------------------x        Argument

9                                           May 8, 2018
                                            4:40 p.m.
10
     Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                            District Judge
13

14                          APPEARANCES

15

16
     GIBSON, DUNN & CRUTCHER, LLP
17        Attorneys for Plaintiff
     BY:  RANDY M. MASTRO
18        ANDREA E. NEUMAN
          ANNE CHAMPION
19        ALEJANDRO A. HERRERA

20
     STERN & KILCULLEN, LLC
21        Attorneys for Plaintiff
     BY:  HERBERT J. STERN
22

23   STEVEN R. DONZIGER
          Pro Se Defendant
24

25

i582che1

1              (Case called)

2              THE DEPUTY CLERK:  Plaintiff, are you ready?

3              MR. MASTRO:  Randy Mastro, from Gibson Dunn, for the

4    plaintiff.  Ready, your Honor.

5              THE COURT:  Mr. Mastro.

6              THE DEPUTY CLERK:  Defendant, are you ready?

7              MR. DONZIGER:  Steven Donziger.  I'm ready.

8              THE COURT:  Mr. Donziger.

9              The motion for an extension that Mr. Donziger made

10   with respect to the discovery motion Chevron brought on

11   recently I have granted.

12             Mr. Mastro.

13             MR. MASTRO:  Thank you, your Honor.

14             We are here, your Honor, today on an application to

15   hold Mr. Donziger in contempt.  May I hand up some charts that

16   I may use during the presentation, your Honor?

17             Thank you, your Honor.

18             You know, your Honor, I am reminded of that famous

19   Yogi Berra saying, "It's like *déjà vu* all over again,"

20   Mr. Donziger not complying with court orders, Mr. Donziger

21   stonewalling on discovery.  But, your Honor, we are well past

22   the point where Mr. Donziger has to comply with this court's

23   judgment in this case rendered back in 2014.

24             Now, your Honor, there are -- the very purpose of that

25   judgment, as your Honor explained in your RICO decision, was

i582che1

that the Lago Agrio judgment was obtained by, your Honor's

corrupt means, and the defendants, Mr. Donziger and the

two LAP representatives, quote, may not be allowed to benefit

from that in any way.

        Now, your Honor entered a judgment on March 4, 2014,

that had three fundamental elements:

        Paragraph 1 imposing a constructive trust on all

property that Donziger has received or hereafter may receive,

directly or indirectly, traceable to the judgment, and that

Donziger shall, under that paragraph 1, transfer and forthwith

assign to Chevron all such property that he has now or

hereafter may obtain.

        THE COURT:  Look, I think I can spare you a lot of

talk.  I have some familiarity with this case.

        MR. MASTRO:  Yes, you do, your Honor.

        So I will race ahead only to say, as your Honor, I

think, knows, the first element of the contempt is that there

has been no such assignment and there has been no, consistent

with paragraph 3 of your Honor's judgment, execution of the

stock power transferring to Chevron all rights, title, and

interest in his Amazonia shares.

        THE COURT:  Why did it take you so long to get here

about that?

        MR. MASTRO:  Your Honor, in -- it's a fair question,

your Honor.  The fact of the matter is that we have been

i582che1

1   pursuing multiple remedies in that regard, and I don't think

2   his contempt is any less important or actionable because we

3   coupled that contempt with a second contempt of which we only

4   became aware more recently.

5          And your Honor in that regard, about the Amazonia

6   shares, there is no factual dispute, and Mr. Donziger has, in

7   fact, not signed over his interests in the judgment or his

8   Amazonia shares.  In fact, your Honor gave him certain relief

9   to deposit them in the registry of the court.  We have, in

10  fact, written to your Honor letters over this past three-year

11  period occasionally bringing up the issue of Mr. Donziger not

12  complying with depositing the Amazonia shares, and we now bring

13  that to the court's attention as a matter warranting contempt

14  sanctions because it is now coupled with another, in our view,

15  egregious violation of your Honor's judgment and the injunction

16  that your Honor imposed.  And that really goes, your Honor, to

17  paragraph 5 of the judgment.  Paragraph 5 relates to paragraph

18  1, but it has its own force and effect as well.

19         Donziger and the LAP representatives, as your Honor

20  knows, were enjoined from undertaking any acts to monetize the

21  judgment, and that could include, without limitation, selling,

22  assigning, pledging, transferring, or encumbering any interest

23  therein.

24         Now, your Honor, Mr. Donziger has, we learned

25  recently, still been engaged in the process of attempting to

i582che1

1    sell interest -- pledge interests in the Ecuadorian judgment in

2    exchange for investor funding.  In essence, doing that which,

3    as Mr. Donziger put it in his opposition brief, admitting he

4    has been doing this, he calls it the fundraising at issue

5    concerns interests, his words, in the Ecuadorian judgment,

6    being pledged for investment purposes.

7            Now, your Honor, he thinks or argues, I don't see how

8    he could not realize it is so clear and unambiguous, that

9    because that is fundraising by pledging, his word, interests in

10   the Ecuadorian judgment for investment purposes that somehow

11   absolves him from the direct prohibition your Honor entered

12   under paragraph 5.

13           But he admits too much.  He does not deny that he did

14   this with Elliott and has been doing it with others, trying to

15   pledge interests in the judgment in exchange for investments,

16   to be able to enforce and monetize the judgment.  And your

17   Honor's provision under paragraph 5 of the judgment couldn't be

18   clearer.  He is undertaking acts, any acts to monetize by

19   pledging any interest in the judgment.  By his own words, he

20   admits to trying to pledge interests to potential investors for

21   investment purposes to, in essence, sell or pledge interests in

22   the judgment to get money to be able to enforce and monetize

23   the judgment.

