## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

          Plaintiff,

   v.

STEVEN DONZIGER *et al.*,

          Defendants.

11 Civ. 0691 (LAK)

## MOTION FOR A PROTECTIVE ORDER
## TO PROTECT FIRST AMENDMENT RIGHTS

Defendant Steven R. Donziger hereby moves the Court pursuant to Fed. R. Civ. P. 26(c)(1) for a protective order necessary to protect his and his colleagues' First Amendment associational rights and to prevent discovery in this case from turning into a private "blank warrant" allowing Chevron to intrude and infiltrate itself into the First Amendment-protected political activities, associations, speech, operational practices, and strategic deliberations of Mr. Donziger and others. Mr. Donziger and others are part of a distinct interest and advocacy group focused on achieving environmental justice for the pollution left at Chevron's former operations sites in Ecuador and the imposition of accountability on Chevron regarding the same, particularly by way of the *Aguinda v. Chevron Corp.* environmental case in Ecuador and the enforcement of the merits judgment in that case ("the Ecuador Judgment"), which was affirmed unanimously by Ecuador's National Court of Justice, in Canada and elsewhere (in sum, "the Ecuador Litigation"). Chevron is an avowed opponent of this group, with a long history of seeking to suppress protected speech and association by directing judicial and extrajudicial harassment, espionage, intimidation,

economic extortion, and other reprisals on individuals and entities it perceives as supporters not just of the Ecuador Litigation but the broader social and environmental cause related to the massive toxic contamination deliberately discharged by Texaco and still existing at the company's former oil drilling, production and storage sites in Ecuador ("the Ecuadorian Environmental Cause"). With this motion, Mr. Donziger seeks an order precluding any discovery in these post-judgment proceedings (including discovery sought from third-parties) that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation ("Ecuador Litigation Team"), and/or more broadly engage in Ecuador Litigation-related advocacy ("Aguinda Supporters").

## I.   **Factual Background**

### A.   *The Ecuadorian Environmental Cause: Demand for Remediation of Chevron's "Amazon Chernobyl"*

As the Court well knows, the Ecuadorian Environmental Cause—a demand for a full remediation Chevron's appalling and still-existing contamination of the Ecuadorian rainforest—is widely considered one of the most important environmental and social justice causes on the planet. Thousands of news articles, video reports, films, interviews, and other projects from media outlets from numerous countries have drawn global attention, while dozens of environmental organizations have made common cause with the plaintiffs in their campaign to impose accountability on Chevron and ensure the collection of the Ecuador judgment.[1] The importance of

---

[1]   *See, e.g.,* Simon Romero and Clifford Krauss, *Ecuador Judge Orders Chevron to Pay $9 Billion*, New York Times, Feb. 14, 2011, at http://www.nytimes.com/2011/02/15/world/americas/15ecuador.html; Bob Herbert, *Disaster in the Amazon*, The New York Times, 4 June 2010, at https://www.nytimes.com/2010/06/05/opinion/05herbert.html; David Feige, *Pursuing the polluters: An*

the cause is tied to the depravity of the underlying tragedy: decades of operational decision-making by Chevron and its predecessors and subsidiaries to systematically eschew standard oil industry practices and instead dump toxic production water and other harmful wastes into hundreds of open-air, unlined ponds in and around indigenous and impoverished farming communities—in and around homes and gardens, schools and soccer fields.[2]

This viciously self-interested and arguably racist decision-making by a wealthy U.S. company (that never engaged in such deliberate and horrific dumping practices in the United States), and the resulting devastation of Indigenous peoples and other rural Ecuadorians ("the Affected Communities"), strikes a deep chord of indignation and outrage in many people. Chevron has heaped indignity on top of outrage by (a) refusing to clean up the toxic oil waste it dumped; (b) conducting a sham "remediation" that in many ways only increased the danger of the contamination to local peoples; (c) litigating a forum-shopping shell game for decades, *e.g.* first insisting the environmental case be heard in Ecuador, then resisting it once it was sent there; (d) using political pressure and intimidation tactics to try to kill off the case and strike fear in the Affected Communities and Aguinda Supporters generally; (e) refusing to abide by the judgment

---

environmental lawsuit may open the door for small countries to take on the multinationals, L.A. Times, Apr. 20, 2008, at http://articles.latimes.com/2008/apr/20/opinion/op-feige20; William Langewiesche, Jungle Law, Vanity Fair (May 2007), at https://www.vanityfair.com/news/2007/05/texaco200705; Abby Martin, "Empire Files": Empire Files: Chevron's Environmental Damages in Ecuador", TeleSUR, at https://www.youtube.com/watch?v=dB7hrQUgIcw; "Holding Chevron accountable" [news segment], Al Jazeera, Nov. 12, 2012, at https://www.aljazeera.com/programmes/insidestoryamericas/2012/11/201211287183855743.html.

[2] *See, e.g.*, Simon Romero and Clifford Krauss, *In Ecuador, Resentment of an Oil Company Oozes*, The New York Times, 15 May 2009, at https://www.nytimes.com/2009/05/15/business/global/15chevron.html; "New Study Confirms Chevron Caused "Widespread" Pollution and Health Problems in Ecuador, Validating Historic Court Judgment," CSRwire, Jun. 18, 2014, at http://www.csrwire.com/press_releases/37188-New-Study-Confirms-Chevron-Caused-Widespread-Pollution-and-Health-Problems-in-Ecuador-Validating-Historic-Court-Judgment (describing how Louis Berger Group, hired for the BIT arbitration, inspected 18 of Chevron's former well sites and "confirm[ed] the findings of the Ecuador trial court").

of the Ecuadorian judiciary and instead selling off its assets in Ecuador and threatening the *Aguinda* plaintiffs with a "lifetime of litigation"; and (f) viciously harassing, spying on, and seeking to intimidate its own victims and their representatives through judicial and extrajudicial means, including this RICO case. As Chevron has deployed this strategy, the Ecuador Litigation and the Ecuadorian Environmental Cause have become only more emblematic for many people of deeper problems of multinational corporate impunity built into the political and justice institutions in many countries and in the global order as a whole.[3]

