UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                Plaintiff,

        -against-                          11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION ON DONZIGER'S MOTIONS
FOR DECLARATORY JUDGMENT AND DISMISSAL,
FOR A PROTECTIVE ORDER AND FOR A STAY**

LEWIS A. KAPLAN, *District Judge.*

        This matter is before the Court in relation to Steven Donziger's motions for (1) a declaratory judgment and other relief [DI 2018], (2) a protective order [DI 2026], and (3) an "emergency administrative stay" [DI 2028]. On June 25, 2018, the Court decided the motions.[1] This opinion sets forth the reasons for those rulings.

        The crux of Donziger's applications in the three motions at issue here is a contention that Chevron Corporation ("Chevron") – which was attempting to enforce both a money judgment against Donziger and an injunction that restrains him from, among other things, "undertaking any acts to monetize or profit from the [Ecuadorian] Judgment" that this Court already has held was obtained by fraud, "including without limitation by selling, assigning, pledging, transferring or

---

[1] DI 2037.

encumbering any interest therein" – was  precluded by the First Amendment from discovering (a) the sources of his recent and present income and assets as well as (b) other information going to the question whether he has complied with the injunction and other provisions of this Court's judgment.

The Court assumes familiarity with its decision on the merits in this case and the Court of Appeals opinion affirmed that decision.[2]

## The Facts

### The Background

Steven Donziger has engaged in a pattern of racketeering activity that has included extortion, mail fraud, wire fraud, violations of the Travel Act and other predicate acts.

As this Court found after a lengthy trial, he and his cohorts have engaged for many years in a corrupt scheme, an object of which is to extort billions of dollars from Chevron.  A lynch pin of that scheme was the fraudulent procurement of a multibillion dollar Ecuadorian judgment coupled with threats and attempts to enforce it in the United States and other countries around the world.  Were that scheme to succeed, Donziger would be made a very wealthy man.

The evidence at trial of Donziger's corruption and extortionate purpose was devastating.  The record showed that Donziger and his Ecuadorian lawyers, as well as others with whom he worked,  produced and obtained the fraudulent judgment and thoroughly corrupted that case.  Among other things:

"They submitted fraudulent evidence. They coerced one judge, first to use a court-

---

[2]

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017).

appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment."[3]

At the end of the trial, the Court found liability and granted equitable relief. It enjoined Donziger and the other defendants who appeared here from, among other things, seeking to enforce the Ecuadorian judgment in the United States, from profiting from it in any way, and "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[4] The proof at trial was sufficiently compelling that Donziger did not challenge *any* of this Court's factual findings on appeal.[5]  The Court of Appeals affirmed the judgment in full,[6] and the Supreme Court denied certiorari.

There have been several developments since the affirmance of the judgment that set the stage for the present applications.

---

[3]
    *Chevron Corp. v. Donziger*, 974 F. Supp.2d at 384.

[4]
    DI 1875, ¶¶ 1-5.

[5]
    *Chevron v. Donziger*, 833 F.3d 74, 81, 86 (2d Cir. 2016) (noting lack of any challenge to any of trial court findings).

[6]
    *Id.*

*The Supplemental Judgment Awarding Costs*

First, the Court entered a supplemental judgment against Donziger awarding to Chevron, the prevailing party, taxable costs in the aggregate amount of $811,602.71.[7]

*Chevron's Contempt Motion and Application for Leave to Conduct Post-Judgment Discovery*

Second, on March 19, 2018, Chevron sought an order to show cause bringing on a motion, *inter alia,* to hold Donziger in civil contempt for violating the terms of the judgment and for leave to conduct post-judgment discovery relevant its enforcement.[8]  It contended that Donziger was in violation both of (1) paragraph 3, which obliged him to execute a stock power transferring to Chevron all of his right, title and interest in shares of Amazonia, a Gibraltar entity formed to receive and distribute any funds collected with respect to the Ecuadorian judgment,[9] and (2) paragraph 5, which enjoined him "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[10]

---

[7]  DI 1962.  *See also Chevron Corp. v. Donziger,* No. 11-cv-0691 (LAK), 2018 WL 1137119 (S.D.N.Y. Mar. 1, 2018) (decision on motion to review taxation of costs).

While Donziger appealed from the costs judgment, he has not obtained a stay of its enforcement either by posting a supersedeas bond or otherwise. The Court notes also that Donziger has not filed an appellate brief, and no briefing schedule has been established. *Chevron Corp. v. Donziger,* No. 18-855 (filed Mar. 29, 2018).

[8]  DI 1968.

[9]  DI 1875, ¶ 3.

[10]  *Id.* ¶ 5.

Insofar as the motion alleges contempt of paragraph 5 of this Court's judgment, it contends principally that Donziger violated that provision by seeking to obtain funds from Elliott Management Corporation ("Elliott") in exchange for an interest in the Ecuadorian judgment or any proceeds of it.  It supported that contention with a declaration of an Elliott official.  But, Chevron suspects other possible violations and sought discovery to determine whether he had done so with respect to other funders or potential funders.

The Court signed the order to show cause.  It observed in doing so that leave of Court was not required to conduct post-judgment discovery with respect to enforcement of the monetary portion of the judgment,[11] i.e., the $811,602.71 costs award.

In an opinion dated May 16, 2018, the Court denied the contempt motion insofar as it relied on paragraph 3 of the judgment and ordered an evidentiary hearing, originally scheduled for May 22, 2018, with respect to the alleged violation of paragraph 5 involving Elliott.[12]  In addition, it ruled that Chevron was entitled to conduct post-judgment discovery with respect to its claim that Donziger had violated paragraph 5 of the judgment, relying on the Second Circuit's ruling to that effect in *State of New York v Shore Realty Corp.*,[13] but temporarily delayed that discovery.[14]

---

[11]

*Id.,* memo endorsement ¶ 2.1.

[12]

DI 2006.  *Chevron Corp. v. Donziger,* No,. 11-0691 (LAK), 2018 WL 2247202 (S.D.N.Y. May 16, 2018).

