# EXHIBIT B

Page 1

1
2   UNITED STATES DISTRICT COURT
3   SOUTHERN DISTRICT OF NEW YORK
4    C.A. No. 11 Civ. 0691 (LAK)
5   ------------------------------------x
    CHEVRON CORPORATION,
6
              Plaintiff,
7
8
        - against -
9
10
    STEVEN DONZIGER, et al.,
11
              Defendants.
12  ------------------------------------x
                June 25, 2018
13              10:07 a.m.
14
15      Videotaped Deposition of STEVEN
16  DONZIGER, taken by Plaintiff, pursuant to
17  Order, held at the offices of Gibson Dunn &
18  Crutcher LLP, 200 Park Avenue, New York,
19  New York, before Todd DeSimone, a
20  Registered Professional Reporter and Notary
21  Public of the State of New York.
22
23
24
25

Page 26

```
 1            DONZIGER
 2  e-mails related to certain people.
 3     Q.    So if you want to keep
 4  information confidential from Chevron such
 5  that Chevron can't discover it during
 6  discovery --
 7     A.    That wasn't the motivation.
 8  You are putting words in my mouth.
 9     Q.    Well, do you --
10     A.    What's your question?
11     Q.    Do you destroy documents in
12  order to avoid having to produce them to
13  Chevron?
14     A.    No.
15     Q.    Have you ever destroyed a
16  document to avoid having to produce it to
17  Chevron?
18     A.    No.
19     Q.    Have you ever suggested to
20  anyone that they destroy a document to
21  avoid its production to Chevron?
22     A.    No.
23     Q.    I'm going to hand the witness a
24  document previously marked as Plaintiff's
25  Exhibit 5305.
```

Page 27

```
 1            DONZIGER
 2         (Plaintiff's Exhibit 5305
 3  marked for identification.)
 4     Q.    Mr. Donziger, this is a
 5  restraining order that Chevron served on
 6  you on April 16th of 2018.
 7         I'm going to direct your
 8  attention to page 2 under the heading
 9  Restraining Notice where the notice says
10  "Take Notice that, pursuant to CPLR
11  5222(b), which is set forth in full herein,
12  you are hereby forbidden to make or suffer
13  any sale, transfer or interference with any
14  property in which you have an interest, or
15  pay over or otherwise dispose of any debt
16  owed to you, except as provided in Section
17  5222."
18         Do you see that, sir?
19     A.    Yes.
20     Q.    Have you transferred any
21  property in which you had an interest since
22  April 16th of 2018?
23     A.    What do you mean by property?
24  Like real property?
25     Q.    Money, real property.
```

Page 28

```
 1            DONZIGER
 2     A.    I have continued to pay my
 3  living expenses, but other than that, no.
 4     Q.    And what are you including in
 5  your living expenses?
 6     A.    That's beyond the scope.
 7     Q.    So you won't define what you
 8  mean --
 9     A.    Living expenses, food,
10  mortgage, maintenance, entertainment,
11  school for kid, etc.
12     Q.    Other than --
13     A.    Garage for car.
14     Q.    Other than continuing to pay
15  what you define as living expenses, have
16  you transferred any asset since April 16th
17  of 2018?
18     A.    No.
19     Q.    I'm going to hand the witness a
20  document previously marked as Plaintiff's
21  Exhibit 558.
22         Are you familiar with this
23  document, Mr. Donziger, your retainer
24  agreement from January 5th of 2011?
25     A.    Yes.
```

Page 29

```
 1            DONZIGER
 2     Q.    Is this agreement still
 3  operative?
 4     A.    I think there has been a
 5  subsequent agreement.
 6     Q.    What is the date of the
 7  subsequent agreement?
 8     A.    I don't know, but it was after
 9  this date.
10     Q.    Do you have a copy of the
11  subsequent agreement?
12     A.    I do.
13     Q.    And who are the parties to the
14  subsequent agreement?
15     A.    I believe it is the FDA and
16  myself.
17     Q.    Has Exhibit 558 been
18  terminated?
19     A.    I think it's been superseded by
20  the subsequent agreement.
21     Q.    Now, in Exhibit 558, your
22  clients consist of the individual Lago
23  Agrio plaintiffs, the FDA, and the UDAPT.
24  Do you see that?
25     A.    Yes.
```

