UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
CHEVRON CORPORATION,                                             :
                                                                 :
                              Plaintiff,                          :
                                                                 :
                  v.                                              :    11 Civ. 0691 (LAK)
                                                                 :
STEVEN DONZIGER, *et al.*,                                        :
                                                                 :
                              Defendants.                         :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**CHEVRON CORPORATION'S SUPPLEMENTAL BRIEF
REGARDING THE CONTEMPT IMPLICATIONS OF DONZIGER'S RETENTION
AGREEMENTS AND OTHER AGREEMENTS AMONG
ENTITIES WITH INTERESTS IN THE ECUADORIAN JUDGMENT**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   FACTUAL BACKGROUND ................................................................................... 3

     A.    Donziger's 2011 Retainer Agreement ................................................... 3

     B.    The Intercreditor Agreement ................................................................. 4

     C.    Amazonia Memorandum of Association ................................................ 4

     D.    Donziger's 2017 Retainer Agreement with the FDA ............................ 6

III.  ARGUMENT .......................................................................................................... 7

     A.    Donziger's Execution of the 2017 FDA Retainer Warrants Contempt
           Sanctions ............................................................................................... 7

     B.    Donziger's 2017 Retainer Agreement Proves He Was Not Selling the
           FDA's Shares of the Ecuadorian Judgment at the Elliott Meeting ........ 8

     C.    Under Agreements Governing the Addition of New Investors, Donziger
           Attempts to Monetize His Interest in the Ecuadorian Judgment Whenever
           Recruiting Funders ............................................................................... 10

     D.    Donziger Profits by Paying Himself Money Raised From Judgment
           Investors .............................................................................................. 11

IV.   CONCLUSION ..................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014).........................................................................3, 4, 9, 11

# I. PRELIMINARY STATEMENT

Donziger's November 2017 solicitation of Elliott Management Corporation was a brazen act of contempt to enrich himself by admittedly purporting to sell an interest in the Ecuadorian judgment to raise funds to pay himself, in clear violation of this Court's RICO Judgment against him. Donziger tried to justify his contempt with Elliott—and the half dozen other investors he now admits he has convinced to provide funding in this same way since the RICO Judgment—by claiming based on a misinterpretation of the RICO Judgment that he was not trying to sell any of *his* own personal interest in the Ecuadorian judgment, but, rather, only the interest of his supposed client, the Frente de Defensa de la Amazonia ("FDA"). *See, e.g.*, Dkt. 2051 at 2 (Donziger claiming that he was only "helping [his] clients obtain resources to pay their litigation expenses"); Champion Dec. Ex. 10 at 58:1–4 (Donziger claims he represented the FDA at the Elliott meeting). However, the Intercreditor Agreement governing the priority schedule for funds recovered from enforcing the Ecuadorian judgment, the Amazonia Memorandum of Association, and Donziger's 2011 and 2017 retainer agreements all confirm that Donziger's defense of his attempted monetization of the Ecuadorian judgment at the Elliott meeting is baseless.

First, the fact that Donziger entered into a retainer agreement with the FDA in November 2017 constitutes a violation of the RICO judgment and thus was itself an act of contempt. Instead of transferring his interests in the Ecuadorian judgment to Chevron (Dkt. 1875 ¶ 1), this agreement—which he did not disclose until after the last contempt hearing—shows that Donziger has continued to pursue new interests, as the agreement purports to carve out for Donziger a personal right to 6.3% of any recovery from the Ecuadorian judgment, separate and apart from the earlier interest granted to his law firm. This agreement also irrevocably commits the FDA to attempting to help Donziger circumvent the constructive trust that this Court imposed

1

under the RICO Judgment.  For these reasons alone, contempt sanctions are appropriate.

