# EXHIBIT 9

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4     C.A. No. 11 Civ. 0691 (LAK)
 5    ------------------------------------x
      CHEVRON CORPORATION,
 6
              Plaintiff,
 7
 8
          - against -
 9
10
      STEVEN DONZIGER, et al.,
11
              Defendants.
12    ------------------------------------x
                 June 25, 2018
13               10:07 a.m.
14
15        Videotaped Deposition of STEVEN
16    DONZIGER, taken by Plaintiff, pursuant to
17    Order, held at the offices of Gibson Dunn &
18    Crutcher LLP, 200 Park Avenue, New York,
19    New York, before Todd DeSimone, a
20    Registered Professional Reporter and Notary
21    Public of the State of New York.
22
23
24
25
```

Page 2

1
2  A P P E A R A N C E S :
3  GIBSON DUNN & CRUTCHER LLP
       200 Park Avenue
4      New York, New York 10166
           Attorneys for Plaintiff
5  BY:  ANDREA E. NEUMAN, ESQ.
           aneuman@gibsondunn.com
6       ANNE CHAMPION, ESQ.
           achampion@gibsondunn.com
7       ALEJANDRO A. HERRERA, ESQ.
           aherrera@gibsondunn.com
8
9
10 STERN KILCULLEN & RUFOLO, LLC
       325 Columbia Turnpike
11     Florham Park, New Jersey 07932
           Attorneys for Plaintiff
12 BY:  HERBERT J. STERN, ESQ.
           hstern@sgklaw.com
13      JOEL M. SILVERSTEIN, ESQ.
           jsilverstein@sgklaw.com
14
15
16
17
       ALSO PRESENT:
18     ANDRES R. ROMERO-DELMASTRO, ESQ., Chevron
       Corporation
19
       CHRISTOPHER HANLON, Videographer
20
21
22
23
24
25

Page 3

1                  DONZIGER
2         THE VIDEOGRAPHER: Good morning.
3  We are going on the record at 10:07 a.m. on
4  June 25th, 2018.  Please note that the
5  microphones are sensitive and may pick up
6  whispering, private conversations and
7  cellular interference.  Please turn off all
8  cell phones or place them away from the
9  microphones as they can interfere with the
10 deposition audio.  Audio and video
11 recording will continue to take place
12 unless all parties agree to go off the
13 record.
14        This is media unit number one
15 of the video-recorded deposition of
16 Mr. Steven Donziger taken in the matter of
17 Chevron Corporation v. Donziger, et al,
18 filed in the U.S. District Court, Southern
19 District of New York, Docket 11 Civ. 0691.
20        This deposition is being held
21 today at Gibson Dunn & Crutcher located at
22 200 Park Avenue, New York, New York.  My
23 name is Christopher Hanlon.  I'm from
24 Veritext.  I'm the videographer today.  Our
25 court reporter is Todd DeSimone also from

Page 4

1                  DONZIGER
2  Veritext.  I am not related to any party in
3  this action nor am I financially interested
4  in the outcome.
5         At this time I would ask
6  counsel to please state your appearances
7  for the record.
8         MS. NEUMAN: Andrea Neuman,
9  Gibson Dunn & Crutcher, for Chevron.
10        MS. CHAMPION: Anne Champion
11 from Gibson Dunn for Chevron Corporation.
12        MR. HERRERA: Alejandro Herrera
13 from Gibson Dunn for Chevron Corporation.
14        MR. STERN: Herbert Stern,
15 Stern Kilcullen & Rufolo, for Chevron.
16        MR. SILVERSTEIN: And Joel
17 Silverstein, also from Stern Kilcullen &
18 Rufolo, for Chevron.
19        THE VIDEOGRAPHER: Thank you.
20 At this time our court reporter can swear
21 in our witness and we can proceed.
22     *  *  *
23 S T E V E N  D O N Z I G E R,
24 called as a witness, having been first duly
25 sworn, was examined and testified

Page 5

1                  DONZIGER
2  as follows:
3  EXAMINATION BY MS. NEUMAN:
4      Q.   Good morning, Mr. Donziger.
5      A.   I think there is one individual
6  who didn't state his name for the record.
7         MR. ROMERO-DELMASTRO: I'm
8  already on the record.  Andres Romero for
9  Chevron Corporation.
10        THE VIDEOGRAPHER: Thank you,
11 sir.  Thank you, Mr. Donziger.
12     A.   Can I just get a clarification
13 from counsel, is this deposition being
14 live-streamed?  Are people watching this
15 deposition over the internet?  Are there
16 other lawyers or people watching this
17 deposition?
18     Q.   In another room.  I don't know
19 that there is anybody in there.
20     A.   There is another room?  This
21 firm?
22     Q.   Yes.
23     A.   Is it being live-streamed back
24 to Chevron headquarters?
25     Q.   No.

Page 38

1    DONZIGER
2  the RICO judgment; is that right?
3      A.   That's false, that's not right,
4  but it is also beyond the scope.  Please
5  ask me about Elliott.
6      Q.   You have referred to your --
7      A.   Let me make a suggestion, okay?
8      Q.   Mr. Donziger, I'm not
9  interested in your suggestions.  I'm just
10 going to ask questions and you can answer
11 the questions.
12     A.   No, you've got to ask questions
13 relevant to the scope and then I will
14 answer the questions.
15     Q.   I am.
16     A.   But what I'm going to do right
17 now is go to the bathroom, so give me five
18 minutes, please.
19          MS. NEUMAN:  Let's go off the
20 record at the witness' request.
21          THE VIDEOGRAPHER:  The time is
22 10:42.  We are going off the record.  This
23 is the end of media file one.
24          (Recess taken.)
25          THE VIDEOGRAPHER:  We are back

Page 39

1    DONZIGER
2  on the record.  The time is 10:50.  This is
3  the beginning of media file number two.
4  BY MS. NEUMAN:
5      Q.   Mr. Donziger, do you still have
6  Exhibit 558 in front of you, your January
7  2011 retainer?
8      A.   Yes.
9      Q.   Are there any provisions of
10 Exhibit 558 that you consider to still be
11 operative or is the entire agreement
12 terminated?
