# EXHIBIT 10

```
I6SJCHE1
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

             Plaintiff,

        v.                                11 Civ. 691 LAK JCF

STEVEN DONZIGER, et al.,

             Defendants.

------------------------------x
                                           June 28, 2018
                                           9:30 a.m.



Before:

                  HON. LEWIS A. KAPLAN,

                                           District Judge

                     APPEARANCES


GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for plaintiff
BY:  RANDY M. MASTRO, Esq.
     HERBERT J. STERN, Esq.
     JOEL SILVERSTEIN, Esq.
     ANDREA NEUMAN, Esq.
     ANNE MARIE CHAMPION, Esq.
     ALEJANDRO HERRERA, Esq.
     JEFFERSON BELL, Esq.


STEVEN ROBERT DONZIGER,
     Appearing pro se


Also Present:
     ANDREW R. ROMERO-DELMASTRO, Supv. Counsel Chevron
```

1   Elliott, was a presentation made to you about the present
2   ownership interest in the judgment?
3   A.  Yes.
4   Q.  So there are two entries, one on your notes and one --
5             THE COURT:  Excuse me, Mr. Stern.  What was said on
6   that subject and by whom?
7             THE WITNESS:  What was said was there was just a kind
8   of a brief summary of the amount of points, as it were, in
9   terms of who or what portion of recoveries different parties
10  would receive to the extent there was successful enforcement
11  proceedings.
12            For instance, in my notes it says Mr. Donziger
13  personally had 6.3 percent out of 100 percent and that there
14  had already been allocated 15 to 20 percent amongst 15 people.
15  BY MR. STERN:
16  Q.  Just for the record, unless you don't want me to do it, do
17  you notice on Page 2 of Ms. Sullivan's notes the same notations
18  appear.  Am I correct?
19  A.  Yes, correct.
20  Q.  All right.  Now, let me put it to you this way.
21            Did you understand that Mr. Donziger was attempting to
22  monetize the judgment by obtaining money from Elliott?
23            MR. DONZIGER:  Objection; calls for a legal
24  conclusion.
25            THE COURT:  Overruled.

1   Q. Am I correct, sir, that you have sold interests in the
2   judgment, since March 2014, to multiple investors?
3             MR. DONZIGER:  Objection.
4   Q. Yes or no.
5             THE COURT:  Yes or no.
6   A. Well, there's a presumption in the question that's not
7   accurate.  Can I explain?
8   Q. No.  I'll rephrase the question, sir.
9             In selling interests in the judgment, am I correct
10  that you have sold interests in the judgment to multiple
11  investors since March 2014?
12  A. First of all, I am not selling interests in the judgment.
13  I am arranging for my clients to sell their interests in the
14  judgment.  But the rest of your question, have there been
15  multiple investors, the answer is yes.
16  Q. So the record is clear, you have sold on behalf of your
17  clients interests in the Ecuadorian judgment to multiple
18  investors since March 2014, correct?
19            MR. DONZIGER:  Objection.
20            THE COURT:  I think that's been asked and answered.
21  Q. How many investors have you arranged to sell an interest in
22  the judgment on behalf of your client or clients since March
23  2014?
24  A. To the best of my recollection, approximately six.
25  Q. Am I correct, sir, that you have raised millions of dollars

1  A.   The meeting was many months ago, so I have a vague
2  recollection only, but I do remember talking in very general
3  terms about how the Ecuadorian client base structures its
4  investment contracts with those who fund.
5  Q.   Can you -- strike that.
6            Mr. Donziger, when you say that you discussed in
7  general terms the structure of an investment, tell us in
8  general terms what it was that you said.
9  A.   When I say "in general terms," it's simply if an entity
10 puts in X amount of money, we would negotiate some percentage
11 of the interest in any collection that they would get if there
12 were to be a collection.  So -- I don't know if that answers
13 your question.
14 Q.   Yes, it does.  So let me ask you a couple of follow-up
15 questions in that regard.  Am I correct that you told
16 Mr. Grinberg and his colleague that you had already arranged
17 sales of -- strike that.
18            Am I correct that you told Mr. Grinberg and his
19 colleague at that November 6, 2017 meeting that you had a 6.3
20 percent interest in the judgment?
21 A.   That came up.  I don't remember how.  But I told him what
22 my percentage interest was, subject, obviously, to the RICO
23 judgment, such as I can't collect.  But that's the percentage I
24 have, or had, I guess.
25 Q.   And you don't recall whether you volunteered that

