UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
CHEVRON CORPORATION,                :
                                    :
         Plaintiff,                 :
                                    :
    v.                              :   11 Civ. 0691 (LAK)
                                    :
STEVEN DONZIGER, et al.,             :
                                    :
                                    :
         Defendants.                :
------------------------------------x

**DECLARATION OF JOHN SLAVEK IN SUPPORT OF
CHEVRON CORPORATION'S SUPPLEMENTAL BRIEF REGARDING
THE CONTEMPT IMPLICATIONS OF DONZIGER'S RETENTION AGREEMENTS
AND OTHER AGREEMENTS AMONG ENTITIES WITH
INTERESTS IN THE ECUADORIAN JUDGMENT**

I, JOHN SLAVEK, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**Background**

1. I am a Managing Director of Business Intelligence and Investigations at Kroll. I have been a Certified Public Accountant for approximately 22 years. I make this declaration in support of Chevron Corporation's ("Chevron") supplemental brief regarding the contempt implications of Donziger's retention agreements and other agreements among entities with interests in the Ecuadorian judgment.

2. Kroll conducted an investigation for Chevron in preparation for the RICO trial in this matter. I did not participate in that investigation and never had any access to any aspect of it. At all times, I have been ethically walled off from the investigation and from any Kroll investigator who participated in it.

3.      Since joining Kroll in 1998, I have assisted clients in confronting a wide range of finance and accounting issues, including corporate fraud, embezzlement, business income losses, bankruptcy, contractual disputes and internal control evaluation.  I have testified in judicial proceedings on numerous issues involving fraudulent financial reporting, improper accounting, lost profits, and violations of a non-compete agreement.

4.      My previous accounting experience includes working for four years as a forensic financial investigator and auditor at KPMG.  As an auditor, my engagements included various financial institutions, healthcare entities, manufacturers, retailers and distributors.  I also previously worked as the Manager of Financial Reporting and Analysis for Admiral Insurance, a property and casualty insurance company.

## Questions Presented

5.      Pursuant to the operation of the amended Articles of Association of Amazonia Recovery Limited (the "Amazonia Articles") as contained within the Memorandum of Association of Amazonia Recovery Limited, Champion Decl., Ex. 3, and the Intercreditor Agreement, Champion Decl, Ex. 1, how would a hypothetical new investment in Amazonia Recovery Limited ("Amazonia") affect the share of recovery proceeds for existing Amazonia shareholders?  In particular, how would such an investment affect the share of recovery proceeds for Donziger & Associates, PLLC?

6.      What transfers were made, after the RICO Judgment was entered on March 4, 2014, into the TD bank accounts of Steven Donziger, Donziger & Associates, PLLC, and the Donziger Family Trust, as reflected in the records produced by TD Bank pursuant to a third-party subpoena served by Chevron?

**Overview of Distribution Under the Amazonia Articles (Scenario A)**

7. Amazonia was created to receive and thereafter distribute the proceeds of the Ecuadorian judgment in the matter of *Maria Aguinda y Otros v. Chevron Corp.*, Case No. 002-2003 ("Judgment"). The shareholders of Amazonia are persons who invested in the Judgment or otherwise assert a contingency fee interest in the Judgment.

8. **Classes of Amazonia Shares**: The Amazonia Articles provides for the following classes of participating shares: A1, A2, A3, A4, A5, A6, B1, B2, C, and D. According to the share registry, however, only participating shares in Classes A1, A2, B1, and C have been issued. Torvia holds Class A1 and A2 shares. Donziger holds Class B1 shares. The Amazonia structure anticipates that monies received into Amazonia will be distributed to its various classes of shareholders as "dividends."

9. **Class D Share Minimum Return**: Specifically, Section 114 of the Amazonia Articles sets forth the distribution structure for dividends from Amazonia to its shareholders. Champion Decl., Ex. 3 § 114. Subsection 114(a) provides, in part, that the first payment of any dividends is made to "any Class D Shareholder [that] has not received dividends or other distribution in an aggregate amount equal to the Class D Minimum Return." The Class D Minimum return is defined as: "An amount equal to the greater of (a) USD $25,000,000 and (b) 2.5% of the Total Proceeds." *Id.* at 8–9.

10. **Class A Share Minimum Return**: Subsection 114(b) provides that the next payment of any dividends is made to "any Class A1 Shareholder [that] has not received dividends or other distribution in an aggregate amount equal to the Class A Minimum Return." Champion Decl., Ex. 3 § 114(b). The Class A Minimum Return is defined as: "an amount equal to (i) the amount expressly stated in the Subscription Deed for such Class A Share to be the Funding Amount for such Class A Share multiplied by (ii) the number, if any, that is expressly

3

stated in the Subscription Deed for such Class A Share to be the Class A Minimum Return for such Class A Share." *Id.* at 7. Subsections (c) through (h) provide for similar Minimum Return payments of dividends to Shareholders in Classes A2 through A6 and any Additional Class A Shareholders.

11. **Shareholder Distributions After Minimum Returns Are Satisfied:** Subsection 114(i) provides that "the remaining amount of Available Proceeds [after payment of any Minimum Returns] shall be distributed to the Class A Shareholders and the Class B Shareholders until each such Shareholder has received . . . an amount equal to such Shareholder's Pro-Rata Share of the Total Proceeds; provided, that (A) if there are insufficient amounts available to satisfy the entitlements of the Class A Shareholders and the Class B Shareholders in full, the Company shall pay to the Class A Shareholders and the Class B Shareholders the maximum amount capable of being paid by way of divided or other distribution, such amount to be paid as between such Shareholders, pari passu and proportionately, on a pro rata basis . . . ." A shareholder's "Pro-Rata Share" is defined as "the percentage obtained by dividing (a) the number of Participation Shares held by such Participation Shareholder by (b) the number of issued and outstanding Shares," *id.* at 11, and the "Total Proceeds" are defined as "[t]he sum of (a) the Available Proceeds, (b) the Remediation Proceeds and (c) any other amount excluded from Available Proceeds . . . that the Directors determine are subsequently available for distribution," *id.* at 13.

12. **Additional Investments Through Amazonia**: Section 16 of the Amazonia Articles provides, in relevant part, that "If the Directors determine that . . . there are insufficient funds currently available to the Claimants [defined as the individual plaintiffs in *Maria Aguinda y Otros v. Chevron Corporation*, El Frente de Defensa de la Amazonia ("FDA"), and the Union de Afectados y Afectadas por las Operaciones Petroleras de Texaco] and/or the Company to pay

4

the reasonably anticipated costs and expenses of the Claim and, as a result, the Claimants and the Company should seek additional funding for the Claim from one or more current or additional funders ("Additional Funders"), the Company may from time to time . . . issue additional further Class A Shares to such Additional Funders."  Champion Decl., Ex. 3 § 16.  Based on this provision, for the purposes of this analysis, I assume that Elliott as a new hypothetical investor in Amazonia, would receive Class A Shares.

### Overview of Distribution Under the Intercreditor Agreement (Scenario B)

13. **Parties to the Intercreditor Agreement**:  The Intercreditor Agreement is dated October 31, 2010 and was entered into by Treca Financial Solutions; Torvia Limited ("Torvia"); Patton Boggs LLP; Donziger & Associates, PLLC; Emery, Celli, Brinckerhoff & Abady LLP; Pablo Estenio Fajardo Mendoza, Esq.; Erik T. Moe; H5; and the FDA.  Not all signatories to the Intercreditor Agreement are shareholders in Amazonia.  Likewise, not all shareholders in Amazonia are parties to the Intercreditor Agreement.  These differences result in different outcomes under the Intercreditor Agreement and the Amazonia Articles.  The persons/entities who are parties to the Intercreditor Agreement and are shareholders in Amazonia are Torvia; Donziger & Associates, PLLC; and the FDA.

14. **Relationship of the Intercreditor Agreeement to Amazonia**:  The Intercreditor Agreement preceded the formation of Amazonia.  After Amazonia was formed, its shareholders executed the Shareholders' Agreement, Champion Decl, Ex. 13, which provides that "each Party which is a party to the Intercreditor Agreement shall seek to procure that the proceeds of the Award are distributed . . . in accordance with the provisions of the Intercreditor Agreement."  *Id.* § 4(c)(i).

15. **Intercreditor Agreement "Distribution Waterfall"**

      a.  **Tranche 1: Taxes and Expenses**:  Section 3.2 of the Intercreditor Agreement sets forth the "Distribution Waterfall" for the payment of any proceeds from the Judgment to the parties to the agreement.  Champion Decl., Ex. 1 § 3.2.  Section 3.2.1 provides first for the payment of taxes on the Judgment proceeds.  Section 3.2.2 then provides for the payment of "reasonable expenses of the Nominated Lawyers, Trustee No. 1 and Trustee No. 2 in carrying out their obligations under this Agreement."

      b.  **Tranche 2: Torvia and Minority Funders**:  Section 3.2.3 next provides for payment "up to an aggregate amount equal to US$2,360,000 . . . to Torvia [Ltd.], and US$140,000 . . . to Torvia or other Minority Funders."  The Intercreditor Agreement defines "Minority Funders" to "mean[] Torvia and any other Person who or which from time to time funds Expenses or other expenses related to the Claim other than the Major Funder."  *Id.* § 1.28.

      c.  **Tranche 3: Major Funder**:  Section 3.2.4 provides that "any remaining proceeds shall be paid to the Major Funder in satisfaction of the amounts that are due pursuant to the terms of the Major Funder Funding Agreement."  The Intercreditor Agreement defines the "Major Funder" as Treca Financial Solutions ("Treca").  *Id.* at 48.

      d.  **Tranche 4: Minority Funders**:  Section 3.2.5 provides that "any remaining proceeds shall be paid to the Minority Funders in satisfaction of the amounts that are due to the Minority Funders pursuant to the terms of the Minority Funders Funding Agreements."

      e.  **Tranche 5: Active Lawyers and Advisors**:  Section 3.2.6 provides that "any remaining proceeds shall be paid to the Active Lawyers and Advisors in satisfactory of [their] unreimbursed fees and expenses (not including any contingency-based fees)."  The term "Active Lawyers" is defined to include Donziger & Associates, PLLC.  *Id.* § 1.3.  Section 3.2.7 provides that "any remaining proceeds shall be paid to the Active Lawyers and the Advisors

(pari passu, and pro rata based upon the amount to which such Active Lawyers and the Advisor is entitled) in satisfaction of the amounts that are due to the Active lawyers and the Advisors pursuant to the terms of their respective Engagement Agreements." Section 3.2.8 provides that "any remaining proceeds shall be paid to any successor(s) of an Active Lawyer and any additional lawyers and/or law firms engaged by the Claimants but who or which has not executed this Agreement."

      f. **Tranches 6: Claimants**: Section 3.2.9 provides that "the balance (if any) shall be paid to the Claimants."

16. **Intercreditor Agreement - New Funders**: Section 12 of the Intercreditor Agreement provides that "Any Person not [part of the Intercreditor Agreement] may become bound by, and entitled to enforce this Agreement by executing a written accession agreement" if such person receives "the prior written consent of each Party adversely affected by the additions of such new party to this Agreement. For the avoidance of doubt, the priority of that Person's claims will, if a Minority Funder, rank equally with the claims set forth in Clause 3.2.5 . . . ." Champion Decl., Ex. 1 § 12. Again, the Agreement defines "Minority Funders" to "mean[] Torvia and any other Person who or which from time to time funds Expenses or other expenses related to the Claim other than the Major Funder [i.e. Treca]." *Id.* § 1.28. Given these provisions, I assume for the purposes of my analysis that Elliott as a new hypothetical investor under the Intercreditor Agreement would be classified as a "Minority Funder."

### Description of Attached Analyses

17. I have prepared three analyses, Exhibits A, B, and C, in analyzing how new funding would affect the shareholders of Amazonia. Each Exhibit shows the distribution outcome under "Hypothetical Awards" of $950 million, $4.75 billion, and $9.5 billion. Under the Shareholders' Agreement, 54.5455% of each Award is distributed among the

shareholders/investors, and 45.4545% of the Award are treated as "Remediation Proceeds." Champion Decl, Ex. 13 § 2(d)(1). Each Exhibit shows the distribution that occurs in two scenarios. Scenario A shows the distribution of proceeds of the Ecuadorian judgment to Amazonia Shareholders—Torvia; Donziger & Associates, PLLC; Servicios Fromboliere Compañia Limitada; and the FDA—based on the Amazonia Articles. Scenario B shows the distribution of proceeds of the Ecuadorian judgment to investors under the Distribution Waterfall as found in the Intercreditor Agreement.

### Dilution of Proceeds as a Result of New Investments

18.   A comparison of Exhibits A and B illustrates the diluting effect that a hypothetical $25 million investment from Elliott would have on the share of proceeds for other investors, including Donziger & Associates, PLLC. Without any investment from Elliott, as shown in Exhibit A, Donziger's recovery for a Hypothetical Award of $950,000,000 would be 5.91% or $30,603,084 under the Amazonia Articles, or 5.23% or $27,100,555 under the Intercreditor Agreement. With a hypothetical $25 million investment from Elliott, as shown in Exhibit B, Donziger's recovery for a Hypothetical Award of $950,000,000 would be 5.44% or $28,181,436 under the Amazonia Articles, or 4.86% or $25,184,146 under the Intercreditor Agreement. Thus, a hypothetical investment of $25 million from Elliott would dilute the value of Donziger's share of the proceeds under the Amazonia Articles and under the Intercreditor Agreement. Exhibits A and B also show that such a hypothetical investment would also dilute the value of Donziger's share if the Award were $4,750,000,000 or $9,500,000,000.

19.   A comparison of Exhibits A and C illustrates the diluting effect that a hypothetical $100 million investment from Elliott would have on the share of proceeds for other investors, including Donziger & Associates, PLLC. Without any investment from Elliott, as shown in Exhibit A, Donziger's recovery for a Hypothetical Award of $950,000,000 would be

5.91% or $30,603,084 under the Amazonia Articles, or 5.23% or $27,100,555 under the Intercreditor Agreement.  With a hypothetical $100 million investment from Elliott, as shown in Exhibit C, Donziger's recovery for a Hypothetical Award of $950,000,000 would be 4.40% or $22,774,854 under the Amazonia Articles, or 4.01% or $20,776,525 under the Intercreditor Agreement.  Thus, a hypothetical investment of $100 million from Elliott would dilute the value of Donziger's share of the proceeds under the Amazonia Articles and under the Intercreditor Agreement.  Exhibits A and C also show that such a hypothetical investment would also dilute the value of Donziger's share if the Award were $4,750,000,000 or $9,500,000,000.

20.  Pursuant to the operation of the Amazonia Articles, Champion Decl., Ex. 3, and the Intercreditor Agreement, Champion Decl, Ex. 1, a hypothetical new investment in Amazonia would dilute the share of recovery proceeds for existing Amazonia shareholders, including Donziger & Associates, PLLC.

21.  Accordingly, based on my analysis, under either the distribution scheme in the Amazonia Articles or in the Intercreditor Agreement, a hypothetical new investment in Amazonia would dilute the value of all other Amazonia shares, including those owned by Donziger & Associates, PLLC.

### Transfers Made to Donziger's Bank Accounts After RICO Judgment

22.  I have analyzed transfers made into the bank accounts of Steven R. Donziger, Donziger & Associates PLLC, and the Donziger Family Trust, based on records produced by TD Bank pursuant to a third-party subpoena served by Chevron.  Based on my analysis, the transfers into these accounts since the Court entered the RICO Judgment on March 4, 2014 total $1,403,265.18.  This total includes transfers totaling $625,940.00 from the law firm, Lenczner Slaght Royce Smith; $342,045.16 from the firm, Forum Nobis, PLLC; $150,000 from George R.

9

Waters; and $125,000 from Streamline Family Office Inc. My analysis is attached hereto as Exhibit D.

Executed on this **24** day of July, 2018 at New York, New York.

                                                     John Slavek