I6SJCHE1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CHEVRON CORPORATION,

4                   Plaintiff,

5            v.                          11 Civ. 691 LAK JCF

6   STEVEN DONZIGER, et al.,

7                   Defendants.

8   ------------------------------x

9                                        June 28, 2018
                                         9:30 a.m.
10

11

12  Before:

13                     HON. LEWIS A. KAPLAN,

14                                       District Judge

15                          APPEARANCES

16
    GIBSON, DUNN & CRUTCHER, LLP
17       Attorneys for plaintiff
    BY:  RANDY M. MASTRO, Esq.
18       HERBERT J. STERN, Esq.
         JOEL SILVERSTEIN, Esq.
19       ANDREA NEUMAN, Esq.
         ANNE MARIE CHAMPION, Esq.
20       ALEJANDRO HERRERA, Esq.
         JEFFERSON BELL, Esq.
21

22  STEVEN ROBERT DONZIGER,
         Appearing pro se
23

24  Also Present:
         ANDREW R. ROMERO-DELMASTRO, Supv. Counsel Chevron
25

I6SJCHE1

```
 1                  (In open court)

 2                  (Case called)

 3             THE COURT:  Let's proceed.  Mr. Mastro, your first

 4   witness.

 5             MR. MASTRO:  Thank your Honor.  My co-counsel, Herb

 6   Stern, is putting on the first witness.

 7             THE COURT:  Mr. Stern.

 8             MR. STERN:  Yes.  We call Lee Grinberg, please.

 9             May it please your Honor, we have our exhibits, and I

10   have provided an extra 3 A to you because I'm going to be going

11   backed and forth and it will be easier for you if you have an

12   extra copy.

13             THE COURT:  Okay.  Thank you.

14             MR. STERN:  Mr. Donziger and I have conferred, and he

15   has no objection to the admissibility of these exhibits.

16             Am I correct?

17             MR. DONZIGER:  That's correct.

18             THE COURT:  So the exhibits are --

19             MR. STERN:  We offer them.

20             THE COURT:  GR 1 through 7, including in some cases

21   lettered subparts.  Am I right?

22             MR. STERN:  Thank you.

23             THE COURT:  They're received.

24             (Plaintiffs' Exhibits GR 1 through 7 received in

25   evidence)
```

I6SJCHE1

```
 1   LEE GRINBERG,
 2          called as a witness by the Plaintiff,
 3          having been duly sworn, testified as follows:
 4   DIRECT EXAMINATION
 5   BY MR. STERN:
 6   Q.  What is your name, sir?
 7   A.  Lee Grinberg.
 8   Q.  You're going to have to use help there.
 9              Where are you employed, Mr. Grinberg?
10   A.  Elliott Management Corporation.
11   Q.  In what capacity are you employed?
12   A.  My title is portfolio manager.
13   Q.  Before getting into that, I'd like to introduce you a
14   little better to the court.  Would you give us an idea of your
15   educational background.  Are you a college graduate?
16   A.  Yes.
17   Q.  Where did you go to school?
18   A.  College, Dartmouth College.
19   Q.  Thereafter, did you take some professional training?
20   A.  Yes.
21   Q.  Where was that?
22   A.  Morgan Stanley and a company called iExchange.
23   Q.  Let me sharpen that a little bit.  Did you go to some
24   schools after college?
25   A.  Yes, University of Pennsylvania.
```

I6SJCHE1

```
 1   Q.  At Pennsylvania, University of Pennsylvania, what degrees
 2   did you take?
 3   A.  An MBA and a JD.
 4   Q.  So you are a lawyer.  Is that correct?
 5   A.  Correct.
 6   Q.  Now, did there come a time when you went to work for
 7   Elliott Management?
 8   A.  Yes.
 9   Q.  How long ago was that?
10   A.  2007.
11   Q.  So that is about 11 years?
12   A.  Correct.
13   Q.  What do you do there?
14   A.  I am a portfolio manager.  We invest capital for our
15   limited partners and general partner.
16   Q.  Now, there did come a time, did there not, when you had a
17   meeting with Mr. Donziger and with Ms. Katie Sullivan.  Is that
18   right?
19   A.  Yes.
20   Q.  I am going to ask you some questions about the events that
21   led up to that meeting.  Do you understand?
22   A.  Yes.
23   Q.  First of all, I would like you to turn, if you will, to
24   what has been marked Exhibit 4 which is now in evidence.
25   A.  I don't have any copies of any documents.
```

I6SJCHE1

1    Q.  Forgive me.  I thought I had given --

2            THE COURT:  Maybe you handed me his copy.

3            MR. STERN:  May I approach him, your Honor?

4            THE COURT:  Yes.

5            (Pause)

6    BY MR. STERN:

7    Q.  Would you kindly turn to Exhibit 4.

8    A.  Yes.

9    Q.  All right.  Now, you are not copied on this exhibit.  Am I

10   correct?

11   A.  Correct.

12   Q.  And the date of that exhibit, would you kindly read it into

13   the record.

14           THE COURT:  Well, it is an e-mail chain.

15           THE WITNESS:  The e-mail chain is October 16th.

16   BY MR. STERN:

17   Q.  You'll note that according to Exhibit 4 in evidence, there

18   is a discussion between Mr. Donziger, on the one hand, and

19   Katie Sullivan, on the other, about attempting to get a meeting

20   with Elliott Management.  Do you see that?

21   A.  Yes.

22   Q.  Am I correct that there is a reference to a man by the name

23   of Paul Singer, do you see that, by Mr. Donziger, saying we

24   need to get to Paul Singer?

25   A.  Yes.

I6SJCHE1

1   Q.  Who heads Elliott Management?

2   A.  Yes, I see that.

3   Q.  Do you know Paul Singer?

4   A.  Yes,.

5   Q.  Does he, in fact, head of Elliott Management?

6   A.  Yes.

7   Q.  Do you see a reference in Ms. Sullivan's e-mail to Led

8   Zeppelin right on the top of the page?

9   A.  I was just looking through all of the e-mails.

10  Q.  Take your time.  I don't mean to rush you.

11  A.  In the latest e-mail, 602, there is a reference to Led

12  Zeppelin.

13  Q.  Is Paul Singer, in fact, a fan of Led Zeppelin?

14  A.  I believe so.

15  Q.  Do you know that of your own knowledge, right?

16  A.  Yeah, I believe so, yes.

17  Q.  Now, you note in there that there is a reference to the

18  suggestion that in the approach to Elliott Management, it might

19  be attractive for them to make an investment, and at the same

20  time, short the Chevron stock.  Do you see that?

21  A.  Yes.

22  Q.  We'll come back to that when we turn to November the 6th,

23  but I'd like now to direct your attention to Exhibit 6 in

24  evidence.  That is an e-mail three days later, am I correct,

25  October 19th?

I6SJCHE1

1          THE COURT:  It doesn't appear to be.

2          THE WITNESS:  Yeah, there is no --

3    BY MR. STERN:

4    Q.  Thursday, October 19th, 2017?

5          MR. STERN:  Do I have the wrong exhibit number?

6    Pardon me.  I have my reading glasses on and I didn't read

7    right.  Exhibit 5, your Honor, you're quite correct.

8          THE WITNESS:  I see that exhibit now.

9    BY MR. STERN:

10   Q.  And again, which we'll come to, there is a reference again

11   to the shorting of Chevron stock.  Do you see that?

12   A.  Yes.

13   Q.  And finally, there is a reference to the NDA.  Indeed, it

14   is in the heading, "Here's the NDA."  Am I correct?

15   A.  Yes, that is the title of the e-mail or subject of the

16   e-mail.

17   Q.  All right.  There did come a time when you were, in fact,

18   presented by Ms. Sullivan with an NDA.  Am I right?

19   A.  Yes.

20   Q.  So, now let us go back to the earlier exhibits.

21          There came a time, did there not, when a meeting was,

22   in fact, arranged between representatives of Elliott and Ms.

23   Katie Sullivan and Mr. Donziger.  Am I right?

24   A.  Yes.

25   Q.  Will you tell the court how that meeting came about.

I6SJCHE1

1  A.  Katie Sullivan reached out to Jesse Cohen at Elliott, who

2  then reached out to me.  Katie introduced the idea of a meeting

3  with her to discuss, I don't remember the exact term, but it is

4  the judgment that had been obtained in Ecuadorian courts

5  related to the Chevron dispute.

6  Q.  Did they use an intermediary to arrange for the meeting?

7  A.  She used I believe a relationship that she had with

8  Jonathan Bush, who was then CEO of Athena Health, who knew

9  Jesse.

10  Q.  Since you mentioned Mr. Jesse Cohen, would you enlighten

11  us, tell us who he is in terms of Elliott Management.

12  A.  I believe his title is senior portfolio manager.

13  Q.  Was it he who selected you to attend the meeting?

14  A.  Yes.

15  Q.  Do you know why he selected you to attend the meeting?

16  A.  I believe because I had been involved in disputes that he

17  thought -- not disputes, but investments that had some touch

18  points with what Katie was suggesting the discussion would be

19  about.

20  Q.  What sort of investments were those?

21  A.  We had an investment in Argentine bonds that involved a

22  long and complicated workout.

23  Q.  Now, did you understand even before the actual meeting what

24  the purpose of the meeting was?

25  A.  Generally speaking, yes.

I6SJCHE1

1    Q.  What was your general understanding at that time?

2    A.  It is that in some fashion the plaintiffs would be seeking

3    some assistance in collection.

4    Q.  By the "plaintiffs," I gather, you're referring to the

5    plaintiffs in the case in Ecuador, correct?

6    A.  Correct.

7    Q.  And that they had a judgment in Ecuador that they sought to

8    collect on?

9    A.  Correct.

10   Q.  Did you understand that they would be seeking financial

11   investment from your firm?

12   A.  I assumed that they would want some form of assistance and

13   that might come in the form of capital.

14   Q.  Let me assist you.

15           Did there come a time, and take a look at exhibit -- I

16   will get it right this time -- Exhibit 2 --

17   A.  Okay.

18   Q.  -- which is in evidence.  Did you receive that from Katie

19   Sullivan?

20   A.  Yes.

21   Q.  With that, was there an attachment?  Let me help you.  In

22   particular, an NDA?

23   A.  There may have been.  I don't see a reference to it in the

24   email.

25   Q.  If you turn the page, it is still part of the same exhibit.

I6SJCHE1

1   Do you have the NDA?  No?

2   A.  No.  This is an email chain from November 3rd, and I don't

3   recall there being an NDA sent to us.

4            THE COURT:  Are you looking at Exhibit 2?

5            MR. STERN:  I don't think you are.

6            THE WITNESS:  Sorry.

7            MR. STERN:  I did the same thing.

8            THE WITNESS:  I am sorry.  I apologize.  I was looking

9   at Exhibit 1.

10            MR. STERN:  I understand.  Thank you, your Honor.

11   BY MR. STERN:

12   Q.  Let's go back to the email.  Do you see --

13   A.  Yes, I see that now, yes.

14   Q.  She tells you that you're going get the NDA along with this

15   email and she wants to sign it so Mr. Donziger can speak

16   freely, right?  Those are the very words she uses, right?

17   A.  Yes.

18   Q.  There is an NDA attached, is there not?

19   A.  Correct.

20   Q.  The NDA tells you what the purpose of the meeting is,

21   correct?  Look at the whereas clause.

22   A.  Correct.

23   Q.  "Whereas, the above-named parties wish to engage in

24   discussions concerning a possible financing of a judgment

25   collection."  Am I correct?

I6SJCHE1

1    A.  Correct.

2    Q.  So did you know going into the meeting what the subject was

3    and what they were looking for from Elliott not in detail, but

4    in general, I mean?

5    A.  No.  I hadn't read the NDA before the meeting because we

6    were not going to sign an NDA so close in advance to a meeting.

7          We have internal procedures.  We have to run these

8    things by counsel, internal counsel and so forth, so it was

9    going to be a non-starter for us to be able to sign something

10   like that.  I actually hadn't read any part of this

11   nondisclosure agreement prior to the meeting later that day.

12   Q.  I think you've already testified you understood they were

13   going to be looking for a capital investment.  Is that correct?

14   A.  That was one of the possibilities, yes, that they would be

15   seeking.

16   Q.  Okay.  Now, in fact, did such a meeting take place?

17   A.  Yes.

18   Q.  When did it take place?

19   A.  On November 6th.

20   Q.  Who was present at the meeting?

21   A.  Myself, Jesse Cohen, Mr. Donziger and Katie Sullivan.

22   Q.  Do you see Mr. Donziger in the court?

23   A.  Yes.

24   Q.  There is no question about that, right?

25   A.  Correct.

I6SJCHE1

Q.  All right.  Now, during the meeting did you take notes?

A.  Yes.

Q.  If you recall, did you see Katie Sullivan taking notes?

A.  Yes.

Q.  So you took notes and Katie Sullivan took notes, and I'm
going to be asking you some questions about what occurred at
the meeting.  Your notes have been marked, if I get this right,
Exhibit 3, and Katie Sullivan's notes have been marked Exhibit
3 A.

          MR. STERN:  Your Honor, for your convenience, I have
kind of given you an extra copy of Katie Sullivan's notes so as
we go back-and-forth, you won't have to flip as we will.

          THE COURT:  Thank you.

BY MR. STERN:

Q.  Now, I see in your notes pretty close to the beginning --
first of all, you have designated it as the Donziger
conversation.  Am I correct?

A.  Correct.

Q.  That is what it was, right?

A.  (No response)

Q.  Now, there is a reference to 33 million third party funders
individuals.  Do you see that?

A.  Yes.

Q.  What is that in reference to?

A.  Capital that has been raised by third parties to facilitate

I6SJCHE1

1    enforcement of the judgment.

2    Q.   Who told you that?

3    A.   Mr. Donziger.

4    Q.   Now, you'll note further down on the page -- indeed, at the

5    very end of the page -- there is a further reference to that

6    subject.   Am I correct?

7    A.   Correct.

8    Q.   Now, the fact that there is that separation would indicate,

9    would it not, that that subject was reverted to later in the

10   conversation in the initial presentation.   Am you I right?

11   A.   Correct.

12   Q.   These are your notes, right?

13   A.   Correct.

14   Q.   Well, we'll come to that.

15           Now, during the course of the meeting, was there any

16   discussion about the fact that it might be difficult to enforce

17   or collect on the judgment because of outstanding court

18   process?

19   A.   Yes.

20   Q.   Now, to the extent it may be helpful to you, I would like

21   you to direct your attention to Exhibit 3 A in evidence, which

22   is Ms. Sullivan's notes, and to two specific entries.   On the

23   first page is a notation, "injunction in the U.S."   Do you see

24   that?

25   A.   Yes.

I6SJCHE1

Q.  And then on the second page, and I don't know how this is set up, it may be front and back, there is a notation Rule 65. Would you read that notation.

A.  "Rule 65 participating, violation in some court order."

Q.  Now, during the course of that meeting, did you come to understand that there had been some difficulty in connection with the collection of the judgment in respect to its legality in terms of United States law?

A.  Correct.

            THE COURT:  What was said on that subject?

            THE WITNESS:  Just --

            THE COURT:  And by whom?

            THE WITNESS:  -- there would be an inability to collect on any Chevron assets in the United States.

BY MR. STERN:

Q.  Now, in that regard I would like to revert back to Exhibit 3, which are your notes, and in particular, although it is cut off, but I think still legible, in the lower-left-hand corner, do you see the entry there, and I wonder if you would be good enough, since it is your handwriting, to read it into the record, although it is already in the record because it is in evidence.

A.  It says, "Can money come into U.S."

Q.  Is there a relationship between what you just testified to about the difficulty or the legality of the enforcement and

I6SJCHE1

```
 1    your entry there about the money coming into the United States?
 2    A.  I don't recall exactly what relation that had to the
 3    discussion.
 4    Q.  Let's put it this way.  You're quite familiar with the
 5    exchange of money between countries and entities in different
 6    countries.  Is that correct?
 7    A.  Not terribly familiar, but --
 8    Q.  You have enforced judgments in various places in the world,
 9    have you not?
10    A.  We tried, yes.
11    Q.  Sometimes with success, true?
12    A.  (No response)
13    Q.  In other words, do you know of any difficulty other than
14    the fact that there is a Rule 65 injunction in terms of money
15    coming into the country?
16    A.  Money can get tied up in foreign jurisdictions for all
17    kinds of reasons.  I don't know that an injunction may be one
18    reason, but there is often --
19    Q.  There is no question in your mind that the subject of the
20    injunction, Rule 65 and legal difficulties attendant thereto,
21    was part of the conversation.  Am I correct?
22    A.  There was no -- I don't recall a discussion specifically
23    about the injunction.  There was discussion about an inability
24    to use the Ecuadorian judgment to be I guess domesticated in
25    some form or some way in enforcing in the United States, but I
```

I6SJCHE1

1    don't recall the term, "injunction" coming up.

2    Q.  Well, that term is now in evidence.  Her notes are in

3    evidence.  You don't say that it didn't come up, do you?

4              MR. DONZIGER:  Objection.  Your Honor --

5              THE COURT:  Overruled.

6              MR. DONZIGER:  Can I state the basis?

7              THE COURT:  State the basis.

8              MR. DONZIGER:  I think Judge Stern is asking the

9    witness to interpret notes made by somebody else, and I think

10   it might be the better way to do it would be maybe ask directly

11   the witness what he remembers about the meeting since it is

12   complicated, looking at Katie Sullivan's notes and asking him

13   to interpret it.

14             THE COURT:  You can do it both ways.  Answer the

15   question.  Mr. Stern, maybe you should ask him what was said.

16             THE WITNESS:  Would you mind repeating.

17   BY MR. STERN:

18   Q.  I think my question was are you in a position to deny that

19   there was a discussion of an injunction?

20   A.  I don't recall the word, "injunction" coming up in the

21   context of the discussion, but it was clear that there was an

22   inability to collect against Chevron assets locally,

23   domestically in the U.S.  That was clear from the discussion.

24   Q.  All right.  Now, did there come a time during the

25   discussion that there was the subject of risk and reward came

I6SJCHE1

1    up?

2    A.  I don't remember using those terms specifically.

3            THE COURT:  Do you remember anyone else using either

4    of those terms?

5            THE WITNESS:  I don't.

6    BY MR. STERN:

7    Q.  Well, let's turn for a moment to Exhibit 3 A do you see the

8    entry GC at Chevron owns the entire strategy?  Do you see that?

9    A.  Yes.

10   Q.  Let us now for the moment turn to your notes, which are

11   Exhibit 3.  Do you see the entry which reads, as best I can

12   read it, "turnover in leadership.  John Watson start 2010."

13           Do you see that?

14   A.  Yes.

15   Q.  Do you know who John Watson is or was?

16   A.  I believe he was the CEO, senior management, CEO of --

17   Q.  Of who?

18   A.  I am sorry.  Of Chevron.

19   Q.  Yes.  Would you favor us by reading the next entry

20   underneath.

21   A.  It says, "Leaving February 1st of 2018," and then a

22   separate bullet point that says, "mismanaged this case."

23   Q.  Was that related to the entry on Ms. Sullivan's notes, "GC

24   at Chevron owns the entire strategy," and so forth.

25           Do you see that?  Do any of those entries stimulate a

I6SJCHE1

1    recollection on your part about what was being said between you

2    and Mr. Donziger and Ms. Sullivan on that subject?

3    A.   I do not recall the relationship between Watson leaving and

4    the GC at Chevron, but I just remember the general context of

5    the discussion being about there being a potential incentive of

6    some way, in some way for Chevron to get past this and to

7    settle the dispute.

8    Q.   Basically if I understand what you're saying, do you

9    understand that there was a change in management and that now

10   the general counsel owned the ability to settle the case?

11   A.   Yeah.  I don't recall it being necessarily now exclusively

12   in the hands of the general counsel, but I do remember the,

13   like I said, the context being that the CEO who had been in

14   place until -- was still in place at that point, but was

15   leaving, you know, the perception Mr. Donziger was given people

16   believed he mismanaged this case and there would be an

17   incentive for the company to settle.

18            I don't recall that the GC being the one who now owns

19   this, and if a CEO at one point owned it, I assume the next CEO

20   would quote-unquote own it as well.

21   Q.   I am confining my questions to what was said.  The topics I

22   am referring to are the topics that are in your notes and her

23   notes.  I will ask you directly.

24            Did you come to understand that there was a window of

25   opportunity arising because of the change of management which

I6SJCHE1

1   might make it easier to settle the case?

2   A.  I didn't necessarily see it as a window of opportunity.  It

3   was just expressed to me that because former management,

4   because management was turning over, that there may be an

5   incentive for the company to settle.  That was just kind of

6   expressed to me.  It wasn't my impression.  I don't know

7   little, if anything, about Chevron's leadership.

8           THE COURT:  Mr. Grinberg, maybe we can move this

9   along.  You understood going in that the purpose of the meeting

10  was because Mr. Donziger and Ms. Sullivan wanted Elliott to put

11  money into or otherwise assist them in their efforts.  Is that

12  true?

13          THE WITNESS:  Correct.

14          THE COURT:  Now, did Mr. Donziger explain to you at

15  that meeting why he thought it was to the advantage of Elliott

16  to do so?

17          THE WITNESS:  Because there would ultimately be

18  recoveries based on enforcing the Ecuadorian judgment that

19  would yield effectively profits on whatever assistance was

20  provided.

21          THE COURT:  Did he say anything to you about why he

22  thought that might be so?

23          THE WITNESS:  Well, because there is pending

24  litigation in jurisdictions outside the U.S. and there may be

25  an incentive because of this leadership change for the company

I6SJCHE1

1    to settle.

2              THE COURT:  What did he say about those litigations,

3    if anything?

4              THE WITNESS:  Just mentioned there was litigation in

5    Canada.

6              THE COURT:  Was anything said by Mr. Donziger to you

7    on what might be in this for Elliott if you invested or

8    otherwise assisted?

9              THE WITNESS:  It would be some financial return based

10   on the proceeds of whatever recoveries they could get by

11   enforcing the judgment against Chevron.

12             THE COURT:  Go ahead, Mr. Stern.

13   BY MR. STERN:

14   Q.  As a matter of fact, there was a discussion of the amount

15   of the judgment; am I correct?  Take a look at your notes,

16   Exhibit 3.

17   A.  Yes.

18   Q.  What did he tell you the amount of the judgment was?

19   A.  It was about nine and a half billion.

20   Q.  In subsequent communications, which I may come to or not

21   that is in evidence, Katie Sullivan referred, did she not, to

22   an interest factor in that, too, didn't she?

23   A.  I don't recall her referring to an interest factor, but I

24   assumed there is some.

25   Q.  Okay.  Now, in regard to the request for money from

I6SJCHE1

1   Elliott, was a presentation made to you about the present

2   ownership interest in the judgment?

3   A.  Yes.

4   Q.  So there are two entries, one on your notes and one --

5          THE COURT:  Excuse me, Mr. Stern.  What was said on

6   that subject and by whom?

7          THE WITNESS:  What was said was there was just a kind

8   of a brief summary of the amount of points, as it were, in

9   terms of who or what portion of recoveries different parties

10  would receive to the extent there was successful enforcement

11  proceedings.

12         For instance, in my notes it says Mr. Donziger

13  personally had 6.3 percent out of 100 percent and that there

14  had already been allocated 15 to 20 percent amongst 15 people.

15  BY MR. STERN:

16  Q.  Just for the record, unless you don't want me to do it, do

17  you notice on Page 2 of Ms. Sullivan's notes the same notations

18  appear.  Am I correct?

19  A.  Yes, correct.

20  Q.  All right.  Now, let me put it to you this way.

21         Did you understand that Mr. Donziger was attempting to

22  monetize the judgment by obtaining money from Elliott?

23         MR. DONZIGER:  Objection; calls for a legal

24  conclusion.

25         THE COURT:  Overruled.

I6SJCHE1

```
 1              THE WITNESS:  I didn't take it -- when you say
 2     "monetize the judgment," to me that means that he would use
 3     those proceeds and actually give them to judgment-holders, but
 4     my understanding would be that if there were any proceeds, it
 5     would be used in an enforcement, not to monetize or to pay
 6     existing plaintiffs.
 7     BY MR. STERN:
 8     Q.  Let me be very clear about the word monetize.
 9              Do you understand he was asking you to purchase part
10     of the judgment?
11     A.  Correct.
12     Q.  I am correct, am I not?
13     A.  Correct.
14     Q.  What he was going to do with the money is not what I am
15     asking you.  What I am asking you is, he is selling a part, an
16     interest in the judgment to you, correct, or trying to?
17     A.  Trying to, correct.
18     Q.  Ultimately you and the management of Elliott concluded that
19     you were not interested.  Am I right?
20     A.  Correct.
21     Q.  I am just going to let the following exhibits speak for
22     themselves because there is a little point, you advised them in
23     a final email that there was no interest in pursuing the
24     conversation.  Am I right?
25     A.  Correct.
```

1            MR. STERN:  I pass the witness, your Honor.

2            THE COURT:  All right.  Mr. Donziger.

3            MR. DONZIGER:  Your Honor, can I have five minutes to

4    gather my thoughts and figure out if I am going to cross?  I am

5    not sure I am.

6            THE COURT:  Five minutes.

7            (Recess)

8            THE COURT:  Mr. Donziger.

9            MR. DONZIGER:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. DONZIGER:

12   Q.  Good morning, Mr. Grinberg.

13           You prepared an affidavit in this case, correct?

14   A.  Correct.

15   Q.  Did you review that affidavit prior to testifying today?

16   A.  Yesterday, I believe, yes.

17   Q.  Is that affidavit, as you sit here today, accurate?

18   A.  Definitely.

19   Q.  Did you write that affidavit yourself, or did someone

20   assist you?

21   A.  I had some assistance.  I don't recall -- I did have some

22   assistance.

23   Q.  From who?

24   A.  I believe it was Judge Stern and his firm, whatever firm

25   they're affiliated with, after interviewing me.

I6SJCHE1                    Grinberg - cros

```
 1   Q.  How was it that you came in contact with Judge Stern or a
 2   representative of his firm such that you prepared an affidavit?
 3   A.  I don't recall exactly.  I believe somebody reached out to
 4   somebody at our firm, asking if there was potential -- if there
 5   had been some meeting between yourself and representatives of
 6   Elliott.
 7   Q.  Do you know who that was?
 8   A.  I don't know who reached out to the firm.  I don't recall.
 9   Q.  Now, it is not the normal practice of Elliott to provide
10   affidavits about meetings it has with potential investment
11   opportunities.  Is that correct?
12   A.  That's correct.
13   Q.  Can you explain why in this case Elliott or whoever made --
14   well, let me withdraw that question.
15           Why in this case did Elliott, as an institution,
16   decide to provide an affidavit about a meeting?
17           MR. STERN:  Objection, your Honor.
18           THE COURT:  Overruled.  If you know?
19           THE WITNESS:  The only reason I recall is that
20   otherwise we would be subpoenaed, so offering a declaration was
21   basically the alternative.
22   BY MR. DONZIGER:
23   Q.  Was that communicated to you by someone within Elliott or
24   someone outside of Elliott?
25   A.  I don't recall.
```

I6SJCHE1                         Grinberg - cros

1   Q.   Do you know how Judge Stern or someone in his law firm came

2   to contact Elliott about getting an affidavit?

3   A.   I do not.

4   Q.   When you prepared the affidavit, was there first a draft or

5   multiple drafts prior to finalizing the affidavit?

6   A.   There were drafts, but my recollection is maybe one or two

7   at best, not many.

8   Q.   Who prepared the drafts?  Do you remember at least one

9   draft, correct?

10  A.   Correct.

11  Q.   Who prepared that draft?

12  A.   It was Judge Stern's firm or -- that was my understanding.

13  Whoever had interviewed me based on that interview prepared

14  that for my review.

15  Q.   Whoever that person is, they sent it to you for your

16  review?

17  A.   Correct.

18  Q.   In that first draft, was it completely accurate or did you

19  suggest changes?

20  A.   I don't recall.  My recollection is that it was generally

21  accurate.  There may have needed to be a couple of things

22  changed, but that is my recollection.

23              (Continued on next page)

24

25

I6SACHE2ps                    Grinberg - Cross

1    Q.  Now, just turning to the substance of the meeting that

2    Katie Sullivan and myself had with you and Jesse Cohen, you

3    don't have any recollection of me offering to sell my

4    particular interests as an investment opportunity for Elliott,

5    do you?

6    A.  No, you did not.

7    Q.  Did you have any contact with any lawyers from the Gibson

8    Dunn firm in the preparation of your affidavit?

9    A.  No.

10   Q.  Do you remember the exact or approximate date that Judge

11   Stern's law firm or the representative from the law firm

12   contacted you about the possibility of signing an affidavit?

13   A.  It was probably a couple of weeks before the affidavit was

14   finalized, about that time frame.

15   Q.  So you sent an e-mail to Katie Sullivan, I believe, on

16   January 19th indicating that Elliott would not be interested in

17   the Ecuador case as an investment, correct?

18   A.  Correct.

19   Q.  Were you contacted by Judge Stern's representative prior to

20   sending that e-mail or after, to the best of your recollection?

21   A.  It was after.

22   Q.  And you mentioned that you had been interviewed by someone

23   from Judge Stern's firm.  Was it Judge Stern himself or

24   somebody else?

25   A.  I believe it was Judge Stern, one of his colleagues.

I6SACHE2ps                    Grinberg - Cross

1  Q.  Where did that interview take place?

2  A.  At Elliott Management.

3  Q.  Do you remember the date of that interview?

4  A.  I don't.  It was probably within a couple of weeks of the

5  completion of the declaration.

6  Q.  As a general matter, Elliott -- it's not unusual for

7  Elliott to be interested in third-party litigation financing

8  opportunities, correct?

9  A.  It wouldn't be, no.  It would be something we would look

10  into as a potential investment.

11  Q.  And you, Elliott, has had successful workouts, for lack of

12  a better term, of prior third-party litigation finance

13  investments it's engaged in, correct?

14  A.  I'm just thinking third-party finance litigation --

15  Q.  Let me rephrase.  It might be easier.

16       Elliott has had successful results in litigation

17  investments Elliott itself has made in the past, correct?

18  A.  Yes.  Well, investments we have had have sometimes involved

19  litigation, in terms of enforcing whatever our claims are, so,

20  yes, in that context, correct.

21  Q.  And the idea of a third party financing a litigation as an

22  investment is, at least within Elliott Capital, considered a

23  legitimate investment, correct?

24  A.  Correct.

25  Q.  And the reason -- well, the reason that Elliott took the

I6SACHE2ps                    Grinberg

1    meeting, if you know, with Katie Sullivan and myself was to at

2    least consider whatever pitch we were to make about the third

3    party -- excuse me -- about a litigation investment opportunity

4    in the Ecuador case, correct?

5    A.  Yes.  I would say that, in many respects, it was a favor

6    for the person who had contacted us through Kate, but to some

7    extent it was to hear the story, you know, without much

8    additional context.

9              THE COURT:  We're wandering off the subject of this

10   hearing, Mr. Donziger.  Let's get back to it.

11             MR. DONZIGER:  I will let the witness go.  I have no

12   further questions.

13             THE COURT:  All right.  I have one or two,

14   Mr. Grinberg.

15             Was there any discussion in the meeting, at all, by

16   anyone, about how an investment by Elliott, if it elected to

17   make one, would have been structured?

18             THE WITNESS:  No, only to the extent that, you know,

19   there could be a percentage involved.  But no structuring

20   beyond that.

21             THE COURT:  A percentage of what exactly?

22             THE WITNESS:  Of whatever -- a percentage of the

23   proceeds that would be generated by a successful enforcement

24   against Chevron.

25             THE COURT:  Or settlement.

I6SACHE2ps                    Grinberg

1           THE WITNESS:  Or settlement, correct.

2           THE COURT:  A percentage of what proceeds

3      specifically?  If that came up.  The gross?  The net?

4      Somewhere in between?

5           THE WITNESS:  Nothing.  There was no discussion beyond

6      the idea that -- just the concept there that there was capacity

7      under, you know, the distribution that may be available to

8      Elliott.  That's it.

9           THE COURT:  At that meeting, were any documents shown

10     to you by Mr. Donziger or Ms. Sullivan?

11          THE WITNESS:  No.  There was -- well, there was a

12     booklet, a marketing document, it seemed, about the case itself

13     that featured, you know, local Ecuadorians who had been dealing

14     with the fallout of whatever environmental problems had

15     surfaced.

16          THE COURT:  Was it given to you?

17          THE WITNESS:  Yes.

18          THE COURT:  Do you have it?

19          THE WITNESS:  I do not.  I believe we handed it over

20     to Judge Stern.

21          THE COURT:  Other than the e-mails that we've seen

22     here this morning, were there any other writings that came to

23     you from Mr. Donziger or Ms. Sullivan or any associates?

24          THE WITNESS:  No.

25          THE COURT:  Do counsel on either side wish to ask any

I6SACHE2ps                    Grinberg - Redirect

1    questions in light of my examination?

2              Judge Stern?

3              JUDGE STERN:  Just one.

4    REDIRECT EXAMINATION

5    BY JUDGE STERN:

6    Q.  In the subsequent e-mail, which is in evidence,

7    Mr. Donziger offered to send you a brochure which he -- and I'm

8    just paraphrasing -- characterized as a pamphlet or brochure

9    that he had prepared for investors.  Do you recall that?

10   A.  I don't recall.  I'd have to look back at the exhibits

11   if --

12             JUDGE STERN:  Yes.  It's in evidence.

13             THE COURT:  Judge Stern, if it's in the exhibit, it's

14   in the exhibit.

15             JUDGE STERN:  I agree, your Honor.  I just thought you

16   were interested, so I --

17   Q.  And in fact you declined to receive it because you said you

18   were not interested; am I correct?  Do you remember that?

19             I think the Judge would like us to move on.

20             JUDGE STERN:  I'll withdraw the question.  It's in

21   evidence.  You're right, your Honor.  Thank you.

22             THE COURT:  Thank you.

23             Mr. Donziger, anything further?

24             MR. DONZIGER:  No.  I'm done.

25             THE COURT:  All right.  Mr. Grinberg, you're excused.

I6SACHE2ps                        Donziger - Direct

1            (Witness excused)

2            THE COURT:  Next witness.

3            MR. MASTRO:  Your Honor, plaintiff calls Mr. Donziger.

4    STEVEN DONZIGER,

5         the defendant herein,

6         having been duly sworn, testified as follows:

7            THE COURT:  Mr. Donziger, since you're representing

8    yourself, let's set this ground rule.  If you have an objection

9    to a question, you will say the word "objection" and nothing

10   more.  If I see any need to have an elaboration, I'll ask you

11   for it.  OK?

12           THE WITNESS:  OK.

13           THE COURT:  Sir?

14           THE WITNESS:  Yes.

15           THE COURT:  All right.  Go ahead, Mr. Mastro.

16           MR. MASTRO:  Thank you, your Honor.

17           Before we start, I just wanted to hand up to the

18   witness and to the Court a binder of the exhibits we may offer

19   during the examination, as well as a copy of Mr. Donziger's

20   deposition of this past Monday and a copy of the transcript of

21   the contempt hearing on May 8, 2018.  I'm also going to leave

22   in front of Mr. Donziger the Grinberg exhibits.

23           THE WITNESS:  Your Honor, I'm sorry to interrupt.  I

24   have kind of a logistical question, could I ask you.

25           THE COURT:  Go ahead.

I6SACHE2ps                    Donziger - Direct

```
 1              THE WITNESS:  So after Mr. Mastro finishes with his
 2     examination, and I want to -- I get to do what would be --
 3              THE COURT:  Redirect.
 4              THE WITNESS:   -- a redirect, what is the way I would
 5     do that?
 6              THE COURT:  Q and A?
 7              THE WITNESS:  Like I would ask the Q --
 8              THE COURT:  You would ask the Q.  That gives him an
 9     opportunity to object if he is so minded.  If there's no
10     objection or I overrule it, he'll answer your question.
11              THE WITNESS:  One other quick question.  Do you mind
12     if I keep a legal pad here with notes, because I need to -- as
13     like the lawyer with a witness.
14              THE COURT:  Sure.
15              THE WITNESS:  I'm just going to go get it.
16              THE COURT:  OK.
17              OK, Mr. Mastro, you may proceed.
18              MR. MASTRO:  Thank you, your Honor.
19     DIRECT EXAMINATION
20     BY MR. MASTRO:
21     Q.  Mr. Donziger, you just heard Mr. Greenberg's testimony --
22              THE COURT:  Isn't the gentleman's name Grinberg, or
23     did I get it wrong?
24              MR. MASTRO:  "Grin."  Thank you.
25     Q.  Mr. Donziger, you just heard Mr. Grinberg's testimony of
```

I6SACHE2ps                    Donziger - Direct

1    what he recalls and understood happened at the November 6, 2017

2    meeting that you and Ms. Sullivan had with him and one of his

3    colleagues.

4    A.  Yes.

5    Q.  So is there anything about Mr. Grinberg's testimony about

6    what he recalled and understood happened at that meeting with

7    which you disagree?  Yes or no.

8    A.  Yes.

9    Q.  Sir, was Mr. Grinberg's testimony accurate as to what he

10   said you described as the opportunity for Elliott at that

11   meeting?

12   A.  I -- my testimony is that what he put in his affidavit and

13   what he testified today with regard to those events was

14   accurate, although not complete.

15   Q.  Now, Mr. Donziger, I'd like to ask you a few follow-up

16   questions.  Am I correct that since March 2014, you have raised

17   money to support the enforcement efforts of the Ecuadorian

18   judgment by selling interests in the judgment?

19   A.  I have helped my clients in Ecuador sell interests in the

20   judgment to raise funds to pay litigation expenses since that

21   day, yes.

22   Q.  Thank you, sir.  Am I also correct that, out of the funds

23   you have raised by selling interests in the judgment, you have

24   paid yourself since March 2014, correct?

25   A.  That is correct.

I6SACHE2ps                    Donziger - Direct

1    Q.  Am I correct, sir, that you have sold interests in the

2    judgment, since March 2014, to multiple investors?

3              MR. DONZIGER:  Objection.

4    Q.  Yes or no.

5              THE COURT:  Yes or no.

6    A.  Well, there's a presumption in the question that's not

7    accurate.  Can I explain?

8    Q.  No.  I'll rephrase the question, sir.

9              In selling interests in the judgment, am I correct

10   that you have sold interests in the judgment to multiple

11   investors since March 2014?

12   A.  First of all, I am not selling interests in the judgment.

13   I am arranging for my clients to sell their interests in the

14   judgment.  But the rest of your question, have there been

15   multiple investors, the answer is yes.

16   Q.  So the record is clear, you have sold on behalf of your

17   clients interests in the Ecuadorian judgment to multiple

18   investors since March 2014, correct?

19             MR. DONZIGER:  Objection.

20             THE COURT:  I think that's been asked and answered.

21   Q.  How many investors have you arranged to sell an interest in

22   the judgment on behalf of your client or clients since March

23   2014?

24   A.  To the best of my recollection, approximately six.

25   Q.  Am I correct, sir, that you have raised millions of dollars

I6SACHE2ps                    Donziger - Direct

1    in support of efforts to enforce the Ecuadorian judgment

2    through this sales process since March 2014?

3            THE COURT:  This is repetitious and it's beyond the

4    scope of this hearing, which has to do with the Elliott

5    solicitation.

6            MR. MASTRO:  I understand, your Honor.

7    Q.  Am I correct that you told Mr. Grinberg at the Elliott

8    meeting that you had raised, over the course of the Ecuadorian

9    litigation, $33 million?

10   A.  I told Mr. Grinberg that the client base in Ecuador had

11   raised that amount of money over the entire course of the

12   litigation since 1993.  I later testified in my deposition that

13   I think that was inaccurate.

14   Q.  You thought that was too high?

15   A.  I think it's too high, but I, as I sit here today, there's

16   obviously been millions of dollars raised.  I don't know the

17   exact number.  It also depends on how you count it and you

18   count Joe Cohen's contribution and that kind of thing.  But

19   there had been, you know, there's been, you know, what some

20   would consider to be, you know, significant resources raised to

21   sustain a litigation over the course of the almost 25 years of

22   its existence.

23   Q.  Sir, at the meeting you had with Mr. Grinberg and his

24   colleague at Elliott, on November the 6th, 2017, did you

25   discuss with him how you structured deals with investors?

I6SACHE2ps                    Donziger - Direct

1    A.  I did in a very general sense.

2    Q.  Did you tell him that in exchange for litigation funding,

3    that Elliott could obtain an interest in whatever judgment

4    proceeds were ultimately generated through enforcement or

5    settlement?

6    A.  Yes.

7    Q.  Did you discuss with Mr. Grinberg and his colleague at that

8    meeting any particular percentage interests that they could

9    acquire?

10   A.  I don't believe I did.

11   Q.  Did you discuss with Mr. Grinberg and his colleague at this

12   meeting the identities of any other investors in the judgment?

13   A.  I don't remember one way or another.

14   Q.  You consider Mr. Grinberg to be a sophisticated party,

15   correct?

16   A.  I'm sorry, excuse me, what?

17   Q.  Sophisticated person.  Correct?

18   A.  As regards what?

19   Q.  As regards investments like this.

20   A.  Yes.

21   Q.  And you recall him asking you about the investment

22   structure, correct?

23            THE COURT:  Would you stay closer to the microphone,

24   Mr. Mastro.

25            MR. MASTRO:  Certainly, your Honor.

I6SACHE2ps                    Donziger - Direct

1    A.  The meeting was many months ago, so I have a vague

2    recollection only, but I do remember talking in very general

3    terms about how the Ecuadorian client base structures its

4    investment contracts with those who fund.

5    Q.  Can you -- strike that.

6             Mr. Donziger, when you say that you discussed in

7    general terms the structure of an investment, tell us in

8    general terms what it was that you said.

9    A.  When I say "in general terms," it's simply if an entity

10   puts in X amount of money, we would negotiate some percentage

11   of the interest in any collection that they would get if there

12   were to be a collection.  So -- I don't know if that answers

13   your question.

14   Q.  Yes, it does.  So let me ask you a couple of follow-up

15   questions in that regard.  Am I correct that you told

16   Mr. Grinberg and his colleague that you had already arranged

17   sales of -- strike that.

18             Am I correct that you told Mr. Grinberg and his

19   colleague at that November 6, 2017 meeting that you had a 6.3

20   percent interest in the judgment?

21   A.  That came up.  I don't remember how.  But I told him what

22   my percentage interest was, subject, obviously, to the RICO

23   judgment, such as I can't collect.  But that's the percentage I

24   have, or had, I guess.

25   Q.  And you don't recall whether you volunteered that

I6SACHE2ps                    Donziger - Direct

1    information or whether he asked you.  Is that your testimony?

2    A.  I don't remember.

3    Q.  Am I correct that you told him that, at this meeting --

4    strike that.

5          Am I correct that you told Mr. Grinberg at this

6    meeting that 15 to 20 percent of the interest in the judgment

7    had already been given to investors or other professionals in

8    connection with the judgment proceeds?

9    A.  So my answer to that question is, I don't have a specific

10   recollection of saying that in the meeting, but having seen the

11   notes presented to me and understanding how I usually talk

12   about this to potential funders, I -- that would be something

13   consistent with what I would tell a potential funder.

14   Q.  And did you tell Mr. Grinberg and his colleague that there

15   were 15 such -- strike that.

16         Did you tell Mr. Grinberg and his colleague at this

17   meeting on November 6, 2017 that there were approximately 15

18   such investors or professionals who had interest in the

19   judgment allocated to them?

20   A.  I believe I did, although I don't have any specific

21   recollection.  That's roughly the case.

22   Q.  Did you tell him the identities of any of those 15, besides

23   yourself?

24   A.  I, I, I don't remember.  I don't believe I did, but I might

25   have.  I don't remember.

I6SACHE2ps                    Donziger - Direct

1   Q.  Did you tell him that Mr. Rizack received interest in the

2   Ecuadorian judgment from you after the RICO judgment in March

3   2014?

4            MR. DONZIGER:  Objection.

5            THE COURT:  Ground?

6            MR. DONZIGER:  It assumes a fact not in existence.

7            I can -- I could answer the question.  I think I know

8   what he's trying to ask.  I can answer it.

9            THE COURT:  Go ahead.

10           MR. DONZIGER:  OK.

11  A.  So the answer to your question about Mr. Rizack is, he

12  received an interest in the judgment not from me but from the

13  Ecuadorian client.  That is the FDA people who signed these

14  investment contracts.  And that happened after the RICO

15  judgment.

16  Q.  And so was it you who arranged, on behalf of the client, to

17  give Mr. Rizack an interest in the judgment after the RICO

18  judgment in March 2017?

19  A.  Well, I --

20  Q.  March 2014.

21  A.  I generally help the clients hook up with service providers

22  they need or I believe they did.  No agreement is signed

23  without their signature and their approval.  But I did

24  facilitate that.

25  Q.  And, sir, Mr. Rizack is not an accountant, correct?

I6SACHE2ps                     Donziger - Direct

1   A.   That's correct.

2   Q.   So he isn't actually able to do an accounting of the

3   finances relating to the Ecuadorian --

4   A.   That's not what he was brought in to do.

5   Q.   Am I correct that he does personal work for you, including

6   paying your bills?

7   A.   Can you -- no, not at the moment.

8   Q.   Am I correct that during the period 2014, 2015, 2016,

9   Mr. Rizack was paying your bills, keeping track of your bills

10  and then writing the checks to pay them?

11            MR. DONZIGER:   Objection, your Honor.

12            I could talk about it, but I think it is a bit far

13  afield from --

14            THE COURT:   Well, it is far afield.  And I think we

15  had testimony about this at trial in 2014.

16            MR. MASTRO:   I understand, your Honor.  I'm just

17  pointing out that Mr. Rizack got an interest in the judgment

18  after the RICO judgment was entered, and at the time was doing

19  only personal work for Mr. Donziger.

20            MR. DONZIGER:   That's -- whoa.  That's --

21            MR. MASTRO:   I'll go on.

22            MR. DONZIGER:   That's not true.

23  BY MR. MASTRO:

24  Q.   Now, let me ask you about the Elliott meeting and some

25  aspects of how that came about.  Am I correct that it was

I6SACHE2ps                    Donziger - Direct

1    Ms. Sullivan who introduced you -- strike that.

2              Am I correct that it was Ms. Sullivan who arranged for

3    you to meet with Elliott?

4    A.  Yes.

5    Q.  But you had already made a contact with Elliott years

6    earlier, correct?

7    A.  I believe -- well, I believe some were working with me and

8    made a contact with Elliott years earlier, although I had

9    forgotten about that until the question was brought up in my

10   deposition this week.

11   Q.  When the subject first came up of you meeting with Elliott,

12   was it Ms. Sullivan who suggested that Elliott might be a good

13   party to pursue for an investment in the Ecuadorian litigation?

14   A.  Yes.

15   Q.  And am I correct that it was Ms. Sullivan who wrote to you

16   on October 16, 2017 that you want someone like Elliott,

17   "someone courageous, who will understand what and why and know

18   this investment is a hatch"?

19             THE COURT:  Mr. Mastro, I've read like seven exhibits

20   and I've read every one of them.  So I don't know what purpose

21   is served by this.

22   Q.  Am I correct that Ms. Sullivan said to you at the time,

23   October 16 of 2017, that Elliott could short Chevron stock in

24   making this investment?

25   A.  She did say that in an e-mail to me.

I6SACHE2ps                    Donziger - Direct

1   Q.  And that Elliott could invest a ton of money in the case,

2   correct?

3   A.  I don't -- if you want to refer me to an exhibit that

4   you're citing from, please do and I'll answer your question.

5   Q.  Did you have in mind, in approaching Elliott, a particular

6   level of investment that you would seek?

7   A.  Not a particular number, no.

8   Q.  Mr. Donziger, I'd like to refer you to what in the binder

9   is PX 9004 but in the Grinberg exhibits already in evidence is

10  an exhibit Grinberg 4.  Do you see that, sir?

11  A.  Yes.

12  Q.  When Ms. Sullivan suggested Elliott as a potential

13  investor, you responded to her, "Great," in this October 16,

14  2017 e-mail exchange, correct?

15          MR. DONZIGER:  Objection.  These are all the e-mails.

16          THE COURT:  Yes, I gather it is.

17          MR. MASTRO:  I'm sorry?

18          THE COURT:  I gather it's all in the e-mails that you

19  put into evidence.

20          MR. MASTRO:  It is.  I was going to ask him a question

21  about it, your Honor.

22          THE COURT:  All right.  So let's ask the question.

23  BY MR. MASTRO:

24  Q.  Please tell the Court what you meant when you responded to

25  Ms. Sullivan by "Great," in terms of approaching Elliott?

I6SACHE2ps                    Donziger - Direct

1    A.  Just that it would be opportunity to meet with a fund that

2    had capital and apparently had, you know, experience in dealing

3    with litigation financing.

4    Q.  Did you have any discussions with Ms. Sullivan about

5    raising with Elliott that they could short the Chevron stock

6    and win both ways?

7    A.  No.

8    Q.  Referring you to Exhibit No. 5 --

9            THE WITNESS:  Hold on one second.  Could I just

10   elaborate on my prior answer?

11           THE COURT:  That's for redirect.

12           THE WITNESS:  OK.

13   BY MR. MASTRO:

14   Q.  Referring you to Grinberg Exhibit No. 5, Mr. Donziger, an

15   e-mail dated October 19, 2017 from Katie Sullivan to you, sir,

16   do you know whether Katie Sullivan made contact with Paul

17   Singer?

18   A.  What I know based on what I remember Katie telling me is

19   that she reached out to Paul Singer directly, I think through

20   maybe the assistant or secretary.  I don't remember her telling

21   me she had any contact directly with Paul.

22   Q.  Am I correct, Mr. Donziger, that the meeting you eventually

23   had on November 6, 2017 was with Jesse Cohen and Mr. Grinberg?

24   Correct?

25   A.  That's correct.  Mr. Cohen was in the meeting for a

I6SACHE2ps                        Donziger - Direct

1  relatively brief period of time, and Mr. Grinberg -- am I

2  getting the name correct?  I still --

3  Q.  Yes.

4  A.  Grinberg, was in the meeting for the entire time.

5  Q.  And the meeting lasted 60 to 90 minutes, correct?

6  A.  That's my recollection.

7  Q.  From your side, Ms. Sullivan and you, who did most of the

8  talking during the meeting?

9  A.  I did.

10 Q.  And you were concerned at the meeting that Elliott might be

11 put off by the RICO judgment, correct?

12         MR. DONZIGER:  Objection, form.

13         MR. MASTRO:  I'll rephrase it.

14 Q.  Let's go to Exhibit No. 3 under Grinberg, the first

15 document being Mr. Grinberg's handwritten notes.  Now, you took

16 notes during this meeting as well, correct?

17 A.  I'm not, I'm not sure as I sit here today.  I mean, I, I, I

18 generally take -- I have -- keep like a pad out.  When I'm

19 talking a lot, I generally don't really take very many notes.

20 I might have jotted down something or I might not have.  I

21 don't remember.

22 Q.  But you didn't produce any notes in response to Chevron's

23 subpoena, correct?

24 A.  I don't believe I have any notes.

25 Q.  You couldn't find them.

I6SACHE2ps                    Donziger - Direct

A.  If I didn't produce any, I don't believe I have any.

Q.  Referring to Mr. Grinberg's notes of the November 6, 2017
meeting, do you see there where Mr. Grinberg writes, "Can money
come into U.S.?"  Do you see that?  Towards the bottom of the
page to the left?

A.  Yes.

Q.  Did you discuss that topic with Mr. Grinberg during the
November 6, 2017 meeting?

A.  So to the best of my recollection I think, I think Lee
raised the question of how the RICO judgment would impact any
collection, or I should say any return on investment, from any
investment.  And I think we had a very brief discussion about
that.

          THE COURT:  What was said on that subject?

          THE WITNESS:  You know, I don't remember it exactly,
because -- but I will say this as a general matter.  Others
have asked me the same question.  And I usually say I'm not
really sure, because I've never seen this kind of situation.

          And the question being, what would a U.S.-based
investor -- what would happen with a U.S.-based investor upon a
collection in a foreign jurisdiction.  That's your question.
And I don't know the answer to that.

BY MR. MASTRO:

Q.  Donziger, turning to 3A, these are Ms. Sullivan's notes of
the November 6, 2017 meeting.  Let me just back up for one

1    second.  And Mr. Grinberg's note, Exhibit 3, is there anything

2    in Mr. Grinberg's notes that does not accurately reflect what

3    was discussed at the meeting with Mr. Grinberg and his

4    colleague on November 6, 2017?

5              MR. DONZIGER:  Objection.  The notes are very --

6    they're not my notes, first of all.  I've already testified

7    that I think the $33 million figure is inaccurate.  A lot of

8    it --

9              THE COURT:  You think it's inaccurate in the sense

10   that you never uttered those words, "$33 million"?

11             THE WITNESS:  No, I didn't.

12             THE COURT:  Or is it now, on reflection, you don't

13   think what you said was accurate?

14             THE WITNESS:  The latter.  The latter.  I, I don't

15   think it's accurate.  But, again, as I testified earlier, it

16   depends how you account for certain confusions.  So I could

17   elaborate on that, but that's, that's, you know, it's unclear

18   to me whether it's entirely accurate.

19   BY MR. MASTRO:

20   Q.  Mr. Donziger --

21             MR. DONZIGER:  I'm --

22   Q.  You did, you already testified that --

23             MR. DONZIGER:  Hold on.

24   Q.  -- you told Mr. Grinberg at this meeting --

25             MR. DONZIGER:  Objection, your Honor.

I6SACHE2ps                    Donziger - Direct

1   Q.   -- that you had raised $33 million.  You did say that to

2   him at this meeting of November 6, 2017, correct?

3   A.   I already testified to that, yes.

4   Q.   Is there anything on this page of notes, by Mr. Grinberg,

5   of what was said at the November 6, 2017 meeting that, as you

6   sit here today, you think is inaccurate?

7            MR. DONZIGER:   I'm going to object.  First of all --

8            THE COURT:   Answer the question.

9            MR. DONZIGER:   I'm going to look at this quite

10  carefully.

11           THE COURT:   Well then, do it.

12  Q.   Let me just clarify it for you.  I'm going to clarify the

13  question.

14           THE COURT:   Look, do you want an answer or not?

15           MR. MASTRO:   Yes, I do, your Honor.

16           THE COURT:   Well then, let's have the answer.

17           MR. MASTRO:   Certainly, your Honor.

18  A.   I think -- I can't testify that notes that someone else

19  wrote are entirely accurate without understanding what they

20  mean.  These are snippets of this and that.  I don't see

21  anything on this page, other than the 33 million, that would be

22  patently inaccurate.  But on the other hand, I can't say what

23  some of this stuff even means, to be able to answer the

24  question.  So that's my answer.

25           THE COURT:   Next question.

I6SACHE2ps                          Donziger - Direct

```
 1   Q.  Is there anything in these notes that you know wasn't said
 2   during the meeting on November 6, 2017?
 3   A.  Well --
 4           THE COURT:  I think the answer to that question is
 5   inherent in the last answer.
 6           MR. MASTRO:  Fine, your Honor.
 7           THE COURT:  Would you please move on.
 8           MR. MASTRO:  Certainly, your Honor.
 9   Q.  Let's go to 3A, please, Mr. Donziger.  These are Katie
10   Sullivan's notes of the November 6, 2017 meeting.  Is there
11   anything in Katie Sullivan's notes of the November 6, 2017
12   meeting that you believe doesn't accurately reflect what was
13   discussed at the meeting?
14   A.  Well, I don't know what most of this stuff means or what
15   she was thinking when she wrote some of this stuff.  I mean,
16   there's nothing that jumps out at me, looking at it all, that
17   appears inaccurate, with the caveat again that I don't know
18   what a lot of it means.  I mean, if you want to take me through
19   each one and tell me what you think it means, I can tell you if
20   I think it's accurate or not.  But other than that, that's my
21   testimony.
22   Q.  Mr. Donziger, referring you to the reference to 400 million
23   frozen assets in Argentina in the middle of the first page, do
24   you see that?
25   A.  Yes.
```

I6SACHE2ps                    Donziger – Direct

Q.   Is that something you recall having been said at your

meeting with Elliott on November 6, 2017?

A.   I do have a recollection of that, yes.

Q.   And what was said in that regard and by whom?

A.   To my best recollection, I believe I told him that at some

point in Argentina, that counsel, Argentinian counsel for the

Ecuadorians had succeeded in getting a court order forcing

Chevron or its Argentinian subsidiary to put a certain portion

of its revenues in escrow or an account under the court's

auspices pending resolution of the enforcement action in that

country.

Q.   Did you say anything else on that subject?

A.   I believe I did.

Q.   What else did you say?

A.   I believe I said that that money was no longer frozen or

under court order, and I believe I described what had happened

down there in terms of the meeting of Chevron's CEO with the

Argentinian president after the lifting of that freeze order.

Q.   So do you see there, farther down the page, where it says

"1782 limitation"?

A.   Yes.

Q.   Was there any discussion at your meeting with Elliott about

"1782 limitation"?

A.   I don't recall.

Q.   So you don't know what that refers to, "1782 limitation"?

I6SACHE2ps                     Donziger - Direct

1   A.  No.

2   Q.  Let's turn the page, please.  Do you see there where,

3   towards the bottom of the second page, Ms. Sullivan's notes of

4   the November 6, 2017 meeting say, "Rule 65, participating

5   violation and some court order"?

6   A.  Yes.

7   Q.  Do you recall that subject being discussed at the -- on

8   November 6, 2017 meeting with Elliott?

9   A.  No.

10  Q.  So you don't know as you sit here today what Ms. Sullivan

11  was referring to when she wrote that down?

12  A.  No.

13  Q.  Mr. Donziger, am I correct that when you refer to your

14  clients in your testimony, what you really mean is one client,

15  the ADF, or the Frente.  Correct?

16          Yes or no, sir.

17  A.  I can't answer that yes or no.  I'll answer it this way.

18  My client is the FDA, and the FDA is the beneficiary of the

19  judgment and has a fiduciary duty, as I understand it, to

20  execute the judgment and collect funds owed to the affected

21  peoples by Chevron around the world.  So my client is the

22  entity that's the beneficiary of the judgment and executes it

23  and representation of all those affected.

24  Q.  Did you explain that to Elliott at the meeting you had with

25  Elliott on November 6, 2017?

I6SACHE2ps                      Donziger - Direct

A.   I don't recall specifically.  Generally when I speak to

potential funders, we explain that that is part of its

structure, who would be the counterparties on any investment

appeal.

Q.   Generally you would have told a potential investor that the

counterparty would be the ADF or the Frente.

A.   Generally, yes.

Q.   Am I correct that you sent Elliott a nondisclosure

agreement just before the meeting that documented that the

nondisclosure agreement would be with the ADF/Frente?

A.   I don't recall.  I believe Ms. Sullivan sent that, but I

don't recall what the --

Q.   And she received that NDA from you?

A.   Don't recall how that NDA was put together.  We have NDAs

we use, and I, I don't remember putting it together.  It's

possible another lawyer on our team did.  I don't remember.

Q.   Ms. Sullivan is not a lawyer, correct?

A.   That's correct.

Q.   And am I correct that she was retained by you mostly to

help fund-raise?

A.   Fundraising was an important part of her responsibilities.

She was also helping or intended to help us get a little better

organized in terms of expenditures, budgets, that sort of

thing.

Q.   Did Ms. Sullivan arrange multiple meetings for you besides

I6SACHE2ps                    Donziger - Direct

1    the Elliott meeting with potential fund sources?

2    A.  Well, I don't know what you mean by "multiple."  I remember

3    one other meeting.  There might have been others.

4    Q.  Ms. Sullivan was retained in approximately November of last

5    year, correct?

6    A.  My recollection is it was more like October, but in the

7    fall of last year, yes.

8    Q.  What were the terms of her retention?

9    A.  I don't recall exactly.  Katie is a person who wanted to

10   get involved to help.  She didn't seem particularly interested

11   in financial compensation.  I asked her if we could do some

12   sort of contract for her services, and I believe we agreed on

13   some sort of contract, but I don't believe she ever signed it,

14   or maybe it was not executed.  I don't remember.  I know we had

15   some document, but I believe it was never signed.

16   Q.  And you have not produced that document in response to

17   Chevron's subpoena, correct?

18   A.  I don't believe I have.  I don't know if I actually have

19   it.  I haven't seen it, looking through my files.

20   Q.  When did Ms. Sullivan -- strike that.

21         Am I correct that Ms. Sullivan ceased to work with you

22   in or about March of 2018?

23   A.  Yes.  Subsequent to the issuance of the subpoena, Chevron's

24   subpoena to her, she ceased working with us.

25   Q.  Am I correct, sir, that -- strike that.

I6SACHE2ps                    Donziger - Direct

1              What compensation did she receive for the work that

2      she did between October 2017 and March 2018?

3      A.  I don't know.

4      Q.  Did she receive compensation, sir?

5      A.  I am not sure.  I, I, I have a recollection that she might

6      have received some what I would consider to be pretty minimal

7      compensation, but I'm not a hundred percent sure.  I'd have to

8      look in the budget that she kept.

9      Q.  Sir, are you the one who would have approved of her

10     compensation?

11     A.  Either me or the client representatives in Ecuador or me

12     under their authority.  I don't recall how it was approved or

13     what it was exactly.

14     Q.  Did Ms. Sullivan receive any interest in the Ecuadorian

15     judgment?

16     A.  I think we had discussion about arranging something along

17     those lines, but I don't believe it ever happened prior to her

18     deciding to leave the, the litigation.

19              THE COURT:  Are we going to get back to what happened

20     at Elliott Management?

21              MR. MASTRO:  Yes, your Honor.  I was just trying to

22     set the stage for her work.

23     BY MR. MASTRO:

24     Q.  Now, Mr. Donziger, at your meeting with Elliott, did you

25     discuss with Elliott the fact that you do not represent any of

I6SACHE2ps                    Donziger - Direct

1  the individual Lago Agrio plaintiffs any longer?

2  A.  I don't recall.  And also I don't accept that as a fact.  I

3  don't --

4          MR. DONZIGER:  Objection.  That's a whole 'nother

5  area.

6  Q.  Sir, in your meeting with Elliott, you were not purporting

7  to represent any of the individual Lago Agrio plaintiffs.

8  A.  Not in their individual capacity, but I represent, by

9  virtue of my representation of the FDA, represent everybody

10  affected.  The FDA represents everybody with interests in the

11  collection of judgment.

12  Q.  And you do not represent UDAP any longer, correct?

13  A.  Correct.

14  Q.  So is it fair to say that you have acted on behalf of the

15  Frente in selling interests in the judgment?

16          MR. DONZIGER:  Objection.  I can answer it, but --

17  Q.  Let me rephrase, because I want to make sure we understand

18  this.

19          You have not represented, to any investors, that you

20  represent any client other than the Frente, correct?

21  A.  Well --

22  Q.  Let me give you a time frame for it, OK.  Since the RICO

23  judgment --

24  A.  Yes.

25  Q.  -- in March 2014, you have not represented, to any

I6SACHE2ps                    Donziger - Direct

1    subsequent investors, that you represent any party other than

2    the Frente, correct?

3    A.  My view is, my client is the Frente, as I've testified.

4    And the Frente, by virtue of its unique role in the Ecuadorian

5    judgment, as the sole and exclusive beneficiary of any

6    collection action, acts in the interests of everybody affected,

7    including the individually named plaintiffs.  But that's

8    correct; I do not actually have contracts with the individually

9    named plaintiffs.  But all of them are represented through the

10   role of the Frente in the Ecuadorian judgment as a beneficiary

11   of the judgment.

12   Q.  Did you explain that to Elliott at the meeting you had with

13   Elliott on November 6, 2017?

14   A.  I don't recall that I explained that specifically.

15   Q.  Now, you made an offer to Mr. Grinberg after the meeting to

16   send him an additional packet of materials.  Correct?

17   A.  Yes.

18   Q.  And you said it's a packet of materials that you typically

19   give potential investors, correct?

20   A.  Yes.

21   Q.  Am I correct that you did not produce that packet of

22   materials in response to Chevron's subpoena?  The materials you

23   would typically give an investor.

24   A.  Well, I testified about this in my deposition, and what --

25   the answer to that question is, we give materials to investors

1    when they ask, and we generally tailor them to the needs of the

2    investors.  So, you know, if an investor is sophisticated and

3    wants to just know this, this certain thing, we give them that.

4    If an investor doesn't know much about the situation and just

5    wants to learn about it, we give him a lot of other types of

6    material.

7            So when I said we have a packet we typically give,

8    there are certain materials like press reports, court judgments

9    that we usually send to everybody who we're just getting going.

10   And I wasn't sure what Mr. Grinberg would want if anything.

11   And the fact he didn't want anything suggested to me Elliott

12   wasn't that interested, and I didn't really think much more of

13   it and never sent him anything.

14   Q.  You didn't produce, in response to Chevron's subpoena, any

15   of the documents you would typically give to investors,

16   correct?

17   A.  No.  The reason for that --

18   Q.  I didn't ask you the reason, sir.  I just asked you whether

19   you --

20   A.  -- is because of --

21   Q.  And the answer is Correct?

22   A.  The pending motion has now since been resolved.  So I

23   didn't revisit that issue and continue production in light of

24   the state of play with your Honor's decision, which I just got

25   late yesterday afternoon while preparing for this and being in

I6SACHE2ps                    Donziger - Direct

1    another deposition.

2    Q.  Am I correct, Mr. Donziger, that, in response to Chevron's

3    subpoenas, to date, these are subpoenas covering both your

4    assets and judgment --

5              THE COURT:  Look, Mr. Mastro, stick to the subject of

6    this hearing.

7              MR. MASTRO:  OK.  Certainly, your Honor.  Certainly.

8              THE COURT:  We're not starting a seven-week trial

9    today.

10             MR. MASTRO:  OK.  Certainly, your Honor.  I just, I

11   wanted the Court to be aware of the limitation --

12             THE COURT:  You've made me aware.  The fusillade of

13   letters is beyond my secretary's ability to keep up with.

14             MR. MASTRO:  Thank you, your Honor.

15             THE COURT:  From both sides.

16   Q.  Mr. Donziger, did you consider the opportunity to pitch

17   Elliott to be a significant meeting?

18   A.  I would say I considered it to be a meeting that we were

19   happy to get that had potential significance if it were to gain

20   traction, but I didn't go in with very high expectations.

21             (Continued on next page)

22

23

24

25

I6SJCHE3                    Donziger - direct

```
 1   Q.  Mr. Donziger, just to be clear, the client you were
 2   representing at the Elliott meeting was the FDA, correct?
 3   A.  That's correct, subject to my prior testimony about the
 4   Frente role, yes.
 5   Q.  Again going back to the Elliott meeting, did you have any
 6   discussion with Mr. Grinberg and Mr. Cohen at the November 6,
 7   2017 meeting about how difficult it would be to enforce the
 8   Ecuadorian judgment in light of the RICO judgment?
 9             THE WITNESS:  Objection.
10             THE COURT:  Overruled.
11   BY MR. MASTRO:
12   Q.  Yes or no?
13   A.  I generally, because I don't remember specifically
14   everything we talked about at the 90 minute meeting, when I
15   talked to potential funders, I always mentioned RICO.  I
16   explained Judge Kaplan's decision, I explained the view of the
17   Ecuadorians of that decision.  Respectfully to your Honor, they
18   disagree, as do I, with a lot of the bases of that decision.
19             I count on potential funders to do their own
20   independent due diligence about that decision and all the other
21   court decisions in this case both in the United States, Canada,
22   Ecuador and the international arbitration.
23             Almost all potential funders, if they express
24   seriousness, do that due diligence and they also consult with
25   independent counsel when doing so.
```

1   Q.  Mr. Donziger, did you discuss with Elliott at the November

2   6, 2017 meeting whether the injunction, at Paragraph 5 under

3   the court's judgment, would be any impediment to collection

4   efforts?

5   A.  I don't recall specifically.

6           Again when I speak to investors, I am working and have

7   been working I believe in good faith off of the April 25th

8   order of Judge Kaplan that I believe allows us, plain and

9   express language that allows the clients in Ecuador to sell

10  interest in the judgment to pay litigation expenses.

11          So to me at that time, it was not a controversial

12  issue.  So it is possible I didn't bring it up.  It was

13  something that I and others who had read the April 25th order

14  felt was permissible and proper.

15  Q.  So you don't recall any discussion at that meeting about

16  the ramifications of Paragraph 5 of the RICO judgment?

17  A.  No.

18  Q.  Sir, immediately after the Elliott meeting on November 6th,

19  2017, did you discuss Ms. Sullivan how the meeting had gone?

20  A.  I don't remember.  I mean I could speculate.

21  Q.  I don't want you to speculate, sir.

22  A.  Well, I don't remember what we talked about after the

23  meeting.  You mean right after we walked out of the meeting?

24          THE COURT:  Look, Mr. Mastro, I would really

25  appreciate it if you would stick to the limited purpose for

1    which I called this hearing.

2              MR. MASTRO:  I understand, your Honor.  I am about to

3    come to why I asked that question.

4    BY MR. MASTRO:

5    Q.  Mr. Donziger, am I correct that shortly after the Elliott

6    meeting ended, Ms. Sullivan sent an email to many parties,

7    including yourself, about how the meeting had gone?

8    A.  I don't recall.  If you want to show me an email?

9    Q.  Am I correct that in response to her email message, you

10   responded that everyone should hold it strictly confidential

11   and that it would be counterproductive in terms of our

12   objectives if the meeting leaked?

13             THE WITNESS:  I'm going to object.  I would like to

14   look at what Mr. Mastro is referring to.  I know there is

15   email.  I think it was before the meeting, not after.  That's

16   the problem I have.

17             THE COURT:  Well, Mr. Mastro, if it was before the

18   meeting, maybe you ought to rephrase your question; and if it

19   wasn't, maybe you need to show it to him.

20   BY MR. MASTRO:

21   Q.  Let me clarify.

22             When you were scheduled to have a meeting with

23   Elliott, did Ms. Sullivan send out an email notice to many

24   parties, including yourself, that a meeting with Elliott had

25   been scheduled?

1    A.   That's my recollection, yes.

2    Q.   Am I correct you responded to her email on November 6,

3    2017, telling everyone on that email that the information was,

4    "strictly confidential and that it would be counterproductive

5    in terms of our objectives" if the information were to leak?

6    A.   I don't know what I said.  I remember saying something

7    along those lines.  If you're trying to say I said what is on

8    an email, show me an email and I will tell you if I sent the

9    email.

10   Q.   I am just asking if you recall it, Mr. Donziger?

11   A.   I remember generally wanting to keep our contacts with

12   Elliott confidential so they wouldn't get into your camp and

13   representation of your clients so you could cause mischief, as

14   had been done in the past.  That was my view, yes.

15   Q.   Am I correct that you recommended everyone on the email

16   chain that they delete all emails relating to this subject?

17   A.   Actually, that email came from another individual on the

18   email chain, and I endorsed it, but I also agree with the

19   subsequent email with Aaron Paige, which explains it was not to

20   impede discovery or hide anything untoward, it was to protect

21   confidentiality such that Chevron wouldn't be able to harass

22   Elliott Capital, as it had done with other funders.

23   Q.   Can we go to Exhibit 6 in the binder, DX-9006, the large

24   binder.

25   A.   This binder?

1    Q.  Yes.

2              THE COURT:  Tab 6?

3              MR. MASTRO:  Yes, your Honor.

4              (Pause)

5    BY MR. MASTRO:

6    Q.  Did you have chance to review it, Mr. Donziger?

7    A.  Yes, I am familiar with the email chain.

8    Q.  Am I correct this is an email, dated November 6, 2017, in

9    which you, Ms. Sullivan and others participated and that you

10   received these emails and sent these emails?

11   A.  I received this email chain, yes, and I sent the email that

12   I sent, but not the other emails, obviously.

13   Q.  But you received the other emails, correct?

14   A.  Yes.

15             MR. MASTRO:  I ask it be received in evidence.

16             THE COURT:  Received.

17             (Defendant's Exhibit 9006 received in evidence)

18   BY MR. MASTRO:

19   Q.  Mr. Donziger, let's go to the first email in the chain,

20   MKS-93.  Ms. Sullivan has sent this email to several people.

21             Are any of the people that she sent this email to

22   other investors in the Ecuadorian judgment?

23             THE WITNESS:  Objection.

24             THE COURT:  Sustained.

25   BY MR. MASTRO:

I6SJCHE3                    Donziger - direct

1   Q.  Mr. Donziger, now Ms. Sullivan writes to you and others

2   that she has been helping you strategize how to connect

3   financial capital with the case.  Do you see that, sir?

4   A.  Yes.

5   Q.  Did you understand her to mean by that she was helping you

6   to identify potential investors from whom you could arrange on

7   behalf of your client Frente --

8            THE WITNESS:  This is long, Mr. Mastro.

9            MR. MASTRO:  I will withdraw that question.

10  BY MR. MASTRO:

11  Q.  Do you see there at the end of her email she talks about

12  supercharging their efforts, meaning your efforts and your

13  team?

14  A.  Yes.

15  Q.  Did you have an understanding what she meant by that?

16  A.  I assume she meant we would be more effective in the

17  endeavor.

18  Q.  If you raised money?

19  A.  Well, the endeavor raising money would be more effective.

20           THE COURT:  Mr. Mastro, do you have any more questions

21  about what happened at the meeting?

22           MR. MASTRO:  Your Honor, I just wanted to --

23           THE COURT:  I know what you want to do.  I know a lot

24  of the things you want to do.  Do you have any more questions

25  that relate to what happened at the meeting or in association

I6SJCHE3                         Donziger - direct

 1   with the meeting that is relevant to the purpose of this

 2   hearing?

 3            MR. MASTRO:  Well, your Honor, I would respectfully

 4   submit that an email chain in which Mr. Donziger is

 5   recommending and seconding that any emails on this subject

 6   should be destroyed --

 7            THE COURT:  But it is in evidence and I read it.

 8            MR. MASTRO:  That is fine, your Honor.  I have it.

 9   May I talk to my client for a second, your Honor?

10            THE COURT:  Sure.

11            (Off-the-record discussion)

12   BY MR. MASTRO:

13   Q.  Mr. Donziger, in terms of the Elliott meeting and meetings

14   like Elliott, am I correct that you do not get paid anything

15   for such a meeting other than your monthly retainer and

16   whatever contingency interest you have in the judgment?

17   A.   If I understand the question as I think you intend to ask

18   it, I don't get paid separate to do fund raising.  I get paid a

19   monthly retainer to do a whole host of things for my client,

20   that being one of them.

21            MR. MASTRO:  I don't have any further questions.

22            THE COURT:  Mr. Donziger, any redirect?

23            MR. DONZIGER:  I have a limited number of questions.

24            THE COURT:  Go right ahead.  I know it is awkward.

25            You know we have pro se litigation here and it very

1    rarely involves money.  It involves who disrespected somebody

2    at Green Haven State Prison or something like that, and the

3    prisoners cope with it, and I am sure you're up to it, though I

4    understand it is awkward.

5    CROSS-EXAMINATION

6    BY MR. DONZIGER:

7    Q.  Can you describe your recollection of any documents given

8    to Mr. Grinberg at the Elliott meeting?

9               THE COURT:  Okay.

10   A.  When I heard Mr. Grinberg testify this morning about what

11   he described as a marketing document, it refreshed my

12   recollection, and I believe that document is actually a

13   photobook put together by a photojournalist named Lou Demitas,

14   and that describes or has photos of some of the human impacts

15   of the oil pollution in Ecuador as well as testimonies, and it

16   was not, to the best of my recollection, a marketing document

17   for funders, although it is often given to funders so they can

18   understand the human nature or human dimension of the problem.

19   Q.  The second question, did you ever discuss with Ms. Sullivan

20   in the context of the Elliott meeting that Elliott could

21   potentially make money on both ends by shorting Chevron stock

22   if they were to invest in the case?

23              THE COURT:  There is no objection.

24   A.  Okay.  I don't recall whether I discussed that with her.

25   That was something that she originally brought up as something

I6SJCHE3

1    that might be enticing or appealing to Elliott.  This is not

2    something that I brought up or endorsed.  It is possible she

3    raised with me in a conversation, I don't have any specific

4    recollection.

5    Q.  I have two more questions.

6            What is the legal basis for fund raising to pay

7    litigation expenses in light of the RICO judgment?

8            THE COURT:  Sustained.  If we are going to have a

9    legal argument, we are not going to have it from the witness

10   stand unless it is relevant for some other reason.

11           MR. DONZIGER:  That is all my questions.

12           THE COURT:  Okay.  In light of those questions,

13   anything else, Mr. Mastro?

14           MR. MASTRO:  No, your Honor.

15           THE COURT:  You're excused.  Thank you, Mr. Donziger.

16           (Witness excused)

17           THE COURT:  I think that probably concludes the

18   hearing, does it not?

19           MR. MASTRO:  It does, your Honor.

20           I would appreciate a brief opportunity to explain some

21   of the other areas we are still seeking discovery on and why we

22   think they're irrelevant.  I didn't attempt to question him

23   because your Honor limited the scope of the hearing, and I

24   understand that and I focused on the Elliott meeting.

25           Your Honor, had I had the chance to examine Mr.

I6SJCHE3

Donziger more broadly, I think I would have been able to

establish through the documents that we have already obtained

mostly from Ms. Sullivan, not produced by Mr. Donziger, because

he has produced virtually nothing, that what basically Mr.

Donziger has been doing is selling interests in the judgment

and then being able to pay himself his monthly retainers, his

expenses and everything.

          THE COURT:  Right, and he said that on the witness

stand.

          MR. MASTRO:  I understand.  We would have shown the

hundreds of thousands of dollars just from the documents we

were able to get for a short period of time he has put in his

own pocket, and we also would have, your Honor, further

established that he only represents one entity at this point

and the very questionable grounds on which he should have the

ability to do any such fund raising.

          That can wait for another day.

          THE COURT:  What does the one have to do with the

other?  Just enlighten me.

          MR. MASTRO:  Your Honor, to us, the whole thing is a

big scam and part of his ongoing fraud.

          He is somebody who is selling interest in the

judgment, he is violating the court's order and he is lining

his own pockets.  He has to raise the money to be able to line

his own pockets and he has made himself quite a bit since doing

I6SJCHE3

1    that.  We would like the court to understand the full extent of

2    the scam and how many people have been scammed and have all of

3    that.

4            THE COURT:  I am sorry.  By category, who has been

5    scammed?

6            MR. MASTRO:  Anyone who has invested since March 2014.

7            THE COURT:  You think that might be a different --

8            MR. MASTRO:  Since you have a right, since we believe

9    that every time he has been soliciting and every time he has

10   been successful in his solicitation, that has, of an investment

11   in the judgment in exchange for an interest in the judgment,

12   that that has violated the Paragraph 5 of the judgment.

13           THE COURT:  I understand that's your position, I do.

14   I know what his position is.

15           MR. MASTRO:  I simply wanted to also point out, your

16   Honor, and again it was beyond the scope, but Mr. Donziger has

17   even taken the brazen position, and I would have cross-examined

18   him on this even after the Frente, even if an argument could be

19   made about their status, even now that the Frente has had a

20   default judgment against him, he has every right to go out and

21   sell interests in the judgment anyway even though he is the

22   agent of the Frente and clearly covered by the injunction in

23   that regard.  He has brazenly taken the position and said at

24   the deposition he absolutely has the right to do that.

25           THE COURT:  That issue is not before me.

I6SJCHE3

1      MR. MASTRO:  I understand.  I am pointing out he will

2  continue to be in contempt even with the default judgment

3  against the Frente.

4      THE COURT:  Look, you have a right to do what you

5  think is appropriate to enforce what you see as your client's

6  rights, but I am not sitting as a roving committee here.  If

7  you tee something up, I will deal with it.  If you don't, that

8  is another matter.

9      MR. MASTRO:  I understand, your Honor.

10      THE COURT:  Okay.  Is there anything else from you,

11  Mr. Donziger, within the bounds I put on Mr. Mastro?

12      MR. DONZIGER:  I have obviously submitted papers and

13  made my positions on this issue clear.  Do you feel like you

14  need anything else in light of what Mr. Mastro just said, which

15  I obviously disagree with pretty much all that he just said?

16      Can I argue or do you feel like it would not be

17  helpful to you?

18      THE COURT:  I think it is probably not helpful at this

19  point -- that was a comma, not a period.  I understand that may

20  be hard to tell sometimes.  I understand what you think, Mr.

21  Donziger, of the April 25th document said.  I wrote it.  I can

22  read it.  I think we may well have or there may well be a

23  disagreement about what its significance is.  I am sure there

24  is.  Certainly I know Mr. Mastro has a different view whatever

25  it says and whatever it was could be construed as.  I

I6SJCHE3

1   understand that.

2          Neither side has attempted to address whether any of

3   this is impacted by the terms of Mr. Donziger's retention

4   agreement, by the inter-creditor agreement, by investment

5   agreements that were in place at relevant times.  The bottom

6   line, maybe you haven't addressed it because you thought about

7   it and you don't think it has any impact, but I just wondered

8   about that now.

9          If anybody thinks any further submissions about that

10  might be useful, you are to write me a letter within 10 days as

11  to what and why, and the letter is no more than two pages, and

12  it is double-spaced, and then I will see whether I think any

13  further submission will be useful, okay?

14          MR. MASTRO:  Yes, your Honor, we will definitely do

15  that.  I just wanted to point out that Mr. Donziger did testify

16  that he has a new retention agreement as of 2016-17 with the

17  Frente, and he has not produced that to us.  We are prepared to

18  do this analysis, but it would be even more constructive if he

19  actually produced his --

20          THE COURT:  Why shouldn't that be produced?

21          MR. DONZIGER:  It is, and I have it right here.  I

22  will produce it right now.  I am not going to argue against Mr.

23  Mastro.  As a lawyer and officer of the court, I will direct

24  this to you directly.  This is a contempt hearing.  I don't

25  want to be in contempt of the court.  I am not at this point

I6SJCHE3

```
 1   arranging any more financing, and I can't until I get clarity,

 2   some sort of clarification from your Honor what is, in your

 3   view, permissible or not permissible.  I want to be clear about

 4   that because --

 5           THE COURT:  Look, I appreciate that, but you seriously

 6   need to consider whether, even if you are right as to what

 7   happened in days of yore, whatever that argument has any

 8   traction at all from the minute the judgment was entered

 9   against all your clients, including the Frente, which I won't

10   prejudge it, but it certainly is a different set of facts.  I

11   am not going to give you a declaratory judgment.

12           MR. DONZIGER:  On that point, you're referring to the

13   default judgment?

14           THE COURT:  Yes, sure.

15           MR. DONZIGER:  Just to be clear, I testified in my

16   deposition that I thought that it did not change the landscape

17   in terms of fund raising.  I, upon further reflection, realized

18   that that is a mistake and not my position.  I didn't quite

19   understand the situation when I said that.  To the extent you

20   read my deposition or they raise it, I want to be clear about

21   that.

22           THE COURT:  I am nodding not to evidence agreement,

23   but to acknowledge the fact you have said something.

24           MR. DONZIGER:  Thank you.

25           THE COURT:  I think everybody will have to think about
```

I6SJCHE3

1     that down the road, okay?

2              Anything else?  Okay.  Thank you.

3              (Court adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   Cross By Mr. Donziger . . . . . . . . . . . .23

 4   Redirect By Judge Stern . . . . . . . . . . .30

 5   STEVEN DONZIGER

 6   Direct By Mr. Mastro . . . . . . . . . . . . .32

 7   Cross By Mr. Donziger . . . . . . . . . . . .65

 8                    PLAINTIFF EXHIBITS

 9   Exhibit No.                           Received

10    GR 1 through 7   . . . . . . . . . . . . . . 2

11                    DEFENDANT EXHIBITS

12   Exhibit No.                           Received

13    9006   . . . . . . . . . . . . . . . . . .62

14

15

16

17

18

19

20

21

22

23

24

25
```