UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

                Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

                Defendants.

11 Civ. 0691 (LAK)

**OPPOSITION TO CHEVRON'S SUPPLEMENTAL BRIEF (DKT. 2057)
AND DECLARATION OF STEVEN DONZIGER IN SUPPORT**

    A month ago, the Ecuadorian Constitutional Court issued a unanimous 8-0 decision fully and finally affirming the validity of the environmental judgment against Chevron, rejecting all of Chevron's fraud arguments and utterly dismissing the impact of this Court's own 8-year vendetta to convince the world that the historic *Aguinda* judgment was "procured by fraud."[1]

    Chevron, despite its habit of apprising the Court of every micro-development in its attack campaign on the undersigned, has yet to even notify the Court of this development, much less provide a copy of the decision. It continues to coo while this Court continues to strut in the echo-chamber of New York, safe in the indulgent assumption that the global destiny of an Ecuadorian court decision now unanimously affirmed by four layers Ecuadorian courts will be determined by

---

[1] The Constitutional Court has extremely broad jurisdiction, empowering it to grant relief for any violation of the robust list of substantive and procedural rights in Ecuador's 2008 Constitution, including any such violation facilitated by any court, at any level, anywhere in the country. Notably, this decision was issued well into the term of office of President Lenin Moreno, who has adopted a cooperative stance with the United States generally, leaving no room for the Court's always dubious argument that no court decision in Ecuador could be trusted because of the influence of prior President Rafael Correa.

the will of an American judge relying on obviously false testimony in a strategic collateral attack to insulate an American company that Your Honor identified in the opening days of this case as being "of considerable importance to our economy." These are fine new clothes, but the pretense will not last. There is no statute of limitations on the *Aguinda* (or "Lago Agrio") judgment. The contamination Chevron left in Ecuador is, tragically, not going anywhere. The communities that have fought for 25 years for justice in this case are prepared to fight for generations to come.

That leaves us mired in the endless rounds of personal attack on the undersigned that Chevron and this Court still seem to think will keep the company safe from justice in Ecuador while generating yet more fees for the Gibson Dunn law firm and the cottage industry of investigations firms, law firms, and even Special Masters that has grown around the case and profited from it. Apparently in recognition of the infirmity of the theory behind Chevron's last attempt to tar me with "contempt," the Court openly invited Chevron to take another shot, and we now have the results in Dkt. 2057.

What a joke. Hundreds of pages of briefing, exhibits, and an expert report all serve to establish the "key" fact that if my efforts to raise funds for my clients had been successful, the extent of my own contingent recovery in the case would be somewhat *diminished*. This somehow incriminates me? The Kafkaesque layer on top is that if the expert had concluded that my recovery would be enhanced, *that* of course would have been the basis to incriminate me. Heads Chevron wins, tails I lose. To quote the Court, "I got it from the beginning."

The Court will do with this latest attack what it will do. I have long since abandoned the pretense that either the truth or the extent of my effort has any ability to shape what goes on in this "Dickensian farce," as my wise former counsel John Keker so percipiently identified it as over five years ago.

I hereby offer the following basic observations and responses, under penalty of perjury, on the utter falsity and disingenuousness of Chevron's latest attack:

- The retainer agreement signed in November 2017 had nothing to do with the Elliott meeting. As other materials Chevron relies on demonstrate, while the Elliott meeting was bright in the imagination of Ms. Sullivan, a newcomer to the case, I and others recognized it as an early stage meeting that could go either way and, in any event, only the first step in a much longer process of building the kind of deeper relationship that is necessary for a funder to make a commitment to a case that is the subject of relentless attacks from a well-heeled defendant with the active assistance from a federal judge. The significance of Chevron's claim that there was a link between the retainer and the meeting is unclear. But in any event it is false.
- The 6.3% contingency interest reflected in the Nov. 2017 retainer agreement is not a "new" interest "separate and apart from the earlier interest [6.3% interest] granted to [my] law firm." Dkt. 2057 at 2. When do I get to laugh out loud at all this? My relationship with my clients goes back 25 years. Perhaps it sounds self-aggrandizing, but the truth is that my clients appreciate me, have affection for me, and fully support me. They are desperate to see me earn a recovery from my tireless efforts on their behalf. I have little cause for concern about my clients not paying me in the event of a recovery, and I am personally far more concerned about recovering monies for remediation purposes than I am about my contingency fee (although I think compensating financial and in-kind investors is a critical part of the model of human rights litigation I have sought to advance through this case). The various complex financial agreements appended to Chevron's motion were drafted over the years by

3

various corporate investors who did not have strong relationships with the clients and naturally had some anxiety about getting paid. My own retainer is more a common-sense recital of existing agreements and understandings, to ensure everyone is "on the same page."

- The Nov. 2017 retainer does not "circumvent the constructive trust." It does reflect the fact that the precise operation and effect of that trust is still uncertain. This is because the constructive trust applies only to property "that is traceable to the Lago Agrio Judgment." Dkt. 1875. When I objected based on the potential expansiveness of the "traceable" concept mere days after the issuance of the RICO Judgment, this Court assured that the Ecuadorian team could continue to raise funds, and pay my fees out of such funds, "as long as no *collections* are made in respect of the Lago Agrio Judgment." Dkt. 1901 at 7-8 (emphasis added). I perceived (and still perceive) no lack of clarity in the Court's clarification in Dkt. 1901. Absent traceability to a collection, my property, including my interest in the Lago Agrio judgment, is presently unencumbered. Of course, the reality is more complicated because my interest *will be* encumbered the moment any recovery is achieved. Thus its legal and substantive status is unclear to say the least. The Nov. 2017 does not pretend to know the future.[2] It recites and reaffirms

---

[2] As I observed in Dkt. 2051: "[T]here is very likely a long road ahead for this case. Even the Second Circuit implicitly acknowledged this when it endorsed judgment enforcement actions in other jurisdictions as part of its affirmance of Your Honor's RICO decision. Among many other scenarios, this Court's judgment could be set aside by a foreign tribunal or by the Court itself in light of new evidence that may further come to light in proceedings where the Ecuadorians and their counsel finally are allowed to fully explore the corruption at the heart of Chevron's various fraud claims (cf. Alberto Guerra). It is also at least conceivable that Chevron might finally see the limitations of its strategy of spending huge sums on Mr. Mastro and other U.S. lawyers to attack me rather than directing those funds to a clean-up of the open ponds of oil waste in Ecuador's rainforest, the existence of which not even Chevron disputes. As part of a potential settlement, Chevron might well need to agree to relinquish its claim to my interest under the Court's judgment, or join a motion to set aside the terms of the RICO judgment entirely (perhaps by acknowledging some of the falsehoods and distortions it presented to the

4

*my clients'* long-standing obligation to pay me a contingency fee for my work on the case. It does not in any way speak to what I would be required to do with the proceeds on that interest if and when I receive them in light of the Court's constructive trust. That will be determined in the future, depending on the facts in place at the time of an actual recovery or collection on the judgment. I have repeatedly assured the Court that I will respect the terms of the Court's judgment, including the constructive trust, just as I have endeavored to respect the Court's judgment as I understand it (and as the Court clarified it) in the last four years.

- The various complex financial agreements that Chevron appends to its motion (the "Intercreditor Agreement"; the various ARL documents) were drafted by investors who have long since relinquished and abandoned their interest in the case, including in some cases by betraying their fiduciary and ethical duties to the Ecuadorian clients and thereby further undermining any possibility that they might retain any interest in any recovery. As I have repeatedly explained, all of those agreements are obsolete, defunct, and void for multiple reasons. I have not seriously considered them for years. Today their only useful existence is for Chevron to manipulate them to continue its attacks on me. They should be disregarded.

- For the record, the pretense that the ARL documents authorize a recovery to investors of 54.5455% of the entirety of a recovery is <u>blatantly false</u>. As I have already explained, and as Chevron and the Court have studiously ignored, the foundational Articles of Association of ARL establish that "the Company has ***no right, title or interest*** in or to

---

Court to secure that judgment). In any of these scenarios, regardless of how remote they might seem to Your Honor, it would be important for the obligations of my clients to me to be reaffirmed."

5

any Remediation Proceeds," and defines Remediation Proceeds as "***All*** proceeds of the Award attributable to amounts paid or collected pursuant to, or in respect of amounts described in, Section Thirteen of the [*Aguinda*] Judgment," *i.e.* the amounts ordered for remediation and collective compensation. Dkt. 2058-3 at 11 (emphasis added). Of course, at the time of the ARL documents, the *Aguinda* Judgment also consisted of a punitive damages component set at 100% of damages, or another $9.5 billion. That money, too, would be used for remediation of Chevron's massive contamination and its sprawling effects, but it could also be used to pay investors. The portion of the Shareholder Agreement from which Chevron draws the 54% figure is drawn from a section that appears to seek agreement on what portion of that excess amount should also be considered Remediation Proceeds. It applies to "each sum or amount paid to, received by or held on behalf of the Company"—amounts which would ***not*** include proceeds attributable to Section Thirteen of the *Aguinda* Judgment, per the clear limitations of the Articles.[3] While undersigned was not involved in drafting or debating the minutiae of the various ARL documents and does not have an understanding of language based in any personal recollection, undersigned knows that the clients have set a very clear limit of the extent of any whole recovery that can be used to pay

---

[3] The decision reflected in the ARL documents to preclude the entirely of the Section Thirteen amounts from use to pay investors is not, as I understand it, a requirement of Ecuadorian law. It was an equitable decision reflective of the investors' view of the importance of fully remediating the environment, albeit a decision made in light of the availability of the sizeable punitive damages award. Just as U.S. law (and contractual liberty generally) allows, without a second thought, for the payment of contingency fees and contractual interests out of a damages award, the same appears to be the case for a recovery under the *Aguinda* judgment. Despite Chevron's desperate efforts to sow conflict, all parties on the Ecuador side of this dispute (lawyers, investors, affected community members and their representatives, miscellaneous allies) believe genuinely in the importance of ***both*** dedicating a maximum amount of funds to a remediation and victim compensation and paying legitimate investors and contingency fee workers for their services, as a matter of ethics and to incentive such work and investment in future human rights vindication efforts.

- investors and contingency fee workers, and it is far below 54%—well below even the standard contingency-fee recovery of 40% common in the United States. Undersigned would never have knowingly subscribed to any agreement that violated the limit set by the clients.

- Chevron claims that I am "profiting" from the Aguinda judgment in violation of the Court's RICO Judgment by taking payment for my own full-time efforts on the Ecuador case. Chevron does not even bother trying to reconcile this claim with the Court's unquestionable clear statement in Dkt. 1901: "as long as no ***collections*** are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, ***the NY Judgment would not prevent Donziger from being paid, just as he has been paid*** at least $958,000 and likely considerably more over the past nine or ten years." Dkt. 1901 at 7-8 (emphasis added).[4] Despite the Court's acknowledgement of this language,[5] the Court disingenuously continues to refuse to hold itself or Chevron to it, despite my repeated pleas for a solid ruling on the subject. *See, e.g.*, Dkts. 1986, 2018, 2026, 2032. The Court's inexcusable refusal to rule is now itself on appeal to the

---

[4] Chevron cannot and does not claim that the *amounts* I have been paid reflect any "profiting" from the Aguinda Judgment beyond the retainer fees expressly approved by the Court. As I have explained and Chevron knows, I have a benchmark agreement for $25,000 per month for my full-time efforts—an amount that works out to just over $100 per hour in light of the 60-hour weeks I routinely work, or $156 per hour for a 40-hour work week. Of course, this is not the reality of work on a human rights case that has suffered the attacks we have endured in the last eight years, or indeed since its inception. Money is usually tight, or unavailable. I must pay a wide range of case expenses out of my own pocket on a daily basis. While Chevron's attacks themselves have contributed to a situation where it has been impossible to find and properly fund a financial management service to improve the organization and management of case funds, finances have been properly managed within the means we have and are supported by the fact that I and others work well below our market rate and are guided by an ethic of contribution to the underlying cause rather than financial self-interest.

[5] *See* Tr. 6/28/2018 ("THE COURT: I understand what you think, Mr. Donziger, of the April 25th document said. I wrote it. I can read it. I think we may well have or there may well be a disagreement about what its significance is. I am sure there is. Certainly I know Mr. Mastro has a different view whatever it says and whatever it was could be construed as. I understand that.").

Second Circuit.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that all the foregoing statements of fact are true and correct to the best of my present recollection and understanding.

DATED:      August 14, 2018          Respectfully submitted,

*s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*