**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

September 14, 2018

**VIA ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:   *Chevron Corp. v. Donziger, et al.*, Case No. 11 Civ. 0691 (LAK)

Dear Judge Kaplan,

I write to notify the Court that on August 30, 2018, the international arbitral tribunal hearing claims brought by Chevron Corporation ("Chevron") and its indirect subsidiary Texaco Petroleum Company ("TexPet") against the Republic of Ecuador pursuant to the U.S.-Ecuador Bilateral Investment Treaty ("BIT") issued its Second Partial Award ("Award").[1]  The Tribunal's Award was unanimous.  Donziger has repeatedly and falsely claimed—including on appeal of this Court's RICO judgment and in response to Chevron's pending contempt motion—that "new" evidence before the BIT Tribunal somehow exonerated him of the already proven charge that the Lago Agrio Plaintiffs' ("LAPs") legal team ghostwrote the corrupt $9.5 billion Ecuadorian judgment against Chevron.  He has also falsely claimed that whistleblower witness Alberto Guerra had changed his testimony before the BIT Tribunal and had been shown to lack credibility.  *Cf.* Dkt. 2068 at 4 n.2.  But the BIT Tribunal found no such thing.  Indeed, it resoundingly concluded, as did this Court, that the Ecuadorian judgment was the product of fraud and corruption, including judicial bribery enabling Donziger and his cohorts to secretly ghostwrite the judgment in exchange for a promise of future payment from judgment proceeds, and that Guerra's corroborating testimony was credible.  *Id*. ¶¶ 8.28–8.34, 8.54–8.56, 4.38.  The Tribunal further held that Ecuador breached its obligations under its contracts releasing TexPet and its affiliates from public environmental claims—the same claims on which Ecuadorian judgment is exclusively based.  *Id.* ¶ 10.8.

Over more than 500 pages, the Tribunal detailed the "overwhelming" evidence of fraud and corruption of Donziger and the LAPs' team.  The Tribunal concluded that "[s]hort of a signed confession by the miscreants . . . , the evidence establishing 'ghostwriting' in this arbitration 'must be the most thorough documentary, video, and testimonial proof of fraud ever put before an arbitral tribunal.'"  *Id*. ¶ 8.54.  All three arbitrators—including the arbitrator appointed by the Republic of Ecuador—joined the decision.

---

[1]  A true and correct copy of the Award is attached hereto as Attachment A.

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

September 14, 2018
Page 2

### I. Background on the BIT Arbitration Proceedings

Chevron commenced the BIT arbitration in 2009 to seek redress for Ecuador's international wrongs in connection with the action against the company in Ecuador ("Ecuadorian litigation"), including Ecuador's failure to honor its 1995 Settlement and 1998 Release with TexPet, the Texaco subsidiary that had operated in Ecuador as a minority participant in a joint venture with Ecuador's national oil company, Petroecuador. The wrongful conduct of Ecuador included its failure to indemnify or otherwise hold Chevron harmless from the claims brought by the LAPs in the *Aguinda* action ("Ecuadorian litigation"). *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 490 n.813 (S.D.N.Y. 2014); *Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235, 248 (S.D.N.Y. 2012). Chevron amended its claim in 2012 to include the denial of justice that occurred through the Ecuadorian court's fraud and corruption during the litigation and the resulting fraudulent $9.5 billion judgment.

### II. Chevron Wins the BIT Arbitration

The Tribunal, administered by the Permanent Court of Arbitration in The Hague, held that Ecuador breached its obligations under the 1995 Settlement Agreement, finding that "TexPet spent approximately $40 million on environmental remediation and community development in Ecuador under the 1995 Settlement Agreement," which was carried out by a "well-known engineering firm specialising in environmental remediation." Award ¶¶ 4.67, 4.68. The Tribunal found "no cogent evidence" supporting Ecuador's claim that TexPet failed to comply with the terms of the remediation plan approved by Ecuador. *Id*. ¶ 4.179. To the contrary, the Award recites the statements of Ecuadorian officials that TexPet's "technical work and environmental work was done well," while Petroecuador, "during more than three decades, had done absolutely nothing" to address its own environmental remediation obligations in the area, even though Ecuador and its national oil company received 97.3% of the oil production revenues from the project. *Id*. ¶¶ 4.64, 4.180, 4.181.

In deciding the issues before it, the BIT Tribunal was required to make many determinations regarding the conduct of the Ecuadorian litigation that overlap with determinations that this Court made in its Opinion deciding Chevron's RICO claim. The BIT Tribunal agreed with this Court's factual findings in all material respects, on a factual record that was overlapping but not entirely co-extensive with what was before this Court: for instance, forensic evidence relating to Judge Zambrano's computers was adduced during the BIT but not during the RICO trial. The BIT Tribunal concluded that the Ecuadorian judgment "violates international public policy," and that "[a]s a matter of international comity, it must follow that the [Ecuadorian judgment] should not be recognised or enforced by the courts of other States." *Id*. ¶ 9.16.

**GIBSON DUNN**

September 14, 2018
Page 3

Finally, the BIT Tribunal held that under international law, the Ecuadorian judgment was unenforceable, and ordered Ecuador to "[t]ake immediate steps, of its own choosing, to remove the status of enforceability from the Lago Agrio Judgment" *id*. ¶ 10.13(i), and to preclude the LAPs, their representatives, "any 'trust' purporting to represent their interests," including the FDA, "and any non-party funder from enforcing any part of the" Ecuadorian judgment, "directly or indirectly." *Id*. ¶ 10.13(ii).  It further ordered Ecuador to "take corrective measures" to "wipe out" the consequences of Ecuador's "internationally wrongful acts in regard to the Lago Agrio Judgment." *Id*. ¶ 10.13(vi).   The Tribunal was unequivocal that, "as a matter of international law, [Chevron] [is] not obliged to comply with the [Ecuadorian] Judgment." *Id*. ¶ 9.34.

### III.   The BIT Tribunal's Independent Factual Findings Correspond to Those Made by this Court

The BIT Tribunal's factual findings align with those of this Court in all material respects.  For example, the Tribunal, like this Court, found that Donziger corrupted the Ecuadorian proceedings from early on, by agreeing to pay Fernando Reyes and Gustavo Pinto to act as "independent experts," when they were in fact working for the LAPs.  The Tribunal found this arrangement "was manifestly wrong by any standard for the administration of justice; and [Donziger] knew it.  Wrong as this was, much worse was to follow." *Id*. ¶ 4.225; *cf. Donziger*, 974 F. Supp. 2d at 417 ("[T]he agreement was for Reyes and Pinto to work covertly for the LAP team and to keep their relationship with the LAPs secret from the judge.  And Donziger well understood that the arrangement was improper.").

The Tribunal's fact findings regarding the appointment and corruption of the Ecuadorian court's supposedly neutral global damages expert, Richard Cabrera, also align with those of this Court.  Specifically, the Tribunal found that the LAPs' team blackmailed the presiding judge, Judge Yánez, into appointing Cabrera in the first instance:  "Judge Yanez' decision to accede to the Lago Agrio Plaintiffs' applications was the direct result of the blackmail committed by Mr Fajardo, with the knowledge and support of [Mr] Donziger and others representing the Lago Agrio Plaintiffs." Award ¶ 4.261; *see Donziger*, 974 F. Supp. 2d at 558.  And as did this Court in finding Donziger violated the Travel Act by arranging for Cabrera to receive bribe payments out of what he and the RICO co-conspirators termed a "secret account," *Donziger*, 974 F. Supp. 2d at 559–60, the Tribunal found that payments to Cabrera from the secret account "were made corruptly as bribes by certain of the Lago Agrio Plaintiffs' representatives, including Mr Fajardo, Mr Yanza and Mr Donziger."  Award ¶ 4.303.  In addition, the Tribunal also found that the LAP's legal team ghostwrote the Cabrera Report (*id*. ¶¶ 4.277, 4.378), and that "[t]he Lago Agrio Judgment indirectly relies upon the Cabrera Report," (*id*. ¶ 4.388), specifically with respect to pit count and the $5.4 billion award for alleged soil remediation damages.  *Id*. ¶¶ 5.119-5.120; *cf. Donziger*, 974 F. Supp. 2d at 559.

With respect to the ghostwriting of the judgment, the BIT Tribunal had available to it forensic evidence from the Ecuadorian court that was not available to this Court, specifically, forensic images of the hard drives from the computers allegedly used to draft the Judgment. Judge Zambrano did not testify before the Tribunal despite numerous requests from the Tribunal that he do so, but the Tribunal had available to it his testimony from the RICO trial. In contrast, Alberto Guerra testified in both proceedings.

Ultimately, the Tribunal found that "the circumstantial and other evidence, including testimony by Dr Zambrano in the RICO Litigation, does not support Dr. Zambrano's account of writing the Lago Agrio Judgment," (*id*. ¶¶ 5.17, 8.54), and rejected his testimony from the RICO trial that he wrote the judgment, finding it to be, "on material issues, incredible." *Id*. ¶ 5.150. The Tribunal found that "Judge Zambrano did not draft the entirety of the [Ecuador] Judgment by himself," but instead, "in return for his promised reward, allowed certain of the Lago Agrio Plaintiffs' representatives, corruptly, to 'ghostwrite' at least material parts of the Lago Agrio Judgment (with its Clarification [Order]). These representatives included Mr Fajardo and Mr Donziger." *Id*. ¶ 5.231; *cf*. *Donziger*, 974 F. Supp. 2d at 483–92 ("The Court rejects Zambrano's claim of authorship, let alone sole authorship, as unpersuasive for a host of reasons."). The Tribunal concluded, moreover, that Donziger had acted with knowledge of the ghostwriting, and was "privy to such 'ghostwriting' and 'collusion,'" "with others." Award ¶¶ 5.163–5.164.

In addition, the Tribunal, like this Court, found that the LAPs' representatives pressured the Ecuadorian government to bring criminal prosecutions against attorneys involved in the Settlement and Release Agreements as a way to "nullify the effect of Chevron's reliance upon the 1995 Settlement Agreement as a defense in the Lago Agrio Litigation." *Id*. ¶ 4.124; *see also id*. ¶ 4.378 (describing the criminal prosecutions against TexPet's lawyers in Ecuador as "collusive"); *cf*. *Donziger*, 974 F. Supp. 2d at 543–44.

As did this Court, the Tribunal also rejected the adequacy of appellate review of the Ecuadorian judgment to "cure" or otherwise cleanse the judgment of this pervasive fraud. The Tribunal expressed "grave doubts" as to "the thoroughness" of the Appellate Court's "de novo hearing," noting the court's own statement that it had "no competence" to review Chevron's allegations of corruption and fraud. *Id*. ¶¶ 5.165–5.171; *cf*. *Donziger*, 974 F. Supp. 2d at 539. The Cassation Court, moreover, "did not review the merits of any of Chevron's allegations of fraud . . . or the 'ghostwriting.'" Award ¶ 5.178. And despite having a record of the fraud before it, the Constitutional Court specifically held that neither it nor the Cassation Court had jurisdiction to rule on those claims. *Id*. ¶¶ 5.189, 5.214–5.215.

Finally, in reference to the "go to jail email"—an email from one of the LAPs' Ecuadorian attorneys to Donziger just as documents were about to emerge demonstrating Stratus' ghostwriting of the Cabrera Report—which this Court characterized as "one of those blinding rays of candor that can occur even in clouds of lies," *Donziger*, 974 F. Supp. 2d at 461, the Tribunal noted that "[t]he reference to 'jail' is significant. Criminal proceedings could have arisen from unlawful conduct over the bribing of Messrs Reyes and Pinto, the blackmailing of Judge Yánez, the corrupt collusion with Mr Cabrera, the 'ghostwriting' of Mr Cabrera's Report, the bribes paid to Dr Guerra for drafting Judge Zambrano's orders, the inappropriate private meetings with several judges of the Lago Agrio Court, the collusive criminal proceedings against Mr Veiga and Dr Pérez and the covert plan for 'ghostwriting' the Lago Agrio Judgment." Award ¶ 4.378.

### IV. Donziger's Claims that the Evidence Before the BIT Exonerated Him Are False

Donziger has repeatedly represented to this Court, the Second Circuit, and the public at large that "new evidence" adduced in the BIT proceeding exonerated him, and he has criticized the Second Circuit for purportedly refusing to consider it. For example, in filings before both this Court and the Second Circuit, Donziger has repeatedly claimed that Alberto Guerra's RICO testimony was undermined by his subsequent BIT testimony. Donziger has claimed that "Guerra admitted under cross-examination in a related international arbitration between Chevron and the Republic of Ecuador that he intentionally and repeatedly lied on the stand and in his sworn statement during the RICO trial." Dkt. 1925 at 2; *see also* Donziger Appellants' Motion for Judicial Notice of Transcripts in Arbitration Proceedings and Filings in Canadian Litigation (Dkt. 461-1) 14-826-cv(L), at 12–13 (2d Cir. Nov. 5, 2015). But the BIT Tribunal rejected these claims. In fact, the Tribunal specifically held that "the Tribunal considers that Dr Guerra was a witness of truth in his testimony at the Track II Hearing. The Tribunal has therefore relied upon his testimony where it can be corroborated by other evidence, at least in part." Award ¶ 4.38.

Donziger has also claimed that forensic evidence relating to Judge Zambrano's computers adduced during the BIT, which was not available to this Court, disproves Chevron's claims that the judgment was ghost written: "[T]he . . . digital forensic examination of the hard drives of the computers of Ecuador trial judge Nicolas Zambrano . . . . revealed unquestionably that the Ecuador judgment was drafted on those computers and that it was done slowly over the course of many months, with hundreds of interim file saves." Dkt. 1925 at 2. The BIT Tribunal disagreed, finding that the forensic evidence proves "the account given at the RICO trial by Dr Zambrano as to how he wrote personally the full Lago Agrio Judgment on his New Computer (with his student secretary) is inaccurate, incomplete and unreliable."

September 14, 2018
Page 6

Award ¶ 6.109.  Overall, the evidence led the panel to conclude that "the Lago Agrio Judgment was at least in material part 'ghostwritten' by certain of the Lago Agrio Plaintiffs' representatives, in corrupt collusion with Judge Zambrano." *Id*. ¶ 6.111; *see also* ¶ 10.4.

### V. The BIT Tribunal Found that Ecuador Violated the 1995 Settlement and 1998 Release Agreements

The BIT Tribunal also found that the claims brought by the LAPs against Chevron in the Ecuadorian litigation were the same "diffuse" claims released by Ecuador in its 1995 Settlement and 1998 Release agreements with TexPet.  Indeed, the Tribunal held that the Constitutional Court's determination that the generalized environmental claims brought by the Plaintiffs in the Ecuadorian litigation were not released "deprives that settlement of any practical meaning, making it a one-sided and open-ended commitment undertaken unilaterally by TexPet and Texaco." *Id*. ¶¶ 5.221–5.224.  The Tribunal noted that, due to these significant issues, it "regrets its inability to follow the Constitutional Court's interpretation and application of the 1995 Settlement Agreement." *Id*. ¶ 5.221.

Moreover, the Tribunal found "no cogent evidence" supporting Ecuador's claim that TexPet failed to comply with the terms of the remediation plan approved by Ecuador (*id*. ¶ 4.179), relying on the testimony of Ecuador's former Under-Secretary of Environmental Protection that TexPet's "technical work and environmental work was done well" (*id*. ¶ 4.180)—in contrast to the claims of Donziger and his allies that the remediation was "fraudulent," and their attempt to pressure the Ecuadorian government to bring criminal prosecutions against Texaco lawyers involved in the Settlement and Release agreements.  In reaching these findings, the Tribunal relied upon statements of the Director of DINAPA (Ecuador's Department of National Environmental Protection Management of the Ministry of Energy) that "Texaco completed the remediation of the pits that were their responsibility" while "Petroecuador, during more than three decades, had done absolutely nothing with regard to the pits that were the state-owned company's responsibility to remediate." *Id*. ¶ 4.181.  This was so even though Ecuador and its national oil company, Petroecuador, received about $22.67 billion (97.3%) of the oil production revenues from the project, while TexPet received only $480 million in revenues (*id*. ¶ 4.64), $40 million of which it allocated to remediation (*id*. ¶ 4.68).

### VI. The BIT Tribunal Found that the Ecuadorian Judgment Is Unenforceable Under International Law

Finally, the BIT Tribunal found that under international law, the Ecuadorian judgment is unenforceable.  Indeed, the Tribunal held that "[a]s a matter of international comity, . . . the [Ecuador] Judgment should not be recognized or enforced by the courts of other States," (*id*. ¶ 9.16), and instructed Ecuador that "the reinstatement of [Chevron's] rights under interna-

tional law requires of [Ecuador] the immediate suspension of the enforceability of the [Ecuador] Judgment and the implementation of such other corrective measures as are necessary to 'wipe out all the consequences' of [Ecuador's] internationally wrongful acts, so as to re-establish the situation which would have existed if those internationally wrongful acts had not been committed by [Ecuador]." *Id*. ¶ 9.17.  The Tribunal further held that Chevron, "as a matter of international law, [is] not obligated to comply with the [Ecuador] Judgment" (*id*. ¶ 9.34), and ordered Ecuador to, among other things, "take immediate steps, of its own choosing, to remove the status of enforceability from the Lago Agrio Judgment," (*id*. ¶ 10.13(i)), "preclude any of the Lago Agrio Plaintiffs, any 'trust' purporting to represent their interests (including the 'Frente de Defensa La Amazonia'), any of the Lago Agrio Plaintiffs' representatives, and any non-party funder from enforcing any part of the [Ecuador] Judgment," "directly or indirectly, whether by attachment, arrest, interim injunction, execution or howsoever otherwise," *id*. ¶ 10.13(ii), and to "take corrective measures, of its own choosing, to 'wipe out all the consequences' of all the Respondent's internationally wrongful acts in regard to the Lago Agrio Judgment."  *Id*. ¶ 10.13(vi).

The BIT Award should put an end to Donziger's unsupported allegations that Guerra's testimony in the BIT arbitration differed materially from his testimony before this Court, that forensic evidence proves that Zambrano wrote the Ecuadorian judgment, and that the evidence presented before the BIT Tribunal somehow exonerates Donziger.

The Tribunal's Award is not subject to further appeal within the arbitration process and is immediately enforceable pursuant to the New York Convention.

As always, we appreciate Your Honor's consideration.

Respectfully,

*/s/ Randy M. Mastro*
Randy M. Mastro


Encl.