## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER, *et al.*,

                Defendants.

11 Civ. 0691 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO HOLD STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER ASSOCIATES, PLLC IN CONTEMPT OF COURT FOR THEIR FAILURE TO COMPLY WITH THE RICO AND DEFAULT JUDGMENTS AND THE APRIL 16, 2018 RESTRAINING NOTICE

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193 Telephone:  212.351.4000
Facsimile: 212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992 Telephone:  973.535.1900
Facsimile: 973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ................................................................ 1

II.  FACTUAL BACKGROUND .................................................................. 3

    A.   Since March 2014, Donziger Has Monetized the Ecuadorian Judgment by Soliciting and Receiving Funds in Exchange for Interests Therein........................ 3

    B.   Donziger Has Received Hundreds of Thousands of Dollars for Personal Gain............................................................................................ 6

    C.   Donziger Is Not Raising Money to Pay His "Clients'" Legal Fees or Costs.......... 8

        1.   Donziger's Retainer Agreements Do Not Authorize His Receipt of Funds................................................................................. 8

        2.   Donziger Has Not Accounted to the LAPs for His Use of Funds ........... 10

        3.   The LAPs Have Repeatedly Represented That They Lack Litigation Funds ...................................................................... 11

    D.   Donziger Has Used Investors' Monies to Continue His Extortionate Campaign ...................................................................................... 14

    E.   ██████████████████████████████████ .................................................. 18

III.  ARGUMENT ................................................................................. 19

    A.   Donziger Is in Contempt for Violating the RICO and Default Judgments........... 19

        1.   Donziger Is Violating Paragraph 1 of the RICO and Default Judgments .................................................................................... 21

            a.   Paragraph 1 is Clear and Unambiguous...................................... 22

            b.   Clear and Convincing Evidence Demonstrates Donziger's Noncompliance with Paragraph 1 ................................................ 23

                i.   Donziger's November 2017 Contingency Interest ........... 24

                ii.   Investor Funds Collected by Donziger ............................ 24

        2.   Donziger Is Violating Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment......................................... 25

# TABLE OF CONTENTS
(continued)

Page

a.    Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment Are Clear and Unambiguous ........................... 25

b.    Clear and Convincing Evidence Proves Donziger Has Violated  Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment ............................................ 26

3.    Donziger's Arguments Regarding the April 2014 Stay Order Are Unavailing ................................................................................. 27

B.    Donziger Is Violating Chevron's Restraining Notice ............................................ 32

C.    Sanctions Are Warranted to Make Donziger Comply with the RICO and Default Judgments and the Restraining Notice, and to Compensate Chevron ....................................................................................................... 33

1.    Donziger's Pattern of Racketeering Continues Unabated ........................ 33

2.    Sanctions Are Necessary to Force Donziger to Comply ......................... 37

IV.    REQUESTED RELIEF ................................................................................................ 38

V.    CONCLUSION ........................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bloom v. Illinois,*
    391 U.S. 194 (1968)...................................................................................................21

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)....................................................................................................20

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016).................................................................................21, 33

*Chevron Corp. v. Donziger,*
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)................................10, 17, 21, 22, 30, 33, 34, 35, 36, 37

*City of New York v. Mickalis Pawn Shop, LLC,*
    645 F.3d 114 (2d Cir. 2011)......................................................................................39

*Cooke v. United States,*
    267 U.S. 517 (1925)..................................................................................................20

*Cordius Tr. v. Kummerfeld Associates, Inc.,*
    658 F. Supp. 2d 512 (S.D.N.Y. 2009).........................................................32, 33, 38

*F.T.C. v. Verity Intern., Ltd.,*
    140 F. Supp. 2d 313 (S.D.N.Y. 2001)......................................................................40

*Gompers v. Bucks Stove & Range Co.,*
    221 U.S. 418 (1911)..................................................................................................20

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994)............................................................................................20, 21

*N.A. Sales Co. v. Chapman Indus. Corp.,*
    736 F.2d 854 (2d Cir. 1984)......................................................................................37

*N.Y. State Nat. Org. for Women v. Terry,*
    159 F.3d 86 (2d Cir. 1998)........................................................................................20

*N.Y. State Nat. Org. for Women v. Terry,*
    886 F.2d 1339 (2d Cir. 1989)....................................................................................40

*Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
    369 F.3d 645 (2d Cir. 2004)................................................................................21, 38

*Roadway Express, Inc. v. Piper,*
    447 U.S. 752 (1980)..................................................................................................19

*Ex Parte Robinson*,
    86 U.S. (19 Wall.) 505 (1873) ...........................................................................20

*Spallone v. United States*,
    493 U.S. 265 (1990) ...........................................................................................40

*United States v. City of Yonkers*,
    856 F.2d 444 (2d Cir. 1988) ...............................................................................40

*United States v. Hudson*,
    11 U.S. (7 Cranch) 32 (1812) .............................................................................20

*United States v. Solow*,
    138 F. Supp. 812 (S.D.N.Y. 1956) .....................................................................37

*United States v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ...........................................................................................20

*Weitzman v. Stein*,
    98 F.3d 717 (2d Cir. 1996) .................................................................................40

**Statutes**

18 U.S.C. § 1341 ...........................................................................................................35

18 U.S.C. § 1343 ...........................................................................................................35

18 U.S.C. § 1956(a)(2) ..................................................................................................36

28 U.S.C. § 1746 .....................................................................................................39, 40

CPLR § 5222 ..............................................................................................................3, 32

CPLR § 5222(b) .............................................................................................................32

CPLR § 5222(e) .............................................................................................................33

CPLR § 5251 ..................................................................................................................32

N.Y. Penal Law § 215.50 ..............................................................................................20

**Rules**

Fed. R. Civ. P. 69(a)(1) .................................................................................................32

## I.   PRELIMINARY STATEMENT

Recently discovered evidence proves that during the four and a half years since this Court entered the RICO Judgment, Steven Donziger's racketeering scheme has continued unabated. Donziger willfully and repeatedly has violated the RICO injunction, monetizing and profiting from the fraudulent Ecuadorian judgment by selling, assigning, pledging, transferring, and encumbering interests therein. At the same time, he has refused to transfer and assign to Chevron funds that are traceable to the Ecuadorian judgment. Donziger's brazen acts of contempt continue the pattern of racketeering for which he was found liable, threaten the integrity of this Court's rulings, and are causing further harm to Chevron. Severe sanctions are warranted to secure Donziger's compliance and compensate Chevron for its injuries because he has shown that he will not comply until compelled to do so. In one of the many demonstrations of his disregard for this Court, Donziger proclaims on his public website that "the U.S. court decisions in Chevron's RICO case—all of which derive from Kaplan's flawed proceeding—deserve no deference by any authority, the public, the financial markets, or even Chevron's own shareholders and employees." Ex. 1 at 1.[1]

Donziger's actions are as contumacious as his rhetoric.  since March 2014, Donziger has sold interests in the fraudulent Ecuadorian judgment in addition to the millions raised from earlier investors. Over $342,000 of this amount was transferred to Donziger by his long-time co-conspirator Aaron Marr Page *after* entry of the Default Judgment in April 2018. Though all of this property is traceable to the Ecuadorian judgment, Donziger has not transferred any of it to Chevron.

While Donziger has tried to defend his conduct as permissible under this Court's order

---

[1]  "Donziger" refers to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates PLLC. Unless otherwise indicated, all citations to Ex. __ are citations to exhibits to the Declaration of Anne Champion.

denying his request for a stay, as fundraising for foreign enforcement actions, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  Donziger is also using funds obtained in violation of the RICO

Judgment to continue his pattern of racketeering, committing new criminal acts of extortion, wire

and/or mail fraud, money laundering, and obstruction of justice.

Donziger is in ongoing contempt of paragraph 1 of both the RICO and Default Judgments.

The evidence to date shows that Donziger obtained, either in his own capacity or as agent for the

FDA, ████████ in exchange for shares in the Ecuadorian judgment—much of which he

then expended from his personal accounts.  These funds are "traceable to the Judgment," but

Donziger has failed to "transfer and forthwith assign" them to Chevron.  Dkt. 1875 ¶ 1; Dkt. 1985

¶ 1.  Donziger has also failed to "transfer and assign" to Chevron the new contingency interests

granted to him in a November 2017 retainer agreement with the FDA.  This ongoing failure is

especially egregious in light of this Court's order holding that any contingency interests Donziger

has in the Ecuadorian judgment are "'subject to execution and attachment[,]'" and "were and re-

main immediately assignable" to Chevron.  Dkt. 2072 at 7.

Donziger's solicitation and collection of proceeds in exchange for interests in the Ecuado-

rian judgment for himself and the FDA also violates paragraph 5 of the RICO Judgment and par-

agraph 4 of the Default Judgment, which prohibit Donziger from "undertaking any acts to monetize

or profit from the Judgment . . . including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." Dkt. 1875 ¶ 5; Dkt 1985 ¶ 4. Donziger's entry into the November 2017 retainer agreement with the FDA further violates paragraph 5 by obtaining an equity interest in the Ecuadorian judgment separate from the one granted by his prior retainer agreement, and securing the FDA's "irrevocable support" of Donziger's efforts to avoid the effect of the constructive trust and to monetize his shares in the Ecuadorian judgment. Further, by continuing to transfer tens of thousands of dollars from their accounts to outside parties, Donziger has repeatedly violated the restraining notice under CPLR § 5222 that Chevron served in April.

It is now beyond question that Donziger has not and will not voluntarily comply with either the RICO Judgment or the Default Judgment, and this Court should hold Donziger in contempt for violating these Judgments, as well as the restraining notice. Strong measures are appropriate, including coercive sanctions and damages to compensate Chevron for the losses it has incurred.

## II.   FACTUAL BACKGROUND

Donziger's long-running efforts to obtain funds in exchange for purported interests in the Ecuadorian judgment did not end upon entry of the RICO Judgment. Donziger himself admits he continues to "try to get funders to buy interest in the [Ecuadorian] judgment." Ex. 2 at 117:15–16; Dkt. 1966 at 5–10. And although he claims that these efforts were "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses" (Ex. 3 at 33:19–21), this claim is belied by his substantial personal gain, his failure to account to his clients for his use of funds, and his clients' representations to foreign courts. *See* Sections II.B–C.

### A.   Since March 2014, Donziger Has Monetized the Ecuadorian Judgment by Soliciting and Receiving Funds in Exchange for Interests Therein

Donziger has testified to arranging for sales of shares in the Ecuadorian judgment to at least six investors since March 2014 (Ex. 3 at 34:21–24), and in fact has arranged for sales of

judgment shares ███████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ The Slavek accounting analysis confirms that,

since 2016, 94.5% of the funds going into Donziger's personal and firm accounts combined originated from investors buying purported interests in the Ecuador judgment.  Slavek Decl. ¶ 51(c).

Based on the evidence uncovered to date (which remains incomplete given Donziger's refusal to comply with this Court's discovery orders, *see, e.g.*, Dkt. 2073), Donziger raised at least

███████████████████████████████████████████████

████████████████████████████████ Donziger explained to a prospective investor in no

uncertain terms that what he was selling was a "percentage of the total claim owed."  Ex. 12 at

JVM 002161.  Expenses, including payments to law firms, were to "come off the top" in any

recovery, but—according to Donziger—there would be "plenty of funds to pay investors."  *Id.*

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

Donziger's newest funding arrangements reflect a concerted push to raise money to per-

sonally benefit himself and his co-conspirators, and to fund the ongoing pressure campaign.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ *see also* Dkt. 1966 at 5–7.

**B.**      **Donziger Has Received Hundreds of Thousands of Dollars for Personal Gain**

Donziger has testified that "[f]or the time period from 2014 to the present," his "only sources of income [we]re 'remuneration . . . paid out of litigation expense funds raised with [his] assistance, [and] a modest monthly income generated by two properties.'" Ex. 2 at 189:14–190:14.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████ The Canadian law firm Lenczner Slaght Royce Smith Griffin LLP ("Lenczner Slaght") transferred $625,940 to Donziger in six payments made between May 10, 2016 and February 21, 2017.  Slavek Decl. Ex. 3-A.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████ Lenczner Slaght appears to have taken direction regarding distributing funds to Donziger not from clients but from

---
[2] █████████████████████████████████████
████████████████████████████

the investors.  Ex. 17; Ex. 18.

███████████████████████████████████████████ transferred

$125,000 to Donziger in three payments made between January 30, 2018 and March 13, 2018.

Slavek Decl. Ex. 3-A.  ████████████████████████████████████



████████████████████████ Page wired ██████████ funds to Donziger's personal bank

account on May 8, 2018, receiving days later an apparent $50,000 kickback.  Slavek Decl. ¶ 19.

Donziger commingled monies in his personal and law firm accounts.  Slavek Decl. ¶¶ 25–

36 & Exs. 4-A, 4-B, 4-C.  He deposited the proceeds from sales of Ecuadorian judgment interests

directly into his personal accounts and frequently transferred monies back and forth between his

personal and firm accounts.  He used judgment proceeds to pay personal expenses, with the top

recipient being his wife, Laura Miller, who received $297,000, and also "incurred $54,037.01 in

American Express charges during 2016 that was also paid out of the Donziger bank accounts."

Slavek Decl. ¶ 52.  Donziger also used investment proceeds to pay his bills, including a $14,040

gym membership, a $5,225 bar tab at Walkers, and $2,578 to Acme Fine Wines.  *Id.* ¶ 46; Slavek

Decl. Ex. 7-A.  Of the $725,940 originally deposited into his law firm accounts from sales of the

---

<sup>3</sup> ████████████████████████████████████████████████████

Ecuadorian judgment, over $500,000 was transferred to his personal accounts.  Slavek Decl. ¶ 32.

**C.    Donziger Is Not Raising Money to Pay His "Clients'" Legal Fees or Costs**

Donziger claims that he is "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses."  Ex. 3 at 33:19–21.  But this notion is belied by the terms of his retainer agreements, his failure to account for his use of funds, the LAPs' accusations regarding Donziger's unauthorized monetization of the Ecuadorian judgment, and by the LAPs' repeated representations to courts that they have no ability to pay litigation costs.

**1.    Donziger's Retainer Agreements Do Not Authorize His Receipt of Funds**

Donziger has raised ███████████████ since the entry of the RICO Judgment, but there is no evidence that he was entitled to keep those funds under any retainer agreement.[4]

On January 5, 2011, Donziger & Associates, PLLC entered into a retainer agreement with the LAPs, FDA, and Asamblea de Afectados por Texaco (the "Assembly").  Ex. 21.  The 2011 retainer agreement provided that Donziger & Associates, PLLC would be "entitled to an Active Lawyer Percentage of thirty-one and one-half percent (31.5%) of the Total Contingency Fee Payment," which "means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies." *Id.* ¶ 3(a).  The 2011 retainer agreement also provided for a monthly retainer payment "in accordance with a budget to be provided by [Donziger & Associates, PLLC]." *Id.* ¶ 3(b).  The budget was to be negotiated initially with the other parties to the Master Agreement among the LAPs, the FDA, the Assembly, and multiple law firms, and revisions to the budget were to be approved by a management committee and subsequently by the LAPs.  *Id.* ¶ 3(e); Ex. 22 ¶ 4(d).  And it provided that Donziger & Associates, PLLC "shall . . . be entitled to reimbursement for any reasonable out-

---

[4]    To date, Donziger has produced three retainer agreements, two of which have been operative following the RICO Judgment.  The first agreement is dated April 27, 2006 and is with the FDA; other indigenous organizations; Kohn, Swift & Graf; and the law offices of Cristóbal Bonifaz and provided for a contingency fee between 10 and 25 percent, in addition to costs incurred.  Ex. 20 at 1.  Under this agreement, Kohn financed the litigation, including paying Donziger for his work on the case and reimbursing his expenses through 2009.  Slavek Decl. Ex. 3-B.

of-pocket expenses or other costs incurred" if the firm "submit[s] a bill to the Plaintiffs . . . setting forth in reasonable details the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation."  Ex. 21 ¶ 3(d), (f).  There is no evidence that Donziger ever produced a budget or a bill with details of monthly expenses in accordance with these provisions, or that Donziger or his firm received authorization for either a retainer or reim-bursement of his expenses per this retainer.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

On November 1, 2017, Donziger entered into a third retainer agreement with the FDA, titled "Durable International Power of Attorney and Agreement for the Continuous Investment of Professional Services."  Ex. 23.  This agreement purports to authorize Donziger to "direct and manage all current and future legal, political, and public relations efforts in connection with the enforcement of the *AGUINDA JUDGMENT*, including, but not limited to, all related enforcement proceedings in Canada and other countries."  *Id.* at 2.  The agreement also states:  "In consideration of his historical leadership and professional services rendered, both in the past and in the future, the FDA irrevocably acknowledges, confirms and undertakes to support Mr. DONZIGER's exist-ing contractual INTEREST, as set forth below, and/or hereby grants Mr. DONZIGER an INTER-EST in his own right equal to his existing contractual INTEREST."  *Id.* at 1.  The "INTEREST" granted to Donziger "in his own right" was "equal to Mr. DONZIGER's existing contractual IN-TEREST" of "6.3% of any FUNDS RECOVERED."  *Id.* at 1, 3.  The 2017 agreement does not provide for any retainer or expense reimbursements.

## 2.    Donziger Has Not Accounted to the LAPs for His Use of Funds

In the RICO Judgment, this Court found that "Donziger spent, or had primary control over spending by others from whom he raised money, at least several million dollars," but "the financial records [we]re incomplete and d[id] not permit a full and accurate accounting."  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 402 n.138 (S.D.N.Y. 2014).  No accounting has ever been produced for the investments received or the expenditure of any of these funds.  When asked at his deposition about an accounting for the funds he has taken purportedly as counsel in the Ecuadorian litigation, Donziger testified that he "ha[d] an accounting" that was "substantially complete."  Ex. 2 at 67:4–6.  Donziger confirmed that the "accounting" to which he was referring was prepared by Josh Rizack.  Ex. 24 at 137:19–138:4.  Rizack, however, said that no such "accounting" exists.  *Id.* at 10:18 ("I'm not an accountant."); *id.* at 15:3–5 ("Do you consider what you produced to be accountings?  A  No.").[5]  Expert analysis of the Rizack spreadsheets has likewise confirmed that they are not accountings and are ridden with "numerous inconsistencies, poor record-keeping, and an apparent overall absence of compliance with even rudimentary accounting and bookkeeping principles."  Slavek Decl. ¶ 54:█████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

Donziger has testified that a portion of the post-RICO Judgment funds he has taken for himself are to pay his monthly "retainer payments" and supposed "litigation expenses."  Ex. 2 at

---

[5]  Confirming the non-existence of a Donziger accounting for the funds he has taken for purported services rendered to Ecuadorian clients is the fact that those former clients continue to request accountings: "[O]n January 29, 2016, the UDAPT, convened at a general meeting, issued a resolution to ask Mr. Steven Donziger, Mr. Luis Yanza, and Mr. Pablo Fajardo to provide an accounting, in other words, to provide the UDAPT with detailed information about all of the money they have managed that belongs to the UDAPT.  To date, only Mr. Pablo Fajardo has provided that information.  Mr. Steven Donziger and Mr. Luis Yanza have failed to do so."  Dkt. 1989-5 at 3.

13:6–8 ("I have been paid out of monies raised to pay litigation expenses . . . ."); *id.* at 194:16–17:2 ("Q. So the money from the Lenczner firm that was transferred to you, was any portion of that money to pay your retainer?  A. . . . The answer to that question is yes.").  But there is no evidence that any invoices for Donziger's purported services ever went to his purported clients.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

### 3.  The LAPs Have Repeatedly Represented That They Lack Litigation Funds

Donziger claims he is the "lifeline for people in Ecuador to raise money."  Ex. 26 at 24:5–6.  But despite his raising of significant sums, the LAPs have represented to courts in enforcement actions that they lack funds even to pay court costs.  Section II.C.3.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

At the time of the RICO trial, Donziger testified that he represented the individual LAPs and "serve[d] at the pleasure of the clients and Mr. [Pablo] Fajardo as their representative." Ex. 27 at 2465:22–23. But since at least 2016, the LAPs (and UDAPT) have publicly stated that the agreements through which Donziger sells interests in the judgment are being entered into without their knowledge or authorization. Fajardo described Donziger and Luis Yanza's entry into a January 19, 2016 "contract for the management of financial resources on behalf of the FDA and the plaintiffs" as "extremely serious, since neither of these two persons represents the plaintiffs" and further asserted that Donziger and Yanza had since executed two more funding agreements between January and early July 2016, "asking for money in the name of persons that [they] do not represent, which clearly constitutes a serious crime, whether as a scam or because [they] are acting as if [they] have powers that neither [they] nor [their] organization has." Ex. 28 ¶¶ b–c.[6] On August 20, 2016, UDAPT issued a declaration—likewise referencing the execution of the January 19, 2016 funding agreement "without informing and without authorization . . . from the plaintiffs"—declaring them personae non gratae. Ex. 30 at 1. ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

The LAPs—the parties in whose names the enforcement actions are being litigated—have represented in proceedings in Brazil, Argentina, and Canada that they are bereft of funds, while at the same time, Donziger was raising hundreds of thousands of dollars. In Brazil, in a filing seeking

---

[6] ██████████████████████████████████████████████████
████████████████████████████████████████████████

to maintain indigent status, the LAPs represented that they should not be required to pay court costs because it is "undeniable" that the LAPs "themselves do not have the means to pay all the procedural costs," and their counsel "have not received any compensation for their work on the case." Ex. 32 ¶¶ 22, 26, 28.  In Argentina, the LAPs likewise claimed indigence.  Ex. 33 at 29.

And in Canada, where the prevailing party is entitled to costs and in some cases to security for costs from non-residents, the LAPs' counsel Lenczner Slaght challenged posting security on the basis of the LAPs' supposed financial inability to pay, representing on June 19, 2017 to the Ontario Court of Appeal that "neither the remediation trustee nor the indigenous appellants can fund the litigation," that "Chevron has known about past third party funding and has impeded any future funding," and that counsel were working on a contingency fee basis.  Ex. 34 at 2.  And on October 3, 2017, Lenczner Slaght represented to the Ontario Court of Appeal that "the actions by Chevron against third party funders and against the applicants' U.S. law firm, resulting in the funders withdrawing financial and other support," had the "effect of discouraging any other third party funder," and that "*any funding assistance that the plaintiffs had in place has long since evaporated*."  Ex. 35 ¶¶ 27, 29 (emphasis added).  But *prior* to that representation, Lenczner Slaght ███████████████████████████████████ (between May 2016 and February 2017), ████████ wired $625,940 *to Donziger*—at the direction of investors as opposed to any client.  Slavek Decl. ¶ 14; Ex. 36 at JVM 002466.  ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████[7] Also in October 2017, Canadian lawyer Peter Grant attempted

---

[7] ██████████████████████████████████████████ Although the Lenczner firm ██████████████████████████████████████ wired $625,940 to Donziger (Slavek Decl. ¶ 14) between May 2016 and February

to file a declaration from Ecuadorian counsel, Patricio Salazar (who claimed to represent the FDA and ten LAPs) asserting that the LAPs were bereft of funds based on Salazar's review of their tax records.  Ex. 39.  ████████████████████████████████████████████

████████████████████████████████████████████

Because the FDA is neither the judgment creditor nor a named plaintiff in the foreign enforcement proceedings, and Donziger now claims to represent only the FDA, Donziger cannot justify his fundraising activities as "help[ing] [his] clients in Ecuador sell interests in the judgment to raise funds to pay litigation expenses."  Ex. 3 at 33:19–21.  According to Dr. Santiago Velázquez Coello, an Ecuadorian attorney with fifty years of experience as a professor and judge, and the former President of the Constitutional Court of Ecuador, Ecuadorian law does not permit the FDA to sell or promise interests in the Ecuadorian judgment.  With respect to remediation proceeds, the FDA is the beneficiary of a Commercial Trust that expressly prohibits the FDA from assigning its rights derived from the Trust.  Velázquez Decl. at 3–4.  Even the 10% compensation associated with the Environmental Management Act was not awarded to the FDA—which was not a plaintiff in the Ecuadorian litigation—but to the LAPs.  *Id.* at 4.  Although the LAPs authorized the FDA to receive the award on their behalf, neither they nor the Ecuadorian court can assign title of the award to the FDA.  *Id.*  In short, the only client Donziger currently claims to represent, the FDA, has nothing to sell and no litigation to fund.

**D.    Donziger Has Used Investors' Monies to Continue His Extortionate Campaign**

Donziger used investor funds to continue his ongoing campaign to extort a payment from

---

2017 ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

Chevron. █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[8]

Documents reveal that Donziger worked with a web of co-conspirators to orchestrate his

pressure campaign, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[8] ███████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

    Donziger also paid a phalanx of activists and journalists to produce inflammatory media coverage against Chevron.  Rex Weyler, a Greenpeace activist who wrote a blog post titled "Chevron's Amazon Chernobyl Case moves to Canada," was paid over ██████.  Slavek Decl. Ex. 8;

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████ Ex. 47 at 2. █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 50.

    Another prominent public supporter of Donziger's media campaign is Pink Floyd's Roger Waters, ███████████████████████████████████ Ex. 51; █████████████

███████████ Kevin Koenig, a senior strategist with Amazon Watch, who attended Chevron's shareholder meeting and contributed to the hostile media coverage surrounding it, was also paid thousands of dollars by Donziger.  Slavek Decl. Ex. 8; Ex. 52. ███████████████████

███████████████████████████████████████████████████

███████████████████████

Karen Hinton, long-time spokesperson for Donziger's team and an "important actor[] in the pressure campaign" (*Donziger*, 974 F. Supp. 2d at 600), █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████ Ex. 55.  Press releases issued by Donziger's team have also quoted Patricio Salazar and Aaron Page, █████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████ Page. █████████████████████████████

█████████████████████████████████████████████ was also paid nearly $100,000 in cash (to himself or his firm, Forum Nobis) out of Donziger's accounts ████████ ████████████████████ including to the $50,000 kickback he received after transferring ███████████████ to Donziger.  Slavek Decl. Ex. 8 ██████████████ █████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

17



*see also* Ex. 61; Ex. 62; Ex. 63

E.



Separately, Donziger arranged for Rizack to receive an interest in the Ecuadorian judgment for the services he has provided Donziger ███████████████████████████████ Ex. 24 at 74:3–16██████████████████████████████████ ██████████████████████████████ Donziger has also paid his personal appellate counsel in this action, as well as collections and bar counsel, from monies raised from the Ecuadorian judgment.  Slavek Decl. Ex. 8 ($25,000 paid to appellate counsel Deepak Gupta; $15,750 paid to debt collections firm Meyers Saxon & Cole; $3,750 to bar counsel Michael Frisch).

## III.    ARGUMENT

### A.    Donziger Is in Contempt for Violating the RICO and Default Judgments

The most "prominent" of the "inherent powers of federal courts" is "the contempt sanction, 'which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court.'"  *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)); *see also*

---

[10]   Donziger also testified that he gave portions of his 6.3% interest in the Ecuadorian judgment to Rick Friedman, Zoe Littlepage, and an unnamed individual who also lent Donziger money to retain John Keker████████████████. *See* Ex. 2 at 144:12–145:17; ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 67.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[I]t is firmly established that '[t]he power to punish for contempts is inherent in all courts.'" (quoting *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1873))); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (holding that "[t]o fine for contempt—imprison for contumacy—inforce the observance of order" are "implied powers" of federal courts "because they are necessary to the exercise of all others").

There are two forms of contempt, criminal and civil, and the distinction between the two "turns on the character and purpose of the sanction."  *N.Y. State Nat. Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998).  "Civil contempt fines seek one of two objectives," one being "coercion—to force the contemnor to conform his conduct to the court's order," and the other "compensation."  *Id.*  "Criminal fines, by contrast, are intended primarily to punish the contemnor and vindicate the authority of the court."  *Id.*; *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–30 (1994) (discussing distinction between criminal and civil contempt); *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441–45 (1911) (same).  "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required."  *Bagwell*, 512 U.S. at 831.

Although Chevron seeks only to hold Donziger in civil contempt via this motion, Donziger's contempt is also criminal given its egregiousness and willfulness.  *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 298–99 (1947) ("Common sense would recognize that conduct can amount to both civil and criminal contempt.  The same acts may justify a court in resorting to coercive and to punitive measures.").  Donziger's disregard for this Court's authority may constitute a violation of New York criminal law.  *See* N.Y. Penal Law § 215.50 (a party is guilty of criminal contempt in the second degree for "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court"); *see also Bagwell*, 512 U.S. at 826 ("'Criminal

contempt is a crime in the ordinary sense.'" (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)).

"A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedecina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotation marks and citation omitted).  In clear and unambiguous language, paragraphs 1 and 5 of the RICO Judgment (and paragraphs 1 and 4 of the Default Judgment) awarded Chevron equitable relief and enjoined Donziger and the other defendants from benefiting from their corrupt and fraudulent conduct.  *See Donziger*, 974 F. Supp. 2d at 639. The Second Circuit affirmed the relief granted by this Court, reiterating that it properly "prohibit[s] Donziger and the LAP Representatives from profiting from [their] corrupt conduct."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017).  Donziger has now exhausted his appeals and cannot question the legality and finality of this Court's mandate.  But since its entry on March 4, 2014, Donziger willfully and repeatedly violated the RICO Judgment.  Donziger also has violated the Default Judgment since its entry on April 23, 2018.

## 1.    Donziger Is Violating Paragraph 1 of the RICO and Default Judgments

Paragraph 1 of the RICO Judgment provides:

> The Court hereby imposes a constructive trust for the benefit of Chevron on ***all property***, whether personal or real, tangible or intangible, ***vested or contingent***, that Donziger ***has received, or hereafter may receive, directly or indirectly***, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is ***traceable to the Judgment or the enforcement of the Judgment*** any in the world including, without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in Amazonia.  Donziger ***shall transfer and forthwith assign*** to Chevron all such property that he now has or hereafter may obtain.

Dkt. 1875 ¶ 1 (emphasis added); *see also* Dkt. 1985 ¶¶ 1, 7 (extending this prohibition to the Defaulted Defendants and their agents).  In its August 15, 2018 order, this Court found that

Donziger's failure to "transfer or assign" his rights to any contingent fee under his 2011 retainer agreement and all stock in Amazonia violated his obligations under paragraph 1 of the RICO Judgment.  Dkt. 2072 at 2.  While Donziger's failure to comply with the Court's orders to transfer and assign these items is the subject of a separate motion (Dkts. 2083, 2084), his failure to transfer to Chevron (i) the new contingency fee interests granted to him under the 2017 retainer agreement, and (ii) ███████████████████████████████████████████████████ render him in continued contempt of the RICO Judgment and in contempt of the Default Judgment.

### a.    Paragraph 1 is Clear and Unambiguous

Paragraph 1 of the RICO Judgment and the Default Judgment is clear and unambiguous, and the Court has already rejected Donziger's arguments to the contrary.  In its August 15, 2018 order, the Court held that "there is no uncertainty in the language of paragraph 1 of the judgment." Dkt. 2072 at 6.  The Court went on to explain that "any property (1) that Donziger (a) had as of the date of the judgment in this case, or (b) acquired from the date of the judgment until now, or (c) hereafter may acquire *and* (2) that Donziger was 'enabled to acquire' by the Ecuadorian Judgment or its enforcement is traceable to that Judgment" and "subject to the constructive trust imposed by the judgment in this case."  *Id.* (citations omitted).

In light of the August 15, 2018 order, Donziger's refusal to comply with his obligation to "transfer and assign" the contingency interests granted to him under the November 17, 2017 retainer agreement is egregious.  The Court has held that the "'right to a contingent fee and the fee itself are property[,]'" "'subject to execution and attachment[,]'" and "were and remain immediately assignable."  *Id.* at 7 (quoting *Donziger*, 974 F. Supp. 2d at 640).  The Court then found "it is entirely plain" that Donziger's rights to a contingency fee under a 2011 retainer agreement "ha[ve] been subject since March 4, 2014 to Donziger's express obligation to transfer and assign them forthwith to Chevron, an obligation that he has disregarded for over four years."  *Id.* at 8.

Although the August 15, 2018 order did not compel Donziger to transfer to Chevron his right to a contingency fee under the 2017 retainer (as the issue was not then before the Court), the Court reaffirmed Donziger's obligation to "transfer and forthwith assign to Chevron" ***any*** contingency interests in the Ecuadorian judgment he has or may receive.

Paragraph 1 "includ[es]" and applies to the transfer of interests in the Ecuadorian judgment, but it is not limited to those interests. Paragraph 1 applies broadly to "all property . . . that is traceable to the Judgment or the enforcement of the Judgment." Dkt. 1875 ¶ 1; Dkt. 1985 ¶ 1.

> The phrase "property, whether personal or real, tangible or intangible, vestige or contingent" is perfectly clear. Nor is there any uncertainty inherent in the limitation of the operation of paragraph 1 to property "traceable to the [Ecuadorian] Judgment or the enforcement of the Judgment." The concept of traceability of property to particular sources, events or activity is extremely well established in the law. Money or other property is "traceable" to a given source, event, or activity if its "acquisition is attributable to" that source, event, or activity.

Dkt. 2072 at 6. Indeed, the Court noted that Donziger is likely obligated to transfer other "unspecified property said to be traceable to the Ecuadorian judgment or to its collection":

> To be sure, the Court assumes without now deciding that any such property interests owned by Donziger as of the date of the judgment in this case or acquired by him from that date on into the future are or will become subject to the constructive trust and to Donziger's obligation to transfer and assign it to Chevron. To the extent such property can be identified and specifically described, Donziger will be compelled, if necessary, to comply with the obligation.

*Id.* at 8–9. Chevron has now "identified and specifically described" 

*See* Section II.B. Donziger's acquisition of these funds is "attributable" to the Ecuadorian judgment and subject to the constructive trust, as the Ecuadorian judgment "enabled [Donziger] to acquire the property." Dkt. 2072 at 6 (quotation marks omitted).

### b.   Clear and Convincing Evidence Demonstrates Donziger's Noncompliance with Paragraph 1

Clear and convincing evidence, including Donziger's own admissions, proves that

Donziger has not complied with paragraph 1 of the RICO Judgment or the Default Judgment.

### i.      Donziger's November 2017 Contingency Interest

On November 1, 2017, Donziger entered into a retainer agreement with the FDA, which granted him an additional, personal 6.3 percent contingency interest in the Ecuadorian judgment. *See* Section II.C.1; Ex. 23 at 1, 3.  Donziger has failed, and outright refused, to transfer and assign that new interest to Chevron.  *See* Champion Decl. ¶ 2; Dkt 2061 at 4 (Donziger arguing that he is under no obligation to transfer the 6.3 percent interest because "my property, including my interest in the Lago Agrio judgment, is presently unencumbered"); *see also* Dkt. 2081, Ex. A at 2 (Donziger stating that "[t]he RICO findings are not the last word on enforcement of the Ecuador judgment and on enforcement of contract the FDA has with equity-holders" and that Donziger "reserve[s]" or "maintain[s]" his rights to challenge this Court's orders).

As this Court previously held with respect to Donziger's failure to transfer and assign the contingency interests arising from the 2011 retainer agreement, Donziger's defiance of paragraph 1 in this respect has also been "brazen and deliberate."  Dkt. 2006 at 9.  In fact, it appears that the November 2017 retainer agreement itself is structured to avoid the effect of the constructive trust, as it purports to *irrevocably* commit the FDA to attempting to help Donziger recognize *his* existing interest in the Ecuadorian judgment and "to the extent it is necessary or useful" grants Donziger a new interest in the Ecuadorian judgment.  Ex. 23 at 3.  In short, Donziger is obligated to transfer this interest to Chevron under paragraph 1 of the RICO Judgment, but he has not.

### ii.      Investor Funds Collected by Donziger

Donziger has admitted that, since the RICO Judgment was entered on March 4, 2014, he has continued to solicit, collect, and retain for his personal use funds from investors in exchange for purported interests in the Ecuadorian judgment.  Ex. 3 at 34:21–24 (Donziger arranged sales of Ecuadorian judgment interests to at least six investors since March 2014).  ████████████



*See* Section II.B.

Donziger has not transferred or assigned this property to Chevron pursuant to his obligations under paragraph 1 of the RICO Judgment (Champion Decl. ¶ 2), instead claiming that he has a "right to help my clients fund their own litigation" and "a right . . . to be paid for my work[,]" regardless of where that payment originates.  Ex. 26 at 23:7–10.

### 2. Donziger Is Violating Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment

Donziger has violated and continues to violate paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment by (i) selling off interests in the Ecuadorian Judgment, (ii) profiting personally from the Ecuadorian Judgment, and (iii) entering into the 2017 retainer agreement that required the LAPs to recognize and protect his contingency interests.

### a. Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment Are Clear and Unambiguous

Paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment prohibit Donziger and the other defendants from "***undertaking any acts to monetize or profit*** from the [Ecuadorian] Judgment, as modified or amended, or any New Judgment, ***including without limitation*** by selling, assigning, pledging, transferring or encumbering ***any interest therein***."  Dkt. 1875 ¶ 5 (emphasis added).  The plain language of these paragraphs is clear and unambiguous: Donziger is prohibited from undertaking ***any act*** to monetize or profit from the fraud he orchestrated.  This includes, but is not limited to, prohibiting Donziger from selling, assigning, pledging, transferring or encumbering ***any*** interest in the Ecuadorian judgment.

> **b.** **Clear and Convincing Evidence Proves Donziger Has Violated Paragraph 5 of the RICO Judgment and Paragraph 4 of the Default Judgment**

Clear and convincing evidence, primarily in the form of Donziger's own admissions, demonstrates that Donziger has not complied with his obligations under paragraph 5 of the RICO Judgment and paragraph 4 of the Default Judgment.

First, Donziger has admitted that he has sold interests in the Ecuadorian judgment to multiple investors since March 4, 2014. *See* Section II.A. Donziger has attempted to defend this practice by arguing that the Court's April 2014 stay order permitted him sell interests in the Ecuadorian judgment, as long as he did not sell his "own" shares or the shares of the two named LAPs. Dkt. 1985 at 6–7; Ex. 26 at 17:23–18:6. But paragraph 5 prohibits Donziger from selling "*any* interest*" in the Ecuadorian judgment. Dkt. 1875 ¶ 5 (emphasis added). Moreover, as described further below and in Chevron's prior briefing, there is no support for Donziger's claim that he was selling his clients' (as opposed to his own) interests in the Ecuadorian judgment, and evidence suggests that the opposite is true. *See* Dkt. 2057 at 8–10; ███████████████████████

███████████████████████████████████████████████████

██████████████████████████████

Second, Donziger admits that he has received money in his personal accounts from investors who invested cash in exchange for a share in the Ecuadorian judgment. *See* Section II.B; ███

███████████████████████████████████████████████████

Donziger argues that an April 2014 stay order "approved" his selling interests in the Ecuadorian judgment "as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid." Dkt. 2068 at 7 & n.4 (quoting Dkt. 1901 at 7–8). While Donziger is correct that nothing in the

RICO Judgment prevents Donziger from being paid for legitimate services rendered to his Ecuadorian client, those payments cannot be ***traceable to the Ecuadorian judgment***, and money raised in exchange for shares in the Ecuadorian judgment is traceable to that judgment. Donziger has also profited from the Ecuadorian judgment by using interests in the judgment to repay his personal loans and to pay his counsel in this action and his bar proceeding. *See* Section II.E.

Third, Donziger violated paragraph 5 of the RICO Judgment by entering into the 2017 retainer agreement. The 2017 retainer agreement promises the FDA's irrevocable support for what amounts to Donziger's pursuit of an avenue of contempt by pursuing his "existing contractual [interest]" in recovery from the Ecuadorian judgment. Ex. 23 at 1, 3. Paragraph 5 prohibits Donziger from "undertaking any acts to monetize or profit from the [Ecuadorian] Judgment." Dkt. 1875 ¶ 5; *see also id.* ¶ 8. By recommitting to Donziger's enforcement efforts, and granting him a new, valuable interest in the Ecuadorean judgment separate from his contingent fee, the 2017 retainer agreement facilitates Donziger's efforts to avoid the effect of the constructive trust and amounts to an act to monetize or profit from the Ecuadorian judgment.

### 3.    Donziger's Arguments Regarding the April 2014 Stay Order Are Unavailing

Donziger has made no effort, much less a diligent effort, to comply with the RICO Judgment. Donziger, instead, has argued that his noncompliance is excused by the Court's April 25, 2014 stay order, which allegedly "clarified" that "[a]bsent traceability to a collection, [his] property, including [his] interest in the Lago Agrio judgment, is presently unencumbered" and "assured that the Ecuadorian team could continue to raise funds, and pay [his] fees out of such funds, 'as long as no ***collections*** are made in respect of the Lago Agrio Judgment.'" Dkt. 2061 at 4–5. But "collections" does not mean only money gained from enforcement of the Ecuadorian judgment, and the stay order in no way changed Donziger's obligations under the RICO Judgment.

As an initial matter, this Court already rejected Donziger's argument that his contingency

interest in the Ecuadorian judgment remains unencumbered absent traceability to a collection.  Dkt. 2072 at 8 ("[I]t is entirely plain that this particular set of contract rights has been subject since March 4, 2014 to Donziger's express obligation to transfer and assign them forthwith to Chevron, an obligation that he has disregarded for over four years."); *id.* at n.18 ("Nor is there anything in the Court's April 25, 2014 order largely denying Donziger's motion for a stay pending appeal that even remotely excused Donziger, either pending appeal or otherwise, from complying with that direction.").  Thus, Donziger cannot rely on the stay order to excuse his noncompliance.

And, as discussed above and as this Court previously held, "there is no uncertainty in the language of paragraph 1 of the judgment."  *Id.* at 6.  The plain language of paragraph 1 requires Donziger to "transfer and forthwith assign" to Chevron all property that Donziger has received, or hereafter may receive, that is traceable to the Ecuadorian judgment or its enforcement.  *See* Dkt. 1875 ¶ 1.  This language does not provide for an exception for so-called "fees" or "expenses" traceable to the Ecuadorian judgment that are paid to Donziger, nor is it conditioned on a collection of the judgment.  Donziger's argument that investors' funds are not "collections" and, therefore, not subject to the constructive trust ignores the fact that paragraph 1 of the RICO Judgment does not impose a constructive trust on property that is traceable to "collections," but on any property "that is traceable to the ***Judgment***."  *Id.* (emphasis added).

Donziger's strained interpretation of the RICO Judgment is contrary to its clear language, as well as its purpose, which was to prevent Donziger from profiting from his fraud.  Indeed, the April 2014 stay order confirmed that Donziger was prohibited from "benefitting personally, at Chevron's expense, from property traceable to [the] fraudulent Judgment."  Dkt. 1901 at 11.  Paying himself money that would otherwise be transferred to Chevron certainly qualifies as Donziger "benefitting personally, at Chevron's expense, from property traceable to [the]

fraudulent judgment." As does ████████████████████ compensating service providers with interests in the Ecuadorian judgment. *See* Section II.D.–E. Even if the stay order indicated that Donziger could do legal work on the Lago Agrio case, it would not allow him to be compensated for that work with proceeds traceable to the Ecuadorian judgment.

Even accepting the erroneous premise that the April 2014 stay order "clarified" the RICO Judgment as Donziger claims, he would still be violating paragraphs 1 and 5 for multiple reasons.

First, the funds Donziger received from investors effectively function as "collections" on Donziger's share in the Ecuadorian judgment because, in exchange for trading his rights to judgment recovery and priority of payment, Donziger received cash in hand. As Chevron explained in its supplemental briefing on the initial motion for contempt (*see* Dkt. 2057 at 10–11; Dkt. 2080 at 6–8), the agreements governing the addition of new funders, including the Intercreditor Agreement, Donziger's 2011 retainer agreement, and the Amazonia Memorandum of Association, confirm that Donziger's collection of funds from investors necessarily amounts to monetizing his own interest in that judgment by obtaining cash in hand in exchange for rights directly traceable to the Ecuadorian judgment. Under the Intercreditor Agreement and Donziger's 2011 retainer agreement, any new investor dilutes the value of Donziger's recovery and lowers Donziger's priority in the distribution sequence. *See* Dkt. 2058-2 at 3–7; Dkt. 2058-1 at 63 (¶ 12), 56 (¶¶ 3.2.5–3.2.7); Dkt. 2059 ¶¶ 17–21. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *See* Section II.A. ████████████████████████

████████████████████████ he further reduced his rights traceable to the Ecuadorian judgment, including by letting funders cut in front of him in the payment order and obtaining a portion of his contingent interest, in exchange for cash that Donziger received and controlled. Dkt. 2058-3 at 15

¶ 16; *id.* at 30–33 ¶ 114; Dkt. 2059 ¶¶ 17–21.

Second, even if fees and expenses paid to Donziger in exchange for legal services he pro-vided to his Ecuadorian clients were somehow exempt from the restrictions of paragraphs 1 and 5, there is no evidence that Donziger has performed bona fide legal services for any of his purported clients in exchange for the funds he has received. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████   Moreover, now that Donziger has been suspended from practicing law in New York (Dkt. 2053-1) and the District of Columbia (Ex. 68; Ex. 69), Donziger has no justifica-tion for continuing to collect a monthly retainer or any other supposed fees for legal services, as he is unable to perform any legal services for anyone.

Not only is Donziger not counsel of record in any ongoing proceeding to enforce the Ecuadorian judgment, as documented above, there is good reason to believe that Donziger no longer has any right to perform legal services on behalf of the LAPs. *See* Section II.C.3.  The evidence, in fact, demonstrates that at the same time that the LAPs are complaining to the Canadian courts about their lack of funds, Donziger is using the money collected from investors, as well as interests in the Ecuadorian judgment, not to fund litigation but rather to support his lifestyle and the continuation of his extortionate "pressure campaign premised on misrepresentations." *Donziger*, 974 F. Supp. 2d at 579–80; Section II.D.–E.  That this campaign continues is clear, as is the fact that funds traceable to the Ecuadorian judgment are being used to fuel this extortionate conduct.  Donziger has also been using the money collected from investors to pay off Page████████

████████ and other individuals involved in publishing his press releases and appearing at shareholder meetings and in bar proceedings against him.  *See* Section II.D.

Finally, the evidence demonstrates that Donziger has likely been selling his own interests in the Ecuadorian judgment, in violation of any interpretation of paragraph 5 of the RICO Judgment.  Donziger's only client, the FDA, has no legal right to sell shares in the Ecuadorian judgment.  *See* Section II.C.3.  Nevertheless, ████████████████████████████████████ ███████████████████████████████████████  *See* Section II.A; Ex. 3 at 34:21–24 (Donziger testifying that he arranges sales to six investors).  It is unclear what interest these investors could possibly have bought:  the FDA had no right to sell its interest (Velázquez Decl. at 3–5), Donziger had no authority to act on behalf of the LAPs, and Donziger maintains he was not selling his own interest.  Even if the FDA had an interest in the Ecuadorian judgment that can be sold, the 2017 retainer agreement states that the FDA is only the "intended recipient" of an award of "10% of the amount for environmental damages" in the Ecuadorian judgment, separate and apart from the damages themselves.  Ex. 23 at 1.  Donziger has not disputed that 15% to 20% percent of the Ecuadorian judgment has already been committed to third parties (*see* Dkt. 2080 at 5), which exceeds the FDA's alleged 10% share, ██████████████████████████████████ ██████████████████████████████████████████████████████[11]

In any event, the operative language in paragraph 5 of the RICO Judgment prohibits

---

[11]  Donziger continued to receive investor funds after April 23, 2018 (*see* Slavek Decl. Ex. 3-A ($342,045.16 via Forum Nobis on May 8, 2018), the date this Court entered the Default Judgment (Dkt. 1985).  Thus, even under Donziger's erroneous interpretation of the 2014 stay order, he is unquestionably in contempt.  *See* Ex. 3 at 70:25–71:21 ("MR. DONZIGER:  I am not at this point arranging any more financing. . . . THE COURT:  Look, I appreciate that, but you seriously need to consider whether, even if you are right as to what happened in days of yore, whatever argument has any traction at all from the minute the judgment was entered against all your clients, including the Frente, which I won't prejudge it, but it certainly is a different set of facts. . . . MR. DONZIGER: On that point, you're referring to the default judgment?  THE COURT: Yes, sure.  MR. DONZIGER:  Just to be clear, I testified in my deposition that I thought that it did not change the landscape in terms of fund raising. I, upon further reflection, realized that that is a mistake and not my position.  I didn't quite understand the situation when I said that.").

Donziger from profiting from the Ecuadorian judgment, which renders whose interest Donziger purports to be selling immaterial in light of his use of judgment proceeds to pay personal expenses.

**B.      Donziger Is Violating Chevron's Restraining Notice**

On February 28, 2018, a supplemental judgment was entered in favor of Chevron against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, and others (collectively, "Donziger"), for the sum of $813,602.71.  Dkt. 1962.  This amount remains due and unpaid.  Champion Decl. ¶ 2.  To facilitate the satisfaction of this judgment, on April 16, 2018, Chevron served Donziger with a restraining notice under CPLR § 5222, which forbade him from "mak[ing] or suffer[ing] any sale, assignment, transfer or interference with any PROPERTY in which [he has] an interest, or pay[ing] over or otherwise dispos[ing] of any debt owed to [him], except as provided in Section 5222."  Ex. 70 at 2.  Donziger's failure to comply with the restraining notice provides a separate basis for holding him in contempt of court.

Federal money judgments are enforced through the procedures of the state where the court rendering the judgment is found.  Fed. R. Civ. P. 69(a)(1).  New York's enforcement procedures are outlined in CPLR § 5222.  *Cordius Tr. v. Kummerfeld Associates, Inc.*, 658 F. Supp. 2d 512, 517 (S.D.N.Y. 2009).  Under Section 5222, a judgment creditor can serve the debtor with a restraining order prohibiting the debtor from transferring or assigning property before the judgment's satisfaction.  CPLR § 5222(b).  "A judgment creditor may move in federal court to hold a judgment debtor in civil contempt for transferring property in violation of N.Y. C.P.L.R. § 5222(b) (2000)."  *Cordius Tr.*, 658 F. Supp. 2d at 517.  "[T]he refusal or willful neglect to obey a restraining notice is punishable as contempt under C.P.L.R. § 5251," and "disobeying a restraining notice issued under CPLR § 5222 is a contempt of federal court where the restraining order was initiated by the judgment creditor as a means of executing a judgment entered in federal court."  *Id.* at 518.

The form and content of the restraining notice complied with the statutory requirements in

CPLR § 5222(e).  *See* Ex. 70 at 17–18; Ex. 71; *Cordius Tr.*, 658 F. Supp. 2d at 518–21.  The restraining notice also stated that "disobedience of this Restraining Notice is punishable as contempt of court."  Ex. 70 at 3.  Donziger, however, has ignored the restraining notice and has not yet satisfied any part of the supplemental judgment (although $150,000 was recently frozen in Donziger's TD Bank accounts as part of an effort to collect on the supplemental judgment).  Donziger's bank records reveal that, since April 16, 2018, Donziger "has continued to transfer funds from four of his five open TD Bank accounts ███████████████ (Slavek Decl. ¶ 62), including transferring $50,000 to Page on May 10, 2018 (Slavek Decl. ¶ 19).  These transfers, among others, violate the restraining notice and warrant holding Donziger in contempt.

## C.   Sanctions Are Warranted to Make Donziger Comply with the RICO and Default Judgments and the Restraining Notice, and to Compensate Chevron

In the RICO Opinion, this Court found that "Chevron has suffered injury—and is threatened with additional irreparable injury—in consequence of defendants' fraud."  *Donziger*, 974 F. Supp. 2d at 636.  Although it recognized that the equitable relief granted "would not provide a complete remedy for Chevron's injuries," the Court held that "[t]he relief granted here—relief that would prevent Donziger and the LAP Representatives from profiting from the Judgment or seeking to enforce it in this country—would partially remedy and partially prevent the injuries, existing and threatened, that cry out for relief."  *Id.* at 639.  But since the entry of the RICO Judgment, not only has Donziger disregarded the equitable relief this Court ordered, his pattern of racketeering has continued unabated, causing further irreparable harm to Chevron.  Significant contempt sanctions are necessary to finally end Donziger's racketeering and take away his ability to profit.

### 1.   Donziger's Pattern of Racketeering Continues Unabated

Despite this Court's RICO Opinion, Donziger, Page, and others continue to commit acts of extortion, wire and/or mail fraud, money laundering, and obstruction of justice.

**Extortion.**  From the very start of the Ecuadorian litigation, Donziger's objective has been to "subject Chevron to pressure sufficient to produce a generous settlement," based not on the merits, but the perceived threat of harm to Chevron.  *Id.* at 577; *see also id.* at 403 ("the object always included ratcheting the pressure up on Chevron in order to extract money from it").  This Court determined that Donziger's corruption of the Ecuadorian litigation and use of a pressure campaign premised on misrepresentations constituted extortion under the Hobbs Act.  *Id.* at 577–80.  Yet Donziger persists in his "wrongful objective" by way of "wrongful means."  *Id.* at 577.

Donziger and his co-conspirators are not trying to enforce the Ecuadorian judgment based on its merit.  They, instead, continue to employ "pressure tactics" to coerce a payoff from Chevron.

Moreover, this Court previously determined that Donziger's pressure tactics, which rely on repeated dissemination of statements Donziger knows to be false, "increased the perceived threat of harm to Chevron" and "were inherently wrongful by any definition."  *Donziger*, 974 F. Supp. 2d at 580.  Donziger has not changed course.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

**Wire and Mail Fraud.**  Donziger continues to engage in acts that are indictable under the wire or mail fraud statutes, which prohibit the use of the mail or wires "for the purpose of executing" a "scheme or artifice to defraud."  18 U.S.C. §§ 1341, 1343.  This Court held Donziger's "false statements to the media and to public officials that were made to increase the pressure on Chevron" were such unlawful "deceitful schemes."  *See Donziger*, 974 F. Supp. 2d at 588–89.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████  Moreover, because Donziger's objective is to coerce a payment from Chevron not based on merit but using inherently wrongful means, his

emails with co-conspirators and funders are criminal acts under the wire and/or mail fraud statutes.

**Money Laundering.** The federal money laundering statute prohibits as a felony the transfer of funds from the United States to a foreign country, or vice versa, "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(2); *see also Donziger*, 974 F. Supp. 2d at 591 ("The record in this case contains persuasive evidence of a number of [money laundering] offenses by Donziger."). Donziger and his co-conspirators have transferred substantial amounts of money between the United States, Ecuador, Canada, and other countries to support their unlawful scheme. Donziger, who claims that he is the "lifeline for people in Ecuador to raise money" (Ex. 26 at 24:1–12), ████████████████████████████████████████

██████████████████████████████ All of the co-conspirators' foreign payments further the enterprise's unlawful, extortionate scheme, and therefore constitute money laundering.

████████████████████████████████████████████████████

████████████████████████████████████ then transferred, at least in part, to New York—specifically into Donziger's accounts. *See* Section II.B. Donziger used the funds both personally and for making international payments to support his extortionate pressure campaign. *See* Slavek Decl. Exs. 6, 8 (showing payments from Donziger to co-conspirators in Ecuador and Rex Weyler and others in Canada); ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ As one investor's counsel noted: "[I]t is a very odd arrangement and gives me some pause. . . . There is some part of this that feels like the steps people may take when they are laundering money." Ex. 89 at JVM 004913. And as one of the escrow agents likewise confirmed, since the funds were immediately dispersed, "the only benefit

to this arrangement was an effort to hide the identity of the Funder from Chevron." *Id.* The investor's counsel noted that, "I am not sure there is much we can do in this agreement to mitigate any fraud that might be involved." *Id.*[12]

**Obstruction of Justice.** Donziger has also violated multiple discovery orders of this Court by concealing bank accounts and assets, failing to conduct even the most basic document searches, failing to produce responsive documents, and refusing to respond to deposition questions. *See* Dkt. 2073 at 1–4. The evidence also shows that Donziger, along with Page, encouraged the deletion of emails, at a minimum relating to his effort to sell an interest in the judgment to Elliott Management Corporation. *See* Dkt. 2058-14; ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Donziger's efforts are intended to obstruct these proceedings—and potentially his criminal acts— and prevent Chevron from discovering the full extent of Donziger's contempt of the RICO Judgment. *See Donziger*, 974 F. Supp. 2d at 593–95; *see also id.* at 434 n.410 ("destruction prior to service of subpoena of evidence material to known investigation constitutes obstruction of justice") (citing *United States v. Solow*, 138 F. Supp. 812, 813–16 (S.D.N.Y. 1956)).

**2.      Sanctions Are Necessary to Force Donziger to Comply**

Donziger's repeated and flagrant violations of this Court's Judgments warrant the imposition of severe sanctions. *See N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857–

---

[12]   Another investor, referring to the judgment ghostwriting evidence, noted counsel's "statement that in the US if this happened there would be an immediate rejection of the ruling and criminal charges filed." Ex. 89 at JVM 004911. Donziger, with Page's help, responded to investor concerns with misleading claims and attacks on this Court.   Ex. 92 ("As for dear Judge Kaplan's quote, it is a typical masterwork of false and misleading information. . . . ").

58 (2d Cir. 1984) ("continuous and obviously willful violation" of court orders provided "ample reason to conclude that only a stiff remedy would suffice to coerce compliance"). Courts "have broad discretion to fashion remedies as equity requires, to ensure compliance with their orders." *Cordius Tr.*, 658 F. Supp. 2d at 524. "The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics*, 369 F.3d at 657. When considering the imposition of coercive sanctions, courts generally consider: "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Cordius Tr.*, 658 F. Supp. 2d at 525 (quotation marks and citation omitted).

Donziger has demonstrated that he is unwilling to abide by this Court's authority and that he will continue to enlarge and profit from his fraud for as long as he can get away with it. Donziger's misconduct not only continues to victimize Chevron—defeating, in part, the relief it was awarded—it threatens other U.S. entities and individuals, along with the integrity of this U.S. court. Donziger's refusal to comply with the RICO Judgment to date—nearly five years after it was entered—indicates that he will not change his conduct absent a severe coercive sanction.

## IV.    REQUESTED RELIEF

To bring Donziger into compliance with the RICO Judgment and the Default Judgment, Chevron requests that Donziger be ordered within seven days of the Court's order on this motion to execute a notarized, unamended Transfer and Assignment attached hereto as Exhibit 88, transferring to Chevron the contingency interests granted to him under the 2017 retainer agreement, and to transfer ███████████████████████████ to Chevron. Donziger should also be required to provide to Chevron a complete statement of his net worth and all assets in his possession or under his control within seven days of the date of the Court's order. *Cf.*

*Cordius Tr.*, 658 F. Supp. 2d at 526 (requiring as a sanction for contempt that judgment debtor to provide a valuation for the property at issue).  This statement should disclose all agreements granting Donziger an interest in the Ecuadorian judgment, and Donziger should provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided in the statement is complete and accurate.

To ensure Donziger's compliance with this Court's Judgments going forward, Donziger should be required to submit quarterly reports to Chevron and this Court to include (a) an updated and complete statement of his net worth and all assets in his possession or under his control, and (b) any new or amended agreements granting Donziger an interest in the Ecuadorian judgment. Donziger should also be required to provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided in the quarterly reports is complete and accurate and to certify that he has complied with paragraphs 1 and 5 of the RICO Judgment and paragraphs 1 and 4 of the Default Judgment by, among other things, "transfer[ing] and forthwith assign[ing]" to Chevron all property traceable to the Ecuadorian judgment or enforcement of the Ecuadorian judgment.  Chevron should also be entitled to ongoing discovery to confirm Donziger's compliance.  The Court should appoint a special master to monitor this discovery and Donziger's compliance with this Court's Judgments.  *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established." (quotation marks and citation omitted)).

To bring Donziger into compliance with the restraining notice, Chevron requests that Donziger be ordered within seven days of this Court's order on this motion: to identify for Chevron each and every bank account for which Donziger or his law firms have had, since April 16, 2018,

directly or indirectly, access to, control of or an interest in; provide a complete accounting of all funds that have entered or exited those accounts since April 16, 2018; and provide a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided is complete and accurate.

To the extent Donziger refuses to comply with any of the aforementioned obligations, Chevron submits that the Court should impose monetary sanctions on Donziger until he fully complies. *See, e.g.*, *United States v. City of Yonkers*, 856 F.2d 444, 459–60 (2d Cir. 1988), *rev'd on other grounds sub nom. Spallone v. United States*, 493 U.S. 265 (1990); *F.T.C. v. Verity Intern., Ltd.*, 140 F. Supp. 2d 313, 317–19 (S.D.N.Y. 2001) (Kaplan, J.).

Any claim by Donziger that he no longer possesses or controls the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ is proof that Chevron has suffered an actual loss in the amount of ▮▮▮▮ as it would mean that Donziger has disposed of property to which the RICO and/or Default Judgments entitle Chevron to possess. If Donziger makes such a claim, the Court should award Chevron ▮▮▮▮ in compensatory damages. *See, e.g.*, *N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989) ("Compensatory sanctions should reimburse the injured party for its actual damages."). Given Donziger's willful violations of this Court's orders, Chevron also seeks a reasonable award of attorneys' fees and costs (including for experts) it has incurred litigating Donziger's contempt. *See, e.g.*, *Weitzman v. Stein*, 98 F.3d 717, 719–21 (2d Cir. 1996). If this request for relief is granted, Chevron will file a separate motion substantiating the amount of fees and costs.

## V.   CONCLUSION

Chevron respectfully requests that the Court hold Donziger in contempt, enter coercive sanctions to prevent further contempt of this Court's RICO Judgment, Default Judgment, and the restraining notice, and compensate Chevron for the injuries it has incurred.

Dated: October 1, 2018

New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

_____*s/ Randy M. Mastro*_____

Randy M. Mastro
Andrea E. Neuman
Anne M. Champion
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com
Email: ANeuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC

Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*