# EXHIBIT 1

# Chevron's RICO Fraud
## An Abuse of Indigenous Peoples, the Environment, and U.S. Courts

*Background, Context, and Responses to the False "Findings"
in the* Chevron v. Donziger *Case*

---

[W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Steven Donziger and the Ecuadorian contamination victim plaintiffs] have attached it in Singapore or wherever else [as part of enforcing their final Ecuadorian judgment].

  —*Hon. Lewis A. Kaplan (SDNY) at the first hearing in Chevron's RICO case, Feb. 2011*

---

This is an extraordinary case that has degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather merit… Encouraged by this Court's implacable hostility toward Donziger, Chevron will file any motion, however meritless, in the hope that the Court will use it to hurt Donziger.

  —*Attorney John Keker in reference to the RICO case, May 2013*

---

"[O]ur L-T [long-term] strategy is to demonize Donziger."

  —*Chevron's lead PR consultant in 2009,
  describing the company's plan to evade liability
  in the Ecuador environmental case*

---

**Legal Team for the Ecuadorian Villagers**
**2017**

## TABLE OF CONTENTS

**INTRODUCTION**......................................................................................................................1

**SUMMARY: THE 12 CORE FALSE "FINDINGS" BY U.S. COURTS** .................................3

**CONTEXT AROUND THE U.S. JUDICIAL DECISIONS**....................................................5

Appeals Court Blindly Accepts Kaplan's Findings ........................................................5
Chevron's Bad Faith Forum Shopping ..........................................................................6
Chevron's "Demonize Donziger" Strategy ....................................................................7
Chevron's Corrupt Witness: "Money Talks, But Gold Screams"....................................8
Judge Kaplan's Favoritism And Bias ............................................................................8
Judge Kaplan's Harassment of Donziger ......................................................................9
Judge Kaplan's Illegal Worldwide "Injunction"............................................................9
RICO Trial: The Dickensian Farce ...............................................................................10
The Role of Chevron's Law Firm In Orchestrating Corruption .....................................10

**DETAIL OF THE 12 FALSE OR DISTORTED FINDINGS BY U.S. COURTS** .................11

False Finding #1: The Plaintiffs "Ghostwrote" the Ecuador Environmental Judgment .......11
*How Chevron Bribed A Witness To Lie* ...............................................................11
*Background on Chevron's False Narrative* .........................................................12
*Guerra's Criminal History*.................................................................................13
*Guerra's Other Credibility Problems* .................................................................13
*Guerra's "Confession" of Lying During the Arbitration* ......................................14
*Chevron's Failed "Documentary Evidence" Argument*........................................15
*Another Chevron Dead End: Computer Forensic Analysis* ...................................15
*Chevron's Final Hail Mary: Unfiled Work Product*.............................................16
False Finding #2: Donziger Tried To Intimidate Chevron With An "Inflated" Cost Estimate.............17
*David Russell's Preliminary Assessment* ............................................................17
*Judge Kaplan's Double Standard* .......................................................................18
False Finding #3: Donziger Refused to Test for Certain Pollutants ...............................19
False Finding #4: Donziger "Falsified" an Expert Report (Calmbacher) ........................20
False Finding #5: Donziger "Secretly" Paid Industry Experts for Neutral Monitoring Services ..........21
False Finding #6: Donziger "Coerced" a Judge to Cancel Certain Site Inspections.............................23
False Finding #7: Donziger "Coerced" a Judge to Appoint a Certain Expert (Cabrera) ......................24
False Finding #8: Donziger "Secretly" Paid Cabrera ....................................................24
False Finding #9: Donziger "Controlled" Cabrera's Work While Denying Involvement .....................25
False Finding #10: A Consulting Expert—Stratus—Wrote the Cabrera Report .................................26
False Finding #11: Stratus "Fabricated" Objections to the Cabrera Report.......................................27
False Finding #12: Donziger Hired New Consultants To "Cleanse" the Cabrera Report .....................27

**THE RESULT: ABSURD LEGAL DETERMINATIONS IN KAPLAN'S RICO RULING** ..........28

Fraud ..........................................................................................................................28
Extortion .....................................................................................................................29
Wire fraud ...................................................................................................................29
Money laundering .......................................................................................................29
Obstruction of justice ..................................................................................................29
Witness tampering.......................................................................................................29
Travel Act ...................................................................................................................30
Kaplan's Final Act of Dishonesty: Inventing a Claim ..................................................30

**CONCLUSION** .......................................................................................................30

# Introduction

*The imagination of American lawyers is just without parallel in the world. It is our one absolutely overwhelming comparative advantage against the rest of the world, apart from medicine. You know, we used to do a lot of other things. Now we cure people and we kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger [with the Ecuador judgment] is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning.  – Judge Lewis A. Kaplan, in Chevron's RICO case*

Chevron's infamous civil "racketeering" (or RICO) case against Ecuadorian indigenous groups and their lawyers began and ended as a disgrace. It involved a U.S. court so desperate to rescue a U.S. company from a significant environmental liability imposed by a foreign court that it endorsed massive illegal payments by Chevron to a corrupt "fact" witness who repeatedly lied in court, and imposed countless other due process abuses that suggest a great degree of intellectual dishonesty. The U.S. judge who oversaw this spectacle, Lewis A. Kaplan, failed to disclose that throughout the proceeding he held significant personal investments in the oil industry – including, through a mutual fund, investments *in Chevron itself*. As prominent U.S. trial attorney John Keker said, the Kaplan/Chevron RICO case "degenerated into a Dickensian farce" because of the judge's "implacable hostility" toward the Ecuadorians and their lawyers. The details of what Kaplan allowed Chevron to do to Ecuadorian indigenous groups in his courtroom are chilling.

Judge Kaplan allowed Chevron to use his court – and by extension, the inherent judicial authority of the United States – to try to "rescue" the company from a large environmental liability of its own making. The environmental judgment against Chevron was imposed based on incontrovertible evidence that the company abandoned thousands of open-air toxic waste pits in the Amazon that still contaminate the groundwater and drinking water of tens of thousands of indigenous and subsistence farming communities in the Ecuadorian Amazon. Evidence also demonstrated that the company systematically and deliberately discharged 16 billion gallons of toxic "water of production" into rivers and streams, flared poisonous gas into the air, and dumped millions of gallons of oil waste along dirt roads in the region. Judge Kaplan refused to consider any of this environmental evidence in the RICO proceeding. For this reason and numerous others explained herein, the U.S. court decisions in Chevron's RICO case – all of which derive from Kaplan's flawed proceeding -- deserve no deference by any authority, the public, the financial markets, or even Chevron's own shareholders and employees. Placed in the context of new evidence that recently emerged proving the abject falsity of the paid-for witness testimony in the RICO matter, the decisions ultimately document a *vast fraud perpetrated by Chevron itself*. To be clear, the decision by Judge Kaplan in 2014 that indigenous groups in Ecuador committed "fraud" and "racketeering" to obtain their environmental judgment is not only erroneous, but the product of *criminal conduct by Chevron* in presenting fabricated evidence to a U.S. court.

Judge Kaplan, and the three appellate judges who accepted his factual "findings" without any independent analysis, turned a blind eye to a gross injustice inflicted by an American oil company on some of the most vulnerable people on the planet. Also targeted by Chevron in the RICO matter was various counsel for the indigenous groups, primarily U.S. human rights attorney Steven Donziger. Chevron admitted in 2013 it had spent at least $15 million on one "corporate investigations" firm—one out of many—to spy on Donziger

and his family and to prepare up to 30 reports on every conceivable aspect of his life. Chevron used six public relations firms and dozens of law firms to try to "demonize" (in the company's own words) Donziger in the realm of public opinion. Chevron's latest gambit is to try to personally bankrupt Donziger: the company is seeking an egregious order allowing the company to seize over $33 million in legal fees and costs from him. Of course, Donziger is a solo practitioner without even a fraction of that amount in his possession. The Chevron exercise of trying to recover "costs" for perpetrating its own fraud is about nothing other than trying to send a message of intimidation to other attorneys who might follow Donziger's example and battle Chevron relentlessly to obtain justice for the Ecuadorian indigenous groups.

Ultimately, Chevron is using the U.S. court opinions to evade responsibility for causing what experts believe is the worst oil-related contamination in history. Judge Kaplan and the appellate court almost completely cooperated with Chevron's unapologetic use of the RICO statute to to distract attention from the company's own environmental crimes and fraud. The main purpose of Chevron's massively expensive retaliation campaign—it has used over 2,000 lawyers and consultants since the inception of the strategy—is to block enforcement of the environmental judgment from Ecuador. The judgment was issued in 2011 in a country where Chevron had earlier insisted the trial be held and where it had accepted jurisdiction. Ecuador's Supreme Court in 2013 unanimously affirmed the ruling in a well-considered 222-page decision. Behind the legal maneuvering, the affected communities in Ecuador suffer from skyrocketing cancer rates and other health problems deriving from Chevron's policy of deliberately dumping harmful toxic oil waste into the rainforest during the time it operated in Ecuador from 1964 to 1992. Chevron never has contested the fundamental fact that its operations in Ecuador caused extensive pollution.[1]

Aside from being the largest environmental civil judgment in history, the Chevron environmental case represents the first time that indigenous communities have held a major oil company legally accountable for the full scale of its pollution. Chevron mounted the most far-reaching corporate defense in history not just to avoid this sizeable judgment, but also out of fear that the precedent might lead vulnerable communities all over the world that have been harmed by the practices of the fossil fuel industry to stand up for their rights -- likely leading to cascading levels of additional liability for Chevron and its industry peers. Structural pressures on the fossil fuel industry due to global warming, the rapidly increasing transition to clean energy, and low oil prices likely have made Chevron management even more angry at having to pay the Ecuador environmental judgment issued from the courts of its preferred forum.

This Report provides specific responses to the many flawed and distorted factual "findings" in the Kaplan and U.S. appellate court decisions.

---

[1]  Chevron's main defense in the Ecuador trial was not that it didn't pollute. Chevron executive Rodrigo Perez Pallares even admitted that the company deliberately dumped at least 15 billion gallons of untreated toxic waste (which contained the carcinogen benzene and other harmful chemicals) into Amazon waterways as a waste disposal mechanism. Rather, Chevron's main defense was that any clean-up should be paid by Petroecuador, Ecuador's state-owned oil company, even though Chevron (operating as Texaco) was the exclusive operator of the oil fields and planned, engineered, and constructed the polluting well sites and production facilities. The Ecuadorians' legal team have prepared a summary of the overwhelming evidence against Chevron in the Ecuador trial available here.

## Summary: The 12 Core False "Findings" by U.S. Courts

This report first provides an overview of the background and analysis of some overarching critical points regarding Chevron's RICO prosecution. It then addresses the "factual findings" made by Judge Kaplan that were rubber-stamped without any inquiry or independent analysis by the Second Circuit. First, the report addresses the core claim of misconduct that drove the case both in the courts and in Chevron's collateral media campaign: the unequivocally false claim that Attorney Donziger and others agreed to bribe the presiding judge in the Ecuador case in exchange for being able to "ghostwrite" the trial court judgment. The thin and patently corrupt evidence Chevron put forward in support of this false claim has been thoroughly debunked, and the claim has more recently been disproven through a forensic analysis of the "digital fingerprints" on the Ecuadorian judge's hard drives. After explaining this in detail, this report starting on page 11 addresses a number of other claims as summarized in the appellate court affirmance of Judge Kaplan's decision, responding to each in turn with supporting documents that illuminate the true facts and context. An executive summary of all these responses is provided here:

**1) False finding: Lawyers for the villagers wrote the Ecuador trial court judgment**. A forensic examination of the trial judge's computer, undertaken by one of the world's leading experts, definitively proved the falsity of this finding. See more at page 11 (or click here).

**2) False finding: Donziger tried to "extort" Chevron by issuing an inflated damages assessment.** The damages assessment, prepared by a scientist after an extensive field inspection at the beginning of the trial, was proper advocacy protected by the First Amendment. Further, contrary to the Kaplan court's "finding" on this point, the damages figure in the report ($6 billion) was significantly lower than Chevron's actual damages as later determined by Ecuador's courts and credible third parties. See more at page 17 (or click here).

**3) False finding: Donziger's refusal to adduce sampling evidence favorable to Chevron was "extortion"**. The legal team for the villagers produced evidence to prove their claims; they were under no legal or ethical obligation to find evidence favorable to Chevron. Contrary to Judge Kaplan's finding, it would have been legal malpractice for Donziger to adduce evidence to help Chevron fight his own clients. See more at page 19 (or click here).

**4) False finding: Donziger falsified the conclusions of an expert report**. This is false. Evidence ignored by Judge Kaplan shows the expert actually signed off on his report, which demonstrated extensive and illegal levels of toxic pollution at two Chevron well sites. See more at page 20 (or click here).

**5) False finding: Donziger secretly hired industry experts**. Donziger hired two technical experts to monitor the trial so the court would feel sufficiently animated to put an end to Chevron's attempts to corrupt the proceedings. This was proper advocacy and any decent lawyer fighting for a fair trial would have done the same. See more at page 21 (or click here).

**6) False finding: Donziger "coerced" the trial judge to cancel judicial inspections of Chevron's well sites**. This is false. Stripped of the demonization rhetoric, the relevant fact here is that the legal team for the Ecuadorians effectively *advocated* for the judge to allow them to withdraw the inspections they had unilaterally requested because they had concluded they had met their burden of proof. The judge granted the motion, as he should have. Chevron still inspected 100% of the sites it had requested. See more at page 23 (or click here).

**7) False finding: Donziger "coerced" the trial judge to appoint an expert witness, Richard Cabrera.** This too is false. The legal team for the villagers nominated Cabrera as a party expert to prepare a report on damages and the court appointed for this purpose in exactly the same way Chevron's experts were appointed by the court for the company's reports. This was part of a *pro forma* process in Ecuador regarding expert witnesses that was affirmed by three layers of courts in the country. See more at page 24 (or click here).

**8) False Finding: Donziger planned the Cabrera report and paid him secretly for the work.** The legal team for the villagers helped Cabrera plan his report, its experts drafted the report based on criteria they established with Cabrera, and they paid Cabrera a reasonable fee that was disclosed. Chevron did exactly the same with its experts. The process was consistent with practice in Ecuador and affirmed as such by Ecuador's highest court. See more at page 24 (or click here).

**9) False Finding: Donziger's team controlled Cabrera while denying involvement.** This is false and condescending. Nobody controlled Cabrera. Cabrera was a paid expert who exercised his independent judgment based on his assessment of the voluminous evidence against Chevron. Judge Kaplan's incessant focus on Cabrera is misplaced and legally irrelevant, as affirmed by the rulings of three layers of courts in Ecuador. See more at page 25 (or click here).

**10) False Finding: Stratus, an American environmental consulting firm, wrote Cabrera's report.** Stratus drafted the bulk of Cabrera's report and it was entirely appropriate to do so as confirmed by Ecuador's courts. After eight years of trial, there were thousands of pages of technical reports in evidence, including 64,000 chemical sampling results. The scientists at Stratus worked as a team to help Cabrera aggregate and present this voluminous information to the court. See more at page 26 (or click here).

**11) False Finding: Donziger arranged for Stratus to file objections to the Cabrera report.** This is true and entirely appropriate given various discrete shortcomings in the Cabrera report that the legal team felt needed to be addressed. See more at page 27 (or click here).

**12) False Finding: Donziger hires consultants to "cleanse" the Cabrera report.** Given Chevron's constant and unfair drumbeat of complaints about Cabrera, the legal team for the villagers asked the court to let both parties prepare additional damages reports. Chevron and Judge Kaplan tried to make this seem sinister by claiming its purpose was to "cleanse" Cabrera's report when in reality Cabrera's report was empirically grounded and prepared consistent with Ecuadorian law. See more at page 27 (or click here).

## Context Around the U.S. Judicial Decisions

As explained in detail below, the U.S. court opinions in question are at their core based on false evidence fabricated by Chevron via the testimony of an admittedly corrupt witness paid $2 million in cash and benefits by the company and coached for 53 consecutive days before being allowed to testify. This witness, Alberto Guerra, later admitted he lied repeatedly when testifying before Judge Kaplan about bedrock facts relied on by the court for its false findings. In fact, the testimony of this corrupt witness was "credited" by Judge Kaplan in an extremely problematic proceeding where the accused were not allowed to put on a meaningful defense and where even the barest mention of Chevron's contamination, corruption and fraud in Ecuador—evidence absolutely critical to explain the basis of the environmental judgment against Chevron—was prohibited from any utterance in open court. Judge Kaplan also refused to seat a jury so he could decide the case alone.

Judge Kaplan also did something with Chevron's racketeering trial that no judge in any country in the world had ever before attempted. He let a disaffected litigant (Chevron) that had lost a case in a foreign court where it had accepted jurisdiction return to its home-country court to collaterally attack that judgment by putting that foreign country's *entire judiciary* on trial. This move had no legal basis and violated longstanding principles of international law. In fact, dozens of legal scholars from nine countries filed a "friend of the court" brief condemning the very idea of Judge Kaplan's concept of the RICO case as a violation of international law.[2] The underlying environmental case in Ecuador was one where both parties had accepted jurisdiction, where the facts had been litigated for several years at great expense, and where the parties had agreed to respect the final judgment subject only to limited defenses on appeal. Not only was Chevron's collateral attack on a foreign country's entire judiciary something that had never before happened, it was a monumental waste of judicial resources and a profoundly disturbing example of U.S. judicial overreach. Ecuador, after all, is a sovereign nation and U.S. ally. The fact the Chevron attack on Ecuador was based on false evidence and distorted facts only makes it more disturbing.

### Appeals Court Blindly Accepts Kaplan's Findings

On appeal, a three-judge appellate panel[3] affirmed Judge Kaplan's decision. It did so blindly, with no independent analysis of his factual findings. The panel was made aware of the fabricated evidence credited by Judge Kaplan, but chose to ignore it. The panel also was presented with extensive evidence of Judge Kaplan's procedural machinations and denial of due process during the RICO case, but chose to ignore it. The panel members also were made aware, as we explain below, that Judge Kaplan repeatedly distorted the context of Ecuadorian law and legal practice in Ecuador to help Chevron try to frame U.S. attorney Donziger as a "racketeer" so it could evade liability for its environmental crimes and fraud committed against indigenous villagers. Donziger, a graduate of Harvard Law School who has been described as a man of "Herculean tenacity" by BusinessWeek magazine, never had even one complaint filed against him in 25 years of legal practice until Chevron launched its demonization campaign. Judge Kaplan also refused to let Donziger pursue his far stronger counterclaims against Chevron for the company's own criminal racketeering scheme (of which the Chevron RICO case targeting him was a central part) that was designed to deny justice to the Ecuadorians by demonizing their lawyers, as outlined in this lawsuit. In civil trials, the accused is supposed to be allowed to file counterclaims against the accuser so all dimensions of the

---

2    The "friend of the court" brief is available here. For additional analysis of why Chevron's RICO case was unprecedented and lacked a proper legal basis, see this appellate petition.

3    The members of the appellate panel were Amalya L. Kearse, Barrington D. Parker, and Richard C. Wesley.

controversy can be heard and balanced by the same jury. Judge Kaplan barred such claims by Donziger and refused to even seat a jury, ensuring a one-sided proceeding in favor of Chevron.

## Chevron's Bad Faith Forum Shopping

Another of Chevron's abusive practices endorsed by Judge Kaplan and the Second Circuit was its continuous forum shopping to try to find a friendly court to help it evade the environmental judgment issued by the court in Ecuador. As mentioned, the environmental trial took place in Ecuador *at Chevron's request* after the company filed 14 affidavits before a U.S. federal court (where the case originally was filed) praising Ecuador's courts. Desperate to avoid a jury trial in the United States where evidence of its toxic dumping would have been presented, Chevron agreed to have the case heard in Ecuador where juries are not used. Chevron's promise to pay any adverse judgment as a condition of the case moving to Ecuador was quickly betrayed when it lost the case. Given that Chevron (operating under the Texaco brand) had systematically dumped toxic oil waste with impunity in Ecuador for almost three decades without facing even a single court judgment, the company thought it would be "business as usual" in the South American nation and that it could force a politically engineered dismissal. In fact, Chevron attempted exactly that when company executive Ricardo Reis Veiga—himself the architect of a sham "clean-up" of the company's waste pits in the 1990s that was later proven to be fraudulent—met with Ecuador's Attorney General on the first day of the trial and demanded that he (illegally) call the trial judge and pressure him to dismiss the case. The Attorney General obliged and placed the call, though the trial judge fortunately refused the demand. Reis Veiga admitted to these facts under oath in a deposition.

The affected communities filed their case in U.S. federal court in New York because of an abiding concern that Chevron would exercise improper political influence over Ecuador's courts. This was the same U.S. court where Judge Kaplan sits and where Chevron returned in 2011, in a fit of buyer's remorse, to file its RICO case. During the trial in Ecuador, which lasted eight years (2003 to 2011) largely because of Chevron's constant attempts to delay and sabotage the proceedings, the company filed an arbitration claim against the government of Ecuador under the U.S.-Ecuador Bilateral Investment Treaty. This claim asserted that Chevron was being denied "due process" in its favored courts in Ecuador and sought to shift any liability that might be imposed to the government. In other words, Chevron was trying to use the arbitration action (which is still pending after eight years) to obtain a taxpayer-funded bailout from the citizens of the country it victimized. As an added insult, the rules of the arbitration barred Chevron's victims from participating as a party or even attending the proceedings, which have been conducted in secret.

After Chevron refused to pay the judgment in Ecuador, and the villagers filed actions to seize company assets in other jurisdictions like Canada, Chevron began to rely on a new technicality to try to evade paying compensation to its victims. Chevron claimed it should never have to pay even one dollar of the judgment because all of its assets around the world were held in wholly-owned subsidiaries. By this logic, Chevron as the parent company did not actually have any assets in the enforcement countries to be seized, even though its subsidiaries were obviously such assets. Chevron's argument is frightening for many reasons, not the least of which is that the company operates around the world *only* through its wholly-owned subsidiaries. In fact, it has roughly 1,300 such subsidiaries in more than 100 countries. The company's subsidiary in Canada, Chevron Canada, has an estimated $15 billion in assets that could be used to pay the entirety of the Ecuador judgment. But Chevron is trying to immunize itself from all liability to its victims by claiming any asset held by Chevron Canada is off limits to collection because it was not a defendant in the Ecuador case. In fact, Canadian law is clear that any asset held by a debtor, including a subsidiary, can be subject to collection. But Chevron is forcing the issue to be litigated, wasting valuable time and resources.

Chevron is essentially arguing that once it removed its assets from Ecuador, there was nothing the villagers could do to collect the first dollar of their judgment anywhere in the world given that all of its assets are held in subsidiaries. Because of Judge Kaplan's erroneous decision and the Second Circuit's endorsement of it, the villagers are now blocked from trying to seize Chevron's assets in the United States. In the legal world, Chevron has converted this sort of courtroom trickery into high art. It is most unfortunate, and ironic, that the same U.S. courts where Chevron's victims in Ecuador originally came to seek relief have now become complicit in the company's forum shopping strategy.

Nonetheless, in the long term there is little that Chevron can do to block the villagers from trying to seize the company's assets around the world—particularly given that the judgment came from a court system that Chevron repeatedly praised until it lost the trial there.  Canada, Brazil, and Argentina—three jurisdictions where company assets are being pursued by the villagers—are only a few among the dozens of countries where Chevron conducts business and maintains substantial assets.  Chevron will eventually be forced to comply with its responsibilities to the people of Ecuador and pay the court-mandated damages necessary to remediate the pollution it created. It is important to remember that the underlying pollution artificially enriched Chevron shareholders and executives by externalizing the costs of production onto some of the world's most impoverished and vulnerable people. Law and basic principles of fairness require that at least some of such funds be returned to the people who were victimized.

## Chevron's "Demonize Donziger" Strategy

Chevron openly admitted its goal with the RICO trial was "to demonize Donziger" and attack adversary counsel to evade paying its enormous liability to the people of Ecuador, which at the time of this writing has risen to $12 billion. Given the success of the legal team for the villagers against Chevron in the Ecuador trial, it is clear that company regarded Donziger as uniquely dangerous; he was spied on for weeks in Manhattan by six agents hired by the corporate espionage firm Kroll, to whom Chevron paid at least $15 million to prepare 20 to 30 reports on Donziger. This was also the firm that found the corrupt witness Guerra in Ecuador and paid him $38,000 in cash out of a backpack to hold him over until he struck a more lucrative long-term deal with Chevron's lawyers in the U.S. Judge Kaplan wholeheartedly embraced the Chevron demonization campaign against Donziger and—as shown in this Report, including most directly through the judge's own words spoken from the bench—delighted in taunting Donziger and his lawyers throughout the case. During one hearing in the opening days of the case (before any evidence was presented), Kaplan inveighed:

> The imagination of American lawyers is just without parallel in the world… [W]e used to do a lot of other things. Now we cure people and kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning…

This report makes clear that the actual "racketeer" in this matter is not the Ecuadorian villagers who have suffered so at Chevron's hands, nor Donziger and other human rights lawyers who for years have fought valiantly for their clients. Rather, it is the oil company that has refused to comply with the rule of law or fulfill its legal and moral responsibilities to the thousands of people in Ecuador that it harmed.

Given that Chevron's paid witness in the RICO case admitted perjuring himself and that Judge Kaplan's hostility toward Donziger has now been comprehensively documented, the U.S. court decisions are fading rapidly into obsolescence.  They are collapsing under the weight of their own internal contradictions and the unfair trial procedure that produced them. Already, Canada's Supreme Court has unanimously rejected

Chevron's attempts to use Judge Kaplan's "facts" to shut down the judgment enforcement process. Brazil's courts also have rejected Chevron's similar request in that country.

## Chevron's Corrupt Witness: "Money Talks, But Gold Screams"

At the very heart of Chevron's RICO attack is the corrupt Chevron witness, Alberto Guerra. As indicated, Chevron paid Guerra at least $2 million in cash and benefits and coached him for weeks before he testified. There is little question but that even today, years since he has performed any services for Chevron, Guerra remains a "kept man," paid significant sums of money by the company merely to keep quiet about the falsity and illegal procurement of his testimony. The original contract—promising value that has reached in excess of $2 million—constituted an enormous windfall by any measure, but especially so given that Guerra testified that until Chevron and Kroll showed up at his door, he had no savings and was making only $500 per month. As Guerra was negotiating with Chevron, he was caught on tape saying, "Money talks, but gold screams." Chevron's exorbitant payments to Guerra also violated various federal laws, as we explain below.

Guerra's resulting testimony provided Judge Kaplan the basis for two of his erroneous findings that are central to the company's public relations and legal campaigns to cover its tracks in Ecuador. First, based on Guerra's testimony, Judge Kaplan erroneously found that Donziger bribed the trial judge. Second, Judge Kaplan erroneously found that lawyers for the villagers led by Donziger arranged for the "ghostwriting" of the trial court judgment. It is now clear that Guerra lied on the stand about both the bribery and ghostwriting allegations—lies definitively proven after the close of the RICO case by scientific forensic analysis and admissions under oath from the witness himself in a separate arbitration proceeding. Given the evidence of corruption, subterfuge, and fabrication of evidence by Chevron lawyers and the company's star witness, it is truly shocking that U.S. federal courts have been willing to turn a blind eye to it all in their rulings in the *Chevron v. Donziger* cases.

It is clear from the factual responses below that the villagers—who live in roughly 80 indigenous and farmer communities in Ecuador's rainforest—not only have been victimized for decades by Chevron's dumping of toxic oil waste onto their ancestral lands, but have been doubly victimized by the fact Judge Kaplan and the Second Circuit allowed Chevron to use the enormous power of the federal judiciary to defame their accountability campaign and immunize a "favorite son" multinational from the consequences of its crimes and fraud. Apart from the many flagrant problems with Judge Kaplan's fact "findings" that are explained in detail below, there are numerous *legal* reasons why the Second Circuit erred in its affirmance of his flawed ruling. These errors—which demonstrate that the RICO case had no legal basis -- have been amply documented in legal briefs (available here and here) and in other materials where Chevron's various claims have been rebutted by Donziger and others. (See this detailed article in a legal publication and this Huffington Post article.)  This Report focuses to how Judge Kaplan and the Second Circuit distorted the underlying facts of the case in order to target Donziger.

## Judge Kaplan's Favoritism And Bias

Evidence of Kaplan's disturbing and even racist comments toward the Ecuadorian villagers, his anger at the villagers for suing Chevron, his refusal to hear key evidence about Chevron's contamination and fraud, his refusal to let Donziger and others tell their story in open court, and his many perplexing and even illegal rulings were all designed to inflict maximum harm on the villagers and their judgment. The unpleasant details of Judge Kaplan's behavior during the trial have been documented at greater length elsewhere, mostly in legal briefs seeking his recusal (see here for one example). We briefly summarize some of the

problems so the reader can understand the actual context in which the false and distorted findings documented in this report were made.

Before Judge Kaplan even held an evidentiary hearing, much less a trial, he jumped on Chevron's bandwagon to turn Donziger into a "whipping boy" to distract from the company's wrongdoing. He called Donziger the "mastermind" of a litigation extortion effort against Chevron in Ecuador. He accepted Chevron's notion that entire Ecuador case was "sham" litigation. He repeatedly characterized the villagers as the "so-called" plaintiffs, refusing to acknowledge their basic humanity.  Judge Kaplan also said Donziger planned to use the case "to be the next big thing to fix the balance of payments deficit" of the United States. "I got it from the beginning," Judge Kaplan said in open court in reference to Donziger's supposed greed. (Greed is a hard label to pin on someone whose entire career has been dedicated to work on on behalf of the indigent criminal defendants and human rights victims.) At another point, Judge Kaplan called the litigation a "game" and said "the name of the game is… to persuade Chevron to come up with some money." Judge Kaplan, who amassed a personal fortune as a corporate defense lawyer before taking the bench, seemed to take offense at the very idea of impoverished indigenous nationalities collecting significant damages from a large American oil company.

## Judge Kaplan's Harassment of Donziger

In what appears to be an unprecedented move in the history of U.S. jurisprudence, Judge Kaplan ordered Donziger to turn over his entire confidential case file to Chevron that was accumulated over 17 years of litigation. Judge Kaplan based the decision on  "local rule" typically referenced as a guideline for discovery practice (requiring the filing of a privilege log at the same time as a motion to quash a subpoena) and never before used to impose draconian penalties of the sort imposed on Donziger. Judge Kaplan tried to justify this move by characterizing Donziger as "some sort of PR guy" rather than a lawyer. He then forced Donziger to sit for a record-breaking 19 days of largely harassing depositions conducted by a large team of Chevron lawyers, when the federal rules normally limit depositions to one day. Judge Kaplan's decisions essentially blew up the sacred attorney-client privilege as held by the affected communities. In the meantime, Judge Kaplan treated as ironclad the same privileges as applied to Chevron and its lawyers, thereby preventing the legal team from the villagers from obtaining the company's internal documents and creating a completely one-sided playing field in favor of Chevron from the outset. Judge Kaplan then went out of his way to defame Donziger by speculating in a written pre-trial decision (again, before any evidentiary hearing) that he might face "criminal exposure" for his work on the Ecuador case—a statement not only patently false, but also a clear effort to spook Donziger's clients and supporters into abandoning him. Judge Kaplan also encouraged Chevron to file hundreds of frivolous motions to squeeze the resources of Donziger's legal team, which ultimately caused Donziger's own lawyer to withdraw from the case and accuse Kaplan of letting it degenerate into the "Dickensian farce" described above. (For a full copy of Keker's highly unusual public condemnation of a sitting federal judge, see here.)

## Judge Kaplan's Illegal Worldwide "Injunction"

Desperate to protect Chevron and impose control over the Ecuador litigation from his Manhattan courtroom, Judge Kaplan, within mere days of the filing of the RICO case, issued an important ruling in favor of the company that was deemed illegal even by U.S. courts. Without first allowing Donziger and the villagers time to hire counsel to respond to Chevron's 150-page lawsuit and thousands of purportedly relevant exhibits, much less to present evidence, Judge Kaplan issued an unprecedented injunction against enforcement of the Ecuador judgment *anywhere in the world*. In essence, Judge Kaplan tried to dictate from his Manhattan courtroom how every judge in every country should rule regarding enforcement of the

Ecuador judgment, should such enforcement actions be filed (and none had been at the time of this ruling). Such a ruling had never before issued from any court in the history of the United States. In fact, no judge *from any country*, including judges from authoritarian and even totalitarian regimes, has ever tried to engage in such arrogant and imperious behavior from the bench. One might imagine Judge Kaplan's reaction if an Ecuador court tried to order U.S. courts to rule a certain way on an enforcement action.

## RICO Trial: The Dickensian Farce

At the subsequent RICO trial, Chevron and Judge Kaplan tried to accomplish the same thing that had already been reversed on appeal—illegally blocking enforcement of the Ecuador judgment. During the RICO proceeding, which ultimately was more a theatrical presentation choreographed by Chevron lawyers than a real trial where both sides could present evidence, Judge Kaplan denied Donziger and his clients a jury of impartial fact finders. He then refused to allow them to present evidence of Chevron's toxic dumping and fraud in Ecuador. He threatened Donziger and his team with contempt if they uttered anything about Chevron's environmental contamination in court—even though, as mentioned, the presentation of that evidence was absolutely vital for Donziger and his clients to be able to explain the context for comments found by Judge Kaplan to be part of the supposedly "extortionate" RICO conspiracy. The judge also allowed Chevron to use secret witnesses whose identities were hidden from Donziger and his clients. Finally, as mentioned, Judge Kaplan heartily accepted the false evidence from Chevron's corrupt witness Guerra about the bribe and ghostwriting that never occurred. This happened after he allowed Chevron to pay Guerra exorbitant sums of money, all in violation of federal law that prohibits payments to fact witnesses. To heap insult upon injury, it later turned out that during the trial Kaplan hid the fact he held investments in Chevron at the same time there was motions pending to recuse him for bias in favor of the oil company.  To be clear, this is only a *partial summary* of the many abuses that took place in Judge Kaplan's courtroom.

## The Role of Chevron's Law Firm In Orchestrating Corruption

Chevron's main law firm in the RICO case, Gibson Dunn & Crutcher LLP, is notorious for its willingness to cross ethical lines in service of its corporate defendants. One U.S. federal court described the firm as being "permeate[d]" by a "culture [that] promote[s] obstruction, gamesmanship and flagrant disregard [for the law]."[4] Another court—the Supreme Court of Montana—was more blunt, calling Gibson Dunn's tactics outright "legal thuggery."[5] Gibson Dunn clearly brought these "skills" to bear for Chevron in the RICO case when, for example, its lawyers coached Guerra for weeks to shore up his obviously untruthful testimony. Led by Randy Mastro (who billed Chevron at $1,140 per hour) and Avi Weitzman, the Gibson Dunn team is unapologetic about offering services, as described in their own marketing materials, as "lifeboat lawyers" to "rescue" high-profile corporate clients from liability by "turning to the tables" against corporate critics through accusations of "fraud" or other wrongdoing. In fact, Gibson Dunn has a long history of bringing harassing lawsuits against persons who have targeted its deep-pocketed clients. Three times in the Ecuador case, the Gibson Dunn firm was sanctioned or criticized by judges for using litigations to harass supporters of the villagers or violate their First Amendment rights. Targets included environmental groups like Amazon Watch, bloggers, journalists, consultants, and even a documentary filmmaker.

---

[4]   E & J Gallo Winery v. Encana Energy Services, Inc., No. CV-F-03-5412, 2005 WL 6408198 (E.D. Cal. July 5, 2005).

[5]   Seltzer v. Morton, 154 P.3d 561, 608-09 (Mont. 2007).

# Detail of the 12 False or Distorted Findings by U.S. Courts

## False Finding #1: The Plaintiffs "Ghostwrote" the Ecuador Environmental Judgment

Apart from Judge Kaplan, Alberto Guerra might be the most important name to remember in the unfortunate saga of Chevron's RICO case. He is the admittedly corrupt witness paid by at least $2 million by Chevron on whose testimony stands the entire "ghostwriting" claim. Guerra not only admitted he lied during the RICO case about key parts of this explosive issue, but a forensic report definitely and scientifically proves he lied. In other words, Guerra's testimony about ghostwriting has been **completely, scientifically, and indisputably debunked**. Yet, the Second Circuit endorsed the false finding about ghostwriting without even considering the evidence that destroys its entire factual predicate.

### How Chevron Bribed A Witness To Lie

With regard to ghostwriting, Guerra testified that Donziger oversaw an arrangement where a bribe was promised to the Ecuador trial judge in exchange being able to write the judgment. This is the central component of Chevron's RICO case. Chevron provided no other witness other than Guerra, or any other direct evidence, to corroborate his claim. A digital forensic analysis of the hard drive of the Ecuadorian trial judge's office computer showed scientifically that the judgment against Chevron was not "ghostwritten" by the plaintiffs and given to the judge on a flash drive, as Guerra claimed.  Rather, the forensic analysis demonstrated that the trial judge wrote the judgment on his office computer incrementally over the course of three months and in fact saved the Word document that became the judgment more than 400 times before issuing it. Additionally, even though Guerra's credibility was already shot, he shockingly admitted in a related arbitration proceeding that he lied about key issues in his testimony in the RICO case. Equally as shocking, none of these developments—which render the Chevron/Kaplan false narrative a nullity—was even considered by the Second Circuit panel before issuing its opinion. For a discussion of the forensic report and to read the report itself, see here.

The Second Circuit's technical basis for refusing to consider this devastating new evidence about Guerra's perjury is that it came "too late" and thus was not part of the official record of the RICO case that it was reviewing. This position is nothing less than Kafkaesque, especially because Donziger's attorneys did present this new evidence to the Second Circuit in timely fashion in supplemental briefing as allowed by the federal rules. The Second Circuit unquestionably had the discretion to take this new and highly probative new evidence into account. The fact that is chose not to, despite the game-changing nature of the evidence and the enormous stakes involved—among other implications, the health and even survival of dozens of indigenous and farmer communities in the rainforest—is unconscionable. It reflects a political decision to protect Judge Kaplan (and Chevron) and join in the scripted "demoniz[ation]" of Donziger.

Much of the new evidence dismantling the false "bribery" and "ghostwriting" findings emerges from the international investment treaty arbitration dispute ("the Arbitration") between Chevron and the Republic of Ecuador. This evidence is powerfully set forth in the briefs and testimony emerging from that case, which was initiated by Chevron in 2009 as a way to create leverage to pressure Ecuador's executive branch to force a dismissal of the underlying environmental claims.[6] The evidence is also available in summaries of the same provided by Donziger's counsel, Deepak Gupta, to the Second Circuit. While the "bribery" and

---

[6]   For further context on the fundamental problems with the arbitration proceeding and how Chevron unethically tried to use it as leverage against the rainforest villagers, see this blog post.

"ghostwriting" claims are thoroughly debunked in those public materials, given their importance we summarize them below in further detail.

### Background on Chevron's False Narrative

Chevron launched its retaliatory RICO litigation based on allegations of procedural irregularities in the Ecuador trial, even though those allegations already had been rejected by Ecuador's courts. But while Chevron wanted these allegations in Judge Kaplan's court, where it could expect a friendly reception, for procedural reasons it couldn't avoid also presenting them in the Ecuador trial. This soon led to trouble for Chevron because it gave Ecuadorian courts—the real authorities on what is and isn't allowed under Ecuadorian law and procedure—the chance to consider Chevron's claims and, given their lack of real basis, to reject them. In 2011, the Ecuador trial court found that there were "no legal grounds whatsoever" supporting Chevron's "fraud" claims. In 2012, an intermediate Ecuadorian appellate court concluded Chevron's allegations "go nowhere without a good dose of imagination". And in 2013, Ecuador's Supreme Court concluded in a 222-page opinion that Chevron "never demonstrated fraud" despite its "incessant harping in this regard." Chevron recognized that foreign courts that might be asked to enforce the judgment against the company's assets likely would defer to Ecuadorian courts, especially given that the company had accepted jurisdiction in Ecuador.

To deal with this obstacle, Chevron went all in with the Gibson Dunn "rescue" plan. Working with Gibson Dunn lawyer Mastro and his team, Chevron neatly manufactured explosive new allegations in service of a larger goal: to implicate the entire Ecuadorian judiciary in wrongdoing, instead of just certain aspects of how the environmental trial was conducted. The idea was to so tarnish Ecuador's judicial branch of government—which encompassed the same court system that Chevron repeatedly had praised when it was to its tactical advantage—such that no enforcing court in any jurisdiction in the world would accept the Ecuador trial court judgment, despite the overwhelming scientific evidence of the company's reckless behavior and toxic dumping on which it was based.

Chevron meticulously built its false narrative about a bribe and ghostwriting from the ground up. First, it recruited Guerra and agreed to pay him massive sums of money. It then coached him to manufacture the "bribery" and "ghostwriting" allegations that observers of the RICO case are now so familiar with. The amounts Chevron paid Guerra by any objective measure can only be described as a bribe.  Chevron's goal was to use the fabricated testimony to broaden its fraud narrative from procedural complaints about the trial—all of which had been rejected by Ecuador's courts—to encompass allegations about the court itself. The company's intention was to lay down a basis to try to beat back enforcement efforts by the villagers in foreign jurisdictions. These enforcement actions were necessary given that Chevron had sold off all of its assets in Ecuador, forcing the villagers to try to collect their judgment elsewhere. Chevron officials also began to openly mock the villagers by asserting that the company would never pay any judgment that might issue. Some Chevron lawyers even taunted the villagers with the threat of a "lifetime of litigation" if they did not drop their claims.

Guerra's central lie was to claim that the Ecuadorian legal team promised a payment of $500,000 to the Ecuador trial judge to be paid when the judgment was enforced. But extensive discovery obtained by Chevron—including access to all of Donziger's hard drives and emails—produced absolutely no direct evidence to corroborate any aspect of Guerra's bribe story.  There was not a single email or text message found between Guerra and any member of the legal team from the villagers related to the judgment. Guerra had told Chevron he emailed lead Ecuadorian lawyer Pablo Fajardo about the draft judgment, but Fajardo's name was never found on Guerra's email contact list and no email was exchanged between them. There was no record of any phone call between Guerra and any lawyer for the Ecuadorians. From the very

beginning, the holes in the Guerra allegations were immense and only grew larger over time. It turned out that no amount of Chevron coaching or evidence fabrication could salvage Guerra's credibility.

### Guerra's Criminal History

Guerra confessed to being a deeply corrupt individual even before Chevron's lawyers enlisted him as their paid-for star witness. As a practicing lawyer, he admitted paying clandestine bribes on at least 20 occasions before becoming a judge on the provincial court that presided over the case against Chevron. His tenure presiding over the environmental case in Ecuador, which began in 2003, lasted only seven months before a new judge took over the case as part of a normal rotation. Guerra later was kicked off the court for his corrupt behavior on another case.

Years later, as he was negotiating his deal to testify for Chevron, Guerra was caught on tape telling a company representative, "Money talks, but gold screams." Before Guerra even uttered the first word under oath in the RICO trial, his "bribe" testimony against Donziger was tainted because Chevron, in flagrant violation of the federal Anti-Gratuity Statute and established rules, paid him huge sums of money. The law bars payments to fact witnesses other than the bare minimum to cover expenses. By any objective measure, the payments and benefits Chevron bestowed on Guerra and his family constituted a bribe. Worse, it was a bribe encouraged by a judge who exploited his inherent prestige to try to frame the illegal payments as "proper" by arguing that Chevron was within its rights to operate a "private" witness protection program—again, a ruling never before seen from a U.S. court.

Chevron truly enriched Guerra, who had no savings and was making only $500 per month prior to becoming a company witness. When Chevron representatives first made contact with Guerra in Ecuador, they turned over to him $20,000 in cash out of a backpack to encourage his initial cooperation. Chevron later showered Guerra with benefits worth over $2 million: immigration to the United States, a lavish monthly salary, a house, a housing allowance, a car, health insurance, immigration lawyers for himself and five members of his family, and the payment of his income taxes.[7] When Dean Erwin Chemerinsky, a leading U.S. legal ethics scholar, heard of the arrangement, he was so outraged that he provided the Ecuadorians a legal opinion *pro bono* condemning what Chevron had done.

### Guerra's Other Credibility Problems

Apart from the illegality of paying a fact witness huge sums for testimony, Guerra lost credibility because his bribery story changed repeatedly as previous versions became discredited by new facts. In the first version of Guerra's story, he claimed that Ecuadorian trial judge Zambrano met him at the airport in the capital city of Quito and gave him a draft of the judgment on a flash drive which he then downloaded into his personal computer to be edited. When Chevron investigators searched Guerra's computer and flash drives and found no digital trace of any draft judgment, this story simply could not be corroborated. Working closely with Chevron lawyers, Guerra then changed his story to account for the absence of any digital trace of the draft judgment. Only then did he begin to claim that he met Zambrano in the remote

---

[7]    The immigration benefit—bringing not just Guerra but several members of his family to the U.S.—was of particular value because it allowed Guerra to see, for the first time in nearly a decade, his children who were living illegally in the U.S. Chevron also offered Guerra and his extended family the only feasible avenue for long-term legal status in the U.S., in the form of an asylum application. Guerra testified that the asylum applications were more important to him than the money and other benefits he received. The big picture here is that Chevron whisked a known criminal out of Ecuador (where he could have been prosecuted for bribing judges) and provided him safe harbor in the United States as part of its plan to undermine the environmental judgment. Judge Kaplan not only blessed the scheme, he encouraged it by deeming it "legal" even though no court in U.S. history had ever tolerated what was essentially a gigantic bribe offered to a witness for his testimony.

jungle town of Lago Agrio where he was given a laptop with a draft of the judgment already on it. In this version, Guerra claimed he then gave the laptop back to Zambrano, hence "explaining" the lack of evidence on his own computer to support the flash drive story. The idea that Guerra was casually "mistaken" about where he was when he was first given secret access to what would be the biggest civil judgment in Ecuador history is absurd on its face and by any objective measure completely undermines his credibility. Other outlandish contradictions and incredulities regarding Guerra and his testimony are outlined in this RICO motion for terminating sanctions against Chevron, this RICO motion to strike his testimony, and this post-trial brief (pp.31-41). All of these submissions were summarily denied or ignored by Judge Kaplan.

Indeed, while Guerra's credibility problems were patently evident at the RICO trial, since the end of that trial they have grown even worse—as inconceivable as that may seem to be for someone who essentially lost all credibility when he lied on the stand. Under a withering cross-examination in the separate arbitration proceeding between Chevron and Ecuador's government, Guerra admitted he had repeatedly perjured himself before Judge Kaplan on several critical factual issues relied on by the U.S. judge for his findings that a bribe occurred in Ecuador. These admissions, of course, further undermine Judge Kaplan's RICO decision given that the judge found the perjured testimony to be credible and the Second Circuit panel completely ignored this new evidence.

### Guerra's "Confession" of Lying During the Arbitration

The lies Guerra admitted to during the arbitration proceeding tainted core evidence in the RICO case. For example, during the RICO trial, Guerra testified that he had an agreement where he would receive 20% of the supposed "bribe" proceeds that were to be paid to Zambrano. He never produced any evidence to support this claim. During his testimony in the arbitration proceeding, Guerra admitted he made up the story: "That was my sworn statement in New York, but what I said is that, because of a circumstance, because of a situation, I mentioned 20 percent when it wasn't true, and I think that, as a gentleman, I should say the truth, and we did not discuss—I did not discuss 20 percent with Mr. Zambrano."

Consider some of Guerra's other confessions in the arbitration proceeding that strongly suggest Judge Kaplan got it wrong when he found the witness to be credible:

- Guerra admitted telling Chevron's representatives that he had the draft judgment against Chevron on his computer. But when Chevron examined his computer, there was no draft judgment. Guerra testified that Chevron representatives told him, "Had we been able to find it, we would have been able to offer you a larger amount of money."

- Guerra testified that Chevron wanted him to contact the Ecuadorian trial judge, Nicholas Zambrano, to offer him money to testify for Chevron. In our view, this was a Chevron attempt to lay the groundwork for another and even larger bribe with Zambrano that was never consummated. In the arbitration, Guerra said, "I understood from the representatives of Chevron that I would get more money once I was able to establish a connection between them and Mr. Zambrano." He also admitted that Chevron representatives warned him if that he did not deliver Zambrano, he "would be left with nothing." It turns out that Zambrano refused completely unethical entreaties from Chevron lawyer Andres Rivero that he meet with Chevron representatives to discuss "payments" for his testimony, in which Chevron no doubt planned to offer him huge sums to recant the judgment against the company.

- Testifying before Judge Kaplan, Guerra claimed he received numerous monthly payments of $1,000 from Judge Zambrano dating to 2008 to help him draft orders on other cases. This

testimony was utterly irrelevant to whether Guerra was involved with the "ghostwriting" of the judgment in the Chevron case. Yet in a bit of circular reasoning, Judge Kaplan accepted it as corroborative of that completely different allegation. Yet even here Guerra's claims fall apart. He admitted he could produce *no physical evidence* of even one such payment of $1,000. The only physical evidence of any payment to Guerra from Zambrano came after the end of the environmental case, and it was for far less than $1,000. Guerra conceded this payment "had no connection" to the Chevron case and Zambrano said it was a personal loan. Yet Judge Kaplan, in yet another display of intellectual dishonesty, relied on this testimony to supposedly "corroborate" the bogus ghostwriting finding in the Chevron case.

More details of Guerra's admitted perjuries are reviewed in this supplemental brief filed by Donziger's counsel before the Second Circuit in the appeal of the RICO decision. In another apparent swipe at Donziger and his clients, the three-judge panel ignored the submission. The panel also refused to consider any of the other problems with Guerra's false and contradictory testimony.

### Chevron's Failed "Documentary Evidence" Argument

Seeing the credibility of its star witness blow up and the Ecuador Supreme Court unanimously affirm the environmental judgment, Chevron tried yet a new tack to salvage its faltering strategy. Chevron's lawyers at Gibson Dunn began to claim they had "documentary evidence" that supposedly backed-up Guerra's claims of a bribe and ghostwriting: a hand-written "daily planner" Guerra allegedly kept that supposedly reflected meetings the witness had with Donziger and others. But this story quickly fell apart as well. Guerra's planner actually did not reflect any meetings with Donziger. In fact, Guerra claimed he "lost" his planner for the time that covered the period when he claimed to have met Donziger in Ecuador's capital city of Quito. Further, immigration records from Ecuador's government showed Donziger was not even in Ecuador during the period of time covering the supposed meeting. The credibility of Chevron's "documentary evidence" thus was completely undermined during the RICO trial. (See, e.g., here at pp.8-11 and here at pp.36-41; also this Arbitration brief at pp.132-40). Yet Judge Kaplan still relied on this documentary evidence as part of what appeared to be his frantic effort to attach a veneer of credibility to Guerra's untruthful testimony.[8]

### Another Chevron Dead End: Computer Forensic Analysis

During the arbitration proceeding and following the RICO trial, Chevron decided to double down and make yet another bet on its discredited "ghostwriting" theory. That bet also backfired against the company, only this time in even more spectacular fashion.

During the arbitration Chevron demanded that the government of Ecuador (known as the Republic of Ecuador or "ROE") produce the hard drives of the office computer of the trial judge who issued the judgment so they could be inspected. Given the almost infinite digital records and traces that working on and printing a document creates throughout a modern operating system, digital forensic experts would be able to determine once and for all whether the document that became the judgment had indeed been drafted on those computers or had been inserted via a flash drive as Chevron had claimed. The ROE allowed experts

---

[8] Even though Guerra admitted before Judge Kaplan that he had bribed judges in Ecuador as a lawyer, Judge Kaplan claimed that Guerra was "credible" based on observations of his in-court demeanor. Of course, Guerra later confessed that he had lied repeatedly in front of Judge Kaplan while Judge Kaplan was observing his in-court demeanor. The reader can come to his or her own conclusions about what this suggests about Judge Kaplan's own judgment.

from both sides to examine the judge's hard drives. The results are absolutely devastating to Chevron, Judge Kaplan, and the Second Circuit.

The ROE expert who examined the judge's hard drives, Christopher Racich, is one of the leading authorities in the world on the subject of computer forensic examination. After examining the judge's hard drives, Racich stated in his report:

> The forensic evidence demonstrates that a document on Judge Zambrano's computer that eventually became the Lago Agrio judgment (named *Providencias.docx*) was created on October 11, 2010, and was saved on Mr. Zambrano's computers at least 439 times between then and March 4, 2011 (i.e., an average of multiple saves per day) . . . Over that time period, the *Providencias* document contained increasing amounts of judgment text. And there is no evidence to suggest any version of that document was provided to Mr. Zambrano by a third party.

This hard data irredeemably destroys Guerra's story of the judgment being drafted by the plaintiffs and given to the trial judge on a flash drive. There is simply no way to square this hard data with Guerra's testimony under oath before Judge Kaplan. In Chevron's final written submission in the arbitration on this issue, ***it doesn't even try*** to rebut this new information. The company's lawyers do not even attempt to explain how the Word document that became the judgment could be on the trial judge's office computer weeks before the time Guerra testified it was given to the judge on a flash drive, just prior to its issuance.

### Chevron's Final Hail Mary: Unfiled Work Product

With Guerra's testimony dying under the weight of its own contradictions, and in the face of conclusive forensic proof that the Ecuador judgment indeed was written by Judge Zambrano, Chevron's entire narrative was in shambles. The company then put forth what can only be described as a Hail Mary claim: that the supposed "ghostwriting" can be inferred from the existence in the Ecuador trial court judgment of text allegedly drawn from internal memos prepared by lawyers for the villagers that Chevron claims were never filed with the court. Chevron calls this the "unfiled work product" theory, but it too fails to withstand serious scrutiny, as follows:

- Most instances where Chevron claims words in the judgment reflect "unfiled work product" have been ***specifically disproven***. ROE lawyers from the prestigious American law firm Winston & Strawn comprehensively reviewed video clips from dozens of field inspections of Chevron's contaminated well sites conducted by the parties under the auspices of Ecuadorian court from 2004-2007. This video review demonstrated that both Chevron lawyers and lawyers for the villagers often filed documents with the Ecuador trial court by handing them to the judge or his clerk at the site inspection. These inspections took place at well sites deep in the jungle many miles from the courthouse. Sometimes these documents made it into the "official record" while other times they did not. When they did not, it was largely due to confusion or clerical error.

- The material submitted at the inspections but not logged due to confusion or clerical error was still properly in the possession of the Court and the opposing party, which received a copy. Once submitted, the material could still be relied on by the Court in its ruling.

- An example of how Chevron and Judge Kaplan tried to manipulate this issue concerned the so-called "Fusion Memo" that related to the Chevron-Texaco merger in 2001. This memo was written by the legal team for the affected communities. The document was relied on in part by the Ecuador

trial judge in writing the portion of the judgment related to this issue. The Winston & Strawn lawyers used emails and other evidence to conclusively prove that this memo was indeed filed with the court on June 12, 2008 -- even though Chevron erroneously claimed otherwise, a view predictably endorsed by Judge Kaplan. (For detail, see this brief at ¶¶ 293-300.)

- The Winston & Strawn analysis of the Ecuador trial court record revealed similar explanations for other documents that Chevron erroneously claimed supported its "unfiled work product" allegation. (See ¶¶ 301-340 of this brief.) The Winston lawyers even found instances where the Ecuador trial court ruled on Chevron motions that were not logged into the official record. They also found instances where both parties submitted DVDs during the inspections that were not formally entered into the record. In other words, the trial court was prone to clerical errors. This is not surprising given the huge volume of material submitted—over 220,000 pages—and the fact the judge worked with only one secretary.

In sum, it is entirely unexceptional that the Ecuador trial court judgment relied on a small number of documents in the possession of both parties that were submitted to the court but not officially logged due to clerical error. The facts on this point do not in the least support the Chevron/Kaplan inference that the judgment was "ghostwritten".  And they certainly do not cure the mammoth credibility problems with Chevron's corrupt witness, Guerra. Significantly, Chevron monitored the official record closely throughout the Ecuador trial and never raised any objection on this point until the company decided during the RICO matter that it could gain a strategic advantage by doing so.

## False Finding #2: Donziger Tried To Intimidate Chevron With An "Inflated" Cost Estimate

The notion put forth by Judge Kaplan that Donziger, or any lawyer, could "intimidate" Chevron into doing anything against its will is rather preposterous. This finding assumes that a solo practitioner working out of his apartment (Donziger) had the capacity to bully the nation's second-largest oil company (Chevron) into a settlement potentially worth billions of dollars even though that company had a team of no fewer than 60 law firms and 2,000 lawyers assembled for its defense. This notion fits neatly into the false and condescending narrative pushed by Chevron and Judge Kaplan that Donziger exercised voodoo-like power over persons, institutions, and events in Ecuador. With the evidence against it mounting in the Ecuador trial, Chevron strategists (led by notorious public relations hit man Sam Singer[9]) called for Donziger to be characterized as "the most powerful man in Ecuador" who was "pulling the strings" of an emerging "Banana Republic."[10]  Throughout his RICO judgment, Judge Kaplan appeared to incorporate Chevron's insulting (and false) propaganda regarding Donziger's supposed power to control Ecuador's courts and executive branch. Given the long and ugly history of U.S. military and political intervention in Latin America, the Chevron posture about Donziger in our view has disturbing neo-colonialist, if not outright racist, overtones.

### David Russell's Preliminary Assessment

This Kaplan/Second Circuit finding relates to a preliminary assessment of the extent of Chevron's environmental damage in Ecuador, published in 2004 just after the trial began. The assessment was authored by David Russell, an American technical expert in oil remediation retained by counsel for the villagers.

---

[9]   *See, e.g.*, Joe Eskenazi, "Trust Me: Who Are You Gonna Believe, Sam Singer or Your Own Eyes?," SF Weekly, Aug. 22, 2014, *at* http://www.sfweekly.com/sanfrancisco/sam-singer-chevron-tatiana-the-tiger-public-relations/Content?oid=3115485

[10]  See this internal Chevron memorandum.

Russell's preliminary assessment was based on an extensive two-week field inspection of the contaminated area and rough estimates of the amounts needed for a comprehensive remediation, based on various defensible and reasonable assumptions. Russell's $6 billion clean-up estimate rocked Chevron's view of the case and infuriated company executives. At the time, the company was insisting it was not responsible for *any damages* despite the fact it had admitted to discharging into Amazon waterways billions of gallons of untreated toxic oil waste. The company also admitted to having abandoned hundreds of unlined waste pits filled with oil sludge that were visible to the naked eye; each such pit would have qualified as a Superfund site under U.S. law, according to experts for the villagers. Russell spoke extensively to the media about his preliminary assessment, which, to the great consternation of Chevron's executives, received coverage in several prominent newspapers.

Contrary to the erroneous Kaplan/Second Circuit finding, the damages amount in Russell's preliminary assessment *turned out to be low rather than inflated*. The Ecuador court, which years later had access to far more information about the extent of Chevron's contamination than Russell did in 2004, found in 2011 that the actual damages caused by Chevron were roughly $8.5 billion. To illustrate just how modest this assessment was, the oil company BP has paid out close to $50 billion in damages and fines in the United States for its far smaller and less damaging accidental spill in 2010 in the Gulf of Mexico. In any event, in the early years of the trial, Donziger and his colleagues pointed to Russell's clean-up assessment to describe publicly how much a comprehensive remediation of Chevron's damage in Ecuador might cost. Judge Kaplan and the Second Circuit "found" that by advocating in this fashion for what turned out to be a relatively low cost estimate, Donziger and the plaintiffs were trying to "extort" money from Chevron and trying to "intimidate" the company to settle the case.

We believe this finding not only is erroneous with respect to the merits of Russell's damages assessment, but also has disturbing implications for advocacy in a democratic society. Even if Russell's preliminary assessment was radically wrong based on the limited information available at the beginning of the trial (and it was not), there is absolutely nothing wrong with putting forth a cost estimate to the public, even a mistaken one. In fact, the touting of Russell's assessment by Donziger and his colleagues is speech protected by the First Amendment to the United States Constitution. But according to the Kaplan/Second Circuit logic, a party to a civil lawsuit can be prosecuted ***criminally*** for putting forth a favorable view of the damages in an early stage of litigation when typically both sides are advocating their respective positions in anticipation of settlement, which resolves the vast majority of cases. As far as we can ascertain, no court ever has ruled in this fashion in the history of the United States.

### Judge Kaplan's Double Standard

This issue is worth exploring further because it is another vivid example of the degree of intellectual dishonesty reflected in Judge Kaplan's handling of much of the RICO case. At the time of Russell's assessment, after admitting to dumping billions of gallons of toxic waste into Amazon waterways, Chevron was publicly claiming that there was "no" environmental harm in its former operations area in Ecuador and that it owed ***no money*** for clean-up. This was an outrageous claim on its face. Yet Judge Kaplan did not find that Chevron, by making this claim for litigation purposes, was attempting to "extort" Ecuadorian indigenous groups from compensation to which they were rightly entitled. To criminalize speech of this sort puts a severe chill on any advocate who might think of properly representing his or her client against powerful corporate defendants like Chevron. That said, it would have been equally inappropriate for Judge Kaplan to sanction Chevron for its claim that it owed no money at all after it caused massive harm to the people of Ecuador. Obviously, Judge Kaplan did not hold Chevron to the same standard (erroneous as it was) that he imposed on the villagers and their counsel. Again, this suggests Judge Kaplan employed a rank double standard designed to protect a corporate polluter and inflict punishment on its litigation adversaries.

18

It later turned out that Russell behaved in a grossly unethical fashion during the RICO trial. After being prepped by Chevron lawyers, he testified that his preliminary assessment performed years earlier – the assessment that he passionately defended to reporters at the time -- was actually based on what he called a "Scientific Wild-Assed Guess" or SWAG. It turns out that the "SWAG" characterization was concocted by Russell *after* he was terminated by Donziger for management problems related to his supervision of the technical work during the trial and *after* he started working closely with Chevron's lawyers. After he settled his outstanding issues with Donziger, Russell unethically ***started offering his services to Chevron*** by sending flirtatious emails to company scientist Sara McMillan -- even though he had a duty of loyalty to the villagers who had hired him. That resulted in Russell appearing in Judge Kaplan's court to trash his own scientific work by claiming the damages figure was inflated. In reality, the damages figure was not inflated and Russell ended up humiliating himself in the eyes of almost everybody but Judge Kaplan.

It would be hard to overstate how unsubstantiated the Kaplan/Second Circuit finding is on the Russell report. As part of its representation of the government of Ecuador in its arbitration with Chevron, the U.S. law firm Winston & Strawn in 2012 hired a team of respected scientists to re-assess the chemical sampling evidence presented in the Ecuador trial. These scientists spent weeks in Ecuador visiting contaminated Chevron sites that had been inspected as part of the trial and testing water and soil samples from the same locations. The sampling results completely checked out and corroborated the findings of the Ecuadorian courts with regard to Chevron's liability and damages, as described at pages 80-108 of this legal brief. The damages figures determined by this team of independent scientists was far higher than those in Russell's preliminary assessment, further illustrating the hollowness of Judge Kaplan's finding. It is worth repeating that three layers of courts in Ecuador, including the country's Supreme Court, found against Chevron, Judge Kaplan, and the Second Circuit on this issue.

## False Finding #3: Donziger Refused to Test for Certain Pollutants

Judge Kaplan concluded that during the Ecuador trial Donziger directed the technical team for the villagers to forego testing for the presence of certain chemicals at Chevron well sites that the judge believed could have produced evidence favorable to the company. Because he did not test for these chemicals, Judge Kaplan (with the affirmance of the Second Circuit) found that Donziger engaged in ***criminal*** behavior to extort a settlement from Chevron. This finding is so ludicrous that it scarcely merits a response. But we will explain it in some detail because it again helps to illustrate the extent of Kaplan's intellectual dishonesty and the Second Circuit's failure to correct the many legal and factual errors that were produced as a result.

The Chevron/Kaplan theory was that testing contaminated soils for BTEX—four harmful chemical compounds that occur naturally in crude oil—would show the presence of toxins of recent vintage such that it could only have been left by PetroEcuador, Ecuador's state oil company that took over Chevron's oil fields in 1992. According to Judge Kaplan, the evidence pointing to PetroEcuador would have helped Chevron lower its potential damages exposure. But Judge Kaplan never explained why Chevron itself could not have tested for BTEX to buttress its defense or why he believed it was Donziger's responsibility to adduce evidence to help Chevron defend against his own clients.

Dig deeper and one might note the frightening implications of what Kaplan and the Second Circuit are trying to do here. The Ecuador trial—like all trials—was an adversarial proceeding where each side is responsible for presenting its own evidence. Chevron was responsible for producing evidence favorable to its defense, while the villagers were responsible for producing evidence to prove their legal claims. Chevron had hundreds of lawyers and technicians on its payroll and was obviously capable of producing the allegedly favorable evidence through its own experts. And, in fact, Chevron did exactly this with respect to BTEX at the beginning of the trial. Judge Kaplan's idea of trying to punish—indeed, to ***criminalize***—Donziger's

decision not to adduce evidence favorable to Chevron is absurd, unethical, and in our view illegal. Other than in Judge Kaplan's proceeding, we *never* have seen a court anywhere in the world try to punish a party in a civil lawsuit for not adducing evidence favorable to its adversary.

Even worse for Chevron, the Kaplan/Second Circuit "finding" does not withstand even superficial scrutiny on the merits. In reality, BTEX can survive in an anaerobic (lacking oxygen) environment for decades. Thus, the presence of BTEX inside the many oil waste pits in Ecuador abandoned by Chevron—which are often sealed with a hard cap of rubbery sludge—could just as easily be traced to the time period of Chevron's operations and thus point to the company's culpability. The BTEX values reported at the very beginning of the site inspections (when the villagers did some limited testing for BTEX) were actually helpful to prove their claims. The rationale for abandoning the BTEX test was explained by Donziger in his testimony in the RICO case: testing for the more commonly used measure of Total Petroleum Hydrocarbons (TPH) not only better captured the presence or absence of oil contamination, but was both cheaper and "more useful because it was the same measurement regulated by Ecuadorian laws and most comparative international laws." (Donziger testimony at ¶113.) The decision by Donziger and his colleagues to test for TPH and not for BTEX was thus perfectly reasonable and in any event totally within their discretion.

Again, the fact Judge Kaplan assumed counsel for Ecuadorian villagers *owed him* some sort of an explanation for why years earlier they made a tactical decision about the production of evidence in a litigation in a foreign jurisdiction – a litigation that Judge Kaplan had nothing to do with – seems utterly absurd. But it again illustrates something important about Judge Kaplan: the extent of the judge's zealotry and intellectual dishonesty as he manufactured reason after phony reason to assist Chevron. It is also another illustration of just how absent the U.S. appellate judges were when asked to correct these "errors" – which actually do not appear to be errors at all, but rather intentional acts by a judge who said he "got it from the beginning" before the first scrap of Chevron's evidence was submitted.

### *False Finding #4: Donziger "Falsified" an Expert Report (Calmbacher)*

This Kaplan/Second Circuit "finding" refers to a report submitted by Charles Calmbacher, an American engineer. The legal team for the Ecuadorians hired Calmbacher as their court-appointed expert in the Ecuador trial. His mandate was to write two of the more than 100 evidentiary technical reports filed by the parties that documented Chevron's pollution. This voluminous body of evidence, which included more than 64,000 chemical sampling results, was used by the Ecuador trial court to find against Chevron and impose liability on the company.

Donziger and the Ecuadorians retained Calmbacher in 2004 to assess the first two of the contaminated Chevron well sites being inspected by the parties under court auspices. Calmbacher ultimately claimed to be ill and refused to complete his reports. Subsequently, Calmbacher sued Donziger for non-payment and sent a series of irate emails threatening physical violence and retaliation. For example, Calmbacher in 2005 sent this email to Donziger:

> Please simply pay up. Don't start a war. Wars have no rules and people can suffer irreparable professional, psychological and physical damage as a result. You don't want that.

Calmbacher's animus toward Donziger, his bizarre behavior generally, his refusal to complete his work, and his hot-tempered outbursts were witnessed by numerous members of the legal team for the Ecuadorians.

Years later, as it was trying to lay down the first bricks for its false narrative in the RICO case, Chevron reached out to Calmbacher and asked him to become a company witness. It used an obscure federal discovery statute to depose Calmbacher in secret near his residence in Georgia. Chevron never notified the legal team for the Ecuadorians that the deposition was taking place. Nobody was in the room except Calmbacher and Chevron's lawyers. Predictably, those lawyers urged Calmbacher to attack Donziger. Apparently still holding a grudge against Donziger after the prior dispute, Calmbacher was more than happy to oblige. He testified with no cross-examination.

Calmbacher's testimony was riddled with errors and contradictions on points large and small. Most significantly, Calmbacher lied when testified that he never authorized the plaintiffs in Ecuador to sign his reports for him given that he was out of the country. In contemporaneous emails from the time, he very specifically so authorizes. And as lawyers for the government of Ecuador have demonstrated, Calmbacher's claim that he didn't make certain conclusions about the existence of contamination is rebutted by the results of his own soil and water samples that prove extensive levels of contamination attributable to Chevron at the sites he investigated. Calmbacher's own sampling of these sites showed levels of TPH contamination more than 70 times higher than the Ecuadorian legal limit and other legally excessive levels of harmful toxins such as Chromium VI, Copper, Lead, Nickel, and Zinc. (See this brief at ¶ 468.) Chevron's own experts, examining the same sites as Calmbacher, also found massive illegal levels of contamination.

Knowing that Calmbacher's testimony was full of holes and highly vulnerable to cross-examination, company lawyers **did not produce him for the RICO trial** as a witness. Instead, the company filed as "evidence" Calmbacher's secret deposition transcript in which he had never been subject to cross-examination. Violating legal rules that bar the use of deposition testimony as evidence when a live witness is available for cross-examination, Judge Kaplan accepted the transcript as "evidence" anyway. The fake testimony from the secret deposition in which there had been no cross-examination is the **only** evidence offered in support of the Second Circuit "finding" in this section.

As the government of Ecuador summarized in its brief in the arbitration matter: "[U]nsupported allegations by a terminated consultant with both an economic interest and a demonstrated animus toward the Plaintiffs cannot establish misconduct by the Plaintiffs, especially in light of Dr. Calmbacher's multiple misrepresentations while under oath." Again, the Second Circuit rubber-stamped Chevron's and Judge Kaplan's interpretation of the untruthful Calmbacher testimony. Judge Kaplan's acceptance of the deposition transcript instead of requiring Calmbacher's cross-examination, as the rules require, is yet another example of the judge's intellectual dishonesty.

## False Finding #5: Donziger "Secretly" Paid Industry Experts for Neutral Monitoring Services

This finding against Donziger for using so-called "independent" experts to monitor the trial is grossly misleading and disconnected from the context of legal practice in Ecuador. It also contradicts the findings of three layers of courts in Ecuador, including the country's Supreme Court.

First, some background information. Expert witnesses are used frequently in litigation in the U.S. and the world over to opine about a technical issue before the court. Generally, in an adversarial system of justice, experts are paid by the party that hires them. Both parties are entitled to hire their own expert. It is standard practice for experts to opine in favor of the litigation position of the party paying them. This is how it worked in both the U.S. and Ecuador with some minor, insignificant differences.

In Ecuador, each party was allowed to nominate its own experts who were then appointed officially by the court. (In the U.S., the court must approve an expert as a witness before testimony is allowed, but the court

21

does not actually appoint the expert.) Consistent with these practices in both countries, experts in Ecuador (although appointed by the court) worked with the party that hired them to develop evidence consistent with their litigation position. In the "finding" on this point, both Judge Kaplan and the Second Circuit got it wrong on how experts work in Ecuador.

Judge Kaplan claimed that by paying their own experts and working closely with them, Donziger and his colleagues violated Ecuadorian law by interfering with the court's own control over these same experts. Again, Ecuador's courts—which obviously know much more than Judge Kaplan about Ecuadorian law and practice—completely rejected this view. Judge Kaplan's finding is also inconsistent with how both parties in the Ecuador trial actually treated experts. Chevron's own lawyers treated their experts in exactly the same way as Donziger did his. Yet Judge Kaplan predictably remained silent about Chevron's control over its experts while excoriating the lawyer for the villagers for exercising control over his experts.

The villagers hired the referenced experts as observers to monitor the judicial inspections to protect the right of the communities to a fair trial. Given that lawyers for the villagers had ample reason to conclude that Chevron was trying to delay the inspections process, Donziger tried to use the presence of the observers to give the court a sense that "the world was watching" such that Chevron's attempts to sabotage the trial would not be tolerated.  Again, this was an entirely appropriate action consistent with long traditions of advocacy in an adversarial system of justice. In fact, any lawyer concerned about corruption in an ongoing trial would be remiss if he or she did not take measures to bring pressure to bear on the court to fulfill its duty to be a neutral arbiter.

There are two striking observations to be made about the Kaplan/Second Circuit claim that Donziger's use of these observers was "criminal" or somehow improper. First, the observers had no official role and no impact on the trial whatsoever, other than perhaps to incentivize the Ecuadorian court to do its job properly. Second, Chevron did exactly the same thing by appointing its own observers to sit in vigilance over the trial process. Yet Judge Kaplan, again employing a double standard, only decided to "punish" Donziger for engaging in this entirely appropriate activity while remaining silent about Chevron's similar behavior. Consider what Judge Kaplan ignored:

- Chevron made public "announcements" (see here and here) that it would use its own "independent international observers" to "monitor" the trial process. Again, Chevron did *exactly* the same thing as Donziger. Judge Kaplan tried to claim that Chevron's practice in this regard was proper, while Donziger's was not.

- Judge Kaplan also refused to consider other evidence that contradicts his so-called "finding" in this regard.  Consider this filing by a Chevron lawyer introducing a report prepared by three experts paid by Chevron. These experts worked for Chevron for years to advocate the company's environmental positions (often despite their "serious doubts" about Chevron's advocacy), yet the Chevron lawyer called the experts "independent" and the experts repeatedly refer to themselves and their conclusions as "independent" in their reports.  Yet Judge Kaplan found it to be *criminal* when Donziger also claimed experts for the villagers were "independent" when exercising their judgment.

- Another expert in the Ecuador trial put forward by Chevron was John Connor, an American environmental consultant. Connor admitted to working for Chevron for 30 years without finding the company liable for even a single dollar in damages. As a classic paid expert, Connor's role was to use the evidence to advocate for Chevron yet he was repeatedly represented by Chevron to the

Ecuador court as "independent." Again, Judge Kaplan found that when Donziger did the same in Ecuador with his experts, it was wrong; when Chevron did it, there was no problem.

In sum, neither Chevron nor Judge Kaplan could cite a single provision of Ecuadorian law that was violated in the way technical experts were used. Ecuador's courts completely rejected the Kaplan/Second Circuit finding on this point.

## False Finding #6: Donziger "Coerced" a Judge to Cancel Certain Site Inspections

This finding is yet another example of Judge Kaplan concocting a phony issue to try to harm Donziger and taint the Ecuador judgment. The rebuttal arguments can be found in great detail in Donziger's sworn testimony (¶122) and in submissions from the government of Ecuador (pages 109-112 of this brief, pages 46-51 of this Annex). We provide a brief summary here.

This issue concerns the court-supervised inspections of Chevron's contaminated oil production sites during the Ecuador trial. These inspections allowed the parties to lift water and soil samples from Chevron's former production sites and have them tested for harmful toxins. The inspections process produced most of the scientific evidence—including roughly 64,000 sampling results—that proved the case against Chevron. Each party had the right to inspect any Chevron oil production site it wanted out of the 400 or so that existed in the geographic area relevant to the claims. The court granted all of Chevron's requests for inspections, which included more than 30 of the company's former well sites and separation stations. The issue arose when the villagers—after inspecting numerous Chevron sites and finding extensive pollution at all of them—concluded *after four years of trial* that they had gathered more than enough evidence to meet their burden of proof.

To accelerate the trial process, the villagers told the court they would withdraw the remaining inspections they had requested. The villagers did not want the trial extended unnecessarily to conduct even more time-consuming and expensive field inspections that would have produced nothing but redundant evidence against Chevron. In Donziger's view, the claims of the villagers already were over-proved with multiple layers of scientific evidence adduced by both parties during the trial, corroborated by various independent third-party studies. Yet Chevron opposed the request by the villagers to cancel their own inspections. Chevron's lawyers clearly preferred for the long trial to keep going rather than have the Ecuador court take a leap toward a final resolution on the merits that the company knew was likely to be unfavorable.

It is axiomatic that a party in a civil trial has total control over what evidence it chooses to produce, or not produce. The plaintiffs clearly had the right to cancel the field inspections of oil well sites that **they had unilaterally requested**. Such a move would have had no impact whatsoever on Chevron's ability to present any evidence it wanted. Indeed, all of the inspections Chevron requested during the Ecuador trial were performed. The company had the right to put forth any other probative evidence it wanted, and in fact did so. For Judge Kaplan to "find" that the cancellation of the inspections at the request of the villagers was improper—and thereby substitute his own judgment for that of the Ecuador judge actually presiding over the trial—is just plain wrong and in our view a wholly inappropriate exercise of American judicial authority.

Judge Kaplan also expressed irritation with the fact the plaintiffs had written a complaint against the Ecuador trial judge after he initially refused to let the villagers cancel the redundant site inspections. At the time, Chevron's lawyers, intent on delaying the end of the trial, were hounding the judge to deny the request of the villagers to cancel the remainder of their previously requested inspections. Preparation of the complaint by the villagers was entirely proper. In Donziger's memoir notes, he suggests that the judge's awareness of the complaint was linked to the ultimate decision to "rule correctly" and to grant the request. Judge Kaplan found that the use of the complaint amounted to improper "coercion" when in fact it was an

example of proper advocacy against a disaffected litigant (Chevron) whose lawyers were trying to derail a trial that they knew the company was losing.

Judge Kaplan's suggestion that the Ecuadorian judge could be so easily "coerced" in this way is condescending. In Judge Kaplan's worldview, an Ecuadorian judge is presumed to be so easily cowed by the prospect of a merits-based complaint that he is somehow "coerced" into action. Feeding these kinds of prejudices about Ecuador's judicial system, both in court and in the media, was and is an explicit part of the Chevron strategy. In 2009, Chevron's lead strategist produced a series of proposals advocating that the company step up its attacks on the Ecuador judgment by way of "relentless[] use of the blogosphere," think tanks, and "elected/regulatory leaders" to push "themes" including positioning Ecuador as "the next major threat to America" and "the next Cuban missile crisis in the making".  This Chevron consultant also suggested stepping up the intensity of the demonization campaign against Donziger by characterizing him as "the most powerful man in Ecuador" who was "pulling the strings of an emerging banana republic."

Judge Kaplan bear-hugged Chevron's strategy and incorporated elements of it into his rulings. In written opinions, he variously called Donziger a "field general" and a "master mind" and suggested that enforcement of the Ecuador judgment would leave gas stations throughout the United States without fuel. He openly mocked the Ecuadorian judiciary and ruled as a matter of law that the country was incapable of providing due process to any litigant—despite the fact that Chevron has won numerous cases in Ecuadorian courts over the years. All this is so egregiously parochial and partisan that it would be laughable—if it weren't now a perspective fully endorsed by the Second Circuit's affirmance of Judge Kaplan's decision.

## False Finding #7: Donziger "Coerced" a Judge to Appoint a Certain Expert (Cabrera)

Ecuador's courts—the courts with obvious competence on the lawfulness and propriety of Ecuadorian procedure—looked carefully at Chevron's allegations on this point and rejected them. There was good reason for doing so, as we explain below.

Part of the context here was discussed above: experts on both sides were expected, just as in the United States, to cooperate with the parties that appointed them and paid them. The distinction indicated by the reference to a "'global expert" is not significant. Like other experts nominated by the parties in the Ecuador litigation, "global" experts were requested and paid by a single party. Chevron requested, nominated, paid, met *ex parte* with, and controlled the work of its own "global" experts who quite clearly "played ball" with Chevron. The villagers wanted their own damages expert, Richard Cabrera, to work closely with them to present to the court accurate, science-based information documenting Chevron's extensive pollution. This is exactly what they did, and it was found by Ecuador's courts to be entirely proper.

Further, a close reading of the Second Circuit decision shows the court made a sloppy mistake. It reveals that the referenced "play ball" quote was not used by Donziger in reference to Cabrera, as the Second Circuit claims.  Rather, it was used in reference to another potential expert who never worked on the case.

## False Finding #8: Donziger "Secretly" Paid Cabrera

Judge Kaplan and the Second Circuit claim that paying Cabrera is somehow suggestive of wrongdoing. This is not true, as affirmed by the courts of Ecuador. Both parties in the Ecuador trial paid their own experts without disclosing the amounts or the means to the other party. This was an open practice and there was nothing "secret" about it as Judge Kaplan and the appellate court tried to claim.  All payments to Cabrera by the legal team for the villagers were entirely proper.

More to the point, the issue of the Cabrera report is legally moot. The Ecuador trial and appellate courts did not consider the report when ruling given the constant drumbeat of Chevron complaints, combined with the

fact there was ample other evidence that pointed to the company's guilt. The fact that Judge Kaplan and the Second Circuit continue to focus on this one technical report out of the 106 such evidentiary reports submitted by the parties during the trial again illustrates their desire to find anything possible to taint the Ecuador judgment, even if it means using a document that is largely irrelevant.

Again, the "secret" payment issue regarding Cabrera was manufactured by Chevron to try to make an innocent act seem sinister. Having unilaterally requested his services, the plaintiffs were legally obligated by the Ecuador court to pay Cabrera. Those payments were made via checks or wire transfers, just as Chevron paid its experts. There was nothing sinister about it.

### *False Finding #9: Donziger "Controlled" Cabrera's Work While Denying Involvement*

This finding again reflects what appears to be a profound misreading by Judge Kaplan of Ecuadorian law and procedure.

This issue can best be understood by the context regarding expert witnesses described above: the Cabrera global damages report was unilaterally requested by the plaintiffs. Cabrera was paid by the plaintiffs as required by Ecuadorian law. The plaintiffs also were involved in the preparation and submission of the work given that Cabrera was their expert, not Chevron's. Indeed, as Donziger noted in his sworn testimony, during the trial in Ecuador Chevron agreed with this non-controversial proposition.  In fact, Chevron proposed that its primary paid expert in the Ecuador litigation (John Connor) be allowed to do the same work as Cabrera. This reflected Chevron's own agreement with Donziger that the nature of the appointment was for a party-controlled expert to do the work.

Donziger also testified that although the plaintiffs worked extensively with Cabrera, the practice was to prepare work within parameters he had indicated were acceptable. Ultimately, Cabrera had final say over the work product. The fact that much of the Cabrera report was drafted by a highly reputable American environmental firm, Stratus, fundamentally speaks to the scientific credibility undergirding the report, not to anything improper.  Donziger and the lawyers for the villagers did not "control" the work of Cabrera any more than Chevron and its consultants "controlled" the work of the company's paid experts.

The trial court in Ecuador considered the company's arguments on this very point and strongly disagreed with Kaplan and the Second Circuit. That court stated:

> [A] review of the case file shows that there have been no defects in the appointment of expert Cabrera, or in the delivery of his report. There are no legal grounds whatsoever for quashing either his appointment or his expert report. It should be stressed that this issue has been resolved on several prior occasions, and no new evidence has been submitted that would suggest the existence of any grounds for quashing that appointment or expert opinion.

On appeal in Ecuador, a panel of three judges—the impartiality of whom Chevron has never had grounds to challenge—affirmed that Chevron's allegations about Cabrera "go nowhere without a good dose of imagination." In 2013, Ecuador's highest court concluded, in a 222-page opinion as follows:

> It suffices to point out that the company never demonstrated fraud, which it has been claiming without any legal support. We reiterate that it has not proven any omission or violation of procedure that would give rise to the nullity sought. The appellant's incessant harping in this regard departs from procedural good faith.

At the same time, the Ecuador trial court recognized that Chevron's strategy of manufacturing so-called "improprieties" regarding Cabrera could amount to a fig-leaf that the company might use to justify not complying with a final judgment. As mentioned, the Ecuador trial court at Chevron's request struck the Cabrera report entirely given that the court had roughly the same scientific sampling information from the other expert evidentiary reports submitted by the parties. The court later emphasized that the Cabrera report "had NO bearing on the decision." Again, the trial court observed there was voluminous other evidence in the record, apart from the Cabrera report, to justify the imposition of liability and damages on Chevron.

Although the decision to strike Cabrera's report put the villagers at an extreme disadvantage, Ecuador's Supreme Court confirmed the approach on a final appeal.  In a unanimous opinion, that court confirmed that the trial judgment "did not take [Cabrera] into account" and noted that Chevron had never even "indicate[d] which law [it thought was] violated" by the Cabrera process. In no normal world would this decision seem remotely unusual or problematic. But without the Cabrera issue, Chevron's efforts to taint Donziger and the Ecuador judgment quickly run out of steam. So in addition to trying to bolster its case by paying for Guerra's false testimony about a bribe that never occurred, Chevron has desperately sought to keep the Cabrera issue alive in the foreign courts where the villagers are targeting Chevron assets to enforce the Ecuador judgment.

Chevron later tried to argue that the Ecuador trial court actually relied on parts of the Cabrera report even though it claimed to have disregarded it. Chevron pointed to small parts of the judgment that it asserted derived from Cabrera's work. But each of Chevron's cited passages was shown at trial to have a basis wholly independent of the Cabrera report. The Second Circuit, again without independent analysis, adopted Judge Kaplan's pro-Chevron view on this point. The degree of condescension and insult to foreign judicial officers required for this move is just staggering.

Chevron presented its complaint about Cabrera repeatedly before the only courts competent to address the issue – those in its preferred forum of Ecuador. Those courts repeatedly rejected Chevron's arguments. In the end, the Cabrera report amounted to a small and unsubstantiated due process complaint by a disaffected litigant. Chevron's arguments were considered and rejected by the trial court and all layers of appeal in Ecuador. The Second Circuit's continued effort to try to override a foreign court judgment on this point is highly inappropriate.

## False Finding #10: A Consulting Expert—Stratus—Wrote the Cabrera Report

This claim is another Second Circuit "finding" unmoored from the context of Ecuadorian law. First, it is true that the prominent American environmental consulting firm Stratus drafted the bulk of Cabrera's report. Second, there was absolutely nothing wrong with this, as confirmed by three layers of courts in Ecuador. Third, it doesn't matter given that Ecuador's trial court disregarded Cabrera's report anyway.

Stratus played a critically important role in advising the villagers on how to gather and interpret scientific data derived from the judicial inspections. Recognizing the vital role Stratus played in marshaling the soil and water sampling results and other scientific evidence for the villagers, Chevron wanted to drive the company off the case. As part of its plan, Chevron named Stratus as a defendant (along with Donziger and the villagers) in the RICO case alleging that the company's role in helping to draft the Cabrera report was part of the supposed "fraud". But Chevron went further to try to pressure Stratus, even employing a form of blackmail. A Chevron official wrote a series of vicious and deceptive letters to clients of Stratus falsely claiming that the company had committed "fraud" in Ecuador and therefore should be terminated. Stratus claimed these letters constituted illegal "tortious interference" with its business because in fact there was no judicial finding at the time that any fraud had occurred.

26

The Chevron lawsuit against Stratus –also before Judge Kaplan -- was in our view designed to blackmail the company into abandoning the villagers. As detailed in Stratus' counterclaims against Chevron, Chevron threatened Stratus and its professionals for years with its intimidation strategy. Chevron even intervened in an insurance dispute to make sure Stratus would have to bear the full cost of defending the litigation rather than have those costs paid by its insurer. Under extreme financial stress and needing to save the jobs of its 75 employees, Stratus ultimately caved to the pressure generated by Chevron and Judge Kaplan and agreed to "disavow" the Cabrera report in exchange for Chevron agreeing to drop its lawsuit. The company survived, but Chevron's legal goon squad was able to claim a valuable scalp from the team of the villagers.

Chevron later promised that Douglas Beltman and Ann Maest, scientists at Stratus who played leading roles in drafting the Cabrera report, would testify for the company in the RICO proceeding. But as with the discredited Chevron witness Calmbacher, Chevron's lawyers never called Beltman and Maest as witnesses—no doubt because in sworn deposition testimony prior to trial they recounted details of the overwhelming evidence proving Chevron's responsibility for the devastating environmental contamination in Ecuador.

Contrary to the Kaplan/Second Circuit finding, Stratus did nothing wrong in Ecuador. Chevron did something very wrong in blackmailing Stratus. And Judge Kaplan and the Second Circuit did something terribly wrong in blessing Chevron's use of our civil justice system as a weapon of blackmail against a small company that had produced hard evidence of the company's environmental crimes.

## False Finding #11: Stratus "Fabricated" Objections to the Cabrera Report

This claim once again reflects Judge Kaplan's apparent disdain for Ecuadorian law. It was also a clear attempt to steamroll Ecuador's courts.

As mentioned above, the Cabrera issue was manufactured by Chevron and in any event is moot under Ecuadorian law.  Chevron and the villagers helped to draft reports for their own nominated "experts" to review and use, including in the case of Cabrera. Objections filed regarding Cabrera's report were indeed prepared by Stratus and were not "fabricated"—they were real, grounded in science, and reflected concerns the villagers had about several discrete shortcomings in some of the material submitted. Chevron filed objections to the same report on various other grounds.

To be clear, Chevron *never produced evidence* showing that any practice involving Cabrera violated Ecuadorian law. Both parties worked closely with their experts, as happens in courts throughout the world. Actual authorities on Ecuadorian law who have examined this issue, most notably Ecuador's courts, have concluded that no law was violated regarding the Cabrera process.

## False Finding #12: Donziger Hired New Consultants To "Cleanse" the Cabrera Report

This finding uses the word "cleanse" to unfairly try to taint the Cabrera report. There was no need to "cleanse" the Cabrera report given that it was grounded in scientific data, prepared consistent with Ecuadorian law, and was an entirely defensible assessment of Chevron's dumping billions of gallons of toxic waste onto indigenous ancestral lands.  The word "cleanse" was invented by Chevron to imply there was some problem with Cabrera's work. Like almost all of Chevron's arguments, it was enthusiastically adopted by Judge Kaplan and then wielded as a sword by the company to try to poke at the validity of the Ecuador judgment.

The only "new" fact here is that the Ecuador trial court—to deal with Chevron's incessant and unsubstantiated complaints about Cabrera—requested in 2010 that both parties submit new damages assessments. These were supplemental reports prepared at the request of the court. Again, this request was

an eminently practical step to deal with Chevron's complaints.  Chevron, per its practice of denying responsibility for its pollution, refused to submit a supplemental damages assessment. The plaintiffs did submit additional damages assessments prepared by several prominent U.S. technical experts. The submission of these reports infuriated Chevron because they took the focus off of Cabrera's report, on which Chevron had staked a huge investment as part of its public relations attack campaign.

The Ecuador trial court ultimately found that once it had made its liability finding against Chevron, it could reach specific damages figures by relying on per unit clean-up cost figures contained in reports by Chevron's own experts that were submitted during the trial. It thus based its damages numbers on neither Cabrera nor the supplemental experts submitted by the plaintiffs.

Chevron can have no legitimate objection to this pragmatic approach. Instead, it attacks with cheap rhetoric. In fact, evidence is used routinely in just this manner in trials the world over. The rhetoric means nothing. Judge Kaplan's embrace of Chevron's rhetoric-only attack is once again revealing of its approach to the case.

## The Result: Absurd Legal Determinations In Kaplan's RICO Ruling

Given how the RICO case played out, it should come as no surprise that Judge Kaplan ruled exactly how Donziger and his lawyer had predicted. Judge Kaplan found that Donziger and his clients were "racketeers" who tried to use the environmental litigation in Ecuador to "extort" money from Chevron—the same company that admitted to dumping billions of gallons of toxic waste into the rainforest, decimating five indigenous nationalities and causing a massive outbreak of cancer. As explained herein, Judge Kaplan did this by accepting false evidence from Chevron, by distorting and misinterpreting Ecuadorian law and procedure, by denying a jury and other due process protections to the defendants, and by consciously tilting the scales of justice to favor Chevron. Donziger's far stronger claims against Chevron for its racketeering in Ecuador, put forth in this stunning lawsuit against the company, was held in abeyance by Judge Kaplan for a full year—thus denying Donziger almost any meaningful discovery of Chevron—before it was denied for no legitimate reason. In so doing, Judge Kaplan shut down the ability of the villagers and their counsel to present the real truth of what Chevron did in Ecuador in open court.

Judge Kaplan also manipulated the case to lower the standard of proof from "beyond a reasonable doubt" to the civil standard of "more probable than not" even though Chevron was putting forth allegations of felonious criminal misconduct against Donziger. In all criminal cases involving felonies, the accused is entitled to a jury of impartial fact finders. But in Judge Kaplan's world, Donziger was denied a jury so the judge could decide the case alone. What resulted from Judge Kaplan's RICO theatrics is the very antithesis of justice. Consider the extent to which Judge Kaplan used tortured and dishonest reasoning to try to harm Donziger's reputation by supposedly finding him "guilty" without a jury of the following predicate felony offenses:

### Fraud

The central finding in the RICO case was that Donziger committed "fraud" by bribing the Ecuador trial judge. But there was no bribe. That finding was based on testimony from Chevron's admittedly corrupt witness Guerra, who admitted he lied repeatedly on the stand and who was paid at least $2 million in cash and other benefits by the company. The reality is the reverse: Chevron committed "fraud" and engaged in racketeering by bribing Guerra to frame Donziger and his clients. Chevron, Guerra, and company lawyers were engaged in or connected to the real racketeering conspiracy.

Our view is that Judge Kaplan allowed his public courtroom, the operation of which is funded by taxpayer dollars, to be taken over and used by a private oil company to create a false record of wrongdoing to try to evade a legitimate environmental liability.

### Extortion

Although it is almost inconceivable, Judge Kaplan also found that Donziger engaged in the "extortion" of Chevron by publishing David Russell's preliminary $6 billion damages assessment at the beginning of the trial. (See the discussion above starting at page 17.) Judge Kaplan found that Donziger was trying to use the damages assessment to pressure Chevron to settle the case. Of course, the very idea behind almost any legitimate civil lawsuit is to pressure the defendant to settle the case as quickly as possible. It turns out the damages figure prepared by Russell was *low* compared to the actual damages caused by Chevron as later found by three layers of courts in Ecuador and other third-parties. But Judge Kaplan insisted with no reasonable basis that the figure was *inflated*, and that Donziger used the inflated figure to improperly pressure Chevron. In any event, a lawyer publishing a damages assessment during a trial – even one that is incorrect -- is certainly not improper, and it is definitely not extortion.

### Wire fraud

Judge Kaplan found Donziger guilty of "wire fraud" because he used telephone and email to communicate with the legal team litigating the case in Ecuador. This claim was entirely derivative of the false "fraud" finding mentioned above.

### Money laundering

Judge Kaplan found Donziger guilty of "money laundering" based on transfers of funds from his law firm in New York to pay case expenses in Ecuador. Again, this claim is entirely derivative of the false "fraud" finding described above.

### Obstruction of justice

Judge Kaplan concluded that Donziger engaged in "obstruction of justice" because of his involvement in the preparation of a sworn declaration that was submitted to U.S. courts by Ecuadorian lawyer Pablo Fajardo concerning the practice of expert witnesses in Ecuador. Fajardo's view in the affidavit was entirely consistent with Ecuadorian law and practice as affirmed by various Ecuador law experts and confirmed by the country's Supreme Court. But Fajardo's view did not comport with Kaplan's subjective view of how the law of Ecuador regarding experts should operate. There was nothing in the Fajardo declaration that was false, and the idea that filing an affidavit of this nature constituted obstruction of justice is preposterous. Donziger did not draft or sign the affidavit – he simply reviewed it with Fajardo prior to his signing to ensure accuracy.

### Witness tampering

In another major stretch that again reflects his intellectual dishonesty, Judge Kaplan found that Donziger engaged in "witness tampering" by suggesting minor changes to a proposed sworn declaration by an expert his team had hired, Mark Quarles. Not only is this standard practice – a lawyer suggesting changes to a draft affidavit from his own expert -- but Quarles cordially rejected all of Donziger's suggested changes, preferring instead to use his own language.  Quarles never

testified he felt pressured by Donziger and the affidavit was submitted as Quarles wrote it. By no possible stretch can this be considered witness tampering.

### Travel Act

Finally, Judge Kaplan found Donziger violated a federal criminal statute called the Travel Act by causing funds to be sent to Ecuador to pay an expert witness for the villagers, Richard Cabrera. The Travel Act forbids the use of the U.S. mail, or interstate or foreign travel, for the purpose of engaging in certain "criminal" acts. Thus, in Judge Kaplan's view, Donziger committed a felony offense simply by traveling to Ecuador and wiring funds into the country to pay case expenses. This supposed felony "violation" is entirely derivative of the so-called "fraud" that never occurred, as explained throughout this report.

## Kaplan's Final Act of Dishonesty: Inventing a Claim

Judge Kaplan seemed to implicitly acknowledge the many legal problems with his unprecedented RICO decision by doing something in his chambers after the trial that can only be described as underhanded in the extreme. Out of sight of the parties, he effectively added to Chevron's case a claim under an archaic and defunct legal doctrine that was used a handful of times in the nineteenth century to "set aside" foreign judgments on the basis of "fraud" outside the context of an enforcement action. The doctrine was not just old: it had been effectively repealed and replaced by the statutory framework for enforcement of foreign judgments (and grounds for resisting the same) implemented by New York and every other U.S. state during the twentieth century. So there was a reason Chevron's army of lawyers, who put everything else plus the kitchen sink into their complaint, either didn't think of it or didn't dare propose it. But Judge Kaplan added it, and of course found it to provide a separate non-RICO ground for giving Chevron victory in the case and the relief it wanted. The motivation was clear: By inserting this claim in his decision after the trial ended, Judge Kaplan gave Chevron (and himself) a sort of insurance policy during the appellate process. If the appellate court could not accept the multiple inventions and distortions of law that Judge Kaplan had to employ to keep Chevron's RICO claims alive, it still might let Kaplan's decision survive on this invented claim.

## Conclusion

If in fact there was any real evidence to support the explosive allegations of criminal misconduct leveled by Chevron, then Donziger and his colleagues almost certainly would have been prosecuted in criminal court where the full panoply of due process protections, including a jury, would have been available. There's a reason this never happened, despite strenuous efforts by Chevron's politically-connected legal team to enlist federal prosecutorial authorities to target Donziger. Any federal prosecutor engaging in even a cursory review of Chevron's bogus bribe and ghostwriting  "evidence" will quickly see that it is a house of cards that no reasonable fact finder would ever accept. Judge Kaplan clearly knew this as well, which is why he refused to seat a jury as Chevron pursued its Plan B civil racketeering case in his court. In fact, it is clear that the *only way* Chevron could have obtained any judicial opinion endorsing its fake narrative was through a historically unprecedented trial orchestrated by a solitary judge who in advance signaled to the company that he would ensure the outcome it sought. That the resulting opinion was obtained via a proceeding in the opinion of many that was actually a Dickensian farce matters little to Chevron, which is trying to leverage Judge Kaplan's endorsement of its false evidence to throw up roadblocks to judgment enforcement actions filed by the villagers around the world.

It is now clear that the filing the RICO case was part of Chevron's own fraud to cover its tracks for losing a major litigation to indigenous groups in its preferred forum of Ecuador. If indeed Chevron representatives fabricated evidence and presented it to Judge Kaplan to try to frame its adversaries, including the very lawyers who won a judgment against the company, then Chevron and all officials responsible for this outrageous conduct might themselves be appropriately subject to criminal prosecution.