# EXHIBIT 2

1
2  UNITED STATES DISTRICT COURT
3  SOUTHERN DISTRICT OF NEW YORK
4   C.A. No. 11 Civ. 0691 (LAK)
5  ------------------------------------x
   CHEVRON CORPORATION,
6
              Plaintiff,
7
8
       - against -
9
10
   STEVEN DONZIGER, et al.,
11
              Defendants.
12 ------------------------------------x
                June 25, 2018
13              10:07 a.m.
14
15      Videotaped Deposition of STEVEN
16 DONZIGER, taken by Plaintiff, pursuant to
17 Order, held at the offices of Gibson Dunn &
18 Crutcher LLP, 200 Park Avenue, New York,
19 New York, before Todd DeSimone, a
20 Registered Professional Reporter and Notary
21 Public of the State of New York.
22
23
24
25

```
                                              Page 13
 1                   DONZIGER
 2      Q.     So you refuse to answer whether
 3   you have received any money raised on the
 4   basis of the judgment since March of 2014?
 5      A.     I have acknowledged before
 6   Judge Kaplan already that I have been paid
 7   out of monies raised to pay litigation
 8   expenses as he expressly permitted in his
 9   April 25th order.  So please stop harassing
10   me.  I mean, ask a question about the
11   Elliott meeting or about my financial
12   condition.  That's what this deposition is
13   about.
14      Q.     So the answer is yes, you have
15   received money --
16      A.     Don't tell me what the answer
17   is.  I answer the questions, you ask the
18   questions.
19      Q.     Well, not so far, but maybe we
20   will get there.
21             On how many occasions have you
22   received monies raised to pay, as you
23   describe it, litigation expenses?
24      A.     I object.  It is beyond the
25   scope of the deposition.  I have received
```

```
                                              Page 67
 1                    DONZIGER
 2        A.     I don't know.  I mean, we are
 3   talking 25 years, so it is a massive amount
 4   of material, and I have an accounting, it's
 5   not complete, it's substantially complete,
 6   but it's not complete.
 7        Q.     And who prepared this
 8   accounting that is substantially complete?
 9        A.     Different people.
10        Q.     Can you identify them, please?
11        A.     I feel like this is intruding a
12   bit on the First Amendment issue.  I will
13   answer it, though, because you already
14   know.  So the person who originally put
15   this together was Josh Rizack and then
16   subsequent to Josh, who didn't complete it,
17   but he got a fair amount down the road with
18   it, we hired Katie Sullivan to complete it.
19        Q.     You retained Ms. Sullivan to
20   prepare your accounting for the Ecuador
21   case?
22        A.     I retained Ms. Sullivan to do a
23   number of different tasks, mostly to help
24   fundraise, but also to provide sort of
25   backup admin support to the case and to the
```

Page 68

1              DONZIGER
2  people on the case who needed it.
3       Q.    When did you retain
4  Ms. Sullivan?
5       A.    You are kind of moving into
6  that area now?  You want to talk about
7  Ms. Sullivan?
8       Q.    When did you retain
9  Ms. Sullivan?
10      A.    This is beyond the scope of the
11 deposition.
12            Generally, okay, I will answer
13 your question, because it is narrow, I
14 retained Ms. Sullivan on behalf of the FDA
15 in approximately October of last year.
16      Q.    2017?
17      A.    Yes.
18      Q.    Do you have any written
19 agreement with Ms. Sullivan or her company?
20      A.    There is a draft of an
21 agreement, but I don't believe that it was
22 executed, although I'm not sure.
23      Q.    And other than fundraising and
24 preparing accountings for you and your
25 firm, any other functions Ms. Sullivan was

```
                                            Page 74
 1                    DONZIGER
 2    organized, as accounts to hold funds that
 3    have been subsequently transferred out to
 4    other people to pay case expenses, yes.
 5          Q.     So am I understanding you that
 6    you have commingled case funds with your
 7    personal funds?
 8          A.     No.  Commingle is your word.
 9          Q.     Well, you have put them in the
10    same account, the money, yes?
11          A.     It's not commingling as far as
12    I'm concerned.  That's an opinion that
13    you're expressing.
14                 You know, the money comes in.
15    We almost never have enough money to meet
16    the need and all the bills, and it has to
17    be then sent out in a way to keep the case
18    going.  I have done that through the years
19    from time to time.
20          Q.     And you keep accurate records
21    of all the case money that comes in and all
22    the case money that flows out, is that
23    right, of your accounts?
24          A.     The records are all electronic
25    and easily retrievable.  I had brought in
```

Page 75

1        DONZIGER
2  Ms. Sullivan to help get it organized and
3  up to speed and pick up where Mr. Rizack
4  left off.
5       Q.    Is there any one of these five
6  accounts that is used exclusively for the
7  Ecuador case and does not contain any of
8  your personal funds?
9       A.    8132.
10      Q.    So that's exclusive to the
11 case?
12      A.    Yes.
13      Q.    Other than these accounts, are
14 there other accounts that you control and
15 to which Ecuador case funds have been
16 deposited?
17      A.    That is beyond the scope.  Are
18 you inquiring as to my present financial
19 condition?  Is that what this is about?
20      Q.    I'm asking you if there are
21 other accounts where Ecuador case funds --
22      A.    Currently -- let me answer your
23 question --
24      Q.    That you control.
25      A.    Let me answer your question

```
                                               Page 117
 1              DONZIGER
 2   I think it is a great organization.  On
 3   occasion I have helped them try to raise
 4   money for other purposes, foundation money,
 5   that kind of thing, projects, health
 6   projects.  People are hurting, so there is
 7   all sorts of projects the FDA does, and on
 8   occasion I have tried to help them raise
 9   money.
10        Q.    And is there any limit to the
11   number of percentage interest you are
12   authorized to sell in the judgment on
13   behalf of the FDA?
14        A.    Well, I don't sell anything.  I
15   try to get funders to buy interest in the
16   judgment, and obviously subject to client
17   approval.  So I will do the best I can for
18   my clients in that regard and present the
19   possibility to them and they can say yes or
20   no.  You know, they determine that.
21        Q.    Well, my question is actually
22   in your view, is there any limit on the
23   percentage interest the FDA can sell in the
24   judgment?  Can they sell somebody 50
25   percent of the judgment, for example?
```

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400

Page 144

1           DONZIGER
2      Q.      Did you discuss with
3  Ms. Sullivan how much you were going to ask
4  Elliott for?
5      A.      I think we did.
6      Q.      When you told Elliott that you
7  had a 6.3 percent interest in the judgment,
8  was that an accurate statement?
9      A.      According to my retainer, yes,
10 but I have given portions of that to other
11 people.
12     Q.      To whom have you given portions
13 of that?
14     A.      Rick Friedman, Zoe Littlepage.
15     Q.      Did you give them --
16     A.      So they would represent me in
17 the RICO case, just to be clear.
18     Q.      You gave them portions of that
19 before or after the RICO judgment?
20     A.      Before.
21     Q.      So what percentage of the 6.3
22 do you currently own?
23     A.      Again, I think it is pretty
24 much a nullity for practical purposes given
25 the RICO judgment. But I think if you were

```
                                              Page 145
 1                  DONZIGER
 2   to discount what has been allocated to
 3   Mr. Friedman and Ms. Littlepage and a
 4   couple of other people --
 5        Q.    Who were the other people?
 6        A.    Two people who had loaned me
 7   money to pay John Keker, family members.  I
 8   would estimate it is about 5 or 5.2
 9   percent.
10        Q.    I'm sorry, what you have left
11   is 5 percent?
12        A.    In other words, instead of 6.3,
13   even though it is all for me and I owe
14   them, that if you were to discount what
15   they have been contractually promised, it
16   would be about 5.2 percent based on my best
17   estimates.
18        Q.    When you say discount, you mean
19   subtract out?
20        A.    Yes, subtract out.
21        Q.    From the 6.3?
22        A.    Yeah.
23        Q.    Why was your 6.3 percentage
24   being discussed with Elliott?
25        A.    I don't remember.  I think
```

Page 189

1                    DONZIGER
2    through April of 2016.  You received the
3    $488,000 from Mr. Lenczner, if it refreshes
4    your recollection, starting in --
5         A.     So the answer to your question
6    is I don't believe -- I think most of these
7    were personal.  Well, I will say all of
8    them were personal because I got money into
9    this account.  I was supposed to use it on
10   myself, my family.
11        Q.     So you were personally paying
12   Mr. Page, for example?
13        A.     From time to time, yes.
14        Q.     In your response to
15   Interrogatory No. 3, you said your only
16   sources of income are "remuneration
17   authorized by my clients and paid out of
18   litigation expense funds raised with my
19   assistance, a modest monthly income
20   generated by two properties, Argyle
21   Knoxville and Lewmike LLC."
22               Do you recall that?
23        A.     Yes.
24        Q.     For the time period from 2014
25   to the present, is that an accurate

1 DONZIGER
2 statement or does it change year to year?
3     A.    Well, it is accurate over that
4 period of time. If your question is, is
5 there other sources of income at any time
6 during that time --
7     Q.    Yes, sir.
8     A.    I don't believe so, but I
9 wouldn't, you know, to the best of my
10 knowledge, no, but, you know, it is a lot
11 of years, and I occasionally try to do
12 other things but I really haven't -- I
13 can't -- I don't think I did anything else
14 during those years.
15     Q.    And do you own any interest in
16 any properties other than Argyle Knoxville
17 and Lewmike LLC?
18     A.    Well, there is one other
19 property I think I mentioned in my
20 responses.
21     Q.    What would that be?
22     A.    It is a property in Florida
23 that I inherited when my dad passed away.
24     Q.    And what's the name of it?
25     A.    It is not on there? I thought

Page 194

1      DONZIGER
2  Elliott meeting, that is covered by your
3  retainer?  You don't bill separately for
4  that with a timesheet?
5      A.    No.
6      Q.    So those types of activities
7  are covered by your retainer?
8      A.    Yes.
9      Q.    When you get reimbursed for
10 expenses, the FDA approves those expenses?
11     A.    On the sort of pretty rare
12 occasion I get reimbursed for expenses, I
13 put it in an invoice, get paid, when I do
14 an accounting with the clients they know
15 what the expenses are and they approve it.
16     Q.    So the money from the Lenczner
17 firm that was transferred to you, was any
18 portion of that money to pay your retainer?
19     A.    I think this is a little bit
20 beyond the scope.
21     Q.    I don't think so.
22     A.    Why not?
23     Q.    Because the issue relates to
24 compliance with the Court's injunction.
25     A.    Okay.  I will answer it.  The

```
 1
 2              CERTIFICATION
 3
 4      I,   TODD DeSIMONE, a Notary Public for
 5   and within the State of New York, do hereby
 6   certify:
 7      That the witness whose testimony as
 8   herein set forth, was duly sworn by me; and
 9   that the within transcript is a true record
10   of the testimony given by said witness.
11      I further certify that I am not related
12   to any of the parties to this action by
13   blood or marriage, and that I am in no way
14   interested in the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set
16   my hand this 26th day of June, 2018.
17
18            [signature: Todd DeSimone]
             ------------------------
19              TODD DESIMONE
20
21            *        *        *
22
23
24
25
```