# EXHIBIT 81

**CITATION:** Yaiguaje v. Chevron Corporation, 2017 ONSC 135
**COURT FILE NO.:** CV-12-9808-00CL
**DATE:** 20170120

# ONTARIO

## SUPERIOR COURT OF JUSTICE

### (Commercial List)

BETWEEN:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA , MARIA CLELIA REASCOS REVELO, HELEODORO PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO, MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA, OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE LUSITANDE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs/Moving Parties

– and –

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON CANADA FINANCE LIMITED

Defendants/Respondents

*Alan J. Lenczner, Q.C., Brendan F. Morrison, Kirk M. Baert, Celeste Poltak* and *Garth Myers*, for the Plaintiffs / Moving Parties

*Larry Lowenstein, Laura Fric, Eric Morgan, Clarke Hunter, Q.C.,* and *Robert Frank,* for the Defendant / Respondent, Chevron Corporation

*Benjamin Zarnett, Suzy Kauffman* and *Peter Kolla*, for the Defendant / Respondent, Chevron Canada Limited

**HEARD:** September 12-15, 2016

2017 ONSC 135 (CanLII)

2017 ONSC 135 (CanLII)

**HAINEY J.**

**REASONS FOR DECISION**

**Introduction**

[1]     Chevron Corporation ("Chevron"), Chevron Canada Limited ("Chevron Canada") and the plaintiffs each move for summary judgment with respect to the plaintiffs' claim against Chevron Canada.

[2]     The plaintiffs also move to strike the defences pleaded by Chevron in its statement of defence.

[3]     I heard all of these motions together. I will give my reasons for decision with respect to Chevron Canada's motion for summary judgment first. The result of this motion will determine the results of the other two motions for summary judgment. My reasons for decision with respect to the plaintiffs' motion to strike Chevron's defences will follow my reasons on the summary judgment motions.

[4]     More than a month after the completion of the argument of these motions, the plaintiffs brought a motion to further amend their statement of claim to add Chevron Canada Capital Company ("CCCC") as a defendant to this proceeding. At counsel's suggestion I deferred delivering my ruling on the four earlier motions until I had heard the plaintiffs' subsequent motion. I intend to provide my decision on this motion in a separate ruling to be released following the release of these reasons.

***CHEVRON CANADA'S MOTION FOR SUMMARY JUDGMENT***

**Background**

[5]     The plaintiffs are residents of Ecuador who hold a judgment of US$9.5 billion against Chevron ("Ecuadorian judgment"). The Ecuadorian judgment was obtained against Chevron in February 2011. It was originally in the amount of approximately US$18 billion. The judgment was upheld by an Ecuadorian intermediate appellate court in 2012. The National Court of Justice of Ecuador partially varied the judgment in November 2013 by reducing it to US$9.5 billion.

[6]     The dispute underlying the Ecuadorian judgment originated in the Oriente region of Ecuador. This oil-rich area attracted exploitation and extraction activities by oil companies, including Texaco Inc., from 1964 to 1992. As a result of these activities, the region suffered extensive environmental pollution that seriously disrupted the lives of its residents. The 47 plaintiffs in this proceeding represent approximately 30,000 indigenous Ecuadorian villagers who live in the region and who have been affected by the environmental pollution.

[7]     The plaintiffs commenced proceedings against Texaco in 1993 in New York. That proceeding was eventually dismissed on the grounds of international comity and *forum non conveniens*. This decision was upheld on appeal, in part, because Texaco agreed to submit to the jurisdiction of the Ecuadorian courts.

Page: 3

[8]     The plaintiffs commenced proceedings against Chevron in Ecuador in 2003. By then Texaco had merged with Chevron.

[9]     Chevron is a Delaware corporation with its head office in California. It is a public company. Its principal business is the holding of shares in subsidiary corporations and managing those investments.

[10]    Chevron Canada is a seventh level, indirect subsidiary of Chevron. It was originally incorporated in 1966. It has since amalgamated under the *Canada Business Corporations Act*[1] ("*CBCA*"). Its head office is in Calgary, Alberta.

[11]    Chevron Canada is an operating company. It has no connection to the legal proceedings in Ecuador that led to the Ecuadorian judgment.

[12]    Chevron Canada's major business activities involve petroleum and natural gas exploration in Canada. It has never carried on business in Ecuador and played no role in the events leading up to the Ecuadorian judgment.

[13]    Chevron Canada's shares are wholly owned by CCCC, which is currently not a defendant in these proceedings. However, as indicated above, the plaintiffs have brought a motion to add CCCC as a defendant. I will deal with this motion separately.

[14]    Chevron has refused to acknowledge or pay the Ecuadorian judgment. It has no assets in Ecuador. As a result, in 2012, the plaintiffs commenced an action in the Ontario Superior Court of Justice for the recognition and enforcement of the Ecuadorian judgment against Chevron, Chevron Canada and Chevron Canada Finance Limited ("CCFL"). The action against CCFL has since been discontinued ("Ontario Action").

[15]    In the Ontario Action, the plaintiffs seek the following relief against Chevron Canada:

    (a)     the Canadian equivalent of US$9,510,000,000 resulting from the Ecuadorian judgment against Chevron;

    (b)     the Canadian equivalent of costs to be determined by the Ecuadorian court;

    (c)     a declaration that the shares of Chevron Canada are exigible to satisfy the Ecuadorian judgment, should it be enforced in Ontario;

    (d)     the appointment of an equitable receiver over the shares and assets of Chevron Canada; and

    (e)     interest and costs.

--------

[1] *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 [*CBCA*].

[16]    The plaintiffs do not allege that Chevron Canada was a party to the Ecuadorian action or that it is an agent of Chevron. In their amended amended statement of claim, the plaintiffs plead that they do not allege any wrongdoing against Chevron Canada.

[17]    Further, the plaintiffs do not allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing.

[18]    The plaintiffs do, however, plead the following, in paras. 17-26 of their amended amended statement of claim:

17.    Chevron no longer has assets in Ecuador.

18.    In Canada, Chevron has two wholly-owned subsidiaries:  Chevron Canada Limited and Chevron Canada Financial Limited (collectively, "Chevron Canada").  The assets of Chevron Canada are significant and are located in many provinces and territories throughout Canada.   The assets are beneficially-owned by Chevron and, through it, by the shareholders of Chevron.

19.    In its required Form 10-K filing with the United States [Securities] and Exchange Commission for the fiscal year ended December 31, 2011, Chevron declares and the fact is that it manages its investments in subsidiaries, provides administrative, financial, management and technology support to its US and international subsidiaries that engage in fully-integrated petroleum operations, chemical operations, mining operations, power generation and energy services. In its Annual Report, Chevron states and the fact is that its operating segments (subsidiaries) are managed by segment managers who report to the CODM (Chief Operating Decision Maker), which is Chevron's Executive Committee.

20.    Chevron wholly owns and controls Chevron Canada. Chevron consolidates the financial results of its wholly owned subsidiaries including Chevron Canada and reports them as its own. Chevron raises capital in the equities markets based on the assets, operations and results of its wholly owned subsidiaries including Chevron Canada. Chevron Canada does not have an independent Board of Directors. Chevron provides a parent guarantee for the debts of its wholly owned subsidiaries including Chevron Canada.

21.    As a condition of obtaining the dismissal of the action in New York, Texaco promised not only to submit to the jurisdiction of the Ecuadorean Court, but also to satisfy the Judgment.

22.    After the Judgment, Chevron has resiled from that position. Chevron now repudiates its undertaking to the New York Court to respect and pay the Judgment rendered in the jurisdiction of its own choosing and, through its general counsel, has stated that "[w]e're going to fight this until Hell freezes over and then fight it out on the ice".

2017 ONSC 135 (CanLII)

23.     As a result of the allegations in paragraphs 4, 5, 17-20 and the fact that the great majority of its assets are held in 73 subsidiaries (as set out in Schedule "A" hereto), Chevron Canada is a necessary party to this action in order to achieve equity and fairness between parties and to yield a result that is not "too flagrantly opposed to justice…".

24.     The plaintiffs do not allege any wrongdoing against Chevron Canada. The action is for collection of a judgment debt.  The plaintiffs will execute against Chevron Canada any legal, equitable or other right, personal property, interest, whether direct or indirect, or equity of redemption that Chevron, the judgment debtor, has in Chevron Canada.

25.     The plaintiffs plead and rely on the *Execution Act*, R.S.O. 1990, c. E.24 and the *Securities Transfer Act, 2006*, S.O. 2006, c. 8.

26.     The plaintiffs seek the appointment of an equitable Receiver to seize the shares and assets of Chevron Canada, the entire beneficial ownership of which belongs to the Judgment-Debtor, Chevron.

**Judicial History in Canada**

[19]    In 2013, Chevron and Chevron Canada challenged the jurisdiction of the Ontario Superior Court of Justice to recognize and enforce the Ecuadorian judgment. The motion judge, D.M. Brown J. (as he then was), dismissed their motion and concluded that the Ontario court has jurisdiction to recognize and enforce the judgment against these defendants.[2] D.M. Brown J. also concluded that this was an appropriate case in which to exercise the court's power to stay the proceedings on its own initiative pursuant to s. 106 of the *Courts of Justice Act*.[3]

[20]    The Court of Appeal for Ontario overruled his imposition of a discretionary stay of the proceedings and upheld his decision on the jurisdictional issue. The court concluded that an Ontario court has jurisdiction to determine whether the Ecuadorian judgment against Chevron may be recognized and enforced in Ontario. The Court of Appeal also upheld D.M. Brown J.'s jurisdictional decision with respect to Chevron Canada concluding (as the Supreme Court of Canada observed) that an Ontario court "has jurisdiction to adjudicate a recognition and enforcement action against Chevron that also names Chevron Canada as a defendant."[4] The Supreme Court of Canada upheld the Court of Appeal for Ontario's decision with respect to the Ontario court's jurisdiction. The Supreme Court made it clear, however, that its decision did not determine the issue of whether

---

[2] *Yaiguaje v. Chevron Corporation*, 2013 ONSC 2527, 361 D.L.R. (4th) 489 [*Ont SC Decision*], aff'd in part 2013 ONCA 758, 118 O.R. (3d) 1, aff'd in part 2015 SCC 42, [2015] 3 S.C.R. 69.
[3] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 106.
[4] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, [2015] 3 S.C.R. 69, at para. 22 [*SCC Decision*].

Chevron Canada has a separate corporate personality from Chevron and whether its assets are available to satisfy the Ecuadorian judgment against Chevron. Gascon J. stated the following:[5]

> Further, my conclusion that the Ontario courts have jurisdiction in this case should not be understood to prejudice future arguments with respect to the distinct corporate personalities of Chevron and Chevron Canada. I take no position on whether Chevron Canada can properly be considered a judgment-debtor to the Ecuadorian judgment. Similarly, should the judgment be recognized and enforced against Chevron, it does not automatically follow that Chevron Canada's shares or assets will be available to satisfy Chevron's debt. For instance, shares in a subsidiary belong to the shareholder, not to the subsidiary itself. Only those shares whose ownership is ultimately attributable to the judgment debtor could be the valid target of a recognition and enforcement action.

**Facts**

[21]    D.M. Brown J. set out the following basic facts about Chevron and Chevron Canada. I agree with and accept these facts for the purpose of this motion:[6]

### C.  Basic facts about the Chevron defendants

[17]    The following uncontested facts emerged from the affidavits of Frank Soler, a Chevron employee, sworn on August 7, 2012, and Jeffrey Wasko, a Chevron Canada employee, sworn August 8, 2012:

(i)     Chevron was incorporated in the State of Delaware, U.S.A. and has its head office in San Ramon, California;

(ii)    Chevron does not itself engage in the exploring, producing, refining or marketing of petroleum products; those activities are carried on by its indirect subsidiaries;

(iii)   Chevron is not currently, and never has been, registered to carry on business in Ontario or anywhere else in Canada;

(iv)    With the exception of its interest in two Bermudian companies, all of Chevron's assets are owned and located in the U.S.A.;

(v)     Chevron does not own the shares of Chevron Canada;

(vi)    Chevron Canada is an operating company which is a 7th level indirect subsidiary of Chevron;

---

[5] *SCC Decision*, at para. 95.
[6] *Ont SC Decision*, at para. 17.

2017 ONSC 135 (CanLII)

Page: 7

(vii) Chevron files consolidated financial statements because it is required by the U.S. Securities and Exchange Commission to do so;

(viii) Chevron Canada was incorporated in 1966 under the *Canada Corporations Act* with its head office, at the time of incorporation, in Ottawa, Ontario. In 1980 it was continued under the *Canada Business Corporations Act* with its registered head office in Vancouver, British Columbia. Then, in 2003 it amalgamated under the *CBCA* with its registered office in Calgary, Alberta;

(ix) As of August 2012, Chevron Canada was registered extra-provincially in a number of provinces, but not in Ontario;

(x) Chevron Canada has never carried on business in Ecuador;

(xi) All of the shares of Chevron Canada are owned by Chevron Canada Capital Company; and

(xii) Chevron and Chevron Canada have separate and independent boards of directors, and none of the Chevron directors or executive officers serve on the board or are involved in managing the operations of Chevron Canada.

[22]   The evidentiary record before me establishes the following additional facts concerning Chevron and Chevron Canada:

(a)   Chevron Canada maintains its own separate corporate records at its head office in Calgary. It complies with all applicable Canadian corporate laws, rules and regulations.

(b)   Chevron Canada prepares annual financial statements that comply with Canadian accounting standards and tax requirements.

(c)   Chevron Canada employs a substantial workforce in Canada ranging from 700 to 900 people.

(d)   Chevron Canada employs, trains and directs the activities of its own professional, operational and administrative staff. It pays their salaries and benefits and provides its own pension plan for its employees, which Chevron does not sponsor or guarantee.

(e)   Chevron Canada has extensive operations in Canada that include ownership in significant oil sands projects, petroleum and natural gas explorations and the ownership of an oil refinery in British Columbia.

2017 ONSC 135 (CanLII)

2017 ONSC 135 (CanLII)

(f)     Chevron Canada develops its own plans and budgets for its businesses and is responsible for and implements its business plans, and manages its own budgets.

(g)     Chevron Canada is a fully capitalized corporation that generates substantial revenue. In the years 2006 to 2014 it generated billions of dollars of revenue and net earnings. In 2014, it had billions of dollars of shareholders equity.

(h)     Chevron Canada funds its significant day-to-day operations and investments without any financial contribution from Chevron. It does not distribute any of its profits or capital to Chevron. It receives no money from Chevron.

(i)     Chevron has provided guarantees of Chevron Canada's obligations to certain of its joint venture partners and to banks for some of Chevron Canada's projects. Chevron has never been called upon to pay under any of these guarantees.

(j)     Chevron Canada adheres to certain policies of Chevron. These policies involve, among other things,

(i)      the review and approval of certain business plans and budgets;

(ii)     the reporting to officers designated by Chevron's policies of certain expenditures or transactions over certain limits or thresholds; and

(iii)    in certain cases, the obtaining of concurrence of a Reporting Officer or his or her delegate, or from Chevron's Executive Committee, for expenditures or transactions.

(k)     Chevron Canada provides these reports, as well as other detailed reports of its financial results, to Chevron so that, among other things,

(i)     Chevron can meet its obligations as a publicly-traded company under the regulatory regime that applies to it, including the *Sarbanes-Oxley*[7] legislation, in order to manage its investments and make timely disclosure; and

(ii)    Chevron can report consolidated financial information to its shareholders and to regulators to meet its obligations as a publicly traded company under *Sarbanes-Oxley* and other regulatory requirements.

(l)     Chevron has approximately 1,500 indirect subsidiaries operating in approximately 60 countries in the world. Chevron Canada is one of these indirect subsidiaries.

---

[7] *Sarbanes-Oxley Act of 2002*, Pub. L. No. 107-204, 116 Stat. 745.

**Issues**

[23]    The parties agree that this is an appropriate case for summary judgment. Therefore, the only issues that I must decide on this motion are the following:

(a)    Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the *Execution Act*[8] to satisfy the Ecuadorian judgment against Chevron?

(b)    If they are not, should Chevron Canada's corporate veil be pierced so that its shares and assets are available to satisfy the Ecuadorian judgment against its indirect parent, Chevron?

**Positions of the Parties**

[24]    Chevron Canada submits that the plaintiffs' claim against it should be dismissed for the following reasons:

(a)    Chevron Canada was not a party to the Ecuadorian proceeding.

(b)    It is not a judgment-debtor under the Ecuadorian judgment.

(c)    The plaintiffs do not allege any wrongdoing against Chevron Canada.

(d)    Chevron Canada is its own separate legal entity, distinct from Chevron. Its shares and assets do not belong to Chevron.

(e)    The plaintiffs' claim against it is barred by the legal principle of corporate separateness and there is no basis to pierce Chevron Canada's corporate veil to make either its shares or assets available to satisfy the Ecuadorian judgment against Chevron.

[25]    The plaintiffs submit that Chevron Canada is an asset of Chevron that is exigible and available for execution and seizure pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron. In the alternative, the plaintiffs submit that the court should pierce Chevron Canada's corporate veil to make its shares and assets available to satisfy the Ecuadorian judgment because of Chevron's total effective control over Chevron Canada and the injustice that would result from applying the limited liability principle to Chevron in the circumstances of this case.

---

[8] *Execution Act*, R.S.O. 1990, c. E.24.

2017 ONSC 135 (CanLII)

**Analysis**

*Previous Judicial Consideration of Chevron Canada's Corporate Separateness*

[26]    D.M. Brown J. considered the issue of Chevron Canada's corporate separateness in the context of his determination of whether there should be a stay of the proceedings pursuant to s. 106 of the *Courts of Justice Act*. Although the Court of Appeal for Ontario reversed his decision to stay the proceedings, it did not consider his decision on the corporate separateness issue. Neither the Court of Appeal nor the Supreme Court of Canada concluded that his decision on this issue was incorrect or that he applied the wrong legal principles in determining that Chevron Canada's corporate veil should not be pierced. Although D.M. Brown J.'s decision on this issue is not binding upon me, I regard it as persuasive authority on the issue. I agree with Chevron Canada's submission that his findings on this issue are a useful guide on this motion.

[27]    After reviewing the evidence adduced on the issue of Chevron Canada's separate corporate identity (which was almost identical to the evidence before me), D.M. Brown J. concluded that there was "no basis in law or fact" to pierce Chevron Canada's corporate veil.[9] He also rejected the plaintiffs' assertion that Chevron Canada's assets were exigible to satisfy a judgment against its ultimate parent, Chevron.

[28]    In his reasons for decision, D.M. Brown J. concluded as follows:[10]

> [104]  In my view, when taken as a whole, the evidence filed on these motions supports a finding that the relationship between Chevron and Chevron Canada is, to echo the language of Sharpe J. (as he then was) in the *Transamerica* case, "that of a typical parent and subsidiary", not an instance of a parent corporation exercising complete domination and control over the subsidiary. Or, to phrase that conclusion in the language of the Court of Appeal in the *Canada Life Assurance* case, the evidence demonstrates that Chevron Canada "looks as though it has its own business, rather than being completely subservient to and dependent upon its parent".

> [105]  Nor do the plaintiffs allege any improper conduct which would support a piercing of the corporate veil of Chevron Canada. In paragraph 21 of their Amended Statement of Claim the plaintiffs specifically pleaded:

>> The plaintiffs do not allege any wrongdoing against Chevron Canada.

> Even the most liberal reading of the Amended Statement of Claim does not disclose any pleading of material facts which would suggest or hint that the activities of Chevron Canada were or are in any way, shape or form carried on as instruments of fraud or as a mechanism or conduit to avoid or to conceal liability for an impropriety

---

[9] *Ont SC Decision*, at para. 109.
[10] *Ont SC Decision*, at paras. 104-106.

committed by Chevron. The Amended Statement of Claim contains no pleading of facts which links Chevron Canada in any way to the events which gave rise to the Ecuadorean Judgment or to events designed to shield Chevron from any liability under that Judgment.

[106]   Under Ontario law, the absence of any pleading of such material facts or the adducing of any evidence to support some arguable case on the issue of improper conduct, coupled with the plaintiffs' admission that they are not alleging any wrongdoing against Chevron Canada, are fatal to the plaintiffs' assertion in the Amended Statement of Claim that the separate corporate identity of Chevron Canada should be ignored so that its assets become available for execution in satisfaction of the Judgment rendered against its ultimate parent.

[29]   D.M. Brown J. concluded on essentially the same evidentiary record as is before me, that there was no basis to consider the assets or shares of Chevron Canada to be owned by Chevron. He declined to pierce Chevron Canada's corporate veil on the basis of the following findings of fact:

   (a)   "The management of Chevron Canada operates its business in a fashion which is separate and distinct from that of its parents up the corporate 'family tree', subject to the direction of its own board of directors which does not contain any over-lapping members with the Chevron board or executive."[11]

   (b)   "Chevron Canada employs, trains and directs the activities of its own professional, operational and administrative staff; it pays their salaries and benefits; and it provides Workers' Compensation coverage as required."[12]

   (c)   "As part of a worldwide 'family' of companies, Chevron Canada is subject to certain 'family' budget reporting requirements and large capital expenditure approval processes, but it initiates its own plans and budgets, it funds its own day to day operations, and the capital expenditures made by it in recent years for the major Athabasca Oil Sands Project, Hibernia Project and Hebron Project were funded from its own operating revenues."[13]

   (d)   "Chevron Canada is a fully capitalized corporation which funds its own day to day operations without financial contributions from Chevron Corp. or any other Chevron entity."[14]

   (e)   "Chevron Canada files its own tax returns and corporate statements."[15]

---

[11] *Ont SC Decision*, at para. 99.
[12] *Ont SC Decision*, at para. 99.
[13] *Ont SC Decision*, at para. 100.
[14] *Ont SC Decision*, at para. 100.
[15] *Ont SC Decision*, at para. 102.

(f)   Chevron files a consolidated set of financial statements because it is required to do so by the U.S. Securities and Exchange Commission and the *Sarbanes-Oxley* legislation.

(g)   The provision of guarantees by Chevron in relation to Chevron Canada underscored the separate corporate existence of each. He concluded that "[c]ertainly the lenders in those cases proceeded on the basis that parent and indirect sub were separate legal entities, otherwise they would not have asked for the guarantees of the ultimate parent."[16]

[30]    I make the same findings of fact on the evidentiary record before me.

**ISSUE # 1**

**Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron?**

[31]    The plaintiffs' principal submission is that Chevron Canada is an asset of Chevron that is exigible and available for execution and seizure.

[32]    The plaintiffs submit that the *Execution Act* authorizes and empowers the sheriff to execute against any interest of a judgment-debtor and that the broad wording of this Act entitles the sheriff to seize any property in which a judgment-debtor has a direct or indirect legal or beneficial interest.

---

[16] *Ont SC Decision*, at para. 101.

According to the plaintiffs, this includes property in which the judgment-debtor has an indirect beneficial interest, such as Chevron's indirect beneficial interest in Chevron Canada. They rely upon the following language in s. 18(1) of the *Execution Act* in support of their position:[17]

> The sheriff may seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property, including leasehold interests in any land of the execution debtor….

[33]   The plaintiffs explain their position, at paras. 51-60 of their factum, as follows:

> 51.   Chevron Canada is a seventh level wholly-owned subsidiary of Chevron Corp. Chevron Corp. owns 100% of the shares of each descending subsidiary, which in turn owns 100% of the next descending subsidiary. None of the intermediary subsidiary companies carries on business. The directors of five of these six subsidiaries are all employees of either Chevron Corp. or of Chevron Global Downstream LLC, itself a wholly-owned subsidiary of Chevron Corp. The four directors of Chevron Canada are all employees. It is obvious that Chevron Canada is wholly-owned and controlled by Chevron Corp. for the sole benefit of Chevron Corp.'s shareholders. Chevron's Corporate Structure Chart, attached at Tab C herein, is illustrative.

> 52.   Chevron itself does not carry on any business. Its revenue producing subsidiaries operate in approximately 60 countries in the world. The vast majority of its 1,500 subsidiaries, well over 90% are interposed, in layers, between Chevron and the operating subsidiaries. They carry on no business. As Chevron's witness Soler stated when asked how many subsidiaries there are in the Chevron group:

>> "It varies literally on a daily basis.  I mean, we create and dissolve companies constantly.  But approximately, there are 1500 companies around the world."

> 53.   As the Court of Appeal found:

>> "… Chevron's income is wholly derived from dividends from indirect subsidiaries that carry out its actual business functions, which include Chevron Canada." … "Chevron guarantees the debt of its indirect subsidiaries which in turn furnish capital to Chevron Canada and [Chevron] has directly guaranteed certain performance obligations of Chevron Canada."

---

[17] *Execution Act*, s. 18(1).

2017 ONSC 135 (CanLII)

54.     One hundred percent ownership by Chevron over the shares and assets of Chevron Canada means it has total control over the affairs of its subsidiary. It can mandate an investment, restrict an expenditure, change the officers and directors and veto any activity.

55.     The shareholders, bondholders, bankers and other lenders to Chevron, consider that all the 1,500 subsidiaries, their shares operations and physical assets are all assets of the public company, Chevron (stock symbol CVX). Logically, no shareholder would buy a share of CVX at about USD 100 to only know that he/she owns only the California bank account of Chevron.  No bondholder or other lender would lend to Chevron believing that, on default, it could only execute on the bank account.

56.     Chevron's own Annual Reports, 10Ks and public pronouncements promote this belief and confirm its validity.

57.     The agencies that rate its debt and its commercial paper program are in no doubt that the assets of this unified entity belong unequivocally to Chevron:

DBRS          Chevron Corporation (Chevron) is one of the world's largest integrated non-government-owned petroleum companies.

              CVX's ratings are supported by its very strong financial profile, the scale and diversity of the Company's integrated operations and its sizeable portfolio of upstream growth projects.

              **Strengths**

                1. Global diversification in core petroleum segments;

                2. Good production growth prospects;

                3. Increasingly focused Downstream operations;

                4. Strong balance sheet and financial flexibility.

Moody's       The ratings upgrade recognizes Chevron's increasingly diversified upstream reserves and production portfolio, the sustainability of its strong financial profile …

58.     Chevron is the sole owner of the shares of Chevron Canada. It is the owner through the 100% ownership of cascading intermediary subsidiaries which carry on no business. If one asks the question: who has the beneficial, indirect ownership of Chevron Canada's shares, the answer must be Chevron. If one asks the corollary question: does anyone else have a beneficial right to those shares, the answer must be no.

2017 ONSC 135 (CanLII)

59.    By its complete dominion and control of the boards of directors of each intervening subsidiary, none of which has an independent director and all of which are populated by Chevron group employees, only Chevron can order a sale of all or substantially all of the assets.

[34]    I do not accept the plaintiffs' submission that Chevron Canada's shares and assets are exigible pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron, for the following reasons.

[35]    Chevron Canada's incorporating statute, the *CBCA*, gives it all the rights, powers and privileges of a natural person. Section 15(1) of the *CBCA* provides the following:[18]

A corporation has the capacity and, subject to this Act, the rights, powers and privileges of a natural person.

[36]    Chevron Canada is not an asset of Chevron. It is a separate legal person. It is not an asset of any other person including its own parent, CCCC. The Supreme Court of Canada confirmed this in *BCE Inc. v. 1976 Debentureholders*,[19] where the court stated, "While the corporation is ongoing, shares confer no right to its underlying assets."

[37]    The *Execution Act*, which is a procedural statute, does not create any rights in property but merely provides for the seizure and sale of property in which a judgment-debtor already has a right or interest. It does not establish a cause of action against Chevron Canada. Chevron Canada is not the judgment-debtor under the Ecuadorian judgment and, therefore, the *Execution Act* does not apply to it with respect to that judgment. The *Execution Act* does not give Chevron any right or interest, equitable or otherwise, in the shares or assets of Chevron Canada.

[38]    Conway J. came to the same conclusion in *Belokon et al. v. The Kyrgyz Republic*.[20] Her decision was recently upheld by the Court of Appeal for Ontario.[21] She concluded as follows:[22]

31.    The *Execution Act* is a procedural statute. It does not create new rights – it only provides a process for the enforcement of otherwise existing rights.

32.    The issue to be determined is whether the Republic has any "equitable or other right, property, interest or equity of redemption in or in respect of" the Centerra shares that are registered in Kyrgyzaltyn's name. If the Republic does, the court has the authority to order the sheriff to seize and sell the Republic's interest in those shares to

---

[18] *CBCA*, s. 15(1).
[19] *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69, [2008] 3 S.C.R. 560, at para. 34.
[20] *Belokon et al. v. The Kyrgyz Republic*, 2016 ONSC 4506 [*Belokon*], aff'd 2016 ONCA 981.
[21] *Belokon v. Krygyz Republic* [*sic*], 2016 ONCA 981.
[22] *Belokon*, at paras. 31-32.

2017 ONSC 135 (CanLII)

satisfy a debt owed by the Republic to the Applicants. If the Republic does not, the procedural mechanisms of the *Execution Act* are not engaged.

[39]    I am satisfied that the *Execution Act* does not give Chevron any interest, beneficial or otherwise, in the shares or assets of Chevron Canada.

[40]    Decisions of other courts are consistent with my conclusion. For example, in *Budd v. MBE Jet Ltd.*,[23] the court held that the Alberta execution legislation does not allow the assets of an indirect subsidiary of a potential judgment-debtor to be subject to a pre-judgment attachment order if the test for piercing the corporate veil has not been met. The court concluded that unless the corporate veil is pierced, the debtor has no indirect or other interest in the assets of its indirect subsidiary.

[41]    In *Nevsun Resources Ltd. v. Delizia Limited*,[24] the Federal Court overturned a garnishment order made against a parent company in relation to a judgment debt owed by an indirect subsidiary. The court concluded that the garnishment order could not stand unless the test for piercing the corporate veil had been satisfied.

[42]    The decisions in *Belokon*, *Budd* and *Nevsun* support my conclusion that the *Execution Act* does not give Chevron any interest in the shares or assets of Chevron Canada.

[43]    The jurisprudence relied upon by the plaintiffs does not support their position. The decision of Thorburn J. in *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*,[25] was overturned by the Court of Appeal for Ontario on the ground that the court lacked jurisdiction because the judgment-debtor did not have notice of the proceeding. I prefer Conway J.'s analysis and decision in *Belokon*. She considered the same issue and her decision was upheld by the Court of Appeal for Ontario.

[44]    The plaintiffs rely upon the decision of Pepall J. (as she then was) in *Banglar Progoti Ltd. v. Ranka Enterprises Inc.*,[26] in which a judgment-creditor was permitted to execute a foreign arbitral award against property that was held in a bare trust. However, in *Banglar*, the trust agreement expressly provided that the property was held in trust for the judgment-debtor. The sole beneficiary of a bare trust clearly has beneficial ownership of the trust property. However, a parent corporation does not beneficially own the property of its wholly-owned direct subsidiary, let alone an indirect subsidiary such as Chevron Canada. That case does not assist the plaintiffs.

---

[23] *Budd v. MBE Jet Ltd.*, 2014 ABQB 778, at para. 82.
[24] *Nevsun Resources Ltd. v. Delizia Limited*, 2016 FC 393, at paras. 42-60.
[25] *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, 2014 ONSC 2407, rev'd 2015 ONCA 447, 126 O.R. (3d) 545, leave to appeal refused, [2015] S.C.C.A. No. 354.
[26] *Banglar Progoti Ltd. v. Ranka Enterprises Inc.*, 2009 CanLII 16292 (ON SC).

[45]     The plaintiffs also rely upon the decision in *Edward Tracy v. The Iranian Ministry of Information and Security*.[27] That case, which involved the enforcement of a recognition order against bank accounts and real property that were determined by the court to be beneficially owned by the judgment-debtor, does not support the plaintiffs' position that the *Execution Act* creates substantive property rights.

[46]     The plaintiffs also rely upon the decision of Cameron J. in *1454495 Ontario Inc. v. J= Systems Inc.*,[28] in support of their position. In that case, shares of a company owned by a judgment-debtor had been pledged to a credit union under a secured guarantee of the company's debts. A judgment-creditor sought to execute against the judgment-debtor's interest in the shares. The court concluded that the judgment-debtor's residual interest in the shares after the credit union's prior security interest had been satisfied could be seized and sold under the *Execution Act*. That case does not assist the plaintiffs because it was clear that the judgment-debtor owned the shares as they were in his name. Accordingly, he had a legally recognized residual interest in the shares that could be sold subject to the prior rights of the credit union. Chevron has no legally recognized interest in Chevron Canada's assets unless the corporate veil between the two companies is pierced.

[47]     A plain reading of the *Execution Act* makes it clear that it does not create any substantive rights that override or supplant the long-established principle of corporate separateness.

[48]     I also agree with Chevron's submission at para. 39 of its reply factum, concerning the effect of the plaintiffs' contention:

> 39.     If the Plaintiffs' position regarding the effect of section 18(1) of the *Execution Act* is accepted, the assets of Ontario subsidiaries of both domestic and foreign companies would automatically and always be subject to execution orders to satisfy judgments against their parent companies.   In fact, the debts of individual shareholders could be enforced against the assets of any Ontario company. This result is not only contrary to law, it would have startling and stark consequences for Ontario's businesses and their ability to attract investment.

[49]     For all of these reasons, I have concluded that the *Execution Act* does not make Chevron Canada's shares and assets exigible and available for execution and seizure in satisfaction of the Ecuadorian judgment against Chevron, absent a finding that Chevron Canada's corporate veil should be pierced for this purpose.

---

[27] *Edward Tracy v. The Iranian Ministry of Information and Security*, 2014 ONSC 1696.
[28] *1454495 Ontario Inc. v. J=Systems Inc.* (2002), 17 C.P.C. (5th) 564 (Ont. S.C.).

**ISSUE # 2**

**Should Chevron Canada's corporate veil be pierced?**

[50]   Chevron Canada submits that the plaintiffs' claim against it is barred by the "bedrock legal principle of corporate separateness." Under this principle, Chevron Canada maintains that the Ecuadorian judgment against Chevron cannot be visited upon it.

[51]   According to the plaintiffs, the following principles which apply to the application of the principle of corporate separateness demonstrate that the principle should not apply to shield Chevron Canada's assets from being available to satisfy the Ecuadorian judgment against Chevron:

(a)   Corporate separateness will not be applied where it would result in an injustice or to default on a legal obligation.

(b)   Corporate separateness will not be applied between a parent and a subsidiary where "there exists a sufficient degree of relationship between the different legal entities" or where there is "an economically significant relationship" such that the "true commercial and practical nature" of the relationship "is of one enterprise."

(c)   Corporate separateness will not be applied to the issue of ownership.

[52]   At para. 71 of their responding factum, the plaintiffs submit that these three principles apply to Chevron and Chevron Canada for the following reasons:

(a)   To declare that the shares and assets of Chevron Canada are so separate by virtue only of its incorporation as a 100% subsidiary, so as to make them unavailable to satisfy the legitimate judgment debt of Chevron, would be an injustice to the 30,000 indigenous people whose way of life has been ruined by Chevron's polluting activities. Such a declaration would undermine the legal obligation they fought for more than 20 years to achieve in both Ecuador and Ontario. It would undermine the whole process of reciprocity and comity.

(b)   As the facts amply demonstrate, Chevron has total effective control over Chevron Canada and immerses itself intimately in the affairs of Chevron Canada. None of Chevron Canada's major projects was accomplished without approval from Chevron for each step from initiation of exploration to drilling, to operation to transportation.

(c)   Ownership is not a corporate separateness issue. Incorporation prevents a plaintiff from joining in an action, as a defendant, the uninvolved, innocent parent of a contract breaking or tortfeasing subsidiary. Corporate separateness has always been an issue answering the question: who is liable? But once judgment ensues against the guilty party, in this case Chevron, there is then no room for the application of corporate separateness.

2017 ONSC 135 (CanLII)

[53]    The plaintiffs rely upon the following statement by Wilson J. in the Supreme Court of Canada's decision in *Kosmopoulos v. Constitution Insurance Co.*,[29] in support of their position that corporate separateness will not be applied if it will result in an injustice:

> As a general rule a corporation is a legal entity distinct from its shareholders: *Salomon v. Salomon & Co.*, [1897] A.C. 22 (H.L.) The law on when a court may disregard this principle by "lifting the corporate veil" and regarding the company as a mere "agent" or "puppet" of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue": L. C. B. Gower, *Modern Company Law* (4th ed. 1979), at p. 112.
>
> …
>
> There is a persuasive argument that "those who have chosen the benefits of incorporation must bear the corresponding burdens, so that if the veil is to be lifted at all that should only be done in the interests of third parties who would otherwise suffer as a result of that choice": Gower, *supra*, at p. 138.

[54]    The plaintiffs also rely upon the Supreme Court of Canada's decision in *Bazley v. Curry*,[30] in support of their position that corporate separateness will not be applied where the true relationship between the parent corporation and its subsidiary is in the nature of an enterprise.

[55]    They cite the following decision of Belobaba J. in *Teti and ITET Corp. v. Mueller Water Products*,[31] as further support for the principle that a court may not apply corporate separateness where the nature of the relationship is a group enterprise:

> … The best explanation of the cases that have considered the "group enterprise" or "single business entity" concept can be found in the 1994 decision of Spence J. in *MacKenzie Trust*:
>
>> These decisions [*Manley* and others] do not support a claim that the test in *Salomon v. Salomon* has been superseded by a new "business entity" or "single business entity" test. They merely illustrate the principle that, *in particular fact situations where the nature of the legal issue in dispute makes it appropriate to have regard to the larger business entity, the court is not precluded by Salomon from doing so.* In a few cases, there are statements that the court will lift the corporate veil" where injustice would otherwise result". I am not able to conclude that such statements are intended to remove the authority of the *Salomon* principle. I think they may be more in the nature of a shorthand formulation reflecting the approach of the courts in the cases discussed above.

---

[29] *Kosmopoulos v. Constitution Insurance Co.*, [1987] 1 S.C.R. 2, at pp. 10-11.
[30] *Bazley v. Curry*, [1999] 2 S.C.R. 534.
[31] *Teti and ITET Corp. v. Mueller Water Products*, 2015 ONSC 4434, 134 C.P.R. (4th) 249, at paras. 19-21.

2017 ONSC 135 (CanLII)

Spence J.'s analysis was recently cited with approval by Strathy J., as he then was, in *Fairview Donut* and by Horkins J. in *Durling*.

I therefore conclude that the "group enterprise" or "single business entity" theory *does* exist in Canadian law but only as a carefully limited exception to the well-established proposition set out in *Salomon*. As Spence J. noted in *MacKenzie Trust*, "in particular fact situations where the nature of the legal issue in dispute makes it appropriate to have regard to the larger business entity, the court is not precluded by *Salomon* from doing so."

[56]    The plaintiffs also rely upon the decision of the Court of Appeal for Ontario in *Christian Brothers of Ireland in Canada (Re)*,[32] in support of their position that the principle of corporate separateness does not apply to a subsidiary that may be liable to pay the debt of its parent corporation. In the *Christian Brothers* case, the Court of Appeal concluded that "all assets of the CBIC, whether owned beneficially or on trust for one or more charitable purposes, are exigible and may be used by the liquidator to pay the claims of the tort victims."[33]

[57]    In my view, the plaintiffs have not established that Chevron Canada's corporate veil should be pierced for the following reasons.

[58]    Chevron and Chevron Canada are separate legal entities with separate rights and obligations. The principle of corporate separateness has been recognized and respected since the 1896 decision of the House of Lords in *Salomon v. Salomon & Co.*[34]

[59]    This principle applies equally to groups of companies such as Chevron's group of companies of which Chevron Canada is a part. The English Court of Appeal made this clear in *Adams v. Cape Industries Plc.*,[35] as follows:

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies … is a separate legal entity possessed of separate legal rights and liabilities."

…

Our law, for better or worse, recognizes the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.

---

[32] *Christian Brothers of Ireland in Canada (Re)* (2000), 47 O.R. (3d) 674 (C.A.), leave to appeal refused, [2000] S.C.C.A. No. 277, reconsideration refused, 2002 CarswellOnt 1770 (S.C.C.).
[33] *Christian Brothers*, at para. 94.
[34] *Salomon v. Salomon & Co.*, [1897] A.C. 22 (H.L. (Eng.)).
[35] *Adams v. Cape Industries Plc.*, [1990] Ch. 433 (C.A.), at pp. 532, 536.

[60]    The principle of corporate separateness provides that shareholders of a corporation are not liable for the obligations of the corporation. It also provides that the assets of the corporation are owned exclusively by the corporation, not the shareholders of the corporation. As a result, Chevron does not have any legal or equitable interest in the assets of Chevron Canada as an indirect shareholder seven-times removed.

[61]    Further, the plaintiffs' claim against Chevron Canada for its shares cannot succeed because its shares do not belong to Chevron Canada. Gascon J. made this clear in the Supreme Court of Canada's decision, in this case, when he stated the following:[36]

> Similarly, should the judgment be recognized and enforced against Chevron, it does not automatically follow that Chevron Canada's shares or assets will be available to satisfy Chevron's debt.  For instance, shares in a subsidiary belong to the shareholder, not to the subsidiary itself.

[62]    The plaintiffs have brought a motion for leave to add CCCC as a defendant in this action. I will decide that motion in a separate ruling. However, whether CCCC is a defendant in this action does not affect my conclusion that Chevron Canada does not own its own shares and, therefore, cannot be sued by the plaintiffs to recover those shares.

[63]    Because the principle of corporate separateness applies to Chevron and Chevron Canada, the plaintiffs must satisfy the test for piercing Chevron Canada's corporate veil, established in *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co*.[37] In *Transamerica*, Sharpe J. (as he then was) held the following:[38]

> As just indicated, the courts will disregard the separate legal personality of a corporate entity where it is completely dominated and controlled and being used as a shield for fraudulent or improper conduct. The first element, "complete control", requires more than ownership. It must be shown that there is complete domination and that the subsidiary company does not, in fact, function independently.
>
> …
>
> The second element relates to the nature of the conduct: is there "conduct akin to fraud that would otherwise unjustly deprive claimants of their rights"? In my view, while Transamerica has alleged fraud against C.L.M.S. there is no evidence to suggest that Canada Life has any involvement in that alleged fraud, apart from the fact that C.L.M.S. is its wholly owned subsidiary. The officers and employees of Canada Life were not involved in the dealings between C.L.M.S. and Transamerica, and no evidence has been advanced sufficient to give rise to a triable issue that Canada Life is somehow using C.L.M.S. as a shield for some nefarious purpose.

---

[36] *SCC decision*, at para. 95.
[37] *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co*. (1996), 28 O.R. (3d) 423 (Ct. (Gen. Div.)) [*Transamerica*], aff'd 1997 CarswellOnt 3496 (C.A.).
[38] *Transamerica*, at pp. 433-434.

2017 ONSC 135 (CanLII)

[64]    The Court of Appeal for Ontario upheld Sharpe J.'s decision in *Transamerica*.[39] In the more recent case of *Indcondo Building Corporation v. Sloan*,[40] the Court of Appeal for Ontario further clarified the test in *Transamerica*, holding that the corporate veil will not be pierced even where complete domination is present in the absence of wrongdoing akin to fraud in the establishment or use of the corporation.

[65]    The plaintiffs do not allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing. In fact, they specifically plead that they "do not allege any wrongdoing against Chevron Canada". As such, they cannot establish wrongdoing akin to fraud in the corporate structure between Chevron and Chevron Canada. They, therefore, do not meet this fundamental condition of piercing Chevron Canada's corporate veil.

[66]    However, the plaintiffs submit that corporate separateness should not be applied as a "strict, inflexible rule" where it will yield a result "too flagrantly opposed to justice". I do not accept the plaintiffs' submission that the corporate veil will be pierced when it is just and equitable to do so. Sharpe J. came to the same conclusion in *Transamerica*, as follows:[41]

> In my view, the argument advanced by Transamerica reads far too much into a dictum plainly not intended to constitute an in-depth analysis of an important area of the law or to reverse a legal principle which, for almost 100 years, has served as a cornerstone of corporate law.

> It was conceded in argument that no case since *Kosmopoulos* has applied the preferred "just and equitable" test.

> …

> There are undoubtedly situations where justice requires that the corporate veil be lifted. The cases and authorities already cited indicate that it will be difficult to define precisely when the corporate veil is to be lifted, but that lack of a precise test does not mean that a court is free to act as it pleases on some loosely defined "just and equitable" standard. …

[67]    The Court of Appeal for Ontario agreed with Sharpe J.'s conclusion in *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*,[42] in which E.A. Cronk J.A. stated the following, "But this does not mean that the courts enjoy '*carte blanche*' to lift the corporate veil absent fraudulent or improper conduct whenever it appears 'just and equitable' to do so."

---

[39] *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.*, 1997 CarswellOnt 3496 (C.A.).
[40] *Indcondo Building Corporation v. Sloan*, 2015 ONCA 752, 31 C.B.R. (6th) 110, at para. 9.
[41] *Transamerica*, at pp. 431, 433.
[42] *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*, 2009 ONCA 256, 305 D.L.R. (4th) 577, at para. 50.

[68]    I am satisfied on the strength of these decisions that there is not an independent "just and equitable" exception to the principle of corporate separateness as the plaintiffs suggest. This is not a basis for piercing Chevron Canada's corporate veil in this case.

[69]    As I have already indicated, the applicable jurisprudence makes it clear that even if the plaintiffs were able to establish that Chevron exercises total effective control over Chevron Canada, which they have not done, this would not satisfy the test for ignoring Chevron Canada's corporate separateness and piercing its corporate veil. There would also have to be wrongdoing "akin to fraud" to meet the test. There is no such wrongdoing in this case.

[70]    I do not accept the plaintiffs' submission that Chevron Canada's corporate veil should be pierced on a theory of enterprise group liability. Belobaba J.'s decision in *Teti*, which is relied upon by the plaintiffs for this purpose, does not stand for this proposition. In *Teti*, Belobaba J. found that the various defendant corporations had worked in common as a single business entity in dealing with the plaintiffs' invention, which supported the allegation that the defendants "together and in concert misappropriated [the plaintiffs'] confidential information" (footnotes omitted).[43] His decision has no application to this case. Chevron Canada had no involvement in the activities in Ecuador that led to the Ecuadorian judgment.

[71]    I also do not accept the plaintiffs' reliance on the *Christian Brothers* case to pierce Chevron Canada's corporate veil. The court's decision in that case had nothing to do with the principle of corporate separateness; rather, it concerned the liquidation of the assets of an incorporated religious order that included shares in not-for-profit schools. The issue before the court was whether the Christian Brothers' corporation, as beneficial owners of the shares in the schools, was impeded from causing the schools to be wound up because the shares were held in trust for the specific purpose of operating the schools. In my view, that case has nothing to do with piercing the corporate veil or with the plaintiffs' contention that the assets of one corporation can be used to pay another corporation's creditors. That case does not assist the plaintiffs.

[72]    I am also satisfied that the plaintiffs have failed to meet the first part of the *Transamerica* test. D.M. Brown J. summarized the jurisprudence on what constitutes complete domination and control in his reasons for decision, as follows:[44]

> Complete control requires more than ownership, but necessitates a demonstration that there is complete domination of the subsidiary corporation and the sub does not, in fact, function independently - or, as put in one case, a demonstration that the subsidiary is a "puppet" of the parent.

---

[43] *Teti*, at para. 13.
[44] *Ont SC decision*, at para. 95.

[73]     The evidence does not establish that Chevron Canada is Chevron's "'puppet'". Rather, I find that Chevron and Chevron Canada have a typical parent/subsidiary relationship. Chevron does not exercise complete dominance or control over the affairs of Chevron Canada. I accept and adopt, for the purpose of this motion, the following findings and analysis of D.M. Brown J. concerning the corporate relationship between Chevron and Chevron Canada, from his reasons for decision:[45]

> [100]   As part of a worldwide "family" of companies, Chevron Canada is subject to certain "family" budget reporting requirements and large capital expenditure approval processes, but it initiates its own plans and budgets, it funds its own day to day operations, and the capital expenditures made by it in recent years for the major Athabasca Oil Sands Project, Hibernia Project and Hebron Project were funded from its own operating revenues. Mr. Wasko deposed:
>
> > Chevron Canada is a fully capitalized corporation which funds its own day to day operations without financial contributions from Chevron Corp. or any other Chevron entity.
>
> This corporate structure has been in place since 1966; it was not a recent creation designed to blunt the effect of the Ecuadorean Judgment. I do not regard the existence of a central review and approval process for large capital expenditures, especially of the magnitude found in the resource extraction industry, as signifying a complete domination by the parent of the indirect subsidiary such as to dissolve the separate legal identity of the subsidiary, especially when, as the evidence showed in this case, the indirect subsidiary carries on its own business operations. Put another way, the centralized strategic planning and allocation of large amounts of capital, by itself, does not undermine the separate legal entity of a company down the corporate chain which operates a tangible business managed by separate directors, officers and senior managers.
>
> [101]   Nor does the fact that on several occasions Chevron guaranteed debt financings and project-related performance obligations of Chevron Canada indicate that the corporations possess a single legal identity. Certainly the lenders in those cases proceeded on the basis that parent and indirect sub were separate legal entities, otherwise they would not have asked for the guarantees of the ultimate parent. Moreover, inter-corporate guarantees are common-place in our commercial world. The granting of a guarantee by Company A does not merge its assets, in the eyes of the law, with those of borrower Company B. The guarantee does expose the separate assets of Company A to the risk of execution in the event of a default by Company B, but that result simply flows from the contractual terms agreed to by Company A, not some dissolution of its corporate separatedness.

---

[45] *Ont SC decision*, at paras. 100-104.

2017 ONSC 135 (CanLII)

Page: 25

[102]   Chevron Canada files its own tax returns and corporate statements. That Chevron files a consolidated set of financial statements simply reflects the legal reporting requirements of its home jurisdiction, in particular the *Sarbanes-Oxley Act of 2002* and the *Securities and Exchange Act of 1934*; it is not an *indicia* of the complete domination and control of the subsidiary by the parent. The same observation applies to the common reporting requirements found in the Chevron family of companies. At a time when legislators are insisting on higher standards of corporate governance for related groups of companies, including the disclosure of material information, efforts to comply with those requirements do not signify that the individual companies have lost their separate legal identities.

[103]   Nor does the dividending-up by Chevron Canada of some of its operating profits to its parent, Chevron Canada Capital Company, which, in turn, may issue dividends up the chain signify, in itself, complete domination of the subsidiary's operations. The distribution of profits from sub to parent via dividends is a standard fact of inter-corporate life. No evidence in this case suggested that the flow of dividends reflected complete domination in the sense used by the *alter ego* cases.

[104]   In my view, when taken as a whole, the evidence filed on these motions supports a finding that the relationship between Chevron and Chevron Canada is, to echo the language of Sharpe J. (as he then was) in the *Transamerica* case, "that of a typical parent and subsidiary", not an instance of a parent corporation exercising complete domination and control over the subsidiary. Or, to phrase that conclusion in the language of the Court of Appeal in the *Canada Life Assurance* case, the evidence demonstrates that Chevron Canada "looks as though it has its own business, rather than being completely subservient to and dependent upon its parent".

**Conclusion on Summary Judgment Motions**

[74]   For all of these reasons, I have concluded that the plaintiffs' claim cannot succeed against Chevron Canada. Chevron Canada's motion for summary judgment is granted. The plaintiffs' claim against it is dismissed.

[75]   As a result of my conclusion on this motion, Chevron's motion for summary judgment is granted and the plaintiffs' motion for summary judgment is dismissed.

2017 ONSC 135 (CanLII)

*THE PLAINTIFFS' MOTION TO STRIKE CHEVRON'S DEFENCE*

**Background**

[76]    The plaintiffs move pursuant to r. 21.01(1)(b) of the *Rules of Civil Procedure*[46] to strike the defences pleaded by Chevron in its statement of defence.

[77]    Chevron delivered its statement of defence in October 2015, following the Supreme Court of Canada's decision confirming the jurisdiction of the Ontario court to hear the Ontario Action.

[78]    The plaintiffs submit that Chevron's entire statement of defence should be struck because it raises impermissible defences that have no reasonable prospect of success. They base their position on the Supreme Court of Canada's decision in *Beals v. Saldanha*.[47] They argue that the Supreme Court stipulated that only three limited and narrowly applied defences are permissible in an action to recognize and enforce a foreign judgment.

[79]    The plaintiffs also submit that none of Chevron's defences fall within the permitted defences established in *Beals* and that they constitute an attempt by Chevron to re-litigate issues that have been finally determined by the Ecuadorian courts.

[80]    Chevron submits that the Ecuadorian judgment was fraudulently procured by the plaintiffs. Chevron argues that its statement of defence sets out the facts it relies upon in support of its position that the Ecuadorian judgment is incapable of enforcement under Canadian law because the plaintiffs obtained it by corrupt and fraudulent acts, including the manipulation of the judicial process and by bribing and intimidating experts and judges of the Ecuadorian courts.

[81]    Chevron's statement of defence also incorporates the extensive facts set out in a decision of Judge Lewis Kaplan of the United States District Court for the Southern District of New York (the "SDNY"), who concluded, following a seven-week trial, that the Ecuadorian judgment was obtained by fraud and bribery.[48]   In his lengthy judgment, Judge Kaplan outlined the plaintiffs' extensive acts of fraud, bribery, forgery, intimidation and collusion in the Ecuadorian proceedings. His decision has been affirmed by the United States Court of Appeals for the Second Circuit.

**Chevron's Statement of Defence**

[82]    Paragraphs 3 and 4 of Chevron's statement of defence summarize the nature of the defences raised by Chevron, as follows:

---

[46] *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 21.01(1)(b).
[47] *Beals v. Saldanha*, 2003 SCC 72, [2003] 3 S.C.R. 416.
[48] *Chevron Corp. v. Donziger*, 974 F. Supp. 2d. 362 (S.D.N.Y. 2014), aff'd 833 F. 3d. 74 (2d Cir. 2016).

3. The Ecuador judgment described in paragraphs 1 and 9 through 16 of the Amended Amended Statement of Claim (the "Ecuador Judgment") cannot be recognized or enforced in Ontario, or elsewhere in Canada, for several reasons:

    (a)  The Ecuador court did not have jurisdiction over Chevron Corp.;

    (b)  The Ecuador Judgment is based upon a law applied in a manner which retroactively created a cause of action against Chevron Corp. for which the Republic of Ecuador had previously issued a binding release;

    (c)  Chevron Corp. was denied Canadian standards of fairness and natural justice throughout the Ecuador proceedings;

    (d)  As found by the United States District Court for the Southern District of New York ("SDNY"), the Ecuador Judgment was obtained by fraudulent means and rendered by a systemically corrupt and biased court; and

    (e)  Any recognition and enforcement of the Ecuador Judgment would constitute a violation of the obligations of the Republic of Ecuador ("the ROE") under international law;

    all of which offends Canadian standards of natural justice and public policy for the recognition and enforcement of foreign judgments.

4.  The plaintiffs are bound by the factual findings made by the SDNY, including *inter alia* that "… [the Ecuador judge] agreed with [plaintiffs' counsel] to fix the case for a payment of $500,000 paid out of any judgment proceeds, … [plaintiffs' counsel] drafted all or most of the Judgment, and [the Ecuador judge] signed their draft without consequential modification as part of the *quid pro quo* for the promise of $500,000."

[83]  Chevron's statement of defence is divided into 14 sections, which contain the following defined terms:

- "TexPet" – The Texaco Petroleum Company, which is a fourth-level subsidiary of Texaco that was originally granted exploration and production rights for the Oriente region of Ecuador. TexPet was the initial operator of the oil production consortium in the region.

- "ROE" – The Republic of Ecuador.

- "Petroecuador" – ROE's state-owned oil agency that operated the oil production consortium with TexPet and took over as its sole operator in 1990.

- "Cabrera" – Richard Stalin Cabrera Vega was a court-appointed independent global assessment expert. He purported to prepare an expert report for the Ecuadorian court that assessed damages of more than US$16 billion arising from Texaco's alleged pollution of the region.

2017 ONSC 135 (CanLII)

[84]     The 14 sections of Chevron's statement of defence can be summarized as follows:

**I. Introduction** – This section summarizes why Chevron maintains that the Ecuadorian judgment cannot be recognized or enforced in Ontario.

**II. Roles of TexPet and Petroecuador in Ecuadorian Operations** – This section describes the operation of the oil-production consortium between TexPet and Petroecuador in the Oriente region of the ROE from 1964 to 1992.

**III. Remediation, Settlements and Releases of TexPet and its Affiliates** – This section describes the 1995 Settlement Agreement between the ROE, Petroecuador and TexPet, entered into in 1995 whereby TexPet agreed to perform environmental remediation work to the region at a cost to TexPet of US$40 million. In 1998, upon the completion of this work, the ROE and Petroecuador provided TexPet with a final release.

Under the terms of the 1995 Settlement Agreement, TexPet was also required to continue negotiating with certain municipalities in the region, including Lago Agrio. These municipalities had each sued TexPet in 1994 to protect the health of their citizens and rivers. TexPet settled with all of these municipalities in 1996, and it was released from all claims arising from the operation of the oil-production consortium in the region. Under Ecuadorian law, these settlements had the effect of final judgments.

**IV. The Aguinda Action in New York** – This section refers to a class action commenced against Texaco in 1993 in New York by 76 Ecuadorian citizens representing 30,000 residents of the Oriente region (the "Aguinda Action"). The SDNY dismissed this action on *forum non conveniens* grounds.

**V. Reversal of ROE Position and Enactment of the *Environmental Management Act*** – This section refers to the *Environmental Management Act* ("EMA"), which was enacted in 1999 by the ROE. The EMA created a new private right of action to redress public environmental harms. Chevron maintains its enactment was the result of improper influence exerted upon the ROE by the plaintiffs in the Aguinda Action.

**VI. Dismissal of the Aguinda Action** – This section refers to the affirmation in 2002 by the United States Court of Appeals for the Second Circuit of the SDNY's dismissal of the Aguinda Action on grounds of *forum non conveniens*. The court noted that Texaco had agreed with the plaintiffs that it would waive any statute of limitation defence and would consent to personal jurisdiction in Ecuador and accept service of process there.

**VII. Reverse Triangular Merger of Chevron Corp. and Texaco** – This section refers to the fact that Texaco and TexPet became indirect subsidiaries of Chevron Corp. in October 2001. According to Chevron, they have continued as separate legal entities since then.

**VIII. The Ecuador Action and Judgment** – This section refers to the commencement of the action against Chevron, that resulted in the Ecuadorian judgment by 42 of the Aguinda Action plaintiffs and 6 others (the "Ecuador Action"). This action relied upon the retroactive application of the EMA. The Ecuador Action was brought against Chevron as the sole

defendant. Chevron contested the jurisdiction of the Ecuadorian court but was required by the court to participate in the proceedings under protest. Chevron never acquiesced to the jurisdiction of the Ecuador court.

In February 2011, Judge Nicolas Augusto Zambrano Lozada ("Judge Zambrano") awarded the plaintiffs judgment against Chevron in the amount of US$8.646 billion plus punitive damages, resulting in a total judgment of over US$19 billion The US$8.646 billion in damages was awarded to "'the community'", for environmental remediation, healthcare costs and damages to indigenous cultures. According to Chevron, all of these claims had been released by the 1995 Settlement Agreement.

The Ecuadorian judgment was affirmed by the Appellate Division of the Provincial Court of Justice of Sucumbios on January 3, 2012. The Appellate Division concluded that it did not have competence to rule upon Chevron's contention that the Ecuadorian judgment had been procured by fraud and corruption, noting that these issues were being litigated in the United States before the SDNY. On November 12, 2013, the National Court of Justice of Ecuador, the final level of appeal in Ecuador, dismissed the punitive damages award but otherwise affirmed the decision of the Appellate Division. As a result, the Ecuadorian judgment now totals approximately US$9.52 billion.

**IX. Pressure Tactics, Political Interference and Systemic Corruption** – This section refers to the findings of the SDNY that the Ecuador Action was replete with political interference, organized pressure tactics intended to influence and intimidate the Ecuadorian judiciary, extortion, fraud and systemic corruption of the judicial system. The pressure tactics carried out by the plaintiffs' "'private army'" and the political interference into the judicial proceedings by the ROE's President, Attorney General and other political officials are detailed in this section. According to Chevron, the public and private support for the plaintiffs by the president of the ROE and his campaign against Chevron ensured that it did not receive a fair trial in Ecuador.

Further, Chevron alleges, in this section of its statement of defence that the plaintiffs' counsel conspired to fraudulently manipulate expert evidence and repeatedly engaged in improper *ex parte* communications with the various Ecuador judges who heard the trial of the Ecuadorian action, for the purpose of gaining unfair and illegal advantages. According to Chevron, the plaintiffs' counsel also manipulated and falsified expert evidence presented to the court. Expert reports filed with the court were "ghostwritten" by the plaintiffs' counsel. They then engaged in fraudulent efforts to "cleanse" the ghostwritten expert reports.

Ultimately, in exchange for the payment of a US$500,000 bribe to Judge Zambrano, which was payable upon the enforcement of the Ecuadorian judgment, Judge Zambrano allowed the plaintiffs' counsel to draft the Ecuadorian judgment. Although the Ecuadorian judgment was signed by Judge Zambrano, the decision was not his own. It was ghostwritten by the plaintiffs' counsel. Accordingly, Chevron maintains that the Ecuadorian judgment was not the decision of an impartial judge or the product of a fair and independent process.

2017 ONSC 135 (CanLII)

**X. The Ecuador Judgment Cannot be Recognized or Enforced in Ontario** – This section sets out the following reasons why Chevron submits that the Ecuadorian judgment cannot be enforced against it in Ontario.

- The Ecuador court did not have jurisdiction over Chevron because Chevron has no real or substantial connection to the jurisdiction or the subject matter of the claim, it had no involvement in the events leading to the Ecuadorian judgment, it is a corporate entity separate from Texaco and TexPet and it did not attorn to the jurisdiction of the Ecuador court.

- The EMA, the legislation upon which the Ecuadorian judgment is based, was enacted and retroactively applied to improperly contrive a claim against Chevron. As such it is contrary to Canadian public policy and repugnant to Canadian concepts of justice. Further, the Ecuador court's decision not to dismiss the claim against Chevron on the basis of the 1995 Settlement Agreement is also contrary to Canadian public policy because Chevron is entitled to rely upon the release provided to TexPet pursuant to the 1995 Settlement Agreement.

- The enforcement of the Ecuadorian judgment against Chevron would constitute a violation of the ROE's obligations under international law and would therefore offend Canadian public policy. Chevron submits that the ROE is subject to a decision of an arbitral tribunal pursuant to the Bilateral Investment Treaty (the "BIT") between the United States and the ROE that recognizes the enforceability of the 1995 Settlement Agreement and requires that the ROE suspend and prevent enforcement of the Ecuadorian judgment.

- The Ecuador court process was contrary to Canada's concept of natural justice because Chevron was denied any meaningful opportunity to be heard by an impartial and unbiased court.

- The Ecuadorian judgment is the product of conspiracy, fraud and systemic corruption because members of the judiciary were coerced, intimidated, extorted and ultimately bribed to decide the case in the plaintiffs' favour. To recognize the Ecuadorian judgment under these circumstances would be contrary to Canadian public policy.

**XI. The Plaintiffs Cannot Dispute the Findings of Fraud and Corruption Made by the SDNY** – This section sets out Chevron's position that it would be unfair and an abuse of the court's process to allow the plaintiffs to re-litigate the findings of fact made by the SDNY, a court of competent jurisdiction, between the same parties and their representatives.

**XII. Chevron Corp. is Not Estopped from Defending this Action -** This section sets out Chevron's position on why the conditions of the dismissal of the Aguinda Action do not preclude Chevron from defending this action on any grounds available under Canadian law.

**XIII. The Shares and Assets of Chevron Canada Limited are not the Shares and Assets of Chevron Corp.** - This section sets out Chevron's position on why the shares and assets of Chevron Canada are not the shares and assets of Chevron.

**XIV. Relief Requested** - This section requests that the action be dismissed with costs on a full indemnity basis.

## Issue

[85]   The issue that I must decide on this motion is whether it is plain and obvious that the defences pleaded by Chevron have no chance of success because they are not permitted defences to an action for the recognition and enforcement of a foreign judgment in accordance with the Supreme Court of Canada's decision in *Beals*.

## Positions of the Parties

[86]   The plaintiffs submit that the defences pleaded by Chevron are either not permissible as a result of *Beals* or were raised or could reasonably have been raised before the courts in Ecuador. During oral argument Mr. Lenczner, on behalf of the plaintiffs, conceded that the questions of whether Judge Zambrano was bribed and whether his decision was ghostwritten by the plaintiffs' counsel were permissible defences for Chevron to raise in this proceeding. However, he argued that these two discrete issues could be summarily determined on a mini-trial. He maintained his position that all of the other defences pleaded by Chevron were impermissible and should be struck.

[87]   Chevron submits that all of the defences it has pleaded are permissible under the *Beals* decision and that I cannot conclude that it is plain and obvious that these defences have no chance of success.

## Analysis

### Applicable Law

[88]   The test for striking out a defence under r. 21.01(1)(b) of the *Rules of Civil Procedure* was clearly articulated by the Court of Appeal for Ontario in *Rausch v. Pickering (City)*.[49] It can be summarized as follows:

- The test is stringent, and the moving party must satisfy a very high threshold in order to succeed.

- Unless it is 'plain and obvious' that there is no chance of success, a [defence], even a novel one, ought to be allowed to proceed.

- The motion proceeds on the basis that the facts pleaded are true unless they are manifestly incapable of being proven.

- While the facts pleaded are the basis upon which the possibility of success must be evaluated, the pleading must be read as generously as possible, erring on the side of permitting an arguable [defence] to proceed to trial.

---

[49] *Rausch v. Pickering (City)*, 2013 ONCA 740, 369 D.L.R. (4th) 691, at para. 34.

2017 ONSC 135 (CanLII)

[89]    In addition, no evidence is admissible on a motion to strike out a defence.[50]

[90]    The Court of Appeal in *Paton Estate v. Ontario Lottery and Gaming Corporation (Fallsview Casino Resort and OLG Casino Brantford)*[51] recently stated that "the purpose of a motion to strike is to eliminate hopeless claims". In *R. v. Imperial Tobacco Canada Ltd.*,[52] the Supreme Court of Canada stressed that it "is a tool that must be used with care." It is against this background that I must determine whether Chevron's defences should be struck.

[91]    The court's role in an action to recognize and enforce a foreign judgment is different than in an action at first instance. The Supreme Court of Canada explained this difference, as follows, in its judgment in this case:[53]

> … First, the purpose of an action for recognition and enforcement is not to evaluate the underlying claim that gave rise to the original dispute, but rather to assist in enforcing an already-adjudicated obligation.  In other words, the enforcing court's role is not one of substance, but is instead one of facilitation: *Pro Swing*, at para. 11. The court merely offers an enforcement mechanism to facilitate the collection of a debt within the jurisdiction.  This entails that the enforcing court does not exercise jurisdiction in the same way as it does in actions at first instance.  In a first instance case like *Van Breda*, the focus is on whether the court has jurisdiction to determine the merits of a substantive legal claim; in a recognition and enforcement case, the court does not create a new substantive obligation, but instead assists with the fulfillment of an existing one.

[92]    The Supreme Court continued, as follows:[54]

> No concern about the legitimacy of the exercise of state power exists in actions to recognize and enforce foreign judgments against judgment debtors.  As I have explained, when such an action comes before a Canadian court, the court is not assuming jurisdiction over the parties in the same way as would occur in a first instance case.  The enforcing court has no interest in adjudicating the original rights of the parties.  Rather, the court merely seeks to assist in the enforcement of what has already been decided in another forum. …

[93]    In *Beals* the Supreme Court of Canada considered the scope of defences available to a domestic defendant in contesting the recognition and enforcement of a foreign judgment. The court held that the defences of fraud, public policy and lack of natural justice are available defences.

---

[50] *Rules of Civil Procedure*, r. 21.01(2)(b).
[51] *Paton Estate v. Ontario Lottery and Gaming Corporation (Fallsview Casino Resort and OLG Casino Brantford)*, 2016 ONCA 458, 19 E.T.R. (4th) 171, at para. 11, citing *R. v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, [2011] 3 S.C.R. 45, at para. 19.
[52] *Imperial Tobacco Canada*, at para. 21.
[53] *SCC decision*, at para. 44.
[54] *SCC decision*, at para. 48.

Although the court stated that these defences are "narrow in application", Major J. qualified this, stating, "Unusual situations may arise that might require the creation of a new defence to the enforcement of a foreign judgment."[55]

*Defence of Fraud*

[94]    In *Beals*, Major J. stated, "As a general but qualified statement, neither foreign nor domestic judgments will be enforced if obtained by fraud."[56] He explained that this is to prevent an abuse of the judicial process. However, he limited the defence of fraud to allegations that are "new and not the subject of prior adjudication", with the exception of fraud going to the jurisdiction of the foreign court, which he concluded "can always be raised before a domestic court to challenge the judgment."[57]

*Defence of Natural Justice*

[95]    Major J. also concluded in *Beals* that if the foreign judgment was obtained in a manner that is contrary to Canadian notions of fundamental justice, it may not be recognized or enforced. He stated, in part, as follows:[58]

> 61      The enforcing court must ensure that the defendant was granted a fair process. … The burden of alleging unfairness in the foreign legal system rests with the defendant in the foreign action.
>
> 62      Fair process is one that, in the system from which the judgment originates, reasonably guarantees basic procedural safeguards such as judicial independence and fair ethical rules governing the participants in the judicial system.  This determination will need to be made for all foreign judgments. … In the case of judgments made by courts outside Canada, the review may be more difficult but is mandatory and the enforcing court must be satisfied that fair process was used in awarding the judgment. …
>
> 63      … If fair process was not provided to the defendant, recognition and enforcement of the judgment may be denied.

---

[55] *Beals*, at paras. 41-42.
[56] *Beals*, at para. 43.
[57] *Beals*, at para. 51.
[58] *Beals*, at paras. 61-63.

2017 ONSC 135 (CanLII)

*Defence of Public Policy*

[96]   The public policy defence prevents the enforcement of a foreign judgment that is contrary to Canadian concepts of justice. According to Major J., this defence "turns on whether the foreign <u>law</u> is contrary to our view of basic morality" and it "guards against the enforcement of a judgment rendered by a foreign court proven to be corrupt or [biased]." [59]

*Test to be Applied*

[97]   In light of this jurisprudence, my consideration of whether the defences pleaded by Chevron in its statement of defence should be struck is to be carried out in the following manner:

- I must consider all of the facts pleaded by Chevron to be true unless I conclude that they are manifestly incapable of being proven.

- I must read Chevron's statement of defence generously and err on the side of allowing an arguable defence to proceed to trial.

- I must consider whether the defences pleaded constitute the defences of fraud, public policy, denial of natural justice or whether this case presents an unusual situation that requires the creation of a new defence.

- Unless I am satisfied that it is plain and obvious that a defence pleaded in Chevron's statement of defence has no chance of successfully raising a defence permitted by *Beals*, I must allow the defence to proceed to trial.

[98]   Mr. Lenczner concedes, and I agree, that to the extent Chevron alleges that Judge Zambrano was bribed and that his decision was ghostwritten by the plaintiffs' counsel, this constitutes a permissible defence under *Beals*.

[99]   If all of the allegations of fraud, corruption, bribery, ghostwriting and the overall corruption of the Ecuadorian judicial system contained in Chevron's statement of defence are considered to be true, I am of the view that they raise all three permissible defences under *Beals*. A judgment obtained from a corrupt judicial system in which the trial judge accepted an offer of a bribe and allowed the plaintiffs' counsel to write his decision would clearly constitute,

- a judgment obtained by fraud;

- a judgment obtained from an unfair process; and

- a judgment that is contrary to Canadian concepts of fundamental justice.

---

[59] *Beals*, at paras. 71-72.

[100]  These defences raised by Chevron, which are permitted under *Beals*, all challenge the jurisdiction of the court presided over by Judge Zambrano, which rendered the Ecuadorian judgment. As such it is not necessary that they are new and not the subject of prior adjudication.

[101]  In *R. v. Curragh Inc.*,[60] the Supreme Court of Canada held that a reasonable apprehension of bias deprives a judge of jurisdiction, and it stated the following:

> … However, when a court of appeal determines that the trial judge was biased or demonstrated a reasonable apprehension of bias, that finding retroactively renders all the decisions and orders made during the trial void and without effect.

[102]  If all of the allegations of judicial corruption and bribery are accepted as true, Judge Zambrano had no jurisdiction to render the Ecuadorian judgment, and it should not be recognized or enforced in Ontario. It, therefore, cannot be said that it is plain and obvious that these defences have no chance of success.

[103]  For these reasons, I will not strike the defences pleaded by Chevron at paras. 3(c) and (d), 4, 27-70, and 81-90 of its statement of defence because these parts of Chevron's statement of defence raise permitted defences that arise from the allegations that the Ecuadorian court was biased and, therefore, lacked jurisdiction.

[104]  I will now consider the other defences raised by Chevron that are not based on the corruption and bias of the Ecuadorian court.

*Paragraph 3(a)*

[105]  In this paragraph of its statement of defence, Chevron pleads that the Ecuadorian court did not have jurisdiction over it for reasons other than judicial corruption and bias. Chevron relies upon the following grounds to challenge the Ecuadorian court's jurisdiction:

- It never attorned to and it contested the jurisdiction of the Ecuadorian court.

- It never conducted any business in Ecuador and the entities that did operate in Ecuador are legally separate from it.

- There was no real and substantial connection between Chevron and Ecuador or the subject matter of the action in Ecuador to permit the Ecuadorian court to take jurisdiction over Chevron under Ontario law.

[106]  Since it is a precondition to the recognition and enforcement of a foreign judgment that the foreign court had jurisdiction according to Canadian law, it is open to Chevron to challenge the Ecuadorian judgment on this basis. The plaintiffs submit that Chevron is precluded from challenging

---

[60] *R. v. Curragh Inc.*, [1997] 1 S.C.R. 537, at para. 8.

the jurisdiction of the Ecuadorian court because it did so and lost before all three levels of court in Ecuador. The Court of Appeal for Ontario determined in *CIMA Plastics Corporation v. Sandid Enterprises Ltd.*,[61] that an Ontario court is not bound by a foreign court's determination of its own jurisdiction in an action for the recognition and enforcement of a foreign judgment in Ontario.

[107]   It is, therefore, not plain and obvious that this defence has no chance of success. The fact that Chevron raised it before the Ecuadorian court does not preclude it from raising it again in the Ontario court as a defence. I will not strike paras. 3 (a), 26, and 71-74 of Chevron's statement of defence for this reason. I should note that paras. 30-31 also contain factual allegations that support this defence and should not be struck for this reason. However, I have already determined that I will not strike these two paragraphs as they also relate to the allegation that the Ecuadorian court was biased.

*Paragraph 3(b)*

[108]   In this paragraph of its statement of defence, Chevron pleads that the Ecuadorian judgment is based upon a law applied in a manner that retroactively created a cause of action against Chevron for which the ROE had previously issued a binding release. The factual allegations in support of this defence are contained in sections III and V of Chevron's statement of defence, which refer to the events leading up to the 1985 Settlement Agreement and the enactment of the EMA by the ROE.

[109]   This defence was raised before the Ecuadorian courts. The plaintiffs submit that it cannot be raised again in this proceeding because that would constitute the re-litigation of a defence to the underlying claim. Chevron submits that it is contrary to Canadian public policy to recognize and enforce a foreign judgment that is based upon a law that the Ecuadorian government enacted to operate retroactively and which ignores the ROE's previous release of Chevron. I do not agree with this submission. Governments often enact retroactive legislation. I do not consider the enactment of the EMA by the ROE to constitute a law that is contrary to our Canadian view of "basic morality". The Court of Appeal for Ontario has cautioned courts to exercise great care "in relying upon public policy as a ground for refusing enforcement" (citations omitted) because of the following: [62]

> The common ground of all expressed reasons for imposing the doctrine of public policy is essential morality. This must be more than the morality of some persons and must run through the fabric of society to the extent that it is not consonant with our system of justice and general moral outlook to countenance the conduct….

[110]   The applicability of the release provided to TexPet under the 1995 Settlement Agreement relates to a defence to the underlying claim on the merits, which the Supreme Court of Canada has stated the domestic court is not to adjudicate in an action for recognition and enforcement of a foreign judgment.

---

[61] *CIMA Plastics Corporation v. Sandid Enterprises Ltd.*, 2011 ONCA 589, 341 D.L.R. (4th) 442.
[62] *Boardwalk Regency Corp. v. Maalouf* (1992), 6 O.R. (3d) 737 (C.A.), at p. 743.

[111]   In my view, for this reason this defence is not permissible under *Beals*. I am, therefore, satisfied that it is plain and obvious that this defence has no chance of success.

[112]   I, therefore, strike paras. 3(b), 5-20, 23-24 and 75-78 of Chevron's statement of defence. These parts of its statement of defence plead an impermissible defence and it is therefore not appropriate to grant Chevron leave to amend these paragraphs.

*Paragraph 3(e)*

[113]   In this paragraph of its statement of defence, Chevron pleads that the recognition and enforcement of the Ecuadorian judgment would constitute a violation of the ROE's obligations under international law. Chevron submits that the ROE is in breach of its obligations to comply with an award of the BIT arbitral panel requiring the ROE to prevent the enforcement of the Ecuadorian judgment. The BIT arbitral panel subsequently concluded that the ROE had violated international law. According to Chevron, the ROE's violation of its international legal obligations is contrary to Canadian public policy.

[114]   I do not consider the ROE's failure to take steps to prevent the enforcement of the Ecuadorian judgment in accordance with the BIT arbitral panel's award to be contrary to our Canadian view of basic morality within the meaning of the Court of Appeal's description in *CIMA*. I have, therefore, concluded that this is not a permissible defence under *Beals*.

[115]   I am satisfied that it is plain and obvious that this defence has no chance of success for this reason. I therefore strike para. 3(e) of Chevron's statement of defence as well as paras. 79 and 80, which contain the factual allegations in support of this defence. I do not grant Chevron leave to amend these paragraphs because they plead an impermissible defence.

*The Remaining Paragraphs*

[116]   Paragraphs 21, 22, 25 and 88-90 of Chevron's statement of defence refer to the Aguinda Action originally brought in the SDNY in 1993 and its eventual dismissal. These facts are relevant to respond to the plaintiffs' allegation that Chevron is estopped from defending this action because of an undertaking given by Texaco in that proceeding. I am satisfied that this is a permissible defence as Chevron is entitled to respond to this allegation contained in the plaintiffs' statement of claim. I will, therefore, not strike these paragraphs of Chevron's statement of defence.

[117]   Paragraphs 91 and 92 of Chevron's statement of defence relate to the plaintiffs' claim against Chevron Canada and the issue of corporate separateness. It is a permissible pleading in light of the plaintiffs' allegations against Chevron Canada. I will not strike these paragraphs of Chevron's statement of defence.

[118]   Paragraphs 1, 2 and 93 contain standard pleadings and are permissible.

2017 ONSC 135 (CanLII)

**Conclusion on Motion to Strike**

[119]   For the reasons outlined above, I have concluded that the plaintiffs' motion is granted in part. The following paragraphs of Chevron's statement of defence are struck pursuant to r. 21.01(1)(b) of the *Rules of Civil Procedure*: 3(b), 3(e), 5-20, 23-24 and 75-80. The remainder of the paragraphs of Chevron's statement of defence all constitute permissible pleadings and may proceed to trial.

**Costs**

[120]   I urge the parties to settle the issue of costs. If they cannot, they may schedule a 9:30 a.m. appointment before me to address the issue of costs.

[121]   I sincerely thank all counsel for the very professional and efficient manner in which they conducted these motions.

_____

HAINEY J.

**Released:** January 20, 2017

2017 ONSC 135 (CanLII)

2017 ONSC 135 (CanLII)

**CITATION:** Yaiguaje v. Chevron Corporation, 2017 ONSC 135
**COURT FILE NO.:** CV-12-9808-00CL
**DATE:** 20170120

# ONTARIO

# SUPERIOR COURT OF JUSTICE

## (Commercial List)

**BETWEEN:**

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA , MARIA CLELIA REASCOS REVELO, HELEODORO PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO, MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA, OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE LUSITANDE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs/Moving Parties

– and –

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON CANADA FINANCE LIMITED

Defendants/Respondents

---

## REASONS FOR DECISION

---

_____

HAINEY J.

**Released:** January 20, 2017

2017 ONSC 135 (CanLII)