# EXHIBIT 1

# Chevron's RICO Fraud
## An Abuse of Indigenous Peoples, the Environment, and U.S. Courts

*Background, Context, and Responses to the False "Findings"
in the* Chevron v. Donziger *Case*

[W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Steven Donziger and the Ecuadorian contamination victim plaintiffs] have attached it in Singapore or wherever else [as part of enforcing their final Ecuadorian judgment].

*—Hon. Lewis A. Kaplan (SDNY) at the first hearing in Chevron's RICO case, Feb. 2011*

This is an extraordinary case that has degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather merit… Encouraged by this Court's implacable hostility toward Donziger, Chevron will file any motion, however meritless, in the hope that the Court will use it to hurt Donziger.

*—Attorney John Keker in reference to the RICO case, May 2013*

"[O]ur L-T [long-term] strategy is to demonize Donziger."

*—Chevron's lead PR consultant in 2009,
describing the company's plan to evade liability
in the Ecuador environmental case*

**Legal Team for the Ecuadorian Villagers**
**2017**

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................................1

SUMMARY: THE 12 CORE FALSE "FINDINGS" BY U.S. COURTS ...................................3

CONTEXT AROUND THE U.S. JUDICIAL DECISIONS.......................................................5
Appeals Court Blindly Accepts Kaplan's Findings ...........................................................5
Chevron's Bad Faith Forum Shopping .............................................................................6
Chevron's "Demonize Donziger" Strategy .......................................................................7
Chevron's Corrupt Witness: "Money Talks, But Gold Screams".......................................8
Judge Kaplan's Favoritism And Bias................................................................................8
Judge Kaplan's Harassment of Donziger .........................................................................9
Judge Kaplan's Illegal Worldwide "Injunction".................................................................9
RICO Trial: The Dickensian Farce ................................................................................10
The Role of Chevron's Law Firm In Orchestrating Corruption .......................................10

DETAIL OF THE 12 FALSE OR DISTORTED FINDINGS BY U.S. COURTS .....................11
False Finding #1: The Plaintiffs "Ghostwrote" the Ecuador Environmental Judgment .....11
*How Chevron Bribed A Witness To Lie* .........................................................................*11*
*Background on Chevron's False Narrative* ....................................................................*12*
*Guerra's Criminal History*.............................................................................................*13*
*Guerra's Other Credibility Problems* ............................................................................*13*
*Guerra's "Confession" of Lying During the Arbitration* ................................................*14*
*Chevron's Failed "Documentary Evidence" Argument* ..................................................*15*
*Another Chevron Dead End: Computer Forensic Analysis* ............................................*15*
*Chevron's Final Hail Mary: Unfiled Work Product* ........................................................*16*
False Finding #2: Donziger Tried To Intimidate Chevron With An "Inflated" Cost Estimate.............17
*David Russell's Preliminary Assessment* ......................................................................*17*
*Judge Kaplan's Double Standard* .................................................................................*18*
False Finding #3: Donziger Refused to Test for Certain Pollutants .................................19
False Finding #4: Donziger "Falsified" an Expert Report (Calmbacher) .........................20
False Finding #5: Donziger "Secretly" Paid Industry Experts for Neutral Monitoring Services ..........21
False Finding #6: Donziger "Coerced" a Judge to Cancel Certain Site Inspections..............23
False Finding #7: Donziger "Coerced" a Judge to Appoint a Certain Expert (Cabrera) ........24
False Finding #8: Donziger "Secretly" Paid Cabrera ......................................................24
False Finding #9: Donziger "Controlled" Cabrera's Work While Denying Involvement .....25
False Finding #10: A Consulting Expert—Stratus—Wrote the Cabrera Report .................26
False Finding #11: Stratus "Fabricated" Objections to the Cabrera Report......................27
False Finding #12: Donziger Hired New Consultants To "Cleanse" the Cabrera Report .....27

THE RESULT: ABSURD LEGAL DETERMINATIONS IN KAPLAN'S RICO RULING ...........28
Fraud .............................................................................................................................28
Extortion ........................................................................................................................29
Wire fraud ......................................................................................................................29
Money laundering ..........................................................................................................29
Obstruction of justice .....................................................................................................29
Witness tampering..........................................................................................................29
Travel Act ......................................................................................................................30
Kaplan's Final Act of Dishonesty: Inventing a Claim .....................................................30

CONCLUSION .................................................................................................................30

# Introduction

*The imagination of American lawyers is just without parallel in the world. It is our one absolutely overwhelming comparative advantage against the rest of the world, apart from medicine. You know, we used to do a lot of other things. Now we cure people and we kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger [with the Ecuador judgment] is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning.  – Judge Lewis A. Kaplan, in Chevron's RICO case*

Chevron's infamous civil "racketeering" (or RICO) case against Ecuadorian indigenous groups and their lawyers began and ended as a disgrace. It involved a U.S. court so desperate to rescue a U.S. company from a significant environmental liability imposed by a foreign court that it endorsed massive illegal payments by Chevron to a corrupt "fact" witness who repeatedly lied in court, and imposed countless other due process abuses that suggest a great degree of intellectual dishonesty. The U.S. judge who oversaw this spectacle, Lewis A. Kaplan, failed to disclose that throughout the proceeding he held significant personal investments in the oil industry – including, through a mutual fund, investments *in Chevron itself*. As prominent U.S. trial attorney John Keker said, the Kaplan/Chevron RICO case "degenerated into a Dickensian farce" because of the judge's "implacable hostility" toward the Ecuadorians and their lawyers. The details of what Kaplan allowed Chevron to do to Ecuadorian indigenous groups in his courtroom are chilling.

Judge Kaplan allowed Chevron to use his court – and by extension, the inherent judicial authority of the United States – to try to "rescue" the company from a large environmental liability of its own making. The environmental judgment against Chevron was imposed based on incontrovertible evidence that the company abandoned thousands of open-air toxic waste pits in the Amazon that still contaminate the groundwater and drinking water of tens of thousands of indigenous and subsistence farming communities in the Ecuadorian Amazon. Evidence also demonstrated that the company systematically and deliberately discharged 16 billion gallons of toxic "water of production" into rivers and streams, flared poisonous gas into the air, and dumped millions of gallons of oil waste along dirt roads in the region. Judge Kaplan refused to consider any of this environmental evidence in the RICO proceeding. For this reason and numerous others explained herein, the U.S. court decisions in Chevron's RICO case – all of which derive from Kaplan's flawed proceeding -- deserve no deference by any authority, the public, the financial markets, or even Chevron's own shareholders and employees. Placed in the context of new evidence that recently emerged proving the abject falsity of the paid-for witness testimony in the RICO matter, the decisions ultimately document a *vast fraud perpetrated by Chevron itself*. To be clear, the decision by Judge Kaplan in 2014 that indigenous groups in Ecuador committed "fraud" and "racketeering" to obtain their environmental judgment is not only erroneous, but the product of *criminal conduct by Chevron* in presenting fabricated evidence to a U.S. court.

Judge Kaplan, and the three appellate judges who accepted his factual "findings" without any independent analysis, turned a blind eye to a gross injustice inflicted by an American oil company on some of the most vulnerable people on the planet. Also targeted by Chevron in the RICO matter was various counsel for the indigenous groups, primarily U.S. human rights attorney Steven Donziger. Chevron admitted in 2013 it had spent at least $15 million on one "corporate investigations" firm—one out of many—to spy on Donziger

and his family and to prepare up to 30 reports on every conceivable aspect of his life. Chevron used six public relations firms and dozens of law firms to try to "demonize" (in the company's own words) Donziger in the realm of public opinion. Chevron's latest gambit is to try to personally bankrupt Donziger: the company is seeking an egregious order allowing the company to seize over $33 million in legal fees and costs from him. Of course, Donziger is a solo practitioner without even a fraction of that amount in his possession. The Chevron exercise of trying to recover "costs" for perpetrating its own fraud is about nothing other than trying to send a message of intimidation to other attorneys who might follow Donziger's example and battle Chevron relentlessly to obtain justice for the Ecuadorian indigenous groups.

Ultimately, Chevron is using the U.S. court opinions to evade responsibility for causing what experts believe is the worst oil-related contamination in history. Judge Kaplan and the appellate court almost completely cooperated with Chevron's unapologetic use of the RICO statute to to distract attention from the company's own environmental crimes and fraud. The main purpose of Chevron's massively expensive retaliation campaign—it has used over 2,000 lawyers and consultants since the inception of the strategy— is to block enforcement of the environmental judgment from Ecuador. The judgment was issued in 2011 in a country where Chevron had earlier insisted the trial be held and where it had accepted jurisdiction. Ecuador's Supreme Court in 2013 unanimously affirmed the ruling in a well-considered 222-page decision. Behind the legal maneuvering, the affected communities in Ecuador suffer from skyrocketing cancer rates and other health problems deriving from Chevron's policy of deliberately dumping harmful toxic oil waste into the rainforest during the time it operated in Ecuador from 1964 to 1992. Chevron never has contested the fundamental fact that its operations in Ecuador caused extensive pollution.[1]

Aside from being the largest environmental civil judgment in history, the Chevron environmental case represents the first time that indigenous communities have held a major oil company legally accountable for the full scale of its pollution. Chevron mounted the most far-reaching corporate defense in history not just to avoid this sizeable judgment, but also out of fear that the precedent might lead vulnerable communities all over the world that have been harmed by the practices of the fossil fuel industry to stand up for their rights -- likely leading to cascading levels of additional liability for Chevron and its industry peers. Structural pressures on the fossil fuel industry due to global warming, the rapidly increasing transition to clean energy, and low oil prices likely have made Chevron management even more angry at having to pay the Ecuador environmental judgment issued from the courts of its preferred forum.

This Report provides specific responses to the many flawed and distorted factual "findings" in the Kaplan and U.S. appellate court decisions.

---

[1]     Chevron's main defense in the Ecuador trial was not that it didn't pollute. Chevron executive Rodrigo Perez Pallares even admitted that the company deliberately dumped at least 15 billion gallons of untreated toxic waste (which contained the carcinogen benzene and other harmful chemicals) into Amazon waterways as a waste disposal mechanism. Rather, Chevron's main defense was that any clean-up should be paid by Petroecuador, Ecuador's state-owned oil company, even though Chevron (operating as Texaco) was the exclusive operator of the oil fields and planned, engineered, and constructed the polluting well sites and production facilities. The Ecuadorians' legal team had prepared a summary of the overwhelming evidence against Chevron in the Ecuador trial available here.

# Summary: The 12 Core False "Findings" by U.S. Courts

This report first provides an overview of the background and analysis of some overarching critical points regarding Chevron's RICO prosecution. It then addresses the "factual findings" made by Judge Kaplan that were rubber-stamped without any inquiry or independent analysis by the Second Circuit. First, the report addresses the core claim of misconduct that drove the case both in the courts and in Chevron's collateral media campaign: the unequivocally false claim that Attorney Donziger and others agreed to bribe the presiding judge in the Ecuador case in exchange for being able to "ghostwrite" the trial court judgment. The thin and patently corrupt evidence Chevron put forward in support of this false claim has been thoroughly debunked, and the claim has more recently been disproven through a forensic analysis of the "digital fingerprints" on the Ecuadorian judge's hard drives. After explaining this in detail, this report starting on page 11 addresses a number of other claims as summarized in the appellate court affirmance of Judge Kaplan's decision, responding to each in turn with supporting documents that illuminate the true facts and context. An executive summary of all these responses is provided here:

**1) False finding: Lawyers for the villagers wrote the Ecuador trial court judgment**. A forensic examination of the trial judge's computer, undertaken by one of the world's leading experts, definitively proved the falsity of this finding. See more at page 11 (or click here).

**2) False finding: Donziger tried to "extort" Chevron by issuing an inflated damages assessment.** The damages assessment, prepared by a scientist after an extensive field inspection at the beginning of the trial, was proper advocacy protected by the First Amendment. Further, contrary to the Kaplan court's "finding" on this point, the damages figure in the report ($6 billion) was significantly lower than Chevron's actual damages as later determined by Ecuador's courts and credible third parties. See more at page 17 (or click here).

**3) False finding: Donziger's refusal to adduce sampling evidence favorable to Chevron was "extortion"**. The legal team for the villagers produced evidence to prove their claims; they were under no legal or ethical obligation to find evidence favorable to Chevron. Contrary to Judge Kaplan's finding, it would have been legal malpractice for Donziger to adduce evidence to help Chevron fight his own clients. See more at page 19 (or click here).

**4) False finding: Donziger falsified the conclusions of an expert report**. This is false. Evidence ignored by Judge Kaplan shows the expert actually signed off on his report, which demonstrated extensive and illegal levels of toxic pollution at two Chevron well sites. See more at page 20 (or click here).

**5) False finding: Donziger secretly hired industry experts**. Donziger hired two technical experts to monitor the trial so the court would feel sufficiently animated to put an end to Chevron's attempts to corrupt the proceedings. This was proper advocacy and any decent lawyer fighting for a fair trial would have done the same. See more at page 21 (or click here).

**6) False finding: Donziger "coerced" the trial judge to cancel judicial inspections of Chevron's well sites**. This is false. Stripped of the demonization rhetoric, the relevant fact here is that the legal team for the Ecuadorians effectively *advocated* for the judge to allow them to withdraw the inspections they had unilaterally requested because they had concluded they had met their burden of proof. The judge granted the motion, as he should have. Chevron still inspected 100% of the sites it had requested. See more at page 23 (or click here).

**7) False finding: Donziger "coerced" the trial judge to appoint an expert witness, Richard Cabrera.** This too is false. The legal team for the villagers nominated Cabrera as a party expert to prepare a report on damages and the court appointed for this purpose in exactly the same way Chevron's experts were appointed by the court for the company's reports. This was part of a *pro forma* process in Ecuador regarding expert witnesses that was affirmed by three layers of courts in the country. See more at page 24 (or click here).

**8) False Finding: Donziger planned the Cabrera report and paid him secretly for the work.** The legal team for the villagers helped Cabrera plan his report, its experts drafted the report based on criteria they established with Cabrera, and they paid Cabrera a reasonable fee that was disclosed. Chevron did exactly the same with its experts. The process was consistent with practice in Ecuador and affirmed as such by Ecuador's highest court. See more at page 24 (or click here).

**9) False Finding: Donziger's team controlled Cabrera while denying involvement.** This is false and condescending. Nobody controlled Cabrera. Cabrera was a paid expert who exercised his independent judgment based on his assessment of the voluminous evidence against Chevron. Judge Kaplan's incessant focus on Cabrera is misplaced and legally irrelevant, as affirmed by the rulings of three layers of courts in Ecuador. See more at page 25 (or click here).

**10) False Finding: Stratus, an American environmental consulting firm, wrote Cabrera's report**. Stratus drafted the bulk of Cabrera's report and it was entirely appropriate to do so as confirmed by Ecuador's courts. After eight years of trial, there were thousands of pages of technical reports in evidence, including 64,000 chemical sampling results. The scientists at Stratus worked as a team to help Cabrera aggregate and present this voluminous information to the court. See more at page 26 (or click here).

**11) False Finding: Donziger arranged for Stratus to file objections to the Cabrera report.** This is true and entirely appropriate given various discrete shortcomings in the Cabrera report that the legal team felt needed to be addressed. See more at page 27 (or click here).

**12) False Finding: Donziger hires consultants to "cleanse" the Cabrera report.** Given Chevron's constant and unfair drumbeat of complaints about Cabrera, the legal team for the villagers asked the court to let both parties prepare additional damages reports. Chevron and Judge Kaplan tried to make this seem sinister by claiming its purpose was to "cleanse" Cabrera's report when in reality Cabrera's report was empirically grounded and prepared consistent with Ecuadorian law. See more at page 27 (or click here).

# Context Around the U.S. Judicial Decisions

As explained in detail below, the U.S. court opinions in question are at their core based on false evidence fabricated by Chevron via the testimony of an admittedly corrupt witness paid $2 million in cash and benefits by the company and coached for 53 consecutive days before being allowed to testify. This witness, Alberto Guerra, later admitted he lied repeatedly when testifying before Judge Kaplan about bedrock facts relied on by the court for its false findings. In fact, the testimony of this corrupt witness was "credited" by Judge Kaplan in an extremely problematic proceeding where the accused were not allowed to put on a meaningful defense and where even the barest mention of Chevron's contamination, corruption and fraud in Ecuador—evidence absolutely critical to explain the basis of the environmental judgment against Chevron—was prohibited from any utterance in open court. Judge Kaplan also refused to seat a jury so he could decide the case alone.

Judge Kaplan also did something with Chevron's racketeering trial that no judge in any country in the world had ever before attempted. He let a disaffected litigant (Chevron) that had lost a case in a foreign court where it had accepted jurisdiction return to its home-country court to collaterally attack that judgment by putting that foreign country's *entire judiciary* on trial. This move had no legal basis and violated longstanding principles of international law. In fact, dozens of legal scholars from nine countries filed a "friend of the court" brief condemning the very idea of Judge Kaplan's concept of the RICO case as a violation of international law.[2] The underlying environmental case in Ecuador was one where both parties had accepted jurisdiction, where the facts had been litigated for several years at great expense, and where the parties had agreed to respect the final judgment subject only to limited defenses on appeal. Not only was Chevron's collateral attack on a foreign country's entire judiciary something that had never before happened, it was a monumental waste of judicial resources and a profoundly disturbing example of U.S. judicial overreach. Ecuador, after all, is a sovereign nation and U.S. ally. The fact the Chevron attack on Ecuador was based on false evidence and distorted facts only makes it more disturbing.

## *Appeals Court Blindly Accepts Kaplan's Findings*

On appeal, a three-judge appellate panel[3] affirmed Judge Kaplan's decision. It did so blindly, with no independent analysis of his factual findings. The panel was made aware of the fabricated evidence credited by Judge Kaplan, but chose to ignore it. The panel also was presented with extensive evidence of Judge Kaplan's procedural machinations and denial of due process during the RICO case, but chose to ignore it. The panel members also were made aware, as we explain below, that Judge Kaplan repeatedly distorted the context of Ecuadorian law and legal practice in Ecuador to help Chevron try to frame U.S. attorney Donziger as a "racketeer" so it could evade liability for its environmental crimes and fraud committed against indigenous villagers. Donziger, a graduate of Harvard Law School who has been described as a man of "Herculean tenacity" by BusinessWeek magazine, never had even one complaint filed against him in 25 years of legal practice until Chevron launched its demonization campaign. Judge Kaplan also refused to let Donziger pursue his far stronger counterclaims against Chevron for the company's own criminal racketeering scheme (of which the Chevron RICO case targeting him was a central part) that was designed to deny justice to the Ecuadorians by demonizing their lawyers, as outlined in this lawsuit. In civil trials, the accused is supposed to be allowed to file counterclaims against the accuser so all dimensions of the

---

[2]    The "friend of the court" brief is available here. For additional analysis of why Chevron's RICO case was unprecedented and lacked a proper legal basis, see this appellate petition.

[3]    The members of the appellate panel were Amalya L. Kearse, Barrington D. Parker, and Richard C. Wesley.

controversy can be heard and balanced by the same jury. Judge Kaplan barred such claims by Donziger and refused to even seat a jury, ensuring a one-sided proceeding in favor of Chevron.

## Chevron's Bad Faith Forum Shopping

Another of Chevron's abusive practices endorsed by Judge Kaplan and the Second Circuit was its continuous forum shopping to try to find a friendly court to help it evade the environmental judgment issued by the court in Ecuador. As mentioned, the environmental trial took place in Ecuador *at Chevron's request* after the company filed 14 affidavits before a U.S. federal court (where the case originally was filed) praising Ecuador's courts. Desperate to avoid a jury trial in the United States where evidence of its toxic dumping would have been presented, Chevron agreed to have the case heard in Ecuador where juries are not used. Chevron's promise to pay any adverse judgment as a condition of the case moving to Ecuador was quickly betrayed when it lost the case. Given that Chevron (operating under the Texaco brand) had systematically dumped toxic oil waste with impunity in Ecuador for almost three decades without facing even a single court judgment, the company thought it would be "business as usual" in the South American nation and that it could force a politically engineered dismissal. In fact, Chevron attempted exactly that when company executive Ricardo Reis Veiga—himself the architect of a sham "clean-up" of the company's waste pits in the 1990s that was later proven to be fraudulent—met with Ecuador's Attorney General on the first day of the trial and demanded that he (illegally) call the trial judge and pressure him to dismiss the case. The Attorney General obliged and placed the call, though the trial judge fortunately refused the demand. Reis Veiga admitted to these facts under oath in a deposition.

The affected communities filed their case in U.S. federal court in New York because of an abiding concern that Chevron would exercise improper political influence over Ecuador's courts. This was the same U.S. court where Judge Kaplan sits and where Chevron returned in 2011, in a fit of buyer's remorse, to file its RICO case. During the trial in Ecuador, which lasted eight years (2003 to 2011) largely because of Chevron's constant attempts to delay and sabotage the proceedings, the company filed an arbitration claim against the government of Ecuador under the U.S.-Ecuador Bilateral Investment Treaty. This claim asserted that Chevron was being denied "due process" in its favored courts in Ecuador and sought to shift any liability that might be imposed to the government. In other words, Chevron was trying to use the arbitration action (which is still pending after eight years) to obtain a taxpayer-funded bailout from the citizens of the country it victimized. As an added insult, the rules of the arbitration barred Chevron's victims from participating as a party or even attending the proceedings, which have been conducted in secret.

After Chevron refused to pay the judgment in Ecuador, and the villagers filed actions to seize company assets in other jurisdictions like Canada, Chevron began to rely on a new technicality to try to evade paying compensation to its victims. Chevron claimed it should never have to pay even one dollar of the judgment because all of its assets around the world were held in wholly-owned subsidiaries. By this logic, Chevron as the parent company did not actually have any assets in the enforcement countries to be seized, even though its subsidiaries were obviously such assets. Chevron's argument is frightening for many reasons, not the least of which is that the company operates around the world **only** through its wholly-owned subsidiaries. In fact, it has roughly 1,300 such subsidiaries in more than 100 countries. The company's subsidiary in Canada, Chevron Canada, has an estimated $15 billion in assets that could be used to pay the entirety of the Ecuador judgment. But Chevron is trying to immunize itself from all liability to its victims by claiming any asset held by Chevron Canada is off limits to collection because it was not a defendant in the Ecuador case. In fact, Canadian law is clear that any asset held by a debtor, including a subsidiary, can be subject to collection. But Chevron is forcing the issue to be litigated, wasting valuable time and resources.

Chevron is essentially arguing that once it removed its assets from Ecuador, there was nothing the villagers could do to collect the first dollar of their judgment anywhere in the world given that all of its assets are held in subsidiaries. Because of Judge Kaplan's erroneous decision and the Second Circuit's endorsement of it, the villagers are now blocked from trying to seize Chevron's assets in the United States. In the legal world, Chevron has converted this sort of courtroom trickery into high art. It is most unfortunate, and ironic, that the same U.S. courts where Chevron's victims in Ecuador originally came to seek relief have now become complicit in the company's forum shopping strategy.

Nonetheless, in the long term there is little that Chevron can do to block the villagers from trying to seize the company's assets around the world—particularly given that the judgment came from a court system that Chevron repeatedly praised until it lost the trial there. Canada, Brazil, and Argentina—three jurisdictions where company assets are being pursued by the villagers—are only a few among the dozens of countries where Chevron conducts business and maintains substantial assets. Chevron will eventually be forced to comply with its responsibilities to the people of Ecuador and pay the court-mandated damages necessary to remediate the pollution it created. It is important to remember that the underlying pollution artificially enriched Chevron shareholders and executives by externalizing the costs of production onto some of the world's most impoverished and vulnerable people. Law and basic principles of fairness require that at least some of such funds be returned to the people who were victimized.

## Chevron's "Demonize Donziger" Strategy

Chevron openly admitted its goal with the RICO trial was "to demonize Donziger" and attack adversary counsel to evade paying its enormous liability to the people of Ecuador, which at the time of this writing has risen to $12 billion. Given the success of the legal team for the villagers against Chevron in the Ecuador trial, it is clear that company regarded Donziger as uniquely dangerous; he was spied on for weeks in Manhattan by six agents hired by the corporate espionage firm Kroll, to whom Chevron paid at least $15 million to prepare 20 to 30 reports on Donziger. This was also the firm that found the corrupt witness Guerra in Ecuador and paid him $38,000 in cash out of a backpack to hold him over until he struck a more lucrative long-term deal with Chevron's lawyers in the U.S. Judge Kaplan wholeheartedly embraced the Chevron demonization campaign against Donziger and—as shown in this Report, including most directly through the judge's own words spoken from the bench—delighted in taunting Donziger and his lawyers throughout the case. During one hearing in the opening days of the case (before any evidence was presented), Kaplan inveighed:

> The imagination of American lawyers is just without parallel in the world… [W]e used to do a lot of other things. Now we cure people and kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning…

This report makes clear that the actual "racketeer" in this matter is not the Ecuadorian villagers who have suffered so at Chevron's hands, nor Donziger and other human rights lawyers who for years have fought valiantly for their clients. Rather, it is the oil company that has refused to comply with the rule of law or fulfill its legal and moral responsibilities to the thousands of people in Ecuador that it harmed.

Given that Chevron's paid witness in the RICO case admitted perjuring himself and that Judge Kaplan's hostility toward Donziger has now been comprehensively documented, the U.S. court decisions are fading rapidly into obsolescence. They are collapsing under the weight of their own internal contradictions and the unfair trial procedure that produced them. Already, Canada's Supreme Court has unanimously rejected

Chevron's attempts to use Judge Kaplan's "facts" to shut down the judgment enforcement process. Brazil's courts also have rejected Chevron's similar request in that country.

## Chevron's Corrupt Witness: "Money Talks, But Gold Screams"

At the very heart of Chevron's RICO attack is the corrupt Chevron witness, Alberto Guerra. As indicated, Chevron paid Guerra at least $2 million in cash and benefits and coached him for weeks before he testified. There is little question but that even today, years since he has performed any services for Chevron, Guerra remains a "kept man," paid significant sums of money by the company merely to keep quiet about the falsity and illegal procurement of his testimony. The original contract—promising value that has reached in excess of $2 million—constituted an enormous windfall by any measure, but especially so given that Guerra testified that until Chevron and Kroll showed up at his door, he had no savings and was making only $500 per month. As Guerra was negotiating with Chevron, he was caught on tape saying, "Money talks, but gold screams." Chevron's exorbitant payments to Guerra also violated various federal laws, as we explain below.

Guerra's resulting testimony provided Judge Kaplan the basis for two of his erroneous findings that are central to the company's public relations and legal campaigns to cover its tracks in Ecuador. First, based on Guerra's testimony, Judge Kaplan erroneously found that Donziger bribed the trial judge. Second, Judge Kaplan erroneously found that lawyers for the villagers led by Donziger arranged for the "ghostwriting" of the trial court judgment. It is now clear that Guerra lied on the stand about both the bribery and ghostwriting allegations—lies definitively proven after the close of the RICO case by scientific forensic analysis and admissions under oath from the witness himself in a separate arbitration proceeding. Given the evidence of corruption, subterfuge, and fabrication of evidence by Chevron lawyers and the company's star witness, it is truly shocking that U.S. federal courts have been willing to turn a blind eye to it all in their rulings in the *Chevron v. Donziger* cases.

It is clear from the factual responses below that the villagers—who live in roughly 80 indigenous and farmer communities in Ecuador's rainforest—not only have been victimized for decades by Chevron's dumping of toxic oil waste onto their ancestral lands, but have been doubly victimized by the fact Judge Kaplan and the Second Circuit allowed Chevron to use the enormous power of the federal judiciary to defame their accountability campaign and immunize a "favorite son" multinational from the consequences of its crimes and fraud. Apart from the many flagrant problems with Judge Kaplan's fact "findings" that are explained in detail below, there are numerous *legal* reasons why the Second Circuit erred in its affirmance of his flawed ruling. These errors—which demonstrate that the RICO case had no legal basis -- have been amply documented in legal briefs (available here and here) and in other materials where Chevron's various claims have been rebutted by Donziger and others. (See this detailed article in a legal publication and this Huffington Post article.) This Report focuses to how Judge Kaplan and the Second Circuit distorted the underlying facts of the case in order to target Donziger.

## Judge Kaplan's Favoritism And Bias

Evidence of Kaplan's disturbing and even racist comments toward the Ecuadorian villagers, his anger at the villagers for suing Chevron, his refusal to hear key evidence about Chevron's contamination and fraud, his refusal to let Donziger and others tell their story in open court, and his many perplexing and even illegal rulings were all designed to inflict maximum harm on the villagers and their judgment. The unpleasant details of Judge Kaplan's behavior during the trial have been documented at greater length elsewhere, mostly in legal briefs seeking his recusal (see here for one example). We briefly summarize some of the

problems so the reader can understand the actual context in which the false and distorted findings documented in this report were made.

Before Judge Kaplan even held an evidentiary hearing, much less a trial, he jumped on Chevron's bandwagon to turn Donziger into a "whipping boy" to distract from the company's wrongdoing. He called Donziger the "mastermind" of a litigation extortion effort against Chevron in Ecuador. He accepted Chevron's notion that the entire Ecuador case was "sham" litigation. He repeatedly characterized the villagers as the "so-called" plaintiffs, refusing to acknowledge their basic humanity. Judge Kaplan also said Donziger planned to use the case "to be the next big thing to fix the balance of payments deficit" of the United States. "I got it from the beginning," Judge Kaplan said in open court in reference to Donziger's supposed greed. (Greed is a hard label to pin on someone whose entire career has been dedicated to work on on behalf of the indigent criminal defendants and human rights victims.) At another point, Judge Kaplan called the litigation a "game" and said "the name of the game is… to persuade Chevron to come up with some money." Judge Kaplan, who amassed a personal fortune as a corporate defense lawyer before taking the bench, seemed to take offense at the very idea of impoverished indigenous nationalities collecting significant damages from a large American oil company.

## Judge Kaplan's Harassment of Donziger

In what appears to be an unprecedented move in the history of U.S. jurisprudence, Judge Kaplan ordered Donziger to turn over his entire confidential case file to Chevron that was accumulated over 17 years of litigation. Judge Kaplan based the decision on "local rule" typically referenced as a guideline for discovery practice (requiring the filing of a privilege log at the same time as a motion to quash a subpoena) and never before used to impose draconian penalties of the sort imposed on Donziger. Judge Kaplan tried to justify this move by characterizing Donziger as "some sort of PR guy" rather than a lawyer. He then forced Donziger to sit for a record-breaking 19 days of largely harassing depositions conducted by a large team of Chevron lawyers, when the federal rules normally limit depositions to one day. Judge Kaplan's decisions essentially blew up the sacred attorney-client privilege as held by the affected communities. In the meantime, Judge Kaplan treated as ironclad the same privileges as applied to Chevron and its lawyers, thereby preventing the legal team from the villagers from obtaining the company's internal documents and creating a completely one-sided playing field in favor of Chevron from the outset. Judge Kaplan then went out of his way to defame Donziger by speculating in a written pre-trial decision (again, before any evidentiary hearing) that he might face "criminal exposure" for his work on the Ecuador case—a statement not only patently false, but also a clear effort to spook Donziger's clients and supporters into abandoning him. Judge Kaplan also encouraged Chevron to file hundreds of frivolous motions to squeeze the resources of Donziger's legal team, which ultimately caused Donziger's own lawyer to withdraw from the case and accuse Kaplan of letting it degenerate into the "Dickensian farce" described above. (For a full copy of Keker's highly unusual public condemnation of a sitting federal judge, see here.)

## Judge Kaplan's Illegal Worldwide "Injunction"

Desperate to protect Chevron and impose control over the Ecuador litigation from his Manhattan courtroom, Judge Kaplan, within mere days of the filing of the RICO case, issued an important ruling in favor of the company that was deemed illegal even by U.S. courts. Without first allowing Donziger and the villagers time to hire counsel to respond to Chevron's 150-page lawsuit and thousands of purportedly relevant exhibits, much less to present evidence, Judge Kaplan issued an unprecedented injunction against enforcement of the Ecuador judgment *anywhere in the world*. In essence, Judge Kaplan tried to dictate from his Manhattan courtroom how every judge in every country should rule regarding enforcement of the

Ecuador judgment, should such enforcement actions be filed (and none had been at the time of this ruling). Such a ruling had never before issued from any court in the history of the United States. In fact, no judge *from any country*, including judges from authoritarian and even totalitarian regimes, has ever tried to engage in such arrogant and imperious behavior from the bench. One might imagine Judge Kaplan's reaction if an Ecuador court tried to order U.S. courts to rule a certain way on an enforcement action.

## RICO Trial: The Dickensian Farce

At the subsequent RICO trial, Chevron and Judge Kaplan tried to accomplish the same thing that had already been reversed on appeal—illegally blocking enforcement of the Ecuador judgment. During the RICO proceeding, which ultimately was more a theatrical presentation choreographed by Chevron lawyers than a real trial where both sides could present evidence, Judge Kaplan denied Donziger and his clients a jury of impartial fact finders. He then refused to allow them to present evidence of Chevron's toxic dumping and fraud in Ecuador. He threatened Donziger and his team with contempt if they uttered anything about Chevron's environmental contamination in court—even though, as mentioned, the presentation of that evidence was absolutely vital for Donziger and his clients to be able to explain the context for comments found by Judge Kaplan to be part of the supposedly "extortionate" RICO conspiracy. The judge also allowed Chevron to use secret witnesses whose identities were hidden from Donziger and his clients. Finally, as mentioned, Judge Kaplan heartily accepted the false evidence from Chevron's corrupt witness Guerra about the bribe and ghostwriting that never occurred. This happened after he allowed Chevron to pay Guerra exorbitant sums of money, all in violation of federal law that prohibits payments to fact witnesses. To heap insult upon injury, it later turned out that during the trial Kaplan hid the fact he held investments in Chevron at the same time there was motions pending to recuse him for bias in favor of the oil company. To be clear, this is only a *partial summary* of the many abuses that took place in Judge Kaplan's courtroom.

## The Role of Chevron's Law Firm In Orchestrating Corruption

Chevron's main law firm in the RICO case, Gibson Dunn & Crutcher LLP, is notorious for its willingness to cross ethical lines in service of its corporate defendants. One U.S. federal court described the firm as being "permeate[d]" by a "culture [that] promote[s] obstruction, gamesmanship and flagrant disregard [for the law]."[4] Another court—the Supreme Court of Montana—was more blunt, calling Gibson Dunn's tactics outright "legal thuggery."[5] Gibson Dunn clearly brought these "skills" to bear for Chevron in the RICO case when, for example, its lawyers coached Guerra for weeks to shore up his obviously untruthful testimony. Led by Randy Mastro (who billed Chevron at $1,140 per hour) and Avi Weitzman, the Gibson Dunn team is unapologetic about offering services, as described in their own marketing materials, as "lifeboat lawyers" to "rescue" high-profile corporate clients from liability by "turning to the tables" against corporate critics through accusations of "fraud" or other wrongdoing. In fact, Gibson Dunn has a long history of bringing harassing lawsuits against persons who have targeted its deep-pocketed clients. Three times in the Ecuador case, the Gibson Dunn firm was sanctioned or criticized by judges for using litigations to harass supporters of the villagers or violate their First Amendment rights. Targets included environmental groups like Amazon Watch, bloggers, journalists, consultants, and even a documentary filmmaker.

---

[4]    E & J Gallo Winery v. Encana Energy Services, Inc., No. CV-F-03-5412, 2005 WL 6408198 (E.D. Cal. July 5, 2005).

[5]    Seltzer v. Morton, 154 P.3d 561, 608-09 (Mont. 2007).

# Detail of the 12 False or Distorted Findings by U.S. Courts

## *False Finding #1: The Plaintiffs "Ghostwrote" the Ecuador Environmental Judgment*

Apart from Judge Kaplan, Alberto Guerra might be the most important name to remember in the unfortunate saga of Chevron's RICO case. He is the admittedly corrupt witness paid by at least $2 million by Chevron on whose testimony stands the entire "ghostwriting" claim. Guerra not only admitted he lied during the RICO case about key parts of this explosive issue, but a forensic report definitely and scientifically proves he lied. In other words, Guerra's testimony about ghostwriting has been ***completely, scientifically, and indisputably debunked***. Yet, the Second Circuit endorsed the false finding about ghostwriting without even considering the evidence that destroys its entire factual predicate.

### **How Chevron Bribed A Witness To Lie**

With regard to ghostwriting, Guerra testified that Donziger oversaw an arrangement where a bribe was promised to the Ecuador trial judge in exchange being able to write the judgment. This is the central component of Chevron's RICO case. Chevron provided no other witness other than Guerra, or any other direct evidence, to corroborate his claim. A digital forensic analysis of the hard drive of the Ecuadorian trial judge's office computer showed scientifically that the judgment against Chevron was not "ghostwritten" by the plaintiffs and given to the judge on a flash drive, as Guerra claimed. Rather, the forensic analysis demonstrated that the trial judge wrote the judgment on his office computer incrementally over the course of three months and in fact saved the Word document that became the judgment more than 400 times before issuing it. Additionally, even though Guerra's credibility was already shot, he shockingly admitted in a related arbitration proceeding that he lied about key issues in his testimony in the RICO case. Equally as shocking, none of these developments—which render the Chevron/Kaplan false narrative a nullity—was even considered by the Second Circuit panel before issuing its opinion. For a discussion of the forensic report and to read the report itself, see here.

The Second Circuit's technical basis for refusing to consider this devastating new evidence about Guerra's perjury is that it came "too late" and thus was not part of the official record of the RICO case that it was reviewing. This position is nothing less than Kafkaesque, especially because Donziger's attorneys did present this new evidence to the Second Circuit in timely fashion in supplemental briefing as allowed by the federal rules. The Second Circuit unquestionably had the discretion to take this new and highly probative new evidence into account. The fact that is chose not to, despite the game-changing nature of the evidence and the enormous stakes involved—among other implications, the health and even survival of dozens of indigenous and farmer communities in the rainforest—is unconscionable. It reflects a political decision to protect Judge Kaplan (and Chevron) and join in the scripted "demoniz[ation]" of Donziger.

Much of the new evidence dismantling the false "bribery" and "ghostwriting" findings emerges from the international investment treaty arbitration dispute ("the Arbitration") between Chevron and the Republic of Ecuador. This evidence is powerfully set forth in the briefs and testimony emerging from that case, which was initiated by Chevron in 2009 as a way to create leverage to pressure Ecuador's executive branch to force a dismissal of the underlying environmental claims.[6] The evidence is also available in summaries of the same provided by Donziger's counsel, Deepak Gupta, to the Second Circuit. While the "bribery" and

---

[6]    For further context on the fundamental problems with the arbitration proceeding and how Chevron unethically tried to use it as leverage against the rainforest villagers, see this blog post.

"ghostwriting" claims are thoroughly debunked in those public materials, given their importance we summarize them below in further detail.

<u>**Background on Chevron's False Narrative**</u>

Chevron launched its retaliatory RICO litigation based on allegations of procedural irregularities in the Ecuador trial, even though those allegations already had been rejected by Ecuador's courts. But while Chevron wanted these allegations in Judge Kaplan's court, where it could expect a friendly reception, for procedural reasons it couldn't avoid also presenting them in the Ecuador trial. This soon led to trouble for Chevron because it gave Ecuadorian courts—the real authorities on what is and isn't allowed under Ecuadorian law and procedure—the chance to consider Chevron's claims and, given their lack of real basis, to reject them. In 2011, the Ecuador trial court found that there were "no legal grounds whatsoever" supporting Chevron's "fraud" claims. In 2012, an intermediate Ecuadorian appellate court concluded Chevron's allegations "go nowhere without a good dose of imagination". And in 2013, Ecuador's Supreme Court concluded in a 222-page opinion that Chevron "never demonstrated fraud" despite its "incessant harping in this regard." Chevron recognized that foreign courts that might be asked to enforce the judgment against the company's assets likely would defer to Ecuadorian courts, especially given that the company had accepted jurisdiction in Ecuador.

To deal with this obstacle, Chevron went all in with the Gibson Dunn "rescue" plan. Working with Gibson Dunn lawyer Mastro and his team, Chevron neatly manufactured explosive new allegations in service of a larger goal: to implicate the entire Ecuadorian judiciary in wrongdoing, instead of just certain aspects of how the environmental trial was conducted. The idea was to so tarnish Ecuador's judicial branch of government—which encompassed the same court system that Chevron repeatedly had praised when it was to its tactical advantage—such that no enforcing court in any jurisdiction in the world would accept the Ecuador trial court judgment, despite the overwhelming scientific evidence of the company's reckless behavior and toxic dumping on which it was based.

Chevron meticulously built its false narrative about a bribe and ghostwriting from the ground up. First, it recruited Guerra and agreed to pay him massive sums of money. It then coached him to manufacture the "bribery" and "ghostwriting" allegations that observers of the RICO case are now so familiar with. The amounts Chevron paid Guerra by any objective measure can only be described as a bribe. Chevron's goal was to use the fabricated testimony to broaden its fraud narrative from procedural complaints about the trial—all of which had been rejected by Ecuador's courts—to encompass allegations about the court itself. The company's intention was to lay down a basis to try to beat back enforcement efforts by the villagers in foreign jurisdictions. These enforcement actions were necessary given that Chevron had sold off all of its assets in Ecuador, forcing the villagers to try to collect their judgment elsewhere. Chevron officials also began to openly mock the villagers by asserting that the company would never pay any judgment that might issue. Some Chevron lawyers even taunted the villagers with the threat of a "lifetime of litigation" if they did not drop their claims.

Guerra's central lie was to claim that the Ecuadorian legal team promised a payment of $500,000 to the Ecuador trial judge to be paid when the judgment was enforced. But extensive discovery obtained by Chevron—including access to all of Donziger's hard drives and emails—produced absolutely no direct evidence to corroborate any aspect of Guerra's bribe story. There was not a single email or text message found between Guerra and any member of the legal team from the villagers related to the judgment. Guerra had told Chevron he emailed lead Ecuadorian lawyer Pablo Fajardo about the draft judgment, but Fajardo's name was never found on Guerra's email contact list and no email was exchanged between them. There was no record of any phone call between Guerra and any lawyer for the Ecuadorians. From the very

beginning, the holes in the Guerra allegations were immense and only grew larger over time. It turned out that no amount of Chevron coaching or evidence fabrication could salvage Guerra's credibility.

### Guerra's Criminal History

Guerra confessed to being a deeply corrupt individual even before Chevron's lawyers enlisted him as their paid-for star witness. As a practicing lawyer, he admitted paying clandestine bribes on at least 20 occasions before becoming a judge on the provincial court that presided over the case against Chevron. His tenure presiding over the environmental case in Ecuador, which began in 2003, lasted only seven months before a new judge took over the case as part of a normal rotation. Guerra later was kicked off the court for his corrupt behavior on another case.

Years later, as he was negotiating his deal to testify for Chevron, Guerra was caught on tape telling a company representative, "Money talks, but gold screams." Before Guerra even uttered the first word under oath in the RICO trial, his "bribe" testimony against Donziger was tainted because Chevron, in flagrant violation of the federal Anti-Gratuity Statute and established rules, paid him huge sums of money. The law bars payments to fact witnesses other than the bare minimum to cover expenses. By any objective measure, the payments and benefits Chevron bestowed on Guerra and his family constituted a bribe. Worse, it was a bribe encouraged by a judge who exploited his inherent prestige to try to frame the illegal payments as "proper" by arguing that Chevron was within its rights to operate a "private" witness protection program—again, a ruling never before seen from a U.S. court.

Chevron truly enriched Guerra, who had no savings and was making only $500 per month prior to becoming a company witness. When Chevron representatives first made contact with Guerra in Ecuador, they turned over to him $20,000 in cash out of a backpack to encourage his initial cooperation. Chevron later showered Guerra with benefits worth over $2 million: immigration to the United States, a lavish monthly salary, a house, a housing allowance, a car, health insurance, immigration lawyers for himself and five members of his family, and the payment of his income taxes.[7] When Dean Erwin Chemerinsky, a leading U.S. legal ethics scholar, heard of the arrangement, he was so outraged that he provided the Ecuadorians a legal opinion *pro bono* condemning what Chevron had done.

### Guerra's Other Credibility Problems

Apart from the illegality of paying a fact witness huge sums for testimony, Guerra lost credibility because his bribery story changed repeatedly as previous versions became discredited by new facts. In the first version of Guerra's story, he claimed that Ecuadorian trial judge Zambrano met him at the airport in the capital city of Quito and gave him a draft of the judgment on a flash drive which he then downloaded into his personal computer to be edited. When Chevron investigators searched Guerra's computer and flash drives and found no digital trace of any draft judgment, this story simply could not be corroborated. Working closely with Chevron lawyers, Guerra then changed his story to account for the absence of any digital trace of the draft judgment. Only then did he begin to claim that he met Zambrano in the remote

---

[7]   The immigration benefit—bringing not just Guerra but several members of his family to the U.S.—was of particular value because it allowed Guerra to see, for the first time in nearly a decade, his children who were living illegally in the U.S. Chevron also offered Guerra and his extended family the only feasible avenue for long-term legal status in the U.S., in the form of an asylum application. Guerra testified that the asylum applications were more important to him than the money and other benefits he received. The big picture here is that Chevron whisked a known criminal out of Ecuador (where he could have been prosecuted for bribing judges) and provided him safe harbor in the United States as part of its plan to undermine the environmental judgment. Judge Kaplan not only blessed the scheme, he encouraged it by deeming it "legal" even though no court in U.S. history had ever tolerated what was essentially a gigantic bribe offered to a witness for his testimony.

jungle town of Lago Agrio where he was given a laptop with a draft of the judgment already on it. In this version, Guerra claimed he then gave the laptop back to Zambrano, hence "explaining" the lack of evidence on his own computer to support the flash drive story. The idea that Guerra was casually "mistaken" about where he was when he was first given secret access to what would be the biggest civil judgment in Ecuador history is absurd on its face and by any objective measure completely undermines his credibility. Other outlandish contradictions and incredulities regarding Guerra and his testimony are outlined in this RICO motion for terminating sanctions against Chevron, this RICO motion to strike his testimony, and this post-trial brief (pp.31-41). All of these submissions were summarily denied or ignored by Judge Kaplan.

Indeed, while Guerra's credibility problems were patently evident at the RICO trial, since the end of that trial they have grown even worse—as inconceivable as that may seem to be for someone who essentially lost all credibility when he lied on the stand. Under a withering cross-examination in the separate arbitration proceeding between Chevron and Ecuador's government, Guerra admitted he had repeatedly perjured himself before Judge Kaplan on several critical factual issues relied on by the U.S. judge for his findings that a bribe occurred in Ecuador. These admissions, of course, further undermine Judge Kaplan's RICO decision given that the judge found the perjured testimony to be credible and the Second Circuit panel completely ignored this new evidence.

### Guerra's "Confession" of Lying During the Arbitration

The lies Guerra admitted to during the arbitration proceeding tainted core evidence in the RICO case. For example, during the RICO trial, Guerra testified that he had an agreement where he would receive 20% of the supposed "bribe" proceeds that were to be paid to Zambrano. He never produced any evidence to support this claim. During his testimony in the arbitration proceeding, Guerra admitted he made up the story: "That was my sworn statement in New York, but what I said is that, because of a circumstance, because of a situation, I mentioned 20 percent when it wasn't true, and I think that, as a gentleman, I should say the truth, and we did not discuss—I did not discuss 20 percent with Mr. Zambrano."

Consider some of Guerra's other confessions in the arbitration proceeding that strongly suggest Judge Kaplan got it wrong when he found the witness to be credible:

- Guerra admitted telling Chevron's representatives that he had the draft judgment against Chevron on his computer. But when Chevron examined his computer, there was no draft judgment. Guerra testified that Chevron representatives told him, "Had we been able to find it, we would have been able to offer you a larger amount of money."

- Guerra testified that Chevron wanted him to contact the Ecuadorian trial judge, Nicholas Zambrano, to offer him money to testify for Chevron. In our view, this was a Chevron attempt to lay the groundwork for another and even larger bribe with Zambrano that was never consummated. In the arbitration, Guerra said, "I understood from the representatives of Chevron that I would get more money once I was able to establish a connection between them and Mr. Zambrano." He also admitted that Chevron representatives warned him if that he did not deliver Zambrano, he "would be left with nothing." It turns out that Zambrano refused completely unethical entreaties from Chevron lawyer Andres Rivero that he meet with Chevron representatives to discuss "payments" for his testimony, in which Chevron no doubt planned to offer him huge sums to recant the judgment against the company.

- Testifying before Judge Kaplan, Guerra claimed he received numerous monthly payments of $1,000 from Judge Zambrano dating to 2008 to help him draft orders on other cases. This

testimony was utterly irrelevant to whether Guerra was involved with the "ghostwriting" of the judgment in the Chevron case. Yet in a bit of circular reasoning, Judge Kaplan accepted it as corroborative of that completely different allegation. Yet even here Guerra's claims fall apart. He admitted he could produce *no physical evidence* of even one such payment of $1,000. The only physical evidence of any payment to Guerra from Zambrano came after the end of the environmental case, and it was for far less than $1,000. Guerra conceded this payment "had no connection" to the Chevron case and Zambrano said it was a personal loan. Yet Judge Kaplan, in yet another display of intellectual dishonesty, relied on this testimony to supposedly "corroborate" the bogus ghostwriting finding in the Chevron case.

More details of Guerra's admitted perjuries are reviewed in this supplemental brief filed by Donziger's counsel before the Second Circuit in the appeal of the RICO decision. In another apparent swipe at Donziger and his clients, the three-judge panel ignored the submission. The panel also refused to consider any of the other problems with Guerra's false and contradictory testimony.

### Chevron's Failed "Documentary Evidence" Argument

Seeing the credibility of its star witness blow up and the Ecuador Supreme Court unanimously affirm the environmental judgment, Chevron tried yet a new tack to salvage its faltering strategy. Chevron's lawyers at Gibson Dunn began to claim they had "documentary evidence" that supposedly backed-up Guerra's claims of a bribe and ghostwriting: a hand-written "daily planner" Guerra allegedly kept that supposedly reflected meetings the witness had with Donziger and others. But this story quickly fell apart as well. Guerra's planner actually did not reflect any meetings with Donziger. In fact, Guerra claimed he "lost" his planner for the time that covered the period when he claimed to have met Donziger in Ecuador's capital city of Quito. Further, immigration records from Ecuador's government showed Donziger was not even in Ecuador during the period of time covering the supposed meeting. The credibility of Chevron's "documentary evidence" thus was completely undermined during the RICO trial. (See, e.g., here at pp.8-11 and here at pp.36-41; also this Arbitration brief at pp.132-40). Yet Judge Kaplan still relied on this documentary evidence as part of what appeared to be his frantic effort to attach a veneer of credibility to Guerra's untruthful testimony.[8]

### Another Chevron Dead End: Computer Forensic Analysis

During the arbitration proceeding and following the RICO trial, Chevron decided to double down and make yet another bet on its discredited "ghostwriting" theory. That bet also backfired against the company, only this time in even more spectacular fashion.

During the arbitration Chevron demanded that the government of Ecuador (known as the Republic of Ecuador or "ROE") produce the hard drives of the office computer of the trial judge who issued the judgment so they could be inspected. Given the almost infinite digital records and traces that working on and printing a document creates throughout a modern operating system, digital forensic experts would be able to determine once and for all whether the document that became the judgment had indeed been drafted on those computers or had been inserted via a flash drive as Chevron had claimed. The ROE allowed experts

---

[8] Even though Guerra admitted before Judge Kaplan that he had bribed judges in Ecuador as a lawyer, Judge Kaplan claimed that Guerra was "credible" based on observations of his in-court demeanor. Of course, Guerra later confessed that he had lied repeatedly in front of Judge Kaplan while Judge Kaplan was observing his in-court demeanor. The reader can come to his or her own conclusions about what this suggests about Judge Kaplan's own judgment.

from both sides to examine the judge's hard drives. The results are absolutely devastating to Chevron, Judge Kaplan, and the Second Circuit.

The ROE expert who examined the judge's hard drives, Christopher Racich, is one of the leading authorities in the world on the subject of computer forensic examination. After examining the judge's hard drives, Racich stated in his report:

> The forensic evidence demonstrates that a document on Judge Zambrano's computer that eventually became the Lago Agrio judgment (named *Providencias.docx*) was created on October 11, 2010, and was saved on Mr. Zambrano's computers at least 439 times between then and March 4, 2011 (i.e., an average of multiple saves per day) . . . Over that time period, the *Providencias* document contained increasing amounts of judgment text. And there is no evidence to suggest any version of that document was provided to Mr. Zambrano by a third party.

This hard data irredeemably destroys Guerra's story of the judgment being drafted by the plaintiffs and given to the trial judge on a flash drive. There is simply no way to square this hard data with Guerra's testimony under oath before Judge Kaplan. In Chevron's final written submission in the arbitration on this issue, ***it doesn't even try*** to rebut this new information. The company's lawyers do not even attempt to explain how the Word document that became the judgment could be on the trial judge's office computer weeks before the time Guerra testified it was given to the judge on a flash drive, just prior to its issuance.

### Chevron's Final Hail Mary: Unfiled Work Product

With Guerra's testimony dying under the weight of its own contradictions, and in the face of conclusive forensic proof that the Ecuador judgment indeed was written by Judge Zambrano, Chevron's entire narrative was in shambles. The company then put forth what can only be described as a Hail Mary claim: that the supposed "ghostwriting" can be inferred from the existence in the Ecuador trial court judgment of text allegedly drawn from internal memos prepared by lawyers for the villagers that Chevron claims were never filed with the court. Chevron calls this the "unfiled work product" theory, but it too fails to withstand serious scrutiny, as follows:

- Most instances where Chevron claims words in the judgment reflect "unfiled work product" have been ***specifically disproven***. ROE lawyers from the prestigious American law firm Winston & Strawn comprehensively reviewed video clips from dozens of field inspections of Chevron's contaminated well sites conducted by the parties under the auspices of Ecuadorian court from 2004-2007. This video review demonstrated that both Chevron lawyers and lawyers for the villagers often filed documents with the Ecuador trial court by handing them to the judge or his clerk at the site inspection. These inspections took place at well sites deep in the jungle many miles from the courthouse. Sometimes these documents made it into the "official record" while other times they did not. When they did not, it was largely due to confusion or clerical error.

- The material submitted at the inspections but not logged due to confusion or clerical error was still properly in the possession of the Court and the opposing party, which received a copy. Once submitted, the material could still be relied on by the Court in its ruling.

- An example of how Chevron and Judge Kaplan tried to manipulate this issue concerned the so-called "Fusion Memo" that related to the Chevron-Texaco merger in 2001. This memo was written by the legal team for the affected communities. The document was relied on in part by the Ecuador

trial judge in writing the portion of the judgment related to this issue. The Winston & Strawn lawyers used emails and other evidence to conclusively prove that this memo was indeed filed with the court on June 12, 2008 -- even though Chevron erroneously claimed otherwise, a view predictably endorsed by Judge Kaplan. (For detail, see this brief at ¶¶ 293-300.)

- The Winston & Strawn analysis of the Ecuador trial court record revealed similar explanations for other documents that Chevron erroneously claimed supported its "unfiled work product" allegation. (See ¶¶ 301-340 of this brief.) The Winston lawyers even found instances where the Ecuador trial court ruled on Chevron motions that were not logged into the official record. They also found instances where both parties submitted DVDs during the inspections that were not formally entered into the record. In other words, the trial court was prone to clerical errors. This is not surprising given the huge volume of material submitted—over 220,000 pages—and the fact the judge worked with only one secretary.

In sum, it is entirely unexceptional that the Ecuador trial court judgment relied on a small number of documents in the possession of both parties that were submitted to the court but not officially logged due to clerical error. The facts on this point do not in the least support the Chevron/Kaplan inference that the judgment was "ghostwritten". And they certainly do not cure the mammoth credibility problems with Chevron's corrupt witness, Guerra. Significantly, Chevron monitored the official record closely throughout the Ecuador trial and never raised any objection on this point until the company decided during the RICO matter that it could gain a strategic advantage by doing so.

## False Finding #2: Donziger Tried To Intimidate Chevron With An "Inflated" Cost Estimate

The notion put forth by Judge Kaplan that Donziger, or any lawyer, could "intimidate" Chevron into doing anything against its will is rather preposterous. This finding assumes that a solo practitioner working out of his apartment (Donziger) had the capacity to bully the nation's second-largest oil company (Chevron) into a settlement potentially worth billions of dollars even though that company had a team of no fewer than 60 law firms and 2,000 lawyers assembled for its defense. This notion fits neatly into the false and condescending narrative pushed by Chevron and Judge Kaplan that Donziger exercised voodoo-like power over persons, institutions, and events in Ecuador. With the evidence against it mounting in the Ecuador trial, Chevron strategists (led by notorious public relations hit man Sam Singer[9]) called for Donziger to be characterized as "the most powerful man in Ecuador" who was "pulling the strings" of an emerging "Banana Republic."[10] Throughout his RICO judgment, Judge Kaplan appeared to incorporate Chevron's insulting (and false) propaganda regarding Donziger's supposed power to control Ecuador's courts and executive branch. Given the long and ugly history of U.S. military and political intervention in Latin America, the Chevron posture about Donziger in our view has disturbing neo-colonialist, if not outright racist, overtones.

### David Russell's Preliminary Assessment

This Kaplan/Second Circuit finding relates to a preliminary assessment of the extent of Chevron's environmental damage in Ecuador, published in 2004 just after the trial began. The assessment was authored by David Russell, an American technical expert in oil remediation retained by counsel for the villagers.

---

[9]   *See, e.g.*, Joe Eskenazi, "Trust Me: Who Are You Gonna Believe, Sam Singer or Your Own Eyes?," SF Weekly, Aug. 22, 2014, *at* http://www.sfweekly.com/sanfrancisco/sam-singer-chevron-tatiana-the-tiger-public-relations/Content?oid=3115485

[10]  See this internal Chevron memorandum.

Russell's preliminary assessment was based on an extensive two-week field inspection of the contaminated area and rough estimates of the amounts needed for a comprehensive remediation, based on various defensible and reasonable assumptions. Russell's $6 billion clean-up estimate rocked Chevron's view of the case and infuriated company executives. At the time, the company was insisting it was not responsible for *any damages* despite the fact it had admitted to discharging into Amazon waterways billions of gallons of untreated toxic oil waste. The company also admitted to having abandoned hundreds of unlined waste pits filled with oil sludge that were visible to the naked eye; each such pit would have qualified as a Superfund site under U.S. law, according to experts for the villagers. Russell spoke extensively to the media about his preliminary assessment, which, to the great consternation of Chevron's executives, received coverage in several prominent newspapers.

Contrary to the erroneous Kaplan/Second Circuit finding, the damages amount in Russell's preliminary assessment *turned out to be low rather than inflated*. The Ecuador court, which years later had access to far more information about the extent of Chevron's contamination than Russell did in 2004, found in 2011 that the actual damages caused by Chevron were roughly $8.5 billion. To illustrate just how modest this assessment was, the oil company BP has paid out close to $50 billion in damages and fines in the United States for its far smaller and less damaging accidental spill in 2010 in the Gulf of Mexico. In any event, in the early years of the trial, Donziger and his colleagues pointed to Russell's clean-up assessment to describe publicly how much a comprehensive remediation of Chevron's damage in Ecuador might cost. Judge Kaplan and the Second Circuit "found" that by advocating in this fashion for what turned out to be a relatively low cost estimate, Donziger and the plaintiffs were trying to "extort" money from Chevron and trying to "intimidate" the company to settle the case.

We believe this finding not only is erroneous with respect to the merits of Russell's damages assessment, but also has disturbing implications for advocacy in a democratic society. Even if Russell's preliminary assessment was radically wrong based on the limited information available at the beginning of the trial (and it was not), there is absolutely nothing wrong with putting forth a cost estimate to the public, even a mistaken one. In fact, the touting of Russell's assessment by Donziger and his colleagues is speech protected by the First Amendment to the United States Constitution. But according to the Kaplan/Second Circuit logic, a party to a civil lawsuit can be prosecuted ***criminally*** for putting forth a favorable view of the damages in an early stage of litigation when typically both sides are advocating their respective positions in anticipation of settlement, which resolves the vast majority of cases. As far as we can ascertain, no court ever has ruled in this fashion in the history of the United States.

### Judge Kaplan's Double Standard

This issue is worth exploring further because it is another vivid example of the degree of intellectual dishonesty reflected in Judge Kaplan's handling of much of the RICO case. At the time of Russell's assessment, after admitting to dumping billions of gallons of toxic waste into Amazon waterways, Chevron was publicly claiming that there was "no" environmental harm in its former operations area in Ecuador and that it owed ***no money*** for clean-up. This was an outrageous claim on its face. Yet Judge Kaplan did not find that Chevron, by making this claim for litigation purposes, was attempting to "extort" Ecuadorian indigenous groups from compensation to which they were rightly entitled. To criminalize speech of this sort puts a severe chill on any advocate who might think of properly representing his or her client against powerful corporate defendants like Chevron. That said, it would have been equally inappropriate for Judge Kaplan to sanction Chevron for its claim that it owed no money at all after it caused massive harm to the people of Ecuador. Obviously, Judge Kaplan did not hold Chevron to the same standard (erroneous as it was) that he imposed on the villagers and their counsel. Again, this suggests Judge Kaplan employed a rank double standard designed to protect a corporate polluter and inflict punishment on its litigation adversaries.

It later turned out that Russell behaved in a grossly unethical fashion during the RICO trial. After being prepped by Chevron lawyers, he testified that his preliminary assessment performed years earlier – the assessment that he passionately defended to reporters at the time -- was actually based on what he called a "Scientific Wild-Assed Guess" or SWAG. It turns out that the "SWAG" characterization was concocted by Russell *after* he was terminated by Donziger for management problems related to his supervision of the technical work during the trial and *after* he started working closely with Chevron's lawyers. After he settled his outstanding issues with Donziger, Russell unethically *started offering his services to Chevron* by sending flirtatious emails to company scientist Sara McMillan -- even though he had a duty of loyalty to the villagers who had hired him. That resulted in Russell appearing in Judge Kaplan's court to trash his own scientific work by claiming the damages figure was inflated. In reality, the damages figure was not inflated and Russell ended up humiliating himself in the eyes of almost everybody but Judge Kaplan.

It would be hard to overstate how unsubstantiated the Kaplan/Second Circuit finding is on the Russell report. As part of its representation of the government of Ecuador in its arbitration with Chevron, the U.S. law firm Winston & Strawn in 2012 hired a team of respected scientists to re-assess the chemical sampling evidence presented in the Ecuador trial. These scientists spent weeks in Ecuador visiting contaminated Chevron sites that had been inspected as part of the trial and testing water and soil samples from the same locations. The sampling results completely checked out and corroborated the findings of the Ecuadorian courts with regard to Chevron's liability and damages, as described at <u>pages 80-108 of this legal brief</u>. The damages figures determined by this team of independent scientists was far higher than those in Russell's preliminary assessment, further illustrating the hollowness of Judge Kaplan's finding. It is worth repeating that three layers of courts in Ecuador, including the country's Supreme Court, found against Chevron, Judge Kaplan, and the Second Circuit on this issue.

## False Finding #3: Donziger Refused to Test for Certain Pollutants

Judge Kaplan concluded that during the Ecuador trial Donziger directed the technical team for the villagers to forego testing for the presence of certain chemicals at Chevron well sites that the judge believed could have produced evidence favorable to the company. Because he did not test for these chemicals, Judge Kaplan (with the affirmance of the Second Circuit) found that Donziger engaged in *criminal* behavior to extort a settlement from Chevron. This finding is so ludicrous that it scarcely merits a response. But we will explain it in some detail because it again helps to illustrate the extent of Kaplan's intellectual dishonesty and the Second Circuit's failure to correct the many legal and factual errors that were produced as a result.

The Chevron/Kaplan theory was that testing contaminated soils for BTEX—four harmful chemical compounds that occur naturally in crude oil—would show the presence of toxins of recent vintage such that it could only have been left by PetroEcuador, Ecuador's state oil company that took over Chevron's oil fields in 1992. According to Judge Kaplan, the evidence pointing to PetroEcuador would have helped Chevron lower its potential damages exposure. But Judge Kaplan never explained why Chevron itself could not have tested for BTEX to buttress its defense or why he believed it was Donziger's responsibility to adduce evidence to help Chevron defend against his own clients.

Dig deeper and one might note the frightening implications of what Kaplan and the Second Circuit are trying to do here. The Ecuador trial—like all trials—was an adversarial proceeding where each side is responsible for presenting its own evidence. Chevron was responsible for producing evidence favorable to its defense, while the villagers were responsible for producing evidence to prove their legal claims. Chevron had hundreds of lawyers and technicians on its payroll and was obviously capable of producing the allegedly favorable evidence through its own experts. And, in fact, Chevron did exactly this with respect to BTEX at the beginning of the trial. Judge Kaplan's idea of trying to punish—indeed, to *criminalize*—Donziger's

decision not to adduce evidence favorable to Chevron is absurd, unethical, and in our view illegal. Other than in Judge Kaplan's proceeding, we *never* have seen a court anywhere in the world try to punish a party in a civil lawsuit for not adducing evidence favorable to its adversary.

Even worse for Chevron, the Kaplan/Second Circuit "finding" does not withstand even superficial scrutiny on the merits. In reality, BTEX can survive in an anaerobic (lacking oxygen) environment for decades. Thus, the presence of BTEX inside the many oil waste pits in Ecuador abandoned by Chevron—which are often sealed with a hard cap of rubbery sludge—could just as easily be traced to the time period of Chevron's operations and thus point to the company's culpability. The BTEX values reported at the very beginning of the site inspections (when the villagers did some limited testing for BTEX) were actually helpful to prove their claims. The rationale for abandoning the BTEX test was explained by Donziger in his testimony in the RICO case: testing for the more commonly used measure of Total Petroleum Hydrocarbons (TPH) not only better captured the presence or absence of oil contamination, but was both cheaper and "more useful because it was the same measurement regulated by Ecuadorian laws and most comparative international laws." ([Donziger testimony at ¶113](#).) The decision by Donziger and his colleagues to test for TPH and not for BTEX was thus perfectly reasonable and in any event totally within their discretion.

Again, the fact Judge Kaplan assumed counsel for Ecuadorian villagers *owed him* some sort of an explanation for why years earlier they made a tactical decision about the production of evidence in a litigation in a foreign jurisdiction – a litigation that Judge Kaplan had nothing to do with – seems utterly absurd. But it again illustrates something important about Judge Kaplan: the extent of the judge's zealotry and intellectual dishonesty as he manufactured reason after phony reason to assist Chevron. It is also another illustration of just how absent the U.S. appellate judges were when asked to correct these "errors" – which actually do not appear to be errors at all, but rather intentional acts by a judge who said he "got it from the beginning" before the first scrap of Chevron's evidence was submitted.

## False Finding #4: Donziger "Falsified" an Expert Report (Calmbacher)

This Kaplan/Second Circuit "finding" refers to a report submitted by Charles Calmbacher, an American engineer. The legal team for the Ecuadorians hired Calmbacher as their court-appointed expert in the Ecuador trial. His mandate was to write two of the more than 100 evidentiary technical reports filed by the parties that documented Chevron's pollution. This voluminous body of evidence, which included more than 64,000 chemical sampling results, was used by the Ecuador trial court to find against Chevron and impose liability on the company.

Donziger and the Ecuadorians retained Calmbacher in 2004 to assess the first two of the contaminated Chevron well sites being inspected by the parties under court auspices. Calmbacher ultimately claimed to be ill and refused to complete his reports. Subsequently, Calmbacher sued Donziger for non-payment and sent a series of irate emails threatening physical violence and retaliation. For example, Calmbacher in 2005 sent this email to Donziger:

> Please simply pay up. Don't start a war. Wars have no rules and people can suffer irreparable professional, psychological and physical damage as a result. You don't want that.

Calmbacher's animus toward Donziger, his bizarre behavior generally, his refusal to complete his work, and his hot-tempered outbursts were witnessed by numerous members of the legal team for the Ecuadorians.

Years later, as it was trying to lay down the first bricks for its false narrative in the RICO case, Chevron reached out to Calmbacher and asked him to become a company witness. It used an obscure federal discovery statute to depose Calmbacher in secret near his residence in Georgia. Chevron never notified the legal team for the Ecuadorians that the deposition was taking place. Nobody was in the room except Calmbacher and Chevron's lawyers. Predictably, those lawyers urged Calmbacher to attack Donziger. Apparently still holding a grudge against Donziger after the prior dispute, Calmbacher was more than happy to oblige. He testified with no cross-examination.

Calmbacher's testimony was riddled with errors and contradictions on points large and small. Most significantly, Calmbacher lied when testified that he never authorized the plaintiffs in Ecuador to sign his reports for him given that he was out of the country. In contemporaneous emails from the time, he very specifically so authorizes. And as lawyers for the government of Ecuador have demonstrated, Calmbacher's claim that he didn't make certain conclusions about the existence of contamination is rebutted by the results of his own soil and water samples that prove extensive levels of contamination attributable to Chevron at the sites he investigated. Calmbacher's own sampling of these sites showed levels of TPH contamination more than 70 times higher than the Ecuadorian legal limit and other legally excessive levels of harmful toxins such as Chromium VI, Copper, Lead, Nickel, and Zinc. (See this brief at ¶ 468.) Chevron's own experts, examining the same sites as Calmbacher, also found massive illegal levels of contamination.

Knowing that Calmbacher's testimony was full of holes and highly vulnerable to cross-examination, company lawyers **did not produce him for the RICO trial** as a witness. Instead, the company filed as "evidence" Calmbacher's secret deposition transcript in which he had never been subject to cross-examination. Violating legal rules that bar the use of deposition testimony as evidence when a live witness is available for cross-examination, Judge Kaplan accepted the transcript as "evidence" anyway. The fake testimony from the secret deposition in which there had been no cross-examination is the **only** evidence offered in support of the Second Circuit "finding" in this section.

As the government of Ecuador summarized in its brief in the arbitration matter: "[U]nsupported allegations by a terminated consultant with both an economic interest and a demonstrated animus toward the Plaintiffs cannot establish misconduct by the Plaintiffs, especially in light of Dr. Calmbacher's multiple misrepresentations while under oath." Again, the Second Circuit rubber-stamped Chevron's and Judge Kaplan's interpretation of the untruthful Calmbacher testimony. Judge Kaplan's acceptance of the deposition transcript instead of requiring Calmbacher's cross-examination, as the rules require, is yet another example of the judge's intellectual dishonesty.

## False Finding #5: Donziger "Secretly" Paid Industry Experts for Neutral Monitoring Services

This finding against Donziger for using so-called "independent" experts to monitor the trial is grossly misleading and disconnected from the context of legal practice in Ecuador. It also contradicts the findings of three layers of courts in Ecuador, including the country's Supreme Court.

First, some background information. Expert witnesses are used frequently in litigation in the U.S. and the world over to opine about a technical issue before the court. Generally, in an adversarial system of justice, experts are paid by the party that hires them. Both parties are entitled to hire their own expert. It is standard practice for experts to opine in favor of the litigation position of the party paying them. This is how it worked in both the U.S. and Ecuador with some minor, insignificant differences.

In Ecuador, each party was allowed to nominate its own experts who were then appointed officially by the court. (In the U.S., the court must approve an expert as a witness before testimony is allowed, but the court

does not actually appoint the expert.) Consistent with these practices in both countries, experts in Ecuador (although appointed by the court) worked with the party that hired them to develop evidence consistent with their litigation position. In the "finding" on this point, both Judge Kaplan and the Second Circuit got it wrong on how experts work in Ecuador.

Judge Kaplan claimed that by paying their own experts and working closely with them, Donziger and his colleagues violated Ecuadorian law by interfering with the court's own control over these same experts. Again, Ecuador's courts—which obviously know much more than Judge Kaplan about Ecuadorian law and practice—completely rejected this view. Judge Kaplan's finding is also inconsistent with how both parties in the Ecuador trial actually treated experts. Chevron's own lawyers treated their experts in exactly the same way as Donziger did his. Yet Judge Kaplan predictably remained silent about Chevron's control over its experts while excoriating the lawyer for the villagers for exercising control over his experts.

The villagers hired the referenced experts as observers to monitor the judicial inspections to protect the right of the communities to a fair trial. Given that lawyers for the villagers had ample reason to conclude that Chevron was trying to delay the inspections process, Donziger tried to use the presence of the observers to give the court a sense that "the world was watching" such that Chevron's attempts to sabotage the trial would not be tolerated. Again, this was an entirely appropriate action consistent with long traditions of advocacy in an adversarial system of justice. In fact, any lawyer concerned about corruption in an ongoing trial would be remiss if he or she did not take measures to bring pressure to bear on the court to fulfill its duty to be a neutral arbiter.

There are two striking observations to be made about the Kaplan/Second Circuit claim that Donziger's use of these observers was "criminal" or somehow improper. First, the observers had no official role and no impact on the trial whatsoever, other than perhaps to incentivize the Ecuadorian court to do its job properly. Second, Chevron did exactly the same thing by appointing its own observers to sit in vigilance over the trial process. Yet Judge Kaplan, again employing a double standard, only decided to "punish" Donziger for engaging in this entirely appropriate activity while remaining silent about Chevron's similar behavior. Consider what Judge Kaplan ignored:

- Chevron made public "announcements" (see here and here) that it would use its own "independent international observers" to "monitor" the trial process. Again, Chevron did **exactly** the same thing as Donziger. Judge Kaplan tried to claim that Chevron's practice in this regard was proper, while Donziger's was not.

- Judge Kaplan also refused to consider other evidence that contradicts his so-called "finding" in this regard. Consider this filing by a Chevron lawyer introducing a report prepared by three experts paid by Chevron. These experts worked for Chevron for years to advocate the company's environmental positions (often despite their "serious doubts" about Chevron's advocacy), yet the Chevron lawyer called the experts "independent" and the experts repeatedly refer to themselves and their conclusions as "independent" in their reports. Yet Judge Kaplan found it to be **criminal** when Donziger also claimed experts for the villagers were "independent" when exercising their judgment.

- Another expert in the Ecuador trial put forward by Chevron was John Connor, an American environmental consultant. Connor admitted to working for Chevron for 30 years without finding the company liable for even a single dollar in damages. As a classic paid expert, Connor's role was to use the evidence to advocate for Chevron yet he was repeatedly represented by Chevron to the

Ecuador court as "independent." Again, Judge Kaplan found that when Donziger did the same in Ecuador with his experts, it was wrong; when Chevron did it, there was no problem.

In sum, neither Chevron nor Judge Kaplan could cite a single provision of Ecuadorian law that was violated in the way technical experts were used. Ecuador's courts completely rejected the Kaplan/Second Circuit finding on this point.

## False Finding #6: Donziger "Coerced" a Judge to Cancel Certain Site Inspections

This finding is yet another example of Judge Kaplan concocting a phony issue to try to harm Donziger and taint the Ecuador judgment. The rebuttal arguments can be found in great detail in Donziger's sworn testimony (¶122) and in submissions from the government of Ecuador (pages 109-112 of this brief, pages 46-51 of this Annex). We provide a brief summary here.

This issue concerns the court-supervised inspections of Chevron's contaminated oil production sites during the Ecuador trial. These inspections allowed the parties to lift water and soil samples from Chevron's former production sites and have them tested for harmful toxins. The inspections process produced most of the scientific evidence—including roughly 64,000 sampling results—that proved the case against Chevron. Each party had the right to inspect any Chevron oil production site it wanted out of the 400 or so that existed in the geographic area relevant to the claims. The court granted all of Chevron's requests for inspections, which included more than 30 of the company's former well sites and separation stations. The issue arose when the villagers—after inspecting numerous Chevron sites and finding extensive pollution at all of them—concluded *after four years of trial* that they had gathered more than enough evidence to meet their burden of proof.

To accelerate the trial process, the villagers told the court they would withdraw the remaining inspections they had requested. The villagers did not want the trial extended unnecessarily to conduct even more time-consuming and expensive field inspections that would have produced nothing but redundant evidence against Chevron. In Donziger's view, the claims of the villagers already were over-proved with multiple layers of scientific evidence adduced by both parties during the trial, corroborated by various independent third-party studies. Yet Chevron opposed the request by the villagers to cancel their own inspections. Chevron's lawyers clearly preferred for the long trial to keep going rather than have the Ecuador court take a leap toward a final resolution on the merits that the company knew was likely to be unfavorable.

It is axiomatic that a party in a civil trial has total control over what evidence it chooses to produce, or not produce. The plaintiffs clearly had the right to cancel the field inspections of oil well sites that **they had unilaterally requested**. Such a move would have had no impact whatsoever on Chevron's ability to present any evidence it wanted. Indeed, all of the inspections Chevron requested during the Ecuador trial were performed. The company had the right to put forth any other probative evidence it wanted, and in fact did so. For Judge Kaplan to "find" that the cancellation of the inspections at the request of the villagers was improper—and thereby substitute his own judgment for that of the Ecuador judge actually presiding over the trial—is just plain wrong and in our view a wholly inappropriate exercise of American judicial authority.

Judge Kaplan also expressed irritation with the fact the plaintiffs had written a complaint against the Ecuador trial judge after he initially refused to let the villagers cancel the redundant site inspections. At the time, Chevron's lawyers, intent on delaying the end of the trial, were hounding the judge to deny the request of the villagers to cancel the remainder of their previously requested inspections. Preparation of the complaint by the villagers was entirely proper. In Donziger's memoir notes, he suggests that the judge's awareness of the complaint was linked to the ultimate decision to "rule correctly" and to grant the request. Judge Kaplan found that the use of the complaint amounted to improper "coercion" when in fact it was an

example of proper advocacy against a disaffected litigant (Chevron) whose lawyers were trying to derail a trial that they knew the company was losing.

Judge Kaplan's suggestion that the Ecuadorian judge could be so easily "coerced" in this way is condescending. In Judge Kaplan's worldview, an Ecuadorian judge is presumed to be so easily cowed by the prospect of a merits-based complaint that he is somehow "coerced" into action. Feeding these kinds of prejudices about Ecuador's judicial system, both in court and in the media, was and is an explicit part of the Chevron strategy. In 2009, Chevron's lead strategist produced a [series of proposals](#) advocating that the company step up its attacks on the Ecuador judgment by way of "relentless[] use of the blogosphere," think tanks, and "elected/regulatory leaders" to push "themes" including positioning Ecuador as "the next major threat to America" and "the next Cuban missile crisis in the making".  This Chevron consultant also suggested stepping up the intensity of the demonization campaign against Donziger by characterizing him as "the most powerful man in Ecuador" who was "pulling the strings of an emerging banana republic."

Judge Kaplan bear-hugged Chevron's strategy and incorporated elements of it into his rulings. In written opinions, he variously called Donziger a "field general" and a "master mind" and suggested that enforcement of the Ecuador judgment would leave gas stations throughout the United States without fuel. He openly mocked the Ecuadorian judiciary and ruled as a matter of law that the country was incapable of providing due process to any litigant—despite the fact that Chevron has won numerous cases in Ecuadorian courts over the years. All this is so egregiously parochial and partisan that it would be laughable—if it weren't now a perspective fully endorsed by the Second Circuit's affirmance of Judge Kaplan's decision.

## False Finding #7: Donziger "Coerced" a Judge to Appoint a Certain Expert (Cabrera)

Ecuador's courts—the courts with obvious competence on the lawfulness and propriety of Ecuadorian procedure—looked carefully at Chevron's allegations on this point and rejected them. There was good reason for doing so, as we explain below.

Part of the context here was discussed above: experts on both sides were expected, just as in the United States, to cooperate with the parties that appointed them and paid them. The distinction indicated by the reference to a "'global expert" is not significant. Like other experts nominated by the parties in the Ecuador litigation, "global" experts were requested and paid by a single party. Chevron requested, nominated, paid, met *ex parte* with, and controlled the work of its own "global" experts who quite clearly "played ball" with Chevron. The villagers wanted their own damages expert, Richard Cabrera, to work closely with them to present to the court accurate, science-based information documenting Chevron's extensive pollution. This is exactly what they did, and it was found by Ecuador's courts to be entirely proper.

Further, a close reading of the Second Circuit decision shows the court made a sloppy mistake. It reveals that the referenced "play ball" quote was not used by Donziger in reference to Cabrera, as the Second Circuit claims.  Rather, it was used in reference to another potential expert who never worked on the case.

## False Finding #8: Donziger "Secretly" Paid Cabrera

Judge Kaplan and the Second Circuit claim that paying Cabrera is somehow suggestive of wrongdoing. This is not true, as affirmed by the courts of Ecuador. Both parties in the Ecuador trial paid their own experts without disclosing the amounts or the means to the other party. This was an open practice and there was nothing "secret" about it as Judge Kaplan and the appellate court tried to claim.  All payments to Cabrera by the legal team for the villagers were entirely proper.

More to the point, the issue of the Cabrera report is legally moot. The Ecuador trial and appellate courts did not consider the report when ruling given the constant drumbeat of Chevron complaints, combined with the

fact there was ample other evidence that pointed to the company's guilt. The fact that Judge Kaplan and the Second Circuit continue to focus on this one technical report out of the 106 such evidentiary reports submitted by the parties during the trial again illustrates their desire to find anything possible to taint the Ecuador judgment, even if it means using a document that is largely irrelevant.

Again, the "secret" payment issue regarding Cabrera was manufactured by Chevron to try to make an innocent act seem sinister. Having unilaterally requested his services, the plaintiffs were legally obligated by the Ecuador court to pay Cabrera. Those payments were made via checks or wire transfers, just as Chevron paid its experts. There was nothing sinister about it.

## *False Finding #9: Donziger "Controlled" Cabrera's Work While Denying Involvement*

This finding again reflects what appears to be a profound misreading by Judge Kaplan of Ecuadorian law and procedure.

This issue can best be understood by the context regarding expert witnesses described above: the Cabrera global damages report was unilaterally requested by the plaintiffs. Cabrera was paid by the plaintiffs as required by Ecuadorian law. The plaintiffs also were involved in the preparation and submission of the work given that Cabrera was their expert, not Chevron's. Indeed, as Donziger noted in his sworn testimony, during the trial in Ecuador Chevron agreed with this non-controversial proposition. In fact, Chevron proposed that its primary paid expert in the Ecuador litigation (John Connor) be allowed to do the same work as Cabrera. This reflected Chevron's own agreement with Donziger that the nature of the appointment was for a party-controlled expert to do the work.

Donziger also testified that although the plaintiffs worked extensively with Cabrera, the practice was to prepare work within parameters he had indicated were acceptable. Ultimately, Cabrera had final say over the work product. The fact that much of the Cabrera report was drafted by a highly reputable American environmental firm, Stratus, fundamentally speaks to the scientific credibility undergirding the report, not to anything improper. Donziger and the lawyers for the villagers did not "control" the work of Cabrera any more than Chevron and its consultants "controlled" the work of the company's paid experts.

The trial court in Ecuador considered the company's arguments on this very point and strongly disagreed with Kaplan and the Second Circuit. That court stated:

> [A] review of the case file shows that there have been no defects in the appointment of expert Cabrera, or in the delivery of his report. There are no legal grounds whatsoever for quashing either his appointment or his expert report. It should be stressed that this issue has been resolved on several prior occasions, and no new evidence has been submitted that would suggest the existence of any grounds for quashing that appointment or expert opinion.

On appeal in Ecuador, a panel of three judges—the impartiality of whom Chevron has never had grounds to challenge—affirmed that Chevron's allegations about Cabrera "go nowhere without a good dose of imagination." In 2013, Ecuador's highest court concluded, in a 222-page opinion as follows:

> It suffices to point out that the company never demonstrated fraud, which it has been claiming without any legal support. We reiterate that it has not proven any omission or violation of procedure that would give rise to the nullity sought. The appellant's incessant harping in this regard departs from procedural good faith.

At the same time, the Ecuador trial court recognized that Chevron's strategy of manufacturing so-called "improprieties" regarding Cabrera could amount to a fig-leaf that the company might use to justify not complying with a final judgment. As mentioned, the Ecuador trial court at Chevron's request struck the Cabrera report entirely given that the court had roughly the same scientific sampling information from the other expert evidentiary reports submitted by the parties. The court later emphasized that the Cabrera report "had NO bearing on the decision." Again, the trial court observed there was voluminous other evidence in the record, apart from the Cabrera report, to justify the imposition of liability and damages on Chevron.

Although the decision to strike Cabrera's report put the villagers at an extreme disadvantage, Ecuador's Supreme Court confirmed the approach on a final appeal. In a unanimous opinion, that court confirmed that the trial judgment "did not take [Cabrera] into account" and noted that Chevron had never even "indicate[d] which law [it thought was] violated" by the Cabrera process. In no normal world would this decision seem remotely unusual or problematic. But without the Cabrera issue, Chevron's efforts to taint Donziger and the Ecuador judgment quickly run out of steam. So in addition to trying to bolster its case by paying for Guerra's false testimony about a bribe that never occurred, Chevron has desperately sought to keep the Cabrera issue alive in the foreign courts where the villagers are targeting Chevron assets to enforce the Ecuador judgment.

Chevron later tried to argue that the Ecuador trial court actually relied on parts of the Cabrera report even though it claimed to have disregarded it. Chevron pointed to small parts of the judgment that it asserted derived from Cabrera's work. But each of Chevron's cited passages was shown at trial to have a basis wholly independent of the Cabrera report. The Second Circuit, again without independent analysis, adopted Judge Kaplan's pro-Chevron view on this point. The degree of condescension and insult to foreign judicial officers required for this move is just staggering.

Chevron presented its complaint about Cabrera repeatedly before the only courts competent to address the issue – those in its preferred forum of Ecuador. Those courts repeatedly rejected Chevron's arguments. In the end, the Cabrera report amounted to a small and unsubstantiated due process complaint by a disaffected litigant. Chevron's arguments were considered and rejected by the trial court and all layers of appeal in Ecuador. The Second Circuit's continued effort to try to override a foreign court judgment on this point is highly inappropriate.

## False Finding #10: A Consulting Expert—Stratus—Wrote the Cabrera Report

This claim is another Second Circuit "finding" unmoored from the context of Ecuadorian law. First, it is true that the prominent American environmental consulting firm Stratus drafted the bulk of Cabrera's report. Second, there was absolutely nothing wrong with this, as confirmed by three layers of courts in Ecuador. Third, it doesn't matter given that Ecuador's trial court disregarded Cabrera's report anyway.

Stratus played a critically important role in advising the villagers on how to gather and interpret scientific data derived from the judicial inspections. Recognizing the vital role Stratus played in marshaling the soil and water sampling results and other scientific evidence for the villagers, Chevron wanted to drive the company off the case. As part of its plan, Chevron named Stratus as a defendant (along with Donziger and the villagers) in the RICO case alleging that the company's role in helping to draft the Cabrera report was part of the supposed "fraud". But Chevron went further to try to pressure Stratus, even employing a form of blackmail. A Chevron official wrote a series of vicious and deceptive letters to clients of Stratus falsely claiming that the company had committed "fraud" in Ecuador and therefore should be terminated. Stratus claimed these letters constituted illegal "tortious interference" with its business because in fact there was no judicial finding at the time that any fraud had occurred.

The Chevron lawsuit against Stratus –also before Judge Kaplan -- was in our view designed to blackmail the company into abandoning the villagers. As detailed in Stratus' counterclaims against Chevron, Chevron threatened Stratus and its professionals for years with its intimidation strategy. Chevron even intervened in an insurance dispute to make sure Stratus would have to bear the full cost of defending the litigation rather than have those costs paid by its insurer. Under extreme financial stress and needing to save the jobs of its 75 employees, Stratus ultimately caved to the pressure generated by Chevron and Judge Kaplan and agreed to "disavow" the Cabrera report in exchange for Chevron agreeing to drop its lawsuit. The company survived, but Chevron's legal goon squad was able to claim a valuable scalp from the team of the villagers.

Chevron later promised that Douglas Beltman and Ann Maest, scientists at Stratus who played leading roles in drafting the Cabrera report, would testify for the company in the RICO proceeding. But as with the discredited Chevron witness Calmbacher, Chevron's lawyers never called Beltman and Maest as witnesses—no doubt because in sworn deposition testimony prior to trial they recounted details of the overwhelming evidence proving Chevron's responsibility for the devastating environmental contamination in Ecuador.

Contrary to the Kaplan/Second Circuit finding, Stratus did nothing wrong in Ecuador. Chevron did something very wrong in blackmailing Stratus. And Judge Kaplan and the Second Circuit did something terribly wrong in blessing Chevron's use of our civil justice system as a weapon of blackmail against a small company that had produced hard evidence of the company's environmental crimes.

## False Finding #11: Stratus "Fabricated" Objections to the Cabrera Report

This claim once again reflects Judge Kaplan's apparent disdain for Ecuadorian law. It was also a clear attempt to steamroll Ecuador's courts.

As mentioned above, the Cabrera issue was manufactured by Chevron and in any event is moot under Ecuadorian law. Chevron and the villagers helped to draft reports for their own nominated "experts" to review and use, including in the case of Cabrera. Objections filed regarding Cabrera's report were indeed prepared by Stratus and were not "fabricated"—they were real, grounded in science, and reflected concerns the villagers had about several discrete shortcomings in some of the material submitted. Chevron filed objections to the same report on various other grounds.

To be clear, Chevron *never produced evidence* showing that any practice involving Cabrera violated Ecuadorian law. Both parties worked closely with their experts, as happens in courts throughout the world. Actual authorities on Ecuadorian law who have examined this issue, most notably Ecuador's courts, have concluded that no law was violated regarding the Cabrera process.

## False Finding #12: Donziger Hired New Consultants To "Cleanse" the Cabrera Report

This finding uses the word "cleanse" to unfairly try to taint the Cabrera report. There was no need to "cleanse" the Cabrera report given that it was grounded in scientific data, prepared consistent with Ecuadorian law, and was an entirely defensible assessment of Chevron's dumping billions of gallons of toxic waste onto indigenous ancestral lands. The word "cleanse" was invented by Chevron to imply there was some problem with Cabrera's work. Like almost all of Chevron's arguments, it was enthusiastically adopted by Judge Kaplan and then wielded as a sword by the company to try to poke at the validity of the Ecuador judgment.

The only "new" fact here is that the Ecuador trial court—to deal with Chevron's incessant and unsubstantiated complaints about Cabrera—requested in 2010 that both parties submit new damages assessments. These were supplemental reports prepared at the request of the court. Again, this request was

an eminently practical step to deal with Chevron's complaints. Chevron, per its practice of denying responsibility for its pollution, refused to submit a supplemental damages assessment. The plaintiffs did submit additional damages assessments prepared by several prominent U.S. technical experts. The submission of these reports infuriated Chevron because they took the focus off of Cabrera's report, on which Chevron had staked a huge investment as part of its public relations attack campaign.

The Ecuador trial court ultimately found that once it had made its liability finding against Chevron, it could reach specific damages figures by relying on per unit clean-up cost figures contained in reports by Chevron's own experts that were submitted during the trial. It thus based its damages numbers on neither Cabrera nor the supplemental experts submitted by the plaintiffs.

Chevron can have no legitimate objection to this pragmatic approach. Instead, it attacks with cheap rhetoric. In fact, evidence is used routinely in just this manner in trials the world over. The rhetoric means nothing. Judge Kaplan's embrace of Chevron's rhetoric-only attack is once again revealing of its approach to the case.

## The Result: Absurd Legal Determinations In Kaplan's RICO Ruling

Given how the RICO case played out, it should come as no surprise that Judge Kaplan ruled exactly how Donziger and his lawyer had predicted. Judge Kaplan found that Donziger and his clients were "racketeers" who tried to use the environmental litigation in Ecuador to "extort" money from Chevron—the same company that admitted to dumping billions of gallons of toxic waste into the rainforest, decimating five indigenous nationalities and causing a massive outbreak of cancer. As explained herein, Judge Kaplan did this by accepting false evidence from Chevron, by distorting and misinterpreting Ecuadorian law and procedure, by denying a jury and other due process protections to the defendants, and by consciously tilting the scales of justice to favor Chevron. Donziger's far stronger claims against Chevron for its racketeering in Ecuador, put forth in this stunning lawsuit against the company, was held in abeyance by Judge Kaplan for a full year—thus denying Donziger almost any meaningful discovery of Chevron—before it was denied for no legitimate reason. In so doing, Judge Kaplan shut down the ability of the villagers and their counsel to present the real truth of what Chevron did in Ecuador in open court.

Judge Kaplan also manipulated the case to lower the standard of proof from "beyond a reasonable doubt" to the civil standard of "more probable than not" even though Chevron was putting forth allegations of felonious criminal misconduct against Donziger. In all criminal cases involving felonies, the accused is entitled to a jury of impartial fact finders. But in Judge Kaplan's world, Donziger was denied a jury so the judge could decide the case alone. What resulted from Judge Kaplan's RICO theatrics is the very antithesis of justice. Consider the extent to which Judge Kaplan used tortured and dishonest reasoning to try to harm Donziger's reputation by supposedly finding him "guilty" without a jury of the following predicate felony offenses:

### Fraud

The central finding in the RICO case was that Donziger committed "fraud" by bribing the Ecuador trial judge. But there was no bribe. That finding was based on testimony from Chevron's admittedly corrupt witness Guerra, who admitted he lied repeatedly on the stand and who was paid at least $2 million in cash and other benefits by the company. The reality is the reverse: Chevron committed "fraud" and engaged in racketeering by bribing Guerra to frame Donziger and his clients. Chevron, Guerra, and company lawyers were engaged in or connected to the real racketeering conspiracy.

Our view is that Judge Kaplan allowed his public courtroom, the operation of which is funded by taxpayer dollars, to be taken over and used by a private oil company to create a false record of wrongdoing to try to evade a legitimate environmental liability.

## Extortion

Although it is almost inconceivable, Judge Kaplan also found that Donziger engaged in the "extortion" of Chevron by publishing David Russell's preliminary $6 billion damages assessment at the beginning of the trial. (See the discussion above starting at page 17.) Judge Kaplan found that Donziger was trying to use the damages assessment to pressure Chevron to settle the case. Of course, the very idea behind almost any legitimate civil lawsuit is to pressure the defendant to settle the case as quickly as possible. It turns out the damages figure prepared by Russell was *low* compared to the actual damages caused by Chevron as later found by three layers of courts in Ecuador and other third-parties. But Judge Kaplan insisted with no reasonable basis that the figure was *inflated*, and that Donziger used the inflated figure to improperly pressure Chevron. In any event, a lawyer publishing a damages assessment during a trial – even one  that is incorrect -- is certainly not improper, and it is definitely not extortion.

## Wire fraud

Judge Kaplan found Donziger guilty of "wire fraud" because he used telephone and email to communicate with the legal team litigating the case in Ecuador. This claim was entirely derivative of the false "fraud" finding mentioned above.

## Money laundering

Judge Kaplan found Donziger guilty of "money laundering" based on transfers of funds from his law firm in New York to pay case expenses in Ecuador. Again, this claim is entirely derivative of the false "fraud" finding described above.

## Obstruction of justice

Judge Kaplan concluded that Donziger engaged in "obstruction of justice" because of his involvement in the preparation of a sworn declaration that was submitted to U.S. courts by Ecuadorian lawyer Pablo Fajardo concerning the practice of expert witnesses in Ecuador. Fajardo's view in the affidavit was entirely consistent with Ecuadorian law and practice as affirmed by various Ecuador law experts and confirmed by the country's Supreme Court. But Fajardo's view did not comport with Kaplan's subjective view of how the law of Ecuador regarding experts should operate. There was nothing in the Fajardo declaration that was false, and the idea that filing an affidavit of this nature constituted obstruction of justice is preposterous. Donziger did not draft or sign the affidavit – he simply reviewed it with Fajardo prior to his signing to ensure accuracy.

## Witness tampering

In another major stretch that again reflects his intellectual dishonesty, Judge Kaplan found that Donziger engaged in "witness tampering" by suggesting minor changes to a proposed sworn declaration by an expert his team had hired, Mark Quarles. Not only is this standard practice – a lawyer suggesting changes to a draft affidavit from his own expert -- but Quarles cordially rejected all of Donziger's suggested changes, preferring instead to use his own language.  Quarles never

testified he felt pressured by Donziger and the affidavit was submitted as Quarles wrote it. By no possible stretch can this be considered witness tampering.

### Travel Act

Finally, Judge Kaplan found Donziger violated a federal criminal statute called the Travel Act by causing funds to be sent to Ecuador to pay an expert witness for the villagers, Richard Cabrera. The Travel Act forbids the use of the U.S. mail, or interstate or foreign travel, for the purpose of engaging in certain "criminal" acts. Thus, in Judge Kaplan's view, Donziger committed a felony offense simply by traveling to Ecuador and wiring funds into the country to pay case expenses. This supposed felony "violation" is entirely derivative of the so-called "fraud" that never occurred, as explained throughout this report.

## Kaplan's Final Act of Dishonesty: Inventing a Claim

Judge Kaplan seemed to implicitly acknowledge the many legal problems with his unprecedented RICO decision by doing something in his chambers after the trial that can only be described as underhanded in the extreme. Out of sight of the parties, he effectively added to Chevron's case a claim under an archaic and defunct legal doctrine that was used a handful of times in the nineteenth century to "set aside" foreign judgments on the basis of "fraud" outside the context of an enforcement action. The doctrine was not just old: it had been effectively repealed and replaced by the statutory framework for enforcement of foreign judgments (and grounds for resisting the same) implemented by New York and every other U.S. state during the twentieth century. So there was a reason Chevron's army of lawyers, who put everything else plus the kitchen sink into their complaint, either didn't think of it or didn't dare propose it. But Judge Kaplan added it, and of course found it to provide a separate non-RICO ground for giving Chevron victory in the case and the relief it wanted. The motivation was clear: By inserting this claim in his decision after the trial ended, Judge Kaplan gave Chevron (and himself) a sort of insurance policy during the appellate process. If the appellate court could not accept the multiple inventions and distortions of law that Judge Kaplan had to employ to keep Chevron's RICO claims alive, it still might let Kaplan's decision survive on this invented claim.

## Conclusion

If in fact there was any real evidence to support the explosive allegations of criminal misconduct leveled by Chevron, then Donziger and his colleagues almost certainly would have been prosecuted in criminal court where the full panoply of due process protections, including a jury, would have been available. There's a reason this never happened, despite strenuous efforts by Chevron's politically-connected legal team to enlist federal prosecutorial authorities to target Donziger. Any federal prosecutor engaging in even a cursory review of Chevron's bogus bribe and ghostwriting "evidence" will quickly see that it is a house of cards that no reasonable fact finder would ever accept. Judge Kaplan clearly knew this as well, which is why he refused to seat a jury as Chevron pursued its Plan B civil racketeering case in his court. In fact, it is clear that the *only way* Chevron could have obtained any judicial opinion endorsing its fake narrative was through a historically unprecedented trial orchestrated by a solitary judge who in advance signaled to the company that he would ensure the outcome it sought. That the resulting opinion was obtained via a proceeding in the opinion of many that was actually a Dickensian farce matters little to Chevron, which is trying to leverage Judge Kaplan's endorsement of its false evidence to throw up roadblocks to judgment enforcement actions filed by the villagers around the world.

It is now clear that the filing the RICO case was part of Chevron's own fraud to cover its tracks for losing a major litigation to indigenous groups in its preferred forum of Ecuador. If indeed Chevron representatives fabricated evidence and presented it to Judge Kaplan to try to frame its adversaries, including the very lawyers who won a judgment against the company, then Chevron and all officials responsible for this outrageous conduct might themselves be appropriately subject to criminal prosecution.

# EXHIBIT 2

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4    C.A. No. 11 Civ. 0691 (LAK)

5   ----------------------------------x

    CHEVRON CORPORATION,

6

              Plaintiff,

7

8

         - against -

9

10

    STEVEN DONZIGER, et al.,

11

              Defendants.

12  ----------------------------------x

                  June 25, 2018

13                10:07 a.m.

14

15       Videotaped Deposition of STEVEN

16  DONZIGER, taken by Plaintiff, pursuant to

17  Order, held at the offices of Gibson Dunn &

18  Crutcher LLP, 200 Park Avenue, New York,

19  New York, before Todd DeSimone, a

20  Registered Professional Reporter and Notary

21  Public of the State of New York.

22

23

24

25

```
 1
 2   A P P E A R A N C E S :
 3   GIBSON DUNN & CRUTCHER LLP
     200 Park Avenue
 4   New York, New York 10166
             Attorneys for Plaintiff
 5   BY:     ANDREA E. NEUMAN, ESQ.
                 aneuman@gibsondunn.com
 6               ANNE CHAMPION, ESQ.
                 achampion@gibsondunn.com
 7               ALEJANDRO A. HERRERA, ESQ.
                 aherrera@gibsondunn.com
 8
 9
10   STERN KILCULLEN & RUFOLO, LLC
     325 Columbia Turnpike
11   Florham Park, New Jersey 07932
             Attorneys for Plaintiff
12   BY:     HERBERT J. STERN, ESQ.
                 hstern@sgklaw.com
13               JOEL M. SILVERSTEIN, ESQ.
                 jsilverstein@sgklaw.com
14
15
16
17
     ALSO PRESENT:
18      ANDRES R. ROMERO-DELMASTRO, ESQ., Chevron
        Corporation
19
        CHRISTOPHER HANLON, Videographer
20
21
22
23
24
25
```

1              DONZIGER

2              THE VIDEOGRAPHER: Good morning.

3    We are going on the record at 10:07 a.m. on

4    June 25th, 2018.  Please note that the

5    microphones are sensitive and may pick up

6    whispering, private conversations and

7    cellular interference.  Please turn off all

8    cell phones or place them away from the

9    microphones as they can interfere with the

10   deposition audio.  Audio and video

11   recording will continue to take place

12   unless all parties agree to go off the

13   record.

14              This is media unit number one

15   of the video-recorded deposition of

16   Mr. Steven Donziger taken in the matter of

17   Chevron Corporation v. Donziger, et al,

18   filed in the U.S. District Court, Southern

19   District of New York, Docket 11 Civ. 0691.

20              This deposition is being held

21   today at Gibson Dunn & Crutcher located at

22   200 Park Avenue, New York, New York.  My

23   name is Christopher Hanlon.  I'm from

24   Veritext.  I'm the videographer today.  Our

25   court reporter is Todd DeSimone also from

1                    DONZIGER
2    Veritext.  I am not related to any party in
3    this action nor am I financially interested
4    in the outcome.
5              At this time I would ask
6    counsel to please state your appearances
7    for the record.
8              MS. NEUMAN:  Andrea Neuman,
9    Gibson Dunn & Crutcher, for Chevron.
10             MS. CHAMPION:  Anne Champion
11   from Gibson Dunn for Chevron Corporation.
12             MR. HERRERA:  Alejandro Herrera
13   from Gibson Dunn for Chevron Corporation.
14             MR. STERN:  Herbert Stern,
15   Stern Kilcullen & Rufolo, for Chevron.
16             MR. SILVERSTEIN:  And Joel
17   Silverstein, also from Stern Kilcullen &
18   Rufolo, for Chevron.
19             THE VIDEOGRAPHER:  Thank you.
20   At this time our court reporter can swear
21   in our witness and we can proceed.
22        *    *    *
23   S T E V E N   D O N Z I G E R,
24   called as a witness, having been first duly
25   sworn, was examined and testified

```
 1                    DONZIGER
 2   as follows:
 3   EXAMINATION BY MS. NEUMAN:
 4        Q.    Good morning, Mr. Donziger.
 5        A.    I think there is one individual
 6   who didn't state his name for the record.
 7                MR. ROMERO-DELMASTRO:  I'm
 8   already on the record.  Andres Romero for
 9   Chevron Corporation.
10                THE VIDEOGRAPHER:  Thank you,
11   sir.  Thank you, Mr. Donziger
12        A.    Can I just get a clarification
13   from counsel, is this deposition being
14   live-streamed?  Are people watching this
15   deposition over the internet?  Are there
16   other lawyers or people watching this
17   deposition?
18        Q.    In another room.  I don't know
19   that there is anybody in there.
20        A.    There is another room?  This
21   firm?
22        Q.    Yes.
23        A.    Is it being live-streamed back
24   to Chevron headquarters?
25        Q.    No.
```

1                    DONZIGER

2         A.      Okay.

3         Q.      Mr. Donziger, you have been

4    deposed before, so you understand the rules

5    of a deposition?

6         A.      Yes.

7         Q.      Are you on any medication that

8    would prevent you from testifying

9    truthfully today?

10        A.      No.

11        Q.      Is there anything else that

12   would interfere with your ability to

13   testify truthfully today?

14        A.      No.

15        Q.      I'm going to hand you a

16   document previously marked as Plaintiff's

17   Exhibit 5302.

18                (Plaintiff's Exhibit 5302

19   marked for identification.)

20        Q.      This is the Court's order which

21   is Docket No. 1875, was entered in March of

22   2014.  You are familiar with this order?

23        A.      Yes.

24        Q.      I'm going to direct your

25   attention to the language on page 2.  It

1                    DONZIGER

2    starts on page 1.  "The Court hereby

3    imposes a constructive trust for the

4    benefit of Chevron on all property, whether

5    personal or real, tangible or intangible,

6    vested or contingent, that Donziger has

7    received or hereafter may receive, directly

8    or indirectly, or to which Donziger now

9    has, or hereafter obtains any right, title,

10   or interest, directly or indirectly, that

11   is traceable to the Judgment or the

12   enforcement of the Judgment anywhere in the

13   world."

14              Do you see that?

15      A.      Yes.

16      Q.      What is your understanding of

17   the language traceable to the enforcement

18   of the Judgment?

19      A.      Well, look, I am going to

20   oppose the question on these grounds:  I

21   have made my position clear in filings with

22   the Court.  This issue is before the Court

23   for a resolution.

24              There is a dispute that I don't

25   think is factual, as I made clear in my

1                    DONZIGER
2    filings, and I made my position clear in
3    what's currently before Judge Kaplan and he
4    has yet to rule.  That's specifically the
5    motion for a declaratory judgment.  So
6    there is nothing more to add to that.
7         Q.    Mr. Donziger, we have a
8    contempt hearing related to this order
9    coming up this week, as you know.
10        A.    Yes.
11        Q.    And we are entitled to explore
12   what you claim your understanding of the
13   order which you are -- which is at issue in
14   that hearing.  So I'm going to ask the
15   question again.  If you are refusing to
16   answer, just say "I refuse to answer" and I
17   will move on.
18        A.    With all due respect, I don't
19   really see that as part of the scope of
20   this deposition.  I mean, this deposition
21   is about --
22        Q.    That's fine.  When I ask the
23   question that you view as not part of the
24   scope, just so we can move it along, say "I
25   refuse to answer based on," and you could

```
 1                    DONZIGER
 2   just say scope --
 3        A.      So you are telling me --
 4        Q.      -- or privilege.
 5        A.      You are telling me how to
 6   represent myself in response to your
 7   questions?  Listen --
 8        Q.      I'm just suggesting an
 9   efficient mechanism.
10        A.      Hold on.  Hold on.  I will try
11   to abide by that, okay?  I believe that is
12   beyond the scope.
13               I will also say this in an
14   effort to move things along as well:  You
15   know, this is a complicated position for me
16   because I am a witness and a lawyer at the
17   same time.  I am representing myself.  So
18   please take that into account.  You know, I
19   am going to do my best to answer the
20   relevant questions that call for
21   non-privileged information or information
22   that there is no grounds to withhold at
23   this point.  So I'm with you.  So I look
24   forward to your next question.
25        Q.      So you declined to answer or
```

1                      DONZIGER

2    provide your understanding of what the

3    language in the Court's order related to

4    traceable to enforcement of the Judgment

5    means, correct?

6         A.    Look, no, I don't decline.  I

7    have already stated that on the record.  I

8    argued it on May 8th at the hearing.  There

9    is a whole --

10        Q.    Mr. Donziger, I'm just

11   interested in whether you are declining

12   today while you are under oath as a

13   witness.

14        A.    I have made my position clear

15   on that legal issue already, and I am not

16   going to go any further on that issue

17   today.

18        Q.    And what's your understanding

19   of the phrase -- the disjunctive phrase

20   "traceable to the Judgment" as opposed to

21   "enforcement of the Judgment" as used in

22   Exhibit 5302?

23        A.    Look, I have made it very clear

24   that this document is not in my view the

25   governing document of this issue.  There

1                    DONZIGER

2    was a subsequent order by Judge Kaplan on

3    April 25th.

4        Q.    Mr. Donziger, I understand your

5    legal position.  I'm asking your factual

6    interpretation of the language.  If you

7    refuse to give it --

8        A.    Listen, this is a legal issue

9    in my view, okay?  It is currently teed up

10   for decision.  I have more than amply

11   explained my position on this issue,

12   specifically in reference to the April 25th

13   clarification order, which you are not

14   bringing out and you completely ignored,

15   that is Chevron completely ignored in this

16   initial motion to hold me in contempt,

17   which I believe is in bad faith, as I made

18   clear.  So there is nothing more to add.

19       Q.    Have you received any monies

20   that are traceable to the judgment since

21   March of 2014?

22       A.    I have made my position clear,

23   okay?

24       Q.    It is a factual question,

25   Mr. Donziger.  Yes or no or I decline to

1                    DONZIGER

2  answer.

3       A.     It isn't a factual question,

4  excuse me, because traceable to the

5  judgments is precisely one of the issues

6  that is teed up before Judge Kaplan.  So I

7  don't know what you mean by that.

8            What do you mean traceable to

9  the judgment?  Do you mean money collected

10 on enforcement or do you mean money raised

11 to pay litigation expenses?  Why don't you

12 tell me, what do you mean?

13      Q.     Mr. Donziger, have you

14 received, since March of 2014, any money

15 that was raised on the basis of the

16 existence of the Ecuador judgment?

17      A.     I object to the question.

18            Let me explain something.  This

19 deposition is about whether I have the

20 ability to pay an $813,000 judgment that

21 Chevron has against me, and I have

22 demonstrated that I can pay that judgment.

23 It is also about the Elliott meeting.  So

24 please limit your questions to those two

25 topics.

1               DONZIGER

2       Q.      So you refuse to answer whether

3   you have received any money raised on the

4   basis of the judgment since March of 2014?

5       A.      I have acknowledged before

6   Judge Kaplan already that I have been paid

7   out of monies raised to pay litigation

8   expenses as he expressly permitted in his

9   April 25th order.  So please stop harassing

10  me.  I mean, ask a question about the

11  Elliott meeting or about my financial

12  condition.  That's what this deposition is

13  about.

14      Q.      So the answer is yes, you have

15  received money --

16      A.      Don't tell me what the answer

17  is.  I answer the questions, you ask the

18  questions.

19      Q.      Well, not so far, but maybe we

20  will get there.

21              On how many occasions have you

22  received monies raised to pay, as you

23  describe it, litigation expenses?

24      A.      I object.  It is beyond the

25  scope of the deposition.  I have received

```
 1                    DONZIGER
 2   retainer payments, as I already expressed,
 3   consistent with the April 25th order.
 4        Q.     And pursuant to what agreement
 5   did you receive these retainer payments?
 6        A.     I have an agreement with my
 7   clients.
 8        Q.     And who do you define currently
 9   as your clients?
10        A.     My client is the FDA.
11        Q.     You stated in pleadings that
12   the UDAPT is no longer your client; is that
13   right?
14        A.     That's correct.
15        Q.     When did the UDAPT stop being
16   your client?
17        A.     Beyond the scope.
18        Q.     The 47 Lago Agrio plaintiffs
19   are no longer your client; is that right?
20        A.     Beyond the scope.
21        Q.     Just so the record is clear,
22   when you say beyond the scope, you are
23   declining to answer the question?
24        A.     I am stating that consistent
25   with court orders, this deposition is
```

1                    DONZIGER
2    limited to the Elliott Management meeting
3    and whether or not I can pay the judgment
4    Chevron has against me, and I would ask you
5    again to please limit your questions to
6    those two topics.
7        Q.    Well, I don't share your
8    interpretation, so I will ask the questions
9    and you can decline to answer if you think
10   it is appropriate.
11       A.    Why don't we -- why don't we
12   focus on what we do agree on, which is I
13   can answer questions about Elliott.  That
14   would probably be more productive.
15       Q.    Can you turn to paragraph 5 of
16   Exhibit 5302, please, which states
17   "Donziger and the LAP Representatives, and
18   each of them, is hereby further enjoined
19   and restrained from undertaking any acts to
20   monetize or profit from the Judgment, as
21   modified or amended."
22             Do you see that, sir?
23       A.    Yes.
24       Q.    Have you undertaken any acts to
25   monetize the judgment since March of 2014?

1                         DONZIGER

2          A.      Andrea, I'm not going to answer

3     these questions, okay?  This is the wrong

4     order.  There is a subsequent order, as I

5     have made clear before Judge Kaplan, okay,

6     that I believe all of my actions have been

7     consistent with that order.  They have been

8     perfectly legal, okay?  They have been

9     perfectly consistent with Judge Kaplan's

10    April 25th order and perfectly consistent,

11    respectfully, with the Second Circuit

12    decision affirming Judge Kaplan.

13         Q.      Describe for me what you mean

14    when you say all your actions in your last

15    answer.

16         A.      My actions in regard to trying

17    to generate resources for my clients to pay

18    litigation expenses.

19         Q.      Since March of 2014 have you

20    represented anybody other than the FDA in

21    connection with this matter?

22         A.      It is beyond the scope.  In

23    connection with this matter?  You mean the

24    case against Chevron?

25         Q.      The Ecuador litigation.  I'm

1                    DONZIGER

2    sorry.

3         A.      The case against Chevron?

4         Q.      The Ecuador litigation.

5         A.      I do not remember the date that

6    sort of things shifted exactly, but my

7    client is now the FDA and has been for at

8    least two years.  I don't know exactly the

9    date that it shifted.

10        Q.      Have you, since March of 2014,

11   have you raised money in connection with

12   the Ecuador litigation for any clients

13   other than the FDA?

14        A.      I'm going to decline to answer

15   on the grounds that that is First Amendment

16   protected, and I have a pending motion, as

17   you know, for a protective order on First

18   Amendment grounds and --

19        Q.      The identity of your client is

20   a First Amendment issue?

21        A.      The identity of -- well,

22   information related to how our team

23   structures itself, who the various client

24   groups are, how they function, resources,

25   is all First Amendment protected.  Right

1                    DONZIGER

2    now my client is the FDA.

3         Q.    So you are taking the position

4    that you are raising money on behalf of

5    clients but for certain time periods you

6    won't identify who those clients are, am I

7    understanding you right?

8         A.    No, my clients have always been

9    the affected communities who live in

10   Ecuador as represented by the FDA.  That's

11   happened for many years.  There was a

12   period of time, as you know, back in the

13   1990s when my clients were individuals.

14   Now they are the FDA, the beneficiary of

15   the judgment, according to the Ecuadorian

16   court order.  That's my client.

17        Q.    And is it -- I'll withdraw

18   that.

19              I'm going to hand the witness a

20   document previously marked as Exhibit 5303.

21   It is Docket No. 1985.

22              (Plaintiff's Exhibit 5303

23   marked for identification.)

24        Q.    This is a judgment entered

25   against your client, the FDA, and others.

1                    DONZIGER

2              You are familiar with this

3    document, Mr. Donziger?

4        A.    Yes.

5        Q.    Since Exhibit 5303 was entered

6    on April 23rd of 2018, have you solicited

7    any investments in the Ecuador litigation?

8        A.    My position is that this

9    default judgment does not change the

10   landscape at all for the FDA's ability to

11   raise money consistent with Judge Kaplan's

12   order from April 25th, 2014.  The specific

13   answer to your question I believe to the

14   best of my recollection is no.

15       Q.    Have you received any funds

16   raised based on the existence of the

17   Ecuador judgment since April 23rd of 2018?

18       A.    I have not.

19             I'm sorry, I need a

20   clarification of the question.  Received

21   any funds from who?

22       Q.    From anyone that were generated

23   based on investments in the Ecuador

24   judgment.

25       A.    No.

1                    DONZIGER

2        Q.      Do you currently control any

3    funds that were raised based on the

4    existence of the Ecuador judgment?

5        A.      Beyond the scope; the scope

6    being my current financial condition and

7    the Elliott meeting.  I mean, it would be

8    great if you could focus on those two areas

9    where we agree.

10       Q.      Mr. Donziger, just so we're

11   clear, there is no theory that it is only

12   your current financial condition.

13       A.      Well, that's my view of it.

14       Q.      Okay.

15       A.      I know you have a different

16   view because you want to find out

17   everything about me, okay?  Look at your

18   subpoena.  But I oppose that view.  I don't

19   think it is fair and I think it violates my

20   constitutional rights.  So that's why I

21   filed the motion for protective order

22   which, by the way, you guys have not

23   responded to.  So are you conceding that

24   motion?

25       Q.      Mr. Donziger, we are here for a

1                    DONZIGER

2   deposition.  We can have a meet and confer

3   later.

4        A.      I momentarily forgot.  I

5   apologize.

6        Q.      So you are refusing to disclose

7   whether or not you currently control funds

8   that were raised based on the existence of

9   the Ecuador judgment?

10       A.      My position --

11       Q.      It is just a yes or no.  Are

12  you currently refusing to provide that

13  information?

14       A.      I already said it is beyond the

15  scope.

16       Q.      Okay.

17       A.      It is beyond the scope of the

18  deposition.

19       Q.      And you have not solicited any

20  investments in the Ecuador judgment since

21  April of this year; did I understand that

22  correctly?

23       A.      You didn't ask that question

24  before.  You asked a different question.

25       Q.      Have you solicited any

1              DONZIGER
2  investments in the Ecuador judgment since
3  April of this year?
4       A.     I have a right to solicit in my
5  view based on Judge Kaplan's clarification
6  order -- well, I should say help my clients
7  generate the resources they need to pay
8  litigation expenses.  These are not
9  investments I'm offering based on anything
10 I own, to be very clear.  These are,
11 generally speaking, these are efforts to
12 assist the client group get the resources
13 they need to keep the litigation going.
14              Since April 23rd I don't
15 believe I have, but it is possible.  I am
16 in a constant state of trying to help my
17 clients generate resources to be sure the
18 litigation continues and ultimately Chevron
19 is held accountable for what it did in
20 Ecuador.
21      Q.     If you have solicited
22 investments in the judgment on behalf of
23 the FDA since April of this year, would you
24 have documents relating to those
25 solicitations?

1                    DONZIGER
2        A.      Not necessarily.
3        Q.      Do you know one way or the
4   other?
5        A.      Well, you know, I don't know
6   the answer to that question because, as I
7   sit here today, as I have already testified
8   I don't know of anyone that has been
9   solicited since the default judgment was
10  entered.
11       Q.      And your view is that the FDA
12  is still free to raise money on the basis
13  of the Ecuador judgment?
14       A.      Absolutely.
15       Q.      I'm going to give the witness a
16  document previously marked as Exhibit 5304.
17  This is Docket No. 1968.
18               (Plaintiff's Exhibit 5304
19  marked for identification.)
20       Q.      If you look at page 2 of this
21  order, Mr. Donziger, it is ordered that
22  "Donziger, having had actual notice of this
23  order" -- oh, I'm sorry, let me restart
24  that.
25               The order states "Ordered that

1                    DONZIGER

2   Donziger, as well as any other person or

3   entity having actual notice of this order

4   and acting at his direction or in concert

5   with him, including without limitation,

6   Katie Sullivan, Streamline Family Office,

7   Inc., Jonathan Bush and athenahealth, Inc.,

8   preserve and maintain within the United

9   States any and all documents or evidence

10  relating to the Judgment or compliance

11  therewith."

12              Do you see that, Mr. Donziger?

13      A.    Yes.

14      Q.    Do you recall when the Court

15  entered this order in March?

16      A.    Yes.

17      Q.    Have you maintained all

18  documents relevant to this action?

19      A.    Yes.

20      Q.    Have you destroyed any

21  documents?

22      A.    No.

23      Q.    Have you destroyed any

24  documents relating to any efforts to raise

25  monies related to the Ecuador judgment?

1                         DONZIGER

2        A.        Since this order was in effect?

3        Q.        Uh-huh.

4        A.        To the best of my recollection,

5    no.   That's not my practice.

6        Q.        Have you destroyed any

7    documents prior to the date of this order?

8        A.        It is possible, when this order

9    was not in effect.   Generally, it's not my

10   practice to destroy documents or e-mails.

11       Q.        So as you sit here today, you

12   don't recall destroying any documents

13   related to solicitations of judgment --

14   investments in the Ecuador judgment?

15       A.        I don't know whether I did or

16   didn't.   I can't definitively say I did

17   not.

18              You know, there is a constant

19   concern about confidentiality given what's

20   happened in the past in this case,

21   Chevron's attacks on funders, etc.   So to

22   maintain confidentiality, to protect

23   investors' identity so they won't be

24   harassed by your law firm and your client,

25   it is conceivable that I or others deleted

```
 1                    DONZIGER
 2   e-mails related to certain people.
 3        Q.     So if you want to keep
 4   information confidential from Chevron such
 5   that Chevron can't discover it during
 6   discovery --
 7        A.     That wasn't the motivation.
 8   You are putting words in my mouth.
 9        Q.     Well, do you --
10        A.     What's your question?
11        Q.     Do you destroy documents in
12   order to avoid having to produce them to
13   Chevron?
14        A.     No.
15        Q.     Have you ever destroyed a
16   document to avoid having to produce it to
17   Chevron?
18        A.     No.
19        Q.     Have you ever suggested to
20   anyone that they destroy a document to
21   avoid its production to Chevron?
22        A.     No.
23        Q.     I'm going to hand the witness a
24   document previously marked as Plaintiff's
25   Exhibit 5305.
```

1              DONZIGER

2              (Plaintiff's Exhibit 5305

3    marked for identification.)

4         Q.     Mr. Donziger, this is a

5    restraining order that Chevron served on

6    you on April 16th of 2018.

7              I'm going to direct your

8    attention to page 2 under the heading

9    Restraining Notice where the notice says

10   "Take Notice that, pursuant to CPLR

11   5222(b), which is set forth in full herein,

12   you are hereby forbidden to make or suffer

13   any sale, transfer or interference with any

14   property in which you have an interest, or

15   pay over or otherwise dispose of any debt

16   owed to you, except as provided in Section

17   5222."

18              Do you see that, sir?

19         A.     Yes.

20         Q.     Have you transferred any

21   property in which you had an interest since

22   April 16th of 2018?

23         A.     What do you mean by property?

24   Like real property?

25         Q.     Money, real property.

1                    DONZIGER
2         A.      I have continued to pay my
3    living expenses, but other than that, no.
4         Q.      And what are you including in
5    your living expenses?
6         A.      That's beyond the scope.
7         Q.      So you won't define what you
8    mean --
9         A.      Living expenses, food,
10   mortgage, maintenance, entertainment,
11   school for kid, etc.
12        Q.      Other than --
13        A.      Garage for car.
14        Q.      Other than continuing to pay
15   what you define as living expenses, have
16   you transferred any asset since April 16th
17   of 2018?
18        A.      No.
19        Q.      I'm going to hand the witness a
20   document previously marked as Plaintiff's
21   Exhibit 558.
22               Are you familiar with this
23   document, Mr. Donziger, your retainer
24   agreement from January 5th of 2011?
25        A.      Yes.

1                    DONZIGER
2        Q.    Is this agreement still
3   operative?
4        A.    I think there has been a
5   subsequent agreement.
6        Q.    What is the date of the
7   subsequent agreement?
8        A.    I don't know, but it was after
9   this date.
10       Q.    Do you have a copy of the
11  subsequent agreement?
12       A.    I do.
13       Q.    And who are the parties to the
14  subsequent agreement?
15       A.    I believe it is the FDA and
16  myself.
17       Q.    Has Exhibit 558 been
18  terminated?
19       A.    I think it's been superseded by
20  the subsequent agreement.
21       Q.    Now, in Exhibit 558, your
22  clients consist of the individual Lago
23  Agrio plaintiffs, the FDA, and the UDAPT.
24  Do you see that?
25       A.    Yes.

1          DONZIGER

2      Q.      At some point in time you

3  stopped representing everybody except the

4  FDA, but you won't say when that point in

5  time was, correct?

6      A.      It's not that I won't say, I

7  just don't know as I sit here today what

8  the exact date is.

9      Q.      Can you give me an

10 approximation?

11     A.      I think it is about two, three

12 years, sometime in that time period.

13     Q.      And at the time that you --

14 well, who terminated the relationship as

15 between you and the UDAPT?

16     A.      So I'm going to decline to

17 answer that question on the grounds that it

18 really relates to the internal functioning

19 of the plaintiff class in Ecuador.

20     Q.      And who terminated the

21 relationship as between you and the Lago

22 Agrio plaintiffs?

23     A.      I'm going to decline to answer

24 that question on the same grounds.

25     Q.      Do you have any consent from

1            DONZIGER
2    the Lago Agrio plaintiffs to continue to
3    represent the FDA but not them in
4    connection with the Ecuador litigation?
5         A.    You mean directly from the
6    individuals?
7         Q.    Yes, sir.
8         A.    I don't believe so.  It is
9    possible.  I'm not really sure.
10        Q.    You don't know as you sit here?
11        A.    I don't know.  My client is the
12   FDA, which has consents from individuals,
13   so whether that would be transferred up to
14   me, I don't know.
15        Q.    Do you have a consent from
16   Mr. Fajardo, acting on behalf of the Lago
17   Agrio plaintiffs, to continue to represent
18   the FDA in this matter but not the Lago
19   Agrio plaintiffs?
20        A.    I don't really understand the
21   question.  I have a relationship to my
22   client, the FDA, which is the beneficiary
23   of the judgment.  I don't have any consent
24   from Mr. Fajardo in that regard.
25        Q.    Do you have any conflict

1               DONZIGER
2    waivers from the Lago Agrio plaintiffs to
3    represent exclusively the FDA in connection
4    with the Ecuador litigation?
5        A.       This is really irrelevant to
6    this deposition, with all due respect.  How
7    is this relevant?
8        Q.       Mr. Donziger, you are claiming
9    to have a valid interest which you are
10   selling on behalf of --
11       A.       What do you mean, valid?  You
12   want to come over here and testify?
13       Q.       Mr. Donziger, can you answer
14   the question?
15       A.       You just said claiming I have a
16   valid interest which I'm selling.  I have
17   never claimed that and that hasn't
18   happened.
19       Q.       Okay.
20       A.       The FDA has an interest.
21       Q.       Define for me the FDA's
22   interest in the Ecuador judgment.
23       A.       The FDA is the beneficiary of
24   the judgment responsible for collecting the
25   money, executing the judgment against

1                     DONZIGER

2    Chevron, and spending consistent with the

3    Ecuador court judgment.

4         Q.    Which says it shall be expensed

5    exclusively for remediation, correct?

6         A.    It also allows for the payment

7    of legal and administrative expenses, so

8    no, it is not exclusive.  What is left

9    after these various obligations are met

10   needs to be paid for remediation.  So if

11   you are trying to suggest that raising

12   money is inconsistent, I disagree with you.

13        Q.    Do you have any opinion from,

14   written opinion, that the FDA has an

15   exigible interest in the judgment under

16   Ecuador law?

17        A.    The FDA is the beneficiary of

18   the judgment according to the Ecuador court

19   judgment.  There is no need to get an

20   opinion.  It is so stated in the Ecuador

21   court judgment.

22        Q.    Other than the Ecuador court

23   judgment, are you relying on anything else

24   when you say the FDA -- well, let me

25   withdraw that.

1                    DONZIGER
2              Is it your position that the
3    FDA, acting alone, can contract to give
4    third parties percentages of the Ecuador
5    judgment?
6         A.     Andrea, your question is -- you
7    know the answer to that question.  I have
8    already stated my position, okay, before
9    Judge Kaplan.
10        Q.     Then just answer the question,
11   Mr. Donziger.  Stop giving speeches.
12        A.     I'm not about speeches, okay?
13   Ask questions that this deposition is
14   supposed to be about.  Ask Elliott
15   Management questions, because I'm not going
16   to sit here all day, I'm just telling you,
17   and sit here and go through all this.
18              MS. NEUMAN:  Can you read the
19   question back to the witness.
20        A.     Ask questions about Elliott.
21   That is what Judge Kaplan ordered this
22   deposition for.
23              MS. NEUMAN:  Can you read the
24   question back for the witness, please.
25              (The record was read.)

```
 1                   DONZIGER
 2        A.      I have stated that already
 3   before Judge Kaplan.  Yes.
 4        Q.      And are there any limits on the
 5   FDA's ability to sell percentage interest
 6   in the judgment?
 7        A.      Stop it.  Limits?  You know,
 8   I'm not opining on that.  It is privileged
 9   and it's beyond the scope.  Next.
10        Q.      Any solicitations that you've
11   made for additional funders in the Ecuador
12   litigation, in making those have you
13   complied with the provisions of Exhibit
14   558?
15        A.      Oh, lord.  What is Exhibit 558,
16   this (indicating)?
17        Q.      Your January 2011 retainer
18   agreement.
19        A.      I'm not answering that
20   question.  I don't know what you're talking
21   about.  You've got to be more specific.
22   What in the exhibit are you talking about?
23        Q.      There is a provision that
24   discusses when and how additional funders
25   will be added on page 6, paragraph 3(j),
```

```
 1                    DONZIGER
 2   under the heading "The Firm hereby
 3   acknowledges and agrees as follows," and
 4   that's a reference to your firm.
 5        A.     Okay.  If you want me to answer
 6   that I need to sort of read this.  I mean,
 7   I haven't read this document for a long
 8   time and, as I said, it's not the current
 9   document.
10        Q.     So you're not complying with it
11   when you are --
12        A.     No, I'm not saying I'm not
13   complying with it.  You said that.
14        Q.     Let me ask you this:  Have you
15   given --
16        A.     Do you want me to read this?
17        Q.     No, I will just ask you a
18   different question.  Have you given the
19   UDAPT notice on the occasions that you have
20   solicited investments in the judgment for
21   the FDA?
22        A.     It's none of your business.
23   It's beyond the scope.
24               The UDAPT has no authority.  I
25   don't work for the UDAPT.  My client is the
```

1              DONZIGER

2    FDA, that's who I work for.  I give them

3    notice.

4         Q.     Have you given the Lago Agrio

5    plaintiffs notice?

6         A.     The Lago Agrio plaintiffs

7    generally know what the FDA is doing with

8    regard to trying to generate resources so

9    they can continue the case to try to get a

10   cleanup of the pollution that your client

11   left on their lands.

12        Q.     The question, Mr. Donziger, is

13   have you given notice to the Lago Agrio

14   plaintiffs when you have solicited --

15        A.     I give notice to my client,

16   which is the FDA, and the FDA is

17   responsible for keeping the affected

18   communities notified, and it's not just the

19   named plaintiffs, it's the leaders of all

20   the affected communities.  The named

21   plaintiffs act for everybody who is

22   affected.

23        Q.     So you have had no

24   communications directly with the individual

25   Lago Agrio plaintiffs since the entry of

```
 1                    DONZIGER
 2   the RICO judgment; is that right?
 3        A.     That's false, that's not right,
 4   but it is also beyond the scope.  Please
 5   ask me about Elliott.
 6        Q.     You have referred to your --
 7        A.     Let me make a suggestion, okay?
 8        Q.     Mr. Donziger, I'm not
 9   interested in your suggestions.  I'm just
10   going to ask questions and you can answer
11   the questions.
12        A.     No, you've got to ask questions
13   relevant to the scope and then I will
14   answer the questions.
15        Q.     I am.
16        A.     But what I'm going to do right
17   now is go to the bathroom, so give me five
18   minutes, please.
19             MS. NEUMAN:  Let's go off the
20   record at the witness' request.
21             THE VIDEOGRAPHER:  The time is
22   10:42.  We are going off the record.  This
23   is the end of media file one.
24             (Recess taken.)
25             THE VIDEOGRAPHER:   We are back
```

1                    DONZIGER
2  on the record.  The time is 10:50.  This is
3  the beginning of media file number two.
4  BY MS. NEUMAN:
5      Q.     Mr. Donziger, do you still have
6  Exhibit 558 in front of you, your January
7  2011 retainer?
8      A.     Yes.
9      Q.     Are there any provisions of
10  Exhibit 558 that you consider to still be
11  operative or is the entire agreement
12  terminated?
13      A.     I would have to read through
14  this and compare it to the subsequent
15  agreement before I could answer that
16  question.
17      Q.     Well, let's look at paragraph
18  3(a), Contingent Fee.  It says "As
19  compensation for its services the firm
20  should be entitled to an Active Lawyer
21  Percentage of thirty one and one-half
22  percent of the Total Contingency Fee
23  Payment.  The Total Contingency Fee Payment
24  means an amount equal to 20 percent of all
25  Plaintiff Collection Monies."

```
 1                    DONZIGER
 2            Do you see that?
 3      A.     Yes.
 4      Q.     Is that provision still
 5 operative in your view?
 6      A.     It is beyond the scope.
 7      Q.     Are the provisions relating to
 8 the monthly retainer on the next page still
 9 operative?
10      A.     That is beyond the scope of the
11 deposition.
12      Q.     Are the provisions relating to
13 budgets, billing and payments still
14 operative?
15      A.     That is beyond the scope.
16      Q.     Have any arbitrations been
17 conducted pursuant to Exhibit 558?
18      A.     It is beyond the scope.
19      Q.     On page 8 of Exhibit 558 it
20 says "Following a final non-appealable
21 order of a court of competent jurisdiction
22 in respect of such Individual Action that
23 the Firm or such attorney has committed
24 actual fraud, professional malpractice or
25 willful misconduct," then "The Plaintiffs
```

1                    DONZIGER

2    may require that the Firm or such attorney

3    pay to the Plaintiffs the amount of the

4    Defense Funds actually paid by the

5    Plaintiffs to or for the benefit of the

6    Firm or such attorney, as applicable."

7              Are you familiar with that

8    provision?

9         A.    It is beyond the scope.

10        Q.    Was Exhibit 558 terminated in

11   2013?

12        A.    It is beyond the scope; the

13   scope being the Elliott meeting, just to

14   reiterate, and my present financial

15   condition, which I would be more than happy

16   to answer appropriate questions about, if

17   you would ask them.

18        Q.    I'm going to have marked as

19   Exhibit 5306 Subscription Deed from

20   Amazonia Recovery Limited.

21              (Plaintiff's Exhibit 5306

22   marked for identification.)

23        Q.    Mr. Donziger, the last page of

24   the document before the appendix, this one

25   (indicating), appears to bear your

1              DONZIGER

2     signature.  Is that your signature, sir?

3          A.     Yes.

4          Q.     And you signed this document to

5     convert your percentage interest under

6     Exhibit 558 to shares in Amazonia, correct?

7          A.     This is beyond the scope.  I

8     mean, the document obviously speaks for

9     itself.

10         Q.     Have you subsequently

11    transferred or disposed of your shares in

12    Amazonia other than sending Chevron a

13    document, since you signed Exhibit 5306?

14         A.     If your question is am I

15    transferring Amazonia shares to more than

16    one entity at the same time, the answer is

17    no.  The only transfer I have effectuated

18    for those shares is the one that you have

19    that I signed subsequent to the hearing on

20    May 8th.

21         Q.     And have you changed your

22    interest in Amazonia in any other way since

23    you executed Exhibit 5306?

24         A.     No.

25         Q.     And have you done anything with

1                    DONZIGER
2   the -- I'll withdraw that.
3               I'm going to mark as Exhibit
4   5307 defendants' June 15th, 2018 responses
5   to discovery.
6               (Plaintiff's Exhibit 5307
7   marked for identification.)
8        Q.    You are familiar with these
9   responses, Mr. Donziger?
10       A.    Yes.
11       Q.    That is your signature that
12  appears on the last page of Exhibit 5307?
13       A.    Yes.
14       Q.    Is everything stated in Exhibit
15  5307 correct?
16       A.    To the best of my knowledge,
17  yes.
18       Q.    In connection with preparing
19  your responses to Chevron's discovery, did
20  you research and review any hard copy
21  documents?
22       A.    Yes.
23       Q.    Where are those documents
24  maintained?
25       A.    In my office, which is in my

1                    DONZIGER
2    home.
3         Q.     What's the volume of the
4    documents that you reviewed, approximately?
5         A.     There is a fair number of
6    documents that I have withheld from you
7    guys on the basis of privilege or First
8    Amendment issues or of the pending motions.
9         Q.     I'm trying to ask you, though,
10   the volume of documents that you have.
11        A.     Well, when you say volume --
12        Q.     That you reviewed.
13        A.     Do you mean mass, number of
14   pages, weight?  What do you mean by volume?
15        Q.     The number of pages.  Or if you
16   can't estimate that, two boxes, five boxes.
17        A.     Bankers boxes?
18        Q.     Sure.
19        A.     I have reviewed a lot of
20   documents.  I have also requested bank
21   records.
22        Q.     Can you estimate --
23        A.     Well, bank records from the
24   accounts that I specify in my response to
25   your questions.

```
1                    DONZIGER
2         Q.      Can you estimate the volume of
3    hard copy documents that you reviewed in
4    responding to Chevron's discovery?
5         A.      I don't know.  A few hundred
6    pages, or maybe less, I don't know.  It is
7    basically the universe of my financial
8    transactions from those accounts since the
9    judgment, since the RICO judgment.
10        Q.      Did you review any electronic
11   documents --
12        A.      Yes.
13        Q.      -- in response --
14        A.      And e-mails.
15        Q.      And how many e-mail accounts do
16   you have, sir?
17        A.      Two.
18        Q.      And what are they?
19        A.      They are
20   sdonziger@donzigerandassociates.com and
21   sdonziger@gmail.com, and there might be an
22   sdonziger2@gmail, but I think there is
23   actually, but I haven't used it for a
24   really long time.
25        Q.      So you have two e-mails that
```

```
 1                    DONZIGER
 2   you use on a regular basis?
 3        A.    Yes.
 4        Q.    And you searched both of those
 5   e-mail accounts for responsive documents?
 6        A.    Yes.
 7        Q.    Do you have any other
 8   electronic servers or files that you use
 9   for storage of information?
10        A.    Not that I am aware of.
11        Q.    Other than searching your
12   e-mail accounts, did you search any other
13   electronic information for responsive
14   documents?
15        A.    Well, files on my computer.
16        Q.    So Word files?
17        A.    Yeah.
18        Q.    And how many computers do you
19   have, sir?
20        A.    One.
21        Q.    And what type of computer is
22   it?
23        A.    It is an Apple.
24              But to be clear, as I have
25   stated in this document, Exhibit 5307, I
```

```
 1                    DONZIGER
 2   consider your subpoena to me to be
 3   overbroad and unduly burdensome.  And I'm
 4   also a sole practitioner with limited time
 5   and limited technical capacity to
 6   effectuate the kind of search that, say,
 7   Chevron would do or you guys would do at
 8   Gibson Dunn on behalf of Chevron.
 9              So taking that into account, I
10   did a fair amount of searching and document
11   gathering and I have more documents that
12   you are seeking that I don't believe is
13   appropriate to turn over at this point
14   given the sort of outstanding legal issues
15   that need to be resolved by the Court.
16        Q.    And what's the volume of
17   documents that you are withholding?
18        A.    Well, it is a few hundred
19   pages, but if Judge Kaplan were to order me
20   to produce everything that you are asking
21   for, it obviously would be a lot more than
22   that.
23        Q.    And so what is the difference
24   between the "a lot more" and the few
25   hundred pages?  Because I'm not sure I'm
```

1              DONZIGER
2    following your train of thought.
3         A.     The difference is I have not
4    searched for documents responsive to every
5    request in your subpoena.  I mean, some of
6    them, in my personal opinion, would be
7    impossible to do.
8              So what I thought was most
9    reasonable, even though I believe this
10   stuff is privileged or for whatever reason
11   is intrusive and in violation of my
12   constitutional rights, I have gathered more
13   documents.  If Judge Kaplan were to order
14   me to produce them, subject to my rights
15   and whatever other recourse I would have,
16   obviously I would be able to do that.
17        Q.     So these documents that you
18   searched for, found and are withholding on
19   the basis of privilege, you have not
20   provided a privilege log for those
21   documents, correct?
22        A.     That's correct.
23        Q.     And you haven't produced them
24   under the 502 we agreed to; is that
25   correct?

1               DONZIGER

2        A.      That's correct.  But just

3   remember the 502 -- well, my view of the

4   whole thing is a lot of this stuff is First

5   Amendment protected, implicates, you know,

6   constitutional rights.  So it goes beyond

7   the normal sort of privilege issues.  It

8   goes well beyond that.

9        Q.      So you are withholding

10  non-privileged documents on the basis of a

11  First Amendment objection?

12       A.      I didn't say that.

13       Q.      I'm just asking if you are or

14  you aren't.

15       A.      I don't know.  I would have to

16  give that a think.  I do know that some of

17  the documents, many of the documents, are

18  being withheld on First Amendment grounds.

19       Q.      Can you describe for me how you

20  did your electronic searches?  Did you use

21  particular terms?  What was your method?

22       A.      Well, for example, for the

23  Elliott meeting, I put in Elliott Capital,

24  I put in Katie Sullivan, search terms.  I

25  think the name is Lee Grinwald.

```
 1                  DONZIGER
 2      Q.      Grinberg?
 3      A.      Grinberg.
 4              For bank stuff -- well, that's
 5  not your question.
 6      Q.      My question was how did you
 7  search for responsive documents?
 8      A.      Well, that's one thing I did.
 9  I don't really recall -- I don't really
10  recall -- in e-mail?
11      Q.      No, electronically.
12      A.      You are talking about e-mail?
13      Q.      I'm talking about
14  electronically.
15      A.      I don't know.  I put in various
16  search terms.
17      Q.      Do you recall the search terms
18  you used other than "Sullivan" and
19  "Elliott"?
20      A.      Not really, but I want to be
21  very, very clear.
22      Q.      You need to let me finish my
23  question because the court reporter can't
24  get us talking over one another.  Go ahead.
25      A.      Well, I thought I was talking
```

```
 1                    DONZIGER
 2    over you.
 3         Q.    You were.
 4         A.    Can you read the question back
 5    or say it again, please?
 6              MS. NEUMAN:  What was the last
 7    question or part thereof?
 8              (The record was read.)
 9         A.    Well, I was searching for the
10    Elliott meeting e-mails that I might have
11    had.  You know, I don't recall any other
12    search terms at this point.
13         Q.    Can we turn to Exhibit 5307,
14    page 3, in response to RFP No. 1 you state
15    "I do not, to my knowledge, own or control
16    any foreign assets."
17              Do you see that?
18         A.    Yes.
19         Q.    Do you have any reason to
20    believe you would own foreign assets that
21    you wouldn't be aware of?
22         A.    No.
23         Q.    You don't have any foreign bank
24    accounts?
25         A.    No.
```

1                    DONZIGER

2        Q.      You don't own property in any

3   foreign country?

4        A.      No.

5        Q.      You state in the next paragraph

6   "My bank accounts as follows," and then you

7   list five TD Bank accounts.  Do you see

8   that?

9        A.      Yes.

10        Q.      You go on to say "A printout

11   from the TD website reflecting the current

12   status of these accounts is attached.  I

13   hereby attest that these are the only bank

14   accounts I presently use and the only bank

15   accounts I have used since March 4, 2014."

16                Is that an accurate statement?

17        A.      Well, they are the only bank

18   accounts I presently use.  As I read this

19   now, I will sort of modify it slightly,

20   because it is possible that other bank

21   accounts at TD were opened and maybe closed

22   during that period of time.  So maybe there

23   is another bank account or two, but they

24   were all sort of part of the same group of

25   accounts.

1                    DONZIGER

2       Q.       Well, before stating and

3  underlining "The only bank accounts I have

4  used since March 14th, 2014," what

5  diligence did you do to confirm that

6  statement?

7       A.       Well, I went to my bank and

8  talked to the person at the bank and said I

9  need all my accounts since 2014.  So I

10  think that's accurate, but I'm not 100

11  percent sure.

12       Q.       Did you do anything else other

13  than ask someone at the bank?  Did you look

14  at your own documents, for example?

15       A.       Well, I count on the bank to

16  keep my documents.  Just to be clear, and

17  this is a general matter, if you will allow

18  me, I work alone, I have no assistant, I

19  have no associates and I have no secretary,

20  okay?  So a lot of my reliance for document

21  preservation is on the institutions that I

22  do business with.

23       Q.       Do you do -- you don't work

24  with Mr. Page?

25       A.       We are colleagues, but he

1                    DONZIGER

2    doesn't work for me.

3         Q.    But he works with you on this

4    matter?

5         A.    We are colleagues, yeah.  He

6    works on the Ecuador matter and he has a

7    whole host of other cases that he works on.

8         Q.    Looking on page 4, RFP response

9    14, you say "My tax accountant has informed

10   me that he does not have a copy of my 2014

11   tax returns."

12               Who are you referring to as

13   your tax accountant?

14        A.    A gentleman by the name of Gary

15   Greenberg.

16        Q.    Mr. Greenberg is located in New

17   York?

18        A.    New York City.

19        Q.    How long has he been your tax

20   accountant?

21        A.    Several years, probably at

22   least ten years, maybe longer.

23        Q.    Is he with a particular firm?

24        A.    He has his own practice.

25        Q.    Did you search your computer

```
 1                  DONZIGER
 2  for copies of your 2014 tax return?
 3       A.     No.  I don't believe it would
 4  be on my computer.  I rely on Mr. Greenberg
 5  to sort of -- to keep my tax records, and
 6  he has requested, as I sit here, the 2014
 7  return, which I will turn over to you when
 8  it comes in.
 9       Q.     Now, response to RFP 26 on the
10  next page, you state "The only payments I
11  have received potentially responsive to the
12  request are in the nature of remuneration
13  described in response to ROG3."
14            What do you mean there when you
15  say "remuneration"?
16       A.     I don't -- I need the other
17  document to see what I'm responding to
18  here, the subpoena.
19       Q.     You mean you want to see the
20  request?
21       A.     Yeah, the request, I'm sorry.
22       Q.     Sure.  I'm going to mark for
23  the record as Exhibit 5308 a combined
24  version of Mr. Donziger's responses and
25  Chevron's requests.
```

1                    DONZIGER

2              (Plaintiff's Exhibit 5308

3    marked for identification.)

4         A.    Okay.  So do you have a

5    question?

6         Q.    Yes, my question is what do you

7    mean when you say "remuneration" in

8    response to RFP 26?

9         A.    Payments of money.

10        Q.    Let's turn to page 6 and go to

11   ROG3.  You state "My only sources of income

12   are remuneration authorized by my clients

13   and paid out of litigation expense funds

14   raised with my assistance, but not based on

15   my interest in the Ecuador judgment."

16              Do you see that?

17        A.    Yes.

18        Q.    What is your interest in the

19   Ecuador judgment?

20        A.    My interest is the percentage

21   contingency fee that I have always had

22   through the years dating back to the RICO

23   trial.

24        Q.    That would be the percentage

25   that you were given pursuant to Exhibit

```
 1                    DONZIGER
 2   558?
 3        A.      Yes, and I think my retainer.
 4   558 is the Amazonia document?
 5        Q.      No, 558 is the retainer.
 6        A.      Okay.  I don't know what
 7   document is the document defining my
 8   retainer percentage.  I believe it is in my
 9   retainer agreement.
10        Q.      Other than Exhibit 558, which
11   is the January 2011 retainer agreement,
12   have you signed any other agreements that
13   give you a percentage interest in the
14   judgment?
15        A.      Look, I already testified to
16   that.  There is a subsequent agreement.
17        Q.      What are the terms of the
18   subsequent agreement --
19        A.      I believe the terms of
20   compensation --
21        Q.      You need to let me finish my
22   question.
23        A.      Go ahead, I'm sorry.
24        Q.      What are the terms of the
25   subsequent retainer that you have
```

1                    DONZIGER
2    exclusively with the FDA?
3         A.      In terms of compensation, legal
4    fees?
5         Q.      In terms of your compensation.
6         A.      My legal fees, my fees for
7    service, is that what you are talking
8    about?
9         Q.      I don't know what the terms
10   are.  I'm asking you.
11        A.      Well, you've got to be
12   specific.  You want the terms of my legal
13   fee?  My contingency fee interest, is that
14   what you are asking about?
15        Q.      Okay, let's try this:  You have
16   entered into an agreement with the FDA?
17        A.      Yes.
18        Q.      Several years ago, correct?
19        A.      Well, two, three years ago, to
20   my best recollection.
21        Q.      And you can't narrow it down
22   any more than that?
23        A.      Not as I sit here today.  I
24   mean, it has happened relatively in that --
25   I believe in that time frame.

1                    DONZIGER

2          Q.     Does this agreement -- is it a

3    retainer agreement?

4          A.     Yes.

5          Q.     Is it governed by New York law?

6          A.     I can't answer that as I sit

7    here today.  Obviously if I signed it, New

8    York would be governed by New York ethical

9    rules and what have you, but I don't know

10   what the retainer agreement says.  I don't

11   have it in front of me right now.

12         Q.     Does the agreement that you

13   signed with the FDA in the last couple of

14   years, the retainer agreement, give you a

15   percentage interest in the judgment, the

16   Ecuadorian judgment?

17         A.     Yes.

18         Q.     What is that percentage

19   interest in the FDA retainer?

20         A.     It's the same percentage

21   interest that I have always had, to the

22   best of my knowledge, 6.3 percent.

23         Q.     And is that 6.3 percent of the

24   total amount recovered or some other --

25   what is it 6.3 percent of?

1                    DONZIGER

2        A.      It is a contingent fee interest

3    in the recovery, any recovery.

4        Q.      The total recovery?

5        A.      Yeah, obviously subject to

6    court orders, like the constructive trust.

7    So right now, for all practical purposes,

8    it is a nullity.  But that is my interest

9    according to my contract.

10        Q.      The contract you signed with

11    the FDA, in addition to granting you the

12    contingency fee interest of 6.3 percent,

13    does it provide for any other types of

14    payments to you?

15        A.      I don't know.  To be clear,

16    though, I have an agreement with my

17    clients, that is the FDA, to be paid a

18    monthly retainer.

19        Q.      When did you enter into that

20    agreement?

21        A.      We have always had that

22    agreement for years.  I rarely got paid

23    because there wasn't enough money, and I

24    occasionally got paid.

25                    THE VIDEOGRAPHER:  Excuse me, I

1                    DONZIGER

2    was informed that we're not on the phone

3    right now.

4                    MS. NEUMAN:  It's fine.  We

5    will worry about it at the break.

6                    THE WITNESS:  I'm sorry, is

7    this phone --

8                    MS. NEUMAN:  It is just into

9    that other room.

10                   THE WITNESS:  Okay.  Have you

11   got a big crowd over there?

12                   MS. NEUMAN:  No takers as far

13   as I know.

14                   THE WITNESS:  Not like the good

15   ole days.

16                   MS. NEUMAN:  Can you read me

17   back the last question.  I think he

18   answered it, but I have lost my train of

19   thought.

20                   (The record was read.)

21       Q.    Is the agreement that you

22   receive a retainer from the FDA written?

23       A.    I believe there is a written

24   agreement from well back, but I'm not 100

25   percent sure.  Certainly we had an

1                    DONZIGER
2    agreement, an oral agreement.
3         Q.      And is this agreement that you
4    receive a retainer for working for the FDA
5    reflected in your new FDA retainer?
6         A.      I don't know an answer to that
7    because I haven't looked at that retainer
8    in preparation for this deposition.
9         Q.      In this agreement that you have
10   with the FDA to receive a retainer, what is
11   the amount of the retainer?
12        A.      It varies.  Right now, or the
13   most recent iteration, was $25,000 a month.
14        Q.      And is there any document
15   confirming that that's your current
16   retainer amount that is signed by the FDA?
17        A.      I don't know, but there is a
18   definite agreement with the FDA.  But I
19   will say this:  I generally don't get paid
20   that amount or get paid anything at all.
21   It all depends on what's available,
22   especially given the rather burdensome, for
23   my client base, demands of the litigation
24   in different jurisdictions, you know, not
25   just this, but Canada and other countries.

```
 1                    DONZIGER
 2       Q.      What is your role in the
 3   Canadian case, if any?
 4       A.      How does that relate to the
 5   deposition?
 6       Q.      It relates to whether monies
 7   you are receiving are for compensation of
 8   work done in Canada or something else.
 9       A.      Well, I get the retainer for a
10   variety of different pieces of work that I
11   do, but I'm not going to get into that on
12   First Amendment grounds and because of the
13   pending motion.
14       Q.      Can you describe the scope of
15   the work you do that is covered by the
16   retainer?
17       A.      I believe that intrudes on
18   First Amendment protected grounds, but I
19   will say this as a general matter:  I do a
20   variety of different types of work on
21   behalf of my clients, advocacy work.
22       Q.      You keep saying clients,
23   plural, but it is client, right, the FDA?
24       A.      Well, the FDA represents all
25   the affected communities in the execution
```

```
 1                    DONZIGER
 2   of the judgment, so there is thousands of
 3   people that the FDA represents, and I
 4   represent the FDA.
 5        Q.    Have the indigenous communities
 6   stated publicly that the FDA does not
 7   represent them?
 8        A.    You would have to be more
 9   specific.  What indigenous communities?
10        Q.    Well, which indigenous
11   communities are in the former
12   concessionary?
13        A.    You don't know that?
14        Q.    I'm asking you, Mr. Donziger.
15        A.    There is five indigenous
16   peoples.
17        Q.    And they are?
18        A.    The Siona, Secoya, Huaorani,
19   Quichua, and Cofan.
20        Q.    And is it your testimony that
21   the FDA currently represents all five of
22   those --
23        A.    The FDA --
24        Q.    -- indigenous communities?
25        A.    The FDA represents all the
```

```
 1                    DONZIGER
 2    beneficiaries of the judgment in the
 3    execution of the Ecuadorian judgment, so
 4    yes, it would include those groups for that
 5    purpose.
 6         Q.    For the purpose of managing the
 7    funds should they ever be paid?
 8         A.    Well, for the purpose that the
 9    Ecuadorian judgment sets out as to be the
10    role of the FDA.  So it is, you know, the
11    FDA is the beneficiary, they have an
12    obligation to collect on the judgment, and
13    then if funds ever get collected, to spend
14    them consistent with the Ecuador judgment.
15         Q.    Can you turn in Exhibit 5307 to
16    page 7, your response to Interrogatory No.
17    16.
18         A.    Uh-huh.
19         Q.    You say "It would be highly
20    burdensome to calculate the total amount of
21    money I have received in the 25 years of my
22    work on the Ecuador case."
23               Do you see that?
24         A.    Yes.
25         Q.    Did you declare all the money
```

1                    DONZIGER
2   that you received for your work on the
3   Ecuador case as taxable income?
4        A.      Well, I declare all income
5   received from any source as taxable income
6   if that's what the law states.
7        Q.      So that's a yes?
8        A.      Yes.
9        Q.      So if you looked at your tax
10  returns, you would be able to calculate the
11  amount of money you received from working
12  on the Ecuador case?
13       A.      Subject to applicable
14  deductions, out of pocket expenses, etc.,
15  yes, perhaps, I don't know, I'm not a tax
16  expert.
17       Q.      Do you have any accountings for
18  the monies that you have received in
19  reimbursement for expenses on the Ecuador
20  case?
21       A.      I have a fair amount of
22  accountings through the years, but they're
23  not complete.
24       Q.      By a fair amount of
25  accountings, how many is that?

1                    DONZIGER
2        A.        I don't know.  I mean, we are
3    talking 25 years, so it is a massive amount
4    of material, and I have an accounting, it's
5    not complete, it's substantially complete,
6    but it's not complete.
7        Q.        And who prepared this
8    accounting that is substantially complete?
9        A.        Different people.
10       Q.        Can you identify them, please?
11       A.        I feel like this is intruding a
12   bit on the First Amendment issue.  I will
13   answer it, though, because you already
14   know.  So the person who originally put
15   this together was Josh Rizack and then
16   subsequent to Josh, who didn't complete it,
17   but he got a fair amount down the road with
18   it, we hired Katie Sullivan to complete it.
19       Q.        You retained Ms. Sullivan to
20   prepare your accounting for the Ecuador
21   case?
22       A.        I retained Ms. Sullivan to do a
23   number of different tasks, mostly to help
24   fundraise, but also to provide sort of
25   backup admin support to the case and to the

1                    DONZIGER
2  people on the case who needed it.
3       Q.     When did you retain
4  Ms. Sullivan?
5       A.     You are kind of moving into
6  that area now?  You want to talk about
7  Ms. Sullivan?
8       Q.     When did you retain
9  Ms. Sullivan?
10      A.     This is beyond the scope of the
11  deposition.
12            Generally, okay, I will answer
13  your question, because it is narrow, I
14  retained Ms. Sullivan on behalf of the FDA
15  in approximately October of last year.
16      Q.     2017?
17      A.     Yes.
18      Q.     Do you have any written
19  agreement with Ms. Sullivan or her company?
20      A.     There is a draft of an
21  agreement, but I don't believe that it was
22  executed, although I'm not sure.
23      Q.     And other than fundraising and
24  preparing accountings for you and your
25  firm, any other functions Ms. Sullivan was

1              DONZIGER
2    hired to perform?
3         A.    I'm not going to answer that
4    question.  That is First Amendment
5    protected.
6         Q.    This accounting that is
7    substantially complete, what year does it
8    go through?
9         A.    It is beyond the scope of the
10   deposition.
11        Q.    Did you review the accounting
12   in responding to Chevron's discovery
13   responses?
14        A.    Not fully, no.
15        Q.    What does that mean, not fully?
16        A.    Well, there is an extensive
17   accounting and there are summaries.  I did
18   look at a summary.
19        Q.    Of the Ecuador case matter?
20        A.    It is relative to your
21   question.
22        Q.    And is the summary that you
23   looked at a document that you produced or
24   one that you just reviewed?
25        A.    No, I did not produce, and the

```
 1                   DONZIGER
 2   reason I didn't produce it is because I
 3   believe it is First Amendment protected,
 4   subject to the resolution of our pending
 5   motion for a protective order.
 6              (Plaintiff's Exhibit 5309
 7   marked for identification.)
 8        Q.    I'm going to mark as Exhibit
 9   5309 a series of documents bearing the
10   Bates numbers DONZPJD 1 through 18.
11        A.    Can we take a quick break?
12        Q.    We can go off the record.
13              THE VIDEOGRAPHER:  The time is
14   11:26.  We are going off the record.  This
15   is the end of media file number two.
16              (Recess taken.)
17              THE VIDEOGRAPHER:  We are back
18   on the record.  The time is 11:34.  This is
19   the beginning of media file number three.
20   BY MS. NEUMAN:
21        Q.    Mr. Donziger, you are still
22   under oath.
23        A.    Yes.
24        Q.    I turn your attention to
25   Exhibit 5309.  These are the documents that
```

1                    DONZIGER

2    you produced in response to Chevron's

3    discovery request, correct?

4        A.    Yes.

5        Q.    On the first page are listed

6    five TD Bank accounts.  Do you see that?

7        A.    Yes.

8        Q.    Other than to pay living

9    expenses, did you transfer any funds out of

10   any of these accounts since April 16th of

11   2018?

12       A.    April 16th of 2018?

13       Q.    When you got the restraining

14   order.

15       A.    Oh.  I have.  Oh, other than

16   pay living expenses?  Yes.

17       Q.    For what purpose?

18       A.    To pay case expenses.

19       Q.    Which of these accounts relates

20   to the Ecuador case?

21       A.    Well, as a general matter,

22   the -- as a general matter Ecuador case

23   funds are not kept generally by me.  They

24   were kept by Ms. Sullivan until recently

25   when she received a subpoena.  The account

1                      DONZIGER
2    that relates to the Ecuador case is 8132.
3        Q.      The TD Premier Checking?
4        A.      Uh-huh.
5        Q.      Any of the other accounts
6    relate to the Ecuador case?
7        A.      Well, as a general matter, I
8    think on occasion have used some of the
9    other accounts to pay Ecuador case expenses
10   from time to time.
11       Q.      Have you deposited funds,
12   client funds, into any of these accounts
13   other than 8132?
14       A.      I believe so, yes.
15       Q.      Which ones?
16       A.      Well, hold on.  What do you
17   mean by client funds?
18       Q.      Funds belonging to your client.
19       A.      Well, funds that have been
20   raised to pay litigation expenses have been
21   transferred into these accounts by others
22   and they have subsequently been used to pay
23   case expenses to others, that is
24   transferred back out to various people.
25   And I can't say because I'm not the most

1                    DONZIGER

2    organized person when it comes to this, but

3    it is possible that that has happened in

4    all of these accounts at one time or

5    another.  And the Ecuador case account was

6    just opened relatively recently because of

7    a situation with Ms. Sullivan.

8         Q.    What does that mean?

9         A.    That she didn't want to handle

10   the funds anymore.

11        Q.    So you have taken money raised

12   in connection with the Ecuador judgment

13   that is intended to pay case expenses to

14   persons other than yourself and deposited

15   it into the accounts shown on the first

16   page of Exhibit 5309?

17        A.    Yes, from time to time, I have

18   done that, because that's where the money

19   was held to be able to fund the case.

20        Q.    And you have deposited these

21   case monies into these accounts which also

22   contained personal money of yours; is that

23   right?

24        A.    Sometimes I have used the

25   accounts, again, because I'm not very

1                    DONZIGER

2    organized, as accounts to hold funds that

3    have been subsequently transferred out to

4    other people to pay case expenses, yes.

5         Q.    So am I understanding you that

6    you have commingled case funds with your

7    personal funds?

8         A.    No.  Commingle is your word.

9         Q.    Well, you have put them in the

10   same account, the money, yes?

11        A.    It's not commingling as far as

12   I'm concerned.  That's an opinion that

13   you're expressing.

14              You know, the money comes in.

15   We almost never have enough money to meet

16   the need and all the bills, and it has to

17   be then sent out in a way to keep the case

18   going.  I have done that through the years

19   from time to time.

20        Q.    And you keep accurate records

21   of all the case money that comes in and all

22   the case money that flows out, is that

23   right, of your accounts?

24        A.    The records are all electronic

25   and easily retrievable.  I had brought in

```
 1                DONZIGER
 2   Ms. Sullivan to help get it organized and
 3   up to speed and pick up where Mr. Rizack
 4   left off.
 5        Q.     Is there any one of these five
 6   accounts that is used exclusively for the
 7   Ecuador case and does not contain any of
 8   your personal funds?
 9        A.     8132.
10        Q.     So that's exclusive to the
11   case?
12        A.     Yes.
13        Q.     Other than these accounts, are
14   there other accounts that you control and
15   to which Ecuador case funds have been
16   deposited?
17        A.     That is beyond the scope.  Are
18   you inquiring as to my present financial
19   condition?  Is that what this is about?
20        Q.     I'm asking you if there are
21   other accounts where Ecuador case funds --
22        A.     Currently -- let me answer your
23   question --
24        Q.     That you control.
25        A.     Let me answer your question
```

DONZIGER

1

2    this way:  As I sit here today, there are

3    no other accounts.

4         Q.     Did you direct -- did anyone

5    other than you direct Ms. Sullivan's work

6    on the Ecuador case?

7         A.     That is beyond the scope.

8         Q.     Did you control the accounts

9    into which Ecuador case funds were

10   deposited that Ms. Sullivan opened?

11        A.     So my position on that is this:

12   It is beyond the scope.  And the reason it

13   is beyond the scope, and to be clear, there

14   is nothing I would try to hide as regards

15   Ms. Sullivan, except for the fact that that

16   is internal operational information as to

17   how we operate, and you're not entitled to

18   that information, in my view, based on the

19   motion filed for the protective order.  So

20   I'm not going to answer that question right

21   now.

22        Q.     The case funds -- I withdraw

23   that.

24               The funds that you have raised

25   in exchange for interest in the judgment

1              DONZIGER
2   since March of 2014, who owns those funds?
3        A.    Well, first of all, I helped my
4   clients raise money.  So when you say funds
5   you have raised, I don't know what you mean
6   by that.  These are funds that clients
7   generate and I help make introductions and
8   help make stuff happen so the clients can
9   have resources.  So they are client funds.
10       Q.    When you say client funds, you
11  mean FDA funds?
12       A.    Yes.
13       Q.    Okay.  And are they deposited
14  into FDA accounts in Ecuador or somewhere
15  else?
16       A.    That's none of your business.
17  I mean, that is beyond the scope.
18       Q.    Do you have any control over
19  these funds after they are raised?
20       A.    The clients control the funds.
21  I am authorized by the clients to manage a
22  bunch of the work and the case and figure
23  out how to keep it moving.
24       Q.    Are you authorized by the
25  clients to manage the funds?

1                    DONZIGER

2        A.        I have a say in how the funds

3    are spent and we talk constantly,

4    regularly, the clients and I, the

5    leadership of the FDA, about how to deploy

6    the limited capital that we have.

7        Q.        And who are you referring to as

8    the leadership of the FDA, by name?

9        A.        Beyond the scope.  It is public

10   information who the president of the FDA

11   is.

12       Q.        Is that who you talk to, the

13   current president of the FDA?

14       A.        One of the people.  There is an

15   Executive Committee.  There is multiple

16   people who are involved.  But that gets to

17   the decision-making process of the client

18   group.

19       Q.        Are you authorized to approve

20   your own compensation from client funds?

21       A.        No.

22       Q.        Are you authorized to approve

23   your own expenses from client funds?

24       A.        All of my approvals for

25   expenses are approved by the clients,

1              DONZIGER
2   subject to review, approval, criticism,
3   etc.  I do not have to get approval in
4   advance for every expenditure of funds for
5   travel, that kind of stuff.
6        Q.    You get written approval --
7        A.    No, I don't get approval in
8   advance.  I review expenditures with
9   clients on a regular basis so they
10  understand how the money, the limited
11  capital, is being spent.
12       Q.    And that's done in writing?
13  You account to the clients in writing on
14  how you have spent the money?
15       A.    I think this is well beyond the
16  scope of the deposition.  I have -- let me
17  just say this:  I have regular
18  communication with my clients about all
19  sorts of matters, including expenditure of
20  funds, that kind of stuff.
21       Q.    And is that communication ever
22  in writing?
23       A.    I wouldn't say never, but
24  generally not.
25       Q.    You said that Ms. Sullivan had

1                    DONZIGER
2    an account in which case funds were held
3    until she received the subpoena; did I
4    understand that correctly?
5         A.    Yes.
6         Q.    What happened to those funds?
7    Were they transferred to you?
8         A.    The answer, and I'm sure she
9    will provide this in her deposition, given
10   her production that I briefly reviewed last
11   night, the money that she had and was
12   holding when she decided to no longer be
13   involved, was transferred to a third party,
14   not me.
15        Q.    And who was this third party?
16        A.    It is beyond the scope.
17        Q.    And how much money was
18   transferred?
19        A.    Beyond the scope.
20        Q.    Can you explain to me how
21   documents relating to your compensation and
22   expenses can be beyond the scope?
23        A.    They indicate internal
24   operational and strategic issues.
25        Q.    Just how much you're paid?

```
 1                    DONZIGER
 2        A.      Huh?
 3        Q.      How much you're paid?
 4        A.      That would implicate First
 5   Amendment considerations.
 6        Q.      Can you define for me this
 7   First Amendment objection?  Because you
 8   seem to apply it to financial documents,
 9   all kinds of documents.  So I'm not
10   understanding it.  Can you describe it for
11   the record, please?
12        A.      No, I'm not going to describe
13   it.  Read it.  I have a 24-page motion.  It
14   really goes into a long history of how
15   Chevron takes information about people who
16   work on the case, harasses them, spies on
17   them, sues them, extorts them, tries to get
18   statements from them that I'm a bad person,
19   all those things.  So I think I have ample
20   reason, with all due respect, to be very
21   concerned about this and to take the
22   position I'm taking.
23        Q.      How are documents related to
24   your, not related to anybody else, your
25   compensation and your expenses, how do
```

```
 1              DONZIGER
 2   those documents implicate the First
 3   Amendment?
 4        A.     Well, let me just say this:
 5   The scope of this deposition is whether I
 6   can pay a judgment.  Does Chevron want this
 7   judgment paid or do they just want to sort
 8   of use it as an excuse to find out about my
 9   business?
10              MR. NEUMAN:  Can you read back
11   the pending question to the witness.  I
12   think he has lost track of it.
13              (The record was read.)
14        A.     Well, they are also beyond the
15   scope of the deposition.
16        Q.     That is one of the questions,
17   Mr. Donziger, do they or don't they
18   implicate the First Amendment?
19        A.     I believe they also implicate
20   the First Amendment as they relate to
21   decisions about deployment of limited
22   resources across service providers and
23   lawyers.
24        Q.     If you could turn to Exhibit
25   5309 with the Bates stamp page 16.  It is
```

1              DONZIGER

2    an e-mail chain among yourself, Lee

3    Grinberg, and Katie Sullivan.  Some of the

4    e-mails also have Jesse Cohn on them.  It

5    is three pages.  Do you see that?

6         A.    Yes.

7         Q.    These are the only documents

8    you produced related to the Elliott

9    meeting, correct?

10         A.    Yes.

11         Q.    Do you have other e-mails that

12    discuss the meeting with Elliott either

13    before or after it took place?

14         A.    Well, I have realized now with

15    Katie Sullivan's production there are some

16    other e-mails that I obviously missed in my

17    search.  So yes, I do have other e-mails.

18         Q.    But those e-mails --

19         A.    I don't believe I have anything

20    beyond what Katie Sullivan produced and I

21    produced.

22         Q.    And is it your testimony that

23    these other e-mails that Ms. Sullivan

24    produced that you didn't, did not come up

25    in response to your search of your e-mail

1            DONZIGER
2   when you searched for Ms. Sullivan's name?
3       A.    I don't know.  I had a
4   recollection of an e-mail string that took
5   place right around the meeting and then
6   some subsequent e-mails, like what I
7   produced, and so when I searched and found
8   that string of e-mails, I thought that was
9   the production, because I didn't remember
10  very many e-mails at all from Elliott.
11  Subsequent to that, last night, when I got
12  Katie Sullivan's production, I realized
13  there were a few more e-mails that didn't
14  come up in my search.
15      Q.    So when you searched your
16  computer, these are the only e-mails, for
17  Katie Sullivan's name, these are the only
18  e-mails that came up related to Elliott?
19      A.    Yeah, related to Elliott.
20      Q.    Did you destroy any e-mails?
21      A.    No, I did not.
22      Q.    So they are still on your
23  computer?  They haven't been deleted?
24      A.    As far as I know.
25      Q.    You are sure?

1                    DONZIGER

2          A.      Well, there is an e-mail

3     with -- are you trying to play a little

4     tricksy here?  I know there is an e-mail

5     that was deleted, okay?  There was no order

6     that it be preserved.  And as I testified

7     earlier, it was to protect the

8     confidentiality of a process that we were

9     engaged in with Elliott Capital Management

10    at the time, the e-mail being an e-mail

11    Katie Sullivan sent around about her

12    enthusiasm of having got a meeting with

13    Elliott Capital Management.  So I believe

14    that was deleted.

15         Q.      By you?

16         A.      I don't know.  As I said, my

17    practice is not to delete, but on occasion

18    I will if it is needed to protect

19    confidentiality.  It is not to avoid

20    discovery to Chevron, it is to protect the

21    funding process so the case can continue

22    and not be harassed out of existence by

23    your client.

24         Q.      I'm going to mark as Exhibit --

25    well, it is already marked as Exhibit 9 to

1                    DONZIGER
2    the Sullivan -- Exhibit 9 to the Sullivan
3    deposition.
4         A.    Can we take a -- go off the
5    record for a second?
6         Q.    Why?
7         A.    Because I need to ask
8    something.  Or we can do it on the record.
9         Q.    That's fine.
10        A.    Has Ms. Sullivan been deposed?
11        Q.    Yes.
12        A.    When was she deposed?
13             MS. CHAMPION:  Thursday.
14             THE WITNESS:  I'm kind of not
15   happy that I was not informed that she was
16   being deposed or had an opportunity to be
17   present.
18             MS. CHAMPION:  As she is your
19   agent, we assumed that she would inform
20   you.
21             THE WITNESS:  Do you have a
22   transcript of her deposition that you can
23   give me, please?
24             MS. CHAMPION:  You can order it
25   from the court reporter.  I will give you

1                    DONZIGER
2    the information.
3        Q.    Mr. Donziger, can I direct your
4    attention to Sullivan Exhibit 9.
5        A.    I need to take a break.
6              MS. NEUMAN:  Go off the record.
7              THE VIDEOGRAPHER:  The time is
8    11:54.  We are going off the record.
9              (Recess taken.)
10             THE VIDEOGRAPHER:  The time 12
11   p.m.  We are back on the record.
12   BY MS. NEUMAN:
13       Q.    Mr. Donziger, you have Sullivan
14   Exhibit 9 in front of you?
15       A.    Yes.
16       Q.    This is an e-mail string
17   bearing the Bates numbers MKS 90 through
18   94.
19             If you go to page 93, which is
20   the last substantive page of the exhibit.
21   Do you have that, sir?
22       A.    Yes.
23       Q.    It is an e-mail from Katie
24   Sullivan dated November 6th, 2017 to a
25   series of people CC'd to you.

1                 DONZIGER

2            Who is L. Fontaine?

3      A.      It is beyond the scope.  That

4   is so beyond the scope.  Are you kidding

5   me?  Ask me questions about my finances --

6      Q.      Mr. Donziger, please stop

7   giving me a speech.

8      A.      I'm not speechifying.  I mean,

9   I'm not going to sit here all day while you

10  go on this major fishing expedition, okay?

11  That's not what this deposition is about.

12  I'm not going to go through who each member

13  of our team is and what they do.

14     Q.      So you are refusing to identify

15  the persons --

16     A.      I'm not answering questions

17  beyond the scope of the deposition.  That's

18  what I'm doing.

19     Q.      You are refusing to identify

20  the persons listed in the to line of the

21  e-mail exchange that's been marked as

22  Sullivan Exhibit 9, correct?

23     A.      I'm not answering questions

24  that go beyond the scope, and you know you

25  already have that information from your

1                    DONZIGER

2    deposition of Ms. Sullivan, so move on to

3    the topics at hand, please.

4         Q.    You respond to Ms. Sullivan's

5    e-mail which reports on the potential

6    Elliott meeting saying "Friends, please

7    keep this information that Katie sent

8    strictly confidential.  As with most

9    institutional investors, this is a heavy

10   lift," and so on.

11               Do you see that?

12        A.    Yes.

13        Q.    And who were you asking them to

14   keep the information confidential from?

15        A.    That's beyond the scope.  Stop

16   it.  Please focus on the topics.

17        Q.    Now, in response to your

18   e-mail, Peter Grant --

19        A.    Andrea, I'm not answering these

20   questions.

21        Q.    Mr. Donziger, I'm going to ask

22   the questions --

23        A.    Listen, I'm not going to sit

24   here if you continue to harass me with

25   questions which have nothing to do with

1                    DONZIGER
2    this deposition.
3        Q.    I'm not harassing you.
4        A.    You are harassing me.
5        Q.    These clearly relate to the
6    Elliott meeting.  You have said repeatedly
7    the Elliott meeting is at issue.  You
8    wanted to get to the Elliott  meeting.  So
9    here we are, we are at the Elliott meeting.
10            Mr. Grant says "I give you very
11   best wishes on this and will now delete all
12   e-mails relating to this.  I recommend
13   others do as well after what I saw the
14   opposition has acquired."
15            Do you see that?
16       A.    I am not answering these
17   questions.  You can ask me questions about
18   the Elliott meeting.  This is not about the
19   Elliott meeting.  This is about an e-mail
20   exchange.
21       Q.    Did you delete this e-mail from
22   your computer, Mr. Donziger?
23       A.    I don't know.  You have already
24   asked that question.  I don't know if I did
25   or didn't.

```
1                    DONZIGER
2        Q.      Did you understand Mr. Grant
3   when he referred to the opposition to be
4   referring to Chevron?
5        A.      I am not answering these
6   questions.  Ask me about the meeting.
7        Q.      On the first page of Sullivan
8   Exhibit 9 you write "I second that.  Please
9   delete all e-mails related to this and,
10  again, keep the info confidential."
11               Do you see that?
12       A.      Yes.
13       Q.      And that's an e-mail you sent
14  on November 6th, 2017 to the person that is
15  indicated?
16       A.      Beyond the scope.  But I will
17  answer it.  Yes, I sent that e-mail.
18       Q.      Do you know whether people
19  deleted --
20       A.      No.
21       Q.      -- the documents in response to
22  your instruction to do so?
23       A.      No.
24       Q.      Did you take any notes at the
25  Elliott meeting?
```

1                    DONZIGER
2        A.      I believe I did, but I don't
3    know for sure.
4        Q.      You didn't produce any notes.
5    Is there a reason you didn't produce your
6    notes?
7        A.      I probably didn't keep them.  I
8    have literally dozens and dozens of
9    meetings.  I don't keep all my notes.  I'm
10   one person.
11       Q.      Did you look for your notes for
12   the Elliott meeting?
13       A.      I did.  I have tons of paper
14   all over the place.  There were no notes
15   from the Elliott meeting.  I think I barely
16   took any notes.  I might have taken a few
17   notes.  But I remember generally what
18   happened at the meeting if you want to ask
19   me about it.
20       Q.      So if you took notes, they no
21   longer exist?
22       A.      I looked for them and there
23   were no notes I found.  My guess is I threw
24   them out, because I have lots of notes.
25       Q.      Other than the e-mail exchange

1                    DONZIGER

2      that you produced and the e-mail exchange

3      that was marked as Sullivan Exhibit 9, did

4      you have any other e-mail communications

5      with anyone relating to the Elliott

6      meeting?

7           A.      I don't know.

8           Q.      Did you search for such

9      communications?

10          A.      I did.  I already answered that

11     question.  I came up with this e-mail

12     string, because that's all that I

13     remembered.  The meeting really was one

14     meeting of lots of meetings I had with lots

15     of people.  It didn't strike me as terribly

16     significant.  It was one meeting on one

17     day.

18          Q.      So when you searched your

19     computer for Elliott, no other documents

20     came up?

21          A.      That were relevant to this, no,

22     that I remember.

23          Q.      That related to the Elliott

24     meeting?

25          A.      No.

1          DONZIGER

2      Q.     And you don't recall e-mailing

3   with anybody else about the Elliott

4   meeting?

5      A.     What do you mean, anybody else?

6   You mean other than the e-mails that Katie

7   Sullivan has produced and I produced?

8      Q.     Yes.

9      A.     No.

10     Q.     Did you send any written

11  information to your client about the

12  Elliott meeting?

13     A.     I don't recall.

14     Q.     Did you look for such

15  communications?

16     A.     I looked up Elliott with the

17  search term and that's what came up.  I

18  don't remember sending my clients any

19  written information about the Elliott

20  meeting.

21     Q.     Either before or after?

22     A.     I don't remember.  I don't

23  believe I did.

24     Q.     I'm going to mark as Exhibit

25  5310 a document bearing the Bates number

1            DONZIGER

2    MKS 396.

3            (Plaintiff's Exhibit 5310

4    marked for identification.)

5        Q.    It is labeled "Invoice, Law

6    Offices of Steven H. Donziger," described

7    as "Legal and Consultation Services/Ecuador

8    Environmental Case, December 2017."

9            This is a document you

10   prepared, Mr. Donziger?

11       A.    Yes.

12       Q.    This is the earliest invoice

13   from you that Ms. Sullivan produced.  Did

14   you send her invoices prior to December

15   2017?

16       A.    I believe this is beyond the

17   scope.

18       Q.    Did you send this invoice to

19   Ms. Sullivan in order to have it paid?

20       A.    It is beyond the scope.

21       Q.    Is there any backup for this

22   invoice or is this the retainer you

23   mentioned earlier?

24       A.    It is the monthly retainer.

25       Q.    Did you copy this invoice to

1              DONZIGER
2    the U.S. representative under Exhibit 558?
3        A.     Beyond the scope.
4        Q.     Who is currently the U.S.
5    representative acting under Exhibit 558?
6        A.     Is Exhibit 558 the retainer
7    agreement?
8        Q.     The January 2011 retainer.
9        A.     It is beyond the scope.
10       Q.     At the time of the RICO trial,
11   I believe you testified it was Mr. Snyder.
12   Is it still Mr. Snyder?
13       A.     I don't even know who that is.
14       Q.     Andres Snyder.
15       A.     Oh.  Beyond the scope.
16       Q.     Is there currently a chairman
17   serving pursuant to Exhibit 558?
18       A.     It is beyond the scope.  I
19   already testified there is a subsequent
20   agreement to that.
21       Q.     But only with the FDA?
22       A.     Yes.
23       Q.     Can you produce that agreement?
24       A.     I will see what I can do.
25       Q.     Well, you have the agreement,

```
 1                  DONZIGER
 2   right?
 3        A.      I should somewhere, yeah.
 4        Q.      Can you produce it today?
 5        A.      I don't believe so.
 6        Q.      Why not?
 7        A.      Because I would have to go back
 8   to my place and find it and -- I might be
 9   able to produce it today, if you let me out
10   of here.
11              MS. CHAMPION:  Someone can
12   e-mail it to you and we can print it for
13   you.
14              THE WITNESS:  Someone?  Who is
15   going to do that, my dog?  Who is going to
16   e-mail it to me?  Do you know I work alone?
17        Q.      You mentioned, Mr. Donziger,
18   that you had a draft agreement with
19   Ms. Sullivan?
20        A.      Yes.
21        Q.      Who drafted that agreement, her
22   or you or someone else?
23        A.      This is beyond the scope.  I
24   thought we were going to talk about the
25   Elliott meeting.
```

1                    DONZIGER
2        Q.      Mr. Donziger, did you draft the
3    tentative agreement with Ms. Sullivan or
4    did she?
5        A.      It is beyond the scope.
6        Q.      Do you have a copy of it?
7        A.      I believe I do.
8        Q.      Pursuant to that agreement, was
9    Ms. Sullivan to receive any kind of a
10   percentage interest in the judgment?
11       A.      Beyond the scope.
12       Q.      Was she or wasn't she?
13       A.      It is beyond the scope.
14       Q.      Is there any -- well, what is
15   the reason the agreement didn't get signed?
16       A.      It is beyond the scope.  I'm
17   not talking about that.
18       Q.      Exhibit 5310, your December
19   2017 invoice for $25,000, did that get
20   paid?
21       A.      It is beyond the scope.
22       Q.      Money you received is beyond
23   the scope?
24       A.      Yes.  You need to know my
25   present financial condition, my ability to

1                    DONZIGER

2    pay a judgment I owe your client, which I

3    can pay, okay?

4            So quit trying to find out

5    everything about my life and about the

6    case, stuff that you have no right to.  You

7    really need to ask questions about the

8    topics at hand.  Do you want to know what

9    happened at the Elliott meeting?  Ask me.

10   That's what Judge Kaplan wanted this

11   deposition to be about.  You haven't asked

12   me one question.  We are now over two

13   hours --

14       Q.    This is a discovery deposition,

15   Mr. Donziger.

16       A.    You haven't asked one question

17   about what Judge Kaplan ordered this

18   deposition to be about.

19       Q.    I'm going to hand you a

20   document that has been marked as

21   Plaintiff's Exhibit 5311.

22            (Plaintiff's Exhibit 5311

23   marked for identification.)

24       Q.    Bearing the Bates number MKS

25   395.  It shows a transfer from CWP

1            DONZIGER
2    Associates to yourself on January 24th,
3    2018 of $25,000.  Do you see that?
4         A.    Yes.
5         Q.    Do you know what the origin of
6    these funds was?
7         A.    This is beyond the scope.
8         Q.    Did the $25,000 that was paid
9    to you from CWP Associates come from money
10   raised in exchange for an interest in the
11   Ecuador judgment?
12        A.    These were obviously case
13   funds.
14        Q.    That's not responsive.  Did the
15   money come from --
16        A.    From interest in the Ecuadorian
17   judgment not owned by me, owned by the FDA
18   and the clients.
19        Q.    When were the monies that were
20   paid to you on January 24th of 2018 raised?
21        A.    No, nice try.  Beyond the
22   scope, First Amendment protected.
23        Q.    Pursuant to what agreement were
24   the monies paid to you on January 24th,
25   2018 raised?

1                    DONZIGER
2        A.      I have, as I testified, and
3    please really get to the point, I have
4    already testified I have authority from the
5    FDA to try to help them raise money to pay
6    litigation expenses.  I have authority from
7    my client.  It is clear.  I had authority.
8        Q.      It is clear in this document
9    that you haven't produced?
10       A.      Don't worry about it.  It is
11   none of your business.  It is beyond the
12   scope of the deposition.  If Judge Kaplan
13   wants you to have that, we will get that
14   resolved in due course and you will get it.
15       Q.      Was anyone other than
16   Ms. Sullivan notified of this transfer of
17   funds to you on January 24th of 2018?
18       A.      It is beyond the scope.
19       Q.      What is CWP Associates?
20       A.      I don't know.
21       Q.      You have no idea?
22       A.      It is some name I think
23   Ms. Sullivan came up with.
24       Q.      Did she come up with it or did
25   you?

1              DONZIGER

2        A.     None of your business, and I

3    don't know, and I don't care, and it is so

4    irrelevant.  Ask me about the Elliott

5    meeting.

6              And I just want to note for the

7    record you keep looking at like notes

8    people are giving you.  These are notes

9    other lawyers are giving you?  Are you

10   doing the deposition or are other lawyers

11   doing the deposition?

12       Q.     When you had the draft

13   agreement with Ms. Sullivan, was it

14   contingent on the outcome of the Elliott

15   meeting?

16       A.     It is beyond the scope.

17             I am going to state for the

18   record, I'm not going to keep sitting here

19   and be subject to questions that are beyond

20   the scope of the deposition.  I have been

21   here two and a half hours, and please don't

22   presume I'm going to keep sitting here and

23   allow myself to be treated this way.  I

24   again would urge you to ask me questions

25   about the Elliott meeting.  That is the

1                    DONZIGER

2   main purpose of this deposition.

3        Q.    How much money have you

4   received from funds raised based on sales

5   of interest in the judgment since March of

6   2014?

7        A.    I have already answered that

8   question.

9        Q.    And what was the amount?

10       A.    I don't know exactly.  It is

11  not a lot.

12       Q.    I'm going to mark as Exhibit

13  5312 -- when you say not a lot, what does

14  that mean?

15       A.    Well, relative to what you

16  make.

17       Q.    So you have been paid less than

18  $100,000?

19       A.    I have been paid -- I don't

20  know.  I pay a lot out, that I have been

21  paid and then I pay it back out to other

22  people at certain times.  And part of the

23  purpose of hiring Ms. Sullivan was to get

24  all that reconciled.

25       Q.    Can you estimate how much

1             DONZIGER
2  you've been paid for working on the Ecuador
3  case since March of 2014?
4      A.     I don't know.  It might be less
5  than zero, I don't know, given the funds
6  that have gone out.  It might be a few
7  hundred grand.  I just don't know.  I hired
8  Ms. Sullivan to reconcile all of that.  It
9  is not a lot of money.
10     Q.     I'm going to hand you a
11  document that we have marked as Exhibit
12  5312.  This was created based on the
13  documents that Ms. Sullivan produced.
14            (Plaintiff's Exhibit 5312
15  marked for identification.)
16     Q.     So they bear MKS Bates number
17  references.  Do you see that?
18     A.     Yes.
19     Q.     This shows that you sent
20  Ms. Sullivan $25,000 invoices for December
21  2017, January 2018, and February 2018, as
22  well as March 2018.  Do you see that?
23     A.     Yes.
24     Q.     It also shows that the
25  December, January and February invoices

```
 1                    DONZIGER
 2   were paid.  You received those funds, yes?
 3        A.     It is beyond the scope.
 4        Q.     The February 5th, 2018 invoice
 5   for $200,000, what was that for?
 6        A.     Beyond the scope.  As a general
 7   matter -- well, forget it.  I will stop
 8   right there.
 9        Q.     I'm going to mark as Exhibit
10   5313 an invoice from Mr. Donziger bearing
11   the Bates number MKS 389.
12              (Plaintiff's Exhibit 5313
13   marked for identification.)
14        Q.     Which states "Partial
15   reimbursement for legal and consultive
16   services and expenses/Ecuador environmental
17   case, 2013 to 2017, due: $200,000."
18              Did you prepare Exhibit 5313,
19   Mr. Donziger?
20        A.     It is beyond the scope.
21        Q.     During the period 2013 to 2017,
22   did you receive any monies related to the
23   Ecuador case that were raised based on the
24   existence of the Ecuador judgment?
25        A.     It is beyond the scope.
```

1            DONZIGER
2       Q.      You indicate on --
3       A.      I'm going to say this for the
4    record, okay, I'm here in good faith.  You
5    have yet -- it is now, I don't know, 12:30,
6    you have yet to ask me about what happened
7    at the Elliott meeting.  I am not going to
8    sit here all day while you go through this
9    little game you are playing and try to ask
10   me questions that are beyond the scope of
11   this very limited deposition.  So if you
12   want to get information about the Elliott
13   meeting, you should start asking questions
14   now, because I'm telling you and I'm
15   warning you, I'm not going to sit here all
16   day and go through this.  You are wasting
17   time.
18       Q.      Mr. Donziger --
19       A.      You are wasting time, Andrea.
20       Q.      This is a discovery deposition.
21       A.      No, it doesn't give you --
22       Q.      Are you going to even let me
23   finish?  I didn't interrupt you.
24       A.      Go ahead.
25       Q.      This is a discovery deposition.

1          DONZIGER

2    All of my questions are appropriate.  I

3    don't agree with your refusals to answer,

4    but they are what they are.  We will make a

5    record of your refusals, then we will make

6    an appropriate motion to compel.  That's

7    how the process works if you are going to

8    refuse to answer.  So don't threaten me or

9    claim that you are being harassed when I

10   have been absolutely 100 percent polite to

11   you, which the video will show.

12        A.     Well, I didn't accuse you of

13   being impolite.  I'm simply saying that the

14   questions you are asking go beyond the

15   scope of the deposition as ordered by Judge

16   Kaplan.  So why don't you --

17        Q.     We disagree about that, sir.

18   So I'm going to ask my questions.

19        A.     Well, let me tell you what we

20   do agree about.  We agree that the Elliott

21   meeting is something that Judge Kaplan

22   ordered, so why don't we focus on what we

23   agree on and get that information out.

24        Q.     I will take the deposition as I

25   believe it is appropriate.

1                    DONZIGER
2              Now, returning your attention
3    to Exhibit 5313, you indicate that funds
4    are to be wired both to yourself and to
5    Laura B. Miller at a Citibank account.  Do
6    you see that?
7         A.    Yes.
8         Q.    Do you have funds that are due
9    and payable to you wired to Ms. Miller's
10   account on a regular basis?
11        A.    No.  That wire never happened.
12        Q.    Why is part of this money being
13   directed to Ms. Miller?
14        A.    Because I periodically give my
15   wife money to pay living expenses.
16        Q.    Have any other funds that were
17   raised in connection with the Ecuador
18   judgment been paid to Ms. Miller at your
19   direction?
20        A.    No.
21        Q.    Have any funds --
22        A.    No funds have been paid to
23   Ms. Miller from the Ecuador judgment as far
24   as I know.
25        Q.    Have any funds that are --

1                        DONZIGER
2         A.      I'm sorry, from funds raised
3    for the case have been paid to Ms. Miller,
4    my wife.
5         Q.      Have any funds raised in
6    connection with the Ecuador judgment since
7    March of 2014 been paid to anybody other
8    than yourself for your benefit?
9         A.      Not that I'm aware of.
10        Q.      I'm going to mark as Exhibit
11   5314 a compilation prepared from documents
12   produced by Ms. Sullivan.
13               (Plaintiff's Exhibit 5314
14   marked for identification.)
15        A.      Is this a Gibson Dunn document?
16        Q.      Yes, sir.  But it has Bates
17   numbers from Ms. Sullivan's production.  It
18   is a summary document.
19               Looking at page 1 of Exhibit
20   5314, there's a $50,000 deposit to your
21   Relationship Checking 2265 on January 25th,
22   2016.  Do you see that?
23        A.      Yes.
24        Q.      Are those funds that were
25   raised in connection with the Ecuador case?

1              DONZIGER

2       A.       This is beyond the scope.

3       Q.       You did not identify account

4   2265 as one of the accounts you have used

5   since 2014.  Is there a reason you didn't

6   disclose that account?

7       A.       No.  I mentioned there might

8   have been other accounts and maybe there

9   was.  I don't know.  I already said that I

10  gave you the current universe, which is

11  what you are entitled to know, and I said

12  that there might have been other accounts

13  that have been opened and closed.

14      Q.       Have you, since March of 2014,

15  have you banked anywhere other than TD?

16      A.       I had sort of a complicated

17  history, because during RICO I got asked to

18  leave my prior bank where I banked for

19  many, many years.

20      Q.       Chase?

21      A.       Chase.  I don't remember

22  exactly when that happened.  I think it was

23  during the trial or sometime before or

24  after.  I don't remember.  That's why I'm

25  at TD Bank because Chase asked me to leave.

1                    DONZIGER
2    So I then went to TD Bank and started
3    banking at TD.  I don't remember exactly
4    the date I started, I think it was prior to
5    the RICO judgment, and I opened accounts.
6         Q.    Did you bank anywhere between
7    Chase and TD or you went --
8         A.    I don't believe I did.  I went
9    to TD.
10        Q.    And other than having other TD
11   accounts that you may not have identified,
12   do you have accounts at any other financial
13   institutions that you haven't identified?
14        A.    Well, I put it in my responses.
15   I had an account at Schwab.
16        Q.    Anywhere else?
17        A.    I don't believe so.
18        Q.    Returning your attention to
19   Exhibit 5314, there are a total of $488,450
20   worth of payments from the Lenczner Slaght
21   Royce & Smith firm, that's the Canadian
22   counsel for the plaintiffs, made to you in
23   2016.  What are the origin of these funds?
24        A.    Beyond the scope.
25        Q.    The $488,450 paid to you by

```
 1                    DONZIGER
 2  Mr. Lenczner's firm, do you still have
 3  those funds?
 4        A.     Beyond the scope.
 5        Q.     Were the monies that were paid
 6  to you by Mr. Lenczner's firm, did they
 7  originate with a funder of the litigation?
 8        A.     It is beyond the scope.
 9        Q.     Do you have any e-mails or
10  other documents relating to your receipt of
11  these funds?
12        A.     Beyond the scope.
13        Q.     Did you direct these monies to
14  be paid first to Mr. Lenczner and then have
15  Mr. Lenczner transfer them to you?
16        A.     Beyond the scope.
17        Q.     You have indicated in your
18  discovery responses that since 2014 your
19  only income has been from working on this
20  case and two rental properties.
21        A.     Yes.
22        Q.     Do all of the deposits shown on
23  Exhibit 5314 relate to your work on the
24  Ecuador matter?
25        A.     Andrea, there is a lot of
```

1                    DONZIGER
2    deposits here.  You just gave me the
3    document.  I have no way of answering that
4    question without studying this document.
5    But, in any event, it is beyond the scope
6    of the deposition.  There is dozens of
7    transactions.
8         Q.    Well, these are all deposits.
9    You have signed discovery responses
10   indicating that you have a very limited
11   number of sources of income.
12        A.    I do.  I do.
13        Q.    So of these two pages of
14   deposits, and for clarification --
15        A.    I mean, it looks like there is
16   more than two pages of deposits, first of
17   all.
18        Q.    There is not.  I will clarify
19   it for you.
20        A.    Okay.
21        Q.    The first two pages put the
22   transactions, organize them by source.  The
23   second two pages organize them by your
24   different bank accounts.  So there is only
25   two pages of transactions.

1                    DONZIGER

2        A.        Okay.  But, anyway, I will note

3    that on these two pages there is, I don't

4    know, it looks to be approximately 25 or 30

5    transactions.  So even if it wasn't beyond

6    the scope, I couldn't answer your question

7    in this limited amount of time.  I would

8    have to study the document.  But this is

9    beyond the scope.

10                    I mean, you know, your interest

11   is in getting your client's judgment

12   against me paid, so what is of interest is

13   what I have now, and I am telling you, and

14   I'm happy to talk about what I have now and

15   how I can pay that, so I don't know why you

16   are doing a fishing expedition into

17   everything that has happened over the last

18   several years, and that's why,

19   respectfully, I think this is harassment.

20   Why don't we talk about what happened in

21   the Elliott meeting.

22       Q.        Is your discovery response in

23   which you state that your only sources of

24   income since 2014 have been this case and

25   two rental properties accurate?

1          DONZIGER

2       A.      I believe it is.  But I will

3    say this, just to clarify, before we go

4    further, a lot of money that came in to my

5    accounts went back out to other people.

6    I'm not embarrassed to get a $500,000

7    income over whatever period of time this

8    is.  But that is not an accurate reflection

9    of monies that I was actually getting from

10   the Ecuador case, to be as clear as I can.

11      Q.      The $488,450 paid to you by

12   Mr. Lenczner's firm, was that compensation

13   to you or something else?

14      A.      That is beyond the scope.

15   Other than to say it wasn't compensation to

16   me only.  There were other people working

17   on the case who had contracts who needed to

18   be paid out of that money.

19      Q.      Did it include compensation to

20   you?

21      A.      To the extent that I could pay

22   myself given my previous testimony, yes.

23      Q.      And did this money come from a

24   funder of the litigation?

25      A.      It is beyond the scope.

1                    DONZIGER

2        Q.      Just yes or no, Mr. Donziger.

3        A.      It is beyond the scope.  I

4   mean, what are you -- look, I have already

5   testified, or I should say argued before

6   Judge Kaplan that we raised money for the

7   case from selling the FDA's shares.

8        Q.      And when you say the FDA's

9   shares, you just mean the judgment in its

10  entirety, right?  They don't have any

11  particular share of the judgment?

12       A.      No, the judgment, interest in

13  the judgment would be a more accurate way

14  to say it.

15       Q.      And, in your view, with the

16  FDA's authorization --

17       A.      I have already testified to

18  that, yes, I am authorized to help them

19  raise money to pay litigation expenses,

20  consistent with Judge Kaplan's April 25th,

21  2014 order.

22       Q.      And in addition to paying

23  actual expenses, are you entitled to help

24  them raise money for any other purpose?

25       A.      I mean, I want to help the FDA.

1                    DONZIGER

2      I think it is a great organization.  On

3      occasion I have helped them try to raise

4      money for other purposes, foundation money,

5      that kind of thing, projects, health

6      projects.  People are hurting, so there is

7      all sorts of projects the FDA does, and on

8      occasion I have tried to help them raise

9      money.

10          Q.     And is there any limit to the

11     number of percentage interest you are

12     authorized to sell in the judgment on

13     behalf of the FDA?

14          A.     Well, I don't sell anything.  I

15     try to get funders to buy interest in the

16     judgment, and obviously subject to client

17     approval.  So I will do the best I can for

18     my clients in that regard and present the

19     possibility to them and they can say yes or

20     no.  You know, they determine that.

21          Q.     Well, my question is actually

22     in your view, is there any limit on the

23     percentage interest the FDA can sell in the

24     judgment?  Can they sell somebody 50

25     percent of the judgment, for example?

1                    DONZIGER
2        A.      I haven't given that any
3    thought.  I mean, this is a contingency fee
4    case.  You know, as you know, the normal
5    contingency fee for a U.S.-based case like
6    this would probably be 40, even 50 percent
7    given the length of time it has taken.
8                 The FDA has sold a very modest
9    amount of its interest to fund it for 24
10   years.  So the FDA is well below the
11   typical U.S. threshold for a contingency
12   fee for a complex case like this.  How far
13   the FDA would go to sell interest is up to
14   them, but right now, you know, they are
15   comfortable with where they are at in terms
16   of the amount that is put aside to pay
17   contingent fees.
18        Q.      How many -- what's the total
19   percentage interest in the judgment that's
20   been sold by the FDA?
21        A.      That's not an appropriate
22   question.  That goes to our internal
23   operations.  I mean, on what basis do you
24   think that's relevant to this deposition?
25        Q.      You told Elliott that you had

```
 1                    DONZIGER
 2   raised $33 million in investor funds for
 3   the case.  Do you recall that?
 4        A.      I don't specifically, but I
 5   might have.
 6        Q.      Is that an accurate statement?
 7        A.      I don't think it was actually.
 8        Q.      What's not accurate about it?
 9        A.      I think that I was confusing
10   the amount of money actually raised with
11   the amount of money that had been, you
12   know, that some document that you guys had
13   put together.
14        Q.      What is the amount of money
15   actually raised?
16        A.      I think it is around -- well,
17   I'm saying this because it is public
18   information, I think it is around $15
19   million over 24 years, but it depends on
20   various issues and how you count it and
21   whether you count certain amount of labor
22   from law firms that was uncompensated, that
23   kind of thing.
24        Q.      Where do you get the number $15
25   million?
```

1              DONZIGER

2       A.       It is an estimate.

3       Q.       Do you have in your

4    documents --

5       A.       Andrea, you guys have this

6    information.  Please don't play possum with

7    me.  You got this information during the

8    RICO case, and then subsequent to that, the

9    RICO case, the RICO judgment, there has

10   been some more money raised, as I have said

11   before Judge Kaplan.

12      Q.       And what are the amount of the

13   additional funds that have been raised?

14      A.       I'm not saying.  It is well

15   beyond the scope of this deposition.  I

16   mean, how does that relate to the Elliott

17   meeting?

18      Q.       And that is included or not

19   included in the $15 million?

20      A.       I don't know.  You know, I'm

21   not a financial wizard.  Like there has

22   been some millions raised to take us

23   through RICO.  There has been some more

24   money raised, as I already said to Judge

25   Kaplan, since RICO.

1                    DONZIGER

2        Q.      But you don't know how much?

3        A.      No, I do know how much.  I'm

4    not telling you.  It is beyond the scope of

5    this deposition.

6        Q.      I'm going to mark as Exhibit

7    5315 a document and a certified

8    translation.

9               (Plaintiff's Exhibit 5315

10   marked for identification.)

11       Q.      The heading Fromboliere,

12   attorneys, addressed to Mr. Carlos Guaman.

13       A.      Guaman.

14       Q.      Guaman, president of the FDA,

15   from Pablo Fajardo.

16               Are you familiar with this

17   document, Mr. Donziger?

18       A.      I have seen it.  I read it when

19   it came out.

20       Q.      It states here that "On January

21   19th, 2016, Mr. Luis Yanza and Mr. Steven

22   Donziger signed a contract for the

23   management of financial resources on behalf

24   of the FDA and the plaintiffs.  This is

25   extremely serious since neither of these

```
 1                    DONZIGER
 2   two persons represents the plaintiffs."
 3             Do you see that?
 4        A.    This is beyond the scope of the
 5   deposition.
 6        Q.    Do you know what contract he is
 7   referring to?
 8        A.    It is beyond the scope of the
 9   deposition.
10        Q.    Do you have that contract?
11        A.    Beyond the scope of the
12   deposition.  Are we going to get to the
13   Elliott meeting questions?  Do you want to
14   know what happened?
15        Q.    In the next paragraph it states
16   "Subsequently, at least two more documents
17   have been signed, supposedly to finance the
18   plaintiffs' case in Canada, the last of
19   which was at the beginning of July 2016."
20        A.    Andrea, this is irrelevant to
21   this deposition.  I'm sorry.
22        Q.    It is not, Mr. Donziger.
23        A.    It is.  You are on a fishing
24   expedition.  Ask me about what Judge Kaplan
25   ordered you to ask me about, seriously.
```

1                    DONZIGER
2    That's what I'm here to talk about.  I am
3    not going to sit here all day --
4         Q.    That's what we are doing,
5    Mr. Donziger.
6         A.    -- while you go on a fishing
7    expedition.  That's what we are doing?
8    Really?  So you admit you are on a fishing
9    expedition?
10        Q.    No, Mr. Donziger.  We are
11   asking questions consistent with our
12   discovery.
13        A.    These are not appropriate
14   questions given Judge Kaplan's order, okay?
15   I am -- you should talk to your client,
16   okay, because I am going to leave this
17   deposition if you don't start asking me
18   questions about the Elliott meeting.
19        Q.    Do you have the documents
20   referenced in paragraph C of Exhibit 5317?
21        A.    It is beyond the scope.
22              You know what I'm going to do,
23   I'm going to take a five-minute break and
24   if you don't start asking me questions
25   about Elliott, talk to your client, and

```
1                    DONZIGER
2    there is really nothing more to do here
3    today.  I mean, if Judge Kaplan rules you
4    can ask these questions, we can do that,
5    but you don't have the right to keep me
6    here all day asking questions that are
7    beyond the scope of the deposition.
8              MS. NEUMAN:  We can go off the
9    record.
10             THE VIDEOGRAPHER:  This is the
11   end of media file number three.  The time
12   is 12:39.  We are going off the record.
13             (Recess taken.)
14             THE VIDEOGRAPHER:  The time is
15   12:45.  We are back on the record.  This is
16   the beginning of media file number four.
17   BY MS. NEUMAN:
18        Q.    Mr. Donziger, you are still
19   under oath.
20        A.    Yes.
21        Q.    When you refer to Judge
22   Kaplan's order ordering your deposition, I
23   want to confirm that you are referring to
24   Docket No. 2009, paragraph 3.  "Donziger
25   shall appear for and testify pursuant
```

```
 1                    DONZIGER
 2  to" --
 3          A.      This is --
 4          Q.      -- "Chevron's subpoena."
 5          A.      There is a subsequent order by
 6  Judge Kaplan that limits the scope of the
 7  deposition to the Elliott issue.
 8          Q.      Why don't you direct me to that
 9  order, Mr. Donziger.
10          A.      I don't have it handy.  You
11  know better than I.
12          Q.      This is the order that ordered
13  your deposition.
14          A.      No, there is a subsequent
15  order.
16          Q.      And you're claiming that
17  subsequent order limited this order in some
18  way?
19          A.      Yes, yes.
20          Q.      But you can't direct me to that
21  order?
22          A.      You can find it.
23          Q.      I don't think there is such an
24  order.  In any event, when you make scope
25  objections, it's not based on Docket No.
```

1                    DONZIGER
2    2009?
3         A.     I haven't looked at this
4    document for a while.
5         Q.     Well, take a moment to read
6    paragraph 3.
7         A.     Listen, there is an order that
8    Judge Kaplan issued limiting this
9    deposition to the Elliott Management issue,
10   but you haven't --
11        Q.     There is no such order,
12   Mr. Donziger.
13        A.     Yes, there is.  It is now
14   12:45, you haven't asked me one question
15   about it.
16        Q.     There is no such order.
17        A.     Why don't you ask me any
18   questions about that?
19        Q.     Mr. Donziger, when you make
20   scope objections --
21        A.     There is an order --
22        Q.     -- are you making them based on
23   Docket 2009 or a different order?
24        A.     I don't know.  I can't say
25   offhand.  I don't have all the orders in

1                    DONZIGER

2   front of me.  Judge Kaplan issued an order,

3   my understanding, which I'm sure I could

4   produce if I went back and looked at the

5   docket, limiting this deposition to the

6   Elliott meeting.

7        Q.     I'm going to hand the witness

8   Exhibit 5316, a Spanish document and

9   translation entitled Declaration of

10  Affected Nationalities in the Province of

11  Sucumbios.

12               (Plaintiff's Exhibit 5316

13  marked for identification.)

14       Q.     Have you seen Exhibit 5316

15  before, Mr. Donziger?

16       A.     I don't know.  It's beyond the

17  scope.

18       Q.     It states in Exhibit 5316, "On

19  January 19th, 2016, Mr. Donziger and

20  Mr. Yanza, without informing and without

21  authorization from the undersigned

22  Nationalities, or from the plaintiffs,

23  executed an agreement with financers from a

24  so-called tax haven on behalf of the people

25  affected and the nationalities, without any

```
1                    DONZIGER
2    authorization to do so."
3              Do you see that?
4         A.      This is beyond the scope.
5         Q.      Did you execute such an
6    agreement in 2016?
7         A.      This is beyond the scope and it
8    is also First Amendment protected.
9              Ms. Neuman?
10        Q.      Yes, sir.
11        A.      I want to say the following,
12   okay:  You are trying to ask questions that
13   are beyond the defined scope of this
14   deposition in my view, okay?  I get that we
15   disagree.
16        Q.      Go ahead, I'm listening.
17        A.      The main basis for your motion
18   for contempt was the Elliott meeting.  This
19   was the motion you filed in March.  It is
20   now June.  I'm here willing to talk about
21   that and you still haven't asked me a
22   question.  So I believe you are harassing
23   me.
24              I know we disagree.  But I'm
25   going to give you one last chance to ask
```

1                    DONZIGER

2    about the Elliott meeting or I'm going to

3    leave this deposition at lunch and I'm not

4    going to come back, and you can file your

5    motion to compel.  I'm not going to sit

6    here all day and be subjected to this.  So

7    if you want to ask about the Elliott

8    meeting, you have from now until lunch, and

9    I will even make it a late lunch to give

10   you some time.  But please ask me about the

11   Elliott meeting or I am going to leave this

12   deposition at lunch.

13        Q.    Mr. Donziger, I'm going to give

14   you a stipulation that you signed, Docket

15   No. --

16        A.    It doesn't give you a right --

17   the stipulation doesn't give you a right to

18   just go on a fishing expedition and you

19   know it.

20        Q.    Mr. Donziger --

21        A.    I know this document.

22        Q.    Okay, so you are aware that you

23   stipulated that you are required to respond

24   to Chevron Corporation's money judgment

25   discovery request and certain paragraph 5

1                    DONZIGER
2    judgment compliance requests per Docket
3    Nos. 2006 and 2020.  Do you see that?
4         A.    2006 and -- I don't even know
5    what those dockets are.  All I know is this
6    is:  Judge Kaplan has issued orders that
7    define the scope of this deposition and you
8    haven't stuck to those, and I have been
9    very patient, I have been here half a day
10   now.
11        Q.    Mr. Donziger, let me finish
12   asking you my questions.  You have done
13   enough speechifying today.  You have barely
14   given any deposition time.
15             This is dated June 21st of
16   2018.  You look at the second page, is that
17   your signature, sir?
18        A.    Yes.
19        Q.    So you signed this stipulation?
20        A.    Yes.
21        Q.    And on the first page, do you
22   see where it says "Donziger, by order of
23   the Court, Docket 2009, and agreement of
24   the parties, will appear for deposition on
25   June 25th, 2018 concerning the same topics

```
 1              DONZIGER
 2  and scope."
 3              Do you see that?
 4      A.    Yes.
 5      Q.    And you see that the docket
 6  that I gave you, which defines your
 7  deposition as pursuant to our subpoena, is
 8  2009?
 9      A.    Listen, that's not the only
10  thing out there that defines the scope of
11  this deposition.  Judge Kaplan issued a
12  subsequent order, some order, which I don't
13  have it at my fingertips --
14      Q.    Do you see that Judge Kaplan
15  signed this order on June 21st?
16      A.    Obviously his signature is
17  there. But, listen, instead of like wasting
18  time, why don't you just ask me about the
19  topic that he suggested the deposition be
20  about, which is the Elliott meeting?  Why
21  are you not asking about the Elliott
22  meeting?
23      Q.    Mr. Donziger, are you refusing
24  to testify to the topics as stipulated in
25  Document 2030?
```

1                    DONZIGER

2        A.      I am -- I am voluntarily

3    happily here in a cooperative spirit to

4    answer any question, appropriate question,

5    relevant question, related to the two

6    topics at hand, okay?  This is not a

7    fishing expedition and that's how you're

8    treating it.

9        Q.      And you have self-defined those

10   two topics --

11       A.      I have not self-defined.

12       Q.      -- as other than the

13   stipulation marked as -- you need to let me

14   finish, sir.  I don't interrupt you.

15               You are defining the topics of

16   your deposition differently than they are

17   defined in Docket No. 2030, correct?

18       A.      Judge Kaplan has defined the

19   topics in his order as I have read his

20   orders.

21       Q.      And these are his orders?

22       A.      There is multiple orders since

23   March.  I don't have them all at my

24   fingertips.

25       Q.      There is another order

1                    DONZIGER
2  regarding your deposition that was issued
3  since June 21st of 2018?
4       A.     I'm not answering the question,
5  okay?  I have made my view clear.  If you
6  want to ask me about the Elliott Capital
7  meeting, please ask me.  I'm here to answer
8  those questions.
9       Q.     So are you now defining the
10 scope of this deposition down to just that
11 meeting?
12      A.     No, that and my financial
13 condition and ability to pay the judgment,
14 and there is not a lot there because I have
15 told you everything I own and I can pay
16 Chevron's judgment.
17      Q.     Then why haven't you paid it?
18      A.     Because you haven't asked for
19 it.  Because you would rather come in here
20 and do a fishing expedition and acting like
21 I can't pay so you can find out everything
22 you can about me, and that's why we have a
23 First Amendment problem.
24      Q.     Is there something preventing
25 you from paying the judgment, sir?  Or are

```
 1                DONZIGER
 2   you just choosing not to?
 3        A.     It is on appeal, by the way.
 4        Q.     Okay.  Is there something
 5   preventing you from paying the judgment or
 6   you are choosing not to?
 7        A.     It is on appeal.  The judgment
 8   is not final.
 9        Q.     I'm going to mark as Exhibit
10   5317 documents produced by Mr. Rizack
11   bearing the Bates numbers RIZACKJD 1
12   through 5.
13               (Plaintiff's Exhibit 5317
14   marked for identification.)
15        Q.     You reviewed Mr. Rizack's
16   production before he made it?
17        A.     Yes.
18        Q.     Did you withdraw, or withhold,
19   I should say, documents that Mr. Rizack
20   gave you to review and not produce them?
21        A.     I didn't withdraw or withhold.
22   I told Mr. Rizack that there was a
23   particular document, actually two documents
24   that I felt were not -- either not
25   responsive or privileged or fell beyond the
```

1                    DONZIGER

2   scope or were First Amendment protected.

3        Q.     And are those documents here or

4   they're not here?

5        A.     They're not.  He didn't produce

6   them.

7        Q.     You directed him not to produce

8   them?

9        A.     I don't direct him to do

10  anything.  I am not his lawyer and he

11  doesn't work for me.  We are colleagues and

12  he appropriately allowed me to review the

13  documents prior to production.

14       Q.     And you identified documents he

15  should not produce and those haven't been

16  produced; is that right?

17       A.     I told him there were a couple

18  of documents that I felt would be subject

19  to these outstanding issues, legal issues,

20  that I have mentioned, and that it would

21  not be appropriate to produce them at this

22  point.

23       Q.     And what do these documents

24  relate to generally?

25       A.     The internal operations of our

```
 1                 DONZIGER
 2   team and the litigation.
 3        Q.      And the documents that he did
 4   produce, you had no objection to him
 5   producing?
 6        A.      No.
 7        Q.      So the last two pages of
 8   Mr. Rizack's production, pages 4 and 5,
 9   relate to the development of a budget for
10   an Ecuador trip.  Do you see that?
11        A.      Yes.
12        Q.      The total for the trip is
13   $45,550.  What does this relate to?
14        A.      That is beyond the scope of the
15   deposition.  I mean, you are asking about a
16   budget to bring some Ecuadorians for a
17   court hearing, according to this document,
18   and you are not asking about the Elliott
19   meeting.
20        Q.      These are documents that you
21   agree that Mr. Rizack should produce.
22        A.      Not should.  He felt they were
23   responsive.  I mean, I don't know why you
24   are asking me about something like that
25   when you are not asking about the Elliott
```

```
 1                  DONZIGER
 2   meeting.
 3        Q.      And are these $50,000 in
 4   expenses that you paid?
 5        A.      Beyond the scope, First
 6   Amendment protected.  And, by the way,
 7   there is no presumption by answering that
 8   that these expenses were paid.
 9        Q.      I'm going to mark as Exhibit
10   5318 an e-mail from Mr. Rizack to
11   Mr. Herrera dated June 24th in which he
12   states he is withholding three -- I'm
13   sorry, four documents at your direction.
14               (Plaintiff's Exhibit 5318
15   marked for identification.)
16        A.      Okay.
17        Q.      Did you direct him to withhold
18   four documents on the basis of privilege?
19        A.      I don't think so.  I thought it
20   was two documents, so I would have to ask
21   him, and I will ask him.
22        Q.      And you have not prepared a log
23   for those documents?
24        A.      Mr. Rizack can send you the
25   basic information.
```

1          DONZIGER

2     Q.     What does that mean?

3     A.     I mean, it is not -- it is not

4  a complicated exercise.  I don't believe it

5  is up to me to provide you a log.  I'm not

6  producing.  He is producing.

7     Q.     When was the first time you met

8  with Elliott Capital?

9     A.     On the day of the meeting.

10     Q.     You indicated in some of your

11  correspondence with Ms. Sullivan that you

12  had met with them previously.  Was that not

13  right?

14     A.     Oh, I forgot.  Yeah, I had met

15  with -- I don't know if I had ever met with

16  them, but I had someone who I was working

17  with many years ago had a contact with them

18  about the case.  It might have been over

19  ten years ago.  I don't remember exactly.

20     Q.     Do you recall who you met with

21  in that original meeting?

22     A.     I believe, to the best of my

23  recollection, it was something that had

24  been arranged by Nicholas Economou of H5.

25     Q.     And do you remember who you met

1                    DONZIGER

2   with?

3         A.      I don't think I met with anyone

4   at Elliott at that time.  I think somebody

5   Nicholas knew approached them with the idea

6   of this and I don't think there was

7   interest, if I remember correctly.

8         Q.      Do you have documents related

9   to that initial meeting?

10        A.      I don't believe I do.

11                MS. NEUMAN:  It is 1 o'clock.

12  I would like to take our lunch break.

13                THE VIDEOGRAPHER:  The time is

14  1 p.m.  We are going off the record.

15                (Discussion off the record.)

16                THE VIDEOGRAPHER:  The time is

17  1:01.  We are back on the record.

18  BY MS. NEUMAN:

19        Q.      Mr. Donziger, you want to make

20  a statement for the record about how you

21  are limiting the scope of this deposition

22  to the Elliott meeting?

23        A.      I have already said this on

24  multiple occasions.  I am leaving this

25  deposition now.  It is my view that

1          DONZIGER

2   Chevron's counsel has wasted the majority

3   of the morning asking me questions beyond

4   the scope, and I am not going to stay when

5   I believe this has turned into a harassing

6   exercise.

7              I am more than happy, as I

8   stated repeatedly starting two or three

9   hours ago, to answer any question about

10  Elliott.  I am not taking a lunch break and

11  staying.  If you want to ask more questions

12  about Elliott I will give you some minutes

13  before lunch, otherwise if you want to have

14  lunch now I am going to leave.

15      Q.      So, Mr. Donziger, you received

16  notice that we planned to take the

17  deposition from 10 to 6, correct?

18      A.      That doesn't matter.  You don't

19  unilaterally decide how long a deposition

20  lasts.

21      Q.      You understand that under the

22  federal rules, there are rules about the

23  length of a deposition?

24      A.      The length of a deposition is

25  not completely up to you, it is also up to

1              DONZIGER

2    the party being deposed, and if you are

3    going beyond the scope of the deposition I

4    have a right not to subject myself to this

5    harassment.  Your remedy is to go to Judge

6    Kaplan and I will respond appropriately,

7    okay?  You have wasted most of this

8    morning --

9         Q.    Okay, Mr. Donziger --

10        A.        -- on all sorts of issues and

11   they don't relate to the scope of this

12   deposition.  I'm sorry, but if you want to

13   ask more questions, I will give you some

14   more minutes right now.

15        Q.    So our position, Mr. Donziger,

16   since we are making speeches, is that it is

17   not up to you to unilaterally limit this

18   deposition, contrary to a stipulation that

19   you signed and contrary to two orders that

20   the Court made.

21             It is also not up to you to

22   unilaterally decide how long the deposition

23   is going to last.  You have taken multiple

24   breaks this morning, an absurd number

25   really, without any objection from us, and

```
 1                    DONZIGER
 2   now when everybody else wants to take a
 3   normal lunch break your position is you are
 4   terminating the deposition.  That is not in
 5   good faith.  None of this behavior has been
 6   in good faith.  All the speechifying you
 7   did all morning to waste the morning time
 8   was not in good faith.
 9        A.     May I respond?  Were you
10   finished?
11        Q.     Yes, go ahead.
12        A.        I didn't speechify.  I stated
13   objections.  I took short breaks.  You had
14   all morning to ask me about the purpose,
15   the main purpose of this deposition, and
16   you refused.  You are playing possum with
17   me and you are asking me questions that
18   were irrelevant and I stood here and
19   patiently went through it all with you and
20   repeatedly offered to answer questions
21   about Elliott.  Since you never asked, I am
22   not going to sit here all day while you go
23   on a fishing expedition.
24             My position is clear in my
25   responses and in the various motions I have
```

```
 1              DONZIGER
 2   filed.  So what I would suggest is we agree
 3   to disagree, we end the deposition, and we,
 4   both parties, will seek appropriate
 5   remedies.
 6        Q.    So I'm not agreeing to end the
 7   deposition, Mr. Donziger.  How long -- you
 8   want to answer questions about Elliott?
 9        A.    I don't, but --
10        Q.    We will see how long the court
11   reporter and the videographer can last,
12   since you won't let people have their
13   normal lunch break because it is
14   inconvenient for you.
15        A.    No, you have wasted the whole
16   morning.  I will give you 15 minutes and
17   you can then go have lunch,.  Ask me any
18   question you want about Elliott.
19        Q.    What were the terms offered to
20   Elliott?
21        A.    There were no terms offered to
22   Elliott.
23        Q.    How much investment were you
24   seeking?
25        A.    We never got to that point.
```

1          DONZIGER

2          Q.      Did you discuss with

3     Ms. Sullivan how much you were going to ask

4     Elliott for?

5          A.      I think we did.

6          Q.      When you told Elliott that you

7     had a 6.3 percent interest in the judgment,

8     was that an accurate statement?

9          A.      According to my retainer, yes,

10    but I have given portions of that to other

11    people.

12         Q.      To whom have you given portions

13    of that?

14         A.      Rick Friedman, Zoe Littlepage.

15         Q.      Did you give them --

16         A.      So they would represent me in

17    the RICO case, just to be clear.

18         Q.      You gave them portions of that

19    before or after the RICO judgment?

20         A.      Before.

21         Q.      So what percentage of the 6.3

22    do you currently own?

23         A.      Again, I think it is pretty

24    much a nullity for practical purposes given

25    the RICO judgment.  But I think if you were

```
1                    DONZIGER
2   to discount what has been allocated to
3   Mr. Friedman and Ms. Littlepage and a
4   couple of other people --
5        Q.     Who were the other people?
6        A.     Two people who had loaned me
7   money to pay John Keker, family members.  I
8   would estimate it is about 5 or 5.2
9   percent.
10       Q.     I'm sorry, what you have left
11  is 5 percent?
12       A.     In other words, instead of 6.3,
13  even though it is all for me and I owe
14  them, that if you were to discount what
15  they have been contractually promised, it
16  would be about 5.2 percent based on my best
17  estimates.
18       Q.     When you say discount, you mean
19  subtract out?
20       A.     Yes, subtract out.
21       Q.     From the 6.3?
22       A.     Yeah.
23       Q.     Why was your 6.3 percentage
24  being discussed with Elliott?
25       A.     I don't remember.  I think
```

```
 1                    DONZIGER
 2    either Lee asked me what I owned and I told
 3    him or I told him roughly how we were
 4    structured.  I don't remember exactly.
 5         Q.    You --
 6         A.    But to be clear, it wasn't in
 7    order to sell any of the 6.3 percent to
 8    Elliott.
 9         Q.    When you have sold additional
10    interest in the judgment, what have been
11    the terms?
12         A.    That's not an appropriate
13    question.  I mean, ask me about the Elliott
14    meeting.
15         Q.    How do you know when you are
16    selling an interest in the judgment that
17    you are not impacting your ownership
18    interest in the judgment?
19         A.    Because they are completely
20    different.  I mean, to be clear, so you
21    understand, every entity that has an
22    interest in the judgment has its own
23    interest that is unaffected by other
24    people's or other entities' interests.
25                    It would be like a business.
```

1                    DONZIGER

2    Say there is 100 percent would be all the

3    equity in a business and, you know, X party

4    owns 3 percent, another owns 2 percent.

5    They are just different pieces of the pie.

6        Q.    Everybody's percentage is

7    affected by the value of the whole,

8    correct?

9        A.    Yes.

10       Q.    And when you bring in new

11   funders, do you reduce the value of the

12   whole?

13       A.    I thought you were going to ask

14   me about the Elliott meeting.  But since

15   you are putting off your lunch, I'm going

16   to answer that question.

17             In theory, the value of the

18   whole, it would be increased because of the

19   support would allow the case to advance.

20   So if you sell an equity interest to X

21   party, it doesn't decrease the value of the

22   whole or the value of what other entities

23   own in the overall interest pie, for lack

24   of a better term, of the case.

25       Q.    So no one, since the entry of

1                    DONZIGER

2    the RICO judgment, has been any kind of a

3    priority interest in the judgment, in other

4    words, they get paid before anybody else?

5         A.    That's generally not how we

6    operate.

7         Q.    When you were discussing

8    offering terms to Elliott, were you doing

9    so in conjunction with the Amazonia

10   structure or ignoring the Amazonia

11   structure?

12        A.    It wasn't in conjunction with

13   the Amazonia structure.

14        Q.    So to the extent Amazonia

15   requires notices of seeking new funders and

16   that sort of thing, you didn't give any of

17   those notices?

18        A.    How do I explain this?  The

19   clients, meaning the FDA, don't want to use

20   the Amazonia structure anymore because of

21   the lawsuit that Chevron filed against it

22   in Gibraltar.  I mean, it is inoperable as

23   far as the FDA is concerned.  So the FDA is

24   making available certain interests in the

25   judgment to get funding in to pay

```
 1              DONZIGER
 2  litigation expenses, but it is independent
 3  of Amazonia.
 4       Q.     The FDA signed the Amazonia
 5  documents, correct?
 6       A.     I believe so, but I don't know
 7  for sure.  I mean, they are right here.
 8       Q.     And do you have any position on
 9  whether the FDA is in breach of the
10  Amazonia documents based on these
11  transactions you have been involved in?
12       A.     I don't believe the Ecuadorian
13  affected communities, be it the FDA or
14  whoever else signed the Amazonia documents,
15  would consider that to be a breach.  I
16  mean --
17       Q.     Do you consider any of the
18  actions you have taken to put you in breach
19  of the Amazonia documents?
20       A.     No, as I have authority from my
21  clients.  I mean, one of the services I
22  provide the FDA is trying to help them
23  generate capital to continue the case.
24       Q.     Do you also provide legal
25  advice or just fundraising advice?
```

1                    DONZIGER

2        A.      I provide -- look, I have lots

3   of different functions, fundraising is one

4   of many.  Well, helping them fundraise,

5   which I might add, if I may, is effectively

6   suspended during the pendency of this

7   litigation, given the contempt motion and

8   the subpoenas issued.

9        Q.      So you have suspended your

10  fundraising efforts since starting what

11  date?

12       A.      It has been -- I have not

13  voluntarily suspended fundraising or

14  seeking of funds, because it's not just

15  selling equity, there is people who like to

16  donate.  But, you know, money is always

17  needed to fund the case, to support the

18  case, to support the various activities of

19  advocacy.

20              But the filing of the contempt

21  motion effectively forced us or put us in a

22  position, I should say, me and others who

23  assist in this effort, where we cannot

24  raise funds.

25       Q.      So you are talking about

1                    DONZIGER

2    funding the case.  Is Canadian counsel on a

3    contingency?

4         A.     That's beyond the scope.  That

5    relates to our internal operations and it

6    is First Amendment protected.

7         Q.     Well, they have stated on the

8    record that they are on a contingency.  Is

9    that an accurate statement?

10        A.     Yes, from my -- based on what I

11   know, yes.  There has been a massive amount

12   of work done by Canadian counsel that is

13   completely uncompensated for.

14        Q.     Doesn't the contingency

15   compensate them?

16        A.     Well, yeah, but it -- you know,

17   yeah, there is a contingency to be paid for

18   work that hasn't been paid for on an hourly

19   basis as far as I know.

20        Q.     Does the contingency agreement

21   get paid if there is collection?

22        A.     That's correct.

23        Q.     So you would anticipate in the

24   meantime that they would not get paid per

25   the agreement?

1                    DONZIGER
2       A.      Sometimes you have hybrid
3  arrangements, people get paid some and
4  they, you know...
5       Q.      Does Canadian counsel have a
6  hybrid arrangement?
7       A.      Look, you know, Canadian
8  counsel has an agreement with his -- well,
9  one of the Canadian counsel has an
10 agreement with his clients, and you can ask
11 him about it.
12      Q.      You said the FDA has an
13 exigible interest in the judgment and you
14 were meeting with Elliott on behalf of the
15 FDA.  If the FDA is the one that owns the
16 judgment, why aren't they plaintiffs in the
17 enforcement actions?
18      A.      I think at the time that was
19 filed, the one in Canada, there was a
20 different organizational structure to the
21 operation in Ecuador than there is today.
22      Q.      And how would that impact who
23 has a right --
24      A.      You would have to ask Canadian
25 counsel.  I mean, I don't know.  I wasn't

1              DONZIGER
2  really involved in the thinking of that at
3  the time.  The FDA is the beneficiary of
4  the judgment according to the Ecuador
5  judgment, so they would collect the funds
6  and spend them on behalf of all the
7  affected communities and the affected
8  people.
9       Q.    But there isn't anything in the
10 judgment that authorizes the FDA to enter
11 into contingency fee agreements, is there?
12      A.    There is language in various
13 documents -- first of all, the answer to
14 that is no, but there is Ecuador law
15 principles that allow claim holders, just
16 like in this country, to finance their case
17 by giving up a portion of their claim.
18      Q.    What provision of Ecuador law
19 are you referring to?
20      A.    I couldn't answer that off the
21 top of my head.  It is basic contracting
22 law and we have researched it extensively,
23 I mean, years ago.  I couldn't really put
24 my finger on any document.  I know you are
25 going to ask.  I mean, I might be able to,

```
 1                    DONZIGER
 2   appropriate, but, you know, basic
 3   contracting principles, the same as in this
 4   country.
 5         Q.     So who participated in the
 6   Elliott meeting?
 7         A.     It was me, Katie Sullivan and
 8   Lee and Jesse Cohn for a period of time,
 9   and then he left early and then it was just
10   me, Katie and Lee Grinwald.
11         Q.     How long did that meeting last?
12         A.     It lasted quite some time, I
13   would say 60 to 90 minutes.
14         Q.     Did Mr. Cohn -- how long did he
15   stay in the meeting?
16         A.     Maybe 20 minutes.
17         Q.     Did he take notes that you saw?
18         A.     I don't remember.  He seemed to
19   be sort of just --
20         Q.     What does this mean
21   (indicating)?
22         A.     The big enchilada, and Lee was
23   sort of handling the meeting.  I think
24   Jesse was just sort of listening.
25         Q.     And what presentation did you
```

1                     DONZIGER

2   make to Mr. Grinberg?

3        A.     I don't recall the specifics,

4   but, of that particular one, but I do know

5   that generally when I talk to potential

6   funders I explain the basic case, why I

7   think the claims are valid.  I explain why

8   I think the RICO judgment is wrong and

9   factually incorrect.  I explain the fraud

10  that I believe Alberto Guerra, you know,

11  engaged in during the RICO matter.  I

12  explain a bit of the structure.

13            It really depends very much on

14  how much interest there is in hearing all

15  this, how far I'll go, how many questions,

16  that kind of stuff.

17       Q.     And do you also discuss the

18  current level of investment in the

19  judgment?

20       A.     If asked.

21       Q.     Did Mr. Grinberg ask you about

22  that?

23       A.     I don't really remember

24  specifically.  I mean, it was a long

25  meeting and he is a very sophisticated

1                    DONZIGER

2  gentleman and I presume he asked me or I

3  told him.

4       Q.    I'm going to show you Sullivan

5  Exhibit 11, the last two pages of which

6  bearing Bates numbers MKS 155 and 156, are

7  Ms. Sullivan's notes from the Elliott

8  meeting.

9            At the beginning, she wrote

10 "FCPA violations unpopular in Australia."

11 Do you see that?

12      A.    Yes.

13      Q.    What does that refer to?

14      A.    I believe, based on my

15 recollection, the "unpopular in Australia,"

16 I mean, I don't remember any specific

17 conversation about this with Lee, but I

18 think it relates to someone saying that

19 Chevron was unpopular in Australia because

20 of its tax problems.

21      Q.    What tax problems?

22      A.    It has a lot of tax problems in

23 Australia, Chevron does, underpayment of

24 taxes.

25      Q.    And your view of that is based

1                    DONZIGER

2    on?

3         A.    It is just news reports.

4         Q.    Underneath that it says

5    "parallel efforts uncares outside of

6    U.S." -- "in cases," I'm sorry, "outside of

7    U.S., Brazil and Argentina."

8         A.    Just to be clear, these are

9    Katie's notes.  I mean, I don't know if she

10   was writing down thoughts she had or she

11   was trying to write about what was actually

12   happening in the meeting.  I mean, I don't

13   know.

14        Q.    Well, did you discuss the

15   Brazil and Argentina cases in the meeting?

16        A.    I don't know.  I don't remember

17   specifically.  I would not be surprised if

18   we did.

19        Q.    But you don't recall?

20        A.    No, I don't recall

21   specifically.

22        Q.    Further down she says "fund

23   Canadian litigation in near term."  Do you

24   see that?

25        A.    Yeah.

1             DONZIGER

2      Q.      And that was the purpose for

3  which you were seeking money from Elliott,

4  to fund the Canadian litigation in the near

5  term?

6      A.      I don't know.  I mean, it

7  certainly would have included that, among

8  other things.

9      Q.      It says "Ecuador judgment

10  injunction in the U.S."

11             Do you see that?

12      A.      Yes.

13      Q.      What was discussed with Elliott

14  about the injunction in the U.S.?

15      A.      I don't know what that refers

16  to.

17      Q.      Down further Ms. Sullivan

18  writes "play with threats versus successful

19  ruling in Canada."

20             What does that refer to?

21      A.      I don't know.

22      Q.      Do you remember discussing

23  threats in the Elliott meeting?

24      A.      I don't know.  I mean, the

25  Elliott meeting was many months ago and I

```
 1                DONZIGER
 2   just don't remember the specifics as I sit
 3   here today other than we had a general
 4   discussion about Elliott potentially
 5   investing in the case.  And these are her
 6   notes, not mine.  I don't know what she is
 7   talking about.
 8        Q.    Further down it says "case
 9   until bank in Ecuador."
10              Do you know what that refers
11   to?
12        A.    "Case until bank in Ecuador,"
13   no, I don't know what that is.
14        Q.    If you look at the next page
15   bearing the Bates numbers MKS 156, at the
16   top it says "boycott time versus Chevron."
17              What does that refer to?
18        A.    I don't know.
19        Q.    "Government to look at it."
20              Do you recall discussing a
21   boycott in the meeting?
22        A.    No.
23        Q.    Further down it says "6.3
24   percent Steven."
25              That's referring to you?
```

1              DONZIGER

2      A.      Yes.

3      Q.      And your claimed ownership

4  interest in the judgment?

5      A.      Well, yeah, subject to the

6  constructive trust.

7      Q.      And you told Elliott this was

8  subject to the constructive trust?

9      A.      I don't recall.  To me it was

10  irrelevant because we weren't selling those

11  shares.  I think this is a part probably --

12  I mean, I cannot speak for Katie's notes

13  and this is ridiculous to even speculate,

14  but I will do it, because you are staying

15  through lunch, basically I think this was

16  the part of the meeting where they asked --

17  or he asked like what was the structure of

18  who owned what.

19      Q.      Okay.  What is the structure of

20  who owned what?

21      A.      It is basically 15 or 16

22  percent is committed to various entities,

23  meaning lawyers, service providers, you

24  know, other service providers, like

25  consultants, and, you know, just people who

```
1                    DONZIGER
2   do various things, and that's apart from
3   the overwhelming interest, which is owned
4   by the clients as manifested through the
5   FDA.
6        Q.     When you said -- when you were
7   telling Elliott the 15 to 16 percent is
8   committed to other people, does that
9   include the amounts committed to Torvia?
10       A.     So to be clear, and I don't
11  mean to leave Chevron out of this equation,
12  because Chevron probably has a different
13  view, but when Torvia and Mr. DeLeon and
14  really all the entities, Woodsford, H5,
15  whoever it was that turned over, in theory,
16  signed those agreements to turn over its
17  interest to Chevron, our view was that was
18  contractually impermissible and that all of
19  those interests reverted back to the FDA
20  or, slash, the clients.
21       Q.     Did you inform Torvia that
22  their 22 million in financing reverted back
23  to the FDA?  When these monies reverted
24  back, do you give them their money back?
25       A.     It is not monies, it is
```

```
 1                    DONZIGER
 2  interest that reverted.  It is the interest
 3  in the judgment that reverted.  The money
 4  was gone.  It was spent.
 5       Q.     So you cancelled their interest
 6  but you didn't refund their money?
 7       A.       They invested money and they
 8  chose, in the case of Torvia, to move in a
 9  different direction in a way that was in
10  violation of their obligations to the
11  client.  So that money reverts back -- I
12  mean not the money, the interest, that is
13  the contingent interest that, for example,
14  Mr. DeLeon had in our view reverts back to
15  the clients.
16       Q.     Do you have any document that
17  shows that Torvia transferred its interest
18  to Chevron?
19       A.     Well, I don't remember
20  specifically.  I remember a series of
21  agreements.
22       Q.     And you have these agreements?
23       A.     I think you have them.
24       Q.     No, I'm asking if you have
25  them.
```

```
 1                    DONZIGER
 2        A.     I don't know.  I remember -- I
 3   mean, this is years ago, but I remember a
 4   series of public relations style press
 5   releases by Chevron Corporate announcing
 6   these agreements.  I mean, I think one was
 7   Patton Boggs, one was Burford, one was
 8   Stratus, one was H5.
 9              I mean, there is a series of
10   these things and some of them, if I
11   remember correctly, interests were turned
12   over from the interest holder to Chevron as
13   part of some sort of settlement agreement
14   with Chevron.
15        Q.     So did Mr. DeLeon or Torvia
16   inform you that they had transferred their
17   interest in the judgment to Chevron?
18        A.     I don't know if they informed
19   me, but Chevron informed the world.
20   Chevron made it public either through court
21   filings, press releases, or both.
22        Q.     Setting aside what Chevron said
23   and how you might have interpreted it, did
24   Mr. DeLeon or Torvia inform you that they
25   had transferred their interest to Chevron?
```

1              DONZIGER
2        A.      I don't believe so.
3        Q.      Did you ever inform Torvia or
4   Mr. DeLeon that the FDA was taking the
5   position that their interest in the
6   judgment no longer existed?
7        A.      I don't know, and it wouldn't
8   be necessarily my responsibility to do
9   that.  But I don't know if he was informed
10  or not.  I do remember --
11       Q.      My question was did you inform
12  him?
13       A.      I don't remember.  I don't
14  believe so because he cut off contact with
15  me.
16       Q.      Have you informed any prior
17  investor in the judgment whom you and the
18  FDA are currently taking the position no
19  longer has an interest in the judgment of
20  that fact?
21       A.      Repeat the question.
22       Q.      So you said there is a series
23  of people who used to have an interest in
24  the judgment who no longer have such an
25  interest.

```
 1                    DONZIGER
 2        A.     Yes.
 3        Q.     Have you informed any of these
 4   people that they no longer have an interest
 5   in the judgment according to you?
 6        A.     I don't know if I have
 7   personally.  I mean, we have, the FDA and
 8   its counsel, have made it clear and the
 9   people have copies of a contract that they
10   had signed as part of their investment that
11   I believe prevents the transfer of shares
12   without approval of the contracting entity.
13        Q.     And those would be the Amazonia
14   documents?
15        A.     I think they are Amazonia
16   documents as well as other -- the contracts
17   that the investors signed outside the
18   Amazonia structure that is prior to the
19   existence of Amazonia or subsequent to the
20   seizure of Amazonia, for lack of a better
21   word.
22        Q.     Are you referring to the
23   intercreditor agreement?
24        A.     No, that didn't occur to me.
25        Q.     I don't know what document you
```

```
 1                    DONZIGER
 2   are referring to.
 3        A.     I don't know what it is either,
 4   except that --
 5        Q.     Do you have this document?
 6        A.     I'm sure I do somewhere, I just
 7   didn't bring it to this deposition.  I
 8   didn't know it would come up.
 9               But if your question is how do
10   I know that it is the position of the FDA
11   that these shares reverted back or this
12   interest reverted back to the FDA, you
13   know, I could find that out for you if you
14   would like me to.
15        Q.     How do you know that?
16        A.     Well, I would have to dig up
17   some old documents.  Do you want me to do
18   that?
19        Q.     Well, I want to understand --
20   I'm not clear on what it is you are trying
21   to say.  So you're saying that, we'll take
22   Torvia as an example, that Torvia executed
23   documents when it obtained its interest in
24   the Ecuador judgment?
25        A.     Torvia executed documents, yes.
```

1                    DONZIGER

2         Q.        And, in your view, they

3    subsequently violated some provision of

4    these documents that caused them to forfeit

5    their interest?

6         A.        Well, they signed a settlement

7    agreement with Chevron.

8         Q.        And is it your view that that

9    violated some provision of the agreement

10   pursuant to which they got their interest?

11        A.        I'm not an expert on this

12   issue, okay?  There is other lawyers in

13   Ecuador and elsewhere who I think know this

14   issue better than I.

15             There is, as I understand it,

16   there is a provision in investor contracts

17   that prevent transfer of shares.  So the

18   signing of the settlement agreement with

19   Chevron which resulted in the transfer of

20   shares that the clients had granted to that

21   investor resulting in a transfer to Chevron

22   would be, what's the word I'm looking for,

23   would be illegal or inoperable on its face,

24   and those shares would not actually

25   transfer despite whatever documents would

1                    DONZIGER
2    be signed by these parties.  That's the
3    position of the FDA as I understand it.
4         Q.     And is that position based on
5    the 2011 retainer which is governed by New
6    York law or the Amazonia documents?
7         A.     It is not based on my retainer.
8    It is based on agreements between investors
9    and the FDA or, you know, the contracting
10   entity that handed over the interest in
11   exchange for funds.
12        Q.     And are these documents
13   something other than the Amazonia
14   documents?
15        A.     Apart from Amazonia, I believe
16   every investor has an investor contract.
17        Q.     And do you have copies of these
18   investor contracts?
19        A.     Some of them I do, maybe all of
20   them.
21        Q.     And these contracts, according
22   to you, prevent people from assigning their
23   beneficial interest?
24        A.     Without the approval, as I
25   understand it, of the FDA.

1              DONZIGER
2      Q.      And you can find the document
3  that says this?
4      A.      I don't know.  I think I can.
5  Do you want it?
6      Q.      Sure.
7      A.      Okay.  I will try to find it.
8      Q.      I'm going to hand you a
9  document that was marked as Exhibit 32 in
10 the Sullivan deposition.  These are the
11 notes that Mr. Grinberg took during the
12 meeting.
13     A.      Okay.
14     Q.      To clarify, your only client
15 during this meeting was the FDA?
16     A.      That's correct.
17     Q.      It says at the top "33 million
18 3rd-party funders individuals."
19             Do you see that?
20     A.      Yup.
21     Q.      And you were telling
22 Mr. Grinberg that that was the amount that
23 had been invested in the judgment so far?
24     A.      I think that's what I told him.
25     Q.      Next it says "Canada as

```
 1              DONZIGER
 2  jurisdiction - don't want to have a trial."
 3          Do you see that?
 4     A.   Yes.
 5     Q.   What does that mean?
 6     A.   Well, you would have to ask
 7  him, but I believe, I mean, my
 8  interpretation, which is inherently
 9  speculative, is that that reflects a
10  comment that I made that Chevron doesn't
11  want to have a trial in Canada where its
12  RICO evidence would be put to the test
13  before a neutral court.
14     Q.   That is just an opinion you
15  were giving?
16     A.   Yes.
17     Q.   Then it says "subsidiary ruling
18  risk assets."
19          What is that a reference to?
20     A.   Can I just -- your questions
21  are sort of -- it would be better if you
22  said what do you think that might mean,
23  because these are not my notes and I don't
24  know what he's thinking, and obviously you
25  have access to him, he gave you an
```

```
 1                DONZIGER
 2   affidavit, and you can ask him.
 3        Q.    Do you recall discussing
 4   anything related to subsidiary ruling or
 5   risking assets?
 6        A.    Yes.
 7        Q.    What do you recall discussing
 8   about those topics?
 9        A.    Well, I don't really recall,
10   but based on this my guess is that we
11   talked about the pending legal issue of
12   whether Chevron Canada would be a defendant
13   in the enforcement action, which, as you
14   know, was recently decided with the Ontario
15   Court of Appeal.
16        Q.    Then Mr. Grinberg wrote "The
17   right of the Ecuadorians to seek a judgment
18   validity to enforcing foreign judgments -
19   judgments to adapt."  Do you see that?  Or
20   "adopt."
21        A.    Uh-huh.
22        Q.    Did you discuss topics which
23   relate to this note that you recall?
24        A.    I don't even know what that
25   means.  I mean, I don't know what he is
```

```
 1                   DONZIGER
 2   saying there.  "The right of the
 3   Ecuadorians to seek a judgment, validity to
 4   enforcing foreign judgments - judges to
 5   adopt."
 6              I'm sure I talked about just
 7   the general idea of enforcing a foreign
 8   judgment.
 9        Q.    Further down it says
10   "prosecuting in Canada, have capital and
11   reputation for staying power and winning."
12              Is that something you
13   represented to Mr. Grinberg?
14        A.    I don't recall.
15        Q.    Then in the margin it says "can
16   money come in the U.S."
17              Do you see that?
18        A.    Yeah.
19        Q.    Do you recall Mr. Grinberg
20   asking you that?
21        A.    I think we talked about that,
22   based on my recollection.
23        Q.    And what was the substance of
24   the conversation as it relates to that
25   topic?
```

1                    DONZIGER

2        A.      I don't remember specifically.

3   I think he had a question as to given Judge

4   Kaplan's order if a party, you know, that's

5   not part of the RICO order could collect in

6   the U.S., a U.S. party.

7        Q.      I'm sorry, could you say that

8   again?

9        A.      I believe, to the best of my

10  recollection, I don't know this for sure, I

11  believe he was asking whether a U.S. party

12  could collect, that invested in the case,

13  could collect funds in the U.S. from the

14  enforcement of a judgment in another

15  jurisdiction.

16       Q.      And what did you tell him?

17       A.      I have no idea.  I mean, I have

18  never seen that situation.  I don't know.

19  I mean, I don't remember what I told him.

20  Certainly I might have offered my

21  completely uninformed opinion.  I have

22  never researched that question.

23       Q.      So further down it says "15 to

24  20 percent committed to 15 people, 6.3

25  percent personally of the 100 percent."

1                    DONZIGER

2              Do you see that?

3       A.     Yes.

4       Q.     The 6.3 personally, that refers

5    to you?

6       A.     Yes, I believe so.

7       Q.     And is that on top of the 15 to

8    20 or is that part of the 15 to 20?

9       A.     I believe it is part of it.

10      Q.     And you are one of the 15

11   people?

12      A.     Right.

13      Q.     Did you discuss anything with

14   Mr. Grinberg about the terms on which

15   Elliott would invest?

16      A.     I don't remember.  I mean, we

17   never -- I do know we never had a specific

18   negotiation because they never expressed

19   interest in investing.

20      Q.     And you didn't give him any

21   initial terms at the meeting?

22      A.     I might have mentioned the

23   terms of other investors that we had

24   recently brought in.

25      Q.     And what were the general terms

```
1              DONZIGER
2   that you mentioned to Mr. Grinberg in the
3   meeting?
4        A.    Well, I don't remember if I
5   mentioned terms.
6        Q.    Well, what terms were you
7   prepared to mention that you can't recall
8   if you mentioned or not?
9        A.    You know, I might have
10  mentioned terms that we had given others
11  who had made, you know, investments at a
12  much smaller level than I think Elliott was
13  capable of making.  So I always sort of in
14  my mind thought if they were interested we
15  would have a unique -- we would have a
16  discussion about the terms because it
17  wouldn't be the same as the others,
18  probably.
19       Q.    The persons who have gotten
20  interests since the RICO judgment, without
21  regard to the amounts, what have been the
22  terms?
23       A.    I know the answer to that
24  question.  I'm trying to figure out if it
25  is privileged or not.  So I'm going to
```

1                    DONZIGER

2    decline to answer that and let me figure

3    out -- I mean, I might easily be able to

4    tell you that.  Let me figure it out and

5    I'll get back to you.

6         Q.    So there are e-mails in which

7    you offered to send Elliott a packet of

8    information --

9         A.    So your question is terms that

10   other investors have gotten since the RICO

11   judgment?

12        Q.    Correct.

13        A.    Go ahead.

14        Q.    In other e-mails you offered to

15   send Mr. Elliott -- I'm sorry, Mr. Grinberg

16   of Elliott -- because I need my lunch -- a

17   packet of information.  Did you ever send

18   him that packet of information?

19        A.    No.

20        Q.    What did the packet consist of?

21        A.    Well, you know, when I send

22   investors information it sort of depends on

23   what they are looking for.  You know, so it

24   consists of documents, legal documents,

25   suggests they go look at the Chevron

1                    DONZIGER

2   website to understand Chevron's point of

3   view, and it could also include a general

4   description of the case.  So it varies with

5   each investor.

6        Q.    Did you have a packet prepared

7   to send to Elliott?

8        A.      Not specifically for Elliott.

9   My purpose in telling Lee that was that if

10  they were interested I would have prepared

11  a packet.

12       Q.    But you didn't have a packet

13  ready to go, for example?

14       A.      Well, I have like stuff.  It is

15  not like a packet that is always the same.

16  I have like my stuff, key documents I guess

17  you would call it, that I will often send.

18  But it is all tailored to the individual

19  needs and interests of what the investor

20  would want to see.  A lot of investors, you

21  know, obviously do their own due diligence,

22  they are not going to rely on me.

23       Q.    Did you ever send any materials

24  to Elliott?

25       A.    No.

1                    DONZIGER

2        Q.      The nondisclosure agreement

3    that you sent to Elliott, is that an

4    agreement you have used with others or was

5    it drafted just for Elliott?

6        A.      I think it is based on other

7    agreements, but I think it was modified for

8    Elliott.  I don't remember specifically.

9        Q.      Did you have the other

10   investors that have invested since the RICO

11   judgment sign that same NDA?

12       A.      I think so, but I'm not 100

13   percent sure everyone signed it.

14       Q.      How many investors have there

15   been since the RICO judgment?

16       A.      Didn't you get this information

17   in Sullivan's discovery, in her production?

18       Q.      The number of investors?

19       A.      Well, yeah.

20       Q.      No, I don't think so.

21       A.      She didn't produce that?

22       Q.      I don't know what that is that

23   you are referring to.

24       A.      Like the investors.

25       Q.      We sent you her production,

1                    DONZIGER

2    Mr. Donziger.

3         A.      Yeah.  I didn't get a chance to

4    look at it that carefully because it came

5    in at 10 o'clock at night.  I'm not blaming

6    you.  Because I didn't have a lot of time.

7    Between the time it came in I was pretty --

8         Q.      So we are short on time and you

9    are refusing to let us take a lunch break

10   for reasons that escape me.  So my question

11   for you is how many people have invested

12   since the RICO judgment has been issued?

13        A.      I don't know if I can answer

14   that question.

15        Q.      Why not?  It is just a number.

16        A.      Because I think it goes to our

17   internal operations.  Look, you know, I

18   will put it down and I will research

19   whether I can answer that.

20        Q.      Did you and Ms. Sullivan

21   discuss terms that you would offer Elliott

22   during the meeting if they were interested,

23   if they requested for terms?

24        A.      You mean just between the two

25   of us?

1                    DONZIGER

2          Q.    Yes, sir.

3          A.    I think we did.

4          Q.    And what were those terms?

5          A.    I don't remember.

6          Q.    Nothing?  You've got nothing?

7          A.    Well, I mean, we had

8    parameters, like from what we had given

9    others.  I'm sure we started with that.  I

10   don't think we talked about it in too much

11   detail.  I mean, you know, the purpose of

12   the Elliott meeting was to see if they were

13   interested.

14         Q.    So you say that, if I'm

15   understanding you correctly, that these --

16   when you are raising money in connection

17   with the Ecuador judgment, the terms that

18   you give to the different investors vary?

19         A.    I think that is sort of not

20   really what the Elliott piece of this

21   deposition is about.  I mean, that is like

22   a general question about how we do our

23   operation, so I'm going to decline to

24   answer that.

25         Q.    Did you and Sullivan discuss

1                    DONZIGER

2    how much money you wanted to ask for from

3    Elliott?

4         A.     I think we did.

5         Q.     And what was that amount?

6         A.     I don't think we ever settled

7    on what we would ask for.  I mean, we were

8    aware of the amount of money Elliott had

9    invested in the Argentina case, the

10   Argentina enforcement case, so we were

11   aware what they were capable of.

12        Q.     Do you have any written

13   documents between yourself and the FDA

14   regarding terms that would be offered to

15   Elliott?

16        A.     I don't believe so.

17        Q.     Do you have written documents

18   relating to the FDA's authorization of your

19   attending the Elliott meeting?

20        A.     No.  I have a general

21   authorization from my clients to do these

22   types of meetings.  I don't generally get

23   authorization to do a meeting.

24        Q.     For specific meetings?

25        A.     For a specific meeting.

1                   DONZIGER

2          Q.       Do you have to get approval

3     from your client to offer terms, or is that

4     at your discretion?

5          A.       Well, I can't do a deal without

6     the approval of the clients.  There is

7     regular communication.  With Elliott, we

8     never got advanced.  We had one meeting and

9     they were not interested.

10                  I mean, Katie tried to follow

11    up on multiple occasions and they just

12    never responded until that e-mail came in

13    where they said they weren't interested.

14    So until you sort of feel out what is going

15    on, you can't really know how to negotiate,

16    I mean, other than just sort of the

17    benchmark of prior deals.

18         Q.       The agreements with funders

19    post the RICO judgment, did you sign any of

20    those agreements yourself?

21         A.       I did, but not as a party.

22         Q.       You signed them as the FDA's

23    representative?

24         A.       I'm not sure -- I'm not sure if

25    I was a witness or whatever, but the

1          DONZIGER

2    parties are the FDA and the investor.  I

3    think that some of the investors wanted my

4    signature on it just for reasons of comfort

5    because like they wanted me to acknowledge

6    the agreement.

7        Q.    And what law governs these

8    investor agreements?

9        A.    I think it is in the

10   agreements.  I think it depends on the

11   agreement.

12       Q.    So multiple different

13   jurisdictions can govern these interests?

14       A.    Well, in any one agreement

15   there is one jurisdiction.

16       Q.    But they're not consistent

17   across agreements?

18       A.    They have changed over time

19   depending, and also investors also

20   negotiate from their point of view, so they

21   are not all the same.

22       Q.    And if the laws conflict among

23   the investor agreements?

24       A.    I can't answer that question.

25   I mean, you know, I don't think, generally

1                    DONZIGER
2   speaking, the laws conflict.  I mean, these
3   are contracts.
4               But if you are asking if there
5   are disagreements between interests,
6   between, say, two or more investors, you
7   know, that will be resolved like any other
8   conflict, I mean, either through a
9   negotiation or a lawsuit or whatever.  I
10  mean, I don't think there is disagreements
11  or conflicts, but if there were to be,
12  that's how it would be resolved.
13      Q.     And your interest which was in
14  the retainer agreement from January of
15  2011, that continues to be governed by New
16  York law?  You haven't signed an agreement
17  agreeing that it would be governed by some
18  other law?
19      A.     Well, I told you there is a
20  superseding agreement, so I don't know if
21  it is New York or some other place.  I'm
22  going to try and get you that document.
23      Q.     The superseding agreement?
24      A.     Yeah.
25      Q.     And is there only one

```
 1                    DONZIGER
 2    superseding agreement or have there been
 3    multiple?
 4         A.      I think there is only one.
 5         Q.      And in the superseding
 6    agreement did it change your interest in
 7    any way from the 2011 retainer?
 8         A.      No.
 9         Q.      So it is exactly the same as it
10    was?
11         A.      I believe it is, yeah.
12         Q.      The 2011 retainer provides that
13    there is going to be pro rata reductions in
14    percentages if additional funders come on.
15    Does the new retainer contain a similar
16    provision?
17         A.      I don't believe so.
18              MS. NEUMAN:  I'm going to go
19    off the record just for a minute because I
20    need to find a document.  Go off the
21    record.
22              THE VIDEOGRAPHER:  The time is
23    1:49.  We are going off the record.  This
24    will be the end of media file number four.
25              (Recess taken.)
```

1                    DONZIGER

2              THE VIDEOGRAPHER:  The time is

3    1:50.  We are back on the record.  This is

4    the beginning of media file five.

5    BY MS. NEUMAN:

6         Q.     Mr. Donziger, in your discovery

7    responses you did not identify any

8    ownership of any stocks or bonds or assets

9    of that nature.  Do you own any such

10   assets?

11        A.     Not that I'm aware of.

12        Q.     Did you own any such assets at

13   the time of the RICO judgment?

14        A.     Yes.

15        Q.     And what has happened to those

16   assets?

17        A.     What happened was I had an

18   account at Schwab and Schwab disinvited me

19   to be their client, just like Chase did, so

20   I liquidated the account.  I don't own

21   anything anymore.

22        Q.     Are you a beneficiary of any

23   trusts of any kind?

24        A.     Not that I'm aware of.

25        Q.     Do you have a contingent

```
 1                   DONZIGER
 2   interest in any asset other than the
 3   Ecuadorian judgment?
 4        A.     You mean like a lawsuit?  Like
 5   another lawsuit?
 6        Q.     It could be any kind of --
 7        A.     I don't believe so.
 8        Q.     -- contingent interest.
 9               I'm going to mark as Exhibit
10   5319 a document relating to disbursements
11   from TD account 2265, which was not
12   identified in your discovery responses.
13               (Plaintiff's Exhibit 5319
14   marked for identification.)
15        Q.     Are these case-related
16   expenditures, or something else?
17        A.     I'm going to say this:  This
18   gets into like my First Amendment issue,
19   but I'm going to answer this generally,
20   which is the following:  We are not getting
21   into details about what these are.  These
22   are mostly case-related, but not all.
23        Q.     Could you indicate which ones
24   are not case-related?
25        A.     The only one not as far as I
```

1                    DONZIGER

2      can tell is Kevin Koenig.

3          Q.      And what is that related to?

4          A.      Just a personal thing between

5      Kevin and I.  I was helping him with

6      something.

7          Q.      And when it existed, was TD

8      Bank account 2265 the account you deposited

9      money into to use for case expenses?

10         A.      I never had a system that was

11     that clear, but I did use this account to

12     pay out case expenses from time to time.

13     Often what would happen is I would be paid

14     or I would get money in hoping to use it

15     for my living expenses and then we would

16     run out of money and then I would

17     personally fund the case from these types

18     of expenses at this level, generally at

19     this level.

20         Q.      Did these expenses, were they

21     paid from funder money or from your money,

22     in 2014, 2015 and 2016?

23         A.      This was my money, but it is

24     possible -- wait, what year is this?

25         Q.      These go from September 2014

```
 1              DONZIGER
 2   through April of 2016.  You received the
 3   $488,000 from Mr. Lenczner, if it refreshes
 4   your recollection, starting in --
 5       A.      So the answer to your question
 6   is I don't believe -- I think most of these
 7   were personal.  Well, I will say all of
 8   them were personal because I got money into
 9   this account.  I was supposed to use it on
10   myself, my family.
11       Q.      So you were personally paying
12   Mr. Page, for example?
13       A.      From time to time, yes.
14       Q.      In your response to
15   Interrogatory No. 3, you said your only
16   sources of income are "remuneration
17   authorized by my clients and paid out of
18   litigation expense funds raised with my
19   assistance, a modest monthly income
20   generated by two properties, Argyle
21   Knoxville and Lewmike LLC."
22              Do you recall that?
23       A.      Yes.
24       Q.      For the time period from 2014
25   to the present, is that an accurate
```

```
 1                    DONZIGER
 2   statement or does it change year to year?
 3        A.    Well, it is accurate over that
 4   period of time.  If your question is, is
 5   there other sources of income at any time
 6   during that time --
 7        Q.    Yes, sir.
 8        A.    I don't believe so, but I
 9   wouldn't, you know, to the best of my
10   knowledge, no, but, you know, it is a lot
11   of years, and I occasionally try to do
12   other things but I really haven't -- I
13   can't -- I don't think I did anything else
14   during those years.
15        Q.    And do you own any interest in
16   any properties other than Argyle Knoxville
17   and Lewmike LLC?
18        A.    Well, there is one other
19   property I think I mentioned in my
20   responses.
21        Q.    What would that be?
22        A.    It is a property in Florida
23   that I inherited when my dad passed away.
24        Q.    And what's the name of it?
25        A.    It is not on there?  I thought
```

```
1              DONZIGER
2   I put it in my responses.
3        Q.     Does it provide income or it is
4   just a property?
5        A.     No, it doesn't provide income.
6        Q.     What's the name of the
7   property?
8        A.     I don't know.  I mean, I might
9   have put it on that.
10       Q.     St. Augustine, Florida?
11       A.     Yeah, I think that's it.  It is
12  a property -- it is a piece of land.
13       Q.     And what's the nature of your
14  ownership interest, do you own it outright?
15       A.     No, I own it with some other
16  people who were daughters of a partner of
17  my dad who passed away.
18       Q.     Do you have the right to sell
19  that property?
20       A.     Subject to approval or
21  agreement with partners, yeah.
22       Q.     What is the value of that
23  property?
24       A.     I would estimate it is worth
25  $800,000, and I own half of it.
```

```
 1                    DONZIGER
 2      Q.      What is the value of your
 3  interest in the Argyle property?
 4      A.      I would estimate it is about 1
 5  to $1.1 million.
 6      Q.      And do you have the right to
 7  sell the Argyle property?
 8      A.      Subject to the same conditions
 9  as the other.
10      Q.      Is it owned with the same
11  co-owners?
12      A.      Yeah.
13      Q.      And is your ownership interest
14  50 percent?
15      A.      Yes.
16      Q.      And is the 1.1 million your
17  interest or the whole?
18      A.      My interest.  The whole
19  interest is double that.
20      Q.      What about Lewmike?
21      A.      Lewmike is a little more
22  complicated.  There is multiple partners
23  and I think I own 15 percent.
24      Q.      And the value is?
25      A.      I don't know much about that
```

1                    DONZIGER

2    one.  I don't think it's -- I don't know.

3    I could find out.  Do you want me to find

4    out?  That certainly goes to the state of

5    my finances.  Do you want me to find out?

6         Q.    Sure.  And these estimates of

7    the monthly income from Lewmike and Argyle,

8    have they been relatively consistent since

9    2014?

10        A.    Yes.  Argyle is based on lease

11   money that is generated every month,

12   because it is a shopping -- it is like a

13   strip shopping center and there is people,

14   stores in there, paying monthly lease

15   money.

16        Q.    And then you get a percentage?

17        A.    I get, yeah.

18        Q.    So if somebody doesn't pay,

19   then you get less?

20        A.    Yes.  But these are reputable

21   national chains, so they pay.

22        Q.    So it is consistent?

23        A.    Yeah, it is consistent.

24        Q.    The time that you spend working

25   on fundraising and doing things like the

```
 1              DONZIGER
 2    Elliott meeting, that is covered by your
 3    retainer?  You don't bill separately for
 4    that with a timesheet?
 5         A.    No.
 6         Q.    So those types of activities
 7    are covered by your retainer?
 8         A.    Yes.
 9         Q.    When you get reimbursed for
10    expenses, the FDA approves those expenses?
11         A.    On the sort of pretty rare
12    occasion I get reimbursed for expenses, I
13    put it in an invoice, get paid, when I do
14    an accounting with the clients they know
15    what the expenses are and they approve it.
16         Q.    So the money from the Lenczner
17    firm that was transferred to you, was any
18    portion of that money to pay your retainer?
19         A.    I think this is a little bit
20    beyond the scope.
21         Q.    I don't think so.
22         A.    Why not?
23         Q.    Because the issue relates to
24    compliance with the Court's injunction.
25         A.    Okay.  I will answer it.  The
```

1                    DONZIGER

2    answer to that question is yes.

3        Q.      And was the money that came

4    through the Lenczner firm also to reimburse

5    you for expenses?

6        A.      In part, yes.  But to repeat,

7    and I hope I have made myself clear about

8    this, I'm owed a lot of money for

9    unreimbursed expenses through the years,

10   like a lot of money that I put into the

11   case and never got paid out for because the

12   clients never had money and we never had

13   enough money.

14       Q.      And you don't view that as

15   covered by your contingency?

16       A.      Not at all.  I mean, that is

17   out of pocket.  I mean, lawyers who do

18   contingency fee work generally don't --

19       Q.      They don't front the costs?

20       A.      It depends on the deal.

21       Q.      Isn't that the nature of why

22   they are entitled to the contingency?

23       A.      No, it is the labor that they

24   are fronting.  They are not being paid

25   hourly, so they are doing free labor, but

```
 1                    DONZIGER
 2    the actual out of pocket in the contingency
 3    fee model is often paid by the client.
 4         Q.     But you are doing neither free
 5    labor nor -- you want to be reimbursed for
 6    your expenses and get a retainer and get a
 7    contingency; that's you agreement?
 8         A.     Reimbursement of expenses, yes.
 9         Q.     Retainer?
10         A.     Get a retainer, a monthly
11    retainer.
12         Q.     And a contingency?
13         A.     Absolutely.
14                But to answer your question,
15    you asked me a question about Lenczner's
16    transfers, so the answer is I tried to pay
17    my retainer out of that but it was not
18    enough money, and I think if one were to
19    reconstruct that period of time it would
20    not -- it would not be a consistent payment
21    by any means.
22         Q.     When did your retainer, it was
23    not $25,000 at the time of the RICO trial,
24    when did it go to $25,000?
25         A.     I don't remember.  What was it
```

```
 1                    DONZIGER
 2   then?
 3        Q.     It varied and as I recall the
 4   most, at the end, was 20.
 5        A.     Okay.  I mean, I don't know.
 6        Q.     And why was the Lenczner firm
 7   paying you your retainer?
 8        A.     I know the answer to that
 9   question.  I'm trying to figure out if it
10   is privileged.  I think I'm going to hold
11   off on that on First Amendment grounds, as
12   it gets into our internal operations.
13        Q.     So Lenczner was passing on to
14   you your share of money that came from
15   outside funders, they weren't paying you
16   money from their pockets; is that fair?
17        A.     I need to not answer that, but
18   I will write it down and I will get back to
19   you if I can answer it.
20        Q.     Mr. Donziger, I'm going to mark
21   as Exhibit 5320 a summary prepared from
22   documents that you produced during RICO. It
23   shows funder money that went into your
24   accounts at Chase.
25                    (Plaintiff's Exhibit 5320
```

```
1                 DONZIGER
2   marked for identification.)
3       Q.     The accounting that you
4   described to us earlier that is
5   substantially complete, would that cover
6   how these funds were used?
7       A.     I don't know, but I don't think
8   necessarily in a complete way, because a
9   lot of these funds were when Kohn, Swift &
10  Graf managed the money.
11      Q.     When did you take over
12  management?
13      A.     When Kohn, Swift & Graf left
14  the case.  Well, I wouldn't say management,
15  I became -- when Kohn Swift left I had to
16  do my best to look for funds for the
17  clients; prior to that Kohn Swift pretty
18  much paid case expenses.
19      Q.     So to be clear, these are
20  monies that are deposited into your bank
21  accounts?
22      A.     Yeah.
23      Q.     As opposed to into Kohn, Swift
24  & Graf's bank accounts, some of it comes
25  from Kohn Swift, but it is all money that
```

```
1                DONZIGER
2    went into your accounts.  So to the extent
3    that you spent this money on case-related
4    expenses out of your accounts, would that
5    be covered by the substantially complete
6    accounting?
7         A.     I don't know, because I don't
8    know if it goes back this far.  But I will
9    say this:  Some of this money had nothing
10   to do with the Ecuador case.  Beyond that,
11   I think this is beyond the scope of this
12   deposition.
13        Q.     What makes you say that?
14        A.     I just know it.  There were
15   other things I was working on at the time.
16   And this is beyond the scope of the
17   deposition.  But, I mean, this is not all
18   Ecuador.
19        Q.     Do you use your website to
20   raise money?
21        A.     No.
22        Q.     Do you have --
23        A.     I mean, other than to, you
24   know, promote the case generally.  I don't
25   raise money through the website.
```

1                    DONZIGER
2        Q.      Do you collect any money
3    through the website?
4        A.      No.
5        Q.      Have you ever?
6        A.      No.
7        Q.      There is nothing you click on
8    in your website?
9        A.      There might be.  I don't know.
10   I have a couple of websites.
11       Q.      And do you raise money pursuant
12   to either of them?
13       A.      No.
14       Q.      And you haven't since the RICO
15   judgment?
16       A.      Not that I know.  I don't
17   believe so.  I mean, there might be a
18   click-through on one of them if I remember
19   correctly.  I don't think anyone has given
20   any money.
21       Q.      And what are the sites?
22       A.      DonzigerLaw and I think
23   StevenDonziger.com.
24       Q.      And is it DonzigerLaw.com or
25   something else?

1                     DONZIGER

2          A.      I think it is .com.

3          Q.      Have you signed any agreements

4    related to the Ecuador litigation in terms

5    of books or movies or other --

6          A.      I'm not going there.

7          Q.      -- publications?

8          A.      Listen, that's just so beyond

9    the scope.  I have zero income from those

10   types of sources, I will say that.

11         Q.      And have you signed any

12   agreements to get income from those types

13   of sources that relates to the Ecuador

14   litigation?

15         A.      There is no agreement I signed

16   that is income producing with regard to any

17   media-related work at this point, although

18   I obviously have a right to do that, but I

19   have no such agreement.

20         Q.      I'm sorry, you have no

21   agreements or you haven't made any money

22   from the agreements that you do have?

23         A.      I have no agreements.  I mean,

24   you know, no.

25                 Do you have any more questions

```
 1              DONZIGER
 2   about Elliott?  You can get your lunch.
 3        Q.    Well, I would like to take a
 4   lunch break and reconvene the deposition.
 5        A.    No, I want to finish on
 6   Elliott.  Please finish on Elliott.
 7        Q.    I'm showing you Exhibit 5321
 8   that Ms. Sullivan produced.
 9              (Plaintiff's Exhibit 5321
10   marked for identification.)
11        Q.    Who is Mr. Aulestia?
12        A.    I'm not getting into that.
13   It's not part of this deposition.
14              In any event, it is part of our
15   internal operations.
16        Q.    Do you direct his activities?
17        A.    We were colleagues.  We worked
18   together.
19        Q.    So do you direct his activities
20   or does someone else?
21        A.    I'm not getting into that.
22        Q.    Why would he provide a budget
23   to Ms. Sullivan?
24        A.    I don't know.
25        Q.    You don't know anything about
```

1              DONZIGER

2    this?

3         A.    No.  I have never seen that

4    before.

5         Q.    Mr. Donziger, can you pull back

6    up Sullivan Exhibit 9.

7         A.    What is it again?

8              MS. CHAMPION:  Sullivan Exhibit

9    9.  It should be about the eighth or so

10   document in your pile, maybe tenth.  It is

11   the e-mail chain starting with the e-mail

12   from --

13             THE WITNESS:  Yeah, I got it.

14   Okay.

15        Q.    Why are all these people being

16   informed of the Elliott meeting?

17        A.    I don't know.  I mean, I think

18   because Ms. Sullivan sent that initial

19   e-mail to all of these people.

20        Q.    Yes.  Do you know why she sent

21   it to this group?

22        A.    I think she regarded these

23   people as part of the team.  My personal

24   interpretation, she was trying to boost

25   morale.  But, I mean, you would have to ask

```
1                    DONZIGER
2    her.  You probably already have.
3         Q.     And are all of these people in
4    your view part of the Ecuador case team?
5         A.     Well, I'm not going to get into
6    that.  That's our internal operations.  As
7    you know, there is lots of people who work
8    on all -- some or parts of this in all
9    different kinds of capacities.  I'm not
10   going to get into our internal operations.
11        Q.     In your discovery responses, in
12   response to some of the requests that Judge
13   Kaplan ordered you to answer, you put "no
14   response required."  Why is that?  What
15   does that mean as you used that phrase?
16        A.     I think they were so far afield
17   and burdensome that I came to the
18   conclusion that no response was required.
19        Q.     Even on requests that the Court
20   ordered you to answer?
21        A.     What are you talking about?
22        Q.     Well, you recall that Judge
23   Kaplan ordered you to answer specific
24   requests, yes?
25        A.     Yes.
```

```
 1                    DONZIGER
 2        Q.      And in response to some of
 3   those you wrote "no response required."
 4        A.      I don't know that sitting here.
 5        Q.      Can you look at Exhibit 5307.
 6   Actually, we are going to have to take a
 7   lunch break pretty soon.
 8        A.      So, listen, I am not going to
 9   stay past lunch, so you can keep going, and
10   I would urge you to stick to Elliott.  Do
11   you have more questions about Elliott?
12        Q.      We are past lunch,
13   Mr. Donziger.  You are just inconveniencing
14   everyone else.
15        A.      No, you have -- don't let me go
16   through this again.  People can go get
17   lunch and sit here and eat.  That's not on
18   me.
19             MS. CHAMPION:  The court
20   reporter can't eat lunch while he is taking
21   down the testimony.
22        A.      Then that's on you because you
23   wasted all the morning.  So keep going and
24   ask me about Elliott.  Do you have more
25   questions about Elliott?
```

```
 1                DONZIGER
 2      Q.     Mr. Donziger, I'm going to ask
 3  you about your discovery responses and I am
 4  going to take a break in a minute.
 5              In response to Interrogatories
 6  21, 23, 24 and 25, do you see you put "no
 7  response required"?  Are you looking at
 8  that exhibit?
 9      A.     Do you have a copy?
10      Q.     It's in your stack.
11      A.     What number is it?
12      Q.     5307.
13      A.     Okay.  So what are you -- what
14  are these in response to, the "no response
15  required"?  What is 18, 21 and 22?
16      Q.     So the Court ordered you to
17  answer fully items 21, 23, 24 and 25, and
18  you see where you put "no response
19  required"?
20      A.     Yeah.  I don't know what I was
21  thinking.  It might be a First Amendment
22  issue, it might be a privilege issue, or
23  these pending motions.  I can get back to
24  you on that.  I don't know.
25      Q.     So you don't know what it
```

1                    DONZIGER

2    means?

3         A.      I think I know what it means.

4    I just don't know what it means as I sit

5    here right now.  I've got to go look at it.

6         Q.      And you are putting that

7    despite the Court's order that you answer

8    those requests?

9         A.      Please, okay, I respond to

10   court orders.  I don't know.  I will have

11   to look at it.  I'm not deliberately

12   flouting a court order.  I mean, there

13   might be no response required because of a

14   pending motion and then once the motion

15   gets resolved I would be required to

16   respond.

17                Again, I would really urge you

18   to finish.  Ask me about Elliott.  Do you

19   have anything else?

20        Q.      Mr. Donziger, I'm entitled to

21   explore your discovery responses in this

22   deposition.  It was part of the Court's

23   order.  It was part of our stipulation.

24   I'm going to take a break here in a minute

25   and get something to eat.  I'm happy to do

```
 1                    DONZIGER
 2  it in short order.  I'm sure the court
 3  reporter is going to have to take a break.
 4       A.    Let's take a break.  I will
 5  make a couple of phone calls and can we
 6  convene in 15 minutes, does that work?
 7             I'm sorry, by the way, I don't
 8  want to embroil you in a situation I have
 9  with these people.  You need to eat.  So
10  let's take 15 minutes and try and if that's
11  not enough time we will keep eating and
12  then we will come back.
13             MS. NEUMAN:  We will go off the
14  record at 2:18.
15             (Luncheon recess:  2:18 p.m.)
16
17
18
19
20
21
22
23
24
25
```

1                    DONZIGER

2          A F T E R N O O N    S E S S I O N

3                    2:43 p.m.

4    S T E V E N    D O N Z I G E R, resumed.

5                    THE VIDEOGRAPHER:  We are back

6    on the record.  The time is 2:43.  This is

7    the a continuation of media file five.

8    CONTINUED EXAMINATION

9    BY MS. NEUMAN:

10        A.    Can I make a quick statement?

11        Q.    Can I stop you?

12        A.    Just in response to one of your

13   prior questions, I think it was the last

14   question, why I put "no response required."

15        Q.    Yeah, okay, that's what I'm

16   going back to.

17        A.    I want to explain that because

18   I figured out why I put that.

19        Q.    Perfect.

20        A.    And the reason is Judge Kaplan

21   divided the responses up between compliance

22   requests and money judgment requests, so

23   those were the compliance requests --

24   request by Chevron that he stayed.  That's

25   why I did that.  Now, you might disagree

1          DONZIGER
2    with my interpretation, but that was the
3    reason behind that.
4         Q.    Okay.  So I think you might
5    have gotten confused with the numbering or
6    something, so I want to show you, because I
7    want to ask you to give us real responses
8    this is Judge Kaplan's order, Docket 2020,
9    and if you read this paragraph, you will
10   see he says answer fully in the ROGs 21 to
11   25.
12        A.    Okay.
13        Q.    Do you see that now, sir?
14        A.    Yes.  But it says, maybe we
15   just disagree on this, but it says "The
16   Donziger Defendants are required to comply
17   with these requests and items only to the
18   extent they are producing documents and
19   providing information bearing on the
20   attempt to obtain funds from Elliott
21   Management Company."
22        Q.    Okay.  So when you say "no
23   response required," you're saying there are
24   no responsive documents as related to
25   Elliott and you're not otherwise required

1              DONZIGER

2  to answer?

3       A.     I think that's what I'm doing.

4  But this is a lot.  What I will do here is

5  look again, I'm going to add this to my

6  list, and I will get back to you promptly,

7  and if I need to supplement this prior to

8  the hearing on Thursday, I will.

9       Q.     Because one thing that is in

10  here is identifying all communications.

11       A.     With Elliott?

12       Q.     Related to the Elliott, which I

13  think we have covered today, but since

14  previously you put "no response required"

15  I'm just asking you to relook.

16       A.     I will.  I will do that

17  promptly.  I want you to be as prepared as

18  possible for Thursday.

19       Q.     Now, do you still have in front

20  of you the combined set?  I think we marked

21  the combined set as Exhibit 5308, I want to

22  say.  Are you finding it, Mr. Donziger?

23       A.     The combined set of -- remind

24  me.

25       Q.     Our requests and your

```
 1                 DONZIGER
 2  responses.
 3        A.     This (indicating)?
 4        Q.     Is it 5308?
 5        A.     Yeah.
 6        Q.     Yes, sir.  Can you go to page
 7  19.
 8        A.     It's not Bates stamped.
 9        Q.     No, page.
10        A.     Page 19, of your document,
11  okay.
12        Q.     Well, we just took your
13  responses, I mean, we took -- yeah, we took
14  your responses and interlineated the
15  question.  Because it is confusing, it was
16  just the response.
17        A.     Okay, got it.
18        Q.     Okay.  So you mentioned that in
19  the Elliott meeting when you mentioned the
20  33 million, that you got that number from
21  some trial document.  Did I hear you
22  correctly?
23        A.     Yes.
24        Q.     Is this the document that you
25  are referring to?
```

```
 1                    DONZIGER
 2        A.      I think it is.
 3        Q.      So in the Commitment Amounts
 4   column, were all those amounts actually
 5   committed, hence you used that number with
 6   Elliott?
 7        A.      So if you were to ask me how
 8   much money have we raised in actual money,
 9   I don't know if I could give you a
10   completely accurate answer.  I think the
11   column on the left, based on my
12   recollection, is accurate.  But, remember,
13   the Kohn Swift contribution was out of
14   pocket, it wasn't an investor.
15             So sometimes people say well,
16   how much have investors put in.  You know,
17   Kohn Swift was a contingency fee law firm.
18   And the column on the right --
19        Q.      Right.  So they were covering
20   the expenses?
21        A.      Say that again.
22        Q.      They were covering the
23   expenses?
24        A.      Yes.
25        Q.      As part of their contingency
```

1                    DONZIGER

2    agreement?

3         A.      Yes.  The column on the right,

4    for example, Burford never contributed 15.

5    I mean, they never invested 15, they

6    invested 4.

7         Q.      According to the Amazonia

8    documents, DeLeon invested 21 million

9    versus 2, no, no, sorry, Torvia, which is

10   down here for 7.250.

11        A.      So what is your question?

12        Q.      Let me ask a different

13   question.

14                Why did you use this 33 million

15   with Elliott if it's not accurate?

16        A.      I wasn't thinking clearly and I

17   didn't have the information in front of me,

18   and I, for some reason, I believe that we

19   raised about 25 or $30 million and it is

20   possible that not all of -- this chart does

21   not encompass everything.  But that's the

22   kind of information that I really brought

23   in Josh Rizack and Katie Sullivan to help

24   manage.  So I don't know the exact number.

25        Q.      I'm going to hand you a

1                    DONZIGER
2    document that was previously marked as
3    Plaintiff's 7033A.  It is minute meetings
4    from the Executive Committee of UDAPT.
5                    UDAPT and the Assembléia are
6    the same organization, yes?
7         A.     I don't know.
8         Q.     Well, the --
9         A.     I have no contact with UDAPT
10   anymore and haven't for quite some time.
11        Q.     As far as you know, is there
12   any distinction between the Assembléia and
13   UDAPT?  Are they just the name that people
14   would give them differed over time?
15        A.     I don't know.  I know what
16   UDAPT is.  I don't know if the Assembléia
17   still exists.
18        Q.     Okay.  Do you have any reason
19   to believe they aren't the same
20   organization?
21        A.     I don't know one way or
22   another.  I don't know one way or another.
23        Q.     So in these meeting minutes
24   from 2013, it states on page 2 of 15,
25   "Mr. Donziger continues saying that years

```
 1              DONZIGER
 2  ago we had a serious crisis due to the fact
 3  that Mr. Kohn, who is financing the case,
 4  in 2009 chose not to continue."
 5              Do you see that?  It is the
 6  second full paragraph on that page.
 7       A.    Uh-huh.
 8       Q.    It then says --
 9       A.    Is this marked from the
10  original RICO case?
11       Q.    Yes.
12       A.    Okay.
13       Q.    That's the trial exhibit
14  number.  Is that what you are asking me?
15       A.    Yeah.
16       Q.    That's my understanding of that
17  sticker.
18              This paragraph indicates that
19  you are representing at this UDAPT meeting
20  that you had raised $25 million since Kohn
21  stopped financing.  Does that refresh your
22  recollection as to the amount raised at
23  least as of the RICO trial?
24       A.    No.
25       Q.    Do you know where that $25
```

1                    DONZIGER
2   million number came from?
3        A.      I don't remember.  I don't
4   remember anything about this meeting.
5        Q.      Go to page 5 of 15.  This is a
6   meeting where they resolved that you would
7   no longer be the U.S. representative.  Does
8   that refresh your recollection of the
9   meeting?
10       A.      I remember a meeting of that
11  nature.
12       Q.      And in paragraph E on page 5 of
13  15 --
14       A.      Paragraph E of 5?
15       Q.      Uh-huh.
16       A.      Uh-huh.
17       Q.      It says they are going to
18  accept the return of 1.33 points that had
19  been assigned to Steven Donziger.  Do you
20  see that?
21       A.      Yeah.  I'm going to object to
22  the question about this document.  I think
23  we're pretty far afield.
24       Q.      Well, you realize your interest
25  is in a constructive trust to Chevron,

1                    DONZIGER

2    right?

3        A.      Yes.

4        Q.      And this relates to what your

5    interest is.

6        A.      Well, my interest, I have

7    already testified, my interest is 6.3.  I

8    mean, this is --

9        Q.      And that's without regard to

10   the return of the 1.3?

11       A.      Rest assured, Chevron, I don't

12   believe that ever happened.  I don't

13   believe it was ever returned.  My interest

14   is 6.3.

15       Q.      So at page 3 in the meeting,

16   the minutes show you as saying "We are

17   preparing an analysis and specifics of how

18   the $25 million contributed by Russ DeLeon

19   was spent.  He has the money and we have

20   survived thanks to him."

21       A.      You are talking about this

22   document?

23       Q.      Yes, sir.  "The failures in

24   handling of the money up north is a failure

25   for which I take responsibility."

```
 1                DONZIGER
 2           Do you see that paragraph?
 3      A.    Do you have a question?
 4      Q.    Yes.  Does that refresh your
 5  recollection of Torvia and Mr. DeLeon
 6  giving $25 million?
 7      A.    You know, first of all, I'm not
 8  going to answer questions about this
 9  document other than to say this:
10  Mr. DeLeon gave a certain amount of money,
11  I believe you know what that is because you
12  struck an agreement, you meaning your
13  client, struck an agreement with him to end
14  his participation in the case, and I'm sure
15  he told you what he had or had done, and if
16  he hadn't, I don't have that information at
17  my fingertips.
18           He was, I testified before, I
19  believe during the RICO trial, that he was
20  our main funder for a period of time.  He
21  was the main funder of the case.
22      Q.    There were -- I'm going to mark
23  as Exhibit 5322 just a summary chart of
24  cost payments made in the Canada action.
25           (Plaintiff's Exhibit 5322
```

```
 1                  DONZIGER
 2   marked for identification.)
 3       Q.     You are aware that Chevron
 4   Canada paid costs to the LAPs during the
 5   Canada action?  Canada has rules about
 6   costs?
 7       A.     These are payments Chevron made
 8   to who?
 9       Q.     The Lago Agrio plaintiffs.
10       A.     Okay.
11       Q.     You are involved in the Canada
12   action, right, or not?
13       A.     Well --
14       Q.     Do you do any work on the
15   Canada action, regardless of what it is?
16       A.     Yes.  The answer is yes.  I
17   don't want to get into the nature of it,
18   but yeah, I talk to lawyers and try to
19   help.  I'm not obviously a lawyer in Canada
20   and don't appear in court and I don't, you
21   know, give legal advice based on Canadian
22   law, but we coordinate.
23       Q.     With Mr. Lenczner?
24       A.     And others.
25       Q.     And do you coordinate with
```

1                   DONZIGER
2   Mr. Lenczner on more than just -- well, let
3   me phrase that differently.
4                   Do you coordinate with
5   Mr. Lenczner on the substance of the Canada
6   case, like pursuing the Canada case itself?
7       A.      I'm not getting into that.
8   That's our internal operations.
9       Q.      So you're aware that in Canada
10  costs get awarded when motions are won and
11  lost and so forth?
12      A.      Yes, I'm aware of that.
13      Q.      And you are aware that on some
14  motions where the Lago Agrio plaintiffs
15  prevailed, they were awarded costs?
16      A.      I don't remember.
17      Q.      Did you receive any portions of
18  these funds?
19      A.      No.
20      Q.      How do you know?
21      A.      When you say "you," you mean
22  Steven Donziger?
23      Q.      Yes, or your law firm.
24      A.      No, not that I'm aware of.
25      Q.      So these weren't part of the

1                    DONZIGER
2   monies that Mr. Lenczner's firm paid to
3   you?
4        A.    I have no knowledge that they
5   would have been and I don't believe they
6   were.
7        Q.    Do you have any interest in a
8   Donpat Gate Parkway LLC?
9        A.    That rings a bell, but I don't
10  know.  I don't believe so.  It kind of
11  rings a bell, something my dad did.
12       Q.    How would you determine if you
13  had any interest?
14       A.    I would have to investigate.  I
15  don't believe so, but I can try to find
16  out.  What's the name of it?
17       Q.    Donpat, D-o-n-p-a-t, Gate
18  Parkway LLC.
19       A.    Oh, that might be the name of
20  the -- I don't know.  I will investigate
21  that and get back to you.
22       Q.    Do you have any interest in
23  Montecito Medical Invest Co. LLC?
24       A.    I might.  As a general matter,
25  when my father passed, he had lots of

1                    DONZIGER
2    things going on and I think some of them
3    were worthless.  That might fall in that
4    category, but I will investigate and get
5    back to you.
6         Q.    He had -- these were all assets
7    that would have been probated or they
8    passed through a trust?
9         A.    I'm not sure.  I mean, there
10   was a trust when he passed and then, you
11   know, I took possession of these properties
12   in the trust.
13        Q.    And that was before the RICO
14   judgment or after?
15        A.    Before.
16        Q.    Since the RICO judgment, have
17   you inherited any property?
18        A.    No.
19        Q.    Has any property been gifted to
20   you?
21        A.    No.
22        Q.    Have you forgiven any loans or
23   debts?
24        A.    No, not that I'm aware of.
25        Q.    So did you want to write down

```
 1                  DONZIGER
 2   Montecito Medical or you did that already?
 3        A.     I did.
 4        Q.     What about Florida Bank Group?
 5        A.     Yeah, I don't know what that
 6   is.  Is that the same category?  I mean,
 7   are you asking me if I own an interest in
 8   Florida Bank Group?
 9        Q.     Yes.
10        A.     I don't know.
11        Q.     Do you have a way to verify?
12        A.     I will try.
13        Q.     Do you own an interest in Bear
14   Creek Manufactured Home?
15        A.     Not that I'm aware of.
16        Q.     Do you own an interest in The
17   Greens at Mumford LP?
18        A.     I think I do.  But, again, I
19   think it is -- I don't think it is -- I
20   don't know.  I will investigate.  I think
21   all of these are worthless investments that
22   my father had.
23        Q.     That currently have no market
24   value?
25        A.     That's what I believe, but I'll
```

```
 1                    DONZIGER
 2   check.
 3         Q.      The value of your -- you own
 4   one apartment in New York?
 5         A.      Yes.
 6         Q.      And what is the value of that?
 7         A.      I don't know.  I would
 8   estimate -- I don't know.  I think I put
 9   that in my responses.
10         Q.      Yes, sir.
11         A.      Didn't I?
12         Q.      I don't think you put the
13   value.
14         A.      It is a two bedroom Upper West
15   Side apartment, seventh floor, looks at
16   another building across the street.  It is
17   probably worth 1.8 or 1.9 is my estimate.
18         Q.      Do you have any agreements with
19   Bill Guttenberg related to the Ecuador
20   case?
21         A.      Yes.
22         Q.      What is the nature of that
23   agreement?
24         A.      Actually, I'm not going to get
25   into that.  I already said that.
```

1            DONZIGER

2      Q.      This is an agreement you have

3  but pursuant to which you have made no

4  money?

5      A.      I have not made any money on

6  that agreement, no.

7      Q.      I asked you about book rights,

8  and am I remembering correctly that you

9  have not sold any book rights pursuant to

10 which you have received any money?

11     A.      That's correct.

12             Do you have more questions

13 about the Elliott meeting?  Because I'm

14 kind of -- I don't want to --

15     Q.      You are feeling peaked from the

16 lack of lunch?

17     A.      Let me explain.  I don't want

18 to get in a bad way with you, and I

19 apologize if prior to lunch I was a

20 little -- I wasn't as polite as I normally

21 am, but I do want to say this in all

22 seriousness.  I want to be cooperative on

23 the Elliott thing and on my personal

24 finance stuff.  I will reiterate that I

25 encourage you to finish up with -- do you

1                    DONZIGER
2  have more Elliott question meetings?  If
3  you do, please ask them.
4                 I don't feel comfortable going
5  beyond what I perceive to be the scope of
6  this deposition.  You know, I have been
7  here a bunch of hours today.  I know you
8  have allotted the whole day for the
9  deposition.  I think it might be better if
10  you don't have more questions about Elliott
11  to end the deposition.
12                 I think you guys are going to
13  file a motion to compel anyway is my guess.
14  Let's litigate this and if Judge Kaplan
15  rules the way you probably think he will,
16  we can take the rest of the time and deal
17  with those questions.  In the meantime, I
18  can get these documents and it would be
19  more productive.
20                 But, I mean, I'm here to answer
21  questions about Elliott and about my
22  finances.  I sort of told you about my
23  finances.  There is not much more.  I will
24  get back to you on this stuff.  But I just
25  don't think we need to go much more.  It

1                    DONZIGER
2    sort of feels like we are at the end here
3    and I feel like a lot of these questions
4    like about UDAPT and about costs in Canada
5    are really far afield.  So if you have more
6    questions about Elliott, please ask them
7    now.
8         Q.      Okay, give me just a second.
9         A.      Okay.
10        Q.      Vis-à-vis Elliott, you
11   understood that any documents where you
12   were asking Elliott to invest or related to
13   the Elliott investment were relevant to
14   your compliance with the injunction, the
15   March 2014 injunction?
16        A.      Say that again.  I don't
17   understand your question.
18        Q.      You understood that
19   documents --
20        A.      Understood when?  At the time
21   of the Elliott meeting?
22        Q.      Yes.
23        A.      Okay.  So just try to rephrase
24   the question if you don't mind, please.
25        Q.      Okay.  At the time that you

```
 1                  DONZIGER
 2   were discussing meeting with Elliott and
 3   actually meeting with Elliott, you
 4   understood that the documents relating to
 5   Elliott were relevant to the Court's March
 6   injunction, March 2014?
 7        A.     No.  I was working off the
 8   clarification order.  So to me there was no
 9   issue then or now.
10        Q.     And there was no need to
11   maintain documents?
12        A.     It didn't even occur to me one
13   way or the other, and I did maintain
14   documents.
15        Q.     In terms of the NDA and the
16   e-mail string about destroying the
17   documents, was there anybody from whom you
18   were attempting to keep them confidential
19   other than Chevron?
20        A.     Not that I can recall.
21        Q.     You understand the Court's
22   injunction of assigning your retainer
23   interest to Chevron, yes, that the
24   injunction orders you to do that?
25        A.     My Amazonia shares.
```

1                    DONZIGER
2         Q.       No, your interest in the
3    judgment.
4         A.       Okay, whatever.  What are you
5    trying to do here?  Can you ask me a
6    question?  I don't know if we agree on
7    this.
8         Q.       Paragraph 1 of the injunction
9    says "The Court hereby imposes a
10   constructive trust for the benefit of
11   Chevron, all property, whether personal or
12   real, tangible, traceable to the judgment,"
13   blah blah blah, "including, without
14   limitation, all rights to any contingent
15   fee under the retainer agreement and all
16   stock in Amazonia.  Donziger shall transfer
17   and forthwith assign to Chevron all such
18   property he has now or hereafter may
19   obtain."  That's what I'm talking about.
20        A.       So why are you asking me that
21   question in this deposition?  I know you
22   tried to get me to do an assignment
23   separate from the Amazonia.  If that's what
24   you want me to do, then take action with
25   the Court.  I mean, I don't -- I don't know

```
 1                    DONZIGER
 2   why you are asking in this deposition.
 3        Q.     Well, I'm going to provide you
 4   with the transfer while we're on the record
 5   which I have marked as Exhibit 5323.
 6               (Plaintiff's Exhibit 5323
 7   marked for identification.)
 8        A.     Okay, I will take it.  Do you
 9   want me to take this or this is an exhibit?
10        Q.     This is an exhibit.  I will
11   give you another copy.  If you want to
12   execute the exhibit copy, that's fine.
13               I take it you are not willing
14   to execute this document today?
15        A.     This is a whole other thing I
16   need to look at, consider, and think about,
17   so no, I'm not willing to execute this
18   document today, and if you are asking me to
19   execute it, I need some time and I will get
20   back to you.
21        Q.     Okay.  In terms of cleaning up
22   a little bit where we are on these document
23   issues, so any documents that you've
24   withheld as privileged either from
25   Mr. Rizack's production or your own, you
```

1           DONZIGER

2     said you had your own group of documents

3     that were privileged, are you willing to

4     produce those pursuant to the 502 or do you

5     intent to provide a log, and, if so, by

6     when?

7          A.     Well, I don't know the answer

8     to that question.  I mean, the Rizack thing

9     is virtually nothing.  I think he can

10    provide a log in a few minutes.

11               I think with regard to my

12    documents, I could provide a log, but I

13    think a lot of them are being withheld not

14    on privilege grounds but on First Amendment

15    grounds.

16               But, you know, I described what

17    I'm withholding to some degree today and

18    I'm ready to produce more if I need to.  I

19    don't want to because, again, I think it

20    intrudes on my constitutional right.  So I

21    will produce more documents if I have to.

22               By the way, a lot of what

23    Sullivan produced, from what I could tell

24    from my brief review, I think is

25    duplicative of some of my stuff.

1                    DONZIGER

2        Q.      That you were withholding?

3        A.      Yeah.  And just to be clear, I

4    don't believe Sullivan was right in

5    producing that, given the pendency of my

6    motion, so we'll see how it plays out.  We

7    might move at some point to claw that back.

8    I don't know.  But I just want to be clear

9    that we do not consider that production to

10   be legally resolved at this point, for lack

11   of a better term.

12       Q.      Okay.  The TD Bank accounts

13   that you've identified, those are

14   completely within your control?

15       A.      Yes.

16       Q.      Nobody else is a signatory or

17   moves money around in those or anything

18   else?

19       A.      That's correct.

20       Q.      And the money that Ms. Sullivan

21   managed in the CWP account has gone to a

22   different account, she closed that account

23   and sent that money somewhere but not to

24   you?

25       A.      That's correct.

1           DONZIGER

2      Q.      Do you control that money?  Do

3   you direct whoever has the account now?

4      A.      So I'm not going to get into

5   that because that deals with our

6   operational issues.  The amount of money

7   that was in the account she managed has

8   been mostly spent.  I mean, we basically

9   have been unable to raise money since

10  Chevron subpoenaed her.  So, you know,

11  there is just virtually nothing left.

12     Q.      Other than your TD accounts and

13  the CWP account and the new account that

14  used to be the CWP account, any other

15  accounts that you direct, that you can

16  direct people to pay money out of or --

17     A.      I'm going to provide a

18  different reason for an objection.  I

19  believe that was asked and answered, wasn't

20  it?

21     Q.      Okay.  Can you remind me?

22     A.      Well, look at the transcript.

23  I mean, didn't I tell you no already?

24     Q.      I believe you said no, you had

25  no foreign accounts.  I'm not sure if I

```
 1                  DONZIGER
 2   asked you if there are any other accounts
 3   that you had the authority to control.
 4         A.    So let me answer the question.
 5         Q.    Okay.
 6         A.    No.
 7         Q.    Thank you.
 8               The FDA retainer, you are going
 9   to produce that?
10         A.    Yeah.
11         Q.    The draft agreement with
12   Ms. Sullivan, would you produce that?
13         A.    I don't know the answer to
14   that.  I suspect I think I would consider
15   that not appropriate to produce, but I'll
16   think about it and get back to you.
17         Q.    And are you going to research
18   for Elliott-related documents or --
19         A.    I will.
20         Q.    And you will let us know
21   tomorrow?
22         A.    Look, I know we are coming up
23   to a hearing.  I will search as soon as I
24   get back today or tomorrow.  You know, my
25   experience with Katie Sullivan is she is
```

```
 1              DONZIGER
 2   very thorough and I would be shocked if I
 3   have anything other than what you already
 4   got from her.  But I will try to see if I
 5   have those documents.  Obviously they are
 6   probably in my e-mail somewhere.
 7         Q.    So you will see if you have
 8   something specifically that she is not on?
 9         A.    Yeah, but I don't know if -- I
10   don't think there is a single e-mail, as I
11   sit here today, that I recall, that I'm on
12   with Elliott that she's not on.  She
13   managed that whole relationship.
14         Q.    No, I mean discussing Elliott.
15   Elliott doesn't need to be on the e-mail.
16         A.    You mean between Katie and
17   myself?
18         Q.    Between Katie and yourself,
19   between you and someone else.  It just has
20   to relate to the Elliott meeting.
21         A.    I will do another search.
22               Do you have anything else with
23   regard to documents?  I mean, I have a
24   list.  What I will do is by tomorrow
25   morning, I will send you a list of what is
```

                    DONZIGER

1
2  pending based on this deposition today,
3  okay?  And I will get you the stuff as soon
4  as I can.
5        Q.     But in all events, before
6  Thursday.
7        A.     Well, I don't know.  The
8  Elliott stuff I will prioritize because I
9  think that's the main thing going on
10  Thursday.  So I will prioritize the Elliott
11  stuff.  I don't know if I will get all the
12  stuff.  For example, all the investments,
13  you know, that's going to take a little bit
14  of time.
15        Q.     If you decide to withhold
16  anything related to Elliott and then
17  including the draft Sullivan agreement --
18        A.     Well, that was between -- that
19  wasn't -- that didn't have anything to do
20  with Elliott.
21        Q.     I'm putting it in two
22  categories here.
23        A.     Yeah.
24        Q.     Could you bring those to court
25  on Thursday?

```
 1                    DONZIGER
 2        A.        I will do my best.
 3        Q.        So if Judge Kaplan addresses
 4   the issue, you will have it there.
 5        A.        I will do my best to get what I
 6   can.  Look, I will do my best to get it to
 7   you before Thursday.  If it ends up that I
 8   have to bring it in and I think I should
 9   withhold it, I will do my best to bring it
10   and he can decide.
11                  Are we good?
12        Q.        I think so.  Give me one
13   second.
14                  And to the extent Ms. Sullivan
15   produced more e-mails than you, that would
16   be because --
17        A.        She is better organized than I
18   am.  I mean, she might have -- I don't
19   know.  I think we were -- she might have
20   had separate communication with them that I
21   was not copied on.  I don't know.  You
22   know, because she set the whole meeting up.
23        Q.        Right.
24        A.        So, I mean, I think she was in
25   touch with Jonathan Bush and others and
```

```
 1                    DONZIGER
 2   stuff that I was not involved in.
 3        Q.     I did forget something else.
 4   You were so hopeful.  You were so hopeful.
 5              Do you have any direct contact
 6   with Jonathan Bush?
 7        A.     No.
 8        Q.     Did you have any direct contact
 9   with anybody else at athenahealth?
10        A.     No.
11        Q.     Not documents, not chats,
12   nothing?
13        A.     Nothing.
14        Q.     Did they have any involvement
15   in the Ecuador matter separate and apart
16   from this Elliott introduction?
17        A.     No.
18        Q.     Mr. Donziger, subject to
19   recalling you to answer the questions that
20   we disagree about in terms of scope or
21   privilege or whatever, the First Amendment
22   objection -- do you want to explain that
23   further, or no, you are done with that?
24   I'm asking you that in seriousness because
25   I don't understand it.
```

```
1                    DONZIGER
2         A.      What was the issue where you
3    felt like raising a First Amendment
4    objection was inappropriate?
5         Q.      Just financial documents.
6         A.      My personal financial
7    documents?
8         Q.      Right.  They are not disposing
9    of you.
10        A.      And if I remember correctly, my
11   answer was that it would be revelatory of
12   certain internal operational strategies.
13   So I will give that another think and I
14   will add that to the list.
15               One other thing on my end,
16   which is Ms. Sullivan's deposition, can I
17   get the name of the court reporter?
18               MS. CHAMPION:  I have already
19   sent it to you, Mr. Donziger.
20               THE WITNESS:  Thank you, I
21   appreciate it.
22        A.      Is there anything else?
23        Q.      There haven't been any other
24   depositions, is that what you are asking?
25        A.      Have there been other
```

1              DONZIGER

2   depositions?

3        Q.     No, sir.

4        A.     Is there a deposition scheduled

5   of Mr. Rizack?

6        Q.     No.  He has not provided us

7   dates despite repeated requests.

8        A.     You are not going to try to

9   depose him before the hearing?

10       Q.     I don't think there is -- we

11  are going to have to get an order.  You are

12  not involved in his refusing to appear for

13  a deposition I take it?

14       A.     No, I am not.  I'm not his

15  attorney.  All I did was tell him that

16  there were a couple of documents that I

17  felt were privileged or subject to the

18  motion for a protective order.

19       Q.     And you would have no objection

20  to him appearing before the hearing?

21       A.     Appearing for a deposition?

22       Q.     Correct.

23       A.     I mean, that's between you and

24  him.  Thank you very much.

25       Q.     Thank you, Mr. Donziger.

1                    DONZIGER
2              THE VIDEOGRAPHER:  Nothing
3    else, Counselor?
4              MS. NEUMAN:  No, we're off the
5    record.
6              THE VIDEOGRAPHER:  The time is
7    3:20.  We are going off the record.  This
8    is the end of media file number five and
9    that concludes this deposition.
10
11
12              [TIME NOTED:  3:20 p.m.]
13
14
       _____
15              STEVEN DONZIGER
16
   _____
17   Subscribed and sworn to
     before me this _____
18   day of _____, 2018.
19   _____
        Notary Public
20
21
22
23
24
25

1
2          I N D E X
3

WITNESS          EXAMINATION BY          PAGE
4
DONZIGER          NEUMAN                    5
5
6
            E X H I B I T S
7

PLAINTIFF'S          DESCRIPTION          PAGE
8    Exhibit 5302   Judgment as to              6
                    Donziger Defendants
9                   and Defendants Camacho
                    and Piaguaje
10   Exhibit 5303   Default Judgment as       18
                    to Defaulted Defendants
11   Exhibit 5304   Order to Show Cause       23
                    and Preservation Order
12                  in Furtherance of This
                    Court's March 4, 2014
13                  Judgment and Application
                    to Have Steven Donziger
14                  Held in Contempt
     Exhibit 5305   Chevron Corporation's     27
15                  First Information
                    Subpoena
16   Exhibit 5306   Subscription Deed         41
     Exhibit 5307   Letter from Donziger      43
17                  dated 6/15/18
     Exhibit 5308   Letter from Donziger      56
18                  dated 6/15/18
     Exhibit 5309   DONZPJD-0000001-          70
19                  0000018
     Exhibit 5310   MKS 0000396               95
20   Exhibit 5311   MKS 0000395               99
     Exhibit 5312   Chart of Donziger         104
21                  Invoices
     Exhibit 5313   MKS 0000389               105
22   Exhibit 5314   Analysis of Bank          109
                    Transactions
23   Exhibit 5315   Letter from Mendoza       121
                    to Guaman
24
25

1
2                  E X H I B I T S
3    PLAINTIFF'S          DESCRIPTION          PAGE
     Exhibit 5316 Declaration of the       127
4                 Affected Nationalities
                  in the Province of
5                 Sucumbios
     Exhibit 5317 RIZACKJD-0000001-         134
6                 0000005
     Exhibit 5318 E-mail from Rizack to     137
7                 Herrera dated 6/21/18
     Exhibit 5319 Transfers from TD Bank    187
8                 Account ending 2265
     Exhibit 5320 Funder Deposits into      197
9                 Donziger's Primary
                  Chase Bank Accounts
10   Exhibit 5321 MKS 0000087               202
     Exhibit 5322 Canada Enforcement        219
11                Action Costs Payments
     Exhibit 5323 Transfer and Assignment 231
12                of Judgment Interests
13
14
15   REQUESTS
16   Page      Line
     96        23
17   169       2
     235       8
18   235       11
     236       21
19
20
21
22
23
24
25

1

2                 CERTIFICATION

3

4    I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do hereby

6   certify:

7    That the witness whose testimony as

8   herein set forth, was duly sworn by me; and

9   that the within transcript is a true record

10  of the testimony given by said witness.

11   I further certify that I am not related

12  to any of the parties to this action by

13  blood or marriage, and that I am in no way

14  interested in the outcome of this matter.

15   IN WITNESS WHEREOF, I have hereunto set

16  my hand this 26th day of June, 2018.

17

18

            _____

19          TODD DESIMONE

20

21              *       *       *

22

23

24

25

1
2                    E R R A T A   S H E E T
              VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME: CHEVRON v. DONZIGER
4  DATE OF DEPOSITION: 6/25/18
   WITNESS' NAME: STEVEN DONZIGER
5
   PAGE/LINE(S)/      CHANGE              REASON
6  ____/_____/_____/_____
   ____/_____/_____/_____
7  ____/_____/_____/_____
   ____/_____/_____/_____
8  ____/_____/_____/_____
   ____/_____/_____/_____
9  ____/_____/_____/_____
   ____/_____/_____/_____
10 ____/_____/_____/_____
   ____/_____/_____/_____
11 ____/_____/_____/_____
   ____/_____/_____/_____
12 ____/_____/_____/_____
   ____/_____/_____/_____
13 ____/_____/_____/_____
   ____/_____/_____/_____
14 ____/_____/_____/_____
   ____/_____/_____/_____
15 ____/_____/_____/_____
   ____/_____/_____/_____
16 ____/_____/_____/_____
   ____/_____/_____/_____
17 ____/_____/_____/_____
   ____/_____/_____/_____
18 ____/_____/_____/_____
   ____/_____/_____/_____
19 ____/_____/_____/_____
20
            _____
21              STEVEN DONZIGER
22 SUBSCRIBED AND SWORN TO
   BEFORE ME THIS_____DAY
23 OF_____, 2018.
24 _____
        NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

| & |
|---|
| **&**   1:17 2:3,10 3:21 4:9,15,17 111:21 198:9,13,24 |

| 0 |
|---|
| **0000001**   243:18 244:5 |
| **0000005**   244:6 |
| **0000018**   243:19 |
| **0000087**   244:10 |
| **0000389**   243:21 |
| **0000395**   243:20 |
| **0000396**   243:19 |
| **0691**   1:4 3:19 |
| **07932**   2:11 |

| 1 |
|---|
| **1**   7:2 51:14 70:10 109:19 134:11 139:11,14 192:4 230:8 |
| **1.1**   192:5,16 |
| **1.3**   218:10 |
| **1.33**   217:18 |
| **1.8**   225:17 |
| **1.9**   225:17 |
| **10**   140:17 179:5 |
| **100**   53:10 61:24 107:10 147:2 173:25 178:12 |
| **100,000**   103:18 |
| **10166**   2:4 |
| **104**   243:20 |
| **105**   243:21 |
| **109**   243:22 |
| **10:07**   1:13 3:3 |
| **10:42**   38:22 |
| **10:50**   39:2 |
| **11**   1:4 3:19 156:5 244:18 |

**11:26**   70:14
**11:34**   70:18
**11:54**   87:8
**12**   87:10
**121**   243:23
**127**   244:3
**12:30**   106:5
**12:39**   124:12
**12:45**   124:15 126:14
**134**   244:5
**137**   244:6
**14**   54:9
**14th**   53:4
**15**   119:18,24 120:19 143:16 160:21 161:7 173:23,24 174:7,8 174:10 192:23 208:6,10 214:4,5 215:24 217:5,13
**155**   156:6
**156**   156:6 159:15
**15th**   43:4
**16**   65:17 82:25 160:21 161:7
**169**   244:17
**16th**   27:6,22 28:16 71:10,12
**18**   70:10 206:15 243:10
**187**   244:7
**1875**   6:21
**19**   212:7,10
**1968**   23:17
**197**   244:8
**1985**   18:21
**1990s**   18:13
**19th**   121:21 127:19

**1:01**   139:17
**1:49**   185:23
**1:50**   186:3

| 2 |
|---|
| **2**   6:25 23:20 27:8 147:4 214:9 215:24 244:17 |

**20**   39:24 154:16 173:24 174:8,8 197:4
**200**   1:18 2:3 3:22
**200,000**   105:5,17
**2006**   130:3,4
**2009**   124:24 126:2 126:23 130:23 131:8 216:4
**2011**   28:24 35:17 39:7 57:11 96:8 168:5 184:15 185:7,12
**2013**   41:11 105:17 105:21 215:24
**2014**   6:22 11:21 12:14 13:4 15:25 16:19 17:10 19:12 52:15 53:4,9 54:10 55:2,6 77:2 103:6 104:3 109:7 110:5,14 112:18 114:24 116:21 188:22,25 189:24 193:9 228:15 229:6 243:12
**2015**   188:22
**2016**   109:22 111:23 121:21 122:19 127:19 128:6 188:22 189:2
**2017**   68:16 87:24 91:14 95:8,15

98:19 104:21 105:17,21
**2018**   1:12 3:4 19:6 19:17 27:6,22 28:17 43:4 71:11 71:12 100:3,20,25 101:17 104:21,21 104:22 105:4 130:16,25 133:3 242:18 245:16 246:23
**202**   244:10
**2020**   130:3 210:8
**2030**   131:25 132:17
**21**   206:6,15,17 210:10 214:8 244:18
**219**   244:10
**21st**   130:15 131:15 133:3
**22**   161:22 206:15
**2265**   109:21 110:4 187:11 188:8 244:8
**23**   206:6,17 243:11 244:16
**231**   244:11
**235**   244:17,18
**236**   244:18
**23rd**   19:6,17 22:14
**24**   81:13 118:9 119:19 206:6,17
**24th**   100:2,20,24 101:17 137:11
**25**   1:12 65:21 67:3 114:4 206:6,17 210:11 214:19 216:20,25 218:18 219:6

**25,000** 62:13 98:19 100:3,8 104:20 196:23,24
**25th** 3:4 11:3,12 13:9 14:3 16:10 19:12 109:21 116:20 130:25
**26** 55:9 56:8
**26th** 245:16
**27** 243:14
**2:18** 208:14,15
**2:43** 209:3,6

**3**

**3** 35:25 39:18 51:14 124:24 126:6 147:4 189:15 218:15
**30** 114:4 214:19
**32** 169:9
**325** 2:10
**33** 119:2 169:17 212:20 214:14
**389** 105:11
**395** 99:25
**396** 95:2
**3:20** 242:7,12
**3rd** 169:18

**4**

**4** 52:15 54:8 136:8 214:6 243:12
**40** 118:6
**41** 243:16
**43** 243:16
**45,550** 136:13
**47** 14:18
**488,000** 189:3
**488,450** 111:19,25 115:11

**5**

**5** 15:15 129:25 134:12 136:8 145:8,11 217:5,12 217:14 243:4
**5.2** 145:8,16
**50** 117:24 118:6 192:14
**50,000** 109:20 137:3
**500,000** 115:6
**502** 48:24 49:3 232:4
**5222** 27:11,17
**5302** 6:17,18 10:22 15:16 243:8
**5303** 18:20,22 19:5 243:10
**5304** 23:16,18 243:11
**5305** 26:25 27:2 243:14
**5306** 41:19,21 42:13,23 243:16
**5307** 43:4,6,12,15 46:25 51:13 65:15 205:5 206:12 243:16
**5308** 55:23 56:2 211:21 212:4 243:17
**5309** 70:6,9,25 73:16 82:25 243:18
**5310** 94:25 95:3 98:18 243:19
**5311** 99:21,22 243:20
**5312** 103:13 104:12,14 243:20

**5313** 105:10,12,18 108:3 243:21
**5314** 109:11,13,20 111:19 112:23 243:22
**5315** 121:7,9 243:23
**5316** 127:8,12,14 127:18 244:3
**5317** 123:20 134:10,13 244:5
**5318** 137:10,14 244:6
**5319** 187:10,13 244:7
**5320** 197:21,25 244:8
**5321** 202:7,9 244:10
**5322** 219:23,25 244:10
**5323** 231:5,6 244:11
**558** 28:21 29:17,21 35:14,15 39:6,10 40:17,19 41:10 42:6 57:2,4,5,10 96:2,5,6,17
**56** 243:17
**5th** 28:24 105:4

**6**

**6** 35:25 56:10 140:17 243:8
**6.3** 59:22,23,25 60:12 144:7,21 145:12,21,23 146:7 159:23 173:24 174:4
**6.3.** 218:7,14
**6/15/18** 243:17,18

**6/21/18** 244:7
**6/25/18** 246:4
**60** 154:13
**6th** 87:24 91:14

**7**

**7** 65:16
**7.250.** 214:10
**70** 243:18
**7033a** 215:3

**8**

**8** 40:19 244:17
**800,000** 191:25
**813,000** 12:20
**8132** 72:2,13 75:9
**8th** 10:8 42:20

**9**

**9** 85:25 86:2 87:4 87:14 88:22 91:8 93:3 203:6,9
**90** 87:17 154:13
**93** 87:19
**94** 87:18
**95** 243:19
**96** 244:16
**99** 243:20

**a**

**a.m.** 1:13 3:3
**abide** 9:11
**ability** 6:12 12:20 19:10 35:5 98:25 133:13
**able** 48:16 66:10 73:19 97:9 153:25 176:3
**absolutely** 23:14 107:10 196:13
**absurd** 141:24
**accept** 217:18

**access** 170:25
**account** 9:18 47:9
52:23 71:25 73:5
74:10 79:13 80:2
108:5,10 110:3,6
111:15 186:18,20
187:11 188:8,8,11
189:9 233:21,22
233:22 234:3,7,13
234:13,14 244:8
**accountable** 22:19
**accountant** 54:9
54:13,20
**accounting** 67:4,8
67:20 69:6,11,17
194:14 198:3
199:6
**accountings** 66:17
66:22,25 68:24
**accounts** 44:24
45:8,15 46:5,12
51:24 52:6,7,12,14
52:15,18,21,25
53:3,9 71:6,10,19
72:5,9,12,21 73:4
73:15,21,25 74:2
74:23 75:6,13,14
75:21 76:3,8
77:14 110:4,8,12
111:5,11,12
113:24 115:5
197:24 198:21,24
199:2,4 233:12
234:12,15,25
235:2 244:9
**accurate** 52:16
53:10 74:20
114:25 115:8
116:13 119:6,8
144:8 151:9
189:25 190:3

**access** 213:10,12 214:15
**accuse** 107:12
**achampion** 2:6
**acknowledge**
183:5
**acknowledged**
13:5
**acknowledges**
36:3
**acquired** 90:14
**act** 37:21
**acting** 24:4 31:16
34:3 96:5 133:20
**action** 4:3 24:18
40:22 171:13
219:24 220:5,12
220:15 230:24
244:11 245:12
**actions** 16:6,14,16
149:18 152:17
**active** 39:20
**activities** 150:18
194:6 202:16,19
**acts** 15:19,24
**actual** 23:22 24:3
40:24 116:23
196:2 213:8
**adapt** 171:19
**add** 8:6 11:18
150:5 211:5
240:14
**added** 35:25
**addition** 60:11
116:22
**additional** 35:11
35:24 120:13
146:9 185:14
**addressed** 121:12
**addresses** 238:3
**admin** 67:25

**administrative**
33:7
**admit** 123:8
**adopt** 171:20
172:5
**advance** 79:4,8
147:19
**advanced** 182:8
**advice** 149:25,25
220:21
**advocacy** 63:21
150:19
**affidavit** 171:2
**affirming** 16:12
**afield** 204:16
217:23 228:5
**agent** 86:19
**ago** 58:18,19
138:17,19 140:9
153:23 158:25
163:3 216:2
**agree** 3:12 15:12
20:9 107:3,20,20
107:23 136:21
143:2 230:6
**agreed** 48:24
**agreeing** 143:6
184:17
**agreement** 14:4,6
28:24 29:2,5,7,11
29:14,20 35:18
39:11,15 57:9,11
57:16,18 58:16
59:2,3,10,12,14
60:16,20,22 61:21
61:24 62:2,2,3,9
62:18 68:19,21
96:7,20,23,25
97:18,21 98:3,8,15
100:23 102:13
127:23 128:6

130:23 151:20,25
152:8,10 163:13
165:23 167:7,9,18
178:2,4 183:6,11
183:14 184:14,16
184:20,23 185:2,6
191:21 196:7
201:15,19 214:2
219:12,13 225:23
226:2,6 230:15
235:11 237:17
**agreements** 57:12
153:11 161:16
162:21,22 163:6
168:8 178:7
182:18,20 183:8
183:10,17,23
201:3,12,21,22,23
225:18
**agrees** 36:3
**agrio** 14:18 29:23
30:22 31:2,17,19
32:2 37:4,6,13,25
220:9 221:14
**ahead** 50:24 57:23
106:24 128:16
142:11 176:13
**aherrera** 2:7
**al** 1:10 3:17
**alberto** 155:10
**alejandro** 2:7 4:12
**allocated** 145:2
**allotted** 227:8
**allow** 53:17
102:23 147:19
153:15
**allowed** 135:12
**allows** 33:6
**amazonia** 41:20
42:6,12,15,22 57:4
148:9,10,13,14,20

149:3,4,10,14,19
165:13,15,18,19
165:20 168:6,13
168:15 214:7
229:25 230:16,23
**amended** 15:21
**amendment** 17:15
17:18,20,25 44:8
49:5,11,18 63:12
63:18 67:12 69:4
70:3 81:5,7 82:3
82:18,20 100:22
128:8 133:23
135:2 137:6 151:6
187:18 197:11
206:21 232:14
239:21 240:3
**amount** 39:24
41:3 47:10 59:24
62:11,16,20 65:20
66:11,21,24 67:3
67:17 103:9 114:7
118:9,16 119:10
119:11,14,21
120:12 151:11
169:22 181:5,8
216:22 219:10
234:6
**amounts** 161:9
175:21 213:3,4
**ample** 81:19
**amply** 11:10
**analysis** 218:17
243:22
**andrea** 2:5 4:8
16:2 34:6 89:19
106:19 112:25
120:5 122:20
**andres** 2:18 5:8
96:14

**aneuman** 2:5
**anne** 2:6 4:10
**announcing** 163:5
**answer** 8:16,16,25
9:19,25 12:2 13:2
13:14,16,17 14:23
15:9,13 16:2,15
17:14 19:13 23:6
30:17,23 32:13
34:7,10 36:5
38:10,14 39:15
41:16 42:16 59:6
62:6 67:13 68:12
69:3 75:22,25
76:20 80:8 91:17
107:3,8 114:6
132:4 133:7 140:9
142:20 143:8
147:16 153:13,20
175:23 176:2
179:13,19 180:24
183:24 187:19
189:5 194:25
195:2 196:14,16
197:8,17,19
204:13,20,23
206:17 207:7
210:10 211:2
213:10 219:8
220:16 227:20
232:7 235:4,13
239:19 240:11
**answered** 61:18
93:10 103:7
234:19
**answering** 35:19
88:16,23 89:19
90:16 91:5 113:3
133:4 137:7
**anticipate** 151:23

**anybody** 5:19
16:20 81:24 94:3
94:5 109:7 148:4
229:17 239:9
**anymore** 73:10
148:20 186:21
215:10
**anyway** 114:2
227:13
**apart** 161:2
168:15 239:15
**apartment** 225:4
225:15
**apologize** 21:5
226:19
**appeal** 134:3,7
171:15
**appealable** 40:20
**appear** 124:25
130:24 220:20
241:12
**appearances** 4:6
**appearing** 241:20
241:21
**appears** 41:25
43:12
**appendix** 41:24
**apple** 46:23
**applicable** 41:6
66:13
**application** 243:13
**apply** 81:8
**appreciate** 240:21
**approached** 139:5
**appropriate** 15:10
41:16 47:13 107:2
107:6,25 118:21
123:13 132:4
135:21 143:4
146:12 154:2
235:15

**appropriately**
135:12 141:6
**approval** 79:2,3,6
79:7 117:17
165:12 168:24
182:2,6 191:20
**approvals** 78:24
**approve** 78:19,22
194:15
**approved** 78:25
**approves** 194:10
**approximately**
44:4 68:15 114:4
**approximation**
30:10
**april** 11:3,12 13:9
14:3 16:10 19:6
19:12,17 21:21
22:3,14,23 27:6,22
28:16 71:10,12
116:20 189:2
**arbitrations** 40:16
**area** 68:6
**areas** 20:8
**argentina** 157:7
157:15 181:9,10
**argued** 10:8 116:5
**argyle** 189:20
190:16 192:3,7
193:7,10
**arranged** 138:24
**arrangement**
152:6
**arrangements**
152:3
**aside** 118:16
163:22
**asked** 21:24 90:24
99:11,16 110:17
110:25 126:14
128:21 133:18

142:21 146:2
155:20 156:2
160:16,17 196:15
226:7 234:19
235:2
**asking**  11:5 47:20
49:13 58:10,14
64:14 75:20 89:13
106:13 107:14
123:11,17,24
124:6 130:12
131:21 136:15,18
136:24,25 140:3
142:17 162:24
172:20 173:11
184:4 211:15
216:14 224:7
228:12 230:20
231:2,18 239:24
240:24
**assembléia**  215:5
215:12,16
**asset**  28:16 187:2
**assets**  51:16,20
170:18 171:5
186:8,10,12,16
223:6
**assign**  230:17
**assigned**  217:19
**assigning**  168:22
229:22
**assignment**  230:22
244:11
**assist**  22:12
150:23
**assistance**  56:14
189:19
**assistant**  53:18
**associates**  53:19
100:2,9 101:19

**assumed**  86:19
**assured**  218:11
**athenahealth**  24:7
239:9
**attached**  52:12
**attacks**  25:21
**attempt**  210:20
**attempting**  229:18
**attending**  181:19
**attention**  6:25
27:8 70:24 87:4
108:2 111:18
**attest**  52:13
**attorney**  40:23
41:2,6 241:15
**attorneys**  2:4,11
121:12
**audio**  3:10,10
**augustine**  191:10
**aulestia**  202:11
**australia**  156:10
156:15,19,23
**authority**  36:24
101:4,6,7 149:20
235:3
**authorization**
116:16 127:21
128:2 181:18,21
181:23
**authorized**  56:12
77:21,24 78:19,22
116:18 117:12
189:17
**authorizes**  153:10
**available**  62:21
148:24
**avenue**  1:18 2:3
3:22
**avoid**  26:12,16,21
85:19

**awarded**  221:10
221:15
**aware**  46:10 51:21
109:9 129:22
181:8,11 186:11
186:24 220:3
221:9,12,13,24
223:24 224:15

## b

**b**  27:11 108:5
243:6 244:2
**back**  5:23 18:12
34:19,24 38:25
51:4 56:22 61:17
61:24 70:17 72:24
82:10 87:11 97:7
103:21 115:5
124:15 127:4
129:4 139:17
161:19,22,24,24
162:11,14 166:11
166:12 176:5
186:3 197:18
199:8 203:5
206:23 208:12
209:5,16 211:6
222:21 223:5
227:24 231:20
233:7 235:16,24
**backup**  67:25
95:21
**bad**  11:17 81:18
226:18
**bank**  44:20,23
50:4 51:23 52:6,7
52:13,14,17,20,23
53:3,7,8,13,15
71:6 110:18,25
111:2,6 113:24
159:9,12 188:8
198:20,24 224:4,8

233:12 243:22
244:7,9
**banked**  110:15,18
**bankers**  44:17
**banking**  111:3
**barely**  92:15
130:13
**base**  62:23
**based**  8:25 19:16
19:23 20:3 21:8
22:5,9 56:14
76:18 103:4
104:12 105:23
118:5 125:25
126:22 145:16
149:10 151:10
156:14,25 168:4,7
168:8 171:10
172:22 178:6
193:10 213:11
220:21 237:2
**basic**  137:25
153:21 154:2
155:6
**basically**  45:7
160:15,21 234:8
**basis**  12:15 13:4
23:12 44:7 46:2
48:19 49:10 79:9
108:10 118:23
128:17 137:18
151:19
**bates**  70:10 82:25
87:17 94:25 99:24
104:16 105:11
109:16 134:11
156:6 159:15
212:8
**bathroom**  38:17
**bear**  41:25 104:16
224:13

**bearing** 70:9
87:17 94:25 99:24
105:10 134:11
156:6 159:15
210:19
**bedroom** 225:14
**beginning** 39:3
70:19 122:19
124:16 156:9
186:4
**behalf** 18:4 22:22
31:16 32:10 47:8
63:21 68:14
117:13 121:23
127:24 152:14
153:6
**behavior** 142:5
**believe** 9:11 11:17
16:6 19:13 22:15
29:15 31:8 47:12
48:9 51:20 55:3
57:8,19 58:25
61:23 63:17 68:21
70:3 72:14 82:19
83:19 85:13 92:2
94:23 95:16 96:11
97:5 98:7 107:25
111:8,17 115:2
128:22 138:4,22
139:10 140:5
149:6,12 155:10
156:14 164:2,14
165:11 168:15
170:7 173:9,11
174:6,9 181:16
185:11,17 187:7
189:6 190:8
200:17 214:18
215:19 218:12,13
219:11,19 222:5
222:10,15 224:25

233:4 234:19,24
**bell** 222:9,11
**belonging** 72:18
**benchmark**
182:17
**beneficial** 168:23
**beneficiaries** 65:2
**beneficiary** 18:14
31:22 32:23 33:17
65:11 153:3
186:22
**benefit** 7:4 41:5
109:8 230:10
**best** 9:19 19:14
25:4 43:16 58:20
59:22 90:11
117:17 138:22
145:16 173:9
190:9 198:16
238:2,5,6,9
**better** 125:11
147:24 165:20
167:14 170:21
227:9 233:11
238:17
**beyond** 9:12 13:24
14:17,20,22 16:22
20:5 21:14,17
28:6 35:9 36:23
38:4 40:6,10,15,18
41:9,12 42:7 49:6
49:8 68:10 69:9
75:17 76:7,12,13
77:17 78:9 79:15
80:16,19,22 82:14
83:20 88:3,4,17,24
89:15 91:16 95:16
95:20 96:3,9,15,18
97:23 98:5,11,13
98:16,21,22 100:7
100:21 101:11,18

102:16,19 105:3,6
105:20,25 106:10
107:14 110:2
111:24 112:4,8,12
112:16 113:5
114:5,9 115:14,25
116:3 120:15
121:4 122:4,8,11
123:21 124:7
127:16 128:4,7,13
134:25 136:14
137:5 140:3 141:3
151:4 194:20
199:10,11,16
201:8 227:5
**big** 61:11 154:22
**bill** 194:3 225:19
**billing** 40:13
**bills** 74:16
**bit** 67:12 155:12
194:19 231:22
237:13
**blah** 230:13,13,13
**blaming** 179:5
**blood** 245:13
**boggs** 163:7
**bonds** 186:8
**book** 226:7,9
**books** 201:5
**boost** 203:24
**boxes** 44:16,16,17
**boycott** 159:16,21
**brazil** 157:7,15
**breach** 149:9,15
149:18
**break** 61:5 70:11
87:5 123:23
139:12 140:10
142:3 143:13
179:9 202:4 205:7
206:4 207:24

208:3,4
**breaks** 141:24
142:13
**brief** 232:24
**briefly** 80:10
**bring** 136:16
147:10 166:7
237:24 238:8,9
**bringing** 11:14
**brought** 74:25
174:24 214:22
**budget** 136:9,16
202:22
**budgets** 40:13
**building** 225:16
**bunch** 77:22 227:7
**burdensome** 47:3
62:22 65:20
204:17
**burford** 163:7
214:4
**bush** 24:7 238:25
239:6
**business** 36:22
53:22 77:16 82:9
101:11 102:2
146:25 147:3
**buy** 117:15

**c**

**c** 2:2 123:20
**c.a.** 1:4
**calculate** 65:20
66:10
**call** 9:20 177:17
**called** 4:24 127:24
**calls** 208:5
**camacho** 243:9
**canada** 62:25 63:8
122:18 152:19
158:19 169:25
170:11 171:12

172:10 219:24
220:4,5,5,11,15,19
221:5,6,9 228:4
244:10
**canadian** 63:3
111:21 151:2,12
152:5,7,9,24
157:23 158:4
220:21
**cancelled** 162:5
**capable** 175:13
181:11
**capacities** 204:9
**capacity** 47:5
**capital** 49:23 78:6
79:11 85:9,13
133:6 138:8
149:23 172:10
**car** 28:13
**care** 102:3
**carefully** 179:4
**carlos** 121:12
**case** 16:24 17:3
25:20 37:9 63:3
65:22 66:3,12,20
67:21,25 68:2
69:19 71:18,20,22
72:2,6,9,23 73:5
73:13,19,21 74:4,6
74:17,21,22 75:7
75:11,15,21 76:6,9
76:22 77:22 80:2
81:16 85:21 95:8
99:6 100:12 104:3
105:17,23 109:3
109:25 112:20
114:24 115:10,17
116:7 118:4,5,12
119:3 120:8,9
122:18 138:18
144:17 147:19,24

149:23 150:17,18
151:2 153:16
155:6 159:5,8,12
162:8 173:12
177:4 181:9,10
187:15,22,24
188:9,12,17
195:11 198:14,18
199:3,10,24 204:4
216:3,10 219:14
219:21 221:6,6
225:20 246:3
**cases** 54:7 157:6
157:15
**categories** 237:22
**category** 223:4
224:6
**cause** 243:11
**caused** 167:4
**cc'd** 87:25
**cell** 3:8
**cellular** 3:7
**center** 193:13
**certain** 18:5 26:2
103:22 119:21
129:25 148:24
219:10 240:12
**certainly** 61:25
158:7 173:20
193:4
**certification** 245:2
**certified** 121:7
**certify** 245:6,11
**chain** 83:2 203:11
**chains** 193:21
**chairman** 96:16
**champion** 2:6 4:10
4:10 86:13,18,24
97:11 203:8
205:19 240:18

**chance** 128:25
179:3
**change** 19:9 185:6
190:2 246:5
**changed** 42:21
183:18
**chart** 214:20
219:23 243:20
**chase** 110:20,21
110:25 111:7
186:19 197:24
244:9
**chats** 239:11
**check** 225:2
**checking** 72:3
109:21
**chevron** 1:5 2:18
3:17 4:9,11,13,15
4:18 5:9,24 7:4
11:15 12:21 15:4
16:24 17:3 22:18
26:4,5,13,17,21
27:5 33:2 42:12
47:7,8 81:15 82:6
85:20 91:4 129:24
148:21 156:19,23
159:16 161:11,12
161:17 162:18
163:5,12,14,17,19
163:20,22,25
167:7,19,21
170:10 171:12
176:25 209:24
217:25 218:11
220:3,7 229:19,23
230:11,17 234:10
243:14 246:3
**chevron's** 25:21
43:19 45:4 55:25
69:12 71:2 125:4
133:16 140:2

177:2
**choosing** 134:2,6
**chose** 162:8 216:4
**christopher** 2:19
3:23
**circuit** 16:11
**citibank** 108:5
**city** 54:18
**civ** 1:4 3:19
**claim** 8:12 107:9
153:15,17
**claimed** 32:17
160:3
**claiming** 32:8,15
125:16
**claims** 155:7
**clarification** 5:12
11:13 19:20 22:5
113:14 229:8
**clarify** 113:18
115:3 169:14
**class** 30:19
**claw** 233:7
**cleaning** 231:21
**cleanup** 37:10
**clear** 7:21,25 8:2
10:14,23 11:18,22
14:21 16:5 20:11
22:10 46:24 50:21
53:16 60:15 76:13
101:7,8 115:10
133:5 142:24
144:17 146:6,20
157:8 161:10
165:8 166:20
188:11 195:7
198:19 233:3,8
**clearly** 90:5
214:16
**click** 200:7,18

client 14:10,12,16
  14:19 17:7,19,23
  18:2,16,25 22:12
  25:24 31:11,22
  36:25 37:10,15
  62:23 63:23 72:12
  72:17,18 77:9,10
  78:17,20,23 85:23
  94:11 99:2 101:7
  117:16 123:15,25
  162:11 169:14
  182:3 186:19
  196:3 219:13
client's 114:11
clients 14:7,9
  16:17 17:12 18:5
  18:6,8,13 22:6,17
  29:22 56:12 60:17
  63:21,22 77:4,6,8
  77:20,21,25 78:4
  78:25 79:9,13,18
  94:18 100:18
  117:18 148:19
  149:21 152:10
  161:4,20 162:15
  167:20 181:21
  182:6 189:17
  194:14 195:12
  198:17
closed 52:21
  110:13 233:22
cofan 64:19
cohn 83:4 154:8
  154:14
colleagues 53:25
  54:5 135:11
  202:17
collect 65:12 153:5
  173:5,12,13 200:2
collected 12:9
  65:13

collecting 32:24
collection 39:25
  151:21
columbia 2:10
column 213:4,11
  213:18 214:3
com 201:2
combined 55:23
  211:20,21,23
come 32:12 83:24
  84:14 100:9,15
  101:24 115:23
  129:4 133:19
  166:8 172:16
  185:14 208:12
comes 55:8 73:2
  74:14,21 198:24
comfort 183:4
comfortable
  118:15 227:4
coming 8:9 235:22
comment 170:10
commingle 74:8
commingled 74:6
commingling
  74:11
commission
  246:25
commitment
  213:3
committed 40:23
  160:22 161:8,9
  173:24 213:5
committee 78:15
  215:4
communication
  79:18,21 182:7
  238:20
communications
  37:24 93:4,9
  94:15 211:10

communities 18:9
  37:18,20 63:25
  64:5,9,11,24
  149:13 153:7
company 68:19
  210:21
compare 39:14
compel 107:6
  129:5 227:13
compensate
  151:15
compensation
  39:19 57:20 58:3
  58:5 63:7 78:20
  80:21 81:25
  115:12,15,19
competent 40:21
compilation
  109:11
complete 66:23
  67:5,5,6,8,16,18
  69:7 198:5,8
  199:5
completely 11:14
  11:15 140:25
  146:19 151:13
  173:21 213:10
  233:14
complex 118:12
compliance 24:10
  130:2 194:24
  209:21,23 228:14
complicated 9:15
  110:16 138:4
  192:22
complied 35:13
comply 210:16
complying 36:10
  36:13
computer 46:15
  46:21 54:25 55:4

84:16,23 90:22
  93:19
computers 46:18
conceding 20:23
conceivable 25:25
concern 25:19
concerned 74:12
  81:21 148:23
concerning 130:25
concert 24:4
concessionary
  64:12
concludes 242:9
conclusion 204:18
condition 13:12
  20:6,12 41:15
  75:19 98:25
  133:13
conditions 192:8
conducted 40:17
confer 21:2
confidential 26:4
  89:8,14 91:10
  229:18
confidentiality
  25:19,22 85:8,19
confirm 53:5
  124:23
confirming 62:15
conflict 31:25
  183:22 184:2,8
conflicts 184:11
confused 210:5
confusing 119:9
  212:15
conjunction 148:9
  148:12
connection 16:21
  16:23 17:11 31:4
  32:3 43:18 73:12
  108:17 109:6,25

180:16
**consent** 30:25
31:15,23
**consents** 31:12
**consider** 39:10
47:2 149:15,17
231:16 233:9
235:14
**considerations**
81:5
**consist** 29:22
176:20
**consistent** 14:3,24
16:7,9,10 19:11
33:2 65:14 116:20
123:11 183:16
193:8,22,23
196:20
**consists** 176:24
**constant** 22:16
25:18
**constantly** 78:3
**constitutional**
20:20 48:12 49:6
232:20
**constructive** 7:3
60:6 160:6,8
217:25 230:10
**consultants**
160:25
**consultation** 95:7
**consultive** 105:15
**contact** 138:17
164:14 215:9
239:5,8
**contain** 75:7
185:15
**contained** 73:22
**contempt** 8:8
11:16 128:18
150:7,20 243:14

**contingency** 39:22
39:23 56:21 58:13
60:12 118:3,5,11
151:3,8,14,17,20
153:11 195:15,18
195:22 196:2,7,12
213:17,25
**contingent** 7:6
39:18 60:2 102:14
118:17 162:13
186:25 187:8
230:14
**continuation**
209:7
**continue** 3:11 31:2
31:17 37:9 85:21
89:24 149:23
216:4
**continued** 28:2
209:8
**continues** 22:18
184:15 215:25
**continuing** 28:14
**contract** 34:3 60:9
60:10 121:22
122:6,10 165:9
168:16
**contracting**
153:21 154:3
165:12 168:9
**contracts** 115:17
165:16 167:16
168:18,21 184:3
**contractually**
145:15 161:18
**contrary** 141:18
141:19
**contributed** 214:4
218:18
**contribution**
213:13

**control** 20:2 21:7
51:15 75:14,24
76:8 77:18,20
233:14 234:2
235:3
**convene** 208:6
**conversation**
156:17 172:24
**conversations** 3:6
**convert** 42:5
**cooperative** 132:3
226:22
**coordinate** 220:22
220:25 221:4
**copied** 238:21
**copies** 55:2 165:9
168:17
**copy** 29:10 43:20
45:3 54:10 95:25
98:6 206:9 231:11
231:12
**corporate** 163:5
**corporation** 1:5
2:18 3:17 4:11,13
5:9
**corporation's**
129:24 243:14
**correct** 10:5 14:14
30:5 33:5 42:6
43:15 48:21,22,25
49:2 58:18 71:3
83:9 88:22 132:17
140:17 147:8
149:5 151:22
169:16 176:12
226:11 233:19,25
241:22
**correctly** 21:22
80:4 139:7 163:11
180:15 200:19
212:22 226:8

240:10
**correspondence**
138:11
**cost** 219:24
**costs** 195:19 220:4
220:6 221:10,15
228:4 244:11
**counsel** 4:6 5:13
111:22 140:2
151:2,12 152:5,8,9
152:25 165:8
**counselor** 242:3
**count** 53:15
119:20,21
**countries** 62:25
**country** 52:3
153:16 154:4
**couple** 59:13
135:17 145:4
200:10 208:5
241:16
**course** 101:14
**court** 1:2 3:18,25
4:20 7:2,22,22
14:25 18:16 24:14
33:3,18,21,22
40:21 47:15 50:23
60:6 86:25 130:23
136:17 141:20
143:10 163:20
170:13 171:15
204:19 205:19
206:16 207:10,12
208:2 220:20
230:9,25 237:24
240:17
**court's** 6:20 10:3
194:24 207:7,22
229:5,21 243:12
**cover** 198:5

covered  63:15
  194:2,7 195:15
  199:5 211:13
covering  213:19
  213:22
cplr  27:10
created  104:12
creek  224:14
crisis  216:2
criticism  79:2
crowd  61:11
crutcher  1:18 2:3
  3:21 4:9
current  20:6,12
  36:8 52:11 62:15
  78:13 110:10
  155:18
currently  8:3 11:9
  14:8 20:2 21:7,12
  64:21 75:22 96:4
  96:16 144:22
  164:18 224:23
cut  164:14
cwp  99:25 100:9
  101:19 233:21
  234:13,14

**d**

d  4:23 209:4
  222:17 243:2
dad  190:23 191:17
  222:11
date  17:5,9 25:7
  29:6,9 30:8 111:4
  150:11 246:4
dated  87:24
  130:15 137:11
  243:17,18 244:7
dates  241:7
dating  56:22
daughters  191:16

day  34:16 88:9
  93:17 106:8,16
  123:3 124:6 129:6
  130:9 138:9
  142:22 227:8
  242:18 245:16
  246:22
days  61:15
deal  182:5 195:20
  227:16
deals  182:17 234:5
debt  27:15
debts  223:23
december  95:8,14
  98:18 104:20,25
decide  140:19
  141:22 237:15
  238:10
decided  80:12
  171:14
decision  11:10
  16:12 78:17
decisions  82:21
declaration  127:9
  244:3
declaratory  8:5
declare  65:25 66:4
decline  10:6 11:25
  15:9 17:14 30:16
  30:23 176:2
  180:23
declined  9:25
declining  10:11
  14:23
decrease  147:21
deductions  66:14
deed  41:19 243:16
default  19:9 23:9
  243:10
defaulted  243:10

defendant  171:12
defendants  1:11
  43:4 210:16 243:8
  243:9,10
defense  41:4
define  14:8 28:7
  28:15 32:21 81:6
  130:7
defined  128:13
  132:9,11,17,18
defines  131:6,10
defining  57:7
  132:15 133:9
definite  62:18
definitively  25:16
degree  232:17
deleon  161:13
  162:14 163:15,24
  164:4 214:8
  218:18 219:5,10
delete  85:17 90:11
  90:21 91:9
deleted  25:25
  84:23 85:5,14
  91:19
deliberately
  207:11
delmastro  2:18
  5:7
demands  62:23
demonstrated
  12:22
depending  183:19
depends  62:21
  119:19 155:13
  176:22 183:10
  195:20
deploy  78:5
deployment  82:21
depose  241:9

deposed  6:4 86:10
  86:12,16 141:2
deposit  109:20
deposited  72:11
  73:14,20 75:16
  76:10 77:13 188:8
  198:20
deposition  1:15
  3:10,15,20 5:13,15
  5:17 6:5 8:20,20
  12:19 13:12,25
  14:25 21:2,18
  32:6 34:13,22
  40:11 62:8 63:5
  68:11 69:10 79:16
  80:9 82:5,15 86:3
  86:22 88:11,17
  89:2 90:2 99:11
  99:14,18 101:12
  102:10,11,20
  103:2 106:11,20
  106:25 107:15,24
  113:6 118:24
  120:15 121:5
  122:5,9,12,21
  123:17 124:7,22
  125:7,13 126:9
  127:5 128:14
  129:3,12 130:7,14
  130:24 131:7,11
  131:19 132:16
  133:2,10 136:15
  139:21,25 140:17
  140:19,23,24
  141:3,12,18,22
  142:4,15 143:3,7
  166:7 169:10
  180:21 199:12,17
  202:4,13 207:22
  227:6,9,11 230:21
  231:2 237:2

240:16 241:4,13
241:21 242:9
246:4
**depositions** 240:24
241:2
**deposits** 112:22
113:2,8,14,16
244:8
**describe** 13:23
16:13 49:19 63:14
81:10,12
**described** 55:13
95:6 198:4 232:16
**description** 177:4
243:7 244:3
**desimone** 1:19
3:25 245:4,19
**despite** 167:25
207:7 241:7
**destroy** 25:10
26:11,20 84:20
**destroyed** 24:20
24:23 25:6 26:15
**destroying** 25:12
229:16
**detail** 180:11
**details** 187:21
**determine** 117:20
222:12
**development**
136:9
**differed** 215:14
**difference** 47:23
48:3
**different** 20:15
21:24 36:18 62:24
63:10,20 67:9,23
113:24 126:23
146:20 147:5
150:3 152:20
161:12 162:9

180:18 183:12
204:9 214:12
233:22 234:18
**differently** 132:16
221:3
**dig** 166:16
**diligence** 53:5
177:21
**direct** 6:24 27:7
76:4,5 87:3
112:13 125:8,20
135:9 137:17
202:16,19 234:3
234:15,16 239:5,8
**directed** 108:13
135:7
**direction** 24:4
108:19 137:13
162:9
**directly** 7:7,10
31:5 37:24
**disagree** 33:12
107:17 128:15,24
143:3 209:25
210:15 239:20
**disagreements**
184:5,10
**disbursements**
187:10
**disclose** 21:6
110:6
**discount** 145:2,14
145:18
**discover** 26:5
**discovery** 26:6
43:5,19 45:4
69:12 71:3 85:20
99:14 106:20,25
112:18 113:9
114:22 123:12
129:25 178:17

186:6 187:12
204:11 206:3
207:21
**discretion** 182:4
**discuss** 83:12
144:2 155:17
157:14 171:22
174:13 179:21
180:25
**discussed** 145:24
158:13
**discusses** 35:24
**discussing** 148:7
158:22 159:20
171:3,7 229:2
236:14
**discussion** 139:15
159:4 175:16
**disinvited** 186:18
**disjunctive** 10:19
**dispose** 27:15
**disposed** 42:11
**disposing** 240:8
**dispute** 7:24
**distinction** 215:12
**district** 1:2,3 3:18
3:19
**divided** 209:21
**docket** 3:19 6:21
18:21 23:17
124:24 125:25
126:23 127:5
129:14 130:2,23
131:5 132:17
210:8
**dockets** 130:5
**document** 6:16
10:24,25 18:20
19:3 23:16 26:16
26:20,24 28:20,23
36:7,9 41:24 42:4

42:8,13 46:25
47:10 53:20 55:17
57:4,7,7 62:14
69:23 94:25 95:9
99:20 101:8
104:11 109:15,18
113:3,4 114:8
119:12 121:7,17
126:4 127:8
129:21 131:25
134:23 136:17
153:24 162:16
165:25 166:5
169:2,9 184:22
185:20 187:10
203:10 212:10,21
212:24 215:2
217:22 218:22
219:9 231:14,18
231:22
**documents** 22:24
24:9,18,21,24 25:7
25:10,12 26:11
43:21,23 44:4,6,10
44:20 45:3,11
46:5,14 47:11,17
48:4,13,17,21
49:10,17,17 50:7
53:14,16 70:9,25
80:21 81:8,9,23
82:2 83:7 91:21
93:19 104:13
109:11 112:10
120:4 122:16
123:19 134:10,19
134:23 135:3,13
135:14,18,23
136:3,20 137:13
137:18,20,23
139:8 149:5,10,14
149:19 153:13

165:14,16 166:17
166:23,25 167:4
167:25 168:6,12
168:14 176:24,24
177:16 181:13,17
197:22 210:18,24
214:8 227:18
228:11,19 229:4
229:11,14,17
231:23 232:2,12
232:21 235:18
236:5,23 239:11
240:5,7 241:16
**dog** 97:15
**doing** 37:7 88:18
102:10,11 114:16
123:4,7 148:8
193:25 195:25
196:4 211:3
**donate** 150:16
**donpat** 222:8,17
**donziger** 1:10,16
3:1,16,17 4:1 5:1
5:4,11 6:1,3 7:1,6
7:8 8:1,7 9:1 10:1
10:10 11:1,4,25
12:1,13 13:1 14:1
15:1,17 16:1 17:1
18:1 19:1,3 20:1
20:10,25 21:1
22:1 23:1,21,22
24:1,2,12 25:1
26:1 27:1,4 28:1
28:23 29:1 30:1
31:1 32:1,8,13
33:1 34:1,11 35:1
36:1 37:1,12 38:1
38:8 39:1,5 40:1
41:1,23 42:1 43:1
43:9 44:1 45:1
46:1 47:1 48:1

49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1,14 65:1 66:1
67:1 68:1 69:1
70:1,21 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1,17 83:1 84:1
85:1 86:1 87:1,3
87:13 88:1,6 89:1
89:21 90:1,22
91:1 92:1 93:1
94:1 95:1,6,10
96:1 97:1,17 98:1
98:2 99:1,15
100:1 101:1 102:1
103:1 104:1 105:1
105:10,19 106:1
106:18 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
116:2 117:1 118:1
119:1 120:1 121:1
121:17,22 122:1
122:22 123:1,5,10
124:1,18,24 125:1
125:9 126:1,12,19
127:1,15,19 128:1
129:1,13,20 130:1
130:11,22 131:1
131:23 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,19 140:1,15
141:1,9,15 142:1
143:1,7 144:1

145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1,2
180:1 181:1 182:1
183:1 184:1 185:1
186:1,6 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1,20 198:1
199:1 200:1 201:1
202:1 203:1,5
204:1 205:1,13
206:1,2 207:1,20
208:1 209:1 210:1
210:16 211:1,22
212:1 213:1 214:1
215:1,25 216:1
217:1,19 218:1
219:1 220:1 221:1
221:22 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1,16
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
239:18 240:1,19
241:1,25 242:1,15
243:4,8,13,16,17
243:20 246:3,4,21

**donziger's** 55:24
244:9
**donzigerandasso...**
45:20
**donzigerlaw**
200:22
**donzigerlaw.com**
200:24
**donzpjd** 70:10
243:18
**double** 192:19
**dozens** 92:8,8
113:6
**draft** 68:20 97:18
98:2 102:12
235:11 237:17
**drafted** 97:21
178:5
**due** 8:18 32:6
81:20 101:14
105:17 108:8
177:21 216:2
**duly** 4:24 245:8
**dunn** 1:17 2:3 3:21
4:9,11,13 47:8
109:15
**duplicative** 232:25

**e**

**e** 2:2,2,5 4:23,23
4:23 25:10 26:2
45:14,15,25 46:5
46:12 50:10,12
51:10 83:2,4,11,16
83:17,18,23,25
84:4,6,8,10,13,16
84:18,20 85:2,4,10
85:10 87:16,23
88:21 89:5,18
90:12,19,21 91:9
91:13,17 92:25
93:2,4,11 94:2,6

97:12,16 112:9
137:10 176:6,14
182:12 203:11,11
203:19 209:2,2,4,4
209:4 217:12,14
229:16 236:6,10
236:15 238:15
243:2,6 244:2,6
**earlier** 85:7 95:23
198:4
**earliest** 95:12
**early** 154:9
**easily** 74:25 176:3
**eat** 205:17,20
207:25 208:9
**eating** 208:11
**economou** 138:24
**ecuador** 12:16
16:25 17:4,12
18:10 19:7,17,23
20:4 21:9,20 22:2
22:20 23:13 24:25
25:14 30:19 31:4
32:4,22 33:3,16,18
33:20,22 34:4
35:11 54:6 56:15
56:19 65:14,22
66:3,12,19 67:20
69:19 71:20,22
72:2,6,9 73:5,12
75:7,15,21 76:6,9
77:14 95:7 100:11
104:2 105:16,23
105:24 108:17,23
109:6,25 112:24
115:10 136:10
152:21 153:4,14
153:18 158:9
159:9,12 166:24
167:13 180:17
199:10,18 201:4

201:13 204:4
225:19 239:15
**ecuadorian** 18:15
59:16 65:3,9
100:16 149:12
187:3
**ecuadorians**
136:16 171:17
172:3
**effect** 25:2,9
**effectively** 150:5
150:21
**effectuate** 47:6
**effectuated** 42:17
**efficient** 9:9
**effort** 9:14 150:23
**efforts** 22:11
24:24 150:10
157:5
**eighth** 203:9
**either** 83:12 94:21
134:24 146:2
163:20 166:3
184:8 200:12
231:24
**electronic** 45:10
46:8,13 49:20
74:24
**electronically**
50:11,14
**elliott** 12:23 13:11
15:2,13 20:7
34:14,20 38:5
41:13 49:23,23
50:19 51:10 83:8
83:12 84:10,18,19
85:9,13 89:6 90:6
90:7,8,9,18,19
91:25 92:12,15
93:5,19,23 94:3,12
94:16,19 97:25

99:9 102:4,14,25
106:7,12 107:20
114:21 118:25
120:16 122:13
123:18,25 125:7
126:9 127:6
128:18 129:2,7,11
131:20,21 133:6
136:18,25 138:8
139:4,22 140:10
140:12 142:21
143:8,18,20,22
144:4,6 145:24
146:8,13 147:14
148:8 152:14
154:6 156:7 158:3
158:13,23,25
159:4 160:7 161:7
174:15 175:12
176:7,15,16 177:7
177:8,24 178:3,5,8
179:21 180:12,20
181:3,8,15,19
182:7 194:2 202:2
202:6,6 203:16
205:10,11,24,25
207:18 210:20,25
211:11,12 212:19
213:6 214:15
226:13,23 227:2
227:10,21 228:6
228:10,12,13,21
229:2,3,5 235:18
236:12,14,15,20
237:8,10,16,20
239:16
**embarrassed**
115:6
**embroil** 208:8
**enchilada** 154:22

**encompass** 214:21
**encourage** 226:25
**ends** 238:7
**enforcement** 7:12
7:17 10:4,21
12:10 152:17
171:13 173:14
181:10 244:10
**enforcing** 171:18
172:4,7
**engaged** 85:9
155:11
**enjoined** 15:18
**enter** 60:19 153:10
**entered** 6:21 18:24
19:5 23:10 24:15
58:16
**entertainment**
28:10
**enthusiasm** 85:12
**entire** 39:11
**entirety** 116:10
**entities** 146:24
147:22 160:22
161:14
**entitled** 8:11 39:20
76:17 110:11
116:23 127:9
195:22 207:20
**entity** 24:3 42:16
146:21 165:12
168:10
**entry** 37:25
147:25
**environmental**
95:8 105:16
**equal** 39:24
**equation** 161:11
**equity** 147:3,20
150:15

**errata** 246:2
**escape** 179:10
**especially** 62:22
**esq** 2:5,6,7,12,13 2:18
**estimate** 44:16,22 45:2 103:25 120:2 145:8 191:24 192:4 225:8,17
**estimates** 145:17 193:6
**et** 1:10 3:17
**ethical** 59:8
**event** 113:5 125:24 202:14
**events** 237:5
**everybody** 30:3 37:21 142:2
**everybody's** 147:6
**evidence** 24:9 170:12
**exact** 30:8 214:24
**exactly** 17:6,8 103:10 110:22 111:3 138:19 146:4 185:9
**examination** 5:3 209:8 243:3
**examined** 4:25
**example** 49:22 53:14 117:25 162:13 166:22 177:13 189:12 214:4 237:12
**exchange** 76:25 88:21 90:20 92:25 93:2 100:10 168:11
**exclusive** 33:8 75:10
**exclusively** 32:3 33:5 58:2 75:6
**excuse** 12:4 60:25 82:8
**execute** 128:5 231:12,14,17,19
**executed** 42:23 68:22 127:23 166:22,25
**executing** 32:25
**execution** 63:25 65:3
**executive** 78:15 215:4
**exercise** 138:4 140:6
**exhibit** 6:17,18 10:22 15:16 18:20 18:22 19:5 23:16 23:18 26:25 27:2 28:21 29:17,21 35:13,15,22 39:6 39:10 40:17,19 41:10,19,21 42:6 42:13,23 43:3,6,12 43:14 46:25 51:13 55:23 56:2,25 57:10 65:15 70:6 70:8,25 73:16 82:24 85:24,25 86:2 87:4,14,20 88:22 91:8 93:3 94:24 95:3 96:2,5 96:6,17 98:18 99:21,22 103:12 104:11,14 105:9 105:12,18 108:3 109:10,13,19 111:19 112:23 121:6,9 123:20 127:8,12,14,18 134:9,13 137:9,14 156:5 169:9 187:9 187:13 197:21,25 202:7,9 203:6,8 205:5 206:8 211:21 216:13 219:23,25 231:5,6 231:9,10,12 243:8 243:10,11,14,16 243:16,17,18,19 243:20,20,21,22 243:23 244:3,5,6,7 244:8,10,10,11
**exigible** 33:15 152:13
**exist** 92:21
**existed** 164:6 188:7
**existence** 12:16 19:16 20:4 21:8 85:22 105:24 165:19
**exists** 215:17
**expedition** 88:10 114:16 122:24 123:7,9 129:18 132:7 133:20 142:23
**expenditure** 79:4 79:19
**expenditures** 79:8 187:16
**expense** 56:13 189:18
**expensed** 33:4
**expenses** 12:11 13:8,23 16:18 22:8 28:3,5,9,15 33:7 66:14,19 71:9,16,18 72:9,20 72:23 73:13 74:4 78:23,25 80:22 81:25 101:6 105:16 108:15 116:19,23 137:4,8 149:2 188:9,12,15 188:18,20 194:10 194:10,12,15 195:5,9 196:6,8 198:18 199:4 213:20,23
**experience** 235:25
**expert** 66:16 167:11
**expires** 246:25
**explain** 12:18 80:20 148:18 155:6,7,9,12 209:17 226:17 239:22
**explained** 11:11
**explore** 8:11 207:21
**expressed** 14:2 174:18
**expressing** 74:13
**expressly** 13:8
**extensive** 69:16
**extensively** 153:22
**extent** 115:21 148:14 199:2 210:18 238:14
**extorts** 81:17
**extremely** 121:25

**f**

**f** 209:2
**face** 167:23
**fact** 76:15 164:20 216:2
**factual** 7:25 11:5 11:24 12:3

factually  155:9
failure  218:24
failures  218:23
fair  20:19 44:5
  47:10 66:21,24
  67:17 197:16
faith  11:17 106:4
  142:5,6,8
fajardo  31:16,24
  121:15
fall  223:3
false  38:3
familiar  6:22 19:2
  28:22 41:7 43:8
  121:16
family  24:6 145:7
  189:10
far  13:19 61:12
  74:11 84:24
  108:23 118:12
  148:23 151:19
  155:15 169:23
  187:25 199:8
  204:16 215:11
  217:23 228:5
father  222:25
  224:22
fcpa  156:10
fda  14:10 16:20
  17:7,13 18:2,10,14
  18:25 22:23 23:11
  29:15,23 30:4
  31:3,12,18,22 32:3
  32:20,23 33:14,17
  33:24 34:3 36:21
  37:2,7,16,16 58:2
  58:16 59:13,19
  60:11,17 61:22
  62:4,5,10,16,18
  63:23,24 64:3,4,6
  64:21,23,25 65:10

65:11 68:14 77:11
  77:14 78:5,8,10,13
  96:21 100:17
  101:5 116:25
  117:7,13,23 118:8
  118:10,13,20
  121:14,24 148:19
  148:23,23 149:4,9
  149:13,22 152:12
  152:15,15 153:3
  153:10 161:5,19
  161:23 164:4,18
  165:7 166:10,12
  168:3,9,25 169:15
  181:13 183:2
  194:10 235:8
fda's  19:10 32:21
  35:5 116:7,8,16
  181:18 182:22
february  104:21
  104:25 105:4
federal  140:22
fee  39:18,22,23
  56:21 58:13,13
  60:2,12 118:3,5,12
  153:11 195:18
  196:3 213:17
  230:15
feel  67:11 182:14
  227:4 228:3
feeling  226:15
feels  228:2
fees  58:4,6,6
  118:17
fell  134:25
felt  134:24 135:18
  136:22 240:3
  241:17
figure  77:22
  175:24 176:2,4
  197:9

figured  209:18
file  38:23 39:3
  70:15,19 124:11
  124:16 129:4
  185:24 186:4
  209:7 227:13
  242:8
filed  3:18 20:21
  76:19 128:19
  143:2 148:21
  152:19
files  46:8,15,16
filing  150:20
filings  7:21 8:2
  163:21
final  40:20 134:8
finance  122:17
  153:16 226:24
financers  127:23
finances  88:5
  193:5 227:22,23
financial  13:11
  20:6,12 41:14
  45:7 75:18 81:8
  98:25 111:12
  120:21 121:23
  133:12 240:5,6
financially  4:3
financing  161:22
  216:3,21
find  20:16 82:8
  97:8 99:4 125:22
  133:21 166:13
  169:2,7 185:20
  193:3,3,5 222:15
finding  211:22
fine  8:22 61:4 86:9
  231:12
finger  153:24
fingertips  131:13
  132:24 219:17

finish  50:22 57:21
  106:23 130:11
  132:14 202:5,6
  207:18 226:25
finished  142:10
firm  5:21 25:24
  36:2,4 39:19
  40:23 41:2,6
  54:23 68:25
  111:21 112:2,6
  115:12 194:17
  195:4 197:6
  213:17 221:23
  222:2
firms  119:22
first  4:24 17:15,17
  17:20,25 44:7
  49:4,11,18 63:12
  63:18 67:12 69:4
  70:3 71:5 73:15
  77:3 81:4,7 82:2
  82:18,20 91:7
  100:22 112:14
  113:16,21 128:8
  130:21 133:23
  135:2 137:5 138:7
  151:6 153:13
  187:18 197:11
  206:21 219:7
  232:14 239:21
  240:3 243:15
fishing  88:10
  114:16 122:23
  123:6,8 129:18
  132:7 133:20
  142:23
five  38:17 44:16
  52:7 64:15,21
  71:6 75:5 123:23
  186:4 209:7 242:8

floor 225:15
florham 2:11
florida 190:22
  191:10 224:4,8
flouting 207:12
flows 74:22
focus 15:12 20:8
  89:16 107:22
follow 182:10
following 40:20
  48:2 128:11
  187:20
follows 5:2 36:3
  52:6
fontaine 88:2
food 28:9
forbidden 27:12
forced 150:21
foreign 51:16,20
  51:23 52:3 171:18
  172:4,7 234:25
forfeit 167:4
forget 105:7 239:3
forgiven 223:22
forgot 21:4 138:14
former 64:11
forth 27:11 221:11
  245:8
forthwith 230:17
forward 9:24
found 48:18 84:7
  92:23
foundation 117:4
four 124:16
  137:13,18 185:24
frame 58:25
fraud 40:24 155:9
free 23:12 195:25
  196:4
friedman 144:14
  145:3

friends 89:6
fromboliere
  121:11
front 39:6 59:11
  87:14 127:2
  195:19 211:19
  214:17
fronting 195:24
full 27:11 216:6
fully 69:14,15
  206:17 210:10
function 17:24
functioning 30:18
functions 68:25
  150:3
fund 73:19 118:9
  150:17 157:22
  158:4 188:17
funder 112:7
  115:24 188:21
  197:23 219:20,21
  244:8
funders 25:21
  35:11,24 117:15
  147:11 148:15
  155:6 169:18
  182:18 185:14
  197:15
funding 85:21
  148:25 151:2
fundraise 67:24
  150:4
fundraising 68:23
  149:25 150:3,10
  150:13 193:25
funds 19:15,21
  20:3 21:7 41:4
  56:13 65:7,13
  71:9,23 72:11,12
  72:17,18,19 73:10
  74:2,6,7 75:8,15

75:21 76:9,22,24
77:2,4,6,9,10,11
77:19,20,25 78:2
78:20,23 79:4,20
80:2,6 100:6,13
101:17 103:4
104:5 105:2 108:3
108:8,16,21,22,25
109:2,5,24 111:23
112:3,11 119:2
120:13 150:14,24
153:5 168:11
173:13 189:18
198:6,9,16 210:20
221:18
further 10:16
  15:18 115:4
  157:22 158:17
  159:8,23 172:9
  173:23 239:23
  245:11
furtherance
  243:12

**g**

g 4:23 209:4
game 106:9
garage 28:13
gary 54:14
gate 222:8,17
gathered 48:12
gathering 47:11
general 53:17
  63:19 71:21,22
  72:7 105:6 159:3
  172:7 174:25
  177:3 180:22
  181:20 222:24
generally 22:11
  25:9 37:7 62:19
  68:12 71:23 79:24
  92:17 135:24

148:5 155:5
181:22 183:25
187:19 188:18
195:18 199:24
generate 16:17
  22:7,17 37:8 77:7
  149:23
generated 19:22
  189:20 193:11
gentleman 54:14
  156:2
getting 114:11
  115:9 187:20
  202:12,21 221:7
gibraltar 148:22
gibson 1:17 2:3
  3:21 4:9,11,13
  47:8 109:15
gibsondunn.com
  2:5,6,7
gifted 223:19
give 11:7 23:15
  30:9 34:3 37:2,15
  38:17 49:16 57:13
  59:14 86:23,25
  90:10 106:21
  108:14 128:25
  129:9,13,16,17
  140:12 141:13
  143:16 144:15
  148:16 161:24
  174:20 180:18
  210:7 213:9
  215:14 220:21
  228:8 231:11
  238:12 240:13
given 25:19 36:15
  36:18 37:4,13
  47:14 56:25 62:22
  80:9 104:5 115:22
  118:2,7 123:14

130:14 144:10,12
144:24 150:7
173:3 175:10
180:8 200:19
233:5 245:10
**giving** 34:11 88:7
102:8,9 153:17
170:15 219:6
**gmail** 45:22
**gmail.com** 45:21
**go** 3:12 10:16
34:17 38:17,19
50:24 52:10 56:10
57:23 69:8 70:12
86:4 87:6,19
88:10,12,24 97:7
106:8,16,24
107:14 115:3
118:13 123:6
124:8 128:16
129:18 141:5
142:11,22 143:17
155:15 176:13,25
177:13 185:18,20
188:25 196:24
205:15,16 207:5
208:13 212:6
217:5 227:25
**goes** 49:6,8 81:14
118:22 179:16
193:4 199:8
**going** 3:3 6:15,24
7:19 8:14 9:19
10:16 16:2 17:14
18:19 22:13 23:15
26:23 27:7 28:19
30:16,23 34:15
38:10,16,22 41:18
43:3 55:22 63:11
69:3 70:8,14
74:18 76:20 81:12

85:24 87:8 88:9
88:12 89:21,23
94:24 97:15,15,24
99:19 102:17,18
102:22 103:12
104:10 105:9
106:3,7,15,22
107:7,18 109:10
121:6 122:12
123:3,16,22,23
124:12 127:7
128:25 129:2,4,5
129:11,13 134:9
137:9 139:14
140:4,14 141:3,23
142:22 144:3
147:13,15 153:25
156:4 169:8
175:25 177:22
180:23 182:14
184:22 185:13,18
185:23 187:9,17
187:19 197:10,20
201:6 204:5,10
205:6,8,9,23 206:2
206:4 207:24
208:3 209:16
211:5 214:25
217:17,21 219:8
219:22 223:2
225:24 227:4,12
231:3 234:4,17
235:8,17 237:9,13
241:8,11 242:7
**good** 3:2 5:4 61:14
106:4 142:5,6,8
238:11
**gotten** 175:19
176:10 210:5
**govern** 183:13

**governed** 59:5,8
168:5 184:15,17
**governing** 10:25
**government**
159:19
**governs** 183:7
**graf** 198:10,13
**graf's** 198:24
**grand** 104:7
**grant** 89:18 90:10
91:2
**granted** 167:20
**granting** 60:11
**great** 20:8 117:2
**greenberg** 54:15
54:16 55:4
**greens** 224:17
**grinberg** 50:2,3
83:3 155:2,21
169:11,22 171:16
172:13,19 174:14
175:2 176:15
**grinwald** 49:25
154:10
**grounds** 7:20 9:22
17:15,18 30:17,24
49:18 63:12,18
197:11 232:14,15
**group** 22:12 52:24
78:18 203:21
224:4,8 232:2
**groups** 17:24 65:4
**guaman** 121:12,13
121:14 243:23
**guerra** 155:10
**guess** 92:23
171:10 177:16
227:13
**guttenberg** 225:19
**guys** 20:22 44:7
47:7 119:12 120:5

227:12

**h**

**h** 95:6 243:6 244:2
**h5** 138:24 161:14
163:8
**half** 39:21 102:21
130:9 191:25
**hand** 6:15 18:19
26:23 28:19 89:3
99:8,19 104:10
127:7 132:6 169:8
214:25 245:16
**handed** 168:10
**handle** 73:9
**handling** 154:23
218:24
**handy** 125:10
**hanlon** 2:19 3:23
**happen** 77:8
188:13
**happened** 18:11
25:20 32:18 58:24
73:3 80:6 92:18
99:9 106:6 108:11
110:22 114:17,20
122:14 186:15,17
218:12
**happening** 157:12
**happily** 132:3
**happy** 41:15 86:15
114:14 140:7
207:25
**harass** 89:24
**harassed** 25:24
85:22 107:9
**harasses** 81:16
**harassing** 13:9
90:3,4 128:22
140:5
**harassment**
114:19 141:5

hard 43:20 45:3
haven 127:24
head 153:21
heading 27:8 36:2
  121:11
headquarters 5:24
health 117:5
hear 212:21
hearing 8:8,14
  10:8 42:19 136:17
  155:14 211:8
  235:23 241:9,20
heavy 89:9
held 1:17 3:20
  22:19 73:19 80:2
  243:14
help 22:6,16 67:23
  75:2 77:7,8 101:5
  116:18,23,25
  117:8 149:22
  214:23 220:19
helped 77:3 117:3
helping 150:4
  188:5
herbert 2:12 4:14
hereunto 245:15
herrera 2:7 4:12
  4:12 137:11 244:7
hide 76:14
highly 65:19
hired 67:18 69:2
  104:7
hiring 103:23
history 81:14
  110:17
hold 9:10,10 11:16
  72:16 74:2 197:10
holder 163:12
holders 153:15
holding 80:12

home 44:2 224:14
hope 195:7
hopeful 239:4,4
hoping 188:14
host 54:7
hourly 151:18
  195:25
hours 99:13
  102:21 140:9
  227:7
hstern 2:12
huaorani 64:18
huh 25:3 65:18
  72:4 81:2 171:21
  216:7 217:15,16
hundred 45:5
  47:18,25 104:7
hurting 117:6
hybrid 152:2,6

**i**

idea 101:21 139:5
  172:7 173:17
identification 6:19
  18:23 23:19 27:3
  41:22 43:7 56:3
  70:7 95:4 99:23
  104:15 105:13
  109:14 121:10
  127:13 134:14
  137:15 187:14
  198:2 202:10
  220:2 231:7
identified 111:11
  111:13 135:14
  187:12 233:13
identify 18:6
  67:10 88:14,19
  110:3 186:7
identifying 211:10
identity 17:19,21
  25:23

ignored 11:14,15
ignoring 148:10
illegal 167:23
impact 152:22
impacting 146:17
impermissible
  161:18
implicate 81:4
  82:2,18,19
implicates 49:5
impolite 107:13
imposes 7:3 230:9
impossible 48:7
inappropriate
  240:4
include 65:4
  115:19 161:9
  177:3
included 120:18
  120:19 158:7
including 24:5
  28:4 79:19 230:13
  237:17
income 56:11 66:3
  66:4,5 112:19
  113:11 114:24
  115:7 189:16,19
  190:5 191:3,5
  193:7 201:9,12,16
inconsistent 33:12
inconveniencing
  205:13
inconvenient
  143:14
incorrect 155:9
increased 147:18
independent 149:2
indicate 80:23
  106:2 108:3
  187:23

indicated 91:15
  112:17 138:10
indicates 216:18
indicating 35:16
  41:25 113:10
  154:21 212:3
indigenous 64:5,9
  64:10,15,24
indirectly 7:8,10
individual 5:5
  29:22 37:24 40:22
  177:18
individuals 18:13
  31:6,12 169:18
info 91:10
inform 86:19
  161:21 163:16,24
  164:3,11
information 9:21
  9:21 17:22 21:13
  26:4 46:9,13
  76:16,18 78:10
  81:15 87:2 88:25
  89:7,14 94:11,19
  106:12 107:23
  119:18 120:6,7
  137:25 176:8,17
  176:18,22 178:16
  210:19 214:17,22
  219:16 243:15
informed 54:9
  61:2 86:15 163:18
  163:19 164:9,16
  165:3 203:16
informing 127:20
inherently 170:8
inherited 190:23
  223:17
initial 11:16 139:9
  174:21 203:18

**injunction** 158:10
158:14 194:24
228:14,15 229:6
229:22,24 230:8
**inoperable** 148:22
167:23
**inquiring** 75:18
**institutional** 89:9
**institutions** 53:21
111:13
**instruction** 91:22
**intangible** 7:5
**intended** 73:13
**intent** 232:5
**intercreditor**
165:23
**interest** 7:10 27:14
27:21 32:9,16,20
32:22 33:15 35:5
42:5,22 56:15,18
56:20 57:13 58:13
59:15,19,21 60:2,8
60:12 76:25 98:10
100:10,16 103:5
114:10,12 116:12
117:11,15,23
118:9,13,19 139:7
144:7 146:10,16
146:18,22,23
147:20,23 148:3
152:13 155:14
160:4 161:3,17
162:2,2,5,12,13,17
163:12,17,25
164:5,19,23,25
165:4 166:12,23
167:5,10 168:10
168:23 174:19
184:13 185:6
187:2,8 190:15
191:14 192:3,13

192:17,18,19
217:24 218:5,6,7
218:13 222:7,13
222:22 224:7,13
224:16 229:23
230:2
**interested** 4:3
10:11 38:9 175:14
177:10 179:22
180:13 182:9,13
245:14
**interests** 146:24
148:24 161:19
163:11 175:20
177:19 183:13
184:5 244:12
**interfere** 3:9 6:12
**interference** 3:7
27:13
**interlineated**
212:14
**internal** 30:18
76:16 80:23
118:22 135:25
151:5 179:17
197:12 202:15
204:6,10 221:8
240:12
**internet** 5:15
**interpretation**
11:6 15:8 170:8
203:24 210:2
**interpreted**
163:23
**interrogatories**
206:5
**interrogatory**
65:16 189:15
**interrupt** 106:23
132:14

**introduction**
239:16
**introductions** 77:7
**intrudes** 63:17
232:20
**intruding** 67:11
**intrusive** 48:11
**invest** 174:15
222:23 228:12
**invested** 162:7
169:23 173:12
178:10 179:11
181:9 214:5,6,8
**investigate** 222:14
222:20 223:4
224:20
**investing** 159:5
174:19
**investment** 143:23
155:18 165:10
228:13
**investments** 19:7
19:23 21:20 22:2
22:9,22 25:14
36:20 175:11
224:21 237:12
**investor** 119:2
164:17 167:16,21
168:16,16,18
177:5,19 183:2,8
183:23 213:14
**investors** 25:23
89:9 165:17 168:8
174:23 176:10,22
177:20 178:10,14
178:18,24 180:18
183:3,19 184:6
213:16
**invoice** 95:5,12,18
95:22,25 98:19
105:4,10 194:13

**invoices** 95:14
104:20,25 243:21
**involved** 78:16
80:13 149:11
153:2 220:11
239:2 241:12
**involvement**
239:14
**irrelevant** 32:5
102:4 122:20
142:18 160:10
**issue** 7:22 8:13
10:15,16,25 11:8
11:11 17:20 67:12
90:7 125:7 126:9
167:12,14 171:11
187:18 194:23
206:22,22 229:9
238:4 240:2
**issued** 126:8 127:2
130:6 131:11
133:2 150:8
179:12
**issues** 12:5 44:8
47:14 49:7 80:24
119:20 135:19,19
141:10 231:23
234:6
**items** 206:17
210:17
**iteration** 62:13

**j**

**j** 2:12 35:25
**january** 28:24
35:17 39:6 57:11
96:8 100:2,20,24
101:17 104:21,25
109:21 121:20
127:19 184:14
**jersey** 2:11

jesse 83:4 154:8,24
joel 2:13 4:16
john 145:7
jonathan 24:7
  238:25 239:6
josh 67:15,16
  214:23
jsilverstein 2:13
judge 8:3 11:2
  12:6 13:6 16:5,9
  16:12 19:11 22:5
  34:9,21 35:3
  47:19 48:13 99:10
  99:17 101:12
  107:15,21 116:6
  116:20 120:11,24
  122:24 123:14
  124:3,21 125:6
  126:8 127:2 130:6
  131:11,14 132:18
  141:5 173:3
  204:12,22 209:20
  210:8 227:14
  238:3
judges 172:4
judgment 7:11,12
  7:18 8:5 10:4,20
  10:21 11:20 12:9
  12:16,20,22 13:4
  15:3,20,25 18:15
  18:24 19:9,17,24
  20:4 21:9,20 22:2
  22:22 23:9,13
  24:10,25 25:13,14
  31:23 32:22,24,25
  33:3,15,18,19,21
  33:23 34:5 35:6
  36:20 38:2 45:9,9
  56:15,19 57:14
  59:15,16 64:2
  65:2,3,9,12,14

73:12 76:25 82:6
82:7 98:10 99:2
100:11,17 103:5
105:24 108:18,23
109:6 111:5
114:11 116:9,11
116:12,13 117:12
117:16,24,25
118:19 120:9
129:24 130:2
133:13,16,25
134:5,7 144:7,19
144:25 146:10,16
146:18,22 148:2,3
148:25 152:13,16
153:4,5,10 155:8
155:19 158:9
160:4 162:3
163:17 164:6,17
164:19,24 165:5
166:24 169:23
171:17 172:3,8
173:14 175:20
176:11 178:11,15
179:12 180:17
182:19 186:13
187:3 200:15
209:22 223:14,16
230:3,12 243:8,10
243:13 244:12
judgments 12:5
  171:18,19 172:4
july 122:19
june 1:12 3:4 43:4
  128:20 130:15,25
  131:15 133:3
  137:11 245:16
jurisdiction 40:21
  170:2 173:15
  183:15

jurisdictions
  62:24 183:13

## k

kaplan 8:3 11:2
  12:6 13:6 16:5,12
  34:9,21 35:3
  47:19 48:13 99:10
  99:17 101:12
  107:16,21 116:6
  120:11,25 122:24
  124:3 125:6 126:8
  127:2 130:6
  131:11,14 132:18
  141:6 204:13,23
  209:20 227:14
  238:3
kaplan's 16:9
  19:11 22:5 116:20
  123:14 124:22
  173:4 210:8
katie 24:6 49:24
  67:18 83:3,15,20
  84:12,17 85:11
  87:23 89:7 94:6
  154:7,10 182:10
  214:23 235:25
  236:16,18
katie's 157:9
  160:12
keep 22:13 26:3
  53:16 55:5 63:22
  74:17,20 77:23
  89:7,14 91:10
  92:7,9 102:7,18,22
  124:5 205:9,23
  208:11 229:18
keeping 37:17
keker 145:7
kept 71:23,24
kevin 188:2,5

key 177:16
kid 28:11
kidding 88:4
kilcullen 2:10 4:15
  4:17
kind 47:6 68:5
  79:5,20 86:14
  98:9 117:5 119:23
  148:2 155:16
  186:23 187:6
  214:22 222:10
  226:14
kinds 81:9 204:9
knew 139:5
know 5:18 8:9
  9:15,18 12:7 17:8
  17:17 18:12 20:10
  23:3,5,5,8 25:15
  25:18 29:8 30:7
  31:10,11,14 34:7
  35:7,20 37:7 45:5
  45:6 49:5,15,16
  50:15 51:11 57:6
  58:9 59:9 60:15
  61:13 62:6,17,24
  64:13 65:10 66:15
  67:2,14 74:14
  77:5 84:3,24 85:4
  85:16 88:24 90:23
  90:24 91:18 92:3
  93:7 96:13 97:16
  98:24 99:8 100:5
  101:20 102:3
  103:10,20 104:4,5
  104:7 106:5
  108:24 110:9,11
  114:4,10,15
  117:20 118:4,4,14
  119:12 120:20,20
  121:2,3 122:6,14
  123:22 125:11

126:24 127:16
128:24 129:19,21
130:4,5 136:23
138:15 146:15
147:3 149:6
150:16 151:11,16
151:19 152:4,7,25
153:24 154:2
155:4,10 157:9,13
157:16 158:6,15
158:21,24 159:6
159:10,13,18
160:24,25 163:2
163:18 164:7,9
165:6,25 166:3,8
166:10,13,15
167:13 168:9
169:4 170:24
171:14,24,25
173:4,10,18
174:17 175:9,11
175:23 176:21,23
177:21 178:22
179:13,17 180:11
182:15 183:25
184:7,20 190:9,10
191:8 192:25
193:2 194:14
197:5,8 198:7
199:7,8,14,24
200:9,16 201:24
202:24,25 203:17
203:20 204:7
205:4 206:20,24
206:25 207:3,4,10
213:9,16 214:24
215:7,11,15,15,16
215:21,22 216:25
219:7,11 220:21
221:20 222:10,20
223:11 224:5,10

224:20 225:7,8
227:6,7 230:6,21
230:25 232:7,16
233:8 234:10
235:13,20,22,24
236:9 237:7,11,13
238:19,21,22
**knowledge** 43:16
51:15 59:22
190:10 222:4
**knoxville** 189:21
190:16
**koenig** 188:2
**kohn** 198:9,13,15
198:17,23,25
213:13,17 216:3
216:20

**l**

**l** 88:2
**labeled** 95:5
**labor** 119:21
195:23,25 196:5
**lack** 147:23
165:20 226:16
233:10
**lago** 14:18 29:22
30:21 31:2,16,18
32:2 37:4,6,13,25
220:9 221:14
**lak** 1:4
**land** 191:12
**lands** 37:11
**landscape** 19:10
**language** 6:25
7:17 10:3 11:6
153:12
**lap** 15:17
**laps** 220:4
**lasted** 154:12
**lasts** 140:20

**late** 129:9
**laura** 108:5
**law** 25:24 33:16
59:5 66:6 95:5
119:22 153:14,18
153:22 168:6
183:7 184:16,18
213:17 220:22
221:23
**laws** 183:22 184:2
**lawsuit** 148:21
184:9 187:4,5
**lawyer** 9:16 39:20
135:10 220:19
**lawyers** 5:16
82:23 102:9,10
160:23 167:12
195:17 220:18
**leaders** 37:19
**leadership** 78:5,8
**lease** 193:10,14
**leave** 110:18,25
123:16 129:3,11
140:14 161:11
**leaving** 139:24
**lee** 49:25 83:2
146:2 154:8,10,22
156:17 177:9
**left** 33:8 37:11
75:4 145:10 154:9
198:13,15 213:11
234:11
**legal** 10:15 11:5,8
16:8 33:7 47:14
58:3,6,12 95:7
105:15 135:19
149:24 171:11
176:24 220:21
**legally** 233:10
**lenczner** 111:20
112:14,15 189:3

194:16 195:4
197:6,13 220:23
221:2,5
**lenczner's** 112:2,6
115:12 196:15
222:2
**length** 118:7
140:23,24
**letter** 243:16,17,23
**level** 155:18
175:12 188:18,19
**lewmike** 189:21
190:17 192:20,21
193:7
**life** 99:5
**lift** 89:10
**limit** 12:24 15:5
117:10,22 141:17
**limitation** 24:5
230:14
**limited** 15:2 41:20
47:4,5 78:6 79:10
82:21 106:11
113:10 114:7
125:17
**limiting** 126:8
127:5 139:21
**limits** 35:4,7 125:6
**line** 88:20 244:16
246:5
**liquidated** 186:20
**list** 52:7 211:6
236:24,25 240:14
**listed** 71:5 88:20
**listen** 9:7 11:8
89:23 126:7 131:9
131:17 201:8
205:8
**listening** 128:16
154:24

**literally** 92:8
**litigate** 227:14
**litigation** 12:11
  13:7,23 16:18,25
  17:4,12 19:7 22:8
  22:13,18 31:4
  32:4 35:12 56:13
  62:23 72:20 101:6
  112:7 115:24
  116:19 136:2
  149:2 150:7
  157:23 158:4
  189:18 201:4,14
**little** 85:3 106:9
  192:21 194:19
  226:20 231:22
  237:13
**littlepage** 144:14
  145:3
**live** 5:14,23 18:9
**living** 28:3,5,9,15
  71:8,16 108:15
  188:15
**llc** 2:10 189:21
  190:17 222:8,18
  222:23 246:2
**llp** 1:18 2:3
**loaned** 145:6
**loans** 223:22
**located** 3:21 54:16
**log** 48:20 137:22
  138:5 232:5,10,12
**long** 36:7 45:24
  54:19 81:14
  140:19 141:22
  143:7,10 154:11
  154:14 155:24
**longer** 14:12,19
  54:22 80:12 92:21
  164:6,19,24 165:4
  217:7

**look** 7:19 9:23
  10:6,23 20:17
  23:20 39:17 53:13
  57:15 69:18 92:11
  94:14 116:4
  130:16 150:2
  152:7 159:14,19
  176:25 179:4,17
  198:16 205:5
  207:5,11 211:5
  231:16 234:22
  235:22 238:6
**looked** 62:7 66:9
  69:23 92:22 94:16
  126:3 127:4
**looking** 54:8 102:7
  109:19 167:22
  176:23 206:7
**looks** 113:15 114:4
  225:15
**lord** 35:15
**lost** 61:18 82:12
  221:11
**lot** 44:19 47:21,24
  49:4 53:20 103:11
  103:13,20 104:9
  112:25 115:4
  133:14 156:22
  177:20 179:6
  190:10 195:8,10
  198:9 211:4 228:3
  232:13,22
**lots** 92:24 93:14,14
  150:2 204:7
  222:25
**lp** 224:17
**luis** 121:21
**lunch** 129:3,8,9,12
  139:12 140:10,13
  140:14 142:3
  143:13,17 147:15

  160:15 176:16
  179:9 202:2,4
  205:7,9,12,17,20
  226:16,19
**luncheon** 208:15

**m**

**m** 2:13
**mail** 45:15 46:5,12
  50:10,12 83:2,25
  84:4 85:2,4,10,10
  87:16,23 88:21
  89:5,18 90:19,21
  91:13,17 92:25
  93:2,4,11 97:12,16
  137:10 182:12
  203:11,11,19
  229:16 236:6,10
  236:15 244:6
**mailing** 94:2
**mails** 25:10 26:2
  45:14,25 51:10
  83:4,11,16,17,18
  83:23 84:6,8,10,13
  84:16,18,20 90:12
  91:9 94:6 112:9
  176:6,14 238:15
**main** 103:2 128:17
  142:15 219:20,21
  237:9
**maintain** 24:8
  25:22 229:11,13
**maintained** 24:17
  43:24
**maintenance**
  28:10
**major** 88:10
**majority** 140:2
**making** 35:12
  78:17 126:22
  141:16 148:24
  175:13

**malpractice** 40:24
**manage** 77:21,25
  214:24
**managed** 198:10
  233:21 234:7
  236:13
**management** 15:2
  34:15 85:9,13
  121:23 126:9
  198:12,14 210:21
**managing** 65:6
**manifested** 161:4
**manufactured**
  224:14
**march** 6:21 11:21
  12:14 13:4 15:25
  16:19 17:10 24:15
  52:15 53:4 77:2
  103:5 104:3,22
  109:7 110:14
  128:19 132:23
  228:15 229:5,6
  243:12
**margin** 172:15
**mark** 43:3 55:22
  70:8 85:24 94:24
  103:12 105:9
  109:10 121:6
  134:9 137:9 187:9
  197:20 219:22
**marked** 6:16,19
  18:20,23 23:16,19
  26:24 27:3 28:20
  41:18,22 43:7
  56:3 70:7 85:25
  88:21 93:3 95:4
  99:20,23 104:11
  104:15 105:13
  109:14 121:10
  127:13 132:13
  134:14 137:15

169:9 187:14
198:2 202:10
211:20 215:2
216:9 220:2 231:5
231:7
**market** 224:23
**marriage** 245:13
**mass** 44:13
**massive** 67:3
151:11
**material** 67:4
**materials** 177:23
**matter** 3:16 16:21
16:23 31:18 53:17
54:4,6 63:19
69:19 71:21,22
72:7 105:7 112:24
140:18 155:11
222:24 239:15
245:14
**matters** 79:19
**mean** 8:20 12:7,8
12:9,10,12 13:10
16:13,23 20:7
27:23 28:8 31:5
32:11 36:6 42:8
44:13,14 48:5
55:14,19 56:7
58:24 67:2 69:15
72:17 73:8 77:5
77:11,17 88:8
94:5,6 103:14
113:15 114:10
116:4,9,25 118:3
118:23 120:16
124:3 136:15,23
138:2,3 145:18
146:13,20 148:22
149:7,16,21
152:25 153:23,25
154:20 155:24

156:16 157:9,12
158:6,24 160:12
161:11 162:12
163:3,6,9 165:7
170:5,7,22 171:25
173:17,19 174:16
176:3 179:24
180:7,11,21 181:7
182:10,16 183:25
184:2,8,10 187:4
191:8 195:16,17
197:5 199:17,23
200:17 201:23
203:17,25 204:15
207:12 212:13
214:5 218:8
221:21 223:9
224:6 227:20
230:25 232:8
234:8,23 236:14
236:16,23 238:18
238:24 241:23
**meaning** 148:19
160:23 219:12
**means** 10:5 39:24
171:25 196:21
207:2,3,4
**mechanism** 9:9
**media** 3:14 38:23
39:3 70:15,19
124:11,16 185:24
186:4 201:17
209:7 242:8
**medical** 222:23
224:2
**medication** 6:7
**meet** 21:2 74:15
**meeting** 12:23
13:11 15:2 20:7
41:13 49:23 51:10
83:9,12 84:5

85:12 89:6 90:6,7
90:8,9,18,19 91:6
91:25 92:12,15,18
93:6,13,14,16,24
94:4,12,20 97:25
99:9 102:5,15,25
106:7,13 107:21
114:21 120:17
122:13 123:18
127:6 128:18
129:2,8,11 131:20
131:22 133:7,11
136:19 137:2
138:9,21 139:9,22
146:14 147:14
152:14 154:6,11
154:15,23 155:25
156:8 157:12,15
158:23,25 159:21
160:16 169:12,15
174:21 175:3
179:22 180:12
181:19,23,25
182:8 194:2
203:16 212:19
215:23 216:19
217:4,6,9,10
218:15 226:13
228:21 229:2,3
236:20 238:22
**meetings** 92:9
93:14 181:22,24
215:3 227:2
**member** 88:12
**members** 145:7
**mendoza** 243:23
**mention** 175:7
**mentioned** 95:23
97:17 110:7
135:20 174:22
175:2,5,8,10

190:19 212:18,19
**met** 33:9 138:7,12
138:14,15,20,25
139:3
**method** 49:21
**microphones** 3:5,9
**miller** 108:5,13,18
108:23 109:3
**miller's** 108:9
**million** 119:2,19
119:25 120:19
161:22 169:17
192:5,16 212:20
214:8,14,19
216:20 217:2
218:18 219:6
**millions** 120:22
**mind** 175:14
228:24
**mine** 159:6
**minute** 123:23
185:19 206:4
207:24 215:3
**minutes** 38:18
140:12 141:14
143:16 154:13,16
208:6,10 215:23
218:16 232:10
**misconduct** 40:25
**missed** 83:16
**mks** 87:17 95:2
99:24 104:16
105:11 156:6
159:15 243:19,20
243:21 244:10
**model** 196:3
**modest** 118:8
189:19
**modified** 15:21
178:7

**modify** 52:19
**moment** 126:5
**momentarily** 21:4
**monetize** 15:20,25
**money** 12:9,10,14
13:3,15 17:11
18:4 19:11 23:12
27:25 32:25 33:12
56:9 60:23 65:21
65:25 66:11 73:11
73:18,22 74:10,14
74:15,21,22 77:4
79:10,14 80:11,17
98:22 100:9,15
101:5 103:3 104:9
108:12,15 115:4
115:18,23 116:6
116:19,24 117:4,4
117:9 119:10,11
119:14 120:10,24
129:24 145:7
150:16 158:3
161:24 162:3,6,7
162:11,12 172:16
180:16 181:2,8
188:9,14,16,21,21
188:23 189:8
193:11,15 194:16
194:18 195:3,8,10
195:12,13 196:18
197:14,16,23
198:10,25 199:3,9
199:20,25 200:2
200:11,20 201:21
209:22 213:8,8
218:19,24 219:10
226:4,5,10 233:17
233:20,23 234:2,6
234:9,16
**monies** 11:19 13:7
13:22 24:25 39:25

63:6 66:18 73:21
100:19,24 105:22
112:5,13 115:9
161:23,25 198:20
222:2
**montecito** 222:23
224:2
**month** 62:13
193:11
**monthly** 40:8
60:18 95:24
189:19 193:7,14
196:10
**months** 158:25
**morale** 203:25
**morning** 3:2 5:4
140:3 141:8,24
142:7,7,14 143:16
205:23 236:25
**mortgage** 28:10
**motion** 8:5 11:16
17:16 20:21,24
63:13 70:5 76:19
81:13 107:6
128:17,19 129:5
150:7,21 207:14
207:14 227:13
233:6 241:18
**motions** 44:8
142:25 206:23
221:10,14
**motivation** 26:7
**mouth** 26:8
**move** 8:17,24 9:14
89:2 162:8 233:7
**moves** 233:17
**movies** 201:5
**moving** 68:5 77:23
**multiple** 78:15
132:22 139:24
141:23 182:11

183:12 185:3
192:22
**mumford** 224:17

**n**

**n** 2:2 4:23,23
209:2,2,2,4,4
222:17 243:2
**name** 3:23 5:6
49:25 54:14 78:8
84:2,17 101:22
190:24 191:6
215:13 222:16,19
240:17 246:3,4
**named** 37:19,20
**narrow** 58:21
68:13
**national** 193:21
**nationalities**
127:10,22,25
244:4
**nature** 55:12
186:9 191:13
195:21 217:11
220:17 225:22
**nda** 178:11 229:15
**near** 157:23 158:4
**necessarily** 23:2
164:8 198:8
**need** 19:19 22:7,13
33:19 36:6 47:15
50:22 53:9 55:16
57:21 74:16 86:7
87:5 98:24 99:7
132:13 176:16
185:20 197:17
208:9 211:7
227:25 229:10
231:16,19 232:18
236:15
**needed** 68:2 85:18
115:17 150:17

**needs** 33:10
177:19
**negotiate** 182:15
183:20
**negotiation** 174:18
184:9
**neither** 121:25
196:4
**neuman** 2:5 4:8,8
5:3 34:18,23
38:19 39:4 51:6
61:4,8,12,16 70:20
82:10 87:6,12
124:8,17 128:9
139:11,18 185:18
186:5 208:13
209:9 242:4 243:4
**neutral** 170:13
**never** 32:17 74:15
79:23 108:11
142:21 143:25
173:18,22 174:17
174:17,18 182:8
182:12 188:10
195:11,12,12
203:3 214:4,5
**new** 1:3,18,19,21
2:4,4,11 3:19,22
3:22 54:16,18
59:5,7,8 62:5
147:10 148:15
168:5 184:15,21
185:15 225:4
234:13 245:5
246:2
**news** 157:3
**nice** 100:21
**nicholas** 138:24
139:5
**night** 80:11 84:11
179:5

**non** 9:21 40:20
  49:10
**nondisclosure**
  178:2
**normal** 49:7 118:4
  142:3 143:13
**normally** 226:20
**north** 218:24
**nos** 130:3
**notary** 1:20
  242:19 245:4
  246:24
**note** 3:4 102:6
  114:2 171:23
**noted** 242:12
**notes** 91:24 92:4,6
  92:9,11,14,16,17
  92:20,23,24 102:7
  102:8 154:17
  156:7 157:9 159:6
  160:12 169:11
  170:23
**notice** 23:22 24:3
  27:9,9,10 36:19
  37:3,5,13,15
  140:16
**notices** 148:15,17
**notified** 37:18
  101:16
**november** 87:24
  91:14
**nullity** 60:8
  144:24
**number** 3:14 39:3
  44:5,13,15 67:23
  70:15,19 94:25
  99:24 104:16
  105:11 113:11
  117:11 119:24
  124:11,16 141:24
  178:18 179:15

  185:24 206:11
  212:20 213:5
  214:24 216:14
  217:2 242:8
**numbering** 210:5
**numbers** 70:10
  87:17 109:17
  134:11 156:6
  159:15

**o**

**o** 4:23 209:2,2,2,4
  222:17
**o'clock** 139:11
  179:5
**oath** 10:12 70:22
  124:19
**object** 12:17 13:24
  217:21
**objection** 49:11
  81:7 136:4 141:25
  234:18 239:22
  240:4 241:19
**objections** 125:25
  126:20 142:13
**obligation** 65:12
**obligations** 33:9
  162:10
**obtain** 210:20
  230:19
**obtained** 166:23
**obtains** 7:9
**obviously** 42:8
  47:21 48:16 59:7
  60:5 83:16 100:12
  117:16 131:16
  170:24 177:21
  201:18 220:19
  236:5
**occasion** 72:8
  85:17 117:3,8
  194:12

**occasionally** 60:24
  190:11
**occasions** 13:21
  36:19 139:24
  182:11
**occur** 165:24
  229:12
**october** 68:15
**offer** 179:21 182:3
**offered** 142:20
  143:19,21 173:20
  176:7,14 181:14
**offering** 22:9
  148:8
**offhand** 126:25
**office** 24:6 43:25
**offices** 1:17 95:6
**oh** 23:23 35:15
  71:15,15 96:15
  138:14 222:19
**okay** 6:2 9:11 11:9
  11:23 16:3,5,8
  20:14,17 21:16
  32:19 34:8,12
  36:5 38:7 53:20
  56:4 57:6 58:15
  61:10 68:12 77:13
  85:5 88:10 99:3
  106:4 113:20
  114:2 123:14,16
  128:12,14 129:22
  132:6 133:5 134:4
  137:16 141:7,9
  160:19 167:12
  169:7,13 194:25
  197:5 203:14
  206:13 207:9
  209:15 210:4,12
  210:22 212:11,17
  212:18 215:18
  216:12 220:10

  228:8,9,23,25
  230:4 231:8,21
  233:12 234:21
  235:5 237:3
**old** 166:17
**ole** 61:15
**once** 207:14
**ones** 72:15 187:23
**ontario** 171:14
**opened** 52:21 73:6
  76:10 110:13
  111:5
**operate** 76:17
  148:6
**operation** 152:21
  180:23
**operational** 76:16
  80:24 234:6
  240:12
**operations** 118:23
  135:25 151:5
  179:17 197:12
  202:15 204:6,10
  221:8
**operative** 29:3
  39:11 40:5,9,14
**opining** 35:8
**opinion** 33:13,14
  33:20 48:6 74:12
  170:14 173:21
**opportunity** 86:16
**oppose** 7:20 20:18
**opposed** 10:20
  198:23
**opposition** 90:14
  91:3
**oral** 62:2
**order** 1:17 6:20,22
  8:8,13 10:3 11:2
  11:13 13:9 14:3
  16:4,4,7,10 17:17

18:16 19:12 20:21
22:6 23:21,23,25
24:3,15 25:2,7,8
26:12 27:5 40:21
47:19 48:13 70:5
71:14 76:19 85:5
86:24 95:19
116:21 123:14
124:22 125:5,9,12
125:15,17,17,21
125:24 126:7,11
126:16,21,23
127:2 130:22
131:12,12,15
132:19,25 146:7
173:4,5 207:7,12
207:23 208:2
210:8 229:8
241:11,18 243:11
243:11
**ordered** 23:21,25
34:21 99:17
107:15,22 122:25
125:12 204:13,20
204:23 206:16
**ordering** 124:22
**orders** 14:25 60:6
126:25 130:6
132:20,21,22
141:19 207:10
229:24
**organization**
117:2 215:6,20
**organizational**
152:20
**organize** 113:22
113:23
**organized** 73:2
74:2 75:2 238:17
**origin** 100:5
111:23

**original** 138:21
216:10
**originally** 67:14
**originate** 112:7
**outcome** 4:4
102:14 245:14
**outright** 191:14
**outside** 157:5,6
165:17 197:15
**outstanding** 47:14
135:19
**overall** 147:23
**overbroad** 47:3
**overwhelming**
161:3
**owe** 99:2 145:13
**owed** 27:16 195:8
**owned** 100:17,17
146:2 160:18,20
161:3 192:10
**owners** 192:11
**ownership** 146:17
160:3 186:8
191:14 192:13
**owns** 77:2 147:4,4
152:15

**p**

**p** 2:2,2 222:17
**p.m.** 87:11 139:14
208:15 209:3
242:12
**pablo** 121:15
**packet** 176:7,17
176:18,20 177:6
177:11,12,15
**page** 6:25 7:2
23:20 27:8 35:25
40:8,19 41:23
43:12 51:14 53:24
54:8 55:10 56:10
65:16 71:5 73:16

81:13 82:25 87:19
87:20 91:7 109:19
130:16,21 159:14
189:12 212:6,9,10
215:24 216:6
217:5,12 218:15
243:3,7 244:3,16
246:5
**pages** 44:14,15
45:6 47:19,25
83:5 113:13,16,21
113:23,25 114:3
136:7,8 156:5
**paid** 13:6 33:10
41:4 56:13 60:17
60:22,24 62:19,20
65:7 80:25 81:3
82:7 95:19 98:20
100:8,20,24
103:17,19,21
104:2 105:2
108:18,22 109:3,7
111:25 112:5,14
114:12 115:11,18
133:17 137:4,8
148:4 151:17,18
151:21,24 152:3
188:13,21 189:17
194:13 195:11,24
196:3 198:18
220:4 222:2
**paper** 92:13
**paragraph** 15:15
35:25 39:17 52:5
122:15 123:20
124:24 126:6
129:25 210:9
216:6,18 217:12
217:14 219:2
230:8

**parallel** 157:5
**parameters** 180:8
**park** 1:18 2:3,11
3:22
**parkway** 222:8,18
**part** 8:19,23 51:7
52:24 103:22
108:12 160:11,16
163:13 165:10
173:5 174:8,9
195:6 202:13,14
203:23 204:4
207:22,23 213:25
221:25
**partial** 105:14
**participated** 154:5
**participation**
219:14
**particular** 49:21
54:23 116:11
134:23 155:4
**parties** 3:12 29:13
34:4 130:24 143:4
168:2 183:2
245:12
**partner** 191:16
**partners** 191:21
192:22
**parts** 204:8
**party** 4:2 80:13,15
141:2 147:3,21
169:18 173:4,6,11
182:21
**passed** 190:23
191:17 222:25
223:8,10
**passing** 197:13
**patient** 130:9
**patiently** 142:19
**patton** 163:7

pay 12:11,20,22
13:7,22 15:3
16:17 22:7 27:15
28:2,14 41:3 71:8
71:16,18 72:9,20
72:22 73:13 74:4
82:6 99:2,3 101:5
103:20,21 108:15
114:15 115:21
116:19 118:16
133:13,15,21
145:7 148:25
188:12 193:18,21
194:18 196:16
234:16
payable 108:9
paying 116:22
133:25 134:5
189:11 193:14
197:7,15
payment 33:6
39:23,23 196:20
payments 14:2,5
40:13 55:10 56:9
60:14 111:20
219:24 220:7
244:11
peaked 226:15
pendency 150:6
233:5
pending 17:16
44:8 63:13 70:4
82:11 171:11
206:23 207:14
237:2
people 5:14,16
26:2 64:3 67:9
68:2 72:24 74:4
78:14,16 81:15
87:25 91:18 93:15
102:8 103:22

115:5,16 117:6
127:24 143:12
144:11 145:4,5,6
150:15 152:3
153:8 160:25
161:8 164:23
165:4,9 168:22
173:24 174:11
179:11 191:16
193:13 203:15,19
203:23 204:3,7
205:16 208:9
213:15 215:13
234:16
people's 146:24
peoples 64:16
perceive 227:5
percent 39:22,24
53:11 59:22,23,25
60:12 61:25
107:10 117:25
118:6 144:7 145:9
145:11,16 146:7
147:2,4,4 159:24
160:22 161:7
173:24,25,25
178:13 192:14,23
percentage 35:5
39:21 42:5 56:20
56:24 57:8,13
59:15,18,20 98:10
117:11,23 118:19
144:21 145:23
147:6 193:16
percentages 34:4
185:14
perfect 209:19
perfectly 16:8,9
16:10
perform 69:2

period 18:12
30:12 52:22
105:21 115:7
154:8 189:24
190:4 196:19
219:20
periodically
108:14
periods 18:5
permitted 13:8
person 24:2 53:8
67:14 73:2 81:18
91:14 92:10
personal 7:5 48:6
73:22 74:7 75:8
188:4 189:7,8
203:23 226:23
230:11 240:6
personally 165:7
173:25 174:4
188:17 189:11
persons 73:14
88:15,20 122:2
175:19
peter 89:18
phone 61:2,7
208:5
phones 3:8
phrase 10:19,19
204:15 221:3
piaguaje 243:9
pick 3:5 75:3
pie 147:5,23
piece 180:20
191:12
pieces 63:10 147:5
pile 203:10
place 3:8,11 83:13
84:5 92:14 97:8
184:21

plaintiff 1:6,16 2:4
2:11 30:19 39:25
plaintiff's 6:16,18
18:22 23:18 26:24
27:2 28:20 41:21
43:6 56:2 70:6
95:3 99:21,22
104:14 105:12
109:13 121:9
127:12 134:13
137:14 187:13
197:25 202:9
215:3 219:25
231:6 243:7 244:3
plaintiffs 14:18
29:23 30:22 31:2
31:17,19 32:2
37:5,6,14,19,21,25
40:25 41:3,5
111:22 121:24
122:2,18 127:22
152:16 220:9
221:14
planned 140:16
play 85:3 120:6
158:18
playing 106:9
142:16
plays 233:6
pleadings 14:11
please 3:4,7 4:6
9:18 12:24 13:9
15:5,16 34:24
38:4,18 51:5
67:10 81:11 86:23
88:6 89:3,6,16
91:8 101:3 102:21
120:6 129:10
133:7 202:6 207:9
227:3 228:6,24

plural 63:23
pocket 66:14
  195:17 196:2
  213:14
pockets 197:16
point 9:23 30:2,4
  47:13 51:12 101:3
  135:22 143:25
  177:2 183:20
  201:17 233:7,10
points 217:18
polite 107:10
  226:20
pollution 37:10
portion 153:17
  194:18
portions 144:10
  144:12,18 221:17
position 7:21 8:2
  9:15 10:14 11:5
  11:11,22 18:3
  19:8 21:10 34:2,8
  76:11 81:22
  141:15 142:3,24
  149:8 150:22
  164:5,18 166:10
  168:3,4
possession 223:11
possibility 117:19
possible 22:15
  25:8 31:9 52:20
  73:3 188:24
  211:18 214:20
possum 120:6
  142:16
post 182:19
potential 89:5
  155:5
potentially 55:11
  159:4

power 172:11
practical 60:7
  144:24
practice 25:5,10
  54:24 85:17
practitioner 47:4
precisely 12:5
premier 72:3
preparation 62:8
prepare 67:20
  105:18
prepared 67:7
  95:10 109:11
  137:22 175:7
  177:6,10 197:21
  211:17
preparing 43:18
  68:24 218:17
present 2:17 41:14
  75:18 86:17 98:25
  117:18 189:25
presentation
  154:25
presently 52:14,18
preservation
  53:21 243:11
preserve 24:8
preserved 85:6
president 78:10,13
  121:14
press 163:4,21
presume 102:22
  156:2
presumption
  137:7
pretty 144:23
  179:7 194:11
  198:17 205:7
  217:23
prevailed 221:15

prevent 6:8
  167:17 168:22
preventing 133:24
  134:5
prevents 165:11
previous 115:22
previously 6:16
  18:20 23:16 26:24
  28:20 138:12
  211:14 215:2
primary 244:9
principles 153:15
  154:3
print 97:12
printout 52:10
prior 25:7 95:14
  110:18 111:4
  135:13 164:16
  165:18 182:17
  198:17 209:13
  211:7 226:19
prioritize 237:8,10
priority 148:3
private 3:6
privilege 9:4 44:7
  48:19,20 49:7
  137:18 206:22
  232:14 239:21
privileged 9:21
  35:8 48:10 49:10
  134:25 175:25
  197:10 231:24
  232:3 241:17
pro 185:13
probably 15:14
  54:21 92:7 118:6
  160:11 161:12
  175:18 204:2
  225:17 227:15
  236:6

probated 223:7
problem 133:23
problems 156:20
  156:21,22
proceed 4:21
process 78:17 85:8
  85:21 107:7
produce 26:12,16
  47:20 48:14 69:25
  70:2 92:4,5 96:23
  97:4,9 127:4
  134:20 135:5,7,15
  135:21 136:4,21
  178:21 232:4,18
  232:21 235:9,12
  235:15
produced 48:23
  69:23 71:2 83:8
  83:20,21,24 84:7
  93:2 94:7,7 95:13
  101:9 104:13
  109:12 134:10
  135:16 197:22
  202:8 232:23
  238:15
producing 136:5
  138:6,6 201:16
  210:18 233:5
production 26:21
  80:10 83:15 84:9
  84:12 109:17
  134:16 135:13
  136:8 178:17,25
  231:25 233:9
productive 15:14
  227:19
professional 1:20
  40:24
profit 15:20
projects 117:5,6,7

**promised** 145:15
**promote** 199:24
**promptly** 211:6,17
**properties** 112:20
 114:25 189:20
 190:16 223:11
**property** 7:4
 27:14,21,23,24,25
 52:2 190:19,22
 191:4,7,12,19,23
 192:3,7 223:17,19
 230:11,18
**prosecuting**
 172:10
**protect** 25:22 85:7
 85:18,20
**protected** 17:16
 17:25 49:5 63:18
 69:5 70:3 100:22
 128:8 135:2 137:6
 151:6
**protective** 17:17
 20:21 70:5 76:19
 241:18
**provide** 10:2
 21:12 60:13 67:24
 80:9 138:5 149:22
 149:24 150:2
 191:3,5 202:22
 231:3 232:5,10,12
 234:17
**provided** 27:16
 48:20 241:6
**providers** 82:22
 160:23,24
**provides** 185:12
**providing** 210:19
**province** 127:10
 244:4
**provision** 35:23
 40:4 41:8 153:18

167:3,9,16 185:16
**provisions** 35:13
 39:9 40:7,12
**public** 1:21 78:9
 119:17 163:4,20
 242:19 245:4
 246:24
**publications** 201:7
**publicly** 64:6
**pull** 203:5
**purpose** 65:5,6,8
 71:17 103:2,23
 116:24 142:14,15
 158:2 177:9
 180:11
**purposes** 60:7
 117:4 144:24
**pursuant** 1:16
 14:4 27:10 40:17
 56:25 96:17 98:8
 100:23 124:25
 131:7 167:10
 200:11 226:3,9
 232:4
**pursuing** 221:6
**put** 49:23,24 50:15
 67:14 74:9 111:14
 113:21 118:16
 119:13 149:18
 150:21 153:23
 170:12 179:18
 191:2,9 194:13
 195:10 204:13
 206:6,18 209:14
 209:18 211:14
 213:16 225:8,12
**putting** 26:8
 147:15 207:6
 237:21

**q**

**question** 7:20 8:15
 8:23 9:24 11:24
 12:3,17 13:10
 14:23 19:13,20
 21:23,24 23:6
 26:10 30:17,24
 31:21 32:14 34:6
 34:7,10,19,24
 35:20 36:18 37:12
 39:16 42:14 50:5
 50:6,23 51:4,7
 56:5,6 57:22
 61:17 68:13 69:4
 69:21 75:23,25
 76:20 82:11 90:24
 93:11 99:12,16
 103:8 113:4 114:6
 117:21 118:22
 126:14 128:22
 132:4,4,5 133:4
 140:9 143:18
 146:13 147:16
 164:11,21 166:9
 173:3,22 175:24
 176:9 179:10,14
 180:22 183:24
 189:5 190:4 195:2
 196:14,15 197:9
 209:14 212:15
 214:11,13 217:22
 219:3 227:2
 228:17,24 230:6
 230:21 232:8
 235:4
**questions** 9:7,20
 12:24 13:17,18
 15:5,8,13 16:3
 34:13,15,20 38:10
 38:11,12,14 41:16
 44:25 82:16 88:5

88:16,23 89:20,22
 89:25 90:17,17
 91:6 99:7 102:19
 102:24 106:10,13
 107:2,14,18
 122:13 123:11,14
 123:18,24 124:4,6
 126:18 128:12
 130:12 133:8
 140:3,11 141:13
 142:17,20 143:8
 155:15 170:20
 201:25 205:11,25
 209:13 219:8
 226:12 227:10,17
 227:21 228:3,6
 239:19
**quichua** 64:19
**quick** 70:11
 209:10
**quit** 99:4
**quite** 154:12
 215:10

**r**

**r** 2:2,18 4:23 209:2
 209:4
**raise** 19:11 23:12
 24:24 77:4 101:5
 116:19,24 117:3,8
 150:24 199:20,25
 200:11 234:9
**raised** 12:10,15
 13:3,7,22 17:11
 19:16 20:3 21:8
 56:14 72:20 73:11
 76:24 77:5,19
 100:10,20,25
 103:4 105:23
 108:17 109:2,5,25
 116:6 119:2,10,15
 120:10,13,22,24

189:18 213:8
214:19 216:20,22
**raising** 18:4 33:11
180:16 240:3
**rare** 194:11
**rarely** 60:22
**rata** 185:13
**read** 34:18,23,25
36:6,7,16 39:13
51:4,8 52:18
61:16,20 81:13
82:10,13 121:18
126:5 132:19
210:9
**ready** 177:13
232:18
**real** 7:5 27:24,25
210:7 230:12
**realize** 217:24
**realized** 83:14
84:12
**really** 8:19 30:18
31:9,20 32:5
45:24 50:9,9,20
81:14 93:13 99:7
101:3 123:8 124:2
141:25 153:2,23
155:13,23 161:14
171:9 180:20
182:15 190:12
207:17 214:22
228:5
**reason** 48:10
51:19 70:2 76:12
81:20 92:5 98:15
110:5 209:20
210:3 214:18
215:18 234:18
246:5
**reasonable** 48:9

**reasons** 179:10
183:4
**recall** 24:14 25:12
50:9,10,17 51:11
94:2,13 119:3
138:20 155:3
157:19,20 159:20
160:9 171:3,7,9,23
172:14,19 175:7
189:22 197:3
204:22 229:20
236:11
**recalling** 239:19
**receipt** 112:10
**receive** 7:7 14:5
61:22 62:4,10
98:9 105:22
221:17
**received** 7:7 11:19
12:14 13:3,15,22
13:25 19:15,20
55:11 65:21 66:2
66:5,11,18 71:25
80:3 98:22 103:4
105:2 140:15
189:2 226:10
**receiving** 63:7
**recess** 38:24 70:16
87:9 124:13
185:25 208:15
**recollection** 19:14
25:4 58:20 84:4
138:23 156:15
172:22 173:10
189:4 213:12
216:22 217:8
219:5
**recommend** 90:12
**reconcile** 104:8
**reconciled** 103:24

**reconstruct**
196:19
**reconvene** 202:4
**record** 3:3,13 4:7
5:6,8 10:7 14:21
34:25 38:20,22
39:2 51:8 55:23
61:20 70:12,14,18
81:11 82:13 86:5
86:8 87:6,8,11
102:7,18 106:4
107:5 124:9,12,15
139:14,15,17,20
151:8 185:19,21
185:23 186:3
208:14 209:6
231:4 242:5,7
245:9
**recorded** 3:15
**recording** 3:11
**records** 44:21,23
55:5 74:20,24
**recourse** 48:15
**recovered** 59:24
**recovery** 41:20
60:3,3,4
**reduce** 147:11
**reductions** 185:13
**refer** 124:21
156:13 158:20
159:17
**reference** 11:12
36:4 170:19
**referenced** 123:20
**references** 104:17
**referred** 38:6 91:3
**referring** 54:12
78:7 91:4 122:7
124:23 153:19
159:25 165:22
166:2 178:23

212:25
**refers** 158:15
159:10 174:4
**reflected** 62:5
**reflecting** 52:11
**reflection** 115:8
**reflects** 170:9
**refresh** 216:21
217:8 219:4
**refreshes** 189:3
**refund** 162:6
**refusals** 107:3,5
**refuse** 8:16,25
11:7 13:2 107:8
**refused** 142:16
**refusing** 8:15 21:6
21:12 88:14,19
131:23 179:9
241:12
**regard** 16:16
31:24 37:8 117:18
175:21 201:16
218:9 232:11
236:23
**regarded** 203:22
**regarding** 133:2
181:14
**regardless** 220:15
**regards** 76:14
**registered** 1:20
**regular** 46:2 79:9
79:17 108:10
182:7
**regularly** 78:4
**reimburse** 195:4
**reimbursed** 194:9
194:12 196:5
**reimbursement**
66:19 105:15
196:8

reiterate 41:14
  226:24
relate 63:4 72:6
  82:20 90:5 112:23
  120:16 135:24
  136:9,13 141:11
  171:23 236:20
related 4:2 8:8
  10:3 17:22 24:25
  25:13 26:2 81:23
  81:24 83:8 84:18
  84:19 91:9 93:23
  105:22 132:5
  139:8 171:4
  187:15,22,24
  188:3 199:3 201:4
  201:17 210:24
  211:12 225:19
  228:12 235:18
  237:16 245:11
relates 30:18 63:6
  71:19 72:2 151:5
  156:18 172:24
  194:23 201:13
  218:4
relating 22:24
  24:10,24 40:7,12
  80:21 90:12 93:5
  112:10 181:18
  187:10 229:4
relations 163:4
relationship 30:14
  30:21 31:21
  109:21 236:13
relative 69:20
  103:15
relatively 58:24
  73:6 193:8
releases 163:5,21
relevant 9:20
  24:18 32:7 38:13

93:21 118:24
  132:5 228:13
  229:5
reliance 53:20
relook 211:15
rely 55:4 177:22
relying 33:23
remediation 33:5
  33:10
remedies 143:5
remedy 141:5
remember 17:5
  49:3 84:9 92:17
  93:22 94:18,22
  110:21,24 111:3
  138:19,25 139:7
  145:25 146:4
  154:18 155:23
  156:16 157:16
  158:22 159:2
  162:19,20 163:2,3
  163:11 164:10,13
  173:2,19 174:16
  175:4 178:8 180:5
  196:25 200:18
  213:12 217:3,4,10
  221:16 240:10
remembered
  93:13
remembering
  226:8
remind 211:23
  234:21
remuneration
  55:12,15 56:7,12
  189:16
rental 112:20
  114:25
repeat 164:21
  195:6

repeated 241:7
repeatedly 90:6
  140:8 142:20
rephrase 228:23
reporter 1:20 3:25
  4:20 50:23 86:25
  143:11 205:20
  208:3 240:17
reporting 246:2
reports 89:5 157:3
represent 9:6 31:3
  31:17 32:3 64:4,7
  144:16
representative
  96:2,5 182:23
  217:7
representatives
  15:17
represented 16:20
  18:10 172:13
representing 9:17
  30:3 216:19
represents 63:24
  64:3,21,25 122:2
reputable 193:20
reputation 172:11
request 38:20 48:5
  55:12,20,21 71:3
  129:25 209:24
requested 44:20
  55:6 179:23
requests 55:25
  130:2 204:12,19
  204:24 207:8
  209:22,22,23
  210:17 211:25
  241:7 244:15
require 41:2
required 129:23
  204:14,18 205:3
  206:7,15,19

207:13,15 209:14
  210:16,23,25
  211:14
requires 148:15
research 43:20
  179:18 235:17
researched 153:22
  173:22
resolution 7:23
  70:4
resolved 47:15
  101:14 184:7,12
  207:15 217:6
  233:10
resources 16:17
  17:24 22:7,12,17
  37:8 77:9 82:22
  121:23
respect 8:18 32:6
  40:22 81:20
respectfully 16:11
  114:19
respond 89:4
  129:23 141:6
  142:9 207:9,16
responded 20:23
  182:12
responding 45:4
  55:17 69:12
response 9:6 44:24
  45:13 51:14 54:8
  55:9,13 56:8
  65:16 71:2 83:25
  89:17 91:21
  114:22 189:14
  204:12,14,18
  205:2,3 206:5,7,14
  206:14,18 207:13
  209:12,14 210:23
  211:14 212:16

**responses** 43:4,9
43:19 55:24 69:13
111:14 112:18
113:9 142:25
186:7 187:12
190:20 191:2
204:11 206:3
207:21 209:21
210:7 212:2,13,14
225:9
**responsibility**
164:8 218:25
**responsible** 32:24
37:17
**responsive** 46:5,13
48:4 50:7 55:11
100:14 134:25
136:23 210:24
**rest** 218:11 227:16
**restart** 23:23
**restrained** 15:19
**restraining** 27:5,9
71:13
**resulted** 167:19
**resulting** 167:21
**resumed** 209:4
**retain** 68:3,8
**retained** 67:19,22
68:14
**retainer** 14:2,5
28:23 35:17 39:7
40:8 57:3,5,8,9,11
57:25 59:3,10,14
59:19 60:18 61:22
62:4,5,7,10,11,16
63:9,16 95:22,24
96:6,8 144:9
168:5,7 184:14
185:7,12,15 194:3
194:7,18 196:6,9
196:10,11,17,22

197:7 229:22
230:15 235:8
**retrievable** 74:25
**return** 55:2,7
217:18 218:10
**returned** 218:13
**returning** 108:2
111:18
**returns** 54:11
66:10
**revelatory** 240:11
**reverted** 161:19
161:22,23 162:2,3
166:11,12
**reverts** 162:11,14
**review** 43:20
45:10 69:11 79:2
79:8 134:20
135:12 232:24
**reviewed** 44:4,12
44:19 45:3 69:24
80:10 134:15
**rfp** 51:14 54:8
55:9 56:8
**rick** 144:14
**rico** 38:2 45:9
56:22 96:10
110:17 111:5
120:8,9,9,23,25
144:17,19,25
148:2 155:8,11
170:12 173:5
175:20 176:10
178:10,15 179:12
182:19 186:13
196:23 197:22
200:14 216:10,23
219:19 223:13,16
**ridiculous** 160:13
**right** 7:9 14:13,19
17:25 18:7 22:4

38:2,3,16 59:11
60:7 61:3 62:12
63:23 73:23 74:23
76:20 84:5 97:2
99:6 105:8 116:10
118:14 124:5
129:16,17 135:16
138:13 141:4,14
149:7 152:23
171:17 172:2
174:12 191:18
192:6 201:18
207:5 213:18,19
214:3 218:2
220:12 232:20
233:4 238:23
240:8
**rights** 20:20 48:12
48:14 49:6 226:7
226:9 230:14
**rings** 222:9,11
**risk** 170:18
**risking** 171:5
**rizack** 67:15 75:3
134:10,19,22
136:21 137:10,24
214:23 232:8
241:5 244:6
**rizack's** 134:15
136:8 231:25
**rizackjd** 134:11
244:5
**road** 67:17
**rog3** 55:13 56:11
**rogs** 210:10
**role** 63:2 65:10
**romero** 2:18 5:7,8
**room** 5:18,20 61:9
**roughly** 146:3
**royce** 111:21

**rufolo** 2:10 4:15
4:18
**rule** 8:4
**rules** 6:4 59:9
124:3 140:22,22
220:5 227:15
**ruling** 158:19
170:17 171:4
**run** 188:16
**russ** 218:18

**s**

**s** 2:2 4:23 209:2,2
209:2,4 243:6
244:2 246:5
**sale** 27:13
**sales** 103:4
**saw** 90:13 154:17
**saying** 36:12 63:22
89:6 107:13
119:17 120:14
156:18 166:21
172:2 210:23
215:25 218:16
**says** 27:9 33:4
39:18 40:20 59:10
90:10 130:22
157:4,22 158:9
159:8,16,23 169:3
169:17,25 170:17
172:9,15 173:23
210:10,14,15
216:8 217:17
230:9
**scheduled** 241:4
**school** 28:11
**schwab** 111:15
186:18,18
**scope** 8:19,24 9:2
9:12 13:25 14:17
14:20,22 16:22
20:5,5 21:15,17

28:6 35:9 36:23
38:4,13 40:6,10,15
40:18 41:9,12,13
42:7 63:14 68:10
69:9 75:17 76:7
76:12,13 77:17
78:9 79:16 80:16
80:19,22 82:5,15
88:3,4,17,24 89:15
91:16 95:17,20
96:3,9,15,18 97:23
98:5,11,13,16,21
98:23 100:7,22
101:12,18 102:16
102:20 105:3,6,20
105:25 106:10
107:15 110:2
111:24 112:4,8,12
112:16 113:5
114:6,9 115:14,25
116:3 120:15
121:4 122:4,8,11
123:21 124:7
125:6,24 126:20
127:17 128:4,7,13
130:7 131:2,10
133:10 135:2
136:14 137:5
139:21 140:4
141:3,11 151:4
194:20 199:11,16
201:9 227:5
239:20
**sdonziger** 45:20
45:21
**sdonziger2** 45:22
**search** 46:12 47:6
49:24 50:7,16,17
51:12 54:25 83:17
83:25 84:14 93:8
94:17 235:23

236:21
**searched** 46:4
48:4,18 84:2,7,15
93:18
**searches** 49:20
**searching** 46:11
47:10 51:9
**second** 16:11 86:5
91:8 113:23
130:16 216:6
228:8 238:13
**secoya** 64:18
**secretary** 53:19
**section** 27:16
**see** 7:14 8:19
15:22 24:12 27:18
29:24 40:2 51:17
52:7 55:17,19
56:16 65:23 71:6
83:5 89:11 90:15
91:11 96:24 100:3
104:17,22 108:6
109:22 122:3
128:3 130:3,22
131:3,5,14 136:10
143:10 156:11
157:24 158:11
169:19 170:3
171:19 172:17
174:2 177:20
180:12 206:6,18
210:10,13 216:5
217:20 219:2
233:6 236:4,7
**seek** 143:4 171:17
172:3
**seeking** 47:12
143:24 148:15
150:14 158:3
**seen** 121:18
127:14 173:18

203:3
**seizure** 165:20
**self** 132:9,11
**sell** 35:5 117:12,14
117:23,24 118:13
146:7 147:20
191:18 192:7
**selling** 32:10,16
116:7 146:16
150:15 160:10
**send** 94:10 95:14
95:18 137:24
176:7,15,17,21
177:7,17,23
236:25
**sending** 42:12
94:18
**sensitive** 3:5
**sent** 74:17 85:11
89:7 91:13,17
104:19 178:3,25
203:18,20 233:23
240:19
**separate** 230:23
238:20 239:15
**separately** 194:3
**september** 188:25
**series** 70:9 87:25
162:20 163:4,9
164:22
**serious** 121:25
216:2
**seriously** 122:25
**seriousness** 226:22
239:24
**served** 27:5
**servers** 46:8
**service** 58:7 82:22
160:23,24
**services** 39:19
95:7 105:16

149:21
**serving** 96:17
**set** 27:11 211:20
211:21,23 238:22
245:8,15
**sets** 65:9
**setting** 163:22
**settled** 181:6
**settlement** 163:13
167:6,18
**seventh** 225:15
**sgklaw.com** 2:12
2:13
**share** 15:7 116:11
197:14
**shares** 42:6,11,15
42:18 116:7,9
160:11 165:11
166:11 167:17,20
167:24 229:25
**sheet** 246:2
**shifted** 17:6,9
**shocked** 236:2
**shopping** 193:12
193:13
**short** 142:13 179:8
208:2
**show** 107:11 156:4
210:6 218:16
243:11
**showing** 202:7
**shown** 73:15
112:22
**shows** 99:25
104:19,24 162:17
197:23
**side** 225:15
**sign** 178:11 182:19
**signatory** 233:16
**signature** 42:2,2
43:11 130:17

131:16 183:4
245:18
**signed** 42:4,13,19
57:12 59:7,13
60:10 62:16 98:15
113:9 121:22
122:17 129:14
130:19 131:15
141:19 149:4,14
161:16 165:10,17
167:6 168:2
178:13 182:22
184:16 201:3,11
201:15
**significant** 93:16
**signing** 167:18
**silverstein** 2:13
4:16,17
**similar** 185:15
**simply** 107:13
**single** 236:10
**siona** 64:18
**sir** 5:11 15:22
27:18 31:7 42:2
45:16 46:19 87:21
107:17 109:16
128:10 130:17
132:14 133:25
180:2 190:7
210:13 212:6
218:23 225:10
241:3
**sit** 23:7 25:11 30:7
31:10 34:16,17
55:6 58:23 59:6
76:2 88:9 89:23
106:8,15 123:3
129:5 142:22
159:2 205:17
207:4 236:11

**sites** 200:21
**sitting** 102:18,22
205:4
**situation** 73:7
173:18 208:8
**slaght** 111:20
**slash** 161:20
**slightly** 52:19
**smaller** 175:12
**smith** 111:21
**snyder** 96:11,12
96:14
**sold** 118:8,20
146:9 226:9
**sole** 47:4
**solicit** 22:4
**solicitations** 22:25
25:13 35:10
**solicited** 19:6
21:19,25 22:21
23:9 36:20 37:14
**somebody** 117:24
139:4 193:18
**soon** 205:7 235:23
237:3
**sophisticated**
155:25
**sorry** 17:2 19:19
23:23 55:21 57:23
61:6 109:2 122:21
137:13 141:12
145:10 157:6
173:7 176:15
201:20 208:7
214:9
**sort** 17:6 36:6
47:14 49:7 52:19
52:24 55:5 67:24
82:7 110:16
148:16 154:19,23
154:24 163:13

170:21 175:13
176:22 180:19
182:14,16 194:11
227:22 228:2
**sorts** 79:19 117:7
141:10
**source** 66:5
113:22
**sources** 56:11
113:11 114:23
189:16 190:5
201:10,13
**southern** 1:3 3:18
**spanish** 127:8
**speak** 160:12
**speaking** 22:11
184:2
**speaks** 42:8
**specific** 19:12
35:21 58:12 64:9
156:16 174:17
181:24,25 204:23
**specifically** 8:4
11:12 119:4
155:24 157:17,21
162:20 173:2
177:8 178:8 236:8
**specifics** 155:3
159:2 218:17
**specify** 44:24
**speculate** 160:13
**speculative** 170:9
**speech** 88:7
**speeches** 34:11,12
141:16
**speechify** 142:12
**speechifying** 88:8
130:13 142:6
**speed** 75:3
**spend** 65:13 153:6
193:24

**spending** 33:2
**spent** 78:3 79:11
79:14 162:4 199:3
218:19 234:8
**spies** 81:16
**spirit** 132:3
**st** 191:10
**stack** 206:10
**stamp** 82:25
**stamped** 212:8
**start** 106:13
123:17,24
**started** 111:2,4
180:9
**starting** 140:8
150:10 189:4
203:11
**starts** 7:2
**state** 1:21 4:6 5:6
22:16 51:14 52:5
55:10 56:11
102:17 114:23
193:4 245:5
**stated** 10:7 14:11
33:20 34:8 35:2
43:14 46:25 64:6
140:8 142:12
151:7
**statement** 52:16
53:6 119:6 139:20
144:8 151:9 190:2
209:10
**statements** 81:18
**states** 1:2 15:16
23:25 24:9 66:6
105:14 121:20
122:15 127:18
137:12 215:24
**stating** 14:24 53:2
**status** 52:12

**stay** 140:4 154:15
205:9
**stayed** 209:24
**staying** 140:11
160:14 172:11
**stern** 2:10,12 4:14
4:14,15,17
**steven** 1:10,15
3:16 95:6 121:21
159:24 217:19
221:22 242:15
243:13 246:4,21
**stevendonziger....**
200:23
**stick** 205:10
**sticker** 216:17
**stipulated** 129:23
131:24
**stipulation** 129:14
129:17 130:19
132:13 141:18
207:23
**stock** 230:16
**stocks** 186:8
**stood** 142:18
**stop** 13:9 14:15
34:11 35:7 88:6
89:15 105:7
209:11
**stopped** 30:3
216:21
**storage** 46:9
**stores** 193:14
**strategic** 80:24
**strategies** 240:12
**stratus** 163:8
**streamed** 5:14,23
**streamline** 24:6
**street** 225:16
**strictly** 89:8

**strike** 93:15
**string** 84:4,8 87:16
93:12 229:16
**strip** 193:13
**struck** 219:12,13
**structure** 148:10
148:11,13,20
152:20 155:12
160:17,19 165:18
**structured** 146:4
**structures** 17:23
**stuck** 130:8
**study** 114:8
**studying** 113:4
**stuff** 48:10 49:4
50:4 77:8 79:5,20
99:6 155:16
177:14,16 226:24
227:24 232:25
237:3,8,11,12
239:2
**style** 163:4
**subject** 48:14 60:5
66:13 70:4 79:2
102:19 117:16
135:18 141:4
160:5,8 191:20
192:8 239:18
241:17
**subjected** 129:6
**subpoena** 20:18
47:2 48:5 55:18
71:25 80:3 125:4
131:7 243:15
**subpoenaed**
234:10
**subpoenas** 150:8
**subscribed** 242:17
246:22
**subscription** 41:19
243:16

**subsequent** 11:2
16:4 29:5,7,11,14
29:20 39:14 42:19
57:16,18,25 67:16
84:6,11 96:19
120:8 125:5,14,17
131:12 165:19
**subsequently**
42:10 72:22 74:3
122:16 167:3
**subsidiary** 170:17
171:4
**substance** 172:23
221:5
**substantially** 67:5
67:8 69:7 198:5
199:5
**substantive** 87:20
**subtract** 145:19
145:20
**successful** 158:18
**sucumbios** 127:11
244:5
**sues** 81:17
**suffer** 27:12
**suggest** 33:11
143:2
**suggested** 26:19
131:19
**suggesting** 9:8
**suggestion** 38:7
**suggestions** 38:9
**suggests** 176:25
**sullivan** 24:6
49:24 50:18 67:18
67:19,22 68:4,7,9
68:14,19,25 71:24
73:7 75:2 76:10
76:15 79:25 83:3
83:20,23 85:11
86:2,2,10 87:4,13

87:24 88:22 89:2
91:7 93:3 94:7
95:13,19 97:19
98:3,9 101:16,23
102:13 103:23
104:8,13,20
109:12 138:11
144:3 154:7 156:4
158:17 169:10
179:20 180:25
202:8,23 203:6,8
203:18 214:23
232:23 233:4,20
235:12,25 237:17
238:14
**sullivan's** 76:5
83:15 84:2,12,17
89:4 109:17 156:7
178:17 240:16
**summaries** 69:17
**summary** 69:18
69:22 109:18
197:21 219:23
**superseded** 29:19
**superseding**
184:20,23 185:2,5
**supplement** 211:7
**support** 67:25
147:19 150:17,18
**supposed** 34:14
189:9
**supposedly** 122:17
**sure** 22:17 31:9
44:18 47:25 53:11
55:22 61:25 68:22
80:8 84:25 92:3
127:3 149:7 166:6
169:6 172:6
173:10 178:13
180:9 182:24,24
193:6 208:2

219:14 223:9
234:25
**surprised** 157:17
**survived** 218:20
**suspect** 235:14
**suspended** 150:6,9
150:13
**swear** 4:20
**swift** 198:9,13,15
198:17,23,25
213:13,17
**sworn** 4:25 242:17
245:8 246:22
**system** 188:10

**t**

**t** 4:23 209:2,4
222:17 243:6
244:2
**tailored** 177:18
**take** 3:11 9:18
27:10 70:11 81:21
86:4 87:5 91:24
107:24 120:22
123:23 126:5
139:12 140:16
142:2 154:17
166:21 179:9
198:11 202:3
205:6 206:4
207:24 208:3,4,10
218:25 227:16
230:24 231:8,9,13
237:13 241:13
**taken** 1:16 3:16
38:24 70:16 73:11
87:9 92:16 118:7
124:13 141:23
149:18 185:25
**takers** 61:12
**takes** 81:15

**talk** 68:6 78:3,12
97:24 114:14,20
123:2,15,25
128:20 155:5
220:18
**talked** 53:8 171:11
172:6,21 180:10
**talking** 35:20,22
50:12,13,24,25
58:7 67:3 98:17
150:25 159:7
204:21 218:21
230:19
**tangible** 7:5
230:12
**tasks** 67:23
**tax** 54:9,11,13,19
55:2,5 66:9,15
127:24 156:20,21
156:22
**taxable** 66:3,5
**taxes** 156:24
**td** 52:7,11,21 71:6
72:3 110:15,25
111:2,3,7,9,10
187:11 188:7
233:12 234:12
244:7
**team** 17:22 88:13
136:2 203:23
204:4
**technical** 47:5
**teed** 11:9 12:6
**tell** 12:12 13:16
107:19 173:16
176:4 188:2
232:23 234:23
241:15
**telling** 9:3,5 34:16
106:14 114:13
121:4 161:7

169:21 177:9
**ten** 54:22 138:19
**tentative** 98:3
**tenth** 203:10
**term** 94:17 147:24
157:23 158:5
233:11
**terminated** 29:18
30:14,20 39:12
41:10
**terminating** 142:4
**terms** 49:21,24
50:16,17 51:12
57:17,19,24 58:3,5
58:9,12 118:15
143:19,21 146:11
148:8 174:14,21
174:23,25 175:5,6
175:10,16,22
176:9 179:21,23
180:4,17 181:14
182:3 201:4
229:15 231:21
239:20
**terribly** 93:15
**test** 170:12
**testified** 4:25 23:7
57:15 85:6 96:11
96:19 101:2,4
116:5,17 218:7
219:18
**testify** 6:13 32:12
124:25 131:24
**testifying** 6:8
**testimony** 64:20
83:22 115:22
205:21 245:7,10
**thank** 4:19 5:10,11
235:7 240:20
241:24,25

**thanks** 218:20
**theory** 20:11
147:17 161:15
**thereof** 51:7
**therewith** 24:11
**thing** 49:4 50:8
117:5 119:23
131:10 148:16
188:4 211:9
226:23 231:15
232:8 237:9
240:15
**things** 9:14 17:6
81:19 158:8 161:2
163:10 190:12
193:25 199:15
223:2
**think** 5:5 7:25
15:9 20:19,19
29:4,19 30:11
45:22 49:16,25
53:10 57:3 61:17
72:8 79:15 81:19
82:12 92:15
101:22 110:22
111:4 114:19
117:2 118:24
119:7,9,16,18
125:23 137:19
139:3,4,6 144:5,23
144:25 145:25
152:18 154:23
155:7,8 156:18
160:11,15 162:23
163:6 165:15
167:13 169:4,24
170:22 172:21
173:3 175:12
178:6,7,12,20
179:16 180:3,10
180:19 181:4,6

183:3,9,10,25
184:10 185:4
189:6 190:13,19
191:11 192:23
193:2 194:19,21
196:18 197:10
198:7 199:11
200:19,22 201:2
203:17,22 204:16
207:3 209:13
210:4 211:3,13,20
213:2,10 217:22
223:2 224:18,19
224:19,20 225:8
225:12 227:9,12
227:15,25 231:16
232:9,11,13,19,24
235:14,16 236:10
237:9 238:8,12,19
238:24 240:13
241:10
**thinking** 153:2
170:24 206:21
214:16
**third** 34:4 80:13
80:15
**thirty** 39:21
**thorough** 236:2
**thought** 48:2,8
50:25 61:19 84:8
97:24 118:3
137:19 147:13
175:14 190:25
**thoughts** 157:10
**thousands** 64:2
**threaten** 107:8
**threats** 158:18,23
**three** 30:11 58:19
70:19 83:5 124:11
137:12 140:8

**threshold** 118:11
**threw** 92:23
**thursday** 86:13
211:8,18 237:6,10
237:25 238:7
**time** 4:5,20 9:17
18:5,12 30:2,5,12
30:13 36:8 38:21
39:2 42:16 45:24
47:4 52:22 58:25
70:13,18 72:10,10
73:4,17,17 74:19
74:19 85:10 87:7
87:10 96:10
106:17,19 114:7
115:7 118:7
124:11,14 129:10
130:14 131:18
138:7 139:4,13,16
142:7 152:18
153:3 154:8,12
159:16 179:6,7,8
183:18 185:22
186:2,13 188:12
188:12 189:13,13
189:24 190:4,5,6
193:24 196:19,23
199:15 208:11
209:6 215:10,14
219:20 227:16
228:20,25 231:19
237:14 242:6,12
**times** 103:22
**timesheet** 194:4
**title** 7:9
**today** 3:21,24 6:9
6:13 10:12,17
23:7 25:11 30:7
58:23 59:7 76:2
97:4,9 124:3
130:13 152:21

159:3 211:13
227:7 231:14,18
232:17 235:24
236:11 237:2
**todd** 1:19 3:25
245:4,19
**told** 118:25 133:15
134:22 135:17
144:6 146:2,3
156:3 160:7
169:24 173:19
184:19 219:15
227:22
**tomorrow** 235:21
235:24 236:24
**tons** 92:13
**top** 153:21 159:16
169:17 174:7
**topic** 131:19
172:25
**topics** 12:25 15:6
89:3,16 99:8
130:25 131:24
132:6,10,15,19
171:8,22
**torvia** 161:9,13,21
162:8,17 163:15
163:24 164:3
166:22,22,25
214:9 219:5
**total** 39:22,23
59:24 60:4 65:20
111:19 118:18
136:12
**touch** 238:25
**traceable** 7:11,17
10:4,20 11:20
12:4,8 230:12
**track** 82:12
**train** 48:2 61:18

**transactions** 45:8
113:7,22,25 114:5
149:11 243:22
**transcript** 86:22
234:22 245:9
**transfer** 27:13
42:17 71:9 99:25
101:16 112:15
165:11 167:17,19
167:21,25 230:16
231:4 244:11
**transferred** 27:20
28:16 31:13 42:11
72:21,24 74:3
80:7,13,18 162:17
163:16,25 194:17
**transferring** 42:15
**transfers** 196:16
244:7
**translation** 121:8
127:9
**travel** 79:5
**treated** 102:23
**treating** 132:8
**trial** 56:23 96:10
110:23 170:2,11
196:23 212:21
216:13,23 219:19
**tricksy** 85:4
**tried** 117:8 182:10
196:16 230:22
**tries** 81:17
**trip** 136:10,12
**true** 245:9
**trust** 7:3 60:6
160:6,8 217:25
223:8,10,12
230:10
**trusts** 186:23
**truthfully** 6:9,13

**try** 9:10 37:9
58:15 76:14
100:21 101:5
106:9 117:3,15
169:7 184:22
190:11 208:10
220:18 222:15
224:12 228:23
236:4 241:8
**trying** 16:16 22:16
33:11 37:8 44:9
85:3 99:4 128:12
149:22 157:11
166:20 175:24
197:9 203:24
230:5
**turn** 3:7 15:15
47:13 51:13 55:7
56:10 65:15 70:24
82:24 161:16
**turned** 140:5
161:15 163:11
**turnpike** 2:10
**two** 12:24 15:6
17:8 20:8 30:11
39:3 44:16 45:17
45:25 52:23 58:19
70:15 99:12
102:21 112:20
113:13,16,21,23
113:25 114:3,25
122:2,16 132:5,10
134:23 136:7
137:20 140:8
141:19 145:6
156:5 179:24
184:6 189:20
225:14 237:21
**type** 46:21
**types** 60:13 63:20
181:22 188:17

194:6 201:10,12
**typical** 118:11

**u**

**u.s.** 3:18 96:2,4
118:5,11 157:6,7
158:10,14 172:16
173:6,6,11,13
217:7
**udapt** 14:12,15
29:23 30:15 36:19
36:24,25 215:4,5,9
215:13,16 216:19
228:4
**uh** 25:3 65:18 72:4
171:21 216:7
217:15,16
**ultimately** 22:18
**unable** 234:9
**unaffected** 146:23
**uncares** 157:5
**uncompensated**
119:22 151:13
**underlining** 53:3
**underneath** 157:4
**underpayment**
156:23
**undersigned**
127:21
**understand** 6:4
11:4 21:21 31:20
79:10 80:4 91:2
140:21 146:21
166:19 167:15
168:3,25 177:2
228:17 229:21
239:25
**understanding**
7:16 8:12 10:2,18
18:7 74:5 81:10
127:3 180:15
216:16

**understood**
228:11,18,20
229:4
**undertaken** 15:24
**undertaking** 15:19
**unduly** 47:3
**unilaterally**
140:19 141:17,22
**uninformed**
173:21
**unique** 175:15
**unit** 3:14
**united** 1:2 24:8
**universe** 45:7
110:10
**unpopular** 156:10
156:15,19
**unreimbursed**
195:9
**upper** 225:14
**urge** 102:24
205:10 207:17
**use** 46:2,8 49:20
52:14,18 82:8
148:19 188:9,11
188:14 189:9
199:19 214:14

**v**

**v** 3:17 4:23 209:4
246:3
**valid** 32:9,11,16
155:7
**validity** 171:18
172:3
**value** 147:7,11,17
147:21,22 191:22
192:2,24 224:24
225:3,6,13
**varied** 197:3
**varies** 62:12 177:4

**variety** 63:10,20
**various** 17:23 33:9
50:15 72:24
119:20 142:25
150:18 153:12
160:22 161:2
**vary** 180:18
**verify** 224:11
**veritext** 3:24 4:2
246:2
**version** 55:24
**versus** 158:18
159:16 214:9
**vested** 7:6
**video** 3:10,15
107:11
**videographer** 2:19
3:2,24 4:19 5:10
38:21,25 60:25
70:13,17 87:7,10
124:10,14 139:13
139:16 143:11
185:22 186:2
209:5 242:2,6
**videotaped** 1:15
**view** 8:23 10:24
11:9 20:13,16,18
22:5 23:11 40:5
49:3 76:18 116:15
117:22 128:14
133:5 139:25
156:25 161:13,17
162:14 167:2,8
177:3 183:20
195:14 204:4
**violated** 167:3,9
**violates** 20:19
**violation** 48:11
162:10
**violations** 156:10

**virtually** 232:9
  234:11
**vis** 228:10,10
**volume** 44:3,10,11
  44:14 45:2 47:16
**voluntarily** 132:2
  150:13

**w**

**wait** 188:24
**waivers** 32:2
**want** 20:16 26:3
  32:12 36:5,16
  50:20 55:19 58:12
  68:6 73:9 82:6,7
  92:18 99:8 102:6
  106:12 116:25
  122:13 124:23
  128:11 129:7
  133:6 139:19
  140:11,13 141:12
  143:8,18 148:19
  166:17,19 169:5
  170:2,11 177:20
  193:3,5 196:5
  202:5 208:8
  209:17 210:6,7
  211:17,21 220:17
  223:25 226:14,17
  226:21,22 230:24
  231:9,11 232:19
  233:8 239:22
**wanted** 90:8 99:10
  181:2 183:3,5
**wants** 101:13
  142:2
**warning** 106:15
**waste** 142:7
**wasted** 140:2
  141:7 143:15
  205:23

**wasting** 106:16,19
  131:17
**watching** 5:14,16
**way** 20:22 23:3
  42:22 74:17 76:2
  102:23 113:3
  116:13 125:18
  134:3 137:6 162:9
  185:7 198:8 208:7
  215:21,22 224:11
  226:18 227:15
  229:13 232:22
  245:13
**website** 52:11
  177:2 199:19,25
  200:3,8
**websites** 200:10
**week** 8:9
**weight** 44:14
**went** 53:7 111:2,7
  111:8 115:5 127:4
  142:19 197:23
  199:2
**west** 225:14
**whereof** 245:15
**whispering** 3:6
**wife** 108:15 109:4
**willful** 40:25
**willing** 128:20
  231:13,17 232:3
**winning** 172:11
**wire** 108:11
**wired** 108:4,9
**wishes** 90:11
**withdraw** 18:17
  33:25 43:2 76:22
  134:18,21
**withheld** 44:6
  49:18 231:24
  232:13

**withhold** 9:22
  134:18,21 137:17
  237:15 238:9
**withholding** 47:17
  48:18 49:9 137:12
  232:17 233:2
**witness** 4:21,24
  9:16 10:13 18:19
  23:15 26:23 28:19
  34:19,24 38:20
  61:6,10,14 82:11
  86:14,21 97:14
  127:7 182:25
  203:13 240:20
  243:3 245:7,10,15
  246:4
**wizard** 120:21
**won** 221:10
**woodsford** 161:14
**word** 46:16 74:8
  165:21 167:22
**words** 26:8 145:12
  148:4
**work** 36:25 37:2
  53:18,23 54:2
  63:8,10,15,20,21
  65:22 66:2 76:5
  77:22 81:16 97:16
  112:23 135:11
  151:12,18 195:18
  201:17 204:7
  208:6 220:14
**worked** 202:17
**working** 62:4
  66:11 104:2
  112:19 115:16
  138:16 193:24
  199:15 229:7
**works** 54:3,6,7
  107:7

**world** 7:13 163:19
**worry** 61:5 101:10
**worth** 111:20
  191:24 225:17
**worthless** 223:3
  224:21
**write** 91:8 157:11
  197:18 223:25
**writes** 158:18
**writing** 79:12,13
  79:22 157:10
**written** 33:14
  61:22,23 68:18
  79:6 94:10,19
  181:12,17
**wrong** 16:3 155:8
**wrote** 156:9
  171:16 205:3

**x**

**x** 1:5,12 147:3,20
  243:2,6 244:2

**y**

**yanza** 121:21
  127:20
**yeah** 46:17 54:5
  55:21 60:5 84:19
  97:3 138:14
  145:22 151:16,17
  157:25 160:5
  172:18 178:19
  179:3 184:24
  185:11 191:11,21
  192:12 193:17,23
  198:22 203:13
  206:20 209:15
  212:5,13 216:15
  217:21 220:18
  224:5 233:3
  235:10 236:9
  237:23

**year**   21:21 22:3,23
  68:15 69:7 188:24
  190:2,2
**years**   17:8 18:11
  30:12 54:21,22
  56:22 58:18,19
  59:14 60:22 65:21
  66:22 67:3 74:18
  110:19 114:18
  118:10 119:19
  138:17,19 153:23
  163:3 190:11,14
  195:9 215:25
**york**   1:3,18,19,21
  2:4,4 3:19,22,22
  54:17,18 59:5,8,8
  168:6 184:16,21
  225:4 245:5 246:2
**yup**   169:20

**z**

**z**   4:23 209:4
**zero**   104:5 201:9
**zoe**   144:14

**à**

**à**   228:10

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 3

I6SJCHE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,

          v.                         11 Civ. 691 LAK JCF

STEVEN DONZIGER, et al.,

                    Defendants.

------------------------------x

                                    June 28, 2018
                                    9:30 a.m.


Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge

                         APPEARANCES

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for plaintiff
BY:  RANDY M. MASTRO, Esq.
     HERBERT J. STERN, Esq.
     JOEL SILVERSTEIN, Esq.
     ANDREA NEUMAN, Esq.
     ANNE MARIE CHAMPION, Esq.
     ALEJANDRO HERRERA, Esq.
     JEFFERSON BELL, Esq.


STEVEN ROBERT DONZIGER,
     Appearing pro se


Also Present:
     ANDREW R. ROMERO-DELMASTRO, Supv. Counsel Chevron

1          (In open court)

2          (Case called)

3          THE COURT:  Let's proceed.  Mr. Mastro, your first

4    witness.

5          MR. MASTRO:  Thank your Honor.  My co-counsel, Herb

6    Stern, is putting on the first witness.

7          THE COURT:  Mr. Stern.

8          MR. STERN:  Yes.  We call Lee Grinberg, please.

9          May it please your Honor, we have our exhibits, and I

10   have provided an extra 3 A to you because I'm going to be going

11   backed and forth and it will be easier for you if you have an

12   extra copy.

13         THE COURT:  Okay.  Thank you.

14         MR. STERN:  Mr. Donziger and I have conferred, and he

15   has no objection to the admissibility of these exhibits.

16         Am I correct?

17         MR. DONZIGER:  That's correct.

18         THE COURT:  So the exhibits are --

19         MR. STERN:  We offer them.

20         THE COURT:  GR 1 through 7, including in some cases

21   lettered subparts.  Am I right?

22         MR. STERN:  Thank you.

23         THE COURT:  They're received.

24         (Plaintiffs' Exhibits GR 1 through 7 received in

25   evidence)

I6SJCHE1

1    LEE GRINBERG,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. STERN:

6    Q.  What is your name, sir?

7    A.  Lee Grinberg.

8    Q.  You're going to have to use help there.

9              Where are you employed, Mr. Grinberg?

10   A.  Elliott Management Corporation.

11   Q.  In what capacity are you employed?

12   A.  My title is portfolio manager.

13   Q.  Before getting into that, I'd like to introduce you a

14   little better to the court.  Would you give us an idea of your

15   educational background.  Are you a college graduate?

16   A.  Yes.

17   Q.  Where did you go to school?

18   A.  College, Dartmouth College.

19   Q.  Thereafter, did you take some professional training?

20   A.  Yes.

21   Q.  Where was that?

22   A.  Morgan Stanley and a company called iExchange.

23   Q.  Let me sharpen that a little bit.  Did you go to some

24   schools after college?

25   A.  Yes, University of Pennsylvania.

1   Q.   At Pennsylvania, University of Pennsylvania, what degrees

2   did you take?

3   A.   An MBA and a JD.

4   Q.   So you are a lawyer.  Is that correct?

5   A.   Correct.

6   Q.   Now, did there come a time when you went to work for

7   Elliott Management?

8   A.   Yes.

9   Q.   How long ago was that?

10  A.   2007.

11  Q.   So that is about 11 years?

12  A.   Correct.

13  Q.   What do you do there?

14  A.   I am a portfolio manager.  We invest capital for our

15  limited partners and general partner.

16  Q.   Now, there did come a time, did there not, when you had a

17  meeting with Mr. Donziger and with Ms. Katie Sullivan.  Is that

18  right?

19  A.   Yes.

20  Q.   I am going to ask you some questions about the events that

21  led up to that meeting.  Do you understand?

22  A.   Yes.

23  Q.   First of all, I would like you to turn, if you will, to

24  what has been marked Exhibit 4 which is now in evidence.

25  A.   I don't have any copies of any documents.

1   Q.  Forgive me.  I thought I had given --

2             THE COURT:  Maybe you handed me his copy.

3             MR. STERN:  May I approach him, your Honor?

4             THE COURT:  Yes.

5             (Pause)

6   BY MR. STERN:

7   Q.  Would you kindly turn to Exhibit 4.

8   A.  Yes.

9   Q.  All right.  Now, you are not copied on this exhibit.  Am I

10  correct?

11  A.  Correct.

12  Q.  And the date of that exhibit, would you kindly read it into

13  the record.

14            THE COURT:  Well, it is an e-mail chain.

15            THE WITNESS:  The e-mail chain is October 16th.

16  BY MR. STERN:

17  Q.  You'll note that according to Exhibit 4 in evidence, there

18  is a discussion between Mr. Donziger, on the one hand, and

19  Katie Sullivan, on the other, about attempting to get a meeting

20  with Elliott Management.  Do you see that?

21  A.  Yes.

22  Q.  Am I correct that there is a reference to a man by the name

23  of Paul Singer, do you see that, by Mr. Donziger, saying we

24  need to get to Paul Singer?

25  A.  Yes.

1    Q.   Who heads Elliott Management?

2    A.   Yes, I see that.

3    Q.   Do you know Paul Singer?

4    A.   Yes,.

5    Q.   Does he, in fact, head of Elliott Management?

6    A.   Yes.

7    Q.   Do you see a reference in Ms. Sullivan's e-mail to Led

8    Zeppelin right on the top of the page?

9    A.   I was just looking through all of the e-mails.

10   Q.   Take your time.  I don't mean to rush you.

11   A.   In the latest e-mail, 602, there is a reference to Led

12   Zeppelin.

13   Q.   Is Paul Singer, in fact, a fan of Led Zeppelin?

14   A.   I believe so.

15   Q.   Do you know that of your own knowledge, right?

16   A.   Yeah, I believe so, yes.

17   Q.   Now, you note in there that there is a reference to the

18   suggestion that in the approach to Elliott Management, it might

19   be attractive for them to make an investment, and at the same

20   time, short the Chevron stock.  Do you see that?

21   A.   Yes.

22   Q.   We'll come back to that when we turn to November the 6th,

23   but I'd like now to direct your attention to Exhibit 6 in

24   evidence.  That is an e-mail three days later, am I correct,

25   October 19th?

1      THE COURT:  It doesn't appear to be.

2      THE WITNESS:  Yeah, there is no --

3  BY MR. STERN:

4  Q.  Thursday, October 19th, 2017?

5      MR. STERN:  Do I have the wrong exhibit number?

6  Pardon me.  I have my reading glasses on and I didn't read

7  right.  Exhibit 5, your Honor, you're quite correct.

8      THE WITNESS:  I see that exhibit now.

9  BY MR. STERN:

10  Q.  And again, which we'll come to, there is a reference again

11  to the shorting of Chevron stock.  Do you see that?

12  A.  Yes.

13  Q.  And finally, there is a reference to the NDA.  Indeed, it

14  is in the heading, "Here's the NDA."  Am I correct?

15  A.  Yes, that is the title of the e-mail or subject of the

16  e-mail.

17  Q.  All right.  There did come a time when you were, in fact,

18  presented by Ms. Sullivan with an NDA.  Am I right?

19  A.  Yes.

20  Q.  So, now let us go back to the earlier exhibits.

21      There came a time, did there not, when a meeting was,

22  in fact, arranged between representatives of Elliott and Ms.

23  Katie Sullivan and Mr. Donziger.  Am I right?

24  A.  Yes.

25  Q.  Will you tell the court how that meeting came about.

1  A.  Katie Sullivan reached out to Jesse Cohen at Elliott, who

2  then reached out to me.  Katie introduced the idea of a meeting

3  with her to discuss, I don't remember the exact term, but it is

4  the judgment that had been obtained in Ecuadorian courts

5  related to the Chevron dispute.

6  Q.  Did they use an intermediary to arrange for the meeting?

7  A.  She used I believe a relationship that she had with

8  Jonathan Bush, who was then CEO of Athena Health, who knew

9  Jesse.

10  Q.  Since you mentioned Mr. Jesse Cohen, would you enlighten

11  us, tell us who he is in terms of Elliott Management.

12  A.  I believe his title is senior portfolio manager.

13  Q.  Was it he who selected you to attend the meeting?

14  A.  Yes.

15  Q.  Do you know why he selected you to attend the meeting?

16  A.  I believe because I had been involved in disputes that he

17  thought -- not disputes, but investments that had some touch

18  points with what Katie was suggesting the discussion would be

19  about.

20  Q.  What sort of investments were those?

21  A.  We had an investment in Argentine bonds that involved a

22  long and complicated workout.

23  Q.  Now, did you understand even before the actual meeting what

24  the purpose of the meeting was?

25  A.  Generally speaking, yes.

1    Q.  What was your general understanding at that time?

2    A.  It is that in some fashion the plaintiffs would be seeking

3    some assistance in collection.

4    Q.  By the "plaintiffs," I gather, you're referring to the

5    plaintiffs in the case in Ecuador, correct?

6    A.  Correct.

7    Q.  And that they had a judgment in Ecuador that they sought to

8    collect on?

9    A.  Correct.

10   Q.  Did you understand that they would be seeking financial

11   investment from your firm?

12   A.  I assumed that they would want some form of assistance and

13   that might come in the form of capital.

14   Q.  Let me assist you.

15       Did there come a time, and take a look at exhibit -- I

16   will get it right this time -- Exhibit 2 --

17   A.  Okay.

18   Q.  -- which is in evidence.  Did you receive that from Katie

19   Sullivan?

20   A.  Yes.

21   Q.  With that, was there an attachment?  Let me help you.  In

22   particular, an NDA?

23   A.  There may have been.  I don't see a reference to it in the

24   email.

25   Q.  If you turn the page, it is still part of the same exhibit.

1    Do you have the NDA?  No?

2    A.  No.  This is an email chain from November 3rd, and I don't

3    recall there being an NDA sent to us.

4          THE COURT:  Are you looking at Exhibit 2?

5          MR. STERN:  I don't think you are.

6          THE WITNESS:  Sorry.

7          MR. STERN:  I did the same thing.

8          THE WITNESS:  I am sorry.  I apologize.  I was looking

9    at Exhibit 1.

10          MR. STERN:  I understand.  Thank you, your Honor.

11   BY MR. STERN:

12   Q.  Let's go back to the email.  Do you see --

13   A.  Yes, I see that now, yes.

14   Q.  She tells you that you're going get the NDA along with this

15   email and she wants to sign it so Mr. Donziger can speak

16   freely, right?  Those are the very words she uses, right?

17   A.  Yes.

18   Q.  There is an NDA attached, is there not?

19   A.  Correct.

20   Q.  The NDA tells you what the purpose of the meeting is,

21   correct?  Look at the whereas clause.

22   A.  Correct.

23   Q.  "Whereas, the above-named parties wish to engage in

24   discussions concerning a possible financing of a judgment

25   collection."  Am I correct?

1   A.  Correct.

2   Q.  So did you know going into the meeting what the subject was

3   and what they were looking for from Elliott not in detail, but

4   in general, I mean?

5   A.  No.  I hadn't read the NDA before the meeting because we

6   were not going to sign an NDA so close in advance to a meeting.

7           We have internal procedures.  We have to run these

8   things by counsel, internal counsel and so forth, so it was

9   going to be a non-starter for us to be able to sign something

10  like that.  I actually hadn't read any part of this

11  nondisclosure agreement prior to the meeting later that day.

12  Q.  I think you've already testified you understood they were

13  going to be looking for a capital investment.  Is that correct?

14  A.  That was one of the possibilities, yes, that they would be

15  seeking.

16  Q.  Okay.  Now, in fact, did such a meeting take place?

17  A.  Yes.

18  Q.  When did it take place?

19  A.  On November 6th.

20  Q.  Who was present at the meeting?

21  A.  Myself, Jesse Cohen, Mr. Donziger and Katie Sullivan.

22  Q.  Do you see Mr. Donziger in the court?

23  A.  Yes.

24  Q.  There is no question about that, right?

25  A.  Correct.

1    Q.  All right.  Now, during the meeting did you take notes?

2    A.  Yes.

3    Q.  If you recall, did you see Katie Sullivan taking notes?

4    A.  Yes.

5    Q.  So you took notes and Katie Sullivan took notes, and I'm

6    going to be asking you some questions about what occurred at

7    the meeting.  Your notes have been marked, if I get this right,

8    Exhibit 3, and Katie Sullivan's notes have been marked Exhibit

9    3 A.

10         MR. STERN:  Your Honor, for your convenience, I have

11   kind of given you an extra copy of Katie Sullivan's notes so as

12   we go back-and-forth, you won't have to flip as we will.

13         THE COURT:  Thank you.

14   BY MR. STERN:

15   Q.  Now, I see in your notes pretty close to the beginning --

16   first of all, you have designated it as the Donziger

17   conversation.  Am I correct?

18   A.  Correct.

19   Q.  That is what it was, right?

20   A.  (No response)

21   Q.  Now, there is a reference to 33 million third party funders

22   individuals.  Do you see that?

23   A.  Yes.

24   Q.  What is that in reference to?

25   A.  Capital that has been raised by third parties to facilitate

1    enforcement of the judgment.

2    Q.   Who told you that?

3    A.   Mr. Donziger.

4    Q.   Now, you'll note further down on the page -- indeed, at the

5    very end of the page -- there is a further reference to that

6    subject.  Am I correct?

7    A.   Correct.

8    Q.   Now, the fact that there is that separation would indicate,

9    would it not, that that subject was reverted to later in the

10   conversation in the initial presentation.  Am you I right?

11   A.   Correct.

12   Q.   These are your notes, right?

13   A.   Correct.

14   Q.   Well, we'll come to that.

15             Now, during the course of the meeting, was there any

16   discussion about the fact that it might be difficult to enforce

17   or collect on the judgment because of outstanding court

18   process?

19   A.   Yes.

20   Q.   Now, to the extent it may be helpful to you, I would like

21   you to direct your attention to Exhibit 3 A in evidence, which

22   is Ms. Sullivan's notes, and to two specific entries.  On the

23   first page is a notation, "injunction in the U.S."  Do you see

24   that?

25   A.   Yes.

1    Q.  And then on the second page, and I don't know how this is

2    set up, it may be front and back, there is a notation Rule 65.

3    Would you read that notation.

4    A.  "Rule 65 participating, violation in some court order."

5    Q.  Now, during the course of that meeting, did you come to

6    understand that there had been some difficulty in connection

7    with the collection of the judgment in respect to its legality

8    in terms of United States law?

9    A.  Correct.

10            THE COURT:  What was said on that subject?

11            THE WITNESS:  Just --

12            THE COURT:  And by whom?

13            THE WITNESS:  -- there would be an inability to

14   collect on any Chevron assets in the United States.

15   BY MR. STERN:

16   Q.  Now, in that regard I would like to revert back to Exhibit

17   3, which are your notes, and in particular, although it is cut

18   off, but I think still legible, in the lower-left-hand corner,

19   do you see the entry there, and I wonder if you would be good

20   enough, since it is your handwriting, to read it into the

21   record, although it is already in the record because it is in

22   evidence.

23   A.  It says, "Can money come into U.S."

24   Q.  Is there a relationship between what you just testified to

25   about the difficulty or the legality of the enforcement and

1    your entry there about the money coming into the United States?

2    A.  I don't recall exactly what relation that had to the

3    discussion.

4    Q.  Let's put it this way.  You're quite familiar with the

5    exchange of money between countries and entities in different

6    countries.  Is that correct?

7    A.  Not terribly familiar, but --

8    Q.  You have enforced judgments in various places in the world,

9    have you not?

10   A.  We tried, yes.

11   Q.  Sometimes with success, true?

12   A.  (No response)

13   Q.  In other words, do you know of any difficulty other than

14   the fact that there is a Rule 65 injunction in terms of money

15   coming into the country?

16   A.  Money can get tied up in foreign jurisdictions for all

17   kinds of reasons.  I don't know that an injunction may be one

18   reason, but there is often --

19   Q.  There is no question in your mind that the subject of the

20   injunction, Rule 65 and legal difficulties attendant thereto,

21   was part of the conversation.  Am I correct?

22   A.  There was no -- I don't recall a discussion specifically

23   about the injunction.  There was discussion about an inability

24   to use the Ecuadorian judgment to be I guess domesticated in

25   some form or some way in enforcing in the United States, but I

1    don't recall the term, "injunction" coming up.

2    Q.  Well, that term is now in evidence.  Her notes are in

3    evidence.  You don't say that it didn't come up, do you?

4                MR. DONZIGER:  Objection.  Your Honor --

5                THE COURT:  Overruled.

6                MR. DONZIGER:  Can I state the basis?

7                THE COURT:  State the basis.

8                MR. DONZIGER:  I think Judge Stern is asking the

9    witness to interpret notes made by somebody else, and I think

10   it might be the better way to do it would be maybe ask directly

11   the witness what he remembers about the meeting since it is

12   complicated, looking at Katie Sullivan's notes and asking him

13   to interpret it.

14               THE COURT:  You can do it both ways.  Answer the

15   question.  Mr. Stern, maybe you should ask him what was said.

16               THE WITNESS:  Would you mind repeating.

17   BY MR. STERN:

18   Q.  I think my question was are you in a position to deny that

19   there was a discussion of an injunction?

20   A.  I don't recall the word, "injunction" coming up in the

21   context of the discussion, but it was clear that there was an

22   inability to collect against Chevron assets locally,

23   domestically in the U.S.  That was clear from the discussion.

24   Q.  All right.  Now, did there come a time during the

25   discussion that there was the subject of risk and reward came

1  up?

2  A.  I don't remember using those terms specifically.

3          THE COURT:  Do you remember anyone else using either

4  of those terms?

5          THE WITNESS:  I don't.

6  BY MR. STERN:

7  Q.  Well, let's turn for a moment to Exhibit 3 A do you see the

8  entry GC at Chevron owns the entire strategy?  Do you see that?

9  A.  Yes.

10  Q.  Let us now for the moment turn to your notes, which are

11  Exhibit 3.  Do you see the entry which reads, as best I can

12  read it, "turnover in leadership.  John Watson start 2010."

13          Do you see that?

14  A.  Yes.

15  Q.  Do you know who John Watson is or was?

16  A.  I believe he was the CEO, senior management, CEO of --

17  Q.  Of who?

18  A.  I am sorry.  Of Chevron.

19  Q.  Yes.  Would you favor us by reading the next entry

20  underneath.

21  A.  It says, "Leaving February 1st of 2018," and then a

22  separate bullet point that says, "mismanaged this case."

23  Q.  Was that related to the entry on Ms. Sullivan's notes, "GC

24  at Chevron owns the entire strategy," and so forth.

25          Do you see that?  Do any of those entries stimulate a

1  recollection on your part about what was being said between you

2  and Mr. Donziger and Ms. Sullivan on that subject?

3  A.  I do not recall the relationship between Watson leaving and

4  the GC at Chevron, but I just remember the general context of

5  the discussion being about there being a potential incentive of

6  some way, in some way for Chevron to get past this and to

7  settle the dispute.

8  Q.  Basically if I understand what you're saying, do you

9  understand that there was a change in management and that now

10  the general counsel owned the ability to settle the case?

11  A.  Yeah.  I don't recall it being necessarily now exclusively

12  in the hands of the general counsel, but I do remember the,

13  like I said, the context being that the CEO who had been in

14  place until -- was still in place at that point, but was

15  leaving, you know, the perception Mr. Donziger was given people

16  believed he mismanaged this case and there would be an

17  incentive for the company to settle.

18         I don't recall that the GC being the one who now owns

19  this, and if a CEO at one point owned it, I assume the next CEO

20  would quote-unquote own it as well.

21  Q.  I am confining my questions to what was said.  The topics I

22  am referring to are the topics that are in your notes and her

23  notes.  I will ask you directly.

24         Did you come to understand that there was a window of

25  opportunity arising because of the change of management which

1  might make it easier to settle the case?

2  A.  I didn't necessarily see it as a window of opportunity.  It

3  was just expressed to me that because former management,

4  because management was turning over, that there may be an

5  incentive for the company to settle.  That was just kind of

6  expressed to me.  It wasn't my impression.  I don't know

7  little, if anything, about Chevron's leadership.

8         THE COURT:  Mr. Grinberg, maybe we can move this

9  along.  You understood going in that the purpose of the meeting

10  was because Mr. Donziger and Ms. Sullivan wanted Elliott to put

11  money into or otherwise assist them in their efforts.  Is that

12  true?

13         THE WITNESS:  Correct.

14         THE COURT:  Now, did Mr. Donziger explain to you at

15  that meeting why he thought it was to the advantage of Elliott

16  to do so?

17         THE WITNESS:  Because there would ultimately be

18  recoveries based on enforcing the Ecuadorian judgment that

19  would yield effectively profits on whatever assistance was

20  provided.

21         THE COURT:  Did he say anything to you about why he

22  thought that might be so?

23         THE WITNESS:  Well, because there is pending

24  litigation in jurisdictions outside the U.S. and there may be

25  an incentive because of this leadership change for the company

1   to settle.

2           THE COURT:  What did he say about those litigations,

3   if anything?

4           THE WITNESS:  Just mentioned there was litigation in

5   Canada.

6           THE COURT:  Was anything said by Mr. Donziger to you

7   on what might be in this for Elliott if you invested or

8   otherwise assisted?

9           THE WITNESS:  It would be some financial return based

10  on the proceeds of whatever recoveries they could get by

11  enforcing the judgment against Chevron.

12          THE COURT:  Go ahead, Mr. Stern.

13  BY MR. STERN:

14  Q.  As a matter of fact, there was a discussion of the amount

15  of the judgment; am I correct?  Take a look at your notes,

16  Exhibit 3.

17  A.  Yes.

18  Q.  What did he tell you the amount of the judgment was?

19  A.  It was about nine and a half billion.

20  Q.  In subsequent communications, which I may come to or not

21  that is in evidence, Katie Sullivan referred, did she not, to

22  an interest factor in that, too, didn't she?

23  A.  I don't recall her referring to an interest factor, but I

24  assumed there is some.

25  Q.  Okay.  Now, in regard to the request for money from

1    Elliott, was a presentation made to you about the present

2    ownership interest in the judgment?

3    A.  Yes.

4    Q.  So there are two entries, one on your notes and one --

5             THE COURT:  Excuse me, Mr. Stern.  What was said on

6    that subject and by whom?

7             THE WITNESS:  What was said was there was just a kind

8    of a brief summary of the amount of points, as it were, in

9    terms of who or what portion of recoveries different parties

10   would receive to the extent there was successful enforcement

11   proceedings.

12            For instance, in my notes it says Mr. Donziger

13   personally had 6.3 percent out of 100 percent and that there

14   had already been allocated 15 to 20 percent amongst 15 people.

15   BY MR. STERN:

16   Q.  Just for the record, unless you don't want me to do it, do

17   you notice on Page 2 of Ms. Sullivan's notes the same notations

18   appear.  Am I correct?

19   A.  Yes, correct.

20   Q.  All right.  Now, let me put it to you this way.

21            Did you understand that Mr. Donziger was attempting to

22   monetize the judgment by obtaining money from Elliott?

23            MR. DONZIGER:  Objection; calls for a legal

24   conclusion.

25            THE COURT:  Overruled.

1         THE WITNESS: I didn't take it -- when you say

2 "monetize the judgment," to me that means that he would use

3 those proceeds and actually give them to judgment-holders, but

4 my understanding would be that if there were any proceeds, it

5 would be used in an enforcement, not to monetize or to pay

6 existing plaintiffs.

7 BY MR. STERN:

8 Q. Let me be very clear about the word monetize.

9         Do you understand he was asking you to purchase part

10 of the judgment?

11 A. Correct.

12 Q. I am correct, am I not?

13 A. Correct.

14 Q. What he was going to do with the money is not what I am

15 asking you. What I am asking you is, he is selling a part, an

16 interest in the judgment to you, correct, or trying to?

17 A. Trying to, correct.

18 Q. Ultimately you and the management of Elliott concluded that

19 you were not interested. Am I right?

20 A. Correct.

21 Q. I am just going to let the following exhibits speak for

22 themselves because there is a little point, you advised them in

23 a final email that there was no interest in pursuing the

24 conversation. Am I right?

25 A. Correct.

1          MR. STERN:  I pass the witness, your Honor.

2          THE COURT:  All right.  Mr. Donziger.

3          MR. DONZIGER:  Your Honor, can I have five minutes to

4    gather my thoughts and figure out if I am going to cross?  I am

5    not sure I am.

6          THE COURT:  Five minutes.

7          (Recess)

8          THE COURT:  Mr. Donziger.

9          MR. DONZIGER:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. DONZIGER:

12   Q.  Good morning, Mr. Grinberg.

13        You prepared an affidavit in this case, correct?

14   A.  Correct.

15   Q.  Did you review that affidavit prior to testifying today?

16   A.  Yesterday, I believe, yes.

17   Q.  Is that affidavit, as you sit here today, accurate?

18   A.  Definitely.

19   Q.  Did you write that affidavit yourself, or did someone

20   assist you?

21   A.  I had some assistance.  I don't recall -- I did have some

22   assistance.

23   Q.  From who?

24   A.  I believe it was Judge Stern and his firm, whatever firm

25   they're affiliated with, after interviewing me.

1    Q.  How was it that you came in contact with Judge Stern or a

2    representative of his firm such that you prepared an affidavit?

3    A.  I don't recall exactly.  I believe somebody reached out to

4    somebody at our firm, asking if there was potential -- if there

5    had been some meeting between yourself and representatives of

6    Elliott.

7    Q.  Do you know who that was?

8    A.  I don't know who reached out to the firm.  I don't recall.

9    Q.  Now, it is not the normal practice of Elliott to provide

10   affidavits about meetings it has with potential investment

11   opportunities.  Is that correct?

12   A.  That's correct.

13   Q.  Can you explain why in this case Elliott or whoever made --

14   well, let me withdraw that question.

15           Why in this case did Elliott, as an institution,

16   decide to provide an affidavit about a meeting?

17           MR. STERN:  Objection, your Honor.

18           THE COURT:  Overruled.  If you know?

19           THE WITNESS:  The only reason I recall is that

20   otherwise we would be subpoenaed, so offering a declaration was

21   basically the alternative.

22   BY MR. DONZIGER:

23   Q.  Was that communicated to you by someone within Elliott or

24   someone outside of Elliott?

25   A.  I don't recall.

1    Q.  Do you know how Judge Stern or someone in his law firm came

2    to contact Elliott about getting an affidavit?

3    A.  I do not.

4    Q.  When you prepared the affidavit, was there first a draft or

5    multiple drafts prior to finalizing the affidavit?

6    A.  There were drafts, but my recollection is maybe one or two

7    at best, not many.

8    Q.  Who prepared the drafts?  Do you remember at least one

9    draft, correct?

10   A.  Correct.

11   Q.  Who prepared that draft?

12   A.  It was Judge Stern's firm or -- that was my understanding.

13   Whoever had interviewed me based on that interview prepared

14   that for my review.

15   Q.  Whoever that person is, they sent it to you for your

16   review?

17   A.  Correct.

18   Q.  In that first draft, was it completely accurate or did you

19   suggest changes?

20   A.  I don't recall.  My recollection is that it was generally

21   accurate.  There may have needed to be a couple of things

22   changed, but that is my recollection.

23                (Continued on next page)

24

25

 1   Q.  Now, just turning to the substance of the meeting that

 2   Katie Sullivan and myself had with you and Jesse Cohen, you

 3   don't have any recollection of me offering to sell my

 4   particular interests as an investment opportunity for Elliott,

 5   do you?

 6   A.  No, you did not.

 7   Q.  Did you have any contact with any lawyers from the Gibson

 8   Dunn firm in the preparation of your affidavit?

 9   A.  No.

10   Q.  Do you remember the exact or approximate date that Judge

11   Stern's law firm or the representative from the law firm

12   contacted you about the possibility of signing an affidavit?

13   A.  It was probably a couple of weeks before the affidavit was

14   finalized, about that time frame.

15   Q.  So you sent an e-mail to Katie Sullivan, I believe, on

16   January 19th indicating that Elliott would not be interested in

17   the Ecuador case as an investment, correct?

18   A.  Correct.

19   Q.  Were you contacted by Judge Stern's representative prior to

20   sending that e-mail or after, to the best of your recollection?

21   A.  It was after.

22   Q.  And you mentioned that you had been interviewed by someone

23   from Judge Stern's firm.  Was it Judge Stern himself or

24   somebody else?

25   A.  I believe it was Judge Stern, one of his colleagues.

1    Q.  Where did that interview take place?

2    A.  At Elliott Management.

3    Q.  Do you remember the date of that interview?

4    A.  I don't.  It was probably within a couple of weeks of the

5    completion of the declaration.

6    Q.  As a general matter, Elliott -- it's not unusual for

7    Elliott to be interested in third-party litigation financing

8    opportunities, correct?

9    A.  It wouldn't be, no.  It would be something we would look

10   into as a potential investment.

11   Q.  And you, Elliott, has had successful workouts, for lack of

12   a better term, of prior third-party litigation finance

13   investments it's engaged in, correct?

14   A.  I'm just thinking third-party finance litigation --

15   Q.  Let me rephrase.  It might be easier.

16        Elliott has had successful results in litigation

17   investments Elliott itself has made in the past, correct?

18   A.  Yes.  Well, investments we have had have sometimes involved

19   litigation, in terms of enforcing whatever our claims are, so,

20   yes, in that context, correct.

21   Q.  And the idea of a third party financing a litigation as an

22   investment is, at least within Elliott Capital, considered a

23   legitimate investment, correct?

24   A.  Correct.

25   Q.  And the reason -- well, the reason that Elliott took the

1    meeting, if you know, with Katie Sullivan and myself was to at

2    least consider whatever pitch we were to make about the third

3    party -- excuse me -- about a litigation investment opportunity

4    in the Ecuador case, correct?

5    A.   Yes.  I would say that, in many respects, it was a favor

6    for the person who had contacted us through Kate, but to some

7    extent it was to hear the story, you know, without much

8    additional context.

9              THE COURT:  We're wandering off the subject of this

10   hearing, Mr. Donziger.  Let's get back to it.

11             MR. DONZIGER:  I will let the witness go.  I have no

12   further questions.

13             THE COURT:  All right.  I have one or two,

14   Mr. Grinberg.

15             Was there any discussion in the meeting, at all, by

16   anyone, about how an investment by Elliott, if it elected to

17   make one, would have been structured?

18             THE WITNESS:  No, only to the extent that, you know,

19   there could be a percentage involved.  But no structuring

20   beyond that.

21             THE COURT:  A percentage of what exactly?

22             THE WITNESS:  Of whatever -- a percentage of the

23   proceeds that would be generated by a successful enforcement

24   against Chevron.

25             THE COURT:  Or settlement.

1          THE WITNESS:  Or settlement, correct.

2          THE COURT:  A percentage of what proceeds

3    specifically?  If that came up.  The gross?  The net?

4    Somewhere in between?

5          THE WITNESS:  Nothing.  There was no discussion beyond

6    the idea that -- just the concept there that there was capacity

7    under, you know, the distribution that may be available to

8    Elliott.  That's it.

9          THE COURT:  At that meeting, were any documents shown

10   to you by Mr. Donziger or Ms. Sullivan?

11         THE WITNESS:  No.  There was -- well, there was a

12   booklet, a marketing document, it seemed, about the case itself

13   that featured, you know, local Ecuadorians who had been dealing

14   with the fallout of whatever environmental problems had

15   surfaced.

16         THE COURT:  Was it given to you?

17         THE WITNESS:  Yes.

18         THE COURT:  Do you have it?

19         THE WITNESS:  I do not.  I believe we handed it over

20   to Judge Stern.

21         THE COURT:  Other than the e-mails that we've seen

22   here this morning, were there any other writings that came to

23   you from Mr. Donziger or Ms. Sullivan or any associates?

24         THE WITNESS:  No.

25         THE COURT:  Do counsel on either side wish to ask any

1    questions in light of my examination?

2              Judge Stern?

3              JUDGE STERN:  Just one.

4    REDIRECT EXAMINATION

5    BY JUDGE STERN:

6    Q.  In the subsequent e-mail, which is in evidence,

7    Mr. Donziger offered to send you a brochure which he -- and I'm

8    just paraphrasing -- characterized as a pamphlet or brochure

9    that he had prepared for investors.  Do you recall that?

10   A.  I don't recall.  I'd have to look back at the exhibits

11   if --

12             JUDGE STERN:  Yes.  It's in evidence.

13             THE COURT:  Judge Stern, if it's in the exhibit, it's

14   in the exhibit.

15             JUDGE STERN:  I agree, your Honor.  I just thought you

16   were interested, so I --

17   Q.  And in fact you declined to receive it because you said you

18   were not interested; am I correct?  Do you remember that?

19             I think the Judge would like us to move on.

20             JUDGE STERN:  I'll withdraw the question.  It's in

21   evidence.  You're right, your Honor.  Thank you.

22             THE COURT:  Thank you.

23             Mr. Donziger, anything further?

24             MR. DONZIGER:  No.  I'm done.

25             THE COURT:  All right.  Mr. Grinberg, you're excused.

1          (Witness excused)

2               THE COURT:  Next witness.

3               MR. MASTRO:  Your Honor, plaintiff calls Mr. Donziger.

4     STEVEN DONZIGER,

5          the defendant herein,

6          having been duly sworn, testified as follows:

7               THE COURT:  Mr. Donziger, since you're representing

8     yourself, let's set this ground rule.  If you have an objection

9     to a question, you will say the word "objection" and nothing

10    more.  If I see any need to have an elaboration, I'll ask you

11    for it.  OK?

12              THE WITNESS:  OK.

13              THE COURT:  Sir?

14              THE WITNESS:  Yes.

15              THE COURT:  All right.  Go ahead, Mr. Mastro.

16              MR. MASTRO:  Thank you, your Honor.

17              Before we start, I just wanted to hand up to the

18    witness and to the Court a binder of the exhibits we may offer

19    during the examination, as well as a copy of Mr. Donziger's

20    deposition of this past Monday and a copy of the transcript of

21    the contempt hearing on May 8, 2018.  I'm also going to leave

22    in front of Mr. Donziger the Grinberg exhibits.

23              THE WITNESS:  Your Honor, I'm sorry to interrupt.  I

24    have kind of a logistical question, could I ask you.

25              THE COURT:  Go ahead.

1          THE WITNESS:  So after Mr. Mastro finishes with his

2     examination, and I want to -- I get to do what would be --

3          THE COURT:  Redirect.

4          THE WITNESS:   -- a redirect, what is the way I would

5     do that?

6          THE COURT:  Q and A?

7          THE WITNESS:  Like I would ask the Q --

8          THE COURT:  You would ask the Q.  That gives him an

9     opportunity to object if he is so minded.  If there's no

10    objection or I overrule it, he'll answer your question.

11         THE WITNESS:  One other quick question.  Do you mind

12    if I keep a legal pad here with notes, because I need to -- as

13    like the lawyer with a witness.

14         THE COURT:  Sure.

15         THE WITNESS:  I'm just going to go get it.

16         THE COURT:  OK.

17         OK, Mr. Mastro, you may proceed.

18         MR. MASTRO:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. MASTRO:

21    Q.  Mr. Donziger, you just heard Mr. Greenberg's testimony --

22         THE COURT:  Isn't the gentleman's name Grinberg, or

23    did I get it wrong?

24         MR. MASTRO:  "Grin."  Thank you.

25    Q.  Mr. Donziger, you just heard Mr. Grinberg's testimony of

1   what he recalls and understood happened at the November 6, 2017

2   meeting that you and Ms. Sullivan had with him and one of his

3   colleagues.

4   A.  Yes.

5   Q.  So is there anything about Mr. Grinberg's testimony about

6   what he recalled and understood happened at that meeting with

7   which you disagree?  Yes or no.

8   A.  Yes.

9   Q.  Sir, was Mr. Grinberg's testimony accurate as to what he

10  said you described as the opportunity for Elliott at that

11  meeting?

12  A.  I -- my testimony is that what he put in his affidavit and

13  what he testified today with regard to those events was

14  accurate, although not complete.

15  Q.  Now, Mr. Donziger, I'd like to ask you a few follow-up

16  questions.  Am I correct that since March 2014, you have raised

17  money to support the enforcement efforts of the Ecuadorian

18  judgment by selling interests in the judgment?

19  A.  I have helped my clients in Ecuador sell interests in the

20  judgment to raise funds to pay litigation expenses since that

21  day, yes.

22  Q.  Thank you, sir.  Am I also correct that, out of the funds

23  you have raised by selling interests in the judgment, you have

24  paid yourself since March 2014, correct?

25  A.  That is correct.

1    Q.  Am I correct, sir, that you have sold interests in the

2    judgment, since March 2014, to multiple investors?

3              MR. DONZIGER:  Objection.

4    Q.  Yes or no.

5              THE COURT:  Yes or no.

6    A.  Well, there's a presumption in the question that's not

7    accurate.  Can I explain?

8    Q.  No.  I'll rephrase the question, sir.

9              In selling interests in the judgment, am I correct

10   that you have sold interests in the judgment to multiple

11   investors since March 2014?

12   A.  First of all, I am not selling interests in the judgment.

13   I am arranging for my clients to sell their interests in the

14   judgment.  But the rest of your question, have there been

15   multiple investors, the answer is yes.

16   Q.  So the record is clear, you have sold on behalf of your

17   clients interests in the Ecuadorian judgment to multiple

18   investors since March 2014, correct?

19             MR. DONZIGER:  Objection.

20             THE COURT:  I think that's been asked and answered.

21   Q.  How many investors have you arranged to sell an interest in

22   the judgment on behalf of your client or clients since March

23   2014?

24   A.  To the best of my recollection, approximately six.

25   Q.  Am I correct, sir, that you have raised millions of dollars

1   in support of efforts to enforce the Ecuadorian judgment

2   through this sales process since March 2014?

3          THE COURT:  This is repetitious and it's beyond the

4   scope of this hearing, which has to do with the Elliott

5   solicitation.

6          MR. MASTRO:  I understand, your Honor.

7   Q.  Am I correct that you told Mr. Grinberg at the Elliott

8   meeting that you had raised, over the course of the Ecuadorian

9   litigation, $33 million?

10  A.  I told Mr. Grinberg that the client base in Ecuador had

11  raised that amount of money over the entire course of the

12  litigation since 1993.  I later testified in my deposition that

13  I think that was inaccurate.

14  Q.  You thought that was too high?

15  A.  I think it's too high, but I, as I sit here today, there's

16  obviously been millions of dollars raised.  I don't know the

17  exact number.  It also depends on how you count it and you

18  count Joe Cohen's contribution and that kind of thing.  But

19  there had been, you know, there's been, you know, what some

20  would consider to be, you know, significant resources raised to

21  sustain a litigation over the course of the almost 25 years of

22  its existence.

23  Q.  Sir, at the meeting you had with Mr. Grinberg and his

24  colleague at Elliott, on November the 6th, 2017, did you

25  discuss with him how you structured deals with investors?

1  A.  I did in a very general sense.

2  Q.  Did you tell him that in exchange for litigation funding,

3  that Elliott could obtain an interest in whatever judgment

4  proceeds were ultimately generated through enforcement or

5  settlement?

6  A.  Yes.

7  Q.  Did you discuss with Mr. Grinberg and his colleague at that

8  meeting any particular percentage interests that they could

9  acquire?

10  A.  I don't believe I did.

11  Q.  Did you discuss with Mr. Grinberg and his colleague at this

12  meeting the identities of any other investors in the judgment?

13  A.  I don't remember one way or another.

14  Q.  You consider Mr. Grinberg to be a sophisticated party,

15  correct?

16  A.  I'm sorry, excuse me, what?

17  Q.  Sophisticated person.  Correct?

18  A.  As regards what?

19  Q.  As regards investments like this.

20  A.  Yes.

21  Q.  And you recall him asking you about the investment

22  structure, correct?

23          THE COURT:  Would you stay closer to the microphone,

24  Mr. Mastro.

25          MR. MASTRO:  Certainly, your Honor.

1    A.  The meeting was many months ago, so I have a vague

2    recollection only, but I do remember talking in very general

3    terms about how the Ecuadorian client base structures its

4    investment contracts with those who fund.

5    Q.  Can you -- strike that.

6              Mr. Donziger, when you say that you discussed in

7    general terms the structure of an investment, tell us in

8    general terms what it was that you said.

9    A.  When I say "in general terms," it's simply if an entity

10   puts in X amount of money, we would negotiate some percentage

11   of the interest in any collection that they would get if there

12   were to be a collection.  So -- I don't know if that answers

13   your question.

14   Q.  Yes, it does.  So let me ask you a couple of follow-up

15   questions in that regard.  Am I correct that you told

16   Mr. Grinberg and his colleague that you had already arranged

17   sales of -- strike that.

18             Am I correct that you told Mr. Grinberg and his

19   colleague at that November 6, 2017 meeting that you had a 6.3

20   percent interest in the judgment?

21   A.  That came up.  I don't remember how.  But I told him what

22   my percentage interest was, subject, obviously, to the RICO

23   judgment, such as I can't collect.  But that's the percentage I

24   have, or had, I guess.

25   Q.  And you don't recall whether you volunteered that

1   information or whether he asked you.  Is that your testimony?

2   A.  I don't remember.

3   Q.  Am I correct that you told him that, at this meeting --

4   strike that.

5        Am I correct that you told Mr. Grinberg at this

6   meeting that 15 to 20 percent of the interest in the judgment

7   had already been given to investors or other professionals in

8   connection with the judgment proceeds?

9   A.  So my answer to that question is, I don't have a specific

10  recollection of saying that in the meeting, but having seen the

11  notes presented to me and understanding how I usually talk

12  about this to potential funders, I -- that would be something

13  consistent with what I would tell a potential funder.

14  Q.  And did you tell Mr. Grinberg and his colleague that there

15  were 15 such -- strike that.

16       Did you tell Mr. Grinberg and his colleague at this

17  meeting on November 6, 2017 that there were approximately 15

18  such investors or professionals who had interest in the

19  judgment allocated to them?

20  A.  I believe I did, although I don't have any specific

21  recollection.  That's roughly the case.

22  Q.  Did you tell him the identities of any of those 15, besides

23  yourself?

24  A.  I, I, I don't remember.  I don't believe I did, but I might

25  have.  I don't remember.

I6SACHE2ps                    Donziger - Direct

1    Q.  Did you tell him that Mr. Rizack received interest in the

2    Ecuadorian judgment from you after the RICO judgment in March

3    2014?

4              MR. DONZIGER:  Objection.

5              THE COURT:  Ground?

6              MR. DONZIGER:  It assumes a fact not in existence.

7              I can -- I could answer the question.  I think I know

8    what he's trying to ask.  I can answer it.

9              THE COURT:  Go ahead.

10             MR. DONZIGER:  OK.

11   A.  So the answer to your question about Mr. Rizack is, he

12   received an interest in the judgment not from me but from the

13   Ecuadorian client.  That is the FDA people who signed these

14   investment contracts.  And that happened after the RICO

15   judgment.

16   Q.  And so was it you who arranged, on behalf of the client, to

17   give Mr. Rizack an interest in the judgment after the RICO

18   judgment in March 2017?

19   A.  Well, I --

20   Q.  March 2014.

21   A.  I generally help the clients hook up with service providers

22   they need or I believe they did.  No agreement is signed

23   without their signature and their approval.  But I did

24   facilitate that.

25   Q.  And, sir, Mr. Rizack is not an accountant, correct?

1    A.  That's correct.

2    Q.  So he isn't actually able to do an accounting of the

3    finances relating to the Ecuadorian --

4    A.  That's not what he was brought in to do.

5    Q.  Am I correct that he does personal work for you, including

6    paying your bills?

7    A.  Can you -- no, not at the moment.

8    Q.  Am I correct that during the period 2014, 2015, 2016,

9    Mr. Rizack was paying your bills, keeping track of your bills

10   and then writing the checks to pay them?

11          MR. DONZIGER:  Objection, your Honor.

12          I could talk about it, but I think it is a bit far

13   afield from --

14          THE COURT:  Well, it is far afield.  And I think we

15   had testimony about this at trial in 2014.

16          MR. MASTRO:  I understand, your Honor.  I'm just

17   pointing out that Mr. Rizack got an interest in the judgment

18   after the RICO judgment was entered, and at the time was doing

19   only personal work for Mr. Donziger.

20          MR. DONZIGER:  That's -- whoa.  That's --

21          MR. MASTRO:  I'll go on.

22          MR. DONZIGER:  That's not true.

23   BY MR. MASTRO:

24   Q.  Now, let me ask you about the Elliott meeting and some

25   aspects of how that came about.  Am I correct that it was

1    Ms. Sullivan who introduced you -- strike that.

2             Am I correct that it was Ms. Sullivan who arranged for

3    you to meet with Elliott?

4    A.   Yes.

5    Q.   But you had already made a contact with Elliott years

6    earlier, correct?

7    A.   I believe -- well, I believe some were working with me and

8    made a contact with Elliott years earlier, although I had

9    forgotten about that until the question was brought up in my

10   deposition this week.

11   Q.   When the subject first came up of you meeting with Elliott,

12   was it Ms. Sullivan who suggested that Elliott might be a good

13   party to pursue for an investment in the Ecuadorian litigation?

14   A.   Yes.

15   Q.   And am I correct that it was Ms. Sullivan who wrote to you

16   on October 16, 2017 that you want someone like Elliott,

17   "someone courageous, who will understand what and why and know

18   this investment is a hatch"?

19             THE COURT:  Mr. Mastro, I've read like seven exhibits

20   and I've read every one of them.  So I don't know what purpose

21   is served by this.

22   Q.   Am I correct that Ms. Sullivan said to you at the time,

23   October 16 of 2017, that Elliott could short Chevron stock in

24   making this investment?

25   A.   She did say that in an e-mail to me.

I6SACHE2ps                    Donziger - Direct

1    Q.  And that Elliott could invest a ton of money in the case,

2    correct?

3    A.  I don't -- if you want to refer me to an exhibit that

4    you're citing from, please do and I'll answer your question.

5    Q.  Did you have in mind, in approaching Elliott, a particular

6    level of investment that you would seek?

7    A.  Not a particular number, no.

8    Q.  Mr. Donziger, I'd like to refer you to what in the binder

9    is PX 9004 but in the Grinberg exhibits already in evidence is

10   an exhibit Grinberg 4.  Do you see that, sir?

11   A.  Yes.

12   Q.  When Ms. Sullivan suggested Elliott as a potential

13   investor, you responded to her, "Great," in this October 16,

14   2017 e-mail exchange, correct?

15              MR. DONZIGER:  Objection.  These are all the e-mails.

16              THE COURT:  Yes, I gather it is.

17              MR. MASTRO:  I'm sorry?

18              THE COURT:  I gather it's all in the e-mails that you

19   put into evidence.

20              MR. MASTRO:  It is.  I was going to ask him a question

21   about it, your Honor.

22              THE COURT:  All right.  So let's ask the question.

23   BY MR. MASTRO:

24   Q.  Please tell the Court what you meant when you responded to

25   Ms. Sullivan by "Great," in terms of approaching Elliott?

1    A.  Just that it would be opportunity to meet with a fund that

2    had capital and apparently had, you know, experience in dealing

3    with litigation financing.

4    Q.  Did you have any discussions with Ms. Sullivan about

5    raising with Elliott that they could short the Chevron stock

6    and win both ways?

7    A.  No.

8    Q.  Referring you to Exhibit No. 5 --

9            THE WITNESS:  Hold on one second.  Could I just

10   elaborate on my prior answer?

11           THE COURT:  That's for redirect.

12           THE WITNESS:  OK.

13   BY MR. MASTRO:

14   Q.  Referring you to Grinberg Exhibit No. 5, Mr. Donziger, an

15   e-mail dated October 19, 2017 from Katie Sullivan to you, sir,

16   do you know whether Katie Sullivan made contact with Paul

17   Singer?

18   A.  What I know based on what I remember Katie telling me is

19   that she reached out to Paul Singer directly, I think through

20   maybe the assistant or secretary.  I don't remember her telling

21   me she had any contact directly with Paul.

22   Q.  Am I correct, Mr. Donziger, that the meeting you eventually

23   had on November 6, 2017 was with Jesse Cohen and Mr. Grinberg?

24   Correct?

25   A.  That's correct.  Mr. Cohen was in the meeting for a

1   relatively brief period of time, and Mr. Grinberg -- am I

2   getting the name correct?  I still --

3   Q.  Yes.

4   A.  Grinberg, was in the meeting for the entire time.

5   Q.  And the meeting lasted 60 to 90 minutes, correct?

6   A.  That's my recollection.

7   Q.  From your side, Ms. Sullivan and you, who did most of the

8   talking during the meeting?

9   A.  I did.

10  Q.  And you were concerned at the meeting that Elliott might be

11  put off by the RICO judgment, correct?

12          MR. DONZIGER:  Objection, form.

13          MR. MASTRO:  I'll rephrase it.

14  Q.  Let's go to Exhibit No. 3 under Grinberg, the first

15  document being Mr. Grinberg's handwritten notes.  Now, you took

16  notes during this meeting as well, correct?

17  A.  I'm not, I'm not sure as I sit here today.  I mean, I, I, I

18  generally take -- I have -- keep like a pad out.  When I'm

19  talking a lot, I generally don't really take very many notes.

20  I might have jotted down something or I might not have.  I

21  don't remember.

22  Q.  But you didn't produce any notes in response to Chevron's

23  subpoena, correct?

24  A.  I don't believe I have any notes.

25  Q.  You couldn't find them.

1    A.  If I didn't produce any, I don't believe I have any.

2    Q.  Referring to Mr. Grinberg's notes of the November 6, 2017

3    meeting, do you see there where Mr. Grinberg writes, "Can money

4    come into U.S.?"  Do you see that?  Towards the bottom of the

5    page to the left?

6    A.  Yes.

7    Q.  Did you discuss that topic with Mr. Grinberg during the

8    November 6, 2017 meeting?

9    A.  So to the best of my recollection I think, I think Lee

10   raised the question of how the RICO judgment would impact any

11   collection, or I should say any return on investment, from any

12   investment.  And I think we had a very brief discussion about

13   that.

14            THE COURT:  What was said on that subject?

15            THE WITNESS:  You know, I don't remember it exactly,

16   because -- but I will say this as a general matter.  Others

17   have asked me the same question.  And I usually say I'm not

18   really sure, because I've never seen this kind of situation.

19            And the question being, what would a U.S.-based

20   investor -- what would happen with a U.S.-based investor upon a

21   collection in a foreign jurisdiction.  That's your question.

22   And I don't know the answer to that.

23   BY MR. MASTRO:

24   Q.  Donziger, turning to 3A, these are Ms. Sullivan's notes of

25   the November 6, 2017 meeting.  Let me just back up for one

1    second.  And Mr. Grinberg's note, Exhibit 3, is there anything

2    in Mr. Grinberg's notes that does not accurately reflect what

3    was discussed at the meeting with Mr. Grinberg and his

4    colleague on November 6, 2017?

5              MR. DONZIGER:  Objection.  The notes are very --

6    they're not my notes, first of all.  I've already testified

7    that I think the $33 million figure is inaccurate.  A lot of

8    it --

9              THE COURT:  You think it's inaccurate in the sense

10   that you never uttered those words, "$33 million"?

11             THE WITNESS:  No, I didn't.

12             THE COURT:  Or is it now, on reflection, you don't

13   think what you said was accurate?

14             THE WITNESS:  The latter.  The latter.  I, I don't

15   think it's accurate.  But, again, as I testified earlier, it

16   depends how you account for certain confusions.  So I could

17   elaborate on that, but that's, that's, you know, it's unclear

18   to me whether it's entirely accurate.

19   BY MR. MASTRO:

20   Q.  Mr. Donziger --

21             MR. DONZIGER:  I'm --

22   Q.  You did, you already testified that --

23             MR. DONZIGER:  Hold on.

24   Q.  -- you told Mr. Grinberg at this meeting --

25             MR. DONZIGER:  Objection, your Honor.

1    Q.   -- that you had raised $33 million.  You did say that to

2    him at this meeting of November 6, 2017, correct?

3    A.   I already testified to that, yes.

4    Q.   Is there anything on this page of notes, by Mr. Grinberg,

5    of what was said at the November 6, 2017 meeting that, as you

6    sit here today, you think is inaccurate?

7              MR. DONZIGER:  I'm going to object.  First of all --

8              THE COURT:  Answer the question.

9              MR. DONZIGER:  I'm going to look at this quite

10   carefully.

11             THE COURT:  Well then, do it.

12   Q.   Let me just clarify it for you.  I'm going to clarify the

13   question.

14             THE COURT:  Look, do you want an answer or not?

15             MR. MASTRO:  Yes, I do, your Honor.

16             THE COURT:  Well then, let's have the answer.

17             MR. MASTRO:  Certainly, your Honor.

18   A.   I think -- I can't testify that notes that someone else

19   wrote are entirely accurate without understanding what they

20   mean.  These are snippets of this and that.  I don't see

21   anything on this page, other than the 33 million, that would be

22   patently inaccurate.  But on the other hand, I can't say what

23   some of this stuff even means, to be able to answer the

24   question.  So that's my answer.

25             THE COURT:  Next question.

1   Q.  Is there anything in these notes that you know wasn't said

2   during the meeting on November 6, 2017?

3   A.  Well --

4            THE COURT:  I think the answer to that question is

5   inherent in the last answer.

6            MR. MASTRO:  Fine, your Honor.

7            THE COURT:  Would you please move on.

8            MR. MASTRO:  Certainly, your Honor.

9   Q.  Let's go to 3A, please, Mr. Donziger.  These are Katie

10  Sullivan's notes of the November 6, 2017 meeting.  Is there

11  anything in Katie Sullivan's notes of the November 6, 2017

12  meeting that you believe doesn't accurately reflect what was

13  discussed at the meeting?

14  A.  Well, I don't know what most of this stuff means or what

15  she was thinking when she wrote some of this stuff.  I mean,

16  there's nothing that jumps out at me, looking at it all, that

17  appears inaccurate, with the caveat again that I don't know

18  what a lot of it means.  I mean, if you want to take me through

19  each one and tell me what you think it means, I can tell you if

20  I think it's accurate or not.  But other than that, that's my

21  testimony.

22  Q.  Mr. Donziger, referring you to the reference to 400 million

23  frozen assets in Argentina in the middle of the first page, do

24  you see that?

25  A.  Yes.

1    Q.  Is that something you recall having been said at your

2    meeting with Elliott on November 6, 2017?

3    A.  I do have a recollection of that, yes.

4    Q.  And what was said in that regard and by whom?

5    A.  To my best recollection, I believe I told him that at some

6    point in Argentina, that counsel, Argentinian counsel for the

7    Ecuadorians had succeeded in getting a court order forcing

8    Chevron or its Argentinian subsidiary to put a certain portion

9    of its revenues in escrow or an account under the court's

10   auspices pending resolution of the enforcement action in that

11   country.

12   Q.  Did you say anything else on that subject?

13   A.  I believe I did.

14   Q.  What else did you say?

15   A.  I believe I said that that money was no longer frozen or

16   under court order, and I believe I described what had happened

17   down there in terms of the meeting of Chevron's CEO with the

18   Argentinian president after the lifting of that freeze order.

19   Q.  So do you see there, farther down the page, where it says

20   "1782 limitation"?

21   A.  Yes.

22   Q.  Was there any discussion at your meeting with Elliott about

23   "1782 limitation"?

24   A.  I don't recall.

25   Q.  So you don't know what that refers to, "1782 limitation"?

1   A.  No.

2   Q.  Let's turn the page, please.  Do you see there where,

3   towards the bottom of the second page, Ms. Sullivan's notes of

4   the November 6, 2017 meeting say, "Rule 65, participating

5   violation and some court order"?

6   A.  Yes.

7   Q.  Do you recall that subject being discussed at the -- on

8   November 6, 2017 meeting with Elliott?

9   A.  No.

10  Q.  So you don't know as you sit here today what Ms. Sullivan

11  was referring to when she wrote that down?

12  A.  No.

13  Q.  Mr. Donziger, am I correct that when you refer to your

14  clients in your testimony, what you really mean is one client,

15  the ADF, or the Frente.  Correct?

16          Yes or no, sir.

17  A.  I can't answer that yes or no.  I'll answer it this way.

18  My client is the FDA, and the FDA is the beneficiary of the

19  judgment and has a fiduciary duty, as I understand it, to

20  execute the judgment and collect funds owed to the affected

21  peoples by Chevron around the world.  So my client is the

22  entity that's the beneficiary of the judgment and executes it

23  and representation of all those affected.

24  Q.  Did you explain that to Elliott at the meeting you had with

25  Elliott on November 6, 2017?

1    A.  I don't recall specifically.  Generally when I speak to

2    potential funders, we explain that that is part of its

3    structure, who would be the counterparties on any investment

4    appeal.

5    Q.  Generally you would have told a potential investor that the

6    counterparty would be the ADF or the Frente.

7    A.  Generally, yes.

8    Q.  Am I correct that you sent Elliott a nondisclosure

9    agreement just before the meeting that documented that the

10   nondisclosure agreement would be with the ADF/Frente?

11   A.  I don't recall.  I believe Ms. Sullivan sent that, but I

12   don't recall what the --

13   Q.  And she received that NDA from you?

14   A.  Don't recall how that NDA was put together.  We have NDAs

15   we use, and I, I don't remember putting it together.  It's

16   possible another lawyer on our team did.  I don't remember.

17   Q.  Ms. Sullivan is not a lawyer, correct?

18   A.  That's correct.

19   Q.  And am I correct that she was retained by you mostly to

20   help fund-raise?

21   A.  Fundraising was an important part of her responsibilities.

22   She was also helping or intended to help us get a little better

23   organized in terms of expenditures, budgets, that sort of

24   thing.

25   Q.  Did Ms. Sullivan arrange multiple meetings for you besides

1   the Elliott meeting with potential fund sources?

2   A.  Well, I don't know what you mean by "multiple."  I remember

3   one other meeting.  There might have been others.

4   Q.  Ms. Sullivan was retained in approximately November of last

5   year, correct?

6   A.  My recollection is it was more like October, but in the

7   fall of last year, yes.

8   Q.  What were the terms of her retention?

9   A.  I don't recall exactly.  Katie is a person who wanted to

10  get involved to help.  She didn't seem particularly interested

11  in financial compensation.  I asked her if we could do some

12  sort of contract for her services, and I believe we agreed on

13  some sort of contract, but I don't believe she ever signed it,

14  or maybe it was not executed.  I don't remember.  I know we had

15  some document, but I believe it was never signed.

16  Q.  And you have not produced that document in response to

17  Chevron's subpoena, correct?

18  A.  I don't believe I have.  I don't know if I actually have

19  it.  I haven't seen it, looking through my files.

20  Q.  When did Ms. Sullivan -- strike that.

21       Am I correct that Ms. Sullivan ceased to work with you

22  in or about March of 2018?

23  A.  Yes.  Subsequent to the issuance of the subpoena, Chevron's

24  subpoena to her, she ceased working with us.

25  Q.  Am I correct, sir, that -- strike that.

1          What compensation did she receive for the work that

2    she did between October 2017 and March 2018?

3    A.  I don't know.

4    Q.  Did she receive compensation, sir?

5    A.  I am not sure.  I, I, I have a recollection that she might

6    have received some what I would consider to be pretty minimal

7    compensation, but I'm not a hundred percent sure.  I'd have to

8    look in the budget that she kept.

9    Q.  Sir, are you the one who would have approved of her

10   compensation?

11   A.  Either me or the client representatives in Ecuador or me

12   under their authority.  I don't recall how it was approved or

13   what it was exactly.

14   Q.  Did Ms. Sullivan receive any interest in the Ecuadorian

15   judgment?

16   A.  I think we had discussion about arranging something along

17   those lines, but I don't believe it ever happened prior to her

18   deciding to leave the, the litigation.

19          THE COURT:  Are we going to get back to what happened

20   at Elliott Management?

21          MR. MASTRO:  Yes, your Honor.  I was just trying to

22   set the stage for her work.

23   BY MR. MASTRO:

24   Q.  Now, Mr. Donziger, at your meeting with Elliott, did you

25   discuss with Elliott the fact that you do not represent any of

1    the individual Lago Agrio plaintiffs any longer?

2    A.  I don't recall.  And also I don't accept that as a fact.  I

3    don't --

4            MR. DONZIGER:  Objection.  That's a whole 'nother

5    area.

6    Q.  Sir, in your meeting with Elliott, you were not purporting

7    to represent any of the individual Lago Agrio plaintiffs.

8    A.  Not in their individual capacity, but I represent, by

9    virtue of my representation of the FDA, represent everybody

10   affected.  The FDA represents everybody with interests in the

11   collection of judgment.

12   Q.  And you do not represent UDAP any longer, correct?

13   A.  Correct.

14   Q.  So is it fair to say that you have acted on behalf of the

15   Frente in selling interests in the judgment?

16           MR. DONZIGER:  Objection.  I can answer it, but --

17   Q.  Let me rephrase, because I want to make sure we understand

18   this.

19           You have not represented, to any investors, that you

20   represent any client other than the Frente, correct?

21   A.  Well --

22   Q.  Let me give you a time frame for it, OK.  Since the RICO

23   judgment --

24   A.  Yes.

25   Q.  -- in March 2014, you have not represented, to any

1  subsequent investors, that you represent any party other than

2  the Frente, correct?

3  A.  My view is, my client is the Frente, as I've testified.

4  And the Frente, by virtue of its unique role in the Ecuadorian

5  judgment, as the sole and exclusive beneficiary of any

6  collection action, acts in the interests of everybody affected,

7  including the individually named plaintiffs.  But that's

8  correct; I do not actually have contracts with the individually

9  named plaintiffs.  But all of them are represented through the

10 role of the Frente in the Ecuadorian judgment as a beneficiary

11 of the judgment.

12 Q.  Did you explain that to Elliott at the meeting you had with

13 Elliott on November 6, 2017?

14 A.  I don't recall that I explained that specifically.

15 Q.  Now, you made an offer to Mr. Grinberg after the meeting to

16 send him an additional packet of materials.  Correct?

17 A.  Yes.

18 Q.  And you said it's a packet of materials that you typically

19 give potential investors, correct?

20 A.  Yes.

21 Q.  Am I correct that you did not produce that packet of

22 materials in response to Chevron's subpoena?  The materials you

23 would typically give an investor.

24 A.  Well, I testified about this in my deposition, and what --

25 the answer to that question is, we give materials to investors

1  when they ask, and we generally tailor them to the needs of the

2  investors.  So, you know, if an investor is sophisticated and

3  wants to just know this, this certain thing, we give them that.

4  If an investor doesn't know much about the situation and just

5  wants to learn about it, we give him a lot of other types of

6  material.

7           So when I said we have a packet we typically give,

8  there are certain materials like press reports, court judgments

9  that we usually send to everybody who we're just getting going.

10 And I wasn't sure what Mr. Grinberg would want if anything.

11 And the fact he didn't want anything suggested to me Elliott

12 wasn't that interested, and I didn't really think much more of

13 it and never sent him anything.

14 Q.  You didn't produce, in response to Chevron's subpoena, any

15 of the documents you would typically give to investors,

16 correct?

17 A.  No.  The reason for that --

18 Q.  I didn't ask you the reason, sir.  I just asked you whether

19 you --

20 A.  -- is because of --

21 Q.  And the answer is Correct?

22 A.  The pending motion has now since been resolved.  So I

23 didn't revisit that issue and continue production in light of

24 the state of play with your Honor's decision, which I just got

25 late yesterday afternoon while preparing for this and being in

1    another deposition.

2    Q.  Am I correct, Mr. Donziger, that, in response to Chevron's

3    subpoenas, to date, these are subpoenas covering both your

4    assets and judgment --

5           THE COURT:  Look, Mr. Mastro, stick to the subject of

6    this hearing.

7           MR. MASTRO:  OK.  Certainly, your Honor.  Certainly.

8           THE COURT:  We're not starting a seven-week trial

9    today.

10          MR. MASTRO:  OK.  Certainly, your Honor.  I just, I

11   wanted the Court to be aware of the limitation --

12          THE COURT:  You've made me aware.  The fusillade of

13   letters is beyond my secretary's ability to keep up with.

14          MR. MASTRO:  Thank you, your Honor.

15          THE COURT:  From both sides.

16   Q.  Mr. Donziger, did you consider the opportunity to pitch

17   Elliott to be a significant meeting?

18   A.  I would say I considered it to be a meeting that we were

19   happy to get that had potential significance if it were to gain

20   traction, but I didn't go in with very high expectations.

21          (Continued on next page)

22

23

24

25

1  Q.  Mr. Donziger, just to be clear, the client you were

2  representing at the Elliott meeting was the FDA, correct?

3  A.  That's correct, subject to my prior testimony about the

4  Frente role, yes.

5  Q.  Again going back to the Elliott meeting, did you have any

6  discussion with Mr. Grinberg and Mr. Cohen at the November 6,

7  2017 meeting about how difficult it would be to enforce the

8  Ecuadorian judgment in light of the RICO judgment?

9              THE WITNESS:  Objection.

10              THE COURT:  Overruled.

11  BY MR. MASTRO:

12  Q.  Yes or no?

13  A.  I generally, because I don't remember specifically

14  everything we talked about at the 90 minute meeting, when I

15  talked to potential funders, I always mentioned RICO.  I

16  explained Judge Kaplan's decision, I explained the view of the

17  Ecuadorians of that decision.  Respectfully to your Honor, they

18  disagree, as do I, with a lot of the bases of that decision.

19              I count on potential funders to do their own

20  independent due diligence about that decision and all the other

21  court decisions in this case both in the United States, Canada,

22  Ecuador and the international arbitration.

23              Almost all potential funders, if they express

24  seriousness, do that due diligence and they also consult with

25  independent counsel when doing so.

1   Q.  Mr. Donziger, did you discuss with Elliott at the November

2   6, 2017 meeting whether the injunction, at Paragraph 5 under

3   the court's judgment, would be any impediment to collection

4   efforts?

5   A.  I don't recall specifically.

6           Again when I speak to investors, I am working and have

7   been working I believe in good faith off of the April 25th

8   order of Judge Kaplan that I believe allows us, plain and

9   express language that allows the clients in Ecuador to sell

10  interest in the judgment to pay litigation expenses.

11          So to me at that time, it was not a controversial

12  issue.  So it is possible I didn't bring it up.  It was

13  something that I and others who had read the April 25th order

14  felt was permissible and proper.

15  Q.  So you don't recall any discussion at that meeting about

16  the ramifications of Paragraph 5 of the RICO judgment?

17  A.  No.

18  Q.  Sir, immediately after the Elliott meeting on November 6th,

19  2017, did you discuss Ms. Sullivan how the meeting had gone?

20  A.  I don't remember.  I mean I could speculate.

21  Q.  I don't want you to speculate, sir.

22  A.  Well, I don't remember what we talked about after the

23  meeting.  You mean right after we walked out of the meeting?

24          THE COURT:  Look, Mr. Mastro, I would really

25  appreciate it if you would stick to the limited purpose for

1    which I called this hearing.

2             MR. MASTRO:  I understand, your Honor.  I am about to

3    come to why I asked that question.

4    BY MR. MASTRO:

5    Q.  Mr. Donziger, am I correct that shortly after the Elliott

6    meeting ended, Ms. Sullivan sent an email to many parties,

7    including yourself, about how the meeting had gone?

8    A.  I don't recall.  If you want to show me an email?

9    Q.  Am I correct that in response to her email message, you

10   responded that everyone should hold it strictly confidential

11   and that it would be counterproductive in terms of our

12   objectives if the meeting leaked?

13            THE WITNESS:  I'm going to object.  I would like to

14   look at what Mr. Mastro is referring to.  I know there is

15   email.  I think it was before the meeting, not after.  That's

16   the problem I have.

17            THE COURT:  Well, Mr. Mastro, if it was before the

18   meeting, maybe you ought to rephrase your question; and if it

19   wasn't, maybe you need to show it to him.

20   BY MR. MASTRO:

21   Q.  Let me clarify.

22            When you were scheduled to have a meeting with

23   Elliott, did Ms. Sullivan send out an email notice to many

24   parties, including yourself, that a meeting with Elliott had

25   been scheduled?

1   A.   That's my recollection, yes.

2   Q.   Am I correct you responded to her email on November 6,

3   2017, telling everyone on that email that the information was,

4   "strictly confidential and that it would be counterproductive

5   in terms of our objectives" if the information were to leak?

6   A.   I don't know what I said.  I remember saying something

7   along those lines.  If you're trying to say I said what is on

8   an email, show me an email and I will tell you if I sent the

9   email.

10  Q.   I am just asking if you recall it, Mr. Donziger?

11  A.   I remember generally wanting to keep our contacts with

12  Elliott confidential so they wouldn't get into your camp and

13  representation of your clients so you could cause mischief, as

14  had been done in the past.  That was my view, yes.

15  Q.   Am I correct that you recommended everyone on the email

16  chain that they delete all emails relating to this subject?

17  A.   Actually, that email came from another individual on the

18  email chain, and I endorsed it, but I also agree with the

19  subsequent email with Aaron Paige, which explains it was not to

20  impede discovery or hide anything untoward, it was to protect

21  confidentiality such that Chevron wouldn't be able to harass

22  Elliott Capital, as it had done with other funders.

23  Q.   Can we go to Exhibit 6 in the binder, DX-9006, the large

24  binder.

25  A.   This binder?

1    Q.   Yes.

2              THE COURT:  Tab 6?

3              MR. MASTRO:  Yes, your Honor.

4              (Pause)

5    BY MR. MASTRO:

6    Q.   Did you have chance to review it, Mr. Donziger?

7    A.   Yes, I am familiar with the email chain.

8    Q.   Am I correct this is an email, dated November 6, 2017, in

9    which you, Ms. Sullivan and others participated and that you

10   received these emails and sent these emails?

11   A.   I received this email chain, yes, and I sent the email that

12   I sent, but not the other emails, obviously.

13   Q.   But you received the other emails, correct?

14   A.   Yes.

15             MR. MASTRO:  I ask it be received in evidence.

16             THE COURT:  Received.

17             (Defendant's Exhibit 9006 received in evidence)

18   BY MR. MASTRO:

19   Q.   Mr. Donziger, let's go to the first email in the chain,

20   MKS-93.  Ms. Sullivan has sent this email to several people.

21             Are any of the people that she sent this email to

22   other investors in the Ecuadorian judgment?

23             THE WITNESS:  Objection.

24             THE COURT:  Sustained.

25   BY MR. MASTRO:

1   Q.  Mr. Donziger, now Ms. Sullivan writes to you and others

2   that she has been helping you strategize how to connect

3   financial capital with the case.  Do you see that, sir?

4   A.  Yes.

5   Q.  Did you understand her to mean by that she was helping you

6   to identify potential investors from whom you could arrange on

7   behalf of your client Frente --

8           THE WITNESS:  This is long, Mr. Mastro.

9           MR. MASTRO:  I will withdraw that question.

10  BY MR. MASTRO:

11  Q.  Do you see there at the end of her email she talks about

12  supercharging their efforts, meaning your efforts and your

13  team?

14  A.  Yes.

15  Q.  Did you have an understanding what she meant by that?

16  A.  I assume she meant we would be more effective in the

17  endeavor.

18  Q.  If you raised money?

19  A.  Well, the endeavor raising money would be more effective.

20          THE COURT:  Mr. Mastro, do you have any more questions

21  about what happened at the meeting?

22          MR. MASTRO:  Your Honor, I just wanted to --

23          THE COURT:  I know what you want to do.  I know a lot

24  of the things you want to do.  Do you have any more questions

25  that relate to what happened at the meeting or in association

1   with the meeting that is relevant to the purpose of this

2   hearing?

3             MR. MASTRO:  Well, your Honor, I would respectfully

4   submit that an email chain in which Mr. Donziger is

5   recommending and seconding that any emails on this subject

6   should be destroyed --

7             THE COURT:  But it is in evidence and I read it.

8             MR. MASTRO:  That is fine, your Honor.  I have it.

9   May I talk to my client for a second, your Honor?

10            THE COURT:  Sure.

11            (Off-the-record discussion)

12  BY MR. MASTRO:

13  Q.  Mr. Donziger, in terms of the Elliott meeting and meetings

14  like Elliott, am I correct that you do not get paid anything

15  for such a meeting other than your monthly retainer and

16  whatever contingency interest you have in the judgment?

17  A.  If I understand the question as I think you intend to ask

18  it, I don't get paid separate to do fund raising.  I get paid a

19  monthly retainer to do a whole host of things for my client,

20  that being one of them.

21            MR. MASTRO:  I don't have any further questions.

22            THE COURT:  Mr. Donziger, any redirect?

23            MR. DONZIGER:  I have a limited number of questions.

24            THE COURT:  Go right ahead.  I know it is awkward.

25            You know we have pro se litigation here and it very

1    rarely involves money.  It involves who disrespected somebody

2    at Green Haven State Prison or something like that, and the

3    prisoners cope with it, and I am sure you're up to it, though I

4    understand it is awkward.

5    CROSS-EXAMINATION

6    BY MR. DONZIGER:

7    Q.  Can you describe your recollection of any documents given

8    to Mr. Grinberg at the Elliott meeting?

9                THE COURT:  Okay.

10   A.  When I heard Mr. Grinberg testify this morning about what

11   he described as a marketing document, it refreshed my

12   recollection, and I believe that document is actually a

13   photobook put together by a photojournalist named Lou Demitas,

14   and that describes or has photos of some of the human impacts

15   of the oil pollution in Ecuador as well as testimonies, and it

16   was not, to the best of my recollection, a marketing document

17   for funders, although it is often given to funders so they can

18   understand the human nature or human dimension of the problem.

19   Q.  The second question, did you ever discuss with Ms. Sullivan

20   in the context of the Elliott meeting that Elliott could

21   potentially make money on both ends by shorting Chevron stock

22   if they were to invest in the case?

23               THE COURT:  There is no objection.

24   A.  Okay.  I don't recall whether I discussed that with her.

25   That was something that she originally brought up as something

1    that might be enticing or appealing to Elliott.  This is not

2    something that I brought up or endorsed.  It is possible she

3    raised with me in a conversation, I don't have any specific

4    recollection.

5    Q.  I have two more questions.

6          What is the legal basis for fund raising to pay

7    litigation expenses in light of the RICO judgment?

8          THE COURT:  Sustained.  If we are going to have a

9    legal argument, we are not going to have it from the witness

10   stand unless it is relevant for some other reason.

11         MR. DONZIGER:  That is all my questions.

12         THE COURT:  Okay.  In light of those questions,

13   anything else, Mr. Mastro?

14         MR. MASTRO:  No, your Honor.

15         THE COURT:  You're excused.  Thank you, Mr. Donziger.

16         (Witness excused)

17         THE COURT:  I think that probably concludes the

18   hearing, does it not?

19         MR. MASTRO:  It does, your Honor.

20         I would appreciate a brief opportunity to explain some

21   of the other areas we are still seeking discovery on and why we

22   think they're irrelevant.  I didn't attempt to question him

23   because your Honor limited the scope of the hearing, and I

24   understand that and I focused on the Elliott meeting.

25         Your Honor, had I had the chance to examine Mr.

1   Donziger more broadly, I think I would have been able to

2   establish through the documents that we have already obtained

3   mostly from Ms. Sullivan, not produced by Mr. Donziger, because

4   he has produced virtually nothing, that what basically Mr.

5   Donziger has been doing is selling interests in the judgment

6   and then being able to pay himself his monthly retainers, his

7   expenses and everything.

8          THE COURT:  Right, and he said that on the witness

9   stand.

10         MR. MASTRO:  I understand.  We would have shown the

11  hundreds of thousands of dollars just from the documents we

12  were able to get for a short period of time he has put in his

13  own pocket, and we also would have, your Honor, further

14  established that he only represents one entity at this point

15  and the very questionable grounds on which he should have the

16  ability to do any such fund raising.

17         That can wait for another day.

18         THE COURT:  What does the one have to do with the

19  other?  Just enlighten me.

20         MR. MASTRO:  Your Honor, to us, the whole thing is a

21  big scam and part of his ongoing fraud.

22         He is somebody who is selling interest in the

23  judgment, he is violating the court's order and he is lining

24  his own pockets.  He has to raise the money to be able to line

25  his own pockets and he has made himself quite a bit since doing

1  that.  We would like the court to understand the full extent of

2  the scam and how many people have been scammed and have all of

3  that.

4         THE COURT:  I am sorry.  By category, who has been

5  scammed?

6         MR. MASTRO:  Anyone who has invested since March 2014.

7         THE COURT:  You think that might be a different --

8         MR. MASTRO:  Since you have a right, since we believe

9  that every time he has been soliciting and every time he has

10  been successful in his solicitation, that has, of an investment

11  in the judgment in exchange for an interest in the judgment,

12  that that has violated the Paragraph 5 of the judgment.

13         THE COURT:  I understand that's your position, I do.

14  I know what his position is.

15         MR. MASTRO:  I simply wanted to also point out, your

16  Honor, and again it was beyond the scope, but Mr. Donziger has

17  even taken the brazen position, and I would have cross-examined

18  him on this even after the Frente, even if an argument could be

19  made about their status, even now that the Frente has had a

20  default judgment against him, he has every right to go out and

21  sell interests in the judgment anyway even though he is the

22  agent of the Frente and clearly covered by the injunction in

23  that regard.  He has brazenly taken the position and said at

24  the deposition he absolutely has the right to do that.

25         THE COURT:  That issue is not before me.

1          MR. MASTRO:  I understand.  I am pointing out he will

2     continue to be in contempt even with the default judgment

3     against the Frente.

4          THE COURT:  Look, you have a right to do what you

5     think is appropriate to enforce what you see as your client's

6     rights, but I am not sitting as a roving committee here.  If

7     you tee something up, I will deal with it.  If you don't, that

8     is another matter.

9          MR. MASTRO:  I understand, your Honor.

10          THE COURT:  Okay.  Is there anything else from you,

11     Mr. Donziger, within the bounds I put on Mr. Mastro?

12          MR. DONZIGER:  I have obviously submitted papers and

13     made my positions on this issue clear.  Do you feel like you

14     need anything else in light of what Mr. Mastro just said, which

15     I obviously disagree with pretty much all that he just said?

16          Can I argue or do you feel like it would not be

17     helpful to you?

18          THE COURT:  I think it is probably not helpful at this

19     point -- that was a comma, not a period.  I understand that may

20     be hard to tell sometimes.  I understand what you think, Mr.

21     Donziger, of the April 25th document said.  I wrote it.  I can

22     read it.  I think we may well have or there may well be a

23     disagreement about what its significance is.  I am sure there

24     is.  Certainly I know Mr. Mastro has a different view whatever

25     it says and whatever it was could be construed as.  I

1    understand that.

2           Neither side has attempted to address whether any of

3    this is impacted by the terms of Mr. Donziger's retention

4    agreement, by the inter-creditor agreement, by investment

5    agreements that were in place at relevant times.  The bottom

6    line, maybe you haven't addressed it because you thought about

7    it and you don't think it has any impact, but I just wondered

8    about that now.

9           If anybody thinks any further submissions about that

10   might be useful, you are to write me a letter within 10 days as

11   to what and why, and the letter is no more than two pages, and

12   it is double-spaced, and then I will see whether I think any

13   further submission will be useful, okay?

14          MR. MASTRO:  Yes, your Honor, we will definitely do

15   that.  I just wanted to point out that Mr. Donziger did testify

16   that he has a new retention agreement as of 2016-17 with the

17   Frente, and he has not produced that to us.  We are prepared to

18   do this analysis, but it would be even more constructive if he

19   actually produced his --

20          THE COURT:  Why shouldn't that be produced?

21          MR. DONZIGER:  It is, and I have it right here.  I

22   will produce it right now.  I am not going to argue against Mr.

23   Mastro.  As a lawyer and officer of the court, I will direct

24   this to you directly.  This is a contempt hearing.  I don't

25   want to be in contempt of the court.  I am not at this point

1    arranging any more financing, and I can't until I get clarity,

2    some sort of clarification from your Honor what is, in your

3    view, permissible or not permissible.  I want to be clear about

4    that because --

5         THE COURT:  Look, I appreciate that, but you seriously

6    need to consider whether, even if you are right as to what

7    happened in days of yore, whatever that argument has any

8    traction at all from the minute the judgment was entered

9    against all your clients, including the Frente, which I won't

10   prejudge it, but it certainly is a different set of facts.  I

11   am not going to give you a declaratory judgment.

12        MR. DONZIGER:  On that point, you're referring to the

13   default judgment?

14        THE COURT:  Yes, sure.

15        MR. DONZIGER:  Just to be clear, I testified in my

16   deposition that I thought that it did not change the landscape

17   in terms of fund raising.  I, upon further reflection, realized

18   that that is a mistake and not my position.  I didn't quite

19   understand the situation when I said that.  To the extent you

20   read my deposition or they raise it, I want to be clear about

21   that.

22        THE COURT:  I am nodding not to evidence agreement,

23   but to acknowledge the fact you have said something.

24        MR. DONZIGER:  Thank you.

25        THE COURT:  I think everybody will have to think about

1    that down the road, okay?

2              Anything else?  Okay.  Thank you.

3              (Court adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Donziger  . . . . . . . . . . . . .23

Redirect By Judge Stern  . . . . . . . . . . .30

STEVEN DONZIGER

Direct By Mr. Mastro . . . . . . . . . . . . . .32

Cross By Mr. Donziger  . . . . . . . . . . . .65

                    PLAINTIFF EXHIBITS

Exhibit No.                                   Received

 GR 1 through 7    . . . . . . . . . . . . . . . 2

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

 9006    . . . . . . . . . . . . . . . . . . .62

# EXHIBIT 4

<center>Ecuador Judgment Investment Agreement
Dated: May 2, 2016</center>

In consideration of an investment of $250,000 to help fund the collection by the claimants and the Frente de Defensa de la Amazonia (together, the "Claimants") of the Ecuador environmental judgment (as defined below) against Chevron and/or its subsidiaries ("Chevron"), the Claimants and the Funder hereby agree as follows:

**Grant of an interest:** The Claimants hereby grant the Funder .125% ("percentage interest") of the total amount of the Ecuador judgment. The "Ecuador judgment" means the net amount of all funds actually collected by Claimants from Chevron, in connection with the enforcement of the Ecuador environmental damages judgment against Chevron. The net amount shall include any settlements of claims by Chevron; any judicial orders obtained by Claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value. This includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% of the judgment apart from actual damages due the Frente de Defensa de la Amazonia ("FDA"), under Ecuador's Environmental Management Law.

** Follow on Investment Right: The Funder shall have the right to participate in or invest alongside one or more future investments in the collection of the Ecuador judgment, up to a maximum of an additional $250,000 in each round, at a 25% discount to the negotiated terms of any such future investments.

Obligations to Funder and Equity Holders: All obligations to the Funder and other third-party equity holders (including lawyers, investors and consultants who are owed compensation by the claimants) will be satisfied "pari passu" among themselves prior to any distributions to the claimants based on their percentage share of the total amount collected from the Ecuador judgment by the claimants anywhere in the world. The "total amount collected" includes actual damages, the 10% additional compensation due to the FDA, interest payments on the judgment, any other fees, or anything of value recovered.

Distribution of funds – priority of payments: In order of priority, with respect to any funds received from the Ecuador judgment that become available for distribution under this Agreement, Claimant will pay the Funder the Percentage Interest "pari passu" with other third-party equity holders (including lawyers, investors and consultants who are owed compensation by the Claimants) prior to Claimant receiving its percentage interest with respect to such funds.

Partial Recovery in non-settlement scenario: To the extent the collection of funds from the Ecuador judgment takes place without a settlement and on a partial or incremental basis, the Funder and other equity holders will be compensated their respective percentage interests on a "pari passu" basis with the Claimant, until all equity holders are paid fully. Such payments shall be made forthwith upon receipt of any funds recovered under the terms of this Agreement.

Settlement subsequent to partial recovery: Should any final and voluntary settlement of claims occur subsequent to a partial recovery, the Funder and all equity holders will be compensated in full prior to claimants, in the order of priority as outlined herein.

Collection of judgment funds outside Canada: Should any funds from the Ecuador judgment be collected from Chevron from any jurisdiction outside Canada, counsel or any other authorized representative of the Claimants in such jurisdiction shall be instructed by claimants to distribute any such funds to the Funder and other equity holders in accordance with their respective Percentage Interests and in the same order of priority as set forth above.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Obligations of the FDA: The FDA agrees that the full amount of its 10% award due under the judgment against Chevron shall, if necessary, be used to guarantee full payment to the Funder and other equity holders in the judgment, or to otherwise effectuate compliance with all terms of this Agreement.

Binding and irrevocable authority of the FDA: The signatory of the FDA to this agreement affirms he has the authority to bind the organization and fully and irrevocably to all obligations under this Agreement.

Payment of Investment Amount: Simultaneously with execution and delivery of this Agreement, the Funder will deposit $250,000 with an escrow agent who will be instructed by the Funder to transfer said funds to the law firm of Lenczner Slaght in Toronto, Ontario.

Escrow Agent: The Funder will deposit the designated amount of funds with an independent law firm in Canada (other than Lenczner Slaght) that will serve as an escrow agent for the Funder, both in the distribution of the Funder's invested funds, either now or in the future, and in the collection of any recovered funds from Canada (or another jurisdiction, if applicable) for the Funder under this agreement.

Use of proceeds: The proceeds of the Funder's investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador judgment in Canada and other jurisdictions as may be determined.

Instructions: The claimants and the FDA, and their representatives, will, in timely fashion and as frequently as necessary, instruct all counsel in Canada and elsewhere involved in the collection of the Ecuador environmental judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any funds under the Ecuador judgment. In any event, claimants agree that any payments due the Funder or other equity holders from any recovery under the Ecuador judgment will be transferred in full within ten days of the receipt of any funds.

Information: Investor will be kept apprised on a regular basis of all material developments in the litigation.

Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one agreement.

Confidentiality: The parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the parties and will not be divulged to third parties.

Conflict of languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.


Dated: May 2, 2016


_____               _____
Client Representative, FDA             Alan Lenczner, Counsel for Claimants, Canada
                                       Acknowledged and Accepted

Glenn J Kuehn    5/3/2016
Funder

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Addendum to Ecuador Judgment Investment Agreement Dated May 2, 2016

Assignment: Nothing in the Ecuador Judgment Investment Agreement (dated May 2, 2016) should be interpreted to prevent the Funder from exercising an exclusive right to assign his interest or any portion thereof to a member of his immediate family, or to a trust for the primary benefit of an immediate family member.

_____
Client Representative, FDA

_____
Alan Lenczner, Counsel for Claimants, Canada
Acknowledged and Accepted

_____
Funder

Addendum to Ecuador Judgment Investment Agreement Dated May 2, 2016

Assignment: Nothing in the Ecuador Judgment Investment Agreement
(dated May 2, 2016) should be interpreted to prevent the Funder from
exercising an exclusive right to assign his interest or any portion thereof to a
member of his immediate family, or to a trust for the primary benefit of an
immediate family member.

Dated: May 20, 2016


_____
Client Representative, FDA



_____
Alan Lenczner, Counsel for Claimants, Canada
Acknowledged and Accepted



_____
Funder

# EXHIBIT 5

# Ecuador Judgment Investment Agreement
Dated: July 11, 2016

In consideration of an investment of $250,000 to help fund the collection by the claimants and the Frente de Defensa de la Amazonia (together, the "Claimants") of the Ecuador Judgment (as defined below) against Chevron and/or its subsidiaries ("Chevron"), the Claimants and the Funder hereby agree as follows:

Grant of an Interest: The Claimants hereby grant the Funder .125% ("Percentage Interest") of the total amount of the Ecuador Judgment. The "Ecuador Judgment" means the total amount of all funds actually collected by Claimants from Chevron, in connection with the enforcement of the Ecuador environmental damages judgment against Chevron. The total amount shall include any settlements of claims by Chevron; any judicial orders obtained by Claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value. This includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% of the judgment apart from actual damages due the Frente de Defensa de la Amazonia ("FDA"), under Ecuador's Environmental Management Law.

Follow on Investment Right: The Claimants hereby grant the Funder the right to participate in or invest alongside one or more future investments in the collection of the Ecuador Judgment, up to a maximum of an additional $250,000 in each round, at a 25% discount to the negotiated terms of any such future investments.

Obligations to Funder and Equity Holders: All obligations to the Funder and other third-party equity holders (including lawyers, investors and consultants who are owed compensation by the Claimants) will be satisfied "pari passu" among themselves, prior to any distributions to the Claimants, based on their percentage share of the total amount collected from the Ecuador Judgment by the Claimants anywhere in the world. The "total amount collected" includes actual damages, the 10% compensation due to the FDA, interest payments on the judgment, any other fees, or anything of value recovered.

Distribution of Funds – Priority of Payments: In order of priority, with respect to any funds received from the Ecuador Judgment that become available for distribution under this Agreement, Claimants will pay the Funder the Percentage Interest "pari passu" basis with other equity holders (including lawyers, investors and consultants who are owed compensation by the Claimants) prior to Claimants receiving its percentage interest with respect to such funds.

Partial Recovery in Non-Settlement Scenario: To the extent the collection of funds from the Ecuador Judgment takes place without a settlement and on a partial or incremental basis, the Funder and other equity holders will be compensated their respective percentage interests on a "pari passu" basis prior to Claimants receiving its percentage interest, until all equity holders are paid fully. Such payments shall be made forthwith upon receipt of any funds recovered under the terms of this Agreement.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002599

Settlement Subsequent to Partial Recovery:  Should any final and voluntary settlement of claims occur subsequent to a partial recovery, the Funder and all equity holders will be compensated in full prior to Claimants, in the order of priority as set forth above.

Collection of Judgment Funds Outside Canada:  Should any funds from the Ecuador Judgment be collected from Chevron from any jurisdiction outside Canada, counsel or any other authorized representative of the Claimants in such jurisdiction shall be instructed by Claimants to distribute any such funds to the Funder and other equity holders in accordance with their respective percentage interests and in the same order of priority as set forth above.

Obligations of the FDA:  The FDA agrees that the full amount of its 10% award due under the judgment against Chevron shall, if necessary, be used to guarantee full payment to the Funder and other equity holders in the judgment, or to otherwise effectuate compliance with all terms of this Agreement.

Binding and Irrevocable Authority of the FDA:  The signatory of the FDA to this agreement affirms he has the authority to bind the organization fully and irrevocably to all obligations under this Agreement.

Payment of Investment Amount:  Simultaneously with execution and delivery of this Agreement, the Funder (unless he chooses to work through an Escrow Agent) will deposit $250,000 with the law firm of Lenczner Slaght in Toronto, Ontario.

Escrow Agent:  The Funder will deposit the designated amount of funds with an independent law firm in Canada (other than Lenczner Slaght) that will serve as an escrow agent for the Funder, both in the distribution of the Funder's invested funds, either now or in the future, and in the collection of any recovered funds in Canada (or another jurisdiction, if applicable) for the Funder under this Agreement.

Use of Proceeds:  The proceeds of the Funder's investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

Instructions:  The Claimants, the FDA, and their representatives will, in a timely fashion and as frequently as necessary, instruct all counsel in Canada and elsewhere involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any funds under the Ecuador Judgment.  In any event, Claimants and the FDA agree that any payments due the Funder or other equity holders from any recovery under the Ecuador Judgment will be transferred in full within ten days of the receipt of any funds.

Information:  Investor will be kept apprised on a regular basis of all material developments in the litigation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002600

Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one agreement.

Confidentiality: The parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the parties and will not be divulged to third parties.

Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

Assignment: References to the parties include their assignees, transferees and successors-in-title and shall include both corporate and unincorporated associations, partnerships, and individuals. Nothing in this agreement can be construed to block the Funder from assigning all or part of his interest to a member of his immediate family, or to a trust for the benefit of an individual in his immediate family.

Governing Law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

*Remainder of page intentionally left blank.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002601

Dated: July 11, 2016

_____
Client Representative, FDA

_____
Funder

_____
Alan Lenczner, Counsel for Claimants, Canada
Acknowledged and Accepted

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002602

# EXHIBIT 6



## CERTIFICACIÓN

En calidad de Secretaria General del Frente de Defensa de la Amazonía –FDA–, doy a conocer la resolución emitida en la reunión extraordinaria del Concejo Ejecutivo el día 29 de agosto del presente año. Dicha resolución dice lo siguiente:

1. Que el concejo ejecutivo, fundamentado en el artículo 32 literal h del estatuto del Frente de Defensa de la Amazonía, autoriza al compañero Carlos Humberto Guamán Gaibor, representante legal del FDA, la suscripción del contrato de financiamiento de 300.000 dólares americanos que serán destinados para los gastos de ejecución de la sentencia "Aguinda vs Chevron" en Canadá.

Dado y firmado en Nueva Loja, el 29 de Agosto de 2016.

Srta. Gladys Solano

**SECRETARIA GENERAL FDA**



Dirección: Calles Eloy Alfaro N° 801 y Progreso - Telefax 593(06) 2831 930 - Lago Agrio, Nueva Loja

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002654

## Ecuador Judgment Investment Agreement

In consideration of an investment of $300,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

   a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (attached in Appendix 1) collectively.

   b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary. Attached in Appendix 1.

2. Parties and Agents:

   a. "FDA": Frente de Defensa de la Amazonia

   b. "Trust Board President": Mr. Ermel Gabriel Chávez Parra, duly appointed President of the Board of the Ecuador Trust.

   c. "Ecuador Parties": The FDA and the Trust Board President.

   d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

   e. "Funder": As identified in Appendix 2, in the possession of Canadian Counsel.

   f. "Funding Escrow Agent": Beard Winter LLP

   g. "U.S. Representative": As identified in Appendix 2, in the possession of Canadian Counsel.



1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

3. Grant of Interest:

    a. Grant: The FDA and the Trust President hereby grant the Funder an Interest ("Funder's Interest") of 0.165% of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds (defined below) as further set forth herein.

    b. Definition of Ecuador Judgment Gross Proceeds: "Ecuador Judgment Gross Proceeds" means the total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

4. Ecuador Parties' Guarantee of Obligations: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and FDA hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its Interest in accordance with this Agreement. Other than the Parties to this Agreement, as defined above, the Funder will have no obligations to third parties. Notwithstanding that the Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various contracts with funders, lawyers, and other service providers (including the Priority Existing Equity Holders identified by the Ecuador Parties in Appendix 3 to this Agreement and the Distribution Escrow Agreement), which also provide a grant of interest in the Ecuador Judgment Gross Proceeds, the Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those contracts and that its Interest will absolutely be honored out of the Gross Proceeds recovered.

5. Co-ownership of Ecuador Judgment: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. Investment Deemed to be Made: Once Funder transfers and clears the full amount of the investment to the Funding Escrow Account, the investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above and will immediately become the co-owner of the Ecuador Judgment as also defined above, subject only to the conditions and limitations outlined herein.

7. Agreements of Ecuador Parties: The Ecuador Parties hereby agree with Funder as follows:

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002656

a. Settlement Process: The FDA will lead the establishment of a Settlement Oversight Committee to facilitate and advise on any settlement opportunities. Members will include Canadian Counsel, two representatives appointed by the FDA, and the U.S. Representative.

b. Additional Representations: The Ecuador Parties hereby represent, warrant and confirm that:

    i. they have (A) full power and authority to enter into and perform their obligations under this Agreement, (B) duly authorised the execution, delivery and performance of their obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to their execution, delivery and performance of their obligations under this Agreement;

    ii. the execution and the delivery of this Agreement does not in any way contravene any laws, rulings, or public policies whether in Ecuador or Canada, nor contravene any of the Ecuador Parties' constituent or other governing documents or another contracts, commitments, or obligations of the Ecuador Parties or their affiliates or representatives (on their behalf) with any third parties; and

    iii. the Ecuador Parties make to the Funder each of the representations and warranties set forth in clauses 10.2(a) through and including (p) of the Funding Agreement between Treca Financial Solutions, the FDA and the Claimants (as defined therein), in the form delivered by FDA to Funder, as if such representations and warranties were incorporated into this Agreement and made a part hereof and were made to Funder *mutatis mutandis* with application to this Agreement and the obligations of the Ecuador Parties and the transactions contemplated by this Agreement.

c. The Ecuador Parties agree and confirm that upon the receipt of the Ecuador Judgment Gross Proceeds the Funder will be entitled to and will receive promptly the Funder's interest in accordance with the "Grant of Interest" provision of this Agreement.

d. Escrow Agent Provisions:

    i. The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement.

    ii. Canadian Counsel hereby confirms that the execution and the delivery of this Agreement does not contravene any laws, rulings and public policies in Canada.

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002657

iii. The Canadian Counsel confirms, as the Exclusive Distribution Escrow Agent, that upon collection of any of the Ecuador Judgment Gross Proceeds, the Funder will receive the Funder's Interest in accordance with this Agreement and in accordance with the Distribution Escrow Agreement (defined below) that shall be approved and executed by the Funder and the Ecuador Parties no later than three (3) weeks from the Notice to Fund.

8. Conditions to Requirement to Transfer Funds: The investment will be in the amount of $300,000. In satisfaction of the investment amount, the Funder shall cause an amount equal to $300,000 less up to $15,000 for legal fees in connection with this Agreement and advice related to the transactions contemplated hereby, to be paid to Funding Escrow Agent. The transfer of the investment by the Funder is subject to: (i) the Notice to Fund; (ii) delivery of a certificate by the Ecuador Parties certifying that this Agreement has been approved by the FDA Executive Committee the Trust, and each other governing body of an Ecuador Party and that all other representations and warranties made by the Ecuador Parties made in or incorporated into this Agreement remain true, correct and complete as of the date of the funding; (iii) the approval and execution of the Funding Escrow Agreement by the Funding Escrow Agent and all the relevant parties and stakeholders sufficient for the establishment of the Funding Escrow Account set forth below; and (iv) confirmation given by Canadian Counsel as articulated in this Agreement.

9. Escrow Accounts: Two escrow accounts will be created by Canadian Counsel, as follows:

   a. The first escrow account ("Funding Escrow Account") will be created by the Funding Escrow Agent to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative, the Funder, and a representative to be appointed by the FDA. Upon due consultation, final authority over distribution of said funds will rest with the U.S. Representative.

   b. The second escrow account ("Distribution Escrow Account") will be created by Canadian Counsel to collect the Ecuador Judgment Gross Proceeds and distribute said proceeds to satisfy the Funder's Interest and other equity holders as set forth above and then distribute funds to the Ecuador Trust for environmental remediation and/or to otherwise implement the remediation ordered by the Ecuador Judgment.

10. No Further Funding Requirement: Canadian Counsel, the Ecuador Parties, and the US Representative hereby confirm to the Funder that upon the investment being made, under no circumstances, will there be a requirement for further funding from the Funder in order to conclude all of the procedures in Canada related to the enforcement of the Ecuador Judgment and the collection of the Ecuador Judgment Gross Proceeds.

11. Use of funds: From time to time, and in order to determine how the Investment will be spent, a budget shall be agreed upon and approved by the US Representative and the Funder, with the US Representative having final authority in the event of a conflict. The Investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002658

12. Obligations of the Funder: Once the Funder has made its investment, the Funder will be under no other obligation whatsoever as per this Agreement.

13. No Dilution: The Funder will not be subject to any dilution of Funder's Interest as defined above.

14. No responsibility for environmental remediation: The Funder will have no responsibility whatsoever for environmental remediation in the area of Ecuador affected by the Ecuador Judgment.

15. Obligations towards the Funder: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder will be satisfied in accordance with this Agreement and the Distribution Escrow Agreement prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Claimants, based on its Interest in the total amount collected from the Ecuador Judgment Gross Proceeds by the Canadian Counsel or any other Counsel for and on behalf of the Ecuador Parties anywhere in the world.

16. Partial Recovery in Non-Settlement Scenario: To the extent the collection of funds from the Ecuador Judgment takes place without a settlement and on a partial or incremental basis, the Ecuador Parties hereby irrevocably warrant that the Funder (along with other Priority Existing Equity Holders as listed in Appendix 3) will be compensated a percentage of funds corresponding to their respective interests assuming a full recovery, prior to any payments to the Ecuador Parties or any other party or stake-holder receiving any interest with respect to such funds. Such payments shall be made forthwith upon receipt of any funds recovered under the terms of this Agreement.

17. Collection of Judgment Funds Outside Canada: Should any part of the Ecuador Judgment Gross Proceeds be collected from Chevron from any jurisdiction outside Canada, Canadian Counsel as the Exclusive Distribution Escrow Agent will collect and distribute any such funds to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 in accordance with their respective interests and in accordance with the Distribution Escrow Agreement.

18. Obligations of the FDA: The FDA hereby irrevocably warrants that the full amount of its 10% award due under the judgment against Chevron plus any interest on the judgment collected in any enforcement jurisdiction, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 until all have fully received their Interests as per this Agreement and others referenced in the Appendix.

19. Obligations of Canadian Counsel: Canadian Counsel hereby accepts irrevocable instructions to adhere to all of the terms of this Agreement and will abide by those instructions.

20. Binding and Irrevocable Authority of the FDA: The signatory of the FDA to this Agreement (upon ratification of the FDA Executive Committee) affirms he has the authority to bind the organization.



5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

21. Instructions: The FDA and its representatives will, in a timely fashion and as frequently as necessary, instruct the Canadian Counsel in Canada and other Counsels elsewhere involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any funds under the Ecuador Judgment. In any event, the Ecuador Parties agree that any payments due to the Funder from any recovery under the Ecuador Judgment will be transferred in full within one week of the final receipt of any funds in accordance with this Agreement and the Distribution Escrow Agreement.

22. Information: Investor will be kept apprised on a regular basis of all material developments in the litigation and shall provide all documents or others information as are reasonably requested by Funder.

23. Common Legal Interest: The FDA, Trust and Funder have a "common legal interest" in the Claim, this Agreement and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

24. Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

25. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third Parties.

26. Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

27. Assignment: This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective assignees, transferees and successors-in-title or interest. References to the parties include their assignees, transferees and successors-in-title or interest, and shall include both corporate and unincorporated associations, partnerships, and individuals. Neither this Agreement, nor any rights, interests, obligations and duties arising hereunder may be assigned or conveyed; provided, however, that nothing in this agreement can be construed to block the Funder from assigning all or part of his interest to a member of his immediate family, or to a trust, pension plan or other entity for the benefit of the Funder or one or more individuals in his immediate family.

28. Severability & Invalidity: If any term or provision in this Agreement will in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement will not be affected. 

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

29. Other Third-party commitments: The Parties warrant to each other that the execution and the delivery of this Agreement are not against any commitments, contracts and / or other obligations that they have with other third Parties.

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016


DATED: 24/08/2016 _____        _____
                                         Carlos Guaman Galbor
                                         President, FDA

DATED: 24/08/2016 _____        _____
                                         Jaimel Gabriel Chavez Parra
                                         BOARD PRESIDENT, ECUADOR TRUST


DATED: _____                   _____
                                         FUNDER


DATED: _____                   _____
                                         Alan Lenczner
                                         Lenczner Slaght Royce Smith Griffin LLP
                                         *All Instructions Acknowledged and Accepted*


7

will receive the Funder's Interest in accordance with this Agreement and in accordance with the Distribution Escrow Agreement (defined below) that shall be approved and executed by the Funder and the Ecuador Parties no later than three (3) weeks from the Notice to Fund.

8. <u>Conditions to Requirement to Transfer Funds</u>: The investment will be in the amount of $300,000. In satisfaction of the investment amount, the Funder shall cause an amount equal to $300,000 less up to $15,000 for legal fees in connection with this Agreement and advice related to the transactions contemplated hereby, to be paid to Funding Escrow Agent. The transfer of the investment by the Funder is subject to: (i) the Notice to Fund; (ii) delivery of a certificate by the Ecuador Parties certifying that this Agreement has been approved by the FDA Executive Committee the Trust, and each other governing body of an Ecuador Party and that all other representations and warranties made by the Ecuador Parties made in or incorporated into this Agreement remain true, correct and complete as of the date of the funding; (iii) the approval and execution of the Funding Escrow Agreement by the Funding Escrow Agent and all the relevant parties and stakeholders sufficient for the establishment of the Funding Escrow Account set forth below; and (iv) confirmation given by Canadian Counsel as articulated in this Agreement.

9. <u>Escrow Accounts</u>: Two escrow accounts will be created by Canadian Counsel, as follows:

   a. The first escrow account ("<u>Funding Escrow Account</u>") will be created by the Funding Escrow Agent to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative, the Funder, and a representative to be appointed by the FDA. Upon due consultation, final authority over distribution of said funds will rest with the U.S. Representative.

   b. The second escrow account ("<u>Distribution Escrow Account</u>") will be created by Canadian Counsel to collect the Ecuador Judgment Gross Proceeds and distribute said proceeds to satisfy the Funder's Interest and other equity holders as set forth above and then distribute funds to the Ecuador Trust for environmental remediation and/or to otherwise implement the remediation ordered by the Ecuador Judgment.

10. <u>No Further Funding Requirement</u>: ~~Canadian Counsel,~~ ✓ A✓ ✓ The Ecuador Parties, and the US Representative hereby confirm to the Funder that upon the Investment being made, under no ₍A₎ circumstances, will there be a requirement for further funding from the Funder ~~in order to~~ A₄ ~~conclude all of the procedures in Canada~~ related to the enforcement of the Ecuador Judgment *in Canada* and the collection of the Ecuador Judgment Gross Proceeds.

11. <u>Use of funds</u>: From time to time, and in order to determine how the Investment will be spent, a budget shall be agreed upon and approved by the US Representative and the Funder, with the US Representative having final authority in the event of a conflict. The Investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016


DATED: _____          _____
                                  Carlos Guaman Gaibor
                                  President, FDA


DATED: _____          _____
                                  Ermel Gabriel Chávez Parra
                                  BOARD PRESIDENT, ECUADOR TRUST


DATED: _____          _____
                                  FUNDER


DATED: September 16, 2016         _____
                                  Alan Lenczner
                                  Lenczner Slaght Royce Smith Griffin LLP
                                  *All Instructions Acknowledged and Accepted*


7

29. Other Third-party commitments: The Parties warrant to each other that the execution and the delivery of this Agreement are not against any commitments, contracts and / or other obligations that they have with other third Parties.

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016

DATED: 24/08/2016          _____
                          Carlos Guaman Gaibor
                          President, FDA

DATED: 24/08/2016          _____
                          Ermel Gabriel Chávez Parra
                          BOARD PRESIDENT, ECUADOR TRUST

DATED: _____     _____
                          FUNDER  Solely as Trustee of Managing Member
                                  and Not in an Individual Capacity

DATED: _____     _____
                          Alan Lenczner
                          Lenczner Slaght Royce Smith Griffin LLP
                          *All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

## APPENDIX 2

### Ecuador Judgment Investment Agreement

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonía ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. **Funder** means:    WDIS Finance LLC.

2. **U.S. Representative** means:    Steven R. Donziger
    245 W. 104th St., #7D
    New York, New York 10025.


DATED: _____    _____
    Carlos Guaman Gaibor
    President, FDA


DATED: _____    _____
    Ermel Gabriel Chávez Parra
    BOARD PRESIDENT, ECUADOR TRUST


DATED: _9/12/16_    _~~~~~~~ as Trustee of Managing member_
    (FUNDER)    _and not in an Individual Capacity_


DATED: _____    _____
    Alan Lenczner
    Lenczner Slaght Royce Smith Griffin LLP
    *All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

## APPENDIX 2

### Ecuador Judgment Investment Agreement

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:          WDIS Finance LLC.

2. U.S. Representative means:    Steven R. Donziger
                                  245 W. 104th St., #7D
                                  New York, New York 10025.

DATED: _____

_____
Carlos Guaman Gaibor
President, FDA

DATED: _____

_____
Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

_____
FUNDER

DATED: _September 16, 2016_

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002666

**Ecuador Judgment Investment Agreement**

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:  WDIS Finance LLC.

2. U.S. Representative means:  Steven R. Donziger
   245 W. 104th St., #7D
   New York, New York 10025.


DATED: 10-09-2016  _____
Carlos Guaman Gaibor
President, FDA

DATED: 18-09-2016  _____
Ermel Gabriel Chavez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____  _____
FUNDER

DATED: _____  _____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

This is Appendix 3 referred to in the **Ecuador Judgment Investment Agreement**, dated as of August 24, 2016 among the Funder (as identified in such agreement) to help fund the collection of the Ecuador Judgment (as defined in such agreement) against Chevron and/or its subsidiaries, by the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined in such agreement), together with the President of the Board of the Ecuador Trust (defined in such agreement). In accordance with and subject to the terms and of Section 4 of such agreement, the FDA identifies that it has previously allocated the following interests:

| Name | Interest[†] |
|---|---|
| Funder I | 0.125% |
| Funder II | 0.050% |
| Funder IV | 0.110% |
| Funder V | 0.165% |

[†] *Percentage of Ecuador Judgment Gross Proceeds*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002668

DATED: _____

                 Carlos Guaman Gaibor
                 President, FDA

DATED: _____

                 Ermel Gabriel Chávez Parra
                 President of the Board, ECUADOR TRUST

DATED: *September 16, 2016*

                 Alan Lenczner
                 Lenczner Slaght Royce Smith Griffin LLP
                 *Acknowledged and Accepted*

2 / 2

DATED: 16-09-2016

_____
Carlos Guaman Gaibor
President, FDA

DATED: 16 09-2016

_____
Ermel Gabriel Chavez Parra
President of the Board, ECUADOR TRUST

DATED: _____

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*Acknowledged and Accepted*

2 / 2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

DATED: _____

_____
Carlos Guaman Gaibor
President, FDA

DATED: _____

_____
Ermel Gabriel Chávez Parra
President of the Board, ECUADOR TRUST

DATED: _September 16, 2016_

_~~Alan Lenczner~~_ (signature)
_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002671

## APPENDIX 2

### Ecuador Judgment Investment Agreement

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:            WDIS Finance LLC.

2. U.S. Representative means:    Steven R. Donziger
                                   245 W. 104th St., #7D
                                   New York, New York 10025.

DATED: 10-04-2016                         _____
                                        Carlos Guaman Gaibor
                                         President, FDA

DATED: 16-09-2016                         _____
                                         Ermel Gabriel Chavez-Parra
                                         BOARD PRESIDENT, ECUADOR TRUST

DATED: _____                         _____
                                         FUNDER

DATED: _____                         _____
                                         Alan Lenczner
                                         Lenczner Slaght Royce Smith Griffin LLP
                                         *All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

September 22, 2016

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
130 Adelaide St. W
Suite 2600
Toronto, ON
Canada M5H 3P5

Dear Alan,

Reference is made to the Ecuador Judgment Investment Agreement (the "Investment Agreement") from the Funder executing this letter, to help fund the collection of the Ecuador Judgment (as defined in such agreement) against Chevron and/or its subsidiaries by the Frente de DeFensa de la Amazonia.

This letter serves to memorialize our acknowledgment and agreement that notwithstanding paragraph 10 of the Investment Agreement, that your firm is not required to carry on its work on the enforcement of the Ecuador Judgment unless your firm is being paid to do so.

Sincerely,

WBf     Solely as Trustee
Funder   of Managing Member
          of Funder

63787332_1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002673

## DIRECTION

O: BEARD WINTER LLP

E: FUNDING ESCROW AGREEMENT dated August 25, 2016, made between WDIS Finance LLC and Beard Winter LLP (the "Funding Escrow Agreement")

---

The undersigned hereby directs BEARD WINTER LLP in its capacity as Escrow Agent nder and pursuant to the Funding Escrow Agreement to hereby pay the sum of TWO IUNDRED AND EIGHTY-FIVE THOUSAND ($285,000.00) DOLLARS U.S. to LENCZNER LAGHT ROYCE SMITH GRIFFIN LLP upon receipt of such funds that will be directed to 1e wire transfer coordinates as set forth below:

ROYAL BANK OF CANADA - U.S. ACCOUNT

| | |
|---|---|
| Bank Address: | 20 King Street West, Toronto, ON M5H 1C4 |
| Bank Number: | 003 |
| Transit Number: | 06012 |
| Account Number: | 4006797 |
| Account Name: | Beard Winter LLP |
| | Suite 701, 130 Adelaide Street West, Toronto, ON M5H 2K4 |
| ABA Number: | 021 0000 21 |
| Swift Code: | ROYCCAT2 |

DATED this _____ day of August, 2016.

WDIS FINANCE LLC

Per: _____

Name: Michael Ben-JACOB

Title: Truske of Managing Member

I have the authority to bind the above-referenced company

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002674

IN WITNESS WHEREOF the parties have executed this Funding Escrow Agreement.

WDIS FINANCE LLC

Per:

Name: Michael Ben-Jacob

Title: Trustee of Managing Member

I have the authority to bind the above-referenced company

BEARD WINTER LLP

By:

George D. Crossman

Managing Partner

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# FUNDING ESCROW AGREEMENT

Funding Escrow Agreement dated August 25, 2016, between WDIS Finance LLC (the "**Client**") and Beard Winter LLP (the "**Escrow Agent**").

## RECITALS:

(a) Certain sums of monies (the "**Escrow Funds**") will be delivered to the Escrow Agent by the Client from time to time; and

(b) The Escrow Agent has agreed to act as escrow agent for the purpose of holding and disbursing the Escrow Funds pursuant to the terms of this Funding Escrow Agreement and in accordance with the instructions from the Client.

In consideration of the foregoing and the mutual agreements contained herein (the receipt and adequacy of which are acknowledged), the parties agree as follows:

## Section 2    Delivery of Escrow Funds

The Client will deliver or cause to be delivered Escrow Funds from time to time to the Escrow Agent by way of certified cheque payable to the Escrow Agent or a wire transfer of immediately available funds to the Escrow Agent, which amount, together with all interest earned thereon as contemplated by Section 3, shall be held and dealt with by the Escrow Agent in accordance with terms of this Funding Escrow Agreement.

## Section 3    Investment of Escrow Funds

The Escrow Agent is hereby authorized and directed to cause the Escrow Funds to be invested and reinvested from time to time with the Royal Bank of Canada in an interest bearing instrument with a maturity of not more than thirty (30) days more or less. Interest earned and paid on such investments shall be added to and form part of the Escrow Funds and shall be invested and reinvested from time to time in accordance with this section. Interest earned on the Escrow Funds will be for the benefit of the Client.

## Section 4    Purpose of the Escrow Funds

The Escrow Funds are to be used to make an investment, to pay certain legal fees and other expenses that the Client has agreed to assume responsibility for and for such other purposes as the Client may direct in writing to the Escrow Agent. The Escrow Funds shall be released by the Escrow Agent only when the Client provides the Escrow Agent with a written Direction (as such term is defined below).

## Section 5    Payment Notices, No Requirement to Act, Funds Received on Behalf of the Client

(1) At any time after the date hereof the Client shall be entitled to deliver a direction to the Escrow Agent substantially in the form attached hereto as Schedule "A" (a

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002676

"**Direction**") setting out what portion, if any, of the Escrow Funds are to be released and the name of the payee.

(2)     The Escrow Agent has the right not to act and will not be held liable for refusing to act unless it has received clear and reasonable documentation which complies with the terms of this Agreement. Such documentation must not require the exercise of any discretion or independent judgment on the part of the Escrow Agent.

(3)     Furthermore, the Escrow Agent agrees to hold in trust for the Client any amounts received for the benefit of the Client relative to the settlement of any legal proceedings. The Escrow Agent agrees to hold such funds in trust for the Client and shall release such funds as the Client may direct in writing to the Escrow Agent, provided first, that the Escrow Agent withholds from such funds any Canada Revenue Agency withholding tax obligations that would be the responsibility of the Client.

**Section 6      Duties and Liabilities of the Escrow Agent.**

(1)     The Escrow Agent shall have no duties or responsibilities other than those existing at law or under rules of professional responsibility and those expressly set forth in this Funding Escrow Agreement, which the parties agree are purely administrative in nature, and no implied duties or obligations shall be read into this Funding Escrow Agreement against the Escrow Agent. For greater certainty, the Escrow Agent is not bound by any agreement, arrangement or understanding relating to or arising out of the matters provided for in this Agreement, except as expressly set forth in this Agreement, and the Escrow Agent shall have no duty to enforce any obligation of any person, other than as provided herein.

(2)     The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its own best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was grossly negligent in ascertaining the pertinent facts or acted intentionally in bad faith.

(3)     The Escrow Agent may rely, and shall be protected in acting, upon any judgment, order, notice, demand, direction, certificate, or other instrument, paper or document which may be submitted to it in connection with its duties hereunder and the directions incorporated therein and which is believed by the Escrow Agent to be genuine and signed or presented by the proper person(s), and may accept the same as sufficient evidence of the facts stated therein. The Escrow Agent shall in no way be bound to enquire as to the veracity, accuracy or adequacy thereof or call for further evidence (whether as to due execution, validity or effectiveness, or the jurisdiction of any court, or as to the truth of any fact), and shall not be responsible for any loss that may be occasioned by its failing to do so.

MKS-0002677

- 3 -

(4)     In the event that the Escrow Agent shall become involved in any arbitration or litigation relating to the Escrow Funds, the Escrow Agent is authorized to comply with any decision reached through such arbitration or litigation.

(5)     In the following circumstances, the Escrow Agent may (i) refrain from taking any action under this Agreement until it is authorized or directed otherwise in writing by the Client, or by an order of a court of competent jurisdiction from which no further appeal may be taken or (ii) deposit the Escrow Funds with a court of competent jurisdiction in the City of Toronto, in the Province of Ontario:

      (a)     The Escrow Agent is uncertain as to its duties or rights hereunder,

      (b)     The Escrow Agent receives instructions, claims or demands from the Client or from a third person with respect to any matter arising pursuant to this Funding Escrow Agreement which, in its opinion, are in conflict with any provision of this Funding Escrow Agreement, or

      (c)     The parties to this Agreement disagree about the interpretation of this Agreement or about the rights and obligations of the Escrow Agent or the propriety of an action contemplated by the Escrow Agent under this Agreement.

(6)     Upon the Escrow Agent depositing the Escrow Funds with a court in accordance with Section 6(5), the Escrow Agent will be released from its duties and obligations under this Agreement. Section 7 and Section 8 and the provisions of this Agreement relating to the protection of the Escrow Agent survive such release of the Escrow Agent.

**Section 7     Escrow Agent's Fees, Costs and Expenses**

The Client agrees to pay, upon request, the reasonable fees, expenses and disbursements incurred by the Escrow Agent in connection with the performance of its obligations hereunder.

**Section 8     Indemnification of Escrow Agent**

The Client hereby indemnifies and save harmless the Escrow Agent at all times against all actions, proceedings, losses, liabilities, costs, claims and demands incurred or sustained by the Escrow Agent in respect of any matter or thing done by it under, pursuant to or in connection with this Funding Escrow Agreement, or otherwise arising in connection with its office as Escrow Agent hereunder, except in so far as the same arose through the gross negligence or wilful misconduct on the part of the Escrow Agent or otherwise arose from any breach by it of its obligations under this Funding Escrow Agreement. Without limiting the generality of the foregoing, the Client will indemnify and save harmless the Escrow Agent against all legal or other fees arising out of or in connection with its entering into this Funding Escrow Agreement and carrying out its duties hereunder, including without limitation the costs and expenses of defending itself against any claim of liability or any

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002678

action for interpleader. This indemnity shall survive the termination or discharge of this Funding Escrow Agreement or the resignation of the Escrow Agent.

### Section 9   Resignation, Removal of Escrow Agent

(1)   The Escrow Agent may resign its trust and be discharged from all further duties and liabilities hereunder after giving thirty (30) days' written notice to the Client or such shorter notice as the Client may accept as sufficient, and may be removed from its office as such Escrow Agent by the Client at any time by not less than five (5) business days' written notice given to the Escrow Agent. Upon discharge or removal, the Escrow Agent shall deliver the Escrow Funds and all interest accrued thereon, subject to any Canada Revenue Agency withholding obligations, by certified cheque or a wire transfer as directed by the Client.

(2)   In the event of the resignation of the Escrow Agent or its removal from office, the Client shall appoint a successor.

(3)   The Escrow Agent which resigns or is removed shall execute such further assurances or documents as, in the opinion of the Escrow Agent and the Client, may be necessary or desirable to vest in the new Escrow Agent the same powers, rights, duties and responsibilities as if the new Escrow Agent had been originally named as Escrow Agent.

### Section 10   Termination of Funding Escrow Agreement

This Funding Escrow Agreement shall terminate and cease to be of any further force and effect (except for the provisions of this Funding Escrow Agreement relating to protection of the Escrow Agent which shall survive any termination of this Funding Escrow Agreement) on the date on which the Escrow Agent shall have disbursed the Escrow Funds in full in accordance with the provisions of this Funding Escrow Agreement.

### Section 11   Determination

The parties hereto agree that the Escrow Agent shall not be required to make any determination or decision with respect to the validity of any claim made by any party, or of any denial thereof, but shall be entitled to rely conclusively on the terms hereof and the documents tendered to it in accordance with the terms hereof.

### Section 12   Solicitor/Client Relationship

The Escrow Agent and the Client acknowledge that a solicitor/client relationship exists. As such, the Escrow Agent agrees to keep in confidence all information made available to it by the Client. Furthermore, it is understood that the Escrow Agent will provide legal advice to the Client from time to time in connection with matters that are the subject of this Funding Escrow Agreement.

### Section 13   Notices

Any notice, direction or other communication to be given under this Funding Escrow Agreement shall be in writing and given by delivering it or sending it by facsimile, e-mail or other similar form of recorded communication addressed:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

(a)     If to the Escrow Agent, to:

Beard Winter LLP
Suite 701 - 130 Adelaide Street West
Toronto, ON   M5H 3V1

| | |
|---|---|
| Attention: | George D. Crossman |
| Facsimile: | 416-593-7760 |
| E-mail: | crossman@beardwinter.com |

(b)     If to the Client, to:

WDIS Finance LLC
c/o Michael Ben-Jacob
Kaye Scholer LLP
New York, NY   10019

| | |
|---|---|
| Facsimile: | 212-836-8565 |
| E-mail: | Michael.Ben-Jacob@kayescholer.com |

A Notice is deemed to be given and received (i) if sent by personal delivery or same day courier, on the date of delivery if it is a business day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next business day, (ii) if sent by overnight courier, on the next business day, or (iii) if sent by facsimile or e-mail, on the business day following the date of confirmation of transmission by the originating facsimile or e-mail. A party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any subsequent Notice must be sent to the party at its changed address. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.

## Section 14     Entire Agreement

This Funding Escrow Agreement sets forth the entire agreement among the parties hereto with respect to the matters contained herein.

## Section 15     Enurement and Assignment

This Funding Escrow Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

## Section 16     Severability

If any provision of this Funding Escrow Agreement is deemed by any court of competent jurisdiction to be invalid or void, the remaining provisions shall remain in full force and effect.

**Section 17    Waiver**

No failure or delay of the Escrow Agent in exercising any right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power or remedy preclude any other or further exercise of any right, power or remedy.

**Section 18    Further Assurance**

Each party shall, at the request of the other party, deliver to the requesting party all further documents or other assurances as may reasonably be necessary or desirable to give effect to this Funding Escrow Agreement.

**Section 19    Time**

Time shall be of the essence in respect of this Funding Escrow Agreement.

**Section 20    Governing Law**

This Funding Escrow Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**Section 21    Counterparts**

This Funding Escrow Agreement may be executed in several counterparts, each of which so executed shall be deemed an original, and all of which shall constitute one and the same instrument.

*[Remainder of this page intentionally left blank]*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**IN WITNESS WHEREOF** the parties have executed this Funding Escrow Agreement.

**WDIS FINANCE LLC**

Per: _____
Name:
Title:
I have the authority to bind the above-referenced company

**BEARD WINTER LLP**

By: _____
George D. Crossman
Managing Partner

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

IN WITNESS WHEREOF the parties have executed this Funding Escrow Agreement.

WDIS FINANCE LLC

Per: 

Name: Michael Ben-JACOB

Title: Trustee of Managing Member

I have the authority to bind the above-referenced company

BEARD WINTER LLP

By: 

George D.J Crossman

Managing Partner

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# DIRECTION

O:   BEARD WINTER LLP

E:   FUNDING ESCROW AGREEMENT dated August 25, 2016, made between WDIS
     Finance LLC and Beard Winter LLP (the "Funding Escrow Agreement")

---

The undersigned hereby directs BEARD WINTER LLP in its capacity as Escrow Agent
nder and pursuant to the Funding Escrow Agreement to hereby pay the sum of TWO
IUNDRED AND EIGHTY-FIVE THOUSAND ($285,000.00) DOLLARS U.S. to LENCZNER
LAGHT ROYCE SMITH GRIFFIN LLP upon receipt of such funds that will be directed to
ie wire transfer coordinates as set forth below:

### ROYAL BANK OF CANADA – U.S. ACCOUNT

| | |
|---|---|
| Bank Address: | 20 King Street West, Toronto, ON  M5H 1C4 |
| Bank Number: | 003 |
| Transit Number: | 06012 |
| Account Number: | 4006797 |
| Account Name: | Beard Winter LLP |
| | Suite 701, 130 Adelaide Street West, Toronto, ON  M5H 2K4 |
| ABA Number: | 021 0000 21 |
| Swift Code: | ROYCCAT2 |

DATED this _____ day of August, 2016.

WDIS FINANCE LLC

Per: _____

Name: Michael Ben-JAcoB

Title: Trustee of Managing Member

I have the authority to bind the above-referenced company

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

September 22, 2016

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
130 Adelaide St. W
Suite 2600
Toronto, ON
Canada M5H 3P5

Dear Alan,

Reference is made to the Ecuador Judgment Investment Agreement (the "Investment Agreement") from the Funder executing this letter, to help fund the collection of the Ecuador Judgment (as defined in such agreement) against Chevron and/or its subsidiaries by the Frente de DeFensa de la Amazonia.

This letter serves to memorialize our acknowledgment and agreement that notwithstanding paragraph 10 of the Investment Agreement, that your firm is not required to carry on its work on the enforcement of the Ecuador Judgment unless your firm is being paid to do so.

Sincerely,

_Solely as Trustee of Managing Member of Funder_

Funder

63787332_1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 7

## Ecuador Judgment Investment Agreement

This Agreement is effective as of August 24, 2016. In consideration of an Investment of $200,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

   a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (attached in Appendix 1) collectively.

   b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary. Attached in Appendix 1.

2. Parties and Agents:

   a. "FDA": Frente de Defensa de la Amazonia

   b. "Trust Board President": Mr. Ermel Gabriel Chávez Parra, duly appointed President of the Board of the Ecuador Trust.

   c. "Ecuador Parties": The FDA and the Trust Board President.

   d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

   e. "Funder": As identified in Appendix 2, in the possession of Canadian Counsel.

   f. "U.S. Representative": As identified in Appendix 2, in the possession of Canadian Counsel.

3. Grant of Interest:

1

a. <u>Grant</u>: The FDA and the Trust President hereby grant the Funder an Interest ("<u>Funder's Interest</u>") of 0.110% of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds (defined below) as further set forth herein.

b. <u>Definition of Ecuador Judgment Gross Proceeds</u>: "<u>Ecuador Judgment Gross Proceeds</u>" means the total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

4. <u>Ecuador Parties' Guarantee of Obligations</u>: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and FDA hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its Interest in accordance with this Agreement. Other than the Parties to this Agreement, as defined above, the Funder will have no obligations to third parties. Notwithstanding that the Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various contracts with funders, lawyers, and other service providers (including the Priority Existing Equity Holders identified by the Ecuador Parties in Appendix 3 to this Agreement and the Distribution Escrow Agreement), which also provide a grant of interest in the Ecuador Judgment Gross Proceeds, the Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those contracts and that its Interest will absolutely be honored out of the Gross Proceeds recovered.

5. <u>Co-ownership of Ecuador Judgment</u>: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. <u>Investment Deemed to be Made</u>: Once Funder transfers and clears the full amount of the investment to the Funding Escrow Account, the investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above and will immediately become the co-owner of the Ecuador Judgment as also defined above, subject only to the conditions and limitations outlined herein.

7. <u>Agreements of Ecuador Parties</u>: The Ecuador Parties hereby agree with Funder as follows:

a. <u>Settlement Process</u>: The FDA will lead the establishment of a Settlement Oversight Committee to facilitate and advise on any settlement opportunities.

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Members will include Canadian Counsel, two representatives appointed by the FDA, and the U.S. Representative.

b. Additional Representations: The Ecuador Parties hereby represent, warrant and confirm that:

  i. they have (A) full power and authority to enter into and perform their obligations under this Agreement, (B) duly authorised the execution, delivery and performance of their obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to their execution, delivery and performance of their obligations under this Agreement;

  ii. the execution and the delivery of this Agreement does not in any way contravene any laws, rulings, or public policies whether in Ecuador or Canada, nor contravene any of the Ecuador Parties' constituent or other governing documents or another contracts, commitments, or obligations of the Ecuador Parties or their affiliates or representatives (on their behalf) with any third parties; and

c. The Ecuador Parties agree and confirm that upon the receipt of the Ecuador Judgment Gross Proceeds the Funder will be entitled to and will receive promptly the Funder's Interest in accordance with the "Grant of Interest" provision of this Agreement.

d. Escrow Agent Provisions:

  i. The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement.

  ii. Canadian Counsel hereby confirms that the execution and the delivery of this Agreement does not contravene any laws, rulings and public policies in Canada.

  iii. The Canadian Counsel confirms, as the Exclusive Distribution Escrow Agent, that upon collection of any of the Ecuador Judgment Gross Proceeds, the Funder will receive the Funder's Interest in accordance with this Agreement and in accordance with the Distribution Escrow Agreement (defined below) that shall be approved and executed by the Funder and the Ecuador Parties no later than three (3) weeks from the Notice to Fund.

8. Conditions to Requirement to Transfer Funds: The investment will be in the amount of $200,000. The Funder shall cause an amount equal to $200,000 in connection with this Agreement to be paid to Canadian Counsel to hold in escrow until use pursuant to paragraph 12 of this Agreement. The transfer of the investment by the Funder is subject to: (i) the Notice to Fund; (ii) delivery of a certificate by the Ecuador Parties certifying that

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001620

this Agreement has been approved by the FDA Executive Committee the Trust, and each other governing body of an Ecuador Party and that all other representations and warranties made by the Ecuador Parties made in or incorporated into this Agreement remain true, correct and complete as of the date of the funding; and (iii) confirmation given by Canadian Counsel as articulated in this Agreement.

9. <u>Escrow Accounts</u>: Two escrow accounts will be created by Canadian Counsel, as follows:

   a. The first escrow account ("<u>Funding Escrow Account</u>") will be created by Canadian Counsel to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative, the Funder, and a representative to be appointed by the FDA. Upon due consultation, final authority over distribution of said funds will rest with the U.S. Representative.

   b. The second escrow account ("<u>Distribution Escrow Account</u>") will be created by Canadian Counsel to collect the Ecuador Judgment Gross Proceeds and distribute said proceeds to satisfy the Funder's Interest and other equity holders as set forth above and then distribute funds to the Ecuador Trust for environmental remediation and/or to otherwise implement the remediation ordered by the Ecuador Judgment.

10. <u>No Further Funding Requirement</u>: Canadian Counsel, the Ecuador Parties, and the US Representative hereby confirm to the Funder that upon the Investment being made, under no circumstances, will there be a requirement for further funding from the Funder in order to conclude all of the procedures in Canada related to the enforcement of the Ecuador Judgment and the collection of the Ecuador Judgment Gross Proceeds.

11. <u>Use of funds</u>: From time to time, and in order to determine how the Investment will be spent, a budget shall be agreed upon and approved by the US Representative and the Funder, with the US Representative having final authority in the event of a conflict. The Investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

12. <u>Obligations of the Funder</u>: Once the Funder has made its investment, the Funder will be under no other obligation whatsoever as per this Agreement.

13. <u>No Dilution</u>: The Funder will not be subject to any dilution of Funder's Interest as defined above.

14. <u>No responsibility for environmental remediation</u>: The Funder will have no responsibility whatsoever for environmental remediation in the area of Ecuador affected by the Ecuador Judgment.

15. <u>Obligations towards the Funder</u>: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder will be satisfied in accordance with this Agreement and the Distribution Escrow Agreement prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Claimants, based on its Interest in the total amount collected from

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

DATED: 24/08/2016     _Carlos Guaman_

Carlos Guaman Gaibor
President, FDA

DATED: 24/08/2016

Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

FUNDER

DATED: _____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001622

DATED: 2u/08/2016 _____

Carlos Guaman Gaibor
President, FDA

DATED: 29/08/2016 _____

Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

FUNDER

DATED: 11/20/2016 _____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001623

DATED: _5u/08/2016_ _____ _Carlos Guaman_

Carlos Guaman Gaibor
President, FDA

DATED: _24/06/2016_ _____

Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _10-7-16_ _____ _Jay Goldstein, Manager_

PUNDER _WELLBECK PARTNERS, LLC_



SIGN HERE

DATED: _____ _____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001624

# EXHIBIT 8

## Ecuador Judgment Investment Agreement

In consideration of an investment of $250,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

    a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (attached in Appendix 1) collectively.

    b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary. Attached in Appendix 1.

2. Parties and Agents:

    a. "FDA": Frente de Defensa de la Amazonia

    b. "Trust Board President": Mr. Ermel Gabriel Chávez Parra, duly appointed President of the Board of the Ecuador Trust.

    c. "Ecuador Parties": The FDA and the Trust Board President.

    d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

    e. "Funder": As identified in Appendix 2, in the possession of Canadian Counsel.

    f. "Funding Escrow Agent": Beard Winter LLP

    g. "U.S. Representative": As identified in Appendix 2, in the possession of Canadian Counsel.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001690

3. Grant of Interest:

   a. Grant: The FDA and the Trust President hereby grant the Funder an Interest ("Funder's Interest") of 0.1375% of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds (defined below) as further set forth herein.

   b. Definition of Ecuador Judgment Gross Proceeds: "Ecuador Judgment Gross Proceeds" means the total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

4. Ecuador Parties' Guarantee of Obligations: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and FDA hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its interest in accordance with this Agreement. Other than the Parties to this Agreement, as defined above, the Funder will have no obligations to third parties. Notwithstanding that the Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various contracts with funders, lawyers, and other service providers (including the Priority Existing Equity Holders identified by the Ecuador Parties in Appendix 3 to this Agreement and the Distribution Escrow Agreement), which also provide a grant of interest in the Ecuador Judgment Gross Proceeds, the Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those contracts and that its Interest will absolutely be honored out of the Gross Proceeds recovered.

5. Co-ownership of Ecuador Judgment: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. Investment Deemed to be Made: Once Funder transfers and clears the full amount of the investment to the Funding Escrow Account, the investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above and will immediately become the co-owner of the Ecuador Judgment as also defined above, subject only to the conditions and limitations outlined herein.

7. Agreements of Ecuador Parties: The Ecuador Parties hereby agree with Funder as follows:

2

MKS-0001691

a. <u>Settlement Process</u>: The FDA will lead the establishment of a Settlement Oversight Committee to facilitate and advise on any settlement opportunities. Members will include Canadian Counsel, two representatives appointed by the FDA, and the U.S. Representative.

b. <u>Additional Representations</u>: The Ecuador Parties hereby represent, warrant and confirm that:

    i. they have (A) full power and authority to enter into and perform their obligations under this Agreement, (B) duly authorised the execution, delivery and performance of their obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to their execution, delivery and performance of their obligations under this Agreement;

    ii. the execution and the delivery of this Agreement does not in any way contravene any laws, rulings, or public policies whether in Ecuador or Canada, nor contravene any of the Ecuador Parties' constituent or other governing documents or another contracts, commitments, or obligations of the Ecuador Parties or their affiliates or representatives (on their behalf) with any third parties; and

    iii. the Ecuador Parties make to the Funder each of the representations and warranties set forth in clauses 10.2(a) through and including (p) of the Funding Agreement between Treca Financial Solutions, the FDA and the Claimants (as defined therein), in the form delivered by FDA to Funder, as if such representations and warranties were incorporated into this Agreement and made a part hereof and were made to Funder *mutatis mutandis* with application to this Agreement and the obligations of the Ecuador Parties and the transactions contemplated by this Agreement.

c. The Ecuador Parties agree and confirm that upon the receipt of the Ecuador Judgment Gross Proceeds the Funder will be entitled to and will receive promptly the Funder's interest in accordance with the "Grant of Interest" provision of this Agreement.

d. <u>Escrow Agent Provisions</u>:

    i. The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement.

    ii. Canadian Counsel hereby confirms that the execution and the delivery of this Agreement does not contravene any laws, rulings and public policies in Canada.

    iii. The Canadian Counsel confirms, as the Exclusive Distribution Escrow Agent, that upon collection of any of the Ecuador Judgment Gross Proceeds, the Funder

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

will receive the Funder's Interest in accordance with this Agreement and in accordance with the Distribution Escrow Agreement (defined below) that shall be approved and executed by the Funder and the Ecuador Parties no later than three (3) weeks from the Notice to Fund.

8. Conditions to Requirement to Transfer Funds: The investment will be in the amount of $250,000. In satisfaction of the investment amount, the Funder shall cause an amount equal to $250,000 less up to $12,500 for legal fees in connection with this Agreement and advice related to the transactions contemplated hereby, to be paid to Funding Escrow Agent. The transfer of the investment by the Funder is subject to: (i) the Notice to Fund; (ii) delivery of a certificate by the Ecuador Parties certifying that this Agreement has been approved by the FDA Executive Committee the Trust, and each other governing body of an Ecuador Party and that all other representations and warranties made by the Ecuador Parties made in or incorporated into this Agreement remain true, correct and complete as of the date of the funding; (iii) the approval and execution of the Funding Escrow Agreement by the Funding Escrow Agent and all the relevant parties and stakeholders sufficient for the establishment of the Funding Escrow Account set forth below; and (iv) confirmation given by Canadian Counsel as articulated in this Agreement.

9. Escrow Accounts: Two escrow accounts will be created by Canadian Counsel, as follows:

   a. The first escrow account ("Funding Escrow Account") will be created by the Funding Escrow Agent to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative, the Funder, and a representative to be appointed by the FDA. Upon due consultation, final authority over distribution of said funds will rest with the U.S. Representative.

   b. The second escrow account ("Distribution Escrow Account") will be created by Canadian Counsel to collect the Ecuador Judgment Gross Proceeds and distribute said proceeds to satisfy the Funder's Interest and other equity holders as set forth above and then distribute funds to the Ecuador Trust for environmental remediation and/or to otherwise implement the remediation ordered by the Ecuador Judgment.

10. No Further Funding Requirement:   Canadian Counsel, the Ecuador Parties, and the US Representative hereby confirm to the Funder that upon the investment being made, under no circumstances, will there be a requirement for further funding from the Funder in order to conclude all of the procedures in Canada related to the enforcement of the Ecuador Judgment and the collection of the Ecuador Judgment Gross Proceeds.

11. Use of funds: From time to time, and in order to determine how the investment will be spent, a budget shall be agreed upon and approved by the US Representative and the Funder, with the US Representative having final authority in the event of a conflict. The investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

12. Obligations of the Funder: Once the Funder has made its investment, the Funder will be under no other obligation whatsoever as per this Agreement.

13. No Dilution: The Funder will not be subject to any dilution of Funder's interest as defined above.

14. No responsibility for environmental remediation: The Funder will have no responsibility whatsoever for environmental remediation in the area of Ecuador affected by the Ecuador judgment.

15. Obligations towards the Funder: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder will be satisfied in accordance with this Agreement and the Distribution Escrow Agreement prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Claimants, based on its interest in the total amount collected from the Ecuador Judgment Gross Proceeds by the Canadian Counsel or any other Counsel for and on behalf of the Ecuador Parties anywhere in the world.

16. Partial Recovery in Non-Settlement Scenario: To the extent the collection of funds from the Ecuador Judgment takes place without a settlement and on a partial or incremental basis, the Ecuador Parties hereby irrevocably warrant that the Funder (along with other Priority Existing Equity Holders as listed in Appendix 3) will be compensated a percentage of funds corresponding to their respective interests assuming a full recovery, prior to any payments to the Ecuador Parties or any other party or stake-holder receiving any interest with respect to such funds. Such payments shall be made forthwith upon receipt of any funds recovered under the terms of this Agreement.

17. Collection of Judgment Funds Outside Canada: Should any part of the Ecuador Judgment Gross Proceeds be collected from Chevron from any jurisdiction outside Canada, Canadian Counsel as the Exclusive Distribution Escrow Agent will collect and distribute any such funds to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 in accordance with their respective interests and in accordance with the Distribution Escrow Agreement.

18. Obligations of the FDA: The FDA hereby irrevocably warrants that the full amount of its 10% award due under the judgment against Chevron plus any interest on the judgment collected in any enforcement jurisdiction, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 until all have fully received their interests as per this Agreement and others referenced in the Appendix.

19. Obligations of Canadian Counsel: Canadian Counsel hereby accepts irrevocable instructions to adhere to all of the terms of this Agreement and will abide by those instructions.

20. Binding and Irrevocable Authority of the FDA: The signatory of the FDA to this Agreement (upon ratification of the FDA Executive Committee) affirms he has the authority to bind the organization.

5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001694

21. Instructions: The FDA and its representatives will, in a timely fashion and as frequently as necessary, instruct the Canadian Counsel in Canada and other Counsels elsewhere involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any funds under the Ecuador Judgment. In any event, the Ecuador Parties agree that any payments due to the Funder from any recovery under the Ecuador Judgment will be transferred in full within one week of the final receipt of any funds in accordance with this Agreement and the Distribution Escrow Agreement.

22. Information: Investor will be kept apprised on a regular basis of all material developments in the litigation and shall provide all documents or others information as are reasonably requested by Funder.

23. Common Legal Interest: The FDA, Trust and Funder have a "common legal interest" in the Claim, this Agreement and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

24. Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

25. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third Parties.

26. Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

27. Assignment: This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective assignees, transferees and successors-in-title or interest. References to the parties include their assignees, transferees and successors-in-title or interest, and shall include both corporate and unincorporated associations, partnerships, and individuals. Neither this Agreement, nor any rights, interests, obligations and duties arising hereunder may be assigned or conveyed; provided, however, that nothing in this agreement can be construed to block the Funder from assigning all or part of his interest to a member of his immediate family, or to a trust, pension plan or other entity for the benefit of the Funder or one or more individuals in his immediate family.

28. Severability & Invalidity: If any term or provision in this Agreement will in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement will not be affected.

29. Other Third-party commitments: The Parties warrant to each other that the execution and the delivery of this Agreement are not against any commitments, contracts and / or other obligations that they have with other third Parties.

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated:                    2016

DATED: _____        _____
                             Carlos Guaman Galbor
                             President, FDA

DATED: _____        _____
                             Ergie Gabriel Companion
                             BOARD PRESIDENT, ECUADOR TRUST

DATED: _____        _____
                             FUNDER    Director -        Director

DATED: _Nov 24 2016_         _____
                             Alan Lenczner
                             Lenczner Slaght Royce Smith Griffin LLP
                             *All Instructions Acknowledged and Accepted*

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001696

## APPENDIX 2

### Ecuador Judgment Investment Agreement

WHEREAS an Investment Agreement for the investment of $250,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to          , 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:

    Indigenous People Limited
    Ordnance House
    31 Pier Road
    St Helier
    Jersey JE4 8PW
    Channel Islands

    a company incorporated in Jersey with registered number 122491

2. U.S. Representative means:

    Steven R. Donziger
    245 W. 104th St., #7D
    New York, New York 10025.

DATED: _____

_____
Carlos Guaman Gaibor
President, FDA

DATED: _____

_____
Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

_____
Director – Indigenous People Limited

DATED: _Nov 24, 2016_

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

*with reference to:*
Ecuador Judgment Investment Agreement dated May 2, 2016
Ecuador Judgment Investment Agreements dated August 24, 2016
Ecuador Judgment Investment Agreement dated November 14, 2016
Distribution Escrow Agreement dated November __, 2016
*and others*

WHEREAS certain Investment Agreements (and Service Agreements) ("the Agreements") have been agreed to and funded to assist the collection of the Ecuador Judgment (as defined in the Agreements) against Chevron and/or its subsidiaries, by and between, on the one hand, the *Frente de Defensa de la Amazonia* (FDA), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (as defined in the Agreements), and the President of the Board of the Ecuador Trust ("Trust Board President"), and, on the other hand, various funders and professionals;

WHEREAS the Parties to the Agreements have irrevocably appointed the firm Lenczner Slaght Royce Smith Griffin LLP ("Canadian Counsel") to serve as Exclusive Distribution Escrow Agent (as defined in the Agreements) to collect any and all Ecuador Judgment Gross Proceeds (as defined in the Agreements) and distribute them in accordance with the Agreements;

WITH REFERENCE TO each Agreement, this Joint Appendix provides the Identity and corresponding Interest held by each of the following "Priority Existing Equity Holders" (as defined in the Agreements), which information shall apply to the understanding and interpretation of said Agreements as if such information was incorporated expressly into said Agreements and made a part thereof:

| Identity | Agreement Date | Interest† |
|---|---|---|
| Kreviln (Investment) | May 2, 2016 July 11, 2016 | 0.1725% |
| Kreviln (Loan Conversion) | Feb. 7, 2011 | Schedule‡ |
| Eisler | July 2016 | 0.1250% |
| WDIS Finance LLC | Aug. 24, 2016 Nov. 1, 2016 | 0.2200% |
| Wellbeck Partners LLC | Aug. 24, 2016 | 0.1100% |
| Indigenous People Limited | November 14, 2016 | 0.1375% |

† *Percentage of Ecuador Judgment Gross Proceeds, unless otherwise noted*
‡ *Reference to Schedule to Purrington Moody memo dated Jan. 23, 2012*

This Joint Appendix 3 may be amended only and exclusively to add one or more interest-holders as may be required by any future funding agreements, but may not be otherwise altered, amended, modified, or superseded in any other capacity, and specifically no interest stated herein may be diminished or diluted without express written consent of the affected interest-holder. The Escrow Agent shall not accept a purported superseding Joint Appendix 3 that does not conform to these instructions.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001698

This Joint Appendix 3 neither affirms nor denies the existence, nature, or quantum of any other claim to an interest, compensation, or reimbursement not stated herein, but rather makes reference to the paragraphs of the Distribution Escrow Agreement which allow the Exclusive Distribution Escrow Agent, in consultation with the Parties, to reserve funds reasonably necessary to pay legitimate claims, and further stands without prejudice to any rights any person or entity may have to make claims on any remainder funds once disbursed by the Escrow Agent pursuant to the Distribution Escrow Agreement.

The Canadian Counsel / Exclusive Distribution Escrow Agent shall maintain an up-to-date copy of this Joint Appendix 3 on file as the official copy.

DATED: _____

Carlos Guaman Guibor
President, FDA

DATED: _____

Ermel Gabriel Chávez Parra
Trust Board President

DATED: _Nov 24, 2016_

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*Acknowledged and Accepted*

2 / 2

# EXHIBIT 9

| **From:** | Aaron Marr Page <aaron@forumnobis.org> |
| **Sent:** | Monday, January 8, 2018 4:33 PM |
| **To:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Subject:** | Re: Aguinda |

That's what I'm referring to in the first two paragraphs of my email

-------- Original message --------
From: Katie Sullivan <Katie@Streamlinefamilyoffice.com>
Date: 1/8/18 4:27 PM (GMT-06:00)
To: Aaron Marr Page <aaron@forumnobis.org>
Subject: RE: Aguinda

In our 'audit' we noted Cliff & FDA signed an enhancement letter dated Jan 3, 2017 that reflects a new total of 0.195% vs. 0.1375%.
Looks like that was addressed as well although c) is not included in your reply.

**From:** Aaron Marr Page [mailto:aaron@forumnobis.org]
**Sent:** Monday, January 8, 2018 12:09 PM
**To:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Subject:** FW: Aguinda

FYI. Hopefully putting this one to bed

**From:** Aaron Marr Page
**Sent:** Monday, January 8, 2018 11:09 AM
**To:** 'Alan Lenczner' <alenczner@litigate.com>
**Cc:** 'Steven Donziger' <sdonziger@donzigerandassociates.com>
**Subject:** RE: Aguinda

Dear Alan,

At Steven's request, I have been following up on the errors/issues you noted (thank you) regarding the 10% "enhancement" granted to Cliff Eisler, pursuant to his agreement and as part of our efforts to keep him on board as an investor going forward.

You were correct about the error regarding the stated interest level. We have re-executed the enhancement letter and made appropriate notifications to all parties concerning the invalidity of the former. The newly executed letter(s) with the correct interest amount is attached in English and Spanish.

As to your other points:
a) The new letter has a current date
b) Our practice has been to have our side sign the agreements and send them to the investor to sign and hold in their files. Eisler may choose to return a fully executed copy to you to hold as an official copy, but that it up to him.
d) The Spanish agreement is dated July 8. These agreements allow execution in counterparts and all hover around a set of dates rather than a single date. Rather than add confusion with multiple dates, Cliff was comfortable with just referencing the July 8 Spanish date, and we think it is his call.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Hopefully this addresses the remaining issues and you can sign and return these as soon as possible.

Many thanks,

Aaron/Steven


---------- Forwarded message ----------
From: **Alan Lenczner** <alenczner@litigate.com>
Date: Wed, Dec 13, 2017 at 11:28 AM
Subject: Aguinda
To: Steven Donziger <sdonziger@gmail.com>

There is some confusion re the Eisler Agreement. The Agreement you sent me bears the date of July 11, not July 8. It references an interest of .125% for $ 250,000.
  The " addendum" you wish me to sign is
    (a) dated Jan 3 2017
    (b) is unsigned by Eisler --so I don't know who the funder is as there is no other reference to him in there
    (c) speaks to the interest increasing from .175% not.125%
    (d) refers to a  previous agreement of July 8 not 11.
  Please revise so that the records are correct and consistent.




--
Steven Donziger
212-570-4499 (land)
917-566-2526 (cell)
212-409-8628 (fax)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025

To learn more about Steven and the Ecuador matter please visit StevenDonziger.com.
------------------------

This e-mail is confidential and privileged.  If the reader is not the intended recipient, any review, dissemination or copying of any part of this e-mail is prohibited.  If you received this e-mail in error, please notify the sender by e-mail or at 212-570-4499.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 10

# Ecuador Judgment Investment Agreement

In consideration of an Investment of $152,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

    a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (contained in Appendix 1) collectively.

    b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary.

    c. Ecuador Judgment Gross Proceeds: The total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

2. Parties and Agents:

    a. "FDA": Frente de Defensa de la Amazonia

    b. "Trust Board President": Mr. Ermel Gabriel Chávez Parra, duly appointed President of the Board of the Ecuador Trust.

    c. "Ecuador Parties": The FDA and the Trust Board President.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002718

d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

e. "Funder": As identified in Appendix 2.

f. "U.S. Representative": As identified in Appendix 2.

3. Grant of Interest: In consideration of the Investment, the FDA and the Trust President hereby grant the Funder an Interest ("Funder's Interest") of **0.076%** of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds as further set forth herein.

4. Investment Deemed to be Made: The Funder shall cause the amount of $152,000 to be paid to in accordance with the instructions of the U.S. Representative. Once Funder transfers and clears the full amount of the Investment, the Investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above.

5. Co-ownership of Ecuador Judgment: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. Ecuador Parties' Guarantees and Warranties: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its Interest in accordance with this Agreement. The Ecuador Parties hereby further represent, warrant, and confirm that:

   a. The Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various contracts with funders, lawyers, and other service providers, which also provide a grant of interest in the Ecuador Judgment Gross Proceeds. The Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those interests and that, to protect Funder's Interest, all such legitimate interests, as listed at Existing Equity Appendix to this Agreement, will be honoured in full out of the Ecuador Judgment Gross Proceeds prior to any distributions to the Ecuador Parties.

   b. The FDA warrants that it has (A) full power and authority to enter into and perform their obligations under this Agreement, (B) duly authorized the execution, delivery and performance of their obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to their execution, delivery and performance of their obligations under this Agreement.

   c. The Ecuador Parties warrant the execution and the delivery of this Agreement does not in any way contravene any laws, rulings, or public policies whether in Ecuador or

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Canada, nor contravene any of the Ecuador Parties' constituent or other governing documents or another contracts, commitments, or obligations of the Ecuador Parties or their affiliates or representatives (on their behalf) with any third parties.

    d.  The FDA warrants that the full amount of its 10% Award due under the Ecuador Judgment, plus any interest on both the 10% Award and the entire corpus of the Ecuador Judgment, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders identified in the Existing Equity Appendix.

7. <u>Instructions to Counsel</u>: The FDA and its representatives will, in a timely fashion and as frequently as necessary, instruct the Canadian Counsel in Canada and other counsel elsewhere involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any Ecuador Judgment Gross Proceeds.

8. <u>Authorization of Canadian Counsel As Exclusive Distribution Escrow Agent</u>: The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement.

9. <u>Use of funds</u>: The Investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined. The Funder shall, at its request, be entitled to consult with the U.S. Representative regarding how the Investment shall be spent, although the U.S. Representative shall retain final authority regarding use of funds, pursuant to the instructions of the FDA.

10. <u>No Dilution</u>: The Funder will not be subject to any dilution of Funder's Interest as defined above.

11. <u>No responsibility for environmental remediation</u>: The Funder will have no responsibility whatsoever for environmental remediation in the area of Ecuador affected by the Ecuador Judgment.

12. <u>Priority of Distribution</u>: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder and the Prior Existing Equity Holders as listed in the Prior Equity Appendix will be satisfied in accordance with this Agreement and other relevant agreements prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Ecuador Judgment plaintiffs or claimants or members of any affected Ecuadorian communities.

13. <u>Partial Recovery in Non-Settlement Scenario</u>: To the extent the collection of any Ecuador Judgment Gross Proceeds takes place without a settlement and on a partial or incremental basis, the Ecuador Parties hereby irrevocably warrant that the Funder, along with other Priority Existing Equity Holders as listed in the Prior Equity Appendix, will be compensated a percentage of such funds corresponding to their respective interests and in accordance with

3

MKS-0002720

the Priority of Distribution as set forth herein. Such payments shall be made forthwith upon receipt of any Ecuador Judgment Gross Proceeds.

14. Collection of Judgment Funds Outside Canada: Should any part of the Ecuador Judgment Gross Proceeds be collected from Chevron from any jurisdiction outside Canada, Canadian Counsel, as the Exclusive Distribution Escrow Agent, is hereby authorized by the Ecuador Parties under this Agreement to obtain custody of said Proceeds and thereupon distribute them to the Funder and the Priority Existing Equity Holders as listed in the Prior Equity Appendix in accordance with this Agreement.

15. Obligations of Canadian Counsel: Canadian Counsel hereby accepts irrevocable instructions to adhere to all of the terms of this Agreement and will abide by those instructions.

16. Binding and Irrevocable Authority of the FDA: The signatory of the FDA to this Agreement affirms that he has the authority to bind the organization, and his signature and agreement shall bind the FDA upon ratification of this Agreement by the FDA Executive Committee.

17. Information: The Funder will be kept apprised on a regular basis, and upon its request, of all material developments in the litigation.

18. Common Legal Interest: The FDA, the Ecuador Trust and the Funder have a "common legal interest" in enforcing the Ecuador Judgment, this Agreement, and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

19. Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

20. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third Parties.

21. Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

22. Assignment: Neither this Agreement, nor any rights, interests, obligations and duties arising hereunder may be assigned or conveyed; except that the Funder shall be allowed the right to assign all or part of his interest to a member of his immediate family, or to a trust, pension plan or other entity for the benefit of the Funder or one or more individuals in his immediate family.

23. Severability & Invalidity: If any term or provision in this Agreement will in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement will not be affected.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002721

24. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

25. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

DATED:                 January [●], 2017

DATED: 03 de febrero, 2017            _____
Carlos Guaman Gaibor
President, FDA

DATED: 03 de febrero 2017            _____
Ermel Gabriel Chávez Parra
President of the Board, ECUADOR TRUST

DATED: _____           _____
FUNDER

5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002722

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# Ecuador Judgment Investment Agreement

In consideration of an Investment of $152,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

   a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (contained in Appendix 1) collectively.

   b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary.

c. Ecuador Judgment Gross Proceeds: The total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

2. Parties and Agents:

a. "FDA": Frente de Defensa de la Amazonia

b. "Trust Board President": Mr. Ermel Gabriel Chávez  Parra, duly appointed President of the Board of the Ecuador Trust.

c. "Ecuador Parties": The FDA and the Trust Board President.

d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

e. "Funder": As identified in Appendix 2.

f. "U.S. Representative": As identified in Appendix 2.

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002725

3. <u>Grant of Interest</u>: In consideration of the Investment, the FDA and the Trust President hereby grant the Funder an Interest ("<u>Funder's Interest</u>") of ⟨0.076%⟩ of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds as further set forth herein.

4. <u>Investment Deemed to be Made</u>: The Funder shall cause the amount of $50,000 to be paid (for total consideration of $152,000 inclusive of earlier payments) in accordance with the instructions of the U.S. Representative. Once Funder transfers and clears the additional $50,000 of the Investment, the full Investment will be deemed to have been made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above.

5. <u>Co-ownership of Ecuador Judgment</u>: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. <u>Ecuador Parties' Guarantees and Warranties</u>: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its Interest in accordance with this Agreement. The Ecuador Parties hereby further represent, warrant, and confirm that:

   a. The Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various

3

contracts with funders, lawyers, and other service providers, which also provide a grant of interest in the Ecuador Judgment Gross Proceeds. The Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those interests and that, to protect Funder's Interest, all such legitimate interests will be honoured in full out of the Ecuador Judgment Gross Proceeds prior to any distributions to the Ecuador Parties.

b. The FDA warrants that it has (A) full power and authority to enter into and perform its obligations under this Agreement, (B) duly authorizes the execution, delivery and performance of its obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to the execution, delivery and performance of its obligations under this Agreement.

c. The FDA warrants that the full amount of its 10% Award due under the Ecuador Judgment, plus any interest on both the 10% Award and the entire corpus of the Ecuador Judgment, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders.

7. <u>Instructions to Counsel</u>: The FDA and its representatives will, in a timely fashion and as frequently as necessary, instruct Canadian Counsel and other counsel involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any Ecuador Judgment Gross Proceeds.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

8. Authorization of Canadian Counsel As Exclusive Distribution Escrow Agent: The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement and the Distribution Escrow Agreement.

9. Use of funds: The Investment shall be used to fund litigation and other expenses dedicated to collecting the Ecuador Judgment and other case-related expenses including but not limited to the defense of the U.S. representative in U.S. courts. The Funder shall, at its request, be entitled to consult with the U.S. Representative regarding how the Investment shall be spent, although the U.S. Representative shall retain final authority regarding use of funds.

10. No Dilution: The Funder will not be subject to any dilution of Funder's Interest as defined above.

11. Priority of Distribution: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder and the Prior Existing Equity Holders will be satisfied prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Ecuador Judgment plaintiffs or claimants or members of any affected Ecuadorian communities.

12. Partial Recovery in Non-Settlement Scenario: To the extent the collection of any Ecuador Judgment Gross Proceeds takes place without a settlement and on a partial or incremental basis, the Ecuador Parties irrevocably warrant that the Funder, along with other Priority Existing Equity Holders, will be compensated a percentage of such funds equivalent to the percentage of Funder's

5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Interest in the Ecuador Judgment. Such payments shall be made forthwith upon receipt of any Ecuador Judgment Gross Proceeds.

13. Collection of Judgment Funds Outside Canada: Should any part of the Ecuador Judgment Gross Proceeds be collected from Chevron from any jurisdiction outside Canada, Canadian Counsel, as the Exclusive Distribution Escrow Agent, is hereby authorized by the Ecuador Parties under this Agreement to obtain custody of said Proceeds and thereupon distribute them to the Funder and the Priority Existing Equity Holders in accordance with this Agreement.

14. Binding and Irrevocable Authority of the FDA: The signatory of the FDA to this Agreement affirms that he has the authority to bind the organization.

15. Information: Upon reasonable request, investor shall be kept apprised on a regular basis of all material developments in the litigation.

16. Common Legal Interest: The FDA, the Ecuador Trust and the Funder have a "common legal interest" in enforcing the Ecuador Judgment, this Agreement, and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

17. Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002729

18. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third Parties.

19. Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

20. Assignment: Neither this Agreement, nor any rights, interests, obligations and duties arising hereunder may be assigned or conveyed; provided, however, that nothing in this agreement can be construed to block the Funder from assigning all or part of his interest to a member of his immediate family, or to a trust, pension plan or other entity for the benefit of the Funder or one or more individuals in his immediate family.

21. Severability & Invalidity: If any term or provision in this Agreement will in whole or in part be held to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement will not be affected.

22. Entire Agreement: This Agreement shall constitute the entire agreement between the parties and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

23. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002730

DATED: _____          _____
                           Carlos Guaman Gaibor
                           President, FDA

DATED: _____          _____
                           Ermel Gabriel Chávez Parra
                           President of the Board, ECUADOR TRUST

DATED: 1/31/17             _____
                           FUNDER

8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002731