# EXHIBIT 11

November 10, 2016

**CONFIDENTIAL**

Frente de Defensa de la Amazonia
Eloy Alfaro No. 801 y Progreso
Lago Agrio / Nueva Loja, ECUADOR

      Re:    Ecuador Judgment Investment Agreement

Ladies and Gentlemen:

      Reference is made to that Ecuador Judgment Investment Agreement, dated as of August 24, 2016 (the "Original Agreement"), by and among the undersigned ("Funder"), the Frente de Defensa de la Amazonia ("FDA") and the President of the Board of the Ecuador Trust (collectively, the "Parties"). Unless otherwise defined herein, initially capitalized terms used in this letter agreement (this "Letter Agreement") shall have the meanings set forth in the Original Agreement.

      Subject to the terms and conditions of this Letter Agreement, the Parties hereby agree as follows:

      1.    Funder shall invest an additional amount of $100,000 in the effort to collect the judgment of which the FDA is beneficiary (the "Investment") as of November 10, 2016, less legal fees in connection with this Agreement and the advice related to the transaction contemplated hereby in the amount of $5,000. The aggregate investment amount by Founder shall be increased to $400,000.

      2.    The FDA and the Trust President shall grant Funder an Interest of 0.055%, increasing Funder's total Funder's Interest to 0.22%.

      3.    All other terms and provisions of the Original Agreement shall apply to this Letter Agreement and the Investment *mutatis mutandis*.

      4.    This Agreement shall be governed by the laws of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Letter Agreement.

      5.    Should any provision of this Letter Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect and the application of such invalid or unenforceable provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

Sincerely,

_____

Funder

Agreed and Accepted as of November 10, 2016.

_____

Carlos Guaman Gaibor
President, FDA

_____

Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR
TRUST

_____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin
LLP

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002648

Sincerely,

Funder  for WDIS LLC

Agreed and Accepted as of November 10, 2016

_____
Carlos Guaman Gaibor
President, FDA

_____
Ermel Gabriel Chavez Parra
BOARD PRESIDENT, ECUADOR
TRUST

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin
LLP

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Sincerely,

_____

Funder

Agreed and Accepted as of November 10, 2016

_____

Carlos Guaman Gaibor
President, FDA

_____

Ermel Gabriel Chavez Parra
BOARD PRESIDENT, ECUADOR
TRUST

_____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin
LLP

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 12

| | |
|---|---|
| **From:** | John van Merkensteijn <jhvm@rossteq.com> |
| **Sent:** | Saturday, October 22, 2016 3:24 PM |
| **To:** | 'John van Merkensteijn' |
| **Subject:** | FW: Deal terms attached |
| **Attachments:** | INVESTOR.Summary.July2016.docx |

**Categories:** KF2

> John H. van Merkensteijn III
> Managing Director
> Rossi Technologies LLC
> 60 Riverside Boulevard
> Suite 2101
> New York, NY. 10069
> Phone (212) 769-4055

jhvm@rossteq.com

**From:** Steven Donziger
**Date:** Sunday, July 10, 2016 at 6:58 PM
**To:** Bill Twist
**Cc:** "John H. van Merkensteijn III"
**Subject:** Re: Deal terms attached
**Resent-From:**

There are no priority shares. Shares are a percentage of the total claim owed which is now a little over $11b with statutory interest in Canada. Expenses come off the top upon recovery. There are approximately $10 million in expenses plus some outstanding fees we owe various law firms; this number could rise modestly in coming years as most costs at behind us. On a $10b recovery, the amount of funds available to pay expenses, investors, and lawyers will be approximately $1.5b and could be as high as $3b depending on how many shares we issue to sustain the case going forward.

I can explain the economics in more detail on Tuesday or feel free to follow up with questions in the meantime.

The larger point is that absent some unforseen event, there will be plenty of funds to pay investors should there be a recovery. Payments to investors are also securitized by a commitment from our Canadian lawyer (who will be collecting the funds in Canada and holding them in escrow until distributed) in addition to the authorized client representatives. Several sophisticated individuals have performed due diligence and invested, including two just in the last few weeks.

JVM 002161

I am also attaching an updated investor summary (dated July 2016) that includes the recent U.S. Supreme Court decision restricting the use of the RICO statute. Please use this summary, rather than the one I sent you yesterday.

Again, please reach out with any more questions.

Thanks!

Best, Steven

**From:** Bill Twist
**Sent:** Sunday, July 10, 2016 6:36:26 PM
**To:** Steven Donziger
**Cc:** John H. van Merkensteijn III
**Subject:** Fwd: Deal terms attached

Steven,
Are there any priority shares in the mix or are everyone's shares treated the same? The shares are expressed as a percentage of what? — total recovery less debts and expenses???
Bill

Begin forwarded message:

**From:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject: Deal terms attached**
**Date:** July 10, 2016 at 3:25:31 PM PDT
**To:** "btwist@pachamama.org" <btwist@pachamama.org>

Confirmed for Tuesday at 1. Thanks for setting it up.

Also, here is the analysis of the U.S. Supreme Court decision on the RICO matter (going to incorporate it into the investment summary I sent you):

http://www.csrwire.com/press_releases/39075-U-S-Supreme-Court-Deals-Blow-to-Chevron-on-Ecuador-Pollution-Case-In-Latest-RICO-Decision

## U.S. Supreme Court Deals Blow to Chevron on Ecuador ...

www.csrwire.com

NEW YORK , Jun. 27 /CSRwire/ - Chevron last week suffered a major setback when a U.S. Supreme Court decision s

JVM 002162

## CONFIDENTIAL MEMORANDUM

1.   INVESTMENT OPPORTUNITY.

This is an opportunity to support a landmark case for justice for the thousands of people in Ecuador who have suffered as a result of the Chevron Corporation's deliberate actions in contaminating the Ecuadoran rainforest.

As detailed below, the Claimants hold an enforceable judgment from Ecuador's highest court in an amount in excess of $9,500,000,000 against Chevron (the "Judgment"). Because of statutory interest, that judgment has grown to roughly $10,500,000,000 in Canada. Further funds are currently being sought by the Claimants to, among other things, finance an international enforcement strategy in Canada to ensure that Chevron meets its legal obligations under the Judgment. In exchange for providing funding in support of the Claim, Investors will receive the right to an agreed upon share of the proceeds received by the Claimants in respect of the Claim. Further details are available for qualifying investors.

The Claimants have put together a world-class team to manage the enforcement of the Judgment. In Canada, they are represented by Alan Lenczner of Lenczner Slaght in Toronto. In Brasil, they are represented by Sergio Bermudes Advogados en Rio de Janiero. Other best of breed law firms and service-providers will be engaged in other jurisdictions, as appropriate. International enforcement is necessary because Chevron, in anticipation of losing the Ecuador case, stripped its remaining assets from the country during the proceeding and now refuses to pay the judgment.

**Copies of significant court decisions and media coverage can be accessed via the links at the end of this document. Chevron's relevant court filings can be found at www.Chevron.com or via the contact below.**

2.   BACKGROUND.

From 1964 to 1992, Chevron[1] built and operated more than 350 well sites and oil production facilities in an approximately 1,500 square mile concession area in Ecuador's rainforest. This concession area is home to five indigenous groups and approximately 80 farmer communities. Throughout the course of its operations in Ecuador, Chevron committed multiple acts of environmental contamination that left a legacy of environmental contamination and degradation from which the local population continues to suffer today. The amount of oil and contaminated water discharged into the Amazonian rainforest by Chevron is several orders of magnitude greater than the BP Deepwater Horizon spill. Moreover, the trial court found that Chevron's contamination was intentional, not accidental, and resulted from, among other things, Chevron's grossly substandard practices carried out over decades of its drilling operations in Ecuador. The litigation was held in Ecuador at Chevron's request after the company agreed to accept jurisdiction there and to abide by any judgment, subject only to enforcement defenses available under New York state law.

The Ecuadorian trial court and the appellate court (in its affirmation such Judgment) found that, during its operations of this concession, Chevron deliberately:

○   dumped many billion of gallons of production water (containing BTEX, TPH and polycyclic hydrocarbons) directly into the Ecuadoran rainforest floor and the nearby rivers and streams used by residents for drinking and bathing;

○   gouged more than 900 unlined open waste pits out of the jungle floor – pits that to

---

[1]   Texaco Petroleum Company was a wholly-owned subsidiary of Texaco, Inc. at all times during its operations in Ecuador until Chevron and Texaco, Inc. merged in 2001.

this day continue to leach toxic waste into soils, groundwater and streams;

o   burned hundreds of millions of cubic feet of gas and waste oil into the atmosphere, poisoning the air and creating "black rain" that inundated the area during tropical thunderstorms; and

o   violated then-current U.S. industry standards, Ecuadoran environmental law, Chevron's own contract with the Ecuadoran government (which prohibited Chevron from using production methods that contaminated the environment) and international law.

Even Chevron's own internal audits of the environmental impacts found extensive contamination at Chevron's oil production facilities. The Ecuadorian trial court also took note of evidence that cancer rates in the concession area where Chevron operated are significantly higher than the norm, according to independent health evaluations. Several indigenous groups have seen their cultures decimated, largely because of Chevron's intentional contamination.

3.   JUDGMENT AGAINST CHEVRON IN ECUADOR.

On February 14, 2011, the Lago Agrio trial court entered the Judgment against Chevron, which was subsequently affirmed by the Sucumbios intermediate appellate court on January 3, 2012. The Judgment and affirmation collectively awarded the following amounts to or for the benefit of the Claimants:

➤   USD $8,646,000,000.00 in basic damages (the "Remediation Award");

➤   an additional USD $8,646,000,000.00 in punitive damages (the "Punitive Damages Award"); and

➤   an additional amount equal to ten percent (10%) of the Remediation Award (the "10% Award")

On January 3, 2012, the intermediate appellate court issued its order affirming the Judgment in its entirety. On November 13, 2013, Ecuador's National Court of Justice unanimously affirmed the liability portion of the judgment, but removed the punitive damages award. Chevron has one further and limited appeal pending before Ecuador's Constitutional Court that does not stop the enforceability of the Judgment now, since Chevron failed to request for and post a bond – the only way that such enforceability can be suspended.

4.   ENFORCEMENT OF ECUADOR JUDGMENT IN CANADA.

On May 30, 2012, the Ecuadorian claimants filed an action to seize Chevron's assets in Canada (estimated to be worth roughly $15 billion) to satisfy the entirety of the Ecuador judgment. Chevron tried to block the action, largely by claiming the Ecuadorians could not establish jurisdiction given that Chevron's assets in Canada were held by a wholly-owned subsidiary. On December 17, 2013, the Ontario Court of Appeal unanimously rejected Chevron's arguments and ruled in a 3-0 decision that the villagers could proceed with their enforcement action. Chevron appealed to Canada's Supreme Court.  On September 4, 2015, Canada's Supreme Court ruled unanimously in favor of the Ecuadorians in a 7-0 decision.  In all, the Ecuadorians have swept each of the ten appellate judges in Canada to rule on the jurisdictional aspects of the case; the same holds for all eight Ecuadorian appellate judges to rule on the merits of the case. The villagers now have an 18-0 record in Ecuador and Canada among appellate judges.

Armed with the unanimous Supreme Court ruling on jurisdiction, the Ecuadorians forced Chevron in October 2015 to file a written defense in the trial court in the Ontario Superior Court of Justice in Toronto. The villagers subsequently filed a motion to strike Chevron's defenses to

2

JVM 002164

the enforcement action on the grounds they were already litigated and resolved in the company's preferred forum of Ecuador, where the underlying trial was held. Chevron filed a motion again raising its largely repetitive jurisdictional arguments. A hearing on the motions is scheduled for September 12, 2016. If the Canada trial court rules in favor of the villagers and strikes most or all of Chevron's defenses, the enforcement action will be scaled back considerably and the time frame to a final resolution likely will accelerate.

If there is no settlement and the villagers prevail in their recognition action in Canada, Chevron will have a right to appeal the decision the Ontario Court of Appeal and ultimately to Canada's Supreme Court. Interest on the Ecuadorian judgment in Canada is running at 3% per annum, or approximately $275 million annually.

## 5.   RELATED LITIGATION – U.S.

On February 1, 2011, Chevron filed a civil action in the SDNY against the Claimants, certain of Ecuadoran and U.S. counsel, and other advisors to the Claimants. In its complaint, Chevron alleged, among other things, that the defendants named in this civil action violated the Racketeer Influenced and Corrupt Organizations Act (RICO), by committing what Chevron tried to characterize as "fraud" and "extortion" (e.g. "fraudulently" pursuing claims the defendants "knew" to be meritless and "extorting" Chevron though public pressure into paying a settlement). Count 9 of Chevron's RICO complaint requested a declaratory judgment that any judgment from the Ecuadorian trial court be rendered unenforceable because of inherent fraud in the Ecuadorian judicial system. In February 2011, Judge Kaplan of the Southern District of New York, without any supporting precedent, granted Chevron's request for a preliminary injunction (the "Preliminary Injunction") that purported to bar enforcement of the Judgment anywhere in the world, pending the outcome of the RICO proceeding. Information later emerged that Judge Kaplan held undisclosed investments in Chevron while making this and other rulings in the case.

The defendants appealed and on September 19, 2011 – the first day after oral argument -- the Second Circuit issued a summary order vacating the Preliminary Injunction in its entirety. On January 26, 2012, the Second Circuit issued its written opinion dismissing the Preliminary Injunction and the claim for declaratory relief under Count 9 in its entirety on grounds that a court's power to determine the enforceability of a foreign judgment could only be exercised when a plaintiff-creditor had sought enforcement under its recognition laws and not as an affirmative lever to bar recognition actions in its courts and, much less, around the world. Notably, the Second Circuit ruling stated that the "[Claimants] hold a judgment from an Ecuadorian court. They may seek to enforce that judgment in any country in the world where Chevron has assets." In addition, it should be noted that the Ecuadorian appellate court specifically confirmed that it had considered and rejected all of Chevron's claims regarding fraud by the Claimants.

After the Preliminary Injunction was reversed on appeal, Judge Kaplan allowed Chevron to continue to pursue its civil RICO claims. During a trial in late 2013, Judge Kaplan openly disparaged the Ecuadorians and their counsel, denied the villagers and their counsel a jury, and refused to consider any of the voluminous evidence of environmental contamination relied on by Ecuador's courts to find Chevron liable. He also allowed Chevron to pay $2 million to a fact witness who claimed, without any credible corroborating evidence and after 53 days of coaching by Chevron's lawyers, that certain of the defendants offered a bribe to the Ecuador trial judge in exchange for ghostwriting a favorable judgment. (The allegations already had been rejected by Ecuador's Supreme Court.) On March 4, 2014, Judge Kaplan found the defendants liable for the RICO violations and imposed an order prohibiting them from enforcing their judgment in the United States or collecting it anywhere in the world. That decision is currently under appeal to the same court that previously reversed Judge Kaplan's preliminary injunction ruling. The Kaplan decision has no dispositive impact on any enforcement action in Canada or other jurisdictions, as affirmed by the actions of the appellate

3

courts (including the country's Supreme Court) as explained above.

Subsequent to the RICO decision, and while the appeal was pending, Chevron suffered two significant setbacks that we believe have caused the factual predicate of its claims to unravel. First, Chevron's main witness in the RICO case (Alberto Guerra) to whom it had paid $2 million recanted key portions of his testimony related to the bribery allegation and admitted he had lied on the stand. Second, a computer forensic analysis ordered by a separate international arbitration panel hearing a dispute between Chevron and Ecuador's government (described below) concluded that the trial court judgment had in fact been authored by the trial judge, and had not been ghostwritten as Chevron had alleged and Judge Kaplan had concluded. In fact, this analysis found that the trial judge opened and saved a draft document on his office computer that became the judgment at least 480 times. These developments have been brought to the attention of the appellate court hearing the appeal of Judge Kaplan's decision.

The U.S. Supreme Court also dealt a severe blow to Chevron's prospects in the RICO matter when it ruled in June 2016 to severely restrict the application of the law. This is another factor that we believe has a negative impact on Chevron's prospects in this aspect of the litigation. (See here for background on this court decision.)

6.    RELATED LITIGATION – INTERNATIONAL ARBITRATION.

In September 2009, Chevron sued the Republic of Ecuador ("ROE") under Ecuador's Bilateral Investment Treaty (BIT) with the United States, which permits private, commercial arbitration between investors and host country governments. Chevron's claims revolve primarily around a series of settlement and release agreements with Ecuador, which Chevron argues relieve it from liability for environmental impact arising out of its activities in Ecuador, including liability for any judgment rendered in the Lago Agrio case. Alternatively, Chevron asserts that the releases require the ROE to indemnify it for any sums collected against Chevron in any Lago Agrio judgment.

During the BIT proceedings, the arbitration panel has issued "interim orders" and "interim awards" purporting to order the ROE to use all measures necessary to enjoin all enforcement of any judgment against Chevron in the Lago Agrio case. The ROE has argued that Ecuadoran constitutional separation of powers principles prevent the executive branch of government from interfering in any way with the judicial process, in particular on behalf of any particular litigant, and that, accordingly, the ROE has very few measures "at its disposal." Accordingly, the ROE has taken the position that it has complied with the interim orders and award, while simultaneously arguing that such ruling are inappropriate, unnecessary and beyond the scope of the BIT arbitrators' power and, as such, should be vacated.

In addition, the Ecuadorian appellate court has ruled on more than one occasion that neither it nor any Ecuadoran court can give effect to any act by the BIT tribunal or by any international tribunal that would have the effect of undermining fundamental human rights guaranteed by Ecuador's Constitution and by international law. Ecuador's courts also have noted that the Lago Agrio case involved citizens exercising their fundamental rights to judicial access and protection, and that any pro-investment principle of commercial rights could not trump those rights and was inapplicable in the context of this case.

The Claimants agree with the ROE and more broadly assert that the BIT proceedings themselves have no application to their claims against Chevron and that any orders emanating from the BIT proceedings will have no binding effect on Claimants or their right to enforcement of the Judgment in or outside Ecuador. The Claimants are not allowed under the BIT system to participate in the state-investor private arbitration, and the ROE is not a party to the Lago Agrio litigation. A recent legal brief on the arbitration is here and an article on this issue is here.

4

JVM 002166

## KEY LEGAL DECISIONS, LEGAL BRIEFS

Ecuador Supreme Court decision affirming judgment against Chevron:
http://chevrontoxico.com/assets/docs/2013-11-12-supreme-court-ecuador-decision-english.pdf

Canada Supreme Court decision affirming right to enforcement:
http://chevrontoxico.com/assets/docs/2015-09-04-chevron-v-yaiguaje-canada-decision.pdf

Ontario Court of Appeal decision affirming right to enforcement:
http://stevendonziger.com/wp-content/uploads/2013/12/Ontario-appeals-reversal-121713.pdf

Motion by Villagers to Strike Chevron Defenses in Canada:
http://chevrontoxico.com/assets/docs/2016-01-20-factum-of-the-respondents-plaintiffs.pdf

Arbitration proceeding – key legal brief of Ecuador government:
http://chevrontoxico.com/assets/docs/2015-03-17-roe-3rd-supp-rejoinder.pdf

Appeal of Judge Kaplan's Decision in RICO Case by Counsel:
http://guptawessler.com/wp-content/uploads/2012/05/CA2-brief-corrections-RC4.pdf

Appeal of RICO decision by Ecuadorian villagers:
http://guptawessler.com/wp-content/uploads/2014/01/LAP-Brief.pdf


## KEY MEDIA ON LITIGATION

Further general background, videos and materials related to the case can be found at
www.chevrontoxico.com and in numerous media articles, including:

*60 Minutes* segment, 2009: https://www.youtube.com/watch?v=UGG1nIwxNhs

*Vanity Fair*: http://www.vanityfair.com/news/2007/05/texaco200705

Video of Chevron defrauding Ecuador court:
http://amazonwatch.org/news/2015/0408-the-chevron-tapes

New York Times on Canada enforcement action:
http://www.nytimes.com/2015/09/05/business/international/court-says-chevron-can-be-pursued-in-canada-over-ecuadorean-damage.html

Chevron Faces Major Difficulties in Canada:
http://www.csrwire.com/press_releases/38268-Chevron-Facing-Major-New-Difficulties-In-Ecuador-Pollution-Case-After-Losing-Before-Canada-Supreme-Court

Chevron Faces Potential "Litigation Catastrophe" in 2016:
http://www.csrwire.com/press_releases/38590-In-2016-Chevron-Faces-Potential-Litigation-Catastrophe-Over-Ecuador-Pollution-Liability

Profile of Alan Lenczner, Canadian counsel:
http://business.financialpost.com/legal-post/meet-alan-lenczner-the-man-fighting-for-ecuadorean-villagers-in-their-canadian-case-against-chevron

##

5

JVM 002167

July 2016
INQUIRIES:
Steven Donziger and Joshua Rizack
sdonziger@donzigerandassociates.com/9175662526
jrizack@therisinggroup.com/203-246-2639

6

JVM 002168

# EXHIBIT 13

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Saturday, December 10, 2016 2:51 PM |
| **To:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Subject:** | Re: Ecuador investment ? |

250,000 gives one-eigth of a point in a 12b judgment

full recovery is a 50x multiple

**From:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Sent:** Saturday, December 10, 2016 3:23:58 PM
**To:** Steven Donziger
**Subject:** Ecuador investment ?

Having a convo at 3:30 and want to plant the seed for an investment in Ecuador. Is it $250k for an 0.125% of the percent you would retain (1/3 of the collected judgement)?

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 14

**CONFIDENTIAL MEMORANDUM**
*May 2017*

1.    INVESTMENT OPPORTUNITY

This is an opportunity to support a landmark case for justice for the thousands of people in Ecuador who have suffered as a result of the Chevron Corporation's deliberate actions in contaminating the Ecuadoran rainforest.

As detailed below, the Claimants hold an enforceable judgment from Ecuador's highest court in an amount in excess of $9,500,000,000 against Chevron (the "Judgment"). Because of statutory interest, that judgment has grown to roughly $12,000,000,000 in Canada. Further funds are currently being sought by the Claimants to, among other things, finance an international enforcement strategy in Canada to ensure that Chevron meets its legal obligations under the Judgment. In exchange for providing funding in support of the Claim, Investors will receive the right to an agreed upon share of the proceeds received by the Claimants in respect of the Claim. Further details are available for qualifying investors.

The Claimants have put together a world-class team to manage the enforcement of the Judgment. In Canada, they are represented by Alan Lenczner of Lenczner Slaght in Toronto. In Brasil, they are represented by Sergio Bermudes Advogados en Rio de Janiero. Other best of breed law firms and service-providers will be engaged in other jurisdictions, as appropriate. International enforcement is necessary because Chevron, in anticipation of losing the Ecuador case, stripped its remaining assets from the country during the proceeding and now refuses to pay the judgment.

**Copies of significant court decisions and media coverage can be accessed via the links at the end of this document. Chevron's relevant court filings can be found at www.Chevron.com or via the contact below.**

2.    BACKGROUND

From 1964 to 1992, Chevron[1] built and operated more than 350 well sites and oil production facilities in an approximately 1,500 square mile concession area in Ecuador's rainforest. This concession area is home to five indigenous groups and approximately 80 farmer communities. Throughout the course of its operations in Ecuador, Chevron committed multiple acts of environmental contamination that left a legacy of environmental contamination and degradation from which the local population continues to suffer today. The amount of oil and contaminated water discharged into the Amazonian rainforest by Chevron is several orders of magnitude greater than the BP Deepwater Horizon spill. Moreover, the trial court found that Chevron's contamination was intentional, not accidental, and resulted from, among other things, Chevron's grossly substandard practices carried out over decades of its drilling operations in Ecuador. The litigation was held in Ecuador at Chevron's request after the company agreed to accept jurisdiction there and to abide by any judgment, subject only to enforcement defenses available under New York state law.

The Ecuadorian trial court and the appellate court (in its affirmation such Judgment) found that, during its operations of this concession, Chevron deliberately:

o    dumped many billion of gallons of production water (containing BTEX, TPH and polycyclic hydrocarbons) directly into the Ecuadoran rainforest floor and the nearby rivers and streams used by residents for drinking and bathing;

---

[1] Texaco Petroleum Company was a wholly-owned subsidiary of Texaco, Inc. at all times during its operations in Ecuador until Chevron and Texaco, Inc. merged in 2001.

- o   gouged more than 900 unlined open waste pits out of the jungle floor – pits that to this day continue to leach toxic waste into soils, groundwater and streams;

- o   burned hundreds of millions of cubic feet of gas and waste oil into the atmosphere, poisoning the air and creating "black rain" that inundated the area during tropical thunderstorms; and

- o   violated then-current U.S. industry standards, Ecuadoran environmental law, Chevron's own contract with the Ecuadoran government (which prohibited Chevron from using production methods that contaminated the environment) and international law.

Even Chevron's own internal audits of the environmental impacts found extensive contamination at Chevron's oil production facilities. The Ecuadorian trial court also took note of evidence that cancer rates in the concession area where Chevron operated are significantly higher than the norm, according to independent health evaluations. Several indigenous groups have seen their cultures decimated, largely because of Chevron's intentional contamination.

3.   JUDGMENT AGAINST CHEVRON IN ECUADOR

On February 14, 2011, the Lago Agrio trial court entered the Judgment against Chevron, which was subsequently affirmed by the Sucumbíos intermediate appellate court on January 3, 2012. The Judgment and affirmation collectively awarded the following amounts to or for the benefit of the Claimants:

➤   USD $8,646,000,000.00 in basic damages (the "Remediation Award");

➤   an additional USD $8,646,000,000.00 in punitive damages (the "Punitive Damages Award"); and

➤   an additional amount equal to ten percent (10%) of the Remediation Award (the "10% Award")

On January 3, 2012, the intermediate appellate court issued its order affirming the Judgment in its entirety. On November 13, 2013, Ecuador's National Court of Justice unanimously affirmed the liability portion of the judgment, but removed the punitive damages award. Chevron has one further and limited appeal pending before Ecuador's Constitutional Court that does not stop the enforceability of the Judgment now, since Chevron failed to request for and post a bond – the only way that such enforceability could have been suspended.

4.   ENFORCEMENT OF ECUADOR JUDGMENT IN CANADA

On May 30, 2012, the Ecuadorian claimants filed an action to seize Chevron's assets in Canada (estimated to be worth roughly $15 billion) to satisfy the entirety of the Ecuador judgment. Chevron tried to block the action, largely by claiming the Ecuadorians could not establish jurisdiction given that Chevron's assets in Canada were held by a wholly-owned subsidiary. On December 17, 2013, the Ontario Court of Appeal unanimously rejected Chevron's arguments and ruled in a 3-0 decision that the villagers could proceed with their enforcement action. Chevron appealed to Canada's Supreme Court. On September 4, 2015, Canada's Supreme Court ruled unanimously in favor of the Ecuadorians in a 7-0 decision. In all, the Ecuadorians have swept each of the ten appellate judges in Canada to rule on the jurisdictional aspects of the case; the same holds for all eight Ecuadorian appellate judges to rule on the merits of the case. The villagers now have an 18-0 record in Ecuador and Canada among appellate judges.

Armed with the unanimous Supreme Court ruling on jurisdiction, the Ecuadorians forced Chevron in October 2015 to file a written defense in the trial court in the Ontario Superior Court

2

of Justice in Toronto. The villagers subsequently filed a motion to strike Chevron's defenses to the enforcement action on the grounds they were already litigated and resolved in the company's preferred forum of Ecuador, where the underlying trial was held. Chevron filed a motion again raising its largely repetitive jurisdictional arguments. A four-day hearing on the motions took place the week of September 12, 2016. At the hearing, the trial judge expressly told Chevron's lawyers that he would not be bound by the "findings" of Judge Kaplan in Chevron's retaliatory U.S. RICO case (Chevron's evidence has largely collapsed, as explained below). The Canada trial court ruled on the motions on January 20 and sharply curtailed Chevron's defenses to enforcement but also granted Chevron's motion to eliminate its Canadian subsidiary from the action. The Ecuadorians are appealing aspects of this decision to the Ontario Court of Appeals, with argument scheduled for October 10, 2017. An asset enforcement trial against Chevron (and possibly its subsidiary) in Canada is likely to take place in 2018.

If there is no settlement and the villagers prevail in their action in Canada, Chevron will have a right to appeal the decision the Ontario Court of Appeal and ultimately to Canada's Supreme Court. Interest on the Ecuadorian judgment in Canada is running at 3% per annum, or approximately $275 million annually. With the statutory interest, the total amount of the judgment in Canada is roughly $12 billion.

5.   RELATED LITIGATION – U.S.

On February 1, 2011, Chevron filed a civil action in the SDNY against the Claimants, certain of Ecuadoran and U.S. counsel, and other advisors to the Claimants. In its complaint, Chevron alleged, among other things, that the defendants named in this civil action violated the Racketeer Influenced and Corrupt Organizations Act (RICO), by committing what Chevron tried to characterize as "fraud" and "extortion" (e.g. "fraudulently" pursuing claims the defendants "knew" to be meritless and "extorting" Chevron though public pressure into paying a settlement). Count 9 of Chevron's RICO complaint requested a declaratory judgment that any judgment from the Ecuadorian trial court be rendered unenforceable because of inherent fraud in the Ecuadorian judicial system. In February 2011, Judge Kaplan of the Southern District of New York, without any supporting precedent, granted Chevron's request for a preliminary injunction (the "Preliminary Injunction") that purported to bar enforcement of the Judgment anywhere in the world. Information later emerged that Judge Kaplan held undisclosed investments in Chevron while making this and other rulings in the case.

The defendants appealed and on September 19, 2011 – the first day after oral argument -- the Second Circuit issued a summary order vacating the Preliminary Injunction in its entirety. On January 26, 2012, the Second Circuit issued its written opinion dismissing the Preliminary Injunction and the claim for declaratory relief under Count 9 in its entirety on grounds that a court's power to determine the enforceability of a foreign judgment could only be exercised when a plaintiff-creditor had sought enforcement under its recognition laws and not as an affirmative lever to bar recognition actions in its courts and, much less, around the world. Notably, the Second Circuit ruling stated that the "[Claimants] hold a judgment from an Ecuadorian court. They may seek to enforce that judgment in any country in the world where Chevron has assets." In addition, it should be noted that the Ecuadorian appellate court specifically confirmed that it had considered and rejected all of Chevron's claims regarding fraud by the Claimants.

After the Preliminary Injunction was reversed on appeal, Judge Kaplan allowed Chevron to continue to pursue its civil claims against U.S. attorney Steven Donziger, Ecuadorian attorney Pablo Fajardo, and all 47 of the named plaintiffs in the underlying environmental action. During a bench trial in late 2013, Judge Kaplan openly disparaged the Ecuadorians and their counsel, denied the villagers and their counsel a jury, and refused to consider any of the voluminous evidence of environmental contamination relied on by Ecuador's courts to find Chevron liable. He also allowed Chevron to pay $2 million to a fact witness who claimed,

3

without any credible corroborating evidence and after 53 days of coaching by Chevron's lawyers, that certain of the defendants offered a bribe to the Ecuador trial judge in exchange for ghostwriting a favorable judgment. (The allegations already had been rejected by Ecuador's Supreme Court.) On March 4, 2014, Judge Kaplan found the defendants liable for the RICO violations and imposed an order prohibiting them from enforcing their judgment in the United States or collecting it anywhere in the world. That decision was affirmed in August 2016 by the same court that previously had reversed Judge Kaplan's preliminary injunction ruling; the three-judge panel did not independently review Judge Kaplan's findings and instead accepted them as true for purposes of the appeal. Neither the Kaplan decision nor the appellate decision affirming it has a dispositive impact on any enforcement action in Canada or other jurisdictions, as affirmed by the actions of the appellate courts (including Canada's Supreme Court). The Kaplan decision is being appealed to the U.S. Supreme Court. The petition for that appeal was filed on March 27, 2017. Several amicus briefs in support of the affected communities and their counsel were filed on May 1, 2017. A decision on whether the U.S. Supreme Court will grant review is expected between June and October, 2017.

Subsequent to the Kaplan decision, and while the first-level appeal was pending, Chevron suffered two significant setbacks that we believe have caused the factual predicate of its claims to collapse. First, Chevron's main witness in the Kaplan case (Alberto Guerra), to whom the company had paid $2 million, recanted key portions of his testimony related to the bribery allegation and admitted he had lied on the stand. Second, a computer forensic analysis ordered by a separate international arbitration panel hearing a dispute between Chevron and Ecuador's government (described below) concluded that the trial court judgment had in fact been authored by the trial judge, and had not been ghostwritten by the plaintiffs as Chevron had alleged and Judge Kaplan had concluded. In fact, this forensic analysis found that the trial judge opened and saved a draft Word document on his office computer that became the judgment at least 400 times. These developments were brought to the attention of the appellate court hearing the appeal of Judge Kaplan's decision, but the court ignored them.

The U.S. Supreme Court also dealt a blow to Chevron's prospects when it ruled in June 2016 to severely restrict the application of the RICO law. This is another factor that we believe has a negative impact on Chevron's prospects in this aspect of the litigation. (See here for background on this court decision.)

6.      RELATED LITIGATION – INTERNATIONAL ARBITRATION

In September 2009, Chevron sued the Republic of Ecuador ("ROE") under Ecuador's Bilateral Investment Treaty (BIT) with the United States, which permits private, commercial arbitration between investors and host country governments. Chevron's claims revolve primarily around a series of settlement and release agreements with Ecuador, which Chevron argues relieve it from liability for environmental impact arising out of its activities in Ecuador, including liability for any judgment rendered in the Lago Agrio case. Alternatively, Chevron asserts that the releases require the ROE to indemnify it for any sums collected against Chevron in any Lago Agrio judgment.

During the BIT proceedings, the arbitration panel has issued "interim orders" and "interim awards" purporting to order the ROE to use all measures necessary to enjoin all enforcement of any judgment against Chevron in the Lago Agrio case. The ROE has argued that Ecuadoran constitutional separation of powers principles prevent the executive branch of government from interfering in any way with the judicial process, in particular on behalf of any particular litigant, and that, accordingly, the ROE has very few measures "at its disposal." Accordingly, the ROE has taken the position that it has complied with the interim orders and award, while simultaneously arguing that such ruling are inappropriate, unnecessary and beyond the scope of the BIT arbitrators' power and, as such, should be vacated.

In addition, the Ecuadorian appellate court has ruled on more than one occasion that neither it nor any Ecuadoran court can give effect to any act by the BIT tribunal or by any international

4

MKS-0000599

tribunal that would have the effect of undermining fundamental human rights guaranteed by Ecuador's Constitution and by international law. Ecuador's courts also have noted that the Lago Agrio case involved citizens exercising their fundamental rights to judicial access and protection, and that any pro-investment principle of commercial rights could not trump those rights and was inapplicable in the context of this case.

The Claimants agree with the ROE and more broadly assert that the BIT proceedings themselves have no application to their claims against Chevron and that any orders emanating from the BIT proceedings will have no binding effect on Claimants or their right to enforcement of the Judgment in or outside Ecuador. The Claimants are not allowed under the BIT system to participate in the state-investor private arbitration, and the ROE is not a party to the Lago Agrio litigation. A decision in that action is pending.

## KEY LEGAL DECISIONS, LEGAL BRIEFS

Ecuador Supreme Court decision affirming judgment against Chevron:
http://chevrontoxico.com/assets/docs/2013-11-12-supreme-court-ecuador-decision-english.pdf

Canada Supreme Court decision affirming right to enforcement:
http://chevrontoxico.com/assets/docs/2015-09-04-chevron-v-yaiguaje-canada-decision.pdf

Ontario Court of Appeal decision affirming right to enforcement:
http://stevendonziger.com/wp-content/uploads/2013/12/Ontario-appeals-reversal-121713.pdf

Motion by Villagers to Strike Chevron Defenses in Canada:
http://chevrontoxico.com/assets/docs/2016-01-20-factum-of-the-respondents-plaintiffs.pdf

Arbitration proceeding – key legal brief of Ecuador government:
http://chevrontoxico.com/assets/docs/2015-03-17-roe-3rd-supp-rejoinder.pdf

Appeal of Judge Kaplan's Decision in RICO Case by Counsel:
http://guptawessler.com/wp-content/uploads/2012/05/CA2-brief-corrections-RC4.pdf

Appeal of RICO decision by Ecuadorian villagers:
http://guptawessler.com/wp-content/uploads/2014/01/LAP-Brief.pdf

## KEY MEDIA ON LITIGATION

Further general background, videos and materials related to the case can be found at www.chevrontoxico.com and in numerous media articles, including:

*60 Minutes* segment, 2009:
http://www.metacafe.com/watch/11468768/amazon-crude-on-60-minutes

*Vanity Fair*: http://www.vanityfair.com/news/2007/05/texaco200705

Video of Chevron defrauding Ecuador court:
http://amazonwatch.org/news/2015/0408-the-chevron-tapes

New York Times on Canada enforcement action:
http://www.nytimes.com/2015/09/05/business/international/court-says-chevron-can-be-pursued-in-canada-over-ecuadorean-damage.html

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000600

Chevron Faces Major Difficulties in Canada:
http://www.csrwire.com/press_releases/38268-Chevron-Facing-Major-New-Difficulties-In-E cuador-Pollution-Case-After-Losing-Before-Canada-Supreme-Court

Chevron Faces Potential "Litigation Catastrophe" in 2016:
http://www.csrwire.com/press_releases/38590-In-2016-Chevron-Faces-Potential-Litigation-C atastrophe-Over-Ecuador-Pollution-Liability

Profile of Alan Lenczner, Canadian counsel:
http://business.financialpost.com/legal-post/meet-alan-lenczner-the-man-fighting-for-ecuador an-villagers-in-their-canadian-case-against-chevron

##

INQUIRIES:

Steven Donziger, Esq.
sdonziger@donzigerandassociates.com
+1-917-566-2526

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000601

# EXHIBIT 15

**From:**     Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Sent:**     Tuesday, November 28, 2017 6:02 PM
**To:**       Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject:**  Fwd: Important Ecuador Investor Call

Begin forwarded message:

> **From:** Ian Watson <iw@watsonassetmanagement.com>
> **Date:** November 27, 2017 at 9:12:15 PM EST
> **To:** katie@streamlinefamilyoffice.com
> **Subject: Fwd: Important Ecuador Investor Call**

Dear Katie

Ian Watson can participate on both dates. When you have a confirmed date please let us know. For your information Ian's most up to date email address is:

iw@watsonassetmanagement.com

Best wishes,

Maureen

Ian Watson
Tel:   +1 250 935 0240
Cell:  +1 250 204 4486
iw@watsonassetmanagement.com

> Begin forwarded message:
>
> **From: Steven Donziger <sdonziger@donzigerandassociates.com>**
> **Subject: Important Ecuador Investor Call**
> **Date:** 26, November2017 at 4:33:46 PM PST
> **To:** Steven Donziger
> <sdonziger=donzigerandassociates.com@mail95.atl161.mcsv.net>,
> Katie Sullivan <Katie@Streamlinefamilyoffice.com>
>
> Dear investors/supporters,
>
> I trust you all had a wonderful holiday. I would like to set up a call this week to bring you up to

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

speed on the case in Canada, to provide an update on our progress in creating relationships with capital partners, and to outline immediate needs. The agenda will be as follows:

1) General update regarding recent legal decisions and upcoming appellate argument, overall timing, and shareholder activity around the case.

2) Discussion of the December meeting in Ottawa of the Assembly of First Nations (AFN), the national indigenous federation in Canada that represents the chiefs of 640 nations. This body will be entering into a formal alliance with the Ecuadorian communities to hold Chevron accountable. Already, there are signs that action in this area is causing great consternation within Chevron.

3) Discussion of our commitment to source funding from a significant capital partner or partners who will give our team the ability to put additional pressure on Chevron in and out of the courtroom. We are at a pivot point and a meaningful commitment of at least $25M from an investor(s) with the financial bandwidth plus best in class thinking is critical. We already are working with Katie Sullivan to create these relationships so my energy can be more focused on strategy and building strategic relationships. Katie will be on the call.

4) We are raising a round of $500k to $1m to bridge us to the larger capital raise. Average monthly overhead costs are approximately $75,000. Given my own situation, where I am under renewed attack from Chevron, I am no longer able to personally absorb any expense shortages as I have done to date. The upcoming AFN meeting is critical and we need to cover the cost of travel, media coverage, monthly stipends as well as legal costs for our incredible team of attorneys. Details will be explained.

**We are proposing this call take place this Wednesday (Nov. 29) at 5 p.m. EST.  The call-in number is 866-802-6672; passcode is 446620#.**

**PLEASE RSVP as soon as you can to me and Katie who is copied.**

If the Wednesday time does not work for most of you, we propose  an alternative date for this Thursday at 5 p.m. EST with the same call-in number.

We expect the call to take approximately 20 to 30 minutes, but we will go as long as necessary to answer any questions.

If neither of these dates work for you, please let me know and we can connect separately.  I am generally available at this email and at 917-566-2526.

On behalf of the affected communities in Ecuador, thanks again to each of you for your critical support.

Best, Steven

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 16

Josh

Account for all SRD labor thru the years (50m)

**Account for all money in since May 2016
Krevlin (250); Cliff (250); IVM (250 minus 15); Ian (250 minus 12,500); Krevlin II (100); IVM (100 minus 5); Josh guy (200); Fenwick (50)

**Divide into two categories: Alan and Other Case Expenses that came to U.S. Rep

**Other includes these recent expenses:
    Transperfect: 31,500
    Gupta: 25,000
    Rizack: 13,000 (approx.)
    Asset counsel: 10,000
    Frisch (bar counsel): 7,500
    Page fees: 25,000 (verify)
    3BL Media: 4,600
    FDA: 10,000 (verify)
    Ecuador other (Yanza): 20,000
    Salazar: 3,200 (verify)
    Snowdy: 50,000
    SRD travel
        June Ecuador trip
        August Ecuador trip
        Sept Ecuador trip w Josh
        Toronto June and then August
        Toronto September
        France trip (calculate airfare at $3,000)
    Wire fees

**Other includes future expenses
    FDA: 25,000
    Page: 25,000
    Gupta: 25,000
    Supreme Court printing: 25,000

**Donziger salary
    hourly actual/donation to case difference between hourly and monthly
    divide between May 1 to today and before
    before May 1 is Donziger debt

**Donziger RICO case expenses

MKS-0006682

MKS-0006683

**Subject:** RE: Accounting
**Date:** Monday, January 23, 2017 11:16:55 AM Eastern Standard Time
**From:** Christien Lam
**To:** Joshua Rizack

Here you go:

| Date | Amount Received in USD | Amount Paid out in USD | Amounts Paid to Our Firm's Account |
|------|------------------------|------------------------|-------------------------------------|
| May 9, 2016 | $250,000.00 | Kremlin | Investor I |
| May 10, 2016 | | $75,000.00 | |
| July 13, 2016 | $100,000.00 | Kremlin | Investor I |
| July 19, 2016 | $250,000.00 | Clff | Inus II |
| July 19, 2016 | | $105,000.00 | |
| October 3, 2016 | $285,000.00 | JVM | Invest III |
| October 6, 2016 | | $143,500.00 | |
| October 19, 2016 | $200,000.00 | Jusk bur | Inves IV |
| October 21, 2016 | | $100,000.00 | |
| December 1, 2016 | $95,000.00 | JVM | Invest III |
| December 19, 2016 | | $65,000.00 | |
| January 3, 2017 | $237,500.00 | TAN | Invest V |

**From:** Joshua Rizack [mailto:jrizack@therisinggroup.com]
**Sent:** Monday, January 23, 2017 11:07 AM
**To:** Christien Lam
**Subject:** Re: Accounting

Thanks you. Can you also add a column for amounts paid to your firms account.s

Thanks,

**From:** Christien Lam <CLam@litigate.com>
**Date:** Monday, January 23, 2017 11:04 AM
**To:** Josh Rizack <jrizack@therisinggroup.com>
**Cc:** Steven Donziger <sdonziger@donzigerandassociates.com>, Alan Lenczner <alenczner@litigate.com>
**Subject:** Accounting

Page 1 of 2

MKS-0006684


Lenczner
Slaght

130 Adelaide St W   T 416-865-9500
Suite 2600          F 416-865-9010
Toronto, ON         www.litigate.com
Canada M5H 3P5

November 11, 2016

Alan J. Lenczner, Q.C.
Direct line:   416-865-3090
Direct fax:    416-865-2844
Email:         alenczner@litigate.com

**Via Email   sdonziger@gmail.com**

Mr. Steven Donziger
245 West 104 Street, #7D
New York, NY
10025

Dear Mr. Donziger:

**RE: Aguinda et al v. Chevron Corporation et al**
**Our File No.:   43222**

Herewith a history of investments:

1. I have an Investment Agreement dated May 22, 2016 signed by the FDA representative, Carlos Guaman. I do not know who the funder is and need some verification of that. US $250,000 was received on May 9, 2016. US $75,000 was remitted to you on May 10, 2016.

2. I received a further US $100,000 on July 13, 2016. I have no record of who the funder is. I only have an email to you from George Crossman indicating that the money came from Glenn Krevlin. Can you kindly provide me with an Investment Agreement for this amount?

3. I have an Investment Agreement dated July 11, 2016 signed by Carlos Guaman, but once again, no documentation indicating the funder. US $250,000 was received on July 19, 2016 and, of that amount, US $105,000 was remitted to you on July 19, 2016.

4. I have an Investment Agreement dated August 24, 2016 which indicates that the funder is WDIS Finance LLC. US $285,000 was received on October 3, 2016 and we remitted US $143,000 to you on October 6, 2016.

5. I have an Investment Agreement dated August 24, 2016 indicating that the funder is Wellbeck Partners. We received US $200,000 on October 19, 2016 and we remitted US $100,000 to you on October 21, 2016.

BARRISTERS                                              LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP

**Mr. Steven Donziger**
**November 11, 2016**

2

I look forward to receiving the requested documentation.

Yours very truly,

Alan J. Lenczner, Q.C.

AJL/klh

MKS-0006686

# EXHIBIT 17

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Saturday, December 17, 2016 1:59 AM |
| **To:** | 'John van Merkensteijn' |
| **Subject:** | another instruction to Alan |
| | |
| **Categories:** | KF2 |

John: Sorry for the bother but Alan says his auditor is asking for the following instruction regarding the recent $95,000 investment. Please send this to Alan from the person (I assume MBJ) who represents your entity. I already have discussed this with Alan and he is in agreement with it. Please confirm or let me know if any problem. This is time-sensitive. Thanks so much for all, Steven

Alan:

I hereby instruct your law firm to allocate $65,000 of the $95,000 investment from ENTITY to the law firm of Steven Donziger for expenses related to work on the Ecuador environmental case against Chevron.

Sincerely,

Representative of ENTITY

JVM 003276

# EXHIBIT 18

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Friday, September 9, 2016 8:09 PM |
| **To:** | 'John van Merkensteijn' |
| **Subject:** | Fw: important -- instructions to Alan about use of funds |
| | |
| **Categories:** | KF2 |

**From:** Steven Donziger
**Sent:** Friday, September 9, 2016 4:00 PM
**To:** John van Merkensteijn
**Subject:** important -- instructions to Alan about use of funds

John,

Can you please send an instruction to Alan Lenczner, via email, that 50% of the investor funds under the Agreement received by his law firm are to be forwarded Steven R. Donziger for expenses related to the Ecuador litigation. Alan's email is alenczner@litigate.com. Alan has indicated he needs said instructions directly from you or your representative. I would appreciate it if you could take care of this with dispatch. If you need detail about use of funds, let me know. Thanks much.

Best, Steven

JVM 003447

# EXHIBIT 19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3          C.A. No. 11 Civ. 0691 (LAK)

4

5  - - - - - - - - - - - - - - - - - X

6  CHEVRON CORPORATION,

7                    Plaintiff,

8      v.

9  STEVEN DONZIGER, et al.,

10                   Defendants.

11 - - - - - - - - - - - - - - - - - X

12   VOLUME I                      Pages 1-231

13

14      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15        VIDEO DEPOSITION OF MARY K. SULLIVAN

16         Thursday, June 21, 2018, 10:07 a.m.

17                 LibbyHoopes, P.C.

18               399 Boylston Street

19            Boston, Massachusetts 02116

20

21

22

23    --- Reporter: Kimberly A. Smith, CRR, CRC, RDR ---

24            Realtime Systems Administrator

25             Veritext Legal Solutions

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

1     APPEARANCES:

2

3         Gibson, Dunn & Crutcher LLP

4         By:  Anne Marie Champion, Esq.

5         and Alejandro A. Herrera, Esq.

6         200 Park Avenue

7         New York, NY  10166-0193

8         (212) 351-4000

9         achampion@gibsondunn.com

10        aherrera@gibsondunn.com

11            and

12        Stern Kilcullen & Rufolo, LLC

13        By:  Michael Dinger, Esq.

14        325 Columbia Turnpike, Suite 110

15        Post Office Box 992

16        Florham Park, NJ  07932-0992

17        (973) 535-2627

18        mdinger@sgklaw.com

19                    for the Plaintiff;

20

21

22

23

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
                                              Page 3

1    APPEARANCES: (continued)

2

3         LibbyHoopes, P.C.

4         By:  Frank A. Libby, Jr., Esq.

5         and Benjamin S. Towbin, Esq.

6         399 Boylston Street

7         Boston, MA  02116

8         (617) 338-9300

9         falibby@libbyhoopes.com

10        btowbin@libbyhoopes.com

11                  for the Witness.

12

13   Also Present:  William Slater, Video Operator

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 4

1                    I N D E X

2

3   WITNESS:  Mary K. Sullivan

4

5   EXAMINATION                                    Page

6      By Ms. Champion                              7

7                 AFTERNOON SESSION

8      By Ms. Champion                             106

9

10  EXHIBITS FOR IDENTIFICATION:

11  Sullivan         Description                   Page

12  Exhibit 1   MKS-0000061 - MKS-0000066           25

13  Exhibit 2   MKS-0000139 - MKS-0000140           53

14  Exhibit 3   6/19/18 court order                 53

15  Exhibit 4   MKS-0000130 - MKS-0000134           65

16  Exhibit 5   MKS-0000022 - MKS-0000027           68

17  Exhibit 6   MKS-0000037                         70

18  Exhibit 7   MKS-0000110 - MKS-0000112           71

19  Exhibit 8   MKS-0000105 - MKS-0000106           76

20  Exhibit 9   MKS-0000090 - MKS-0000094           77

21  Exhibit 10  MKS-0000031 - MKS-0000032          106

22  Exhibit 11  MKS-0000149 - MKS-0000156          111

23  Exhibit 12  MKS-0000370 - MKS-0000374          158

24  Exhibit 13  MKS-0000396                        189

25  Exhibit 14  MKS-0000398                        190

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 5

```
1    EXHIBITS FOR IDENTIFICATION: (continued)

2    Sullivan           Description                    Page

3    Exhibit 15  MKS-0000405                           192

4    Exhibit 16  MKS-0000395                           193

5    Exhibit 17  MKS-0000390                           193

6    Exhibit 18  MKS-0000397                           194

7    Exhibit 19  MKS-0000403                           198

8    Exhibit 20  MKS-0000404                           200

9    Exhibit 21  MKS-0000365                           201

10   Exhibit 22  MKS-0000389                           203

11   Exhibit 23  MKS-0000383                           204

12   Exhibit 24  MKS-0000401                           206

13   Exhibit 25  MKS-0000399                           207

14   Exhibit 26  MKS-0000388                           211

15   Exhibit 27  MKS-0000366 - MKS-0000368             212

16   Exhibit 28  MKS-0000369                           215

17   Exhibit 29  MKS-0000428                           215

18   Exhibit 30  MKS-0000011                           217

19   Exhibit 31  List of Donziger TD Bank accounts  219

20   Exhibit 32  Grinberg handwritten notes            220

21

22

23

24   Original exhibits retained by reporter to be

25   returned to Gibson Dunn
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

```
 1              THE VIDEO OPERATOR:  Good morning.
 2      We are going on the record at 10:06 a.m. on June 21,
 3      2018.  Please note the microphones are sensitive and
 4      may pick up whispering, private conversations, and
 5      cellular interference.  Please turn off all cell
 6      phones or place them away from microphones as they
 7      can interfere with the deposition audio.  Audio and
 8      video recording will continue to take place unless
 9      all parties agree to go off the record.
10                   This is Media Unit No. 1 in the video
11      recorded deposition of Katie Sullivan in the matter
12      of Chevron Corporation vs. Steven Donziger, et al.
13      filed in the United States District Court for the
14      Southern District of New York, Case No. 11 Civ. 0691
15      (LAK).
16                   This deposition is being held at the
17      offices of LibbyHoopes, located at 399 Boylston
18      Street, Boston, Massachusetts.  My name is Bill
19      Slater from the firm Veritext.  I'm the
20      videographer.  The court reporter is Kimberly Smith
21      from the firm Veritext.  I'm not authorized to
22      administer an oath.  I'm not related to any party in
23      this action, nor am I financially interested in the
24      outcome.
25                   Counsel and all present in the room will
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 7

1    now state their appearances and affiliations for the

2    record.

3              MS. CHAMPION:  Anne Champion from Gibson

4    Dunn for Chevron Corporation.

5              MR. HERRERA:  Alejandro Herrera from

6    Gibson Dunn on behalf of Chevron Corporation.

7              MR. DINGER:  Michael Dinger from Stern

8    Kilcullen & Rufolo on behalf of Chevron.

9              MR. LIBBY:  Frank Libby, LibbyHoopes,

10   for Ms. Katie Sullivan.

11             MR. TOWBIN:  Benjamin Towbin,

12   LibbyHoopes, for Ms. Sullivan.

13             THE VIDEO OPERATOR:  Will the court

14   reporter please swear in the witness and we can

15   proceed.

16             MARY K. SULLIVAN,

17        having been satisfactorily identified by the

18        production of her driver's license, and

19        duly sworn by the court reporter, was deposed

20        and testified as follows:

21                       EXAMINATION

22   BY MS. CHAMPION:

23        Q.  Good morning, Ms. Sullivan.  I'm just going

24   to go over some ground rules.  I'm sure your counsel

25   has prepared you well.  But just remember that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 8

1    you're under oath.

2              Is there any reason you can't testify

3    truthfully today?

4        A.   No.

5        Q.   You're not on any medication or --

6        A.   Zero.

7        Q.   Okay.  Not suffering from any illness that

8    would affect your --

9        A.   Zero.

10       Q.   Great.  And just remember too that because

11   we -- the court reporter has to take down your

12   testimony, that you need to give verbal answers.

13   So it's better not to just give a nod of the head,

14   et cetera.  We need something that the court

15   reporter can take down.

16       A.   Okay.

17       Q.   If you need a break, you should ask for

18   one.  But I just request that you not do so while a

19   question is pending.

20              And you understand that you're here

21   today to provide testimony on behalf of yourself

22   personally, as well as Streamline Family Office,

23   correct?

24       A.   Correct.

25       Q.   I just want to just briefly go over your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 9

1    background just so I have a grounding in, you know,

2    the events that led up to today.

3              You have a bachelor's degree in

4    psychology; is that correct?

5        A.  Yes.  Correct.

6        Q.  And do you have any graduate school?

7        A.  No.

8        Q.  And after college, you worked at Merrill

9    Lynch; is that right?

10       A.  Correct.

11       Q.  And how long were you there?

12       A.  Oh, about five years with a -- I had a job

13   at Banco in between.  I was at Merrill Lynch twice.

14       Q.  Got it.  Was that in Boston?

15       A.  Correct.  Yes.

16       Q.  And so you've been in Boston since college?

17       A.  Yes.

18       Q.  And then you started your own business;

19   is that right?

20       A.  Correct.

21       Q.  And you've been running that business since

22   then.  Has it always been Streamline Family Office?

23       A.  Since 2005, incorporated.

24       Q.  Okay.  And incorporated.  There was

25   something you started in 2003.  Was that different?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 10

1    I think --
2         A.  I started as -- yes.  That's when I started
3    my entrepreneur -- Streamline.
4         Q.  Got it.
5         A.  Streamline Private Wealth and then it
6    became Streamline Family Office, incorporated in
7    2005 as an S-corp.
8         Q.  Got it.  And that business is wealth
9    management; is that correct?
10        A.  No.  It is wealth coordination.  We do not
11   manage assets of any kind.
12        Q.  Oh, okay.  So can you just briefly describe
13   for me what that entails.
14        A.  Sure.  So we work with families that have
15   significant assets, the average about 300 --
16   anywhere from 100 to $500 million of individual
17   family assets.
18             And so what Streamline does is we manage
19   the complexity between complex financial capital and
20   complex human capital.  So we quarterback between
21   all their advisers, the -- you know, manage all
22   their cash flow, all their investments, you know, in
23   between, you know, their accountant, their lawyer,
24   their insurance folks, their investment advisers.
25             We are really partnered with the family

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 11

```
 1    to take that burden off of them.
 2         Q.  Wow.  Yes.  That actually sounds very
 3    useful.
 4         A.  It is.
 5         Q.  Do you have any employees?
 6         A.  Yes.
 7         Q.  How many?
 8         A.  Six.
 9         Q.  Six.  And is that -- how long have you had
10    six employees?
11         A.  Well, it's a small business so it's ebbed
12    and flowed.  We've had that for the past two years.
13         Q.  So how did you get involved in that line of
14    work?  Did you just see a need for that and . . .
15         A.  I did.
16         Q.  Yeah.  Very interesting.  So how did you
17    first come to hear about -- if I call it the Lago
18    Agrio litigation, will you know what I'm talking
19    about?
20         A.  Yes.
21         Q.  Sometimes I say Ecuadorian litigation.
22         A.  I know about the litigation.
23         Q.  And so how did you first come to hear about
24    it?
25         A.  I -- in 2016, I read a book called "The
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 12

1    Soul of Money," and I wanted to meet the author, so

2    I reached out to her.  Her name is Lynne Twist.  And

3    somehow it got me invited to a founders trip, which

4    is through a nonprofit, the Pachamama Alliance.

5           And I accepted it a week before the trip

6    was taking off so I could meet her.  And on that

7    trip, where there was about 30 of us, I was

8    introduced -- Steven was a special guest for part of

9    that trip, and that's how we all got to meet him.

10      Q.  Got it.

11      A.  And that's how I understood the story.

12      Q.  Understand.  So he was the first person

13   that you met --

14      A.  No.

15      Q.  -- associated with --

16      A.  Oh.  He was the first person I met

17   associated with -- yes.

18      Q.  With the litigation?

19      A.  Yes.

20      Q.  So what did you understand at that time,

21   what was this litigation?  What was your

22   understanding of what it was?

23      A.  That there was a big dumping mess in

24   Ecuador that was responsible by oil companies.  That

25   Chevron was involved because they bought Texaco back

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 13

1    in some date.  And he was working on behalf of the
2    indigenous peoples to try to help get it cleaned up.
3         Q.  So this trip was in -- was that in 2016?
4         A.  August 2016.
5         Q.  And so was that your first trip to Ecuador?
6         A.  Yes.
7         Q.  And have you been there since then?  I
8    think in --
9         A.  Yes.
10        Q.  -- 2017, there were some documents that --
11        A.  Yes.
12        Q.  -- you were at a meeting there?
13        A.  Yes.  I was invited to go back to actually
14   see -- I was in the part of the rain forest that was
15   still beautiful.  And so I had an opportunity and an
16   invitation to see the other part of the rain forest,
17   which I thought would be an interesting contrast.
18        Q.  And what were your impressions?
19        A.  It was interesting.
20        Q.  What do you mean by that?
21        A.  It kind of opened my world to -- you know,
22   outside of my little bubble that I live in.  I just
23   really thought it was interesting.  I was just
24   learning.  For me, it was all about just learning
25   something new.  And I learned a lot; I met a lot of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

1    interesting people, and I was an observer.

2        Q.   So when was that trip?

3        A.   That trip?  I think it was in September of

4    '17.

5        Q.   And so that was your second trip to Ecuador.

6    Have you been there since then?

7        A.   No.

8        Q.   And who were you with on that trip?

9            MR. LIBBY:  If I may at this time, Anne,

10   how much more background are you going to get into?

11   What I understood from our conversation prior to

12   Ms. Sullivan coming in was that you wanted to get

13   into some -- a little of her background.  And now

14   we're getting into facts and circumstances having to

15   do with Ecuador and Donziger.  So how much more?

16           MS. CHAMPION:  First of all, I think she

17   produced a couple documents related to this trip.

18   And so I think I'm entitled to ask about the trip.

19   The documents refer to it.  But I'm just trying to

20   understand her -- the base of her knowledge and her

21   role in the case so that I can -- you know, so that

22   I can ask her questions.

23           MR. LIBBY:  And we're all bound by the

24   court's June 19 order where it laid out the three

25   subject areas.  And I think at this point, we're

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 15

1   moving well past that and into something other

2   that's not allowed under the court's order, the

3   Streamline order.

4           MS. CHAMPION:  I think I'm entitled to

5   ask her about her role in the case and how she came

6   to have that role.

7           MR. LIBBY:  Well, I disagree.  And at

8   this point under Rule 30, I'm going to instruct the

9   witness not to answer.

10          MS. CHAMPION:  Okay.

11          MR. LIBBY:  If we can move on to those

12   areas that the court has, in fact, carved out, I

13   think it would be helpful.

14          MS. CHAMPION:  We also agreed that I

15   could ask her about documents.  She produced a

16   document about this trip.

17          MR. LIBBY:  Correct.  Subject to the

18   limitations set forth in the June 19 order.  And

19   those are three areas, none of which are to be

20   encroached upon by reference to paragraph 3, which

21   has to do with paragraph 5 compliance discovery.

22          So what I'm suggesting is -- you do as

23   you see fit.  But under the -- our reading of the

24   court's June 19 order, the questioning here has run

25   far afield.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1           MS. CHAMPION:  I'm going to have to
2    disagree with you.  And I think that, in fact, the
3    email that she sent about this trip is directly
4    connected to the Elliott solicitation, which is a
5    subject that the court identified.
6           MR. LIBBY:  Well, when we get to that
7    email, why don't we pick it up then.
8           MS. CHAMPION:  Well, I think you should
9    take it question by question.  I'm happy to
10   introduce the email, but I think I'm entitled to ask
11   about the trip that she referenced in the email
12   about the Elliott solicitation.
13          MR. LIBBY:  I understand.  But let's --
14   let's distinguish between what appears on the face
15   of a document and the production of the document
16   because it meets a production obligation under the
17   order versus the scope of the order with respect to
18   subject areas.
19          And those are, again, the Elliott
20   Management meeting, Donziger's assets and
21   liabilities and financial situation, and any
22   payments to Donziger.  I fail to see how that --
23   these questions have to do with those three discrete
24   subject areas.
25          MS. CHAMPION:  I just explained to you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 17

1    the connection between this trip to Ecuador and the

2    Elliott solicitation.

3                    MR. LIBBY:  I think we disagree.

4                    MS. CHAMPION:  All right.  Well, you

5    know, we obviously reserve the right to recall this

6    witness.

7                    MR. LIBBY:  Of course you do.

8    BY MS. CHAMPION:

9        Q.  What was your understanding about -- how

10   did you come to look for investors for the case?

11                   MR. LIBBY:  No.  I'm sorry.  I don't see

12   how that's any different -- I don't see how that

13   fits any of these three --

14                   MS. CHAMPION:  I'm not going to do this

15   extensive argument with you on the record.  I'm here

16   to talk to this witness --

17                   MR. LIBBY:  I understand.

18                   MS. CHAMPION:  -- and I have a limited

19   amount of time with her.  So please just stop.

20                   MR. LIBBY:  Well, then I instruct her

21   not to answer because I see that as outside the

22   scope.

23                   MS. CHAMPION:  You can instruct her not

24   to answer.  Just stop with the speaking objections.

25   I'm here to talk to her and find out what she knows,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 18

1    not what you know and what you think.

2              MR. LIBBY:  Understood.  Understood.

3    Understood.  We did have a conversation beforehand.

4    BY MS. CHAMPION:

5        Q.  How did you come to search for investors

6    for this case?

7              MR. LIBBY:  Same objection.

8              Instruct not to answer.

9    BY MS. CHAMPION:

10       Q.  How did you come to identify Elliott

11   Management as a potential investor for this case?

12             MR. LIBBY:  You may answer.

13             THE WITNESS:  I had a random reach-out

14   to me by -- I think this fellow's name is Steven

15   Saltzenburg or Saltzen something, on LinkedIn.  And

16   I typically don't answer any of those, and I did,

17   and I had a conversation with him.  He's in New

18   York.  He's got this family office network.  They're

19   very transaction based.

20             And so I just had about a half hour call

21   with him, and I mentioned, you know, that I became

22   aware of this litigation, you know, in this process.

23   And he's the one that said, Oh, that would be a

24   great thing for a place like Elliott Management.

25   That was it.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 19

```
 1   BY MS. CHAMPION:
 2       Q.  And who directed your work on the case?
 3               MR. LIBBY:  Objection, form.
 4               You may answer.
 5               THE WITNESS:  Myself.
 6   BY MS. CHAMPION:
 7       Q.  You didn't answer to Mr. Donziger?
 8       A.  I did not, no.  I answered to myself.
 9       Q.  Did you answer to the Ecuadorian plaintiffs?
10       A.  No.  I don't speak Spanish.
11       Q.  So you just understood you were acting as a
12   freelancer on behalf of the plaintiffs?  I'm just
13   trying to understand, you know, your role, who you
14   took direction from, that type of thing.
15               MR. LIBBY:  Objection.  Is this with
16   respect to the Elliott Management meeting?
17               MS. CHAMPION:  Yes.  I mean, she's
18   having a discussion about the case with this
19   Mr. Saltzstein.  He tells her Elliott Management
20   would be a good fit.  And I'm just asking, you know,
21   did someone direct her to have the conversation with
22   Mr. Saltzstein, et cetera.  It's a perfectly
23   legitimate question.
24               MR. LIBBY:  Go ahead.
25               THE WITNESS:  Curiosity.  I would say
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 20

1    curiosity.  I have a deep curiosity.

2    BY MS. CHAMPION:

3        Q.  But you understood that the case needed

4    investors?

5        A.  Yes.  I understood that the case needed

6    funding to be able to continue to reach some type of

7    solution.

8        Q.  And what type of funding did you think --

9    what did you think Elliott Management would be

10   interested in funding exactly?

11       A.  Funding the litigation costs.  I think

12   that's the only thing that I understood was

13   necessary.

14       Q.  What litigation costs?  Where did you

15   understand those costs were coming from?

16       A.  Just inherently there are costs to do

17   business and to try to litigate the case on behalf

18   of the Ecuadorian peoples who have no money.

19       Q.  But I just want to be clear.  What pending

20   proceedings were you aware of --

21            MR. LIBBY:  No.  At this point, this has

22   nothing to do --

23   BY MS. CHAMPION:

24       Q.  -- that Elliott would be funding?

25            MR. LIBBY:  Objection.  This has nothing

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 21

1    to do with the intent to obtain funds.  I'm drawing

2    the line here.

3              MS. CHAMPION:  You're wrong.  It does.

4    What is she asking the money for?  And that's in the

5    notes.

6              MR. LIBBY:  That's a different thing.

7    Whether it's in the documents or not, this has to do

8    with the court's order, which is the attempt to

9    obtain funds, and what you're doing is ranging far

10   afield, Anne, respectfully, and I'm instructing her

11   not to answer.

12   BY MS. CHAMPION:

13       Q.  What did you think that you were asking --

14   When you ultimately did ask Elliott Management for

15   money, what were you asking them for money to fund?

16              MR. LIBBY:  Objection to form.

17              Go ahead.

18              THE WITNESS:  I -- The meeting with

19   Elliott was a personal challenge because I heard it

20   and I thought, Hmm.  Could I get a meeting with

21   Elliott Management.  That's as simple as it was.

22   And so I attempted to do that, thinking that it

23   probably would never happen.

24   BY MS. CHAMPION:

25       Q.  Right.  I understand that.  But you went to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

```
 1    them with a specific request.  And I'm just trying
 2    to find out what was that request, what were you
 3    asking them for money for?
 4         A.  I went --
 5              MR. LIBBY:  Objection, objection.  And I
 6    think it misstates her prior testimony.
 7              But go ahead and answer.
 8              THE WITNESS:  Can you answer -- ask that
 9    again.
10    BY MS. CHAMPION:
11         Q.  What was the request that you made of
12    Elliott?
13         A.  For a meeting.
14         Q.  And you didn't ask them for -- to fund
15    anything at that meeting?
16         A.  No.
17         Q.  Okay.
18         A.  It was an introduction.
19         Q.  So you said Mr. Saltzstein suggested
20    Elliott Management.  And you said that
21    Mr. Saltzstein had reached out to you on LinkedIn?
22         A.  Correct.
23         Q.  How did you come to discuss Elliott
24    Management with him?
25         A.  I didn't bring up Elliott Management.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 23

1  I didn't know of Elliott Management.  I knew there
2  was large hedge funds in the world, but I didn't
3  know of Elliott Management.
4      Q.  Right.  I understand that.  But how did he
5  come to identify them as someone that would be
6  interested in funding this potentially?
7      A.  His business, Family Office Networks,
8  is transactional based and so it was just a
9  conversation to -- I was really exploring just, does
10  this even make sense for people.  So that's all the
11  conversation really was.  And that's when the
12  Elliott Management came up.
13      Q.  Got it.  And what do you mean by, does this
14  make sense for people?  Does what make sense?
15      A.  Does connecting capital to do -- have an
16  impact in the world and do good things.
17      Q.  I see.  But not specifically the Ecuadorian
18  litigation?
19      A.  Not -- Well, no, not specifically.  In my
20  view, it was a general understanding of that world.
21  And Elliott was brought up for that particular
22  conversation.
23      Q.  Understand.  And by "particular
24  conversation," you mean as a potential funder for
25  the Ecuadorian litigation?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 24

1      A.   Yes.

2      Q.   And did he raise the Ecuadorian litigation,

3   or did you in the course of this conversation?

4      A.   I raised it.

5      Q.   And you thought he might be a good -- he

6   might have good ideas because, as you said before,

7   he worked in a transactional space?

8      A.   It is not my space, so, yes, I was looking

9   for . . .

10      Q.   And just so I understand, because I'm so

11   not a finance person, when you say his space and

12   your space, how do they differ?

13      A.   I'm not transactional.

14      Q.   Because you do this more sort of

15   consulting -- it's like a consulting business that's

16   just more managing different pieces --

17      A.   I'm like a primary care doctor --

18      Q.   Got it.

19      A.   -- for wealthy families.  I take care of

20   the whole piece.  I know everything that's going on,

21   and I know transactions are happening, but I am in

22   no way, shape, or form involved in them.  The only

23   fees I receive are directly from clients.  I'm not

24   transactional.

25      Q.   Got it, okay.  And so he was the first

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 25

1    person that mentioned Elliott Management to you as a
2    possible funder?
3         A.  Yes.
4         Q.  And you said you had not heard of Elliott
5    Management previously; is that right?
6         A.  Well, I've known -- I knew they were a big
7    hedge fund and I've known of them.  But I've never
8    kind of understood them more deeply than I know that
9    they're activist investors and they invested in --
10   they invest in companies.
11        Q.  Got it, okay.  And -- I mean, I believe you
12   said to Donziger -- we'll mark this as Sullivan 1.
13                    (Discussion off the record.)
14                    (Sullivan Exhibit 1 was marked
15                     for identification.)
16   BY MS. CHAMPION:
17        Q.  So do you recall telling Mr. Donziger that
18   you knew of Elliott Management because "they bought
19   into one of my client's companies and riding his ass
20   to create shareholder value"?
21        A.  Um-hum.  Yes.
22        Q.  Do you recall that?  And which client were
23   you referring to there?  What client company?
24                    MR. LIBBY:  Objection.  Say that again,
25   please.  Where are we on the email?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1           MS. CHAMPION:  It's the bottom of the
2     second page.
3           MR. LIBBY:  Right.
4           MS. CHAMPION:  The email dated
5     October 16, 2017.
6     BY MS. CHAMPION:
7        Q.  And just for the record, I've handed you
8     what we've marked as Sullivan Exhibit 1.  It's an
9     email chain with the Bates label MKS-0000061 through
10    66.
11          And just to be clear, the bottom of the
12    email chain, page 65, you'll see there's an email
13    from Steven Saltzstein.  That's the gentleman that
14    reached out to you on LinkedIn; is that correct?
15       A.  Correct.
16       Q.  So what did you mean when you said to
17    him -- or said to Mr. Donziger that Elliott
18    Management had bought into one of your "client's
19    companies and was riding his ass to create
20    shareholder value - not in the way we would think a
21    so-called activist might work"?
22          MR. LIBBY:  Go ahead.
23          THE WITNESS:  That Elliott Management
24    is -- they have a certain style that is, I'd say,
25    aggressive, and that they -- they're

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 27

1    strategically -- they're good at what they do.

2    And this is what they do.

3    BY MS. CHAMPION:

4        Q.  And why did you say that that was not --

5    "not in the way we would think a so-called activist

6    might work"?  How would a so-called activist

7    normally work?

8        A.  To uplift people.

9        Q.  But you nonetheless considered them an

10   activist investor?

11       A.  They called themselves an activist

12   investor.

13       Q.  Got it, okay.  And so you also say to

14   Mr. Donziger here, "I 100 percent agree with him."

15           Do you see that?

16       A.  I do.

17       Q.  And why did you agree with him?

18       A.  Because I think you need to match

19   opponents.  You need to match people who have

20   resources and strategies for the best, fairest

21   outcome.

22       Q.  Okay.

23       A.  Just in general.  That's a general common

24   sense in my view.

25       Q.  Yes.  It makes sense.  And why did you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 28

```
 1     think Elliott might be a good fit for this case?
 2         A.  They're a $34 billion fund.
 3         Q.  Anything else?
 4         A.  They're really good at what they do.
 5         Q.  I mean, but among the many, many, many
 6     hedge funds, why Elliott?  I mean, there's lots
 7     of billion dollar -- multibillion dollar funds?
 8         A.  There's a certain reputation they have.
 9         Q.  And how was that reputation a good fit for
10     the Ecuadorian litigation?
11         A.  It was just a feeling that I had it might
12     be a good fit.  I don't -- I didn't really give it a
13     whole lot of deep thinking.
14         Q.  You say -- you said here that "strategy" --
15     excuse me.  Strike that.
16             You say here, "Strategy would be to go
17     to the top and get in analysts' ears to bring the
18     idea forward - like in the show 'Billions.'"
19         A.  Um-hum.
20         Q.  What did you mean by that?
21         A.  Meaning that in that hierarchy, there's a
22     lot of people that are out there looking for deals
23     and then they bring them up to the partners or
24     portfolio managers, if you will; they bring them up
25     to the partners as ideas.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1          So they are out scouring the world for

2     good ideas that are going to make them a lot of

3     money.  That's their model.

4          Q.  Got it, okay.  And "go to the top," what

5     did you mean by "the top"?

6          A.  Go to Paul Singer.

7          Q.  And you understood him to be what at

8     Elliott Management?

9          A.  The founder.

10         Q.  And how is it like the show "Billions,"

11    which I also watch.  I like that show.

12         A.  I assume that's the culture at Elliott.

13    I don't know.  I've never worked in a place like

14    that, but just -- it comes from somewhere.

15         Q.  Got it.  So what is your view -- so was it

16    your view that they -- that as a hedge fund, that

17    they were interested in identifying potentially

18    risky investments?

19         A.  No, that wasn't my view.

20         Q.  Do risky investments tend to be the most

21    potentially profitable?

22         A.  That's a fair economic assumption.

23         Q.  Was it your understanding that Elliott

24    Management would be interested in investing in the

25    Ecuadorian litigation if they wouldn't make a profit

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1    doing so?

2        A.  Say that again.

3        Q.  Was it your understanding that Elliott

4    Management would be interested in investing in

5    Ecuadorian litigation if they would not make a

6    profit doing so?

7        A.  My assumption would be that they wouldn't.

8        Q.  Right.  So you were interested in

9    approaching them because you thought you had a

10   potentially profitable investment opportunity for

11   them?

12       A.  I knew there was risk.  Would I say that

13   there was a -- Profits are other people's decision

14   to make.  It was never mine.  It was a

15   conversation -- I was starting a conversation that

16   would then be held by people who would make those

17   decisions.  So I don't have the skills nor the --

18   to say if it would be or wouldn't be.

19       Q.  Right.  But you weren't asking them for a

20   charitable contribution?

21       A.  Correct.

22       Q.  So in other words, you were trying to bring

23   to them a potentially profitable opportunity?

24       A.  That would be what they would be most

25   interested in.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 31

1          Q.   In Mr. Saltzstein's email on the next

2     page -- it's page 63 -- it says here, "I'll touch

3     base with Jeff and make the introduction."

4               Was that an introduction to Elliott

5     Management, or what was the introduction he was

6     offering to make there?

7          A.   That was not Elliott Management.

8          Q.   And Jeff has nothing to do with Elliott

9     Management, whoever Jeff is?

10          A.   Correct.

11          Q.   So -- Oh, I see.  So in your email above

12     that you say, "He's going to introduce me to Jeff

13     Cohn."

14               Is that the Jeff referred to in the

15     email from Mr. Saltzstein?

16          A.   Correct.

17          Q.   And was he somebody you also viewed as a

18     potential investor?  In the Ecuadorian litigation,

19     to be clear.

20               MR. LIBBY:  No, that's outside the

21     scope -- Anne, that's outside the scope of Elliott

22     Management.

23               So instruct not to answer.

24     BY MS. CHAMPION:

25          Q.   So Mr. Donziger responded to you, "I need

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 32

1    Elliott Management, but not sure."  Do you see that

2    in the email above yours on page 62?

3        A.  Yes.

4        Q.  And he said, "I talked to them in the

5    past."  Did you talk to him about what his prior

6    conversations had been with Elliott?

7        A.  No.

8        Q.  And then he says -- and he also says, "I

9    need Elliott Management, but not sure."  Why did he

10   need Elliott Management?  What was your understanding

11   of what he meant by that?

12       A.  Capital and strategic thinking.

13       Q.  And then he also says, "I think with RICO

14   judgment, it would be too problematic.  They are too

15   large and exposed, although they totally get this

16   kind of thing."

17              What did he mean by -- what was your

18   understanding of what he meant by, it would be

19   problematic with the RICO judgment?

20              MR. LIBBY:  Objection, competence.

21              You may answer if you know.

22              THE WITNESS:  I don't know.  Those

23   were -- RICO -- my understanding is that a RICO

24   judgment is there.  So -- and it's out in the open.

25   So he was just stating something that I think was

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 33

```
 1    obvious.
 2    BY MS. CHAMPION:
 3        Q.   What's your understanding of what a RICO
 4    judgment is?
 5             MR. LIBBY:   You may answer.
 6             THE WITNESS:   It's a civil --
 7             MR. LIBBY:   Hang on a second.   Then or
 8    now, Anne?
 9             MS. CHAMPION:   I think then.   I'm more
10    interested in her views then.
11             MR. LIBBY:   Okay.
12             MS. CHAMPION:   I can pivot to now.
13             MR. LIBBY:   Well, I'd have an objection
14    to now.
15             MS. CHAMPION:   Yes.   I understand, yes.
16             THE WITNESS:   That it was a -- in some
17    international racketeering civil -- I don't even
18    know the right word.
19    BY MS. CHAMPION:
20        Q.   Where did your understanding of the RICO
21    judgment come from?
22        A.   I first learned about it --
23             MR. LIBBY:   I'm sorry.   Was the question
24    "the RICO judgment"?   Because I think the prior
25    question was RICO generally.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

1           MS. CHAMPION:  I understand.

2      BY MS. CHAMPION:

3           Q.  So you understood, you said before -- and

4      whenever I characterize your prior testimony, don't

5      hesitate to correct me.  I'm just doing it to move

6      things along.  But I think you testified a minute or

7      two ago that you knew there was a RICO judgment out

8      there, right?

9           A.  Correct.

10          Q.  So what was your understanding of what that

11     RICO judgment was or how it related to the

12     Ecuadorian litigation?

13          A.  Can you ask that again, please.

14          Q.  Sure.  You testified previously that you

15     knew there was a RICO judgment out there, and that's

16     why Mr. Donziger mentioned it in this email.

17          A.  Um-hum.

18          Q.  What was your understanding of what the

19     RICO judgment was that he was referring to in this

20     email?

21          A.  That it was a judgment in the U.S., that

22     the case -- you know, the judgment is still valid

23     outside of the U.S., but in the U.S. it was deemed

24     as gained by RICO or fraudulently or through some

25     things that I don't fully understand.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 35

1      Q.  And where did your understanding of what

2   the RICO judgment was come from?

3      A.  From -- I first heard about it when I was

4   in Ecuador and it was part of the story.  And

5   then -- that's when I first heard about it.

6      Q.  And you heard about it from who?

7      A.  From Steven when he shared kind of the

8   story with the group.

9      Q.  Did you ever discuss the RICO judgment with

10  anyone else?

11          MR. LIBBY:  Excuse me.  Objection.

12  Could we define what you mean by "the RICO

13  judgment"?  Generally or an actual document?

14          MS. CHAMPION:  I'm really trying to use

15  her terms.

16          MR. LIBBY:  Okay.

17  BY MS. CHAMPION:

18      Q.  But you understand there was a RICO

19  judgment out there.  Mr. Donziger told you there was

20  a RICO judgment that had the effect of making the

21  judgment invalid inside the U.S., but potentially

22  valid outside the U.S.?  Is that consistent with

23  your understanding?

24      A.  Yes.  That's -- Yes.

25      Q.  And did you learn about the RICO judgment

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 36

1    from anyone but Mr. Donziger?

2              MR. LIBBY:  Same objection.

3              Go ahead.  If you understand.

4              THE WITNESS:  Can you ask again, please.

5    BY MS. CHAMPION:

6         Q.  What I mean is, where did you come to your

7    understanding of what the RICO judgment was?  Was it

8    just from conversations with Mr. Donziger?  Did you

9    talk to other people about it?  Did you read

10   anything?  Did you read the judgment?

11             That's kind of what I'm getting at.

12   I'm just trying to understand the sources of your

13   knowledge.

14        A.  I knew it was there, and I never had

15   in-depth conversations of what it was.  So it would

16   just be referenced in conversation.  Yes.  I

17   don't . . .

18        Q.  That's fine.  I understand.  And if you

19   don't remember everything that's fine, but --

20        A.  I definitely don't remember everything.

21        Q.  Who else would you have talked about it

22   with?

23        A.  I don't remember.

24        Q.  Aaron Page?

25             MR. LIBBY:  You know, at this point,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 37

```
 1    Anne, I think that this is outside the scope.  This
 2    is outside the scope of the Elliott Management
 3    attempt.
 4              MS. CHAMPION:  It is not.
 5              MR. LIBBY:  I disagree.  I think what
 6    you're doing now is you're getting into the
 7    reference -- the language "RICO judgment" in an
 8    email and going outside the scope of (a).
 9              I'm going to instruct you not to answer.
10              MS. CHAMPION:  I'm just going to explain
11    this briefly, again, because I don't want to do this
12    lengthy back-and-forth on the record --
13              MR. LIBBY:  I don't either.
14              MS. CHAMPION:  -- but the RICO judgment
15    is mentioned all over the Elliott documents.  I'm
16    trying to understand her view of why it was an issue
17    and why it presented a risk.  And so I want to
18    understand what she knew about it and how she knew
19    it.  That's all.  So that's all I'm getting at.
20    It's obviously relevant to the Elliott solicitation.
21              MR. LIBBY:  Well, I disagree.
22              And, Madam Court Reporter, I'd like to
23    have marked as an exhibit the June 19 order -- not
24    to upset your numbering system -- but to make sure
25    the transcript's clear when I make reference to (a),
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1    that it's from the June 19 Judge Kaplan order with

2    respect to certain prehearing discovery.  If we

3    could have that marked.  At the appropriate time.

4              MS. CHAMPION:  Sure.

5              MR. LIBBY:  I think we're going far

6    afield now, and I'll instruct you not to answer at

7    this point.

8    BY MS. CHAMPION:

9        Q.  So you say here in your email to

10   Mr. Donziger on page 61, "I appreciate RICO is a big

11   deal...if you only see the surface."

12              Why did you appreciate it was a big

13   deal?

14       A.  Simply because I think it's a -- I thought

15   it's a big deal.

16       Q.  Why?

17       A.  Because it -- there's a federal judge that

18   made some ruling.  And it -- yeah.

19       Q.  Made some ruling that what?  How did it

20   affect the case?  I mean, why would it matter?  Why

21   is it a big deal?

22       A.  That it could never be in the U.S.

23       Q.  That it could never be what?

24       A.  That it could never be -- that monies could

25   never be collected and that it could never be -- no

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 39

1    longer allowed in the U.S., whatever this litigation

2    was going on.  That's simply what I knew.

3        Q.  Got it.  And so you said that your

4    understanding was that no monies could be collected.

5    Do you mean that no monies could be collected in the

6    U.S.?

7        A.  No.  That it's a transaction that can't

8    happen in the U.S.

9        Q.  What transaction?

10       A.  If there was ever a settlement.

11       Q.  Oh, okay.  A settlement with Chevron?

12       A.  Yes.

13       Q.  And then you say here, "I appreciate RICO

14   is a big deal...if you only see the surface."

15            What did you think was under the surface

16   that make RICO not a big deal?

17       A.  I can't say in particular.  That's a

18   general view I have on most things.

19       Q.  Right.  But what did you mean here?  So you

20   go on to say, "You don't want to associate with

21   those only willing to look at the surface.  Not

22   everyone will see it as a problem."

23            So what kind of -- what did you think

24   was below the surface of the RICO judgment?  I'm

25   assuming that's what you mean by "the surface,"

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 40

1    that, you know, some people would view as not -- you

2    know, make the RICO judgment, you know, not a big

3    deal, or not a problem.

4              MR. LIBBY:  Objection to form.

5              You may answer.

6              THE WITNESS:  If they understood the law

7    more deeply and the international pieces.  I mean,

8    that's -- this is -- yeah.

9    BY MS. CHAMPION:

10       Q.  And what was your understanding of what the

11   international pieces were?

12       A.  Limited to zero, closer to zero.

13       Q.  Got it, okay.  And then what about -- you

14   know, you said something earlier to the effect of,

15   you know, you viewed Elliott as an activist investor

16   and you viewed activist investing normally as like

17   trying to do good, right, with your investments?

18       A.  Correct.

19       Q.  And so was it your view that, you know,

20   someone trying to do good with their investments

21   might be willing to look past the RICO judgment

22   because they thought they were investing in a worthy

23   cause?

24       A.  Can you repeat that.

25       Q.  Yeah.  And I don't want to put words in

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 41

1    your mouth.  I'm just trying to get a little more

2    about what your thinking was here about why the RICO

3    judgment was not big deal -- would not be a big deal

4    for some investors.

5              So I don't want to put words in your

6    mouth, so I'm trying to get a little bit more

7    information about, you know, who you thought

8    wouldn't see it as a problem.

9              Would it be because someone thought they

10   might be doing good by investing in the litigation

11   and so, therefore, might be willing to look past the

12   RICO judgment?

13             But, I mean, I want you to tell me what

14   you think.  I'm just trying to guess.

15       A.   I think an activist investor wants a double

16   or triple bottom line where they can put capital to

17   places that do good, have an impact, and potentially

18   could have a rate of return that's positive.

19   BY MS. CHAMPION:

20       Q.   Got it, okay.  That makes sense.  And did

21   you think that that type of investor who's looking

22   at more than just profits, right, was the type of

23   investor that would not see the RICO judgment as a

24   problem in this context?

25             MR. LIBBY:  No.  Aside from competency

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 42

```
 1      and foundation, this is well far afield of the
 2      court's order here at this point.
 3               MS. CHAMPION:  I'm trying to understand
 4      her email.
 5               MR. LIBBY:  I understand what you're
 6      trying to understand.  And it's way beyond --
 7               MS. CHAMPION:  No.
 8               MR. LIBBY:  -- the attempt to obtain
 9      funds from Elliott Management.  Yes, it is, Anne.
10      I'm going to instruct her not to answer.
11               MS. CHAMPION:  It explains why she
12      approached them in the first place.
13               MR. LIBBY:  This is all about Donziger.
14      And the court's order makes it very clear, it's
15      about the attempt to obtain funding from Elliott
16      Management, and you've just gone way past the marker
17      here.
18               MS. CHAMPION:  Well, clearly I disagree
19      with that.  This is an email about talking to
20      Elliott Management, and she's explaining she thinks
21      they're worth approaching.
22               MR. LIBBY:  Right.  And so what I'm
23      saying is this is beyond -- well beyond the scope of
24      what (a) is intended to establish here --
25               MS. CHAMPION:  Okay.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
                                              Page 43

 1              MR. LIBBY:  -- for purposes of the

 2      hearing.

 3      BY MS. CHAMPION:

 4          Q.  So then Donziger says, "We need to get to

 5      Paul Singer.  He heads Elliott Capital."

 6              Do you see that?

 7          A.  I see that.

 8          Q.  And you respond, "He lives in the Upper

 9      West Side.  I'll send him a Led Zeppelin T-shirt and

10      ask for a meeting."

11              Do you see that?

12          A.  I see that.

13          Q.  And did you ultimately reach out to

14      Mr. Singer?

15          A.  I did.

16          Q.  To go back to this email -- I just want to

17      finish up with this before I move on to your

18      communications with Mr. Singer -- you say,

19      "You want someone like Elliott, maybe not them

20      specifically . . . investors who are bold,

21      courageous, and understand what and why, know that

22      this investment is a hedge.  They can short Chevron,

23      invest a ton of money in the case, and make money on

24      both ends."

25              What did you mean by "make money on both
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 44

1    ends"?

2         A.  Make money in the public market and make

3    money on a private investment.

4         Q.  Got it, okay.  And what did you mean by

5    "this investment is a hedge"?

6         A.  Exactly what I said after it.

7         Q.  But I don't understand that.  I'm just not

8    a finance person.  So by "hedge," you mean -- by

9    "hedge," you mean they could make money in two ways

10   so that protected them?  I really don't understand.

11        A.  Yeah.

12        Q.  So explain that to me.  So the private

13   investment is the interest in the proceeds, is that

14   correct, of the judgment?

15        A.  Could be.  I -- there's -- could be.  I was

16   taking --

17        Q.  What did you mean by "private investment"?

18        A.  Not in the public markets.

19        Q.  So a short is like when you invest in a way

20   that you make money if the stock price drops; is

21   that right?  That's what a short is?

22        A.  Correct.

23        Q.  So how did you think that the Ecuadorian

24   litigation would affect Chevron's stock price?

25        A.  I had no idea.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 45

1       Q.  But you say here, "They can short Chevron,

2   invest a ton of money in the case, and make money on

3   both ends."

4               So how would it be a hedge to short

5   Chevron if you have no idea how anything will affect

6   the stock price?  Why would it be a hedge?  I'm just

7   trying to understand because I literally don't get

8   it.

9       A.  This was just an idea.  This was not a --

10  this was -- that's all it was.

11      Q.  Right.  I understand.  But you say here

12  that they can hedge by shorting Chevron, invest

13  money -- "a ton of money in the case, and make money

14  on both ends."

15              I just want you to explain to me how

16  that strategy would work in practice.

17      A.  I don't think I have the skills to explain

18  it in practice.

19      Q.  So when you said this to Mr. Donziger, you

20  didn't have an idea of how this would work?  I mean,

21  I'm just trying to understand the basis for the

22  statement.

23              MR. LIBBY:  Asked and answered.

24  Objection.

25              Go ahead.  One last time.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 46

1          THE WITNESS:  Okay.

2          MR. LIBBY:  If you know.

3          THE WITNESS:  So if you were to buy

4    something at $100 -- or short something at $100 and

5    also buy some private investment with that same

6    company that may affect the stock price, you can

7    potentially -- this is what I understand people do;

8    I've never been involved in a transaction in --

9    whatsoever -- that if the private investment affects

10   the stock negatively, then the price of the stock

11   goes down from $100, and then you buy it back and

12   you can make money here and you can make money here.

13   BY MS. CHAMPION:

14       Q.  Okay.  I understand now.  So the private

15   investment here would be the interest in the

16   litigation itself, right, in this scenario?

17       A.  Yes.

18       Q.  And the public investment would be the

19   stock, the interest in the stock, whether it's a

20   short or otherwise?

21       A.  It's something in the public markets.

22       Q.  Right.  And so how did you view, in this

23   scenario, the private investment affecting the stock

24   price?

25          MR. LIBBY:  Objection.  We're, once

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 47

```
1    again, way beyond where this order permits, Anne.
2              You're getting into her state of mind on
3    some language taken from a document when, in fact,
4    the court -- what the court clearly contemplates and
5    the order expressly states is the attempt to obtain
6    funding -- the attempt to obtain funding from
7    Elliott Management.
8              And at this point, I think we're --
9    we're not getting anywhere near that.  And that's
10   what the court has ordered that she sit and testify
11   to.
12             MS. CHAMPION:  Obviously I disagree with
13   you.  This is about the terms they were seeking from
14   Elliott, proposing to Elliott, and obviously relates
15   to Elliott.
16             MR. LIBBY:  Not at all.  I disagree with
17   that.  You're asking about her state of mind and
18   asking her to define and explain to you language
19   that has nothing to do with the actual attempt to
20   obtain funding from Elliott Management.
21             And for that reason, I'm going to
22   instruct her not to answer.  I think you've gone far
23   enough on this.
24             MS. CHAMPION:  I disagree.  This whole
25   email chain is about approaching Elliott Management.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 48

```
 1              MR. LIBBY:  And you're asking her not
 2     about the approach, but you're asking her to parse
 3     specific language and give specific examples about
 4     things that have nothing to do with the actual
 5     attempt made.
 6              MS. CHAMPION:  That's incorrect.
 7              MR. LIBBY:  I think we just disagree.
 8              MS. CHAMPION:  This is a paragraph where
 9     she's explaining to Mr. Donziger why she thinks it's
10     a good idea -- why you want someone like Elliott --
11              MR. LIBBY:  Right.
12              MS. CHAMPION:  -- because of this.
13     That's all I'm asking her about.  I'm not going to
14     argue about this with you.  If your instruction is
15     to the witness not to answer --
16              MR. LIBBY:  It is.
17              MS. CHAMPION:  -- make your instruction.
18              MR. LIBBY:  I just did.
19              MS. CHAMPION:  I think that's outrageous
20     and we'll have to recall her.
21              MR. LIBBY:  I don't want to -- Listen,
22     I don't want to have -- this is why we had the
23     conversation before the deposition to avoid this
24     very thing.  This is not pretext.
25              I mean, this is -- I don't want this to
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 49

1    be pretext at all.  We should be focusing on the

2    facts and circumstances of the attempt to obtain

3    financing of Elliott Management, the lead-in, the

4    actual meeting, and after the fact.  And that's fine.

5             MS. CHAMPION:  That's what this is.

6             MR. LIBBY:  No.  But you're asking her

7    for a lesson on investing, which is completely

8    different.  And we disagree.

9             MS. CHAMPION:  I am entitled to

10   understand her emails about this very topic about

11   the solicitation of Elliott Management.  That's all.

12   That's all I'm asking about.

13            MR. LIBBY:  The court has allowed this

14   kind of questioning to go into -- it's one exception

15   to paragraph 5 compliance-type discovery.  It's the

16   one exception.  Elliott Management and that's it.

17            This line of questioning has nothing to

18   do with it.  So my instruction stands.  And you

19   reserve your rights respectfully.

20   BY MS. CHAMPION:

21       Q.  So why did you think you want someone like

22   Elliott who would be interested in this, "investment

23   is a hedge -- they can short Chevron, invest a ton

24   of money in the case, and make money on both ends --

25   everyone wins"?  So why did you think you needed

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      someone like Elliott for that?

2                  MR. LIBBY:  Same objection and same

3      instruction.  Let's move on.

4                  MS. CHAMPION:  Counsel, I just want to

5      say --

6                  MR. LIBBY:  Do you want to go off the

7      record?  Do you want to go off the record?

8                  MS. CHAMPION:  Sure.

9                  MR. LIBBY:  Let's go off the record,

10     Bill.

11                  Why don't you take a break.

12                  THE WITNESS:  Thank you.

13                  THE VIDEO OPERATOR:  The time is 10:54.

14     We're off the record.

15                       (Recess at 10:55 a.m.,

16                       resumed at 11:00 a.m.)

17                  THE VIDEO OPERATOR:  This is the

18     beginning of Media No. 2.  We're back on the record.

19     The time is 11:00 o'clock.

20                  MS. CHAMPION:  Can the court reporter

21     read back the question, please.

22                       (Record read as requested.)

23                  MR. LIBBY:  I'm going to reverse myself

24     on that last objection, allow the witness to answer

25     that one question.  But this is the end of the line

Page 51

1    of questioning on that.

2              Go ahead.

3              THE WITNESS:  Because Elliott is a very

4    sophisticated investor.

5    BY MS. CHAMPION:

6        Q.  Can you elaborate on that a little bit.

7    You thought it required a sophisticated investor?

8        A.  Yes.

9        Q.  And how did you think that the private

10   investment would affect the stock price?

11       A.  I have no opinion on that.  It could go --

12       Q.  But you did have an opinion at this time,

13   right?

14       A.  It could go up; it could go down.  I do not

15   have the skills to determine that.  A sophisticated

16   investor would.

17       Q.  I see.  But you did say they can short

18   Chevron.  Which means that's a bet on the stock

19   going down, right?

20       A.  Anybody could.

21       Q.  So you did have a view on it at the time?

22       A.  I had -- I know there are strategic things

23   that you can do because I work with people that have

24   done successfully at -- sophisticated things, and

25   you need sophisticated people in conversation.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 52

1    So Elliott fit that description.

2         Q.  So did you, in fact, reach out to

3    Mr. Singer?

4         A.  I did.

5         Q.  And how did you reach out to him?

6         A.  I sent him a Led Zeppelin book and a Led

7    Zeppelin miniature musical box that sings "Stairway

8    to Heaven," and I wrote a handwritten note.

9         Q.  Why Led Zeppelin?

10        A.  Because if I'm going to email or send

11   something to someone, I do some research to see what

12   they like.

13        Q.  I see.  And you understood that he was a

14   Led Zeppelin fan?

15        A.  It was stated in something I read: he loved

16   Led Zeppelin.

17        Q.  Got it, okay.  And you sent him a -- did

18   you say a handwritten note?

19        A.  Yes.

20        Q.  Did you produce a copy of that note?

21        A.  No.

22        Q.  You don't have a copy of it?

23        A.  No.

24        Q.  Is it similar -- do you remember the --

25   I think you may have had a version of it in your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 53

1      notes.  I can pull those out later.

2          A.  No, I did.  I was trying to say, you know,

3      what would I say to Paul Singer.

4          Q.  Understood.  And do you remember if that

5      version was similar to what you actually sent?

6      I can show it to you if it's easier.

7          A.  I don't recall.

8              MS. CHAMPION:  I'll show it to you in a

9      little bit and we can go over it.

10             I'm going to introduce what I'm going to

11     mark as Sullivan Exhibit 2.  This is a document that

12     you produced Bates labeled MKS-0000139 through 140.

13                     (Sullivan Exhibit 2 was marked

14                      for identification.)

15             MR. LIBBY:  And while we're at it, may

16     we mark as 3 the June 19 order that I mentioned

17     previously to Kim?

18             MS. CHAMPION:  Sure.  Just for the

19     record, we're marking as Sullivan Exhibit 3,

20     Document 2027 from the Southern District case,

21     Chevron Corp. v. Steven Donziger, 11 Civ. 0691, an

22     order dated June 19, 2018.

23                     (Sullivan Exhibit 3 was marked

24                      for identification.)

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 54

1    BY MS. CHAMPION:

2       Q.  So referring to Exhibit 2.  So Donziger

3    says to you in his email dated October 19, 2017,

4    "Let me know next steps.  Can't thank you enough."

5    And he also says -- there's an attachment to this

6    email, NDA.FDA.2017.doc.

7                Is that the NDA that was ultimately sent

8    to Elliott Management?

9       A.  I'm not sure.  Do not know.

10      Q.  Did you have a hand in drafting the NDA?

11      A.  No.

12      Q.  Did you review it?

13      A.  No.

14      Q.  What was your understanding of the need for

15   it?

16      A.  I understand an NDA is a confidentiality

17   document that I've seen in other cases, so it's just

18   to keep things private.

19      Q.  And why was there a need for it here?

20      A.  I'm not certain.

21      Q.  So you said you "Will send the NDA along as

22   well" in your response to him.

23                Do you see that in the email above?

24      A.  I do.

25      Q.  Did you ultimately send it?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 55

1      A.   To Paul Singer?

2      Q.   Or to anyone at Elliott Management.

3      A.   Sent it to Lee Grinberg and Jesse Cohn in

4    advance of the in-person meeting.  And Natalie, I

5    think, as well, their assistant.

6      Q.   So you tell him, "Asked him to give me some

7    dates to meet in New York City."

8           So I'm assuming you mean there that you

9    asked Mr. Singer to give you dates for a meeting;

10   is that right?

11     A.   I did in my handwritten note, but I do not

12   believe that's what -- that's not what that

13   references.

14     Q.   Oh, what's the reference?

15     A.   Something different.

16     Q.   Oh, okay.  It says here -- so it's a

17   meeting with someone else?  It doesn't refer to

18   Elliott Management, the dates -- "Asked him to give

19   me some dates to meet in New York City," that's not

20   the reference to the meeting with Elliott?

21     A.   Correct.

22     Q.   Who is it a reference to a meeting with?

23          MR. LIBBY:  Objection.

24          Don't answer.

25          MS. CHAMPION:  Can you just state the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 56

1    basis for the objection?

2              MR. LIBBY:  Yes.  It's outside the

3    scope.  And it's actually right in the wheelhouse of

4    paragraph 3.  No further paragraph 5 compliance-type

5    discovery.

6              MS. CHAMPION:  I just wanted the basis

7    for the objection on the record.

8              MR. LIBBY:  Listen, Anne, that's what

9    I'm looking for here.  And I prefer that you not

10   just casually ask questions which actually encroach

11   into that because that puts me on the spot, and I

12   don't want to hold this up anymore.

13             MS. CHAMPION:  I understand.

14   BY MS. CHAMPION:

15       Q.  So you go on to say here, "Ordered Led

16   Zeppelin book and sound thing/toy that plays

17   'Stairway to Heaven' to send to Paul Singer...asking

18   him for a meeting."  And then you say, "They invest

19   in the case, short Chevron stock as you near

20   collection - they make money on both ends."  So --

21   "plus he becomes part of the legend of corporate

22   accountability which is his whole shtick at Elliott.

23   Seems obvious," right?

24             Do you see that?

25       A.  I do.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 57

1    Q.  So was your understanding or belief at that

2  time that Chevron stock price would go down as you

3  near -- as they neared collection on the Ecuadorian

4  judgment?  Am I understanding that correctly?

5    A.  Anything is possible.

6    Q.  But when you said, "They invest in the

7  case, short Chevron stock as you near collection -

8  they make money on both ends," the way they would

9  make money there is if, in fact, Chevron stock price

10  went down as they neared collection, right?  I mean,

11  I'm just trying to understand --

12    A.  As I explained before.

13    Q.  Okay.  So I'm correct?  I'm characterizing

14  it correctly?  I just want to make sure I understand

15  what your email means.  That's all.

16    A.  Yes.  As I explained to you before, when

17  you short something and when you make a private

18  investment, and they're a hedge fund, and they

19  invest in public markets.

20    Q.  And when you said, "he becomes part of the

21  legend of corporate accountability," how was that

22  relevant to this potential investment from Elliott?

23    A.  Can you ask that again, please.

24    Q.  When you say here, "plus he becomes part of

25  the legend of corporate accountability," how is that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 58

1    relevant to this potential investment from Elliott?

2         A.  If they're activist investors, corporate

3    accountability is, I assume, a cornerstone -- a

4    pillar of what activist investors do.  Corporate

5    accountability is a key piece of that.

6         Q.  Yeah, I got that.  But I'm just trying to

7    understand what the corporate accountability is

8    here.  Which corporation being held accountable for

9    what?

10        A.  Well, the only corporation would be Chevron.

11        Q.  And being held accountable for what?

12        A.  For cleaning up --

13        Q.  Cleaning --

14        A.  -- Ecuador.

15        Q.  Sorry.  I didn't mean to interrupt you.

16        A.  Can you ask that again.

17        Q.  Cleaning up what?

18        A.  The oil pits.

19        Q.  Did Mr. Singer respond?

20        A.  No.

21        Q.  But you continued to try to make contact

22    with Elliott; is that correct?

23        A.  I saw it as a challenge.

24        Q.  So when you say he didn't respond, did he

25    have anybody else at Elliott respond to you, to your

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 59

1   knowledge?  Or you ultimately made contact in a

2   different way?

3       A.  His assistant sent a note and said, Thank

4   you for the gift.  Mr. Singer is busy.

5       Q.  Got it, okay.  And so then how did you try

6   to approach Elliott after that?

7       A.  I was on my way to a meeting, and I -- it

8   popped in my head that I knew somebody that knew

9   somebody at Elliott and thought about asking, wasn't

10  sure if I was going to ask.

11      Q.  And who was that person?

12      A.  Jonathan Bush.

13      Q.  And did you ask?

14      A.  I -- Yes, I asked.

15      Q.  And did you tell him what the purpose of it

16  was?

17      A.  I -- Yes.

18      Q.  And did he, in fact, put you in contact

19  with anyone at Elliott?

20      A.  He did.

21      Q.  Who?

22      A.  Jesse Cohn.

23      Q.  And did you have any further discussions

24  with Mr. Bush about the solicitation of Elliott

25  Management?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 60

1      A.  Zero.

2      Q.  Did you have any further discussions with

3   him about the Ecuadorian litigation?

4      A.  Zero.

5      Q.  Are you aware of any contacts between him

6   and Mr. Donziger regarding the Ecuadorian litigation?

7      A.  I am not.

8          MS. CHAMPION:  I appreciate you letting

9   me ask that.  I know that it's outside, but I'm

10  actually trying to help --

11         MR. LIBBY:  And I appreciate that too.

12  Without waiving my rights obviously down the road,

13  Anne --

14         MS. CHAMPION:  Yes.

15         MR. LIBBY:  -- I have every interest in

16  getting this done.

17  BY MS. CHAMPION:

18     Q.  So just so we can close off the discussions

19  with Mr. Bush, do you know whether he had any

20  contacts with Mr. Donziger about this case, in your

21  knowledge?

22     A.  Zero.

23     Q.  With anybody else that you're aware of?

24     A.  None.

25     Q.  Did you give him any documents about the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 61

1    case?

2        A.   None.

3        Q.   So Mr. Bush did make an introduction; he

4    introduced you to Jesse Cohn, I think you said?

5        A.   Yes.

6        Q.   And he did that by email; is that correct?

7        A.   He did that by phone.

8        Q.   Oh, he did it by phone.  And then was there

9    a follow-up email?

10       A.   After our meeting, he said, I'll connect

11   you two by email, and there was that -- a quick

12   intro email.

13       Q.   Got it.  And so he called Mr. Cohn while

14   you were standing right there?

15       A.   Yes.

16       Q.   Got it, okay.  And do you remember

17   approximately what he said?

18       A.   There's some Ecuadorian -- Katie who runs

19   my family office and, you know, it's like the

20   Argentinian case that you told me about with seizing

21   ships in the middle of the ocean.  And then he sent

22   email.

23       Q.   Got it.  How long was the call; do you

24   remember?

25       A.   I do not remember.  Quick.

Page 62

1      Q.  Were there any other topics discussed?

2      A.  No.

3      Q.  So you think it was a minute, two minutes

4   max?

5      A.  Yes.

6      Q.  And so you did, in fact -- what was your

7   understanding of Mr. Cohn's role at Elliott?

8      A.  He was a partner who is responsible for the

9   investment -- buying shares of athenahealth.

10     Q.  And athenahealth is Mr. Bush's company?

11     A.  It is a public company that he founded.

12     Q.  Got it.  Understood.  And so basically

13  that's how -- it's your understanding that's how

14  Jonathan Bush knew him?

15     A.  Correct.

16     Q.  And so did you then schedule a meeting with

17  Elliott Management?

18     A.  Yes.

19     Q.  And was that through Mr. Cohn?

20     A.  That was through Natalie, his assistant.

21     Q.  Understood.  And did you have communications

22  with Mr. Cohn prior to the meeting that you

23  ultimately had?

24     A.  If I did, you have copies of them.

25     Q.  Just emails?

Page 63

1      A.   Just emails.

2      Q.   No phone calls?

3      A.   None.

4      Q.   And how about Mr. Grinberg?  Did you have

5   any communications with him prior to the meeting?

6      A.   None.

7      Q.   Except what's in an email, if there is any?

8      A.   Correct.

9      Q.   Did you have any communications with anyone

10  else at Elliott Management before that meeting?

11     A.   No.

12     Q.   And the meeting was ultimately scheduled;

13  is that correct?

14     A.   It was.

15     Q.   For November 6, 2017?

16     A.   Whatever that Monday was.  I was actually

17  driving to New York, so it was that -- on Friday.

18  And the meeting was on Friday -- the meeting was

19  scheduled on Friday afternoon, and it happened on

20  that Monday, whatever that date was.

21     Q.   Got it, okay.  And you were pretty excited

22  about this meeting; is that accurate?

23     A.   I was excited I got it to happen.

24     Q.   Why was the meeting moved from Friday to

25  Monday?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 64

1          A.  It wasn't.

2          Q.  Oh.  I was confused.  You're saying -- I

3     guess you went to New York on a Friday or something?

4          A.  I was driving to New York on a Friday after

5     my meeting Friday morning with the call that

6     Jonathan made with Jesse.

7          Q.  Got it.

8          A.  Driving to New York for -- it was marathon

9     weekend -- with my family.  And the meeting was

10    scheduled for Monday at 4:00 o'clock.

11         Q.  I see.  So did you run the marathon that

12    weekend?

13         A.  I did not run that marathon.

14              MS. CHAMPION:  Oh, man.

15                   (Discussion off the record.)

16    BY MS. CHAMPION:

17         Q.  So did you tell Mr. Donziger about the

18    meeting getting scheduled?

19         A.  Yes.

20         Q.  Do you remember how you told him?

21         A.  By phone or --

22              MS. CHAMPION:  Okay.  I'm going to hand

23    you what's been marked as Sullivan Exhibit 4.  It's

24    a document, an email chain you produced with the

25    Bates label MKS-129 --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 65

1          Are you sure this is . . .

2          I'm just going to fix this.  I'm going

3    to cross this out because it's actually a different

4    document.  It's actually Bates 130 through 34.

5               (Discussion off the record.)

6          MR. LIBBY:  So we just did some

7    housekeeping there, Anne; is that it?  We just put

8    these in order?

9          MS. CHAMPION:  Yes, I apologize.  These

10   were copied double-sided.  So to be clear, page 129

11   is not part of the same email chain.

12         MR. LIBBY:  Okay.  So we cross that out?

13         MS. CHAMPION:  Yes.  I crossed it out on

14   the copy I marked.

15         MR. LIBBY:  And this is 4?

16         MS. CHAMPION:  Yes.  Exhibit 4.

17              (Sullivan Exhibit 4 was marked

18               for identification.)

19   BY MS. CHAMPION:

20      Q.  So I see an email here from Natalie

21   Underwood.  She was the person you testified was

22   Jesse's assistant; is that right?

23      A.  I assume she is.

24      Q.  So she schedules this meeting at 4:00 p.m.

25   at Elliott's offices, right?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 66

1          A.   Correct.

2          Q.   And you forward this to Mr. Donziger and

3     say, "This is so awesome.  You must join."

4               You wanted him to come to the meeting?

5     Is that what you meant by that email?

6          A.   Yes.

7          Q.   So did you see Mr. Donziger that weekend in

8     New York before the meeting or on Monday before the

9     meeting?

10         A.   Yes.

11         Q.   When did you see him?

12         A.   We had -- my family -- I was there with my

13    entire family, and we had dinner Saturday evening

14    with his wife and his son.  And then on Sunday

15    evening, I got together at -- for dinner at a

16    restaurant.  Those two times.

17         Q.   On Sunday?

18         A.   Correct.

19         Q.   And did you talk about the Elliott meeting

20    at those dinners?

21         A.   At the Sunday dinner only.

22         Q.   And what do you remember talking about?

23    Just were you planning for the meeting, figuring out

24    what you were going to say?  What were you talking

25    about?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      A.  It was just a, There's a meeting happening,

2   and let's just make sure everyone's on -- in sync

3   conversation.

4      Q.  What did you do to prepare for the meeting?

5      A.  I researched Jesse Cohn.  I couldn't find

6   much on Lee Grinberg.  And that was pretty much it.

7      Q.  So you researched the two people you

8   understood you'd be meeting with?

9      A.  Correct.

10     Q.  For what purpose?

11     A.  That's what I do if I meet somebody.  I try

12  to understand who they are in advance.

13     Q.  I don't mean to ask you things that are

14  obvious, but I just need to hear it from you and not

15  just in my own brain.

16          You research them because you think it

17  will be -- make it more likely that you'll be

18  successful -- I mean, in whatever you're requesting

19  from them?  I mean, what's the purpose of doing the

20  research?

21     A.  I like to be prepared.  If I'm meeting

22  someone face to face, I like to know a little bit of

23  background so I have more information than just

24  walking in blindly.

25          MS. CHAMPION:  And I'm going to hand you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 68

```
 1    what's been marked as Sullivan Exhibit 5.
 2              I'll just give her my copy because my
 3    copy doesn't have this issue.  Give him . . .
 4                    (Sullivan Exhibit 5 was marked
 5                    for identification.)
 6    BY MS. CHAMPION:
 7       Q.  So I'm handing the witness what's been
 8    marked as Sullivan Exhibit 5.  It's an email with an
 9    attachment Bates numbered MKS-0000022 through 27.
10              Do you remember sending this email?
11       A.  It's in front of me, so I sent it.  I don't
12    remember specifically, but yeah.
13       Q.  When you described Mr. Donziger as "the
14    architect of successfully winning the judgment,"
15    what did you mean by that?
16       A.  That he was the lead person in winning the
17    judgment in Ecuador -- in the Ecuadorian courts.
18       Q.  Do you know whether the LAPs also had
19    Ecuadorian counsel in the Ecuadorian courts?
20       A.  I have no idea what you're asking.
21       Q.  Was it your understanding that Mr. Donziger
22    represented the Ecuadorian plaintiffs in the
23    Ecuadorian court?
24       A.  Can you ask that again.
25       Q.  Sure.  Was it your understanding that
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    Mr. Donziger represented the Ecuadorian plaintiffs

2    in the Ecuadorian court?

3         A.   I do not -- I don't know.

4         Q.   Do you know Pablo Fajardo?  Have you ever

5    met him?

6         A.   No.

7         Q.   Have you ever met any of the Ecuadorian

8    lawyers that are involved in this case?

9         A.   I have.

10        Q.   Who?

11        A.   I've met Agustin -- that's his first

12   name -- Salazar and Patricio Salazar.

13        Q.   Anybody else?

14        A.   No.

15        Q.   So did you let anybody else know about the

16   meeting with Elliott before it happened?

17        A.   I did.

18        Q.   Who?

19        A.   There was an email for -- with folks that

20   went to the Ecuador trip September of -- no.  I

21   think it was September of '17.

22             MS. CHAMPION:  I'm going to hand you

23   what I will mark as Sullivan Exhibit 6.  It's a

24   document marked Bates No. MKS-0000037.

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 70

```
 1                    (Sullivan Exhibit 6 was marked
 2                    for identification.)
 3               MR. LIBBY:  Is this another one with a
 4     scratch through it?
 5               MS. CHAMPION:  Yes.
 6               MR. LIBBY:  Which one should we scratch?
 7               MS. CHAMPION:  You should scratch out
 8     38.  The copy the witness has does not have that.
 9     It's only the copy you have.  The one I gave you is
10     double-sided.  The one she has I don't think is
11     double-sided.
12               MR. LIBBY:  So 38 scratch?
13               MS. CHAMPION:  Yes.
14               MR. LIBBY:  And this is 6?
15               MS. CHAMPION:  Yes.
16     BY MS. CHAMPION:
17         Q.  So can you tell me what motivated this
18     email?
19         A.  I asked on Sunday evening, Would you like
20     me to share this meeting with the folks that went on
21     the Ecuador trip?  And I was -- I was instructed to
22     do that.
23         Q.  By who?
24         A.  Steven.
25         Q.  Got it, okay.  And so all these people were
```

1    on that trip with you?

2        A.  It was an email chain that was -- that I

3    just went from a prior email.

4        Q.  Understood.  Do you remember if all these

5    people were actually on the trip or not?

6        A.  Yes, they were on the trip.

7            MS. CHAMPION:  So I'm just going to go

8    through some of the responses to this email --

9    I'm going to hand you what I will mark Sullivan

10   Exhibit 7.  This is a document Bates numbered

11   MKS-000110 through 112.

12            (Sullivan Exhibit 7 was marked

13             for identification.)

14            MS. CHAMPION:  Again, I apologize that

15   the copy I'm going to hand counsel has -- you should

16   X out that second page again.  But the copy in the

17   record is clean.

18   BY MS. CHAMPION:

19       Q.  This is an email chain with the Bates

20   number MKS-0000110 through 112 and this is a

21   response to your email from Karen Hinton.

22            What was your understanding of Karen

23   Hinton's role in the case?

24       A.  She's a PR person.

25       Q.  And she says here, "Make sure they know

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 72

1    about the hardships Chevron has created for the

2    Ecuadorians, including the fraud allegations before

3    Kaplan."

4            What did you understand her to mean by

5    "the hardships Chevron has created for the

6    Ecuadorians"?

7            MR. LIBBY:  What was your question again?

8            MS. CHAMPION:  What did she understand

9    Ms. Hinton to mean about the hardships Chevron has

10   created for the Ecuadorians that she needed to

11   inform Elliott Management about.

12           MR. LIBBY:  If you know.

13           THE WITNESS:  I don't know.

14   BY MS. CHAMPION:

15       Q.  And "including the fraud allegations before

16   Kaplan," did you understand what she meant by that?

17       A.  No.  It would be RICO.  I would see that as

18   RICO.

19       Q.  Where she says, "If we don't address them

20   directly, they will get information about it, and

21   the false allegations can probably" -- "possibly

22   move them away."

23           Do you see that?

24       A.  I see that.

25       Q.  What do you think she meant by that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 73

```
 1            MR. LIBBY:  Same objection.
 2            THE WITNESS:  I don't know.
 3   BY MS. CHAMPION:
 4       Q.  Why would the false allegations move them
 5   away?
 6            MR. LIBBY:  Same objection.
 7            THE WITNESS:  I don't know.  Just -- not
 8   my words.
 9   BY MS. CHAMPION:
10       Q.  But you understood that the RICO judgment
11   would probably come up in any meeting with Elliott,
12   right?
13       A.  Correct.
14       Q.  And you were prepared for that to come up?
15       A.  I knew it would come up.
16       Q.  So how did you prepare to -- how did you
17   prepare to address it?
18       A.  I didn't prepare.
19       Q.  Not to be cute, but you were just saying
20   about how you like to be prepared.  So you just
21   didn't prepare for that to come up at all even
22   though you knew it would come up?
23       A.  Yeah.  I didn't -- I prepared to know the
24   people that I would be speaking with, but I did
25   not -- I did not envision this meeting, me saying
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 74

1      anything other than this meeting happened, and I did

2      not -- yeah.  No, I was not going to be speaking

3      about any specifics.

4          Q.  So who did you expect to address the RICO

5      judgment at the meeting?

6          A.  Steven.

7          Q.  Steven.  And then there was some further

8      emails on this chain where people were talking about

9      deleting the chain.

10              Do you know why they felt that they had

11     to delete the chain?

12         A.  Just they wanted to keep it confidential.

13         Q.  Why?

14              MR. LIBBY:  Objection.  You know,

15     competency, foundation.

16              THE WITNESS:  I don't know.  I wouldn't

17     have sent it.

18     BY MS. CHAMPION:

19         Q.  You wouldn't have sent what?

20         A.  I wouldn't have sent the email if I -- if

21     it was something that I thought needed to be

22     confidential.  So this was other people's opinions.

23         Q.  And what's your understanding of why they

24     thought that the email would not remain confidential?

25     I mean, if none of them were going to hand it out,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 75

1   how would it get out?

2              MR. LIBBY:  Same objection.

3              THE WITNESS:  Your guess is as good as

4   mine.

5   BY MS. CHAMPION:

6       Q.  You have no guess at all?

7       A.  I have no guess.  No.

8       Q.  So did you delete the emails?

9       A.  The emails that you have came from me.

10      Q.  I understand that.  But sometimes we can

11  recover deleted emails.  I'm just asking you --

12      A.  I thought I might have.  But there was a

13  lot of emails that were coming back and forth.

14  I don't operate in a world of having to delete my

15  emails.

16      Q.  Understand.  So you think you may have

17  deleted some of the emails?

18      A.  I may have deleted some.

19      Q.  Do you know which ones?

20      A.  No.

21      Q.  Do you know whether you've deleted other

22  emails related to your involvement in the Ecuadorian

23  litigation?

24      A.  No, I have not.

25              MR. LIBBY:  Objection to form.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 76

1    BY MS. CHAMPION:

2        Q.   Do you know whether the document -- the

3    emails that were produced here that talk about this

4    were found in your trash folder or anyplace else

5    besides your inbox and your outbox?

6        A.   I don't know.

7              MS. CHAMPION:   I will mark as Exhibit 8

8    an email chain labeled MKS-0000105 through 06.

9                    (Sullivan Exhibit 8 was marked

10                    for identification.)

11   BY MS. CHAMPION:

12       Q.   So this is an email responding to your

13   email from Rex Weyler, correct?

14       A.   Correct.

15       Q.   And he says, "I'm convinced that we can win

16   this collection case in Canada as long as the legal

17   team has the resources to keep pushing through all

18   the obstacles thrown up by Chevron and their

19   lawyers," right?

20       A.   That's what it says.

21       Q.   So was it your understanding that you might

22   be able to get Elliott to provide financial resources

23   for the Canadian collection action that he refers to?

24       A.   Correct.

25       Q.   And Mr. Weyler also says, "Likewise, I'll

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 77

1    delete everything and will not forward any of this

2    information."

3              Do you see that?

4      A.   I do.

5      Q.   Do you know whether he, in fact, deleted it?

6      A.   I do not.

7      Q.   Did you delete this email?

8      A.   No.

9              MS. CHAMPION:  I will mark as Sullivan

10   Exhibit 9 a document Bates stamped MKS-0000090

11   through 94.  I'm giving you the good copy.

12             Yours might have an extra page on the

13   back -- on the back of the first page.

14                  (Sullivan Exhibit 9 was marked

15                   for identification.)

16   BY MS. CHAMPION:

17     Q.   So just starting at the bottom, you've got

18   your email at the bottom, you see that on page 93?

19     A.   Yes.

20     Q.   So I'm going to work my way up the chain;

21   that's why I'm starting at the bottom.  So then on

22   top of that, there is an email from lfontaine that

23   says, "Best wishes."

24             Do you see that?

25     A.   Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 78

1      Q.   Who is lfontaine?

2      A.   Phil Fontaine.

3      Q.   And who is he?

4      A.   He's a former two-time grand national chief

5   of the AFN in Canada.

6      Q.   And "AFN," do you know what that stands

7   for?

8      A.   Don't remember.

9      Q.   Is it your understanding that it's like an

10   indigenous group of --

11      A.   It's an indigenous group of all the

12   different tribes.

13      Q.   Yes, I think it might be First Nations?

14      A.   First Nations, yes.

15      Q.   But I don't know what the A stands for

16   either.

17           And who is Ed John -- just working along

18   the chain of email addresses here, who is

19   edjohn@fns.bc.ca?

20      A.   Ed John is a chief in Canada.

21      Q.   And, again, by "chief," you mean chief of

22   an indigenous tribe?

23      A.   First Nations group.

24      Q.   Got it.  And John Phillips?

25           MR. LIBBY:  Objection.  I want to make

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 79

```
 1    sure we're clear we stay within the bounds of the

 2    court's June 19 order, Exhibit 3 here, that it

 3    doesn't stray into paragraph 3-type information,

 4    okay?

 5              MS. CHAMPION:  I understand.  I'm just

 6    trying to understand --

 7              MR. LIBBY:  Oh, I understand.  But I

 8    don't know -- I want to make sure that the witness

 9    understands this has nothing to do with paragraph 5

10    compliance discovery.  If your answer does, then I'm

11    going to instruct you not to answer.  But go ahead.

12    BY MS. CHAMPION:

13        Q.  John Phillips, who's that?

14        A.  He's a Canadian attorney.

15        Q.  And was it your understanding he represented

16    someone in the Canadian collection action?

17        A.  He's an attorney from Canada.  I don't --

18    I don't know his -- don't know his role.

19        Q.  And Peter Grant?

20        A.  Attorney in Canada.

21        Q.  Do you know what his role was -- is?

22        A.  No.

23        Q.  How about Ian Watson?

24        A.  He's -- I don't know.  I just met him on

25    this trip.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 80

1        Q.  Is he an attorney?  What is he?

2        A.  I don't -- he's not an attorney.  I think

3    he's just a businessperson.

4        Q.  In the United States?  In Canada?  Do you

5    know where?

6        A.  I think he has a place in Canada.  I did

7    not -- I don't -- I did not converse with him.

8    I do not know.

9        Q.  Do you know whether he or anyone else on

10   this email chain has invested money in the Lago

11   Agrio litigation that has resulted in any payments

12   to Mr. Donziger?

13               MR. LIBBY:  Objection.

14               Instruct you not to answer.

15               MS. CHAMPION:  That's squarely within

16   (c), squarely.

17               MR. LIBBY:  It's completely in the

18   wheelhouse of paragraph 3.

19               MS. CHAMPION:  It's (c).  I will

20   rephrase the question quoting that.  Give it to me.

21               MR. LIBBY:  No, I have it.  I have it.

22   "Any payments to Donziger, past or anticipated, out

23   of proceeds of financing granted in whole or in part

24   in exchange for any portion of any future

25   collections."  "Any payments to Donziger."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 81

1              MS. CHAMPION:  That's what I asked

2    about.

3              MR. LIBBY:  Okay.

4              MS. CHAMPION:  I asked -- my question

5    was -- let me go back to the question --

6              MR. LIBBY:  Right.

7    BY MS. CHAMPION:

8        Q.  Do you know whether he or anyone else on

9    this email chain has invested money in the Lago

10   Agrio litigation that has resulted in any payments

11   to Mr. Donziger?

12             MR. LIBBY:  Fair enough, okay.

13             Go ahead, if you know.

14             THE WITNESS:  Can you ask it one more

15   time.

16   BY MS. CHAMPION:

17       Q.  Sure.  Do you know whether Ian Watson or

18   anyone else on this email chain has invested money

19   in the Lago Agrio litigation that has resulted in

20   any payments to Mr. Donziger?

21       A.  I'm not --

22             MR. LIBBY:  Do you understand the

23   question?

24             THE WITNESS:  Yeah.  I don't know.

25   I'm not certain.

Page 82

1    BY MS. CHAMPION:

2        Q.  And do you know whether Mr. Watson or

3    anyone else on this email chain has invested money

4    in the Lago Agrio litigation that is intended to

5    result in some payment to Mr. Donziger in the

6    future?

7        A.  I do not know.

8        Q.  Do you know whether anyone -- Mr. Watson or

9    anyone else on this email chain controls any vehicle

10   that has made an investment in the Lago Agrio

11   litigation that has resulted in any payments to

12   Mr. Donziger?

13       A.  I'm not aware.

14       Q.  Do you know whether Mr. Watson or anyone

15   else on this email chain has invested money --

16   Strike that.

17             Do you know whether Mr. Watson or anyone

18   else on this email chain controls any vehicle that

19   has invested in the Lago Agrio litigation that is

20   intended to result in any payment to Mr. Donziger in

21   the future?

22       A.  Can you ask that again, please.

23       Q.  Sure.  I think I can probably phrase it a

24   little better.  I think that was a little sloppy.

25             Do you know whether Mr. Watson or anyone

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 83

1  else on this email chain controls any vehicle that

2  has made an investment in the Lago Agrio litigation

3  that is intended to result in any payment to

4  Mr. Donziger in the future?

5      A.  I'm not.

6      Q.  Just to be clear, there's a lot of

7  documents in your production that show payments to

8  Mr. Donziger.  Are you aware of whether any of those

9  payments came out of funds that were invested in the

10  Lago Agrio litigation?

11          MR. LIBBY:  Hang on a second.  That's

12  really broad, Anne.  I'm interested in moving along

13  too.  So do you want to restate that for me.

14  BY MS. CHAMPION:

15      Q.  There's a lot of documents in your

16  production that show payments to Mr. Donziger.  Are

17  you aware of at least some of those payments?

18          MR. LIBBY:  What kind of payments are we

19  talking about?

20          MS. CHAMPION:  Well, she produced

21  documents that show $25,000 transfers, $100,000

22  transfers to Mr. Donziger.

23          MR. LIBBY:  Oh, okay, those type of

24  documents.

25          THE WITNESS:  I know of --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 84

1              MR. LIBBY:  Wait for the question.

2     BY MS. CHAMPION:

3         Q.  Just tell me what you were going to say.

4     You're aware that --

5         A.  What was the question again?

6              MR. LIBBY:  I --

7     BY MS. CHAMPION:

8         Q.  What payments to Mr. Donziger are you aware

9     of?

10             MR. LIBBY:  No, that ain't going to make

11    it.

12             MS. CHAMPION:  Yes, it is.  Assets,

13    liabilities, and financial.

14             MR. LIBBY:  Oh, no.  It has to track (c)

15    very specifically.

16             MS. CHAMPION:  I'm talking about (b).

17             MR. LIBBY:  "Assets, liabilities, and

18    financial situation"?

19             MS. CHAMPION:  Yes.  "Are you aware of

20    payments to Mr. Donziger?"  It's just a simple

21    question.

22             MR. LIBBY:  If she's aware of assets,

23    liabilities, and financial situations.

24             MS. CHAMPION:  I'm not asking her about

25    the source yet.  I'm asking her if she's aware of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 85

1    payments -- monies that Mr. Donziger has received.

2    That's obviously within the scope of (b).

3              MR. LIBBY:  And I think you went on to

4    say -- and my concern is, I'm sort of the gatekeeper

5    on paragraph 3.  We all should be careful about

6    that.  Paragraph 5 compliance discovery is out of

7    this deposition.  So tell me how that is out of this

8    deposition -- how does it reconcile.  I want to

9    be . . .

10             MS. CHAMPION:  I'm not talking about

11   paragraph 5 at all.  I'm asking about Mr. Donziger's

12   assets.

13             MR. LIBBY:  Oh, no.  But I am asking

14   about 5 because the court has said that that's out.

15   So how does that square with your question about

16   assets, liability, and financial situation?

17   Because I think what you said was payments to

18   Mr. Donziger -- what?

19             MS. CHAMPION:  No.  I'm just asking, is

20   she aware of payments/monies received by

21   Mr. Donziger.  That's all.  Monies sent to him.

22   Monies received by him.  Payments made to him.

23             MR. LIBBY:  Okay.  All right --

24             MS. CHAMPION:  It's very simple.

25             MR. LIBBY:  -- on that.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 86

```
1    BY MS. CHAMPION:
2        Q.  Are you aware of payments made to
3    Mr. Donziger?
4        A.  Yes.
5        Q.  What payments are you aware of?
6        A.  $25,000, $25,000, and $75,000.
7        Q.  And when were those payments made, to your
8    recollection?
9        A.  Sometime between January, February, and --
10   I don't know -- maybe the beginning of March.
11   There's --
12       Q.  2018?
13       A.  Only 2018.
14       Q.  And do you know whether those payments were
15   made out of the proceeds of financing granted in
16   whole or in part in exchange for any portion of any
17   future collections on the Ecuadorian judgment?
18             MR. LIBBY:  Hang on a second.  Okay.
19   That question.
20             THE WITNESS:  Can you restate it, please.
21   BY MS. CHAMPION:
22       Q.  Sure.  Do you know whether those payments
23   were made out of the proceeds of financing granted
24   in whole or in part in exchange for any portion of
25   any future collections on the Ecuadorian judgment?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 87

1              MR. LIBBY:  You may answer.

2              THE WITNESS:  Yes.

3      BY MS. CHAMPION:

4          Q.  What were those proceeds?

5              MR. LIBBY:  Now I'm going to have to

6      object on -- just I don't understand the question.

7      What were the proceeds?  What was the amount or . . .

8              MS. CHAMPION:  What was the source of

9      the money?

10             MR. LIBBY:  When you say "source," we've

11     got to be careful here.  The paying entity?  The

12     payor entity?

13             MS. CHAMPION:  Sure.

14             MR. LIBBY:  Okay.  Yes.

15             THE WITNESS:  CWP Associates' bank

16     account at Bank of America.

17     BY MS. CHAMPION:

18         Q.  What is CWP Associates?

19         A.  It is a d/b/a under the umbrella of

20     Streamline Family Office as just a passthrough.

21         Q.  Was it created for this case?

22             MR. LIBBY:  Objection to form.

23             Go ahead, if you know.

24             THE WITNESS:  It was created to help

25     manage expenses.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    BY MS. CHAMPION:

2        Q.  For this case?  For the Ecuadorian

3    litigation?

4        A.  Yes.  It's completely -- Yes.

5        Q.  When?

6        A.  I think in -- end of December of '17.

7        Q.  Why was it created at the end of December?

8        A.  For the anticipation of receiving monies.

9        Q.  You anticipated receiving money at the end

10   of December?

11       A.  There was a -- Yeah.  Yes.

12       Q.  And some of that money was used to pay

13   Mr. Donziger?

14       A.  Correct.

15       Q.  And what was the source of that money?

16           MR. LIBBY:  That's over the line.

17           MS. CHAMPION:  Why?  It falls squarely

18   within (c).

19           MR. LIBBY:  No, it doesn't.  It says

20   payments made.  And that's why I asked you, which

21   entity was the paying, and you said yes.  And now

22   you're asking the source.  And that's paragraph 5

23   compliance.

24           MS. CHAMPION:  I don't think it is

25   because it relates to payments made to Donziger.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 89

```
 1              MR. LIBBY:  I understand.  And you got
 2     that.  And you got that.  And then you got the
 3     payment source -- rather, the payment paying entity
 4     was CWP Associates.
 5              THE WITNESS:  CWP.
 6              MR. LIBBY:  And anything beyond that is
 7     beyond the line.
 8              MS. CHAMPION:  Well, I disagree with
 9     that, but we've noted that.
10              MR. LIBBY:  Right.
11     BY MS. CHAMPION:
12        Q.  Do you know what the terms of that
13     investment -- those -- was it one investment or many
14     investments?
15              MR. LIBBY:  Excuse me.  No.  That's
16     still paragraph 5 compliance discovery, Anne.
17              MS. CHAMPION:  I'm trying to get at how
18     the financing relates to the proceeds of the
19     Ecuadorian judgment.  I'm trying to understand the
20     relationship between the financing provided and the
21     proceeds of the Ecuadorian judgment.
22              Was it just a straight, We'll give you
23     $200,000 and you're buying 1 percent of the
24     judgment?  I mean, what was the relationship between
25     the financing and the proceeds of future collections
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 90

1    of the Ecuadorian judgment?

2              MR. LIBBY:  Are you talking about the

3    three payments that she mentioned here?

4              MS. CHAMPION:  Yes.  The funds paid to

5    Mr. Donziger that are out of proceeds of financing.

6              MR. LIBBY:  Right.

7              MS. CHAMPION:  I'm trying to understand

8    the terms of that financing, whether it was a

9    straight percentage interest or what it was.

10             MR. LIBBY:  No, I don't see that.

11   That's -- No.  It says, "any payments to Donziger,

12   past or anticipated, out of proceeds."  You got

13   that.  You got the amounts, and you got the entity

14   that was paying it.

15             MS. CHAMPION:  What I'm trying to

16   understand is, was the full amount of the payments

17   made to Mr. Donziger out of proceeds of financing

18   granted in whole or in part in exchange for any

19   portion of any future collections, or was it only

20   part?

21             Do you understand what I'm saying?

22   Maybe some of the money was a loan and some was an

23   investment in the proceeds.  Was 100 percent of the

24   money paid to Mr. Donziger the result of a financing

25   granted in whole or in part in exchange for future

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 91

1      collections on the Ecuadorian judgment, or was some

2      of it a loan and some of it was an interest in

3      proceeds?

4                  Do you understand what I'm saying?  You

5      probably have cleaner language than I do to describe

6      it.  I'm trying to figure out how much of these

7      payments fall within paragraph (c).

8                  MR. LIBBY:  Fall within paragraph (b)?

9                  MS. CHAMPION:  (c).

10                 MR. LIBBY:  (c).  Yes, and I am too.

11     I'm tracking your language, trying to understand --

12     make sure that it's not straying into paragraph 3-

13     type territory.  And you want to know if those

14     payments were result of loans or actual monies paid?

15                 MS. CHAMPION:  Financing granted in

16     exchange for any portion of any future collections

17     on the Ecuadorian judgment.

18                 MR. LIBBY:  And your question was?

19                 MS. CHAMPION:  Did 100 percent of the

20     money -- the payments she identified, the $25,000,

21     the $25,000, and the $75,000 -- did 100 percent of

22     that money come out of financing provided in

23     exchange for a percentage --

24                 MR. LIBBY:  Okay, I got it.

25                 Go ahead.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 92

```
 1    BY MS. CHAMPION:
 2         Q.  -- of future collections in the Ecuadorian
 3    judgment?
 4              MR. LIBBY:  You may answer.
 5              THE WITNESS:  That is my understanding.
 6    BY MS. CHAMPION:
 7         Q.  But you won't tell me the source of that
 8    financing?
 9              MR. LIBBY:  Oh, no.  I've instructed her
10    not to give you that source.
11              MS. CHAMPION:  I understand.
12    BY MS. CHAMPION:
13         Q.  And you won't tell me whether there were
14    multiple investors or just one?
15              MR. LIBBY:  Same.  Same objection, same
16    instruction.  Anne, I'm listening very carefully and
17    sitting back --
18              MS. CHAMPION:  I understand.
19              MR. LIBBY:  -- very sensitive to the
20    effective reach of paragraph 3.  So --
21              MS. CHAMPION:  I understand.  I think we
22    have -- we have disagreements, but I think it's
23    going fine.  Frankly, I didn't intend to get into
24    that now, but I think it shortcut a lot of things.
25    So hopefully the second half will be fast.
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 93

1          MR. LIBBY:  How are we doing for lunch?

2     Is it time for lunch?

3               (Discussion off the record.)

4          MS. CHAMPION:  Why don't you let me

5     finish going through this email chain and then we

6     can break if you're ready.

7     BY MS. CHAMPION:

8          Q.  Let's go back to Exhibit -- was this

9     Exhibit 8 or 9?

10         A.  9.

11         Q.  I just want to go back through the bottom

12    there where we were going through the recipients.

13    So you told me what you knew about Mr. Watson.

14              What about Victoria Watson?

15              MR. LIBBY:  Recall my instruction to

16    you, my admonition to you, that no answer should

17    stray into paragraph 3 of the order with respect to

18    paragraph 5, compliance discovery, if you understand

19    what I just said.

20              THE WITNESS:  Yes.

21              MR. LIBBY:  Thank you.

22              THE WITNESS:  She is the wife of Ian

23    Watson.

24    BY MS. CHAMPION:

25         Q.  And what did you understand her role in the

1    case to be?

2         A.  I don't -- she -- no formal role.

3    I don't -- I'm not aware of one.

4         Q.  And what about Mr. Weyler, Rex Weyler?

5         A.  He is the founder of Greenpeace, one of the

6    founders of Greenpeace.

7         Q.  And what was his role in the case?

8         A.  Just -- I'm not 100 percent certain.

9         Q.  And how about Lisa Gibbons?

10        A.  Rex's partner/spouse.

11        Q.  Did she have any role in the case that

12   you're aware of?

13        A.  No.

14        Q.  And lbmiller104, who is that?

15        A.  That's Laura Miller.

16        Q.  Who is she?

17        A.  Steven's wife.

18        Q.  Did she have any role in the case that

19   you're aware of?

20        A.  No.

21        Q.  And how about Luis Yanza?

22        A.  He is an Ecuadorian, and I believe he's

23   part of the FDA.  He doesn't speak English.

24        Q.  What's your understanding of what the FDA

25   is?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 95

1       A.   It's the organized Ecuadorian peoples.
2       Q.   What's your understanding of its
3   relationship to the case?
4       A.   That it's -- the cleanup is for their
5   benefit.
6       Q.   And how about aaron@forumnobis.org?
7       A.   He's an attorney.
8       Q.   What's your understanding of his role?
9       A.   He works on the case.
10      Q.   You mean he works on the Canadian
11  collection action?  What case is he working on?
12      A.   He's works on the overall -- whatever they
13  do legally.  He's a lawyer.
14      Q.   Aside from the Canadian collection action,
15  do you have any sense of what active proceedings
16  there might be?
17      A.   No.
18      Q.   Are you aware of other collection actions?
19      A.   No.
20      Q.   How about Karen Hinton -- well, Karen
21  Hinton we talked about earlier.  You understood her
22  to be a PR person?
23      A.   Correct.
24      Q.   How about Howard Glaser?
25      A.   Karen's spouse.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 96

1      Q.  Did he have any role in the case?

2      A.  Not that I'm aware of.

3      Q.  How about juanaulestia01@gmail.com?  Who's

4   that?

5      A.  He's an Ecuadorian.  I think he's been

6   working with the Ecuadorian peoples in Ecuador for a

7   long time.

8      Q.  Do you understand if he had a role on the

9   case?

10      A.  No, I'm not sure what it is.

11      Q.  How about Lupita de Heredia, the next name

12   after Juan Aulestia?  Do you know her?

13      A.  I met her and she is some PR -- I did not

14   speak to her.  If anything, just briefly and

15   cordially.

16      Q.  And Cristina Muñoz, who is that?

17      A.  I believe she's an Ecuadorian, and similar.

18   She's --

19      Q.  Similar to Lupita --

20      A.  Similar in that I don't really know.

21   I think she was helping coordinate some things for

22   this visit in Ecuador.

23      Q.  But did you understand her to be a PR

24   person or you're not sure?

25      A.  I'm not sure.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 97

1      Q.  And how about -- you had identified

2  Patricio Salazar and Agustin Salazar to me earlier

3  as Ecuadorian lawyers that you had met for the

4  Ecuadorian plaintiffs?

5      A.  Correct.

6      Q.  And are these the gentlemen that are copied

7  here --

8      A.  Correct.

9      Q.  -- patriciosalazarcordova@gmail.com and

10 Agustin?

11     A.  Correct.

12     Q.  And -- Okay.  And you understood them to be

13 lawyers for the Ecuadorian plaintiffs, correct?

14     A.  They're Ecuadorians in Ecuador.  Yes,

15 that's how I understood it.

16     Q.  Did you understand what proceeding, if any,

17 they were acting in?

18     A.  Zero.

19     Q.  Do you know who represents the Ecuadorian

20 plaintiffs in the Canadian collection action?

21     A.  I believe it's Alan Lenczner.

22     Q.  Did you ever talk to him?

23     A.  No.

24     Q.  So scrolling up to the email that's on

25 page 92 from Mr. Donziger where he says, "Friends,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 98

1    Please keep this information that Katie sent
2    strictly confidential.  As with most institutional
3    investors, this is a heavy lift with a very
4    uncertain outcome.  If this information goes beyond
5    our tight circle, it likely will be counterproductive
6    in terms of our objectives."
7              Do you know what he meant by it would be
8    counterproductive?
9        A.  No.  These are his words.
10       Q.  Do you know whether he discussed this
11   potential investment with the Ecuadorian plaintiffs?
12       A.  I'm not aware.
13       Q.  Do you know whether he discussed it with
14   anyone outside of this email chain?
15       A.  I am not aware.
16       Q.  And then do you know why he asked everybody
17   to keep the information strictly confidential?
18       A.  I am not aware.
19       Q.  So scrolling up to the email from Peter
20   Grant that appears on page 91 where he says, "I give
21   you very best wishes on this and will now delete all
22   emails relating to this.  I recommend others do as
23   well after what I saw the opposition acquired."
24              Do you know what he's referring to
25   there: what the opposition acquired?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 99

1        A.   No idea.

2        Q.   And do you know whether he did, in fact,

3    delete his emails?

4        A.   No idea.

5        Q.   Who is the opposition?  Is it Chevron?

6        A.   Those are his words, not mine.

7        Q.   Do you know whether Chevron at some point

8    acquired emails or other documents from the

9    Ecuadorian plaintiffs' team?

10       A.   No idea.

11       Q.   You never saw any emails?

12       A.   Never saw any.

13       Q.   You never saw any emails that Chevron

14   acquired from the Ecuadorian plaintiffs' lawyers or

15   representatives?

16       A.   None.

17       Q.   Did you read the RICO judgment, the

18   District Court's RICO judgment?

19       A.   No.

20       Q.   Did you read the Appellate Court's opinion

21   affirming the judgment, the Second Circuit Court of

22   Appeals affirming the District Court's RICO

23   judgment?

24       A.   No.

25       Q.   Did you know that those documents existed?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 100

```
 1        A.  I --
 2        Q.  It's fine if you didn't.  I'm just asking.
 3        A.  Well, I assume they existed, but not from
 4   my tracking them down.
 5        Q.  You assumed why?  Were you told that there
 6   was a judgment out there, like a written opinion?
 7   I mean, what do you mean when you say you assumed?
 8        A.  Can you ask that question again.
 9        Q.  Sure.  Were you told there was a judgment
10   out there, like a written opinion?  I mean, what do
11   you mean when you say you assumed?
12        A.  Well, if there was a RICO -- my assumption
13   was if there was a RICO judgment, that there was
14   some legal document -- some legal words -- that's
15   all lawyers seem to do -- that one exists.
16        Q.  I understand.  Well, you're right that
17   lawyers create lots of documents and lots of words.
18   But sometimes there's a document of a judgment and
19   sometimes there's not.  Like if there's a jury
20   verdict, it might just be --
21        A.  I would have no skill to opine either
22   way --
23        Q.  Got it, okay.
24        A.  -- and wouldn't go looking for it because I
25   wouldn't know -- I wouldn't have the skills to
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 101

1    understand it.

2        Q.  And so you never asked to see anything like

3    that?

4        A.  I did not.

5        Q.  And nobody ever gave you anything like a

6    judicial opinion relating to the case?

7        A.  No.

8        Q.  Then scrolling up to the email from

9    Mr. Donziger on page 90 to 91, he says, responding

10   to Mr. Grant's email, "I second that.  Please delete

11   all emails related to this and, again, keep the info

12   confidential."

13           Did you follow his instruction to delete

14   emails related to this?

15       A.  No.

16       Q.  Do you know why he issued that instruction?

17       A.  I don't know why.

18       Q.  Have you received similar instructions from

19   him as to other documents?

20       A.  Can you clarify.

21       Q.  Sure.  Did he ever tell you to delete or

22   destroy any other documents relating to the

23   Ecuadorian litigation?

24       A.  No.

25       Q.  Did you ever destroy or delete any

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 102

1    documents relating to the Ecuadorian litigation?

2        A.  No.

3        Q.  And then Mr. Page responds above that on

4    page 90, "I'll add one more email to the chain,

5    which is simply to clarify that the request for

6    deletion does not reflect anything problematic about

7    the meeting itself, but rather the fact that Chevron

8    has in the past improperly used information about

9    perfectly legitimate funding discussions to start

10   put [sic] pressure on potential funders and kill off

11   potential deals."

12               Do you see that?

13       A.  I do.

14       Q.  So was it your understanding that the

15   request for deletion related to the fear that

16   Chevron would use information to put pressure on

17   funders and kill off potential deals?

18               MR. LIBBY:  Objection, competency,

19   foundation.

20               Go ahead, if you know.

21               THE WITNESS:  These are not my words, so

22   I just received this email.

23   BY MS. CHAMPION:

24       Q.  I understand.  But you're on an email chain

25   where there's like several emails about deleting

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 103

1    documents and about the need for confidentiality

2    that refer to Chevron.

3              I mean, did you have no understanding of

4    what the concern was, why people would be deleting

5    emails?  I'm just asking for your understanding of

6    why people thought it was necessary to delete these

7    emails.  Because there's multiple people echoing

8    this.

9         A.  Just to keep things private.  Some people

10   like to keep things private and out of . . .

11        Q.  Yes.  I understand that.  But we don't --

12   our emails normally are private, right, unless we

13   give them out?  So why do you have to delete emails

14   to keep them private?

15             MR. LIBBY:  Objection.

16   BY MS. CHAMPION:

17        Q.  How would they get out?

18             MR. LIBBY:  Objection.  Argumentative

19   and speculation.

20             Go ahead, if you know.

21             THE WITNESS:  I don't know.

22   BY MS. CHAMPION:

23        Q.  So you don't know what Mr. Grant's referring

24   to when he says what the opposition acquired?

25        A.  I have no idea.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 104

1      Q.  And do you know what Mr. Page is referring

2   to that Chevron has in the past improperly used

3   information?  Do you have any idea of how Chevron

4   got that information?

5      A.  I have no idea.

6      Q.  And when he says "Confidentiality here is

7   important to protect a process that is not only

8   perfectly legitimate but also, as we all know, an

9   important piece of delivering access to justice for

10  the affected clients in this case," what did you

11  understand him to mean by that: the confidentiality

12  was important to protect a process that was

13  perfectly legitimate?  What process is he referring

14  to?

15              MR. LIBBY:  Same objection.

16              If you know.

17  BY MS. CHAMPION:

18     Q.  Your understanding of what he was referring

19  to there.

20     A.  That it's a battle.  That it's been a battle

21  since the beginning.  I don't know.  That's . . .

22     Q.  That what's a battle?

23     A.  That this case is a battle to try to clean

24  up for the affected clients in the case.

25     Q.  A battle between who?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 105

1        A.   Chevron and the FDA.

2        Q.   Do you have an understanding of the

3    relationship between the FDA and the plaintiffs in

4    the Ecuadorian action?

5        A.   No.

6        Q.   And do you have an understanding of the

7    FDA's role in the Canadian collection action, if

8    any?

9        A.   No.

10       Q.   And how about the Ecuadorian plaintiffs?

11   Do you have any understanding of what their role is

12   in the Canadian collection action?

13       A.   No.

14            MS. CHAMPION:  Okay.  That's fine.

15            MR. LIBBY:  I think the reporter wanted

16   a break about 15 minutes ago.

17            MS. CHAMPION:  Yes, we can take a break.

18   We can go off the record.

19            THE VIDEO OPERATOR:  The time is 12:07.

20   We're off the record.

21                     (Whereupon, at 12:08 p.m.,

22                      the deposition was recessed,

23                      to reconvene at 12:30 p.m.

24                      this same date.)

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 106

1                   AFTERNOON SESSION

2                                (12:42 p.m.)

3              THE VIDEO OPERATOR:  This is the

4    beginning of Media No. 3.  We're back on the record.

5    The time is 12:41.

6              MS. CHAMPION:  Good afternoon, I'm going

7    to hand you what I've marked for identification as

8    Exhibit 10.  This is MKS-0000031 through 32, just an

9    email chain.

10                     (Sullivan Exhibit 10 was marked

11                      for identification.)

12              MARY K. SULLIVAN,

13       the witness at the time of recess, having

14       been previously duly sworn, was further

15       deposed and testified as follows:

16              EXAMINATION (continued)

17    BY MS. CHAMPION:

18       Q.  So as you'll see, this is a continuation of

19    your email chain telling everybody about the Elliott

20    meeting.  And I want to direct your attention to the

21    top of the email chain.

22              So Mr. Page writes back and says,

23    "Also - fabulous work and good luck.  Hope you are

24    well and hope we have the chance to meet up again

25    soon."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 107

1           Do you see that?

2       A.  I do.

3       Q.  Had you met with Page on any occasion

4   besides the Ecuador trip that you referred to?

5       A.  No.

6       Q.  And then you say to him above that,

7   "Apologies for my exuberance for sharing the news

8   beyond the walls."

9               What did you mean by "the walls"?  What

10  walls?

11      A.  I don't know.  The metaphorical walls of --

12  of -- yeah, metaphorical walls.  I don't recall

13  exactly what I meant by that.

14      Q.  Did you mean like outside of a certain

15  circle of people?

16      A.  Yeah.  I don't know a lot of -- I mean,

17  in -- when I realized that I thought it was okay to

18  send this email and when I realized it was

19  apparently not okay to send the email, then I was

20  breaking some kind of metaphorical wall or boundary,

21  and I just was acknowledging that I don't know a lot

22  of these people, so maybe there was people that

23  didn't need to know that, I guess.

24      Q.  I understand.  I want to now go through

25  some of your notes related to the Elliott

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 108

1    transaction.

2              So the meeting took place on November 6,

3    right?

4        A.  Yes.  If it was a Monday, that's correct.

5        Q.  And how long did it last?

6        A.  An hour and a half.

7        Q.  And who was there?

8        A.  I arrived with Steven Donziger, and we were

9    greeted, I think, in the reception by Jesse Cohn

10   and -- I don't know if Lee was there, but Lee was in

11   the meeting.  There was the four of us in the

12   meeting.

13       Q.  Got it.  And were any documents exchanged

14   at the meeting?

15       A.  No.

16       Q.  Did anybody -- did you like show slides or

17   do any kind of presentation?

18       A.  None.

19       Q.  Did you just sit and talk?

20       A.  I sat there.

21       Q.  Did Donziger stand up and give a

22   presentation or --

23       A.  No.

24       Q.  Did he just sit and talk?

25       A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 109

1      Q.  Can you tell me how the meeting went?  Like
2    how did you start off and what was said and who said
3    what?
4      A.  The meeting started off by me saying, you
5    know, I'm the link between these two -- between
6    Elliott and Steven, so I was just making -- opening
7    the door for a conversation, and I'll let you just
8    talk.
9      Q.  And so how much more did you say at the
10   meeting, to your recollection?
11     A.  I don't recall specifically, but it would
12   be close to nil.
13     Q.  So did Elliott do most of the talking or
14   did Donziger do most of the talking?  I guess I
15   should be clear.  Did Mr. Grinberg and Mr. Cohn do
16   most of the talking or did Donziger do most of the
17   talking or was it about evenly split?
18     A.  I would say most of the conversation was
19   between Donziger and Grinberg.
20     Q.  And what were they talking about, do you
21   remember?  What was discussed?
22     A.  Not specifically, no.
23     Q.  Were like the terms of a potential
24   investment discussed?
25     A.  No.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 110

1      Q.  Was Mr. Donziger's interest in the judgment

2  discussed?

3      A.  In my notes, there was a mention of it,

4  that there was a -- if I recall, like 6.3 percent

5  and then some 13 to 15 percent-ish.  That was the

6  only reference to how the percentages have been

7  allocated to date.

8      Q.  And what was your understanding of

9  Mr. Donziger's interest?  You just said 6.3 percent.

10  Was it your understanding that that was 6.3 percent

11  of the whole judgment?

12      A.  I don't know.  I was -- it was not clear.

13      Q.  Was it your understanding that he would be

14  entitled to be paid 6.3 percent of any monies that

15  came in as a result of enforcement or settlement?

16      A.  Not clear.

17      Q.  And how about the other investors'

18  interests?  Did you have any understanding of how

19  those worked?

20              MR. LIBBY:  Hang on a second.  Other

21  investors?

22              MS. CHAMPION:  She identified 13 to 15

23  other investors that owned some percentage.

24              THE WITNESS:  Other parties.  I think in

25  my notes, it was investors and lawyers.  So people

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 111

1    involved in some way, shape, or form in the case.

2    BY MS. CHAMPION:

3        Q.  Did the RICO judgment come up?

4        A.  I don't recall specifically.

5            MS. CHAMPION:  Well, why don't we go

6    over some of those notes.  I'm going to hand you

7    what I've marked as Exhibit 11.  This is MKS-0000149

8    through 156.

9                    (Sullivan Exhibit 11 was marked

10                    for identification.)

11            MR. LIBBY:  This is 12?

12            THE WITNESS:  11.

13            MS. CHAMPION:  11.

14            MR. LIBBY:  11.  I'm sorry.  It starts

15    at 149?

16            MS. CHAMPION:  Yes.  149 and goes

17    through 156.

18            MR. LIBBY:  Okay.

19    BY MS. CHAMPION:

20        Q.  I think there might actually be two sets of

21    notes here.  So let's just clarify what we're

22    talking about here.  When we look at the last two

23    pages, you'll see -- 155 through 156, you'll see

24    that there's a date in the upper right-hand corner?

25        A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 112

1      Q.  So -- and that date is November 6, 2017,
2  right?
3      A.  Correct.
4      Q.  The date of the meeting?
5      A.  Correct.
6      Q.  And it says at the top, "Elliott Mtg,"
7  which I'm assuming means "meeting," right?
8      A.  Yes.
9      Q.  So are these your notes from the actual
10  meeting?
11      A.  Yes.
12      Q.  And do you have other notes from the actual
13  meeting --
14      A.  No.
15      Q.  -- any of these other notes here, are they
16  from the meeting?
17      A.  No.
18      Q.  They're not.  So let's go over the notes.
19  So this says "Lee."  That's a reference to
20  Mr. Grinberg, I assume, correct?
21      A.  Yes.
22      Q.  And it says "distressed situation,
23  sovereign space."
24            What's your recollection of why you
25  wrote that down, or what was being talked about that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 113

1    prompted you to write that down?

2        A.  I can't say specifically.

3        Q.  And how about here where it says, "FCPA

4    violations"?  What's your understanding of what that

5    means?

6        A.  I have no idea.

7        Q.  Do you know what the FCPA is?

8        A.  I have no idea.

9        Q.  And where it says, "unpopular in

10   Australia," do you know what that means, or what

11   that refers to?

12       A.  That FCPA violations are unpopular in

13   Australia.

14       Q.  And why would that have been relevant?

15   Do you remember why that was being discussed?

16       A.  No.

17       Q.  Is it a reference to Chevron being unpopular

18   in Australia?

19       A.  I don't recall.

20       Q.  Do you know whether Chevron has operations

21   in Australia?

22       A.  I have no idea.

23       Q.  Why was Australia being discussed?

24       A.  I have no idea.

25       Q.  And then it says, moving on -- and if I get

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

1    your handwriting wrong, please tell me, but you have

2    pretty good handwriting -- "Parallel efforts - in

3    cases outside of U.S., Brazil, and Argentina."

4              Do you know what that's a reference to?

5        A.  Making parallel efforts and working in the

6    U.S. and then working in other countries.

7        Q.  So what -- efforts for what?

8        A.  I don't recall.  This was conversation

9    between two gentlemen that I was just listening to.

10       Q.  So are you aware of enforcement actions

11   being filed on the Lago Agrio judgment in Brazil and

12   Argentina?

13       A.  No.

14       Q.  Do you know if that's what they were

15   talking about?

16       A.  No.

17       Q.  And where it says then, "Really good

18   lawyers, need support," do you know what that's a

19   reference to?

20       A.  No.

21       Q.  And how about below that, I can't really

22   read that number.  Is it --

23       A.  "$400 million."

24       Q.  "$400 million frozen assets in Argentina"?

25       A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 115

1    Q.  What's your understanding of what that

2    reference means?

3    A.  I know that Elliott had some bond deal in

4    Argentina that they were very successful at doing,

5    so I imagine there was some reference/conversation

6    about that.

7    Q.  So you think it's a reference to Elliott's

8    work rather than anything related to the Ecuadorian

9    litigation?

10   A.  Looking at my notes, I believe that's true.

11   Q.  How about this "Brazilian process takes

12   forever," do you know what that's a reference to?

13   A.  No.

14   Q.  Then it says below that -- can you read

15   that first word for me?  Is it "Fund"?

16   A.  "Fund."

17   Q.  "Canadian litigation in near term"; is that

18   right?

19   A.  Yes.

20   Q.  So I assume that's a reference to the

21   Canadian collection litigation, correct?

22   A.  Yes.  The Canadian litigation that is

23   currently in place.

24   Q.  Right.  The litigation to enforce the

25   Ecuadorian judgment in Canada?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 116

1      A.  Correct.

2      Q.  Got it.  And then it says, "Ecuadorian

3   judgment, injunction in the U.S."

4            Do you understand that to be a reference

5   to the injunctions that stemmed from the RICO case?

6            And I don't think we've used that word

7   before, but you testified earlier your understanding

8   that they couldn't do anything with the judgment in

9   the U.S. or they couldn't enforce --

10     A.  They couldn't -- Yes.  Chevron U.S. Dollars

11  could not pay out for the judgment.

12     Q.  So do you recall what that reference is,

13  "Ecuadorian judgment, injunction in the U.S."?

14  Do you think those are connected?

15     A.  I don't know.

16     Q.  Do you know what an injunction is?

17     A.  No.

18     Q.  It's fine.  I don't know what a hedge is,

19  so . . .

20          MR. LIBBY:  There's some people left

21  that don't.

22          THE WITNESS:  I don't ever want to know.

23  BY MS. CHAMPION:

24     Q.  And then there it says, "1782 limitation."

25  Do you have any recollection of what that referred

Page 117

1    to?

2         A.   No idea.

3         Q.   Do you know what 1782 is in the legal

4    context?

5         A.   None.

6         Q.   That just has no meaning for you?

7         A.   Zero.

8         Q.   Got it, okay.  So you don't remember any

9    discussion of that?

10        A.   No.

11        Q.   Do you remember any discussion about

12   discovery proceedings that Chevron brought to obtain

13   evidence related to the Ecuadorian litigation?

14        A.   Please ask that again.

15        Q.   No problem.  Do you remember any discussion

16   at this meeting about discovery proceedings that

17   Chevron brought to obtain evidence related to the

18   Ecuadorian litigation?

19        A.   No.

20        Q.   Any discussion about any discovery related

21   to the Ecuadorian litigation?

22        A.   No.

23        Q.   And then it says here, "GC @ Chevron - owns

24   the entire strategy and," and that last word I can't

25   read.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 118

1          A.   I think it's "keep."  And then --

2          Q.   You don't know what that means?

3          A.   Yeah.

4          Q.   Do you know who the GC was at Chevron at

5     this time?

6          A.   No.

7          Q.   Do you remember the discussion about the GC

8     at Chevron owning the entire strategy?

9          A.   I only remember what I wrote down.

10         Q.   And who said that?  Was it Mr. Donziger or

11    Elliott?

12         A.   It would be Steven.

13         Q.   And then it says, "Play with threats vs.

14    successful ruling in Canada."

15              Did I read that right?

16         A.   Yes.

17         Q.   So can you give me some context for that?

18         A.   No.

19         Q.   Do you know what -- you have a little arrow

20    then -- well, not an arrow, but a line where it says

21    "Chevron know," I think that's what that says?

22         A.   Yes.  Correct.

23         Q.   Do you know what the connection is between

24    that and the "Play with threats," the line you have

25    it connecting to?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 119

1      A.  No.

2      Q.  I'm just trying to get anything you may

3  remember.

4      A.  I apologize.

5      Q.  That's okay.

6      A.  This is so out of my scope of knowledge.

7  So I was really just listening.

8      Q.  I understand.  Okay.  And then how about

9  this -- do you know who would have said this?  Would

10  it have been Steven also, the "Play with threats vs.

11  successful ruling in Canada"?

12      A.  Could have been either one of them.

13      Q.  Do you remember Jesse -- Mr. Cohn or

14  Mr. Grinberg or Mr. Donziger talking about different

15  strategies that might be successful in enforcing the

16  judgment or settling with Chevron?

17      A.  There was some dialogue kind of back and

18  forth kind of sharing perspectives.  And if I would

19  have written down -- I can't recall any off the top

20  of my head.

21      Q.  And then where it says, "SEC disclosures

22  are so misleading," do you know who would have said

23  that?

24      A.  No.  It could have been either.

25      Q.  And is it a reference to Chevron's SEC

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 120

1    disclosures?

2         A.  I'm not certain.

3         Q.  And then below that it says, "Case" --

4         A.  "Until."

5         Q.  "Until"?

6         A.  "Until."

7         Q.  "Bank"?  "Back in Ecuador"?

8         A.  I think it says "Case until bank - in

9    Ecuador, discovery in."

10        Q.  Do you know what that's a reference to?

11        A.  I do not.

12        Q.  Is it a reference to a discovery

13   proceeding -- Do you remember any discussion of a

14   discovery proceeding involving Banco Pichincha,

15   which is an Ecuadorian bank?  Does that ring a bell?

16        A.  No.

17        Q.  And then on the next page it says, "Boycott

18   time vs. Chevron."

19             Do you know what that is a reference to?

20   Boycott who?

21        A.  I don't know.  I don't -- I'm not certain.

22        Q.  And do you know who would have said that,

23   who would have been talking about boycotts?

24        A.  Could have been either one of them.

25        Q.  And do you think it was like --

A. It was a discussion. The whole meeting was really a back-and-forth conversation.

Q. Did you discuss amounts that Elliott might invest?

A. No.

Q. Did you make a specific ask?

A. No.

Q. Did you say -- did anyone offer to draw up papers documenting a potential investment?

A. No.

Q. Was there any discussion of meeting again or follow-up?

A. Just a general follow-up, and I recall them saying it will take them at least a few weeks to have whoever they have looking at the deals that come across to them.

Q. Do you know who there looked at it?

A. No idea.

Q. And then it also says, "Government to look at it," under the "Boycott time vs. Chevron."

Do you know what that refers to?

A. No.

Q. Or "don't know vulnerability"? Do you remember what that refers to?

A. No.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      Q.  Then moving on down, "Venezuela," do you
2  remember why discussion of Venezuela came up or what
3  the context for that was?
4      A.  No.  I think it was in a general comment
5  about how things were so terrible in Venezuela at
6  the time.  But other than that, I have no idea.
7      Q.  Are you aware whether Chevron has business
8  operations in Venezuela?
9      A.  I am not.
10     Q.  Then down below that it says, "Humanitarian
11  and oppression."  Then there's a little line, "every
12  oil company is just waiting."
13          Do you have any recollection of what
14  that was referring to?  What were the oil companies
15  waiting for?
16     A.  I'm not certain.
17     Q.  How about the "risk/reward - oil companies
18  are shameless"?  Do you know what that refers to?
19     A.  That was said by Lee Grinberg.
20     Q.  About what?
21     A.  I don't know.  I just wrote down that
22  comment.
23     Q.  And how do you remember it was him that
24  said it?
25     A.  Because I thought it was interesting that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 123

1    he said it.

2         Q.  And then here it says, "6.3 percent Steven

3    of."  And I'm assuming, based on your testimony

4    earlier, that's a reference to his percentage

5    interest in the judgment; is that right?

6         A.  That's my assumption.

7         Q.  Did you have any understanding of how the

8    RICO judgment affected his interest in the judgment,

9    if at all?

10        A.  No.

11        Q.  Have you ever read the RICO judgment?

12        A.  No.

13        Q.  And then it says, "15-16 percent

14   committed - 15 other people, investors and lawyers,"

15   right?

16        A.  Correct.

17        Q.  Do you know who those other investors and

18   lawyers are?

19             MR. LIBBY:  Objection.  That's across

20   the line.  That's paragraph 5 on its face.

21             MS. CHAMPION:  Are you instructing the

22   witness not to answer?

23             MR. LIBBY:  Oh, yeah, I am.  I beg your

24   pardon.  I'm instructing her not to answer.

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 124

1    BY MS. CHAMPION:

2       Q.  Do you have any understanding of

3    Mr. Donziger's compensation -- entitlement

4    compensation for his work related to the Ecuadorian

5    litigation?

6       A.  Can you clarify?

7       Q.  I mean, what's your understanding of what

8    he's entitled to be compensated?

9       A.  Some fair amount for his work to coordinate

10   and do whatever he's doing.

11      Q.  Have you ever reviewed any agreements that

12   document what he's entitled to be paid?

13      A.  Um --

14          MR. LIBBY:  Hang on a second.  Let's

15   see.

16          MS. CHAMPION:  This goes to (b).

17          MR. LIBBY:  Yes.

18          If you know.

19          THE WITNESS:  Can you clarify that.

20   BY MS. CHAMPION:

21      Q.  Have you ever seen any documents, or are

22   you aware of any documents that describe what he's

23   entitled to be paid, any contracts --

24      A.  Can you clarify "paid."

25      Q.  Okay.  Well, we know you already testified

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 125

1      he has a 6.3 percent interest in the proceeds of the

2      judgment, right?

3          A.  Correct.

4          Q.  Although you're not aware of exactly how

5      that's structured --

6          A.  Correct.

7          Q.  -- and that's fine.  Is he entitled to

8      compensation on top of that: retainer payments,

9      hourly fees, anything of that nature?

10         A.  I have never seen a document referencing

11     any agreement on that.

12         Q.  And do you know who, if anyone, has to

13     approve any payments made to him?

14         A.  I do not know.

15         Q.  Now, then, below that, it says, "Rule 65 -

16     participating violation in some court order."

17             Do you know what that refers to?

18         A.  I have no idea.

19         Q.  Do you know what Rule 65 is?

20         A.  No.

21         Q.  Do you remember any discussion of any

22     injunctions or whether an investment in the case

23     would be problematic and might violate a court order

24     injunction?

25         A.  Not specifically.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 126

1     Q.  Did Elliott express any concern that it

2  couldn't invest in the Ecuadorian litigation because

3  of any court order?

4     A.  No.  Not that I recall there being like

5  a -- Yeah, I don't recall any.

6     Q.  Do you know why there was discussion about

7  "participating violation in some court order"?

8     A.  I do not.

9     Q.  What questions did Elliott ask at the

10  meeting about a potential investment, if you recall?

11           MR. LIBBY:  I think you mean a name.

12           MS. CHAMPION:  No, you're right.  I'm

13  sorry, I should stop doing that.

14  BY MS. CHAMPION:

15     Q.  Do you recall Mr. Cohn asking any questions

16  at the meeting?

17     A.  Mr. Cohn left about 20 minutes in.

18     Q.  And do you recall him asking any questions

19  before he left?

20     A.  No.  He left because it was not his area of

21  expertise, and he left it to Lee, who had -- this

22  was his area of expertise.

23     Q.  Do you recall specific questions that

24  Mr. Grinberg asked?

25     A.  I do not.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 127

1       Q.  Do you recall any reservations he expressed?

2       A.  None.

3       Q.  Do you recall him asking about the Canadian

4   enforcement action?

5       A.  The only thing I would recall is literally

6   what I wrote down in my notes.

7       Q.  Did you discuss the concept at the meeting

8   that was reflected in your emails with Mr. Donziger

9   that Elliott management could both make an investment

10   in exchange for proceeds of the litigation and also

11   short Chevron stock?

12       A.  No.

13       Q.  Do you recall any discussion of the

14   structure of any potential investment?

15       A.  There was no conversation about structure.

16       Q.  So what was the conversation about?  I mean,

17   what was the purpose of it really?  If you didn't

18   talk about structure or amounts, what was the

19   purpose of it?

20       A.  It was an introductory meeting/conversation

21   for a potential partnership/opportunity, whatever,

22   may have arisen from that.

23       Q.  Yes, I understand that.  But what did he

24   seem interested in knowing about the situation, you

25   know, so that he could evaluate it?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 128

1      A.  Who is "he"?

2      Q.  Mr. Grinberg, I guess, if he was doing most

3   of the talking on the part of Elliott.

4      A.  I don't know.  It was just a conversation

5   of two lawyers dealing with complex litigation-type

6   things, and there was really just -- it was really

7   simply a conversation.  It didn't come across as a

8   Q&A.

9      Q.  I understand.

10      A.  It was kind of one topic might have led

11   into another topic into another topic.

12      Q.  And then finally at the end of your note

13   says, "Canadian - legal due diligence, look at few

14   other jurisdictions, Chevron's vulnerability."

15          Do you know what that's a reference to?

16      A.  That they would look into other countries

17   to see where vulnerabilities may lie related to

18   Chevron.

19      Q.  Was that a concept raised by Mr. Donziger

20   or Mr. Grinberg if you recall?

21      A.  It could have been either.

22      Q.  Do you recall anything specific that

23   Mr. Cohn said at the meeting?

24      A.  Just that, I'm going to leave and leave it

25   to you.  He's technology.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 129

1      Q.  Understood.  And then how about

2  Mr. Grinberg?  You said that you remembered him

3  saying the "oil companies are shameless."  Do you

4  remember anything else specific that he said at the

5  meeting?

6      A.  I remember him saying they get a lot of

7  crazy ideas that come to them, you know, like sheiks

8  or kings or whatever from other countries.  And they

9  have these very unique things, and, you know, they

10  usually just disregard.  I thought that was

11  interesting -- I didn't write it down, but that was

12  interesting.

13      Q.  Disregard in what way?

14      A.  They don't entertain them.

15      Q.  Let's go back to the beginning of this

16  document.  We covered the last couple of pages.  I

17  just want to understand these other notes.  Do you

18  know, were these all taken at the same time?  Were

19  they taken on different occasions?  And by "these,"

20  I mean pages 149 through 154.

21      A.  They would have been all at -- I mean, I

22  didn't take them all at -- they were at different

23  occasions.

24      Q.  Let's talk about page 1.

25      A.  Okay.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 130

1      Q.  Is page 1 related to page 2, or does page 1
2  stand alone?
3      A.  I don't know 100 percent, but I believe
4  that page 1 is a standalone.
5      Q.  So do you remember when you took these
6  notes?
7      A.  I don't.
8      Q.  Do you remember if you were on the phone or
9  it was a meeting?
10     A.  It looks to me as it would be from a phone
11  call.
12     Q.  With Mr. Donziger?
13     A.  Yes.  It wouldn't be anyone else I'd talk
14  to.
15     Q.  And do you think that this was likely
16  before the meeting with Elliott or after?
17     A.  I can't say for certain.
18     Q.  So let's just go through some of these and
19  maybe you can explain your understanding of what
20  they mean.  No. 1, "Control issue, piece of judgment
21  owned by someone else," do you know what that refers
22  to?
23     A.  No.
24     Q.  What was your understanding of
25  Mr. Donziger's authority to enter into agreements

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
                                         Page 131

 1    with investors with Elliott where they would invest

 2    in exchange for a percentage of the proceeds of the

 3    Ecuadorian judgment?

 4               MR. LIBBY:  Objection, competency,

 5    foundation.

 6               You may answer.

 7               THE WITNESS:  My understanding was that

 8    he could do so.

 9    BY MS. CHAMPION:

10        Q.  And what was that based on?  Just

11    conversations with him?  Did you review agreements?

12    I mean, I just want a sense --

13        A.  Just a general understanding, not from

14    looking at any particular document, but . . . yeah.

15        Q.  And it would be based on conversations with

16    him?

17        A.  Primarily.

18        Q.  And others?

19        A.  And others that were -- that I -- yeah,

20    others.

21        Q.  Like people that were on that email chain

22    that you met with in Ecuador?

23        A.  Yes.

24        Q.  Any of them in particular?  The Salazars?

25    Mr. Page?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 132

1      A.  Not in particular.

2      Q.  What was your understanding of whose

3   interest in the judgment Mr. Donziger had authority

4   to enter into agreements regarding?

5      A.  Can you clarify.

6      Q.  So, in other words, when you went into the

7   meeting with Elliott, what was your understanding of

8   whether he was offering Elliott an investment in his

9   6.3 percent or in the remaining percentage interest

10  in the judgment, or the portion unspoken for already?

11     A.  My understanding was that it was the

12  portion unspoken for.  I don't even know what that

13  portion pot even was.

14     Q.  Got it.  And do you have any -- do you

15  recall seeing any documents related to what was left

16  or what he had the authority to request investors

17  for?

18     A.  I was trying to understand that.  I did

19  not -- I did not know.

20     Q.  Got it, okay.  And do you recollect seeing

21  any documents related to him giving back any portion

22  of his 6.3 percent interest in the judgment?

23     A.  I was aware of two -- I think it was two

24  loans around RICO that were to help pay -- I believe

25  to help pay for his legal expenses during that time.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 133

1      Q.  And you think he got those loans in exchange

2   for a piece of his 6.3 percent?

3      A.  I understood them to be straight loans.

4      Q.  From whom?

5              MR. LIBBY:  Um --

6              MS. CHAMPION:  I think that goes to

7   assets and liabilities.

8              MR. LIBBY:  Yes, but I'm trying to make

9   sure we don't have a paragraph 3 issue.

10             MS. CHAMPION:  I understand.  But I

11  think it goes to his assets and liabilities.

12             MR. LIBBY:  Yes, I understand your

13  argument.  But it's not an investment in the

14  judgment.  It's a straight loan, is what I'm

15  hearing.

16             MS. CHAMPION:  Agreed.  Right.  And that

17  goes to (b), right?

18             MR. LIBBY:  Fair enough.

19             THE WITNESS:  I believe one of them was

20  Sherman, I can't remember his first name.  Something

21  Sherman.  And Glenn Krevlin.

22  BY MS. CHAMPION:

23     Q.  Are you aware of any other loans

24  Mr. Donziger got based on, you know, any security

25  interest in the judgment or any other collateral,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 134

1    for that matter?

2        A.  No.

3        Q.  So moving on down in these notes, do you

4    know what you meant by -- you have some numbers

5    here.  I think that's "$100 million," right?

6        A.  "$100 million," yes.

7        Q.  And "$25 million other partner," do you

8    recall what that references?

9            MR. LIBBY:  Recalling my admonition to

10    steer clear of paragraph 5 compliance discussion-

11    type answer.

12            THE WITNESS:  I don't know what these

13    amounts are --

14    BY MS. CHAMPION:

15        Q.  Okay.

16        A.  -- in relation to.

17        Q.  And how about "Chevron intimidation," do

18    you know what that refers to?

19        A.  Nothing other than intimidation pressure

20    that Chevron puts on people and places.

21        Q.  Related to what?

22        A.  Related to the litigation.

23        Q.  So do you know who said that: Chevron

24    intimidates people?  Was that Mr. Donziger?

25        A.  I don't know.  Yes.  Those are not my words.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 135

1      Q.  I understand.  How often did you meet with

2   Mr. Donziger?  Was your primary way of communicating

3   with him by phone, or did you meet with him

4   frequently?

5      A.  Primarily by phone and then I would -- for

6   work-related things, if I was in New York, then we

7   might meet up.

8      Q.  And so you met him, I think you said

9   earlier, in September 2016 or August 2016?

10      A.  August.

11      Q.  So how many times do you think you've met

12   with him total?  I mean, just ballpark?  10 to 20 --

13           MR. LIBBY:  I'm going to let this go

14   even though it's outside the scope.

15           Go ahead.

16           THE WITNESS:  How many times have I met

17   with him?

18   BY MS. CHAMPION:

19      Q.  Yes.

20      A.  Seven?

21      Q.  And then how about phone calls?  More

22   frequent than that?

23      A.  Yeah.  More frequent, yeah.

24      Q.  Like once a week?  Twice a week?  Depends?

25      A.  No.  It just all depends.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 136

1       Q.  So then moving on down this page, I think
2    it says "Strategy, structure of decision making."
3              Was that a discussion about the decision
4    making related to the Lago Agrio litigation or
5    decision making related to investments or what?
6    Do you remember what that relates to?
7       A.  I don't remember.
8       Q.  How about here where it says, "Investigation
9    plan"?  Is that something Mr. Donziger was telling
10   you about?
11      A.  Yes.  Those are not my words.
12      Q.  And what about this "super charge" -- what
13   does that say?
14      A.  "Super charge it."
15      Q.  What does that mean; do you know?
16      A.  Just boost it.
17      Q.  And it says, "What can they bring to the
18   table?"  Who's "they"?  Are "they" investors?  Who
19   are "they"?  Do you know?  Do you remember?
20      A.  I don't recall who I was referring to as
21   "they."
22      Q.  Do you think "super charge it" came from
23   you or Mr. Donziger?
24      A.  I usually don't say "super charge it."
25      Q.  So you think it probably came from him?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 137

1      It's a small thing.  I'm just trying to understand --

2          A.  Most likely.

3          Q.  And then here it says, "$100 million -

4      LOE"?  Is that what that says?

5          A.  That's what that says.  And I don't know

6      what that means.

7          Q.  And then "Canada - super charge,

8      Australia," was that a reference to potential

9      proceedings in Australia?

10         A.  Could be.

11         Q.  Do you understand there to be an active

12     proceeding in Australia related to the Ecuadorian

13     case?

14         A.  I'm not aware of one.

15         Q.  How about this "Legal relationship,

16     corporate law"?  Do you know what that refers to?

17         A.  No.

18         Q.  How about "Infrastructure, Canada"?  Is

19     that a reference to Chevron's infrastructure?

20         A.  I don't -- I don't recall.

21         Q.  And then it says also, "Kroll $15 million

22     30 reports."  Is that what that says?

23         A.  Yes.

24         Q.  Do you know what that refers to?

25         A.  That Kroll would have been paid 15 --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 138

1    approximately $15 million to produce 30 reports,
2    which I believe were on Steven.
3        Q.  And that was information he gave to you?
4    He told you that?
5        A.  Yes.
6        Q.  And I'm assuming that the payments there,
7    that are referred to there, that's money Chevron
8    purportedly paid to Kroll?
9        A.  That Kroll received.
10       Q.  Why do you think he told you that?
11            MR. LIBBY:  Objection, competency,
12   foundation.
13            Go ahead, if you know.
14   BY MS. CHAMPION:
15       Q.  Was this discussion just him giving you
16   background?  Do you remember what the purpose of
17   this discussion was?
18       A.  I don't remember what the purpose is.  It
19   was -- I would write notes because I have a habit of
20   writing notes, and especially with things that I am
21   learning about.
22       Q.  Yeah.  Agreed.  I do the same thing.  Now,
23   here at the top of the second page, do you remember
24   if this is a new conversation or do you think it's
25   related to the notes on page 1?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 139

1          A.   I think this is a new conversation.

2          Q.   And would it have been a conversation with

3     Mr. Donziger?

4          A.   It would have been on Sunday evening before

5     the Elliott meeting --

6          Q.   Oh, okay.

7          A.   -- at dinner.

8          Q.   And who was at that dinner?

9          A.   Steven and a family friend of his.

10    I believe her name is Sue.

11         Q.   Was she a lawyer?

12         A.   No.  She's a beer distributor.

13         Q.   So she was just at the meeting as a friend

14    of Mr. Donziger's?

15         A.   As a friend.  Yes, a friend.  Somehow

16    related to his family.  I don't know the source.

17         Q.   Got it.  So here it says, "$2-3 billion to

18    block paying $9-12 billion."

19              Now, is it your understanding that

20    "9-12" is a reference to the amount Chevron owes as

21    a result of the Ecuadorian judgment?  I think that's

22    a number you've used elsewhere.

23         A.   My understanding is that the judgment in

24    Ecuador was $9 billion and then there's interest and

25    whatnot that accumulates to about $12 billion in

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 140

1    current dollars.

2        Q.  And then what's the "$2-3 billion" a

3    reference to?

4        A.  That's how much Chevron has paid in

5    expenses to try to block the $9-12 billion.

6        Q.  And so would that information have come

7    from Mr. Donziger?

8        A.  Yes.

9        Q.  Now, moving down here, "Independence -

10   we need it.  The assets they have vs. Chevron."

11            Do you remember what that discussion was

12   about?  What's the "independence" part about?

13       A.  I don't recall.

14       Q.  And "The assets they have vs. Chevron," is

15   that a reference to the concept that the Lago Agrio

16   plaintiffs or the FDA don't have as much in assets

17   as Chevron does?  Do you remember -- what's the

18   comparison there?

19       A.  I don't know who "they" is.

20       Q.  And how about "Old world power vs. new

21   world power"?  Do you know what that means?

22       A.  No.  It's just said in conversation.

23       Q.  And how about this "Power plus capital"?

24   What's that about?

25       A.  That -- Since we were talking in preparation

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 141

```
 1    of the Elliott meeting, it would be that, you know,
 2    two forces of having power plus also having capital,
 3    you know, creates a better outcome.
 4        Q.  Would that have been something that you
 5    suggested or that Donziger suggested?
 6        A.  I can't say for certain.
 7        Q.  And "very few can stand up," what's that a
 8    reference to?
 9        A.  Very few people can stand up to the --
10    again, Chevron.
11        Q.  So then moving down, "Committed because
12    they did wrong," right?  Do you remember what that's
13    a reference to?
14        A.  Not specifically.
15        Q.  Is it about -- is the reference to doing
16    wrong that Chevron did wrong?
17        A.  If I read the next passage, I would assume
18    that is correct.
19        Q.  And "committed," that would be -- who's
20    committed?  Donziger's committed?  Who's committed?
21        A.  I don't recall.
22        Q.  And then moving on down, you said that
23    these notes under here informed what you meant
24    above.  Can you explain this passage to me.
25                Tell me if I get any of your handwriting
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 142

1    wrong.  "Why personal because the facts don't

2    support the case.  The only way they can win - It

3    becomes personal when they can't win."

4              Did I read that right?

5         A.  Correct.

6         Q.  Is it "when they can't win" or "where they

7    can't win," do you know?

8         A.  I think it's "when they can't win."

9         Q.  So can you explain that to me.  Who's

10   trying to make it personal?  What facts don't

11   support what case?

12        A.  My understanding of this is that you attack

13   people.  They make it personal when -- I don't

14   know -- the legal facts or some facts don't support

15   the actual case, then the only way that Chevron

16   could win would be to make it personal, which

17   is . . .

18        Q.  Understand.  And do you mean when the

19   Ecuadorian litigation, the RICO case, or something

20   else?  The enforcement actions?

21        A.  Just the whole thing.

22        Q.  The whole thing?

23        A.  Yes.

24        Q.  And how about here where it says "Kaplan,"

25   do you know who Kaplan is?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 143

1          A.   Judge Kaplan.

2          Q.   And who is Judge Kaplan?

3          A.   He is a federal judge in Southern District

4     of New York.

5          Q.   And what's your knowledge of him?

6          A.   He was the one who heard the RICO trial or

7     whatever it's called.

8          Q.   And where it says here, "He wants to make

9     his name," was that something that Mr. Donziger said

10    about Judge Kaplan?

11         A.   Those were not my own words.

12         Q.   So you think they were Mr. Donziger's words?

13         A.   Yes.

14         Q.   They would not have been Sue's words,

15    right?

16         A.   They would not have been Sue's words.

17         Q.   Do you know what he meant by that [as

18    read], Judge Kaplan wants to make his name?

19         A.   No.

20         Q.   And then on this next page, I love your

21    large "Humble."  Do you know what that -- why did

22    you write that down and why did you write it so big?

23         A.   Because to me, that's the most important

24    thing when you're going into a meeting with Elliott:

25    to be humble.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 144

1          Q.  So did you do that to remind yourself or to
2     remind Mr. Donziger or . . .
3          A.  Mr. Donziger.
4          Q.  Did you have concerns that he might not be
5     humble?
6          A.  Big egos need to be humbled.
7          Q.  And so you viewed him as having a big ego?
8          A.  Yeah, he has a big ego.
9          Q.  Yeah.  I mean, I think it's a fair
10    characterization, and it's not necessarily negative?
11         A.  Yeah.
12         Q.  Was this something you showed him before
13    the meeting or after the meeting or --
14         A.  That would have been Sunday night.
15         Q.  Oh.  You showed it to him Sunday night?
16         A.  Yes.
17         Q.  Then looking at page 152, do you remember
18    when these notes were taken?  Were these still
19    Sunday night, the Sunday night dinner?
20         A.  This would have been Sunday night.
21         Q.  And then it says here, "Power of capital
22    plus fear and intimidation."
23              Do you remember what that's a reference
24    to or who was talking or what they were talking
25    about?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 145

1      A.   I do not.   Just I think the general

2   conversation was just that when you have lack of or

3   when you have an incredible amount of capital, it

4   affects just general outcomes.

5      Q.   And then below that it says, "Rewarded.

6   Your name, your commitment, and the power of."

7              What's that all about?   Who's being

8   rewarded?   Whose commitment?   What's that a

9   reference to?

10     A.   I don't know.   It would have been in some

11  way conversation, again, in preparation of Elliott.

12  But it makes no sense when I'm looking at it right

13  now.

14     Q.   Was the general gist of this discussion on

15  Sunday night before the meeting like, What are we

16  going to talk about?   Or was it more, Let's fire

17  ourselves up?   Or both?   Like what was the general

18  gist of the discussion?

19     A.   My objective generally and always is to get

20  in the right mindset.   So that I would -- you know,

21  what -- that's all that, you know, I was bringing to

22  that conversation.

23     Q.   And what do you view as the right mindset?

24  I mean, you mentioned humility.

25     A.   Just going in and just kind of telling it

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 146

1      like it is with just being clear, concise, without

2      too much story line and just -- yeah.

3          Q.  So why do you think humility is important

4      when dealing with somebody like Elliott, or why was

5      it important for that particular meeting?

6          A.  I think humility is important every single

7      day.  You know, I would not say it was for that one

8      particular thing.  But you're more successful in

9      many cases in life if you bring humility with you.

10         Q.  And did you think that was important for

11     this meeting in particular?  I mean, obviously you

12     did.  You wrote it on here.

13         A.  That was giant letters, yes.

14         Q.  Why in dealing with Elliott in this

15     situation?

16         A.  Because you have one opportunity.  Just,

17     again, in a general term, you have one opportunity

18     to meet somebody, a first impression.  So that's,

19     I feel, very important regardless of who you are,

20     where you're going.

21         Q.  Did you feel like you needed to go in and

22     do a sales pitch?

23         A.  Absolutely not.

24         Q.  Did you feel like Mr. Donziger was trying

25     to make a sales pitch?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 147

1       A.   No.

2       Q.   Moving on to the next page, so it's 153, do

3   you know what this diagram is?  Is that any -- is

4   that like a reference to Chevron's asset structure

5   or corporate structure or do you --

6       A.   God, no.

7       Q.   Is it a doodle?  Do you know what it is?

8       A.   It's a doodle and it would be -- this is

9   how I view -- there was probably a reference to

10  complexity, and so I would just start -- this is how

11  I see the world that I work in.

12      Q.   What do you mean?  Just that things are

13  interconnected but there's kind of different --

14      A.   Everything's connected.

15      Q.   And there's like different like orbits or

16  something, kind of thing?

17      A.   Yeah.

18      Q.   I like it.  It reminds me of molecules

19  though.

20      A.   Like a mind map.

21      Q.   Okay.

22      A.   A really good program.

23      Q.   Oh, really?

24      A.   Um-hum.

25      Q.   So is this from the dinner meeting also?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 148

1       A.  Yes.

2       Q.  So I'm assuming the reference to assets is

3   about Chevron's assets, right, or is it about

4   Elliott's; do you know?

5       A.  I can't say.

6       Q.  And then how about below the graph that you

7   drew?  "Have to do the right thing.  Only defense is

8   personal attack."

9           I'm assuming that relates to the

10  concepts we were talking about?

11      A.  Yes.

12      Q.  So it's like the idea that Chevron was

13  going to personally attack who?  Mr. Donziger?

14      A.  Mr. Donziger, yes, personal.

15      Q.  "There has never been a more perfect

16  opportunity than now."

17          Do you know who said that?

18      A.  It could have been Sue or it could have

19  been Steven.

20      Q.  And do you know why now?  Why has there

21  never been a more perfect opportunity than now?

22      A.  I believe because of what was going on in

23  Canada.

24      Q.  You mean the chances that they would

25  succeed in the Canadian enforcement action?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 149

1       A.   Yes.

2       Q.   And so was the opportunity to settle or was

3   the opportunity to win in the Canadian enforcement

4   action?

5       A.   I don't know.

6       Q.   Was there talk about trying to get Chevron

7   to settle?

8       A.   No, not -- no.

9       Q.   And then, "The people who step up get the

10  reward," what do you think that means?

11      A.   I believe it's like a risk/reward comment.

12      Q.   Coming from Donziger, from you, or . . .

13      A.   Not from me.  But either Sue or Steven.

14      Q.   And what do you mean by, "The people who

15  step up get the reward"?  Is the reward a monetary

16  reward?  What's the reward?

17      A.   I don't know.  If it was an investment, it

18  would be monetary.

19      Q.   And then "Losers lose, winners win," do you

20  know who said that and what it was in reference to?

21      A.   No.  And it's -- it's true.  Losers lose

22  and winners win.

23      Q.   Yeah.  It's just sort of definitional.  But

24  I'm wondering like, does it mean like whoever wins

25  this is going to win it, or does it mean like -- I

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    don't know what it means.
2         A.  I don't either.
3         Q.  Losers in what sense; you don't remember?
4         A.  No.
5         Q.  So then the last page before we get to the
6    meeting, do you know what -- are these from the
7    dinner also; do you remember?
8         A.  This would have been the morning of.
9         Q.  And it says, "1:30 lunch meeting."  Did you
10   have a meeting at lunch?  Is that what these notes
11   are from?  I know you just said morning, but I just
12   noticed -- I was reading this as 7:30 but then I
13   realized it's probably --
14        A.  I think that's 1:30.  That's just a
15   scanning.
16        Q.  And so do you think these are notes from a
17   lunch meeting that you had before --
18        A.  No.  I think it might have been reference
19   to like, Do you want to meet before the meeting, at
20   lunch.
21        Q.  Okay.
22        A.  But I -- Yeah.
23        Q.  And what does that say?  "Catch," what does
24   it say below?  "Catch" what?
25        A.  "Catch war" doesn't make sense.  I don't

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 151

```
 1    know what it -- "Catch work."  "Catch" -- I don't
 2    know.
 3         Q.  Yeah, okay.  We don't know either.
 4         A.  Yeah.
 5         Q.  It looks like maybe you didn't finish the
 6    word.
 7         A.  That's possible.
 8         Q.  "Email inadvertently," is that what that
 9    says?
10         A.  Yes.
11         Q.  Do you know what that's about?
12         A.  The email that I sent out inadvertently.
13         Q.  The email where you were informing
14    everybody about the meeting?
15         A.  Yes.
16         Q.  Well, that wasn't really inadvertent, right?
17    I mean, you intended to send it, right?  So why are
18    you referencing it, saying "inadvertently" here?
19         A.  There would have been a conversation and
20    I -- the night before I said, Would you like me to
21    send an email to let the people who are on the trip
22    know, and it was affirmed that I should do that.
23    So I did that.
24         Q.  And so why "inadvertently"?  Did Donziger
25    get upset then that the email was sent, or why does
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 152

1    it say "inadvertently"?

2        A.  He was -- he was not thrilled that it was

3    sent.

4        Q.  Even though he had told you to send it?

5        A.  Correct.

6        Q.  And did he yell at you?  I mean --

7        A.  No.

8        Q.  It's not a --

9        A.  He never yells at me.

10       Q.  So what was the discussion about there with

11   the email?  Why were you discussing it?  He was

12   concerned -- I mean, it says below, "Happening can

13   get back to some lawyer.  They operate in high level

14   world."

15           Do you know what that's a reference to?

16       A.  Just I think the risk of what goes beyond

17   when the email's sent.

18       Q.  And who's "they"?  Is that Chevron who

19   operates in a high level world?

20       A.  I would assume, yes, that Chevron or the

21   attorneys.  And there's just a -- yeah, they operate

22   at a different level and a higher level.

23       Q.  Was there any discussion at that time about

24   any ongoing or potential future discovery obligation

25   that Mr. Donziger had relating to that email or --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 153

1      A.  No.

2      Q.  No?  Was there any discussion about it

3   potentially being relevant to any litigation past,

4   present, or future?

5      A.  No.

6      Q.  Who raised the email?  Did he raise it or

7   did you?

8      A.  Can you clarify "raise."

9      Q.  So I'm assuming this reflects a conversation

10   with Mr. Donziger.

11      A.  Yes.

12      Q.  Was it in person or on the phone?

13      A.  On the phone.

14      Q.  Did he talk -- Did he raise the email going

15   out, or did you raise it?  Were you apologizing

16   because you were concerned by all the traffic

17   following up saying, We have to delete this?

18   I mean, do you remember who raised it or why it came

19   up?

20      A.  Well, I thought it was okay to send it, so

21   he would have raised it because it wasn't okay to

22   receive it.

23      Q.  Why wasn't it okay to send the email?  I'm

24   confused by that.  The email just says, We're going

25   to meet with Elliott.  There's other emails that

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 154

1    that's already documented in.  So why is that

2    particular email problematic?

3         A.  I do not know.

4         Q.  And Mr. Donziger didn't try to explain that

5    to you?

6         A.  No.  Dealing with lawyers, there's -- No,

7    he didn't.  Just I know that in general, lawyers

8    are -- are very kind protective of things that go

9    out.

10        Q.  Agreed.  So was the concern that it had

11   gone to so many people?  Was that the nature of the

12   concern?

13        A.  I believe so.  And that it could just --

14   you know, you lose control of communication, just in

15   general, and there's people that were on there that

16   he, in hindsight, wouldn't have -- probably -- don't

17   need to know, so why are they on there.

18        Q.  Got it.

19        A.  That would be my assumption.

20        Q.  Did he say anything else about why he was

21   unhappy that the email had gone out?

22        A.  No.

23        Q.  And then below that it says -- Can you read

24   what you think that says below that, below "They

25   operate in a high level world."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 155

1       A.  "Unless strategically, no corrective
2   email."
3       Q.  So what does that refer to?
4       A.  Well, I was probably like, Oh.  Do you want
5   me to do something to fix it?
6       Q.  Got it.
7       A.  And that would have been "no corrective
8   email."  So I did nothing.
9       Q.  And then it says, "Cultivated ambiguity -
10   90 percent."
11           Do you know what that means?
12       A.  No.
13       Q.  Do you know who would have said it?  You?
14   Mr. Donziger?
15       A.  I would not have said it.  I do not like
16   ambiguity.
17       Q.  And the "90 percent," do you know what that
18   means?
19       A.  No.
20       Q.  And "Nobody understand how much" --
21       A.  "Time."
22       Q.  -- "time."  Do you know, what is that a
23   reference to?
24       A.  I'm not sure.
25       Q.  And "Keep it close to the chest, a lot of

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 156

1    enemies, protect their confidentiality at all

2    times."

3              Do you recall why you wrote those things

4    down.

5                   (Video operator interruption.)

6              THE WITNESS:  Can you repeat that

7    question, please.

8    BY MS. CHAMPION:

9        Q.  No problem.  Do you know why you would have

10   written that stuff down, "Keep it close to the

11   chest, a lot of enemies, protect their

12   confidentiality at all times"?

13       A.  Because that would have been said.

14       Q.  By who?

15       A.  Steven.

16       Q.  About what?  Like keep what close to the

17   chest?  Who are the enemies?  Whose confidentiality?

18   Do you remember the specifics of any of this?

19       A.  No.  I mean, I don't operate in that world,

20   so it would have been -- if I'm looking at this, it

21   was probably a little bit of a, Hey, by the way --

22       Q.  Got it.

23       A.  -- giving you some guidance on how this --

24   this world operates.

25       Q.  And when it says, "A lot of enemies," who

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 157

1    has enemies?  Donziger?  The Ecuadorian plaintiffs?

2    Who?

3        A.  I'm not certain.

4        Q.  Anything else you want to discuss about

5    that conversation?  Anything else you remember was

6    discussed?

7        A.  No.

8            MS. CHAMPION:  Just take one short

9    break, and then we'll do the other set of notes and

10   do some stuff on payments.

11           MR. LIBBY:  Do some stuff on?

12           MS. CHAMPION:  Payment.

13           MR. LIBBY:  Oh, payment.

14           THE VIDEO OPERATOR:  The time is 1:38.

15   We're off the record.

16               (Recess at 1:39 p.m.,

17                resumed at 1:53 p.m.)

18           THE VIDEO OPERATOR:  This is the

19   beginning of Media No. 4.  We're back on the record.

20   The time is 1:52.

21           MS. CHAMPION:  So I want to go over the

22   other set of notes we have related to the Elliott

23   meeting.  So let's mark those as Exhibit 12.  I

24   think there's a little bit less here to go over.

25   And that is MKS-0000370 to 374.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1              (Sullivan Exhibit 12 was marked

2                 for identification.)

3           MR. LIBBY:  This is 12?

4           MS. CHAMPION:  Yes.  Exhibit 12.

5     BY MS. CHAMPION:

6       Q.  So tell me about these notes.  Do you

7     remember when these were taken, what they relate to?

8       A.  I don't recall when they were taken.  They

9     were taken probably about 10 days prior to the

10    Elliott meeting.

11      Q.  Okay.

12      A.  Like the week -- Yeah.

13      Q.  And so you think that -- I mean, some of it

14    looks to me like it was prep for the Elliott

15    meeting?

16      A.  It was -- Yes.  So page 1 was just where I

17    was going to send Mr. Singer's presents.  Page 2 was

18    my kind of draft of what I was going to say to

19    someone like Paul Singer.

20      Q.  Um-hum.

21      A.  And doing a little research on him and what

22    kind of keywords.  Like "accountability" seemed to

23    come up in some things I read about him.  That's

24    kind of it --

25      Q.  And so --

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 159

1          A.   -- on those first two.

2          Q.   So do you remember if your note to

3    Mr. Singer looked more or less like what you wrote

4    here at the top of page 371?

5          A.   I didn't say why I wanted to meet him.

6    There was no -- there was no mention of Ecuadorian

7    anything.

8          Q.   Oh, okay.  So you basically just said --

9          A.   I sent a blind, handwritten note, hoping

10   that he would take a meeting with me.

11         Q.   Okay.

12         A.   Because it was so weird, he had to take a

13   meeting with me.

14         Q.   And then do you remember the references

15   here, "Andrew and Gordon"?  Do you know who that is?

16   Does it say "Gordon"?  I actually can't read that

17   word.

18         A.   Yes.  It looks like "Andrew and" -- I don't

19   think that's "Gordon," but I don't know what that's

20   reference to.

21         Q.   And how about at the top where it says

22   "money map"?  Do you know what that's all about?

23         A.   No.  I like maps, like, of where things

24   flow.  So it could have been some reference to

25   knowing where dollars go.  That informs a lot.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 160

1      Q.  And then looking further down that page,
2   "Odeon - not too" -- what does that say?
3      A.  "Not too inconvenient, or recommend a place
4   closer."
5      Q.  Is that a restaurant you're referring to in
6   New York, The Odeon?
7      A.  I think so.  It could have been.  Yeah.
8      Q.  Was that like you were thinking about
9   places you could have a meeting?
10     A.  No.  I don't -- that has nothing to do
11  with . . .
12     Q.  Because that's downtown, isn't it: Odeon?
13     A.  I don't -- I don't --
14     Q.  Oh, yeah.
15     A.  I don't think this is related to my notes
16  to Elliott.
17     Q.  Oh, okay.  So "Google, near New York
18  financial district," you don't think that's related
19  to Elliott?
20     A.  No.
21     Q.  And how about the stuff under that,
22  "Downtown village south"?
23     A.  No.  I think this was a completely
24  unrelated -- I wasn't visualizing a meeting with
25  him.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 161

1      Q.  Got it.  Well, and also from what I
2   remember in the documents, Elliott's at 57th Street,
3   right?
4      A.  Yeah.
5      Q.  Which is nowhere near that.
6      A.  No.  So this is just random notes that I
7   didn't --
8      Q.  So then on the top of page 372, it says
9   "RICO decision, cancelled . . . meeting," do you
10  know what that refers to?
11     A.  "RICO decision cancelled the" --
12     Q.  Oh, "the"?
13     A.  -- "better meeting," it looks like?
14     Q.  Do you know what that refers to?
15     A.  "Cancelled the better meeting"?  No.  There
16  was no other meeting to be cancelled.
17     Q.  So you don't remember what that refers to?
18     A.  No.
19     Q.  Do you know what these notes are?  Do these
20  relate to your research of Mr. Cohn or . . .
21     A.  Yes.
22     Q.  Any recollection, "EMC, Juniper
23  Networks" -- or Juniper Networks, I'm not sure if
24  that says Juniper Networks.
25     A.  "Juniper Networks."  These are all

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 162

1    investments that Elliott had made into public

2    companies.

3        Q.  Got it, okay.  So these are just notes on

4    those deals?

5        A.  Yes.  And just that -- who is he, what is

6    he like, just --

7        Q.  Then on the left-hand side of the page, it

8    has some notes here.  Can you read that to me, what

9    that says.  Does it say "defamation campaign"?  The

10   ones that are kind of at a slant.

11       A.  Yes, it looks like it's the beginning of

12   "defamation" without the -o-n.

13       Q.  And then can you see what that says?  It's

14   a little hard to read.

15       A.  It says "Lupita."  Then it says "Pablo

16   Fajardo."  And then it says, "Working on it.

17   Embedded authenticity" -- um --

18       Q.  "Authority"?

19       A.  "Authority.  Constant battles.  He who

20   controls the money."

21       Q.  Do you know what that's a reference to?

22       A.  No.

23       Q.  Do you know who Pablo Fajardo is?

24       A.  I know that he is an Ecuadorian attorney.

25       Q.  Do you know what his role is in the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 163

1    Ecuadorian litigation or any other proceedings,

2    if any?

3         A.   No.  Historically that it was -- he was,

4    I think, one of the lead attorneys.

5         Q.   And do you know if he still has that role?

6         A.   I'm not certain.

7         Q.   And how about -- do you know what it means

8    "Working on it" or "Embedded authority"?  Do you

9    know what that reference is?

10        A.   No.

11        Q.   Do you know why you took these notes?  Were

12   you talking to Lupita or somebody else?

13        A.   No.  I wasn't talking to Lupita.

14        Q.   Were you talking to Steven Donziger?

15        A.   Yes.  I think this is probably in reference

16   to the post, I sent the email out and in hindsight

17   shouldn't have.

18        Q.   Oh, okay.

19        A.   And it was just -- when someone just talks

20   and talks, I just actively listen by writing stuff

21   down.

22        Q.   Understood.  And so "He who controls the

23   money," is that a reference to Fajardo controlling

24   the money or Donziger controlling the money?  Who

25   controls the money?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 164

1      A.  I think it's just whomever controls the
2   money.
3      Q.  So is the battle referred to here over who
4   controls the money?  Is it a battle over who
5   controls the money?
6      A.  I'm not sure.
7      Q.  Was the concern that if your email got out
8   or the news of the Elliott meeting got out, that
9   that would spark some kind of a dispute between
10  Fajardo and Donziger or someone else?
11     A.  I'm not certain.
12     Q.  Do you remember what it means about the
13  constant battles?  Who are the battles between and
14  among and what are they about that are referred to
15  here; do you know?
16     A.  To me, it was all battles all over.
17     Q.  So do you think the battles here are
18  battles with Chevron or battles with Fajardo
19  or . . .
20     A.  I can't say with certainty.
21     Q.  Why are there references -- Do you know why
22  there are references to Lupita and Cristina Muñoz in
23  these notes?  There's -- "Lupita" appears at the top
24  of the page over here on the left and also at the
25  bottom?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 165

1      A.  Yeah, I think -- I believe that these two
2   have nothing to do with any -- they wouldn't need to
3   know that there was a meeting at Elliott and
4   wouldn't really -- there was no need for them to
5   know that.
6      Q.  Was there a concern that they would give
7   that information to Pablo Fajardo?
8      A.  I'm not certain.
9      Q.  And it says, "Working with Steven, talk to
10  you in particular."
11          Do you know what that's about at the
12  bottom there under "Lupita/Cristina Munoz"?
13     A.  I think that was, you know, a suggestion
14  like, like do you want me to call Lupita or
15  Cristina?  Do you want me to contact them directly?
16  Like what do you want me to do?  If so, what could
17  I -- how would I frame it?
18     Q.  And did you end up contacting either of
19  them?
20     A.  Lupita, just by email.
21     Q.  And what was that email about?
22     A.  I just -- I don't recall specifically.
23  I think it was, you know, Could you give me a call,
24  just so I could tell her, Sorry I sent that email.
25  Please disregard it.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 166

1     Q.  Did you end up talking to her?

2     A.  No.

3     Q.  Do you know if Donziger did?

4     A.  I'm not certain.

5     Q.  Did you talk to Cristina Munoz?

6     A.  No.

7     Q.  Did you send her an email?

8     A.  No.

9     Q.  Looking at the next page here, 373, again,

10    this just looks like notes on research regarding

11    Jesse Cohn; is that right?

12    A.  Correct.

13    Q.  And just looking down here, you say "Value

14    created for people, planet, and profits."

15         Do you recall what that's a reference

16    to?  Is that something you read about him or

17    something you thought might appeal to him; do you

18    remember?

19    A.  I think something that would appeal.  Kind

20    of having that -- you know, "impact investing" is

21    such a buzzword these days.

22    Q.  Um-hum.  And then how about at the bottom

23    there where it says, "Capital needed to collect,"

24    what do you understand that to refer to?

25    A.  That capital money was needed in order to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 167

1    attempt to successfully collect.  Capital, just

2    funding.

3          Q.  Understood.  Okay.  To collect on the

4    Ecuadorian judgment?

5          A.  Correct.

6          Q.  And then on page 374, that at the top has

7    the November 6, 2017 date.  Do you know if these

8    notes were taken during the meeting?

9          A.  No.  This would have been my walking into a

10   blind meeting, how might I -- you know, how might it

11   be structured or . . .

12         Q.  How you would introduce yourself?

13         A.  Yes.

14         Q.  So did you end up delivering an introduction

15   like this or any other introduction?

16         A.  I didn't have my notes out to do that.

17   I just -- I did deliver an introduction of just,

18   You know Jonathan Bush.  I know Jonathan Bush.  He

19   connected us.  You know, I learned about this case

20   when I went to travel to Ecuador, and I thought it

21   would be an interesting opportunity for you two to

22   discuss.

23         Q.  Okay.

24         A.  That's it.

25         Q.  At the bottom there it says, "Negative

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 168

1    impact for you?  Risks, due diligence."

2              Can you tell me what that refers to?

3    What would be the negative impact for them?

4        A.  I'm not certain.  That would have been

5    probably just a random question that I would have

6    thought to inquire, although I did not see myself

7    participating in this meeting.

8        Q.  All right.  I don't have any other questions

9    on those notes.

10             Well, let's go into some issues

11   regarding compensation or other payments to

12   Mr. Donziger.  Do you have any agreements with

13   Mr. Donziger?

14       A.  No.

15       Q.  Do you have any agreements related to your

16   work on this case?

17       A.  No.

18       Q.  Do you know Josh Rizack?

19       A.  Yes.

20       Q.  So the records in particular, I don't know

21   if you're familiar with, your attorneys made two

22   productions.  The first one was mostly emails --

23       A.  Yes.

24       Q.  -- the second was a bunch of financial

25   records.  You're generally aware of that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 169

1     A.  Yes.

2     Q.  So those financial records, where did you

3   obtain them?  And if it's from multiple places,

4   that's fine.  The reason I'm asking is because I'm

5   guessing that you obtained at least some of them

6   from Mr. Rizack; is that right?

7     A.  I did.

8     Q.  Because we have been discussing with him

9   also, and he did tell us that he had provided you

10   with documents.

11     A.  Yes.  I went to his office somewhere in

12   Connecticut and got two boxes of stuff.

13     Q.  Two boxes of stuff, okay.  And so your

14   attorneys looked over that stuff, and they decided

15   what was responsive, and that's what was produced?

16     A.  Correct.

17     Q.  So it's not everything you got from him,

18   correct, what we received?

19     A.  Correct.

20     Q.  And then in terms of the more recent stuff,

21   so -- again, I'm just speaking in general terms, and

22   I'm not trying to trap you or anything like that.

23        But there was a lot of stuff that was

24   quite old that predates your knowledge of this case,

25   right?  So I'm assuming anything that old you got

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 170

```
 1    from Mr. Rizack; is that right?
 2         A.  100 percent.
 3         Q.  Did Mr. Donziger provide you with any older
 4    records --
 5         A.  No.
 6         Q.  -- that you recall?
 7              And then how about the new -- what would
 8    be stuff that maybe you got directly, some of the
 9    newer stuff from 2018, 2017 maybe?
10         A.  2018.
11         Q.  And what was -- how did you obtain those
12    documents?  Mr. Donziger gave them to you?  It looks
13    like there's some invoices from various sources,
14    like Mr. Page's firm, Forum Nobis.  And then there's
15    also invoices from Mr. Donziger's firm.
16              Were those sent directly to you?  How
17    did you obtain them?
18         A.  They would have come from Steven.
19         Q.  So were you compensated for your work?
20         A.  Nope.
21         Q.  So you were doing this because -- tell me
22    why you were doing it.
23         A.  Great question.  I was doing it because I
24    created professional space in my days with my
25    business and took a risk with my time to learn
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 171

1    something that was interesting that a lot of people

2    that I respect were supporters of.  And I embarked

3    to just learn more.  It was like an adult education.

4         Q.  Got it, okay.  So everything you did was

5    pro bono basically?  What we would call pro bono?

6         A.  100 percent.

7         Q.  And so we talked -- Let me just close out

8    Elliott.  Did you do any follow-up after the meeting?

9         A.  Just by email.

10        Q.  And it was the email where you said -- I've

11   seen the emails.  We don't need to go over them.

12        A.  Just to -- I think it was maybe a month and

13   a half later.  I didn't hear from them.  And then I

14   just out of -- oh, yeah, I don't know, let's -- I'll

15   email them.

16        Q.  And when you followed up with Mr. Grinberg,

17   after he said Elliott isn't going to go forward with

18   this matter, and you asked Mr. Grinberg for -- to

19   have a chat?

20        A.  Um-hum.

21        Q.  Did you ever end up chatting with him?

22        A.  No.  I thought about calling him, but I was

23   respecting his no answer.

24        Q.  And do you know if Donziger talked to him?

25        A.  Not aware.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 172

1      Q.  Or how about Mr. Cohn?

2      A.  I did not talk to Mr. Cohn.

3      Q.  I think you suggested the call with

4    Mr. Grinberg.  That's why I'm asking if you talked

5    to Mr. Cohn also?

6      A.  No.  No, no.

7      Q.  And so was there any other follow-up?

8    Did you send them any documents?  Did Mr. Donziger,

9    to your knowledge, send them any documents?

10     A.  No.

11     Q.  He referred to a packet of information in

12   an email.  Does that -- does that -- do you recall

13   that?

14     A.  Yes.  I think there was some due diligence

15   pack.  I don't know what it is or have never seen it.

16     Q.  Do you know whether Mr. Donziger sent that

17   to them or had anyone send it to them?

18     A.  I'm not aware he did.

19     Q.  And you've never seen it?

20     A.  No.

21     Q.  You didn't help put it together?

22     A.  No.

23     Q.  Do you know whether they ever signed the

24   NDA that was provided to them?

25     A.  I don't believe that they did.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 173

1      Q.   You said you did all your work for free.

2   Did you have any agreement to any future payment,

3   for example, if they successfully enforced the

4   judgment?

5      A.   No.   There was conversation about that

6   possibility, but I was not in a position to explore

7   that because I was still trying to determine the

8   understanding -- general understanding of it, and

9   if, in fact, I even wanted to be involved in it.

10     Q.   Understood.   So why did you end up obtaining

11  those records from Mr. Rizack?   What was the purpose

12  of providing you with those records?   Were you

13  intending to take over something of his role, or

14  what I understand to have been his role?

15     A.   Well, I viewed it as an organization.

16  Everything that I could understand was completely

17  disorganized.   And I was attempting to -- I thought

18  there would maybe be something useful and interesting

19  in those materials, but it was all old and --

20  historically.

21          Like I like to see how money flows.

22  Money flowing tells me a story.   And so if I had the

23  benefit of seeing some historical information, it

24  would give me a better perspective of what I was

25  even looking at.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 174

1      Q.  And what do you mean by that?  Like in
2  terms of understanding what the funding needs were
3  for the case or where the money was going, what
4  money would need to be raised or what was the
5  purpose of kind of wanting to understand that?
6      A.  Well, one, I thought it was interesting.
7  Two, it needed to be done.  There needed to be some
8  sort of order.  And, you know, if there's money
9  moving around, there's got to be good controls
10  around it just in general.  Just a general kind of
11  business principles.
12      Q.  Did you feel there was good controls over
13  the money related to the case?
14      A.  I was getting the feeling that there were
15  not great controls.
16      Q.  So let's just get more specific as to money
17  provided to Mr. Donziger.  So the records that you
18  produced do show, you know, quite a few payments to
19  Mr. Donziger.  They show payments from Lenczner.  We
20  talked about him earlier, from Lenczner Slaght Royce
21  Smith.
22          That's the law firm where Mr. Lenczner
23  works, right?
24      A.  Um-hum.
25      Q.  So there were a lot of payments -- monies

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 175

1    that came to Mr. Donziger from Lenczner according to

2    the records that you provided.

3                Do you recall that?

4        A.   Those would have come from Josh.

5        Q.   From --

6        A.   Josh Rizack's files.

7        Q.   You mean the records that show those

8    payments?

9        A.   Yes.

10       Q.   And did you analyze those records at all?

11       A.   I did not analyze them.

12       Q.   So you didn't do any analysis of monies

13   that Mr. Donziger had received or anything like

14   that?

15       A.   No.  There was a hope that that could be a

16   project.  But it was such a mess, I didn't even

17   attempt.

18       Q.   When did you get those records; do you

19   remember?

20       A.   I think it was sometime like the third week

21   of January of 2018.

22       Q.   So pretty recently?

23       A.   Yes.

24       Q.   So what did you do with the records,

25   if anything?  Did you dump any of the numbers into a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 176

1    spreadsheet?  Did you try to do any analysis --

2        A.  No.  I put them in my home office above our

3    garage.

4        Q.  And you never took them out of the box?

5        A.  I thumbed through them just to get

6    familiar.  One of them I don't think I even did

7    because it was all old and not relevant.

8        Q.  Understood.  So let's talk about some of

9    the more recent records.  So you testified earlier

10   about three payments you were aware of being made to

11   Mr. Donziger?

12       A.  Correct.

13       Q.  $25,000, $25,000, and $75,000, right?

14       A.  Correct.

15       Q.  All in the first few months of 2018, right?

16       A.  Yes.

17       Q.  Let's talk about those payments.

18           Can you get the records out related to

19   those.

20           What was the purpose of those payments?

21       A.  $25,000 would be a monthly retainer payment.

22   And then the $75,000 payment was $25,000 retainer

23   payment and $50,000 reimbursement for unpaid

24   retainers, prior -- prior unpaid retainers or

25   reimbursement for expenses.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 177

```
1        Q.  Now, I asked you this previously, but I'm
2   just asking again for the sake of clarity for
3   follow-up questions.
4               I think you testified earlier that you
5   were not aware of any agreement pursuant to which he
6   received a $25,000 monthly retainer --
7        A.  Correct.
8        Q.  -- is that right?
9               So were you responsible for approving
10  the invoices?
11       A.  No.
12       Q.  No.  Who was responsible for that?
13       A.  He was.
14       Q.  And did you show those invoices to anyone
15  else?  Do you know whether he did?
16       A.  No.  I did not and I am not certain if he
17  did.
18       Q.  And so in terms of -- you testified also
19  that the money came out of CWP Associates?
20       A.  Yes.
21       Q.  And you testified that that entity is under
22  the Streamline Family umbrella?
23       A.  Yes.
24       Q.  Is it a domestic entity?  Is it
25  incorporated?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 178

1      A.   It's a doing-business-as.

2      Q.   So it's not separately incorporated --

3      A.   No.

4      Q.   -- or LLC'd or anything like that?

5      A.   No.

6      Q.   And what was the purpose of having the

7   money go through there?

8      A.   Better recordkeeping.

9      Q.   And that was something that -- when was it

10  created or when did you start using it?

11     A.   It was created at the end of December,

12  like -- and I -- yeah, the end of December it was

13  opened.

14     Q.   Were any other monies paid to Mr. Donziger

15  from CWP Associates?

16     A.   No.

17     Q.   How about to Laura Miller, his wife?

18     A.   No.

19     Q.   Were any other monies from there used to

20  pay any of his expenses?

21     A.   There was a -- I think there was one month

22  of a -- he had an American Express card that was

23  segregated from my account because he was not good

24  at keeping track of anything financially that I

25  could recognize.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 179

1          So I said, Why don't you use this card

2     for your expenses, and then it will be very clear

3     what it's for, you know, this purpose -- whatever

4     work you're doing on this.

5          Q.  I see.  So you told him to use a separate

6     card for his case-related expenses?

7          A.  Yes.  So I wouldn't get 1,000 receipts

8     of -- or never get them.

9          Q.  Got it, okay.

10         A.  It was a better bookkeeping -- the decision

11    was a cleaner bookkeeping.

12         Q.  And when would you have given him that card?

13         A.  Maybe February, sometime in February.

14         Q.  Of 2018?

15         A.  Um-hum.

16         Q.  And has he been using it, to your knowledge?

17         A.  He did use it and he's no longer -- he no

18    longer has it -- Well, he might have it, but he can

19    no longer use it.

20         Q.  And when did he stop using it?

21         A.  The day I received a packet of information.

22         Q.  Was it the day you received the preservation

23    order that the judge issued in the Southern District

24    of New York, or is it some other information?

25         A.  I don't recall specifically.  But it was

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 180

1    sometime in mid March when I said [nonverbal sound].

2        Q.  Is it when you received legal papers from

3    Gibson Dunn related to the legal case or -- I'm not

4    trying to confuse you.  I just --

5        A.  When I received the subpoena by email from,

6    I believe, Alejandro, I was like, Yeah.  And it

7    wasn't that day.  But that started the process of

8    like, No.

9        Q.  So are you continuing to manage funds

10   through this CWP Associates entity?

11       A.  No.

12       Q.  And so I don't actually understand the

13   concept of a doing-business-as entity or how that's

14   an entity.  So it's not legally constituted?  You

15   just sort of . . .

16       A.  You can pay $30 and go to the Town Hall and

17   have a registration -- you know, there's a

18   certificate form, a one-page that you fill out.

19       Q.  Yes.

20       A.  And they stamp it and then you're able to

21   do -- it's like a sole proprietor.  So when I

22   started my business, I went in as Streamline Private

23   Wealth as a sole proprietor.

24       Q.  Got it.

25       A.  Which is just a person doing a business as.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 181

1    And in this case it was -- you know, Streamline is

2    an S-corp.  And so CWP Associates was a d/b/a of

3    Streamline, the S-corp.

4        Q.  And what does "CWP" stand for?

5        A.  "Chevron will pay."

6        Q.  Very clever.  So does this entity still

7    exist?

8        A.  No.

9        Q.  To the extent it is an entity at all?

10       A.  No.

11       Q.  It doesn't.  So did you actually go in and

12   say --

13       A.  No.  But I will -- I did not go into the

14   Town Hall, but I will.  The bank account -- the only

15   purpose for it was to open up a bank account.  And

16   that has been closed.

17       Q.  It probably is in these records -- oh, it's

18   Bank of America, right?

19       A.  Yes.

20       Q.  And now it's closed.  And what did you do

21   with the money that's in there?

22               MR. LIBBY:  Um --

23   BY MS. CHAMPION:

24       Q.  Did it go to Mr. Donziger?  Maybe I can ask

25   it that way.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 182

1      A.  It did not.

2      Q.  Did it go to his wife?

3      A.  It did not.

4      Q.  So you talked about some loans that you

5   thought Mr. Donziger had received.  And you talked

6   about these three payments.  Are you familiar with

7   any other monies that he received either as loans or

8   that were borrowing against his interest or as

9   retainer payments?

10     A.  No.

11     Q.  And are you aware of any other assets that

12  he received over the time that you've been involved?

13     A.  No.

14     Q.  So let's talk about --

15          Do we have the records?  I want the

16  invoices.  These ones?

17          Who is John van Merkensteijn?

18     A.  John is a supporter of Pachamama Alliance.

19  And he hosts a lot of events at his place in New

20  York.

21     Q.  Did you update him after the Elliott

22  meeting?

23     A.  He -- I believe I did.  Or we -- I saw

24  him -- I saw him that weekend because our kids -- my

25  whole family went to where he lives.  And there's a

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 183

1    giant gym in the basement, so they play basketball.
2    And so I believe he became aware of it then.
3        Q.  And what's the relationship between
4    Pachamama Alliance and the Ecuadorian litigation, if
5    you know?
6        A.  What I know is that Pachamama Alliance is a
7    nonprofit organization to help preserve the rain
8    forest.  And they are in Quito -- there's a lot of,
9    I think, commonality of people that they deal with.
10       Q.  And do you know whether he knows
11   Mr. Donziger?
12       A.  Who?
13       Q.  Does Mr. Merkensteijn know Mr. Donziger?
14       A.  van Merkensteijn?
15       Q.  Yes.
16       A.  Yes.
17       Q.  Are you aware of anyone giving Mr. Donziger
18   money?
19       A.  I am not.
20            MS. CHAMPION:  Let's go over some of
21   these invoices that you have, the more recent ones
22   from Mr. Donziger.
23            (Discussion off the record.)
24   BY MS. CHAMPION:
25       Q.  Are you aware of a loan made to Mr. Donziger

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 184

1    by a Mr. Waters, Mr. George Waters in 2016, January

2    2016?

3         A.  Is that Roger Waters, some singer?

4         Q.  I'm assuming it is.  It's George R. Waters.

5    It's in some of the documents that you probably got

6    from Mr. Rizack.

7         A.  Yes.

8         Q.  So it may be something you're not familiar

9    with, but I just wondered if you had any knowledge

10   of it?

11        A.  No.

12        Q.  And you don't have any knowledge of any of

13   the transfers from Lenczner's firm to Mr. Donziger

14   or why those were made?

15        A.  None.

16        Q.  And how about payments made to Mr. Page, to

17   Forum Nobis, his firm?  Who approved those payments,

18   to your knowledge?

19        A.  Steven would have.

20        Q.  Steven would have.  Okay.  And would those

21   have been made also from the CWP Associates account?

22        A.  Yes.

23        Q.  Was anybody else paid money out of that

24   account?

25        A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 185

1      Q.  Who?
2      A.  I'm trying to think.  That's a lot to ask
3    for me to remember.
4      Q.  Just to your recollection.
5      A.  There was --
6      Q.  I see maybe some charges to a printer.
7    Does that ring a bell, EPES, Wilson-EPES Printing?
8      A.  That sounds familiar.  It was like a
9    printing for legal documents kind of thing?
10     Q.  Yes.
11     A.  That sounds familiar.
12     Q.  Anything else that you recall?
13     A.  There was some, you know, payments to -- I
14   believe there was payments to -- one payment to the
15   FDA, payments to individuals helping in Ecuador,
16   you know, very small payments.
17     Q.  Do you know --
18     A.  There were lawyer, Canadian lawyer payments.
19     Q.  And were those paid pursuant to invoices
20   that you recall?
21     A.  Everything was paid with a -- pursuant to
22   invoices.
23     Q.  And did Mr. Donziger approve all those
24   invoices?
25     A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 186

1             MS. CHAMPION:  Well, let's go over some
2    of these records.  So I have here --
3             MR. LIBBY:  Hold on, Anne.  We're
4    talking about Donziger's assets, liabilities, and
5    financial situation?
6             MS. CHAMPION:  Yes.  But I'm just trying
7    to understand that he -- I think that, you know, you
8    could make an argument that he benefitted from some
9    of these payments.  So I'm trying to understand who
10   was paid.
11            For example, there were invoices in here
12   related to redesign of his website.  You know,
13   I think you could argue that's not really a case
14   expense.  Do you charge your clients for redesigning
15   your website?
16            MR. LIBBY:  I don't want to stop
17   progress here, but I'm having difficulty reconciling
18   the line of questioning with (b).  It's a Donziger
19   thing.
20            MS. CHAMPION:  Right.  I'm just trying
21   to understand who was paid, and then to the extent I
22   think that it would arguably be something that's
23   actually benefitting him, then I would follow up.
24   But I'm just trying to establish --
25            MR. LIBBY:  Oh, I know you're trying to

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 187

1    establish a baseline.  Maybe we can go backwards and

2    ask if any of that was a benefit to him, and then

3    follow that up.

4                 MS. CHAMPION:  But I think that's a

5    legal conclusion, right?

6                 MR. LIBBY:  It could be.  I honestly

7    don't want to -- I don't want to stop progress, but

8    then again, I don't want to get mushy on the scope

9    of (b).

10                MS. CHAMPION:  Yes.  I understand.

11                MR. LIBBY:  So you're saying that if

12   somehow some third party got paid, but actually it

13   was a benefit to him, is it an asset?  I don't get

14   it.  Is it not a liability?  Is it --

15                MS. CHAMPION:  Well, it's proceeds that

16   he received, right?

17                MR. LIBBY:  Oh, well if, in fact, they

18   were proceeds that he, Donziger, received --

19                MS. CHAMPION:  I don't mean proceeds of

20   the judgment --

21                MR. LIBBY:  Oh, no.  Proceeds generally.

22                MS. CHAMPION:  Yes.

23                MR. LIBBY:  So if that's the baseline

24   question, okay.  I thought you were talking about

25   monies spent -- I mean, paid out to third parties.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 188

1              MS. CHAMPION:  The reason I want to know

2     the third parties is to know whether or not there's

3     an argument.  For example, if his wife received

4     money --

5              MR. LIBBY:  All right.  That's clear.

6     I get that.  Okay.

7              MS. CHAMPION:  That's all.

8              MR. LIBBY:  Anybody else?

9              MS. CHAMPION:  Well, I don't know.

10    That's why I'm asking her.

11             MR. LIBBY:  You're going to move right

12    through this, right?

13             MS. CHAMPION:  I don't think that's out

14    of line.  And I'm almost done.

15             MR. LIBBY:  Well, it's kind of

16    attenuated, but I'm going to let you go and do it in

17    the interest of time and get moving.

18                  (Discussion off the record.)

19             MR. LIBBY:  And I take it we're on the

20    short strokes here?  We're getting close to the

21    finish line?

22             MS. CHAMPION:  Yes.  We are.

23             So I'm going to hand you what I will

24    mark as Exhibit 20.

25                  (Discussion off the record.)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 189

1              MS. CHAMPION:  Exhibit 13.  Sorry about

2     that.  This is MKS-0000396.

3                        (Sullivan Exhibit 13 was marked

4                        for identification.)

5     BY MS. CHAMPION:

6         Q.  So it's clear enough what this is, right?

7     An invoice from Donziger's firm?

8         A.  Yes.

9         Q.  And did this have any backup with it, any

10    receipts or anything?

11        A.  No.

12        Q.  And you testified that the $75,000 payment

13    was a combination of retainer and expenses, right?

14        A.  Correct.

15        Q.  Was backup provided for the expenses?

16        A.  No.

17        Q.  And because you were not responsible for

18    approving the payment?

19        A.  Correct.

20        Q.  So you didn't need to see the backup, right?

21        A.  I did not.

22        Q.  And you did not request it?

23        A.  I did not.

24        Q.  Did he represent to you that there was

25    backup?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 190

1      A.  Well, I think there was the -- a lot of
2  expenses and a lot of things that he has paid
3  personally.  I don't know what those are.  But he
4  did reference that he did.
5      Q.  But you didn't view that as your role to
6  check that?
7      A.  No.
8      Q.  Or your role to ensure that he was, in fact,
9  entitled to the retainer that he said he was?  You
10 didn't view that as your role?
11     A.  No.
12          MS. CHAMPION:  So I'm going to introduce
13 as 14, Exhibit 14, a document --
14 BY MS. CHAMPION:
15     Q.  So I'm sorry.  Let's go back to 13.  Was
16 this invoice paid?
17     A.  This would have been paid, the $25,000
18 payment, in January.
19          MS. CHAMPION:  And then I'm going to
20 mark as Exhibit 14, MKS-0000398.
21               (Sullivan Exhibit 14 was marked
22               for identification.)
23 BY MS. CHAMPION:
24     Q.  Do you recognize this document?
25     A.  Yes, it's an invoice.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 191

1      Q.  And it's an invoice from the Law Offices of
2    Steven Donziger, January 2018, $25,000, right?
3      A.  Correct.
4      Q.  Is that your note on it, "Paid 2/2/2018"?
5      A.  Yes.
6      Q.  And so this invoice was paid also?
7      A.  Yes.
8      Q.  So that would have been the second $25,000
9    payment that you referred to?
10     A.  Yes.
11     Q.  And do you know what this was for?
12     A.  His legal work.
13     Q.  Is it a January 2018 retainer payment, or
14   is it some back payment?
15     A.  I'm assuming by looking at it, it was a
16   January payment.  It was paid in February for work
17   done in January.  And the prior invoice was work
18   done in December, paid in January.
19     Q.  Got it.  So by "the prior invoice," you
20   mean Exhibit 13 --
21     A.  Yes.
22     Q.  -- the December 2017 invoice?
23     A.  Yes.
24          MS. CHAMPION:  And then how about
25   MKS-0000405.  We'll mark that as Exhibit 15.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 192

1                    (Sullivan Exhibit 15 was marked

2                    for identification.)

3    BY MS. CHAMPION:

4        Q.  Can you identify that document?

5        A.  Yes.  This is an invoice for $25,000.

6        Q.  And what do you understand that invoice to

7    represent?

8        A.  Legal services.

9        Q.  Is that a retainer payment, or is it like

10   hourly . . .

11       A.  Retainer payment.

12       Q.  And was this paid?

13       A.  I'd have to look at the other records that

14   show a confirmation to confirm that.

15       Q.  And then let's look at some of those.

16   I think I know the ones you need.

17               Can you find those records for me.

18               Do these look like the ones that would

19   help you figure it out?

20       A.  No.  There would have been the invoice with

21   a confirmation of payment for me to confirm if it

22   was paid.

23       Q.  This kind of thing?

24       A.  Yes.

25               MS. CHAMPION:  I'll mark this as 16.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 193

1                    (Sullivan Exhibit 16 was marked

2                       for identification.)

3              MS. CHAMPION:  It's MKS-0000395.  Can

4     you tell me which of the invoices, if any, that

5     relates to.

6              THE WITNESS:  This was paid January 24.

7              MS. CHAMPION:  It may make it easier if

8     I give you this exhibit also.  I'll mark this as

9     Exhibit 17.  It's MKS-0000390.

10             MR. LIBBY:  Is this 16 or 17?

11             MS. CHAMPION:  That's 17.

12             MR. LIBBY:  Do I have 16?

13             MS. CHAMPION:  You might not.  I'll give

14    it to you.

15             MR. LIBBY:  I don't think I do.

16                   (Discussion off the record.)

17                   (Sullivan Exhibit 17 was marked

18                      for identification.)

19             THE WITNESS:  So by looking at --

20             MR. LIBBY:  Hold on a second.  You have?

21             THE WITNESS:  390.

22             MR. LIBBY:  390.  Is that Exhibit 17?

23             THE WITNESS:  17.

24             MR. LIBBY:  I just need 16 whenever you

25    get a chance.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

                                        Page 194

1    BY MS. CHAMPION:

2        Q.  Do you know which confirmation page relates

3    to which invoice?

4        A.  I do not.

5            MS. CHAMPION:  And how about -- I'm

6    going to mark this as Exhibit 18.  It's MKS-0000397.

7                (Sullivan Exhibit 18 was marked

8                for identification.)

9    BY MS. CHAMPION:

10       Q.  That appears to be a separate confirmation

11   page also; do you agree?

12       A.  Yes.

13       Q.  They all have different dates, right?

14       A.  Yes.

15       Q.  So --

16       A.  This would have -- so Exhibit 18 on 2/2

17   would be connected to Exhibit 14 as confirmation of

18   payment.

19            MR. LIBBY:  Which two again?

20            THE WITNESS:  18 and 14.

21            MR. LIBBY:  18 and 14, okay.  Okay.

22   BY MS. CHAMPION:

23       Q.  Are you able to match up the other ones, or

24   not?

25       A.  No.  Because there's no -- my note is not

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 195

1    on there.  That's how I'm matching them up.

2        Q.  Oh, I see.  There's no invoice number on

3    that or anything like that?

4        A.  No.

5        Q.  So 390 is Exhibit 17; is that right?

6        A.  Yes.

7             MS. CHAMPION:  Is that the one you're

8    missing?

9             MR. LIBBY:  No.  I'm missing Exhibit 16.

10             THE WITNESS:  On 1/24.

11             MR. LIBBY:  Here we go.  That will help

12    you.

13             MS. CHAMPION:  390?

14             THE WITNESS:  No.  January 24.  That was

15    the transfer date.

16             MS. CHAMPION:  And what's the Bates

17    number at the bottom?

18             THE WITNESS:  395.  But he has it now.

19             MR. LIBBY:  395, got it.

20             MS. CHAMPION:  And that's Exhibit 17?

21             MR. LIBBY:  Yes.  16.

22             MR. HERRERA:  16.

23             THE WITNESS:  16.

24             MS. CHAMPION:  Got it, okay.  Sorry, so

25    confusing.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 196

1    BY MS. CHAMPION:

2        Q.  So Exhibit 16, you believe that relates to

3    which invoice, or you don't know?

4        A.  16, I am not certain.

5        Q.  But it's your belief that if a payment were

6    made to Mr. Donziger, there would be a page like

7    this reflecting it?  If a payment were made to him

8    from the CWP account?

9        A.  Yes.  And I'm just noticing on Exhibit 17,

10   this is actually not to Steven.  This is to Forum

11   Nobis.

12       Q.  Okay, got it.  And that's 390?

13       A.  That's 390.

14       Q.  Got it.  Bates 390.  What's the exhibit

15   number again?

16       A.  17.

17       Q.  Got it, okay.  So let me just look for the

18   confirmation pages related to Mr. Donziger.  So we

19   have Exhibit 16, which is January 24, Bates 395,

20   right?

21       A.  Yes.

22       Q.  And we have Exhibit -- did we mark 397

23   that's the $25,000 payment to Donziger and

24   Associates?

25       A.  Yes.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 197

1      Q.  Do you have that?

2      A.  That's a confirmation for Exhibit 14.

3      Q.  That's Exhibit 18 then, right?

4      A.  Yes.

5              MR. LIBBY:  Wait.  397 is going to be

6    Exhibit --

7              MR. HERRERA:  18.

8              THE WITNESS:  18.

9              MS. CHAMPION:  That might be -- Do we

10   have any more confirmation pages to Donziger?

11              (Discussion off the record.)

12   BY MS. CHAMPION:

13      Q.  What about the $75,000 payment?  Do you

14   recall when that was made?

15      A.  The end of February or very beginning of

16   March.

17      Q.  And do you know why -- if we don't have a

18   confirmation page, why that would be?  I'm going to

19   search right now and see if we have one.

20      A.  There should be a confirmation page.

21      Q.  Okay.  I'm going to look for it.

22      A.  Because I remember I know that I noted

23   $25,000 monthly or retainer and $50,000

24   reimbursement.

25              MS. CHAMPION:  So I do see a page in

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 198

1    here.  Alejandro, if you can find me Bates 403.  I

2    think it just looks a little bit different.  I'm not

3    sure why.

4                    (Discussion off the record.)

5              MS. CHAMPION:  Let's go off the record

6    for a minute.

7              THE VIDEO OPERATOR:  The time is 2:42.

8    We're off the record.

9                    (Recess at 2:43 p.m.,

10                    resumed at 2:48 p.m.)

11             THE VIDEO OPERATOR:  This is the

12   beginning of Media No. 5.  We're back on the record.

13   The time is 2:47.

14             MS. CHAMPION:  I'm going to mark as

15   Exhibit 19 a document labeled MKS-0000403.

16             MR. LIBBY:  This is 19?

17             THE WITNESS:  Should be 19.

18             MS. CHAMPION:  Here we go.  This, I

19   think, should clear things up.

20                    (Sullivan Exhibit 19 was marked

21                    for identification.)

22   BY MS. CHAMPION:

23        Q.  So are those your -- What is this document,

24   first of all?

25        A.  This is a confirmation that a wire had been

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 199

1    sent and there would be an invoice to back this up.

2    But it was confirmation from Bank of America.

3         Q.  So that document is dated March 13, 2018,

4    right?

5         A.  Yes.

6         Q.  And it shows a $75,000 payment?

7         A.  Correct.

8         Q.  So let's see if we can match that up with

9    an invoice.  I note that your note says "$25,000

10   services, $50,000 reimbursements," right?

11        A.  Yes.

12        Q.  That's consistent with what you said

13   earlier?

14        A.  Yes.

15        Q.  Do you know whether those would have been

16   on the same invoice?

17        A.  I believe they were two invoices.  25 and

18   then a 50.

19        Q.  Got it, okay.  That may be one reason I'm

20   confused because I don't think there's a $75,000

21   invoice?

22        A.  No.  25 and then a 50 would have been

23   for . . .

24        Q.  Do you know whether it's any of the invoices

25   that I've already introduced as exhibits or you

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 200

1      can't tell?

2          A.  If I were to guess properly, I think it

3      goes with Exhibit 15.  And the only thing that we're

4      missing is the $50,000 reimbursement invoice.

5                  MS. CHAMPION:  I'm going to mark this as

6      Exhibit 20.  This is MKS-0000404.  I think this

7      might be our $50,000 invoice that we're looking for.

8                      (Sullivan Exhibit 20 was marked

9                      for identification.)

10                 THE WITNESS:  Yes.

11     BY MS. CHAMPION:

12         Q.  Does that --

13         A.  Correct.

14         Q.  And that is for -- for reimbursements?

15         A.  Yes.

16                 MS. CHAMPION:  Got it, okay.

17                 MR. LIBBY:  Can we just get a copy of

18     that when you . . .

19                 MS. CHAMPION:  Here.  I've got one right

20     here that you can have.

21     BY MS. CHAMPION:

22         Q.  So that is 404, right?  And that is

23     Exhibit 20, right?

24         A.  Yes.

25         Q.  So then -- Okay.  So Exhibit 18 goes with

Page 201

1    Exhibit 14.  Exhibit 19 goes with Exhibit 15.  And
2    then Exhibit 13, which was the December 2017
3    invoice --
4         A.  I'm assuming would go with Exhibit 16.
5              MS. CHAMPION:  Okay.  That makes sense.
6              And then let's introduce MKS-0000365 as
7    Exhibit 21.
8                   (Sullivan Exhibit 21 was marked
9                   for identification.)
10   BY MS. CHAMPION:
11        Q.  So do you recall any other payments being
12   made to Mr. Donziger out of that CWP account?
13        A.  There would have been -- No, none other.
14        Q.  And do you know how he was receiving
15   payments prior to the creation of the CWP account?
16        A.  No.
17        Q.  So what is that document?
18              MR. LIBBY:  Is this 21?
19              MS. CHAMPION:  Yes.
20              THE WITNESS:  This would have just been
21   a summary of outstanding payments.  And the
22   September trip that was to Ecuador, apparently
23   $45,000 was the cost to him.
24   BY MS. CHAMPION:
25        Q.  The cost of -- his own personal cost for

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 202

1    the trip?

2        A.  I don't have any backup, so I cannot say

3    definitively.

4        Q.  You don't know whether that covered

5    expenses for anyone else who went on the trip?  Like

6    you, for example?

7        A.  I know the only thing that was covered for

8    me was the hotel for one or two nights.  But it was

9    Phil Fontaine, Ed John.  I think it was a trip that

10   was -- you know, Come to Ecuador and we'll cover all

11   the expenses.

12       Q.  Got it.

13       A.  And he fronted those.

14       Q.  Got it, okay.  You think Mr. Donziger

15   fronted them?

16       A.  That's what -- Yeah.  That's what I was

17   told.

18       Q.  And was this paid to him?

19       A.  No.

20       Q.  And I have another invoice here for like

21   $200,000, which based on your testimony so far, I'm

22   going to assume was not paid; is that correct?

23       A.  Correct.

24       Q.  Do you recall that invoice?

25       A.  Correct.

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 203

1           MS. CHAMPION:  And do you know -- I'll

2      just go ahead and introduce that so we have it in

3      the record.

4                   (Discussion off the record.)

5           MR. LIBBY:  This is 22?

6           MS. CHAMPION:  This will be 22, yes.

7                   (Sullivan Exhibit 22 was marked

8                   for identification.)

9      BY MS. CHAMPION:

10          Q.  And do you know what this was for, this

11     $200,000 invoice, which I'm handing you right now

12     marked as Exhibit 22, MKS-0000389?

13          A.  This would have been for reimbursement of

14     legal and -- legal services and consultative

15     services and expenses for -- over the course of four

16     years.

17          Q.  And what does the notation mean at the top,

18     "Do not pay until SRD approval"?

19          A.  Because I received it, but I don't do

20     anything -- I don't make any payments until I get

21     approval to do so.

22          Q.  And what was the approval separate from the

23     invoice?  Because if he's submitting the invoice but

24     also responsible for approving it, what was the

25     separate step?  How would he approve it?  Would he

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 204

1    send you an email or tell you on the phone, Go ahead

2    and pay that?  Like how would that work?

3         A.  It was mixed.  It was mixed.  So this one --

4    you know, I would have just noted either maybe in a

5    phone call to say, You know, do not pay this until

6    he approves it.  And I would just put it in a

7    folder.

8              MS. CHAMPION:  I'm going to mark as

9    Exhibit 23, MKS-0000383.

10                  (Sullivan Exhibit 23 was marked

11                   for identification.)

12             MR. LIBBY:  This is 23?

13             MS. CHAMPION:  Exhibit 23, yes.

14   BY MS. CHAMPION:

15        Q.  Can you tell me what this document is?

16   I mean, most of it's redacted.  But it does say --

17   and I believe that's your handwriting, correct --

18        A.  Yes.

19        Q.  -- "Paid SRD 25K 1/24/18."

20        A.  It would just be a confirmation of

21   Exhibit 16.

22        Q.  The confirmation page, like from the bank?

23   I'm just -- I'm confused about what it is because

24   it's redacted.  The other ones aren't.  So is this a

25   confirmation page or is it something else?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 205

1      A.  So on the top of it, it says "Payments

2   due."

3      Q.  Um-hum.

4      A.  And that date is actually 1/11/18, should

5   be.

6      Q.  Got it, okay.

7      A.  Because when you're in the year, it takes

8   about a month to do it right.

9      Q.  Um-hum.

10      A.  And this would be a summary of payments as

11   of 1/11 that were due for the case.

12      Q.  So not just to Mr. Donziger?

13      A.  No.

14      Q.  And that's why it's redacted, to your

15   knowledge?

16      A.  That's why it's redacted.  And then there

17   would be just my notation of this amount.  It was

18   probably a spreadsheet.

19      Q.  Then I want to talk about some of these --

20   this whole thing with the University of Calgary --

21   that was another thing I was curious about.

22          So it looks like you were helping to set

23   up a conference there; is that right?

24      A.  I was not helping to set up the conference.

25      Q.  You were just -- you just received some

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 206

```
 1    invoices related to it?
 2        A.  I was aware it was happening and, yes, I
 3    received some -- there was expenses related to that.
 4        Q.  And were those paid out of the CWP account?
 5        A.  Yes.
 6            MS. CHAMPION:  I'm going to mark as
 7    Exhibit 24, MKS-0000401.
 8                    (Sullivan Exhibit 24 was marked
 9                    for identification.)
10            MR. LIBBY:  And these are -- What's
11    your --
12            MS. CHAMPION:  I'm honestly just trying
13    to understand what the payments -- this is actually
14    an invoice from Mr. Donziger, so I'm just trying to
15    understand what this relates to.
16            MR. LIBBY:  Okay.
17    BY MS. CHAMPION:
18        Q.  So is this related to the conference?
19    These are payments to Mr. Donziger for the
20    conference, or what are they for, this invoice?
21        A.  This would be an invoice submitted to the
22    Law Offices of Steven Donziger for the conference
23    that was in -- to be planned in November of '18, to
24    be paid.
25        Q.  I see.  So it's actually an invoice to
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 207

1    his --

2         A.  Yes.

3         Q.  -- law office?

4         A.  University -- No.  University of -- it was

5    an invoice to his law office and the University of

6    Calgary.  Group for Education and Human Rights was

7    the recipient.

8         Q.  Understood, okay.  So would he have been in

9    charge of approving the payment of this invoice

10   also?

11        A.  Yes.

12             MS. CHAMPION:  And then I notice too

13   on -- I'll introduce MKS-0000399 as Exhibit 25.

14                  (Sullivan Exhibit 25 was marked

15                   for identification.)

16   BY MS. CHAMPION:

17        Q.  So this one -- I just notice on this

18   form -- Did you fill out this form?  It looks like

19   your handwriting, right?

20        A.  I did.

21        Q.  So when it says "Customer legal name" in

22   Section 3, "Law Office of Steven R. Donziger - CWP

23   Associates," what's the connection between those

24   entities?

25        A.  The -- and this is somewhat unusual, but in

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 208

1    order to receive the wire, they required this form
2    to be filled out.  And so I would have put "CWP
3    Associates" on there because the monies would have
4    referenced CWP.
5        Q.  Okay.
6        A.  I've never had to fill one of these out
7    before for initiating a wire, but that's what it was
8    related to.
9        Q.  So it wasn't intended to convey that CWP
10   Associates and Law Office of Steven Donziger were
11   the same entity --
12       A.  No.
13       Q.  -- or related entitles?
14       A.  No.  No.
15       Q.  And are they related?
16       A.  No.
17       Q.  Does CWP -- or did it, rather, have
18   officers or trustees or anything like that?
19       A.  Nothing.
20       Q.  Okay.
21       A.  It would have been -- it's the umbrella of
22   Streamline, which is solely me.
23       Q.  So when you fill out whatever form you fill
24   out in the Town Hall to create that, does it ask you
25   for like a business address or anything like that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 209

1      A.  I believe it does.

2      Q.  And would that just say your business

3  address?

4      A.  Yes.

5      Q.  And your contact info?

6      A.  Yes.

7      Q.  And does it ask for officers, or do you

8  remember what you put for information?

9      A.  Well, there are no officers for a d/b/a.

10      Q.  I defer to you on that.

11      A.  Yes.

12      Q.  I don't know anything about that.  I've

13  always been curious about that, actually.

14      A.  You can start anything.

15      Q.  So another question I wanted to ask also

16  was, you have a lot of Mr. Donziger's, it looks

17  like, personal financial records.

18          Were those just obtained from Mr. Rizack

19  or --

20      A.  Yes.

21      Q.  -- did you have any role with respect to

22  his personal finances?

23      A.  None.

24      Q.  And then the other thing would be his bank

25  accounts.  Did you have knowledge of his bank

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 210

1   accounts?

2       A.   The only knowledge I have was the

3   instructions that he gave me to wire his retainer

4   payments to.

5       Q.   Okay.

6       A.   Which I believe was the business account.

7       Q.   And is that the only account you recall

8   making transfers to?

9       A.   Yes.

10      Q.   And so you were not -- I'm just going to

11  introduce a document that he produced.  And, you

12  know, I think, you know, likely you're not aware of

13  anything else, but I just want to see --

14      A.   That Mr. Rizack produced?

15      Q.   No.  That Donziger produced.

16      A.   Okay.

17      Q.   -- and find out if you're aware of any

18  other bank account.  I'll find it.  But there are a

19  few cleanup questions I want to ask you in the

20  meantime.

21          Do you know if at any point Mr. Donziger

22  closed any bank accounts he was using related to the

23  case?  Are you aware of that?

24      A.   Aware of none.

25      Q.   And do you know where he banked, what his

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 211

1    bank is?

2         A.  I assume TD.

3              MS. CHAMPION:  Yes.  That's consistent

4    with my understanding as well.

5              So let's mark this as Exhibit 26.  It's

6    MKS-0000388.

7                   (Sullivan Exhibit 26 was marked

8                   for identification.)

9    BY MS. CHAMPION:

10        Q.  That looks like a payment to Mr. Weyler.

11   Did Mr. Donziger direct you to make that payment?

12        A.  I didn't make this payment.

13        Q.  Okay.

14        A.  This is coming from TD Bank to Rex Weyler.

15        Q.  So you think this is a document you got

16   from Mr. Rizack, or why would you have it?

17        A.  It would have been --

18              MR. LIBBY:  388 she produced or you say

19   that this came from?

20              MS. CHAMPION:  She produced.

21              MR. LIBBY:  Okay.

22              MS. CHAMPION:  Yeah, I'm looking for the

23   document.

24              MR. LIBBY:  Oh, I beg your pardon.

25              THE WITNESS:  This would have come from

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 212

1      Mr. Rizack.

2                MS. CHAMPION:  Fine.  Now, this

3      document -- I have 3, 4 -- I don't know that I have

4      1 and 2.  Do we have the first two pages of there?

5      Or maybe they only produced certain pages?  I just

6      want to make sure that I give her a complete

7      document.  It's 366 -- I'll just look back at your

8      production and make sure.

9                This is how we received it.  So it's a

10     document, as we received it, Bates stamped

11     MKS-0000366 through 368 -- well, actually 36 -- 368,

12     yes.  I'll mark that as Exhibit 27.

13                     (Sullivan Exhibit 27 was marked

14                     for identification.)

15     BY MS. CHAMPION:

16         Q.  Can you just walk me through what this

17     document is.

18         A.  It's a bank statement for Account 4660 0179

19     9158.

20         Q.  Is that the CWP account?

21         A.  Yes.

22         Q.  And so these unredacted line items, these

23     reflect wires, right?

24         A.  The unredacted reflect wires, yes.

25         Q.  And so these are wires to Mr. Donziger?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1      A.  Well, these would be wires coming back

2   in -- these are deposits.

3      Q.  And they're not redacted because they

4   relate to Mr. Donziger?

5      A.  Yes.  He -- when he gave me the first

6   instructions for the January, he gave me the wrong

7   account number.  And I attempted it -- this was a

8   first -- I attempted it three times because I didn't

9   assume that he would have given me the wrong account

10  number.

11     Q.  I see.

12     A.  But --

13     Q.  So these are just basically wires

14  returned -- you were trying to pay his December

15  invoice; is that correct?

16     A.  Correct.  And every time it got bounced

17  back.  Three times.

18     Q.  That's helpful.  I was a little confused.

19     A.  So was I.

20     Q.  Then the next page, page 4 of 6, so 367,

21  those are all debits, right?

22     A.  They're out -- yes, wired out.

23     Q.  And the first one says 1/24 to Steven

24  Donziger, $25,000; 1/26, $25,000 to Donziger &

25  Associates; 1/29, Donziger and Associates; 1/30,

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 214

1    Donziger and Associates.

2               So they're each for $25,000?

3       A.   Right.  So the first three are wires out.

4    And the three that are listed on the prior page are

5    them coming directly back in at the end of the

6    business day.

7       Q.   I understand.

8       A.   So the only one that went out, that truly

9    went out was on 1/30.

10      Q.   Thank you.  That clears up a lot.  And then

11   the next page there, 368, at the top of the page, it

12   says, "Transfer Streamline Family of: Donziger and

13   Associates."

14              Is that a second -- that's a payment of

15   maybe the January invoice?

16      A.   Yes.  That was a -- I don't like paying

17   wire fees if I don't have to because they're $30,

18   and so that is a transfer, an ACH debit --

19      Q.   Got it.

20      A.   -- which only cost $3 or $10.  So that's

21   what that represents.

22      Q.   Got it.  Oh, right.  And because it was

23   CWP, you could transfer without that fee; is that

24   right?

25      A.   I think it's just the way that they -- the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 215

```
1    banks, the way they reference -- it doesn't go
2    through the fed reference system.  It goes through
3    the banking system.
4              MS. CHAMPION:  Got it, okay.  And again
5    if we go -- I think this actually might be a
6    separate document.  I'm going to introduce this as
7    Exhibit 28.  And this is MKS-0000369 through -- oh,
8    no.  This is just one page.  This is one page
9    standing alone.  This is how it was produced to us.
10   So it says page 3 of 4, but we only have that page.
11             THE WITNESS:  Yes.
12                  (Sullivan Exhibit 28 was marked
13                   for identification.)
14   BY MS. CHAMPION:
15       Q.  So can you clarify for me what this is.
16       A.  This would be a wire transfer of $75,000,
17   representing $25,000 of services and $50,000 of --
18       Q.  Expenses?
19       A.  -- expense reimbursement.
20             MS. CHAMPION:  I think we are almost
21   done here.
22             So I'm just going to hand you
23   MKS-0000428.  We'll mark this as Exhibit 29.
24                  (Sullivan Exhibit 29 was marked
25                   for identification.)
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 216

1    BY MS. CHAMPION:

2        Q.  Can you just tell me what that document is

3    and why you have it.

4        A.  It's a --

5            MR. LIBBY:  Hang on a second.

6                (Discussion off the record.)

7    BY MS. CHAMPION:

8        Q.  What is this document?  I mean, it looks

9    like a bank record for Mr. Donziger, right?

10       A.  It's a bank statement.

11       Q.  So why do you have it?

12       A.  Because it's from -- if it's from 2014, it

13   came in a box from Josh Rizack.

14       Q.  Oh, okay.  For some reason, I thought this

15   said 2017.  I think I couldn't read it very well

16   because it's a little bit unclear, the copy?

17       A.  Yes.

18       Q.  So this would just have been in the Rizack

19   documents?

20       A.  Yes.

21            MS. CHAMPION:  Let me make sure there's

22   no more of these I need to cover with you, but I

23   think I'm almost done.

24            Let's just take a 90-second break.

25   Because I think I might be done, but I want to look

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 217

1      through my outline real quick.

2                 MR. LIBBY:  We can do that.

3                 THE VIDEO OPERATOR:  The time is 3:09.

4      We're off the record.

5                       (Recess at 3:10 p.m.,

6                       resumed at 3:16 p.m.)

7                 THE VIDEO OPERATOR:  This is the

8      beginning of Media No. 5.  We're back on the record.

9      The time is 3:16.

10                 MS. CHAMPION:  I'm going to hand you

11     what I've marked as Exhibit 30.  It's MKS-0000011.

12                       (Sullivan Exhibit 30 was marked

13                       for identification.)

14     BY MS. CHAMPION:

15         Q.  This is an email -- an email chain sent

16     after the Elliott meeting; is that correct?

17         A.  Correct.

18         Q.  Between you and Mr. -- how do you say it

19     again?

20         A.  van Merkensteijn.

21         Q.  And I just wanted to ask you about what you

22     meant at the top there where you said, "They would

23     be an incredible powerhouse to align with and use

24     their influence to overwhelm Chevron, even outside

25     of the courts, which could be even more effective."

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 218

1          What did you mean by that?

2      A.   What I meant by that is that me having

3  no -- not being able to understand the legal things,

4  I was making an assumption that there are things

5  that can you do outside of a court environment

6  strategically.

7      Q.   That would help you prevail in the court

8  case or otherwise how would they be to your

9  advantage?

10     A.   I would say that they would influence it in

11  some way.

12     Q.   In what way?

13     A.   I don't know.  Shareholder services types

14  of things or -- I'm trying to think of other --

15  I don't know.  It's not my area of strategy.

16     Q.   So when you say "could be even more

17  effective," do you mean more effective in getting

18  Chevron to pay?  Is that what you mean?

19     A.   Even outside of the courts, which could be

20  even more effective.  Yeah.  Yeah.  Things happen

21  inside the courts and things happen outside the

22  courts.

23     Q.   I agree with that.  And when you say,

24  "I know much of this momentum started with you,"

25  what do you mean by that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 219

1      A.   He is -- he's a very incredibly positive

2  person.  And has always been -- I've met him through

3  Pachamama Alliance, so I just really, really respect

4  and like him.  And he supports the Pachamama

5  Alliance and the rain forest and the Ecuadorian

6  mission.

7             MS. CHAMPION:  I'm going to hand you

8  what I've marked as Exhibit 31, a document produced

9  by Mr. Donziger.  I only have one copy of this so if

10 you can let your counsel see it.

11            MR. LIBBY:  I'll just take a peek.

12                 (Sullivan Exhibit 31 was marked

13                 for identification.)

14 BY MS. CHAMPION:

15      Q.   Since this is a document produced by

16 Mr. Donziger, he didn't Bates number it.  But as you

17 can see, it purports to list his bank accounts.  And

18 I know you said you were not aware of any account

19 outside of the one that you made payments to or that

20 CWP made payments to, but I just want you to take a

21 look at that list and see if you remember anything

22 else.  Any other bank accounts he has, any other

23 banks he banks with, any trusts he might have.

24      A.   I'm not aware of any.  The only account I

25 was aware of was the one I was wiring money to and

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 220

1    its existence.

2         Q.  What about any real property that he owns?

3    Are you aware of any real property that he owns?

4         A.  I knew that he received some real estate

5    from his parents' estate.  Beyond that, I have no

6    idea.

7         Q.  And you don't have any specific knowledge

8    of what that property was?

9         A.  Don't even know what it is or where it is.

10   It's just real estate.

11              MS. CHAMPION:  I'm going to mark as

12   Exhibit 32 -- this is a document that was attached

13   to Mr. Grinberg's declaration that we filed with our

14   contempt motion.

15                   (Sullivan Exhibit 32 was marked

16                    for identification.)

17   BY MS. CHAMPION:

18        Q.  Did you read his declaration?

19        A.  I think I did.

20        Q.  Well, these are his notes that he attaches

21   as an exhibit to that declaration.  And I just want

22   to ask you a few questions about -- if they refresh

23   your recollection about what was discussed at the

24   meeting.

25              For example, down in the bottom

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 221

1    left-hand corner, you'll see it says, "Can money

2    come into the U.S.?"

3              Do you have any recollection of a

4    discussion about whether the money could come into

5    the U.S.?

6         A.  No.

7         Q.  And up at the top where it says,

8    "$33 million, third party funders, individuals,"

9    does that refresh your recollection about anything

10   that was discussed at the meeting regarding, for

11   example, how much money had been raised in support

12   of the Ecuadorian litigation?

13        A.  I believe that's what it was referencing.

14   I don't know the total to validate that number.

15   But . . .

16        Q.  Do you think that's a number Mr. Donziger

17   would have supplied as opposed to you?

18        A.  I definitely would not have supplied it.

19        Q.  And then how about further down where he

20   says, "Canada as jurisdiction - don't want to have a

21   trial"?

22             Do you remember any discussion about a

23   trial in Canada?  Who didn't want to have a trial?

24   Was it the Ecuadorian plaintiffs?  Was it Chevron?

25   Do you recall anything like that?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 222

```
1          A.  I don't.  I -- No.  Just that I think in
2     general, most people try to avoid a trial when
3     possible.
4          Q.  Okay.  I don't think I have any further
5     questions about this document.  I just have a couple
6     more questions and then I'll let you go.
7          A.  Okay.
8          Q.  Who owned the money in the CWP account?
9          A.  It would be for the benefit of the FDA.
10         Q.  So you testified earlier that Mr. Donziger
11    approved payments to himself out of that account,
12    right?
13         A.  Correct.
14         Q.  So was it your understanding that the FDA
15    approved those payments, or was there any process
16    you were aware of for him getting approval?
17         A.  My understanding was that the FDA had
18    granted him the responsibility to manage the case.
19         Q.  Are you aware of any funding agreement
20    signed since the entry of the RICO injunction that
21    included proceeds that were paid in part to
22    Mr. Donziger over the years since that judgment was
23    issued?
24         A.  Can you ask that question again.
25         Q.  Yes.  It's a little bit compound, but I
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 223

1    don't want to run afoul of the order, so I'm just

2    trying to ask it in a way that includes all of the

3    limitations.

4                Are you aware of any funding agreement

5    signed since the entry of the RICO judgment that

6    resulted in proceeds that were paid in part to

7    Mr. Donziger?  In whole or in part to Mr. Donziger.

8        A.  I'm aware of none.

9        Q.  You're aware -- But you did say that funds

10   were received at the end of 2017, a portion at least

11   of which was paid to Mr. Donziger, right?

12       A.  I said the bank account was opened in

13   December of 2017.

14       Q.  So you're not aware of any funding agreement

15   that resulted in those funds being placed in the

16   account that were then paid over in part to

17   Mr. Donziger?  You're not aware of the signing of

18   any funding agreement?

19                MR. LIBBY:  Do you want to restate the

20   question?

21                MS. CHAMPION:  Can the court reporter

22   read it back.

23                     (Record read as requested.)

24                MR. LIBBY:  Do you understand the

25   question?

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 224

1          THE WITNESS:  Not really.

2          MR. LIBBY:  Okay.

3     BY MS. CHAMPION:

4       Q.  Okay.  So your counsel has instructed you

5     not to respond to questions about the sources of

6     funds.  What about the timing of funds?  The funds

7     that came into that account, the CWP account, when

8     were they obtained by the FDA or the LAPs?

9          Because we know that those funds were

10    used in part to pay Mr. Donziger.  So they fall

11    within Section C of the order, right?

12          MR. LIBBY:  Well --

13    BY MS. CHAMPION:

14      Q.  When were they received?  I understand they

15    were placed into this account in December 2017,

16    right?  But when were they received?

17          MR. LIBBY:  I think that asks to link

18    together, connect together some potentially

19    disparate things, and I think that's the difficulty

20    I'm having with that.  You're making a presumption

21    about source of funds there in the CWP account.  And

22    then adding timing on top of that.  And I'm having

23    difficulty on that.

24          MS. CHAMPION:  Well, she's already

25    testified that there were funds in the CWP account

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 225

1    that were used in part to pay Mr. Donziger that came

2    from the proceeds of financing provided in exchange

3    for a percentage of the proceeds of the Ecuadorian

4    judgment.

5              MR. LIBBY:  Do you recall that testimony?

6              I don't remember when that was.

7              THE WITNESS:  I . . .

8    BY MS. CHAMPION:

9       Q.  I asked you earlier, did 100 percent of the

10   money -- the payments she identified, the $25,000,

11   the $25,000, and the $75,000 -- did 100 percent of

12   that money come out of financing provided in

13   exchange for a percentage" of the proceeds?

14             And you said, "That is my understanding."

15             MR. LIBBY:  Okay.

16   BY MS. CHAMPION:

17      Q.  So I'm asking you, when that money was

18   raised.

19             MR. LIBBY:  If you know.  Just --

20             Hang on a second.  When it was raised?

21             MS. CHAMPION:  Yes.

22             MR. LIBBY:  No, that's -- that's

23   sneaking back across the line, Anne, paragraph 5

24   compliance discovery.  It just is.

25             MS. CHAMPION:  All right.  Well, we

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 226

```
 1    disagree on that.  Are you instructing the witness
 2    not to answer?
 3              MR. LIBBY:  Yeah, I am.  I'm sorry.  But
 4    I think that it is.  I think it's across the line.
 5              MS. CHAMPION:  Well, again, we disagree.
 6    I'd like you to instruct her not to answer.
 7              MR. LIBBY:  I'll instruct the witness
 8    not to answer.
 9              Are you good?
10              MS. CHAMPION:  I think we're done.
11    Thank you very much for your time.
12              THE WITNESS:  Thank you.
13              MS. CHAMPION:  I know it's stressful to
14    come here and I appreciate your time.
15              THE WITNESS:  Thank you for getting me
16    in and out.
17              THE VIDEO OPERATOR:  We're going off the
18    record at 3:28 p.m.  This concludes today's
19    testimony in the deposition of Katie Sullivan.  The
20    number of media used was six and will be retained by
21    Veritext.
22              MS. CHAMPION:  Did you designate it
23    confidential on the record?
24              MR. LIBBY:  Yes.
25              MS. CHAMPION:  You did?
```

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 227

1                    MR. LIBBY:  I think we did.  For the

2          record, I'd like to deem the entire transcript of

3          this proceeding, this particular deposition, to fall

4          under the protective order of January 11, 2013 and

5          be deemed confidential for all those purposes.

6                    MS. CHAMPION:  I'd like to state our

7          agreement before the deposition that Chevron can

8          nonetheless use this transcript --

9                    MR. LIBBY:  Oh, yeah.

10                    MS. CHAMPION:  -- at the --

11                    MR. LIBBY:  At the hearing.

12                    MS. CHAMPION:  And at the deposition of

13          Mr. Donziger.

14                    MR. LIBBY:  That's fine.  I think that's

15          provided for in the agreement.

16                    MS. CHAMPION:  There is.  But there's a

17          provision in the agreement that says if we're going

18          to use it in open court, we should have a conference.

19                    MR. LIBBY:  Yes.

20                    MS. CHAMPION:  So if we're going to do

21          anything crazy, I'll let you know.

22                    MR. LIBBY:  Well, can we just close the

23          loop on that, let me take a peek at the thing, and

24          then I'll just confirm with you.

25                    MS. CHAMPION:  Yes.  And then the other

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 228

1    thing I would like to say is, of course, that

2    Chevron reserves all rights to recall Ms. Sullivan,

3    in particular since she was instructed not to answer

4    certain questions where there's a dispute between

5    the parties as to whether they fall within the

6    permissible scope of this deposition.

7              And so Chevron reserves all rights.  And

8    we also reserve rights as to the designation of the

9    transcript as confidential.

10             MR. LIBBY:  But you don't expect that's

11   going to be controversial?

12             MS. CHAMPION:  No, I don't think that

13   will be controversial but --

14             MR. LIBBY:  But as to its scope and

15   application; is that what you meant?

16             MS. CHAMPION:  Well, I think there may

17   be portions that we would view as not really

18   confidential, but we can cross that bridge when we

19   come to it.

20             MR. LIBBY:  We can cross that bridge.

21   Okay.  That's fine.

22             (Deposition concluded at 3:31 p.m.)

23

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 229

1               C E R T I F I C A T E

2        I, Kimberly A. Smith, a Certified Realtime

3    Reporter, Certified Realtime Captioner, Registered

4    Diplomate Reporter, Realtime Systems Administrator,

5    and Notary Public in and for the Commonwealth of

6    Massachusetts, do hereby certify that the foregoing

7    deposition of MARY K. SULLIVAN, who was first duly

8    sworn, taken at the place and on the date

9    hereinbefore set forth, was stenographically

10   reported by me and later reduced to print through

11   computer-aided transcription, and the foregoing is a

12   full and true record of the testimony given by the

13   deponent.

14        I further certify that I am a disinterested

15   person in the event or outcome of this cause of

16   action.

17        THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

18   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

19   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

20   DIRECTION OF THE CERTIFYING COURT REPORTER.

21        Signed this 22nd day of June, 2018.

22

23                    

24   _____

         KIMBERLY A. SMITH, CRR, CRC, RDR

25   My commission expires:  November 20, 2020

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 230

1       ERRATA SHEET DISTRIBUTION INFORMATION

2       DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

3

4

5       ERRATA SHEET DISTRIBUTION INFORMATION

6       The original of the Errata Sheet has been

7   delivered to Frank A. Libby, Jr., Esquire.

8       When the Errata Sheet has been completed by the

9   deponent and signed, a copy thereof should be

10  delivered to each party of record and the ORIGINAL

11  forwarded to Anne Marie Champion, Esquire, to whom

12  the original deposition transcript was delivered.

13

14

15       INSTRUCTIONS TO DEPONENT

16      After reading this volume of your deposition,

17  please indicate any corrections or changes to your

18  testimony and the reasons therefor on the Errata

19  Sheet supplied to you and sign it.  DO NOT make

20  marks or notations on the transcript volume itself.

21  Add additional sheets if necessary.  Please refer to

22  the above instructions for Errata Sheet distribution

23  information.

24

25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 231

1    PLEASE ATTACH TO THE DEPOSITION OF MARY K. SULLIVAN

2    CASE:  CHEVRON CORPORATION v. STEVEN DONZIGER, et al.

3    DATE TAKEN:  June 21, 2018

4                        ERRATA SHEET

5    Please refer to page 230 for Errata Sheet

6    instructions and distribution instructions.

7     PAGE   LINE      CHANGE            REASON

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19       I have read the foregoing transcript of my

20   deposition and except for any corrections or changes

21   noted above, I hereby subscribe to the transcript as

22   an accurate record of the statements made by me.

23       Executed this _____ day of _____, 2018.

24           _____

25                        MARY K. SULLIVAN

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[& - 19]                                                                   Page 1

| & | | |
|---|---|---|
| **&**   2:3,12 7:8 | | |
| 213:24 230:2 | | |

**0**

**0000011**   5:18 217:11
**0000022**   4:16 68:9
**0000027**   4:16
**0000031**   4:21 106:8
**0000032**   4:21
**0000037**   4:17 69:24
**0000061**   4:12 26:9
**0000066**   4:12
**0000090**   4:20 77:10
**0000094**   4:20
**0000105**   4:19 76:8
**0000106**   4:19
**0000110**   4:18 71:20
**0000112**   4:18
**0000130**   4:15
**0000134**   4:15
**0000139**   4:13 53:12
**0000140**   4:13
**0000149**   4:22 111:7
**0000156**   4:22
**0000365**   5:9 201:6
**0000366**   5:15 212:11
**0000368**   5:15
**0000369**   5:16 215:7
**0000370**   4:23 157:25

**0000374**   4:23
**0000383**   5:11 204:9
**0000388**   5:14 211:6
**0000389**   5:10 203:12
**0000390**   5:5 193:9
**0000395**   5:4 193:3
**0000396**   4:24 189:2
**0000397**   5:6 194:6
**0000398**   4:25 190:20
**0000399**   5:13 207:13
**0000401**   5:12 206:7
**0000403**   5:7 198:15
**0000404**   5:8 200:6
**0000405**   5:3 191:25
**0000428**   5:17 215:23
**000110**   71:11
**0179**   212:18
**02116**   1:19 3:7
**06**   76:8
**0691**   1:3 6:14 53:21
**07932-0992**   2:16

**1**

**1**   4:12 6:10 25:12 25:14 26:8 89:23 129:24 130:1,1,4 130:20 138:25 158:16 212:4
**1,000**   179:7
**1-231**   1:12

**1/11**   205:11
**1/11/18**   205:4
**1/24**   195:10 213:23
**1/24/18**   204:19
**1/26**   213:24
**1/29**   213:25
**1/30**   213:25 214:9
**10**   4:21 106:8,10 135:12 158:9 214:20
**100**   10:16 27:14 46:4,4,11 90:23 91:19,21 94:8 130:3 134:5,6 137:3 170:2 171:6 225:9,11
**100,000**   83:21
**10166-0193**   2:7
**106**   4:8,21
**10:06**   6:2
**10:07**   1:16
**10:54**   50:13
**10:55**   50:15
**11**   1:3 4:22 6:14 53:21 111:7,9,12 111:13,14 227:4
**110**   2:14
**111**   4:22
**112**   71:11,20
**11:00**   50:16,19
**12**   4:23 111:11 139:25 157:23 158:1,3,4
**129**   64:25 65:10
**12:07**   105:19
**12:08**   105:21
**12:30**   105:23
**12:41**   106:5
**12:42**   106:2

**13**   4:24 110:5,22 189:1,3 190:15 191:20 199:3 201:2
**130**   65:4
**14**   4:25 190:13,13 190:20,21 194:17 194:20,21 197:2 201:1
**140**   53:12
**149**   111:15,16 129:20
**15**   5:3 105:16 110:5,22 123:14 137:21,25 138:1 191:25 192:1 200:3 201:1
**15-16**   123:13
**152**   144:17
**153**   147:2
**154**   129:20
**155**   111:23
**156**   111:8,17,23
**158**   4:23
**16**   5:4 26:5 192:25 193:1,10,12,24 195:9,21,22,23 196:2,4,19 201:4 204:21
**17**   5:5 14:4 69:21 88:6 193:9,10,11 193:17,22,23 195:5,20 196:9,16
**1782**   116:24 117:3
**18**   5:6 194:6,7,16 194:20,21 197:3,7 197:8 200:25 206:23
**189**   4:24
**19**   5:7 14:24 15:18 15:24 37:23 38:1

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

53:16,22 54:3
79:2 198:15,16,17
198:20 201:1
**190** 4:25
**192** 5:3
**193** 5:4,5
**194** 5:6
**198** 5:7
**1:30** 150:9,14
**1:38** 157:14
**1:39** 157:16
**1:52** 157:20
**1:53** 157:17

**2**

**2** 4:13 50:18 53:11
53:13 54:2 130:1
158:17 212:4
**2-3** 139:17 140:2
**2/2** 194:16
**2/2/2018** 191:4
**20** 5:8 126:17
135:12 188:24
200:6,8,23 229:25
**200** 2:6 5:8
**200,000** 89:23
202:21 203:11
**2003** 9:25
**2005** 9:23 10:7
**201** 5:9
**2013** 227:4
**2014** 216:12
**2016** 11:25 13:3,4
135:9,9 184:1,2
**2017** 13:10 26:5
54:3 63:15 112:1
167:7 170:9
191:22 201:2
216:15 223:10,13
224:15
**2018** 1:16 6:3
53:22 86:12,13

170:9,10 175:21
176:15 179:14
191:2,13 199:3
229:21 231:3,23
**2020** 229:25
**2027** 53:20
**203** 5:10
**204** 5:11
**206** 5:12
**207** 5:13
**21** 1:16 5:9 6:2
201:7,8,18 231:3
**211** 5:14
**212** 2:8 5:15
**215** 5:16,17
**217** 5:18
**219** 5:19
**22** 5:10 203:5,6,7
203:12
**220** 5:20
**22nd** 229:21
**23** 5:11 204:9,10
204:12,13
**230** 231:5
**24** 5:12 193:6
195:14 196:19
206:7,8
**25** 4:12 5:13 134:7
199:17,22 207:13
207:14
**25,000** 83:21 86:6
86:6 91:20,21
176:13,13,21,22
177:6 190:17
191:2,8 192:5
196:23 197:23
199:9 213:24,24
214:2 215:11
225:10,11
**25k** 204:19

**26** 5:14 211:5,7
**27** 5:15 68:9
212:12,13
**28** 5:16 215:7,12
**29** 5:17 215:23,24
**2:42** 198:7
**2:43** 198:9
**2:47** 198:13
**2:48** 198:10

**3**

**3** 4:14 15:20 53:16
53:19,23 56:4
79:2,3 80:18 85:5
91:12 92:20 93:17
106:4 133:9
207:22 212:3
214:20 215:10
**30** 5:18 12:7 15:8
137:22 138:1
180:16 214:17
217:11,12
**300** 10:15
**31** 5:19 219:8,12
**32** 5:20 106:8
220:12,15
**325** 2:14
**33** 221:8
**338-9300** 3:8
**34** 28:2 65:4
**351-4000** 2:8
**36** 212:11
**366** 212:7
**367** 213:20
**368** 212:11,11
214:11
**371** 159:4
**372** 161:8
**373** 166:9
**374** 157:25 167:6
**38** 70:8,12

**388** 211:18
**390** 193:21,22
195:5,13 196:12
196:13,14
**395** 195:18,19
196:19
**397** 196:22 197:5
**399** 1:18 3:6 6:17
**3:09** 217:3
**3:10** 217:5
**3:16** 217:6,9
**3:28** 226:18
**3:31** 228:22

**4**

**4** 4:15 64:23 65:15
65:16,17 157:19
212:3 213:20
215:10
**400** 114:23,24
**403** 198:1
**404** 200:22
**45,000** 201:23
**4660** 212:18
**4:00** 64:10 65:24

**5**

**5** 4:16 15:21 49:15
56:4 68:1,4,8 79:9
85:6,11,14 88:22
89:16 93:18
123:20 134:10
198:12 217:8
225:23
**50** 199:18,22
**50,000** 176:23
197:23 199:10
200:4,7 215:17
**500** 10:16
**53** 4:13,14
**535-2627** 2:17

| | |
|---|---|
| **57th** 161:2 | |
| **6** | |
| **6** 4:17 63:15 69:23 70:1,14 108:2 112:1 167:7 213:20 | |
| **6.3** 110:4,9,10,14 123:2 125:1 132:9 132:22 133:2 | |
| **6/19/18** 4:14 | |
| **61** 38:10 | |
| **617** 3:8 | |
| **62** 32:2 | |
| **63** 31:2 | |
| **65** 4:15 26:12 125:15,19 | |
| **66** 26:10 | |
| **68** 4:16 | |
| **7** | |
| **7** 4:6,18 71:10,12 | |
| **70** 4:17 | |
| **71** 4:18 | |
| **75,000** 86:6 91:21 176:13,22 189:12 197:13 199:6,20 215:16 225:11 | |
| **76** 4:19 | |
| **77** 4:20 | |
| **7:30** 150:12 | |
| **8** | |
| **8** 4:19 76:7,9 93:9 | |
| **9** | |
| **9** 4:20 77:10,14 93:9,10 139:24 | |
| **9-12** 139:18,20 140:5 | |
| **90** 101:9 102:4 155:10,17 216:24 | |

**91** 98:20 101:9
**9158** 212:19
**92** 97:25
**93** 77:18
**94** 77:11
**973** 2:17
**992** 2:15

**a**

**a.m.** 1:16 6:2 50:15,16
**aaron** 36:24 95:6
**able** 20:6 76:22 180:20 194:23 218:3
**absolutely** 146:23
**accepted** 12:5
**access** 104:9
**account** 87:16 178:23 181:14,15 184:21,24 196:8 201:12,15 206:4 210:6,7,18 212:18 212:20 213:7,9 219:18,24 222:8 222:11 223:12,16 224:7,7,15,21,25
**accountability** 56:22 57:21,25 58:3,5,7 158:22
**accountable** 58:8 58:11
**accountant** 10:23
**accounts** 5:19 209:25 210:1,22 219:17,22
**accumulates** 139:25
**accurate** 63:22 231:22
**ach** 214:18

**achampion** 2:9
**acknowledging** 107:21
**acquired** 98:23,25 99:8,14 103:24
**acting** 19:11 97:17
**action** 6:23 76:23 79:16 95:11,14 97:20 105:4,7,12 127:4 148:25 149:4 229:16
**actions** 95:18 114:10 142:20
**active** 95:15 137:11
**actively** 163:20
**activist** 25:9 26:21 27:5,6,10,11 40:15 40:16 41:15 58:2 58:4
**actual** 35:13 47:19 48:4 49:4 91:14 112:9,12 142:15
**add** 102:4 230:21
**adding** 224:22
**additional** 230:21
**address** 72:19 73:17 74:4 208:25 209:3
**addresses** 78:18
**administer** 6:22
**administrator** 1:24 229:4
**admonition** 93:16 134:9
**adult** 171:3
**advance** 55:4 67:12
**advantage** 218:9
**advisers** 10:21,24

**affect** 8:8 38:20 44:24 45:5 46:6 51:10
**affiliations** 7:1
**affirmed** 151:22
**affirming** 99:21 99:22
**afield** 15:25 21:10 38:6 42:1
**afn** 78:5,6
**afoul** 223:1
**afternoon** 4:7 63:19 106:1,6
**aggressive** 26:25
**ago** 34:7 105:16
**agree** 6:9 27:14,17 194:11 218:23
**agreed** 15:14 133:16 138:22 154:10
**agreement** 125:11 173:2 177:5 222:19 223:4,14 223:18 227:7,15 227:17
**agreements** 124:11 130:25 131:11 132:4 168:12,15
**agrio** 11:18 80:11 81:10,19 82:4,10 82:19 83:2,10 114:11 136:4 140:15
**agustin** 69:11 97:2 97:10
**ahead** 19:24 21:17 22:7 26:22 36:3 45:25 51:2 79:11 81:13 87:23 91:25 102:20 103:20

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[ahead - associates]**                                    Page 4

135:15 138:13
203:2 204:1
**aherrera**  2:10
**aided**  229:11
**ain't**  84:10
**al**  1:9 6:12 231:2
**alan**  97:21
**alejandro**  2:5 7:5
  180:6 198:1
**align**  217:23
**allegations**  72:2
  72:15,21 73:4
**alliance**  12:4
  182:18 183:4,6
  219:3,5
**allocated**  110:7
**allow**  50:24
**allowed**  15:2 39:1
  49:13
**ambiguity**  155:9
  155:16
**america**  87:16
  181:18 199:2
**american**  178:22
**amount**  17:19
  87:7 90:16 124:9
  139:20 145:3
  205:17
**amounts**  90:13
  121:3 127:18
  134:13
**analysis**  175:12
  176:1
**analysts**  28:17
**analyze**  175:10,11
**andrew**  159:15,18
**anne**  2:4 7:3 14:9
  21:10 31:21 33:8
  37:1 42:9 47:1
  56:8 60:13 65:7
  83:12 89:16 92:16

186:3 225:23
  230:11
**answer**  15:9 17:21
  17:24 18:8,12,16
  19:4,7,9 21:11
  22:7,8 31:23
  32:21 33:5 37:9
  38:6 40:5 42:10
  47:22 48:15 50:24
  55:24 79:10,11
  80:14 87:1 92:4
  93:16 123:22,24
  131:6 134:11
  171:23 226:2,6,8
  228:3
**answered**  19:8
  45:23
**answers**  8:12
**anticipated**  80:22
  88:9 90:12
**anticipation**  88:8
**anybody**  51:20
  58:25 60:23 69:13
  69:15 108:16
  184:23 188:8
**anymore**  56:12
**anyplace**  76:4
**apologies**  107:7
**apologize**  65:9
  71:14 119:4
**apologizing**
  153:15
**apparently**  107:19
  201:22
**appeal**  166:17,19
**appeals**  99:22
**appearances**  2:1
  3:1 7:1
**appears**  16:14
  98:20 164:23
  194:10

**appellate**  99:20
**application**  228:15
**apply**  229:18
**appreciate**  38:10
  38:12 39:13 60:8
  60:11 226:14
**approach**  48:2
  59:6
**approached**  42:12
**approaching**  30:9
  42:21 47:25
**appropriate**  38:3
**approval**  203:18
  203:21,22 222:16
**approve**  125:13
  185:23 203:25
**approved**  184:17
  222:11,15
**approves**  204:6
**approving**  177:9
  189:18 203:24
  207:9
**approximately**
  61:17 138:1
**architect**  68:14
**area**  126:20,22
  218:15
**areas**  14:25 15:12
  15:19 16:18,24
**argentina**  114:3
  114:12,24 115:4
**argentinian**  61:20
**arguably**  186:22
**argue**  48:14
  186:13
**argument**  17:15
  133:13 186:8
  188:3
**argumentative**
  103:18

**arisen**  127:22
**arrived**  108:8
**arrow**  118:19,20
**aside**  41:25 95:14
**asked**  45:23 55:6,9
  55:18 59:14 70:19
  81:1,4 88:20
  98:16 101:2
  126:24 171:18
  177:1 225:9
**asking**  19:20 21:4
  21:13,15 22:3
  30:19 47:17,18
  48:1,2,13 49:6,12
  56:17 59:9 68:20
  75:11 84:24,25
  85:11,13,19 88:22
  100:2 103:5
  126:15,18 127:3
  169:4 172:4 177:2
  188:10 225:17
**asks**  224:17
**ass**  25:19 26:19
**asset**  147:4 187:13
**assets**  10:11,15,17
  16:20 84:12,17,22
  85:12,16 114:24
  133:7,11 140:10
  140:14,16 148:2,3
  182:11 186:4
**assistant**  55:5 59:3
  62:20 65:22
**associate**  39:20
**associated**  12:15
  12:17
**associates**  87:15
  87:18 89:4 177:19
  178:15 180:10
  181:2 184:21
  196:24 207:23
  208:3,10 213:25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[associates - believe]**                                                    Page 5

213:25 214:1,13
**assume** 29:12 58:3
65:23 100:3
112:20 115:20
141:17 152:20
202:22 211:2
213:9
**assumed** 100:5,7
100:11
**assuming** 39:25
55:8 112:7 123:3
138:6 148:2,9
153:9 169:25
184:4 191:15
201:4
**assumption** 29:22
30:7 100:12 123:6
154:19 218:4
**athenahealth** 62:9
62:10
**attach** 231:1
**attached** 220:12
**attaches** 220:20
**attachment** 54:5
68:9
**attack** 142:12
148:8,13
**attempt** 21:8 37:3
42:8,15 47:5,6,19
48:5 49:2 167:1
175:17
**attempted** 21:22
213:7,8
**attempting** 173:17
**attention** 106:20
**attenuated** 188:16
**attorney** 79:14,17
79:20 80:1,2 95:7
162:24
**attorneys** 152:21
163:4 168:21

169:14
**audio** 6:7,7
**august** 13:4 135:9
135:10
**aulestia** 96:12
**australia** 113:10
113:13,18,21,23
137:8,9,12
**authenticity**
162:17
**author** 12:1
**authority** 130:25
132:3,16 162:18
162:19 163:8
**authorized** 6:21
**avenue** 2:6
**average** 10:15
**avoid** 48:23 222:2
**aware** 18:22 20:20
60:5,23 82:13
83:8,17 84:4,8,19
84:22,25 85:20
86:2,5 94:3,12,19
95:18 96:2 98:12
98:15,18 114:10
122:7 124:22
125:4 132:23
133:23 137:14
168:25 171:25
172:18 176:10
177:5 182:11
183:2,17,25 206:2
210:12,17,23,24
219:18,24,25
220:3 222:16,19
223:4,8,9,14,17
**awesome** 66:3

**b**

**b** 84:16 85:2 87:19
91:8 124:16
133:17 181:2

186:18 187:9
209:9
**bachelor's** 9:3
**back** 12:25 13:13
37:12 43:16 46:11
50:18,21 75:13
77:13,13 81:5
92:17 93:8,11
106:4,22 119:17
120:7 121:2
129:15 132:21
152:13 157:19
190:15 191:14
198:12 199:1
212:7 213:1,17
214:5 217:8
223:22 225:23
**background** 9:1
14:10,13 67:23
138:16
**backup** 189:9,15
189:20,25 202:2
**backwards** 187:1
**ballpark** 135:12
**banco** 9:13 120:14
**bank** 5:19 87:15
87:16 120:7,8,15
181:14,15,18
199:2 204:22
209:24,25 210:18
210:22 211:1,14
212:18 216:9,10
219:17,22 223:12
**banked** 210:25
**banking** 215:3
**banks** 215:1
219:23,23
**base** 14:20 31:3
**based** 18:19 23:8
123:3 131:10,15
133:24 202:21

**baseline** 187:1,23
**basement** 183:1
**basically** 62:12
159:8 171:5
213:13
**basis** 45:21 56:1,6
**basketball** 183:1
**bates** 26:9 53:12
64:25 65:4 68:9
69:24 71:10,19
77:10 195:16
196:14,19 198:1
212:10 219:16
**battle** 104:20,20
104:22,23,25
164:3,4
**battles** 162:19
164:13,13,16,17
164:18,18
**beautiful** 13:15
**beer** 139:12
**beg** 123:23 211:24
**beginning** 50:18
86:10 104:21
106:4 129:15
157:19 162:11
197:15 198:12
217:8
**behalf** 7:6,8 8:21
13:1 19:12 20:17
**belief** 57:1 196:5
**believe** 25:11
55:12 94:22 96:17
97:21 115:10
130:3 132:24
133:19 138:2
139:10 148:22
149:11 154:13
165:1 172:25
180:6 182:23
183:2 185:14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

196:2 199:17
204:17 209:1
210:6 221:13
**bell** 120:15 185:7
**benefit** 95:5
173:23 187:2,13
222:9
**benefitted** 186:8
**benefitting** 186:23
**benjamin** 3:5 7:11
**best** 27:20 77:23
98:21
**bet** 51:18
**better** 8:13 82:24
141:3 161:13,15
173:24 178:8
179:10
**beyond** 42:6,23,23
47:1 89:6,7 98:4
107:8 152:16
220:5
**big** 12:23 25:6
38:10,12,15,21
39:14,16 40:2
41:3,3 143:22
144:6,7,8
**bill** 6:18 50:10
**billion** 28:2,7
139:17,18,24,25
140:2,5
**billions** 28:18
29:10
**bit** 41:6 51:6 53:9
67:22 156:21
157:24 198:2
216:16 222:25
**blind** 159:9 167:10
**blindly** 67:24
**block** 139:18
140:5

**bold** 43:20
**bond** 115:3
**bono** 171:5,5
**book** 11:25 52:6
56:16
**bookkeeping**
179:10,11
**boost** 136:16
**borrowing** 182:8
**boston** 1:19 3:7
6:18 9:14,16
**bottom** 26:1,11
41:16 77:17,18,21
93:11 164:25
165:12 166:22
167:25 195:17
220:25
**bought** 12:25
25:18 26:18
**bounced** 213:16
**bound** 14:23
**boundary** 107:20
**bounds** 79:1
**box** 2:15 52:7
176:4 216:13
**boxes** 169:12,13
**boycott** 120:17,20
121:20
**boycotts** 120:23
**boylston** 1:18 3:6
6:17
**brain** 67:15
**brazil** 114:3,11
**brazilian** 115:11
**break** 8:17 50:11
93:6 105:16,17
157:9 216:24
**breaking** 107:20
**bridge** 228:18,20
**briefly** 8:25 10:12
37:11 96:14

**bring** 22:25 28:17
28:23,24 30:22
136:17 146:9
**bringing** 145:21
**broad** 83:12
**brought** 23:21
117:12,17
**btowbin** 3:10
**bubble** 13:22
**bunch** 168:24
**burden** 11:1
**bush** 59:12,24
60:19 61:3 62:14
167:18,18
**bush's** 62:10
**business** 9:18,21
10:8 11:11 20:17
23:7 24:15 122:7
170:25 174:11
178:1 180:13,22
180:25 208:25
209:2 210:6 214:6
**businessperson**
80:3
**busy** 59:4
**buy** 46:3,5,11
**buying** 62:9 89:23
**buzzword** 166:21

**c**

**c** 80:16,19 84:14
88:18 91:7,9,10
224:11 229:1,1
**c.a.** 1:3
**calgary** 205:20
207:6
**call** 11:17 18:20
61:23 64:5 130:11
165:14,23 171:5
172:3 204:5
**called** 11:25 26:21
27:5,6,11 61:13

143:7
**calling** 171:22
**calls** 63:2 135:21
**campaign** 162:9
**canada** 76:16 78:5
78:20 79:17,20
80:4,6 115:25
118:14 119:11
137:7,18 148:23
221:20,23
**canadian** 76:23
79:14,16 95:10,14
97:20 105:7,12
115:17,21,22
127:3 128:13
148:25 149:3
185:18
**cancelled** 161:9,11
161:15,16
**capital** 10:19,20
23:15 32:12 41:16
43:5 140:23 141:2
144:21 145:3
166:23,25 167:1
**captioner** 229:3
**card** 178:22 179:1
179:6,12
**care** 24:17,19
**careful** 85:5 87:11
**carefully** 92:16
**carved** 15:12
**case** 6:14 14:21
15:5 17:10 18:6
18:11 19:2,18
20:3,5,17 28:1
34:22 38:20 43:23
45:2,13 49:24
53:20 56:19 57:7
60:20 61:1,20
69:8 71:23 76:16
87:21 88:2 94:1,7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[case - chevron]                                                        Page 7

94:11,18 95:3,9,11
96:1,9 101:6
104:10,23,24
111:1 116:5 120:3
120:8 125:22
137:13 142:2,11
142:15,19 167:19
168:16 169:24
174:3,13 179:6
180:3 181:1
186:13 205:11
210:23 218:8
222:18 231:2
**cases** 54:17 114:3
146:9
**cash** 10:22
**casually** 56:10
**catch** 150:23,24,25
151:1,1
**cause** 40:23
229:15
**cell** 6:5
**cellular** 6:5
**certain** 26:24 28:8
38:2 54:20 81:25
94:8 107:14 120:2
120:21 122:16
130:17 141:6
157:3 163:6
164:11 165:8
166:4 168:4
177:16 196:4
212:5 228:4
**certainty** 164:20
**certificate** 180:18
**certification**
229:17
**certified** 229:2,3
**certify** 229:6,14
**certifying** 229:20

**cetera** 8:14 19:22
**chain** 26:9,12
47:25 64:24 65:11
71:2,19 74:8,9,11
76:8 77:20 78:18
80:10 81:9,18
82:3,9,15,18 83:1
93:5 98:14 102:4
102:24 106:9,19
106:21 131:21
217:15
**challenge** 21:19
58:23
**champion** 2:4 4:6
4:8 7:3,3,22 14:16
15:4,10,14 16:1,8
16:25 17:4,8,14,18
17:23 18:4,9 19:1
19:6,17 20:2,23
21:3,12,24 22:10
25:16 26:1,4,6
27:3 31:24 33:2,9
33:12,15,19 34:1,2
35:14,17 36:5
37:4,10,14 38:4,8
40:9 41:19 42:3,7
42:11,18,25 43:3
46:13 47:12,24
48:6,8,12,17,19
49:5,9,20 50:4,8
50:20 51:5 53:8
53:18 54:1 55:25
56:6,13,14 60:8,14
60:17 64:14,16,22
65:9,13,16,19
67:25 68:6 69:22
70:5,7,13,15,16
71:7,14,18 72:8,14
73:3,9 74:18 75:5
76:1,7,11 77:9,16
79:5,12 80:15,19

81:1,4,7,16 82:1
83:14,20 84:2,7,12
84:16,19,24 85:10
85:19,24 86:1,21
87:3,8,13,17 88:1
88:17,24 89:8,11
89:17 90:4,7,15
91:9,15,19 92:1,6
92:11,12,18,21
93:4,7,24 102:23
103:16,22 104:17
105:14,17 106:6
106:17 110:22
111:2,5,13,16,19
116:23 123:21
124:1,16,20
126:12,14 131:9
133:6,10,16,22
134:14 135:18
138:14 156:8
157:8,12,21 158:4
158:5 181:23
183:20,24 186:1,6
186:20 187:4,10
187:15,19,22
188:1,7,9,13,22
189:1,5 190:12,14
190:19,23 191:24
192:3,25 193:3,7
193:11,13 194:1,5
194:9,22 195:7,13
195:16,20,24
196:1 197:9,12,25
198:5,14,18,22
200:5,11,16,19,21
201:5,10,19,24
203:1,6,9 204:8,13
204:14 206:6,12
206:17 207:12,16
211:3,9,20,22
212:2,15 215:4,14

215:20 216:1,7,21
217:10,14 219:7
219:14 220:11,17
223:21 224:3,13
224:24 225:8,16
225:21,25 226:5
226:10,13,22,25
227:6,10,12,16,20
227:25 228:12,16
230:11
**chance** 106:24
193:25
**chances** 148:24
**change** 231:7
**changes** 230:17
231:20
**characterization**
144:10
**characterize** 34:4
**characterizing**
57:13
**charge** 136:12,14
136:22,24 137:7
186:14 207:9
**charges** 185:6
**charitable** 30:20
**chat** 171:19
**chatting** 171:21
**check** 190:6
**chest** 155:25
156:11,17
**chevron** 1:6 6:12
7:4,6,8 12:25
39:11 43:22 45:1
45:5,12 49:23
51:18 53:21 56:19
57:2,7,9 58:10
72:1,5,9 76:18
99:5,7,13 102:7,16
103:2 104:2,3
105:1 113:17,20

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[chevron - compound]                                                Page 8

116:10 117:12,17
117:23 118:4,8,21
119:16 120:18
121:20 122:7
127:11 128:18
134:17,20,23
138:7 139:20
140:4,10,14,17
141:10,16 142:15
148:12 149:6
152:18,20 164:18
181:5 217:24
218:18 221:24
227:7 228:2,7
231:2
**chevron's** 44:24
119:25 128:14
137:19 147:4
148:3
**chief** 78:4,20,21
78:21
**circle** 98:5 107:15
**circuit** 99:21
**circumstances**
14:14 49:2
**city** 55:7,19
**civ** 1:3 6:14 53:21
**civil** 33:6,17
**clarify** 101:20
102:5 111:21
124:6,19,24 132:5
153:8 215:15
**clarity** 177:2
**clean** 71:17 104:23
**cleaned** 13:2
**cleaner** 91:5
179:11
**cleaning** 58:12,13
58:17
**cleanup** 95:4
210:19

**clear** 20:19 26:11
31:19 37:25 42:14
65:10 79:1 83:6
109:15 110:12,16
134:10 146:1
179:2 188:5 189:6
198:19
**clearly** 42:18 47:4
**clears** 214:10
**clever** 181:6
**client** 25:22,23
**client's** 25:19
26:18
**clients** 24:23
104:10,24 186:14
**close** 60:18 109:12
155:25 156:10,16
171:7 188:20
227:22
**closed** 181:16,20
210:22
**closer** 40:12 160:4
**cohn** 31:13 55:3
59:22 61:4,13
62:19,22 67:5
108:9 109:15
119:13 126:15,17
128:23 161:20
166:11 172:1,2,5
**cohn's** 62:7
**collateral** 133:25
**collect** 166:23
167:1,3
**collected** 38:25
39:4,5
**collection** 56:20
57:3,7,10 76:16,23
79:16 95:11,14,18
97:20 105:7,12
115:21

**collections** 80:25
86:17,25 89:25
90:19 91:1,16
92:2
**college** 9:8,16
**columbia** 2:14
**combination**
189:13
**come** 11:17,23
17:10 18:5,10
22:23 23:5 33:21
35:2 36:6 66:4
73:11,14,15,21,22
91:22 111:3
121:16 128:7
129:7 140:6
158:23 170:18
175:4 202:10
211:25 221:2,4
225:12 226:14
228:19
**comes** 29:14
**coming** 14:12
20:15 75:13
149:12 211:14
213:1 214:5
**comment** 122:4,22
149:11
**commission**
229:25
**commitment**
145:6,8
**committed** 123:14
141:11,19,20,20
141:20
**common** 27:23
**commonality**
183:9
**commonwealth**
229:5

**communicating**
135:2
**communication**
154:14
**communications**
43:18 62:21 63:5
63:9
**companies** 12:24
25:10,19 26:19
122:14,17 129:3
162:2
**company** 25:23
46:6 62:10,11
122:12
**comparison**
140:18
**compensated**
124:8 170:19
**compensation**
124:3,4 125:8
168:11
**competence** 32:20
**competency** 41:25
74:15 102:18
131:4 138:11
**complete** 212:6
**completed** 230:8
**completely** 49:7
80:17 88:4 160:23
173:16
**complex** 10:19,20
128:5
**complexity** 10:19
147:10
**compliance** 15:21
49:15 56:4 79:10
85:6 88:23 89:16
93:18 134:10
225:24
**compound** 222:25

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[computer - correct]                                                              Page 9

computer  229:11
concept  127:7
    128:19 140:15
    180:13
concepts  148:10
concern  85:4
    103:4 126:1
    154:10,12 164:7
    165:6
concerned  152:12
    153:16
concerns  144:4
concise  146:1
concluded  228:22
concludes  226:18
conclusion  187:5
conference  205:23
    205:24 206:18,20
    206:22 227:18
confidential  1:14
    74:12,22,24 98:2
    98:17 101:12
    226:23 227:5
    228:9,18
confidentiality
    54:16 103:1 104:6
    104:11 156:1,12
    156:17
confirm  192:14,21
    227:24
confirmation
    192:14,21 194:2
    194:10,17 196:18
    197:2,10,18,20
    198:25 199:2
    204:20,22,25
confuse  180:4
confused  64:2
    153:24 199:20
    204:23 213:18

confusing  195:25
connect  61:10
    224:18
connected  16:4
    116:14 147:14
    167:19 194:17
connecticut
    169:12
connecting  23:15
    118:25
connection  17:1
    118:23 207:23
considered  27:9
consistent  35:22
    199:12 211:3
constant  162:19
    164:13
constituted  180:14
consultative
    203:14
consulting  24:15
    24:15
contact  58:21 59:1
    59:18 165:15
    209:5
contacting  165:18
contacts  60:5,20
contemplates  47:4
contempt  220:14
context  41:24
    117:4 118:17
    122:3
continuation
    106:18
continue  6:8 20:6
continued  3:1 5:1
    58:21 106:16
continuing  180:9
contracts  124:23
contrast  13:17

contribution
    30:20
control  130:20
    154:14 229:19
controlling  163:23
    163:24
controls  82:9,18
    83:1 162:20
    163:22,25 164:1,4
    164:5 174:9,12,15
controversial
    228:11,13
conversation
    14:11 18:3,17
    19:21 23:9,11,22
    23:24 24:3 30:15
    30:15 36:16 48:23
    51:25 67:3 109:7
    109:18 114:8
    115:5 121:2
    127:15,16,20
    128:4,7 138:24
    139:1,2 140:22
    145:2,11,22
    151:19 153:9
    157:5 173:5
conversations  6:4
    32:6 36:8,15
    131:11,15
converse  80:7
convey  208:9
convinced  76:15
coordinate  96:21
    124:9
coordination
    10:10
copied  65:10 97:6
copies  62:24
copy  52:20,22
    65:14 68:2,3 70:8
    70:9 71:15,16

77:11 200:17
    216:16 219:9
    230:9
cordially  96:15
corner  111:24
    221:1
cornerstone  58:3
corp  10:7 53:21
    181:2,3
corporate  56:21
    57:21,25 58:2,4,7
    137:16 147:5
corporation  1:6
    6:12 7:4,6 58:8,10
    231:2
correct  8:23,24
    9:4,5,10,15,20
    10:9 15:17 22:22
    26:14,15 30:21
    31:10,16 34:5,9
    40:18 44:14,22
    55:21 57:13 58:22
    61:6 62:15 63:8
    63:13 66:1,18
    67:9 73:13 76:13
    76:14,24 88:14
    95:23 97:5,8,11,13
    108:4 112:3,5,20
    115:21 116:1
    118:22 123:16
    125:3,6 141:18
    142:5 152:5
    166:12 167:5
    169:16,18,19
    176:12,14 177:7
    189:14,19 191:3
    199:7 200:13
    202:22,23,25
    204:17 213:15,16
    217:16,17 222:13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[corrections - deposed]                                                Page 10

**corrections** 230:17
231:20
**corrective** 155:1,7
**correctly** 57:4,14
**cost** 201:23,25,25
214:20
**costs** 20:11,14,15
20:16
**counsel** 6:25 7:24
50:4 68:19 71:15
219:10 224:4
**counterproductive**
98:5,8
**countries** 114:6
128:16 129:8
**couple** 14:17
129:16 222:5
**courageous** 43:21
**course** 17:7 24:3
203:15 228:1
**court** 1:1 4:14
6:13,20 7:13,19
8:11,14 15:12
16:5 37:22 47:4,4
47:10 49:13 50:20
68:23 69:2 85:14
99:21 125:16,23
126:3,7 218:5,7
223:21 227:18
229:20
**court's** 14:24 15:2
15:24 21:8 42:2
42:14 79:2 99:18
99:20,22
**courts** 68:17,19
217:25 218:19,21
218:22
**cover** 202:10
216:22
**covered** 129:16
202:4,7

**crazy** 129:7
227:21
**crc** 1:23 229:24
**create** 25:20 26:19
100:17 208:24
**created** 72:1,5,10
87:21,24 88:7
166:14 170:24
178:10,11
**creates** 141:3
**creation** 201:15
**cristina** 96:16
164:22 165:12,15
166:5
**cross** 65:3,12
228:18,20
**crossed** 65:13
**crr** 1:23 229:24
**crutcher** 2:3
**cultivated** 155:9
**culture** 29:12
**curiosity** 19:25
20:1,1
**curious** 205:21
209:13
**current** 140:1
**currently** 115:23
**customer** 207:21
**cute** 73:19
**cwp** 87:15,18 89:4
89:5 177:19
178:15 180:10
181:2,4 184:21
196:8 201:12,15
206:4 207:22
208:2,4,9,17
212:20 214:23
219:20 222:8
224:7,21,25

**d**

**d** 4:1 87:19 181:2
209:9
**date** 13:1 63:20
105:24 110:7
111:24 112:1,4
167:7 195:15
205:4 229:8 231:3
**dated** 26:4 53:22
54:3 199:3
**dates** 55:7,9,18,19
194:13
**day** 146:7 179:21
179:22 180:7
214:6 229:21
231:23
**days** 158:9 166:21
170:24
**de** 96:11
**deal** 38:11,13,15
38:21 39:14,16
40:3 41:3,3 115:3
183:9
**dealing** 128:5
146:4,14 154:6
**deals** 28:22 102:11
102:17 121:15
162:4
**debit** 214:18
**debits** 213:21
**december** 88:6,7
88:10 178:11,12
191:18,22 201:2
213:14 223:13
224:15
**decided** 169:14
**decision** 30:13
136:2,3,5 161:9,11
179:10
**decisions** 30:17

**declaration**
220:13,18,21
**deem** 227:2
**deemed** 34:23
227:5
**deep** 20:1 28:13
**deeply** 25:8 40:7
**defamation** 162:9
162:12
**defendants** 1:10
**defense** 148:7
**defer** 209:10
**define** 35:12 47:18
**definitely** 36:20
221:18
**definitional**
149:23
**definitively** 202:3
**degree** 9:3
**delete** 74:11 75:8
75:14 77:1,7
98:21 99:3 101:10
101:13,21,25
103:6,13 153:17
**deleted** 75:11,17
75:18,21 77:5
**deleting** 74:9
102:25 103:4
**deletion** 102:6,15
**deliver** 167:17
**delivered** 230:7,10
230:12
**delivering** 104:9
167:14
**depends** 135:24,25
**deponent** 229:13
230:9,15
**deponent's** 230:2
**deposed** 7:19
106:15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[deposition - donziger]                                      Page 11

**deposition** 1:15
6:7,11,16 48:23
85:7,8 105:22
226:19 227:3,7,12
228:6,22 229:7
230:12,16 231:1
231:20
**deposits** 213:2
**depth** 36:15
**describe** 10:12
91:5 124:22
**described** 68:13
**description** 4:11
5:2 52:11
**designate** 226:22
**designation** 228:8
**destroy** 101:22,25
**determine** 51:15
173:7
**diagram** 147:3
**dialogue** 119:17
**differ** 24:12
**different** 9:25
17:12 21:6 24:16
49:8 55:15 59:2
65:3 78:12 119:14
129:19,22 147:13
147:15 152:22
194:13 198:2
**difficulty** 186:17
224:19,23
**diligence** 128:13
168:1 172:14
**dinger** 2:13 7:7,7
**dinner** 66:13,15
66:21 139:7,8
144:19 147:25
150:7
**dinners** 66:20
**diplomate** 229:4

**direct** 19:21
106:20 211:11
229:19
**directed** 19:2
**direction** 19:14
229:20
**directly** 16:3
24:23 72:20
165:15 170:8,16
214:5
**disagree** 15:7 16:2
17:3 37:5,21
42:18 47:12,16,24
48:7 49:8 89:8
226:1,5
**disagreements**
92:22
**disclosures** 119:21
120:1
**discovery** 15:21
38:2 49:15 56:5
79:10 85:6 89:16
93:18 117:12,16
117:20 120:9,12
120:14 152:24
225:24
**discrete** 16:23
**discuss** 22:23 35:9
121:3 127:7 157:4
167:22
**discussed** 62:1
98:10,13 109:21
109:24 110:2
113:15,23 157:6
220:23 221:10
**discussing** 152:11
169:8
**discussion** 19:18
25:13 64:15 65:5
93:3 117:9,11,15
117:20 118:7

120:13 121:1,11
122:2 125:21
126:6 127:13
134:10 136:3
138:15,17 140:11
145:14,18 152:10
152:23 153:2
183:23 188:18,25
193:16 197:11
198:4 203:4 216:6
221:4,22
**discussions** 59:23
60:2,18 102:9
**disinterested**
229:14
**disorganized**
173:17
**disparate** 224:19
**dispute** 164:9
228:4
**disregard** 129:10
129:13 165:25
**distinguish** 16:14
**distressed** 112:22
**distribution** 230:1
230:5,22 231:6
**distributor** 139:12
**district** 1:1,2 6:13
6:14 53:20 99:18
99:22 143:3
160:18 179:23
**doctor** 24:17
**document** 15:16
16:15,15 35:13
47:3 53:11,20
54:17 64:24 65:4
69:24 71:10 76:2
77:10 100:14,18
124:12 125:10
129:16 131:14
190:13,24 192:4

198:15,23 199:3
201:17 204:15
210:11 211:15,23
212:3,7,10,17
215:6 216:2,8
219:8,15 220:12
222:5
**documented** 154:1
**documenting**
121:9
**documents** 13:10
14:17,19 15:15
21:7 37:15 60:25
83:7,15,21,24 99:8
99:25 100:17
101:19,22 102:1
103:1 108:13
124:21,22 132:15
132:21 161:2
169:10 170:12
172:8,9 184:5
185:9 216:19
**doing** 21:9 30:1,6
34:5 37:6 41:10
67:19 93:1 115:4
124:10 126:13
128:2 141:15
158:21 170:21,22
170:23 178:1
179:4 180:13,25
**dollar** 28:7,7
**dollars** 116:10
140:1 159:25
**domestic** 177:24
**donziger** 1:9 5:19
6:12 14:15 16:22
19:7 25:12,17
26:17 27:14 31:25
34:16 35:19 36:1
36:8 38:10 42:13
43:4 45:19 48:9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[donziger - elliott]                                                     Page 12

| | | | |
|---|---|---|---|
| 53:21 54:2 60:6 | 213:24,25 214:1 | 123:4 135:9 | 219:5 221:12,24 |
| 60:20 64:17 66:2 | 214:12 216:9 | 174:20 176:9 | 225:3 |
| 66:7 68:13,21 | 219:9,16 221:16 | 177:4 199:13 | **ecuadorians** 72:2 |
| 69:1 80:12,22,25 | 222:10,22 223:7,7 | 222:10 225:9 | 72:6,10 97:14 |
| 81:11,20 82:5,12 | 223:11,17 224:10 | **ears** 28:17 | **ed** 78:17,20 202:9 |
| 82:20 83:4,8,16,22 | 225:1 227:13 | **easier** 53:6 193:7 | **edjohn** 78:19 |
| 84:8,20 85:1,18,21 | 231:2 | **ebbed** 11:11 | **education** 171:3 |
| 86:3 88:13,25 | **donziger's** 16:20 | **echoing** 103:7 | 207:6 |
| 90:5,11,17,24 | 85:11 110:1,9 | **economic** 29:22 | **effect** 35:20 40:14 |
| 97:25 101:9 108:8 | 124:3 130:25 | **ecuador** 12:24 | **effective** 92:20 |
| 108:21 109:14,16 | 139:14 141:20 | 13:5 14:5,15 17:1 | 217:25 218:17,17 |
| 109:19 118:10 | 143:12 170:15 | 35:4 58:14 68:17 | 218:20 |
| 119:14 127:8 | 186:4 189:7 | 69:20 70:21 96:6 | **efforts** 114:2,5,7 |
| 128:19 130:12 | 209:16 | 96:22 97:14 107:4 | **ego** 144:7,8 |
| 132:3 133:24 | **doodle** 147:7,8 | 120:7,9 131:22 | **egos** 144:6 |
| 134:24 135:2 | **door** 109:7 | 139:24 167:20 | **either** 37:13 78:16 |
| 136:9,23 139:3 | **double** 41:15 | 185:15 201:22 | 100:21 119:12,24 |
| 140:7 141:5 143:9 | 65:10 70:10,11 | 202:10 | 120:24 128:21 |
| 144:2,3 146:24 | **downtown** 160:12 | **ecuadorian** 11:21 | 149:13 150:2 |
| 148:13,14 149:12 | 160:22 | 19:9 20:18 23:17 | 151:3 165:18 |
| 151:24 152:25 | **draft** 158:18 | 23:25 24:2 28:10 | 182:7 204:4 |
| 153:10 154:4 | **drafting** 54:10 | 29:25 30:5 31:18 | **elaborate** 51:6 |
| 155:14 157:1 | **draw** 121:8 | 34:12 44:23 57:3 | **elliott** 16:4,12,19 |
| 163:14,24 164:10 | **drawing** 21:1 | 60:3,6 61:18 | 17:2 18:10,24 |
| 166:3 168:12,13 | **drew** 148:7 | 68:17,19,19,22,23 | 19:16,19 20:9,24 |
| 170:3,12 171:24 | **driver's** 7:18 | 69:1,2,7 75:22 | 21:14,19,21 22:12 |
| 172:8,16 174:17 | **driving** 63:17 64:4 | 86:17,25 88:2 | 22:20,23,25 23:1,3 |
| 174:19 175:1,13 | 64:8 | 89:19,21 90:1 | 23:12,21 25:1,4,18 |
| 176:11 178:14 | **drops** 44:20 | 91:1,17 92:2 | 26:17,23 28:1,6 |
| 181:24 182:5 | **due** 128:13 168:1 | 94:22 95:1 96:5,6 | 29:8,12,23 30:3 |
| 183:11,13,17,22 | 172:14 205:2,11 | 96:17 97:3,4,13,19 | 31:4,7,8,21 32:1,6 |
| 183:25 184:13 | **duly** 7:19 106:14 | 98:11 99:9,14 | 32:9,10 37:2,15,20 |
| 185:23 186:18 | 229:7 | 101:23 102:1 | 40:15 42:9,15,20 |
| 187:18 191:2 | **dump** 175:25 | 105:4,10 115:8,25 | 43:5,19 47:7,14,14 |
| 196:6,18,23 | **dumping** 12:23 | 116:2,13 117:13 | 47:15,20,25 48:10 |
| 197:10 201:12 | **dunn** 2:3 5:25 7:4 | 117:18,21 120:15 | 49:3,11,16,22 50:1 |
| 202:14 205:12 | 7:6 180:3 | 124:4 126:2 131:3 | 51:3 52:1 54:8 |
| 206:14,19,22 | | 137:12 139:21 | 55:2,18,20 56:22 |
| 207:22 208:10 | **e** | 142:19 157:1 | 57:22 58:1,22,25 |
| 210:15,21 211:11 | **e** 4:1 229:1,1 | 159:6 162:24 | 59:6,9,19,24 62:7 |
| 212:25 213:4,24 | **earlier** 40:14 | 163:1 167:4 183:4 | 62:17 63:10 66:19 |
| | 95:21 97:2 116:7 | | |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[elliott - exhibit]**                                                       Page 13

69:16 72:11 73:11
76:22 106:19
107:25 109:6,13
112:6 115:3
118:11 121:3
126:1,9 127:9
128:3 130:16
131:1 132:7,8
139:5 141:1
143:24 145:11
146:4,14 153:25
157:22 158:10,14
160:16,19 162:1
164:8 165:3 171:8
171:17 182:21
217:16
**elliott's** 65:25
115:7 148:4 161:2
**email** 16:3,7,10,11
25:25 26:4,9,12,12
31:1,11,15 32:2
34:16,20 37:8
38:9 42:4,19
43:16 47:25 52:10
54:3,6,23 57:15
61:6,9,11,12,22
63:7 64:24 65:11
65:20 66:5 68:8
68:10 69:19 70:18
71:2,3,8,19,21
74:20,24 76:8,12
76:13 77:7,18,22
78:18 80:10 81:9
81:18 82:3,9,15,18
83:1 93:5 97:24
98:14,19 101:8,10
102:4,22,24 106:9
106:19,21 107:18
107:19 131:21
151:8,12,13,21,25
152:11,25 153:6

153:14,23,24
154:2,21 155:2,8
163:16 164:7
165:20,21,24
166:7 171:9,10,15
172:12 180:5
204:1 217:15,15
**email's** 152:17
**emails** 49:10 62:25
63:1 74:8 75:8,9
75:11,13,15,17,22
76:3 98:22 99:3,8
99:11,13 101:11
101:14 102:25
103:5,7,12,13
127:8 153:25
168:22 171:11
**embarked** 171:2
**embedded** 162:17
163:8
**emc** 161:22
**employees** 11:5,10
**encroach** 56:10
**encroached** 15:20
**ends** 43:24 44:1
45:3,14 49:24
56:20 57:8
**enemies** 156:1,11
156:17,25 157:1
**enforce** 115:24
116:9
**enforced** 173:3
**enforcement**
110:15 114:10
127:4 142:20
148:25 149:3
**enforcing** 119:15
**english** 94:23
**ensure** 190:8
**entails** 10:13

**enter** 130:25 132:4
**entertain** 129:14
**entire** 66:13
117:24 118:8
227:2
**entities** 207:24
**entitled** 14:18 15:4
16:10 49:9 110:14
124:8,12,23 125:7
190:9
**entitlement** 124:3
**entitles** 208:13
**entity** 87:11,12
88:21 89:3 90:13
177:21,24 180:10
180:13,14 181:6,9
208:11
**entrepreneur** 10:3
**entry** 222:20
223:5
**environment**
218:5
**envision** 73:25
**epes** 185:7,7
**errata** 230:1,2,5,6
230:8,18,22 231:4
231:5
**especially** 138:20
**esq** 2:4,5,13 3:4,5
**esquire** 230:7,11
**establish** 42:24
186:24 187:1
**estate** 220:4,5,10
**et** 1:9 6:12 8:14
19:22 231:2
**evaluate** 127:25
**evening** 66:13,15
70:19 139:4
**evenly** 109:17
**event** 229:15

**events** 9:2 182:19
**everybody** 98:16
106:19 151:14
**everyone's** 67:2
**everything's**
147:14
**evidence** 117:13
117:17
**exactly** 20:10 44:6
107:13 125:4
**examination** 4:5
7:21 106:16
**example** 173:3
186:11 188:3
202:6 220:25
221:11
**examples** 48:3
**exception** 49:14
49:16
**exchange** 80:24
86:16,24 90:18,25
91:16,23 127:10
131:2 133:1 225:2
225:13
**exchanged** 108:13
**excited** 63:21,23
**excuse** 28:15
35:11 89:15
**executed** 231:23
**exhibit** 4:12,13,14
4:15,16,17,18,19
4:20,21,22,23,24
4:25 5:3,4,5,6,7,8
5:9,10,11,12,13,14
5:15,16,17,18,19
5:20 25:14 26:8
37:23 53:11,13,19
53:23 54:2 64:23
65:16,17 68:1,4,8
69:23 70:1 71:10
71:12 76:7,9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

77:10,14 79:2
93:8,9 106:8,10
111:7,9 157:23
158:1,4 188:24
189:1,3 190:13,20
190:21 191:20,25
192:1 193:1,8,9,17
193:22 194:6,7,16
194:17 195:5,9,20
196:2,9,14,19,22
197:2,3,6 198:15
198:20 200:3,6,8
200:23,25 201:1,1
201:1,2,4,7,8
203:7,12 204:9,10
204:13,21 206:7,8
207:13,14 211:5,7
212:12,13 215:7
215:12,23,24
217:11,12 219:8
219:12 220:12,15
220:21
**exhibits**  4:10 5:1
5:24 199:25
**exist**  181:7
**existed**  99:25
100:3
**existence**  220:1
**exists**  100:15
**expect**  74:4 228:10
**expense**  186:14
215:19
**expenses**  87:25
132:25 140:5
176:25 178:20
179:2,6 189:13,15
190:2 202:5,11
203:15 206:3
215:18
**expertise**  126:21
126:22

**expires**  229:25
**explain**  37:10
44:12 45:15,17
47:18 130:19
141:24 142:9
154:4
**explained**  16:25
57:12,16
**explaining**  42:20
48:9
**explains**  42:11
**explore**  173:6
**exploring**  23:9
**exposed**  32:15
**express**  126:1
178:22
**expressed**  127:1
**expressly**  47:5
**extensive**  17:15
**extent**  181:9
186:21
**extra**  77:12
**exuberance**  107:7

**f**

**f**  229:1
**fabulous**  106:23
**face**  16:14 67:22
67:22 123:20
**fact**  15:12 16:2
47:3 49:4 52:2
57:9 59:18 62:6
77:5 99:2 102:7
173:9 187:17
190:8
**facts**  14:14 49:2
142:1,10,14,14
**fail**  16:22
**fair**  29:22 81:12
124:9 133:18
144:9

**fairest**  27:20
**fajardo**  69:4
162:16,23 163:23
164:10,18 165:7
**falibby**  3:9
**fall**  91:7,8 224:10
227:3 228:5
**falls**  88:17
**false**  72:21 73:4
**familiar**  168:21
176:6 182:6 184:8
185:8,11
**families**  10:14
24:19
**family**  8:22 9:22
10:6,17,25 18:18
23:7 61:19 64:9
66:12,13 87:20
139:9,16 177:22
182:25 214:12
**fan**  52:14
**far**  15:25 21:9
38:5 42:1 47:22
202:21
**fast**  92:25
**fcpa**  113:3,7,12
**fda**  94:23,24 105:1
105:3 140:16
185:15 222:9,14
222:17 224:8
**fda's**  105:7
**fear**  102:15 144:22
**february**  86:9
179:13,13 191:16
197:15
**fed**  215:2
**federal**  38:17
143:3
**fee**  214:23
**feel**  146:19,21,24
174:12

**feeling**  28:11
174:14
**fees**  24:23 125:9
214:17
**fellow's**  18:14
**felt**  74:10
**figure**  91:6 192:19
**figuring**  66:23
**filed**  6:13 114:11
220:13
**files**  175:6
**fill**  180:18 207:18
208:6,23,23
**filled**  208:2
**finally**  128:12
**finance**  24:11 44:8
**finances**  209:22
**financial**  10:19
16:21 76:22 84:13
84:18,23 85:16
160:18 168:24
169:2 186:5
209:17
**financially**  6:23
178:24
**financing**  49:3
80:23 86:15,23
89:18,20,25 90:5,8
90:17,24 91:15,22
92:8 225:2,12
**find**  17:25 22:2
67:5 192:17 198:1
210:17,18
**fine**  36:18,19 49:4
92:23 100:2
105:14 116:18
125:7 169:4 212:2
227:14 228:21
**finish**  43:17 93:5
151:5 188:21

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**fire** 145:16
**firm** 6:19,21
   170:14,15 174:22
   184:13,17 189:7
**first** 11:17,23
   12:12,16 13:5
   14:16 24:25 33:22
   35:3,5 42:12
   69:11 77:13 78:13
   78:14,23 115:15
   133:20 146:18
   159:1 168:22
   176:15 198:24
   212:4 213:5,8,23
   214:3 229:7
**fit** 15:23 19:20
   28:1,9,12 52:1
**fits** 17:13
**five** 9:12
**fix** 65:2 155:5
**florham** 2:16
**flow** 10:22 159:24
**flowed** 11:12
**flowing** 173:22
**flows** 173:21
**fns.bc.ca** 78:19
**focusing** 49:1
**folder** 76:4 204:7
**folks** 10:24 69:19
   70:20
**follow** 61:9 101:13
   121:12,13 171:8
   172:7 177:3
   186:23 187:3
**followed** 171:16
**following** 153:17
**follows** 7:20
   106:15
**fontaine** 78:2
   202:9

**forces** 141:2
**foregoing** 229:6
   229:11,17 231:19
**forest** 13:14,16
   183:8 219:5
**forever** 115:12
**form** 19:3 21:16
   24:22 40:4 75:25
   87:22 111:1
   180:18 207:18,18
   208:1,23
**formal** 94:2
**former** 78:4
**forth** 15:18 37:12
   75:13 119:18
   121:2 229:9
**forum** 170:14
   184:17 196:10
**forumnobis.org**
   95:6
**forward** 28:18
   66:2 77:1 171:17
**forwarded** 230:11
**found** 76:4
**foundation** 42:1
   74:15 102:19
   131:5 138:12
**founded** 62:11
**founder** 29:9 94:5
**founders** 12:3
   94:6
**four** 108:11
   203:15
**frame** 165:17
**frank** 3:4 7:9
   230:7
**frankly** 92:23
**fraud** 72:2,15
**fraudulently**
   34:24

**free** 173:1
**freelancer** 19:12
**frequent** 135:22
   135:23
**frequently** 135:4
**friday** 63:17,18,19
   63:24 64:3,4,5
**friend** 139:9,13,15
   139:15
**friends** 97:25
**front** 68:11
**fronted** 202:13,15
**frozen** 114:24
**full** 90:16 229:12
**fully** 34:25
**fund** 21:15 22:14
   25:7 28:2 29:16
   57:18 115:15,16
**funder** 23:24 25:2
**funders** 102:10,17
   221:8
**funding** 20:6,8,10
   20:11,24 23:6
   42:15 47:6,6,20
   102:9 167:2 174:2
   222:19 223:4,14
   223:18
**funds** 21:1,9 23:2
   28:6,7 42:9 83:9
   90:4 180:9 223:9
   223:15 224:6,6,6,9
   224:21,25
**further** 56:4 59:23
   60:2 74:7 106:14
   160:1 221:19
   222:4 229:14
**future** 80:24 82:6
   82:21 83:4 86:17
   86:25 89:25 90:19
   90:25 91:16 92:2
   152:24 153:4

173:2

**g**

**gained** 34:24
**garage** 176:3
**gatekeeper** 85:4
**gc** 117:23 118:4,7
**general** 23:20
   27:23,23 39:18
   121:13 122:4
   131:13 145:1,4,14
   145:17 146:17
   154:7,15 169:21
   173:8 174:10,10
   222:2
**generally** 33:25
   35:13 145:19
   168:25 187:21
**gentleman** 26:13
**gentlemen** 97:6
   114:9
**george** 184:1,4
**getting** 14:14
   36:11 37:6,19
   47:2,9 60:16
   64:18 174:14
   188:20 218:17
   222:16 226:15
**giant** 146:13 183:1
**gibbons** 94:9
**gibson** 2:3 5:25
   7:3,6 180:3
**gibsondunn.com**
   2:9,10
**gift** 59:4
**gist** 145:14,18
**give** 8:12,13 28:12
   48:3 55:6,9,18
   60:25 68:2,3
   80:20 89:22 92:10
   98:20 103:13
   108:21 118:17

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[give - hear]** Page 16

165:6,23 173:24
193:8,13 212:6
**given**  179:12
213:9 229:12
**giving**  77:11
132:21 138:15
156:23 183:17
**glaser**  95:24
**glenn**  133:21
**gmail.com**  96:3
97:9
**go**  6:9 7:24 8:25
13:13 19:24 21:17
22:7 26:22 28:16
29:4,6 36:3 39:20
43:16 45:25 49:14
50:6,7,9 51:2,11
51:14,14 53:9
56:15 57:2 71:7
79:11 81:5,13
87:23 91:25 93:8
93:11 100:24
102:20 103:20
105:18 107:24
111:5 112:18
129:15 130:18
135:13,15 138:13
146:21 154:8
157:21,24 159:25
168:10 171:11,17
178:7 180:16
181:11,13,24
182:2 183:20
186:1 187:1
188:16 190:15
195:11 198:5,18
201:4 203:2 204:1
215:1,5 222:6
**god**  147:6
**goes**  46:11 98:4
111:16 124:16

133:6,11,17
152:16 200:3,25
201:1 215:2
**going**  6:2 7:23
14:10 15:8 16:1
17:14 24:20 29:2
31:12 37:8,9,10
38:5 39:2 42:10
47:21 48:13 50:23
51:19 52:10 53:10
53:10 59:10 64:22
65:2,2 66:24
67:25 69:22 71:7
71:9,15 74:2,25
77:20 79:11 84:3
84:10 87:5 92:23
93:5,12 106:6
111:6 128:24
135:13 143:24
145:16,25 146:20
148:13,22 149:25
153:14,24 158:17
158:18 171:17
174:3 188:11,16
188:23 190:12,19
194:6 197:5,18,21
198:14 200:5
202:22 204:8
206:6 210:10
215:6,22 217:10
219:7 220:11
226:17 227:17,20
228:11
**good**  6:1 7:23
19:20 23:16 24:5
24:6 27:1 28:1,4,9
28:12 29:2 40:17
40:20 41:10,17
48:10 75:3 77:11
106:6,23 114:2,17
147:22 174:9,12

178:23 226:9
**google**  160:17
**gordon**  159:15,16
159:19
**government**
121:19
**graduate**  9:6
**grand**  78:4
**grant**  79:19 98:20
**grant's**  101:10
103:23
**granted**  80:23
86:15,23 90:18,25
91:15 222:18
**graph**  148:6
**great**  8:10 18:24
170:23 174:15
**greenpeace**  94:5,6
**greeted**  108:9
**grinberg**  5:20 55:3
63:4 67:6 109:15
109:19 112:20
119:14 122:19
126:24 128:2,20
129:2 171:16,18
172:4
**grinberg's**  220:13
**ground**  7:24
**grounding**  9:1
**group**  35:8 78:10
78:11,23 207:6
**guess**  41:14 64:3
75:3,6,7 107:23
109:14 128:2
200:2
**guessing**  169:5
**guest**  12:8
**guidance**  156:23
**gym**  183:1

**h**

**habit**  138:19
**half**  18:20 92:25
108:6 171:13
**hall**  180:16 181:14
208:24
**hand**  54:10 64:22
67:25 69:22 71:9
71:15 74:25 106:7
111:6,24 162:7
188:23 215:22
217:10 219:7
221:1
**handed**  26:7
**handing**  68:7
203:11
**handwriting**
114:1,2 141:25
204:17 207:19
**handwritten**  5:20
52:8,18 55:11
159:9
**hang**  33:7 83:11
86:18 110:20
124:14 216:5
225:20
**happen**  21:23 39:8
63:23 218:20,21
**happened**  63:19
69:16 74:1
**happening**  24:21
67:1 152:12 206:2
**happy**  16:9
**hard**  162:14
**hardships**  72:1,5,9
**head**  8:13 59:8
119:20
**heads**  43:5
**hear**  11:17,23
67:14 171:13

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[heard - initiating]**                                              Page 17

**heard** 21:19 25:4
  35:3,5,6 143:6
**hearing** 43:2
  133:15 227:11
**heaven** 52:8 56:17
**heavy** 98:3
**hedge** 23:2 25:7
  28:6 29:16 43:22
  44:5,8,9 45:4,6,12
  49:23 57:18
  116:18
**held** 6:16 30:16
  58:8,11
**help** 13:2 60:10
  87:24 132:24,25
  172:21 183:7
  192:19 195:11
  218:7
**helpful** 15:13
  213:18
**helping** 96:21
  185:15 205:22,24
**heredia** 96:11
**hereinbefore**
  229:9
**herrera** 2:5 7:5,5
  195:22 197:7
**hesitate** 34:5
**hey** 156:21
**hierarchy** 28:21
**high** 152:13,19
  154:25
**higher** 152:22
**hindsight** 154:16
  163:16
**hinton** 71:21 72:9
  95:20,21
**hinton's** 71:23
**historical** 173:23
**historically** 163:3
  173:20

**hmm** 21:20
**hold** 56:12 186:3
  193:20
**home** 176:2
**honestly** 187:6
  206:12
**hope** 106:23,24
  175:15
**hopefully** 92:25
**hoping** 159:9
**hosts** 182:19
**hotel** 202:8
**hour** 18:20 108:6
**hourly** 125:9
  192:10
**housekeeping** 65:7
**howard** 95:24
**hum** 25:21 28:19
  34:17 147:24
  158:20 166:22
  171:20 174:24
  179:15 205:3,9
**human** 10:20
  207:6
**humanitarian**
  122:10
**humble** 143:21,25
  144:5
**humbled** 144:6
**humility** 145:24
  146:3,6,9

**i**

**ian** 79:23 81:17
  93:22
**idea** 28:18 44:25
  45:5,9,20 48:10
  68:20 99:1,4,10
  103:25 104:3,5
  113:6,8,22,24
  117:2 121:18
  122:6 125:18

148:12 220:6
**ideas** 24:6 28:25
  29:2 129:7
**identification** 4:10
  5:1 25:15 53:14
  53:24 65:18 68:5
  70:2 71:13 76:10
  77:15 106:7,11
  111:10 158:2
  189:4 190:22
  192:2 193:2,18
  194:8 198:21
  200:9 201:9 203:8
  204:11 206:9
  207:15 211:8
  212:14 215:13,25
  217:13 219:13
  220:16
**identified** 7:17
  16:5 91:20 97:1
  110:22 225:10
**identify** 18:10
  23:5 192:4
**identifying** 29:17
**illness** 8:7
**imagine** 115:5
**impact** 23:16
  41:17 166:20
  168:1,3
**important** 104:7,9
  104:12 143:23
  146:3,5,6,10,19
**impression** 146:18
**impressions** 13:18
**improperly** 102:8
  104:2
**inadvertent**
  151:16
**inadvertently**
  151:8,12,18,24
  152:1

**inbox** 76:5
**included** 222:21
**includes** 223:2
**including** 72:2,15
**inconvenient**
  160:3
**incorporated** 9:23
  9:24 10:6 177:25
  178:2
**incorrect** 48:6
**incredible** 145:3
  217:23
**incredibly** 219:1
**independence**
  140:9,12
**indicate** 230:17
**indigenous** 13:2
  78:10,11,22
**individual** 10:16
**individuals** 185:15
  221:8
**influence** 217:24
  218:10
**info** 101:11 209:5
**inform** 72:11
**information** 41:7
  67:23 72:20 77:2
  79:3 98:1,4,17
  102:8,16 104:3,4
  138:3 140:6 165:7
  172:11 173:23
  179:21,24 209:8
  230:1,5,23
**informed** 141:23
**informing** 151:13
**informs** 159:25
**infrastructure**
  137:18,19
**inherently** 20:16
**initiating** 208:7

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

injunction 116:3
116:13,16 125:24
222:20
injunctions 116:5
125:22
inquire 168:6
inside 35:21
218:21
institutional 98:2
instruct 15:8
17:20,23 18:8
31:23 37:9 38:6
42:10 47:22 79:11
80:14 226:6,7
instructed 70:21
92:9 224:4 228:3
instructing 21:10
123:21,24 226:1
instruction 48:14
48:17 49:18 50:3
92:16 93:15
101:13,16
instructions
101:18 210:3
213:6 230:2,15,22
231:6,6
insurance 10:24
intend 92:23
intended 42:24
82:4,20 83:3
151:17 208:9
intending 173:13
intent 21:1
interconnected
147:13
interest 44:13
46:15,19 60:15
90:9 91:2 110:1,9
123:5,8 125:1
132:3,9,22 133:25
139:24 182:8

188:17
interested 6:23
20:10 23:6 29:17
29:24 30:4,8,25
33:10 49:22 83:12
127:24
interesting 11:16
13:17,19,23 14:1
122:25 129:11,12
167:21 171:1
173:18 174:6
interests 110:18
interfere 6:7
interference 6:5
international
33:17 40:7,11
interrupt 58:15
interruption 156:5
intimidates 134:24
intimidation
134:17,19 144:22
intro 61:12
introduce 16:10
31:12 53:10
167:12 190:12
201:6 203:2
207:13 210:11
215:6
introduced 12:8
61:4 199:25
introduction
22:18 31:3,4,5
61:3 167:14,15,17
introductory
127:20
invalid 35:21
invest 25:10 43:23
44:19 45:2,12
49:23 56:18 57:6
57:19 121:4 126:2
131:1

invested 25:9
80:10 81:9,18
82:3,15,19 83:9
investigation
136:8
investing 29:24
30:4 40:16,22
41:10 49:7 166:20
investment 10:24
30:10 43:22 44:3
44:5,13,17 46:5,9
46:15,18,23 49:22
51:10 57:18,22
58:1 62:9 82:10
83:2 89:13,13
90:23 98:11
109:24 121:9
125:22 126:10
127:9,14 132:8
133:13 149:17
investments 10:22
29:18,20 40:17,20
89:14 136:5 162:1
investor 18:11
27:10,12 31:18
40:15 41:15,21,23
51:4,7,16
investors 17:10
18:5 20:4 25:9
41:4 43:20 58:2,4
92:14 98:3 110:17
110:21,23,25
123:14,17 131:1
132:16 136:18
invitation 13:16
invited 12:3 13:13
invoice 189:7
190:16,25 191:1,6
191:17,19,22
192:5,6,20 194:3
195:2 196:3 199:1

199:9,16,21 200:4
200:7 201:3
202:20,24 203:11
203:23,23 206:14
206:20,21,25
207:5,9 213:15
214:15
invoices 170:13,15
177:10,14 182:16
183:21 185:19,22
185:24 186:11
193:4 199:17,24
206:1
involved 11:13
12:25 24:22 46:8
69:8 111:1 173:9
182:12
involvement 75:22
involving 120:14
ish 110:5
issue 37:16 68:3
130:20 133:9
issued 101:16
179:23 222:23
issues 168:10
items 212:22

| j |
| --- |

january 86:9
175:21 184:1
190:18 191:2,13
191:16,17,18
193:6 195:14
196:19 213:6
214:15 227:4
jeff 31:3,8,9,12,14
jesse 55:3 59:22
61:4 64:6 67:5
108:9 119:13
166:11
jesse's 65:22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[job - know]**                                                                 Page 19

**job** 9:12
**john** 78:17,20,24
  79:13 182:17,18
  202:9
**join** 66:3
**jonathan** 59:12
  62:14 64:6 167:18
  167:18
**josh** 168:18 175:4
  175:6 216:13
**jr** 3:4 230:7
**juan** 96:12
**juanaulestia01**
  96:3
**judge** 38:1,17
  143:1,2,3,10,18
  179:23
**judgment** 32:14
  32:19,24 33:4,21
  33:24 34:7,11,15
  34:19,21,22 35:2,9
  35:13,19,20,21,25
  36:7,10 37:7,14
  39:24 40:2,21
  41:3,12,23 44:14
  57:4 68:14,17
  73:10 74:5 86:17
  86:25 89:19,21,24
  90:1 91:1,17 92:3
  99:17,18,21,23
  100:6,9,13,18
  110:1,11 111:3
  114:11 115:25
  116:3,8,11,13
  119:16 123:5,8,8
  123:11 125:2
  130:20 131:3
  132:3,10,22
  133:14,25 139:21
  139:23 167:4
  173:4 187:20

222:22 223:5
  225:4
**judicial** 101:6
**june** 1:16 6:2
  14:24 15:18,24
  37:23 38:1 53:16
  53:22 79:2 229:21
  231:3
**juniper** 161:22,23
  161:24,25
**jurisdiction**
  221:20
**jurisdictions**
  128:14
**jury** 100:19
**justice** 104:9

**k**

**k** 1:15 4:3 7:16
  106:12 229:7
  231:1,25
**kaplan** 38:1 72:3
  72:16 142:24,25
  143:1,2,10,18
**karen** 71:21,22
  95:20,20
**karen's** 95:25
**katie** 6:11 7:10
  61:18 98:1 226:19
**keep** 54:18 74:12
  76:17 98:1,17
  101:11 103:9,10
  103:14 118:1
  155:25 156:10,16
**keeping** 178:24
**key** 58:5
**keywords** 158:22
**kids** 182:24
**kilcullen** 2:12 7:8
**kill** 102:10,17
**kim** 53:17

**kimberly** 1:23
  6:20 229:2,24
**kind** 10:11 13:21
  25:8 32:16 35:7
  36:11 39:23 49:14
  83:18 107:20
  108:17 119:17,18
  128:10 145:25
  147:13,16 154:8
  158:18,22,24
  162:10 164:9
  166:19 174:5,10
  185:9 188:15
  192:23
**kings** 129:8
**knew** 23:1 25:6,18
  30:12 34:7,15
  36:14 37:18,18
  39:2 59:8,8 62:14
  73:15,22 93:13
  220:4
**know** 9:1 10:21,22
  10:23 11:18,22
  13:21 14:21 17:5
  18:1,21,22 19:13
  19:20 23:1,3
  24:20,21 25:8
  29:13 32:21,22
  33:18 34:22 36:25
  40:1,2,2,14,15,19
  41:7 43:21 46:2
  51:22 53:2 54:4,9
  60:9,19 61:19
  67:22 68:18 69:3
  69:4,15 71:25
  72:12,13 73:2,7,23
  74:10,14,16 75:19
  75:21 76:2,6 77:5
  78:6,15 79:8,18,18
  79:21,24 80:5,8,9
  81:8,13,17,24 82:2

82:7,8,14,17,25
  83:25 86:10,14,22
  87:23 89:12 91:13
  96:12,20 97:19
  98:7,10,13,16,24
  99:2,7,25 100:25
  101:16,17 102:20
  103:20,21,23
  104:1,8,16,21
  107:11,16,21,23
  108:10 109:5
  110:12 113:7,10
  113:20 114:4,14
  114:18 115:3,12
  116:15,16,18,22
  117:3 118:2,4,19
  118:21,23 119:9
  119:22 120:10,19
  120:21,22 121:17
  121:21,23 122:18
  122:21 123:17
  124:18,25 125:12
  125:14,17,19
  126:6 127:25
  128:4,15 129:7,9
  129:18 130:3,21
  132:12,19 133:24
  134:4,12,18,23,25
  136:15,19 137:5
  137:16,24 138:13
  139:16 140:19,21
  141:1,3 142:7,14
  142:25 143:17,21
  145:10,20,21
  146:7 147:3,7
  148:4,17,20 149:5
  149:17,20 150:1,6
  150:11 151:1,2,3
  151:11,22 152:15
  154:3,7,14,17
  155:11,13,17,22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[know - libby]**                                                    Page 20

156:9 159:15,19
159:22 161:10,14
161:19 162:21,23
162:24,25 163:5,7
163:9,11 164:15
164:21 165:3,5,11
165:13,23 166:3
166:20 167:7,10
167:18,18,19
168:18,20 171:14
171:24 172:15,16
172:23 174:8,18
177:15 179:3
180:17 181:1
183:5,6,10,13
185:13,16,17
186:7,12,25 188:1
188:2,9 190:3
191:11 192:16
194:2 196:3
197:17,22 199:15
199:24 201:14
202:4,7,10 203:1
203:10 204:4,5
209:12 210:12,12
210:21,25 212:3
218:13,15,24
219:18 220:9
221:14 224:9
225:19 226:13
227:21
**knowing** 127:24
159:25
**knowledge** 14:20
36:13 59:1 60:21
119:6 143:5
169:24 172:9
179:16 184:9,12
184:18 205:15
209:25 210:2
220:7

**known** 25:6,7
**knows** 17:25
183:10
**krevlin** 133:21
**kroll** 137:21,25
138:8,9

**l**

**label** 26:9 64:25
**labeled** 53:12 76:8
198:15
**lack** 145:2
**lago** 11:17 80:10
81:9,19 82:4,10,19
83:2,10 114:11
136:4 140:15
**laid** 14:24
**lak** 1:3 6:15
**language** 37:7
47:3,18 48:3 91:5
91:11
**laps** 68:18 224:8
**large** 23:2 32:15
143:21
**laura** 94:15
178:17
**law** 40:6 137:16
174:22 191:1
206:22 207:3,5,22
208:10
**lawyer** 10:23
95:13 139:11
152:13 185:18,18
**lawyers** 69:8
76:19 97:3,13
99:14 100:15,17
110:25 114:18
123:14,18 128:5
154:6,7
**lbmiller104** 94:14
**lead** 49:3 68:16
163:4

**learn** 35:25 170:25
171:3
**learned** 13:25
33:22 167:19
**learning** 13:24,24
138:21
**leave** 128:24,24
**led** 9:2 43:9 52:6,6
52:9,14,16 56:15
128:10
**lee** 55:3 67:6
108:10,10 112:19
122:19 126:21
**left** 116:20 126:17
126:19,20,21
132:15 162:7
164:24 221:1
**legal** 1:25 76:16
100:14,14 117:3
128:13 132:25
137:15 142:14
180:2,3 185:9
187:5 191:12
192:8 203:14,14
207:21 218:3
**legally** 95:13
180:14
**legend** 56:21
57:21,25
**legitimate** 19:23
102:9 104:8,13
**lenczner** 97:21
174:19,20,22
175:1
**lenczner's** 184:13
**lengthy** 37:12
**lesson** 49:7
**letters** 146:13
**letting** 60:8
**level** 152:13,19,22
152:22 154:25

**lfontaine** 77:22
78:1
**liabilities** 16:21
84:13,17,23 133:7
133:11 186:4
**liability** 85:16
187:14
**libby** 3:4 7:9,9
14:9,23 15:7,11,17
16:6,13 17:3,7,11
17:17,20 18:2,7,12
19:3,15,24 20:21
20:25 21:6,16
22:5 25:24 26:3
26:22 31:20 32:20
33:5,7,11,13,23
35:11,16 36:2,25
37:5,13,21 38:5
40:4 41:25 42:5,8
42:13,22 43:1
45:23 46:2,25
47:16 48:1,7,11,16
48:18,21 49:6,13
50:2,6,9,23 53:15
55:23 56:2,8
60:11,15 65:6,12
65:15 70:3,6,12,14
72:7,12 73:1,6
74:14 75:2,25
78:25 79:7 80:13
80:17,21 81:3,6,12
81:22 83:11,18,23
84:1,6,10,14,17,22
85:3,13,23,25
86:18 87:1,5,10,14
87:22 88:16,19
89:1,6,10,15 90:2
90:6,10 91:8,10,18
91:24 92:4,9,15,19
93:1,15,21 102:18
103:15,18 104:15

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[libby - madam]**                                                     Page 21

105:15 110:20
111:11,14,18
116:20 123:19,23
124:14,17 126:11
131:4 133:5,8,12
133:18 134:9
135:13 138:11
157:11,13 158:3
181:22 186:3,16
186:25 187:6,11
187:17,21,23
188:5,8,11,15,19
193:10,12,15,20
193:22,24 194:19
194:21 195:9,11
195:19,21 197:5
198:16 200:17
201:18 203:5
204:12 206:10,16
211:18,21,24
216:5 217:2
219:11 223:19,24
224:2,12,17 225:5
225:15,19,22
226:3,7,24 227:1,9
227:11,14,19,22
228:10,14,20
230:7
**libbyhoopes** 1:17
3:3 6:17 7:9,12
**libbyhoopes.com**
3:9,10
**license** 7:18
**lie** 128:17
**life** 146:9
**lift** 98:3
**likewise** 76:25
**limitation** 116:24
**limitations** 15:18
223:3

**limited** 17:18
40:12
**line** 11:13 21:2
41:16 49:17 50:25
88:16 89:7 118:20
118:24 122:11
123:20 146:2
186:18 188:14,21
212:22 225:23
226:4 231:7
**link** 109:5 224:17
**linkedin** 18:15
22:21 26:14
**lisa** 94:9
**list** 5:19 219:17,21
**listed** 214:4
**listen** 48:21 56:8
163:20
**listening** 92:16
114:9 119:7
**literally** 45:7
127:5
**litigate** 20:17
**litigation** 11:18,21
11:22 12:18,21
18:22 20:11,14
23:18,25 24:2
28:10 29:25 30:5
31:18 34:12 39:1
41:10 44:24 46:16
60:3,6 75:23
80:11 81:10,19
82:4,11,19 83:2,10
88:3 101:23 102:1
115:9,17,21,22,24
117:13,18,21
124:5 126:2
127:10 128:5
134:22 136:4
142:19 153:3
163:1 183:4

221:12
**little** 13:22 14:13
41:1,6 51:6 53:9
67:22 82:24,24
118:19 122:11
156:21 157:24
158:21 162:14
198:2 213:18
216:16 222:25
**live** 13:22
**lives** 43:8 182:25
**llc** 2:12
**llc'd** 178:4
**llp** 2:3
**loan** 90:22 91:2
133:14 183:25
**loans** 91:14 132:24
133:1,3,23 182:4,7
**located** 6:17
**loe** 137:4
**long** 9:11 11:9
61:23 76:16 96:7
108:5
**longer** 39:1 179:17
179:18,19
**look** 17:10 39:21
40:21 41:11
111:22 121:19
128:13,16 192:13
192:15,18 196:17
197:21 212:7
216:25 219:21
**looked** 121:17
159:3 169:14
**looking** 24:8 28:22
41:21 56:9 100:24
115:10 121:15
131:14 144:17
145:12 156:20
160:1 166:9,13
173:25 191:15

193:19 200:7
211:22
**looks** 130:10 151:5
158:14 159:18
161:13 162:11
166:10 170:12
198:2 205:22
207:18 209:16
211:10 216:8
**loop** 227:23
**lose** 149:19,21
154:14
**losers** 149:19,21
150:3
**lot** 13:25,25 28:13
28:22 29:2 75:13
83:6,15 92:24
107:16,21 129:6
155:25 156:11,25
159:25 169:23
171:1 174:25
182:19 183:8
185:2 190:1,2
209:16 214:10
**lots** 28:6 100:17,17
**love** 143:20
**loved** 52:15
**luck** 106:23
**luis** 94:21
**lunch** 93:1,2 150:9
150:10,17,20
**lupita** 96:11,19
162:15 163:12,13
164:22,23 165:12
165:14,20
**lynch** 9:9,13
**lynne** 12:2

| m |
| --- |

**ma** 3:7
**madam** 37:22

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[making - meeting]**                                                          Page 22

| | | | |
|---|---|---|---|
| **making** 35:20 | 211:5 212:12 | 29:5 32:17 35:12 | 217:22 218:2 |
| 109:6 114:5 136:2 | 215:23 220:11 | 36:6 38:20 39:5 | 228:15 |
| 136:4,5 210:8 | **marked** 25:14 | 39:19,25 40:7 | **media** 6:10 50:18 |
| 218:4 224:20 | 26:8 37:23 38:3 | 41:13 43:25 44:4 | 106:4 157:19 |
| **man** 64:14 | 53:13,23 64:23 | 44:8,9,17 45:20 | 198:12 217:8 |
| **manage** 10:11,18 | 65:14,17 68:1,4,8 | 48:25 55:8 57:10 | 226:20 |
| 10:21 87:25 180:9 | 69:24 70:1 71:12 | 58:15 67:13,18,19 | **medication** 8:5 |
| 222:18 | 76:9 77:14 106:7 | 68:15 72:4,9 | **meet** 12:1,6,9 55:7 |
| **management** 10:9 | 106:10 111:7,9 | 74:25 78:21 89:24 | 55:19 67:11 |
| 16:20 18:11,24 | 158:1 189:3 | 95:10 100:7,7,10 | 106:24 135:1,3,7 |
| 19:16,19 20:9 | 190:21 192:1 | 100:11 103:3 | 146:18 150:19 |
| 21:14,21 22:20,24 | 193:1,17 194:7 | 104:11 107:9,14 | 153:25 159:5 |
| 22:25 23:1,3,12 | 198:20 200:8 | 107:16 124:7 | **meeting** 13:12 |
| 25:1,5,18 26:18,23 | 201:8 203:7,12 | 126:11 127:16 | 16:20 19:16 21:18 |
| 29:8,24 30:4 31:5 | 204:10 206:8 | 129:20,21 130:20 | 21:20 22:13,15 |
| 31:7,9,22 32:1,9 | 207:14 211:7 | 131:12 135:12 | 43:10 49:4 55:4,9 |
| 32:10 37:2 42:9 | 212:13 215:12,24 | 136:15 142:18 | 55:17,20,22 56:18 |
| 42:16,20 47:7,20 | 217:11,12 219:8 | 144:9 145:24 | 59:7 61:10 62:16 |
| 47:25 49:3,11,16 | 219:12 220:15 | 146:11 147:12 | 62:22 63:5,10,12 |
| 54:8 55:2,18 | **marker** 42:16 | 148:24 149:14,24 | 63:18,18,22,24 |
| 59:25 62:17 63:10 | **market** 44:2 | 149:25 151:17 | 64:5,9,18 65:24 |
| 72:11 127:9 | **markets** 44:18 | 152:6,12 153:18 | 66:4,8,9,19,23 |
| **managers** 28:24 | 46:21 57:19 | 156:19 158:13 | 67:1,4,8,21 69:16 |
| **managing** 24:16 | **marking** 53:19 | 174:1 175:7 | 70:20 73:11,25 |
| **map** 147:20 | **marks** 230:20 | 187:19,25 191:20 | 74:1,5 102:7 |
| 159:22 | **mary** 1:15 4:3 | 203:17 204:16 | 106:20 108:2,11 |
| **maps** 159:23 | 7:16 106:12 229:7 | 216:8 218:1,17,18 | 108:12,14 109:1,4 |
| **marathon** 64:8,11 | 231:1,25 | 218:25 | 109:10 112:4,7,10 |
| 64:13 | **massachusetts** | **meaning** 28:21 | 112:13,16 117:16 |
| **march** 86:10 | 1:19 6:18 229:6 | 117:6 | 121:1,11 126:10 |
| 180:1 197:16 | **match** 27:18,19 | **means** 51:18 57:15 | 126:16 127:7,20 |
| 199:3 | 194:23 199:8 | 112:7 113:5,10 | 128:23 129:5 |
| **marie** 2:4 230:11 | **matching** 195:1 | 115:2 118:2 137:6 | 130:9,16 132:7 |
| **mark** 25:12 53:11 | **materials** 173:19 | 140:21 149:10 | 139:5,13 141:1 |
| 53:16 69:23 71:9 | **matter** 6:11 38:20 | 150:1 155:11,18 | 143:24 144:13,13 |
| 76:7 77:9 157:23 | 134:1 171:18 | 163:7 164:12 | 145:15 146:5,11 |
| 188:24 190:20 | **max** 62:4 | 229:19 | 147:25 150:6,9,10 |
| 191:25 192:25 | **mdinger** 2:18 | **meant** 32:11,18 | 150:17,19 151:14 |
| 193:8 194:6 | **mean** 13:20 19:17 | 66:5 72:16,25 | 157:23 158:10,15 |
| 196:22 198:14 | 23:13,24 25:11 | 98:7 107:13 134:4 | 159:10,13 160:9 |
| 200:5 204:8 206:6 | 26:16 28:5,6,20 | 141:23 143:17 | 160:24 161:9,13 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 23

161:15,16 164:8
165:3 167:8,10
168:7 171:8
182:22 217:16
220:24 221:10
**meets**  16:16
**mention**  110:3
159:6
**mentioned**  18:21
25:1 34:16 37:15
53:16 90:3 145:24
**merkensteijn**
182:17 183:13,14
217:20
**merrill**  9:8,13
**mess**  12:23 175:16
**met**  12:13,16
13:25 69:5,7,11
79:24 96:13 97:3
107:3 131:22
135:8,11,16 219:2
**metaphorical**
107:11,12,20
**michael**  2:13 7:7
**microphones**  6:3,6
**mid**  180:1
**middle**  61:21
**miller**  94:15
178:17
**million**  10:16
114:23,24 134:5,6
134:7 137:3,21
138:1 221:8
**mind**  47:2,17
147:20
**mindset**  145:20,23
**mine**  30:14 75:4
99:6
**miniature**  52:7
**minute**  34:6 62:3
198:6

**minutes**  62:3
105:16 126:17
**misleading**  119:22
**missing**  195:8,9
200:4
**mission**  219:6
**misstates**  22:6
**mixed**  204:3,3
**mks**  4:12,12,13,13
4:15,15,16,16,17
4:18,18,19,19,20
4:20,21,21,22,22
4:23,23,24,25 5:3
5:4,5,6,7,8,9,10,11
5:12,13,14,15,15
5:16,17,18 26:9
53:12 64:25 68:9
69:24 71:11,20
76:8 77:10 106:8
111:7 157:25
189:2 190:20
191:25 193:3,9
194:6 198:15
200:6 201:6
203:12 204:9
206:7 207:13
211:6 212:11
215:7,23 217:11
**model**  29:3
**molecules**  147:18
**momentum**
218:24
**monday**  63:16,20
63:25 64:10 66:8
108:4
**monetary**  149:15
149:18
**money**  12:1 20:18
21:4,15,15 22:3
29:3 43:23,23,25
44:2,3,9,20 45:2,2

45:13,13,13 46:12
46:12 49:24,24
56:20 57:8,9
80:10 81:9,18
82:3,15 87:9 88:9
88:12,15 90:22,24
91:20,22 138:7
159:22 162:20
163:23,24,24,25
164:2,4,5 166:25
173:21,22 174:3,4
174:8,13,16
177:19 178:7
181:21 183:18
184:23 188:4
219:25 221:1,4,11
222:8 225:10,12
225:17
**monies**  38:24 39:4
39:5 85:1,20,21,22
88:8 91:14 110:14
174:25 175:12
178:14,19 182:7
187:25 208:3
**month**  171:12
178:21 205:8
**monthly**  176:21
177:6 197:23
**months**  176:15
**morning**  6:1 7:23
64:5 150:8,11
**motion**  220:14
**motivated**  70:17
**mouth**  41:1,6
**move**  15:11 34:5
43:17 50:3 72:22
73:4 188:11
**moved**  63:24
**moving**  15:1 83:12
113:25 122:1
134:3 136:1 140:9

141:11,22 147:2
174:9 188:17
**mtg**  112:6
**multibillion**  28:7
**multiple**  92:14
103:7 169:3
**munoz**  165:12
166:5
**mushy**  187:8
**musical**  52:7
**muñoz**  96:16
164:22

|               n               |

**n**  4:1 162:12
**name**  6:18 12:2
18:14 69:12 96:11
126:11 133:20
139:10 143:9,18
145:6 207:21
**natalie**  55:4 62:20
65:20
**national**  78:4
**nations**  78:13,14
78:23
**nature**  125:9
154:11
**nda**  54:7,10,16,21
172:24
**nda.fda.2017.doc.**
54:6
**near**  47:9 56:19
57:3,7 115:17
160:17 161:5
**neared**  57:3,10
**necessarily**  144:10
**necessary**  20:13
103:6 230:21
**need**  8:12,14,17
11:14 27:18,19
31:25 32:9,10
43:4 51:25 54:14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

54:19 67:14 103:1
107:23 114:18
140:10 144:6
154:17 165:2,4
171:11 174:4
189:20 192:16
193:24 216:22
**needed**  20:3,5
49:25 72:10 74:21
146:21 166:23,25
174:7,7
**needs**  174:2
**negative**  144:10
167:25 168:3
**negatively**  46:10
**network**  18:18
**networks**  23:7
161:23,23,24,25
**never**  21:23 25:7
29:13 30:14 36:14
38:22,23,24,25,25
46:8 99:11,12,13
101:2 125:10
148:15,21 152:9
172:15,19 176:4
179:8 208:6
**new**  1:2 2:7 6:14
13:25 18:17 55:7
55:19 63:17 64:3
64:4,8 66:8 135:6
138:24 139:1
140:20 143:4
160:6,17 170:7
179:24 182:19
**newer**  170:9
**news**  107:7 164:8
**night**  144:14,15,19
144:19,20 145:15
151:20
**nights**  202:8

**nil**  109:12
**nj**  2:16
**nobis**  170:14
184:17 196:11
**nod**  8:13
**nonprofit**  12:4
183:7
**nonverbal**  180:1
**nope**  170:20
**normally**  27:7
40:16 103:12
**notary**  229:5
**notation**  203:17
205:17
**notations**  230:20
**note**  6:3 52:8,18
52:20 55:11 59:3
128:12 159:2,9
191:4 194:25
199:9,9
**noted**  89:9 197:22
204:4 231:21
**notes**  5:20 21:5
53:1 107:25 110:3
110:25 111:6,21
112:9,12,15,18
115:10 127:6
129:17 130:6
134:3 138:19,20
138:25 141:23
144:18 150:10,16
157:9,22 158:6
160:15 161:6,19
162:3,8 163:11
164:23 166:10
167:8,16 168:9
220:20
**notice**  207:12,17
**noticed**  150:12
**noticing**  196:9

**november**  63:15
108:2 112:1 167:7
206:23 229:25
**number**  71:20
114:22 139:22
195:2,17 196:15
213:7,10 219:16
221:14,16 226:20
**numbered**  68:9
71:10
**numbering**  37:24
**numbers**  134:4
175:25
**ny**  2:7

**o**

**o**  162:12
**o'clock**  50:19
64:10
**oath**  6:22 8:1
**object**  87:6
**objection**  18:7
19:3,15 20:25
21:16 22:5,5
25:24 32:20 33:13
35:11 36:2 40:4
45:24 46:25 50:2
50:24 55:23 56:1
56:7 73:1,6 74:14
75:2,25 78:25
80:13 87:22 92:15
102:18 103:15,18
104:15 123:19
131:4 138:11
**objections**  17:24
**objective**  145:19
**objectives**  98:6
**obligation**  16:16
152:24
**observer**  14:1
**obstacles**  76:18

**obtain**  21:1,9 42:8
42:15 47:5,6,20
49:2 117:12,17
169:3 170:11,17
**obtained**  169:5
209:18 224:8
**obtaining**  173:10
**obvious**  33:1
56:23 67:14
**obviously**  17:5
37:20 47:12,14
60:12 85:2 146:11
**occasion**  107:3
**occasions**  129:19
129:23
**ocean**  61:21
**october**  26:5 54:3
**odeon**  160:2,6,12
**offer**  121:8
**offering**  31:6
132:8
**office**  2:15 8:22
9:22 10:6 18:18
23:7 61:19 87:20
169:11 176:2
207:3,5,22 208:10
**officers**  208:18
209:7,9
**offices**  6:17 65:25
191:1 206:22
**oh**  9:12 10:12
12:16 18:23 31:11
39:11 55:14,16
61:8 64:2,14 79:7
83:23 84:14 85:13
92:9 123:23 139:6
144:15 147:23
155:4 157:13
159:8 160:14,17
161:12 163:18
171:14 181:17

| | | | |
|---|---|---|---|
| 186:25 187:17,21 195:2 211:24 214:22 215:7 216:14 227:9 | 211:21 215:4 216:14 222:4,7 224:2,4 225:15 228:21 | 148:21 149:2,3 167:21 | **outstanding** 201:21 |

oil 12:24 58:18 122:12,14,17 129:3

okay 8:7,16 9:24 10:12 15:10 22:17 24:25 25:11 27:13 27:22 29:4 33:11 35:16 39:11 40:13 41:20 42:25 44:4 46:1,14 52:17 55:16 57:13 59:5 61:16 63:21 64:22 65:12 70:25 79:4 81:3,12 83:23 85:23 86:18 87:14 91:24 97:12 100:23 105:14 107:17,19 111:18 117:8 119:5,8 124:25 129:25 132:20 134:15 139:6 147:21 150:21 151:3 153:20,21,23 158:11 159:8,11 160:17 162:3 163:18 167:3,23 169:13 171:4 179:9 184:20 187:24 188:6 194:21,21 195:24 196:12,17 197:21 199:19 200:16,25 201:5 202:14 205:6 206:16 207:8 208:5,20 210:5,16 211:13

old 140:20 169:24 169:25 173:19 176:7
older 170:3
once 46:25 135:24
ones 75:19 162:10 182:16 183:21 192:16,18 194:23 204:24
ongoing 152:24
open 32:24 181:15 227:18
opened 13:21 178:13 223:12
opening 109:6
operate 75:14 152:13,21 154:25 156:19
operates 152:19 156:24
operations 113:20 122:8
operator 3:13 6:1 7:13 50:13,17 105:19 106:3 156:5 157:14,18 198:7,11 217:3,7 226:17
opine 100:21
opinion 51:11,12 99:20 100:6,10 101:6
opinions 74:22
opponents 27:19
opportunity 13:15 30:10,23 127:21 146:16,17 148:16

opposed 221:17
opposition 98:23 98:25 99:5 103:24
oppression 122:11
orbits 147:15
order 1:14 4:14 14:24 15:2,3,18,24 16:17,17 21:8 37:23 38:1 42:2 42:14 47:1,5 53:16,22 65:8 79:2 93:17 125:16 125:23 126:3,7 166:25 174:8 179:23 208:1 223:1 224:11 227:4
ordered 47:10 56:15
organization 173:15 183:7
organized 95:1
original 5:24 230:6,10,12
outbox 76:5
outcome 6:24 27:21 98:4 141:3 229:15
outcomes 145:4
outline 217:1
outrageous 48:19
outside 13:22 17:21 31:20,21 34:23 35:22 37:1 37:2,8 56:2 60:9 98:14 107:14 114:3 135:14 217:24 218:5,19 218:21 219:19

outstanding 201:21
overall 95:12
overwhelm 217:24
owes 139:20
owned 110:23 130:21 222:8
owning 118:8
owns 117:23 220:2 220:3

**p**

p.c. 1:17 3:3
p.m. 65:24 105:21 105:23 106:2 157:16,17 198:9 198:10 217:5,6 226:18 228:22
pablo 69:4 162:15 162:23 165:7
pachamama 12:4 182:18 183:4,6 219:3,4
pack 172:15
packet 172:11 179:21
page 4:5,11 5:2 26:2,12 31:2,2 32:2 36:24 38:10 65:10 71:16 77:12 77:13,18 97:25 98:20 101:9 102:3 102:4 104:1 106:22 107:3 120:17 129:24 130:1,1,1,4 131:25 136:1 138:23,25 143:20 144:17 147:2 150:5 158:16,17 159:4 160:1 161:8 162:7 164:24 166:9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[page - permissible]                                                          Page 26

167:6 180:18
184:16 194:2,11
196:6 197:18,20
197:25 204:22,25
213:20,20 214:4
214:11,11 215:8,8
215:10,10 231:5,7
**page's** 170:14
**pages** 1:12 111:23
129:16,20 196:18
197:10 212:4,5
**paid** 90:4,24 91:14
110:14 124:12,23
124:24 137:25
138:8 140:4
178:14 184:23
185:19,21 186:10
186:21 187:12,25
190:2,16,17 191:4
191:6,16,18
192:12,22 193:6
202:18,22 204:19
206:4,24 222:21
223:6,11,16
**papers** 121:9
180:2
**paragraph** 15:20
15:21 48:8 49:15
56:4,4 79:3,9
80:18 85:5,6,11
88:22 89:16 91:7
91:8,12 92:20
93:17,18 123:20
133:9 134:10
225:23
**parallel** 114:2,5
**pardon** 123:24
211:24
**parents** 220:5
**park** 2:6,16

**parse** 48:2
**part** 12:8 13:14,16
35:4 56:21 57:20
57:24 65:11 80:23
86:16,24 90:18,20
90:25 94:23 128:3
140:12 222:21
223:6,7,16 224:10
225:1
**participating**
125:16 126:7
168:7
**particular** 23:21
23:23 39:17
131:14,24 132:1
146:5,8,11 154:2
165:10 168:20
227:3 228:3
**parties** 6:9 110:24
187:25 188:2
228:5
**partner** 62:8
94:10 134:7
**partnered** 10:25
**partners** 28:23,25
**partnership**
127:21
**party** 6:22 187:12
221:8 230:10
**passage** 141:17,24
**passthrough** 87:20
**patricio** 69:12
97:2
**patriciosalazarc...**
97:9
**paul** 29:6 43:5
53:3 55:1 56:17
158:19
**pay** 88:12 116:11
132:24,25 178:20
180:16 181:5

203:18 204:2,5
213:14 218:18
224:10 225:1
**paying** 87:11
88:21 89:3 90:14
139:18 214:16
**payment** 82:5,20
83:3 89:3,3
157:12,13 173:2
176:21,22,23
185:14 189:12,18
190:18 191:9,13
191:14,16 192:9
192:11,21 194:18
196:5,7,23 197:13
199:6 207:9
211:10,11,12
214:14
**payments** 16:22
80:11,22,25 81:10
81:20 82:11 83:7
83:9,16,17,18 84:8
84:20 85:1,17,20
85:22 86:2,5,7,14
86:22 88:20,25
90:3,11,16 91:7,14
91:20 125:8,13
138:6 157:10
168:11 174:18,19
174:25 175:8
176:10,17,20
182:6,9 184:16,17
185:13,14,15,16
185:18 186:9
201:11,15,21
203:20 205:1,10
206:13,19 210:4
219:19,20 222:11
222:15 225:10
**payor** 87:12

**peek** 219:11
227:23
**pending** 8:19
20:19
**people** 14:1 23:10
23:14 27:8,19
28:22 30:16 36:9
40:1 46:7 51:23
51:25 67:7 70:25
71:5 73:24 74:8
103:4,6,7,9 107:15
107:22,22 110:25
116:20 123:14
131:21 134:20,24
141:9 142:13
149:9,14 151:21
154:11,15 166:14
171:1 183:9 222:2
**people's** 30:13
74:22
**peoples** 13:2 20:18
95:1 96:6
**percent** 27:14
89:23 90:23 91:19
91:21 94:8 110:4
110:5,9,10,14
123:2,13 125:1
130:3 132:9,22
133:2 155:10,17
170:2 171:6 225:9
225:11
**percentage** 90:9
91:23 110:23
123:4 131:2 132:9
225:3,13
**percentages** 110:6
**perfect** 148:15,21
**perfectly** 19:22
102:9 104:8,13
**permissible** 228:6

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[permits - private]**                                    Page 27

permits 47:1
person 12:12,16
  24:11 25:1 44:8
  55:4 59:11 65:21
  68:16 71:24 95:22
  96:24 153:12
  180:25 219:2
  229:15
personal 21:19
  142:1,3,10,13,16
  148:8,14 201:25
  209:17,22
personally 8:22
  148:13 190:3
perspective
  173:24
perspectives
  119:18
peter 79:19 98:19
phil 78:2 202:9
phillips 78:24
  79:13
phone 61:7,8 63:2
  64:21 130:8,10
  135:3,5,21 153:12
  153:13 204:1,5
phones 6:6
phrase 82:23
pichincha 120:14
pick 6:4 16:7
piece 24:20 58:5
  104:9 130:20
  133:2
pieces 24:16 40:7
  40:11
pillar 58:4
pitch 146:22,25
pits 58:18
pivot 33:12
place 6:6,8 18:24
  29:13 42:12 80:6

108:2 115:23
  160:3 182:19
  229:8
placed 223:15
  224:15
places 41:17
  134:20 160:9
  169:3
plaintiff 1:7 2:19
plaintiffs 19:9,12
  68:22 69:1 97:4
  97:13,20 98:11
  99:9,14 105:3,10
  140:16 157:1
  221:24
plan 136:9
planet 166:14
planned 206:23
planning 66:23
play 118:13,24
  119:10 183:1
plays 56:16
please 6:3,5 7:14
  17:19 25:25 34:13
  36:4 50:21 57:23
  82:22 86:20 98:1
  101:10 114:1
  117:14 156:7
  165:25 230:17,21
  231:1,5
plus 56:21 57:24
  140:23 141:2
  144:22
point 14:25 15:8
  20:21 36:25 38:7
  42:2 47:8 99:7
  210:21
popped 59:8
portfolio 28:24
portion 80:24
  86:16,24 90:19

91:16 132:10,12
  132:13,21 223:10
portions 228:17
position 173:6
positive 41:18
  219:1
possibility 173:6
possible 25:2 57:5
  151:7 222:3
possibly 72:21
post 2:15 163:16
pot 132:13
potential 18:11
  23:24 31:18 57:22
  58:1 98:11 102:10
  102:11,17 109:23
  121:9 126:10
  127:14,21 137:8
  152:24
potentially 23:6
  29:17,21 30:10,23
  35:21 41:17 46:7
  153:3 224:18
power 140:20,21
  140:23 141:2
  144:21 145:6
powerhouse
  217:23
pr 71:24 95:22
  96:13,23
practice 45:16,18
predates 169:24
prefer 56:9
prehearing 38:2
prep 158:14
preparation
  140:25 145:11
prepare 67:4
  73:16,17,18,21
prepared 7:25
  67:21 73:14,20,23

present 3:13 6:25
  153:4
presentation
  108:17,22
presented 37:17
presents 158:17
preservation
  179:22
preserve 183:7
pressure 102:10
  102:16 134:19
presumption
  224:20
pretext 48:24 49:1
pretty 63:21 67:6
  114:2 175:22
prevail 218:7
previously 25:5
  34:14 53:17
  106:14 177:1
price 44:20,24
  45:6 46:6,10,24
  51:10 57:2,9
primarily 131:17
  135:5
primary 24:17
  135:2
principles 174:11
print 229:10
printer 185:6
printing 185:7,9
prior 14:11 22:6
  32:5 33:24 34:4
  62:22 63:5 71:3
  158:9 176:24,24
  191:17,19 201:15
  214:4
private 6:4 10:5
  44:3,12,17 46:5,9
  46:14,23 51:9
  54:18 57:17 103:9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[private - read]                                                                    Page 28

103:10,12,14
180:22
pro  171:5,5
probably  21:23
72:21 73:11 82:23
91:5 136:25 147:9
150:13 154:16
155:4 156:21
158:9 163:15
168:5 181:17
184:5 205:18
problem  39:22
40:3 41:8,24
117:15 156:9
problematic  32:14
32:19 102:6
125:23 154:2
proceed  7:15
proceeding  97:16
120:13,14 137:12
227:3
proceedings  20:20
95:15 117:12,16
137:9 163:1
proceeds  44:13
80:23 86:15,23
87:4,7 89:18,21,25
90:5,12,17,23 91:3
125:1 127:10
131:2 187:15,18
187:19,21 222:21
223:6 225:2,3,13
process  18:22
104:7,12,13
115:11 180:7
222:15
produce  52:20
138:1
produced  14:17
15:15 53:12 64:24
76:3 83:20 169:15

174:18 210:11,14
210:15 211:18,20
212:5 215:9 219:8
219:15
production  7:18
16:15,16 83:7,16
212:8
productions
168:22
professional
170:24
profit  29:25 30:6
profitable  29:21
30:10,23
profits  30:13
41:22 166:14
program  147:22
progress  186:17
187:7
project  175:16
prompted  113:1
properly  200:2
property  220:2,3
220:8
proposing  47:14
proprietor  180:21
180:23
protect  104:7,12
156:1,11
protected  44:10
protective  1:14
154:8 227:4
provide  8:21
76:22 170:3
provided  89:20
91:22 169:9
172:24 174:17
175:2 189:15
225:2,12 227:15
providing  173:12

provision  227:17
psychology  9:4
public  44:2,18
46:18,21 57:19
62:11 162:1 229:5
pull  53:1
purportedly  138:8
purports  219:17
purpose  59:15
67:10,19 127:17
127:19 138:16,18
173:11 174:5
176:20 178:6
179:3 181:15
purposes  43:1
227:5
pursuant  1:14
177:5 185:19,21
pushing  76:17
put  40:25 41:5,16
59:18 65:7 102:10
102:16 172:21
176:2 204:6 208:2
209:8
puts  56:11 134:20

q

q&a  128:8
quarterback
10:20
question  8:19 16:9
16:9 19:23 33:23
33:25 50:21,25
72:7 80:20 81:4,5
81:23 84:1,5,21
85:15 86:19 87:6
91:18 100:8 156:7
168:5 170:23
187:24 209:15
222:24 223:20,25
questioning  15:24
49:14,17 51:1

186:18
questions  14:22
16:23 56:10 126:9
126:15,18,23
168:8 177:3
210:19 220:22
222:5,6 224:5
228:4
quick  61:11,25
217:1
quite  169:24
174:18
quito  183:8
quoting  80:20

r

r  184:4 207:22
229:1
racketeering
33:17
rain  13:14,16
183:7 219:5
raise  24:2 153:6,8
153:14,15
raised  24:4 128:19
153:6,18,21 174:4
221:11 225:18,20
random  18:13
161:6 168:5
ranging  21:9
rate  41:18
rdr  1:23 229:24
reach  18:13 20:6
43:13 52:2,5
92:20
reached  12:2
22:21 26:14
read  11:25 36:9,10
50:21,22 52:15
99:17,20 114:22
115:14 117:25
118:15 123:11

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

[read - referring]                                                    Page 29

141:17 142:4
143:18 154:23
158:23 159:16
162:8,14 166:16
216:15 220:18
223:22,23 231:19
**reading**  15:23
150:12 230:16
**ready**  93:6
**real**  217:1 220:2,3
220:4,10
**realized**  107:17,18
150:13
**really**  10:25 13:23
23:9,11 28:4,12
35:14 44:10 83:12
96:20 114:17,21
119:7 121:2
127:17 128:6,6
147:22,23 151:16
165:4 186:13
219:3,3 224:1
228:17
**realtime**  1:24
229:2,3,4
**reason**  8:2 47:21
169:4 188:1
199:19 216:14
231:7
**reasons**  230:18
**recall**  17:5 25:17
25:22 48:20 53:7
93:15 107:12
109:11 110:4
111:4 113:19
114:8 116:12
119:19 121:13
126:4,5,10,15,18
126:23 127:1,3,5
127:13 128:20,22
132:15 134:8

136:20 137:20
140:13 141:21
156:3 158:8
165:22 166:15
170:6 172:12
175:3 179:25
185:12,20 197:14
201:11 202:24
210:7 221:25
225:5 228:2
**recalling**  134:9
**receipts**  179:7
189:10
**receive**  24:23
153:22 208:1
**received**  85:1,20
85:22 101:18
102:22 138:9
169:18 175:13
177:6 179:21,22
180:2,5 182:5,7,12
187:16,18 188:3
203:19 205:25
206:3 212:9,10
220:4 223:10
224:14,16
**receiving**  88:8,9
201:14
**reception**  108:9
**recess**  50:15
106:13 157:16
198:9 217:5
**recessed**  105:22
**recipient**  207:7
**recipients**  93:12
**recognize**  178:25
190:24
**recollect**  132:20
**recollection**  86:8
109:10 112:24
116:25 122:13

161:22 185:4
220:23 221:3,9
**recommend**  98:22
160:3
**reconcile**  85:8
**reconciling**  186:17
**reconvene**  105:23
**record**  6:2,9 7:2
17:15 25:13 26:7
37:12 50:7,7,9,14
50:18,22 53:19
56:7 64:15 65:5
71:17 93:3 105:18
105:20 106:4
157:15,19 183:23
188:18,25 193:16
197:11 198:4,5,8
198:12 203:3,4
216:6,9 217:4,8
223:23 226:18,23
227:2 229:12
230:10 231:22
**recorded**  6:11
**recording**  6:8
**recordkeeping**
178:8
**records**  168:20,25
169:2 170:4
173:11,12 174:17
175:2,7,10,18,24
176:9,18 181:17
182:15 186:2
192:13,17 209:17
**recover**  75:11
**redacted**  204:16
204:24 205:14,16
213:3
**redesign**  186:12
**redesigning**
186:14

**reduced**  229:10
**refer**  14:19 55:17
103:2 155:3
166:24 230:21
231:5
**reference**  15:20
37:7,25 55:14,20
55:22 110:6
112:19 113:17
114:4,19 115:2,5,7
115:12,20 116:4
116:12 119:25
120:10,12,19
123:4 128:15
137:8,19 139:20
140:3,15 141:8,13
141:15 144:23
145:9 147:4,9
148:2 149:20
150:18 152:15
155:23 159:20,24
162:21 163:9,15
163:23 166:15
190:4 215:1,2
**referenced**  16:11
36:16 208:4
**references**  55:13
134:8 159:14
164:21,22
**referencing**
125:10 151:18
221:13
**referred**  31:14
107:4 116:25
138:7 164:3,14
172:11 191:9
**referring**  25:23
34:19 54:2 98:24
103:23 104:1,13
104:18 122:14
136:20 160:5

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[refers - resumed]**                                                    Page 30

**refers**  76:23
    113:11 121:21,24
    122:18 125:17
    130:21 134:18
    137:16,24 161:10
    161:14,17 168:2
**reflect**  102:6
    212:23,24
**reflected**  127:8
**reflecting**  196:7
**reflects**  153:9
**refresh**  220:22
    221:9
**regarding**  60:6
    132:4 166:10
    168:11 221:10
**regardless**  146:19
**registered**  229:3
**registration**
    180:17
**reimbursement**
    176:23,25 197:24
    200:4 203:13
    215:19
**reimbursements**
    199:10 200:14
**relate**  158:7
    161:20 213:4
**related**  6:22 14:17
    34:11 75:22
    101:11,14 102:15
    107:25 115:8
    117:13,17,20
    124:4 128:17
    130:1 132:15,21
    134:21,22 135:6
    136:4,5 137:12
    138:25 139:16
    157:22 160:15,18
    168:15 174:13
    176:18 179:6

    180:3 186:12
    196:18 206:1,3,18
    208:8,13,15
    210:22
**relates**  47:14
    88:25 89:18 136:6
    148:9 193:5 194:2
    196:2 206:15
**relating**  98:22
    101:6,22 102:1
    152:25
**relation**  134:16
**relationship**  89:20
    89:24 95:3 105:3
    137:15 183:3
**relevant**  37:20
    57:22 58:1 113:14
    153:3 176:7
**remain**  74:24
**remaining**  132:9
**remember**  7:25
    8:10 36:19,20,23
    52:24 53:4 61:16
    61:24,25 64:20
    66:22 68:10,12
    71:4 78:8 109:21
    113:15 117:8,11
    117:15 118:7,9
    119:3,13 120:13
    121:24 122:2,23
    125:21 129:4,6
    130:5,8 133:20
    136:6,7,19 138:16
    138:18,23 140:11
    140:17 141:12
    144:17,23 150:3,7
    153:18 156:18
    157:5 158:7 159:2
    159:14 161:2,17
    164:12 166:18
    175:19 185:3

    197:22 209:8
    219:21 221:22
    225:6
**remembered**
    129:2
**remind**  144:1,2
**reminds**  147:18
**repeat**  40:24 156:6
**rephrase**  80:20
**reported**  229:10
**reporter**  1:23 5:24
    6:20 7:14,19 8:11
    8:15 37:22 50:20
    105:15 223:21
    229:3,4,20
**reports**  137:22
    138:1
**represent**  189:24
    192:7
**representatives**
    99:15
**represented**  68:22
    69:1 79:15
**representing**
    215:17
**represents**  97:19
    214:21
**reproduction**
    229:18
**reputation**  28:8,9
**request**  8:18 22:1
    22:2,11 102:5,15
    132:16 189:22
**requested**  50:22
    223:23
**requesting**  67:18
**required**  51:7
    208:1
**research**  52:11
    67:16,20 158:21
    161:20 166:10

**researched**  67:5,7
**reservations**  127:1
**reserve**  17:5 49:19
    228:8
**reserves**  228:2,7
**resources**  27:20
    76:17,22
**respect**  16:17
    19:16 38:2 93:17
    171:2 209:21
    219:3
**respectfully**  21:10
    49:19
**respecting**  171:23
**respond**  43:8
    58:19,24,25 224:5
**responded**  31:25
**responding**  76:12
    101:9
**responds**  102:3
**response**  54:22
    71:21
**responses**  71:8
**responsibility**
    222:18
**responsible**  12:24
    62:8 177:9,12
    189:17 203:24
**responsive**  169:15
**restate**  83:13
    86:20 223:19
**restaurant**  66:16
    160:5
**result**  82:5,20 83:3
    90:24 91:14
    110:15 139:21
**resulted**  80:11
    81:10,19 82:11
    223:6,15
**resumed**  50:16
    157:17 198:10

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[resumed - says]**                                                                        Page 31

217:6
**retained** 5:24
  226:20
**retainer** 125:8
  176:21,22 177:6
  182:9 189:13
  190:9 191:13
  192:9,11 197:23
  210:3
**retainers** 176:24
  176:24
**return** 41:18
**returned** 5:25
  213:14
**reverse** 50:23
**review** 54:12
  131:11
**reviewed** 124:11
**reward** 122:17
  149:10,11,15,15
  149:16,16
**rewarded** 145:5,8
**rex** 76:13 94:4
  211:14
**rex's** 94:10
**rico** 32:13,19,23
  32:23 33:3,20,24
  33:25 34:7,11,15
  34:19,24 35:2,9,12
  35:18,20,25 36:7
  37:7,14 38:10
  39:13,16,24 40:2
  40:21 41:2,12,23
  72:17,18 73:10
  74:4 99:17,18,22
  100:12,13 111:3
  116:5 123:8,11
  132:24 142:19
  143:6 161:9,11
  222:20 223:5

**riding** 25:19 26:19
**right** 9:9,19 17:4,5
  21:25 23:4 25:5
  26:3 30:8,19
  33:18 34:8 39:19
  40:17 41:22 42:22
  44:21 45:11 46:16
  46:22 48:11 51:13
  51:19 55:10 56:3
  56:23 57:10 61:14
  65:22,25 73:12
  76:19 81:6 85:23
  89:10 90:6 100:16
  103:12 108:3
  111:24 112:2,7
  115:18,24 118:15
  123:5,15 125:2
  126:12 133:16,17
  134:5 141:12
  142:4 143:15
  145:12,20,23
  148:3,7 151:16,17
  161:3 166:11
  168:8 169:6,25
  170:1 174:23
  176:13,15 177:8
  181:18 186:20
  187:5,16 188:5,11
  188:12 189:6,13
  189:20 191:2
  194:13 195:5
  196:20 197:3,19
  199:4,10 200:19
  200:22,23 203:11
  205:8,23 207:19
  212:23 213:21
  214:3,22,24 216:9
  222:12 223:11
  224:11,16 225:25
**rights** 49:19 60:12
  207:6 228:2,7,8

**ring** 120:15 185:7
**risk** 30:12 37:17
  122:17 149:11
  152:16 170:25
**risks** 168:1
**risky** 29:18,20
**rizack** 168:18
  169:6 170:1
  173:11 184:6
  209:18 210:14
  211:16 212:1
  216:13,18
**rizack's** 175:6
**road** 60:12
**roger** 184:3
**role** 14:21 15:5,6
  19:13 62:7 71:23
  79:18,21 93:25
  94:2,7,11,18 95:8
  96:1,8 105:7,11
  162:25 163:5
  173:13,14 190:5,8
  190:10 209:21
**room** 6:25
**royce** 174:20
**rufolo** 2:12 7:8
**rule** 15:8 125:15
  125:19
**rules** 7:24
**ruling** 38:18,19
  118:14 119:11
**run** 15:24 64:11
  64:13 223:1
**running** 9:21
**runs** 61:18

**s**

**s** 3:5 10:7 181:2,3
**sake** 177:2
**salazar** 69:12,12
  97:2,2

**salazars** 131:24
**sales** 146:22,25
**saltzen** 18:15
**saltzenburg** 18:15
**saltzstein** 19:19,22
  22:19,21 26:13
  31:15
**saltzstein's** 31:1
**sat** 108:20
**satisfactorily** 7:17
**saturday** 66:13
**saw** 58:23 98:23
  99:11,12,13
  182:23,24
**saying** 42:23 64:2
  73:19,25 90:21
  91:4 109:4 121:14
  129:3,6 151:18
  153:17 187:11
**says** 31:2 32:8,8
  32:13 43:4 54:3,5
  55:16 71:25 72:19
  76:15,20,25 77:23
  88:19 90:11 97:25
  98:20 101:9
  103:24 104:6
  106:22 112:6,19
  112:22 113:3,9,25
  114:17 115:14
  116:2,24 117:23
  118:13,20,21
  119:21 120:3,8,17
  121:19 122:10
  123:2,13 125:15
  128:13 136:2,8,17
  137:3,4,5,21,22
  139:17 142:24
  143:8 144:21
  145:5 150:9 151:9
  152:12 153:24
  154:23,24 155:9

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

156:25 159:21
161:8,24 162:9,13
162:15,15,16
165:9 166:23
167:25 199:9
205:1 207:21
213:23 214:12
215:10 221:1,7,20
227:17
**scanning** 150:15
**scenario** 46:16,23
**schedule** 62:16
**scheduled** 63:12
63:19 64:10,18
**schedules** 65:24
**school** 9:6
**scope** 16:17 17:22
31:21,21 37:1,2,8
42:23 56:3 85:2
119:6 135:14
187:8 228:6,14
**scouring** 29:1
**scratch** 70:4,6,7
70:12
**scrolling** 97:24
98:19 101:8
**search** 18:5
197:19
**sec** 119:21,25
**second** 14:5 26:2
33:7 71:16 83:11
86:18 92:25 99:21
101:10 110:20
124:14 138:23
168:24 191:8
193:20 214:14
216:5,24 225:20
**section** 207:22
224:11
**security** 133:24

**see** 11:14 13:14,16
15:23 16:22 17:11
17:12,21 23:17
26:12 27:15 31:11
32:1 38:11 39:14
39:22 41:8,23
43:6,7,11,12 51:17
52:11,13 54:23
56:24 64:11 65:20
66:7,11 72:17,23
72:24 77:3,18,24
90:10 101:2
102:12 106:18
107:1 111:23,23
124:15 128:17
147:11 162:13
168:6 173:21
179:5 185:6
189:20 195:2
197:19,25 199:8
206:25 210:13
213:11 219:10,17
219:21 221:1
**seeing** 132:15,20
173:23
**seeking** 47:13
**seen** 54:17 124:21
125:10 171:11
172:15,19
**segregated** 178:23
**seizing** 61:20
**send** 43:9 52:10
54:21,25 56:17
107:18,19 151:17
151:21 152:4
153:20,23 158:17
166:7 172:8,9,17
204:1
**sending** 68:10
**sense** 23:10,14,14
27:24,25 41:20

95:15 131:12
145:12 150:3,25
201:5
**sensitive** 6:3 92:19
**sent** 16:3 52:6,17
53:5 54:7 55:3
59:3 61:21 68:11
74:17,19,20 85:21
98:1 151:12,25
152:3,17 159:9
163:16 165:24
170:16 172:16
199:1 217:15
**separate** 179:5
194:10 203:22,25
215:6
**separately** 178:2
**september** 14:3
69:20,21 135:9
201:22
**services** 192:8
199:10 203:14,15
215:17 218:13
**session** 4:7 106:1
**set** 15:18 157:9,22
205:22,24 229:9
**sets** 111:20
**settle** 149:2,7
**settlement** 39:10
39:11 110:15
**settling** 119:16
**seven** 135:20
**sgklaw.com** 2:18
**shameless** 122:18
129:3
**shape** 24:22 111:1
**share** 70:20
**shared** 35:7
**shareholder** 25:20
26:20 218:13

**shares** 62:9
**sharing** 107:7
119:18
**sheet** 230:1,5,6,8
230:19,22 231:4,5
**sheets** 230:21
**sheiks** 129:7
**sherman** 133:20
133:21
**ships** 61:21
**shirt** 43:9
**short** 43:22 44:19
44:21 45:1,4 46:4
46:20 49:23 51:17
56:19 57:7,17
127:11 157:8
188:20
**shortcut** 92:24
**shorting** 45:12
**show** 28:18 29:10
29:11 53:6,8 83:7
83:16,21 108:16
174:18,19 175:7
177:14 192:14
**showed** 144:12,15
**shows** 199:6
**shtick** 56:22
**sic** 102:10
**side** 43:9 162:7
**sided** 65:10 70:10
70:11
**sign** 230:19
**signature** 229:23
230:2
**signed** 172:23
222:20 223:5
229:21 230:9
**significant** 10:15
**signing** 223:17
**similar** 52:24 53:5
96:17,19,20

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

101:18
simple  21:21
84:20 85:24
simply  38:14 39:2
102:5 128:7
singer  29:6 43:5
43:14,18 52:3
53:3 55:1,9 56:17
58:19 59:4 158:19
159:3 184:3
singer's  158:17
single  146:6
sings  52:7
sit  47:10 108:19,24
sitting  92:17
situation  16:21
84:18 85:16
112:22 127:24
146:15 186:5
situations  84:23
six  11:8,9,10
226:20
skill  100:21
skills  30:17 45:17
51:15 100:25
slaght  174:20
slant  162:10
slater  3:13 6:19
slides  108:16
sloppy  82:24
small  11:11 137:1
185:16
smith  1:23 6:20
174:21 229:2,24
sneaking  225:23
sole  180:21,23
solely  208:22
solicitation  16:4
16:12 17:2 37:20
49:11 59:24

solution  20:7
solutions  1:25
somebody  31:17
59:8,9 67:11
146:4,18 163:12
somewhat  207:25
son  66:14
soon  106:25
sophisticated  51:4
51:7,15,24,25
sorry  17:11 33:23
58:15 111:14
126:13 165:24
189:1 190:15
195:24 226:3
sort  24:14 85:4
149:23 174:8
180:15
soul  12:1
sound  56:16 180:1
sounds  11:2 185:8
185:11
source  84:25 87:8
87:10 88:15,22
89:3 92:7,10
139:16 224:21
sources  36:12
170:13 224:5
south  160:22
southern  1:2 6:14
53:20 143:3
179:23
sovereign  112:23
space  24:7,8,11,12
112:23 170:24
spanish  19:10
spark  164:9
speak  19:10 94:23
96:14
speaking  17:24
73:24 74:2 169:21

special  12:8
specific  22:1 48:3
48:3 121:6 126:23
128:22 129:4
174:16 220:7
specifically  23:17
23:19 43:20 68:12
84:15 109:11,22
111:4 113:2
125:25 141:14
165:22 179:25
specifics  74:3
156:18
speculation
103:19
spent  187:25
split  109:17
spot  56:11
spouse  94:10
95:25
spreadsheet  176:1
205:18
square  85:15
squarely  80:15,16
88:17
srd  203:18 204:19
stairway  52:7
56:17
stamp  180:20
stamped  77:10
212:10
stand  108:21
130:2 141:7,9
181:4
standalone  130:4
standing  61:14
215:9
stands  49:18 78:6
78:15
start  102:9 109:2
147:10 178:10

209:14
started  9:18,25
10:2,2 109:4
180:7,22 218:24
starting  30:15
77:17,21
starts  111:14
state  7:1 47:2,17
55:25 227:6
stated  52:15
statement  45:22
212:18 216:10
statements  231:22
states  1:1 6:13
47:5 80:4
stating  32:25
stay  79:1
steer  134:10
stemmed  116:5
stenographically
229:9
step  149:9,15
203:25
steps  54:4
stern  2:12 7:7
steven  1:9 6:12
12:8 18:14 26:13
35:7 53:21 70:24
74:6,7 108:8
109:6 118:12
119:10 123:2
138:2 139:9
148:19 149:13
156:15 163:14
165:9 170:18
184:19,20 191:2
196:10 206:22
207:22 208:10
213:23 231:2
steven's  94:17

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| **stock** 44:20,24 | **stuff** 156:10 | 204:10 206:8 | **sync** 67:2 |
| 45:6 46:6,10,10,19 | 157:10,11 160:21 | 207:14 211:7 | **system** 37:24 |
| 46:19,23 51:10,18 | 163:20 169:12,13 | 212:13 215:12,24 | 215:2,3 |
| 56:19 57:2,7,9 | 169:14,20,23 | 217:12 219:12 | **systems** 1:24 |
| 127:11 | 170:8,9 | 220:15 226:19 | 229:4 |
| **stop** 17:19,24 | **style** 26:24 | 228:2 229:7 231:1 | |
| 126:13 179:20 | **subject** 14:25 | 231:25 | **t** |
| 186:16 187:7 | 15:17 16:5,18,24 | **summary** 201:21 | **t** 43:9 229:1,1 |
| **story** 12:11 35:4,8 | **submitted** 206:21 | 205:10 | **table** 136:18 |
| 146:2 173:22 | **submitting** 203:23 | **sunday** 66:14,17 | **take** 6:8 8:11,15 |
| **straight** 89:22 | **subpoena** 180:5 | 66:21 70:19 139:4 | 11:1 16:9 24:19 |
| 90:9 133:3,14 | **subscribe** 231:21 | 144:14,15,19,19 | 50:11 105:17 |
| **strategic** 32:12 | **succeed** 148:25 | 144:20 145:15 | 121:14 129:22 |
| 51:22 | **successful** 67:18 | **super** 136:12,14 | 157:8 159:10,12 |
| **strategically** 27:1 | 115:4 118:14 | 136:22,24 137:7 | 173:13 188:19 |
| 155:1 218:6 | 119:11,15 146:8 | **supplied** 221:17 | 216:24 219:11,20 |
| **strategies** 27:20 | **successfully** 51:24 | 221:18 230:19 | 227:23 |
| 119:15 | 68:14 167:1 173:3 | **support** 114:18 | **taken** 47:3 129:18 |
| **strategy** 28:14,16 | **sue** 139:10 148:18 | 142:2,11,14 | 129:19 144:18 |
| 45:16 117:24 | 149:13 | 221:11 | 158:7,8,9 167:8 |
| 118:8 136:2 | **sue's** 143:14,16 | **supporter** 182:18 | 229:8 231:3 |
| 218:15 | **suffering** 8:7 | **supporters** 171:2 | **takes** 115:11 205:7 |
| **stray** 79:3 93:17 | **suggested** 22:19 | **supports** 219:4 | **talk** 17:16,25 32:5 |
| **straying** 91:12 | 141:5,5 172:3 | **sure** 7:24 10:14 | 36:9 66:19 76:3 |
| **streamline** 8:22 | **suggesting** 15:22 | 32:1,9 34:14 | 97:22 108:19,24 |
| 9:22 10:3,5,6,18 | **suggestion** 165:13 | 37:24 38:4 50:8 | 109:8 127:18 |
| 15:3 87:20 177:22 | **suite** 2:14 | 53:18 54:9 57:14 | 129:24 130:13 |
| 180:22 181:1,3 | **sullivan** 1:15 4:3 | 59:10 65:1 67:2 | 145:16 149:6 |
| 208:22 214:12 | 4:11 5:2 6:11 7:10 | 68:25 71:25 79:1 | 153:14 165:9 |
| **street** 1:18 3:6 | 7:12,16,23 14:12 | 79:8 81:17 82:23 | 166:5 172:2 176:8 |
| 6:18 161:2 | 25:12,14 26:8 | 86:22 87:13 91:12 | 176:17 182:14 |
| **stressful** 226:13 | 53:11,13,19,23 | 96:10,24,25 100:9 | 205:19 |
| **strictly** 98:2,17 | 64:23 65:17 68:1 | 101:21 133:9 | **talked** 32:4 36:21 |
| **strike** 28:15 82:16 | 68:4,8 69:23 70:1 | 155:24 161:23 | 95:21 112:25 |
| **strokes** 188:20 | 71:9,12 76:9 77:9 | 164:6 198:3 212:6 | 171:7,24 172:4 |
| **structure** 127:14 | 77:14 106:10,12 | 212:8 216:21 | 174:20 182:4,5 |
| 127:15,18 136:2 | 111:9 158:1 189:3 | **surface** 38:11 | **talking** 11:18 |
| 147:4,5 | 190:21 192:1 | 39:14,15,21,24,25 | 42:19 66:22,24 |
| **structured** 125:5 | 193:1,17 194:7 | **swear** 7:14 | 74:8 83:19 84:16 |
| 167:11 | 198:20 200:8 | **sworn** 7:19 106:14 | 85:10 90:2 109:13 |
| | 201:8 203:7 | 229:8 | 109:14,16,17,20 |
| | | | 111:22 114:15 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[talking - tight]**                                                                 Page 35

119:14 120:23
128:3 140:25
144:24,24 148:10
163:12,13,14
166:1 186:4
187:24
**talks** 163:19,20
**td** 5:19 211:2,14
**team** 76:17 99:9
**technology** 128:25
**tell** 41:13 55:6
59:15 64:17 70:17
84:3 85:7 92:7,13
101:21 109:1
114:1 141:25
158:6 165:24
168:2 169:9
170:21 193:4
200:1 204:1,15
216:2
**telling** 25:17
106:19 136:9
145:25
**tells** 19:19 173:22
**tend** 29:20
**term** 115:17
146:17
**terms** 35:15 47:13
89:12 90:8 98:6
109:23 169:20,21
174:2 177:18
**terrible** 122:5
**territory** 91:13
**testified** 7:20 34:6
34:14 65:21
106:15 116:7
124:25 176:9
177:4,18,21
189:12 222:10
224:25

**testify** 8:2 47:10
**testimony** 8:12,21
22:6 34:4 123:3
202:21 225:5
226:19 229:12
230:18
**texaco** 12:25
**thank** 50:12 54:4
59:3 93:21 214:10
226:11,12,15
**therefor** 230:18
**thereof** 230:9
**thing** 18:24 19:14
20:12 21:6 32:16
48:24 56:16 127:5
137:1 138:22
142:21,22 143:24
146:8 147:16
148:7 185:9
186:19 192:23
200:3 202:7
205:20,21 209:24
227:23 228:1
**things** 23:16 34:6
34:25 39:18 48:4
51:22,24 54:18
67:13 92:24 96:21
103:9,10 122:5
128:6 129:9 135:6
138:20 147:12
154:8 156:3
158:23 159:23
190:2 198:19
218:3,4,14,20,21
224:19
**think** 10:1 13:8
14:3,16,18,25 15:4
15:13 16:2,8,10
17:3 18:1,14 20:8
20:9,11 21:13
22:6 26:20 27:5

27:18 28:1 32:13
32:25 33:9,24
34:6 37:1,5 38:5
38:14 39:15,23
41:14,15,21 44:23
45:17 47:8,22
48:7,19 49:21,25
51:9 52:25 55:5
61:4 62:3 67:16
69:21 70:10 72:25
75:16 78:13 80:2
80:6 82:23,24
85:3,17 88:6,24
92:21,22,24 96:5
96:21 105:15
108:9 110:24
111:20 115:7
116:6,14 118:1,21
120:8,25 122:4
126:11 130:15
132:23 133:1,6,11
134:5 135:8,11
136:1,22,25
138:10,24 139:1
139:21 142:8
143:12 144:9
145:1 146:3,6,10
149:10 150:14,16
150:18 152:16
154:24 157:24
158:13 159:19
160:7,15,18,23
163:4,15 164:1,17
165:1,13,23
166:19 171:12
172:3,14 175:20
176:6 177:4
178:21 183:9
185:2 186:7,13,22
187:4 188:13
190:1 192:16

193:15 198:2,19
199:20 200:2,6
202:9,14 210:12
211:15 214:25
215:5,20 216:15
216:23,25 218:14
220:19 221:16
222:1,4 224:17,19
226:4,4,10 227:1
227:14 228:12,16
**thinking** 21:22
28:13 32:12 41:2
160:8
**thinks** 42:20 48:9
**third** 175:20
187:12,25 188:2
221:8
**thought** 13:17,23
21:20 24:5 30:9
38:14 40:22 41:7
41:9 51:7 59:9
74:21,24 75:12
103:6 107:17
122:25 129:10
153:20 166:17
167:20 168:6
171:22 173:17
174:6 182:5
187:24 216:14
**threats** 118:13,24
119:10
**three** 14:24 15:19
16:23 17:13 90:3
176:10 182:6
213:8,17 214:3,4
**thrilled** 152:2
**thrown** 76:18
**thumbed** 176:5
**thursday** 1:16
**tight** 98:5

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**time** 12:20 14:9
17:19 38:3 45:25
50:13,19 51:12,21
57:2 78:4 81:15
93:2 96:7 105:19
106:5,13 118:5
120:18 121:20
122:6 129:18
132:25 152:23
155:21,22 157:14
157:20 170:25
182:12 188:17
198:7,13 213:16
217:3,9 226:11,14
**times** 66:16
135:11,16 156:2
156:12 213:8,17
**timing** 224:6,22
**today** 8:3,21 9:2
**today's** 226:18
**told** 35:19 61:20
64:20 93:13 100:5
100:9 138:4,10
152:4 179:5
202:17
**ton** 43:23 45:2,13
49:23
**top** 28:17 29:4,5
77:22 106:21
112:6 119:19
125:8 138:23
159:4,21 161:8
164:23 167:6
203:17 205:1
214:11 217:22
221:7 224:22
**topic** 49:10 128:10
128:11,11
**topics** 62:1
**total** 135:12
221:14

**totally** 32:15
**touch** 31:2
**towbin** 3:5 7:11,11
**town** 180:16
181:14 208:24
**toy** 56:16
**track** 84:14
178:24
**tracking** 91:11
100:4
**traffic** 153:16
**transaction** 18:19
39:7,9 46:8 108:1
**transactional** 23:8
24:7,13,24
**transactions** 24:21
**transcript** 227:2,8
228:9 229:17
230:12,20 231:19
231:21
**transcript's** 37:25
**transcription**
229:11
**transfer** 195:15
214:12,18,23
215:16
**transfers** 83:21,22
184:13 210:8
**trap** 169:22
**trash** 76:4
**travel** 167:20
**trial** 143:6 221:21
221:23,23 222:2
**tribe** 78:22
**tribes** 78:12
**trip** 12:3,5,7,9
13:3,5 14:2,3,5,8
14:17,18 15:16
16:3,11 17:1
69:20 70:21 71:1
71:5,6 79:25

107:4 151:21
201:22 202:1,5,9
**triple** 41:16
**true** 115:10
149:21 229:12
**truly** 214:8
**trustees** 208:18
**trusts** 219:23
**truthfully** 8:3
**try** 13:2 20:17
58:21 59:5 67:11
104:23 140:5
154:4 176:1 222:2
**trying** 14:19 19:13
22:1 30:22 35:14
36:12 37:16 40:17
40:20 41:1,6,14
42:3,6 45:7,21
53:2 57:11 58:6
60:10 79:6 89:17
89:19 90:7,15
91:6,11 119:2
132:18 133:8
137:1 142:10
146:24 149:6
169:22 173:7
180:4 185:2 186:6
186:9,20,24,25
206:12,14 213:14
218:14 223:2
**turn** 6:5
**turnpike** 2:14
**twice** 9:13 135:24
**twist** 12:2
**two** 11:12 34:7
44:9 61:11 62:3
66:16 67:7 78:4
109:5 111:20,22
114:9 128:5
132:23,23 141:2
159:1 165:1

167:21 168:21
169:12,13 174:7
194:19 199:17
202:8 212:4
**type** 19:14 20:6,8
41:21,22 49:15
56:4 79:3 83:23
91:13 128:5
134:11
**types** 218:13
**typically** 18:16

**u**

**u.s.** 34:21,23,23
35:21,22 38:22
39:1,6,8 114:3,6
116:3,9,10,13
221:2,5
**ultimately** 21:14
43:13 54:7,25
59:1 62:23 63:12
**um** 25:21 28:19
34:17 124:13
133:5 147:24
158:20 162:17
166:22 171:20
174:24 179:15
181:22 205:3,9
**umbrella** 87:19
177:22 208:21
**uncertain** 98:4
**unclear** 216:16
**understand** 8:20
12:12,20 14:20
16:13 17:17 19:13
20:15 21:25 23:4
23:23 24:10 33:15
34:1,25 35:18
36:3,12,18 37:16
37:18 42:3,5,6
43:21 44:7,10
45:7,11,21 46:7,14

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

49:10 54:16 56:13
57:11,14 58:7
67:12 72:4,8,16
75:10,16 79:5,6,7
81:22 87:6 89:1
89:19 90:7,16,21
91:4,11 92:11,18
92:21 93:18,25
96:8,23 97:16
100:16 101:1
102:24 103:11
104:11 107:24
116:4 119:8
127:23 128:9
129:17 132:18
133:10,12 135:1
137:1,11 142:18
155:20 166:24
173:14,16 174:5
180:12 186:7,9,21
187:10 192:6
206:13,15 214:7
218:3 223:24
224:14
**understanding**
12:22 17:9 23:20
29:23 30:3 32:10
32:18,23 33:3,20
34:10,18 35:1,23
36:7 39:4 40:10
54:14 57:1,4 62:7
62:13 68:21,25
71:22 74:23 76:21
78:9 79:15 92:5
94:24 95:2,8
102:14 103:3,5
104:18 105:2,6,11
110:8,10,13,18
113:4 115:1 116:7
123:7 124:2,7
130:19,24 131:7

131:13 132:2,7,11
139:19,23 142:12
173:8,8 174:2
211:4 222:14,17
225:14
**understands** 79:9
**understood** 12:11
14:11 18:2,2,3
19:11 20:3,5,12
25:8 29:7 34:3
40:6 52:13 53:4
62:12,21 67:8
71:4 73:10 95:21
97:12,15 129:1
133:3 163:22
167:3 173:10
176:8 207:8
**underwood** 65:21
**unhappy** 154:21
**unique** 129:9
**unit** 6:10
**united** 1:1 6:13
80:4
**university** 205:20
207:4,4,5
**unpaid** 176:23,24
**unpopular** 113:9
113:12,17
**unredacted**
212:22,24
**unrelated** 160:24
**unspoken** 132:10
132:12
**unusual** 207:25
**update** 182:21
**uplift** 27:8
**upper** 43:8 111:24
**upset** 37:24
151:25
**use** 35:14 102:16
179:1,5,17,19

217:23 227:8,18
**useful** 11:3 173:18
**usually** 129:10
136:24

---
**v**
---

**v** 1:8 53:21 231:2
**valid** 34:22 35:22
**validate** 221:14
**value** 25:20 26:20
166:13
**van** 182:17 183:14
217:20
**various** 170:13
**vehicle** 82:9,18
83:1
**venezuela** 122:1,2
122:5,8
**verbal** 8:12
**verdict** 100:20
**veritext** 1:25 6:19
6:21 226:21
**version** 52:25 53:5
**versus** 16:17
**victoria** 93:14
**video** 1:15 3:13
6:1,8,10 7:13
50:13,17 105:19
106:3 156:5
157:14,18 198:7
198:11 217:3,7
226:17
**videographer** 6:20
**view** 23:20 27:24
29:15,16,19 37:16
39:18 40:1,19
46:22 51:21
145:23 147:9
190:5,10 228:17
**viewed** 31:17
40:15,16 144:7
173:15

**views** 33:10
**village** 160:22
**violate** 125:23
**violation** 125:16
126:7
**violations** 113:4
113:12
**visit** 96:22
**visualizing** 160:24
**volume** 1:12
230:16,20
**vs** 6:12 118:13
119:10 120:18
121:20 140:10,14
140:20
**vulnerabilities**
128:17
**vulnerability**
121:23 128:14

---
**w**
---

**wait** 84:1 197:5
**waiting** 122:12,15
**waiving** 60:12
**walk** 212:16
**walking** 67:24
167:9
**wall** 107:20
**walls** 107:8,9,10
107:11,12
**want** 8:25 20:19
37:11,17 39:20
40:25 41:5,13
43:16,19 45:15
48:10,21,22,25
49:21 50:4,6,7
56:12 57:14 78:25
79:8 83:13 85:8
91:13 93:11
106:20 107:24
116:22 129:17
131:12 150:19

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

155:4 157:4,21
165:14,15,16
182:15 186:16
187:7,7,8 188:1
205:19 210:13,19
212:6 216:25
219:20 220:21
221:20,23 223:1
223:19
**wanted**   12:1 14:12
56:6 66:4 74:12
105:15 159:5
173:9 209:15
217:21
**wanting**   174:5
**wants**   41:15 143:8
143:18
**war**   150:25
**watch**   29:11
**waters**   184:1,1,3,4
**watson**   79:23
81:17 82:2,8,14,17
82:25 93:13,14,23
**way**   24:22 26:20
27:5 42:6,16
44:19 47:1 57:8
59:2,7 77:20
100:22 111:1
129:13 135:2
142:2,15 145:11
156:21 181:25
214:25 215:1
218:11,12 223:2
**ways**   44:9
**we've**   11:12 26:8
87:10 89:9 116:6
**wealth**   10:5,8,10
180:23
**wealthy**   24:19
**website**   186:12,15

**week**   12:5 135:24
135:24 158:12
175:20
**weekend**   64:9,12
66:7 182:24
**weeks**   121:14
**weird**   159:12
**went**   21:25 22:4
57:10 64:3 69:20
70:20 71:3 85:3
109:1 132:6
167:20 169:11
180:22 182:25
202:5 214:8,9
**west**   43:9
**weyler**   76:13,25
94:4,4 211:10,14
**whatnot**   139:25
**whatsoever**   46:9
**wheelhouse**   56:3
80:18
**whispering**   6:4
**wife**   66:14 93:22
94:17 178:17
182:2 188:3
**william**   3:13
**willing**   39:21
40:21 41:11
**wilson**   185:7
**win**   76:15 142:2,3
142:6,7,8,16 149:3
149:19,22,25
**winners**   149:19,22
**winning**   68:14,16
**wins**   49:25 149:24
**wire**   198:25 208:1
208:7 210:3
214:17 215:16
**wired**   213:22
**wires**   212:23,24
212:25 213:1,13

214:3
**wiring**   219:25
**wishes**   77:23
98:21
**witness**   3:11 4:3
7:14 15:9 17:6,16
18:13 19:5,25
21:18 22:8 26:23
32:22 33:6,16
36:4 40:6 46:1,3
48:15 50:12,24
51:3 68:7 70:8
72:13 73:2,7
74:16 75:3 79:8
81:14,24 83:25
86:20 87:2,15,24
89:5 92:5 93:20
93:22 102:21
103:21 106:13
110:24 111:12
116:22 123:22
124:19 131:7
133:19 134:12
135:16 156:6
193:6,19,21,23
194:20 195:10,14
195:18,23 197:8
198:17 200:10
201:20 211:25
215:11 224:1
225:7 226:1,7,12
226:15
**wondered**   184:9
**wondering**   149:24
**word**   33:18 115:15
116:6 117:24
151:6 159:17
**words**   30:22 40:25
41:5 73:8 98:9
99:6 100:14,17
102:21 132:6

134:25 136:11
143:11,12,14,16
**work**   10:14 11:14
19:2 26:21 27:6,7
45:16,20 51:23
77:20 106:23
115:8 124:4,9
135:6 147:11
151:1 168:16
170:19 173:1
179:4 191:12,16
191:17 204:2
**worked**   9:8 24:7
29:13 110:19
**working**   13:1
78:17 95:11 96:6
114:5,6 162:16
163:8 165:9
**works**   95:9,10,12
174:23
**world**   13:21 23:2
23:16,20 29:1
75:14 140:20,21
147:11 152:14,19
154:25 156:19,24
**worth**   42:21
**worthy**   40:22
**wow**   11:2
**write**   113:1 129:11
138:19 143:22,22
**writes**   106:22
**writing**   138:20
163:20
**written**   100:6,10
119:19 156:10
**wrong**   21:3 114:1
141:12,16,16
142:1 213:6,9
**wrote**   52:8 112:25
118:9 122:21
127:6 146:12

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**[wrote - zero]**                                                            Page 39

| |
|---|
| 156:3 159:3 |
| **x** |
| **x**   1:5,11 4:1 71:16 |
| **y** |
| **yanza**   94:21 |
| **yeah**   11:16 38:18 |
| 40:8,25 44:11 |
| 58:6 68:12 73:23 |
| 74:2 81:24 88:11 |
| 107:12,16 118:3 |
| 123:23 126:5 |
| 131:14,19 135:23 |
| 135:23 138:22 |
| 144:8,9,11 146:2 |
| 147:17 149:23 |
| 150:22 151:3,4 |
| 152:21 158:12 |
| 160:7,14 161:4 |
| 165:1 171:14 |
| 178:12 180:6 |
| 202:16 211:22 |
| 218:20,20 226:3 |
| 227:9 |
| **year**   205:7 |
| **years**   9:12 11:12 |
| 203:16 222:22 |
| **yell**   152:6 |
| **yells**   152:9 |
| **york**   1:2 2:7 6:14 |
| 18:18 55:7,19 |
| 63:17 64:3,4,8 |
| 66:8 135:6 143:4 |
| 160:6,17 179:24 |
| 182:20 |
| **z** |
| **zeppelin**   43:9 52:6 |
| 52:7,9,14,16 56:16 |
| **zero**   8:6,9 40:12 |
| 40:12 60:1,4,22 |
| 97:18 117:7 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 20

[emblem:]
Defending the Amazonian region means
saving the world.

Amazonian Region Defense Front

Approved through Ministerial Decree No. 5

Calle Eloy Alfaro y Progreso, Nueva Loja – Sucumbios
Fax: 593-6 2831-930
Post Office Box: 21-01-30, Email: admin@fda.ecuanex.net.ec
www.amazoniavive.org
Av. Alejandro Labaka, frente a FUSA, Coca – Orellana
Telephone: (593-6) 2882-274

**AMAZONIAN REGION – ECUADOR**



## AGREEMENT TO DISPUTE A CASE AGAINST
## CHEVRON TEXACO, NOW CHEVRON, IN ECUADOR

1.  The Amazonian Region Defense Front ("FDA"), on its own behalf and representing all of its member organizations, as well as the farmers residing in the Amazonian region impacted by the practices of Texaco (now known as Chevron); the Organization of Zionist Aboriginal Citizens of Ecuador (ONISE), representing the Zionist citizens; the Sequoia Aboriginal Organization of Ecuador (OISE), representing the Sequoia citizens; the Aboriginal Federation of Cofán Citizens of Ecuador (FEINCE), representing the people of Cofán, hereby enter into this agreement with the law firm of Kohn, Swift & Graf, of One South Broad Street, Philadelphia, Pennsylvania, the law offices of Steven R. Donziger, 111 E. 79th Street, New York, New York, and the law offices of Cristóbal Bonifaz of 48 North Pleasant Street, Amherst, Massachusetts, to take on the litigation of the case *Aguinda vs. Texaco* in Ecuador. This agreement supersedes any prior agreements.

2.  The three law firms mentioned above hereby agree that they will handle the litigation of this case in Ecuador and/or the United States. The agreement with these law firms for them to handle the case includes the costs of Ecuadorian attorneys' fees to continue with this lawsuit in Ecuador and the litigation expenses.

3.  On their part, the organizations indicated above to represent those affected by Texaco hereby agree that they will pay as legal compensation to the attorneys involved in the litigation a percentage of what is won in the case, this in addition to the costs incurred by the attorneys during the process of the litigation. This percentage will range between ten (10) and twenty-five (25) percent of the monetary value obtained as a result of the litigation or a settlement.

    The exact percentage to be paid to the attorneys will be determined by them on the basis of the nature of their efforts and in relationship with the monetary amount obtained as a result of the litigation or a settlement.

4.  When signing this document, the three law firms involved or one of their representatives agree that they will abide by the principles, guidelines and internal procedures established by the Executive Committee, the legal and legitimate entity representing the communities that are suing Chevrontexaco, today known as Chevron. The United States attorneys declare that they will work as a legal team and as authorized by the Committee that represents the parties involved.

For the purpose of leaving a record of this document and making it valid, the United States attorneys and the representatives of the parties involved sign it in four original copies.

January 2, 2006

[signature]
Ermel Chávez
**PRESIDENT OF AMAZONIAN REGION
DEFENSE FRONT (FDA)**

[signature]
Ricardo Payaguaje
**PRESIDENT OF SEQUOIA NATIONALS (OISE)**

4682-2 Frente-KSG Agreement (00045130)

[signature]
Luis Narváez
**PRESIDENT OF**
**COFAN NATIONALS (FEINCE)**

[signature]
Joseph C. Kohn
**ATTORNEY**


Cristóbal Bonifaz
**ATTORNEY**

[signature]
Venancio Criollo
**PRESIDENT OF**
**ZIONIST NATIONALS (ONISE)**

[signature]
Steven R. Donziger
**ATTORNEY**                    *April 27, 2006*

4682-2 Frente-KSG Agreement (00045130)



Aprobado mediante acuerdo ministerial N° 5.

Calle Eloy Alfaro y Progreso, Nueva Loja – Sucumbíos
Telefax: 593-6 2831-930
Casilla postal 21-01-30, Email, admin@ifda.exunex.net.ec
www.amazoniavive.org
Av. Alejandro Labaka, frente a FUSA, Coca – Orellana
Teléfono (593-6) 2882-274

REGION AMAZONICA - ECUADOR

## CONVENIO PARA LITIGIAR EL CASO EN CONTRA DE CHEVRON TEXACO, AHORA CHEVRON, EN ECUADOR

1. El Frente de Defensa de la Amazonía ("FDA") por sí mismo y en representación de todas sus organizaciones miembras así como también en representación de los residentes colonos de la Amazonía impactadas por las prácticas de Texaco (ahora conocido como Chevron); la Organización de la Nacionalidad Indígena Siona del Ecuador, ONISE, en representación de la Nacionalidad Siona; la Organización Indígena Secoya del Ecuador, OISE, en representación de la Nacionalidad Secoya; La Federación Indígena de la Nacionalidad Cofán del Ecuador, FEINCE, en representación de la Nacionalidad Cofán, suscriben este convenio con las firmas de abogados: Kohn Swift & Graf de One South Broad Street, Philadelphia, Pennsylvania, y Law Offices of Steven R. Donziger, 111 E. 79th Street, New York, New York, Las Offices de Cristóbal Bonifaz de 48 North Pleasant Street, Amherst, Massachussets, para hacer la litigación del juicio *Aguinda vs. Texaco* en el Ecuador. Este convenio suplanta otros convenios previos.

2. Las tres firmas legales mencionadas se comprometen a llevar a cabo la litigación de este caso en el Ecuador y/o en los Estados Unidos. El compromiso de estas firmas, para hacer este caso, incluye la financiación de abogados ecuatorianos para proseguir con este juicio en el Ecuador y cubrir los gastos de la litigación.

3. Por su parte las organizaciones mencionadas en representación de los afectados por Texaco se comprometen a pagar por compensación legal para todos los abogados involucrados en la litigación, un porcentaje de lo que se gane en el caso, a parte de los gastos incurridos por los abogados al litigar el caso. Este porcentaje variará entre un diez (10) y un veinticinco (25) por ciento del valor que se gane a razón de la litigación o de una negociación.

La determinación del porcentaje exacto será fijada por los abogados quienes lo harán después de determinar la naturaleza del esfuerzo efectuado y en relación al monto del resultado económico del juicio o de una negociación.

4. Las tres firmas legales o uno de sus representantes, al firmar este documento, se comprometen con los principios, normas y procesos internos establecidos por el Comité Ejecutivo, que es el órgano legal y legítimo que representan a las comunidades afectadas que están demandando a Chevrontexaco, hoy Chevron. Los abogados norteamericanos declaran que trabajan como parte del equipo legal y bajo la autoridad del Comité que representan a los afectados.

Para constancia y validez de este documento firman los abogados norteamericanos y los representantes de los afectados en cuatro versiones originales.

2 de enero del 2006

Ermel Chávez
**PRESIDENTE DEL FRENTE DE DEFENSA DE LA AMAZONIA (FDA)**

Ricardo Payaguaje
**PRESIDENTE DE LA NACIONALIDAD SECOYA (OISE)**

Luis Narváez
**PRESIDENTE DE LA NACIONALIDAD COFAN (FEINCE)**

Joseph C. Kohn
**ABOGADO**

Cristóbal Bonifaz
**ABOGADO**

Venancio Criollo
**PRESIDENTE DE LA NACIONALIDAD SIONA (ONISE)**

Steven R. Donziger
**ABOGADO**      27 Ap.r.7 2004

DONZ00022907 Page 4 of 4

# EXHIBIT 21

# EXHIBIT 2

RETAINER AGREEMENT

    THIS RETAINER AGREEMENT (as from time to time may be amended in accordance with the terms hereof, this "Agreement"), dated as of January 5, 2011, is made between and among (i) each of the individual plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation* (as listed on the attached Exhibit A, and together with their respective successors and assigns, the "Plaintiffs"), by Pablo Estenio Fajardo Mendoza, Esq., as lead counsel for and Ecuadorian legal representative of the Plaintiffs, (ii) EL FRENTE DE DEFENSA DE LA AMAZONIA (as listed on the attached Exhibit A, and together with its successors and assigns, the "Amazon Defense Front"), duly represented by Ermel Gabriel Chávez Parra, who is authorized by the Board of Directors and as beneficiary of any judicial or settlement award granted to the Plaintiffs, (iii) ASAMBLEA DE AFECTADOS POR TEXACO (as listed on the attached Exhibit A, and together with its successors and assigns, the "Assembly of Communities Affected by Texaco" and, collectively with the Amazon Defense Front, the "Plaintiffs' Coordinators") by Luis Yanza under that certain Special Power of Attorney dated March 1, 2010 (the "POA") granted by Ermel Gabriel Chávez Parra, Ernesto Germán Maniguaje Piaguaje, Angel Justino Piaguage Lucitante, Toribio Aguinda Lucitante and Pedro Bienvenido Galarza Bravo, and (iv) DONZIGER & ASSOCIATES, PLLC, a New York professional limited liability company having offices at 245 W. 104th St., #7D, New York, New York 10025 (the "Firm").

WITNESSETH:

    WHEREAS, the case *MariaAguinda y Otros v. Chevron Corporation* [No. 002-2003] is pending in the Provincial Court of Justice of Sucumbíos to recover clean-up costs and other damages and relief from defendant Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron) for Texaco's role as drilling operator in Ecuador and/or consortium partner; and

    WHEREAS, a number of actions pursuant to 28 U.S.C. § 1782 have been filed by Chevron and Chevron lawyers Rodrigo Perez Pallares and Ricardo Reis Veiga in various United States District Courts against various of the Plaintiffs' advisors, including two of their former and current lawyers; and

    WHEREAS, additional related litigation and associated activities are occurring and anticipated, including, without limitation,initiating actions pursuant to 28 U.S.C. § 1782 and as necessary to enforce a judgment against Chevron or its subsidiaries in Ecuador, the United States and/or other countries and pursue or defend any appeals therefromand conducting possible settlement negotiationswith Chevron and its representatives (all of the above, collectively, the "Litigation"); and

    WHEREAS, the Plaintiffs previously engaged the Firm to provide legal services to pursue and defend, as the case may be, the Litigation to its conclusion, and desire to more particularly set forth the terms of the attorney-client relationship between the Plaintiffs and the Firm, and to document and define the economic compensation to which the Firm is entitled to receive for its representation of the Plaintiffs in connection with the Litigation; and

    WHEREAS, by virtue of having acted as the primary United States attorney on behalf of



DEPOSITION EXHIBIT
**Camacho 3611**

PLAINTIFF'S
EXHIBIT
**558**
11 Civ. 0691 (LAK)

the Plaintiffs to date, the Plaintiffs desire to appoint Steven R. Donziger, Esq. to act as Plaintiffs' U.S. Representative (defined below) with such responsibilities as are set forth below, and to cooperate in such capacity with Pablo Fajardo Mendoza, Esq. and Luis Yanza (the foregoing, collectively with any successors thereto, the "Other Plaintiffs' Representatives"); and

WHEREAS, the Plaintiffs and the Firm desire to enter into this Agreement after careful and extended consideration on terms that each party considers commercially reasonable (taking into account, among other things, all relevant facts and circumstances related to the Litigation).

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Plaintiffs and the Firm, intending to be legally bound, hereby agree as follows:

    (1)    Scope of Representation.

The Plaintiffs previously engaged the services of the Firm to serve as legal counsel to the Plaintiffs in connection with the Litigation, which such engagement is hereby continued as set forth herein, with Steven R. Donziger, Esq. as the Firm's lead partner on the engagement. The Firm will cooperate and coordinate its efforts as requested by the Plaintiffs with any other lawyers or law firms retained by the Plaintiffs in connection with the Litigation (whether such efforts are to occur in the United States, Ecuador or elsewhere).

    (2)    Devotion of Resources.

        (a)    The Firm agrees that it shall zealously represent the Plaintiffs in connection with the Litigation and shall commit substantial resources to the Litigation as may be required in order to zealously prosecute and defend the Litigation whether foreseen or unforeseen. The Firm shall devote significant and sufficient time, attention and effort to the Litigation as may be necessary or desirable to advance and significantly further the interests of the Plaintiffs in the Litigation (including, without limitation, in developing and executing defensive and offensive litigation strategy, including actions under 28 USC § 1782 and all related Litigation now occurring or which may arise in the future, including, without limitation, claims Chevron may assert against active or inactive lawyers, experts, advisors, consultants or others, litigation relating to the Chevron's claims under the Bilateral Investment Treaty between the United States and Ecuador, claims asserted by the Plaintiffs and/or Chevron related to the underlying environmental case in Lago Agrio, Ecuador and enforcement of any judgment in favor of the Plaintiffs in the Litigation).

        (b)    In addition, the Plaintiffs hereby appoint Steven R. Donziger, Esq. to act as their United States representative ("Plaintiffs' U.S. Representative") to exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation. Without limiting the generality of the foregoing, the Plaintiffs' U.S. Representative shall have primary responsibility for the following:

            (i)    coordinating the overall legal strategy of the Plaintiffs to pursue and defend all aspects of the Litigation, as applicable, in such a manner as to advance and

2

further the interests of the Plaintiffs in the Litigation to the maximum extent (including, without limitation, coordinating the United States legal strategy with the Ecuadoran legal strategy);

(ii) assembling and organizing the various United States lawyers and law firms who or which from time to time will represent the Plaintiffs in connection with the Litigation (including, without limitation, preparing and negotiating engagement agreements with such lawyers and law firms on behalf of the Plaintiffs; and coordinating the efforts and undertakings of such lawyers and law firms);

(iii) coordinating the efforts to procure funding or financing for the Litigation from one or more third parties (including, without limitation, from time to time obtaining and evaluating bids from third parties in respect of such funding or financing, making recommendations to the Plaintiffs in respect of such bids and preparing and negotiating on behalf of the Plaintiffs the definitive transactional documents and agreements with each funder or financer selected by the Plaintiffs to provide any such funding or financing);

(iv) assembling and organizing the various non-legal advisors, experts, service providers and others who or which from time to time will assist the Plaintiffs in pursuing and/or defending various aspects of the Litigation, and coordinating the efforts and undertakings of such advisors, experts, service providers and others; and

(v) coordinating the media, public affairs and public relations activities on behalf of the Plaintiffs (including, without limitation, retaining lobbyists, public affairs advisors and public relations advisors on behalf of the Plaintiffs).

The Plaintiffs' U.S. Representative hereby acknowledges that, in carrying out the foregoing responsibilities, he will be required to provide his efforts in the United States, Ecuador and elsewhere. The Plaintiffs' U.S. Representative may not enter into agreements, settlements or negotiations with representatives, agents, lobbyists or any other person associated with Chevron without authorization and direction from the Plaintiffs. This authorization and direction may be given by the Other Plaintiffs' Representative in the Republic of Ecuador.

(3) Fees and Expenses; Budget and Billing.

(a) Contingent Fee. As compensation for its services hereunder, the Firm shall be entitled to an Active Lawyer Percentage of thirty one and one-half percent (31.5%) of the Total Contingency Fee Payment. The "Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies. "Plaintiff Collection Monies" means any amounts paid, whether in lump sum or installments, whether from Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or its respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened. Funds are considered "paid" when the monies are disbursed to the Plaintiffs or are available to be so disbursed. For the

3

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

avoidance of doubt, the Plaintiff Collection Monies shall be reduced for taxes and similar assessments required to be paid in the United States or Ecuador but not the application of the 100/10 Law. If it is determined that the 100/10 Law prevents the Plaintiffs from paying the entire amount of their contingency fee obligations from the Plaintiff Collection Monies, the term "Total Contingency Fee Payment" means an amount equal to one hundred percent (100%) of all portions of the Plaintiff Collection Monies that may be paid by the Plaintiffs in satisfaction of their contingency fee obligations. The "100/10 Law" means Article 43 of Ecuador's Environmental Management Act, Law No. 37, RO/245 of July 30, 1999.

(b)     Monthly Retainer. As further compensation for its services hereunder, for each month during the term of this Agreement, the Plaintiffs shall pay to the Firm a monthly retainer in accordance with a budget to be provided by the Firm to the Chairman from time to time (the "Monthly Retainer"). The Monthly Retainer that is due and payable for each month during the term of this Agreement shall be paid by the Plaintiffs on or before the 10th day of the calendar month to which the Monthly Retainer applies.

(c)     Other Amounts. The parties acknowledge that, from time to time, the Plaintiffs or one of the Other Plaintiffs' Representatives will submit requests to the Plaintiffs' U.S. Representative for funds to pay or reimburse, as applicable, certain case expenses and fees and expenses of Ecuadoran counsel, advisors and/or service providers who or which have provided legal or other services to the Plaintiffs in connection with the Litigation. In such event, the Plaintiffs' U.S. Representative shall promptly present such requests (in the form of an invoice) to the Chairman (defined below) for approval and payment in accordance with Clause 3(f) below.

(d)     Expenses. In addition to payment of the Monthly Retainer, the Firm shall, subject to Clause 3(e) and Clause 3(f) below, be entitled to reimbursement for any reasonable out-of pocket expenses or other costs incurred by the Firm in connection with its representation of the Plaintiffs in the Litigation (the "Expenses").

(e)     Budget. The Plaintiffs, the Firm and the other attorneys actively involved in the Litigation are preparing a preliminary budget (to be broken down on a monthly basis) of fees, costs and expenses of the Litigation and related activities that may be billed to the Plaintiffs by the Firm and others, which such budget will be attached to the Master Agreement (defined below) as an exhibit thereto (the "Budget"). The parties (i) acknowledge that the preliminary budget is not yet final, and is still being finalized by the Plaintiffs, the Firm and such other attorneys and (ii) agree that the monthly allocation for the Firm that will be included in the Budget, when finalized, shall be an amount equal to the Monthly Retainer Fee. The parties hereto acknowledge that the Budget may change from time to time as may be set forth in the Master Agreement.

(f)     Billing and Payment. As soon as practicable after the end of a calendar month, the Firm shall submit a bill to the Plaintiffs for reimbursement of its Expenses for such month setting forth in reasonable detail the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation. If requested by the Plaintiffs, the Firm will also provide a written description to the Plaintiffs setting forth in

4

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

reasonable detail the legal services that the Firm provided during the preceding month in connection with its representation of the Plaintiffs in the Litigation and time spent by the Firm's attorneys and other professionals during the preceding month on the Litigation; provided, that, and for the avoidance of doubt, any such written description of legal services and time provided by the Firm upon any such request shall not affect the obligation of the Plaintiffs to pay the Monthly Retainer to the Firm in accordance with Section 3(b) above. Billsfor Expenses shall be sent for approval to (i) the Plaintiffs'U.S. Representative and (ii) once designated, the chairman of the management committee (to be discussed in the Master Agreement) (the "Chairman").No amount will be paid with respect to a bill for Expenses absent the approval of each of the Chairman and the Plaintiffs' U.S. Representative.

(g)     Payments to Other Attorneys.   The Firm acknowledges that other law firms, advisors and service providers retained by the Plaintiffs in connection with the Litigation and related activities have been instructed to submit their respective monthly invoices to (x) the Chairman and (y) the Plaintiffs' U.S. Representative.  The Firm further acknowledges that the Chairman's law firm is not authorized to make any payment in respect of any such invoice unless and until it has received the written authorization to pay such invoice from (i) the Chairman and (ii) the Plaintiffs' U.S. Representative. The Plaintiffs' U.S. Representative shall coordinate with the Chairman for the review and approval or disapproval (in whole or in part) of each such invoice in accordance with the terms of the underlying engagement agreement, the Budget, the Master Agreement and this Agreement.  So long as the fees and expenses on such invoice do not exceed the applicable monthly allocation for the presenting law firm, advisor or service provider set forth in the Budget, and are approved by the Chairman and the Plaintiffs' U.S. Representative, the Plaintiffs' U.S. Representative shall sign whatever written authorization(s) may be reasonably required in order to release the funds necessary to pay such invoice from the Trust Accounts(as defined below) or accounts in which the Plaintiffs' funds are then being held.

(h)     Trust Accounts.   If requested by the Plaintiffs or one of the Other Plaintiffs' Representatives, the Firm agrees to maintain one or more segregated trust accounts (the "Trust Accounts"), and to hold and maintain in such Trust Accounts the proceeds of one or more third party fundings or financings pending the disbursement and payment of such proceeds in accordance with the provisions of this Agreement, the Budget and the Master Agreement. In such event, the Firm shall maintain accurate records of all deposits and withdrawals from each Trust Account, and provide true and correct copies of those records to the Other Plaintiffs' Representatives promptly upon a written request for the same.

(i)     Acknowledgement of Payment Terms; Intercreditor Agreement.  The Firm acknowledges and agrees that (a) there will be no payment of the contingent fee described in Section 3(a) in the event no award is granted and/or actually paid to the Plaintiffs in respect of the Litigation and (b) the terms of the engagement set forth in this Agreement (including the payment of the success fee described in Section 3(a)) are subject to the priorities, terms and provisions set forth in the Intercreditor Agreement dated as of October 31, 2010 by and among the Plaintiffs, the Plaintiffs' Coordinators, certain parties providing funding for the Litigation and the Plaintiffs' lawyers and other advisors (the "Intercreditor Agreement"). The Firm shall, as a condition to the engagement, execute and deliver the Intercreditor Agreement and agrees to comply with the terms thereof.

5

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                                    WOODS00045394

Plaintiff's Exhibit 558   p. 5 of 13

(j)     The Firm hereby acknowledges and agrees as follows:

(i)     If, from time to time, the Plaintiffs reasonably determine that (i) one or more additional lawyers and/or law firms should be retained by the Plaintiffs in order to assist with the pursuit or defense of the Litigation ("Additional Lawyers") and/or (ii) there are insufficient funds currently available to the Plaintiffs to pay the reasonably anticipated costs and expenses of the Litigation as shown on the then current Budget and, as a result, the Plaintiffs should seek additional funding for the Litigation from one or more additional funders ("Additional Funders"), then the Plaintiffs shall deliver notice of that fact to the Chairman and the Plaintiffs' U.S. Representative setting forth such determination and requesting that the Chairman and the Plaintiffs' U.S. Representative agree to reduce the Active Lawyer Percentages of each lawyer engaged by the Plaintiffs on a contingency fee basis in respect of the Litigation (each, an "Active Lawyer") on a pro rata basis (based upon their then existing Active Lawyer Percentages under each Active Lawyer's respective retainer agreement with the Plaintiffs) in order to allow for the Plaintiffs to engage such Additional Lawyers or enter into a funding arrangement with such Additional Funders, as applicable (such notice, a "Request Notice"). Each Request Notice shall describe the proposed economic terms and conditions for any agreement with Additional Lawyers and/or Additional Funders, including, without limitation, as applicable, the Active Lawyer Percentage proposed to be allocated to any Additional Lawyers (the "Additional Lawyer Percentage") and the percentage of Plaintiff Collection Monies proposed to be paid to any Additional Funder (the "Additional Funder Percentage"). Immediately upon receipt of any Request Notice, the Chairman and the Plaintiffs' U.S. Representative shall deliver a copy thereof to the Firm and each other Active Lawyer, for notification purposes only.

(ii)     No later than 10 days after the delivery of a Request Notice by the Plaintiffs, the Chairman and the Plaintiffs' U.S. Representative shall discuss and decide jointly to either approve or reject the requested actions set forth in such Request Notice. If both the Chairman and the Plaintiffs' U.S. Representative agree to approve the requested actions set forth in such Request Notice, then the requested actions set forth in such Request Notice shall be deemed approved, and the Plaintiffs thereafter may engage the Additional Lawyers or enter into a funding agreement with Additional Funders, as applicable, upon economic terms no more favorable to the Additional Lawyers or Additional Funders, as applicable, than as set forth in the approved Request Notice.

(iii)     Immediately upon the engagement of any Additional Lawyers or the entry into a funding agreement with any Additional Funders which, in each case, has been approved in accordance with this Section 3(j), the Active Lawyer Percentage of the Firm shall be reduced by the Firm's pro rata share (based upon the Firm's then existing Active Lawyer Percentage) of the amount required to enable the Plaintiffs to grant, as applicable, (a) the Additional Lawyer Percentage to such Additional Lawyer or (b) the Additional Funder Percentage to such Additional Funder, in each case, taking into account any reductions made to the portion of the Plaintiff Collection Moines which are or may be paid to any non-lawyer advisors to the Plaintiffs in accordance with the terms

6

of the agreement then in place between the Plaintiffs and such non-lawyer advisor. For avoidance of doubt, no Active Lawyer shall bear any more or any less than its pro rata share of the reductions referred to in this Section 3(j).

(4)     Reporting Obligations.

The Firm shall provide timely updates to the Other Plaintiffs' Representatives on the status of its legal efforts on behalf of the Plaintiffs, and shall promptly respond to any reasonable request for information received from any of the Other Plaintiffs' Representative.

(5)     Other Attorneys.

The Plaintiffs have entered into, and expect to enter into, agreements with other attorneys to work on the Litigation. These agreements are expected to differ from this Agreement in various ways. For example, some of those attorneys will be compensated through a combination of hourly or monthly fees (with various degrees of discount or no discount) and contingent fee payments, or exclusively on a contingent basis. Other attorneys may be retained to work without any contingent fees. Any attorneys who the Plaintiffs agree to compensate, in whole or part, on a contingent basis shall be required to become parties to a master agreement to be agreed to by all firms representing the Plaintiffs on a contingency basis (the "Master Agreement").

(6)     Confidentiality of Client Information.

The Firm shall not disclose anyconfidential information of the Plaintiffs to any third parties, including otherclients, unless (a) specifically authorized by the Plaintiffsor theOther Plaintiffs' Representativesto do so or (b)legally required to do so.

(7)     Client Files.

In the course of the representation of the Plaintiffs, the Firm shallmaintain and safeguard the Plaintiffs' files to the same extent and in the same manner as the Firmmaintains its client files generally. The Plaintiffs' files shall consist of all correspondence, pleadings,deposition transcripts, exhibits, physical evidence, experts' reports, attorney work product and other items related to the Firm's representation of the Plaintiffs. The Plaintiffs' filesshall be and remain the property of the Plaintiffs.The Firm will provide the Other Plaintiffs' Representativeswith access to the Plaintiffs'files at such reasonable times as may be requested by the Other Plaintiffs' Representatives. The Firm will dispose of the Plaintiffs' files after the conclusion of the Litigation in accordance with the Firm's document retention policies.

(8)     Conflicts of Interest.

The Firm confirms that it has performed a conflicts check on the known parties and is unaware of any conflict (either waivable or non-waivable) that would prevent or preclude the Firm's representation of the Plaintiffs. Furthermore, the Firm represents that it has no preexisting attorney-client relationship with any party in the Litigation (other than the Plaintiffs).

7

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045396

(9)     Individual Actions.

In the event that any person or entity (whether a party to the Litigation or otherwise), other than any Plaintiff, brings a legal action against the Firm or any attorney thereof relating to the Firm's or such attorney's representation of the Plaintiffs in connection with the Litigation(whether in Ecuador, the United States or elsewhere) (including, for avoidance of doubt, actions brought pursuant to 28 U.S.C. § 1782) (each, an "Individual Action"), the Plaintiffs shall make available to the Firm and/or each such attorney the funds necessary to pay the reasonable costs of defending against such Individual Action (the "Defense Funds"). The Defense Fundsshall be paid out of and to the extent of the monies then available to fund the general expenses of the case. Following a final, non-appealable order of a court of competent jurisdiction in respect of such Individual Action that the Firm or such attorney has committed actual fraud, professional malpractice or willful misconduct (or following the entry of a guilty plea or settlement agreement admitting the same), then the Plaintiffs may require that the Firm or such attorney pay to the Plaintiffs the amount of the Defense Funds actually paid by the Plaintiffs to or for the benefit of the Firm or such attorney, as applicable.

(10)    Arbitration of Disputes.

(a)     Any controversy or claim arising out of or relating to this Agreement, the relationship among the Plaintiffs' Representatives, the Plaintiffs, other attorneys involved in the Litigation or any of their affiliates or successors (the "Arbitration Parties") and the Firm,its attorneys and staff or any of their successors (the "Firm Arbitration Parties") or theservices provided by the Firm Arbitration Parties pursuant to this Agreement orotherwise shall be submitted to binding arbitration, in accordance with this Section 10, if the parties have been unable to resolve the dispute through negotiation, mediation or otherwise within thirty (30) days after one party has provided written notice of a dispute to the other party.  The Firm shall send any such notice to all three of the Plaintiffs' Representatives by registered overnight delivery service such as Federal Express or DHL at the last-known address of each such person in the Firm's records.By agreeing to arbitrate, the parties are agreeing to waive any right to a jury trial.The arbitration shall be conducted and administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules (the "ICDR Rules"), this Agreement and the Federal Arbitration Act. In the event of a conflict, the provisions of the ICDR Rules shall control, except wherethe ICDR Rules conflict with this Agreement, in which case this Agreement shall control. Thearbitration shall be conducted before a panel of three arbitrators (all of whom shall be formerstate or federal judges, with at least five years judicial experience and each of whom shall be fluent speakers and readers of both English and Spanish), regardless of the size of thedispute, to be selected as provided in the ICDR Rules. The arbitration shall be commenced andheld in Miami, Florida, unless otherwise required by a person or entity who or which has provided funding to the Plaintiffs in respect of the Litigation. Any issue concerning the location of the arbitration, the extent towhich any dispute is subject to arbitration, the applicability, interpretation, or enforceability ofthese procedures, including any contention that all or part of these procedures are invalid orunenforceable, and any discovery disputes, shall be resolved by all of the arbitrators. No potential arbitrator may serve on the panel unless he or she has agreed in writing to be bound by these procedures.  To the extent state law is applicable, the arbitrators shall apply the substantivelaw of the State of New York. Each party shall, upon the

8

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

Plaintiff's Exhibit 558   p. 8 of 13

written request of the other party,promptly provide the other with copies of all documents on which the producing party may relyin support of or in opposition to any claim or defense and a report of any expert whom theproducing party may call as a witness in the arbitration hearing. At the request of a party, andupon the showing of good cause, the arbitrators shall have the discretion to order production bythe other party or by a third party of other documents relevant to any claim or defense. Eachparty shall be entitled to depose a maximum of three witnesses (which number may not be increased by the arbitral tribunal), plus all experts designated to bewitnesses at the arbitration. The depositions shall be held within thirty (30) days of the makingof a request and shall be limited to a maximum of six hours per deposition. All objections arereserved for the arbitration hearing, except for objections based on privilege and proprietary orconfidential information.

(b)     All aspects of the arbitration shall be treated asconfidential and neither the parties nor the arbitrators may disclose the existence, content orresults of the arbitration, except as necessary to comply with legal or regulatory requirements.Before making any such disclosure, a party shall give written notice to all other parties and shallafford such parties a reasonable opportunity to protect their interests. The result of thearbitration shall be binding on the parties, and judgment on the arbitrators' award may be enteredin any court having jurisdiction. In no event shall the arbitrators have any authority to award punitive damages.

(c)     The parties acknowledge that the Plaintiffs intend to enter into agreements with other attorneys on or after the date of this Agreement and that all such agreements will contain provisions obligating the parties thereto to submit any disputes to binding arbitration substantially similar to the provisions of this Section10. In the event of any dispute between the Plaintiffs and an attorney (whether active or inactive) or any other person or entity with a legitimate or alleged claim to Plaintiff Collection Monies (any such person, a "Claimant"), the Plaintiffs desire to resolve such dispute in a single arbitration proceeding involving all such Claimants. In view of the foregoing, in the event of an arbitration proceeding involving the Plaintiffs and a Claimant, the Firm agrees to participate in such proceeding if it is joined by the Plaintiffs or any Claimant and agrees not to oppose joinder of other attorneys or the Claimants if sought by the Plaintiffs or a Claimant who or which is a party to the arbitration proceedings. Furthermore, the Firm agrees that under no circumstances shall it demand, claim or seek to obtain a greater amountor increased percentage of Plaintiff Collection Monies than it has agreed to in this Agreement and in the Master Agreement, and hereby unconditionally and irrevocably waives any right to make such a demand or claim in any arbitral, judicial or other proceeding anywhere in the world.

(d)     In the event of any dispute between a party hereto and any provider of funding or financing for the Litigation, the parties hereto agree to be bound by and comply with any arbitration provisions in the definitive documentation with such provider of funding or financing.

(11)     Controlling Law.

This Agreement shall be governed by and construed and interpreted in accordance with the laws of New York without reference to principles of conflict of laws.

9

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045398

(12)   Privilege.

In the course of representing the Plaintiffs, the parties understand that therewill be a need for the Firm to communicate with the Other Plaintiffs' Representatives and the Plaintiffs and other counsel retained by the Plaintiffs. The partiesagree that all such communications are to be treated as confidential and protected to themaximum extent permitted under applicable law by the attorney/client, work product, jointprosecution, common interest, and all other applicable privileges and doctrines.

(13)   Modification in Writing.

No modification, amendment, waiver or release of any provisions of this Agreement or ofany right, obligation, claim or course of action arising hereunder shall be valid or binding for anypurpose unless in writing and duly executed by the party against whom same is asserted.

(14)   Entire Agreement.

This Agreement contains all the agreements between the parties hereto regarding thesubject matter of this Agreement and all prior and contemporaneous agreements and understandings between the parties with respect to the subject matter hereof are deemed mergedherein, including, without limitation, the letter agreements dated as of January 2, 2006 and April 27, 2006.  In the event of a conflict between the terms of this Agreement and the Master Agreement (once executed), the terms of the Master Agreement will prevail.

(15)   Termination of Agreement.

Either party may terminate this Agreement upon thirty (30) days notice in writing to theother party. The provisions of Clauses6,7,9-12, and14-19 shall survive the termination of thisAgreement.Upon the termination of this Agreement, the Firm shall no longer be a party to, or have any rights under, the Master Agreement or the Intercreditor Agreement.  If either party terminates this Agreement prior to the recovery by the Plaintiffs of amounts otherwise payable to the Firm under the Master Agreement(if applicable) or the Intercreditor Agreement, then in the event of a recoveryby Plaintiffs of any amounts otherwise so payable, the parties will negotiate in good faith a payment to the Firm on an equitable basis taking into account all relevant circumstances.

(16)   Confidentiality of Agreement.

The partieshereby acknowledge and agree that the information contained in thisAgreement is not known to thepublic, is confidential and proprietary, and is not to be disclosed by either party to any otherperson without the prior written approval of the other party except (a) to the extent necessary to comply with any applicable law, rule or regulation or thevalid order of any governmental agency or any court of competent jurisdiction and (b) as necessary to enforce its rights under, and perform its agreements and obligationsunder, this Agreement.

10

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045399

(17)  Severability.

If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

(18)  Language.

This Agreement has been drafted in English and Spanish, and the Parties will execute both versions. In the event of a conflict between the English version of this Agreement and the Spanish version, the English version shall control.

(19)  Assignment by Plaintiffs.

It is understood and agreed that the Plaintiffs and the Plaintiffs' Coordinators may establish a trust for the purpose of, among other things, more efficiently carrying out the Litigation (such trust, the "Litigation Trust"). In the event that the Litigation Trust is established, the Plaintiffs covenant and agree that they will (a) assign all of their respective rights and obligations under this Agreement to the Litigation Trust and (b) within ten (10) days of such assignment, one of the Other Plaintiffs' Representatives will provide notice thereof to the Firm at the address listed in the forepart to this Agreement

[Remainder of page intentionally left blank]

11

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045400

Plaintiff's Exhibit 558   p. 11 of 13

IN WITNESS WHEREOF, the Plaintiffs, through their duly authorized representatives, and the Firm have executed this Agreement as of the date first written above.

PLAINTIFFS:

On behalf of each of the plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation*

Witness:

By: _____  06-01-11

Pablo Estenio Fajardo Mendoza, Esq., as Lead Counsel For and Ecuadorian Legal Representative of the Plaintiffs

El Frente de Defensa de la Amazonia

Witness:

By: _____  05/01/2011

Ermel Gabriel Chávez Parra, President

On behalf of the Asamblea de Afectados por Texaco

Witness:

By: _____  05-01-2011

Luis Yanza, as Coordinator under the POA

FIRM:

Donziger & Associates, PLLC

Witness:

By: _____

Steven R. Donziger, Partner

12

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045401

EXHIBIT A

| | |
|---|---|
| Plaintiffs' Coordinators:<br><br>Asamblea de Afectados por Texaco (Assembly of Communities Affected by Texaco) comprising the Frente de Defensa de la Amazonia; Organization of the Indigenous Nationality Siona of Ecuador (ONISE); the Organization of the Indigenous Nationality Secoya of Ecuador; the Indigenous Federation of the Cofan Nationality of Ecuador (FEINCE); Los Kichwas Firmantes de la Demanda; and Los Colonos Afectados<br><br>El Frente de Defensa de la Amazonia<br><br>Plaintiffs:<br><br>Maria Victoria Aguinda Salazar;<br>Carlos Grega Huatatoca;<br>Catalina Antonia Aguinda Salazar;<br>Lidia Alexandra Aguinda Aguinda;<br>Patricio Alberto Chimbo Yumbo;<br>Clide Ramiro Aguinda Aguinda;<br>Luis Armando Chimbo Yumbo;<br>Beatriz Mercedes Grefa Tanguila;<br>Lucio Enrique Grefa Tanguila;<br>Patricio Wilson Aguinda Aguinda;<br>Celia Irene Viveros Cusangua;<br>Fransisco Matias Alvarado Yumbo;<br>Fransisco Alvardo Yumbo;<br>Olga Gloria Grefa Creda;<br>Lorenzo Jose Alvardo Yumbo;<br>Narcisa Aida Tanguila Narvaez;<br>Berta Antonia Yumbo Tanguila;<br>Gloria Lucrecia Tanquila Grefa;<br>Fransisco Victor Tanguila Grefa;<br>Rosa Teresa Chimbo Tanguila;<br>Jose Gabriel Revelo Llore; | Maria Clelia Reascos Revelo;<br>Maria Magdalena Rodriguez Barcenes;<br>Hugo Gerardo Camacho Naranjo;<br>Jose Miguel Ipiales Chicaiza;<br>Heleodoro Pataron Guaraca;<br>Luiza Delia Tanguila Narvaez;<br>Lourdes Beatriz Chimbo Tanguila;<br>Maria Hortencia Viveros Cusangua;<br>Segundo Angel Amanta Milan;<br>Octavio Ismael Cordova Huanca;<br>Elias Roberto Piyahuaje Payahuaje;<br>Javier Piaguaje Payaguaje;<br>Daniel Carlos Lusitande Yaiguaje;<br>Benacio Fredy Cimbo Grefa;<br>Guillermo Vincentepayaguaje Lusitante;<br>Delfin Leonidas Payaguaje Payaguaje;<br>Alfredo Donaldo Payaguaje Payaguaje;<br>Teodoro Gonzalo Piaguaje Payaguaje;<br>Miguel Mario Payaguaje Payaguaje;<br>Fermin Piaguaje Payaguaje;<br>Reinaldo Lusitande Yaiguaje;<br>Luis Agustin Payaguaje Piaguaje;<br>Emilio Martin Lusitande Yaiguaje;<br>Simon Lusitande Yaiguaje;<br>Armando Wilfrido Piaguaje Payaguaje; and<br>Angel Justino Piaguaje Lucitante. |

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

# EXHIBIT 22

PMW Draft
December 6, 2010

## MASTER AGREEMENT

THIS MASTER AGREEMENT (as from time to time may be amended in accordance with the terms hereof, this "Agreement"), dated as of December ___, 2010, is made between and among (i) each of the individual plaintiffs in the matter *Maria Aguinda y Otros v. Chevron Corporation* (as listed on the attached Exhibit A, and together with their respective successors and assigns, the "Plaintiffs"), by Pablo Estenio Fajardo Mendoza, Esq., as lead counsel for and Ecuadorian legal representative of the Plaintiffs, (ii) EL FRENTE DE DEFENSA DE LA AMAZONIA (as listed on the attached Exhibit A, and together with its successors and assigns, the "Amazon Defense Front"), duly represented by Ermel Chavez Parra, who is authorized by the Board of Directors and as beneficiary of any judicial or settlement award granted to the Plaintiffs, (iii) ASAMBLEA DE AFECTADOS POR TEXACO (as listed on the attached Exhibit A, and together with its successors and assigns, the "Assembly of Communities Affected by Texaco" and, collectively with the Amazon Defense Front, the "Plaintiffs' Coordinators") by Luis Yanza under that certain Special and Judicial Power of Attorney dated March 1, 2010 (the "POA") granted by Ermel Gabriel Chávez Parra, Ernesto Germán Maniguaje Piaguaje, Ángel Justino Piaguage Lucitante, Toribio Aguinda Lucitante and Pedro Bienvenido Galarza Bravo, (iv) DONZIGER & ASSOCIATES, PLLC, a New York professional limited liability company having its main office at 245 W. 104th St., #7D, New York, New York 10025 ("Donziger"), (v) MOTLEY RICE LLC, a South Carolina limited liability company having its main office at 28 Bridgeside Boulevard, Mt. Pleasant, South Carolina 29464 ("Motley Rice"), (vi) PATTON BOGGS LLP, a District of Columbia limited liability partnership having offices at 1185 Avenue of the Americas, 30th Floor, New York, New York 10036 and at One Riverfront Plaza, 6th Floor, 1037 Raymond Boulevard, Newark, New Jersey 07102 ("Patton Boggs"), (vii) EMERY, CELLI, BRINCKERHOFF & ABADY LLP, a New York limited liability partnership having offices at 75 Rockefeller Plaza, 20th Floor, New York, NY 10019 ("ECBA"), (viii) PABLO ESTENIO FAJARDO MENDOZA, ESQ., an individual residing in Ecuador ("Fajardo"), and (ix) each Person who hereafter executes an Accession Agreement. For purposes of this Agreement, the Plaintiffs, the Plaintiffs' Coordinators, Donziger, Motley Rice, Patton Boggs, ECBA, Fajardo and each Person who hereafter executes an Accession Agreement hereinafter may be referred to individually as a "Party" and collectively as the "Parties". Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.

## WITNESSETH:

WHEREAS, the case *Maria Aguinda y Otros v. Chevron Corporation* [No. 002-2003] is pending in the Provincial Court of Justice of Sucumbios, Ecuador to recover clean-up costs and other damages and relief from defendant Chevron Corporation (a/k/a Texaco, ChevronTexaco, Chevron) for Texaco's role as drilling operator in Ecuador and/or consortium partner; and

WHEREAS, a number of actions pursuant to 28 U.S.C. § 1782 have been filed by Chevron and Chevron lawyers (including, without limitation, Rodrigo Perez Pallares and



DEPOSITION EXHIBIT
**Donziger 5049**

PLAINTIFF'S EXHIBIT
**556**
11 Civ. 0691 (LAK)

Ricardo Reis Veiga) in various United States District Courts against various of the Plaintiffs' advisors, including several of their former and current lawyers; and

WHEREAS, additional related litigation and associated activities is occurring and is anticipated, including, without limitation, initiating actions pursuant to 28 U.S.C. § 1782, and as necessary to enforce a judgment against Chevron or its subsidiaries in Ecuador, the United States and/or other countries and to pursue or defend any appeals therefrom and conducting possible settlement negotiations with Chevron and its representatives (all of the above, collectively, the "Litigation"); and

WHEREAS, the Plaintiffs are represented by Pablo Estenio Fajardo Mendoza, Steven R. Donziger, Esq. (the "Plaintiffs' U.S. Representative") (the foregoing, collectively with any successors thereto, the "Plaintiffs' Representatives"), and the Active Lawyers; and

WHEREAS, the Plaintiffs have engaged the Active Lawyers to pursue and defend, as applicable, the Litigation to its conclusion, which may take several months or many years and which may or may not be successful; and

WHEREAS, each of the Active Lawyers has agreed to commit substantial resources to the Litigation as may be required in order to prosecute and defend the Litigation, as applicable; and

WHEREAS, each Party desires to enter into this Agreement after careful and extended consideration on terms that such Party considers commercially reasonable (taking into account, among other things, all relevant facts and circumstances related to the Litigation).

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Parties, intending to be legally bound, hereby agree as follows:

1.     Definitions.

"100/10 Law" means Section 43, paragraph third of the Republic of Ecuador's *Environmental Management Act*, Law No. 37, RO/245 of July 30, 1999, as may be amended from time to time.

"Accession Agreement" means an accession agreement substantially in the form attached hereto as Exhibit D.

"Active Lawyers" means each law firm and/or lawyer representing the Plaintiffs in the Litigation who or which are working, either in whole or in part, in consideration for a contingency fee. As of the date of this Agreement, each Active Lawyer is listed on the attached Exhibit B. If, subsequent to the date of this Agreement, (a) the Plaintiffs retain or engage one or more law firms and/or lawyers to represent the Plaintiffs in the Litigation on a partial or total contingency fee basis and (b) such engagement is undertaken in compliance with the terms of this Agreement (including Section 4(c) hereof), then such law firm or lawyer, as applicable, shall, upon execution of an Accession Agreement, be deemed to be an Active Lawyer, the Active

- 2 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

Lawyer Percentages of each of the other Active Lawyers shall be reduced on a pro rata basis (unless such new law firm or lawyer is compensated completely out of the Bonus Pool or other unallocated portions of the Total Contingency Fee Payment) and the attached Exhibit B shall be updated accordingly by the Plaintiffs' U.S. Representative.

"Active Lawyer Percentage" means, with respect to each Active Lawyer, the percentage of the Total Contingency Fee Payment set forth opposite such Active Lawyer's name on the attached Exhibit B under the heading "Active Lawyer Percentage" (as such exhibit may be revised in accordance with the terms of this Agreement).

"Additional Funder Percentage" has the meaning given to such term in Section 2(f)(i) below.

"Additional Funders" has the meaning given to such term in Section 2(f)(i) below.

"Additional Lawyer Percentage" has the meaning given to such term in Section 2(f)(i) below.

"Additional Lawyers" has the meaning given to such term in Section 2(f)(i) below.

"Agreement" has the meaning given to such term in the forepart of this Agreement.

"Allegation" and "Allegations" have the respective meanings given to such terms in Section 6(b) below.

"Amazon Defense Front" has the meaning given to such term in the forepart of this Agreement.

"Arbitration Party" has the meaning given to such term in Section 8(a) below.

"Assembly of Communities Affected by Texaco" has the meaning given to such term in the forepart of this Agreement.

"Bonus Pool" means (a) the Initial Bonus Pool plus (b) any amounts in addition to the Initial Bonus Pool that are made available for allocation to Active Lawyers as a bonus pool pursuant to this Agreement.

"Budget" has the meaning given to such term in Section 4(d) below.

"Business Day" means any day other than a Saturday, a Sunday, or a holiday on which commercial banks in the State of New York or London, England or Quito, Ecuador are authorized or required by applicable law to close.

"Chairman" has the meaning given to such term in Section 4(c) below.

- 3 -

WOODS00045344

"Claimant" has the meaning given to such term in Section 8(c) below.

"Claims" has the meaning given to such term in Section 5 below.

"Complaint" means the complaint filed by or on behalf of the Plaintiffs in the case *Maria Aguinda y Otros v. Chevron Corporation* [No. 002-2003] that, as of the date of this Agreement, is pending in the Provincial Court of Justice of Sucumbios, Ecuador.

"Covered Expenses" has the meaning given to such term in Section 5 below.

"Donziger" has the meaning given to such term in the forepart of this Agreement.

"ECBA" has the meaning given to such term in the forepart of this Agreement.

"Engagement Agreement" means, with respect to each Active Lawyer, the retainer or engagement letter or agreement pursuant to which the Plaintiffs have engaged such Active Lawyer to represent them in the Litigation.

"Excess Expense Register" means a register maintained by the Plaintiffs' U.S. Representative showing the amount of expenses paid or incurred by each Active Lawyer which may be reimbursed in accordance with the terms hereof, but which have not been paid to such Active Lawyer.

"Fajardo" has the meaning given to such term in the forepart of this Agreement.

"Funder" means any Person who or which (a) has previously entered, or hereafter enters, into a binding written agreement with the Plaintiffs to provide funding to the Plaintiffs to finance the costs of the Litigation and which agreement is and remains, as of the time in question, in full force and effect, and (b) is not an Active Lawyer, an Inactive Lawyer or a Non-Lawyer Advisor. For the avoidance of doubt, Torvia is a Funder.

"Funding Agreement" has the meaning given to such term in Section 2(c) below.

"ICDR Rules" has the meaning given to such term in Section 8(a) below.

"Inactive Lawyers" means any lawyers or law firms who or which previously represented Plaintiffs in the Litigation but who or which are no longer active in the Litigation (including, without limitation, the lawyers or law firms listed on Exhibit C).

"Indemnified Party" has the meaning given to such term in Section 5 below.

"Initial Bonus Pool" means an amount equal to five percent (5%) of the Total Contingency Fee Payment, which shall be available for allocation to certain Active Lawyers and others as a bonus pool in accordance with Section 2(e) below.

- 4 -

                                  WOODS00045345

"Initial Budget" has the meaning given to such term in Section 4(d) below.

"Litigation" has the meaning given to such term in the Recitals to this Agreement.

"Litigation Trust" has the meaning given to such term in Section 4(f) below.

"Motley Rice" has the meaning given to such term in the forepart of this Agreement.

"Non-Lawyer Advisor" means each Person who or which has been engaged by the Plaintiffs, other than in an attorney/client relationship, to provide services or advice to the Plaintiffs in connection with the Litigation (not including any business advisors).

"Party" and "Parties" have the respective meanings given to such terms in the forepart of this Agreement.

"Patton Boggs" has the meaning given to such term in the forepart of this Agreement.

"Person" means any natural person, corporation, partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, or other organization whether or not a legal entity, custodian, trustee-executor, administrator, nominee or entity in a representative capacity and any government or agency or political subdivision thereof.

"Plaintiff Collection Monies" means any amounts paid, whether in lump sum or installments, whether from Chevron Corporation (a/k/a Texaco; ChevronTexaco; Chevron), any other party listed as a defendant in respect of the Litigation (including, without limitation, his or its respective affiliates and successors in interest), or any other party added or joined to the Litigation from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened. Funds are considered "paid" when the monies are disbursed to the Plaintiffs or are available to be so disbursed. For the avoidance of doubt, the Plaintiff Collection Monies shall be reduced for taxes and similar assessments required to be paid in the United States or Ecuador and by the amount of any counterclaims or similar judgments which may be made against the Plaintiffs but not the application of the 100/10 Law.

"Plaintiffs" has the meaning given to such term in the forepart of this Agreement.

"Plaintiffs' Coordinators" has the meaning given to such term in the forepart of this Agreement.

"POA" has the meaning given to such term in the forepart of this Agreement.

"Released Party" has the meaning given to such term in Section 6(a) below.

"Releasing Party" has the meaning given to such term in Section 6(a) below.

- 5 -

WOODS00045346
Plaintiff's Exhibit 556   p. 5 of 24

"Request Notice" has the meaning given to such term in Section 2(f)(i) below.

"Torvia" means Torvia Limited, a Gibraltar company.

"Total Contingency Fee Payment" means an amount equal to twenty percent (20%) of all Plaintiff Collection Monies. If it is determined that the 100/10 Law prevents the Plaintiffs from paying the entire amount of their contingency fee obligations from the Plaintiff Collection Monies, the term "Total Contingency Fee Payment" means an amount equal to one hundred percent (100%) of all portions of the Plaintiff Collection Monies that may be paid by the Plaintiffs in satisfaction of their contingency fee obligations (less any amounts that the Plaintiffs are obligated to pay for unreimbursed case expenses and to the Funders, Inactive Lawyers, Non-Lawyer Advisors and/or other business advisors).

2. Agreements Regarding Total Contingency Fee Payment.

(a) Upon and subject to each of the other terms and conditions set forth in this Agreement and the terms of the separate Engagement Agreement with each Active Lawyer, the Plaintiffs hereby covenant and agree to pay to the Active Lawyers, as compensation to the Active Lawyers, a portion of the Total Contingency Fee Payment as set forth in Section 3 below.

(b) Each Active Lawyer hereby acknowledges and agrees that (i) the Total Contingency Fee Payment will include any amounts owed by the Plaintiffs or any Active Lawyers to Inactive Lawyers, and (ii) if any Inactive Lawyer is entitled to receive any Plaintiff Collection Monies, directly or indirectly, by decision of a court of competent jurisdiction, arbitration decision, settlement agreement or otherwise, such Inactive Lawyers will be paid from the Total Contingency Fee Payment and that the portion of the Total Contingency Fee Payment due each of the Active Lawyers may be reduced by an amount equal to its pro rata share of the amounts required to be paid to Inactive Lawyers (provided that such amounts shall first reduce any unallocated share of the Bonus Pool).

(c) Each Active Lawyer hereby acknowledges and agrees that the Plaintiffs have entered into, and hereafter will enter into, one or more agreements with Funders to finance the costs of the Litigation (each, a "Funding Agreement"), which may, and in some cases do, include terms that entitle such Funder to receive payment from the Plaintiff Collection Monies in preference and/or priority to the Plaintiffs and the Active Lawyers. If the Plaintiffs ultimately pay the Funders and any business advisors less than 10% of the Plaintiff Collection Monies, then the amount by which 10% of the Plaintiff Collection Monies exceeds the amount actually paid to the Funders and business advisors shall be paid to the Active Lawyers in proportion to their Active Lawyer Percentages.

(d) In connection with any Funding Agreement (whether now in place or hereafter entered into), each Active Lawyer agrees to execute any documents and/or agreements (including, without limitation, any intercreditor agreements) that may be required or requested by a Funder to evidence the preferential financial rights to which such Funder is entitled under its respective Funding Agreement.

- 6 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

(e)     The Active Lawyers hereby acknowledge the existence of the Bonus Pool, and agree that Plaintiffs' U.S. Representative shall have the right to allocate the proceeds of the Bonus Pool among the Active Lawyers and others in his sole discretion; provided, that the Initial Bonus Pool may not be allocated to Donziger or the Ecuador Attorney.  To the extent that any additional portion of the Bonus Pool is not specifically allocated pursuant to the immediately preceding sentence, it shall be allocated among all Active Lawyers in proportion to their Active Lawyer Percentages.  In connection with any allocation of the Bonus Pool pursuant to this Section 2(e), the attached Exhibit B shall be updated accordingly by the Plaintiffs' U.S. Representative.

(f)     Each Active Lawyer hereby acknowledges and agrees as follows:

(i)     If, from time to time, the Plaintiffs reasonably determine that (A) one or more additional lawyers and/or law firms should be retained by the Plaintiffs in order to assist with the pursuit or defense of the Litigation ("Additional Lawyers") and/or (B) there are insufficient funds currently available to the Plaintiffs to pay the reasonably anticipated costs and expenses of the Litigation as shown on the then current Budget and, as a result, the Plaintiffs should seek additional funding for the Litigation from one or more additional funders ("Additional Funders"), then the Plaintiffs shall deliver notice of that fact to the Chairman and the Plaintiffs' U.S. Representative setting forth such determination and requesting that the Chairman and the Plaintiffs' U.S. Representative agree to reduce the Active Lawyer Percentages of each Active Lawyer on a pro rata basis (based upon their then existing Active Lawyer Percentages) in order to allow for the Plaintiffs to engage such Additional Lawyers or enter into a funding arrangement with such Additional Funders, as applicable (such notice, a "Request Notice").  Each Request Notice shall describe the proposed economic terms and conditions for any agreement with Additional Lawyers and/or Additional Funders, including, without limitation, as applicable, the Active Lawyer Percentage proposed to be allocated to any Additional Lawyers (the "Additional Lawyer Percentage") and the percentage of Plaintiff Collection Monies proposed to be paid to any Additional Funder (the "Additional Funder Percentage").  Immediately upon receipt of any Request Notice, the Chairman and the Plaintiffs' U.S. Representative shall deliver a copy thereof to each Active Lawyer, for notification purposes only.

(ii)     No later than 10 days after the delivery of a Request Notice by the Plaintiffs, the Chairman and the Plaintiffs' U.S. Representative shall discuss and decide jointly to either approve or reject the requested actions set forth in such Request Notice. If both the Chairman and the Plaintiffs' U.S. Representative agree to approve the requested actions set forth in such Request Notice, then the requested actions set forth in such Request Notice shall be deemed approved, and the Plaintiffs thereafter may engage the Additional Lawyers or enter into a funding agreement with Additional Funders, as applicable, upon economic terms no more favorable to the Additional Lawyers or Additional Funders, as applicable, than as set forth in the approved Request Notice.

(iii)     Immediately upon the engagement of any Additional Lawyers or

- 7 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER                                                      WOODS00045348

the entry into a funding agreement with any Additional Funders which, in each case, has been approved in accordance with this Section 2(f), the Active Lawyer Percentage of each Active Lawyer shall be reduced by such Active Lawyer's pro rata share (based upon their then existing Active Lawyer Percentages) of the amount required to enable the Plaintiffs to grant, as applicable, (a) the Additional Lawyer Percentage to such Additional Lawyer or (b) the Additional Funder Percentage to such Additional Funder, in each case, [taking into account any reductions made to the portion of the Plaintiff Collection Moines which are paid to any Non-Lawyer Advisors in accordance with the terms of the agreement then in place between the Plaintiffs and such Non-Lawyer Advisor. For avoidance of doubt, no Active Lawyer shall bear any more or any less than its pro rata share of the reductions referred to in this Section 2(f).

        3.    Application of Plaintiff Collection Monies; Disbursement of Total Contingency Fee Payment. Following receipt of any Plaintiff Collection Monies, 100% of such Plaintiff Collection Monies shall be deposited in one or more escrow accounts for further disbursement to the Parties hereto, the Funders, any Inactive Lawyers, the Non-Lawyer Advisors and/or other business advisors or Persons. Amounts shall be released from escrow upon the signature of the Plaintiffs' U.S. Representative and the Chairman, as representative of the Active Lawyers. It is understood and agreed that, to the extent that there are any amounts owing as shown on the Excess Expense Register, such amounts shall be paid out of such escrow to the relevant Active Lawyer in preference to the payments of any other amounts owing to the Active Lawyers and otherwise in accordance with any applicable intercreditor agreement(s). It is understood and agreed that, to the extent that there is any dispute with respect to the amounts proposed to be disbursed, the Plaintiffs' U.S. Representative and the Chairman may elect to retain such amounts in escrow pending resolution of any such dispute. Subject to payments required to be made to the Funders, any Inactive Attorneys, the Non-Lawyer Advisors and/or other business advisors or Persons, and after reimbursement of any unreimbursed fees and/or expenses that an Active Lawyer is expressly entitled to receive under its respective Engagement Agreement, each Active Lawyer shall be entitled to an amount equal to the Total Contingency Fee Payment, if any, multiplied by its Active Lawyer Percentage.

        4.    Further Acknowledgments and Agreements.

        (a)    By entering into this Agreement, each Party acknowledges that the unusual length of the litigation and inherent risk of litigating in a foreign jurisdiction in which the defendant has no assets create circumstances frequently not seen in typical contingency-fee cases in the United States. Each Party further acknowledges that:

        (i)    the outcome and course of the Litigation is uncertain and cannot be predicted;

        (ii)    the duration of the Litigation is uncertain, cannot be predicted and may last several months or many years;

        (iii)    if the Plaintiffs recover a significant amount of Plaintiff Collections Monies, the disbursement of the Total Contingency Fee Payment may

- 8 -

produce a large financial result to the Active Lawyers in a short period of time;

(iv)  the Plaintiffs have agreed to pay and disburse the Total Contingency Fee Payment in full as set forth in this Agreement despite the fact that the Litigation has been ongoing for many years, in large part in consideration for the agreement of each Active Lawyer to dedicate all necessary resources to vigorously prosecute and defend the Litigation, as applicable, until conclusion (including the exhaustion of all appeals), however long that may take;

(v)  the Plaintiffs may be unable to obtain any Plaintiff Collection Monies, in which event there would be no Total Contingency Fee Payment available for payment and disbursement to the Active Lawyers;

(vi)  the needs of the Litigation are uncertain and may include initiating legal actions as well as defending legal actions in judicial and/or arbitration proceedings in the United States, Ecuador and other countries; and

(vii)  the Plaintiffs may need to hire or retain other law firms and/or attorneys, who or which may be entitled to be paid on an hourly basis or on a contingent basis or both.

(b)  In view of the foregoing, each Party hereby agrees that this Agreement, and the disbursement of the Total Contingency Fee Payment, is fair and equitable, considering the risks of the Litigation and the financial and other benefits that each Active Lawyer and the Plaintiffs would receive from a successful conclusion of the Litigation. Each Party further agrees that he or it shall not seek to increase or decrease his or its Active Lawyer Percentage or the amount of the Bonus Pool, notwithstanding (i) the amount of the Plaintiff Collection Monies, (ii) the duration of the Litigation or (iii) the amount or type of work involved and/or undertaken.

(c)  Each Party hereby acknowledges and agrees that the Litigation shall be coordinated and managed by a management committee comprised of one individual designated by each Party to this Agreement and one individual designated by the Plaintiff's U.S. Representative. The Plaintiffs' U.S. Representative shall appoint a chairman of the management committee (the "Chairman"), who, along with the Plaintiffs' U.S. Representative, will exercise overall responsibility for the strategic direction of the Litigation and the day-to-day management of the Litigation (subject, however, to the other provisions of this Section 4(c)). The management committee shall ensure that the work related to the Litigation shall be divided among the Active Lawyers in accordance with their respective responsibilities and expertise. Except for amounts to be paid out of Plaintiff Collection Monies as specifically contemplated in an Engagement Agreement, each Active Lawyer agrees that, for any particular month during the term of this Agreement, (i) it shall not charge Plaintiffs for any legal fees in connection with the Litigation in excess of the amount set forth under such Active Lawyer's name on the then current Budget for such month and (ii) it shall not charge Plaintiffs for expenses incurred in connection with the Litigation except to the extent such expenses (A) are in the amount

- 9 -

Plaintiff's Exhibit 556   p. 9 of 24

set forth under such Active Lawyer's name on the then current Budget for such month or (B) such expenses were incurred with the prior approval of the Chairman and the Plaintiffs' U.S. Representative or were incurred with concurrent notice to the Chairman and the Plaintiffs' U.S. Representative in order to meet an urgent need with respect to the Litigation. The management committee shall have regular telephonic meetings or special meetings, if necessary, at which any material matters related to the Litigation (including, without limitation, the addition of any new Active Lawyers, the addition of any Non-Lawyer Advisors and any settlement discussions) will be discussed. It is understood and agreed that the Plaintiffs shall take into consideration the views of all members of the management committee, and shall use good faith efforts to arrive at a consensus agreement as to how to proceed in respect of any material matter related to the Litigation that has been presented (or should have been presented) to the management committee for discussion (including, without limitation, any decision to add one or more Additional Lawyers or Non-Lawyer Advisors and/or to settle the Litigation).

(d)     The Parties shall negotiate in good faith to agree upon a six-month budget (to be broken down on a monthly basis) of fees, costs and expenses of the Litigation and related activities that may be billed to the Plaintiffs by the Active Attorneys and others. The Parties agree to finalize such budget in a reasonable period of time following the execution of this Agreement, whereupon such agreed initial budget shall be incorporated into and added to this Agreement as Exhibit E by means of an amendment to this Agreement (the "Initial Budget"). Each Active Lawyer shall, from time to time as requested by the Plaintiffs (but in any event no less frequently than twice a year), prepare and submit proposed revisions to the Budget based on the anticipated activity with respect to the Litigation or related activities to the Plaintiffs' U.S. Representative and the other members of the management committee. The management committee shall review such proposed revisions, and shall submit a recommended revised budget to the Plaintiffs no later than 5 Business Days before commencement of the next succeeding six-month budgetary period. The Plaintiffs shall either (i) approve such recommended revised budget or (ii) make revisions to such recommended revised budget and approve the same, as so revised. The Initial Budget and any such revised budget approved by the Plaintiffs as set forth above shall be referred to in this Agreement as the "Budget".

(e)     Each Active Lawyer shall be entitled to rely and act upon written and oral instructions of the Plaintiffs' Representatives. Each Party shall extend all reasonable assistance and cooperation to the other Parties and to other Persons (including Non-Lawyer Advisors) retained or engaged by the Plaintiffs in connection with the Litigation.

(f)     The Plaintiffs and the Plaintiffs' Coordinators hereby covenant and agree not to amend the Complaint in any way to remove or replace the Amazon Defense Front as beneficiary under or in respect of the Complaint, or to appoint or designate one or more additional beneficiaries thereof (in addition to the Amazon Defense Front). The Plaintiffs and the Plaintiffs' Coordinators hereby covenant and agree not to assign, transfer, delegate or encumber all or any part of their respective rights, title and interest in and to any Plaintiff Collection Monies, except as otherwise set forth in this Agreement. Notwithstanding anything to the contrary contained herein or in any Engagement

- 10 -

Agreement, the Plaintiffs and the Plaintiffs' Coordinators may establish a trust for the purpose of, among other things, more efficiently carrying out the Litigation (such trust, the "Litigation Trust"). In the event the Litigation Trust is established, the Plaintiffs have the absolute right to, and shall promptly, (i) assign to the Litigation Trust (A) all of their respective rights and obligations under this Agreement and each Engagement Agreement and (B) all of their respective rights and interest in and to the Plaintiff Collection Monies and (ii) provide notice thereof to the members of the management committee.

(g)     To the extent possible, the Plaintiffs and the Active Lawyers shall arrange to have third party costs and expenses payable in respect of expert services, deposition fees, transcription and court reporter services, translation services, filing fees and similar third party costs and expenses incurred in respect of the Litigation paid directly out of the funds maintained by the Plaintiffs to finance the Litigation (which may include funds contributed by Funders). To the extent that (i) an Active Lawyer incurs such third party costs and expenses that are allowed to be reimbursed by the Plaintiffs under this Agreement and (ii) there are insufficient funds to pay such third party costs and expenses to such Active Lawyer, then the amount of such third party costs and expenses shall be added to the Excess Expense Register to be paid on the earlier to occur of (x) the date on which additional funds become available to the Plaintiffs for the financing of the Litigation which may be used to pay such third party costs and expenses and (y) the date on which the Plaintiff Collection Monies are disbursed otherwise available to be disbursed to the Active Lawyers in accordance with the terms hereof and otherwise in accordance with any applicable intercreditor agreement(s). For the avoidance of doubt, any amounts listed on the Excess Expense Register shall be paid to the Active Lawyers to whom or which such amounts are owed in preference to any other payment to the Active Lawyers, on a pro rata basis (based upon the total amounts owed to each Active Lawyer to whom or which such amounts are owed).

5.     Indemnification of Plaintiffs' Representatives and Active Attorneys. The Plaintiffs hereby agree to (a) indemnify and hold harmless each Plaintiffs' Representative and each Active Lawyer and each of his or its respective heirs, successors, assigns, personal or legal representatives and anyone claiming through or under any of the foregoing (each, an "Indemnified Party") from and against any and all losses, costs, liabilities, damages, awards and expenses (including, without limitation, legal fees and expenses and costs of suit, and out-of-pocket expenses, such as travel) (collectively, "Covered Expenses") actually incurred by such Indemnified Party in connection with the Litigation (including, without limitation, the defense and/or pursuit, as applicable, of appealing any judgments or decisions or other appellate proceedings) and/or arising out of his activities on behalf of Plaintiffs in connection with the Litigation (collectively, "Claims") to the fullest extent provided by law, and (b) advance any Covered Expenses as may be necessary or reasonable to defend any Claim or Claims brought against such Indemnified Party, which advances are intended to be made from Plaintiffs' monies received from certain Funders, which amounts may be deposited in a trust account with an Active Lawyer selected by the Plaintiffs' U.S. Representative. It is further understood and agreed that to the extent that any Plaintiffs' Representative is no longer able to render legal services to the Plaintiffs or where any Plaintiffs' Representative withdraws from the Litigation as a legal advisor and agrees to continue to provide other services to the Plaintiffs, such Plaintiffs'

- 11 -

Representative may be engaged by the Plaintiffs as a Non-Lawyer Advisor, in which case (i) his or its Active Lawyer Percentage shall not be added to the Bonus Pool, but rather shall be added to the amounts required to be disbursed to Non-Lawyer Advisors as described above, and (ii) he or it shall continue to be an Indemnified Party for purposes of the foregoing indemnity.

      6.    <u>Agreement Regarding Exculpation</u>.

      (a)    By signing this Agreement below, each Active Lawyer (for itself and each of his or its heirs, successors, assigns, personal or legal representatives and anyone claiming through or under any of the foregoing, a "<u>Releasing Party</u>") acknowledges and agrees that Chevron, either directly or by and though its affiliates and its or their respective advisors and counsel, has made, and in the future may continue to make, Allegations (defined below) against certain of the Active Lawyers, Plaintiffs' Representatives and Non-Lawyer Advisors (each, together with its heirs, successors, assigns, personal or legal representatives and anyone claiming through or under any of the foregoing, the "<u>Released Party</u>"). Each Releasing Party further acknowledges and agrees that he or it (a) has had a full and complete opportunity to conduct, and has conducted, its own independent investigations with respect to the Allegations, (b) has sufficient knowledge, experience, sophistication and expertise in legal and business matters so as to be capable of evaluating the Allegations (including, without limitation, the possibility or probability of future Allegations) and (c) has in fact carefully evaluated the Allegations. Accordingly, each Releasing Party hereby fully releases and discharges forever each Released Party of and from any and all manner of actions, suits, complaints, charges, liability, rights, claims, demands, damages, loss, costs, expenses, and causes of action of any type or nature whatsoever, in law or in equity, which such Releasing Party ever had, now has, or hereafter may have, whether known or unknown, existing or potential, now existing or hereafter arising, contingent or certain, against each and every Released Party for, upon or by reasons of any matter, cause, damages or thing whatsoever, relating to or arising out of the conduct of such Released Party or Released Parties in the Litigation (including in any Allegations).

      (b)    For purposes of the foregoing, "<u>Allegation</u>" means each, and "<u>Allegations</u>" means all, allegations or assertions of misconduct, fraud or any other nature or basis, whether now existing or asserted or hereafter brought or asserted, in any way relating to or arising out of the conduct of such Released Party or Released Parties in the Litigation (including, without limitation, (i) those alleged by Chevron, either directly or by and though its affiliates and its or their respective advisors and counsel, in its various filings made under 28 U.S.C. § 1782 and related proceedings, (ii) any civil, criminal or professional or ethical proceedings and (iii) any damages, convictions, professional sanctions or other action that may be taken against a Person arising from his or its representation of the Plaintiffs in the Litigation).

      7.    <u>Representations and Warranties</u>. Each Party hereby represents to the other Parties as follows: (a) such Party has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery; (b) performance by such Party of this Agreement have been duly authorized by all necessary action; and (c) this Agreement has been duly and validly executed and delivered by such Party and constitutes the binding obligation of such Party, enforceable against such Party in accordance with its terms.

- 12 -

WOODS00045353

8.      Arbitration of Disputes.

         (a)      Any controversy or claim arising out of or relating to the relationship among the Parties or any of their affiliates or successors (the "Arbitration Parties") arising under or in connection with this Agreement or otherwise shall be submitted to binding arbitration if such Parties have been unable to resolve the dispute through negotiation, mediation or otherwise within thirty (30) days after one Party has provided written notice of a dispute to each other Party and to all three of the Plaintiffs' Representatives by registered overnight delivery service such as Federal Express or DHL at the last-known address of such Persons.  By agreeing to arbitrate, the Parties are agreeing to waive any right to a jury trial.  The arbitration shall be conducted and administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules (the "ICDR Rules"), this Agreement and the Federal Arbitration Act.  In the event of a conflict, the provisions of the ICDR Rules shall control, except where the ICDR Rules conflict with this Agreement, in which case this Agreement shall control.  The arbitration shall be conducted before a panel of three arbitrators (all of whom shall be former state or federal judges, with at least five years judicial experience and each of whom shall be fluent speakers and readers of both Spanish and English), regardless of the size of the dispute, to be selected as provided in the ICDR Rules.  The arbitration shall be commenced and held in Miami, Florida, unless otherwise required by a Funder.  Any issue concerning the location of the arbitration, the extent to which any dispute is subject to arbitration, the applicability, interpretation, or enforceability of these procedures (including, without limitation, any contention that all or part of these procedures are invalid or unenforceable and any discovery disputes) shall be resolved by all of the arbitrators.  No potential arbitrator may serve on the panel unless he or she has agreed in writing to be bound by these procedures and is a fluent speaker and reader of both English and Spanish.  To the extent state law is applicable, the arbitrators shall apply the substantive laws of the State of New York.  Each Party shall, upon the written request of any other Party, promptly provide the other Party with copies of all documents on which the producing Party may rely in support of or in opposition to any claim or defense and a report of any expert whom the producing party may call as a witness in the arbitration hearing.  At the request of a Party, and upon the showing of good cause, the arbitrators shall have the discretion to order production by any other Party or by a third party of other documents relevant to any claim or defense.  Each Party shall be entitled to depose a maximum of three witnesses (which number may not be increased by the arbitral tribunal), plus all experts designated to be witnesses at the arbitration.  The depositions shall be held within thirty (30) days of the making of a request and shall be limited to a maximum of six hours per deposition.  All objections are reserved for the arbitration hearing, except for objections based on privilege and proprietary or confidential information.

         (b)      All aspects of the arbitration shall be treated as confidential and neither the Parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a Party shall give written notice to all other Parties and shall afford such Parties a reasonable opportunity to protect their interests.  The result of the arbitration shall be binding on the Parties and judgment on the arbitrators' award may be entered in any court having jurisdiction.  In no event shall the arbitrators have any authority to award punitive damages.

- 13 -

(c)     The Parties acknowledge that the Plaintiffs intend to enter into agreements with other attorneys on or after the date of this Agreement and that all such agreements will contain provisions obliging the parties thereto to submit any disputes to binding arbitration substantially similar to the provisions of this Section 8. In the event of any dispute between the Plaintiffs and an attorney (whether active or inactive) or any other person or entity with a legitimate or alleged claim to Plaintiff Collection Monies (any such person, a "Claimant"), the Plaintiffs desire to resolve such dispute in a single arbitration proceeding involving all Claimants. In view of the foregoing, in the event of an arbitration proceeding involving the Plaintiffs and a Claimant, each Active Lawyer hereby agrees to participate in such proceeding if he or it is joined by the Plaintiffs or any Claimant and agrees not to oppose joinder of other attorneys if sought by the Plaintiffs or a Claimant who is a party to the arbitration proceedings. Furthermore, each Active Lawyer hereby agrees that under no circumstances shall it seek a greater amount or increased percentage of Plaintiff Collection Monies than it is entitled to under, and has agreed to in, this Agreement and hereby unconditionally and irrevocably waives any right to make such a demand or claim in any arbitral, judicial or other proceeding anywhere in the world.

(d)     In the event of any dispute between a Party and any Funder, the Parties agree to be bound by and comply with any arbitration provisions in the definitive documentation with such Funder.

9.     Controlling Law. This Agreement shall be governed by and construed and interpreted in accordance with the laws of New York (without reference to principles of conflicts of laws).

10.     Privilege. In the course of representing the Plaintiffs, the Active Lawyers understand that there will be a need for the Active Lawyers to communicate with the Plaintiffs, the Plaintiffs' Representatives and other counsel retained by the Plaintiffs. The Parties agree that all such communications are to be treated as confidential and protected to the maximum extent permitted under applicable law by the attorney/client, work product, joint defense, common interest, and all other applicable privileges and doctrines.

11.     Amendments. Except for amendments to the schedules by the Plaintiffs' U.S. Representative permitted hereby, this Agreement (including, without limitation, any exhibit or schedule hereto) may not be amended, modified, supplemented or restated, nor may any provisions of this Agreement be waived, without a written instrument adopted, executed and agreed to by each Party.

12.     Entire Agreement. Except for any Engagement Agreements and any agreements (such as intercreditor agreements) hereafter signed by the Parties and any Funder(s), this Agreement (including exhibits and schedules hereto which are integral parts hereof) contains all the agreements between the parties hereto regarding the subject matter of this Agreement, and all prior and contemporaneous agreements and understandings between the Parties with respect to the subject matter hereof are deemed merged herein. For the avoidance of doubt, each Party hereby agrees that (a) in the event of any direct conflict between the terms of this Agreement and

- 14 -

the terms of any Engagement Agreement, the terms of this Agreement will prevail, and (b) in the event of any direct conflict between the terms of this Agreement and the terms of any intercreditor or similar agreement hereafter signed by the Parties and any Funder(s), the terms of such intercreditor or similar agreement will prevail.

13.   Confidentiality.  The Parties hereby acknowledge and agree that the information contained in this Agreement is not known to the public, is confidential and proprietary, and is not to be disclosed by any Party to any other Person (including, without limitation, any Non-Lawyer Advisor or any Inactive Lawyer) without the prior written approval of each of the other Parties except (a) to the extent necessary to comply with any applicable law, rule or regulation or the valid order of any governmental agency or any court of competent jurisdiction, and (b) as may be necessary to enforce its rights under, and perform its agreements and obligations under, this Agreement.

14.   Severability.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term of this Agreement, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.  Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

15.   Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of each Party and its respective heirs, permitted successors, permitted assigns, permitted distributees and legal representatives, upon the execution of this Agreement by such Party (notwithstanding that one or more other of the named Parties shall not have then executed this Agreement).  By their signatures hereto, each Party intends to and does hereby become bound hereby.  Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any Person other than the Parties any legal or equitable right, remedy or claim under, in or in respect of this Agreement or any provision herein contained.  The rights under this Agreement may be not assigned by any Party.

16.   Further Assurances.  In connection with this Agreement and the transactions contemplated hereby, each Party hereby agrees to execute and deliver all such future instruments and take such other and further action as may be reasonably necessary or appropriate to carry out the provisions of this Agreement and the intention of the Parties as expressed herein.

17.   Counterparts; Electronic or Facsimile Signatures.  This Agreement (a) may be executed in any number of counterparts, all of which together shall constitute a single instrument, and (b) may be executed and/or delivered by means of electronic transmission (email) or facsimile.

18.   Specific Performance.  Each Party acknowledges that it shall be impossible to

- 15 -

measure in money the damage to itself and the other Parties, if any of them fails to comply with any of the restrictions or obligations imposed by this Agreement, that every such restriction and obligation is material, and that in the event of any such failure, the Parties shall not have an adequate remedy at law or in damages. Therefore, each Party consents to the issuance of an injunction or the enforcement of other equitable remedies against such Party (unless such Party is a Plaintiff) at the suit of an aggrieved Party without the posting of any bond or other security, to compel specific performance of all of the terms hereof, and waives any defenses thereto, including, without limitation, the defenses of (a) failure of consideration, (b) breach of any other provision of this Agreement and (c) availability of relief in damages.

19.    No Third Party Beneficiaries. Except as set forth below in this Section 19, (a) the provisions of this Agreement are solely for the benefit of the Parties, (b) this Agreement does not and is not intended to confer any rights or remedies upon any Person other than the Parties, and (c) no Person other than a Party shall have any rights as a third party beneficiary of any of the provisions hereof. Notwithstanding the foregoing, the Parties hereby agree that (i) each Indemnified Party shall be entitled to the benefits of, and shall have the right to enforce as necessary, the indemnification provisions set forth in Section 5 above, and (ii) each Released Party shall be entitled to the benefits of, and shall have the right to enforce as necessary, the release and discharge provisions set forth in Section 6 above.

20.    Language. This Agreement has been drafted in English and in Spanish, each of which version shall be execute by the parties hereto. In the event of a conflict between the English version and Spanish version of this Agreement, the Spanish version shall control.

[signatures on following pages]

- 16 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

Plaintiff's Exhibit 556   p. 16 of 24

IN WITNESS WHEREOF, Plaintiffs, through their duly authorized representatives, and each of the Active Lawyers have executed this Agreement as of the date first written above.

PLAINTIFFS

On behalf of each of the plaintiffs in the matter
*Maria Aguinda y Otros v. Chevron Corporation*

Witness: _____

By: _____
      Pablo Estenio Fajardo Mendoza, Esq., as
      Lead Counsel For and Ecuadorian Legal
      Representative of the Plaintiffs

PLAINTIFFS' COORDINATORS

El Frente de Defensa de la Amazonia

Witness: _____

By: _____
      Name: Ermel Chavez Parra
      Title: President

On behalf of the Asamblea de Afectados por
Texaco

Witness: _____

By: _____
      Luis Yanza, as Coordinator under the POA

[signatures continue on following pages]

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

DONZIGER

Donziger & Associates, PLLC

Witness: _____

By: _____
      Steven R. Donziger, Partner

MOTLEY RICE

Motley Rice LLC

Witness: _____

By: _____
      Name:
      Title:

PATTON BOGGS

Patton Boggs LLP

Witness: _____

By: _____
      Name:
      Title:

ECBA

Emery, Celli, Brinckerhoff & Abady LLP

Witness: _____

By: _____
      Name:
      Title:

[signatures continue on following pages]

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

FAJARDO

Witness:                              Pablo Estenio Fajardo Mendoza, Esq.

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

EXHIBIT A

Individual Plaintiffs

| |
|---|

Daniel Carlos Lusitande Yaiguaje;
Venancio Freddy Chimbo Grefa;
Miguel Mario Payaguaje Payaguaje;
Teodoro Gonzalo Piaguaje Payaguaje;
Simón Lusitande Yaiguaje;
Armando Wilmer Piaguaje Payaguaje;
Javier Piaguaje Payaguaje;
Fermín Piaguaje;
Luis Agustín Payaguaje Piaguaje;
Emilio Martin Lusitande Yaiguaje;
Reinaldo Lusitande Yaiguaje;
María Victoria Aguinda Salazar;
Carlos Grega Huatatoca;
Catalina Antonia Aguinda Salazar;
Lidia Alexandra Aguinda Aguinda;
Clide Ramiro Aguinda Aguinda;
Luis Armando Chimbo Yumbo;
Beatriz Mercedes Grefa Tanguila;
Lucio Enrique Grefa Tanguila;
Patricio Wilson Aguinda Aguinda;
Patricio Alberto Chimbo Yumbo;
Segundo Ángel Amanta Milán;
Francisco Matías Alvarado Yumbo;
Olga Gloria Grefa Cerda;
Narcisa Tanguila Narváez;
Bertha Yumbo Tanguila;
Lucrecia Tanguila Grefa;
Francisco Victor Tanguila Grefa;
Rosa Teresa Chimbo Tanguila;
María Clelia Reascos Revelo;
Heleodoro Pataron Guaraca;
María Viveros Cusangua;
Lorenzo José Alvarado Yumbo;
Francisco Alvarado Yumbo;
José Gabriel Revelo Llore;
Luisa Delia Tanguila Narváez; and
José Miguel Ipiales Chicaiza.

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

## EXHIBIT B

Active Lawyers

| Name: | Active Lawyer Percentage:** |
|---|---|
| | |
| Donziger | 31.5% |
| Motley Rice | 16.5% |
| Patton Boggs | 12% |
| ECBA | 10% |
| Fajardo | 10% |

    ** -- The Parties acknowledge that the allocations set forth above do not add up to 100%, and do not include any bonus pools amounts or any other amounts that the Plaintiffs' and/or the Plaintiffs' U.S. Representative, in their respective sole discretion, may allocate to one or more Active Lawyers, Inactive Lawyers, Non-Lawyer Advisors and/or other business advisors or Persons.

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045362

Plaintiff's Exhibit 556   p. 21 of 24

EXHIBIT C

Inactive Lawyers

Kohn, Swift & Graf, P.C.
Cristobal Bonifaz
Beldock, Levine & Hoffman

- 22 -

CONFIDENTIAL - ACCESS LIMITED BY PROTECTIVE ORDER

WOODS00045363

EXHIBIT D

Form of Accession Agreement

To:   Each of the Parties to the Master Agreement (defined below)

From: _____

        The undersigned, _____, a _____, hereby joins
in the execution of that certain Master Agreement dated as of _____, 2010 (as amended,
supplemented or otherwise modified from time to time, the "Master Agreement"), between and
among the (i) Plaintiffs, (ii) the Amazon Defense Front, (iii) the Assembly of Communities
Affected by Texaco, (iv) Donziger, (v) Motley Rice, (vi) Patton Boggs, (vii) ECBA, (viii)
Fajardo and (ix) each Person who or which from time to time shall execute and deliver an
accession agreement providing that such Person agrees to be bound by the Master Agreement.

        By executing this Accession Agreement, the undersigned hereby agrees as follows: (i) the
undersigned is an Active Lawyer for all purposes of and under the Master Agreement; (ii) the
undersigned has an Active Lawyer Percentage of _____%; and (iii) the undersigned shall be
bound by, comply with and otherwise be entitled to enforce each of the terms and provisions of
the Master Agreement as if the undersigned were an original signatory thereto. The undersigned
hereby represents and warrants to the other Parties to the Master Agreement that the
representations set forth in Section 7 of the Master Agreement are, with respect to the
undersigned, true, complete and correct as of the date hereof as if made on and as of the date
hereof. From and after the date of this Accession Agreement, each reference to an Active
Lawyer in the Master Agreement shall be deemed to include the undersigned. Each capitalized
term that is used but not otherwise defined herein shall have the meaning given to such term in
the Master Agreement.

        IN WITNESS WHEREOF, the undersigned has executed this Accession Agreement as of
the _____ day of _____, 20____.

                                        [Name]

                        By: _____
                                Name:
                                Title:
                                Address for Notices: [Insert Address]

<u>EXHIBIT E</u>

Initial Budget

[To Be Finalized and Then Attached By Means of Amendment]

CONFIDENTIAL – ACCESS LIMITED BY PROTECTIVE ORDER

# EXHIBIT 23

# DURABLE INTERNATIONAL POWER OF ATTORNEY

## and

## *AGREEMENT FOR THE CONTINUOUS INVESTMENT OF PROFESSIONAL SERVICES*

This **AGREEMENT** is entered into on the dates below, signed in October 2017, between the *Amazon Defense Front* (the **FDA**) and Steven R. Donziger, Esq. (**Mr. DONZIGER**). Through this AGREEMENT, the FDA grants a paramount durable international legal power of attorney to Mr. DONZIGER and, in consideration of his historical leadership and professional services rendered, both in the past and in the future, the FDA irrevocably acknowledges, confirms and undertakes to support Mr. DONZIGER's existing contractual INTEREST, as set forth below, and/or hereby grants Mr. DONZIGER an INTEREST in his own right equal to his existing contractual INTEREST.

\*     \*     \*

**WHEREAS** the FDA was considered the prevailing party in the case known as *Maria Aguinda Salazar v. Chevron Corporation* rendered by the Sucumbios Provincial Court of Justice trial court (Case No. 2003-0002), Feb. 14, 2011, affirmed on appeal (National Court of Justice, Case No. 174-2012, Nov. 12, 2013), and the subject of the enforcement proceedings before the Ontario Court of Justice (Canada) (collectively, the *AGUINDA* **CASE**);

**WHEREAS** the final judgment in *AGUINDA* CASE (the *AGUINDA* **JUDGMENT**) in this AGREEMENT refers to the legal obligation imposed on CHEVRON by the Ecuadorian courts and as the enforcement of that judgment is sought in other countries as is evident by the decisions and proceedings jointly mentioned above;

**WHEREAS** the FDA is the intended recipient of an award pursuant to the Ecuadorian Environmental Management Act equal to 10% of the amount for environmental damages in the *AGUINDA* JUDGMENT (10% AWARD) to be paid by CHEVRON;

**WHEREAS** the FDA is the exclusive beneficiary of the *ADAT Commercial Trust for the Management of Funds* (the **ECUADOR TRUST**), created at the direction of the Ecuadorian courts to receive, maintain, and disburse funds paid by CHEVRON in the enforcement of the *AGUINDA* JUDGMENT, with the purpose of implementing and attaining the environmental remediation and paying legal and administrative costs considered necessary by its Administrative Board, and to which all named plaintiffs in the *AGUINDA* CASE have assigned the totality of their individual interests in the *AGUINDA* JUDGMENT;

**WHEREAS** Mr. Steven Donziger (**Mr. DONZIGER**) has played a prominent and historical role in the *AGUINDA* CASE and the enforcement of the *AGUINDA* JUDGMENT for more than 23 years, a role that has been understood by all pertinent parties

as critical for the survival and progress of the *AGUINDA* CASE, and that his efforts have been particularly important in obtaining funds to continue the fight for the *AGUINDA* JUDGMENT outside Ecuador;

**THEREFORE**, I, Carmen Cartuche, president of the FDA, by virtue of the powers vested in me, freely and voluntarily declare, because it is in its best interest, that I grant a paramount durable international legal power of attorney to Mr. DONZIGER so that, on behalf of the FDA, he may direct and manage all current and future legal, political, and public relations efforts in connection with the enforcement of the *AGUINDA* JUDGMENT, including, but not limited to, all related enforcement proceedings in Canada and other countries, collateral actions which have been filed or may be filed by the company to seek payment of the *AGUINDA* CASE judgment, and any other action which may be necessary to fulfill, defend, or promote the interests of the FDA and the affected communities. The power of attorney granted to Mr. DONZIGER includes, but is not limited to:

- the power to direct and manage all lawyers and service providers connected to or retained by the FDA, including lawyers in enforcement jurisdictions;
- the power to negotiate additional contracts with lawyers and service providers, subject to final ratification by the FDA of any contract incurring in any debt payable by the FDA exceeding $2,000;
- the power to, with prior consultation and approval by the FDA, terminate and withdraw the authorization previously given to any other lawyer or service provider working with the FDA outside Ecuador;
- the power to negotiate—and with prior consultation and approval by the FDA, also to finalize and execute—financing agreements granting a percentage interest in any recovery related to the *AGUINDA* JUDGMENT;
- the power to appear before judges, courts, and any other international or national adjudicatory body where Mr. DONZIGER is authorized to appear, as well as any other formal or informal venue or institution;
- the power to initiate, discuss, negotiate with the purpose of reaching an out-of-court settlement, and authorize other persons to do the same, except that this power of attorney does not include authorization to finalize or execute any agreement terminating, setting aside, or in any way compromising the *AGUINDA* JUDGMENT unless done in full consultation with and with the express approval of the FDA.

CERT. ULG VER: JD

DONZPJD-0000020

- the power to represent the FDA in public matters, official meetings, delegations, conferences, workshops, discussions, and negotiations, and to act as Mr. DONZIGER may deem it necessary to defend and promote the interests of the FDA and the communities represented by the FDA.

**RESIDUAL CLAUSE:** Mr. DONZIGER has the broadest powers and attributions awarded by the law to representatives. Mr. DONZIGER is liable to his clients for the proper execution of the powers described herein; therefore, no one may allege that this power of attorney is insufficient.

**DELEGATION:** Mr. DONZIGER may delegate his powers to other persons to act in his name and under his direction, but not to act independently in the capacities herein granted only to Mr. DONZIGER.

**TERM:** This power of attorney is granted for an indefinite period of time.

**COMPENSATION AND RECOGNITION OF VALID INTEREST:** In consideration of Mr. DONZIGER's leadership, investment, professional and collection services, as set forth above, both in the past and in the future, the FDA hereby acknowledges, confirms, and undertakes to support Mr. DONZIGER's existing contractual **INTEREST** or, alternatively, to the extent it is necessary or useful, hereby grants Mr. DONZIGER an **INTEREST** in his own right equal to Mr. DONZIGER's existing contractual **INTEREST**. Such INTEREST, in any case, shall be understood to entitle Mr. DONZIGER to **6.3%** of any **FUNDS RECOVERED**, which are defined as any funds recovered in connection with the *AGUINDA* CASE or the *AGUINDA* JUDGMENT, whether by court order or private out-of-court settlement, in Canada or in any other country, including, without limitation, any FUNDS RECOVERED as actual/environmental damages to the extent permitted by law; the FUNDS RECOVERED out of the 10% AWARDED to the FDA; the FUNDS RECOVERED in post-judgment interest or any other award of legal interest; or the FUNDS RECOVERED as part of any additional right for professional fees or costs awarded by a court in Ecuador, Canada, the U.S., or any other country.

IN WITNESS WHEREOF, the FDA and Mr. DONZIGER have executed this AGREEMENT on the date and year stated.


**DATE:** 11/01/2017                                    [Signature]

                                                       President, FDA

**DATE:**

                                                       Steven Donziger

CERT. ULG VER: JD

DONZPJD-0000021

[Emblem:] Amazon Defense Front

## CERTIFICATION

In my capacity as General Secretary of the Amazon Defense Front—FDA, I hereby give notice of the resolution adopted at the ordinary meeting of the Executive Council on October 2, 2017. The resolution states:

*1. The Executive Council, pursuant to Art. 32(h) of the Amazon Defense Front bylaws, authorizes Ms. Carmen Filomena Cartuche Uchuari, legal representative of the FDA, to grant a paramount durable international legal power of attorney to Mr. STEVEN DONZIGER.*

Executed and delivered in Nueva Loja, on November 1, 2017.

[Signature]

Ms. Gladys Solano

**FDA GENERAL SECRETARY**

Address: Calles Eloy Alfaro No. 801 y Progreso Telefax: 593 (06) 2831 930 Lago Agrio, Nueva Loja
frentedefensadelamazonia@gmail.com

CERT. ULG VER:JD



**United Language Group**
3 Columbus Circle
14th Floor
New York, NY 10119
+1 888.601.9814
legaltranslations@ulgroup.com

State of New York )
Estado de Nueva York )

                        )        ss:
                        )     a saber:

County of New York )
Condado de Nueva York )

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: June 28, 2018
Fecha: 28 de junio 2018

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
           [firmado]
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this ___28th___ day of
mi, a los ___28___ días del
____June____ 2018
mes de___ junio ___ de 2018

Notary Public
Notario/Público
    GINA MARIE ST.LAURENT        [firmado]
   Notary Public, State of New York    [sello]
       No. 01ST6148442
    Qualified in New York County
   Commission Expires May 15, 2022

DONZPJD-0000023

### PODER LEGAL
### INTERNACIONAL DURADERO

*y*

### *ACUERDO PARA INVERSIÓN CONTINUA*
### *DE LOS SERVICIOS PROFESIONALES*

Este **ACUERDO** se celebra en las fechas abajo señaladas en las firmas de octubre de 2017, entre, por un lado, el *Frente de Defensa de la Amazonía* (**el FDA**) y el doctor Steven R. Donziger (**DR. DONZIGER**). En este ACUERDO, el FDA otorga un poder superior legal internacional duradero a favor del DR. DONZIGER y en consideración del su liderazgo histórico y su provisión de servicios profesionales tanto en el pasado como en el futuro, el FDA de manera irrevocable reconoce, afirma y se obliga a apoyar al INTERÉS existente por contrato del DR. DONZIGER, según se establece a continuación, y / o por la presente concede a DR. DONZIGER un INTERÉS en sus propios derechos equivalente a su INTERÉS existente por contrato.

<div align="center">*     *     *</div>

**CONSIDERANDO** que el FDA se consideró como la parte que prevalece en el caso a que se alude como *María Aguinda Salazar v. Chevron Corporation*, dictada en primera instancia por la Corte Provincial de Justicia de Sucumbíos (Nº de expediente 2003-0002), 14 feb. 2011, afirmado en apelación (Corte Nacional de Justicia, Nº de expediente 174-2012, 12 nov. 2013), y también el objeto de los procedimientos de ejecución en la Corte de Justicia de Ontario (Canadá) (colectivamente, el **CASO** *AGUINDA*);

**CONSIDERANDO** que la sentencia final en el CASO *AGUINDA* (la **SENTENCIA** *AGUINDA*) en el presente ACUERDO se refiere a la obligación legal impuesta a CHEVRON por la justicia ecuatoriana y puesto que se busca a la ejecución de la misma sentencia en otros países como se desprende de las decisiones y procedimientos antes mencionadas conjuntamente;

**CONSIDERANDO** que el FDA es el destinatario de un concedido al amparo de la Ley de Gestión Ambiental de Ecuador en la cantidad de 10% de la cantidad de los daños ambientales en la SENTENCIA AGUINDA (el 10% CONCEDIDO) que se abonará por CHEVRON;

**CONSIDERANDO** que el FDA es el beneficiario exclusivo del *Fideicomiso Mercantil de Administración de Flujos ADAT* (el **FIDEICOMISO DE ECUADOR**), que fue creado por instrucciones de las cortes ecuatorianas para recibir, mantener y desembolsar los fondos pagados por CHEVRON en ejecución de la SENTENCIA *AGUINDA*, con el fin de poner en práctica y lograr la remediación ambiental y pagar los gastos legales y administrativos que se consideren necesarias por su Junta Administrativa, y a la cual todos los demandantes nombrados en el CASO *AGUINDA* han asignado la totalidad de su interés individual en la SENTENCIA *AGUINDA*;

**CONSIDERANDO** que el Dr. Steven Donziger (**DR. DONZIGER**) ha desempeñado un papel destacado e histórico en el enjuiciamiento del CASO *AGUINDA* y la ejecución de la SENTENCIA *AGUINDA* por más de 23 años, papel que ha sido entendido por todas las partes

<div align="center">1 / 3</div>

DONZPJD-0000024

pertinentes como crítico para la supervivencia y el avance del CASO *AGUINDA*, y que sus esfuerzos han sido particularmente importantes en la recaudación de fondos para continuar la lucha la SENTENCIA *AGUINDA* afuera del Ecuador;

**POR LO TANTO**, yo, Carmen Cartuche, Presidenta del FDA, por los derechos que representa, en forma libre y voluntaria y por así convenir a sus intereses, declara que otorga un poder superior legal internacional duradero a favor del DR. DONZIGER para que a nombre y en representación del FDA pueda dirigir y gestionar todas los esfuerzos legales, políticos y de relaciones públicas actuales y futuras involucrados en la ejecución de la SENTENCIA *AGUINDA*, enumerándose, pero no limitándose, todos los procedimientos de ejecución relacionados con el mismo en Canadá y otros países, litigios colaterales que la empresa ha iniciado o puede iniciar para combatir el pago de la sentencia del CASO *AGUINDA*, y cualquier otra acción que sea necesaria para realizar, defender, o promover los intereses del FDA y las comunidades afectadas. El poder otorgado al DR. DONZIGER se incluye, pero no se limita:

- el poder de dirigir y gestionar a todos los abogados y proveedores de servicios vinculados o contratados por el FDA, incluidos los abogados en las jurisdicciones de ejecución;

- el poder de negociar contratos con abogados y proveedores de servicios adicionales, sujeto a la ratificación final por parte del FDA de cualquier contrato que incurra en cualquier deuda pagadera por la FDA que supere los $2.000;

- el poder, con previa consulta y aprobación del FDA, para terminar y retirar la autoridad otorgada previamente a cualquier otro abogado o proveedor de servicios que trabaje con el FDA fuera de Ecuador;

- el poder de negociar —y con previa consulta y aprobación del FDA, también finalizar y ejecutar— acuerdos de financiamiento que otorguen un porcentaje de interés en cualquier recuperación vinculada con la SENTENCIA *AGUINDA*;

- el poder de que comparezca ante los jueces, tribunales, y cualquier otro órgano de administración de justicia internacional o nacional en lo que el DR. DONZIGER es capaz de hacerlo, así como cualquier otro foro o institución formal o informal;

- el poder de iniciar, discutir, negociar con el fin de llegar a un acuerdo extrajudicial, y autorizar a otras personas a hacer lo mismo, excepto que este poder no se extiende para incluir la autoridad para finalizar o ejecutar cualquier acuerdo que terminaría, desistiría, absolvería, o comprometería de otro modo la SENTENCIA *AGUINDA* a menos que sea con la plena consulta y aprobación explícita del FDA.

2 / 3

DONZPJD-0000025

- el poder de representar el FDA en asuntos públicos, reuniones oficiales, delegaciones, conferencias, talleres, discusiones y negociaciones, y para actuar según el DR. DONZIGER pueda juzgar necesario para defender y promover los intereses del FDA y las comunidades que el FDA representa.

**CLÁUSULA RESIDUAL:** DR. DONZIGER queda investido de las más amplias facultades y atribuciones que confiere la ley a los mandatarios. DR. DONZIGER es responsable ante sus representados por la debida ejecución de este poder, razón por la cual nadie podrá argumentar insuficiente poder.

**DELEGACIÓN:** DR. DONZIGER podrá delegar sus poderes a otras personas para actuar en su nombre y bajo su dirección, pero no para actuar independientemente en las capacidades aquí otorgadas solamente al DR. DONZIGER.

**PLAZO:** El presente poder se confiere por tiempo indefinido.

**INDEMNIZACIÓN Y RECONOCIMIENTO DEL INTERÉS VIGENTE:** En consideración del liderazgo del DR. DONZIGER, su inversión y su provisión de servicios profesionales y de recaudación de fondos, como se establece arriba, tanto en el pasado y esperado en el futuro, el FDA por este medio reconoce, afirma y se obliga a apoyar el **INTERÉS** existente por contrato de DR. DONZIGER, o, alternativamente en la medida en que sea necesario o útil, otorgan por la presente a DR. DONZIGER un **INTERÉS** en sus propios derechos equivalente al **INTERÉS** de DR. DONZIGER existente por contrato. Dicho INTERÉS, en cualquier caso, se entenderá dar derecho a DR. DONZIGER al 6,3% de cualquier **FONDOS RECAUDADOS**, que se define como cualquier colección de fondos relacionados con el CASO *AGUINDA* o la SENTENCIA *AGUINDA*, ya sea por orden judicial o por acuerdo privado extrajudicial, en Canadá o en cualquier país, incluyendo, sin limitación, los FONDOS RECAUDADOS como daños reales / ambientales a la medida permitida por la ley; los FONDOS RECAUDADOS del 10% CONCEDIDO del FDA; los FONDOS RECAUDADOS como interés post-juicio o cualquier otro concedido basado en los intereses legales; o los FONDOS RECAUDADOS como parte de cualquier derecho concedido adicional de honorarios o gastos adjudicados por un corte de Ecuador, Canadá, EE.UU., o cualquier otro país.

EN FE DE LO CUAL, el FDA y DR. DONZIGER han suscrito este ACUERDO en el día y el año que se indica.

**FECHA:** 01 / 11 / 2017

_____
Presidenta, FDA


**FECHA:** _____

_____
Steven Donziger

DONZPJD-0000026



# CERTIFICACIÓN

En calidad de Secretaria General del Frente de Defensa de la Amazonía – FDA, doy a conocer acerca de la resolución emitida en la reunión ordinaria del Consejo Ejecutivo el día 02 de octubre del presente año. Dicha resolución dice lo siguiente:

1. *Que el consejo ejecutivo, fundamentado en el artículo 32 literal h del estatuto del Frente de Defensa de la Amazonía, autoriza a la compañera Carmen Filomena Cartuche Uchuari, representante legal del FDA la suscripción del poder superior legal internacional duradero a favor del DR. STEVEN DONZIGER.*

Dado y firmado en Nueva Loja, el 01 de noviembre de 2017.

Srta. Gladys Solano

**SECRETARIA GENERAL FDA**



Dirección: Calles Eloy Alfaro No 801 y Progreso Telefax 593 (06) 2831930 Lago Agrio, Nueva Loja
frentedefensadelamazonia@gmail.com

DONZPJD-0000027