# EXHIBIT 24

Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      Case No. 11 Civ. 0691 (LAK)

4      ----------------------------------------x

5      CHEVRON CORPORATION,

6                              Plaintiff,

7           - against -

8      STEVEN DONZIGER, et al.,

9                              Defendants.

10     ----------------------------------------x

11                         June 27, 2018

                           4:13 p.m.

12

13

14          DEPOSITION of JOSH RIZACK, held at

15     the offices of Gibson, Dunn & Crutcher LLP,

16     located at 200 Park Avenue, New York, New

17     York 10166, before Anthony Giarro, a

18     Registered Professional Reporter and a

19     Notary Public of the State of New York.

20

21

22

23

24

25

Page 2

1

2    A P P E A R A N C E S :

3

4    GIBSON, DUNN & CRUTCHER LLP
      Attorneys for Plaintiff
5     200 Park Avenue
      New York, New York 10166

6

     BY:  ANDREA E. NEUMAN, ESQ.
7         ALEJANDRO A. HERRERA, ESQ.
          ANNE CHAMPION, ESQ.

8

9

10    STERN & KILCULLEN, LLC
      Attorneys for Plaintiffs
11    325 Columbia Turnpike, Suite 110
      P.O. Box 992
12    Florham Park, New Jersey 07932

13    BY:  MICHAEL DINGER, ESQ.
          HERBERT STERN, ESQ.
14        JOEL SILVERSTEIN, ESQ.

15

16    STEVEN DONZIGER, ESQ.
      Pro Se
17    245 West 104th Street, Suite 7D
      New York, New York 10025

18

19

20    Also Present:

21            Jonathan Popham, Videographer

22            Andres Romero, Chevron

23

24

25

Page 3

1

2                    S T I P U L A T I O N S

3

4         IT IS HEREBY STIPULATED AND AGREED,

5    by and among counsel for the respective

6    parties hereto, that the filing, sealing

7    and certification of the within deposition

8    shall be and the same are hereby waived;

9         IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to form of

11   the question, shall be reserved to the time

12   of the trial;

13        IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be signed

15   before any Notary Public with the same

16   force and effect as if signed and sworn to

17   before the Court.

18              *      *      *

19

20

21

22

23

24

25

Page 4

1

2              THE VIDEOGRAPHER:  Good

3       afternoon.  We are going on the

4       record at 4:13 p.m. on June 27th,

5       2018.  Please note that the

6       microphones are sensitive, and they

7       may pick up whispering, private

8       conversations and cellular

9       interference.  Please turn off all

10      cell phones or place them away from

11      the microphones as they can interfere

12      with the deposition audio.  Audio and

13      video recording will continue until

14      all parties agree to go off the

15      record.

16              This is Media No. 1 of the

17      video deposition of Josh Rizack,

18      taken by counsel for plaintiff, in

19      the matter of Chevron Corporation

20      versus Steven Donziger, et al. filed

21      in the United States District Court

22      for the Southern District of New

23      York, Case No. 11 Civ. 0691 (LAK).

24      This deposition is being held at

25      Gibson, Dunn & Crutcher, located at

1

2          200 Park Avenue, New York, New York.

3                     My name is Jonathan Popham

4          from Veritext.  And I'm the

5          videographer.  The court reporter is

6          Anthony Giarro, also from Veritext.

7                     I'm not authorized to

8          administer an oath.  I'm not related

9          to any party in this action, nor am I

10         financially interested in the

11         outcome.

12                     Counsel and all present and

13         those attending remotely will now

14         please state their appearances and

15         affiliations for the record.

16                     MS. NEUMAN:  Andrea Neuman,

17         Gibson, Dunn, on behalf of Chevron

18         Corporation.

19                     MR. HERRERA:  Alejandro

20         Herrera, of Gibson, Dunn, also on

21         behalf of Chevron Corporation.

22                     MR. ROMERO:  Andres Romero

23         for Chevron Corporation.

24                     THE VIDEOGRAPHER:  Counsel

25         on the phone, please.

Page 6

1

2              MS. NEUMAN:  Can you

3      identify yourself for the record?

4              MR. DONZIGER:  Sure.  It's

5      Steven Donziger, D-O-N-Z-I-G-E-R, on

6      behalf of myself and my law firm.

7              THE VIDEOGRAPHER:  Will the

8      court reporter please swear in the

9      witness.

10   J O S H   R I Z A C K, after having

11   first been duly sworn by a Notary Public

12   of the State of New York, was examined

13   and testified as follows:

14    EXAMINATION BY

15    MS. NEUMAN:

16       Q      Good afternoon, Mr. Rizack.

17              MS. NEUMAN:  I think before

18      we get started, in earnest,

19      Mr. Donziger wanted to make a

20      statement for the record.

21              MR. DONZIGER:  Yes.  Thank

22      you.  Steven Donziger here.  I want

23      to state a general objection.  And

24      just for context, I don't want to be

25      in a position, particularly from a

Page 7

1                    JOSH RIZACK

2      remote location, of regularly

3      interrupting the deposition to state

4      objections.  So I'm going to state a

5      couple of general objections that

6      apply to the entirety of the

7      deposition.

8                 Number One is I generally

9      continue to assert the objections to

10     this proceeding and my motion for

11     declaratory relief and to dismiss.

12     And my motion for a protective order

13     on First Amendment grounds cover the

14     entirety of the deposition.  The

15     First Amendment motion seeks a

16     protective order, quote, forbidding

17     the disclosure of or any inquiry into

18     matters that would tend to reveal the

19     identity of any funder or other

20     materials supported in the Ecuador

21     litigation and/or the internal

22     operational, organizational,

23     administrative or financial

24     management practices of individuals

25     and organizations who directly or

1                    JOSH RIZACK

2        indirectly oppose Chevron Corporation

3        as regards, the Ecuador litigation,

4        or otherwise support the Ecuador

5        litigation and/or Ecuador

6        environmental cause.

7                    I generally object to

8        proceeding now with the deposition.

9        Before, I have been given reasons for

10       the denial of my motions for relief

11       by the court and before I can

12       consider appellate review remedies

13       and before I can understand the

14       precise scope of protections still

15       available or deemed denied by the

16       court.

17                   It is my view that we are

18       effectually proceeding to this

19       hearing tomorrow on Chevron's motion

20       to hold me in contempt of court

21       without the law being clear in effect

22       by a secret law.  And that violates

23       my rights and Mr. Rizack's rights.

24                   Finally, I want to deal with

25       the 502(b) order.  I take the

Page 9

```
 1                    JOSH RIZACK

 2         position that discovery and the

 3         testimony of Mr. Rizack today is

 4         covered by the 502(b) order

 5         stipulated by me and also, I believe,

 6         by Ms. Sullivan, among other reasons,

 7         Mr. Rizack's production and

 8         testimony, I believe, will be mostly

 9         redundant after the Sullivan

10         discovery and deposition.

11                 So that is the entirety of

12         my general objections.  And I'm ready

13         to listen and make specific

14         objections as wanted.

15                 MS. NEUMAN:  Chevron does

16         not agree with Mr. Donziger's

17         positions or statements or

18         objections.  And we'll proceed with

19         the deposition of Mr. Rizack at this

20         time.

21            Q      Mr. Rizack, where were you

22    born?

23            A      New York.

24            Q      What year?

25            A      1966.
```

```
                                            Page 10

 1                   JOSH RIZACK
 2       Q        And could you describe
 3   briefly for me your educational
 4   background?
 5       A        My last --
 6       Q        You could start with
 7   college.  How about that?
 8       A        I went to New York
 9   University, got a degree in economics.
10       Q        What year did you graduate
11   NYU?
12       A        1988.
13       Q        Have you had any studies
14   after graduating NYU in 1988?
15       A        Not at a university, no.
16       Q        Any studies relevant to your
17   practice as an accountant?
18       A        I'm not an accountant.
19       Q        Any studies relevant to your
20   professional practice?
21       A        I've attended conferences
22   and, you know, workshops and so forth.
23       Q        Any other degrees other than
24   your degree in economics?
25       A        No.
```

```
                                          Page 11
 1                      JOSH RIZACK
 2       Q        What is -- can you briefly
 3   describe for me your professional history
 4   since graduating from NYU in 1988?
 5       A        I briefly worked at UBS as a
 6   precious metal trader, and then I worked
 7   for Buccino & Associates as a consultant.
 8       Q        What was the first name?
 9       A        B-U-C-C-I-N-O & Associates
10   as a financial consultant, doing workouts
11   of troubled companies.  And then from
12   there, I was self-employed.  And for a
13   short period, I worked for Zolfo Cooper.
14       Q        What years were you at UBS?
15       A        That would have been 1988, I
16   believe.
17       Q        Until or just the one year?
18       A        Just the one year.
19       Q        And then Buccino?
20       A        Buccino was like shortly
21   after that.  And I think I was there for
22   like three years.
23       Q        So you became self-employed
24   around 1991, 1992?
25       A        Yeah, about that.
```

Page 12

                           JOSH RIZACK

1

2        Q        When did you create The

3    Rising Group?

4        A        I don't recall.  It was a

5    while ago, though.

6        Q        Is that the name of your own

7    company pursuant to which you're

8    self-employed?

9        A        Correct.

10       Q        You know what, I forgot.

11                Have you been deposed

12   before?

13       A        Yes.

14       Q        Do you want me to run back

15   through the rules or do you feel that

16   you're comfortable?

17       A        I'm comfortable.

18       Q        The only thing I would

19   mention is you would need to let me

20   finish so the court reporter can get it

21   down, even though you are anticipating

22   what I'm going to say; is that fair?

23       A        Never anticipate.

24       Q        Obviously, if you need a

25   break for any reason, let us know.  If

```
 1                   JOSH RIZACK
 2   you don't understand my question, ask me
 3   to clarify.
 4               Are you currently
 5   self-employed?
 6       A       Yes.
 7       Q       And is The Rising Group
 8   currently a going concern?
 9       A       Yes.
10       Q       What type of entity is it?
11       A       It's a corporation.
12       Q       LLC?
13       A       It's an S Corporation.
14       Q       When did you first meet
15   Mr. Donziger?
16       A       I don't recall but a long
17   time ago.
18       Q       Can you give me your best
19   estimate?  Not a wild guess but an
20   estimate is appropriate.
21       A       I don't know if it was 15
22   years ago or 20 years ago.  It's a guess.
23       Q       Where did you meet?
24       A       I don't recall the first
25   time we met.  I believe it was at a law
```

Page 14

                              JOSH RIZACK

1

2    firm.  I don't recall precisely.

3          Q        Can you estimate when you

4    started working for Mr. Donziger?

5          A        It was about approximately

6    five years ago; five, six years ago.

7          Q        And what were you retained

8    to do?

9          A        I was retained to help

10   them -- to help him with -- with putting

11   the records, you know, to help with the

12   payments and expenses and, you know, the

13   case expenses and so forth.

14         Q        Anything else you were hired

15   to do?

16         A        Those are the main things I

17   did.

18         Q        And you mentioned that

19   you're not an accountant?

20         A        No.

21         Q        You're not trained in GAAP?

22         A        No.

23         Q        When you would do work for

24   Mr. Donziger in putting these

25   accountings -- well, let me withdraw

```
 1                    JOSH RIZACK
 2    that.
 3              Do you consider what you
 4    produced to be accountings?
 5         A        No.  I mean I didn't produce
 6    in the formal sense any income statements
 7    or balance sheets or formal GAAP
 8    accounting.  It was more putting together
 9    what bills needed to be paid, what was
10    outstanding and putting together the
11    expenses of the case and Steven
12    Donziger's expenses related to the case.
13         Q        In doing so -- when you say
14    the case, you mean the Ecuador case?
15         A        Correct.
16         Q        In doing this work for
17    Mr. Donziger related to the case, did you
18    work with anyone other than Mr. Donziger?
19         A        I would say predominantly,
20    the work was with Mr. Donziger.  On other
21    occasions, I know there was -- and I
22    don't recall her name and when.  But
23    there was a woman that helped put a lot
24    of this data together; you know, I think
25    she was a, you know, temp that would, you
```

Page 16

1                    JOSH RIZACK

2    know, look at the expenses and put them

3    in Excel and list them in Excel.

4         Q        And did she do that work at

5    your office or somewhere else?

6         A        No.  Somewhere else.

7         Q        And she would send it to

8    you?

9         A        Yeah.  Or Steven Donziger

10   would have it.  And I would get it from

11   him.

12        Q        Electronically or in hard

13   copy?

14        A        No.  This was hard copy.

15        Q        So hard-copy Excel sheets?

16        A        Yeah.  It would be excel

17   with the backup of bills, of the

18   invoices.

19        Q        In what time frame was this

20   woman involved?

21        A        This was when I -- I think

22   it was at the beginning when I started

23   helping them out, working with them.

24        Q        Would you estimate it to be

25   in 2012?

Page 17

```
 1                    JOSH RIZACK
 2        A         You know what --
 3        Q         I'm just trying to do the
 4   math.
 5        A         I don't really recall the
 6   dates, to be honest.
 7        Q         Other than the temporary
 8   woman whose name we don't recall --
 9        A         Right.
10        Q         -- and Mr. Donziger, anybody
11   else you would work with on this matter?
12        A         I'm sure there was other
13   people.  My main contact was Steven
14   Donziger.
15        Q         Anyone else you recall?
16        A         I mean there was always
17   people.  But that's who -- that's who I
18   dealt with.
19        Q         When you say there were
20   always people, were these people who were
21   calling you and asking you for things?
22        A         No; you know, he had other
23   people that helped him along the way that
24   assisted him.
25        Q         But to the extent you did
```

```
                                        Page 18
 1                       JOSH RIZACK
 2    work in the matter, you took your
 3    direction from Mr. Donziger?
 4          A        Correct.
 5          Q        Did there come a time when
 6    you stopped working for Mr. Donziger?
 7          A        Yes.
 8          Q        When was that?
 9          A        I think -- I think, you
10    know, during and pretty much after the
11    Rico trial, I was still involved.  But it
12    was -- it was very little work.  It would
13    be -- he would call me and ask for
14    something or, you know, could you put a
15    little Excel sheet together, you know, it
16    was very little.
17          Q        Did there come a time when
18    either of you terminated the
19    relationship, the professional
20    relationship?
21          A        Right; you know, I don't
22    think it was ever so formal.  It just --
23    you know, I just wasn't doing things, you
24    know.  They didn't call on me to do
25    things, you know.
```

```
                                              Page 19

 1                        JOSH RIZACK

 2        Q         The phone stopped ringing?

 3        A         He called me when he would

 4   need something.  And, you know, I had

 5   other work also, you know.  This was

 6   never a full-time job.  I always had

 7   other work.

 8        Q         Were you retained pursuant

 9   to any kind of written agreement?

10        A         No.  I don't believe we

11   had -- no.  We didn't have -- did we have

12   a -- I honestly don't recall if we had a

13   written agreement.

14        Q         Did you hire anybody else to

15   help you in your work on the Ecuador

16   case?

17        A         No.

18        Q         I believe you mentioned at

19   one point in time prior to your

20   deposition that you have boxes of

21   Mr. Donziger's documents in your offices.

22   Do you recall that?

23        A         That's incorrect.  I

24   mentioned that I had boxes.  But I no

25   longer had those boxes.
```

```
                                            Page 20
 1                    JOSH RIZACK
 2        Q         Right.  Had.
 3        A         Had, correct.
 4        Q         How many boxes did you have?
 5        A         I don't know.  Three to
 6   five, I'm guessing.  I'm not 100 percent
 7   sure.
 8        Q         And these were boxes of
 9   documents that previously belonged to
10   Mr. Donziger that he had brought to you
11   in connection with your work; is that
12   right?
13        A         Correct.
14        Q         And are these documents --
15   let me withdraw that.
16                  Are these boxes of documents
17   that you had been through or that you
18   needed to go through?
19        A         I think I've been through
20   most of the documents in those boxes.
21   But there might have been stuff that I
22   still needed to go through.
23        Q         And just generally, what
24   type of documents did the boxes contain?
25        A         Mostly backup receipts and
```

```
                                      Page 21

 1                    JOSH RIZACK

 2    American Express bills and bank

 3    statements and so forth.

 4         Q       When you were doing work for

 5    Mr. Donziger, did you ever get the

 6    documents directly from the provider,

 7    i.e., either the bank or AMEX or did you

 8    always get copies of the documents from

 9    Mr. Donziger?

10         A       They would be copies from

11    Mr. Donziger, like I did not have direct

12    access --

13         Q       -- to his accounts?

14         A       Right.

15         Q       The three to five boxes that

16    you no longer have --

17         A       Right.

18         Q        -- where are they?

19         A       I don't know.  Last I saw

20    them, Katie Sullivan took them.

21         Q       She came to your offices and

22    picked them up?

23         A       Correct.

24         Q       Do you recall roughly when

25    that was?
```

```
                                              Page 22
 1                   JOSH RIZACK
 2        A       No.
 3        Q       Can you estimate for me?
 4        A       But it was some months
 5   before I provided you an e-mail from her.
 6   And I would say it was some months, a
 7   couple of months before, whatever that
 8   date of that e-mail would have been.
 9        Q       Did you understand
10   Ms. Sullivan to be picking up the
11   documents at Mr. Donziger's direction?
12        A       Yes.  He was with us.  He
13   was there.
14        Q       He was there when she picked
15   them up?
16        A       Correct.
17        Q       Other than Ms. Sullivan
18   coming to your house and getting the
19   boxes of documents and the one e-mail
20   exchange you produced from her or with
21   her, any other contacts with
22   Ms. Sullivan?
23        A       Just two e-mails.  I think
24   an e-mail -- I sent her an e-mail, and
25   she sent me an e-mail back.
```

Page 23

1                    JOSH RIZACK

2      Q        So you guys weren't on the
3   phone?

4      A        No, not that I recall.
5   There could have been a phone call.  It
6   wasn't an ongoing --

7      Q        It wasn't an ongoing
8   exchange?

9      A        Yes.

10               MS. NEUMAN:  We're going to
11        mark as Plaintiff's Exhibit 5324, a
12        copy of the -- one of the subpoenas
13        served on Mr. Rizack by Chevron in
14        this matter.

15               (The above-referred-to
16        document was marked as Plaintiff's
17        Exhibit 5324 for identification, as
18        of this date.)

19     Q        Mr. Rizack, have you seen
20   this subpoena before?

21     A        I believe so.

22     Q        This is a subpoena that was
23   served on you by Chevron in this matter
24   to which you responded; correct?

25     A        Yes.

Page 24

```
 1                    JOSH RIZACK
 2              MS. NEUMAN:  Now I'm going
 3       to mark as Exhibit 5325, the
 4       responses that you served on us
 5       initially.
 6              (The above-referred-to
 7       document was marked as Plaintiff's
 8       Exhibit 5325 for identification, as
 9       of this date.)
10              MS. NEUMAN:  For the record,
11       Plaintiff's Exhibit 5325 bears the
12       Bates numbers Rizack PJD6 through 77.
13       Q       Mr. Rizack, can you describe
14  for me the process you undertook to
15  locate the documents you produced?
16       A       I looked in my -- well, I
17  don't have files because I turned them
18  over to Katie.  And I looked at my
19  computer, what I had.
20       Q       So that time -- just to make
21  sure the record's clear, at the time you
22  got the subpoena, you had no hard-copy
23  documents related to your work for
24  Mr. Donziger; is that right?
25       A       Correct.  I put them all in
```

```
 1                   JOSH RIZACK
 2    boxes.  And Katie took all of them.
 3         Q        In terms of electronic
 4    media, did you have responsive documents
 5    in your e-mail account?
 6         A        Everything I found relating
 7    to the subpoena to the questions in the
 8    subpoena, that's what I pulled.
 9         Q        From e-mails?
10         A        E-mails and other documents,
11    other electronic documents.
12         Q        And how did you search for
13    documents?
14         A        I just searched under the
15    topics that -- that were listed on here.
16         Q        Do you have any reason to
17    believe your search was incomplete in any
18    way?
19         A        No.
20         Q        Did you initially withhold
21    documents from production?
22         A        Yes.
23         Q        Why did you do that?
24         A        Because I gave the client a
25    chance to look at the documents you
```

```
                                              Page 26
  1                    JOSH RIZACK
  2    requested and to see if they had any
  3    objections.
  4         Q        When you say the client, you
  5    mean Mr. Donziger?
  6         A        Correct.
  7         Q        So you sent him your
  8    production?
  9         A        Correct.
 10         Q        Did you do that by e-mail?
 11         A        Correct.
 12         Q        Have you produced that
 13    e-mail?
 14         A        Excuse me?
 15         Q        Have you produced that
 16    e-mail where you sent it to Mr. Donziger?
 17         A        No.  But all it was was --
 18    it was the document -- here's the
 19    documents.  There wasn't much more to the
 20    e-mail.
 21         Q        Fair enough.
 22                  And did Mr. Donziger --
 23                  MR. DONZIGER:  Hey, guys.
 24       I'm sorry.  I was on mute.  And I was
 25       trying to object to that last
```

Page 27

```
 1                     JOSH RIZACK
 2         question on the grounds -- I object
 3         to the last question on the grounds
 4         it is protected by attorney-client
 5         privilege.  E-mails between a
 6         consultant and counsel for purposes
 7         of a review are not properly subject
 8         to being turned over.  So I wanted to
 9         state that objection for the record.
10      Q       Did you get a written
11   response from Mr. Donziger without
12   telling us the substance?
13      A       I don't recall if it was
14   written or a phone call.
15                 MS. NEUMAN:  I'm going to
16         mark as Exhibit 5326, a June 21st,
17         2018 e-mail from Mr. Rizack to
18         Mr. Herrera.
19                 (The above-referred-to
20         document was marked as Plaintiff's
21         Exhibit 5326 for identification, as
22         of this date.)
23      Q       Is this an e-mail that you
24   wrote, Mr. Rizack, on or about June 21st
25   of this year?
```

```
                                        Page 28
 1                      JOSH RIZACK
 2           A        Yes.
 3           Q        In Exhibit 5326, you state,
 4      "Please see the attached documents in
 5      response to subpoena.  The chart of
 6      Donziger expenses was previously
 7      provided, but let me know if you need the
 8      document again.  And I will send it to
 9      you.  I am withholding four documents at
10      the direction of Mr. Donziger that he
11      asserts attorney-client privilege work
12      product and understand that he will
13      provide a privilege log in regard to
14      those documents."  Do you see that, sir?
15           A        Mm-hmm.
16           Q        You wrote that document?
17           A        I did write it, yes.
18           Q        Is it a true and accurate
19      statement when you wrote it?
20           A        That's what I thought.
21           Q        And what caused you to think
22      that you were withholding four documents
23      at the direction of Mr. Donziger?
24           A        Because they were -- they
25      were reviewing the documents.  And they
```

Page 29

```
1                    JOSH RIZACK
2    said that they were going to --
3         Q        Who's they?
4         A        Object.  I mean Mr. Donziger
5    was going to object to the turnover of
6    those documents.
7         Q        So Mr. Donziger identified
8    for you four documents he did not want
9    you to turn over?
10        A        I sent him the documents I
11   was going to turn over.  And they
12   mentioned -- he mentioned that he was
13   going to object to those documents.
14        Q        The four documents that
15   Mr. Donziger asked you not to turn over,
16   what did they relate to?
17        A        Well, you have copies of
18   them.  So they were -- they were charts.
19   I believe they were charts of, you
20   know -- of how much an investment could
21   possibly yield.  And additionally, I
22   believe it was some American Express
23   account statements or listings of
24   expenses.
25        Q        Any other categories of
```

Page 30

```
 1                    JOSH RIZACK
 2   documents?
 3        A       I believe that was all.  But
 4   they were turned over to you.  So you
 5   have them all now.
 6        Q       So you're currently not
 7   withholding any responsive documents?
 8        A       You are correct.
 9                MS. NEUMAN:  I'm going to
10        mark as Plaintiff's Exhibit 5327, a
11        document bearing the Bates numbers
12        Rizack PJD69.
13                (The above-referred-to
14        document was marked as Plaintiff's
15        Exhibit 5327 for identification, as
16        of this date.)
17        Q       Can you tell me what this
18   document is, Mr. Rizack?
19        A       It's a what if scenario, if
20   somebody invested X amount and got X
21   percentage of the case, how much that
22   would return if there was a successful
23   recovery.
24        Q       In?
25        A       In the Chevron case.
```

```
                                        Page 31
 1                      JOSH RIZACK
 2        Q        And is this one of the
 3     documents that was initially withheld at
 4     Mr. Donziger's request?
 5        A        Yes.
 6        Q        At the top of Exhibit 5327,
 7     there's a box that says 5 million
 8     investment equals.  And then it has
 9     columns:  Settlement amount shares,
10     return on investment over X.
11                 Can you describe the columns
12     for me?
13                 MR. DONZIGER:  I'm going to
14          state an objection to testimony about
15          the document.  It's, in my view,
16          privileged.  I stated the general
17          objections at the top of the
18          deposition.  I want to restate it
19          here with regard to this specific
20          question.
21        A        So a column would -- the
22     first column, settlement amount, is the
23     amount that hypothetically, if there was
24     a settlement and if that amount was
25     settled on and somebody had a share, a
```

```
                                         Page 32
 1                    JOSH RIZACK
 2   percentage share as listed, then their
 3   return on an investment in that would
 4   yield that number or X times what they
 5   invested.
 6        Q        So this is just a straight
 7   10 million times 2.5 percent equals?
 8        A        Correct.
 9        Q        Or is that 10 billion?
10   That's billion, I guess.
11        A        Yeah, correct.
12        Q        Equals 250 million?
13        A        Correct.
14        Q        Which means you have a 50
15   times return on your investment?
16        A        Correct.
17        Q        Did you understand why you
18   were being asked to run these scenarios?
19        A        Yes.
20        Q        Why?
21        A        They were, you know --
22   hypothetical, you know, if they found an
23   investor, you know, what kind of returns
24   an investor could possibly yield under
25   various -- various settlement amounts.
```

Page 33

1                    JOSH RIZACK

2        Q         Were you asked to run any of

3    these scenarios like the one in

4    Exhibit 5327 for any particular investor

5    or potential investor?

6        A         No.

7        Q         Were you asked to run a

8    scenario like this in connection with

9    Mr. Donziger's meeting with Elliot

10   Capital?

11       A         I don't believe so.  I think

12   these were done before that time.

13       Q         Do you recall the last time

14   you ran one of these scenarios?

15       A         It's been a while.

16       Q         Can you estimate?

17       A         I really don't remember the

18   last time.

19       Q         In determining these return

20   on investments, was it just math or were

21   you consulting any underlying documents?

22       A         No.  It was just math, just

23   what ifs.  No, I was not consulting -- I

24   mean I was not looking at any other

25   documents.

```
                                              Page 34

 1                      JOSH RIZACK

 2        Q        Have you ever analyzed the

 3    documents related to a structure called

 4    Amazonia?

 5        A        No.  I never analyzed those

 6    documents.

 7                  MS. NEUMAN:  I'm going to

 8         give the witness a document that I'm

 9         marking as Exhibit 5328 which bears

10         the Bates number Rizack PJD70.

11                  (The above-referred-to

12         document was marked as Plaintiff's

13         Exhibit 5328 for identification, as

14         of this date.)

15        Q        Could you tell me what this

16    document is, Mr. Rizack?

17                  MR. DONZIGER:  Excuse me,

18         Andrea.  Could you repeat that

19         exhibit number?  I couldn't quite

20         catch that.

21                  MS. NEUMAN:  The exhibit

22         number is 5328.  And the Bates number

23         is Rizack PJD-70.

24                  MR. DONZIGER:  Thank you.

25        A        This document is essentially
```

Page 35

```
   1                    JOSH RIZACK
   2    the same as 5327, just with more
   3    scenarios.
   4         Q       Do you recall the purpose
   5    for which you created this document?  I
   6    mean Exhibit 5328.
   7         A       From my understanding, it
   8    was just to see if -- if -- if an
   9    investor put funds in, what kind of
  10    returns they could achieve.  And it was
  11    just something I put together, just
  12    laying out a lot of scenarios.
  13         Q       Can you walk me just through
  14    one row?  I think the rows are similar.
  15         A       Yeah.  I'm happy to.  I'm
  16    just going to grab some glasses.
  17         Q       Sure.
  18         A       Because --
  19         Q       It's very tiny.
  20         A       Yeah.
  21              MR. DONZIGER:  I'm going to
  22         take the opportunity while he's
  23         grabbing his glasses to restate my
  24         objection, specifically on First
  25         Amendment grounds, as this goes to
```

```
1                    JOSH RIZACK
2        the operational and organizational
3        structure of the Ecuador litigation,
4        legal team and advocacy team.
5         A        So this chart is very
6    similar to the 5327.  It's amount of
7    investment, a return amount and different
8    settlement scenarios and what percentage
9    that would be.
10        Q        So just to go across one
11   row, if you invest $100,000, if you are
12   seeking a 20 percent return, then you're
13   going to get 2 million which would give
14   you 0.8 percent of 0.25 billion?
15        A        If the settlement was
16   0.25 -- if it was a quarter of a billion,
17   then that would equate to 0.8 percent and
18   so forth.  So the topline --
19        Q        0.8 what?  I'm just trying
20   to make the record clear.
21        A        0.8 percent -- if you put
22   100,000 in and you are seeking a 20 times
23   return, then your return would be
24   2 million.  And 2 million divided by a
25   quarter of a billion would be
```

1                    JOSH RIZACK

2    0.8 percent.  And 0.5, if it was a half

3    billion, it would be 0.4 percent and so

4    forth.

5         Q         So the percentages relate to

6    the amounts in the first column --

7         A         -- divided by --

8         Q         -- the investment?

9         A         Correct.  The amount

10   invested, divided by the hypothetical

11   return -- the hypothetical amount of a

12   settlement, of a settlement.  And that

13   would give you the percent.

14        Q         And did Mr. Donziger ask you

15   to run the scenarios from investments

16   starting at 100,000 and going to

17   10 million or is that a decision you made

18   on your own?

19        A         That's a decision I made on

20   my own.

21        Q         And in terms of the

22   resolution amounts, the 0.25 billion to

23   10 billion, was that at his direction or

24   a decision you made on your own?

25        A         A decision I made on my own.

JOSH RIZACK

1

2      Q       Is there any particular

3   reasons you decided to use those amounts?

4      A       I was just trying to be

5   broad, trying to give a very broad chart

6   so I wouldn't -- so it wouldn't ask me to

7   do it myself.  I just thought it would be

8   helpful if I did a very broad chart.

9      Q       And was this one of the four

10  documents you were withholding as

11  potentially privileged?

12     A       Correct.

13     Q       You said -- how often would

14  you run these scenarios at Mr. Donziger's

15  request?

16     A       I guess it was probably, you

17  know, somewhere between two and five

18  times.  I just guess.

19     Q       In total or over some time

20  frame?

21     A       Yeah, over a time frame.

22             MS. NEUMAN:  I'm going to

23      hand the witness a document marked as

24      Exhibit 5329 which bears the Bates

25      number Rizack PJD71.

```
                                              Page 39

 1                        JOSH RIZACK

 2                   (The above-referred-to

 3          document was marked as Plaintiff's

 4          Exhibit 5329 for identification, as

 5          of this date.)

 6      Q        Is this a document you

 7   produced, Mr. Rizack?  Sorry if I

 8   mispronounced your name in your absence

 9   before.  So if I do it, feel free to

10   correct me.

11      A        Don't worry about it.

12                   It seems to me like it's the

13   same printout of 5327.  Either you

14   inadvertently printed it out twice, or I

15   inadvertently sent it to you twice.

16      Q        They look the same to me

17   too.

18      A        They're the same.

19                   MS. NEUMAN:  I'm going to

20          mark as Plaintiff's Exhibit 5330, a

21          document bearing the Bates number

22          Rizack PJD72.

23                   (The above-referred-to

24          document was marked as Plaintiff's

25          Exhibit 5330 for identification, as
```

```
                                          Page 40
 1                      JOSH RIZACK
 2        of this date.)
 3        Q        Is this a document you
 4   produced, Mr. Rizack?
 5        A        Yes.
 6        Q        Can you describe it for me,
 7   please?
 8        A        It's essentially the same
 9   document as the other two documents.  If
10   somebody put a certain amount in and
11   there was a certain settlement amount,
12   what the recovery would be.
13        Q        And these are all related to
14   a $3 million hypothetical investment?  Am
15   I reading that correctly?
16        A        Yes.
17        Q        And then under shares, the
18   percentage changes.
19                 Is that referring to shares
20   in the Ecuadorian judgment or something
21   else?
22        A        When I use the word shares,
23   that just means if somebody made an
24   investment, what -- what percentage of
25   the case they would recover.
```

```
                                          Page 41

 1                    JOSH RIZACK

 2        Q        So if you own 1.5 percent of

 3    a $10 million settlement amount, you get

 4    $150,000?

 5        A        Correct.

 6        Q        And then what's the last

 7    column convey?

 8        A        I think that's a multiple of

 9    what your return would be based on their

10    own math, based on that recovery.  So if

11    you put $1 million in and it was

12    1 percent and you got 10 million and you

13    put in 300,000, that's roughly 3.33 times

14    return.

15        Q        Got it.

16                 Was this one of the

17    documents Mr. Donziger asked you to

18    withhold:  Exhibit 5330?

19        A        I believe so.

20        Q        Feel free to finish your

21    answer.  Did you want to add something?

22        A        Or I was waiting for Judge

23    Kaplan to make a decision on the

24    objection that was filed.

25                 MR. DONZIGER:  For the
```

```
                                              Page 42
 1                    JOSH RIZACK
 2        record, this is Steven Donziger.  I
 3        want to state for the record that I
 4        had requested that Mr. Rizack
 5        withhold documents based on
 6        attorney-client privilege not to
 7        impede discovery.
 8            Q       Mr. Rizack, I'm going to
 9      give you a document marked as Plaintiff's
10      Exhibit 5331, bearing the Bates number
11      Rizack PJD2.
12                    (The above-referred-to
13        document was marked as Plaintiff's
14        Exhibit 5331 for identification, as
15        of this date.)
16            Q       It appears to be an e-mail
17      exchange between yourself and Katie
18      Sullivan of streamlinefamilyoffice.com,
19      dated February 20th of 2018.
20                    Is this an e-mail exchange
21      that you, in fact, had with Ms. Sullivan,
22      Mr. Rizack?
23            A       Yes.
24            Q       This is dated in February.
25                    You mentioned earlier in
```

Page 43

1                    JOSH RIZACK

2    your testimony that you believe

3    Ms. Sullivan picked up the boxes from

4    your house a couple of months before this

5    e-mail exchange; is that correct?

6         A      Yes.

7         Q      So does this e-mail refresh

8    your recollection that she picked up

9    those boxes in or about December of 2017?

10        A      I don't recall the month.  I

11   mean it could have been three months,

12   could have been four months, could have

13   been two months.  I don't recall the

14   exact time frame.  But she did pick up

15   the boxes.

16        Q      Would it be accurate that

17   you're confident that she picked up the

18   boxes before the e-mail exchange in

19   Exhibit 5331?

20        A      Yes.

21        Q      In this Exhibit 5331, it

22   appears that you're responding to an

23   inquiry from her because you start with,

24   "Sorry for the delay.  I've been buried

25   with tax work."  Do you see that?

Page 44

1                    JOSH RIZACK

2        A        Yes.

3        Q        Her inquiry, was that a

4    phone inquiry or is it a different e-mail

5    chain?  Where is her initial inquiry?

6        A        I believe that when she

7    picked up the boxes, I said that I would

8    search for some Excel files.  And I

9    had -- I just said -- I was just buried

10   with work and didn't get back to her with

11   our initial discussion that I told her I

12   would do that.  So I had it on my to-do

13   list and finally got to it and sent it to

14   her.

15       Q        So this is really just

16   referring back to your in-person

17   conversation when she picked up the

18   boxes?

19       A        Correct.

20       Q        Then you sent her an Excel

21   file you named Final Steven Account 2007

22   to 2016?

23       A        Correct.

24       Q        She responded.

25                And have you had any

Page 45

```
 1                    JOSH RIZACK
 2   communications with Ms. Sullivan since
 3   then?
 4        A       I don't believe we did.  I
 5   don't believe we had any more
 6   conversation.  I mean it's possible but
 7   not that I recollect.
 8        Q       And what is included in
 9   final Steven account 2007 to 2016?
10        A       I gave you that file.  But I
11   think it was a list of -- of expenses
12   incurred in the case by Mr. Donziger.
13   And I believe that -- I believe
14   additionally, it had case expenses on
15   there.
16                MS. NEUMAN:  I'm going to
17        show the witness a document, marked
18        as Plaintiff's Exhibit 5332.  It
19        bears the Bates numbers J Rizack 18
20        to 19.
21                (The above-referred-to
22        document was marked as Plaintiff's
23        Exhibit 5332 for identification, as
24        of this date.)
25        Q       This is a document you
```

Page 46

1                    JOSH RIZACK

2    produced previously, Mr. Rizack?

3         A        I believe so.

4         Q        This document says at the

5    top "Historic Payments."  And then it has

6    a dollar sign.  And then it has two

7    columns:  Selva Viva CIA Limited on the

8    left and Steven Donziger on the right.

9    Do you see that?

10        A        I do.

11        Q        Can you describe for me how

12   this document was created and what it

13   represents?

14        A        You know, I really --

15                 MR. DONZIGER:  I'm sorry.  I

16        was on mute.  And I tried to object.

17        So I'm going to object to the

18        question on the same grounds as

19        before:  First Amendment protective

20        order motion.

21        A        You know, I don't -- I don't

22   recall the exact.  But I think this was

23   just part of just incoming and outgoing

24   flows of funds.  But I don't -- I don't

25   recall specifically what -- what these

Page 47

```
 1                    JOSH RIZACK
 2    exact payments for.
 3         Q       In the Steven Donziger
 4    column, you show payments totaling
 5    $4,834,486.18 between July 3rd of 2007
 6    and January 3rd of 2013.  Do you see
 7    that?
 8         A       I do.  But to take this
 9    document on its own is incorrect because
10    there's probably another document that
11    goes with this because what -- funds
12    would come in to his accounts.  And
13    pretty much within days, those funds
14    would flow out to pay attorneys and case
15    expenses and so forth, so that this
16    probably goes with another -- there's
17    probably another document that would show
18    the details of where those funds would
19    go.
20         Q       Well, let's take it one
21    document at a time.
22                 This document, which is
23    showing what you call historic payments,
24    where did you get these amounts?  Did you
25    get them from bank statements or
```

                                                            Page 48

1                        JOSH RIZACK

2      somewhere else?

3           A        Yeah.  Everything -- all

4      the -- all the incoming and outgoing

5      funds were all from bank statements that

6      were either wires or checks or --

7      predominantly wires and checks written.

8      But most of the large payments were

9      wires.

10          Q        And were you going off, just

11     to understand your process, the physical

12     checks and wires or the bank statements?

13          A        In all likelihood, the bank

14     statements.

15          Q        So in creating Exhibit 5333,

16     you would have reviewed Mr. Donziger's

17     bank statements for this time frame?

18          A        Are you referring to 5332?

19     You just said 5333.

20          Q        What's the real number on

21     that?

22          A        Would you like to see it

23     (handing)?

24          Q        Sorry.

25          A        The 5332 is the next one in

Page 49

1                    JOSH RIZACK

2    order.  In order, the documents you've

3    given me, 5332 is the next one.

4        Q        So 5332 is titled Historic

5    Payments.

6                 In creating the information

7    in the right-hand column, you would have

8    reviewed Mr. Donziger's bank statements

9    and noted the deposit amounts that you

10   understood to be Ecuadorian case-related

11   and put them in the right-hand column?

12       A        Correct.

13       Q        In creating the left-hand

14   column, what would you have reviewed?

15       A        Again, bank statements.

16       Q        For what account?

17       A        For his -- for his accounts,

18   it would -- they would have been either

19   incoming or outgoing wires.  From this

20   document, I don't recall.  This is

21   probably incoming without the outgoing.

22       Q        Did you have statements from

23   a bank account held in the name of Selva

24   Viva CIA Limited?

25       A        No.

```
                                              Page 50
 1                      JOSH RIZACK
 2        Q         Do you recall why these --
 3    what bank account would correspond to the
 4    left-hand column?
 5        A         No.  This would have been --
 6    there would have been statements that
 7    would go with this.
 8        Q         But you wouldn't recall off
 9    the top of your head the account number,
10    the bank?
11        A         No.  It's only one bank
12    account.  I can remember that.  That's
13    mine from a long time ago.
14                  MS. NEUMAN:  I'm going to
15        mark as Plaintiff's Exhibit 5334, a
16        document bearing the Bates number J
17        Rizack 28.
18                  (The above-referred-to
19        document was marked as Plaintiff's
20        Exhibit 5334 for identification, as
21        of this date.)
22        Q         Do you recognize this
23    document, Mr. Rizack?
24        A         Yes.
25        Q         Can you tell me what it is?
```

1                    JOSH RIZACK

2         A         So this would be funds that

3    were put into Steven Donziger's attorney

4    escrow account.  And then this has

5    expenses relating to the case, you know,

6    travel expenses, you know, hotels, meals,

7    printing, et cetera, shipping,

8    professional services.  And then it goes

9    down.  There was, you know, professional

10   fees, bank fees, attorney expenses,

11   payroll fees and taxes.  I guess there's

12   a -- there's a loan that was made to the

13   case.  And then there was fees from

14   Donziger working on the case.  And then

15   at the end, it's -- you have a negative

16   $1,482,772.3 which was based on those

17   numbers on what was owed to Mr. Donziger.

18        Q         So starting at the top of

19   Exhibit 5334, you have two -- under

20   income, it says personal account, and

21   then the next line says attorney escrow's

22   account.  Do you see that?

23        A         Correct.

24        Q         Is there a particular bank

25   account that the attorney escrow's

Page 52

1                    JOSH RIZACK

2    account reference refers to?  Was it a

3    singular bank account?

4         A       It was a singular bank

5    account, yes.

6         Q       Do you recall what bank it

7    was at?

8         A       I believe at that time, it

9    was a Chase Bank account.

10        Q       And do you know -- I don't

11   suppose you know the number?

12        A       No, I don't.

13                MR. DONZIGER:  Andrea?

14                MS. NEUMAN:  Yes.

15                MR. DONZIGER:  I just want

16       to state an objection to this line of

17       questioning.  This is prior, I

18       believe -- it encompasses accounts or

19       information that reflects activity

20       prior to the issuance of the RICO

21       judgment.  I don't have the exhibit

22       in front of me.  But just based on

23       what I'm hearing, it's prior to the

24       issuance of the RICO judgment.

25                So I'm going to object on

```
                                        Page 53
 1                    JOSH RIZACK
 2      the grounds it's beyond the scope of
 3      the issues that Judge Kaplan has
 4      authorized to be dealt with at the
 5      hearing tomorrow which are the Elliot
 6      meeting my presence financial
 7      condition and payments made to me as
 8      to the RICO judgment.  And can
 9      someone -- even though I'm in a
10      remote location, I apologize.  Can
11      someone just verify that this
12      document that you're referencing or
13      this exhibit concerns activity
14      engaged in prior to the issuance of
15      the RICO judgment in March of 2014?
16             MS. NEUMAN:  These are
17      documents produced by Mr. Rizack
18      during the RICO case, relating to
19      your finances which we don't view as
20      having the same limit as you do as
21      you know from your deposition.  And
22      so the columns go from 2007 to 2011.
23             MR. DONZIGER:  It just seems
24      very far afield.  And I will restate
25      my objection that I don't think it's
```

Page 54

                        JOSH RIZACK

1
2          proper to get into this area, given
3          that it was so many years ago.  And
4          the question for the hearing is
5          whether I'm in violation of the RICO
6          judgment which didn't even exist at
7          the time that the activity of the
8          summary reflects happened.
9                   So I object on those grounds
10          and also the First Amendment grounds
11          because it really gets into our
12          organizational structure.  So I'll
13          just leave it at that.
14          Q       Mr. Rizack, looking at
15     Exhibit 5334, the amounts you have for
16     expenses -- air transportation, taxi,
17     train, car rental -- how would you verify
18     those amounts?
19          A       So those were very detailed
20     printouts of either receipts or the
21     receipt from an American Express
22     statement.  And there were -- somebody
23     prior to me had put this together month
24     by month with backup of all the expenses.
25          Q        And did you re-review the

1                    JOSH RIZACK

2    backup or you took the other person's

3    work?

4         A         I reviewed it to see if it

5    was accurate and that it was -- that it

6    added up.

7         Q         And when you were looking

8    at, say, for example, the receipts for

9    the $93,000 plus in airfare in 2011 --

10        A         Yes.

11        Q         -- how would you know it was

12   case-related or is that something

13   Mr. Donziger just represented to you?

14        A         That was represented that it

15   was case -- you know, case-related and

16   who -- who traveled and when.

17        Q         And as to all the expenses

18   in your various -- what should we call

19   them since they're not accountings?

20   Financial summaries?

21        A         Expense reports or reporting

22   of expenses.

23        Q         In the various expense

24   reports that you've produced, both

25   previously and more recently, is it

```
 1                    JOSH RIZACK
 2   accurate that you made no independent
 3   determination that any expense was
 4   actually related to the case?
 5       A        No.  I would say that's not
 6   true.  I constantly would ask Steven, you
 7   know, what this was for, where do you go,
 8   if it wasn't marked on the expense or,
 9   you know, who was this for, you know.  I
10   see -- you know, typically on American
11   Express bill when you charge a ticket, it
12   says, you know, the name of who the
13   ticket was issued to and where it was
14   for, you know, where it was to, the
15   ticket.
16               So I would constantly ask
17   him, you know, where, you know, I see you
18   went, where this person went, who was
19   this.  I would make inquiries to what the
20   expense was for.
21       Q        And would you reject
22   expenses that Mr. Donziger indicated were
23   case-related?
24       A        Yes.  Well, you know --
25               MR. DONZIGER:  I'm going to
```

Page 57

```
                          JOSH RIZACK
 1
 2        object again.  This is so beyond the
 3        scope.  I mean we're supposed to be
 4        dealing with the issues that are
 5        going to be dealt with tomorrow.  It
 6        has no connection to my present
 7        finances.  Mr. Rizack gave me the
 8        courtesy of coming in on the 11th
 9        hour prior to the hearing tomorrow.
10        I have a ton of stuff to do to
11        prepare for tomorrow.  I don't know
12        why you don't stick to the topics
13        that are up for discussion or
14        evidence tomorrow.  So anyway, I'll
15        leave it at that.  Go ahead.
16        Q        Were you finished with your
17   answer, Mr. Rizack?
18        A        Can you restate?  I believe
19   what you asked, if I ever questioned or
20   objected to any of the expenses?  And I
21   would say, yes, I would sometimes say,
22   you know, what was this amount for and
23   was this -- you know, was this truly a
24   case expense.  And, you know, we would
25   discuss and say yes or no.  But I mean
```

```
                                        Page 58
 1                    JOSH RIZACK
 2    they were -- they were never large
 3    amounts.
 4         Q      So would you say -- this is
 5    an example -- for the $30,577 in meals in
 6    2011, you were able to verify all those
 7    meals were case-related?
 8         A      Yeah.  We would go over them
 9    and, you know, who was at the meeting and
10    what it was for.  And, you know, we went
11    through -- I mean he marked them because
12    I would not know what those expenses
13    would be for.  So I'd have to ask him if
14    they were marked.
15         Q      And your verification
16    process consisted of discussing these
17    issues with Mr. Donziger?
18         A      Yes; you know, he would
19    often, you know, take people out in
20    regard to the case.  There was often
21    people working with him and, you know,
22    during the day, you know, there would be
23    a meal involved, you know, it was
24    appropriate to, you know, feed the people
25    who were working there.
```

```
1                    JOSH RIZACK
2        Q        And did you ever reject
3    expenses because they were too, for
4    example, extravagant, like it was a
5    $1,000 night hotel instead of $200 or as
6    long as it was case-related, you included
7    it?
8        A        I don't recall ever seeing
9    extravagant hotel expenses for $1,000 a
10   night.
11       Q        Regardless of whether you
12   saw my particular example, did you
13   regulate in any way the amounts spent per
14   person on a hotel room or a meal or a
15   flight or were you just verifying with
16   Mr. Donziger that it was a case-related
17   expense?
18       A        I was verifying that it was
19   an appropriate case expense, yes.
20       Q        When you say appropriate,
21   you just mean related to the case?
22       A        Well, why don't you define
23   appropriate.  And then I can answer the
24   question.
25       Q        Well, were you using any
```

Page 60

1                     JOSH RIZACK

2    standards?  And if so, can you describe

3    them for me in determining whether an

4    expense was appropriate or not other than

5    discussing with Mr. Donziger that it was

6    case-related?

7         A        You know, anything -- you

8    know, I've been traveling my whole life

9    extensively, you know, if anything stood

10   out as, you know, wasn't standard or

11   wasn't, you know, that I thought, you

12   know, looked inappropriate, I would ask

13   him about it.  And it was rare.

14                  I mean, you know, once in a

15   while, there would be something on there

16   like a small expense, and I'm like, you

17   know, I'm not sure this is case-related.

18   And we'd say yes or no.  And sometimes it

19   was no.  But it was a rarity.  It wasn't

20   very often that that was the case.

21        Q        And what were you using as a

22   standard meal cost?

23        A        I don't know that we had

24   like a standard meal cost.  But, you

25   know, this is New York City.  And it's an

```
                                    Page 61
 1                    JOSH RIZACK
 2   expensive city, you know.  I don't know
 3   what you're asking.
 4        Q        So on Exhibit 334, there's a
 5   miscellaneous column.  What does that
 6   include?
 7        A        The 8,911 in 2010 and the
 8   12,878 in 2011.  Miscellaneous could be,
 9   you know, something we didn't have one of
10   these categories for.  But it could be an
11   expense for -- I don't know -- storage,
12   messenger service, you know, needed a
13   piece of equipment, you know, a printer,
14   did we have office supplies.  It could be
15   office supplies if that's not a category.
16        Q        That's a category.
17        A        So anything that wasn't a
18   category on here that was related to the
19   case.  But in the scheme of things, it's
20   not a very big number.
21        Q        So under personal account
22   expenses, it says professional fees.
23                 Whose fees are those?  Are
24   those Mr. Donziger's fees or somebody
25   else's fees?
```

```
                                        Page 62
 1                     JOSH RIZACK
 2        A        Which line?  I'm sorry.
 3        Q        Under the heading Personal
 4   Account Expenses Professional Fees.
 5        A        Professional fees would have
 6   been fees paid to professionals other
 7   than attorneys.
 8        Q        And then under attorney
 9   escrow account expenses professional
10   fees.
11        A        Those would be fees to
12   attorneys.
13        Q        Including or excluding
14   Mr. Donziger?
15        A        Excluding Mr. Donziger.
16        Q        At the bottom, you show
17   Donziger & Associate fees monthly fee.
18   Do you see that?
19        A        Correct.
20        Q        And in 2007, you have 25,
21   and then you go to 30 and then you go to
22   35.  Do you see that?
23        A        Yes.
24        Q        You have a retainer
25   agreement that backs up this monthly fee?
```

Page 63

1                    JOSH RIZACK

2        A        I don't recall.

3        Q        Why did it change between

4    '07 and '08?

5        A        We probably had a

6    discussion.  But I don't recall exactly

7    why it changed.  But we were trying to --

8    you know, Steven was -- what we were

9    doing was -- always running a deficit.

10   He had put more money into the case than

11   he had received.

12       Q        And what do you base that

13   on?

14       A        On bank records.

15       Q        So you showed deposits going

16   from his accounts to where?

17       A        We showed expenses that he

18   paid and that, you know -- that he was

19   always behind in being reimbursed for his

20   expenses.  And, you know -- and I know

21   that money would come out of his accounts

22   to cover case expenses when there was --

23   when there was no money coming in.

24       Q        Focusing again on the

25   monthly fee amount, did you ever have any

Page 64

JOSH RIZACK

1       backup for this retainer, like any
2       written agreement of an entitlement to a
3       retainer?
4
5           A       I don't recall if there was
6       written or not.
7           Q       So in terms of the retainer
8       monthly fee amount, is it accurate that
9       you would put in whatever amount
10      Mr. Donziger indicated?
11          A       You know, I honestly don't
12      recall.  But I'm sure there was a
13      discussion.  But I don't recall exactly
14      how that was put in.
15          Q       If you had had a backup
16      agreement, would you have produced it?
17          A       If I had --
18          Q         -- a backup agreement
19      related to his entitlement to a retainer
20      fee.
21          A       I don't recall if there was
22      one in those files I turned over or not.
23                  MS. NEUMAN:  I'm going to
24          give the witness a document that's
25          been marked as Plaintiff's Exhibit

Page 65

```
1                    JOSH RIZACK
2       5335.
3                    (The above-referred-to
4       document was marked as Plaintiff's
5       Exhibit 5335 for identification, as
6       of this date.)
7                    MS. NEUMAN:  Bearing the
8       Bates number J Rizack 37.
9       Q       Is this a document you
10   created Mr. Rizack?
11      A       Yes.
12      Q       Can you describe for the
13   record what the document is?
14      A       Yes.  It is -- we took
15   various buckets of expenses.
16      Q       Who is we?
17      A       I took various buckets of
18   expenses based on bank records.  And we
19   took the amounts of outgoing wires and
20   checks and put it into various categories
21   to show where the funds were going.
22      Q       And who was this prepared
23   for?
24                   MR. DONZIGER:  I'm going to
25      object to this question on the
```

Page 66

1                    JOSH RIZACK

2         grounds of privilege, attorney-client

3         privilege.  I'm somewhat handicapped.

4         Is this a pie chart?  I don't see it.

5                    THE WITNESS:  Yes.

6                    MS. NEUMAN:  There's a pie

7         chart on the exhibit, yes.

8                    MR. DONZIGER:  Okay.  So I'm

9         objecting on the grounds that this is

10        subject to various privileges,

11        attorney-client work product.

12        Andrea, I assume you're going to just

13        respect my objection.  You're going

14        to keep going?

15                   MS. NEUMAN:  I don't know

16        what you mean.  Are you instructing

17        the witness not to answer?

18                   MR. DONZIGER:  No, I'm not.

19        I'm just making the objection.  I

20        think he can describe what it says.

21        I don't want him to answer if you're

22        going to get into what it means in

23        terms of strategy, this, that and the

24        other thing.  I don't know where

25        you're going with it.  Keep going.

                    JOSH RIZACK

1

2    Q        Mr. Rizack, without giving

3    me names, did you provide your expense

4    statements to anyone other than

5    Mr. Donziger?

6    A        I provided this to

7    Mr. Donziger.  I believe -- I don't

8    recall who else.  I mean this was a while

9    ago.  This is years ago.  So I don't

10   recall if we presented this to other

11   people or I presented it to Mr. Donziger.

12   And he presented it.  I just don't

13   remember.  I remember putting the

14   document together, though.

15   Q        Were you putting this

16   document together for some particular

17   purpose?

18   A        I think we were just

19   looking.  I don't know if somebody had

20   requested.  I don't recall, honestly.

21   But I'm sure either he wanted to know or

22   other people wanted to know where the

23   funds had gone, into what categories.

24   Q        So on Exhibit 5335, the

25   first category is miscellaneous for

Page 68

                    JOSH RIZACK

1.1 million plus.

1    A        Correct.

2    Q        Is that the same
3    miscellaneous you previously described?

4    A        I mean I'm sure there's --
5    all these buckets had detailed --
6    detailed -- you know, detailed either
7    bank statements receipts or so forth.
8    Most of the expenses that were paid were
9    paid through checks and wires.  So it was
10   not hard to go back to the bank
11   statements to get most of these expenses.

12   Q        So there's a backup schedule
13   for the miscellaneous?

14   A        There, I'm sure, is a file
15   with -- with the backup for that, yes.

16   Q        And you would have produced
17   that?

18   A        Yes.  It would have been --
19   you know, it would have been in all those
20   boxes.

21   Q        You have on here over
22   1.5 million for Ecuador Legal.  Do you
23   see that?

Page 69

1                    JOSH RIZACK

2        A        Correct.

3        Q        Do you recall how you

4   determined if something was being paid

5   for Ecuador Legal?

6        A        It would have been a wire --

7   it would have been a wire sent to a law

8   firm.

9        Q        In Ecuador?

10       A        Correct.

11       Q        And would you know -- would

12  the law firm then account for how they

13  spent the 1.5 million or that's where

14  your inquiry ended?

15       A        No.  The expenses were the

16  legal fees.  And expenses and so forth

17  were always backed by receipts.

18       Q        So you had invoices from

19  Ecuador law firms for over 1.5 million?

20       A        I believe so.  When we would

21  send out wires, we had receipt -- we had

22  invoices.

23                 MR. DONZIGER:  Is there a

24     question pending?

25                 MS. NEUMAN:  No.  There was

Page 70

```
 1                    JOSH RIZACK

 2      not a question pending.

 3              MR. DONZIGER:  I would ask

 4      that the witness not speak unless

 5      it's in response to a question.  Do

 6      you guys have any desire to take a

 7      short break?  I'm just curious.

 8      We've been, I guess, a little over an

 9      hour.

10              MS. NEUMAN:  Sure.  Do you

11      want to go off the record for ten

12      minutes?

13              MR. DONZIGER:  Yes.  That

14      would be great.  And just call me

15      back when you guys reconvene.  Thanks

16      a lot.

17              THE VIDEOGRAPHER:  We're

18      going off the record at 5:28 p.m.

19      This marks the end of Media 1.

20              (A short recess was taken.)

21              THE VIDEOGRAPHER:  We're

22      back on the record at 5:39 p.m.  This

23      marks the beginning of Media 2, if we

24      could just have folks introduce

25      themselves for the record.
```

Page 71

```
 1                      JOSH RIZACK
 2            MS. CHAMPION:  Anne
 3       Champion, from Gibson, Dunn, for
 4       Chevron Corporation.
 5            MR. DINGER:  Michael Dinger,
 6       from Stern & Kilcullen, for Chevron
 7       Corporation.
 8            MR. DONZIGER:  I'm just sort
 9       of objecting to the line of
10       questioning for the last several
11       minutes prior to the break where you
12       were questioning Mr. Rizack about
13       events well before the -- even the
14       commencement of the RICO trial and
15       very well before the RICO judgment
16       which was issued in March of 2014.
17            Mr. Rizack, I'm going to
18       state for the record, was not
19       involved in the Elliot Management
20       meeting, either setting up that
21       meeting and the meeting itself and
22       any follow-up contact.  He is not
23       familiar with -- and I think he would
24       verify this -- with my present
25       financial condition.  And I think
```

```
 1                    JOSH RIZACK
 2       that given that we have a hearing
 3       tomorrow on some pretty discreet
 4       issues related to your allegation
 5       that I'm in contempt of the RICO
 6       judgment, I think these questions are
 7       really well beyond the scope of what
 8       would be considered a proper scope.
 9       It just seems inappropriate.
10                 And I don't know what -- I
11       mean obviously you don't have to
12       answer this.  But I don't know what,
13       Andrea, your sense is how long this
14       deposition is going to last because
15       we're on the eve of a hearing in the
16       morning.  And I'm pro se.  And I need
17       to prepare.
18                 So I want to state that as
19       an objection and ask if you'd be
20       willing to answer what your sense is
21       how long you think the deposition
22       will take, absent my interventions.
23       Like on your end, how much longer you
24       think you're going to need?
25                 MS. NEUMAN:  I'm not sure.
```

```
                                        Page 73
 1                    JOSH RIZACK
 2        Why don't we get back to it and see
 3        how quickly we can move things along.
 4                    MR. DONZIGER:  Okay.
 5                    MS. NEUMAN:  Are we good to
 6        go now?
 7                    MR. DONZIGER:  Yes.  Good to
 8        go.
 9          Q         Mr. Rizack, I didn't ask you
10    earlier.
11                    How were you compensated for
12    your work with Mr. Donziger?
13          A         It was an hourly rate.
14          Q         What was your hourly rate?
15          A         Honestly, I don't recall.
16          Q         Did you keep time sheets?
17          A         I kept -- yes, I did.  Did I
18    keep time sheets?  Hold on.  I don't
19    recall.  I would have to look.
20          Q         You don't recall, one way or
21    the other?
22          A         No, I don't.
23          Q         Did you ever have any sort
24    of contingent interest in the Ecuador
25    judgment?
```

```
                                        Page 74
 1                    JOSH RIZACK
 2       A        Restate the question.
 3       Q        Did you ever have or do you
 4   have a contingent interest in the Ecuador
 5   judgment?
 6       A        Yes.
 7       Q        Could you describe that
 8   interest for me, please, sir?
 9       A        I believe it's either an
10   eighth or a quarter percent of
11   recoveries.
12       Q        But you don't know which:
13   An eighth or a quarter?
14       A        No.  I would have to check.
15       Q        Do you have a document?
16       A        Yes.
17       Q        Did you produce that
18   document?
19       A        I don't believe so.
20                MR. DONZIGER:  I'm going to
21          object to the production of that,
22          which we'll deal with later,
23          obviously, because he doesn't have
24          it.  But getting into issues of who,
25          you know, owns what other than like a
```

Page 75

JOSH RIZACK

1
2          general structure, in my mind, would
3          violate the associational rights of
4          the folks working on this Ecuador
5          environmental litigation and advocacy
6          effort.
7          Q       When did you obtain the
8      interest and the judgment you just
9      described?
10         A       It was -- it was -- you
11     know, it was promised, you know,
12     throughout the case when it was actually
13     memorialized.  I don't remember the exact
14     date.  I would have to look in the file.
15         Q       Can you give me an estimate?
16         A       I don't recall.
17         Q       Was it before or after the
18     RICO judgment was issued?
19         A       It was discussed before.
20     But I think it was memorialized after.
21         Q       And did your percentage come
22     out of Mr. Donziger's percentage or from
23     some other source?
24         A       I believe from some other
25     source.

Page 76

1                    JOSH RIZACK

2        Q        And the agreement you

3    signed, was it with anybody other than

4    Mr. Donziger?

5        A        Yes.

6        Q        And who was it with?

7        A        It was the -- I don't

8    recall.  But I believe it was -- it's on

9    the agreement.  The official -- I don't

10   remember the official group in Ecuador.

11   But they were on that.

12       Q        And did you meet with them

13   in negotiating this agreement?

14       A        I had been with -- I had met

15   with several people.  And I believe it

16   was agreed upon, presented on numerous

17   occasion to numerous people.

18       Q        Can you tell me the names of

19   any of these people?

20       A        I don't recall offhand.

21       Q        But you do have this

22   agreement?

23       A        Yes.

24       Q        What were you giving in

25   exchange for your either 1/8th or 1

```
                                      Page 77
 1                 JOSH RIZACK
 2   quarter percent interest in the
 3   recoveries under the Ecuador judgment?
 4        A       For work that I had done
 5   putting things together or the work
 6   product that you've seen here, some of
 7   this work product.
 8        Q       Anything other than your
 9   services?
10        A       I don't understand the
11   question.
12        Q       In exchange for your
13   interest in the Ecuador judgment --
14        A       Right.
15        Q        -- did you give the
16   official Ecuador group anything other
17   than your services?  Did you give them
18   any money?
19        A       No.
20        Q       Did you provide anything of
21   value to them other than the financial
22   statements, services you had provided to
23   Mr. Donziger?
24        A       Yeah.  I gave them work
25   product of, you know, where money went,
```

Page 78

1                        JOSH RIZACK

2     expenses.  And I had done other work in

3     addition to this.

4          Q         In addition to the

5     case-related financial work?

6          A         No.  All related to the

7     case.

8          Q         And you did work other than

9     financial work; is that what you're

10    saying?

11         A         No.  It was all

12    financial-related.

13         Q         And it all relates to the

14    documents you produced?

15         A         Correct.

16                   MS. NEUMAN:  I just want to

17         give the witness what's been marked

18         as Plaintiff's Exhibit 5336.  J

19         Rizack 52 is the Bates number.

20                   (The above-referred-to

21         document was marked as Plaintiff's

22         Exhibit 5336 for identification, as

23         of this date.)

24         Q         Before we go to

25    Exhibit 5336, Mr. Rizack, have you

Page 79

                        JOSH RIZACK

1
2    received any moneys under your agreement
3    that provided you with a percentage
4    interest in the Ecuador judgment?
5         A        Restate the question.
6         Q        Have you received any money
7    under your agreement that provided you
8    with a percentage interest in the Ecuador
9    judgment?
10        A        We answered that already,
11   didn't we not?
12        Q        I don't think so.  Well, not
13   did you give them money.  Have they given
14   you any money?
15        A        Have I been paid any money
16   throughout the time period?
17        Q        No.
18                 Have you been paid any money
19   under the agreement pursuant to which you
20   got a percentage interest in the
21   judgment?
22        A        I don't understand the
23   question.
24                 MR. DONZIGER:  Objection;
25       lack of foundation; right?  There's

Page 80

1                    JOSH RIZACK
2         no testimony or evidence that that
3         agreement provides anything other
4         than a contingency to Mr. Rizack, not
5         money, if that's what you mean by the
6         question, if you mean cash or some
7         other money payment.  There's no
8         foundation for that question.
9         Q       Mr. Rizack, you testified
10   that you signed an agreement that gives
11   you a percentage interest in the Ecuador
12   judgment; correct?
13        A       Correct.
14        Q       Has anyone paid to you any
15   moneys under that agreement, saying
16   here's payment on your percentage or part
17   of your percentage?
18        A       So you're asking, have I
19   been paid based on the percentage that
20   I've given -- that I was given in the
21   case, did I get paid -- I mean that -- I
22   don't understand the question.
23        Q       Well, let me ask a different
24   question.
25                Have you been paid any

Page 81

1                   JOSH RIZACK

2    moneys in connection with the work you do

3    on the Ecuador case since you signed the

4    percentage agreement?

5        A        I don't believe so.  I'm not

6    sure.  But I don't believe so.  I would

7    have to check my records.

8        Q        And when you were paid, what

9    was your understanding of the origin of

10   the funds that you were paid with?

11       A        They were -- the origins of

12   the fund had been from investors.

13       Q        Now, returning to

14   Exhibit 5336 --

15       A        Okay.

16       Q         -- do you have that one?

17       A        Mm-hmm, yes.

18       Q        The Bates No. 52.

19       A        Mm-hmm.

20       Q        There's a column that says

21   payment March 19th, 2012.  Do you see

22   that?  The gray column.

23       A        Yes.

24                MR. DONZIGER:  I'm going to

25        object because this is part of the

Page 82

1                   JOSH RIZACK

2        RICO judgment.  And, Mr. Rizack --

3        I'm going to tell Mr. Rizack that he,

4        as I understand Judge Kaplan's

5        orders, does not have to answer

6        questions related to any of this

7        stuff if it's prior to the RICO

8        judgment which came down on

9        March 4th, 2014.

10       Q      The amounts in the column,

11    entitled Payment, March 19th, 2012, are

12    those payments that were made on that day

13    or were due on that day or something

14    else?

15             MR. DONZIGER:  Objection for

16       reasons just stated in my prior

17       objection.

18       A      There's notes on the side

19    that you can see in the comments.  So

20    they were either paid or needed or needed

21    information or needed wire info.  There's

22    comments.  So, no, not all of those would

23    have been paid on that date.

24       Q      In the comments, it says SD

25    call and workout deal.  What does that

Page 83

1                    JOSH RIZACK

2    refer to?

3         A        Which?

4         Q        Up here (indicating).  You

5    see right here (indicating)?

6         A        Yes.  Those are bounces due

7    and that we were trying to -- that we

8    were probably trying to, you know, work

9    out either a payment deal or a -- get the

10   bill reduced.

11        Q        In the agreement where you

12   got a percentage interest in the

13   judgment, did anybody else get a

14   percentage interest in the judgment in

15   the same agreement?

16        A        No.

17                 MR. DONZIGER:  Andrea, just

18        a quick question, I apologize.  Can

19        you give a general estimate of how

20        long you think you expect to go with

21        Mr. Rizack tonight?  I'm asking that

22        for various purposes, including I've

23        got to plan my own time.  So I just

24        wanted to know.  I'm not trying to

25        cut you off.  I'm just trying to

Page 84

1                    JOSH RIZACK

2        plan.  So do you have a sense of how

3        long you think you'll need?

4                 MS. NEUMAN:  I'm hopeful

5        that we can get through this in an

6        hour, hour and 20.

7                 MR. DONZIGER:  Okay.  That's

8        good.  Keep going.  Thank you.

9                 MS. NEUMAN:  Sure.

10       Q        Mr. Rizack, I'm going to

11   give you a document that I'm marking as

12   Plaintiff's Exhibit 5337.  You produced

13   it electronically.  So it printed without

14   Bates numbers.

15                 (The above-referred-to

16       document was marked as Plaintiff's

17       Exhibit 5337 for identification, as

18       of this date.)

19       Q        Is this a document that you

20   produced?

21       A        Yes.

22       Q        If you go to the third page

23   of this exhibit --

24       A        Yes.

25       Q        -- do you see there's an

Page 85

1                    JOSH RIZACK

2   entry three down from the top:  Amazonia

3   Recovery Limited?

4        A       Yes.

5        Q       It says credit of 45,000.

6                Does that mean you received

7   money from Amazonia Recovery Limited?

8        A       Yeah.  If it's in the

9   credit -- you know, I don't recall the

10  exact transaction.  But that's what it

11  would indicate.

12       Q       And the same of the -- so

13  the 150, the 45, the 52 and the credit

14  column were all incoming moneys?

15       A       You know, I don't recall.

16  And, you know -- you know, I don't

17  recall.

18       Q       Do you know what bank

19  statements these credits would be sourced

20  to from looking at this document?

21       A       Well, it says at the top TD

22  Bank Debit Card Purchases.  Okay.  So

23  page 3.

24       Q       That didn't really narrow it

25  down.

Page 86

1                    JOSH RIZACK

2        A        Yeah.  It says wires.  So

3    these -- these were all wires that you're

4    referring to.  And I don't see which bank

5    account it refers to.

6        Q        And how do you know they're

7    wires?

8        A        There would have been backup

9    to this that would have had the bank

10   statements.  And on the bank statements,

11   it would show wires.

12       Q        So where it says check

13   number, is that actually a wire number?

14   That's what I'm finding confusing.

15       A        No.  Checks are actual

16   checks written.

17       Q        So if there's a check

18   number, these were checks?

19       A        They were, right, correct.

20       Q        So these would have been

21   checks rather than wires?

22       A        Correct.

23                MR. DONZIGER:  Can I just

24       interrupt for a quick second?  Can

25       you just indicate what the date of

Page 87

```
 1                    JOSH RIZACK
 2      the document, Exhibit 5337, is?
 3                MS. NEUMAN:  It doesn't have
 4      a particular date on it.  It has
 5      entries.  It's not in chronological
 6      order.  So I can't be completely
 7      accurate.  But it has entries from
 8      2013 through 2016.
 9                MR. DONZIGER:  Okay.  Object
10      to the extent it covers stuff prior
11      to the RICO judgment and doesn't
12      relate to my present financial
13      condition.  Go ahead.
14                MS. NEUMAN:  I'm going to
15      mark as Plaintiff's Exhibit 5338
16      another document, produced by
17      Mr. Rizack, as part of the final
18      Steven Account Worksheet Summary
19      2012.
20                (The above-referred-to
21      document was marked as Plaintiff's
22      Exhibit 5338 for identification, as
23      of this date.)
24       Q      Is this a document you
25    produced, Mr. Rizack?
```

Page 88

JOSH RIZACK

1

2          A          Yes.

3          Q          What are the source for the

4     entries on this document?

5          A          This would have been a

6     continuation of the money that went

7     through the -- went through the accounts,

8     incoming, outgoing.  And then we started

9     with a negative balance of

10    $1,482,777 from whatever the prior year

11    would have been of money that was owed to

12    Steven Donziger from the case.  And then

13    you have incoming wires that went into

14    the attorney escrow account.

15                    So funds would come into his

16    attorney escrow account.  And then he

17    would pay out funds for, you know,

18    professional fees, for expenses and so

19    forth.

20         Q          So the 225,000 and the

21    380,000 that are incoming, those are

22    investor funds in the case which then

23    you're showing expenses charged against?

24         A          Right.  Expenses and

25    professional fees, correct.

Page 89

1                    JOSH RIZACK

2        Q        And then the 35,000 monthly

3    retainer, that's the same as on the prior

4    document?

5        A        Correct.

6        Q        Are any fees charged against

7    the retainer or all expenses on top of

8    the retainer?  Like regular office

9    expenses, are those charged on top of the

10   retainer?

11       A        Are you talking to -- are

12   you referring to a specific expense?  I'm

13   sorry.

14       Q        Like a telephone or paper,

15   you know, no more overhead.  Is there any

16   overhead that's wrapped into the retainer

17   or is it all expensed?

18       A        No.  It would be expensed.

19   You know what, quite frankly, I don't

20   know if he charged every ream of paper.

21       Q        We don't need to volunteer.

22   Just answer the question.

23       A        I said I didn't know.

24       Q        You don't know if the

25   retainer included expenses?

```
 1                    JOSH RIZACK
 2       A       If the -- are you referring
 3    to which line?
 4       Q       Just in general.
 5               Were there expenses that you
 6    said, oh, this is included in the
 7    retainer, so I'm not going to account for
 8    it separately?
 9       A       Which line of retainer?
10       Q       The 35,000.
11       A       Oh.  The monthly fee.  My
12    understanding, that was -- you know, that
13    was for his work on the case.
14               MR. DONZIGER:  Just to be
15          clear because I think the witness
16          might be a little confused -- and,
17          Andrea, please correct me if you
18          don't agree with this -- when
19          Chevron's lawyer says retainer, I
20          believe she means the amount paid for
21          my or whoever's worked on the case as
22          distinct from out-of-pocket
23          expenditures, like travel, et cetera,
24          which should be expenses.
25               So if a question is, are any
```

Page 91

```
1                  JOSH RIZACK
2       expenses included in the retainer, I
3       don't know, I just want to make sure
4       that the witness is clear about what
5       retainer means because I'm not so
6       sure he is.
7              MS. NEUMAN:  We've
8       identified the retainer as the
9       monthly fee shown on the document.
10      So we've identified it specifically
11      by the document.
12       A       Are you asking me?
13       Q       No.  I was letting --
14  Mr. Donziger, I don't know if he's
15  pulling up these documents as we go
16  along.
17             MR. DONZIGER:  Yes.  I'm
18      somewhat in the dark.  And I don't
19      want to delay things.  So please go
20      ahead.
21             MS. NEUMAN:  I'm going to
22      hand the witness a document that's
23      been marked as Exhibit 5339.  It's
24      also part of Final Steven Accounting
25      '07 to 2016.
```

```
                                              Page 92
 1                    JOSH RIZACK
 2              (The above-referred-to
 3      document was marked as Plaintiff's
 4      Exhibit 5339 for identification, as
 5      of this date.)
 6      Q        What does it mean when it
 7   says paren 2217?  Is that the date that
 8   you created the worksheet?  At the top
 9   here.
10      A        Yeah.  I don't recall.  But
11   that -- could be that it was produced.
12   That's the date I worked on it, 2/2/17.
13      Q        Can you describe for me
14   what's on this document when you refer to
15   attorney trust account, what account is
16   that?
17      A        That would have been one
18   of -- that would have been the bank
19   account that -- that funds would have
20   come into and gone out; you know, pretty
21   much as soon as funds came in, they'd go
22   out to pay expenses.
23      Q        Can you identify the account
24   any more specifically than that?
25      A        You know, as I refer before,
```

Page 93

JOSH RIZACK

1
2      there was bank accounts, first at Chase
3      and then TD.  So it would be one of the
4      two.
5           Q      Do you know of Mr. Donziger
6      having bank accounts at any other
7      institution?
8           A      Not that I'm aware of.
9           Q      What does the 1,800,000 --
10     let me start over.
11                 What does the $1,803,708.12
12     represent?
13          A      Without the backup for this,
14     I couldn't tell you.
15          Q      Would that had been the
16     balance in this attorney trust account or
17     something else?
18          A      You know, I would need the
19     backup that would indicate what this was
20     for.  I mean it could -- you know, I'm
21     not -- I don't know if it was a bounce on
22     a given day or if it was, you know, at a
23     year end or a snapshot at any given time.
24          Q      And do you know what the
25     1,750,000 on this document refers to?

Page 94

1                    JOSH RIZACK

2        A         1,750,000?

3        Q         It's just sort of randomly

4    right here (indicating).

5        A         No.  Again, I would need the

6    backup that would go with this.

7        Q         If we wanted to find the

8    backup for one of your documents without

9    calling you, how would we know what was

10   the backup for this?  Did you have a

11   system you can describe?

12       A         This was -- there was files

13   with backup.

14       Q         But did you have any system

15   for labeling stuff, so that you would

16   know where the backup -- you pulled this

17   doc up on your computer?

18       A         Correct.

19       Q         And if you wanted to know

20   where the backup was, how would you know?

21       A         I would pull it out of a

22   folder.  All this stuff was in folders

23   and boxes.

24       Q         So the backup is only hard

25   copy?

```
                                              Page 95

 1                    JOSH RIZACK

 2        A        Correct.

 3        Q        So in the stuff that you

 4   produced, because the hard copy had

 5   already gone to Ms. Sullivan, you would

 6   not have had the backup?

 7        A        Correct.

 8        Q        So the mystery would remain?

 9        A        Unless you have those boxes.

10        Q        Go I'm going to hand you a

11   document that we marked as Plaintiff's

12   Exhibit 5340.

13                 (The above-referred-to

14        document was marked as Plaintiff's

15        Exhibit 5340 for identification, as

16        of this date.)

17        Q        It's also a document from

18   your final Steven account, '07 to 2016,

19   with the 2/2/17 parenthetical date,

20   entitled TD Bank Debit Card Purchases.

21                 Do you recognize this

22   document?

23        A        Yes.

24        Q        Can you tell me what it is?

25        A        It's expenses -- so these
```

1                    JOSH RIZACK

2     were expenses that were put on a debit

3     card from the TD account that were

4     attributed to expenses.

5          Q        For the case?

6          A        Correct.

7          Q        Can you flip to the last --

8     why is the Brussels highlighted?

9          A        On which page?

10         Q        On the first page.

11         A        TVX Midi Shop, Brussels, I

12    actually kind of -- I actually recall

13    this.  It was an expense for I think

14    headphones.  And I highlighted it because

15    I questioned -- I questioned that

16    expense.

17         Q        Did you ever travel to

18    Brussels with Mr. Donziger?

19         A        Yes.

20         Q        For what purpose?

21         A        To meet with a potential

22    investor.

23         Q        When was that?

24         A        I don't recall.  Several

25    years ago.

Page 97

1                    JOSH RIZACK

2        Q        Were you generally involved

3    in fundraising for the case?

4        A        No.  I mean in certain

5    instances, I went to -- I recall going to

6    that meeting.  But overall, no, I wasn't

7    going to.  That wasn't my -- I wasn't

8    going to a lot of meetings.  But, you

9    know, once in a while in that particular

10   case, yes, we would go to that meeting.

11       Q        And what was your role at

12   the meeting?

13       A        I think, you know, he wanted

14   a second set of ears and if there was

15   going to be any negotiating, to help him

16   negotiate, you know, and understand, you

17   know, help him with the numbers and so

18   forth.

19       Q        And did you meet with other

20   funders other than the one in Brussels?

21       A        Yes.

22       Q        On how many occasions did

23   you meet with funders or potential

24   funders?

25       A        On many occasions in the

```
 1                    JOSH RIZACK
 2   early, early days when I first, you know,
 3   got involved, we had met.
 4       Q        After the RICO judgment was
 5   entered, on how many occasions had you
 6   met with potential funders?
 7       A        After the RICO, I believe
 8   that the only time was with Brussels.  I
 9   don't believe there was any other times
10   that I went, no.  I don't recall any
11   other times.
12                 MR. DONZIGER:  I'm going to
13         object to this line of questioning
14         about meetings.  That's our internal
15         stuff.  And I'm going to direct the
16         witness not to talk about any
17         meetings with investors or the
18         identities of any investors.  I
19         recognize it's possible in the
20         Sullivan production that Chevron has
21         named these individuals.
22                 But our intention -- my
23         intention, rather -- is to continue
24         to litigate that issue and claw that
25         stuff back that Ms. Sullivan produced
```

```
                                                      Page 99
 1                        JOSH RIZACK
 2           that violates the associational
 3           rights of me and others.
 4                    So I just want to instruct
 5           Mr. Rizack not to talk about those
 6           meetings other than the fact that
 7           there were meetings.
 8           Q        Mr. Rizack, do you intend to
 9      follow Mr. Donziger's instruction?
10           A        Well, I quite frankly don't
11      have legal advice to know whether I
12      should or not.  So I have two competing
13      attorneys saying two different things,
14      you know.  You can't advise me.  And he
15      can't advise me.
16                    MR. DONZIGER:  What I would
17           recommend, Andrea, is coming to an
18           agreement between us on this point,
19           is given that how important this is
20           in terms of tomorrow, maybe what you
21           could do is allow him to get
22           independent legal advice on this
23           issue.  And if you have to go back to
24           this stuff in a limited way, it can
25           be done later.  It can be done later
```

```
                                          Page 100

 1                        JOSH RIZACK

 2         after court.

 3                    MS. NEUMAN:  Let me ask the

 4         witness this question.

 5          Q        Mr. Rizack, have you been

 6    involved in fundraising since the RICO

 7    judgment where you succeeded in getting

 8    additional funds for the case, the funds

 9    were deposited in accounts with which

10    you're familiar and some of those moneys

11    were then paid to Mr. Donziger?

12                    MR. DONZIGER:  Before you

13         answer, let me just digest that

14         question.  Can you read it back?

15                    (The requested portion was

16         read back by the court reporter.)

17                    MR. DONZIGER:  This is what

18         I would suggest because there's like

19         four questions in that one question.

20         Why don't, Andrea, you start with the

21         very first part and see what he says

22         and go from there, the very first

23         part, the very first thing that you

24         questioned in that long question.

25          Q        Mr. Rizack, are you aware
```

```
 1                    JOSH RIZACK
 2   since the issuance of the RICO judgment
 3   of moneys being deposited into any
 4   accounts controlled by Mr. Donziger that
 5   originated with funders of the Ecuador
 6   litigation?
 7        A     Yes.
 8        Q     On how many occasions?
 9        A     I'm not sure how many; a
10   few.
11        Q     Can you estimate?
12        A     A few; two, three, four.  I
13   was, you know, on the outskirts helping
14   him with these charts and so forth.
15        Q     When these moneys would come
16   from funders, what account would they be
17   deposited into, post-RICO?
18        A     I don't know the exact bank
19   or account numbers, if that's what you're
20   asking.
21        Q     Would those moneys then be
22   controlled by Mr. Donziger?
23        A     Not sure.
24        Q     When you were working on his
25   expense accountings, did you see funder
```

                        JOSH RIZACK

1

2    money that came in after the RICO

3    judgment be put into Mr. Donziger's

4    personal accounts?

5         A        I was not.  Post-RICO, I was

6    not working on his expenses.

7         Q        But some of these

8    spreadsheets are --

9         A        Are they?

10        Q         -- dated 2017.

11        A        A lot of these are dated.

12   But most of this stuff was put in -- when

13   was the --

14        Q        2014.

15        A        2014 was the RICO.  So --

16   so, yeah.  I might have put some of this

17   stuff in, or it was provided by -- by

18   Mr. Donziger.  And I popped it into the

19   chart.  But I was -- you know, this

20   was -- to the extent I was working on it

21   prior, afterwards was very Limited.

22        Q        So setting aside the general

23   extent of your work, post-RICO, are you

24   aware of occasions where funder money

25   went into Mr. Donziger's accounts?

1                    JOSH RIZACK

2              MR. DONZIGER:  I'm sorry.

3        Just to understand the question, is

4        that limited by any date, your

5        question?

6              MS. NEUMAN:  Since RICO.

7              MR. DONZIGER:  Since the

8        RICO judgment?

9              MS. NEUMAN:  Yes.

10             MR. DONZIGER:  Okay.

11       A        I don't know where -- which

12   account the investor moneys went into.

13       Q        The three to four post-RICO

14   investors with whom you're familiar or

15   know of --

16       A        Right.

17       Q         -- are you familiar with

18   the terms on which they made their

19   investments?

20       A        I don't recall.

21       Q        Do you recall anything?

22       A        I just -- I recall --

23             MR. DONZIGER:  I'm going to

24        object again.  That goes right to the

25        core of our internal operations and

```
 1                    JOSH RIZACK
 2      organizational structure.  He could
 3      speak to his particular terms.  But I
 4      would instruct him not to speak to
 5      the terms of others if he knows about
 6      them.  I don't even know if he does.
 7         Q      Do you intend to follow that
 8   instruction?
 9         A      What's your question?
10         Q      Do you know any of the terms
11   on which funders who invested in the
12   judgment after RICO made those
13   investments?
14         A      I don't recall the details
15   of any of those investors.
16         Q      Do you recall anything?
17         A      Yes.
18         Q      What do you recall?
19         A      I mean I recall Steven
20   asking questions, asking me to build
21   these charts for him but no specific.
22   This is not stuff I worked on recently.
23         Q      You said that you're aware
24   that some people invested, post-RICO?
25         A      Correct.
```

Page 105

1                    JOSH RIZACK

2        Q        Do you have any knowledge as

3    to whether they were investing in

4    exchange for a percentage interest in the

5    judgment?

6        A        I would assume that.

7        Q        But do you know, one way or

8    the other?  Were you in meetings where

9    that was discussed?

10       A        I don't recall being in any

11   meetings.  I would recall that Steven

12   would call and ask for, you know, these

13   charts, or he would ask a question.  But

14   I was not the main person dealing with

15   these kind of issues.

16       Q        So the meeting in Brussels

17   that you do recall --

18       A        Yes.

19       Q         -- with a funder --

20       A        Yes.

21       Q         -- do you recall the terms?

22                Let me withdraw that.

23                Did that funder invest?

24       A        No.

25       Q        Do you recall the terms that

```
 1                    JOSH RIZACK
 2    were offered to that funder?
 3         A        There was just general
 4    negotiation, not even negotiation,
 5    general discussions.  It never came to a
 6    funding.
 7         Q        Do you still have
 8    Exhibit 5340 in front of you?
 9         A        Yes.
10         Q        Can you go to page 4,
11    please.
12         A        Yes.
13         Q        In the credit column where
14    you have the 45,000 from Amazonia
15    Recovery Limited, is that incoming?
16         A        We discussed this before
17    from a prior exhibit.
18         Q        Yes.  I think it's the same.
19    But I'm trying to confirm that.
20         A        Yes.  It looks like the
21    exact same information.
22         Q        And when you go down the
23    page, there are entries that just say
24    Yanza.  Do you know the purpose of those
25    payments?
```

```
                                      Page 107
 1                   JOSH RIZACK
 2        A        No.
 3        Q        Further down, payments to
 4   Aaron Page.
 5                 Do you know the purpose of
 6   those payments?
 7        A        Aaron Page was an attorney.
 8        Q        So this is legal work, as
 9   far as you know?
10        A        As far as I know, yes.
11        Q        Then in the next section
12   down to the right, there are Ps and Bs.
13   Do you see that?
14        A        Yes.
15                 MR. DONZIGER:  I'm going to
16        interrupt.  What's the date of the
17        document, the Exhibit 64?  My
18        apologies.
19                 MS. NEUMAN:  February 2nd,
20        2017.
21                 MR. DONZIGER:  Does it
22        refer -- let me just state an
23        objection.  If you're referring to
24        information or a compilation of
25        information that came into existence
```

Page 108

1                    JOSH RIZACK

2        prior to the RICO judgment, I think

3        it's off limits.  So even if it's

4        dated 2017, I believe some of this

5        information was prior to the RICO

6        judgment because I think that the

7        Amazon recovery moneys you just

8        referenced happened prior to the RICO

9        judgment based on my own

10       recollection.

11              So I would caution the

12       witness to -- to sort of distinguish

13       between the dates of questions

14       related to information, RICO

15       judgment, and later and prior to the

16       RICO judgment with former meaning the

17       part about information related to the

18       RICO and later being appropriate and

19       the part that relates to information

20       prior to the RICO not being

21       appropriate.

22        Q       Mr. Rizack, do you still

23    have the question in mind or should I

24    re-ask it?

25        A       Re-ask it, please.

```
 1                   JOSH RIZACK
 2      Q         On Exhibit 5340, the Ps and
 3   the Bs --
 4      A         Yes.
 5      Q          -- what are those for?
 6      A         I don't recall.
 7      Q         You got nothing?
 8      A         I got nothing.  I really
 9   don't recall.
10              MS. NEUMAN:  I'm going to
11        mark as Plaintiff's Exhibit 5341, a
12        document bearing the Bates numbers
13        MKS254 through 256.
14              (The above-referred-to
15        document was marked as Plaintiff's
16        Exhibit 5341 for identification, as
17        of this date.)
18      Q         Do you recognize this
19   document, Mr. Rizack?
20      A         No.
21      Q         Do you see on page 2, it
22   refers to -- appears to be a hotel bill
23   from the Manos Premier hotel in Brussels?
24      A         Yes.
25      Q         It has Mr. Donziger's name
```

```
                                        Page 110
 1                    JOSH RIZACK
 2    and your name?
 3          A       Yes.
 4          Q       And it appears to be dated
 5    January 10th of 2015?
 6          A       Yes.
 7          Q       Is this the trip you and
 8    Mr. Donziger took to Brussels in
 9    relationship to fundraising?
10          A       I would assume, yes, that
11    was the date.
12                  MS. NEUMAN:  I'm going to
13        hand the witness a document
14        previously marked as Plaintiff's
15        Exhibit 5314.  This is a document
16        that was marked during Mr. Donziger's
17        deposition.
18          Q       It is not a document that
19    you created, Mr. Rizack.  But I have a
20    couple of questions for you about it.
21                  On the first page, you'll
22    see a January 25th, 2016 deposit from a
23    JP Morgan account for $50,000 into
24    Mr. Donziger's 2265 account.
25          A       Okay.
```

```
 1                    JOSH RIZACK
 2       Q        Do you see that?  Do you
 3   know the origin of those funds?
 4                MR. DONZIGER:  Objection.
 5       No.  Do not answer that.
 6       Q        Do you intend to follow that
 7   instruction, Mr. Rizack?
 8                MR. DONZIGER:  I'm sorry.
 9       Let me state the basis before he
10       answers your question on whether he's
11       going to follow the instruction.  The
12       basis is that tends -- could tend to
13       reveal the identity of a funder.  And
14       I've outlined in a motion to -- a
15       protective order based on the First
16       Amendment the danger of disclosing
17       that information, given Chevron's
18       long history of harassing funders
19       that have funded this litigation in
20       violation we believe of the First
21       Amendment of associational rights.
22                So I don't know if the
23       witness knows the answer to that
24       question.  I would direct him not to
25       answer that question.
```

```
                                    Page 112

 1                    JOSH RIZACK

 2            MS. NEUMAN:  So object to

 3      the speaking objections.

 4        Q       Does the witness intend to

 5      follow the instruction?

 6        A       I love the way how you guys

 7      put me in the middle of this whole thing.

 8            MR. DONZIGER:  I couldn't

 9      hear.  Someone else talked.

10            MS. NEUMAN:  Ms. Champion

11      noted for the witness that your

12      motions had been denied by the court

13      in case that information was relevant

14      to him.

15            MR. DONZIGER:  I understand

16      that.  That's not end of story.

17      There's potential and hope for

18      appellate review.  Anyway, you can

19      blame me, or I can blame you.  And I

20      think Mr. Rizack has been very

21      forthcoming.  And I think I have

22      merely stood by while you have gone

23      pretty far afield from what the scope

24      of this thing should be.

25                    So I would just say, why
```

Page 113

```
 1                    JOSH RIZACK
 2        don't we agree not to put Mr. Rizack
 3        in a complicated position when he's
 4        unrepresented, both the question and
 5        let him consult with counsel, you
 6        know, take it up with Judge Kaplan.
 7        I think in terms of tomorrow, it
 8        doesn't really matter because I've
 9        acknowledged in my own deposition
10        raising funds, post-RICO, as I said
11        the April 25th order of the court.
12        So whatever the names of the people
13        are at this point is not really
14        needed for tomorrow.  So I would urge
15        you to just let that one go and move
16        on.  And we can take it up later if
17        we need to.
18        Q      Mr. Rizack, without
19   identifying the source, do you know the
20   source of the $50,000 deposit made on
21   January 25th, 2016 to Mr. Donziger's 2265
22   account?
23        A      Okay.  I've never seen this
24   document.  I haven't prepared this
25   document.  So I don't know the source or
```

```
                                         Page 114
 1                   JOSH RIZACK
 2    use of these funds.  So, no, I don't
 3    know.
 4         Q       If we gave you the
 5    underlying -- these are prepared based on
 6    the documents produced by Ms. Sullivan,
 7    namely the bank records.
 8         A       Right.
 9         Q       So you see where it says TD
10    Bank, gives the account number, gives the
11    Bates number of the document that was
12    produced?
13         A       Right.
14         Q       You were working with
15    Mr. Donziger in 2016; correct?
16         A       Yes.  Off and on.
17         Q       So if I put the actual bank
18    record with this entry on it --
19         A       Right.
20         Q        -- would that change your
21    answer?
22         A       No.
23         Q       So do you recall in looking
24    down at the next set of deposits -- and
25    we know who these are from, so there's no
```

```
 1                    JOSH RIZACK
 2    issue there -- these are from the
 3    Canadian law firm representing the Lago
 4    Agrio plaintiffs.  There's transfers of
 5    $488,450.  Do you see that?
 6         A         Right.
 7         Q         Do you know the purpose of
 8    the transfer of this money from Canadian
 9    counsel to Mr. Donziger?
10         A         No.
11         Q         Are these transfers of
12    $488,450 reflected in the accounting that
13    you were preparing?
14         A         No.
15         Q         Why not?
16         A         I just -- I wasn't doing
17    that at that time.
18         Q         So even though your
19    accounting is labeled Financial Steven
20    Account --
21                    MR. DONZIGER:  I would
22         object.
23         Q         -- 2007 through 2016, it
24    doesn't include moneys that came in in
25    2016?
```

JOSH RIZACK

1
2     A        No, because there was a lot
3  of empty gaps on those reports.  They
4  were not finished.  And that's why there
5  was -- some of those American Express and
6  some of those other things had to be
7  verified and gone through.  So that was
8  not complete.
9     Q        Is there any year for which
10  you would consider your final Steven
11  accounting 2007 through 2016 to be final?
12     A        Yes.  Some of the earlier
13  years.  And that was probably labeled
14  final in the earlier years.  And we just
15  kept adding years on to that.  So I
16  wouldn't read anything into the word
17  final on there.
18     Q        Would you be able to tell me
19  which years are final and which years are
20  not?
21     A        In what regard?  I mean I
22  never audited this information.  I put
23  this information together.  So final, I
24  mean I don't know.
25     Q        So none of it is final; is

```
 1                    JOSH RIZACK
 2    that fair to say?
 3        A        From an audit, from a GAAP
 4    point of view, no.
 5        Q        When was the last time that
 6    you talked to Mr. Donziger prior to
 7    today?
 8        A        Prior to -- I've spoken to
 9    him this week.
10        Q        On how many occasions?
11        A        I don't recall.  I don't
12    recall.  Several times.
13        Q        What were the topics of
14    those several phone calls?
15        A        That, you know --
16                 MR. DONZIGER:  Objection.  I
17        would ask the witness -- you can talk
18        about contacts that you've had with
19        me but not the substance of the
20        conversations based on privilege,
21        attorney-client.
22        Q        Is Mr. Donziger your lawyer?
23        A        No.
24        Q        What was the topic of the
25    conversation?
```

```
 1                    JOSH RIZACK
 2              MR. DONZIGER:  Hold on, hold
 3       on, hold on.  That's not a fair
 4       question.  Obviously, I'm not his
 5       lawyer.  He's never said I'm his
 6       lawyer.  I never said I'm his lawyer.
 7       But he is a consultant of mine on a
 8       litigation covered by privilege.  I
 9       am reminding him of his obligations
10       in that regard.
11       Q        What were the topics of the
12    conversations?
13       A        For me to say that he didn't
14    want that answered.
15       Q        If he's going to instruct
16    you not to answer, he can instruct you.
17    And I can ask you if you're going to
18    follow his instruction.  And then we'll
19    go from there.
20       A        If the two parties can't
21    agree and that this deposition was so
22    last-minute that I didn't even have an
23    opportunity to get counsel, I'm not going
24    to get in the middle of you two.  So
25    somebody needs to -- you know, I'm not
```

```
 1                    JOSH RIZACK
 2    going to make legal determinations.
 3        Q        So you're going to follow
 4    the instruction?
 5        A        I'm not going to follow
 6    either instructions on these points.  You
 7    know, we can deal with it at a later time
 8    when I have proper advice.
 9        Q        So you're declining to
10    answer the question?
11        A        Well, you say one thing, he
12    says something else.  So I don't know
13    what -- what the lawyers are on these
14    things.
15                 MR. DONZIGER:  I kind of
16        feel like you're not being fair.
17        He's already testified that we had
18        communication about privileged issues
19        with regard to his productions.  And
20        that's already on the record.
21                 MS. NEUMAN:  Mr. Donziger, I
22        don't see there's any basis for an
23        objection that you're making.  It's
24        very important to know what's been
25        said to a witness immediately before
```

```
              JOSH RIZACK
 1
 2    a deposition.  You do not have an
 3    attorney-client privilege with this
 4    witness as far as I can tell.  If you
 5    think you do, you can instruct him
 6    not to answer.  And if he follows
 7    your instruction, then if we want the
 8    answer, we can move on that.  There's
 9    a process to be followed.
10            MR. DONZIGER:  I'm not going
11    to -- let's put it this way.  I have
12    my objection.  He is a consultant.
13    He is covered.  I don't want him
14    talking about, you know, strategies
15    and that kind of stuff.  I'm not
16    going to instruct him not to answer
17    as long as the answer doesn't get
18    into those areas of work product,
19    attorney-client stuff.  If you want
20    to ask him about, did I prepare him
21    for this deposition for whatever and,
22    you know, what did he do to prepare
23    for the deposition, yes.
24            As far as I can tell based
25    on what happened, I think this
```

JOSH RIZACK

1
2      deposition was planned today or
3      yesterday or something.  So if you
4      want to ask him that, yeah, go.
5          Q       Mr. Rizack, in the several
6   conversations that you had with
7   Mr. Donziger this week, did you discuss
8   your potential deposition?
9          A       Did we discuss if there was
10   a -- if there was a request for a
11   deposition?
12          Q       Did you discuss anything
13   about potentially testifying?
14          A       I discussed that Alejandro
15   had requested a deposition.
16          Q       And what did Mr. Donziger
17   say?
18          A       Okay, you know, I need to
19   know that there's going to be a
20   deposition.
21          Q       Did you and Mr. Donziger
22   discuss anything about topics that you
23   would speak to at your deposition?
24          A       No.
25          Q       Did you and Mr. Donziger

```
 1                    JOSH RIZACK
 2    talk about any positions you would or you
 3    wouldn't take at your deposition?
 4         A      No.
 5         Q      Did you and Mr. Donziger
 6    talk about the documents that you had
 7    withheld and then subsequently produced?
 8         A      Not that I recall.
 9         Q      Can you tell me, generally,
10    what the topics of your conversations
11    with Mr. Donziger were this week?
12         A      Just in general, when the
13    deposition would be, if I was going to
14    agree to a deposition, what the timing
15    would be, just general questions like
16    that.
17         Q      Did Mr. Donziger discourage
18    you in any way from agreeing to a
19    deposition?
20         A      No.
21         Q      When you were working with
22    Mr. Donziger and working on these
23    financial accountings, what were his
24    sources of income?
25                MR. DONZIGER:  Hold on.  Can
```

```
                                    Page 123
 1                   JOSH RIZACK
 2       you limit that question by date?
 3                   MS. NEUMAN:  I did.  While
 4       Mr. Rizack was working with you.
 5                   MR. DONZIGER:  Well, can you
 6       limit it then by post-RICO, please?
 7                   MS. NEUMAN:  No.
 8       A         Repeat the question, please.
 9       Q         What were Mr. Donziger's
10    sources of income of which you were
11    aware?
12       A         You're asking post-RICO?
13       Q         No.  While you were working
14    with him.
15       A         At any time.  You know, I
16    don't know all of his financing, all of
17    his -- where his income came from.  I
18    didn't deal with that.  That wasn't what
19    I dealt with.  I dealt with paying bills,
20    putting documents together and going
21    through mail, and I would -- I would put
22    together that -- you know, these personal
23    bills need to be paid.  Occasionally, I
24    would cut checks and say you need to sign
25    these.  But I didn't deal with his
```

Page 124

```
 1                    JOSH RIZACK
 2    personal finances beyond that.
 3         Q        So you had a checkbook for
 4    one or more of Mr. Donziger's accounts?
 5         A        No.  He would give it to me.
 6    And I would literally -- here's your
 7    mortgage, here's your whatever bill that
 8    needs to be paid, AT&T.  And I might
 9    write out those bills for him.
10         Q        Were you aware of any of
11    Mr. Donziger's sources of income while
12    you were working with him?
13         A        No.  I mean there was, you
14    know, case money that came in that we
15    discussed.  But beyond that, I didn't
16    deal with his personal sources, whether
17    they were from him, his wife or whatever.
18         Q        On Exhibit 5314,
19    Plaintiff's, the firm Lenczner, Slaght,
20    Royce & Smith, paid the 488,000 in 2016,
21    are you aware of any other moneys coming
22    from that firm to Mr. Donziger?
23         A        No.
24         Q        Are you aware of any
25    payments going from Mr. Donziger to the
```

```
                                        Page 125

 1                    JOSH RIZACK

 2    Lenczner Firm?

 3         A        No.

 4         Q        Are you aware of any reason

 5    why the Lenczner Firm would be wiring

 6    money to Mr. Donziger?

 7         A        I can only make assumptions.

 8                  MR. DONZIGER:  Well, I would

 9         object.  If you know, answer.  If you

10         don't know, don't answer.

11         A        I can only speculate.

12         Q        Is it informed speculation?

13         A        No, it's not informed.

14                  MR. DONZIGER:  Objection.

15         Informed speculation, I never heard

16         of that one.  That's good, a good

17         one.  Informed speculation.  You mean

18         like based on something, some

19         information?

20         A        No.  I was not privy to the

21    wires going in and out.

22         Q        Are you aware of whether or

23    not this -- the money that came from the

24    Lenczner Firm originated with a funder

25    that bought an interest in the judgment?
```

```
 1                    JOSH RIZACK

 2       A        I don't know who deposited

 3   money where.  So, no, I wasn't privy to

 4   that.

 5       Q        Are you aware of

 6   Mr. Donziger controlling any bank

 7   accounts that weren't held in his name or

 8   the name of his law firm while you were

 9   working with him?

10       A        The only accounts I knew

11   about were the TD, the ones in his name

12   at TD Bank and Chase.

13       Q        So you weren't aware of any

14   accounts that he controlled, but they

15   were in the name of a different entity?

16       A        No.  I don't know, not

17   aware.

18       Q        I'll show you what was

19   marked as Plaintiff's Exhibit 5320 at

20   Mr. Donziger's deposition.

21       A        Okay.

22       Q        It's a summary of deposits

23   into Mr. Donziger's Chase accounts before

24   they were closed --

25       A        Okay.
```

```
                                      Page 127

 1                    JOSH RIZACK

 2       Q        -- based on his production

 3   of documents.

 4       A        Okay.

 5       Q        It shows 7.7 million in

 6   deposits --

 7       A        Okay.

 8       Q        -- through 2012.

 9       A        Okay.

10            MR. DONZIGER:  I'm going to

11       object.  First off, just a point of

12       clarification, is this a summary

13       prepared by Gibson, Dunn or by who?

14            MS. NEUMAN:  It's

15       Exhibit 5320 from your depo.

16            MR. DONZIGER:  Yeah.  I

17       don't have it in front of me.  Can

18       you just help me out, please?

19            MS. NEUMAN:  Yes.  It's a

20       summary of your documents that you

21       produced, Donziger's exhibits.  The

22       summary part's just math.

23            MR. DONZIGER:  It's the

24       summary you guys put together in your

25       law firm?
```

Page 128

                        JOSH RIZACK

1

2              MS. NEUMAN:  Just the cover

3        page is a summary.

4              MR. DONZIGER:  Who put the

5        summary together?

6              MS. NEUMAN:  We had the

7        summary prepared.

8              MR. DONZIGER:  Okay.  So it

9        was done from your law firm.  I mean

10       I would object for that reason.  And

11       it's also prior to the RICO judgment.

12       And it is not relevant to the issues

13       of the hearing tomorrow.

14        A        I could also say, I didn't

15     prepare this information.  And I don't

16     know who did.

17        Q        Is the 7.7 million going

18     into these accounts during this time

19     frame consistent with what you saw in

20     your work?

21        A        I mean I would have to

22     review -- review this information line by

23     line and do a comparison.

24              MR. DONZIGER:  Hold on.  I

25        would object because it assumes a

```
 1                    JOSH RIZACK
 2      fact that isn't in existence.  I mean
 3      this is a summary Gibson, Dunn
 4      prepared.  And he has not seen the
 5      underlying original documents that
 6      led you folks in your law firm to
 7      come up with these figures.  I think
 8      that's not an appropriate question.
 9      For that reason, I would object.  And
10      I would urge you to move on to your
11      next question.
12       Q      The accounts that you
13   reviewed documents for while you were
14   working with Mr. Donziger, did they
15   contain both his personal funds, as well
16   as case funds in the same account?
17       A      No.  I don't believe they
18   did.  I believe there was two different
19   accounts.
20       Q      So there weren't case
21   expenses paid from Mr. Donziger's
22   accounts, personal accounts?
23       A      Yes.  That wasn't your
24   question, though, or I didn't understand
25   that, your question.  You want to restate
```

```
                                            Page 130
 1                      JOSH RIZACK
 2    the question?
 3         Q         Which account -- when you
 4    said there was an account exclusively for
 5    the case, how was that account used?
 6         A         That account was used for
 7    incoming funds and to pay bills out of
 8    that account.
 9         Q         And that account was never
10    used to pay personal expenses?
11         A         Not that I recall.
12         Q         And moneys were never
13    transferred from that account to
14    Mr. Donziger's personal accounts?
15         A         No.  That's not what I said.
16         Q         Were moneys transferred from
17    that account to Mr. Donziger's personal
18    account?
19         A         If there was expenses being
20    reimbursed to Mr. Donziger, funds would
21    come out of that account into his
22    personal account.
23         Q         And would funds go back and
24    forth between the two accounts?
25         A         Possibly because often,
```

```
 1                    JOSH RIZACK
 2   there was money needed.  And Mr. Donziger
 3   would put money into accounts.  But I
 4   don't -- I would have to specifically
 5   look at a date and a time to comment on
 6   that accurately.
 7        Q        Have you seen any retainer
 8   agreement that Mr. Donziger has related
 9   to the Ecuador case, dated after the RICO
10   judgment?
11        A        Not that I recall.
12        Q        Pursuant to which he's
13   claiming a retainer, for example?
14        A        I don't recall.
15        Q        Have you ever -- I will
16   withdraw that.
17                 MS. NEUMAN:  We've been
18        going for another hour.  Let's take a
19        five-minute break.
20                 THE WITNESS:  Fine with me.
21                 MR. DONZIGER:  Do you have a
22        sense of how much longer it's going
23        to be at this point?
24                 MS. NEUMAN:  I don't think
25        too much longer.  But let's take a
```

```
 1                    JOSH RIZACK
 2      break.  And then we can see where we
 3      are.
 4               MR. DONZIGER:  So I'm going
 5      to hang up.  Call me back when we
 6      reconvene.
 7               THE VIDEOGRAPHER:  We're
 8      going off the record at 6:43 p.m.
 9      This marks the end of Media 2.
10               (A short recess was taken.)
11               THE VIDEOGRAPHER:  We're
12      back on the record at 6:57 p.m.  This
13      marks the beginning of Media 3, if I
14      could just have these two gentlemen
15      introduce themselves.
16               MR. STERN:  Herb Stern.
17               MR. SILVERSTEIN:  And Joel
18      Silverstein.
19               MS. NEUMAN:  I'm going to
20      hand the witness a document that we
21      marked as Plaintiff's Exhibit 5342.
22      It appears to be part of the Final
23      Steven Account '07 to 2016 Worksheet
24      Summary.
25               (The above-referred-to
```

```
                                    Page 133
 1                  JOSH RIZACK
 2       document was marked as Plaintiff's
 3       Exhibit 5342 for identification, as
 4       of this date.)
 5       Q        Is this a document you
 6   prepared, Mr. Rizack?
 7       A        Yes.
 8       Q        Do you know why there's no
 9   entries for 2012?
10       A        The information hadn't been
11   completed.  The analysis hadn't been
12   completed of the expenses.
13       Q        How about '08?
14       A        Yeah.  My guess is that
15   that -- similarly, that the expenses
16   weren't analyzed yet.
17       Q        Is the same true for '09?
18       A        Correct.
19       Q        And the '14 and the '15?
20       A        Correct.
21       Q        This would be a draft
22   document?
23       A        Correct.
24       Q        The top, there's three
25   numbers.  Do you see those?
```

Page 134

```
                                    JOSH RIZACK

 1
 2        A         Yes.
 3        Q         Can you tell me what those
 4   are?
 5        A         I don't recall.
 6        Q         What about the number that's
 7   over on the right-hand margin?  Looks
 8   like a stray number.
 9        A         I don't recall.  But, you
10   know, without quickly highlighting it,
11   could this be a total.
12        Q         But you don't know, as you
13   sit here today?
14        A         No.  I mean if I pull up the
15   worksheet, I could quickly figure it out
16   or if I got a calculator and added those
17   numbers and see if they added up to that
18   number.
19        Q         Oh.  The numbers in the row?
20        A         Yeah.  It looks like they
21   might add up to that.
22                  MS. NEUMAN:  I'm going to
23       mark a document bearing the Bates
24       numbers --
25        A         They did.  That's my guess,
```

```
                                         Page 135
 1                    JOSH RIZACK
 2    yeah.
 3                 MS. NEUMAN:  -- J Rizack 43
 4        through 44, the heading Total Case
 5        Expenditures by Entity.
 6                 (The above-referred-to
 7        document was marked as Plaintiff's
 8        Exhibit 5343 for identification, as
 9        of this date.)
10                 MS. NEUMAN:  5343.
11        Q        This is a document you
12    prepared, Mr. Rizack?
13        A        I believe so.
14        Q        And this is -- when you
15    organize the expenses into these
16    categories, is that something you did or
17    somebody else did?
18        A        No.  I believe I did.
19        Q        So you decided who went into
20    which category?
21        A        Yes.
22        Q        Have you ever for backup
23    compared the cost and fee claim that was
24    submitted in Ecuador in the Ecuador case
25    to the amount of expenses that you
```

Page 136

```
 1                     JOSH RIZACK
 2    charged to Ecuador Legal?
 3         A       No.
 4         Q       In your accountings, did you
 5    treat all the expenses shown on
 6    Exhibit 5343 as case expenses?
 7                 MR. DONZIGER:  I object to
 8         the form in this sense.  I think he
 9         testified he's not doing accounting.
10         He's doing compilations of expense
11         summaries.  I know that's kind of a
12         subtle distinction because that's
13         probably not what you mean.  Just to
14         be clear, these aren't accountings.
15         They're efforts to compile
16         expenditures and flows, that kind of
17         stuff.
18         Q       To clarify further, when you
19    testified you had a substantially
20    complete accounting, this document that
21    Mr. Rizack produced is not what you were
22    referring to?
23                 MR. DONZIGER:  I can't see
24         the document.  My apologies.  And I
25         know that's on me because I'm not
```

```
 1                    JOSH RIZACK
 2       physically there.  But generally,
 3       I've seen -- you know, obviously,
 4       I've seen his summary.  And if I --
 5       if I testify that it was accounting,
 6       I'm probably misusing the word a bit
 7       myself because it depends on how you
 8       define it, obviously.  These aren't
 9       like official accounting an
10       accountant would do.  The witness
11       testified he's not an accountant.  He
12       does have professional skill, though,
13       in this kind of work in terms of
14       numbers and, you know, trying to
15       reconcile accounts and all that
16       stuff.  But I just think we need to
17       be clear about what this is.  I don't
18       think it's an official accounting.
19               MS. NEUMAN:  Okay.  But when
20       you referred to a substantially
21       complete accounting, even if you
22       slightly misused the word, you were
23       referring to Mr. Rizack's work?
24               MR. DONZIGER:  That is not
25       my deposition.  But I will give you
```

Page 138

1              JOSH RIZACK

2       the courtesy of an answer.  Yes, I

3       was, and also Ms. Sullivan subsequent

4       to that.

5              MS. NEUMAN:  Oh.  Her work.

6       Sorry.  I was thinking about her

7       testimony.  And I was confused.

8              MR. DONZIGER:  Yes.

9              MS. NEUMAN:  I understand

10      what you're saying.

11             MR. DONZIGER:  Yeah.

12       Q       Mr. Rizack, are you aware of

13   any occasions on which post the RICO

14   judgment where there was funder money

15   that had been obtained but it was

16   directed into someone else's account for

17   the benefit of Mr. Donziger as opposed to

18   one of his TD accounts, say to his wife's

19   account, for example?  Anything like

20   that?

21       A       I don't know where the

22   money, post-funding, where it went to.

23       Q       Do you know how much it was?

24       A       No.

25       Q       Do you have any information

```
 1                    JOSH RIZACK
 2    on that?
 3                 MR. DONZIGER:  Correct me if
 4         I'm wrong, I think the witness
 5         testified he really wasn't involved
 6         in post-RICO inflows from investors.
 7         I know he was helping -- he testified
 8         he was helping --
 9                 MS. NEUMAN:  Mr. Donziger,
10         you can't really make speaking
11         objections.  They're giving the
12         impression you're trying to coach the
13         witness.
14                 MR. DONZIGER:  I withdraw
15         that.  But the objection is related
16         to the question being confusing, I
17         think.  So I'm just trying to help
18         but go ahead.
19                 MS. NEUMAN:  Can you read
20         the question back to the witness,
21         please?
22                 (The requested portion was
23         read back by the court reporter.)
24                 MS. NEUMAN:  The total
25         amount post-RICO.
```

1                    JOSH RIZACK

2        A        Yeah.  No.

3        Q        You said that there were

4   three or four successful fundings after

5   RICO.

6                 How do you know that?

7        A        I was told.

8        Q        By?

9        A        By Steven Donziger.

10       Q        And did you review any

11   documents related to those fundings,

12   funding agreements, deposits, anything?

13       A        I might have seen some of

14   that stuff and put it in folders.  But,

15   you know, I don't have any intimate

16   knowledge of them.

17       Q        And you have no

18   recollection, as you sit here today?

19       A        I know that there was.  But

20   I don't know amounts, people, that kind

21   of thing.

22       Q        And you don't even know the

23   range of amounts?

24       A        No.

25       Q        Have you ever deleted or

```
 1                    JOSH RIZACK
 2   disposed of any documents related to your
 3   work for Mr. Donziger?
 4        A        Have I ever deleted -- I
 5   mean not that -- not on purpose, not to
 6   hide anything, if that's what you're
 7   looking for.  Might I have gotten rid of
 8   a worksheet that was no longer used or
 9   something, that's possible.
10        Q        Can you recall specifically
11   whether you've deleted or disposed of any
12   documents related to your work on this
13   matter?
14        A        No.
15        Q        Has anyone ever asked you to
16   delete or destroy any documents related
17   to your work on this matter?
18        A        No.
19                 MS. NEUMAN:  Mr. Donziger,
20        setting aside the areas that we
21        didn't get into -- so we leave the
22        deposition open for that purpose --
23        do you have questions for the witness
24        at this time?
25                 MR. DONZIGER:  I'll ask a
```

Page 142

```
 1                       JOSH RIZACK
 2        couple of questions, if I may.
 3     EXAMINATION BY
 4     MR. DONZIGER:
 5        Q        Mr. Rizack, do you -- in the
 6     course of your work with me, did you ever
 7     observe me sell -- directly sell any of
 8     my contingency interest in the Ecuador
 9     litigation to any other entity or person?
10        A        Not that I'm aware of.
11                 MS. NEUMAN:  Objection;
12        lacks foundation.
13                 MR. DONZIGER:  You're
14        objecting to my question now?
15                 MS. NEUMAN:  Yes.  That's
16        how it works.
17                 MR. DONZIGER:  Okay.  Fair.
18        Fair enough.
19        Q        Mr. Rizack, did you ever see
20     me in any way misuse funds from the
21     Ecuador litigation -- scratch that.  Let
22     me rephrase.
23                 Did you ever see me take
24     funds from the Ecuador litigation and
25     misappropriate them to spend for other
```

```
 1                    JOSH RIZACK
 2    purposes?
 3         A       No.
 4         Q       Can you describe, briefly,
 5    the degree of organization of -- scratch
 6    that.
 7                  Can you describe efforts
 8    that I made to try to organize the
 9    accounting or for lack of a better word,
10    the use of funds on the Ecuador
11    litigation?
12         A       Yes.  The amounts that we
13    would put on the -- that I would put on
14    the spreadsheets, we would go through
15    detailed bills, invoices that were
16    produced by the various entities.  On
17    your expenses, you would submit by trip
18    your expenses, your credit card receipts,
19    your hotel receipts, your airline
20    receipts.  We would go through American
21    Express and your debit card to make sure
22    we weren't missing things and make sure
23    we had the backup for those expenses.
24    And then we would put those back up
25    together on a monthly basis with a
```

1                    JOSH RIZACK

2    spreadsheet with the receipts behind it.

3         Q        When I hired you to do

4    the -- the offer to lend the professional

5    services that you did, how would you

6    describe the state of organization of the

7    case funds when you began your work?

8         A        All the information was

9    available on bank statements.  Everything

10   was either a wire transfer or a check and

11   mostly wire transfers.  The bank

12   statements indicated where the money was

13   going, who it was going to.  And the

14   expenses were -- they were there.  But

15   they weren't put together.  And we --

16   myself -- and I don't recall the woman's

17   name who helped -- put it all together,

18   painstakingly put it together month by

19   month.  And we identified what was

20   missing and time periods that were

21   missing.  And we would go back to get

22   those credit card bills, so that they

23   would -- so they could be gone through in

24   detail and identified what the expenses

25   were for.  But you had asked that, you

```
                                    Page 145

 1                    JOSH RIZACK

 2   know -- that there'd be backup for all

 3   the expenses.

 4        Q        Is that the end of your

 5   answer?

 6        A        It is.

 7        Q        Couple of more quick

 8   questions.

 9                  In the meetings you

10   described to Ms. Neuman that you attended

11   with me with potential funders, did you

12   ever observe me trying to sell my own

13   interest to those funders?

14        A        No.

15        Q        In those meetings that you

16   described with potential funders, is it

17   correct that the interests that were

18   discussed to offer to potential investors

19   came directly from the case itself as

20   distinct from any individual's personal

21   interest?

22                  MS. NEUMAN:  Objection;

23      lacks foundation.

24        A        Yeah.  That's what I

25   understood.
```

1                    JOSH RIZACK

2        Q        Can you explain why there's

3    gaps in some of the years where you tried

4    to compile expense summaries?

5        A        'Cause we did not finish

6    going through numerous, numerous pages of

7    American Express bills and debit card

8    bills for you to finish identifying

9    expense by expense of what it was for,

10   who it was with and so forth.

11       Q        In your estimation, was the

12   reason that it wasn't fully completed a

13   function of lack of resources, i.e., time

14   or money to pay you for your services?

15       A        Yes, yes.  There was a lack

16   of funds to pay me or someone else to do

17   it.

18       Q        And it is true, is it not,

19   that you worked for a significant period

20   of time without compensation; correct?

21       A        Correct.

22                MR. DONZIGER:  I think

23      that's it on my end.

24   FURTHER EXAMINATION BY

25   MS. NEUMAN:

```
 1                    JOSH RIZACK
 2      Q        So the significant period of
 3   time that you worked without
 4   compensation, when was it by dates?
 5      A        I would have to go look back
 6   to find the dates from the last
 7   compensation to -- but it's been -- it's
 8   been a while.  And it was a huge gap
 9   where there wasn't funds to pay me.
10      Q        Well, you just testified,
11   though, that you weren't compensated for
12   a significant period of time.
13      A        Right.
14      Q        What period of time were you
15   thinking of when you testified it was
16   significant?
17      A        I would have to go back and
18   look at dates.  I don't recall off the
19   top of my head of the dates.
20      Q        Can you estimate?
21      A        No.
22      Q        What is the total amount you
23   have been compensated for your work on
24   the Ecuador matter, setting aside your
25   contingency fee interest in cash?
```

```
 1                    JOSH RIZACK
 2       A        Do you think I'm going to
 3   get something on that?  The -- I don't
 4   know.  I'd have to look.  I'd have to
 5   look what the total amount was.  I think
 6   it's indicated on here somewhere.
 7       Q        And did anybody approve your
 8   compensation other than Mr. Donziger that
 9   you're aware of?
10       A        I believe that he would send
11   to the group in Ecuador what was being
12   paid.
13       Q        What's the basis of that
14   belief?
15       A        That he would send -- that
16   he would send lists of what were being
17   paid every month.
18       Q        To who?
19       A        To the -- whoever was
20   managing -- whoever was part of the case
21   in Ecuador.  I don't recall.
22       Q        How do you know that?  Were
23   you copied on these?
24       A        I was in the room when he
25   would do that or go over it.
```

1                    JOSH RIZACK

2        Q        In what room?

3        A        I was with him, you know, in

4    his apartment.

5        Q        When he would send these

6    e-mails?

7        A        I don't know if he sent

8    e-mails, or he'd just go over it on the

9    phone.  But I know he would share this

10   information.  It was not just randomly

11   paying people.

12       Q        Well, previously, you said

13   he would send these summaries to them.

14                Did you mean he would send

15   them or he would just discuss them?

16       A        You're referring to that pie

17   chart we discussed?

18       Q        I don't know what you're

19   referring to.  You said that Mr. Donziger

20   would send the financial information to

21   Ecuador.

22       A        I think we were talking

23   about those pie charts, the summary of

24   information.  And I don't know if he sent

25   it, verbally, you know, in front of them,

Page 150

```
 1                    JOSH RIZACK
 2   presented that.
 3        Q       So you don't know, one way
 4   or the other?
 5        A       No.  I think you're talking
 6   about two different things.  I'm not
 7   sure.  You're not being clear to me.
 8        Q       Let me ask you a different
 9   question.
10        A       Okay.
11        Q       You said that in these
12   meetings with the funders --
13        A       Right.
14        Q       -- Mr. Donziger asked you
15   some questions about his interest in the
16   judgment; right?
17        A       I don't recall that.
18        Q       His contingent interest in
19   the judgment.
20        A       Are you talking -- these
21   questions he just asked me?
22        Q       Yes.
23                MR. DONZIGER:  Can I just
24      object?  I think he's confused.  What
25      exactly is your question?  Maybe you
```

JOSH RIZACK

1
2     could rephrase it because I don't
3     understand it myself.  I don't think
4     the witness does either.  Can you
5     please rephrase the question?
6        Q      Mr. Rizack, Mr. Donziger
7     asked you some questions about whether or
8     not he was selling his contingent
9     interest in the judgment to funders.  Do
10    you recall that?
11       A      Yes.
12       Q      When he used the word
13    funders, who did you understand him to be
14    referring to?
15       A      People who invest in the
16    case.
17       Q      Have you ever seen any
18    documents which gives Mr. Donziger a
19    contingent fee interest in the judgment?
20       A      Yes.
21       Q      What documents have you
22    seen?
23       A      I believe there was a
24    document of his early on in this case
25    where he was allocated shares.

```
                                       Page 152
1                        JOSH RIZACK
2          Q        And do you remember the
3    terms of that document?
4          A        No.  I don't recall the
5    details of it.
6          Q        Were you familiar with the
7    details of that document at the time you
8    were sitting in these funder meetings?
9          A        I was aware of it.
10         Q        Anything beyond just being
11   aware of it?
12         A        No.
13         Q        Do you recall the name of
14   the document?
15         A        No.
16         Q        Now, what were the
17   particulars that you can remember of the
18   pitch to these funders in terms of making
19   investments and what they were being
20   offered in return?
21                  MR. DONZIGER:  I'm going to
22        object.
23                  MS. NEUMAN:  You solicited
24        this from him about what they were
25        and weren't being offered at the
```

```
 1                      JOSH RIZACK
 2      meetings.  You can't now object.
 3              MR. DONZIGER:  Andrea, with
 4      all due respect, it's different;
 5      okay?  That is the precise issue or
 6      one of the precise issues in play for
 7      the hearing tomorrow that the
 8      deposition is about.  To do a general
 9      fishing expedition to find out what
10      we talked about, all the terms, you
11      already have way too much
12      information, in my view, given the
13      various constitutional issues.
14              MS. NEUMAN:  You had him
15      testify about terms.  So I'm going to
16      question him about terms.  Simple as
17      that.  Can you read the question back
18      to the witness?
19              (The requested portion was
20      read back by the court reporter.)
21              MR. DONZIGER:  Objection.
22      Q       You can answer the question.
23      A       They were -- from what I was
24   aware, they were being offered, you know,
25   points in the case that were being made
```

```
 1                 JOSH RIZACK
 2   available from the group in Ecuador.
 3        Q        What was the basis for that
 4   understanding?
 5        A        What was being spoken.
 6        Q        Did you see any documents
 7   related to that?
 8        A        No.  No.  I take that back.
 9   I believe there might have been -- no.  I
10   believe there was -- I'm not 100 percent
11   sure.  But I believe there was, you know,
12   authorization from people in Ecuador,
13   that there were shares available, making
14   shares available.
15        Q        When you say shares, what
16   does that mean?
17        A        Or a percentage interest in
18   the case.
19        Q        Is your belief that they're
20   a percentage interest in the case
21   available for sell based on anything
22   other than your conversations with
23   Mr. Donziger?
24        A        I can't -- I don't recall.
25   I believe there was a document.  I'm not
```

1                    JOSH RIZACK

2     sure because I don't have -- I don't have

3     the documents anymore.

4          Q        What did this document talk

5     about?

6          A        You know what, I don't

7     remember the details, honestly.

8          Q        What do you remember about

9     it?

10         A        I just -- I just remember

11    that there was -- you know, these

12    documents were all in those boxes.  So I

13    assume you have the documents.

14         Q        How do you know in these

15    meetings whose interest in the judgment

16    Mr. Donziger was and wasn't trying to

17    sell?

18         A        Just from conversations that

19    shares were being made from -- interest

20    in the case was being made available from

21    the Ecuadorians.

22         Q        And was it referred to as

23    the Ecuadorians or was there some

24    particular name for these people?

25         A        There was.  But I don't

Page 156

1                       JOSH RIZACK

2    recall the exact name of which group.

3         Q         On this issue of this

4    vetting of expenses that you included on

5    statements, did you interview anyone else

6    to verify expenses other than

7    Mr. Donziger?

8         A         No.

9         Q         So if Mr. Donziger said I

10   had dinner with Ms. Neuman and it related

11   to the case and here's where we ate --

12        A         There's no reason for an

13   audit to be conducted.  I wasn't asked to

14   do an audit.

15        Q         When you would get -- make

16   payments to Mr. Yanza, for example, how

17   would you know how much was due to be

18   paid to him or would you just pay what

19   Mr. Donziger instructed you to pay?

20        A         Well, first of all, I never

21   executed the payments.  So I didn't -- I

22   didn't have access to send out wires.  I

23   would just, you know, put down the

24   entries.  And there was -- there was

25   usually receipts or invoices that were

```
 1                    JOSH RIZACK
 2   being paid off of.  There was invoices,
 3   backups supplied by the people who were
 4   being paid.
 5         Q        So you have invoices from
 6   Mr. Yanza?
 7         A        I don't have them.
 8         Q        But you believe you did have
 9   them?
10         A        I believe at the time, there
11   was documents -- that there was receipts
12   that were put in all those boxes with all
13   the, you know, expenses paid.
14         Q        Did Mr. Donziger in his
15   quest to account for the case funds
16   discuss with you why he didn't hire an
17   accountant to do the accounting that
18   would comply with GAAP?
19         A        I don't think there was a
20   requirement to have GAAP reporting.
21         Q        Did he discuss with you,
22   though, why he didn't hire an accountant?
23                    MR. DONZIGER:  Objection.
24      Let's move on.  I got a couple of
25      more questions.  Do you have more
```

```
                                      Page 158
 1                    JOSH RIZACK
 2      questions, Andrea?
 3                 MS. NEUMAN:  Yes.  I'm still
 4      questioning the witness.
 5       Q        Mr. Rizack, in these funder
 6    meetings in which you participated, were
 7    the funders being offered a percentage of
 8    the whole judgment or some portion of it?
 9       A        They were being offered a
10    percentage of recovered funds.
11       Q        Whatever that recovery might
12    be?
13       A        Correct.
14       Q        And were there any
15    discussions of whether any funders had a
16    right to prioritize, in other words,
17    would get money off the top?
18                 MR. DONZIGER:  Objection.
19       A        There might have been
20    discussions.  I don't know.
21                 MR. DONZIGER:  That feels
22      like internal business.  And there's
23      no need to answer that question.  The
24      witness has testified that money was
25      being raised based on shares or,
```

Page 159

```
 1                    JOSH RIZACK
 2      whatever, interest in the judgment
 3      offered by the Ecuadorian clients.
 4       Q       Were there priorities given
 5    that you're aware of?
 6              MR. DONZIGER:  Objection,
 7      objection.  Look, that is part of
 8      your fishing expedition.  We have a
 9      hearing tomorrow -- okay? -- on the
10      Elliot meeting.
11              MS. NEUMAN:  Mr. Donziger,
12      you asked questions that had nothing
13      to do with the Elliot meeting.
14              MR. DONZIGER:  Well, that's
15      only because I needed to clean up
16      questions that you asked that had
17      nothing to do with the Elliot
18      meeting.  You've asked --
19       Q       Mr. Rizack, was anybody
20    offered an investment on a priority
21    basis?
22       A       Was anybody given a
23    priority; is that what you're saying?  I
24    don't remember.  I mean I'd have to look
25    at the -- I don't have the final
```

1                    JOSH RIZACK

2    agreements that people had.

3         Q        Did the boxes of documents

4    that you had, that Ms. Sullivan came and

5    collected include funder agreements?

6         A        Some.

7         Q        Post-RICO funder agreements?

8         A        I'm not sure.  If I had

9    them, they were in there.

10        Q        In the boxes?

11        A        Everything I had was put

12   into those boxes.

13                  MS. NEUMAN:  No further

14       questions of the witness.

15                  MR. DONZIGER:  I'm going to

16       have a couple more, if you can just

17       bear with me.

18    FURTHER EXAMINATION BY

19    MR. DONZIGER:

20        Q        Mr. Rizack, did you ever

21   travel to Ecuador with me?

22        A        Yes.

23        Q        Do you remember what dates

24   you traveled there with me?

25        A        No.

Page 161

1                    JOSH RIZACK

2       Q        Approximately?

3       A        No.  I would have to check

4    my records.

5       Q        Do you remember how many

6    times you traveled to Ecuador with me?

7       A        I believe it was twice.  No.

8    I think it was once.

9       Q        And on that meeting, do you

10   remember meeting the client

11   representatives of the FDA in Quito with

12   me?

13      A        Yes.

14      Q        Can you describe -- during

15   that meeting, I presented summaries of

16   expenditures to the client

17   representatives in your presence?

18      A        Yes.

19      Q        And did you observe the

20   client representatives ask me and you

21   questions about those summaries?

22      A        Yes.

23      Q        And did you observe me

24   making efforts or answering the questions

25   that were being posed?

```
                                          Page 162

 1                      JOSH RIZACK

 2         A       Yes.

 3         Q       Do you remember the names of

 4   the people who were client

 5   representatives who were in that meeting

 6   by chance?

 7         A       No.

 8         Q       And how would you -- based

 9   on your observations at that meeting, how

10   would you describe my relationship as a

11   lawyer to the client representatives?

12                 MS. NEUMAN:  Objection;

13      lacks foundation, calls for

14      speculation.

15                 MR. DONZIGER:  I'll withdraw

16      the question.  That's all I have.

17    FURTHER EXAMINATION BY

18    MS. NEUMAN:

19         Q       Mr. Rizack, when and where

20   was this meeting?

21         A       In Quito, Ecuador.

22         Q       What year, what day?

23         A       Honestly, I don't remember.

24         Q       And you didn't know any of

25   these people's names?
```

```
 1                    JOSH RIZACK
 2       A         No.  I don't remember them
 3   off -- I'd have to look at my notes.
 4       Q         And your understanding of
 5   their involvement in the case was what
 6   Mr. Donziger told you?
 7       A         Correct.
 8       Q         Do you speak Spanish?
 9       A         No.
10       Q         Was Mr. Donziger speaking
11   Spanish?
12       A         Spanish and English.
13       Q         When he went over the
14   accountings, was he speaking Spanish or
15   English?
16       A         Both.
17       Q         When he was speaking
18   Spanish, could you understand what he was
19   saying?
20       A         No.  But there was somebody
21   always there telling me, translating.
22       Q         Whose name you don't know?
23       A         No.  One of the attorneys in
24   Ecuador would translate.
25       Q         Were the other people in the
```

```
 1                    JOSH RIZACK
 2   meeting speaking Spanish or English?
 3        A         Some spoke Spanish, some
 4   spoke English.
 5        Q         Were most of the questions
 6   in Spanish or English?
 7        A         Depends.  Some of the people
 8   spoke English.  And they would ask in
 9   English.  And some only spoke Spanish.
10   So some were only asked in Spanish.
11        Q         How many people were present
12   at this meeting?
13        A         I think there was -- I
14   believe there was seven or eight people
15   in the meeting.
16        Q         Were there other Americans
17   in the meeting?
18        A         No.  I don't believe so.
19        Q         Was Mr. Yanza at the
20   meeting?
21        A         I don't recall.
22        Q         Do you have any notes from
23   this trip?
24        A         I would have to look.  I
25   don't know.
```

Page 165

JOSH RIZACK

1

2       Q        A meeting that was held in

3    Ecuador --

4               MS. NEUMAN:  Which we have

5         minutes, Mr. Donziger.

6       Q        -- according to the minutes,

7    represented that there had been a

8    $25 million investment in the case by

9    Russ DeLeon.

10              MR. DONZIGER:  Can you

11        please lay a foundation and show him

12        the document?  You can't just ask a

13        question like that.  There's no

14        foundation.

15      Q        Can you answer the question,

16    please, sir?

17      A        What was the question?

18              MS. NEUMAN:  Can you read

19        the question back to the witness?

20              (The requested portion was

21        read back by the court reporter.)

22      A        I believe so.

23      Q        That was the same meeting?

24      A        I believe -- I believe so.

25      Q        And do your non-accounting

```
 1                     JOSH RIZACK
 2    financial statements --
 3                  MR. DONZIGER:  Hold on, hold
 4          on, hold on.  Objection.
 5       Q          -- reflect the 25 million?
 6                  MR. DONZIGER:  No, no.
 7          There's confusion right now.
 8                  MS. NEUMAN:  Mr. Donziger,
 9          do not give speaking objections and
10          attempt to coach the witness again.
11          If you have an objection, you can
12          state it in just a word, objection,
13          privilege.
14                  MR. DONZIGER:  Look, I'm
15          objecting.  And this is the grounds
16          of my objection.  The document you
17          just asked him about -- because I saw
18          it yesterday -- it was an UDAPT
19          document.  It was not an FDA
20          document.
21                  MS. NEUMAN:  I didn't
22          represent to him anything about the
23          nature of the organization.
24                  MR. DONZIGER:  He cannot
25          opine on a meeting, what meeting it
```

Page 167

```
1                  JOSH RIZACK
2        was without seeing the document.  So
3        why don't you present the document,
4        let him read it.  And that was an
5        extensive document that describes all
6        sorts of stuff.
7                  MS. NEUMAN:  Mr. Donziger,
8        enough with the speaking objections.
9         Q      Those aren't organizations
10   you mentioned today, Mr. Rizack?
11        A      No.
12        Q      I'm going to hand you a
13   document that's been previously marked as
14   Plaintiff's Exhibit 7033A, turn your
15   attention to page 3 where there's the
16   following statement.  It's attributed to
17   Mr. Donziger.  Last sentence of the first
18   full paragraph.
19        A      Last full sentence of the
20   first full?
21        Q      Yes.
22                "We are preparing an
23   analysis of the specifics on how the
24   25 million contributed by Russ DeLeon was
25   spent.  He has the money.  And we have
```

```
 1                    JOSH RIZACK
 2   survived thanks to him.  The failures and
 3   handling of the money up north is a
 4   failure for which I take responsibility."
 5   Do you see that?
 6        A       Yes.
 7        Q       Were you at a meeting where
 8   Mr. Donziger made such a speech?
 9        A       I can't tell from reading
10   that, those two lines.
11        Q       Do you remember a speech
12   where Mr. Donziger talked about the
13   $25 million contributed by Russ DeLeon?
14        A       I recall him speaking of
15   that.  But I don't know if this was the
16   meeting I was in.
17        Q       And to the best of your
18   recollection, do your expense and
19   disbursement statements reflect the
20   $25 million investment by Mr. DeLeon as
21   incoming?
22        A       Yes.
23        Q       That entire amount is
24   reflected?
25        A       I don't know which -- I mean
```

Page 169

```
 1                    JOSH RIZACK
 2   we looked at that whole amount and, you
 3   know, listed out where all that money
 4   went.  I don't know which document you're
 5   referring that did that.
 6        Q        I'll show you a document
 7   that's been marked as Plaintiff's
 8   Exhibit 5315.  It's a letter from
 9   Mr. Fajardo to the president of the
10   Amazon Defense Front.  Are you familiar
11   with Mr. Fajardo?
12        A        Yeah.  I heard his name.
13        Q        Have you met him?
14        A        Yes.
15        Q        What is his role in the case
16   as you understand it?
17        A        That he was -- I think he
18   was one of the attorneys involved.
19        Q        So in paragraph B on page 1
20   of Exhibit 5315, Mr. Fajardo writes, "On
21   January 19th, 2016, Mr. Luis Yanza and
22   Mr. Steven Donziger signed a contract for
23   the management of financial resources on
24   behalf of the FDA and the plaintiffs.
25   This is extremely serious since neither
```

```
                                          Page 170

 1                    JOSH RIZACK

 2     of these two persons represent the

 3     plaintiffs.  Since the filing of the case

 4     in Ecuador, Mr. Donziger has not been the

 5     plaintiff's attorney.  Therefore, he does

 6     not represent any of the plaintiffs.

 7     Mr. Yanza also does not represent any of

 8     the plaintiffs."  Do you see that?

 9          A      Yes.

10          Q      Have you ever seen this

11     document before, Exhibit 5315?

12          A      No, not that I'm aware of.

13          Q      Are you familiar with a

14     document that Mr. Donziger and Mr. Yanza

15     signed about the financial resources of

16     the case in January of 2016?

17          A      I'd have to look at the

18     document.

19          Q      Well, this is just a letter

20     from Mr. Fajardo describing such a

21     document.

22                 Does that document ring any

23     bells with you?

24          A      I'm not sure which document

25     they're referring to.
```

```
 1              JOSH RIZACK
 2      Q       In paragraph C, Mr. Fajardo
 3   goes on to say, "Subsequently, at least
 4   two more documents have been signed,
 5   supposedly to finance the plaintiff's
 6   case in Canada, the last of which was at
 7   the beginning of July 2016."  Do you see
 8   that?
 9      A       Yes.
10      Q       Are you familiar with any
11   documents signed supposedly to finance
12   the plaintiff's case in Canada?
13      A       I know there was investors
14   documents.  But I don't know specifically
15   what they're referring to here.
16      Q       And were there investor
17   documents that you had in the boxes that
18   specifically related to funding the
19   Canadian action?
20      A       I believe there were
21   documents.
22              MS. NEUMAN:  I'm going to
23       show the witness Plaintiff's
24       Exhibit 5316.
25      Q       It's in the declaration of
```

Page 172

```
 1                    JOSH RIZACK

 2    the effected nationalities in the

 3    Province of Sucumbios.

 4              MR. DONZIGER:  Andrea, I'm

 5         going to object.  Respectfully, you

 6         said you were done.  You're now well

 7         beyond the stuff I asked about.  This

 8         witness obviously did a very sort of

 9         narrow specific expense compilation.

10         He said he went to Ecuador one time.

11         Come on.

12              MS. NEUMAN:  Mr. Donziger,

13         I'm going to finish my questions.

14         Q     Mr. Rizack, do you have

15    Plaintiff's Exhibit 5316 in front of you,

16    sir?

17         A     I do.

18         Q     Can you turn to the second

19    page for me?

20         A     Yes.

21         Q     In the first-full paragraph,

22    it says, "Mr. Donziger, Mr. Luis Yanza

23    and in recent years, Mr. Pablo Fajardo

24    have administered and managed money owned

25    by the plaintiffs.  Consequently on
```

```
 1                   JOSH RIZACK
 2   January 29th, 2016, the UDAPT convened at
 3   a general meeting, issued a resolution to
 4   ask Mr. Donziger, Mr. Yanza and Mr.
 5   Fajardo to provide an accounting, in
 6   other words, to provide the UDAPT with
 7   detailed information about all the money
 8   they had managed that belonged to the
 9   UDAPT.  To date, only Mr. Fajardo has
10   provided that information.  Mr. Steve
11   Donziger and Mr. Luis Yanza have failed
12   to do that."  Do you see that?
13        A       I see it.
14        Q       Were you ever asked to
15   provide an accounting to the UDAPT by
16   Mr. Donziger?
17        A       I provided financial
18   information.  I don't know to who it went
19   to.
20        Q       Further down in
21   Exhibit 5316, have you seen this document
22   before?  This is something that
23   Mr. Donziger provided to you.
24        A       I don't recall seeing this.
25        Q       Under the heading Declare
```

1               JOSH RIZACK

2    the Following in paragraph 3, it says,

3    "We demand that within two months

4    starting August of this year, Mr. Luis

5    Yanza and Mr. Steve Donziger submit a

6    detailed report, accounting all the money

7    they had managed on behalf of the people

8    affected or the plaintiffs in the case

9    that our people have against Chevron."

10   Do you see that?

11        A       Which number was that?

12        Q       Paragraph 3.

13        A       Okay.

14        Q       Under Declare the Following.

15        A       Mm-hmm.

16        Q       Were you at or about the

17   time of this document requested to

18   prepare the accounting being demanded in

19   paragraph 3?

20        A       I don't recall if it was

21   related to this or not since I'm not

22   aware of this document.

23             MS. NEUMAN:   I don't have

24      any further questions of Mr. Rizack

25      at this time, leaving his deposition

```
 1                    JOSH RIZACK
 2        for the areas in which he was -- of
 3        Mr. Donziger's objections.
 4                  Mr. Donziger, do you have
 5        any further questions for the
 6        witness?
 7                  MR. DONZIGER:  I'm done.
 8                  MS. NEUMAN:  We're going to
 9        go off the record.
10     (Continued on the following page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 176

1

2              THE COURT REPORTER:  Are you

3      going to be ordering a copy of the

4      transcript?

5              MR. DONZIGER:  I don't know.

6              THE VIDEOGRAPHER:  This

7      concludes the testimony of Josh

8      Rizack.  We're going off the record

9      at 7:41 p.m.  This also concludes

10     Media 3.

11              (Time noted:  7:41 p.m.)

12

13          _____

                JOSH RIZACK

14

15

16     Subscribed and sworn to

17     before me on this _____day

18     of _____, 2018.

19

     _____

20              NOTARY PUBLIC

21

22

23

24

25

Page 177

I N D E X

E X A M I N A T I O N

EXAMINATION   FURTHER EXAMINATION
Ms. Neuman              6   146, 162
Mr. Donziger          142   160

E X H I B I T S

Plaintiff's                   Description        Page
Plaintiff's Exhibit 5324 Subpoena               23
Plaintiff's Exhibit 5325 Responses              24
Plaintiff's Exhibit 5326 E-mail                 27
Plaintiff's Exhibit 5327 What If                30
                         Scenario

Plaintiff's Exhibit 5328 What if                34
                         Scenario
Plaintiff's Exhibit 5329 Same                   39
                         printout of
                         Exhibit 5327
Plaintiff's Exhibit 5330 What if                40
                         Scenario

Plaintiff's Exhibit 5331 E-mail                 42

Plaintiff's Exhibit 5332 Document               45
                         entitled
                         Historic
                         Payments

```
 1
 2                      INDEX (Cont.)
 3
 4   Plaintiff's Exhibit 5334 Funds put        50
                             into Steven
 5                           Donziger's
                             Attorney
 6                           Escrow Account
 7   Plaintiff's Exhibit 5335 Various          65
                             buckets of
 8                           expenses
 9   Plaintiff's Exhibit 5336 AP as of         78
                             3-1-12
10
     Plaintiff's Exhibit 5337 Summary of       84
11                           debit card
                             transactions
12
     Plaintiff's Exhibit 5338 Worksheet        87
13                           summary
14   Plaintiff's Exhibit 5339 Summary of       92
                             a 2010 to 2011
15                           attorney set
                             of bank
16                           accounts
17   Plaintiff's Exhibit 5340 Document         95
                             entitled TD
18                           Bank Debit
                             Card Purchases
19
     Plaintiff's Exhibit 5341 Folio           109
20
     Plaintiff's Exhibit 5342 Worksheet       133
21                           summary
22   Plaintiff's Exhibit 5343 Total Case      135
                             Expenditures
23                           by Entity
                             2007-2013
24
25
```

Page 179

1

2                    C E R T I F I C A T I O N

3

4

5         I, ANTHONY GIARRO, a Shorthand

6    Reporter and a Notary Public, do hereby

7    certify that the foregoing witness, JOSH

8    RIZACK, was duly sworn on the date

9    indicated, and that the foregoing, to the

10   best of my ability, is a true and accurate

11   transcription of my stenographic notes.

12        I further certify that I am not

13   employed by nor related to any party to

14   this action.

15

16

17

                     _____

18                   ANTHONY GIARRO

19

20

21

22

23

24

25

Page 180

```
 1
 2                          ERRATA SHEET
              VERITEXT/NEW YORK REPORTING, LLC
 3                      1-800-727-6396
 4      330 Old Country Road     1250 Broadway
        Mineola, NY 11501        New York, New York
 5      10001
 6      NAME OF CASE:  Chevron versus Donziger, et
        al.
 7      DATE OF DEPOSITION: June 27, 2018
        NAME OF DEPONENT:   Josh Rizack
 8
 9      PAGE LINE (S)  CHANGE           REASON
        ____|_____|_____|_____
10
        ____|_____|_____|_____
11
        ____|_____|_____|_____
12
        ____|_____|_____|_____
13
        ____|_____|_____|_____
14
        ____|_____|_____|_____
15
        ____|_____|_____|_____
16
        ____|_____|_____|_____
17
        ____|_____|_____|_____
18
        ____|_____|_____|_____
19
        ____|_____|_____|_____
20
        ____|_____|_____|_____
21
                      _____
22                    JOSH RIZACK
23
        SUBSCRIBED AND SWORN TO BEFORE ME
24      THIS ____ DAY OF _____, 2018.
        _____  _____
25        (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```

**[& - 488,000]**                                                                 Page 1

| **&** |
| --- |

**&**   1:15 2:4,10 4:25
11:7,9 62:17 71:6
124:20

| **0** |
| --- |

**0.25**   36:14,16
37:22
**0.4**   37:3
**0.5**   37:2
**0.8**   36:14,17,19,21
37:2
**0691**   1:3 4:23
**07**   63:4 91:25
95:18 132:23
**07932**   2:12
**08**   63:4 133:13
**09**   133:17

| **1** |
| --- |

**1**   4:16 41:11,12
70:19 76:25
169:19
**1,000**   59:5,9
**1,482,772.3**   51:16
**1,482,777**   88:10
**1,750,000**   93:25
94:2
**1,800,000**   93:9
**1,803,708.12**   93:11
**1-800-727-6396**
180:3
**1.1**   68:2
**1.5**   41:2 68:24
69:13,19
**1/8th**   76:25
**10**   32:7,9 37:17,23
41:3,12
**100**   20:6 154:10
**100,000**   36:11,22
37:16

**10001**   180:5
**10025**   2:17
**10166**   1:17 2:5
**104th**   2:17
**109**   178:19
**10th**   110:5
**11**   1:3 4:23
**110**   2:11
**11501**   180:4
**11th**   57:8
**12,878**   61:8
**1250**   180:4
**133**   178:20
**135**   178:22
**14**   133:19
**142**   177:7
**146**   177:7
**15**   13:21 133:19
**150**   85:13
**150,000**   41:4
**160**   177:7
**162**   177:7
**18**   45:19
**19**   45:20
**1966**   9:25
**1988**   10:12,14 11:4
11:15
**1991**   11:24
**1992**   11:24
**19th**   81:21 82:11
169:21

| **2** |
| --- |

**2**   36:13,24,24
70:23 109:21
132:9
**2.5**   32:7
**2/2/17**   92:12 95:19
**20**   13:22 36:12,22
84:6
**200**   1:16 2:5 5:2
59:5

**2007**   44:21 45:9
47:5 53:22 62:20
115:23 116:11
**2007-2013**   178:23
**2010**   61:7 178:14
**2011**   53:22 55:9
58:6 61:8 178:14
**2012**   16:25 81:21
82:11 87:19 127:8
133:9
**2013**   47:6 87:8
**2014**   53:15 71:16
82:9 102:14,15
**2015**   110:5
**2016**   44:22 45:9
87:8 91:25 95:18
110:22 113:21
114:15 115:23,25
116:11 124:20
132:23 169:21
170:16 171:7
173:2
**2017**   43:9 102:10
107:20 108:4
**2018**   1:11 4:5
27:17 42:19
176:18 180:7,24
**20th**   42:19
**21st**   27:16,24
**2217**   92:7
**225,000**   88:20
**2265**   110:24
113:21
**23**   177:12
**24**   177:13
**245**   2:17
**25**   62:20 165:8
166:5 167:24
168:13,20
**250**   32:12

**256**   109:13
**25th**   110:22
113:11,21
**27**   1:11 177:14
180:7
**27th**   4:4
**28**   50:17
**29th**   173:2
**2nd**   107:19

| **3** |
| --- |

**3**   40:14 85:23
132:13 167:15
174:2,12,19
176:10
**3-1-12**   178:9
**3.33**   41:13
**30**   62:21 177:15
**30,577**   58:5
**300,000**   41:13
**325**   2:11
**330**   180:4
**334**   61:4
**34**   177:16
**35**   62:22
**35,000**   89:2 90:10
**37**   65:8
**380,000**   88:21
**39**   177:18
**3rd**   47:5,6

| **4** |
| --- |

**4**   106:10
**4,834,486.18**   47:5
**40**   177:20
**42**   177:21
**43**   135:3
**44**   135:4
**45**   85:13 177:22
**45,000**   85:5 106:14
**488,000**   124:20

**488,450** 115:5,12
**4:13** 1:11 4:4
**4th** 82:9

**5**

**5** 31:7
**50** 32:14 178:4
**50,000** 110:23
  113:20
**502** 8:25 9:4
**52** 78:19 81:18
  85:13
**5314** 110:15
  124:18
**5315** 169:8,20
  170:11
**5316** 171:24
  172:15 173:21
**5320** 126:19
  127:15
**5324** 23:11,17
  177:12
**5325** 24:3,8,11
  177:13
**5326** 27:16,21 28:3
  177:14
**5327** 30:10,15 31:6
  33:4 35:2 36:6
  39:13 177:15,19
**5328** 34:9,13,22
  35:6 177:16
**5329** 38:24 39:4
  177:18
**5330** 39:20,25
  41:18 177:20
**5331** 42:10,14
  43:19,21 177:21
**5332** 45:18,23
  48:18,25 49:3,4
  177:22
**5333** 48:15,19

**5334** 50:15,20
  51:19 54:15 178:4
**5335** 65:2,5 67:24
  178:7
**5336** 78:18,22,25
  81:14 178:9
**5337** 84:12,17 87:2
  178:10
**5338** 87:15,22
  178:12
**5339** 91:23 92:4
  178:14
**5340** 95:12,15
  106:8 109:2
  178:17
**5341** 109:11,16
  178:19
**5342** 132:21 133:3
  178:20
**5343** 135:8,10
  136:6 178:22
**5:28** 70:18
**5:39** 70:22

**6**

**6** 177:7
**64** 107:17
**65** 178:7
**6:43** 132:8
**6:57** 132:12

**7**

**7.7** 127:5 128:17
**70** 34:23
**7033a** 167:14
**77** 24:12
**78** 178:9
**7:41** 176:9,11
**7d** 2:17

**8**

**8,911** 61:7
**84** 178:10
**87** 178:12

**9**

**92** 178:14
**93,000** 55:9
**95** 178:17
**992** 2:11

**a**

**aaron** 107:4,7
**ability** 179:10
**able** 58:6 116:18
**absence** 39:8
**absent** 72:22
**access** 21:12
  156:22
**account** 25:5
  29:23 44:21 45:9
  49:16,23 50:3,9,12
  51:4,20,22,25 52:2
  52:3,5,9 61:21
  62:4,9 69:12 86:5
  87:18 88:14,16
  90:7 92:15,15,19
  92:23 93:16 95:18
  96:3 101:16,19
  103:12 110:23,24
  113:22 114:10
  115:20 129:16
  130:3,4,5,6,8,9,13
  130:17,18,21,22
  132:23 138:16,19
  157:15 178:6
**accountant** 10:17
  10:18 14:19
  137:10,11 157:17
  157:22
**accounting** 15:8
  91:24 115:12,19

116:11 136:9,20
  137:5,9,18,21
  143:9 157:17
  165:25 173:5,15
  174:6,18
**accountings** 14:25
  15:4 55:19 101:25
  122:23 136:4,14
  163:14
**accounts** 21:13
  47:12 49:17 52:18
  63:16,21 88:7
  93:2,6 100:9
  101:4 102:4,25
  124:4 126:7,10,14
  126:23 128:18
  129:12,19,22,22
  130:14,24 131:3
  137:15 138:18
  178:16
**accurate** 28:18
  43:16 55:5 56:2
  64:8 87:7 179:10
**accurately** 131:6
**achieve** 35:10
**acknowledged**
  113:9
**action** 5:9 171:19
  179:14
**activity** 52:19
  53:13 54:7
**actual** 86:15
  114:17
**add** 41:21 134:21
**added** 55:6 134:16
  134:17
**adding** 116:15
**addition** 78:3,4
**additional** 100:8
**additionally** 29:21
  45:14

administer 5:8
administered 172:24
administrative 7:23
advice 99:11,22 119:8
advise 99:14,15
advocacy 36:4 75:5
affiliations 5:15
afield 53:24 112:23
afternoon 4:3 6:16
ago 12:5 13:17,22 13:22 14:6,6 50:13 54:3 67:9,9 96:25
agree 4:14 9:16 90:18 113:2 118:21 122:14
agreed 3:4,9,13 76:16
agreeing 122:18
agreement 19:9,13 62:25 64:3,16,18 76:2,9,13,22 79:2 79:7,19 80:3,10,15 81:4 83:11,15 99:18 131:8
agreements 140:12 160:2,5,7
agrio 115:4
ahead 57:15 87:13 91:20 139:18
air 54:16
airfare 55:9
airline 143:19
al 1:8 4:20 180:6
alejandro 2:7 5:19 121:14

allegation 72:4
allocated 151:25
allow 99:21
amazon 108:7 169:10
amazonia 34:4 85:2,7 106:14
amendment 7:13 7:15 35:25 46:19 54:10 111:16,21
american 21:2 29:22 54:21 56:10 116:5 143:20 146:7
americans 164:16
amex 21:7
amount 30:20 31:9,22,23,24 36:6 36:7 37:9,11 40:10,11 41:3 57:22 63:25 64:8 64:9 90:20 135:25 139:25 147:22 148:5 168:23 169:2
amounts 32:25 37:6,22 38:3 47:24 49:9 54:15 54:18 58:3 59:13 65:19 82:10 140:20,23 143:12
analysis 133:11 167:23
analyzed 34:2,5 133:16
andrea 2:6 5:16 34:18 52:13 66:12 72:13 83:17 90:17 99:17 100:20 153:3 158:2 172:4

andres 2:22 5:22
anne 2:7 71:2
answer 41:21 57:17 59:23 66:17 66:21 72:12,20 82:5 89:22 100:13 111:5,23,25 114:21 118:16 119:10 120:6,8,16 120:17 125:9,10 138:2 145:5 153:22 158:23 165:15
answered 79:10 118:14
answering 161:24
answers 111:10
anthony 1:17 5:6 179:5,18
anticipate 12:23
anticipating 12:21
anybody 17:10 19:14 76:3 83:13 148:7 159:19,22
anymore 155:3
anyway 57:14 112:18
ap 178:9
apartment 149:4
apologies 107:18 136:24
apologize 53:10 83:18
appearances 5:14
appears 42:16 43:22 109:22 110:4 132:22
appellate 8:12 112:18
apply 7:6

appropriate 13:20 58:24 59:19,20,23 60:4 108:18,21 129:8
approve 148:7
approximately 14:5 161:2
april 113:11
area 54:2
areas 120:18 141:20 175:2
aside 102:22 141:20 147:24
asked 29:15 32:18 33:2,7 41:17 57:19 141:15 144:25 150:14,21 151:7 156:13 159:12,16,18 164:10 166:17 172:7 173:14
asking 17:21 61:3 80:18 83:21 91:12 101:20 104:20,20 123:12
assert 7:9
asserts 28:11
assisted 17:24
associate 62:17
associates 11:7,9
associational 75:3 99:2 111:21
assume 66:12 105:6 110:10 155:13
assumes 128:25
assumptions 125:7
at&t 124:8
ate 156:11
attached 28:4

[attempt - bounces]

**attempt** 166:10
**attended** 10:21
   145:10
**attending** 5:13
**attention** 167:15
**attorney** 27:4
   28:11 42:6 51:3
   51:10,21,25 62:8
   66:2,11 88:14,16
   92:15 93:16 107:7
   117:21 120:3,19
   170:5 178:5,15
**attorneys** 2:4,10
   47:14 62:7,12
   99:13 163:23
   169:18
**attributed** 96:4
   167:16
**audio** 4:12,12
**audit** 117:3 156:13
   156:14
**audited** 116:22
**august** 174:4
**authorization**
   154:12
**authorized** 5:7
   53:4
**available** 8:15
   144:9 154:2,13,14
   154:21 155:20
**avenue** 1:16 2:5
   5:2
**aware** 93:8 100:25
   102:24 104:23
   123:11 124:10,21
   124:24 125:4,22
   126:5,13,17
   138:12 142:10
   148:9 152:9,11
   153:24 159:5
   170:12 174:22

**b**

**b** 8:25 9:4 11:9
   169:19 177:9
**back** 12:14 22:25
   44:10,16 68:12
   70:15,22 73:2
   98:25 99:23
   100:14,16 130:23
   132:5,12 139:20
   139:23 143:24
   144:21 147:5,17
   153:17,20 154:8
   165:19,21
**backed** 69:17
**background** 10:4
**backs** 62:25
**backup** 16:17
   20:25 54:24 55:2
   64:2,15,18 68:14
   68:17 86:8 93:13
   93:19 94:6,8,10,13
   94:16,20,24 95:6
   135:22 143:23
   145:2
**backups** 157:3
**balance** 15:7 88:9
   93:16
**bank** 21:2,7 47:25
   48:5,12,13,17 49:8
   49:15,23 50:3,10
   50:11 51:10,24
   52:3,4,6,9 63:14
   65:18 68:9,12
   85:18,22 86:4,9,10
   92:18 93:2,6
   95:20 101:18
   114:7,10,17 126:6
   126:12 144:9,11
   178:15,18
**base** 63:12

**based** 41:9,10 42:5
   51:16 52:22 65:18
   80:19 108:9
   111:15 114:5
   117:20 120:24
   125:18 127:2
   154:21 158:25
   162:8
**basis** 111:9,12
   119:22 143:25
   148:13 154:3
   159:21
**bates** 24:12 30:11
   34:10,22 38:24
   39:21 42:10 45:19
   50:16 65:8 78:19
   81:18 84:14
   109:12 114:11
   134:23
**bear** 160:17
**bearing** 30:11
   39:21 42:10 50:16
   65:7 109:12
   134:23
**bears** 24:11 34:9
   38:24 45:19
**began** 144:7
**beginning** 16:22
   70:23 132:13
   171:7
**behalf** 5:17,21 6:6
   169:24 174:7
**belief** 148:14
   154:19
**believe** 9:5,8 11:16
   13:25 19:10,18
   23:21 25:17 29:19
   29:22 30:3 33:11
   41:19 43:2 44:6
   45:4,5,13,13 46:3
   52:8,18 57:18

**based** 67:7 69:20 74:9
   74:19 75:24 76:8
   76:15 81:5,6
   90:20 98:7,9
   108:4 111:20
   129:17,18 135:13
   135:18 148:10
   151:23 154:9,10
   154:11,25 157:8
   157:10 161:7
   164:14,18 165:22
   165:24,24 171:20
**bells** 170:23
**belonged** 20:9
   173:8
**benefit** 138:17
**best** 13:18 168:17
   179:10
**better** 143:9
**beyond** 53:2 57:2
   72:7 124:2,15
   152:10 172:7
**big** 61:20
**bill** 56:11 83:10
   109:22 124:7
**billion** 32:9,10
   36:14,16,25 37:3
   37:22,23
**bills** 15:9 16:17
   21:2 123:19,23
   124:9 130:7
   143:15 144:22
   146:7,8
**bit** 137:6
**blame** 112:19,19
**born** 9:22
**bottom** 62:16
**bought** 125:25
**bounce** 93:21
**bounces** 83:6

[box - column]                                                                    Page 5

**box** 2:11 31:7
**boxes** 19:20,24,25
  20:4,8,16,20,24
  21:15 22:19 25:2
  43:3,9,15,18 44:7
  44:18 68:22 94:23
  95:9 155:12
  157:12 160:3,10
  160:12 171:17
**break** 12:25 70:7
  71:11 131:19
  132:2
**briefly** 10:3 11:2,5
  143:4
**broad** 38:5,5,8
**broadway** 180:4
**brought** 20:10
**brussels** 96:8,11
  96:18 97:20 98:8
  105:16 109:23
  110:8
**bs** 107:12 109:3
**buccino** 11:7,19
  11:20
**buckets** 65:15,17
  68:7 178:7
**build** 104:20
**buried** 43:24 44:9
**business** 158:22

**c**

**c** 2:2 6:10 11:9,9
  171:2 179:2,2
**calculator** 134:16
**call** 18:13,24 23:5
  27:14 47:23 55:18
  70:14 82:25
  105:12 132:5
**called** 19:3 34:3
**calling** 17:21 94:9
**calls** 117:14
  162:13

**canada** 171:6,12
**canadian** 115:3,8
  171:19
**capital** 33:10
**car** 54:17
**card** 85:22 95:20
  96:3 143:18,21
  144:22 146:7
  178:11,18
**case** 1:3 4:23
  14:13 15:11,12,14
  15:14,17 19:16
  30:21,25 40:25
  45:12,14 47:14
  49:10 51:5,13,14
  53:18 55:12,15,15
  56:4,23 57:24
  58:7,20 59:6,16,19
  59:21 60:6,17,20
  61:19 63:10,22
  75:12 78:5,7
  80:21 81:3 88:12
  88:22 90:13,21
  96:5 97:3,10
  100:8 112:13
  124:14 129:16,20
  130:5 131:9 135:4
  135:24 136:6
  144:7 145:19
  148:20 151:16,24
  153:25 154:18,20
  155:20 156:11
  157:15 163:5
  165:8 169:15
  170:3,16 171:6,12
  174:8 178:22
  180:6
**cash** 80:6 147:25
**catch** 34:20
**categories** 29:25
  61:10 65:20 67:23

135:16
**category** 61:15,16
  61:18 67:25
  135:20
**cause** 8:6 146:5
**caused** 28:21
**caution** 108:11
**cell** 4:10
**cellular** 4:8
**certain** 40:10,11
  97:4
**certification** 3:7
**certify** 179:7,12
**cetera** 51:7 90:23
**chain** 44:5
**champion** 2:7 71:2
  71:3 112:10
**chance** 25:25
  162:6
**change** 63:3
  114:20 180:9
**changed** 63:7
**changes** 40:18
**charge** 56:11
**charged** 88:23
  89:6,9,20 136:2
**chart** 28:5 36:5
  38:5,8 66:4,7
  102:19 149:17
**charts** 29:18,19
  101:14 104:21
  105:13 149:23
**chase** 52:9 93:2
  126:12,23
**check** 74:14 81:7
  86:12,17 144:10
  161:3
**checkbook** 124:3
**checks** 48:6,7,12
  65:20 68:11 86:15
  86:16,18,21

123:24
**chevron** 1:5 2:22
  4:19 5:17,21,23
  8:2 9:15 23:13,23
  30:25 71:4,6
  98:20 174:9 180:6
**chevron's** 8:19
  90:19 111:17
**chronological** 87:5
**cia** 46:7 49:24
**city** 60:25 61:2
**civ** 1:3 4:23
**claim** 135:23
**claiming** 131:13
**clarification**
  127:12
**clarify** 13:3
  136:18
**claw** 98:24
**clean** 159:15
**clear** 8:21 24:21
  36:20 90:15 91:4
  136:14 137:17
  150:7
**client** 25:24 26:4
  27:4 28:11 42:6
  66:2,11 117:21
  120:3,19 161:10
  161:16,20 162:4
  162:11
**clients** 159:3
**closed** 126:24
**coach** 139:12
  166:10
**collected** 160:5
**college** 10:7
**columbia** 2:11
**column** 31:21,22
  37:6 41:7 47:4
  49:7,11,14 50:4
  61:5 81:20,22

[column - court]                                                                    Page 6

82:10 85:14
106:13
**columns** 31:9,11
46:7 53:22
**come** 18:5,17
47:12 63:21 75:21
88:15 92:20
101:15 129:7
130:21 172:11
**comfortable** 12:16
12:17
**coming** 22:18 57:8
63:23 99:17
124:21
**commencement**
71:14
**comment** 131:5
**comments** 82:19
82:22,24
**commission**
180:25
**communication**
119:18
**communications**
45:2
**companies** 11:11
**company** 12:7
**compared** 135:23
**comparison**
128:23
**compensated**
73:11 147:11,23
**compensation**
146:20 147:4,7
148:8
**competing** 99:12
**compilation**
107:24 172:9
**compilations**
136:10

**compile** 136:15
146:4
**complete** 116:8
136:20 137:21
**completed** 133:11
133:12 146:12
**completely** 87:6
**complicated** 113:3
**comply** 157:18
**computer** 24:19
94:17
**concern** 13:8
**concerns** 53:13
**concludes** 176:7,9
**condition** 53:7
71:25 87:13
**conducted** 156:13
**conferences** 10:21
**confident** 43:17
**confirm** 106:19
**confused** 90:16
138:7 150:24
**confusing** 86:14
139:16
**confusion** 166:7
**connection** 20:11
33:8 57:6 81:2
**consequently**
172:25
**consider** 8:12 15:3
116:10
**considered** 72:8
**consisted** 58:16
**consistent** 128:19
**constantly** 56:6,16
**constitutional**
153:13
**consult** 113:5
**consultant** 11:7,10
27:6 118:7 120:12

**consulting** 33:21
33:23
**cont** 178:2
**contact** 17:13
71:22
**contacts** 22:21
117:18
**contain** 20:24
129:15
**contempt** 8:20
72:5
**context** 6:24
**contingency** 80:4
142:8 147:25
**contingent** 73:24
74:4 150:18 151:8
151:19
**continuation** 88:6
**continue** 4:13 7:9
98:23
**continued** 175:10
**contract** 169:22
**contributed**
167:24 168:13
**controlled** 101:4
101:22 126:14
**controlling** 126:6
**convened** 173:2
**conversation**
44:17 45:6 117:25
**conversations** 4:8
117:20 118:12
121:6 122:10
154:22 155:18
**convey** 41:7
**cooper** 11:13
**copied** 148:23
**copies** 21:8,10
29:17
**copy** 16:13,14,15
23:12 24:22 94:25

95:4 176:3
**core** 103:25
**corporation** 1:5
4:19 5:18,21,23
8:2 13:11,13 71:4
71:7
**correct** 12:9 15:15
18:4 20:3,13
21:23 22:16 23:24
24:25 26:6,9,11
30:8 32:8,11,13,16
37:9 38:12 39:10
41:5 43:5 44:19
44:23 49:12 51:23
62:19 68:3 69:2
69:10 78:15 80:12
80:13 86:19,22
88:25 89:5 90:17
94:18 95:2,7 96:6
104:25 114:15
133:18,20,23
139:3 145:17
146:20,21 158:13
163:7
**correctly** 40:15
**correspond** 50:3
**cost** 60:22,24
135:23
**counsel** 3:5 4:18
5:12,24 27:6
113:5 115:9
118:23
**country** 180:4
**couple** 7:5 22:7
43:4 110:20 142:2
145:7 157:24
160:16
**course** 142:6
**court** 1:2 3:17
4:21 5:5 6:8 8:11
8:16,20 12:20

100:2,16 112:12
113:11 139:23
153:20 165:21
176:2
**courtesy**  57:8
138:2
**cover**  7:13 63:22
128:2
**covered**  9:4 118:8
120:13
**covers**  87:10
**create**  12:2
**created**  35:5 46:12
65:10 92:8 110:19
**creating**  48:15
49:6,13
**credit**  85:5,9,13
106:13 143:18
144:22
**credits**  85:19
**crutcher**  1:15 2:4
4:25
**curious**  70:7
**currently**  13:4,8
30:6
**cut**  83:25 123:24

**d**

**d**  6:5 177:2
**danger**  111:16
**dark**  91:18
**data**  15:24
**date**  22:8 23:18
24:9 27:22 30:16
34:14 39:5 40:2
42:15 45:24 50:21
65:6 75:14 78:23
82:23 84:18 86:25
87:4,23 92:5,7,12
95:16,19 103:4
107:16 109:17
110:11 123:2

131:5 133:4 135:9
173:9 179:8 180:7
**dated**  42:19,24
102:10,11 108:4
110:4 131:9
**dates**  17:6 108:13
147:4,6,18,19
160:23
**day**  58:22 82:12
82:13 93:22
162:22 176:17
180:24
**days**  47:13 98:2
**deal**  8:24 74:22
82:25 83:9 119:7
123:18,25 124:16
**dealing**  57:4
105:14
**dealt**  17:18 53:4
57:5 123:19,19
**debit**  85:22 95:20
96:2 143:21 146:7
178:11,18
**december**  43:9
**decided**  38:3
135:19
**decision**  37:17,19
37:24,25 41:23
**declaration**
171:25
**declaratory**  7:11
**declare**  173:25
174:14
**declining**  119:9
**deemed**  8:15
**defendants**  1:9
**defense**  169:10
**deficit**  63:9
**define**  59:22 137:8
**degree**  10:9,24
143:5

**degrees**  10:23
**delay**  43:24 91:19
**deleon**  165:9
167:24 168:13,20
**delete**  141:16
**deleted**  140:25
141:4,11
**demand**  174:3
**demanded**  174:18
**denial**  8:10
**denied**  8:15
112:12
**depends**  137:7
164:7
**depo**  127:15
**deponent**  180:7
**deposed**  12:11
**deposit**  49:9
110:22 113:20
**deposited**  100:9
101:3,17 126:2
**deposition**  1:14
3:7,14 4:12,17,24
7:3,7,14 8:8 9:10
9:19 19:20 31:18
53:21 72:14,21
110:17 113:9
118:21 120:2,21
120:23 121:2,8,11
121:15,20,23
122:3,13,14,19
126:20 137:25
141:22 153:8
174:25 180:7
**deposits**  63:15
114:24 126:22
127:6 140:12
**describe**  10:2 11:3
24:13 31:11 40:6
46:11 60:2 65:12
66:20 74:7 92:13

94:11 143:4,7
144:6 161:14
162:10
**described**  68:5
75:9 145:10,16
**describes**  167:5
**describing**  170:20
**description**  177:11
**desire**  70:6
**destroy**  141:16
**detail**  144:24
**detailed**  54:19
68:7,8,8 143:15
173:7 174:6
**details**  47:18
104:14 152:5,7
155:7
**determination**
56:3
**determinations**
119:2
**determined**  69:4
**determining**  33:19
60:3
**different**  36:7 44:4
80:23 99:13
126:15 129:18
150:6,8 153:4
**digest**  100:13
**dinger**  2:13 71:5,5
**dinner**  156:10
**direct**  21:11 98:15
111:24
**directed**  138:16
**direction**  18:3
22:11 28:10,23
37:23
**directly**  7:25 21:6
142:7 145:19
**disbursement**
168:19

disclosing 111:16
disclosure 7:17
discourage 122:17
discovery 9:2,10
  42:7
discreet 72:3
discuss 57:25
  121:7,9,12,22
  149:15 157:16,21
discussed 75:19
  105:9 106:16
  121:14 124:15
  145:18 149:17
discussing 58:16
  60:5
discussion 44:11
  57:13 63:6 64:13
discussions 106:5
  158:15,20
dismiss 7:11
disposed 141:2,11
distinct 90:22
  145:20
distinction 136:12
distinguish 108:12
district 1:2,2 4:21
  4:22
divided 36:24 37:7
  37:10
doc 94:17
document 23:16
  24:7 26:18 27:20
  28:8,16 30:11,14
  30:18 31:15 34:8
  34:12,16,25 35:5
  38:23 39:3,6,21,24
  40:3,9 42:9,13
  45:17,22,25 46:4
  46:12 47:9,10,17
  47:21,22 49:20
  50:16,19,23 53:12

64:24 65:4,9,13
67:14,16 74:15,18
78:21 84:11,16,19
85:20 87:2,16,21
87:24 88:4 89:4
91:9,11,22 92:3,14
93:25 95:11,14,17
95:22 107:17
109:12,15,19
110:13,15,18
113:24,25 114:11
132:20 133:2,5,22
134:23 135:7,11
136:20,24 151:24
152:3,7,14 154:25
155:4 165:12
166:16,19,20
167:2,3,5,13 169:4
169:6 170:11,14
170:18,21,22,24
173:21 174:17,22
177:22 178:17
documents 19:21
20:9,14,16,20,24
21:6,8 22:11,19
24:15,23 25:4,10
25:11,13,21,25
26:19 28:4,9,14,22
28:25 29:6,8,10,13
29:14 30:2,7 31:3
33:21,25 34:3,6
38:10 40:9 41:17
42:5 49:2 53:17
78:14 91:15 94:8
114:6 122:6
123:20 127:3,20
129:5,13 140:11
141:2,12,16
151:18,21 154:6
155:3,12,13
157:11 160:3

171:4,11,14,17,21
doing 11:10 15:13
  15:16 18:23 21:4
  63:9 115:16 136:9
  136:10
dollar 46:6
donziger 1:8 2:16
  4:20 6:4,5,19,21
  6:22 13:15 14:4
  14:24 15:17,18,20
  16:9 17:10,14
  18:3,6 20:10 21:5
  21:9,11 24:24
  26:5,16,22,23
  27:11 28:6,10,23
  29:4,7,15 31:13
  34:17,24 35:21
  37:14 41:17,25
  42:2 45:12 46:8
  46:15 47:3 51:14
  51:17 52:13,15
  53:23 55:13 56:22
  56:25 58:17 59:16
  60:5 62:14,15,17
  64:10 65:24 66:8
  66:18 67:5,7,11
  69:23 70:3,13
  71:8 73:4,7,12
  74:20 76:4 77:23
  79:24 81:24 82:15
  83:17 84:7 86:23
  87:9 88:12 90:14
  91:14,17 93:5
  96:18 98:12 99:16
  100:11,12,17
  101:4,22 102:18
  103:2,7,10,23
  107:15,21 110:8
  111:4,8 112:8,15
  114:15 115:9,21
  117:6,16,22 118:2

119:15,21 120:10
121:7,16,21,25
122:5,11,17,22,25
123:5 124:22,25
125:6,8,14 126:6
127:10,16,23
128:4,8,24 129:14
130:20 131:2,8,21
132:4 136:7,23
137:24 138:8,11
138:17 139:3,9,14
140:9 141:3,19,25
142:4,13,17
146:22 148:8
149:19 150:14,23
151:6,18 152:21
153:3,21 154:23
155:16 156:7,9,19
157:14,23 158:18
158:21 159:6,11
159:14 160:15,19
162:15 163:6,10
165:5,10 166:3,6,8
166:14,24 167:7
167:17 168:8,12
169:22 170:4,14
172:4,12,22 173:4
173:11,16,23
174:5 175:4,7
176:5 177:7 180:6
donziger's 9:16
  15:12 19:21 22:11
  31:4 33:9 38:14
  48:16 49:8 51:3
  61:24 75:22 99:9
  102:3,25 109:25
  110:16,24 113:21
  123:9 124:4,11
  126:20,23 127:21
  129:21 130:14,17
  175:3 178:5

[draft - exhibit]

Page 9

**draft** 133:21
**due** 82:13 83:6
153:4 156:17
**duly** 6:11 179:8
**dunn** 1:15 2:4 4:25
5:17,20 71:3
127:13 129:3

**e**

**e** 2:2,2,6 6:5 22:5,8
22:19,23,24,24,25
25:5,9,10 26:10,13
26:16,20 27:5,17
27:23 42:16,20
43:5,7,18 44:4
149:6,8 177:2,4,9
177:14,21 179:2
**earlier** 42:25
73:10 116:12,14
**early** 98:2,2
151:24
**earnest** 6:18
**ears** 97:14
**economics** 10:9,24
**ecuador** 7:20 8:3,4
8:5 15:14 19:15
36:3 68:24 69:5,9
69:19 73:24 74:4
75:4 76:10 77:3
77:13,16 79:4,8
80:11 81:3 101:5
131:9 135:24,24
136:2 142:8,21,24
143:10 147:24
148:11,21 149:21
154:2,12 160:21
161:6 162:21
163:24 165:3
170:4 172:10
**ecuadorian** 40:20
49:10 159:3

**ecuadorians**
155:21,23
**educational** 10:3
**effect** 3:16 8:21
**effected** 172:2
**effectually** 8:18
**effort** 75:6
**efforts** 136:15
143:7 161:24
**eight** 164:14
**eighth** 74:10,13
**either** 18:18 21:7
39:13 48:6 49:18
54:20 67:21 68:8
71:20 74:9 76:25
82:20 83:9 119:6
144:10 151:4
**electronic** 25:3,11
**electronically**
16:12 84:13
**elliot** 33:9 53:5
71:19 159:10,13
159:17
**else's** 61:25 138:16
**employed** 11:12
11:23 12:8 13:5
179:13
**empty** 116:3
**encompasses**
52:18
**ended** 69:14
**engaged** 53:14
**english** 163:12,15
164:2,4,6,8,9
**entered** 98:5
**entire** 168:23
**entirety** 7:6,14
9:11
**entities** 143:16
**entitled** 82:11
95:20 177:23

178:17
**entitlement** 64:3
64:19
**entity** 13:10
126:15 135:5
142:9 178:23
**entries** 87:5,7 88:4
106:23 133:9
156:24
**entry** 85:2 114:18
**environmental** 8:6
75:5
**equals** 31:8 32:7
32:12
**equate** 36:17
**equipment** 61:13
**errata** 180:2
**escrow** 51:4 62:9
88:14,16 178:6
**escrow's** 51:21,25
**esq** 2:6,7,7,13,13
2:14,16
**essentially** 34:25
40:8
**estimate** 13:19,20
14:3 16:24 22:3
33:16 75:15 83:19
101:11 147:20
**estimation** 146:11
**et** 1:8 4:20 51:7
90:23 180:6
**eve** 72:15
**events** 71:13
**evidence** 57:14
80:2
**exact** 43:14 46:22
47:2 75:13 85:10
101:18 106:21
156:2
**exactly** 63:6 64:13
150:25

**examination** 6:14
142:3 146:24
160:18 162:17
177:6,6
**examined** 6:12
**example** 55:8 58:5
59:4,12 131:13
138:19 156:16
**excel** 16:3,3,15,16
18:15 44:8,20
**exchange** 22:20
23:8 42:17,20
43:5,18 76:25
77:12 105:4
**excluding** 62:13
62:15
**exclusively** 130:4
**excuse** 26:14
34:17
**executed** 156:21
**exhibit** 23:11,17
24:3,8,11 27:16,21
28:3 30:10,15
31:6 33:4 34:9,13
34:19,21 35:6
38:24 39:4,20,25
41:18 42:10,14
43:19,21 45:18,23
48:15 50:15,20
51:19 52:21 53:13
54:15 61:4 64:25
65:5 66:7 67:24
78:18,22,25 81:14
84:12,17,23 87:2
87:15,22 91:23
92:4 95:12,15
106:8,17 107:17
109:2,11,16
110:15 124:18
126:19 127:15
132:21 133:3

**[exhibit - focusing]**

135:8 136:6
167:14 169:8,20
170:11 171:24
172:15 173:21
177:12,13,14,15
177:16,18,19,20
177:21,22 178:4,7
178:9,10,12,14,17
178:19,20,22
**exhibits**  127:21
**exist**  54:6
**existence**  107:25
129:2
**expect**  83:20
**expedition**  153:9
159:8
**expenditures**
90:23 135:5
136:16 161:16
178:22
**expense**  55:21,23
56:3,8,20 57:24
59:17,19 60:4,16
61:11 67:3 89:12
96:13,16 101:25
136:10 146:4,9,9
168:18 172:9
**expensed**  89:17,18
**expenses**  14:12,13
15:11,12 16:2
28:6 29:24 45:11
45:14 47:15 51:5
51:6,10 54:16,24
55:17,22 56:22
57:20 58:12 59:3
59:9 61:22 62:4,9
63:17,20,22 65:15
65:18 68:10,13
69:15,16 78:2
88:18,23,24 89:7,9
89:25 90:5,24

91:2 92:22 95:25
96:2,4 102:6
129:21 130:10,19
133:12,15 135:15
135:25 136:5,6
143:17,18,23
144:14,24 145:3
156:4,6 157:13
178:8
**expensive**  61:2
**expires**  180:25
**explain**  146:2
**express**  21:2 29:22
54:21 56:11 116:5
143:21 146:7
**extensive**  167:5
**extensively**  60:9
**extent**  17:25 87:10
102:20,23
**extravagant**  59:4
59:9
**extremely**  169:25

**f**

**f**  179:2
**fact**  42:21 99:6
129:2
**failed**  173:11
**failure**  168:4
**failures**  168:2
**fair**  12:22 26:21
117:2 118:3
119:16 142:17,18
**fajardo**  169:9,11
169:20 170:20
171:2 172:23
173:5,9
**familiar**  71:23
100:10 103:14,17
152:6 169:10
170:13 171:10

**far**  53:24 107:9,10
112:23 120:4,24
**fda**  161:11 166:19
169:24
**february**  42:19,24
107:19
**fee**  62:17,25 63:25
64:8,20 90:11
91:9 135:23
147:25 151:19
**feed**  58:24
**feel**  12:15 39:9
41:20 119:16
**feels**  158:21
**fees**  51:10,10,11
51:13 61:22,23,24
61:25 62:4,5,6,10
62:11,17 69:16
88:18,25 89:6
**figure**  134:15
**figures**  129:7
**file**  44:21 45:10
68:16 75:14
**filed**  4:20 41:24
**files**  24:17 44:8
64:22 94:12
**filing**  3:6 170:3
**final**  44:21 45:9
87:17 91:24 95:18
116:10,11,14,17
116:19,23,25
132:22 159:25
**finally**  8:24 44:13
**finance**  171:5,11
**finances**  53:19
57:7 124:2
**financial**  7:23
11:10 53:6 55:20
71:25 77:21 78:5
78:9,12 87:12
115:19 122:23

149:20 166:2
169:23 170:15
173:17
**financially**  5:10
**financing**  123:16
**find**  94:7 147:6
153:9
**finding**  86:14
**fine**  131:20
**finish**  12:20 41:20
146:5,8 172:13
**finished**  57:16
116:4
**firm**  6:6 14:2 69:8
69:12 115:3
124:19,22 125:2,5
125:24 126:8
127:25 128:9
129:6
**firms**  69:19
**first**  6:11 7:13,15
11:8 13:14,24
31:22 35:24 37:6
46:19 54:10 67:25
93:2 96:10 98:2
100:21,22,23
110:21 111:15,20
127:11 156:20
167:17,20 172:21
**fishing**  153:9
159:8
**five**  14:6,6 20:6
21:15 38:17
131:19
**flight**  59:15
**flip**  96:7
**florham**  2:12
**flow**  47:14
**flows**  46:24 136:16
**focusing**  63:24

folder 94:22
folders 94:22
  140:14
folio 178:19
folks 70:24 75:4
  129:6
follow 71:22 99:9
  104:7 111:6,11
  112:5 118:18
  119:3,5
followed 120:9
following 167:16
  174:2,14 175:10
follows 6:13 120:6
forbidding 7:16
force 3:16
foregoing 179:7,9
forgot 12:10
form 3:10 136:8
formal 15:6,7
  18:22
former 108:16
forth 10:22 14:13
  21:3 36:18 37:4
  47:15 68:9 69:16
  88:19 97:18
  101:14 130:24
  146:10
forthcoming
  112:21
found 25:6 32:22
foundation 79:25
  80:8 142:12
  145:23 162:13
  165:11,14
four 28:9,22 29:8
  29:14 38:9 43:12
  100:19 101:12
  103:13 140:4
frame 16:19 38:20
  38:21 43:14 48:17

128:19
frankly 89:19
  99:10
free 39:9 41:20
front 52:22 106:8
  127:17 149:25
  169:10 172:15
full 19:6 167:18,19
  167:20 172:21
fully 146:12
function 146:13
fund 81:12
funded 111:19
funder 7:19
  101:25 102:24
  105:19,23 106:2
  111:13 125:24
  138:14 152:8
  158:5 160:5,7
funders 97:20,23
  97:24 98:6 101:5
  101:16 104:11
  111:18 145:11,13
  145:16 150:12
  151:9,13 152:18
  158:7,15
funding 106:6
  138:22 140:12
  171:18
fundings 140:4,11
fundraising 97:3
  100:6 110:9
funds 35:9 46:24
  47:11,13,18 48:5
  51:2 65:21 67:23
  81:10 88:15,17,22
  92:19,21 100:8,8
  111:3 113:10
  114:2 129:15,16
  130:7,20,23
  142:20,24 143:10

144:7 146:16
147:9 157:15
158:10 178:4
further 3:9,13
  107:3 136:18
  146:24 160:13,18
  162:17 173:20
  174:24 175:5
  177:6 179:12

## g

g 6:5
gaap 14:21 15:7
  117:3 157:18,20
gap 147:8
gaps 116:3 146:3
general 6:23 7:5
  9:12 31:16 75:2
  83:19 90:4 102:22
  106:3,5 122:12,15
  153:8 173:3
generally 7:8 8:7
  20:23 97:2 122:9
  137:2
gentlemen 132:14
getting 22:18
  74:24 100:7
giarro 1:17 5:6
  179:5,18
gibson 1:15 2:4
  4:25 5:17,20 71:3
  127:13 129:3
give 13:18 34:8
  36:13 37:13 38:5
  42:9 64:24 75:15
  77:15,17 78:17
  79:13 83:19 84:11
  124:5 137:25
  166:9
given 8:9 49:3
  54:2 72:2 79:13
  80:20,20 93:22,23

99:19 111:17
  153:12 159:4,22
gives 80:10 114:10
  114:10 151:18
giving 67:2 76:24
  139:11
glasses 35:16,23
go 4:14 20:18,22
  36:10 47:19 50:7
  53:22 56:7 57:15
  58:8 62:21,21
  68:12 70:11 73:6
  73:8 78:24 83:20
  84:22 87:13 91:15
  91:19 92:21 94:6
  95:10 97:10 99:23
  100:22 106:10,22
  113:15 118:19
  121:4 130:23
  139:18 143:14,20
  144:21 147:5,17
  148:25 149:8
  175:9
goes 35:25 47:11
  47:16 51:8 103:24
  171:3
going 4:3 7:4
  12:22 13:8 23:10
  24:2 27:15 29:2,5
  29:11,13 30:9
  31:13 34:7 35:16
  35:21 36:13 37:16
  38:22 39:19 42:8
  45:16 46:17 48:10
  50:14 52:25 56:25
  57:5 63:15 64:23
  65:21,24 66:12,13
  66:14,22,25,25
  70:18 71:17 72:14
  72:24 74:20 81:24
  82:3 84:8,10

87:14 90:7 91:21
95:10 97:5,7,8,15
98:12,15 103:23
107:15 109:10
110:12 111:11
118:15,17,23
119:2,3,5 120:10
120:16 121:19
122:13 123:20
124:25 125:21
127:10 128:17
131:18,22 132:4,8
132:19 134:22
144:13,13 146:6
148:2 152:21
153:15 160:15
167:12 171:22
172:5,13 175:8
176:3,8
**good** 4:2 6:16 73:5
73:7 84:8 125:16
125:16
**gotten** 141:7
**grab** 35:16
**grabbing** 35:23
**graduate** 10:10
**graduating** 10:14
11:4
**gray** 81:22
**great** 70:14
**grounds** 7:13 27:2
27:3 35:25 46:18
53:2 54:9,10 66:2
66:9 166:15
**group** 12:3 13:7
76:10 77:16
148:11 154:2
156:2
**guess** 13:19,22
32:10 38:16,18
51:11 70:8 133:14

134:25
**guessing** 20:6
**guys** 23:2 26:23
70:6,15 112:6
127:24

## h

**h** 6:10 177:9
**half** 37:2
**hand** 38:23 49:7
49:11,13 50:4
91:22 95:10
110:13 132:20
134:7 167:12
**handicapped** 66:3
**handing** 48:23
**handling** 168:3
**hang** 132:5
**happened** 54:8
108:8 120:25
**happy** 35:15
**harassing** 111:18
**hard** 16:12,14,15
24:22 68:12 94:24
95:4
**head** 50:9 147:19
**heading** 62:3
135:4 173:25
**headphones** 96:14
**hear** 112:9
**heard** 125:15
169:12
**hearing** 8:19
52:23 53:5 54:4
57:9 72:2,15
128:13 153:7
159:9
**held** 1:14 4:24
49:23 126:7 165:2
**help** 14:9,10,11
19:15 97:15,17
127:18 139:17

**helped** 15:23
17:23 144:17
**helpful** 38:8
**helping** 16:23
101:13 139:7,8
**herb** 132:16
**herbert** 2:13
**hereto** 3:6
**herrera** 2:7 5:19
5:20 27:18
**hey** 26:23
**hide** 141:6
**highlighted** 96:8
96:14
**highlighting**
134:10
**hire** 19:14 157:16
157:22
**hired** 14:14 144:3
**historic** 46:5 47:23
49:4 177:23
**history** 11:3
111:18
**hmm** 28:15 81:17
81:19 174:15
**hold** 8:20 73:18
118:2,2,3 122:25
128:24 166:3,3,4
**honest** 17:6
**honestly** 19:12
64:11 67:20 73:15
155:7 162:23
**hope** 112:17
**hopeful** 84:4
**hotel** 59:5,9,14
109:22,23 143:19
**hotels** 51:6
**hour** 57:9 70:9
84:6,6 131:18
**hourly** 73:13,14

**house** 22:18 43:4
**huge** 147:8
**hypothetical**
32:22 37:10,11
40:14
**hypothetically**
31:23

## i

**i.e.** 21:7 146:13
**identification**
23:17 24:8 27:21
30:15 34:13 39:4
39:25 42:14 45:23
50:20 65:5 78:22
84:17 87:22 92:4
95:15 109:16
133:3 135:8
**identified** 29:7
91:8,10 144:19,24
**identify** 6:3 92:23
**identifying** 113:19
146:8
**identities** 98:18
**identity** 7:19
111:13
**ifs** 33:23
**immediately**
119:25
**impede** 42:7
**important** 99:19
119:24
**impression** 139:12
**inadvertently**
39:14,15
**inappropriate**
60:12 72:9
**include** 61:6
115:24 160:5
**included** 45:8 59:6
89:25 90:6 91:2
156:4

**including** 62:13 83:22

**income** 15:6 51:20 122:24 123:10,17 124:11

**incoming** 46:23 48:4 49:19,21 85:14 88:8,13,21 106:15 130:7 168:21

**incomplete** 25:17

**incorrect** 19:23 47:9

**incurred** 45:12

**independent** 56:2 99:22

**index** 178:2

**indicate** 85:11 86:25 93:19

**indicated** 56:22 64:10 144:12 148:6 179:9

**indicating** 83:4,5 94:4

**indirectly** 8:2

**individual's** 145:20

**individuals** 7:24 98:21

**inflows** 139:6

**info** 82:21

**information** 49:6 52:19 82:21 106:21 107:24,25 108:5,14,17,19 111:17 112:13 116:22,23 125:19 128:15,22 133:10 138:25 144:8 149:10,20,24 153:12 173:7,10

173:18

**informed** 125:12 125:13,15,17

**initial** 44:5,11

**initially** 24:5 25:20 31:3

**inquiries** 56:19

**inquiry** 7:17 43:23 44:3,4,5 69:14

**instances** 97:5

**institution** 93:7

**instruct** 99:4 104:4 118:15,16 120:5,16

**instructed** 156:19

**instructing** 66:16

**instruction** 99:9 104:8 111:7,11 112:5 118:18 119:4 120:7

**instructions** 119:6

**intend** 99:8 104:7 111:6 112:4

**intention** 98:22,23

**interest** 73:24 74:4 74:8 75:8 77:2,13 79:4,8,20 80:11 83:12,14 105:4 125:25 142:8 145:13,21 147:25 150:15,18 151:9 151:19 154:17,20 155:15,19 159:2

**interested** 5:10

**interests** 145:17

**interfere** 4:11

**interference** 4:9

**internal** 7:21 98:14 103:25 158:22

**interrupt** 86:24 107:16

**interrupting** 7:3

**interventions** 72:22

**interview** 156:5

**intimate** 140:15

**introduce** 70:24 132:15

**invest** 36:11 105:23 151:15

**invested** 30:20 32:5 37:10 104:11 104:24

**investing** 105:3

**investment** 29:20 31:8,10 32:3,15 36:7 37:8 40:14 40:24 159:20 165:8 168:20

**investments** 33:20 37:15 103:19 104:13 152:19

**investor** 32:23,24 33:4,5 35:9 88:22 96:22 103:12 171:16

**investors** 81:12 98:17,18 103:14 104:15 139:6 145:18 171:13

**invoices** 16:18 69:18,22 143:15 156:25 157:2,5

**involved** 16:20 18:11 58:23 71:19 97:2 98:3 100:6 139:5 169:18

**involvement** 163:5

**issuance** 52:20,24 53:14 101:2

**issue** 98:24 99:23 115:2 153:5 156:3

**issued** 56:13 71:16 75:18 173:3

**issues** 53:3 57:4 58:17 72:4 74:24 105:15 119:18 128:12 153:6,13

**j**

**j** 6:10 45:19 50:16 65:8 78:18 135:3

**january** 47:6 110:5,22 113:21 169:21 170:16 173:2

**jersey** 2:12

**job** 19:6

**joel** 2:14 132:17

**jonathan** 2:21 5:3

**josh** 1:14 4:17 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1

[josh - lawyer]                                                      Page 14

72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:7
176:13 179:7
180:7,22
**jp**   110:23
**judge**   41:22 53:3
   82:4 113:6

**judgment**   40:20
   52:21,24 53:8,15
   54:6 71:15 72:6
   73:25 74:5 75:8
   75:18 77:3,13
   79:4,9,21 80:12
   82:2,8 83:13,14
   87:11 98:4 100:7
   101:2 102:3 103:8
   104:12 105:5
   108:2,6,9,15,16
   125:25 128:11
   131:10 138:14
   150:16,19 151:9
   151:19 155:15
   158:8 159:2
**july**   47:5 171:7
**june**   1:11 4:4
   27:16,24 180:7

**k**

**k**   6:10
**kaplan**   41:23 53:3
   113:6
**kaplan's**   82:4
**katie**   21:20 24:18
   25:2 42:17
**keep**   66:14,25
   73:16,18 84:8
**kept**   73:17 116:15
**kilcullen**   2:10 71:6
**kind**   19:9 32:23
   35:9 96:12 105:15
   119:15 120:15
   136:11,16 137:13
   140:20
**knew**   126:10
**know**   10:22 12:10
   12:25 13:21 14:11
   14:12 15:21,24,25
   16:2 17:2,22
   18:10,14,15,21,23

18:24,25 19:4,5
20:5 21:19 28:7
29:20 32:21,22,23
38:17 46:14,21
51:5,6,9 52:10,11
53:21 55:11,15
56:7,9,9,10,12,14
56:17,17,24 57:11
57:22,23,24 58:9
58:10,12,18,19,21
58:22,23,24 60:7,8
60:9,10,11,12,14
60:17,23,25 61:2,2
61:9,11,12,13 63:8
63:18,20,20 64:11
66:15,24 67:19,21
67:22 68:8,21
69:11 72:10,12
74:12,25 75:11,11
77:25 83:8,24
85:9,15,16,16,18
86:6 88:17 89:15
89:19,20,23,24
90:12 91:3,14
92:20,25 93:5,18
93:20,21,22,24
94:9,16,19,20 97:9
97:13,16,17 98:2
99:11,14 101:13
101:18 102:19
103:11,15 104:6
104:10 105:7,12
106:24 107:5,9,10
111:3,22 113:6,19
113:25 114:3,25
115:7 116:24
117:15 118:25
119:7,12,24
120:14,22 121:18
121:19 123:15,16
123:22 124:14

125:9,10 126:2,16
128:16 133:8
134:10,12 136:11
136:25 137:3,14
138:21,23 139:7
140:6,15,19,20,22
145:2 148:4,22
149:3,7,9,18,24,25
150:3 153:24
154:11 155:6,11
155:14 156:17,23
157:13 158:20
162:24 163:22
164:25 168:15,25
169:3,4 171:13,14
173:18 176:5
**knowledge**   105:2
   140:16
**knows**   104:5
   111:23

**l**

**l**   3:2
**labeled**   115:19
   116:13
**labeling**   94:15
**lack**   79:25 143:9
   146:13,15
**lacks**   142:12
   145:23 162:13
**lago**   115:3
**lak**   1:3 4:23
**large**   48:8 58:2
**law**   6:6 8:21,22
   13:25 69:7,12,19
   115:3 126:8
   127:25 128:9
   129:6
**lawyer**   90:19
   117:22 118:5,6,6
   162:11

lawyers 119:13
lay 165:11
laying 35:12
leave 54:13 57:15
  141:21
leaving 174:25
led 129:6
left 46:8 49:13
  50:4
legal 36:4 68:24
  69:5,16 99:11,22
  107:8 119:2 136:2
lenczner 124:19
  125:2,5,24
lend 144:4
letter 169:8
  170:19
letting 91:13
life 60:8
likelihood 48:13
limit 53:20 123:2,6
limited 46:7 49:24
  85:3,7 99:24
  102:21 103:4
  106:15
limits 108:3
line 51:21 52:16
  62:2 71:9 90:3,9
  98:13 128:22,23
  180:9
lines 168:10
list 16:3 44:13
  45:11
listed 25:15 32:2
  169:3
listen 9:13
listings 29:23
lists 148:16
literally 124:6
litigate 98:24

litigation 7:21 8:3
  8:5 36:3 75:5
  101:6 111:19
  118:8 142:9,21,24
  143:11
little 18:12,15,16
  70:8 90:16
llc 2:10 13:12
  180:2
llp 1:15 2:4
loan 51:12
locate 24:15
located 1:16 4:25
location 7:2 53:10
log 28:13
long 13:16 50:13
  59:6 72:13,21
  83:20 84:3 100:24
  111:18 120:17
longer 19:25 21:16
  72:23 131:22,25
  141:8
look 16:2 25:25
  39:16 73:19 75:14
  131:5 147:5,18
  148:4,5 159:7,24
  163:3 164:24
  166:14 170:17
looked 24:16,18
  60:12 169:2
looking 33:24
  54:14 55:7 67:19
  85:20 114:23
  141:7
looks 106:20 134:7
  134:20
lot 15:23 35:12
  70:16 97:8 102:11
  116:2
love 112:6

luis 169:21 172:22
  173:11 174:4

**m**

m 177:4
mail 22:5,8,19,24
  22:24,25 25:5
  26:10,13,16,20
  27:17,23 42:16,20
  43:5,7,18 44:4
  123:21 177:14,21
mails 22:23 25:9
  25:10 27:5 149:6
  149:8
main 14:16 17:13
  105:14
making 66:19
  119:23 152:18
  154:13 161:24
managed 172:24
  173:8 174:7
management 7:24
  71:19 169:23
managing 148:20
manos 109:23
march 53:15
  71:16 81:21 82:9
  82:11
margin 134:7
mark 23:11 24:3
  27:16 30:10 39:20
  50:15 87:15
  109:11 134:23
marked 23:16
  24:7 27:20 30:14
  34:12 38:23 39:3
  39:24 42:9,13
  45:17,22 50:19
  56:8 58:11,14
  64:25 65:4 78:17
  78:21 84:16 87:21
  91:23 92:3 95:11

95:14 109:15
  110:14,16 126:19
  132:21 133:2
  135:7 167:13
  169:7
marking 34:9
  84:11
marks 70:19,23
  132:9,13
materials 7:20
math 17:4 33:20
  33:22 41:10
  127:22
matter 4:19 17:11
  18:2 23:14,23
  113:8 141:13,17
  147:24
matters 7:18
meal 58:23 59:14
  60:22,24
meals 51:6 58:5,7
mean 15:5,14
  17:16 26:5 29:4
  33:24 35:6 43:11
  45:6 57:3,25
  58:11 59:21 60:14
  66:16 67:8 68:6
  72:11 80:5,6,21
  85:6 92:6 93:20
  97:4 104:19
  116:21,24 124:13
  125:17 128:9,21
  129:2 134:14
  136:13 141:5
  149:14 154:16
  159:24 168:25
meaning 108:16
means 32:14 40:23
  66:22 90:20 91:5
media 4:16 25:4
  70:19,23 132:9,13

176:10
**meet** 13:14,23
76:12 96:21 97:19
97:23
**meeting** 33:9 53:6
58:9 71:20,21,21
97:6,10,12 105:16
159:10,13,18
161:9,10,15 162:5
162:9,20 164:2,12
164:15,17,20
165:2,23 166:25
166:25 168:7,16
173:3
**meetings** 97:8
98:14,17 99:6,7
105:8,11 145:9,15
150:12 152:8
153:2 155:15
158:6
**memorialized**
75:13,20
**mention** 12:19
**mentioned** 14:18
19:18,24 29:12,12
42:25 167:10
**merely** 112:22
**messenger** 61:12
**met** 13:25 76:14
98:3,6 169:13
**metal** 11:6
**michael** 2:13 71:5
**microphones** 4:6
4:11
**middle** 112:7
118:24
**midi** 96:11
**million** 31:7 32:7
32:12 36:13,24,24
37:17 40:14 41:3
41:11,12 68:2,24

69:13,19 127:5
128:17 165:8
166:5 167:24
168:13,20
**mind** 75:2 108:23
**mine** 50:13 118:7
**mineola** 180:4
**minute** 118:22
131:19
**minutes** 70:12
71:11 165:5,6
**misappropriate**
142:25
**miscellaneous**
61:5,8 67:25 68:5
68:15
**mispronounced**
39:8
**missing** 143:22
144:20,21
**misuse** 142:20
**misused** 137:22
**misusing** 137:6
**mks254** 109:13
**mm** 28:15 81:17
81:19 174:15
**money** 63:10,21
63:23 77:18,25
79:6,13,14,15,18
80:5,7 85:7 88:6
88:11 102:2,24
115:8 124:14
125:6,23 126:3
131:2,3 138:14,22
144:12 146:14
158:17,24 167:25
168:3 169:3
172:24 173:7
174:6
**moneys** 79:2 80:15
81:2 85:14 100:10

101:3,15,21
103:12 108:7
115:24 124:21
130:12,16
**month** 43:10
54:23,24 144:18
144:19 148:17
**monthly** 62:17,25
63:25 64:8 89:2
90:11 91:9 143:25
**months** 22:4,6,7
43:4,11,12,13
174:3
**morgan** 110:23
**morning** 72:16
**mortgage** 124:7
**motion** 7:10,12,15
8:19 46:20 111:14
**motions** 8:10
112:12
**move** 73:3 113:15
120:8 129:10
157:24
**multiple** 41:8
**mute** 26:24 46:16
**mystery** 95:8

**n**

**n** 2:2 3:2 6:5 11:9
177:2,4,4 179:2
**name** 5:3 11:8
12:6 15:22 17:8
39:8 49:23 56:12
109:25 110:2
126:7,8,11,15
144:17 152:13
155:24 156:2
163:22 169:12
180:6,7
**named** 44:21
98:21

**names** 67:3 76:18
113:12 162:3,25
**narrow** 85:24
172:9
**nationalities** 172:2
**nature** 166:23
**need** 12:19,24 19:4
28:7 72:16,24
84:3 89:21 93:18
94:5 113:17
121:18 123:23,24
137:16 158:23
**needed** 15:9 20:18
20:22 61:12 82:20
82:20,21 113:14
131:2 159:15
**needs** 118:25
124:8
**negative** 51:15
88:9
**negotiate** 97:16
**negotiating** 76:13
97:15
**negotiation** 106:4
106:4
**neither** 169:25
**neuman** 2:6 5:16
5:16 6:2,15,17
9:15 23:10 24:2
24:10 27:15 30:9
34:7,21 38:22
39:19 45:16 50:14
52:14 53:16 64:23
65:7 66:6,15
69:25 70:10 72:25
73:5 78:16 84:4,9
87:3,14 91:7,21
100:3 103:6,9
107:19 109:10
110:12 112:2,10
119:21 123:3,7

127:14,19 128:2,6
131:17,24 132:19
134:22 135:3,10
137:19 138:5,9
139:9,19,24
141:19 142:11,15
145:10,22 146:25
152:23 153:14
156:10 158:3
159:11 160:13
162:12,18 165:4
165:18 166:8,21
167:7 171:22
172:12 174:23
175:8 177:7
**never**   12:23 19:6
34:5 58:2 106:5
113:23 116:22
118:5,6 125:15
130:9,12 156:20
**new**   1:2,16,16,19
2:5,5,12,17,17
4:22 5:2,2 6:12
9:23 10:8 60:25
180:2,4,4
**night**   59:5,10
**non**   165:25
**north**   168:3
**notary**   1:19 3:15
6:11 176:20 179:6
180:25
**note**   4:5
**noted**   49:9 112:11
176:11
**notes**   82:18 163:3
164:22 179:11
**number**   7:8 32:4
34:10,19,22,22
38:25 39:21 42:10
48:20 50:9,16
52:11 61:20 65:8

78:19 86:13,13,18
114:10,11 134:6,8
134:18 174:11
**numbers**   24:12
30:11 45:19 51:17
84:14 97:17
101:19 109:12
133:25 134:17,19
134:24 137:14
**numerous**   76:16
76:17 146:6,6
**ny**   180:4
**nyu**   10:11,14 11:4

**o**

**o**   3:2 6:5,10 11:9
177:4 179:2
**oath**   5:8
**object**   8:7 26:25
27:2 29:4,5,13
46:16,17 52:25
54:9 57:2 65:25
74:21 81:25 87:9
98:13 103:24
112:2 115:22
125:9 127:11
128:10,25 129:9
136:7 150:24
152:22 153:2
172:5
**objected**   57:20
**objecting**   66:9
71:9 142:14
166:15
**objection**   6:23
27:9 31:14 35:24
41:24 52:16 53:25
66:13,19 72:19
79:24 82:15,17
107:23 111:4
117:16 119:23
120:12 125:14

139:15 142:11
145:22 153:21
157:23 158:18
159:6,7 162:12
166:4,11,12,16
**objections**   3:10
7:4,5,9 9:12,14,18
26:3 31:17 112:3
139:11 166:9
167:8 175:3
**obligations**   118:9
**observations**
162:9
**observe**   142:7
145:12 161:19,23
**obtain**   75:7
**obtained**   138:15
**obviously**   12:24
72:11 74:23 118:4
137:3,8 172:8
**occasion**   76:17
**occasionally**
123:23
**occasions**   15:21
97:22,25 98:5
101:8 102:24
117:10 138:13
**offer**   144:4 145:18
**offered**   106:2
152:20,25 153:24
158:7,9 159:3,20
**offhand**   76:20
**office**   16:5 61:14
61:15 89:8
**offices**   1:15 19:21
21:21
**official**   76:9,10
77:16 137:9,18
**oh**   90:6,11 134:19
138:5

**okay**   66:8 73:4
81:15 84:7 85:22
87:9 103:10
110:25 113:23
121:18 126:21,25
127:4,7,9 128:8
137:19 142:17
150:10 153:5
159:9 174:13
**old**   180:4
**once**   60:14 97:9
161:8
**ones**   126:11
**ongoing**   23:6,7
**open**   141:22
**operational**   7:22
36:2
**operations**   103:25
**opine**   166:25
**opportunity**   35:22
118:23
**oppose**   8:2
**opposed**   138:17
**order**   7:12,16 8:25
9:4 46:20 49:2,2
87:6 111:15
113:11
**ordering**   176:3
**orders**   82:5
**organization**
143:5 144:6
166:23
**organizational**
7:22 36:2 54:12
104:2
**organizations**   7:25
167:9
**organize**   135:15
143:8
**origin**   81:9 111:3

**[original - plaintiff's]** Page 18

original 129:5
originated 101:5
125:24
origins 81:11
outcome 5:11
outgoing 46:23
48:4 49:19,21
65:19 88:8
outlined 111:14
outskirts 101:13
outstanding 15:10
overall 97:6
overhead 89:15,16
owed 51:17 88:11
owned 172:24
owns 74:25

**p**

p 2:2,2 3:2
p.m. 1:11 4:4
70:18,22 132:8,12
176:9,11
p.o. 2:11
pablo 172:23
page 84:22 85:23
96:9,10 106:10,23
107:4,7 109:21
110:21 128:3
167:15 169:19
172:19 175:10
177:11 180:9
pages 146:6
paid 15:9 62:6
63:18 68:10,11
69:4 79:15,18
80:14,19,21,25
81:8,10 82:20,23
90:20 100:11
123:23 124:8,20
129:21 148:12,17
156:18 157:2,4,13

painstakingly
144:18
paper 89:14,20
paragraph 167:18
169:19 171:2
172:21 174:2,12
174:19
paren 92:7
parenthetical
95:19
park 1:16 2:5,12
5:2
part 46:23 80:16
81:25 87:17 91:24
100:21,23 108:17
108:19 132:22
148:20 159:7
part's 127:22
participated 158:6
particular 33:4
38:2 51:24 59:12
67:16 87:4 97:9
104:3 155:24
particularly 6:25
particulars 152:17
parties 3:6 4:14
118:20
party 5:9 179:13
pay 47:14 88:17
92:22 130:7,10
146:14,16 147:9
156:18,19
paying 123:19
149:11
payment 80:7,16
81:21 82:11 83:9
payments 14:12
46:5 47:2,4,23
48:8 49:5 53:7
82:12 106:25
107:3,6 124:25

156:16,21 177:24
payroll 51:11
pending 69:24
70:2
people 17:13,17,20
17:20,23 58:19,21
58:24 67:11,22
76:15,17,19
104:24 113:12
140:20 149:11
151:15 154:12
155:24 157:3
160:2 162:4
163:25 164:7,11
164:14 174:7,9
people's 162:25
percent 20:6 32:7
36:12,14,17,21
37:2,3,13 41:2,12
74:10 77:2 154:10
percentage 30:21
32:2 36:8 40:18
40:24 75:21,22
79:3,8,20 80:11,16
80:17,19 81:4
83:12,14 105:4
154:17,20 158:7
158:10
percentages 37:5
period 11:13
79:16 146:19
147:2,12,14
periods 144:20
person 44:16
56:18 59:14
105:14 142:9
person's 55:2
personal 51:20
61:21 62:3 102:4
123:22 124:2,16
129:15,22 130:10

130:14,17,22
145:20
persons 170:2
phone 5:25 19:2
23:3,5 27:14 44:4
117:14 149:9
phones 4:10
physical 48:11
physically 137:2
pick 4:7 43:14
picked 21:22
22:14 43:3,8,17
44:7,17
picking 22:10
pie 66:4,6 149:16
149:23
piece 61:13
pitch 152:18
pjd 34:23
pjd2 42:11
pjd6 24:12
pjd69 30:12
pjd70 34:10
pjd71 38:25
pjd72 39:22
place 4:10
plaintiff 1:6 2:4
4:18
plaintiff's 23:11
23:16 24:7,11
27:20 30:10,14
34:12 39:3,20,24
42:9,13 45:18,22
50:15,19 64:25
65:4 78:18,21
84:12,16 87:15,21
92:3 95:11,14
109:11,15 110:14
124:19 126:19
132:21 133:2
135:7 167:14

169:7 170:5 171:5
171:12,23 172:15
177:11,12,13,14
177:15,16,18,20
177:21,22 178:4,7
178:9,10,12,14,17
178:19,20,22
**plaintiffs** 2:10
115:4 169:24
170:3,6,8 172:25
174:8
**plan** 83:23 84:2
**planned** 121:2
**play** 153:6
**please** 4:5,9 5:14
5:25 6:8 28:4 40:7
74:8 90:17 91:19
106:11 108:25
123:6,8 127:18
139:21 151:5
165:11,16
**plus** 55:9 68:2
**pocket** 90:22
**point** 19:19 99:18
113:13 117:4
127:11 131:23
**points** 119:6
153:25
**popham** 2:21 5:3
**popped** 102:18
**portion** 100:15
139:22 153:19
158:8 165:20
**posed** 161:25
**position** 6:25 9:2
113:3
**positions** 9:17
122:2
**possible** 45:6
98:19 141:9

**possibly** 29:21
32:24 130:25
**post** 101:17 102:5
102:23 103:13
104:24 113:10
123:6,12 138:13
138:22 139:6,25
160:7
**potential** 33:5
96:21 97:23 98:6
112:17 121:8
145:11,16,18
**potentially** 38:11
121:13
**practice** 10:17,20
**practices** 7:24
**precious** 11:6
**precise** 8:14 153:5
153:6
**precisely** 14:2
**predominantly**
15:19 48:7
**premier** 109:23
**prepare** 57:11
72:17 120:20,22
128:15 174:18
**prepared** 65:22
113:24 114:5
127:13 128:7
129:4 133:6
135:12
**preparing** 115:13
167:22
**presence** 53:6
161:17
**present** 2:20 5:12
57:6 71:24 87:12
164:11 167:3
**presented** 67:10
67:11,12 76:16
150:2 161:15

**president** 169:9
**pretty** 18:10 47:13
72:3 92:20 112:23
**previously** 20:9
28:6 46:2 55:25
68:5 110:14
149:12 167:13
**printed** 39:14
84:13
**printer** 61:13
**printing** 51:7
**printout** 39:13
177:18
**printouts** 54:20
**prior** 19:19 52:17
52:20,23 53:14
54:23 57:9 71:11
82:7,16 87:10
88:10 89:3 102:21
106:17 108:2,5,8
108:15,20 117:6,8
128:11
**priorities** 159:4
**prioritize** 158:16
**priority** 159:20,23
**private** 4:7
**privilege** 27:5
28:11,13 42:6
66:2,3 117:20
118:8 120:3
166:13
**privileged** 31:16
38:11 119:18
**privileges** 66:10
**privy** 125:20
126:3
**pro** 2:16 72:16
**probably** 38:16
47:10,16,17 49:21
63:5 83:8 116:13
136:13 137:6

**proceed** 9:18
**proceeding** 7:10
8:8,18
**process** 24:14
48:11 58:16 120:9
**produce** 15:5
74:17
**produced** 15:4
22:20 24:15 26:12
26:15 39:7 40:4
46:2 53:17 55:24
64:16 68:18 78:14
84:12,20 87:16,25
92:11 95:4 98:25
114:6,12 122:7
127:21 136:21
143:16
**product** 28:12
66:11 77:6,7,25
120:18
**production** 9:7
25:21 26:8 74:21
98:20 127:2
**productions**
119:19
**professional** 1:18
10:20 11:3 18:19
51:8,9 61:22 62:4
62:5,9 88:18,25
137:12 144:4
**professionals** 62:6
**promised** 75:11
**proper** 54:2 72:8
119:8
**properly** 27:7
**protected** 27:4
**protections** 8:14
**protective** 7:12,16
46:19 111:15
**provide** 28:13
67:3 77:20 173:5

**[provide - recess]**

173:6,15
**provided** 22:5
28:7 67:6 77:22
79:3,7 102:17
173:10,17,23
**provider** 21:6
**provides** 80:3
**province** 172:3
**ps** 107:12 109:2
**public** 1:19 3:15
6:11 176:20 179:6
180:25
**pull** 94:21 134:14
**pulled** 25:8 94:16
**pulling** 91:15
**purchases** 85:22
95:20 178:18
**purpose** 35:4
67:17 96:20
106:24 107:5
115:7 141:5,22
**purposes** 27:6
83:22 143:2
**pursuant** 12:7
19:8 79:19 131:12
**put** 15:23 16:2
18:14 24:25 35:9
35:11 36:21 40:10
41:11,13 49:11
51:3 54:23 63:10
64:9,14 65:20
96:2 102:3,12,16
112:7 113:2
114:17 116:22
120:11 123:21
127:24 128:4
131:3 140:14
143:13,13,24
144:15,17,18
156:23 157:12
160:11 178:4

**putting** 14:10,24
15:8,10 67:13,15
77:5 123:20

**q**

**quarter** 36:16,25
74:10,13 77:2
**quest** 157:15
**question** 3:11 13:2
27:2,3 31:20
46:18 54:4 59:24
65:25 69:24 70:2
70:5 74:2 77:11
79:5,23 80:6,8,22
80:24 83:18 89:22
90:25 100:4,14,19
100:24 103:3,5
104:9 105:13
108:23 111:10,24
111:25 113:4
118:4 119:10
123:2,8 129:8,11
129:24,25 130:2
139:16,20 142:14
150:9,25 151:5
153:16,17,22
158:23 162:16
165:13,15,17,19
**questioned** 57:19
96:15,15 100:24
**questioning** 52:17
71:10,12 98:13
158:4
**questions** 25:7
72:6 82:6 100:19
104:20 108:13
110:20 122:15
141:23 142:2
145:8 150:15,21
151:7 157:25
158:2 159:12,16
160:14 161:21,24

164:5 172:13
174:24 175:5
**quick** 83:18 86:24
145:7
**quickly** 73:3
134:10,15
**quite** 34:19 89:19
99:10
**quito** 161:11
162:21
**quote** 7:16

**r**

**r** 2:2 6:5,10 179:2
**raised** 158:25
**raising** 113:10
**ran** 33:14
**randomly** 94:3
149:10
**range** 140:23
**rare** 60:13
**rarity** 60:19
**rate** 73:13,14
**read** 100:14,16
116:16 139:19,23
153:17,20 165:18
165:21 167:4
**reading** 40:15
168:9
**ready** 9:12
**real** 48:20
**really** 17:5 33:17
44:15 46:14 54:11
72:7 85:24 109:8
113:8,13 139:5,10
**ream** 89:20
**reason** 12:25
25:16 125:4
128:10 129:9
146:12 156:12
180:9

**reasons** 8:9 9:6
38:3 82:16
**recall** 12:4 13:16
13:24 14:2 15:22
17:5,8,15 19:12,22
21:24 23:4 27:13
33:13 35:4 43:10
43:13 46:22,25
49:20 50:2,8 52:6
59:8 63:2,6 64:5
64:12,13,21 67:8
67:10,20 69:3
73:15,19,20 75:16
76:8,20 85:9,15,17
92:10 96:12,24
97:5 98:10 103:20
103:21,22 104:14
104:16,18,19
105:10,11,17,21
105:25 109:6,9
114:23 117:11,12
122:8 130:11
131:11,14 134:5,9
141:10 144:16
147:18 148:21
150:17 151:10
152:4,13 154:24
156:2 164:21
168:14 173:24
174:20
**receipt** 54:21
69:21
**receipts** 20:25
54:20 55:8 68:9
69:17 143:18,19
143:20 144:2
156:25 157:11
**received** 63:11
79:2,6 85:6
**recess** 70:20
132:10

**recognize** 50:22
95:21 98:19
109:18
**recollect** 45:7
**recollection** 43:8
108:10 140:18
168:18
**recommend** 99:17
**reconcile** 137:15
**reconvene** 70:15
132:6
**record** 4:4,15 5:15
6:3,20 24:10 27:9
36:20 42:2,3
65:13 70:11,18,22
70:25 71:18
114:18 119:20
132:8,12 175:9
176:8
**record's** 24:21
**recording** 4:13
**records** 14:11
63:14 65:18 81:7
114:7 161:4
**recover** 40:25
**recovered** 158:10
**recoveries** 74:11
77:3
**recovery** 30:23
40:12 41:10 85:3
85:7 106:15 108:7
158:11
**reduced** 83:10
**redundant** 9:9
**refer** 83:2 92:14
92:25 107:22
**reference** 52:2
**referenced** 108:8
**referencing** 53:12
**referred** 23:15
24:6 27:19 30:13

34:11 39:2,23
42:12 45:21 50:18
65:3 78:20 84:15
87:20 92:2 95:13
109:14 132:25
135:6 137:20
155:22
**referring** 40:19
44:16 48:18 86:4
89:12 90:2 107:23
136:22 137:23
149:16,19 151:14
169:5 170:25
171:15
**refers** 52:2 86:5
93:25 109:22
**reflect** 166:5
168:19
**reflected** 115:12
168:24
**reflects** 52:19 54:8
**refresh** 43:7
**regard** 28:13
31:19 58:20
116:21 118:10
119:19
**regardless** 59:11
**regards** 8:3
**registered** 1:18
**regular** 89:8
**regularly** 7:2
**regulate** 59:13
**reimbursed** 63:19
130:20
**reject** 56:21 59:2
**relate** 29:16 37:5
87:12
**related** 5:8 15:12
15:17 24:23 34:3
40:13 49:10 55:12
55:15 56:4,23

58:7 59:6,16,21
60:6,17 61:18
64:19 72:4 78:5,6
78:12 82:6 108:14
108:17 131:8
139:15 140:11
141:2,12,16 154:7
156:10 171:18
174:21 179:13
**relates** 78:13
108:19
**relating** 25:6 51:5
53:18
**relationship** 18:19
18:20 110:9
162:10
**relevant** 10:16,19
112:13 128:12
**relief** 7:11 8:10
**remain** 95:8
**remedies** 8:12
**remember** 33:17
50:12 67:13,13
75:13 76:10 152:2
152:17 155:7,8,10
159:24 160:23
161:5,10 162:3,23
163:2 168:11
**reminding** 118:9
**remote** 7:2 53:10
**remotely** 5:13
**rental** 54:17
**repeat** 34:18 123:8
**rephrase** 142:22
151:2,5
**report** 174:6
**reporter** 1:18 5:5
6:8 12:20 100:16
139:23 153:20
165:21 176:2
179:6

**reporting** 55:21
157:20 180:2
**reports** 55:21,24
116:3
**represent** 93:12
166:22 170:2,6,7
**representatives**
161:11,17,20
162:5,11
**represented** 55:13
55:14 165:7
**representing**
115:3
**represents** 46:13
**request** 31:4 38:15
121:10
**requested** 26:2
42:4 67:20 100:15
121:15 139:22
153:19 165:20
174:17
**requirement**
157:20
**reserved** 3:11
**resolution** 37:22
173:3
**resources** 146:13
169:23 170:15
**respect** 66:13
153:4
**respectfully** 172:5
**respective** 3:5
**responded** 23:24
44:24
**responding** 43:22
**response** 27:11
28:5 70:5
**responses** 24:4
177:13
**responsibility**
168:4

**responsive** 25:4
  30:7
**restate** 31:18
  35:23 53:24 57:18
  74:2 79:5 129:25
**retained** 14:7,9
  19:8
**retainer** 62:24
  64:2,4,7,19 89:3,7
  89:8,10,16,25 90:7
  90:9,19 91:2,5,8
  131:7,13
**return** 30:22
  31:10 32:3,15
  33:19 36:7,12,23
  36:23 37:11 41:9
  41:14 152:20
**returning** 81:13
**returns** 32:23
  35:10
**reveal** 7:18 111:13
**review** 8:12 27:7
  54:25 112:18
  128:22,22 140:10
**reviewed** 48:16
  49:8,14 55:4
  129:13
**reviewing** 28:25
**rico** 18:11 52:20
  52:24 53:8,15,18
  54:5 71:14,15
  72:5 75:18 82:2,7
  87:11 98:4,7
  100:6 101:2,17
  102:2,5,15,23
  103:6,8,13 104:12
  104:24 108:2,5,8
  108:14,16,18,20
  113:10 123:6,12
  128:11 131:9
  138:13 139:6,25

**140:5** 160:7
**rid** 141:7
**right** 17:9 18:21
  20:2,12 21:14,17
  24:24 46:8 49:7
  49:11 77:14 79:25
  83:5 86:19 88:24
  94:4 103:16,24
  107:12 114:8,13
  114:19 115:6
  134:7 147:13
  150:13,16 158:16
  166:7
**rights** 8:23,23 75:3
  99:3 111:21
**ring** 170:22
**ringing** 19:2
**rising** 12:3 13:7
**rizack** 1:14 4:17
  6:16 7:1 8:1 9:1,3
  9:19,21 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1,13
  23:19 24:1,12,13
  25:1 26:1 27:1,17
  27:24 28:1 29:1
  30:1,12,18 31:1
  32:1 33:1 34:1,10
  34:16,23 35:1
  36:1 37:1 38:1,25
  39:1,7,22 40:1,4
  41:1 42:1,4,8,11
  42:22 43:1 44:1
  45:1,19 46:1,2
  47:1 48:1 49:1
  50:1,17,23 51:1
  52:1 53:1,17 54:1
  54:14 55:1 56:1
  57:1,7,17 58:1

**59:1** 60:1 61:1
  62:1 63:1 64:1
  65:1,8,10 66:1
  67:1,2 68:1 69:1
  70:1 71:1,12,17
  72:1 73:1,9 74:1
  75:1 76:1 77:1
  78:1,19,25 79:1
  80:1,4,9 81:1 82:1
  82:2,3 83:1,21
  84:1,10 85:1 86:1
  87:1,17,25 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1,5,8
  100:1,5,25 101:1
  102:1 103:1 104:1
  105:1 106:1 107:1
  108:1,22 109:1,19
  110:1,19 111:1,7
  112:1,20 113:1,2
  113:18 114:1
  115:1 116:1 117:1
  118:1 119:1 120:1
  121:1,5 122:1
  123:1,4 124:1
  125:1 126:1 127:1
  128:1 129:1 130:1
  131:1 132:1 133:1
  133:6 134:1 135:1
  135:3,12 136:1,21
  137:1 138:1,12
  139:1 140:1 141:1
  142:1,5,19 143:1
  144:1 145:1 146:1
  147:1 148:1 149:1
  150:1 151:1,6
  152:1 153:1 154:1
  155:1 156:1 157:1
  158:1,5 159:1,19

**160:1,20** 161:1
  162:1,19 163:1
  164:1 165:1 166:1
  167:1,10 168:1
  169:1 170:1 171:1
  172:1,14 173:1
  174:1,24 175:1
  176:8,13 179:8
  180:7,22
**rizack's** 8:23 9:7
  137:23
**road** 180:4
**role** 97:11 169:15
**romero** 2:22 5:22
  5:22
**room** 59:14
  148:24 149:2
**roughly** 21:24
  41:13
**row** 35:14 36:11
  134:19
**rows** 35:14
**royce** 124:20
**rules** 12:15
**run** 12:14 32:18
  33:2,7 37:15
  38:14
**running** 63:9
**russ** 165:9 167:24
  168:13

**s**

**s** 2:2 3:2,2 6:10
  13:13 177:9 180:9
**saw** 21:19 59:12
  128:19 166:17
**saying** 78:10 80:15
  99:13 138:10
  159:23 163:19
**says** 31:7 46:4
  51:20,21 56:12
  61:22 66:20 81:20

82:24 85:5,21
86:2,12 90:19
92:7 100:21 114:9
119:12 172:22
174:2
**scenario**  30:19
33:8 177:15,17,20
**scenarios**  32:18
33:3,14 35:3,12
36:8 37:15 38:14
**schedule**  68:14
**scheme**  61:19
**scope**  8:14 53:2
57:3 72:7,8
112:23
**scratch**  142:21
143:5
**sd**  82:24
**se**  2:16 72:16
**sealing**  3:6
**search**  25:12,17
44:8
**searched**  25:14
**second**  86:24
97:14 172:18
**secret**  8:22
**section**  107:11
**see**  26:2 28:4,14
35:8 43:25 46:9
47:6 48:22 51:22
55:4 56:10,17
62:18,22 66:4
68:25 73:2 81:21
82:19 83:5 84:25
86:4 100:21
101:25 107:13
109:21 110:22
111:2 114:9 115:5
119:22 132:2
133:25 134:17
136:23 142:19,23

154:6 168:5 170:8
171:7 173:12,13
174:10
**seeing**  59:8 167:2
173:24
**seeking**  36:12,22
**seeks**  7:15
**seen**  23:19 77:6
113:23 129:4
131:7 137:3,4
140:13 151:17,22
170:10 173:21
**self**  11:12,23 12:8
13:5
**sell**  142:7,7 145:12
154:21 155:17
**selling**  151:8
**selva**  46:7 49:23
**send**  16:7 28:8
69:21 148:10,15
148:16 149:5,13
149:14,20 156:22
**sense**  15:6 72:13
72:20 84:2 131:22
136:8
**sensitive**  4:6
**sent**  22:24,25 26:7
26:16 29:10 39:15
44:13,20 69:7
149:7,24
**sentence**  167:17
167:19
**separately**  90:8
**serious**  169:25
**served**  23:13,23
24:4
**service**  61:12
**services**  51:8 77:9
77:17,22 144:5
146:14

**set**  97:14 114:24
178:15
**setting**  71:20
102:22 141:20
147:24
**settled**  31:25
**settlement**  31:9,22
31:24 32:25 36:8
36:15 37:12,12
40:11 41:3
**seven**  164:14
**share**  31:25 32:2
149:9
**shares**  31:9 40:17
40:19,22 151:25
154:13,14,15
155:19 158:25
**sheet**  18:15 180:2
**sheets**  15:7 16:15
73:16,18
**shipping**  51:7
**shop**  96:11
**short**  11:13 70:7
70:20 132:10
**shorthand**  179:5
**shortly**  11:20
**show**  45:17 47:4
47:17 62:16 65:21
86:11 126:18
165:11 169:6
171:23
**showed**  63:15,17
**showing**  47:23
88:23
**shown**  91:9 136:5
**shows**  127:5
**side**  82:18
**sign**  46:6 123:24
**signature**  179:17
**signed**  3:14,16
76:3 80:10 81:3

169:22 170:15
171:4,11
**significant**  146:19
147:2,12,16
**silverstein**  2:14
132:17,18
**similar**  35:14 36:6
**similarly**  133:15
**simple**  153:16
**singular**  52:3,4
**sir**  28:14 74:8
165:16 172:16
**sit**  134:13 140:18
**sitting**  152:8
**six**  14:6
**skill**  137:12
**slaght**  124:19
**slightly**  137:22
**small**  60:16
**smith**  124:20
**snapshot**  93:23
**solicited**  152:23
**somebody**  30:20
31:25 40:10,23
54:22 61:24 67:19
118:25 135:17
163:20
**somewhat**  66:3
91:18
**soon**  92:21
**sorry**  26:24 39:7
43:24 46:15 48:24
62:2 89:13 103:2
111:8 138:6
**sort**  71:8 73:23
94:3 108:12 172:8
**sorts**  167:6
**source**  75:23,25
88:3 113:19,20,25
**sourced**  85:19

**sources** 122:24
123:10 124:11,16
**southern** 1:2 4:22
**spanish** 163:8,11
163:12,14,18
164:2,3,6,9,10
**speak** 70:4 104:3,4
121:23 163:8
**speaking** 112:3
139:10 163:10,14
163:17 164:2
166:9 167:8
168:14
**specific** 9:13 31:19
89:12 104:21
172:9
**specifically** 35:24
46:25 91:10 92:24
131:4 141:10
171:14,18
**specifics** 167:23
**speculate** 125:11
**speculation**
125:12,15,17
162:14
**speech** 168:8,11
**spend** 142:25
**spent** 59:13 69:13
167:25
**spoke** 164:3,4,8,9
**spoken** 117:8
154:5
**spreadsheet** 144:2
**spreadsheets**
102:8 143:14
**standard** 60:10,22
60:24
**standards** 60:2
**start** 10:6 43:23
93:10 100:20

**started** 6:18 14:4
16:22 88:8
**starting** 37:16
51:18 174:4
**state** 1:19 5:14
6:12,23 7:3,4 27:9
28:3 31:14 42:3
52:16 71:18 72:18
107:22 111:9
144:6 166:12
**stated** 31:16 82:16
**statement** 6:20
28:19 54:22
167:16
**statements** 9:17
15:6 21:3 29:23
47:25 48:5,12,14
48:17 49:8,15,22
50:6 67:4 68:9,13
77:22 85:19 86:10
86:10 144:9,12
156:5 166:2
168:19
**states** 1:2 4:21
**stenographic**
179:11
**stern** 2:10,13 71:6
132:16,16
**steve** 173:10 174:5
**steven** 1:8 2:16
4:20 6:5,22 15:11
16:9 17:13 42:2
44:21 45:9 46:8
47:3 51:3 56:6
63:8 87:18 88:12
91:24 95:18
104:19 105:11
115:19 116:10
132:23 140:9
169:22 178:4

**stick** 57:12
**stipulated** 3:4,9,13
9:5
**stood** 60:9 112:22
**stopped** 18:6 19:2
**storage** 61:11
**story** 112:16
**straight** 32:6
**strategies** 120:14
**strategy** 66:23
**stray** 134:8
**streamlinefamil...**
42:18
**street** 2:17
**structure** 34:3
36:3 54:12 75:2
104:2
**studies** 10:13,16
10:19
**stuff** 20:21 57:10
82:7 87:10 94:15
94:22 95:3 98:15
98:25 99:24
102:12,17 104:22
120:15,19 136:17
137:16 140:14
167:6 172:7
**subject** 27:7 66:10
**submit** 143:17
174:5
**submitted** 135:24
**subpoena** 23:20
23:22 24:22 25:7
25:8 28:5 177:12
**subpoenas** 23:12
**subscribed** 176:16
180:23
**subsequent** 138:3
**subsequently**
122:7 171:3

**substance** 27:12
117:19
**substantially**
136:19 137:20
**subtle** 136:12
**succeeded** 100:7
**successful** 30:22
140:4
**sucumbios** 172:3
**suggest** 100:18
**suite** 2:11,17
**sullivan** 9:6,9
21:20 22:10,17,22
42:18,21 43:3
45:2 95:5 98:20
98:25 114:6 138:3
160:4
**summaries** 55:20
136:11 146:4
149:13 161:15,21
**summary** 54:8
87:18 126:22
127:12,20,22,24
128:3,5,7 129:3
132:24 137:4
149:23 178:10,13
178:14,21
**supplied** 157:3
**supplies** 61:14,15
**support** 8:4
**supported** 7:20
**suppose** 52:11
**supposed** 57:3
**supposedly** 171:5
171:11
**sure** 6:4 17:12
20:7 24:21 35:17
60:17 64:12 67:21
68:6,16 70:10
72:25 81:6 84:9
91:3,6 101:9,23

143:21,22 150:7
154:11 155:2
160:8 170:24
**survived** 168:2
**swear** 6:8
**sworn** 3:16 6:11
176:16 179:8
180:23
**system** 94:11,14

**t**

**t** 3:2,2 177:4,9
179:2,2
**take** 8:25 35:22
47:8,20 58:19
70:6 72:22 113:6
113:16 122:3
131:18,25 142:23
154:8 168:4
**taken** 4:18 70:20
132:10
**talk** 98:16 99:5
117:17 122:2,6
155:4
**talked** 112:9 117:6
153:10 168:12
**talking** 89:11
120:14 149:22
150:5,20
**tax** 43:25
**taxes** 51:11
**taxi** 54:16
**td** 85:21 93:3
95:20 96:3 114:9
126:11,12 138:18
178:17
**team** 36:4,4
**telephone** 89:14
**tell** 30:17 34:15
50:25 76:18 82:3
93:14 95:24
116:18 120:4,24

122:9 134:3 168:9
**telling** 27:12
163:21
**temp** 15:25
**temporary** 17:7
**ten** 70:11
**tend** 7:18 111:12
**tends** 111:12
**terminated** 18:18
**terms** 25:3 37:21
64:7 66:23 99:20
103:18 104:3,5,10
105:21,25 113:7
137:13 152:3,18
153:10,15,16
**testified** 6:13 80:9
119:17 136:9,19
137:11 139:5,7
147:10,15 158:24
**testify** 137:5
153:15
**testifying** 121:13
**testimony** 9:3,8
31:14 43:2 80:2
138:7 176:7
**thank** 6:21 34:24
84:8
**thanks** 70:15
168:2
**thing** 12:18 66:24
100:23 112:7,24
119:11 140:21
**things** 14:16 17:21
18:23,25 61:19
73:3 77:5 91:19
99:13 116:6
119:14 143:22
150:6
**think** 6:17 11:21
15:24 16:21 18:9
18:9,22 20:19

22:23 28:21 33:11
35:14 41:8 45:11
46:22 53:25 66:20
67:18 71:23,25
72:6,21,24 75:20
79:12 83:20 84:3
90:15 96:13 97:13
106:18 108:2,6
112:20,21 113:7
120:5,25 129:7
131:24 136:8
137:16,18 139:4
139:17 146:22
148:2,5 149:22
150:5,24 151:3
157:19 161:8
164:13 169:17
**thinking** 138:6
147:15
**third** 84:22
**thought** 28:20
38:7 60:11
**three** 11:22 20:5
21:15 43:11 85:2
101:12 103:13
133:24 140:4
**ticket** 56:11,13,15
**time** 3:11 9:20
13:17,25 16:19
18:5,17 19:6,19
24:20,21 33:12,13
33:18 38:19,21
43:14 47:21 48:17
50:13 52:8 54:7
73:16,18 79:16
83:23 93:23 98:8
115:17 117:5
119:7 123:15
128:18 131:5
141:24 144:20
146:13,20 147:3

147:12,14 152:7
157:10 172:10
174:17,25 176:11
**times** 32:4,7,15
36:22 38:18 41:13
98:9,11 117:12
161:6
**timing** 122:14
**tiny** 35:19
**titled** 49:4
**today** 9:3 117:7
121:2 134:13
140:18 167:10
**told** 44:11 140:7
163:6
**tomorrow** 8:19
53:5 57:5,9,11,14
72:3 99:20 113:7
113:14 128:13
153:7 159:9
**ton** 57:10
**tonight** 83:21
**top** 31:6,17 46:5
50:9 51:18 85:2
85:21 89:7,9 92:8
133:24 147:19
158:17
**topic** 117:24
**topics** 25:15 57:12
117:13 118:11
121:22 122:10
**topline** 36:18
**total** 38:19 134:11
135:4 139:24
147:22 148:5
178:22
**totaling** 47:4
**trader** 11:6
**train** 54:17
**trained** 14:21

**transaction** 85:10
**transactions**
178:11
**transcript** 176:4
**transcription**
179:11
**transfer** 115:8
144:10
**transferred**
130:13,16
**transfers** 115:4,11
144:11
**translate** 163:24
**translating** 163:21
**transportation**
54:16
**travel** 51:6 90:23
96:17 160:21
**traveled** 55:16
160:24 161:6
**traveling** 60:8
**treat** 136:5
**trial** 3:12 18:11
71:14
**tried** 46:16 146:3
**trip** 110:7 143:17
164:23
**troubled** 11:11
**true** 28:18 56:6
133:17 146:18
179:10
**truly** 57:23
**trust** 92:15 93:16
**try** 143:8
**trying** 17:3 26:25
36:19 38:4,5 63:7
83:7,8,24,25
106:19 137:14
139:12,17 145:12
155:16

**turn** 4:9 29:9,11
29:15 167:14
172:18
**turned** 24:17 27:8
30:4 64:22
**turnover** 29:5
**turnpike** 2:11
**tvx** 96:11
**twice** 39:14,15
161:7
**two** 22:23 38:17
40:9 43:13 46:6
51:19 93:4 99:12
99:13 101:12
118:20,24 129:18
130:24 132:14
150:6 168:10
170:2 171:4 174:3
**type** 13:10 20:24
**typically** 56:10

**u**

**u** 3:2 11:9
**ubs** 11:5,14
**udapt** 166:18
173:2,6,9,15
**underlying** 33:21
114:5 129:5
**understand** 8:13
13:2 22:9 28:12
32:17 48:11 77:10
79:22 80:22 82:4
97:16 103:3
112:15 129:24
138:9 151:3,13
163:18 169:16
**understanding**
35:7 81:9 90:12
154:4 163:4
**understood** 49:10
145:25

**undertook** 24:14
**united** 1:2 4:21
**university** 10:9,15
**unrepresented**
113:4
**urge** 113:14
129:10
**use** 38:3 40:22
114:2 143:10
**usually** 156:25

**v**

**value** 77:21
**various** 32:25,25
55:18,23 65:15,17
65:20 66:10 83:22
143:16 153:13
178:7
**verbally** 149:25
**verification** 58:15
**verified** 116:7
**verify** 53:11 54:17
58:6 71:24 156:6
**verifying** 59:15,18
**veritext** 5:4,6
180:2
**versus** 4:20 180:6
**vetting** 156:4
**video** 4:13,17
**videographer** 2:21
4:2 5:5,24 6:7
70:17,21 132:7,11
176:6
**view** 8:17 31:15
53:19 117:4
153:12
**violate** 75:3
**violates** 8:22 99:2
**violation** 54:5
111:20
**viva** 46:7 49:24

**volunteer** 89:21

**w**

**waiting** 41:22
**waived** 3:8
**walk** 35:13
**want** 6:22,24 8:24
12:14 29:8 31:18
41:21 42:3 52:15
66:21 70:11 72:18
78:16 91:3,19
99:4 118:14 120:7
120:13,19 121:4
129:25
**wanted** 6:19 9:14
27:8 67:21,22
83:24 94:7,19
97:13
**way** 17:23 25:18
59:13 73:20 99:24
105:7 112:6
120:11 122:18
142:20 150:3
153:11
**we've** 70:8 91:7,10
131:17
**week** 117:9 121:7
122:11
**went** 10:8 56:18
56:18 58:10 77:25
88:6,7,13 97:5
98:10 102:25
103:12 135:19
138:22 163:13
169:4 172:10
173:18
**west** 2:17
**whispering** 4:7
**whoever's** 90:21
**wife** 124:17
**wife's** 138:18

wild 13:19
willing 72:20
wire 69:6,7 82:21
86:13 144:10,11
wires 48:6,7,9,12
49:19 65:19 68:11
69:21 86:2,3,7,11
86:21 88:13
125:21 156:22
wiring 125:5
withdraw 14:25
20:15 105:22
131:16 139:14
162:15
withheld 31:3
122:7
withhold 25:20
41:18 42:5
withholding 28:9
28:22 30:7 38:10
witness 6:9 34:8
38:23 45:17 64:24
66:5,17 70:4
78:17 90:15 91:4
91:22 98:16 100:4
108:12 110:13
111:23 112:4,11
117:17 119:25
120:4 131:20
132:20 137:10
139:4,13,20
141:23 151:4
153:18 158:4,24
160:14 165:19
166:10 171:23
172:8 175:6 179:7
woman 15:23
16:20 17:8
woman's 144:16
word 40:22 116:16
137:6,22 143:9

151:12 166:12
words 158:16
173:6
work 14:23 15:16
15:18,20 16:4
17:11 18:2,12
19:5,7,15 20:11
21:4 24:23 28:11
43:25 44:10 55:3
66:11 73:12 77:4
77:5,7,24 78:2,5,8
78:9 81:2 83:8
90:13 102:23
107:8 120:18
128:20 137:13,23
138:5 141:3,12,17
142:6 144:7
147:23
worked 11:5,6,13
90:21 92:12
104:22 146:19
147:3
working 14:4
16:23 18:6 51:14
58:21,25 75:4
101:24 102:6,20
114:14 122:21,22
123:4,13 124:12
126:9 129:14
workout 82:25
workouts 11:10
works 142:16
worksheet 87:18
92:8 132:23
134:15 141:8
178:12,20
workshops 10:22
worry 39:11
wrapped 89:16
write 28:17 124:9

writes 169:20
written 19:9,13
27:10,14 48:7
64:3,6 86:16
wrong 139:4
wrote 27:24 28:16
28:19

| x |
| --- |

x 1:4,10 30:20,20
31:10 32:4 177:2
177:4,9

| y |
| --- |

yanza 106:24
156:16 157:6
164:19 169:21
170:7,14 172:22
173:4,11 174:5
yeah 11:25 16:9
16:16 32:11 35:15
35:20 38:21 48:3
58:8 77:24 85:8
86:2 92:10 102:16
121:4 127:16
133:14 134:20
135:2 138:11
140:2 145:24
169:12
year 9:24 10:10
11:17,18 27:25
88:10 93:23 116:9
162:22 174:4
years 11:14,22
13:22,22 14:6,6
54:3 67:9 96:25
116:13,14,15,19
116:19 146:3
172:23
yesterday 121:3
166:18

yield 29:21 32:4
32:24
york 1:2,16,17,19
2:5,5,17,17 4:23
5:2,2 6:12 9:23
10:8 60:25 180:2
180:4,4

| z |
| --- |

z 6:5,10
zolfo 11:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 25

d
uador
16 neeting
N
21

Date:
Card Typ M
Acct #:
Card Ent
Trans Ty
Auth Code
Check:
Check ID:
Server:

Subtotal: 10

TIP_____

TOTAL_____

SIGNATURE___

Thank you fo us!

Custome

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# AppealTech

7 West 36th Street, 10th Floor
New York, NY 10018

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/6/2018 | 18-03-011 |

PAID 03/14/2018

**Bill To**

Steven Donziger, Esq.
245 West 104th, #7D
New York, New York 10025

| P.O. No. | Terms | Due Date | FED.TAX ID | REP | CASE NAME |
|----------|-------|----------|------------|-----|-----------|
| 33272 | Due on receipt | 3/6/2018 | 20-2475416 | JLM | IMO Steven R. Donziger |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Service Date: 3/5/18 | | | |
| DECLARATIONS | | | |
| 1 Copy - 206 Pages @ $.30 | 206 | 0.30 | 61.80T |
| Binding and Printing of Covers - 1 Book @ $12.50 | 1 | 12.50 | 12.50T |
| | | | |
| EXHIBITS (2 VOLUMES) | | | |
| 1 Copy - 779 Pages @ $.30 | 779 | 0.30 | 233.70T |
| Binding and Printing of Covers - 2 Books @ $12.50 | 2 | 12.50 | 25.00T |
| | | | |
| OPPOSITION TO MOTION | | | |
| 1 Copy - 58 Pages, Stapled @ $.30 | 58 | 0.30 | 17.40T |
| | | | |
| Service by Mail - 1 Party @ $35.00 | 1 | 35.00 | 35.00T |
| | | | |
| Postage for Service Copies | | 18.75 | 18.75T |
| | | | |
| Sub-Total | | | 404.15 |
| Sales Tax - NYC @ 8.875% | | 8.875% | 35.87 |

| | |
|---|---|
| **Total** | $440.02 |
| **Payments/Credits** | -$440.02 |
| **Balance Due** | $0.00 |

Payable to  Z & J LLC dba APPEALTECH  TIN#20-2475416
TO ASSIST YOU AND YOUR CLIENT, WE NOW ACCEPT MAJOR CREDIT CARDS.
Tel: 212-213-3222 Fax: 212-213-4133 e-mail: mail@appealtech.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

# AppealTech

7 West 36th Street, 10th Floor
New York, NY 10018

# Invoice

PAID 03/14/2018

| Date | Invoice # |
|------|-----------|
| 3/19/2018 | 18-03-085 |

**Bill To**

Steven Donziger, Esq.
245 West 104th, #7D
New York, New York 10025

| P.O. No. | Terms | Due Date | FED.TAX ID | REP | CASE NAME |
|----------|-------|----------|------------|-----|-----------|
| 33272 | Due on receipt | 3/19/2018 | 20-2475416 | JLM | IMO Steven R. Donziger |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Filing Date: 3/19/18 | | | |
| DECLARATIONS | | | |
| 5 Copies - 206 Pages @ $.30 | 1,030 | 0.30 | 309.00T |
| Binding and Printing of Covers - 5 Books @ $12.50 | 5 | 12.50 | 62.50T |
| | | | |
| EXHIBITS (2 VOLUMES) | | | |
| 5 Copies - 779 Pages @ $.30 | 3,895 | 0.30 | 1,168.50T |
| Binding and Printing of Covers - 10 Books @ $12.50 | 10 | 12.50 | 125.00T |
| | | | |
| OPPOSITION TO MOTION | | | |
| 5 Copies - 58 Pages, Stapled @ $.30 | 290 | 0.30 | 87.00T |
| | | | |
| LESS COURTESY DISCOUNT | | -305.75 | -305.75 |
| | | | |
| Filing of Documents at AD1 | | 65.00 | 65.00T |
| | | | |
| Sub-Total | | | 1,511.25 |
| Sales Tax - NYC @ 8.875% | | 8.875% | 134.12 |

| | | |
|---|---|---|
| **Total** | | $1,645.37 |
| **Payments/Credits** | | -$1,645.37 |
| **Balance Due** | | $0.00 |

Payable to  Z & J LLC dba APPEALTECH TIN#20-2475416
TO ASSIST YOU AND YOUR CLIENT, WE NOW ACCEPT MAJOR CREDIT CARDS.
Tel: 212-213-3222 Fax: 212-213-4133 e-mail: mail@appealtech.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# AppealTech

7 West 36th Street, 10th Floor
New York, NY 10018

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/21/2018 | 18-02-084 |

**PAID 02/16/2018**

**Bill To**

Steven Donziger, Esq.
245 West 104th, #7D
New York, New York 10025

| P.O. No. | Terms | Due Date | FED.TAX ID | REP | CASE NAME |
|----------|-------|----------|------------|-----|-----------|
| 33171 | Net 30 | 3/23/2018 | 20-2475416 | JLM | IMO Steven R. Donziger |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Service & Filing Date: 2/16/18 | | | |
| EXHIBITS | | | |
| 3 Copies of 779 Pages (Perfect Binding Included) | | 1,498.50 | 1,498.50T |
| | | | |
| OPPOSITION TO MOTION | | | |
| 3 Copies of 58 Pages, Stapled @$.30 | 174 | 0.30 | 52.20T |
| | | | |
| Service and Filing of Documents at AD1 | | 95.00 | 95.00T |
| E-Filing of Documents | | 75.00 | 75.00T |
| Premium Charge for Expedited Service | | 300.00 | 300.00T |
| | | | |
| Sub-Total | | | 2,020.70 |
| Sales Tax - NYC @ 8.875% | | 8.875% | 179.34 |

Accounts forwarded to collections will be assessed a 25% processing fee.

| | |
|---|---|
| **Total** | $2,200.04 |
| **Payments/Credits** | -$2,200.04 |
| **Balance Due** | $0.00 |

Payable to  Z & J LLC dba APPEALTECH TIN#20-2475416
TO ASSIST YOU AND YOUR CLIENT, WE NOW ACCEPT MAJOR CREDIT CARDS.
Tel: 212-213-3222 Fax: 212-213-4133 e-mail: mail@appealtech.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

The Westin Ottawa
11 Colonel By Drive
Ottawa, ON  K1N 9H4
Canada
Tel: 613-560-7000 Fax: 613-234-5396

# WESTIN®

## HOTELS & RESORTS

Steven Donzinger
ASSEMBLY OF FIRST NATIONS
AK30AD - Sub Block

| | | | | |
|---|---|---|---|---|
| Page Number | : | 1 | Invoice Nbr | : 366870 |
| Guest Number | : | 1355722 | | |
| Folio ID | : | A | | |
| Arrive Date | : | 05-DEC-17 | 16:43 | |
| Depart Date | : | 07-DEC-17 | 11:13 | |
| No. Of Guest | : | 1 | | |
| Room Number | : | 1517 | | |
| Club Account | : | | | |

Tax Invoice

Tax ID :   811719848RT0001
The Westin Ottawa  DEC-07-2017  11:13  A0058671

| Date | Reference | Description | Charges (CAD) | Credits (CAD) |
|---|---|---|---|---|
| 05-DEC-17 | 7252 | The Shore Club | 90.79 | |
| 05-DEC-17 | RT1517 | Room | 199.00 | |
| 05-DEC-17 | RT1517 | Tax-HST Rooms | 25.87 | |
| 05-DEC-17 | RT1517 | Destination Marketing Program | 5.97 | |
| 05-DEC-17 | RT1517 | Dest Marketing Program HST | 0.78 | |
| 06-DEC-17 | 7381 | The Shore Club | 100.09 | |
| 06-DEC-17 | RT1517 | Room | 199.00 | |
| 06-DEC-17 | RT1517 | Tax-HST Rooms | 25.87 | |
| 06-DEC-17 | RT1517 | Destination Marketing Program | 5.97 | |
| 06-DEC-17 | RT1517 | Dest Marketing Program HST | 0.78 | |
| 07-DEC-17 | 12/7 | Early Departure Fee | 100.00 | |
| 07-DEC-17 | 12/7 | Tax-HST Rooms | 13.00 | |
| 07-DEC-17 | 12/7 | Destination Marketing Program | 3.00 | |
| 07-DEC-17 | 12/7 | Dest Marketing Program HST | 0.39 | |
| 07-DEC-17 | VI | Visa-8490 | | |

-770.51

S.R.D Ottawa

Continued on the next page

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

The Westin Ottawa
11 Colonel By Drive
Ottawa, ON K1N 9H4
Canada
Tel: 613-560-7000 Fax: 613-234-5396

# WESTIN®

## HOTELS & RESORTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Steven Donzinger | Page Number | : | 2 | Invoice Nbr | : | 366870 |
| ASSEMBLY OF FIRST NATIONS | Guest Number | : | 1355722 | | | |
| AK30AD - Sub Block | Folio ID | : | A | | | |
| | Arrive Date | : | 05-DEC-17 | 16:43 | | |
| | Depart Date | : | 07-DEC-17 | 11:13 | | |
| | No. Of Guest | : | 1 | | | |
| | Room Number | : | 1517 | | | |
| | Club Account | : | | | | |

Approve EMV Receipt for VI - 8490: no CVM
TC:5877F18DBED907D0  TVR:8080008000  AID:A0000000031010
Application Label:VISA CREDIT

|  | | |
|---|---|---|
| ** Total | 770.51 | -770.51 |
| *** Balance | 0.00 | |

I agreed to pay all room & incidental charges.



Amount (CAD)

0.00
0.00
0.00
0.00
0.00

FIND CLARITY, BOOST HAPPINESS - Like a gym membership for your mind, Headspace gives you simple tools to feel happier, work smarter and sleep better. Get some Headspace at westin.com/headspace

Continued on the next page

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000380

SRD
Ottawa



## CHÂTEAU LAURIER

1 Rideau Street
Ottawa, ON, Canada  K1N 8S7
T (613) 241-1414  F (613) 562-7030
G.S.T. / H.S.T Registration #843511775

| | |
|---|---|
| Room/Chambre | : 0265 |
| Folio # | : |
| Invoice # | : |
| Cashier/Cassier # | : 3857 |
| Page # | : 1 of 1 |

Reference No.

Mr Steven Donziger
245 West 104
7D
New York NY

| | |
|---|---|
| Arrival/Arrivée | : 12-06-17 |
| Departure/Départ | : 12-07-17 |
| **Fairmont President's Club** | |
| 3240920790 | |

| Date | Description | Additional Information/Supplémentaire | Charges | Credits |
|---|---|---|---|---|
| 12-06-17 | Zoe's Lounge | CHECK# 3435 | 25.91 | |
| 12-06-17 | Refreshment Centre Mineral | Room# 0265 : CHECK# 32432 Eska Spring Water 1 | 10.17 | |
| 12-06-17 | Room Charge | | 409.00 | |
| 12-06-17 | Destination Marketing Fee | | 12.27 | |
| 12-06-17 | Room HST (13%) | | 54.77 | |

| | | | | |
|---|---|---|---|---|
| | Total | | 512.12 | 0.00 |
| | Balance Due/Solde | | 512.12 | |

| GST Summary / Sommaire | | HST Summary / Sommaire | |
|---|---|---|---|
| Room/Chambre | 0.00 | Room/Chambre | 54.77 |
| F&B/Restauration | 0.00 | F&B/Restauration | 3.58 |
| Other/Autres | 0.00 | Other/Autres | 0.00 |
| Total | 0.00 | Total | 58.35 |

Thank you for choosing Fairmont Hotels & Resorts.
To provide feedback about your stay, please contact Mr. Claude Sauvé, General Manager, at Claude.Sauve@fairmont.com.
We also invite you to share memories of your experience on our community forum - visit www.everyonesanoriginal.com.

Merci d'avoir choisi les Hôtels Fairmont.
Pour donner votre opinion sur votre séjour, veuillez contacter M. Claude Sauvé, Directeur général, à Claude.Sauve@fairmont.com.
Nous vous invitons également à partager les souvenirs de votre expérience sur notre forum - www.everyonesanoriginal.com.

For information or reservations, visit us at
**www.fairmont.com** or call Fairmont Hotels & Resorts from:
United States or Canada  1 800 441 1414
Pour information et réservations visitez notre web au
**www.fairmont.com** ou téléphoner au Hôtels Fairmont de:
États-Unis ou Canada  1 800 441 1414

I agree that my liability for this bill is not waived and I agree to be help personally liable in the event that the indicated person, company or association fails to pay for any part of or the full amount of these charges. Overdue balance subject to a surcharge at the rate of 1.5% per month after one month. (18.00% per annum.) I have accepted delivery of The Globe and Mail. Had I refused, I would have been eligible for a $1.00 (Mon-Fri) and $2.00 (Sat.) credit to my account. (At participating hotels.)

Je me porte personnellement responsable du règlement total de cette note au cas ou la compagnie, l'association ou son représentant tant désigné en refuserait le paiement. Les comptes en souffrance sont sujets à un intérêt du 1.5% par mois après un mois. (18.00% par année) J'ai accepté la livraison du journal The Globe and Mail. Si j'avais refusé, j'aurais du obtenir un crédit à mon compte de 1.00$ par jour (du Lundi au Vendredi) et de 2.00$ le Samedi. (Dans les hôtels participants.)

## Thank you for choosing to stay with Fairmont Hotels & Resorts
## Merci d'avoir choisi les Hôtels Fairmont

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)



## OPTIONS DE DÉPART SIMPLIFIÉ

Afin de mieux vous servir, Fairmont vous offre des options de départ simplifié.

**Départ express**

Si vous souhaitez profiter de notre option Départ express, veuillez remplir tous les champs à droite et déposer le formulaire dans la boîte située au comptoir de la réception.

**Autres options de départ**

Communiquez avec le service Royal pour obtenir les options suivantes :
· départ par téléphone;
· vérification de la facture à l'avance
· services par courriel.

## EASY DEPARTURE OPTIONS

For your convenience, Fairmont offers you easy departure options.

**Express checkout**

To take advantage of our Express Checkout option, please complete all information in the form at right and return to the dropoff box located at the Front Desk.

**Other departure options**

Contact Royal Service for:
· telephone checkout
· advance folio review
· e-mail services

_265_

Nom (en caractères d'imprimerie) | Name (please print)        Chambre | Room

◯ J'autorise l'utilisation de ma carte de crédit pour payer le montant total de mon compte. | I authorize my entire account be processed through my credit card.

Signature | Signature                                        Date | Date

Veuillez envoyer un exemplaire de mon relevé de compte à l'adresse de courriel ci-dessous : | Please send a copy of my account to the e-mail address below:

Adresse de courriel | E-mail address

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000383

**3BL Media, LLC**
136 West Street
Suite 104
Northampton, MA  01060 US
(866) 508-0993 x187
accounting@3blmedia.com
www.3blmedia.com



## INVOICE

**BILL TO**
Steven Donziger
Donziger & Associates
245 West 104th Street
Suite 7D
New York, NY  10025 USA

**INVOICE #** 29863
**DATE** 12/08/2017
**DUE DATE** 12/12/2017
**TERMS** Due on receipt

| ACTIVITY | AMOUNT |
|---|---|
| **Featured Placement**<br>Guaranteed Placement of one press release as Editor's Pick on CSRwire.com | 275.00 |

Contact: Steven Donziger  (sdonziger@donzigerandassociates.com)

THANK YOU FOR YOUR BUSINESS!                **BALANCE DUE**        **USD 275.00**

PLEASE NOTE 3BL Media BANKING INSTRUCTIONS:
Payment by ACH transfer in US$ is requested and may be made to:
  Wells Fargo Bank NA
  San Francisco, CA
  ABA/Routing #: 121000248
  Account #:    4434890109
  SWIFT Code:  WFBIUS6S
  Account Name: 3BL MEDIA, LLC
           2222 Sedwick Road
           Durham, NC  27713
  TIN#:       35-2553958

*[handwritten] 1/17/18 Per SRD do not send anything*

*[handwritten] Verify total due — 3 invoices attached #4095*

*[handwritten] $3410 due 12/15/17 for package pmt*
*410 due from 9/15/17 for prepaid balance*
*275 due 12/12/17 guarantee + placement*
*#4,095 total*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**3BL Media, LLC**
136 West Street
Suite 104
Northampton, MA 01060 US
(866) 508-0993 x187
accounting@3blmedia.com
www.3blmedia.com



INVOICE

**BILL TO**
Steven Donziger
Donziger & Associates
245 West 104th Street
Suite 7D
New York, NY 10025 USA

**INVOICE #** 29411
**DATE** 05/31/2017
**DUE DATE** 12/15/2017

| ACTIVITY | AMOUNT |
|---|---|
| **Featured Press Release** Package of 24 Featured Press Releases - 24 @ $775 less: 45% discount - one Featured Press Release is guaranteed to be the Editor's Pick on CSRwire.com - one Featured Press Release is guaranteed to be a CSRlive Story | 3,410.00 |

Total Featured Press Release Package cost is $10,230, to be paid as follows:
  #29409   $3,410 - due June 6, 2017
  #29410   $3,410 - due September 15, 2017
  #29411   $3,410 - due December 15, 2017

Contact: Steven Donziger  (sdonziger@donzigerandassociates.com)

Please Note Our New Payment Details and TIN. For your convenience attached
is our updated Form W-9:
  2222 Sedwick Road
  Durham, NC 27713

THANK YOU FOR YOUR BUSINESS!          BALANCE DUE          **USD 3,410.00**

PLEASE NOTE 3BL Media BANKING INSTRUCTIONS:
Payment by ACH transfer in US$ is requested and may be made to:
  Wells Fargo Bank NA
  San Francisco, CA
  ABA/Routing #: 121000248
  Account #:    4434890109

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**3BL Media, LLC**
136 West Street
Suite 104
Northampton, MA  01060 US
(866) 508-0993 x187
accounting@3blmedia.com
www.3blmedia.com



## INVOICE

**BILL TO**
Steven Donziger
Donziger & Associates
245 West 104th Street
Suite 7D
New York, NY  10025 USA

**INVOICE #** 29410
**DATE** 05/31/2017
**DUE DATE** 09/15/2017

| ACTIVITY | AMOUNT |
|---|---|
| **Featured Press Release**<br>Package of 24 Featured Press Releases<br>- 24 @ $775 less: 45% discount | 3,410.00 |

- one Featured Press Release is guaranteed to be the Editor's Pick on CSRwire.com
- one Featured Press Release is guaranteed to be a CSRlive Story

Total Featured Press Release Package cost is $10,230, to be paid as follows:
  #29409   $3,410  -  due June 6, 2017
  #29410   $3,410  -  due September 15, 2017
  #29411   $3,410  -  due December 15, 2017

Contact: Steven Donziger  (sdonziger@donzigerandassociates.com)

Please Note Our New Payment Details and TIN.  For your convenience attached
is our updated Form W-9:
  2222 Sedwick Road
  Durham, NC  27713

THANK YOU FOR YOUR BUSINESS!

PLEASE NOTE 3BL Media BANKING INSTRUCTIONS:
Payment by ACH transfer in US$ is requested and may be made to:
  Wells Fargo Bank NA
  San Francisco, CA
  ABA/Routing #: 121000248
  Account #:   4434890109

| PAYMENT | 3,000.00 |
|---|---|
| BALANCE DUE | **USD 410.00** |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000386

```
SWIFT Code:    WFBIUS6S
Account Name:  3BL MEDIA, LLC
               2222 Sedwick Road
               Durham, NC  27713
TIN#:          35-2553958
```

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000387

 **Bank**
America's Most Convenient Bank®

2868-MTD29000092517001722-000000


DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK , NY. 10025-0000

To: DONZIGER AND ASSOCIATES PLLC

    In accordance with your instructions, we have DEBITED your
account #:                         **********8783 for USD $4905.44 on 09/25
                                   /2017.
If you have any questions, please contact your nearest TD Bank Branch
or call 1-888 751-9000.

    The Wire transfer equivalent of CAD 5,864.95
Exchange rate:                     0.8364
    A wire transfer fee in the amount of $40.00 has been deducted from you
    r account.
Sender Reference:                  09221705444855LN
    * * *
Beneficiary:                       Rex Weyler
Address:                           822 Austin Dr
                                   Mansons Landing Canada
Beneficiary Bank:                  Royal Bank Of Canada
Address:                           10Th Street And Sasamat
                                   Vancouver Canada
    * * *
Originator Bank Info:
Bank to Bank info fields:          {6500} Pay Invoice*

THANK YOU FOR CHOOSING TD BANK



Page 01

Member FDIC TD Bank N.A.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000388

# Invoice

Law Offices of Steven R. Donziger
245 West 104ᵗʰ Street, #7D
New York, NY  10025

*2/5/2018*
*Do not pay until*
*SRD approval*

**Partial reimbursement for legal and consultative services and expenses/Ecuador environmental case**

**2013-2017**

Due: $200,000.00

**Wire $150,000:**

**Steven Donziger**
TD Bank
2831 Broadway, New York, NY
Account # 4273938783
RTN 026013673
Swift Code NRTHUS33XXX

**Wire $50,000:**

Laura B. Miller
Citibank
Account # 33346374
RTN: 0210-0008-9
Swift Code CITI US 33

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Bank of America | Online Banking | Transfer Submitted

Transfer Submitted

close window

Print this Page

**Transfer status: In Process**
**Order Number: 221092316**

### Transfer Accounts

**From:** CWP Associates : Avail. Bal REDACTED

**To:** Forum Nobis (Citibank)

### Transfer Details

#### Send amount

Send amount: $10,000.00

Additional fee: $30.00

#### Transfer description

legal fees

#### Transfer dates

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 01/12/2018

Estimated delivery date: 01/12/2018
**Note:** The receiving bank may make funds available later than this.

#### Send email to recipient

Email to:

Email from:

Subject:

Message:

#### Transfer on behalf of

Name:

ID:

Email:

Street address:

City:

https://transfers.bankofamerica.com/jsp/bofa/transfer_printable_version.jsp?isConfirm=fal...   1/12/2018

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000390

*aaron legal fees*

# FORUM NOBIS
PLLC

## INVOICE FOR PROFESSIONAL SERVICES

**DATED:**  January 9, 2018

**SERVICES DATED:**  August 1, 2017 - January 12, 2018

# $10,000.00

STEVEN R. DONZIGER
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

pd 1/12/18
KS

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

**MATTER(s):**      Ecuador

### FEES

| DATE | ITEM | HOURS | TOTAL |
|---|---|---|---|
| Aug to Dec 2017 | FOR PROFESSIONAL SERVICES RENDERED | | $2,500.00 |
| Jan 12 - Feb 9, 2018 | RETAINER (Approx. 75% of full-time) | | $7,500.00 |
| | | Total | $10,000.00 |

### EXPENSES

| DATE | ITEM | QUANTITY | TOTAL |
|---|---|---|---|
| | [ incorporated ] | | |
| | | Net Total | - |

**TOTAL**    **$10,000.00**

PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** 009250571194
**Routing Number:** 254070116
**SWIFT:** CITIUS33

OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370
http://forumnobis.org
aaron@forumnobis.or

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000391

# FORUM NOBIS
PLLC

## ACCOUNT STATUS

**DATED:** August 16, 2017

**BALANCE:** # -$2,500.00

**STEVEN R. DONZIGER**
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

## TRUST ACCOUNT

| DATE | TRANSACTION | AMOUNT | BALANCE |
|---|---|---|---|
| 1-Aug-17 | Outstanding balance | -912.50 | -912.50 |
| 16-Oct-17 | Payment | 15,000.00 | 14,087.50 |
| 9-Jan-18 | Agreed charges re Fall 2017 work and expenses | -16,587.50 | -2,500.00 |

|  |  | **BALANCE** | **-2,500.00** |
|---|---|---|---|

PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** 009250571194
**Routing Number:** 254070116
**SWIFT:** CITIUS33

OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370
htt ://forumnobis.or,
aaron@forumnobis.or,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000392

**CWP ASSOCIATES**

Wilson-EPES Printing

1002

1/12/2018

1,143.00

CWP Associates     Invoive 0028724/Donziger

1,143.00

**CWP ASSOCIATES**

Wilson-EPES Printing

1002

1/12/2018

1,143.00

CWP Associates     Invoive 0028724/Donziger

1,143.00

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)



**WILSON-EPES PRINTING CO., INC.**

775 H Street, NE
Washington, DC 20002
Tel: (202) 789-0096
briefs@wilsonepes.com
www.wilsonepes.com

Steven Donzinger
245 W. 104th Street, #7D
New York, NY 10025

## Invoice

Invoice No:   00028724
Invoice Date:  05/31/2017
Order No:
Account No:  GUPTAWES

| Quantity | Description | Sub Total |
|---|---|---|
| 50 | C/R Reply (Donzinger v. Chevron), #16-1178 | $1,143.00 |

TERMS: Due Upon Receipt
Checks are made payable to Wilson-Epes Printing Co., Inc.
Please contact robyndorsey@wilsonepes.com for any questions or additional payment options.

| | |
|---|---|
| Sub Total: | $1,143.00 |
| Tax: | $0.00 |
| Amount Due: | $1,143.00 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000394

Bank of America | Online Banking | Transfer Submitted

Transfer Submitted

close window

Print this Page

**Transfer status: In Process**
**Order Number: 221947770**

**Transfer Accounts**

From: CWP Associates : Avail. Bal REDACTED

To: Steven Donziger (TD Bank)

**Transfer Details**

**Send amount**

Send amount: $25,000.00

Additional fee: $30.00

**Transfer description**

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 01/24/2018

Estimated delivery date: 01/24/2018
**Note:**The receiving bank may make funds available later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

State:

https://transfers.bankofamerica.com/jsp/bofa/transfer_printable_version.jsp?isConfirm=fal...   1/24/2018

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000395



Invoice

Law Offices of Steven R. Donziger,
245 West 104th Street, #7D
New York, NY 10025

Legal and consultative services/Ecuador environmental case
December 2017

Due: $25,000.00

Wire info:

Steven Donziger
TD Bank
2831 Broadway, New York, NY
Account # 42733938783
RTN 026013673
Swift Code NRTHUS33XXX

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Bank of America | Online Banking | Transfer Submitted                    Page 1 of 2

Transfer Submitted                                                    close window

Print this Page

**Transfer status: In Process**
**Confirmation Number: 222903924**

### Transfer Accounts

**From:** CWP Associates : Avail. Bal REDACTED

**To:** Donziger and Associates PLLC (TD Bank)

### Transfer Details

**Send amount**

Send amount: $25,000.00

Additional fee: $10.00

**Transfer description**

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Next Business Day

Delivery method: ACH

Start on date: 02/02/2018

Estimated delivery date: 02/05/2018
**Note:**The receiving bank may make funds available later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

https://transfers.bankofamerica.com/jsp/bofa/transfer_printable_version.jsp?productClassPo...   2/2/2018

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                              MKS-0000397
PROTECTED BY FED R. EVID. 502(d)

# Invoice

Law Offices of Steven R. Donziger
245 West 104th Street, #7D
New York, NY  10025

**Legal and consultative services/Ecuador environmental case
January 2018**

Due: $25,000.00

*pd 2/2/2018
Actt pmct 2/5/18*

**Wire info:**

**Steven Donziger**
TD Bank
2831 Broadway, New York, NY
Account # 4273938783
RTN 026013673
Swift Code NRTHUS33XXX

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)



# University of Calgary
# Banking Information
# Request Form

**UNIVERSITY OF CALGARY**

**Accounts Receivable**
2500 University Drive NW
Calgary, AB
T2N 1N4
arhelp@ucalgary.ca

| SECTION 1 | Requestor Info | | |
|---|---|---|---|
| Date of Request: | 3/9/2018 | Requested By: | Law Office of Steven R. Donziger |
| Phone Number: | 617-817-3512 | E-mail Address: | Sdonziger@donzigerandassociates.com |

| SECTION 2 | Department Info | |
|---|---|---|
| Department Name: | | Faculty: |

| SECTION 3 | Customer Contact Information |
|---|---|
| Customer Legal Name: | Law office of Steven R. Donziger - CWP Associates |
| Customer Contact Person: | Katie Sullivan |
| Customer Phone Number: | 617-817-3512 |
| Customer E-mail Address: | Katie@streamlinefamilyoffice.com |

| SECTION 4 | Additional Information | |
|---|---|---|
| PeopleSoft Invoice Number(s): | | |
| PeopleSoft Customer ID Number: | | |
| If PeopleSoft invoice not created, attach copy of document provided to customer: Invoice Copy Attached? | | Yes |
| If funds are a donation, does the donor wish to remain anonymous? | | |
| Expected Payment Amount: | 25,000 - | Currency: CAD |

| SECTION 5 | Special Notes or Instructions |
|---|---|
| Nov 2018 Conference: Indigenous Solutions to Environmental Catastrophe<br># 60-25010-RT693480-00001 | |

| Accounts Receivable Office Use Only | |
|---|---|
| Date Request Received: | Request Approved By: |
| Date Request Approved: | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000399

Bank of America | Online Banking | Transfer Funds | Transfer Submitted                    Page 1 of 2



Business Online Banking

Streamline Family Office Inc.   Profile & Settings   Sign Out

How can we help you?

Accounts    Bill Pay    Transfer | Send    Business Services    Special Offers & Deals    Tools & Investing    Open an Account    Help & Support

## Send money to/from other banks, or to someone else using an account number

Make Transfer        Transfer Activity        Add Account/Recipient        Manage Accounts/Recipients

Your transfer is on the way.

Once the transfer is processed, you'll receive an email with a confirmation number.

**Quick Help**

Use this screen to obtain your confirmation number.

What you need?

Obtain your confirmation number and print a copy

Make another transfer.

More information about transfers

**From:** xxxxxxxx9158
**To:** xxx9293
**Description:** _____ deposit

**Transfer Amount**

**Sender**
30 SPRINGDALE AVE
DOVER, MA 02030

**Confirmation Code:** 225860056

**Recipient**
University of Calgary
2500 University Drive NW
Calgary, CANADA T2N1N4 CA

| | |
|---|---|
| Transfer Amount | $19,993.60 |
| Transfer Fees | $35.00 |
| Total: | $20,028.60 |
| Exchange Rate: US $1.00 = 1.2504 CAD | |
| Total to recipient | 25,000.00 CAD |

Make Another Transfer

Secure Area                                                                                         Sign Out

Locations | Contact Us | Invest with Specialist | Privacy & Security | Online Banking Service Agreement | Advertising Practices

Investment and insurance products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
| Are Not Deposits | Are Not Insured By Any Federal Government Agency | Are Not a Condition to Any Banking Service or Activity |

Banking, credit card, automobile loans, mortgage and home equity products are provided by Bank of America, N.A. and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation. Credit and collateral are subject to approval. Terms and conditions apply. This is not a commitment to lend. Programs, rates, terms and conditions are subject to change without notice.

Investing in securities involves risks, and there is always the potential of losing money when you invest in securities. You should review any planned financial transactions that may have tax or legal implications with your personal tax or legal advisor.

Merrill Lynch is the marketing name for Merrill Lynch and Merrill Edge® which are made available through Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S).

https://transfers.bankofamerica.com/jsp/bofa/receive_transfer_dfie_gen3.jsp?processAction...   3/9/2018

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000400

**Invoice**

The Law Offices of Steven Donziger
245 W. 104th St.
New York, NY 10025
United States

Inv. 1

**RE:** 2018

November 2018 Conference: Indigenous Solutions to Environmental Catastrophe

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| **December 8 to February 26, 2018** | Preparations for conference, including meetings, deposit on venue and other intial expenses. | $25,000.00 |

Total:
**$25,000.00**

Please make cheque payable to:
The University of Calgary Group for Education and Human Rights

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000401



**UNIVERSITY OF CALGARY**

**Financial Operations**
**Accounts Receivable**
4ᵗʰ Floor, MLT
2500 University Drive NW
Calgary AB T2N 1N4
ARHelp@ucalgary.ca
(403)220-5611

## UNIVERSITY OF CALGARY BANKING INFORMATION

### CANADIAN DOLLAR ACCOUNT

*This document contains CONFIDENTIAL INFORMATION, which must not be released to a third party or any person within the University of Calgary external to Central Accounts Receivable.*

All payment notifications must be sent to ARHelp@ucalgary.ca, and must contain the date, amount of payment, contact information for the issuing entity and one or more of the following criteria:

- University of Calgary Invoice Number
- University of Calgary Project Number
- Conference Name
- Student ID
- University of Calgary Contact Name

Please remit funds to the following Bank Account:

Beneficiary: University of Calgary

Royal Bank of Canada
335 – 8ᵗʰ Avenue SW, Calgary AB
Bank #: 003
Transit #: 00009
Account #: 106-929-3
Swift Code: ROYCCAT2



AUTHORIZED ACCOUNT SIGNATORY INFORMATION

*University of Calgary Treasurer and Director of Investments*

*Authorized Signature:*  _____

*Printed Name:*   JALLYN PERROT

## Katie Sullivan

| | |
|---|---|
| **From:** | Online Transfers from Bank of America |
| | <bankofamericatransfers@mail.transfers.bankofamerica.com> |
| **Sent:** | Tuesday, March 13, 2018 4:10 PM |
| **To:** | Katie Sullivan |
| **Subject:** | Your Same Day wire transfer was successfully sent |

We have successfully sent the following transfer:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Item #:      226141900
Amount:      $75,000.00
To:      Donziger and Associates PLLC
Fee:      30.00
Send on Date:  03/13/2018
Service: Same Day
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

If there is a problem with executing your request, we will notify you both by email and on the Manage Accounts tab. You can always check your transfer status on the Review Transfer screen at www.bankofamerica.com.

Sincerely,

Member Service

www.bankofamerica.com

*$25,000 services*
*$50,000 reimburse*
*$75,000 total*

-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------

This is a service email from Bank of America. Please note that you may receive service emails in accordance with your Bank of America service agreements, whether or not you elect to receive promotional email.

Read our privacy policy: http://www.bankofamerica.com/privacy

Please don't reply directly to this automatically-generated email message.

Bank of America Email, 8th Floor-NC1-002-08-25, 101 South Tryon St., Charlotte, NC 28255-0001

Bank of America, N.A. Member FDIC. Equal Housing Lender:

http://www.bankofamerica.com/help/equalhousing.cfm

(C) 2018 Bank of America Corporation. All rights reserved.

This email was sent to: katie@streamlinefamilyoffice.com

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000403

**Katie Sullivan**

| | |
|---|---|
| **From:** | Katie Sullivan |
| **Sent:** | Monday, March 12, 2018 6:26 PM |
| **To:** | Katie Sullivan |
| **Subject:** | Print |

## Invoice

Law Offices of Steven R. Donziger
245 West 104th Street, #7D
New York, NY 10025

Date: March 11, 2018

**Partial Expense Reimbursement/Ecuador environmental case
2015, 2016, 2017**

Due: $50,000.00

**Wire $50,000:**

**Steven Donziger**
**TD Bank**
2831 Broadway, New York, NY
Account # 42733938783
RTN: 026013673

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000404

# Invoice

Law Offices of Steven R. Donziger
245 West 104th Street, #7D
New York, NY 10025

**Invoice, February 2018**
**Due: $25,000.00**

**Wire $25,000.00:**

**Steven Donziger**
**TD Bank**
2831 Broadway, New York, NY
Account # 42733938783
**RTN: 026013673**

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000405

Bank of America | Online Banking | Transfer Submitted                              Page 1 of 2

Transfer Submitted                                                            close window

Print this Page

**Transfer status: In Process**
**Confirmation Number: 226230644**

### Transfer Accounts

**From:** CWP Associates : Avail. Bal REDACTED

**To:** Forum Nobis (Citibank)

### Transfer Details

**Send amount**

Send amount: $7,500.00

Additional fee: $10.00

**Transfer description**

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Next Business Day

Delivery method: ACH

Start on date: 03/14/2018

Estimated delivery date: 03/15/2018
**Note:**The receiving bank may make funds available
later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

https://transfers.bankofamerica.com/jsp/bofa/transfer_printable_version.jsp?productClassP...   3/14/2018

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000406

# FORUM NOBIS
PLLC

## INVOICE FOR PROFESSIONAL SERVICES

**DATED:**   March 5, 2018

**SERVICES DATED:**   Feb. 9 – March 9, 2018

# $7,500.00

**STEVEN R. DONZIGER**
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

**MATTER(s):**      Ecuador

## FEES

| DATE | ITEM | HOURS | TOTAL |
|------|------|-------|-------|
| Feb 9 – March 9, 2018 | FOR PROFESSIONAL SERVICES RENDERED | | $7,500.00 |
| | | Total | $7,500.00 |

## EXPENSES

| DATE | ITEM | QUANTITY | TOTAL |
|------|------|----------|-------|
| | [ incorporated ] | | |
| | | Net Total | - |

**TOTAL      $7,500.00**

PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** 009250571194
**Routing Number:** 254070116
**SWIFT:** CITIUS33

OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370

Okay to pay SRD
3/13/18

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000407

## Katie Sullivan

| | |
|---|---|
| **From:** | Online Transfers from Bank of America |
| | \<bankofamericatransfers@mail.transfers.bankofamerica.com> |
| **Sent:** | Friday, March 16, 2018 1:43 PM |
| **To:** | Katie Sullivan |
| **Subject:** | Funds Transfer Request #226432268 Has Been Scheduled |

We have received the following International wire transfer request on March 16, 2018:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Item #:    226432268
Amount:    $21,158.06
To:      University of Calgary
Fee:      35.00
Rate:      1 USD = 1.2767 CAD
Send on Date: 03/16/2018
Service:   International
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Once your wire is done processing, we will transfer the funds and send you a confirmation receipt via email. You can always check your transfer status on the Review Transfer screen at www.bankofamerica.com.

Sincerely,

Member Service

www.bankofamerica.com

---

---

This is a service email from Bank of America. Please note that you may receive service emails in accordance with your Bank of America service agreements, whether or not you elect to receive promotional email.

Read our privacy policy: http://www.bankofamerica.com/privacy

Please don't reply directly to this automatically-generated email message.

Bank of America Email, 8th Floor-NC1-002-08-25, 101 South Tryon St., Charlotte, NC 28255-0001

Bank of America, N.A. Member FDIC. Equal Housing Lender:

http://www.bankofamerica.com/help/equalhousing.cfm

(C) 2018 Bank of America Corporation. All rights reserved.

This email was sent to: katie@streamlinefamilyoffice.com

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000408

# Invoice

The Law Offices of Steven Donziger
245 W. 104th St.
New York, NY 10025
United States

Inv. 2

**RE:** 2018

November 2018 Conference: Indigenous Solutions to Environmental Catastrophe

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| March 12, 2018 | Further deposit for venue | $27,012.50 |

*Approved by SRD 3/16/18*

Total:
$27,012.50

USD $31,158.00

Please make cheque payable to:
The University of Calgary, Group for Education and Human Rights

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000409

## Katie Sullivan

| | |
|---|---|
| **From:** | Kathleen Elizabeth Mahoney <kmahoney@ucalgary.ca> |
| **Sent:** | Monday, March 12, 2018 3:21 PM |
| **To:** | Katie Sullivan |
| **Cc:** | Steven Donziger |
| **Subject:** | FW: UOA1811 -- November 9-12, 2018  Indigenous Solutions to Environmental Catastrophe - |
| **Attachments:** | UOC1811 Revised Contract.pdf; Invoice March 2018 to SDonziger.pdf |
| **Importance:** | High |

Dear Katie,

The dean of University of Calgary is wanting to have the full contract amount for the Banff center of 50k in the account because he fears if the conference was cancelled for some reason, the terms of the contract would put the faculty on the hook for the amount of the contract. Please see Page 4 of 14 in the revised contract that refers to this. I've attached an invoice for the amount of $27, 012.50.

Best regards,

Michelle Davis, BAMus
Assistant to Professor Kathleen Mahoney, QC
Tel: (403) 239-8982
Fax: (403) 208-1714

CONFIDENTIALITY NOTICE: This e-mail and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed and may contain confidential and privileged information protected by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify the sender immediately by return e-mail and delete all copies from your system.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 26

i582che1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                    Plaintiff,              New York, N.Y.

            v.                              11 Civ. 691(LAK)

STEVEN DONZIGER, *et al.*,

                    Defendants.

------------------------------x             Argument

                                            May 8, 2018
                                            4:40 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                            District Judge


                    APPEARANCES


GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     ANNE CHAMPION
     ALEJANDRO A. HERRERA


STERN & KILCULLEN, LLC
     Attorneys for Plaintiff
BY:  HERBERT J. STERN


STEVEN R. DONZIGER
     Pro Se Defendant

i582che1

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Plaintiff, are you ready?

 3              MR. MASTRO:  Randy Mastro, from Gibson Dunn, for the

 4    plaintiff.  Ready, your Honor.

 5              THE COURT:  Mr. Mastro.

 6              THE DEPUTY CLERK:  Defendant, are you ready?

 7              MR. DONZIGER:  Steven Donziger.  I'm ready.

 8              THE COURT:  Mr. Donziger.

 9              The motion for an extension that Mr. Donziger made

10    with respect to the discovery motion Chevron brought on

11    recently I have granted.

12              Mr. Mastro.

13              MR. MASTRO:  Thank you, your Honor.

14              We are here, your Honor, today on an application to

15    hold Mr. Donziger in contempt.  May I hand up some charts that

16    I may use during the presentation, your Honor?

17              Thank you, your Honor.

18              You know, your Honor, I am reminded of that famous

19    Yogi Berra saying, "It's like déjà vu all over again,"

20    Mr. Donziger not complying with court orders, Mr. Donziger

21    stonewalling on discovery.  But, your Honor, we are well past

22    the point where Mr. Donziger has to comply with this court's

23    judgment in this case rendered back in 2014.

24              Now, your Honor, there are -- the very purpose of that

25    judgment, as your Honor explained in your RICO decision, was
```

i582che1

```
 1    that the Lago Agrio judgment was obtained by, your Honor's

 2    words, corrupt means, and the defendants, Mr. Donziger and the

 3    two LAP representatives, quote, may not be allowed to benefit

 4    from that in any way.

 5            Now, your Honor entered a judgment on March 4, 2014,

 6    that had three fundamental elements:

 7            Paragraph 1 imposing a constructive trust on all

 8    property that Donziger has received or hereafter may receive,

 9    directly or indirectly, traceable to the judgment, and that

10    Donziger shall, under that paragraph 1, transfer and forthwith

11    assign to Chevron all such property that he has now or

12    hereafter may obtain.

13            THE COURT:  Look, I think I can spare you a lot of

14    talk.  I have some familiarity with this case.

15            MR. MASTRO:  Yes, you do, your Honor.

16            So I will race ahead only to say, as your Honor, I

17    think, knows, the first element of the contempt is that there

18    has been no such assignment and there has been no, consistent

19    with paragraph 3 of your Honor's judgment, execution of the

20    stock power transferring to Chevron all rights, title, and

21    interest in his Amazonia shares.

22            THE COURT:  Why did it take you so long to get here

23    about that?

24            MR. MASTRO:  Your Honor, in -- it's a fair question,

25    your Honor.  The fact of the matter is that we have been
```

i582che1

1    pursuing multiple remedies in that regard, and I don't think

2    his contempt is any less important or actionable because we

3    coupled that contempt with a second contempt of which we only

4    became aware more recently.

5         And your Honor in that regard, about the Amazonia

6    shares, there is no factual dispute, and Mr. Donziger has, in

7    fact, not signed over his interests in the judgment or his

8    Amazonia shares.  In fact, your Honor gave him certain relief

9    to deposit them in the registry of the court.  We have, in

10   fact, written to your Honor letters over this past three-year

11   period occasionally bringing up the issue of Mr. Donziger not

12   complying with depositing the Amazonia shares, and we now bring

13   that to the court's attention as a matter warranting contempt

14   sanctions because it is now coupled with another, in our view,

15   egregious violation of your Honor's judgment and the injunction

16   that your Honor imposed.  And that really goes, your Honor, to

17   paragraph 5 of the judgment.  Paragraph 5 relates to paragraph

18   1, but it has its own force and effect as well.

19        Donziger and the LAP representatives, as your Honor

20   knows, were enjoined from undertaking any acts to monetize the

21   judgment, and that could include, without limitation, selling,

22   assigning, pledging, transferring, or encumbering any interest

23   therein.

24        Now, your Honor, Mr. Donziger has, we learned

25   recently, still been engaged in the process of attempting to

i582che1

1     sell interest -- pledge interests in the Ecuadorian judgment in

2     exchange for investor funding.  In essence, doing that which,

3     as Mr. Donziger put it in his opposition brief, admitting he

4     has been doing this, he calls it the fundraising at issue

5     concerns interests, his words, in the Ecuadorian judgment,

6     being pledged for investment purposes.

7          Now, your Honor, he thinks or argues, I don't see how

8     he could not realize it is so clear and unambiguous, that

9     because that is fundraising by pledging, his word, interests in

10    the Ecuadorian judgment for investment purposes that somehow

11    absolves him from the direct prohibition your Honor entered

12    under paragraph 5.

13         But he admits too much.  He does not deny that he did

14    this with Elliott and has been doing it with others, trying to

15    pledge interests in the judgment in exchange for investments,

16    to be able to enforce and monetize the judgment.  And your

17    Honor's provision under paragraph 5 of the judgment couldn't be

18    clearer.  He is undertaking acts, any acts to monetize by

19    pledging any interest in the judgment.  By his own words, he

20    admits to trying to pledge interests to potential investors for

21    investment purposes to, in essence, sell or pledge interests in

22    the judgment to get money to be able to enforce and monetize

23    the judgment.

24         Now, your Honor, this seems to me such a clear

25    violation, but I have to go to what Mr. Donziger raises as his

i582che1

excuses or defenses to the violation in the injunction, and
this has been made easier, your Honor, because Mr. Donziger
doesn't deny, nor could he, given the sworn testimony of an
Elliott witness and the handwritten notes and materials that
were provided pursuant to subpoena, but he admits he is doing
this with Elliott and potentially others and has been doing it
in recent months.  He says, well, I can't sell or pledge my
interest.  I guess he means his contingent fee, his 6.3 percent
contingency fee, the percentage he is entitled on anything
that's collected.  The LAPs can't pledge their interest, the
two LAP representatives, but the judgment, and he admits, it
prohibits monetization of his and Messrs. Camacho and
Payaguaje's interest.  But he says, you know, I -- that doesn't
preclude other interests from being pledged.

Now, your Honor, I suggest to you that that is
sophistry and it is not consistent in any way, shape, or form
with the express prohibition on him, quote, undertaking any
acts to monetize the judgment by selling, assigning, or
pledging any interests in the judgment.  It is not so limited.
Your language was as broad as could be and, your Honor,
Mr. Donziger's only bargaining chip in negotiation with
potential funders that he did personally, this is not some
other ally of the Ecuadorian litigation effort, this is him
personally, the enjoined party, his only bargaining chip was to
pledge an interest in future enforcement proceeds in the

i582che1

judgment in exchange for current funding from an investor in

order to be able to enforce and monetize the Ecuadorian

judgment.  That's exactly what your Honor's injunction

prohibited.

Now, he raises your Honor's April 25, 2014 order.

And, again, your Honor is more familiar with that order than

anyone in this courtroom, but if I can take just one moment to

say what I think the order clearly provided for and the context

in which it arose.

Mr. Donziger argued at the time -- there was an

attempt to get a stay pending appeal.  Mr. Donziger argued at

the time that the injunction could have, you know, prevented

him from working on the case, being paid for his work on the

case.  Your Honor flatly rejected that argument and said that

it prevented him from, quote, benefiting personally from

property traceable to the fraudulent judgment.

And your Honor went on to explain that the judgment,

including paragraph 5, the operative paragraph here, deprived

Donziger of the ability to profit in any way from the Lago

Agrio judgment he obtained by fraud.  Your Honor made very

clear, quote, the point of paragraph 5 was to prevent Donziger

and the two LAP representatives from avoiding the effect of the

constructive trust you imposed in paragraph 1 of the injunction

and judgment, that he was supposed to have assigned to Chevron

by selling, assigning, or borrowing on their interests in the

i582che1

1   Lago Agrio judgment, and thus at least confusing the issue of

2   traceability.  That's what your Honor wrote at page 10, and

3   went on to say that paragraph 5 expressly prohibited him from

4   monetizing or profiting from the judgment, including the

5   selling, assigning, or pledging of any interest.

6           In other words, Donziger may not benefit from the

7   personal use of funds obtained by selling, assigning, or

8   pledging any interest in the judgment which would necessarily

9   be traceable to the judgment.  Of course selling an interest in

10  the judgment to an investor is traceable to the judgment.  And

11  of course Mr. Donziger, then using those funds personally,

12  whether it is to advance a litigation interest or he has a 6.3

13  percent contingency fee or lining his pockets, as some of his

14  own clients back in Ecuador, your Honor will recall, charged

15  him with during the trial, that he had misused and mismanaged

16  millions of dollars in funds.  Either way, it is his personal

17  use, a selling or a pledging of an interest in the judgment

18  that he was not allowed to benefit from.

19          Now, your Honor -- your Honor went on, and I think

20  this made it crystal clear, your Honor went on to address the

21  argument that was made by the two LAP representatives in

22  seeking a stay pending appeal.  They argued specifically, and

23  your Honor recognized it, that the litigation against Chevron

24  has been funded by investors in exchange for shares of any

25  eventual recovery.  That was on page 11 of your Honor's April

i582che1

```
 1     2014 decision.  And here is where your Honor made it as crystal

 2     clear as could be, in response to the LAPs' argument, when they

 3     said, We will no longer be able to do that, the two LAPs, your

 4     Honor said -- and that the litigation effort of the LAP group

 5     as a whole and their allies would be stymied, and they wouldn't

 6     be able to pursue their appeal, your Honor said, no.  Your

 7     Honor said nothing in the New York judgment prevents the LAPs,

 8     other than the two LAP representatives who are named in the New

 9     York judgment, and their allies from continuing to raise money

10     in the same fashion.  That's on page 12.  In other words, your

11     Honor could not have made --

12              THE COURT:  So, in other words, to cut to the chase of

13     what I take to be your argument --

14              MR. MASTRO:  Yes, your Honor.

15              THE COURT:  -- and viewing the horizon as it existed

16     then, not as it exists today, when there is now also a separate

17     judgment against the other LAPs --

18              MR. MASTRO:  Precisely, your Honor.

19              THE COURT:  -- which is not at issue on this motion,

20     but is there, the essence of the point is the other 45 of the

21     Lago Agrio plaintiffs were at liberty, given the injunction I

22     entered four years ago, to go out and do whatever they wanted

23     to do to raise money, but not Mr. Donziger --

24              MR. MASTRO:  Precisely, your Honor.

25              THE COURT:  -- regardless of who he is getting the
```

i582che1

1   money for.

2            MR. MASTRO:  Correct, your Honor.  Your Honor made it

3   crystal clear that Mr. Donziger and the two LAPs were enjoined

4   from doing just that, but the other dozens of LAPs, their other

5   allies, they were not.  So your Honor made this crystal clear;

6   and, under those circumstances, to us, it is shocking that

7   Mr. Donziger has continued, apparently with abandon, but

8   certainly we know in the case of Elliott, to have specifically,

9   within recent months, done exactly that which the injunction

10   prohibits.

11            This is not in dispute, your Honor.  Mr. Donziger does

12   not dispute it at all.  And I note that that effort benefits

13   him personally in any event because he has a contingency fee

14   arrangement where he gets a percentage of whatever is

15   collected.

16            THE COURT:  Or so he thinks.  It is subject to the

17   trust I imposed.

18            MR. MASTRO:  Correct, your Honor.  But this is what he

19   is out there selling.  As you can see from the very notes of

20   the Elliott meeting where he is touting his 6.3 percent

21   contingency fee interest.

22            Your Honor, this is directly contrary to your Honor's

23   injunction, and I just want to say this, your Honor, before I

24   close, we don't know the full extent, the full egregiousness of

25   the contempt.  We have been stonewalled in the discovery, so we

i582che1

1   want to continue to receive that discovery because I think the

2   court, in determining the contempt sanction, has a right to

3   know how extensive the contempt has been, and therefore how to

4   remedy it, but that there has been a contempt, that it is clear

5   and unambiguous, and that it is now supported by admissions

6   beyond clear and convincing evidence.  He admits it and says, I

7   have the right to do it.  Your Honor, it is a contempt.

8         THE COURT:  Mr. Donzinger, are you rising because you

9   want to say something or are you rising because you have a

10  medical problem.

11        MR. DONZIGER:  Out of respect for you, but I would

12  like to say something.

13        THE COURT:  Well have a seat.  You will get your

14  chance.

15        MR. MASTRO:  So, your Honor, we are here today to ask

16  your Honor to hold Mr. Donziger in contempt, to compel him to

17  provide discovery of the extent of his contempt, as well as to

18  his assets in connection with the money portion of the

19  judgment.  He has stonewalled us on the discovery entirely.

20        THE COURT:  Okay.

21        MR. MASTRO:  But we ask your Honor to hold

22  Mr. Donziger in contempt, and then we will subsequently ask

23  your Honor to please impose appropriate civil contempt

24  sanctions that coerce him to comply with this court's orders.

25        And I have to say one other thing, your Honor, I asked

i582che1

1   Mr. Donziger today, before he rises, please come here today,

2   bring the Amazonia shares that you don't deny you have, bring

3   the packet of materials offered to provide the folks at Elliott

4   about the opportunity for them to buy an interest in the

5   judgment.  I asked him to bring those just as a sign of good

6   faith that they could be compelled today.  We came with

7   assignment documents with us for him to assign his interest in

8   the judgment as your Honor directed several years ago.  And I

9   hope your Honor --

10           THE COURT:  I don't remember that part.

11           MR. MASTRO:  Your Honor, it is at the end of paragraph

12   1 in the judgment, that you shall transfer and forthwith assign

13   to Chevron all such property in connection with the

14   constructive trust.  It includes any interest he has received

15   or may receive directly or indirectly.  You know, that

16   obviously hasn't happened, your Honor.  But I simply suggest

17   that when Mr. Donziger rises, I hope he will explain why he has

18   or hasn't brought those documents with him, and I hope he will

19   be made to produce them if he hasn't brought them with him

20   today.

21           Thank you very much, your Honor.  Appreciate all the

22   time.

23           THE COURT:  I have a question or two for you.

24           MR. MASTRO:  Certainly, your Honor.

25           THE COURT:  I'm a little bit confused about -- I

i582che1

1    understand the contempt part of the contempt application with

2    respect to paragraph 3.  I'm not entirely clear on paragraph 5

3    in this respect.  Are you asking me to proceed to adjudicate

4    the contempt application with respect to whatever exactly

5    happened with Elliott Management and to give you discovery and

6    then conceivably proceed to further contempt proceeding in

7    relation to whatever else, if anything, occurred, or are you

8    asking me for discovery first and the opportunity to make as

9    full a record as you can with respect to paragraph 5 and then

10   deal with that full record?

11            MR. MASTRO:  Your Honor, I think the contempt as to

12   Elliott has been established now by admission, and Mr. Donziger

13   has suggested, in responding, that he is engaged in a broader

14   array of activity.  I think that, therefore, your Honor is in a

15   position today to issue a contempt finding in relation to

16   Elliott based on the admitted record and conduct, but your

17   Honor then would have to determine what is the appropriate

18   remedy for the contempt.  And I think in order to be able to do

19   that, your Honor and we need to be able to present your Honor

20   with the discovery evidence of the full extent of his contempt.

21   Who else besides Elliott has he done this with?  How has he

22   been doing it?  And your Honor can fashion a remedy.

23            THE COURT:  Look, I don't understand that distinction.

24   There is an injunction, and he either violated it on this

25   occasion he didn't.  And if there are other occasions, he

i582che1

1    either violated it or he didn't.  He is subject to the

2    injunction.  He is subject to the panoply of contempt remedies

3    in the event there is a violation.

4          What is it that you can imagine asking me to do down

5    the road, assuming there is a contempt on paragraph 5, that you

6    can't explain to me now?

7          MR. MASTRO:  Your Honor, I would say it falls into two

8    categories.

9          One, your Honor, is that we know the approach with

10   Elliott.  We don't know what his conduct was with other

11   potential investors as to which a remedy should be fashioned

12   that may have been somewhat of a different approach.

13         Number two, we don't know whether he succeeded during

14   this period in actually obtaining funding.  So therefore, the

15   remedy that your Honor might order -- let's say he raised 5

16   million from investors and he now has control over that amount

17   of money.  You have a right to know, we have a right to know

18   that he has now had personal use of that money by selling

19   interests in the judgment in violation of your Honor's

20   judgment, and that your Honor would then be in a position to

21   issue a contempt sanction of a very different kind, not simply

22   barring him from doing this in the future and holding him in

23   contempt, but actually other remedies about him having to

24   disgorge that money.

25         So I think, your Honor, I have to say this, we need

i582che1

1     the discovery.  I think your Honor has a right to that

2     discovery.  If your Honor were to decided to that you prefer to

3     have the benefit of that discovery first before making a

4     decision on the contempt, even though we think he has admitted

5     his contempt about Elliott, I understand and respect whatever

6     the court wants to do, but I think your Honor has a right to

7     know, in fashioning the remedy, how extensive the conduct has

8     been and what the results of the conduct have been, that you

9     can fashion an appropriate remedy to address his contempt if he

10    is he has actually succeeded at all, how he has been doing it

11    and what kind of steps you would want to take to make sure he

12    doesn't do it anymore and undoes the damage he has done by

13    having violated your Honor's order, including potentially

14    having raised money illegally during this period of time in

15    violation of your Honor's order.

16          THE COURT:  I still don't quite have your position on

17    whether you want me, assuming it is not quite as clear-cut as

18    you do and I'm not saying whether I do or not, to wait on the

19    Elliott Management issue until you have pursued discovery or

20    not.

21          (Continued on next page)

22

23

24

25

I58HChe2

```
1          MR. MASTRO:  Your Honor, I think that it's imperative

2     that you understand the full extent of Mr. Donzinger's contempt

3     and whether he's actually been successful in some of these

4     efforts which are such blatant violations of your Honor's

5     orders and then be able to issue appropriate contempt

6     sanctions.

7          I simply say, your Honor, that the Elliott contempt to

8     us is already a clear violation of your Honor's orders, but we

9     believe that discovery will reveal even more egregious

10    violations and perhaps even successful fundraising, selling off

11    interest in the judgment, and the remedy under those

12    circumstances would have to be even more extensive to address

13    the contempt than the Elliott situation alone.

14         So, your Honor, we definitely want the discovery.  So

15    if your Honor believes that it would be an aid to the Court for

16    the discovery to be had before your Honor rules on the

17    contempt, we understand that and accept that, because we

18    definitely want to have that discovery and the benefit of

19    giving you a full record.

20         THE COURT:  OK.  Thank you.

21         Your turn, Mr. Donzinger.

22         MR. MASTRO:  Your Honor, Amazonia is, of course --

23         THE COURT:  Separate.  I understand that.

24         MR. MASTRO:  And that's ready for resolution.

25         THE COURT:  I understand that.
```

1          MR. MASTRO:  Thank you.

2          Thank you, Mr. Donzinger.  Sorry.

3          MR. DONZINGER:  Your Honor, good afternoon.

4  Mr. Mastro could not be more wrong, and I'm going to tell you

5  why.

6          Chevron exhibited tremendous bad faith in its initial

7  motion to hold me in contempt by citing the wrong order.  They

8  cited your originally RICO judgment rather than the

9  clarification order that you issued on my motion on April 25,

10  2014.

11          THE COURT:  Mr. Donzinger, that was not a

12  clarification order.  That was a ruling on a motion for a stay

13  pending appeal.

14          MR. DONZINGER:  Be that as it may, in that order you

15  made it explicit that my clients in Ecuador were allowed to

16  sell their shares in the judgment to finance litigation

17  expenses, that is, to sell shares to investors in anticipation

18  of some sort of future collection, and you distinguished

19  between doing that and actually selling shares that I owned

20  myself to profit personally.

21          And they have not met their burden.  They haven't

22  presented one iota of evidence.  And the Greenwald -- Lee

23  Grinberg affidavit does not make this out.  It describes me

24  going to a meeting, trying to sell shares of my clients, not my

25  own shares.  There is no evidence.  And I promise you if you

I58HChe2

got Mr. Grimwald in here to testify, he could provide no

evidence, or Ms. Sullivan, that I ever have attempted or ever

have sold my shares.  I am allowed, if I sell the shares of my

clients, to get paid for my work on this case.  You yourself

said that in the April 25 order and I can quote that right

here.

You said:  "Thus as long as no collections are made in

respect to the Lago Agrio judgment," which has never happened,

"the New York judgment could not prevent Donzinger from being

paid just as he has been paid" -- you put an amount of money in

there -- "over the last nine or ten years."  I'm going on your

guidance from April 25.

Further, I feel like I have been acting in full

compliance with the order as explained in docket 1801.  His

little booklet is almost all citing docket 1875.  But in 1801,

your Honor explicitly said we could sell shares to fund the

litigation.  You said it in multiple ways.

In terms of monetization -- let me just cite one other

quote.  You said on page 3 of the judgment, 1801:

"Significantly, the New York judgment did not restrict the

other LAPs, who remain free to sell, assign, or transfer their

interests, if any, in the Lago Agrio judgment and to seek to

enforce it anywhere in the world."

I'm selling, as an intermediary, the points or the

aspects of the judgment that are held by my clients.  I am not

I58HChe2

1    selling my own shares, because that obviously is prohibited by

2    your Honor's RICO judgment.

3            On page 7, you write -- you distinguish between a

4    contingency fee and being paid a retainer from selling -- from

5    generating investments to sell --

6            THE COURT:  You're going to have to clarify,

7    Mr. Donzinger, because docket 1801 is a notice by a court

8    reporter of the filing of a transcript.  So I don't know what

9    you're referring to.

10           MR. DONZINGER:  I'm sorry.  It's 1901.  My apologies.

11           THE COURT:  OK.  Thank you.

12           MR. DONZINGER:  Anyway, on page 7 of 1901, this is

13   what you wrote:  "While any payments of a contingent fee would

14   be traceable to the Lago Agrio judgment, and thus subject to

15   the constructive trust imposed by paragraph 1, the same would

16   not be true of monthly retainer payments unless those payments

17   were traceable to the Lago Agrio judgment."

18           THE COURT:  So why wouldn't a retainer payment, the

19   funds for which were raised from an investor in exchange for an

20   interest in the judgment, be directly traceable to the

21   judgment?

22           MR. DONZINGER:  Because you made a distinction between

23   funds from collecting on the judgment, that is, as a result of

24   enforcement and then executing, and selling interest to pay

25   litigation expenses to pursue valid enforcement actions in

I58HChe2

1   other jurisdictions, which you yourself said was valid and,

2   obviously, the Second Circuit said was valid and permissible.

3   This is why you wrote, if you think back to four years ago when

4   I raised this issue, you said:  At least as long as no

5   collections, that is, collections from enforcing the judgment,

6   are made in respect to the Lago Agrio judgment and funneled

7   to --

8          THE COURT:  Suppose you settle the case for

9   $20 billion.  You think that might be a collection within the

10  meaning of what I wrote?

11         MR. DONZINGER:  Yes.  But there's no settlement.

12  There's no collection.

13         THE COURT:  So it doesn't have to be by execution?

14         MR. DONZINGER:  I haven't really thought that issue

15  through.  All I'll say is there has been no collection on the

16  judgment.  There might not ever be a collection on the

17  judgment.  You have ruled in the RICO judgment that this

18  judgment can be enforced anywhere in the world except in the

19  United States by me and two other people.  That was your

20  ruling.

21         THE COURT:  Well, that's your version.

22         MR. DONZINGER:  Well, I believe that's your ruling.

23  And then you said the New York judgment would not permit

24  Donzinger from being paid, just as he has been paid at least

25  $958,000 and likely considerably more over the last nine or ten

I58HChe2

1    years.  That is what is happening.  I'm not conceding --

2              THE COURT:  In what affidavit by you does it explain

3    exactly what's happening?

4              MR. DONZINGER:  I don't believe I should be obligated

5    to present evidence because they haven't met any of their

6    burden.  What evidence have they presented to show I have sold

7    a single piece of my interest?  Zero.  And it hasn't happened.

8    I'll make that representation right now.

9              This is an attempt, with all due respect to my friends

10   at Gibson Dunn, it is an attempt to dig into my personal

11   finances, to dig in and figure out who the heck is funding this

12   case and to go subpoena them, as they've already done to

13   Ms. Sullivan, in an effort to dry up our funding.  That is why

14   I say at times, even though I know you probably disagree with

15   me, that this is a SLAAP attack.  We have a right to pursue

16   enforcement in other countries.  That can't happen without at

17   least some money to pay expenses.

18             THE COURT:  Mr. Donzinger, lower the temperature.

19   I've heard this SLAAP attack argument for years.  You know I

20   don't accept it, and if the name of the game is to catch a

21   fish, at least put the hook near the fish.

22             MR. DONZINGER:  I'm not sure I know what you mean by

23   that, but I'll say this:  Going back to 1901, you said that the

24   New York -- this is page 10 -- "The New York judgment,

25   including paragraph 5" -- this is the key paragraph on

I58HChe2

1    monetization -- "in fact would deprive Donzinger of the ability

2    to profit from the Lago Agrio judgment that he obtained by

3    fraud," which, by the way, I disagree still.  "The practical

4    effect of that, however, is not to prevent him from working on

5    the case, nor to prevent him from being paid his monthly

6    retainer for his labors.  It is to prevent him from benefiting

7    personally from property traceable to the fraudulent judgment."

8           That is collection.  It is not selling shares to pay

9    litigation expenses.

10          Page 11, 1901:  "The litigation against Chevron has

11   been funded by investors in exchange for shares of any eventual

12   recovery."  That's how it had been funded prior to the RICO

13   case.

14          And then you write:  Nothing in the New York judgment

15   prevents the LAPs, other than the two LAPs named in the

16   judgment, and their allies from continuing to raise money in

17   the same fashion.

18          And then on page 27, you describe your own judgment as

19   "carefully cabined relief."  And I will point out, when the

20   Second Circuit affirmed your Honor, they specifically cited to

21   the fact -- this is very unusual because there had never been a

22   RICO case absent damages in the United States, other than maybe

23   one other.  It was unusual relief that you granted Chevron in

24   the RICO case compared to any other RICO case.

25          The Second Circuit, I believe if you read their

I58HChe2

1    decision carefully, got comfortable with it precisely because

2    your Honor tailored the relief very narrowly and made it

3    explicit that the Second Circuit's decision that this judgment

4    could be enforced by the Ecuadorians anywhere in the world

5    really prevented exactly what Mr. Mastro and Chevron are

6    seeking here, which is a complete shutdown of the ability of

7    the Ecuadorians -- and I am still their lawyer, OK.  I have a

8    right to help my clients fund their own litigation.  I have a

9    right, with my client's permission, to be paid for my work.

10   And none of this money violates the RICO judgment.  And

11   Mr. Mastro is just wrong.  And I really fear for this case,

12   which is making, by the way, tremendous progress in another

13   jurisdiction, but I fear for this case if your Honor grants

14   what Mr. Mastro is seeking.  Because at that point this case,

15   which is exactly what they want because they cannot win, in my

16   opinion, on the merits, they want to shut this down through the

17   back door by drying up financing.

18          I have been in full compliance with your Honor's

19   order.  I really urge you not to grant their motion to hold me

20   in contempt.  This is the sixth time they've tried to do that.

21   They want to wave around that Donzinger was held in contempt.

22   I've had to live with a RICO judgment on me now for many years,

23   sir.  It has not been easy.  Now they want a contempt citation.

24          This case is playing out around the world, in Canada

25   right now.  Your judgment stands on its own.  You found fraud,

I58HChe2

1    OK.  The evidence is what it is.  This ultimately will be

2    reviewed by Canadian courts, and I would urge you to please let

3    this process play out without denying the ability of my clients

4    to continue to fund this action, because I can tell you, and I

5    will represent right here, that I am the lifeline for people in

6    Ecuador to raise money.  And I don't want intimidation to the

7    funders that I have had to solicit from this camp, which they

8    have done repeatedly and they did, as you know, during the RICO

9    case with Burford and Russ DeLeon and many others.  If that

10   goes down again, which is what they really want to do by

11   getting this discovery, it will be virtually impossible for the

12   indigenous peoples of Ecuador and the farmer communities of

13   Ecuador to raise money to fund this litigation.

14        It's not fair, and that's why I say it's SLAAP,

15   because it really is designed -- I have a right to advocate, no

16   matter what you think of me, and I know you don't have a very

17   high opinion of me.  I have a right to continue advocating for

18   my clients, and I have a right to sell their shares to raise

19   money for perfectly legal action in Canada that is progressing,

20   as you know, with three straight appellate court victories in

21   our favor.

22        So I don't get what's happening here.  This is an

23   attack on the First Amendment and the ability of me to be a

24   lawyer or an advocate because, as you know, I might not be a

25   lawyer because there's a Bar complaint against me based on your

I58HChe2

 1        findings.  So I would urge you to take this no further.

 2               You know, if -- I'll say this:  If you want

 3        reassurance from me that I have not sold my interests, there

 4        are ways to do that in camera without the Chevron lawyers

 5        finding out and starting to subpoena all of the goodhearted

 6        individuals who didn't fund me because they like Steve

 7        Donzinger, but because they care about the people down there.

 8        And not even you dispute those people are living in terrible

 9        life conditions as a result of oil pollution.  They deserve a

10        chance, sir, to continue fighting this.

11               And, you know, this has gone on now -- I've had to

12        live with RICO thing filed on February 1, 2011.  My life

13        changed that day, and it has never recovered.  There's only so

14        much that a lawyer should have to take from these types of

15        attacks.

16               If it's your opinion, sir, that I can't raise money, I

17        need clarity, because right now, if you look at 1901 that I'm

18        citing, that is not clear at all.  I believe I'm in compliance

19        with 1901 right now.  I would urge you to go back and really

20        review that carefully, to think deeply about what I'm saying.

21               You know, paragraph 5, cited by Mr. Mastro, also only

22        applies to collections; it doesn't apply to fundraising.  You

23        say in 1901 -- I was concerned with paragraph 5 when I filed

24        that motion way back that your monetization argument prevented

25        me from raising money, and you wrote that the idea that

I58HChe2

1    monetization would prevent financing was so unfounded that it

2    bordered on the irresponsible by me.  How can I take away from

3    that anything other than that we are allowed to continue

4    financing?  I'm not selling my shares; I'm selling my clients'

5    shares.

6           And by the way, the agreements for these deals are

7    between people in Ecuador who own the judgment and the

8    investors.

9           As regards Amazonia --

10          THE COURT:  Who owns the judgment?

11          MR. DONZINGER:  What's that?

12          THE COURT:  Who owns the judgment?

13          MR. DONZINGER:  Well, the Amazon Defense Fund is the

14   beneficiary of the judgment as part of the collective interest

15   of all those affected.  So if there is a collection, the fund

16   would flow to the Amazon Defense Coalition, which is known as

17   the FDA in Ecuador, and they would be obligated to use those

18   funds consistent with the Ecuador judgment -- I mean the

19   Ecuador judgment, which would be for cleanup purposes.

20          THE COURT:  I'm not exactly sure that was an answer to

21   my question.  I don't know whether you meant it to be or not.

22          MR. DONZINGER:  Well, when you say who owns the

23   judgment, it's a class action Ecuador style, and it's owned by

24   all the people affected, with the FDA being the nonprofit

25   entity designated by the court to receive the funds.  I don't

I58HChe2

 1   know if that answers your question or not.

 2            THE COURT:  Well, let's see.

 3            MR. DONZINGER:  As regards the Amazonia issue, because

 4   there's two separate bases they're arguing where I should be

 5   held in contempt, one is this raising money issue, which I just

 6   argued; the second issue, the Amazonia issue, I believe, is

 7   completely baseless, and I'm going to tell you why.

 8            OK.  I have never violated your Honor's order.  OK.  I

 9   am a lawyer in good standing of this state and this court as I

10   sit here today.  I am not violating court orders.  They control

11   Amazonia.  They have my shares already.

12            THE COURT:  How exactly did that happen?

13            MR. DONZINGER:  They sued Amazonia in Gibraltar, as I

14   understand it.  And the people who run Amazonia, there's a

15   board of directors, there was an initial attempt to defend, and

16   ultimately they just gave up for whatever reason, lack of

17   resources.  And they got a default judgment against Amazonia,

18   and then the entity, as I understand it, was put into

19   liquidation.

20            When I filed my opposition to the contempt motion, I

21   mentioned that I wasn't sure of the status of it because they

22   have never disclosed the status of it, and I assume Mr. Mastro

23   had three banker boxes of stuff from that case delivered to my

24   apartment by 9:00 a.m. the next morning.  So somewhere in this

25   massive amount of material, I assume, is the answer to that

I58HChe2

1    question.

2            But I don't think we should play possum here.  I think

3    you should ask the Chevron lawyers do they own my shares,

4    because I don't, as far as I know, have a document that has

5    shares on it.  However, I will be more than happy to do

6    whatever the Court instructs, because I think this is a

7    completely ridiculous issue.

8            THE COURT:  I instructed in 2014.  We are all waiting.

9            MR. DONZINGER:  Why didn't they pursue it for four

10   years?

11           THE COURT:  I asked that question.  That's neither

12   here nor there.

13           MR. DONZINGER:  Just so you know --

14           THE COURT:  You're a lawyer who says he complies with

15   court orders.  There is a court order outstanding since 2014

16   that compels you to deliver an executed stock power.  I am told

17   it has never happened.  You have not denied that.

18           MR. DONZINGER:  Well, that's not the end of the story,

19   sir, OK.  In 2014 -- this was the problem in 2014.  I sent them

20   a letter saying I would be more than happy to negotiate

21   something that would work for both of us.

22           THE COURT:  I read the letter, Mr. Donzinger.

23           MR. DONZINGER:  OK.  They never responded.

24           THE COURT:  So what?

25           MR. DONZINGER:  I acted in good faith.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I58HChe2

1          THE COURT:  So what?

2          MR. DONZINGER:  So why are they here now four years

3     later?  Because we're winning in Canada?

4          THE COURT:  They won.  They got a judgment.  You made

5     them an offer.  They blew it off.  Not the first time in legal

6     history, not the last.

7          MR. DONZINGER:  Well, I'm representing to you today

8     that I do not believe I have violated the order.  I have looked

9     for a way to do it, because had I done that, there would have

10    been all sorts of other problems with divestment.  Had I won

11    the case on appeal, number one; number two, I ran into problems

12    with my clients because I was not allowed to transfer shares

13    absent an agreement by the board of directors in Amazonia.

14          But I will say this:  It doesn't matter, because they

15    own it.  OK.  This is a fake issue.  And if they want me to

16    sign my shares over, which they already have because this would

17    be a public relations exercise for them, I'm happy to do it.  I

18    am not going to sit here and be held in contempt over something

19    that's completely meaningless, when I'm here today ready to do

20    that.

21          So tell me what you want me to do.  He says he has

22    something for me to sign.  Well, why hasn't he presented that

23    to me?  Where is it?  I'm sitting here.  He sent me an email

24    this morning looking for discovery.  Why is he playing possum

25    with me?  To make me look foolish?  Just give me the document

I58HChe2

1   you want me to sign.

2           Do you have it, sir?  I mean, come on.

3           MR. MASTRO:  I do have an assignment here, and I asked

4   you to bring the shares to court today.

5           MR. DONZINGER:  I don't have the shares, sir.  I told

6   you that.

7           And beyond that, excuse me, they filed a motion to

8   compel discovery.

9           THE COURT:  We're not getting there.

10          MR. DONZINGER:  I have a right to answer that before I

11  deal with these issues.

12          THE COURT:  Did I just give you an extension to

13  respond?

14          MR. DONZINGER:  I appreciate that.  Thank you.  I

15  appreciate that.

16          THE COURT:  All right.

17          MR. DONZINGER:  But, I mean, when starts trying to say

18  why don't I bring stuff to court, these issues are still being

19  litigated.

20          To authorize broad-based discovery into my files

21  again -- I remind you I sat for 19 days of depositions between

22  RICO and 1782 process.  Your Honor ordered me to turn over, as

23  you know, my entire case file, entire case file at that time,

24  17 years of work.  To have to now go through that process again

25  when they haven't shown a single piece of evidence that I've

I58HChe2

1   sold my own shares would be, in my mind, very inappropriate.  I

2   really would urge you, please, not to do that.

3          If there is a narrow concern based on 1901 -- they

4   don't believe me.  They think I'm up here lying perhaps.  So

5   they're like, Oh, he's probably telling not telling the truth.

6   How do we know he hasn't sold his shares?  Well, I'm a lawyer

7   and I'm representing to you as an officer of the court right

8   now I have not sold my own shares.  And if you don't believe

9   me, if you need more than that, please fashion a narrow

10  solution for me to give you materials in camera to prove that

11  to you, and I can.  I can do that if you're willing.

12         And if you come away satisfied that that's consistent

13  with docket 1901, which explicitly allows the LAPs to sell

14  shares in the case to finance litigation expenses -- again, I'm

15  not selling my shares, I'm selling their shares.  And I have a

16  fiduciary duty to them, and they understand what's happening

17  with the money.  And, by the way, this issue of my clients

18  being concerned about this and that, that's a whole other

19  group, UDA, that's not my client.  That's a footnote in their

20  reply.

21         I am happy, would be happy -- well, not happy, but I

22  would be more than willing to work with you and to see if that

23  would satisfy your Honor before we go through this incredibly

24  cumbersome process of sitting for depositions, turning over

25  documents.  It's expensive; it's time-consuming.  And with all

I58HChe2

1    due respect, you might not like this, but I'm heavily, heavily

2    focused on helping my clients in Canada do what you said was

3    appropriate, do what you authorized to do and the Second

4    Circuit authorized, which is deal with that very complex

5    litigation.

6           The other problem is I have very little

7    infrastructure.  I'm still a sole practitioner working out of

8    my apartment.  For them to give me this incredibly burdensome

9    subpoena -- by the way, one of the things they're seeking is

10   for me to tell them every single conversation I have had since

11   the RICO judgment came down about the Ecuador case with anybody

12   in the world.  I don't know how I would start doing that.  This

13   is designed to hurt me.  It is designed to get in the way of my

14   advocacy.

15          If there is a legitimate part, legitimate information

16   that they are seeking in discovery, this has to be severely,

17   severely narrowed.  And to me, if there's anything -- I think

18   this whole thing should be shut down.  That's what I'm asking

19   you for.  But if there's anything that might be arguably legit

20   about what they're seeking, it's something related to the

21   narrow issue of am I selling my own shares.  And if you're not

22   going to accept my representation, I can prove to you that I

23   have not sold my own shares, and that's what it should be

24   limited to.

25          Do you have any questions or anything?

I58HChe2

```
 1              THE COURT:  No.

 2              MR. DONZINGER:  Thank you.

 3              THE COURT:  Thank you.

 4              Mr. Mastro.

 5              MR. MASTRO:  Thank you, your Honor.

 6              Your Honor, I'll be uncharacteristically brief.  Your

 7    Honor, Mr. Donzinger describes himself as a lifeline.  I think

 8    your Honor knows from the submissions we've put in, he's

 9    actually now in an ongoing battle with Mr. Fajardo and others

10    as to who actually represents the indigenous people in Ecuador.

11    So I respectfully suggest that that characterization doesn't

12    accurately describe the situation.

13              Your Honor, two separate things:  The Amazonia shares

14    which your Honor ordered back in March 2014, he doesn't deny

15    that he hasn't turned it over, he doesn't deny that he --

16              THE COURT:  He says he doesn't -- I understand him to

17    be saying he doesn't have a stock certificate.

18              MR. MASTRO:  Right.  But that doesn't prevent him,

19    your Honor, from effectuating something that assigns his

20    interest, and your Honor ordered this back in 2014, on appeal

21    ordered him to turn it over into the registry of the court.  I

22    hear Mr. Donzinger saying two things.  I hear him saying, one,

23    and this is what he said in his brief, he said he can't do it

24    because a transfer of shares will materially prejudice my

25    clients.  He says, I can't do it.  Then he says, Oh, but I will
```

I58HChe2

1    do it now.  He speaks out of both sides of his mouth in the

2    same conversation, but he hasn't done it.

3            I just want to be clear to your Honor.  It is an issue

4    we've raised in the past.  In fact, there were appeals and

5    there was Supreme Court denial of cert on June 19, 2017.  We

6    wrote to your Honor immediately after the denial of cert, when

7    there could no longer be any excuse whatsoever for why -- and

8    this is docket entry 1922, your Honor -- why he hadn't turned

9    over the shares.  And of course, when we became aware of his

10   latest contempt, within months later, in soliciting investors

11   by selling off shares of the interest in the judgment, we

12   coupled the two together in this contempt application.

13           So to us there could be no doubt.  And the excuse, and

14   it isn't even an excuse, that even after we obtained the

15   judgment of this Court that he was to turn over the Amazonia

16   shares and assign that interest, that we went to Gibraltar

17   against Amazonia, not him, obtained a money judgment against

18   Amazonia and have put them into a liquidation proceeding, OK,

19   which, by the way, does not mean under English or Gibraltar law

20   that it doesn't still exist.

21           THE COURT:  Of course.

22           MR. MASTRO:  We have a right to our remedy here, just

23   like we're pursuing our remedy there.  We shouldn't even be

24   having this conversation.  He's in contempt about that and

25   should be so held.

I58HChe2

1          THE COURT:  Are you in a position to inform me as to

2     what, if any, rights Amazonia has with respect to the

3     Ecuadorian judgment?

4          MR. MASTRO:  Your Honor, it was our understanding at

5     the time that the Ecuadorian judgment as proceeds were -- and I

6     think we made a record of this during the trial -- that as

7     proceeds from the judgment were collected, they were to go

8     through Amazonia for a distribution system that included

9     Mr. Donzinger's personal contingency fee, as well as other

10    distribution of the moneys.  That was the state of play that we

11    proved in the RICO trial.  I think that's why your Honor

12    ordered --

13         THE COURT:  Is there any reason to think that isn't

14    still the state of play?

15         MR. MASTRO:  Well, your Honor, because there's been so

16    many violations of court orders and so many attempts to change

17    the landscape, but we believe that Amazonia is still the entity

18    that was created for that purpose and exists for that purpose.

19         THE COURT:  So if that were true, for the sake of

20    discussion, what you have is a Gibraltar corporation which is

21    in liquidation, which I understand to be analogous to

22    bankruptcy if it were in the United States; there is an

23    outstanding judgment for whatever billions of dollars; the

24    judgment you obtained is against it; it is unable now to pay

25    that judgment; there is still equity owned by the equity

I58HChe2

1      shareholders who were there to begin with; and it has a

2      contingent right to receive anything that ultimately is

3      collected on the judgment.  Therefore, if the judgment is

4      collected, you have a company in litigation which has nine,

5      ten, whatever number of billions of dollars in collections, a

6      $28 million, or whatever it is, judgment payable.  The company

7      is suddenly enormously solvent, and the equity is highly

8      valuable.

9              Is that about right?

10             MR. MASTRO:  Your Honor, absolutely correct.

11             Now, your Honor, to us the Amazonia question is

12     crystal clear and right for decision.

13             THE COURT:  So here's your $64 question.

14             MR. MASTRO:  Yes, your Honor.

15             THE COURT:  Do you have the stock power you want him

16     to sign?

17             MR. MASTRO:  Your Honor, we do have a share transfer

18     form and assignment ready to present to Mr. Donzinger right

19     now.

20             THE COURT:  Well, you can give it to him.  I'm not

21     going to insist that he sign it.  He is a free actor.  Your

22     motion is outstanding.  I imagine I'll rule on it soon.  And

23     you can let me know, both of you, whether it's in that regard

24     moot.

25             MR. MASTRO:  Thank you, your Honor.

I58HChe2

1           It's two forms actually relating to the different

2     shares of stock.

3           THE COURT:  Whatever.  I'm not getting involved in

4     that negotiation --

5           MR. MASTRO:  Thank you, your Honor.

6           THE COURT:  -- for whatever it is.

7           MR. MASTRO:  Let the record reflect that I just handed

8     Mr. Donzinger the two forms that are share transfer forms

9     related to Amazonia.

10          Now, your Honor --

11          THE COURT:  I won't do anything for 24 hours.

12          MR. MASTRO:  Thank you, your Honor.

13          THE COURT:  Maybe longer.

14          MR. MASTRO:  Your Honor, as to the issues relating to

15    your April 2014 decision, I don't want to belabor them other

16    than Mr. Donzinger, reading aloud some of the same sentences

17    that I read from that opinion which prove beyond question that

18    your Honor was saying that he and the two LAP representatives,

19    as the enjoined parties, could not be involved in undertaking

20    any acts to sell, transfer, pledge any interest in the

21    judgment.

22          MR. DONZINGER:  He didn't say that.

23          MR. MASTRO:  Excuse me, please, sir.

24          MR. DONZINGER:  He didn't say that, sir.

25          THE COURT:  Mr. Donzinger, look, I nearly had to have

I58HChe2

```
1    a criminal defendant dragged out of court this afternoon for

2    doing that, and I don't want to have to do it with you.  Quiet.

3    You had your chance.  He didn't interrupt you.

4              MR. MASTRO:  And I just wanted to say two more things

5    very briefly, your Honor.

6              Mr. Donzinger tries to say, in revisionist history,

7    that paragraphs 1 and 5 of the judgment could relate only to

8    collections.  Actually, the word "collection" is not used in

9    either of those two paragraphs.  It talks about moneys

10   traceable to the judgment.  You chose those words carefully,

11   your Honor.

12             And I suggest just this, your Honor:  We're not here

13   today, as Mr. Donzinger likes to put it, to hurt Mr. Donzinger.

14   He already hurt himself by his own actions.  We're here to

15   enforce a judgment, a judgment in which he is in contempt of,

16   and that's the only reason we are here, your Honor.  We want to

17   know the truth about the full extent of his contempt, and then

18   we ask your Honor to impose appropriate contempt sanctions.

19             Thank you, your Honor.

20             THE COURT:  All right.  Thank you.

21             I'm going to take this under advisement.

22             MR. DONZINGER:  Can I respond, please, just briefly?

23             THE COURT:  Very briefly.

24             MR. DONZINGER:  The word "collection," sir, he's

25   right, it's not used in the order he cites, but it is used
```

I58HChe2

1    extensively in docket 1901.  So he's citing the wrong docket,

2    wrong document.  I would urge you, please, to focus on what I

3    focused on, which is your Honor's order from April 25, 2014,

4    which is the latest version of whether shares can be sold.

5            And your order -- why are you looking at me like that?

6    Your order doesn't prohibit me from selling my client's shares.

7            THE COURT:  OK, Mr. Donzinger.  I have your position.

8    Thank you.

9            Now, there is one other pending motion, at least, that

10   I want to address briefly.  There is the motion that Chevron

11   made on May 4 to compel responses to the post-judgment

12   discovery request.  I've just extended Mr. Donzinger's time to

13   respond.  If Chevron wishes to reply, it can do so by Monday.

14   I'll see you all back here Tuesday afternoon at 4:30 to deal

15   with that.

16           OK.  Thank you.

17           MR. MASTRO:  Thank you, your Honor.

18           (Adjourned)

19

20

21

22

23

24

25

# EXHIBIT 27

Page 2368

SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

        Plaintiff,

      v.                 11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

        Defendants.

------------------------------x

                      November 18, 2013
                      9:35 a.m.

Before:

               HON. LEWIS A. KAPLAN

                     District Judge

            APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     REED M. BRODSKY
     JEFFERSON E. BELL
     ANNE CHAMPION

FRIEDMAN RUBIN
     Attorneys for Donziger Defendants
BY:  RICHARD H. FRIEDMAN
     DEE TAYLOR

LITTLEPAGE BOOTH
     Attorneys for Donziger Defendants
BY:  ZOE LITTLEPAGE
     RAINEY BOOTH

GOMEZ LLC
     Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:  JULIO C. GOMEZ

Page 2369

1            (Trial resumed)

2            THE COURT:  Good morning.

3            What is next?  Do you have a witness?

4            MR. GOMEZ:  Yes.  Good morning, your Honor.

5            THE COURT:  Good morning.

6            MR. GOMEZ:  Defendants call defendant Javier Piaguaje

7   Payaguaje.

8    JAVIER PIAGUAJE PAYAGUAJE,

9        called as a witness by the defendants,

10       having been duly sworn, through Spanish

11       interpreter, testified as follows:

12           THE DEPUTY CLERK:  State your name for the record.

13           THE WITNESS:  Javier Piaguaje.

14  DIRECT EXAMINATION

15  BY MR. GOMEZ:

16  Q.  Good morning, Mr. Piaguaje.

17  A.  Good morning.

18           MR. GOMEZ:  Your Honor, may I approach?

19           THE COURT:  Yes.

20           MR. GOMEZ:  Your Honor, I have handed the witness

21  Defendants' Exhibit 1800 and a copy of the exhibits that are

22  referenced therein.

23           THE COURT:  Let's separate them.  Defendants' Exhibit

24  1800 will be the statement.

25           MR. GOMEZ:  Yes, your Honor.

Page 2370

1   Q.  Mr. Piaguaje, would you please take a look at Defendants'

2   Exhibit 1800 that is before you, sir?  The first eight pages

3   are in Spanish, followed by an English translation and a

4   certificate of translation.

5        Sir, do you recognize this document?

6   A.  Yes.

7   Q.  What is this document, sir?

8   A.  This document is my testimony.

9   Q.  Sir, would you please turn to page 8 of the document?

10       Do you see a signature there, sir?

11  A.  Yes.

12  Q.  Is that your signature?

13  A.  Yes, sir.

14  Q.  Did you review this document before you signed it, sir?

15  A.  Yes.

16  Q.  When you reviewed it and signed it, were all of the

17  statements therein true and accurate to the best of your

18  knowledge?

19  A.  Yes, sir.

20  Q.  And as of now, do all of those statements remain true and

21  accurate?

22  A.  Yes.

23       MR. GOMEZ:  Your Honor, at this time, I would like to

24  move in Defendants' Exhibit 1800.

25       Paragraph 13 references five exhibits:  Defendants'

1   Exhibit 227, 229, 231, 234 and 236.  I would ask that all of

2   those also be moved in at this time.

3              THE COURT:  Well, 1800 is received on the same basis

4   as other statements, that is, subject to objections that will

5   be, I take it, filed if they haven't been already.

6              Right, Mr. Brodsky?

7              MR. BRODSKY:  I believe they have been filed by us,

8   but if they haven't yet yesterday, they will be this morning,

9   unless your Honor wants to hear from us on the objections

10  specifically on that basis.

11             (Plaintiff's Exhibit 1800 received in evidence)

12             THE COURT:  Not now.  The exhibits that were handed

13  up, what about that Mr. Brodsky?

14             MR. BRODSKY:  These are a select portion of the

15  asamblea minutes that the defendants produced in selective

16  fashion weeks ago, prior to the start of the trial, having

17  denied Chevron's repeated requests and subpoenas for the

18  production of documents falling squarely, these falling

19  squarely within those subpoenas.  Your Honor has that motion

20  before you with respect to redactions that have been made in

21  some of the asamblea minutes.  So our objections are as follows

22  in sum.

23             First, it appears that they are using these asamblea

24  minutes as a sword and a shield.  They are shielding what they

25  don't want to be disclose, and they are selectively producing

Page 2372

1    the minutes that they believe help their case.  And your Honor

2    has a sanctions opinion that lays out a lot of the arguments

3    that they make which are frivolous.

4         Second, many of the items in here are hearsay within

5    hearsay, statements made by certain people about actions that

6    are being taken or taken.  So there may be some problems with

7    respect to them on that basis as well.

8         Finally, your Honor, we have our motion before you

9    seeking to view some of the minutes that have been redacted.

10   Some of them may complete these minutes.  It's hard to tell

11   from just receiving a subset.

12        THE COURT:  You want to be heard, Mr. Gomez?

13        MR. GOMEZ:  Yes, your Honor.

14        To begin with, none of the minutes that are attached

15   to Mr. Piaguaje's statement contain redacted materials.

16        In addition, as we have stated before, defendants, Mr.

17   Piaguaje and Mr. Camacho, do not control the asamblea.  They

18   don't have control over these documents.  We have requested all

19   of the minutes of the asamblea to be produced here.  We have

20   not provided anyone with instructions to select which minutes

21   to be provided to us or not.  And we have produced all of the

22   minutes we have received, including those that contain

23   privileged material, which currently has been filed with the

24   Court for in camera review on the privilege redactions.

25        In terms of hearsay, I would say that these documents

Page 2373

1   are not being submitted for the truth of the statements that

2   they contain by various persons.  They are being submitted for

3   the sole purpose of demonstrating that certain matters were

4   discussed at the meetings that Mr. Piaguaje was in attendance

5   in and certain decisions were taken.

6          Now, whether action in conformance with those

7   decisions was actually undertaken is a different question.  Mr.

8   Piaguaje was present during the meetings, the five minutes that

9   are attached to his statement.  He participated in those

10  discussions.  And he voted on the decisions that took place at

11  those meetings.  That's the limited purpose for their use, and

12  we would ask that they be admitted in evidence.

13         THE COURT:  I am not going to rule now.  I would note

14  at least this.  That to the extent they are offered for the

15  purpose of demonstrating that certain matters were discussed at

16  the meetings, they are offered for the truth of the statements

17  contained therein, and they are therefore hearsay, but I will

18  consider that further in the fullness of time.  Decision is

19  reserved on the exhibits.

20         I note, I think, please correct me if I am wrong, that

21  the January 15 minutes are not among those you're offering.

22         MR. GOMEZ:  That is correct.  Not with this witness.

23         THE COURT:  All right.  Let's proceed.

24         MR. GOMEZ:  Mr. Brodsky, I assume I don't need to

25  establish through each one that he was present for these five,

Page 2374

1   and I can hand over the witness.

2          THE COURT:  I'm sorry?

3          MR. GOMEZ:  I don't think there is a dispute that Mr.

4   Piaguaje was present during the five meetings that are

5   referenced in the statement.  I can either do a small direct

6   and confirm that or he can stipulate that particular point and

7   I can hand over the witness.

8          THE COURT:  Mr. Brodsky.

9          MR. BRODSKY:  We have never received these minutes

10  until recently before trial.  There was a deposition of Mr.

11  Piaguaje made this year.  He was never questioned about any

12  minutes because we didn't have any.  I have no idea whether or

13  not Mr. Piaguaje was present simply because the document says

14  it's so.  So I think if Mr. Gomez wants to establish that Mr.

15  Piaguaje was present, he should do so.

16         THE COURT:  Go ahead, Mr. Gomez.

17  BY MR. GOMEZ:

18  Q.  Mr. Piaguaje, you have before you Defendants' Exhibit 227.

19  Would you please locate that exhibit?

20         MR. GOMEZ:  Your Honor, may I approach so I can help

21  the witness separate everything out?

22         THE COURT:  Yes.

23  A.  Which one?

24  Q.  227.

25         Mr. Piaguaje, I would like to direct your attention to

Page 2375

1    Defendants' Exhibit marked DX 0227.  Do you have that in front

2    of you?  The number appears in the lower right-hand corner.

3    The Spanish version of that appears on page 6 of 9.  Do you

4    have that before you, sir?

5    A.  Yes.

6    Q.  Sir, would you please take a moment to look at that

7    document and tell me if you recognize it?

8          Mr. Piaguaje, do you recognize the document, sir?

9    A.  Yes.

10   Q.  What is this document, sir?

11   A.  This document is the minutes of the assembly in which we

12   reached a resolution.

13   Q.  At the top paragraph of this document, there is a reference

14   to March 10, 2012.  Were you present at this meeting on March

15   10, 2012, sir?

16   A.  Yes.

17   Q.  Why were you there?

18   A.  I was here because I am the president of the nationality so

19   I had to represent them here.

20   Q.  Sir, does this document accurately reflect the statements

21   that were made and the decisions that were taken at this

22   meeting?

23   A.  Yes.

24          MR. GOMEZ:  I would move in Exhibit 227.

25          THE COURT:  The decision is reserved.

Page 2376

1   Q.  Mr. Piaguaje, I would like to direct your attention to

2   exhibit marked 0229 that is before you.  The Spanish language

3   of this exhibit appears on the last page.

4          Sir, I would ask you to look at this document and tell

5   me if you recognize it?

6          Mr. Piaguaje, do you recognize this document,

7   Defendants' Exhibit 229?

8   A.  Yes.

9   Q.  What is this document, sir?

10  A.  This is also minutes in which we make decisions in the

11  meeting.

12  Q.  This document makes reference to the date April 15, 2011.

13  Were you present for this meeting, sir?

14  A.  Yes.

15  Q.  Does this document accurately reflect the discussions and

16  the decisions made during that meeting?

17  A.  Yes, sir.

18          MR. GOMEZ:  I would ask to move in Defendants' Exhibit

19  229.

20          THE COURT:  Decision is reserved.

21  Q.  Mr. Piaguaje, I would now like to direct your attention to

22  Defendants' Exhibit 231.  The Spanish language of this exhibit

23  appears on page 5 of 7.

24          Would you please take a moment to look at that

25  document and tell me if you can recognize it?

Page 2377

1          Do you recognize Defendants' Exhibit 231, sir?

2    A.  I'm still reading it.

3    Q.  Do you recognize Defendants' Exhibit 231, sir?

4    A.  Yes.

5    Q.  What is it?

6    A.  It is also the minutes from the assembly.

7    Q.  This document makes reference to the dates of February 17

8    and 18 of 2011.  Were you present for this meeting, sir?

9    A.  Yes.

10   Q.  Does this document accurately reflect what was stated and

11   decided at that meeting?

12   A.  Yes.

13          MR. GOMEZ:  I would ask to move in Defendants' Exhibit

14   231.

15          THE COURT:  Decision is reserved.

16   Q.  Mr. Piaguaje, I would like to direct your attention to

17   Defendants' Exhibit 234 in front of you.  The Spanish language

18   version appears on page 4 of 5 of this exhibit.

19          Would you kindly take a moment to look at that

20   document and tell me if you recognize what it is, sir?

21          Mr. Piaguaje, do you recognize Defendants' Exhibit

22   234?

23   A.  Yes.

24   Q.  What is it, sir?

25   A.  This is regarding a meeting.

Page 2378

1   Q.  A meeting of what, sir?

2   A.  This document is regarding this meeting in which we decide

3   the working points.

4   Q.  When you say "we," who are you referring to?

5   A.  What was that again?

6   Q.  When you say "we," who are you referring to?

7   A.  Well, us, for example, the assembly.

8   Q.  This document makes reference to the date March 21, 2011.

9   Were you present on that day for this meeting?

10  A.  Yes.

11  Q.  Do these minutes accurately reflect what was stated and

12  what was decided during that meeting, sir?

13  A.  Yes, sir.

14         MR. GOMEZ:  I would move into evidence Defendants'

15  Exhibit 234.

16         THE COURT:  Decision is reserved.

17  Q.  Mr. Piaguaje, I would like to now direct your attention to

18  the last exhibit in front of you, Defendants' Exhibit 236.  The

19  Spanish language of which appears on page 4 of 5 of this

20  exhibit.

21         Would you please take a moment to look at that

22  document and tell me if you can recognize it?

23         Mr. Piaguaje, do you recognize Defendants' Exhibit

24  236?

25  A.  Yes.

Page 2379

1  Q.  This document makes reference to a meeting of June 27,

2  2011.  Were you present at this meeting on that date?

3  A.  Yes.

4  Q.  Does this document accurately reflect what was stated and

5  what was decided during that meeting, sir?

6  A.  Yes.

7        MR. GOMEZ:  Your Honor, I would ask to move into

8  evidence Defendants' Exhibit 236.

9        THE COURT:  Decision is reserved.

10  Q.  Mr. Piaguaje, whose responsibility was it to prepare all of

11  these minutes for the asamblea?

12  A.  The secretary and the coordinators.

13  Q.  To your knowledge, were minutes always prepared of all the

14  meetings in which you were in attendance?

15        THE COURT:  It might be more helpful if you rephrase

16  that question because an answer "yes" would mean conceivably,

17  as far as he knows, that's true, or it might be an

18  all-encompassing declaration, and it might be significant as to

19  which it is.

20  Q.  Mr. Piaguaje, were minutes prepared of all the meetings in

21  which you were in attendance?

22  A.  Yes.  After the meeting was over, everything that was

23  resolved at the meeting was written down, and then it was read

24  so we could all hear it.

25  Q.  Was it the regular practice of the asamblea to prepare

Page 2380

1  these minutes?

2  A.  Yes, so we could then remember it, have a record.

3  Q.  Was it the practice of the asamblea to file and save these

4  documents, these minutes?

5  A.  Yes.  The secretary.

6        MR. GOMEZ:  Your Honor, I pass the witness.

7        THE COURT:  Thank you.

8        Mr. Brodsky.

9        MR. BRODSKY:  Just a moment so I can set up.

10  CROSS-EXAMINATION

11  BY MR. BRODSKY:

12  Q.  Good morning, Mr. Piaguaje.

13  A.  Good morning.

14  Q.  You know Pablo Fajardo Mendoza?

15  A.  Yes.

16  Q.  He is an attorney, correct?

17  A.  He is an attorney.

18  Q.  He is your attorney in the case of Maria Aguinda v. Chevron

19  Corporation in the Lago Agrio courthouse?

20  A.  Yes.

21  Q.  And there are 47 plaintiffs, including you, in the case of

22  Maria Aguinda v. Chevron?

23  A.  Yes.

24  Q.  In 2006, sir, you and the other plaintiffs authorized

25  attorney Pablo Fajardo Mendoza to represent you and the other

Page 2381

1   plaintiffs as the common attorney, or procurador comun, in the

2   case of Maria Aguinda v. Chevron Corporation?

3   A.  In 2006, I don't recall.

4          MR. BRODSKY:  May I approach, your Honor?

5          THE COURT:  All right.

6   Q.  Mr. Piaguaje, I am going to show you two documents,

7   Plaintiff's Exhibit 323 in evidence and Plaintiff's Exhibit

8   323B in evidence.  If you wouldn't mind, I am going to direct

9   your attention to a particular portion of the document.

10         With respect to 323B, you see the second document I

11  handed you, the larger of the two?

12         Do you have that in front of you, sir?

13         MR. BRODSKY:  May I approach to help him identify the

14  document?

15         THE COURT:  Yes.

16  Q.  If you would take a look at the second page, Mr. Piaguaje,

17  of that very document I just handed you, do you recognize on

18  that document your signature on the seventh column down?

19         THE COURT:  I think you meant row.

20         MR. BRODSKY:  Row.  Thank you.

21  A.  Yes.

22  Q.  This is something you signed authorizing Pablo Fajardo to

23  represent you in the Lago Agrio Chevron case, correct?

24  A.  Yes.

25  Q.  Then, sir, since that time, 2006 -- you can put the

Page 2382

1   document down, Mr. Piaguaje.  Since that time, 2006, Pablo

2   Fajardo has been one of the lawyers representing you in the

3   Lago Agrio Chevron case?

4   A.  Yes.

5   Q.  Then in 2006, you also signed a document -- withdrawn.

6        In 2006, sir, you gave Mr. Fajardo the authority to

7   file motions and make presentations on behalf of the Lago Agrio

8   plaintiffs, correct?

9        MR. GOMEZ:  Objection to form.

10        THE COURT:  Overruled.

11   A.  Yes.

12   Q.  In 2006, you also gave Mr. Fajardo the authority to waive

13   all the judicial inspections, right?

14   A.  I don't recall.

15   Q.  You remember the judicial inspections, correct?

16   A.  Yes.

17   Q.  And you remember Pablo Fajardo telling you that he didn't

18   want judicial inspections conducted anymore?

19   A.  No.

20   Q.  Mr. Fajardo, did he tell you about any threats being made

21   to the presiding judge of the Lago Agrio Chevron case in

22   2010 -- withdrawn.

23        Did he tell you in 2006, did Mr. Fajardo tell you

24   about any threats being made to the presiding judge in the Lago

25   Agrio Chevron case?

Page 2383

1  A.  No.

2  Q.  In November 2010, you and the other Lago Agrio plaintiffs

3  in the Aguinda v. Chevron case approved of each and every

4  action that Mr. Fajardo had undertaken in the case, right?

5          MR. GOMEZ:  Objection.  Form.

6          THE COURT:  Overruled.

7  A.  What was that again?

8  Q.  In November 2010, Mr. Piaguaje, you and the other Lago

9  Agrio plaintiffs in the Maria Aguinda v. Chevron case approved

10  of each and every action that Mr. Fajardo had undertaken in the

11  case, right?

12  A.  I don't understand the question exactly.

13  Q.  Would you mind moving the microphone a little bit closer to

14  you, Mr. Piaguaje, and speaking into the microphone, if you

15  don't mind?

16          Sir, in November 2010, you signed a document in

17  connection with Pablo Fajardo's representation of you, correct?

18  A.  I don't recall.

19  Q.  How many documents, sir, have you signed in connection with

20  Mr. Fajardo's representation of you?

21  A.  I have signed documents, but I don't recall how many

22  documents I have signed.

23  Q.  Mr. Fajardo has asked you to sign some documents over the

24  years?

25  A.  We have signed documents when we have granted him power of

Page 2384

1   attorney.

2   Q.  Do you remember granting him this power of attorney in

3   2010?

4   A.  Well, for example, I want to understand exactly the

5   question.  I want to understand exactly what power of attorney

6   we had granted because I want to understand the question

7   exactly.

8   Q.  Sir, you just said, we have signed documents when we have

9   granted him, Pablo Fajardo, power of attorney.  What did you

10  mean by power of attorney?

11  A.  So that he can get -- well, so that he can defend part of

12  us, the plaintiffs, what we are asking for regarding the

13  contamination.

14          MR. BRODSKY:  May I approach, your Honor?

15          THE COURT:  Yes.

16  Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 390 in

17  evidence.

18          MR. BRODSKY:  For the record, it's entitled, "Special

19  Power of Attorney and Agency for Judicial Matters.  Executed by

20  Armando Wilfrido Piaguaje Payaguaje, et al., in favor of

21  attorney Pablo Estenio Fajardo Mendoza."

22          It's 49 pages.  The first 24 pages in English and

23  pages 26 through 49 in Spanish.

24  Q.  Mr. Piaguaje, let me direct your attention to a particular

25  page.

Page 2385

1          Would you turn to page 34 of 49 at the bottom of the

2     page?  Or you could look up at the screen.

3          If we look at this section right here that's

4     highlighted, Mr. Piaguaje, is that your signature on the

5     document?

6     A.  Yes, sir.

7     Q.  Let me ask you to turn to certain pages.

8          Do you remember signing this document, Mr. Piaguaje?

9     A.  Yes, but I don't recall the year.  I mean, I did sign it,

10    but I don't recall the year.  I don't have the documents with

11    me, but I don't recall the year, but this is my signature.

12    Q.  I understand Mr. Piaguaje.  Mr. Piaguaje, before you signed

13    it, you read the document, right?

14    A.  Yes.  But no -- of course, it was explained to me a little.

15    Q.  Mr. Piaguaje, you read your witness statement before you

16    signed that, correct, in connection with this case?

17          MR. GOMEZ:  Objection.  Asked and answered.

18          THE COURT:  Overruled.

19    A.  Regarding my testimony from today?

20    Q.  Yes, sir.  This morning, when Mr. Gomez showed you Defense

21    Exhibit 1600, your witness statement -- 1800, you read that

22    document before you signed it?

23    A.  Yes.

24    Q.  And looking at this document 390 --

25          MR. BRODSKY:  Your Honor, just for the record, we will

Page 2386

1   move into evidence 323 and this document 390.

2           THE COURT:  Aren't they in?

3           MR. BRODSKY:  I thought they were in, but I received a

4   note from my colleagues to move them in.

5           THE COURT:  Are you including 323B or not?

6           MR. BRODSKY:  And 323B as well.

7           THE COURT:  Any objection?

8           MR. GOMEZ:  No objection.

9           MR. FRIEDMAN:  No.

10          THE COURT:  They are received.

11          (Defendant's Exhibits 323, 323B and 390 received in

12   evidence)

13  Q.  Let me ask you, Mr. Piaguaje, on page 29 of the document in

14  Spanish -- we can put it up on the screen for you in Spanish on

15  the left-hand side, page 4.  So on one side 4 and the other

16  side page 49.

17          Directing your attention to where it says, Second,

18  special power of attorney, do you see that?

19  A.  Yes.

20  Q.  This is where you're giving Mr. Fajardo the power of

21  attorney for judicial matters, correct?

22  A.  Yes.

23          MR. BRODSKY:  Where it says "the principals," right

24  over here, can we highlight that?  Down a little bit below.

25  Q.  Do you see where it says, "The principals," Mr. Fajardo may

Page 2387

1   on behalf of the principals appear before judges or courts of

2   justice, arbitration or mediation in Ecuador, in the United

3   States of America, or any other country to defend the interests

4   of the principals?

5   A.  Yes.

6   Q.  That's where you were giving Mr. Fajardo the power to

7   represent you and the other Lago Agrio plaintiffs in the Lago

8   Agrio Chevron case, right, Mr. Piaguaje?

9           MR. GOMEZ:  Objection.

10          THE COURT:  Sustained.

11  Q.  Mr. Piaguaje, you authorized with this power of attorney

12  Mr. Fajardo to appear before courts throughout the world,

13  correct?

14  A.  Yes.

15  Q.  And Mr. Fajardo on your behalf, and on behalf of the other

16  Lago Agrio plaintiffs, could seek to get the judgment

17  recognized around the world, right?

18  A.  Yes.

19  Q.  You haven't revoked Mr. Fajardo's power of attorney to seek

20  recognition of the judgment in the Lago Agrio Chevron case,

21  right?

22  A.  What was that?

23  Q.  Mr. Fajardo still has the power to represent you and the

24  other Lago Agrio plaintiffs around the world to get the Lago

25  Agrio Chevron judgment recognized?

Page 2388

1          MR. GOMEZ:  Objection.  Form.

2          THE COURT:  Overruled.

3   A.  Yes.

4   Q.  Sir, let me direct your --

5          THE COURT:  Just a second.  It's not just a matter of

6   what the documents says.  It's a matter of whether this

7   gentleman has ratified what is going on.

8   Q.  Mr. Piaguaje, let me ask you to look at the bottom of this

9   document, the last sentence.

10         MR. BRODSKY:  Can we highlight from "the" through the

11  bottom?

12  Q.  Would you read that silently to yourself, Mr. Piaguaje,

13  that last sentence?

14  A.  OK.  I have read it.

15  Q.  Mr. Piaguaje, in this document that you signed, you

16  approved of each and every one of the actions undertaken by

17  attorney Pablo Fajardo Mendoza in the Lago Agrio Chevron case,

18  right?

19         MR. GOMEZ:  Objection.

20  A.  Yes.

21         THE COURT:  Overruled.  The same point I made a minute

22  ago.

23  Q.  You approved of each and every one of the actions

24  undertaken by Mr. Fajardo in all the courts in which he

25  represented you, correct?

Page 2389

1    A.  Yes.

2    Q.  And if we go to the next page?

3            MR. BRODSKY:  And if we can highlight where it begins

4    "all financial" through the end of the sentence?

5            You see that on the top?  It says "all financial

6    administrative acts."

7    Q.  Mr. Piaguaje, you approved of all the financial and

8    administrative acts which Mr. Fajardo carried out for your

9    defense in the Lago Agrio Chevron case?

10   A.  Yes.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2390

1  Q.  And you approved of all the financial acts Mr. Fajardo

2  carried out through other people that he legally authorized on

3  your behalf?

4           MR. GOMEZ:  Objection.

5           THE COURT:  Overruled.

6  A.  Yes.

7  Q.  That includes Mr. Fajardo -- withdrawn.

8           That includes, Mr. Piaguaje, how Mr. Fajardo raised

9  money to litigate the Chevron, the Lago Agrio Chevron case?

10  A.  I do not understand that question.

11  Q.  You have approved of how Mr. Fajardo and others working

12  with him have raised money in connection with the Lago Agrio

13  Chevron case?

14           MR. GOMEZ:  Objection.

15           THE COURT:  Overruled.

16  A.  No.

17  Q.  Does Mr. Fajardo tell you how the money is raised?

18  A.  Yes, to pay the attorneys for that defense.

19  Q.  And you know Mr. Fajardo is working with other people to

20  raise money to pay for lawyers?

21  A.  Yes, so that they will move forward with this process, with

22  this case, the trial.

23  Q.  And you approve of Mr. Fajardo's actions to raise money,

24  correct?

25           MR. GOMEZ:  Objection.

Page 2391

1          THE COURT:  Overruled.

2   A.  Yes, because we want to accomplish our goal.

3   Q.  Let me ask you to turn to two pages later, page 7 in

4   English, and page 32 in Spanish.  Let me direct your attention

5   to where it says three term and if we can highlight that

6   sentence.

7          Mr. Piaguaje, you agree with me that you and the other

8   Lago Agrio plaintiffs gave Mr. Fajardo this power of attorney

9   for an indefinite period of time?

10  A.  I don't understand Spanish that well, but still I need to

11  know a little more.

12  Q.  Mr. Piaguaje, when you gave Mr. Fajardo this power in 2010,

13  there was no termination or end date?

14  A.  Right, for what?

15  Q.  To represent you, correct?

16  A.  No, there was no end.

17  Q.  And this, under this power of attorney, you and the other

18  Lago Agrio plaintiffs had the right to revoke Mr. Fajardo's

19  power, correct?

20  A.  Yes, we were -- we could do that.  But if we did that, then

21  we wouldn't have, we would no longer have a person that would

22  be helping us.

23  Q.  You would no longer have the person you want most to

24  represent you; is that right?

25  A.  What was that again?

1    Q.   Pablo Fajardo is the person you most want -- withdrawn.

2            Pablo Fajardo, Pablo Fajardo is the person you and the

3    other Lago Agrio plaintiffs have chosen as the person best

4    suited to represent you?

5    A.   Yes.

6    Q.   You know there are other lawyers in Ecuador?

7    A.   Yes.

8    Q.   You've chosen him?

9    A.   Yes.

10   Q.   You trust him?

11   A.   Yes.

12   Q.   You like what he's done for you so far?

13           MR. GOMEZ:  Objection, vague.

14           THE COURT:  Sustained.

15   Q.   You approve -- withdrawn.

16           Now, you've spoken with Mr. Fajardo about the Lago

17   Agrio Chevron litigation at several meetings of the asamblea

18   over the years, right?

19   A.   Yes, he has reported during the assembly.

20   Q.   And outside of those asamblea meetings, you've met with him

21   in person on several occasions?

22   A.   No.

23   Q.   Is it your testimony that outside the asamblea meetings

24   you've never met with Mr. Fajardo?

25   A.   Well, yes, stops by to say hello.

1   Q.  And besides stopping by to say hello, you've had meetings

2   with him outside the assembly, right?

3   A.  No, because I live inside, I live in the community.  I'm

4   hardly ever outside.

5   Q.  On sometimes you're outside the community, right?

6   A.  Yes.

7   Q.  And on some occasions you actually have traveled abroad?

8   A.  Me?

9   Q.  Yes, you, sir.

10  A.  Yes.

11  Q.  And there are some occasions when you've had meetings with

12  Mr. Fajardo outside your community?

13  A.  You mean just Pablo and myself?

14  Q.  Pablo, yourself, and other people, or just Pablo and

15  yourself.

16  A.  We haven't had meetings like that like outside of the

17  meeting, nothing, no.

18        MR. BRODSKY:  May I approach, your Honor?

19        THE COURT:  Yes.

20  Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 2407R.

21  Let me ask you to turn to the last page.  Do you recognize your

22  signature on that, sir?

23  A.  Yes.

24  Q.  Is it accurate when it says that you certified that before

25  signing this, the contents of the document were translated to

Page 2394

1    you in Spanish?

2    A.  Let me read that for a minute.

3    Q.  Please, sir.

4    A.  Yes.

5    Q.  Am I correct, sir, that you read that -- it's accurate that

6    you, the contents of this document were translated to you in

7    Spanish before you signed it?

8    A.  Yes.

9    Q.  And it's correct, sir, that in that certification, you

10   certified that, among other things, the response No. 6 in this

11   document contained facts and matters that were within your

12   personal knowledge?

13   A.  Yes.

14   Q.  Can I ask you to --

15           MR. BRODSKY:  Your Honor, I just want to read

16   something into the record on page 24.  Page 24, this paragraph

17   right here, Randall, if we could blow that up.

18           THE COURT:  And you're offering that?

19           MR. BRODSKY:  I'm offering the paragraph, yes, the

20   supplemental response to interrogatory No. 6 between these

21   three paragraphs right there.

22           THE COURT:  Any objection?

23           MR. GOMEZ:  No, your Honor.

24           MR. FRIEDMAN:  No.

25           THE COURT:  Received.

1          (Plaintiff's Exhibit 2407R, specified paragraphs

2    received in evidence)

3          MR. BRODSKY:   Should I read it, your Honor, for the

4    record?

5          THE COURT:   It's not necessary.

6          MR. BRODSKY:   Okay.   We can take that down.   Thank

7    you.

8    Q.   You know Steven Donziger, correct?

9    A.   Yes.

10   Q.   You see him in this courtroom?

11   A.   Yes.

12   Q.   Without pointing, would you tell us where he is by

13   describing an article of clothing that he's wearing and where

14   he is in the courtroom?

15   A.   He's sitting beside my attorney, Julio Gomez.

16          THE COURT:   Indicating Mr. Donziger.

17   Q.   Mr. Fajardo told you that he hired Mr. Donziger to work on

18   your behalf?

19   A.   Well, we have authorized my attorney, Pablo Fajardo, to do

20   that.

21   Q.   And Mr. Fajardo told you that he hired Mr. Donziger to work

22   on your behalf, right?

23   A.   Well, he didn't tell me on my behalf for myself as a

24   plaintiff, but for the group, for the group of plaintiffs.

25   Q.   Mr. Fajardo told you he had hired Mr. Donziger to represent

Page 2396

1   you and all the other Lago Agrio plaintiffs?

2   A.  Yes.

3   Q.  And you met Mr. Donziger in person several years ago,

4   right?

5   A.  Yes.

6   Q.  In fact, you met Mr. Donziger on at least three occasions,

7   right?

8   A.  Yes.

9   Q.  Several years ago, correct?

10  A.  Years back.

11  Q.  And the purpose of each of those meetings -- withdrawn.

12          The purpose of each of those three meetings that you

13  had with Mr. Donziger was to discuss the lawsuit against

14  Chevron in Lago Agrio?

15  A.  Well, when I, well, at that time when I met him, it's not

16  like I knew all of that much.  But what we did know and what

17  all of us did know is all about the contamination and the fact

18  that we all wanted to get help to resolve that contamination,

19  which is what we were doing.

20  Q.  Sir, is the answer to my question that the purpose of each

21  of those three meetings that you had with Mr. Donziger was to

22  discuss the lawsuit against Chevron in Lago Agrio yes?

23  A.  Not all of them, because it's not like I had a meeting

24  together with Mr. Steven, but it was --

25  Q.  Sorry.

Page 2397

1   A.  -- I did not have a direct conversation with Steven.

2   Q.  You were in a meeting with Mr. Donziger and other

3   individuals?

4   A.  Yes, but I wasn't there with him for a long time, just for

5   a while.  But, yes, I did see him there.

6   Q.  And putting aside the amount of time, Mr. Piaguaje, that

7   you spent with Mr. Donziger and others on the three occasions

8   that you were meeting with Mr. Donziger and other people, the

9   purpose was to discuss the lawsuit against Chevron in Lago

10  Agrio, right?

11  A.  Yes.

12  Q.  Now, you know, sir, that documents have been filed in

13  foreign countries seeking recognition of the judgment issued in

14  the Lago Agrio Chevron case?

15  A.  I don't understand that very well.

16  Q.  Are you aware that your -- withdrawn.

17          Are you aware that your name and the name of the other

18  Lago Agrio plaintiffs appears on a document filed in Brazil

19  seeking the recognition of the judgment in Lago Agrio?

20  A.  Well, I haven't exactly seen the document, but I was told,

21  they explained something about that.  I know that.

22  Q.  Who's they?

23  A.  They were talking at the assembly.

24  Q.  Who is they?

25  A.  For example, Pablo was speaking, but it was almost like the

Page 2398

1  time to leave and I was already on my way out so I wasn't able

2  to hear it all very well.

3  Q.  When you say Pablo, you mean Pablo Fajardo?

4  A.  Yes.

5  Q.  And I take it that because you were on your way out of that

6  meeting -- withdrawn.

7          Was it towards the end of the meeting that Mr. Fajardo

8  reported to you and others that a lawsuit was filed in Brazil

9  seeking recognition of the judgment?

10 A.  That I have heard.

11 Q.  Who did you hear that from?

12 A.  It's what I was just saying about the meeting, but I have

13 not seen documents.

14 Q.  I see.  Mr. Fajardo reported -- withdrawn.

15         Mr. Fajardo told you and others at this meeting that a

16 document was filed in Brazil seeking recognition of the

17 judgment?

18 A.  Yes.

19 Q.  And prior to Mr. Fajardo informing you of that, there

20 wasn't a vote by the assembly, right?

21         MR. GOMEZ:  Objection, vague.

22         THE COURT:  Overruled.  Sustained.  Be more specific.

23 Q.  Mr. Piaguaje, prior to Mr. Fajardo telling you that papers

24 were being filed in Brazil seeking recognition of the judgment,

25 you and others at this meeting did not take a vote about

Page 2399

1    whether to file those papers?

2    A.  Well, no, I haven't seen that vote, but we do want to

3    accomplish what we are seeking.

4    Q.  And Mr. Fajardo has the power that you've conferred on him

5    and others in the Lago Agrio case have conferred on him to file

6    these lawsuits around the world to seek recognition of the

7    judgment?

8    A.  Yes.

9    Q.  And you know, sir, that Mr. Fajardo -- withdrawn.

10         Mr. Fajardo, did Mr. Fajardo tell you that he and

11   others filed a claim against Chevron in Canada?

12   A.  Well, the truth is I can talk about what I know.  We have,

13   we have said like here the big company, they don't want to

14   admit, they don't want to pay.  We want to find a way.

15   Q.  Mr. Piaguaje, let me interrupt you because my question is,

16   sir, did Mr. Fajardo tell you that he and others filed a claim

17   against Chevron in Canada?

18   A.  I'm -- I don't understand what the question is saying.

19   Q.  Were you present for any discussions, sir, with Mr. Fajardo

20   and others in which Mr. Fajardo discussed that papers were

21   filed in Canada seeking recognition of the judgment in Lago

22   Agrio?

23   A.  Yes, I've heard.

24   Q.  Did Mr. Fajardo tell you that?

25   A.  Yes.

Page 2400

1    Q.  And did Mr. Fajardo tell you also that a petition was filed

2    in Argentina seeking recognition of the Lago Agrio judgment?

3    A.  Yes, I have heard.

4    Q.  And isn't it true, sir, that Mr. Fajardo has told you and

5    the other Lago Agrio plaintiffs that he will continue to seek

6    enforcement of this judgment in Lago Agrio in other countries?

7    A.  I haven't heard that.

8    Q.  Are you aware one way or the other whether there's a list

9    of approximately 30 countries in which Mr. Fajardo and others

10   working with him are trying to -- withdrawn.

11          Are you aware, sir, of a list of approximately 30

12   countries around the world in which Mr. Fajardo and others have

13   said they will seek to enforce the judgment in Lago Agrio?

14          MR. GOMEZ:  Objection, privilege, your Honor.

15          THE COURT:  Sustained as least at to form and then

16   we'll see what happens.

17   Q.  Has Mr. Fajardo spoken to the asamblea about seeking to

18   enforce the Lago Agrio judgment against Chevron in 30 countries

19   around the world?

20          MR. GOMEZ:  Objection, privileged.

21          THE COURT:  Answer yes or no, please.

22   A.  What, 30 countries?

23   Q.  Yes.

24   A.  No, I haven't heard that.

25   Q.  You haven't heard -- do you know who Juan Pablo Saenz is?

Page 2401

1   A.  No.

2   Q.  Have you heard Mr. Fajardo speaking to the press or the

3   media as recently as November 13, 2013, last week, about trying

4   to get recognition for the judgment in Lago Agrio around the

5   world?

6           MR. GOMEZ:  Objection, relevance.

7           THE COURT:  Overruled.  Goes to threatened irreparable

8   injury at least.

9   A.  No, I'm not updated.  I didn't understand.

10  Q.  Did you not understand my question, sir?

11  A.  Yes.

12  Q.  Have you heard Pablo Fajardo speaking to the media, the

13  press, about --

14  A.  No, I haven't heard, no, no.

15  Q.  Okay.  Now you're a defendant in this case, in this RICO

16  action, in this courthouse, correct?

17  A.  Yes.

18  Q.  And Chevron has filed a lawsuit against you and other

19  people, correct?

20  A.  Yes.

21  Q.  And you of course have read the allegations against you,

22  right?

23  A.  Excuse me, I didn't understand your question exactly, the

24  question.

25  Q.  You know -- withdrawn.

Page 2402

1          You're aware of the allegations that Chevron has made

2   in this case, in this courthouse, against you, sir?

3   A.  Regarding the whole trial?

4   Q.  Sir, you're aware Chevron has filed allegations in a

5   complaint against you?

6   A.  Where, in Ecuador?

7   Q.  In this courthouse.

8   A.  No.

9   Q.  You have lawyers who have been representing you in this

10  case, right?

11  A.  Yes.

12  Q.  Mr. Julio Cruz -- withdrawn.

13          Mr. Julio Gomez is one of your lawyers, correct?

14  A.  Yes.

15          THE COURT:  Let's take a break here.

16          (Recess)

17          THE COURT:  Let's continue.

18          MR. BRODSKY:  Thank you, your Honor.

19  Q.  Mr. Piaguaje, in addition to Julio Gomez, you've been

20  represented in connection with this case by Larry Veselka,

21  correct?

22  A.  Larry?

23  Q.  Yes.

24  A.  Yes.

25  Q.  And Jarrod Stewart as well?

Page 2403

1    A.   Yes.

2    Q.   Mr. Veselka and Mr. Stewart visited you in Ecuador in

3    connection with this case?

4    A.   Yes.

5    Q.   And you've received updates about what's happening in this

6    case, correct?

7    A.   What do you mean?

8    Q.   You have learned about Chevron's allegations against you in

9    this case?

10   A.   Complaints.

11   Q.   You've learned about those complaints?

12   A.   Complaints, yes.

13   Q.   And you've discussed those complaints in this case with

14   Pablo Fajardo, correct?

15           MR. GOMEZ:   Objection, vague.

16           THE COURT:   Overruled.

17   A.   No.

18   Q.   Hasn't Mr. Fajardo provided you with legal advice in

19   connection with this case?

20           MR. GOMEZ:   Objection, privilege.

21           THE COURT:   The question doesn't call for the

22   substance.   Overruled.

23           Answer yes or no.

24   A.   No.

25           MR. BRODSKY:   One moment, your Honor.

Page 2404

1   Q.  We'll come back to that, Mr. Piaguaje.

2          Did you inform Mr. Fajardo you were coming here to

3   testify?

4   A.  This time, for this time, for this testimony?

5   Q.  Yes, for this time, this week.

6   A.  Yes.

7   Q.  And the last time you testified earlier this year in this

8   courthouse, you informed Mr. Fajardo you were testifying,

9   correct?

10  A.  Yes.

11  Q.  Did you seek Mr. Fajardo's permission to testify?

12  A.  Well, I didn't seek it.  I was told I had to come here to

13  testify before this judge to testify and that's what I'm doing,

14  testifying to what I know, what is the truth.

15  Q.  Did Mr. Fajardo tell you he was not going to testify?

16  A.  No.

17  Q.  Did Mr. Fajardo inform the asamblea that he was not going

18  to testify?

19  A.  No, I didn't hear that.

20  Q.  Did the asamblea make any decisions in connection with

21  whether with Mr. Fajardo would come here to testify?

22  A.  Well, I have not been involved in the assembly recently.  I

23  don't know.

24  Q.  When did you stop being involved in the asamblea?

25  A.  2012.

Page 2405

1  Q.  When in 2012?

2  A.  Well, I've been participating in the meetings in Lago

3  Agrio.

4  Q.  When in 2012?

5  A.  What do you mean what part?

6  Q.  When in 2012 did you stop participating in the asamblea?

7  A.  I don't recall exactly the month because it was when, well,

8  I finished my term as president of my nationality in the first

9  half of the month of June.

10  Q.  Did you participate in any asamblea meetings this year?

11  A.  I don't think so, no, I don't think so.

12  Q.  And nobody from the asamblea -- withdrawn.

13        Did you tell Mr. Yanza you were coming here to

14  testify?

15  A.  No.

16  Q.  Mr. Yanza is the coordinator of the asamblea, correct?

17  A.  Yes.

18  Q.  Sir, just before we move on to one other topic, I wanted to

19  ask you with respect to the power of attorney, do you remember

20  the questions I asked you and the answers you gave regarding

21  the power of attorney and you gave to Mr. Fajardo?

22  A.  Yes.

23        MR. GOMEZ:  Objection, form.

24        THE COURT:  The objection as to form is overruled.

25  Q.  Mr. Piaguaje, since conferring that power of attorney on

Page 2406

1   Mr. Fajardo, you and the other Lago Agrio plaintiffs have never

2   revoked it, correct?

3   A.  No.

4   Q.  No, you've never revoked it, right?

5   A.  Yes.

6   Q.  Okay.  Mr. Piaguaje, let's go on to one other thing, couple

7   other things.

8        Before we get to the asamblea a little bit, I want to

9   talk a little bit about your background and experience.  Let me

10  direct your attention to your declaration.  Do you have that in

11  front of you, Defense Exhibit 1800?  I always get the number

12  wrong.  Here is Defense Exhibit 1800.

13       (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Page 2407

1  Q.  Let me direct your attention to paragraph 5.

2       MR. BRODSKY:  Can we put the English and the Spanish

3  side by side?

4  Q.  You testified at your deposition in May of this year in

5  Spanish, right?

6  A.  Yes.

7  Q.  You wrote your direct testimony today in Spanish, right?

8  A.  Yes.

9  Q.  And let me direct your attention to page 2, paragraph 7,

10  the last sentence.

11       What were your responsibilities as president of the

12  entire Siekopai nation during those two two-year terms?

13  A.  I was president two times.

14  Q.  What were your responsibilities?

15  A.  Well, the people of my nationality elected me president so

16  that I could obtain benefits for our community.

17  Q.  What did you do to obtain those benefits?

18  A.  I was making efforts to obtain benefits which we weren't

19  able to obtain yet, regarding issues such as water, education,

20  many other things.

21  Q.  You have travelled outside -- withdrawn.

22       You travelled to the United States in 1997, right?

23  A.  Yes.

24  Q.  That was during your first term as president of the

25  Siekopai nation?

Page 2408

1  A.  Yes.

2  Q.  During that trip you visited Miami, right?

3  A.  Miami, Boston, and Washington.

4  Q.  By Washington you mean, Washington, D.C.?

5  A.  Yes.

6  Q.  And in 1998 you visited Peru?

7  A.  Yes.

8  Q.  In 2010, approximately, you visited Venezuela?

9  A.  Yes.

10  Q.  In 2010, you visited Brazil?

11  A.  Yes.

12  Q.  And you have an e-mail account, right, Mr. Piaguaje?

13  A.  Yes.

14  Q.  You have a Facebook account, right?

15  A.  That too.

16        MR. BRODSKY:  May I approach, your Honor?

17        THE COURT:  Yes.

18        MR. BRODSKY:  One moment, your Honor.  I have just got

19  to do a quick organization here.

20        Let me ask my colleague to do that while I move on to

21  something else.

22  Q.  We will get back to your Facebook in a moment, Mr.

23  Piaguaje.

24        Mr. Piaguaje, your Facebook account is in Spanish,

25  right?

Page 2409

1   A.  Yes.

2   Q.  We will get back to that in a minute.

3          Staying with your declaration, sir, let me direct your

4   attention to page 2, paragraph 11.

5          What do you mean by settlers in paragraph 11?

6          Sir, what do you mean by settlers?

7   A.  Settlers are the people from outside who want to live there

8   in the Amazon region.

9   Q.  Would you agree, sir, that the only purpose of the Asamblea

10  de Afectados por Texaco is to address the case in Ecuador

11  against Chevron, right?

12  A.  Yes.

13  Q.  You mentioned the Tarapoa field at least twice in your

14  declaration, right?

15          THE INTERPRETER:  What is the name of the field?

16          MR. BRODSKY:  T-A-R-A-P-O-A.

17  Q.  Let me direct your attention to paragraph 8.  You want

18  Chevron to clean up that field, right?

19  A.  Yes.

20  Q.  Was the Tarapoa contaminated by Texaco or TexPet?

21  A.  At that time, I was young, I didn't do anything.  I would

22  say it was the Texaco company.

23  Q.  Do you have any idea of who actually operated the Tarapoa

24  field?

25  A.  Well, I really cannot say because at that time I didn't

Page 2410

1   know anything.

2   Q.  Sir, have you made any effort, you yourself, to find out

3   who operated the Tarapoa field?

4   A.  Yes.  I first started to find out about this subject who

5   was causing the spills, I have heard some settlers mention the

6   Texaco company, because that's how I started to find out a bit

7   at a time.

8   Q.  Let me direct your attention to the Tarapoa field itself,

9   just isolated to the Tarapoa field.  Do you have any personal

10  knowledge as to who contaminated that field?

11          MR. GOMEZ:  Objection.  Relevance, your Honor.

12          THE COURT:  Overruled.

13  A.  That's what I told you earlier that some persons, settlers,

14  told me it was Texaco, but I can't tell you personally.  That's

15  why I trusted in them that it was Texaco.

16  Q.  Sir, the asamblea has nothing to do with addressing

17  contamination by Petroecuador, right?

18  A.  To start a trial again?

19  Q.  The asamblea, you're a member of, right?

20  A.  Yes.

21  Q.  The asamblea that has the name Texaco in it, right?

22  A.  What do you mean?  Of course I hear the title, but what do

23  you mean?  I don't know.

24          THE COURT:  You're belaboring this point.

25          MR. BRODSKY:  Yes, your Honor.  Understood.

Page 2411

1  Q.  Is it your testimony, sir, that each affected field, and

2  directing your attention to paragraph 11, each affected field

3  or region is part of the asamblea?

4           MR. GOMEZ:  Objection.  Form.

5           THE COURT:  Overruled.

6  A.  What is in my statement, what I have written, for example,

7  in my statement and what is written is what I have seen

8  personally.

9  Q.  Are you familiar with the Huaorani?

10  A.  Yes.

11  Q.  Aren't they one of the indigenous groups in this region?

12           MR. GOMEZ:  Objection.  Vague.

13           THE COURT:  Overruled.

14  A.  In Orellana, but on the other side of the Napo River.

15  Q.  Would they fall within, your words in paragraph 11,

16  affected field or region or indigenous nation affected by

17  petroleum contamination?

18           MR. GOMEZ:  Objection.  Form.

19           THE COURT:  Overruled.

20  A.  Yes.

21  Q.  And they are not part of the asamblea, correct?

22  A.  Yes, they do belong to it.

23  Q.  Sir, isn't it a fact that the Huaorani have sued, filed a

24  lawsuit, against Steven Donziger and the Amazon defense front

25  in this courthouse stating they are not part of the asamblea?

Page 2412

1   A.  Well, I don't know anything about that part.

2   Q.  Have you seen any representatives of the Huaorani at your

3   asamblea meetings?

4   A.  Yes.

5   Q.  When did you see them?

6   A.  When I was there in 2012, in early 2012.

7   Q.  So it's your testimony, sir, that they are part of the

8   assembly?

9   A.  Yes.  Because the Huaorani do participate there, at least

10  as far as I saw.

11  Q.  Your witness statement, sir, does not mention the Amazon

12  Defense Front, correct?

13          THE COURT:  It either does or it doesn't.

14  Q.  You're not a member of the Amazon Defense Front, correct?

15  A.  No.

16  Q.  You have never been a member?

17  A.  No.

18  Q.  Who runs the Amazon Defense Front?

19  A.  The truth is I don't know.  It's administered or run by the

20  president of the Amazon Defense Front.

21  Q.  Who is the president?

22  A.  Well, when I was there, it was always the president Ermel

23  Chavez, but I don't know now.

24  Q.  You have agreed to give a portion of the judgment in the

25  Lago Agrio Chevron case to the ADF, the Amazon Defense Front,

Page 2413

1    right?

2    A.  You mean when we win?

3    Q.  You understand that a judgment was issued in the Lago Agrio

4    Chevron case, right?

5    A.  Yes.

6    Q.  And you understand you have agreed, you and the other Lago

7    Agrio plaintiffs, have agreed to give a portion of the judgment

8    in that case to the Amazon Defense Front?

9    A.  Are you asking me if I have heard that?

10   Q.  I am asking if you agree with me that you have agreed to

11   give a portion of the judgment in the Lago Agrio Chevron case

12   to the Amazon Defense Front?

13            MR. GOMEZ:  Objection.  Form.  Vague.

14            THE COURT:  Overruled.  There is nothing vague about

15   it.

16   A.  No.

17   Q.  Sir, is it fair to say you do not want to give the Amazon

18   Defense Front 10 percent or more of the judgment?

19   A.  No.

20            THE COURT:  Ambiguous.

21   Q.  Is that no, you do not want to give the Amazon Defense

22   Front 10 percent or more of the judgment?

23   A.  Well, at the moment or up to now, I haven't heard anything

24   about that from my group of giving them 10 percent or anything.

25   I myself haven't heard that.

Page 2414

1  Q.  So in none of the asamblea meetings that you attended,

2  nobody ever informed you that the Amazon Defense Front was

3  going to receive at least 10 percent of the judgment?

4  A.  No.

5  Q.  Isn't it a fact, sir, that you have ceded all rights to the

6  Lago Agrio judgment to the Amazon Defense Front?

7         MR. GOMEZ:  Objection.

8         THE COURT:  Overruled.

9  A.  I didn't understand your question very well.

10 Q.  Sir, isn't it a fact that you have ceded, given up, all

11 rights to the proceeds from the Lago Agrio judgment to the

12 Amazon Defense Front?

13        MR. GOMEZ:  Objection.  Vague.

14        THE COURT:  There is nothing vague about it, sir.

15 Overruled.

16 A.  I'm sorry.  I don't understand the question.

17 Q.  You understand what the Lago Agrio judgment is, correct?

18 A.  Yes.

19 Q.  You understand that the Lago Agrio judgment has

20 states -- withdrawn.

21        You understand that, according to the Lago Agrio

22 judgment, money will be given to certain people, correct?

23 A.  No.

24 Q.  You understand that the Lago Agrio judgment -- withdrawn.

25        You understand, sir, that a judge in Lago Agrio issued

1  a judgment ordering Chevron to pay billions of dollars to

2  certain people and groups, correct?

3  A.  I would like to hear the question again, please.

4       MR. BRODSKY:  Can we ask the court reporter to read

5  back the question?

6       THE COURT:  Yes.

7       (Record read)

8  A.  Well, what I don't understand here -- what I understood was

9  that Chevron wanted to pay a judge money.  So I am not

10  understanding this question.

11      MR. BRODSKY:  Move to strike, your Honor.

12      THE COURT:  Stricken, apart from his statement that he

13  doesn't understand the question.

14 Q.  Let's do it this way, Mr. Piaguaje.  Do you have

15  Plaintiff's Exhibit 2407R?  Do you have that in front of you?

16      We will put it on the screen, sir.  It's in English

17  anyway.

18      MR. BRODSKY:  Can we go to the last page.

19 Q.  Sir, do you remember I asked you questions about this

20  certification that you made?

21 A.  Yes.

22 Q.  And you agree, sir, that you certified that response number

23  11, among others, contain facts within your personal knowledge?

24 A.  Yes.

25      MR. BRODSKY:  Can we turn to page 29, supplemental

1   response to interrogatory number 11, and blow up where it says

2   "respondent has ceded."

3   Q.  You agree, sir, that you certified that you, the

4   respondent, had ceded all rights to the proceeds from the Lago

5   Agrio judgment to the Amazon Defense Front, correct?

6           MR. GOMEZ:  Objection.  The witness has been asked and

7   answered the question, and he cannot understand the document

8   that's on the video screen.

9           THE COURT:  He has been asked the question many times,

10  and he has repeatedly responded that he doesn't understand it.

11  So that portion of the objection is overruled.

12          The point about the language of course is apt.  So

13  let's go to the Spanish.  Put them both up there and direct his

14  attention to the Spanish.

15          MR. BRODSKY:  I do not have the Spanish version.  He

16  certified in the document on page 43 that before signing the

17  responses, the contents were translated to him in Spanish.

18          THE COURT:  So you're offering that first sentence of

19  the second paragraph of the supplemental response to

20  interrogatory number 11.

21          MR. BRODSKY:  I am, your Honor.

22          THE COURT:  Received.

23          (Plaintiff's Exhibit 2407R received in evidence)

24  Q.  Sir, when you attended the meetings of the asamblea, they

25  were at Selva Viva's offices, right?

Page 2417

1   A.   Yes, when there were meetings of the committee.

2   Q.   You received notification of the meetings by e-mail,

3   correct?

4   A.   No, by telephone.

5   Q.   Did you ever receive notification of an asamblea meeting by

6   e-mail?

7   A.   No.

8           MR. BRODSKY:   May I approach, your Honor?

9           THE COURT:   Yes.

10   Q.   I am showing you, Mr. Piaguaje, a multipage document,

11   Plaintiff's Exhibit 6724 for identification, Bates number JP55.

12   The first page is in English and the third page is the

13   translation in Spanish.   So please turn to the third page.

14   It's an e-mail, dated November 8, 2010, from Luis Francisco to

15   a number of e-mail addresses.

16           Have you had a chance to read it?

17   A.   Yes.

18   Q.   Does your e-mail address appear as a recipient of this

19   e-mail?

20   A.   Yes.

21   Q.   Does this relate to an asamblea meeting?

22   A.   I think it was about a meeting of the committee.

23   Q.   A meeting of the committee of the asamblea?

24   A.   Yes.   Part of the assembly, but only the presidents of the

25   indigenous nations and the settlers.

Page 2418

1          MR. BRODSKY:  We offer 6724.

2          THE COURT:  Received hearing no objection.

3          MR. GOMEZ:  No objection.

4          MR. FRIEDMAN:  No objection.

5          (Plaintiff's Exhibit 6724 received in evidence)

6   Q.  Did this committee meeting of the asamblea take place on

7   November 12, 2010?

8   A.  I'm not familiar with this document very much, and I don't

9   remember the exact date of when it was.

10  Q.  You produced this document, did you not?

11  A.  To whom?

12  Q.  You gave it to your lawyers who gave it to Chevron

13  Corporation in this case.

14  A.  Yes.

15  Q.  Do you know whether or not there are minutes -- regardless

16  of whether you remember the exact date, do you know whether or

17  not there are minutes to this meeting that took place in

18  Plaintiff's Exhibit 6724?

19          MR. GOMEZ:  Objection.  It assumes facts.

20          THE COURT:  Overruled.

21  A.  Yes.  There may be, but I don't remember exactly.  When we

22  have meetings, there are minutes taken, but I don't remember

23  the exact date.

24  Q.  In collecting documents in connection with this case, did

25  you ask anyone for the minutes of the asamblea meetings?

Page 2419

1   A.  Did I ask the secretary?

2   Q.  Or anybody at the asamblea.

3   A.  Yes.

4   Q.  Who did you ask?

5   A.  Once I told Luis I think.  No, it was Pablo.  I told Pablo

6   to give me the minutes of the meeting so that I can remember

7   because I live far away and I haven't yet gotten them.

8   Q.  By Pablo, you mean Pablo Fajardo?

9   A.  Yes.

10         MR. BRODSKY:  May I approach, your Honor?

11  A.  When I say Pablo, it's Pablo Fajardo.

12  Q.  Mr. Piaguaje, I am going to show you another document you

13  produced in this case, Plaintiff's Exhibit 6714 for

14  identification, Bates labeled JP 65.  The third page is in

15  Spanish Mr. Piaguaje.

16         Do you recognize the document, Mr. Piaguaje?

17         Mr. Piaguaje, do you recognize your e-mail address?

18  A.  Yes.

19  Q.  That's an e-mail exchange that you had with Luis Yanza,

20  correct?

21  A.  Yes.

22  Q.  Relating to an asamblea meeting?

23  A.  Yes.  He sent me these, but this was some time ago, these

24  e-mails back before, and I don't really pay a lot of attention

25  to my e-mail.  I read them quickly and then I move on.  I don't

Page 2420

1  spend a lot of time reading e-mail.

2          MR. BRODSKY:  We offer 6714.

3          MR. GOMEZ:  No objection.

4          MR. FRIEDMAN:  No objection.

5          THE COURT:  Received.

6          (Plaintiff's Exhibit 6714 received in evidence)

7  Q.  Now, sir, directing your attention to Luis Yanza's e-mail

8  to you on November 15, 2010, you remember, sir, there were

9  discussions in the asamblea meetings when you were on the

10  executive committee about legalizing the existence of the

11  asamblea?

12  A.  Yes, I do remember that.

13  Q.  These discussions started in late 2010, right?

14          MR. GOMEZ:  Objection.  Vague.

15          THE COURT:  Overruled.

16  A.  Well, as I said to you earlier, when I was president of my

17  nation, I began attending to these things.

18  Q.  And the discussions about legalizing the existence of the

19  asamblea started in the latter half of 2010, correct?

20          MR. GOMEZ:  Objection.  It calls for a legal

21  conclusion.

22  A.  Yes.

23          THE COURT:  Overruled.

24          MR. BRODSKY:  May I approach?

25          THE COURT:  Yes.

Page 2421

1  Q.  Mr. Piaguaje, let me show you another e-mail that you

2  produced in this case, JP 77 to JP 79.  The last three pages

3  are in Spanish.

4           This is another e-mail exchange, sir, you had,

5  correct, with Luis Yanza?

6  A.  Yes.

7  Q.  Directing your attention to the bottom of the first page,

8  starting with "the main purpose of this workshop," you

9  attended, Mr. Piaguaje, this workshop on December 3 and

10  December 4, 2010, right?

11  A.  Let me try to remember.  Yes, it seems so.

12  Q.  And that workshop was about getting ready to receive money

13  in the Lago Agrio Chevron case, right?

14           MR. GOMEZ:  Objection.

15           THE COURT:  Overruled.

16  A.  Yes.  It was for all manner of work, of planning work.

17  Q.  Planning to manage the money from a judgment in the Lago

18  Agrio Chevron case, right?

19  A.  Yes, it seems so.  That's what I recall.

20  Q.  And if you look at the second page, sir, you see how Luis

21  Yanza's title is coordinator of the Texaco case, the ADF?  Do

22  you see that?

23  A.  Yes.

24  Q.  What was Mr. Yanza's responsibilities as the coordinator of

25  the Texaco case, the ADF?

Page 2422

1        MR. BRODSKY:  Withdrawn.

2        THE COURT:  I think you may be misreading the

3  document.

4  Q.  Does it say there, Luis Yanza, coordinator of the Texaco

5  case?

6        MR. BRODSKY:  Let me withdraw that question and ask a

7  better one.

8  Q.  What were Mr. Yanza's responsibilities as coordinator of

9  the Texaco case at asamblea meetings?

10  A.  Luis Yanza's job?

11  Q.  Yes.

12  A.  He coordinates us, the indigenous nations, when we have

13  assemblies, so that we can express our views.

14  Q.  Is it fair to say --

15        THE COURT:  Let him finish.

16        MR. BRODSKY:  I apologize.

17  A.  For the indigenous nations and the settlers.

18  Q.  Is it fair to say, Mr. Piaguaje, that Mr. Yanza and Mr.

19  Fajardo set the agenda for the asamblea meetings?

20  A.  Yes.  Well, at the first meeting, we decide what we are

21  going to address, and then Luis Yanza, he is our coordinator,

22  he does that.  My lawyer, Pablo Fajardo, deals with the legal

23  aspects, and as far as the legal aspects, I don't know much

24  about that.  That's up to the attorneys.

25  Q.  Sir, is it fair to say the executive committee of the

Page 2423

1 asamblea made the decisions, according to you, about how the

2 funds that are raised to finance the judgment for collection of

3 the judgment are spent?

4 A.  Yes.

5 Q.  Did the asamblea determine what percentage of the judgment

6 was going to go to the attorneys?

7 A.  Yes.

8 Q.  Did the asamblea determine how much money Mr. Donziger

9 would be paid on a monthly basis?

10 A.  No.

11 Q.  Did the asamblea determine how much money Fajardo, Pablo

12 Fajardo was paid on a monthly basis?

13 A.  No.

14 Q.  Before the Lago Agrio judgment was issued in February 2011,

15 did the asamblea discuss whether to give Pablo Fajardo 10

16 percent of the total fees going to the lawyers?

17         MR. GOMEZ:  Objection.  It assumes facts.

18         THE COURT:  Overruled.

19 A.  No.

20 Q.  Did you know, prior to the issuance of the Lago Agrio

21 judgment in February 2011, that Pablo Fajardo signed an

22 agreement with the representative of the asamblea giving Pablo

23 Fajardo the right to 10 percent of all of the attorneys' fees?

24 A.  No.

25         MR. BRODSKY:  May I approach, your Honor?

Page 2424

1          THE COURT:  You may.

2   Q.  Mr. Piaguaje, let me show you Plaintiff's Exhibit 559A for

3   identification, which is a multipage document.  The first 11

4   pages, sir, are in Spanish and pages 13 through 23 are in

5   English.

6          MR. BRODSKY:  For the record, the title of the

7   document is retainer agreement.  The Bates number is Woods

8   45416 to 45426.

9   Q.  Have you ever seen this document before?

10  A.  No.

11  Q.  Let me ask you to turn to page 10 of the document, the

12  signature page.

13          I would like you to turn to the signature page in the

14  English version, sir.  So it's page 22 of 23.

15          MR. BRODSKY:  Your Honor, with your permission, may I

16  help the witness?

17          THE COURT:  Yes.

18  Q.  It's also on the screen, Mr. Piaguaje.

19          Do you recognize that distinct signature of Ermel

20  Gabriel Chavez Parra, president it says of Frente de Defensa de

21  la Amazonia?

22  A.  I don't recall the signature very well because I haven't

23  seen it much.

24  Q.  Do you know who Ermel Gabriel Chavez Parra is?

25  A.  Ermel Chavez, I know who he is.

Page 2425

1   Q.  Who is he?

2   A.  Well, I have seen that Ermel Chavez was the president of

3   the Amazon Defense Front.

4   Q.  Have you seen Luis Yanza's signature in the past?

5   A.  Of course I have seen it, but I don't recall what his

6   signature looks like.

7   Q.  What about Pablo Fajardo?

8   A.  Likewise, I couldn't say because I don't know it very well.

9   Q.  Did Mr. Chavez ever mention to the asamblea, prior to the

10  issuance of the judgment in the Lago Agrio case in February

11  2011, that Pablo Fajardo was going to receive 10 percent of the

12  attorneys' fees in the case?

13  A.  I didn't hear that.

14  Q.  Did Mr. Yanza ever tell the Asamblea de Afectados por

15  Texaco that he was going to sign an agreement giving Pablo

16  Fajardo 10 percent of the attorneys' fees in the case?

17  A.  I didn't hear that.

18  Q.  Now, Mr. Donziger never provided you and the Lago Agrio

19  plaintiffs with an accounting of how money was spent by him in

20  connection with the Lago Agrio Chevron case, right?

21          MR. DONZIGER:  Objection.  Vague.  Lago Agrio

22  plaintiffs.

23          THE COURT:  Mr. Friedman is the lawyer on this

24  witness.

25          MR. DONZIGER:  I don't know if it is clear.

1          THE COURT:  Well, it is clear, because he is the one

2    who has indicated no objection to various exhibits.  If Mr.

3    Friedman has an objection, I will hear it.  You know this rule.

4    We set it up before the trial.

5          MR. DONZIGER:  I represent another party per the

6    Court's order.

7          THE COURT:  Mr. Friedman is the lawyer.

8          Mr. Friedman, do you have a problem?

9          MR. FRIEDMAN:  I guess I would say vague, your Honor.

10         THE COURT:  I guess I would say overruled.

11         MR. BRODSKY:  Your Honor, can I ask the reporter to

12   read back the question.

13         THE COURT:  Yes.

14         (Record read)

15   A.  No.

16   Q.  Did you ever ask Mr. Donziger for an accounting of how he

17   spent the money in connection with the Lago Agrio Chevron case?

18   A.  No.

19   Q.  Did the asamblea ever ask Mr. Donziger for an accounting of

20   how he spent funds raised in connection with the Lago Agrio

21   Chevron case?

22         MR. GOMEZ:  Objection, your Honor.  During his

23   service?

24         THE COURT:  He is capable of answering to the best of

25   his knowledge.

Page 2427

1   A.  I have not heard that.

2   Q.  Did you ever hear of the Amazonia Recovery Limited?

3   A.  From whom?

4   Q.  From anybody at the asamblea.

5   A.  Because of this trial?

6   Q.  Have you ever heard of a company called Amazonia Recovery

7   Limited ever?

8   A.  No.

9   Q.  Did you hear from anyone at the asamblea, including

10  Mr. Yanza and Mr. Fajardo, that an entity was going to be

11  formed in Gibraltar that was going to receive the money from

12  the Lago Agrio Chevron judgment?

13  A.  Yes.  What we have set up is a trust that would, if we win,

14  would manage the money that we would receive.

15  Q.  Pablo Fajardo told you this?

16  A.  Well, yes, Pablo Fajardo, yes.  If we win, if we win money

17  from this, to be able to manage it properly, we set up a fund

18  so it would be a good accounting and good management of the

19  money.

20  Q.  Did you participate in any discussion with Mr. Fajardo or

21  others at the asamblea that any money received from the Lago

22  Agrio Chevron judgment would be managed in a trust outside of

23  Ecuador?

24  A.  No, in Ecuador itself.

25  Q.  Are you aware one way or the other whether -- withdrawn.

Page 2428

1           Who told you that the money would be received in

2   Ecuador as opposed to outside of Ecuador?

3           MR. GOMEZ:  Objection.  It assumes facts.

4           THE COURT:  The witness just testified that the trust

5   was set up to handle the money and it would be in Ecuador.

6   Overruled.

7   A.  Could you please repeat the question?

8   Q.  Who told you that any money received from the Lago Agrio

9   Chevron judgment would be managed in a trust in Ecuador itself?

10  A.  Well, we have the coordinators.  You have Luis Yanza and

11  you have Humberto Piaguaje as coordinators, and they inform us

12  of what is going on, because for my part I don't know anything

13  about this so they inform us.

14          MR. BRODSKY:  May I approach, your Honor?

15          THE COURT:  Yes.

16  Q.  I am showing you, Mr. Piaguaje, two exhibits, Plaintiff's

17  Exhibit 7701 and Plaintiff's Exhibit 7700.

18          If we take the first one, 7701 first, it's Bates

19  labeled JRIZACK 35 through 42, and the first eight pages are in

20  Spanish and pages 10 through 17 are in the original English.

21          Have you ever seen this document before, sir?

22  A.  No.

23  Q.  Did you, sir, have any knowledge that 21 million, more than

24  $21 million has been spent in connection with the Lago Agrio

25  litigation by your attorneys between 2007 and 2013?

Page 2429

1              MR. GOMEZ:  Objection.  It assumes facts.

2              THE COURT:  Sustained as to form.

3    Q.  Are you aware, sir, of how much money has been spent in the

4    Lago Agrio Chevron case and related litigation by Mr. Donziger

5    and those working with him between 2007 and 2013?

6    A.  No.

7    Q.  In looking at Plaintiff's Exhibit 7700, would you take a

8    moment to look at the Spanish portion?  This is Bates number

9    JRIZACK 14 -- it's got different Bates numbers on it, but we

10   will just go with, at the top it says Steven Donziger &

11   Associates.  It has an address in New York, New York.

12              On the first page it has the date of February 2, 2012.

13   And then it has a different date every month from February 2012

14   through July 2012.

15              Have you ever seen this document before, Mr. Piaguaje?

16   A.  No.

17   Q.  Did you know Mr. Donziger was receiving $35,000 a month

18   from January 2012 through at least July 2012 in professional

19   service fees?

20              MR. FRIEDMAN:  I would object.  I don't think that

21   fact has been established.

22              THE COURT:  Sustained as to form.

23              MR. BRODSKY:  If I can offer this document subject to

24   connection, 7700 and 7701.

25              THE COURT:  Any objection?

1          MR. FRIEDMAN:  To offering the document, no.

2          MR. GOMEZ:  Subject to connection.

3          THE COURT:  All right.  They are both received subject

4    to connection.

5          (Plaintiff's Exhibits 7700 and 7701 received in

6    evidence)

7    Q.  Mr. Piaguaje, if you look at the first page of 7700, in

8    Spanish, you see where it says Steven Donziger & Associates at

9    the top?

10   A.  This here?

11   Q.  Yes.

12          Did you know, sir, that Mr. Donziger received $35,000

13   a month from at least February 2012 through July 2012 in

14   professional service fees?

15          MR. FRIEDMAN:  Objection again, your Honor.

16          THE COURT:  Sustained as to form.

17   Q.  Were you aware, sir, of how much Mr. Donziger received per

18   month from February 2012 to July 2012 in professional service

19   fees?

20   A.  No.

21          MR. FRIEDMAN:  I would object as to form.

22          THE COURT:  That's not objectionable as to form, but

23   it might be helpful and more expeditious if counsel remembered

24   that in the practice of law, there can sometimes be a

25   difference between billed and received, like in most other

Page 2431

1  economic activities.  After you're out of the U.S. attorney's

2  office a couple of more years, you will remember.

3           MR. BRODSKY:  I never did a securities fraud case,

4  your Honor.  That was a joke for the record, a bad one.

5  Q.  Mr. Piaguaje, were you aware that Mr. Donziger and

6  associates charged $35,000 a month in professional service fees

7  each month from February 2012 through at least July 2012?

8           MR. FRIEDMAN:  Object, your Honor, on form.

9           THE COURT:  What is the objection?  Obviously, you can

10  see its authenticity.  So it's in.  It looks like a bill from

11  Mr. Donziger.  And who do you suppose that bill would be

12  rendered to other than the Lago Agrio plaintiffs?

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Page 2432

1          MS. FRIEDMAN:  Well, that's exactly the point, your

2     Honor.  I don't think it's clear who that bill is rendered to

3     and --

4          THE COURT:  Do you have another candidate?

5          MS. FRIEDMAN:  Well, there's not even -- I don't

6     think -- my understanding of the source of these documents,

7     your Honor, is a -- it's not actually an accountant, but

8     Mr. Rizack, who kept various financials for Mr. Donziger.  I

9     don't even know, I don't think it's been established these were

10    ever even sent.

11         THE COURT:  It seems to me that the document is

12    sufficient to permit the question.  And then if you want to

13    deal with it in some other way, that's your privilege, of

14    course.

15         MS. FRIEDMAN:  All right.

16    A.  No.

17         MR. BRODSKY:  Your Honor, I was going to go to a

18    different part.  Happy to do it now.  I'll go forward.

19    Q.  Mr. Piaguaje, can you turn back to your witness statement,

20    Defendant's Exhibit 1800.  We'll put it up on the screen for

21    you.  Let me direct your attention to paragraph 40, which is on

22    page 7.  Do you see where it says I have -- withdrawn.

23         Directing your attention to that paragraph,

24    Mr. Piaguaje, what did you mean by "ratify"?

25    A.  It would be to repeat again it means.

Page 2433

1   Q.  Did you choose -- I'm sorry.

2         Did you choose that word, Mr. Piaguaje, or did your

3   lawyer choose that word, ratify?

4   A.  My attorney.

5   Q.  What did you mean, what court rules are you talking about

6   in paragraph 40 where you say violation of court rules by

7   anyone?

8   A.  With the rules it means, how can you explain this, well,

9   you have to follow -- you have to follow what is being done,

10  for example.

11  Q.  Were you referring to court rules in Ecuador or court rules

12  in the United States or both?

13  A.  Well, in Ecuador.

14  Q.  Let me ask you to turn to paragraph 18, page 4.  The first

15  sentence there, what did you mean by extort money?

16  A.  To lie.

17  Q.  Let me ask you to turn to paragraph 36, page 6.  When you

18  wrote this, sir, in paragraph 36, you meant, of course, that

19  you've never had knowledge of actions taken by Mr. Donziger

20  prior to Chevron filing its complaint against you in 2011,

21  right?

22  A.  Once again?

23  Q.  Sir, did you, when you wrote this that you'd never had any

24  knowledge of actions taken by Mr. Donziger in New York, did you

25  mean you don't have any personal knowledge?

Page 2434

1  A.  No.  I'm aware that he's supporting with this part of the

2  trial.

3  Q.  Since the complaint against you by Chevron and --

4  withdrawn.

5       Since the complaint by Chevron against you and others

6  was filed, you've learned about the documentary film Crude,

7  right?

8  A.  What do you mean, if I had seen the movie Crude?

9  Q.  Did you, sir, in your deposition, did you view a portion of

10 the outtakes or of the movie Crude?

11 A.  The photographs?

12 Q.  Did you watch any movie, a video clip during your

13 deposition, sir?

14 A.  Where, in Lima?

15 Q.  Yes.

16 A.  No.

17 Q.  Let me direct your attention to paragraph 31.  You were a

18 plaintiff, sir, in the Aguinda v. Texaco case filed in this

19 very courthouse in Manhattan, New York, in 2003, right?

20       THE COURT:  I think, Mr. Brodsky, you've got the year

21 wrong by about a decade.

22       MR. MASTRO:  '93.

23       MR. BRODSKY:  Thank you, your Honor.

24 Q.  You were a plaintiff in the Aguinda v. Texaco case filed in

25 this very courthouse in 1993?

Page 2435

1          THE COURT:  Let me help you a little further, sir.
2    This courthouse didn't exist in 1993.
3          MR. BRODSKY:  I meant metaphorically, your Honor.
4          THE COURT:  Let's stick to the real analog world.
5          MR. BRODSKY:  I'll move on, your Honor.  I'll move on.
6    Q.  Mr. Piaguaje, let me direct your attention to other
7    paragraphs.  Paragraph 18, page 4, last sentence, prior to
8    Chevron complaining.
9          Sir, when did you learn Chevron was complaining about
10   your attorneys intimidating or pressuring a judge?
11   A.  I don't know the date.
12   Q.  Was it in 2011?
13   A.  Yes, after the judgment.
14   Q.  When Chevron filed this complaint against you and others?
15   A.  For example, yes, here where it says, yes, exactly.
16   Q.  And in paragraph 19, is your answer the same, that you
17   learned about Chevron's complaining about your attorneys
18   drafting a complaint against an Ecuadorian judge when the
19   allegations were filed against you and others?
20         MR. GOMEZ:  Objection, vague.
21         THE COURT:  Rephrase it.
22   Q.  In paragraph 19 where you state prior to Chevron's
23   complaining about it, do you see that, the "it" is what you
24   mentioned, correct, that your attorneys, that you never
25   authorized your -- withdrawn.

Page 2436

1          That you learned Chevron was complaining your

2   attorneys drafted a complaint against an Ecuadorian judge,

3   correct?

4          THE COURT:  Sustained as to form.  Please, a cleaner

5   question.

6          MR. BRODSKY:  Sorry.

7          THE COURT:  It's hard enough to get it in English.

8   Q.  Paragraph 20, do you see that, Mr. Piaguaje, did you learn

9   that Chevron was complaining that your attorneys put pressure

10  over the judge presiding over the Lago Agrio case when Chevron

11  filed allegations against you and others?

12  A.  Yes.

13  Q.  In paragraph 21, did you learn about Chevron's allegation

14  that your attorneys threatened to file a complaint against

15  Judge Yanez unless your attorneys -- unless Judge Yanez allowed

16  the plaintiffs to waive the judicial inspections when Chevron

17  filed its complaint against you and others?

18  A.  Let's see.  I can't answer because I'm not understanding

19  the question very well.

20          THE COURT:  Let's take our lunch break.  2 o'clock,

21  please.

22          (Luncheon recess)

23

24

25

Page 2437

1                        AFTERNOON SESSION

2                            2:09 p.m.

3          THE COURT:  There's a matter that I want to discuss

4    before we resume and the witness should leave the room for the

5    time being.

6          (Witness not present)

7          THE COURT:  I received over the lunch hour a request

8    from Chevron for an order to show cause with respect to the

9    hard drives, hard drive, or, I think to be more precise, the

10   images of the hard drive of Mr. Moncayo's computer.  Among

11   other things, the papers represent that Mr. Gomez is now

12   representing Mr. Moncayo.

13          First of all, is that right, Mr. Gomez?

14          MR. GOMEZ:  That's correct, your Honor.  I was

15   informed yesterday that we are out of funds to pay for

16   Mr. Russell Yankwitt to continue representation.  Given that

17   the amount of work involved has exceed our expectations, there

18   being no other person that could step in, I've elected to step

19   in.  And I had a discussion with Mr. Russell yesterday evening

20   at 11 p.m. to understand what the current status is of the

21   reviews and to arrange for transfer of the file today.

22          THE COURT:  Has the hard drive been imaged?

23          MR. GOMEZ:  The hard drive was copied.  And my

24   understanding, your Honor, is that a firm, RVM, has possession

25   of the drive and is indexing its contents.  As of last night, I

Page 2438

1   recall seeing an email that that process was still underway and

2   was expected to be completed at some point today, but I don't

3   know that it's been completed yet or when it's expected to be

4   completed exactly.

5          THE COURT:  And there are two copies or one?

6          MR. GOMEZ:  My understanding is that there are I

7   believe three copies, your Honor:  one that's filed under seal

8   with the court last week, one in the possession of RVM, and one

9   that went back with Mr. Moncayo.

10         THE COURT:  So you're telling me that one is with the

11  clerk of the court; is that right?

12         MR. GOMEZ:  That's my understanding, your Honor, that

13  it was filed under seal last week.

14         THE COURT:  And the indexing, tell me what that's

15  about.

16         MR. GOMEZ:  I haven't had any of these communications,

17  your Honor.  My understanding is that there is a vendor that

18  plaintiff has agreed to pay for who has received the one of the

19  copies of the drives and is required to index, essentially

20  create a list of all of the computer files that are on the

21  drive.

22         THE COURT:  And that's RVM.

23         MR. GOMEZ:  That's RVM.

24         THE COURT:  All right.  And where is it intended that

25  this index go?

1           MR. GOMEZ:  My understanding is that index was to have

2    gone to Mr. Russell Yankwitt for him to use in his review of

3    the contents of the drive.

4           THE COURT:  And where is Mr. Moncayo?

5           MR. GOMEZ:  Mr. Moncayo is in Ecuador.

6           THE COURT:  All right.  Now, Mr. Mastro, I read your

7    proposed order.  You're asking me to order various people or

8    organizations who are not parties to this case to do things.

9           MR. MASTRO:  Well, the difficulty, your Honor, is that

10   an organization called Earth Rights is claiming some kind of

11   privilege claim.  We don't know how they possibly could.  But,

12   you know, we're trying to deal with these issues so that we get

13   the documents in a timely way to be able to use in these

14   proceedings.  It's also the case, your Honor, so we've spelled

15   out in our application why we think they have no rights and

16   they haven't tried to appear here.

17          THE COURT:  I understand that.  I understand that.

18   But they're not even parties to the case.

19          MR. MASTRO:  I understand.

20          THE COURT:  There's no standing here.

21          MR. MASTRO:  They have been very litigious in the

22   past, your Honor, in trying to obstruct discovery of Amazon

23   Watch and otherwise.  So, therefore, we felt we needed to make

24   application to the Court about being able to receive these

25   documents, including, your Honor, the emails which were also

Page 2440

1   imaged but not deposited with the Court.  And Mr. Yankwitt told

2   us last night that he was prepared to produce emails and a

3   privilege log this morning.  So that's something that should be

4   able to go forward forthwith, but for Earth Rights which we

5   think has no understanding here saying, oh, we should have to

6   review it first.

7           THE COURT:  If, as, and when they intervene in this

8   case, I'll deal with any assertions they may make.  I would

9   simply say this.  All concerned ought to take very careful

10  legal advice before anything further happens.

11          Mr. Gomez, you are directed forthwith, as soon as you

12  leave this courtroom today, to complete whatever review you

13  feel you need to make on behalf of Mr. Moncayo and, if

14  Mr. Moncayo has any privileges to assert, to do it as you see

15  fit and forthwith.  And I am going to entertain an application,

16  to which you will have an opportunity to respond, and it may be

17  orally, to direct you forthwith to turn over any responsive

18  materials as to which no privilege is claimed and to move on an

19  extremely expedited schedule as to anything else.

20          Do you understand me?

21          MR. GOMEZ:  I understand, your Honor.

22          THE COURT:  All right.  Let's proceed.  Let's get the

23  witness back.

24          MR. BRODSKY:  Just for your information on scheduling,

25  your Honor, I have maybe 15, 20 minutes left.

1          THE COURT:  Thank you.

2          (Witness present)

3          THE COURT:  All right.  The witness is reminded he's

4   still under oath.

5          Let's proceed, Mr. Brodsky.

6          MR. BRODSKY:  May I approach, your Honor?

7          THE COURT:  Yes.

8   BY MR. BRODSKY:

9   Q.  I'm showing you, Mr. Piaguaje, Plaintiff's Exhibits 2241

10  through 2247 and 6730 for identification.  Would you take a

11  moment to look at those photographs.

12         Mr. Piaguaje, these are photographs, correct, from

13  your Facebook account?

14  A.  Yes.

15  Q.  And you updated your Facebook page frequently, correct?

16  A.  When, when I leave where there is a internet signal.

17  Q.  So in, for example, Plaintiff's Exhibit 6730 for

18  identification, those are photographs that you uploaded during

19  your trip here late last week?

20  A.  Yes.

21  Q.  And you access the internet to upload these photographs,

22  correct?

23  A.  Yes, in Facebook.

24  Q.  And on a regular -- withdrawn.

25         When you have the ability to access the internet, you

Page 2442

1    know how to do that, correct?

2    A.  A little.

3          MR. BRODSKY:  Your Honor, we offer 2241 through 2247

4    and 6730.

5          MR. GOMEZ:  Your Honor, I have an objection to these

6    documents on the grounds of relevance.

7          THE COURT:  The relevance, Mr. Brodsky?

8          MR. BRODSKY:  At least in two respects.  First, I

9    think they reflect evidence of a sophistication in terms of

10   uploading and using and accessing the internet.  And, your

11   Honor, reasonable inferences can be drawn from that that if

12   Mr. Piaguaje wanted to learn information about the case or the

13   allegations or what steps are being taken or the Court's

14   findings, he can do that.

15         And, second, these are all uploaded by him in Spanish,

16   and I think they're his messages in Spanish which reflect that

17   that's the language that he's using when he's uploading images

18   to his Facebook account.

19         MR. GOMEZ:  Your Honor, for one, I don't think the

20   images establish the kind of understanding of the internet that

21   one would need to conduct searches of various items using

22   search engines.  I think they're two different things, or at

23   least the questioning hasn't established that he possesses that

24   kind of expertise in terms of use of the internet.

25         And, two, with respect to the language, I think

Page 2443

1   Mr. Piaguaje has been testifying today in Spanish.  I don't

2   think there's a dispute that he speaks and understands the

3   language.

4           THE COURT:  Well, actually he said earlier that he

5   spoke it a little or understood it a little, something to that

6   effect.

7           MR. GOMEZ:  Yes, that's correct, your Honor.  I don't

8   think that the photographs or Facebook pages one way or the

9   other really add to that particular testimony.

10          THE COURT:  That all goes to the weight.  They're all

11  received.

12          (Plaintiff's Exhibits 2241 through 2247 and 6730

13  received in evidence)

14  Q.  Mr. Piaguaje, just a few final questions focusing on the

15  period of late 2010.

16          Do you recall attending asamblea meetings in the

17  latter half of 2010?

18  A.  I do not remember.

19  Q.  Do you remember --

20          MR. BRODSKY:  Well, may I approach, your Honor?

21          THE COURT:  Yes.

22  Q.  Let me show you, Mr. Piaguaje, Plaintiff's Exhibit 7019 for

23  identification, Bates labeled LAP1660 through 1662.  And the

24  first few pages, Mr. Piaguaje, are in English.  And if you go

25  to the back, the last three pages are the Spanish original.

Page 2444

1        Does this refresh your recollection, Mr. Piaguaje,

2   regarding topics of conversation at asamblea meetings in late

3   2010?

4   A.  Well, I don't remember.

5   Q.  If I can direct your attention to the first page of the

6   minutes where it says confirmation of quorum and direct your

7   attention to OISE.  Do you recognize what OISE is?

8   A.  Yes.

9   Q.  What is it?

10  A.  That's the indigenous organization of the Secoya of

11  Ecuador.

12  Q.  And at this time in 2010, you were the delegate from OSIE,

13  correct?

14  A.  Yes, from June on.

15  Q.  From June 2010 through 2012?

16  A.  Yes.

17        MR. BRODSKY:  We offer 7019, your Honor.

18        THE COURT:  Received without objection.

19        (Plaintiff's Exhibit 7019 received in evidence)

20  Q.  And directing you to the third page, at the top of the

21  page, do you remember Mr. Yanza presenting a proposal of

22  support for Steven Donziger?

23  A.  No.

24  Q.  Does this document refresh your recollection at all of a

25  discussion in late 2010 at asamblea meetings regarding attacks,

Page 2445

1   so-called attacks on Mr. Donziger?

2   A.  I'm sorry, I didn't hear it very well.  Could you repeat

3   the question.

4   Q.  Does this document refresh your recollection at all that

5   there was discussion at asamblea meetings in late 2010 about

6   Chevron's allegations relating to Steven Donziger?

7   A.  Yes.  Humberto Piaguaje commented that to me.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2446

1    Q.   And the asamblea issued an agreement of support for Mr.

2    Donziger?

3    A.   I don't know.   I don't know.

4         MR. BRODSKY:   May I approach for the final time, your

5    Honor?

6         THE COURT:   Yes.

7    Q.   Let me show you, Mr. Piaguaje, a document that you

8    produced.   It's Plaintiff's Exhibit 6703.   The first part is in

9    English.   The document you produced starts from pages 6 through

10   9 in Spanish and it's Bates number JP 3 through JP 6.

11        Do you remember producing this document, Mr. Piaguaje?

12   A.   Yes.

13   Q.   This is an informational bulletin put out by the assembly

14   of the affected by Texaco?

15   A.   Yes.

16   Q.   Directing your attention to the third page, paragraph 4.

17   We will put it up on the screen for you, too, Mr. Piaguaje.

18        Does this refresh your recollection, Mr. Piaguaje,

19   that the asamblea expressed support for Mr. Donziger in late

20   2010?

21   A.   Well, at that time, I wasn't aware of this.   When I was

22   asked, I gave this document but I didn't have a thorough

23   knowledge of it.

24   Q.   You don't recall reading the document at the time?

25   A.   Well, yes, about struggling for 17 years or fighting for 17

Page 2447

1   years, but not much more detail than that.

2          MR. BRODSKY:  No further questions, your Honor.

3          THE COURT:  Thank you.

4          Redirect, Mr. Gomez.

5          MR. GOMEZ:  Before I begin, for the sake of

6   completeness, Mr. Brodsky made reference to Plaintiff's Exhibit

7   6407R.  In particular, Mr. Piaguaje's response to

8   interrogatories number 6 and 11.  I would ask that the entirety

9   of those responses be moved into evidence for the Court's

10  consideration as opposed to just portions or one sentence.

11         THE COURT:  Any problem, Mr. Brodsky?

12         MR. BRODSKY:  When Mr. Gomez says the entirety, if he

13  means the portion below supplemental response to the

14  interrogatory and above the next interrogatory, no objection.

15         MR. GOMEZ:  That's what I mean.

16         THE COURT:  Those additional portions are received.

17         Was there an intention to offer 6703?

18         MR. BRODSKY:  Yes, your Honor.  We offer that.  I

19  believe I may have omitted offering 559A.

20         THE COURT:  One thing at a time.

21         Is it offered for the truth or is it offered simply as

22  a statement?

23         MR. BRODSKY:  Simply as a statement.

24         THE COURT:  6703 is received not for the truth.

25         (Plaintiff's Exhibit 6703 received in evidence)

Page 2448

1           THE COURT:  What was the other one?

2           MR. BRODSKY:  559A is the agreement between Mr.

3   Fajardo, Mr. Yanza, and the leader of the asamblea.

4           THE COURT:  Any objection?

5           MR. GOMEZ:  No objection.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 559A received in evidence)

8   REDIRECT EXAMINATION

9   BY MR. GOMEZ:

10  Q.  Goods afternoon, Mr. Piaguaje.

11  A.  Good afternoon.

12  Q.  Mr. Piaguaje, who is Humberto Piaguaje?

13  A.  He is the vice coordinator or sub-coordinator of the

14  assembly of the affected.

15  Q.  Is that the position he held when you were a member of the

16  executive committee or the position he holds presently?

17  A.  Yes.

18  Q.  Did Humberto Piaguaje hold the position of vice

19  sub-coordinator of the asamblea when you were on the executive

20  committee in year 2010 through 2012?

21  A.  Yes.

22  Q.  Does Mr. Piaguaje, Mr. Humberto Piaguaje, hold the position

23  of vice sub-coordinator of the asamblea at present?

24  A.  No.  Now he is the coordinator.

25  Q.  What is the responsibility of the sub-coordinator of the

Page 2449

1    asamblea?

2              MR. GOMEZ:  Withdrawn.

3    Q.  What is the responsibility of the coordinator of the

4    asamblea?

5    A.  That person coordinates all matters related to this trial,

6    that is, he is a liaison or a link with the attorneys, as well

7    as with us, with the communities.

8    Q.  Is he responsible for preparing the agendas of the asamblea

9    meetings?

10             MR. BRODSKY:  Objection.  Leading.

11             THE COURT:  Sustained.

12   Q.  What are the specific tasks that he is required to perform

13   as coordinator?

14   A.  Well, as the category, I am not very familiar.  It's not a

15   position that I myself have held.  But he works with the

16   indigenous communities and with the attorneys deciding or

17   working with us to decide what we will do, the presidents of

18   all of the indigenous nations and the settlers as well.

19   Q.  Why was the asamblea created?

20             MR. BRODSKY:  Objection.

21             THE COURT:  Sustained.

22   Q.  What is the purpose of the executive committee in the

23   asamblea?

24   A.  The executive committee holds meetings with representatives

25   of all of the indigenous nations as well as the cooperative,

Page 2450

1  part of the affected, the persons affected.

2  Q.  How many persons sat on the executive committee of the

3  asamblea when you were a member of it between 2010 and 2012?

4  A.  I don't know how to tell you exactly how many.  There is a

5  representative from all of the indigenous nationalities, as

6  well as the coordinator and the representative of the Amazon

7  Defense Front.  So exactly I don't know, 10, 12.

8  Q.  You mean 10 to 12 people?

9  A.  Yes.

10  Q.  Which indigenous nationalities were represented on the

11  executive committee on the asamblea when you were a member of

12  it between 2010 and 2012?

13  A.  The Kofan and the Siona, the Kichwa, the Siekopai, my own,

14  the settlers.  Those all meet in the committee.

15  Q.  Who did the settlers represent?

16  A.  Themselves.

17  Q.  How were they selected, the settlers, to participate on the

18  executive committee?

19  A.  Each one of the cooperatives was given a chance to be

20  represented on the executive committee.

21  Q.  When you say cooperative, what are you referring to?

22  A.  In Ecuador, when settlers get together and form a group in

23  a community of sorts, that's what a cooperative is.  We use the

24  word comunidad in Ecuador really to refer to indigenous people

25  so it's a cooperative.

Page 2451

1   Q.  Can you identify some of the cooperatives that were

2   represented in the executive committee when you were a member

3   between 2010 and 2012?

4   A.  Yes.  I know the communities, but I don't know the names of

5   all of the cooperatives, the settler communities.

6   Q.  How were the representatives of the indigenous groups who

7   sat on the executive committee of the asamblea selected?

8           MR. BRODSKY:  Objection.  Foundation.

9           THE COURT:  Sustained.

10  Q.  Who selected the representatives of indigenous groups to

11  sit on the executive committee of the asamblea?

12          MR. BRODSKY:  Same objection.

13          THE COURT:  Sustained.

14          MR. GOMEZ:  What is the objection?

15          THE COURT:  There is no foundation.  No showing that

16  he has personal knowledge.

17  Q.  Sir, how were you selected to sit on the executive

18  committee of the asamblea?

19  A.  Because I was president, that's why I had to join in the

20  executive committee.

21  Q.  At the time that you were sitting on the executive

22  committee of the asamblea, were there representatives of other

23  indigenous nations sitting on that committee?

24  A.  Of other indigenous nationalities?

25  Q.  Yes.

Page 2452

1   A.  Yes.

2   Q.  How were they selected to participate on this committee?

3        MR. BRODSKY:  Objection.

4        THE COURT:  Sustained.  It's the same question you

5   have asked twice before.

6   Q.  Mr. Piaguaje, do you know how representatives of other

7   indigenous groups were selected to sit on the executive

8   committee of the asamblea between 2010 and 2012?

9   A.  Yes.  Because each community, they will elect who their

10  candidate is, who becomes like a president, and that president

11  is on the executive committee representing that community.

12  Q.  Mr. Piaguaje, was a quorum always taken at every executive

13  committee meeting that you attended?

14  A.  Yes.

15  Q.  How was that done?

16  A.  It had to be one more than half.

17  Q.  Whose responsibility was it to identify sufficient

18  participation to constitute a quorum for a meeting of the

19  executive committee?

20  A.  Well, those of us who are there can see ourselves because

21  we know who is there, and we can tell if there is more than

22  half of the number and put in from among ourselves.  We appoint

23  somebody to do that.

24  Q.  Did you ever read the minutes of previous executive

25  committee meetings?

Page 2453

1   A.  I didn't, but I did hear when others were reading them.

2   Q.  When an executive committee meeting of the asamblea

3   started, were the minutes of a previous executive committee

4   meeting read and approved?

5   A.  Yes.

6   Q.  When you were a member of the executive committee between

7   2010 and 2012, you testified in response to Mr. Brodsky's

8   questions that a trust was discussed.  Do you remember that

9   testimony?

10  A.  Yes.

11  Q.  What was discussed at the executive committee meetings that

12  you attended between 2010 and 2012 regarding a trust?

13          MR. BRODSKY:  Objection.  Time period, your Honor.

14          THE COURT:  No.  He said 2010 to 2012.  Overruled.

15  A.  Well, we began working to build together with those

16  affected and together with our supporters, the coordinator, the

17  attorneys and other colleagues, participants, representatives

18  of the Amazon Defense Front, and we understood that we needed

19  to set up a trust in order to manage money and not waste it and

20  focus on the projects for which we had started this lawsuit and

21  the four issues that we had set out to address.

22  Q.  Who was supposed to manage the trust to which you refer?

23  A.  Who started using that word?

24  Q.  No.  Who was supposed to manage the trust that you are

25  talking about?

Page 2454

1  A.  Well, what we talked about in the executive committee was

2  that we would need to hire outside persons, professionals, but

3  that they couldn't just spend the money any way, and that there

4  should be one person from each indigenous nationality, as well

5  as a settlers there, to have oversight over that.

6  Q.  Has the assembly identified specific people to perform

7  oversight of the trust that you were talking about?

8          MR. BRODSKY:  Objection.

9          THE COURT:  Sorry.  Did you say objection?

10          MR. BRODSKY:  Yes.

11          THE COURT:  Ground.

12          MR. BRODSKY:  Relevance.

13          THE COURT:  Why is it relevant?

14          MR. GOMEZ:  Your Honor, there is an allegation --

15          THE COURT:  And why wasn't it in the witness

16  statement?

17          MR. GOMEZ:  First of all, there is an allegation that

18  all of these decisions are being made or at least directed by

19  Mr. Donziger.  I would like to elicit testimony from the

20  witness that contradicts that allegation.

21          As for the reason it was not in the witness statement,

22  your Honor, the questions about the trust were raised on cross.

23  It revealed to me that the witness possesses a greater

24  understanding of this than I once imagined, and I would like to

25  ask him questions to elicit his knowledge.

Page 2455

1             THE COURT:  Confine it to the relevant time period.

2    BY MR. GOMEZ:

3    Q.  Mr. Piaguaje, after 2011, did the asamblea select specific

4    individuals to provide oversight of a trust that you were

5    talking about?

6    A.  Yes.

7    Q.  Can you identify who those persons were?

8    A.  Well, I only know as to my indigenous community.

9    Q.  Who would that be, sir?

10   A.  His name is Felipe Lusitande.

11            MR. GOMEZ:  Your Honor, may I confer with co-counsel?

12            THE COURT:  Yes.

13            MR. GOMEZ:  Nothing further.

14            THE COURT:  Mr. Friedman?

15            MR. FRIEDMAN:  Nothing for us.

16            THE COURT:  Recross?

17            MR. BRODSKY:  No, your Honor.

18            THE COURT:  All right.  Thank you, Mr. Piaguaje.  You

19   are excused.

20            (Witness excused)

21            MR. FRIEDMAN:  Can we have a side bar before we call

22   our next witness?

23            (At the side bar)

24            MR. FRIEDMAN:  Your Honor, Mr. Donziger wanted to

25   address the Court, and I thought it would be more appropriate

1    that he do it at the side bar than in open court, if that's OK.

2            MR. DONZIGER:  I don't know if it's more appropriate

3    to do it at the side bar.

4            I am the next witness.  Really, two issues.  One is my

5    witness statement is in.  Chevron has a motion to strike

6    portions of it.  So there is that issue.  I would like to get

7    some clarity on that before I testify.

8            The second issue is we would like to do a relatively

9    brief direct before they start on cross, on the theory that my

10   credibility is obviously very much at issue.  The Court allowed

11   Judge Guerra to put in a statement and also testify on direct

12   before the cross.

13           So I would like to ask the Court to allow Mr. Friedman

14   to do a relatively brief direct to start before Chevron does

15   the cross, but I also would like some clarity on the issue of

16   what I am going to be allowed to testify about in terms of what

17   was in my statement or the scope of it given their motion.

18           THE COURT:  Define relatively brief.

19           MR. DONZIGER:  A couple of hours.

20           MR. FRIEDMAN:  I was going to say 45 minutes.

21           THE COURT:  The answer is no.  I have ruled on that.

22   Obviously, it would have been different had you complied with

23   the directions about your witness statement, but you didn't.

24           As to the other, what I am prepared to say now,

25   inasmuch as you have filed your witness statement yesterday or

1   possibly even this morning, and thus, I have had relatively

2   little time to consider Chevron's motion and your counsel

3   hasn't even responded to it, I guess I will do this.

4          Mr. Friedman, do you want to address the motion

5   briefly now?

6          MR. FRIEDMAN:  Yes.  I don't know that we need to do

7   this at side bar.  I have notes to address it.

8          THE COURT:  Go ahead now.

9          MR. FRIEDMAN:  Your Honor, here are the main points in

10  opposition to Chevron's brief.

11         Chevron has alleged extortion.  As I understand the

12  law of extortion, it is incumbent upon Chevron to prove that

13  there was no valid claim to the damages that were supposedly

14  being extorted from Chevron or trying to be extorted, and also

15  has to prove that Mr. Donziger did not believe, or did not

16  believe reasonably in good faith, that the plaintiffs had a

17  valid claim to damages.

18         I think the bulk, as I remember it, the bulk of

19  Chevron's motion is addressed to issues relating to

20  contamination and to the corporate relationship between Texaco,

21  Chevron and Petroecuador.  All of that goes to the point of Mr.

22  Donziger having a good faith belief that there was in fact a

23  valid claim for the Ecuadorian plaintiffs for the money he was

24  supposedly trying to extort.  So that's the heart of our

25  opposition.  I can't recall if there were other points in their

1   brief, but I think they were mainly trying to keep out

2   contamination and legal status issues.

3            MR. DONZIGER:  Can I make one quick point of

4   clarification?  You might not be aware of it.  My witness

5   statement was turned in Thursday evening.  The statement that

6   we sent over yesterday evening was exactly the same but for one

7   paragraph at the very end.

8            THE COURT:  But for your addition of a large number of

9   exhibits, which in some respects make it a significantly

10  different ball game.  And that's simply where it is.  Even if

11  it were last whenever, it was way late, and you have been given

12  extraordinarily great latitude, and I have no doubt that I will

13  have the opportunity to assess your credibility fully through

14  an extensive cross-examination and redirect.  So that takes

15  care of that.

16           Now, what I am prepared to do right now vis-a-vis

17  Chevron's motion is this, subject to the possibility that on

18  further consideration there may be some alterations.  As a

19  general matter, statements attributed in the witness statement

20  to persons other than Mr. Donziger, or references to statements

21  in writings by persons other than Mr. Donziger, will not be

22  considered for the truth of the matters asserted.  All or

23  substantially all are hearsay to the extent they are offered

24  for the truth of the matters, and there is nothing in the

25  witness statement that establishes the applicability of any

Page 2459

1    exception to the hearsay rule.  That is not to say it

2    necessarily will be considered for nonhearsay purposes, only

3    that it will not be considered for the truth of the matters

4    asserted.  I will rule on this other issue later.

5              The statement, moreover, contains and refers

6    extensively to exhibits and other materials relating to

7    environmental conditions in the Oriente.  I see nothing in the

8    statement and nothing in what counsel has said or submitted to

9    suggest that any of that information is relevant if and to the

10   extent it is offered to prove the truth.

11             That's what I am prepared to say now.  You will have a

12   ruling on the motion in full before very long.

13             MR. FRIEDMAN:  Could I address just two quick points?

14             One, there are some exhibits listed in the witness

15   statement that are documents of Chevron's that we would ask be

16   admitted for the truth.  I just wanted to make that clear.

17             THE COURT:  Fair enough.  That's why I left some

18   flexibility here.  I can't be expected to have in mind each and

19   every exhibit referred to in there, particularly since it's

20   been a moving target as late as 8:00 this morning.  I will deal

21   with that in the fullness of time.  But you wanted guidance,

22   you have got it.

23             (Continued on next page)

24

25

Page 2460

1          (In open court)

2          THE COURT:  Why don't we take our afternoon break

3    before we start.

4          (Recess)

5          THE COURT:  Next witness, Mr. Friedman.

6          MR. FRIEDMAN:  Steven Donziger, your Honor.

7    STEVEN DONZIGER,

8        called as a witness by the defendants,

9        having been duly sworn, testified as follows:

10          THE DEPUTY CLERK:  State your name for the record.

11          THE WITNESS:  Steven Donziger.

12          MR. FRIEDMAN:  May I approach the witness, your Honor?

13          THE COURT:  You may.

14    DIRECT EXAMINATION

15    BY MR. FRIEDMAN:

16    Q.  Mr. Donziger, do you recognize Defendants' Exhibit 1750?

17    A.  I do.

18    Q.  Could you tell us what it is?

19    A.  It's my witness statement.

20    Q.  Who prepared it?

21    A.  I did.

22    Q.  Who signed it?

23    A.  I did.

24    Q.  Is it true and accurate to the best of your ability?

25    A.  Yes, it is.

1          MR. FRIEDMAN:  I move into evidence DX 1750.

2          MR. MASTRO:  Your Honor, subject to the motion to

3     strike that we have already made in so many respects, we have

4     objected to major portions of it.

5          THE COURT:  Received subject to the motion.

6          (Defendant's Exhibit 1750 received in evidence)

7          MR. FRIEDMAN:  Pass the witness, your Honor.

8          MR. MASTRO:  Thank you, your Honor.

9     CROSS-EXAMINATION

10    BY MR. MASTRO:

11    Q.  We meet again, Mr. Donziger.  Good afternoon.

12         Sir, am I correct that you only served on us last

13    night around 6:30 a final version of your witness statement,

14    the declaration that was just offered into evidence, correct,

15    sir?

16    A.  Yes.

17    Q.  And that you served on us a draft of that statement on

18    Thursday evening, around 8:00, correct, sir?

19    A.  That's correct.

20    Q.  In the evening, correct?

21    A.  Yes.

22    Q.  But you had already given it out, that draft, to the press

23    before you ever gave it to us or to the Court, correct, sir?

24    A.  No.

25    Q.  Did you not give your statement to The New York Times the

Page 2462

1   day before or earlier before you gave it to us or to the Court?

2   A.  I gave an earlier version to The New York Times.

3   Q.  Thank you for that clarification.  I appreciate it.

4        Am I correct that you yourself describe yourself as

5   someone who could have been a propagandist?

6   A.  I don't know.

7   Q.  You recall saying that on the Crude outtakes, sir, that you

8   could have been a propagandist?

9   A.  No.

10   Q.  We will refresh your recollection later.

11        Mr. Donziger, this is not the first time you have

12   testified, is it, sir, in this case?

13   A.  No.

14   Q.  You also gave a deposition in your 1782 proceeding,

15   correct?

16   A.  Many days, yes.

17   Q.  Sir, you prepared yourself to give that testimony in your

18   1782 proceeding, correct?

19   A.  I don't understand your question.

20   Q.  You prepared yourself to give testimony at your deposition

21   in your 1782 proceeding, correct?  You didn't just go in cold,

22   you prepared, correct?

23   A.  I prepared with my then counsel.

24   Q.  And you prepared responses to give to questions in your

25   1782 proceeding, correct, sir?

1   A.  Well, I did a preparation where I tried to think of

2   truthful responses to questions that I expected to be posed.

3   Q.  Isn't it a fact, sir, that one of the responses you

4   prepared for yourself to give when you were about to give

5   testimony then was to respond to questions, "It's possible, but

6   I don't think so"?

7   A.  If that were to be an accurate response, yes, I would give

8   that response.

9   Q.  Didn't you also prepare yourself to give the response, "I

10  guess it's possible, but to the best of my recollection I

11  didn't"?

12  A.  If that would be accurate, yes, I would give that response.

13  Q.  I am going to show you, sir, what has been marked as

14  Plaintiff's Exhibit 2457.

15          MR. MASTRO:  May I approach, your Honor?

16          THE COURT:  Yes.

17  Q.  I am referring you, Mr. Donziger, to the very top part of

18  the page where it says, "Comments:  It's possible, but I don't

19  think so.  I guess it's possible, but to the best of my

20  recollection I didn't."  Do you see that, sir?

21  A.  Yes.

22  Q.  You wrote this document yourself to prepare yourself to

23  give testimony in a courtroom, correct, sir?

24  A.  I did write the document myself.

25  Q.  And you didn't write that paragraph in response to any

Page 2464

1  particular question, did you, sir?

2  A.  I wrote it in response to what could be questions that I

3  anticipated.

4  Q.  Sir, simple question.  You didn't write that paragraph

5  about giving those responses in response to any specific

6  question, did you, sir?

7          MR. GOMEZ:  Objection.  Asked and answered.

8          THE COURT:  Overruled.

9  A.  I wrote it in response to specific questions that might

10  come up that that would be an appropriate response to.

11  Q.  You didn't cite any specific questions that you had in mind

12  to give those responses to, "It's possible, but I don't think

13  so.  I guess it's possible, but to the best of my recollection

14  I didn't," correct, sir?

15          MR. GOMEZ:  Objection.  The document speaks for

16  itself.

17          MR. MASTRO:  I will withdraw, your Honor.

18  Q.  Mr. Donziger, can you tell the Court how many times during

19  your deposition you responded to questions with, it's possible,

20  but I don't think so, or, I guess it's possible, but to the

21  best of my recollection I didn't, in words or substance?  Can

22  you tell the Court how many times you did that in your

23  deposition?

24  A.  Given that I was deposed 19 days, and I don't have the 19

25  days and thousands of pages in front of me, no, I can't answer

Page 2465

1    that question right now.

2    Q.  Was it more than 100 times, sir?

3    A.  I have no idea, sir.

4    Q.  More than 200 times?

5    A.  I don't know.

6          MR. MASTRO:  I will move on, your Honor.

7    Q.  Mr. Donziger, referring to your witness statement, you

8    claim that Pablo Fajardo has been the "lead lawyer" in the Lago

9    Agrio case "from 2005 until the present"?

10         THE COURT:  Can I have the paragraph, please?

11         MR. MASTRO:  Paragraph 10.

12   Q.  That's your testimony to this Court, correct, sir?

13   A.  Yes.

14   Q.  And that he is the sole representative, that's your

15   testimony?

16   A.  Before the court in Ecuador, yes.

17   Q.  And that you have "served on the case at the pleasure of

18   the plaintiffs and their representative," correct, sir?

19   A.  Yes.

20   Q.  And their representative is Mr. Fajardo, you serve at his

21   pleasure, that's your testimony here, correct?

22   A.  I serve at the pleasure of the clients and Mr. Fajardo as

23   their representative.

24   Q.  So you work for Mr. Fajardo, he doesn't work for you,

25   that's your testimony?

Page 2466

1  A.  In that time frame, yes.

2  Q.  2005 to the present, correct?

3  A.  Yes.

4  Q.  Sir, I want to ask you a few questions about that.

5        First, in terms of serving at the pleasure of the Lago

6  Agrio plaintiffs.  You were just here for Mr. Piaguaje's

7  testimony, weren't you, sir?

8  A.  Yes.

9  Q.  So you know that he just told the Court in his statement

10  that, "I have never had the direct authority, discretion or

11  control of the actions taken by Steven Donziger."

12        That's paragraph 36 of his statement.  Isn't that

13  correct, sir, that's the testimony he just gave to the Court?

14  A.  I don't know.  I don't have his statement in front of me,

15  but if it is, it's not what I'm talking about.

16  Q.  And you know that Mr. Camacho, the other defendant in this

17  case, also a Lago Agrio plaintiff, has testified that he has

18  never even met you, correct, sir?

19        THE COURT:  Mr. Mastro, they have said whatever they

20  have said.

21  Q.  Mr. Donziger, I want to ask you about how you have

22  described yourself since 2005.

23        Isn't it a fact that you have described yourself since

24  2005 as "the lead lawyer in the class action trial that seeks

25  damages for a cleanup, Aguinda v. Chevron Texaco, currently

Page 2467

1   being heard by the superior court in Nueva Loja, in Ecuador,

2   before German Yanez."

3          You have described yourself since 2005 as the lead

4   lawyer in that class action trial, haven't you, sir?

5   A.  At times I have.

6   Q.  And you have described yourself since 2005 as "the person

7   primarily responsible for putting this team together and

8   supervising it," correct, sir?

9   A.  This team not being the Ecuadorian team; the team outside

10  of Ecuador, yes.

11  Q.  Sir, haven't you also described yourself since 2005 as

12  "playing an integral role in designing the trial strategy and

13  working closely with the local team of lawyers," correct, sir?

14  A.  I don't know.

15  Q.  Sir, the integral role in designing the trial strategy,

16  that would be the Lago Agrio Chevron trial, correct, sir?

17  A.  Well, not necessarily.

18  Q.  So let me put up on the screen Plaintiff's Exhibit 806 and

19  go to page 21.

20          This is a book proposal that you prepared yourself

21  since 2005, correct, sir?

22  A.  I am seeing one paragraph.  I don't know if there is a

23  complete document.

24  Q.  Let's hand him the complete document.

25          MR. MASTRO:  May I approach, your Honor?

Page 2468

1          THE COURT:  Yes.

2   Q.  On the first page of Plaintiff's Exhibit 806, that's an

3   e-mail from you to someone named David Kuhn, dated November 3,

4   2006, correct, sir?

5   A.  Yes.

6   Q.  So this is your draft book proposal, correct?

7   A.  Yes.

8   Q.  Let's go, sir, to page 21 of that proposal.

9          THE COURT:  Which number, counsel?

10         MR. MASTRO:  It's page 21.

11         THE COURT:  There are two page 21s.  You're going off

12  the bottom numbers or the other numbers?

13         MR. MASTRO:  I am going by the bottom numbers, your

14  Honor.  Not 22.  I am going on the one in the lower right-hand

15  corner.

16         THE COURT:  Thank you.

17  Q.  Sir, am I correct that you have described yourself as a

18  person supervising -- strike that.

19         Am I correct that you have described yourself as

20  playing an integral role in designing the trial strategy and

21  working closely --

22         THE COURT:  The document says what it says.  If you

23  want to read something to him and ask him something based on

24  it, go ahead.  But no responsive readings.

25  Q.  Where in your book proposal you refer to playing an

1   integral role in designing the trial strategy and working

2   closely with the local team of lawyers, you are referring to

3   the trial strategy in the Lago Agrio Chevron case, correct,

4   sir?

5   A.  No.  Yes, but I refer in the same paragraph to Mr. Fajardo

6   as the lead lawyer.

7   Q.  Sir, the lead local lawyer in the Ecuadorian case, correct?

8   A.  That's an accurate description.

9   Q.  Isn't it a fact that you have also described yourself since

10  2005 as being "at the epicenter of the legal, political and

11  media activity surrounding the case, both in Ecuador and in the

12  U.S," correct, sir?

13  A.  I don't know if you're reading from the proposal.  Feel

14  free to point it out to me and I can answer it.

15  Q.  Do you recall describing yourself in those terms, sir?

16  A.  No.

17  Q.  Sir, isn't it a fact that you wrote to Joseph Kohn in 2009

18  and described your firm's role as a primary obligation is to

19  run the case on a day-to-day basis?

20  A.  I believe I did, but --

21  Q.  Isn't it a fact, sir, that you described yourself as doing

22  "the overwhelming amount of work on this case"?

23  A.  Yeah.  But that's a very incomplete description of my

24  actual role.  My role was much more nuanced than that.

25            THE COURT:  Mr. Donziger, answer the questions and

1   then stop when you have answered them.  Your counsel will have

2   the opportunity on redirect to ask you anything he wants to ask

3   you to clarify.

4   Q.  Isn't it a fact, Mr. Donziger, that you would give

5   directions to local counsel in Ecuador on what to do with the

6   litigation?

7   A.  On occasion I would express my opinion as to what they

8   should do, and I would do it in forceful terms.  It didn't

9   change the fundamental relationship, which is I worked for

10  them.

11  Q.  Isn't it a fact, Mr. Donziger --

12          MR. MASTRO:  And I apologize in advance, your Honor,

13  for using this language.  It is not my language, his.

14  Q.  But isn't it a fact, Mr. Donziger, that there were times

15  when since 2005, you gave instructions to Mr. Fajardo and other

16  local counsel in Ecuador to just get this done on time and

17  don't fuck it up?

18  A.  Is your question did I say that?

19  Q.  Yes.

20  A.  I would often use very forceful language, yes.  I don't

21  know if I said that.

22  Q.  Mr. Donziger, isn't it also a fact that in your own

23  notebook, that you call a memoir, you describe personally

24  meeting privately with the Ecuadorian judges on the Lago Agrio

25  case at least eight separate times between March 2006 and May

Page 2471

1  2007?

2  A.  I met with judges in Ecuador when it was appropriate to do

3  so on occasion.  I don't know the exact number.

4  Q.  The judge in the Lago Agrio Chevron case, you document in

5  your notebook meeting with the judge overseeing the Lago Agrio

6  Chevron case privately, without Chevron present, eight separate

7  occasions between March 2006 and May 2007, correct, sir?

8       MR. GOMEZ:  Objection.  The document speaks for

9  itself.

10      THE COURT:  Overruled.

11  A.  I don't know the exact number.  There were occasions that I

12  met with the judge.

13  Q.  Sir, isn't it a fact that you have described yourself as

14  the cabeza on the Lago Agrio Chevron case?

15  A.  I don't have any recollection of that.

16  Q.  And cabeza means head, correct?

17  A.  Cabeza means head in Spanish.

18  Q.  That's the way Pablo Fajardo has introduced you since 2005,

19  as the cabeza on the case, correct?

20  A.  I don't know.  He certainly hasn't in recent years.

21  Q.  Sir, I would like to show you your notebook.

22       Sir, directing your attention to page 27 of 119.

23       MR. MASTRO:  That's at the bottom center of the page,

24  your Honor.

25  Q.  Directing your attention to the passage, "Pablo is

Page 2472

1   obviously single-handedly providing the glue to hold much of

2   the left together.  Still introduces me as the cabeza of the

3   lawsuit, which I don't like, but that is fixable."  Do you see

4   that, sir?

5           Do you see that, sir?

6   A.  Yes.

7   Q.  Does that refresh your recollection that Pablo Fajardo

8   referred to you in 2007 as the cabeza of the lawsuit?

9   A.  I don't have any independent recollection other than my

10  notes.

11  Q.  Now, sir, isn't it a fact that Pablo Fajardo also used to

12  refer to you as the commander-in-chief of the Ecuadorian legal

13  team?

14  A.  Pablo had a lot of nicknames for me.  That might have been

15  one of them.

16  Q.  He did that as recently as October 2009, when the final

17  plan for the case, his words, was to be done and our

18  "commander-in-chief Steven Donziger must be at that workshop."

19  Isn't that true, sir?

20  A.  I vaguely remember that, but I think he was joking.

21  Q.  Sir, when you're putting together the final plan for the

22  case, he is calling you commander, and your testimony to this

23  Court is that was a joke?

24  A.  We had a lot of jokes among us about authority.  So I think

25  that was a joke.

Page 2473

1    Q.  Isn't it a fact that Mr. Fajardo referred to you as

2    commander repeatedly from 2007 to the present?  Isn't that

3    true, sir?

4    A.  He used the word comandante.

5    Q.  Which means commander in Spanish, correct?

6    A.  It was done more as a term of affection, akin to like good

7    buddy or something like that.

8    Q.  Isn't it a fact since 2005, you referred to Mr. Fajardo in

9    discussions with others as "your young field lawyer in Lago"?

10   A.  I don't have any recollection of that.

11               MR. MASTRO:  May I approach, your Honor?

12               THE COURT:  Yes.

13   Q.  Mr. Donziger, this is an e-mail that you sent to Raul

14   Herrera in August 2006, correct, sir?

15   A.  Yes.

16   Q.  Raul Herrera was the lawyer representing the Republic of

17   Ecuador, correct?

18   A.  I believe he was at that time.

19   Q.  He was at Winston & Strawn, correct?

20   A.  I believe so.

21   Q.  When you're communicating to Raul Herrera of Winston &

22   Strawn representing the Republic of Ecuador, you called Pablo

23   Fajardo "a young field lawyer in Lago," correct?

24   A.  Yes.

25   Q.  Does that refresh your recollection whether that is the way

Page 2474

1   you used to refer to him in the period in 2005?

2   A.  No.

3   Q.  Is it also the case that Mr. Fajardo only became a lawyer

4   and graduated from school sometime in 2004?

5   A.  I have a recollection he became a lawyer in the early 2000s

6   and the Lago case was his first case.  I don't know if it was

7   that particular year or not.

8   Q.  Isn't it correct that you told Vanity Fair that Pablo

9   Fajardo only became a lawyer in 2004?

10  A.  I don't recall.

11  Q.  Isn't it a fact, sir, that you are the one who installed

12  Pablo Fajardo as the person to be the lead local lawyer in late

13  2005 when you and Joe Kohn were forcing Christopher Bonifaz out

14  of the case?

15        THE COURT:  Sustained as to form.  Break it up.

16  Q.  Isn't it a fact, sir, that you're the person who directed

17  that Pablo Fajardo become the lead local lawyer in the Lago

18  Agrio Chevron case in December 2005?

19  A.  I remember recommending him.  I did not direct it.  The

20  decision was made by others.

21  Q.  At the time, you and Mr. Kohn were forcing Christopher

22  Bonifaz out of the representation, correct?

23  A.  First of all, it's Cristobal Bonifaz.  And the answer is,

24  no, we were not at that time.

25  Q.  Am I right that you directed that Pablo become the joint

Page 2475

1   counsel of record in December 2005 to take control of the case

2   within the current team -- strike that.

3            Am I correct that up until December 2005, Pablo

4   Fajardo had not been the person speaking as lead local counsel

5   in the Lago Agrio Chevron case?

6   A.  I don't recall the specific dates, but at the beginning of

7   the trial he was not, and then he replaced the person who was.

8   Q.  And that in December 2005, you instructed that it was

9   important for Pablo to become the joint counsel of record as

10  soon as possible to take control of the case within the current

11  team?

12  A.  I don't recall.

13           MR. MASTRO:  Your Honor, may I approach?

14           THE COURT:  Yes.

15           MR. MASTRO:  I will show the witness what has been

16  marked as Plaintiff's Exhibit 7673.

17  Q.  Mr. Donziger, am I correct that this is an e-mail from you

18  to Alejandro Ponce and Pablo Fajardo, copy to Luis Yanza, dated

19  December 7, 2005?

20  A.  That's correct.

21  Q.  I am referring you to the bottom of the first page.

22           Does that refresh your recollection on December 7,

23  2005, that you wrote to the local Ecuadorian legal team that it

24  was "even more important for Pablo to become the joint counsel

25  of record as soon as possible to take control of the case

Page 2476

1    within the current team"?

2    A.  Yes.

3    Q.  That was because you were upset with something that Alberto

4    Wray had just done on the case, correct, sir?

5    A.  I think it was a variety of reasons, that being one of

6    them.

7    Q.  Mr. Donziger, am I correct that you have been practicing

8    law for over 25 years?

9    A.  No, not that long.

10   Q.  You're in your early 50s, correct?

11   A.  Yes.

12   Q.  And Mr. Fajardo, is he even 40 years old now?

13   A.  He is 40, or 41.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Page 2477

1  Q.  And, sir, am I correct that you still refer to him today as

2  local counsel, correct?

3  A.  There's different descriptive terms I use and that is one

4  that I think I do use and is accurate.

5  Q.  Let me ask you about financial terms between you and

6  Mr. Fajardo.

7       Am I correct that you stand to make more than three

8  times what Mr. Fajardo stands to make on a contingency fee

9  basis in this case?

10  A.  I don't know.

11       MR. MASTRO:  Your Honor, referring to the sanctions

12  hearing testimony, page 136, lines 10 through 13:

13       "So you make more than three times what Mr. Fajardo

14  makes on this case but you work for him.  That is your

15  testimony in this court?

16       "Answer:  Yes, it is."

17  Q.  Now, Mr. Donziger --

18       THE COURT:  Are you offering that?

19       MR. MASTRO:  I am offering it as impeachment, your

20  Honor.

21       THE COURT:  Is there an objection to its being

22  received?

23       MR. FRIEDMAN:  Your Honor, if the whole page is put in

24  for context, there's no objection.

25       MR. MASTRO:  No problem, your Honor.

Page 2478

1          THE COURT:   Page 13 in its entirety of the sanctions

2    hearing is in.

3    Q.  Mr. Donziger, am I correct that Mr. Fajardo makes

4    approximately 2,000 a month?

5    A.  I don't know at this point what he makes.

6    Q.  You're the person who doles out the checks to pay the

7    Ecuadorian legal team, correct, sir?

8    A.  No.

9    Q.  You've done that historically, haven't you, sir, you've

10   arranged for them to get their pay, correct?

11   A.  Yes, but I don't dole out the checks.

12   Q.  And so you know that the lawyers on your local Ecuadorian

13   team -- Mr. Fajardo, Mr. Saenz, Mr. Prieto -- make around

14   $2,000 a month, correct?

15   A.  I think that was the case at a certain point in time and I

16   think I testified to that.  I don't know if that's the case

17   today.

18   Q.  And, sir, you have made on this case typically 15,000 or

19   more a month, correct?

20   A.  No.

21   Q.  Isn't it a fact that when Joe Kohn was funding this case

22   that you made about 150,000 a year in salary during that period

23   of time up to 2009, correct?

24   A.  It's roughly the case, but a lot of that money was went

25   back out to pay other people.

Page 2479

1    Q.  So, sir, you made 150,000 a year in 2009, Mr. Fajardo made

2    about 24,000 a year in 2009, correct?

3    A.  I don't know.

4    Q.  So would it be fair to say that you made in a typical year

5    salary-wise on the case six or seven times more than

6    Mr. Fajardo typically made on the case, correct, sir?

7    A.  It's roughly correct, but it reflects also cost of living

8    in New York as opposed to Lago Agrio.

9            MR. MASTRO:  Move to strike after cost of living.

10           MR. FRIEDMAN:  Your Honor, he could be allowed to

11   finish his answer before there's a move to strike.

12           THE COURT:  Well, the problem is the answer is

13   supposed to be responsive and only responsive, not an argument.

14   And, therefore, the motion to strike is granted, everything

15   after it's roughly correct.  You can ask him on redirect.

16   Q.  Sir, I want to make sure I understand your testimony.

17           On a contingency fee basis, you make three times or

18   more what Mr. Fajardo stands to make if you collect on this

19   judgment, correct, sir?

20   A.  I think that's roughly correct.  I don't know his exact

21   arrangement at this point.

22   Q.  And you make, you have made on this case typically six,

23   seven times more in salary each year than Mr. Fajardo has made,

24   correct, sir?

25   A.  I just testified to that.

Page 2480

1  Q.  But you say you work for him, he doesn't work for you;

2  that's your testimony?

3  A.  It is.

4  Q.  He must be a very generous boss, Mr. Donziger.

5          THE COURT:  Let's cut it out, Mr. Mastro.

6          MR. MASTRO:  I'm sorry, your Honor.

7  Q.  Now let's talk about your retainer agreement and the

8  authority you have under your retainer agreement.

9          Am I correct that your retainer agreement is signed by

10  Mr. Fajardo and Mr. Yanez, correct?

11  A.  Yanza.

12  Q.  Withdraw that.

13          Your retainer agreement was signed in January 2011 by

14  Mr. Fajardo and Mr. Yanza, correct, sir?

15  A.  I think others or another or yes.

16  Q.  Your retainer agreement gives you the responsibility to

17  exercise "overall responsibility for the strategic direction of

18  the litigation and the day-to-day management of the

19  litigation."

20          Isn't that right, sir?

21  A.  I don't know.

22  Q.  Isn't it a fact, sir, that the litigation that you have

23  overall responsibility for the strategic direction of and

24  day-to-day management of includes Lago Agrio Chevron case, the

25  1782 actions in the United States, and this litigation,

Page 2481

1  correct?

2  A.  No, that's not correct.

3  Q.  Now, sir, I'm going to show you --

4       MR. MASTRO:  May I approach, your Honor?

5  Q.  -- what's been marked as Plaintiff's Exhibit 558.

6       Mr. Donziger, referring you to page 2 of this

7  document, this is your retainer agreement, correct, sir?

8  A.  Yes, it is.

9  Q.  This is the one you signed on January 5, 2011, correct?

10 A.  It's January 2011.  It does not have a date next to my

11 name.

12 Q.  And the first signatory on behalf of the plaintiffs is

13 Pablo Fajardo, correct?

14 A.  Yes.

15 Q.  And, sir, referring you specifically to page 2,

16 subparagraph 2B, where it says that you as the plaintiffs' U.S.

17 representative are authorized "to exercise overall

18 responsibility for the strategic direction of the litigation

19 and the day-to-day management of the litigation."

20       Does that refresh your recollection as to, you know,

21 whether you have that authority under your retention agreement?

22 A.  I'm going to read the other subsections real quick before I

23 answer that question, if that's okay.

24 Q.  Well, while you're on it, Mr. Donziger, please also read

25 section 2BI where it says that you have authority to

Page 2482

1    "coordinate the overall legal strategy to pursue and defend all

2    aspects of the litigation."

3          Does that refresh your recollection, sir, whether you

4    have that authority?

5    A.  Yeah, but I would say reading this it's not an accurate

6    depiction.

7          MR. MASTRO:  Your Honor, move to strike after --

8          THE COURT:  Everything after "yeah" is stricken.

9    Q.  Sir, am I also correct, directing your attention to page 1,

10   that the litigation is defined as including the Maria Aguinda

11   v. Chevron corporation litigation, that's the Lago Agrio

12   Chevron litigation, correct?

13   A.  Where are you reading from?

14   Q.  Page 1.  The term litigation is defined in the first three

15   paragraphs of your retention agreement, correct, sir?

16   A.  Can you --

17   Q.  Under witnesseth.

18   A.  Okay.

19   Q.  See there where it defines in the third paragraph

20   collectively all of the above are litigation, the first,

21   second, and third paragraphs, starting whereas, do you see

22   that, sir?

23   A.  Yes.

24   Q.  So your authority to exercise overall responsibility for

25   the strategic direction of the litigation and day-to-day

1    management of the litigation includes the Lago Agrio Chevron

2    litigation, the 1782 actions, and any related litigations,

3    including this one, correct, sir?

4    A.  This contract is not an accurate depiction of my actual

5    authority.

6    Q.  Sir, isn't it a fact that this contract, this retention

7    agreement can't be changed other than in writing signed by all

8    parties, correct?

9    A.  I don't know.

10   Q.  Have you signed any new agreements since this one that

11   alter your rights and obligations and responsibilities under

12   this agreement one whit?

13   A.  There has been an alteration, yes.

14   Q.  Is that something signed in writing but you altering your

15   role?

16   A.  It's been signed by the plaintiffs or plaintiffs'

17   representatives.

18   Q.  Now, sir, I'm going to direct you to page 10 of this

19   agreement, paragraph 13, modification in writing, "No

20   modification, amendment, waiver or release of any provisions of

21   this agreement or of any right, obligation, claim or course of

22   action arising hereunder shall be valid or binding for any

23   purpose unless in writing and duly executed by the party

24   against whom same is asserted."

25            Now, sir, you haven't signed any modification

Page 2484

1   amendment, waiver or release of any provision of this retention

2   agreement, correct, sir?

3   A.  That is correct.

4   Q.  So as far as you're concerned, under the terms of this

5   agreement, you continue to this day to have the rights,

6   responsibilities, and obligations that apply under this

7   agreement, correct?

8   A.  That's not correct.

9   Q.  Now, sir, let me ask you this:  Aren't you also responsible

10  under this agreement for assembling and organizing the various

11  United States lawyers and law firms representing the Lago Agrio

12  plaintiffs, correct?

13  A.  Yes.

14  Q.  Mr. Fajardo doesn't do that, you do that, correct, sir?

15  A.  I would say --

16  Q.  Yes or no, sir?

17  A.  I did do that.  I do not do that fully at this point, no.

18  Q.  Do you consider yourself to have fulfilled your obligations

19  to your clients, the Lago Agrio plaintiffs, under this

20  retention agreement?

21  A.  I haven't really thought about it.  I've tried my best, but

22  I don't know if I completely fulfilled all my obligations.  I'd

23  have to look at it.  It's been a while.

24         MR. MASTRO:  Your Honor, I offer for impeachment

25  sanctions hearing, page 49, starting line 6:

Page 2485

1    "Q.  Do you consider yourself to have fulfilled your

2    obligations to your clients, the plaintiffs, under this

3    retention agreement, sir?

4    "A.  Yes, I do."

5             THE COURT:  Proceed.  What was the date of that

6    testimony?

7             MR. MASTRO:  Your Honor, that was on April 16, 2013.

8             THE COURT:  Thank you.

9    Q.  Mr. Donziger, was that testimony true and correct when you

10   gave it just a few months ago, was that true and correct, yes

11   or no?

12   A.  Yes, it was, but it was several months ago.

13   Q.  Thank you, sir.  Now, Mr. Donziger, am I correct, sir,

14   that -- strike that.

15            Is there anyone else besides Mr. Fajardo and the Lago

16   Agrio plaintiffs who you are telling this Court is your boss?

17   A.  Mr. Fajardo is the person I deal with.  But behind him he

18   has to answer to others who, in theory, would have authority

19   over me if they wanted to exercise it, in my opinion.

20   Q.  Now, sir, am I correct that you are the person who has

21   decided how much people working on the team in Ecuador get

22   paid?

23   A.  In the past I worked with the local team to, like Mr. Yanza

24   and others, to come up with amounts that we felt were

25   appropriate.

Page 2486

1  Q.  And in Mr. Yanza's case, you not only paid him a monthly

2  salary -- correct, sir?

3  A.  I didn't pay him.

4  Q.  You approved of funds going to Mr. Yanza in amounts of 500

5  to 2,000 a month, correct, sir?

6  A.  We would set budgets jointly and in the budget would be a

7  salary for him.

8  Q.  And you also approved buying a house for Mr. Yanza, didn't

9  you, sir?

10 A.  Yes.

11 Q.  And you paid that out of your budget, correct, sir?

12 A.  I believe, yes, I believe that came out of the budget.

13 Q.  Now, sir, I want to ask you a few questions about financial

14 matters.

15         In your statement you claim that all of your efforts

16 on the Aguinda case have been to achieve a just result for your

17 clients.  That's your testimony, right?

18 A.  Yes.

19 Q.  But this isn't a pro bono case for you, is it, sir?

20 A.  No.

21 Q.  You expect to get paid and you're proud of that, aren't

22 you, sir?

23 A.  Yes.

24 Q.  You've even referred to looking forward to getting the

25 "juicy check" from Chevron, haven't you, sir?

Page 2487

1  A.  That was a joke.

2  Q.  It's not only a term you've used, it's a term that

3  Mr. Fajardo and others on the Ecuadorian legal team have used,

4  to get juicy checks out of Chevron, correct, sir?

5  A.  That originated with Mr. Callejas at a judicial inspection.

6  Q.  Move to strike.

7  A.  He would make a joke about it, so it's not my term.

8       THE COURT:  Answer is stricken.

9  Q.  Mr. Donziger, haven't you written that you dream of

10 billions of dollars on the table?

11 A.  For the clients, yeah.

12 Q.  And haven't you spoken openly about jacking this thing up

13 to $30 billion if you could have, haven't you done that, sir?

14 A.  I did say that, but it comes with a certain context that it

15 was always based on the amounts of money needed for a cleanup.

16 Q.  Yes or no.  Yes or no.

17      THE COURT:  Answer is stricken after "I did say that."

18      MR. MASTRO:  Again, your Honor, I apologize for having

19 to use this language, but.

20 Q.  Isn't it a fact, sir, that you've described the business

21 you're in, the business of plaintiffs' law, as being about

22 "making fucking money"?

23 A.  I may have, I don't know.

24 Q.  Didn't you say that on the Crude outtakes as you were

25 leaving the San Francisco Chronicle after giving an interview

Page 2488

1   there about your case, didn't you say that?

2   A.  It's possible.  I don't know if I said it.

3   Q.  We'll come back to it, sir.

4          Am I correct that between 2003 and 2009, Joseph Kohn

5   was funding the litigation?

6   A.  During those years he was the primary funder, but not the

7   only funder.

8   Q.  And am I also correct, sir, that over that period of time,

9   2003 to 2009, Mr. Kohn paid you over $1 million in connection

10  with this case, the Lago Agrio Chevron case?

11  A.  It sounds about right.  I don't know exactly.

12  Q.  And, sir, isn't it also the case that in 2007 and 2008 --

13  strike that.

14          Isn't it also the case that in late aughts Russ DeLeon

15  also became a funder on the Lago Agrio Chevron case?

16  A.  That is correct, yes.

17  Q.  And Mr. DeLeon is someone you know from school days?

18  A.  Yes.

19  Q.  And Mr. DeLeon now lives on Gibraltar, correct?

20  A.  No.

21  Q.  He's a fugitive from U.S. justice, isn't he, sir?

22  A.  No.

23  Q.  Isn't it a fact, sir, that in 2007 and 2008, Mr. DeLeon

24  also paid you over $800,000?

25  A.  For --

Page 2489

1  Q.  Yes or no.

2  A.  For a different matter.

3  Q.  Yes or no, sir.

4  A.  I don't know the exact amount.

5  Q.  And isn't it a fact that you also received $10,000 for

6  appearing in the movie Crude?

7  A.  I think Mr. Berlinger bought my rights for documentary film

8  purposes and that might have been the amount of money he paid

9  me.

10  Q.  And that's money you put in your pocket, correct, sir?

11  A.  I don't recall.

12  Q.  And am I also correct, sir, that you have by far the

13  largest contingency fee interest of any lawyer or law firm in

14  the Lago Agrio Chevron case?

15  A.  No, it's not correct.

16  Q.  Isn't it a fact, sir, that you have the largest contingency

17  fee interest of any lawyer in the Lago Agrio Chevron case?

18  A.  No.

19  Q.  Now, sir, let's break it down.

20        Is there somebody else, some other lawyer or law firm,

21  that has a larger contingency fee interest in the Lago Agrio

22  Chevron case than you?

23  A.  I don't know.

24  Q.  So as you sit here today, you're not aware of any other

25  lawyer or law firm that has a larger contingency fee interest

Page 2490

1    in the Lago Agrio Chevron case than you, correct, sir?

2    A.  I don't know.  I know what I have and I can estimate what

3    some others have and it's --

4    Q.  Let's ask you about what you have, sir, all right.

5             Again, under your retention agreement, the total

6    contingency fee payment to go to lawyers on the Lago Agrio

7    Chevron case is 20 percent, correct, sir?

8    A.  Yes.

9    Q.  And under your retention agreement, you are entitled to

10   31.5 percent of that 20 percent, correct, sir?

11   A.  Yes.

12   Q.  So when the judgment was over $19 billion, if the Lago

13   Agrio plaintiffs had been able to collect the entirety of the

14   judgment, you would have made approximately $1.2 billion,

15   correct?

16   A.  More or less, subtracting what I would owe other people.

17   Q.  And, sir, am I also correct that even today, after last

18   week's decision eliminating the punitive damage award, you

19   still stand to make approximately $600 million on the Lago

20   Agrio Chevron judgment if the Lago Agrio plaintiffs are able to

21   collect on the entirety of the judgment as it now stands?

22   A.  That's correct.

23   Q.  Mr. Donziger, I want to ask you a few questions about

24   Amazonia Recovery Limited.  That's a Gibraltar company,

25   correct, sir?

Page 2491

1   A.  Yes.

2   Q.  And you're a shareholder in that company, correct?

3   A.  That's correct.

4   Q.  That's because of your contingency fee interest, correct?

5   A.  Yes.

6   Q.  Can you tell me what percentage of the shares of Amazonia

7   Recovery Limited you have, sir?

8   A.  The structure of the case was designed -- I mean the

9   structure of that entity was designed to reflect the

10  contingency fee equity in the lawsuit, so it's roughly the

11  equivalent.

12  Q.  And you own shares in Amazonia Recovery Limited because the

13  expectation is that amounts collected on the judgment will be

14  kept there and then able to be distributed to the lawyers based

15  on their different contingency fee interests, correct, sir?

16  A.  Not really.

17  Q.  Well, sir, I want to break it down because I want to

18  understand it.

19        You own shares in Amazonia Recovery Limited, correct?

20  A.  Yes.

21  Q.  You can't tell the Court what number of shares you own in

22  Amazonia Recovery Limited?

23  A.  I don't know the number.  It's the equivalent of what the

24  contingency fee interest was before it was created.

25  Q.  So --

Page 2492

1          THE COURT:  Is that 31 and a half percent,

2    Mr. Donziger?

3          THE WITNESS:  No, it was 31 and a half percent of the

4    20 percent.

5          THE COURT:  Thank you.

6    Q.  So let me make sure I understand the structure of the

7    pay-out on the judgment.

8          Am I correct that off the top of the judgment or any

9    moneys that are collected come payment of expenses and fees,

10   correct, sir?

11   A.  That's my understanding.

12   Q.  And you have a substantial amount of expenses and fees

13   you're still claiming off the top, correct?

14   A.  Yes.

15   Q.  And you have someone you've described as a quote/unquote

16   accountant, Mr. Rizack, correct, sir?

17   A.  Yes.

18   Q.  Who you referred us to to try to get documents about what

19   expenses you had and what you're claiming, correct?

20   A.  Yes.

21   Q.  And you know that Mr. Rizack didn't produce all of those

22   records to us, that privilege claims were asserted, correct,

23   sir?

24   A.  I know we asserted privilege claims, but I don't know how

25   it ended up.  I know you got documents from him.

1    Q.  And you know that your cocounsel, Mr. Friedman, agreed to a

2    502 stip so we could see the rest of the documents, he agreed

3    to that last night, you know that, sir, correct?

4    A.  No.

5    Q.  You know, sir, that from Mr. Friedman because when he asked

6    you this morning for permission to sign the 502 stip, you told

7    him he couldn't sign it, correct, sir?

8            MR. FRIEDMAN:  Your Honor, I'll object on

9    attorney-client privilege.

10           MR. MASTRO:  It was disclosed to me, your Honor.  It

11   was hardly a secret.

12           MR. FRIEDMAN:  Well, we have a different idea of what

13   was disclosed and, your Honor, I guess you could take testimony

14   from me and Mr. Mastro but that -- I'd object on relevance

15   grounds at this point.

16   Q.  Mr. Donziger, are you aware that Mr. Rizack just today,

17   while we were here in court, midday, produced more financial

18   records to us about your accountant in the Lago Agrio Chevron

19   case (indicating)?

20   A.  I don't know what you mean by accountant (indicating).

21   Q.  He's not really an accountant --

22   A.  I'm not aware --

23   Q.  He's not really an accountant, correct?

24   A.  No, he is not an accountant.

25   Q.  But you, you're aware that just today midday he produced

1  more documents to us, correct?

2  A.  No.

3  Q.  You're aware that he's still withholding hundreds of

4  documents on alleged privilege grounds, correct, sir?

5  A.  No.

6  Q.  Am I correct that you're not willing to sign a 502 stip to

7  allow us to see the rest of those records?

8  A.  Sir --

9       MR. FRIEDMAN:  Excuse me, your Honor.  I would object

10 on relevance grounds.  I'm happy to take this issue up, but I

11 don't think it's appropriate in the context of

12 cross-examination.  I'd be happy to tell you what our position

13 is.

14      THE COURT:  Well, if there's going to be an

15 application with respect to it, I'll be happy to hear what your

16 position is.  But at the moment the question, it seems to me,

17 goes to whether the witness is prepared to have whatever the

18 evidence is come out, whether it's privileged or not, and it

19 seems to me relevant, therefore.

20 Q.  Mr. Donziger, please answer the question.

21 A.  What's the question?

22 Q.  The question is whether you're willing to enter into a 502

23 stip so that Mr. Rizack will allow us to review the rest of

24 your financial records relating to the Lago Agrio case as to

25 which you've claimed privilege up until now.

1   A.  Sir, I can't answer that.  I'd have to consult with my

2   counsel.  I don't know what the implications of that are.  I

3   have not talked to my counsel about that, so I can't answer

4   that until I talk to my counsel.  Sorry.

5           MR. MASTRO:  Your Honor, may we approach the side bar

6   for a moment on this point?

7           THE COURT:  Very briefly.

8           (At the side bar)

9           MR. MASTRO:  Your Honor, we are making an application

10  that because we thought we had an agreement last night.  We

11  didn't move before your Honor.  With Mr. Friedman we thought we

12  had an understanding under 502 stip.  I was told this morning

13  that that wasn't going to happen and, you know, we think the

14  Court should direct that.  There's been waiver here.  There's

15  clearly no privilege as to those documents.

16          THE COURT:  I'm not hearing this now.

17          MR. MASTRO:  I just want to make the point that the

18  way this has played out has been to deny us having full access

19  to those records for his cross-examination.  And I'm going to

20  continue to cross.  I'm not asking for any latitude that way,

21  but it's been clearly designed to prevent us from having the

22  full records to be able to cross-examine him on his financial

23  mismanagement.

24          THE COURT:  If, as, and when there's an application,

25  I'll deal with it.  If your intention is to make it now, I'm

Page 2496

1    not going to hear it now.  Let's continue.

2              MR. MASTRO:  Thank you.

3              THE COURT:  Hear it at the end of the day, if need be.

4              MR. MASTRO:  Thank you, your Honor.

5              (In open court)

6    BY MR. MASTRO:

7    Q.  Mr. Donziger, I'd like to show you what's been marked as

8    Plaintiff's Exhibit 7700 and Plaintiff's Exhibit 7701.

9              MR. MASTRO:  May I approach, your Honor?

10   Q.  Mr. Donziger, before I ask you some questions about these

11   documents, in your statement to the Court, you claim you've

12   been "operating under constant pressure of lack of resources."

13             Do you recall that, sir?

14   A.  Yes, yes.

15   Q.  And you've been making that complaint since the inception

16   of this RICO case back in early 2011, correct, sir?

17   A.  That's correct.

18             MR. MASTRO:  Did the court reporter get that?

19   Q.  You have to speak up, Mr. Donziger.  That's correct.  Thank

20   you.

21             Mr. Donziger, can you explain to the Court what

22   Plaintiff's Exhibit 7700 is?

23   A.  This was an effort by Mr. Rizack to reconstruct my

24   financials over a period of time, and it was an effort to allow

25   me to potentially be paid for months that I had never been

Page 2497

1    paid.  So we created invoices to submit to the clients that

2    were never sent.  These invoices were never sent, and they were

3    just sort of for my internal records to gain an understanding

4    of what I might be entitled to from the client should funds be

5    raised or recovery be had in the litigation.

6    Q.  Is it your testimony that these invoices have never been

7    sent to the client or any other client representative?

8    A.  These invoices, as far as I know, have never been sent.

9    Q.  Is it your intention, if the Lago Agrio plaintiffs are able

10   to collect on their judgment, to seek reimbursement for these

11   amounts?

12   A.  There is an amount of money that I put into the case

13   personally, as well as salaries that I am owed by the clients

14   that have never been paid.  And, yes, I intend to get

15   reimbursed for those amounts if funds become available.

16   Q.  And, sir, referring you to --

17            THE COURT:  And, excuse me, and are these the amounts?

18   Q.  Are these the amounts you would intend to seek

19   reimbursement of?

20   A.  Mr. Rizack and I were engaged in a process to determine the

21   amounts.  This is roughly accurate.  I don't know if it's

22   exactly accurate and so it's roughly the amounts.

23   Q.  Let's go through some of that, sir.

24            When Mr. Kohn was funding the litigation, you said you

25   were making about 15,000 a month, correct?

Page 2498

1    A.  I think for most of the time I was making 10,000 a month.

2    Q.  Between ten and 15, correct, sir?

3    A.  I think it was 10,000 most of the time.

4    Q.  Sir, the amounts you claim here, let's look at page 14.

5    That's the English language version of these documents.

6            The amounts you claim here every month for every one

7    of these months in 2012 is 35,000 for your professional

8    services; is that correct, sir?

9    A.  That was the idea, yes, sir.

10   Q.  Am I correct that in January 2012 you're claiming that you

11   spent 24,000 on transportation expenses?

12   A.  I couldn't answer that question.  I think at that month I

13   had that amount of transportation expenses that was

14   unreimbursed.  I don't think it was from that particular month

15   only.

16   Q.  And, sir, can you please explain to the Court what is the

17   difference between the 35,000 in professional services you're

18   claiming for January 2012 and the 24,000 and change you're

19   claiming for professional fees and expenses; do you know what

20   the difference is?

21   A.  I think the answer is no.  Mr. Rizack put this together,

22   but I certainly was not double charging for professional fees.

23   There was some other expense involved.

24   Q.  And am I correct, sir, that you're claiming, as someone

25   under constant pressure of lack of resources, that in

Page 2499

1   January 2012 you should be owed over a hundred thousand dollars

2   in fees, services, and expenses?

3   A.  Well, because I was owed that.  I had no resources.  I was

4   putting money out.

5   Q.  Sir, let me ask you this.  Can you turn to page 25 of this

6   document.

7         Can you see there, sir, these are the itemized

8   expenses for June of 2012, correct, sir, correct?

9   A.  I don't know, sir.  What are you looking at?

10  Q.  Well, first look at page 24, and that's the potential

11  invoice that's been created for you to cover expenses in June

12  and services and fees of June 2012, correct?

13  A.  Yes.

14  Q.  And then the next page itemizes the expenses, correct, sir,

15  for June 2012; do you see that, sir?

16  A.  I see a chart.  Oh, yes, I do.

17  Q.  Now, sir, can I ask you, do you see there where it says

18  purpose of meals and persons on the right-hand column, the

19  second to last one says Pablo.

20        Do you see that, sir?

21  A.  Mm-hmm.

22  Q.  That's Pablo Fajardo, correct?

23  A.  I assume.

24  Q.  And this is an expense, expenses for June 29, 2012,

25  correct, sir?

Page 2500

1   A.  I think it's June 28.

2   Q.  June 28, 2012, correct, sir?

3   A.  That's what it says.

4   Q.  Can you tell us what you and Mr. Fajardo were doing that

5   you had a $443.36 breakfast on June 28, 2012 that you are

6   saying you're going to bill back to the clients later, can you

7   tell me what you were doing then?

8           MR. GOMEZ:  Objection, relevance.

9   A.  I can tell you what I was doing, yes.

10          THE COURT:  The objection is overruled.  It goes to

11  credibility.

12  Q.  Can you tell me where you incurred that $443 breakfast with

13  Mr. Fajardo?

14  A.  If I remember correctly, I think we, in Quito, we hosted a

15  breakfast for the press corps.

16  Q.  And, sir, can I also ask you, where it was that you had a

17  $437 lunch on June 5 that you're now planning to bill back to

18  the Lago Agrio plaintiffs?

19  A.  I don't think that's accurate.  It might have been an

20  accumulation of various meals that he put in that box, but I

21  haven't checked this for accuracy.

22  Q.  So you are planning to put in for $437 for lunch on June 5,

23  2012, but that may be multiple lunches?

24  A.  I don't know.  You know, everything that I instructed

25  Mr. Rizack to put together was backed up by receipts and credit

Page 2501

1    card charges and I'm sure he could answer this, but I don't

2    know what that is for specifically.  I haven't looked at it.

3    Q.  We're going do come back to these, especially when we have

4    the rest of the documents.

5         Now, sir, I want to go to PX7701.  Can you tell the

6    Court what that is, sir, what is that document, sir?

7    A.  If I remember correctly, this is a document that I asked

8    Mr. Rizack to put together trying to reconstruct all the

9    expenditures in the case for these years.

10   Q.  These are actual expenses?

11   A.  Excuse me, can I finish?

12   Q.  Sure.

13   A.  That he could reconstruct from my records, but they

14   wouldn't necessarily be all the case expenditures because other

15   money was being spent through other sources.

16   Q.  But just so we're clear, these are actual expenditures that

17   were made and paid for, correct, sir?

18   A.  This was Mr. Rizack's best effort to reconstruct some

19   admittedly disorganized financial records that I had, and I

20   don't know if this is entirely accurate.  I was trying to get

21   at the time at least a rough sense of what had been spent so I

22   could convey that to the clients and so I could understand it

23   myself.

24   Q.  And you just testified that you've been "operating under

25   constant pressure for lack of resources" going back to the

1  inception of this RICO case at the beginning of 2011, correct,

2  sir?

3  A.  That's correct.

4  Q.  And am I right that -- and this is turning now to page 11

5  of 17, this is the English language version -- that from 2007

6  to 2013, you on the Lago Agrio Chevron case spent over

7  $21.4 million, correct, Mr. Donziger?

8  A.  That's roughly accurate, but it was de minimis compared to

9  our expenses.

10  Q.  Sir, sir, I just asked you yes or no.

11        And, sir, I want you to go to page 16, this is 2011,

12  the year you just testified you were already operating under

13  constant pressure of lack of resources.  Am I correct, sir,

14  that you on the Lago Agrio Chevron team spent over

15  $10.4 million that year?

16  A.  Well.

17  Q.  Yes or no, sir?

18  A.  I don't know if that's accurate.  All I can say is there

19  were times during that year that I was flat-out broke and had

20  to borrow money.

21        MR. MASTRO:  Move to strike, your Honor.

22        MR. FRIEDMAN:  Your Honor, I think that's fairly

23  responsive to what he was asked.  It wasn't a yes or no

24  question.

25        THE COURT:  Denied.

Page 2503

1   Q.  Mr. Donziger, isn't it a fact that in 2012, you on the Lago

2   Agrio Chevron team spent over $6.4 million?

3   A.  With the caveat that this is an estimate put together by

4   Mr. Rizack that is a rough approximation based on limited

5   records.  That's what Mr. Rizack came up with, yes.

6   Q.  Am I correct, sir, that in spring of this year, you found a

7   new funding source, a British firm, for the Lago Agrio Chevron

8   litigation, correct?

9   A.  There was a new funding source, but it was found not by me

10  but by the clients, directly with the clients.

11  Q.  Woodsbridge is the name of it, correct, sir?

12  A.  No.

13  Q.  What's the name of it, sir?

14       MR. FRIEDMAN:  Your Honor, I object on relevance

15  grounds.  I think funding sources at the present time don't

16  seem to have anything to do with allegations in the complaint.

17       THE COURT:  What's the relevance?

18       MR. MASTRO:  Your Honor, it has to do both with the

19  witness's credibility for having just sworn to your Honor that

20  he's been operating under constant pressure of lack of

21  resources.  It also has to do with not only questioning his

22  credibility, but also that they have plenty of resources even

23  though he's constantly claiming he can't comply with court

24  orders because he says he has none.

25       THE COURT:  What about it, Mr. Friedman?

Page 2504

1          MR. FRIEDMAN:  I think both of Mr. Mastro's arguments

2   are that the fact that he has a funding source now relates to

3   his credibility.  I don't follow that.

4          THE COURT:  Well, the argument, it seems to me, is

5   pretty clear in the context of the case.

6          There was a withdrawal in May by his prior counsel

7   ostensibly on the ground that they weren't being paid.  Then

8   all through the spring and summer and fall, Mr. Donziger sought

9   relief of various kinds from the Court claiming that he

10  couldn't do one thing or the other because he lacked resources.

11          Over and over again the Court said I'd be happy to

12  consider this argument if you provide sworn evidence to back up

13  your claim.  Never was anything forthcoming.

14          And it seems to me that in that context, the question

15  of whether there was funding while he was seeking relief from

16  this Court on the ground that there wasn't is pertinent to

17  credibility.

18          Now, tell me why that isn't correct.

19          MR. FRIEDMAN:  Well, I guess I would raise a 403

20  issue, your Honor, in the sense that Mr. Donziger obviously

21  made a decision not to give you a sworn statement and have you

22  micromanage how he was going to spend his money.

23          THE COURT:  Which presupposes there was money there to

24  spend.

25          MR. FRIEDMAN:  Exactly.

1          THE COURT:  And the statement that there wasn't
2   perhaps wasn't the entire truth, if the premise is right.
3          MR. FRIEDMAN:  Well, and, your Honor, what I'm
4   suggesting is that, you know, the money here for a year is what
5   I -- I don't want to make -- it's all relative, your Honor.
6   I've been to courts where we spent a hundred thousand dollars
7   and that seemed like all the money in the world.  In this case,
8   given the way it's been litigated, even $20 million is a drop
9   in the bucket and I've seen what Chevron has submitted to the
10  Court and so I know that.
11         So my point is this, your Honor.  Unless we're going
12  to embark upon -- the Court kind of -- Mr. Donziger
13  acknowledges he's always had funding sources.  The issue isn't
14  does he have funding sources.
15         THE COURT:  I haven't heard that acknowledged.
16         MR. FRIEDMAN:  Well, he just did.
17         THE COURT:  He said that in the spring of 2013 his
18  client found a new funding source.  That's exactly what he
19  said.
20         MR. FRIEDMAN:  Right, right.  And there has been
21  funding along the way and how it's been spent has been laid out
22  for the Court up until, say until Mr. Keker left, you've got
23  various -- speaking of Mr. Dahlberg, your Honor, Mr. Dahlberg
24  testified to various expenditures in his report that were made
25  by our side.

Page 2506

1            THE COURT:  I don't remember the exact language, but

2      doesn't Mr. Donziger's witness statement assert that

3      Mr. Dahlberg's testimony essentially was a fantasy or words

4      that that effect?

5            MR. FRIEDMAN:  It says much of it is a fantasy, yes.

6            THE COURT:  But now I'm to rely on it.

7            MR. FRIEDMAN:  I'm not saying -- no.  What I'm saying,

8      your Honor, is there's no question that there's been money.

9      The question is the extent of the money available to accomplish

10     and to meet the sort of litigation effort mounted by Chevron.

11     And if what Mr. Donziger did is he made a decision, at the

12     Court's prodding, said I'd be happy to consider granting you

13     relief if you want to present your funding situation to me and

14     he elected not to do that, I think that's privileged.  And for

15     the present time what his funding source is, that sort of thing

16     is privileged and doesn't really relate to credibility.

17            THE COURT:  I don't want to take all evening with

18     this.  But when a litigant comes into court and says I have no

19     money and the question is then put, well, what's your financial

20     situation?  You can't say that it's privileged.  You may have

21     other arguments, but privileged isn't one of them under

22     Bilzerian and you're very well familiar with all the cases.

23     It's the sword and shield doctrine.  You can't assert a

24     particular proposition and then invoke privilege to prevent

25     examination of the factual basis for the privilege.

Page 2507

1         Mr. Bilzerian came into court and said I'm not guilty

2    of securities fraud because I acted in good faith.  And the

3    Court of Appeals said that by making that assertion, he had

4    waived any privilege there was as to what his lawyers told him

5    about the conduct with respect to which he said he was in good

6    faith.  It's an exact application of that rule.

7         MR. FRIEDMAN:  Here's what I think is the most

8    important argument, your Honor.  It's a 403 argument and it's

9    simply this, that if you're going to take testimony on funding

10   sources, it's like saying somebody is tall or they're short.

11   It's compared to what.

12        Here when Mr. Donziger says I have inadequate

13   resources, then it's compared to what.  And if we're going to

14   get into the compared to what, so be it.  But that's the

15   argument I'm trying to say to the Court is do we really want to

16   go here.  If you say, yes, we want to go here, we will go here.

17        MR. MASTRO:  Your Honor, it's not a -- excuse me --

18   it's not a compared to what.  It's the direct representations

19   made by Mr. Donziger and others on this side of the table right

20   up to the first week of this trial that they had no resources

21   to go forward, and they've never made any such showing.  I

22   intend to prove that is just demonstrably false and that's why

23   I have a right to ask these questions.

24        MR. FRIEDMAN:  So, your Honor, what we're going to get

25   into, if you want to go into that, is our arrangements for our

Page 2508

1   copy machine and how we had to do it versus what's --

2          THE COURT:  I have a feeling nobody is interested in

3   your copy machine.

4          MR. MASTRO:  Not going to ask about that, your Honor.

5          MR. FRIEDMAN:  My point, your Honor, is if we get into

6   this and for whatever relevance it has, which I would suggest

7   is relatively minor in the big scheme of things, if we get into

8   this, then what it requires is no resources means compared to

9   what.  It's not an absolute.  Obviously, he has the resources

10  to buy a suit of clothes and come to court and to feed himself

11  and to make some copies.  Obviously he has some resources.  The

12  question is compared to what and that's the point I'm saying

13  under 403.  I think we're getting pretty far afield.  That's my

14  point.

15         THE COURT:  I'll sleep on this one.  And if anybody

16  wants to submit anything on it, I'll be happy to receive it.

17         We'll break with the witness now.

18         What if anything needs to be dealt with this evening

19  before we break?

20         MR. MASTRO:  Your Honor, just two things before we go.

21         THE COURT:  You can step down for now, Mr. Donziger.

22         MR. MASTRO:  My colleagues remind me I should have

23  moved in exhibits, or many of them I think might already be in

24  evidence, but Plaintiff's Exhibits 169, 558, 806, 2457, 7549,

25  and 7673.

1          I also move in 7700 and 7701 now that I -- they were

2     admitted subject to connection.  I believe I have connected

3     them.

4          And finally, your Honor, I believe that the sanctions

5     hearing page that should be coming into evidence is page 136.

6     I think the record might have said 13.

7          MR. FRIEDMAN:  And, your Honor, just a procedural

8     question, I would guess, though I haven't gone back and looked.

9          THE COURT:  One thing at a time.

10         The correction on the sanctions page, unless someone

11    has an objection, is accepted.  Any objection, page 136?

12         MR. FRIEDMAN:  No, your Honor.

13         MR. GOMEZ:  No, your Honor.

14         THE COURT:  All right.  Now.

15         MR. FRIEDMAN:  That was my question though, your

16    Honor, about that procedurally.  I think that's a page that's

17    been designated by Chevron as just like a deposition has been

18    designated.  I think it's gone to the Court, so I'm not exactly

19    sure what we're doing when you accept that into evidence.

20         THE COURT:  I think the answer is belt and suspenders,

21    is that right, Mr. Mastro?

22         MR. MASTRO:  Yes.  I don't think we designated the

23    entire page, your Honor.  We did designate many hours of

24    Mr. Donziger's deposition testimony.

25         THE COURT:  Please don't take many hours telling me

Page 2510

 1   things I don't need to know.

 2            MR. MASTRO:  No problem, your Honor.

 3            THE COURT:  Is there any objection as to 7549, 7673,

 4   7700 or 7701 at this point?

 5            MR. FRIEDMAN:  No, your Honor.

 6            THE COURT:  They are all received.

 7            MR. MASTRO:  7559.

 8            THE COURT:  7559.

 9            MR. MASTRO:  Thank you, your Honor.

10            MR. FRIEDMAN:  No objection.

11            (Plaintiff's Exhibits 7549, 7673, 7700, 7701, 7559

12   received in evidence)

13            THE COURT:  We're not done yet.

14            Now, I'm glad you mentioned 169 and 806 because I had

15   a question about them.  I do believe they have come in earlier,

16   but Plaintiff's Exhibit 169 is listed twice in the plaintiff's

17   exhibit list, once with a hash mark after the letter number and

18   once with the letter R after the number.

19            MR. MASTRO:  Yes.

20            THE COURT:  Now, the one with the hash mark bears in

21   the heading under the heading exhibit description the words for

22   identification only.  But in the column in which Chevron

23   articulates the bases for admissibility, it seems obvious that

24   in some parts it is offered for the truth of the matters

25   asserted and in other parts it's not offered for the truth of

Page 2511

1    the matters asserted.

2          MR. MASTRO:  Yes, your Honor.

3          THE COURT:  And then there are various other arguments

4    about admissibility; and the only objections made with respect

5    to it are relevance, hearsay, and privilege.  The privilege has

6    already been disposed of.  Relevance I'll deal with later.

7          What is the significance, if any, of the legend for

8    identification only and why are there two versions of this

9    exhibit here and what is the meaning of these two little

10   different designations?

11         MR. MASTRO:  Certainly, your Honor.  Sorry for the

12   confusion.  What we did with the diary -- and we have a series

13   of exhibits that follow 169 that are excerpts from the diary,

14   but in originally preparing for a jury trial, we were not going

15   to offer the entire diary.  But now what we have done is

16   because it is a bench trial not offer it for the truth of the

17   matters asserted, but the entirety of the diary should be

18   available to the Court.  And then we have separately designated

19   particular entries that we're offering for the truth of the

20   matters asserted, your Honor, in sequence on the exhibit list.

21         THE COURT:  So that would be 170 and following?

22         MR. MASTRO:  Correct, your Honor.  So that was the

23   intention, not to offer it for the truth, only the individual

24   parts that follow for truth.

25         THE COURT:  Well, I think I understand.  So 169 hash

Page 2512

1   mark is the whole document.

2           MR. MASTRO:  Correct, your Honor.

3           THE COURT:  You're not offering that for the truth.

4           MR. MASTRO:  Correct.

5           THE COURT:  But in 170 and many following, you're

6   offering pieces of it for the truth.

7           MR. MASTRO:  Correct, your Honor.

8           THE COURT:  What's 169R?

9           MR. MASTRO:  That's a redacted version, your Honor.

10  It's a combined version of all the ones that follow.  So it's

11  the redacted 169 with all the little pieces that follow that we

12  marked separately as exhibits redacting.

13          THE COURT:  I'm so happy I have so many copies of it.

14          And then we have 806.

15          MR. MASTRO:  Same principle, your Honor.

16          THE COURT:  All right.  So 806 hash mark is the whole

17  document, but 806R is the part that you are offering for the

18  truth of the matters asserted.

19          MR. MASTRO:  Correct, your Honor.

20          THE COURT:  All right.  So that takes care of those.

21          Now, 2457.

22          MR. MASTRO:  It's not offered for the truth, your

23  Honor.  That's one Mr. Donziger prepared his responses not to

24  remember.

25          THE COURT:  Well, we can do without the sarcastic

Page 2513

1    comments from both sides.

2              MR. MASTRO:  Sorry, your Honor.

3              THE COURT:  All right.  So 2457 is received, the

4    document written by Mr. Donziger, but not for the truth of the

5    matter, right?

6              MR. MASTRO:  Yes, your Honor.

7              (Plaintiff's Exhibit 2457 received in evidence)

8              THE COURT:  And 558, remind me what that is?

9              MR. FRIEDMAN:  The retainer agreement, your Honor.

10             MR. MASTRO:  That's the retainer agreement, your

11   Honor.

12             THE COURT:  All right.  And unless there's objection,

13   that's received as an agreement between the parties.

14             MR. FRIEDMAN:  Yes.

15             MR. MASTRO:  Yes, your Honor.

16             THE COURT:  Right?

17             MR. GOMEZ:  Yes, your Honor.

18             THE COURT:  Right, Mr. Friedman?

19             MR. FRIEDMAN:  Yes, your Honor.

20             (Plaintiff's Exhibit 558 received in evidence)

21             THE COURT:  Okay.  That takes care of that.  What else

22   tonight?

23             MR. MASTRO:  Your Honor, I did want to be heard on the

24   issue with Mr. Rizack's documents.

25             THE COURT:  Fire away.

1            MR. MASTRO:  Your Honor, we don't see how there could

2     at this point be any valid privilege claim, but the way we

3     proceeded in this case throughout has been 502 stips.  We can't

4     get a stip apparently from defendants as Mr. Donziger won't

5     agree to let his counsel do that.

6            So I think it's within the Court's right to direct in

7     these extraordinary circumstances under 502 that we should be

8     allowed to review them without any waiver on the defendant's

9     part any privilege claim, and to the extent we wanted to offer

10    any of those documents, then the Court could rule on the

11    privilege claim then.  We have both issues of crime fraud and

12    waiver that should really answer this completely.

13           MR. FRIEDMAN:  Your Honor.

14           MR. MASTRO:  They haven't offered any showing it's

15    privileged.  Financial information in the hands of someone

16    denominated accountant.

17           MR. FRIEDMAN:  Here is my understanding, your Honor,

18    based on conversations and emails with Mr. Rizack.  He received

19    a subpoena for all accounting documents.  He produced a bunch.

20    He told me that he had withheld some bills and at the time I

21    didn't know what they were and I was --

22           THE COURT:  Bills by Rizack to Donziger or other

23    bills?

24           MR. FRIEDMAN:  Lawyer bills, mostly.

25           THE COURT:  Well, lawyer bills.  What lawyer for whom?

1           MR. FRIEDMAN:  I'm about to say.  They're some of them

2    are bills for people who were hired to do 1782, like I think

3    one is from Tallahassee or someplace.  I can't remember where

4    it was from, but they're from all other the place.  Some of

5    them were from vendors that weren't getting paid, like court

6    reporters.

7           So there's a variety of bills and I told him turn over

8    all the bills and he had one question about Keker's bills

9    because they were -- Mr. Keker had bills and he said what I've

10   done is I redacted the itemization and just left the totals.

11          THE COURT:  This is Keker redacting or this is Rizack

12   redacting?

13          MR. FRIEDMAN:  This is Rizack redacting Keker's bills.

14   And I said I don't know and I didn't see a problem with the

15   totals going in, but there might be privileges to the

16   itemization.  That's what I think is in dispute.  Now, I have

17   to say --

18          THE COURT:  Are you telling me that the only thing in

19   dispute are the redactions from the Keker bills?

20          MR. FRIEDMAN:  That is my belief.  Now, if someone --

21   if I'm wrong on that, I don't have a hundred percent

22   confidence.  It was a tiny bit of what I've done over the last

23   couple weeks, but that's my understanding.

24          THE COURT:  You do have my sympathy, Mr. Friedman.

25          MR. MASTRO:  It's the first I'm hearing that is the

Page 2516

1    only thing.  We don't care about the substance of the Keker

2    bills.  But we understand that he's withheld, Mr. Rizack, over

3    200 separate documents.  That can't be Keker bills.  He wasn't

4    in the case that long.

5              MR. FRIEDMAN:  I didn't see -- what he showed me total

6    was maybe 200 pages.  But most of it my understanding is he was

7    going to turn over.  I think the only thing we dispute is the

8    Keker itemization.  If they don't want it, I think I can make a

9    call to Mr. Rizack and be done with it.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. MASTRO:  I have no problem with that, your Honor,

2    and Mr. Friedman I am sure will do that.  I am not asking for

3    the itemization of the Keker bills.

4            THE COURT:  Is there any doubt that I have the

5    authority under 502(d) to order disclosure of the Rizack

6    materials that have been withheld, without waiver of any

7    privilege in this or any other litigation, simply for the

8    purpose of allowing Mr. Mastro to see whether he really cares

9    about any of this stuff?  And if he doesn't, the whole thing

10   goes away.  And if he does, then that will then get litigated.

11   Is there any doubt about my authority to do that?

12           MR. FRIEDMAN:  No doubt about your authority to do

13   that.

14           THE COURT:  I am ahead of you I think.

15           You confirm with Mr. Rizack what the shape of the

16   table is and you and Mr. Mastro talk.  If this whole thing goes

17   away on that basis, a blessing on both your heads.  If it

18   doesn't, I am ordering disclosure now under 502(d), without

19   waiver, to Mr. Mastro so that he can see whether there is

20   anything left to fight about.  I am hopeful that that won't be

21   necessary, and I am hopeful that if it is necessary, it will be

22   easily and speedily resolved.  But let's get it done tonight if

23   we can.

24           MR. FRIEDMAN:  We should be able to.

25           THE COURT:  Anything else?

1          MR. MASTRO:  Nothing else tonight, your Honor.

2          Thank you.

3          (Adjourned to November 19, 2013, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2  Examination of:                              Page

3  JAVIER PIAGUAJE PAYAGUAJE

4  Direct By Mr. Gomez  . . . . . . . . . . . .2369

5  Cross By Mr. Brodsky . . . . . . . . . . . .2380

6  Redirect By Mr. Gomez  . . . . . . . . . . .2448

7  STEVEN DONZIGER

8  Direct By Mr. Friedman . . . . . . . . . . .2460

9  Cross By Mr. Mastro  . . . . . . . . . . . .2461

10                    PLAINTIFF EXHIBITS

11  Exhibit No.                              Received

12   1800     . . . . . . . . . . . . . . . 2371

13   2407R, specified paragraphs  . . . . 2395

14   2407R    . . . . . . . . . . . . . . . 2416

15   6724     . . . . . . . . . . . . . . . 2418

16   6714     . . . . . . . . . . . . . . . 2420

17   7700 and 7701   . . . . . . . . . . . . .2430

18   2241 through 2247 and 6730  . . . . . . . .2443

19   7019     . . . . . . . . . . . . . . . 2444

20   6703     . . . . . . . . . . . . . . . 2447

21   559A     . . . . . . . . . . . . . . . 2448

22   7549, 7673, 7700, 7701, 7559  . . . . . . .2510

23   2457     . . . . . . . . . . . . . . . 2513

24

25

Page 2520

```
 1   558    . . . . . . . . . . . . . . 2513

 2                   DEFENDANT EXHIBITS

 3   Exhibit No.                        Received

 4   323, 323B and 390   . . . . . . . . . . . .2386

 5   1750    . . . . . . . . . . . . . 2461

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 28



**Fromboliere**

attorneys

Mr. Carlos Guaman
**PRESIDENT OF THE AMAZON DEFENSE FRONT**
Hand Delivered

Copy to:
**FDA and UDAPT Executive Board**

Dear Sirs:

I write this letter in my capacity as attorney and legal representative of the plaintiffs in the lawsuit that, for more than 22 years, residents of the provinces of Orellana and Sucumbios have been pursuing against the Chevron Corporation oil company.

In recent months, we have seen several inappropriate and unlawful actions by the Amazon Defense Front (FDA), actions that place at serious risk the lawsuit that the plaintiffs with their team of Ecuadorian attorneys have legitimately won against the Chevron Corporation oil company.

To better illustrate this, here are a few examples:

a.      On November 20, 2015, the FDA arbitrarily and unlawfully adopted a resolution that gravely affected the lawsuit's financing process, and in turn, the legitimate defense of the plaintiffs' rights in this case.

b.      On January 19, 2016, Mr. Luiz Yanza and Mr. Steven Donziger signed a contract for the management of financial resources on behalf of the FDA and the plaintiffs. This is extremely serious, since neither of these two persons represents the plaintiffs. Since the filing of the case in Ecuador, Mr. Donziger has not been the plaintiffs' attorney, therefore, he does not represent any of the plaintiffs. Mr. Yanza also does not represent any of the plaintiffs. Presumably, the FDA gave him the authority to sign that contract, when in fact, the FDA also does not represent any of the plaintiffs.

c.      Subsequently, at least two more documents have been signed, supposedly to finance the plaintiffs' case in Canada, the last of which was at the beginning of July 2016, in which you, sir, the President of the FDA, signed those

[Initials]

CERT. ULG VER: JD



**PLAINTIFF'S
EXHIBIT
S315
NO.** 6/25/18  rb

PENGAD 800-631-6989



**Fromboliere**

attorneys

documents on behalf of the organization and of the "plaintiffs." In other words, you are asking for money in the name of persons that you do not represent, which clearly constitutes a serious crime, whether as a scam or because you are acting as if you have powers that neither you nor your organization has.

d.      According to the information that your own organization is disseminating through various means, the FDA, on behalf of the plaintiffs, has obtained disbursements of 250,000 dollars each, which totals 500,000 dollars. Likewise, the information being disseminated indicates that all the money has been delivered to the law firm of Alan Lenczner, in Canada; however, according to the report that we have, in the first disbursement, attorney Alan Lenczner was only sent the sum of 175,000 dollars. Therefore, 75,000 is missing, and I do not know if you or the base of your organization know the destination of that money; or in what account it is.

e.      It is worth reminding you, Mr. President of the FDA, that the FDA's leading role begins when the judgment proceeds have been received, and not before. But at that time, you and your organization must display honesty, transparency and respect for the litigation rights of the plaintiffs; something that is not currently the case. The fact that there is an assignment of rights, in addition to being unlawful, does not mean that you or your organization have the green light to make use of third party rights in an arbitrary fashion.

In conclusion, Mr. Guaman, I must remind you and tell you that:

1.      The Amazon Defense Front does not represent any of the plaintiffs in this lawsuit, therefore, any document, contract or agreement that you have signed on behalf of the Plaintiffs is unlawful and will not be recognized at any time; everything seems to indicate that this is a scam.

2.      In representation of the plaintiffs, until they themselves decide otherwise, I do not authorize and you and the FDA are prohibited from signing any document, contract or anything else on behalf of the plaintiffs, without my consent, since, to date, I am the person who represents them, or that of the plaintiffs themselves, in a total and absolute manner.

3.      I ask you to immediately provide me with a copy of each and every one of the documents, contracts or agreements that the FDA has signed with the different third parties, whether they be: funders, possible funders, resource managers, supporters, advisers,

[Initials]

CERT. ULG VER: JD



Fromboliere

attorneys

in conclusion, any type of document, contract or agreement that is related to the Aguinda v. Chevron lawsuit.

4.     I demand that you immediately hand over all details, with the supporting documentation recognized by the law, of the use that has been made of all the money that the FDA represents it has obtained; that is, for each of the disbursements it has made. The money was requested on behalf of the plaintiffs and, therefore, they have the absolute right to adequately and timely know the use made of every cent, with special attention to the first disbursement, in which we already know 75,000 dollars are missing.

5.     Any embezzlement, fraud, waste of money or theft, which is related to the Chevron case, to the plaintiffs, is the responsibility of the Amazon Defense Front, of which you are the legal represented.

As I am open to dialogue, I urge you and the organization you represent to act within the framework of the law. If you want to discuss any of these matters, I will gladly listen.

Without prejudice to the foregoing, I reserve the right to file the relevant legal actions if necessary, in the legitimate defense of those I represent.

I will receive any correspondence at the UDAPT office, which is well known by you, and at the following email: pablofajardom@gmail.com.


Cordially,

[Signature]
Atty. Pablo Fajardo Mendoza
**REPRESENTATIVE OF THE PLAINTIFFS IN THE LAWSUIT AGAINST CHEVRON**




CERT. ULG VER: JD



**United Language Group**
3 Columbus Circle
14th Floor
New York, NY 10119
+1 888.601.9814
legaltranslations@ulgroup.com

State of New York )
Estado de Nueva York )

) ss:
) a saber:
County of New York )
Condado de Nueva York )

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: March 9, 2018
Fecha: 9 de marzo 2018

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
_____ [firmado] _____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____ 9th _____ day of
mí, a los _____ 9 _____ días del
_____ March _____ 2018
mes de ____ marzo _____ de 2018

Notary Public
Notario Público

[firmado]
[sello]

GINA MARIE STLAURENT
Notary Public, State of New York
No. 01ST6146442
Qualified in New York County
Commission Expires May 15, 2018

 Fromboliere
abogados

Señor

Carlos Guamán

*PRESIDENTE DEL FRENTE DE DENESA DE LA AMAZONIA*

Presente

Con copia a:

**Consejo Ejecutivo del FDA y de la UDAPT.**

De mi consideración;

Le escribo esta carta en mi calidad de abogado y representante legal de los actores o demandantes en el juicio que por más de 22 años, pobladores de las provincias de Orellana y Sucumbíos, mantenemos en contra de la Petrolera Chevron Corporation.

En los últimos meses hemos visto distintas acciones inadecuadas e ilegales por parte del Frente de Defensa de la Amazonía, acciones que ponen en grave riesgo el proceso que los demandantes con su equipo de abogados ecuatorianos ha ganado de forma legítima en contra de la petrolera Chevron Corporation.

Para una mejor ilustración aquí unos pocos ejemplos;

a.       El día 20 de noviembre del 2015, el FDA de forma arbitraria e ilegal adoptó una resolución, que afectó gravemente el proceso de financiamiento del juicio y a la vez, la legítima defensa de los derechos de los acci0onantes en éste proceso.

b.       El día 19 de enero del 2016 los señores: Luis Yanza y Steven Donziger, suscriben un contrato para la gestión de recursos económicos, en nombre del FDA y de los demandantes. Cosa tremendamente grave, ya que ninguna de las dos personas representa a los demandantes. El señor Donziger, desde que el proceso se instaló en el Ecuador, no es abogado de los demandantes, por ende no representa a ningún demandante. El señor Yanza tampoco representa a ningún demandante. Presumiblemente el FDA le habría dado el aval para dicha suscripción de contrato, cuando el FDA tampoco representa a ningún demandante.

c.       Posteriormente se han suscrito al menos dos documentos más, para supuesto financiamiento del caso de los accionantes en Canadá, siendo el último de ellos a inicios del mes de julio del año 2016, en los cuales, usted señor Presidente del FDA, suscribe dichos


Fromboliere
abogados

documentos en nombre de su organización y de los "demandantes". Es decir, se está pidiendo dinero en nombre de personas a las cuales usted no representa, lo que a legua constituye un grave delito, sea por estafa o por arrogarse funciones de las cuales usted ni su organización no las tiene.

d.     Según la información que su misma organización está difundiendo por distintos medios, se indica que el FDA, en nombre de los demandantes, han conseguido dos desembolsos de 250.000 dólares cada uno de ellos, lo que da un total de 500.000 dólares. Igualmente la información que se difunde indica que la totalidad del dinero ha sido entregada a la firma de abogados de Alan Lenczner, de Canadá; sin embargo de acuerdo al reporte que disponemos, en el primer desembolso, al abogado Alan Lenczner, únicamente le entregaron la suma de 175.000 dólares. Por lo tanto faltan 75.000, que no se si usted y las bases de su organización saben el destino de ese dinero; o en que cuenta están.

e.     Cabe recordarle señor Presidente del FDA, que el rol protagónico del FDA inicia cuando se hayan recaudado los recursos económicos de la sentencia, no antes. Pero en ese momento usted y su organización deben demostrar honradez, transparencia y respeto a los derechos litigiosos de los demandantes. Cosa que no está pasando en la actualidad. El hecho que exista una cesión de derechos, además de ser ilegal, no quiere decir que usted ni su organización tienen luz verde, para disponer de derechos de terceros de forma arbitraria.

En conclusión señor Guamán debo recordarle y decirle que:

1.     El Frente de Defensa de la Amazonía no representa a ningún demandante en éste proceso judicial, por lo tanto cualquier documento, contrato o convenio que haya firmado en nombre de los Demandantes, carece de toda legalidad y no será reconocido en ningún momento, todo apunta que se trataría de una estafa.

2.     En representación de los demandantes, mientras ellos mismos no dispongan lo contrario, no autorizo, y le queda prohibido a usted y al FDA suscribir cualquier documento, contrato o lo que fuere; en nombre de los demandantes, sin el consentimiento de mi persona que hasta ahora soy quien los representa o de los mismos demandantes en forma total y absoluta.

3.     Le solicito que de forma inmediata, me proporcione una copia de todos y cada uno de los documentos, contratos o convenios que el FDA ha suscrito con distintos actores externos, sean éstos: Financistas, posibles financistas, gestores de recursos, patrocinadores, asesores,

 **Fromboliere**
abogados

en conclusión cualquier tipo de documentos, contratos o convenios que tengan relación con el juicio Aguinda Vs. Chevron.

4.   Le exijo, que de forma inmediata, entregue todos los detalles, con los justificativos legalmente reconocidos del destino de todo el dinero que el FDA asegura a ver conseguido. Es decir, de cada uno de los desembolsos que ha logrado. Ese dinero fue pedido en nombre de los demandantes y por ende tienen pleno derecho para conocer de forma adecuada y oportuna el destino de cada centavo. Poniendo especial atención en el primer desembolso, donde desde ya conocemos que faltan 75.000 dólares.

5.   Cualquier desfalco, estafa, despilfarro de dinero o robo, que esté vinculado con el caso Chevron, con los demandantes, o actores, es de responsabilidad del Frente de Defensa de la Amazonía, legalmente representada por usted.

Como un amante del diálogo, le exhorto, a usted y a la organización que usted representa, a actuar dentro del marco de la ley. Si usted quiere dialogar sobre cualquiera de éstos temas, gustosamente lo escuchare.

Sin perjuicio de lo dicho, me reservo el derecho de iniciar las acciones legales pertinentes en caso de ser necesario, en legítima defensa de quienes represento.

Comunicaciones que me correspondan, las recibiré en la oficina de la UDAPT, plenamente conocida por usted y en el correo electrónico: pablofajardom@gmail.com

Cordialmente

Ab. Pablo Fajardo Mendoza
**PROCURADOR DE LOS DEMANDANTES EN EL JUICIO CONTRA CHEVRON**

# EXHIBIT 29

**From:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Sent:** Monday, March 19, 2018 2:20 PM
**To:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject:** Fwd: Here

Done

Let me know if or when okay to send Juan's $2k.

**From:** Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
**Sent:** Monday, March 19, 2018 12:12 PM
**To:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Subject:** Fwd: Here

His wire instructions are below

Sent from my iPhone

Begin forwarded message:

> **From:** Luis Yanza <lfya62@gmail.com>
> **Date:** March 19, 2018 at 11:55:30 AM EDT
> **To:** Steven Donziger <sdonziger@donzigerandassociates.com>
> **Subject: Re: here**
>
> I hope this is ok.
>
> Here is the account information but it is in my
> daughter's name. That could be a problem.
>
> Let me know xf
>
>
> Account No. 39641505 Banco de Guayaquil
> Name: Shuyana Natalia Yanza Allauca
> Address: Calle Gonzalo Pizarro N 3-88, Barrio San Blas, Tumbaco, province of Pichincha.
> Telephone 593 2 2372910
> Swift Code (for transfers from abroad): GUAYECEG
> Bank address: Centro Comercial Rio Centro Sur, suite 122, 123. Avenida 25 de Julio, Guayaquil.
> Telephone 593 42 3730100.
>
>
> On 3/19/18, Steven Donziger  <sdonziger@donzigerandassociates.com> wrote:
>
>> Please attach the bank information and send it to me again.
>>
>> This is key, and please do it every time you send a receipt.

MKS-0006038



**United Language Group**
433 Broadway
New York, NY 10013
+1 888.601.9814

legaltranslations@ulgroup.com

State of New York                    )
Estado de Nueva York
                                     )              ss:
                                     )              a saber:
County of New York                   )
Condado de Nueva York

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation of the attached document, carried out by translators competent to translate from Spanish into English.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y precisa del documento adjunto, realizada por traductores competentes para traducir del español al inglés.

Dated: September 27, 2018
Fecha: 27 de septiembre de 2018

_____
Yasushi Sasaki
Senior Project Manager – Legal Translations
United Language Group

_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
me, this _____27th_____ day of
mí, a los _____27_____ días del
_____September_____ 2018
mes de ___septiembre___ de 2018

_____
Notary Public
Notario Público

GINA MARIE STLAURENT          [firmado]
Notary Public, State of New York
No. 01ST6148442               [sello]
Qualified in New York County
Commission Expires May 15, 2022

| From: | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
|---|---|
| Sent: | Monday, March 19, 2018 2:20 PM |
| To: | Steven Donziger <sdonziger@donzigerandassociates.com> |
| Subject: | RE: aqui |

Done

Let me know if or when okay to send Juan's $2k.

**From:** Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
**Sent:** Monday, March 19, 2018 12:12 PM
**To:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Subject:** Fwd: aqui

His wire instructions are below

Sent from my iPhone

Begin forwarded message:

> **From:** Luis Yanza <lfya62@gmail.com>
> **Date:** March 19, 2018 at 11:55:30 AM EDT
> **To:** Steven Donziger <sdonziger@donzigerandassociates.com>
> **Subject: Re: aqui**
>
> Ojala esto valga.
>
> Los dastos de la cuenta son estos pero estan a nombre de mi hija. Eso tal vez puede ser un problema.
>
> Me avisa xf
>
>
> Cuenta No. 39641505
> Banco de Guayaquil
> Nombre: Shuyana Natalia Yanza Allauca
> Dirección: Calle Gonzalo Pizarro N 3-88, Barrio San Blas, Tumbaco, provincia de Pichincha.
> Teléfono 593 2 2372910
> Código Swift (para transferencias desde afuera): GUAYECEG
> Dirección del banco: Centro Comercial Río Centro Sur, suite 122, 123. Avenida 25 de Julio, Guayaquil. Telefono 593 42 3730100.
>
>
> El 19/3/18, Steven Donziger <sdonziger@donzigerandassociates.com> escribió:
>
>> Pone por favor la informacion bancaria en la adjunto, y me mande otra vez.
>> Eso es clave y hagalo por favor cada vez que manda usted un recibo.

MKS-0006038

# EXHIBIT 30

## DECLARATION OF THE AFFECTED NATIONALITIES IN THE PROVINCE OF SUCUMBIOS

On August 20, 2016, the presidents of the nationalities represented by Mr. Juan Yiyocuro, in his capacity as president of the Siona nationality, ONISE; Mr. Justino Piaguaje, as president of the Siekopai nationality, NASIEPAI; Mr. Roberto Aguinda, President of the Indigenous Nationality A'i Cofan of Ecuador, NOAIKE; and Mr. Guillermo Grefa, representative of the Kichwa nationality, meet in the city of Lago Agrio.

We are the plaintiffs and people affected—Siekopai, "Secoya," Siona, A'i Cofan, and Kichwa nationalities—who have supported and backed this fight for over 22 years, together with the settler peasants who live in the oil fields operated by Texaco in the provinces of Sucumbios and Orellana. The immense desire and dream of the nationalities is to achieve justice, repair the environmental and cultural damage, and remediate the natural habitat of the indigenous groups of Ecuador's northern Amazon. For all these reasons, for over two decades we have kept UNITY, AND TOGETHER WE SEEK JUSTICE FOR THE DIGNITY OF THOSE CURRENTLY ALIVE AND FOR FUTURE GENERATIONS, AND FOR THE HEALTH OF OUR AMAZON AND THE PLANET.

In recent months the technicians, advisors and leaders of the AMAZON DEFENSE FRONT, FDA, have made public statements about the position they have adopted. These statements have appeared in local, national and international media and have been made at meetings and conversations held with different people, both in the communities of Orellana and Sucumbios, and with NGO allies of the UDAPT. They have discussed the fight that belongs exclusively to the plaintiffs, the different communities of the nationalities who have been affected. They state that "we do not represent [them], and we have no right to the proceeds from this fight," disregarding the UNION OF PEOPLE AFFECTED BY TEXACO'S OIL OPERATIONS, UDAPT, claiming that it has exclusively prosecuted the court case against Chevron on behalf of the indigenous nationalities and peasants affected by the oil fields through the 47 plaintiffs that signed the complaint and under a power of attorney given to Atty. Pablo Fajardo, joint counsel in the case.

WHEREAS:

This seriously harms our fight and the unity of the indigenous nationalities and peasants and the UDAPT, the highest body, which represents us, due to the malicious and reckless actions of some former leaders, such as Luis Yanza, Steven Dozinger and Ermel Chavez, who led this historic case, through the FDA, at the start of the court case in the U.S. and Ecuador, and Dr. Patricio Salazar, whom we have never met.

On January 19, 2016, Mr. Steven Donziger and Mr. Luis Yanza, without informing and without authorization from the undersigned Nationalities, or from the plaintiffs, executed an agreement with financers from a so-called tax haven on behalf of the people affected and the nationalities, without any authorization to do so.

Judging by their actions, Mr. Luis Yanza, Mr. Steven Donziger, Mr. Ermel Chavez, and Dr. Patricio Salazar are working to break up and to deprive the indigenous nationalities and plaintiffs of any right to social and cultural benefit from the case.

Steven Donziger, who is not authorized to represent the nationalities, has repeatedly issued statements in different media in the

CERT. ULG VER: JD

PLAINTIFF'S
EXHIBIT
S 316
NO. 6/25/18  TD
PENGAD 800-631-6989

U.S., and lately in Ecuador, claiming to be the attorney in the case, though he does not represent any nationality or any of the plaintiffs.

Mr. Steven Donziger, Mr. Luis Yanza, and, in recent years, Mr. Pablo Fajardo, have administered or managed money owned by the Plaintiffs. Consequently, on January 29, 2016, the UDAPT, convened at a general meeting, issued a resolution to ask Mr. Steven Donziger, Mr. Luis Yanza, and Mr. Pablo Fajardo to provide an accounting, in other words, to provide the UDAPT with detailed information about all of the money they have managed that belongs to the UDAPT. To date, only Mr. Pablo Fajardo has provided that information. Mr. Steven Donziger and Mr. Luis Yanza have failed to do so.

It is clear that the above individuals have an obvious desire to take economic advantage of the case and to achieve some public fame for personal benefit, without considering the UDAPT's fight, which seeks to achieve a dignified, healthy life without contamination, through remediation of the damage caused by the human rights violation caused by the oil operations of Texaco, now Chevron, in the Ecuadorian Amazon.

Based on the foregoing background and considerations, the nationalities Siona, Siekopai, Cofan and Kichwa, exercising our right and in order to protect the fight we have carried on and unity we have had for 22 years while fighting Texaco in search for JUSTICE for human life and nature, publicly

DECLARE THE FOLLOWING:

1. Mr. Luis Yanza and Mr. Steven Donziger are hereby considered personae non gratae because they failed to defend the collective interest rights of the indigenous nationalities and peasants. It is clear to us that they seek to advance their own private and personal interests.

2. Mr. Luis Yanza, Mr. Steven Donziger, Mr. Ermel Chavez and Mr. Patricio Salazar are prohibited perpetually and absolutely from speaking for or representing the Siona, Siekopai and Cofan nationalities before any organization, court, or media of any kind, investor, or any other person. None of them represent the undersigned Nationalities.

3. We demand that within two months, starting August 20 of this year, Mr. Luis Yanza and Mr. Steven Donziger submit a detailed report accounting for all of the money they have managed on behalf of the people affected or the plaintiffs in the case that our people have against Chevron.

4. In previous years, the leaders of the nationalities, trusting him, gave Mr. Luis Yanza a power of attorney to conduct certain acts. However, it is apparent that Mr. Yanza abused that power and used it inappropriately, signing documents on behalf of the nationalities without the power to do so. Consequently, the special power of attorney the three nationalities gave Mr. Luis Yanza is hereby revoked, as is any other document that gave him power to act on our behalf. Also, as nationalities, we disavow any contract, agreement, arrangement or any other document that Mr. Luis Yanza may have signed on our behalf in 2015 and 2016. Those documents were not authorized by the nationalities and therefore are not, and will not be, valid.

CERT. ULG VER: JD

5. This resolution will be immediately sent to all social organizations, law firms and other persons who, in any way, work jointly or in cooperation with the plaintiffs in the case we are pursuing against Chevron.

In the defense of the ancestral and cultural rights of our nationalities, we, the presidents of the nationalities, sign this declaration on the 20th day of August 2016.


[signature]
Mr. Justino Piaguaje

PRESIDENT SIEKOPAI


[signature]
Mr. Juan Yiyocuro

PRESIDENT ONISE-SIONA


[signature]
Mr. Roberto Aguinda

PRESIDENT NOAIKE KOFAN


[signature]
Mr. Guillermo Grefa

REPRESENTATIVE OF THE KICHWA NATIONALITY


CERT. ULG VER: JD



**United Language Group**
3 Columbus Circle
14th Floor
New York, NY 10119
+1 888.601.9814
legaltranslations@ulgroup.com

State of New York                    )
Estado de Nueva York                 )
                                     )              ss:
                                     )              a saber:
County of New York                   )
Condado de Nueva York

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: October 11, 2017
Fecha: 11 de octubre 2017

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____11th_____ day of
mí, a los _____11_____ días del
_____October_____ 2017
mes de ____octubre____ de 2017

_____
Notary Public
Notario Público

SELIN CAYIRLI
Notary Public, State of New York
No. 01CA6275260
Qualified in New York County
Commission Expires Jan 22, 20___

[firmado]
[sello]

DECLARATORIA DE LAS NACIONALIDADES AFECTADAS DE LA PROVINCIA DE SUCUMBIOS

A los 20 días del mes de Agosto del 2016, se reúnen en la ciudad de Lago Agrio los presidentes de las nacionalidades representado por el Sr. Juan Yiyocuro en calidad de Presidente de la Nacionalidad Siona ONISE, por el Sr. Justino Piaguaje en calidad de Presidente de la nacionalidad Siekopar NASIEPAI, el Sr. Roberto Aguinda Presidente de la Nacionalidad Originaria A'i Kofan del Ecuador NOA'IKE y el Señor Guillermo Grefa Representante de las Nacionalidad Kichwa.

Somos las Nacionalidades Siekopar "Secoya", Siona, A'i "Kofán" y Kichwa demandantes y afectados quienes llevamos respaldando y apoyando esta lucha más de 22 años, conjuntamente con los compañeros campesinos colonos que viven en los campos petroleros operados por la Texaco en las provincias de Sucumbios y Orellana. El gran sentimiento y sueño de las nacionalidades es lograr justicia, reparar los daños ambientales y culturales, la reparación del hábitat natural de los grupos originarios de esta Amazonia Norte del Ecuador, por todas aquellas razones es que, durante más de dos décadas, hemos mantenido la UNIDAD Y JUNTOS BUSCAMOS JUSTICIA POR LA DIGNIDAD DE LA VIDA ACTUAL Y DE NUESTRA FUTURA GENERACIÓN, ASI COMO POR LA SALUD DE NUESTRA AMAZONIA Y DEL PLANETA.

En los últimos meses, se han generado pronunciamientos y versiones públicas, sobre la posición que han adoptaron los técnicos, asesores y dirigentes del FRENTE DE DEFENSA DE LA AMAZONIA, FDA, a través de los medios de comunicación local, nacional e internacional, así como también a través de reuniones y conversaciones con distintas personas tanto en las comunidades de Orellana y Sucumbios, como con ONGs, aliadas de la UDAPT, sobre la lucha exclusivamente de los demandantes afectados por las diferentes comunidades de las nacionalidades en donde mencionan que "no lo representamos ni tenemos derechos al beneficio a esta lucha", y por el desconocimiento a la UNION DE AFECTADOS Y AFECTADAS POR LAS OPERACIONES PETROLERAS TEXACO "UDAPT" a la instancia que viene representando exclusivamente al proceso del juicio en contra de Chevron a favor de las nacionalidades indígenes y campesinos afectados de los campos petroleros, a través de los 47 demandantes firmantes y bajo poder concedido al Abg. Pablo Fajardo Procurador Común del caso.

CONSIDERANDO:

Que, afecta severamente a nuestra lucha y la unidad de las nacionalidades indígenas y campesinos y a la UDAPT instancia máxima que nos representa, por algunos actos maliciosos y temerarios de algunos líderes históricos como Luis Yanza, Steven Dozinger y Ermel Chávez dirigentes que llevaron este proceso de lucha histórica mediante el FDA al inicio del caso Judicial en los EEUU y en Ecuador, el señor Dr. Patricio Salazar a quien nunca le habíamos conocido.

Que, los señores Steven Donziger y Luis Yanza sin previa información y sin la autorización de las Nacionalidades suscriptoras de esta resolución, ni de los demandantes, el día 19 de Enero del 2016, procedieron a suscribir un convenio, con gestores de financiamiento, de un lugar denominado Paraíso Fiscal, a nombre de los afectados y de las nacionalidades, sin tener ninguna facultad ni autorización para aquello.

Que, de acuerdo a las acciones y actitudes, los señores Luis Yanza, Steven Donziger, Ermel Chávez y el Dr. Patricio Salazar, están trabajando con el fin de lograr la desunión y dejar sin derecho a ningún beneficio social y cultural de las nacionalidades indígenas y a los demandantes.

Que, el Ab. Steven Donziger sin ser abogado autorizado por las nacionalidades reiteradamente emite pronunciamiento en distintos medios de comunicación en los

EEUU y últimamente en los medios nacional como abogado del caso, cuando él, no representa a ninguna Nacionalidad, ni a ninguno de los demandantes.

Que, los señores Steven Donziger, Luis Yanza y en los últimos años el abogado Pablo Fajardo, han administrado o manejado cantidades de dinero, de propiedad de los Demandantes, en consecuencia, el día 29 de enero del 2016, la Asamblea Ordinaria de la UDAPT, resolvió pedir a los señores Steven Donziger, Luis Yanza y Pablo Fajardo, que rindan cuenta, es decir, que informen detalladamente a la UDAPT sobre todo el dinero que ellos han manejado y que es propiedad de la UDAPT. Hasta éste día únicamente el señor Pablo Fajardo ha rendido cuentas. No lo han hecho los señores Steven Donziger y Luis Yanza.

Que, es evidente, que los señores antes mencionados, existe una clara muestra de ambición por aprovecharse económicamente del caso y lograr algún tipo de Notoriedad Pública para su beneficio personal; sin considerar ni tener en cuenta la lucha de la UDAPT que es *Hacer realidad una vida digna, sana y sin contaminación, mediante la reparación de los daños provocados debido a la violación de los derechos humanos causados por la operación petrolera de Texaco, hoy Chevron, en la Amazonía ecuatoriana.*

Con todos estos antecedentes y consideraciones las nacionalidades Siona, Siekopai, A'i y Kichwa bajo nuestro derecho y por precautelar la lucha y la unidad que sostenemos y seguimos los 22 años de lucha a Texaco en busca de JUSTICIA a la vida humana y naturaleza, ante la opinión pública;

## DECLARAMOS.-

1.- Persona no grata al señor Luis Yanza y al Abogado Steven Donziger por no defender a los derechos intereses colectivos de las nacionalidades indígenas y campesinos; es más está claro para nosotros que ellos defienden sus interés particulares y personales

2.- Se prohíbe de forma absoluta y perpetua a los señores Luis Yanza y Steven Donziger, Ermel Chávez y Patricio Salazar, hablar y representar a las nacionalidades Siona, Siekopai y A'i en cualquier instancia, judicial, medios de comunicación de cualquier naturaleza, inversores, o cualquier persona. Ninguno de ellos representa a las Nacionalidades suscriptoras de ésta resolución

3. Le exigimos a los señores Luis Yanza y Steven Donziger, que en un plazo de dos meses, contados a partir del día 20 de agosto del presente año, entreguen el informe detallado de todo el dinero que ellos han administrado en nombre de los afectados o demandantes del caso que nuestros pueblos mantenemos en contra de Chevron

4.- En años anteriores, los dirigentes de las Nacionalidades, en confianza, le otorgaron algún tipo de poder para determinadas actuaciones al señor Luis Yanza; sin embargo, es visible que el señor Yanza abusó de ese poder y lo ha utilizado en forma inadecuada, ha suscrito documentos en nombre de las nacionalidades sin tener ninguna facultad para hacerlo. En consecuencia, dejamos sin efecto, el poder especial de representación otorgado por las tres nacionalidades en favor del señor Luis Yanza, y cualquier otro documento que le daba algún tipo de facultad para actuar en nombre nuestra. A la vez, que como Nacionalidades no reconocemos ningún tipo de contratos, convenios, acuerdos o cualquier documento que el señor Yanza Luis haya suscrito en nuestro nombre, durante los años 2015 y 2016. Los mismos no fueron autorizados por las Nacionalidades y no tienen ni tendrán ningún valor

5 - Esta resolución, será enviada de forma inmediata a todas las organizaciones sociales, bufetes de abogados, y más personas que de una u otra manera tienen algún tipo de trabajo en solidaridad, cooperación, con los demandantes del caso que sostenemos en contra de Chevron

En defensa a los derechos ancestrales y culturales de nuestras nacionalidades firmamos esta declaratoria los presidentes de las nacionalidades, a los 20 días del mes de Agosto del 2016.


Sr Justino Piaguaje

PRESIDENTE SIEKOPAI


Sr Juan Yiaicuro

PREIDENTE ONISE- SIONA


Sr Roberto Aguinda

PRESIDENTE NOAIKE KOFAN


Sr Guadalupe Grefa

REPRESENTANTE DE LA NACIONALIDAD KICHWA

# EXHIBIT 31

## SUPERSEDING RETAINER AGREEMENT

THIS RETAINER AGREEMENT, dated November 1, 2016 ("Superseding Agreement"), amends, replaces, and supersedes entirely the retainer agreement dated March 1, 2012 ("the Prior Agreement") engaging and authorizing Lenczner Slaght LLP ("the Firm") with respect to the prosecution of the Canadian enforcement action on the judgment of the Ecuadorian Courts in the environmental damages action of *Maria Aguinda v. Chevron Corporation.*

The Ecuadorian Court, in its decision of February 14, 2011, required the individual plaintiffs to the *Aguinda* case (a "representative action" under Ecuadorian law) to establish a commercial trust to administer the monies to be received from Chevron Corporation; to assign the extent of their individual interests to said trust; and to establish the *Frente de Defensa de la Amazonía* ("the FDA") as the beneficiary of the trust. In addition, the Ecuadorian Court ordered that an amount equivalent to 10% of the US $8.51 billion environmental damages award adjudged against Chevron be paid directly to the FDA, in its own right, under the incentive award provision of Ecuador's Environmental Management Act. The individual plaintiffs and the FDA established a trust in compliance with the Ecuadorian Court's requirements on March 1, 2012, in Quito, Ecuador ("Fideicomiso Mercantil de Administración de Flujos ADAT") ("the Trust").

Both the FDA, through its President, Mr. Carlos Guamán Gaibor, and the Trust, through the President of its Administrative Board, Mr. Ermel Gabriel Chávez Parra, hereby execute this Superseding Agreement. The undersigned hereby instruct Lenczner Slaght to continue to prosecute the action for recognition and enforcement of the *Aguinda* judgment in Canada, to seize Chevron (and subsidiary) assets in Canada as necessary, and to continue to follow

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

instructions and consult with the FDA and the Trust and their designated agents and representatives. Fees for the Firm's services shall continue to be as set forth in joint Exhibit B to the Prior Agreement and this Superseding Agreement.

For the avoidance of doubt, the undersigned hereby instruct Lenczner Slaght to act only upon their instructions and to no longer act upon the instructions of Pablo Fajardo or any others not acting pursuant to express authority from the FDA or the Trust.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date stated.

DATED:                          November            1,          2016

FOR THE FDA:                          FOR THE TRUST:

_____            _____
Sr. Carlos Guamán G.                  Ermel Gabriel Chavez Parra
President                             President of the Administrative Board

FOR THE FIRM:

_____
Alan Lenczner
Partner

2