24           Now, your Honor, this seems to me such a clear

25   violation, but I have to go to what Mr. Donziger raises as his

i582che1

1    excuses or defenses to the violation in the injunction, and

2    this has been made easier, your Honor, because Mr. Donziger

3    doesn't deny, nor could he, given the sworn testimony of an

4    Elliott witness and the handwritten notes and materials that

5    were provided pursuant to subpoena, but he admits he is doing

6    this with Elliott and potentially others and has been doing it

7    in recent months.  He says, well, I can't sell or pledge my

8    interest.  I guess he means his contingent fee, his 6.3 percent

9    contingency fee, the percentage he is entitled on anything

10   that's collected.  The LAPs can't pledge their interest, the

11   two LAP representatives, but the judgment, and he admits, it

12   prohibits monetization of his and Messrs. Camacho and

13   Payaguaje's interest.  But he says, you know, I -- that doesn't

14   preclude other interests from being pledged.

15          Now, your Honor, I suggest to you that that is

16   sophistry and it is not consistent in any way, shape, or form

17   with the express prohibition on him, quote, undertaking any

18   acts to monetize the judgment by selling, assigning, or

19   pledging any interests in the judgment.  It is not so limited.

20   Your language was as broad as could be and, your Honor,

21   Mr. Donziger's only bargaining chip in negotiation with

22   potential funders that he did personally, this is not some

23   other ally of the Ecuadorian litigation effort, this is him

24   personally, the enjoined party, his only bargaining chip was to

25   pledge an interest in future enforcement proceeds in the

i582che1

1   judgment in exchange for current funding from an investor in

2   order to be able to enforce and monetize the Ecuadorian

3   judgment.  That's exactly what your Honor's injunction

4   prohibited.

5          Now, he raises your Honor's April 25, 2014 order.

6   And, again, your Honor is more familiar with that order than

7   anyone in this courtroom, but if I can take just one moment to

8   say what I think the order clearly provided for and the context

9   in which it arose.

10          Mr. Donziger argued at the time -- there was an

11   attempt to get a stay pending appeal.  Mr. Donziger argued at

12   the time that the injunction could have, you know, prevented

13   him from working on the case, being paid for his work on the

14   case.  Your Honor flatly rejected that argument and said that

15   it prevented him from, quote, benefiting personally from

16   property traceable to the fraudulent judgment.

17          And your Honor went on to explain that the judgment,

18   including paragraph 5, the operative paragraph here, deprived

19   Donziger of the ability to profit in any way from the Lago

20   Agrio judgment he obtained by fraud.  Your Honor made very

21   clear, quote, the point of paragraph 5 was to prevent Donziger

22   and the two LAP representatives from avoiding the effect of the

23   constructive trust you imposed in paragraph 1 of the injunction

24   and judgment, that he was supposed to have assigned to Chevron

25   by selling, assigning, or borrowing on their interests in the

i582che1

Lago Agrio judgment, and thus at least confusing the issue of

traceability.  That's what your Honor wrote at page 10, and

went on to say that paragraph 5 expressly prohibited him from

monetizing or profiting from the judgment, including the

selling, assigning, or pledging of any interest.

In other words, Donziger may not benefit from the

personal use of funds obtained by selling, assigning, or

pledging any interest in the judgment which would necessarily

be traceable to the judgment.  Of course selling an interest in

the judgment to an investor is traceable to the judgment.  And

of course Mr. Donziger, then using those funds personally,

whether it is to advance a litigation interest or he has a 6.3

percent contingency fee or lining his pockets, as some of his

own clients back in Ecuador, your Honor will recall, charged

him with during the trial, that he had misused and mismanaged

millions of dollars in funds.  Either way, it is his personal

use, a selling or a pledging of an interest in the judgment

that he was not allowed to benefit from.

Now, your Honor -- your Honor went on, and I think

this made it crystal clear, your Honor went on to address the

argument that was made by the two LAP representatives in

seeking a stay pending appeal.  They argued specifically, and

your Honor recognized it, that the litigation against Chevron

has been funded by investors in exchange for shares of any

eventual recovery.  That was on page 11 of your Honor's April

```
1    2014 decision.  And here is where your Honor made it as crystal

2    clear as could be, in response to the LAPs' argument, when they

3    said, We will no longer be able to do that, the two LAPs, your

4    Honor said -- and that the litigation effort of the LAP group

5    as a whole and their allies would be stymied, and they wouldn't

6    be able to pursue their appeal, your Honor said, no.  Your

7    Honor said nothing in the New York judgment prevents the LAPs,

8    other than the two LAP representatives who are named in the New

9    York judgment, and their allies from continuing to raise money

10   in the same fashion.  That's on page 12.  In other words, your

11   Honor could not have made --

12             THE COURT:  So, in other words, to cut to the chase of

13   what I take to be your argument --

14             MR. MASTRO:  Yes, your Honor.

15             THE COURT:  -- and viewing the horizon as it existed

16   then, not as it exists today, when there is now also a separate

17   judgment against the other LAPs --

18             MR. MASTRO:  Precisely, your Honor.

19             THE COURT:  -- which is not at issue on this motion,

20   but is there, the essence of the point is the other 45 of the

21   Lago Agrio plaintiffs were at liberty, given the injunction I

22   entered four years ago, to go out and do whatever they wanted

23   to do to raise money, but not Mr. Donziger --

24             MR. MASTRO:  Precisely, your Honor.

25             THE COURT:  -- regardless of who he is getting the
```

i582che1

1    money for.

2              MR. MASTRO:  Correct, your Honor.  Your Honor made it

3    crystal clear that Mr. Donziger and the two LAPs were enjoined

4    from doing just that, but the other dozens of LAPs, their other

5    allies, they were not.  So your Honor made this crystal clear;

6    and, under those circumstances, to us, it is shocking that

7    Mr. Donziger has continued, apparently with abandon, but

8    certainly we know in the case of Elliott, to have specifically,

9    within recent months, done exactly that which the injunction

10   prohibits.

11             This is not in dispute, your Honor.  Mr. Donziger does

12   not dispute it at all.  And I note that that effort benefits

13   him personally in any event because he has a contingency fee

14   arrangement where he gets a percentage of whatever is

15   collected.

16             THE COURT:  Or so he thinks.  It is subject to the

17   trust I imposed.

18             MR. MASTRO:  Correct, your Honor.  But this is what he

19   is out there selling.  As you can see from the very notes of

20   the Elliott meeting where he is touting his 6.3 percent

21   contingency fee interest.

22             Your Honor, this is directly contrary to your Honor's

23   injunction, and I just want to say this, your Honor, before I

24   close, we don't know the full extent, the full egregiousness of

25   the contempt.  We have been stonewalled in the discovery, so we

i582che1

1    want to continue to receive that discovery because I think the

2    court, in determining the contempt sanction, has a right to

3    know how extensive the contempt has been, and therefore how to

4    remedy it, but that there has been a contempt, that it is clear

5    and unambiguous, and that it is now supported by admissions

6    beyond clear and convincing evidence.  He admits it and says, I

7    have the right to do it.  Your Honor, it is a contempt.

8         THE COURT:  Mr. Donziger, are you rising because you

9    want to say something or are you rising because you have a

10   medical problem.

11        MR. DONZIGER:  Out of respect for you, but I would

12   like to say something.

13        THE COURT:  Well have a seat.  You will get your

14   chance.

15        MR. MASTRO:  So, your Honor, we are here today to ask

16   your Honor to hold Mr. Donziger in contempt, to compel him to

17   provide discovery of the extent of his contempt, as well as to

18   his assets in connection with the money portion of the

19   judgment.  He has stonewalled us on the discovery entirely.

20        THE COURT:  Okay.

21        MR. MASTRO:  But we ask your Honor to hold

22   Mr. Donziger in contempt, and then we will subsequently ask

23   your Honor to please impose appropriate civil contempt

24   sanctions that coerce him to comply with this court's orders.

25        And I have to say one other thing, your Honor, I asked

i582che1

```
 1    Mr. Donziger today, before he rises, please come here today,
 2    bring the Amazonia shares that you don't deny you have, bring
 3    the packet of materials offered to provide the folks at Elliott
 4    about the opportunity for them to buy an interest in the
 5    judgment.  I asked him to bring those just as a sign of good
 6    faith that they could be compelled today.  We came with
 7    assignment documents with us for him to assign his interest in
 8    the judgment as your Honor directed several years ago.  And I
 9    hope your Honor --
10              THE COURT:  I don't remember that part.
11              MR. MASTRO:  Your Honor, it is at the end of paragraph
12    1 in the judgment, that you shall transfer and forthwith assign
13    to Chevron all such property in connection with the
14    constructive trust.  It includes any interest he has received
15    or may receive directly or indirectly.  You know, that
16    obviously hasn't happened, your Honor.  But I simply suggest
17    that when Mr. Donziger rises, I hope he will explain why he has
18    or hasn't brought those documents with him, and I hope he will
19    be made to produce them if he hasn't brought them with him
20    today.
21              Thank you very much, your Honor.  Appreciate all the
22    time.
23              THE COURT:  I have a question or two for you.
24              MR. MASTRO:  Certainly, your Honor.
25              THE COURT:  I'm a little bit confused about -- I
```

i582che1

1  understand the contempt part of the contempt application with

2  respect to paragraph 3.  I'm not entirely clear on paragraph 5

3  in this respect.  Are you asking me to proceed to adjudicate

4  the contempt application with respect to whatever exactly

5  happened with Elliott Management and to give you discovery and

6  then conceivably proceed to further contempt proceeding in

7  relation to whatever else, if anything, occurred, or are you

8  asking me for discovery first and the opportunity to make as

9  full a record as you can with respect to paragraph 5 and then

10  deal with that full record?

11        MR. MASTRO:  Your Honor, I think the contempt as to

12  Elliott has been established now by admission, and Mr. Donziger

13  has suggested, in responding, that he is engaged in a broader

14  array of activity.  I think that, therefore, your Honor is in a

15  position today to issue a contempt finding in relation to

16  Elliott based on the admitted record and conduct, but your

17  Honor then would have to determine what is the appropriate

18  remedy for the contempt.  And I think in order to be able to do

19  that, your Honor and we need to be able to present your Honor

20  with the discovery evidence of the full extent of his contempt.

21  Who else besides Elliott has he done this with?  How has he

22  been doing it?  And your Honor can fashion a remedy.

23        THE COURT:  Look, I don't understand that distinction.

24  There is an injunction, and he either violated it on this

25  occasion he didn't.  And if there are other occasions, he

i582che1

```
 1    either violated it or he didn't.  He is subject to the
 2    injunction.  He is subject to the panoply of contempt remedies
 3    in the event there is a violation.
 4            What is it that you can imagine asking me to do down
 5    the road, assuming there is a contempt on paragraph 5, that you
 6    can't explain to me now?
 7            MR. MASTRO:  Your Honor, I would say it falls into two
 8    categories.
 9            One, your Honor, is that we know the approach with
10    Elliott.  We don't know what his conduct was with other
11    potential investors as to which a remedy should be fashioned
12    that may have been somewhat of a different approach.
13            Number two, we don't know whether he succeeded during
14    this period in actually obtaining funding.  So therefore, the
15    remedy that your Honor might order -- let's say he raised 5
16    million from investors and he now has control over that amount
17    of money.  You have a right to know, we have a right to know
18    that he has now had personal use of that money by selling
19    interests in the judgment in violation of your Honor's
20    judgment, and that your Honor would then be in a position to
21    issue a contempt sanction of a very different kind, not simply
22    barring him from doing this in the future and holding him in
23    contempt, but actually other remedies about him having to
24    disgorge that money.
25            So I think, your Honor, I have to say this, we need
```

i582che1

the discovery.  I think your Honor has a right to that

discovery.  If your Honor were to decided to that you prefer to

have the benefit of that discovery first before making a

decision on the contempt, even though we think he has admitted

his contempt about Elliott, I understand and respect whatever

the court wants to do, but I think your Honor has a right to

know, in fashioning the remedy, how extensive the conduct has

been and what the results of the conduct have been, that you

can fashion an appropriate remedy to address his contempt if he

is he has actually succeeded at all, how he has been doing it

and what kind of steps you would want to take to make sure he

doesn't do it anymore and undoes the damage he has done by

having violated your Honor's order, including potentially

having raised money illegally during this period of time in

violation of your Honor's order.

        THE COURT:  I still don't quite have your position on

whether you want me, assuming it is not quite as clear-cut as

you do and I'm not saying whether I do or not, to wait on the

Elliott Management issue until you have pursued discovery or

not.

        (Continued on next page)

I58HChe2

1          MR. MASTRO:  Your Honor, I think that it's imperative

2     that you understand the full extent of Mr. Donziger's contempt

3     and whether he's actually been successful in some of these

4     efforts which are such blatant violations of your Honor's

5     orders and then be able to issue appropriate contempt

6     sanctions.

7          I simply say, your Honor, that the Elliott contempt to

8     us is already a clear violation of your Honor's orders, but we

9     believe that discovery will reveal even more egregious

10    violations and perhaps even successful fundraising, selling off

11    interest in the judgment, and the remedy under those

12    circumstances would have to be even more extensive to address

13    the contempt than the Elliott situation alone.

14          So, your Honor, we definitely want the discovery.  So

15    if your Honor believes that it would be an aid to the Court for

16    the discovery to be had before your Honor rules on the

17    contempt, we understand that and accept that, because we

18    definitely want to have that discovery and the benefit of

19    giving you a full record.

20          THE COURT:  OK.  Thank you.

21          Your turn, Mr. Donziger.

22          MR. MASTRO:  Your Honor, Amazonia is, of course --

23          THE COURT:  Separate.  I understand that.

24          MR. MASTRO:  And that's ready for resolution.

25          THE COURT:  I understand that.

I58HChe2

1              MR. MASTRO:  Thank you.

2          Thank you, Mr. Donziger.  Sorry.

3              MR. DONZIGER:  Your Honor, good afternoon.  Mr. Mastro

4     could not be more wrong, and I'm going to tell you why.

5          Chevron exhibited tremendous bad faith in its initial

6     motion to hold me in contempt by citing the wrong order.  They

7     cited your originally RICO judgment rather than the

8     clarification order that you issued on my motion on April 25,

9     2014.

10             THE COURT:  Mr. Donziger, that was not a clarification

11    order.  That was a ruling on a motion for a stay pending

12    appeal.

13             MR. DONZIGER:  Be that as it may, in that order you

14    made it explicit that my clients in Ecuador were allowed to

15    sell their shares in the judgment to finance litigation

16    expenses, that is, to sell shares to investors in anticipation

17    of some sort of future collection, and you distinguished

18    between doing that and actually selling shares that I owned

19    myself to profit personally.

20             And they have not met their burden.  They haven't

21    presented one iota of evidence.  And the Greenwald -- Lee

22    Grinberg affidavit does not make this out.  It describes me

23    going to a meeting, trying to sell shares of my clients, not my

24    own shares.  There is no evidence.  And I promise you if you

25    got Mr. Grimwald in here to testify, he could provide no

I58HChe2

```
1    evidence, or Ms. Sullivan, that I ever have attempted or ever
2    have sold my shares.  I am allowed, if I sell the shares of my
3    clients, to get paid for my work on this case.  You yourself
4    said that in the April 25 order and I can quote that right
5    here.
6          You said:  "Thus as long as no collections are made in
7    respect to the Lago Agrio judgment," which has never happened,
8    "the New York judgment could not prevent Donziger from being
9    paid just as he has been paid" -- you put an amount of money in
10   there -- "over the last nine or ten years."  I'm going on your
11   guidance from April 25.
12         Further, I feel like I have been acting in full
13   compliance with the order as explained in docket 1801.  His
14   little booklet is almost all citing docket 1875.  But in 1801,
15   your Honor explicitly said we could sell shares to fund the
16   litigation.  You said it in multiple ways.
17         In terms of monetization -- let me just cite one other
18   quote.  You said on page 3 of the judgment, 1801:
19   "Significantly, the New York judgment did not restrict the
20   other LAPs, who remain free to sell, assign, or transfer their
21   interests, if any, in the Lago Agrio judgment and to seek to
22   enforce it anywhere in the world."
23         I'm selling, as an intermediary, the points or the
24   aspects of the judgment that are held by my clients.  I am not
25   selling my own shares, because that obviously is prohibited by
```

I58HChe2

1   your Honor's RICO judgment.

2           On page 7, you write -- you distinguish between a

3   contingency fee and being paid a retainer from selling -- from

4   generating investments to sell --

5           THE COURT:  You're going to have to clarify,

6   Mr. Donziger, because docket 1801 is a notice by a court

7   reporter of the filing of a transcript.  So I don't know what

8   you're referring to.

9           MR. DONZIGER:  I'm sorry.  It's 1901.  My apologies.

10          THE COURT:  OK.  Thank you.

11          MR. DONZIGER:  Anyway, on page 7 of 1901, this is what

12  you wrote:  "While any payments of a contingent fee would be

13  traceable to the Lago Agrio judgment, and thus subject to the

14  constructive trust imposed by paragraph 1, the same would not

15  be true of monthly retainer payments unless those payments were

16  traceable to the Lago Agrio judgment."

17          THE COURT:  So why wouldn't a retainer payment, the

18  funds for which were raised from an investor in exchange for an

19  interest in the judgment, be directly traceable to the

20  judgment?

21          MR. DONZIGER:  Because you made a distinction between

22  funds from collecting on the judgment, that is, as a result of

23  enforcement and then executing, and selling interest to pay

24  litigation expenses to pursue valid enforcement actions in

25  other jurisdictions, which you yourself said was valid and,

I58HChe2

obviously, the Second Circuit said was valid and permissible.
This is why you wrote, if you think back to four years ago when
I raised this issue, you said:  At least as long as no
collections, that is, collections from enforcing the judgment,
are made in respect to the Lago Agrio judgment and funneled
to --

THE COURT:  Suppose you settle the case for
$20 billion.  You think that might be a collection within the
meaning of what I wrote?

MR. DONZIGER:  Yes.  But there's no settlement.
There's no collection.

THE COURT:  So it doesn't have to be by execution?

MR. DONZIGER:  I haven't really thought that issue
through.  All I'll say is there has been no collection on the
judgment.  There might not ever be a collection on the
judgment.  You have ruled in the RICO judgment that this
judgment can be enforced anywhere in the world except in the
United States by me and two other people.  That was your
ruling.

THE COURT:  Well, that's your version.

MR. DONZIGER:  Well, I believe that's your ruling.
And then you said the New York judgment would not permit
Donziger from being paid, just as he has been paid at least
$958,000 and likely considerably more over the last nine or ten
years.  That is what is happening.  I'm not conceding --

I58HChe2

1          THE COURT:  In what affidavit by you does it explain

2     exactly what's happening?

3          MR. DONZIGER:  I don't believe I should be obligated

4     to present evidence because they haven't met any of their

5     burden.  What evidence have they presented to show I have sold

6     a single piece of my interest?  Zero.  And it hasn't happened.

7     I'll make that representation right now.

8               This is an attempt, with all due respect to my friends

9     at Gibson Dunn, it is an attempt to dig into my personal

10    finances, to dig in and figure out who the heck is funding this

11    case and to go subpoena them, as they've already done to

12    Ms. Sullivan, in an effort to dry up our funding.  That is why

13    I say at times, even though I know you probably disagree with

14    me, that this is a SLAAP attack.  We have a right to pursue

15    enforcement in other countries.  That can't happen without at

16    least some money to pay expenses.

17         THE COURT:  Mr. Donziger, lower the temperature.  I've

18    heard this SLAAP attack argument for years.  You know I don't

19    accept it, and if the name of the game is to catch a fish, at

20    least put the hook near the fish.

21         MR. DONZIGER:  I'm not sure I know what you mean by

22    that, but I'll say this:  Going back to 1901, you said that the

23    New York -- this is page 10 -- "The New York judgment,

24    including paragraph 5" -- this is the key paragraph on

25    monetization -- "in fact would deprive Donziger of the ability

I58HChe2

 1    to profit from the Lago Agrio judgment that he obtained by

 2    fraud," which, by the way, I disagree still.  "The practical

 3    effect of that, however, is not to prevent him from working on

 4    the case, nor to prevent him from being paid his monthly

 5    retainer for his labors.  It is to prevent him from benefiting

 6    personally from property traceable to the fraudulent judgment."

 7            That is collection.  It is not selling shares to pay

 8    litigation expenses.

 9            Page 11, 1901:  "The litigation against Chevron has

10    been funded by investors in exchange for shares of any eventual

11    recovery."  That's how it had been funded prior to the RICO

12    case.

13            And then you write:  Nothing in the New York judgment

14    prevents the LAPs, other than the two LAPs named in the

15    judgment, and their allies from continuing to raise money in

16    the same fashion.

17            And then on page 27, you describe your own judgment as

18    "carefully cabined relief."  And I will point out, when the

19    Second Circuit affirmed your Honor, they specifically cited to

20    the fact -- this is very unusual because there had never been a

21    RICO case absent damages in the United States, other than maybe

22    one other.  It was unusual relief that you granted Chevron in

23    the RICO case compared to any other RICO case.

24            The Second Circuit, I believe if you read their

25    decision carefully, got comfortable with it precisely because

I58HChe2

1   your Honor tailored the relief very narrowly and made it

2   explicit that the Second Circuit's decision that this judgment

3   could be enforced by the Ecuadorians anywhere in the world

4   really prevented exactly what Mr. Mastro and Chevron are

5   seeking here, which is a complete shutdown of the ability of

6   the Ecuadorians -- and I am still their lawyer, OK.  I have a

7   right to help my clients fund their own litigation.  I have a

8   right, with my client's permission, to be paid for my work.

9   And none of this money violates the RICO judgment.  And

10  Mr. Mastro is just wrong.  And I really fear for this case,

11  which is making, by the way, tremendous progress in another

12  jurisdiction, but I fear for this case if your Honor grants

13  what Mr. Mastro is seeking.  Because at that point this case,

14  which is exactly what they want because they cannot win, in my

15  opinion, on the merits, they want to shut this down through the

16  back door by drying up financing.

17          I have been in full compliance with your Honor's

18  order.  I really urge you not to grant their motion to hold me

19  in contempt.  This is the sixth time they've tried to do that.

20  They want to wave around that Donziger was held in contempt.

21  I've had to live with a RICO judgment on me now for many years,

22  sir.  It has not been easy.  Now they want a contempt citation.

23          This case is playing out around the world, in Canada

24  right now.  Your judgment stands on its own.  You found fraud,

25  OK.  The evidence is what it is.  This ultimately will be

I58HChe2

1    reviewed by Canadian courts, and I would urge you to please let

2    this process play out without denying the ability of my clients

3    to continue to fund this action, because I can tell you, and I

4    will represent right here, that I am the lifeline for people in

5    Ecuador to raise money.  And I don't want intimidation to the

6    funders that I have had to solicit from this camp, which they

7    have done repeatedly and they did, as you know, during the RICO

8    case with Burford and Russ DeLeon and many others.  If that

9    goes down again, which is what they really want to do by

10   getting this discovery, it will be virtually impossible for the

11   indigenous peoples of Ecuador and the farmer communities of

12   Ecuador to raise money to fund this litigation.

13        It's not fair, and that's why I say it's SLAAP,

14   because it really is designed -- I have a right to advocate, no

15   matter what you think of me, and I know you don't have a very

16   high opinion of me.  I have a right to continue advocating for

17   my clients, and I have a right to sell their shares to raise

18   money for perfectly legal action in Canada that is progressing,

19   as you know, with three straight appellate court victories in

20   our favor.

21        So I don't get what's happening here.  This is an

22   attack on the First Amendment and the ability of me to be a

23   lawyer or an advocate because, as you know, I might not be a

24   lawyer because there's a Bar complaint against me based on your

25   findings.  So I would urge you to take this no further.

I58HChe2

1              You know, if -- I'll say this:  If you want

2      reassurance from me that I have not sold my interests, there

3      are ways to do that in camera without the Chevron lawyers

4      finding out and starting to subpoena all of the goodhearted

5      individuals who didn't fund me because they like Steve

6      Donziger, but because they care about the people down there.

7      And not even you dispute those people are living in terrible

8      life conditions as a result of oil pollution.  They deserve a

9      chance, sir, to continue fighting this.

10             And, you know, this has gone on now -- I've had to

11     live with RICO thing filed on February 1, 2011.  My life

12     changed that day, and it has never recovered.  There's only so

13     much that a lawyer should have to take from these types of

14     attacks.

15             If it's your opinion, sir, that I can't raise money, I

16     need clarity, because right now, if you look at 1901 that I'm

17     citing, that is not clear at all.  I believe I'm in compliance

18     with 1901 right now.  I would urge you to go back and really

19     review that carefully, to think deeply about what I'm saying.

20             You know, paragraph 5, cited by Mr. Mastro, also only

21     applies to collections; it doesn't apply to fundraising.  You

22     say in 1901 -- I was concerned with paragraph 5 when I filed

23     that motion way back that your monetization argument prevented

24     me from raising money, and you wrote that the idea that

25     monetization would prevent financing was so unfounded that it

I58HChe2

bordered on the irresponsible by me.  How can I take away from

that anything other than that we are allowed to continue

financing?  I'm not selling my shares; I'm selling my clients'

shares.

          And by the way, the agreements for these deals are

between people in Ecuador who own the judgment and the

investors.

          As regards Amazonia --

          THE COURT:  Who owns the judgment?

          MR. DONZIGER:  What's that?

          THE COURT:  Who owns the judgment?

          MR. DONZIGER:  Well, the Amazon Defense Fund is the

beneficiary of the judgment as part of the collective interest

of all those affected.  So if there is a collection, the fund

would flow to the Amazon Defense Coalition, which is known as

the FDA in Ecuador, and they would be obligated to use those

funds consistent with the Ecuador judgment -- I mean the

Ecuador judgment, which would be for cleanup purposes.

          THE COURT:  I'm not exactly sure that was an answer to

my question.  I don't know whether you meant it to be or not.

          MR. DONZIGER:  Well, when you say who owns the

judgment, it's a class action Ecuador style, and it's owned by

all the people affected, with the FDA being the nonprofit

entity designated by the court to receive the funds.  I don't

know if that answers your question or not.

I58HChe2

1          THE COURT:  Well, let's see.

2          MR. DONZIGER:  As regards the Amazonia issue, because

3     there's two separate bases they're arguing where I should be

4     held in contempt, one is this raising money issue, which I just

5     argued; the second issue, the Amazonia issue, I believe, is

6     completely baseless, and I'm going to tell you why.

7          OK.  I have never violated your Honor's order.  OK.  I

8     am a lawyer in good standing of this state and this court as I

9     sit here today.  I am not violating court orders.  They control

10    Amazonia.  They have my shares already.

11         THE COURT:  How exactly did that happen?

12         MR. DONZIGER:  They sued Amazonia in Gibraltar, as I

13    understand it.  And the people who run Amazonia, there's a

14    board of directors, there was an initial attempt to defend, and

15    ultimately they just gave up for whatever reason, lack of

16    resources.  And they got a default judgment against Amazonia,

17    and then the entity, as I understand it, was put into

18    liquidation.

19         When I filed my opposition to the contempt motion, I

20    mentioned that I wasn't sure of the status of it because they

21    have never disclosed the status of it, and I assume Mr. Mastro

22    had three banker boxes of stuff from that case delivered to my

23    apartment by 9:00 a.m. the next morning.  So somewhere in this

24    massive amount of material, I assume, is the answer to that

25    question.

I58HChe2

1              But I don't think we should play possum here.  I think

2      you should ask the Chevron lawyers do they own my shares,

3      because I don't, as far as I know, have a document that has

4      shares on it.  However, I will be more than happy to do

5      whatever the Court instructs, because I think this is a

6      completely ridiculous issue.

7              THE COURT:  I instructed in 2014.  We are all waiting.

8              MR. DONZIGER:  Why didn't they pursue it for four

9      years?

10             THE COURT:  I asked that question.  That's neither

11     here nor there.

12             MR. DONZIGER:  Just so you know --

13             THE COURT:  You're a lawyer who says he complies with

14     court orders.  There is a court order outstanding since 2014

15     that compels you to deliver an executed stock power.  I am told

16     it has never happened.  You have not denied that.

17             MR. DONZIGER:  Well, that's not the end of the story,

18     sir, OK.  In 2014 -- this was the problem in 2014.  I sent them

19     a letter saying I would be more than happy to negotiate

20     something that would work for both of us.

21             THE COURT:  I read the letter, Mr. Donziger.

22             MR. DONZIGER:  OK.  They never responded.

23             THE COURT:  So what?

24             MR. DONZIGER:  I acted in good faith.

25             THE COURT:  So what?

I58HChe2

1              MR. DONZIGER:  So why are they here now four years

2      later?  Because we're winning in Canada?

3              THE COURT:  They won.  They got a judgment.  You made

4      them an offer.  They blew it off.  Not the first time in legal

5      history, not the last.

6              MR. DONZIGER:  Well, I'm representing to you today

7      that I do not believe I have violated the order.  I have looked

8      for a way to do it, because had I done that, there would have

9      been all sorts of other problems with divestment.  Had I won

10     the case on appeal, number one; number two, I ran into problems

11     with my clients because I was not allowed to transfer shares

12     absent an agreement by the board of directors in Amazonia.

13             But I will say this:  It doesn't matter, because they

14     own it.  OK.  This is a fake issue.  And if they want me to

15     sign my shares over, which they already have because this would

16     be a public relations exercise for them, I'm happy to do it.  I

17     am not going to sit here and be held in contempt over something

18     that's completely meaningless, when I'm here today ready to do

19     that.

20             So tell me what you want me to do.  He says he has

21     something for me to sign.  Well, why hasn't he presented that

22     to me?  Where is it?  I'm sitting here.  He sent me an email

23     this morning looking for discovery.  Why is he playing possum

24     with me?  To make me look foolish?  Just give me the document

25     you want me to sign.

I58HChe2

1                 Do you have it, sir?  I mean, come on.

2                 MR. MASTRO:  I do have an assignment here, and I asked

3     you to bring the shares to court today.

4                 MR. DONZIGER:  I don't have the shares, sir.  I told

5     you that.

6                 And beyond that, excuse me, they filed a motion to

7     compel discovery.

8                 THE COURT:  We're not getting there.

9                 MR. DONZIGER:  I have a right to answer that before I

10    deal with these issues.

11                THE COURT:  Did I just give you an extension to

12    respond?

13                MR. DONZIGER:  I appreciate that.  Thank you.  I

14    appreciate that.

15                THE COURT:  All right.

16                MR. DONZIGER:  But, I mean, when starts trying to say

17    why don't I bring stuff to court, these issues are still being

18    litigated.

19                To authorize broad-based discovery into my files

20    again -- I remind you I sat for 19 days of depositions between

21    RICO and 1782 process.  Your Honor ordered me to turn over, as

22    you know, my entire case file, entire case file at that time,

23    17 years of work.  To have to now go through that process again

24    when they haven't shown a single piece of evidence that I've

25    sold my own shares would be, in my mind, very inappropriate.  I

I58HChe2

1    really would urge you, please, not to do that.

2            If there is a narrow concern based on 1901 -- they

3    don't believe me.  They think I'm up here lying perhaps.  So

4    they're like, Oh, he's probably telling not telling the truth.

5    How do we know he hasn't sold his shares?  Well, I'm a lawyer

6    and I'm representing to you as an officer of the court right

7    now I have not sold my own shares.  And if you don't believe

8    me, if you need more than that, please fashion a narrow

9    solution for me to give you materials in camera to prove that

10   to you, and I can.  I can do that if you're willing.

11           And if you come away satisfied that that's consistent

12   with docket 1901, which explicitly allows the LAPs to sell

13   shares in the case to finance litigation expenses -- again, I'm

14   not selling my shares, I'm selling their shares.  And I have a

15   fiduciary duty to them, and they understand what's happening

16   with the money.  And, by the way, this issue of my clients

17   being concerned about this and that, that's a whole other

18   group, UDAPT, that's not my client.  That's a footnote in their

19   reply.

20           I am happy, would be happy -- well, not happy, but I

21   would be more than willing to work with you and to see if that

22   would satisfy your Honor before we go through this incredibly

23   cumbersome process of sitting for depositions, turning over

24   documents.  It's expensive; it's time-consuming.  And with all

25   due respect, you might not like this, but I'm heavily, heavily

I58HChe2

focused on helping my clients in Canada do what you said was

appropriate, do what you authorized to do and the Second

Circuit authorized, which is deal with that very complex

litigation.

        The other problem is I have very little

infrastructure.  I'm still a sole practitioner working out of

my apartment.  For them to give me this incredibly burdensome

subpoena -- by the way, one of the things they're seeking is

for me to tell them every single conversation I have had since

the RICO judgment came down about the Ecuador case with anybody

in the world.  I don't know how I would start doing that.  This

is designed to hurt me.  It is designed to get in the way of my

advocacy.

        If there is a legitimate part, legitimate information

that they are seeking in discovery, this has to be severely,

severely narrowed.  And to me, if there's anything -- I think

this whole thing should be shut down.  That's what I'm asking

you for.  But if there's anything that might be arguably legit

about what they're seeking, it's something related to the

narrow issue of am I selling my own shares.  And if you're not

going to accept my representation, I can prove to you that I

have not sold my own shares, and that's what it should be

limited to.

        Do you have any questions or anything?

        THE COURT:  No.

I58HChe2

1          MR. DONZIGER:  Thank you.

2          THE COURT:  Thank you.

3          Mr. Mastro.

4          MR. MASTRO:  Thank you, your Honor.

5          Your Honor, I'll be uncharacteristically brief.  Your

6     Honor, Mr. Donziger describes himself as a lifeline.  I think

7     your Honor knows from the submissions we've put in, he's

8     actually now in an ongoing battle with Mr. Fajardo and others

9     as to who actually represents the indigenous people in Ecuador.

10    So I respectfully suggest that that characterization doesn't

11    accurately describe the situation.

12         Your Honor, two separate things:  The Amazonia shares

13    which your Honor ordered back in March 2014, he doesn't deny

14    that he hasn't turned it over, he doesn't deny that he --

15         THE COURT:  He says he doesn't -- I understand him to

16    be saying he doesn't have a stock certificate.

17         MR. MASTRO:  Right.  But that doesn't prevent him,

18    your Honor, from effectuating something that assigns his

19    interest, and your Honor ordered this back in 2014, on appeal

20    ordered him to turn it over into the registry of the court.  I

21    hear Mr. Donziger saying two things.  I hear him saying, one,

22    and this is what he said in his brief, he said he can't do it

23    because a transfer of shares will materially prejudice my

24    clients.  He says, I can't do it.  Then he says, Oh, but I will

25    do it now.  He speaks out of both sides of his mouth in the

I58HChe2

same conversation, but he hasn't done it.

            I just want to be clear to your Honor.  It is an issue
we've raised in the past.  In fact, there were appeals and
there was Supreme Court denial of cert on June 19, 2017.  We
wrote to your Honor immediately after the denial of cert, when
there could no longer be any excuse whatsoever for why -- and
this is docket entry 1922, your Honor -- why he hadn't turned
over the shares.  And of course, when we became aware of his
latest contempt, within months later, in soliciting investors
by selling off shares of the interest in the judgment, we
coupled the two together in this contempt application.

            So to us there could be no doubt.  And the excuse, and
it isn't even an excuse, that even after we obtained the
judgment of this Court that he was to turn over the Amazonia
shares and assign that interest, that we went to Gibraltar
against Amazonia, not him, obtained a money judgment against
Amazonia and have put them into a liquidation proceeding, OK,
which, by the way, does not mean under English or Gibraltar law
that it doesn't still exist.

            THE COURT:  Of course.

            MR. MASTRO:  We have a right to our remedy here, just
like we're pursuing our remedy there.  We shouldn't even be
having this conversation.  He's in contempt about that and
should be so held.

            THE COURT:  Are you in a position to inform me as to

I58HChe2

1    what, if any, rights Amazonia has with respect to the

2    Ecuadorian judgment?

3              MR. MASTRO:  Your Honor, it was our understanding at

4    the time that the Ecuadorian judgment as proceeds were -- and I

5    think we made a record of this during the trial -- that as

6    proceeds from the judgment were collected, they were to go

7    through Amazonia for a distribution system that included

8    Mr. Donziger's personal contingency fee, as well as other

9    distribution of the moneys.  That was the state of play that we

10   proved in the RICO trial.  I think that's why your Honor

11   ordered --

12             THE COURT:  Is there any reason to think that isn't

13   still the state of play?

14             MR. MASTRO:  Well, your Honor, because there's been so

15   many violations of court orders and so many attempts to change

16   the landscape, but we believe that Amazonia is still the entity

17   that was created for that purpose and exists for that purpose.

18             THE COURT:  So if that were true, for the sake of

19   discussion, what you have is a Gibraltar corporation which is

20   in liquidation, which I understand to be analogous to

21   bankruptcy if it were in the United States; there is an

22   outstanding judgment for whatever billions of dollars; the

23   judgment you obtained is against it; it is unable now to pay

24   that judgment; there is still equity owned by the equity

25   shareholders who were there to begin with; and it has a

I58HChe2

```
 1    contingent right to receive anything that ultimately is

 2    collected on the judgment.  Therefore, if the judgment is

 3    collected, you have a company in litigation which has nine,

 4    ten, whatever number of billions of dollars in collections, a

 5    $28 million, or whatever it is, judgment payable.  The company

 6    is suddenly enormously solvent, and the equity is highly

 7    valuable.

 8              Is that about right?

 9              MR. MASTRO:  Your Honor, absolutely correct.

10              Now, your Honor, to us the Amazonia question is

11    crystal clear and right for decision.

12              THE COURT:  So here's your $64 question.

13              MR. MASTRO:  Yes, your Honor.

14              THE COURT:  Do you have the stock power you want him

15    to sign?

16              MR. MASTRO:  Your Honor, we do have a share transfer

17    form and assignment ready to present to Mr. Donziger right now.

18              THE COURT:  Well, you can give it to him.  I'm not

19    going to insist that he sign it.  He is a free actor.  Your

20    motion is outstanding.  I imagine I'll rule on it soon.  And

21    you can let me know, both of you, whether it's in that regard

22    moot.

23              MR. MASTRO:  Thank you, your Honor.

24              It's two forms actually relating to the different

25    shares of stock.
```

I58HChe2

1          THE COURT:  Whatever.  I'm not getting involved in

2     that negotiation --

3          MR. MASTRO:  Thank you, your Honor.

4          THE COURT:  -- for whatever it is.

5          MR. MASTRO:  Let the record reflect that I just handed

6     Mr. Donziger the two forms that are share transfer forms

7     related to Amazonia.

8          Now, your Honor --

9          THE COURT:  I won't do anything for 24 hours.

10         MR. MASTRO:  Thank you, your Honor.

11         THE COURT:  Maybe longer.

12         MR. MASTRO:  Your Honor, as to the issues relating to

13    your April 2014 decision, I don't want to belabor them other

14    than Mr. Donziger, reading aloud some of the same sentences

15    that I read from that opinion which prove beyond question that

16    your Honor was saying that he and the two LAP representatives,

17    as the enjoined parties, could not be involved in undertaking

18    any acts to sell, transfer, pledge any interest in the

19    judgment.

20         MR. DONZIGER:  He didn't say that.

21         MR. MASTRO:  Excuse me, please, sir.

22         MR. DONZIGER:  He didn't say that, sir.

23         THE COURT:  Mr. Donziger, look, I nearly had to have a

24    criminal defendant dragged out of court this afternoon for

25    doing that, and I don't want to have to do it with you.  Quiet.

I58HChe2

 1   You had your chance.  He didn't interrupt you.

 2           MR. MASTRO:  And I just wanted to say two more things

 3   very briefly, your Honor.

 4           Mr. Donziger tries to say, in revisionist history,

 5   that paragraphs 1 and 5 of the judgment could relate only to

 6   collections.  Actually, the word "collection" is not used in

 7   either of those two paragraphs.  It talks about moneys

 8   traceable to the judgment.  You chose those words carefully,

 9   your Honor.

10           And I suggest just this, your Honor:  We're not here

11   today, as Mr. Donziger likes to put it, to hurt Mr. Donziger.

12   He already hurt himself by his own actions.  We're here to

13   enforce a judgment, a judgment in which he is in contempt of,

14   and that's the only reason we are here, your Honor.  We want to

15   know the truth about the full extent of his contempt, and then

16   we ask your Honor to impose appropriate contempt sanctions.

17           Thank you, your Honor.

18           THE COURT:  All right.  Thank you.

19           I'm going to take this under advisement.

20           MR. DONZIGER:  Can I respond, please, just briefly?

21           THE COURT:  Very briefly.

22           MR. DONZIGER:  The word "collection," sir, he's right,

23   it's not used in the order he cites, but it is used extensively

24   in docket 1901.  So he's citing the wrong docket, wrong

25   document.  I would urge you, please, to focus on what I focused

I58HChe2

on, which is your Honor's order from April 25, 2014, which is

the latest version of whether shares can be sold.

And your order -- why are you looking at me like that?

Your order doesn't prohibit me from selling my client's shares.

THE COURT:  OK, Mr. Donziger.  I have your position.

Thank you.

Now, there is one other pending motion, at least, that

I want to address briefly.  There is the motion that Chevron

made on May 4 to compel responses to the post-judgment

discovery request.  I've just extended Mr. Donziger's time to

respond.  If Chevron wishes to reply, it can do so by Monday.

I'll see you all back here Tuesday afternoon at 4:30 to deal

with that.

OK.  Thank you.

MR. MASTRO:  Thank you, your Honor.

(Adjourned)