People all over the world thus have rallied to support the Ecuadorian Environmental Cause, including financially, for reasons both specific to correcting the environmental harm caused by Chevron in Ecuador and with a view toward strengthening our civil institutions and mechanisms such that the rights of Indigenous groups can be adequately protected. A wide range of environmental, Indigenous, human rights, and other groups have supported the Ecuador Litigation and the Affected Communities both as to the entirety of their struggle and with respect to specific issues arising therein.[4] Many philanthropic foundations and wealthy individuals have also been

---

[3]  *See, e.g.*, James North, *Ecuador's Battle for Environmental Justice Against Chevron*, The Nation, June 2, 2015, at https://www.thenation.com/article/ecuadors-battle-environmental-justice-against-chevron/; Alexander Zaitchik, *Sludge Match: Inside Chevron's $9 Billion Legal Battle With Ecuadorean Villagers*, Rolling Stone, Aug. 28, 2014, http://www.rollingstone.com/politics/news/sludge-match-chevron-legal-battle-ecuador-steven-donziger-20140828; Rex Wyler, *Chevron's SLAPP suit against Ecuadorians: corporate intimidation*, Greenpeace International, May 11, 2018, at https://www.greenpeace.org/international/story/16448/chevrons-slapp-suit-against-ecuadorians-corporate-intimidation/; Katie Redford, The New Corporate Playbook, Or What To Do When Environmentalists Stand In Your Way, Huffington Post, Jun. 29, 2016, at https://www.huffingtonpost.com/katie-redford/the-new-corporate-playboo_b_10599544.html; "Roger Waters on Chevron SLAPP suit against Donziger & Ecuadorians," YouTube, at https://www.youtube.com/watch?v=To6yf9_9wHo.

[4]  *See, e.g.*, Open Letter from 41 Environmental Groups, dated Jan. 23, 2014, at https://amazonwatch.org/assets/files/2014-chevrons-threat-to-open-society.pdf (condemning Chevron's "legal 'scorched earth' tactics" in and leading up to this RICO case, signed by the Sierra Club, Friends of the Earth, Greenpeace, 350.org, Avaaz, CorpWatch, the Institute for Policy Studies, Global Exchange, and others).

moved to support the Ecuadorian Environmental Cause and the Ecuador Litigation, both for the specific environmental concerns and as a vehicle to address systemic inequities and access-to-justice gaps—that is, by supporting the development of an advocacy model to empower substantively powerful justice claims of marginalized peoples with the resources of enlightened capitalism. Such ambitions are not uncommon in certain parts of the litigation finance community, nor in the rapidly growing ranks of socially responsible or Environmental-Social-Governance (ESG) investors, who seek to "do well" (earn a respectable return) while "doing good" (advancing a vision of social justice).[5] Many funders of the Ecuador Litigation have sought to support the Ecuadorian Environmental Cause both for the financial logic of the investment and as an expression of their political and social views.

### B. Chevron's History of Vicious Reprisals Against the Ecuador Litigation Team and Perceived Supporters of the Ecuadorian Cause

Chevron's long and sordid history of seeking to suppress speech and association by Aguinda Supporters with judicial and extrajudicial harassment, espionage, intimidation, economic extortion, and other reprisals is well-established and hardly needs detailed repetition in this context. Indeed, perhaps the most notorious example of this conduct is this very RICO case and these gruesome post-judgment proceedings designed to personally bankrupt Mr. Donziger in retaliation for his career-long efforts to hold Chevron accountable for the Ecuador contamination. Nonetheless, it is important to briefly review the intensity, maliciousness, breadth, and deeply bad

---

[5]   *See, e.g.*, "Global Investor Alliance for Human Rights Launches today," Interfaith Center on Corporate Responsibility, May 24, 2018, at https://www.iccr.org/global-investor-alliance-human-rights-launches-today ("A cross section of 101 institutional investors representing $2 trillion in assets under management have already joined the Alliance" to "empower collective investor action on business and human rights"); Dkt. 1329 (describing situation with Burford Capital and noting that "Burford's then-Chairman, Selvyn Seidel . . . who took an interest in human rights litigation, championed Burford's investment in the Ecuador matter").

faith nature of much of Chevron's conduct.

As early as 2007, when Chevron realized it likely would lose the environmental trial in Ecuador on the merits, the company publicly and unapologetically threatened the *Aguinda* plaintiffs and their allies with "a lifetime of appellate and collateral litigation" if they continued to pursue their cause.[6] In addition to its express strategy of endless judicial delay, Chevron quickly developed what its lead internal strategist on the case referred to, privately and casually, as "[o]ur L-T [long-term] strategy to demonize Donziger," *i.e.* to distract courts and the general public from the merits of the well-documented environmental harm by portraying it as a "sham" concocted by American "trial lawyers."[7] Reliance on this false narrative has sadly been embraced by this Court[8] and continues to be Chevron's primary defense to this day.[9]

While the "demonization" strategy itself is deeply abusive, the means Chevron has employed to implement and propagate it have been even worse. Due to undersigned's limited means and litigation capacity, this motion cannot pretend to comprehensively review all of the

---

[6]   "Chevron Calls for Dismissal of Ecuador Lawsuit," Oct. 8, 2007, at https://www.chevron.com/stories/chevron-calls-for-dismissal-of-ecuador-lawsuit.

[7]   RICO Tr. Ex. DX24. *See also* DX 505, Memorandum from Chevron's lead external strategist, Sam Singer, to Chevron's head of public relations, Kent Robertson, dated Oct. 14, 2008 (suggesting "Message Themes" including "Ecuador: the next major threat to America?" and "Steven Donziger: the most powerful man in Ecuador? How one American attorney is pulling the strings of an emerging banana republic"). *See generally* David Baker, "How Chevron turned the tables in Ecuador," San Fran. Chron., June 28, 2013, at https://blog.sfgate.com/energy/2013/06/28/how-chevron-turned-the-tables-in-ecuador/ (observing that Chevron's "aggressive strategy has worked wonders, putting Chevron's opponents on the defensive and convincing many people that the Ecuador suit is a sham" and that "you can trace much of that strategy back to a 2008 memo by San Francisco's master of crisis communications, Sam Singer").

[8]   *See, e.g.*, Hearing Tr. at 77-78, In re Chevron, 10-MC-002 (LAK) (S.D.N.Y. Sept. 23, 2010) ("[THE COURT:] The imagination of American lawyers is just without parallel in the world. . . . Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning.").

[9]   *See, e.g.*, George Avalos, "Chevron sets sights on future, despite Ecuador questions," San Jose Mercury News, May 30, 2018, at https://www.mercurynews.com/2018/05/30/chevron-sets-sights-on-future-despite-ecuador-questions/ (quoting new Chevron CEO Michael Wirth telling Chevron shareholders on May 30, 2018, that "the true tragedy here is American trial lawyers").

different instances and aspects of Chevron's attack strategy. Rather, the motion focuses on the most relevant points, which include that Chevron *(a)* has targeted a wide range of groups who support the Affected Communities in their campaign to hold Chevron accountable; *(b)* has focused with particular intensity on attacking sources of financial support for Aguinda Supporters; *(c)* has repeatedly relied on extortionate tactics such as interfering with a target's unrelated third-party business relationships; *(d)* has repeatedly resorted to the use of extrajudicial tactics like espionage and shadowy threats of future harm; and *(e)* maintains a network of proprietary media outlets and relationships with mainstream media to perpetuate its demonization narrative int the public discourse.

**Wide range of groups.** In 2009, Chevron commissioned a 50-page report identifying "10 key philanthropic foundations" and "five key activist groups" as "the leaders of the [public advocacy] campaign against Chevron."[10] The report was conceived as "a starting point in the development of a constructive strategy by Chevron to impact donations to NGOs that oppose the Corporation"—Orwellian doublespeak obviously referring to a strategy to "dry up" funding for those NGOs by putting pressure on the foundations.[11] In its campaign of § 1782 discovery lawsuits, and later in its blizzard of RICO trial subpoenas, Chevron targeted and inflicted varying degrees of pressure and litigation burden on literally hundreds of individuals it perceived as sympathetic to the Ecuadorian cause, from lawyers and activists to scientists, Chevron shareholders, bloggers, academics, and more.[12] Some individuals and groups had the wherewithal to fund their own

---

[10]   RICO Tr. Ex. DX688 at 2-3.

[11]   *Id.* at 1. The report also notes that the author, the firm Singer & Associates had "prepared a complete and lengthy donor list for Amazon Watch" as a particular target. *See infra*.

[12]   *See, e.g.*, Kevin Jon Heller, "My Encounter with a Chevron Subpoena — and the ACLU's Assistance (Updated)," Opinio Juris, Sept. 28, 2012, at http://opiniojuris.org/2012/09/28/my-encounter-with-a-chevron-subpoena-and-the-aclus-assistance/.

defense or to generate support from groups like the ACLU and the Electronic Frontier Foundation to resist the improper dimensions of these pressure tactics. For example, Amazon Watch successfully resisted the trial subpoena served on it when a the U.S. district court for the District of Northern California, see *Chevron Corp. v. Donziger*, No. 13-MC-80038 CRB (NC), 2013 WL 1402727, at *7 (N.D. Cal. Apr. 5, 2013), and the environmental group ELAW litigated its subpoena and ultimately won a sanctions award against Chevron of $32,945 after the U.S. district court for the District of Oregon found that Chevron's discovery efforts were "meant to harass," *see Chevron Corp. v. Environmental Law Alliance Worldwide*, No. 6:11-mc-7003 (D. Or. Nov. 30, 2011). But countless other individuals and entities simply caved to Chevron's demands, actively or passively, and "escaped," probably deeply wary of ever again attracting the company's ire by associating with the Ecuadorian Environmental Cause. There are countless similar examples. Chevron has filed ethical complaints against politicians it considers too sympathetic to the Ecuadorian environmental cause.[13] In another  striking example, Chevron publicly "punished" the leading public relations firm Ogilvy Government Relations by entirely terminating its relationship with the firm (Chevron was the Ogilvy's third-largest client at the time) merely because the firm unknowingly hired an individual who, years earlier, had given a presentation to some of the "activist groups" targeted in the aforementioned 2009 report.[14] The move "reverberated" throughout the PR industry and more broadly: "One agency chief says it prompted him to meet his senior staff and speak about the importance of knowing what their employees are doing, from

---

[13]  *See, e.g.*, Philip Bump, *Chevron is newly concerned about politicians being influenced by money*, Grist, Nov. 21, 2012, at  https://grist.org/news/chevron-is-newly-concerned-about-politicians-being-influenced-by-money/.

[14]  *See, e.g.*, Jim Edwards, *Chevron Fired Its PR Agency Because ONE Staffer Spoke To Environmentalists 4 Years Ago*, Business Insider, June 1, 2012, at http://www.businessinsider.com/chevron-fired-its-pr-agency-because-one-staffer-spoke-to-some-environmentalists-4-years-ago-2012-6.

events they're speaking at, to their posts on social media."[15] Through such extreme reprisals, Chevron has sought to enforce disciplined adherence to its "demonization" narrative by participants throughout the global public discourse on the Chevron/Ecuador Dispute.

   ***Focus on financial supporters.*** As reflected in the focus of the 2009 report discussed above, Chevron has engaged in particularly ferocious attacks targeting any person or entity it believes is providing the financial support not just to the Ecuador Litigation but to any advocacy efforts by Aguinda Supporters to push for a clean-up of the contamination. Chevron's extreme efforts to inflict pressure on the first major outside funder, Burford Capital, were documented in pre-trial motion practice in this case.[16] Chevron has taken this strategy almost literally to the ends of the earth, including by initiating an extremely aggressive and overwhelming litigation "blitzkrieg" against funder Russ Deleon in the tiny British territory of Gibraltar (pop. 34,000). The company then filed a follow-on retaliation suit against London-based Woodsford Litigation Funding—also in Gibraltar, where it was particularly expensive and difficult for the firm to mount a defense. Chevron also brought the firm Patton Boggs to its knees by serving it subpoenas invoking a massively expensive litigation and privilege review process,[17] and by putting intense pressure on the firm during a critical juncture when the firm was finalizing its merger with Squire Sanders.[18] While certain individuals in these firms fought against Chevron's pressure valiantly and

---

[15]   Chris Daniels, *Ogilvy's Sacking by Chevron*, June 8, 2012, https://www.prweek.com/article/1278999/ogilvys-sacking-chevron-highlights-conflict-interest-issue.

[16]   *See* Dkt. 1329 at 16-18 (describing Chevron's elaborate efforts to "blackball" not only Burford in retaliation for its work on the Ecuador Litigation but also to "blackball" the firm Latham & Watkins because one of its retiring partners had joined Burford).

[17]   *See, e.g.*, Declaration of James K. Leader, dated Aug. 9. 2013 (describing how Patton Boggs had incurred over $1.1 million in legal fees and vendor costs relating to Chevron's document and deposition subpoenas).

[18]   *See, e.g.,* Steven Mufson, *Chevron, Patton Boggs settle their epic legal battle over jungle oil pits in Ecuador*, Wash. Post , May 7, 2014, at https://www.washingtonpost.com/business/economy/chevron-and-patton-boggs-settle-their-epic-legal-battle-over-jungle-oil-pits-in-ecuador/2014/05/07/8fa73ad4-d5ef-11e3-aae8-c2d44bd79778_story.html?utm_term=.42df51228e02 (quoting source: "There's no

made profound sacrifices based on their commitment to the Ecuadorian environmental cause and their disgust with Chevron's tactics, the firms themselves, unsurprisingly, could not justify sustaining the expense of litigation at the intensity level deliberately orchestrated by Chevron and ultimately "settled," abandoning their clients and agreeing to do virtually whatever Chevron asked of them. These intimidation victories were important for Chevron not just to "dry up" funding for RICO defense and appeal efforts, and for enforcement efforts on the Ecuadorian Judgment, but also, as noted above, to enforce disciplined adherence to its larger "demonization" narrative. In each case, Chevron publicly humiliated its target by making it issue a legally meaningless public "confession" disavowing continued support for the Ecuadorian environmental cause and conceding Chevron's righteousness.[19]

*Extortionate tactics against unrelated business interests.* In its attacks on sympathetic civil society groups and funders, one of Chevron's main tactics, as reflected in the 2009 report, is to apply its demonization strategy to threaten Aguinda Supporters' unrelated third-party business relationships. The Court is aware that Chevron used this tactic aggressively against former defendant Stratus Consulting, for example by sending letters seeking to get Stratus fired from critical government contracts.[20] The situation escalated to the point that Stratus filed counterclaims

---

way anybody is going to merge with that firm with that liability hanging over it . . . They're more interested in the firm's survival than they are in the hit that this is going to be to them from a publicity standpoint.").

[19] *See, e.g.,* Financial Backer of Fraudulent Ecuador Litigation Withdraws Support, Settles, https://www.chevron.com/stories/financial-backer-of-fraudulent-ecuador-litigation-withdraws-support-settles, Chevron And Burford Joint Statement Regarding The Lago Agrio Litigation, *at* https://www.chevron.com/stories/chevron-and-burford-joint-statement-regarding-the-lago-agrio-litigation; Chevron Corporation Reaches Settlement Agreement With Patton Boggs Law Firm, at https://www.chevron.com/stories/chevron-corporation-reaches-settlement-agreement-with-patton-boggs-law-firm.

[20] *See, e.g.*, Dkt. 694-3 (Letter from Chevron to Stratus client Portland Harbor Trustee Council attacking "the Trustees' continued use of Stratus Consulting (Boulder, Colorado) on the Natural Resource Damage (NRD) Assessment for the Portland Harbor Site in Portland, Oregon," a massive federal project); Dkt. 768 (Stratus counterclaims) ("Chevron has concocted and executed a scheme to tortiously

detailing how Chevron

> has concocted and executed a scheme to tortiously destroy Stratus (and the livelihood of its U.S. employees) financially pretrial, in an attempt to prevent Stratus from being able to successfully defend itself . . . [by means including] (i) asserting lurid allegations against Stratus, many concocted from lies and inappropriate manipulation of documentary, visual, and testimonial evidence; (ii) widely and publicly disseminating these lurid allegations in an extra judicial campaign attacking Stratus; (iii) using numerous federal FOIA and State "Sunshine Law" requests in a broad, sweeping effort to obtain detailed information about Stratus' clients; . . . (vi) explicitly and repeatedly requesting, in direct and indirect communications to Stratus clients, that such Stratus clients fire Stratus; (vii) making public its intention to communicate its defamation to Stratus' prospective clients and others in the field; and (viii) creating, posting, and publicizing defamatory and malicious videos about Stratus on websites.

Dkt. 768 at 95-97. Actual and threatened efforts to undermine unrelated business interests were also deployed by Chevron with respect to Burford, Woodsford, Patton Boggs, and many others.[21]

*Use of abusive extrajudicial tactics.* Chevron's use and abuse of extrajudicial tactics also has been well-documented in this case. In pre-trial proceedings, Donziger produced a declaration from Denis Collins, a 25-year veteran of the FBI's New York field office, who described a counter-intelligence operation in which he observed individuals following Mr. Donziger and his family around Manhattan.[22] Another third-party target of Chevron's ire, Ted Dunkelberger, produced a

---

destroy Stratus (and the livelihood of its U.S. employees) financially pretrial, in an attempt to prevent Stratus from being able to successfully defend itself . . . [by means including]

[21] *See* Dkt. 1329, *supra*; Declaration of Paul Paz y Miño, dated Feb. 23, 2013, *Chevron v. Donziger*, Case No. 3:13-mc-80038-CRB, Dkt. 6 (N.D. Cal. Feb. 25, 2013) ("Amazon Watch's donors and ally organizations have received letters condemning the Ecuador Litigation . . . written by an attorney paid by Chevron . . . [and] clearly aimed at cutting off Amazon Watch's financing."); "Once Again Chevron Masquerades As A News Organization," The Chevron Pit, May 31, 2011, at http://thechevronpit.blogspot.com/2011/05/once-again-chevron-masquerades-as-news.html (describing how a Chevron-linked individual "sent e-mails to several [Amazon Watch] funders . . . in which he claimed to be working on an 'article'" and "then asked the funders 'if it is time' to 'reevaluate' their support for Amazon Watch").

[22] Dkt. 1197-2.

declaration describing how agents of Chevron and Gibson Dunn repeatedly came to his house and called him to aggressive pressure him to be a "smart guy" and "flip" to cooperate with Chevron, because this "would be far easier than the 'alternative' [he] would face" and that "me sort of hassle would follow if [he] turned down Gibson Dunn's request."[23] In other proceedings, *Aguinda* Supporters have described how they "have been repeatedly harassed by Chevron in relation to their [advocacy] activites," including by being "followed, videotaped, photographed, and surveilled" to the extent that they "feel as if [they are] living and working under Chevron's microscope" and are "fearful for [their] safety."[24] Chevron investigators infamously attempted to infiltrate the Ecuadorian plaintiff team by recruiting freelance journalist Mary Cuddehe to "pretend[]to write a story [while] . . . actually shilling for Chevron."[25] While all of this abuse and misconduct has been ignored and excused by this Court, it nonetheless clearly establishes the extraordinary and abusive lengths Chevron will go to in its efforts to intimidate.

### C. Chevron's Sweeping Discovery Requests Aimed at Infiltrating the Ecuador Litigation Team

On March 19, 2018, Chevron moved to hold Donziger in contempt of the Court's March 4, 2014 judgment (Dkt. 1875) ("NY Judgment") on the theory that his assistance in raising funds to cover litigation expenses for ongoing efforts to enforce the Ecuador Judgment was somehow in violation of the terms of the NY Judgment. Dkt. 1966. In the motion, Chevron sought leave "to

---

[23]  Dkt. 1218-05.

[24]  Declaration of Kevin Koenig, dated Feb. 24, 2013, *Chevron v. Donziger*, Case No. 3:13-mc-80038-CRB, Dkt. 8 (N.D. Cal. Feb. 25, 2013).

[25]  Mary Cuddehe, *A Spy in the Jungle*, The Atlantic (Aug. 2, 2010), *at* http://www.theatlantic.com/international/archive/2010/08/a-spy-in-the-jungle/60770 ("[T]here was a reason they wanted me . . . With one Google search, anyone could see that I was, in fact, a journalist. If I went to Lago Agrio as myself and pretended to write a story, no one would suspect that the starry-eyed young American poking around was actually shilling for Chevron."). *See also* RICO Tr. DX700 ("Chevron's Secret Wars").

serve post-judgment discovery on Donziger and any other person or entity reasonably calculated to possess information relevant to enforcement of the Judgment." *See, e.g.*, Dkt. 1965. Chevron's motion and 24-page accompanying memorandum made **no mention whatsoever** of the money judgment entered a month earlier by the Court based on RICO case costs (mostly Special Master) assessed against Donziger. *See* Dkt. 1962 (the "Costs Judgment"). However, in the Court's Order to Show Cause issued the same day as Chevron's contempt filing, the Court essentially suggested to Chevron a new theory by which it might pursue post-judgment discovery against Mr. Donziger, writing that "[i]nsofar as the judgment is for the payment of money, enforcement proceedings are governed by Fed. R. Civ. P. 69(a)" and "to the extent the discovery is sought in aid of enforcement of the monetary portion of the judgment, leave of court is not required." Dkt. 1968. But there is no "monetary portion" *of the NY Judgment* that could be separately enforced apart from the Costs Judgment,[26] and as noted, Chevron had made no claim as to any payment of money in its motion or memorandum.

Chevron picked up on the hint and in a letter dated March 29, 2018, sought confirmation that the Court's money judgment discovery approach would also allow it to inquire into the financing behind, and financial practices of, Mr. Donziger and others associated with the Ecuador Litigation. *See* Dkt. 1973. The Court declined to provide any such confirmation. Dkt. 1974. Nonetheless, Chevron promptly proceeded to serve Mr. Donziger and several other individuals— including Josh Rizack, a Westport, Conn.-based bankruptcy consultant who has worked with Mr. Donziger for several years and Katie Sullivan, a Dover, Mass.-based financial advisor who started working with Mr. Donziger in 2017 to address accounting, fundraising, and management issues—

---

[26] The NY Judgment only recites the generic instruction that "Chevron shall recover . . . the costs of this action." Obviously this "portion" of the NY Judgment is not enforceable under Fed. R. Civ. P. 69 or there would have been no need for Chevron to dedicate nine months to the task of moving for allocation of costs and for the Court to decide the allocation and issue the Costs Judgment.

with a battery of discovery requests under the purported authority of both Fed. R. Civ. P. 69 and NY CPLR §§ 5223-5224. However, the requests interposed by Chevron reach far beyond the sort of discovery "relevant to the satisfaction of the judgment," *i.e.* related to the present whereabouts and extent of assets potentially available to satisfy the money judgment, authorized by Rule 69 and Sections 5223-5224. *See infra*.

Mr. Donziger provided Chevron with objections and responses to the requests on April 30, 2018. On May 4, 2018, Chevron raised "three threshold issues" with the Court by way of a motion to compel, while simultaneously assuring the Court that Chevron was "continu[ing] to meet and confer with Donziger to narrow disputes where possible." Dkt. 1989. In its order on the motion to compel, the Court divided Chevron's discovery requests into what it called the Money Judgment Discovery Requests and Compliance Discovery Requests. *See* Dkt. 2009.[27] By subsequent order, the Court effectively stayed all discovery on the Compliance Discovery Requests with the exception of the materials related to a single meeting between Donziger, Sullivan, and representatives of Elliott Management Corporation. *See* Dkt. 2020. However, the Court left in place the instruction from the order on the motion to compel that Donziger comply with the Money

---

[27]  Donziger opposed Chevron's contempt claims (*i.e.*, non-compliance with the injunctive terms of NY Judgment) directly on April 24, 2018, *see* Dkt. 1986, and further challenged the adequacy of the factual showing underlying the claims by way of a motion for declaratory relief and motion to dismiss under Fed. R. Div. P. 12(b)(6) on May 31, 2018, *see* Dkt. 2018. In these filings, Donziger showed that failed entirely to cite the relevant portions of this Court's order subsequent to the NY Judgment, dated April 25, 2014 (Dkt. 1901) ("Clarification Order"), that clarified that financing for expenses would not be considered a "profit" on, nor involve "proceeds" of, the Ecuador Judgment, and thus not be property "traceable" to the Ecuador Judgment for purposes of either the constructive trust as set out in paragraphs 1-2 of the NY Judgment or the "monetization" injunction set out in paragraph 5. *See* Clarification Order at 7-8 (distinguishing between contingency fee payments made after a "collection" on the Ecuador Judgment, which would be subject to the NY Judgment "constructive trust" and profit/monetization injunction, and retainer fee payments, which would not); *id.* at 10 ("The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on ***their*** interests in the [Ecuador] Judgment and thus at least confusing the issue of traceability.") (emphasis original).[27] *See* Dkt. 2018 at 6-8.

Judgment Discovery Requests by June 15, 2018. Dkt. 2009 at 3. The Money Judgment Discovery Requests the Court left in place sweep, as noted, far beyond the limited inquiry into the whereabout and extent of assets legally available to Mr. Donziger to satisfy a money judgment, and reveal with utter transparency Chevron's attempt to deeply infiltrate the inner workings of the team maintaining the Ecuador Litigation and the broader advocacy community standing behind it. As mere examples, Chevron's "Money Judgment Discovery Requests" demand:

- a "detailed" description of "any ACCOUNTINGS" or "any other kind of record relating to how funds received in support of the Ecuador Litigation . . . have been received or expended" (ROG27);

- all documents relating to any actual or promised payment that Donziger has ever received (RFP26, ROG16, ROG17), or promised to another (RFP 29), in his 25+ years of working on the Ecuador Litigation;

- all documents "evidencing the source, date, and amount" of **any** transfer or payment over $2,000 made by Donziger since issuance of the NY Judgment (March 4, 2014) (RFP11, as modified by the Court);

- a "detailed" description of how essentially all Ecuador Litigation "monies" were "received or expended" by Donziger "at any time" (ROG26);

- a "detailed" description of all payments or "value" made or "promised" to any "agent, attorney, or representative" of the plaintiffs in the Ecuador Litigation, including 14 specifically named individuals and entities (ROG28);

- a "detailed" description of the assets and liabilities of Donziger's client, the Amazon Defense Front[28] (ROG29);

- a "detailed" description of any "contemplated, anticipated, or potential" media advocacy project, such as documentaries, books, podcasts, etc. (ROG19, RFP28).

On June 15, 2018, Donziger responded to the Requests by providing Chevron with *(a)* records reflecting the present status of all of his personal bank accounts and a representation that these

---

[28] The Amazon Defense Front or *Frente de Defensa de la Amazonía* is a registered Ecuadorian civil society and human rights organization that has been fighting for a clean-up of Chevron's contamination and engaging in other countless other community rights advocacy issues for over 20 years.

were the only bank accounts he had used since entry of the NY Judgment; *(b)* a description of his four real property interests and related documents in his possession; and *(c)* substantive responses to the Requests to the extent possible. However, Mr. Donziger objected to numerous requests on relevance and undue burden grounds, as well as on the First Amendment grounds articulated in this motion.

## II.   **Argument**

### A.   *Applicable Case Law and Constitutional Protection*

"Supreme Court decisions establish that the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings, whether the names of an organization's members, the names of campaign contributors, the names of producers of political leaflets, or the names of persons who circulate petitions." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 202 (2d Cir. 2004). The use of court authority and discovery procedures by private litigant in a civil case to compel disclosure implicates the same concerns. *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, No. 75 CIV. 5388, 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985) ("Defendants' interrogatories entail an extensive inquiry into plaintiffs' associations and their finances, and there is a strong interest in maintaining the privacy of this information, particularly when the group's causes are unpopular.

The rights at stake here were first addressed in the seminal case of *NAACP v. Alabama*, which held that disclosure could violate First Amendment rights at least where a party could show that "revelation of the identity of its [] members [could] expose[] these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," because "compelled disclosure [would be] likely to affect adversely the ability of [the

party] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." 357 U.S. 449, 462-62 (1958) ("*NAACP v. Alabama*"); *cf. id.* at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). From this constitutional origin "has been derived a qualified privilege, which applies to compelled disclosure of the identity of an association's members or sympathizers." *Krishna Consciousness*, 1985 WL 315, at *8 (citing, *inter alia*, *Gibson v. Florida Legislative Committee*, 372 U.S. 539, 544 (1963); *Bates v. Little Rock*, 361 U.S. 516, 523–24 (1960); *Eilers v. Palmer*, 575 F. Supp. 1259, 1261 (D. Minn. 1984). The privilege applies equally to "compelled disclosure of the sources or uses of an organization's funds." *Id.* (citing, *inter alia*, *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) ("the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for [f]inancial transactions can reveal much about a person's activities, associations, and beliefs.")). "Such chilling of expression is repugnant to the First Amendment." *Citizens United v. Schneiderman*, 882 F.3d 374, 381 (2d Cir. 2018).

Where the First Amendment rights and applicable privileges are implicated, disclosure "should not be ordered unless it is substantially related to a compelling governmental interest." *St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1094 (2d Cir. 1988). In the case of private litigant discovery requests proceeding under the authorization of the court, this means, at minimum, that a "party must show that the information sought 'is crucial to the party's case, or that it goes to the 'heart of the claims.'" *Krishna Consciousness*, 1985 WL 315, at *8 (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981), and *Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Nat'l Right to*

*Work Legal Defense and Education Foundation, Inc.*, 590 F.2d 1139, 1152-53 (D.C. Cir. 1978)). *See also id.* (noting that "the courts have phrased the applicable standard in different ways" but "have consistently emphasized the strictness of the showing that the inquiring party must make"). First Amendment concerns may also be addressed by narrowly tailoring discovery requests to eliminate or mitigate the threat to associational rights. *See, e.g.*, *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. Waterfront Comm'n of New York Harbor*, 667 F.2d 267, 274 (2d Cir. 1981) ("[w]e approve the District Court's modification of the subpoena to permit disclosure on a random basis of only 10%" of the requested discovery).

Under Fed. R. Civ. P. 26(c)(1), "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; . . . (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." To establish "good cause," a party must demonstrate "a particular need for protection." *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71 (S.D.N.Y. 2010). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test. Moreover, the harm must be significant, not a mere trifle." *Id.* (quoting *Schiller v. City of New York*, 2007 WL 136149 at *5 (S.D.N.Y. Jan. 17, 2007)).

### B.  The Particular Need for the Requested Protective Order

Members of the Aguinda Litigation Team and other Aguinda Supporters are "pursu[ing] [a] collective effort to foster beliefs which they admittedly have the right to advocate," *NAACP v. Alabama* at 463. These beliefs in include not just the funders' and supports' belief in the importance of remediating the extant contamination at Chevron's former operations sites in the Ecuadorian Amazon, but their belief in the necessity of confronting certain root causes—national,

cultural, and racial double standards, a restrictive view of corporate obligations, and a general lack of accountability within larger political, legal, and economic structures and ideologies—that allowed the contamination to happen in the first place. *Supra* at Section I.A. As described in Section I.B, Chevron has responded to this exercise of associational rights with a vicious campaign of reprisals in the form of collateral litigation, public relations pressure including outright "demonization," and other judicial and extrajudicial retaliation and harassment aimed directly at suppressing the protected associational speech of funding, organizing, and spending. These reprisals were plainly aimed at "drying up" support for the Aguinda Litigation from specific funders, potential future funders, and other types of supporters in the public discourse generally.

In this context, the subpoenas must be seen as what they are: the immediate delivery of a new disincentivizing blow to dissuade current and potential supporters from associating with the Aguinda Litigation and the Ecuador Environmental Cause, and the platform for a potential new round of reprisals targeting (a) supporters, the identity of whom Chevron hopes to learn, and (b) the effectiveness of the Aguinda Litigation Team, the practices (and potential vulnerabilities) of which Chevron hopes to investigate with the wildly broad range of information it seeks to obtain through the Requests.

The harm at stake is significant, concrete, and imminent—indeed, to an extent it *already* has inflicted ongoing and irreparable harm. At one level, the harm of subpoenas is their mere existence, because investors, philanthropists, activists, service-providers, and other supporters are less likely to associate with the *Aguinda* Litigation and the Ecuadorian Cause if they have reason to worry about being served a subpoena and if they believe they will have to endure the sort of litigation the subpoenas have already produced in this case, irrespective of the subpoenas' content and/or ultimate disposition. While this already-inflicted harm is partially irreparable, it can also be

significantly mitigated if this Court properly recognizes the First Amendment protections at stake, makes clear that future efforts to chill association rights with improper discovery requests will not be tolerated, and awards sanctions against Chevron to incentivize future compliance.

The content of the Requests represents a deeper and even more invidious harm. As shown in the few examples recited above, through the requests Chevron is transparently seeking to intrude into the most detailed and confidential inner workings of not just the Ecuador Litigation Team, but also the broader universe of actual and "contemplated" Aguinda Supporters. Thus, for example, if an author was potentially interested in writing a book on the case and exchanged some emails with Mr. Donziger, these Requests would require production of those emails and a "detailed" description by Mr. Donziger of the interaction and the proposed project, *see* Section I.C (ROG19, RFP28), thus allowing Chevron to scrutinize the proposal and, if it disfavors the author's approach, initiate one of its sadly familiar reprisal tactics, such as spying on or investigating the author, putting pressure on the author's publisher or other business and projects, or disparaging the author through its network of media outlets. Most critically, the Requests would reveal the identity of any individuals who have provided or considered providing financial support to the Ecuador Litigation, thus opening them up to the sorts of particularly intense reprisals as seen against Deleon, Woodsford, Patton Boggs, and others, as Chevron—having lost the underlying case on the merits in its preferred forum—continues is desperate efforts to "dry up" funding and support for the Ecuador Litigation and the Ecuadorian Environmental Cause.

Both the actually inflicted and imminent threat of harm posed by the Subpoenas is illustrated by the situation of third-party Katie Sullivan, a distinguished personal financial advisor in the Boston area and a passionate supporter of a wide range of social and environmental causes. After learning about the Ecuador Litigation case on an unrelated trip to the Ecuadorian Amazon,

Ms. Sullivan volunteered her professional services to help improve accounting and financial management practices and assist in additional fund-raising (consistent with the NY Judgment) for the Ecuador Litigation Team. She worked for several months, providing critically-needed services of exceptional value to the Ecuador Litigation Team, and by proxy to the Affected Communities. As soon as Ms. Sullivan received subpoenas from Chevron, she unsurprisingly retained an attorney and indicated that she would no longer be working on the case. The use of the subpoenas by themselves to inflict pressure and resulting harm is particular evident in Ms. Sullivan's case because Chevron took the extra step of subpoenaing not just Ms. Sullivan but *also* one of her clients, Jonathan Bush, who had at best an utterly marginal relationship to the purported justification for the Subpoenas. Chevron also served a subpoena on Bush's employer, athenaHealth, which has zero connection to anything. The athenaHealth subpoena is patently in bad faith, but irrespective of its ultimate disposition serves effectively to put pressure on Bush and consequentially on Ms. Sullivan. As part of her work, Ms. Sullivan took possession of a number of confidential documents revealing and discussing the internal organizational, operational, and financial practices of the Ecuador Litigation Team and the Affected Communities. Disclosure of these materials pursuant to Chevron's wildly overbroad Requests, *see* Section I.C, would reveal the names of numerous actual and potential funders and supporters, making these individuals vulnerable to Chevron's reprisal tactics as discussed above, and would generally allow Chevron to infiltrate and investigate the associational activity and related speech and advocacy of a group it has long subjected to various forms of persecution.

In the context of Chevron's history of reprisals, Aguinda Supporters who have chosen to maintain their anonymity are properly protected by the "qualified privilege which applies to compelled disclosure of the identity of an association's members or sympathizers." *Krishna*

*Consciousness*, 1985 WL 315, at *8. "[P]rivacy [of] group association" for current and future Aguinda Supporters is truly "indispensable to preservation of [their] freedom of association," *NAACP v. Alabama* at 462, not just because of Chevron's own reprisals but because Supporters' views as to the importance of genuine accountability against powerful corporations are arguably "dissident" to powerful interests in our society.[29] The same constitutional protection extends to broader privacy interests of the Ecuador Litigation Team, including Mr. Donziger, such as a qualified privilege against "compelled disclosure of the sources or uses of [funds]," *id.*—precisely what Chevron seeks in its Requests.

To overcome this privilege, Chevron needs to show that information as to the identity of Aguinda Supporters and the internal operational, organizational, and financial practices of the Ecuador Litigation "'is crucial to [its] case, or that it goes to the 'heart of [its] claims.'" *Krishna Consciousness*, *supra*, at *8. But nothing could be further from the case. In light of the Court's effective stay on the Compliance Discovery Requests, the threatened intrusion that is challenged here is posed by the remaining Money Judgment Discovery Requests that can at most seek information "relevant to the satisfaction of the judgment," *i.e.* the existence and extent of Mr. Donziger's assets that might be available to satisfy the money judgment. This is a relatively simple inquiry that has essentially been satisfied by Mr. Donziger's responses to the Requests, including his production of documents regarding his bank accounts and properties. *Supra* Section I.C.

---

[29] *See, e.g.*, Michael Isikoff, A \$16 Billion Problem, Newsweek, Jul 25, 2008, http://www.thedailybeast.com/newsweek/2008/07/25/a-16-billion-problem.html (quoting Chevron spokesperson: "We can't let little countries screw around with big companies like this—companies that have made big investments around the world."); Tr. 02/08/2011 ("[THE COURT]: [W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Steven Donziger and the Ecuadorian plaintiffs] have attached it in Singapore or wherever else.").

Chevron has presented no prima facie evidence of any fraudulent transfer or conveyance that would require additional scrutiny or investigation. Indeed, Chevron has a complete record of Mr. Donziger's financial condition as of five years ago, based on unfettered access to all of his accounts and transactions. The lack of any basis to suggest that Mr. Donziger's financial condition is anything other than what he has represented removes even the fig leaf from Chevron's transparent attempts to use the "Money Judgment" requests to investigate and infiltrate itself into the affairs of the Ecuador Litigation Team and Aguinda Supporters. As seen in the examples recited above, many Requests are wildly unrelated, such as the demand for a detailed descriptions of the assets and liabilities of Mr. Donziger's client, the Amazon Defense Front, without any suggestion that any such assets could be made available to Mr. Donziger personally (which they could not). *Id.* (ROG29). Even those that purport to relate to Mr. Donziger's own financial transactions reveal themselves in that they do not focus on what assets are presently available but rather repeatedly seek "detailed" information regarding every single payment received, or payment made, by Mr. Donziger not just in recent times but over the entire 25-year history of his involvement in the Ecuador Litigation. *Id.* (RFP26, RFP29, ROG16-17, ROG 26, ROG28). While these Requests are plainly irrelevant to the Money Judgment satisfaction inquiry and have been objected to as such, they also directly impact and infringe, in the unique factual circumstances here, the associational rights of Mr. Donziger and the group of Ecuador Litigation Team members and Aguinda Supporters with whom he operates and engages in public discourse and advocacy.

## <u>Conclusion</u>

Good cause having been shown in the form of specific and significant threats of harm to constitutionally protected First Amendment rights and privileges, Mr. Donziger respectfully requests that the Court must enter an order Fed. R. Civ. P. 26(c)(1) forbidding the disclosure of,

or any inquiry into matters that would tend to reveal, the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of individuals and organizations who directly or indirectly oppose Chevron Corporation as regards the Ecuador Litigation or who otherwise support the Ecuador Litigation and/or the Ecuador Environmental Cause, as those terms are defined above. Mr. Donziger requests that the Court make clear that the order applies to all subpoenas issued in these post-judgment proceedings, including subpoenas issued to non-parties.

DATED:       June 15, 2018       Respectfully submitted,

*s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*
*Counsel to Donziger & Associates, PLLC, and*
*the Law Offices of Steven R. Donziger*