[13]

763 F.2d 49, 53 (2d Cir. 1985).

[14]

DI 2006

*The Post-Judgment Discovery*

Third, Chevron propounded post-judgment discovery both to Donziger and to various non-party witnesses. As the foregoing suggests, some of that discovery is directed at locating property in which Donziger has an interest, property to which he is or may become entitled, or property that he may have transferred fraudulently, all so that Chevron by appropriate means may obtain that property or its proceeds in satisfaction of the money judgment. Other aspects of the discovery go, generally speaking, to determining whether Donziger has violated or is violating the provisions of the judgment that imposed a constructive trust and enjoined Donziger from engaging in certain activities.[15] Motion practice concerning that discovery is described below.

*Injunction Granted Against Defaulting Defendants*

Fourth, on April 23, 2018, the Court granted Chevron's unopposed motion for a default judgment against the many defendants who did not appear in this action, including the plaintiffs in the Ecuadorian case, at least one of their Ecuadorian lawyers, and others associated with them. The decree, like that against Donziger and the two other defendants who appeared in this case, enjoins the defaulted defendants from, among other things, seeking to enforce the Ecuadorian judgment in the United States, from profiting from it in any way, and "from undertaking any acts to

---

[15] It is important to note that the discovery sought does not in each case fall neatly into only one or the other category. That is so, among other reasons, because discovery directed at learning what payments Donziger has received, is entitled to receive, or hereafter may receive from any collections on the Ecuadorian judgment or from the proceeds of financing extended in exchange for a share of any such collections certainly is relevant to Chevron's collection of its money judgment against Donziger and, in the case of his receipt of proceeds of such financing, is likely to be relevant to whether he has violated, or threatens to violate, this Court's injunction, which among other things enjoins him from monetizing the Ecuadorian judgment.

7

monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[16]  Thus, all of the Ecuadorian plaintiffs now also are enjoined from seeking to monetize or profit from the fraudulent judgment.

With that general background, we turn to the specific details relevant to resolution of Donziger's motions.

*Post Judgment Discovery Rulings*

*Donziger*

In April 2018, Chevron, as noted, served discovery requests on Donziger and various non-parties.  Those served on Donziger included a document request, an information subpoena, and a subpoena *ad testificandum* to take the deposition of Donziger.

Donziger interposed largely boilerplate objections to substantially every discovery request[17] and ultimately took the position that he would not appear for a deposition.  Despite his broad brush approach, he did not object to any discovery request on the ground now advanced in his motion for a protective order, viz. that compelled discovery of the identities of persons supporting his efforts, financially or otherwise, would violate the First Amendment.

---

[16]

DI 1984, ¶¶ 1-4.

The Court concluded that it has personal jurisdiction over all of the defaulted defendants. DI 1984, at 1 n.1.

[17]

DI 1988-2.

Chevron then moved to compel compliance.[18]   Donziger's answering memorandum made essentially two points.  He argued, first, that post-judgment discovery should be suspended because he hoped at some point to post  a supersedeas bond.[19]  Second, he contended that the parties should continue to confer concerning his previously interposed objections to specific discovery requests.  He proposed that Chevron should be satisfied with "a  descriptive  summary  or  guidance as  to  [his] relatively simple financial condition, backed up by documentation."[20]   Once again, however, he did not contend that compelled discovery of the identities of persons supporting his efforts, financially or otherwise, would violate the First Amendment.[21]

The Court ruled on the motion to compel on May 17, 2018.[22]  For convenience of exposition, the Court divided the specific discovery requests into two rough categories.  The first category, which it referred to as Money Judgment Discovery, was directed principally but not

---

[18]

DI 2009.

He never did so.

[19]

DI 2002, at 1-2.

[20]

*Id.* at 2-3.

[21]

In an unauthorized surreply in opposition to Chevron's motion, Donziger asserted that "Chevron's obvious goal is to access information about specific funders in order to harass and intimdate them" ands suggested that this would raise "profound First Amendment concerns."  DI 2005, at 2.

It is well established, of course, that arguments first raised in reply briefs are forfeited or waived.  *E.g.*, *Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016); *Knippe v. Singer*, 999 F.2d 708, 711 (2d Cir. 1993).  It necessarily follows that the same is true of arguments first raised in an unauthorized surreply submission.

[22]

DI 2009.

9

exclusively to identifying assets with respect to which the money judgment for costs may be enforced.[23]   The second category, which it referred to as Paragraph 5 Compliance Discovery, principally seeks information with respect to whether Donziger has violated paragraph 5 of the March 4, 2014 judgment in this case, the provision that enjoined Donziger and the two Ecuadorian plaintiffs who appeared in this action from seeking to monetize or profit from the Ecuador judgment, including by selling, assigning, pledging, transferring or encumbering any interest therein.[24]   It is pertinent to note, however, that at least some of the specific discovery requests actually seek information that is relevant both to collecting on the costs judgment and to the question whether Donziger has violated paragraph 5 of this Court's judgment.

In relevant part, the Court's ruling modified certain of Chevron's discovery requests to make them more specific and directed Donziger to comply with the Money Judgment Discovery requests and to submit to a deposition.  But it extended the delay in required compliance with the Paragraph 5 Compliance Discovery requests.

*The Postponement of the Contempt Hearing and Its Effect on the Discovery Schedule*

On the same day as the Court's discovery ruling, Donziger moved to postpone the contempt hearing.  The Court granted the request, ultimately moving the hearing to June 28, 2018.

---

[23]   The specific document requests that the Court characterized as Money Judgment Discovery are Requests 1 through 17, 19, 23 through 28 and 30.  The specific information subpoena requests included within the term Money Judgment Discovery are paragraphs 1 through 20 and 26-31.

[24]   The specific document requests that the Court deemed to be Paragraph 5 Compliance Discovery are Requests 18, 21, 22 and 29.  The specific information subpoena requests so deemed are numbers 21 through 25.

Chevron responded to the postponement, however, by requesting that Donziger be required to respond to all outstanding post-judgment discovery requests, including the Paragraph 5 Compliance Discovery, in advance of the hearing.[25]

In a June 1, 2018 ruling, the Court granted only part of Chevron's request.  It ordered Donziger to comply – fully and by June 15, 2018 – with certain of the Paragraph 5 Compliance Discovery "to the extent of producing documents and providing information bearing on the attempt to obtain funds from" Elliott and related entities.[26]  It continued to reserve judgment with respect to the balance of the Paragraph 5 Compliance Discovery.

*The Sullivan Discovery Ruling*

Among the non-parties on whom Chevron had served post judgment discovery requests are Mary Katherine Sullivan and Streamline Family Office, Inc. ("Streamline"), a company she apparently controls.  Sullivan, Chevron claims, participated in Donziger's efforts to raise funds from Elliott and others.

Following the June 1, 2018 ruling with respect to discovery against Donziger concerning to the Elliott matter, Sullivan and others, according to Chevron, continued to refuse to comply with Chevron's discovery requests.  Chevron sought clarification from the Court that its rulings with respect to discovery from Donziger applied also to discovery from non-party witnesses.

---

[25]  DI 2016.

[26]  DI 2020.

Donziger did not oppose that request, which the Court granted.[27]  But that was not to be the end of the story.

Ms. Sullivan's counsel informed the Court of what her attorney said was their understanding of Ms. Sullivan's discovery obligations in light of the Court's rulings and sought a protective order (a) barring her deposition or, alternatively, (b) limiting the questioning to the identification of "assets available to satisfy [the] money judgment."[28]  In short, Ms. Sullivan sought to preclude any examination of her at all or, failing that, to foreclose deposition testimony with respect to the Elliott matter in which she is said to have participated.

On June 15, 2018, the Court directed Ms. Sullivan, "without further delay," to (1) produce all requested documents and information concerning (a) the attempt to obtain funds from Elliott, any affiliates of Elliot, and/or any funds managed by Elliott or its affiliates, (b) Donziger's assets, liabilities and financial situation, and (c) any payments to Donziger, past or anticipated, out of proceeds of financing granted in whole or in part in exchange for any portion of any future collections on the Ecuadorian judgment, and (2) appear for an testify at a deposition on those subjects in advance of the June 28 contempt hearing.[29]

---

[27]    DI 2021, DI 2022.

[28]    DI 2031.

[29]    DI 2027.

*The Present Motions*

 *The Declaratory Judgment - Dismissal Motion*

  On May 31, 2018, Donziger filed a motion styled as "Defendant Donziger's Motion for Declaratory Relief and Motion to Dismiss Plaintiff's Application to Hold Donziger in Contempt for 'Profiting' From the Judgment."[30]

  The first aspect of the motion seeks a declaration that this Court's judgment:

"in no way prevents:

"1. Mr. Donziger or third-parties from exercising their legal rights in non-U.S. jurisdictions to obtain enforcement and related recovery on the Ecuador Judgment, consistent with the NY Judgment and the Second Circuit's affirmance thereof;

"2. Mr. Donziger from providing legal and other services including assistance in raising funds to cover litigation expenses, debts, and fees, from third-party litigation finance investors predicated on an interest in any recovery other than his specific contingency interest (or any specific interest that Mssrs. Camacho and Piaguaje may have);

"3. Mr. Donziger from receiving payments out of such third-party litigation finance funds to cover his legal expenses and fees for providing legal and other services, consistent with the terms of any such agreement and any applicable law."[31]

He contends in substance that certain statements in the Court's April 2014 ruling granting in part and denying in part his motion for a stay pending appeal of the Court's March 2014 injunction[32] modified that injunction as he purports to relate in the statements quoted above.

---

[30]  DI 2018.

[31]  *Id.* at 2-3.

[32]  DI 1901.

The second branch of the motion seeks "dismissal," pursuant to Fed. R. Civ. P. 12(b)(6), of Chevron's contempt motion. In substance, his argument seems to be that the allegations of Chevron's contempt motion are insufficient to make out a claim of violation of paragraph 5 of the injunction with respect to the Elliott solicitation, as allegedly modified by the Court's comments on the motion for a stay pending appeal, with respect to the Elliott matter.

### The Protective Order Motion

On June 15, 2018, Donziger moved for a protective order

> "precluding any discovery in these post-judgment proceedings (including discovery sought from third-parties) that would tend to reveal the identity of any funder or other material supporter of the Ecuador Litigation and/or the internal operational, organizational, administrative, or financial management practices of the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation ('Ecuador Litigation Team'), and/or more broadly engage in Ecuador Litigation-related advocacy ('Aguinda Supporters')."[33]

The essence of the argument is that such discovery would violate alleged First Amendment rights of Donziger funders and "material supporters" of his efforts as well as "the teams of individuals and organizations" that support them. He asserts that disclosure of the identities of supporters would subject them to "reprisals" by Chevron.

### The So-Called "Emergency Stay" Motion

On June 19, 2018, Donziger filed yet another motion, that one for "an emergency administrative stay of provision 1(c)" of the Sullivan order of June 15, 2018 – which requires

---

[33] DI 2026, at 2.

14

Sullivan to provide discovery in advance of the contempt hearing regarding "any payments to Donziger, past or anticipated, out of proceeds of financing granted in whole or in part in exchange for any portion of any future collections on the Ecuadorian judgment" – pending a decision on his protective order motion.  As the Court's June 25 denial of the protective order mooted this motion, it requires no further discussion.

*Discussion*

I have set out in detail the unnecessarily complex history of the matters now before the Court.  At the end of the day, however, the substance of the parties' disputes reduces to a few simple points.  It is useful to put them on the table before proceeding to analysis of Donziger's submissions.

1.      While Donziger would portray himself as a rescuer of the helpless dwellers of a polluted rain forest from depredations of Chevron, the facts are quite different.  As this Court found, Donziger:

> "and the Ecuadorian lawyers he led corrupted the Lago Agrio case. They submitted fraudulent evidence. They coerced one judge, first to use a court-appointed, supposedly impartial, ''global expert'' to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to ''totally play ball'' with the LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment."[34]

---

[34]      *Chevron Corp. v. Donziger,* 974 F. Supp. 2d at 384.

In short, the Ecuadorian judgment is a fraud and Donziger's activities extortionate.[35]  And that is no less true because this Court, out of considerations of comity, did not enjoin the plaintiffs in the Ecuadorian case from seeking to enforce the Ecuadorian judgment in countries other than the Untied States.

2.      Donziger had every opportunity to contest this Court's findings on appeal but conspicuously did not do so.  The Second Circuit affirmed the injunction barring him from profiting from his misdeeds in any way and from seeking to monetize the Ecuadorian judgment, "including by selling, assigning, pledging, transferring or encumbering any interest therein."  A largely identical injunction now has been entered against all or substantially all of the Ecuadorian plaintiffs and others in the Donziger complaint.

3.      Donziger now is liable to Chevron on an $811,670 costs judgment.  He has not obtained any stay of enforcement.  The judgment is enforceable now.  Chevron is entitled to try to collect it.  It is entitled to conduct discovery in an effort to locate assets subject to execution or other process.  It is entitled to find out from where he derives any revenue that he has received or is likely to receive because it may well have the right to execute on or otherwise reach that revenue as well as any money owed to him by others.[36]  It is not obliged to take Donziger's word that a simple statement by him as to his financial position would suffice.

4.      In addition, Chevron, in its view, has caught Donziger violating this Court's injunction with respect to Elliott.  It has sound reason to suspect that he has done so in other

---

[35]

     *Id.* at 576-88.

[36]

     N.Y. CPLR § 5231.  *See also id.* §§ 5225, 5227, 5232.  (New York law governs on this matter under Fed. R. Civ. P. 69.)

instances, although the Court has not reached any conclusion as to either.  Donziger contends that whatever exactly he did with respect to Elliott – and he has not submitted any affidavit or declaration disclosing his version of the events – did not violate the injunction.  Once the facts regarding are known, perhaps he will prove correct.  But the Court has ruled that a hearing is appropriate to determine whether the evidence ultimately will warrant a finding of contempt with respect to Elliott and granted limited discovery in order to facilitate that hearing.  Moreover, the evidence at that hearing may affect the Court's ultimate views regarding the Paragraph 5 Compliance Discovery.  The second and to some extent the first branch of his declaratory judgment-dismissal motion are attempts to overturn that ruling and to avoid a hearing.

     5. Donziger is concerned that post judgment discovery may reveal the identity of some or all of those funding and otherwise supporting his efforts.  He fears that Chevron will sue or otherwise discourage whoever is funding his efforts if he or others are compelled to disclose their identities.  His protective order motion and to some extent his declaratory judgment dismissal motion are attempts to overturn this Court's ruling that Chevron, at least in principle,  is entitled to some discovery with respect to whether Donziger has complied generally with paragraph 5 of the injunction in this case and to foreclose any such possibility.  So too his "emergency administrative stay" motion with respect to clause 1(c) of the Sullivan order.

     So, in the last analysis, these motions reflect efforts by Donziger to block any meaningful inquiry with respect to whether he is defying this Court's injunction and to frustrate collection of the money judgment against him.

     With that, the Court turns to the specific motions.

A.      *The Declaratory Judgment-Dismissal Motion*

Donziger's motion for a declaratory judgment construing this Court's 2014 injunction and to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), Chevron's motion to hold him in contempt suffers from fatal flaws independent of whether his arguments with respect to the 2014 injunction or Chevron's contempt motion relating to the Elliott matter have substantive merit. In other words, no declaratory judgment would be appropriate in these circumstances for several reasons, not least because the proceedings on the contempt motion will resolve that issue. Nor does Rule 12(b)(6) have any application to Chevron's contempt motion.

Insofar as the motion seeks a declaratory judgment, it is entirely without merit on procedural grounds alone, essentially for the reasons set forth in Chevron's memorandum.[37] Briefly summarized, a declaratory judgment must be sought in a plenary civil action by the filing of a complaint. It may not be sought, as it was here, by motion, least of all a motion in an action that already has been tried to judgment and remains before the Court only with respect to judgment enforcement proceedings. Moreover, declaratory relief, even when sought properly, is discretionary. The Court would not exercise its discretion to entertain such relief here.[38]

---

[37]

DI 2024, at 1-3.

[38]

In determining whether to grant declaratory relief, courts consider "(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy." *Dow Jones & Co. v. Harrod's, Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003). Here, Donziger's motion for a declaratory judgment is being used "used merely for procedural fencing" in that he is trying to avoid a short evidentiary hearing on the contempt motion with respect to the Elliott solicitation, a hearing scheduled to take place later this week. Resolution of that contempt application

Insofar as Donziger seeks to "dismiss" part of Chevron's contempt motion pursuant to Civil Rule 12(b)(6), his motion also is entirely without merit on procedural grounds alone, again substantially for the reasons set forth in Chevron's memorandum.[39]  In short, Rule 12(b)(6) may be employed to challenge the legal sufficiency of a complaint or other "pleading."  But Chevron's motion to hold Donziger in civil contempt is not a "pleading."  Rule 12(b)(6) does not apply to it at all.

In addition, Donziger's motion is flawed in both its prongs in yet another respect. This Court ruled that it would hold an evidentiary hearing on the portion of Chevron's contempt motion relating to the Elliott incident on May 16, 2018.  Donziger's motion is nothing more than an untimely and baseless effort to obtain reconsideration of this Court's determination that an evidentiary hearing is appropriate to the resolution of the portion of Chevron's contempt motion that relates to the Elliott solicitation.  Not only is there no proper basis for reconsideration of that ruling, but Donziger fails entirely to come to grips with the fact that, even on his view of his obligations under the judgment, the question whether the Elliott solicitation involved contumacious behavior on his part may well depend upon exactly what happened, which is not entirely clear from the papers before the Court.

Finally, events may have overtaken Donziger's motion.  On April 23, 2018, the

---

would be a better or more effective remedy, particularly as it will give the Court the benefit of a factual record with respect to what actually happened, which may prove important with respect to determining the contempt issue.  A determination of the contempt motion will settle the legal issues just as well as Donziger's request here.  Accordingly, the Court would deny the motion for a declaratory judgment even if entertaining a request for declaratory relief by motion rather than in an action were appropriate, which it is not.

[39]  DI 2024, at 3-4.

Ecuadorian plaintiffs who did not appear in this action and the Frente de la Defensa de la Amazonia (the "ADF"), also a non-appearing defendant here, also were enjoined "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."[40]  From that date onward, the question whether  "the Court's March 4, 2014 judgment . . . prevent[ed] the beneficiaries of the Ecuadorian environmental judgment . . . from raising funds to cover litigation fees and expenses, at a minimum *so long as the specific legal interests of the three individual defendants named in the NY Judgment are not pledged or collateralized as part of any such fundraising*" – the question as to which Donziger seeks declaratory relief – arguably has become academic.[41]  In any case, it certainly casts the question of declaratory relief – even if there were a proper basis for considering it, which there is not – in quite a different light, as it places the issue in a posture that none of the parties has addressed.

---

[40]

DI 1984, ¶¶ 1-4.

The Court specifically concluded that it has personal jurisdiction over all of the defaulted defendants.  DI 1984, at 1 n.1.

[41]

Emphasis added.

It arguably has become academic in consequence of the default judgment because the non-appearing defendants also now have been enjoined "from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." In consequence, even if Donziger were correct that paragraph 5 of the 2014 injunction restrained him only from seeking to monetize or profit from his own interest in the Ecuadorian judgment, as Chevron has suggested (*cf.* DI 2040, at 1), the question now would arise whether Donziger's active concert or participation with any of the non-appearing and now defaulted defendants in seeking to monetize or profit from any interest whatsoever in the Ecuadorian judgment would constitute contempt of court.

B.     *The Protective Order Motion*

Donziger asks the Court for a protective order "forbidding the disclosure of, or any inquiry into matters that *would tend to reveal*, the identity of *any funder or other material supporter* of the Ecuador Litigation and/or the internal *operational*, organizational, administrative, or *financial management practices* of individuals and organizations *who directly or indirectly oppose Chevron Corporation* as regards the Ecuador Litigation *or who otherwise support the Ecuador Litigation and/or the Ecuador Environmental Cause*"[42] and requests that the order apply to "all subpoenas issued in these post-judgment proceedings, including subpoenas issued to non-parties."[43]  He thus attempts to assert the rights of a vast and diverse group of people and organizations all over the globe, some or even many of whom he probably never has nor never will meet.  Among other things, he attempts to block any discovery of the identities of people and organizations who pay or owe him money or other property and thereby to prevent or substantially hinder Chevron's efforts to collect the money judgment by which he is indebted to it.   He now asserts that the First Amendment gives him the right to such relief.  But this remarkably ambitious effort fails.

---

[42]

Donziger defines the "Ecuador Litigation" as "the *Aguinda v. Chevron Corp.* environmental case in Ecuador and the enforcement of the merits judgment in that case . . . in Canada and elsewhere."  DI 2026, at p. 1.  He defines the "Ecuador Environmental Cause as "the broader social and environmental cause related to the massive toxic contamination deliberately discharged by Texaco and still existing at the company's former oil drilling, production and storage sites in Ecuador."  *Id.* at 2.

In addition, he defines the "Ecuador Litigation Team" as "the teams of individuals and organizations that directly and indirectly oppose Chevron in the Ecuador Litigation."  *Id.* at 2.  Those that "more broadly engage in Ecuador Litigation-related advocacy" are defined as the "Aguinda Supporters."  *Id.*

[43]

*Id.* at pp. 23-24 (emphasis added).

*Waiver, Forfeiture and Standing*

The time for Donziger to object to the discovery Chevron has requested of him long came and went long before he moved for a protective order.  As noted above, Chevron served the discovery requests now at issue on Donziger on April 16, 2018.[44]  These discovery requests asked specifically for the information that Donziger now resists revealing.[45]  And Donziger objected to the requests – first in response to Chevron's requests[46] and then (twice) in response to Chevron's motion to compel.[47]  But Donziger failed to timely make the First Amendment argument that he raises now.[48]  That failure waived or forfeited the argument he advances in this motion.[49]  Moreover, this protective order motion is essentially an attempt to reargue the Court's May 17 ruling on Chevron's motion to compel.  But treating this motion as one for reargument or reconsideration would not help Donziger.

---

[44]      DI 1989-1.

[45]      *E.g.*, *id.* ¶¶ 18-22.

[46]      DI 1989-2.

[47]      DI 2002; DI 2008.

[48]      *See supra* n.21.

[49]      *See, e.g., UBS Intern. Inc. v. Itete Brasil Instalacoes Telefonicas Ltd.*, No. 09 Civ. 4286 (LAK), 2010 WL 743371, at *3 (S.D.N.Y. Feb. 24, 2010); *Eldaghar v. City of New York Dep't of Citywide Administrative Services*, No. 02 Civ. 9151 (KMW) (HBP), 2003 WL 22455224, at *1 (S.D.N.Y. Oct. 28, 2003); 8A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2035 (3d ed. 2018) ("At least with regard to depositions, the [protective] order should ordinarily be obtained before the date set for the discovery, and failure to move at that time has been held to preclude objection later."); *id.* at § 2173 ("Failure to make a timely objection is no the only way in which an objection can be waived. A voluntary answer to an interrogatory is also a waiver of the objection.").

So treated, the motion would be untimely[50] and meritless, the latter because it does not "point to controlling decisions or data that the court overlooked."[51]  Rather, it  raises a new ground for objection without even an acknowledgment of the fact that these arguments could have been, but were not, raised at an earlier point.

   Accordingly, Donziger's belated arguments in this motion have been forfeited, at least insofar as he makes them on behalf of himself as distinguished from the multitude of unidentified and to some extent unidentifiable other people and organizations on behalf of whom he purports to seek relief.  And even if Donziger's purported assertion of First Amendment rights of that multitude has not been waived or forfeited, Donziger lacks standing to assert those interests, whatever they may be.[52]  "In the absence of a claim of privilege a party usually does not have standing to object to

---

[50]

  Such a motion must be made within fourteen days of the ruling it would call into question. S.D.N.Y. CIV. R. 6.3.  This motion was not made until about a month after the Court ruled on Chevron's motion to compel.

[51]

  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

[52]

  Moreover, Donziger's First Amendment argument, insofar as it is asserted on behalf of the perhaps vast multitude of unidentified funders, material supporters, appears in significant part to be an attempt to assert First Amendment rights on the behalf of non-citizens living outside the United States and so  would fail on the merits even if he had standing. In any case, Donziger certainly has not established that all, or even any, of the persons or entities whose alleged rights he purports to assert are citizens or residents of, or have any material connection to, the United States.   Nor has he established any other "practical considerations" that indicate that the First Amendment right to association applies extraterritorially.  *See Boumediene v. Bush*, 553 U.S. 723, 759 (2008).

  "The First Amendment provides, in relevant part, that 'Congress shall make no law . . . abridging the freedom of speech, or . . . the right of the people peaceably to assemble.' The Supreme Court has noted that a textual analysis of the Constitution 'suggests that 'the people' protected by the [First Amendment], refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.' [footnote omitted] Indeed, as early as 1904, the Supreme Court held that the First Amendment's guarantees of freedom of speech

a subpoena directed to a non-party witness."[53]  "A party's general desire to thwart disclosure of information by a non-party is simply not an interest sufficient to create standing."[54]  The fact that Donziger purports to assert those interests in the form of a motion for a protective order rather than by objecting to subpoenas is of no moment because "[t]his is not a distinction recognized in this circuit. Moreover, it would be peculiar indeed if a party could circumvent the well-established standing requirements under Rule 45 simply by styling what is effectively a motion to quash as a motion for a protective order."[55]

---

and assembly do not apply to an excludable alien because '[h]e does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law.' [footnote omitted] Much more recently, the D.C. Circuit relied on this principle in affirming a district court's determination 'that the interests in free speech and freedom of association of foreign nationals acting outside the borders, jurisdiction, and control of the United States do not fall within the interests protected by the First Amendment. [footnote omitted]'" *Chevron Corp. v. Donziger,* No. 1:12–MC–65 LAK/CFH, 2013 WL 3228753, at *4 (N.D.N.Y. June 25, 2013).

Accordingly, Donziger's attempt to rest his protective order argument on the purported First Amendment rights of unidentified non-parties all over the world fails because he has failed even to allege, let alone establish, that any of them is "acting [in]side the borders, jurisdiction, and control of the United States."  Such persons have no First Amendment rights to assert.  And even assuming, as may be true, that some of those whose purported rights Donziger seeks to assert do have First Amendment rights, his motion would be grossly overbroad as it seeks to sweep within its ambit many of do not.

[53]

*Langford v. Chrysler Motors Corp., 5*13 F.2d 1121, 1126 (2d Cir.1975).  *Accord,* 9A CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2459 (3d ed. 2018) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought." (footnote omitted)).

[54]

*US Bank Nat'l Ass'n v. PHL Variable Ins. Co.,* No. 12-cv-6811 (CM)(JCF), 2012 WL 5395249, at *2 (S.D.N.Y. Nov. 5, 2012) (Francis, M.J.).

[55]

*Id.*

*No Good Cause Shown*

The Court may issue a protective order only if "good cause" is shown by the moving party.[56]  "'Good cause' is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury."[57]  A court will not grant a request that relies on "conclusory or speculative statements about the need for a protective order and the harm that will be suffered without one."[58]  Ultimately, courts will decide whether to grant a protective order after weighing the interests of both parties – the movant's interest in protecting against disclosure and the party seeking discovery's interest in full disclosure of relevant information.[59]

It is important to recall, moreover, that "[a] party's general desire to thwart disclosure of information by a non-party is simply not an interest sufficient to create standing."  The type of the "injury" that disclosure allegedly would cause is relevant.  After all, nearly all discovery requests may cause injury to the opposing party in the sense that disclosure of evidence helpful to the requesting party ordinarily "injures" its adversary by making the requesting party more likely to prevail.  For example, a judgment creditor's discovery request that would reveal the source of a judgment debtor's income would work an "injury" to the debtor in the sense that it allows for the possibility of the creditor garnishing the debtor's wages.  Yet surely a protective order cannot issue to prevent such a disclosure.  Or, to present an analogy perhaps closer to the situation at hand:

---

[56]

FED. R. CIV. P. 26(c)(1).

[57]

6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE §26.104[1] (3d ed. 2017).

[58]

*Huthnance v. District of Columbia et al.*, 255 F.R.D. 285, 296 (D.D.C. 2008).

[59]

*Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71-72 (S.D.N.Y. 2010).

suppose a judgment debtor transfers his assets to a third party, post-judgment, in an attempt to shield those assets from the creditor.  Suppose the creditor suspected as much and issued discovery requests in the reasonable expectation of revealing where the debtor squirreled away its assets.  Surely such requests are appropriate, assuming they are reasonable.  They may be "injurious" to the debtor and conceivably impose some burden on non-party discovery recipients.  Yet so long as the requests are relevant, reasonable and in pursuit of the legitimate end of enforcing a court's judgment, no protective order ordinarily should issue.

This idea that appropriate litigation activity does not usually warrant a protective order is supported by principles in other areas of the law.  One is found in the tort of intentional interference with a contract.  To make out this tort, a plaintiff must prove not only that there was intentional interference, but also that it was improper.[60]  The defendant's conduct is actionable only if it was done for an improper reason and in an improper fashion.[61]  Notably, threats of civil suit are "ordinarily wrongful if the actor *has no belief in the merit of the litigation* or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, *intending only to harass the third parties* and not to bring his claim to definitive adjudication."[62]

These principles confirm that "injuries" that flow from the proper functioning of the

---

[60]

RESTATEMENT (SECOND) OF TORTS § 767 cmt. a (1979).

[61]

*Id.* (factors to determine whether interference is improper include "the nature of the actor's conduct," "the actor's motive," "the interests of the other with which the actor's conduct interferes," and "the interests sought to be advanced by the actor"); *see also* 86 C.J.S. TORTS § 48 ("The defendant may avoid liability for interference with contractual relations by showing that its actions were privileged or *justified by a lawful object that it had a right to pursue*." (emphasis added)).

[62]

RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (emphasis added).

justice system are not circumstances that warrant a protective order.  In fact, litigation, if it has a appropriate basis and is conducted properly, "is a constitutionally protected right in the United States."[63]  Yet here, the "injury" that Donziger seeks to avoid through the requested protective order would flow, he says, from disclosure of information identifying his funders, supporters, and associates in pursuing enforcement of the judgment he procured by fraud about the sources of his income, the identification of his assets, and whether he has violated the terms of this Court's injunction.  He contends that disclosure of their identities conceivably might subject them to discovery, cause them to fear being sued or actually named in litigation, or otherwise result in complications for either them or for Donziger.  And there is a very considerable irony in Donziger making such an assertion because the position he now takes is irreconcilable with the position he took earlier in this lawsuit.

At the conclusion of the trial, Donziger argued that liability could not be imposed upon him with respect to the fraudulent and corrupt procurement of the Ecuadorian judgment and other dishonest activities because he and his associates merely "asserted their case against Chevron in courts, the halls of government," and elsewhere.[64]  "The actions about which Chevron complains," he said, "thus constitute activity that is protected either by the First Amendment or by immunity doctrines that serve the same interests."[65]  "Chevron," he asserted, "cannot premise liability . . . on

---

[63]

   *Chevron Corp. v. Donziger* 974 F. Supp. 2d at 579-80.

[64]

   Donziger Post-Trial Mem. [DI 1850], at 64-65.

[65]

   *Id.* at 65.

such protected activity."[66]  And he was right – but only to a point.  While some of his activities no doubt were protected, the bribery and other corruption in which he and his confederates engaged and the false statements they knowingly made in order to tarnish and pressure Chevron "remove[d] any shield that the First Amendment otherwise would [have] provide[d]."[67]  And the irony is that he now complains that he and others on whose behalves he purports to seek relief would be "injured," if at all, only by Chevron's exercise of its own right to pursue enforcement of its judgment, to seek discovery from persons thought to have relevant knowledge necessary for that purpose, and to seek legal redress against anyone whom it may allege is complicit in Donziger's tortious activities – in other words, by exercising its rights under the law.  As long as it acts legally and properly, Chevron has a constitutional right to do so – the same right that Donziger claimed for himself.  And Donziger has offered no competent or persuasive evidence that Chevron has or is likely to pursue those rights in any but a lawful and proper manner.

Instead, the limited material Donziger offers to support his claim of threatened injury suffers from one or both of two flaws.  It is unsupported by competent evidence, failing the requirement of "specifically demonstrat[ing] that disclosure will cause a clearly defined and serious injury."  Or he complains of "injuries" that do not justify a protective order.  The past and supposedly threatened actions, if there is any proof of his allegations at all, would amount to nothing more than Chevron's vindication of, or possible future efforts to vindicate, its legal rights through proper means.  That does not constitute good cause.

---

[66]

*Id.*

[67]

*Chevron Corp. v. Donziger,* 974 F. Supp.2d at 581-84.

*Donziger Has Not Demonstrated a Clearly Defined Threat of Serious Injury Absent a Protective Order*

The burden was on Donziger to demonstrate – with competent evidence – a substantial risk of a clearly defined and serious injury should the Court not issue a protective order. But Donziger's motion was lacking in two major respects.  First, he presented little in the way of competent evidence.  Second, the verifiable evidence he did present did not demonstrate that a cognizable injury would result absent a protective order.

Donziger's motion is replete with stories of his and his allies' supposed persecution at the hands of Chevron.  And, his argument goes, Chevron's discovery requests are just more of the same. But he presents no actual evidence demonstrating Chevron engaging in inappropriate conduct. His motion is unaccompanied by declarations or affidavits.  The majority of his sources of support are news articles, which amount to unsworn hearsay.  And beyond these articles' inherent weakness as evidence, Donziger draws conclusions from them that are not there.

For example, Donziger cites a published report of Chevron allegedly firing Ogilvy & Mather after finding out that someone affiliated with the firm had worked with Amazon Watch, an NGO aligned with Donziger.  Donziger says that this news article is evidence of Chevron "publicly punish[ing]" Ogilvy in order to "enforce disciplined adherence to its 'demonization' narrative."[68]  But the article did not characterize it as public punishment in the service of a grand narrative; that part is all Donziger.  Whatever Chevron's reasons for firing Ogilvy were, assuming *arguendo* it already did so, Donziger presents no evidence of them.  Rather, he just repeats his claims

---

[68] *Id.* at p. 8-9.

that Chevron is harassing or persecuting him.  Despite Donziger's words to the contrary, repetition cannot turn a lie into a fact.[69]

Donziger does present some verifiable facts, to be sure.  He revives a number of disputes from this litigation's long history that he claims are examples of "Chevron's long and sordid history of seeking to suppress speech and association by Aguinda Supporters."[70]  The problem for Donziger is that these examples are all merely instances Chevron engaging in legitimate litigation activity.  They do nothing to support a claim that Donziger's post-judgment discovery is likely to result in cognizable injury to Donziger or others.

Another example is Donziger's reliance on  Chevron's efforts to get discovery from non-parties both before and during this case, which he characterizes as an improper pressure tactic used by Chevron improperly to burden Donziger's supporters.  But that, to put it mildly, is a mischaracterization of what happened.  It is conceivable that some of those efforts may have been somewhat burdensome to some of those involved.  But there is no evidence that anything was improper in any respect.  Many of the courts that saw the Section 1782 suits concluded the Chevron had established a *prima facie* case of fraud,[71] and some of those suits led to invaluable evidence of

---

[69]

> *See* PX 1059 (Donziger email to Fajardo, Aug. 13, 2008) ("If you repeat a lie a thousand times it becomes the truth.").

[70]

> *Id.* at 5.

[71]

> *Chevron Corp. v. Donziger*, No. 11-cv-691, 2013 WL 646399, at *4 (S.D.N.Y. Feb. 21, 2013) (noting that six other district courts had so found as of the time of writing).

the fraud Donziger had perpetrated.[72]  Indeed, the Court understands that Chevron prevailed in the substantial majority of those cases.

Another example is Donziger's vehement complaints of Chevron's "focus on [his] financial supporters" or others, including Stratus Consulting, Burford, Russell DeLeon, and Patton Boggs.[73]  But these "supporters" were alleged to be his co-conspirators.  Stratus Consulting was a named defendant in this case.[74]  Burford, Russell DeLeon, and Patton Boggs all were named as non-party co-conspirators.[75]  And now that Donziger is enjoined from profiting from  the Ecuadorian judgment, it perhaps is arguable that a "funder" now might be accused properly of assisting Donziger or others in defying a Court order, although the Court expresses no view as to the merit of any such claim.  The fundamental point is that Chevron is entitled to use the justice system – in an appropriate manner – to assert claims against and seek discovery from such people and organizations.

Finally, and perhaps most tellingly, Donziger argues that this case itself – *in which he was found to have committed a massive fraud* – is "the most notorious example" of Chevron's allegedly bad-faith conduct.[76]  This small point in the motion is revelatory of the fact that Donziger refuses to acknowledge the legitimacy of this suit and the binding nature of this Court's judgment.

---

[72]

    *See Chevron Corp. v. Donziger* 974 F. Supp. 2d at 455-474 (describing the Colorado and New York § 1782 proceedings).

[73]

    DI 2026, at 9.

[74]

    DI 1, ¶ 14.

[75]

    *Id.* at ¶ 17.

[76]

    DI 2026, at 5.

In the end, the "injuries" that Donziger fears in the absence of a protective order, even if they were to come to pass, would not justify the protective order he seeks. Chevron is entitled to enforce the judgment in its favor through appropriate discovery requests and take appropriate legal action. The Court will not issue a protective order on the basis of such actions.

### *Non-Parties Have Various Legal Protections At Their Disposal*

As a final note with respect to good cause, a denial of Donziger's motion would not leave non-parties without recourse to protect themselves from any improper Chevron discovery requests or legal action. They may file well-founded, timely motions to quash or limit any subpoena Chevron serves upon them.[77] They may file well-founded, timely objections to discovery requests they deem unreasonable or overly burdensome. In fact, Ms. Sullivan already has done so, and the Court responded to her motion by limiting the scope of her discovery obligations, at least for the time being.[78] Should they be sued, they may resort to appropriate defense of any action.[79]

Because Donziger has failed to muster evidence that demonstrates any cognizable injury that probably would result from the denial of the requested protective order, the Court finds that good cause was not shown.

---

[77] FED. R. CIV. P. 45(d).

[78] DI 2027.

[79] *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010).

*First Amendment Concerns Do Not Necessitate A Protective Order*

Donziger's First Amendment arguments do not support any different result.

*Standing*

Donziger has asserted no facts that would justify a conclusion that he has standing to assert the putative rights of the multitude of people and entities on whose behalf he to seek relief. Generally speaking, "an association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties."[80]  For example, in *NAACP v. Alabama*,[81] the Supreme Court found that the NAACP could assert its members' rights to freedom of association because "its nexus with them [was] sufficient to permit that it act as their representative."[82]  Facts supporting the finding of that nexus included that the NAACP and its members were "in every practical sense identical," and "the reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production is compelled."[83]

But here the situation is markedly different.  There is no organization asserting the rights of a discrete pool – its members.  Instead, here the Court has Donziger (not an organization) asserting the rights of essentially anyone engaged in activism related to the alleged Texaco oil spill

---

[80]     *Warth v. Seldin,* 422 U.S. 490, 511 (1975).

[81]     357 U.S. 449 (1958).

[82]     *Id.* at 458–59.

[83]     *Id.* at 459-60.

in Ecuador (not the members of an established organization).[84]  Plainly Donziger does not represent all such people – some groups of people for whom he claims to speak have disavowed him entirely.[85] And he has alleged no basis for showing that any of them – let alone all of them – have a connection to the United States that affords them any protection at all under the First Amendment in any circumstances.[86]

### Merits

Standing aside, Donziger is wrong on the merits.  He relies on *NAACP v. Alabama*, in which the Supreme Court allowed the NAACP to withhold from the State of Alabama the list of its rank-and-file members, which the State sought to require as a prerequisite for the NAACP conducting business in Alabama.[87]  The Court considered the members' right to associate in order to engage in effective advocacy; the showing of likely harm to members whose identities were revealed, which included "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility;" and Alabama's explanation of its need for the list.  To that final point, the Court noted that the NAACP had turned over to the State everything relevant to the dispute over its qualifications to conduct business in Alabama – including "furnishing business records, its charter and statement of purposes, the names of all of its directors and officers, and . .

---

[84]

*See supra* p. 20, n.42.

[85]

*E.g.*, DI 1945-1.

[86]

*See supra* n.52.

[87]

357 U.S. at 451-54.

. the total number of its Alabama members and the amount of their dues."[88]   In short, it gave Alabama everything it needed.  Alabama was left with no substantial interest in obtaining the membership list, and the interest of the NAACP members in maintaining their anonymity was substantial indeed.[89]  As the Court put it,

> "Whether there was 'justification' in this instance turns solely on the substantiality of Alabama's interest in obtaining the membership lists.  * * *  The exclusive purpose [of Alabama's inquiry concerning the NAACP[ was to determine whether [the NAACP] was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question.  The issues in the litigation . . . were whether the character of [the NAACP] and its activities in Alabama had been such as to make [it] subject to the registration statute, and whether the extent of [its] activities without qualifying suggested its permanent ouster from the State.  Without intimating the slightest view upon the merits of these issues, we are unable to perceive that the disclosure of the names of [the NAACP's] members has a substantial bearing on either of them."[90]

This case could not be more different.  Chevron (and, for that matter, the United States) have extremely substantial interests in seeing to it that the money judgment of this federal court is satisfied and the equitable remedies contained in its judgment complied with.  The protective order that Donziger seeks, if granted, would promise to prevent or interfere substantially with the vindication of these substantial interests.  The discovery that would (or, at least, should) occur, given the denial of the requested an order, would go directly to determining the location of assets and choses in action upon which Chevron could execute, or which it could attach in an effort to satisfy the money judgment, and to ascertaining whether Donziger has violated the terms of the equitable

---

[88]
     *Id.* at 465.

[89]
     *Id.* at 464.

[90]
     357 U.S. at 404.

provisions of the judgment.  These are entirely appropriate purposes of post-judgment discovery.

These important private and public interests – even if Donziger's First Amendment arguments had

not been forfeited, even if he had standing to assert the alleged First Amendment interests of the

members of the large and vaguely described multitude that he purports to champion, and even if he

had shown that many or, for that matter, any of those individuals and organizations had connections

to the United States sufficient to afford them any First Amendment rights at all – would be more than

sufficient to warrant this Court's denial of the protective order.


*Conclusion*

For the foregoing reasons, Donziger's motions for a declaratory judgment and other

relief [DI 2018], for a protective order [DI 2026], and for "an emergency administrative stay" [DI

2028] all were denied.


SO ORDERED.

Dated:        June 27, 2018

_____
                     Lewis A. Kaplan
              United States District Judge