8 (Pages 26 - 29)

```
                                                    Page 58
 1              DONZIGER
 2   exclusively with the FDA?
 3       A.    In terms of compensation, legal
 4   fees?
 5       Q.    In terms of your compensation.
 6       A.    My legal fees, my fees for
 7   service, is that what you are talking
 8   about?
 9       Q.    I don't know what the terms
10   are.  I'm asking you.
11       A.    Well, you've got to be
12   specific.  You want the terms of my legal
13   fee?  My contingency fee interest, is that
14   what you are asking about?
15       Q.    Okay, let's try this:  You have
16   entered into an agreement with the FDA?
17       A.    Yes.
18       Q.    Several years ago, correct?
19       A.    Well, two, three years ago, to
20   my best recollection.
21       Q.    And you can't narrow it down
22   any more than that?
23       A.    Not as I sit here today.  I
24   mean, it has happened relatively in that --
25   I believe in that time frame.
```

```
                                                    Page 59
 1              DONZIGER
 2       Q.    Does this agreement -- is it a
 3   retainer agreement?
 4       A.    Yes.
 5       Q.    Is it governed by New York law?
 6       A.    I can't answer that as I sit
 7   here today.  Obviously if I signed it, New
 8   York would be governed by New York ethical
 9   rules and what have you, but I don't know
10   what the retainer agreement says.  I don't
11   have it in front of me right now.
12       Q.    Does the agreement that you
13   signed with the FDA in the last couple of
14   years, the retainer agreement, give you a
15   percentage interest in the judgment, the
16   Ecuadorian judgment?
17       A.    Yes.
18       Q.    What is that percentage
19   interest in the FDA retainer?
20       A.    It's the same percentage
21   interest that I have always had, to the
22   best of my knowledge, 6.3 percent.
23       Q.    And is that 6.3 percent of the
24   total amount recovered or some other --
25   what is it 6.3 percent of?
```

```
                                                    Page 60
 1              DONZIGER
 2       A.    It is a contingent fee interest
 3   in the recovery, any recovery.
 4       Q.    The total recovery?
 5       A.    Yeah, obviously subject to
 6   court orders, like the constructive trust.
 7   So right now, for all practical purposes,
 8   it is a nullity.  But that is my interest
 9   according to my contract.
10       Q.    The contract you signed with
11   the FDA, in addition to granting you the
12   contingency fee interest of 6.3 percent,
13   does it provide for any other types of
14   payments to you?
15       A.    I don't know.  To be clear,
16   though, I have an agreement with my
17   clients, that is the FDA, to be paid a
18   monthly retainer.
19       Q.    When did you enter into that
20   agreement?
21       A.    We have always had that
22   agreement for years.  I rarely got paid
23   because there wasn't enough money, and I
24   occasionally got paid.
25            THE VIDEOGRAPHER:  Excuse me, I
```

```
                                                    Page 61
 1              DONZIGER
 2   was informed that we're not on the phone
 3   right now.
 4            MS. NEUMAN:  It's fine.  We
 5   will worry about it at the break.
 6            THE WITNESS:  I'm sorry, is
 7   this phone --
 8            MS. NEUMAN:  It is just into
 9   that other room.
10            THE WITNESS:  Okay.  Have you
11   got a big crowd over there?
12            MS. NEUMAN:  No takers as far
13   as I know.
14            THE WITNESS:  Not like the good
15   ole days.
16            MS. NEUMAN:  Can you read me
17   back the last question.  I think he
18   answered it, but I have lost my train of
19   thought.
20            (The record was read.)
21       Q.    Is the agreement that you
22   receive a retainer from the FDA written?
23       A.    I believe there is a written
24   agreement from well back, but I'm not 100
25   percent sure.  Certainly we had an
```

Page 62

```
 1                DONZIGER
 2  agreement, an oral agreement.
 3       Q.    And is this agreement that you
 4  receive a retainer for working for the FDA
 5  reflected in your new FDA retainer?
 6       A.    I don't know an answer to that
 7  because I haven't looked at that retainer
 8  in preparation for this deposition.
 9       Q.    In this agreement that you have
10  with the FDA to receive a retainer, what is
11  the amount of the retainer?
12       A.    It varies.  Right now, or the
13  most recent iteration, was $25,000 a month.
14       Q.    And is there any document
15  confirming that that's your current
16  retainer amount that is signed by the FDA?
17       A.    I don't know, but there is a
18  definite agreement with the FDA.  But I
19  will say this:  I generally don't get paid
20  that amount or get paid anything at all.
21  It all depends on what's available,
22  especially given the rather burdensome, for
23  my client base, demands of the litigation
24  in different jurisdictions, you know, not
25  just this, but Canada and other countries.
```

Page 63

```
 1                DONZIGER
 2       Q.    What is your role in the
 3  Canadian case, if any?
 4       A.    How does that relate to the
 5  deposition?
 6       Q.    It relates to whether monies
 7  you are receiving are for compensation of
 8  work done in Canada or something else.
 9       A.    Well, I get the retainer for a
10  variety of different pieces of work that I
11  do, but I'm not going to get into that on
12  First Amendment grounds and because of the
13  pending motion.
14       Q.    Can you describe the scope of
15  the work you do that is covered by the
16  retainer?
17       A.    I believe that intrudes on
18  First Amendment protected grounds, but I
19  will say this as a general matter:  I do a
20  variety of different types of work on
21  behalf of my clients, advocacy work.
22       Q.    You keep saying clients,
23  plural, but it is client, right, the FDA?
24       A.    Well, the FDA represents all
25  the affected communities in the execution
```

Page 64

```
 1                DONZIGER
 2  of the judgment, so there is thousands of
 3  people that the FDA represents, and I
 4  represent the FDA.
 5       Q.    Have the indigenous communities
 6  stated publicly that the FDA does not
 7  represent them?
 8       A.    You would have to be more
 9  specific.  What indigenous communities?
10       Q.    Well, which indigenous
11  communities are in the former
12  concessionary?
13       A.    You don't know that?
14       Q.    I'm asking you, Mr. Donziger.
15       A.    There is five indigenous
16  peoples.
17       Q.    And they are?
18       A.    The Siona, Secoya, Huaorani,
19  Quichua, and Cofan.
20       Q.    And is it your testimony that
21  the FDA currently represents all five of
22  those --
23       A.    The FDA --
24       Q.    -- indigenous communities?
25       A.    The FDA represents all the
```

Page 65

```
 1                DONZIGER
 2  beneficiaries of the judgment in the
 3  execution of the Ecuadorian judgment, so
 4  yes, it would include those groups for that
 5  purpose.
 6       Q.    For the purpose of managing the
 7  funds should they ever be paid?
 8       A.    Well, for the purpose that the
 9  Ecuadorian judgment sets out as to be the
10  role of the FDA.  So it is, you know, the
11  FDA is the beneficiary, they have an
12  obligation to collect on the judgment, and
13  then if funds ever get collected, to spend
14  them consistent with the Ecuador judgment.
15       Q.    Can you turn in Exhibit 5307 to
16  page 7, your response to Interrogatory No.
17  16.
18       A.    Uh-huh.
19       Q.    You say "It would be highly
20  burdensome to calculate the total amount of
21  money I have received in the 25 years of my
22  work on the Ecuador case."
23             Do you see that?
24       A.    Yes.
25       Q.    Did you declare all the money
```

17 (Pages 62 - 65)