Second, this November 2017 retainer agreement—which is dated just five days before the Elliott solicitation meeting and obviously in anticipation of it—undermines Donziger's claim that he was seeking to monetize the FDA's interest when he approached Elliott.  On its face, the November 2017 retainer agreement states that the FDA's only interest in the Ecuadorian judgment is a 10% award on top of, not out of, environmental damages.  Even *assuming arguendo* the FDA could lawfully transfer even some of its purported interest to third parties, it unquestionably has no right or ability to sell or transfer any part of the environmental damages portion. Yet Donziger has admitted that 15% to 20% of the Ecuadorian judgment has already been pledged to investors and stated that fact to Elliott during the solicitation meeting.  *See* Champion Dec. Ex. 10 at 38:5–13.  There is no way to reconcile that claim with Donziger's argument here that he was attempting to sell to Elliott just the FDA's interest in the Ecuadorian judgment, rather than a portion of his own purported interest, unless Donziger is selling to investors "interests" in the judgment that are themselves fictitious.

Third, the agreements governing the addition of new funders, including the Intercreditor Agreement, Donziger's 2011 retainer agreement, and the Amazonia Memorandum of Association, confirm that Donziger's attempt to raise funding from Elliott violated the RICO Judgment. Under these agreements, whenever Donziger attempts to sell an interest in the Ecuadorian judgment in exchange for funding, Donziger is necessarily attempting to monetize his own interest in that judgment by obtaining cash in hand, subject to his absolute control, in exchange for future rights traceable directly to the Ecuadorian judgment.  Under the Intercreditor Agreement and Donziger's 2011 retainer agreement, any new investor dilutes the value of Donziger's recovery and lowers Donziger's priority in the distribution sequence.  Slavek Dec. ¶ 21.  Amazonia—the

LAPs' chosen vehicle to administer judgment funds—would produce the same result, assuming Amazonia could still issue new shares notwithstanding its liquidation directive in July 2016. Thus, when Donziger attempted to sell "shares" in the judgment to Elliott, he was offering to reduce rights traceable to the Ecuadorian judgment, including by letting Elliott cut in front of him in the order of payees while obtaining a portion of his contingency interest in any recovery, in exchange for cash that Donziger admittedly would have received and controlled.

Finally, the November 2017 retainer agreement makes plain that Donziger has complete control of all finances obtained from investors. As the documentary evidence shows and as Donziger has admitted, Donziger has used that control to line his pockets with investors' capital. *See* Champion Dec. Ex. 9 at 94:24–95:11; 100:8–18; 194:9–195:6. Donziger is using funds from investors to profit from the Ecuadorian judgment by paying himself directly from money raised, in clear violation of the RICO Judgment, and the Elliott solicitation was part of that scheme.

## II. FACTUAL BACKGROUND

### A.     Donziger's 2011 Retainer Agreement

On January 5, 2011, Donziger executed a retainer agreement (Champion Dec. Ex. 2) with the Lago Agrio Plaintiffs ("LAPs"), the FDA, and the Assembly of Communities Affected by Texaco, which later became the Union of People Affected by Texaco's Petroleum Operations ("UDAPT"), *see* Champion Dec. Ex. 5. Section 3(a) of the agreement grants Donziger's firm a 6.3% interest in any recovery on the Ecuadorian judgment. Champion Dec. Ex. 2 at 3–4. The agreement states that 20% of any recovery is earmarked as the "Total Contingency Fee Payment," and Donziger & Associates, PLLC is entitled to 31.5% of that 20% (which works out to 6.3% of any recovery). *Id.*; *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 532–33, 602 (S.D.N.Y. 2014). The agreement also sets out how new funders are integrated into the existing recovery scheme. Champion Dec. Ex. 2 at 6–7. Under Section 3(j)(iii), upon the entry of a

3

new funding agreement, Donziger's share of the Total Contingency Fee Payment is reduced *pro rata* to enable the LAPs to grant the new funder a portion. *Id.* Nothing in the 2011 retainer agreement authorizes either an increase in the Total Contingency Fee Payment to accommodate more funders or the sale of any proceeds that are not part of the Total Contingency Fee Payment.

**B.      The Intercreditor Agreement**

The Intercreditor Agreement was executed in October 2010 among Treca Financial Solutions, an investment vehicle for Burford Capital LLC; Torvia Limited; Patton Boggs LLP; Donziger & Associates, PLLC; Emery, Celli, Brinckerhoff & Abady LLP; Pablo Estenio Fajardo Mendoza, Esq.; Erik T. Moe; H5; and the FDA. Champion Dec. Ex. 1 at 48. In exchange for a 5.545% interest in the Ecuadorian judgment, Burford (through Treca) agreed to invest $15 million in three separate infusions under a separate funding agreement, executed alongside the Intercreditor Agreement. Champion Dec. Ex. 1 at 36; *see also Chevron*, 974 F. Supp. 2d at 475–76.

The Intercreditor Agreement provides a waterfall for the order of priority of payments to creditors in the event of recovery on the Ecuadorian judgment. Champion Dec. Ex. 1 at 56–58; Slavek Dec. ¶ 15. Any new funders who invest subsequent to the Agreement's execution are paid at the fifth level of distributions (*see* Champion Dec. Ex. 1 at 63 (¶ 12) and 56 (¶ 3.2.5)), whereas Donziger's unreimbursed fees and expenses are paid sixth and his contingency interest is paid seventh (*see id.* at 56 (¶¶ 3.2.6 and 3.2.7)). Donziger's interest is also diluted because the new funder will recover their portion of the proceeds in full before Donziger is paid. *See* Slavek Dec. ¶¶ 17–21.

**C.      Amazonia Memorandum of Association**

In May 2012, the LAP team created Amazonia Recovery Limited in Gibraltar to receive and distribute the proceeds from the Ecuadorian judgment. Champion Dec. Ex. 3 at 38; *see also Chevron*, 974 F. Supp. 2d at 528 n.1110. The Memorandum of Association of Amazonia Recov-

4

ery Limited authorizes the issuance of certain shares, including 200,000 Participation Shares for each of Classes A1 through A6, and 250,000 Participation Shares for each of Classes B1 and B2. Champion Dec. Ex. 3 at 1–2.  The Articles of Association of Amazonia Recovery Limited further authorize Amazonia's directors to "seek additional funding" if "there are insufficient funds currently available . . . to pay the reasonably anticipated costs and expenses" of the Lago Agrio litigation, and to issue additional Class A Shares to new funders.  *Id.* at 15 ¶ 16.

The Articles require the payment of a "Class A Minimum Return" to Class A Shareholders, which is defined based on a particular Class's Subscription Deed.  Champion Dec. Ex. 3 at 7, 30–33 ¶ 114; *see also* Slavek Dec. ¶¶ 7–12.  Within Class A Shareholders, Class A1 Shareholders are paid first, and then Class A2 Shareholders, and so forth until any Additional Class A Shareholders are paid their respective Class A Minimum Returns.  Champion Dec. Ex. 3 at 30–33.  After all Class A Shareholders—including Additional Class A Shareholders—receive their respective Class A Minimum Returns, "the remaining amount of Available Proceeds shall be distributed to the Class A Shareholders and the Class B Shareholders until each such Shareholder has received . . . an amount equal to such Shareholder's Pro-Rata Share of the Total Proceeds." *Id.* at 32.

In exchange for his contingency interest in the Ecuadorian judgment, Donziger obtained equivalent value Class B1 shares in Amazonia.  *See* Dkt. 1901 at 16 ("Donziger's interest in Amazonia corresponds to his equity interest in any proceeds of the [Ecuadorian judgment], which is only 6.3 percent."); Champion Dec. Ex. 4 (subscription deed); Champion Dec. Ex. 9 at 41:18–42:24 (authenticating Donziger's signature on the subscription deed).

In December 2015, Chevron obtained a default judgment against Amazonia for approximately $28 million and equitable relief.  *See* Dkt. 1987 at 4.  Amazonia failed to satisfy this

judgment and, in July 2016, the Gibraltar court granted Chevron's application to place Amazonia into liquidation.  *Id.*  Amazonia's capacity to issue new shares or approve transfer of existing shares is encumbered by this liquidation.  But, if new shares could be issued despite the liquidation, any infusions of investor capital in exchange for new Amazonia shares would further dilute Donziger's shares.  Slavek Dec. ¶¶ 17–21.  In addition, new funders such as Elliott would be issued Class A shares, which have a higher payment priority than Donziger's.  Champion Dec. Ex. 3 at 15 ¶ 16; *id.* at 30–33 ¶ 114.

**D.     Donziger's 2017 Retainer Agreement with the FDA**

On November 1, 2017—just five days before Donziger met with Elliott—Donziger and the FDA executed a "Durable International Power of Attorney and Agreement for the Continuous Investment of Professional Services" (the "2017 retainer agreement").  Champion Dec. Ex. 6.  The agreement states that the FDA is the "intended recipient" of a reward of "10% of the amount for environmental damages" in the Ecuadorian judgment, separate and apart from the damages themselves.  *See id.* at 1.  The FDA then grants Donziger "the broadest powers and attributions awarded by law to representatives" to enable him to "direct and manage all current and future legal, political, and public relations efforts in connection with the enforcement of the [Ecuadorian judgment]," including recognition and enforcement actions pending in Canada and elsewhere (though the FDA is not a party to those cases).  *Id.* at 2–3.

The 2017 retainer agreement further states that the FDA "irrevocably acknowledges, confirms and undertakes to support Mr. DONZIGER'S existing contractual INTEREST" in any recovery from the Ecuadorian judgment.  *Id.* at 1.  Beyond reaffirming the 6.3% interest due to Donziger's firm under the 2011 retainer agreement (Champion Dec. Ex. 2 at 3–4), the 2017 retainer agreement "grants Mr. Donziger" a *personal* interest in 6.3% of any funds recovered from enforcement of the Ecuadorian judgment.  *Id.* at 3.

6

### III.     ARGUMENT

**A.     Donziger's Execution of the 2017 FDA Retainer Warrants Contempt Sanctions**

Donziger committed two different acts of contempt in executing the November 2017 re-
tainer agreement.  First, the agreement not only affirms Donziger's firm's prior interest in any
recovery from the Ecuadorean judgment, but it grants Donziger a new *personal* interest in 6.3%
of any funds raised from enforcement.  Champion Dec. Ex. 6 at 3.  The Court's RICO Judgment
obligates Donziger to turn over his interest in the Ecuadorean judgment to Chevron (Dkt. 1875
¶ 1), yet Donziger continues to refuse to comply with that obligation (*see* Dkt. 2054 at 2–3), and
now has attempted to end-run the constructive trust with this new agreement.

Second, the 2017 retainer agreement promises the FDA's irrevocable support for what
amounts to Donziger's pursuit of an avenue of contempt by pursuing his "existing contractual in-
terest" in recovery from the Ecuadorian judgment.  Champion Dec. Ex. 6.  The Court's RICO
Judgment prohibits Donziger and his co-conspirators from "undertaking any acts to monetize or
profit from the [Ecuadorian] Judgment, as modified or amended, or any New Judgment, includ-
ing without limitation by selling, assigning, pledging, transferring or encumbering any interest
therein."  Dkt. 1875 ¶ 5; *see also id*. ¶ 8.  The Court's April 25, 2014 opinion confirms that the
purpose of the March 2014 Judgment was to "prevent Donziger and the LAP Representatives
from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise
would have been direct proceeds of the [Ecuadorian] Judgment by selling, assigning, or borrow-
ing on their interests in the [Ecuadorian] Judgment and thus at least confusing the issue of trace-
ability."  Dkt. 1901 at 10.  By re-committing to Donziger's enforcement efforts, and granting
him a new, valuable interest in the Ecuadorean judgment separate from his contingent fee, the
2017 retainer agreement facilitates Donziger's "avoiding the effect of the constructive trust."  *Id.*

**B.    Donziger's 2017 Retainer Agreement Proves He Was Not Selling the FDA's Shares of the Ecuadorian Judgment at the Elliott Meeting**

Donziger claims that he met with Elliott to "arrang[e] for [his] clients to sell their interests," Champion Dec. Ex. 10 at 34:13, arguing that selling the FDA's interests does not violate the RICO Judgment because the Court's April 2014 Order (Dkt. 1901) "clarified" that Donziger is not forbidden from monetizing anyone's interests in the Ecuadorian judgment except for the interests of himself, his law firms, Camacho, and Piaguaje. Dkt. 1986 at 6.

As an initial matter, Donziger's interpretation of the RICO Judgment is wrong.  The April 2014 Order only resolved the issue of whether a stay was appropriate pending appeal, and did not "license Donziger to profit from funds traceable to the corrupt Ecuadorian judgment, much less purport to decide conclusively what would or would not constitute a violation of the Judgment's prohibition on attempts to monetize it." Dkt. 1987 at 6.  Furthermore, "[t]hat Order confirmed that Donziger was prohibited from 'benefitting personally, at Chevron's expense, from property traceable to [the] fraudulent Judgment' (Dkt. 1901 at 11), and money raised in exchange for pieces of a potential recovery is certainly 'traceable' to the 'fraudulent Judgment.'" *Id.* at 6–7.  "Donziger's purported reading of that order would enable him to continue to conduct the very scheme that this Court's Judgment aimed to bring to an end." *Id.* at 2.

Even if Donziger's interpretation of the April 25, 2014 Order were correct, the November 2017 retention agreement shows that Donziger is wrong in claiming that his meeting with Elliott was to "arrang[e] for [his] clients to sell their interests in the judgment." Champion Dec. Ex. 10 at 34:13–14.  As the November 2017 retainer agreement states, the Ecuadorian judgment commits a reward equal to 10% of the environmental award to the FDA.  Champion Dec. Ex. 6 at 1. The remainder was committed to remediation, with the funds going to a trust controlled by the FDA for purposes of overseeing the remediation. *Chevron*, 974 F. Supp. 2d at 481–82.  In other

8

words, assuming the FDA could sell any interest in the Ecuadorian judgment, at most, that interest is capped at the value of the 10% reward—the environmental award is encumbered.

Donziger, however, represented to Elliott (and others) that 15–20% of the judgment has already been committed to 15 people.  Champion Dec. Ex. 10 at 38:5–21.[1]  Both Lee Grinberg and Katie Sullivan recorded a discussion of these figures in their notes from the meeting.  *See* Champion Dec. Ex. 11 ("15–20% committed $\rightarrow$ 15 people"); Champion Dec. Ex. 12 ("15–16% committed – 15 other people"); *see also* Champion Dec. Ex. 10 at 21:5–14 (Mr. Grinberg testifying to the same).  When Donziger was asked whether he "told Mr. Grinberg . . . that 15 to 20 percent of the interest in the judgment had already been given to investors or other professionals," he testified that "that would be something consistent with what [he] would tell a potential funder."  *Id.* at 38:5–13.  Similarly, when Donziger was asked whether he had told Mr. Grinberg "that there were approximately 15 such investors or professionals who had interest in the judgment," he testified, "I believe I did . . . .  That's roughly the case."  *Id.* at 38:16–21.

Based on this testimony and evidence, by the time Donziger solicited funds from Elliott, the FDA appears to have already sold well more than its purported 10% reward.  Therefore, Donziger cannot claim that he was selling the FDA's interest, as there was nothing left to sell even assuming the FDA could sell any interests in the first place.  Instead, the far more plausible explanation is that Donziger was intending to offer his own personal 6.3% interest in the Ecuado-

---

[1]  This figure does not include interests in the Ecuadorian judgment held by Patton Boggs, Deleon/Torvia, H5, and Woodsford, among others.  Donziger testified that "when Torvia and Mr. DeLeon and really all the entities, Woodsford, H5, whoever it was that turned over, in theory, signed those agreements to turn over its interest to Chevron, our view was that was contractually impermissible and that all of those interests reverted back to the FDA or, slash, the clients," Champion Dec. Ex. 9 at 161:13–20, notwithstanding the fact that DeLeon/Torvia and Woodsford did not actually turn over any shares to Chevron, *see* Champion Dec. Exs. 7 and 8 ¶¶ 3–6 (noting that these entities merely agreed to not assign or vote their interests without Chevron's written consent and to comply with Chevron's requests in relation to proceeds received).

rian judgment from his 2011 retainer agreement—a topic that Donziger admits "came up" at the Elliot meeting.  Champion Dec. Ex. 10 at 37:18–21.

## C.   Under Agreements Governing the Addition of New Investors, Donziger Attempts to Monetize His Interest in the Ecuadorian Judgment Whenever Recruiting Funders

Under either the 2011 retainer agreement and accompanying Intercreditor Agreement or the Amazonia Memorandum of Association, Donziger's meeting with Elliott was an attempt to monetize his own interest by trading Donziger's rights to judgment recovery and priority of payment in exchange for cash in hand.

First, even accepting Donziger's (false) claim that Amazonia is "utterly obsolete and meaningless" (Dkt. 2054 at 1 n.1), Donziger's 2011 retainer agreement requires him to reduce his share of the 20% "Total Contingency Fee Payment" *pro rata* to accommodate a new funder. Champion Dec. Ex. 2 at 3–4, 6–7.  The 2011 retainer agreement—the only agreement Donziger has produced between himself and the LAPs, who are the actual parties to foreign recognition and enforcement proceedings—does not otherwise allow new funders to obtain an interest in proceeds from the Ecuadorian judgment.  And pursuant to the accompanying Intercreditor Agreement, Donziger also would have had his interest diluted and forfeited payment priority to a new investor: new funders are paid in full at the fifth level of distributions while Donziger is paid at the sixth and seventh levels.  *See* Champion Dec. Ex. 1 at 63 (¶ 12) and 56 (¶¶ 3.2.5–3.2.7); Slavek Dec. ¶¶ 17–21.

Second, assuming the Amazonia Memorandum of Association controls and new Amazonia shares could issue to accommodate deals Donziger negotiates despite the pending liquidation, any new investment similarly dilutes Donziger's recovery and distribution priority.  Donziger's targeted investment outcome from the Elliott meeting would have reduced his share of any payout from the judgment, as new funders would be issued Class A shares that are paid before his

10

Class B1 shares.  Champion Dec. Ex. 3 at 15 ¶ 16 and 30–33 ¶ 114; Slavek Dec. ¶¶ 17–21.

Donziger was thus trying to obtain cash in hand from Elliott in exchange for his own in-
terest in the Ecuadorian judgment under either scenario because, had Elliott provided capital,
Donziger would have had to reduce the portion and priority of payment of his ultimate potential
recovery to provide Elliott a share as a new investor.  *See* Slavek Dec. ¶¶ 17–21; *Chevron*, 974 F.
Supp. 2d at 602 n.1539 (noting that Donziger's interest may have "been slightly diluted subse-
quently in order to accommodate giving equity to new investors").  By approaching Elliott,
Donziger was attempting to obtain money now in exchange for forfeiting both a portion of his
contingency interest and his spot in line for payouts from recovery on the judgment.

**D.     Donziger Profits by Paying Himself Money Raised From Judgment Investors**

Paragraph 5 of the RICO Judgment—which prohibits Donziger from "undertaking any
acts to monetize or profit from" the Ecuadorian judgment (Dkt. 1875 ¶ 5)—was intended to pre-
vent Donziger from "confusing the issue of traceability" as to assets "that otherwise would have
been direct proceeds of" the Ecuadorian judgment.  Dkt. 1901 at 10.  Donziger has obtained such
direct proceeds in the form of "collections . . . made in respect of the Lago Agrio Judgment" that
are "funneled to Donziger as retainer payments," Dkt. 1901 at 7, over which the November 2017
retainer agreement grants him total control.  *See* Champion Dec. Ex. 6 at 2–3 (providing that
Donziger "may direct and manage all current and future legal, political, and public relations ef-
forts in connection with the enforcement of the *AGUINDA* JUDGMENT" and that Donziger has
"the broadest powers and attributions awarded by the law to representatives").

Donziger is reimbursed for expenses with funds raised from selling interests in the Ecua-
dorian judgment.  *See* Champion Dec. Ex. 9 at 76:24–77:12 ("[F]unds . . . raised in exchange for
interest in the judgment" are "client funds"); 78:22–79:5 (Donziger does not always need advance
approval to pay himself expenses from client funds).  Donziger also is paid a monthly "retainer"

of $25,000.  *Id.* at 62:9–13.  In order to obtain these monies, Donziger prepares undifferentiated

lump sum invoices (*see id.* at 94:24–95:11) (authenticating invoice), which are then paid out of

case funds.  *See id.* at 100:8–18 (Donziger was paid $25,000 retainer from money raised in ex-

change for an "interest in the Ecuador judgment" purportedly owned by FDA).  Funds received

from Elliott would have been treated identically, lining Donziger's pockets.  *See id.* at 100:8–18,

194:9–195:6 (Donziger receiving retainer and expense payment from Alan Lenczner of Lenczner

Slaght, the LAPs' counsel in the Canadian recognition and enforcement action); Slavek Dec. ¶ 22

and Ex. D (documenting over $625,000 in payments from Lenczner and a May 2018 payment of

over $340,000 from Forum Nobis PLLC, the law firm of Donziger collaborator Aaron Marr Page,

a D.C.-licensed attorney who actively participated in the RICO trial in this Court as well as the

email discussion about destroying evidence of the Elliott meeting, Champion Dec. Ex. 14).[2]

## IV.    CONCLUSION

For the foregoing reasons and those articulated at the June 28, 2018 hearing and in Chev-

ron's prior submissions (Dkt. 1966 at 5–9, 14–16; Dkt. 1987 at 1–3, 5–8), Chevron respectfully

requests that this Court hold Donziger in contempt of the Court's RICO Judgment (Dkt. 1875)

and enter coercive sanctions to prevent further contempt of that Judgment.

---

[2]  Chevron intends to file another, broader contempt motion against Donziger, based on evidence
already amassed and additional discovery now to be pursued.  *See* Dkt. 2056.  As Chevron ex-
plained in moving for contempt, the Elliott solicitation is only an *example* of Donziger's recent
illicit activities, not his exclusive act of contempt.  *See* Dkt. 1966 at 4 ("Based on Donziger's lat-
est acts of contempt, evidence suggesting other contemptuous acts by Donziger that require fur-
ther inquiry through discovery . . . .").  Donziger has now *admitted* to having committed at least
six more acts of monetization of the Ecuadorian judgment after issuance of the RICO judgment,
Champion Dec. Ex. 10 at 34:21–24, and Chevron has confirmed this monetization through sub-
poenaed bank records showing the payments he made to himself out of new investor funds he
raised by selling interests in the Ecuadorian judgment, in violation of this Court's injunction.
Donziger's misconduct in paying himself in this manner has violated both Paragraphs 1 and 5 of
the RICO Judgment, as Chevron will explain in its forthcoming motion.

Dated:  July 24, 2018

New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Randy M. Mastro*

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
rmastro@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*