13     A.   I would have to read through
14 this and compare it to the subsequent
15 agreement before I could answer that
16 question.
17     Q.   Well, let's look at paragraph
18 3(a), Contingent Fee.  It says "As
19 compensation for its services the firm
20 should be entitled to an Active Lawyer
21 Percentage of thirty one and one-half
22 percent of the Total Contingency Fee
23 Payment.  The Total Contingency Fee Payment
24 means an amount equal to 20 percent of all
25 Plaintiff Collection Monies."

Page 40

1    DONZIGER
2          Do you see that?
3      A.   Yes.
4      Q.   Is that provision still
5  operative in your view?
6      A.   It is beyond the scope.
7      Q.   Are the provisions relating to
8  the monthly retainer on the next page still
9  operative?
10     A.   That is beyond the scope of the
11 deposition.
12     Q.   Are the provisions relating to
13 budgets, billing and payments still
14 operative?
15     A.   That is beyond the scope.
16     Q.   Have any arbitrations been
17 conducted pursuant to Exhibit 558?
18     A.   It is beyond the scope.
19     Q.   On page 8 of Exhibit 558 it
20 says "Following a final non-appealable
21 order of a court of competent jurisdiction
22 in respect of such Individual Action that
23 the Firm or such attorney has committed
24 actual fraud, professional malpractice or
25 willful misconduct," then "The Plaintiffs

Page 41

1    DONZIGER
2  may require that the Firm or such attorney
3  pay to the Plaintiffs the amount of the
4  Defense Funds actually paid by the
5  Plaintiffs to or for the benefit of the
6  Firm or such attorney, as applicable."
7          Are you familiar with that
8  provision?
9      A.   It is beyond the scope.
10     Q.   Was Exhibit 558 terminated in
11 2013?
12     A.   It is beyond the scope; the
13 scope being the Elliott meeting, just to
14 reiterate, and my present financial
15 condition, which I would be more than happy
16 to answer appropriate questions about, if
17 you would ask them.
18     Q.   I'm going to have marked as
19 Exhibit 5306 Subscription Deed from
20 Amazonia Recovery Limited.
21          (Plaintiff's Exhibit 5306
22 marked for identification.)
23     Q.   Mr. Donziger, the last page of
24 the document before the appendix, this one
25 (indicating), appears to bear your

Page 42

1      DONZIGER
2  signature.  Is that your signature, sir?
3      A.    Yes.
4      Q.    And you signed this document to
5  convert your percentage interest under
6  Exhibit 558 to shares in Amazonia, correct?
7      A.    This is beyond the scope.  I
8  mean, the document obviously speaks for
9  itself.
10     Q.    Have you subsequently
11 transferred or disposed of your shares in
12 Amazonia other than sending Chevron a
13 document, since you signed Exhibit 5306?
14     A.    If your question is am I
15 transferring Amazonia shares to more than
16 one entity at the same time, the answer is
17 no.  The only transfer I have effectuated
18 for those shares is the one that you have
19 that I signed subsequent to the hearing on
20 May 8th.
21     Q.    And have you changed your
22 interest in Amazonia in any other way since
23 you executed Exhibit 5306?
24     A.    No.
25     Q.    And have you done anything with

Page 43

1      DONZIGER
2  the -- I'll withdraw that.
3          I'm going to mark as Exhibit
4  5307 defendants' June 15th, 2018 responses
5  to discovery.
6          (Plaintiff's Exhibit 5307
7  marked for identification.)
8      Q.    You are familiar with these
9  responses, Mr. Donziger?
10     A.    Yes.
11     Q.    That is your signature that
12 appears on the last page of Exhibit 5307?
13     A.    Yes.
14     Q.    Is everything stated in Exhibit
15 5307 correct?
16     A.    To the best of my knowledge,
17 yes.
18     Q.    In connection with preparing
19 your responses to Chevron's discovery, did
20 you research and review any hard copy
21 documents?
22     A.    Yes.
23     Q.    Where are those documents
24 maintained?
25     A.    In my office, which is in my

Page 44

1      DONZIGER
2  home.
3      Q.    What's the volume of the
4  documents that you reviewed, approximately?
5      A.    There is a fair number of
6  documents that I have withheld from you
7  guys on the basis of privilege or First
8  Amendment issues or of the pending motions.
9      Q.    I'm trying to ask you, though,
10 the volume of documents that you have.
11     A.    Well, when you say volume --
12     Q.    That you reviewed.
13     A.    Do you mean mass, number of
14 pages, weight?  What do you mean by volume?
15     Q.    The number of pages.  Or if you
16 can't estimate that, two boxes, five boxes.
17     A.    Bankers boxes?
18     Q.    Sure.
19     A.    I have reviewed a lot of
20 documents.  I have also requested bank
21 records.
22     Q.    Can you estimate --
23     A.    Well, bank records from the
24 accounts that I specify in my response to
25 your questions.

Page 45

1      DONZIGER
2      Q.    Can you estimate the volume of
3  hard copy documents that you reviewed in
4  responding to Chevron's discovery?
5      A.    I don't know.  A few hundred
6  pages, or maybe less, I don't know.  It is
7  basically the universe of my financial
8  transactions from those accounts since the
9  judgment, since the RICO judgment.
10     Q.    Did you review any electronic
11 documents --
12     A.    Yes.
13     Q.    -- in response --
14     A.    And e-mails.
15     Q.    And how many e-mail accounts do
16 you have, sir?
17     A.    Two.
18     Q.    And what are they?
19     A.    They are
20 sdonziger@donzigerandassociates.com and
21 sdonziger@gmail.com, and there might be an
22 sdonziger2@gmail, but I think there is
23 actually, but I haven't used it for a
24 really long time.
25     Q.    So you have two e-mails that

12 (Pages 42 - 45)

Page 58

1        DONZIGER
2  exclusively with the FDA?
3      A.    In terms of compensation, legal
4  fees?
5      Q.    In terms of your compensation.
6      A.    My legal fees, my fees for
7  service, is that what you are talking
8  about?
9      Q.    I don't know what the terms
10 are.  I'm asking you.
11     A.    Well, you've got to be
12 specific.  You want the terms of my legal
13 fee?  My contingency fee interest, is that
14 what you are asking about?
15     Q.    Okay, let's try this:  You have
16 entered into an agreement with the FDA?
17     A.    Yes.
18     Q.    Several years ago, correct?
19     A.    Well, two, three years ago, to
20 my best recollection.
21     Q.    And you can't narrow it down
22 any more than that?
23     A.    Not as I sit here today.  I
24 mean, it has happened relatively in that --
25 I believe in that time frame.

Page 59

1        DONZIGER
2      Q.    Does this agreement -- is it a
3  retainer agreement?
4      A.    Yes.
5      Q.    Is it governed by New York law?
6      A.    I can't answer that as I sit
7  here today.  Obviously if I signed it, New
8  York would be governed by New York ethical
9  rules and what have you, but I don't know
10 what the retainer agreement says.  I don't
11 have it in front of me right now.
12     Q.    Does the agreement that you
13 signed with the FDA in the last couple of
14 years, the retainer agreement, give you a
15 percentage interest in the judgment, the
16 Ecuadorian judgment?
17     A.    Yes.
18     Q.    What is that percentage
19 interest in the FDA retainer?
20     A.    It's the same percentage
21 interest that I have always had, to the
22 best of my knowledge, 6.3 percent.
23     Q.    And is that 6.3 percent of the
24 total amount recovered or some other --
25 what is it 6.3 percent of?

Page 60

1        DONZIGER
2      A.    It is a contingent fee interest
3  in the recovery, any recovery.
4      Q.    The total recovery?
5      A.    Yeah, obviously subject to
6  court orders, like the constructive trust.
7  So right now, for all practical purposes,
8  it is a nullity.  But that is my interest
9  according to my contract.
10     Q.    The contract you signed with
11 the FDA, in addition to granting you the
12 contingency fee interest of 6.3 percent,
13 does it provide for any other types of
14 payments to you?
15     A.    I don't know.  To be clear,
16 though, I have an agreement with my
17 clients, that is the FDA, to be paid a
18 monthly retainer.
19     Q.    When did you enter into that
20 agreement?
21     A.    We have always had that
22 agreement for years.  I rarely got paid
23 because there wasn't enough money, and I
24 occasionally got paid.
25          THE VIDEOGRAPHER:  Excuse me, I

Page 61

1        DONZIGER
2  was informed that we're not on the phone
3  right now.
4          MS. NEUMAN:  It's fine.  We
5  will worry about it at the break.
6          THE WITNESS:  I'm sorry, is
7  this phone --
8          MS. NEUMAN:  It is just into
9  that other room.
10         THE WITNESS:  Okay.  Have you
11 got a big crowd over there?
12         MS. NEUMAN:  No takers as far
13 as I know.
14         THE WITNESS:  Not like the good
15 ole days.
16         MS. NEUMAN:  Can you read me
17 back the last question.  I think he
18 answered it, but I have lost my train of
19 thought.
20         (The record was read.)
21     Q.    Is the agreement that you
22 receive a retainer from the FDA written?
23     A.    I believe there is a written
24 agreement from well back, but I'm not 100
25 percent sure.  Certainly we had an

16 (Pages 58 - 61)

Page 62

1          DONZIGER
2  agreement, an oral agreement.
3     Q.   And is this agreement that you
4  receive a retainer for working for the FDA
5  reflected in your new FDA retainer?
6     A.   I don't know an answer to that
7  because I haven't looked at that retainer
8  in preparation for this deposition.
9     Q.   In this agreement that you have
10 with the FDA to receive a retainer, what is
11 the amount of the retainer?
12    A.   It varies.  Right now, or the
13 most recent iteration, was $25,000 a month.
14    Q.   And is there any document
15 confirming that that's your current
16 retainer amount that is signed by the FDA?
17    A.   I don't know, but there is a
18 definite agreement with the FDA.  But I
19 will say this:  I generally don't get paid
20 that amount or get paid anything at all.
21 It all depends on what's available,
22 especially given the rather burdensome, for
23 my client base, demands of the litigation
24 in different jurisdictions, you know, not
25 just this, but Canada and other countries.

Page 63

1          DONZIGER
2     Q.   What is your role in the
3  Canadian case, if any?
4     A.   How does that relate to the
5  deposition?
6     Q.   It relates to whether monies
7  you are receiving are for compensation of
8  work done in Canada or something else.
9     A.   Well, I get the retainer for a
10 variety of different pieces of work that I
11 do, but I'm not going to get into that on
12 First Amendment grounds and because of the
13 pending motion.
14    Q.   Can you describe the scope of
15 the work you do that is covered by the
16 retainer?
17    A.   I believe that intrudes on
18 First Amendment protected grounds, but I
19 will say this as a general matter:  I do a
20 variety of different types of work on
21 behalf of my clients, advocacy work.
22    Q.   You keep saying clients,
23 plural, but it is client, right, the FDA?
24    A.   Well, the FDA represents all
25 the affected communities in the execution

Page 64

1          DONZIGER
2  of the judgment, so there is thousands of
3  people that the FDA represents, and I
4  represent the FDA.
5     Q.   Have the indigenous communities
6  stated publicly that the FDA does not
7  represent them?
8     A.   You would have to be more
9  specific.  What indigenous communities?
10    Q.   Well, which indigenous
11 communities are in the former
12 concessionary?
13    A.   You don't know that?
14    Q.   I'm asking you, Mr. Donziger.
15    A.   There is five indigenous
16 peoples.
17    Q.   And they are?
18    A.   The Siona, Secoya, Huaorani,
19 Quichua, and Cofan.
20    Q.   And is it your testimony that
21 the FDA currently represents all five of
22 those --
23    A.   The FDA --
24    Q.   -- indigenous communities?
25    A.   The FDA represents all the

Page 65

1          DONZIGER
2  beneficiaries of the judgment in the
3  execution of the Ecuadorian judgment, so
4  yes, it would include those groups for that
5  purpose.
6     Q.   For the purpose of managing the
7  funds should they ever be paid?
8     A.   Well, for the purpose that the
9  Ecuadorian judgment sets out as to be the
10 role of the FDA.  So it is, you know, the
11 FDA is the beneficiary, they have an
12 obligation to collect on the judgment, and
13 then if funds ever get collected, to spend
14 them consistent with the Ecuador judgment.
15    Q.   Can you turn in Exhibit 5307 to
16 page 7, your response to Interrogatory No.
17 16.
18    A.   Uh-huh.
19    Q.   You say "It would be highly
20 burdensome to calculate the total amount of
21 money I have received in the 25 years of my
22 work on the Ecuador case."
23         Do you see that?
24    A.   Yes.
25    Q.   Did you declare all the money

17 (Pages 62 - 65)

Page 74

1                DONZIGER
2  organized, as accounts to hold funds that
3  have been subsequently transferred out to
4  other people to pay case expenses, yes.
5      Q.    So am I understanding you that
6  you have commingled case funds with your
7  personal funds?
8      A.    No.  Commingle is your word.
9      Q.    Well, you have put them in the
10 same account, the money, yes?
11     A.    It's not commingling as far as
12 I'm concerned.  That's an opinion that
13 you're expressing.
14          You know, the money comes in.
15 We almost never have enough money to meet
16 the need and all the bills, and it has to
17 be then sent out in a way to keep the case
18 going.  I have done that through the years
19 from time to time.
20     Q.    And you keep accurate records
21 of all the case money that comes in and all
22 the case money that flows out, is that
23 right, of your accounts?
24     A.    The records are all electronic
25 and easily retrievable.  I had brought in

Page 75

1                DONZIGER
2  Ms. Sullivan to help get it organized and
3  up to speed and pick up where Mr. Rizack
4  left off.
5      Q.    Is there any one of these five
6  accounts that is used exclusively for the
7  Ecuador case and does not contain any of
8  your personal funds?
9      A.    8132.
10     Q.    So that's exclusive to the
11 case?
12     A.    Yes.
13     Q.    Other than these accounts, are
14 there other accounts that you control and
15 to which Ecuador case funds have been
16 deposited?
17     A.    That is beyond the scope.  Are
18 you inquiring as to my present financial
19 condition?  Is that what this is about?
20     Q.    I'm asking you if there are
21 other accounts where Ecuador case funds --
22     A.    Currently -- let me answer your
23 question --
24     Q.    That you control.
25     A.    Let me answer your question

Page 76

1                DONZIGER
2  this way:  As I sit here today, there are
3  no other accounts.
4      Q.    Did you direct -- did anyone
5  other than you direct Ms. Sullivan's work
6  on the Ecuador case?
7      A.    That is beyond the scope.
8      Q.    Did you control the accounts
9  into which Ecuador case funds were
10 deposited that Ms. Sullivan opened?
11     A.    So my position on that is this:
12 It is beyond the scope.  And the reason it
13 is beyond the scope, and to be clear, there
14 is nothing I would try to hide as regards
15 Ms. Sullivan, except for the fact that that
16 is internal operational information as to
17 how we operate, and you're not entitled to
18 that information, in my view, based on the
19 motion filed for the protective order.  So
20 I'm not going to answer that question right
21 now.
22     Q.    The case funds -- I withdraw
23 that.
24          The funds that you have raised
25 in exchange for interest in the judgment

Page 77

1                DONZIGER
2  since March of 2014, who owns those funds?
3      A.    Well, first of all, I helped my
4  clients raise money.  So when you say funds
5  you have raised, I don't know what you mean
6  by that.  These are funds that clients
7  generate and I help make introductions and
8  help make stuff happen so the clients can
9  have resources.  So they are client funds.
10     Q.    When you say client funds, you
11 mean FDA funds?
12     A.    Yes.
13     Q.    Okay.  And are they deposited
14 into FDA accounts in Ecuador or somewhere
15 else?
16     A.    That's none of your business.
17 I mean, that is beyond the scope.
18     Q.    Do you have any control over
19 these funds after they are raised?
20     A.    The clients control the funds.
21 I am authorized by the clients to manage a
22 bunch of the work and the case and figure
23 out how to keep it moving.
24     Q.    Are you authorized by the
25 clients to manage the funds?

Page 78

```
 1                  DONZIGER
 2     A.    I have a say in how the funds
 3  are spent and we talk constantly,
 4  regularly, the clients and I, the
 5  leadership of the FDA, about how to deploy
 6  the limited capital that we have.
 7     Q.    And who are you referring to as
 8  the leadership of the FDA, by name?
 9     A.    Beyond the scope.  It is public
10  information who the president of the FDA
11  is.
12     Q.    Is that who you talk to, the
13  current president of the FDA?
14     A.    One of the people.  There is an
15  Executive Committee.  There is multiple
16  people who are involved.  But that gets to
17  the decision-making process of the client
18  group.
19     Q.    Are you authorized to approve
20  your own compensation from client funds?
21     A.    No.
22     Q.    Are you authorized to approve
23  your own expenses from client funds?
24     A.    All of my approvals for
25  expenses are approved by the clients,
```

Page 79

```
 1                  DONZIGER
 2  subject to review, approval, criticism,
 3  etc.  I do not have to get approval in
 4  advance for every expenditure of funds for
 5  travel, that kind of stuff.
 6     Q.    You get written approval --
 7     A.    No, I don't get approval in
 8  advance.  I review expenditures with
 9  clients on a regular basis so they
10  understand how the money, the limited
11  capital, is being spent.
12     Q.    And that's done in writing?
13  You account to the clients in writing on
14  how you have spent the money?
15     A.    I think this is well beyond the
16  scope of the deposition.  I have -- let me
17  just say this:  I have regular
18  communication with my clients about all
19  sorts of matters, including expenditure of
20  funds, that kind of stuff.
21     Q.    And is that communication ever
22  in writing?
23     A.    I wouldn't say never, but
24  generally not.
25     Q.    You said that Ms. Sullivan had
```

Page 80

```
 1                  DONZIGER
 2  an account in which case funds were held
 3  until she received the subpoena; did I
 4  understand that correctly?
 5     A.    Yes.
 6     Q.    What happened to those funds?
 7  Were they transferred to you?
 8     A.    The answer, and I'm sure she
 9  will provide this in her deposition, given
10  her production that I briefly reviewed last
11  night, the money that she had and was
12  holding when she decided to no longer be
13  involved, was transferred to a third party,
14  not me.
15     Q.    And who was this third party?
16     A.    It is beyond the scope.
17     Q.    And how much money was
18  transferred?
19     A.    Beyond the scope.
20     Q.    Can you explain to me how
21  documents relating to your compensation and
22  expenses can be beyond the scope?
23     A.    They indicate internal
24  operational and strategic issues.
25     Q.    Just how much you're paid?
```

Page 81

```
 1                  DONZIGER
 2     A.    Huh?
 3     Q.    How much you're paid?
 4     A.    That would implicate First
 5  Amendment considerations.
 6     Q.    Can you define for me this
 7  First Amendment objection?  Because you
 8  seem to apply it to financial documents,
 9  all kinds of documents.  So I'm not
10  understanding it.  Can you describe it for
11  the record, please?
12     A.    No, I'm not going to describe
13  it.  Read it.  I have a 24-page motion.  It
14  really goes into a long history of how
15  Chevron takes information about people who
16  work on the case, harasses them, spies on
17  them, sues them, extorts them, tries to get
18  statements from them that I'm a bad person,
19  all those things.  So I think I have ample
20  reason, with all due respect, to be very
21  concerned about this and to take the
22  position I'm taking.
23     Q.    How are documents related to
24  your, not related to anybody else, your
25  compensation and your expenses, how do
```

21 (Pages 78 - 81)

Page 94

```
 1              DONZIGER
 2    Q.   And you don't recall e-mailing
 3  with anybody else about the Elliott
 4  meeting?
 5    A.   What do you mean, anybody else?
 6  You mean other than the e-mails that Katie
 7  Sullivan has produced and I produced?
 8    Q.   Yes.
 9    A.   No.
10    Q.   Did you send any written
11  information to your client about the
12  Elliott meeting?
13    A.   I don't recall.
14    Q.   Did you look for such
15  communications?
16    A.   I looked up Elliott with the
17  search term and that's what came up.  I
18  don't remember sending my clients any
19  written information about the Elliott
20  meeting.
21    Q.   Either before or after?
22    A.   I don't remember.  I don't
23  believe I did.
24    Q.   I'm going to mark as Exhibit
25  5310 a document bearing the Bates number
```

Page 95

```
 1              DONZIGER
 2  MKS 396.
 3        (Plaintiff's Exhibit 5310
 4  marked for identification.)
 5    Q.   It is labeled "Invoice, Law
 6  Offices of Steven H. Donziger," described
 7  as "Legal and Consultation Services/Ecuador
 8  Environmental Case, December 2017."
 9        This is a document you
10  prepared, Mr. Donziger?
11    A.   Yes.
12    Q.   This is the earliest invoice
13  from you that Ms. Sullivan produced.  Did
14  you send her invoices prior to December
15  2017?
16    A.   I believe this is beyond the
17  scope.
18    Q.   Did you send this invoice to
19  Ms. Sullivan in order to have it paid?
20    A.   It is beyond the scope.
21    Q.   Is there any backup for this
22  invoice or is this the retainer you
23  mentioned earlier?
24    A.   It is the monthly retainer.
25    Q.   Did you copy this invoice to
```

Page 96

```
 1              DONZIGER
 2  the U.S. representative under Exhibit 558?
 3    A.   Beyond the scope.
 4    Q.   Who is currently the U.S.
 5  representative acting under Exhibit 558?
 6    A.   Is Exhibit 558 the retainer
 7  agreement?
 8    Q.   The January 2011 retainer.
 9    A.   It is beyond the scope.
10    Q.   At the time of the RICO trial,
11  I believe you testified it was Mr. Snyder.
12  Is it still Mr. Snyder?
13    A.   I don't even know who that is.
14    Q.   Andres Snyder.
15    A.   Oh.  Beyond the scope.
16    Q.   Is there currently a chairman
17  serving pursuant to Exhibit 558?
18    A.   It is beyond the scope.  I
19  already testified there is a subsequent
20  agreement to that.
21    Q.   But only with the FDA?
22    A.   Yes.
23    Q.   Can you produce that agreement?
24    A.   I will see what I can do.
25    Q.   Well, you have the agreement,
```

Page 97

```
 1              DONZIGER
 2  right?
 3    A.   I should somewhere, yeah.
 4    Q.   Can you produce it today?
 5    A.   I don't believe so.
 6    Q.   Why not?
 7    A.   Because I would have to go back
 8  to my place and find it and -- I might be
 9  able to produce it today, if you let me out
10  of here.
11        MS. CHAMPION:  Someone can
12  e-mail it to you and we can print it for
13  you.
14        THE WITNESS:  Someone?  Who is
15  going to do that, my dog?  Who is going to
16  e-mail it to me?  Do you know I work alone?
17    Q.   You mentioned, Mr. Donziger,
18  that you had a draft agreement with
19  Ms. Sullivan?
20    A.   Yes.
21    Q.   Who drafted that agreement, her
22  or you or someone else?
23    A.   This is beyond the scope.  I
24  thought we were going to talk about the
25  Elliott meeting.
```

25 (Pages 94 - 97)

Page 98

1         DONZIGER
2    Q.   Mr. Donziger, did you draft the
3 tentative agreement with Ms. Sullivan or
4 did she?
5    A.   It is beyond the scope.
6    Q.   Do you have a copy of it?
7    A.   I believe I do.
8    Q.   Pursuant to that agreement, was
9 Ms. Sullivan to receive any kind of a
10 percentage interest in the judgment?
11   A.   Beyond the scope.
12   Q.   Was she or wasn't she?
13   A.   It is beyond the scope.
14   Q.   Is there any -- well, what is
15 the reason the agreement didn't get signed?
16   A.   It is beyond the scope.  I'm
17 not talking about that.
18   Q.   Exhibit 5310, your December
19 2017 invoice for $25,000, did that get
20 paid?
21   A.   It is beyond the scope.
22   Q.   Money you received is beyond
23 the scope?
24   A.   Yes.  You need to know my
25 present financial condition, my ability to

Page 99

1         DONZIGER
2 pay a judgment I owe your client, which I
3 can pay, okay?
4        So quit trying to find out
5 everything about my life and about the
6 case, stuff that you have no right to.  You
7 really need to ask questions about the
8 topics at hand.  Do you want to know what
9 happened at the Elliott meeting?  Ask me.
10 That's what Judge Kaplan wanted this
11 deposition to be about.  You haven't asked
12 me one question.  We are now over two
13 hours --
14   Q.   This is a discovery deposition,
15 Mr. Donziger.
16   A.   You haven't asked one question
17 about what Judge Kaplan ordered this
18 deposition to be about.
19   Q.   I'm going to hand you a
20 document that has been marked as
21 Plaintiff's Exhibit 5311.
22        (Plaintiff's Exhibit 5311
23 marked for identification.)
24   Q.   Bearing the Bates number MKS
25 395.  It shows a transfer from CWP

Page 100

1         DONZIGER
2 Associates to yourself on January 24th,
3 2018 of $25,000.  Do you see that?
4    A.   Yes.
5    Q.   Do you know what the origin of
6 these funds was?
7    A.   This is beyond the scope.
8    Q.   Did the $25,000 that was paid
9 to you from CWP Associates come from money
10 raised in exchange for an interest in the
11 Ecuador judgment?
12   A.   These were obviously case
13 funds.
14   Q.   That's not responsive.  Did the
15 money come from --
16   A.   From interest in the Ecuadorian
17 judgment not owned by me, owned by the FDA
18 and the clients.
19   Q.   When were the monies that were
20 paid to you on January 24th of 2018 raised?
21   A.   No, nice try.  Beyond the
22 scope, First Amendment protected.
23   Q.   Pursuant to what agreement were
24 the monies paid to you on January 24th,
25 2018 raised?

Page 101

1         DONZIGER
2    A.   I have, as I testified, and
3 please really get to the point, I have
4 already testified I have authority from the
5 FDA to try to help them raise money to pay
6 litigation expenses.  I have authority from
7 my client.  It is clear.  I had authority.
8    Q.   It is clear in this document
9 that you haven't produced?
10   A.   Don't worry about it.  It is
11 none of your business.  It is beyond the
12 scope of the deposition.  If Judge Kaplan
13 wants you to have that, we will get that
14 resolved in due course and you will get it.
15   Q.   Was anyone other than
16 Ms. Sullivan notified of this transfer of
17 funds to you on January 24th of 2018?
18   A.   It is beyond the scope.
19   Q.   What is CWP Associates?
20   A.   I don't know.
21   Q.   You have no idea?
22   A.   It is some name I think
23 Ms. Sullivan came up with.
24   Q.   Did she come up with it or did
25 you?

26 (Pages 98 - 101)

Page 158

1    DONZIGER
2    Q.    And that was the purpose for
3    which you were seeking money from Elliott,
4    to fund the Canadian litigation in the near
5    term?
6    A.    I don't know.  I mean, it
7    certainly would have included that, among
8    other things.
9    Q.    It says "Ecuador judgment
10   injunction in the U.S."
11         Do you see that?
12   A.    Yes.
13   Q.    What was discussed with Elliott
14   about the injunction in the U.S.?
15   A.    I don't know what that refers
16   to.
17   Q.    Down further Ms. Sullivan
18   writes "play with threats versus successful
19   ruling in Canada."
20         What does that refer to?
21   A.    I don't know.
22   Q.    Do you remember discussing
23   threats in the Elliott meeting?
24   A.    I don't know.  I mean, the
25   Elliott meeting was many months ago and I

Page 159

1    DONZIGER
2    just don't remember the specifics as I sit
3    here today other than we had a general
4    discussion about Elliott potentially
5    investing in the case.  And these are her
6    notes, not mine.  I don't know what she is
7    talking about.
8    Q.    Further down it says "case
9    until bank in Ecuador."
10         Do you know what that refers
11   to?
12   A.    "Case until bank in Ecuador,"
13   no, I don't know what that is.
14   Q.    If you look at the next page
15   bearing the Bates numbers MKS 156, at the
16   top it says "boycott time versus Chevron."
17         What does that refer to?
18   A.    I don't know.
19   Q.    "Government to look at it."
20         Do you recall discussing a
21   boycott in the meeting?
22   A.    No.
23   Q.    Further down it says "6.3
24   percent Steven."
25         That's referring to you?

Page 160

1    DONZIGER
2    A.    Yes.
3    Q.    And your claimed ownership
4    interest in the judgment?
5    A.    Well, yeah, subject to the
6    constructive trust.
7    Q.    And you told Elliott this was
8    subject to the constructive trust?
9    A.    I don't recall.  To me it was
10   irrelevant because we weren't selling those
11   shares.  I think this is a part probably --
12   I mean, I cannot speak for Katie's notes
13   and this is ridiculous to even speculate,
14   but I will do it, because you are staying
15   through lunch, basically I think this was
16   the part of the meeting where they asked --
17   or he asked like what was the structure of
18   who owned what.
19   Q.    Okay.  What is the structure of
20   who owned what?
21   A.    It is basically 15 or 16
22   percent is committed to various entities,
23   meaning lawyers, service providers, you
24   know, other service providers, like
25   consultants, and, you know, just people who

Page 161

1    DONZIGER
2    do various things, and that's apart from
3    the overwhelming interest, which is owned
4    by the clients as manifested through the
5    FDA.
6    Q.    When you said -- when you were
7    telling Elliott the 15 to 16 percent is
8    committed to other people, does that
9    include the amounts committed to Torvia?
10   A.    So to be clear, and I don't
11   mean to leave Chevron out of this equation,
12   because Chevron probably has a different
13   view, but when Torvia and Mr. DeLeon and
14   really all the entities, Woodsford, H5,
15   whoever it was that turned over, in theory,
16   signed those agreements to turn over its
17   interest to Chevron, our view was that was
18   contractually impermissible and that all of
19   those interests reverted back to the FDA
20   or, slash, the clients.
21   Q.    Did you inform Torvia that
22   their 22 million in financing reverted back
23   to the FDA?  When these monies reverted
24   back, do you give them their money back?
25   A.    It is not monies, it is

41 (Pages 158 - 161)

Page 194

```
 1                DONZIGER
 2   Elliott meeting, that is covered by your
 3   retainer?  You don't bill separately for
 4   that with a timesheet?
 5       A.    No.
 6       Q.    So those types of activities
 7   are covered by your retainer?
 8       A.    Yes.
 9       Q.    When you get reimbursed for
10   expenses, the FDA approves those expenses?
11       A.    On the sort of pretty rare
12   occasion I get reimbursed for expenses, I
13   put it in an invoice, get paid, when I do
14   an accounting with the clients they know
15   what the expenses are and they approve it.
16       Q.    So the money from the Lenczner
17   firm that was transferred to you, was any
18   portion of that money to pay your retainer?
19       A.    I think this is a little bit
20   beyond the scope.
21       Q.    I don't think so.
22       A.    Why not?
23       Q.    Because the issue relates to
24   compliance with the Court's injunction.
25       A.    Okay.  I will answer it.  The
```

Page 195

```
 1                DONZIGER
 2   answer to that question is yes.
 3       Q.    And was the money that came
 4   through the Lenczner firm also to reimburse
 5   you for expenses?
 6       A.    In part, yes.  But to repeat,
 7   and I hope I have made myself clear about
 8   this, I'm owed a lot of money for
 9   unreimbursed expenses through the years,
10   like a lot of money that I put into the
11   case and never got paid out for because the
12   clients never had money and we never had
13   enough money.
14       Q.    And you don't view that as
15   covered by your contingency?
16       A.    Not at all.  I mean, that is
17   out of pocket.  I mean, lawyers who do
18   contingency fee work generally don't --
19       Q.    They don't front the costs?
20       A.    It depends on the deal.
21       Q.    Isn't that the nature of why
22   they are entitled to the contingency?
23       A.    No, it is the labor that they
24   are fronting.  They are not being paid
25   hourly, so they are doing free labor, but
```

Page 196

```
 1                DONZIGER
 2   the actual out of pocket in the contingency
 3   fee model is often paid by the client.
 4       Q.    But you are doing neither free
 5   labor nor -- you want to be reimbursed for
 6   your expenses and get a retainer and get a
 7   contingency; that's you agreement?
 8       A.    Reimbursement of expenses, yes.
 9       Q.    Retainer?
10       A.    Get a retainer, a monthly
11   retainer.
12       Q.    And a contingency?
13       A.    Absolutely.
14             But to answer your question,
15   you asked me a question about Lenczner's
16   transfers, so the answer is I tried to pay
17   my retainer out of that but it was not
18   enough money, and I think if one were to
19   reconstruct that period of time it would
20   not -- it would not be a consistent payment
21   by any means.
22       Q.    When did your retainer, it was
23   not $25,000 at the time of the RICO trial,
24   when did it go to $25,000?
25       A.    I don't remember.  What was it
```

Page 197

```
 1                DONZIGER
 2   then?
 3       Q.    It varied and as I recall the
 4   most, at the end, was 20.
 5       A.    Okay.  I mean, I don't know.
 6       Q.    And why was the Lenczner firm
 7   paying you your retainer?
 8       A.    I know the answer to that
 9   question.  I'm trying to figure out if it
10   is privileged.  I think I'm going to hold
11   off on that on First Amendment grounds, as
12   it gets into our internal operations.
13       Q.    So Lenczner was passing on to
14   you your share of money that came from
15   outside funders, they weren't paying you
16   money from their pockets; is that fair?
17       A.    I need to not answer that, but
18   I will write it down and I will get back to
19   you if I can answer it.
20       Q.    Mr. Donziger, I'm going to mark
21   as Exhibit 5320 a summary prepared from
22   documents that you produced during RICO.  It
23   shows funder money that went into your
24   accounts at Chase.
25             (Plaintiff's Exhibit 5320
```

Page 242

```
 1                DONZIGER
 2        THE VIDEOGRAPHER:  Nothing
 3  else, Counselor?
 4        MS. NEUMAN:  No, we're off the
 5  record.
 6        THE VIDEOGRAPHER:  The time is
 7  3:20.  We are going off the record.  This
 8  is the end of media file number five and
 9  that concludes this deposition.
10
11
12        [TIME NOTED:  3:20 p.m.]
13
14
         _____
15            STEVEN DONZIGER
16
    _____
17  Subscribed and sworn to
    before me this _____
18  day of _____, 2018.
19  _____
        Notary Public
20
21
22
23
24
25
```

Page 243

```
 1
 2        I N D E X
 3
    WITNESS    EXAMINATION BY      PAGE
 4
    DONZIGER    NEUMAN             5
 5
 6
        E X H I B I T S
 7
    PLAINTIFF'S   DESCRIPTION      PAGE
 8  Exhibit 5302 Judgment as to     6
              Donziger Defendants
 9            and Defendants Camacho
              and Piaguaje
10  Exhibit 5303 Default Judgment as 18
              to Defaulted Defendants
11  Exhibit 5304 Order to Show Cause 23
              and Preservation Order
12            in Furtherance of This
              Court's March 4, 2014
13            Judgment and Application
              to Have Steven Donziger
14            Held in Contempt
    Exhibit 5305 Chevron Corporation's 27
15            First Information
              Subpoena
16  Exhibit 5306 Subscription Deed   41
    Exhibit 5307 Letter from Donziger 43
17            dated 6/15/18
    Exhibit 5308 Letter from Donziger 56
18            dated 6/15/18
    Exhibit 5309 DONZPJD-0000001-    70
19            0000018
    Exhibit 5310 MKS 0000396         95
20  Exhibit 5311 MKS 0000395         99
    Exhibit 5312 Chart of Donziger  104
21            Invoices
    Exhibit 5313 MKS 0000389        105
22  Exhibit 5314 Analysis of Bank   109
              Transactions
23  Exhibit 5315 Letter from Mendoza 121
              to Guaman
24
25
```

Page 244

```
 1
 2         E X H I B I T S
 3  PLAINTIFF'S   DESCRIPTION       PAGE
    Exhibit 5316 Declaration of the  127
 4            Affected Nationalities
              in the Province of
 5            Sucumbios
    Exhibit 5317 RIZACKJD-0000001-   134
 6            0000005
    Exhibit 5318 E-mail from Rizack to 137
 7            Herrera dated 6/21/18
    Exhibit 5319 Transfers from TD Bank 187
 8            Account ending 2265
    Exhibit 5320 Funder Deposits into  197
 9            Donziger's Primary
              Chase Bank Accounts
10  Exhibit 5321 MKS 0000087         202
    Exhibit 5322 Canada Enforcement  219
11            Action Costs Payments
    Exhibit 5323 Transfer and Assignment 231
12            of Judgment Interests
13
14
15  REQUESTS
16  Page   Line
     96     23
17  169      2
    235      8
18  235     11
    236     21
19
20
21
22
23
24
25
```

Page 245

```
 1
 2        CERTIFICATION
 3
 4    I, TODD DeSIMONE, a Notary Public for
 5  and within the State of New York, do hereby
 6  certify:
 7    That the witness whose testimony as
 8  herein set forth, was duly sworn by me; and
 9  that the within transcript is a true record
10  of the testimony given by said witness.
11    I further certify that I am not related
12  to any of the parties to this action by
13  blood or marriage, and that I am in no way
14  interested in the outcome of this matter.
15    IN WITNESS WHEREOF, I have hereunto set
16  my hand this 26th day of June, 2018.
17
18        Todd DeSimone
          _____
19          TODD DESIMONE
20
21        *   *   *
22
23
24
25
```