1   information or whether he asked you.  Is that your testimony?
2   A.  I don't remember.
3   Q.  Am I correct that you told him that, at this meeting --
4   strike that.
5        Am I correct that you told Mr. Grinberg at this
6   meeting that 15 to 20 percent of the interest in the judgment
7   had already been given to investors or other professionals in
8   connection with the judgment proceeds?
9   A.  So my answer to that question is, I don't have a specific
10  recollection of saying that in the meeting, but having seen the
11  notes presented to me and understanding how I usually talk
12  about this to potential funders, I -- that would be something
13  consistent with what I would tell a potential funder.
14  Q.  And did you tell Mr. Grinberg and his colleague that there
15  were 15 such -- strike that.
16       Did you tell Mr. Grinberg and his colleague at this
17  meeting on November 6, 2017 that there were approximately 15
18  such investors or professionals who had interest in the
19  judgment allocated to them?
20  A.  I believe I did, although I don't have any specific
21  recollection.  That's roughly the case.
22  Q.  Did you tell him the identities of any of those 15, besides
23  yourself?
24  A.  I, I, I don't remember.  I don't believe I did, but I might
25  have.  I don't remember.

1  Q.  Mr. Donziger, just to be clear, the client you were
2  representing at the Elliott meeting was the FDA, correct?
3  A.  That's correct, subject to my prior testimony about the
4  Frente role, yes.
5  Q.  Again going back to the Elliott meeting, did you have any
6  discussion with Mr. Grinberg and Mr. Cohen at the November 6,
7  2017 meeting about how difficult it would be to enforce the
8  Ecuadorian judgment in light of the RICO judgment?
9           THE WITNESS:  Objection.
10          THE COURT:  Overruled.
11 BY MR. MASTRO:
12 Q.  Yes or no?
13 A.  I generally, because I don't remember specifically
14 everything we talked about at the 90 minute meeting, when I
15 talked to potential funders, I always mentioned RICO.  I
16 explained Judge Kaplan's decision, I explained the view of the
17 Ecuadorians of that decision.  Respectfully to your Honor, they
18 disagree, as do I, with a lot of the bases of that decision.
19          I count on potential funders to do their own
20 independent due diligence about that decision and all the other
21 court decisions in this case both in the United States, Canada,
22 Ecuador and the international arbitration.
23          Almost all potential funders, if they express
24 seriousness, do that due diligence and they also consult with
25 independent counsel when doing so.

1  A.  That's my recollection, yes.
2  Q.  Am I correct you responded to her email on November 6,
3  2017, telling everyone on that email that the information was,
4  "strictly confidential and that it would be counterproductive
5  in terms of our objectives" if the information were to leak?
6  A.  I don't know what I said.  I remember saying something
7  along those lines.  If you're trying to say I said what is on
8  an email, show me an email and I will tell you if I sent the
9  email.
10 Q.  I am just asking if you recall it, Mr. Donziger?
11 A.  I remember generally wanting to keep our contacts with
12 Elliott confidential so they wouldn't get into your camp and
13 representation of your clients so you could cause mischief, as
14 had been done in the past.  That was my view, yes.
15 Q.  Am I correct that you recommended everyone on the email
16 chain that they delete all emails relating to this subject?
17 A.  Actually, that email came from another individual on the
18 email chain, and I endorsed it, but I also agree with the
19 subsequent email with Aaron Paige, which explains it was not to
20 impede discovery or hide anything untoward, it was to protect
21 confidentiality such that Chevron wouldn't be able to harass
22 Elliott Capital, as it had done with other funders.
23 Q.  Can we go to Exhibit 6 in the binder, DX-9006, the large
24 binder.
25 A.  This binder?

1  Q.  Yes.
2           THE COURT:  Tab 6?
3           MR. MASTRO:  Yes, your Honor.
4           (Pause)
5  BY MR. MASTRO:
6  Q.  Did you have chance to review it, Mr. Donziger?
7  A.  Yes, I am familiar with the email chain.
8  Q.  Am I correct this is an email, dated November 6, 2017, in
9  which you, Ms. Sullivan and others participated and that you
10 received these emails and sent these emails?
11 A.  I received this email chain, yes, and I sent the email that
12 I sent, but not the other emails, obviously.
13 Q.  But you received the other emails, correct?
14 A.  Yes.
15          MR. MASTRO:  I ask it be received in evidence.
16          THE COURT:  Received.
17          (Defendant's Exhibit 9006 received in evidence)
18 BY MR. MASTRO:
19 Q.  Mr. Donziger, let's go to the first email in the chain,
20 MKS-93.  Ms. Sullivan has sent this email to several people.
21         Are any of the people that she sent this email to
22 other investors in the Ecuadorian judgment?
23          THE WITNESS:  Objection.
24          THE COURT:  Sustained.
25 BY MR. MASTRO: